Libby

regard to Glenn Taylor, you write, "Their final diagnosis was questionable asbestosis in his case." Do you see that?
A Yes, sir.
Q Do you recall we reviewed the report from the doctor?
A Yes, sir.
Q And it was not questionable asbestosis but just plain asbestosis?
A No, sir.
MR. GRAHAM: I'd object to that as a misstatement of the discharge certificate, and if you want to refer back to it and refer to the recommendations, it says, "Patient should return for a lung biopsy, which he did not prefer to have done at this time, to determine definitely the diagnosis of asbestosis."
THE WITNESS: And --
BY MR. HEBERLING:
Q So here in Exhibit 29 you quoted "Questionable asbestosis," did you not?
A I quoted whatever that report says. What number is it?
Q It's Exhibit 22. Do you see on the first page in the middle "Admission Diagnosis:

Libby

Questionable asbestosis"?
A Yes, sir.
Q And then do you see on the second page in the middle "Final Diagnosis on Discharge: Asbestosis"?
A It states that -- It does state that, but the first page says, Questionable diagnosis (sic), and then the second page, on the last sentence, it says, "(The) patient shall return for a lung biopsy, which he did not prefer to have done at this time, to determine definitely the diagnosis of asbestosis."
Q So is it your position that in quoting "Questionable asbestosis" that wasn't an error?
MR. MURPHY: Objection. Argumentative.
BY MR. HEBERLING:
Q Go ahead.
A No, I don't think that was an error, because it's quoted right from the report.
Q And then in the fifth paragraph down, do you see where it says, Dr. Little "also stated, though, that we have a greater moral obligation to remove the hazard if one exists. This, I believe, we all agree with." Do you see that?

Libby

A Yes, sir.
Q And was that true even if it meant spending more money to alleviate the situation?
MR. MURPHY: Objection to the form. Vague and ambiguous.
THE WITNESS: There's no conditions stated in this statement.
BY MR. HEBERLING:
Q So if it meant spending more money on maintenance crews, the company would do that?
A Yes, sir.
Q Then in the last paragraph, there's a discussion of when follow-up exams should take place. The last sentence, do you see it says, "He was not too definite in a suggestion for a follow-up. Perhaps a blanket in two years"? Do you see that?
A Yes, sir.
Q Did you seek other advice on how soon the follow-up exam should be?
A We pretty much relied on Dr. Little's suggestion, because he was a pulmonologist with -- a radiologist with experience in industrial diseases, and we may have gotten some opinions from other doctors locally, but, primarily, we were relying on

Libby

Dr. Little.
Q Dr. Little is talking about a follow-up in one or two years. Did the company do that?
A He says, Perhaps in two years. No, we did not do it.
Q In fact, the company did not do that for five years; correct?
A That's correct.
Q Let's refer to Exhibit 30. Does that appear to be a letter signed by you to fellow employees dated September 9, 1959?
A Yes, sir.
Q And does it attach a list of doctors and various employees who, apparently, had those doctors?
A Yes, sir.
Q Okay. Are you the author of this Exhibit 30?
A Yes, sir.
Q And let's refer to Exhibit 32. Does that appear to be a memo from Mr. Bleich to Mr. Kelley dated April 13, 1961?
A Yes, sir.
Q Did you see this memo in Libby in 1961?
A I don't recall.

Libby

Q Is it likely that this is a Zonolite document?
A Yes, sir.
Q Then let's refer to Exhibit 33, and does this appear to be a letter by you --
MR. MURPHY: Did you skip 31 on purpose, or did you just miss it?
MR. HEBERLING: I skipped over it.
MR. MURPHY: Okay.
BY MR. HEBERLING:
Q Does Exhibit 33 appear to be a letter by you to Mr. C.A. Pratt dated June 14, 1961?
A Yes, sir.
Q Are you the author of this letter?
A Yes, sir.
Q Who was Mr. Pratt?
A He was the vice-president of Western Mineral Products Company in Minneapolis, who were one of our customers.
Q And did they purchase vermiculite from your company?
A Yes, sir.
Q Did Zonolite own part of Western Mineral?
A They had a financial interest. Yes, they owned a part of it.

Libby

Q And then did Grace later acquire Western Mineral?
A Yes, sir.
Q Had Mr. Pratt been making an inquiry with concern for his own workers' health?
A I don't recall.
Q You're saying "In reply to your letter of June 12".
A Excuse me. Yes. He would have made an inquiry, which is why I would have written this letter.
Q Have you seen the letter of June 12 any time in the last ten years?
A Not that I recall.
Q Then in the first paragraph, you say, "I am happy to outline our past experience (with) regard to the effect of dust in our mill upon our employees' health. This is a very complex and confusing thing and one from which it is difficult to draw any conclusions." Do you see that?
A Yes, sir.
Q What further information did you need at the time to draw any conclusions?
MR. MURPHY: Objection to the form. Lack of foundation.

Libby

THE WITNESS: I don't know.
BY MR. HEBERLING:
Q Did you recognize at the time that you needed further information to draw conclusions?
A We couldn't draw any conclusions at that time, so, obviously, we would have needed more information.
Q What efforts were underway to gather more information to draw conclusions from?
A Well, among other things, we talked with the doctors collectively that were in Libby about the situation of our employees and asked their advice on what could be done or what information could gather, and we went along with what we lear from them, and their conclusion was -- is that the could not say that we had a serious problem with employees and employees' health.
Q Is that your understanding of what information you got from the doctors?
A Yes, sir.
Q Do you have any document from the docto that so states?
A Not that I recall, because this information was given in meetings with them, an think that there are documents which I have seen

Libby

that outline what was stated by the doctors a of these meetings.
Q How recently have you seen these documents?
A I don't know. In the last few years. That's as close an estimate in time as I can g you.
Q Do you know who the author of such a document might be?
A Me.
Q So is this some document where you summarized what was said at a meeting?
A Yes, sir.
Q Do you know when you did that?
A Well, it would have been about in this period of time, when we were dealing with problem.
MR. GRAHAM: It's right in this letter.
BY MR. HEBERLING:
Q Okay. At the bottom of page one you repeat the statement. You say at the very l sentence, "However, the asbestos dust in the the air is of considerable toxicity." Is that repeating a statement from the 1956 report

Libby

A It's quoted from that, yes.
Q And then on page two you discuss -- Do you see where you discuss the Glenn Taylor case, and then about the middle of the page you repeat -- you state, "The final diagnosis of the man's case was, one, of histoplasmosis and, two, of questionable asbestosis"? Do you see that?
A Yes.
Q Now, is it fair to say that that's in error, that the final diagnosis was plain asbestosis, not questionable?
MR. MURPHY: Objection. It's been asked and answered.
THE WITNESS: I don't think this is a conflict, because while it's true it does say "Asbestosis" -- But there's a footnote there. It says he should return for a biopsy for that to be proven.
BY MR. HEBERLING:
Q Then on page three, second full paragraph, about two-thirds of the way down, do you see, "In the case of the employees where their x-rays interpretation showed some intrathoracic pathology, it was up to the doctors to determine whether further tests or examination or treatment should be

Libby

given. In the event that it was, this was to be at the employees' responsibility and expense"? Do you see that?
MR. MURPHY: I'm sorry. Where are you, which paragraph?
THE WITNESS: I don't --
MR. HEBERLING: This is about two-thirds of the way down. There's a small paragraph.
MR. MURPHY: I see that.
THE WITNESS: Yes. I see that.
BY MR. HEBERLING:
Q Was that the company's position at the time?
A Yes, sir. However, I would like to -- I would like to add, it states that, but we had employees' insurance for the employees, so that insurance, which the health insurance that the companies had, which was paid for by the company, would cover much of this expense.
Q Okay. Then on page three you discuss a meeting with the doctors, and I'll read part of this.
MR. GRAHAM: Which meeting, because there are two meetings discussed?

Libby

BY MR. HEBERLING:
Q "After all of the results of these x-rays were in, we again met with the doctors and with the radiologist and discussed what our situation actually was in regard to pulmonary diseases from our plant. The preliminary results of the interpretations made it appear that we had a high incidence of pulmonary disease among our employees. However, after the doctors had analyzed the results, the conclusion they came to was there was nothing to indicate that there was a higher incidence of pulmonary trouble among our people than there was among any other group in the geographical area." Do you see that?
A Yes, sir.
Q So even though you had 48 out of 130 abnormals -- Correct?
A Yes, sir.
Q Which is over a third abnormals?
A Yes.
Q Was it your understanding the doctors told you that this was not unusual?
A It's not my understanding at all. That's fact. That's what they told us at the meeting.
Q Is it possible you got it wrong?

Libby

A No, sir.
Q You're 100 percent of sure of that?
A Yes, sir.
Q Did you ever find out that the normal percentage of abnormal chests in a population is five percent at most?
A No, sir. I never found out any figures.
Q In the group of doctors -- Which local doctors would that have been --
A It would have been all of the doctors that were in the city of Libby at that time.
Q So would that be Dr. Cairns, Dr. Nelson, Dr. Seifert, Dr. Matthews and Dr. Little, the radiologist?
A Yes, sir.
Q Any others?
A Probably -- Probably or possibly Dr. MacKenzie.
Q Were any of those doctors lung specialists?
A No, sir.
Q Do you recall any presentation of normal figures for the incidence of abnormal chests?
A No, sir.
Q Now, Dr. Cairns, in his report, had warned

Libby

that an examination was necessary for a diagnosis of pulmonary disease; correct?

MR. GRAHAM: What was the number of that exhibit so that we can refer to it and see exactly what he said?

MR. MURPHY: And I object to the form of the question, "Warned," in particular.

BY MR. HEBERLING:

Q This is Exhibit 26. Would you refer back to that?

MR. GRAHAM: Thank you, Jon.

BY MR. HEBERLING:

Q Have you found it?

A Yes, sir.

Q Do you see in the second sentence where he's talking about the survey, "It is not accurate nor complete without a personal, physical differential diagnosis, which should be done on all cases showing any abnormal defects of the chest"?

A Yes, sir. It states that.

Q So is it fair to say that he cautioned that a full exam was necessary for the diagnosis?

MR. MURPHY: Objection to the form of the question. The document speaks for itself.

THE WITNESS: He made this

Libby

statement. I guess you can interpret that as you wish.

BY MR. HEBERLING:

Q Now, by the time you met with the doctors, did you have results of physical examinations, or was it still just the chest x-rays?

MR. GRAHAM: Vague and ambiguous as to who it is he's talking about. He or the doctors having the results of the tests, physical exams?

BY MR. HEBERLING:

Q Did you understand that I said, Did you have any results?

A If these doctors -- If these employees had physical examinations, we would not have received copies of the results of those examinations.

Q So does it appear, then, that this conclusion was drawn without physical examinations?

A No.

Q Was the conclusion based solely upon the x-ray results?

A Now, which conclusion are you talking about?

Q Page three of -- Back to Exhibit 33, which I read, "The conclusion they came to was there was nothing to indicate that there was a higher

Libby

incidence of pulmonary trouble among our people . there was among any other group in this geographic area."

A This was a conclusion of the doctors, and it was based upon all the information that they had available to them.

Q Do you know if they had full physical exams on these employees?

A No. I don't know what they had at all.

Q To your knowledge did the doctors produce anything written at this meeting where you receive this conclusion?

A No, sir. I don't believe they did.

Q Was this a lunch meeting?

A Yes, sir.

Q At this meeting was there any suggestion for a follow-up study?

A I don't recall whether there was at that meeting or not, but we had -- We had other discussions with Dr. Little and the doctors as to what we should do about a follow-up study.

Q What's your understanding about those discussions?

A One was -- There was not an agreement, as I remember, when it should be given, but we start

Libby

in 1964 to have annual chest x-rays of all of employees.

Q So that's three years after the -- No. It would be five years after the 1959 meeting?

A Yes, sir.

Q And at this meeting with the doctors, th lunch meeting, had anyone collected the med literature on asbestosis?

MR. MURPHY: Objection to the form the question.

THE WITNESS: I don't recall. I don't know.

BY MR. HEBERLING:

Q To your knowledge were any of the dc familiar with medical literature on asbestosi:

A I have no idea what the doctors were familiar with.

Q Except for Dr. Little, who is a radiologist, were all the others general practitioners?

A Yes, sir. Well, they all had general practices. The only specialist was Dr. Nels was a surgeon.

Q At the meeting was there a consensus what to do next?

Libby

Page 145

A Well, I don't -- I don't recall, but there were -- I don't recall that there was a consensus or any differing of opinions on it.

Q To your knowledge, after this meeting in Libby, was there any effort by the company to consult with specialists in Chicago, where the company headquarters were?

A I don't know. I'm not aware of any, but I don't know.

Q Then at page four, second sentence at the top says, "There were people where some condition of fibrosis or pulmonary emphysema showed up who had been with us only a very short period of time." Do you see that?

A Yes, sir.

Q Did that cause you concern?

A No. What this meant to us is that they came to us with these conditions, and it could not have been our responsibility for causing them.

Q And that's how you interpreted that?

A Yes, sir.

Q Was that on the advice of any medical person?

A Well, I don't recall that it was. I think it's a matter of common sense. These things don't

Libby

Page 146

happen overnight. There's always a latency period of some length.

Q Now, again, on page four of this Exhibit 33, in the middle of the page there's a large paragraph about -- Let's see. There's a paragraph on respirators, and here you say, "For quite a few years now, our employees at the dry mill, loading station and other points in the operation where dust exposure is high have been required to wear respirators." Were you aware as of 1961 that there were difficulties wearing respirators in hot weather?

A Yes, sir.

Q Were you aware that it was difficult to communicate while wearing a respirator?

A Yes, sir.

Q Were you aware that the respirators had problems that they'd get plugged up with dust?

A Yes, sir.

Q Did you know Peter Kostic?

A Yes, sir.

Q And was he the safety supervisor for Grace beginning 1963 and thereafter?

A Yes, sir.

Q Okay. Let's refer to --

Libby

Page 147

MR. MURPHY: You said earlier your interest was in making an accurate record. You just asked him, Was he the safety supervisor from a certain date thereafter? And there's been earlier testimony from Mr. Lovick at some point in time Mr. Eschenbach joined the company, and you asked him several questions as to what their respective responsibilities were once Eschenbach joined, the point being that earlier today he testified that Kostic was a safety engineer at some point in time and Eschenbach was his supervisor.

MR. HEBERLING: I understand that.

BY MR. HEBERLING:

Q Let's refer to Exhibit 85.

A 85?

Q Yes. Now, at page five, just above the word "Summary," the last sentence, Mr. Kostic makes the statement, "Respirators are fine for short periods of time, but to get a man to wear one eight hours a day is next to impossible." Do you see that?

A No, sir, I don't.

Q Just above "Summary," at the bottom of the page, the sentence just above that.

A Yes, sir, I see that.

Libby

Page 148

Q Would you agree with Mr. Kostic on that statement?

A Yes, sir.

Q And let's refer to Exhibit 71. Who was Mr. Rupp, R-U-P-P?

A He was the treasurer of the Zonolite division of W.R. Grace & Company.

Q Okay. Mr. Rupp has made the statement, "Employees are often inclined to remove them," meaning respirators, "when a supervisor is not present." Do you see that on the first page of Exhibit 71, toward the bottom?

A Yes, sir.

Q Do you agree with that?

A Yes, sir.

Q And did you know Walt Baker?

A Yes, sir.

Q Was he the mill superintendent?

A He was the dry mill foreman, yes, sir.

Q Was he ever superintendent, or was he --

A No, he was never superintendent, but he was dry mill supervisor.

