**Trial Testimony Designations for:**
**EARL D. LOVICK**
**April 29, 1997**

**Deposition Designation Key**

Arrowood = Arrowood Indem. Co.
f/k/a Royal Indem. Co. (Light Green)

BNSF = BNSF Railway Co. (Pink)

Certain Plan Objectors "CPO" = Government Employees Insurance Co.; Republic Insurance Co.
n/k/a Starr Indemnity and Liability Co.; OneBeacon America Insurance Co.; Seaton Insurance
Co.; Fireman's Fund Insurance Co.; Allianz S.p.A. f/k/a Riunione Adriatica Di Sicurta; and Allianz
SE f/k/a Allianz Aktiengesellschaft; Maryland Casualty Co.; Zurich Insurance Co.; and Zurich
International (Bermuda) Ltd.; Continental Casualty Co. and Continental Insurance Co. and
related subsidiaries and affiliates; Federal Insurance Co.; and AXA Belgium as successor to Royal
Belge SA (Orange)

CNA = Continental Cas. Co & Continental Ins. Co. (Red)

FFIC = Fireman Funds Ins. Co. (Green)
FFIC SC = Fireman Funds Ins. Co. "Surety Claims" (Green)

GR = Government Employees Ins. Co.; Republic Ins. Co. n/k/a Starr Indemnity and Liability Co.

Libby = Libby Claimants (Black)

OBS = OneBeacon America Ins. Co. and Seaton Ins. Co. (Brown)

PP = Plan Proponents (Blue)

Montana = State of Montana (Magenta)

Travelers = Travelers Cas. and Surety Cos. (Purple)

UCC & BLG = Unsecured Creditors' Committee & Bank Lenders Group (Lavender)

| | |
|---|---|
| AFNE = Assume Fact Not in Evidence | L = Leading |
| | LA = Legal Argument |
| AO = Attorney Objection | LC = Legal Conclusion |
| BE = Best Evidence | LPK - Lacks Personal Knowledge |
| Cum. = Cumulative | LO = Seeking Legal Opinion |
| Ctr = Counter Designation | NT = Not Testimony |
| Ctr-Ctr = Counter-Counter | Obj: = Objection |
| ET = Expert Testimony | R = Relevance |
| F = Foundation | S = Speculative |
| 408 = Violation of FRE 408 | UP = Unfairly Prejudicial under Rule 403 |
| H = Hearsay | V = Vague |
| IH - Incomplete Hypothetical | |

# COPY

### CONDENSED TRANSCRIPT

---

### DANIEL R. SCHNETTER and DELLA F. SCHNETTER

### VS.

### W.R. GRACE & CO., ET. AL.

### Cause Nos. CDV-94-74

---

### TRANSCRIPT OF PROCEEDINGS

### TESTIMONY

### OF

### EARL LOVICK

### April 29, 1997

Reported by Debra M. Hedman, RPR, RMR
Hedman, Asa & Gilman Reporting
974 South Main
P.O. Box 394
Kalispell, Montana 59901
(406)752-5751

TRANSCRIPT OF PROCEEDINGS   CondenseIt!™   SCHNETTER vs W.R. GRACE

*Libby*

Page 25

1    A An average of about 1,000 tons.
2    Q And that was an approximate average
3 again?
4    A Yes, sir.
5    Q Some days you got 900 tons, some days you
6 got 1,100 tons?
7    A Yes, sir.
8    Q Do you agree that as of 1967, you knew you
9 had a serious asbestos-related disease problem in
10 the mill?
11    A We -- I think we realized we had a problem
12 in the mill because of -- because of the dust.
13    Q Well, do you agree that at least by 1967
14 there was significant evidence that asbestos or
15 asbestos-related disease was a serious health hazard
16 to your employees?
17    A Well, I don't know that we realized what
18 significance -- how serious a significance the
19 asbestos was in the dust.
20    Q I'm going to hand you a trial transcript
21 of your testimony in the case of Mildred Johnson
22 versus W.R. Grace. Direct your attention to page
23 53, line 8. Do you -- Question: Do you agree that
24 at least by 1967 there was significant evidence that
25 asbestosis or asbestos elicited disease was a

*Libby*

Page 26

1 serious health hazard to your employees?
2       Answer: I think it's true that by 1967 we
3 recognized that there was -- that there was a
4 problem with asbestosis with some of our employees,
5 yes. Is that -- Was that your testimony in that
6 trial?
7    A Yes, sir.
8    Q Do you think that you knew about that for
9 many years before 1967?
10    A I don't know. I don't know whether we
11 knew about that for many years or not.
12    Q You don't think you knew about that as
13 early as 1956, as your counsel suggested in his
14 opening statement?
15    A We were told that asbestos was a toxic
16 substance in 1956.
17    Q What do you understand "toxic substance"
18 to mean?
19    A Something that's unhealthy.
20    Q Well, if asbestos was a toxic substance,
21 then by definition, your definition, it would mean
22 that it would be something that was unhealthy,
23 right?
24    A Yes, sir.
25    Q You knew your men were being exposed to

*Libby*

Page 27

1 high levels of asbestos as early as 1956, correct?
2    A We knew that they were being exposed to
3 asbestos, yes, sir.
4    Q And you knew that from 1956 up to 1974,
5 when the old mill closed, that in the old mill, at
6 least, that was a terribly dusty place, correct?
7    A It was a very dusty place, yes, sir.
8    Q You described it as a terribly dusty
9 place, correct?
10    A Okay. Yes.
11    Q And you knew that in that terribly dusty
12 place, there were high amounts of asbestos fibers,
13 correct?
14    A Yes, sir.
15    Q Floating in the air?
16    A Yes.
17    Q Correct? Now, asbestos fibers themselves,
18 are they visible to the naked eye?
19    A No.
20    Q So what the men were really seeing in this
21 dust was what you folks referred to as "nuisance
22 dust," correct? What was visible was nuisance
23 dust?
24    A I don't know that that's a true statement,
25 no, sir. What we knew in there was dust, but I

*Libby*

Page 28

1 don't know that we ever classified it as nuisance
2 dust.
3    Q You never used the term "nuisance dust"?
4    A Oh, yes.
5    Q Did you ever represent to any of the
6 employees, at any time while you were working at
7 W.R. Grace, that all they were dealing with up there
8 was nuisance dust?
9    A No, I never used a term like -- I never
10 made a statement like that.
11    Q Did you ever tell any of the employees
12 that this nuisance dust -- that all this was was
13 nuisance dust and it was harmless to them?
14    A No, sir.
15    Q I ask you, under your oath, did you ever
16 make such statements?
17    A Not to my recollection, no, sir.
18    Q Did you ever participate in safety
19 meetings?
20    A Yes, sir.
21    Q Did you participate in safety meetings
22 throughout your employment at W.R. Grace?
23    A Well, throughout much of it, yes, sir.
24    Q And you participated in safety meetings
25 from 1963 through 1981?

Page 29

1   A   Yes, sir.
2   Q   And by safety meetings, usually safety
3 meetings where both management and some line
4 employees were present, correct?
5   A   Yes, sir.
6   Q   Do you recall in your opening -- in his
7 opening statement, Mr. Graham saying that there was
8 a dust problem at the mill?
9   A   I believe so, yes, sir.
10   Q   But the truth of the matter is, the
11 problem really wasn't a dust problem at all.  It was
12 an asbestos problem, correct?
13   A   We always considered it a dust problem.
14   Q   As opposed to an asbestos problem?
15   A   Yes, sir.
16   Q   Now, one could be a farmer and have a dust
17 problem, correct?
18   A   Yes.
19   Q   One could work in a feed plant and have a
20 dust problem, correct?
21   A   Yes.
22   Q   But that wouldn't necessarily lead to
23 exposure of dangerous levels of asbestos, correct?
24   A   Possibly.  Possibly not.
25   Q   Well, surely not levels of asbestos like

Page 30

1 your men were exposed to up at Vermiculite Mountain?
2   A   I wouldn't expect so, no, sir.
3   Q   You know, as you sit here, the levels of
4 asbestos exposure that were present in the old dry
5 mill are among the highest ever known to man; is
6 that true?
7   A   No, sir.
8   Q   You know, as you sit here, that you folks
9 at W.R. Grace were repeatedly told, from many
10 different authorities, that you had an
11 extraordinarily high amount of asbestos in the air
12 at the old dry mill, correct?
13   A   Yes, sir, we were told that.
14   Q   Over and over you were told that the
15 levels of asbestos in that mill exceeded any
16 acceptable level, correct?
17   A   We were told that, at times, yes, sir.
18   Q   But in the safety meetings, you never even
19 discussed asbestos, did you?
20   A   That's not true, no, sir.
21   Q   Now you -- Sir, I asked you, under your
22 oath, did the subject of the dangers inherent in
23 asbestos come up at any of those safety committee
24 meetings, at any time?
25   A   I don't recall.

Page 31

1   Q   You just said you did recall and they came
2 up.  Now, which is it?
3   A   We certainly discussed -- We certainly
4 discussed the dust problems, and asbestos was one of
5 the components of the dust.
6   Q   There is a big difference between a dust
7 problem and an asbestos problem, correct?  Right?
8   A   Yes.
9   Q   The men could see the dust, right?
10   A   Yes.
11   Q   But they couldn't see the asbestos,
12 right?
13   A   Yes.
14   Q   Okay.  Now sir, just to put it in its
15 proper perspective, could I have Mr. -- Where is
16 the deposition -- I need his deposition -- Do we
17 have his deposition filed?
18      (A discussion was held off the record.)
19 BY MR. LEWIS:
20   Q   But I want to ask you one more question.
21 You really, at these safety meetings, just talked
22 about nuisance dust; is that correct?
23   A   We talked about dust.
24   Q   You didn't ever talk about asbestos dust,
25 did you?

Page 32

1   A   I don't know.  I would assume that we did,
2 yes, sir.  But --
3   Q   That's just an assumption on your part?
4   A   I don't recall specifically, no, sir.
5   Q   Do you remember your deposition now, after
6 reflecting on this?
7   A   No, sir, I don't know what deposition --
8   Q   Do you remember saying in your deposition,
9 I don't recall that the dangers of asbestos would
10 have come up, but I know that the problem of dust
11 exposure came up?
12   A   Isn't this what I just said?
13   Q   But dust exposure is not asbestos
14 exposure, per se, is it?
15   A   No, sir.
16   Q   Okay.  And then you were asked again, You
17 don't recall ever attending a safety meeting where
18 the dangers of asbestos dust were discussed, but
19 there were discussions of nuisance dust that you
20 earlier discussed.  That's what really happened at
21 these safety meetings.  You talked about nuisance
22 dust, right?
23   A   We talked about dust in general, yes, sir.
24   Q   Did you talk about nuisance dust?
25   A   Possibly.  Possibly that word was used

Page 33

1 from time to time, but generally we were concerned
2 about total dust.
3    Q  Total dust?
4    A  Total dust.
5    Q  And you personally never ever brought up
6 the subject of asbestos at a safety meeting; is that
7 true?
8    A  I don't recall, no, sir.
9    Q  You don't recall one way or the other?
10    A  Yes, sir.
11    Q  Well, now, that's inconsistent with what
12 you said a little while ago when you said it was
13 brought up.
14        MR. GRAHAM:  Objection,
15 argumentative, Your Honor.
16        MR. LEWIS:  I'll withdraw the
17 question.
18 BY MR. LEWIS:
19    Q  You were on the safety committee and there
20 were -- you were on that committee for many years,
21 right?
22    A  Various -- It wasn't the same committee
23 the whole time, but yes, I was on the safety
24 committee for many years.
25    Q  But in any event, as you sit here right

Page 34

1 now, knowing how important this asbestos issue was,
2 back in the '50s and '60s, and certainly into the
3 '70s and '80s, you can't recall a single time where
4 you brought up the subject of the dangers of
5 asbestos at a safety meeting; is that true?
6    A  Yes, sir, that's true.
7    Q  Would you agree with me that for every ton
8 of vermiculite concentrate, it took about 22 tons of
9 ore?
10    A  Well, I would have to ask at what -- in
11 what period of time?  At what period of time?
12    Q  Well, I'm just talking about an average.
13 In an average, over the long haul.
14    A  Again, I would have to ask what period of
15 time, because that amount varied from the time --
16 from the old mill until we got -- from what it was
17 in the new mill.
18        MR. LEWIS:  Could I have
19 Exhibit G-42, please.  (Pause.)  Thank you, Your
20 Honor.
21 BY MR. LEWIS:
22    Q  I'm handing you what has been marked as
23 Exhibit G-42.  Have you ever seen that document
24 before?
25    A  Yes, I have.

Page 35

1    Q  And what is it?
2    A  It's a letter to C.M. Graf from R.M.
3 Vining dated July 24, 1969.
4    Q  The first page is a cover letter,
5 correct?
6    A  Yes.
7    Q  And how is that marked in capital bold
8 print at the top?
9    A  Confidential.
10    Q  And who was Mr. R.M. Vining?
11    A  He was president of Construction Products
12 Division, which was responsible for -- of which the
13 Zonolite operation was a part of.
14    Q  A very high company official?
15    A  Yes, sir.
16    Q  And who was C.M. Graf?
17    A  I believe he -- At that time, he was
18 either president or executive vice president of W.R.
19 Grace and Company.
20    Q  Even higher than Mr. Vining?
21    A  Yes, sir.
22    Q  And would Mr. Vining's job encompass what
23 had formerly been Zonolite operations?
24    A  Yes, sir.
25    Q  Okay.  To this cover letter he attached a

Page 36

1 vermiculite ore report called -- or, let me change
2 that.  Actually it's called a Zonolite Vermiculite
3 Ore Review, correct?
4    A  Yes.
5    Q  And that was prepared by Harry A. Brown
6 and O. Floyd Stewart, correct?
7    A  Yes, sir.
8    Q  July 24, 1969?
9    A  Yes.
10    Q  Who is Harry A. Brown?
11    A  He was executive vice president of
12 Construction Products Division.
13    Q  And all of these gentlemen were back
14 east?
15    A  Yes, sir.
16    Q  At Boston?
17    A  Mr. Brown was in Boston, Mr. Stewart was
18 in South Carolina.
19    Q  What was Mr. Stewart's position?
20    A  Well, I believe at that time he had the
21 title of Manager of Mines and he was in -- had
22 jurisdiction over the Libby operation.
23    Q  I would like you to turn to page IV-1.
24 Roman numeral IV-1.  Down on the bottom there is
25 some paragraphs there -- paragraph 3, do you see

TRANSCRIPT OF PROCEEDINGS    CondenseIt!™    SCHNETTER vs W.R. GRACE

Page 37

1 that?
2    A  Yes.
3    Q  Read that to the jury, please.
4        MR. LEWIS: Let me offer this exhibit
5 into evidence. Plaintiffs' Exhibit 42 is offered.
6        THE COURT: Do you have any
7 objection, Counsel?
8        MR. GRAHAM: No, Your Honor.
9        THE COURT: Plaintiffs' Exhibit 42
10 will be admitted without objection.
11 BY MR. LEWIS:
12    Q  Mr. Lovick, what does number 3 --
13 subparagraph 3 near the bottom of the page say?
14    A  It says, "A higher mine waste to ore ratio
15 exists at Libby. At Libby, the mine moves
16 approximately 22 tons of material for each ton of
17 concentrate produced whereas at South Carolina the
18 ratio is 10 to 1."
19    Q  So would you agree with me that for every
20 ton of vermiculite concentrate you folks processed
21 through the mill, it took about 22 tons of ore?
22    A  At this point in time, yes.
23    Q  Did that change from time to time?
24    A  It changed after that -- when the new mill
25 was built, it changed.

Page 38

1    Q  Did it take more or less?
2    A  It took more.
3    Q  How much more?
4    A  I don't really remember.
5    Q  So there was a greater amount of waste
6 product after the new mill was built?
7    A  In the mill feed, yes, sir.
8    Q  In any event, if we assume that we only
9 had, in this case, 21 tons of waste product out of
10 every 22 that were produced, that would be a fair
11 estimate at this time, correct?
12    A  Yes, sir.
13    Q  What is the Construction Products
14 Division?
15    A  It was a division of W.R. Grace and
16 Company which was headquartered in Cambridge. They
17 had responsibility for the Libby operation, the
18 South Carolina operation, the various expanding
19 plants throughout the company, and plus, they were
20 involved in some other businesses of W.R. Grace.
21    Q  These records -- These documents, Exhibit
22 Number 42, were these prepared in the ordinary and
23 usual course of business?
24    A  I would assume so, yes, sir.
25    Q  They were intended to be accurate

Page 39

1 representations of the true facts that existed at
2 the time the report was prepared?
3        MR. GRAHAM: Objection, foundation.
4        THE WITNESS: I would assume so, yes,
5 sir.
6 BY MR. LEWIS:
7    Q  Well, let me -- Let me change the
8 question. I think the objection was fair. You
9 answered before he had a chance to rule. Did you
10 take these reports --
11    A  No, sir.
12    Q  Okay. Do you take these reports now as
13 being accurate and correct? Do you accept them as
14 being accurate and correct?
15    A  Yes, sir.
16    Q  What percentage of that ore was tremolite
17 asbestos?
18    A  Well, that would vary from time to time,
19 actually probably from day to day, depending on
20 where they were mining. But, I would make an
21 estimate that probably -- probably between 3 and
22 5 percent.
23    Q  Well, let's just assume it's 3 percent.
24 That would be the lowest level -- Is that the lowest
25 level it would be?

Page 40

1    A  No, it could be lower than that.
2    Q  What was the average? What would be the
3 average, in your opinion, amount of tremolite
4 asbestos in each -- whatever volume of ore?
5    A  That's very hard to judge, but I think an
6 estimate of 3 percent would be fair.
7    Q  And there is official records that say
8 that the average was 3 percent, correct?
9        MR. LEWIS: Would you hand me
10 Plaintiffs' Exhibit 40.1.
11        THE COURT: 40 --
12        MR. LEWIS: 40.1. I'm sorry, Your
13 Honor.
14        THE COURT: That's fine. No
15 problem. I assume that's it, Counsel.
16        MR. LEWIS: Thank you.
17        THE COURT: It says 1-5 on the tab.
18 Is that the one you wanted?
19        MR. LEWIS: Yes.
20        THE COURT: Do you want to put a
21 staple in it?
22        MR. LEWIS: Yes, please.
23        THE COURT: Thank you.
24 BY MR. LEWIS:
25    Q  I'm handing you what has been marked as

TRANSCRIPT OF PROCEEDINGS    CondenseIt!™    SCHNETTER vs W.R. GRACE

**Page 41**

Libby

1 Plaintiffs' Exhibit 40.1. Would you describe that
2 document for the jury, please.
3    A  Well, this is a letter to R.M. Vining from
4 R.E. Schneider dated March 3rd, 1969. The subject
5 is Insitu and Environmental Dust Control for
6 Vermiculite Mining and Expanding Operations.
7    Q  Anywhere in that report that says that the
8 vermiculite is 3 percent? To help you -- the
9 percentage of asbestos in the vermiculite is
10 3 percent, to help you with your conundrum of
11 whether it's 3 or 5 percent. (Pause.) Why don't
12 you go back to the previous exhibit, 42. Look at
13 page 2 of that exhibit. Now look at page 4.
14    A  Are you talking about 1, 4 or 1, 2?
15    Q  See, what the problem is, your exhibit is
16 not numbered like mine is. Let me help you find
17 it. Well, can we agree that it's 3 percent at
18 least? That there was 3 percent contamination of
19 tremolite asbestos in the ore?
20    A  I would have to qualify that by saying
21 approximately 3 percent.
22    Q  Okay. Good enough. So if there was a
23 production -- so if the production was a thousand
24 tons of concentrated vermiculite a day, as it was
25 later on, near the time that Dan Schnetter went to

**Page 42**

Libby

1 work there, how much ore would it take to get a
2 thousand tons a day?
3    A  Well again, I don't remember. It would
4 take more than the 22,000.
5    Q  So what do you think -- How much ore do
6 you think a day would be required at the time that
7 Dan Schnetter was employed up there at the old dry
8 mill?
9    A  During the period that the dry mill was
10 running, and he went to work in '73 when it was,
11 until '74, the 22,000 tons would be --
12    Q  Would be accurate?
13    A  -- would be accurate, yes, sir.
14    Q  Okay. And in that 22,000 tons of ore that
15 was waste material, how many tons of that would be
16 pure tremolite asbestos?
17    A  Well, it would be -- It would be more than
18 3 percent, but I can't tell you how much more.
19    Q  And 3 percent is how many tons? Three
20 percent is how many tons of asbestos?
21    A  It would be 660.
22    Q  Okay. And now so it would be at least 600
23 tons of pure asbestos fibers -- or, pure asbestos
24 was having to be discarded on that hill every single
25 day of operation, correct?

**Page 43**

Libby

1    A  Well, it would be -- it would be slightly
2 less than that, but, yes, it would have to be -- it
3 would have to be discarded, if you will. That would
4 include the amount that was in the waste and the
5 amount that was in the concentrate.
6    Q  So some of it would remain in the
7 concentrate, because you could never get that
8 completely out, correct?
9    A  Yes, sir.
10    Q  So the concentrate that you were selling
11 to the public, the vermiculite concentrate, was
12 contaminated with asbestos fibers, right?
13    A  Contaminated with asbestos, yes, sir.
14    Q  And it was never -- You were never able to
15 get that completely out, even up until the time you
16 shut down the mill?
17    A  That's correct.
18    Q  But you were able to get some of it out,
19 right?
20    A  Oh, yes.
21    Q  And that's where the vast majority of that
22 660 tons per day of pure tremolite asbestos stayed
23 up on the hill, right?
24    A  Yes, sir.
25    Q  And some of it turned into fibrous dust

**Page 44**

Libby

1 that the men breathed, right?
2    A  Some of it would turn into fibrous dust,
3 yes.
4    Q  That was invisible to the men?
5    A  Yes, sir, basically.
6    Q  And then some of it Mr. Graham referred --
7 In his opening statement, he said something like, It
8 was put over the mountain, right?
9    A  Yes, sir.
10    Q  And if you look up on the mountain and you
11 see that big gash up there, that's where that --
12 those tailings, those -- that discarded ore was
13 placed on the mountain, right?
14    A  That's where a good part of it is, yes,
15 sir.
16    Q  You had about a mile down the hill on one
17 side, right?
18    A  Yes, sir, roughly.
19    Q  And a mile on the other side?
20    A  Yes, sir.
21    Q  Did you have a tailings pond up there?
22    A  Yes, sir.
23    Q  When did you put that in?
24    A  I believe in 1970.
25    Q  Before that, what happened to the

TRANSCRIPT OF PROCEEDINGS     CondenseIt!™     SCHNETTER vs W.R. GRACE

Page 45

*Libby*

1 tailings?
2    A   It was discharged into Rainy Creek.
3    Q   Right into the creek?
4    A   Well, it ended up in the creek, yes, sir.
5    Q   So you had asbestos going right into the
6 creek?
7    A   Yes, sir.
8    Q   And the creek ran into the Kootenai River?
9    A   Yes, sir.
10       MR. GRAHAM: Objection, relevancy,
11 Your Honor.
12       THE COURT: Overruled.
13 BY MR. LEWIS:
14    Q   And that ran right through town, right?
15    A   Well, it ran past the town, yes, sir.
16    Q   And where did the rest of the asbestos --
17 the tremolite go?
18    A   It remained on the mountain -- on the side
19 of the mountain.
20    Q   Did some of it go up the smoke stack or
21 anything like that?
22    A   Yes, some of it would.
23    Q   Go up into the atmosphere?
24    A   Yes, sir.
25    Q   Are you aware of publications that

Page 46

*Libby*

1 indicate that it's well known that people living as
2 far as a half a mile from asbestos plants were
3 getting asbestosis or lung disease?
4    A   Yes, sir, I've seen articles.
5    Q   You knew that back in the '60s, right?
6    A   I believe so, yes, sir.
7    Q   Did you ever tell any of your employees
8 that?
9    A   I don't recall, no, sir.
10    Q   You don't recall or you did not?
11    A   I don't recall that we did.
12    Q   Well, is that -- Don't recall that we did,
13 is that a "yes" or a "no"? I don't understand --
14    A   Well, that would be a "no." But I would
15 like to point out that we had nobody living within a
16 half a mile of that mine.
17    Q   But your employees worked within a half a
18 mile of it every day.
19    A   Yes.
20    Q   This is a case of an employee against your
21 company, right?
22    A   Yes.
23    Q   And all of your employees were within a
24 half a mile of the old dry mill, just about, right?
25    A   Yes, sir.

