Trial Testimony Designations for:
*In Re:  W. R. Grace & Co., et al.*
(U.S. Bankr. Ct., Dist. of Delaware, Case No. 01-1139)
**January 14, 2008**

<u>Deposition Designation Key</u>

Arrowood = Arrowood Indem. Co.
f/k/a Royal Indem. Co. (Light Green)

BNSF = BNSF Railway Co. (Pink)

Certain Plan Objectors "CPO" = Government Employees Insurance Co.; Republic Insurance Co.
n/k/a Starr Indemnity and Liability Co.; OneBeacon America Insurance Co.; Seaton Insurance
Co.; Fireman's Fund Insurance Co.; Allianz S.p.A. f/k/a Riunione Adriatica Di Sicurta; and Allianz
SE f/k/a Allianz Aktiengesellschaft; Maryland Casualty Co.; Zurich Insurance Co.; and Zurich
International (Bermuda) Ltd.; Continental Casualty Co. and Continental Insurance Co. and
related subsidiaries and affiliates; Federal Insurance Co.; and AXA Belgium as successor to Royal
Belge SA (Orange)

CNA = Continental Cas. Co & Continental Ins. Co. (Red)

FFIC = Fireman Funds Ins. Co. (Green)
FFIC SC = Fireman Funds Ins. Co. "Surety Claims" (Green)

GR = Government Employees Ins. Co.; Republic Ins. Co. n/k/a Starr Indemnity and Liability Co.

Libby = Libby Claimants (Black)

OBS = OneBeacon America Ins. Co. and Seaton Ins. Co. (Brown)

PP = Plan Proponents (Blue)

Montana = State of Montana (Magenta)

Travelers = Travelers Cas. and Surety Cos. (Purple)

UCC & BLG = Unsecured Creditors' Committee & Bank Lenders Group (Lavender)

| | |
|---|---|
| **AFNE = Assume Fact Not in Evidence** | **L = Leading** |
| **AO = Attorney Objection** | **LA = Legal Argument** |
| **BE = Best Evidence** | **LC = Legal Conclusion** |
| **Cum. = Cumulative** | **LPK - Lacks Personal Knowledge** |
| **Ctr = Counter Designation** | **LO = Seeking Legal Opinion** |
| **Ctr-Ctr = Counter-Counter** | **NT = Not Testimony** |
| **ET = Expert Testimony** | **Obj: = Objection** |
| **F = Foundation** | **R = Relevance** |
| **408 = Violation of FRE 408** | **S = Speculative** |
| **H = Hearsay** | **UP = Unfairly Prejudicial under Rule 403** |
| **IH - Incomplete Hypothetical** | **V = Vague** |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                        .    Case No.  01-1139 (JKF)
                              .
W.R. GRACE & CO.,             .
et al.,                       .    USX Tower - 54th Floor
                              .    600 Grant Street
                              .    Pittsburgh, PA 15219
              Debtors.  .
                              .    January 14, 2008
. . . . . . . . . . . . . ..    8:50 a.m.

TRANSCRIPT OF TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:         Kirkland & Ellis, LLP
                         By:  DAVID BERNICK, ESQ.
                              BARBARA HARDING, ESQ.
                              JANET BAER, ESQ.
                              BRIAN STANSBURY, ESQ.
                              RAINA JONES, ESQ.
                              HENRY THOMPSON, ESQ.
                         200 East Randolph Drive
                         Chicago, IL  60601


For the Debtors:         Kirkland & Ellis, LLP
                         By:  THEODORE FREEDMAN, ESQ.
                         Citigroup Center, 153 East 53rd St.
                         New York, NY  100


For the ACC:             Caplin & Drysdale, Chartered
                         By:  PETER LOCKWOOD, ESQ.
                              NATHAN FINCH, ESQ.
                         One Thomas Circle, NW
                         Washington, D.C.  20005


Audio Operator:          Cathy Younker


Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609)586-2311     Fax No. (609) 587-3599

15

PP  
Obj:  
R;  
F;  
L.A.;  
LPK

Libby

1   we ought to proceed with that.

2          I believe that we've reached  agreement among counsel

3   that the side of the room that stands for truth and justice

4   over here gets two hours, and then the other side of the room

5   that stands for truth and justice gets two hours, and then we

6   all will have an hour for rebuttal.  That's a half hour per

7   side, so -- I'll be going this morning for about two hours, and

8   I'd like to take a break I think halfway through that process

9   to catch my breath and to set up a couple of different things,

10  and then I'll finish up, and they'll go a half hour

11  (indiscernible) --

12          THE COURT:  That's fine.

13          MR. BERNICK:  I understand that the video system is

14  hooked up, so the next thing is --

15          THE CLERK:  You can't step away, sir.

16          MR. BERNICK:  Maybe just put on the screen, it will

17  be visible to Your Honor, and visible back on those screens,

18  and then all those (indiscernible).

19          Let me start out with some introductory remarks, Your

20  Honor.  I'm not going to go back, because of the long history

21  of the case.  We've done enough of that in this courtroom.  But

22  I want to make an observation that really lies at the heart of

23  the estimation issue that brings us here, which is that Your

24  Honor is going to hear about a very unusual bubble, a bubble

25  that drives the estimation that's being done by the plaintiffs

Libby

16

PP
Obj:
R;
F;
L.F.,
LPK'

1  in this case, and that drives the estimation literally billions
2  of dollars worth of claims that have now been dealt with in the
3  course of bankruptcy, and also drives, therefore, literally
4  billions of dollars that have now been set up in a series of
5  trusts.
6          The bubble really began just before Grace went into
7  Chapter 11, and that was a bubble of claims.  It was a very
8  dramatic increase of claims.  It was an overwhelming increase
9  of claims.  It was an unmanageable increase of claims.  It was
10  an increase in claims that we know today had absolutely no
11  basis in medicine, and no basis in law.  But the fact of the
12  matter was that Grace and its various constituencies didn't
13  really have an alternative to try to deal with that problem.
14  The fact of the matter was that it couldn't be managed, and the
15  only recourse was, therefore, Chapter 11.  Sometime,
16  ironically, about the same time, there was another problem.
17  That was the stock market bubble.  And that also was --
18  (indiscernible) exuberant.  It was unmanageable.  It seemed
19  like it might go on forever.  Nobody knew what, ultimately,
20  would come of it.  But the time came when that bubble burst,
21  and people were in denial for a period of time, but eventually
22  they got up and about their business, and they went on to
23  create another (indiscernible) we'll call the real estate
24  bubble.  That's a story for a different day.
25          The claimants here, both the ACC and the FCR, have

J&J COURT TRANSCRIBERS, INC.

27

PP
Obj:
R;
F;
LA;
H;
LPK

Libby

1  into, well, what was the basis for that statement?  And it
2  turns out that the basis of that statement was not this --
3  having established that the estimates were predictive of a
4  company still in the tort system, but rather they were
5  predictive of the experience of a bankruptcy trust, which, of
6  course, has a much different situation in established criteria.
7  It has pay outs that are all fixed in amount with -- subject to
8  some adjustments over time, a totally different beast from the
9  huge volatility that a litigant sees during the course of the
10  litigation process.  it turns out that there was only one
11  estimate, one estimate that he could even think of of a company
12  that he had done at a company still in the tort system where he
13  said it still had some predictive value.  And that was a
14  private estimate that he says that he did of W.R. Grace, never
15  been published, never been reviewed.
16        '  So, if we go to Peterson 80, we now see -- any others
17  beyond Grace.  (Indiscernible) any other forecast for a company
18  not (indiscernible) bankruptcy that's been shown to be accurate
19  for a period of five years or more?  Answer:  "I've done
20  forecasts for other companies, but I don't know whether or not
21  -- I haven't had a chance to look at the back up data, so I
22  can't answer that yes or no."  No record of predictability.
23  Only a record of unpredictability.
24        Why is it that it should be so difficult to predict
25  even a few years out?  The answer is very simple.  The

J&J COURT TRANSCRIBERS, INC.

37

Libby

PP
Obj:
R;
F;
L.P.;
H;
LPK

1  basic parameters, exposure, dose, risk and diagnosis of
2  disease.  We then used, we deployed exactly the right and very
3  well established scientific disciplines, industrial hygiene,
4  epidemiology, and quantitative statistics, and medicine, and
5  here are the experts that we have brought to bear in connection
6  with this work.  Lee and Lees (phonetic), Mugavaker (phonetic)
7  and Anderson, Weill, and Henry Parker, all people who are
8  experts in these underlying disciplines.  Notably, there is not
9  a single expert in this case on the other side in any of these
10  disciplines who has sought and undertaken to perform the same
11  kind of analysis.  These people are all available, but you
12  don't see any of them saying, oh, well, gee, we have developed
13  a different epidemiological model, and here's the output.  They
14  quarrel with (indiscernible) from our analysis, they propose no
15  alternative model, no alternative estimate based upon an
16  alternative deployment of these established scientific
17  disciplines.  At the end of the day their whole model says
18  forget all of that stuff.  We've got a person named Dr.
19  Peterson who is a Ph.D. and a lawyer.  We've got a person named
20  Ms. Biggs, who has a background in statistics, I believe.  We
21  have Mr. Staylor, who has got a background in statistics.  We
22  don't have people who actually go through and construct this
23  kind of model because we're not engaging in that enterprise.
24          The next slide.  This flow chart that we've developed
25  is probably extremely difficult to ascertain from the expert

38

Libby

PP
Obj:
R;
F;
LP;
H;
LPL

1   reports, but we've laid it out here.  And essentially what

2   we're doing is we're taking -- remember, we see the same

3   building blocks, exposure, dose, risk, and diagnosis of

4   disease.  So, we start out by taking a look at the kinds of

5   activities in which claimants against Grace as of April of '01,

6   the kinds of activities in which they engaged, in terms of did

7   they mix asbestos containing products, did they remove their

8   (indiscernible), did they install, they were at a site, or they

9   were in a space?  And, of course, the questionnaires asked for

10  this information flat out, and we know that almost nobody

11  filled out the questionnaires because they decided they didn't

12  want to.  So, what we had to do, and again focusing

13  specifically on mesothelioma, we actually read all the

14  mesothelioma files in order to find out, well, what is it that

15  they said they did with Grace asbestos?

