Libby

PP
Obj:
R;
F;
H;
UP;
ET

1  contrast microscopy, and how does it work?

2  A    Oh.  Okay.  Sure.  Phase contrast microscopy is the method

3  of analysis for air samples.  Okay?  A sample, as I said, is

4  collected -- fibers are collected on a filter.  The filter is

5  examined under a light microscope that is not a whole lot

6  different than the microscope that you used in tenth grade

7  biology.  Fibers conforming to certain dimensions are counted,

8  and then from that we can calculate the concentration of fibers

9  in the air.

10 Q    Does the phased contrast microscopy method allow you to

11 determine which of those fibers are asbestos?

12 A    No.  It does not differentiate.

13       MR. WEHNER:  Objection.  Foundation.  Hearsay.  This

14 is beyond the scope of his expert report, his disclosures.

15       MR. McMILLAN:  Your Honor, no, it's not.  As part of

16 his expert disclosures he applies a conversion factor.  He

17 applies a different method that we're about to get into to

18 determine what proportion of the fibers are actually asbestos,

19 and then applies that within his job exposure matrix.

20       MR. WEHNER:  Your Honor, this is the subject of the

21 expert report -- an entirely different expert with a similar

22 name, a Dr. Richard Lee, not Dr. Peter Lees.

23       THE COURT:  Well, pull out the report and show me

24 where it is.  That's the easiest way to find out whether it's

25 in or outside the scope of the report.

Libby

PP
Obj:
R;
H;
F;
UP;
ET

1   MR. McMILLAN:  Your Honor, I would refer you to his

2   July 31st, 2007 report, on Page 1.

3        THE COURT:  Where is it?

4        MR. McMILLAN:  Could I have the ELMO, please?

5                     (Pause)

6        MR. McMILLAN:  As Dr. Lees explains here, as

7   described in his earlier report and the reports of other Grace

8   experts, it's widely accepted that PCM fiber analysis of air

9   samples collected in non-manufacturing environments will

10  overestimate actual asbestos fiber exposures, which is just

11  what he said.  TEM analysis of samples allows the

12  identification of asbestos fibers and thereby a more accurate

13  estimation of actual asbestos fiber concentration.  The

14  magnitude of this overestimation, i.e., the ratio of the

15  asbestos fiber concentration derived from TEM analysis to the

16  total fiber concentration derived from PCM analysis varies with

17  the composition of the product.  So, ratio can be used to

18  adjust total fiber exposure estimates to derive equivalent

19  asbestos fiber exposures termed PCME from PCM analyses to

20  determine compliance with OSHA exposure standards.  That's

21  exactly what I'm asking him to describe right now.

22       MR. WEHNER:  Your Honor, I'd point out the next

23  paragraph states, "These analyses have been completed and are

24  presented in the expert report of R.J. --"  Richard J. Lee,

25  dated July 31st, 2000.

**J&J COURT TRANSCRIBERS, INC.**

*Libby*

PP
Obj:
R;
F;
H;
UP;
E7

1    THE COURT:  Yes.  And this witness is an expert.

2    He's been offered to report an expert opinion, and experts use

3    other expert reports as part of their opinion.

4    MR. WEHNER:  That's right, Your Honor.  Another

5    expert developed these factors, and we would object to any

6    testimony from this expert about those factors.

7    THE COURT:  Wait.  He's not testifying to factors.

8    He's simply describing a process that his report identifies.

9    So far that's all he's done.  He hasn't been asked yet, at

10   least, to talk about factors.  What he's been asked to do is --

11   at the moment, the last question was whether or not you could

12   count particular types of factors based on the concentration of

13   fibers in the air using particular methodology.  That's all.

14   MR. McMILLAN:  Your Honor, may I ask him a couple of

15   foundation questions?

16   THE COURT:  Well, I think the issue is this in his

17   report or not?  And so far, I think it's within the construct

18   of his report.  If you get too far outside it, then I think

19   it's going to go perhaps beyond the industrial hygiene, and you

20   do have another expert who has developed factors that you may

21   wish to get into.  But so far I think you're within his report.

22   That objection is overruled, so far.

23   Q    Dr. Lees, is it customary as an industrial hygienist to

24   work with and rely upon the work of a materials expert to help

25   you develop an adjustment factor for your PCM samples?

