**Trial Testimony Designations for:**
*In Re: W. R. Grace & Co., et al.*
(U.S. Bankr. Ct., Dist. of Delaware, Case No. 01-1139)
**March 26, 2008**

<u>**Deposition Designation Key**</u>

Arrowood = Arrowood Indem. Co.
f/k/a Royal Indem. Co. (Light Green)

BNSF = BNSF Railway Co. (Pink)

Certain Plan Objectors "CPO" = Government Employees Insurance Co.; Republic Insurance Co.
n/k/a Starr Indemnity and Liability Co.; OneBeacon America Insurance Co.; Seaton Insurance
Co.; Fireman's Fund Insurance Co.; Allianz S.p.A. f/k/a Riunione Adriatica Di Sicurta; and Allianz
SE f/k/a Allianz Aktiengesellschaft; Maryland Casualty Co.; Zurich Insurance Co.; and Zurich
International (Bermuda) Ltd.; Continental Casualty Co. and Continental Insurance Co. and
related subsidiaries and affiliates; Federal Insurance Co.; and AXA Belgium as successor to Royal
Belge SA (Orange)

CNA = Continental Cas. Co & Continental Ins. Co. (Red)

FFIC = Fireman Funds Ins. Co. (Green)
FFIC SC = Fireman Funds Ins. Co. "Surety Claims" (Green)

GR = Government Employees Ins. Co.; Republic Ins. Co. n/k/a Starr Indemnity and Liability Co.

Libby = Libby Claimants (Black)

OBS = OneBeacon America Ins. Co. and Seaton Ins. Co. (Brown)

PP = Plan Proponents (Blue)

Montana = State of Montana (Magenta)

Travelers = Travelers Cas. and Surety Cos. (Purple)

UCC & BLG = Unsecured Creditors' Committee & Bank Lenders Group (Lavender)

| | |
|---|---|
| AFNE = Assume Fact Not in Evidence | L = Leading |
| AO = Attorney Objection | LA = Legal Argument |
| BE = Best Evidence | LC = Legal Conclusion |
| Cum. = Cumulative | LPK - Lacks Personal Knowledge |
| Ctr = Counter Designation | LO = Seeking Legal Opinion |
| Ctr-Ctr = Counter-Counter | NT = Not Testimony |
| ET = Expert Testimony | Obj: = Objection |
| F = Foundation | R = Relevance |
| 408 = Violation of FRE 408 | S = Speculative |
| H = Hearsay | UP = Unfairly Prejudicial under Rule 403 |
| IH - Incomplete Hypothetical | V = Vague |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Case No.  01-1139 (JKF) |
| W.R. GRACE & CO., | . | |
| et al., | . | USX Tower - 54th Floor |
| | . | 600 Grant Street |
| | . | Pittsburgh, PA 15219 |
| Debtors. | . | |
| | . | March 26, 2008 |
| . . . . . . . . . . . . .. | . | 8:38 a.m. |

TRANSCRIPT OF TRIAL
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               BARBARA HARDING, ESQ.
                               JANET BAER, ESQ.
                               BRIAN STANSBURY, ESQ.
                               SAL BIANCA, ESQ.
                               RAINA JONES, ESQ.
                               HENRY THOMPSON, ESQ.
                               SCOTT McMILLAN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  10022

Audio Operator:           Cathy Younker

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

---

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609)586-2311    Fax No. (609) 587-3599

Libby

PP
Obj.
R;
F;
H;
ET

1   proceed.

2          THE COURT:  All right.  Dr. Anderson.

3          COURT CLERK:  Please stand and raise your right hand.

4   DR. ELIZABETH ANDERSON, DEBTOR'S WITNESS, SWORN:

5          COURT CLERK:  You may be seated.  Please speak into

6   the microphone.

7                      DIRECT EXAMINATION

8   BY MR. BERNICK:

9   Q    Good morning, Dr. Anderson.  We apologize for --

10                  (Adjusting microphones)

11  Q    We apologize for the delay in the elevator and then making

12  you sit through scheduling matters, but we'll get to your

13  testimony now.

14         Could you tell the Court briefly what it is that you are

15  here to address this morning?

