Libby

PP.
Obj:
R;
F;
VP;
H;
ET;
LR

1  here, in the risk assessment.  Tell us why it is that the mean

2  is used.

3  A    Well, the mean is used and has been used, as I said, for

4  the last 30 years as the predominate way to capture

5  concentration in a risk assessment and that is because over a

6  long period of time, and that is for long term exposures over a

7  long period of time, with the predominance of environmental

8  factors, they will cancel out.  If a person is doing the same

9  activity repeatedly, always a receptor and the same location

10  repeatedly, the variables and the environmental data will

11  cancel out and the person will be exposed over a long period of

12  time to that mean value.  So, that's why we've always used the

13  mean value for those kinds of analysis.

14  Q    Let's take a case where we have a factory that's emitting

15  a certain material of interest and we want to know what kind of

16  concentration for that material exists right at the border of

17  te factory, right at the fence line.  Could you give me an

18  example of a factor that would produce variability in the

19  results but would tend to cancel out over time?

20  A    Wind.

21  Q    I'm sorry?

22  A    Wind.

23  Q    Explain for us why it is that wind is one of those

24  variables.

25  A    Well, wind patterns are definable variables and over time,

**J&J COURT TRANSCRIBERS, INC.**

*Libby*

PP
Obj:
R;
F;
UP;
H;
E7;
Ln

1    if we have a monitor at a fence line and we have variable data

2    over a long enough period of time, all those variable in the

3    wind pattern, will be captured.

4    Q    Okay.

5    A    And, that is why long term monitoring for air, for

6    example, is encouraged over short term monitoring.

7    Q    Okay.  And if the wind pattern tends to predominate, that

8    is that overwhelmingly it's always in one direction, what

9    happens to that fact as time evolves?  What happens --

10                THE COURT:  I'm sorry, would you restate that?

11   Q    If there's a predominating direction for the wind, how

12   does that emerge over the long term?

13                THE COURT:  All right.

14                THE WITNESS:  Well, the concentration data that are

15   collected will eventually come to a mean concentration that

16   will reflect the predominance of that wind pattern.  But in

17   different times and different days, that's going to change.

18   Q    I want you to look at 2272 and we can show it on the

19   screen and ask whether this would assist you in explaining what

20   you've just described regarding variability and a mean over the

21   long term.  Would that help you describe that to the Court?

22                MR. MULLADY:  Objection, foundation.  Your Honor, I

23   think with this witness we haven't yet heard that she created

24   these slides and that they would assist her in her testimony.

25                MR. BERNICK:  Well, I just asked her the latter and

Libby

PP
Obj:
R;
F;
UP;
H;
Er;
LA

1  it's irrelevant whether she created the slides.  You can cover

2  that on cross examination.  The foundation is whether it would

3  assist the Court.

4        THE COURT:  I think that is the foundation question.

5  Whether it would assist and that is the question he just posed

6  to the witness.  So, I need an answer to that question before I

7  can rule on the -- before there is an objection.  You may

8  answer.

9        THE WITNESS:  All right.  What we see here is --

10        MR. BERNICK:  No, no, no.

11        THE COURT:  Answer yes, or no.  Whether it will

12  assist you.

13 Q   Mr. Mullady is raising issues about the admissibility of

14  your testimony, so I want to just ask you, tell us whether this

15  demonstrative would assist you in explaining to the Court your

16  testimony regarding the mean?

17 A   I believe it will.

18        MR. BERNICK:  Okay.  And could you -- Your Honor, may

19  I have the witness address the demonstrative 2272 for the

20  Court?

21        THE COURT:  Yes.

22        MR. BERNICK:  Thank you.  Go ahead, Dr. Anderson.

23        THE WITNESS:  Yes.  I think what this helps us do is,

24  we see on the left hand side the exposure variability.  If we

25  were thinking of that monitor at the fence line, we will see

**J&J COURT TRANSCRIBERS, INC.**

Anderson - Direct/Bernick                    59

*Libby*

*PP Obj:*
*R;*
*F;*
*UP;*
*H;*
*ET;*
*LA*

1    some days lower exposures, some days a higher exposure and in

2    the short term, we see guidance from EPA that says, you can't

3    really use those data to characterize long term.  And if we're

4    dealing with short term risk assessments, we sometimes,

5    depending on the circumstance, use our professional judgment as

6    to whether we have to reflect that variation in short term

7    cases, whether it's acute or whether it's short term meaning

8    very few events over a long period of time.

