Anderson - Direct/Bernick                    81

Libby

PP
Obj:
R;
F;
UP;
H;
E?;
LA

1  answering that initial question that I proposed?  Did they get

2  their illness from exposure to a Grace product?

3  Q    I'm showing you 2283.  Could you explain exactly why the

4  issue is framed in the way or question is framed in the way

5  reflected on 2283?

6  A    Yes, and the question really is exactly this question,

7  what does science say about the significance of doses resulting

8  from exposure to Grace products.

9  Q    In order to answer that question, I see that the next step

10 is reflected in 2269.  Just to compare the doses to these

11 benchmarks, could you describe in your own terms what is

12 involved in that exercise?

13 A    Yes, as I spoke of earlier, we spoke of the Koch

14 principles.  We spoke of the world of epidemiology and dose

15 response, and I know that this Court has heard from Dr.

16 Moolgavkar who works in this particular field, and the concept

17 of having now these cumulative exposures and asking this

18 essential question really is what does it mean in terms of

19 disease causation or these high levels, low levels, how can we

20 compare them to some benchmarks that might give us guidance as

21 to their significance.

22 Q    What benchmarks did you use?

23 A    I used benchmarks from Dr. Moolgavkar's analysis, and I

24 think I emphasized in my deposition that I have the utmost

25 confidence in Dr. Moolgavkar, but there's a long history here.

J&J COURT TRANSCRIBERS, INC.

Libby

PP
Obj.
R;
F;
UP;
H;
ET;
LA

1  There's a longer history than just his opinions, because this

2  work has been evolving over many, many years, and his work is

3  the essential work that brings all of this literature together,

4  but we find a great deal of support in the literature for his

5  work.

6  Q    Have you offered an independent opinion with respect to

7  the epidemiology, or are you relying upon Dr. Moolgavkar's

8  work?

9  A    I'm relying on Dr. Moolgavkar's work.

10  Q    I'm showing you 2262.  Is this --

11        MR. BERNICK:  I believe, Your Honor, it may actually

12  already be in evidence under a different number.

13  Q    But are these the benchmarks -- from what Dr. Moolgavkar,

14  but are these the benchmarks that you used in the course of

15  your analysis?

16  A    Yes, they are.

17  Q    Okay.  Now, Dr. Moolgavkar talked about the fact that

18  there were not reliable data -- observational data that was

19  gathered below 15 -- a burden of 15 fibers per mil per year.

20  Are you familiar with the 15 fiber per mil -- fiber per mil per

21  year concept?

22  A    Yes, I am.

23  Q    Okay, and he then further observed that once you get below

24  15, you're in, therefore, a range of the unobserved, and then

25  below 2.8, which came from the auto workers study or the auto

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  mechanics study, you were in a range of risk, in a sense,

2  affirmatively not being seen.  Now, I don't want to ask you

3  about the details of those different numbers.  I simply want to

4  ask you are you familiar with those basic concepts?  That is a

5  range of observed data -- reliably-observed data, a range where

6  there isn't reliable observational data, and then an area where

7  there is reliable observational data, but it doesn't show a

8  risk.

9  A    Yes, I am, and we have spoken of this concept since 1976.

10 Q    I want to show --

11 A    The range of observation --

12 Q    Wait.  Let me interrupt you for just a second --

13 A    Yes.

14 Q    -- and just put on the board 2284, which I believe already

15 has been used by Dr. Moolgavkar, but I'm -- my focus with you

16 is to simply have you, as you were beginning to say, provide

17 the historical regulatory perspective.  That's what I want you

18 to comment on, is the regulatory side of what is illustrated in

19 that chart.

20 A    Yes, I spoke earlier on the earlier slide of the

21 divergence between evidence of causality and evidence that is a

22 preemptive public health policy-based approach.  And here the

23 first one of these curves was drawn when I was at EPA in 1976.

24 Conceptually, we see with agents an observed range from human

25 studies, sometimes only animal studies, but the important thing

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

 1  is as we leave that range of observation, we regard that range

 2  as science based.

