Libby

PP
Obj:
R;
F;
UP;
H;
ET;
La

1  argument in part is -- reflects an issue of their own creation.

2  We asked them for all of what they had to support these claims.

3  This witness' people were given the results of that request.

4  Your Honor will well recall how arduous our efforts were to

5  find anything else.

6        In this particular case we have industrial hygiene

7  data that describes the categories.  We take exactly the

8  definition for those categories that was used to collect that

9  or organize that industrial hygiene data, and then her people

10  go and review the PIQs where the PIQs say I was an X, then we

11  take it at face.  Where they say -- don't say it, we then

12  review the attachments to see what category they've fallen in.

13        What counsel's argument says is that you can't -- you

14  don't even have -- you know, it's not a question of competent

15  evidence.  It has nothing to do with the issue of competence.

16  The question is whether it is probative evidence -- relevant

17  evidence that you have an industrial hygienist who has studied

18  and gathered data with respect to what is definitionally the

19  same exposure, or whether in every single asbestos case you

20  have to have somebody -- industrial hygienist that was there at

21  the time and walked around with each individual claimant to get

22  their particular exposure at the time.

23        Now, he may say, well, that's what really is

24  necessary to do an industrial hygiene analysis.  Maybe that's

25  what he wants to say.  It's completely different from what

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  they've said in every other context, which is that none of this

2  really matters scientifically.

3       But that would be a position that would go to the

4  weight of the industrial hygiene data for its application to

5  this group of people.  It does not go to admissibility, and not

6  only that, it's completely impossible and a farfetched notion

7  of relevance, but whatever it is, it's a question of probative

8  value.  It is not a question of admissibility.  Admissibility

9  is governed completely and utterly by Rule 702 and 703.

10       This witness was qualified as an expert with respect

11  to risk assessment.  She has now said that the basis of her

12  opinion is the information that was provided by the industrial

13  hygienist. Seven 0 two and 703 govern the totality of that

14  equation.  So I just don't understand what it is that the

15  objection is, but I'd like to get the witness' answer to my

16  question finally, so that we can go on and conclude.

17       THE COURT:  Well, I understand the basis for the

18  objection.  I think, however, you know, the -- as we keep

19  talking in this case about the sauce for the goose and sauce

20  for the gander, well, it's going to be a problem on the other

21  side, too.  So I know your evidence isn't going to come in the

22  same way, but nonetheless, at some point in time these

23  claimants have to prove exposure.

24       And at this point in time these plants don't operate

25  with this product in place anymore, so we're going to have a

Libby

PP
Obj:
R;
F;
UP;
H.;
ET;
Lα

1  trust at some point, folks, that have to pay claims, and I'm

2  here to tell you at this point the evidence is in.  The PIQs

3  are finished.  The x-rays have been submitted, and this Court's

4  order was very clear the current claims don't get a second bite

5  at this apple.

6           MR. FINCH:  I join in Mr. Mullady's objection.  I

7  would note for the record though that the personal injury

8  questionnaires do not ask the claimants to identify who they're

9  testifying experts would be as an industrial hygienist for the

10  purposes of working up an individual exposure assessment for

11  that individual person.  None of your orders ordered them to --

12           THE COURT:  That's correct.

13           MR. FINCH:  -- identify their testifying experts.

14  That is an individual exposure assessment question --

15           THE COURT:  Yes, it is.

16           MR. FINCH:  -- that would be at issue in an

17  individual case.

18           THE COURT:  Yes, it would.

19           MR. FINCH:  Our basic objection is a relevance of

20  risk-based population estimates are relevant to the question of

21  individual causation in each individual case as to which no

22  plaintiff has been required to put on their causation proof

23  through the questionnaires.  That's the basis for the

24  objection.

25           MR. BERNICK:  I'd be happy to debate -- I'm sorry.

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1    THE COURT:  The individuals have not been required to

2  produce that type -- that level of witness identification.

