PP
Ctr

1   doing one kind of work compared to another facility doing a

2   different kind of work?

3   Q    Let's go to 3018.  I want to pull up the OSHA regulation.

4   This is 29 CFR Section 1926.1101.

5            THE COURT:  Mr. Mullady, I apologize.  I didn't get

6   the exhibit number.

7            MR. MULLADY:  It's ACC/FCR 3018.

8            THE COURT:  Thank you.

9   Q    Okay, this is the OSHA regulation.  Can we explode it a

10  little bit so it's readable.  Okay, 1926.1101 construction at

11  the top here.

12           THE COURT:  This is the new one?

13           MR. MULLADY:  Yes.

14  Q    Construction, alteration, repair, maintenance et cetera.

15  I want to go down and refer you to the section Appendix A OSHA

16  reference method mandatory.  This mandatory appendix specifies

17  the procedure for analyzing air samples for asbestos and

18  specifies quality control procedures that must be implemented

19  by laboratories performing the analysis.  The sampling in

20  analytical methods described below represent the elements of

21  the available monitoring methods such as Appendix B of this

22  regulation.  The most current version of the OSHA method id-160

23  or the most current version of the NIOSH method 7400.  All

24  employers who are required to conduct air monitoring under

25  Paragraph F of the standard are required to utilize analytical

1  laboratories that use this procedure or an equivalent method

2  for collecting and analyzing samples.  Did I read that

3  correctly?

4  A    Yes, you did.

5  Q    Now these options listed here, Appendix B of OSHA,

6  Appendix B OSHA method id-160 and NIOSH method 7400 are all PCM

7  methods, aren't they?

8  A    I am not an expert on OSHA methods so I can't tell you

9  exactly the numbers but I do know that in mixed environment

10 following the logic that I've just described that OSHA makes a

11 provision and I believe it's 7204 for conversion when you are

12 in these mixed environments.  So I don't know.  You can read me

13 all of the OSHA regulations but it's not exactly my field.

14 Q    I understand and I understand that --

15 A    I do know the logic and I do know that OSHA has the same

16 provisions as EPA does.  The same logic because it only makes

17 sense.

18 Q    Let's go to the third page of this document.  A great deal

19 of experience is required to routinely and correctly perform

20 differential counting.  It is discouraged unless it is legally

21 necessary.  Do you see that?

22 A    Yes, I see that.

23 Q    What is your understanding of what is meant by

24 differential counting?

25 A    I think that for you to give me one sentence at a time

**J&J COURT TRANSCRIBERS, INC.**

PP
Cxr

1  from OSHA regulations isn't helpful.  Because it would have to

2  be read in context.  Because I know the logic that OSHA uses.

3  I know the logic that EPA uses and to read me one sentence at a

4  time I think can be very misleading.

5  Q    Well let's -- and I don't want to mislead and I will read

6  more because -- and maybe that's necessary to put this in

7  context.  At the top of this page it reads as follows.  "As

8  previously mentioned in Section 1.3 PCM does not provide

9  positive confirmation of asbestos fibers.  Alternate

10 differential counting techniques should be used if

11 discrimination is desirable.  Differential counting may include

12 primary discrimination based on morphology, polarized light

13 analysis fibers or modification of PCM data by scanning

14 electron or transmission electron microscopy."

15      I'll stop there for a second.  Transmission electron

16 microscopy is also known as TEM, correct?

17 A    Correct.

18 Q    Then it goes on to say, the regulation does, a great deal

19 of experience is required to routinely and correctly perform

20 differential counting.  It is discouraged unless it is legally

21 necessary.  Then only if a fiber is obviously not asbestos

22 should it be excluded from the count.  Further discussion of

23 this technique can be found in reference 8.10.  That is OSHA's

24 position, correct?

25 A    I would not characterize this as the totality of OSHA's

**J&J COURT TRANSCRIBERS, INC.**

PE
CAT

1  position because there is something wrong here that is

2  discouraged unless it is legally necessary.  I know that -- I

3  know the logic that OSHA uses and there is something wrong.

4  I'm not seeing the entire regulation.  I don't know about the

5  date.  But I do know that there is the same logic at OSHA as

6  there is at EPA, and that is when you are in a mixed

7  environment you do need, and when you do need to do risk

8  assessment work and you do need to know if you are counting

9  asbestos fibers they need to be converted to PCME.

