**Trial Testimony Designations for:**
***United States v. W. R. Grace & Co., et al.*** **(U.S. Dist. Ct., Dist. of Montana, Missoula Division, Case No. CR 05-07-M-DWM)**
**February 23, 2009**
**Afternoon Session**

**Deposition Designation Key**

**Arrowood = Arrowood Indem. Co. f/k/a Royal Indem. Co. (Light Green)**

**BNSF = BNSF Railway Co. (Pink)**

**Certain Plan Objectors "CPO" = Government Employees Insurance Co.; Republic Insurance Co. n/k/a Starr Indemnity and Liability Co.; OneBeacon America Insurance Co.; Seaton Insurance Co.; Fireman's Fund Insurance Co.; Allianz S.p.A. f/k/a Riunione Adriatica Di Sicurta; and Allianz SE f/k/a Allianz Aktiengesellschaft; Maryland Casualty Co.; Zurich Insurance Co.; and Zurich International (Bermuda) Ltd.; Continental Casualty Co. and Continental Insurance Co. and related subsidiaries and affiliates; Federal Insurance Co.; and AXA Belgium as successor to Royal Belge SA (Orange)**

**CNA = Continental Cas. Co & Continental Ins. Co. (Red)**

**FFIC = Fireman Funds Ins. Co. (Green)**
**FFIC SC = Fireman Funds Ins. Co. "Surety Claims" (Green)**

**GR = Government Employees Ins. Co.; Republic Ins. Co. n/k/a Starr Indemnity and Liability Co.**

**Libby = Libby Claimants (Black)**

**OBS = OneBeacon America Ins. Co. and Seaton Ins. Co. (Brown)**

**PP = Plan Proponents (Blue)**

**Montana = State of Montana (Magenta)**

**Travelers = Travelers Cas. and Surety Cos. (Purple)**

**UCC & BLG = Unsecured Creditors' Committee & Bank Lenders Group (Lavender)**

**AFNE = Assume Fact Not in Evidence**
**AO = Attorney Objection**
**BE = Best Evidence**
**Cum. = Cumulative**
**Ctr = Counter Designation**
**Ctr-Ctr = Counter-Counter**
**ET = Expert Testimony**
**F = Foundation**
**408 = Violation of FRE 408**
**H = Hearsay**
**IH - Incomplete Hypothetical**
**L = Leading**
**LA = Legal Argument**
**LC = Legal Conclusion**
**LPK - Lacks Personal Knowledge**
**LO = Seeking Legal Opinion**
**NT = Not Testimony**
**Obj: = Objection**
**R = Relevance**
**S = Speculative**
**UP = Unfairly Prejudicial under Rule 403**
**V = Vague**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

---

UNITED STATES OF AMERICA,

Plaintiff,

vs.

W.R. GRACE & COMPANY, HENRY A. ESCHENBACH, JACK W. WOLTER, WILLIAM J. McCAIG, ROBERT J. BETTACCHI, and ROBERT C. WALSH,

Defendants.

CASE NO.
CR 05-07-M-DWM

Missoula, Montana
2.23.09
1:00 p.m.

---

JURY TRIAL - VOLUME 1 - AFTERNOON SESSION
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE DONALD W. MOLLOY,
UNITED STATES DISTRICT JUDGE, and a jury.

Proceedings recorded by mechanical stenography and transcript produced by computer by
Julie M. Lake, RDR, RMR, CCR,
Martin-Lake & Associates, Inc.

Libby

PP Obj: F; R

period of time after which the mine had been shut down, commencing with the reclamation process and the conveyance of these properties.

And then finally the conspiracy to defraud does go back during an earlier period of time, but now a conspiracy to defraud is not endangerment. The claim is not that there was a conspiracy to endanger back in the '70s and '80s, but rather a conspiracy to defraud back in the '80s.

So as the Court has indicated, these are very, very specific claims, very, very specific charges that are being made and you have to keep your eye on the ball of those charges.

