**Deposition Designations for:**
**DAVID AUSTERN**
**May 15, 2009**

**<u>Deposition Designation Key</u>**

**Arrowood = Arrowood Indem. Co.**
**f/k/a Royal Indem. Co. (Light Green)**

**BNSF = BNSF Railway Co. (Pink)**

**Certain Plan Objectors "CPO" = Government Employees Insurance Co.; Republic Insurance Co.**
**n/k/a Starr Indemnity and Liability Co.; OneBeacon America Insurance Co.; Seaton Insurance**
**Co.; Fireman's Fund Insurance Co.; Allianz S.p.A. f/k/a Riunione Adriatica Di Sicurta; and Allianz**
**SE f/k/a Allianz Aktiengesellschaft; Maryland Casualty Co.; Zurich Insurance Co.; and Zurich**
**International (Bermuda) Ltd.; Continental Casualty Co. and Continental Insurance Co. and**
**related subsidiaries and affiliates; Federal Insurance Co.; and AXA Belgium as successor to Royal**
**Belge SA (Orange)**

**CNA = Continental Cas. Co & Continental Ins. Co. (Red)**

**FFIC = Fireman Funds Ins. Co. (Green)**
**FFIC SC = Fireman Funds Ins. Co. "Surety Claims" (Green)**

**GR = Government Employees Ins. Co.; Republic Ins. Co. n/k/a Starr Indemnity and Liability Co.**

**Libby = Libby Claimants (Black)**

**OBS = OneBeacon America Ins. Co. and Seaton Ins. Co. (Brown)**

**PP = Plan Proponents (Blue)**

**Montana = State of Montana (Magenta)**

**Travelers = Travelers Cas. and Surety Cos. (Purple)**

**UCC & BLG = Unsecured Creditors' Committee & Bank Lenders Group (Lavender)**

| | |
|---|---|
| **AFNE = Assume Fact Not in Evidence** | **L = Leading** |
| **AO = Attorney Objection** | **LA = Legal Argument** |
| **BE = Best Evidence** | **LC = Legal Conclusion** |
| **Cum. = Cumulative** | **LPK - Lacks Personal Knowledge** |
| **Ctr = Counter Designation** | **LO = Seeking Legal Opinion** |
| **Ctr-Ctr = Counter-Counter** | **NT = Not Testimony** |
| **ET = Expert Testimony** | **Obj: = Objection** |
| **F = Foundation** | **R = Relevance** |
| **408 = Violation of FRE 408** | **S = Speculative** |
| **H = Hearsay** | **UP = Unfairly Prejudicial under Rule 403** |
| **IH - Incomplete Hypothetical** | **V = Vague** |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

In Re:                    : Chapter 11
                          :
                          : Case No.
W.R. GRACE & CO., et al,  : 01-01139 JKF
                          :
                          : (Jointly
          Debtors         : Administered)


- - -


Friday, May 15, 2009


- - -


                Oral deposition of DAVID T.

AUSTERN, ESQUIRE, taken pursuant to

notice, was held at the offices of ORRICK

HERRINGTON & SUTCLIFFE, LLP, Columbia

Center, 1152 15th Street, N.W.,

Washington, DC  20005-1706, commencing at

10:07 a.m., on the above date, before

Lori A. Zabielski, a Registered

Professional Reporter and Notary Public

in and for the Commonwealth of

Pennsylvania.

                - - -

          MAGNA LEGAL SERVICES
           Seven Penn Center
           1635 Market Street
               8th Floor
     Philadelphia, Pennsylvania 19103

Page 10   CPO

1   EXHIBITS (continued)
2
    NO.    DESCRIPTION         PAGE
3
    Austern-10
4      Form 8-K           124
5   Austern-11
       Exhibit 8 to Exhibit Book
6      Best Interests Analysis   156
7           - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 11   CPO

1           - - -
2   DEPOSITION SUPPORT INDEX
3           - - -
4
5   Direction to Witness Not to Answer:
6   Page   Line     Page   Line
7   181    13       225    16
    229    04       239    03
8
9
10  Request for Production of Documents:
11  Page   Line     Page   Line
12  NONE
13
14
15  Stipulations:
16  Page   Line     Page   Line
17  NONE
18
19
20  Area(s) Marked Confidential:
21  Page   Line     Page   Line
22  NONE
23
24

Page 12

1           - - -
2           PROCEEDINGS
3           - - -
4        MR. GUY:  We will follow the
5   federal rules.
6           - - -
7        DAVID T. AUSTERN, ESQUIRE,
8   after having been first duly
9   sworn, was examined and testified
10  as follows:
11          - - -
12          EXAMINATION
13          - - -
14  BY MR. BROWN:
15       Q.   Good morning, Mr. Austern.
16  My name is Michael Brown.  I represent
17  OneBeacon American Insurance Company,
18  Seaton Insurance Company, GEICO, and
19  Republic Insurance Company.
20       Could you state your full
21  name for the record, please?
22       A.   David Thomas Austern.
23       Q.   Have you ever been deposed
24  before?

Trav.

Page 13

1        A.   Yes.
2        Q.   How many times?
3        A.   Somewhere between 25 and 30
4   times.
5        Q.   So it's fair to say that you
6   are familiar with the protocol for a
7   deposition then?
8        A.   I am.
9        Q.   Okay.  Can you give me a
10  summary of your professional background?
11       A.   I was an assistant district
12  attorney in the New York County District
13  Attorney's Office for four years; I was
14  an assistant United States attorney in
15  the United States Attorney's Office in
16  Washington, D.C. for four years; I was a
17  law professor for two years; I was in the
18  private practice of law for something
19  like 12 years; and I've been general
20  counsel of the Manville Personal Injury
21  Settlement Trust, and I have had some
22  other asbestos matters for the last 21
23  and a half years.  That doesn't add up to
24  45, and it should, but...

PP Obj: R

PP Obj: R

260d1ee9-cc5e-438d-b137-446673430c89



CPO

PP Obj: R

1   Q.   Those are estimates, I take
2   it?
3   A.   Those are estimates, yes.
4   Q.   What did you do in
5   preparation for today's deposition?
6   A.   I reviewed some documents,
7   and I spoke to counsel.
8   Q.   What documents did you
9   review?
10   A.   I also reviewed some
11   transcripts.
12       I reviewed the Personal
13   Injury Trust Agreement; the Trust
14   Distribution Process -- the Personal
15   Injury Trust Distribution Process; the
16   Transfer Agreement; the Cooperation
17   Agreement; I reviewed Ms. Biggs' latest
18   estimation report; Dr. Peterson's latest
19   report; Dr. Florence's latest report;
20   Dr. Whitehouse's -- one of
21   Dr. Whitehouse's reports -- I am sorry --
22   two of Dr. Whitehouse's reports; the
23   rebuttal to those reports from Dr. Welsh
24   and Dr. Freedman; the objections filed by

CPO

PP Obj: R

1   the Libby claimants and by one or more
2   insurance companies, and I am not sure I
3   know which ones; my prior deposition in
4   this case; my prior deposition in the
5   Combustion Engineering case; my testimony
6   in the Combustion Engineering case.  I
7   may have left something out, but I think
8   those are most of the documents I
9   reviewed.
10   Q.   Okay.  And you also
11   mentioned that you had reviewed some
12   transcripts?
13   A.   Those were the depositions
14   and trial testimony -- oh, excuse me.
15   Yes.  I reviewed Mr. Lockwood's
16   deposition.
17   Q.   Did you actually review the
18   Amended Plan of Reorganization?
19   A.   Yes -- and excuse me -- and
20   the Disclosure Statement.
21   Q.   And over what period of time
22   did you review all these materials in
23   preparation for your deposition?
24   A.   Two weeks.  I did one other

PP Obj: R

CPO

1   thing in preparation of the deposition.
2   I listened to parts of, albeit not all,
3   of the Lockwood deposition.
4   Q.   Did you meet with counsel in
5   preparation for the deposition?
6   A.   Yes.
7   Q.   When?
8   A.   Last Friday and yesterday.
9   Q.   And for how long last
10   Friday?  What period of time did you meet
11   with counsel?
12   A.   I confess I don't remember,
13   but it was several hours.
14   Q.   And the more recent meeting?
15   A.   I would say three hours.
16   Q.   Was it just counsel for the
17   Future Claimants' Representative or were
18   other Plan proponent counsel present?
19   A.   No.  There were no other
20   Plan proponent counsel.
21   Q.   In reviewing Mr. Lockwood's
22   deposition testimony, was there anything
23   in his transcript with which you
24   disagreed?

