

Page 86

1 PI Trust will become the insured under
2 the policies that are listed on Schedule
3 1 to this agreement?
4          MR. GUY: Objection, calls
5 for a legal conclusion.
6          THE WITNESS: Mr. Brown, I
7 don't know. I certainly hope so.
8 BY MR. BROWN:
9     Q.   Do you have an understanding
10 as to what, if anything, happens to the
11 obligations of the insured under the
12 policies on Schedule 1 if the Plan is
13 confirmed?
14          MR. GUY: Objection to form.
15          MR. LIESEMER: I join in
16 that objection.
17          THE WITNESS: Let me make
18 sure I understand the question.
19 What happens to the obligations of
20 -- if the policy was still in the
21 hands of the Debtor, what would
22 happen to the obligations of the
23 Debtor and the rights of the
24 insurance company?

Page 87

1 BY MR. BROWN:
2     Q.   I am not sure I understood
3 the qualification. Let me try it a
4 little differently.
5          To the extent that the
6 Debtor has duties and obligations under
7 one or more of its insurance policies, if
8 this Plan is confirmed, what happens to
9 those duties and obligations, as you
10 understand it?
11          MR. LIESEMER: Object to the
12 form.
13          MS. BAER: I join in the
14 objection.
15          THE WITNESS: The Plan is
16 going to be administered pursuant
17 to the Trust Distribution Process
18 as it affects personal injury
19 asbestos claims.
20          To that extent, the personal
21 injury Trust, as far as I know, is
22 not going to call up each and
23 every insurance company and say
24 "Can I settle this claim?" I hope

Page 88

1 that's responsive to your
2 question.
3 BY MR. BROWN:
4     Q.   What is it going to do?
5 What is the Trust going to do?
6          MS. BAER: Objection to
7 form.
8          MR. LIESEMER: I join.
9          THE WITNESS: It's going to
10 settle claims pursuant to the
11 Trust Distrubution Process.
12 BY MR. BROWN:
13     Q.   Okay. Will the Debtors'
14 insurers have any role in the handling
15 defense or settlement of any claim
16 submitted to the Asbestos PI Trust?
17          MR. GUY: Objection.
18          MR. LIESEMER: Objection to
19 form.
20          MR. GUY: Objection, calls
21 for speculation.
22          MS. BAER: Objection, same.
23          THE WITNESS: Let me address
24 audit rights. In my copious free

Page 89

1 time, Mr. Brown, I am the claims
2 administrator of the Dow Corning
3 Trust -- that is not an asbestos
4 Trust -- and this issue has arisen
5 in that context. And I dare say
6 it may arise in the context of the
7 W.R. Grace Trust.
8          If insurance companies
9 object to paying because they do
10 not have audit rights or because
11 of any other input into the Trust,
12 I dare say they are going to bring
13 that to the attention of the
14 trustees. And either that will be
15 worked out between the trustees
16 and the insurance company or
17 some -- I don't like this phrase
18 because I am not sure I know what
19 it means -- but some coverage
20 court will have to determine the
21 rights of the insurance company as
22 a function of the trustees'
23 duties.
24          MR. BROWN: Could you read

260d1ee9-cc5e-438d-b137-446673430c89



Page 90

1    back the question?
2        (The reporter read from the
3    record as requested.)
4    BY MR. BROWN:
5        Q.    Other than what you just
6    described, will the Debtors' insurers
7    have any role in the handling defense or
8    settlement of asbestos PI claims into the
9    Trust?
10        MR. GUY:  Same objection as
11    to speculation.
12        MR. LIESEMER:  Same
13    objection.
14        MS. BAER:  Same.
15        THE WITNESS:  I don't know
16    what the trustees are going to do
17    about that, so I don't know.
18        MR. BROWN:  Why don't we
19    take five minutes.
20        (There was a break from
21    11:46 a.m. to 11:57 a.m.)
22        MR. BROWN:  Let's go ahead
23    and mark this document.
24        (Austern-5 marked for

Page 91

1    identification at this time.)
2    BY MR. BROWN:
3        Q.    Mr. Austern, you have been
4    handed what's been marked Austern-5.
5    It's Exhibit 4 to the Exhibit Book.
6        Can you identify it?
7        A.    This is the TDP for the
8    Plan.
9        Q.    I am correct, am I not, that
10    this is one of the documents that you
11    reviewed in preparation for today's
12    deposition?
13        A.    Yes.
14        Q.    Are you aware of any
15    provision in the TDP or the Trust
16    Agreement that we spoke about earlier
17    that provides for any role for the
18    Debtors' insurers in the handling,
19    defense, or settlement of any asbestos
20    claims submitted to the Trust?
21        A.    No.
22        Q.    Are you aware of any other
23    Plan document that provides for such a
24    role?

Page 92

1        A.    No.
2        Q.    Is there a reason for that?
3        A.    I don't know.
4        MR. BROWN:  All right.
5    Let's mark this.
6        (Austern-6 marked for
7    identification at this time.)
8    BY MR. BROWN:
9        Q.    Mr. Austern, you have
10    another document in front of you now
11    marked Austern-6. It's Exhibit 10 to the
12    Exhibit Book.
13        Can you identify this
14    development?
15        A.    It is the Cooperation
16    Agreement between the Debtor and others.
17        Q.    And, again, this is one of
18    the documents that you reviewed in
19    preparation for today's deposition,
20    correct?
21        A.    I don't remember if I
22    specifically did it for that purpose, but
23    I have certainly reviewed it in the past.
24        Q.    Okay.  What is the purpose

Page 93

1    of this document?
2        A.    I am not sure I know the
3    legal purpose.  It creates certain rights
4    and obligations between and among some of
5    the parties.
6        Q.    Okay.  And who are those
7    parties?
8        A.    Well, the Debtor, the
9    Reorganized Debtor, and the Trust.  I
10    mean the personal injury Trust.
11        Q.    The Debtors' insurers are
12    not a party to this agreement, correct?
13        A.    No.
14        Q.    We talked a little bit
15    earlier about general liability insurance
16    policies.
17        Are you generally familiar
18    with what's called duty to cooperate in a
19    general liability policy on the part of
20    the insured?
21        A.    Generally.
22        MR. LIESEMER:  Objection to
23    form.
24    BY MR. BROWN:

260d1ee9-cc5e-438d-b137-446673430c89

Page 94

1    Q.   If the Joint Plan is
2  confirmed and if there is a duty to
3  cooperate under a given policy, what
4  happens to that duty?
5          MR. GUY:  Objection, calls
6  for speculation.
7          THE WITNESS:  Well, the
8  proceeds of the policy have been
9  transferred to the Personal Injury
10  Trust.  I don't know what happens
11  to the duty of the Trust standing
12  in the shoes of the Debtor.
13  BY MR. BROWN:
14    Q.   So you don't know whether
15  the Trust steps into the shoes of the
16  Debtor with respect to the Debtors'
17  obligations under the policy; is that
18  what your telling me?
19    A.   I don't know.
20          MR. BROWN:  I think I am
21  going to pass you to the next
22  questioner, Mr. Austern.  Thank
23  you.  Subject to maybe a few
24  follow-ups, I am finished.

Page 95

1          - - -
2          EXAMINATION
3          - - -
4  BY MS. ALCABES:
5    Q.   Hello, Mr. Austern.  My name
6  is Elisa Alcabes from Simpson Thacher &
7  Bartlett.  I am counsel for Travelers
8  Casualty and Surety Company.
9          Travelers served a Notice of
10  Deposition on you.  I am just going to
11  have that marked.
12          (Austern-7 marked for
13          identification at this time.)
14  BY MS. ALCABES:
15    Q.   Do you recall seeing this
16  notice?
17    A.   I saw many notices.  I don't
18  know if I saw this one.
19    Q.   Okay.  And are you familiar
20  at all with any of the agreements between
21  Travelers and W.R. Grace that were
22  entered into pre-petition?
23    A.   No.
24    Q.   Can you turn to Austern

Page 96

1  Exhibit-4, which is the Transfer
2  Agreement, and look at Schedules 2 and 3?
3    A.   (Witness complies with
4  request.)
5    Q.   Correct me if I'm wrong, I
6  believe you said you weren't sure what
7  the difference was between Schedules 2
8  and 3?
9    A.   In the sense that I don't
10  know why there are two schedules.  I
11  mean, clearly different people are listed
12  under certain schedules.
13    Q.   Do you have an understanding
14  that the types of settlement agreements
15  are different on Schedule 2 and Schedule
16  3?
17    A.   I assume that's why there
18  are two schedules.
19    Q.   You previously also
20  mentioned that you understood that there
21  were three types of insurance agreements;
22  there were settlements -- there were
23  settled insurers, there were unsettled
24  insurers, and there were insurers are

Page 97

1  coverage in place agreements or
2  reimbursement agreements?  I am not sure
3  I said that exactly right.
4          I believe you said you
5  understood there were three types of
6  settled insurers -- three types of
7  insurers.  I have got it right now.
8  Three types of insurers.
9          There are unsettled
10  insurers, fully settled insurers, and
11  insurers with coverage in place and
12  reimbursement agreements; is that right?
13    A.   That is my understanding.
14    Q.   And that's how you
15  understand this Plan to operate; is that
16  correct?
17    A.   Yes.
18    Q.   Okay.  So do you understand
19  that Schedule 2 lists the fully settled
20  insurers, the insurers that have fully
21  settled agreements?
22    A.   What do you mean by fully?
23    Q.   Fully paid settlement
24  agreements.

