**Deposition Designations for:**
**RICHARD FINKE**
**March 30, 2009**

**Deposition Designation Key**

**Arrowood = Arrowood Indem. Co. f/k/a Royal Indem. Co. (Light Green)**

**BNSF = BNSF Railway Co. (Pink)**

**Certain Plan Objectors "CPO" = Government Employees Insurance Co.; Republic Insurance Co. n/k/a Starr Indemnity and Liability Co.; OneBeacon America Insurance Co.; Seaton Insurance Co.; Fireman's Fund Insurance Co.; Allianz S.p.A. f/k/a Riunione Adriatica Di Sicurta; and Allianz SE f/k/a Allianz Aktiengesellschaft; Maryland Casualty Co.; Zurich Insurance Co.; and Zurich International (Bermuda) Ltd.; Continental Casualty Co. and Continental Insurance Co. and related subsidiaries and affiliates; Federal Insurance Co.; and AXA Belgium as successor to Royal Belge SA (Orange)**

**CNA = Continental Cas. Co & Continental Ins. Co. (Red)**

**FFIC = Fireman Funds Ins. Co. (Green)**
**FFIC SC = Fireman Funds Ins. Co. "Surety Claims" (Green)**

**GR = Government Employees Ins. Co.; Republic Ins. Co. n/k/a Starr Indemnity and Liability Co.**

**Libby = Libby Claimants (Black)**

**OBS = OneBeacon America Ins. Co. and Seaton Ins. Co. (Brown)**

**PP = Plan Proponents (Blue)**

**Montana = State of Montana (Magenta)**

**Travelers = Travelers Cas. and Surety Cos. (Purple)**

**UCC & BLG = Unsecured Creditors' Committee & Bank Lenders Group (Lavender)**

**AFNE = Assume Fact Not in Evidence**
**AO = Attorney Objection**
**BE = Best Evidence**
**Cum. = Cumulative**
**Ctr = Counter Designation**
**Ctr-Ctr = Counter-Counter**
**ET = Expert Testimony**
**F = Foundation**
**408 = Violation of FRE 408**
**H = Hearsay**
**IH - Incomplete Hypothetical**
**L = Leading**
**LA = Legal Argument**
**LC = Legal Conclusion**
**LPK - Lacks Personal Knowledge**
**LO = Seeking Legal Opinion**
**NT = Not Testimony**
**Obj: = Objection**
**R = Relevance**
**S = Speculative**
**UP = Unfairly Prejudicial under Rule 403**
**V = Vague**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al | ) | Case No. 01-01139 JKF |
| | ) | |
| | ) | |
| Debtors | ) | |

Deposition of RICHARD CHARLES FINKE taken pursuant to notice at the law offices of Drinker, Biddle & Reath, LLP, 1100 North Market Street, Suite 1000, Wilmington, Delaware, beginning at 9:35 a.m., on Monday, March 30, 2009, before Allen S. Blank, Registered Merit Reporter and Notary Public.

APPEARANCES:

LISA G. ESAYIAN, ESQUIRE
KIRKLAND & ELLIS, LLP
200 East Randolph Drive
Chicago, IL 60601

For - Debtors

DANIEL A. SPEIGHTS, ESQUIRE
SPEIGHTS & RUNYAN
200 Jackson Avenue, East
Hampton, SC 29924

For - Anderson Memorial Hospital

---

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

Page 2

APPEARANCES: CONTINUED
JOHN W. KOZYAK, ESQUIRE
KOZYAK TROPIN THROCKMORTON
2525 Ponce de Leon, 9th Floor
Miami, FL 33134
For - Anderson Memorial Hospital

MATTHEW I. KRAMER, ESQUIRE
BILZIN, SUMBERG, BAENA, PRICE & AXELROD, LLP
200 S. Biscayne Boulevard, Suite 2500
Miami, FL 33131-5340
For - PD Committee

ARLENE G. KRIEGER, ESQUIRE
STROOCK & STROOCK & LAVAN, LLP
180 Maiden Lane
New York, NY 10038-4982
For - Official Committee of Unsecured Creditors

ALAN B. RICH, ESQUIRE
Elm Place
1401 Elm Street, Suite 4620
Dallas, TX 75202
For - PD FCR

ELISA ALCABES, ESQUIRE
SIMPSON, THACHER & BARTLETT, LLP
425 Lexington Avenue
New York, NY 10017-3954
For - Travelers Casualty & Surety Company

KATHLEEN A. ORR, ESQUIRE
ORRICK, HERRINGTON & SUTLIFFE, LLP
1152 15th Street, N.W.
Washington, D.C. 20005
For - David Anstern, Asbestos PI

Page 3

APPEARANCES: CONTINUED
MICHAEL F. BROWN, ESQUIRE
DRINKER, BIDDLE & REATH, LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996
For - Government Employees Insurance Company, Columbia Insurance, One Beacon America Insurance Company and Seaton Insurance Company

SHANNON L. GRIFFIN, ESQUIRE
O'MELVENY & MYERS, LLP
Times Square Tower
7 Times Square
New York, NY 10036
For - Arrowood Indemnity Company, f/k/a Royal Indemnity Co.

