**Deposition Designations for:**
**JAY HUGHES**
**June 11, 2009**

**Deposition Designation Key**

**Arrowood = Arrowood Indem. Co. f/k/a Royal Indem. Co. (Light Green)**

**BNSF = BNSF Railway Co. (Pink)**

**Certain Plan Objectors "CPO" = Government Employees Insurance Co.; Republic Insurance Co. n/k/a Starr Indemnity and Liability Co.; OneBeacon America Insurance Co.; Seaton Insurance Co.; Fireman's Fund Insurance Co.; Allianz S.p.A. f/k/a Riunione Adriatica Di Sicurta; and Allianz SE f/k/a Allianz Aktiengesellschaft; Maryland Casualty Co.; Zurich Insurance Co.; and Zurich International (Bermuda) Ltd.; Continental Casualty Co. and Continental Insurance Co. and related subsidiaries and affiliates; Federal Insurance Co.; and AXA Belgium as successor to Royal Belge SA (Orange)**

**CNA = Continental Cas. Co & Continental Ins. Co. (Red)**

**FFIC = Fireman Funds Ins. Co. (Green)**
**FFIC SC = Fireman Funds Ins. Co. "Surety Claims" (Green)**

**GR = Government Employees Ins. Co.; Republic Ins. Co. n/k/a Starr Indemnity and Liability Co.**

**Libby = Libby Claimants (Black)**

**OBS = OneBeacon America Ins. Co. and Seaton Ins. Co. (Brown)**

**PP = Plan Proponents (Blue)**

**Montana = State of Montana (Magenta)**

**Travelers = Travelers Cas. and Surety Cos. (Purple)**

**UCC & BLG = Unsecured Creditors' Committee & Bank Lenders Group (Lavender)**

**AFNE = Assume Fact Not in Evidence**
**AO = Attorney Objection**
**BE = Best Evidence**
**Cum. = Cumulative**
**Ctr = Counter Designation**
**Ctr-Ctr = Counter-Counter**
**ET = Expert Testimony**
**F = Foundation**
**408 = Violation of FRE 408**
**H = Hearsay**
**IH - Incomplete Hypothetical**

**L = Leading**
**LA = Legal Argument**
**LC = Legal Conclusion**
**LPK - Lacks Personal Knowledge**
**LO = Seeking Legal Opinion**
**NT = Not Testimony**
**Obj: = Objection**
**R = Relevance**
**S = Speculative**
**UP = Unfairly Prejudicial under Rule 403**
**V = Vague**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

| | |
|---|---|
| In Re: | : Chapter 11 |
| | : |
| | : Case No. |
| W.R. GRACE & CO., et al, | : 01-01139 JKF |
| | : |
| | : (Jointly |
| Debtors | : Administered) |

- - -

Thursday, June 11, 2009

- - -

Oral deposition of JAY W. HUGHES, JR., ESQUIRE, taken pursuant to notice, was held at the offices of KIRKLAND & ELLIS, 665 Fifteenth Street, NW, Washington, DC 20005, commencing at 9:07 a.m., on the above date, before Lori A. Zabielski, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

- - -
EXHIBITS
- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Hughes-1 | Monthly Asbestos Litigation Summary - March | 86 |
| Hughes-2 | Letter dated 3/27/01 to Allan McGarvey from Terry MacDonald | 168 |
| Hughes-3 | Exhibit 4 to Exhibit Book Trust Distribution Procedures | 211 |
| Hughes-4 | Documents bearing Bates stamps GCO 000023 through 000026 | 242 |
| Hughes-5 | Documents bearing Bates stamps GCO 000081 through 000091 | 254 |
| Hughes-6 | Document bearing Bates stamp GCO 000174 | 257 |
| Hughes-7 | Documents bearing Bates stamps GCO 000111 through 000112 | 275 |
| Hughes-8 | Document bearing Bates stamp GCO 000173 | 280 |
| Hughes-9 | Document bearing Bates stamp GCO 000140 | 281 |

EXHIBITS (continued)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Hughes-10 | Documents bearing Bates stamps GCO 000207 through 000215 | 282 |
| Hughes-11 | Letter dated 4/25/09 to Counsel from Barbara Harding with attachment | 296 |
| Hughes-12 | Exhibit 6 to Exhibit Book Asbestos Insurance Transfer Agreement | 299 |
| Hughes-13 | Document bearing Bates stamp GCO 000219 | 362 |
| Hugbhes-14 | Documents bearing Bates stamps GCO 000199 through 000200 | 367 |
| Hughes-15 | Exhibit 5 to Exhibit Book Schedule of Settled Asbestos Insurers Entitled to 524(g) Protection | 479 |

- - -

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer:

| Page | Line | Page | Line |
|---|---|---|---|
| 408 | 22 | | |

Request for Production of Documents:

| Page | Line | Page | Line |
|---|---|---|---|
| NONE | | | |

Stipulations:

| Page | Line | Page | Line |
|---|---|---|---|
| NONE | | | |

Area(s) Marked Confidential:

| Page | Line | Page | Line |
|---|---|---|---|

(Mr. Speights dropped of teleconference from:)

285 01 to 299 24

- - -
PROCEEDINGS
- - -

MR. LEWIS: Federal rules.

- - -

JAY W. HUGHES, JR., ESQUIRE, after having been first duly sworn, was examined and testified as follows:

- - -
EXAMINATION
- - -

BY MR. LEWIS:

Q. Good morning, Mr. Hughes. My name is Tom Lewis. We met sometime ago when we were negotiating on some settlements out of Libby, Montana.
Do you recall that?
A. Yes, I do.
Q. What's your full name?
A. Jay, J-A-Y, W. Hughes, Jr.
Q. Who is your employer?
A. W.R. Grace & Company.
Q. And what is your position

CPO

PP obj.

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

CPO

Page 14

with W.R. Grace?

