Page 162

record as requested.)

MR. LIESEMER: Same objection.

MS. HARDING: Same objection.

THE WITNESS: I mean, in this area, the TDP says what it says.

MR. LEWIS: Okay.

THE WITNESS: I am not going to start giving my interpretation. The values are set forth specifically.

BY MR. LEWIS:

Q. Do you take the position that the TDP is fair, or do you not take a position on that issue?

A. I think I said that I think the TDP is -- in terms of the differences between the claims, that the criteria in terms of exposure, disease and so on, that differentiate between the hundreds of thousands of asbestos personal injury claims that were filed against Grace

GR Obj: R; H

PP Ctr.

OBS Obj: R; H

Page 163

pre-petition, that the Trust Distribution Procedure adequately addresses the difference in valuing the claims and provides a forum for those -- a procedure and forum for those claimants who differ with the valuation of the claims to litigate the issues.

GR Obj: R; H

PP Ctr.

OBS Obj: R; H

Q. Do you agree that the best estimate of the historical value of claims would be based on the information that's provided in Exhibit-1, page 91-1625?

A. That's --

MS. HARDING: I am just going to object to the form again with respect to the vague reference to claims and whether you are talking about what claims you are trying to value now.

MR. LIESEMER: Object to the form of the question.

MR. LEWIS: Would you read back it back? He was starting to answer.

Page 164

(The reporter read from the record as requested.)

THE WITNESS: I think that, like any valuation, when you are looking at a large population, that this information is a good measure. When you try to -- for example, when you talk about Libby claims, you have identified a much smaller population. And while it's a measure, there is always the potential which I think I believe is the case in the Libby situation, that there is a fundamental shift in terms of the types of claims we are seeing at Libby that were being filed that were 15, 20 years ago from those that I see that are being filed currently, both in terms of the exposure and the disease.

So while I agree that this is valuable data and most important data because it

Page 165

accurately reflects Grace's experience in the tort system, I think that, as you get into smaller groups, there is the potential that the smaller population can change over time. And so you are better off using criteria that addresses value, medical exposure that reflects a much broader population.

BY MR. LEWIS:

Q. What claims are being filed since Grace went into bankruptcy that you are relying on in your answer?

MS. HARDING: Object to form.

BY MR. LEWIS:

Q. Claims to date?

MS. HARDING: I don't know if he said filed or asserted.

THE WITNESS: I meant asserted.

BY MR. LEWIS:

Q. What claims are there; do



f3c1f9f3-836d-4241-8af9-fe4b0129cb7d


MS. HARDING: Object to the extent it requires divulging attorney-client communication or work product.

THE WITNESS: Again, it's not a defined term. I certainly made that argument.

But I think that is a question that can't be answered without knowing the particular jurisdiction and the particular time period involved. Defendants' profile changed over time and differed from jurisdiction to jurisdiction.

BY MR. LEWIS:

Q. The reason I inquire about the term is you have used it in prior depositions, and I couldn't determine from the term what you meant by it.

But with respect to Libby, at no time was Grace a peripheral defendant; do you agree with that?

A. Yes.



BNSF

MR. LEWIS: Okay. I think I have gone 15 minutes. I think I can get done in 30 minutes after we take a break.

MS. HARDING: Okay.

\- - -

(There was a luncheon recess from 11:57 a.m. to 12:51 p.m.)

\- - -



\- - -

AFTERNOON SESSION

\- - -

Arrowood Obj: LPK; F

PP Ctr

BNSF

BY MR. LEWIS:

Q. I want to go to page 13 of the document entitled Topic of Deposition that Grace produced here. I want to go to the Rights of BNSF, BNSF being Burlington Northern Santa Fe Railway Company.

A. Yes.

Q. What do you know about those claims in the bankruptcy?

MS. HARDING: Object to broadness and form.

But go ahead.

THE WITNESS: What I know is that Burlington Northern Railroad -- well, let me start again.

Grace's mine and milling facility outside of Libby, Montana had a process where from the mill, it ran down the mountain to a

PP Obj: R

CNA Obj: F; R; BE; H



Arrowood Obj: LPK; F

loading station on railroad tracks that were on the banks of the Kootenai River that they operated this loading station on railroad property and rail line owned by the Burlington Northern Railroad; that in connection with the agreement to which Grace operated the loading facility, for lack of a better term, they agreed to indemnify the Burlington Northern Railroad for injuries and personal injuries resulting from the loading activities on the property down at the railroad; and that there is a question in my mind, and although I have seen some documents, and there is also that there was some insurance provided to them in connection with the indemnification, either through a specific policy that Grace acquired that Burlington Northern was the insured or there were also

PP Obj: R

CNA Obj: F; R; BE; H

BNSF

Page 186

some allegations -- again, I don't know which one -- I am not sure this latter part was ever proven, at least to my satisfaction.

There were also some allegations that there may have been some Grace policies in existence during some period of time during Grace's operation that Burlington Northern was added as an additional insured on the Grace policies.

BY MR. LEWIS:

Q. You have never seen those policies?

A. I have seen some of the indemnification agreements, and I may have seen the policies, some of the policies over the course of time.

Q. Do you recall that the policies --

MS. HARDING: Were you finished? I didn't know if you were finished.

BNSF

PP Obj: R

CNA Obj: F; R; BE; H

Page 187

THE WITNESS: Yes.

MS. HARDING: Sorry. Okay.

BY MR. LEWIS:

Q. By the way, any time if I interrupt you, sometimes I get going and I interrupt -- I am in a good way today, but sometimes I interrupt -- you stop me, and I will let you finish your answer. I may not like it, but I will let you answer.

Did you see any of the policies that named Burlington Northern Santa Fe as an additional named insured?

A. I don't recall specifically seeing those, no.

Q. Are you referring to siding agreements? Is that what you are referring to?

A. Yes.

Q. So it's your understanding that the siding agreements themselves provided that Grace would indemnify the BNSF?

MS. HARDING: I just don't

PP Obj: R

PP Obj: R; BE

CNA Obj: F; R; BE; H

Page 188

think --

MR. LEWIS: I thought that's what you said.

