Page 310

to. I think it's unquestionably clear that we have gone over and beyond our requirements under 30(b)(6) in this whole process.

MR. BROWN: Okay. Can I ask my next question?

MS. HARDING: Yes, you may.

BY MR. BROWN:

Q. Mr. Hughes, let's go to other schedules for the moment. Let's take a look at the second schedule.

MS. HARDING: Again, Mr. Hughes wasn't even designated with respect to this schedule or this exhibit, but go ahead. I am happy to let him answer the question.

MR. BROWN: We was designated as a person that would be produced on insurance issues. There are nine topics on that chart that had his name next to it. We don't need to quarrel about it. If he doesn't know the

Page 311

answer, fine.

BY MR. BROWN:

Q. Mr. Hughes, my question with respect to Schedule 2 of Hughes-12 is, do you understand what the schedule reflects?

A. Yes.

Q. What is that?

A. It's a list of the insurance settlement agreements -- settlement agreements which resolved coverage disputes with liability insurers that provided Grace with insurance coverage for asbestos-related personal injury and property damage claims and the dates of those agreements.

Q. If you could take a look at Schedule 3, which is a couple pages along, do you have an understanding of what is reflected on Schedule 3?

A. It's a similar list of insurers where we have what's characterized here as a asbestos reimbursement agreements.

Page 312

Q. All right. Let's go back to Schedule 1 and specifically page 7 of Schedule 1.

A. Okay.

Q. And you heard me when I introduced myself that one of my clients is GEICO. You will see in the middle of the page that there are three policies for GEICO listed on page 7.

Do you see those?

A. Yes.

Q. Okay. Did Grace to your knowledge have any settlement with GEICO?

A. Not to my knowledge.

Q. Okay. Let's go a little bit further on to page 16. Another one of the companies that I indicated I represent is Republic, and you will see toward the top of that page there are two policies listed for Republic.

To your knowledge, did Grace have any settlements with Republic Insurance Company?

A. Again, I am familiar with

Page 313

and maintain a list in my office because of my involvement in terms of what -- I don't know and don't recall specifically an agreement with Republic.

But the other issue, of course, when you come with insurance companies is kind of the changing landscape of who they are. But I don't specifically recall Republic Insurance. I think there are over 60 or 70 agreements, settlement agreements with different kinds.

Q. Would you agree with me that Republic Insurance Company does not appear on either Schedule 3 -- excuse me -- either 2 or 3?

A. No.

Q. Does that help refresh your recollection as to whether Grace had --

MR. LEWIS: That sounds like a double negative. I don't know that the record is clear on that.

MR. SCHIAVONI: No, he doesn't agree or not?

Page 314

MR. LEWIS: Can you read it back? I might have muddled it.
(The reporter read from the record as requested.)
THE WITNESS: I agree that it's correct.
BY MR. BROWN:
Q. We were talking about Republic. Why don't we try to fix that.
I am correct, am I night knot that Republic Insurance Company does not appear on Schedule 2 or 3?
A. Yes, you are correct. It does not appear on Schedule 2 or 3.
Q. Does that refresh your recollection as to whether Grace had a settlement agreement with Republic?
A. I have no recollection that it does, and since it doesn't appear on 2 and 3 and my understanding is 2 and 3 are accurate, then I would say my understanding would be no, that there is no settlement agreement with Republic.
Q. Okay. You indicated at the

Page 315

outset that you were generally familiar with Grace's insurance program.
Are you generally familiar with the rights and duties of the insured, on the one hand, and the insurer, on the other, under an excess policy?
MS. HARDING: Object to form.
Go ahead.
THE WITNESS: Yes, I am generally familiar.
BY MR. BROWN:
Q. Okay. Can you describe your familiarity in terms of -- what do you understand to be the insurer's, the excess insurer's rights under an excess policy?
MS. HARDING: I am just going to object to form and to the extent it's overly broad and doesn't refer to a specific policy.
But if you can answer the

Page 316

question, go ahead.
THE WITNESS: Well, to provide insurance coverage and to provide indemnity payments when the underlying policies under the terms of the insurance contract. If a loss covered within the scope of the coverage provided to the insured and that the underlying policies have been exhausted, that it would trigger an obligation on the part of the excess insurer to pay the claim, again, in a manner consistent with the insurance policy.
BY MR. BROWN:
Q. Okay. And just following up on that latter phrase at the end of your answer, do you understand generally -- and I understand that it may be different from policy to policy. But do you understand generally that the insurer has a duty to cooperate with the excess insurer?

Page 317

MS. HARDING: Object to form. Again, same objection.
THE WITNESS: I know generally that in terms of insurance policies, an insured has a duty to cooperate.
BY MR. BROWN:
Q. And the insured has a duty to give notice of claims; you are familiar with that as well?
A. Yes.
Q. And are you generally familiar at that the excess layer, the insure has a right to associate in the defense of claims?
MS. HARDING: Object to form.
THE WITNESS: To associate in defense of claims?
BY MR. BROWN:
Q. Yes.
A. Yes, although I think that, again, that's something that you alluded to earlier that I would think varied from



PP Obj: R; F; LO; S

CPO

Page 318

policy to policy in specific relation.
Q. Okay. To your knowledge, does Grace have any agreement with GEICO pursuant to which GEICO gave up any of its rights or ceded any of its rights under the policies that appear page 7 of Schedule 1 of Hughes-12?
MS. HARDING: Object to form.

PP Ctr

CPO

THE WITNESS: Not to my knowledge.
BY MR. BROWN:
Q. And would your answer be the same with respect to Republic?
A. Yes.
Q. To your knowledge, has GEICO or Republic given up any of its claims handling rights pursuant to any agreement with Grace?

PP Obj: R; F; LO; S

MS. HARDING: Just objection to form. That assumes facts not in evidence.
But go ahead.

