Page 386

making a blanket statement about what they provide and what they don't provide.
Q. Fair enough. They may or may not have, and you would have to look at the agreement?
A. Right.
MR. IFFT: I don't have anything further.
- - -
EXAMINATION
- - -
BY MS. DeCRISTOFARO:
Q. Good afternoon, Mr. Hughes, my name is Elizabeth DeCristofaro. I represent a group of insurance companies, Continental Insurance Company, Continental Casualty, generally referred to as the CNA Insurance Companies.
And you are familiar that the CNA Insurance Companies issued insurance policies to Grace?
A. Yes.
Q. I am trying to do this without having to take you through a

Page 387

number of names and policies.
You are aware that some of the policies issued by the CNA Companies to Grace were high level excess policies; is that correct?
A. Yes.
Q. And there has been no settlement or other agreements affecting those high level high level excess policies; is that correct?
MS. HARDING: Object to form.
Go ahead.
THE WITNESS: That's my understanding, yes.
BY MS. DeCRISTOFARO:
Q. So to follow up on the questions you were asked previously, you are not aware of any agreement in which the companies that issued those high level excess policies waived or surrendered any rights under those policies?
MR. LIESEMER: Object to

Page 388

form.
MS. HARDING: Object the form.
THE WITNESS: No, I am not aware of any agreement.
MS. DeCRISTOFARO: Then I have no further questions.
MS. HARDING: We are done in the room. Elisa, do you want to go?
- - -
EXAMINATION
- - -
BY MS. ALCABES:
Q. Hi. This is Elisa Alcabes from Simpson, Thacher & Bartlett, Mr. Hughes. I am counsel for Travelers Casualty and Surety Company previously known AETNA.
A. Yes.
Q. You mentioned before that you had involvement in the reimbursement agreement pre-petition; is that correct?
A. Yes.

Page 389

Q. And I believe you said that you were in part responsible for insuring that Grace undertook its obligations under the reimbursement agreement?
A. Yes. And I was involved in disputes that arose concerning those obligation.
Q. With respect to allocation, I believe you just mentioned that there was a model that Grace used; is that correct?
MS. HARDING: Object to form. It misstates the testimony but go ahead.
THE WITNESS: Yes.
BY MS. ALCABES:
Q. Can you just explain a little bit more how Grace allocated or performed allocation that was necessary under the reimbursement agreement?
A. I can tell you who did it, I can tell you that it was done, but I can't give you specifics and the details of how that was done.

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 442

MS. HARDING: Same objection.

BY MR. LEWIS:

Q. Did the policy purport to extinguish BNSF's indemnification rights under the Royal policies?

MR. SCHIAVONI: Objection to form.

MR. LEWIS: I misspoke.

BY MR. LEWIS:

Q. Did the settlement with Royal Indemnity purport to extinguish BNSF's indemnification rights under policies issued by Royal Indemnity?

MR. SCHIAVONI: Objection to form.

MS. HARDING: Same objection.

THE WITNESS: Again, the indemnification rights of BNSF is what I don't understand. Of the agreement, Royal had indemnification rights against Grace for claims made by third

Page 443

parties that met the definition of arising out of the insurance policies in question. So I am not sure I understand your question.

BY MR. LEWIS:

Q. Well, you testified earlier, you corrected the record and went back after a break, and said that there were policies that protected BNSF, independent policies.

Do you recall that testimony?

A. Yes.

Q. Were some of those policies with Royal Indemnity?

MS. HARDING: Object to form and foundation.

THE WITNESS: Yes.

BY MR. LEWIS:

Q. All right. If they were independent policies that provided indemnification coverage under the policy to BNSF, how could BNSF's rights be extinguished under the settlement

BNSF

Page 444

agreement you had with Royal Indemnity?

MS. HARDING: Objection to form.

MR. SCHIAVONI: Objection. No foundation, it's an incomplete hypothetical, and it mischaracterizes prior testimony. He didn't say there was such prior policy. He said that he had heard an allegation or read some letter. He said he never saw such policies.

MR. LEWIS: Sorry. He just said he did see --

MR. SCHIAVONI: You misled him. You frankly misled him.