Q Okay. So he was management?

A Yes, sir.

Q Were you aware that he rarely wore a

Libby

respirator?

A No, sir, I'm not. I don't know that.

Q Now, if we bring in a dozen witnesses who are ex-workers who will testify that most of the time the workers in the dry mill and elsewhere did not wear respirators in the '60s and '70s, would you dispute that?

MR. GRAHAM: Objection to the form of the question.

MR. MURPHY: Objection. Lack of foundation. Argumentative.

THE WITNESS: It was previously stated that I spent maybe five percent of my time at the mining and milling operation. If you brought in the witnesses who worked in the mill and made a statement about what happened there, I would not be in a position to dispute that statement from personal observation.

BY MR. HEBERLING:

Q In the 1960s did you ever tell employees the reason for wearing respirators, mainly, that asbestos dust is toxic?

MR. MURPHY: Objection to the form of the question.

THE WITNESS: I don't recall -- I

Libby

don't recall that employees would have been told they should wear respirators for that reason.

BY MR. HEBERLING:

Q And was that true in the early '70s as well?

A Probably.

Q Up to the time of the smoking ban in '79?

MR. MURPHY: Object to the form of the question.

THE WITNESS: Probably, but there are some things that shouldn't be a need to be explain. You shouldn't have to tell an employee that they shouldn't put their fingers to a piece of red hot iron either, and we never told them that.

BY MR. HEBERLING:

Q Okay. Back to Exhibit 33. Let's see. I'll eliminate a few questions here. You talk about, in the middle of the page, on the x-ray follow-up -- In the middle of the page, it says, "At that time it was the feeling of the radiologist that a minimum of two years should elapse before the follow-up should be made, and it would probably be better to wait a longer period where there would be more likelihood of some conclusions showing up." Do you see that?

Libby

A Yes, sir.

Q Was that the company's position that you're stating here?

A No. I'm stating that this was the feelin of Dr. Little, and we were relying on the judg of Dr. Little rather than coming to conclusio our own, because Dr. Little was much more more knowledgeable about that sort of thing t were.

Q Then the last sentence, "It is probable, therefore, that in the next two or three years may schedule a follow-up blanket survey so can be compared." Do you see that?

A Yes, sir.

Q Did you know as of '61 that it was goi to be yet two or three more years before anot of x-rays was taken?

A I state that in that letter.

Q So had there been some kind of decisic that point by management not to do one for t three more years?

MR. GRAHAM: I object to the form c the question in that it requires a misstatemen what the letter itself says in stating that it is probable.

Libby

Go ahead and answer it to the extent y can.

BY MR. HEBERLING:

Q Do you know of any decision as to wh have a follow-up exam?

A Well, I don't -- I don't recall specifically how the decision was reached o but I state this in the letter, and that would l been the consensus of the management at Li that's what we would do.

Q Okay. Let's refer to Exhibit 34, and this appear to be a letter from Mr. Pratt to y dated August 11, 1961?

A I -- Yes. Yes.

Q Did you receive this at or about its da

A Yes, sir.

Q Okay. Then we'll move on to Exhibi and does this appear to be a report of the Bı Mines dated October 11, '61?

A Yes, sir.

Q Did you receive this in Libby in 1961

A Yes, sir.

Q Would that be at or about the date of report?

A Yes, sir.

Libby

Page 153

Q Okay. Then on page two there's mention as "E.D. Lovick, personnel manager". Were you, in fact, administration manager, or what was your title then?

MR. MURPHY: It's page one of the report, isn't it, not page two?

MR. HEBERLING: Right.

MR. MURPHY: I think he's not looking at the same page you're asking him about.

THE WITNESS: Well, I think probably my official title in 1961 was assistant manager or assistant to the manager or something like that.

BY MR. HEBERLING:

Q Okay. Then on page two of the report, in the last paragraph, do you see where it says, "The mill operated (on) three, eight-hour shifts a day, five days a week"?

A Yes, sir.

Q Was that typical at the time?

A Yes, sir.

Q Was that typical for the 1950s?

A Yes, sir.

Q Was it typical for the 1960s?

A Yes, sir.

Q And then three lines from the bottom

Libby

Page 154

they're talking about numbers of workers. It says "Five on construction". Do you see that?

A Yes, sir.

Q Did they handle repairs and construction at the mine and mill?

A Yes, sir.

Q Go to Exhibit 36. This is a letter by Ben Wake to Mr. Keenan at the Occupational Health Research & Training Facility in Cincinnati dated March 13, 1962. Is that what it appears to be?

A Yes.

Q Did you receive this in Libby in 1962?

A I don't recall that I did, no, sir.

Q Do you think you've seen it before?

A I don't recall having seen it before.

Q When did you learn that the type of asbestos in the ore at Libby was tremolite asbestos?

A I don't really know, but it would have been -- Well, I don't really know. It would have been probably in the late 1950s.

Q Here we go. Then let's refer next to Exhibit 37, and does this appear to be a letter from Mr. Keenan of the Public Health Service to Ben Wake dated April 13, 1962?

A Yes, sir.

Libby

Page 155

Q And did you see this in Libby in April 1962?

A Not that I recall, no, sir.

Q Do you recall a document from the State showing a sample that was 40 percent asbestos in airborne dust?

A Well, I recall -- I recall a letter from the State on the 40 percent asbestos, and I don't remember specifically how it was defined, but, yes, I remember that.

Q But you don't recall seeing this particular letter, which is Exhibit 37?

A No, sir, I don't.

Q Refer to Exhibit 38, and does this appear to be a letter of April 19, 1962 from John Anderson, M.D., of the Montana Board of Health to Mr. Bleich, manager, Zonolite?

A Yes, sir, I do.

Q And was this received in Libby in 1962?

A Yes, sir, I believe so.

Q And was that at or about the date of April 19th?

A Yes, sir.

Q And did you -- I'll ask it this way. In the fifth line do you see where it says, "We were

Libby

Page 156

instructed by the board at that time to invite from time to time certain of those who had not complied with previous recommendations to meet with the board"? Do you see that?

A Yes, sir.

Q Did you understand -- Was it your understanding that the Board of Health's position was that Zonolite had not complied with previous recommendations?

A Apparently, that's what this infers, yes, sir.

Q And did you understand that the company was invited to explain itself at the next Board of Health meeting?

A Yes, sir. I was aware of that.

Q Did you do so?

A Mr. Bleich met with them. I did not.

Q Do you want to take a break at this point?

A No.

Q Okay. Let me know if you do.

Let's refer to Exhibit 39, and does this appear to be an April 19, 1962 report of an industrial hygiene study by the Montana State Board of Health?

A Yes, sir.

Libby

Q Was this received in Libby in 1962?
A Yes, sir.
Q Was that at or about the date of the report?
A Yes.
Q Okay. Then on the first page, third paragraph up from the bottom, do you see where it says, "During the time of this study, all of the plant was in operation such that the dust samples and other samples indicated should represent normal working conditions"? Do you see that?
A Yes, sir.
Q To your knowledge did the company dispute that or any other statement in this report?
A No, sir. Not to my knowledge.
Q Have you testified that you always had notice when Ben Wake would come or the Board of Health would come to inspect?
A I don't believe I ever testified to that. I don't believe that -- When the Bureau of Mines came, we never received notice. It was their policy. And I really don't remember whether we had notice from Ben Wake that he was coming or not. I just don't recall what their procedure was.
Q I'm now showing you your deposition of

Libby

May 27, 1992, and at page 274 we see the question, So if a witness said, We always had advance notice when Ben Wake would come or the Department of Health would come to inspect us, you could not refute that one way or the other?

And the answer, Well, I'd say that's true.

Do you see that?

MR. GRAHAM: I'd object to -- While the witness is studying that, I would object to two things. One is the improper impeachment, and the second one is that the objections that were made to the question at that time have not been referred to and would be repeated at this time.

BY MR. HEBERLING:
Q So I read the question and the answer. Was that the testimony you gave at that time?
A That's what I said at that time. Perhaps I remembered something then that I don't now, but I really don't remember what the procedure of the Board of Health was.
Q Now, you mentioned when the Bureau of Mines came you didn't have advance notice; is that correct?
A No, sir, we did not.

Libby

Q Now, the Bureau of Mines did spot inspections; is that correct?
A I don't know what that means.
Q Okay. We'll look at some of the documents later.

Now, Don Riley, construction supervisor, has testified that he always had notice ahead of time, and there was an effort to clean up ahead of time before an inspection. Do you dispute that?
A Yes, sir, I do.
Q Page two. Let's look at page two of Exhibit 39, which is the 1962 report, and at the bottom do you see "Maximum Allowable Concentration, five"?
A Yes, sir.
Q And that would be million particles per cubic foot?
A Yes.
Q And then is it fair so say that out of the first 16 samples from the dry mill 15 of them violated that standard?

MR. MURPHY: Would you read that back, please?

(The reporter then read back the preceding question.)

Libby

THE WITNESS: Well, according to this report, this file, that's what it states. However, I would like to point out that this states the asbestos concentrates are calculated. They are not measured, and they're calculated by taking the 40 percent of the total of the million particles per cubic foot of dust that was in the air, and I think that that 40 percent is subject to question.

BY MR. HEBERLING:
Q Isn't it true that the standard would be violated even if 20 percent asbestos was used?
A In some cases, yes.
Q Were you aware that as of 1962 the standard in the literature was five for asbestos?

MR. MURPHY: Objection to the form of the question.

THE WITNESS: Yes, I was aware of that.

BY MR. HEBERLING:
Q Okay. Then page three, the first sentence, it says, "A review of Table I indicates concentrations of dust in the dry mill as being extremely high and substantially over the maximum allowable concentration for either an asbestos dust, mica dust and even, in most cases, a nuisance

Libby

Page 161

dust." Did the company dispute that?
A Not to my knowledge, no, sir.
Q Did that statement alarm you back then?
A Probably, yes.
Q Did Mr. Bleich give you any directive after he received the report?
A Not that I recall, no, sir.
Q And on the cover page for the report, do you see the usual statement of confidentiality?
A Yes, sir.
Q And was this report kept so my management?
A I would assume so, yes.
Q Was it disseminated to the employees?
A No, sir.
Q Up to this point had there been any notice to the employees regarding the serious hazards of asbestos exposure?
A Not that I recall, no, sir.
Q Did you refer this report or its subject matter to the safety committee after you received it?
A Not to my knowledge, no, sir.
Q Did Mr. Bleich die in 1968?
A Yes, sir.
Q And that's when you took over as general

Libby

Page 162

manager?
A Yes, sir.
Q Did he die of lung problems?
A Yes, sir.
Q As of '62, was it fair to say that Mr. Bleich was in denial over the asbestos problem?
MR. GRAHAM: Objection to the form of the question.
MR. MURPHY: Objection to the form of the question. Lack of foundation.
THE WITNESS: I don't know what the question means.
BY MR. HEBERLING:
Q You were with Mr. Bleich a lot as assistant manager --
A Yes, sir.
Q -- and general manager? What was his attitude toward the dust -- the asbestos problem in the early '60s?
A Well, I think he was concerned about it, like all of us were.
Q Did he recognize that it was significant?
A Certainly.
MR. GRAHAM: Same objection.
/////

Libby

Page 163

BY MR. HEBERLING:
Q Did you push for any improvements at the plant or the areas where storage of the ore was done --
MR. MURPHY: Object to the --
BY MR. HEBERLING:
Q -- that he put a hold on?
MR. MURPHY: Read that back, please.
(The reporter then read back the preceding question.)
MR. MURPHY: Object to the form of the question.
THE WITNESS: Well, no, sir, but I'd like to clarify something about pushing for improvements because of this. We were all concerned about the high dust incidence and wanted to improve it, but in large part no one knew how to do this. So we did what we could, but there was a big lack in technology and the knowledge as to how we could accomplish what was desired.
BY MR. HEBERLING:
Q Did you make some inquiries to determine that no one knew how to approach this?
A Well, certainly it was discussed with many people as to what could be done, and so in that

Libby

Page 164

sense, yes, we would have been making inquiries.
Q I believe you've testified that, through the '60s and maybe -- If I'm wrong, please tell me, but I believe you've testified that no industrial hygiene engineer was consulted. Is that correct?
A Yes, sir.
Q As far as maintenance is concerned, wouldn't it have been feasible to simply add more men on to maintenance?
A Yes, and I think that that was done in large part.
Q And since the dry mill was down at least one day a week, was it feasible to do some maintenance or cleanup on those days?
A There was that work done on those days.
Q Was it feasible to do more than what was done?
MR. MURPHY: Objection to the form of the question.
THE WITNESS: Well, I can't answer that question. You can always say it's possible to have done more for whatever circumstance.
BY MR. HEBERLING:
Q Did you know -- In 1965 the bigger fan was bought; correct?

Libby

Page 165

A Uh-huh.
Q Now, as of 1962, wasn't it feasible to get more fans, more ventilating capacity to get the dust out of the dry mill?
A Possibly, yes, it could have been.
Q Do you recall disagreeing with Mr. Bleich on the approach to dust control?
A No, sir.
Q Let's refer to page four of the 1962 report from the Board of Health. At the top it states, "At the time of this study, there was no attempt made to determine each of the locations which were contributing to dustiness in the building, as was done in the past study of 1958, since, on the observation, it was clear that all of the locations enumerated during the 1958 study were still in existence and, perhaps, even others were added to this group." Do you see that?
A Yes, sir.
Q Did the company dispute that statement?
A No, sir.
Q And then under "Conclusions," the first sentence, do you see where it says, "As indicated in the findings of this study, it appeared that no progress had been made in reducing dust concentrations in the dry mill to an acceptable level and that, indeed, the dust concentrations had been increased substantially over those in the past"? Do you see that?

Libby

Page 166

A Yes, sir.
Q And did the company dispute that statement?
A No, sir.
Q Then the next page is a cover letter for the report. Do you see that? It's a letter from Ben Wake to Mr. Bleich, manager, Zonolite?
A Yes, sir.
Q Was that received at Zonolite in Libby in 1962?
A Yes, sir.
Q And it says in the middle paragraph, "We appreciate your interest and cooperation in the performance of the study but are disappointed with the lack of progress made in dust control." Do you see that?
A Yes, sir.
Q And do you recall discussing this with Mr. Wake at the time?
A No, sir, I don't recall.
Q Then let's go to Exhibit 40. Does this

Libby

Page 167

appear to be a letter from Ben Wake to Mr. Bleich, manager of Zonolite, dated May 21, 1962?
A Yes, sir.
Q And was this received at Zonolite in May of 1962?
A Yes, sir.
Q Let's refer to Exhibit 41. Does this appear to be a memo from you to Mr. Kelley dated September 25, 1962?
A Yes, sir.
Q Are you the author of this memo?
A Yes, sir.
Q At the top, first sentence, it says, "John, Dan and I have gone through the proposed asbestos circuit trying to get an estimate of capital expenditures required as well as operating costs for mills of various capacities." Do you see that?
A Yes, sir.
Q What was the proposed asbestos circuit?
A Well, at that time we were investigating the possibility of adding an asbestos circuit or building an asbestos mill for the purpose of concentrating asbestos which could be used as a commercial product and sold as asbestos.