Page 47

*Libby*

1    Q   Everybody up there was working within that
2 area, right?
3    A   Yes.
4    Q   And you didn't require respirators for
5 everybody up there, did you?
6    A   No.
7    Q   When you were up there walking across the
8 grounds, did you wear a respirator?
9    A   No, sir.
10    Q   And you were within a half a mile of this
11 operation, right?
12    A   Yes.
13    Q   And would you agree with me, at least,
14 that this operation was one of the biggest
15 operations in the country that had asbestos waste in
16 the air?
17    A   No, sir, I don't know that to be a fact.
18    Q   You don't?
19    A   No.
20    Q   Anyplace else in the United States where
21 they had tremolite asbestos?
22    A   I don't know.
23    Q   You don't know one way or the other?
24    A   No, sir.
25    Q   Okay. Mr. Graham made a lot in his

Page 48

1 opening statement about respirators. Do you recall
2 him talking about respirators in his opening
3 statement?
4    A   Yes, sir.
5    Q   And did you know a lot about respirators?
6    A   Well, I knew about respirators.
7    Q   Did you know if they worked?
8    A   Yes, sir, I understood that they did, from
9 what we had been told.
10    Q   Did you ever talk to Mr. Melcher about
11 that?
12    A   I don't recall specifically, no, sir.
13    Q   Did you know that it was very, very
14 difficult for your men to work in the old dry mill
15 and wear a respirator all day long?
16    A   Yes, sir, I knew that.
17    Q   Did the company know very well that it was
18 impossible to get the men to wear respirators eight
19 hours a day?
20    A   I certainly knew it was very difficult,
21 yes.
22    Q   And isn't it a fact that the respirators
23 you had up there were good for nuisance dust, but
24 absolutely useless for asbestos fibers?
25    A   No, sir, that's not a true statement.

**Page 49**

1 Q Did you ever test them independently to
2 find out if they got out the asbestos fibers?
3 A No, sir. I don't know how we would do
4 that.
5 Q Well, who would have a greater obligation
6 to your employees to do that than you?
7 MR. GRAHAM: I would object,
8 argumentative.
9 MR. LEWIS: I'll rephrase the
10 question, Your Honor.
11 BY MR. LEWIS:
12 Q These were your employees, right?
13 A Yes.
14 Q You knew, long before you hired Dan
15 Schnetter, for at least a couple of decades, that
16 you had a significant health problem at the mill and
17 the mine, correct?
18 A Yes.
19 Q You knew that the health problem was
20 tremolite asbestos fibers in the air, correct?
21 A Yes.
22 Q And that these fibers were invisible to
23 the men, correct?
24 A Yes.
25 Q You knew that what they saw in the old dry

**Page 50**

1 mill was nuisance dust, something other than
2 asbestos fibers, right?
3 A Yes.
4 Q You knew that when they were outside away
5 from what was nuisance dust, there might be asbestos
6 fibers in the air, but they couldn't see them,
7 correct?
8 A Yes.
9 Q You knew that when they were not in the
10 old dry mill, they weren't required to wear
11 respirators, correct?
12 A Most places, yes, sir.
13 Q You didn't wear a respirator there,
14 correct?
15 A Not -- most places where I was, no, sir.
16 Q You knew that the men could not work and
17 wear those respirators eight hours a day in the dry
18 mill, correct?
19 A No, we didn't know that they couldn't. We
20 knew it was very difficult for them to do it.
21 Q You knew that this asbestos in the air was
22 destroying your men's lungs before Dan Schnetter was
23 hired, correct?
24 A We knew that it was causing problems to
25 some of our employees' lungs, yes, sir.

**Page 51**

1 Q You knew that men were getting fibrosis of
2 the lungs, correct?
3 A Yes, sir.
4 Q That's a symptom -- That's a condition
5 caused by asbestos, correct?
6 A Possibly.
7 Q You knew your men were getting asbestosis
8 before Dan was hired, correct?
9 A Yes, sir.
10 Q You knew that they were getting cancer
11 before Dan was hired, correct?
12 A Yes, sir.
13 Q You even knew that they were getting
14 mesothelioma before Dan was hired, correct?
15 A Yes, sir.
16 Q And you knew that mesothelioma was a
17 signature disease caused only by asbestos, correct?
18 A Excuse me, sir. I think that that is an
19 incorrect statement that I just made. I don't know
20 that -- We did not know of any cases of mesothelioma
21 before Dan Schnetter was -- was hired.
22 Q You knew in the literature that
23 mesothelioma was a signature disease, correct?
24 A Yes.
25 Q So you're changing your testimony, you're

**Page 52**

1 saying you didn't know about mesothelioma?
2 MR. GRAHAM: Objection, argumentative
3 at this point, Your Honor.
4 MR. LEWIS: I examined him. He
5 testified two different ways, Judge.
6 THE COURT: Proceed, Counsel.
7 Overruled.
8 BY MR. LEWIS:
9 Q So you testified once that you knew about
10 mesothelioma and now you say you didn't know about
11 mesothelioma?
12 A That was a mistake. The first case that
13 we knew of, of one of our employees -- or
14 ex-employees having mesothelioma was, I believe,
15 in 1979.
16 Q 1979?
17 A Yes.
18 Q Okay. Did you suspect -- Did you have
19 records that suggested that mesothelioma would be
20 caused by your asbestos before Dan was hired?
21 A I don't understand your question.
22 Q Did you have records in your possession
23 that indicated that mesothelioma was caused by
24 exposure to asbestos fibers before you hired Dan
25 Schnetter?

*Libby*

**Page 53**

1  A I'm not sure whether we had any records in
2 our -- that would indicate that or not. I mean,
3 certainly it would be in the literature before that
4 that we would have seen.
5  Q Let me ask you this. The literature
6 clearly established that mesothelioma is a signature
7 disease related to asbestos exposure, correct?
8  A Yes, sir.
9  Q A signature disease means it can only be
10 caused by asbestos exposure, correct?
11  A I'm not sure that that's a true
12 statement.
13  Q What about asbestosis? Is that a
14 signature disease?
15  A Would you define "signature disease" for
16 me, please.
17  Q Do you know what "signature disease" is?
18  A No, sir.
19  Q I define signature disease as something
20 that is specific to a particular insult. In other
21 words, there is a specific cause and effect
22 relationship between an exposure and the disease.
23 Do you know anything else besides asbestos that
24 causes asbestosis?
25  A No, sir.

*Libby*

**Page 54**

1  Q Okay. Smoking doesn't cause asbestosis,
2 does it?
3  A No, sir.
4  Q And you don't suggest that Dan's
5 asbestosis is caused by smoking, do you?
6  A No, sir.
7  THE COURT: Would this be a
8 convenient place for you to take a break, Counsel?
9  MR. LEWIS: Yes; I would appreciate
10 that.
11  THE COURT: Ladies and gentlemen, you
12 are admonished not to discuss this case amongst
13 yourselves or allow anyone to discuss the case with
14 you, nor should you express or form any opinion
15 regarding the matter until it's finally submitted to
16 you. We will take a 10 minute recess.
17  (A recess was held in the proceedings.)
18  THE COURT: Counsel, you may
19 continue.
20  MR. LEWIS: Thank you, Your Honor.
21 I am happy to announce that the clerk has found the
22 exhibits that we sent to her a couple weeks ago.
23 She found them in the clerk's office. But I'm sure
24 it was just one of those things. We should have
25 checked it, and I apologize, because it's delayed

*Libby*

**Page 55**

1 the trial here a few minutes not having those
2 exhibits.
3  THE COURT: That's fine. Those
4 things will happen.
5
6  CROSS-EXAMINATION CONTINUED
7 BY MR. LEWIS:
8  Q Mr. Lovick, what was the first written
9 notice that you had of the dangers of asbestos
10 exposure?
11  A The first written notice that I recall was
12 a notice from the Montana State Board of Health,
13 written by one Benjamin Wake in 1956, that pointed
14 out that the asbestos was a material of -- a toxic
15 material.
16  Q And did you review his report?
17  A Well, yes, sir.
18  Q Did you look it over carefully?
19  A I don't recall.
20  Q Did W.R. Grace contest the report?
21  A No, sir.
22  Q So it assumed that it was an accurate
23 report?
24  A Yes, sir.
25  Q Did you understand at that time what the

*Libby*

**Page 56**

1 term "toxic" meant?
2  A Well, I don't know --
3  Q Did you understand that the fact that
4 asbestos was toxic in 1956 meant that it was harmful
5 to humans?
6  A I would think that we would, yes, sir.
7  Q And what did you do to bring that
8 awareness of that hazard to the attention of the
9 workers and their families?
10  A I don't recall that anything specifically
11 was done.
12  Q You did nothing; is that correct?
13  A So far as I recall, yes.
14  Q And you -- Who was the general manager at
15 that time?
16  A Mr. R.A. Bleich.
17  Q Do you recall if Mr. Bleich did anything
18 to bring this toxic -- knowledge of toxic asbestos
19 to the employees and their families?
20  A Not that I recall.
21  MR. GRAHAM: We would make an
22 objection as to relevancy, and could we have a
23 continuing objection as to relevancy as to these
24 specific reports to employees?
25  MR. LEWIS: Well, Your Honor,

TRANSCRIPT OF PROCEEDINGS          CondenseIt!™          SCHNETTER vs W.R. GRACE

---

**Page 57**

1 continuing objections in a trial are very
2 difficult.
3        THE COURT: I think you better,
4 Counsel.
5        MR. GRAHAM: Okay.
6        THE COURT: The objection is
7 overruled.
8 BY MR. LEWIS:
9    Q  Now, just -- this nuisance dust thing.
10 You folks classified the dust out there as a
11 nuisance dust; is that correct?
12    A  Yes, sir, I believe that would be
13 correct.
14    Q  So if you classified this as a nuisance
15 dust, did that classification apply to all the
16 management people?
17    A  Well, I can't speak for all of the
18 management people.
19    Q  You just said you agreed that you folks up
20 there at the mill classified it as nuisance dust.
21 Would that be a term that people would use all the
22 time up there?
23    A  Well, I think that we would refer to the
24 dust that was present. I don't know that it would
25 be particularly identified as nuisance dust or toxic

---

**Page 58**

1 dust or anything else. It would just be referred to
2 as the dust levels that we have.
3    Q  Well, you just said a minute ago that you
4 agreed that you classified it as nuisance dust.
5 Those were my words. I put them in your mouth. But
6 you agreed to that. I'm offering you an opportunity
7 to change your testimony, if you want. Do you say
8 now that you didn't classify it as nuisance dust?
9    A  Well, generally, I would say that we
10 considered it a nuisance dust.
11    Q  Okay. And that's what just about
12 everybody considered it, a nuisance dust, correct?
13    A  Yes, sir.
14    Q  Now, nuisance keynotes something far
15 different from toxicity or toxic; do you agree with
16 that?
17    A  Yes.
18    Q  So if you referred to it as nuisance dust
19 and told the men, and referred to it as nuisance
20 dust, would that be something that they should be
21 alarmed about?
22        MR. GRAHAM: Object as to the
23 relevancy unless time and place is established, Your
24 Honor.
25        MR. LEWIS: I'll lay some more

---

**Page 59**

1 foundation.
2        THE COURT: Rephrase the question.
3        MR. LEWIS: I don't mind that at
4 all.
5 BY MR. LEWIS:
6    Q  This was a term, nuisance dust, that was
7 used throughout the term of your employment up
8 there, correct?
9    A  Yes.
10    Q  So right up until 1983, the dust up there
11 was referred to as nuisance dust, correct?
12    A  Yes.
13    Q  And the men referred to it as nuisance
14 dust, correct?
15    A  I don't know how they would refer to it --
16    Q  Well, if the management referred to it as
17 nuisance dust, did the men refer to it as nuisance
18 dust?
19    A  Yes, sir.
20    Q  Does "nuisance" imply anything harmful or
21 dangerous, like something that's toxic?
22    A  No.
23    Q  So if the men overheard management saying,
24 this is just nuisance dust, would it be reasonable,
25 in your mind, for them to assume that it was just a

---

**Page 60**

1 nuisance and relatively harmless?
2    A  Well, yes.
3    Q  So right up until 1983, when you left, the
4 men had a right to assume that this nuisance dust
5 was essentially harmless; do you agree with that?
6    A  Yes.
7    Q  And one of the men was Dan Schnetter,
8 correct?
9    A  Yes.
10    Q  And he left employment with W.R. Grace in
11 1981, correct?
12    A  Yes, sir.
13    Q  On very good terms, as suggested in the
14 letter that you read to the jury?
15    A  Yes, sir.
16    Q  And at the time that he left in 1981, he
17 had no reason to believe that he was diseased by
18 asbestos, correct?
19    A  Not that I know of, no, sir.
20    Q  There were no x-rays that said that he had
21 any asbestos-related diseases; is that correct?
22    A  I don't recall, no, sir.
23    Q  You folks got the x-ray reports, right?
24    A  Yes, sir.
25    Q  And all of the tests that you did, you got

---

**Libby**

Page 61

1 those reports, and none of those indicated that Dan
2 Schnetter, at that time, was diseased, correct?
3    A  I don't know if that's correct or not.
4 I certainly can't remember what all of those x-ray
5 reports stated, because we had, you know, at that
6 time two, three hundred each year, and over a period
7 of years, so I can't recall what they all said.
8    Q  That's fair enough, you can't recall all
9 of them, but now you know -- you knew that this
10 trial involved Dan Schnetter, correct?
11    A  Well, yes, sir.
12    Q  And you looked at documents relating to
13 Dan Schnetter, correct, in preparing for your
14 testimony?
15    A  Yes, sir.
16    Q  And you met with counsel for W.R. Grace
17 repeatedly concerning this case, correct?
18        MR. GRAHAM:  Object as to relevancy
19 and competency if the question -- well --
20        MR. LEWIS:  I didn't ask what he
21 said, Your Honor.
22        THE COURT:  Overruled.
23        MR. LEWIS:  That's the only question
24 I'm going to ask about it, Your Honor.
25 BY MR. LEWIS:

**Libby**

Page 62

1    Q  You met with counsel repeatedly concerning
2 Dan Schnetter's case, correct?
3    A  Yes, sir.
4    Q  You didn't make it -- You didn't check to
5 see if Dan had any disease before he left the
6 company in 1981?
7    A  No, sir.
8    Q  But as you sit here now, you don't know of
9 any evidence that he had any disease in his lung
10 before he left the company, right?
11    A  No, sir, I don't.
12    Q  And all of this test and lung capacity
13 tests -- lung function tests and his x-rays, as far
14 as you know, were normal, correct?
15    A  Seems to me that one of his lung function
16 tests showed a slight deficiency on -- in one area.
17    Q  Before he left the company?
18    A  Yes, sir.
19    Q  Did you tell him about that?
20    A  Well, I didn't take that particular test,
21 I don't believe.  But whoever did would have told
22 him.
23        MR. LEWIS:  Wait a second.  Wait,
24 wait.  I asked him if he told him about it, and I
25 move to strike any hearsay that he's trying to get

**Libby**

Page 63

1 in here.
2        THE COURT:  Okay, just answer the
3 question "yes" or "no," Mr. Lovick.
4        THE WITNESS:  No, sir, I did not take
5 that test.  I don't believe I did.  If I had taken
6 that test, I would have not -- told him about it.
7 BY MR. LEWIS:
8    Q  In any event, we know one thing, that
9 he was one of the employees that left the company
10 in '81 and he, like all the other employees, had a
11 right to rely on the idea that nuisance dust would
12 not harm him, correct?
13    A  Yes.
14    Q  So when we talked about dust, we had dust
15 meetings or we discussed dust, do we agree with me
16 that may not bring home the fact to the employees
17 that that dust has something very harmful in it?
18    A  Yes, I would agree with that.
19    Q  Did you ever observe Mr. Bleich tell
20 anybody that this dust had toxic substances in it?
21    A  No, sir, not that I recall.
22    Q  Did the management of W.R. Grace or its
23 predecessor in interest, Zonolite Company, ever
24 attempt to keep official records concerning the
25 dangers of asbestos in the workplace confidential

**Libby**

Page 64

1 and for the eyes of management only?
2    A  The reports that we received from the
3 State Board of Health were marked by them,
4 Confidential, For Management Only -- For Management
5 Use Only.
6    Q  And you kept those reports confidential?
7    A  Yes, sir.
8    Q  Did you give a copy of the report to each
9 of the employees?
10    A  No, sir.
11    Q  And the contents of those reports were not
12 disseminated directly to the employees; is that
13 correct?
14    A  No, sir.
15    Q  Is that correct?
16    A  Yes, that's correct.
17        MR. LEWIS:  Okay.  Could I have
18 Exhibit G-10.1.  (Pause.)  Thank you very much.
19 BY MR. LEWIS:
20    Q  Would you just take a moment to look at
21 G-10.1 and satisfy yourself as to what it is and
22 then I'll ask you a couple questions about it.
23 (Pause.)  I'm just going to ask you a few questions.
24 This is a Discharge Summary for the hospitalization
25 of Glenn Taylor, correct?

Page 65

1    A  Yes, sir.
2    Q  He was an employee of W.R. -- of
3  Zonolite?
4    A  Yes, sir.
5    Q  And he was discharged on February 11,
6  1959; is that correct?
7    A  Well, he was admitted on --
8    Q  I apologize. He was admitted.
9    A  -- on February --
10    Q  Go ahead.
11    A  He was, yes, sir.
12    Q  He was admitted on February 11, 1959?
13    A  Yes, sir.
14    Q  And turn to page 2. He was discharged on
15  March 20, 1959, correct?
16    A  Yes, sir.
17    Q  And the final diagnosis on discharge was
18  hystoplasmosis and asbestosis, correct?
19    A  Yes, sir.
20    Q  When would you have received a copy of
21  this medical report?
22    A  Shortly after that. But I would like to
23  call your attention to the recommendation which
24  follows that final diagnosis, if I might.
25    Q  Oh, yeah.

Page 66

1    A  Could I read that?
2    Q  Sure you can.
3    A  "Recommendation: Patient should return
4  for a lung biopsy, which he did not prefer to have
5  done at this time, to determine definitely the
6  diagnosis of asbestosis."
7    Q  What happened to Mr. Taylor?
8    A  He died.
9    Q  Of asbestosis?
10    A  Well, I'm not sure what --
11    Q  Did he die of lung disease?
12        MR. GRAHAM: Objection, foundation.
13        THE WITNESS: Well --
14        MR. LEWIS: Do you know?
15        THE COURT: If he knows the answer.
16  BY MR. LEWIS:
17    Q  Do you know if he died of lung disease?
18    A  I don't know what his death certificate --
19  I don't remember what his death certificate stated.
20    Q  In any event, was that your first
21  knowledge that you had that one of your employees
22  had been diagnosed with asbestosis?
23    A  To my knowledge, yes.
24    Q  Okay. Did you tell any of your employees
25  about that? Did you tell any of your employees that

Page 6

1  one of your -- one of their brethren had been
2  diagnosed with asbestosis?
3    A  I don't recall that we did, no, sir.
4    Q  Did you folks institute a periodic x-ray
5  program up there at the mill?
6    A  Yes, sir.
7    Q  When did you do that?
8    A  Well, we instituted a periodic x-ray
9  annually starting in 1964.
10    Q  Did you also start a pre-employment x-ray
11  process?
12    A  Yes, sir.
13    Q  And when did you start that?
14    A  The same time, I believe.
15    Q  And the truth of the matter is, the
16  purpose of that x-ray was to protect the company; is
17  that true?
18    A  Well, I don't know that that would be
19  true. We wanted the employees to -- we wanted to
20  know the lung condition of the employees when we
21  hired them and whether it changed during the periods
22  that they worked. And if there were -- The
23  employees were notified of the results of all of
24  these, and if there were any changes, they were
25  advised of these. And so from that standpoint, we

Page 68

1  were also protecting the employees.
2    Q  But the primary purpose of instituting the
3  x-ray program, according to your testimony in our
4  cases, is to protect the company, correct?
5    A  We wanted to know the condition of the
6  employees and have a record of that.
7    Q  But the reports never went to the
8  employees, right?
9    A  That's not true. The reports never --
10  In some cases, they went to the employees, but each
11  employee was to have received a report on what the
12  x-ray interpretation showed, and if they chose to
13  have a copy, if they asked for a copy, they were
14  given one.
15    Q  You got -- You folks got a copy of the
16  report, right?
17    A  Yes, sir.
18    Q  But the men were not routinely given
19  copies of the x-ray reports, correct?
20    A  No, but they were all advised of what the
21  results were.
22    Q  And if they were -- the results were
23  normal, they felt good about that, right? You felt
24  good about that?
25    A  I would assume so, yes, sir.

TRANSCRIPT OF PROCEEDINGS    Condenseit!™    SCHNETTER vs W.R. GRACE

**Page 69**

1  Q  Did you ever share with those people who
2  had normal x-rays the fact that you had determined
3  by this process that you had a significant health
4  problem existing with your employees?
5  A  No, I don't recall that that would have
6  been done.
7  Q  So somebody like Dan Schnetter, whose
8  x-rays were normal, would think everything is okay
9  and he might not know about the 40 or 50 or 60 who
10  were diseased, right?
11  A  He might not.  He might, also.
12  Q  But you folks did nothing to bring that to
13  his attention, right?
14  A  No, sir.
15       MR. LEWIS: I would offer Plaintiffs'
16  Exhibit 10.1.
17       THE COURT: Any objection?
18       MR. LEWIS: G-10.1, excuse me.
19       THE COURT: Any objection?
20       MR. GRAHAM: No objection.
21       THE COURT: G-10.1 will be admitted
22  without objection.
23  BY MR. LEWIS:
24  Q  I want to direct your attention back again
25  to Plaintiffs' Exhibit G-40.1, which has already

**Page 70**

1  been admitted into evidence.  Would you read that --
2  First of all, would you tell us what the date of
3  that letter is.
4  A  The date is March 3rd, 1969.
5  Q  And who is it addressed to?
6  A  It's addressed to R.M. Vining.
7  Q  He was the head of the -- essentially of
8  what had been Zonolite, right?
9  A  He was president of Construction Products
10  Division, which Zonolite was a part of.
11       MR. GRAHAM: Excuse me, Counsel.
12  What is the exhibit number?
13       MR. LEWIS: It's G-40.1.
14       MR. GRAHAM: Thank you.
15  BY MR. LEWIS:
16  Q  And copies -- Who was that from?
17  A  From R.E. Schneider.
18  Q  Who is R.E. Schneider?
19  A  He was chief engineer for the Construction
20  Products Division.
21  Q  Okay.  And is this document marked
22  Personal and Confidential?
23  A  Yes, sir.
24  Q  And copies went to who?
25  A  R.T. Sterrett.

**Page 71**

1  Q  Who is he?
2  A  He was a -- an official in the
3  Construction Products Division.
4  Q  John Murphy?
5  A  He was also an officer in Construction
6  Products Division; R.A. Brown, who was executive
7  vice president of Construction Products Division;
8  W.R. Wright, who was -- I don't remember what his
9  title was.  He was in charge of expanding plants in
10  the division.
11  O.F. Stewart was the manager of the mine
12  in South Carolina; Earl Lovick, which was myself;
13  Ray Kujawa, who was an engineer and geologist at
14  Libby; Peter Kostic, who was safety engineer for
15  Construction Products Division; and F.W. Eaton, who
16  was on the engineering staff of Construction
17  Products Division.
18  Q  So this document went to virtually every
19  high official in the Construction Products Division
20  plus you and Mr. Kujawa in Libby, correct?
21  A  Yes, sir.
22  Q  The date of the report is March 3, 1969?
23  A  Yes, sir.
24  Q  Would you read that report to the jury,
25  please.