16          Now, it will be said, oh, well, there's all kinds of

17  evidence that might be introduced with respect to what these

18  people actually did, that maybe we wouldn't have gotten until

19  the time of trial, and that's been a constant refrain.  There

20  are two answers to that, actually, three.  And we'll take them

21  up in more detail later.  But the key thing about what we did

22  with exposure, we did with exposure, is we relied upon the

23  claimants themselves to say what they did, and certainly the

24  claimants themselves ought to be able to say what they did.

25  That doesn't take time to evolve for trial.  That comes from

39

Libby

PP Obj;
R;
F;
LA;
H;
LPK

1  the claimant.  Now, the calculations based upon that, that's

2  more involved.  We rely upon them for the calculations.  We

3  relied upon them to simply talk about what it is that they did.

4  And they are the best sorts of information with respect to what

5  it is that they did.

6          We then took the next step.  We now need exposure and

7  dose.  Let's go back to that first slide.  We're going to fill

8  it in.  We're going to find out, okay, what's the exposure and

9  dose associated with these activities?  What, then, is the

10 maximum lifetime exposure?  And we assumed that these people,

11 and they said they did, we assumed that they did it for an

12 entire lifetime.  What, then, is the ultimate risk that comes

13 from the epidemiological studies?  Then we take a look at

14 diagnosis of disease, the medical screen, and we'll talk about

15 that.  And then we took both of the outputs in order to create

16 a grid of considerations that then applied to each claimant

17 pursuant to the P.I. cues.  So, we have exactly a by the book,

18 exposure, dose, risk assessment, screening process, using

19 exactly the same disciplines that have been at the core of

20 epidemiology, industrial hygiene, and diagnostic medicine for

21 years, and years, and years.

22         When we find out the exposure and dose -- next slide,

23 please.  That's Slide 13.  This table indicates down at the

24 bottom A through E, those are the exposure categories, what the

25 industrial hygienist did is to look at all of the available

J&J COURT TRANSCRIBERS, INC.

40

Libby

PP
Obj:
R;
F;
LA;
H;
LPk

1  industrial hygiene data to find out, well, what is -- what

2  would be the mean eight hour that is time weighted average air

3  concentration that these individuals would be exposed to?

4  Following an absolutely traditional analysis.  And what we can

5  see is that here's a figure from Nicholson.  Here's the

6  Nicholson construction trace 58 to 72, 73 to 79.  You can see

7  how high they were for construction as compared to these

8  people.  These people didn't have that kind of exposure.  And

9  it may well be that they had exposure later on.  But in any

10 event, these are people who were involved in construction

11 trades.  The application of this kind of product, in the

12 cutting and removal, etcetera, etcetera, being at the site, is

13 a lower level activity than many of the other construction

14 trades, which would have included people who were actually

15 working with insulation and other more toxic products.  So, the

16 industrial hygiene data was all illustratives down here.

17         If we focus on B, D, and E, see how small they are?

18 We're now going to zoom in on get bigger on B, D, and E.  We

19 can see that even there, this is now the OSHA permissible

20 exposure limit, .1.  These are trades that are below even the

21 (indiscernible).  This is what the data actually shows in all

22 cases.  So, this now gave us a rubric of data.  We now had to

23 apply it to create a lifetime dose.  That's the next step.

24 Next slide, please.

25         So, what did Dr. Anderson assume?  She'll be

J&J COURT TRANSCRIBERS, INC.

41

Libby

PP
Obj:
R;
F;
LA;
H;
LPK

1  testifying about this.  She assumed that all of the exposures

2  were only to Grace products.  Any exposure we had was to a

3  Grace product, as long as it's indicated there.  If you worked

4  with a non-Grace product any day of the -- 11,250 is lifetime

5  exposure, obviously that's very conservative, and if you worked

6  with any non-Grace product, that would take a day away from the

7  Grace exposure.  If you worked in an alternative occupation,

8  then the cumulative exposure associated with Grace products

9  actually declined.  So, these are the assumptions, extremely

10  conservative.  Next slide.

11          On the basis of these assumptions you then end up

12  with a certain number of 45 year, that is lifetime cumulative

13  exposures, assuming that constant exposure driven by the

14  industrial hygiene data, you can see, now, A is 17, B is 2.1, C

15  is 12, D is 1.3, and 1.5.  Now, when it comes to B, D, and E,

16  which are so low, we took a further look to see, well, how many

17  people actually, under the plaintiff population, the ones who

18  gave us enough data for us to determine how long they were

19  actually exposed, how many of them actually were exposed at

20  that level?  Are these numbers skewed by a few cases of higher

21  exposures?  And we found out that the latter was true.  This is

22  --

23          THE COURT:  Would you go back?  I'm sorry.  Go back

24  to the prior slide for a minute, please.

25                          (Pause)

42

Libby

PP
Obj;
R;
F;
LA;
H;
LPK

1          THE COURT:  Okay.  Thank you.

2          MR. BERNICK:  Thank you, Your Honor.  And we found

3  out, as it turns out to be true, that you can actually take the

4  people who gave us enough information for us to actually find

5  out how long they actually did work with the product, that what

6  we find out is that the actual numbers for B, D, and E are not

7  as high as indicated on the prior slide, that overwhelmingly

8  they're below one fiber per millimeter a year.  So, it's below

9  one for it looks like about anywhere -- anywhere close to --

10  maybe 95 percent of the cases.  So, the numbers you saw on the

11  prior page are actually extremely conservative numbers.

12          What, then, does that enable us to do?  Well, now,

13  with those kinds of risks -- go back to the prior slide,

14  please.  With these kinds of lifetime exposures, what is the

15  risk that's associated with that?  That's the next step.  Very

16  traditional next step.  Risk assessment analysis used by the

17  federal government in a thousand different offices every hour

18  of every day of every year.

19          Let's go to the next slide.  What we've done here is

20  display the epidemiology, because epidemiology tells you about

21  risk.  And under the epidemiology, what you're always looking

22  for is a dose and a response.  So, here we have, on the

23  horizontal axis, we have the dose, the cumulative dose,

24  (indiscernible) units, and here we have response in the sense

25  of do you have an excess of disease in the population, which is

J&J COURT TRANSCRIBERS, INC.

Libby

PP
Obj:
R;
F;
LA;
H;
LPK

1   what the epidemiology look to.  That is, in each given dose we

2   have data that says that that dose, down here, here's what the

3   relative risk is, the relevant risk would be over on the

4   vertical column.  What we've done is, you see, we now have a

5   very nice dose response curve.  Gee, that's just terrific.  And

6   what that says is that there's actually a regularity in the

7   relationship between dose and response, exactly what you'd

8   expect with a well established potential carcinogen, based upon

9   epidemiological data.  But we see, in fact, that there are

10  limits to what you can observe.  We have a limit in the sense

11  of what the actual data points in the studies establish.  These

12  are mostly studies that took place at very, very high levels.

13  That's where the dose response relationship was well observed.

14  At lower doses the robustness of the data, that is, do you even

15  have data that shows that there's an increased risk, diminishes

16  significantly.  And when you get down here, that is we don't

17  know if we're seeing -- actually seeing something that is real,

18  and as you get down -- way down here, this is very interesting.

19  In this we actually have studies that looked for risks and

20  didn't find them, that is, that measured those actual doses and

21  said we do not see an excess.  So, you would say that at that

22  level a variety of different things might occur.  And we're

23  going to get to that in the next slide.  So, this is

24  observation.  This is now inference.  The data is not hard.

25  This you've got hard data that says you don't actually have a

44

PP
Obj:
R;
F;
LA;
H;
LPK

Libby

1  risk.

2          What do we do about this low area, this inference --

3  inference, in a sense negative area?  The answer is that a lot

4  of very smart people spent their lives working on that very

5  question for the last 20, 25 years.  What do you do about

6  exposures that are in an area where there is not scientifically

7  observable relationships?  You don't find statistically

8  significant associations using reliable data?  What do you do

9  in that area?  And it's a real issue, because we have chemicals

10  that are present in the environment, and in the workplace.  And

11  radiation, you had people working in the (indiscernible), and

12  the power utility complex, all exposed to low levels.  You can

13  say, well, we don't want to have anything, and then the

14  operation would shut down.  So, people spent a long time

15  saying, well, where do we really think that the key lies here?

16  What should we do?  Go to the next slide, please.

17          And so, you have this kind of problem, the data here.

18  You then have a limitation.  What do you do in the zone of

19  interest?  Next slide, please.  The answer is that for public

20  health purposes, like the EPA, they develop models that have no

21  threshold, that go all the way down to zero dose and find, not

22  find, but state that they are assuming that there is a risk,

23  whereas the actual potential response is, that is what the

24  truth might be, could be beyond that line, or below that line,

25  it could be above that line, conceivably.  Actual responses,

J&J COURT TRANSCRIBERS, INC.