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
F;
H;
UP;
ET

1  A    Yes.  Industrial hygienists typically do not do the

2  analytical portion of any exposure assessment.  That -- we rely

3  on experts to do that, other experts.

4  Q    And as Richard Lee was doing the analytics, develop the

5  conversion factors that you're using, were you involved in

6  discussing with him how to do that analysis and what you needed

7  it for in your report?

8  A    Yes.  We had extensive discussions before he carried out

9  the actual mechanics of calculating the conversion factors.

10 Q    And was it your work for vermiculite attic insulation back

11 in 2002 where you collected many of the samples that were then

12 analyzed by Dr. Lee to create the conversion factor that you

13 used?

14 A    Yes, it was -- my samples were the basis of those

15 conversions.

16 Q    The question I was on before, Dr. Lees, is does the -- do

17 the fibers counted with phase contrast microscopy, do you know

18 if those are asbestos fibers or other types of fibers?

19 A    The method does not differentiate as to composition.

20 Q    Is there another way to determine whether those fibers are

21 actually asbestos?

22 A    Certainly.  Transmission electron microscopy hooked with

23 another tool called energy dispersive spectrometry will allow

24 the identification of the composition -- whether it's asbestos

25 or not.

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
F;
H;
UP;
ET

1    MR. McMILLAN:  Could we have the graphics back,

2  please?

3  Q    Has OSHA approved a method involving transmission electron

4  microscopy for determining the proportion of fibers that are

5  actually asbestos?

6  A    Yes.  In 19 -- I believe it was '88, NIOSH published as a

7  standard method such a procedure, and OSHA recognized it as --

8  recognized it -- I can't even say it -- recognizes it as a way

9  of showing compliance.

10  Q    How does --

11    MR. WEHNER:  Excuse me, Scott.  Your Honor, I would

12  renew the objection.  He's now describing the conversion

13  method, which he did not develop.

14    THE COURT:  He is not describing the conversion

15  factor.  He's been asked whether the government recognizes and

16  has approved a process, and he's testified that, yes, it does,

17  and his earlier background indicates that, in fact, he has been

18  a participant in certain, not particular, but in certain

19  aspects of government studies that have utilized those factors.

20  So far, he's within the bounds of this witness's expertise, and

21  not outside the bounds of the report.  Overruled.

22  Q    Could you please explain how NIOSH Method 7402 works?

23  A    Okay.  I'll try to do it quickly.  A filter, a given

24  filter is analyzed using phase contrast microscopy, and the

25  fibers -- all fibers counted that conform to certain size --

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
OBJ:
R;
F;
H;
UP;
E]

1  specified size characteristics.  So, that gives you the total

2  number of fibers of all types.  The fiber is then counted using

3  transmission electron microscopy, which allows us to identify

4  what proportion of all of those fibers are asbestos fibers.

5  And quite simply, you develop a ratio of asbestos fibers to

6  total fibers, and so you could say, for instance, that 50

7  percent of the fibers conforming to these certain size

8  characteristics on the filter were asbestos fibers.

9  Q    Was it necessary for you in this case to determine what

10 proportion of the fibers that were measured in the PCM data

11 that you had were actually asbestos?

12 A    As I said earlier, especially in the construction

13 environment, there are many different types of fibers present,

14 and the concern here, and the risk of disease is related to the

15 asbestos fibers.

16         MR. McMILLAN:  I'd like to show GG-2220, please.

17 Q    How did you determine which conversion factors you should

18 use for the PCM data in your report?

19 A    Okay.  Well, I should start out by stating, first of all,

20 that there is not a universal conversion factor or adjustment

21 factor.  They are specific to products, and product uses, so

22 using these groupings that I previously developed, I discussed

23 with Dr. Lee the criteria, the relevant samples that could be

24 used to -- to be used according to the method described in

25 NIOSH Method 7402 to develop these factors.

Libby

PP
Obj:
R;
F;
H;
UP;
ET

1  Q    So, was NIOSH Method 7402 what was used to develop the

2  conversion factors that you employed?

3  A    Yes.

4         MR. WEHNER:  Objection.  I'm going to renew the

5  objection again.  He's now talking definitely about how the

6  conversion factor was developed.

7         THE COURT:  In this instance that's a hearsay

8  statement.  Sustained.

9  Q    Dr. Lees, did you participate in the decision as to how to

10 develop the conversion factor to be utilized for PCM data in

11 your report?