16  A    Yes.  Your Honor, I am here to address the essential

17  question of whether exposures to Grace products have caused the

18  diseases that the claimants have introduced.

19  Q    Okay.  With that as an introduction, could you tell us a

20  little bit about your educational background and we would show

21  at this point demonstration 2264.  Go ahead, Dr. Anderson.

22  A    Yes.  My academic training began at the College of William

23  and Mary where I was a pre-med student planning to go to

24  medical school and my fourth year I decided to not do that, but

25  I had equivalent training in biology and chemistry and chose

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
F;
H;
ET

1  chemistry as my major.  I was solicited by fellowship to go to

2  the University of Virginia to continue in the training and

3  organic chemistry, mechanistic organic chemistry, where I

4  completed my Masters Degree work.  And during that time I

5  taught the pre-med sections of the laboratories in organic

6  chemistry, and continued my academic training under a Defense

7  Department fellowship which dictated that I do my research at a

8  military base in concert with an academic institution.

9  Completed by Ph.D. work in 1970.

10 Q    Thank you.  The Court has heard about risk assessment

11 already in this trial and, indeed, heard very specifically from

12 Dr. Joseph Rodricks.  Do you know Dr. Rodricks?

13 A    Yes.  Dr. Rodricks and I were colleagues as early as the

14 mid-70's.  He was the functional head of the risk assessment

15 activities at the FDA, Food and Drug Administration and I was

16 the counterpart at EPA.

17 Q    How far back, and maybe you've already identified that,

18 but how far back do you go in the field of risk assessment and

19 I don't mean to ask embarrassing questions, but it's designed

20 to find out what the extent of your background is.

21 A    Yes.  I go back to origins of the first applications of

22 risk assessment, to judgments about environmental agents,

23 incorporating for the first time in 1975, the concepts of

24 exposure, past, current and future exposures, to understand the

25 potential for disease causation.

Libby

PP
Obj:
R;
F;
H;
ET

1  Q    Did your experience include a series of years spent at the

2  EPA, the Environmental Protection Administration?

3  A    Yes.  As soon as I was released from my Defense Department

4  fellowship obligations, I went directly to EPA in its first

5  year of operation.

6  Q    I'm going to show you --

7  A    In 1972.

8  Q    I'm sorry.  I want to show you demonstrative 2265 and ask

9  you whether that would help you go through your activities at

10 the EPA relating to risk assessment?

11 A    Yes.  And, in the early years, I had begun working with

12 the then administrator Bill Ruckelshaus on a series of issues

13 involving carcinogens.  It was a period of time in the nation's

14 history where there was thought to be an epidemic of cancer

15 caused by environmental agents.  So, the focus at EPA in 1971

16 was on suspect carcinogenic agents.  We worked on a series of

17 pesticides, became aware of a series of air pollutants where

18 there were tumors in animals or humans and we had pursued a

19 policy of zero tolerance because the application of safety

20 factors and threshold levels for safety for carcinogens had not

21 been accepted and the origin of that policy came form the Food,

22 Drug and Cosmetic Act, the Delaney clause, which it said if

23 there were tumors in animals or humans there was no tolerable

24 risk.

25       Trying to follow that policy at EPA had not worked and I

Anderson - Direct/Bernick                    36

Libby

1   was asked to direct the first committee to address a functional

2   cancer policy.  That was in the fall of 1975.  I was the

3   executive director of that committee.  We reported at the first

4   use of risk assessment and risk management that had ever been

5   reported or adopted by any agency in the United States.

6       That policy called for, for the first time, if you can

7   imagine, exposure assessment, does response modeling, in

8   addition to what had been done in the past.  The concept of

9   evaluating how likely an agent is to be a carcinogen based on

10  human data supplemented by animal studies.  These first

11  guidelines called for a systematic approach to evaluating the

12  weight of evidence and exposure and likelihood of risk to human

13  populations.  It also called for creating a group within the

14  agency to carry out these responsibilities.