9           But as we go across the bottom to the long term, what

10   we find is that those variable converge to the mean, that that

11   receptor, staying there long enough is the constant.  So that

12   receptor will get over time that mean concentration.

13   Q    I want to stop you right now and just focus on what you've

14   just sais.   This receptor, that is the person whose exposure

15   you're measuring, is a constant.  Tell us what you mean when

16   you say that person as a receptor is a constant over the long

17   term.

18   A    If that receptor is in a particular place, doing a

19   particular activity with respect to a product, or living in a

20   particular place with respect to a source, a factory, they

21   become a constant because they capture, they don't change what

22   they're doing, what changes around them that influences the

23   variability, the overwhelming variability are these

24   environmental factors that cancel out as the person stays there

25   a long time.

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
F;
MP;
H;
ET;
LA

1  Q    What have you indicated -- first let me just ask you, in

2  order to satisfy Mr. Mullady, did you or did you not

3  participate in the creation of this slide?

4  A    Yes, I did.

5  Q    What about the word receptor?  Was that your word or

6  somebody else's word?

7  A    That's my word.

8  Q    Okay.  What about the word mean, was that your word or

9  somebody else's word?

10 A    That is my word.

11 Q    What about all the words on this slide, are they your

12 words or somebody else's words?

13 A    Those are my words.

14 Q    Okay.  Now, what is indicated at the right hand side when

15 you talk about the use of the product, the composition of the

16 product and the proximity up to the product?

17 A    Very specific to the evaluation in this case, we have the

18 use of the product, meaning the person who is spraying, or the

19 person who is mixing, or the bottom individuals and the

20 categories that are bystanders to other applications, we have

21 them at a proximity to the product application.  These become

22 constant factors.  The composition of the product is going to

23 also be a constant factor as we take the exposures from that as

24 the source, as if it were the factory.

25 Q    That's fine.  Now, on the basis of this, could you tell

J&J COURT TRANSCRIBERS, INC.

Libby

PP
obj:
K;
F;
UP;
H

1  me, this analysis that you've gone through, do you have

2  experience and familiarity with what the -- well, let me take

3  -- let me strike that and go back.  You've said that the EPA

4  has now been involved in risk assessment for more than 30

5  years?

6  A    Starting in 1976.

7  Q    Okay.  And you've said that at the EPA you've participated

8  in literally hundreds of risk assessments?

9  A    Yes, I did.

10 Q    Okay.  Tell us whether the EPA, whether you're familiar

11 with what the EPA has said by way of guidance on this very

12 subject?

13 A    Well, the guidance on this subject comes from the logic

14 behind what I just discussed and the guidance consistently says

15 that the mean is the appropriate value to use when assessing

16 concentrations at the maximum exposed point under the Clean Air

17 Act.  It says the mean is the appropriate concentration for

18 evaluating site wide data when an individual has potential to

19 be exposed to variable data over that site.  The mean

20 concentration is used in EPA's pesticide programs for the same

21 reasons, for the application and use of pesticides.  We see

22 this use of the mean based on the logic I just described.  And

23 it's prevalent in EPA guidance.

24 Q    Showing you 2217, are there particular documents that have

25 reflected the EPA's guidance?

J&J COURT TRANSCRIBERS, INC.