 3          As we go downward, EPA to this day -- and we created

 4  this curve in 1976 as a means of establishing a plausible upper

 5  bound on the risk, meaning the real risk could be less even

 6  approaching zero, and we put that label on every document that

 7  we wrote at EPA when I was there.  And I think the other

 8  important thing is I've observed the use of this generic

 9  approach by the National Academy of Sciences and the Institute

10  of Medicine.  I was familiar with and commented on some of

11  their work, and an example of that work is the Gulf War

12  veterans study where they actually made distinctions about

13  establishing causality from exposure for those individuals and

14  chose to use only the observed range for that work.

15  Q    Thank you.  And that gets back to the difference between

16  science --

17  A    That's right.

18  Q    -- and the regulatory guidance or rule?

19  A    That's right, and the inference judgments that I used to

20  fill gaps, so that rule making can go forward.

21  Q    Thank you.  I want to now turn to how it is that you used

22  -- if we could go back to 2262, you said that you used Dr.

23  Moolgavkar's benchmarks.  I want to talk about how it is that

24  you applied or used those benchmarks by reference to the

25  cumulative doses that you determine in part on the basis of Dr.

*Libby*

PP.
Obj:
R;
F;
UP;
H;
E7;
LA

1  Lees' with an S work.  And I want to show you Exhibit 2285 and

2  ask you whether this would assist you in explaining to the

3  Court the comparison that you did.  The answer to that is yes

4  or no.

5  A    Yes, I think it will assist us.

6  Q    Okay, so now could you explain how -- what it is that is

7  reflected in 2285?

8  A    Yes, the values that we saw earlier and which are

9  displayed here as the dose cumulative exposure values can now

10  be compared to these benchmarks to give us some guidance as to

11  what they mean.  We see for the A category an accedence of

12  these conservative screens of the 15.  We see for the B

13  category an accedence of no benchmark.  For the C category the

14  maximum is a 12, so it's below the 15.  It's in the zone of

15  inference.  It's above the relative risk, a modeled calculation

16  for Libby Fibers, but it's -- well, let's move on to D.  D and

17  E are very small exposures relative to the benchmarks, and they

18  are under all of the benchmarks.

19  Q    Okay.  This compare --

20  A    And I should note that the 3.2 number is a mixed fiber

21  number that includes chrysitolite, which is the most potent of

22  the fibers and is not in the Grace product, so I don't take

23  that benchmark to be particularly useful.

24  Q    That's the one that's --

25       THE COURT:  Which one?  I'm sorry.  Which one.  I'm

**J&J COURT TRANSCRIBERS, INC.**

*PP*
*Obj:*
*R;*
*F;*
*UP;*
*H;*
*ET;*
*LA*

*Libby*

1  sorry?

2            THE WITNESS:  Three point two.

3            THE COURT:  Point two.

4            THE WITNESS:  It's referred to as meso-relative risk

5  to mixed fibers.

6            THE COURT:  Okay.

7            THE WITNESS:  My understanding from speaking with Dr.

8  Moolgavkar is that's taken from --

9            MR. MULLADY:  Objection, Your Honor.

10            THE WITNESS:  -- an EPA --

11            MR. MULLADY:  Objection, Your Honor, the witness is

12  about to tell us about a conversation she had with Dr.

13  Moolgavkar about these fiber concentrations.  That's hearsay.

14            THE COURT:  She is, but --

15            MR. BERNICK:  No, it --

16            THE COURT:  -- Dr. Moolgavkar's already made that

17  same statement yesterday on the stand.

18            MR. BERNICK:  Right, but it's -- she's an expert.

19            THE COURT:  He also testified to that same fact on

20  the stand yesterday.  The record will substantiate that.  He

21  made the same statement on the stand yesterday.