3  They have been required to file their proofs of claim and to

4  address the information by way of discovery in response to the

5  PIQs, and this Court's orders have been very clear with respect

6  to the fact that they have been required to provide that

7  information.  The objections are noted.  I still believe this

8  is going to go to weight.  Nonetheless, I am going to take this

9  -- as I said before, when I get the whole record, I will take a

10  look at all of these objections in the context when I have a

11  chance to take a look at the whole record.  Mr. Mullady.

12    MR. MULLADY:  Yes, Your Honor.  Respectfully, I do

13  respect the Court's ruling.  One additional basis for my

14  objection.  We represent the future claimants in this case, as

15  the Court is aware.  Our future claimants, of course, did not

16  submit information in the form of PIQs.

17    THE COURT:  Yes, sir.

18    MR. MULLADY:  We, therefore, would object to the

19  admissibility of this evidence as to us in its entirety, and

20  failing that -- well, we would object on that basis and

21  principally under Rule 403, because whatever probative value

22  that evidence would have as to future claimants is greatly

23  outweighed by the prejudicial effect of using, for example,

24  mean averages of exposures taken from actual claimant and

25  applying those averages to screen current claimants which are

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LR

1    then extrapolated to exclude the claims and disallow in effect

2    the claims of thousands of future claimants.

3              THE COURT:  Now, wait.

4              MR. BERNICK:  Now, yes.

5              THE COURT:  First of all, I am in no way disallowing

6    any future client's claims or current -- future demand holders'

7    claims.  We've had that information on this record for quite

8    some time.  That's premise Number 1.  Premise --

9              MR. MULLADY:  I said in effect.  I'm sorry.

10             THE COURT:  Premise Number 2 is that you're here

11   representing those people who obviously are currently alive.

12   Whether or not they know that they have a particular asbestos

13   disease, they are alive.  They had to have worked or been

14   exposed to a Grace product, and this evidence as is clearly

15   relevant to them as it is to a current claim holder.  And

16   that's why you're here, Mr. Mullady.  You stand in their shoes,

17   and every bit of discovery work you did is for their benefit,

18   so the fact that they are not here and don't know that they may

19   exist right now, that's why you're here, sir, and as a result,

20   your work is clearly as relevant, and you stand in their shoes,

21   and that objection is overruled on that basis.  Mr. Bernick.

22             MR. BERNICK:  Yes, I'm tempted to respond

23   substantively.

24             THE COURT:  You don't need to respond.  You just won

25   that objection temporarily --

**J&J COURT TRANSCRIBERS, INC.**

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1    MR. BERNICK:  Yes, I --

2    THE COURT:  -- and if there's an issue down the road,

3  you'll brief it.

4    MR. BERNICK:  Well, we'll -- we're looking forward to

5  getting into that so --

6    THE COURT:  All right.  You may answer it, Doctor.

7    MR. BERNICK:  Can get I get --

8  BY MR. BERNICK:

9  Q   Dr. Anderson, the question is whether in your view as to

10  Categories B, D, and E --

11    THE COURT:  No, it was to A and C, actually.

12  Q   Okay.  Well, to A and C -- I happened to begin with A and

13  C.  I'm going to get to all of them.  What is your opinion on

14  whether there is reliable science to support -- based upon the

15  information that you have to support the proposition that their

16  diseases may have been caused in part or in whole by exposure

17  to Grace asbestos?

18  A   For the A's and C's, as I've said before, I think I have

19  been very generous, but I have said that those claims should be

20  evaluated further.  That there is some reliable scientific

21  evidence that points that direction.

22  Q   Okay.  Same question with respect to B, D, and E.

23  A   For B's, D's, and E's, the cumulative exposure values --

24  the maximum of cumulative exposure values are so small.  They

25  are so very small as to not exceed any benchmark.  I do not

Libby

PP
Obj;
R;
F;
UP;
H;
ET;
LA

1   think there is such evidence, and I do not think they need to

2   be considered in the next evaluation.

3            MR. BERNICK:  Thank you.  Now, Your Honor, I do --

4            THE COURT:  Does that mean, Doctor, that your view is

5   that there is no reliable scientific evidence to support the

6   proposition that exposure to Grace's product caused any

7   person's disease in Categories B, D and e?