10 Q    Thank you.

11         MR. MULLADY:  I'll pass the witness.

12         THE COURT:  Pardon me, Mr. Mullady.  I'd like to ask

13 the witness a question based on the OSHA regulation.  I know

14 Dr. Anderson, you don't confess to be an expert in the OSHA

15 regulations.  I understand that, but is the policy not

16 consistent with the EPA policy that you are looking for the

17 maximum possible counts so that you can ensure public health?

18         DR. ANDERSON:  Yes, but if it's not asbestos fibers

19 there is a provision made for using the TEM to find out if you

20 are dealing with an asbestos fiber or if you are dealing -- PCM

21 can just count all kinds of fibers beside a road when people

22 are doing roadwork and there can be virtually none or none as

23 far as asbestos counts are concerned.

24         So once you know the environment you are dealing

25 with, then maybe you don't need to use it.  But if you are

1  going to try to identify what's asbestos it's essential to use

2  some method that can identify if you are not in an asbestos

3  rich environment.  When you are in construction trades and

4  transportation trades you can have a predominance of other

5  kinds of fibers that would be seen by PCM.

6           THE COURT:  All right, thank you.  Mr. Mullady, do

7  you have any follow up based on my question to the witness?

8           MR. MULLADY:  No, I think to the extent we would have

9  any more inquiry on that Mr. Finch is quite capable of

10  following up.

11           THE COURT:  All right, thank you.  Mr. Finch.

12           MR. FINCH:  Nathan Finch for the Asbestos Claimant's

13  Committee.

14                    CROSS EXAMINATION

15  BY MR. FINCH:

16  Q    Just one follow up.  Dr. Anderson, you are not a

17  microscopy expert and you are not professing an expertise in

18  that area, correct?

19  A    That's correct.  And I have looked through these

20  microscopes and I do know what microscopists do.

21  Q    You were asked some questions by Mr. Mullady about the

22  review of the person injury questionnaires.  Do you recall

23  those questions, that Exponent did?

24  A    Yes.

25  Q    Okay, is it correct that unless someone either in their

PP
Ctr

1  questionnaire or their questionnaire attachments said that they

2  personally mixed or personally installed a Grace containing

3  product they would have been put in the B, D or E categories?

4  A    Not necessarily.  You are saying if they didn't self-

5  identify as an A or C.

6  Q    In review of the backup materials you couldn't tell if

7  they were in an A or C, then they would most likely have been

8  in the B, D, or E category.

9         MR. BERNICK:  Objection to the form of the question.

10 A    No.  I don't think so at all.  I think we -- there was

11 equal weight to end up in any one of the categories from the

12 background review of the materials.  It just depended on what

13 was in the background review.  There was no bias as to if they

14 didn't self-identify then they weren't going to be -- to have

15 an opportunity to be placed in an A category.  That was not the

16 approach.

17 Q    I think you misunderstood my question.  If someone said,

18 let's say that they are an electrician and they didn't say that

19 they personally mixed or personally installed a Grace

20 containing product then they would be categorized as someone

21 who is in a space or in a site or removed or cut the product a

22 B, D or E, correct?

23        MR. BERNICK:  Again, I'm objecting to that form of

24 the question.  You are saying that they identify a job title

25 but they don't have anything in the backup that relates to or

Anderson - Cross/Finch                    212

1  talks about their actual, what other category they would fall

2  into in terms of contact with asbestos?

3          DR. ANDERSON:  Is that the question?

4  Q    They identify themselves as an electrician and they don't

5  have anything further.

6  A    We did not classify anyone according to just a job title.

7  Q    Okay.  Could you turn to your July 31st expert report?

8  It's in the notebook up there but it's ACC/FCR-432.  Page 12.

9  So if the PIQ or the attachments included the relevant key word

10 such as mix or move, cut or install, you would put them in the

11 appropriate category, correct?

12 A    That's correct.

13 Q    So if someone said that they mixed Grace Zonolite plaster,

14 then they should have been put in the Category A, correct?

15 A    If the rest of the materials, you know, supported that.  I

16 mean the whole file had to be read, but if that's what the file

17 said in its totality that's where they would have been placed.

18 And if they had had two job experiences.  Let's say they were

19 at some point at a site where something was being done but at

20 another time they actually were a mixer and that's what the

21 totality of the materials, the backup materials said, and if

22 they also identified they had been exposed to a Grace product,

23 they would have been elevated to the highest exposure category.

24 Q    Okay, if there was insufficient information from which to

25 tell whether they were an A through an E, then you

                    **J&J COURT TRANSCRIBERS, INC.**

Anderson - Cross/Finch                        213

PP
Cr

1  characterized the people with insufficient information in the

2  same ratio as if they did have information, correct?