Now, what I'm going to try to do for this afternoon and spend most of my time on is talking about what the evidence will show. Because together with these very specific claims you have to deal with all the evidence in the case.

But I want to come back and say that given these claims there is one charge that is not being made here even by the Government. There is no charge in this case that the Defendants, either Grace or the individuals, acted criminally to cause injury to the miners and their families. There is not that charge in this case. And I say that without saying--trying to say, well, let's just kind of gloss all over that. There is no question that the miners and their families suffered tragic losses as a consequence of the operation of

Libby

PP Obj: F; R

this mine. There is no question about that. And the fact of that injury and that toll casts a dark shadow over Grace, over Libby and over this courtroom. And I'm not denying that. Nobody can deny that.

But this case requires that you, in satisfaction of your oath, focus on what is it that counts on the charges that actually are being made, and there is no such charge in this case.

So what is the story then? What is the evidence? What will the evidence show? To lay out the evidence I'm going to talk about one common story that carries throughout this case from beginning to end, and I'm going to come back to the charges in order to help organize some of those facts towards the very end, God willing, if I have enough time. But the most important thing that I want to accomplish is to talk about the story, the basic story line, so that you can hear it all in one sequence and start to think about that story.

In service of that, T.J., if you can help out with this board here. I'm going to walk through one sequence of history and try to lay that story out for you.

So, where do we begin? We begin in 1976. Because in 1976 is the point in time at which the criminal charges in this case begin. 1976.

Now, we could just start there; that's where the conspiracy is charged to have begun, but we're going to go back

to offer evidence that says that the people of the Libby community are now getting sick with asbestos-related disease at an alarming rate. And even this week you are going to hear testimony from witnesses who will talk about the fact that they have lived in Libby and that they are getting sick. Witness after witness after witness. And the effect of that, of seeing all those witnesses line up, will obviously be to invoke the pall. Obviously to invoke the question of people getting hurt. Will it really be relevant to any of these different theories, any of these different charges? You will have to decide that. But you are going to hear about it. You are going to hear from Dr. Whitehouse who has diagnosed almost all of these different people. He's a local doctor in the area who has basically diagnosed hundreds of people, and he's going to come in here and testify.

So it is the position of Grace in this case that the existence of disease claims and charges in Libby with respect to these people in the community is not part of the charges here. We don't believe it's relevant, but we also do not believe that it's true.

I want to take you through a couple concepts to leave in your mind as you think about the evidence that you hear from the stand, because science has a way of clarifying and deemotionalizing these very important claims that are being made. They cannot be decided on the basis of emotion. They

PP Ctr.

have to be decided on the basis of science. And you will have the opportunity to see this science, and what you will see, you will see that there is this concept called latency. Remember how I said you have the workers that are exposed back here long ago who are now getting sick today? That is the concept of latency. It says that the exposure is long before the actual diagnosis. You know that that's so, it's been demonstrated by science with respect to asbestos. It is the heart of asbestos science. Latency, latency, latency.

We have an illustration of that in the case of Libby with the workers. The workers are the ones who have been exposed the most. And the mortality studies that you have heard about are studies that deal with the workers. And, in fact, they had high exposure, there was a latency period, and now, over time, the disease has risen. And that disease includes lung cancer, mesothelioma, asbestosis and diffuse pleural thickening. This is the arc type of latency: High exposure, a lag, later disease. Later disease isn't caused by something in the '60s or '70s. It's caused by something--or the '70s, '80s. It's caused by exposures that took place long ago. It will start in the '60s, probably tracing back to exposure in the '40s and so on and so forth.

So now the question becomes, okay, what about community disease? The first thing that you know is if people are getting sick today, it's not because of a condition today

PP Ctr.

PP Ctr.

or for that matter recently. Now, there may be an individual who says that. There may be some evidence in some cases, but by and large the curve should be--the curve today like this, you should be looking for exposure like this back in a long period of time ago and at very high concentrations.