PP Obj: R

CPO

1   A.   I don't remember -- nothing
2   occurs to me, although if you showed me a
3   question and answer, I might say I
4   disagreed.  But I don't recall anything.
5   Q.   Okay.  When you listened in
6   on a portion of the deposition, was there
7   anything that you heard by way of an
8   answer by Mr. Lockwood that struck you as
9   inaccurate?
10   A.   Not that I recall.
11   Q.   Okay.  Now, you mentioned
12   that you had reviewed the Disclosure
13   Statement, the Plan, the PI Trust
14   Agreement I assume you were referring to,
15   the PI Trust Distribution Procedures, the
16   Transfer Agreement, and the Cooperation
17   Agreement?
18   A.   Yes.
19   Q.   Do you understand all of
20   those documents?
21   A.   No.
22   Q.   Are there particular
23   documents that you understand better than
24   others?

PP Obj: R

260d1ee9-cc5e-438d-b137-446673430c89

Page 18

```
 1      A.   Yes.
 2      Q.   Which ones?
 3      A.   The Trust Distrubution
 4  Process.
 5      Q.   By that, you mean the
 6  Asbestos PI Trust Distribution
 7  Procedures?
 8      A.   Yes, yes.
 9      Q.   Okay.
10      A.   I will refer to it as the
11  TDP, most likely.
12      Q.   We will finish the
13  deposition a lot sooner if you do that.
14      A.   And there were some sections
15  in some of the other documents I thought
16  I understood and some sections I thought
17  I did not.
18      Q.   Okay.  How about the Trust
19  Agreement?
20      A.   I believe I understood most
21  of that.
22      Q.   Okay.  You were appointed by
23  the bankruptcy court as the, quote, legal
24  representative, close quote, under
```

Page 19

```
 1  Section 524(g) of the bankruptcy code,
 2  correct?
 3      A.   Correct.
 4      Q.   When did that occur?
 5      A.   Just about this time of year
 6  five years ago.
 7      Q.   Okay.  So in 2004?
 8      A.   Yes.
 9      Q.   And, as I understand it,
10  under the Plan your title is the asbestos
11  PI FCR, correct?
12      A.   Yes.
13      Q.   And the FCR is for Future
14  Claimants' Representative?
15      A.   Yes.
16      Q.   You will understand if I
17  refer to you as the FCR in the
18  deposition?
19      A.   I will understand what the
20  reference is.
21      Q.   Okay.  You are a
22  co-proponent of the Plan, correct?
23      A.   Yes.
24      Q.   How did you come to be the
```

Page 20

```
 1  FCR?  I understand that you were approved
 2  by the bankruptcy court, but how were you
 3  presented, if you will, for that role?
 4      A.   Understanding I was not in
 5  the case at the time, I can only tell you
 6  what documents I have looked at appear to
 7  say.
 8      Q.   Okay.
 9      A.   The Debtor presented to the
10  court a motion of seeking an appointment
11  of an FCR, provided the court with three
12  names and an untitled fourth name -- I
13  will explain that in a moment.  The three
14  names proposed were me and two other
15  people, and then a statement that the
16  Property Damage Representatives didn't
17  want any of the three names mentioned by
18  the Debtor and wanted some unnamed fourth
19  person.  So there were four, if you will,
20  potential choices presented to the
21  bankruptcy court.
22      Q.   Who were the other two named
23  individuals?
24      A.   Professor Eric Green and
```

Page 21

```
 1  Dean Trafelet.
 2      Q.   I gather from your answer
 3  that at the time this occurred, it was
 4  contemplated that there would be a single
 5  asbestos trust that would handle both
 6  personal injury claims and property
 7  damage claims?
 8      A.   I don't know.
 9      Q.   Do you have any idea how the
10  Debtors came up with the three names that
11  they did?
12      A.   I know what they said in
13  their pleading.  They said they had
14  discussed this matter with, well,
15  obviously, the Property Damage Trust
16  Representatives that I mentioned, and
17  they had discussed it with one or more
18  Creditors Committees and the Asbestos
19  Claimants Committee.
20      Q.   And then did the bankruptcy
21  court select you from the list of
22  contenders for the position?
23      A.   Well, I have left out a
24  pleading.
```

260d1ee9-cc5e-438d-b137-446673430c89

Page 22

1    Q.   Okay.
2    A.   The Asbestos Claimants
3  Committee filed a motion, I guess, in
4  response to the Debtors motion in which
5  they -- I should back up a step.
6         The Debtors motion had a
7  chart on it, as I recall, which showed
8  who opposed various of the names
9  mentioned and who was in favor of various
10 of the names mentioned, looking at the
11 committees.  And one of the things that
12 was said was that the ACC opposed me and
13 wanted Dean Trafelet.  The ACC responded
14 to that, I believe, saying they did not
15 oppose me, but they wanted Dean Trafelet
16 rather than me.
17   Q.   Okay.  And did judge
18 Fitzgerald then make a decision based
19 upon the pleadings you just described?
20   A.   I don't know what drove her
21 decision, but she made a decision and she
22 selected me.
23   Q.   Okay.  Now, did you have the
24 title FCR with respect to other asbestos

Page 23

1  trusts?
2    A.   Yes.
3    Q.   Which ones?  Actually, just
4  for purposes of that question, I want to
5  focus on trusts that are obviously up and
6  running as opposed to ones that may be in
7  the works.
8    A.   One other trust, the
9  Combustion Engineering Trust.
10   Q.   And then you mentioned
11 earlier that you are the general counsel
12 for the Manville Trust?
13   A.   Yes.
14   Q.   Is your role as the general
15 counsel for the Manville Trust akin to
16 your role as the FCR for the Combustion
17 Engineering Trust?
18   A.   No.
19   Q.   Okay.  Can you describe the
20 differences in your roles?
21   A.   Well, first of all, the
22 Manville Trust has a Futures Claims
23 Representative.
24   Q.   Okay.

Page 24

1    A.   So I certainly don't have
2  that role.  I advise the trustees -- I am
3  the legal advisor to the trustees and
4  sometimes trust staff.
5    Q.   And what is your role as the
6  FCR for the Combustion Engineering Trust?
7    A.   I represent future
8  claimants.
9    Q.   Are you familiar with a term
10 "Trust Advisory Committee"?
11   A.   Yes.
12   Q.   Is there a Trust Advisory
13 Committee for the Combustion Engineering
14 Trust?
15   A.   Yes.
16   Q.   And who are its current
17 members?
18   A.   Mr. Cooney, Mr. Weitz,
19 Mr. Kazan, and there is somebody else.
20 And I am not sure who it is.
21   Q.   With respect to the
22 Combustion Engineering Trust, did you
23 have the role of future claimants -- let
24 me back up.  Strike that.

Page 25

1         Did you have the role of
2  legal representative, as that term is
3  used in Section 524(g) of the bankruptcy
4  code?
5    A.   I believe that was what I
6  was, yes.
7    Q.   Okay.  And were you a
8  co-proponent of the CE Trust --
9    A.   Yes.
10   Q.   The CE Plan?
11   A.   Yes.
12   Q.   Putting aside confirmed
13 plans and trusts that are up and running,
14 are you the designated Future Claimants'
15 Representative in connection with any
16 pending asbestos bankruptcy cases other
17 than the Grace case?
18   A.   No.
19   Q.   Are you familiar with the
20 statutory requirements for a Section
21 524(g) trust?
22   A.   I am generally familiar.  I
23 am not sure I can recall each and every
24 one right at the moment.