260d1ee9-cc5e-438d-b137-446673430c89

Page 98

1    A.    I don't know that that they
2   are all fully paid.  They are certainly
3   all fully settled.
4        Q.    What is your understanding
5   of Schedule 3, if any?
6        A.    That they are reimbursement
7   agreements or coverage in place
8   agreements.
9        Q.    Do you have a general
10  understanding of what a reimbursement
11  agreement or coverage in place agreement
12  is?
13       A.    A very general
14  understanding.
15       Q.    What's your very general
16  understanding?
17       A.    That there is an agreement
18  between the insured and the insurance
19  company and that agreement determines
20  that certain monies will be paid --
21  forgetting what's in the policy for a
22  moment, that certain insurance will be
23  paid under certain circumstances over a
24  discrete period of time.

Page 99

1        Q.    Now, as the Future Claim
2   Representative, do you agree that
3   reimbursement agreements are a source of
4   potential payment for future claimants?
5        A.    It's a source of
6   insurance payments, yes.
7        Q.    And do you have the same
8   understanding for the agreements that are
9   listed on Schedule 2, where the payments
10  have been fully made prior to the
11  petition date?
12       A.    Well, I am familiar with the
13  Lloyd's payment.  I don't know that I am
14  familiar with necessarily any other
15  payments.
16       Q.    But you do understand that
17  under -- and, by the way, when you refer
18  to coverage in place or reimbursement
19  agreements, are you equating those two?
20       A.    I am.
21       Q.    And you do understand that
22  the coverage in place or reimbursement
23  agreements are a source of payment to the
24  Trust for future claims?

Page 100

1        A.    Yes.
2        Q.    Will you be involved in any
3   way in the performance of any obligations
4   under reimbursement agreements?
5        A.    By whom?
6        Q.    By the Trust.
7        A.    If I am asked, but the
8   trustees are going to have to decide what
9   that is.
10       Q.    In your experience in other
11  cases, have you ever been asked to
12  participate in the analysis of coverage
13  in place agreements?
14       A.    No.
15       Q.    And if a dispute were to
16  arise with respect to coverage in place
17  agreements in the Grace Trust, what will
18  your role be?
19       A.    Okay.
20       Q.    If you know.
21       A.    I will tell you what I would
22  like it to be.
23       Q.    Okay.
24       A.    Trustees and insurance

Page 101

1   companies are going to have to talk about
2   the rights of the insurance companies
3   versus the administration of the Trust.
4   If there is litigation as between those
5   parties, it is always the futures
6   claimants who ends up paying for it,
7   because there is sufficient money for the
8   presents.
9            So although I have no
10  consent rights pursuant to the Trust
11  Agreement, which is purely consultation,
12  I would like to see less money spent on
13  litigation and more on settlement for any
14  disputes that arise.
15       Q.    In your general
16  understanding of reimbursement
17  agreements, do you have an understanding
18  of the obligations that remain on the
19  part of Grace in this particular case?
20       A.    Beyond cooperation?
21       Q.    Just generally, what is your
22  understanding of the obligations that
23  Grace has under the reimbursement
24  agreements?

Page 102

1      A.   Well, they may have audit
2   rights.  They may have -- the insurance
3   company may have the right to audit claim
4   payments or even the handling of the
5   claims, and that's going to have to be
6   worked out.
7      Q.   Do you have an understanding
8   that at least some of the reimbursement
9   agreements provide for Grace to allocate
10  claims in a certain way before they
11  charge the insurers for amounts that were
12  paid for claims?
13     A.   I am not familiar with that.
14     Q.   You are not familiar at all
15  with allocation?
16     A.   I am familiar with
17  allocation by a trust.  I am not familiar
18  with allocation by an insurance company
19  pursuant to an agreement.
20     Q.   Can you turn to the
21  Cooperation Agreement, Austern-6.
22     A.   Yes.
23     Q.   And if you turn to page 3 of
24  Exhibit-6, you will see in Romanette 4,

Page 103

1   it says that "Grace has already provided
2   documents describing Grace's allocation
3   program and coverage-in-place agreement
4   policy registers for all settled
5   carriers."
6          Do you see that?
7      A.   I see that.
8      Q.   Do you have any
9   understanding of what all that refers to?
10     A.   They have not provided it to
11  me.
12     Q.   They have not provided it to
13  you?
14     A.   No.
15     Q.   Is that something that you
16  would typically want to look at?
17     A.   I assume that my counsel
18  would want to look at it because I am not
19  sure I would understand it.
20     Q.   If Grace has an obligation
21  to allocate claims in a certain way under
22  a reimbursement agreement, is it your
23  understanding that the Trust will comply
24  with those obligations going forward?

Page 104

1          MR. LIESEMER:  Objection to
2   form.
3          MR. GUY:  Objection,
4   hypothetical.
5          THE WITNESS:  I don't know.
6   BY MS. ALCABES:
7      Q.   Does the Plan say anywhere
8   whether or not the Trust will be
9   obligated to perform obligations under
10  the reimbursement agreements?
11     A.   I don't believe the Plan
12  does.
13     Q.   You believe the Plan is
14  silent on whether or not the Trust will
15  have to perform obligations under the
16  reimbursement agreements?
17     A.   As I sit here, I can't think
18  of any provision that covers that.
19     Q.   Can you turn to the Plan,
20  which has been marked as Austern-3, and
21  turn to page 63.
22     A.   (Witness complies with
23  request.)
24     Q.   Can you just read to

Page 105

1   yourself at 7.2.2(d)(iv), which appears
2   on page 63?  It starts, "On the Effective
3   Date, the Asbestos PI Trust shall be the
4   successor..."?
5      A.   Yes.
6      Q.   Okay.  Do you understand
7   what this provision means?
8      A.   I believe so.
9      Q.   Can you explain to me what
10  you understand it to mean?
11     A.   When the Personal Injury
12  Trust settles and pays a claim pursuant
13  the Trust Distrubution Process, it
14  constitutes a payment by Grace.
15     Q.   Do you see the words "in
16  full compliance with each Asbestos
17  Insurance Reimbursement Agreement"?
18     A.   Yes.
19     Q.   Do you know what those words
20  mean?
21          MR. GUY:  Objection.
22          THE WITNESS:  Well, I know
23  what I think they mean.
24  BY MS. ALCABES:

Trav.

Page 106

1  Q.   What do you think they mean?
2  A.   I think they mean that the
3  terms of the Asbestos Insurance
4  Reimbursement Agreement has been complied
5  with.
6  Q.   Is it your view that the
7  Trust's payment of a claim is sufficient
8  to trigger obligations under
9  reimbursement agreements?
10  MR. GUY:  Objection.
11  THE WITNESS:  I think that's
12  going to have to be either
13  litigated or settled in the
14  future.
15  BY MS. ALCABES:
16  Q.   Aside from the Trust
17  demonstrating that it made payments to
18  claimants, is there anything else in your
19  view that the Trust would have to
20  demonstrate to a reimbursement agreement
21  insurer in order to recover
22  reimbursements under that agreement?
23  A.   If it wants to get paid, it
24  may have to.