MARNIE E. SIMON, ESQUIRE
STEVENS & LEE
1818 Market Street, 29th Floor
Philadelphia, PA 19103-1702
- and -
JOHN D. DEMMY, ESQUIRE (VIA TELEPHONE)
STEVENS & LEE
1105 North Market Street, 7th Floor
Wilmington, DE 19801
For - Fireman's Fund Insurance Company

SHAYNE W. SPENCER, ESQUIRE
ELIZABETH DeCRISTOFARO, ESQUIRE (VIA TELEPHONE)
FORD, MARRIN, ESPOSITO, WITMEYER & GLESER, LLP
Wall Street Plaza
New York, NY 10005-1875
For - CNA Insurance Company

Page 4

APPEARANCES: CONTINUED
ANDREW F. CRAIG, ESQUIRE (VIA TELEPHONE)
CUYLER BURK, LLP
Parsippany Corporate Center
Four Century Drive
Parsippany, NJ 07054
For - Allstate Insurance Company

LAURA M. STOVER, ESQUIRE (VIA TELEPHONE)
NEARHOOD LAW OFFICES
7537 E. McDonald Drive
Scottsdale, AZ 85250
- and -
GABRIELLA V. CELLAROSI, ESQUIRE (VIA TELEPHONE)
ECKERT SEAMANS
1747 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C. 20006-4604
For - Maryland Casualty Insurance Company and Zurick Insurance Company

* * * * * *

RICHARD CHARLES FINKE, the deponent herein, having first been duly sworn on oath, was examined and testified as follows:

CPO

EXAMINATION

BY MR. SPEIGHTS:
Q. Would you state your full name, please, sir?
**A. Yes. Richard Charles Finke, F-i-n-k-e.**
Q. Mr. Finke, who are you employed by?

Page 5

CPO

**A. W. R. Grace & Co.**
Q. How long have you been employed by Grace?
**A. Twenty years.**
Q. Can you tell me the approximate date you started?
**A. No. I can tell you the exact date I started. February 27, 1989.**
Q. Who do you presently report to?
**A. Mark Shelnitz, general counsel of W. R. Grace.**
Q. How long have you reported to Mr. Shelnitz?
**A. Since he became general counsel, which was three or four years ago. I forget how long.**
Q. Does April 2005 seem about right?
**A. It seems about right, yes.**
Q. Would you give me the positions you have held at Grace and the approximate dates you held each position?
**A. When I was hired, I held the position of senior litigation counsel and I became assistant general counsel for litigation in -- it was around March of 2006.**
Q. Is that your present position?

CPC

Page 6

A. Yes.
Q. When you initially went to work at Grace, who did you report to?
A. I reported to Robert Beber, B-e-b-e-r.
Q. And how long did you report to Mr. Beber?
A. Until he retired. He was general counsel of W. R. Grace. When he retired, I frankly don't recall the year or the date.
Q. Who did you report to between the retirement of Mr. Beber and Mr. Shelnitz taking over as general counsel?
A. I reported to David Siegel, S-i-e-g-e-l, who became general counsel after Mr. Beber.
Q. Were you reporting to Mr. Siegel when Grace filed its petition for reorganization?
A. Yes.
MS. GRIFFIN: May I interrupt? I apologize. I'm Shannon Griffin with O'Melveny & Myers. I represent Arrowood Indemnity. And I thought we were going to do introductions. So I apologize for the interruption.
But I would like to enter an exhibit before we take off on Arrowood's objections, which were filed last night. Everyone should

Page 7

have received a copy. And I have copies for everybody here. But I would like to mark this as Exhibit 1 so I don't have to keep objecting throughout.
MR. SPEIGHTS: I have not seen it so I would like to see it before you mark it.
MS. GRIFFIN: Sure.
(Finke Deposition Exhibit No. 1 was marked for identification.)
MR. SPEIGHTS: Although it's normal for a party to mark its exhibits during its own examination, I certainly don't object to counsel marking it now to avoid having to state these same objections orally or restate them innumerable times.
MS. GRIFFIN: Thank you.
MR. BROWN: While we are doing that, so that we can avoid it. My clients, Government Employees Insurance Company, Columbia Insurance Company and Seaton Insurance Company and One Beacon America Insurance Company, join in those objections.
MS. ALCABES: My clients as well, Travelers Casualty & Surety Company, also joins

Page 8

in the objection.
And to the extent that the debtor implied on Friday that this was the one and only time that this witness would be provided, we object to any implication of that sort and reserve our rights to take another deposition as required.
MS. SIMON: And my clients, Firemen's Fund Insurance Company, also joins in the objections and reserves its rights to depose the deponent at that time, if necessary.
MR. SPENCER: Continental Casualty also joins in the objection and reserves its rights as stated by all other counsel previously.
MS. ESAYIAN: From the debtor's perspective, everyone's reservations of rights are noted and I believe our position was clearly stated on Friday. And I won't take more time here.
BY MR. SPEIGHTS:
Q. Mr. Finke, were your general duties and responsibilities the same from 1989 until the bankruptcy?
A. Yes.