A. I am a senior litigation counsel in the legal department.

Q. How long have you held that position?

A. I have had that title probably since 1991.

Q. When asbestos claims began accumulating against Grace in the '80s and '90s right up until the time of the bankruptcy, what was your role with respect to those claims?

A. I was responsible for the day-to-day management and resolution of the asbestos personal injury claims filed against the company.

Q. Who was your -- or who were your supervisors at that time, your direct reports?

A. Since 1991, my supervisor was the general counsel, Bob Beber. Bob retired in 1998. In 1998, David Siegel became general counsel. I reported to Dave. Dave retired in -- well, it was

PP Obj: R

CPO

Page 15

after bankruptcy -- in 2005. Mark Shelnitz became general counsel. And at some point after Shelnitz became the general counsel, Richard Finke became assistant general counsel for litigation, and I reported to Richard since then.

Q. We have taken the deposition of Mr. Finke. What documents have you reviewed to prepare to testify in this 30(b)(6) deposition?

A. I've reviewed the deposition transcripts of Mr. Finke, of Mr. Posner, and I have taken a look at the Trust Distribution Procedures, the Trust Agreement, and some other insurance agreements, just to kind of refresh my recollection about the issues that I am testifying about.

PP Obj: R

Q. Have you reviewed any written communications between insurers and Grace relating to resolution of disputes with insurance carriers in preparation for this deposition?

A. No.

CPO

Page 16

Q. Were you involved with resolution disputes with insurers during your time as senior litigation counsel assigned to the asbestos claims?

A. Yes.

Q. How would you describe your role in those insurance dispute resolutions, by settlement, I assume, primarily, right? That's a compound question.

MS. HARDING: Object to form.

MR. LEWIS: I will rephrase the question.

BY MR. LEWIS:

CPO

Q. How were you involved in resolving the disputes with the insurance companies?

A. Well, my primary role involved what I would refer to as post-settlement or post-resolution disputes with insurance carriers. I wasn't directly involved, although I was obviously consulted because of my

CPO

Page 17

involvement in the underlying asbestos personal injury cases. I wasn't generally involved in the coverage litigation between Grace and coverage disputes and the insurance carriers.

I have had a much greater involvement in certain disputes that arose based on what I would call the kind of execution and implementation of the insurance and agreements and settlement agreements and coverage in place agreements and reimbursement agreements.

MS. HARDING: Wait one second. To everybody that's on the phone, could everybody please mute their lines while the questioning is going on here in the room. We hear a lot of rustling and talking and things. So please put your phones on mute. Thank you.

MS. ALCABES: Barbara, if the witness could speak up a little bit, it would be helpful,

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 18

too. Thanks.
MS. HARDING: The witness is talking pretty loudly, so there is not a whole lot we can do about that. Sorry.
MR. LEWIS: Can you hear me?
MS. ALCABES: Yes.
MR. LONGOSZ: Yes.
MS. HARDING: All right. Thank you.
BY MR. LEWIS:
Q. Did you review your prior depositions or testimony relating to the Grace bankruptcy to prepare for this deposition?
A. Yes, I did.
Q. How many times have you been deposed with respect to the bankruptcy, once?
A. Twice before today.
Q. Okay. I have one deposition. Where were you deposed the first time?
A. The first time I was deposed

Page 19

in the fraudulent conveyance lawsuit, which was an adversary proceeding, I believe, in the bankruptcy, and that took place in 2002. And then I was deposed in 2007 in connection with the personal injury estimation trial.
Q. Did you testify on behalf of Grace in the estimation trial?
A. No, I didn't.
Q. Well, I don't want to cover that. I have been through that deposition.

CPO

And I think what you are referring to when you talk about post-settlement disputes, just generally, you were talking about arranging for audits, reporting to settled insurers, and this sort of thing; is that generally correct?
A. Yes, documenting settlements and issues that arose in terms of Grace's documentation of payment, in terms of reimbursements under the agreement.
Q. One of the interesting

Page 20

things to the Libby counsel that it involved when we became involved in this case was the way insurance was --
MR. SCHIAVONI: Objection to form.
MS. HARDING: He didn't ask a question.
MR. LEWIS: Let me finish the question.
MR. SCHIAVONI: I wanted to give you a chance to start over.
MR. LEWIS: What did you say, sir?
MR. SCHIAVONI: I was giving you an opportunity to start over.
MR. LEWIS: Just let me complete my question. My question is going to be pretty benign. I just want to get this witness to another subject. And you can make your objection, and we will proceed.
BY MR. LEWIS:
Q. When we got in the case, we

Page 21

made interrogatory requests early on in all of our cases, inquiring as to whether there was liability insurance available to Grace to resolve these claims, and the answer we got was generally, don't worry about it, we have got enough money, you don't need to know about insurance. And no insurance information was provided.
MR. SCHIAVONI: Objection.
MR. LEWIS: I am not done. Okay.
MR. SCHIAVONI: You are giving a speech. You are not asking a question.
BY MR. LEWIS:
Q. Do you recall that sort of response early on?
MS. HARDING: Object to form. I would have to --
MR. SCHIAVONI: Object to form.
THE WITNESS: I would have to see a response. I am familiar with our discovery responses

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

MS. HARDING: I am not telling him not to answer. I am just stating my objection.
MR. LEWIS: Thank you. Are you done?
MS. HARDING: Yes.
MR. SCHIAVONI: Counsel, you are asking for a legal conclusion, point-blank. It's obvious. You can certainly say otherwise, but that's what you are asking for. We object. And stop making speeches. Just answer [sic] questions.
MR. LEWIS: I think you should keep your composure and not get so upset, Counsel. I am going to conduct this deposition. You can object, and we will proceed. Okay?
All right. Read back the last question, please.
(The reporter read from the record as requested.)