BY MR. LEWIS:

Q. Did you say that?

A. There is an indemnification around.

Q. Whether it's a siding agreement, there is an indemnification?

A. Right. And I have seen those. I just don't recall the specific details.

Q. And there were Grace employees that worked on that siding loading vermiculite concentrate -- do you know what vermiculite concentrate is?

A. Yes, I do.

Q. Okay. It's partially processed. It's ore processed before it's expanded, correct?

A. Yes. It's the beneficiated up at the mine and mill that's processed, and it's shipped in railcars out to expanding plants. And it generally then

CNA Obj: F; R; BE; H

PP Obj: BE

Page 189

goes to further processing out at the plants.

Q. Okay. But you are not able to ascertain for sure that there were policies that named BNSF as an additionally named insured; is that true?

MS. HARDING: Object to form.

THE WITNESS: I don't recall seeing policies --

MR. LEWIS: Okay. Fair enough.

THE WITNESS: -- or evidence there was.

BY MR. LEWIS:

Q. BNSF, have they filed a valid proof of claim in the bankruptcy?

MS. HARDING: Object to form.

THE WITNESS: They filed proofs of claim.

MS. HARDING: To the extent it calls for a legal conclusion.

Go ahead.

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 210

A. Yes.

Q. I know at least one -- I think that Burlington Northern has filed an objection to the Plan in which they contend that there is coverage that was available that's not listed here. I think it was specifically with respect to Royal Indemnity.

Are you aware of that?

MS. HARDING: Aware of their objection; is that the question?

MR. LEWIS: Yes, the objection.

THE WITNESS: I am generally aware of the objection.

BY MR. LEWIS:

Q. Is there a claim that there were earlier policies issued to Zonolite that are not addressed by this Plan?

MS. HARDING: Just object to the form to the extent that the objection speaks for itself.

But to the extent you recall, go ahead and answer.

Montana

Page 211

THE WITNESS: I don't recall.

MR. LEWIS: Let me look at my notes. I think I am finished.

I will pass the witness.

MS. HARDING: Could I just have two minutes? Just give me two minutes.

MR. LEWIS: Sure.

(There was a break from 1:18 p.m. to 1:26 p.m.)

(Hughes-3 marked for identification at this time.)

\- - -

EXAMINATION

\- - -

BY MR. MANGAN:

Q. Good afternoon, Mr. Hughes. Kevin Mangan on behalf of the State of Montana.

Mr. Hughes, are you familiar -- and I know Mr. Lewis had asked you a few questions regarding various defendants in litigation relating

Montana

Page 212

to Montana.

Are you familiar with the claims against the State of Montana by the Libby claimants?

A. Yes.

Q. Okay. Do you need me to identify or define what I mean by the Libby claimants?

A. Yes.

Q. Okay. Mr. Lewis is among other attorneys that represent plaintiffs in state court actions pending in Montana, including Lincoln County.

And you are familiar with those?

A. Yes.

Q. Okay. Are you aware that the State of Montana has been named as a defendant in over 140 cases in the various Montana state courts?

A. I know that there are cases against the State of Montana in Montana state courts. I didn't know the number.

Q. And you testified earlier

Montana

Page 213

that you are aware that the State of Montana has filed a contribution indemnification claim against Grace in this bankruptcy proceeding; is that correct?

A. Yes.

Q. Do you know what the basis is for this contribution indemnification claim?

A. I think that Grace's operations, that the exposures and the injuries that are the subject of the State of Montana claims were a result of Grace's operations and that the State of Montana, to the extent it has to reimburse these people or compensate these people for these injuries, are entitled to recover from portion of that under theories of indemnification and contribution from W.R. Grace.

Q. And would these claims have arisen from mining and processing of vermiculite within Montana?

PP Obj: F

MR. LEWIS: Objection as to

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 214

what do you mean by these claims?
MR. MANGAN: I am sorry. The Libby claims.
MS. HARDING: Object to form and foundation. To the extent you know, whatever the claims are, if they have been filed, they speak for themselves.
But go ahead.
THE WITNESS: My understanding is that they are the result of Grace's vermiculite mining and processing operations in Lincoln County, Montana.
BY MR. MANGAN:
Q. Mr. Hughes, are you aware that the State of Montana has denied liability with regard to claims brought by the Libby claimants against the State?
A. Not specifically, no.
Q. Are you aware of whether the State of Montana has paid any claims -- strike that.
Are you aware of whether the

Page 215

State of Montana has paid with regard to claims, whether it be through settlement or verdict?
A. I am not familiar with the history up there so far.
Q. Mr. Hughes, are you aware of the basis which the Libby claimants have sued the State of Montana?
A. Yes.
Q. And what is that?
A. I think I testified --
MS. HARDING: Object, asked and answered.
THE WITNESS: -- earlier. It's that the State of Montana in exercising its regulatory power over the operations in Lincoln County conducted inspections of the mine and mill facility through various couple of different agencies over time, and that in so doing, they created a duty between the State and the individuals working at the mine. And as a

Page 216

result of -- somehow the inspections breached that duty, and they are entitled to compensation and damages as a result of the breach.
BY MR. MANGAN:
Q. And do those allegations form the basis for the State's claims for contribution indemnification against Grace?
A. Yes, they are related to the claims.
Q. And will you agree with me that the State of Montana has filed a timely proof of claim within this bankruptcy case?
MS. HARDING: Object to the form.
MR. LIESEMER: Object to the form.
MS. HARDING: And with respect to the respect it calls for a legal conclusion.
If you can answer, go ahead.

Page 217

THE WITNESS: My understanding is that it had, but, again, I would be more comfortable if we could verify that. But yes.
BY MR. MANGAN:
Q. But you are aware that the State has filed a proof of claim?
A. It's my understanding that the State has filed a proof of claim.
Q. How are the claims of State of Montana for contribution indemnification being treated under the Plan?
MS. HARDING: I am just going to object to the extent that this witness wasn't designated for that purpose. Mr. Finke was, and I think he's testified, as has Mr. Lockwood and other folks.
But to the extent you know, go ahead.
THE WITNESS: Well, they are treated as asbestos personal injury claims, and within the

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 218

asbestos personal injury claim, there are asbestos derivative claims. And they would be channelled to the Trust and treated in accordance with the Trust Distribution Procedures. There are provisions of the Trust Distribution Procedures that deal with derivative asbestos claims.