PP Ctr

CPO

THE WITNESS: Not to my

PP Obj: R; F; S

CPO

Page 319

knowledge.
BY MR. BROWN:
Q. Okay. You indicated earlier that your title is senior litigation counsel; is that correct?
A. Yes.
Q. And I guess at the time of the petition you reported to Mr. Siegel; is that correct?
A. Yes.
Q. And he was the general counsel at the time?
A. Yes.
Q. How would you describe your responsibilities with respect to asbestos personal injury claims pre-petition?
MS. HARDING: I am just going to object to the form to the extent it's overly broad, requires an overly broad interpretation.
But to the extent you can answer it --
MR. LEWIS: I am not.
MR. BROWN: I am not asking

Page 320

for an exhaustive list.
MS. HARDING: Right.

CPO

THE WITNESS: As I said earlier, I was responsible for the day-to-day management and resolution of the claims internally. And as such, I worked with the outside law firms in litigating the cases and settling cases, and internally I worked with different groups within the company to appropriately record and manage the provision of services from outside counsel firms, payment of the firms, payment of the settlements.
BY MR. BROWN:
Q. Okay. What was the period of time over which you had that role?
A. I would say from 1989 through 19 -- excuse me -- through 2001, April of 2001.
Q. Okay. And that was the petition date?

CPO

Page 321

A. Yes.
Q. Is it fair to say that you are the person at Grace most knowledgeable with respect to the manner in which asbestos personal injury claims were handled pre-petition?
A. Yes.

PP Obj: R

Q. Did Grace have national coordinating counsel with respect to asbestos bodily injury claims?
A. It depends on how you define national coordinating counsel. We had a national -- Casner & Edwards in Boston handled all our documents, and Bob Murphy, a partner there, would participate in trials and work with outside counsel. And there were some other lawyers around the country who I would call upon to do that as well.
Q. Okay. I gather from your answer that he didn't have the official title national coordinating counsel?
A. Well, also, I think after 1989, the outside counsel didn't report

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 322

to him. I view national coordinating counsel kind of strictly as I understand it is when the outside counsel in a particular jurisdiction report on a day-to-day basis to the firm, and then the national counsel, in turn, reports to the client and the corporation.

And we had it set up a little differently, that after 1989 -- again, before that, I viewed Bob Murphy as serving what I would call traditional national coordinating counsel and that the outside firms reported to him. But we kind of reversed that.

Q. Okay. If I understood your answer then, is it fair to say from 1989 to 2001, that effectively you acted as the national coordinating counsel?

A. Yeah, with the assistance of Casner & Edwards and Bob Murphy and others.

Q. Mr. Finke, I believe, testified that in addition to Casner & Edwards Grace had approximately 25 other

Page 323

firms around the country that were defending Grace in various jurisdictions against asbestos PI claims.

Does that sound about right to you?

A. It sounds a little low, actually, since there are 50 different states and then I think we had cases in virtually every state and in some jurisdictions, California, Texas, would have more than one counsel.

Q. So what would be your estimate or number?

A. My estimate would be 50.

Q. Now, what was your interaction with each of those 50 or so law firms in terms of defending against asbestos claims?

A. They would report on a regular basis in terms of developments, they would -- again, obviously when you talk about 50 firms, a lot of the level of activity of some of the firms was lot less than others.

Page 324

But, again, there were communications on the status of cases on what was going on, on working with Grace witnesses, expert, fact, was done through me. And I made the arrangements. The only exception to that was, again, with Casner & Edwards that the process worked that discovery responses, Grace's discovery responses in the underlying cases, those would be -- I would be copied on them. But they would be directly sent to Casner & Edwards and Bob Murphy or the associates at that firm that were actually prepared and would work directly with the local counsel in preparing responses.

Q. Okay. Is it fair to say that you and the local firms, the 50 or so firms that you testified that defended Grace, and the Casner & Edwards firm acted as a group in the defense of asbestos claims asserted against Grace?

A. Yes.

MS. HARDING: Object to

Page 325

form.

Go ahead.

BY MR. BROWN:

Q. Can you describe for me the types of things that that group did in defending Grace against asbestos claims?

A. Virtually everything an attorney would do representing the company in asbestos or any kind of toxic tort case. You know, they responded to complaints, they responded to discovery, they appeared on Grace's behalf at depositions, they tried cases, they negotiated settlements, they participated in defense groups.

Q. Let me just give you an example. A complaint comes in the door. Was it the responsibility of whatever counsel was handling that particular case to look at the complaint, to see if the complaint had procedural defects or the statute of limitations had expired, to do those sort of things?

A. Yeah. The complaints came

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

CPO

Page 326

and generally were served through us. I know some people had systems where local counsel accepted service. We did not do that.

We had a system where when the complaint was entered into the case management system, it automatically sent the complaint to the firm that had been designated as local counsel in that jurisdiction, and that local counsel, once they received the complaint, review the complaint and file an appropriate response and then handle the case.

Q. And an appropriate response might be a motion to dismiss? It could be an Answer?

A. It could be an Answer; it could be a motion to dismiss. You have to keep in mind we don't have to get -- we have to keep in mind the asbestos personal injuries cases in a lot of jurisdictions, a lot of this was kind of institutionalized through case management orders that in some cases, all you had to

PP Obj: R

CPO

Page 327

do was enter an appearance. There wasn't -- some of the analysis because of the repetitious nature of it, that typically if I was involved in a lawsuit today as an in-house lawyer and sent it to somebody, we might sit down and talk about what the Answer is and what the allegations are.

In an asbestos case, again, because there were thousands of them -- in some cases there were actually what I would call form Answers and form Complaints and so on. So it was highly managed by a case management order and the court.

Q. Let me give you an example from my own experience and ask you whether Grace did these sort of things.

I used to do some of the that work when I was a junior associate, and one of the things I was charged with was reviewing complaints and finding out if there were procedural defects with complaints. And sometimes the complaints

PP Obj: R

CPO

Page 328

would come in in a box load and you would look through them and see if they made the statute of limitations, whether they had other procedural defects that might have been peculiar to the given jurisdiction, and, if appropriate, file motions, file preliminary objections. It's called different things in different jurisdictions.

Were your local counsel doing that sort of thing pre-petition?

A. Yes.

MS. HARDING: Object to form. Are you asking him generally did that happen or did it happen with all cases?

MR. BROWN: I am trying to get a sense of how the cases were handled pre-petition, whether motions were filed if it was appropriate.