MR. LEWIS: I didn't mislead him.

MS. DeCRISTOFARO: Yes, because you mischaracterized his testimony.

MR. SCHIAVONI: That's what we objected to. He never saw such a policy. Ask him right now.

Page 445

MR. LEWIS: He testified after a break that Grace purchased independent policies that provided coverage to BNSF.

BY MR. LEWIS:

Q. That was your testimony, correct?

A. I don't think that's what I testified to. I think that prior to the break, I had testified that there were two -- it is my understanding there were two allegations by BNSF of possible insurance coverage related to the loading facility at Libby, Montana in the railroads, the right-of-way, and that I had testified beforehand that I had heard and was aware of documents and letters concerning the existence of support for the allegation that they had been named as an additional insured under the Grace comprehensive general liability policies.

And I think I corrected that and said that the letters and the information I was talking about indicated

PP Ctr

Arrowood Obj: LPK

PP Obj: BE; F; S

CNA Obj: R; BE; H

Page 446

that there were policies that Grace had purchased and that -- for BNSF rather than being named as additional insured under the Grace policies.

Q. That's my understanding of your testimony, sir. So Grace purchased policies that covered BNSF, correct?

MR. SCHIAVONI: Objection. That's not what he testified to.

THE WITNESS: I haven't seen the policies. I said I was shown correspondence, and the correspondence I was referring to that I had seen before indicated that there were policies of that kind. But I hadn't seen the policies. I hadn't seen the policies.

BY MR. LEWIS:

Q. You had been identified as Grace's 30(b)(6) designated witness on the subject of these insurance policies.

Is it your testimony now --

A. Well, I testified --

Page 447

Q. Let me finish my question.

A. Let me finish.

Q. No. I had the floor. I would like to finish my question. Okay?

A. Go ahead.

Q. I am not being disrespectful.

A. No. I understand.

Q. I lost my train of thought now. I am getting old.

MR. LEWIS: Read back my question, please.

MR. SCHIAVONI: By the way, that not within the scope of your 30(b)(6) notice. You have questions about Maryland Casualty. You have no such questions about Royal.

So you are not seeking or -- you didn't seek when you noticed this corporate designee testimony. You can only be questioning this witness as a fact witness on these issues, and he's already told you

Page 448

that he doesn't know. He hasn't seen such a policy.

It's utterly improper for you to ask him in the context where you haven't served a 30(b)(6) notice on the topic to give you corporate designee top testimony on the topic.

MR. LEWIS: Are you finished?

MR. SCHIAVONI: No. Are you finished, sir, because you are questioning the witness about something outside of the notice and after 5:00.

MR. LEWIS: These are the insurance areas that were designated for this witness, if you want to complete the record: Number one, Grace's insurance policies whether owned by Grace or purchased from another entity, coverage issues and settlement with insurers.

Page 449

MR. SCHIAVONI: This is Zonolite, my friend. This is not Grace.

MR. LEWIS: Grace is the successor to Zonolite.

MR. SCHIAVONI: Was that on your notice?

MS. HARDING: All right. It's very late, and I am going to suggest -- I suggest the witness can answer questions that the witness knows about and can't what the witness doesn't know about. And we have identified Mr. Posner has somebody who is very knowledgeable about Grace's insurance, and he's already deposed for an entire day on some of these issues. And everybody had a chance to ask him any question they wanted to ask.

Just ask this witness questions. If he knows the answer, he knows the answer. If

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 458

Q. Who signed the great, can you tell?
A. For who?
Q. Zonolite.
A. There is no signature on this copy I have in front of me.
Q. All right. So you can't testify that this contract was ever entered into by Zonolite with BNSF or Great Northern?
A. Well, it's not signed by either party.
Q. Okay.
A. This particular copy.
Q. Do you agree that -- well, I will ask it this way: Did Grace agree to indemnify the railroad with respect to liability relating to the loading facility at Libby?
MS. HARDING: Object to form and foundation.
THE WITNESS: Assuming the agreement was entered into?
BY MR. LEWIS:

Page 459

Q. Well, I am asking -- no, I am asking you what you know about that.
From your own knowledge, did Zonolite or Grace, or and Grace, agree to indemnify the railroad contractually for liability relating to that citing in Libby?
MS. HARDING: I will object on foundation to the extent you know.
MR. LEWIS: If he doesn't know, he can say he doesn't know.
THE WITNESS: I don't know. I would have to see a document, this document and certainly correspondence which would imply that. But I don't see anything directly evidencing that kind of agreement between Grace, Zonolite, and the railroad.
BY MR. LEWIS:
Q. Did Zonolite agree to purchase insurance at any time to provide -- to provide coverage for BNSF,

Page 460

if you know?
MR. SCHIAVONI: Objection to form, no foundation.
THE WITNESS: Again, there are documents that would indicate that that was the case, but I haven't seen any of the policies.
BY MR. LEWIS:
Q. Does Grace have copies of the insurance policies?
MS. HARDING: I will object to the form.
THE WITNESS: Grace has copies of insurance policies.
BY MR. LEWIS:
Q. We have requested those, and Grace has not provided those to us. Where are those policies kept?
MS. HARDING: Objection to form. I think you asked him does Grace have copies of insurance policies, and he said yes, we have copies of insurance policies.
Secondly, we have no

Page 461

document request for those insurance policies.
MR. LEWIS: We requested that you provide us copies of --
MS. HARDING: I don't know if we have them, but I don't think we have a document request outstanding for any policies.
MS. BAER: There is a document request for insurance policies related to Arrowwood, CNA, and Maryland Casualty. The insurance policies have been loaded into the confidential database only very recently because only very recently did Judge Fitzgerald enter the order on the confidentiality permitting us to do so.
But those have been put into a confidential database. A letter went out I believe about a week ago, informing everybody and telling them how to get into the

BNSF
Arrowood Obj: S; F; LPK
PP Obj: BE; F
PP Ctr

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 466

indemnification to Royal, and we have the correspondence that is present before us to show the handling of those claims, correct?

A. Right.

Q. And what I am asking you to assume is that, let's say, the same hypothetical exactly that we used in the State of Montana situation. A Libby claimant brings a suit against BNSF, it goes to verdict and judgment, and you get a $500,000 judgment. Okay.

And let's say the railroad then proceeds against Royal Indemnity or any other insurer and succeeds in obtaining coverage. Is there a potential claim for indemnity by that insurer against the Grace bankruptcy?

MS. HARDING: Object to form, improper hypothetical, and it mischaracterizes -- it's not the same hypothetical you do with the State of Montana.

But go ahead.

Page 467

MR. LIESEMER: Object to the form of the question.

MR. SCHIAVONI: I will object. It has no foundation. It calls for a legal conclusion. It's an obvious and complete hypothetical because is the claim based on, say, a train falling over in Big Sky or does it have to be in Montana? What's the nature of the claim that arises? It's an utterly improper, incomprehensible hypothetical that calls for a legal conclusion from a lawyer, that by answering will waive his attorney-client communications.

BY MR. LEWIS:

Q. Did you understand the question, sir?

A. Yes, but I also think that it can't be answered unless I understand the basis for the indemnification claim and the policies involved.

Q. Let me ask you this: Are

Page 468

any of the claims against the railroad based on a products liability theory of recovery?

MS. HARDING: Object to form, foundation.

BY MR. LEWIS:

Q. In Libby, if you know.

MR. SCHIAVONI: Outside the scope of the 30(b)(6) notice, so I take it this is -- now you are asking a lay opinion of a fact witness. This is not corporate designee testimony. Is it, counsel for Grace? Is the witness answering as corporate designee?

MR. LEWIS: It's within the scope. It's a very simple question.

BY MR. LEWIS:

Q. Do you understand the question?

MS. HARDING: I stated my objection. Why don't you read the question again so the witness

Page 469

can -- unless you want to restate it. I can't even remember what it was at this point.

BY MR. LEWIS:

Q. All right. I am asking whether you know the Libby claims brought against the railroad involve any claims for product liability?

MS. HARDING: Whatever the Libby claims are against the railroad, if there are claims against them, they speak for themselves, whatever the complaint says. What this witness thinks about them or says about them is irrelevant.