Libby

Page 168

Q Back then was Zonolite adding asbestos to its final product, the products you described, the cement and the fireproofing products?
A Not in Libby.
Q Was that done elsewhere?
A Yes, sir.
Q And so was it the purpose to have an asbestos circuit to produce pure asbestos?
A Yes, sir. That was the object. We were purchasing asbestos, and we wanted to determine two things: No. 1, whether we could recover asbestos from the Libby deposit, which would be a form of asbestos which would be a marketable, usable product, which we could use in our own plants and possibly have for sale to others.
Q Then in the middle paragraph of that letter, do you see, "Estimated capital investment for this size mill, (680,000) for production of two or three tons per hour"?
A This copy I have is very difficult to read, and I don't see that. What paragraph number is it in?
Q The third one.
A Oh, I see it. I see.
Q So that would be $680,000 for a mill with

Libby

an asbestos circuit in it?
A Well, the mill would be an asbestos mill.
Q It would be a separate building?
A Yes, sir.
Q And where was that going to be placed?
A We didn't know. We never did determine that. It couldn't really be established until we had -- until we had the circuitry worked out and the flow sheet developed to know how much space it would take and where would be a practical place to have it.
Q Then at page two of this same memo, second line, it says "From work done so far in the laboratory". Do you see that?
A No, I don't.
Q It's the second line of page two of the memo.
A Okay.
Q "From work done so far in the laboratory".
A Okay.
Q What I want to ask is, is this the experimental lab down by the railroad tracks by the edge of town?
A No.
Q Which laboratory was being used?

Libby

A A laboratory up in the mill area next to the mill.
Q Was there also work done in the, I think it was called -- the experimental laboratory down by the railroad tracks by the edge of town?
A Not on this -- Not on this there wouldn't have been.
Q Okay. Now, Les Skramstad will testify that he worked on some kind of pure asbestos project in the years '59 to '61 in the experimental lab down by the railroad tracks by the edge of town. What could that have been?
A I don't know what that would have been.
Q Did David Robinson have a role in the asbestos project that's being discussed in these memos?
A No, sir, he did not. There was a David Robinson, but his function was the development of expanding furnaces, which work was done in the area that you're talking about.
Q Okay. And the area that I'm talking about, is that now a woodworking company, Montana Woodwork Company or something like that?
A Yes. Yes.
Q And so the building is still there?

Libby

A The building is still there.
Q Is David Robinson still alive?
A Yes.
Q Do you know where he lives?
A Great Falls. No. He lives in Lakeside, Montana.
Q Is he David W. Robinson?
A Yes, sir.
Q Okay. Let's refer to Exhibit 42. Does this appear to be a memo, Lovick to Kelley, dated October 9, 1962?
A Yes, sir.
Q Are you the author of this?
A Yes, sir.
Q The first line says, "The asbestos pilot plant was in partial operation last week." Do you see that?
A Yes.
Q Was that a pilot project for the asbestos circuit that you've described?
A Yes, sir.
Q Where was that located?
A It was located up near the mill -- next to the mill, actually, in one of the mill buildings.
Q Okay. Then let's refer to Exhibit 43.

Libby

Does this appear to be a memo, Lovick to Kelley, dated December 10, 1962?
A Yes, sir.
Q Are you the author of this?
A Yes, sir.
Q Okay. The second paragraph says, "In March of this year, it was decided that Libby would go ahead and develop a process for concentrating asbestos." Do you see that?
A Yes, sir.
Q And was this the same project as the asbestos circuit?
A Yes, sir.
Q And then in this memo are you reporting to Mr. Kelley in Chicago as to the progress of this project?
A Yes, sir.
Q Then the last paragraph, the last half of the last paragraph on the first page here says, "Considering the asbestos faces which averaged 32 percent". Do you see that?
A Yes, sir.
Q What does that mean, "Asbestos faces which averaged 32 percent"?
A Well, the asbestos which was in these

Libby

Page 173

faces, in these dikes, averaged 32 percent asbestos.
Q And what are dikes?
A A wide vein.
Q And then you say "A recovery figure of 33 1/3 percent, production to be 5,000 tons per year," and that would be 5,000 tons of asbestos?
A Yes, sir.
Q And on page two of that memo, the second paragraph, it says, "Our laboratory studies were directed toward a program for selective flotation on the tremolite from the feed. The first efforts were to float the asbestos." Do you see that?
A Yes, sir.
Q Were you eventually successful in floating the asbestos?
A Yes, sir.
Q And was that so that tremolite could be used in lieu of other forms of asbestos in building materials?
A Yes, sir.
Q And on page four of the memo, last paragraph, it says, "We have been in contact with several engineering firms." Do you see that?
A Yes.
Q Is it fair to say that Zonolite sought

Libby

Page 174

outside help when it needed it?
A Yes, sir.
Q Then paragraph -- No. The next exhibit is 44. If you'd refer to that. Does that appear to be a memo from Kelley to Lovick dated February 7, 1963, and did you -- Does it appear to be what I said it is?
A Yes, sir.
Q And did you receive that on or about its date?
A Yes, sir.
Q Now, in the last paragraph do you see where Kelley says, "Let us get a little more steam into this thing"? Do you see that?
A Yes, sir.
Q What was your understanding of what that meant?
A Well, my understanding is what he says. He had the feeling that there was not the enthusiasm for getting this project going that there had been, and he wanted that enthusiasm renewed.
Q Was there a Superior Asbestos Company formed?
A Yes, sir.
Q When was that?

Libby

Page 175

A About then, about 1960.
Q '60 to '63, in there?
A Somewhere in there, yes.
Q And who was the owner of Superior Asbestos Company?
A Zonolite Company.
Q What was the purpose of that company?
A It was an independent company, a subsidiary that was set up for the purpose of investigating this asbestos project.
Q Okay. And you mentioned that the asbestos was not finally produced. Why was that?
A Well, I need a definition of that question, please. When you say "Finally produced" --
Q Did you ever go into production and sale of pure asbestos?
A No, we did not. No, we did not.
Q Why not?
A Because it was felt there was not the market for the material, that we couldn't sell the material at a price which would be -- justify making the capital expenditure that was required.
Q Okay. Then was it a factor that Libby was so far away from markets?

Libby

Page 176

A Well, that would probably be a factor. I'm not sure that that would have been the controlling factor. As I recall, it was felt that there just weren't the markets available anywhere to make it.
Q Was it due in part --
MR. MURPHY: Excuse me. Had you finished your answer, Mr. Lovick?
THE WITNESS: I think so.
BY MR. HEBERLING:
Q Sorry. I don't mean to interrupt you.
A No. That's fine.
Q Was it due in part to the fact that tremolite asbestos fibers are shorter than other asbestos fibers?
A Well, that's one of the reasons. The tremolite fibers are short, and there's not the market for short fiber asbestos that there is for longer fiber asbestos, such as chrysotile.
Q Let's refer to Exhibit 45, and does that appear to be a letter from Ben Wake to Mr. Bleich, manager, Zonolite, dated May 23, 1963?
A Yes, sir.
Q Was this received in Libby in May 1963?
A I would assume so, yes.

Libby

Page 177

Q Is it probable?
A Yes.
Q And as part of the exhibit, there's attached a report of an industrial hygiene study by the Montana State Board of Health dated April 11, 1963. Do you see that?
A Yes, sir.
Q And, again, on the face of the report, it states "Confidential". Do you see that?
A Yes, sir.
Q And was this report kept within management?
A Yes, sir. To the best of my --
Q Was it disseminated to the employees?
A No, sir.
Q And up to this point had there been any notice to the employees that asbestos in the dust was a hazardous substance?
A Not that I recall, no, sir.
Q Then at page two, under "Description of Operations" -- Probably the next page.
A Yes, sir.
Q In the middle of that paragraph, do you see where it says, "In general, there appeared to be little, if any, improvement at any point in the

Libby

Page 178

plant"? Do you see that?
A Yes, sir.
MR. GRAHAM: Could you read the rest of the sentence?
MR. HEBERLING: Okay.
BY MR. HEBERLING:
Q "Except, perhaps, at the voll grinder". What is a voll grinder?
A It should be roll, R-O-L-L. That "V" is a misprint.
Q What is a roll grinder?
A Well, it's a machine to grind ore, and there are two -- made up of two rolls, generally two rolls which revolve, and the ore falls in between them, and as it goes through those rolls which are revolving, it is crushed.
Q And does that cause dust?
A Yes, sir.
Q Then on page --
MR. GRAHAM: I would object. The full sentence hasn't finally been read, but I'd just make that objection. You don't have to read it if you don't want to, but I just want to point out that it hasn't been read.
/////

Libby

Page 179

BY MR. HEBERLING:
Q Then continuing on that page, is there a listing of first floor, fourth floor, third floor and so forth?
A Yes, sir.
Q And are these many of the same problems that were discussed before, in 1956, '58, '62?
A Yes, sir.
Q And does this include the backs being off some screens?
A Yes, sir.
Q And leaks here and there?
MR. GRAHAM: I'd object to the form of the question because it's unclear as to whether you're referring to whether those things that you specifically mentioned are problems that occurred in precisely the same location formerly. I think the question is vague and ambiguous.
MR. HEBERLING: Okay. I'll rephrase it.
BY MR. HEBERLING:
Q Do you see in the discussion of the second floor, "No. 34 screen still leaked badly"? Do you see that?
A Yes, sir.

Libby

Page 180

Q "And there was no improvement in this area since last study"? Do you see that?
A Yes, sir.
Q And then on the first floor, it says, "Leaks from all pipes should be stopped and ventilation applied where dust cannot be controlled by stopping." Do you see that?
A Yes, sir.
Q Then on page three, after the discussion of the first floor where the specific problems were, do you see this paragraph which states, "The size distribution of the dust in the air as determined by the U.S. Public Health Service indicates an average size of about 3.44 microns. It should be noted that these small diameter particles can be deposited in the deep lung tissue and are more apt to be of physiological significance than those above 10 microns. In any case, over 60 percent of the particles were five microns or less, and 75 percent were less than 10 microns, all indicating a serious dust concentration, particularly in view of the quantity of asbestos known to be in the mixture." Do you see that?
A Yes, sir.
MR. GRAHAM: Objection. Improper

Libby

examination.

BY MR. HEBERLING:

Q Okay. Now, do you know what size particles were visible? Was that over five?

A No, sir, I don't know.

Q Was it your understanding that the State is telling you that 60 percent of the particles are not visible?

A No, sir. I don't know. I don't know what they're trying to tell us.

Q Did you understand that the smallest ones were not visible to the naked eye?

A Yes, sir.

Q But you didn't know what size that was?

A That's correct. I don't know what size that is.

Q Have you testified that you always knew that it was the smallest ones which are the most dangerous?

A Well, I don't recall, but I think that that's not an accurate statement. The small particles are the most dangerous, but it would have to be defined as to how small is small, and I can't tell you what size that would be, and I don't think I would ever have been able to say.

Libby

Q Was this 1963 report when you first learned that the small diameter particles are more apt to be dangerous, or did you know that before '63?

A Oh, I'm sure I knew it before '63.

Q Okay. Then do you see on page -- the same page a table with a series of samples taken with a maximum allowable concentration of five and all the samples exceeding that?

A Yes, sir.

Q So all eight samples were over the maximum?

A Yes, sir.

Q And did you understand that where it's over the maximum that's hazardous to a worker's health?

A Yes, sir.

Q Then, also, at the bottom of the table, it says there's calculations on the basis of 40 percent asbestos in the airborne dust. Do you see that?

A Yes.

Q Is this where you learned about the 40 percent test or the 40 percent result that somebody got?

MR. GRAHAM: I'd object on the basis

Libby

of foundation to the question.

Go ahead and answer.

THE WITNESS: Well, one of the reports from the State board is where I heard t 40 percent, and I don't know if this report is t first time I've heard of it or not.

BY MR. HEBERLING:

Q Okay. Then under "Conclusions and Recommendations," do you see, "As noted in previous reports, considerable effort should be immediately to improve the dust control"? Do see that?

A Yes, sir.

Q And at the end do you see where it says, "Dust control measures will have been applied that the hazardous condition existing at this pla is eliminated"? Do you see that?

A Yes, sir.

Q Did you have any doubt in 1963 as to wh the State Board of Health was telling you?

A I don't think so.

THE VIDEOGRAPHER: Excuse me. We' going to have to stop to change the tape.

MR. HEBERLING: Okay.

THE VIDEOGRAPHER: Going off the

Libby

Page 184

record at approximately 2:34.

MR. MURPHY: We've been going for an hour and a half. Let's take a five-minute break, at least, anyway.

(Brief recess.)

THE VIDEOGRAPHER: We're back on the record at approximately 2:51.

BY MR. HEBERLING:

Q Was it about April 15, 1963 that the Zonolite Company was merged into W.R. Grace?

A Yes, sir.

Q And was that a stock-for-stock transaction?

A Yes, sir.

Q Did you own stock in Zonolite at the time?

A Yes, sir.

Q And after that, did you own stock in Grace?

A Yes, sir.

Q Do you still?

A No, sir.

Q When did you sell?

A Within the last ten years.

Q And after April 15, 1963, did Mr. Bleich continue as plant manager in Libby?

Libby

Page 185

A Yes.

Q And did Mr. Kelley continue as the person to whom Mr. Bleich reported?

A Yes.

Q And did you continue in the same position you'd been in?

A Yes, sir.

Q And that was assistant manager?

A Yes.

Q And did all other Libby employees continue in their positions as well?

A Yes.

Q Now, while Mr. Kelley was president of Zonolite approximately '55 to '63, was he kept informed of what was happening in Libby?

A I think so, yes, sir.

Q And did he visit Libby a few times a year?

A Yes, sir.

Q And then after April 15, 1963, I believe you testified that Mr. Kostic was safety supervisor?

A Yes, sir.

Q And after April of '63, was Mr. Kostic kept informed of what was happening in Libby?

A Yes, sir.

Q And did Mr. Kostic visit two or three

Libby

Page 186

times a year?

A Well, he visited periodically. I don't know what kind of a schedule he was on, but, yes, he did.

Q Was it, generally, more than once a year?

A Yes.

Q And when he did visit, did he make a safety inspection?

A Yes, sir.

Q Did you ever see any reports produced by Mr. Kostic as to safety inspections on Zonolite?

A Well, I certainly saw reports of -- reporting on his visit. I don't know if you'd say that they were results of his safety inspection, but in a broad sense it would be.

Q Did you see reports that he prepared about his visits?

A Yes, sir.

Q Do you know where these are now?

A No, sir.

Q Have you seen any in the last ten years in these depositions?

A I don't recall.

Q And in the years both before 1963 and after 1963, did you send all governmental inspection

Libby

Page 187

reports to company headquarters?

A Yes, sir.

Q Was that a, Yes?

A Yes.

Q Okay. Let's refer to Exhibit 46, and does that appear to be a letter by Ben Wake to Mr. Bleich, manager, Zonolite, dated July 3, 1963?

A Yes.

Q And was this received in Libby in July 1963?

A Yes, sir.

Q And in the first paragraph it says -- There's an examination of six vermiculite samples. Do you see that?

A Yes.

Q Was that the ore or the product?

A I don't know.

Q Well, the percentage tremolite came out to be a range of six to 22 percent. Does that seem to tell you that it's the ore?

A It would have to be the ore, yes.

Q Then please refer to Exhibit 47. Does that appear to be a letter of Dr. Woodrow Nelson to Zonolite's insurance company, Maryland Casualty, dated February 14, 1964?

Libby

A Yes, sir.
Q And did you receive this in Libby in February 1964?
A I don't recall when we would have received it.
Q Is it likely that you received it at or about its date?
A It's very possible, yes.
Q Is it likely?
MR. GRAHAM: Object.
MR. HEBERLING: It's not foundationed unless he says it's probable or something.
MR. GRAHAM: He can't foundation it unless he knows.
MR. HEBERLING: Right.
MR. GRAHAM: And he's testified he doesn't know when he received it.
BY MR. HEBERLING:
Q This is a document that you've seen a number of times?
A Yes, it is.
Q And is it probable that it was received in 1964 at Zonolite in Libby?
A Probably, yes.
MR. GRAHAM: Object as to form.