**Page 72**

1       MR. SLOVAK: Excuse me, I don't think
2  G-40.1 has been offered.
3       MR. LEWIS: We would offer it now,
4  Your Honor.
5       THE COURT: Do you have any
6  objection, Counsel?
7       MR. GRAHAM: No objection.
8       THE COURT: Very well.  40.1 is
9  admitted without objection.
10       THE WITNESS: The attached report on
11  Dust Control for Vermiculite Mining and Expanding
12  Operations authored by Messrs. Eaton, Kujawa and
13  Kostic is the result of their initial studies of the
14  dust control problems of the Zonolite operations.
15  The inclination of public agencies to
16  protect the worker at any expense, parenthesis,
17  usually the employer's, end of parentheses, seems to
18  be a firmly entrenched political phenomenon which
19  should be of considerable concern to us.
20  Our recent experience at Libby, viewed in
21  light of this public policy, may well create for us
22  a significant financial liability.  We also should
23  be concerned with the obligation of our employees,
24  namely, permitting them to perform their services
25  under working conditions which we have good reason

TRANSCRIPT OF PROCEEDINGS    CondenseIt!™    SCHNETTER vs W.R. GRACE

**Page 73**

1 to believe are hazardous.
2     The report recommends testing and
3 monitoring procedures with an expenditure of some
4 $423,000 $23,000, parentheses, admittedly a guess
5 estimate, end of parentheses, and indicates a
6 continuing monitoring cost of approximately $14,000
7 per year. I estimate the additional costs of
8 capital equipment at approximately 5 percent for
9 $20,200 per year.
10     I would suggest you read the attached copy
11 of an article from the October 12th, 1968, issue of
12 the New Yorker magazine. This kind of publicity
13 cannot help but engender sympathy for anyone working
14 under conditions such as those present in our
15 Zonolite operation.
16     I do not believe we should ignore the
17 possibility we may be subjected to substantial
18 financial liability over the next few years as we
19 continue to gather information as to the potential
20 hazards at Libby and elsewhere in Zonolite, we must
21 be concerned about our moral obligations to our
22 employees. Current evidence dictates that we must
23 take prompt action.
24     It is my recommendation that authorization
25 be granted to proceed with the program outlined in

**Page 74**

1 the report. It's signed R.E. Schneider.
2 BY MR. LEWIS:
3   Q   You received a copy of this report a few
4 days after it was authored, I assume?
5   A   Yes, sir.
6   Q   And did you agree that you had a moral
7 obligation to your employees to protect them from
8 this dangerous asbestos?
9   A   Yes, sir.
10   Q   Did you tell any of your employees about
11 this personal and confidential letter?
12   A   I don't recall that I did, no, sir.
13   Q   Did anybody else from your company?
14   A   I don't know.
15   Q   Are any of the people that are on the
16 letterhead copied on this workers?
17   A   No, sir.
18   Q   Okay. Were you concerned about
19 financial -- the financial aspects of protecting the
20 men against asbestos exposure?
21   A   No, sir, that was not my concern.
22   Q   But obviously somebody was?
23   A   Yes, sir.
24   Q   Did they go ahead with this program that
25 was --

**Page 75**

1   A   Pretty much, I believe, yes, sir.
2   Q   Okay. Did you hear Mr. Graham say in his
3 opening statement that you folks at Libby did not
4 know about the dangers of cigarette smoking and lung
5 disease until about '79 and they changed it to '76,
6 do you recall that?
7     MR. GRAHAM: I would object to that
8 being a misstatement of the opening statement.
9     MR. LEWIS: I'll let the jury
10 decide --
11     THE COURT: You may proceed.
12 Overruled counsel.
13 BY MR. LEWIS:
14   Q   Did you hear something -- Did you hear
15 that?
16   A   Yes.
17   Q   That's what he said, wasn't it?
18   A   Yes.
19   Q   But actually, you knew in 1969, 10 years
20 before you commenced your no smoking policy, you
21 knew that smoking and asbestos had a synergistic
22 effect and created a very difficult health problem
23 for your employees, correct?
24   A   No, sir, I don't recall that I knew.
25   Q   You didn't know that in 1969?

**Page 76**

1   A   No, sir.
2   Q   When did you first learn about that?
3   A   I don't really know when I first learned
4 about it. But I know when it was brought home
5 sharply to me.
6   Q   When was it brought home sharply to you?
7   A   I believe that would have been either in
8 1977 or 1978.
9   Q   Okay. Now, you don't know of any company
10 document that identifies the dangers of smoking with
11 asbestos in 1969?
12   A   I don't recall any, no, sir.
13   Q   You say that under oath?
14   A   Yes, sir.
15   Q   Did anybody from management headquarters
16 suggest that a no smoking policy should be
17 instituted by 1970?
18   A   I don't recall. I know that it was
19 recommended, but I don't recall that it was done by
20 1970. I really don't remember when that was.
21   Q   Well, if the company -- if there was
22 evidence of the synergistic effect between smoking
23 and asbestos within the knowledge of management in
24 1969, do you think it was appropriate to wait 10
25 years to do something about it?

Page 77

*Libby*

1   A  Well, that would seem -- that would seem
2  to be a long time.
3      Q  Management instituted its own non-smoking
4  policy about a year and a half before it did it for
5  the employees; is that right?
6      A  Yes, sir.
7      Q  Did you tell the employees about that
8  management policy?
9      A  Yes, sir.
10     Q  We will come back to that issue in a
11 little bit.  I can't find anything.  (Pause.)  Do
12 you have the photographs?  Do you have any
13 photographs?
14         MR. GRAHAM:  I don't have -- I think
15 they are in the exhibits we filed.
16         MR. LEWIS:  I would like to have the
17 photographs, please.  Do you have the original
18 photographs or just --
19         THE COURT:  Here are Defendant's
20 exhibits.
21         (A discussion was held off the record.)
22         MR. GRAHAM:  Not even mine are
23 working for you.  I thought they were filed with the
24 clerk, but --
25         MR. LEWIS:  I need them.  Maybe we

Page 78

*Libby*

1  could get them after the next break.
2         MR. GRAHAM:  I think that's the only
3  group.
4         MR. LEWIS:  You didn't bring the
5  originals with you?
6         MR. GRAHAM:  I thought they were in
7  there.
8         MR. LEWIS:  Okay.
9         MR. GRAHAM:  I thought they were sent
10 to the clerk to be filed.
11 BY MR. LEWIS:
12     Q  Look at Exhibit 40.1 again, please.  Does
13 that refer to an October 12, 1968, article in the
14 New Yorker magazine?
15     A  Yes, sir.
16     Q  Does that New Yorker magazine refer to the
17 dangers -- the synergistic effect between smoking
18 and asbestos?
19     A  Mr. Lewis, I don't ever remember receiving
20 a copy of that issue of the New Yorker magazine with
21 this letter.
22     Q  So you just got a copy of the cover
23 letter?
24     A  As I -- I think of the cover letter, and
25 the -- the attached correspondence.  But I don't

Page 79

*Libby*

1  ever recall receiving a copy of that New Yorker
2  article and I don't ever remember reading it.
3      Q  Did --
4         MR. LEWIS:  Could I have
5  Exhibit G-47.1.
6  BY MR. LEWIS:
7      Q  For the record, I'm handing you what has
8  been marked as G-47.1.  Could you identify that for
9  the jury, please.
10     A  This is a letter to O.F. Stewart from H.A.
11 Brown dated --
12     Q  What's the subject?
13     A  It was dated March 31st, 1971 and the
14 subject is smoking at Libby.
15     Q  Would you just read that to yourself
16 without reading that to the jury.  That might speed
17 up this process.  (Pause.)  Did that letter indicate
18 to you that Mr. Brown, who was a high official in
19 W.R. Grace understood as of March 31st, 1971, that
20 smoking was a particularly bad problem for workers
21 exposed to asbestos at the Libby facility?
22         MR. GRAHAM:  Objection, competency,
23 Your Honor.
24         THE COURT:  Overruled.
25         THE WITNESS:  This seems to indicate

Page 80

1  that, yes, sir.
2         MR. LEWIS:  I'll offer Plaintiffs'
3  Exhibit G-47.1.
4         MR. GRAHAM:  Objection, foundation,
5  competency, Your Honor.
6         MR. LEWIS:  I'll lay some foundation,
7  Your Honor.
8         THE COURT:  Proceed.
9  BY MR. LEWIS:
10     Q  Did you know Mr. H.A. Brown?
11     A  Yes, sir.
12     Q  What was his position with the company?
13     A  He was vice president of the construction.
14     Q  Did you know O.F. Stewart?
15     A  Yes, sir.
16     Q  Does this appear to be -- was he within
17 the company, also?
18     A  Yes, sir.
19     Q  Does this appear to be a document that was
20 prepared in the ordinary and usual course of the
21 business of W.R. Grace and Company?
22     A  It appears to be, yes, sir.
23     Q  Do you have any reason to question the
24 accuracy of this document?
25     A  No, sir.

Page 81

1    MR. LEWIS: Reoffer G-47.1.
2    MR. GRAHAM: Same objection. Doesn't
3 satisfy the exceptions to the hearsay rule.
4    THE COURT: Objection is overruled.
5 It may be admitted.
6 BY MR. LEWIS:
7    Q    That letter specifically states that there
8 is a problem with asbestos -- smoking in an asbestos
9 atmosphere, correct?
10    A    It appears to indicate that, yes, sir.
11    Q    Do you know -- Did you ever see that
12 document before today?
13    A    I don't really know whether I have or
14 not. I did not receive a copy of it.
15    Q    At that time you were the general manager
16 in Libby, right?
17    A    Yes, sir.
18    Q    The highest official in Libby, and the
19 people in Boston didn't tell you about that?
20    A    I never received a copy of this letter, as
21 it so indicates.
22    Q    At least people in Boston knew there was a
23 problem here, but they didn't tell you, right?
24    MR. GRAHAM: I would object again.
25 Argumentative again, Your Honor.

Page 82

1    THE COURT: Sustained. It is
2 argumentative.
3 BY MR. LEWIS:
4    Q    Does this indicate to you that the people
5 in Boston, the high officials, knew about the
6 synergistic effect of smoking and asbestos?
7    A    It appears so, yes, sir.
8    Q    Did they tell you about that problem in
9 1971?
10    A    I don't recall it, no, sir.
11    Q    The men that were diseased before Dan
12 Schneider was hired, in 1973 -- Were there men that
13 were diseased?
14    A    Yes, sir.
15    Q    A large number of them?
16    A    Well, there were men diseased. I don't
17 know what a large number means.
18    Q    Well, had there been men who had died from
19 asbestos exposure by then?
20    A    Yes, sir.
21    Q    Had there been men who contracted
22 asbestosis before Dan Schneider was hired?
23    A    Yes, sir.
24    Q    Had there been men that had interstitial
25 fibrosis before Dan was hired?

Page 83

1    A    Yes, sir.
2    Q    Do you know if anybody told Dan about that
3 before he was hired?
4    A    I don't know.
5    Q    Now Peter Kostic was a resident of Libby,
6 correct?
7    A    No, sir.
8    Q    Where did he reside?
9    A    Cambridge, Massachusetts.
10    Q    What was his position with the company?
11    A    He was a safety engineer for Construction
12 Products Division.
13    Q    Do you know whether he kept track of
14 health-related problems in Libby?
15    A    No, sir, I don't know.
16    Q    You remember Bleich, right?
17    A    Yes, sir.
18    Q    Who was his boss?
19    A    Well, at what point?
20    Q    When the company was initially acquired by
21 W.R. Grace.
22    A    J.A. Kelley.
23    Q    Who succeeded Kelley as president?
24    A    R.W. Sterrett.
25    Q    Were those men all advised of the reports

Page 84

1 from the Montana Health Department -- Montana State
2 that you had a serious health problem concerning
3 asbestos exposure at your Libby facility?
4    A    I believe so, yes, sir.
5    Q    Did they do anything to bring it to the
6 attention of the employees?
7    A    Not that I recall, no, sir.
8    Q    In fact, they told you to keep it
9 confidential; is that correct?
10    A    No, sir.
11    Q    Did they give you any directions to tell
12 the men about the problems?
13    A    No, sir.
14    Q    Did they take any action whatsoever to
15 address the problem?
16    A    Well, yes, sir, we were continuously
17 taking steps to improve the atmosphere of the
18 industrial environment for our people by making
19 improvements in controlling dust at the operation.
20    Q    But at least as of the latest report from
21 the State, Dan Schnetter's hiring, you continued to
22 have a significant health problem in the old dry
23 mill, correct?
24    A    We continued to have a dust problem, yes,
25 sir.

Page 85

*Libby*

1  Q  A dust problem.
2  A  Yes, sir.
3  Q  You didn't have an asbestos problem?
4  A  Asbestos is one of the ingredients in the
5  dust.
6  Q  Okay.  But it wasn't the dust that was
7  killing these men, it was the asbestos, correct?
8  A  Well, asbestos was the bad actor in the
9  dust.
10  Q  Right.  It was the bad actor.  And you
11  knew at the time that Dan Schneider was hired that
12  your men were being exposed daily to this asbestos
13  hazard, correct?
14  A  Yes, sir.
15  Q  You knew that there was no way that --
16  when they were working in the dry mill, to protect
17  them from that hazard, correct?
18  A  No, sir.
19  Q  Well, if they couldn't see it and they had
20  to breathe, weren't they going to get asbestos up
21  there?
22  A  They were required to wear respirators
23  when they were working in the dry mill, and
24  respirators were approved as an application where
25  the harmful dust would be removed.

Page 86

*Libby*

1  Q  Well, if these respirators work so
2  good, how come all these guys got asbestosis and
3  disease --
4      MR. GRAHAM:  Objection, argumentative
5  again, Your Honor.
6  BY MR. LEWIS:
7  Q  Do you know how they got asbestosis if
8  they worked --
9  A  Is there an objection pending here?
10      THE COURT:  The other objection --
11  He changed his question, Mr. Lovick.  The first
12  objection in fact I sustained -- I didn't say it,
13  but I sustained it because he changed his question.
14      THE WITNESS:  Thank you, Your Honor.
15  BY MR. LEWIS:
16  Q  Do you know how they got asbestos if
17  they -- if it wasn't dangerous up there?
18  A  Well, no, they got asbestos from
19  breathing -- they got asbestosis from breathing
20  asbestos dust.
21  Q  You followed the company rules, I assume?
22  A  Yes, sir.
23  Q  And you got it?
24  A  Yes, sir.
25  Q  And all the other management officials

Page 87

*Libby*

1  followed the rules and a number of them got it,
2  right?
3  A  Yes, sir.
4  Q  Mr. Melcher got it?
5  A  Yes, sir.
6  Q  Mr. McCaig got it?
7  A  Yes, sir.
8  Q  And you all followed the rules, right?
9  A  I think so, yes, sir.
10  Q  But you all knew about it, didn't you?
11  A  Yes.
12  Q  And the men weren't told, were they?
13  A  Well, I don't know that they were not told
14  specifically --
15  Q  You didn't tell them, did you?
16  A  No.  And again, I guess at what point in
17  time?
18  Q  Well, you didn't tell them on the safety
19  committee right up until the time you left in 1983.
20  You have already testified to that.  You never
21  brought up the subject of asbestos in the safety
22  committee.  You agreed to that about an hour and a
23  half ago; do you recall that?
24  A  Yes, sir.
25  Q  Where else would you bring it up if you

Page 88

*Libby*

1  didn't bring it up in the safety committee?  It was
2  a safety issue, right?
3  A  Yes, sir.
4  Q  Forgive me, but I have got to go through
5  some documents here to get them in evidence here,
6  and I think we will about wrap it up.
7      MR. LEWIS:  Could I have Plaintiffs'
8  Exhibit G-5, please.  Is G-9 in evidence?  I would
9  offer G-9.
10      THE COURT:  That was 10, wasn't it?
11      MR. SLOVAK:  No, 9.
12      THE WITNESS:  Here is 10.
13      MR. LEWIS:  I think you're right -- I
14  think G -- I don't think G-9 has been -- Do you have
15  G-5 and G-9?
16  BY MR. LEWIS:
17  Q  I'm going to hand you G-5.  Have you ever
18  seen that document before?
19  A  No, sir, I don't ever recall seeing this
20  document.
21  Q  Did that appear in the records of W.R.
22  Grace or Zonolite?
23  A  I don't know.
24  Q  You don't know where it came from?
25  A  No, sir.

TRANSCRIPT OF PROCEEDINGS    CondenseIt!™    SCHNETTER vs W.R. GRACE

Page 89

*Libby*

1  Q G-9? Is G-9 a 1956 State report, first
2  identifying to you that asbestos was a toxic
3  substance?
4  A (Pause.) Is there a question?
5  Q Yes. Is G-9 the State report -- 1956
6  State report that first identified for you the fact
7  that asbestos was a toxic substance?
8  A Yes, sir.
9  Q And that you had this toxic substance as a
10 by-product of your vermiculite mining operation?
11 A Yes, sir.
12 Q G-7?
13     MR. LEWIS: G-13, G-13.3 and G-15,
14 16, 17.
15 BY MR. LEWIS:
16 Q I'm handing you what has been marked as
17 G-13. Do you recognize that document?
18 A Yes, sir.
19 Q Is that a 1963 report from the State?
20 A Yes, sir.
21 Q And does -- Did you receive that?
22 A Yes, sir.
23 Q As you received G-9, correct?
24 A Yes.
25 Q What does G-13 purport to be?

Page 90

*Libby*

1  A It's stated that it's an industrial
2  hygiene study made at the Zonolite company at Libby,
3  Montana.
4  Q And did you folks quarrel with that
5  report?
6  A No, sir.
7  Q And in the Conclusions and Recommendations
8  in that State report, "As noted in all previous
9  reports, considerable effort should be made,
10 immediately, to improve the dust control procedures
11 in the plant to reduce dustiness to an acceptable
12 level." Does it say that?
13 A Yes, sir.
14     MR. LEWIS: I would offer G-9 and
15 G-13, Your Honor.
16     THE COURT: Any objection?
17     MR. GRAHAM: No objection.
18 BY MR. LEWIS:
19 Q I'm handing you what has been marked as
20 G-13.3. Have you ever seen that document?
21 A Yes, sir.
22 Q And what is that?
23 A It's a letter from Woodrow Nelson, MD, to
24 Maryland Casualty Company dated 14th of February of
25 1964.

Page 91

*Libby*

1  Q Did you receive a copy of that within a
2  short period of time after that, February 14, 1964?
3  A I believe so, yes, sir.
4  Q Did it identify the fact that Eitel Ludwig
5  was diagnosed with a disease because of asbestos
6  exposure?
7  A It does not -- Yes, he's suffering from
8  pneumoconiosis, almost certainly from the asbestos
9  content of the dust.
10 Q That's what it said and you got that and
11 you knew about that?
12 A Yes, sir.
13 Q And neither you nor any other management
14 official told the employees about that, correct?
15 A No, sir.
16 Q You didn't tell anybody; is that correct?
17 A Yes, sir, that's correct.
18     MR. LEWIS: I would offer Plaintiffs'
19 G-13.3.
20     MR. GRAHAM: No objection.
21     THE COURT: 13.3 will be admitted
22 without objection.
23     MR. LEWIS: I'm sorry, I need G-14
24 also.
25 BY MR. LEWIS:

Page 92

*Libby*

1  Q I'm handing you Exhibit G-14. Would you
2  identify that for the jury -- or, for the Court.
3  A It's a letter to J.A. Kelley, General
4  Manager of Zonolite Division, W.R. Grace, Chicago
5  arcs, and it's written by an a C.A. Graf. It's on
6  the letter of Western Mineral Products Company,
7  Minneapolis.
8  Q Did you receive a copy of that letter?
9  A Yes, sir.
10 Q It says on the bottom, it says cc Mr. E.D.
11 Lovick?
12 A Yes, sir.
13 Q And the subject of the letter is
14 vermiculite dust health hazard; is that correct?
15 A Yes, sir.
16 Q April 2, 1964?
17 A Yes, sir.
18 Q What did you do in response to receiving a
19 copy of this letter?
20 A 1 -- As I recall, I wrote to Mr. Pratt
21 about the vermiculite dust health hazard in Libby.
22 Q What did you tell him?
23 A Well, I told him what the situation was as
24 far as we knew it.
25 Q Did you tell him that you had a hazard?

Page 93

*Libby*

1   A   I don't recall that I would have used
2   those words.
3   Q   Now, he's inquiring about a vermiculite
4   dust health hazard?
5   A   Yes.
6   Q   Did you confirm or deny that you folks had
7   a vermiculite dust health hazard?
8   A   I don't recall.
9   Q   But you did receive this letter; is that
10   correct?
11   A   Yes, sir.
12      MR. LEWIS: Offer Plaintiffs' G-14.
13      MR. GRAHAM: No objection.
14      THE COURT: Any objection?
15      MR. GRAHAM: No objection, Your
16   Honor.
17   BY MR. LEWIS:
18   Q   Handing you what has been marked as G-15,
19   did you receive a copy of that document?
20   A   I was the author of this document.
21   Q   Okay, and is that your response?
22   A   Yes, sir.
23   Q   Okay. Now, as part of G-14 -- We should
24   go back. There is another letter, correct? An
25   April 1 letter?

Page 94

*Libby*

1   A   Yes, sir.
2   Q   And you were responding to these two
3   letters by G-15; is that correct?
4   A   Yes, sir.
5   Q   And the second letter was actually -- is
6   dated April 1; is that correct?
7   A   Yes.
8   Q   And in that letter to Mr. Pratt, the City
9   of Minneapolis, Division of Public Health, is making
10   inquiry concerning your asbestos problem; is that
11   correct?
12   A   Well, this opening paragraph of this
13   letter states, "The death of an employee of another
14   company who had a long exposure to vermiculite dust
15   has renewed our interest in the importance of
16   vermiculite dust in the causation of lung disease."
17   I don't see anything where it says anything about
18   asbestos.
19   Q   Vermiculite dust could only cause
20   asbestosis or lung disease if it had asbestos in it,
21   correct?
22   A   I believe that would be correct, yes,
23   sir.
24   Q   So you weren't mining asbestos up there,
25   you were mining and processing vermiculite, right?

Page 95

*Libby*

1   A   Yes, sir.
2   Q   As you said earlier, the vermiculite that
3   went out of this facility never was able to be
4   completely decontaminated from tremolite asbestos,
5   correct?
6   A   Yes, sir.
7   Q   When you responded to this -- these
8   letters in Exhibit 15, did you inform Mr. Pratt of
9   Western Mineral Products Company of the fact that
10   you had a problem with asbestos in 1964?
11   A   Yes, sir.
12   Q   Did you tell him that you had by then men
13   who were diseased from being exposed to your
14   facility?
15      MR. GRAHAM: Objection, the document
16   speaks for itself.
17      THE COURT: Sustained.
18   BY MR. LEWIS:
19   Q   Let me ask you this. You sent a letter to
20   Mr. Pratt informing him that a man had died from
21   lung problems, or you had some positive x-rays,
22   correct?
23   A   Yes, sir.
24   Q   Mr. Pratt was from Western Mineral
25   Companies, a totally different company than yours,

Page 96

*Libby*

1   right?
2   A   Yes.
3   Q   Did you do business with that company?
4   A   Yes, sir.
5   Q   And you were providing vermiculite to that
6   company, right?
7   A   Yes, sir.
8   Q   Mr. Pratt was concerned that this employee
9   that he had had got -- had been poisoned from your
10   vermiculite, right?
11      MR. GRAHAM: Object. Again, the
12   documents speak for themselves.
13   BY MR. LEWIS:
14   Q   Is that your understanding?
15      THE COURT: That's overruled, that
16   question.
17      THE WITNESS: Would you repeat the
18   question, please.
19   BY MR. LEWIS:
20   Q   Was it your understanding that Mr. Pratt
21   was inquiring as to whether the cause of this man's
22   disease was your vermiculite? Correct?
23   A   I believe so, yes, sir.
24   Q   And you wanted to continue to do business
25   with that company, correct?

**Libby**

Page 97

1  A  Yes, sir.
2  Q  And you told him about the problem,
3 correct?
4  A  Yes.
5  Q  But you didn't tell your employees at the
6 same time, didn't you?
7  A  No, sir.
8  Q  I'm handing you what has been marked as
9 Plaintiffs' G-16. Have you seen Plaintiffs'
10 Exhibit G-16 before?
11  A  Yes, sir.
12  Q  What is it, please?
13  A  It's a letter from Mr. Wake in which he
14 encloses a copy of a study of the dry mill section
15 of the plant in Libby.
16  Q  Did you receive this document?
17  A  Yes, sir.
18  Q  Would it have been around May 11th, 1964?
19  A  Yes, sir.
20  Q  And it was addressed to your manager,
21 Mr. Bleich, correct?
22  A  Yes, sir.
23  Q  Did it identify any more significant
24 health problems?
25  A  I don't know. I would have to review it.