45

Libby

PP
Obj:
R;
F;
LA;
H;
LPK.

1  though, are not known.  So, the models, which also have been

2  quoted for the proposition that, well, every little dose

3  carries with it risk.  Sure, that's true in a modeling health

4  protective sense.  It is not true in a scientific sense when

5  you get down to doses that are that low.

6          So, how does this, then, now relate back to our

7  problem?  Next slide.  The other sides' experts, all of them,

8  admit, Dr. Wadley (phonetic) admits, next slide, Dr. Hammar

9  (phonetic) admits, another one of their experts, next slide,

10 Dr. Lehman (phonetic), that's another one of their experts,

11 they all admit that there probably is a threshold, that is, it

12 really doesn't go all the way down to zero.  It kind of goes

13 along the bottom line, and then it pops up some.  So, it's a

14 threshold situation.  What they disagree about, they disagree

15 about how low that threshold goes.  So, Your Honor will see --

16 this is the next slide -- that there are different studies that

17 are being used.  We believe that we have all of the studies

18 that matter.  They also uniformly -- we have an area where risk

19 is not measurable, not detectable, not present.  They have a

20 few studies that, Your Honor, we would submit, even -- show the

21 next slide -- they even confess -- next slide -- that they have

22 limitations on what can actually ascertained from their data.

23 So, we have a series of limitations.  Number one, they don't

24 use actual industrial hygiene data.  For example, they report

25 as fiber millimeters per year, with quotes, indicating that

46

Libby

PP
Obj:
R;
F;
LA;
H;
LPK

1  they actually haven't measured it.  They -- going down -- they
2  use job titles instead of having actual airborne asbestos
3  information, which you would need.  The results are generic.
4  They are unable to make distinctions of risks for different
5  fiber characteristics.  They can't render opinions with any
6  degree of scientific certainty.  The (indiscernible), in many
7  cases, say it would be assumed that the measured levels -- the
8  levels that are being used are assumed, not measured, and
9  therefore they have reliability issues.
10        But under any set of circumstances, we are talking
11  about a situation where everybody agrees that the fact that
12  there is a threshold, and where it is clear -- let's put up
13  that slide -- that we are talking about risks that are
14  extremely small.  Next slide, please.
15        So, what do we reach as a conclusion with regard to
16  these types of exposures?  With respect to B, D, and E, they
17  cannot be demonstrated in a scientifically sound manner that
18  these people had sufficient cumulative exposures to cause
19  disease.  Exposures have not been demonstrated scientifically
20  to contribute to a risk of disease, and therefore these claims
21  are being set aside.  They don't make it past the Daubert
22  standard that says it has to be scientifically demonstrable.
23  The (indiscernible) of the -- disciplines, the methodologies
24  established in this area say it is not scientifically
25  observable.  Do we say, however, that we consider whether they

J&J COURT TRANSCRIBERS, INC.

Libby

PP
Obj:
R;
F;
LA;
H;
LPK

1  might substantially contribute, or are we relying upon the

2  doubling of dose standard to say we're excluding these people?

3  And the answer is we are not excluding B, D, and E, based upon

4  the doubling of risk dose.  We are, in fact, considering

5  whether there is evidence that they would -- these exposures

6  were a substantial contributing factor.  That's what Dr.

7  Anderson does.  They have mis-characterized Dr. Anderson's

8  report, and her testimony to say otherwise.  Dr. Anderson

9  specifically considered whether the data showed substantial

10 contribution, and given the very minuscule levels of exposure

11 that we're talking about here, her conclusion was that it did

12 not -- there was not scientifically ascertainable evidence that

13 there was a substantial contribution.

14        Now, does that mean that there is no theoretical

15 risk?  Well, of course there's always a theoretical risk.  The

16 EPA model assumes theoretical risk.  The EPA model assumes that

17 every little bit that you add causes or has an effect.  But the

18 line is a policy statement, and the line is a guidance that is

19 stronger than the science.  The science doesn't take you down

20 to these very low levels, and show a positive increase of risk.

21 (Indiscernible) studies do not show you a positive increased

22 risk.  And even at higher levels, that last solid line that you

23 see doesn't say that as you get down, tiny, tiny, tiny, in each

24 fiber, that, in fact, there is a detectable increase in risk.

25 It doesn't say that.  It says that for purpose of establishing

48

Libby

PP
Obj:
R;
F;
LA;
H;
LPK

1   a general relationship of dose and response, yeah, higher

2   levels of exposure have been shown to have higher levels of

3   risk.  It doesn't say that if we had .5, or one fiber

4   millimeter per year, that, in fact, you observed any increase

5   of risk.

6           Your Honor I will also observe that if you take those

7   -- let's go back a couple of slides.  Back more.  Dose.  Dose.

8   More.  Ah.  If you assume the models, you go all along that

9   curve and assume it's totally solid, it -- and you had studies

10  at each and every point along the way to measure, measure,

11  measure.  Let's assume that you had that.  And you assumed,

12  therefore, that every increment of exposure carried with it an

13  actual risk as opposed to a theoretical risk, you're talking

14  about risk contributions that are not substantial.  You're

15  talking about risk contributions that are minuscule risks,

16  risks that are of the order of magnitude of dying by drowning

17  in your lifetime.  Those are the kinds of risks that we're

18  talking about.  They are not -- the idea that any increase,

19  theoretically, in risk, means substantial contribution enjoys

20  no support in the law, and enjoys no support scientifically.

21  The data doesn't get you there.  There is no study that starts

22  here and then goes -- let's go a little (indiscernible) -- that

23  defines -- oh, yes, by God, we can see a risk.  That's not the

24  way the science works.

25          So, then, we then go to the -- let's go through a

49

Libby

PP
Obj:
R;
F;
LA;
H;
UPK

1    couple more slides, back to where we were.  Beyond that.

2    Disease screens.  We're not going to spend as much time on

3    disease screens.  Your Honor is familiar with this.  These are

4    the screens that we used.  It would have to be a one slash

5    zero, and to have the circumstances, must be greater than --

6    has to be one slash zero or more, not greater than.  And it has

7    to be -- x-rays have to be done in compliance with the actual

8    standards that are set forth by the ILO.  The same thing with

9    the PFD.  And then we have a screen for (indiscernible) cancer.

10          We have taken out the screens that are litigation

11   screens as unreliable.  And why did we do that?  Let's go

12   through the next couple of slides.   The ILO, which talks about

13   how these x-rays are to be used, actually sets out a standard

14   for how they should be conducted.  So, we've (indiscernible)

15   Daubert, and reliable evidence, we go to a set standard that's

16   established by the ILO and NIOSH themselves about what must be

17   done in order to produce a reliable result.  And this says --

18   we'll take the next slide -- where you have a contested

19   proceeding, NIOSH recommends a minimum of two independent

20   classifications by appropriately selected readers with a third

21   classification if the first two disagree.  You have to have

22   three different readings, two of which got to be right.  And

23   they should be blinded.  They should be blinded.

24          So, what is it that we did?  Next slide, please.  We

25   did a study, the Henry study.  Remember, we asked for all those

J&J COURT TRANSCRIBERS, INC.

Libby

PP
Obj:
R;
F;
LFr;
H;
LPR

1 x-rays. And we sent them out to be re-read. We sent them out

2 on a blinded basis, the number of readers was determined in

3 advance, not ad hoc. We (indiscernible) with strong

4 credentials, and controlled inputs, that is, we sent -- the

5 plaintiffs' lawyers sent in the actual x-rays. And then we

6 also did something else. We used control films, so we could

7 see whether the readers were over-reading or under-reading in

8 some kind of biased fashion. And we found out, in fact, that

9 they didn't. So, what, then, happened? What were the results?

10 If we take plaintiffs' alleging radiographic evidence of

11 asbestos related disease, we used x-rays, all of which came

12 from plaintiffs, who said that they were relying upon the x-ray

13 in order to establish that their lung cancer was asbestos-

14 related, that is to establish evidence of fibrosis. In 82

15 percent of the cases, the claimants' readers made a finding of

16 one slash zero. How many of those were establishable in

17 accordance with the standard? Seven percent. So, when you

18 actually comply with the standard, the data that's being

19 submitted, although it says 82 percent actually show an ILO

20 positive reading, we only had seven that are replicated in

21 accordance with the standards. And we would note that 90

22 percent of those have a significant smoking history. There

23 were a variety of things that could cause the finding on a B

24 Read.

25          Next slide. We also, then, in the study, eliminated

**J&J COURT TRANSCRIBERS, INC.**

51

Libby

PP
Obj:
R;
F;
LA;
H;
LPK

1  those people -- took a look at how many of those people

2  actually were seen by doctors who are no longer accepted by the

3  trusts, or B Reads, or other doctors who we know by virtue of

4  their testimony and how they actually -- depositions were

5  taken, we know how they actually conducted the B Reads, and

6  they didn't do the B Reads in accordance with the standards by

7  their own admission.  So, we took those folks out, as well.

8       Next slide.  What then happens?  This is now -- the

9  flow chart has been filled out.  We have the A, B, E, D, and E,

10  the different exposure categories, the eight hour PWA's, the

11  maximum exposures over the lifetime, and therefore, then, using

12  our risk models, we said with respect to B, D, and E, they are

13  too low to have even scientifically observe the -- even

14  present, even to exist.  With respect to A and C, we say there

15  is a potential risk.  We don't enough to say that it's there,

16  but it's good enough for this case, so we let them through.