12 A    Yes.  In my discussions with Dr. Lee, it was jointly

13 decided that NIOSH Method 7402 was the appropriate method to

14 develop these conversion factors.

15                          (Pause)

16 Q    One last question, Doctor.  Dr. Lees, on Table 1 shown in

17 GG-2220, do those represent the conversion factors that you

18 used to apply to the PCM data in your analysis in this case?

19 A    They do.

20         MR. McMILLAN:  Can we show GG-2221, please?

21 Q    I think you mentioned earlier that you had created a job

22 exposure matrix.  Can you explain to us what a job exposure

23 matrix is?

24 A    Well, again, it is a tool for organizing exposure data in

25 terms of the relevant predictors of exposure in broad terms.

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
F;
H;
UP;
Et

1  Q    Is a job exposure matrix something that's commonly used in

2  industrial hygiene?

3  A    It is a standard part, in particular, of retrospective

4  exposure assessment, and it's used more broadly within the

5  field, too.

6  Q    Okay.  If we look at GG-2221, let's start first with the

7  product and use categories.  Are those the ones that we talked

8  about earlier --

9         THE COURT:  Pardon me.  Mona, can you turn that off?

10 Otherwise we're never going to be able to hear against that.

11 If you turn -- I think it's -- okay.

12        THE WITNESS:  I'm having a hard time, too.

13        THE COURT:  Yes.  I'm sorry.  It's -- they keep

14 pushing the date earlier.  I think they don't change the

15 clocks, even though the clock is changed.

16        THE WITNESS:  It's spring, right?

17        THE COURT:  It should turn off in a second.  Or not.

18                    (Pause)

19        MR. McMILLAN:  It's winding down.

20 Q    Dr. Lees, first discussing the product and use categories

21 that you created, can you show us where those product and use

22 categories appear in your job exposure matrix?

23 A    Okay.  The product and uses are defined on the left-hand

24 side, the left-hand column of the matrix, by the number one.

25 This -- not all of the -- in this portrayal not all of the

Libby

PP
Obj:
R;
F;
H;
UP;
EJ

1  categories are listed.  This is just a summary, or a brief

2  excerpt.

3  Q    Second, the nature of exposure categories, or the exposure

4  groups that you created, where do those appear on your job

5  exposure matrix?

6  A    Those are number two, across the top of the matrix.  And

7  again, there were five categories there instead of just the

8  three shown.

9  Q    Okay.  And essentially this just looks like a spreadsheet.

10 Is that essentially what it is?

11 A    Yes.

12 Q    Now, lastly, the exposure data that you had gathered and

13 calculated averages on, where does the exposure data go?

14 A    Okay.  Each of these groups of data that I've previously

15 described as being put into buckets would be -- the average

16 from each bucket would be transferred or entered into the

17 appropriate part of the matrix, which -- we use the word cell,

18 it sounds better than bucket -- but so that where it says

19 eight-hour TWA right there, that would be the average exposure

20 of people who used vermiculite dry and were mixers.

21 Q    Okay.  Could you look in your binder with me at Exhibits

22 GX-002, 003, 004, and 005, Dr. Lees?

23 A    Well, not so fast here.  What was the first one?

24 Q    GX-002.

25                          (Pause)

Lees - Direct/McMillan                              71

1   A     I'd love to help you out on that, but I don't see it.
2   GX-002?
3   Q     Through 005.
4   A     I don't see any 00's here.  I'm sorry.
5   Q     Okay.
6   A     Is it front, back, middle?
7               THE COURT:  Can you put it up on the chart?
8               UNIDENTIFIED ATTORNEY:  What did you hand up there,
9   Scott?
10              THE COURT:  Because it's not in anybody's binder.
11              UNIDENTIFIED ATTORNEY:  Do you want me to put it up?
12              UNIDENTIFIED ATTORNEY:  Yes.
13              MR. McMILLAN:  002 through five.
14  Q     Dr. Lees, have you -- do you now see GX-002 through 005?
15  A     I've got it now.
16  Q     Are these the job exposure matrix that you created
17  analyzing the exposure data from W.R. Grace?
18  A     Yes.  Two through five are four tables taken directly from
19  my July 31 report.
20  Q     And are GX-002 through 005 true and accurate copies of the
21  job exposure matrix that you created as a result of your
22  analysis of the W.R. Grace data?
23  A     Yes.  They appear to be.
24              MR. McMILLAN:  Your Honor, I would move GX-002, 003,
25  004 and 005 into Evidence.