15      I founded and directed that group, it was called the

16  Carcinogen Assessment Group and rapidly, after the success of

17  that group, I founded the Exposure Assessment Group, the

18  Productive Effects Group, and the expanded office for all of

19  the risk assessment activities.  I directed that officer for

20  ten years and I am co-author of EPA cancer policy with the then

21  administrator Russell Train.  It was published in the Journal

22  of the National Cancer Institute.  We performed hundreds of

23  risk assessment.  I co-authored those risk assessments during

24  that period.

25  Q    Thank you.  I want to ask you about turning to

J&J COURT TRANSCRIBERS, INC.

Libby

PP
Obj.
Rj
F;
H;
ET

1  demonstrative 2266.  There's been a reference made, I believe,

2  by Dr. Rodricks, concerning the red book.  Could you tell us

3  about the red book and what your involvement, if any, in the

4  red book was?

5  A   Yes.  The EPA experience had formed a lightening rod for

6  discussions about using dose response extrapolations, exposure

7  assessment and estimation of risk for public policy decisions.

8  It was one of the major, I would say, stimulus, for the

9  convening of the National Academy's Committee to address the

10 appropriateness of these policies, could risk assessment and

11 risk management work on a broader basis, and by that time my

12 group at EPA had published more than 150 risk assessments.  So,

13 we were very far down the road.  This committee and this

14 publication, to which I was an advisor and visited many times

15 because our work was one of the cornerstones of their

16 deliberations, is the landmark book that's established the

17 paradigm for risk assessment.  It's cited all the time, cited

18 by parties and interested organizations all over the world and

19 in many subsequent National Academy documents.

20 Q   Thank you.  Turning to demonstrative 2006, which is also a

21 demonstrative that we used in connection with Dr. Rodricks

22 testimony, could you tell us briefly how it is that the science

23 of risk assessment has evolved, particularly in the last two or

24 three decades?

25 A   I guess I can.  I often think of risk assessment as

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
F;
H;
ET

1  originating with Koch's principles.  These principles sought to

2  answer questions of causation for infectious disease, isolating

3  the organism form the host, cultivating the organism and then

4  reinserting it in the host and if the host responded to the

5  original disease, causation was established.

6      Also, going on pre-1964, in the public health regulatory

7  communities, were these simplistic safety factor approaches

8  that established no observed effect levels or other means of

9  establishing a level that was regarded as safe and in the

10 scientific community, there were early observational studies we

11 call case reports in epidemiology that addressed the results

12 that some medical doctors had diagnosed in their patients,

13 certain diseases that might be associated with occupational

14 exposures.

15     By 1964, we were seeing several different things

16 happening.  One of the critical events in 1964 was the

17 publication of the Bradford Hill criteria which for the first

18 time gave a real structure to what was expected of epidemiology

19 studies, if they were going to establish causality between the

20 agent and the disease and these principles addressed

21 consistence across the studies, the temporal issues and other

22 issues.

23     These principles promptly became useful, as I understand,

24 to the interface of judicial use, which is not my field, but I

25 understand that structure was useful.  But they were useful in

Libby

PP
Obj:
R;
F;
H;
ET

1  other ways, because they stimulated the conduct of structured

2  epidemiology studies.  So, studies became more structured, they

3  became more useful in many different ways.  Of course, human

4  data still remain the best source of information.   But

5  following the regulatory approach of what I call the Public

6  Health Agency approach, during the 70's is just what I've

7  discussed.  We've encountered the situation with suspect

8  carcinogens and the rejection by the scientific community of

9  just willy-nilly applying safety factors.  And, so, the

10  quantitative based risk assessment process was established, but

11  here were see a divergence between what Public Health Agencies

12  were doing to carry out their missions to be preemptive and

13  protective and what was really called for in establishing

14  causality.  So, it's been an interesting period and interesting

15  that I've been able to participate in a good deal of it.

16  Q    Well, let's talk a little bit about that divergence.  I

17  know we're going to return to it later, but since you've

18  mentioned it, what exactly was the divergence that you just

19  referred to that began to evolve in the 1970's?

20  A    Yes.  The process of risk assessment that was defined by

21  EPA in 1975 simply sought to answer two questions.  How likely

22  is an agent to cause disease or if a disease is already caused,

23  what is the dose that -- what is the circumstance that might

24  have caused the disease or if a disease is -- if a dose is

25  current, would you expect that there might be impacts on

Libby

Anderson - Direct/Bernick                    40

PP
Obj:
R;
F;
H;
Et

1  populations in the future.