Libby

PP
Obj:
R;
F;
VP;
H;
et;
LR

1  A     Yes, there are.  I think this is just one of many

2  excerpts.  Here we see from the 1992 risk assessment guidance

3  for superfund sites, the average concentration is most

4  representative of the concentration that would be contacted at

5  a site over time.  On the right hand column we see that in the

6  EPA 1986 risk assessment, that the average concentrations were

7  used from the epidemiology studies in order to construct what

8  is still used, this is the document I spoke of earlier, what is

9  still used by EPA as the dose response characterization for

10 asbestos.

11 Q     Thank you.  Showing you 2274, could you explain how this

12 bears upon the same subject?

13 A     Yes.  There has been -- this is a directive from the

14 deputy administrator of EPA that was issued in 1992, warning

15 against the overuse of maximums and suggesting that leaving

16 values at their mean is more appropriate.  Because if we

17 maximize everything we vastly -- we create a community of

18 numbers that have no relevance to the populations and that's

19 essentially what this is saying.

20 Q     I'll take you back to 2272 for a moment, if we could do

21 that, TJ.  What if you had a -- I believe what you've done here

22 is a risk assessment that is -- or reconstructing as the risk

23 assessment relating to long term exposures?

24 A     Yes.

25 Q     What if you had a totally different mission in this case,

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1    what if your mission in this case was not to talk about risk
2    over the long term, but to talk about risk for somebody who had
3    only very sporadic exposure to the product.  Would you follow
4    the same approach?
5    A    No, if they're over or under these either short-term
6    exposures or a few short-term events, I would probably express
7    both an average concentration and a maximum concentration,
8    because they're still on this left-hand part of the curve.
9    They have not had time enough to converge to the exposure of
10   the mean concentration.
11   Q    I'm showing you 2273.  Does this relate to the same
12   subject?
13   A    Yes.
14   Q    And could you just give a short explanation of how 2273
15   bears upon your testimony in this case?
16   A    Well, it's a demonstration of what we've been discussing.
17   In this particular case we're not talking about the short-term
18   exposures on the left.  The concentration and duration factors
19   have been set to very long-term maximums, so the risk
20   assessment is dealing with -- the risk assessment exposure work
21   is dealing with chronic exposure, and the only appropriate
22   metric is the average concentration.
23   Q    Why is it that you focused on long-term exposure?  That is
24   to say -- we're going to talk about what you've done with
25   duration and cumulative exposure.  Why is it that you keep on

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  focusing on the long-term?  What is that -- what, if any,

2  relationship does that have to the kind of dose that you're

3  calculating?

4  A    In this -- this particular case I thought it important to

5  set up a maximum screen.  Not to try to come to realistic

6  factors, but that's essentially the first question.  If we

7  assume maximums -- that is not just EPA's Exposure Factors

8  Handbook maximum -- recommended maximum of 25 years for an

9  occupation but 45.  If we assume constant exposure over a full

10  day, every day, eight hours a day for that 45 occupational

11  lifetime, we're talking about 11,250 days or 90,000 hours of

12  exposure.  So we are clearly as far out on the long-term

13  exposure curve as we can get with any reasonable --

14  unreasonable, actually, assignment of occupational exposures.

15  Q    Go back to 2272 for a moment.  If we now assume that the

16  long-term is 45 years, is there any sense from your point of

17  view in assuming that for 45 years a person was constantly -- a

18  constant person at the site was constantly exposed to the

19  maximal wind pattern, maximal exposure circumstance that might

20  exist from time to time.  Is there any merit to that kind of

21  approach?

22  A    I think it's inconceivable that that person could be at

23  the wrong place at the wrong time all of the time for 45 years.

24  Q    So let's take, for example, wind.  If the wind is in the

25  direction such that say from the spray -- the spray is always

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LR

1  in -- is in your face, would that be on a given day?

2  A    Yes.

3  Q    Would that be the high concentration or the low

4  concentration?

5  A    That would be the high concentration.

6  Q    Is there any sense in assuming that wherever that person

7  is for 45 years the wind is kind of following them around, so

8  it's always in their face?