22            MR. BERNICK:  Right.

23  BY MR. BERNICK:

24  Q    Just to review briefly, we have marked here the 2.8, which

25  he said came from the auto workers study or the risk was not

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  observed, the relative risk calculation -- relative risk of 2

2  with respect to mixed fibers, the 3.2, the working lifetime

3  exposure, the OSHA fell 4.5, the relative risk of 2 for --

4  based on modeling for Libby fibers and meso, 15 which is the

5  lowest observed average exposure for meso, and then ranging way

6  up to asbestosis threshold, chrysotile, relative risk of 2 and

7  the like.  Now, does Exhibit 2285 accurately summarize the

8  comparative data that you used in connection with benchmarking

9  the dose -- the cumulative doses with respect to the five

10  categories?

11  A    Yes, it does.

12  Q    I want to turn to ask you and show you 2286.  Could you

13  explain, based upon the comparison that you did, what

14  determinations you made with respect to the exposures as

15  determined in accordance with your risk assessment?  What

16  assessment did you make with respect to the exposures of people

17  who worked in occupations A, B, C, D, and E?  What decision or

18  what determination did you make?

19  A    Well, I found unequivocally that people in Categories B,

20  D, and E are well below all of the benchmarks and need not be

21  considered further.  The Categories A and C claimants I have

22  suggested should be further evaluated despite the fact that the

23  C category is below the observed benchmark, and they have

24  passed through -- if we want to call this a screening exercise,

25  those two categories have passed through for further analysis

Libby

PP:
Obj:
R;
F;
UP;
H;
ET;
LR

1  but not B, D, and E.

2  Q    I want to take the last step now that we see on the board,

3  2296, which we see it's called Risk for Claimants.  Why is it

4  that risk assessment goes beyond the comparison of calculated

5  doses in benchmarks?  Why is it that the risk assessment takes

6  another step?

7  A    I'm not sure I understand the question.

8  Q    Yes.  Well, why do we have another step to take here?

9  A    Oh.

10  Q    Why another step?

11  A    Well, I mean the important issue, as I understand it, is

12  what are the merits of these claims going forward, and the

13  information that I have now provided, as I understand it, will

14  go into a claims review analysis for further evaluation.  So

15  the results of this analysis now go to the claims reviewers and

16  Dr. Florence.

17  Q    So we're talking about a risk for a population of people.

18  A    That's right.

19  Q    Okay.  Now, in order to get into this area could you tell

20  the Court whether or not at your direction the PIQs -- a

21  certain number of PIQs and a certain number of closed claims

22  were reviewed?

23  A    Yes, they were.

24  Q    Okay, and showing you 2289, does this reflect -- 2289

25  first.  Does this reflect the claims that reviewed by people in

Libby

PP
Obj:
R;
F
UP;
H;
E?;
LR

1  your organization at your direction for purposes of figuring

2  out what categories they belong?

3  A    Yes.

4  Q    Okay, and we have 15 hundred 96 mesothelioma claims, 32

5  lung cancer claims, 115 laryngeal cancer claims, 152 non-

6  malignant disease claims, and then with respect to the closed

7  claims, 350 mesothelioma claims.  Is that right?

8  A    That's correct.

9  Q    Okay.  Now was there a procedure -- were there procedures

10 established for purposes of this review?

11 A    Yes, there were very strict procedures established with

12 the team who did the review?

13 Q    Showing you 2288, does this slide -- would this slide

14 assist you in explaining the procedures or the steps that were

15 taken in order to conduct this review?

16 A    Yes, it does.  We first needed to and did design a

17 protocol to insure the proper assignment of claimants to the

18 nature of exposure categories that would be consistent with Dr.

19 Lees' definitions of exposure.

20 Q    Okay.  Let's -- Dr. Lees' defined categories on the basis

21 of those definitions looked for corresponding industrial

22 hygiene data, and then in order -- and then in doing the claims

23 review to find out what categories people belonged in, tell us

24 why it was important for the same definitions to be used.  That

25 is not just the definitions that somebody else might think of

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1   like a claimant or a worker or anybody.  Why was it important

2   to use Dr. Lees' definitions in reviewing the claim files?

3   A    Because we were assigning these claimants to a nature of

4   exposure category, and he had defined that category and

5   collected the data, analyzed the data, and presented the data.