8            THE WITNESS:  That's correct.

9            THE COURT:  Thank you.

10           MR. BERNICK:  Your Honor, I -- just -- maybe we can

11  take up the issue after lunch, but I would tender as summaries,

12  and I think established the predicate from the witness already,

13  the Rule 1006 requirements for Exhibits 2276, 2277, 2279, 228

14  --

15           THE COURT:  Wait.  I'm sorry.  2276, 2277?

16           MR. BERNICK:  2279, 2282 and 2291 to 96.  I'd ask

17  that each and every case, whether the exhibit -- and I only

18  picked out the ones that reflect the data -- whether they

19  accurately reflected the data that she had mustered relating to

20  the topic reflected in the exhibit.  So, we would make that

21  proffer.  I don't know if there's an objection now, or if you'd

22  like to take that up after the break.  Either way is fine.

23           UNIDENTIFIED ATTORNEY:  After the break.

24           MR. BERNICK:  And subject to that we would pass the

25  witness.

**J&J COURT TRANSCRIBERS, INC.**

Libby

Recess                                                    113

PP
Obj:
R;
F;
UP;
H;
Et;
LA

1     THE COURT:  All right.  We'll return with the

2 question of admissibility of 2276, 77, 79, 82, 91 through 96

3 after lunch.  And --

4     MR. BERNICK:  I would note that my examination this

5 morning, after we factor in about 25 minutes of colloquy,

6 lasted for about an hour and 50 minutes --

7     UNIDENTIFIED ATTORNEY:  Two hours and ten minutes.

8     THE COURT:  Two hours and ten minutes.

9     MR. BERNICK:  Well, after you take into consideration

10 the 20 minutes that we just spent on one objection and the voir

11 dire, which took ten minutes.

12     UNIDENTIFIED ATTORNEY:  Congratulations.

13     THE COURT:  All right.  We will be in recess until

14 one p.m.

15     MR. BERNICK:  Thank you, Your Honor.

16     THE COURT:  Do you have your case cite --

17                    (Recess)

18     THE CLERK:  -- come to order.

19     THE COURT:  Please be seated.  Mr. Bernick?

20     MR. BERNICK:  Yes.  I think -- we've given the other

21 side the --

22     THE CLERK:  Mr. Bernick, talk into the mike, please.

23     MR. BERNICK:  Yes.  I'm sorry.  We've given the other

24 side the opportunity to take a look at Exhibits 2276, 77, 79,

25 82, 91 and -- 91 through 96, which are proffered as summaries

J&J COURT TRANSCRIBERS, INC.

Libby

PP
Obj:
R;
F;
UP;
H;
ET;
LA

1  under Rule 1006.  I'm told that beyond preserving -- making and

2  therefore preserving the prior objection that was lodged as to

3  the conversion from PCM to PCME, that with that exception there

4  is no objection to the proffer, and therefore we would ask to

5  have those admitted, and ask Your Honor to, again, overrule the

6  objection that now is being made for preserving the record to

7  the -- to anything that's based in any way, shape, or form

8  under the -- on PCM conversion.

9         THE COURT:  All right.  Well, Exhibits 2276, 77, 79,

10 82, 91 through 96 are admitted.  I have previously overruled

11 that objection, but as I indicated I am going to be looking at

12 all of these objections, every objection, when I get the whole

13 transcript and the case ready for decision.

14        MR. BERNICK:  There are two other small matters

15 before Mr. Mullady starts his cross examination of Dr. Anderson

16 -- I think you may want to help move things along -- with

17 respect to scheduling the ZAI hearing, I am told by Mr. Kramer

18 that Mr. Baena is available on the 22nd, as is Mr. Scott.

19 Messages have been left with Mr. Westbrook's office.

20 Apparently Mr. Westbrook has an enviable schedule, because he's

21 on vacation today, as well.  So -- but people are optimistic

22 that he'll be able to respond promptly and will be able to do

23 this on the 22nd.  My proposal would be that we schedule it on

24 that basis, and if it turns out that Mr. Westbrook is not

25 available on that date, that we'll let the Court know, and then

1 I guess we'll have to have a short call to try to schedule an

2 alternative date.