3  A    I think I, if I understand your question correctly, the

4  answer is no.  If they had information and they were clearly

5  either an A or E, and we didn't know which one we put them in

6  the A.  We wouldn't have put them in insufficient and that is

7  if the information showed other factors that they were exposed

8  to a Grace product and the whole file supported the information

9  not just some word that was not supported by other information

10 in the file or there were contradictions in the file or that

11 kind of thing.  But no, we wouldn't have put them in

12 insufficient merely because at one point they did one job and

13 at another point they did another job.

14 Q    If they were a construction laborer and they said that

15 they were in the vicinity of someone who was mixing Monokote,

16 then they would not be treated as a mixer and installer,

17 correct?  They would be put either at a site or at a space?

18 A    I think that has to be --

19 Q    Well could --

20 A    I think I can't generalize.  It would depend on the file.

21       MR. BERNICK:  Your Honor, the protocol was being

22 displayed to the witness in the court and all of a sudden, the

23 screen went blank.

24       MR. FINCH:  We put the screen back up.  Sorry.

25 BY MR. FINCH:


**J&J COURT TRANSCRIBERS, INC.**

1 Q    Would you -- you also reviewed about 350 closed, settled

2 mesothelioma claims, is that correct, Exponent did?

3 A    Exponent did.  They're not in my report.

4 Q    But they did that for purposes of Dr. Florence's later

5 analysis, correct?

6 A    I understand that they are going to be provided to him.  I

7 don't really know very much about them.

8 Q    Okay, obviously, the settled mesothelioma claims don't

9 have questionnaires, correct?

10 A    I believe that's correct.

11 Q    Okay, so in that case what the Exponent people did is they

12 reviewed whatever materials Grace provided to them and put the

13 person in the appropriate A through E classification, correct?

14 A    That's my understanding.

15 Q    And they were supposed to use the same protocol for

16 reviewing the settled claims files as for reviewing the

17 questionnaires in terms of whether someone was a mixer or an

18 installer or one of the other categories, correct?

19         MR. BERNICK:  I'm sorry, Your Honor.  At this point

20 the witness is being asked about work that her firm didn't do

21 and I don't believe that she is relying -- if I am mistaken

22 about that, I'd like to know, but I think --

23         MR. FINCH:  That's not correct.

24 BY MR. FINCH:

25 Q    Dr. Anderson, your firm did review 350 settled

**J&J COURT TRANSCRIBERS, INC.**

1  mesothelioma questionnaires, correct?

2  A    I have said they did but it's not part of my report and

3  it's not part of my analysis.

4  Q    Do you know to the extent to which Dr. Florence relied on

5  that review of the settled claims?

6  A    No.

7        MR. BERNICK:   Object.

8  BY MR. FINCH:

9  Q    If a document in the settled claims file said the worker

10  personally mixed a Grace asbestos product, they should have

11  been categorized as an A, correct?

12        MR. BERNICK:   Objection to the form of the question

13  and foundation and it goes beyond the scope of this witness's

14  testimony and her opinions in this case and he's now seeking to

15  get this witness to comment on work that may or may not have

16  been done in connection with Dr. Florence's work.  He should

17  ask the question of Dr. Florence and not ask this witness to

18  express opinions that he can then use to impeach --

19        THE COURT:   I think what I said earlier was I would

20  take the objection in a short summary of the basis for it.  I

21  don't need the argument, I think, unless I ask for it.  Mr.

22  Finch, I think the witness has said she doesn't know how this

23  was done.

24        MR. FINCH:   Your Honor, Dr. Florence also said he

25  didn't know how this was done.  It was her firm that did the

Anderson - Cross/Finch                    216

1  work.

2          THE COURT:  Well, that doesn't mean you know

3  everything that's happening in your firm.  Sometimes it would

4  be nice if you did.  If you want to lay a foundation, fine, but

5  so far --

6  BY MR. FINCH:

7  Q    Okay, would you agree with me that the Exponent people

8  reviewed whatever documents Grace gave them for reviewing the

9  settled mesothelioma claims files?

10          MR. BERNICK:  I object to this question.  It's going

11 beyond the scope of my examination and any other cross.  He's

12 seeking to use this witness now to express opinions that go

13 beyond the scope of her appearance here.  If he wants to call

14 her as part of his case, he can do that but he doesn't do it on

15 our time as --

16          MR. FINCH:  I'm not asking her to express an opinion.

17 I'm asking her did they do this or did they not do this.

18          THE COURT:  You can ask her if she knows.

19 BY MR. FINCH:

20 Q    Do you know if they did this?

21 A    I said I am aware that some closed claims were reviewed.

22 I did not include the analysis in my report.  I don't know the

23 results of those analyses.