So what do we see? First of all, science says precisely that. Then you have to ask, is there some other explanation for the fact that nonworkers could be getting sick? The first one that's very well documented is family illness often is associated with occupational exposures because of take-home dust. People did take home dust. Take-home dust is not the endangerment in this case. It's not the conspiracy to endanger in this case. It's known as one of those things that we would say doesn't fit with this case at all but we'll discuss it.

But, in fact, we do know that workers used to bring home asbestos dust on their clothes. As a consequence, their families were exposed and there is family illness. That illness is not from dust in the town. It's not from the kind of endangerment, ambient air that's being discussed in this case. It's from an occupational exposure in the home associated with the job.

Another potential dynamic is you have people who get, in Libby, asbestos-related disease but is not related to the mine. It's related to the fact that they used to work in

another occupation or another job where they were exposed to asbestos. Asbestos has been pervasive all over the country. Lots and lots of people have been hurt by asbestos completely independently of the Libby mine.

So when somebody comes in today and presents with something that amounts to evidence of exposure, and you'll hear all about what's disease, what's not disease, you'll hear about pleural plaques. Again, one of the explanations is potential exposure at nonLibby occupational environments.

Well, is there any disease at Libby that is caused solely by exposure to ambient air, which is the heart of the endangerment claim, that is unrelated to the mine, unrelated to worker take-home dust, unrelated to other exposure, is just a consequence of being in the Libby community?

Well, science would tell you two things: One, that if that's true, if there is such disease today, there must have been a high exposure event long ago. In other words, there must be evidence that people in the town were exposed long ago to very, very high exposures. There may be some people who fit this bill going back to the '40s and '50s, we don't believe there are very many at all, and they go back to this very, very long ago period of time. They are not people who are exposed at all, they are not people who have gotten sick at all as a consequence of any of the charges that have been made in this case, but there may be some. We think probably a very, very

PP Ctr.

PP Ctr.

few. Certainly not the hundreds that you are going to hear about.

The other thing that you would expect from the science if there were true community disease caused by the air at Libby, the endangerment air, is that they would emerge in a study. That is, studies have been done to see--you are always going to get a certain level of disease, including diseases that are similar to or in some cases actually overlap with asbestos- related disease, such as lung cancer being caused by smoking. So the way to tease out whether there is an excess of disease is to do these mortality studies.

Well, there has been science mortality studies regarding Libby to see is there an excess of disease at Libby. And counsel quoted from that study this morning and told you about 40 to 80 times or something percent or whatever excess mortality at Libby. That's what he told you. In fact, there was a mortality study in very recent times that asks exactly that question.

What he didn't tell you when he quoted that study was that the study actually distinguishes disease at Libby associated with the mine from disease at Libby that is not associated at the mine. It's more community disease. And if you take the disease at Libby and that mortality study that's associated with the mine out, what you find is that there is no statistically increased incidence of mortality associated with

being in Libby. The study that counsel quoted this morning needs to be read very, very carefully.

Are there other explanations for the fact that a lot of people have come actually more or less since the EPA came into town in 1999? Are there alternative explanations for how all these hundreds of people can now be being diagnosed? And there are a lot of other explanations. There are very, very logical explanations completely consistent with the scientific work that I just cited to you.

So I would ask you when it comes to this idea and when you hear all these different people testify and you hear from Dr. Whitehouse, this is an area of science. I would ask you to keep an open mind and listen to the science. It's going to be very easy to be affected by the pall of mortality at Libby, but that pall doesn't answer your questions in this case, we believe. So we would ask you to keep an open mind and listen to the science.

PP Ctr.

On that note, I would say I'd urge you on behalf of Grace, keep your eye on the ball. What's this case all about? I think you now begin to appreciate it's a difficult case in which to do that.

I agree with Mr. McLean; look at what did Grace know and when did they know it? Likewise with the individual Defendants, what did the individual Defendants know and when did they know it? Why is that important? It's important