260d1ee9-cc5e-438d-b137-446673430c89

Page 26

```
 1        Q.    You have read Section
 2   524(g)?
 3        A.    I have.
 4        Q.    How many times?
 5        A.    Countless times.
 6        Q.    Okay.  That's what I thought
 7   you would say.
 8             Did you play any role in the
 9   drafting or enactment of Section 524(g)?
10        A.    I met with some legislators
11   and the staff of some legislators at the
12   time it was being proposed.
13        Q.    And who were they?
14        A.    Senator Heflin, one of
15   Senator Heflin's legislative assistants,
16   counsel to Senator Kennedy.  There were
17   some other staff members of some other
18   senators that I met with.  I am not sure
19   I can recall them.
20        Q.    Besides meeting with them,
21   did you have any input in the provisions
22   that appear in Section 524(g)?
23        A.    I am not sure I know what
24   you mean by input.  I attended --
```

Page 27

```
 1        Q.    Let me back up.
 2             Did you comment on any
 3   drafts?  Did you provide suggestions as
 4   to what the legislation should involve in
 5   terms of requirements for 524(g) trust?
 6        A.    No.
 7        Q.    Okay.  What was the nature
 8   of your input then?
 9        A.    I was asked to come answer
10   questions that they had about the
11   necessity for 524(g).
12        Q.    Okay.  And what, if you
13   recall, did they specifically ask you?
14        A.    Well, the Manville Trust, of
15   course, did not have the benefits of a
16   524(g) injunction, and it frustrated
17   somewhat dramatically our ability to sell
18   our Manville stock, which was a very
19   large percentage of the assets of the
20   Trust.  And they wanted to know why --
21   because there was another injunction
22   under Section 105.  They wanted to know
23   why I thought it would be easier to sell
24   the Manville stock if we had 524(g)
```

Page 28

```
 1   protection in addition to whatever
 2   Section 105 gave us.
 3        Q.    And what was your rationale
 4   or your response?
 5        A.    First of all, we couldn't
 6   sell the stock because people,
 7   prospective purchasers were worried about
 8   Section 105 protection, and that came out
 9   again and again in attempts to sell the
10   stock.  I can't think of any other way of
11   putting it.
12        Q.    Okay.  Other than what you
13   have just described, did you have any
14   other input with respect to Section
15   524(g)'s enactment?
16        A.    No.
17        Q.    All right.  In this case,
18   there are actually two Future Claimants'
19   Representatives, correct?
20        A.    Yes.
21        Q.    There is the PI FCR and
22   there is the PD FCR?
23        A.    Yes.
24        Q.    I want to focus on your role
```

Page 29

```
 1   as the PI FCR, obviously, and what I
 2   would like you to do first is to identify
 3   for me the members of the Asbestos PI
 4   Trust Advisory Committee in this case.
 5        A.    Well, the members --
 6        Q.    The proposed members, I
 7   should say.
 8        A.    The members are actually, as
 9   I understand it, individual claimants,
10   but they are represented by certain
11   lawyers, who I guess you would say appear
12   on their behalf.  And they are Mr. Budd,
13   Mr. Cooney, Mr. Weitz, and Mr. Rice.
14             MR. BROWN:  Okay.  Could you
15        read my last question?
16             (The reporter read from the
17        record as requested.)
18             MR. BROWN:  Let me back up.
19        You might have misunderstood my
20        question, Mr. Austern.
21   BY MR. BROWN:
22        Q.    I was asking about the Trust
23   Advisory Committee as opposed to the
24   asbestos PI Committee.  But let's start
```

260d1ee9-cc5e-438d-b137-446673430c89

Page 30

```
 1   with what you went through.
 2          Why don't you tell me who
 3   the members of the Asbestos PI Committee
 4   are?
 5          A.   Again, they are claimants,
 6   but the PI Committee, I believe, is a
 7   much larger group of people than the ones
 8   I have just mentioned.
 9          Q.   Right.
10          A.   And I don't know all the
11   people who are on it.
12          Q.   Okay.  Does Mr. Weitz's firm
13   have a client that is on the PI
14   Committee?
15          A.   As far as I know, he does.
16          Q.   And Mr. Cooney's firm?
17          A.   Yes.
18          Q.   And Mr. Rice's firm?
19          A.   Yes.
20          Q.   And Mr. Budd's firm?
21          A.   Yes.
22          Q.   And then there are others?
23          A.   Yes.
24          Q.   But you are not sure how
```

Page 31

```
 1   many others?
 2          A.   And I don't know who they
 3   are.
 4          Q.   Now, let's get to the
 5   asbestos PI TAC.  The members of the
 6   asbestos PI TAC in this case are who?
 7          A.   Well, I could look at the
 8   signature page on the Trust Agreement and
 9   tell you, but some of the people I have
10   mentioned.
11          Q.   Actually, before we do that,
12   I neglected to mark your notice.  So why
13   don't we go back to that.
14          MR. BROWN:  We will mark
15       this as Austern-1.
16          (Austern-1 marked for
17       identification at this time.)
18   BY MR. BROWN:
19          Q.   Mr. Austern, you have before
20   you what's been marked as Austern-1.  I
21   neglected to do this at the outset of the
22   deposition.
23          Why don't you review that
24   and let me know if you can tell me what
```

Page 32

```
 1   it is.
 2          A.   It's the amended notice of
 3   my deposition.
 4          Q.   Okay.  And that's the notice
 5   pursuant to which you are appearing here
 6   today?
 7          A.   Yes.
 8          Q.   And you received a number of
 9   other Notices of Deposition from other
10   parties?
11          A.   Yes.
12          Q.   You can put that aside.
13          MR. BROWN:  This will be
14       Austern-2.
15          (Austern-2 marked for
16       identification at this time.)
17   BY MR. 1234:
18          Q.   Mr. Austern, you now have
19   before you a document that has been
20   marked Austern-2.  It is Exhibit 2 to the
21   Exhibit Book.  You will see that there is
22   prior exhibit label on it.  This document
23   was used in Mr. Lockwood's deposition.
24          But why don't you tell me
```

Page 33

```
 1   what this document is?
 2          A.   It is the Asbestos PI Trust
 3   Agreement.
 4          Q.   Okay.  And this is the
 5   document to which you wanted to refer to
 6   find the members of the TAC, correct?
 7          A.   That's correct.
 8          Q.   Who are the members
 9   of the TAC?
10          A.   I believe I already
11   mentioned them:  Mr. Budd, Mr. Cooney,
12   Mr. Rice, and Mr. Weitz.
13          Q.   Okay.  I am correct, am I
14   not, that the members of the TAC were
15   selected by the Asbestos PI Committee?
16          A.   I assume that is true.  I
17   was not present when they were selected.
18          Q.   Does the law firm of Baron
19   and Budd have clients that have submitted
20   claims to the Combustion Engineering
21   Trust?
22          A.   As far as I know.
23          Q.   Okay.  And would your answer
24   be the same for Mr. Cooney's firm?
```

260d1ee9-cc5e-438d-b137-446673430c89

Page 38

1          MR. BROWN:  I couched it as
2     does he have an understanding.
3          THE WITNESS:  I don't know.
4   BY MR. BROWN:
5          Q.   Do you have an understanding
6     as to whether Section 524(g) of the
7     bankruptcy code requires someone with the
8     title Future Claimants' Representative
9     after a Plan of Reorganization has been
10    confirmed and gone effective?
11         MR. GUY:  Same objection.
12         THE WITNESS:  I believe it
13    does.
14  BY MR. BROWN:
15         Q.   And what is the basis for
16    your belief?
17         A.   Well, my belief is based on
18    Fibreboard and the decision in Fibreboard
19    by the Supreme Court.  And I don't
20    remember if I am confusing that with
21    actually what got into the language of
22    524(g).  But the Supreme Court found
23    something of a conflict between present
24    claimants and future claimants, or at