Page 107

1  Q.   Sitting here today, can you
2  think of anything else that they might
3  have to show?
4  A.   If the insurance company
5  says we are not going to pay, I think
6  that's going to have to be worked out.
7  Q.   Do you know how the Trust
8  will calculate an insurer's payment
9  obligation under a reimbursement
10  agreement?
11  MR. LIESEMER:  Objection to
12  form.
13  THE WITNESS:  I am sorry.
14  Calculate the insurance company's
15  amount of payment?
16  MS. ALCABES:  Yes.
17  THE WITNESS:  No.
18  BY MS. ALCABES:
19  Q.   You are aware that the Trust
20  will be paying claims subject to a
21  payment percentage?
22  A.   Yes.
23  Q.   And when the Trust pays
24  claims subject to a payment percentage,

Trav.

Page 108

1  there is some amount before they apply
2  the payment percentage and some amount
3  after they apply the payment percentage,
4  correct?
5  A.   I am not sure what amount is
6  after the payment percentage.
7  Q.   That's the amount that they
8  actually pay.  The Trust looks at a
9  scheduled amount, applies a payment
10  percentage, and then pays, correct?
11  A.   Pays, yes.
12  Q.   So you have got two amounts
13  there?
14  A.   Excuse me.  Yes, I
15  understand.
16  Q.   Do you understand which
17  amount will be tendered to a
18  reimbursement agreement insurer for
19  payment?
20  A.   I do not.
21  Q.   Does it say anywhere in the
22  Plan to your knowledge whether the
23  reimbursement agreement insurer will be
24  charged for the scheduled amount or the

Trav.

Page 109

1  scheduled amount multiplied by the
2  payment percentage?
3  A.   I do not know of any such
4  provision.
5  Q.   Can you turn to Section
6  7.15?
7  A.   (Witness complies with
8  request.)
9  Q.   And look at 7.15(j).  In
10  your copy it may look like a Romanette 2.
11  It follows (i).
12  A.   The last section?
13  Q.   Yes.
14  A.   Yes.
15  Q.   Now, I believe you said you
16  didn't understand 7.15; is that correct?
17  MR. GUY:  Objection.
18  THE WITNESS:  I simply don't
19  understand all of it.
20  BY MS. ALCABES:
21  Q.   Do you understand the
22  provision that you just read, 7.15(j)?
23  A.   Assuming I understood
24  7.2.2(d)(iv).

28  (Pages 106 to 109)

Page 110

1    Q.   What do you understand this
2  provision to mean?
3    A.   Are you referring to --
4    Q.   7.15(j).
5    A.   Well, the insurance
6  companies are bound by what 7.2.2(d)(iv)
7  gives them.
8    Q.   Do you have an understanding
9  as to whether reimbursement agreements
10  are subject to the insurance neutrality
11  provisions of 7.15?
12        MR. GUY:  Objection, vague.
13        THE WITNESS:  I don't know.
14  BY MS. ALCABES:
15    Q.   I am just going to show you
16  a portion of Mr. Lockwood's testimony and
17  ask if you just agree or disagree with
18  it.
19    A.   Okay.
20    Q.   I am directing you to
21  Mr. Lockwood's transcript, page 320, line
22  18 through 22.
23    A.   I am sorry.  Did you say
24  320?

Page 111

1    Q.   Yes.  Line 18 through 22.
2    A.   That's the question.
3    Q.   May I read it out loud?
4    A.   Yes.
5    Q.   It reads:
6        "You agree that the
7  reimbursement agreements are not
8  subject to the insurance
9  neutrality provisions, correct?
10        "Answer:  Correct."
11        Do you agree or disagree
12  with him?
13    A.   I don't know that I have a
14  view at all.
15    Q.   Okay.  Is there something
16  else that you would need to look at to
17  develop a view?
18    A.   Well, what I would have to
19  look at would be post-confirmation, and
20  that is to how this was working out,
21  whether the insurance companies were
22  objecting to making payments on the
23  grounds that the insurance reimbursement
24  agreements were being violated and how

Page 112

1  the trustees got money or didn't get
2  money.
3    Q.   Do you expect to take a view
4  on whether the insurance neutrality
5  provisions apply to reimbursement
6  agreements at the confirmation hearing?
7    A.   Me?
8        MR. GUY:  Objection.
9        THE WITNESS:  Me personally?
10  BY MS. ALCABES:
11    Q.   Yes.
12    A.   Not that I know of.
13    Q.   Is it your view that the
14  insurance neutrality provisions will have
15  no -- strike that.
16        Post-confirmation, is it
17  your view that the insurance neutrality
18  provisions will or will not impact your
19  constituency being the Future Claims?
20        MR. LIESEMER:  Objection to
21  form.
22        THE WITNESS:  To the
23  assistant that the insurance
24  companies refuse to pay and the

Page 113

1  proceeds are for my clients, yes,
2  it could.
3  BY MS. ALCABES:
4    Q.   Sitting here today, do you
5  know how you anticipate dealing with that
6  kind of situation?
7        MS. BAER:  Objection.
8        THE WITNESS:  The trustees
9  will have to deal with it.
10  BY MS. ALCABES:
11    Q.   I believe you said when
12  Michael Brown was asking you some
13  questions that you are generally familiar
14  with contractual indemnity provisions in
15  agreements with insurers?
16    A.   I know something about them.
17    Q.   Can you just remind me what
18  you know about them?
19    A.   I understand that there are
20  various types of indemnity agreements.
21  Sometimes an insured has to indemnify an
22  insurance company under certain
23  circumstances.  So do third parties.
24        I am also aware,

260d1ee9-cc5e-438d-b137-446673430c89



**Trav.** Page 114

1  unfortunately, because of the Manville
2  Trust, aware of the fact that indemnity
3  litigation in most states requires a
4  perfectly innocent joint tortfeasor or a
5  perfectly innocent party. Beyond that, I
6  would have to look at the terms of an
7  agreement.
8       Q. Do you have an understanding
9  of how the Plan treats indemnity claims
10 by insurers under reimbursement
11 agreements?
12      A. I would have to rely on the
13 advice of insurance counsel on that.
14      Q. What about claims for
15 indemnity under what I will call the
16 fully settled agreements, which are in
17 Schedule 2 to the Transfer Agreement?
18      A. I would have the same
19 answer.
20      Q. So you just don't know?
21      A. I just don't know.
22      Q. Can you turn to the TDPs,
23 which are Austern-5?
24      A. Yes.

Page 115

1       Q. And Section 5.6 which starts
2  on page 35.
3       A. Yes.
4       Q. Do you have a general
5  understanding of what indirect PI Trust
6  claims are?
7       A. A general understanding.
8       Q. What's your understanding
9  general understanding?
10      MR. GUY: Objection, asked
11 and answered.
12      MS. ALCABES: I am sorry if
13 you went into it before. Did you
14 go into in detail?
15      MR. BROWN: Yes.
16 BY MS. ALCABES:
17      Q. Do you have any
18 understanding of whether or not indemnity
19 claims under reimbursement agreements
20 would be subject to 5.6?
21      A. I believe they would be.
22      Q. And if you turn to Section
23 5.13 on page 49, Indemnified Insurer TDP
24 Claims?

**Trav.** Page 116

1       A. Yes.
2       Q. Do you understand that
3  provision?
4       A. I have a general
5  understanding of it.
6       Q. And is it your understanding
7  that indemnification claims arising under
8  fully settled settlement agreements would
9  be subject to that provision?
10      A. Yes.
11      Q. Are you aware of the
12 distinction between executory and
13 non-executory contracts in the bankruptcy
14 context?
15      A. I thought executory
16 contracts were signed contracts, but, no,
17 I am not.
18      Q. Are you aware of whether the
19 Plan modifies any reimbursement
20 agreements?
21      MR. GUY: Objection, calls
22 for a legal conclusion.
23      THE WITNESS: I don't know.
24 BY MS. ALCABES:

Page 117

1       Q. Are you aware of whether the
2  Plan modifies the terms or provisions of
3  any fully settled settlement agreements?
4       MR. GUY: Same objection.
5       THE WITNESS: I don't know.
6  BY MS. ALCABES:
7       Q. And, again, is it your
8  position that if a dispute arose as to
9  whether the Plan modifies obligations
10 under either one of those settlement
11 agreements, that your role would not
12 arise until post-confirmation?
13      A. That's correct.
14      Q. And your role would be to
15 participate in whatever way the trustee
16 asks you to participate in the resolution
17 of those claims?
18      A. Subject to my inserting
19 myself into it, yes.
20      Q. Do you have any intention of
21 reviewing any reimbursement agreements
22 prior to the confirmation hearing?
23      A. Not unless insurance counsel
24 suggests I do so.