Page 9

Q. Can you generally describe what your duties and responsibilities were during that period?
A. Primarily, I was responsible for oversight and management of asbestos property damage cases, including reporting to Grace management on the status or developments in those cases.
I also was responsible for oversight of expert witnesses that Grace retained or Grace's counsel retained to testify in the asbestos property damage litigation.
Q. Were you part of a, for lack of a better term, a team of lawyers working under Mr. Beber?
A. Yes.
Q. And what did you call the team?
A. Just the asbestos litigation group informally.
Q. When a case was filed against Grace, how was it decided which member of the group would be responsible for that case?
A. Early in the process or shortly after the team was formed, the caseload was divided geographically so that each person of the team

Page 30

**did.**

Q. Was it searchable?

**A. To a limited extent, yes.**

Q. Who in your office was the person that you would go to if you needed something searched?

**A. I would have gone to my paralegal. Initially, it was Gail, whose last name I can't recall. And after Gail, to my paralegal that's still with us, Adie Hammond. A-d-i-e.**

Q. H-a-m-m-o-n-d?

**A. Yes.**

Q. Have you seen pages of the index?

**A. Yes.**

Q. Have you seen the entire index printed out?

**A. No.**

Q. Do you know how long the index would be, how many pages if you printed it out or how many gigabytes or whatever these computer people call the amount of it in the computer?

**A. No, I don't know. I think it would be extremely voluminous if it were printed out in hard copy. But I don't know by how much.**

Q. Does the index actually show the document

Page 31

like in a PDF format or is it just a list of the documents with certain information?

**A. It's a list of the documents with certain fields.**

Q. What fields?

**A. Product type, job sites, product names, dates, names of addressees, names of the sender or author. And number, a number had been assigned to each document. So the document number would appear. I don't recall what else.**

Q. Would that be a Bates stamp number?

**A. Yes.**

Q. And, as I understand it, someone with computer skills could search it by any of these fields?

**A. That's correct.**

Q. Did you have any involvement with the personal injury litigation before the bankruptcy?

**A. Very little.**

Q. What little did you have?

**A. On occasion, there may be an issue in a personal injury case that came to my attention or an expert involved in the property damage litigation would be appearing in a personal**

Page 32

**injury case. And then I would talk to Jay Hughes about that issue or the expert to determine either if he needed assistance relating to that issue or expert or if -- or just for my own edification to see if anything going on in this personal injury case might impact the property damage.**

Q. Who is Jay Hughes?

**A. Jay Hughes is an attorney with W. R. Grace. He has been with Grace longer than I have. He is still with Grace. And Jay's primary responsibility at Grace was to oversee the personal injury litigation.**

Q. Did he report to Mr. Beber before Mr. Beber's retirement?

**A. Yes.**

Q. And did he then report to Mr. Siegel while he was general counsel?

**A. Yes.**

Q. And does he presently report to Mr. Shelnitz?

**A. He presently reports to me.**

Q. I'd like to talk about Anderson before the bankruptcy a few minutes. First of all, see

Page 33

if we can try to pin down when you had responsibility for Anderson. Did you have responsibility for Anderson when the venue motion was decided and the judge said it could be maintained in Hampton County?

**A. No.**

Q. Did you have responsibility for Anderson at the time of the evidentiary hearing on certification?

**A. Yes.**

Q. Did you have responsibility for Anderson when the motion to certify was filed and briefed?

**A. I believe so. I do recall reading the briefs. I don't recall specifically if that -- if I did that because they had already been filed when I took over the case or if I had already assumed responsibility for the case and then they were filed. I just don't recall.**

Q. Do you recall whether you were involved in the decision to challenge the adequacy of Speights & Runyan?

**A. Yes.**

Q. And, yes, you recall you were involved?

**A. Yes.**

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 162

**A. My understanding is that the homeowner would have a claim against the personal injury trust.**

Q. Where is that set forth?

**A. I believe that's in the plan under the definition of indirect PI trust claim. I may not have the exact terminology there.**

Q. Does the indemnification cover defense as well as payment of the claim?

**A. That would be set forth in the PI TDP. And I would refer to that document before trying to answer your question. Because I'm not sure of the answer.**

Q. If somebody had sued Grace in 1979 for exposure to Monokote in the Jordan Hospital in Plymouth, Massachusetts, would someone at Grace have gone to see whether it had any records of Monokote being in the Jordan Hospital?

**A. This is a hypothetical lawsuit before 1979?**

Q. No. In 1999. I said before the bankruptcy. I meant to say that. I may have misspoken.

**A. Maybe I misheard it. Okay. I'm sorry.**

Page 163

CPO

Q. 1999. Somebody serves a complaint alleging mesothelioma exposure in the Jordan Hospital in Plymouth, Mass, would the Grace person handling the PI claims check to see if there were any records showing Monokote had been installed in the Jordan Hospital?

**A. I don't know.**

Q. Who would be the best person to ask that question to?

**A. Jay Hughes.**

Q. Is Mr. Hughes in Columbia or Boca?

**A. He is based in Cambridge, Massachusetts.**

MR. SPEIGHTS: That's all I have at this time, Mr. Finke. I reserve my position to be able to pursue those questions which counsel has instructed you not to answer and other questions that flow from that, if I am permitted to proceed along those lines.

Would somebody who wants to question the witness like to have this chair or can we do it from wherever you are?

MR. BROWN: Does anyone else on the PD side have any questions?

Okay. Why don't we take a five

Page 164

minute break.

(The deposition was recessed from 3:46 p.m. to 3:53 p.m.)

CPO

EXAMINATION

BY MR. BROWN:

Q. Mr. Finke, my name is Michael Brown and I represent the cast of foreign insurance companies that I identified earlier.