CPO

BY MR. LEWIS:
Q. With that preface --
MR. SCHIAVONI: I object. If you are going to incorporate your statements about the law in questions, it's just objectionable. And you are a very experienced trial lawyer. You know that. You know better. Objection to form.
MR. LEWIS: Are you finished with your objection?
Okay.
BY MR. LEWIS:
Q. With that preface and acknowledging your objection, was it important to you in your role in settling these cases that you have a passing knowledge of the laws of the various states in which the cases were brought?
MS. HARDING: Object to form.
MR. SCHIAVONI: Objection to form.

THE WITNESS: Yes.
BY MR. LEWIS:
Q. For example, you settle cases in a multitude of states, correct?
A. Yes.
MS. HARDING: Just object to form in terms of you.
But go ahead.
BY MR. LEWIS:
Q. When I say "you," I am referring to you on behalf of Grace.
If you want me to use Grace, I will use Grace. Would that be better? I will use Grace if that bothers you so much.

CPO

PP Obj: R

Were you mindful of what jurisdiction or even venue you were in when you evaluated cases for settlement?
A. Yes.
Q. And why is that?
A. Well, I think there obviously can be legal distinctions in terms of the law with respect to personal injury cases that would be relevant to

PP Obj: R

the value of the case. And also there are differences in historical verdicts, the amount of the verdicts in a case, so the jurisdiction would be relevant there as well.
Q. For example, whether there is joint and several liability in a state or not might impact your valuation of the settlement; is that true?
A. Yes.
Q. What factors did you consider in evaluating a case for settlement?
A. Well, I think I have testified in both of my prior depositions in this case in a fairly detailed manner on that question.
But I think the same types of factors that any individual involved in resolving asbestos cases, specifically in personal injury cases, generally the quality of the evidence in terms of the exposure of the particular plaintiff to Grace's products, the particular

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

CPO PP Obj: R

Page 30

individual in terms of his age, the seriousness of the disease. In the asbestos arena, there is a distinction between, say, lung cancer and mesothelioma. Primarily it is due to the fact that lung cancer, there are established alternative causes to it. And those are -- that's kind of an overview.

Q. Would the nature and extent of the exposure in most cases be of paramount importance to you in evaluating a case for settlement?

MS. HARDING: Object to form.

CPO PP Obj: R

THE WITNESS: I don't know if it would be paramount importance, but I think that certainly the evidence of exposure to Grace products was something that was one of the primary issues in terms of evaluating the case against Grace and what it might be worth.

Page 31

BY MR. LEWIS:

Q. What percentage of the cases, if you know, that are claims that were brought against Grace were primarily Monokote exposure cases?

MS. HARDING: Object to form, foundation, and overly broad.

But if you can answer, go ahead.

THE WITNESS: I couldn't give a specific percentage, but a substantial portion of the cases historically involved exposures to Monokote 3 and other products to which a commercially chrysotile asbestos had been added commercially.

BY MR. LEWIS:

Q. Do you consider the Monokote cases as primarily chrysotile cases?

MS. HARDING: Object to form.

THE WITNESS: I think that

Page 32

in terms of the percentage of asbestos in the products, they were overwhelmingly chrysotile. The only other asbestos that would have been involved would have been that which was incidental to the vermiculite, if it originated from Libby.

BY MR. LEWIS:

Q. Was there any other source amphibole asbestos besides the asbestos that contaminated the vermiculite in Libby and products manufactured by Grace?

MR. SCHIAVONI: Objection, no foundation, speculation.

THE WITNESS: It's fairly well-known that chrysotile deposits in Quebec, I believe, and other parts of the world may have some tremolite contamination as well. Besides that, I would say only the vermiculite and the potential for -- Libby vermiculite and the potential for Libby

Page 33

amphibole.

BY MR. LEWIS:

Q. So if I suggested that most amphibole asbestos used in Grace products came from Libby, would you agree or not agree with that?

MS. HARDING: Just object to form.

You can answer.

THE WITNESS: I don't have a basis for agreeing because I don't have --

MR. SCHIAVONI: Objection, calls for speculation, no foundation.

MR. LEWIS: I think he was saying that, Counsel. But don't interrupt the witness again. You can make your objections, but don't interrupt the witness. I don't interrupt the witness. Let's have some decorum here.

Would you like to finish your answer, sir?

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

CPO

MR. SCHIAVONI: I think he just acknowledged that the question called for speculation.

MR. LEWIS: I think he did, but allow him to answer. That was a foundational question.

THE WITNESS: I said I don't know enough about the issue of contamination -- amphibole contamination in chrysotile to answer that question.

BY MR. LEWIS:

Q. Fair enough.

Do you have enough understanding of the asbestos that was generated from Grace's and Zonolite's operations in Libby was amphibole?

MS. HARDING: Object to form, generated.

But go ahead.

THE WITNESS: Yes.

BY MR. LEWIS:

Q. Was it all amphibole as far as you know?

CPO

MS. HARDING: Object to form.

MR. SCHIAVONI: No foundation, calls for speculation. We have a lawyer testifying here, not a fact witness from Libby or a scientist or anything else.

MR. LEWIS: Go ahead and answer.

THE WITNESS: Well, I was going to start by saying what counsel down the table just said.

But my understanding is amphibole, but I am not a mineralogist and I don't have that kind of expertise.

CPO

BY MR. LEWIS:

Q. Yes, but one of the things that you said was important and a factor in evaluating a claim was the nature of the exposure, correct?

PP Obj: R

MS. HARDING: Object to form.

Go ahead.

PP Obj: R

THE WITNESS: But that's not what I meant by nature of the exposure. By nature of the exposure I meant the extent, the duration of the exposure and the extent to which the activity that was involved in terms of was the individual applying our product, was he working in a work space where someone else was applying it, did they mix our product. That's what I am talking about, the kind of factors that an industrial hygienist would use in assessing the nature of the exposure and the risk to the worker, who was the plaintiff.

BY MR. LEWIS:

CPO

PP Obj: R

Q. Another factor you talked about was the quality of the evidence.

What did you mean by that?