BY MR. MANGAN:

Q. Would that be Section 5.6?

A. I believe so.

Q. Let me mark as an exhibit or it already has been marked. Excuse me. Hughes-3. Could you take a look at that?

A. Sure.

Q. Could you identify what Hughes-3 is, sir?

A. It's Exhibit 4 to the Exhibit Book, it says here, with I believe the Plan, and it's a copy of the Trust Distribution Procedures that are part of the proposed Plan in the Grace bankruptcy.

Page 219

Q. Okay. And I believe you had testified earlier that you have reviewed that in preparation of this deposition?

A. Yes.

Q. And I think you had testified to this, but I just want to be clear. You did not draft this; is that correct?

A. Yes.

Q. You only reviewed it?

A. Yes.

Q. And who was the draftsman of this document?

MS. HARDING: Object to form and foundation.

To the extent that you know, go ahead.

THE WITNESS: I don't know specifically who was the draftsman. I think Peter Lockwood, when he testified, may have provided more information about that.

BY MR. MANGAN:

Page 220

Q. Does the Plan or the TDP make any distinction between contribution indemnification claims versus personal injury, wrongful death, or property damage claims?

MS. HARDING: Object to form. The Plan speaks for itself.

To the extent that you know...

THE WITNESS: Well, it certainly has -- 5.6 deals with indirect PI Trust claims, so there is certainly some provisions that recognize a difference between, you know, direct claims, personal injury plaintiffs and injured parties, and claims that arise from some sort of obligation of Grace to indemnify parties or contribution claims.

BY MR. MANGAN:

Q. Would you consider Montana's claims of a different nature than a typical personal injury wrongful death or

Page 221

property damage claim?

MS. HARDING: Objection, calls for a legal conclusion.

MR. LIESEMER: I join in the objection.

THE WITNESS: Again, I agree with those who have objected that it calls for a legal conclusion, but they are certainly different. The State of Montana is the State of Montana, and individual claimants are individual claimants.

BY MR. MANGAN:

Q. To your understanding, are the Montana claims based on different acts from the types of claims which other asbestos PI claims relate?

A. I don't know what you mean by different acts.

MS. HARDING: Object the form.

MR. LIESEMER: Object to form.

Montana

MS. HARDING: Again, I think it calls for a legal conclusion.

BY MR. MANGAN:

Q. You testified earlier that you believe that claims were based on the failure to warn; is that correct?

PP Obj: BE; F; R; LO

MS. HARDING: Object to form, and I think it --

THE WITNESS: I don't think I said that.

MS. HARDING: I don't think he said anything about failure to warn.

PP Obj: BE; F; R; LO

THE WITNESS: Do you mean the claims against State of Montana?

BY MR. MANGAN:

Q. Yes, sir.

A. I thought I said the State in exercising its right to power to regulate the operations of Grace in Montana undertook to inspect the facilities, and as a result of that activity, they had duties vis-a-vie the

Montana

PP Obj: BE; F; R; LO

employees in that it's alleged that there is a breach of these duties, whether it be a failure to warn or other things of things. I don't know I said anything about that. And I don't know the details.

MS. HARDING: And I am just going to object to the extent that this witness is being asked to characterize other claimants' claims and issues that can be readily read from a document that describes the claim.

I don't know what relevance it has to have this witness characterize somebody else's claims in light of the fact that we are trying to get out of here.

But go ahead.

MR. MANGAN: I will be brief.

MS. HARDING: I am trying to let him answer everything.

MR. MANGAN: Thank you. And

Montana

I just want to note that I believe he was identified with regard to claims, specifically the claims of the State of Montana and other BNSF and MCC as well as others. So to the extent --

MS. HARDING: Let's just go on. He's certainly not identified to be the lawyer for anybody else but W.R. Grace.

MR. MANGAN: Fair enough.

MS. HARDING: Go ahead. I am not trying to be difficult.

BY MR. MANGAN:

PP Obj: BE; LO; F

Q. What is your understanding how contribution indemnification claims would be eventually paid pursuant to the Trust, in what form would the payment take?

MS. HARDING: Object to form.

MR. LIESEMER: Object to form.

MS. HARDING: The document

Montana

speaks for itself, and it calls for speculation.

But go ahead.

PP Obj: BE

THE WITNESS: I am not sure I understand the question. What do you mean by what form?

BY MR. MANGAN:

PP Obj: F; BE; LO

Q. Would contribution indemnification claims be paid through cash payment or stock or some or form of payment?

A. I think they would be paid pursuant to the Trust Distribution Procedure, and I think the people are paid in cash generally.

Q. At what point in time pursuant to the Trust Distribution Procedures would a contribution indemnification claim be made?

MS. HARDING: Object to form. It calls for speculation.

THE WITNESS: Pardon?

BY MR. MANGAN:

PP Obj: F; BE; LO

Q. Within the TDP, at what

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Montana

point in time would payments be made to avail a contribution indemnification claim?

MS. HARDING: I am just going to object to form. I think to the extent the document addresses that, it speaks for itself. I am just not sure I understand the question.

But go ahead, if you understand.

THE WITNESS: I am not sure I understand. I think as a general rule, it would be when the indirect personal injury -- the holder of the indirect personal injury claim, its liability to the underlying claimant and it would become, for lack of a better term, fixed.

BY MR. MANGAN:

Q. Okay. Claims under the TDP, are they processed on a first-in/first-out basis?

PP Obj: F; BE; LO

PP Obj: F; BE; LO

PP Obj: BE; F; LO

Montana

MS. HARDING: Object to form.

THE WITNESS: Generally, there is a first-in/first-out process, but the Trust distribution procedure describes in much more detail. There is a lot of exceptions and different kind of -- the details of how the first-in/first-out queue operates.

BY MR. MANGAN:

Q. Is that also true when claims would be paid under the Trust?

A. Again, the document speaks for itself, but, yes, there are differences when claims would be paid.

Q. Is it fair to say that claims that are, as you said, fixed earlier in the process would be paid earlier than other claims later in the process?

MR. LIESEMER: Object to form.

MS. HARDING: Object to

PP Obj: BE; F; LO

Montana

form.

THE WITNESS: You will have to ask the question again.