MS. HARDING: Right. But they have hundreds of thousands of cases. Are you just saying did

PP Obj: R

PP Ctr

Page 329

that ever happen or are you asking if that happened in every case?

MR. BROWN: No.

MS. HARDING: I am asking you because it's not clear.

CPO

MR. BROWN: I am asking him whether in the course of evaluating a case that came in the door, whether it was the responsibility of counsel to look at it for procedural defects and, if appropriate, file a motion and if appropriate, file an answer.

THE WITNESS: Yes.

BY MR. BROWN:

Q. You also mentioned discovery, and I think you said the Casner & Edwards firm, if I understood you correctly, handled Grace's responses to discovery; is that correct?

A. Asbestos personal injury cases, yes.

Q. Okay. How was the discovery that Grace took of claimants handled by

PP Obj: R

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

CPO PP Obj: R

you, by Casner & Edwards, and the other local firms that were defending cases?

MS. HARDING: And I am just going to -- I think you have already taken this into consideration. I will object. To the extent it calls for attorney-client privilege or work product, do not answer. But I don't think you are asking him for that. So I just want to make it clear.

CPO PP Obj: R

THE WITNESS: With a couple of exceptions, which were important but were relatively infrequent, it would be handled by the local counsel. The exceptions are that if we received the deposition notice of a Grace or fact witness of a Grace former employee or an expert, kind of a national asbestos personal injury expert, and we had specific expertise and the fact witness

CPO PP Obj: R

case would generally be Bob Murphy.

But we might have somebody from an outside firm that wasn't specifically assigned a jurisdiction to handle that. But in terms of coworker depositions, plaintiff depositions, developing discovery with respect to a particular job site, that would be handled by the local counsel.

BY MR. BROWN:

Q. Okay. Do I gather from your answer that local counsel, for example, in written discovery depositions would inquire into exposure to Grace products?

A. Yes.

Q. Okay. And product ID sometimes called?

A. Yes.

Q. And how about medical issues?

A. Well, as you may know, if you had some prior involvement with it,

CPO

the answer to the question is yes, although in many jurisdictions and certainly in the major jurisdictions, there tended to be a joint medical defense group. And one firm or one particular -- lawyers would often handle some of the medical records issues and the medical testimony issues in the case on behalf of all of the defendants.

Q. Okay. And did your local counsel look for other causes to a particular claimant's injury? For example, if they were a long-term smoker, would that be an issue that Grace pursued in discovery?

A. Sure.

Q. What other sort of defenses in that regard would Grace inquire into?

A. Smoking, alternative exposures, history, you know, whether the person -- where the person worked and exposure to other people's products, questionable diagnoses in a meso case. We would have it sent out to somebody

CPO

else to review the pathology. All the kinds of things that a defense lawyer in an asbestos case and just more broadly in a personal injury case would do.

They were given relatively broad, they being the local counsel, authority to act on Grace's behalf in defending the cases.

PP Obj: R

Q. Were they told to zealously defend Grace?

PP Ctc

MS. HARDING: Well, object to the extent it calls for attorney-client communications.

CPO PP Obj: R

THE WITNESS: I certainly hope I wouldn't have to tell people to do that since they are members of the bar and they have that ethical obligation.

But, yeah, they were certainly told -- there was a management process, and there were guidelines provided to them to some degree of what they wanted to do and what they shouldn't do.

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

And there were things that I did in terms of resolving cases that would have taken them out.
But, yeah, I think they understood that they were to zealously defend it, and we had some very good lawyers representing us.
BY MR. BROWN:
Q. And was it your responsibility internally to make certain that that happened?
A. Yes.
Q. Now, did you work with any asbestos plaintiffs lawyers? When I say work with them, did you have interaction with any of the big guns in the asbestos bar?
A. Personally?
Q. Yes.
A. Yes.
Q. Who?
A. And I was alluding to this earlier. Most of them, certainly in

terms of the inventory settlement agreements and when we got into the process of settling larger groups, local defense counsel on the asbestos personal injury cases, when it's comes to resolving larger groups, have kind of conflicting motivations.
On one hand, they want to do their client a good service, and they want to get rid of cases as cheaply as possible, but on the other hand, inventory settlements where we might buy up or settle the docket for six months, eight months, even two, three months, settlements like that cause the defense lawyers to lose billable hours in terms of their own businesses, lawyers.
So when we started getting into those negotiations in the larger groups, I would handle them personally. And it was generally in that capacity that I dealt directly with plaintiffs' lawyers.
Q. Okay.

A. And I dealt with most of them, at least at that time. It's been eight years. I am sure it's a new group. But at that point, many of them.
Q. I am not so sure.
Give me some examples.
A. You can go down geographically. I know Perry Weitz, and I have met with Perry Weitz. I know Joe Rice. I know Greitzer & Locks. I have dealt with Dino Vovet (phonetic), Peter Angelos' firm many times. I used to know Mike Kelly who has passed away. I know Jim Ferraro. I know Irving Gonzalez, who is in jail. I know -- who else? I have dealt with -- I know Russell Budd and Fred Baron. I have dealt with Peter Krauss.
Q. You mentioned Mr. Cooney earlier, I think.
A. Cooney, I know John Cooney. I have met with him.
Q. Any others that you can think of?

A. There is probably others I have met with, and I have missed some. But there are some that I haven't met, either because we didn't get into those kinds of discussions or I was comfortable with the ability of our local counsel to negotiate cases and just the need for me to meet with them didn't arise. Particularly in California, the traditional California firms, I don't recall meeting working with Steve Casner, and there are others out there.
Q. All right. Again, we are still focused on the pre-petition time frame.
Was Grace required to obtain the consents of any of the members of the plaintiffs bar with respect to the manner in which Grace defended itself against asbestos claims, any of the gentlemen you just mentioned?
MS. HARDING: Object to form.
THE WITNESS: You will have

to repeat that.
MR. LEWIS: We will have it read back.
(The reporter read from the record as requested.)
MS. HARDING: I am sorry.
MR. LEWIS: I am sorry. I don't understand the question.
MR. BROWN: You are not answering it.
MR. LEWIS: I just object to the question as unintelligible as stated.
MR. BROWN: Do you understand the question?
THE WITNESS: I think so. I think the answer is no, although they would occasionally volunteer information to tell Grace how to defend cases.
BY MR. BROWN:
Q. And you didn't seek their consent?
A. No.