But to the extent you know what they say, go ahead and answer.

THE WITNESS: Well, the claims brought against the railroad wouldn't be products liability climbs because the unexpanded concentrate that was

Arrowood

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 470

Affirmed

being loaded wasn't a product, I guess, that was manufactured and sold or a products liability responsibility for BNSF. But it could be a products claim with respect to Grace, same kinds of exposures.

BY MR. LEWIS:

Q. If the concentrate were deemed a finish product?

A. And if the concentrate -- and the claims weren't employees, weren't employed by W.R. Grace.

Q. All right. There is one other area I want to get into.

You were asked about Exhibit-1. You were asked if you -- would you get that in of front of you?

A. The monthly report, yes.

Q. Was that a document that was originated by Grace personnel?

A. Yes.

Q. Was it prepared in the usual and ordinary course of business of W.R.

Page 471

Grace?

A. Yes.

Q. Was it a document that's regularly maintained by Grace?

A. Yes.

Q. And as to the numbers, the dollar numbers in that communication, you agree that you have no reason to question them and the best available evidence; is that correct?

MS. HARDING: I will object to form. There was a lot of testimony on this issue.

MR. LEWIS: There was.

MR. LIESEMER: I join in the objection.

MS. HARDING: I think it's asked and answered repeatedly previously.

MR. LEWIS: You may answer the question.

MR. SCHIAVONI: No, he can't because there is no foundation. He didn't prepare it, and it

Page 472

wasn't prepared under his supervision. He could just draw speculation only it.

THE WITNESS: To the extent I used the document and relied on the document in my work as an attorney involved in the asbestos personal injury litigation for Grace, I found that the dollar amounts and the overall claims amounts with respect to personal injury were generally accurate.

Some of the other information concerning the categorization of the claims, both in terms of filing and settling amounts, I wouldn't have as the same level of confidence on their accuracy.

BY MR. LEWIS:

Q. Okay. Do you recall being asked if there were claims in Libby relating to exposures at the lumber mill?

A. There was a reference in an

Page 473

objection, I think, to exposures at the lumber mill.

Q. Have you ever been to the lumber mill?

A. No.

Q. Did you know that for years W.R. Grace stored asbestos-contaminated vermiculite at the Libby lumber mill?

MS. HARDING: Objection.

MR. SCHIAVONI: Now are you testifying?

MS. HARDING: Object to form.

MR. LEWIS: I think he knows it to be true.

MR. SCHIAVONI: What about the pipes in the lumber mill? Do you want to ask him about that?

MS. BAER: Counsel, back you off here. If he doesn't know, he can deny it.

MR. SCHIAVONI: Counsel, you are making a representation of fact.

Page 478

I think that's a question that's overly broad, and I think it really -- it's specific to an insurance company and to law firms and to jurisdictions.

But, again, we worked with insurance companies in settling and resolving these claims and resolving their coverage over the course of the 15, 20 years I was involved in it.

BY MR. LEWIS:

Q. Did any insurer that had coverage for Grace, any insurer, object to the manner in which you were conducting the defense of the claims for asbestos-related disease against Grace?

MR. SCHIAVONI: Object to form.

THE WITNESS: None that I recall.

MR. LEWIS: That's all I have.

MR. BROWN: Let's mark

Page 479

Hughes-15.

(Hughes-15 marked for identification at this time.)

MS. HARDING: Just to save time, again, Exhibit 5 to the Plan was topic upon which Mr. Finke was designated to testify and I think did. But to the extent that the witness can answer the questions related to it, go ahead.

MR. BROWN: It's an insurance-related question.

MS. HARDING: I understand.

- - -

EXAMINATION

- - -

BY MR. BROWN:

Q. Mr. Hughes, can you look at what's been marked Exhibit-6, Schedule 1, we talked about that earlier? I think that's 5 there in front of you.

A. Yes.

Q. If you look at Exhibit 6.

MS. HARDING: Which is

Page 480

Hughes Exhibit-12.

BY MR. BROWN:

Q. Can you go to Schedule 1 of that document?

A. Yes.

Q. And specifically, page 18, I direct your attention down toward the bottom of the document, you will see Unigard Security.