Libby

BY MR. HEBERLING:
Q In paragraph one -- Now, this is regarding Eitel Ludwig, a worker at Zonolite?
A Yes.
Q Did you know Mr. Ludwig?
A Yes, sir.
Q And paragraph one talks about a shortness of breath on exertion. Did you observe that with Mr. Ludwig as well?
MR. GRAHAM: Objection as to form. Time and place.
THE WITNESS: I can't recall that I specifically did on Mr. Ludwig, no.
BY MR. HEBERLING:
Q Okay. And then in the second full paragraph, in the middle, it says, "A marked advance in fibrosis is obvious." Do you see that?
A Yes.
Q And then page two, there's a doctor's conclusion, "In my opinion his lung condition is due to (pneumoconiosis), almost certainly from the asbestos content of the dust." Do you see that?
A Yes.
Q And is it fair -- Was it your understanding that pneumoconiosis is a dust disease?

Libby

A Well, it would be a lung disease. I don' know that I knew it was a dust disease specifi
Q Did you discuss this doctor's conclusio with anyone after you received it, do you thin
A I don't recall.
Q Was there any transfer of Mr. Ludwig f his position to a safer one after this letter was received?
MR. GRAHAM: Objection as to the fo of the question because of the lack of knowle to this witness as to precisely when the letter received.
Go ahead and answer it to the extent yo can.
THE WITNESS: To my recollection there was no transfer of his duties, no, sir.
BY MR. HEBERLING:
Q Do you see where the doctor says at the first part of page two, "The treatment recomm at this time is that this man avoid as much as possible dust exposure"?
A Yes, sir.
Q Did Mr. Ludwig die of lung problems?
A I don't recall what his cause of death w listed at, but Mr. Ludwig did die, yes, sir.

Libby

Q Do you know how long he worked after
A No, sir. I don't remember.
Q Let's refer to Exhibit 48, and does that appear to be a letter of one, Dr. Park, to Mr. I dated April 1, 1964?
A Yes, sir.
Q Did you receive a copy of this and then later respond to the questions in it?
A I don't recall.
Q Okay. We'll perhaps clear that up. Le refer to Exhibit 49. Does this appear to be a letter of Mr. Pratt of Western Mineral to Mr. Kelley, general manager, Zonolite?
A Yes, sir.
Q And is it dated April 2, 1964?
A Yes.
Q And was this received in Libby in Apri 1964?
A Yes, sir.
Q Okay. And Mr. Pratt is the president o one of Zonolite's customers?
A He was a vice-president.
Q Okay. And would you agree that he is acting responsibly in inquiring about health h and asking follow-up questions?

Libby

Page 192

MR. GRAHAM: Object to the form of the question. Vague and ambiguous as to, Responsible.

THE WITNESS: I would say, Yes.

BY MR. HEBERLING:

Q Okay. Then please refer to Exhibit 50, and does this appear to be a letter by you to Mr. Pratt dated April 9, 1964?

A Yes, sir.

Q Are you the author of this letter?

A Yes, sir.

Q And here do you answer the questions posed in the letter which is Exhibit 48, which we looked at earlier?

A Yes.

Q So is it likely, then, that you did receive a copy of the letter of April 1, 1964, which is Exhibit 48?

A Yes, sir.

Q Then Exhibit 51, does this appear to be a notice to employees signed by you?

A Yes, sir.

Q Are you the author of this notice?

A Yes, sir.

Q And does this relate to an x-ray survey

Libby

Page 193

for 1964?

A Yes, sir.

Q Would this be posted, or was it sent out to each employee?

A It would be posted -- would have been posted.

Q Where would it have been posted?

A On bulletin boards in the operation.

Q And where were the bulletin boards back then?

A Throughout the operation in various places, in all departments. Each department had a bulletin board.

Q And how many departments were there, four or five?

A More than that.

Q So was there any other way that this -- that the prospective survey of chest x-rays was noticed to the employees?

A Yes. We made arrangements with the hospital to schedule so many people at a particular time and from each of the various departments, and the people in that department would be notified as to when they were to appear at the hospital. And it should be noted that we furnished transportation for

Libby

Page 194

our employees from the town of Libby to the operation on a bus, and so we would assign the people on a particular shift riding in a particular bus that on Tuesday or whatever, at the termination of the shift, they were to go to the hospital at that time for their chest x-ray, and that would be scheduled in groups of about 20.

Q Okay. And as far as any notice to the employees, was this notice, which is Exhibit 51, the extent of it?

MR. MURPHY: Objection to the form of the question. Asked and answered.

THE WITNESS: Well, it would be this notice plus the notice as to when they were to report, and a schedule was kept as to who showed up for their x-rays, and anybody that did not show up when they were scheduled, if they were off work or whatever reason, they were notified to report at a different time.

BY MR. HEBERLING:

Q To your knowledge was any reason given to the employees for the x-ray survey?

A Well, just to evaluate their chest x-rays.

Q As stated on this notice, which is Exhibit 51?

Libby

Page 195

A Yes.

Q And was this the same procedure you followed each year as far as how employees were notified of chest x-rays?

A Yes, sir.

Q To your knowledge did the company ever post a notice stating the reason for the chest x-rays in any more detail than is here?

A No, sir.

Q And that's true all the way up to '83, when you left?

A Yes, sir.

Q Let's refer to Exhibit 52. Does this appear to be a letter of Ben Wake to Bud Vinion at Zonolite dated May 8, 1964?

A Yes, sir.

Q Was this received at Zonolite in May 1964?

A I'm sure it was, yes, sir.

Q Then let's refer to Exhibit 53, and does this appear to be a letter of Ben Wake to Mr. Bleich, manager of Zonolite, dated May 11, 1964?

A Yes, sir.

Q Was this received at Zonolite in May of 1964?

A Yes, sir.

Libby

Page 196

Q And was the attached report of an inspection of the dry mill also received with the cover letter?

A I would assume so, yes, sir.

Q Okay. On page one, under "Description of Operations," second sentence, it says, "The backs to the screens have been replaced on nearly all machines, and the rubbers on the screens were in good shape, generally, although a few were broken." Do you see that?

A Yes, sir.

Q And it says, "Those that were broken were leaking dust badly." Do you see that?

A Yes.

Q And then in the next paragraph, it says, "A new 35,000 CFM," cubic feet per minute, "fan which discharged at ground level had been installed. According to Mr. Vinion, the plant expects, in addition, to have a south side fan, old 600, hooked up soon." Do you see that?

A Yes.

Q Okay. So the first reference to the 35,000 CFM fan is the big fan that was bought; correct?

A Yes, sir.

Libby

Page 197

Q That we talked about --

MR. GRAHAM: Object to the form of the question.

Go ahead.

BY MR. HEBERLING:

Q And is that the big fan we talked about earlier?

A Yes.

Q And then what about this south side old 600 fan? Was that ever hooked up?

A Yes, sir.

Q Okay. Do you know when?

A No, sir, I don't know. I don't recall.

Q And then on page one also, paragraph three, under "Description of Operations," it states, "It was noted that the rafters were heavily loaded with dust." "It is unfortunate that the good work that has been done in the ventilation system is reduced by extremely poor housekeeping." Do you see that?

A Yes.

Q And then a number of other problems are discussed in the report; is that correct?

A Yes.

Q And did Zonolite dispute any of these

Libby

Page 198

statements in the report?

MR. GRAHAM: Object to the form of the question as to what is meant by the term "Dispute".

Go ahead and answer it to the best of your recollection.

THE WITNESS: No, sir. I don't believe so.

BY MR. HEBERLING:

Q And then on the next page, do you see a table of samples over the years '56, '59, '62, '63, '64?

A Yes.

Q And if the standard is 20, is it fair to say that almost all the samples in those years were over 20?

MR. GRAHAM: I would object to the form of the question on the basis that, if it's meant the ones that are recounted here, that's one thing. If it's meant all samples taken throughout those years, that's another thing.

MR. HEBERLING: I'll restate the question.

BY MR. HEBERLING:

Q Please focus on the standard for dust, not

Libby

Page 199

asbestos, but just dust, generally, of 20. Do you see that?

A Yes.

Q And if that standard is 20, is it fair to say that almost all the samples over the years '56 to '64 listed on this table exceed the standard?

A The thing that is missing is, the maximum allowable concentration of 20 was what the allowable concentration was in 1964, and I do not believe that that standard was the same in previous years, back to 1956. I think in previous years -- some of the previous years the allowable concentration was higher than 20.

Q And was it your understanding that the standard in 1964 at 20 was based on current scientific knowledge at that time?

A Yes, sir.

MR. GRAHAM: Object to the foundation.

BY MR. HEBERLING:

Q Then under "Toxicology," it says, "In a recent article published in the Journal of the American Medical Association, April 6, 1964, by Selikoff and others, it is indicated that the, quote, 'Building trades insulation workers have

Libby

Page 200

relatively light, intermittent exposure to asbestos. Of 632 insulation workers who entered the trade before 1943 and were traced through '62, 45 died of cancer of the lung or pleura, whereas only 6.6 such deaths were expected. Three of the pleural tumors were mesotheliomas.'" Do you see that?

A Yes.

MR. GRAHAM: Objection. Improper examination.

BY MR. HEBERLING:

Q "Four mesotheliomas in a total of 255 deaths is an exceedingly high incidence for such a rare tumor." Do you see that?

A Yes.

MR. GRAHAM: Same objection.

BY MR. HEBERLING:

Q And then at the end, "Twelve men died of asbestosis."

MR. GRAHAM: Same objection.

BY MR. HEBERLING:

Q Okay. Now, first of all, there's reference to a light, intermittent exposure to asbestos in building trades workers. Do you recall that?

A Yes.

Libby

Page 201

Q And at Zonolite you had workers with heavy exposure at times; correct?

MR. GRAHAM: Objection. Vague and ambiguous in relation to what the document he's being examined on says.

Go ahead and answer it if you can.

THE WITNESS: Yes, that would be correct at times.

BY MR. HEBERLING:

Q And have you also testified that at times exposure in the dry mill was very great?

A Yes, sir, I have.

Q Have you also testified that the dry mill was a terribly dusty place to work?

A I don't know that I would have used those exact words, but, yes, it was a very dusty place to work.

Q And did this continue up to 1974, when the dry mill closed, that it was still a very dusty place?

A Yes, sir, it did.

Q So did you understand in 1964, from the excerpt in the American Medical Association article, that with 45 men dying and about seven expected to die of lung cancer that's a rate of six times normal

Libby

Page 202

for workers exposed to asbestos?

MR. MURPHY: Objection. Lack of foundation.

THE WITNESS: Well, this was people in the building trade, insulation workers, which had nothing to do with our operation.

BY MR. HEBERLING:

Q Now, did you have workers who had relatively light, intermittent exposure to asbestos?

A Well, yes.

Q And did you have workers with more exposure than light or intermittent?

MR. GRAHAM: Object to the form of the question. The terms being utilized are vague and ambiguous and not sufficiently defined to be able to make an answer.

Go ahead and answer.

THE WITNESS: Yes, we would have.

BY MR. HEBERLING:

Q And was it the company's position on receiving this quote from the American Medical Association article that this had nothing to do with the Libby workers?

MR. MURPHY: Objection. Lack of foundation.

Libby

Page 203

THE WITNESS: Well, I would think, yes, it didn't have anything to do with Libby workers, because it was a different class of people, and it was different asbestos that they were exposed to than what we had at Libby.

BY MR. HEBERLING:

Q So to your knowledge the company didn't consider this excerpt from the American Medical Association journal significant?

MR. MURPHY: Objection. Lack of foundation. He can't speak for the company.

BY MR. HEBERLING:

Q To your knowledge?

A To my knowledge I can't answer that question because I don't know what they considered.

Q Did you consider it significant?

A Well, I considered it worthy of consideration, yes, sir.

Q But I take it you didn't consider it -- that it had any application to the workers in Libby?

A No. There was no direct relationship to the workers in Libby from this.

Q So you would need something that would be more in the way of a study of the workers in Libby before you would consider the statement significant;

Libby

is that correct?

MR. MURPHY: Objection. Vague and ambiguous.

THE WITNESS: That would be correct, yes.

BY MR. HEBERLING:

Q And in 1964 or the year after, did Grace ever undertake a study of the workers in Libby as to what workers may have died of?

A Yes.

Q In 1964 the company did?

A No, sir. Not 1964, but I believe your question was, 1964 or after.

Q I think I said 1964 or 1965.

A I'm sorry.

MR. MURPHY: I think you were right, Mr. Lovick.

BY MR. HEBERLING:

Q Okay. Let's clarify the question. In 1964 or '65, did Grace undertake a study of what the Zonolite workers in Libby may have died of?

A No, sir.

Q Was that ever done in the 1960s?

A No, sir.

Q Was it done in the 1970s?

Libby

A No, sir.

Q Was it done by a grant from W.R. Grace in 1983, '84?

A Yes, sir.

Q Now, the word "Mesothelioma" appears here. I think I read it back to you. Was that your first understanding of what mesothelioma might be, 1964, when you received this Exhibit 53?

A I don't recall when my first understanding of what mesothelioma might have been -- when I would have -- when it would have meant anything to me.

Q So in 1964 were you aware that mesothelioma was, in the opinion of some, related to exposure to asbestos?

A Yes, sir, I would have realized that in '64.

Q Did you have any information to the contrary?

A No, sir.

Q And were you aware also that lung cancer, as of 1964, was related to the exposure to asbestos?

MR. GRAHAM: I'd object to the form --

Well, go ahead and answer if you can.

Libby

THE WITNESS: I think I would have realized that lung cancer could have been cause asbestos, but not necessarily.

BY MR. HEBERLING:

Q There are other things that cause lung cancer?

A Yes.

Q And did you have any information indicating that lung cancer was not caused by asbestos?

A I don't understand that question.

Q In 1964 did you have any information indicating that lung cancer was not caused by asbestos exposure?

A I'm sorry. I still don't understand what the question is. I think it's ambiguous. It's misleading.

Q Well, did you --

MR. GRAHAM: Are you asking him whether there are other causes of lung cancer? Because that's the way --

MR. HEBERLING: No.

MR. GRAHAM: That's where I think th confusion lies, Jon.

/////

Libby

BY MR. HEBERLING:

Q Okay. In 1964 you got this article from the Journal of the American Medical Associati excerpt, which I read.

A Uh-huh.

Q And is it fair to say that this indicates a relationship between asbestos exposure and l cancer?

A That's what this excerpt from the article indicates, that there can be a relationship, yes, sir.

Q Okay. So then I'm asking whether you l any information to the contrary as of '64.

A No, sir.

MR. GRAHAM: Just so I can summari that, the question and answer is that he didn't any information that asbestos couldn't cause l cancer or didn't cause lung cancer? Is that -- still confused, and I would prefer --

MR. HEBERLING: I think the record is clear, and you can ask questions later. Okay?

MR. GRAHAM: Okay. Because of yo invitation, I will try not to interrupt anymore f clarification purposes, and the jury can unders that I'll have a chance to later clarify matters,

Libby

Page 208

and the reason I can't now is because counsel wishes to proceed with his examination at this point, and that's fine.

MR. HEBERLING: Okay. And I'm asking what his understanding was as a result of this AMA article and not his opinions on what causes lung cancer. Okay?

BY MR. HEBERLING:

Q Now, after you received this excerpt of the American Medical Association article, was there an effort in Libby to obtain a copy of it?