**Libby**

Page 98

1  Q  Look at the top of the third page of the
2 document. Or actually look at the second
3 paragraph. Does it say that -- Does it again remind
4 you that your operation -- the asbestos content of
5 the material at your operations creates a
6 significant health risk for your employees?
7          MR. GRAHAM:  Object again. The
8 document speaks for itself, Your Honor.
9          THE COURT:  What page are you
10 referring to, counsel?
11          MR. LEWIS:  Page 3 of 5. Second
12 paragraph.
13          THE COURT:  Overruled. He may
14 answer.
15          THE WITNESS:  I wonder if I could ask
16 you to repeat that question, please.
17 BY MR. LEWIS:
18  Q  Did this document, in general, remind you
19 again that you had a significant health problem with
20 asbestos at your facility according to the State
21 authorities?
22  A  Yes, sir, it did.
23  Q  And did you give that to your employees?
24  A  No, sir.
25  Q  I'm handing you what has been marked as

**Libby**

Page 99

1 G-17.
2          MR. LEWIS:  I haven't offered
3 Plaintiffs 15 or 16, have I?
4          MR. SLOVAK:  No.
5          MR. LEWIS:  Offer Plaintiffs'
6 Exhibit 15 and 16.
7          MR. GRAHAM:  No objection.
8          THE COURT:  15 and 16 will be
9 admitted without objection.
10 BY MR. LEWIS:
11  Q  Have you seen this document, Plaintiffs'
12 Exhibit G-17 before today?
13  A  Yes, sir.
14  Q  And what is it, please?
15  A  This is a letter from Woodrow Nelson, MD,
16 dated 8-25-64, to Joseph Kelley, with the Zonolite
17 Division.
18  Q  So he wrote directly to the president.
19 And what did he offer to do, generally?
20  A  He offered to carry out an analysis of the
21 data concerning x-ray studies on our employees.
22  Q  In the second paragraph does he document a
23 meeting of doctors and Libby Zonolite personnel?
24  A  Yes, sir.
25  Q  Did you attend that meeting?

**Libby**

Page 100

1  A  Yes, sir.
2  Q  And did he correctly state here that at
3 this meeting the consensus of local medical opinion
4 was that an increased incidence of chronic
5 respiratory disease existed in Zonolite employees
6 who had prolonged exposure to dust?
7  A  I don't recall that, but this is what he
8 states, so it probably was correct.
9  Q  You don't have any reason to question that
10 then?
11  A  No, sir.
12  Q  And what did Mr. Kelley do about this?
13  A  I don't know.
14  Q  Did Mr. Kelley ever contact you or the
15 management in Libby as far as you know to try to
16 address this problem that Dr. Nelson had identified
17 for you?
18  A  I don't recall, no, sir.
19  Q  And at that time Mr. Kelley was still in
20 Chicago?
21  A  Yes, sir.
22  Q  But this was after the acquisition of
23 Zonolite by W.R. Grace, correct?
24  A  Yes.
25          MR. LEWIS:  I'll offer Plaintiffs'

TRANSCRIPT OF PROCEEDINGS     CondenseIt!™     SCHNETTER vs W.R. GRACE

Page 101

1 Exhibit G-17.
2     MR. GRAHAM: No objection.
3     THE COURT: G-17 will be admitted
4 without objection.
5 BY MR. LEWIS:
6    Q   Who was George W. Blackwood?
7    A   George Blackwood was president of Dewey
8 and Almy Chemical Division which, initially,
9 Zonolite Company came under when we first were
10 acquired by W.R. Grace.
11    Q   Okay. So Dewey and Almy, was that the
12 precursors to the Construction Products Division?
13    A   Well, in a sense, yes. The Construction
14 Products Division was set up after the acquisition
15 of Grace and they split off from Dewey and Almy, and
16 I think operations at a couple of the other
17 divisions also went into the makeup of Construction
18 Products Division.
19    Q   In 1964, was Mr. Blackwood a high official
20 for W.R. Grace and Company?
21    A   Yes, sir, he was president of Dewey and
22 Almy Chemical Division.
23    Q   Do you know of anything that Mr. Blackwood
24 did at that time to minimize or insulate Grace's
25 exposure from liability for asbestos-related disease

Page 102

1 to its employees?
2    A   No, sir, I don't.
3    Q   Did Mr. Blackwood ever correspond with
4 you?
5    A   Not with me, no, sir.
6    Q   Do you know if he corresponded with
7 Mr. Kelley?
8    A   I'm sure he did, yes, sir.
9    Q   Who was Mr. Cahalane? I'm not sure if I
10 pronounced that right.
11    A   Cahalane is correct. He was an employee
12 in the Construction Products Division. He was in
13 charge of cash management and he was in charge of
14 insurance, among other things.
15    Q   Did he work closely over the years with
16 you?
17    A   Well, yes, he worked with us somewhat.
18    Q   And did he work with Mr. Eschenbach?
19    A   I can't answer that. I don't know.
20    Q   Did you work with Mr. Eschenbach?
21    A   Yes.
22    Q   What was Mr. Eschenbach's position with
23 the company?
24    A   He was in charge of toxicology in the
25 Construction Products Division.

Page 103

1    Q   So you don't know one way or the other
2 whether Mr. Cahalane or Mr. Eschenbach worked
3 together on claims matters?
4    A   No, sir, I don't.
5    Q   Or whether they worked together on
6 occupational toxic exposure?
7    A   I just don't know what their relationship
8 would have been.
9    Q   Okay. Fair enough. I'll get on to
10 another question. But you worked with Mr. Cahalane,
11 correct?
12    A   Yes, sir.
13    Q   What did you do with Mr. Cahalane?
14    A   Mr. Cahalane was responsible for cash
15 management, as I said, and we got our cash from the
16 Construction Products Division, if you will, and so
17 we worked back and forth on that -- on the balances
18 we would keep in the Libby bank. And I also worked
19 with Mr. Cahalane, who was responsible for, I
20 believe, all of the insurance for the Construction
21 Products Division. If we had any insurance
22 problems, I would work with him.
23    Q   So Mr. Cahalane was primarily responsible
24 for hanging on to the company's money, right?
25    A   Well, I --

Page 104

1    Q   Would that be correct?
2    A   I'm sure that any money he had, he would
3 have to see that it was safeguarded, yes, sir.
4    Q   He was a financial man. He was trying to
5 see that the money was spent wisely and they weren't
6 spending too much money for things such as
7 occupational exposure to chemicals or substances,
8 right?
9     MR. GRAHAM: Objection, foundation.
10 Argumentative.
11     THE COURT: Rephrase the question,
12 Counsel.
13 BY MR. LEWIS:
14    Q   Mr. Cahalane was -- One of the principle
15 parts of his job, since you worked with him rather
16 closely, was to limit the company's liability for
17 occupational exposures that resulted in disease,
18 correct?
19    A   Well, he was responsible for the insurance
20 which would cover the company in that regard, yes,
21 sir.
22    Q   Who was Mr. Kingery?
23    A   I don't know exactly, except he was an
24 officer of W.R. Grace in New York.
25    Q   Who was Mr. C.F. Krauter?

**Page 105**

1  A  I don't know.
2  Q  Mr. Samuels?
3  A  Mr. Samuels was an officer of one of the
4 other divisions in Cambridge, I believe. I'm not
5 even sure which division.
6  Q  Mr. Stover?
7  A  I don't know.
8  Q  Mr. Taggart?
9  A  Mr. Taggart at one time was the president
10 of Dewey and Almy Chemical Division.
11  Q  All of these individuals I've mentioned
12 were very high officials within the W.R. Grace
13 family of companies, right?
14  A  Yes, sir.
15  Q  Okay.
16      MR. LEWIS: Could I have G-19.1,
17 please.
18 BY MR. LEWIS:
19  Q  I'm handing you what has been marked and
20 identified as Plaintiffs' G-19.1, which purports to
21 be a December 16, 1964, letter from George Blackwood
22 to J.A. Kelley. Do you see that?
23  A  Yes, sir.
24  Q  Does that document appear to be a document
25 prepared in the ordinary and usual course of the

**Page 106**

1 business of W.R. Grace and Company?
2  A  Yes, sir, it would appear to be.
3  Q  Would it be an ordinary and usual thing
4 for Mr. Blackwood to correspond with Mr. Kelley
5 concerning important financial matters?
6  A  Well, I don't think it would be unusual
7 for him to correspond with Mr. Kelley at all because
8 I believe at that time Mr. Blackwood was Joe
9 Kelley's boss.
10  Q  That was the next question. When
11 Mr. Blackwood talked to Mr. Kelley, he was supposed
12 to do something about it, right?
13  A  Yes, sir.
14  Q  Okay.
15      MR. LEWIS: I move the admission of
16 G-19.1.
17      MR. GRAHAM: Objection, foundation,
18 hearsay. Doesn't fall within the exception to the
19 hearsay rule -- business records exception to the
20 hearsay rule.
21      THE COURT: Overruled. It may be
22 admitted.
23 BY MR. LEWIS:
24  Q  Does the third paragraph of this letter
25 state, "We cannot solely rely on Maryland Casualty

**Page 107**

1 Company's doctor to be 'interested in this problem.'
2 Zonolite, and you particularly, must direct the
3 effort to minimize Grace's exposure." Is that what
4 it says?
5  A  Yes, sir.
6  Q  And we have gone through the Maryland
7 Casualty doctor's report. Did you get a copy of
8 this document?
9  A  No, sir.
10  Q  Did Mr. Kelley ever contact you regarding
11 minimizing Grace's exposure?
12  A  Well, I don't -- I don't recall that he
13 ever would have contacted me on that particular --
14 in those particular words.
15  Q  Well, did anybody from W.R. Grace, higher
16 officials, ever contact you concerning limiting your
17 exposure to liability for asbestos claims for your
18 workers?
19  A  No, sir, but I would like to point out
20 that I am not the one that Mr. Kelley would have --
21 would have directed that sort of thing to. He would
22 have directed that to the Libby manager, who at that
23 time was Mr. Bleich.
24  Q  Okay.
25      MR. LEWIS: I would like exhibit

**Page 108**

1 number G-20.
2 BY MR. LEWIS:
3  Q  Handing you what has been marked as
4 Exhibit Number G-20, this is a letter to Mr. Kelley
5 from Mr. Bleich.
6  A  Yes, sir, that's what it is.
7  Q  Did that appear to be responsive to the
8 previous letter we were just talking about, which
9 was G-19?
10      MR. GRAHAM: Objection, calls for
11 speculation.
12      THE COURT: If he knows, he may
13 answer.
14      THE WITNESS: I don't know that it is
15 a response to that letter.
16 BY MR. LEWIS:
17  Q  It's a January 2, 1985 (sic), letter,
18 correct?
19  A  Yes.
20  Q  From Mr. R.A. Bleich, Libby Manager, to
21 Mr. J.A. Kelley, the president at the home office in
22 Chicago, at that time?
23  A  Yes.
24  Q  Was that letter prepared in the usual and
25 ordinary course of business in the W.R. business?

**Page 109**

1    A  Yes, sir.
2        MR. SLOVAK: Tom, 1965.
3        MR. LEWIS: I apologize if I said
4  1975. It's 1965.
5        THE WITNESS: That's correct. Yes,
6  sir.
7        MR. LEWIS: And it says -- I'm going
8  to offer G-20.
9        MR. GRAHAM: I would object on the
10  basis of competency, hearsay, and not falling within
11  the hearsay -- or the business records exception to
12  the hearsay rule, Your Honor.
13        THE COURT: Overruled. It may be
14  admitted.
15  BY MR. LEWIS:
16    Q  The letter states, in the first two
17  paragraphs, "Dear Joe. Earl has sent to you copies
18  of all reports we have from Montana State Board of
19  Health on the dust problem. In going over these
20  reports, I can only say that it represents a very
21  sorry record. There is some improvement indicated
22  during 1964 but still totally inadequate."
23        Do you agree with Mr. Bleich's assessment
24  of your performance as of January, 1965?
25    A  I don't know -- That's what -- That's what

**Page 110**

1  Mr. Bleich states.
2    Q  Do you agree with that?
3    A  That's apparently his opinion. I don't
4  know that I would agree with it in total, no, sir.
5    Q  He was your supervisor?
6    A  Yes, sir.
7    Q  And he references the fact that you had
8  sent copies of all of the reports to Mr. Kelley,
9  correct?
10    A  Yes, sir.
11    Q  You routinely did that?
12    A  Yes, sir.
13    Q  You routinely made copies of those reports
14  identifying the serious health hazard to the
15  president of your company in every case, correct?
16    A  I believe so, yes, sir.
17    Q  But you didn't do it -- You didn't send
18  them to the employees, did you?
19    A  No, sir.
20    Q  Correct?
21    A  That is correct, we did not send them to
22  the employees.
23        MR. LEWIS: Plaintiffs'
24  Exhibit 20.1.
25  BY MR. LEWIS:

**Page 111**

1    Q  I'm handing you a document marked
2  Plaintiffs' Exhibit 20.1. What's the date of that
3  document?
4    A  January 2nd, 1965.
5    Q  And that happens to be exactly the same
6  date that Mr. Bleich wrote to Mr. Kelley, as
7  evidenced by G-20, correct?
8    A  Yes, sir.
9    Q  And you wrote this interoffice
10  correspondence of January 2, 1965, to Mr. Kelley,
11  correct?
12    A  Yes, sir.
13    Q  And the subject is what?
14    A  Dust at Libby.
15    Q  In this letter or this report that you
16  wrote to Mr. Kelley, did you intend it to be
17  accurate?
18    A  Yes, sir.
19    Q  He was the highest official in the
20  Zonolite division, correct?
21    A  Yes, sir.
22    Q  And did you intend to give him some
23  guidance as to what to do with this health problem?
24    A  I don't know. I think it was my intent to
25  tell him what the situation was.

**Page 112**

1    Q  Do you remember when I asked you earlier
2  whether or not you instituted the x-ray program for
3  the benefit of the employees or for the benefit of
4  company? Do you recall that?
5    A  Yes, sir.
6    Q  Did you say in this report, "In order to
7  protect ourselves and place ourselves on record as
8  to the condition of our employees, as of the
9  effective date of the law, we instituted a program
10  whereby all of our employees would have x-rays at
11  the local hospital." Did you say that?
12        MR. GRAHAM: Excuse me, Counsel.
13  Could you point out where that is?
14        MR. LEWIS: That's fair.
15        MR. GRAHAM: For my edification and
16  for the witness'.
17  BY MR. LEWIS:
18    Q  We're starting with that. Read that
19  sentence there (indicating).
20        THE COURT: What page, Counsel?
21        MR. LEWIS: Page 2.
22        THE WITNESS: Page 2.
23        THE LEWIS: "In order to protect
24  ourselves and place ourselves on record as to the
25  condition of our employees, as of the effective date

**TRANSCRIPT OF PROCEEDINGS**    CondenseIt!™    **SCHNETTER vs W.R. GRACE**

Page 113

1  of the law, we instituted a program whereby all of
2  our employees would have x-rays at the local
3  hospital."
4        MR. GRAHAM: We would request that in
5  fairness to the jury, to understand what the context
6  is, that the preceding portion of the statement be
7  read, too, because otherwise it's -- We would object
8  to it as being only a partial and unintelligible
9  statement of what the witness was addressing.
10       MR. LEWIS: I have absolutely no
11 objection to that. I'll start with, "This law
12 specified..." Is that satisfactory?
13       MR. GRAHAM: At the beginning of the
14 paragraph.
15 BY MR. LEWIS:
16    Q  In 1956 we started requiring -- Well, I
17 don't know what that is.
18       MR. GRAHAM: No, the paragraph at the
19 top of the page.
20       MR. LEWIS: All right.
21 BY MR. LEWIS:
22    Q  "Montana has had for many years an
23 Industrial Accident law, but it was not until 1959
24 that they passed an industrial disease law. This
25 law specified certain specific industrial diseases

Page 114

1  for which employers would be responsible. The only
2  specified disease which we felt could apply to us
3  was silicosis.
4        "The law stated that employers would not
5  be responsible for anything which had been
6  contracted by their employees prior to the date that
7  the law became effective. However, they would be
8  responsible for any contraction of disease after
9  that date or any aggravation of the condition which
10 existed in the employee due to industrial conditions
11 which existed in a particular plant.
12       "In order to protect ourselves and place
13 ourselves on record as to the condition of our
14 employees, as of the effective date of the law, we
15 instituted a program whereby all of our employees
16 would have x-rays at the local hospital. We made
17 arrangements with the hospital to schedule these
18 x-rays and in turn we arranged to have the employees
19 there at the stipulated time. All x-rays were
20 interpreted by a radiologist and a report written on
21 each one."
22       So does that refresh your recollection as
23 to why you instituted the x-ray program?
24    A  Yes, sir.
25    Q  You instituted that x-ray program for W.R.

Page 115

1  Grace, not for the employees; is that true?
2    A  Yes, but the employees could also benefit
3  from this.
4    Q  But it was merely an incidental benefit;
5  is that true?
6    A  It would be an additional benefit.
7    Q  Now, did this program directly advise the
8  employees of the results of their x-rays?
9    A  Yes, sir.
10   Q  Didn't they have to go to their doctors to
11 get the x-rays?
12   A  Yes, sir.
13   Q  And that was, you did not have to give any
14 information to the employees as to their physical
15 condition so that you would not be liable for in any
16 way of giving out information, right?
17   A  No, sir, that's not true at all.
18   Q  Read the last two -- Just read the last
19 sentences of the second paragraph. Read it to the
20 jury, please.
21       MR. GRAHAM: Again --
22       MR. LEWIS: This directly impeaches,
23 Your Honor.
24       THE COURT: You said the last two
25 sentences.

Page 116

1        MR. LEWIS: The last sentence.
2        THE WITNESS: In the second
3  paragraph.
4        MR. GRAHAM: I would make the same
5  objection, Your Honor. It's incomplete and
6  misleading to the jury.
7        THE COURT: Is it all right if he
8  reads the other part, Counsel? I think that's what
9  you're objecting to.
10       MR. GRAHAM: Yes.
11       THE COURT: He wants the preceding
12 paragraphs, I'm assuming.
13       MR. LEWIS: Preceding paragraphs?
14       THE COURT: Preceding sentences.
15       MR. LEWIS: Yeah, I have no objection
16 to that.
17       MR. GRAHAM: Starting with, "The
18 doctors ..."
19       MR. LEWIS: Your Honor, this is my
20 examination, not his, okay.
21       THE COURT: He can ask if he wants.
22 Overruled. Proceed, Counsel.
23 BY MR. LEWIS:
24   Q  Read the last two sentences, please.
25   A  "This applied to all employees, even those

TRANSCRIPT OF PROCEEDINGS    CondenseIt!™    SCHNETTER vs W.R. GRACE

**Page 117**

1 whose x-ray interpretations showed normal chests.
2 In this way, we did not give any information to the
3 employees as to their physical condition, so we
4 could not be responsible for or liable in any way
5 for giving out information which might be construed
6 as misleading."
7    Q  Did the preliminary results of these
8 x-rays indicate a high incidence of pulmonary
9 disease among your employees?
10    A  I don't know.
11    Q  Would you read the last paragraph on the
12 page, please.
13    A  "After all the results of these x-rays
14 were in, we again met with the doctors and with the
15 radiologist and discussed what our situation
16 actually was in regard to pulmonary diseases from
17 our operation.  The preliminary results of the
18 interpretations made it appear that we had a high
19 incidence of pulmonary disease among our employees.
20        "However, after the doctors had analyzed
21 the results, the conclusion they came to was that
22 there was nothing to indicate that there was a
23 higher incidence of pulmonary trouble among our
24 people than there was among any other group in this
25 geographical area.

**Page 118**

1        "In other words, they felt that they
2 could not come to any conclusion as to whether our
3 mill operation presented an above-normal occurrence
4 of respiratory trouble.  The radiologist who had had
5 industrial disease experience in the coal mine
6 fields of Indiana could offer nothing constructive
7 in the way of a conclusion either."
8    Q  Read the rest of the paragraph.  There is
9 another sentence on the other page.  Well, read the
10 next two lines.
11    A  "In this regard, Libby itself has an air
12 pollution problem.  Enclosed is a copy of a news
13 release from the local paper on the subject."
14    Q  Okay.  In 1965, you're writing to
15 President Kelley and you're telling him that you
16 don't have any more problem there than anybody else
17 in Libby?
18    A  No, sir, I'm not telling them at all --
19 him that at all.  I'm telling him what the consensus
20 of the doctors in Libby were.
21    Q  Did you meet with the doctors?
22    A  Yes, sir.
23    Q  These doctors were paid by you folks to do
24 this study?
25    A  No, sir.

**Page 119**

1    Q  Well, why would you meet with these
2 doctors?
3    A  So that we could tell them what we were
4 doing and why we were doing it and ask their
5 cooperation about giving the results of these x-rays
6 to the employees of ours who had designated them as
7 their primary physicians.  And they agreed to do
8 this.
9    Q  None of them were pulmonologists, were
10 they?
11    A  No, sir.
12    Q  In fact, W.R. Grace never consulted a
13 pulmonary regarding the condition of their
14 employees; is that true?
15    A  I don't know.
16    Q  But in any event, were you trying to
17 convince Mr. Kelley that you didn't have a problem
18 in 1965?
19    A  No, sir, I was not.
20    Q  You knew very well you had a problem in
21 1965, correct?
22    A  I was telling Mr. Kelley what we knew.
23    Q  If you didn't have a problem, if these
24 doctors -- if you were accurately reporting what
25 these doctors were saying, why were you so worried

**Page 120**

1 about representations being made to the men?  Why
2 couldn't you tell them directly?
3    A  Very simple, Counselor.  We had the
4 doctors tell the men.  In the event that there were
5 any abnormal x-rays, the doctors were in the
6 position to advise them whether any follow-up work
7 should be done.  Whatever the interpretations were,
8 the doctors could interpret those observations, the
9 radiologists, and tell them directly what it meant
10 and what the results were.  We were not medically
11 trained to be able to do this and come to the
12 conclusions the doctors could as to what these
13 people should do.
14    Q  Were these doctors medically trained in
15 this particular matter, if you know?
16    A  They were medically trained.
17    Q  Were they medically trained to handle
18 these kinds of conditions?
19    A  I don't know.
20    Q  You didn't request a specialist, correct?
21    A  No, sir, we did not.
22    Q  These were general practitioners in this
23 community?
24    A  Yes, sir.
25    Q  And they would just get an x-ray report or

TRANSCRIPT OF PROCEEDINGS        Condenselt!™        SCHNETTER vs W.R. GRACE

Page 121

1 would they get the x-rays?
2    A  They got the x-ray reports.
3    Q  They didn't get the x-rays, did they?
4    A  They were at the hospital. But they were
5 not radiologists, either. These x-rays were
6 interpreted by a radiologist who is better equipped
7 to interpret them than the general practitioners
8 were.
9    Q  After the tests were normal, then what
10 happened? Nothing, right? If the x-rays were
11 normal, nothing happened? The men weren't told
12 about --
13    A  Oh, yes, they were. Oh, yes.
14    Q  They were told it was normal?
15    A  Yes, sir.
16    Q  Or they were told no change, right?
17    A  They were told both.
18    Q  Did any of those reports say anything
19 about the fact that their lung condition or lung
20 changes, abnormalities, were associated with
21 asbestos exposure?
22    A  Some of them said --
23    Q  Just a second. Did those reports say any
24 of the problems were secondary to asbestos exposure?
25         MR. GRAHAM: I would object to

Page 122

1 counsel interrupting the witness' answer, Your
2 Honor.
3         THE COURT: Overruled. You may
4 answer, Mr. Lovick.
5         THE WITNESS: So far as I recall,
6 there were never any statements made that the
7 results of their chest condition, if there was one,
8 was the result of asbestos exposure.
9  BY MR. LEWIS:
10    Q  And you don't know if any of the doctors
11 that reviewed those x-rays were qualified or had the
12 experience to determine whether or not abnormalities
13 in the x-rays were associated with asbestos
14 exposure; is that true?
15    A  Well, I don't think that's true.
16    Q  What do you know, is the question. Do you
17 know whether they were qualified?
18    A  No, I don't.
19    Q  Now, would you go to page 4. Does this
20 list some employees as of January 2 who had abnormal
21 chests?
22    A  Yes, sir.
23    Q  Were all of these workers or were some of
24 them management?
25    A  I don't see on here any people who were

Page 123

1 management at that time.
2    Q  Did you give this report to any of these
3 people listed on page 4?
4    A  No, sir.
5    Q  No question you're the author of this
6 report?
7    A  No question.
8         MR. LEWIS: Offer Plaintiffs' Exhibit
9 G-20.1.
10        MR. GRAHAM: No objection.
11        THE COURT: Admitted without
12 objection.
13 BY MR. LEWIS:
14    Q  Mr. Lovick, were there discussions as to
15 how to go about attacking your dust problem at W.R.
16 Grace?
17    A  Yes.
18    Q  Were there discussions at high management
19 level?
20    A  Oh, I believe so, yes, sir.
21    Q  Did you ever discuss how to go about
22 correcting the problem with J.A. Kelley or
23 Blackwood?
24    A  With J.A. Kelley, but not with Blackwood,
25 no, sir.