17  And then we then apply to the population the screens that we've

18  indicated.

19       What, then, comes out at the other end?  At the other

20  end, therefore, we have, using the same basic elements of risk

21  assessment, we go through those plaintiffs who have claims

22  pending as of the filing of bankruptcy.  We know that a certain

23  number of them did not actually complete the PIQ, or the proof

24  of claim.  Because they're -- if they haven't picked up a proof

25  of claim, they're not included under Bankruptcy Rules, and they

94

Libby

PP
Obj:
R;
F;
LA;
H;
LPK

1  expert report we've put before the Court would be a rebuttal

2  witness.  We note that Dr. Heckman was not the subject of a

3  Dalbert challenge and so the equity committee never answered

4  any Dalbert motion that was made against us.

5          THE COURT:  All right.

6          MR. HOROWITZ:  That's it.  Thank you, Your Honor.

7          THE COURT:  Okay.  How long do you think it will take

8  you for lunch to get wherever you are going to go?  I mean to

9  get everyone out and back I think it usually takes about an

10 hour so I mean keep it as short as you like, but I think much

11 less than an hour doesn't work in this building very well.  An

12 hour, okay see you back at one o'clock then.  We are in recess

13 until one.

14                    (Lunch recess)

15          THE COURT:  Please be seated.  Who is next?

16          MR. LOCKWOOD:  I am Your Honor.  I will be right

17 there.

18          THE COURT:  Okay, Mr. Lockwood.

19          MR. LOCKWOOD:  Good afternoon, Your Honor.

20          THE COURT:  Good afternoon.

21          MR. LOCKWOOD:  This is somewhat unusual combination

22 of occurrences here because unlike the normal situation where

23 you would have motions in limine/Dalbert type exercises

24 separate from opening statements, as Mr. Bernick has

25 demonstrated and as we agreed we are basically combining the

J&J COURT TRANSCRIBERS, INC.

1 fact that as a general proposition you don't have bar dates in
2 524G plan context because there is no perk if you are not -- if
3 the trust is going to resolve the claims and not the bankruptcy
4 court.  The purpose of a bar date is generally in a bankruptcy
5 case to indemnify the claim so that they can then be allowed or
6 disallowed and that was not going to be the purpose for this.

7     Instead the purpose was to enable the Court to have
8 jurisdiction to award sanctions if it felt they were
9 appropriate against claimants who declined and failed to take
10 the second mechanism, or to accomplish a second mechanism which
11 Grace has in this bankruptcy which is the personal injury
12 questionnaire or PIQ.

13     That PIQ again after much debate in front of the
14 Court was set out and was for the expressed and stated purpose
15 by Grace and has been argued throughout Mr. Bernick's
16 presentation today and in his papers, for the purpose of
17 generating information that would supposedly provide the
18 necessary, in Grace's view, evidence that would tell the Court
19 whether the claim of the person filling out the questionnaire
20 was or was not valid.

21     The third mechanism that Grace is proposing in its
22 so-called merit based or legal liability estimation is that
23 Grace is submitting the testimony of a group of experts in
24 medicine, industrial hygiene and risk analysis.  To opine on
25 the legal inadequacy from the standpoint of their particular

PP
Obj:
R;
F;
LA;
H;
LPK

Libby

1  disciplines, medicine, risk analysis, industrial hygiene of

2  tens of thousands of claims.  And the final step in this

3  process is the submission of the wrap it up testimony of an

4  expert Dr. Thomas Florence who jettisons as the record will

5  show, Your Honor, when we get to the actual evidence in this

6  case, who jettisons his customary methodology of doing

7  estimations to do what amounts to really a fairly simple

8  mathematical tally of all of the claims purportedly invalidated

9  by the experts, the previous group of experts.  And then it

10 takes the percentage of the surviving valid claims which is

11 needless to say very low and extrapolates that to the future to

12 allegedly demonstrate that the simpler, very low percentage of

13 claims in the future would be legally valid.

14        It should be noted that none of these witnesses

15 assuming that they could otherwise do it, which I don't believe

16 they could, none of these witnesses is a lawyer.  None of these

17 witnesses is going to tell the Court, assuming that the Court

18 will permit them to do so, what the actual legal requirements

19 are and how those legal requirements and the state courts where

20 these claims were filed and whose law the Court is obligated to

21 apply, how that law fits, if you will, with these opinions

22 about medicine, risk analysis, industrial hygiene.

23        The -- after having sort of put Dr. Florence on the

24 number and these other experts for the number and amounts of

25 the present and future claims and the validity, the validity of

PP
Gdr.

1  those claims and sort of rejecting out of hand the expert

2  testimony from the ACC and FCR as not fitting because they

3  aren't opining as to the legal liability of Grace.  And the

4  basis of which their testimony is generally being rejected is a

5  combination of it relates to the tasks where the tort system

6  was broken, not is anymore but was broken, and to Rule 408

7  which we'll discuss later.

8        But having done all of that Grace then has to put a

9  dollar figure on these claims.  How does it do that?  Well it

10 gets Dr. Florence to value this reduced universe of legally

11 valid claims that he's come up with here by using the amounts

12 paid in settlements.  Not judgments where juries and courts can

13 determine the legal validity of the claim or the amount that

14 the defendant Grace could be legally obligated to pay for the

15 claim.  No settlements and more only settlements of six cases.

16 Now Mr. Bernick went through a long to do about how gee, if he

17 used more cases he could have come up with lower values.  So

18 they are really getting generous to us in using six cases as

19 the starting point for the valuation.  And as another one of

20 Mr. Bernick's charts demonstrated all the other values for all

21 the other claims are in Dr. Florence's methodology, while they

22 are not obtained by valuing those other claims by the

23 historical amounts, they are claimed by deriving the values as

24 ratios of the value, the settlement value of those other claims

25 to the settlement value of the six mesothelioma claims.

**J&J COURT TRANSCRIBERS, INC.**

106

PP
Ctr.

1        So everything, the entirety of this number that Dr.

2   Florence comes up with here is dependent upon the value.  (A)

3   the values on these six meso claims and (B) the proposition

4   that they can use those settlement values for that purpose,

5   notwithstanding their insistence that this is a merits based

6   analysis which presupposes that some courts and/or jury

7   somewhere is going to decide whether the claim is valid and

8   what it is worth.

9        Then where is Grace going to go with that number if

10  the Court accepts it?  Well as long as the Court comes up with

11  a number that is no more than the $1.6 billion for whatever the

12  PI portion of the combined PI PD number is, we don't -- since

13  we don't know yet what the PD number is the PI portion of that

14  is kind of a moving target.  But it's obviously somewhere south

15  of 1.4 billion because Grace has already settled a couple of

16  hundred million dollars worth of PD claims.

17       Grace is going to cram that down on the asbestos

18  classes.  And assuming that it can do that, the effect of it

19  would be to fund the 524G trust with the PI portion of the $1.6

20  billion, which the Court will have presumptively ruled as

21  Grace's legal liability for present and future claims.  Then

22  one of two things is going to happen with respect to the trust.

23  Either the trust agreement and the TDP will have to provide

24  that the values and the criteria which Grace has persuaded the

25  Court to accept as the basis for the legal liability

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
LA

1  determination will have to be baked into the trust distribution
2  procedure so that the numbers will match.  In other words, the
3  trusts -- the Court's valuation will be the same as the trust's
4  obligation to pay claims.  That's one alternative.
5      The other alternative is that notwithstanding the
6  fact that the trust -- the Court found that Grace's legal
7  liability was $1.6 billion minus X, the trust will wind up
8  having an obligation to pay more than $1.6 billion minus X to
9  claimants when it resolves these claims over the many years
10 into the future that the trust will exist.  In which event, the
11 claimant's will not get 100 cents on the dollar.
12     Those are the two alternatives.  I personally can't
13 figure out any other way of doing it.  Since the Grace plan
14 proposes to pay all its non-asbestos creditors 100 cents on the
15 dollar plus post-petition interest and proposes that a
16 shareholder should retain their equity interests, the second
17 possibility which is that the trust might not pay 100 cents on
18 the dollar can't work.  Because it would violate the absolute
19 priority rule as well as potentially, depending upon how far
20 short it fell, potentially violate the unfair discrimination
21 provision code.
22     So the Court effectively can't confirm a plan that
23 would have that possibility in it.  So that means basically the
24 only option here is that the trust is going to have to be
25 legally required only to pay those claims that the Court has

1  or what have you, the same sort of specific causation issues

2  that are being addressed when we talk about, you know, do you

3  have enough asbestos in your lungs, do you have enough

4  exposure, et cetera, et cetera, to be a substantial

5  contributing factor to your disease.  Those are specific

6  causations because they are addressing the individual claim.

7          And at the end of the day he never resolved any of

8  that.  He just simply said I'm going to deny the estimation

9  motions.  I'm going to consider the debtor's motion for summary

10  judgment on its omnibus objections and conditionally if he

11  denied the causation -- the summary judgment motion on general

12  causation he was going to send his opinion to the district

13  court as a recommendation as to how that court should proceed

14  to litigate -- liquidate those claims.

15          Now if we apply the Dow-Corning decision to this case

16  what does it tell us?  Well it says first you can't use

17  estimation in the bankruptcy court which is where this

18  estimation proceeding is going on, can't use estimation to

19  impose the cap liability amount on a non-consenting class of

20  creditors in lieu of actual allowance or disallowance

21  procedures, which I might add Your Honor has repeatedly stated

22  that we are not allowing or disallowing claims.  You have no

23  intention to do that and Grace in its papers has agreed that we

24  are not allowing and disallowing claims.