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R,
F;
H,
UP;
ET

1    MR. WEHNER:  We would object on the grounds that he

2 has PCME data in there -- PCME that has been subject to the

3 PCME conversion that we discussed earlier.

4    MR. McMILLAN:  Your Honor --

5    THE COURT:  But he's already stated that he used

6 those conversion tables, and -- over your objection he can't

7 testify to the standards, but I think we'll admit it now

8 subject to connecting up with respect to how those data are

9 calculated.  You're calling Dr. Lees -- Dr. Lee, correct?

10    MR. McMILLAN:  Dr. Lee is not currently on our

11 witness list, Your Honor.

12    THE COURT:  Well, how are you going to connect up the

13 standards, then?

14    MR. WEHNER:  That's my point, Your Honor.

15                    (Pause)

16    MR. McMILLAN:  Your Honor, when I asked foundation

17 questions of Dr. Lees, what he said was that it is standard for

18 industrial hygienists to send out the samples for analysis and

19 for calculation of this type of conversion factor.  This is

20 someone who is a materials scientist, and that's what he did,

21 and he consulted with Dr. Lee about how it was going to be

22 done, what standards and protocols were going to be followed,

23 and he reached agreement on that.  So, the fact that Dr. Lee

24 may have run the analysis and produced a mathematical

25 conversion doesn't mean that it's not within the purview of Dr.

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
F;
H;
UP;
E7

1  Lees' expert testimony here today to say that he used the

2  conversion factor, what he specified, and why he used it.

3          MR. WEHNER:  Your Honor, I'd ask for some voir dire

4  on this fact?

5          THE COURT:  Voir dire on a summary chart?  You get to

6  cross examine --

7          MR. WEHNER:  No.  Voir dire on his --

8          UNIDENTIFIED ATTORNEY:  On the foundation.

9          MR. WEHNER:  -- on the foundation for this PCME

10  exposure factor that he's included in his chart.

11          MR. McMILLAN:  I think that's cross examination, Your

12  Honor.

13          THE COURT:  I think it's cross examination, too,

14  isn't it?  I have not heard of a voir dire on an issue of cross

15  examination.

16          MR. WEHNER:  Fine, Your Honor.  We'll stand on our

17  objection.

18          THE COURT:  All right.  I think it's overruled.  This

19  is a summary chart, so I assume at this point in time you've

20  had access to the data that underlies the summary because I

21  don't hear an objection on that basis.  To the extent that this

22  is a summary chart, it is admitted as a summary chart.  Those

23  are what these purport to be, at least, 02.  These are not in

24  the binders, so --

25          MR. McMILLAN:  I apologize for that, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
F;
H;
UP;
ET

1    THE COURT:  -- I'm not sure what 03, 04, an 05 are.

2  The witness has them.  I haven't seen the rest.  Oh.  These are

3  03.  Go ahead.  What's 04 and 05?  All right.  These are just

4  --

5    MR. McMILLAN:  The table takes four pages, Your

6  Honor.

7    THE COURT:  Okay.  It's one table on two pages.

8    MR. WEHNER:  Your Honor, we're objecting to those on

9  the same basis that I articulated just now.

10    THE COURT:  Yes.  Apparently it's just different

11  tables that are additional time weighted average summaries, and

12  so, I accept the objection to relate to 02, 03, 04 and 05, but

13  the objections are overruled on the same bases.  These are

14  summary charts of additional evidence.  This witness has

15  testified that this is customary in his field to have someone

16  else prepare the underlying data and for him then to categorize

17  it in the fashion that is categorized here.  So, the objection

18  is overruled.

19    MR. McMILLAN:  Can we see GG-2227, please?

20    THE COURT:  In the event that your cross examination

21  indicates that there is some problem with these exhibits that

22  I'm not aware of now, because I've never heard about voir dire

23  with respect to an exhibit in this fashion, then I will subject

24  this to a different ruling at that time if this appears to be

25  an error.  But at the moment I see no basis on which not to

Libby

PP
Obj:
R;
F;
H;
UP;
ET

1    offer -- to admit these exhibits.

2              MR. McMILLAN:  2226.  I apologize.

3              THE COURT:  So, just give me a minute, please.  And I

4    would like copies of these handed up.  Tomorrow will be fine.