2      In that case, the Public Health Agencies essentially have
3  to fill data gaps and the red book that I mentioned earlier
4  details those gaps and calls them inference judgments.  So
5  when, for example, the EPA did their risk assessments when I
6  was there, we followed guidelines and said where the science
7  stops we will fill the gaps with very precautionary
8  assumptions.  So, we were seeking to establish plausible upper
9  bounds on risk, recognizing that the risk could be considerably
10 less, even approaching zero, but to make decisions to preempt
11 and protect the public.  It's a very different process from
12 establishing causality which is, as I understand, causality
13 needs to be science based and not inference judgment based.
14 Q    Okay.  And I know that we're going to return to that.
15 Turning to slide, or demonstrative 2267, have you been involved
16 in developing literature in the field of risk assessment?
17 A    Yes, I have.  I have published, I have participated in
18 founding the leading society in risk assessment.  I served as
19 its president from 1984 to 1985.  I have held other posts in
20 that society, but I think the most exciting one has been as
21 editor and chief of the Journal, Risk Analysis and
22 International Journal which I think is undeniably the leading
23 journal in the field of risk assessment.

24     It has a world wide circulation of 4,000, it goes to about
25 80 countries and its board and its editorial staff are made up

Libby

PP
Obj:
R;
F;
H;
E7

1  of scientists from the academic communities, governmental

2  bodies, and international representatives in the private

3  sector.  It is ranked high in the impact factor and it's also

4  ranked very high in the social science citation index.  We've

5  been as high as number two of 65 journals, I believe, within

6  the last six years and as high as number four, more recently

7  listed in the Interdisciplinary and Mathematics citation index.

8          MR. BERNICK:  Your Honor, at this time, we would

9  proffer Dr. Anderson as an expert in the field of the risk

10 assessment of toxic agents or potentially toxic agents,

11 including specifically asbestos.

12         MR. MULLADY:  Brief voir dire, Your Honor?

13         THE COURT:  Yes.

14              VOIR DIRE EXAMINATION

15 BY MR. MULLADY:

PP
Ctr

16 Q    Good morning, Dr. Anderson.

17 A    Good morning.

18 Q    Your doctoral degree is in organic chemistry, is that

19 correct?

20 A    Yes.  Mechanistic organic chemistry.

21 Q    Your expertise in risk assessment, as I understand it form

22 your CV, has been in the context of regulatory and legal

23 matters, is that right?

24 A    I think it's in the scientific context of evaluating multi

25 disciplinary information to address issues of how likely an

**J&J COURT TRANSCRIBERS, INC.**

Anderson - Voir Dire/Direct/Mullady                42

1  agent is to cause disease, to address issues of dose response

2  characteristics, that is, at what level could that disease

3  occur and then to address issues of exposure and then to wed

4  the two, to address the essential questions of how likely is

5  there to be an association between that exposure and disease.

6  Q    May I see 433 please?  Exhibit 433 on the screen here is a

7  copy of your CV which I believe you appended to one of your

8  expert reports in this case.  And I was reading from the second

9  sentence in the first paragraph which says, she specializes,

10 referring to you, in risk assessment as a basis for addressing

11 the complex problems that arise in the context of regulatory

12 and legal matters, related to health and the environment for

13 national, international companies and governments.  Is that

14 accurate?

15          MR. BERNICK:  Your Honor, I don't believe that's

16 proper impeachment.

17          THE COURT:  I --

18          MR. BERNICK:  There's nothing that's inconsistent

19 about that.

20          THE COURT:  This witness can answer the question if

21 it's coming from her's.  I'm not sure it's inconsistent, but

22 I'm sure the witness can answer this question.

23 Q    Is that an accurate statement of your credentials, ma'am?

24 A    Well, I don't think any single declarative sentence can

25 accurately reflect my credentials.  I think this sentence

**J&J COURT TRANSCRIBERS, INC.**

PP
Ctr

1  reflects some of what I've done.

2  Q    Now, you have no formal medical training, is that right,

3  ma'am?