9  A    No.

10  Q    Let's show 2275 to get to the point at which you enter

11  into this process.  We Dr. Lees, who has the product

12  descriptions, the definitions, and gives you the mean

13  concentrations.  What is it that you decided to do with the

14  mean concentrations?

15  A    Yes, for each of the nature of exposure categories defined

16  on the left-hand side that we discussed earlier, I selected the

17  highest mean value from Dr. Lees' analysis to assign to each of

18  those categories for each product type.

19  Q    Thank you.  And do we now -- are we now in the position --

20  we're taking off the magnet boards.  We see a summary of what

21  was done when it comes to concentration.  That is that we had

22  Categories A through E that Dr. Lee defined them, that Dr. Lee

23  gave you the mean concentration, and then again what is it that

24  you did with the mean concentrations?  Which one did you use to

25  choose -- did you choose to use?

Libby

PP
Obj.
R;
F;
UP;
H

1  A    I chose to use the highest, because he presented two means

2  of evaluating his data.  I chose the highest from whichever the

3  data set was.

4  Q    Thank you.  Let's talk about frequency and duration.

5  Could you just describe in general terms what now -- how now

6  the risk assessment proceeds, what the next steps are in

7  general terms, and then we'll focus on how you implemented

8  those stages?

9  A    Yes, to get to the cumulative exposure assessment I needed

10 to take his maximum concentrations and then ask the question

11 how much frequency of exposure would an individual in these

12 categories get and over what time period.  So those were the

13 next two steps in my analysis.

14 Q    Okay.  Could you just describe in your own words -- well,

15 let me just put it this way.  Tell us whether there was a

16 specific analysis that was done in order to provide the factual

17 predicate for your calculations.

18 A    Well, I did several levels of analysis.  Initially, I

19 thought it would be very important to really characterize how

20 often a Grace product might be in a building that a person

21 would contact or how often events might occur, or, in fact, how

22 many buildings actually have these kinds of products.  And for

23 the bi-standard categories, the D's and E's, how often would

24 they -- if they are visiting a site, how often are they likely

25 to overlap with an exposure circumstance at a site, and I did

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP.
Obj.
R;
F;
MP;
H;
ET;
LA

1    those analyses, and they're reported in my report.

2              But, eventually, I decided that the most important

3    thing in this analysis is to make this a very conservative

4    screening analysis.  Meaning if I set all the parameters very

5    high, I could be very certain that there would be a low

6    probability that anybody would be exposed to anything any high

7    than those values.  So I have chosen in the screening analysis

8    that I have really used this final set of assumptions.

9    Q    Let's focus, first of all, on exposures to different kinds

10   of products.  I'm going to show you 2276 and ask you whether

11   this accurately summarizes the work that people working for you

12   did in order to analyze what products were available to the

13   marketplace over time.  That is what Grace products were

14   available over time to the marketplace.

15   A    Yes, this is a display.  If we look down the left-hand

16   side, we see the Grace product types, the vermiculite-only

17   products, then the next category of vermiculite with chrysotile

18   added, then the category of chrysotile-only products, and then

19   combined post-construction.  What the bars going across show is

20   the lifetime of those products in commerce, and what we did

21   with these data was to choose for any one year the maximum

22   concentration that any one in any of the nature of exposure

23   categories could've had to any of these products.

24             In other words, that person had a choice of getting

25   the highest exposure to any one of these products in that year,

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  and here I have chosen to illustrate that with the max to a D

2  exposure -- category D in 1953 from acoustical plaster.  That

3  turned out in 1953 to be the highest exposure for a mean TWA

4  value used over the period of 250 in the year for that person

5  in D exposure category.

6  Q    So the analysis that you've just talked about, you get the

7  products out there in use over time.  You then figure out the

8  maximum by year.  Am I right from what you just said --

9  A    Yes.

10  Q    -- that this is done not for all categories together but

11  for each category separately?

12  A    Correct.

13  Q    Okay.  Now, what was the next step?  After you've done

14  that with the products, what was the next step?