6   So the two had to mesh.  They had to be identical, as close as

7   we could get them.

8   Q    Okay.  Why don't you continue to go on and talk about the

9   steps that were undertaken thereafter in connection with the

10  review?

11  A    Well, next the review team was identified, obviously

12  choosing people with appropriate experience and credentials.

13  We established training sessions.  We established quality

14  control procedures.  We had double review.  And the actual

15  claims review proceeded along the following lines.  Obviously,

16  the claims were inconsistent, and there were times when things

17  were not quite as simple as other times, but we, first of all,

18  accepted the self-identified claimants.  If they checked the

19  box that they were asked to check, A, B, C, D, or E, we

20  accepted that.  If they checked more than one box, we elevated

21  their exposures to the highest exposure category.  So they'd

22  become an A or C instead of if they checked all boxes.

23         If a claimant did not self-identify, then we bent

24  over backwards to review the attached materials referred to

25  here as best evidence.  We wanted to try as hard as we could to

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  classify the claimants from that attached material.  So we did

2  review the attachments, and we looked for identifying

3  statements of what kind of product they were exposed to, how

4  they were exposed, and over what durations.

5  Q    Okay.

6  A    If, in fact, there was insufficient information and after

7  all of the review we called it insufficient, allocated it to

8  insufficient category, and I've already mentioned always

9  elevating to the highest category if they mentioned several

10 possible exposures.

11 Q    I want to focus on one particular feature, which you've

12 just talked about, and use Slide 2290 to do that.

13       MR. BERNICK:  Could you show 2290, P.J.?

14 Q    There have been questions asked about, well, what if

15 somebody says here's what my job was, and so I -- and I want

16 you to explain how it is that you figured out what category a

17 claimant belonged in where they had actually checked off the

18 box on the form or not checked off the box on the form.

19 A    Well, if they checked off the box on the form, we call

20 that the claimant's identified the nature of exposure.  We did

21 not question that.  If they checked the box, we accepted it.

22 Q    Or if their lawyer checked the box, and they signed off on

23 it.

24 A    That's right.

25 Q    Okay.

Libby

PP
Obj:
R;
F;
UP;
H;
E1;
LA

1  A    Whoever checked the box, it was accepted.  We then went to

2  the attached materials where there was no self-identification,

3  and we reviewed the claimant's information that was attached.

4  And I think I've discussed some of the elements of that review.

5  If there were inconsistencies, if there were questions, we had

6  a key senior team to help answer those questions about what had

7  been found.

8  Q    Okay.  Showing you 2291, based upon the results that came

9  from this review process, were you later able to compare and

10  see whether there was a significant difference between the

11  self-identifieds and the best evidence claimants when it came

12  to these different categories?  And just explain 2291, if you

13  would.

14  A    Yes, on the left-hand side there is a pie chart that shows

15  the percentages of nature of exposure categories that the self-

16  identified claimants fell into.  So we see 77 percent of the B,

17  D, and E, 19 percent fell into the A/C category, and 4 percent

18  into the other category.  On the right-hand side we see a pie

19  chart that reflected what I'm referring to as the best

20  evidence.  This means there was no self-identification.

21        We have to go to the attached materials and analyze

22  the attached materials in order to assign a nature of exposure

23  category, and we see here the very similar results.  We had 90

24  -- 79 percent B, D, and E's versus 77.  The A's and C's turned

25  out to be pretty much identical, and the opposite two percent

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  difference.  So this gave us confidence that we had a pattern

2  that was evolving and was repeated in the best evidence review.

3  Q    Okay.  Is 2291 an accurate summary of the data that exists

4  on that subject?

5  A    Yes, it is.

6  Q    Turning to 2292, what did you find out after the -- let me

7  just ask did you have the opportunity to look at the results of

8  the review to gather further information about how these -- how

9  these claimants based upon their attachments compared to the

10 benchmarks that applied to your work?