3          THE COURT:  All right.  That's fine.

4          MR. BERNICK:  With respect to Rule 1006, I know that

5 Your Honor has received our cases and the other side's cases.

6 Mr. Ansbro gave me another case, U.S. v. Goss (phonetic), which

7 --

8          THE COURT:  Yes.  I just looked a it.

9          MR. BERNICK:  Which we'd be happy -- that's the case

10 where their -- the underlying evidence for the summary was

11 excluded on hearsay grounds, and essentially you couldn't

12 revive it.  But be that as it may, we have not had an

13 opportunity to otherwise look at this case, but that's not a

14 problem.  So, we're happy to take Your Honor's ruling.

15          THE COURT:  All right.  Let's finish the evidence.

16 I'll deal with the issues of Rule 1006 and the 408 issue after

17 the witness is finished today.  Do you have any other questions

18 for Dr. Anderson?

19          MR. BERNICK:  No, we don't.  We now pass the witness.

20          THE COURT:  All right.  Mr. Mullady?

21          MR. MULLADY:  Thank you, Mr. Bernick.

22                    CROSS EXAMINATION

23 BY MR. MULLADY:

24 Q    Good afternoon, Dr. Anderson.

25 A    Good afternoon.

PP
Ctr

**J&J COURT TRANSCRIBERS, INC.**

Anderson - Cross/Mullady                116

PP
Chr

1  Q     I want to begin by reviewing the sequence of your analysis

2  for your disposition of mesothelioma claims.  And I've put on

3  the ELMO here the same exhibit that we have in the exploded

4  version in front of you.  As I understand what you did, you put

5  all the PIQ claimants into these five categories, A through E,

6  correct?

7  A     Not exactly.

8  Q     All right.  Well, they were assigned either by self-

9  identification, or by review of their underlying back-up

10  material, they were assigned a category?

11  A     Yes, to the extent that was possible.

12  Q     To the extent possible?

13  A     Yes.

14  Q     And then, in terms of the duration of their exposure, you

15  have assumed a 45-year full occupational exposure at the

16  highest exposure product for the maximum of any 45-year period,

17  correct?

18  A     That's correct.

19  Q     And you've concluded, on the basis of your entire

20  analysis, not just the two pieces that I articulated, that it

21  is not scientifically plausible that for anyone in the B, D,

22  and E categories, with 45 years of exposure to Grace asbestos

23  products to have contracted mesothelioma from that exposure?

24  Did I understand that correctly?

25  A     I think that's, in essence, what I said.  But the first

**J&J COURT TRANSCRIBERS, INC.**

1  part of your question said anyone, and I'm addressing these

2  exposure -- nature of exposure categories, and -- but I think

3  the answer is yes, if I understand your question.

4  Q    Very good.  Now, you also discussed this exhibit, 2291,

5  which I have placed on the ELMO, which you told us was the

6  percentage breakdown of mesothelioma claimants by nature of

7  exposure, the self-identified versus those who were placed into

8  the B, D, and E, or A and C, or F categories on the basis of

9  best evidence, correct?

10 A    That's correct.

11 Q    And you told us that the results are similar, 77 percent

12 for the self-identified in B, D, and E, and 79 percent for the

13 best evidence in B, D, and E, correct?

14 A    That's right.

15 Q    So, what you've got here is you've allocated 77 to 79

16 percent of all Grace mesothelioma claimants in these

17 categories, B, D, and E, where according to you they could not

18 plausibly have contracted mesothelioma?  Is that right?

19 A    No.  I didn't say they couldn't plausibly have attracted

20 mesothelioma.  I said the scientific evidence that they

21 contracted it from exposure to Grace products is not there,

22 there's no such evidence.

23 Q    It would have been scientifically implausible for anyone

24 in these categories to have contracted mesothelioma from Grace

25 product exposure, right?

**J&J COURT TRANSCRIBERS, INC.**

1  A    For these exposures I said that that is the reliable

2  scientific evidence, and I've said that there is no scientific

3  evidence that I have that would suggest that that would not be

4  the case.

5  Q    Yet --

6  A    There would be a very low probability of that, that

7  someone would be at a more extreme exposure to a Grace product

8  than has been displayed in this analysis.