24 Q    And you're aware that the same people who reviewed -- the

25 same people at Exponent who reviewed the questionnaires also

**J&J COURT TRANSCRIBERS, INC.**

1 reviewed the claims -- the closed claim files?

2 A    That's right.

3 Q    And they were given the same protocols?

4 A    As far as I understand it.

5 Q    Do you have a big, fat notebook in front of you, Dr.

6 Anderson?  On direct examination you were asked about Dr.

7 Moolgavkar's 3.2 benchmark, do you recall that?

8 A    Yes.

9 Q    Okay, and you said that was based on the all fibers

10 calculation from the 1986 EPA airborne asbestos health

11 assessment update document?

12 A    I think that Dr. Moolgavkar has discussed this in detail

13 in his report.  I prefer to rely on him for that analysis.

14 Q    Could you turn your book to Grace Exhibit 188?  It's also

15 ACC/FCR 298.  Are you familiar with this document?

16 A    Yes, I am.

17 Q    It was authored by Dr. William Nicholson under contract

18 for the EPA?

19 A    Yes.

20 Q    This is the same William Nicholson who published projected

21 future mesothelioma incidence in the United States paper in

22 1982?

23 A    Yes, it is.

24 Q    Could you turn to Page 90?  You understand that -- you see

25 the table at the top there, Dr. Anderson?

**J&J COURT TRANSCRIBERS, INC.**

Anderson - Cross/Finch                218

1  A    Yes.

2  Q    You understand that K Sub-M is the relative potency factor

3  for various types of asbestos fiber?

4  A    It's a potency constant.

5  Q    It's a potency constant.  And the 1.0 times ten to the

6  minus eight is the all fibers constant, correct?

7  A    I'm not sure that that's correct because what Dr.

8  Nicholson did to derive his dose -- I don't think that's

9  correct.

10  Q    You testified on direct that you thought that the 3.2

11  benchmark wasn't appropriate because it included chrysitolite,

12  correct?

13  A    That came from Dr. Moolgavkar.  My understanding is --

14  what you're looking at is the data table that has the summary

15  of the four studies that Dr. Nicholson used to merge the

16  studies to get K Sub-M for mesothelioma from these four studies

17  and then he used the K Sub-M ratio to the K Sub-L to use the

18  other -- these were the only studies he could qualify for the

19  meso analysis.  So then he used the ratio to the K Sub-L to go

20  back and pick up the other studies so he used ten studies and

21  he used one dose response curve and it was from that EPA dose

22  response curve that I believe this three point number was

23  derived and Dr. Moolgavkar has discussed that.

24  Q    Okay, you don't know whether the --

25  A    He didn't use one study out of one of the four studies

**J&J COURT TRANSCRIBERS, INC.**

1  that was used as the basis for the derivation of the single

2  curve that Dr. Nicholson presented that's in the EPA IRIS --

3  the basis for the EPA IRIS file.

4  Q    The basis for the EPA IRIS is the 1.0 times ten to the

5  minus eight.  That's within the EPA, correct?

6  A    No.

7  Q    That's not what the EPA used?

8  A    No, this is a summary of the four studies that were used

9  to derive the K Sub-M factor for EPA's dose response work and

10 then the ratio was used -- Dr. Nicholson derived only one dose

11 response curve for cancer for all fiber types.

12 Q    Isn't it true that the average value of K Sub-M in the

13 1986 EPA paper is thus 1.0 times ten to the minus eight?

14 A    No.

15 Q    Would you turn to Page --

16 A    What you're talking about -- you're trying to take the

17 parameter, the single parameter and equate it to the dose

18 response curve that Dr. Suresh Moolgavkar used in his analysis

19 and that EPA has used for years for the dose response curving.

20 What he was doing was a doubling of risk using that curve which

21 is based on all of these studies to derive that --

22 Q    I understand that, but --

23 A    And so you have to ask him about what he did.  It's his --

24 Q    Okay well, I asked Dr. Moolgavkar what he did yesterday

25 and we'll move on.  Would you agree with me that this table on

PP
Cₕᵣ

1  page 90 shows a K Sub-M for insulation workers that is higher

2  than 1.0 times ten to the minus eight, correct?