Page 39

1     least potential conflicts, and there was
2     a Future Claims Representative or
3     essentially a requirement in that case.
4     And I think it was transferred into
5     524(g).
6          Q.   If I showed you the language
7     of 524(g), would you be able to tell me
8     where that is set forth?
9          A.   If it's not there, I
10    wouldn't.
11         Q.   You are not sure whether
12    it's there?
13         A.   That's right.
14         Q.   Okay.  The Joint Plan in
15    this case has two trusts, correct?
16         A.   Yes.
17         Q.   It has an Asbestos PI Trust,
18    and it has an Asbestos PD Trust.  Why?
19         A.   Well, that's the way the
20    Plan proponents have done it.  My view of
21    this is that property damage claimants
22    are different than personal injury
23    claimants.
24         Q.   Are you aware of any other

Page 40

1     asbestos trust that is up and running
2     that has a two-trust structure, one trust
3     involving PI claims and the other
4     involving PD claims?
5          A.   The answer to the first part
6     of your question would be yes, but not
7     because of that division.
8          Q.   Okay.  What's the division?
9          A.   Well, I believe that -- I
10    believe what I refer to as the
11    Halliburton Trust has a number of
12    sub-trusts for dispute claims but not the
13    differentiation as between property
14    damage and otherwise.
15         Q.   When you say sub-trust, do
16    you mean by that sub-funds within a
17    single trust?
18         A.   Yes.
19         Q.   Okay.  As opposed to two
20    distinct trusts?
21         A.   Yes.
22         MR. COHN:  Michael, I think
23    he's referring to silica trust.
24  BY MR. BROWN:

Page 41

1          Q.   You mentioned the PD claims
2     and PI claims are different.  They are
3     actually treated differently under this
4     Joint Plan; are they not?
5          A.   Yes.
6          Q.   Can you describe the
7     difference between asbestos PI claims and
8     asbestos PD claims under the Joint Plan?
9          A.   I can describe the treatment
10    of personal injury claims; I cannot
11    describe the treatment of property damage
12    claims.
13         Q.   Can you describe the
14    differences?
15         A.   No, because I can't...
16         Q.   Do you know whether Section
17    524(g) addresses the propriety of a
18    two-trust structure of bankruptcy?
19         A.   I do not.
20         Q.   Are you familiar with the
21    distinction between the term "demand" as
22    it's used in 524(g) and "claim" as it's
23    used in the bankruptcy code?
24         A.   No.

11 (Pages 38 to 41)

260d1ee9-cc5e-438d-b137-446673430c89



Page 42

1    Q.   Do you have any
2    understanding at all of what a demand is?
3    A.   In bankruptcy law, no.
4    Q.   Who do you understand to be
5    your constituency?
6    A.   Future claimants.
7    Q.   Do you have an understanding
8    that future claimants are the holders of
9    future demands?
10   A.   I don't know.
11   Q.   Do you have an understanding
12   as to whether the Debtors face the
13   prospect of any future asbestos PD
14   demands or asbestos PD claims?
15   A.   I believe there are
16   scenarios in which they do.
17   Q.   Could you describe them?
18   A.   No, but I believe that there
19   are property damage claims that -- that
20   the Debtor is responsible
21   post-confirmation for certain property
22   damage claims.
23   Q.   And that those property
24   damage claims would fit within what you

Page 43

1    understand to be a future property damage
2    claim as opposed to a current property
3    damage claim?
4    A.   I am not sure.
5    Q.   All right.
6    MR. BROWN:  We will mark
7    this Austern-3.
8    (Austern-3 marked for
9    identification at this time.)
10   BY MR. BROWN:
11   Q.   Mr. Austern, you have before
12   you a document that we have marked
13   Austern-3.
14   My first question is, can
15   you identify it?
16   A.   It's the first Amended Joint
17   Plan of Reorganization.
18   Q.   And this is one of the
19   documents you indicated previously that
20   you reviewed in preparation for this
21   deposition, correct?
22   A.   Yes.
23   Q.   Are there particular
24   provisions in the Plan, as you sit here

Page 44

1    today, for which you -- strike that.
2    Are there particular
3    provisions in the Plan that you don't
4    understand?
5    A.   Yes.
6    Q.   Are there any that stick out
7    in your mind in that regard?
8    A.   Can I look at the Plan for a
9    moment?
10   Q.   Sure.
11   A.   By way of example, 7.15 of
12   the document.
13   Q.   That's one that you do not
14   understand?
15   A.   Well, it's one I have
16   trouble trying to understand.
17   Q.   You are in good company.
18   A.   There are other sections of
19   the Plan and other documents I reviewed
20   that address insurance issues, which I
21   have trouble understanding and rely on
22   counsel to explain to me.
23   Q.   Well, as would have it, 7.15
24   is an area that I wanted to question you

Page 45

1    about.  So why don't we turn to that
2    section.
3    A.   (Witness complies with
4    request.)
5    Q.   And why don't you take a
6    moment to review it.  It's not terribly
7    long.
8    MR. GUY:  Is there any
9    particular section, Michael?
10   MR. BROWN:  Well, I have
11   questions about a few sections, so
12   it might be easiest if he reads
13   the whole thing.
14   THE WITNESS:  Okay.  I have
15   reviewed it.
16   BY MR. BROWN:
17   Q.   Okay.  Recognizing that you
18   don't understand it fully, do you have an
19   idea of what its intended purpose is?
20   A.   Its intended purpose, as I
21   understand it, is to create insurance
22   neutrality.
23   Q.   And what do you understand
24   insurance neutrality to be?

260d1ee9-cc5e-438d-b137-446673430c89



**Page 46**

1  A.  That the Plan does not
2  interfere with the rights of the
3  insurance companies.
4  Q.  Okay.  Are there any
5  exceptions to that broad statement, as
6  you understand Section 7.15?
7  MR. COHN:  You might want to
8  rephrase that because you just
9  changed from his understanding of
10  insurance neutrality in the broad
11  concept to a provision that very
12  clearly is not what it was
13  announced to be.
14  MR. BROWN:  Can you read the
15  last question?
16  (The reporter read from the
17  record as requested.)
18  BY MR. BROWN:
19  Q.  You understand Section 7.15
20  to be intended to preserve the insurers'
21  rights; is that a fair statement?
22  A.  Yes.
23  Q.  Okay.  Is it your belief
24  that that's what it accomplishes?

**Page 47**

1  A.  I don't know.
2  (There was a discussion held
3  off the record at this time.)
4  BY MR. BROWN:
5  Q.  Mr. Austern, are you
6  familiar with the UNR decision in the
7  Seventh Circuit, the citation to which is
8  942 F.2d 1101?
9  A.  I am familiar with the UNR
10  Trust.  I am not familiar with the
11  decision.
12  Q.  Are you familiar with what
13  happened in the trial court in the
14  Fuller-Austin coverage case?
15  MR. GUY:  Objection, vague.
16  THE WITNESS:  No.
17  BY MR. BROWN:
18  Q.  You said you just read
19  Section 7.15.  Let's focus on (a).
20  Is your understanding that
21  (a) is a preemptory provision with
22  respect to the Plan, Plan documents, and
23  Confirmation Order except as specifically
24  set forth in Section 7.15?