260d1ee9-cc5e-438d-b137-446673430c89

Page 118

1    MS. ALCABES:  Can you give
2    me two minutes?  I may be
3    finished.
4        (There was a break from
5    12:24 p.m. to 12:25 p.m.)
6    BY MS. ALCABES:
7        Q.   I just have one more
8    question, and it relates to the
9    Disclosure Statement, which I don't know
10   if I have a copy to mark as an exhibit.
11   But I just want to read you one passage
12   from Section 7.2.2(d)(iv).
13       MR. GUY:  I have one if you
14   want to mark it.
15       MS. ALCABES:  Thank you.
16   Let's mark this as Austern-8.
17       (Austern-8 marked for
18   identification at this time.)
19   BY MS. ALCABES:
20       Q.   In my copy, it appears on
21   page 105.  Actually, I quoted it wrong.
22   It's 4.7.2.2, Funding of the Asbestos PI
23   Trust.
24       A.   4.7.2?

Page 119

1        Q.   4.7.2.2, and I am going to
2    direct you to the paragraph just before
3    4.7.2.3, the paragraph that starts,
4    "Section 7.2.2(d)(iv) of the Plan..."
5        Do you see that?  Have you
6    found it?
7        A.   No.
8        MR. GUY:  It's on the bottom
9    of --
10       THE WITNESS:  Okay.  I am
11   sorry.
12   BY MS. ALCABES:
13       Q.   If you go towards the latter
14   part of the paragraph, there is a
15   sentence that starts, "As a result, the
16   Plan Proponents believe that, without
17   Section 7.2.2(d)(iv), the Asbestos PI
18   Trust may not be able to fulfill the
19   literal terms of certain reimbursement
20   conditions in the Asbestos Insurance
21   Reimbursement Agreements..."
22       And I would just ask you to
23   refer to the literal terms of certain
24   reimbursement conditions and ask you if

Page 120

1    you know what that is referring to.
2        A.   I hesitate because I spent
3    some time studying 7.2.2(d)(iv) or
4    whatever this is, which is not here.  It
5    might help me if I could look at that.
6        Q.   7.25.2(d)(iv)?
7        A.   Yes.
8        Q.   It's in the Plan, which is
9    the section we were just looking at
10   before on page --
11       A.   Wait a minute.  I have not
12   found the Plan.  Yes.  I am sorry.
13       Q.   It's on page 63 of the Plan.
14       A.   Okay.  I am sorry.  What was
15   the question?
16       Q.   What does the reference to
17   the literal terms of certain
18   reimbursement conditions in the
19   Disclosure Statement passage that I read
20   to you mean?
21       A.   Well, to the extent I
22   understand this -- and I am not positive
23   this is responsive to your question --
24   pursuant to some of the reimbursement

Page 121

1    agreements, an insurance company would be
2    required to pay Grace money if Grace had
3    paid a claim following judgment of the
4    tort system or by way of settlement.
5        And what this is, I believe,
6    saying is that that the insurer now has
7    to pay Personal Injury Trust when the
8    Personal Injury Trust pays a claim.
9        Q.   But, again, it doesn't speak
10   to any other obligations that may exist
11   under the reimbursement agreement on the
12   part of Grace before it can demand
13   payment from an insurer?
14       MR. LIESEMER:  Objection to
15   form.
16       MS. BAER:  Objection.
17       THE WITNESS:  The document
18   does not, that's correct.
19   BY MS. ALCABES:
20       Q.   So, for example, it does not
21   address whether or not the Trust will
22   have to allocate payments or provide
23   reporting to the insurers or allow audits
24   to be taking place, correct?

260d1ee9-cc5e-438d-b137-446673430c89

Page 122

1      MR. LIESEMER: Objection to
2   form.
3      MS. BAER: Same.
4      THE WITNESS: The document
5   does not say that.
6   BY MS. ALCABES:
7      Q.   And the Plan does not say
8   that?
9      A.   And the Plan does not say
10  that.
11     Q.   And does the fact that the
12  Plan doesn't address the obligations --
13  strike that.
14     Does the fact that the Plan
15  doesn't address how the Trust will
16  perform obligations under a reimbursement
17  agreement impact your view as to whether
18  the Plan is fair as to the future
19  claimants?
20     MR. GUY: Objection, lacks
21  foundation.
22     THE WITNESS: It does not
23  impact it.
24  BY MS. ALCABES:

Page 123

1      Q.   Why not?
2      A.   Because I believe the
3   insurance money is going to come to the
4   Trust, and I am only interested in the
5   money.
6      MS. ALCABES: I will pass
7   the witness. Thank you.
8          - - -
9      (There was a luncheon recess
10  from 12:31 p.m. to 1:05 p.m.)
11
12     AFTERNOON SESSION
13         - - -
14     EXAMINATION
15         - - -
16  BY MR. CANDON:
17     Q.   Good afternoon, Mr. Austern.
18  My name is Chris Candon. I am from the
19  law firm Cohn Whitesell & Goldberg,
20  representing the Libby claimants. By
21  Libby claimants, it is terminology that
22  clients of our firm that are based in
23  Libby and expressed to asbestos exposure
24  in Lincoln County, Montana. I probably

Page 124

1   need to speak up a little bit so everyone
2   can hear me.
3      MR. CANDON: I would like to
4   mark this as Exhibit-9.
5      (Austern-9 marked for
6   identification at this time.)
7   BY MR. CANDON:
8      Q.   It's the Notice of
9   Deposition. Do you recall having
10  received or have seen that?
11     A.   Yes.
12     Q.   I will start with another
13  exhibit here.
14     MR. CANDON: Austern-10.
15     (Austern-10 marked for
16  identification at this time.)
17  BY MR. CANDON:
18     Q.   Can you tell me what that
19  is?
20     MR. GUY: Do you have
21  another copy?
22     MR. CANDON: No, I don't.
23  This was an exhibit in
24  Mr. Lockwood's deposition.

Page 125

1   BY MR. CANDON:
2      Q.   If you focus on pages 8, 9,
3   10.
4      MS. BAER: What is it?
5      MR. CANDON: It's the 8-K
6   and the Term Sheet.
7      MS. BAER: And that's
8   Exhibit-10?
9      MR. CANDON: Yes.
10  BY MR. CANDON:
11     Q.   Do you recall having
12  participated in negotiations of this Term
13  Sheet?
14     A.   I participated in
15  negotiations of the Term Sheet. It was
16  in a somewhat different form than an 8-K,
17  but yes.
18     Q.   Other than the terms that
19  are embodied on the Term Sheet, were you
20  aware of any other agreements made with
21  respect to Plan proponents and going
22  forward?
23     MR. GUY: Objection, vague.
24     MS. BAER: Objection to

260d1ee9-cc5e-438d-b137-446673430c89

Page 150

```
 1   award.
 2       Q.   For my own edification, does
 3   that occur at the same time?  Can you be
 4   in individual review and extraordinary
 5   claims?
 6       A.   No.
 7       Q.   It's a multiple-step
 8   process?
 9       A.   Yes.
10       Q.   And for purposes of time,
11   can you estimate a time frame for
12   claiming individual review and getting an
13   offer from the Trust?
14           MS. BAER:   Objection,
15       speculation.  It also doesn't
16       exist.
17           THE WITNESS:  No.  But I
18       will tell you it will be faster in
19       the second year than it is in the
20       start-up year.
21   BY MR. CANDON:
22       Q.   Given that this case has
23   gone on for eight years, does that have
24   any other impact on the Trust, the first
```

Page 151

```
 1   one to two years?
 2           MR. GUY:  Objection, vague.
 3           MS. BAER:  Same objection.
 4           THE WITNESS:  The answer is
 5       I don't know, but I assure you it
 6       will be addressed because it has
 7       gone on so long.
 8   BY MR. CANDON:
 9       Q.   It's a significant back load
10   of claims?  Backlog, I should say.
11       A.   Well, that is almost always
12   true, but beyond that, it has gone on a
13   long time.
14       Q.   If a claimant is not
15   satisfied with the individual review
16   offer, what's the next step?
17       A.   Arbitration.
18       Q.   And I think the TDP offers
19   two, either binding or nonbinding
20   arbitration?
21       A.   That's correct.
22       Q.   Who actually represents the
23   Trust in the arbitration proceeding?
24       A.   Ordinarily -- let me stop
```