I want to go back and fill in some of the blanks in terms of your employment history with Grace. And I want to start by asking the role that you had pre-petition and then go to post-petition.

As I understand it, you were senior litigation counsel at the time the petition was filed?

**A. Yes.**

Q. And prior to that, your primary responsibility was with PD claims, is that correct?

**A. Yes.**

Q. And I think you identified some minimal involvement on the PI side?

**A. Right. Very sporadic.**

Page 165

Q. And that was primarily when there was a PD expert, as I understood it, that may have some application to PI claims?

**A. More or less, yes. Or was involved in some way in a property -- I'm sorry, personal injury case, which might have ramifications for property damage litigation.**

Q. Okay. And then other than what you described earlier, you had no involvement on the PI side?

**A. That's right.**

Q. Okay. Who did have the involvement on the PI side?

**A. Jay Hughes.**

Q. And what was Mr. Hughes' title pre-petition?

**A. I believe it was also senior litigation counsel.**

Q. Okay. So you were senior litigation counsel on PD, he was senior litigation counsel on PI?

**A. Correct.**

Q. And who did you report to at that time?

**A. When I first started, it was in 1989, it**

42 (Pages 162 to 165)

Wilcox and Fetzer, Ltd. Registered Professional Reporters 302-655-0477

CPO

Page 166

was Robert Beber.
Q. How do you say that?
A. Beber. B-e-b-e-r.
Q. Okay. Beber?
A. Right.
I don't recall his title at the time. He was not general counsel. He became general counsel a year to two after that.
Q. Okay. And at the time of the petition, that's who you were reporting to?
A. At the time of the Chapter 11 petition, I was reporting to David Siegel, general counsel.
Q. Okay. Mr. Siegel had replaced Mr. Beber by that point?
A. Yes.
Q. Okay. And how about Mr. Hughes at the time of the petition? Who did he report to directly?
A. Also to Mr. Siegel.
Q. And Mr. Siegel was the GC at that time?
A. Yes.

PP Obj: R; BE

Q. Did Grace have national coordinating counsel for PI claims pre-petition?
A. I don't know if they were actually deemed

CPO

Page 167

PP Obj: R; BE

or considered national coordinating counsel. But the Casner & Edwards law firm in Boston --
Q. I'm sorry. What was the name of that?
A. Casner & Edwards, C-a-s-n-e-r, & Edwards law firm in Boston performed some of the functions of national coordinating counsel.
Q. Okay. Were they also local counsel for the Boston area?
A. I believe they were, yes. Yes, in fact, I think they were.
Q. Okay. And what were the national coordinating counsel functions that they undertook?
A. Supported local counsel throughout the country in terms of providing documents and transcripts, coordinating the use of experts. I think they were also involved in responding to standard discovery requests.
Q. And how many sets of counsel around the country did Grace have with respect to the defense of PI claims?
A. Probably -- I'm going to say 25. That's just a little bit more than a guess. As I said, I wasn't involved with the litigation of the

CPO

Page 168

PP Obj: R; BE

personal injury cases.
Q. Okay. Mr. Hughes was the individual who dealt primarily with the outside counsel handling PI claims?
A. Yes.
Q. Who else at Grace was involved in the handling of PI claims?
A. Really, no one else. He had a staff of legal assistants that helped to maintain the files. But Jay was really the only in-house attorney involved with the personal injury cases.
Q. What about Mr. Beber?
A. He would have been involved as well to the extent of being Jay's superior.
Q. And then Mr. Siegel after Mr. Beber?
A. After Mr. Beber, right.
Q. All right. You I believe testified earlier this morning that you became assistant GC for litigation in March of 2006, is that correct?
A. I think so.
Q. Was that a new position?
A. Yes.
Q. Okay. And if I understood your testimony earlier today, that from that point forward,

CPO

Page 169

Mr. Hughes reported to you rather than reporting to the general counsel?
A. Yes.
Q. Okay. So from March of 2006 on, is it fair to say you have played some role on the PI side?
A. Yes. But I would describe it still as a minor role.
Q. Can you describe for me what the role has been?
A. More coordination with the other parts of our reorganization effort to make sure that others working on the reorganization such as finance, such as those who prepare our SEC disclosure documents, were kept informed of developments, facts, relating to the personal injury claims in the Chapter 11.
Q. I think you used the term you were coordinating the parts. Can you tell me what you mean by the parts?
A. Well, yes. When I -- part of the role of assistant general counsel in the Chapter 11 was to coordinate and oversee all of the individuals involved, both at Grace as well as outside

Page 174

A. **Pre-petition or post-petition?**
Q. Post-petition we are talking about. As you were describing his role in the negotiations.
A. **I don't know.**
Q. And was your role in dealing with PI issues and the resolution of PI issues indirect in the sense that Mr. Hughes reported to you or did you have any direct involvement?
A. **It was really indirect.**
Q. And besides Mr. Hughes, who else was involved in that effort on the Grace side?
A. **Mark Shelnitz, the general counsel. Robert Tarola.**
Q. I'm sorry?
A. **Robert Tarola, T-a-r-o-l-a, the former CFO. The CEO, Fred Festa, had some involvement. And outside counsel, David Bernick. And I believe -- I don't know if Ted Freedman was involved with the negotiations or came in after a deal had been reached.**
Q. Other than the individuals you have just run through on the Grace side, was there anyone else that you can recall that was on the Grace negotiating team for the resolution of the PI