A. What I meant is that if there were -- in a typical asbestos personal injury case, you might have

CPO

PP Obj: R

coworkers who said a Monokote product and/or Zonolite product was present at this work site. And if the individual again, if the plaintiff himself recalled it and accurately described it in deposition testimony, that, in my opinion, would be better evidence and would be more persuasive to a jury than if a coworker who had no personal relationship with or didn't work alongside the plaintiff gave the same kind of testimony and it was an indirect connection between that.

And also there was documentary evidence. If we had evidence in our files that our product was used at a particular building at a particular time period, then I would consider that higher quality evidence than if we had no documents, which was often the case, no documents actually which showed shipments or sale of our product for installation in a particular building and an individual coworker or person at the

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

CPO

PP Obj: R

Page 38

site, sometimes somebody who wasn't even involved in the application of the product, testified about it.

Q. Have you ever been to Libby?

A. Yes, I have.

Q. How many times did you go there?

A. I have been there twice.

Q. Did you go up to the mine?

A. No, I haven't been to the mine. It was closed.

Q. Have you ever reviewed documents concerning the kinds of exposures at Libby?

A. Yes, I have.

Q. Libby claims did not involve products claims; is that correct?

MS. HARDING: Object to form.

MR. SCHIAVONI: Objection, calls for a legal conclusion, overly broad.

MS. HARDING: And it's overly broad.

Page 39

MR. LIESEMER: I join in the objection.

MR. SCHIAVONI: Lacks foundation, overly ambiguous.

MR. LEWIS: Do you want the question read back or do you remember?

THE WITNESS: You should probably read it back.

MR. LEWIS: I will just restate it.

BY MR. LEWIS:

Q. Did Libby claims involve products claims?

MS. HARDING: I am just going to object to form in terms of Libby claims. There is a wide variety of Libby claims and a wide variety of people. I don't know --

MR. LEWIS: Do you want me to define Libby claims? That's fine.

MS. HARDING: I will object

Page 40

to form and let the witness answer.

MR. LEWIS: The witness knows exactly what I am asking about here.

MS. HARDING: I don't know that the witness knows what you are talking about.

MR. SCHIAVONI: Are you contending that all the policies have same definitions for products in asking this question? Because when you say the witness understands, I mean, you seem to be coaching the witness. Is that your contention, that every policy has the same definition for products?

MR. LEWIS: I am not even referring to policies here, sir. I am referring to common law, tort law. Okay. Those kinds -- the distinction is between products claims --

Page 41

MR. SCHIAVONI: And what?

MR. LEWIS: -- injuries that result from exposures to products as opposed to injury in Libby that related to exposure to the mining and manufacturing of products or sub-products. So I am not talking about insurance policies right here right now. I will later.

MR. JACOB COHN: If there is a question, I object to the form.

MS. HARDING: I just object to the form, and I think you can answer. Did we get the question back yet?

MR. LEWIS: I might take eight hours here today if we keep doing this.

MS. HARDING: Well, I don't want to take eight hours, but I do want to make sure the witness understands the question.

MS. DeCRISTOFARO: And I join.

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 54

A. The McDonald study, Amanda study, 1986.

Q. Do you believe that the exposures at the dry mill were substantially similar to the exposures to Monokote 3 on construction sites?

MS. HARDING: Object to form and foundation. This witness is not an expert, and I think it's an improper question to ask this witness.

But you can answer.

MR. LIESEMER: Object to the form of the question.

MR. SCHIAVONI: On a more fundamental basis, this witness is a 30(b)(6) witness. He is not an expert; he is not a fact witness. And this is not a topic that is designated.

MR. LEWIS: Yes, it is.

MR. SCHIAVONI: Really? Which one?

MR. LEWIS: Just look a

Page 55

them, Counsel. I am not going to answer your questions. I don't have to answer to you. You make your objections on the record, and we will proceed. Or otherwise we will be here forever.

MR. SCHIAVONI: If you can't identify it --

MS. HARDING: Let's just answer. I don't think he can answer, but go ahead.

MR. LEWIS: Do you want to the question read back? Let's read the question back so he can get a complete record.

(The reporter read from the record as requested.)

MR. SCHIAVONI: I object to form, and I object to Grace offering this testimony. It's not designated as corporate testimony. If that's what Grace is going to do, then you have my objection on the record.

Page 56

MS. HARDING: Grace has already made its objections, and the witness can answer to the extent that --

THE WITNESS: Again, I am not an industrial hygienist, and I really -- having my opinion on whether they are quote/unquote substantially similar, I don't think I can do that.

They both involve asbestos exposures. I have described in my earlier testimony the conditions were different, that one involved the spray application of a finished product at the construction site, the Libby exposures involved working at a mine and mill operation. And the data that does exist is available, and I would rather rely on the data that's available. And I don't have that in front of me.

BY MR. LEWIS:

Page 57

Q. Do you recall when we started this deposition that I asked you to testify in the role of senior litigation counsel, settling asbestos claims?

A. Yes.

Q. We talked about that.

Do you agree that to perform that role well for your employer, you had to know something about asbestos exposure?

A. Absolutely.

MS. HARDING: Object to form.

Go ahead.

BY MR. LEWIS:

Q. And you differentiated -- let me withdraw that question.

CPO

In every case that you looked at as an individual case, would the nature and extent of the exposure be fundamental to your evaluation of the case?

PP Obj: R

MS. HARDING: Objection to

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 58

form.
THE WITNESS: Yes.