BY MR. MANGAN:

Q. Is it fair to say that claims under the Trust that are made under the Trust, they could be paid at an earlier time than other claims that start in the process later?

MS. HARDING: Object to form.

THE WITNESS: I think there is that possibility, but, again, I think the agreement in the Trust Distribution Procedures in the document speak for themselves.

BY MR. MANGAN:

Q. Is it your understanding that any of the claims that Montana might have against the Debtor for their contribution indemnification are based on independent conduct on the part of the State?

MR. LIESEMER: Object to the

PP Obj: BE; F; LO

PP Obj: BE; F; LO

PP Obj: LO; F

Montana

form, legal conclusion.

MS. HARDING: Object to the form. It calls for a legal conclusion.

THE WITNESS: It's based on the -- they are based on the State's conduct, and I think that the Montana Supreme Court decision is probably where you -- it defines that conduct and defines the legal basis for the claims against the State.

BY MR. MANGAN:

Q. Does the Trust make any distinction between claims that would be derivative as opposed to claims that might not otherwise be derivative?

A. You will have to ask the question again. I am not sure I understand it.

Q. I will strike that.

Under 5.6 of the TDP, are you familiar with that section, sir?

A. Generally, yes.

PP Obj: LO; F

PP Obj: LO; F

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Montana

Q. Okay. And that's relating to the indirect PI Trust claims?
A. Yes.
Q. Is there a provision in there that these indirect claims would proceed or process in accordance with procedures to be developed at a later point in time?
MS. HARDING: Object to form. Is there a particular language you want him to look at? It would just be helpful.
MR. MANGAN: Okay. Let me go back to that in a second.
BY MR. MANGAN:
Q. If you could turn to page 32 of the Trust, Section 5.4(a), that's relating to extraordinary claims.
A. Yes.
Q. Could you tell me what are the requirements for a claimant to bring an extraordinary claim?
MS. HARDING: Object to form.

PP Obj: BE; LO

Montana

MR. MANGAN: Generally.
MS. HARDING: Do you want him to -- in his own words?
BY MR. MANGAN:
Q. What is your understanding of that, sir?
A. My understanding is that there are people who -- excuse me -- whose exposure occurred primarily at a Grace facility or that at least 75 percent of their asbestos exposure was the result of exposure to Grace products, and to some other language about Grace conduct for or conduct for which Grace had legal responsibility. And then there is a subgroup that also requires 95 percent exposure to Grace products.
Q. And is one of the conditions also that there would be little likelihood of substantial recovery elsewhere?
A. Yes.
Q. What is meant by that term?
MS. HARDING: Object to

PP Obj: BE; LO

PP Obj: BE; F

Montana

form.
MR. LIESEMER: Objection to form.
MS. HARDING: And foundation.
BY MR. MANGAN:
Q. Are you familiar with that phrase and why that was put into the Trust?
A. Yeah. I mean, it's logically consistent with the idea that seven people who have 75 percent or 95 percent of their exposure to asbestos from Grace products or conduct for which Grace had legal responsibility, therefore where these are primarily Grace exposure cases, the logic and behind that is that Grace would therefore have a higher level of responsibility for claims and, therefore, these people are entitled to additional compensation.
If claims of this group, for example, have 75 to 95 percent, if it develops over the course of time, have

PP Obj: F; LO

Montana

other sources of compensation, then it seems to me the logic for these claims being treated as extraordinary claims -- an individual claim collapses, and that's why that language is there.
So you don't have a series of people coming in who have already been compensated, who are receiving substantial amounts of money from other parties, being able to come in and claim extraordinary claim status under the TDP.
But, again, all of this, all of this is really a question about the operations of the Trust, and the Trust hasn't even been formed, let alone be in operation. And I think while the Trust Distribution Procedures set forth kind of a roadmap of what's going to happen, some of these questions and some of your questions really are questions that are kind of operational. And you would have to see how it operates in practice once the Trust is up and running.
Q. So there are a lot of issues

PP Obj: F; LO

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 234

that need to be ironed out with operations of this Trust?

MS. HARDING: Object to form.

THE WITNESS: There is with any contract. I think this is a fairly detailed one in an effort to kind of govern it. But when you are setting up a Trust or any process, the document can only do so much. Some of the specific issues that come up are going to have to be dealt with once the Trust becomes operational.

BY MR. MANGAN:

Q. And who would be making those decisions when the Trust becomes operational?

MS. HARDING: Object to form, foundation, speculation, and it's overly broad in terms of what issues.

THE WITNESS: The Trust.

BY MR. MANGAN:

Page 235

Q. And the Trust is yet to be created, right?

A. Yes.

Q. If you could flip to Section 5.5, sir, Secondary Exposure Claims, do you see that section?

A. Yes.

Q. Does this provision relate to family members or does it also relate to people who live in the community?

MR. LIESEMER: Object to form.

MS. HARDING: Object to form. Again, the document speaks for itself.

THE WITNESS: I don't think it would be necessary to relate it to family members. But in virtually -- in most cases, it would be, because I think it's dealing with situations where the individual who has exposure is the result of proximity to another individual, spouse, and therefore

Page 236

it's appropriate to use the same criteria in terms of just measuring their exposure to the exposure of the person to be a related occupationally exposed person.

So it doesn't have to be a family member, but I don't think it would necessarily be applicable to a community member as I read it. But, again, others may differ.

BY MR. MANGAN:

Q. Do you know what was the history of this provision in the Trust? Are you familiar with that.

MS. HARDING: Object to form.

BY MR. MANGAN:

Q. How did this get into the Trust?

MS. HARDING: And foundation.

THE WITNESS: Well, I think

Page 237

secondary exposure issues have been around the asbestos litigation for years and is something that has to be dealt with by the Grace Trust and is dealt with by the other Trust as well.

BY MR. MANGAN:

Q. Do you know whether this was placed in there directly related to Libby claimants?

MS. HARDING: Object to form to the extent it calls for Plan negotiations.

But you can answer.

THE WITNESS: I don't know.