Q. Did the plaintiffs bar participate in the internal decision-making regarding the manner in which Grace defended asbestos claims pre-petition?
A. No.
Q. Did Grace leave it up to the plaintiffs' attorneys to decide how much Grace would pay for a claim?
A. No.
Q. Did Grace consult with the plaintiffs bar with respect to the manner in which Grace and its outside counsel defended claims?
A. No.
Q. Did the plaintiffs' attorneys decide what medical criteria were satisfactory for a settlement with Grace?
A. It was a product of negotiation if there were inventory settlements that had specific objective medical criteria. They didn't dictate to Grace what the medical criteria was.

Q. How about the exposure criteria? Did that dictate that to Grace?
A. No, they didn't.
Q. Did they dictate to Grace the types of proofs that Grace would accept for a settlement?
A. Again, it was a negotiation. But, no, they didn't dictate it.
Q. Did they decide what type of release Grace would accept in exchange for a settlement?
A. No. It's a negotiation.
Q. All right. Again, pre-petition, your title was senior litigation counsel?
A. Yes.
Q. Okay. Did the plaintiff's attorney have the power to remove you if they didn't like the way you were handling the defense of Grace claims?
MS. HARDING: Objection. It's relevance at this point. Go ahead.

THE WITNESS: No, they didn't.
BY MR. BROWN:
Q. Did they control how much you were paid for your job at Grace?
A. No.
MR. BROWN: I might be finished. Let me have a couple of minutes.
(There was a break from 4:11 p.m. to 4:16 p.m.)
BY MR. BROWN:
Q. Mr. Hughes, can I ask you to take a look at what was previously marked Hughes-3?
A. (Witness complies with request.)
MS. HARDING: Exhibit 4 to the Exhibit Book.
MR. LEWIS: Exhibit 4 to the Exhibit Book, which is Exhibit-3 to the deposition.
BY MR. BROWN:
Q. Mr. Hughes, Exhibit-3, there

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d



Page 342

was a question earlier today. It's the Trust Distribution Procedures, correct?
A. Yes.
Q. And I think you indicated that you did not draft this document; do I have that correct?
A. Yes.
Q. I believe you said the ACC, asbestos claimants committee, drafted the document; is that correct?
MR. LIESEMER: Object to the form of the question.
THE WITNESS: That was my understanding, yes.
BY MR. BROWN:
Q. Okay. And you indicated that you had reviewed the document?
A. Yes, I have.
Q. And if I remember your testimony correctly, you indicated that you were given an opportunity to comment on the document?
A. Yes.
Q. I believe you also stated

Page 343

that you didn't recall any comment that you had on the document; is that correct?
A. I didn't recall any specific comment. I recall that there were some comments I had made.
Q. Okay. Do you recall what those comments were?
A. Not as I sit here today, no.
Q. Okay. I think you were also asked who else at Grace reviewed the document, and I believe your answer was your outside counsel did, reviewed it; do I have that right?
A. Yes.
Q. Other than you and your outside counsel, are you aware of anyone else that reviewed and drafted the TDP on the Grace side?
A. I don't know if Richard Finke or Mark Shelnitz, our general counsel, had taken a look at it at that time. Perhaps Richard was asked about that question when he was deposed. But they would be the other logical

Page 344

candidates who may have taken a look at it.
Q. Okay. And the Trust Distribution Procedures are the procedures pursuant to which asbestos personal injury claims are to be handled if the Plan is confirmed, correct?
A. Right, by the Trust.
MR. BROWN: Okay. All right. I am going to pass you to Mr. Cohn. Thank you.

- - -

EXAMINATION

- - -

BY MR. JACOB COHN:
Q. Good afternoon, Mr. Hughes. Jacob Cohn for Federal Insurance Company. How are you?
MS. HARDING: Did you all join in somebody's 30(b)(6)?
MR. JACOB COHN: No. I am participating as a party in interest here.
MS. HARDING: So just to be

Page 345

clear, you didn't notice the dep and you didn't join anybody else's notice?
MR. JACOB COHN: No. I am just a party to the case, and I came to the deposition. And I am entitled to cross-examine, so I am.
BY MR. JACOB COHN:
Q. Now, Mr. Hughes --
MS. HARDING: There are a lot of people who want to ask questions today. Do you have a sense of how long it will take?
MR. JACOB COHN: I would think no more than 15 to 20 minutes, hopefully less.
MS. HARDING: All right. I think in the interest of not having to come back, I will go forward, but I --
MR. JACOB COHN: You are burning --
MS. HARDING: I will State

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

an objection on the record that you didn't notice the deposition.

MR. JACOB COHN: I don't understand that to be a bona fide deposition objection.

MS. DeCRISTOFARO: At one point, there was an email that said in the interest of not having a notice, that not everyone needed to serve separate notices.

MR. JACOB COHN: Everything is on the record.

BY MR. JACOB COHN:

Q. From 1989 to 2001, you were principally in charge of handling asbestos claims against Grace, correct?

A. Asbestos personal injury claims, yes.

Q. And from 1989 to 2001 Grace was a for-profit business corporation, correct?

A. Yes.

Q. So your goal was to minimize the amount of money that Grace had to pay

in the defense and settlement and resolution of asbestos PI claims, correct?

A. Yes.

Q. Now, just looking for a moment at what was marked Hughes-12, which is Exhibit 6 to the Exhibit Book from the Plan, if you would just take a quick look at the Schedule 2.

Now, Schedule 2, am I correct, these are insurance companies that had settlement agreements where they paid a lump sum of money to Grace and received a release for policy obligation; would that be correct?

A. That's my understanding.

Q. Okay. And, for example, Federal Insurance Company, my client, has a settlement for one of its policies, and I will represent to you that they paid $300,000 in 1997 to settle a $500,000 sub-limit.

Now, that $300,000 was put into Grace's treasury; is that right?

MS. HARDING: Object to form and foundation.

MR. JACOB COHN: Whatever. You can answer.

THE WITNESS: I assume so, yes.