Do you see that?

A. Yes.

Q. And do you see in the policy number column that there are two policies listed?

A. Yes.

Q. Okay. There is one 1-0589 and 1-2517. Do you see those?

A. Yes.

Q. Now, could you go to what's been marked as Exhibit-15, which is Exhibit 5 to the Exhibit Book, and turn to page 9.

If you see at the bottom of that there is a reference there to two

Page 481

settlement agreements for Unigard Security Insurance Company? Do you see those?

A. Yes.

Q. And it says "now known as Seaton"?

A. Yes.

Q. Okay. Do you understand those two settlement agreements to pertain to the two policies that are on the first exhibit that I had you look at?

MS. HARDING: Object on foundation, to the extent that you know. And --

BY MR. BROWN:

Q. You can look at the policy numbers.

A. Yeah, they have the same policy numbers.

Q. Okay. Now, would you look at Schedule 2 to Exhibit 6? Do you see that there are two settlement agreements listed there for Unigard Security Insurance Company?

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Page 482

A. Yes.
Q. Do you understand those two settlement agreements to relate to the references of the prior document?
MS. HARDING: Object on foundation. Mr. Finke testified that he prepared these schedules. But to the extent that you know, go ahead.
THE WITNESS: I mean, they have the same policy numbers -- excuse me. They don't have policy numbers on Schedule 2, but they have the same dates in the agreement.
BY MR. BROWN:
Q. It's your understanding it's the same agreement, correct?
MS. HARDING: Object on foundation.
THE WITNESS: Yes.
BY MR. BROWN:
Q. Okay. Are you aware of any other agreements between Grace and

Page 483

Unigard, or its successor, Seaton, regarding Unigard policy number 1-0589 or 1-2517 relating to asbestos-related coverage other than the two that are listed there?
A. Settlements, did you say?
Q. Yes.
A. No, I am not.
Q. Are you aware of any other agreements between Grace and Unigard, or Seaton, regarding claims handling under any coverage that is alleged to exist under policy number 1-0589 or 1-2517?
A. No, I am not.
MR. BROWN: Thank you.
MR. SCHIAVONI: Just four or five things, sir.

- - -

EXAMINATION

- - -

BY MR. SCHIAVONI:
Q. Is it fair to say that you have no personal knowledge concerning the circumstances under which Exhibits 6

Page 484

through 9 were prepared?
A. No.
MS. HARDING: Is it fair to say?
THE WITNESS: I am sorry.
BY MR. SCHIAVONI:
Q. Let me ask again. That was a mistake right that you just said?
A. Yes, it was.
Q. Is it fair to say that you have no personal knowledge concerning the circumstances under which Exhibits 6 through 9 were prepared?
A. I have no personal knowledge of the circumstances through which Exhibits 6 through 9 were prepared.
Q. All right. Those are exhibits at this deposition, 6 through 9, right?
A. Yes.
Q. And I am sorry to ask you this, I apologize, but how old were you in 1963?
MR. LEWIS: I object.

Page 485

That's an impertinent question.
THE WITNESS: I was 6 years old.
MR. SCHIAVONI: It demonstrates how silly your questions were, sir.
BY MR. SCHIAVONI:
Q. How old were you in 1963?
A. I was 6.
Q. Is it fair to say you didn't work at Grace in the '50s and '60s, right?
A. No, I didn't.
Q. And you never worked at the Zonolite Company; is that right?
A. No, I didn't.
Q. Is it fair to say that you, Mr. Hughes, have no personal knowledge as to whether or not any policies were actually issued to BNSF in the '50s or '60s, do you, because you weren't around then?
A. No, I don't.
MR. SCHIAVONI: Thank you,

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d

Arrowood

sir.

MS. HARDING: All right.

(The deposition concluded at 6:42 p.m.)

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

Lori A. Zabielski
Registered Professional Reporter
Dated: JUNE 15, 2009

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

\- - - - - -

ERRATA

\- - - - - -

| PAGE | LINE | CHANGE |
| --- | --- | --- |
| | | |

f3c1f9f3-836d-4241-8af9-fe4b0129cb7d