A Not that I recollect, no, sir.

Q Did you receive any directives from W.R. Grace as a result of this report, the 1963 State Board of Health report? 1964. Excuse me.

A Not that I recall, no, sir.

Q Did this report further support your view that the asbestos and the dust in the air was a serious hazard?

A Yes. I would say that it did.

Q Then, at the top of the next page, there's a further quote from the American Medical Association article referencing a study in South Africa. I'll just read it. "'The recent demonstration by South African and British

Libby

Page 209

investigators of pleural and peritoneal neoplasms among individuals who had chance environmental exposure to asbestos many years before raises the very important question of possible widespread carcinogenic air pollution.' It was also demonstrated that asbestos bodies were found in a man not employed in an industry but living next door to an asbestos factory." Do you see that?

A Yes.

MR. GRAHAM: Objection. Improper examination.

BY MR. HEBERLING:

Q Now, in 1964 Zonolite had its expanding plant down by the railroad on the edge of town; correct?

A Yes, sir.

Q And that was near the ball fields?

A Yes, sir.

Q And was there also the municipal swimming pool down there?

A Yes, sir.

Q And by 1964 Zonolite also had a bagging plant in that same area, did it?

A Yes, sir.

Q What was done at the bagging plant?

Libby

Page 210

A The vermiculite concentrate was bagged and shipped out.

Q What kind of bag? Were those like --

A They were 100-pound paper bags.

Q Okay. And in 1964 did Zonolite also have its experimental lab down by the railroad tracks on the edge of town?

A Yes, sir.

Q In the 1950s and '60s, were you aware that children played on piles of the ore near the railroad tracks?

MR. MURPHY: Objection. Irrelevant to the issues in this case.

THE WITNESS: We had --

BY MR. HEBERLING:

Q Well, let me address this objection.

MR. HEBERLING: We're using this deposition for all pending cases, and it includes some cases where people had exposure as children playing on piles of it, so that's where I'm going.

BY MR. HEBERLING:

Q Okay. So were you aware in the '50s or '60s that children played on piles of the ore near the railroad track?

A We had one storage bin where vermiculite

Libby

Page 211

concentrate was stored, and it was an open bin, in effect, and there was one pile of material in there, and we knew that from time to time people, children particularly, did get on that pile of ore. We were not successful in keeping them away.

Q And were you aware that the kids enjoyed sliding on the pile?

MR. GRAHAM: I would object on the basis of the form of the question because it calls for speculation as to what was the state of mind of those people who were sliding on the pile, if there were any.

MR. HEBERLING: I'll rephrase the question.

BY MR. HEBERLING:

Q Did you ever see the kids sliding on the pile?

A No, sir.

Q Did your kids ever do that?

A Not to my knowledge, no, sir.

Q Is it possible they went down there without you knowing it?

A Certainly it's possible, but I doubt that.

Q Did they play down by the ball fields?

A No.

Libby

Q Okay. Were you aware that it was a faster slide down the ore pile than it would be on sand --

MR. GRAHAM: Objection.

BY MR. HEBERLING:

Q -- because the ore was somewhat slippery?

MR. GRAHAM: Object to the form of the question.

THE WITNESS: I don't know.

BY MR. HEBERLING:

Q Were you aware that it was fun for that reason?

MR. GRAHAM: Objection.

THE WITNESS: No. I don't know that.

BY MR. HEBERLING:

Q Okay. Would it surprise you if a large number of people in Libby could testify that they played on those piles as children?

MR. GRAHAM: Object to the form and the fact that it's an improper examination trying to elicit -- present hearsay testimony to the jury.

Go ahead and answer it, if you can.

THE WITNESS: May I hear the question again, please?

/////

Libby

BY MR. HEBERLING:

Q I'll rephrase it. Would you be surprised to hear that quite a few children played on the piles of vermiculite ore?

A I don't know what "Quite a few children" means, but I would not be surprised if some children hadn't played on that.

Q In the '50s and '60s, did the company ever fence the kids out of the company areas?

A I don't believe so, no, sir.

Q In the '70s?

MR. GRAHAM: I would object on the basis of vagueness as to what you mean by "Company areas".

MR. HEBERLING: Okay. I'll rephrase that.

BY MR. HEBERLING:

Q In the '50s and '60s, did the company ever fence the kids out of the company areas where the bagging plant, expanding plant and storage area was near the railroad near the edge of town?

A No, sir.

Q In the '70s did they do that?

A No, sir.

Q Are you aware that even today there's no

Libby

fence in the area?

A No, I don't believe there is a fence in the area.

Q In the '50s and '60s, were you aware that children would get the vermiculite ore and pop it b[y] setting a match to it?

A No, I'm not specifically aware that that happened.

Q You never saw kids doing that?

A No, sir.

Q In the '50s and '60s, did the company ever have warning signs about asbestos hazards on com[pany] property anywhere?

A I don't really recall when they put up warning signs, but at some point there were warnin[g] signs put up, but I don't believe there were any in the '50s and '60s.

Q Is it probable that that was the late '70s?

A It's probable that it was in the '70s, but I -- I can't be more specific than that.

Q And to your knowledge did the company ev[er] notify neighbors, meaning the people in the houses, say, within a quarter mile of the facilities near the railroad tracks near the edge of town, that

Libby

inhaling asbestos was a serious health hazard?

MR. GRAHAM: Object to the form of the question based on the implication that it has.

Go ahead and answer the question.

MR. MURPHY: And, then, also, vague and ambiguous in that there's absolutely no eviden[ce] on this or many other similar questions as to duration, intensity, type of asbestos exposure.

THE WITNESS: I have no knowledge of any such notification, no, sir.

BY MR. HEBERLING:

Q To your knowledge did the company ever notify the public in the Libby community that inhaling asbestos was a serious health hazard?

MR. GRAHAM: Same objection.

MR. MURPHY: Same objection as to the last question.

THE WITNESS: Not to my knowledge.

BY MR. HEBERLING:

Q Back to the 1964 report, page three, paragraph two. I think that's the same page we w[ere] still on there. Do you see where it says, "The asbestos content of the material with which you ar[e] working appears to provide some serious potential for the development of disease, if not properly

Libby

Page 216

controlled"?

MR. GRAHAM: Is that the same sentence that starts out "While the above situation does not apply specifically to operations at your plant"?

MR. HEBERLING: Yes.

MR. GRAHAM: Okay.

THE WITNESS: Yes, sir, I see that.

BY MR. HEBERLING:

Q And did you understand that as a reference that there was a serious potential for the development of disease, not only to the workers, but to the community as well?

MR. MURPHY: Objection. Lack of foundation.

THE WITNESS: No, sir. I was not aware that there was any potential for a large -- for a problem in the community.

BY MR. HEBERLING:

Q Where the report talks about asbestos bodies found in a man living next door to an asbestos factory and asbestos air pollution, did you understand that that meant a possible danger to the community?

MR. GRAHAM: Same objection.

Libby

Page 217

MR. MURPHY: Objection. Asked and answered. Argumentative.

THE WITNESS: You're comparing our operation to an asbestos operation, and the amount of asbestos or tremolite that was found in that concentrate that would be liberated into the air in the area would be extremely small amounts, and I don't -- didn't believe -- understand then and I don't believe now that it would be of such quantity that it would be a threat.

BY MR. HEBERLING:

Q Did Grace ever test the air for asbestos in the neighborhoods near the Grace facilities, near the railroad tracks on the edge of town?

A Yes, they did.

Q They did?

A Yes.

Q And what was the result of that?

A As I recall, they could never come up with any figures, any asbestos fibers being present.

Q When was that done?

A Oh, in the -- Probably in the '60s and certainly in the '70s.

Q And have you recently seen any documents, say, in the last five years at any of these

Libby

Page 218

depositions regarding those tests of the air on the edge of Libby?

A No, sir.

Q But you recall that being done; is that correct?

A Yes, sir.

Q Did you ever see days where there was dust drifting from the Grace facilities across the ball fields to town?

A No, sir.

Q Where was your office downtown? What was the address of that?

A It was in the 300 block of Mineral Avenue, which is the main street of Libby. 317 Mineral was the specific address.

Q In the '60s or '70s, do you recall any public meetings regarding effects on the community from asbestos exposure?

A No, sir.

Q Then on the same page of the '64 report, Item 3, there's a recommendation "That the blower discharged, presently at ground level, be elevated to such a degree that reentry is not so prevalent". Do you see that?

A Yes, sir.

Libby

Page 219

Q And then above "Conclusions," do you see where it says, "In addition, the discharge of large volumes of asbestos-laden dust at ground level sets up a condition where all members of the plant can be exposed in addition to those who work in the dry mill"?

MR. MURPHY: Where are you reading from now?

BY MR. HEBERLING:

Q Do you see that above the "Conclusions and Recommendations" section, in the paragraph?

A I see it, yes.

Q Okay. Now, this ground level discharge, is that related to the new 35,000 CFM fan?

A Yes, sir.

Q And did it have a stack on it?

A At that time when it was installed, it did not have a stack, or if it had a stack, it was a very short stack. I don't recall whether there was a stack or not. I don't believe there was.

Q Well, was there a horizontal -- Shall we call it a stack? A conduit that the fan discharged out?

A As I recall, yes.

Q And did that discharge dust over into the

Libby

Page 220

service areas?
A It could, yes.
Q And what buildings were in the service areas?
A Well, there were several buildings over there. The warehouse and the machine shop and the construction shop and the sheet metal shop and the garage and the offices up there. They were all in the service area.
Q And were their workers in each of these buildings?
A Generally, yes.
Q And after this discharge at ground level was set up, could you see dust going into the service areas?
A I don't recall that you could see dust going into them, no, sir, but I just don't remember seeing any dust going in.
Q At this point did you know that this dust was 20 or perhaps even 30 percent asbestos?
A No.
MR. MURPHY: Objection. Lack of foundation.
THE WITNESS: No. I didn't know what percentage of asbestos it would be.

Libby

Page 221

BY MR. HEBERLING:
Q Now, we've discussed various percentages for the airborne dust, and would those same percentages apply to the discharge from the ground level -- the ground level discharge from the 600 fan?
MR. MURPHY: Objection. Lack of foundation.
BY MR. HEBERLING:
Q And did you just nod your head?
A I don't know, but it would be reasonable to think that the percentages would be similar.
Q Okay. And that range was, what, 10 to 30 percent?
A Yes, sir. That was one of the figures that was used.
Q Okay. Now, after you got this report in 1964, do you recall any discussions of fixing the problem by using, instead of a horizontal stack, a vertical stack?
A Yes.
Q And what was the result of that?
A We installed a vertical stack.
Q And why did it take over three years to do that?

Libby

Page

A I don't know.
Q You have no idea?
A No.
Q Were there arguments within management as to whether to spend money on this?
A Yes, sir.
Q Were you pushing the idea of spending money to have a vertical stack?
A Yes, sir.
Q Do you know who was opposed for it -- opposed to it?
A No. I don't remember specifically.
Q The local management people in Libby, were they in favor of having a vertical stack?
A I believe so, yes, sir.
Q And did the opposition come from Grace executives in Massachusetts?
A No. I think not.
Q Where did it come from? Do you know?
A It came from the people in Libby.
Q Do you know what Mr. Bleich's position was on having a vertical stack?
A I think he favored it.
Q If he favored it and he was plant manager and you favored it and you're assistant manager, wh

Libby

Pag

didn't it happen?
A I don't know.
Q In 1964 did -- Strike that. Do you know what position Mr. Kostic took on having a vert stack for that big fan?
A No, I don't.
Q Okay. Then on the same page of the '64 report, No. 1, do you see where it says, "That a careful program of housekeeping be instituted : that (the) dust collected on rafters does not rea the subsidence point"? Do you see that?
A Yes, sir.
MR. GRAHAM: Let me do one thing, a then maybe it will keep me from interrupting. objecting to your form of examination by read question and then just saying, "See that?" and l virtue of doing that, you're getting in hearsay testimony before the jury. That's what I'm objecting to, and the question I have is, Can I l a continuing objection to that particular object to the form of the question so that I won't be interrupting you on that issue any longer?
MR. HEBERLING: Yes, you may, and I understand the objection.
MR. GRAHAM: Okay. We disagree on

Libby

it.

MR. HEBERLING: This exhibit will be in evidence.

MR. GRAHAM: I understand.

BY MR. HEBERLING:

Q Okay. I was going to ask you, what does "The subsidence point" mean with regard to the dust on the rafters?

A Where does it say that?

Q Item 1.

MR. MURPHY: Under "Conclusions".

BY MR. HEBERLING:

Q Under "Conclusions and Recommendations".

A I don't know.

Q Okay. Then it says, "Careful cleaning of the floors should be done on a sufficiently frequent and routine basis as to prevent dust from falling off the rafters or from collecting on the floor to such a degree that this dust is a contributor to the overall load generated by the machines." Do you see that?

A Yes.

Q And in the dry mill, if the floors were not to contribute to the overall load, that would require frequent cleaning, wouldn't it?

Libby

A Yes.

Q And at this point, in 1964, had a vacuum been purchased as yet?

A I don't recall.

Q Then No. 2 talks about putting in this additional fan by the first of September, '64?

A Yes.

Q Okay. And then at the cover page for the report, I don't see a "Confidential" sticker or stamp. Was this report also kept confidential by management?

A I don't believe there's a cover page here, but I would say, yes, that it was kept confidential.

Q And up to this point, had there been any notice to the employees regarding the dangers of inhaling asbestos?

A No. Not specifically I don't believe, no, sir.

Q Then please refer to Exhibit 54, and does this appear to be a "Report of Spirometry Tests, Libby Zonolite Employees" by Dr. Nelson?

A Yes, sir.

Q And did you receive this in Libby in 1964?

A This -- I don't see Dr. Nelson's name on here anywhere.

Libby

Q Okay. We'll connect that up. There's a letter later where he refers to it.

A Okay.

Q I guess the current question is whether you received this report in 1964 at Zonolite.

A Yes.

Q And there's mention of pulmonary function tests here. What's your understanding as to what those are?

A Well, they're pulmonary function tests of individual employees which were conducted by Dr. Nelson and his staff by spirometer readings.

Q Okay. And that involved blowing into balloons and that sort of thing?

A Blowing into a tube, not a balloon.

Q Okay. Was Dr. Nelson hired by Grace to do this?

A No, sir. He did this on his own.

Q Was he paid for it?

A No, sir. He never was paid.

Q Now, on page two there's reference to x-rays on 140 employees. Was that the 1964 regular examination of employees, or did Dr. Nelson do a separate one?

A It would have been from our program, and I

Libby

don't know whether this would have been the 1964 program or not, but on the heading of the paper, it says, "In May and June of 1964, spirometry measurements ... were carried out on 140 men employed at Zonolite in Libby." So there's every indication that that would have based on the 1964 x-rays.

Q Then at page two, under Item 2, do you see where it says, "30 employees of the 140 had definite pneumoconiotic changes on x-ray"?

A Yes, sir.

Q And is that, basically, the same as abnormal?

MR. MURPHY: Objection. Lack of foundation. He's not a doctor.

THE WITNESS: I don't know what "Abnormal" means.

BY MR. HEBERLING:

Q And then would such changes in your understanding include fibrosis?

MR. MURPHY: Objection. Lack of foundation.

THE WITNESS: Yes, it would include fibrosis, I would say.