Page 124

1    Q  Do you know if Mr. Kelley prepared a
2 report to Mr. Blackwood based upon your report of
3 January 2, 1965?
4    A  I don't know.
5         MR. LEWIS: Could I see
6 Exhibit 20.2.
7 BY MR. LEWIS:
8    Q  Handing you what has been marked as
9 Exhibit 20.2. For purposes of identification, is
10 that an interoffice correspondence from Mr. J.A.
11 Kelley to Mr. G.W. Blackwood which was dictated
12 January 8, 1965, and finally dated January 13, 1965?
13    A  Yes, sir.
14    Q  Mr. Blackwood was in Cambridge,
15 Mr. Blackwood was in Chicago; is that correct?
16    A  Yes, sir.
17    Q  You remember earlier you folks said that
18 you sent all of the reports to Mr. Kelley, correct?
19    A  Yes, sir, I said that.
20    Q  Did you send -- You said that you sent the
21 reports to Mr. Kelley as they became available to
22 you?
23    A  I believe so, yes, sir.
24    Q  I would like you to read that whole letter
25 so we don't have any objections and everything is

Page 125

1 put in its proper context to the jury. But I'll
2 offer it first. This is a -- This report was
3 prepared in the ordinary and usual course of
4 business of W.R. Grace and Company, correct?
5    A I believe so, yes, sir.
6    Q It's on official Zonolite Division, W.R.
7 Grace and Company letterhead?
8    A Yes, sir.
9    Q You recognize Mr. Kelley and Mr. Blackwood
10 as you described for the jury, correct?
11    A Yes, sir.
12        MR. LEWIS: Offer G-20.2.
13        MR. GRAHAM: Objection, comprehensive
14 hearsay objection, and further object on the basis
15 that the document does not fall within the business
16 records exception of the hearsay rule.
17        THE COURT: Objection is overruled.
18 20.2 will be admitted without objection.
19        MR. SLOVAK: Over objection.
20        THE COURT: Or over objection.
21 Excuse me. I'm sorry, Counsel. My question is,
22 we're 5 minutes to. By the time Mr. Lovick reads a
23 two page letter, do you still have further questions
24 of him?
25        MR. LEWIS: Yes. After this I

Page 126

1 have --
2        THE COURT: Very well, we will take a
3 noon recess and he can begin -- he can read the
4 letter when we return.
5        Ladies and gentlemen of the jury, you're
6 admonished not to discuss this case amongst
7 yourselves or with anyone else, nor allow anyone to
8 discuss the case with you. Nor shall you express or
9 form any opinion regarding the matter until it's
10 finally submitted to you for your decision. We will
11 return at 1:30. Be here by about 20 after so we can
12 start right away. Thank you. Court will stand in
13 recess.
14        (A recess was held in the proceedings.)
15
16        THE COURT: Will counsel agree that
17 the jury is all present?
18        MR. LEWIS: Agreed.
19        MR. GRAHAM: Yes, Your Honor.
20        THE COURT: Very well, I think,
21 Mr. Lewis, you were talking about Exhibit 20.3 and
22 you were going to have Mr. Lovick read it.
23        MR. LEWIS: Has it been admitted?
24        THE COURT: I think it did get
25 admitted.

Page 127

1        MR. SLOVAK: Yes.
2        MR. LEWIS: Thank you, Your Honor.
3 Good afternoon.
4        CROSS-EXAMINATION CONTINUED
5 BY MR. LEWIS:
6    Q I'm not going to have Mr. Lovick read this
7 whole exhibit. I'm just going to ask him a couple
8 of questions and I'll try to speed this process up.
9 What did you folks do about Dr. Nelson's
10 suggestions?
11    A Concerning the study that he wanted to
12 make?
13    Q Yes, concerning the long term problem with
14 some of your employees.
15    A Well, I -- I'm not sure that I understand
16 your question. If it -- The major effort that we
17 put in was trying to improve conditions up at the
18 operation to cut down on the amount of dust that was
19 present --
20    Q This was in 1965 --
21        MR. GRAHAM: I would object, Your
22 Honor. He cut the witness off again before the
23 answer has been completed.
24        MR. LEWIS: You were finished
25 answering the question, weren't you, sir?

Page 128

1        THE WITNESS: Yes.
2 BY MR. LEWIS:
3    Q I apologize. And if I do that again, as
4 your counsel suggests, just put up your hand and
5 I'll stop. You're entitled to finish your answer if
6 I ask an open question like that. Okay?
7    A Okay.
8    Q Did this report or this letter from
9 Mr. Kelley to Mr. Blackwood confirm that asbestos
10 had a known record for harmfulness at your
11 facility?
12    A Yes, sir.
13    Q Okay. Was this report provided to any of
14 your employees, other than management officials?
15    A Well, I don't know that this report was
16 made available to anybody at Libby.
17    Q So it was definitely back in Chicago and
18 in Boston or Cambridge, Massachusetts, but you don't
19 know whether this was ever given to you or the
20 employees here in Libby concerning the known record
21 for harmfulness of this asbestos?
22    A No, sir, I don't.
23        MR. LEWIS: Exhibit 20.3 and 20.4,
24 please. Make it 20.5, too, while we're at it.
25 BY MR. LEWIS:

Page 129

1   Q  I'm going to hand to you, sir, Plaintiffs'
2  Exhibit G-20.3, G-20.4 and 20.5.  Starting with
3  20.3, have you ever seen this document?
4   A  I don't recall -- I don't recall whether I
5  ever have or not, no, sir.
6   Q  Did the University of Maryland review a
7  group of records of employees from the W.R. Grace
8  company associated with the Zonolite operation in
9  northwestern Montana?
10   A  As I recall, they reviewed a group of
11  x-rays from our employees.
12   Q  Did you provide those to the University of
13  Maryland?
14   A  Well, they were provided by the hospital
15  in Libby, gathered there.
16   Q  Do you know how this document came to be
17  part of the records of W.R. Grace?
18   A  No, sir, I don't.
19   Q  Do you know if it is part of the records
20  of W.R. Grace?
21   A  No, sir, I don't.
22   Q  Go to Plaintiffs' Exhibit 20.4.  Do you
23  recognize this as a document that was generated by
24  W.R. Grace and Company?
25   A  Yes, sir.

Page 130

1   Q  Now is this a February 9, 1965, letter
2  from Mr. O.F. Stewart to Mr. M.F. Bushell of Grant
3  Industries?
4   A  Yes, sir.
5   Q  That's a company in Vancouver, British
6  Columbia, Canada, correct?
7   A  Yes.
8   Q  Have you ever seen this document before?
9   A  Yes, sir, I have.
10   Q  This document was generated in the
11  ordinary and usual course of the business of W.R.
12  Grace; is that correct?
13   A  Yes, sir.
14   Q  And it would be found in the regularly
15  kept business records of W.R. Grace; is that also
16  correct?
17   A  I would assume so, yes, sir.
18   Q  And it pertains to Libby's asbestos
19  problems; is that correct?
20   A  In my rather hasty review of the document,
21  I see no reference to asbestos in here.
22   Q  Are we talking about the same February,
23  1965, letter?
24   A  I believe so.
25   Q  Would you look at the first full paragraph

Page 131

1  on page 2.  Does it not say, "A copy of 'Dusts,
2  fumes and mists in Industry' published by the
3  National Safety Council is enclosed which contains
4  some very good information.  The threshold limit or
5  concentration of dust for vermiculite is 50 mppcf
6  and for asbestos 5 mppcf."  Which means million
7  particles per cubic foot?
8   A  Yes, sir, I see that now.
9   Q  "Vermiculite is classified as a nuisance
10  dust whereas asbestos is usually considered as a
11  health hazard unless the dust is controlled."  Do
12  you see that?
13   A  Yes, sir.
14   Q  And it goes on to say, "The point I am
15  making is that Libby vermiculite does contain a
16  small amount of asbestos dust."  Correct?
17   A  Yes, sir.
18   Q  That means the processed, completed
19  vermiculite contains a small amount of asbestos
20  dust, right?
21   A  Yes, sir.
22   Q  That's what they are referring to here?
23   A  Yes, sir.  I believe so.
24   Q  And then it talks down below, there is two
25  paragraphs in a row, just before number 1 there.

Page 132

1  "There have been reports at Libby of men having
2  pulmonary trouble.  I also believe Western Mineral
3  Products have had a report or two.  I'm sure Earl
4  Lovick will cover this in his letter.  We have
5  adopted the position that ANY DUST is a health
6  hazard and should be kept within a safe limit.  We
7  are attacking this problem by several methods."
8  Do you see "ANY DUST" there is capitalized and
9  underscored?
10   A  Yes, sir, I do.
11   Q  Who was O.F. Stewart?
12   A  He was an employee of W.R. Grace.  He was
13  headquartered in South Carolina, but he had -- at
14  that time he had responsibility for the Libby
15  plant.
16   Q  Why would he have responsibility for the
17  Libby plant if he was in South Carolina?
18   A  That was the way the organization was set
19  up, because they also had the mine and mill in South
20  Carolina, and he was responsible for that, also.
21   Q  Were you his number one assistant here at
22  that time?
23   A  No, sir.
24   Q  Who was?
25   A  Mr. Bleich.

TRANSCRIPT OF PROCEEDINGS    CondenseIt!™    SCHNETTER vs W.R. GRACE

Page 133

1  Q  Okay.  So Mr. Bleich was the manager in
2  residence, but Mr. Stewart had the ultimate
3  responsibility for this operation?
4  A  Yes, sir.
5  Q  Who was Mr. Bushell?
6  A  He was an employee of Grant Industries in
7  Vancouver.
8  Q  Were they one of your customers?
9  A  Yes, sir.
10  Q  And were you sending vermiculite to them?
11  A  Yes, sir.
12  Q  Would you send that by rail?
13  A  Yes, sir.
14  Q  Okay.  On this first page, Mr. Stewart
15  says, In general, the dust control could be broken
16  down to two separate situations.  1. Inside the
17  plant - that effects the workers and other plant
18  personnel, and I can't read -- Can you read that
19  next --
20  A  No, sir, I can't.
21  Q  Oh, and then 2. -- personnel and
22  housekeeping; is that what that says?
23  A  I believe that's what it says, yes.
24  Q  And 2. Dust ejected outside the plant into
25  the atmosphere and neighborhood.  This affects our

Page 134

1  neighbors.  Correct?
2  A  It affects your neighbors, yes.
3  Q  That's correct.  I'm sorry.  Well, these
4  concerns then were well known in 1965?
5  A  Yes, sir.
6  Q  That asbestos dust could endanger workers
7  and other plant personnel?
8  A  Yes, sir.
9  Q  And that asbestos dust could effect and
10  endanger your neighbors, right?
11  A  Yes, sir.
12  Q  Did you tell any of your neighbors about
13  this problem?
14  A  Not that I recall, no, sir.
15  Q  Did you do -- ever do anything to keep it
16  from your neighbors at any time?
17  A  No, sir.
18  MR. GRAHAM:  I would object, Your
19  Honor.  Relevancy.
20  THE COURT:  Overruled.  He answered.
21  BY MR. LEWIS:
22  Q  Do you know a man named Mr. Eschenbach?
23  A  Yes, sir.
24  Q  You testified about this morning.
25  He's a toxicologist or --

Page 135

1  A  Yes, sir.
2  Q  You know him pretty well?
3  A  Yes, sir.
4  Q  He used to come here?
5  A  Yes, sir.
6  Q  And you have met with him in Canada a few
7  times?
8  A  I took one trip into Canada with him, one
9  time, yes, sir.
10  Q  Montreal, Quebec?
11  A  Yes, sir.
12  Q  Was that after you retired and became a
13  consultant or before?
14  A  Yes, sir, it was after I retired.
15  Q  And you went up to Montreal to learn about
16  asbestos?
17  A  No, sir.
18  Q  You went up there to confer with
19  Mr. Eschenbach about a case?
20  A  No, sir.
21  Q  Did Mr. Eschenbach come out here quite a
22  bit?
23  A  He did.  He came out here on a regular
24  basis.
25  Q  How frequently would you say he came out

Page 136

1  here?
2  A  Well, I don't know.  He would come out, I
3  would -- I would say once or twice a year.
4  Q  Not any more than that?
5  A  Possibly.  Possibly some years he could be
6  here more than that.  He did not have a regular
7  schedule.
8  Q  Okay.  Now, you said that you never -- you
9  folks at W.R. Grace, Libby plant, never did anything
10  to try to keep this asbestos health problem out of
11  the public eye?
12  A  Yes, sir, I said that.
13  Q  And you say that under oath?
14  A  Yes, sir.
15  Q  Is it perhaps possible that someone else
16  besides you tried to keep it out of the public eye?
17  A  Certainly it's possible.
18  Q  Somebody in high management somewhere?
19  A  I don't know.
20  Q  How about Mr. McCaig?  Did Mr. McCaig ever
21  do anything that -- or, tried to keep the fact of
22  pulmonary problems and illness in the workers away
23  from the community?
24  A  Not to my knowledge, no, sir.
25  Q  Was Mr. McCaig the manager of this

TRANSCRIPT OF PROCEEDINGS          CondenseIt!™          SCHNETTER vs W.R. GRACE

Page 137

*Libby*

1  facility here in January of 1983?
2      A  Yes, sir.
3      Q  And who was Jack Wolter?
4      A  He was Mr. McCaig's boss in Cambridge.
5      Q  And do you remember a man named James
6  Gidley?
7      A  Yes, sir.
8      Q  When he retired from W.R. Grace, was he
9  disabled from asbestos?
10     A  I don't remember the exact cause or his
11 purpose of retirement.  I know that he had
12 respiratory problems, but he was also severely
13 crippled up with arthritis.
14     Q  Did he ultimately die at the age of 61?
15     A  Well, he ultimately died.  I don't
16 remember his age.
17            MR. GRAHAM:  Objection.
18 BY MR. LEWIS:
19     Q  Did you folks at W.R. Grace do anything to
20 try to keep the public from learning about the cause
21 of his death as pulmonary problems associated with
22 his work at W.R. Grace?
23            MR. GRAHAM:  Objection, relevancy,
24 Your Honor.  As I understand it we're talking about
25 1983, which is after all of this transpired.

Page 138

*Libby*

1            THE COURT:  Sustained.
2            MR. LEWIS:  May we approach the
3  bench?
4      (A discussion was held off the record.)
5            MR. LEWIS:  Would you mark that ZZ.
6            THE COURT:  What number?  ZZ.
7  BY MR. LEWIS:
8      Q  When did Mr. Gidley retire?
9      A  I don't remember.
10     Q  Did he retire in January of 1978?
11     A  I previously said I don't remember.
12     Q  I'm going to hand you what has been marked
13 as Plaintiffs' Exhibit ZZ.  Would you look at that
14 exhibit and see if that refreshes your recollection
15 as to when James Gidley retired.
16     A  Well, it states here he retired on
17 January 31st, 1978.
18     Q  Was that a time during which Dan Schnetter
19 was employed at W.R. Grace?
20     A  Yes, sir.
21     Q  And then did you get a copy of this
22 letter?
23     A  It states that I did.
24     Q  Would you read that whole letter over to
25 yourself and then I would like to ask you a couple

Page 139

*Libby*

1  more foundational questions.
2      A  (Deponent complied.)
3      Q  Do you recall that letter now?
4      A  Yes, sir, I believe I do.
5      Q  Was this letter prepared in the ordinary
6  and usual course of business of W.R. Grace?
7      A  Yes, sir, I would say so.
8      Q  And does it appear to be authentic in
9  every respect?
10     A  Yes, sir.
11            MR. LEWIS:  I would offer Plaintiffs'
12 Exhibit ZZ.
13            MR. GRAHAM:  I would renew the
14 objection, Your Honor.
15            THE COURT:  Objection is overruled.
16 It may be admitted.
17 BY MR. LEWIS:
18     Q  This letter states that after Mr. Gidley's
19 death, his wife applied for death benefits; is that
20 correct?
21     A  Apparently so, yes, sir.
22     Q  And it says that Jim was well known, well
23 liked and a model employee, correct?
24     A  Yes, sir.
25     Q  And it says that no claim was filed, by

Page 140

*Libby*

1  your company, I assume?
2      A  I assume by his widow.
3      Q  Well, this is something that confuses
4  me here, and you maybe can straighten this out.
5  "No claim was filed because of our practice/advice
6  (See September 20, 1982, letter Harry Eschenbach to
7  J.P. Cahalane), not because his lung problems had
8  not been identified or understood."
9            Now, when you were on notice of a
10 disease -- a lung disease, was it ordinarily your
11 practice to file some kind of report with some
12 governmental entities to confirm that you knew about
13 that?
14     A  It was our practice ordinarily to file a
15 claim on behalf of that employee.
16     Q  That's exactly the point I'm making.
17 Ordinarily you would have filed a claim, right, but
18 for some reason you were told not to file a claim by
19 Mr. Eschenbach in some kind of a September 20, 1982,
20 letter.  Do you recall that?
21     A  No, sir, I don't, but that's what it
22 states there.
23     Q  And even where the lung problems were
24 legitimate, as you knew they were in this case, no
25 claim was initiated by your company, correct?

Page 141

1  A  That's what it states, yes, sir.

2  Q  Now, it says in this last paragraph, "This
3  claim is well justified (other than lack of timely
4  filing) as others which are being paid. We feel
5  some settlement with Mrs. Gidley should be
6  negotiated. Our image with our employees and with
7  the community would suffer irreparable damage should
8  this situation become public knowledge."

9  Now, do you -- When you got that letter,
10 did you feel that that was appropriate to try to
11 keep that out of the public eye?

12  A  Well, I think it was appropriate that the
13 company should have filed a claim and asked that
14 that claim be honored.

15  Q  And do you think, though, that the public
16 and the employees had a right to know about the
17 danger that was occurring up there?

18  MR. GRAHAM: I would object to the
19 form of the question. It misinterprets the
20 document.

21  MR. LEWIS: I'm not referring to the
22 document, Your Honor.

23  THE COURT: He just asked his
24 opinion.

25  MR. GRAHAM: If it's not with regard

Page 142

1  to the document, I don't have any objection, Your
2  Honor.

3  THE COURT: I think he just asked
4  him, do you think it's fair, or something like
5  that. Okay. You withdraw your objection?

6  MR. GRAHAM: Yes, as long as he's not
7  referring to the document.

8  THE WITNESS: Is your question --

9  BY MR. LEWIS:

10  Q  I'll rephrase the question, sir.

11  A  Thank you.

12  Q  I can see I've caused some confusion
13 here. Did you ever talk to Mr. McCaig about that
14 letter?

15  A  I don't recall that I did, but I just
16 don't remember.

17  Q  Did it appear to you -- Was it your
18 impression from reading that letter that it was
19 important to the company for this information
20 concerning Mr. Gidley's lung disease not be made
21 public?

22  A  Well, I would -- It would be my opinion
23 that the claim should have been -- could have
24 been -- should have been filed and should have been
25 paid, but I don't know that that's the primary

Page 143

1  reason I would have felt that way.

2  Q  Well, the question I have is, was it
3  management policy to try to keep the asbestos
4  hazards at your mill away from the public eye?

5  A  No, sir, I don't believe it was.

6  Q  Did you ever tell the employees about the
7  nature and extent of Mr. Gidley's disease and
8  death?

9  A  I don't remember ever doing it, no, sir.

10  Q  And when this came up, it was after he had
11 left the company for three years, correct?

12  A  Yes, sir.

13  Q  So he died about three years afterward,
14 and -- So whatever Mr. McCaig did, you don't think
15 that that was -- keeping out of the public eye was
16 consistent with the public policy; is that your
17 testimony?

18  A  That was Mr. McCaig's judgment. I don't
19 know that that was public policy. It was certainly
20 his judgment to feel that way.

21  Q  And that letter went to Mr. Jack Wolter?

22  A  Yes, sir.

23  Q  Where is he located?

24  A  Cambridge.

25  Q  Let's set that exhibit right here, because

Page 144

1  I have more questions on a different subject a
2  little bit later.

3  MR. LEWIS: Could I have Exhibits 24
4  and 25. Thank you very much.

5  BY MR. LEWIS:

6  Q  I'm handing you what has been marked as
7  Plaintiffs' Exhibit G-24 and 25. And would you
8  review those and advise us as to whether you're
9  familiar with either or both of those documents.

10  A  I have seen both of these documents
11 before, and it was not about the time that they --
12 that they were written. It was sometime afterward.

13  Q  Okay. I think that's important to
14 establish -- And I'll give you an opportunity to
15 explain. Let me ask you a few foundational
16 questions and I'll let you explain that. These
17 documents are W.R. Grace documents; is that
18 correct?

19  A  Yes, sir.

20  Q  The first one, G-24 is on the letterhead
21 called Cambridge, correct?

22  A  Yes, sir.

23  Q  Does that refer to Cambridge,
24 Massachusetts?

25  A  Yes, sir.

Page 145

*Libby*

1  Q  It's from Peter Kostic to John F. Murphy;
2  is that correct?
3  A  Yes, sir.
4  Q  From my copy I can't read the date.  Can
5  you read the date?
6  A  March 29th, 1966.
7  Q  And what is the subject of this document?
8  A  Zonolite Dust Conditions.
9  Q  And Mr. Murphy, what was his position with
10 the company?
11 A  There are two John F. Murphy's, as you
12 will notice on this letter.  I believe the John F.
13 Murphy at the top was chief engineer of the
14 Zonolite -- of Construction Products Division at
15 that time, and I believe J.F. Murphy, Junior, was
16 vice president of finance of Construction Finance
17 Division.
18 Q  Was that his son?
19 A  No, sir.
20 Q  No relation?
21 A  No relation.
22 Q  Who was J.D. Kingery?
23 A  He was a Grace official in New York.
24 Q  Now this document here, G-24, was
25 Cambridge document dated March 29, 1966, was

Page 146

*Libby*

1  prepared by Mr. Kostic you said, and his position
2  was head of safety or something like that?
3  A  He was a safety engineer in Cambridge.
4  Q  He basically, in this G-24 -- Exhibit G-24
5  summarizes the problems at least -- at least some of
6  your problems in Libby; is that correct?
7  A  That's the way it appears.
8  Q  He has got things set out by date
9  beginning January 23, 1959, and he goes through a
10 number of statements ending on February 16 --
11 February 15, 1966; is that correct?
12 A  Yes, sir.
13 Q  And without going through all of that, the
14 last two paragraphs in the body on page -- on the
15 fifth page say -- Let me offer this first.
16      MR. LEWIS: I would offer Plaintiffs'
17 Exhibit G-24 as a document generated by the
18 management of W.R. Grace.
19      MR. GRAHAM: Objection, competency.
20 Doesn't fall within the hearsay exception.
21      THE COURT: Objection is overruled.
22 BY MR. LEWIS:
23 Q  Just to make the record very clear, this
24 document was prepared in the ordinary and usual
25 course of the business of W.R. Grace; is that

Page 147

*Libby*

1  correct?
2  A  I would think so, yes, sir.
3  Q  And you have indicated you knew all -- you
4  knew all of the gentlemen that are referenced in
5  this report, correct?
6  A  I don't know Mr. Kingery.
7  Q  But you know Mr. Kingery is an official
8  with W.R. Grace?
9  A  Yes.
10 Q  You recognize this as a document that
11 Mr. Kostic prepared and you saw it before, you
12 indicated, in fairness to you, that you may have
13 seen it later than March 30, 1966; is that correct?
14 A  Much later.
15 Q  When did you first see it?
16 A  I don't really know.  It has been --
17 Q  Would it have been after you retired?
18 A  I think so, yes, sir.
19 Q  That's important.  You believe you did not
20 see this yourself until after you retired?
21 A  I don't believe so, no, sir.
22 Q  Did you see this for the first time in the
23 course of litigation?
24 A  I think so, yes, sir.
25 Q  And it's not copied to you?