25          Even if there was some mechanism for avoiding the

114

Libby

PP
obj:
R;
LA

1  individual allowance, disallowance problems identified by Judge

2  Spector, this Court would at most have the power to rule

3  favorably to Grace on a summary judgment motion on an omnibus

4  objection to all asbestos claims on the ground that asbestos

5  doesn't cause disease.  Not surprisingly, we haven't seen that

6  motion because there is no dispute that asbestos causes

7  disease.  The dispute is if somebody -- does somebody have an

8  asbestos related disease and if they do, did exposure to a

9  Grace product constitute a substantially contributing factor to

10 the development of that disease?  Both of which are the do you

11 have a disease is individual to the plaintiff, and do you have

12 exposure to a Grace product in sufficient amounts to have

13 contributed to that, to substantially contributed to that

14 disease?

15       Again it looks at the individual work history of the

16 individual claimant.  So there is just no mechanism for

17 achieving even the theoretically possible result in this Court

18 that Judge Spector thought he might be able to achieve in Dow-

19 Corning.  So under Dow-Corning if Grace actually wants to

20 litigate the merits of its liability for these claims in this

21 Court -- well first it can't do it in this Court.  It would

22 have to have the district court withdraw the reference because

23 as we've noted earlier this Court doesn't have the power to,

24 either through estimation or otherwise address the allowance of

25 personal injury claims.

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
LA

1       Secondly, the district court would then have to

2   identify and determine the consolidate -- the so called common

3   issues and you would have to address what, if any, issues could

4   be addressed on summary judgment.  You have to empanel juries

5   for all claims not summarily adjudicated and you then have to

6   try the resulting cases including individual issues such as

7   specific causation and damages.

8       Needless to say that is not what this Court

9   contemplates doing.  And I would note in that connection that

10  the Rule 42 approach was (A) tried by Mr. Bernick in the

11  Babcock and Wilcox case or was proposed and after Judge Vance

12  inquired of Mr. Bernick how many cases over how many years was

13  she as the district judge who he persuaded to withdraw the

14  reference for this purpose going to have to spend on these

15  cases and they requested further briefing on that subject.

16  That was the last anybody heard about the 42 trial, case

17  settled.

18      Secondly, he also originally proposed to do it in

19  this case.  But for reasons which I suspect have something to

20  do with his realization that it simply wouldn't work in

21  anybody's lifetime in this Court or Judge Woolan or whoever had

22  the case at the time wasn't going to be very receptive to that,

23  he withdrew that proposal.  And instead he moved to have an

24  aggregate estimation.  But when he moved to have an aggregate

25  estimation, he made sure to move to have an aggregate "merits

**J&J COURT TRANSCRIBERS, INC.**

116

Libby

PP
Obj:
R;
LA

1 based" estimation, notwithstanding the fact that that term

2 appears to have been invented by Mr. Bernick for purposes of

3 this case.

4        The only other case offered by Grace in support of

5 what it wants to do here is the one we heard about earlier

6 today which is the A.H. Robins case.  The Court can read the

7 A.H. Robins case for itself.  I submit to you that it is a

8 pretty slender read here.

9        First, the context of the case was in the fourth

10 circuit that the class of Dalcon Shield claimants whose claims

11 were being addressed in that estimation had voted 95 percent in

12 favor of that plan.  Notwithstanding the fact that the

13 disclosure statement expressly stated that the payments to

14 claimants under that plan were going to be limited to the

15 amount being contributed for that purpose by the debtor, some

16 $2.5 billion, that the estimation was inherently uncertain, and

17 that as a result it was possible that the claimants wouldn't

18 get their share of what that number was supposed to produce by

19 way of a recovery.

20        Indeed, the appeal was from a dissident group of

21 claimants and the actual grounds for appeal that they were

22 raising were 1129A(11) feasibility and 1129A(7) best interest.

23 And as for the feasibility objection since Robins was never

24 going to have to pay any more than the estimated amount and

25 since there was no dispute that it had the ability to pay the

117

Libby

PP
Obj:
Rj
LA

1  estimated amount, the feasibility objection is sort of

2  ridiculous on its face.  Of course it was feasible.  I mean,

3  all it had to do was pay the money and walk away.  That was the

4  end of it.

5       There would be no subsequent claims against Robins

6  because they were being cut off, discharged.  As for the best

7  interest test, the opinion is absolutely opaque as to what the

8  estimation issue was related to best interest.  I mean, I can't

9  -- I don't know what it was.  It certainly however didn't seem

10  to -- none of the issues, none of the arguments seem to involve

11  what we've got here which is a situation in which you had some

12  multi-expert, multi-disciplinary, multi-expert case that was

13  going to determine A.H. Robins legal liability for Dalcon

14  Shield claims for all time and all purposes in an aggregate

15  mass tort litigation.  Instead what can be gleaned from the

16  opinion was there were a number of different experts much as

17  there are in asbestos cases who come in and testify that in

18  their opinion the aggregate amount of the liability based on

19  whatever criteria they chose to bring to that assignment is in

20  their judgment this horrible term that Mr. Bernick keeps

21  saying, their judgment X dollars and the district court chose

22  among them.

23       He came -- the district court came up with a number

24  which happens to conform to Francine Rabinowitz who is a

25  typical asbestos expert who comes in and uses the same

J&J COURT TRANSCRIBERS, INC.

118

Libby

PP
Obj:
R;
LA

1  methodologies that Dr. Peterson and Dr. Biggs use usually and

2  yeah, she didn't -- she used the questionnaires to determine

3  that some of the claims weren't valid and beyond that who

4  knows.  But the bottom line is that number one, you can't tell

5  how it was done except to know it was done differently from

6  what Grace is doing here.  And secondly, it was a battle among

7  estimation experts, not among doctors and industrial hygienists

8  and what have you.

9          The final thing, I have to say is I would suggest

10 that Your Honor read Judge Spector's view of what happened in

11 A.H. Robins which appears at 211 Bankruptcy Reporter at 601 at

12 Note 60.  To put it mildly he had some questions about the

13 integrity of that entire process and how it played out.  In any

14 event, the -- what is going on here is in our judgment a

15 fundamentally illegitimate use of Dalbert in this sort of mass

16 aggregation context.

17         What is going on here is the experts are being asked

18 to testify about albeit in a sort of combined fashion about the

19 legal validity of whole classes of claims against Grace.  And

20 the -- as I've attempted to elaborate here the legal merits of

21 individual claims, even if they went into groups, is simply not

22 and cannot be an issue in this Court.

23         Secondly, the experts while it can give opinions

24 about medicine and risk analysis of law, excuse me, and

25 industrial hygiene they cannot come in here and usurp the

Libby

PP
Obj:
R;
LA

1    powers of the court or the jury in telling the Court whether

2    claims are legally valid or not.  But that is exactly what is

3    happening here because what you are being asked to take these

4    criteria that Grace is positing in here and do one of two

5    things with them through these experts.

6          One is since Dr. Florence simply zeros out everything

7    that they say isn't valid, that's a legal judgment.  Because

8    the questions of what is the evidence needed to support a

9    personal injury claim at the end of the day is something that a

10   judge determines or a jury or a combination of the two.  It's

11   not something -- and the expert can opine on the medicine and

12   the components of it.  But they can't say and I'm right and

13   this claim isn't any good and that is what they are doing.

14          The alternative is what Grace might be arguing, is

15   that no other expert in the world could have credible

16   difference of opinion on these subjects.  This is the Dalbert

17   angle.  Dalbert as you know doesn't decide the law.  I mean

18   Dalbert isn't a rule that says an expert that the trial judge

19   determines whether some expert's testimony is a correct

20   statement of law.  Dalbert is an issue about whether or not

21   expert testimony is admissible in the trial of a contested

22   issue of fact.  And if there is two sets of experts whose

23   testimony is both admissible then the trier of fact ultimately

24   decides on the basis of the particular case in front of it

25   which of those experts is more credible on the facts of that

120

PP
Obj:
R;
LA

Libby

1   case.

2          Grace seems to be suggesting at points in its

3   argument that because it -- the experts in-house are so

4   credible and so persuasive and so credentialed that no other

5   expert could possibly be admitted in the case, in an individual

6   case to controvert their finding, if you will, that a plaintiff

7   not meeting their criteria doesn't have a valid case.   And

8   again, that's not what this Court is here to do nor could it.

9          Even if in some way or another you could try and

10  argue that there was some basis for having this mass allowance

11  disallowance process done in this Court, the ACC and the FCR

12  aren't the parties that could do that.   As the Kensington case

13  in the third circuit clearly held, the ACC and the FCR do not

14  -- excuse me, not the ACC, official committees do not bind by

15  their actions individual members of their constituency.   And

16  while in the case, in that case the issue was whether they were

17  bound by failing to raise and objection or something and in

18  this case it is a different issue.   The principle is the same.

19         We can't -- I remember at one point in one of the

20  charts Mr. Bernick had he said the ACC and the FCR could have

21  taken discovery on all of these claims.   That was his response

22  to our argument that the personal injury questionnaires didn't

23  afford individual claimants the full panoply of protections

24  that they would normally have in a trial to get discovery

25  against the defendant.   For example, to find product ID

**J&J COURT TRANSCRIBERS, INC.**

127

Libby

PP
Obj:
R;
LA

1        We've argued that in our papers The technical aspects

2   of why Rule 408 doesn't apply.  Mr. Bernick's response in his

3   reply brief is pretty -- is a series of bullet points that

4   don't really provide any significant authority to The contrary

5   for The proposition that you can -- you could even admit all

6   these settlements as long as you are not trying to prove

7   liability for The invalidity of a claim or its amount.   The

8   testimony here is not taking a particular settlement or group

9   of settlements from The past and saying Grace has legal

10  liability for these particular settlements in The future.   Or

11  Grace has even legal liability for a case very similar to these

12  cases in The future.