5              MR. McMILLAN:  We'll do that, Your Honor.

6              THE COURT:  Exhibits 02, 3, 4 and 5 are admitted.

7                          (Pause)

8    Q    Dr. Lees, I have shown you GG-2227, which is a summary of

9    your job exposure matrix.

10             THE COURT:  This is 2226.

11             MR. McMILLAN:  I'm sorry.  2226.

12             THE COURT:  Okay.

13   Q    Now, Dr. Lees, if we look down at the line here that's

14   highlighted, mix, wet, and sprayed, can you tell me what

15   products would fit within that category that you've created?

16   A    Okay.  The category is vermiculite mixed, wet, and

17   sprayed, encompasses the Monokote IV and V -- primarily the

18   Monokote IV and V spray applied fireproofing materials.

19   Q    So, when there's data in the row next to mixed, wet, and

20   sprayed for asbestos, what types of asbestos fibers would

21   likely be making those data?

22   A    I'm sorry.  Could you ask that question again?

23   Q    Sure.  When you look at the numerical values you have in

24   the rows following mixed, wet, and sprayed for vermiculite,

25   which you said was Monokote IV and V, what fibers would likely

Libby

PP
Obj:
R;
F;
H;
UP;
ET

1  make up those asbestos exposures?

2  A    Okay.  Well, it says this was vermiculite.  These would be

3  an amphibole-type asbestos.

4  Q    Now, when you look down at vermiculite -- sorry --

5  vermiculite and chrysotile sprayed, where it says paren

6  construction --

7  A    Yes.

8  Q    What type of product in that category did you have

9  exposure data on?

10  A    In that category we're primarily talking about the

11  Monokote III material that preceded the IV and V.

12              THE COURT:  I'm sorry.  Where are you now?

13              MR. McMILLAN:  Under vermiculite and chrysotile, the

14  first row that says sprayed construction.

15                          (Pause)

16              MR. McMILLAN:  That's now highlighted.

17  Q    Dr. Lees, what type of asbestos fibers would you expect

18  would make up the exposure values you see in the row after

19  sprayed construction?

20  A    Those would be predominantly, overwhelmingly chrysotile

21  fibers.

22  Q    Would there be any other type of fibers in there?

23  A    Well, since there was vermiculite present, there's the

24  possibility that there could be some contribution of amphibole

25  to that number.

Libby

PP
Obj:
R;
F;
H;
UP;
E7

1  Q    Is there a way in which you could use the data for mixed,

2  wet, and sprayed, which were the Monokote IV and V data, to

3  allow you to determine a rough percentage of the Monokote III

4  fibers that could be attributed to Libby amphibole?

5  A    I think that can be estimated -- you know, estimated.

6  Q    Well, if you look at the data that goes across for A, C,

7  D, and E, for the Monokote IV and V data, and compare it to the

8  same data for the Monokote III and the sprayed row --

9  A    Um-hmm.

10  Q    -- what does that tell you about what proportion of the

11  Monokote III data could be Libby amphibole?

12  A    Okay.  Well, let's just confine ourselves to A to make

13  life simple for a moment here.  Excuse me.  The vermiculite

14  mixed, wet, and sprayed, and the vermiculite and chrysotile

15  mixed, wet, and sprayed are very similar in composition with

16  the exception of, obviously, the added chrysotile in the latter

17  category there.  So that in the vermiculite it's just the

18  contribution of vermiculite.  In the vermiculite and chrysotile

19  it's both.

20  Q    Well, what does that tell you about what proportion of the

21  Monokote III asbestos would likely be Libby amphibole?

22  A    Well, just --

23        MR. WEHNER:  Objection, Your Honor.  This, again, is

24  beyond the scope of his report.  He had nothing in his reports

25  that disclosed that he was going to be testifying about the

Libby

PP
Obj:
R;
F;
H;
UP;
E7

1  relative components of vermiculite and chrysotile products of

2  Libby amphiboles.

3          THE COURT:  They're on his chart.

4          MR. WEHNER:  He didn't talk anything in his report

5  that he was going to be talking about the components of the --

6          THE COURT:  You could have asked him that in his

7  deposition.  It's in his report.  I mean, it's on his chart.

8          MR. McMILLAN:  All he's going to do is divide one

9  number in the chart by another one, Your Honor.