4  A    I have not been to medical school, if that's what you're

5  asking me.   No.

6  Q    Yes.   You also have no legal training, correct?

7  A    Correct.

8  Q    And, you're not an industrial hygienist, right?

9  A    I am not an industrial hygienist.

10  Q    And you're not a bio-statistician, correct?

11  A    I've had courses in statistics.   I have used statistics in

12  my work, but I would not say I'm a bio-statistician.

13  Q    Okay.   And, as I understand it, none of the risk

14  assessments that you've done, that have dealt with asbestos,

15  have been published in a peer reviewed journal, is that right?

16  A    That's wrong.

17  Q    That's wrong?   What risk assessments on asbestos that

18  you've done have been published in peer reviewed journals?

19  A    Risk assessment has many steps.   I would say the work that

20  I did at EPA passes more scrutiny than the several -- in our

21  journal we have three to four peer reviewers.   So the work I

22  did at EPA was certainly carefully scrutinized.   I did the risk

23  assessment work on the first issue of Ingestion of Asbestos

24  over a period of time in the 70's, from 73 to 78, to determine

25  whether or not amosite from reserved mining might be a

PP
Ctr

1  causative agent of any health issues for people who consumed

2  the water from Lake Superior.

3      In 1978, I was co-author of the first risk assessment work

4  for EPA's air programs.  In 19 -- late 84, I believe, is the

5  date, I was responsible for commissioning the work with Dr.

6  Nicholson to do the cancer chapter for the 1986 publication of

7  EPA's risk assessment.

8          MR. MULLADY:  Excuse me, Your Honor, but --

9          THE WITNESS:  I'm getting there.

10          MR. MULLADY:  Excuse me, ma'am.  I believe the

11  question, Your Honor, was very simply, have any of her risk

12  assessments been published in a peer reviewed journal.

13          THE WITNESS:  I'm getting there.  I said these --

14          MR. MULLADY:  Well, that was the question.

15          THE WITNESS:  -- these risk assessments that I'm a

16  part of received far more scrutiny than just a risk assessment

17  journal.  So, to dismiss them is not appropriate.  But in my

18  resume, you will see that I published one of the earliest

19  papers, if not the earliest papers, inspecting a part of the

20  risk assessment process which is the proposed six different

21  mechanisms of action.  Very critical to both the hazard

22  identification and to exposure in dose response.

23          Later, within the next year, I published comparative

24  risk assessment investigating the risk associated with asbestos

25  in place and asbestos removal.  So, it was a comparative risk

Anderson - Voir Dire/Direct/Mullady                    45

1   assessment.  So, those two --

2   Q    And, what peer reviewed journal was that published in,

3   ma'am?

4   A    Pardon.  Yes --

5            MR. BERNICK:  Excuse me.

6            MR. MULLADY:  No --

7            THE WITNESS:  It's on my resume.

8            MR. BERNICK:  Excuse me.  She said she can answer the

9   question.  She's already given you two examples, we're now onto

10  the third.  If you want to ask what journal it's been published

11  in, Your Honor, she can -- that's a follow up question.  He

12  shouldn't be interrupting the witness.

13           THE COURT:  I think you did ask, so I think she

14  should be entitled to answer the question.

15  Q    I'm sorry, ma'am, have you finished your answer?

16  A    Yes.  I was just citing these publications.  They're on my

17  resume and they're peer reviewed journals and they were some of

18  the first work done in risk assessment on asbestos.  Both on

19  mechanisms of action, one of the very important questions to

20  risk assessment, and one on full comparative risk assessments

21  in particular circumstances on asbestos, exposures and disease.

22  Q    I asked you the same -- well, my partner, Garret Rasmussen

23  or Mr. Slocum, I can't remember which, asked you this same

24  question at your deposition.  Can we take a look at Pages 27 to

25  28, please.  Let's go back up a little bit further in the

PP
Ctr

1  text.

2  A    I was speaking to the EPA risk assessments.

3  Q    Excuse me, ma'am, I haven't asked you a question yet.

4  A    That they were not published -- well, you put this in

5  front of me.