15  A    The next step was to incrementally take 45-year rolling

16  blocks of exposure starting in 1920 when the first products

17  appeared and to calculate for each of the A, B, C, and D

18  categories blocks of 45 years of exposure that had three

19  maximums.  We maximized in the beginning the mean highest

20  concentration.  We allow that person to be exposed to any one

21  of the products in a single year that had the highest

22  concentration for that year, and we maximized that

23  concentration for all days in that year.  Then we had the

24  rolling block of 45 years going forward through 2007, and then

25  we chose the highest one of those 45-year blocks to

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  characterize the exposure to that exposure -- nature of

2  exposure category individual group.

3  Q    I'm showing you 2277.  Does that chart summarize the data

4  that was used in the application of the parameters that you

5  just described?

6  A    Yes, it does.  It shows at the top the historical data

7  when the products were on the market.  Next it shows an

8  illustration of the 45-year going forward blocks, 1920, 1965,

9  1921, 1966.  The last block of years going out in the analysis,

10  1963 to 2007.  So we have a cumulative exposure here of 100

11  percent of the time for frequency for every person for 250 days

12  -- occupational days in a year for a 45-year life span to not

13  only the highest mean concentration, but the highest mean

14  concentration to any product in the year.

15  Q    I'm showing you 2278.  Does this now reflect the inputs to

16  the dose calculation formula that you used?  That is which

17  concentrations were selected, which frequency of exposure was

18  selected, and which duration was selected?

19  A    Yes, it does.  The frequency was set to 100 percent for

20  every day, 250 days per year.  I've already discussed the

21  concentration.  And the duration was set to an occupational

22  extreme upper bound of 45 years to the highest exposure product

23  for each year within the 45-year block, and then we chose the

24  maximum of the 45-year blocks to characterize the group.

25  Q    And now I want to talk about conservatism.  That is you

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LR

1   said that you wanted to take a conservative approach.  Have you

2   -- do we have a series of slides that go through the different

3   respects in which this approach is conservative?

4   A    (No verbal response from the witnesss.)

5   Q    You have to respond.

6   A    I'm sorry.  I didn't hear you.

7   Q    I said do you have a series of slides that explain the

8   different respects in which this approach that you took was

9   conservative?

10  A    Yes, I do.

11  Q    Okay.  For purposes of kind of keeping the Court

12  remembering the part of this slide that matters, we have for

13  frequency exposure 100 percent and for duration 45 years,

14  highest exposure product for each year, and the maximum of any

15  45-year period.  Those -- that's the -- those are the

16  parameters that you've chosen?

17  A    Yes.

18  Q    I'm showing you Slide 2279.  Could you explain how -- is

19  this one of the slides that relates to the conservatism of your

20  approach?

21  A    Yes.

22  Q    Could you explain to the Court how this slide relates to

23  the conservatism of your approach?

24  A    Yes.  In -- on the right-hand side just thinking now of

25  the frequency duration assumption wetted, we have 90,000 hours

Libby

PP
Obj:
R;
F;
WP;
H;
ET;
LA

1  for the individual claimants for exposure to Grace products.

2  Q    Now, where did that 90,000 come from?  This is Category B?

3  A    This is Category B, but we used it for everybody.

4  Q    Okay.

5  A    So we're taking Category B as an illustration and one sub-

6  group of occupational individuals in Category B would be in the

7  custodial maintenance trade.  In earlier work we've done using

8  data from the literature we find estimates of the hours that

9  custodial workers actually contact asbestos-containing

10 materials in buildings, and that number is 8,100.  And for the

11 same kind of workers coming in contact with VAI attic

12 insulation, we find that number is 692.  So in a very careful

13 analysis of how much contact there would actually be, we see

14 that by choosing for screening purposes the 90,000 hours for

15 this particular example, we have been extremely conservative

16 and have set a very high screen.

17 Q    Now for the Court's benefit, V refers to vermiculite?

18 A    That's right.

19 Q    Well, we've referred obviously to Zonolite.  So it's ZAI

20 and VAI are the same thing?