11 A    Yes, and this slide summarizes that work.  We did the same

12 kind of review for the lung cancer claimants and the -- for the

13 laryngeal cancer claimants, and we find the results of those

14 analyses all were below the benchmarks.

15 Q    Okay.  Well, let's be --

16 A    They did not exceed the benchmarks.

17 Q    Let's be clear about this.  Were you able to -- this slide

18 reflects a comparison between the results of your review, on

19 the one hand, and the benchmarks, on the other.  Were you able

20 to make that comparison with respect to all people who make

21 claims that you reviewed for lung cancer?  That is is the

22 comparison one that you were able to make for all the claimants

23 that you looked at?

24 A    Yes, we could -- well, I don't recall how many did not

25 provide sufficient information.

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  Q    Okay, so this is where they had sufficient information to

2  make --

3  A    Well, we had sufficient information, yes.

4  Q    Okay.

5  A    We did the very same thing we did with the other reviews.

6  Q    Okay, and you said all claims did not exceed benchmarks

7  with respect to both lung cancer and laryngeal cancer?

8  A    That's right.  And you'll recall that those are very high

9  benchmarks on Dr. Moolgavkar's benchmark chart.

10 Q    What did you find out with respect to their status as

11 smokers?

12 A    Well, we found, of course, there's a confounder with

13 smoking, and we found that all of the lung cancer claimants but

14 one was a smoker, and about 90 percent of the claimants who

15 claimed laryngeal cancer were smokers.

16 Q    Could you tell us to what extent -- strike that.  Two two

17 nine two, does it accurately summarize the data that you

18 gathered with respect to the comparison of claimants to

19 benchmarks on lung cancer and laryngeal cancer?

20 A    Yes.

21 Q    And also their smoking status?

22 A    Yes.

23 Q    Okay.  Turning to 2293, let's turn to mesothelioma and

24 mesothelioma for people in Categories A and C, the ones that

25 passed through the filter.  Could you tell us in cases where it

Anderson - Direct/Bernick                    95

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  was possible to make the determination based upon the data that

2  you had how the A -- the mesothelioma claimants who fell into

3  Categories A and C, how they compared with the benchmarks?

4  A    Yes, this was interesting, because for those claimants who

5  gave us information about that duration of exposure, we were

6  able to adjust the duration from 45 years to the number of

7  years they gave us, and, of course, then we had to go back to

8  that rolling average, those tables, and select for that time

9  period that they gave us, what the exposures would be.  But in

10 essence what we find for the A's and C's is that 98 percent are

11 lower than 15 fibers per mil year, and 16 percent are lower,

12 and that's the benchmark that's at the bottom of the range of

13 observation.  And we found 69 percent are lower than the 8.9

14 fibers per mil year.

15       So that's just one adjustment from the very high

16 screening values we used.  All of the others are in here, the

17 100 percent exposure, frequency 250 days a year.  The only

18 adjustment is just the duration adjustment we could claim.

19 Q    I want to make that very clear.  You went back to the

20 PIQs, and based on the review you looked to the people who had

21 fallen into Categories A and C and had mesothelioma, and where

22 the information regarding duration was available you

23 substituted in your risk assessment calculation the actual

24 duration as reflected in --

25 A    Correct.

J&J COURT TRANSCRIBERS, INC.

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
Lए

1  Q    -- the PIQ.  But when it came to the other assumptions

2  that you made, that is regarding the product that they were

3  exposed to where you maximized the product concentration and

4  the very -- and the other assumptions that you used, did you

5  change those conservative assumptions to be in a sense actual

6  based upon the PIQ data, or did you continue to make those

7  other conservative assumptions?

8          MR. MULLADY:  Your Honor, objection.

9  A    Continued to make all of the other conservative --

10         MR. MULLADY:  Objection, Your Honor.  Excuse me.

11 I've been pretty tolerant of the leading up to this point, but

12 this is a very important area of the case.  I think we just

13 heard Mr. Bernick testify for about five minutes.

14         MR. BERNICK:  Well, actually, if you want to have the

15 record read back, the witness said exactly the same point.