9  Q    Yet --

10 A    For those categories.

11 Q    I'm sorry.

12 A    Sorry.

13 Q    I don't mean to step on your answers.  Yet, 77 to 79

14 percent of these mesothelioma claimants against Grace who

15 you've put into these -- into this category, who put the -- or,

16 who put themselves there, have mesothelioma, correct?

17 A    I didn't -- they were labeled as such.  I'm not a

18 physician.  I did not diagnose them.

19 Q    Well, recognizing that you did not diagnose them, if 79

20 percent of them had mesothelioma, and you've assumed 45 years

21 of continuous occupational exposure to asbestos, and you've

22 considered as part of your analysis that even if it wasn't

23 Grace exposure, you would assume it was Grace exposure.  This

24 79 percent of people have mesothelioma, which, in your view,

25 was not occupationally related to asbestos exposure?

**J&J COURT TRANSCRIBERS, INC.**

1    MR. BERNICK:  Objection to the form of the question.

2   It's about three or four questions, more of an argument than a

3   question.

4    THE COURT:  No.  I think that's proper cross.

5   Overruled.

6   Q    Do I have that right, ma'am?

7   A    I didn't quite -- what is the exact question?

8   Q    I'm asking you if you've concluded that 79 -- 77 to 79

9   percent of all of the people with mesothelioma who have claimed

10  against Grace, that it's scientifically implausible that they

11  got that mesothelioma exposure from 45 years of occupational

12  exposure to asbestos -- Grace asbestos?

13  A    That's not correct.

14  Q    Why is that incorrect?

15  A    I said that it's implausible that they got their

16  mesothelioma from 45 years of exposure, eight hours a day,

17  every day, to a Grace product.

18  Q    Right.  But where the plaintiffs had evidence of exposure

19  to non-Grace asbestos, you've concluded that it was all Grace

20  exposure, have you not?

21    MR. BERNICK:  Objection to the form of the question.

22  A    I don't quite understand the question.

23  Q    One of the conservative, as you've coined it in your

24  reports, aspects of your analysis, I thought, was that you

25  assumed that a claimant had exposure to Grace asbestos for the

**J&J COURT TRANSCRIBERS, INC.**

PP
Ctr

1  entire course of his working life, even if he had exposure to

2  non-Grace asbestos, correct?

3  A    I think we're getting it a little bit twisted.  I said

4  that I did not take a discounting value for buildings that

5  might have had -- or for situations that might have involved

6  non-Grace products.  I didn't scale the values down by assuming

7  that only 20 percent of the buildings had non -- had -- only 20

8  percent of the buildings had even sprayed on or troweled on

9  products and 80 percent didn't.  So, I could have scaled back,

10 saying, you know, it's a probability that people didn't go

11 every day to one of those 20 percent buildings, but I didn't.

12 It would also have been conceivable to collect information to

13 try to get what was Grace's share of that 20 percent.  I did

14 not do that, either.  So, if you mean that in this analysis I

15 assumed for these job categories that for that occupational

16 category it was a Grace exposure, that's correct.

17 Q    Continuously over 45 years?

18 A    That's right.

19 Q    Okay.  And despite that continuous exposure over 45 years

20 to Grace asbestos, counting no other exposures to anybody

21 else's asbestos, it's your view that 77 to 79 percent of these

22 people cannot scientifically plausibly claim that they got

23 their mesothelioma from that exposure?

24          MR. BERNICK:  I'm going to object to the form of the

25 question.

J&J COURT TRANSCRIBERS, INC.

1  Q    Is that right?

2        MR. BERNICK:  Excuse me.  Object to the form of the

3  question.  If the question is whether her analysis assumes all

4  exposure to Grace asbestos, I understand that.  If the question

5  is her analysis assumes all exposure to Grace asbestos plus

6  whatever other asbestos exposure was, that's a different

7  question.  And I think we have to be clear in asking the

8  witness which hypothetical, or which assumption we're asking

9  her to verify.

10       MR. MULLADY:  I don't think it's unclear at all.  And

11 the witness hasn't told me she didn't understand the question.