3  A    I think he displays all of his K Sub-M for the four

4  studies that he used here so --

5  Q    And would you agree with me that 1.5 times ten to the

6  minus eight is a higher potency factor than 1.0 times ten to

7  the minus eight?

8  A    This isn't a potency factor.  It's a constant that's used

9  in the equation.

10  Q    Would you agree that it's a larger constant?

11  A    Yes, it's a larger constant.

12  Q    Okay, and would you -- do you agree that the insulator

13  cohort that is referenced there with the potency constant was

14  exposed only to chrysotile and amosite fibers and not to

15  chrysitolite?

16  A    I'm going to ask you to have this discussion with Dr.

17  Moolgavkar.  This is what is in his expert report.  It is not

18  in my expert report.  I relied entirely on his work and I'm not

19  going to get into his dose response work in my testimony.

20  Q    Okay well, you have the document in front of you.  Could

21  you turn to Page 13 in the 1986 EPA document?  You are familiar

22  with this document because you have relied upon it from time to

23  time in your own work, correct?

24  A    Yes, and I also commissioned the work and I was director

25  of the office when the work was done but that doesn't mean that

1  I presumed to do the dose response work myself and I'm not

2  going to redo Dr. Moolgavkar's work.  And if you asked him

3  about it yesterday, you have his answers.

4  Q    Could you turn to Page -- the bottom -- it talks -- the

5  study of U.S. and Canadian insulation workers by Selikoff, do

6  you see that, 3.2 mortality associated with asbestos exposure?

7  A    I'm not sure where you are.

8  Q    Bottom of the document.  The study of U.S. and Canadian

9  insulation workers by Selikoff, et al.

10 A    Yes.

11 Q    Okay, the last sentence on the page reads, "The mortality

12 experience of 17,800 asbestos insulation workers was studied

13 prospectively from January 1, 1967 through December 31st, 1976.

14 The workers were exposed primarily to chrysotile prior to 1940,

15 to chrysotile and amosite from 1940 through 1965 and largely to

16 chrysotile thereafter.  No chrysitolite is known to have been

17 used in the U.S. insulation materials.  Selikoff, et al.,

18 1970."  You don't dispute the facts as stated in this 1986 EPA

19 document, do you?

20 A    This is one of ten studies that Dr. Nicholson used to

21 derive his merge to curve for -- for his cancer dose response

22 curve.  Now as I've said, I'm not going to discuss Dr.

23 Moolgavkar's dose response work.  I think you had him here

24 yesterday to ask him his questions.  He has characterized this

25 work in his report.  He has characterized this 3.2 as

Anderson - Cross/Finch                        222

1  containing chrysitolite.  My understanding is that the relative

2  risk of two was calculated from this very conservative EPA dose

3  response curve that's an upper bound.  And as I said earlier,

4  there are a host of factors to be discussed when one wants to

5  discuss this relative risk factor and I've already listed a

6  number of them.  As to the dose response work, I am certainly

7  deferring to Dr. Moolgavkar.

8  Q    But you are saying that you believe the 3.2 dose response

9  isn't applicable here?

10 A    Yes.

11 Q    Because you believe it contains chrysitolite.  And I'm

12 pointing out to you that the insulation potency factor is

13 higher than the one that Dr. Moolgavkar used and it's a cohort

14 of people that were not exposed to chrysitolite, correct?

15 A    Dr. Nicholson did not derive his dose --

16        MR. BERNICK:  Objection.  Objection to -- I'm sorry,

17 Dr. Anderson.  I object to the form of the question.  It's

18 compound and it assumes a record with regard to Dr.

19 Moolgavkar's testimony that's not been before this witness.

20        THE COURT:  No, I think that's not what it assumes.

21 I think the basic question which was based on this document

22 which I think the witness did not answer which is whether or

23 not she accepts the proposition that's stated in this document

24 and that's really the appropriate question.

25        MR. FINCH:  That's the question.

Anderson - Cross/Finch                        223

 1          THE COURT:  Let's go back to that question.

 2          MR. BERNICK:  So what statement are we talking about?

 3          THE COURT:  The statement on Pages --

 4   BY MR. FINCH:

 5   Q     Do you accept the proposition that the insulator cohort of

 6   the study by Selikoff from 1967 to 1976, that these workers

 7   were exposed primarily to chrysotile products to 1940, to

 8   chrysotile and amosite from 1940 through 1965 and largely to

 9   chrysotile thereafter, no chrysitolite is known to have been

10   used in the U.S. insulation material.  Do you accept that

11   factual statement in this document, Dr. Anderson?