**Page 48**

1  MR. GUY:  Objection.
2  MR. LIESEMER:  Object to the
3  form of the question.
4  MR. GUY:  It calls for a
5  legal conclusion.  The witness is
6  a fact witness.
7  MS. BAER:  Same objection.
8  THE WITNESS:  I am not
9  positive I know what you mean by
10  preemptory.  You sort of focused
11  on my problem with 7.15.  I don't
12  know how you read the successive
13  paragraphs as impacting on each
14  other.
15  BY MR. BROWN:
16  Q.  Do you believe Section 7.15
17  to be unclear?
18  A.  To me.
19  MR. GUY:  Objection.
20  BY MR. BROWN:
21  Q.  Okay.  Well, let's explore
22  that a little bit.
23  Let's look at Section
24  7.15(b), and you will see that there is a

**Page 49**

1  reference in subsection (b) to, quote,
2  the beneficiaries of the Asbestos PI
3  Trust?
4  Do you see that?
5  A.  Yes.
6  Q.  Do you have any
7  understanding as to what that means?
8  A.  It means what it states, the
9  beneficiaries of the Personal Injury
10  Trust.
11  Q.  And who are they?
12  A.  Well, there are personal
13  injury claimants obviously, and there
14  are, under certain circumstances,
15  indirect personal injury claimants.
16  Q.  Okay.  And who do you
17  understand to be within the definition of
18  indirect PI Trust claimants?
19  A.  Entities that can bring
20  claims as indirect claimants on the
21  grounds that they have paid dollars that
22  the Personal Injury Trust should
23  reimburse them for.
24  Q.  Okay.  Are you familiar at

13  (Pages 46 to 49)



Page 50

1  all with any of the Debtors' pre-petition
2  settlements with insurance companies?
3      A.   I have seen a list, and
4  that's the extent of my knowledge.
5      Q.   Are you aware that at least
6  certain of those insurers have
7  contractual indemnity provisions against
8  the Debtors in those settlement
9  agreements?
10     A.   Can you explain to me what
11 you mean by contractual?
12     Q.   Sure.  I will represent to
13 you that there are settlement agreements
14 that are pre-petition settlement
15 agreements in which the insurer paid a
16 sum of money to the Debtors, and in
17 exchange for paying that money, the
18 Debtors agreed to indemnify the insurer
19 in the event that claims were asserted
20 against the policy after the settlement
21 by other parties.
22     A.   Third party claimants?
23     Q.   Third parties.
24         Do you understand the term

Page 51

1  "indirect PI Trust claims" to include the
2  insurers insofar as they have the type of
3  contractual indemnity claim that I just
4  described?
5         MR. LIESEMER:  Object to the
6  form of the question.
7         MR. GUY:  Same objection.
8         THE WITNESS:  Mr. Brown, I
9  understand that all asbestos
10 personal injury insurance has been
11 channeled to the Asbestos
12 Personal Injury Trust.  And there
13 are settled insurance companies
14 that -- how would I describe it --
15 their obligations have been
16 settled with the Debtor; there are
17 unsettled ones; and then there are
18 those that have coverage in place
19 agreements or reimbursement
20 agreements.
21         I don't know where your
22 question fits into my
23 understanding of those buckets of
24 insurance entities.

Page 52

1  BY MR. BROWN:
2      Q.   Okay.  Let me parse that
3  out.  Do you understand certain of the
4  Debtors' insurance companies to have
5  indirect asbestos PI claims?
6      A.   They could.  They could have
7  the right to file them, yes.
8      Q.   Okay.  And do you understand
9  those insurers to fit within the phrase
10 in (b), the beneficiaries of the Asbestos
11 PI Trust?  In other words, are the
12 insurers that have the contractual
13 indemnity claims against the Debtors,
14 quote, beneficiaries of the Asbestos PI
15 Trust, as that term is used in 7.15(b)?
16         MR. LIESEMER:  Object to the
17 form of the question.
18         MR. GUY:  Objection, asked
19 and answered, compound.
20         MS. BAER:  Same objection.
21         MR. GUY:  You may answer.
22         THE WITNESS:  As far as I
23 know, they could be under certain
24 circumstances.

Page 53

1  BY MR. BROWN:
2      Q.   All right.  Then I would now
3  like you to compare the language in (a)
4  and the language in (b) based on the
5  assumption that they are.
6         MR. GUY:  Now I am confused.
7         MR. BROWN:  Anyone who reads
8  this provision is confused.
9         MR. GUY:  I am confused.
10 It's talking --
11         THE WITNESS:  You are asking
12 me to compare (a) to (b) or (b) to
13 (a)?
14         MR. GUY:  For what purpose?
15 BY MR. BROWN:
16     Q.   If the insurer that I just
17 described is a beneficiary of the
18 Asbestos PI Trust, then, according to
19 (b), it is bound by the Plan, the Plan
20 documents, and the Confirmation Order,
21 correct?
22     A.   That's what (b) says, yes.
23     Q.   So does (b) then supersede
24 subsection (a)?

260d1ee9-cc5e-438d-b137-446673430c89



Page 54

1    A.   I don't know.
2    Q.   Let's go to a defined term
3  in the Plan which appears on page 6,
4  number 16, quote, asbestos insurer
5  coverage defenses.  Take a moment to
6  review that provision.
7         MR. GUY:  So that I don't
8  have to repeat it throughout, I am
9  going to enter a standing
10  objection.  The witness is here
11  not as a 30(b)(6) witness on
12  insurer issues, and the Plan says
13  what it says.
14         MR. BROWN:  I understand.
15         MR. COHN:  Can you keep your
16  voice up, Tom?
17         MR. GUY:  We will go off the
18  record.
19         (There was a discussion held
20  off the record at this time.)
21  BY MR. BROWN:
22    Q.   Have you had a chance to
23  review the definition of asbestos insurer
24  coverage defenses?

Page 55

1    A.   Yes.
2    Q.   Do you understand it?
3    A.   No.
4    Q.   Fair enough.  You are not
5  alone.
6         Let's get back to 7.15.
7    A.   Can you give me the page
8  again?
9    Q.   I am sorry.  It's page 87.
10  Actually, what I would like to do is I
11  want to do a comparison.  Can you also
12  look at Section 11.9?  You might want to
13  take a moment to read 11.9.
14    A.   Can you give me a page
15  number?
16    Q.   Yes.  Page 115, Section 11.9
17  entitled Exculpation.
18    A.   Okay.
19    Q.   If you keep that page handy
20  and go back and look at Section 7.15, I
21  will represent to you, feel free to look
22  yourself, that there is no specific
23  reference in 7.15 to Section 11.9.
24    A.   I believe that's correct.

Page 56

1    Q.   Okay.  My question is, do
2  you have an understanding as to whether
3  the language in 7.15(a) supersedes the
4  language in 11.9?
5    A.   I don't know.
6    Q.   Do you know whether it's
7  intended to?
8    A.   No.
9    Q.   Reading both of those
10  provisions, do you understand whether it
11  does?
12         MR. GUY:  Objection, calls
13  for a legal conclusion.
14         MR. BROWN:  It just calls
15  for his understanding.
16         THE WITNESS:  Mr. Brown, I
17  must confess to you when I read
18  11.9 both the first time and the
19  second time, what I concentrated
20  on was on the fact that I had
21  exculpation, and I didn't
22  concentrate very much more.
23  BY MR. BROWN:
24    Q.   So you have been exculpated

Page 57

1  if the Plan is confirmed?
2    A.   Yes.
3    Q.   Let's just use that as an
4  example, not to pick on you, but since
5  you understand at least that much in
6  11.9.
7         Insofar as an insurer had a
8  claim against you, would you still be
9  exculpated in light of Section 7.15 as
10  you understand it?
11         MR. LIESEMER:  Object to the
12  form of the question.
13         MR. GUY:  Objection, calls
14  for a legal conclusion.
15         THE WITNESS:  The first part
16  of the answer is that in the Trust
17  Agreement, I also have what is not
18  labeled as exculpation but
19  indemnification rights, not
20  including gross negligence.
21         The answer is I don't know
22  the answer to that question.
23  BY MR. BROWN:
24    Q.   Does that concern you?