Page 152

```
 1   for a second.  In most trusts,
 2   arbitration is on the papers.  It's not
 3   an appearance, if you will, process,
 4   although.  And the arbitration procedures
 5   for this Plan have not been written.  But
 6   traditionally, the only opportunity, if
 7   the arbitrator agrees, is by telephone
 8   conference call.  So representation with
 9   a small R.  It's not a formal appearance
10   or hearing.
11           In which case, it depends on
12   the trust.  In the case of Manville
13   Trust, someone at the general counsel's
14   office; the Eagle-Picher Trust has a
15   lawyer who does it in-house.  And I am
16   not sure what the other trusts are doing.
17       Q.   And, again, the claimant
18   cannot exceed the maximum value or cannot
19   be offered more than the maximum value of
20   the TDP?
21       A.   That's correct.
22       Q.   So the maximum value still
23   is the ruling number on whether or not
24   the outcome of arbitration?
```

Page 153

```
 1       A.   Yes, but there are
 2   arbitrators who have written opinions
 3   suggesting that is an extraordinary
 4   claim.
 5       Q.   So if we go through the
 6   arbitration process and the claimant
 7   agrees to the figure, do they have the
 8   ability to then take that claim to
 9   extraordinary --
10       A.   If they choose binding
11   arbitration, it's binding arbitration.
12       Q.   Suppose they go through
13   nonbinding arbitration and still no
14   agreement is reached.  What's the next
15   step?
16       A.   Exit to the tort system.
17       Q.   In your experience, how
18   frequently does that happen?
19       A.   Well, the Manville Trust has
20   a little over 800,000 claims, and it's
21   happened once.
22       Q.   So infrequently?
23       A.   I would say infrequently.
24       Q.   Now, if the claimant is
```

*CPO*

*PP Obj: R; BE; F*

260d1ee9-cc5e-438d-b137-446673430c89

Page 170

1    Q.   Right.  You are not aware of
2  the numbers?
3    A.   No.
4    Q.   Is there any reason why a
5  recusal mechanism with respect to TAC
6  members in connection with the individual
7  review of claims could not be written
8  into the Grace TDPs?
9    A.   I suppose it could be.  I
10 think it would be redundant.
11   Q.   Redundant how?
12   A.   Well, the Model Rules of
13 Professional Conduct require that lawyers
14 recuse themselves where they have
15 conflicts.
16   Q.   Is it your view that the
17 Grace Trust Agreement and/or TDPs would
18 incorporate those model rules in
19 connection with any potential conflicts?
20   A.   I am not sure I know what
21 you mean by incorporate.  But those rules
22 exist for all practicing lawyers who are
23 licensed to practice law.
24   Q.   It's your view that the TAC

Page 171

1  members will be bound by those rules in
2  connection with their activities with
3  regard to the Grace Trust?
4    A.   That is a much better answer
5  than I gave and that's my answer.
6    Q.   In the event -- let me start
7  over.
8        After the Grace Trust is
9  implemented, if it is, or is established,
10 I should say, if there is occasion in
11 which an individual claim becomes the
12 subject of a review and the TAC members
13 are involved in that, would you request
14 their recusal if the claim was one in
15 which a TAC member was the claimant's
16 counsel?
17       MR. GUY:  Objection.
18       MR. LIESEMER:  Objection to
19 form.
20       MR. GUY:  Hypothetical,
21 speculation.
22       You may answer.
23       THE WITNESS:  If that TAC
24 member did not recuse themselves

Page 172

1  and I knew that this claim was
2  theirs, yes.
3  BY MR. DEMMY:
4    Q.   Changing subjects a bit, you
5  understand that one of the provisions of
6  the Plan is -- and I think you have
7  looked at the Transfer Agreement
8  previously in the deposition.
9        One of the provisions of the
10 Plan is a proposed assignment of
11 insurance rights by Grace to the Trust,
12 correct?
13   A.   Yes.
14   Q.   Are you aware of any
15 requirement in the bankruptcy code or
16 otherwise that requires Grace to assign
17 insurance rights to the Trust in
18 connection with a Plan that incorporates
19 a Section 524(g) channelling injunction?
20   A.   I am not a bankruptcy
21 lawyer, but I don't know of any
22 requirement.
23   Q.   So that's a discretionary
24 activity by Grace or a discretionary

Page 173

1  proposal by Grace as part of this Plan?
2    A.   I am not sure I know what
3  you mean by discretionary, but I would
4  agree they have done that.
5    Q.   Okay.  Grace doesn't have to
6  propose a transfer of insurance rights to
7  the Trust as part of this Plan, correct?
8        MS. BAER:  Objection to the
9  form.
10       THE WITNESS:  To the extent
11 I understand the bankruptcy code,
12 that's true.
13       MR. DEMMY:  I don't have any
14 other questions.
15       - - -
16       EXAMINATION
17       - - -
18 BY MR. COHN:
19   Q.   Mr. Austern, you said that
20 in preparation for these depositions, you
21 reviewed the updated reports of Jenny
22 Biggs and Mr. Florence and Mr. Peterson;
23 is that right?
24   A.   Yes.

260d1ee9-cc5e-438d-b137-446673430c89



Page 182

```
 1          MR. COHN:  And the Lockwood
 2     deposition, that as soon as I
 3     start getting into substantive
 4     issues about what happened in the
 5     negotiation of the Plan of the
 6     TDPs, I am going to face an
 7     instruction not to answer on the
 8     bases that Ms. Harding has set
 9     forth previously?
10          MR. GUY:  I didn't attend
11     Finke.  I did attend Peter's.  I
12     know that objection was raised,
13     but I also know that he got into a
14     lot of those issues.  So we will
15     take it question by question.
16          MS. BAER:  The Debtor will
17     object to any of those questions
18     being asked and answered.
19          MR. LIESEMER:  So will the
20     ACC.
21     BY MR. COHN:
22     Q.   Who besides the FCR and the
23     ACC was involved in the negotiation of
24     the TDPs, if anyone?
```

Page 183

```
 1     A.   I don't remember anybody
 2     else.
 3     Q.   So, as far as you know, the
 4     TDPs were drafted in consultation between
 5     the FCR and the ACC alone; is that
 6     correct?
 7          MR. GUY:  Objection.
 8          THE WITNESS:  Well,
 9     recognizing that the ACC included
10     a Libby claimant, the answer is
11     yes.
12     BY MR. COHN:
13     Q.   Okay.  Is it fair to say
14     that -- strike that.
15          In constructing TDPs, what
16     are the major concerns of you, as the
17     FCR?
18     A.   The payment percentage; the
19     maximum available payment; the maximum
20     payment meaning the year; whether there
21     is sequencing, which in plain English is
22     if you are not paid -- if you are awarded
23     a payment but not paid because of maximum
24     available payment percentages, you get
```

Page 184

```
 1     interest called sequencing; inflation
 2     issues; and the scheduled values.
 3     Q.   You want to maximize the
 4     recovery for your constituency, correct?
 5     A.   Yes.
 6     Q.   You want to maximize the
 7     likelihood that money is going to be
 8     available to pay your constituency,
 9     correct?
10     A.   That's correct.
11     Q.   You want to at the same time
12     maximize the payment to all beneficiaries
13     within the confines of making sure there
14     is enough money around; is that right?
15          MR. GUY:  Objection as to
16     beneficiaries.
17          THE WITNESS:  Well --
18          MR. COHN:  Let me take that
19     back.
20     BY MR. COHN:
21     Q.   Do you understand
22     beneficiaries to be those people who are
23     entitled to receive money from the Trust?
24     A.   Yes.
```

Page 185

```
 1          MR. GUY:  Presents or
 2     futures?
 3          MR. COHN:  Aren't the
 4     futures and the presents all
 5     beneficiaries of the contemplated
 6     Trust?
 7          MR. GUY:  But your questions
 8     have been asking about futures,
 9     and the witness has been answering
10     as to futures.  And now you are
11     bringing it back as to --
12          MR. COHN:  I thought I was
13     talking holistically.
14     BY MR. COHN:
15     Q.   Does your answer change for
16     the last couple of questions?
17     A.   No.  But I was going to say
18     the Plan -- the TDP and I believe the
19     Plan itself requires that all
20     beneficiaries be treated similarly.  So
21     to the extent that I have to live with
22     that, the answer is yes.
23     Q.   What is the FCR's view with
24     respect to the propriety of inflation,
```

260d1ee9-cc5e-438d-b137-446673430c89

Page 190

1      Q.   How many meetings did you
2  personally attend in the course of
3  negotiating the TDPs?
4          MR. GUY:  Meetings with who?
5          MS. BAER:  Objection.
6  BY MR. COHN:
7      Q.   I guess with the ACC would
8  be the other involved party that wasn't
9  your counsel.
10     A.   I am sorry.  Are you
11 eliminating this to negotiating the TDP?
12     Q.   Yes.
13     A.   I would have to guess.
14 Somewhere between eight and 12.
15     Q.   Was there discussion of
16 whether or not to permit the insurers to
17 be involved in the processing of claims?
18         MR. LIESEMER:  Objection.
19         MR. GUY:  Objection.
20         You can answer -- well, you
21 know what?  I will defer to these
22 guys.
23         MS. BAER:  Can you read back
24 the question?