Page 175

claims?
A. **Pam Zilly was involved in some of the discussions as well. She is with Blackstone. She is our financial advisor.**
Q. What was her role?
A. **Beyond being financial adviser, I don't know. I wasn't directly involved.**
Q. What was Mr. Festa's role?
A. **I think primarily to ensure that the other parties understood that the Grace representatives there spoke with the full authority of the company, but, again, I was not present at the meetings and discussions that he attended with the personal injury representatives.**
Q. Were you at any of the meetings with the personal injury representatives?
A. **No.**
Q. I gather Mr. Hughes was?
A. **I believe he was, yes.**
Q. And Mr. Shelnitz?
A. **Yes.**
CPO
Q. Okay. I want to shift gears for a second and turn to insurance. And, again, looking at

Page 176

CPO
the issue pre-petition. Have you had any role or did you have any role in connection with Grace's liability insurance program before the petition date?
A. **No.**
Q. Who was responsible for this at Grace?
A. **Bob Beber handled it from the litigation standpoint. And Jeff Posner was in charge of our risk management function, including insurance.**
Q. When did Mr. Posner leave Grace?
A. **I honestly don't know. I don't recall.**
Q. Was it after the petition date?
A. **I believe it was before.**
Q. And his title immediately before he left was risk manager?
A. **I don't know.**
Q. But that's the function that he had, was risk manager for Grace?
A. **Yes.**
Q. Post-petition, have you had any role in connection with Grace's liability insurance program?
A. **A limited one. Limited to the extent of motions that have been made or objections**

Page 177

**asserted by insurance. To the extent an issue is being litigated, I have been involved in reviewing motion papers and related documents, participating in conference calls on strategy.**
Q. For dealing with the insurance?
A. **For dealing with the insurance. Some of the insurance issues. Certainly not all of them.**
Q. Can you tell me which issues you're talking about?
A. **Issues related to the claims by Keneb pipeline that they believe they are entitled to insurance coverage. In connection with remediation costs or potential responsibility for remediation costs in connection with the Otis pipeline.**
**There were a few others. I'm just drawing a blank right now.**
Q. Have you had any role in the Scotts adversary proceeding?
A. **Yes. Thank you. Yes, I have reviewed the papers, not that there have been much -- there has been much recently. But I did review the adversary proceeding papers when Scotts first commenced its adversary proceeding. And, again,**

Page 178

CPO

**participated in conference calls relating to their claim that they are entitled to coverage.**

Q. And with whom were these conference calls that you participated?

**A. Outside counsel from Kirkland & Ellis. And Mr. Posner is often on those calls. I think that's -- and it's usually the same group.**

Q. Did you play any role in the manner in which insurance is handled under the plan?

**A. No.**

Q. Who did?

**A. Other than Kirkland & Ellis, I don't know who else was involved.**

Q. Other than what you have just described, have you had any role in the manner in which insurance, unsettled insurance, is handled under the plan?

**A. No.**

Q. How about any role in connection with the manner in which settled insurance is handled under the plan?

**A. No.**

Q. Did anyone replace Mr. Posner as the risk manager?

Page 179

CPO

**A. No. He basically still serves the same function but as an outside consultant.** PP Obj: R

Q. Okay. Thank you.

CPO

(Finke Deposition Exhibit No. 12 was marked for identification.)

BY MR. BROWN:

Q. Mr. Finke, you have what's been marked Exhibit 12. If you would take a few moments to look at it. My first question is going to be whether you have ever seen it before?

**A. Yes, I have seen it before.**

Q. Can you identify it for me?

**A. It's Form 8K that Grace filed with the SEC announcing its agreement in principle with the personal injury committee and others to resolve present and future asbestos related PI claims.**

Q. When did you first see it?

**A. I believe it was shortly after it was filed. A day or two after it was filed.**

Q. Had you seen drafts of it before it was filed?

**A. I don't believe I did. But I -- I cannot be a hundred percent sure I didn't see a draft.**

Page 180

PP obj: R

**But I don't think that I did.**

Q. Do you know, if it wasn't you, do you know who was involved at Grace in the preparation of this document?

And just for clarification, it's an 8-K. It has attachments to it. You probably noted.

**A. Right.**

Q. One is a pre release and the other is a terms sheet. So we can probably take -- why don't we take them one by one.

**A. Typically, the 8-K's are prepared by an in-house attorney, Michael Conron, who obtains input and facts from persons who are involved firsthand with the events being reported. In this case, I believe he would have obtained the details from Mark Shelnitz since Mr. Shelnitz was personally involved in the negotiations.**

Q. Did he receive any information from you?

**A. No.**

Q. Okay. How about the press release that's attached to it? There is a couple of names at the top from media relations and investor relations. But do you know who prepared the

Page 181

PP obj: R

press release?