CPO PP Obj: R

BY MR. LEWIS:
Q. The Libby cases were largely settled on a case-by-case basis, correct?
MS. HARDING: Object to Libby cases. It's overly broad.
But go ahead.
THE WITNESS: Yes.
BY MR. LEWIS:
Q. Again, I am talking about Libby cases, as you earlier defined them, correct?
A. Yes.
MS. HARDING: Who defined them?
MR. LEWIS: He agreed that we were talking about Libby cases, we were talking about cases that arose in Lincoln County, and he's testified that they were not -- that they were manufactured -- they were exposure cases different from Monokote exposures in the

Page 59

sense -- and that's what I am asking about.
MS. HARDING: Okay. I object to the form. I think the terminology of "Libby cases" is overly broad.
But go ahead.
MR. SCHIAVONI: Can you just add to that those are a pre-petition cases, right?
MR. LEWIS: Please answer the question.
MR. SCHIAVONI: Objection to form, overly broad.
MS. DeCRISTOFARO: I join.
THE WITNESS: Prior to bankruptcy, the cases in Libby involving Libby employees and family members that were settled generally were settled individually, although in the period of time just prior to the bankruptcy, there were cases that were settled in small groups of

Page 60

five to ten cases.
BY MR. LEWIS:
Q. Was that with the Heberling firm?
A. Yes.
Q. There were other settlements where you settled cases, 10,000 claims at a time, correct?
A. Yes. Not Libby cases. Cases in other parts of the country involving exposures to finished products.
Q. Right.
In those cases where you settled them 10,000 at a time or several thousand at a time, did you evaluate the quality of evidence for each individual claim in those cases?
MS. HARDING: Object to form.
THE WITNESS: Generally, the agreement set forth specific requirements for a case, qualifying materials, and we reviewed, individually reviewed

Page 61

the qualifying materials that were submitted for each case before the case was settled.
I have testified about this and how those settlement agreements or inventory settlements worked in both of my prior depositions in this case.
BY MR. LEWIS:
Q. Did you evaluate the exposure for each individual claim?
A. Exposure --
MS. HARDING: Object to form, and I am just going to not -- I am not going to instruct the witness not to answer, but he has had prior deposition testimony on how these cases were settled. And counsel has indicated that you have reviewed those transcripts, so I just would request that we try not to repeat the same questions that were asked previously since the witness has

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

already testified so we can try to get through this today. I am not going to -- with that, I am just making a request.

MR. LEWIS: Could you read back the question, please?

(The reporter read from the record as requested.)

THE WITNESS: Well, the qualifying materials that were required under the settlement agreements generally included evidence of exposure, and that would have been evaluated before the settlement was made.

BY MR. LEWIS:

Q. As I recall your testimony, you were highly critical of the nature of evidence of exposure in most products cases; is that true?

MS. HARDING: Object to form.

THE WITNESS: I was critical as to the credibility of the

exposure evidence in many cases historically that were being filed in the period from -- well, throughout the period of the asbestos litigation, but specifically in the late '90s and early 2000.

BY MR. LEWIS:

Q. Did you feel that plaintiffs' counsel were inventing evidence for their clients?

MS. HARDING: Object to form.

MR. LIESEMER: Object to form.

THE WITNESS: Inventing evidence implies something that -- I questioned the validity of the process through which the evidence was created. Whether it's invented, I don't know. But there are people's memories, and the way memory works, in my experience as a human being and also from people

who are experts in the area, a lot this evidence seemed inconsistent with it.

BY MR. LEWIS:

Q. It was inconsistent with your own documents relating to where your asbestos was located or Grace's asbestos was located, correct?

MS. HARDING: Object to form.

THE WITNESS: I don't know if it was inconsistent because we unfortunately didn't have a complete set of documents which would have told us where our products were located.

It was often inconsistent with what we knew about our products and how they were used and, you know, the product formulas and the type of material and the conditions that were being used, they were being applied under.

BY MR. LEWIS:

Q. Okay. In the Finch deposition that I read, I could not understand how you went through the information submitted for each claimant in this inventory or mass settlements, I would call them.

Did you do that post-settlement or pre-settlement?

A. Post-settlement --

MS. HARDING: Object to form.

THE WITNESS: -- generally.

BY MR. LEWIS:

Q. So if you settled 10,000 cases for $50 million, as you did in one case, does that mean that you paid the $50 million regardless of whether there was proof, actual proof, in each individual case?

MR. JACOB COHN: Object to form.

MS. HARDING: Object to form.

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 66

THE WITNESS: We paid them 50 million -- it varied from settlement to settlement, quite frankly. In certain situations, we paid the money, but the authority for the attorneys representing the claimants to release the money and pay the money was subject to receiving communications from us that the qualifying materials met the requirements of the agreement.

BY MR. LEWIS:

Q. In any one of those settlements, did Grace ever reject the proof offer to support the individual claims post settlement?

A. Yes.

Q. How many times did that happen?

MS. HARDING: Object to form.

THE WITNESS: It happened more times than I could -- it

Page 67

happened on a fairly regular basis, although it wasn't a substantial percentage of the cases.

BY MR. LEWIS:

Q. So if you settle a case for 50 -- 10,000 claims for $50 million, and 100 of those claims, for example -- I am asking you to assume a hypothetical here -- didn't show substantial proof of exposure or disease, the proof was defective in some manner, would the amount allocated for those 100 claimants be deducted from the settlement?

A. Yes.

Q. In every case?

A. Not in every case, but, I mean, there were other -- it's difficult to say. I mean, in the administration of cases like that, you could assume a certain percentage of cases weren't going to meet the requirements in valuing the cases. There are all kinds of ways you could do it, but there was definitely a

Page 68

process in place.

And, again, I am -- and I think as I have testified in the past, there was a process was in place, and I was confident that in the process that we had in place was reviewing the qualifying materials and we were paying places only where they had submitted qualifying materials consistent with the agreement.

I think my opinion as to the relative credibility of some of the qualifying materials, both medical and exposure, I have testified before and that is --

Q. You have so testified. I am not going to get into that.

A. Okay.

Q. Do you recall the case, the specific case where you settled 10,000 claims for $50 million, the firm you settled with?

A. I believe it was Baron & Budd.

Q. Were those 10,000 claims

Page 69

just asbestosis claims or were there cancer and mesos in those claims?

A. There were cancers and mesos.

Q. Did the settlement provide that the mesos would get a different amount than the asbestosis claims?

A. As I recall, yes.

Q. Who made the decision as to who got what, how much each claimant was individually paid? Did Grace have any input in that?