BY MR. MANGAN:

Q. Could you turn to page 42? I will direct you to 5.7(b)(3), Grace Exposure.

A. Yes.

Q. Does this provision refer only to Libby claims?

MS. HARDING: Object to

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Montana

form.
MR. LIESEMER: Object to form.
THE WITNESS: Refer only to Libby claims?
BY MR. MANGAN:
Q. Yes sir.
A. No.
Q. Was it placed into the Trust to address Libby claims?
MS. HARDING: Objection.
THE WITNESS: Some portion of it was.
MS. HARDING: Objection to form.
MR. LIESEMER: Objection to form.
BY MR. MANGAN:
Q. Is it necessary to read this provision, 5.7(b)(3), together with 5.5, which we discussed just a moment ago?
MS. HARDING: Object to the form to the extent it calls for a legal conclusion, and also the

PP Obj: F

PP Obj: BE; LO

Montana

document speaks for itself.
But to the extent you know the answer, go ahead.
And what is the answer, whether it has to be read?
BY MR. MANGAN:
Q. Do those two provisions need to be read together, sir?
A. Well, to the extent that secondary exposure claims in 5.5 is a reference to exposure to Grace products and 5.7(b)(3) defines what's considered Grace exposure, I suppose they have to be read together.
Q. Could you turn to page 44, Section 5.9, Second Disease Claims? Would you take a look at that for a second?
A. (Witness complies with request.)
Q. Were the Libby claimants in mind when this was drafted?
MR. LIESEMER: Object to form.

PP Obj: BE; LO

PP Obj: F

Montana

MS. HARDING: Object to form. The witness has already testified he didn't draft the document, so I object on foundation. You are asking when it was drafted and was it drafted for that reason, then I object on foundation.
THE WITNESS: It would seem to me that the answer to your question is no, but I don't know.
MR. MANGAN: That is all I have, sir.

\- - -

EXAMINATION

\- - -

BY MS. CASEY:
Q. Good afternoon, Mr. Hughes. My name is Linda Casey. I represent BNSF Railway Corporation.
When I refer to BNSF, I am going to be referring to BNSF Railway Corporation and its predecessors, including Great Northern and Burlington

PP Obj: F

Northern Santa Fe.
Is that acceptable?
A. Sure, that's great.
Q. And when I refer to Grace, I will be referring to W.R. Grace Company and its predecessors that operated at the mine, including Zonolite Corporation.
Is that okay?
A. That's fine.
Q. Are you aware of the historical business relationship between Grace and BNSF?
BNSF A. Yes.
Q. Would it be a fair and accurate summary of that relationship to say that from at least as early as 1942 Grace operated, through various leases and agreements between BNSF and Grace, a loading dock and suspension bridge over the railway's right-of-way and also transported vermiculite to be mined over the railway tracks?
A. Yes.
Q. And do you have an

Arrowood Obj: LPK; F

PP Obj: R

CNA Obj: F; R; BE; H

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 242

understanding as to whether Grace provided indemnification to BNSF for any personal injury or death that resulted from Grace's operations of the suspension bridge and loading dock?

MS. HARDING: Object to the form.

MR. LIESEMER: Object to the form of the question.

THE WITNESS: Yes.

(Hughes-4 marked for identification at this time.)

BY MS. CASEY:

Q. Take a look at exhibit Hughes-4 for me, please.

A. Sure.

Q. Do you recognize this document?

A. I think I have seen it before.

Q. Do you know what this document is?

A. Based on my review this afternoon, it is an agreement between

Page 243

Great Northern Railway and the Zonolite company concerning the Zonolite's operation of the loading dock on the railway company's right-of-way in Libby, Montana.

Q. If I can direct your attention to Bates number GCO 00024 -- it's the second page of Hughes-4 -- and in particular, paragraph 8.

A. Yes.

Q. I will just read it. The second line in paragraph 8 reads: "The Applicant shall, and hereby does, further agree to indemnify and hold harmless the Railway Company of and from any and all liability, damages, recoveries, judgments, cost, expense, or other charges and demands on account of injuries to or death of one or more persons or damage to or destruction of the property of one or more persons" -- I think that reads -- "and from or during the construction, repair, maintenance, or operation of said bridge and conveyor

Page 244

belt resulting from or during the use of said premises by the Applicant..."

Is that your understanding of one of the indemnification agreements that Grace had provided to BNSF?

MS. HARDING: Just object to form and the document speaks for itself.

Are you just asking him if that's how the document reads?

MS. CASEY: Yes.

THE WITNESS: Grace wasn't a party to the agreement. Zonolite Company, it certainly was one of the indemnification agreements between Zonolite Company and the predecessors to BNSF.

BY MS. CASEY:

Q. Do you have an understanding whether Grace subsequently assumed the obligations under this agreement when it -- strike that.

Did Grace purchase the Zonolite Company at some point?

Page 245

A. Yes.

Q. Do you have an understanding as to whether Grace assumed this agreement and the obligations under this agreement when it purchased the Zonolite Corporation?

MS. HARDING: Just object to the extent it calls for a legal conclusion.

Go ahead.

THE WITNESS: I know that Grace assumed generally the contractual liabilities of the Zonolite Company in connection with its acquisition of Zonolite assets. I don't know specifically whether or not this agreement was identified in the acquisition documentation.

BY MS. CASEY:

Q. Are you of whether the Zonolite Company obtained insurance, whether direct insurance or through endorsement of its generally liability

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 246

policies, to insure its indemnification obligation under paragraph 8 or through any other agreement to BNSF?

MS. HARDING: Object to form, foundation, and to the extent it calls for a legal conclusion.

But go ahead, if you can answer.

THE WITNESS: It was required to do so under this agreement. I don't have a specific recollection of whether or not there is any documentation indicating that it did so, although I do recall that there was some correspondence indicating that it did.

BY MS. CASEY:

Q. Okay. Let's clarify what I am asking. If you go to page GCO 00025, which is the third page of that, Hughes-4.

A. Right.

Page 247

Q. And look at paragraph 9, if you would take a look at that. And I will go ahead and read it into the record: "The Applicant shall obtain and keep in full force and effect during the continuance of this agreement, at its own sole cost and expense, a policy of public liability and property damage insurance protecting the Railway Company against loss on account of injuries to or death of persons and loss of or damage to property arising out of use of said premises or arising out of the construction, use and removal of said suspension bridge and conveyor belt."

Is that the provision that you are referring to when you said that this agreement requires them to obtain policies for BNSF?