BY MR. JACOB COHN:

Q. So that became part of the money that would be available to you, whatever settlement would come in to pay for the resolution of asbestos PI claims, correct?

MS. HARDING: Object to form.

THE WITNESS: Well, again, I don't -- yeah. I mean, perhaps indirectly. But there was $300,000 that was settled and $300,000 was entered -- became Grace's property, and Grace settled cases as part of its business operations.

BY MR. JACOB COHN:

Q. And Grace would typically

have to promise the insurer to use those funds to pay for the resolution of asbestos claims; is that accurate?

MS. HARDING: Object to form, in terms of typically.

THE WITNESS: Yeah, I guess it's an accounting matter they would apply it to asbestos liabilities.

BY MR. JACOB COHN:

Q. All right. Now, Schedule 3 is listed as schedule Asbestos Insurance Reimbursement Agreements, right?

A. Right.

Q. Now, those are what would be typically called a coverage in place agreement; would you agree with that terminology?

A. Yes.

Q. Okay. So as I understand from Grace's Securities and Exchange Commission filings, most of these agreements require the insurer to pay a portion of every claim that Grace settles

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 350

that triggers their policy; would that be right?

MS. HARDING: Object to form and object to asking him questions about generally insurance settlement agreements.

MR. JACOB COHN: Okay.

MS. HARDING: Every agreement is different.

MR. JACOB COHN: That's fine.

BY MR. JACOB COHN:

Q. Can I rely upon Grace's SEC filings?

A. Yes.

Q. Okay. So can you describe to me the policies that are identified in those filings as policies that pay on a pro rata basis, how the money would be spent and recouped from those insurers?

MS. HARDING: Object to form.

THE WITNESS: We certainly had arrangements with insurance

Page 351

companies that provided that they would pay us a percentage or a pro rata portion of the money we spent that triggered their policy that we spent on asbestos claims.

BY MR. JACOB COHN:

Q. And Grace itself paid a portion of every dollar that was spent to resolve an asbestos claim, correct?

A. I think we generally paid it in the first instance and was reimbursed under these kinds of agreements, but yes.

Q. And typically how much of every dollar that you paid out would you be reimbursed from one of these agreements?

MS. HARDING: Object to form, foundation.

Go ahead.

THE WITNESS: Again, it would vary, but based on valuation we do on the 1.7 billion and the 500 million I referred to earlier, I think 25 cents on the dollar, 30

Page 352

cents on the dollar.

BY MR. JACOB COHN:

Q. Would come back in?

A. Again, it would vary depending on where we were in terms of the coverage, yes, we would be reimbursed. And it varied when, you know, during the time period. There is a lot of factors that go into that. And I don't think you can answer it definitively, but it certainly would be in the range I mentioned for some period of the time.

Q. And Grace believed it could do a better job of handling the claims by itself without having the insurers be involved; is that accurate?

MS. HARDING: Object to form.

THE WITNESS: Whether or not we thought we could do a better job or the insurance carriers would prefer that we did it, the evolution of it was that Grace

Page 353

handled it itself?

BY MR. JACOB COHN:

Q. Okay. And at all times, while you were there, Grace endeavored to minimize the amount of money it had paid to resolve asbestos claims; is that fair to say?

A. Yes.

Q. Now, in 2005, there was a conference call between Grace and its insurers. Were you a participant in that call?

A. I don't specifically recall, but I may have been.

Q. Do you remember any discussion between Grace and its insurers to the effect that Grace was not ready to deal with its high level excess insurers?

A. In what sense not ready?

Q. In the sense of , in the course of the bankruptcy proceedings, W.R. Grace communicating that sentiment to its non-settled high level insurers?

A. I don't recall that

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

conversation.

Q. You said you were given a chance to review the TDPs in 2008 -- I am sorry. Was it 2008?

A. Yeah, it would have been 2008.

Q. Okay. Now, at that point in time, Grace's obligations pursuant to the settlement it reached in April 2008 were established, correct?

MS. HARDING: Object to form.

THE WITNESS: Yes. There had been a Term Sheet and an agreement reached.

BY MR. JACOB COHN:

Q. There was a defined amount of money and other things that Grace was going to give to the Trust to settle its asbestos liabilities; is that right?

A. Yes.

MS. HARDING: Well, just object to form.

THE WITNESS: Asbestos

personal injury liabilities.

BY MR. JACOB COHN:

Q. And is it fair to say that thereafter, the most significant interest that Grace had in the TDPs was insuring that it obtained the 75 percent or greater vote from the asbestos PI claimants?

MS. HARDING: Object to form.

THE WITNESS: It was important to Grace that we emerge from bankruptcy and that the Trust and so on and the Plan proceed so that the reorganized company could emerge from bankruptcy and be free from its asbestos liabilities. That was the purpose of the Chapter 11, and that was obviously Grace's interest.

BY MR. JACOB COHN:

Q. So is the answer to my prior question yes, getting 75 percent super majority approval by the asbestos

constituencies was the most important consideration to Grace in reviewing the TDPs?

MR. LIESEMER: Object to the form.

MS. HARDING: Object to the form.

THE WITNESS: I think that the most important consideration to Grace in the TDP was that they were, from a legal standpoint, sufficiently consistent with, to the extent they had to be, consistent with the prior practice and that they were a reasonable means of processing and paying claims so that the Plan would be confirmed.

BY MR. JACOB COHN:

Q. So it was important at this point -- strike that.

At this point, Grace had no additional financial interest in how asbestos claims were handled; is that

correct?

MS. HARDING: Object to the form.

THE WITNESS: Well, that's not necessarily correct. But we certainly had -- since our obligation to fund the Trust, personal injury Trust, was fixed, both in terms of the payments that were to be made at the time of emergence and the payments off in the future, then I guess to that extent, yeah, we had already established what our liability was. And our concern was that the Trust Distribution Procedures were met whatever legal criteria that were necessary and that the Plan be confirmed.

BY MR. JACOB COHN:

Q. So as of the time that the settlement was reached, your concern with the TDPs was that they enable a Plan to be confirmed in a way that would enable

Page 358

Grace to have finality with respect to its asbestos obligations and emerge as a for-profit corporation again?