/////

Libby

BY MR. HEBERLING:
Q And then of the 30 abnormals or the 30 with definite changes on x-ray, do you see where Dr. Nelson says, "Only four of the 30 men in the pneumoconiotic group had forced vital capacity of above 90 percent," meaning -- and is it your understanding that that's -- above 90 percent would be normal?
A I don't see that.
Q Let's go back to the first page, then. Four lines up from the bottom, do you see where it says, "FVC percentage and FEV1 percentage of less than 90 percent was considered probably abnormal"?
A Yes, I see that.
Q Okay. So we have a group of 30 men with definite changes, and out of that 30 only four had normal pulmonary function tests? Do you see that?
A Yes, sir.
MR. MURPHY: Well, I object. You made the statement and asked him, Did you see that? and the statement that you made doesn't appear anywhere in this document.
MR. HEBERLING: Okay. I'll rephrase the question.
/////

Libby

BY MR. HEBERLING:
Q Did you understand that as what the doctor is saying here?
MR. GRAHAM: I'll still object on the basis that "Probably abnormal" doesn't mean abnormal, and there might be normal -- Anyway, the language is vague and ambiguous and undefined.
Go ahead and answer it if you can, Earl.
MR. MURPHY: Frankly, I'm lost, so I don't know where the witness might be. Could we hear the question he's supposed to answer now, please?
MR. HEBERLING: May I have a continuing objection to having two attorneys object at a deposition?
MR. GRAHAM: We're representing different people.
MR. MURPHY: Of course you can, but it's not unusual, and it's been my experience, when you are suing a corporation and you have a witness, that the corporation be represented and the witness be represented by different people. It's not an uncommon event, but, anyway, you made your objection.
MR. HEBERLING: The point is that the

Libby

corporation is paying for both lawyers.
MR. MURPHY: That doesn't have anything to do with it, but rather than waste more time debating among ourselves, my point simply w Could I hear the question?
THE REPORTER: I can go back and look.
MR. HEBERLING: I'll restate it, if that's easier.
THE REPORTER: It went up off my screen.
BY MR. HEBERLING:
Q We went through the percentages, and was it -- And then I asked, Did you see that? There wa an objection, and then I followed by saying, Was that your understanding? meaning that there were only four of the 30 men in the pneumoconiotic gro which had normal pulmonary function tests.
MR. GRAHAM: I still have the same objection as I made to the earlier question.
THE WITNESS: Well, four of the men in that group had above 90 percent of standard, bu those 30 were also included in the 140 people, so you could say that only four of the 140 people involved had -- 26 of the 140 had less than

Libby

standard, 90 percent.
BY MR. HEBERLING:
Q Okay. And that's your understanding?
A Yes.
Q Now let's read the next sentence. "Only three of" -- Let's see. I guess we aren't told for the other group, the 110, how many had abnormal pulmonary function tests. Do you see any indicat of how many from that group are abnormals?
A I read this as -- on the non-pneumoconiotic group, that 90 percent of the 110 employees were standard or above.
Q Well, is it possible that that's an average?
MR. MURPHY: Objection to the form of the question.
BY MR. HEBERLING:
Q I don't think we'll resolve this here. We don't need to --
A I don't think "Average" means anything.
Q Okay. Then at the bottom of page two, do you see where the doctor says, "I would conclude that a serious hazard for pneumoconiosis exists to the employees at Libby"? Do you see that?
A Yes.

Libby

Page 232

Q Did Grace dispute that conclusion?
A Not that I recall, no.
Q And the version of this report that we have as Exhibit 54 is two pages. At past depositions or at any other time, have you seen a longer version of this report, particularly attaching names of workers?
A Not that I recall.
Q And after receiving this report, did Grace do anything to notify the 26 workers who were abnormal on both the x-rays and the pulmonary function test?
A Well, they were notified as to what the results of their tests were.
Q Do you know that? Do you have personal knowledge that each one of the 26 was notified?
A Well, I guess I don't have personal knowledge that every one of them were, but it would be my belief that they were.
Q And is your belief -- Is it your belief based upon the notice by sending the copies to the family doctors?
A Yes, sir.
Q Through that procedure?
A Yes, sir.

Libby

Page 233

Q Okay. Was there any attempt to move these 26 to jobs with less asbestos exposure?
A No, sir.
Q Then let's refer to Exhibit 55. Does this appear to be a letter of Ben Wake to Robert Vinion dated June 30, '64?
A Yes, sir.
Q Did you receive that in Libby in June 19 -- well, in July 1964?
A Yes, sir.
Q Then let's refer to Exhibit 56, and does this appear to be a letter of Dr. Nelson to Joseph Kelley, president of Zonolite, dated August 25, 1964?
A Yes, sir.
Q And did you receive this in Libby in August 1964?
A I don't know.
Q Is it probable?
A I don't know.
Q Have you seen this before?
A Yes, I have, but I don't know when I saw it the first time.
Q Do you recall a follow-up effort by Dr. Nelson to do a further study of the workers at

Libby

Page 234

Libby who had abnormal chest x-rays or pulmonary function tests?
A Well, I recall -- I recall Dr. Nelson proposing that further studies be done on -- I think on all employees in Libby. I don't think it would have been confined to only the people with pulmonary problems or spirometer problems, but I'm not certain of that.
Q Were you consulted by Mr. Kelley or somebody from the Chicago office with regard to Dr. Nelson's efforts to set up a further study?
A I don't recall that I was, no, sir.
Q Do you recall a meeting regarding Dr. Nelson's findings where the consensus of local medical opinion was that an important increased incidence of chronic respiratory diseases existed in Zonolite employees?
A No, I don't recall such a meeting.
Q Is Joseph Kelley still alive?
A No, sir.
Q Do you recall Dr. Nelson suggesting and offering to carry out a further study of lung function on the employees?
A Yes, but -- I do, but I don't recall when I first heard of this. I don't remember if it was

Libby

Page 235

at the time or somewhat later that I heard about it, but I do recall him offering to do this.
Q Were you aware of an offer by Dr. Nelson to do this work in Chicago without pay but with expenses for the work paid by Grace?
A Yes. That's what I recall.
MR. GRAHAM: Including the loss -- income lost for the time involved?
BY MR. HEBERLING:
Q Was Dr. -- Is it your understanding that Dr. Nelson was asking for some compensation for his time?
A Well, when he proposed -- When he proposed following this up, he stated that he would have to go for additional training and he should be compensated for loss of income during the period that he was away from his practice. So I don't know if you define that as compensation or not, but that was what his proposal was.
Q Let's refer to Exhibit 57, and does this appear to be a letter by Dr. Nelson to -- No. A letter from F.W. Rupp, treasurer, to Dr. Nelson?
A Yes, sir.
Q And is it likely that this was dated 1964 based on the content of the letter?

Page 236

A Yes, sir.
Q Who was -- Let's see. I think I asked who Mr. Rupp was. You explained that he was the treasurer of the company?
A Who?
Q Mr. Rupp was the treasurer of the company?
A Yes. Yes. Yes.
Q Did you see this letter at Libby at Zonolite in 1964?
A I don't recall.
Q Now, Maryland Casualty Company is referred to here. Was that Zonolite's insurance company?
A Yes. They handled our industrial accident -- industrialization insurance.
Q And do you recall Dr. Nelson's proposal for further work being referred to the insurance company?
A No, I don't recall.
Q You didn't have anything to do with that part of it?
A No. No.
Q Let's refer to Exhibit 61. Does this appear to be a letter by Dr. Nelson dated November 20, 1964 to Mr. Kelley, Zonolite executive?
A Yes, sir.

Page 237

Q And did you see this letter in Libby in 1964?
A I don't recall. I don't recall whether I did or not.
Q Is it your recollection that you were not copied in on this correspondence with Dr. Nelson?
A Yes. That's a true statement. I don't recall being copied in.
Q And do you recall discussing Dr. Nelson's proposal with him in '64?
A No, I don't recall.
Q Do you recall Dr. Nelson recommending Dr. Thatcher Hubbard of Spokane as being qualified to do the study?
A Yes, sir. I've seen this letter somewhere at some time, and I don't remember what point in time it was. I don't remember whether it was then or whether it would have been in connection with some of these depositions.
Q Then let's refer to Exhibit 62, and does this appear to be a memo from George Blackwood to J.A. Kelley?
A Yes, sir.
Q And who was Mr. Blackwood in 1964?
A He was president of Dewey-Almy Chemical

Page

Division of which our Grace operations were a part of.
Q So was he further up the chain of command than Mr. Kelley?
A Yes, sir.
Q Did you receive this memorandum, a copy of it, in Libby in 1964?
A I doubt it very much.
Q Do you recall inquiries by the Grace executives as to why Dr. Nelson was making these proposals?
A No, sir, I don't.
Q Okay. Let's go back to Exhibit 58. Does this appear to be -- Well, let me ask one further question. Whatever became of Dr. Nelson's propos for a further study of the Libby employees in 1964, '65?
A I don't know whatever happened to it, but it was never done.
Q Do you know why it wasn't ever done?
A No.
Q Does Exhibit 58 appear to be a letter from Ben Wake of the State of Montana Board of Health Mr. Bleich, manager, Zonolite, dated October 2, '64
A Yes, sir.

Pag

Q Did you receive that in Libby in Octobe '64?
A Yes, sir.
Q Okay. Then on page one do you see wh four samples were taken of the air in the dry n
A Yes.
Q And does it appear that two of them wer over the standard?
A Yes, sir.
Q Then on page two, at the bottom, do you see where it says, "It was further noted that th dust discharged at ground level from the main collection fan was continuously contaminatin whole plant work area and needs to be raised substantially so that the dust-laden air dischar substantially above the plant area or that clear be provided"? Do you see that?
A Yes, sir.
Q Now, is this the same problem of groun level discharge that we discussed before?
A Yes, sir.
Q Then on page two is there a list of dust producers with particular machine numbers a forth? Do you see that?
A Yes.

Libby

Q Then let's refer to Exhibit 59. Does that appear to be an excerpt from a newspaper article?
A Yes, sir, it appears to be a copy of a --
Q Was this sent to you in Libby in 1964?
A I believe not. It was sent to -- It was sent to R.A. Bleich, but I don't ever remember seeing it.
Q If it was sent to R.A. Bleich, is it likely that it arrived and was received by him?
A Yes.
MR. MURPHY: Could we take a very short break?
MR. HEBERLING: Sure.
MR. MURPHY: We've been going about an hour and twenty minutes.
THE VIDEOGRAPHER: Going off the record at 4:06.
(Brief recess.)
THE VIDEOGRAPHER: We're back on the record approximately 4:14.
BY MR. HEBERLING:
Q Let's refer to Exhibit 60, and does this appear to be a letter from Mr. Park of the insurance company to W.R. Grace dated November 5, 1964?
A Yes.

Libby

Q And I'll represent to you that it's difficult to read, but it relates to respirators, and it refers to Wilders, Kentucky. Do you see that?
A Yes.
Q Did you receive this or a similar letter relating to Libby --
A No.
Q -- and the use of respirators?
A No. Not that I recall.
Q And let's refer to Exhibit 63, and does this appear to be a letter of Mr. Park of the insurance company, once again, to W.R. Grace, again, relating to Wilders, Kentucky and respirators?
A Yes.
Q Did you receive this or a similar letter relating to use of respirators in Libby in 1964, '65, early '65?
A Not that I recall. I believe not.
Q Do you recall receiving any kind of indication of a respirator program from the insurance company, say, in early '65?
A No, sir.
Q Then let's refer to Exhibit 65. Does this appear to be a memo from Mr. Bleich to Mr. Kelley

Libby

relating to dust control at Libby?
A Yes, sir.
Q Did you see this memo in Libby at or about its date?
A I believe so, yes, sir.
Q Okay. Paragraph one on the first page, there's mention of a Joy Drillmobile. What was that?
A It was a machine that was used in the mine to drill holes for blasting.
Q And how long -- Up until what time was it used?
A I don't recall the --
Q Did this rotary drill replace the Joy Drillmobile?
A Yes.
Q Paragraph two on the first page, there's mention of road dust and mention that the use of -- Was it your understanding that the use of water on the roads at the mine was not a sufficient dust control?
A Well, yes.
Q And then you started oiling the roads?
A Yes, sir.
Q And did that provide better control?

Libby

A Yes, sir.
Q Could you still see dust as the trucks came down the roads, generally, in dry days?
A At times, yes.
The water, of course, evaporated very fast, and the oil was longer lasting. That's why it would make a difference.
Q And were you aware in the '60s that dust on the roads would include some asbestos dust?
A Yes, sir.
Q And would that be from ore falling off the trucks?
A Well, the roads were right over the -- right over the pit itself, right -- the material that was being mined, and so it would -- The asbestos found in the mine would also be where the roads were.
Q And is it likely that there was some asbestos in the dust on the road down to the river as well?
A It's very possible there could have been some asbestos in that dust, yes.
Q Then paragraph three on the first page, it says, "The actual digging and loading is no problem." Did you agree with that statement when it

Libby

was made?
A Yes, sir.
Q So you agreed that there was really no problem as to digging and loading as far as creating dust?
A Yes, sir.
Q Isn't it true that when the ore is loaded into the trucks dust is created?
A Not in the mine, no, sir. Not generally, because it states here that that ore is always slightly damp.
Q And when the trucks were dumped at the transfer point, was there dust then?
A Very little.
Q If there's ore by the transfer point and a worker watching how the truck is dumping at the transfer point -- Can you envision that?
A Uh-huh.
Q Okay. Under those circumstances would the worker be standing in some asbestos dust?
A Very possibly --
MR. MURPHY: Objection. Your question is hypothetical.
THE WITNESS: Very possibly the ground that he was standing on could contain

Libby

asbestos, but as far as standing in asbestos dust, I don't know whether that would be true.
BY MR. HEBERLING:
Q Then still on page one, it says, The Mill. "The dust problem in the mill is entirely concentrated in the dry mill." Did you agree with that statement?
A Yes, sir.
Q And does that mean that there was no dust problem in the wet mill or the mill feed bins?
A Yes, sir.
Q You considered that there was no problem in the wet mill?
A Yes, sir.
Q And there were no dusty areas in the wet mill?
A No, sir.
Q If workers testify -- workers who worked in there in the '60s testified that there were -- there was dust in the wet mill, would you dispute that?
MR. MURPHY: Objection. Hypothetical.
THE WITNESS: I'd have to hear their testimony as to where the dust was supposed to have

Libby

been.
BY MR. HEBERLING:
Q Was there mist in the wet mill?
A Yes, sir.
Q And is it likely that that mist contained asbestos dust or asbestos particles?
MR. MURPHY: Which? Objection. Compound.
THE WITNESS: I don't know.
BY MR. HEBERLING:
Q And as to the mill feed bins, was there some dust created there?
A No. I would say generally not.
Q So based on what you know today, would you -- is it your position that there was really no problem with the mill feed bins or the wet mill?
MR. GRAHAM: Objection. Asked and answered.
THE WITNESS: Yeah. I've stated that. I don't think there was a problem there.
BY MR. HEBERLING:
Q Now, in the last paragraph on page one, Mr. Bleich goes through the number of fans and the exhaust capacity for the dry mill. Do you see that?
A Yes.

Libby

Q There's 8,000, 12,000, 15,000, 40,000, and if we add those up, that would be 75,000 cubic feet per minute total ventilating capacity for the dry mill?
A Yes.
Q To your knowledge was that a correct statement of the ventilating capacity at the time?
A Yes, I believe so.
Q And did this 75,000 ventilating capacity remain the same up until the dry mill closed?
A I believe it would have, basically, remained the same, yes.
Q Then page two, paragraph two, the second sentence, do you see where it says, "However, in no instance" --
A Excuse me. I'm sorry.
MR. MURPHY: I don't have a page two.
THE WITNESS: I don't have a page two.
MR. GRAHAM: I think what happened is that they are not in the right order. If you go back --
MR. HEBERLING: Let's go off the record. We have an exhibit problem.