Page 148

*Libby*

1  A  No, sir.
2  Q  Okay.  Kostic is a high company official
3  concerning safety, however; is that true?
4  A  Well, I don't know that he would fall
5  within the category of a high public official.
6  Q  Not public; company, I said.
7  A  Excuse me, high company official.  He was
8  the safety engineer in Construction Products
9  Division.  He wasn't head of the division.
10 Q  All right.  That's helpful.  But as far as
11 the Construction Products Division, which was what
12 your mill was part of, he was the chief safety
13 engineer; is that correct?
14 A  Well, he is the one that we saw here the
15 most often.
16 Q  Okay.  Was there any other safety engineer
17 with the company that came out here?
18 A  Yes, I believe he had another one that
19 came out a time or two, but I don't recall his
20 name.
21 Q  In any event, he said -- In that --
22 "Regarding the elaborate studies and tests
23 recommended by Dr. Spicer, I feel that they would be
24 of greater value to the medical and health
25 professions than to us.  The fact that employees had

**Page 149**

1  contracted lung conditions is not as important now
2  as determining if there is a health exposure (by
3  scheduled air samplings and analysis) and applying
4  proper controls."
5      When you saw this, finally, did you
6  understand what he meant by that?
7      A  When I saw this, sir, I'm not sure that I
8  even read it.  I just said that I saw it.
9      Q  Then the last paragraph he says, in the
10  body, "I agree with L. Park of Maryland Casualty in
11  that respirators should not be considered a
12  substitute for proper engineering controls.
13  Respirators are fine for short periods of time, but
14  to get a man to wear one eight hours a day is next
15  to impossible."  Do you agree with that statement?
16      A  Yes, sir.
17      Q  You see the summary of things that Kostic
18  recommends to attack this problem?
19      A  Yes.
20      Q  There are four things, right?
21      A  Yes.
22      Q  But it doesn't include any recommendation
23  that the men be warned about this hazard, does it?
24      A  Well, I still haven't read this.
25      Q  Why don't you read those last four to

**Page 150**

1  yourself.
2      A  (Pause.)  Yes, sir, I've read them.
3      Q  That does not recommend that a full
4  disclosure be made to the men, correct?
5      A  It does not, no, sir.
6      Q  And it does not recommend a full
7  disclosure be made to the public, correct?
8      A  It does not, no, sir.
9      Q  And in fact it doesn't even recommend that
10  a full disclosure be made to the management on the
11  ground here in Libby; is that correct?
12      A  It does not, no, sir.
13      Q  Now going to G-25, which you have in front
14  of you.  This is another W.R. Grace document.
15  Actually it's not a W.R. Grace document.  This is an
16  office memorandum from the Montana State Board of
17  Health dated March 31, 1966, to Mr. Bleich; is that
18  correct?
19      A  Yes, sir.
20      Q  And who originated this short memorandum?
21      A  Benjamin F. Wake.
22      Q  This would have been found in the -- in
23  the documents, the records of W.R. Grace; is that
24  correct?
25      A  Probably, yes, sir.

**Page 151**

1      Q  Did you see this at or near the time that
2  it purports to have been mailed?
3      A  No, sir, I don't believe I did.
4      Q  Okay.  Do you have any doubt that
5  Mr. Bleich received it?
6      A  No, sir.
7      Q  In fact it's got numbers stamped on it
8  indicating that it's -- it was probably -- it was a
9  W.R. Grace document, right?
10      A  It has numbers stamped on it.
11      Q  Do you know how the litigation support
12  team back there in Boston numbers their records?
13      A  No, sir, I do not.
14      Q  Haven't been consulted on that?
15      A  No, sir.
16      Q  But you have no doubt that this was
17  received by Mr. Bleich, do you?
18      A  No, sir.
19          MR. LEWIS:  I'll offer Plaintiffs'
20  Exhibit G-25.
21          MR. GRAHAM:  Object, hearsay.
22          THE COURT:  Pardon, counsel?
23          MR. GRAHAM:  Object, hearsay, Your
24  Honor.
25          THE COURT:  Overruled.  It may be

**Page 152**

1  entered.
2  BY MR. LEWIS:
3      Q  Now, attached to this little short
4  memorandum from Mr. Benjamin Wake from the State of
5  Montana is an excerpt advising as to the dangers of
6  asbestos being documented by a doctor named Irving
7  Selikoff; is that correct?
8      A  Yes, sir.
9      Q  And it also advises that an asbestos
10  cancer link is being studied; is that correct?
11      A  Yes, sir, it appears to say that.
12      Q  And it documents the fact that, "They
13  found six to seven times the 'expected' rate of
14  cancer of the lung.  And they also found that
15  mesothelioma, a form of cancer ordinarily so rare
16  that it's not separately coded among causes of
17  death, was found to have 'extraordinarily' high
18  incidence among asbestos workers."  Is that
19  correct?
20      A  It states that, yes, sir.
21      Q  That would have been received by
22  Mr. Bleich in 1966, but did you not -- he did not
23  share that with you, that's your feeling?
24      A  Not that I recall, no, sir.
25      Q  You remember I asked you early on whether

Page 153

1  you received information concerning the link between
2  asbestos and mesothelioma before Mr. Schnetter was
3  hired and you said you did not. Does this explain
4  why you didn't, because you never saw this? You
5  didn't see this document before you retired?
6      A  No, sir, I don't believe so.
7      Q  But your boss did, right?
8      A  Yes, sir.
9      Q  Do you know of anything he did to bring
10  that to the attention to the workers?
11      A  No, sir.
12      Q  Now, there is something that -- I
13  shouldn't say that. I'm just going to ask you this
14  question. You knew by now at least, 1966, that men
15  were being diseased up there, right?
16      A  Yes, sir.
17      Q  You had men who had been diagnosed with
18  serious lung problems by that time, correct?
19      A  Yes, sir.
20      Q  Mr. Gidley, had he died yet? Not yet.
21  He was still working up there, though. Right?
22      A  Yes.
23      Q  And he had been diagnosed as having
24  disease already by that time?
25      A  Apparently, yes.

Page 154

1      Q  And many others had been diagnosed having
2  disease at that time, right?
3      A  Yes, sir.
4      Q  And they were -- You were allowing them to
5  continue to work up there, right?
6      A  Yes, sir.
7      Q  Did you ever look at the fact that men who
8  were already diseased were being harmed every day
9  that they continued to work up there in that mill?
10  Did you ever consider that?
11      A  I don't know that we would have thought of
12  it in that way, no, sir.
13      Q  Well, think of it -- The question is
14  this. With respect to those men that were already
15  diseased, you not only knew that there was a chance
16  that they were being -- they might be harmed, you
17  knew that they were in fact being harmed with every
18  breath; is that true?
19      A  Well, we certainly would have realized
20  that there is a chance that they were being harmed
21  continuously, yes, sir.
22      Q  But there was no doubt as to those men who
23  were already diseased, they were being harmed. You
24  had absolute proof of that in your confidential
25  records; is that right?

Page 155

1      MR. GRAHAM: Objection, foundation.
2      THE COURT: Sustained.
3  BY MR. LEWIS:
4      Q  You had absolute proof that these men had
5  been diseased up there at the mill by 1966 at the
6  latest; is that true?
7      A  Yes, sir, that would be true.
8      Q  And you have told us that none of the
9  records you had on that were shared with the men; is
10  that true? That's what you told us, correct?
11      A  Yes, sir.
12      Q  And so at this point it wasn't just a
13  matter of men being exposed to something that might
14  injure or kill them, these men were already injured
15  and dying, and they were continuing to be exposed
16  every day; is that true?
17      MR. GRAHAM: I would object again.
18  Foundation and relevancy, Your Honor, at this point
19  in time. Not a medical witness.
20      THE COURT: Are you asking questions
21  in regard to the exhibit?
22      MR. LEWIS: No, I'm asking him of his
23  own knowledge, what he knew. He was the man who did
24  all the -- got all the information together, looked
25  at all the death certificates.

Page 156

1  BY MR. LEWIS:
2      Q  Is that true, sir?
3      A  Yes, sir. But I would like to point out
4  that this is some time after that.
5      Q  But you knew that the men were already
6  diseased then, right?
7      A  Some of them, yes, sir.
8      Q  Well, at least by the time Dan Schnetter
9  was hired in 1973, you knew that men were diseased
10  then, didn't you?
11      A  Yes, sir.
12      Q  And you knew that men had already died
13  then, right?
14      A  Yes, sir.
15      MR. GRAHAM: Objection. Your Honor,
16  this is repetitive. These have all been asked and
17  answered on a number of different occasions.
18      THE COURT: I'm going to sustain
19  that. You have gone over this, and unless you have
20  something different, Counsel, that is repetitious.
21  BY MR. LEWIS:
22      Q  Well, the -- I won't argue with the
23  Court. I'll get on to something else. Did you make
24  any effort to assign those men who were diseased to
25  jobs that did not result in as much exposure to

TRANSCRIPT OF PROCEEDINGS       CondenseIt!™       SCHNETTER vs W.R. GRACE

Page 157

1 asbestos?
2    A  We did not have the authority to do that.
3    Q  So if a man was diseased already and he
4 was a sweeper, he went right back into the old mill;
5 is that right?
6    A  He continued to work as a sweeper, yes,
7 sir.
8    Q  Because that was his job, right?
9    A  Yes, sir.  We did not have the authority
10 to reassign him to another job.
11    Q  You certainly had the authority to tell
12 him that if he continued to breathe abnormally
13 dangerous asbestos fibers, it might kill him,
14 though, right?
15        MR. GRAHAM: Argumentative, Your
16 Honor.
17        THE COURT: Overruled.  He may
18 answer.
19        THE WITNESS: Well, in the course
20 of -- in the course of their employment, when they
21 took the chest x-rays and the spirometer tests,
22 those things would be pointed out to them.  If --
23        MR. LEWIS: You didn't --
24        MR. GRAHAM: Wait.
25        MR. LEWIS: I'm sorry.

Page 158

1        MR. GRAHAM: Go ahead.
2        MR. LEWIS: That is a non-responsive
3 answer, though, Your Honor.
4        THE COURT: Let him finish the
5 question and then we will deal with the -- whether
6 it's responsive or not.  You may respond,
7 Mr. Lovick.
8        THE WITNESS: In the course of the
9 review of the chest x-rays and the spirometer tests
10 that were given to them, these things would be
11 pointed out to them and so that they would be --
12 they would be informed.  These people would also see
13 probably some of their friends and neighbors whose
14 conditions continued to increase.  They would be
15 aware that these things could happen.
16 BY MR. LEWIS:
17    Q  Yes, but did you give the spirometry
18 tests?
19    A  I'm one of them that gave spirometry
20 tests, yes, sir.
21    Q  When did do you that?
22    A  I don't really remember when we started.
23    Q  When did you last give spirometry tests?
24    A  I don't remember that, either.
25    Q  You don't remember ever giving a

Page 159

1 spirometry test to Dan Schnetter, do you?
2    A  Yes, sir, I've seen evidence that I gave
3 one to Dan Schnetter.
4    Q  That you gave one to Dan Schnetter?
5    A  Yes, sir.
6    Q  When was that?
7    A  I don't remember the date.
8    Q  Was his spirometry test completely
9 normal?
10    A  I don't remember for sure.  I believe that
11 it was, though.
12    Q  So you would have no reason to warn Dan
13 Schnetter at that time of the spirometry test?
14    A  If his test was normal, I would not have.
15    Q  Let's get back to the question -- the
16 inquiry I'm trying to get at here.  W.R. Grace had
17 no program to protect diseased men from additional
18 harm; is that correct?
19    A  Well, I guess it would be correct that we
20 did not have a program of that nature, no, sir.
21        MR. LEWIS: Plaintiffs'
22 Exhibit G-26.
23 BY MR. LEWIS:
24    Q  I'm handing you Plaintiffs' Exhibit Number
25 G-26.  Do you recognize this document?

Page 160

1    A  Yes, sir.
2    Q  What is the date of the document?
3    A  September 7th, 1966.
4    Q  And who is L.E. Park?
5    A  He was with Maryland Casualty Company in
6 Baltimore, who are the -- is the company that
7 carried the Workers' Comp insurance for Libby
8 operation.
9    Q  Who is Mr. William E. Walker?
10    A  He was their -- He was an engineer in
11 their office in Seattle.
12    Q  Did you receive this document at or near
13 the time of its origination on September 7, 1966?
14    A  I don't believe -- I think that -- I think
15 that I did.
16    Q  Okay.  Do you see where it refers to you
17 in the body of the letter?
18    A  Yes, sir.
19    Q  Does this document appear in the business
20 records of W.R. Grace?
21    A  I don't know.
22    Q  You saw it -- How did you come into
23 possession of this document?
24    A  Well, I'm inclined to think that this --
25 This document?  You handed it to me.

Page 161

1  Q  No, how did you come into possession of
2  this document shortly after it was originated, as
3  you testified?
4     A  I think it would have been hand carried by
5  Mr. Walker when he visited the Libby office.
6     Q  Mr. who?
7     A  Walker.
8     Q  Now, he came over to visit you at or about
9  the time of this letter?
10    A  Sometime after that, yes, sir.
11    Q  Do you know whose handwriting is on the --
12 these two pages?
13    A  No, sir, I don't.
14    Q  Did Mr. Walker do what Mr. Park suggested
15 here in this letter?
16    A  Yes, sir, I believe he did.
17    Q  He came over to you and talked to you
18 about some certain personnel that were diseased?
19    A  Yes, sir.
20    Q  And he asked you to basically keep this
21 under wraps, correct?
22    A  Yes, sir.
23    Q  And he said, I -- "I would therefore
24 suggest that you take this up with E.D. Lovick at
25 the time of your visit and if possible without

Page 162

1  anyone else being in on the conversation." Did he
2  do that?
3     A  Yes, sir.
4     Q  Did you see that no -- Did you yourself
5  see that no one else heard your conversation?
6     A  What was that?
7     Q  Did you yourself see that no one else
8  heard your conversation?
9     A  I don't believe anyone else did, no, sir.
10    Q  Did their letter conclude that the reports
11 of your disease experience here were alarming
12 because you had nine employees that "... must
13 definitely be protected over and above the
14 protection they have been afforded in the past
15 year"?
16    A  Would you please repeat that question?
17    Q  Did you and -- Did you agree with
18 Mr. Park's assessment that your reports were
19 alarming because you had nine employees that
20 "... must definitely be protected over and above the
21 protection they had been afforded in the past
22 year"?
23    A  I don't see where he says that in here.
24    Q  Look at the first full paragraph on the
25 second page.



Page 163

1     A  Yes, sir.
2     Q  Does it say that?
3     A  Yes, sir.
4     Q  And he is referring to Perley Vatland, Rex
5  Smith, Hal Shrewsbury, Harvey Noble, Lloyd Miller,
6  Michael McNair, Eitel Ludwig, Edward Gaston and
7  Walter Baker; is that correct?
8     A  Yes, sir.
9     Q  All of those men were diseased at that
10 time; is that correct?
11    A  Apparently.
12    Q  How many of those men died of lung
13 disease?
14       MR. GRAHAM:  I would object on the
15 basis of foundation and relevancy.
16       MR. LEWIS:  I'll lay some
17 foundation.
18 BY MR. LEWIS:
19    Q  Do you know these men?
20    A  Yes, sir.
21    Q  Did you know these men?
22    A  Yes, sir.
23    Q  Did they all work at W.R. Grace?
24    A  Yes, sir.
25    Q  All working men?

Page 164

1     A  Yes, sir.
2     Q  All of them had lung disease?
3        MR. GRAHAM:  Again, I would object on
4  the basis of foundation as far as medical
5  capabilities of the witness, Your Honor.
6        THE COURT:  If he knows.  If he
7  knows, he can answer.
8        THE WITNESS:  I believe that all
9  these men did, yes, sir.
10 BY MR. LEWIS:
11    Q  Did all of them die of lung disease?
12    A  No, sir.
13    Q  Did a number of them die of lung disease?
14    A  Yes, sir.
15    Q  Which ones?
16       MR. GRAHAM:  Objection, relevancy,
17 Your Honor.
18       THE COURT:  Overruled.
19       THE WITNESS:  I can't tell you for
20 sure which ones.  I can tell you which ones died.
21 BY MR. LEWIS:
22    Q  All right.  If you don't know, you don't
23 know.  We will get on to another subject.  That's
24 fair.  But you do know that they all had lung
25 disease?

Page 165

Libby

1    A  No, sir, I know some of them did.
2       MR. LEWIS: Plaintiffs' Exhibit G-26
3  offered.
4       MR. GRAHAM: We would object on the
5  basis of it being hearsay, Your Honor.  Not within
6  the exception to the business records rule.
7       THE COURT:  Overruled.  Exhibit 26 --
8  G-26 may be admitted -- is admitted over objection.
9       MR. LEWIS: Can I have a minute to
10 confer, Your Honor?
11      THE COURT: Pardon?  Oh, yeah.
12 BY MR. LEWIS:
13    Q  Did the government ever ask you folks for
14 information concerning the danger to your
15 employees?
16    A  No, sir, not that I know of.
17    Q  Department of Health didn't -- United
18 States Department of Health didn't ask you for any
19 information?
20    A  Yes, sir, the Department of Health asked
21 us for some information one time.
22    Q  And did they ask you for information
23 concerning mortality rates on the part of your
24 workers who were exposed to asbestos?
25    A  No, sir, I don't believe that's what they

Page 166

Libby

1  asked for.
2    Q  They didn't ask for your cooperation
3  concerning a study of the health conditions of your
4  workers who were exposed to tremolite?
5    A  Yes, sir, they did.
6    Q  Did you cooperate with that study?
7    A  Yes, sir.
8    Q  Did you cooperate immediately with the
9  study?
10    A  No, sir.
11    Q  Initially, you determined not to
12 cooperate; is that true?
13    A  Yes, sir.
14    Q  There was what, a year or so delay before
15 you actually cooperated?
16    A  Well, it was approximately a year, yes,
17 sir.
18    Q  Did you tell your employees that the
19 Department of Health, Education and Welfare were
20 inquiring as to the danger on Vermiculite Mountain?
21       MR. GRAHAM: Objection --
22       THE WITNESS: That is not what they
23 told us.
24 BY MR. LEWIS:
25    Q  Did you tell your employees about the fact

Page 167

Libby

1  that there were inquiries concerning the health
2  hazards associated with asbestos on Vermiculite
3  Mountain?
4    A  That's not what the inquiry was, no, sir.
5    Q  Was it just about dust controls?
6    A  No, sir.
7    Q  Now, go back to Exhibit G-40.1.  I think
8  it's already in evidence.  If you can find it.
9  (Pause.)  Do you have that, sir?
10    A  Yes, sir.
11    Q  Was this report of March 3, 1969, from
12 Schneider to Vining, the result of the inquiry from
13 the Department of Health, Education and Welfare?
14    A  I don't know.
15    Q  This was a Personal and Confidential,
16 Insitu and Environmental Dust Controls for
17 Vermiculite Mining Operations report generated by
18 Eaton, Kujawa and Kostic and under cover letter of
19 Schneider; is that correct?
20    A  Yes, sir.
21    Q  And at the time of this report in 1969,
22 you still had a significant problem at the old dry
23 mill, correct?
24    A  Yes, sir.  Yes.
25    Q  And in fact you never really got the old

Page 168

Libby

1  dry mill in shape, and the only way you could really
2  get that -- make that place safe was to shut it
3  down; is that true?
4    A  Yes, sir.
5    Q  And anybody who worked up at that old dry
6  mill was exposed to high levels of asbestos fibers;
7  is that true?
8    A  Yes, sir.
9    Q  And that was true in 1973 and 1974; is
10 that correct?
11    A  Yes, sir, that's correct.
12    Q  And if Dan Schnetter worked up there, he
13 was exposed to a high level of asbestos fibers; is
14 that correct?
15    A  Yes, sir.
16       MR. LEWIS: Now, I would like to show
17 you G-40.2.
18 BY MR. LEWIS:
19    Q  There you go, sir.  For purposes of
20 identification, G-40.2 is a June 19, 1996 (sic),
21 document; is that correct?
22    A  'Sixty-nine, sir.
23    Q  You're right, 1969.  I told everybody I
24 couldn't see through these glasses, Your Honor.
25 This is from Peter Kostic; is that correct?