13        It is simply a method of trying to figure out how

14  much money Grace, outside of bankruptcy, post bankruptcy if you

15  will, would have to pay for these cases.  And Mr. Bernick spent

16  a lot of time talking about how conservative his experts are.

17  Well The fact of The matter is that This is an extremely

18  conservative assumption because as Mr. -- as The evidence will

19  show in This case The reason Grace settled cases, The reason

20  that virtually all asbestos defendants settled The vast

21  majority of cases against them, is that they have made a

22  determination that it is cheaper for them than to try The

23  cases.

24        Sure if they try The cases they will win a lot more

25  of them.  But The problem is that The ones they lose they get

128

Libby

PP
Obj:
R;
LA

1  killed.  And as Dr. Peterson has pointed out in one of his

2  reports, he actually substituted The sort of -- The litigation

3  history which is The only thing resembling an actual merits

4  based history that Grace has.  If you substituted that history

5  for The settlement based history as opposed to combining The

6  two wherein The judgments The verdicts get, because they are

7  such a small percentage, The effect of them is dramatically

8  reduced.  But if you substituted them you would wind up with

9  Grace paying very, a lot fewer cases, a lot more money.  And

10  The total Grace liability would be way, way higher than The

11  highest number that Dr. Peterson or Ms. Biggs has come up with

12  here.

13        There are also -- they've also tried to blow off The

14  notion that Rule 703 allows an expert to testify about things

15  that would be inadmissable as The basis for opinions.  They

16  cite some cases.  Read The cases, Judge, they don't support

17  that notion here.  And particularly what they don't support is

18  whether Mr. Bernick likes it or not, The estimation methodology

19  utilizing This type of analysis is routinely used by experts in

20  This field for This purpose.

21        Now at their conclusions -- but the fact is it is

22  used and testified in a lot of cases that it is used outside of

23  litigations as I said earlier and under those circumstances for

24  them to use the same type of factual basis, whether it's

25  admissible as we say, or in admissible, as they argue, is

131

Libby

PP
obj:
R;
LA

1  juries and the courts that have jurisdiction of those claims.

2           If you take what Grace is doing here at face value,

3  it never intended from the day it filed this case to use this

4  Chapter 11 proceeding for the normal purpose of restructuring

5  its business through arrangements with its creditors that the

6  Bankruptcy Code contemplates.  In violation instead of the

7  spirit if not the letter of the Third Circuit's decision in the

8  SGL Carbon case, Grace is simply attempting to convert the

9  bankruptcy -- its bankruptcy case into a form of aggregate mass

10  tort litigation that it couldn't accomplish outside of

11  bankruptcy, and in the process it's basically trying to

12  convince this Court that the normal rules in claims allowance

13  that allow the claimant to -- you know, you've got to have an

14  objection to the claim.

15           I mean here under the bar date, Your Honor, Grace has

16  never objected to these claims.  They're all deemed allowed

17  right now, because there's never been an objection filed.  All

18  the claims were filed under POCs and the bar date.  I mean,

19  obviously, they're not allowed, but I mean the whole notion of

20  a claim, an objection, a hearing, a right to defend yourself,

21  put your claim forward, a right to elect who your trial expert

22  is going to be as opposed to some guy who you might have gotten

23  some x-ray from while you were considering filing a lawsuit

24  against somebody, everything of that is just tossed out the

25  window, and it is simply not possible under the Bankruptcy

Libby

PP
Obj:
R,
LA

1  Code.   It's not a legitimate use of the Bankruptcy Code, and

2  I'm sure at the end of the day this Court will not countenance

3  it.

4          That said, I rather suspect that the Court is not

5  going to Daubertize any of the witnesses.  We've been through a

6  process in some other cases before Your Honor, and so while I'm

7  going to turn the podium over now to others to address some of

8  that, particularly given the fact that Mr. Bernick didn't spend

9  a lot of time on most of the witnesses, hopefully, we will be

10  able to avoid having too much further discussion on that

11  subject.   Thank you.

12          THE COURT:  Mr. Finch.

13          MR. FINCH:   Nathan Finch for the Asbestos Claimants

14  Committee.  Don't show any graphics unless I tell you to.

15          The -- let's talk about what's not disputed here.

16  There is well-established epidemiology for the projected future

17  course of mesothelioma.  Dr. Nicholson's projections, you heard

18  Mr. Bernick say that they were sound science.

19          Second, we know that 27 million Americans have been

20  occupationally expoed to asbestos.

21          Third, we know that Grace made asbestos-containing

22  products that were broadly used in a wide variety of places.

23  Their Monokote III, which is the asbestos spray on insulation

24  product, has been called one of the -- it become the dominant

25  fireproofing product in the country and was the focus of most

133

1  of the litigation.  They also made insulating cement and made

2  acoustical plaster, all of which had chrysotile asbestos that

3  was infected with Trimolite from the Canadian mines.  They

4  have --

5            UNIDENTIFIED SPEAKER:  Excuse me.  If you could just

6  lean a -- I can hardly hear.

7            MR. FINCH:  Sure.  Excuse me, Your Honor.  They have

8  admitted that -- testified -- their witnesses have testified

9  that Grace products have been identified by plaintiffs as being

10 on any kind of construction or industrial site.  It runs the

11 whole gamut except for possibly shipyards.  And, in fact, they

12 have actually lost some cases arising out of shipyards.

13           So you've got this huge toll of disease nationwide.

14 The United States government statistics show that the

15 mesothelioma incidence rate, what they actually count, is still

16 going up.  I mean it's basically been flat for a long time, but

17 it's still going up.  We've got, you know, 26/27 hundred

18 mesothelioma deaths in the United States now.  The death rate

19 from asbestosis is going up, and the number of people who die

20 from asbestosis is only a very small fraction of the people

21 actually ultimately who have the disease.

22           And so the question is how do you estimate that

23 liability on Grace's part.  And I'm going to first talk a

24 little bit about their methodology and explain why -- in

25 addition to the reasons Mr. Lockwood articulated, why it's just

PP
Ctr.

134

PP
Ctr.

1 not reliable and doesn't fit the law.  What Grace is ultimately

2 trying to do is take <u>Daubert</u> and turn it into a substantive

3 rule of decision under state law.  Forty-six states have

4 <u>Daubert</u> or a version of <u>Daubert</u>.  They call it <u>Havner</u> in Texas.

5 They call it <u>High</u> in Maryland.  But the point is the scientific

6 basis for getting an expert's report or expert's opinion in

7 front of a jury, there's a mechanism to challenge that or has

8 been for many, many years after 1993 and in some states before

9 that.

10          So what they're trying to do is they're trying to say

11 only if you believe our experts, are -- would any case

12 conceivably get to a jury, and that's making a factual

13 determination that -- it's going to depend on the facts and

14 circumstances of each of the 100,000 individual cases.  You

15 can't do it globally, and they're inconsistent with the law.

16 And a couple of the cases that we cited in our reply papers,

17 I'll just read you the quotes.

18          The first is the <u>Rutherford</u> case from California,

19 which the substantive rule in California says, "If plaintiff's

20 prove causation in asbestos-related cancer cases by

21 demonstrating that the plaintiff's exposure to the defendant's

22 asbestos-containing product in reasonable medical probability

23 was a substantial factor in contributing to the aggregate dose

24 of asbestos the plaintiff or decedent inhaled or ingested and,

25 hence, to the risk of developing asbestos-related cancer."

**J&J COURT TRANSCRIBERS, INC.**

135

PP
Ctr.

1  There's no requirement that there's a doubling of the risk for

2  each exposure or each particular product.

3          The <u>Berger vs. Amkin</u> (phonetic) case, which is a case

4  in New York by the judge who has all of the asbestos cases in

5  New York, who listened to the testimony of Dr. Mogavkar, one of

6  Grace's experts here, and a lot of other experts trying to

7  Daubertize the -- or New York state law equivalent -- the

8  expert testimony from plaintiff experts in braverker cases,

9  which is a lower exposure and a different type of exposure than

10  the types of exposure we're talking about here.  What the Court

11  wrote in that opinion, and this is at 818 New York South 2d

12  762, "Scientists and physicians use various means to establish

13  causation in particular situations, not the least of which are

14  toxicological and pathological studies and documented case

15  studies.  While epidemiology may be the gold standard, it can't

16  be the only standard in an area where caustion is both

17  particularistic and well established.  Federal courts have also

18  held that epidemiological evidence is not necessary to

19  establish causation.  It is not really important to have an

20  epidemiology study to determine whether the risk of cancer is

21  increased by asbestos exposure in every occupation."

22          That's what Grace is trying to do here.  The ACC and

23  the FCR are going to call on medical experts, Dr. Laura Welch,

24  who is an industrial medicine doctor and an epidemiologist

25  who's run the largest screening epidemiological study of sheet

**J&J COURT TRANSCRIBERS, INC.**

PP
Ctr.