10          THE COURT:  This is -- I'm sorry, but this clearly is

11  something that is evident.  If it is something more than a math

12  calculation, then maybe I'll make my -- change my mind, but

13  this appears to be something all the witness is going to be

14  asked to do is to make a math calculation.  If it's beyond that

15  I will reconsider.  Overruled.  Go ahead.

16  Q    Can you tell us, Dr. Lees, the proportion for the -- all

17  the various sprayed numbers that would be made up of Libby

18  amphibole by comparing it to the Monokote IV and V numbers?

19  A    Using a simple math calculation, because of the similarity

20  of the products and their use of the number .4283, roughly

21  speaking about .009 would be the contribution from the

22  vermiculite, and the remainder would be the contribution from

23  the chrysotile.  So, doing the math, it looks like about two,

24  two-and-a-half percent of the fibers in that mixed category are

25  in the vermiculite and chrysotile category are attributable to

Libby

PP
Obj.
R;
F;
H;
UPE;
ET

1  the vermiculite.

2  Q    And if you look at the C, D, and E, roughly what

3  percentage of the Monokote III data is likely to be Libby

4  amphibole?

5  A    Those appear to be on the order of maybe one to two

6  percent contribution from the vermiculite.

7  Q    Thank you.

8         MR. McMILLAN:  Can we see GG-2228?

9  Q    I want to talk, finally, about a comparison of your data.

10 If you look at this slide, Dr. Lees, you'll see that there are

11 two dotted lines on it.  Do you recognize what those dotted

12 lines are?

13 A    Yes.  Those represent the construction industry average

14 exposures reported by Nicholson in his 1982 or '83 paper.

15 Q    And do you see the small bars along the bottom of the

16 graph?  What do those represent?

17 A    The bars down at the bottom represent the average

18 exposures for the different product groupings and exposure

19 categories for W.R. Grace products.

20 Q    And when you compare them, what do you see?

21 A    Well, the Grace product exposure concentrations are

22 considerably less than those reported by Nicholson for the

23 construction industry average.

24 Q    Thank you.

25        MR. McMILLAN:  I now tender the witness for cross.

**J&J COURT TRANSCRIBERS, INC.**

Lees - Cross/Wehner                    85

1                        (Laughter)

2  Q    My name is Jim Wehner.  I am with the ACC.  We haven't met

3  before, Dr. Lees, but good afternoon.

4  A    Good afternoon.

5            MR. WEHNER:  Your Honor, may I approach the witness

6  --

7            THE COURT:  Yes.

8            MR. WEHNER:  -- and the bench to give you a binder?

9            THE COURT:  Yes.

10                       (Pause)

11           THE COURT:  Mr. Wehner, are you not going to be

12 referring to the debtor's binder?

13           MR. WEHNER:  No.  I might be referring to one or two

14 of their demonstratives, and I'll put them on the ELMO --

15           THE COURT:  All right.

16           MR. WEHNER:  -- if that works.

17           THE COURT:  Thank you.

18 Q    Dr. Lees, you started your direct testimony by explaining

19 that what you have done is a retrospective exposure analysis of

20 those who worked with Grace products.  Is that correct?

21 A    Yes.  That's correct.

22 Q    Now, you did not review any individual claimants' response

23 to the W.R. Grace personal injury questionnaire, is that

24 correct?

25 A    I saw one or two as examples, but there was really no

                J&J COURT TRANSCRIBERS, INC.

Lees - Cross/Wehner                                    86

1 review of the individual responses.

2 Q    You haven't reviewed the exposure information that

3 individual claimants attached to their PIQ responses, for

4 example?

5 A    No, I have not.

6 Q    In fact, in your work in this case you have not relied on

7 the personal injury questionnaire data at all, is that correct?

8 A    I stated that in my previous testimony.  Yes.

9 Q    You are not going to -- you opinion here is not about what

10 concentration of asbestos fibers from a Grace product any

11 particular individual has been exposed to, isn't that correct?

12 A    That is correct.

13 Q    And you have not determined the cumulative exposure of any

14 individual making a claim against W.R. Grace, is that correct?

15 A    That is correct.  I've presented the average eight-hour

16 time weighted averages -- concentration associated with a given

17 product and use.

18        MR. WEHNER:  I don't know who I ask, but could I have

19 the ELMO?