6  Q    I'm about to ask you a question and then I'll be happy to

7  listen to your answer.  At deposition, were asked the following

8  question:  "Do any of your publications attempt to assess

9  whether exposure to asbestos caused an individual's illness?"

10 And your answer was: "I have worked with asbestos and risk

11 assessment since the earliest days at EPA starting in the

12 1970's.  One does not generally publish a risk assessment and I

13 don't think I have attempted to publish any of my risk

14 assessments that have dealt with asbestos."  I'm sorry, the

15 question was -- and let's go further in, so we see the full

16 context here.  The question is a publication that addresses

17 whether exposure to asbestos caused an individual's illness as

18 opposed to assessments of the risk to a general population.

19 And you asked, "When you say published, what do you mean?"

20 And, the question was:  "Let's start out, published in a peer

21 reviewed journal?"  And your answer was:  "No, I don't think I

22 have published any of my risk assessments in a peer reviewed

23 journal.  All of my risk assessments addressed risk to

24 individuals as well as risk most all, risk to individuals as

25 well as the risk to populations."  Was that the testimony that

J&J COURT TRANSCRIBERS, INC.

Anderson - Direct/Bernick                          47

1  you gave in deposition, ma'am?

2  A    Yes, and he was asking me about the EPA risk assessments

3  and I was explaining that those risk assessments normally are

4  not published in peer reviewed journals.  Today I'm saying,

5  those risk assessments are under more scrutiny than articles in

6  peer reviewed journals because they are read by so many

7  different parties and scrutinized by so many scientists.

8  Q    Thank you, ma'am.

9  A    And, he has my resume, so he certainly knew my

10  publications otherwise.

11         MR. MULLADY:  I think we understand your answer.

12  Thank you, ma'am.  No objection to the proffer.

13         MR. BERNICK:  Nate?  I take it from Mr. Finch's

14  shaking his head that you don't -- the ACC does not have an

15  objection.

16         MR. FINCH:  No, objection to the proffer.

17         MR. BERNICK:  Thank you.

18         THE COURT:  All right.  The witness may express an

19  expert opinion as proffered.

20                CONTINUED DIRECT EXAMINATION

21  BY MR. BERNICK:

22  Q    Dr. Anderson, could you just tell us and we're going to

23  get right to the risk assessment that we're going to be talking

24  about in this case here, on the very next questions, but could

25  you just tell us what the basic elements of a risk assessment

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  are as a general matter, and I'd like to show demonstrative

2  2268.

3  A    Yes.  I think as I said earlier, the first question is,

4  can an agent cause disease and, of course, we know asbestos in

5  certain situations considering fiber size and type, can

6  absolutely cause disease.  The dose response assessment is the

7  next critical step, that's been discussed, I think here.

8  Exposure assessment is then the evaluation of the cumulative

9  exposure that individuals and populations receive and the

10  fourth step is the characterization, wedding all the previous

11  three steps together to address the essential question and in

12  this case, are exposures to Grace product groups responsible

13  for claimants disease.

14  Q    Thank you.  Now, we've already heard from Dr. Lees.  Did

15  he participate in the risk assessment that was associated, or

16  that's been done for Grace in this case?

17  A    Yes, he did.

18  Q    Okay.  And just indicate for the Court where you're going

19  generally, what role, if any, did you play, what was the nature

20  of your role in connection with the risk assessment that was

21  done for purposes of this case?

22  A    My role, I suppose is, I integrated the information from

23  the first part of exposure assessment, the concentration data

24  from the industrial hygiene studies I received from Dr. Lees.

25  I added the frequency and duration portion of the exposure

Libby

PP
obj:
R;
F;
UP;
H;
E7;
LR

1  assessment to arrive at a cumulative exposure.  Dr. Moolgavkar

2  has discussed, I believe the dose response characteristics for

3  asbestos and has identified certain levels that I've called

4  benchmarks, so I could have the benchmarks for the risk

5  characterization.  I have then gone forward to evaluate the

6  cumulative exposures for groupings, we call nature of exposure

7  groups and then compared their exposures to Dr. Moolgavkar's

8  benchmarks.

9      I've then organized the outcome of that comparison to pass

10 that outcome on for the next analysis which I understand is Dr.