21 A    Yes.

22 Q    Okay.  Now, let's turn to Slide 2280, and on 2280, in

23 order to talk about conservatism we've included 100 percent and

24 45 years as the reminders of the approach that you used?

25 A    That's right.

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  Q    Could you explain what information you have, if any, as

2  reflected on this chart that reflects the conservatism of those

3  benchmarks?  That is 100 percent for 45 years.

4  A    Well, yes.  Again for the exposure frequency in earlier

5  work we find the building maintenance worker actually is in

6  contact with the ACM material 16 percent of the time, for attic

7  insulation, VAI, Zonolite, 1 percent of the time.  And also an

8  analysis we did in one of our early -- one of the earlier

9  analysis I mentioned before, is we found that if we used

10  published data, that the trawled-on and sprayed-on products for

11  those product categories, even if we assumed that all trawled-

12  on/sprayed-on products were Grace products, which they're not,

13  would be in only 20 percent of the buildings.

14         So here all of this cancels out, because we have

15  assumed 100 percent exposure.  So every building -- every time

16  one of these maintenance workers goes to a building, it is a

17  building with Grace products, not the 20 percent, and they're

18  not spending 1 percent of the time.  They're spending 100

19  percent of the time, eight hours a day, five days a week, in

20  contact with the source of exposure depending on their labor

21  category.

22  Q    What about the 45 years?  What, if any, comparisons did

23  you do in order to analyze the conservatism of the 45-year

24  parameter?

25  A    Yes, I mentioned earlier that EPA's guidance in the

J&J COURT TRANSCRIBERS, INC.

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  Exposure Factors Handbook is for a maximum of 25 years, and

2  it's interesting when -- and I think we will discuss this

3  later, but when I reviewed -- our team reviewed the information

4  from the PIQs, we found that for those who reported the time

5  periods, the duration, we found that 100 percent were under 50

6  years, 98 percent under 45 years, and interestingly enough, 54

7  percent, the EPA number, under 25 years, and 27 percent under

8  10 years.  So this means that there's every indication that

9  we're vastly overestimating and intentionally so, because we

10 set it up as a very conservative screen, the cumulative

11 exposures for individuals in these nature of exposure

12 categories.

13 Q    Now, this is for the A and C categories?

14 A    That's for A and C.

15 Q    And when you say 27 percent under 10 years, was that under

16 10 years of exposure to a Grace product or under 10 years of

17 exposure to all asbestos products?

18 A    It was under 10 years of exposure to Grace products.

19 Q    Okay.  Now, incidentally --

20 A    Well --

21         THE COURT:  Oh, wait.  Pardon me.  I'm sorry.  I

22 misunderstood.  Just a minute until I correct my note, please.

23                    (Pause)

24         THE COURT:  Okay.  Thank you.

25 A    I should add that in the review of the questionnaires we

J&J COURT TRANSCRIBERS, INC.

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  accepted if someone self-identified as an AC, that they were

2  exposed to the Grace product.  And so, yes, we are assuming

3  that they're exposed to Grace products in the PIQ review.

4  Q    Okay, but do you actually know whether they were exposed

5  to Grace products alone or other products?

6  A    No.

7  Q    Okay.

8  A    No.

9  Q    Now, do you have one more slide that related to the

10  conservatism analysis?

11        MR. BERNICK:  Could we show the Court 2281?

12  Q    Could you explain how this slide relates to conservatism?

13  A    Well, first of all, as I've said, we don't give these

14  claimants any time to do anything else but be exposed to Grace

15  products, because this a full working lifetime of 11,250 days,

16  90,000 hours, and yet we know they had other exposures, which I

17  can talk about later.

18        Secondly, we -- if we worked with any non-Grace

19  product or non-exposed to a Grace product, of course, they had

20  no time to have that exposure, because they're -- all of

21  they're exposure time has been consumed.  And if they worked

22  less than the 11,250 days, of course, their exposures would

23  decline.  And we've seen the less-than hours in an earlier

24  exhibit.