16 That is that she had kept the other matters constant, and I

17 wanted to make sure that the details of that were evident to

18 the Court.

19 Q    Happy to have the question rephrased, so that she can

20 explain exactly what it is that you meant when you said in

21 response to my question that you altered the duration alone.

22 Just explain to the Court what you meant.

23 A    All right.  The only thing that we could glean from the

24 questionnaire data that could be useful to this analysis that

25 would alter the analysis in any way was the duration

**J&J COURT TRANSCRIBERS, INC.**

Anderson - Direct/Bernick                    97

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  information.   So we altered the 45 years to match the actual

2  years that the claimants provided for us.  We continued to use

3  all of the other conservative assumptions, and the only other

4  thing we did is to match -- for those years they claimed, we

5  have to go back to that rolling, instead of 45 year, that time

6  period, select the highest value for the year -- for each year

7  in the time period and do that analysis.  All of the other

8  maximum values were retained, nothing else is adjusted.

9  Q    Okay.  On the basis of this analysis what conclusion did

10 you reach with respect to the A/C claimants?

11 A    I concluded that on the -- I wrote this to -- on the

12 right-hand side that there's a very high probability that many

13 or most of the A's and C's that we are saying should be further

14 evaluated actually are generously passed through the screen and

15 passed on for further evaluation, because we see here just the

16 impact of the alteration of one very conservative factor.

17 Q    Let's -- go ahead.  Let's turn to 2294.  Does this slide

18 now relate to the B, D, and E mesothelioma claimants?

19 A    Yes, it does.

20 Q    And could you tell us what it is that this slide reflects?

21 A    All right.  This slide is a similar analysis.  This is for

22 the B's, D's, and E's, and in those claimant questionnaires

23 where they gave us their duration of exposure, we did the very

24 same thing.  We went back and took that duration of exposure,

25 went to the data tables for the history of the products that

J&J COURT TRANSCRIBERS, INC.

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  were in trades of commerce during that block of identified

2  years, again selected the highest value for each year in the

3  identified block, did the rolling average, and kept the highest

4  value for those claimants.  And what -- we altered absolutely

5  nothing else.

6          We kept all of the maximum values, and what you see

7  here is a shifting of the numbers.  One hundred percent or less

8  than the background -- I mean less than the benchmark except

9  background, and I made a very similar conclusion here  but a

10  opposite one, and that is a very low probability, and no

11  scientific evidence whatsoever that any of these B's, D's, and

12  E's would exceed the benchmarks.

13  Q    Okay, and does 2294 accurately summarize the data that

14  came from that comparison?

15  A    Yes, it does.

16  Q    Turning to 2295, did you also look to see -- you had --

17  you told us that you assumed that people spent their entire

18  lives -- eight -- working lives eight hours a day working with

19  Grace product.  Based upon your review of the PIQs, what did

20  you find about what the actual evidence showed?

21  A    Well, in the PIQs I found that 94 percent of the claimants

22  in Category A and C asserted other claims against other

23  entities, and in 93 percent of the B's, D's, and E's asserted

24  claims against other entities.  So this tells me that the 45

25  years is certainly too much.  If they were doing other

Libby

PP;
Obj;
R;
F;
UP;
H;
ET;
LA

1  occupations, they could not have had that much exposure most

2  likely.

3  Q    And what would that have done to your cumulative

4  calculations by category if they actually had factored in this

5  actual data?

6  A    Well, if they left the workforce of exposure to Grace

7  products and went into the workforce of exposure to other

8  products, these numbers would be lowered in a commensurate way.

9  Q    Were you able to make this comparison or derive these data

10 with respect to all the claimants that you looked at?  That's

11 all the mesothelioma claimants.

12 A    I can't recall, but I think most of them that we reviewed

13 did provide -- we were able to make this comparison.

14 Q    Okay.  Let's go back to then our Board 2296.

15            THE COURT:  Mr. Bernick --

16            MR. BERNICK:  Yes.

17            THE COURT:  -- you said 15 minutes 40 minutes ago.  I

18 think what we're going to do is take the recess if you're going

19 to be much longer.  How long are you going to be?