12       MR. BERNICK:  Well --

13 A   Well, I --

14       MR. MULLADY:  Excuse me.  There's a motion pending.

15       THE COURT:  Okay.  I think you need to restate the

16 question to make sure that it is clear which question you're

17 asking her, because I think in the process of her prior answer

18 it did get a little muddled.  I'm not sure your question did,

19 but I think --

20       MR. MULLADY:  I'd be happy to rephrase it, Your

21 Honor.

22       THE COURT:  All right.

23 Q   Dr. Anderson, you've assumed for the Grace mesothelioma

24 claimants that for the 45 years that they have worked in the

25 construction trades, they have worked around Grace asbestos --

**J&J COURT TRANSCRIBERS, INC.**

PP
Ctr

1  strike that.  Let me start over.  You've assumed that for the

2  45 years of occupational experience of these construction

3  workers who have made claims against Grace that their only

4  asbestos exposure has been to Grace products.  Is that correct?

5  A    That's --

6  Q    Occupationally.

7  A    I have not addressed what other asbestos exposures they

8  may have had, and if that's the point of confusion -- this

9  analysis deals with the concentration data that comes from

10  these job categories that goes into my analysis without

11  discounting the possibility that some of these products could

12  have been non-Grace products.  These claimants may have had

13  other alternative exposures.  I did not deal with other

14  alterative exposures.

15  Q    But I thought you assumed that for the exposures -- for

16  the jobs that they were performing for the life of their

17  employment, that to the extent they had exposure to asbestos it

18  was Grace asbestos.  Am I wrong about that?

19  A    For these nature of exposure categories in this analysis,

20  we were analyzing the job-specific exposure concentration data,

21  the exposure frequency duration for these jobs for those

22  categories.  That's correct.

23  Q    Okay.  You've been doing consulting work for W.R. Grace

24  for over 20 years.  Is that right, Dr. Anderson?

25  A    I have had some -- I have worked for W.R. Grace

**J&J COURT TRANSCRIBERS, INC.**

Anderson - Cross/Mullady                    123

PP
Ctr

1  periodically at one point, and then not for a long period of

2  time, and another point, so --

3  Q    Fair enough.  I think you told us at deposition that the

4  first case that you worked on many years ago was the school

5  class action case in the late 1980's?

6  A    Yes.  I did that, and then many, many, many years elapsed

7  before I worked for W.R. Grace again.

8  Q    In addition to working on that case for Grace, you've

9  worked on the ZAI attic insulation case, correct?

10 A    That's right.

11 Q    You've worked on the environmental cost recovery case for

12 Grace?

13 A    Correct.

14 Q    And now you're working for Grace on this estimation case.

15 Is that right?

16 A    Yes.

17 Q    Other than Grace, as I understand it you've done asbestos-

18 related consulting work for the Big Three automakers -- Ford,

19 Daimler-Chrysler, and GM.  Is that right?

20 A    Yes.

21 Q    You've never been retained by an individual asbestos

22 plaintiff or plaintiff attorney in an asbestos case, or offered

23 testimony in an asbestos personal injury case at the request of

24 a plaintiff's attorney.  Is that correct?

25 A    No, I haven't.  I've never been asked.

**J&J COURT TRANSCRIBERS, INC.**

Anderson - Cross/Mullady                    124

1  Q    Is it fair to say that all of your asbestos-related work

2  for litigation purposes has been done for defendants, and none

3  of it has been done for plaintiffs?

4  A    No.

5  Q    It's not fair to say?  Or that's true?

6  A    That's not true.  I did litigation related work on

7  asbestos while I was at EPA, and that's not for defendants, so

8  I don't know how you classified it.  But I was very active in

9  the Reserve Mining case, which was an early -- the earliest, I

10 think, environmental case involving asbestos exposure,

11 particularly by ingestion.

12 Q    If I confine my question to your private practice, would

13 that be a correct statement?

14 A    Then -- would you ask me the question again?

15 Q    Yes.

16 A    Sorry.

17 Q    That in your non-governmental private consulting practice

18 you've never undertaken to consult for the plaintiff's side of

19 an asbestos matter.  Is that correct?