12          MR. BERNICK:  Objection, lack of foundation.

13          THE WITNESS:  I said -- you've read it correctly but

14   Dr. Nicholson used ten studies to derive a common dose response

15   curve.

16   BY MR. FINCH:

17   Q     Dr. Nicholson didn't use --

18   A     And I don't see what bearing that has --

19   Q     Dr. Nicholson used the four studies in here, correct?

20   A     But then he derived a ratio so that he could go back and

21   pick up the other studies to complete his dose response work.

22   Dr. Moolgavkar has discussed this in detail in his report and I

23   don't wish -- I don't want to and I don't feel it necessary for

24   me to try to invade his territory.  But you read that statement

25   correctly.


                    **J&J COURT TRANSCRIBERS, INC.**

Anderson - Cross/Finch                          224

1  Q    And you don't dispute that it's factually accurate?

2           MR. BERNICK:  It's the same question that he's now

3  put to her four different times --

4           THE WITNESS:  You read the statement --

5           MR. BERNICK:  -- and there's no foundation for it now

6  and there wasn't foundation for it before.

7           THE COURT:  Well, I don't know the foundation for it.

8  I don't know whether she has any personal knowledge of the

9  facts.  So if she does, she can answer the question.  If she

10 has no personal knowledge of the facts, she'll state so.  Dr.

11 Anderson, do you have any personal knowledge of the facts

12 within this report?

13          THE WITNESS:  I do and I know that he's reading

14 correctly one summary statement from one of the ten studies

15 that were eventually used.  And I said that the eventual dose

16 response work involved a number of studies and that's what Dr.

17 Moolgavkar -- that's his specialty and that's what he has

18 discussed and it is not my specialty.

19 BY MR. FINCH:

20 Q    All right, this is a graphic that -- would you put the

21 ELMO on please?

22          UNIDENTIFIED SPEAKER:  I'm sorry, what?

23          MR. FINCH:  Put the ELMO on please?

24 BY MR. FINCH:

25 Q    Dr. Anderson, this is one of the graphics that Mr. Bernick

J&J COURT TRANSCRIBERS, INC.

PP
Cxr

1  showed you, is that correct?

2  A    Yes.

3  Q    Okay, you have various what you call benchmarks on the

4  right-hand side here, correct?

5  A    Yes, and they are truncated because there are ones that

6  are higher.

7  Q    Right, the scale is broken on the right-hand side, right?

8  A    Right.

9  Q    Now, in your view, someone who has been exposed -- is it

10  correct that someone who has mesothelioma who has been exposed

11  to cumulative fiber years of exposure to Grace asbestos of 17,

12  that their mesothelioma could have resulted from that exposure

13  to the Grace products?

14        MR. BERNICK:  Objection to the form of the question.

15        THE WITNESS:  No, that's not what this analysis

16  shows.  What I said is using these screening analysis

17  techniques -- now, later on I looked at the information I had

18  and I saw that just by adjusting even one parameter which was

19  the duration from the PIQ's, you see very different patterns

20  emerge.  But I said using a very severe upper bound

21  conservative screen, that I would recommend that the A's and

22  the C's be further analyzed.

23  Q    Okay, so it's at least possible that those -- that you

24  would admit that those could have been caused by exposure to

25  Grace asbestos?

J&J COURT TRANSCRIBERS, INC.

1          MR. BERNICK:  Objection.  Calls for speculation, lack

2   of foundation.

3          THE WITNESS:  I was not addressing causality.  This

4   is a screening process and what I have said is there could be

5   some reliable scientific information behind these claims and

6   they should be looked at further.

7   BY MR. FINCH:

8   Q    Okay, what about -- do you believe that -- is it your

9   opinion that someone who is exposed to 4.5 fiber years of

10  exposure to Grace asbestos that that person's mesothelioma

11  could not under any circumstances be attributed to the Grace

12  asbestos exposure?

13         MR. BERNICK:  Objection.  What person are we talking

14  about?

15         THE COURT:  Yes.

16         MR. FINCH:  A hypothetical person.

17         MR. BERNICK:  A hypothetical person under what

18  particular circumstances?

19         MR. FINCH:  Your Honor, may I get an answer to my

20  question?

21         MR. BERNICK:  Your Honor, I really --

22         THE COURT:  No, you can get a ruling on the

23  objection.  Gentlemen, both of you have to stop this.  All of

24  you have to stop it.  The ruling on the objection is that the

25  objection is sustained.  The hypothetical at this point does

**J&J COURT TRANSCRIBERS, INC.**

Anderson - Cross/Finch                    227

1  not fit the facts.  You may restate the question.