260d1ee9-cc5e-438d-b137-446673430c89



Page 58

```
 1        A.   Does a possible conflict of
 2   7.15 to 11.9 concern me?
 3        Q.   Well, yes.
 4        A.   No.
 5        Q.   Okay.  Would you go back to
 6   Section 7.7 of the Plan?
 7        A.   Did you say 7.7?
 8        Q.   Yes.  7.7 entitled
 9   Conditions to Occurrence of the
10   Confirmation Date.
11             MR. GUY:  What page is that?
12             MR. BROWN:  I am sorry.  It
13        starts on page 69, and there are a
14        lot of conditions.  So it runs to
15        page 81.
16             THE WITNESS:  Okay.
17   BY MR. BROWN:
18        Q.   You are free to look at
19   that, if you want, but I understand you
20   have already reviewed the Plan.
21        A.   Yes.
22        Q.   My question is, do you have
23   an understanding as to whether Section
24   7.15 entitled Insurance Neutrality
```

Page 59

```
 1   preempts Section 7.7 insofar as the
 2   Debtors's insurers are concerned?
 3             MR. GUY:  Objection, calls
 4        for a legal conclusion.
 5             THE WITNESS:  I don't know.
 6   BY MR. BROWN:
 7        Q.   Okay.  If you look at
 8   Section 7.8, which begins on page 81,
 9   that one is entitled Conditions to
10   Occurrence of the Effective Date.
11             If I asked you the same
12   question, would your answer be the same
13   with respect to Section 7.8?
14        A.   Can I look at 7.8 for a
15   moment?
16        Q.   Sure.
17        A.   I am sorry.  Could you
18   repeat the question?
19        Q.   Let me see if I can rephrase
20   it.  My question is whether the
21   preemptory language that appears in
22   Section 7.15(a) preempts the conditions
23   set forth in Section 7.8, as understand
24   it?
```

Page 60

```
 1             MR. GUY:  Objection.
 2             MR. LIESEMER:  I join in
 3        that objection.
 4             MR. GUY:  It calls for a
 5        legal conclusion.
 6             THE WITNESS:  I don't know.
 7   BY MR. BROWN:
 8        Q.   Okay.  Can you now look at
 9   7.15(h)?
10        A.   Did you say (e)?
11        Q.   (H).  It appears on page 88.
12        A.   Yes.
13        Q.   Do you understand 7.15(h) to
14   bind all of the Debtors' insurers to all
15   of the releases and injunctions set forth
16   in the Plan?
17             MR. GUY:  Objection, calls
18        for a legal conclusion.
19             THE WITNESS:  I don't know.
20   BY MR. BROWN:
21        Q.   Let's go to page 97 of the
22   Plan, Section 8.5 entitled Successor
23   Claims Injunction.
24             MR. GUY:  When you get to a
```

Page 61

```
 1   point for a break, can we take
 2   one?
 3             MR. BROWN:  Why don't we do
 4        that right now.
 5             (There was a break from
 6        11:03 a.m. to 11:13 a.m.)
 7             (The reporter read from the
 8        record as requested.)
 9   BY MR. BROWN:
10        Q.   Mr. Austern, I don't know if
11   you have had a chance to review that
12   section during the break, but if not, can
13   you take a look at it?
14        A.   Yes, I have reviewed this.
15        Q.   Do you have an understanding
16   as to the purpose of the successor claims
17   injunction?
18             MR. LIESEMER:  Object to the
19        form of the question.
20             THE WITNESS:  Well, as its
21        name implies, it is intended to
22        enjoin certain conduct.  Beyond
23        that, I, of course, was not part
24        of this case when either the
```

260d1ee9-cc5e-438d-b137-446673430c89

Page 62

1    Sealed Air or the Fresenius
2    actions were commenced and
3    concluded and settled.
4  BY MR. BROWN:
5    Q.   Do you understand the
6  Fresenius indemnified parties and the
7  Sealed Air indemnified parties to be the
8  beneficiaries of the successor claims
9  injunction?
10    A.   I believe they are.
11    Q.   Okay.  The successor claims
12  injunction is a 105 injunction, correct?
13    A.   Correct.  It's not a 524(g)
14  injunction.
15    Q.   I gather from your answer
16  that you understand the difference
17  between a Section 105 injunction and a
18  Section 524(g) injunction?
19    A.   To the extent that Manville
20  had only a Section 105 injunction, yes.
21    Q.   Okay.  Do you have an
22  understanding as to whether the successor
23  claims injunction enjoins any claims that
24  are asbestos-related claims?

Page 63

1    MR. GUY:  Objection, calls
2  for a legal conclusion.
3    THE WITNESS:  Do you mean
4  asbestos personal injury, or no?
5  BY MR. BROWN:
6    Q.   Could be, or any other type
7  of asbestos-related claim.
8    A.   I am not sure.
9    Q.   Do you understand there to
10  be a problem with using a Section 105
11  injunction to enjoin asbestos-related
12  claims?
13    MR. GUY:  Objection, vague
14  as to problem.
15    MR. LIESEMER:  I join in the
16  objection.
17    THE WITNESS:  There are
18  certain 105 injunctions that can
19  be lifted.  I assume you cannot do
20  that with a 524(g) injunction as
21  it is inexorably intertwined with
22  the Plan itself.  I don't know of
23  any other distinctions.
24  BY MR. BROWN:

Page 64

1    Q.   The successor claims
2  injunction by its terms cannot be lifted?
3    A.   It cannot, as I understand
4  it.
5    Q.   If a claim fits within the
6  definition of the successor claim, as
7  that term is defined in the Plan, do you
8  understand the successor claims
9  injunction to enjoin that claim?
10    MR. LIESEMER:  Object to the
11  form of the question.
12    MR. GUY:  Same objection.
13    MS. BAER:  Same objection.
14    THE WITNESS:  I don't know.
15  BY MR. BROWN:
16    Q.   Let's turn back for a moment
17  to asbestos PI channelling injunction,
18  page 90, Section 8.2.
19    A.   Okay.
20    Q.   Do you understand the
21  asbestos PI channelling injunction to be
22  purely a 524(g) injunction?
23    MR. GUY:  Objection.
24    THE WITNESS:  I don't know.

Page 65

1    I don't know if it is or not.
2  BY MR. BROWN:
3    Q.   All right.  Mr. Austern, I
4  want to shift gears here and turn back to
5  the Asbestos PI Trust Agreement, which we
6  marked as Austern-2.  And I would like to
7  direct your attention to Section 6.1.
8  And you are going to want a page.
9    A.   It's 34.
10    Q.   In 6.1, the second sentence
11  says, "He shall serve in a fiduciary
12  capacity, representing the interests of
13  the holders of future PI Trust Claims for
14  the purpose of protecting the rights of
15  such persons."
16    Do you see that?
17    A.   Yes.
18    Q.   And the "he" there is you,
19  correct?
20    A.   Yes.
21    Q.   What do you understand your
22  obligations to be to the holders of
23  future PI Trust claims?
24    A.   I represent them, and, as to

260d1ee9-cc5e-438d-b137-446673430c89

Page 66

1  them, I am a fiduciary.
2  Q.  Okay.  And what is the
3  nature of your fiduciary duties?
4  A.  To make sure the Trust has
5  sufficient funds and the funds to pay
6  them.
7  Q.  Anything else?
8  A.  It's more than to just pay
9  them.  It's to pay them in the same
10  manner that people who preceded them were
11  paid.
12  Q.  Is that all future
13  claimants?
14  A.  It's all future personal
15  injury claimants.
16  Q.  Does it matter whether they
17  have meritorious claims or not?
18  A.  Oh, I don't know.  I
19  haven't -- if it's not a meritorious
20  claim -- let me back up a second.  These
21  claimants are people I have never met,
22  and I dare say the day I meet them, they
23  are no longer my clients.
24  Q.  It's a convenient

Page 67

1  arrangement.
2  A.  I am principally responsible
3  for making sure there are funds available
4  to pay them in the same manner in which
5  claimants in the FIFO Queue of the Trust
6  were paid.  In that respect, I have a
7  fiduciary obligation to them.
8  Q.  Okay.  Can you turn to
9  Section 5.2 of the Trust Agreement, and
10  that appears on page 28.
11  A.  Yes.
12  Q.  Now, the first sentence of
13  Section 5.2 says, "The members of the TAC
14  shall serve in a fiduciary capacity
15  representing all holders of present PI
16  Trust Claims."  And we have already gone
17  through earlier the members of the TAC:
18  Mr. Weitz, Mr. Cooney, Mr. Rice, and
19  Mr. Budd.
20  Do you have an understanding
21  as to what their fiduciary duties are to
22  all holders of present PI Trust claims?
23  A.  All holders of present PI
24  Trust claims?