Page 191

1          (The reporter read from the
2  record as requested.)
3          MS. BAER:  Objection.
4          MR. LIESEMER:  Objection.
5          MR. GUY:  But do you want
6  the witness to answer?
7          MS. BAER:  To the extent the
8  witness would have to reveal
9  discussions about negotiations of
10 the various Plan documents, I
11 would object.
12         If you can answer without
13 revealing that kind of
14 information, then I won't object.
15         THE WITNESS:  I don't think
16 I can.
17         MR. COHN:  So you are
18 instructing?
19         MR. GUY:  Yes.
20         MR. DEMMY:  Can I ask a
21 clarifying question?  Who is
22 instructing the witness not to
23 answer?
24         MR. GUY:  I am instructing,

Page 192

1  as counsel for the FCR,
2  Mr. Austern not to answer the
3  question because the other Plan
4  proponents are raising
5  confidentiality issues with regard
6  to settlement discussions, and I
7  am adhering to that request.
8          And as the Court has stated
9  many times, negotiations are not
10 relevant and, therefore, would not
11 be admissible at the Plan
12 confirmation hearing.
13         MR. COHN:  We disagree.
14         MR. GUY:  Understood.
15         MR. COHN:  I think I tested
16 your tolerance to where I am going
17 to get instructions not to answer.
18 I think I will stand down now and
19 let Mr. Plevin question.
20         - - -
21         EXAMINATION
22         - - -
23 BY MR. PLEVIN:
24     Q.   Good afternoon, Mr. Austern.

Page 193

1      A.   Good afternoon.
2      Q.   Just so we are straight, I
3  represent Fireman's Fund Insurance
4  Company in this case only with respect to
5  issues concerning Fireman's Fund's proof
6  of claim and the indemnity agreement
7  between Fireman's Fund and Grace and the
8  supersedeas bond that Fireman's Fund
9  posted with respect to a case in Texas
10 that I want to ask you some questions
11 about.
12         Let me start, first of all,
13 by asking if you are generally familiar
14 with the Edwards case in Texas?
15     A.   Yes.
16     Q.   Can you tell me what you
17 know about that case in general?
18     A.   Mr. Reaud, R-E-A-U-D, I
19 think --
20     Q.   Correct spelling.  I don't
21 know if the pronunciation is right.
22     A.   -- has a judgment on appeal
23 in an asbestos personal injury claim
24 against Grace in a number of millions of

260d1ee9-cc5e-438d-b137-446673430c89

FFIC Sc

PP
Obj:
R;
BE

1    dollars. I think that's what I know --
2    which was stayed, of course, because of
3    the bankruptcy.
4        Q.    And in which the appeal was
5    stayed?
6        A.    The appeal was stayed.
7        Q.    And I will represent to you
8    that there were five plaintiffs who are
9    part of that judgment.
10        But your understanding then
11    is that there was a judgment in the trial
12    court, correct?
13        A.    Correct.
14        Q.    Which was appealed?
15        A.    Correct.
16        Q.    And that the appellate
17    proceedings were stayed by the Grace
18    bankruptcy?
19        A.    Correct.
20        Q.    Do you know that as part of
21    the appellate proceedings, Fireman's Fund
22    posted a supersedeas bond to enable Grace
23    to go forward on the appeal without
24    Grace's assets being immediately at risk

1    for execution by the plaintiffs?
2        A.    I have been told that.
3        Q.    Do you understand that in
4    connection with the issuance of the
5    supersedeas bond, Fireman's Fund and
6    Grace entered into an indemnity agreement
7    pursuant to which Grace agreed to
8    indemnify Fireman's Fund for any amounts
9    that Fireman's Fund paid pursuant to the
10    bond?
11        A.    I have been told that.
12        Q.    And do you know that
13    Fireman's Fund has filed a proof of claim
14    seeking to recover from Grace's estate
15    any and all amounts that Fireman's Fund
16    might be obligated to pay under the
17    supersedeas bond?
18        A.    I have been told that.
19        Q.    Do you have a view as to the
20    likelihood of success on Grace's appeal
21    or the strength of Grace's position on
22    appeal?
23        MR. GUY:    Objection, seeks a
24    legal conclusion.

1        MS. BAER:    Objection. It
2    also seeks attorney-client
3    communication.
4        MR. LIESEMER:    Same
5    objection.
6        MR. GUY:    To the extent you
7    can answer without revealing
8    communications with your
9    counsel --
10        MR. PLEVIN:    Let me just be
11    certain that I did not ask him for
12    any communications. I didn't ask
13    him what anybody told him or what
14    he said to anybody. I asked him
15    if he has a view.
16        He is a party to the
17    bankruptcy as the Future
18    Claimants' Representative, and he
19    either has a view or he doesn't.
20    If he has a view, I intend to ask
21    him what his view is and what the
22    basis for it is.
23        And if the point then is
24    that he can only say it based on

1    counsel, that would be the proper
2    time to make that objection.
3        MR. GUY:    I actually don't
4    think you can, because what you
5    are trying to elicit is expert
6    testimony from a lawyer about a
7    merits of a case that's pending in
8    court. And that testimony would
9    be barred on a 701 F.R.E. I don't
10    think you can ask that. It would
11    not be admissible in the
12    bankruptcy case.
13        If you can explain to me how
14    Mr. Austern's view about the
15    merits of a legal case would be
16    admissible before Judge
17    Fitzgerald, I would be happy to
18    hear it. Maybe you can try it
19    another way.
20        MR. PLEVIN:    I am trying to
21    think of what the other way would
22    be.
23        MR. GUY:    There is no good
24    way.

260d1ee9-cc5e-438d-b137-446673430c89

Page 198

1    MR. PLEVIN:  Let me
2  reiterate my view that Mr. Austern
3  is a party to the case, and -- all
4  right.  Let me see if I can get to
5  the point of demonstrating the
6  relevance in this fashion.
7    MR. GUY:  I will tell you
8  what.  If I could talk to my
9  client for two seconds, I think we
10  can cut through this.
11    MR. PLEVIN:  Sure.
12    (There was a discussion held
13  off the record at this time.)
14    MR. GUY:  You may answer the
15  question as long as there is an
16  express understanding that you are
17  not going to argue that there is
18  any kind of waiver of privilege in
19  the answer.
20    MR. PLEVIN:  That's
21  acceptable.
22    THE WITNESS:  I believe
23  there is a question on the floor.
24  BY MR. PLEVIN:

Page 199

1    Q.  Yes.  And I believe the
2  question on the floor is whether you have
3  an opinion as to the likelihood of
4  success on appeal or the strength of
5  Grace's position on appeal in the Edwards
6  matter?
7    A.  No.
8    MS. BAER:  Objection to the
9  extent you are requesting
10  communications among the
11  co-proponents and therefore the
12  codefendants.
13    MR. LIESEMER:  And I join
14  the objection.
15    MR. PLEVIN:  And I will
16  reiterate that I was not asking
17  him about any communications.  I
18  was asking him about his own view.
19  BY MR. PLEVIN:
20    Q.  And your answer,
21  Mr. Austern?
22    A.  I have no view.
23    Q.  Do you have a view as to the
24  proper classification under the Plan of

Page 200

1  the proof of claim filed by Fireman's
2  Fund that I described a moment ago?
3    MS. BAER:  Objection as to
4  form.
5    MR. GUY:  Objection.
6    You may answer.
7    THE WITNESS:  No.
8  BY MR. PLEVIN:
9    Q.  Do you have an
10  understanding, Mr. Austern, as to what
11  the rights of the Edwards plaintiffs
12  would be under the Plan in the TDPs in
13  the event that the judgment that they
14  currently hold were to be reversed by
15  either the Texas Court of Appeals or the
16  Texas Supreme Court?
17    MS. BAER:  Objection, form.
18    MR. LIESEMER:  Same
19  objection.
20    MR. PLEVIN:  What was the
21  objection?
22    MS. BAER:  Form.
23    THE WITNESS:  You are asking
24  me, do I have a view of what they