**A. Where are you at? I'm not finding it.**

Q. I think it's probably page five it starts at.

**A. Okay. Okay. There we go. William Corcoran is -- I forget if he is executive vice-president or senior vice-president. And he is in charge of media relations, among other things. Typically, Mr. Corcoran prepares press releases. In the same manner as I described, I described Mr. Conron preparing 8-K's. He would have obtained the information from whoever was personally involved.**

Q. And would that have been Mr. Shelnitz or someone else?

**A. I'm pretty confident it would have been Mr. Shelnitz.**

Q. But it was not you?

**A. Correct.**

Q. Let's go to the terms sheet, which appears to begin on page eight.

**A. Um-hmm.**

Q. Had you seen this terms sheet prior to the filing of the 8-K?

Page 182

**A. I believe I did.**
Q. When?
**A. I think I saw it in a prior draft. Within a few days of the final, the final version.**
Q. Were you involved in preparing any of the drafts?
**A. No, I was not.**
Q. Do you know who was?
**A. No, I don't. I believe Mr. Shelnitz was involved along with outside counsel.**
Q. How about Mr. Hughes?
**A. I don't know.**
Q. Do you know who was involved for the other constituencies that are a party to the terms sheet?
**A. No, I do not.**
Q. In the first line of the text, it says, this term sheet sets forth certain of the principal terms and conditions.
Are there other principal terms and conditions that are not reflected or were not reflected in the terms sheet?
**A. I don't know. I wasn't involved in the**

Page 183

**discussions. I don't know if there were other principal terms and conditions that have been agreed upon at that time and not included.**
Q. Were any of Grace's insurers involved in the discussions that led up to the execution of the terms sheet?
**A. Not to my knowledge. But, again, I wasn't personally involved in the discussions.**
Q. Do you know whether Grace's insurers were purposely left out of any discussions leading up to the terms sheet?
**A. Not that I know of.**
Q. Who would be the individual at Grace, to your knowledge, that would know the answer to those questions?
**A. Mr. Shelnitz.**
Q. If you look on the first page down at I.A.1.b, titled, Insurance?
**A. Yes.**
Q. There is a reference there to the assignment of insurance policies and all insurance proceeds. Do you see that?
**A. Yes.**
Q. Did Grace, to your knowledge, seek the

Page 184

consent of any of its insurers prior to agreeing to that term with the other constituencies to the terms sheet?
**A. I don't know.**
Q. Who would know?
**A. Mr. Shelnitz.**
Q. If you turn to the next page on page nine under v. I want to direct your attention to the second paragraph that begins with the word, provided.
**A. Okay.**
Q. Do you understand what's being referred to in that section?
**A. No, I'm not sure what's being referred to by the foregoing.**
**(Finke Deposition Exhibit Nos. 13 and 14 were marked for identification.)**
BY MR. BROWN:
Q. Mr. Finke, you have two documents that have been marked Exhibit 13 and one is Exhibit 14 in front of you. Can you just identify them both for me?
**A. Exhibit 13 is debtor's preliminary list of witnesses that they intend to call during the**

Page 185

**confirmation hearing and is dated March 13, 2009.**
**Exhibit 14 is the second amended case management order related to the first amended joint plan of reorganization and was ordered on January 29, 2009.**
Q. Would I be correct if I said that you have seen both of these documents before?
**A. Yes, you would.**
Q. If you look at the witness list, you'll note that your name appears first?
**A. Yes.**
Q. As someone who, at least on a preliminary basis, is going to testify in Phases I and II of the confirmation hearing?
**A. Um-hmm.**
Q. About company information.
What is the company information that you possess relevant to plan confirmation?
MS. ESAYIAN: Objection to the form of the question. You can answer, if you can.
THE WITNESS: I was asked by outside counsel to be available to testify at one or both of the confirmation hearings to the extent they needed someone to present their basic company

CPO

information, such as anything from the nature of our businesses to number of employees and more specifically with respect to our asbestos litigation and claims, both historical, meaning pre-petition litigation history relating to asbestos claims, as well as the asbestos related claims filed in the Chapter 11.

The only thing I wanted to add was, in a subsequent discussion, it was decided that Jay Hughes would most likely handle any issues relating or testimony relating to personal injury -- asbestos personal injury claims and issues.

BY MR. BROWN:

Q. That was going to be my question. You used the generic term asbestos litigation. Did you mean PD asbestos litigation?

**A. Well, initially the discussion was generic. But, as I say, subsequently it was narrowed to property damage and attic insulation within my purview.**

Q. To your knowledge, you're not going to be proffering any testimony on PI issues?

**A. That is my understanding, yes.**

CPO

Q. Would your answer be the same with respect to insurance related issues?

**A. Yes.**

Q. How about with the manner in which indirect asbestos PI trust claims are handled under the plan?

**A. I would expect that Jay Hughes would handle that.**

Q. Okay. If you can look at what's been marked as Exhibit 14, the second amended case management order. I want to direct your attention specifically to paragraph two.

The second sentence in paragraph two talks about the first phase of the confirmation hearing. Do you see that?

**A. Yes.**

Q. And there are three Romanettes in that sentence.

Do I understand you correctly that you are not, to your knowledge, being proffered to offer any testimony relevant to i or ii?

**A. That's correct.**

Q. And if you go to the next sentence, which talks about the topics to be addressed in the

second phase of the confirmation hearing, are you, to your knowledge, being proffered to offer any testimony with respect to i or iii?

**A. I think that's unknown at this point.**

Q. Is that true for both i and iii?

**A. Yes.**

Q. Okay. I want to go back to the preliminary witness list. And I think most of these individuals on here we have already identified in terms of what their acknowledge is. Pam Zilly, she is with the Blackstone Group, she is the financial person?