MS. HARDING: Just object to the extent it calls for attorney-client work product information. And to the extent -- I instruct the witness not to answer to the extent that it calls for that. To the extent it doesn't, you can answer.

MR. LEWIS: I think the that's a fair objection because the question is not very precise. I will rephrase the question.

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d



Page 74

disease of each individual claimant involved in an inventory settlement before settling the case?

MS. HARDING: Object to form.

Go ahead.

THE WITNESS: Well, there is a couple things. One is that, as I said, there were medical documentation requirements in the inventory settlements, and we reviewed the medical evidence that was submitted as part of the qualifying materials to make sure that it met the requirements of the particular inventory settlement.

The other thing you need to keep in mind is that in the evolution of the litigation, many of the inventory settlements, if not most, involved or were agreed to after a substantial amount of time in litigation with the

Page 75

particular law firm, so we were familiar with their clientele, the disease that was involved, the quality of the medical evidence in terms of the specific doctors that were submitting it and so on.

MR. LEWIS: To the extent that that response is nonresponsive so my question, I move to strike it.

BY MR. LEWIS:

Q. I am asking you about what knowledge you had concerning the seriousness of the disease of each individual claimant before you entered into these inventory settlements. And I am not arguing with you. Did you understand that was my inquiry?

MS. HARDING: Object to form. I think it's confusing. Are you talking about their complaints? I don't understand the question, and I object.

BY MR. LEWIS:

Page 76

Q. You listed the four factors that you used to decide whether a claim -- what settlement value was assigned to a claim.

A. Right.

Q. Did you have information as to all of these four factors for each claimant in inventory settlements before you entered into the settlement agreement, the inventory settlement agreement?

MS. HARDING: Object to form.

If you can answer, go ahead.

THE WITNESS: Again, not necessarily for all of the claimants, but we had procedures in the settlement agreement itself that required that kind of information to be submitted to us. And, as I said before -- and I feel was responsive -- we generally had a course of dealing and history with the particular

Page 77

firm so we knew something about the clients and we knew something about the quality of evidence we expected to see as far as exposure and the medical condition of the plaintiff.

BY MR. LEWIS:

Q. So does that mean if Grace had a good relationship with a particular firm, that firm's claimants got to settle their cases and other unfamiliar plaintiffs' lawyers couldn't settle their cases?

MR. LIESEMER: Object to the form.

MS. HARDING: Object to the form.

THE WITNESS: No.

BY MR. LEWIS:

Q. Well, for example, you had a good relationship with Worthington, right?

MS. HARDING: Object to form.

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 126

MR. LEWIS: How what? I am sorry. I couldn't hear that. I am hard of hearing.

MR. SCHIAVONI: How claims --

MS. BAER: He's criticizing my city and its ethical reputation.

MR. LEWIS: That was a joke. I get it now.

BY MR. LEWIS:

Q. Did you study the TDP that's part of the Reorganization Plan in preparation for your deposition today?

MS. HARDING: Object to the word "study," but go ahead.

THE WITNESS: Yes, I did.

BY MR. LEWIS:

Q. You reviewed it?

A. I reviewed it.

Q. Were you part of the team that helped formulate the TDP?

A. I reviewed --

MS. HARDING: Object to

Page 127

form.

THE WITNESS: -- it on behalf of Grace at the request of the general counsel when it was being distributed among the Plan proponents, but I wouldn't say that I was involved in drafting it. That was something that was done by, as I recall, the Asbestos Creditors Committee and the Future Claimants' Representative.

BY MR. LEWIS:

Q. I will get back to that more later.

So it was drafted by the ACC, correct?

MR. LIESEMER: Object to form.

MR. SCHIAVONI: Object.

MS. HARDING: Object to form in terms of foundation.

THE WITNESS: That's my understanding, but, again, my involvement was that while after

Page 128

the process and the original draft, was that either the general counsel or Richard Finke asked me to take a look at it for Grace.

BY MR. LEWIS:

Q. Did Grace have any significant input on the TDP?

MR. LIESEMER: Object to the form.

MS. HARDING: Object to the form.

THE WITNESS: I don't recall whether we had any significant input in terms of the draft that was circulated, but we certainly were given an opportunity to provide comments.

BY MR. LEWIS:

Q. What, if any, comments did you provide concerning the TDP?

A. I don't recall.

Q. Who else would have reviewed the TDP on behalf of Grace?

MS. HARDING: Object to

Page 129

foundation.

MR. LEWIS: If you know.

THE WITNESS: Counsel for Grace in the bankruptcy.

BY MR. LEWIS:

Q. Do you know if counsel in the bankruptcy offered any comments to the ACC's proposed TDP?

A. I don't recall.

Q. You are identified, according to the document provided by your counsel, as the 30(b)(6) representative on development of the TDP, including negotiations, other discussions between or within the Plan proponents and preparation of documents, including drafts.

Do you have knowledge of what's identified there?

MS. HARDING: I am just going to object, Counsel, to the line of questioning in that category, and the objections are set out in full in the objection

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 130

we filed with the court. And I am not going to list them all here, but they are listed in that category.

And as we have said in other depositions we listed somebody for every category, noting in our objections and in our communications with counsel, that we didn't believe that all categories were proper categories for inquiry in the 30(b)(6) deposition, as we believe this category is not.

MR. LEWIS: Do you direct the witness not to answer any questions in this category, development of the --

MS. HARDING: I have allowed the witness to answer, and he's answered he didn't know. I just wanted to note that for the record to the extent that you are complaining that he is not --

Page 131

MR. LEWIS: I am not complaining about anything. I am just asking questions.

I wanted to ask more questions in this area, and I was asking you if you are going to direct -- you are claiming privilege?

MS. HARDING: I am not going to have a blanket objection, but I wanted to remind counsel of that objection. And then you can ask questions, and we can go from there.