A. Yes.

Q. Going back to my previous question, paragraph 8 provides an indemnification from Grace to BNSF.

My question is, did Grace

Page 248

purchase or obtain insurance in its own name to insure its indemnification obligation to BNSF?

MS. HARDING: Object to form.

THE WITNESS: I don't know.

BY MS. CASEY:

BNSF

Q. And then moving on to paragraph 9, are you aware of any policies that were purchased for BNSF in accordance with paragraph 9 of this agreement?

A. As I said, I am not sure I have seen any policies. I do recall that there is correspondence in the file that would indicate that there may have been policies purchased.

CNA Obj: R; S; H

PP Obj: R; F

Q. Have you seen any certificates of insurance indicating that policies have been purchased?

A. Not that I specifically recall.

MS. CASEY: Okay. On the record real quick, I am going to

Page 249

mark as Hughes-5 a compilation of endorsements to insurance policies issued by Royal Indemnity Company.

I have an been informed by BNSF that these endorsements were provided to BNSF by the Royal Indemnity or its successors a long time before the confidentiality order was entered into this case with an was provided to them without a designation of confidentiality or under any confidentiality restriction.

I understand from a review yesterday of the Debtors confidential website that the Debtor has now produced the policies and has designated them confidential. These copies do not have that designation as being confidential on it.

For purposes of this deposition, BNSF is willing to abide by the confidentiality

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 254

MS. CASEY: Okay. I will go ahead and mark Hughes-5.

(Hughes-5 marked for identification at this time.)

BY MS. CASEY:

Q. Do you recognize this document?

A. Yes, I do.

Q. And what is this document?

A. It's a series of emails and some attachments concerning the issue of these certificates of insurance that indicate that Burlington Northern has been named as an insured under some policies of W.R. Grace.

Q. And if I can direct your attention to GCO 000090, do you recognize this document?

A. Not specifically, but I --

MR. SCHIAVONI: Objection. It calls for speculation.

THE WITNESS: I don't specifically remember this document, but I do remember the

Page 255

correspondence around it, the email exchange.

BY MS. CASEY:

Q. If you would go to GCO 000089, do you recognize this document?

A. Again, I recall the specific email exchange in 2006 and the issue coming up at that time, and that's what I was alluding to, that there was correspondence that was consistent with Grace. And now my memory has been refreshed, and I see there are actually certificates of insurance that indicate that Burlington Northern was named as an insured under some Continental Casualty policies to W.R. Grace.

Q. Okay.

Ms. DeCRISTOFARO: Ms. Casey, this group of documents, the one marked GCO 000090, that was produced by BNSF's counsel; is that correct?

MS. CASEY: No. This was produced by the Debtors. I don't

Page 256

know who -- I was going to ask the witness that, but he said he didn't recognize the document.

THE WITNESS: And, quite frankly, I don't believe -- well, I won't speculate.

MS. DeCRISTOFARO: I am sorry. It does appear from the correspondence, at least the way it was produced, that it was generated by counsel.

MS. BAER: Has it been established where you got this from? From these Bates numbers, I don't know in what production that was made. When did you obtain this?

MS. CASEY: Through the website that the Debtors produced.

MS. BAER: So this is on with the policies?

MS. CASEY: No, not on the confidential website that was just created, but the website that

Page 257

Debtors created --

MS. BAER: In December?

MS. CASEY: -- when the first round of discovery was produced. I have had these documents for months now.

Off the record.

(There was a discussion held off the record at this time.)

MS. DeCRISTOFARO: Hedger Moyers represents BNSF?

MS. CASEY: I believe so, yes, in the state court actions.

MR. LEWIS: Yes, they do, although that firm does not exist anymore as such. The surviving firm represents them.

MS. DeCRISTOFARO: It's an attachment to an email from Hedger Moyers.

MS. CASEY: Mark that as 6.

(Hughes-6 marked for identification at this time.)

BY MS. CASEY:

pp Ctr

Page 258

Q. Do you recognize this document?
A. Not specifically, but I -- not specifically, no.
Q. Generally?
MS. HARDING: Object to form. You asked him if he recognized the document. He said no.
BY MS. CASEY:
Q. This document is dated May 1961 -- I can't read the actual date -- to the Great Northern Railway Company from the Detroit Insurance Agency.
Do you know who the Detroit Insurance Agency is?
A. They were insurance brokers for Zonolite Company at the time.
Q. And if you read this letter, it refers to a Royal Indemnity Company general liability policy RLG-02161.
Are you familiar with that policy number?
A. No.

PP Ctr

Page 259

MR. LEWIS: Just a second. Actually, it was the first of the two policies.
MS. CASEY: I was going to get to the second policy.
MR. LEWIS: All right.
BY MS. CASEY:
Q. And then halfway down the letter, it refers to another policy RLH-021669, and this letter states specifically naming the Great Northern Railway Company as the insured.
Are you familiar with that policy?
A. No.
Q. Are you familiar with Grace's document retention policy?
A. Yes.
Q. What is Grace's document retention policy?
A. Well, I mean --
MS. HARDING: Object to form and it's overly broad.
THE WITNESS: And quite

PP Ctr

Page 260

frankly --
MS. HARDING: You can answer.
THE WITNESS: -- this document and documents like it for the last 25 years have been subject to asbestos litigation. So this document and any documents that would be relevant to this case would not be subject to the Grace record retention policy and would have been maintained.
BY MS. CASEY:
Q. Okay. Would that include policy number RLH-021669?
MS. HARDING: Object to form. He already said he didn't know what that was, so I don't know how he can answer.
But go ahead.
MR. SCHIAVONI: Could we establish whether the witness was born at this date in time?
THE WITNESS: Thank you,

Page 261

because I was born at this date and time, only a few years before.
MR. SCHIAVONI: So you were 3 or 4 years old when the document was authored?
MR. JACOB COHN: Did he author it?
MR. SCHIAVONI: I object to the lack of the foundation. It calls for speculation.
MS. CASEY: As to whether Grace has maintained that policy of insurance?
MS. HARDING: You asked if he knew what that policy was, and he said no. So I am not sure how he would know whether they maintained it if he didn't know what it was.
But to the extent you can answer, go ahead.
THE WITNESS: Again, I don't know -- obviously, I know that Royal was the general liability

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 270

BY MS. CASEY:

Q. Okay. You previously testified that you are aware of correspondence that indicates that the Zonolite Company, the predecessor to Grace, did, in fact, purchase policies that named BNSF as the insured?