MS. HARDING: Object to form. I think it mischaracterizes and doesn't completely accurately summarize what he just said regarding legal criteria.

BY MR. JACOB COHN:

Q. Would you agree with what I just said?

A. No. We operated in bankruptcy as a for-profit company. I think our goal would be to operate as a corporation unencumbered by asbestos liabilities.

MR. JACOB COHN: No further questions. Thanks.

\- - -

EXAMINATION

\- - -

BY MS. SIMON:

Q. Good afternoon. My name is Marnie Simon. I represent Fireman's Fund

Page 359

Insurance Company and the Allianz related entities.

A. Sure.

Q. I believe you testified when speaking with Michael Brown that reviewing the GEICO policies under, I think it was, Exhibit-12 here and Exhibit 6 to the Plan Asbestos Insurance Transfer Agreement, I believe you testified there that to your knowledge, GEICO had not -- there were no agreements between Grace and GEICO in terms of GEICO ceding or waiving its rights under those excess policies; is that correct?

A. Yes.

Q. And would you answer --

A. That I was aware of.

Q. That you were aware of.

And would your answer be the same for the Fireman's Fund and Allianz companies?

A. You are talking with respect to the excess insurance policies?

Q. The excess policies of

Page 360

Allianz on page 1 of Schedule 1, the Fireman's Fund policies on page 7 of Schedule 1, and then the Reunion - Adriatica policy on page 16.

MS. MAHALEY: I object to the form of the question.

BY MS. SIMON:

Q. Are you aware of any agreements with those insurance companies to waive their rights under their excess policies that was in place with Grace pre-petition?

A. No, I am not.

MS. HARDING: Object to form.

MS. SIMON: That's all.

\- - -

EXAMINATION

\- - -

BY MS. McCABE:

Q. Good afternoon, Mr. Hughes. My name is Eileen McCabe, and I here today --

A. I remember you Eileen.

Page 361

Q. I am here today on behalf of AXA Belgium as a successor to Royale Belge.

And just to make this go quickly, if I could follow up with the same questions that were just asked to you with regard to the Royale Belge policies that appear on page 16 of what's been designated Hughes Exhibit-12. There are three policies that are identified there for excess policies.

Are you aware of any agreement that Royale Belge had pre-petition pursuant to Royale Belge ceded or waived any of its excess policies as listed on that policy?

MS. HARDING: Object to form.

THE WITNESS: No, I am not.

MS. McCABE: That's it.

\- - -

EXAMINATION

\- - -

BY MR. SCHIAVONI:

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Arrowood

Q. Mr. Hughes, hi. I am Tank Schiavoni from O'Melveny for Arrowwood.
Mr. Hughes, you were asked some questions about BNSF. Do you recall that generally?
A. Yes.
Q. BNSF was asking about or their counsel was asking about whether claims against them were broadly covered in the policy issues to Grace.
Do you remember that line of questioning, just the line of questioning generally?
A. Yes.
Q. In February of 2006, did Royal give notice to you and to Grace that BNSF was seeking coverage from Royal under Grace's Zonolite policies for claims against BNSF by Libby claimants?
A. I recall discussions at that period of time between Grace and Royal concerning BNSF claims, yes.
MR. SCHIAVONI: 13 is next.
(Hughes-13 marked for

Arrowood

identification at this time.)
BY MR. SCHIAVONI:
Q. Would you take a minute to read Exhibit-13. And then my question, Mr. Hughes, is whether you have seen Exhibit-13 before.
A. I do recall seeing this, yes.
Q. And can you tell us what Exhibit-13 is?
A. It's a letter from Carl Pernicone to me dated February 24th, 2006, and he is writing on behalf of Royal, advising Grace that BNSF Railway is seeking coverage from Royal under the Zonolite policies for the Libby claims.
Q. Okay. And did you receive a copy of Exhibit-13 on or about February 24, 2006?
A. I believe so.
Q. And --
A. Although it looks like the stamp is March, but...
Q. You may have received it as

Arrowood

late as March, right?
A. Uh-huh.
Q. And did you receive a copy of Exhibit-13 in the ordinary course of your business?
A. Yes.
Q. Okay. And having reviewed Exhibit-13, does it refresh your memory that Royal gave you notice in February of 2006 that BNSF was seeking coverage from Royal under Grace's Zonolite policies for claims asserted against BNSF by the Libby claimants?
A. Yes.
Q. Did Royal provide Grace with a copy of the January 31 letter from BNSF to Royal demanding coverage under Grace's Zonolite policies?
A. Yes.
Q. Am I correct that Royal advised Grace in February of 2006 that Royal had declined to accept the tender of claims by BNSF under Grace's Zonolite policies?

Arrowood

A. Yes.
Q. Am I also correct that in February of 2006, Royal advised Grace that it was referring to Grace the BNSF claims that were being made under the Grace Zonolite policies?
A. Repeat that question.
MS. HARDING: Object to form.
MR. SCHIAVONI: Why don't is we have it read again.
(The reporter read from the record as requested.)
THE WITNESS: Yes.
BY MR. SCHIAVONI:
Q. Is one of the things that Royal did in February of 2006 was invoke the indemnity of the 1995 settlement agreement that it had with Grace?
A. Yes, it did.
Q. Am I correct in May of 2006, Grace joined Royal in jointly responding to BNSF's request for coverage under the Grace's Zonolite policies?