Libby

Page 248

THE VIDEOGRAPHER: We're going off the record at 4:24.

(Discussion off the record.)

THE VIDEOGRAPHER: Back on the record at 4:26.

BY MR. HEBERLING:

Q Okay. We've fixed the exhibit problem, and at page two of Exhibit 65, do you see where it says in Mr. Bleich's report on dust control, "However, in no instance has there actually been a surplus of fan capacity so that an increase of airflow throughout each individual system as a whole could be made"? Do you see that?

A Yes.

Q So was it your understanding that there was no excess fan capacity in the ventilating system in the dry mill?

A Yes, sir. That's what this indicates.

Q So if that is so, why wasn't more fan capacity added? Was that ever considered?

Excuse me. That's two questions. Answer the first one.

A I don't know.

Q Do you remember discussions through the '60s and up until the time of the closing of the

Libby

Page 249

dry mill of possibly adding more fans or larger fans?

A No, sir. I don't remember any such discussions.

Q From '68 to '71, when you were general manager, you would likely have been in on any such discussion; correct?

A Probably.

Q And if money was going to be spent on a large fan in any other year, you would have been involved in a decision to spend that money; correct?

A Yes, sir.

MR. GRAHAM: Objection. Vague and ambiguous as to time and date.

THE WITNESS: Yes, sir.

BY MR. HEBERLING:

Q And in the question I was referring to in any other year from 1964 to '74, when the dry mill was closed.

A Yes.

Q Did you understand that?

A Yes.

Q Okay. Then in the same paragraph two, it says, "Another factor contributing to the inefficiency of the system has been the loss of air

Libby

Page 250

effectiveness by leaks in flexible connections, holes in elevator casings, open hand holes and chutes, et cetera." Do you see that?

A Yes.

Q Were some of those holes cut to free rocks that got stuck in the system?

A Not to my knowledge, no, sir.

Q What was an open hand hole?

A I don't know.

Q What was Mr. Bleich's background?

A He was an engineer.

Q Do you know what kind?

A Mechanical, I believe.

Q Was this problem of leaks and holes in the areas referenced in the sentence I just read -- Was that a continuing problem at the dry mill?

A Yes.

Q Was if ever completely solved?

A No. It would be solved only by continuing maintenance of the equipment, which is what was done.

Q I'm wondering why each of these reports seems to find leaks and holes.

A I don't know.

Q Okay. Then Item 1 on page two talks about

Libby

Page 251

the ground level discharge, and it says, "An excessive amount of dust and larger particles are being discharged from the fan outlet which adds to the air pollution within the general shop and service area." Do you see that?

A Yes, sir.

Q And this is that ground level discharge from the big 600 fan?

A Yes.

Q Do you recall any discussion with Grace executives over fixing this problem at this point when this memo was done?

A No, sir.

Q And on page three of the memo, Item 4, do you see a discussion of the buildup of dust on rafters and so forth?

A Yes, sir.

Q And then at the end it says, "A monthly 'Sweepdown' interval is now effect." Do you see that?

A Yes, sir.

Q Do you know when that went into effect?

A Well, it would have been prior to the writing of this letter, but I don't know exactly when it would have been.

Q The same year, in '64?
A Probably, yes.
Q What was the sweepdown interval before that?
A Well, they didn't -- When this was put into effect, it was on a regular basis, and they didn't have one on a regular basis prior to that.
Q Okay. And what is a sweepdown? Would you describe what happened during a sweepdown?
A They would sweep the dust off of the top of the rafters where it had settled.
Q And was there a sweep of the floors at the same time?
A Yes, sir. The dust that was swept off of the rafters would have to be cleaned up.
Q And was this done at a time when the mill was closed?
A No. It would have been ongoing.
Q So it might be done while the mill was running?
A That's possible, yes.
Q Was it sometimes done on a Sunday --
A Yes.
Q -- when the mill was not open?
A Yes. It could have been done on a

Saturday or Sunday, when the mill was not running.
Q And you recall it happening on weekends at times?
A Well, I don't recall, but we always had maintenance crews on duty during periods when the mill was not running, so it's a strong likelihood that it would have been done then.
Q How long did this monthly sweepdown interval continue after '64?
A I think forever probably.
Q Was it ever more frequent than that?
A I don't know. I don't recall.
Q Was there any reason why the sweepdown couldn't have been done every Sunday when the mill was closed?
A No.
Q Item 5 on page three talks about, "A dust count apparatus identical (to) that used by the State Board of Health is on hand." As of the end of '64, had the company begun its own dust counts?
A Yes, sir.
Q Okay. I think you reported in a later summary that the dust counts began in 1965. Is that correct?
A I don't know. I don't recall.

Q I'm now showing you Exhibit 192, which we looked at before. Does that appear to be a memo from you to Mr. Eschenbach dated November 18, 1980?
A Yes.
Q And were you the author of that memo?
A Yes.
Q Then do you see where it states, "We started sampling with the impinger method in about 1965"?
A Yes.
Q Did you sample by any other method before 1965, or was that the first sampling that was done?
MR. GRAHAM: I'd object to the form of the question in that the question -- the predicate to the question is the statement you just read, and it said "About 1965".
Go ahead and answer the question if you can.
THE WITNESS: No. The impinger method was the first method that we used, and if I said that we started in 1965, that must have been an error, because this letter, which is dated December 30th, 1964, it said that that testing program was in effect at that time.
/////

BY MR. HEBERLING:
Q So you could have started a few months before the beginning of '65?
A Yes, sir.
Q And on page four, paragraph one, under "Hauling" -- No. Under -- Right at the top it says, "The skipping operation is not a dust-free operation, but (it) is not a hazardous operation." Do you see that?
A Yes.
Q Is it fair to say if there was dust present then there was asbestos in the dust?
A Yes.
Q As we sit here now, do you see any problem with Mr. Bleich's statement in 1964 that the skip operation was not a hazardous operation?
A No, I don't see any problem.
Q Now, under "Hauling" -- let's see -- it says, "The dumping the skip cars into the lower ore bins creates dust, as does any handling of vermiculite concentrates." Do you see that?
A Yes, sir.
Q Did you agree with that in 1964?
A Yes, sir.
Q Do you agree with that now?

Libby

Page 256

16:38:10 A Yes, sir.
16:38:22 Q So can we infer from that that any handling of vermiculite concentrates will create dust, any movement of them?
16:38:28 MR. MURPHY: Objection to the form of the question.
16:38:32 THE WITNESS: It would be correct to say it could create dust.
16:38:34 BY MR. HEBERLING:
16:38:36 Q All right. It's also possible that it would be a rainy day and it could be raining so much there wouldn't be any dust; right?
16:38:44 MR. MURPHY: Objection. Argumentative.
16:38:46 THE WITNESS: In the operation I don't know how that could happen. The concentrates wouldn't be that wet, I don't think, but there could be conditions where, if they were wet from rain or whatever, then there would be no free dust in the vicinity.
16:39:06 BY MR. HEBERLING:
16:39:18 Q Okay. And vermiculite concentrates are what is -- what emerge from the dry mill; correct?
16:39:20 A Yes, sir.
16:39:20 Q And then it's handled, goes down the

Libby

Page 257

16:39:20 mountain on the skip; correct?
16:39:20 A Yes.
16:39:22 Q And then trucked to the river storage; correct?
16:39:22 A Yes.
16:39:26 Q And then goes on the conveyors across the river; correct?
16:39:28 A Yes.
16:39:30 Q So every time it was moved is it fair to say that dust would be created in most instances?
16:39:34 A Yes, sir.
16:39:46 Q Okay. But as I understand your position, you're saying the raw ore when moved or dumped from a truck at the transfer point would be -- in most cases would not create dust; is that correct?
16:40:00 A That's correct, yes, sir.
16:40:14 Q Then paragraph two, there's talk of, "Loading of the Kenworth truck beneath the lower ore bins is a dusty operation in a somewhat confined space." Do you see that?
16:40:24 A Yes.
16:40:26 Q And is it likely that there would be asbestos in this dust?
16:40:28 A Yes.
16:40:32 Q And is it likely, then, that anyone who

Libby

Page 258

16:40:34 enters that space for repairs or whatever reason would be standing in asbestos dust?
16:40:40 MR. MURPHY: Objection. Lack of foundation. Hypothetical.
16:40:46 THE WITNESS: I don't know what that question means. I don't know what you mean. When that truck is being loaded, there is dust created, but that's only for a very short period of time, and there's no person there that's exposed to that dust at that time. He opens the gates, and he gets out of the way.
16:41:02 BY MR. HEBERLING:
16:41:04 Q Then, as a matter of common sense, does the dust settle on the ground?
16:41:08 A I suppose it would, yes.
16:41:12 Q And would any worker who later came to the area and stood at that same spot be standing in asbestos dust?
16:41:20 MR. MURPHY: Objection to the form of the question.
16:41:20 BY MR. HEBERLING:
16:41:20 Q Is that likely?
16:41:22 A That's possible, yes.
16:41:32 Q Okay. Then in the second paragraph, still talking about the loading of the Kenworth truck, it

Libby

Page 259

16:41:42 says, "The ventilation problem is immense." Would you agree with that?
16:41:44 A Yes.
16:41:52 Q Was the problem of dust at the lower ore bins ever solved? The ventilation -- Was the ventilation problem at the lower ore bins ever solved?
16:42:06 A No.
16:42:14 Q Paragraph four, still under "Hauling," do you see where it says, "The dumping of the Kenworth truck into either the river loading hoppers or the horizontal storage creates dust in considerable quantities"? Do you see that?
16:42:26 A Yes, sir.
16:42:30 Q Now, the horizontal storage, is that a building that's closed on three sides, more or less?
16:42:34 A More or less, yes.
16:42:36 Q And is that where a nursery is currently in operation?
16:42:38 A Yes, sir.
16:42:42 Q And the storage building that is there, does that currently contain boats?
16:42:48 A I don't know what it contains.
16:42:50 Q At any rate, is it your understanding that the building is still there?

Page 260

Libby

A Yes, sir. I know it's still there.

Q And when the operation -- When the mine and mill were still operating, would anyone who would be standing in the area, say within 30 feet of that building, be standing -- Is it likely that they would be standing in asbestos dust?

MR. MURPHY: Objection to the form of the question, the reference to "Asbestos dust," which was the basis of my objection the last time.

THE WITNESS: It's possible they could be standing in dirt or in dust with asbestos in it, but there would not be piles of dust laying around in these areas.

BY MR. HEBERLING:

Q Is that because the dust would be cleaned up, or why would that be?

A No. There would not be that much dust generated and settled.

Q And at the horizontal storage, how -- Okay. A truck dumped the ore -- let's say the vermiculite concentrate --

A Yes.

Q -- at the horizontal storage?

A Yes.

Q And then how did the concentrate get into

Page 261

Libby

the conveyors?

A The conveyors were on the floor underneath this concentrate, and there were gates on these conveyors that would be opened, and they were opened from a remote location so the ore would fall down through them onto a conveyor belt.

Q And the place where the conveyors were, was that called the tunnels?

A Yes, sir.

Q And at times did a dozer operator push the concentrate into the area of the tunnels?

A Yes, sir.

Q And at times did workers shovel concentrate which fell off the conveyor back onto the conveyor?

A Yes, sir.

Q And what kind of ventilation did the tunnels have in the '60s, just natural?

A No. They had -- They had fans that sucked air out of the tunnels and exhausted it.

Q Do you know how big the fan or fans were?

A No, sir.

Q And, then, later, in the '70s, was a different ventilation system applied there?

A Well, the ventilation system always --

Page 262

Libby

Basically, the same system would have applied, but there was an improvement made, and I don't -- improvements made, and I don't know when it would have been. Probably in the '60s the bag houses were installed so that when the dust was picked up it would be collected in these bag houses.

Q Okay. So how did the fan pick up the dust, or how was the dust picked up? Let me ask it that way.

A Well, there would be ducts under there that the air would flow into these ducts and carry the dust with it.

Q And what's your understanding of when the bag house was applied there?

A In the '60s.

Q And was there ever something called a super sucker built for the tunnels?

A I don't know. I don't know.

Q Butch Hurlbert, who worked there and worked on installing it, called it a super sucker, which was some kind of ventilation system for the area of the conveyor in the tunnels. You don't know it by that name?

A No, sir.

Q Do you know of any kind of major

Page 263

Libby

improvement of the ventilation system in the tunnels in 1975 or 1976?

A No. I know that it was improved. I don't know what -- I don't know when in time it would have been done.

Q Okay. Back to the December 30, 1964 memo, and under "Storage," it says, "The unloading of the horizontal storage bins requires the use of the Cat 955 loader-dozer. This is a dusty operation." Is this what you described before?

A Yes, sir.

Q Where the dozer pushes the concentrate onto the conveyor belts?

A Yes.

Q And what are the load-out gates?

A Well, they are the gates that are in the tunnels that the concentrate falls through when it falls onto the conveyor belt.

Q Okay. So that would be a gate in the ceiling of the tunnels which would be opened to allow the concentrate to fall in?

A Yes, sir.

Q Then in the last paragraph of page four, there's mention of silo-type storage bins built during the period of March '59 to December '61.

Libby

Page 264

What were those?
A A silo-type bin.
Q How did the ore get up into the silos?
A By an elevator and a conveyor belt across the top of the silos.
Q How did the operators select which ore to put into the horizontal storage and which ore to put into the silos?
A The fine ore, No. 4, was put into the silos, and two, three and four were put into the horizontal storage.
Q Okay. Then at the top of page five, still on the silos, it says, "Although there is no ventilation system on the screw and belt conveyor galleys across the top of the bins, there is no personnel exposure because bin changes ... are made during down time." As we sit here today, do you agree with that statement?
A Yes, sir.
Q If any personnel were in there repairing, performing repairs or making this bin change, wouldn't they be standing in asbestos -- asbestos dust as they worked?
MR. MURPHY: Objection to the form of the question.

Libby

Page 265

THE WITNESS: I don't know. Possibly.
BY MR. HEBERLING:
Q Okay. Then under "Loading," it's mentioned at the end, the last little paragraph, "The downtown storage and loading facilities are comparable to the river storage and loading. All truck dumping is into open hoppers which reduces the hazard. Except for truck loading, all loading is bagged. The bagging equipment is ventilated." Do you see that?
A Yes, sir.
Q And so here the workers would be moving the concentrate, and there would be some dust involved, wouldn't there?
A Yes, sir.
Q And that would mean some asbestos exposure, would it not?
A Yes, sir.
Q Now, there are no controls suggested for these facilities by the railroad tracks by the edge of town, at least by Mr. Bleich; is that correct?
A Yes.
MR. GRAHAM: I'd object to the form of the question on the basis of the description of

Libby

Page 266

the location, but it's already been answered.
BY MR. HEBERLING:
Q How was the bagging equipment ventilated in 1964?
A There was a ventilating fan at the bagging facility, and it discharged -- went into a bag house.
Q And then under "Expanding Plant," it says, "The expanding plant, including the special verxite equipment". What is verxite equipment?
A It's a form of highly concentrated expanded material that they made.
Q So would that be a very fine dust?
A No, it's not a dust at all. It was a -- It was a product that was made from, basically, No. 4 ore, which was highly concentrated and treated.
Q Okay. So it goes on, "The expanding plant ... is no better or no worse than any normal commercial plant. Complete dust control will be designed into any new installation." Do you see that?
A Yes, sir.
Q Was there ever a new installation?
A Not at Libby, no, sir.