Page 169

1  A  Yes, sir.
2  Q  And can you tell who it's addressed to by
3 the form of this letter?
4  A  It's addressed to H.A. Brown.
5  Q  And is there a copy to R.A. Kulberg?
6  A  Yes, sir.
7  Q  And what was his position with the
8 company?
9  A  I believe that he was Peter Kostic's boss.
10  Q  Would he have had responsibility in the
11 area of safety of your employees?
12  A  Yes, sir, I -- I believe so.
13  Q  And Mr. Brown, what was his position?
14  A  He was executive vice president of
15 Construction Products Division.
16  Q  One step below Mr., what, Sterrett, or who
17 was it at that time?
18  A  Mr. Vining.
19  Q  Mr. Vining.  You remember I asked you the
20 question about putting sick men back in the
21 workplace exposed to asbestos?
22  A  Yes, sir.
23  Q  Does Kostic take up that subject in this
24 letter?
25  A  I would like to point out I've never seen

Page 170

1 this letter before right now, so --
2  Q  Is that right?
3  A  That's correct.
4  Q  You don't doubt that it's a W.R. Grace
5 record, do you?
6  A  No, sir.
7  Q  Do you agree it was prepared in the
8 ordinary and usual course of business?
9  A  I would think so, yes, sir.
10  Q  And Kostic was a -- at least a safety
11 engineer for W.R. Grace?
12  A  Yes, sir.
13      MR. LEWIS:  Offer Plaintiffs'
14 Exhibit G-40.2.
15      MR. LEWIS:  Objection, competency,
16 hearsay.  Not within the business records exception,
17 Your Honor.
18      THE COURT:  Overruled.  It may be
19 admitted.
20 BY MR. LEWIS:
21  Q  I guess rather than ask you questions
22 about this letter, it may be best for me to read
23 it.  You have never seen this letter before?
24  A  Not that I recall, no.
25      MR. LEWIS:  May I have permission to

Page 171

1 read the letter?
2      MR. GRAHAM:  Object.  The letter
3 speaks for itself, Your Honor.  It has been offered
4 as an exhibit and admitted as an exhibit.
5      THE COURT:  Overruled.  He may read
6 the letter.
7      MR. LEWIS:  Thank you, sir.
8 BY MR. LEWIS:
9  Q  "Regarding our deliberations and questions
10 having to do with pneumoconiosis cases, here are a
11 few of my thoughts:  If a man has a definite case of
12 pneumoconiosis, is it prudent to put him to work in
13 an environment containing fibers in air in
14 quantities less than the threshold limit?  How many
15 more years could he be expected to live under such
16 circumstances as compared to complete removal from
17 such environment?  Should he be required to wear
18 approved respiratory protective equipment?
19      Two:  "What are some of the things he
20 should be advised to help him keep as physically fit
21 as possible, i.e. no smoking, vitamins, diet, etc.?
22 How much should (he) be told of his condition?
23      Three:  "Is disability retirement an
24 acceptable approach?  At what stage and/or age
25 should this be considered?  What are some of the

Page 172

1 rules covering disability retirement?
2      Four:  "What should be our overall program
3 of chest x-ray examinations?  Who should interpret
4 the pictures?  How should comparison with previous
5 pictures be handled?  I shall be glad to set up a
6 meeting with J-M's top medical and workmen's
7 compensation personnel whenever you're ready."
8 Peter Kostic.
9      Now, in fairness to you, sir, that letter
10 was never forwarded to you, correct?
11  A  I don't ever recall seeing it before
12 today, sir.
13  Q  And remarkably it only pertains to the
14 problems here in Libby; is that true?
15  A  I don't think that's true.
16  Q  Well, where else did you have asbestos
17 exposure?
18  A  At every expanding plant.
19  Q  Oh, you did.  So you sent the vermiculite
20 out from here in its concentrate form and it was
21 expanded, right?
22  A  Yes, sir.
23  Q  And where were your expansion plants?
24  A  Located all over the country.  There were
25 about -- between 20 and 30 of them in the United

TRANSCRIPT OF PROCEEDINGS     CondenseIt!™     SCHNETTER vs W.R. GRACE

Page 173

1 States.
2    Q And so you never told the men at the
3 expansion plants about these harmful effects of
4 asbestos either, did you?
5    A No.
6      MR. GRAHAM: Objection, relevancy,
7 Your Honor.
8      THE COURT: Sustained.
9 BY MR. LEWIS:
10    Q For certain you never told the men here.
11 You have told us that, right?
12      MR. GRAHAM: Objection, repetitive,
13 Your Honor.
14 BY MR. LEWIS:
15    Q Did you tell --
16      THE COURT: Overruled. That one is
17 overruled. You may answer.
18      THE WITNESS: Well, the people, the
19 men that were here, we never had a program of
20 telling them as such. But the men that were here,
21 they certainly had, by observation and so on and
22 association -- they would have known of these
23 things, and I'm sure that many of them were told on
24 an individual basis.
25 BY MR. LEWIS:

Page 174

1    Q Some may have learned that their men --
2 their brethren were diseased and dying, by looking
3 at them, right?
4    A Yes, sir.
5    Q Many of the men were diseased and then
6 they'd died after they left the company, after they
7 retired, correct?
8    A Yes, sir.
9    Q And that's because of the latency of this
10 particular kind of disease, right?
11    A In some cases, yes, sir.
12    Q For example, Dan Schnetter left your
13 company in 1983 having --
14      MR. SLOVAK: '81.
15 BY MR. LEWIS:
16    Q -- in 1981, having no reason to believe
17 that he was going to get this disease. He had no
18 reason to know that, did he?
19    A I don't know.
20    Q And the men were getting sick, but just
21 seeing that they were sick may not have told them
22 why they were getting sick; do you agree with that?
23    A Yes, sir.
24    Q Was it nuisance dust or was it something
25 worse than nuisance dust, they might not have been

Page 175

1 able to figure that out, right?
2    A It could have been both.
3    Q But in any event, did the management
4 people back in Boston ever tell you about these
5 considerations concerning exposing diseased men to
6 more asbestos --
7      MR. GRAHAM: You know, I would
8 object. It misstates the document that was read by
9 counsel, which doesn't even mention asbestos.
10 BY MR. LEWIS:
11    Q Well, do you understand pneumoconiosis to
12 be a disease associated with asbestos?
13    A I understand pneumoconiosis to be a
14 disease of the lungs, yes, sir.
15    Q And in the context of this letter, there
16 is no question that this pneumoconiosis is just
17 another problem, a lung problem related to exposure
18 to vermiculite; is that true?
19      MR. GRAHAM: I would object.
20 Foundation.
21 BY MR. LEWIS:
22    Q Is that true?
23      THE COURT: Overruled. He may
24 answer, if he knows.
25      THE WITNESS: It could -- It could

Page 176

1 have been -- I don't know what all the cause of that
2 disease could be. It could probably be several
3 causes.
4 BY MR. LEWIS:
5    Q Well, is pneumoconiosis frequently
6 associated with asbestos exposure?
7      MR. GRAHAM: Again, I would object.
8 Foundation, Your Honor.
9      MR. LEWIS: I'll ask foundation.
10 BY MR. LEWIS:
11    Q Do you know whether pneumoconiosis is
12 frequently associated with asbestos exposure?
13    A I would have to say I really don't know.
14    Q Haven't you filed reports indicating that
15 one of the problems associated with exposure to
16 asbestos is pneumoconiosis?
17    A Yes, sir.
18    Q Where did you get that information if you
19 didn't know what you were saying in those reports?
20 I mean, let me rephrase the question. If you didn't
21 know that pneumoconiosis was associated with
22 asbestos exposure, where did you get the information
23 to put that in your reports?
24    A My point is, is that these people that
25 were subject to this were shown to have

Page 177

1 pneumoconiosis. Those conditions may have been
2 caused by asbestos or they may have been caused by
3 something else.
4    Q Okay. I think that bags the question
5 here. I will ask you this. Regardless of whether
6 it was asbestosis or pneumoconiosis or any lung
7 disease, were you ever advised by the high
8 management officials back in Boston of Mr. Kostic's
9 concern that these people that had diseased lungs
10 not be exposed to more asbestos?
11    A I don't believe so, no, sir.
12    Q Were you ever advised by management
13 officials in Boston or Cambridge of Mr. Kostic's
14 concern that men with pneumoconiosis, with lung
15 problems, be advised to keep as physically fit as
16 possible, take vitamins, diet or whatever they can
17 do to minimize the impact of their disease? Ever
18 advised of that?
19    A I don't believe so.
20       THE COURT: Would this be a
21 convenient place to stop, counsel?
22       MR. LEWIS: Yes, sir
23       THE COURT: Very well. Ladies and
24 gentlemen of the jury, we will take a 15 minute
25 recess until 3:00. Once again you're admonished not

Page 178

1 to discuss this case among yourselves or with anyone
2 else, nor allow anyone to discuss the case with
3 you. Nor shall you express or form any opinion
4 regarding the matter until it's finally submitted to
5 you for your decision.
6       (A recess was held in the proceedings.)
7
8       THE COURT: Mr. Lewis, you may
9 continue.
10       MR. LEWIS: Thank you Your Honor.
11 Could I have Exhibit 47, please.
12       (A recess was held in the proceedings.)
13       MR. LEWIS: What exhibit were we on
14 when we finished here?
15       THE CLERK: 40.2.
16       MR. LEWIS: 40.2. I apologize, Your
17 Honor, for taking so long, but the only way we can
18 get this stuff in is -- we have a lot of documents
19 here and Mr. Lovick is the only person from W.R.
20 Grace that is here. We will try to speed it up as
21 fast as we can. 40.2 is in evidence; is that
22 correct, Your Honor?
23       THE COURT: Yes, over Mr. Graham's
24 objection.
25       MR. GRAHAM: That's correct, Your

Page 179

1 Honor.
2       MR. LEWIS: Most strenuous objection.
3       MR. GRAHAM: Not very strenuous.
4 Actually pretty quiet.
5       MR. LEWIS: Okay.
6
7       CROSS-EXAMINATION CONTINUED
8 BY MR. LEWIS:
9    Q Just for clarification purposes, I'm
10 handing you Plaintiffs' Exhibit 47. Earlier today
11 we talked about Exhibit 47.1. Do you have that
12 there?
13       THE COURT: I think they are in the
14 order that they were offered.
15 BY MR. LEWIS:
16    Q Do you recall testifying about
17 Exhibit 47.1, that you don't think you ever received
18 this document concerning the adverse effects of
19 smoking and asbestos back at the time that the
20 document was issued on March 31, 1971?
21    A No, sir, I don't believe I did.
22    Q Okay. I would like you to look at
23 document number 47. G-47. It's a very poor copy.
24 Can you read it? Don't read it out loud, but can
25 you read it?

Page 180

1    A Yes, I can read most of it.
2    Q Okay. That document is also from
3 Mr. Brown; is that correct?
4    A Yes, sir.
5    Q And can you tell who that goes to?
6    A Well, it's written to E.D. Lovick and
7 O.F. --
8    Q It's written to you, right?
9    A It's written to me and someone else, and I
10 can't read the second name. I don't know the second
11 name. No, sir. I can't read it.
12    Q Does that appear to be the -- The date of
13 that document, can you tell what that document
14 says? Is it March 18, 1971?
15    A It looks like that's the date, yes, sir.
16    Q And it's from Mr. Brown, and there are
17 other people copied. And is that a document that
18 was prepared during the ordinary and usual course of
19 the business of W.R. Grace and Company?
20    A I would say so, yes, sir.
21    Q And it is addressed to you, but from your
22 earlier testimony, I'm not sure whether you received
23 it or not, and I would like you to just read it over
24 to yourself, and then I'll ask you whether you
25 received it.

Page 181

1   A  (Pause.) Yes, sir.  I honestly can't say
2  whether I remember this or not.
3   Q  If you had received it, would it have
4  informed you of the synergistic effect of cigarette
5  smoking and asbestos exposure as early as March of
6  1971?
7   A  Yes, sir.
8        MR. GRAHAM:  Objection, the document
9  speaks for itself and calls for speculation on his
10  part as to what he may have learned from the
11  document, if it goes beyond the document itself.
12        THE COURT:  Well, the document is
13  addressed to him.  Even though he says he doesn't
14  recall it, it's a document.  Overruled.  You may
15  answer.
16        THE WITNESS:  Yes, sir, it would
17  have.
18        MR. LEWIS:  Offer G-47.
19        THE COURT:  Objection, I assume,
20  Counsel?
21        MR. GRAHAM:  No, I have no objection
22  to the counsel.  It was just the question that I had
23  the objection to.
24        THE COURT:  You don't object to it
25  being admitted?

Page 182

1        MR. GRAHAM:  No.
2        THE COURT:  Okay.
3  BY MR. LEWIS:
4   Q  It is copied to Peter Kostic; is that
5  correct?
6   A  I can't tell.
7   Q  How about D.G. Powell?
8   A  I don't know who that is.
9   Q  And it's somebody from NRA; is that
10  correct?  J.F. Brower from Enoree?  Was there a J.F.
11  Brower in Enoree?
12   A  That's not familiar to me.  That's where
13  our other plant is -- was -- is.
14   Q  That company -- That letter was a report
15  from the United States Department of the Interior,
16  Bureau of Mines, correct?
17   A  That's extracts from that report.
18   Q  Okay.  And that suggests that asbestos is
19  a carcinogen; is that correct?
20   A  Yes, sir.
21   Q  And you already knew that by this time,
22  1971?
23   A  Yes, sir.
24   Q  The report, though, itself is actually
25  dictated -- was prepared in 1969 and then extracted

Page 183

1  by H.A. Brown, a W.R. Grace official on March 3,
2  1971; is that correct?
3   A  That's what it states, yes, sir.
4   Q  Have you ever seen that report before?  Or
5  that extracts, to be more accurate?
6   A  I don't remember.
7   Q  But it documented as early as 1971 the
8  synergistics -- in fact, it has a paragraph entitled
9  synergistics?
10   A  Right.
11   Q  Do you know what synergism means?
12   A  One or more different elements or one or
13  more different matters combined -- Combined, they
14  tend to exacerbate the influence of either one of
15  them alone.
16   Q  It's a little bit like two and two doesn't
17  equal four, two and two equals 24, right?  Something
18  like that?
19   A  Something like that, yes, sir.
20   Q  All right.
21        MR. LEWIS:  Plaintiffs' Exhibit 48 --
22  G-48.  Excuse me.
23  BY MR. LEWIS:
24   Q  Handing you what has been marked as
25  Plaintiffs' G-48.  Have you seen that document

Page 184

1  before?
2   A  I don't recall having seen it before, no,
3  sir.
4   Q  Was it -- Does it purport to be routed to
5  Libby?
6   A  Well, no, it does not.
7   Q  Well, was R.L. Olivario in Libby at the
8  time?
9   A  Yes, sir.  A copy of it is --
10   Q  That's what I mean, a copy would have been
11  routed?
12   A  Yes, sir.
13   Q  The date of it is October 21, 1971,
14  correct?
15   A  Yes, sir.
16   Q  Does it indicate problems with fibers at
17  the plant or is it something that's beyond your
18  knowledge?
19   A  Well, it -- It regards fibers at the
20  plant, yes, sir.
21   Q  Is it a document that was prepared in the
22  ordinary and usual course of the business of W.R.
23  Grace?
24   A  I believe so, yes, sir.
25   Q  Does it have Cambridge to the top?

Page 185

1    A   Yes, sir.
2    Q   It's from Peter Kostic to H.A. Brown,
3  right?
4    A   Yes, sir.
5    Q   It talks about somebody by the name of Rex
6  Smith; do you see that?
7    A   Yes, sir.
8    Q   Is there some problem with something
9  related to Rex Smith there, or do you understand
10  that?
11    A   Well, what it appears that -- the Bureau
12  of Mines were here and took dust samples and Rex
13  Smith at the same time took dust samples along with
14  them, which was a very usual thing for our people to
15  do, to see that there was a correlation. And in
16  this case, there was a vast difference between the
17  samples that Rex Smith took and the ones that the
18  Bureau of Mines took.
19    Q   Who was Rex Smith?
20    A   He was one of our employees, and he took
21  dust samples for us.
22    Q   And his dust samples in 1970 showed a
23  lower asbestos content than the Bureau of Mines,
24  right?
25    A   These did, yes, sir.

Page 186

1    Q   Were you able to figure out or determine
2  what happened?
3    A   No, sir.
4    Q   So there was never any conclusion on
5  that?
6    A   I don't know whether there is or not, but
7  not to my knowledge there was not.
8    Q   You just knew of the incident, but you
9  didn't know of the result; is that fair?
10    A   I'm not even sure that I knew of the
11  incident.
12    Q   So you can't -- other than to say that
13  this is a business record to your company, you
14  really don't know anything about this document?
15    A   No, sir, I do not.
16    Q   Or this discrepancy? Let's call it a
17  discrepancy.
18    A   No, sir, I do not.
19        MR. LEWIS: There is a couple of
20  exhibits, Your Honor, that we talked about but we
21  never offered. They are Plaintiffs' Exhibits 20.4
22  and 20.5. And I'm going to re-lay foundation just
23  to be perfectly careful here.
24  BY MR. LEWIS:
25    Q   We talked extensively about 20.4. That

Page 187

1  was the letter to Mr. Bushell from Mr. O.F. Stewart,
2  and you testified that that was prepared in the
3  ordinary and usual course of the business of W.R.
4  Grace and maintained in the ordinary and usual
5  course of business of W.R. Grace; is that true?
6    A   Yes, sir.
7        MR. LEWIS: Offer G-24.4.
8        MR. GRAHAM: Object as hearsay, Your
9  Honor, without -- outside the scope of the business
10  records rule.
11        THE COURT: Objection is overruled.
12  BY MR. LEWIS:
13    Q   The next document is 20.5. Do you have
14  G-20.5 in front of you, sir?
15    A   Yes, sir.
16    Q   Does that appear to be a Zonolite
17  pre-printed interoffice correspondence memo?
18    A   Yes, sir.
19    Q   It indicates that Zonolite is a division
20  of W.R. Grace and Company?
21    A   Yes, sir.
22    Q   It's a March 2, 1965, document?
23    A   Yes, sir.
24    Q   From J.A. Kelley, who -- in Chicago, who
25  was the -- at that time was president of the

Page 188

1  Zonolite Division, right?
2    A   Yes, sir.
3    Q   To his supervisor, Mr. Blackwood, in
4  Cambridge, Massachusetts?
5    A   Yes.
6    Q   Do you have any reason to doubt that this
7  was prepared in the ordinary and usual course of the
8  business at W.R. Grace?
9    A   No, sir.
10    Q   And does it appear to be a document that
11  would be regularly maintained in the business
12  records of W.R. Grace?
13    A   Yes, sir.
14        MR. LEWIS: Offer Exhibit 20.5.
15        MR. GRAHAM: The same hearsay
16  objection, Your Honor.
17        THE COURT: Objection is overruled.
18  BY MR. LEWIS:
19    Q   And this refers to correspondence from
20  Maryland Casualty Company; is that correct?
21    A   Yes.
22    Q   It says, "Dear George: I'm attaching
23  correspondence from Maryland Casualty Company
24  regarding the Libby situation with regard to
25  possible risk of health hazard. We are going to

Page 189

1 follow Maryland Casualty's recommendations, but we
2 are going to try to get them to pay the bill since
3 we will be unable to monitor the activities of their
4 consultant. As you can see from Dr. Spicer's
5 letter, it is a complex problem which we have known
6 all along. The only real answer is to eliminate
7 exposure." Is that what your president said on that
8 date?
9    A  Yes, sir.
10    Q  Now we talked briefly about Mr. Oliverio.
11 When did he come to Libby to work?
12    A  In -- I believe it was 1971.
13    Q  And what was his position when he came in
14 '71?
15    A  He was general manager of the Libby
16 operation.
17    Q  Had he ever worked at Libby before?
18    A  No, sir.
19    Q  And how long did he work here in Libby?
20    A  Until 1979.
21    Q  Did he work in the office?
22    A  Yes, sir.
23    Q  Was he -- Did you inform him of the health
24 hazards of asbestos that were diseasing your men?
25    A  Yes, sir, he would have become familiar

Page 190

1 with that.
2    Q  Now, he's not available now; is that
3 right?
4    A  No, sir, he's not.
5    Q  Is he deceased?
6    A  Yes, sir.
7    Q  Do you know what caused his death?
8        MR. GRAHAM: Objection, relevancy,
9 Your Honor.
10 BY MR. LEWIS:
11    Q  If you know.
12        THE COURT: If you know. Overruled.
13        THE WITNESS: As I understand it, he
14 died of --
15 BY MR. LEWIS:
16    Q  To be fair, I don't know what the answer
17 is, but he didn't die of anything related to
18 asbestos?
19    A  No, sir.
20    Q  Okay. But he's not available for this
21 trial that went on from the time he became president
22 until '71 until he left, right?
23    A  Yes. As I understand it, he died of
24 pancreatic, liver cancer.
25    Q  You don't know of anything that

Page 191

1 Mr. Oliverio did to bring -- He never told the men
2 about this problem, did he, that you saw?
3    A  I don't know what he told the men.
4        MR. LEWIS: G-51, please. G-51.
5 BY MR. LEWIS:
6    Q  There you go, sir. Plaintiffs'
7 Exhibit G-51 is a letter on Cambridge letterhead
8 dated June 5, 1972, from Mr. Eschenbach to
9 Mr. Vining; is that true?
10    A  Yes, sir.
11    Q  And the subject of the letter is Asbestos
12 Update; is that correct?
13    A  Yes, sir.
14    Q  And did you get a copy of this letter?
15    A  No, sir.
16    Q  Have you ever seen this letter before?
17    A  I don't believe so, no, sir.
18    Q  By 1972, you knew full well by then, as
19 you testified earlier, that you had a significant
20 disease problem associated with asbestos exposure at
21 your plant, right?
22    A  Yes, sir.
23    Q  Okay. And was there any doubt in your
24 mind that the disease to your men's lungs was being
25 caused by asbestos exposure?

Page 192

1    A  There was no doubt that -- to me that it
2 was being caused by dust cancer -- or dust
3 exposure.
4    Q  And in 1971, you had already seen some of
5 the men who worked for you who unfortunately passed
6 away because of lung disease?
7        MR. GRAHAM: Objection, repetitive,
8 Your Honor.
9        MR. LEWIS: I'm laying some
10 foundation here, Your Honor --
11        THE COURT: Proceed.
12        MR. LEWIS: -- for a question
13 regarding this document.
14        THE WITNESS: Yes, sir, that's true.
15 BY MR. LEWIS:
16    Q  Mr. Eschenbach, at that time, was charged
17 with some kind of public health -- company health
18 responsibility; is that right?
19    A  Yes, sir.
20    Q  In 1972 he would have been a man who had
21 responsibilities to see that the workplace was as
22 safe as possible. That was part -- the primary
23 function of his job -- One of them?
24    A  I would think that would be part of his
25 job, yes, sir.

TRANSCRIPT OF PROCEEDINGS      CondenseIt!™      SCHNETTER vs W.R. GRACE

Page 193

1    Q   He was -- He was an industrial hygienist,
2  toxicologist or some sort of thing?
3    A   Yes, sir.
4    Q   Do you know why Mr. Eschenbach would be
5  involved with claims?
6    A   No, sir.
7    Q   Do you know why Mr. Eschenbach would try
8  to help the company develop defenses to tremolite
9  asbestos claims when everybody here knew that the
10 disease was being caused by your tremolite
11 asbestos?
12   A   No, sir, I don't.
13   Q   Now, Plaintiffs' Exhibit G-51 was marked
14 Personnel and Confidential; is that correct?
15   A   Yes, sir.
16   Q   Does it appear to have been prepared in
17 the ordinary and usual course of the business?
18   A   I believe so, yes, sir.
19   Q   And Mr. Vining was the highest official in
20 the Construction Products Division at the time?
21   A   Yes, sir.
22   Q   Do you know why -- Let me offer the
23 exhibit first.
24          MR. LEWIS:  Offer Plaintiffs'
25 Exhibit G-51.

Page 194

1          MR. GRAHAM:  We would make the same
2  hearsay objections, your Honor.
3          THE COURT:  Okay, overruled.  They
4  will be admitted.
5  BY MR. LEWIS:
6    Q   Now, you had already, by this time,
7  provided high management officials in Boston with
8  extensive data concerning the health experience of
9  diseased individuals at this facility, correct?
10   A   I believe so, yes, sir.
11   Q   You provided them with copies of death
12 certificates, correct?
13   A   Yes.
14   Q   Showing the cause of deaths, some of them
15 pulmonary problems; is that correct?
16   A   Yes, sir.
17   Q   You had provided them with lists of line
18 workers who were diseased with lung problems as a
19 result of asbestos before 1972, correct?
20   A   Yes, sir.
21   Q   And had you provided the information even
22 as to management people at the request of the
23 company?
24   A   I believe so, yes, sir.
25   Q   For example, Mr. Thompson died of lung

Page 195

1  problems; is that correct?
2    A   Yes, sir.
3    Q   Dale Thompson?
4    A   Yes, sir.
5    Q   He was a management official, correct?
6    A   Yes, sir.
7    Q   Would you look -- Turn to page 2 of
8  Mr. Eschenbach's letter to Mr. Vining.  And I'm
9  going to read the second full paragraph.  "However,
10 the issue has become emotional that decisions
11 concerning the TLV, etc are not based rationally
12 upon knowledge.  It is a foregone conclusion that
13 the TLV will be 2 fibers (greater than 5 microns)
14 per milliliter, and some unions and researchers
15 (Selikoff) pushing for 1 or 0 fiber levels.
16        "Lack of significant reliable information
17 to oppose this type of regulation will allow the
18 panic button set to do pretty much as they wish.  I
19 believe that we had better start building up a base
20 of -- a bank of knowledge on tremolite, its
21 properties, etc. as well as the medical data to show
22 that Libby has no significant problems.  Failure to
23 do so could result in a total lack of defense if
24 someone decides to make allegations concerning
25 'tremolite asbestos.'"  Do you see that?

Page 196

1    A   Yes, sir.
2    Q   Now, based on what you knew at the time,
3  you could not in good faith agree with the
4  suggestion here that you should be developing a bank
5  of knowledge to show that asbestos was not
6  dangerous; is that true?
7    A   I would like to point out that this is
8  Harry Eschenbach's letter and I've never seen it
9  until right now.
10   Q   But it did occur in 1972, after you had
11 provided a company with extensive data and extensive
12 reports on the problem that existed here, right?
13   A   Yes, sir.
14   Q   And you said that Mr. Eschenbach came out
15 here many times, correct?
16   A   Yes, sir.
17   Q   And you said there was no question but
18 there was a huge -- or a significant problem here,
19 right?
20   A   Yes, sir.
21   Q   And nobody ever showed that there was
22 medical data or other evidence indicating that there
23 was no significant problem after 1972, as far as you
24 know; is that true?
25   A   I don't know of any, no, sir.