1  metal workers, 17,000 workers over the past 20 years, Samuel

2  Hammar, a pathologist, a Dr. Rodwi (phonetic), another

3  pathologist, Arnold Brirody (phonetic), a cell biologist.  All

4  of them basically take issue with Grace's threshold idea that

5  you need to have -- that only people who have personally mixed

6  or personally installed asbestos could be possibly be exposed

7  to enough Grace asbestos to cause their disease.

8          The fact is each case turns on its own individual

9  facts.  The plaintiff in each of those cases would be able to

10 hire his or her own expert for the purposes of proving up a

11 case against Grace, and the medical literature -- there is

12 medical literature.  Grace discounts the studies relied upon by

13 the doctors that the ACC and the FCR will put on, but the fact

14 is they do show an excess risk or a doubling or quadrupling of

15 the risk with fiber exposures down to well below one fiber a

16 year of exposure.  And, you know, Grace can take issue with the

17 peer review medical literature, but that's a function of cross

18 examination that would come up in each individual case, and

19 Your Honor is not going to sit here and try 100,000 cases.

20         How much exposure and whether someone has an

21 asbestos-related disease turns on the facts and circumstances

22 of the case.  And in a mesothelioma case -- and most of what

23 I'm talking about here is mesothelioma, and it's real --

24 there's not a dispute about the disease.  It's just did the

25 defendant's asbestos contribute to the causation of the

137

PP
Ctr.

1   disease?  And there's not -- it doesn't have to be that the

2   defendant's asbestos was the sole cause of the disease, or that

3   the defendant's asbestos doubled the risk, because it's

4   cumulative asbestos exposure which ultimately causes disease.

5   So that's their mix and install criteria for mesothelioma.

6          Another criteria they have is you have to have

7   radiologically diagnosable asbestosis in order to attribute

8   lung cancer to asbestos exposure.  And the consensus medical

9   view by the Helsinki criteria, which is a group of experts with

10  over 1,000 years studying asbestos-related disease, have said

11  that you can have asbestos-related lung cancer if you have

12  sufficient exposure, but you don't need to have radiologically

13  diagnosable asbestosis.  And, in fact, Grace's criteria don't

14  even permit someone to prove pathologically that they have

15  asbestosis, and I think Grace's experts would admit that if you

16  have asbestosis pathologically, it may not show up on an x-ray,

17  but you definitely have asbestosis.

18         And so even if you were to say that you need

19  underlying asbestos to attribute lung cancer to asbestos

20  exposure, which the medical literature says you don't need --

21  there's a lot of medical literature that says you don't need --

22  Grace's criteria rule out even the people who can prove it

23  pathologically.

24         The -- Mr. Bernick, quote, testified or talked about

25  various aspects of the tort system, and in the tort system --

**J&J COURT TRANSCRIBERS, INC.**

138

Libby

PP
Obj:
R;
F;
LA
H;
LPK

1  what people did and didn't do in the tort system.  Whatever Mr.

2  Bernick says, whatever I say, whatever any of the lawyers say

3  up here is not evidence.  We're going to -- you're going to

4  hear evidence from Steve Snyder, who's -- who has represented

5  companies in the tort system for over 20 years, from Dan Meyer,

6  who's a claims adjuster who's settled over -- he or his group

7  have settled over 200,000 asbestos claims, from Peter Krause

8  and John Cooney, who represent primarily mesothelioma victims,

9  about what the standards are in the tort system, what Grace

10 required in order to settle cases.

11      Mr. Bernick would have you believe that Grace settled

12 any case that came in the door without regard to whether it

13 posed a risk to it.  In fact, for every case that Grace paid

14 money to -- and here I'd like to -- well, I'll pass on the

15 graphic.  Grace required proof of exposure to a Grace product

16 sufficient to satisfy it and proof of disease to satisfy it,

17 and it paid the plaintiff the amount of money that was

18 something less than what he would recover at trial.  Something

19 far less than what he would recover at trial, but both sides

20 are basically hedging their bets as to what might happen if

21 discover played out.

22      And the defense lawyers from Grace testified at

23 deposition, which is going to be their trial testimony -- since

24 they haven't been listed by witnesses, and we can't compel them

25 here by subpoena -- that the reason they chose to settle these

139

Libby

PP
Obj:
R;
F;
LA;
H;
LPK

1    cases and the standards they used to settle these cases was the

2    best way to minimize the liability.

3              MR. BERNICK:  Yes, I'm remimded that the testimony

4    that Mr. Finch is reciting --

5              THE CLERK:  I'm not picking you up, sir.

6              MR. BERNICK:  I'm reminded that the testimony that

7    Mr. Finch is citing is testmiony that was taken I believe

8    subject to a confidentiality order, because it relates to

9    settlement materials, and I believe that that was one of the

10   conditions pursuant to which we agreed to allow that discovery

11   to take place.  So to the extent that Mr. Finch wants to get

12   into that, and I would I guess suggest that I believe that some

13   of this -- I'm not sure this is covered in the briefs, but to

14   the extent that Mr. Finch would want to get into it, I think

15   that we have an open court here, and I'm not sure that that

16   would be appropriate.  I really don't want to spend a huge

17   amount of time on this, but I am compelled to point out that I

18   believe those are the terms of the order.

19             THE COURT:  All right.

20             MR. FINCH:  I'll pass that.  That's the only

21   reference I'm going to have to this, Your Honor.  I'm not going

22   to show any of the documents.  Suffice it to say there's a lot

23   of them, and we'll put them into evidence at the appropriate

24   time.

25             We do have -- Grace did try some asbestos cases.  It

140

Libby

1  tried about 80 cases to judgment.  It won about two thirds of

2  them, but the ones that lost, the judgments were catastrophic

3  compared to settlement averages.

4         Let's talk about the Peterson and Biggs estimation

5  methodology.  The fact is that it is generally accepted in non

6  -- both in litigation and non-litigation settings.  One of the

7  things we attached to our brief was an expert report from Tom

8  Florence in the Vellumoid case where he testified in the

9  Federal-Mogul cases this summer about Vellumoid's asbestos

10  liabilities, about the asbestos liabilities of Pneumo Abex,

11  about other asbestos liabilities, and in each and every one of

12  those reports he said, and I quote, that, "His estimates were

13  based on generally accepted forecasting methods and pre-

14  petition filing trends."  And he goes on to describe, "The

15  forecasting processes incorporated the methods illustrated in

16  Nicholson and Perkel --" John, can we show this?

17         "The forecasting process incorporated the methods

18  illustrated in Nicholson, Perkel, and Selikoff, the courts have

19  accepted this or similar -- the same or similar methodologies

20  for forecasting future asbestos claims in numerous

21  proceedings."

22         And Dr. Peterson has studied asbestos litigation and

23  mast tort litigation for over 25 years.  He's a Trustee of the

24  Manville Trust.  He is a Trustee of the Fuller-Austin Trust.

25  He was a founding member of the Rand Institute for Civil

PP
Obj:
R;
F;
LA;
H;
LPR

**J&J COURT TRANSCRIBERS, INC.**

PP
Ctr.

1          MR. MULLADY:  I'd like to begin, Your Honor, by

2   reminding the Court of the magnitude of Grace's liability to

3   future asbestos personal injury claimants.  By the consensus of

4   all of the individuals who have estimated Grace's liability in

5   this case, the future claims liability is over 80 percent of

6   the total liability.  Ms. Biggs has it at 90 percent.  Mr.

7   Peterson has it at 89 percent.  Even Dr. Florence, whose

8   estimate obviously is much lower, has it at 82 percent.  And

9   Grace in its SEC filings most recently, it's 10k for the period

10  ending 12/31, 2000, projected that 84 percent of the liability

11  would fall in the future years.

12          Thus, Your Honor, if Grace's liability for asbestos

13  personal injury claims is channeled to a Section 524(g) trust,

14  by everyone's consensus over 80 percent of the assets in the

15  trust will be used to pay future claimants.  For this reason,

16  the due process rights of future claimants who are absent

17  parties here are paramount.  The U.S. Supreme Court has long

18  recognized that constitutional due process limits a court's

19  ability to rule on the merits of the claims of absent parties.

20  And that case is -- the case cite is Hansbury vs. Lee at 311 US

21  32, a 1940 case.

22          Thus, Your Honor, the due process rights of future

23  claimants limits this Court's ability to estimate Grace's

24  liability in a way that would involve ruling on the merits of

25  future claims.  That's very important, yet this is what Grace's

1  estimation methodology contemplates.  The Bankruptcy Code also

2  insures that the rights of future claimants are protected in

3  cases involving a 524(g) trust, as the Court knows.  That

4  section provides that the trust, "will value and be in a

5  position to pay," present and future claims, "in substantially

6  the same manner."

7           So we've heard a lot about merits-based estimation,

8  but make no mistake Grace's estimation methodology does not

9  assess the actual merits of future claims.  Instead it

10 arbitrarily eliminates thousands of future claims and in the

11 process tramples the due process rights of claimants that we

12 just talked about.  Can we have Exhibit 4, Tom?

13          This is a chart from Grace's Daubert opposition brief

14 at Page 32.  The sliver of pending claims after Grace's

15 winnowing process is shown right down here.  They start with

16 pending claims here.  They eliminate those without a proof of

17 claim.  They further eliminate claims that do not meet their

18 exposure criteria, and this last one here, no asbestos-related

19 disease.  So what starts as a pending group here of claims,

20 becomes this tiny sliver here.  Exhibit 5, Tom, please.

21          After this winnowing process is completed, we have

22 the future estimate down here.  The Nicholson disease inputs

23 curve is up here.  The only way this delta gets as wide as it

24 is in the Grace estimation is if history is completely

25 disregarded and new criteria are imposed to screen out claims

153

PP
Ctr.