20 Q    Dr. Lees, do you recognize that as one of the

21 demonstratives you just used with -- in your direct testimony

22 with Mr. McMillan?

23        THE COURT:  What exhibit is it, please?  It's off the

24 --

25        THE WITNESS:  Oh, I'm sorry.  It's GG-2210.

**J&J COURT TRANSCRIBERS, INC.**

PP
Chr

1          THE COURT:  Thank you.

2          THE WITNESS:  That's --

3                    (Pause)

4   Q    You explained earlier that you sorted W.R. Grace asbestos

5   containing products into several product categories; isn't that

6   right?

7   A    That is correct.

8   Q    Okay.  And this chart shows those categories that you

9   sorted them into; is that correct?

10  A    Yes.

11  Q    There's vermiculite products, there's vermiculite and

12  chrysotile products, and there's chrysotile products.  Is that

13  right?

14  A    That's correct.

15  Q    Now, Dr. Lees, you didn't go out, as part of your work on

16  this -- in your expert work for this case, you didn't go out

17  and take measurements yourself; isn't that right?

18  A    That's correct.  The measurements that I used were

19  collected in the 1960's, the 1970's, and the 1980's, when these

20  Grace products were actually in use.

21  Q    So, your -- what you did is go out and look for historical

22  reports of Grace products and measurements that were associated

23  with those products?  Is that right?

24  A    That is correct.

25  Q    In fact, you testified, didn't you, that there were --

                    **J&J COURT TRANSCRIBERS, INC.**

Lees - Cross/Wehner                    88

1  that you found about 300 such reports.  Is that right?

2  A    Yes.  That's correct.

3  Q    With respect to the product category chrysotile --

4  A    Yes.

5  Q    -- you found no historical measurements for any of the

6  products in that group, is that correct?

7  A    There were no existing measurements.  That is correct.

8  Q    So, you don't have any historical measurements associated

9  with the use of those products, is that correct?

10 A    That is correct.

11 Q    And this category, vermiculite and chrysotile -- right

12 there, when you went out and looked for historical reports you

13 found seven?  Is that right?

14 A    No.  I believe there were ten individual site reports.

15 Q    Ten site reports contained -- ten sites -- measurements at

16 ten sites contained in seven reports?  Is that fair?

17 A    Semantics, but yeah.

18 Q    That's all the historical measurements you had for

19 vermiculite and chrysotile, is that correct?

20 A    In terms of direct measurements?  I -- well --

21 Q    Are you referring to something?

22 A    I'm referring to GX-0002 through 0005.

23 Q    Those are the portions of your expert report that

24 summarize --

25 A    Correct.  Correct.  And the answer to your question is

J&J COURT TRANSCRIBERS, INC.

Lees – Cross/Wehner                          89

PP
Ctr

1   yes, the data were confined to the sprayed material that fell

2   within that category.

3   Q    That sprayed material was Monokote III, correct?

4   A    That's correct.

5   Q    So, for all the products that you put into vermiculite and

6   chrysotile, the only one you had any historical measurements on

7   was Monokote III, is that correct?

8   A    Monokote III.  That's correct.

9   Q    So, for vermiculite and chrysotile, and chrysotile, the

10  only thing we've got are measurements at ten sites for Monokote

11  III?

12  A    And knowledge of the associated other similar products by

13  which I drew some analogies, or some conclusion.

14  Q    You drew analogies, but as far as the actual hard data you

15  found, it was just the Monokote III data?

16  A    That is correct.

17  Q    The 300 reports that you found, the rest were in the

18  vermiculite category, is that correct?

19  A    Yes.  That's correct.

20  Q    The category vermiculite and chrysotile sprayed -- I'm

21  going to put that back up because it might be helpful for us to

22  refer to that.  The category vermiculite and chrysotile sprayed

23  includes about 30 different Grace products.  Is that correct?

24  A    There is the Monokote III and then there are approximately

25  30 decorative or acoustical plasters.  That's correct.

**J&J COURT TRANSCRIBERS, INC.**

Lees - Cross/Wehner                    90

1    Q      In vermiculite and chrysotile troweled, in that product

2    category and use subcategory, one of the products that's in

3    there is Zonolite High Temperature Cement.  Is that correct?

4    A      I'll take your word on that.  It's a long list, and off

5    the top of my head exactly where things go I'm not certain.