11 Florence's analysis.

12 Q  Thank you.  I want to show you what we have as a

13 demonstrative, and we've put it in the form of a big magnetic

14 board, Your Honor, we will also tender the demonstrative as a

15 slide or a smaller version of this after it's completed, as

16 2296, for its files.

17         UNIDENTIFIED MALE SPEAKER:  What was the number for

18 that, Dave?

19         MR. BERNICK:  2296.

20 Q  But, Dr. Anderson, looking to the portion of 2296 that's

21 displayed on the magnetic board, does this show the sequence

22 of, or the different steps of the risk assessment that you

23 participated in in connection with this case?

24 A  Yes, it does.  As I said, the concentration information

25 for the exposed claimants groupings was provided, analyzed and

Anderson - Direct/Bernick                    50

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  provided to me by Dr. Lees.  I performed the -- I completed the

2  exposure assessment by using his concentration values.  I added

3  the exposure frequency and duration to arrive at cumulative

4  exposures of dose and then I compared those cumulative

5  exposures of dose to benchmarks from Dr. Moolgavkar's work and

6  from the literature that he used to define benchmarks for

7  comparison.

8  Q    Okay.  This formula that appears at the top of 2296,

9  concentration times exposure frequency times duration equals

10  dose, and then to proceed to look at dose response and then to

11  risk, is that a sequence and a formula that is unique to this

12  case?

13  A    No, it is not.  This has been the sequence and formula, if

14  you will, that has been consistently used since the origins of

15  risk assessment in my background since 1976, codified in the

16  four steps by the National Academy in 1983.

17  Q    Okay.  Let's begin with the first part of that formula,

18  which is dose.  The calculation of dose.  Turning to Exhibit

19  2270, could you explain for us the central question that was

20  addressed in the risk assessment for this case, as concerns the

21  calculation of dose?

22  A    Yes.  The central question is how our accepted methods,

23  used to calculate the doses resulting from exposure to Grace

24  products and the ingredients of that analysis are listed here,

25  the concentration, multiplied by the frequency, by the duration

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1    of exposures, provide the cumulative exposure for the

2    individual or the claimant group.

3    A    Okay.  Now, we've already heard from Dr. Lees but I want

4    to talk first of all about the concentration part of it and ask

5    you just to give the Court an overview of what it is that Dr.

6    Lees did as you understood it, in order to provide a foundation

7    for how it is that you then pick up from his work and what you

8    did with it.  So could you just give the Court a very brief

9    overview of your understanding of what it is that Dr. Lees did?

10   A    Well, Dr. Less did several things.  The first thing he did

11   is, he defined or he flushed out the exposure definitions for

12   the nature of exposure categories A through E.

13   Q    Okay.  Let's show 2269 and I want to ask you whether 2269

14   reflects the basic categories that Dr. Lees worked with?

15   A    It does and the Category A is the category of individuals

16   who mixed Grace products.  Category B, category of individuals

17   who were in areas to exercise their trade by removing or

18   cutting Grace products.  The C category is the category of

19   individuals involved in installing Grace products.  D is a

20   person at a site where these products were being used, but they

21   were not in the room with, they were out of the line of sight,

22   most likely with the products in it.  Category E would be an

23   individual in the space when the products were being either

24   applied or sprayed.

25   Q    Now, in this chart it emphasizes that these are all job

Libby

Anderson - Direct/Bernick                    52

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  activities that were analyzed as concerns Grace products.  For

2  purposes of the work, the risk assessment that was done in this

3  case, did you or others working with you analyze the exposures

4  that the claimants had with respect to -- or industrial hygiene

5  data that was available with respect to job activities relating

6  to non-Grace products?

7  A    No.  We did not have information relating to non-Grace

8  products.  So, we were focused on what exposure did these

9  particular claimants have from Grace products, per se.

10  Q    Okay. Now, as an example, Dr. Lees talked about the fact

11  that when it came to the personal installation we have a person

12  who is spraying, what kind of product that Grace was being

13  analyzed when it came to the asbestos containing mixture being

14  sprayed from a hose?

15  A    Grace had fireproofing products that were being sprayed

16  and I understand from Dr. Lees that they were using a wet

17  method of application for their products.