25  Q    So put simply, you've assumed 45 years, eight hours a day

Anderson - Direct/Bernick                    75

Libby

PP
Obj:
R;
F;
UP;
H

1  exposure to Grace product.  If it turns out that they worked

2  with other products, then what effect, if any, would that have

3  on -- what would that tell you about the duration that you've

4  assumed and the dose that results from it?

5  A    If they worked with other Grace products, of course,

6  then --

7  Q    But not -- of a non --

8  A    I mean other non-Grace product.  Sorry.  In other

9  occupations.  Then -- or if they worked in other occupations

10 and had no other exposure, the number of hours would go down,

11 therefore, the cumulative exposure concentrations that have

12 been presented in this analysis would be lessened accordingly.

13 Q    On the basis of all the work that was then done with the

14 approaches you've described to the Court, did you, in fact,

15 come up with a maximum cumulative exposure for each of the

16 different categories?

17 A    Yes, I did.

18 Q    I want to show you Exhibit 2282 and have you explain that

19 to the Court.

20      MR. FINCH:  Objection, Your Honor.  This data is

21 based on the PCM/PCME conversations.  I'm going to object on

22 lack of foundation and hearsay grounds.

23      MR. MULLADY:  Join

24      THE COURT:  Mr. Bernick.

25      MR. BERNICK:  Well, I'll respond to that as follows.

Libby

PP
Obj:
R;
F;
UP;
H;
E7;
LA

1  First of all, this witness has testified that she took the mean

2  concentration calculations from Dr. Lees and used those for

3  purposes of her analysis.  She has not expressed an opinion

4  that is the same or different from Dr. Lees' opinion.  Your

5  Honor resolved that issue in connection with Dr. Lees' opinion

6  and overruled it.

7           So all of the -- for them to come out and say, oh,

8  well, this witness here, who hasn't even expressed an opinion

9  on the matter, is using Dr. Lees' data is now subject to an

10  objection that you previously overruled with respect to Dr.

11  Lees, I don't understand where that comes from.  So they can

12  make the objection, but it's already been overruled, and I'm

13  not going to go back over each element of Dr. Lees' analysis

14  with this witness she's relying on.  Now, I can bring that out

15  if you'd like.

16           MR. FINCH:  Your Honor, I stand on the objection even

17  though the prior objection is overruled.  I believe that's in

18  error.  To protect my client's interest and their rights, I

19  stand on the objection that any testimony from this witness

20  that is based on Dr. Lees' estimates, which in turn are based

21  on the PCM to PCME conversions, are (a) objectionable, because

22  neither Ms. Anderson nor Dr. Lees with an S has the expertise

23  or the foundation to make those conversions, and secondly that

24  they're hearsay.  That's the basis of the objection.  I

25  understand the Court has overruled the objection with respect

Libby

PP
Obj:
R;
F;
UP;
H;
εr;
Ln

1  to Dr. Lees with an S, but I need to preserve the objection

2  with respect to this witness as well.

3          MR. MULLADY:  Joined by the FCR.

4          MR. BERNICK:  Your Honor, I -- not only did Your

5  Honor overrule it, you overruled it after Dr. Lees with an S

6  testified very specifically about how the conversion was done,

7  and that he not only participated in the conversion, but

8  they're making something sound like a big deal.  It's a piece

9  of arithmetic.  But be that as it may, if their purpose is to

10 preserve their record as having made the objection, I don't

11 have any problem with that, but --

12         THE COURT:  All right.  The -- I think the objections

13 have a different purpose.  With respect to Dr. Lees, Dr. Lees

14 testified that he participated in designing what the conversion

15 was about and for, and I think the objection is different with

16 respect to that.  The objection as to this witness using that

17 data I think is objectionable for a different reason.  But I

18 think at this point in time the objection's also going to be

19 overruled.