20            MR. BERNICK:  Is it really that bad, Your Honor?

21            THE COURT:  Yes, it is.

22            MR. BERNICK:  Well, I apologize.  I have this

23 question.  The last strip, and I've got three questions.

24            THE COURT:  All right.  We'll finish.

25            MR. BERNICK:  I know if I didn't make a

Libby

PP
Obj:
R;
F;
UP,
H;
ET;
LA

1  representation about how much longer it would take --

2  Q    Are we now in a position to peel off the last magnet and

3  show the balance of the assessments that you did as reflected

4  now in 2296?

5  A    Yes.

6  Q    Okay, and what conclusion did you reach with respect to

7  Categories A and C when it came -- comes to the evidence that

8  came from the PIQ review?

9  A    Yes, I alluded to earlier, we have suggested that there's

10  some scientific evidence that those claims should be further

11  reviewed.  For the B's, D's, and E's, we found no such

12  evidence.

13  Q    Okay.  Question 1, have you reached any conclusion as to

14  whether the process that you followed in conducting your risk

15  assessment analysis complies with accepted methods for

16  assessing whether there's scientific support for the claims

17  that have been made against Grace that you reviewed?

18  A    Yes, this is certainly accepted scientific methodology.

19  Q    Are you aware of any other accepted or any other accepted

20  or reliable scientific method for determining whether claims --

21  asbestos claims or claims of exposure and causation from

22  asbestos, whether they are supported by reliable science?  Is

23  there any other accepted or reliable method for reaching that

24  assessment?

25  A    I am under -- I'm unaware of any other method that would

Libby

PP
Obj:
R;
F;
UF;
H;
ET;
LA

1  allow one to answer that essential question I posed in the

2  beginning, and that is our -- the claimants exposure groups

3  getting their disease from Grace product exposure.  Without

4  doing this assessment, I have no idea alternatively how any

5  methodology can answer that question.

6  Q    Okay.  With respect to the claims that fall into

7  Categories B, D, and E, do you have an opinion on whether there

8  is reliable science supporting those claims of disease as being

9  caused in whole or in part by exposure to Grace asbestos?  Do

10 you have an opinion?

11           THE COURT:  We -- I'm sorry.

12           MR. MULLADY:  Objection for --

13           THE COURT:  We --

14           MR. MULLADY:  Objection for the record, Your Honor.

15           THE COURT:  Will you read the question for me again,

16 please?

17           MR. BERNICK:  Yes.

18 Q    Do you have an opinion about whether there is reliable

19 science to support the proposition that the claims falling into

20 B, D, and E were caused in part or in whole by exposure to

21 Grace asbestos?  Do you have an opinion?

22 A    Yes, I do.

23 Q    And what is your opinion?

24           MR. MULLADY:  Objection.  For the record, Your Honor,

25 the objection is to foundation.  This witness is -- and this

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
4A

1  will be borne out on cross examination.  But for the record,

2  the opinion is incompetent and without foundation, because the

3  witness has not worked with any actual exposure data from any

4  actual Grace claimants in this case.  She has not taken time

5  waited average exposure samples, or I should say Dr. Lees did

6  not take time waited average exposure samples from any actual

7  Grace claimants.  She's not been presented with that data.

8          She has been provided with instead the results of

9  point-in-time studies and a very -- of a very small number of

10  studies done by Dr. Lees of other workers in the vicinity of

11  Grace products at different times who were not claimants in

12  this case.  Average or mean values were taken by Dr. Lees from

13  those limited numbers of studies and provided to the witness.

14  She has in turn then used that data to make judgments about the

15  merits of actual claimants' cases on the basis of that evidence

16  and not the evidence submitted by the claimants themselves

17  insofar as their time waited average exposures and quantitative

18  metrics are concerned.

19          I could make -- I could say a lot more about this

20  issue, but I think that's the essence of the foundational

21  objection to the offer of this opinion.