20 A    I said I've never been asked.  That's correct.

21 Q    And you never -- okay.  Fair enough.  Something, as I

22 understand it, you've also never done for Grace before this

23 estimation proceeding is to use risk assessment to opine in an

24 individual personal injury asbestos case that a plaintiff

25 bringing a claim against Grace did or did not have a

**J&J COURT TRANSCRIBERS, INC.**

1  meritorious claim.  Is that correct?

2  A     That's correct.

3  Q     Do you agree, Doctor, that the point of all risk

4  assessment modeling is to determine population risk, not

5  individual risk?

6  A     No.

7  Q     Did you review the expert reports of Dr. Peter Lees in

8  this case?

9  A     Yes, I did.

10           MR. MULLADY:  Can we have ACC/FCR-535, please?

11           MR. BERNICK:  Do we have a copy of any of these

12  exhibits that you're going to use?

13           MR. MULLADY:  Jim?  Sorry.

14           THE COURT:  What's the exhibit number, please?

15           MR. MULLADY:  535.

16           THE COURT:  All right.

17           MR. BERNICK:  Can we get a bunch of them, so we don't

18  have to keep on doing this?

19           MR. MULLADY:  We can give you the deck.  Give one to

20  the Court.  Thank you.

21  Q     What we have on the screen, Dr. Anderson, Dr. Lees' -- I'm

22  looking for the date --

23           MR. BERNICK:  Can we get the rest?  I'm sorry.

24           MR. MULLADY:  I'm sorry.  We didn't have the -- okay.

25           MR. BERNICK:  Okay.  Go ahead.  I'm sorry.  Go ahead.

Anderson - Cross/Mullady                          126

1  Q    We have Dr. Lees' July rebuttal report to the report of

2  Steven Hays (phonetic) on the screen.  At Page 6 Dr. Lees

3  writes, in response to something Mr. Hays had said, "The point

4  of all risk assessment modeling, and in particular that

5  conducted by others as part of this case," and he's referring

6  to the estimation case, "is to determine population risk, not

7  individual risk.  Thus, the appropriate exposure assessment is

8  for the population, not individuals."

9          MR. BERNICK:  Your Honor, I would object to this line

10  of examination.  First of all, there can't be impeachment

11  because it's not her statement.  Second, if it's offered for

12  the truth of the matter asserted in the report, that's

13  improper.  And further, it violates the stipulation.  Under the

14  stipulation in this case, whatever it is that the witness has

15  reviewed but not relied upon cannot be used for any purpose in

16  connection with the examination of the witness.  I don't think

17  it's been established that she relied upon this report.

18          MR. MULLADY:  That grossly overstates the

19  stipulation, Your Honor.  In no way --

20          MR. BERNICK:  Well, let's get the stipulation,

21  because I believe that's exactly --

22          MR. MULLADY:  Mr. Bernick?  Excuse me.  There is no

23  limitation on the use of impeachment material in cross

24  examination of experts.

25          THE COURT:  Well, that may be, but this is not proper

**J&J COURT TRANSCRIBERS, INC.**

PP
CRr

1  impeachment.  This isn't this witness's statement, so you can't

2  impeach her with somebody else's statement.

3          MR. MULLADY:  Fine.  I'll move on, Your Honor.  Thank

4  you.

5  Q    Have you read the trial testimony of your former

6  colleague, Dr. Rodricks, in this case?

7  A    No, I haven't.

8  Q    Are you aware of what Dr. Rodricks' views are with respect

9  to risk assessment?

10 A    I'm sorry.  I'm not quite hearing you.  Am I aware of?

11 Q    I'm sorry.  Are you aware of Dr. Rodricks' testimony about

12 the use of risk assessment that he gave in this trial, in this

13 proceeding?

14 A    I'm not entirely aware of exactly what he said.  I've

15 known Dr. Rodricks for so many years.  We've served on so many

16 panels together, I know his views.  I can probably imagine what

17 he said, but I have not seen the transcript.

18 Q    Do you agree with the general proposition that regulatory

19 risk-based standards are not useful to evaluate disease

20 causation in particular individuals?