2  BY MR. FINCH:

3  Q    Dr. Anderson, is it your view that someone who is exposed

4  to 4.5 fiber years cumulative exposure to Grace products does

5  not have a scientifically plausible claim that their

6  mesothelioma was caused by the Grace exposure?

7  A    All right, if we take this completely away from my

8  analysis because I did not do individual analysis, I am not

9  trying to establish causality.  I was trying to establish a

10 viable screen at a very severe upper bound conservative level

11 from the analysis.  But if you ask me if I think that someone,

12 anyone with this kind of exposure has -- what did you say?

13 Q    Has a mesothelioma that has a scientifically valid claim

14 that their mesothelioma could have been caused by exposure to

15 Grace asbestos.

16            MR. BERNICK:  I object to the form of the question.

17            THE COURT:  That's sustained.

18            THE WITNESS:  Certainly not.

19            THE COURT:  It's sustained.  This witness is not

20 doing individual causation analysis.  There is no foundation on

21 this record for that.

22 BY MR. FINCH:

23 Q    Okay, so in your view someone who has 4.5 fiber years of

24 exposure to Grace asbestos and has mesothelioma, that person

25 cannot scientifically, validly attribute their mesothelioma to

**J&J COURT TRANSCRIBERS, INC.**

PP
Ctr

1  the Grace exposure?

2  A    I said I was willing to answer in the abstract.  That's

3  not the subject of my analysis.  We're on the inference part of

4  that curve.  I presented all of these benchmarks to give a feel

5  for just how low these values are or how high they are.  I had

6  the benchmarks and then I assembled the data.  But when you're

7  speaking of these very low levels that are vastly lower than

8  the observed range, I can tell you what, I think, that is, that

9  we are getting very far away from the scientific basis for

10 making that judgment.  And that's what I've said in my

11 deposition.  I'm being consistent.

12       But this is not -- I'm not doing individual causality

13 analysis in this work I've done.  I'm looking again --

14 Q    So you're not doing -- you're not offering any opinion

15 that someone with any particular exposure to Grace products,

16 that their mesothelioma couldn't have been caused by that

17 exposure?

18       MR. BERNICK:  Objection to the form of the question.

19 Are we talking about a specific individual?  Are we talking

20 about individuals within a group?

21       MR. FINCH:  Any individual.

22       MR. BERNICK:  I don't think that addresses the issue.

23 Your Honor, at this point I think this witness has been here

24 for a long time.  This is argumentative --

25       MR. FINCH:  Your Honor, this is an argumentative

**J&J COURT TRANSCRIBERS, INC.**

Anderson - Cross/Finch                          229

1 objection.  He should either object to form or not object to

2 form.

3          THE COURT:  Mr. Finch, the witness has testified

4 repetitiously that she has been doing analyses within

5 categories, that she is not looking at individual analyses --

6          MR. FINCH:  Okay, let me ask three more questions.

7 BY MR. FINCH:

8 Q    You have something called OSHA PEL on there as a

9 benchmark, correct?

10 A    Yes.

11 Q    Is it your view that the OSHA PEL is -- that there is no

12 excess risk of mesothelioma from exposure to asbestos at that

13 level?

14 A    Using public health protective risk analysis, they have

15 done some statements, hypothetical statements of risk

16 associated with that.  They're not that high.  It's what OSHA

17 accepts.  What I have said is that if we're dealing with

18 scientific-based information, we would need to be above the

19 observed range, about 25 fibers per milliliter year.  And as we

20 go down that curve, the competence that there is any

21 association becomes less and this is very low on that

22 competence curve.  So I'm not establishing causality.  I was

23 providing this information for a screen and against that screen

24 I was using an exceptionally severe set of assumptions.  And so

25 I think you are -- I don't think I can answer individual claim

1 questions.

2           The second part of that answer has to be, for any

3 individual claim, I think one must look at, if anyone is doing

4 this which I am not as far as risk analysis is concerned, you'd

5 have to look at the whole set of circumstances, how long a

6 person has been exposed, what are the alternative exposures.

7 And just to say if someone was exposed at 4.5 and the inference

8 zone of a hypothetical dose response curve where the curve is

9 uncertain in the inference zone anyway and it's uncertain by

10 factors -- Nicholson said factor of 20 on either side -- I

11 don't think that this OSHA number is created to establish

12 causality.  That's my view.