Page 68

1  Q.  Yes.  I am just reading from
2  Section 5.2.
3  A.  They are, as I am to some
4  extent, an advisor to the trustees who
5  are there to protect the rights of
6  present claimants.
7  Q.  Okay.  And when you say
8  present claimants, all present claimants,
9  right?
10  A.  Yes.
11  Q.  If you compare the language
12  in the second sentence of 6.1 with the
13  first sentence in 5.2, the wording is a
14  little different.
15  Do you see that?
16  A.  Yes.
17  Q.  What's the reason for the
18  different wording, if you know?
19  MR. LIESEMER:  Object to the
20  form of the question.
21  MR. GUY:  Objection as to
22  what difference you are referring
23  to.
24  BY MR. BROWN:

Page 69

1  Q.  Okay.  In 6.1, it says that
2  "he," meaning you, "shall serve in a
3  fiduciary capacity," and then it goes on
4  to say, "representing the interest of
5  holders of future PI Trust Claims..."
6  Do you see that?
7  A.  Yes.
8  Q.  And then there is another
9  phrase, and it says, "for the purpose of
10  protecting the rights of such persons."
11  Do you see that?
12  A.  Yes.
13  Q.  Now, if you go to 5.2, that
14  latter phrase, "for the purpose of
15  protecting the rights of such persons,"
16  is not there.
17  Is there a reason?
18  A.  I don't know.
19  Q.  Do you understand the TAC
20  members to have the same fiduciary
21  obligations to all holders of present PI
22  Trust claims that you have to all holders
23  of future PI Trust claims?
24  MR. LIESEMER:  Object to the

260d1ee9-cc5e-438d-b137-446673430c89





Page 70

1    form of the question.
2          THE WITNESS:  Well, I don't
3    think 6.1 says "all," but I will
4    accept the way you phrased it.
5    BY MR. BROWN:
6          Q.    Okay.
7          A.    I can't think of any
8    difference, as I sit here now, in terms
9    of -- it's a different population, but
10   other than that, I can't I can't think of
11   any difference.
12         Q.    You rightly noted that the
13   word "all" does not appear in 6.1.
14             Is there any particular
15   reason for that?
16         A.    Not that I know of.
17         Q.    Let me ask you a more
18   general question.  What is the purpose of
19   the TAC?
20         MR. LIESEMER:  Object to the
21   form of the question.
22         THE WITNESS:  To advise the
23   trustees with respect to present
24   claimants and the operation of the

Page 71

1    Trust.
2    BY MR. BROWN:
3          Q.    And what do you mean by
4    advise?
5          A.    Well, present their views to
6    the trustees and under some
7    circumstances, in the Trust Agreement,
8    either give or do not give their consent
9    to certain trustee action.
10         Q.    Is there a reason why the
11   TAC members are personal injury asbestos
12   lawyers?
13         A.    I can give you my personal
14   view.
15         Q.    Okay.
16         A.    They represent the
17   beneficiaries of the Trust, and I don't
18   know who else you would appoint.
19         Q.    You are familiar, are you
20   not, with the consultation provisions
21   that appear in Section 2.2(e) of the
22   Trust Agreement, correct?
23         MR. GUY:  What page?
24         MR. BROWN:  Page 10.

Page 72

1          MS. ALCABES:  Page 10.
2          THE WITNESS:  Yes.
3    BY MR. BROWN:
4          Q.    Why don't you tell me what
5    the general purpose of the consultation
6    provisions is for?  Well, it's actually
7    for the TAC and for the Futures'
8    Representative.
9          A.    There are a lot of decisions
10   trustees have to make.  This is
11   consultation, not carving out consent for
12   a moment, in terms of investments, in
13   terms of selecting vendors, in terms of
14   things that are not in the Trust
15   Distribution Process, and that
16   consultation is described in (e).
17         Q.    Okay.  You mentioned in your
18   answer the consent provisions.
19         A.    There are consent
20   provisions.
21         Q.    And those appear in (f),
22   correct, on page 11?
23         A.    Yes.
24         Q.    What is the rationale for

Page 73

1    the consent provisions that appear in the
2    Trust Agreement?
3          A.    As distinguished from
4    consultation?
5          Q.    Or as distinguished from not
6    having them at all?
7          A.    As I understand it, there
8    are certain decisions that trustees make
9    that are so important, they can only be
10   made with the consent of both the TAC and
11   the Future Claims Representative.
12         Q.    And that was a negotiated
13   term of the overall Plan, correct?
14         A.    Well, it's been negotiated a
15   lot before, and I am not sure if any
16   specific provision was negotiated in this
17   Plan.
18         Q.    Why can't the trustees make
19   these decisions on their own?
20         MR. GUY:  Objection as to
21   "these decisions."
22         MR. BROWN:  Well, let's back
23   up.
24   BY MR. BROWN:

260d1ee9-cc5e-438d-b137-446673430c89



Page 74

1    Q.   You will agree with me that
2  Section 2.2(f) sets forth a number of
3  different items for which the trustees
4  need the consent of the TAC and the
5  Future Claimants' Representative,
6  correct?
7    A.   Yes.
8    Q.   It goes on from Romanette I
9  to Romanette 15, correct?
10   A.   Yes.
11   Q.   Why is there a need to have
12 the consent of the Future Claimants'
13 Representative and the TAC on these
14 particular items rather than simply
15 consultation?
16   A.   My answer is the same, and I
17 will speak forgetting the TAC, as the
18 Future Claimants' Representative, I want
19 the right to under certain circumstances
20 not agree to a decision by the trustees
21 and have that be the end of the decision.
22   Q.   Well, it's not actually the
23 end of the decision, is it?
24   A.   No.  There are ways of

Page 75

1  resolving that difference.
2    Q.   And what are those?
3    A.   Well, I may confuse this
4  with the Manville Trust, but you can
5  seek, shall we say, guidance from the
6  bankruptcy court.
7    Q.   By that, you mean a ruling?
8    A.   Yes, yes.
9    Q.   If your consent has been
10 unreasonably withheld in the views of the
11 trustees?
12   A.   That's correct.
13   Q.   Is there anything in Section
14 524(g) to your knowledge that requires a
15 Trust, an asbestos Trust, to have a
16 consultation and consent provisions that
17 are set forth in this Trust Agreement?
18   A.   I do not know of anything in
19 524(g) like that.
20   Q.   Do you know who the
21 designated trustees are for the Asbestos
22 PI Trust?
23   A.   Yes.
24   Q.   Okay.  Who are they?  Or

Page 76

1  list of them.
2    A.   Dean Trafelet, Lewis
3  Sifford, and Harry Huge.
4    Q.   And do you know each of
5  those gentlemen?
6    A.   Well, in the case of
7  Mr. Huge and Mr. Trafelet, I do know
8  them.  In the case of Mr. Sifford, I have
9  met him on a number of occasions.
10   Q.   Okay.  What is the
11 professional background of Mr. Huge?
12   A.   Let's see.  I first met him
13 about 40 years ago at the Justice
14 Department.  I am sorry.  He is a lawyer.
15 He has been with the government.  He has
16 been in private practice.  Do you want
17 more?
18   Q.   Does he have experience with
19 asbestos trusts?
20   A.   Yes, he does.
21   Q.   What is that experience?
22   A.   He is a trustee of Armstrong
23 and I believe a trustee of OCF.
24   Q.   How long has he had the role

Page 77

1  of trustee in Armstrong?
2    A.   I met with him shortly after
3  he was appointed, and I should be able to
4  remember that.  I think four or five
5  years.
6    Q.   And how about as a trustee
7  in OCF?
8    A.   I don't know.
9    Q.   Okay.  Why don't you tell me
10 what the professional background of
11 Mr. Sifford is?
12   A.   I know him less well.
13 Mr. Sifford is a practicing lawyer in a
14 law firm, and he is an Armstrong trustee,
15 I believe.  And that's, I believe, the
16 first time I met him, and thus I looked
17 him up.  And according to
18 Martindale-Hubbell, he does both personal
19 injury plaintiff's work and personal
20 injury defense work.  I am getting close
21 to exhausting my knowledge of him.
22   Q.   Okay.  Is the personal
23 injury work that he does, both defense
24 and plaintiff's work, asbestos-related?