Page 201

1  would do?
2  BY MR. PLEVIN:
3    Q.  What their rights would be
4  under the Plan.
5    A.  I assume their rights would
6  be to file a personal injury claim with
7  the Trust.
8    Q.  As opposed to taking their
9  case back to a trial court, if it were
10  remanded for a new trial and retrying the
11  case in the trial court?
12    MS. BAER:  Objection.  Now
13  you are asking for a legal
14  conclusion.
15    MR. LIESEMER:  Objection,
16  speculation, hypothetical.
17    THE WITNESS:  I don't know.
18  My understanding of the Plan is
19  they got to file a Personal Injury
20  Trust claim.
21  BY MR. PLEVIN:
22    Q.  If there is a reversal?
23    A.  Yes.
24    Q.  Do you understand,

51 (Pages 198 to 201)

Page 202

1  Mr. Austern, the concept of set-off in
2  bankruptcy?
3      A.   I understand set-off
4  generally as a proposition.  I am not
5  sure I would apply it -- I don't know
6  that I know enough bankruptcy law to
7  apply it to bankruptcy.
8      Q.   Okay.  What is your
9  understanding of the concept of set-off?
10     A.   Well, if I owe you $10,000
11  and I have to pay Mr. Guy because you owe
12  him some money, I can set-off from what I
13  paid Mr. Guy what I owe you.
14         MR. PLEVIN:  Can you read
15      that answer back?
16         (The reporter read from the
17      record as requested.)
18  BY MR. PLEVIN:
19     Q.   Are you aware, Mr. Austern,
20  that Grace has made claims for insurance
21  coverage against Fireman's Fund under
22  liability insurance policies issued by
23  Fireman's Fund?
24     A.   Yes.

Page 203

1      Q.   And that the insurance
2  coverage claims Grace has made at least
3  include, if not -- they are not limited
4  to claims for coverage of asbestos
5  personal injury claims?
6      A.   I am sorry.  Can you say
7  that again?
8      Q.   I got a little tied up
9  there.
10         Grace is seeking coverage
11  from Fireman's Fund under the Fireman's
12  Fund insurance coverage policies for
13  asbestos personal injury claims asserted
14  against Grace, correct?
15     A.   Yes.
16     Q.   Do you have a view as to
17  whether in the event that Fireman's Fund
18  is obligated to pay insurance coverage to
19  Grace, Fireman's Fund would be able to
20  reduce that obligation by any amount that
21  Grace is obligated to pay under the
22  indemnity agreement?
23         MR. GUY:  Objection.  I
24      don't see how he can answer that

Page 204

1  question without getting into a
2  legal analysis.  He is here as a
3  fact witness.
4         But, again, let me talk to
5  my client, and I think we can
6  resolve it with the answer.
7         MS. BAER:  We join in the
8  objection.
9         (There was a discussion held
10  off the record at this time.)
11         THE WITNESS:  I have no
12      view.
13  BY MR. PLEVIN:
14     Q.   Do you have a concern that
15  if the Edwards appeal were to be --
16  withdrawn.
17         Do you have a concern that
18  if the Edwards judgment were to be
19  affirmed on appeal and Fireman's Fund
20  paid money to Edwards and then made a
21  claim against Grace for the amount paid,
22  that that would in some way reduce the
23  amount of money coming into the Trust
24  from the Fireman's Fund insurance policy?

Page 205

1         MR. LIESEMER:  Objection to
2  the form.
3         MS. BAER:  Objection.
4         MR. GUY:  Objection to form.
5         THE WITNESS:  Mr. Plevin, I
6  have any concern that the activity
7  might reduce the amount of
8  insurance coming into the Grace
9  Trust.  And I understand this is
10  approximately $6 million.  And if
11  Fireman's Fund were to reduce its
12  payment or be entitled to reduce
13  its payment under the Fireman's
14  Fund policy for asbestos personal
15  injury to the Trust and it would
16  reduce it by $6 million, yes, I
17  have a concern.
18  BY MR. PLEVIN:
19     Q.   And I am sure this has been
20  established on the record long before I
21  came here, but let me just ask this
22  question for foundational purposes.
23         You are an attorney,
24  Mr. Austern?

260d1ee9-cc5e-438d-b137-446673430c89

Page 206

1    A.    Yes.
2    Q.    And you have practiced law
3  for how many years?
4    A.    45.
5        MR. PLEVIN:  Thank you.  I
6  have no further questions.
7        MR. CALOGERO:  I have no
8  questions.
9        MR. WISLER:  Maryland
10  Casualty has no questions.
11        MR. GUY:  Are there any
12  insurers on the phone who have
13  questions?
14        Scotts?  BNSF?  Do you have
15  any questions?
16        MS. COBB:  Yes.  This is
17  Tiffany Cobb on behalf of The
18  Scotts Company, LLC, with Vorys,
19  Sater, Seymour and Pease.  Can you
20  hear me?
21        MR. GUY:  Yes.  Hi, Tiffany.
22          - - -
23        EXAMINATION
24          - - -

Page 207

1  BY MS. COBB:
2    Q.    Mr. Austern, in your
3  capacity as the Asbestos PI Future
4  Claimants' Representative, what fiduciary
5  duties do you owe?
6        MR. GUY:  Tiffany, we
7  covered that earlier in the
8  deposition.  Were you listening
9  in?
10        MS. COBB:  I was.
11        MR. GUY:  I just don't want
12  to have a lot of duplicity in the
13  questioning.  I will allow this
14  one.
15        THE WITNESS:  I have a
16  fiduciary duty to future
17  claimants.
18  BY MS. COBB:
19    Q.    But what are the duties?
20    A.    Essentially to make sure
21  there is sufficient funds, that when they
22  file claims they will be treated the same
23  or similarly to present claimants.
24    Q.    In your capacity as the FCR,

Page 208

1  who specifically do you view as your
2  punitive clients?
3    A.    Future claimants.
4    Q.    Okay.  And in your capacity
5  as the FCR then, do you owe a fiduciary
6  duty to asbestos PI claimants as defined
7  in the Plan who hold future demands
8  against any entity that is addressed in
9  the definition of an asbestos PI
10  claimant?
11    A.    Can you repeat the last part
12  of that.  Against whom?
13    Q.    Sure.  Against any entity
14  that is addressed in the definition of
15  asbestos PI claimant?
16    A.    Yes.
17    Q.    In your capacity as the FCR,
18  do you owe a fiduciary duty to indirect
19  PI Trust claimants who hold future
20  demands against the Debtors?
21    A.    Yes.
22    Q.    In your capacity as the FCR,
23  do you owe a fiduciary duty to
24  insurance-related claimants who hold

Page 209

1  future demands against any settled
2  insurance company?
3    A.    I think I would have to go
4  back and look at the definition of those
5  people.
6    Q.    Okay.  Then let's do that.
7  If you would, please, look at Exhibit-5
8  which is the TDP, and if you would please
9  look at Section 5.12.
10    A.    I am looking at it, but give
11  me a moment.
12    Q.    Sure.
13    A.    Okay.  What was the
14  question?
15    Q.    In your capacity as the FCR,
16  do you owe a fiduciary duty to
17  insurance-related claimants who hold
18  future demands against any settled
19  insurance companies?
20    A.    I don't know.  I would have
21  to think about that.  I realize they
22  could be indirect claimants, at least I
23  think they could be indirect claimants.
24  So I would have to think about that.  I

260d1ee9-cc5e-438d-b137-446673430c89

Page 242

```
 1   Mr. Austern, but I would like to
 2   read a statement into the record,
 3   if that's okay.
 4        As counsel for the
 5   Creditors' Committee that Plan
 6   proponents have previously
 7   discussed and agreed the
 8   Creditors' Committee may seek a
 9   subsequent deposition of
10   Mr. Austern or any other person or
11   persons solely in connection with
12   Plan feasibility issues.  Thank
13   you.
14        MR. GUY:  Mr. Brown.
15           - - -
16        EXAMINATION
17           - - -
18   BY MR. BROWN:
19   Q.   Mr. Austern, I have a few
20   follow-up questions mainly to what
21   Mr. Cohn questioned you about.
22        I think one of the documents
23   that the Libby claimants' counsel handed
24   you was an 8-K.  I don't recall the name
```