**A. Correct.**

Q. I believe you said Denise Martin is a PD expert?

**A. Yes, she is an expert. She'll offer expert testimony concerning the likelihood that future property damage and ZAI claims will be brought.**

Q. Okay. I believe I heard earlier the name Hudson LaForce. Who is that?

**A. He is our current chief financial officer.**

Q. And Derrick Tay?

**A. He is a Canadian restructuring attorney who represents Grace in Canada concerning the Canadian ZAI claimants.**

Q. And Mr. Dunbar, he is an outside modelling consultant?

**A. Yes, I believe that's right.**

Q. Mr. Hughes we have talked about.

What about all the doctors?

**A. Can you be more specific what you're asking?**

Q. What's the area? Have each of the other witnesses listed here starting with I guess Dr. Florence, are they all experts?

**A. Other than Jay Hughes, yes.**

Q. And they have all submitted reports at this point?

**A. I presume so.**

CPO

PP Obj: R

**(Finke Deposition Exhibit No. 15 was marked for identification.)**

BY MR. BROWN:

Q. All right. Mr. Finke, you have before you a document marked Exhibit 15. The first question is, can you identify it?

**A. Exhibit 15 is debtors' response to**

CPO

PP Obj: R

**Government Employees Insurance Company and Columbia Insurance Company's requests for admission, interrogatories and requests for production of documents.**

Q. And I gather you have seen this document before?

**A. Yes, I have.**

Q. Okay. If you would turn to the last page.

**A. Um-hmm.**

Q. Is that your signature on the verification?

**A. Yes, it is.**

Q. The verification is worded a little oddly. At least in my experience.

The first question I have for you is that, do you actually have any personal knowledge of the information that's contained in the responses to the interrogatories that you verified?

**A. Well, I'm just going to note for the record that it's a rather long document. So if you want him to read the whole thing, that's going to take a while.**

CPO

PP Obj: R

Q. I don't want him to read the whole thing. If you turn to page 50.

**A. I was just going to read the -- review the answers to interrogatories.**

**In general, no, I would not have firsthand knowledge of most of the facts or the facts asserted in the responses to the interrogatories.**

Q. In your verification, you note, sort of the middle or halfway down, that the responses are true and correct to the best of my personal knowledge or based on information supplied to me by others.

**A. Right.**

Q. Who are the others?

**A. Primarily counsel at Kirkland & Ellis.**

Q. Anyone else?

**A. No, I don't believe so.**

Q. Okay. Can I direct your attention to the first interrogatory?

**A. Um-hmm.**

Q. Just let me know when you're finished reading it.

**A. Okay. I'm ready.**

CPO

PP Obj: R

Q. It says that, prior to September 19, 2008, which is when the initial joint plan was filed, correct?

**A. Yes.**

Q. Okay. It says, prior to that time, debtors did not communicate or consult with GEICO or Columbia regarding the proposed terms of the plan, asbestos PI trust agreement, asbestos insurance transfer agreement with TDP.

Why not?

**A. I was not involved in whatever decision was made concerning communicating or consulting with the insurers.**

Q. And would that have been Mr. Shelnitz again that was involved in that?

**A. I don't know that. But that is who I would -- who I would ask.**

Q. I want to direct your attention to the fourth interrogatory.

**A. Okay.**

Q. In Grace's response to interrogatory four, the latter portion of it, it says, but also does not prohibit participation. Do you see that?

CPO

PP Obj: BE

**A. Yes.**

Q. Could you describe for me your understanding of the manner in which Grace's insurance companies could participate in the investigation and evaluation defense in allowance or settlement of the asbestos PI claims in the event the plan is confirmed?

**A. My understanding of that provision is the insurers could negotiate with the PI trust for whatever role the insurers would seek to have with respect to the claim submitted to the PI trust.**

Q. And with whom would they be negotiating specifically, the individuals?

**A. Well, the trustees. Whoever that is.**

Q. Would the TAC be involved in that process?

**A. I would not know that. I do not know that.**

Q. So it's your understanding that the only way in which the insurers would be involved was through some sort of negotiation with the trust?

MS. ESAYIAN: Objection to foundation. But you can answer, if you can.

CPO

PP Obj: R; BE

Page 194

THE WITNESS: I wouldn't say it's the only way because I haven't -- I'm not knowledgeable enough about the manner in which the trust would operate to know whether that's the only avenue.

BY MR. BROWN:

Q. It's the only one you're aware of?

**A. It is the only one I am aware of, yes.**

Q. Is there someone that has some knowledge about other mechanisms by which Grace's insurers could be involved in the topics that are identified in interrogatory number four?

**A. I doubt very much that anyone at Grace would have such knowledge since I don't believe anybody at Grace has been involved in bankruptcies before or asbestos 524 G trusts.**

Q. If not at Grace, where or who?

**A. You would have to consult with experienced bankruptcy counsel.**

Q. Kirkland & Ellis?

**A. They are taken.**

Q. Okay.

MR. BROWN: Why don't we take a five minute break.

Page 195

THE WITNESS: Okay.

(Deposition recessed from 4:52 p.m. to 5:03 p.m.)