BY MR. LEWIS:

Q. So your involvement in the development of the TDP was, as you described earlier? You just reviewed it, correct?

A. Yes, a draft.

Q. Were there any negotiations between you and the ACC concerning the language of the TDP?

MR. LIESEMER: Object to the

Page 132

question.

MS. HARDING: Object to the form, and I think the witness has already asked and answered.

THE WITNESS: I think I may have participated in a phone call where drafts were discussed in discussions with ACC and FCR representatives and Grace and Grace's counsel, but I don't have a specific recollection.

BY MR. LEWIS:

Q. Do you have any knowledge of the preparation of the documents, including the drafts of the TDP?

A. Again, I described my involvement and the knowledge I have. I was provided with copies of the drafts early on in the process and reviewed them and advised Grace and Grace's counsel and my comments based on my experience in asbestos litigation. But the primary drafting role was with the ACC and FCR, as it probably should be.

Page 133

Q. Why do you say it probably should be?

MS. HARDING: Object to form.

THE WITNESS: Because their constituency will ultimately be the beneficiaries of the Trust.

BY MR. LEWIS:

Q. Because, to Grace, Grace will pay the same amount under the settlement regardless of how the TDP is drawn, correct?

MR. LIESEMER: Object to the form.

MS. HARDING: Object to the form.

THE WITNESS: I guess that's probably part of it but, again, the terms of their constituency, the ultimate beneficiaries of the Trust and the way the Trust operates and the distribution procedure is something that they probably -- the asbestos claimants

CPO CPO CPO CPO PP Ctr PP Obj: R; 408 PP Obj: R; 408 PP Obj: R; 408 PP Obj: R; 408

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

OBS Obj: R; H
GR Obj: H
PP Ctr.
OBS Obj: H; R
GR Obj: H
PP Ctr.
OBS Obj: H; R
GR Obj: H; R
PP Ctr

Page 134

and the Future Claimants'
Representative have a direct
interest in.
BY MR. LEWIS:
Q. Did you review any TDPs in other asbestos bankruptcy settlements?
A. I have over the course of my career. I had reviewed them beforehand.
Q. Did you review them in order to provide input concerning the TDP in this case?
A. I think I may have pulled a couple out and taken a look at when the issue of the TDPs in this case came up. I also -- you know, early on in bankruptcies, Grace was a codefendant and participated, and so I probably was concerned at that point with what Trust Distribution Procedures in earlier bankruptcies said about, you know, codefendant claims and so on.
Q. When you say "probably," do you mean that's one of the reasons you would have reviewed them?

Page 135

A. In the past, yes.
Q. Okay. Do you understand the disease categories under the TDP that's been offered by this Plan?
A. Yes.
Q. Have you reviewed the severe pleural disease category under the TDP?
A. Yes, I have.
Q. Did you offer any input on behalf of Grace concerning the severe pleural disease category under the TDP?
MS. HARDING: I will let you answer if you recall any input. But in terms of actual negotiations and discussions about the drafting, we are going to avoid those.
THE WITNESS: Yeah, I don't recall, and I think that, as a general rule, the issue of the disease category and Grace's view of it would be that it's primarily an issue for experts. And my recollection was, again, that

Page 136

disease categories and the criteria were consistent with the understanding of the asbestos-related disease and myself as a non-expert, an attorney involved in resolving cases for many years, that they accurately or at least were consistent with the medical criteria that were used in evaluating cases by Grace and by other defendants in the asbestos litigation.
BY MR. LEWIS:
Q. What is your understanding -- as a person primarily responsible for claims in Libby from 1985 to the date of the bankruptcy filing, what is your understanding of the nature of the disease in Libby?
MS. HARDING: Object to form in terms of nature of disease. But to the extent you can answer, go ahead.

Page 137

THE WITNESS: That the --
MR. SCHIAVONI: No foundation, calls for privileged information, vague, ambiguous. Do you want to know what you are telling him and what you are alleging? The whole thing is sort of --
MR. LEWIS: Counsel, that's a wide open question. It's a perfectly proper question. Would you please read it back?
(The reporter read from the record as requested.)
MR. LIESEMER: I object to the form of the question. No foundation.
MR. SCHIAVONI: The basis is there is no personal knowledge of this witness. So you want him to just speculate and say what the plaintiffs' lawyers have told him? Fine. That's what you will get.

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 150

so, but I don't think my opinion on that subject, you know, is what's relevant here.

But, again, I don't think so. I think it sets forth the procedure for the handling of asbestos claims by the proposed Grace Trust that handles similarly situated claims in kind of a uniform manner.

BY MR. LEWIS:

Q. Given that claims settlement history for Libby as compared to other claimants, do you consider the Libby claims substantially similar to those other claimants with respect to settlement value?

MR. LIESEMER: Object to form.

MS. HARDING: Object, again, to the broad characterization of Libby claims.

But to the extent you can answer, go ahead.

Page 151

MR. SCHIAVONI: Apples and oranges, where people live rather than what their diseases are.

MR. LIESEMER: Object to the form, no foundation.

GR Obj: R;H

PP Ctr

BY MR. LEWIS:

Q. I direct your attention back to Exhibit-1, 1625.

A. Uh-huh.

Q. Let's go with Libby Employees. You categorize Libby employees, and you described how you categorized those correctly, right?

A. Yes.

Q. And Libby employees included people who worked there and family members were claimed to be exposed to asbestos as a result of the worker bringing the asbestos home, correct?

A. Yes.

Q. Do you think those Libby claimants cases that settled for an average of 268,000 are substantially similar to Monokote claims?

OBS Obj: H;R

Page 152

MR. LIESEMER: Object to the form.

MS. HARDING: Objection to form, substantially similar.

MR. SCHIAVONI: Vague, ambiguous, incomprehensible, incomplete hypothetical and comparison.