MR. SCHIAVONI: Objection.

MS. HARDING: Objection.

THE WITNESS: If I testified to that that way, I didn't intend to. I said I was aware of policies of correspondence indicating that Grace had specifically added BNSF as a named insured on the Grace's comprehensive general liability policies. And it has been alleged that Grace also purchased insurance for or on behalf of the Burlington Northern Railroad.

BY MS. CASEY:

Q. And does Grace take a position as to whether, in fact, it did

Page 271

purchase insurance policies for BNSF?

MS. HARDING: I am going to object to the line of the questions.

THE WITNESS: This a factual question.

MS. HARDING: These are factual questions.

MS. CASEY: And he was designated as the 30(b)(6) deponent for insurance available to BNSF.

MS. HARDING: But you are not asking about any specific policies or about on any particular documents. You are asking him in general. And I think it's very confusing and very broad. I think the record has now gotten completely confused. So I think you need to be more specific.

MR. SCHIAVONI: I think it's asked answered.

Page 272

THE WITNESS: I think I answered, and I said I am not aware of any policies that were purchased by Grace or for the benefit of Burlington -- excuse me -- Zonolite or Grace, for Burlington Northern, that -- again, if I misspoke, but that I was aware of initially of correspondence indicating that Grace had added Burlington Northern as an insured under its own liability insurance policies. And you showed me correspondence which was consistent with my recollection.

BY MS. CASEY:

Q. Okay. If you go back to Hughes-6.

A. Yes.

MR. SCHIAVONI: Could I have a copy of Hughes-6?

MR. PERNICONE: Here you go.

MS. HARDING: Could we take

Page 273

a break so I have time to read all the documents that have been marked and just take a ten-minute break?

MS. CASEY: Yes.

MS. HARDING: I want to make sure that I am making my proper objections. Thanks.

(There was a break from 2:43 p.m. to 2:57 p.m.)

THE WITNESS: Before we go further, in reviewing the documents here, I think I misspoke. I had it reversed in looking at the correspondence in a couple of things you said.

The certificates of insurance and the correspondence from 1961, my understanding is that there is evidence that Grace purchased insurance for the benefit of the Burlington Northern related to the operation of the loading facility out in Libby,

BNSF

PP Ctr

CNA Obj: F; R; BE; H

PP Obj: BE; F

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

BNSF

PP Obj: BE; F

CNA Obj: F; R; BE; H

Page 274

Montana.

I haven't seen -- I am not familiar with the fact that Burlington Northern was specifically added as an insured to Grace's own general liability policies, and I think I had that reversed when we were speaking a moment ago.

BY MS. CASEY:

Q. Is it your understanding that to the extent any policy was purchased naming BNSF as the insured, that it is the subject of a settlement agreement with the insurers and Grace?

MS. HARDING: Object to foundation to the extent that you know.

MR. SCHIAVONI: Vague and ambiguous.

THE WITNESS: I would have to look at the insurance agreements themselves.

BY MS. CASEY:

Page 275

Q. The settlement agreements?

A. The settlement agreements. Excuse me.

MS. CASEY: I would like to mark this as Hughes-7.

(Hughes-7 marked for identification at this time.)

MS. HARDING: I am objecting to the previous question because I think I didn't understand it. To the extent that you were asking him about whether the insurance that Grace purchased for you was settled.

MS. CASEY: Correct.

MS. HARDING: Okay. I don't understand how he can answer that question, so I object. I think I objected originally, but I want to make sure.

THE WITNESS: All right.

BY MS. CASEY:

Q. Are you familiar with Hughes-7?

Page 276

A. I have read it right now. I don't recall seeing it before.

Q. And Hughes-7, on the second page, states: "Zonolite Company has complied with this provision by providing liability policy for the benefit of the Great Northern Railway Company under Royal Indemnity Policy RLH 703154, effective for the period April 23, 1953 to April 23, 1956."

Have you ever seen that policy?

A. Not that I recall.

Q. It also refers to the --

MR. SCHIAVONI: I object to the reading of the document to the extent the witness has made it clear he hasn't seen it before. And you are not offering this document in any way to refresh the recollection that the witness said he was not knowledgeable about. I object.

MS. HARDING: I haven't

Page 277

objected yet because I don't think you have asked him questions about the document. You asked if he has seen a reference to a policy in here, and I think he said no.

So I agree generally with the objection about the document, but I don't think you have asked a question about it yet.

BY MS. CASEY:

Q. Who at Grace is responsible for maintaining Grace's business records? Who would be the document custodian?

MS. HARDING: Object to form in terms of breadth and time.

THE WITNESS: Again, it would vary between what types of records and the business unit involved and so on.

BY MS. CASEY:

Q. Do you have any idea who would be able to authenticate the documents, Hughes-6 and Hughes-7?

A. It's not a Grace document,

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 294

prepare this witness for those questions because we weren't aware you were going to ask him about it.

MS. CASEY: I join in the objection. He was listed as the 30(b)(6) deponent for insurance issues related to BNSF, which is why I prepared my questions for today.

But I have no further questions.

MR. SCHIAVONI: If you feel there aren't any questions that have been answered, ask them now.

MS. HARDING: Right. He's answering all of your questions.

MS. CASEY: He's already answered my questions and now said he does not know.

MR. SCHIAVONI: If there are any questions that you feel haven't been answered, you should state them right now, Counselor.

Page 295

MS. CASEY: He answered the questions.

Excuse me?

MS. HARDING: Never mind. He answered -- you asked a question, and he answered it.

THE WITNESS: Well, you didn't ask a question, actually. But...

MS. CASEY: Can you read the last question, please, and the answer if there was one?

(The reporter read from the record as requested.)

THE WITNESS: My point -- my answer is that -- the answer to the question is in the settlement agreement with CNA at Continental Casualty Company in assuming that the Exhibit 5 is accurate, policies, which have the policy number CCP 4834440, appear on Exhibit 5 and listed as settled insurance policies under the Plan.