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Arrowood

Page 366

A. Yes.
Q. And am I correct, Mr. Hughes, that Grace advised BNSF in May of 2006 that Royal had fully discharged and satisfied any obligation it may have owed to Grace for asbestos-related claims under the Zonolite policies?
MS. HARDING: Object to form.
But go ahead.
THE WITNESS: Yeah, my recollection was that that was the general message in the letter.
BY MR. SCHIAVONI:
Q. Is it also true, Mr. Hughes, that Grace told Royal -- and this is in May of 2006 -- that Royal had fully discharged and satisfied any obligations it may have owed to Grace for asbestos-related claims under the Zonolite policies?
A. We may have told them that, but the agreement itself had -- I think

Arrowood

Page 367

the answer to your question is yes.
MR. SCHIAVONI: Okay. I am going to hand you a copy, and we will mark this as Exhibit-14.
(Hughes-14 marked for identification at this time.)
BY MR. SCHIAVONI:
Q. Have you seen a copy of Exhibit-14 before, Mr. Hughes?
A. Yes, I have.
Q. And can you tell us what it is generally?
A. It's a letter on Wilson Elser letterhead that was sent by Royal and Grace to attorneys for BNSF Railway in Montana indicating that we had -- that Royal had discharged its obligations under the policies and that if they intended to proceed against Grace, that we would have to take action in the bankruptcy court.
Q. Mr. Hughes, on the second page of this letter, the page that's marked GCO 000200, does your signature

Arrowood

Page 368

appear on the bottom?
A. Somebody signed it on my behalf. Anybody who knows my writing knows that's definitely not my writing.
Q. Did you authorize had person to sign on your behalf?
A. Yes.
Q. And were you authorized to enter into this letter on behalf of Grace?
A. Yes, I was.
Q. And your entry into this letter or author -- was your authorization of this letter part of the ordinary course of your duties at Grace?
A. Yes.
Q. Were the statements that are made in Exhibit-14 true and correct when they were made?
A. I believe so, yes.
Q. Prior to issuing the May 5th letter that's marked as Exhibit-14, did you review the 1995 Grace/Royal settlement?

Arrowood

Page 369

A. Yes, I did.
Q. And prior to issuing the May 5, 2006 letter that's marked as Exhibit-14, did you have occasion to speak to anybody at Grace who was involved in the 1995 Grace/Royal settlement?
A. Yes.
Q. And did you speak to Mr. Posner?
A. Yes, I did.
Q. Did you speak to anyone else?
A. I think that Mr. Finke and Grace counsel were also involved in this letter.
Q. And am I correct that in May of 2006, one of the other things you did was that you advised BNSF that Grace had fully and finally released Royal from any further liability for asbestos-related claims under the Grace/Zonolite policies?
MR. LEWIS: Objection, leading.

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Arrowood

Page 370

MR. SCHIAVONI: All right. I will rephrase the question.
BY MR. SCHIAVONI:
Q. Did you --
MR. JACOB COHN: This is cross.
MR. LEWIS: It's not cross. These guys are in perfect symphony here.
BY MR. SCHIAVONI:
Q. In May of 2006, Mr. Hughes, did you advise BNSF on behalf of Grace that Grace had fully and finally released Royal from any further liability for asbestos-related claims under the Grace/Zonolite policies?
MR. LEWIS: Same objection, leading.
THE WITNESS: This letter says that.
BY MR. SCHIAVONI:
Q. And that's a statement you authorized to be made to BNSF, right?
MR. LEWIS: Same objection,

Arrowood

Page 371

leading.
THE WITNESS: Yes. Grace authorized, yes.
BY MR. SCHIAVONI:
Q. And, Mr. Hughes, did you believe that statement to be a true and correct statement at the time it was made?
MR. LEWIS: Objection, asked and answered.
THE WITNESS: Yes.
BY MR. SCHIAVONI:
Q. And is one of the other -- strike that.
Mr. Hughes, did you also advise BNSF in May of 2006 that there was no basis for BNSF to pursue coverage from Royal for asbestos-related claims under the Grace/Zonolite policies?
MR. LEWIS: Objection, leading.
THE WITNESS: Where does it say that in this letter?
BY MR. SCHIAVONI:

Arrowood

Page 372

Q. Let's look together.
A. "There is no basis for BNSF to pursue coverage from Royal for asbestos related claims under the Zonolite policies," is the final sentence of the first paragraph on page 2. But that's not how I understood your question.
Q. Let me see if I can ask it again. Okay.
In May of 2006, did you advise BNSF that there was no basis for BNSF to pursue coverage from Royal for asbestos-related claims under the Zonolite policies?
A. Yes.
MR. LEWIS: Objection, leading. Let the record reflect that the witness answered before I had an opportunity to state my objection.
BY MR. SCHIAVONI:
Q. And was that a true and correct statement when it was made?

Arrowood

Page 373

MR. LEWIS: Objection, asked and answered.
THE WITNESS: Yes.
BY MR. SCHIAVONI:
Q. You were asked some questions by Libby's counsel about your knowledge of the exposure that the manner in which folks were exposed in Libby.
Do you recall generally those questions?
A. Yes.
Q. Do you have any personal knowledge based on your own observations of how anybody in Libby was, in fact, exposed to asbestos?
MR. LEWIS: Objection. That question is loaded up and leading.
MS. HARDING: I will object to form as well.
Go ahead.
THE WITNESS: I never was personally present at the Libby mine and mill and the Libby operation, but there is a

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Arrowood

Page 374

substantial amount of documentary evidence and scientific evidence, industrial hygiene records and so on concerning the exposure levels of employees at the mine and mill. And my earlier testimony was based on my familiarity generally with that information.

BY MR. SCHIAVONI:

Q. Okay. So you were relying on general documentation about things that occurred in Libby; is that right?

MS. HARDING: Object to form as to things that occurred in Libby.

But go ahead.

THE WITNESS: I was relying on air sampling data that had been collected by the company, by the State of Montana, by the United States Federal Government, by insurance carriers providing coverage to Grace, I believe as well on air sampling and personal

Arrowood

Page 375

air sampling that was for employees involved in the mine and milling of vermiculite. So I think that's a significant body of data out there, and that's what I was relying on.

BY MR. SCHIAVONI:

Q. Would it be fair to say that you can't offer any testimony about how any individual Libby claimant was, in fact, exposed to asbestos based on any personal knowledge that you might have with regard to that Libby claimant?

MS. HARDING: Objection.

MR. LEWIS: Objection, leading.

MS. HARDING: Objection to form and to the broad characterization of Libby claimant.

THE WITNESS: Again, I was never present in Libby during the manufacture and mining and milling of vermiculite and vermiculite

Arrowood

Page 376

concentrate. So to that extent, no.

But, again, there is a body of data out there that I am very familiar with that was created by various individuals, trained industrial hygienists, measuring the exposures associated with the Libby work, and that's what was the basis for what my earlier testimony.

BY MR. SCHIAVONI:

Q. Is it true that some of the people in Libby that have brought claims against Grace also asserted that they were exposed to asbestos from non-Grace sources?