Libby

Page 267

Q And the expanding plant continued to operate until what year?
A About 1969, but the operation of that should be defined. It operated very little. The primary purpose of that expanding plant was for research into more efficient means of expanding the ore, exfoliating the ore. It was not operated as a commercial plant.
Q Then under "Laboratory," it says, "The regular mill testers do not wear respirators in the laboratory." Do you see that?
A Yes, sir.
Q And the laboratory was not in the dry mill; right?
A No.
Q It was a separate building?
A Yes, sir.
Q Okay. Is it fair to say that most people in the 1960s who worked outside the dry mill did not wear respirators?
A Yes, sir.
Q Was that true in the '70s as well?
A Yes, sir.
Q Was this extensive review by Mr. Bleich dated December 30, 1964 -- Is this the most detailed

Libby

16:54:34 evaluation of dust control at the Grace mine and mill that you saw while working there?
MR. GRAHAM: Object to the form of the question.
Go ahead.
THE WITNESS: I believe so, yes.
BY MR. HEBERLING:
Q Did you ever see a similar step-by-step review done by Mr. Kostic or anyone else?
A I don't recall, no, sir.
Q Beyond the use of respirators and repairs in the dry mill, was anything done in 1965 as a result of this report?
A I don't recall.
Q Let's refer to Exhibit 66. Does this appear to be --
MR. MURPHY: Could I just, before you go to the next exhibit, inquire of the witness?
Are you okay? You look like you're getting a little tired, and it's five o'clock, and we'll go to five-thirty if you're up to it as agreed, or if you're tired, we'll certainly break. You strike me as you're winding down a little bit, but you tell me. I just wanted to give you the opportunity to say -- How are you doing?

Libby

THE VIDEOGRAPHER: This may be a good time to go off the record. We're about out of tape.
MR. MURPHY: If I knew that, I would have waited.
THE VIDEOGRAPHER: We're going off the record at 4:55.
(Brief recess.)
THE VIDEOGRAPHER: We're back on the record. It's approximately 4:57.
BY MR. HEBERLING:
Q Let's refer to Exhibit 66. Does this appear to be a memo from Mr. Bleich to Mr. Kelley dated January 2, 1965?
A Yes, sir.
Q And was this a memo generated by Zonolite in Libby at or about this date?
A It was apparently generated by Mr. Bleich, yes, sir.
Q Then it starts off, "Earl has sent two copies of all reports we have from Montana State Board of Health on the dust problem." Do you see that?
A Yes, sir.
Q And you are Earl; is that right?

Libby

A That's right.
Q Then the second paragraph, "In going over these reports, I can only say that it presents a very sorry record." There is still some improvement -- Excuse me. "There is some improvement indicated during 1964, but still totally inadequate." Do you see that?
A Yes, sir.
Q Did you agree with that statement when it was made?
A Well, I don't recall. This was Mr. Bleich's statement. I don't have any comment on it.
Q Do you agree with it now?
A Well, I don't know that I do, no. I think that we did the best that we could.
Q Let's refer to Exhibit 67, and does that appear to be a memo from you to Mr. Kelley dated January 2, 1965?
A Yes, sir.
Q Are you the author of this memo?
A Yes, sir.
Q And was this memo written pursuant to a direction from Mr. Blackwood, who's high up in Grace, to present an evaluation of dust control and

Libby

the history of it?
A Yes, sir.
Q Then page two, in the middle of the first paragraph, it says, "In order to protect ourselves and place ourselves on record as ... the condition of our employees, as of the effective date of the law," referring to the occupational disease law, "we instituted a program whereby all of our employees would have x-rays at the local hospital." Do you see that?
A Yes.
Q Is that a correct statement of what happened?
A Yes, sir.
Q Then on page three at the bottom, it says, "Upon completion of the x-rays and interpretations by Dr. Little, the reports were again turned over to the employees' personal doctors for notification of results as before. In this survey there were 143 x-rays taken, which included 21 salaried supervisory people. Of the 143, 92 have had more than five years' employment with us. Of these, 30 show some emphysema or fibrotic respiratory condition." Do you see that?
A Yes, sir.

Libby

Q Who did this analysis of all the x-rays?
A Dr. William Little.
Q And did he --
A I should qualify that. In 1965 I believe he did them all. He later on took over one or two associates that may have interpreted them, but they were in Dr. Little's office.
Q What I'm wondering is, who did the statistical review? Was this done by you or somebody at Zonolite, based on the reports, or did Dr. Little do the statistical work?
A Now, what statistical work?
Q Well, for example, saying, for the 92 employees with more than five years' employment, "Of these, 30 show some emphysema or fibrotic respiratory condition."
A I probably did that, based on Dr. Little's interpretations.
Q So you had all the reports?
A Yes, sir.
Q And you just used the conclusions in the reports?
A Yes, sir.
Q Okay. Then further down it says, "39 have over ten years' employment with us. Of this 39, the

Libby

radiologist interprets 21 of them to have normal chests and 18 to have abnormal chests." Do you see that?
A Yes, sir.
Q And, again, you did this statistical review?
A Yes, sir.
Q Then the next page do you see a listing of normal chests and abnormal chests?
A Yes, sir.
Q Of the abnormal chests, do you see Allen Boothman?
A Yes.
Q Did he die of lung disease?
A I don't recall what he died from. He died. I know that, but I don't recall what his cause of death was.
Q The next one, Robert Cohenour, did he die of lung disease?
A Yes, sir.
Q Floyd Cole, did he die of lung disease?
A I believe not, but I'm not really -- I don't really know what he died from. It was after I left the employ of the company.
Q Did you testify in a deposition in his

Libby

case against Grace?
A I don't know.
Q Okay. We've referred to a deposition -- I'm not going to dig that out right now.
Jack Garrison, did he die of lung disease?
A Yes, sir.
Q Ernie Hamilton, did he die of lung disease?
A Yes, sir. I believe so.
Q Louis Hoppe, did he die of lung disease?
A No. He drowned.
Q And Michael McNair, did he die of mesothelioma?
A Yes, sir.
Q Which is a lung disease?
A Yes, sir.
MR. MURPHY: Objection to the form of the last question.
BY MR. HEBERLING:
Q Lloyd Miller, did he die of lung disease?
A Yes, sir.
Q Richard Rayome, did he die of lung disease?
A Yes, sir.
Q Stuart Risley, did he die of lung disease?

Libby

A I don't know.
Q Harold Shrewsberry, did he die of lung disease?
A I don't know.
Q And L.D. Welch -- that would be Lylus Welch -- did he die of lung disease?
A Well, certainly a contributing factor.
Q And then of the normal chests, W.D. Fields, did he die of lung disease?
A I don't know.
Q Do you know his widow, Lila Fields?
A Yes, I do.
Q But you don't know the circumstances of Mr. Fields's death?
A No, sir, I don't.
Q James Gidley, did he die of lung disease?
A Yes, sir.
Q And Donald Johnson, has he had asbestosis for some time?
A He has a lung disease. I don't know what it is.
Q And Harvey Noble, did he die of lung disease?
A Yes, sir.
Q Derward Preston, did he die of lung

Libby

disease?
A I don't know.
Q Arnold Smith, did he die of lung disease?
A I can't say.
Q James Smith, did he die of lung disease?
A No, sir.
Q And Edward Wittlake, did he die of lung disease?
A I don't know. On all of these cases where I said, "I don't know. I don't recall," I probably knew at one time.
Q And were all these employees whose names I just read exposed to asbestos dust?
A Yes, sir, they would have been.
Q And at any point -- No. At this point, in 1965, was any information given to these employees that inhaling asbestos dust could be dangerous and hazardous to their health?
A Well, you have asked this question before today, and, specifically, I don't know that we gave any specific information on the hazards of asbestos or whatever, but there's every reason to think that these employees were aware of it. Among other things, the union, which they all belonged to, had information on the hazards of asbestos to their

Libby

welfare, and --
Q Do you have any personal knowledge of any discussion at a union meeting --
MR. MURPHY: Excuse me, Mr. Heberling. I don't think the witness had finished his answer. I believe you interrupted him. If he's finished, fine, but I don't believe he was finished.
BY MR. HEBERLING:
Q If you have more, please go ahead.
A No. I'll stop there.
Q Okay. Do you have any personal knowledge of a union meeting where asbestos hazards were discussed as of the 1960s?
A Well, I certainly was never in any attendance at any union meetings except --
Q Except by -- Excuse me.
A -- one that I presented some information. It had nothing to do with this, but I have seen copies of union meeting minutes where the asbestos problem was discussed in the union meetings.
Q Do you know the dates of those minutes?
A No, sir.
Q And do you know if those minutes refer to the dust problem or exactly what the reference is

Libby

to?
A Well, some of the references are to inspections by the State Board of Health, which addressed the dust problems, but other than that, I can't say specifically what it would be.
Q Okay. As of 1965, did W.R. Grace have a policy of keeping asbestos dust away from its employees?
MR. MURPHY: Objection to the form of the question.
THE WITNESS: Well, it's not possible to have a policy to do that. We did everything we could to keep the dust exposure to all of the employees that we had at the minimal that we could.
BY MR. HEBERLING:
Q Okay. And then at page six do you see a list of enclosures?
A Yes, sir.
Q And No. 1, do you see "Dr. Woodrow Nelson - Report of Spirometry Tests, 1964"?
A Yes, sir.
Q Go back to Exhibit 54. Is this Exhibit 54 titled "Report of Spirometry Tests"?
A Yes, sir. I'd have every reason to believe that the enclosure of Dr. Nelson's listed

Libby

here is this report.
Q "This report," and you're pointing at Exhibit 54?
A Yes, sir.
Q Okay. Then let's refer to Exhibit 68. Does this appear to be a letter of Mr. Rupp, treasurer, to the insurance company, Maryland Casualty, dated January 6, '65?
A Yes, sir.
Q And down under "bc," for blind copy, do you see "E.D. Lovick"?
A Yes, sir.
Q Did you receive a copy of this Exhibit 68 in 1965, January?
A Yes, sir.
Q Now we're back to talking about Dr. Nelson's proposal for further study, and do you understand from this letter that there was the reference to the insurance company to undertake the study?
A Yes, sir.
Q And the last sentences of the letter appear to read, "Mr. Kelley then met with Dr. Woodrow (Wilson) in Libby." Do you recall meeting with Mr. Kelley and Mr. Wilson in Libby?

Libby

Page 280

MR. GRAHAM: I probably should correct that. "Woodrow Wilson" is a Freudian slip. It probably should be Woodrow Nelson.

MR. HEBERLING: I don't know where I've heard that name.

MR. MURPHY: Maybe I should have asked Mr. Heberling if we should have quit at five o'clock instead of Mr. Lovick.

BY MR. HEBERLING:

Q Okay. It says, "Mr. Kelley then met with Mr. Woodrow Nelson in Libby." Do you recall a meeting between you and Mr. Kelley and Mr. Nelson?

A No, sir, I don't.

Q "And arranged for the forwarding of the desired records. Mr. E. Lovick, assistant manager of the Libby operation, today was handling the (packaging) and shipping of the records." Did you do that?

A Yes, sir.

Q And in doing so did you ship off the results of Dr. Nelson's spirometry tests to the Maryland Casualty Company?

A I'm not sure about this particular time what they wanted, but because the spirometry thing was referred to here --

Libby

Page 281

Q I think we can answer this with the next letter.

A Okay.

MR. MURPHY: I think you could go back to --

BY MR. HEBERLING:

Q Exhibit 69 --

A Yes.

Q -- does this appear to be a letter from you to the insurance company dated January 6, '65?

A Yes.

Q And are you the author of this letter?

A Yes, I am.

Q And do you list what you sent off to the insurance company?

A Yes, sir.

Q And was that a fairly complete set of what Dr. Nelson had?

A That was everything that -- everything that he had, I'm sure.

Q Then let's refer to Exhibit 70, and does that appear to be a letter or a memo from Mr. Kelley to Bleich and Lovick?

A Yes, sir.

Q Did you receive this on or about

Libby

Page 282

January 8, '65?

A Yes, sir.

Q And in the second paragraph, do you see where it says, "I am very disappointed in the slowness to react to the recommendations of the Montana State Department of Health, and you are hereby required and directed to bring the recommendations into effect immediately"? Do you see that?

A Yes, sir, I see that.

Q Did you interpret that as a reprimand from Mr. Kelley?

A Yes, sir.

Q Then I believe -- In fairness, was there any doubt that Mr. Kelley was aware of the problem from 1956 on?

MR. GRAHAM: Object to the form of the question. I don't understand it.

Go ahead and answer it if you can understand it.

THE WITNESS: I don't either. I don't understand it either. You say "That Mr. Kelley was aware of the problem." I don't know which problem you're talking about.

/////

Libby

Page 283

BY MR. HEBERLING:

Q The problem of slowness to react or what was being done in response to the recommendations of the State Health Department.

A Well, this was his feeling that this was a problem. I don't know that I agreed or disagreed at that time, but that was his reaction.

Q And then it says, "Not later than April 15 I expect you to request a resurvey by the Montana State Department of Health"?

A Yes.

Q That's toward the bottom. Do you see that?

A Yes.

Q Was that done?

A I don't recall.

Q Was there an inspection by the Montana State Board of Health in 1965, to your knowledge?

A I don't recall. If there was, there would be a report on it.

Q Now, one of the recommendations had been to have this ground level exhaust from the 600 fan raised up and, instead of having a horizontal stack, have a vertical stack?

A Yes.

Libby

Page 284

Q And since you were to bring the recommendations into effect immediately and that was one of the recommendations, why wasn't that yet done for three more years?
A I don't know.
Q And they had recommended a vacuum system. Do you recall that in the 1956 report?
A Yes.
Q And was that bought at this time, in '65?
A I don't recall.
Q And do you recall a recommendation to clean the floors and rafters so that dust from the floors and rafters was not a factor?
A Yes, sir. I recall that.
Q And yet the monthly sweepdown was continued, was it not?
A Well, that was part of the program.
Q Let's refer to Exhibit 71. Does this appear to be a letter of January 11, '65 by Mr. Park of the insurance company to W.R. Grace?
A Yes.
Q Did you receive a copy of this in Libby in January '65?
A I don't believe so, no, sir. I don't recall.

Libby

Page 285

MR. HEBERLING: Okay. Let's stop right here.
THE VIDEOGRAPHER: We're going off the record at 5:18 on the 19th to recess this deposition until tomorrow morning.
(Whereupon, the deposition of Earl D. Lovick was recessed at 5:18 a.m.)

Libby

Page 286

CORRECTION PAGE

PAGE LINE CORRECTION

I have read the foregoing testimony and believe the same to be true, except for the corrections noted above.

DATED this __ day of ____________, 1997.

Earl D. Lovick

Subscribed and sworn to before me this ____ day of ________, 1997.

Notary Public for the State of Montana.
Residing at ______________

My Commission expires: __________

Libby

Page 287

REPORTER'S CERTIFICATE

I, Jolene Asa, Registered Professional Reporter and Notary Public for the State of Montana, do hereby certify:

THAT I did report the foregoing transcript after having first duly sworn the witness to testify to the truth;

THAT said transcript was taken at the time and place stated on the caption hereto; and

THAT the testimony of the witness was taken in shorthand by me and subsequently reduced to writing under my direction; and

THAT the foregoing is a true and correct description of all the testimony of said witness to the best of my ability.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal of office this 13th day of January, 1997.

JOLENE ASA, RPR, and Notary Public for the State of Montana.
Residing in Flathead County, Montana.
My Commission expires 8/10/96