Page 197

1  Q  You don't doubt, as you sit here right
2 now, you know very well that this has been a very
3 significant problem and it continues to be a
4 significant problem; is that true?
5    A  Yes, sir, I believe that's true.
6    Q  Okay.
7       MR. LEWIS: 30.1 and 47.2 and 50.
8 (Pause.)
9 BY MR. LEWIS:
10   Q  I'll let you start looking at these, sir.
11 Directing your attention to Plaintiffs'
12 Exhibit G-30.1, is this a January 18, 1968, letter
13 from the Department of Health, Education and
14 Welfare, to Mr. Peter Kostic of the Dewey and Almy
15 Division of W.R. Grace and Company?
16   A  Yes, sir.
17   Q  And do you recognize Jeremiah R. Lynch as
18 the author of this document?
19   A  Yes, sir.
20   Q  Do you know who Jeremiah Lynch is?
21   A  He was an employee of the Department of
22 Health, Education and Welfare in Cincinnati and he
23 had visited Libby.
24   Q  Did you ever see a copy of this document?
25   A  I don't --

Page 198

1    Q  Look in the upper left-hand corner.  Do
2 you have any writing in the upper left-hand corner?
3    A  Yes, sir, it states, Carbon copies to
4 Lovick and Stewart.
5    Q  Do you recall receiving this document?
6    A  No, sir, I don't recall.
7    Q  Do you recognize it as a document that was
8 mailed to Kostic and would be in the regular and
9 usual -- maintained in the regular and usual course
10 of the business of W.R. Grace and Company?
11   A  Yes, sir.
12   Q  Were you made aware of the results of this
13 letter or the content of this letter by Kostic?
14   A  Well, I think he made me aware of it by
15 sending me a copy and I have -- I don't recall
16 receiving it, but I --
17   Q  Do you have any doubt that you did receive
18 it?
19   A  No, sir, I don't.
20      MR. LEWIS: Offer Plaintiffs'
21 Exhibit G-30.1.
22      MR. GRAHAM: No objection.
23      THE COURT: 30.1 will be admitted
24 without objection.
25 BY MR. LEWIS:

Page 199

1    Q  Have you looked at this letter recently?
2    A  No, sir.
3    Q  Could you just skim it real quick, and
4 I'll just ask you about two questions about it.
5    A  Okay, sir.
6    Q  Does this letter suggest that the dust
7 concentrations that were measured are from ten to a
8 hundred times in excess of the safe limit?
9    A  That's what it states, yes.
10   Q  Does it have -- On the second page, does
11 it have the raw data or the measurements that were
12 taken?
13   A  Yes, sir.
14   Q  At the second, fifth and sixth floor of
15 what?
16   A  Undoubtedly the dry mill.
17   Q  Okay.  Okay.  Does it also conclude that
18 it is likely that a hazardous asbestos exposure does
19 exist?
20   A  That's what it states, yes, sir.
21      MR. LEWIS: 47.2.
22 BY MR. LEWIS:
23   Q  Have you seen this document before, sir?
24   A  Yes, sir.
25   Q  And is this a May 18-21, 1971, report from

Page 200

1 the United States Department of the Interior Bureau
2 of Mines?
3    A  Yes, sir.
4    Q  And did you folks at W.R. Grace receive
5 this in the regular and usual course of your
6 business?
7    A  Yes, sir.
8    Q  And does it relate to your mine and mill?
9    A  Yes, sir.
10   Q  Does it document -- Well, has it been
11 maintained in the regular and usual course of the
12 business of W.R. Grace?
13   A  I believe so, yes, sir.
14   Q  And does it appear to be a genuine copy of
15 the document that you saw at or near the time it was
16 issued?
17   A  Yes, sir.
18      MR. LEWIS: Move the admission of
19 G-47.2.
20      MR. GRAHAM: No objection.
21      THE COURT: 47.2 will be admitted
22 without objection.
23 BY MR. LEWIS:
24   Q  Does this document conclude that you have
25 significant problems associated with asbestos

Page 201

1 exposure to your employees in the -- near the middle
2 of 1971?
3    A  Yes, sir, it indicates that.
4    Q  And specifically documents problems with
5 sweepers working in the old dry mill?  Near the
6 bottom of page 4.
7    A  Yes.
8    Q  It says, "Two sweepers were sampled; both
9 were exposed to seven times the proposed TLV. They
10 were required to wear respirators in the dry mill on
11 all but the first floor.  During the sweeping and
12 cleanup process, the settled dust, while being
13 swept, fell through the cracks in the floor and
14 added to the ambient dust load in the air."  Do you
15 see that?
16    A  This is on page 4, sir?
17    Q  Maybe we've got another page enumeration
18 problem.
19        THE COURT:  Six, I think.
20        MR. LEWIS:  See, it's numbered 4 on
21 this one (indicating).
22        THE WITNESS:  Okay.
23 BY MR. LEWIS:
24    Q  Do you see that there, sir?
25    A  Yes, sir, I do.

Page 202

1    Q  Does it -- It indicates that company
2 officials involved in this inspection report
3 included Mr. Oliverio, the manager; is that true?
4    A  Yes.
5    Q  Mr. Luther Krupp, Mine Superintendent and
6 Mr. John Riggleman, Mill Superintendent, correct?
7    A  Yes, sir.
8    Q  Conclusions and Recommendations, it says
9 the exposures in the dry mill -- This would be about
10 page 6 I think, under Conclusions and
11 Recommendations.  Do you see that?
12    A  Yes, sir.
13    Q  Conclusions and Recommendations.  "In
14 summation, exposures in the dry mill and associated
15 areas were high."  Do you see that?
16    A  Yes, sir.
17    Q  Then it goes down to third paragraph,
18 "Dusty conditions existed at the concentrate
19 loading bins ..."  Where was that at?
20    A  That was down at the storage and the
21 loading place on the banks of the Kootenai River.
22    Q  And at that time it remarks that the new
23 mill was to be constructed around 1972, right?
24    A  That's what this states, yes, sir.
25    Q  Now, I want to talk to you a little bit

Page 203

1 about that new mill.  You -- The new mill was -- It
2 took awhile to get it on line, and you believe it
3 went on line in '74, right?
4    A  Yes, sir.
5    Q  You believe in '74 the old dry mill
6 closed?
7    A  Yes, sir.
8    Q  You don't remember what month it was?
9    A  Well, as I remember, the new mill went on
10 stream early in the year, like in March or April,
11 but I believe that the -- the old dry mill operated
12 at least once after that for a very short period of
13 time, maybe four days.
14    Q  Weren't there problems with the new mill
15 that caused the dry mill to go on into -- at least
16 into 1975 and perhaps into '76?
17    A  No, sir, I don't believe it ever operated
18 in '75 and '76.
19    Q  You don't recall that?
20    A  No, sir.
21    Q  Well, in any event, the new mill used a
22 wet process, right?
23    A  Yes, sir.
24    Q  And there is advantages to the wet process
25 because there is not as much asbestos in the air,

Page 204

1 correct?
2    A  Yes, sir.
3    Q  But even in the wet mill, the new mill,
4 there was mud that would cake on equipment and
5 things, and on the men; is that correct?
6    A  In some places, yes, sir, the asbestos
7 could cake on some of the machinery.
8    Q  It would cake on machinery and it would
9 cake on their clothes, correct?
10    A  Well, I don't know.  There shouldn't have
11 been much reason for them to come in contact to have
12 it cake on their clothes.
13    Q  If some employees were to come before this
14 court and testify that they had to get up to their
15 knees in asbestos contaminated mud to do their work
16 from time to time, would that be incorrect?
17    A  No, I can't -- I couldn't say that that
18 was incorrect.
19    Q  In any event, mud would get on the men's
20 clothing; is that correct?
21    A  Could, yes, sir.
22    Q  And then -- When it was wet and in a mud
23 form it might be more likely to stick to their
24 clothing than if it were in a dry form, correct?
25    A  That could be, yes, sir.

Page 205

1   Q And they could carry it around with them
2 on the facility; is that right?
3   A Possibly.
4   Q And take it home, mud on their clothes,
5 correct?
6   A Possibly.
7   Q And when the mud dried, what would happen
8 to the substance? Would it be released into the
9 air?
10    MR. GRAHAM: Objection, calls for
11 total speculation.
12    MR. LEWIS: If you know.
13    THE COURT: If he knows, he can
14 testify.
15    THE WITNESS: I don't know. If it
16 were not -- If it were not handled or so on, I
17 don't know any reason why it wouldn't disintegrate
18 and vaporize and get into the air.
19 BY MR. LEWIS:
20   Q Well, it was a fine mud, right?
21   A Well, it was mud made up of fine
22 particles, yes, sir.
23   Q And what was its consistency? Like
24 ketchup?
25   A No, I think when it was caked on the

Page 206

1 machinery, it was solid.
2   Q When it was wet, what was its consistency?
3   A It would be the same way. If it was caked
4 on there, it would be solid.
5   Q Well, did the wet mill process the
6 vermiculite in a wet form?
7   A Yes, sir.
8   Q So there -- In the mud, there would be
9 vermiculite contaminated with asbestos; isn't that
10 the way it worked?
11   A There could be, but generally when it
12 caked on the machinery it was pretty well
13 concentrated and most of the material was asbestos.
14   Q Most of it was asbestos?
15   A Yes, sir.
16   Q Okay. So the mud had a much higher amount
17 of asbestos in it even than the ore, right?
18   A Yes, sir.
19   Q It was almost pure asbestos?
20   A Yes, sir.
21   Q And the mud would get on men's clothing --
22 Did you ever go into the wet mill?
23   A Many times.
24   Q Did you ever get mud splashed on your
25 pants or anything like that?

Page 207

1   A I don't recall.
2   Q Could that have happened?
3   A I suppose it could, but there would be
4 very little -- there would be very little reason why
5 that mud would get on anybody's clothing.
6   Q Did you ever see any of that mud on
7 anybody's clothing?
8   A Not that I recall, no, sir.
9   Q But if it did get on somebody's clothing,
10 they could take it right home with them, couldn't
11 they?
12    MR. GRAHAM: Calls for speculation
13 again, Your Honor.
14    THE COURT: Sustained.
15 BY MR. LEWIS:
16   Q Did the men have to work around the
17 machinery with the mud caked on them?
18   A Well, that machinery was an integral part
19 of the concentration process in the mill and
20 ordinarily the machinery where the mud would cake
21 would be entirely covered with water.
22   Q Well, in any event, you said it's
23 conceivable that men could get mud on their clothing
24 and that this mud would be almost pure asbestos,
25 right?

Page 208

1   A Yes, sir, I said that.
2   Q And what would happen to that asbestos
3 after it dried on their clothing, and wherever they
4 would be, that would be just peer speculation,
5 according to you; isn't that right?
6   A Yes, sir, I don't know.
7   Q You would have no reasonable expectation
8 of what would happen to that mud on that clothing?
9   A No, I don't know.
10   Q What about this other support equipment
11 associated with the wet mill? Were there other
12 areas where the men were exposed to asbestos
13 fibers? Were there tunnels or something like that?
14   A Not on a regular basis, no, sir.
15   Q How did the asbestos get to the wet mill?
16   A It would have been in the mill feed.
17   Q Just like it went to the dry mill?
18   A Yes, sir.
19   Q What happened to the mud? What happened
20 to the asbestos mud? Did you have to routinely
21 remove it, discard it or what?
22   A I don't really know.
23   Q Well, if you had asbestos mud almost
24 100 percent tremolite asbestos mud accumulating in
25 the process, at some point you would to to get rid

Page 209

1  of this waste; is that correct?
2  A  Yes.
3  Q  Where would that waste go?
4  A  We're not talking about large quantities
5  here, I would like to point out.
6  Q  We're talking about pure asbestos, right?
7  A  If it -- If and when it was removed from
8  the machinery, it would go out with the mill
9  tailings.
10  Q  So how would it get out to the mill
11  tailings?
12  A  It would be put -- It would be put on a
13  tailings belt or in a -- in the slurry that was
14  pumped to the mill tailings pond.
15  Q  And would it -- Would the men have to get
16  in proximity to the tailings belt at any time when
17  it was working?
18  A  Well, yes -- Yes.
19  Q  Any other place where the men would come
20  into contact with fly-able or air-borne asbestos?
21  A  Well, one place that that could happen
22  would be in the dryer area.  And the dryer was in an
23  enclosed room.  But there would be no workers there
24  at all times.  Once in a while they would have to
25  get in there.  There was -- Above the dryer there

Page 210

1  was a large bag house, and the bags would have to be
2  changed, and anybody that went into that bag house,
3  they would have to be wearing respirators.  And I
4  believe that there were -- there were pressure suits
5  in there also for those people.
6  Q  Okay.  Now Mr. Schnetter was an
7  electrician after he left the old dry mill; did you
8  understand that to be correct?
9  A  Yes, sir.
10  Q  And an electrician, would that job require
11  him to work all over the mill site?
12  A  Yes, sir, he -- An electrician could work
13  anywhere in the operation.
14  Q  He could work in an area where they had an
15  accumulation of that pure tremolite asbestos mud?
16  A  Yes, sir.
17  Q  He might have to work around that
18  machinery that had that mud on it?
19  A  Possibly.
20  Q  He might have to work on the conveyor
21  system?
22  A  Possibly.
23  Q  And that would be the conveyor system
24  where the pure tremolite asbestos mud would be
25  discarded with the tailings, correct?

Page 211

1  A  Yes.  There would -- The conveyor systems
2  in the new mill were very limited and most of the
3  tailings were handled in the slurry.  And -- Which
4  meant that the solids were mixed with water and
5  pumped to a point.
6  Q  And would these be taken to a tailings
7  pond?
8  A  Some of it would, yes.
9  Q  And what would the rest -- where would the
10  rest of it go?
11  A  It would be dumped on the side of the
12  mountain.
13  Q  So some of that pure asbestos mud would go
14  on the side of the mountain and some of it would go
15  in the tailings pond; is that correct?
16  A  Yes, sir.
17  Q  Did you ever go out and look at the side
18  of the mountain to see where that mud was and what
19  would happen to it, that pure asbestos when it dried
20  out?
21  A  I was out there and looked at the tailings
22  pile many times.  I don't ever remember looking at
23  the asbestos.
24  Q  Once that pure asbestos was in that water,
25  like a mud, it was no longer trapped in the ore; is

Page 212

1  that correct?
2  A  That's correct.
3  Q  Would you agree with me, just based upon
4  your ordinary experience as a human being, that if
5  some of that asbestos mud had dried on something and
6  you gave it a kick, you could release asbestos
7  fibers?
8  MR. GRAHAM:  Objection, relevancy,
9  speculation.
10  THE COURT:  Overruled.  You may
11  answer if you know, Mr. Lovick.
12  THE WITNESS:  Well, I don't know.
13  I think the likelihood of that is very, very remote,
14  because there would be no occasion that I know of
15  that someone would be walking down there.
16  BY MR. LEWIS:
17  Q  But was it open to the weather?
18  A  Yes, sir.
19  Q  Could it be disturbed by the weather?
20  A  I suppose it's possible, but I think it's
21  very unlikely.
22  Q  Could it be diluted by rain and snow and
23  spread around?
24  A  I don't know how it would react.
25  Q  Well, you do know one thing, there was

Page 213

1  100 percent asbestos mud that was being discarded on
2  the side of that mountain and in the tailings pond,
3  right?
4      A  Yes, sir.
5      Q  And the tailings pond was open also,
6  right?  It wasn't covered by anything?
7      A  No, sir.  It was covered by water.
8      Q  Well, the mud that went over the side of
9  the mountain, that wasn't covered by water and the
10 rain could get on that, take it right down the
11 mountain; is that right?
12     A  Yes, sir.
13     Q  All right.  What about, was there an area
14 where there was a tunnel or anything that an
15 electrician would have to work in?
16     A  Well, yes, there were -- Yes, there were.
17     Q  Was there asbestos fibers in that tunnel?
18     A  Yes, sir, there could be.
19     Q  And there was -- Was there a problem with
20 the ventilation system in any of those tunnels?
21     A  Yes, sir.
22     Q  So once that asbestos got worked up, those
23 fibers, it may not easily be ventilated; is that
24 correct?
25     A  I don't know if that's correct or not.

Page 214

1  I don't know whether those ventilation shafts would
2  become clogged.
3      Q  The electricians had to work in the
4  ventilation shafts; is that right?
5      A  I'm sure they did at times, yes, sir.
6      Q  Okay.  Well, I'm just about done here,
7  sir.  I want to ask you a couple questions about the
8  nature of the exposure up there at your W.R. Grace
9  facility.  Let's take your situation.  How many
10 years did you work up there?
11     A  Thirty-five.
12     Q  There were other men that worked up there
13 for 35 years; is that correct?
14     A  Yes, sir.
15     Q  And some of them were exposed to asbestos
16 for 35 years, right?
17     A  Yes, sir, that's possible.
18     Q  There is an interesting statement in
19 Plaintiffs' Exhibit zz.  And it talks about
20 Mr. Gidley.  And I don't want to get into the
21 particulars of Mr. Gidley because that's really not
22 relevant here, except that it says -- One thing, it
23 says that, He had 211 fiber-years exposure to
24 asbestos.  Do you see that?
25     A  Yes, sir.

Page 215

1      Q  I want to talk about that.  What's a
2  fiber year of asbestos exposure?
3      A  That's being exposed to one fiber of
4  asbestos for a year's time in the atmosphere.
5      Q  How did you make that determination that
6  he had 211 fiber-years exposure?
7      A  It was done by classifying all of the jobs
8  at the operation, and what the average exposure
9  would be to these people at each one of their jobs.
10 And these -- In the various jobs they had, there was
11 the total of fiber exposure they would been exposed
12 to over the time that they had worked at that job,
13 and all of these would be -- would be added together
14 and the total employment would be divided into that
15 and that would give you the number of fiber years.
16     Q  Who worked up that system of determining
17 fiber years?
18     A  It was done by statistician at McGill
19 University.
20     Q  But one could have 211 fiber years of
21 exposure with only 30 years of work if the exposure
22 was in a real bad place, right?
23     A  Yes, sir.
24     Q  And if one were in the old dry mill for,
25 say, a year and a half or two years, one could have

Page 216

1  20 fiber years of exposure from just that short
2  period of time; is that correct?
3      A  You could put any number on there and it
4  would be possible.
5      Q  Okay.  Did you keep fiber years of
6  exposure for the employees right up until the end?
7      A  No, sir.
8      Q  That was something that was done early
9  on?
10     A  No, sir.
11     Q  When was it done?
12     A  It was done in 1983 and '84 as part of the
13 McGill study.
14     Q  The McGill study, did it include everybody
15 that had ever worked there?
16     A  No, sir.
17     Q  Who did it include?
18     A  It included -- They had what was known as
19 a cohort list.  There was four hundred and some
20 employees on that.  In order to be placed on the
21 cohort list, it was somebody that had been hired in
22 1963 or before and had worked one or more years at
23 the operation.
24     Q  So it excluded every employee who was
25 hired after W.R. Grace acquired the mill; is that

TRANSCRIPT OF PROCEEDINGS   CondenseIt!™   SCHNETTER vs W.R. GRACE

Page 217

1 correct?

2   A  Yes, sir.

3   Q  That would have excluded Dan Schnetter; is

4 that correct?

5   A  Well, let me clarify that. He would have

6 been excluded in the conclusions of the study, but

7 his fiber years would have been calculated and part

8 of -- it would have been part of the records. But

9 he would not have been in the statistics that made

10 up the study.

11   Q  All right. Couple more areas, then we're

12 going to be finished here. Mr. Melcher was -- held

13 the position of safety supervisor or trainer

14 sometime in the '70s; is that correct?

15   A  Yes, sir.

16   Q  What was that position?

17   A  Well, he was -- After the MSHA law was

18 passed that new miners were required to have

19 training -- above-ground miners, 24 hours of

20 training before they could go to work, and

21 underground miners 40 hours before they were allowed

22 to go to work, he was responsible for drawing up the

23 training programs and administering these training

24 programs to these employees and new hires. It was

25 also a requirement that each employee would have

Page 218

1 eight hours of training each year and he was

2 responsible for doing that training.

3   Q  When did the MSHA training requirements

4 come into existence?

5   A  I don't remember.

6   Q  Was it 1979?

7   A  I don't remember.

8   Q  Okay. When Mr. Melcher retired, do you

9 remember when that was?

10   A  No, sir.

11   Q  Do you know who took his place?

12   A  No, sir.

13   Q  Who would know that?

14   A  Mr. Melcher, I would assume.

15   Q  Did you ever attend any of Mr. Melcher's

16 training sessions?

17   A  Yes, sir.

18   Q  Did you provide most of the data for the

19 McGill study? You, personally?

20   A  I gathered the majority of the data, yes,

21 sir.

22   Q  Nobody else provided any data for the

23 McGill study besides you; is that true?

24   A  No, that would not be true.

25   Q  You gathered all the data?

Page 219

1   A  Yes.

2   Q  You picked the kids who would be included

3 in the cohort list?

4   A  Well, yes, sir.

5   Q  And not everybody who worked before 1963

6 was included in the cohort list; is that correct?

7   A  If they worked a year or more, they were,

8 yes, sir.

9   Q  Even the ones that couldn't be found?

10   A  They would have been on the cohort list,

11 yes, sir.

12   Q  Okay. But this McGill study was dependent

13 upon the accuracy of what you reported to some

14 degree; is that true?

15   A  Yes, sir.

16   Q  And if what you reported was not accurate,

17 then the study was flawed, correct?

18   A  Well, yes.

19      (A discussion was held off the record.)

20      MR. LEWIS: Exhibit 53.1, please.

21 BY MR. LEWIS:

22   Q  Mr. Lovick, I'm handing you what has been

23 marked as Exhibit 53.1. Have you seen that document

24 before?

25   A  Yes, sir, I believe so.

Page 220

1   Q  Did you folks receive that in the regular

2 and usual course of the business at W.R. Grace and

3 Company?

4   A  Yes, sir.

5   Q  Is it a document that's regularly

6 maintained in the records of W.R. Grace?

7   A  Yes, sir.

8      MR. LEWIS: I move the admission of

9 Exhibit 53.1, Your Honor.

10      MR. GRAHAM: Just so that we're

11 talking about the same thing, is that the Bureau of

12 Mines -- or MSHA -- MESA report of October 2nd

13 through 4th, 1973?

14      MR. LEWIS: No, that's the October 2

15 through 4, 1973.

16      MR. GRAHAM: This one.

17      MR. LEWIS: Right.

18      MR. GRAHAM: No objection, Your

19 Honor.

20      THE COURT: G-53.1 will be admitted

21 without objection.

22      MR. LEWIS: Would you look at

23 Exhibit 50? I think it's already in evidence.

24 BY MR. LEWIS:

25   Q  Do you have Exhibit 50?

TRANSCRIPT OF PROCEEDINGS    CondenseIt!™    SCHNETTER vs W.R. GRACE

Page 221

1    A  Yes, sir.
2    Q  Were you folks issued a violation -- a
3 notice violation as part of that report of May --
4 excuse me, October 21, 1971?
5    A  We were issued a notice.
6    Q  Were you informed that asbestos fiber
7 concentration in the dry mill and portions in the
8 river transfer facilities exceeded the threshold
9 limits for asbestos?
10    A  Yes, sir.
11    Q  And time allowed to abate this violation
12 was to May 15, 1972; is that correct?
13    A  Yes, sir.
14        MR. LEWIS:  Now, I move the admission
15 of G-53.1, Your Honor.  It's in, I guess.
16        MR. GRAHAM:  That was already --
17        THE COURT:  That's already been
18 admitted.
19        MR. GRAHAM:  -- been admitted.
20        THE COURT:  53.1 has.
21        MR. LEWIS:  Is 50 in?
22        THE COURT:  50 -- I don't have a
23 record of 50.
24        MR. GRAHAM:  I believe --
25        THE COURT:  The clerk says she

Page 222

1 doesn't have a record of 50.
2 BY MR. LEWIS:
3    Q  You have 50 in front of you; is that
4 correct?
5    A  Yes, sir.
6    Q  And that was received by you folks and
7 maintained in the regular course of your business
8 activities?
9    A  Yes, sir.
10        MR. LEWIS:  Okay, offer G-50.
11        MR. GRAHAM:  No objection.
12        THE COURT:  50 will be admitted
13 without objection.
14 BY MR. LEWIS:
15    Q  Now the notice violation that was to be
16 abated in 1972 was not abated; is that correct?
17    A  I don't remember.
18    Q  Look at page 3 of Exhibit 53.1.  Did --
19 Does that state that asbestos fiber concentrations
20 in the dry mill still exceeded the TLV's?
21    A  Yes, sir.
22        MR. LEWIS:  Your witness.
23        (Whereupon, after a discussion at the
24 bench, Court was adjourned for the day.)
25