1  that Grace traditionally paid pre-petition.  And that is the
2  vagary of the process that they are using here with respect to
3  future claimants.  So as to future claimants, the screening
4  process begins with the Grace PIQs, which were not completed by
5  future claimants, so the Court has no data on individual future
6  claims, only assumptions by Grace and their experts as to the
7  number of claims that will be filed, and a second assumption,
8  an unscientific prediction, about how many future claims will
9  be meritorious.

10        Now, we know that Dr. Florence allocates zero value
11  to thousands of future claims.  This is undisputed.  He does
12  this by failing to include large numbers of claimants in the
13  claim base that he uses for his future projections.  But, as we
14  will see, his exclusions are unfair and deny claimants --
15  excuse me -- future claimants their due process rights.
16  Exhibit 6, please.

17        Now, Your Honor, this is a demonstrative.  It's a
18  little bit playful.  I hope Your Honor will give me a little
19  creative license here.  But the concept is very, very serious,
20  and this is the best way I thought we could depict this.  What
21  we show here in this first cut is a hypothetical game board.
22  The players are current asbestos personal injury claimants.
23  The object of the game is to reach the 524(g) trust here and be
24  eligible for compensation.  Hypothetical future claimants are
25  shown here awaiting the outcome of the game, because under

**J&J COURT TRANSCRIBERS, INC.**

154

1  Grace's estimation methodology their fate is dictated by the

2  ability of future claimants -- excuse me -- current claimants

3  to reach the finish line here.

4          So the first player begins and gets to the first

5  question did I file a POC, a proof of claim. He did not, and

6  his claim is not paid. The future claimants are affected by

7  this denial, because the exclusion of this player and many

8  other players who did not file a proof of claim or the many who

9  did file proofs of claim that Dr. Florence could simply not

10 match to the CMS database, they're all used to under estimate

11 the number of future claims. This in turn results in fewer

12 assets being allocated to the 524(g) trust under Grace's

13 estimation, and note that the money bag has shrunk somewhat.

14         Our next player proceeds through the claim filter but

15 is asked whether he entered his claim in CMS before the

16 petition date. He answers no, and he's denied payment. The

17 524(g) trust shrinks even more. Future claimants ask

18 themselves why the value of their claims suffers as a result.

19 They didn't have pre-petition claims. They were not

20 responsible for Grace not timely entering claims into CMS.

21         The next player, he's asked whether his PIQ said that

22 he personally mixed or personally installed a Grace asbestos

23 product. He answers no. His claim is denied, and future

24 claimants ask the question why should we be affected. We

25 didn't file a PIQ. His PIQ said he didn't personally mix or

**J&J COURT TRANSCRIBERS, INC.**

155

PP
Ctr.

1  install.  We weren't sent PIQs.  We aren't bound by Grace's

2  exposure criteria by any court.  Even if in the future a 524(g)

3  trust is established, what are the odds that Grace's exposure

4  criteria will be used?  They're not the law that they state,

5  and the trust criteria will have to be negotiated between the

6  debtor and the personal injury claimants and the futures rep.

7  Next, please.

8          The next player gives the wrong answer to the

9  question whether he identified a Grace product in his PIQ

10 response.  He's sent to the do not pay category.  The trust

11 shrinks further.  Future claimants wonder why they are being

12 affected by the response of a claimant to a PIQ where the

13 claimant's case had not been fully developed at the time of the

14 Grace bankruptcy petition and where the automatic stay

15 prevented that claimant from taking any discovery against

16 Grace.

17         The next player is a pending claimant who did not

18 comply with Your Honor's x-ray order.  My goodness, we heard

19 enough about that order over the last two or three years.  His

20 claim is denied.  The trust shrinks further.  The future

21 claimants ask themselves why their recovery's been diluted.

22 They weren't subject to the Court's x-ray order.

23         When all is said and done, Your Honor, and, of

24 course, many claimants can pass through the various Grace

25 liability filters and make it to a position where they're

**J&J COURT TRANSCRIBERS, INC.**

PP
Ctr.

1    eligible for payment under the trust, but for every claimant

2    that doesn't make it, numbers of future claimants by

3    extrapolation for the Dr. Florence methodology will not receive

4    full compensation for their claims.  And at the end of the day

5    the money that is not paid to the future claimants is returned

6    Grace shareholders.  It moves over there.  And what was once

7    the province of future claimants becomes the province of Grace

8    shareholders.  This is the game that Grace is playing here, and

9    this is why we thought this demonstrative was a good way to

10   depict it.

11           The future claimants, Your Honor, will submit their

12   claims against the trust over the next 50 years.  This Court is

13   bound to estimate Grace's liability by taking into account the

14   future and as yet unasserted claims against Grace, and those

15   claims must be treated fairly and equitably.  As we just saw,

16   Dr. Florence's methodology does just the opposite.

17           Now, of course, Dr. Florence disclaims all

18   responsibility for the assumptions that underlie his

19   calculation of the number of pending and future claims.  He

20   instead follows the lead of Dr. Elizabeth Anderson, who opines

21   that certain categories of claims, as we've heard, have

22   insufficient exposure to Grace products to have a plausible

23   claim against Grace.

24           Dr. Anderson eliminates all claimants except those

25   who personally mixed or personally installed Grace asbestos

**J&J COURT TRANSCRIBERS, INC.**

PP
Ctr.

1  products, as we've heard.  Moreover, she does so in an

2  unscientific way, as I will discuss in a moment.

3        Now, Dr. Anderson in turn relies on Dr. Peter Lees,

4  who has computed the asbestos exposure rates for various

5  classes of Grace workers, but remarkably and unscientifically,

6  Dr. Lees does not even report the variations from the averages

7  that he calculates.  That's an important point.

8        Now, Dr. Anderson also relies on Dr. Mugavkar.  He's

9  the one who's collected the benchmark exposure levels to

10 asbestos that, according to Dr. Anderson, are then necessary to

11 attribute asbestos-related diseases to the exposure.  Now, we

12 submit we've argued in our Daubert papers that Dr. Anderson's

13 opinion that only workers who personally mixed or personally

14 installed Grace asbestos products could have been exposed to

15 sufficient levels of asbestos to cause disease.  We've argued

16 that that opinion is unreliable and inadmissible.

17       She arrives at this opinion by improperly assuming,

18 Your Honor, that the average asbestos exposure of cohorts in

19 each of the PIQ categories -- those categories that Mr. Bernick

20 referred to, A through F.  She assumes that the average

21 exposure of the cohorts in those categories is representative

22 of all workers in that category.  She does not account for

23 individual exposure levels at all.

24       So, for example, Dr. R.J. Lees underlying data shows

25 that the average exposure for a worker -- quote, worker -- is

**J&J COURT TRANSCRIBERS, INC.**

PP
ctr.

1  much higher than the exposure for a, quote, helper, and that

2  only makes sense, because the worker is more directly working

3  with the product than the helper in the same job category.  Yet

4  Dr. Anderson uses the average of the workers and helpers, so

5  that, of course, dilutes the workers' exposure, and by doing

6  this what she does is she eliminates workers even though the

7  average exposures for the workers over 45 years exceed her

8  thresholds.

9          Now to make things worse, she ignores the fact that

10  not all workers in a category have average cumulative exposure.

11  Some have much higher than average cumulative exposures, but

12  she doesn't consider this, which is surprising.  If Grace is to

13  be believed that what they're doing here is determining the

14  merits of individual claims on a claim-by-claim basis, then she

15  should be considering these claimants individually and not

16  grouping them and using averages.

17          Now, Your Honor, this is a complicated area of the

18  case.  It requires some study.  We recommend that the Court

19  carefully read the declarations of Professor Eric Stallard that

20  are attached to the FCR's Daubert papers.  Professor Stallard's

21  an expert in demographic risk modeling.  In his declarations he

22  explains the importance of accounting for heterogeneity, which

23  is the differences in individual exposures, and he explains how

24  important it is to account for heterogeneity when studying the

25  exposures of individual members of a population, which is what

J&J COURT TRANSCRIBERS, INC.

PP
Ct.

1  Grace purports to be doing here.   Instead, Dr. Anderson's

2  calculating average exposures and ignoring everyone above the

3  average.

4         Now, Professor Stallard also exposes as unscientific

5  and flawed Dr. Anderson's assumption that workers in the same

6  job categories will have, quote, independent exposures.   Now,

7  this is a different concept, but it's equally important.   So,

8  in other words, she assumes that each day that a worker in one

9  of her groups comes to work, and he has an equal chance of

10  doing any of the jobs in the work category as any other worker

11  just as every flip of a coin has an equal chance of coming up

12  heads as it does coming up tails.   That's the independence

13  assumption.   So under Dr. Anderson's assumption an exposed

14  worker has an equal chance of doing the job of a helper on any

15  given day, and that's just counterfactual.

16         Dr. Stallard explains why the independence assumption

17  is not scientifically valid, and it's not consistent with

18  accepted scientific practice for the purpose of rejecting

19  individual claims on the premise that they have insufficient

20  exposures to asbestos to cause disease.   Your Honor, this is

21  very important.   If Dr. Anderson's independence assumption is

22  wrong, then her exclusion of thousands of claimants is wrong,

23  and Dr. Florence's estimate is wildly inaccurate and

24  unreliable.

25         I'd like to talk about Ms. Biggs' methodology.   We

**J&J COURT TRANSCRIBERS, INC.**