6    Q      Would it help you to take a look at your report?

7    A      Well, I'll take your word for it.

8    Q      It's in there.

9    A      Okay.

10   Q      But we don't have any measurements, historical

11   measurements associated with the use of Zonolite High

12   Temperature Cement?

13   A      We do not.

14   Q      Likewise, in vermiculite and chrysotile brushed and

15   painted category, you have Zonolite Finish Coat in there?

16   Decorator's White?  You're nodding.  Can you say yes or no,

17   just --

18   A      I'm sorry.  You're correct.

19   Q      Okay.  High-Sorb Acoustical Plaster?

20   A      If you say so.

21   Q      Okay.  I'm not saying so.

22   A      No.  If you are --

23   Q      I'm asking you.

24   A      As I say, there are over 100 products, and off the top of

25   my head with these specific -- you know, a lot of these

Lees - Cross/Wehner                    91

1  specific minor products, exactly where they go, there was a lot

2  of thought and study that went into it.  At the time exactly

3  what ended up where I don't totally recollect at this point.

4  Q    But no historical measurements for those products?

5  A    That is correct.

6  Q    In fact, for all the Grace products that contain added

7  chrysotile asbestos, except for Monokote III, you had no

8  historical measurements?

9  A    I have -- yes.  The actual measurements are limited to the

10  Monokote III.

11  Q    Let's take a closer look at the vermiculite and chrysotile

12  sprayed category, and I know it's hard to remember all of the

13  products that you put in there, but --

14         MR. WEHNER:  Let's put up on the screen, John, if you

15  would, ACC/FCR-532?

16  Q    This is your July 31st report, I believe, the same one

17  that you referenced in your direct testimony.

18         MR. WEHNER:  If you could put up Page 68?

19  Q    Do you see the Page 68?  Just zoom back out so we can have

20  a look at the page.  Do you recognize that --

21  A    Yes.

22  Q    -- Dr. Lees?

23  A    Yes.

24  Q    That's Page 68 of your July 31st report?

25  A    That's correct.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And that has a list of the products that you put in this

2  category, vermiculite and chrysotile sprayed?

3  A    That's correct.

4  Q    Zonocoustic MK2 vermiculite acoustical plaster, all of

5  these products you have put in this category?

6  A    That's correct.  They were placed in that category on the

7  basis of their composition --

8  Q    Right.

9  A    -- as I stated earlier.

10  Q    Now, all of these products don't have the same amount of

11  asbestos in them, is that correct?

12  A    They are within a range close.

13  Q    They're close?

14  A    Yes.  They're not exact.  They are similar would be a good

15  way to characterize it.

16  Q    Do you see down on the list Prep-Coat #5?

17  A    That's one of the ones listed.

18  Q    That's right.  That has five to seven percent asbestos by

19  weight, is that correct?

20  A    Again, I will -- if you've read that, and that's correct,

21  I will take that -- I don't have a specific recollection of all

22  these -- details of all these hundreds of products.

23  Q    You put that number in an appendix to your June 11th

24  report, didn't you?

25  A    The data in terms of the composition have been presented

Lees - Cross/Wehner                    93

1  in my reports.  That's correct.

2  Q    Let's take a look at your June 11th report, ACR -- I'm

3  sorry -- ACC/FCR-531.  If you -- this is your June 11th report.

4  Do you see that?

5  A    Yes.

6  Q    Do you recognize that as your report?

7  A    Yes.

8  Q    Okay.  Let's go to Appendix B of that report, which is the

9  reproduces product appendix.

10         MR. WEHNER:  Can we see the first page of Appendix B

11  there?  Let's go to the first page of Appendix B, so it would

12  be back, I think, to Page 1 of that particular series.

13                         (Pause)

14  Q    Do you recognize this as Appendix B of your June 11th

15  expert report?

16  A    It appears to be.  Yes.

17  Q    Now, let's go to Page 25 of that appendix.  We see Prep-

18  Coat there.  Do you see the entry Prep-Coat?

19  A    I do.

20  Q    Okay.  Do you see, in Paragraph G, J, it says

21  approximately five to seven percent asbestos by weight?

22  A    Yes.

23  Q    Do you have any reason to doubt that that's correct?

24  A    This was taken directly from a Grace disclosure.  This is

25  a Grace disclosure document, as it says on the beginning of the

**J&J COURT TRANSCRIBERS, INC.**