18  Q    That's exactly what I was going to get to.  In connection

19  with the work that was done to do the risk assessment in this

20  case, did you all focus not on the wet application, not only on

21  the wet application pertaining to Grace product, but did you

22  also analyze dry applications of other kinds of products?

23  A    Dr. Lees is aware of the difference between the dry

24  applications, which were not Grace products, as I understand it

25  and the wet application of Grace products.  We also analyzed or

Libby

PP
Obj:
R;
F;
UP;
H;
€7;
Ln

1  he analyzed the exposure data and we used that to analyze

2  further through the exposure duration and frequency the

3  exposures to individuals who were painting on or troweling on

4  Grace products.

5  Q    Okay.  But when you carried through the industrial hygiene

6  data, was that the data that related to the wet application or

7  the dry application done by others?

8  A    His work was related to the Grace installation per se.

9  The wet application.

10 Q    Okay.  Now, what kinds of values, what kinds of values did

11 Dr. Lees calculate after having reviewed the industrial hygiene

12 data with respect to these different job activities? What  kind

13 of calculations did he do?

14 A    Well, he first of all defined the exposure for the

15 categories.  He gathered the data, he qualified the data and he

16 provided his time weighted average mean concentrations by two

17 analyses.  One was what he called a stratified analysis where

18 he took each study and averaged the study to get the mean of

19 the study and he averaged them across the studies and the other

20 was what is, I think he referred to as a meta analysis when he

21 averaged all the values across all the studies.  So, he

22 provided all of this to me.

23 Q    Okay.  Now, you just reused the word mean, in talking

24 about a mean concentration, and mean also appears on the

25 overall exhibit, which is 2269.  Let's deal with this question

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  of the mean concentration.  Tell us whether or not industrial

2  hygiene data that is generally available in risk assessment,

3  tell us whether or not industrial hygiene data reflects to

4  varying degrees, variability, variability.

5  A    Well, certainly it does because industrial hygienists

6  collect their data on different days and different places when

7  environmental factors are changing, and there are variations in

8  those factors.  There will be some other variations in

9  collection methods and analytical methods and even in the way

10  some individuals work with the products.

11  Q    Showing you 2271, does this capture some of the reasons

12  why or the drivers for variations, and what kinds of affects

13  they can have on concentration values.

14          MR. MULLADY:  Objection, leading.

15          MR. BERNICK:  That's fine.

16  Q    Could you explain, please, Dr. Anderson, what it is that

17  Exhibit 2271, the demonstrative, reflects as concerns

18  variation?

19          MR. MULLADY:  Objection, leading.

20          THE COURT:  No, it is not leading.  Explain what this

21  slide reflects.  It is leading.  If anything.  You can correct

22  the statement, thank you, not leading.

23  Q    Go ahead, Dr. Anderson.

24          THE COURT:  You can answer.

25          THE WITNESS:  May I?

Libby

PP
Obj:
R;
F;
UP;
H;
E7,
LA

1      THE COURT:  Yes, please.

2      THE WITNESS:  Well, I think the question is, why is

3  that variation measure data and we've always dealt with this.

4  We dealt with this very overtly at EPA in the early years when

5  we were trying to measure for the first time environmental data

6  and use it for exposure assessment.  We quickly found that we

7  had variation in sample technique, analytical technique,

8  different people may apply or do something as a receptor that's

9  different from another person.  And we found that environmental

10  variables were very essential.  Which way the wind is blowing

11  and where the samples are taken, with respect to humidity, and

12  open windows, it's very difficult to get just samples that are

13  not widely influenced by these factors.

14      At the end of the day, I know that Dr. Lees has

15  stated that the environmental variables predominate by far.

16  From my experience I would agree with him, that's what I've

17  seen in the data that I've seen collected over the last 30

18  years.

19  Q    Now, Exhibit 2269 reflects that in the work that was done

20  on concentration, the concentration data and I think you've

21  indicated the same thing, focused on -- a mean was calculated

22  for the concentration data, is that accurate?

23  A    That is accurate.

24  Q    Okay.  Now, tell us why it is that the mean is something

25  that is of value, or that is the step that we're talking about