20         I'm going to take a look at all of this when I get

21 all of the evidence into the case and analyze at that point in

22 time how it all goes.  But nonetheless, for now we're going to

23 finish this trial with all the witnesses here, so that in the

24 event that I do at some point have to reconsider any of this,

25 I've at least got the evidence on the record.

Libby

PP
Obj:
R;
F;
UP;
H

1    So that you understand, I do not believe that I'm

2  going to reverse this decision when I see all the evidence, but

3  nonetheless, for now it's overruled.  And in the event that I

4  think I'm wrong when I do have all the evidence, I will on my

5  own reconsider whether it's appropriate.  So it's overruled.

6        MR. BERNICK:  Let me just ask, so that I'm sure that

7  my record is also good down the road.

8  BY MR. BERNICK:

9  Q    Dr. Anderson, tell us whether or not you relied upon the

10  concentrations determined -- the concentration calculations

11  determined by Dr. Lees.

12  A    Yes, I relied on the concentration values that he

13  provided, and, in fact, one can't really proceed with a risk

14  assessment in any other way.  If we look at the guidance that's

15  in the IRIS database at EPA, it cautions against not making

16  corrections.  So while I wouldn't make them myself, I don't

17  proceed with an asbestos-type risk assessment, unless this

18  factor has been taken into account by someone qualified to do

19  that work.

20  Q    Is it customary for you in your field of expertise of risk

21  assessment to -- strike that.  Is the kind of information --

22  the information that you got from Dr. Lees regarding

23  concentration calculations including the adjustment for PCM and

24  PCME, is that the kind of information that is reliable --

25  considered to be reliable by people like yourself in the field

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LR;

1  of risk assessment?

2  A    Yes, it is.

3  Q    Okay, and in Dr. Lees' case do you have any issue in your

4  mind whatsoever concerning the qualifications and expertise of

5  Dr. Lees to perform the mean concentration determinations?

6  A    No.

7  Q    Do you have any issue about the propriety of his decision

8  to in turn rely upon a person who is expert in materials fiber

9  analysis who actually go look in the microscope once, go look

10 in the microscope twice to make the calculation?

11 A    This is routine -- routinely done in the world of risk

12 assessment for asbestos.

13 Q    Now I'd like to turn to Exhibit 2282 and have you explain

14 to the Court what it is that Exhibit 2282 reflects.

15 A    These are the resulting screening values that we have been

16 speaking of presented here for screening purposes for each of

17 the nature of exposure categories, with emphasis on the fact

18 that they are very high screens, meaning very, very

19 conservative screens, and at the bottom of this slide there's

20 the repetition of the frequency and duration assumptions.

21 Q    Let me just ask does Exhibit 2282 accurately summarize the

22 data that you have generated regarding the cumulative doses for

23 each of the categories there displayed, A through --

24 A    Yes, it does.

25 Q    Does this then bring us to the conclusion of the work on

J&J COURT TRANSCRIBERS, INC.

Lib

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  your risk assessment up through dose?

2  A    Yes.

3  Q    Okay, and do we now see in Exhibit 2296 a summary of the

4  work that has taken place that brings you to the different

5  doses that we have as displayed under the first column?

6  A    Yes, it does.

7        MR. BERNICK:  Now, Your Honor, I have I think

8  probably about 15 minutes left in the direct examination.  I

9  can complete it, or if Your Honor would feel more comfortable

10 taking the morning break, either way is fine.

11       THE COURT:  Isn't it only 11:00?

12       MR. BERNICK:  Yes.

13       THE COURT:  You want to take a recess?

14       MR. BERNICK:  I don't want to take a recess.  I'm

15 prepared to go -- take it to the end, but I just --

16       THE COURT:  I think -- why don't you finish, and then

17 we'll take a short recess and let the -- we'll take a recess

18 before cross.

19       MR. BERNICK:  Okay.  Fine.

20 BY MR. BERNICK:

21 Q    What is the next step in the analysis -- the risk

22 assessment analysis?

23 A    Well, of course, it's the risk characterization question

24 of what do these mean.  Do these -- what do these mean in terms

25 of the nature of exposure categories of claimants as far as