22          MR. BERNICK:  Well, the foundational objection would

23  be properly lodged, although I didn't hear it, under Rule 702

24  and 703 of the Federal Rules of Evidence.  Now, I asked the

25  witness a very simple question in order to address any

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1   remaining or any -- just to address the objection.

2   BY MR. BERNICK:

3   Q    In all the work that you did in coming to the point where

4   you were about to answer the question that I just asked you, I

5   take it from your testimony that you relied upon Dr. Lees'

6   work, Dr. Moolgavkar's work, and you relied upon the PIQ

7   analysis.  Is that right?

8   A    That's correct.

9   Q    Okay, and I just want you to tell me whether the work and

10  the materials that you relied upon for purposes of offering an

11  opinion on whether these claims are supported by reliable

12  science, are those materials and is that -- are they the kind

13  of information and evidence that people within the field of

14  risk assessment find to be reliable for purposes of offering

15  opinions of doing scientific work in that area?

16  A    Absolutely.

17  Q    Okay.  Is there any respect in which you believe that the

18  materials that you've relied upon don't satisfy that

19  requirement?  That is the requirement that they be the kind of

20  materials that experts within your field find reliable for

21  purposes of their expert work?

22  A    I found that reliable.  It's what I would expect, and I

23  would not have used them otherwise.

24  Q    Thank you.  And based upon that foundation and based upon

25  the work that you have done, could you tell us what your

J&J COURT TRANSCRIBERS, INC.

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1    opinion is as to whether there is reliable science as to claims

2    falling within A and C -- whether there is reliable science to

3    say that those claims of injury were caused by Grace exposure

4    either in part or in whole?  Is there such reliable science?

5              MR. MULLADY:  Objection.

6    A    For A's and C's --

7              THE COURT:  Just a minute.  I believe that this would

8    go to the weight not to the admissibility.  Once again, I'm

9    going to have to consider all of this when I get all of this

10   testimony in and have an opportunity to look at the entire

11   record, but I -- so for now I'm going to overrule it.  I

12   believe this will go to weight not admissibility.

13             MR. MULLADY:  Your Honor, just one more statement for

14   the record --

15             THE COURT:  Yes.

16             MR. MULLADY:  -- to clarify our position.  The

17   objection is not to under Rule 702 and 703 in the sense that

18   the witness cannot rely on the opinions of these other experts.

19   It is not -- that is not the basis for the objection.  The

20   basis for the objection is that the work of these other experts

21   does not put this witness in a position to draw the conclusions

22   that she is drawing.  In effect, the underlying predicate for

23   the opinion she's giving is incompetent to deliver the result

24   that she wants to present before the Court.

25             THE COURT:  Your --

                    **J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1    MR. BERNICK:  There's no such things as --

2    THE COURT:  Your objection, if I understand it,

3  essentially is going to the medical condition of the particular

4  claimants involved.  If I understand what you're saying, you're

5  attempting, I think, to get to whether or not each individual

6  claimant has a condition that is founded on a Grace product?

7    MR. MULLADY:  Not exactly, Your Honor.

8    THE COURT:  No.  Okay.

9    MR. MULLADY:  This more goes to the issue of

10  exposure.

11    THE COURT:  All right.

12    MR. MULLADY:  The exposure estimates that she's using

13  are averages of exposure TWA fiber concentrations gathered by

14  Dr. Lees from a limited sample of observations of people who

15  work around -- who have worked around Grace products.  It's our

16  position that in order to express a competent opinion on

17  causation in this case, whatever witnesses Grace would tender

18  this opinion through, would have to testify that on the basis

19  of actual quantitative data from actual claimants and a review

20  of those claimants' actual exposure histories, there is or

21  there is not scientific causation.  We do not have that from

22  this witness, and we certainly didn't hear it from Dr. Lees or

23  Dr. Moolgavkar, and that's the basis for our objection.

24    MR. BERNICK:  Yes, well, the interesting thing is,

25  Your Honor, that this is an argument that -- this is an