21 A    Not as a declarative sentence, and I can tell you why.  It

22 is useful and proper to use the approaches and guidelines of

23 public health agencies if you can -- if you are seeking to rule

24 out a risk.  That is, you would calculate the upper-bound risk,

25 and if the risks don't exceed that, then you know that you

Anderson - Cross/Mullady                        128

1  don't have a risk.  But if they are lower than that, you can't
2  use the public health agencies' approaches to define a real
3  risk because they are overstatements.  But if your risk is
4  lower than that, you can be quite certain that you're not
5  dealing with a risk.  And I did something similar here with the
6  screening exercise.
7  Q    Do you agree that to assess disease causation in an
8  individual you have to look at that specific individual's
9  exposure?
10 A    Well, not necessarily, because if an individual -- I mean,
11 everybody would like to know exactly all the details of every
12 situation, whether it's an individual or a population.  It's
13 usually not possible.  But in this exercise the analysis
14 addressed exposure to jobs, job categories.  If an individual
15 is in one of these job categories, I think it's a fair
16 appraisal of the data, fair analysis of the data to say if this
17 person is in this job, this would be the likely exposure to
18 that person if they had the long-term exposure, and so forth.
19 Q    All right.  Well, we're going to spend some time on that
20 in a few minutes.  Let me ask you first, though, before we get
21 to that, about the methods that you used to review and comment
22 on the information submitted by the mesothelioma claimants
23 against Grace.
24 A    Okay.
25 Q    As I understand it from your report, you reviewed

Anderson - Cross/Mullady                    129

1  materials submitted by 1,596 people who have filed claims

2  against Grace alleging that they developed mesothelioma because

3  of exposure to asbestos in Grace products, correct?

4  A    That's right.

5       MR. MULLADY:  And could we have ACC/FCR-432, please?

6  Actually, we don't need that.  You can take that down.

7  Q    The material that you reviewed, as I understand it,

8  consisted of PIQs that were submitted by the claimants, along

9  with any attachments and supporting material, correct?

10  A    We did review that, yes.

11  Q    Yes.

12       MR. MULLADY:  Could we go to the ELMO, please?

13  Q    Now, before I get into my questions about your analysis of

14  that data, I want to get something -- make something perfectly

15  clear for the record that I saw -- that you had actually given

16  us on this chart 2291, which is on the ELMO, and that is that

17  66 percent of the mesothelioma claimants against Grace did not

18  provide sufficient information to put them into a nature of

19  exposure category.  Is that correct?

20  A    That's correct.

21  Q    So, your analysis concerns less than half, specifically,

22  44 percent of the mesothelioma claimants who have brought their

23  claims in this bankruptcy case against Grace.  Is that correct?

24  A    The slide says that 66 percent of those claimants did not

25  provide sufficient information to be classified.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    So, 66 percent of the data that would have been -- strike

2  that.  And then your procedure was, if a mesothelioma claimant

3  identified a nature of exposure code for his direct exposure in

4  Part 3 of the PIQ, that you accepted that definition as an

5  accurate determination of his nature of exposure?

6  A    That's right.

7            MR. BERNICK:  Let me -- if they filled out the form

8  that way?  Or -- what was the --

9            MR. MULLADY:  I'll repeat the question.

10           MR. BERNICK:  I'm sorry.

11           MR. MULLADY:  For counsel's benefit I'll repeat the

12 question.

13           MR. BERNICK:  Thank you.

14 Q    If a meso claimant identified a nature of exposure code

15 for his direct exposure in Part 3 of the PIQ, you accepted that

16 identification as an accurate determination of his nature of

17 exposure?

18 A    I put -- that person would have gone into that nature of

19 exposure category.  I didn't say it was accurate.  I said we

20 didn't second guess what the SEF identifiers checked.  We

21 didn't try to prove or disprove that they checked the correct

22 box.

23 Q    Understood.  I just want to make sure -- let's go to

24 ACC/FCR-432 to your report.

25           UNIDENTIFIED SPEAKER:  It's off the ELMO.

**J&J COURT TRANSCRIBERS, INC.**