13 Q    Are you aware that OSHA's preamble to the regulation

14 states that OSHA's risk assessment also show that reducing

15 exposures to 0.1 fiber per cc would reduce excess cancer risk

16 to 3.4 per 1,000 workers?

17 A    That is -- that's what I was talking about earlier when I

18 talked about the divergence between causality and

19 inference-based judgments.  OSHA is speaking as a public health

20 protective agency.  They're charged with protecting worker

21 health.  They're using the same precautionary dose response

22 curves I used at EPA and that's what they mean.  They're

23 reading that value off of this hypothetical default curve that

24 I described earlier that I described as a plausible upper bound

25 on the risk, meaning the risk could be considerably lower even

PP
Ctr

1  approaching zero.

2          So they're saying if I go down that curve somewhat

3  more, I would get a smaller number.  But, in fact, we don't

4  know that there's any cancer caused, or mesothelioma or any

5  cancer, caused on this linear non threshold curve.  And the

6  desire in all of risk analysis for carcinogens now is to

7  understand the mechanisms of action so that we can better

8  describe the slow dose range.  So these are hypothetical upper

9  bound risk estimates and that's all they are.

10 Q    And you didn't make any attempt to analyze causation on an

11 individual claimant level, correct?

12 A    Correct.

13 Q    And you did not -- you didn't make any attempt to estimate

14 any exposure to asbestos that these individuals would have had

15 from sources other than Grace, correct?

16 A    That's correct.

17          MR. BERNICK:  Objection.

18          THE WITNESS:  I made in my expert report only of

19 alternative claims and then also I did make note of those

20 claimants that I particularly made the assertion that they were

21 exposed in shipyards.

22 BY MR. FINCH:

23 Q    Okay, if the category B claimants showed cumulative

24 asbestos exposure of 4.5 fiber years, would you have concluded

25 that those claims in that category should be subject to further

Anderson - Cross/Finch                              232

1  review?

2           MR. BERNICK:  I'm sorry, could I have the question

3  read again?

4  BY MR. FINCH:

5  Q    If the category B claimants showed that they had

6  cumulative exposure to Grace products of 4.5 fiber years, would

7  you have concluded that those claims in that category should be

8  subject to further review to determine whether Grace --

9           MR. BERNICK:  Objection.

10          MR. FINCH:  -- could have caused their mesothelioma?

11          MR. BERNICK:  Objection to the form of the question.

12  Is he asking about if there was one person in the category or

13  whether the mean dose in that category was 4.5?

14  BY MR. FINCH:

15  Q    If the mean dose in that category was 4.5 instead of 2.1.

16  A    It would depend on the product, the product mix and a view

17  of all the benchmarks.  I wouldn't do it necessarily just

18  because -- that's if you're exposed to the OSHA standard for 45

19  years and that does not mean that OSHA has set a standard, that

20  they think, in an occupational setting would cause

21  mesothelioma, nor do I.  But I think before that judgment could

22  be made, one would have to look at the entire nature of

23  exposure category, what the product is that one is being

24  exposed to and make judgments against all of the benchmarks.

25  But probably not.

                  J&J COURT TRANSCRIBERS, INC.

1          MR. BERNICK:  Your Honor, at this point I would note

2    that Mr. Finch has now doubled his 15 minutes and their

3    estimate of two and a half hours is wrong by 35 minutes and

4    they have now doubled the time that I spent on direct

5    examination and I'm concerned about finishing today.

6          MR. FINCH:  Your Honor, I don't have any more

7    questions.

8          THE COURT:  Redirect?

9          MR. BERNICK:  Let's do a couple of things here this

10   afternoon quickly.  Could I have the ELMO on please for just a

11   moment?  Thank you very much.

12                    REDIRECT EXAMINATION

13   BY MR. BERNICK:

14   Q    Referring you to that same table which is contained in

15   GX-188 that had the K-M factors that Mr. Finch talked about, he

16   asked you a lot about this one here which is insulation workers

17   which is 1.5 times ten to the minus eight, do you recall that?

18   A    Yes.

19   Q    And if we take a look at the insulation workers and in

20   fact the description that Mr. Finch directed you to, it was at

21   Section 3.2, and the continuing on or the continuing language

22   on Page 14 was, "These workers were exposed primarily to

23   chrysotile prior to 1940, to chrysotile and amosite or from

24   1940 to 1965, and largely to chrysotile thereafter."  You see

25   where it refers to exposure to chrysotile and amosite for 25