20 (Pages 74 to 77)

Page 78

```
 1        A.    It is not as far as I know.
 2        Q.    Do you know what it does
 3   relate to?
 4        A.    No.
 5        Q.    Okay.  Do you know how long
 6   he has been a trustee of the Armstrong
 7   Trust?
 8        A.    The same period of time
 9   Mr. Huge has been, but I don't remember
10   when that started.
11        Q.    I thought you said that one
12   was four to five years ago?
13        A.    Four to five years ago.  I
14   don't remember exactly.
15        Q.    All right.  And what is the
16   professional background of Mr. Trafelet?
17        A.    Before I get to that, let me
18   explain.  Armstrong was confirmed, and
19   for a long time, there was no activity
20   for reasons that allude me.  So I can't
21   remember exactly when I got involved in
22   talking to those people.
23        Q.    Okay.
24        A.    Mr. Trafelet is a lawyer who
```

Page 79

```
 1   was a judge of, I believe, the Circuit
 2   Court in Cook County, Illinois for a
 3   period of time, and he is an asbestos
 4   trustee of -- it seems to me, he is the
 5   sole trustee of the Loomis Trust and also
 6   a Futures Rep, I believe, at Armstrong.
 7        Q.    Okay.  And he was one of the
 8   gentlemen that you mentioned that, if I
 9   remember correctly, the Asbestos PI
10   Committee, otherwise known as the ACC,
11   wanted to have the role that you have?
12        A.    Yes.
13        Q.    Do you know how long he has
14   been a trustee of the Loomis Trust?
15        A.    Since it was confirmed.  And
16   this I really should know, but I think it
17   was confirmed about three years ago.
18        Q.    Okay.  And do you know
19   whether he was the FCR in Armstrong
20   before a plan was confirmed?
21        A.    I do not know.
22        Q.    Okay.  But he is the FCR for
23   the Trust?
24        A.    Yes, I believe he is.
```

Page 80

```
 1        Q.    And would I be correct that
 2   he's been that for four or five years?
 3        A.    Yes.
 4        Q.    Let's go to Section 4.9 of
 5   the Trust Agreement.  Take a moment to
 6   read that, if you would.
 7        A.    Okay.
 8        Q.    The second-to-the-last
 9   sentence in Section 4.9 says, "No Trustee
10   shall act as an attorney for any person
11   who holds an asbestos claim."
12              Do you see that?
13        A.    Yes.
14        Q.    What's the reason for that?
15        A.    To avoid conflicts.
16        Q.    What type of conflicts?
17        A.    Well, you are a trustee of a
18   Plan paying somebody; you shouldn't be
19   paying your client.
20        Q.    Is there any other reason?
21        A.    Not that I know of.
22              MR. BROWN:  Mark this as
23   Austern-4.
24              (Austern-4 marked for
```

Page 81

```
 1   identification at this time.)
 2   BY MR. BROWN:
 3        Q.    Exhibit-4, Mr. Austern, is
 4   Exhibit 6 to the Exhibit Book.  My first
 5   question for you is, can you identify it?
 6        A.    It's the Asbestos Insurance
 7   Transfer Agreement, which is part of the
 8   Plan, as you point out.
 9        Q.    And I believe you said this
10   is one of the documents that you had
11   reviewed; am I correct?
12        A.    Yes.
13        Q.    Do you understand this
14   agreement?
15        A.    Not in its entirety.
16        Q.    Okay.  Are there particular
17   provisions of this agreement that you do
18   not understand that you could direct my
19   attention to?
20        A.    Well, I would have to look
21   at it for a moment.  I am not sure I
22   understand all of the representations and
23   warranties and some of the terms in them.
24   There are two schedules, if I remember
```

260d1ee9-cc5e-438d-b137-446673430c89



Page 82

1  correctly, here.
2      Q.    I think there is three.
3      A.    All right.  I was never
4  quite sure I understood the constant or
5  individual differences between the
6  Schedules 2 and 3.
7      Q.    Okay.  Other than what you
8  what you just described, do you generally
9  have a good handle on the Asbestos
10  Insurance Transfer Agreement?
11      A.    I wouldn't describe it as a
12  good handle, but I recognize some of the
13  paragraphs.
14      Q.    All right.  Let me direct
15  your attention -- let's look at Section 1
16  on page 2, and you should probably look
17  at subsection (a).  And then (d) is the
18  one I have the question on.
19      A.    Yes.
20      Q.    In (d), it says, "The
21  Transfer is not an assignment of any
22  insurance policy."
23          Do you see that?
24      A.    Yes.

Page 83

1      Q.    What is it?
2      A.    It's an assignment of a --
3  do you mean what is the Transfer
4  Agreement?
5      Q.    Yes.  What is the transfer,
6  which is a defined term?
7      A.    Being transferred?
8      Q.    Yes.
9      A.    The proceeds.
10      Q.    Anything else?
11      A.    Well, I confess as the
12  Futures Claims Rep, I never got past the
13  proceeds because the money was what
14  interested me.
15      Q.    Okay.  Have you reviewed any
16  of the Debtors' insurance policies?
17      A.    No.
18      Q.    Have you ever reviewed a
19  general liability insurance policy?
20      A.    Yes.
21      Q.    Do you have a general
22  understanding as to the duties and
23  obligations of an insured under general
24  liability insurance policy?

Page 84

1      A.    In general.
2      Q.    Could you describe for me
3  what some of those duties are?
4      A.    Well, you have to report
5  claims.
6      Q.    Okay.
7      A.    And you have to, under
8  certain policies, confer with the
9  insurance company about what you are
10  settling and why and for how much.  And,
11  forgetting individual policies for a
12  minute, under corporate policies, there
13  are certain audit rights that sometimes
14  exist as a condition of payment to the
15  insured.
16      Q.    Are you familiar with the
17  requirement in some policies that the
18  insurer have a right to defend the
19  insured?
20          MR. LIESEMER:  Object to
21  form.
22          THE WITNESS:  As well as an
23  obligation.
24  BY MR. BROWN:

Page 85

1      Q.    Okay.  And are you aware
2  that in some policies there is a right on
3  the part of the insurer to associate in
4  the defense of the insured?
5          MR. LIESEMER:  Object to
6  form.
7          THE WITNESS:  I am not sure
8  I am familiar with that.
9  BY MR. BROWN:
10      Q.    Okay.  Well, you indicated
11  that the one thing you knew that was
12  being transferred was proceeds.
13          Are you aware of anything
14  else that's being transferred pursuant to
15  the Asbestos Insurance Transfer
16  Agreement?
17      A.    I am not sure what you mean
18  by anything else, other than the money.
19      Q.    That's it?
20      A.    Well, other things may be
21  being transferred, but I can't think of
22  anything right now.
23      Q.    Okay.  Do you have an
24  understanding as to whether the Asbestos

260d1ee9-cc5e-438d-b137-446673430c89