Page 243

```
 1   of it.  Do you have it there?
 2   A.   I have it here.  I have it.
 3   Q.   Okay.  And attached to that
 4   8-K there is a Term Sheet, correct?
 5   A.   Yes.
 6   Q.   And I believe your testimony
 7   was earlier that you have seen this Term
 8   Sheet but some other iteration of it; is
 9   that correct?
10   A.   Yes.
11   Q.   Not in the form of an
12   attachment to an 8-K?
13   A.   Oh, no.  I meant I have seen
14   a printed version of this.
15   Q.   Okay.  But, in substance,
16   it's the same document as what is
17   attached to the 8-K?
18   A.   Yes.
19   Q.   Okay.  You will agree with
20   me, will you not, that the Term Sheet is
21   dated April 6, 2008?
22   A.   If you will tell me -- yes,
23   it is.
24   Q.   Okay.  To your knowledge,
```

Page 244

```
 1   were any of the Debtors' insurers
 2   consulted about any term of this Term
 3   Sheet prior to April 6, 2008?
 4   A.   Well, I didn't consult with
 5   them, so I don't know.  I did not consult
 6   with them.
 7   Q.   Are you aware of anyone else
 8   consulting with them?
 9   A.   No.
10   Q.   To your knowledge, did any
11   of the Debtors' insurers consent to any
12   term in the Term Sheet prior to April 6,
13   2008?
14   A.   Not that I know of.
15   Q.   Now, the initial Joint Plan
16   was filed in September of 2008, correct?
17   A.   Yes.
18   Q.   Would I be correct in
19   assuming that between April 6, 2008 and
20   September 2008 that the Plan proponents
21   were working on the terms of the Plan and
22   Plan documents?
23   A.   I was, and I know others
24   were.
```

Page 245

```
 1   Q.   Okay.  And would I also be
 2   correct that in that time period the Plan
 3   proponents and their counsel were
 4   drafting Plan documents?
 5   A.   I know my counsel was.
 6   Q.   In that time frame, April 6,
 7   2008 to September 2008, to your
 8   knowledge, were any of the Debtors
 9   insurers' consulted about any of the
10   terms in the Plan or Plan documents?
11   A.   I do not know of any
12   consultations that took place.
13   Q.   Okay.  To your knowledge,
14   were any of the Debtors insurers'
15   consented about any term in the Plan or
16   Plan documents in that time frame?
17   A.   Well, having not been
18   consulted, I would be surprised if they
19   consented, but I don't know if they
20   consented.
21   Q.   All right.  Now, in your
22   prior testimony, in answer to one of
23   Mr. Cohn's questions, you indicated that
24   you were aware of circumstances in which
```

260d1ee9-cc5e-438d-b137-446673430c89

Page 246

```
 1   plaintiff's personal injury attorneys had
 2   waived their fees?
 3        A.   Yes.
 4        Q.   Putting those circumstances
 5   aside, do you have an understanding as to
 6   what the customary contingency fee
 7   arrangement is for plaintiffs' asbestos
 8   personal injury lawyers?
 9            MR. LIESEMER:  Objection to
10        the form.  No foundation.
11            THE WITNESS:  I know what it
12        is in the Manville Trust because
13        the Manville Trust dictates what
14        it will be.
15   BY MR. BROWN:
16        Q.   Okay.
17        A.   Putting that aside, I think
18   it depends on the case.  I am familiar
19   with the fact, for instance, that medical
20   malpractice attorneys charge a somewhat
21   higher contingency fee than others do.  I
22   am not sure I know what the standard fee
23   is for asbestos personal injury.
24        Q.   Do you have any idea what
```

Page 247

```
 1   Mr. Cooney's firm charges by way of
 2   contingency fee?
 3        A.   No.
 4        Q.   Mr. Weitz?
 5        A.   No.
 6        Q.   Mr. Rice?
 7        A.   No.
 8        Q.   Mr. Budd?
 9        A.   No.
10        Q.   Anyone?
11        A.   No.
12        Q.   You mentioned that there is
13   a cap -- I am not sure you used the term
14   "cap" -- there is a fee in the Manville
15   Trust Agreement?
16        A.   Yes.
17        Q.   Is it a cap?
18        A.   No -- it is a cap.  It says
19   the fee cannot exceed 5 percent.
20        Q.   Okay.  How did that term
21   come about in the Manville Trust?
22        A.   In words of one syllable,
23   Judge Weinstein insisted on it.
24        Q.   Is there a cap under this
```

Page 248

```
 1   Plan?
 2        A.   Not that I know of.
 3        Q.   Why?
 4        A.   I don't know.
 5        Q.   Are you aware of other
 6   asbestos trusts where there is a cap with
 7   respect to contingency fees that can be
 8   paid to plaintiffs lawyers?
 9        A.   You did say asbestos trusts?
10        Q.   Yes.
11        A.   I do not know of any other
12   asbestos trust that has a cap.
13        Q.   Focusing for a moment on the
14   CE Trust, are the TAC members paid for
15   their services as TAC members?
16        A.   You know, I don't remember.
17   I know there is a provision to pay their
18   expenses.  I can't remember if they are
19   paid.  I just know I am paid.
20        Q.   Well, that's important.
21            How about with respect to
22   this Trust in the Grace bankruptcy?  Do
23   you know whether the TAC members will be
24   paid in any fashion for their services
```

Page 249

```
 1   TAC members?
 2        A.   Do you mean other than
 3   expenses?
 4        Q.   Yes.
 5        A.   And I don't recall any
 6   specific provision.
 7        Q.   Okay.  I found it.
 8        A.   Which page?
 9        Q.   Page 32.
10        A.   Are we in the Plan?
11        Q.   No.  We are in the Trust
12   Agreement, page 32 of the Trust
13   Agreement.
14        A.   I am sorry.  Just a minute.
15   What page?
16        Q.   32, Section 5.6.
17        A.   I seem to have an agreement
18   that's out of pagination.  Just a moment.
19            Yes.  5.6, yes, they are
20   paid -- I stand corrected -- an hourly
21   rate.
22        Q.   All right.  Do you have any
23   understanding today as to what the hourly
24   rate will be for the members of the TAC
```

260d1ee9-cc5e-438d-b137-446673430c89

Page 250

CPO

PP
Obj:
R;
BE

1  if the Plan is confirmed?
2     A.   No, I don't.
3     Q.   Do you have any view as to
4  what the hourly rate would be if the Plan
5  is confirmed?
6     A.   I confess, Mr. Brown, having
7  forgotten that they are entitled to an
8  hourly rate, I would have to think about
9  that.  But I, at this point, have no
10  view.
11     Q.   Okay.  Do you have a view as
12  to whether they should be paid that
13  hourly rate above and beyond whatever
14  fees they get from their individual
15  clients who recover from the Trust?
16     A.   If Section 5.6 gives them
17  the right to get the hourly rate, I think
18  they should get the hourly rate.
19        MR. BROWN:  I think that's
20  all.  Thank you, Mr. Austern.
21        MR. CANDON:  I have one
22  follow-up question.
23        MR. GUY:  Sure.  Go ahead.
24             - - -

Page 251

1        EXAMINATION
2           - - -
3  BY MR. CANDON:
4     Q.   Mr. Austern, you had
5  mentioned that you reviewed Mr. Biggs'
6  estimation report, and the figure was
7  somewhere exactly between, you said, 3
8  and 5 billion?
9     A.   Let me explain.  There was a
10  follow-up letter to the report.  The
11  report I believe said 3.8, and it was
12  reduced to 3.6 because of the
13  mathematical error.
14     Q.   Did she provide a separate
15  estimate for Libby claims?
16     A.   No, she did not.
17        MR. CANDON:  Okay.  That's
18  all I have.  Thank you.
19        MR. GUY:  Okay.  We are
20  done.
21        (The deposition concluded at
22  3:27 p.m.)
23
24

Page 252

1        CERTIFICATE
2
3
4        I HEREBY CERTIFY that the witness
5  was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10
11
12  _____
13        Lori A. Zabielski
14        Registered Professional Reporter
15        Dated:  MAY 17, 2009
16
17
18
19
20        (The foregoing certification
21  of this transcript does not apply to any
22  reproduction of the same by any means,
23  unless under the direct control and/or
24  supervision of the certifying reporter.)

Page 253

1     INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over
4  carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8        After doing so, please sign the
9  errata sheet and date it.
10  You are signing same subject to the
11  changes you have noted on the errata
12  sheet, which will be attached to your
13  deposition.
14        It is imperative that you return
15  the original errata sheet to the deposing
16  attorney within thirty (30) days of
17  receipt of the deposition transcript by
18  you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

260d1ee9-cc5e-438d-b137-446673430c89