CPO

PP Obj: R

BY MR. BROWN:

Q. Mr. Finke, I understand you had a clarification on one of your responses?

**A. Yes. With respect to Exhibit 15, I had identified counsel as Kirkland & Ellis as having supplied information upon which I relied in connection with the debtor's interrogatory responses. An additional person that I forgot about was, but who did review the interrogatory responses, was Jeff Posner. I also relied on his review and comments concerning the answers.**

Q. Did Mr. Posner review all of the answers or were there certain ones that he passed on?

**A. My understanding is he reviewed all of them.**

Q. The question will probably come up. But there is a lot of other insurers here that served interrogatories on you, on Grace. Is the answer the same for all of them as well?

**A. Yes. As far as I know, he reviewed all of the interrogatory answers or answers to**

CPO

Page 196

PP Obj: R

**interrogatories that have been propounded by insurers.**

Q. Is it fair to say that you didn't have any independent knowledge of any of the responses that were given to the insurance companies?

**A. The answer is if I had -- if I had any, it would be very little. I hate to make the sweeping statement that there is not a single answer.**

Q. I'm just trying to save you the question from seven other lawyers.

**A. I understand. I just don't want to be caught with a generalization where somebody finds an exception.**

Q. Okay. Fair enough.

Have you either pre-petition or post-petition had occasion to review the terms of any of Grace's insurance policies?

**A. Certain specific provisions I have reviewed. I have not read any of the policies in their entirety. But, for example, in connection with the Scotts adversary proceeding, I did review the I guess relevant provisions of the policy that Scotts is relying on.**

Page 197

Q. By that, do you mean the vendor endorsement?

**A. Yes.**

Q. Anything else?

**A. There might have been a few, very few other portions of policies that I reviewed. But nothing specific comes to mind.**

Q. How about in connection with Keneb's claims? Have you reviewed any policies in connection with that?

**A. I have not.**

Q. You're aware, are you not, that Grace had a number of pre-petition settlement agreements with various insurers?

**A. Yes.**

Q. Have you reviewed any of those agreements?

**A. I have not.**

CPO

PP Obj: BE

Q. You mentioned I guess that you had reviewed the complaint, I think, in the Scotts adversary?

**A. Yes.**

Q. When is the last time you reviewed that complaint?

W.R. Grace & Co., et al.
RICHARD CHARLES FINKE

Page 198

**A. I don't think I have reviewed it since shortly after they filed it.**
Q. Back in the fall of 2004?
**A. That sounds right, yeah.**
Q. Is that when you reviewed the vendor endorsement that you just referred to?
**A. Yes. All at the same time.**
Q. Do you have an understanding as to how the claims that Scotts has against the various insurers that are named in the adversary proceeding, how those claims are treated under the plan?
**A. I believe they are treated as indirect PI trust claims under the plan.**
Q. And what does that mean in real terms?
**A. That the insurers' claims would be presented to the or submitted to the PI trust.**
MS. ESAYIAN: Are you asking about the insurers claims or Scotts' claims?
MR. BROWN: I was asking about the Scotts claims against the insurers.
THE WITNESS: I apologize. I thought you were referring to any insurers' claims resulting from coverage of Scotts' claims.

Page 199

Scotts' claims, I believe those are also indirect PI trust claims.
BY MR. BROWN:
Q. And is it your understanding that they are enjoined in their entirety as against the insurers?
MS. ESAYIAN: Objection to form. But you can answer, if you can.
THE WITNESS: I don't know.
BY MR. BROWN:
Q. Do you have an understanding as to whether the claims that Keneb is asserting give rise to any claims by certain insurers against Grace?
**A. I think, in theory, my understanding is that, in theory, it could, they could, Keneb's claims could give rise. But that the likelihood that there is any coverage available is very small.**
Q. Coverage available to --
**A. Keneb.**
Q. Do you understand what the reason for that is or the basis is for that statement?
**A. Only that what coverage might otherwise**

Page 200

**have been available has been exhausted.**
Q. To the extent that the claims by Keneb do give rise to claims by the insurers, how are they treated under the plan, to your knowledge?
**A. That I do not know.**
**(Finke Deposition Exhibit No. 16 was marked for identification.)**
BY MR. BROWN:
Q. All right, Mr. Finke, you have before you Exhibit 16. Can you identify this document?
**A. Yes. This is the debtors' response to One Beacon America Insurance Company and Seaton Insurance Company's requests for admission, interrogatories and requests for production of documents.**
Q. Okay. And you'll note that on page 21, the interrogatory responses begin?
**A. Yes.**
Q. And your verification, I believe, is essentially identically worded to the one we just looked at for GEICO and Columbia, is that correct?
**A. Correct.**
Q. And am I correct that the direct source

Page 201

of any knowledge with respect to the responses comes either from Kirkland & Ellis or from Mr. Posner?
**A. That's correct.**
Q. You don't have any personal knowledge of the responses?
**A. No, I do not.**
Q. Let me direct your attention to interrogatory number three and the response to it.
**A. Okay.**
Q. Were you involved in the events leading up to the January 13, 2005 amended joint plan that Grace filed?
**A. I was involved in certain aspects or certain sections of the plan.**
Q. Did you play a role with that plan similar to the one you played with the joint plan?
**A. In general, yes.**
Q. Are you familiar with the term resolved that was used to describe the insurance policies under that prior plan?
**A. I remember the prior plan included that**