GR Obj: H;R

PP Ctr

THE WITNESS: But the differences, to the extent they exist, are reflected in the Trust distribution procedure in valuing the claims in the Trust Distribution Procedure. It sets forth medical criteria; it sets forth multipliers in terms of values based on exposure criteria which, as I read -- or the percentage of total exposure, which I read many of the Libby claimants would fit within.

So I think that to the extent there are differences, the Trust Distribution Procedures in

OBS Obj: R;H

Page 153

GR Obj: H;R

OBS Obj: H;R

PP Ctr

the current Plan adequately addressed those differences.

MR. LEWIS: Could you read back the question, please?

(The reporter read from the record as requested.)

MR. LEWIS: Yes or no, if you can answer that question yes or no.

MS. HARDING: Object to form. I think it's unanswerable. Libby claims meaning what? What exposure? What disease? Monokote claims meaning what, when, where, what exposure? It's absolutely -- he's doing his best to answer your question, but it's impossible to answer.

MR. LIESEMER: I join the objection.

MR. SCHIAVONI: I have a different objection. It's called asked and answered. You asked the same exact question, you got an

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 154

answer, and now you have to move on.

MR. LEWIS: He never answered the question, sir.

MR. SCHIAVONI: You are not happy with it.

MS. HARDING: I think he tried very hard to answer a question that is...

BY MR. LEWIS:

Q. Okay. Let me rephrase the question slightly. I am talking about Libby employees here.

As you categorize them in Exhibit-1, 91-1625 --

A. Yes.

Q. -- are those claims substantially similar to the Construction & Other claims set forth on line 38 of that document?

MS. HARDING: Object to form. Again, I think it's a very important objection. It's overly broad. It assumes facts not in

Page 155

evidence. It makes comparisons between claims without giving any characteristics of the claims, disease, levels of exposure, time periods, all of those things. I think it's impossible to answer.

If you think you can answer it, Jay, or do your best, go ahead. I think it's asked and answered, but go ahead.

MS. BAER: It also assumes that you know what the definition of "substantially similar" is, which has not been defined here.

MR. LEWIS: He's the one that used the term "substantially similar." I just embraced it. It was his word.

MS. HARDING: In any event --

MR. LEWIS: So that's why I am entitled to inquire about it.

MR. SCHIAVONI: You don't understand what it means, either.

Page 156

I object. No one in the room understands.

MS. HARDING: Sorry, Jay.

MR. LEWIS: Do you want to answer the question please or we can have it read back again.

THE WITNESS: I do feel that I answered the question, again.

There are obviously differences. There are differences between every claim. One claim of 328,000 claims that were filed against Grace, there were differences from one to the other.

The Libby claims, in terms of the value, the values are reported here. But to talk about -- there are certainly similarities. They are all asbestos personal injury claims alleging pulmonary and lung problems and mesothelioma, lung cancer, pleural disease,

Page 157

asbestosis resulting from exposure to asbestos, and there are substantial similarities between the claims.

And, in my opinion, the Trust Distribution Procedures, as I read them, deal with these differences in terms of value and by providing, for example, an exposure if a person is exposed substantially to Grace products by a five or eight times multiplier of the value, they provide for litigation in the tort system, they provide for, you know, again, both the forum and the criteria to differentiate between different kinds of cases. And the Libby cases are asbestos personal injury cases, and there are differences in severity.

So the extent to which the Libby cases are different, the Trust Distribution Procedures

GR Obj: R;H

PP Ctr

OBS Obj: R;H

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

GR Obj: R;H
PP Ctr
OBS Obj: R;H

address those differences.
BY MR. LEWIS:
Q. Under the TDP, would the average Libby claim be valued anywhere near $268,000 per claim?
MS. HARDING: Object to the form and to the use of the term "average Libby claim." I think that's the problem with the entire deposition.
But go ahead.
MR. LIESEMER: Object to the form. Mr. Hughes is not going to be valuing claims under the TDP. It would be the Asbestos PI Trust.
MR. LEWIS: Are they here today? Is the PI Trust here, anybody on their behalf?
(No response.)
THE WITNESS: Well, the PI Trust doesn't exist.
MR. LEWIS: I know.
THE WITNESS: And we don't know how they will be valued and

the average is. So for me to answer your question would involve several layers of speculation, and I am not going to do it, quite frankly.
BY MR. LEWIS:
Q. Your average settlement for all mesotheliomas was on the order of $90,000, correct?
MR. LIESEMER: Object to the form.
THE WITNESS: Pre-petition?
BY MR. LEWIS:
Q. Pre-petition.
A. That sounds right, but I don't have the date right in front of me.
Q. Why does a TDP evaluate mesotheliomas at $180,000 per claim --
MS. HARDING: Object to form.
MR. LEWIS: Can I finish?
MS. HARDING: I am sorry. I thought you were finished. Sorry.
BY MR. LEWIS:

Q. Why does a TDP value mesothelioma claims at $180,000 if the average settlement for mesothelioma claims system-wide for Grace was on the order of $90,000?
MS. HARDING: Object to form, foundation.
Go ahead.
THE WITNESS: I think that the values that are included in the TDP are based upon the Grace historical settlement averages. But I am not familiar with the methodology in terms of how the relationship between those and -- it's my understanding that it was done with the guidance of experts in the area, and I am not an expert in terms of the relationship between the two numbers.
BY MR. LEWIS:
Q. So we have an average settlement for mesothelioma that was 90,

but under the TDP, you get 180. And you got an average settlement in Libby of 268, and under the TDP, the most they could ever get, if they don't have mesothelioma, is 50,000 times the payment percentage? Is that what you understand the TDP to say?
MS. HARDING: Object to form.
MR. LIESEMER: Object to the form of the question, speculative, no foundation.
MS. HARDING: I think it is improperly characterized.
BY MR. LEWIS:
Q. You understand the question, right?
A. If you could repeat the question, I would appreciate it.
MR. LEWIS: Why don't we read it back? And I will withdraw it, if I think it's an unfair question.
(The reporter read from the