Page 296

MS. CASEY: I have no further questions, but I would like to, in addition to the objections that have already been stated on the record, also object on the basis that the Debtors had not produced the insurance policies prior to Mr. Posner's deposition but has produced the insurance policies prior to Mr. Hughes' deposition. With that, I pass the witness.

MR. BROWN: Why don't we mark that as 11.

(Hughes-11 marked for identification at this time.)

\- - -

EXAMINATION

\- - -

BY MR. BROWN:

CPO

Q. Good afternoon, Mr. Hughes. My name is Michael Brown. I represent GEICO, Republic Insurance Company, Seaton Insurance Company, and OneBeacon America

PP Obj: R

Page 297

CPO

PP Obj: R

Insurance Company.

We have just had marked as Hughes-11 a document that I would like you to take a look at and tell me if you can identify it.

A. It's a letter indicted April 25th, 2009 from Barbara Harding to counsel, and attached is the witness designations and topics of deposition and a listing of the designated witness based on deposition notices that have been filed in this case and the confirmation hearing.

Q. Okay. And have you seen this document before today?

A. I have.

Q. And just so it's clear, this is a compilation of all the various topics and particular Grace witness that is prepared to testify about the subjects where his name appears, correct?

A. Right.

Q. Okay. You can put that aside.

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 298

Are you generally familiar with Grace's liability insurance program?
A. Yes.
Q. Okay. Do you understand that Grace has various layers of insurance?
A. Yes.
Q. Okay. Could you describe for me your understanding of that?
A. Well, under the period of time from, say, pre-1985 when there was asbestos insurance available, Grace would each year or -- and it would have a primary policy with CNA from 1973 through '85, Maryland Casualty before that, and that there would be additional policies, excess policies, which would provide coverage for losses or claims in the event that the aggregate limits of the primary policies were exhausted.
And so a company like Grace would go up and buy, you know, coverage, insurance coverage for a particular year, a particular policy period, and they

Page 299

would have a primary policy. And then they would have policies above that, say, you know, at $5 million level, $10 million level, depending on how they assess their risk.
Q. Okay. And you have a general familiarity with the concept of a coverage chart, correct?
A. Yes.
Q. Okay. And you understand that there is various layers of coverage from the primary to the umbrella and the excess above that?
A. Yes.
Q. And Grace, as you just testified, purchased policies in each policy year at each of those levels?
A. Yes.
MR. BROWN: Let me mark a second document, and this will be Hughes-12.
(Hughes-12 marked for identification at this time.)
(Mr. Speights re-joined the

Page 300

deposition via teleconference at this time.)
BY MR. BROWN:
Q. Mr. Hughes, you have before you a document we marked as Hughes-12. Can you take a few moments to familiarize yourself with it?
A. Sure.
MS. HARDING: I am going to note for the record that we did designate Mr. Finke with respect to the Transfer Agreement. But if you want to ask prosecute Hughes a question --
MR. BROWN: I am not going to ask him a lot about the agreement. I am going to ask about the attachment to the agreement.
MS. HARDING: I don't think it changes the notation for the record. But go ahead and ask him questions, and to the extent he can answer without speculating...

Page 301

BY MR. BROWN:
Q. Let me start by asking you whether you have seen the document marked Hughes-12 before?
A. I have seen the agreement before.
Q. Okay. Can you look at the back of it, and you will note that the agreement has some schedules?
A. Yes.
Q. I believe there are three of them.
Have you seen those schedules before today?
A. I can't say that I have seen these schedules. I have seen similar documents.
Q. Okay. Have you seen ones similar to what's been marked or what is identified as Schedule 1?
A. Yes.
Q. Okay. In what connection did you see the document that is attached as Schedule 1 to Hughes-12?

CPO

Page 302

A. Just in connection with the case, in connection with, you know, my involvement in asbestos litigation and the coverage issues associated with it to Jeff Posner and others within Grace. I think I have seen this policy list before.

Q. Okay. Is this a document that Mr. Posner prepared; do you know?

A. Not specifically, no.

Q. Okay. Is it a document that someone at Grace prepared?

A. I don't know this specific version of the document, but Mr. Posner certainly would be the person that if I were to have undertaken the task of creating this document, I would have consulted with Mr. Posner.

Q. Okay. Can you take a look at the first page? It's a -- the Schedule is a 20-page document. And you will see that there are -- well, first of all, what do you understand the schedule generally to be?

PP Obj: R; F

CPO

Page 303

A. The list of policies that were available to Grace to pay asbestos-related claims.

Q. Okay. Would these be policies that would have been in the part of the general liability program that you indicated you were generally familiar with?

A. Yes.

Q. Okay. Can you describe for me what each of the headings along the top of the first page, what you understand those to mean?

A. Well, the policy year is the year that the insurance policy covered in terms of losses that occurred in the year or at least triggered the insurance coverage for that period of time. Insurer is obviously the insurer. And then insurance company that's providing the coverage is obligated to provide insurance for losses that triggered the policy.

The policy number identifies

PP Obj: R

CPO

Page 304

the specific insurance policies. Generally, you have a policy number identifying which policy. And then the layers, when we were talking about before about the program and how you have to umbrella policies and excess policies, and they are layered based on the amount of the coverage available for a particular policy period. That identifies which policy -- excuse me -- which layer the particular policy is in the Grace coverage block.

Q. If it says primary, that's the very bottom level of insurance; is that correct?

A. Yes.

Q. And then if it has a one next to it, is that the first layer excess?

A. First layer excess would be the way I understand it.

Q. And it goes up to -- the highest number I thought I saw was 8 and would be the highest level for any policy

PP Obj: R

CPO

Page 305

year? That is the highest level of excess insurance?

A. That's the highest I saw.

Q. Okay. Now, I think you testified earlier that you were the person that was primarily responsible for handling the day-to-day defense of Grace PI claims at least internally at Grace; is that right?

A. Yes.

Q. Okay. And in that capacity, did you have occasion to deal with insurance issues?

A. Yes. Again, as I have described, primarily in the context of Grace's obligations under insurance arrangements with reimbursement or coverage in place arranged. Grace had obligations to insurers in making sure we met those obligations and getting reimbursed under the agreements.

Q. Okay.

A. And the policies as well, I suppose.

PP Obj: R

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d