A. Yes.

Q. Okay. And the lumber yard out there is one such source, right?

A. Yes.

Q. And is it also true that some of the people in Libby have identified other sources of asbestos that

Arrowood

Page 377

are unrelated to Grace besides the lumber yard?

A. Yes.

Q. You were shown a copy of Exhibit Hughes-1. Let me hand you what was previously marked as Exhibit-1.

Did you prepare Exhibit-1?

A. No.

Q. Was Exhibit-1 prepared under your supervision?

A. No. I think I testified to this earlier that I was involved in the collection of the data a lot of which is reported in the report. But Mr. Port didn't directly report to me, and I didn't draft the report itself or the attached tables.

Q. So some of the data in Exhibit-1 may have been collected by you, but you didn't prepare the exhibit and you didn't supervise its preparation; is that right?

A. No.

MS. HARDING: His question

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Arrowood
CPO
PP Obj: R
PP Obj: R; Lo; S
PP Obj: R; S
PP Obj: R; BE
PP Obj: R; S; LO
PP Obj: R; Lo; S

was correct, that you didn't -- it
was one of those backwards things.
THE WITNESS: Sorry.
BY MR. SCHIAVONI:
Q. Some of your data may be in Exhibit-1, but you didn't prepare Exhibit-1 and you didn't supervise the preparation of Exhibit-1; is that right?
A. I did not prepare Exhibit-1, nor did I supervise the preparation of Exhibit-1.
Q. The 1995 Grace/Royal settlement covered policies issued to the Zonolite Company; is that generally right?
A. Yes.
Q. Okay. Are you aware whether Royal's also alleged to have issued, entirely separate from that, a high level excess policy in the 1980s to Grace?
A. I learned that in connection with the bankruptcy. I am not sure I knew that beforehand.
Q. Okay. But sitting here

today, you are familiar with the fact that there is a separate high level excess policy that Royal has issued in '80s to Grace; is that right?
A. I believe so, yes.
Q. And Mr. Brown asked you some questions about whether or not rights to associate in the defense and to cooperated had been ceded by his clients to Grace.
Do you remember those questions generally?
MS. HARDING: Object to form.
But go ahead.
MR. SCHIAVONI: All right.
THE WITNESS: There are questions about it. I think the question was whether we had waived or all agreed, and the answer was no, I wasn't aware of any such agreement.
BY MR. SCHIAVONI:
Q. Has either Royal or

Arrowwood ceded or in any way waived or given up any of its rights to associate in the defense or cooperate or any other rights under its high level excess policy?
A. Not that I am aware of.
MS. HARDING: Object the form with respect to rights.
BY MR. SCHIAVONI:
Q. And am I correct that prior to the bankruptcy filing, Grace hadn't tendered any claims to Royal under that high level excess policy?
A. I don't know the extent to which we were tendered claims pre-petition to high level excess policies. Generally, the notice of the claims was done by our insurance broker.
Q. Okay. So you don't know one way or the other?
A. I don't.
MR. SCHIAVONI: That's all I have. Thank you, Mr. Hughes.
- - -

EXAMINATION
- - -
BY MR. IFFT:
Q. Good afternoon, Mr. Hughes.
A. Good afternoon.
Q. My name is Richard Ifft. I represent Maryland Casualty Company and two Zurich entities, Zurich Insurance Company and Zurich Insurance Bermuda Company.
A. Okay.
Q. I am not, I think, going to ask many questions about Maryland Casualty today.
With respect to Zurich, I will represent to you that the two Zurich entities issued a number of high level excess policies, and I will direct your attention to what we have marked as Exhibit-12, the Exhibit 6 to the Exhibit Book for the Plan.
Directing your attention to Schedule 1, page 20, you will see there is about 11 or so participations on that

Page 382

last page.
A. Yes.
Q. If I were to ask you the same questions that other carriers have asked you, if you are aware of any waivers by any of the Zurich entities of their rights under the policy, are you aware of that with respect to those policies?
A. No, I am not.
MS. HARDING: Object to form --
MR. LIESEMER: Object to form.
MS. HARDING: -- as to rights.
BY MR. IFFT:
Q. You are aware, Mr. Hughes, that the excess insurers under their policies typically have certain rights with respect to their ability to be involved with respect to the handling of the claims against Grace?
A. Yes.

Page 383

MR. LIESEMER: Object to the form.
BY MR. IFFT:
Q. And is it your testimony that you are not aware of any waiver of any such rights by the Zurich companies with respect to their policies?
MS. HARDING: Object to form again.
But go ahead.
MR. IFFT: You can answer.
THE WITNESS: I am not aware of any.
BY MR. IFFT:
Q. Let me direct your attention to Schedule 3. I will represent to you that this is the Schedule of Asbestos Insurance Reimbursement Agreements, and you will see at the bottom there is one agreement with Zurich International with respect to, I will represent to you, one of those 11 policies.
Do you happen to be familiar with that agreement, sitting here today?

Page 384

A. No, I am not.
Q. I think you testified that you had some familiarity with Asbestos Insurance Reimbursement Agreements generally, correct?
A. Yes.
Q. And what's your understanding as to how those typically work?
A. They typically would work that as the costs were incurred under -- we would agree in terms of how it was allocated, but Grace had a model in terms of how the terms were allocated on different policies. And to the extent the policy was triggered that the party, in this case Zurich International, would pay Grace or reimburse Grace for some portion of the costs that were incurred for those claims.
Q. Pursuant to a defined percentage in the agreement?
A. Defined percentage, generally, yes.

Page 385

Q. Do those agreements also typically have any provisions that on their face alter the rights that otherwise might exist under the policy with respect to the insurer's involvement in the claims?
MS. HARDING: Object to form.
MR. LIESEMER: Join.
THE WITNESS: I think that would vary. My understanding would be generally no, but I think that it certainly -- I would have to look at the individual agreement to comfortably say that.
BY MR. IFFT:
Q. Okay. You are not sure, sitting here today?
A. I am not sure, but you are also ask asking me specifically about agreements. And your other questions were generally in the absence, but here there were agreements. And I have to look at the individual agreements before