**Deposition Designations for:**
**ELIHU INSELBUCH**
**June 12, 2009**

**Deposition Designation Key**

Arrowood = Arrowood Indem. Co.
f/k/a Royal Indem. Co. (Light Green)

BNSF = BNSF Railway Co. (Pink)

Certain Plan Objectors "CPO" = Government Employees Insurance Co.; Republic Insurance Co. n/k/a Starr Indemnity and Liability Co.; OneBeacon America Insurance Co.; Seaton Insurance Co.; Fireman's Fund Insurance Co.; Allianz S.p.A. f/k/a Riunione Adriatica Di Sicurta; and Allianz SE f/k/a Allianz Aktiengesellschaft; Maryland Casualty Co.; Zurich Insurance Co.; and Zurich International (Bermuda) Ltd.; Continental Casualty Co. and Continental Insurance Co. and related subsidiaries and affiliates; Federal Insurance Co.; and AXA Belgium as successor to Royal Belge SA (Orange)

CNA = Continental Cas. Co & Continental Ins. Co. (Red)

FFIC = Fireman Funds Ins. Co. (Green)
FFIC SC = Fireman Funds Ins. Co. "Surety Claims" (Green)

GR = Government Employees Ins. Co.; Republic Ins. Co. n/k/a Starr Indemnity and Liability Co.

Libby = Libby Claimants (Black)

OBS = OneBeacon America Ins. Co. and Seaton Ins. Co. (Brown)

PP = Plan Proponents (Blue)

Montana = State of Montana (Magenta)

Travelers = Travelers Cas. and Surety Cos. (Purple)

UCC & BLG = Unsecured Creditors' Committee & Bank Lenders Group (Lavender)

| | |
|---|---|
| AFNE = Assume Fact Not in Evidence | L = Leading |
| AO = Attorney Objection | LA = Legal Argument |
| BE = Best Evidence | LC = Legal Conclusion |
| Cum. = Cumulative | LPK - Lacks Personal Knowledge |
| Ctr = Counter Designation | LO = Seeking Legal Opinion |
| Ctr-Ctr = Counter-Counter | NT = Not Testimony |
| ET = Expert Testimony | Obj: = Objection |
| F = Foundation | R = Relevance |
| 408 = Violation of FRE 408 | S = Speculative |
| H = Hearsay | UP = Unfairly Prejudicial under Rule 403 |
| IH - Incomplete Hypothetical | V = Vague |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
————————————————X

In Re:                      Chapter 11
                            Case No.

                      01-01139 JKF

W.R. Grace & Co., et al.,

                            (Jointly
             Debtors.   Administered)
————————————————X

—   —   —

June 12, 2009

—   —   —

DEPOSITION of ELIHU INSELBUCH,

held at the offices of Caplin &

Drysdale, Chartered, 375 Park Avenue,

New York, New York, commencing at

approximately 9:37 A.M., on the above

date, before Lisa Lynch, a Registered

Merit Reporter, New Jersey Certified

Court Reporter, License No. XI00825,

and Certified Realtime Reporter

—   —   —

MAGNA LEGAL SERVICES, LLP

7 Penn Center, 8th Floor
1635 Market Street
Philadelphia, PA  19103
1.866.MAGNA.21

Page 10

Trav.

1
2
3    DEPOSITION SUPPORT INDEX
4
5    Direction to Witness Not To Answer
     Page  Line    Page  Line
     (None)
6    Request For Production of Documents
7    Page  Line    Page  Line
     (None)
8    Stipulations
9    Page  Line    Page  Line
     (None)
10   Questions Marked
11   Page  Line    Page  Line
     (None)

12            -  -  -
13
14
15
16
17
18
19
20
21
22
23
1

Page 12

1        A.   Not really.
2        Q.   Are you able to describe
3   it for me?
4        A.   It appears to be a
5   notice of my deposition.
6        Q.   All right.  And do you
7   understand that you are here today
8   pursuant to this Notice of
9   Deposition?
10       A.   Yes.
11       Q.   And that that's in
12  connection with the contested matter
13  that is at issue by the proposed
14  confirmation of the Chapter 11 plan
15  in the Grace case?
16       A.   If you say so.
17       Q.   Thank you.  This
18  deposition will go very quickly if
19  you take that position to all of my
20  questions.
21            Now, today I am going to be
22  referring to the Libby claimants.  Do
23  you understand that those are people
24  who are clients of the firms of

Page 11

Trav.

1   ELIHU INSELBUCH,
2       having been sworn by the Notary
3       Public of the States of New
4       York and New Jersey, was
5       examined and testified as
6       follows:
7
8            MR. COHN:  All right.
9   Let's start off marking this as
10  Exhibit 1.
11           (Notice of Deposition
12  marked for identification as
13  Inselbuch Exhibit 1.)
14
15  EXAMINATION BY
16  MR. COHN:
17       Q.   Good morning.
18       A.   Good morning.
19       Q.   As you know, I'm Dan
20  Cohn, counsel for the Libby
21  claimants.
22           I've placed in front of you a
23  document marked Exhibit 1.  Do you
24  recognize it?

Trav.

Page 13

1   McGarvey Heberling or Lewis Slovack
2   in Montana?
3        A.   I understand that some
4   of them may be clients of those
5   firms.
6        Q.   Well, you understand the
7   ones that are being represented here
8   today at the deposition?
9            MR. FINCH:  Objection.
10  You can answer.
11       Q.   And you understand these
12  are people who are represented in the
13  bankruptcy case also by my firm, Cohn
14  Whitesell & Goldberg?
15       A.   I understand that you
16  represent some people and that the
17  other two firms represent some
18  people.  My understanding of the
19  concept of the Libby claimants are
20  claimants that may have claims now or
21  may in the future have claims against
22  Grace who reside in the Libby area.
23       Q.   And who claim to have
24  been exposed -- excuse me -- to have

Page 18

1        MR. FINCH:  Object to
2    form.
3        A.    I don't know what you
4    mean.  I have served as, and do serve
5    as, counsel to some of the trust
6    advisory committees.
7        **Q.    And would you explain**
8    **for the record what a trust advisory**
9    **committee is?**
10        MR. FINCH:  Object to
11    form.
12        A.    Under the terms of these
13    plans and under the terms of the TDPs
14    that are part of the plan documents,
15    an entity is created called a trust
16    advisory committee which consists of
17    one or more attorneys who have
18    responsibilities that are defined
19    within the TDP documents and within
20    the trust agreement documents.
21        MR. J. COHN:  Dan, let's
22    just note the arrival of two
23    more counsel.  Would you
1    identify yourselves?

Page 19

1        MR. MUELLER:  Alex
2    Mueller from Mendes & Mount for
3    certain London market insurance
4    companies.
5        MS. DeCHRISTOFARO:
6    Elizabeth DeChristofaro from
7    Ford Marrin for Continental
8    Casualty Company and
9    Continental Insurance
10    Company.
11        THE WITNESS:  Those
12    appearances are not part of the
13    roles of the TACs, and I don't
14    remember where I was in the
15    middle of my answer.
16        MR. COHN:  Well, let's
17    help you by reading back as far
18    as you got in this answer.
19        (Off the record.)
20        (The Reporter reads the
21    last answer.)
22    BY MR. COHN:
23        **Q.    Do you have anything to**
24    **add?**

Page 20

1        A.    That's enough.
2        **Q.    And in that capacity,**
3    **have you been actually called upon to**
4    **render advice to those trust advisory**
5    **committees?**
6        A.    From time to time.
7        **Q.    Now, what is your role**
8    **in the W.R. Grace Chapter 11 case?**
9        A.    My firm is counsel to
10    the asbestos creditors committee.
11        **Q.    And what is your**
12    **personal role in connection with that**
13    **representation?**
14        A.    I suspect that I am the
15    lead counsel.
16        **Q.    You suspect or is that**
17    **what you are?**
18        A.    What I am is in the eye
19    of the beholder.
20        **Q.    Did you participate in**
21    **negotiations concerning the plan --**
22    **strike that.**
23        **Did you participate in**
24    **negotiations that led to the filing**

Page 21

1    of the Chapter 11 plan that is now
2    coming before the Bankruptcy Court?
3        A.    I did.
4        **Q.    Would you describe your**
5    **role in those negotiations?**
6        A.    I was counsel to the
7    asbestos creditors committee.
8        **Q.    Would it be fair to say**
9    **that you were the lead negotiator for**
10    **the asbestos creditors committee?**
11        MR. FINCH:  Object to
12    form.
13        A.    I wouldn't say so.
14        **Q.    Who else participated in**
15    **the negotiations on behalf of the**
16    **ACC?**
17        A.    Well, if we're talking
18    about the part of the negotiations
19    that involve the crafting and
20    agreement to the term sheet or the
21    economic arrangements with the
22    debtor, the committee -- when I say
23    "the committee", I mean the asbestos
24    creditors committee -- the committee

Page 22

1    appointed a negotiating subcommittee
2    that attended those negotiations and
3    I attended with them.
4         That negotiating subcommittee,
5    as I remember, consisted of Mr. Rice;
6    Mr. Weitz, W-e-i-t-z; Mr. Cooney, and
7    one or both of Mr. Budd and/or Mr.
8    Baron.
9         If we're talking about the
10   negotiations thereafter that involved
11   work with the futures rep and other
12   plan proponent constituencies in
13   developing what became the documents
14   that reflect the plan, I played a
15   minor role in that other than --
16   well, I should say I played a minor
17   role in that other than in connection
18   with the development of the trust
19   agreement and the TDP.
20        The other documents and the
21   negotiation of those documents were
22   assigned by the committee to my
23   partner, Mr. Lockwood, and others who
24   worked under his leadership.

Page 23

1         Q.   So is it fair to say on
2    behalf of the ACC you were the person
3    primarily responsible for the trust
4    agreement and the TDP?
5         A.   I was the counsel
6    primarily involved in that work.
7         MR. COHN:  Let's mark
8    this as Exhibit 2, please.
9         (Term sheet, 11 pages,
10   marked for identification as
11   Inselbuch Exhibit 2.)
12   BY MR. COHN:
13        Q.   Do you have Exhibit 2 in
14   front of you?
15        A.   I do.
16        Q.   Do you recognize it?
17        A.   No.
18        Q.   If you would turn to the
19   last four pages of that document, let
20   me ask you whether you recognize
     those four pages.
22        A.   I do not.  It purports
23   to be the term sheet.  I've never
24   seen it in this form so I guess I

Page 24

1    could compare it with my copy of the
2    term sheet that I signed and figure
3    out whether it's the same document,
4    but I have no way of knowing.  If you
5    represent to me that it is, I'll
6    accept your representation.
7         Q.   Well, yes, let me
8    represent to you that's the same
9    document that I have always seen and
10   has always been represented to me to
11   be the correct term sheet.
12        A.   Well, I have a book in
13   front of me with three documents that
14   I've been working with.  One is the
15   TDP as it exists in the plan, one is
16   the trust agreement as it exists in
17   the plan and the other is the term
18   sheet that I signed.
19        MR. COHN:  Let's go off
20   the record.
21        (Off the record.)
22        (Term sheet, seven
23   pages, marked for
24   identification as Inselbuch

Page 25

1    Exhibit 2A.)
2         (Preliminary Expert
3    Report on W.R. Grace Trust by
4    Mark Peterson dated March
5    2009 marked for identification
6    as Inselbuch Exhibit 3.)
7         (Exhibit 4 to Exhibit
8    Book, Trust Distribution
9    Procedures, marked for
10   identification as Inselbuch
11   Exhibit 4.)
12        MR. COHN:  All right,
13   back on the record.
14        Q.   Do you now have in front
15   of you a document that has been
16   marked as Exhibit 2A?
17        A.   Yes, sir.
18        Q.   Do you recognize that
19   one?
20        A.   I do.
21        Q.   Tell us what it is.
22        A.   It's the term sheet that
23   was signed among the debtor, the
24   futures rep, the committee and I

Page 26

*CPO*

*PP Obj: R*

1  believe the equity.  Yes, the equity
2  committee I guess they're called.
3      **Q.   Okay.  And when you said**
4  **"the committee" in your answer, you**
5  **meant the Asbestos Claimants**
6  **Committee?**
7      A.   Yes.  I will mean that
8  always.
9      **Q.   Terrific.  And that's**
10  **also what we mean when we say ACC?**
11      A.   Yes.
12      **Q.   Now, does this document,**
13  **Exhibit 2A, reflect the entire deal**
14  **amongst those parties concerning the**
15  **subject matter thereafter at the time**
16  **that it was entered into?**
17          MR. FINCH:  Object to
18      form.
19      A.   Like all term sheets, it
20  reflects all the points that the
21  people who signed it needed
22  to be put on paper at the time.
23      **Q.   And what points were**
24  **agreed to but not put on paper?**

Page 27

1      A.   None that I recall.  But
2  for sure when you -- when you
3  negotiate a term sheet, you
4  understand that what will evolve in
5  what are much more complicated
6  documents are issues subsidiary to
7  the issues that are agreed in the
8  term sheet that will need to be
9  resolved over time within the context
10  of the term sheet agreement.
11      **Q.   Were there any**
12  **understandings reached in connection**
13  **with this term sheet that would not**
14  **rise to the level of an agreement?**
15      A.   Not --
16          MR. FINCH:  Object to
17      form.
18      A.   -- that I recall.
19      **Q.   And specifically**
20  **concerning treatment of Libby claims,**
21  **were there any agreements or**
22  **understandings?**
23      A.   Not that I recall, other
24  than what's provided in the

Page 28

1  document.
2      **Q.   Have you reviewed a**
3  **transcript of the recent deposition**
4  **of Peter Lockwood?**
5      A.   I read it briefly,
6  quickly.
7      **Q.   In that brief reading,**
8  **did you come across any statements**
9  **made by Mr. Lockwood with which you**
10  **disagreed?**
11          MR. FINCH:  Object to
12      form, vague, overbroad.
13      A.   Yeah, there was one
14  place where he was talking about or
15  answering questions that had to do
16  with a provision in the term sheet --
17  in the TDP -- let's see -- in the
18  extraordinary claims section as to
19  whether or not that portion of the
20  extraordinary claims criteria which
21  requires that there not be the
22  potential for substantial recovery
23  elsewhere would apply to the
24  extraordinary claim that would

Page 29

1  satisfy the criteria otherwise for an
2  eight times treatment.  He was
3  unclear about that, at best, and
4  perhaps wrong.  My understanding of
5  that provision is that that
6  requirement is included in either
7  category of the extraordinary claims
8  treatment.
9      **Q.   All right.  To qualify**
10  **for the eight times multiplier under**
11  **extraordinary claims treatment, you**
12  **must, in addition to meeting the**
13  **exposure criteria set forth in the**
14  **TDP, also show little likelihood of**
15  **substantial recovery elsewhere?**
16      A.   Whatever that language
17  is, yes, for sure.
18      **Q.   Any other statements**
19  **come to mind that you saw with which**
20  **you did not agree?**
21          MR. FINCH:  Object to
22      form.
23      A.   Not that I recall off
24  the top of my head.

Page 30

1    Q.    Have you reviewed a
2    transcript of the recent deposition
3    of Mark Peterson?
4    A.    No.
5    Q.    All right.  Let me now
6    hand you a document that has been
7    marked as Exhibit 3.  This is Dr.
8    Peterson's report.
9    MR. COHN:  What I'm
10    handing around the room are
11    just the pages on which I
12    intend to ask questions because
13    otherwise the copying would
14    have been voluminous.
15    Q.    I'm sorry.  Did I --
16    A.    You didn't ask me
17    anything.
18    Q.    Thank you.  Do you
19    recognize the document that has been
20    marked Exhibit 3?
21    A.    I recognize it says what
22    it says it is.
23    Q.    Which is what?
24    A.    It says it's the

Page 31

1    Preliminary Expert Report on W.R.
2    Grace Trust by Mark Peterson of Legal
3    Analysis Systems dated March 2009.
4    Q.    And do you know Dr.
5    Peterson?
6    A.    I do.
7    Q.    What is his capacity in
8    this case?
9    A.    He is engaged as an
10    expert to assist the asbestos -- to
11    assist the committee.
12    Q.    Thank you.
13    Let me now hand you a document
14    that's been marked as Exhibit 4.  I
15    will represent to everyone concerned
16    this is a copy of the trust
17    distribution procedures, or TDP, that
18    has been attached to the plan.
19    MR. COHN:  In accordance
20    with our custom at these
21    depositions, the parties will
22    use their own copies to refer
23    to but we understand it is the
24    same document.

Page 32

1    Q.    Do you recognize Exhibit
2    4, Mr. Inselbuch?
3    A.    I accept your
4    representation that it is what it
5    says it is.
6    Q.    Okay, thank you.
7    Now, let me ask you to look at
8    Exhibit 3, which is Dr. Peterson's
9    report, and take a look at page five.
10    A.    I'm at page five.
11    Q.    All right.
12    A.    I should warn you I'm
13    reading this for the first time.
14    Q.    Okay.  Let me point you
15    then to exactly the statement I want
16    you to read.  Would you read the
17    first sentence of the second
18    paragraph on page five?
19    A.    Yes.
20    Q.    Would you like to read
21    it out loud, please, for the
22    record?
23    A.    "The trust's TDP follows
24    the standard form used for almost

Page 33

1    every asbestos trust created since
2    2002."
3    Q.    Do you agree with that
4    statement?
5    A.    Yes.
6    Q.    So when I talk about the
7    standard form or a term such as that,
8    you'll understand that I'm referring
9    to what Dr. Peterson is referring to
10    here, which is the standard form of
11    TDP that has been used for almost
12    every asbestos trust created since
13    2002?
14    MR. FINCH:  Object to
15    form.
16    A.    Is that a question?
17    Q.    Will you understand that
18    that's what I mean by that term?
19    A.    Okay.
20    Q.    Now, in this case there
21    were some departures from the
22    standard form; is that correct?
23    A.    In each case there is
24    some departures from the standard

Page 34

1  form and there were some here too.
2      Q.   Who drafted the TDP in
3  this case?
4      A.   The TDP that evolved
5  into the one in this case?
6      Q.   Yes.
7      A.   That's now on file?
8      Q.   Exhibit 4.
9      A.   The first draft, my
10  office, probably Anne McMillan.
11      Q.   And how did the document
12  evolve from that first draft into
13  Exhibit 4?
14      A.   Okay.  You will recall
15  that at some point the Court relieved
16  the debtor's exclusivity.  At that
17  point the committee and the futures
18  rep determined to file their own
19  plan, proposed plan of
20  reorganization.
21      In that connection, it was
22  understood that there would be the
23  need for a trust agreement and a TDP
24  and it was at that point, which I

Page 35

1  believe was somewhere in the fall of
2  2007, that we began the preparation
3  of the TDP.
4      A draft was crafted by our
5  office for consideration by the
6  committee.  After the committee
7  considered the draft and considered
8  input from Dr. Peterson, the draft
9  was put in a form that was then
10  submitted to the futures rep's
11  counsel for their consideration.  And
12  after we received their comments and
13  suggestions, the draft was further
14  edited and reconsidered by the
15  committee and sometime by the
16  beginning/early part of 2008 there
17  was a TDP that was agreeable to the
18  committee and to the futures rep.
19      Prior to that time we had
20  actually filed a plan, I believe,
21  that was proposed by the committee
22  and the futures rep but I believe --
23  my best memory is that plan was filed
24  before there was agreement between

Page 36

1  the committee and the futures rep on
2  the terms of the TDP.
3      Events then overtook that plan.
4  In fact, the events that you make
5  reference to with this term sheet
6  which was signed -- I'm referring to
7  Exhibit 2A -- in early April of 2008
8  and now there was a TDP that needed
9  to be considered by the other plan
10  proponents because it would now not
11  be associated with a separate plan
12  that had been filed by the committee
13  and the futures rep but, rather,
14  would evolve into a plan that would
15  be filed by the plan proponents as
16  part of that plan.
17      In the spring of 2008 the
18  committee and the futures rep were
19  already aware of criticisms that
20  counsel for some of the Libby
21  claimants had with the terms of the
22  TDP and we entered into a dialogue at
23  the instructions of the committee
24  with you and with Mr. Heberling to

Page 37

1  see whether points that you were
2  making were of sufficient validity to
3  cause us to consider changes in the
4  TDP.  Some of those points were so
5  considered and resulted in changes in
6  the TDP that evolved in the spring
7  and summer of 2008 and are reflected
8  in the plan as filed.
9      There were also comments to the
10  TDP that were received from other
11  parties who had an interest and a
12  right to consider the documents.  I'm
13  mindful of the representatives that
14  counsel for Sealed Air participated
15  in some parts of the TDP and trust
16  agreement and there may have been
17  comments as well from the debtor.
18  I'm not -- I don't recall.  But the
19  effect of all of that was it was --
20  the result of all of that was the TDP
21  that is now your Exhibit 4.  That's
22  the general history of its evolution.
23      Q.   Let's turn to Section
24  5.3(b)(3) of the TDP at pages 31 and

Page 102

1  into two parts. The first part is
2  the greater of the trust's last offer
3  to the claimant or the award that the
4  claimant declined in non-binding
5  arbitration. That's what it says the
6  first part is. However, that amount
7  should not exceed the amount that the
8  jury decides.
9      Now, the balance, it says, gets
10  divided into five equal installments
11  in years 6 through 10 following the
12  year of the initial payment, all of
13  that again subject to the applicable
14  payment percentage, the maximum
15  available payment and the claims
16  payment ratio provisions. So that's
17  how it gets paid out. And it doesn't
18  get any sequencing adjustments.
19      Q.   And is it subject to
20  maximum value or is it --
21      A.   Yes, and it's subject to
22  the maximum values.
23      Q.   So that the amount of
24  the trust's last offer or the

Page 103

1  non-binding arbitration award --
2      A.   Yes.
3      Q.   -- assuming that they --
4  that the jury verdict is not less
5  than those amounts --
6      A.   Yes.
7      Q.   -- will get paid on the
8  same basis as though the claim had
9  been allowed -- excuse me --
10  liquidated upon expedited review?
11      A.   That's what it seems to
12  say.
13      Q.   The next traunch, if you
14  will, of the jury verdict is the
15  amount between that initial payment
16  and the maximum value for the claim.
17  Is that correct?
18      MR. FINCH: Object to
19  form. Maximum value or maximum
20  extraordinary value as the case
21  may be.
22      THE WITNESS: Could I
23  have the question back?
24      (The reporter reads the

Page 104

1  pending question.)
2      MR. FINCH: Object to
3  form.
4      A.   No. It's the amount
5  between whatever the award was and
6  what was paid, limited by the maximum
7  value.
8      Q.   Right. So --
9      A.   Could be less.
10      Q.   That's a very fair
11  point. So let's assume that the jury
12  verdict is in excess of the --
13      A.   Then it would be the
14  difference between the maximum --
15      Q.   -- maximum value.
16      A.   -- value and what was
17  already paid.
18      Q.   And when we say "maximum
19  value", to Mr. Finch's point --
20      A.   Yeah.
21      Q.   -- we are including --
22  that is the greater of the maximum
23  value set forth in the matrix or the
24  scheduled value multiplied by the

Page 105

1  extraordinary claims multiplier if
2  the claim is an extraordinary
3  claim?
4      A.   Well, maximum value is a
5  defined term. It's a defined term
6  with respect to extraordinary claims
7  too.
8      Q.   And then to the extent
9  that there is remaining value to the
10  jury verdict over and above those two
11  traunches that we spoke about, how
12  does that get paid?
13      A.   It doesn't.
14      Q.   I just want to make sure
15  I understand your testimony a few
16  minutes ago. Did I hear you
17  correctly that, to your knowledge, no
18  claimant has ever exercised the right
19  to pursue its claim in the tort
20  system under one of these standard
21  form TDPs?
22      A.   That's my best
23  recollection.
24      Q.   And you would most

Page 106

1 likely have been aware if such an
2 event had taken place?
3     A.   I think so, but I can't
4 be sure of that.
5     Q.   All right.  Let's talk
6 about the extraordinary claims
7 multiplier under Section 5.4(a).
8     A.   Yes.
9          MR. J. COHN: I'm sorry,
10 Dan.  Where are you?
11         MR. COHN:  Section
12 5.4(a) in the TDP.
13         MR. FINCH:  Page 32.
14     Q.   Now, is it fair to say
15 that to obtain liquidation of a claim
16 as an extraordinary claim a claimant
17 must meet two criteria, one having to
18 do with exposure and one having to do
19 with little likelihood of a
20 substantial recovery elsewhere?
21     A.   I don't know whether
22 it's fair to say that.  I think
23 that's correct.
24     Q.   Now, focusing first on

Page 107

1 the exposure criteria, how do these
2 vary from standard form TDPs that
3 we've been referring to?
4     A.   The variance is the
5 additional provision toward the
6 bottom of the runover paragraph on
7 page 33 that provides for an
8 additional category where the
9 exposure was 95 percent the result of
10 exposure to Grace products.
11     Q.   So under the standard
12 form of TDP, there is an
13 extraordinary claim treatment for
14 exposures that are 75 percent the
15 result of the debtor's asbestos?
16     A.   Correct.
17     Q.   And those provide a five
18 times multiplier for such claims?
19     A.   That's correct.
20     Q.   And here the change is
21 that there's an eight times
22 multiplier for exposures of 95
23 percent?
24     A.   That's correct.

Page 108

1     Q.   How did this change come
2 about?
3     A.   Based upon discussions
4 that I and members of the committee
5 had with you and Mr. Heberling, the
6 idea was that, as distinguished from
7 the usual situation where asbestos
8 claimants were generally exposed to
9 more than one defendant's product, it
10 would be the case in Libby or for
11 people exposed in Libby that there
12 would be only exposure to Grace's
13 product and, thus, that was a little
14 different from what was normally
15 provided.
16     To put in context what the
17 extraordinary claims provision is
18 trying to accomplish, as you know,
19 the scheduled values or even the
20 individual review values are meant to
21 reflect the respective defendants'
22 share of the responsibility for the
23 claim as kind of evidenced
24 historically by what the defendant

Page 109

1 had paid to settle claims.
2     In most jurisdiction, the
3 defendant, which would be Grace here
4 but it could be any of the others,
5 would be jointly and severally liable
6 with others for the tort
7 responsibility and, thus, if the case
8 went to verdict, they would be a
9 single recovery, a single amount, and
10 any one of the jointly and severally
11 responsible tort feasors would have
12 to pay that if called upon to pay
13 that.  And that would develop into,
14 under the state law, rules that would
15 involve contribution or things like
16 that among joint tort feasors.
17     The TDP is designed to provide
18 for an award in the normal case where
19 there are multiplicity of available
20 defendants of that defendant's
21 respective share.  When we first
22 worked with this concept, which I
23 believe goes back to the original
24 Manville, maybe even the Manville

Page 190

CPO

1  defendant would have specific
2  liability to the particular claimant
3  because of the exposure to the
4  particular product which was caused
5  in part by this defendant even if
6  they didn't manufacture it.
7      MR. SPEIGHTS: Thank
8  you, sir.
9      THE WITNESS: Next?
10     MR. FINCH: Lunch break?
11     (Off the record.)
12
13  EXAMINATION BY
14  MR. BROWN:
15     Q.  Good afternoon, Mr.
16  Inselbuch. Michael Brown. I
17  represent Geico, Republic Insurance
18  Company, Seaton Insurance Company
19  and OneBeacon America Insurance
20  Company.
21     A.  How fortunate for you.
22     Q.  I want to follow up on
23  some of Mr. Cohn's questioning of you
1   earlier this morning and I think --

PP Obj: R; BE; F; 408

Page 191

CPO

1   I'm not sure I followed all of the
2   exhibits but I believe Exhibit 2A is
3   the term sheet, at least your copy of
4   the term sheet, the one you were
5   familiar with. Is that correct?
6      A.  Yes, sir. It's the one
7   I signed.
8      Q.  Okay. Do you have that
9   in front of you?
10     A.  I do.
11     Q.  Okay. I'm correct, am I
12  not, that it's dated April 6, 2008?
13     A.  That's correct.
14     Q.  And you executed it on
15  behalf of the official committee of
16  asbestos personal injury claimants,
17  otherwise known as the committee, or
18  the ACC, correct?
19     A.  That's correct.
20     Q.  Okay. You indicated
21  earlier in response to one of Mr.
22  Cohn's questions that the ACC had a
23  negotiating subcommittee and I
24  understood you to be saying that that

PP Obj: R; RE; F; 408

Page 192

PP Obj: R; BE; F; 408

1   was a subcommittee in connection with
2   the negotiations leading to the term
3   sheet. Is that correct?
4      A.  That's correct.
5      Q.  Okay. And those
6   individuals were Joe Rice, Perry
7   Weitz, John Cooney and Fred Baron
8   and/or Russell Budd. Am I correct?
9      A.  No, not Fred, no. Steve
10  Baron --
11     Q.  Steve Baron. I'm sorry.
12     A.  -- and/or Russell
13  Budd.
14     Q.  All right. Am I correct
15  that counsel for the ACC was also
16  involved in those negotiations?
17     A.  Correct.
18     Q.  And would that be you
19  and Mr. Lockwood?
20     A.  It would certainly be
21  me. I don't recall whether Lockwood
22  was there for some or all of that.
23     Q.  Okay. Did the other
24  parties that ultimately became the

Page 193

PP Obj: R; BE; F; 408

1   plan proponents -- did they also have
2   negotiating teams?
3      A.  The debtor certainly
4   did, the futures claimants certainly
5   did, the equity security holder
6   certainly did, yes.
7      Q.  Okay. Can you identify
8   the debtor's negotiating team?
9      A.  Their chairman was
10  there, their general counsel was
11  there, their chief financial officer
12  was there, Mr. Bernick was there, the
13  chief legal officer was there. There
14  may have been others but those are
15  the people I remember.
16     Q.  Okay. The chairman was
17  Mr. Festa?
18     A.  Yes, sir.
19     Q.  And the general counsel
20  was Mr. Shelnitz?
21     A.  Yes, sir.
22     Q.  And the CFO was Mr.
23  LaForce?
24     A.  I don't recall his

Page 194

1    name.
2         Q.    Okay.  Who was the chief
3    legal officer?
4         A.    That would have been Mr.
5    Shelnitz.
6         Q.    Okay.  And who was the
7    negotiating team for the FCR?
8         A.    Mr. Frankel, at some
9    points David Austern I believe was
10   there.  There may have been others.
11        Q.    You don't recall them?
12        A.    I don't recall now.
13        Q.    Okay.  And how about the
14   equity committee?
15        A.    Mr. Weschler.
16        Q.    Is that it?
17        A.    As far as I recall.
18        Q.    Now, other than the four
19   parties that ultimately signed the
20   term sheet, were there any other
21   parties or entities or individuals
22   that were involved in the
23   negotiations leading up to the April
1    6, 2008 term sheet?

Page 195

1         MR. FINCH:  Object to
2    form.
3         A.    Not that I recall.
4         Q.    Were any of the debtor's
5    insurers involved in the negotiations
6    that resulted in the term sheet?
7         A.    None that I attended.
8         Q.    To your knowledge, were
9    any of them asked or invited to
10   participate in the negotiations that
11   led up to the term sheet?
12        MR. FINCH:  Objection,
13   lack of foundation.
14        A.    I don't know.
15        Q.    Were you ever advised by
16   any other party to the negotiations
17   that they did not want the insurers
18   to participate in the negotiations?
19        MS. BAER:  Objection.
20        A.    No.
21        Q.    Did any other party to
22   the negotiations suggest that they
23   did want the insurers involved in the
24   negotiations?

Page 196

1         A.    Not that I recall.
2         Q.    All right.  I think you
3    testified earlier this morning that
4    after the term sheet -- Well, let me
5    back up.
6         You indicated in your earlier
7    testimony, I believe, that Anne
8    McMillan from your office prepared
9    the initial draft of the TDP.  Is
10   that correct?
11        A.    I said it may have been
12   Anne McMillan.
13        Q.    Okay.  Do you know
14   whether whoever created it -- well,
15   let me back up.
16        Was it someone from Caplin &
17   Drysdale that created the initial
18   draft?
19        A.    Correct.
20        Q.    Do you know whether that
21   draft still exists today?
22        A.    No.
23        Q.    Do you know what
24   model -- I think I heard the term

Page 197

1    earlier in your testimony that there
2    was a model that was used.
3         Do you know what model was used
4    to create the first draft of the
5    TDP?
6         A.    My ex -- I don't know
7    the answer.  My expectation would be
8    that she or someone else in the firm
9    would have started with the
10   then-most-recent rendition of the TDP
11   sometime in 2007 that had been
12   approved either by a committee in
13   some other bankruptcy or in court and
14   used that as the beginning place to
15   start.  I don't recall what that
16   might have been.
17        Q.    Okay.  Now, you
18   indicated that that initial draft was
19   created by your office in the fall of
20   two thousand --
21        A.    Two thousand --
22        Q.    Sorry -- in the fall of
23   2007 for consideration by the
24   committee.



Page 198

A. I think that's correct.

Q. Is that right?

A. I believe that's correct.

Q. And that was after your office had received input from Mark Peterson on the draft, as I understood your earlier testimony?

A. No, before.

Q. Okay.

A. The draft would have had blanks for all of the numbers and for the payment percentage.

Q. Okay. Did it go to Mark Peterson first or did it go to your client first?

A. I don't recall. It certainly would not have gone to Peterson first. It might have gone to him simultaneously.

Q. And Mr. Peterson, I gather, provided you with his comments?

Page 199

A. Provided the committee with his thoughts, yes.

Q. Okay. And what were the nature of his thoughts or comments on the draft that was provided to him?

A. He doesn't comment on the draft. He provides information --

Q. What does he comment on?

A. He doesn't comment. He provides information that will facilitate the committee's decisions as to what figures to place in the matrix and also to deal with the -- just a second. I've got to get the right word for you -- the claims payment ratio.

Q. Does he actually provide the committee with figures for the matrix?

A. He does. He provides his recommendations, he provides them with considered -- sometimes with

Page 200

alternate recommendations based upon different concepts. He sometimes provides them with ranges of recommendations for them to consider.

Q. Okay. You indicated earlier that in or around early 2008 that the committee shared its then working draft of the TDP with the FCR. Do I have that correct?

A. I think that timing is correct but I'm not sure. It could have been a little earlier than that.

Q. And had there been a plan filed, a joint plan, proposed plan, by the ACC and FCR at that point?

A. That's my recollection.

Q. All right. You then indicated that the -- the plan I suppose you were talking about was superseded by events was, I think,

Page 201

the term that you've used and that's what ultimately led up to the term sheet. What events were you alluding to?

A. Well, soon thereafter we began the estimation hearings and in the course of the estimation hearings what the -- the negotiations that led to the term sheet began. And once there was agreement on the term sheet with the debtor, there was no need to pursue the separate plan that the committee and the futures rep had filed because we would be pursuing a plan with the debtor and the equity committee.

Q. When did the estimation hearing begin?

A. I don't recall offhand, but my best guess would be sometime in March of 2008.

THE WITNESS: Earlier than that?

A. Well, I've got that

Page 202

1    wrong.  I'm told I got that wrong.
2    It was earlier in 2008.
3        Q.   You indicated also that
4    at some point -- it wasn't clear to
5    me when in this process -- the draft
6    TDP was shared with Sealed Air.  Can
7    you tell me when that was?
8        A.   It would have been later
9    on, after there was pretty much a
10   draft of plan documents because they
11   didn't just see the TDP; they saw a
12   whole bunch of plan documents to
13   provide their comments.  I can't give
14   you a date, but it would have been in
15   2008 at some point.
16       Q.   Would it have been after
17   the term sheet was signed but before
18   the initial plan documents were filed
19   in September of 2008?
20       A.   I don't recall.
21       Q.   Do you have an
22   understanding as to why Sealed Air
23   had an interest in the TDPs?
24       A.   There was a settlement

Page 203

1    agreement with Sealed Air and
2    Fresenius under which they would pay
3    considerable sums that would be
4    available to compensate some of the
5    claimants here.  And under the terms
6    of that settlement agreements, there
7    were requirements that had to be
8    accomplished in order to trigger
9    their obligation to pay the monies.
10   Some of those obligations involved
11   protections and language in plans --
12   in a plan of reorganization for their
13   benefit.
14       Q.   At the time that the
15   TDPs were shared with Sealed Air for
16   their review, were they also shared
17   with the debtor's insurers for the
18   debtor's insurers' review?
19       A.   I have no idea.
20       Q.   Let me shift gears for a
21   moment because I gather Mr. Cohn is
22   not back with the copies.
23       MR. J. COHN:  I am.
24       MR. BROWN:  Oh, you

Page 204

1    are.
2        MR. J. COHN:  Yes.
3        MR. BROWN:  Do you want
4    to, I guess, give the witness
5    the one-page bio first?
6        MR. J. COHN:  Sure.
7        (Biography page of Elihu
8    Inselbuch marked for
9    identification as Inselbuch
10   Exhibit 5.)
11       Q.   Mr. Inselbuch, you
12   should have before you a one-page
13   document that I'm going to bet that
14   you don't have any trouble
15   identifying but I'll ask the question
16   anyway.  Can you identify it?
17       A.   It's a biography of me
18   that is, I believe, put together by
19   my firm and is either on the website
20   or in other material where the firm
21   collects a rogues gallery of its
22   lawyers.
23       Q.   I will represent to you
24   that I pulled it off your website.

Page 205

1        In the second paragraph there
2    are a number of cases that are
3    referenced --
4        A.   Yes.
5        Q.   -- some of which you
6    have mentioned earlier in your
7    testimony today, and what I want to
8    ask you about each of those cases is
9    whether Mark Peterson was involved in
10   those cases.  So can you run down the
11   list that is in the bio and tell me,
12   one, whether Mark Peterson was
13   involved and, two, as to each what
14   his role was?
15       A.   Okay.
16       MR. FINCH:  Object to
17   form.  You can answer.
18       THE WITNESS:  I can
19   answer this?
20       MR. FINCH:  Yes.
21       A.   The best I can do, let's
22   see.  Johns-Manville, he was not
23   involved in the original bankruptcy
24   proceeding.  In the restructuring

Page 222

1  throughout the country, how
2  information might be made available
3  to the trust, how the process can be
4  made less cumbersome, things like
5  that.
6      Q.   Are the members of the
7  plaintiffs' asbestos bar the only
8  ones that have that knowledge?
9      A.   In that detail, yes.
10     Q.   There's no defense
11 attorneys in asbestos litigation that
12 would have that knowledge?
13     A.   No, not all of it.  Very
14 little of it.  The defense attorneys
15 will be familiar with what's in their
16 files and what they do.
17     Q.   And how does that
18 differ --
19         MR. FINCH:  Object to
20 form.
21     Q.   -- from what the
22 plaintiffs' asbestos attorneys do?
23     A.   It's like day and
24 night.

Page 223

1      Q.   In your experience with
2  other asbestos trusts, does the trust
3  agreements provide that the trustees
4  will be required to consult with the
5  TAC members on various issues?
6      A.   The documents say what
7  they say.  They often call for
8  consultation on specific issues.
9      Q.   And do they often also
10 call for the trustees to obtain the
11 consent of the TAC and the future
12 claimants' representative before
13 certain actions can be taken?
14     A.   Yes.  And failing that
15 consent, there are provisions for
16 overriding the refusal of consent.
17     Q.   What is the necessity of
18 having these consent provisions in
19 the trust agreement?
20         MR. FINCH:  Object to
21 form.
22     A.   So that as -- as the
23 trust is administered, it will be
24 administered in a way that is

Page 224

1  consistent with the expectations of
2  the constituencies that care about
3  it.
4      Q.   And the only
5  constituencies that care about it, I
6  gather, are the asbestos claimants?
7      A.   And the futures
8  representative.
9      Q.   Do the insurers have any
10 interest in it?
11     A.   The insurers have an
12 interest in what they're required to
13 pay.  What they're required to pay is
14 defined by their contracts.
15         MR. BROWN:  All right.
16 I think, Mr. Inselbuch, that
17 may be all I have.  I'll pass
18 to the next questioner.
19         MR. J. COHN:  I'll
20 follow up.  I think it makes
21 sense.
22  _ _ _ _
23 EXAMINATION BY
24 MR. J. COHN:

Page 225

1      Q.   Mr. Inselbuch, Jacob
2  Cohn for Federal Insurance Company.
3  If we could go to the TDPs for
4  a moment, Exhibit --
5      A.   I'd ask you to speak a
6  little louder --
7      Q.   Sure.  You know what?
8  Why don't I come down there?
9      A.   -- because you're
10 talking in my bad ear.
11     Q.   All right.  You have
12 the --
13     A.   I have the TDP.
14     Q.   -- TDPs.  If you take a
15 look at page 31, the end of
16 5.3(b)(1)(B) --
17     A.   Yeah.
18     Q.   -- it's the paragraph
19 above the scheduled value
20 paragraph --
21     A.   Yes.
22     Q.   -- beginning provision.
23     A.   Yes.
24     Q.   It has a reference to

Page 226

1   choice of law.
2       A.   Yes.
3       Q.   And it says -- there's a
4   reference to the Alabama wrongful
5   death statute and there's a reference
6   to "shall only govern the rights
7   between the PI trust and the
8   claimant, and, to the extent the PI
9   trust seeks recovery from any entity
10  that provided insurance coverage to
11  Grace, the Alabama wrongful death
12  statute shall govern."
13      A.   Uh-huh.
14      Q.   Are you familiar with
15  that provision?
16      A.   I see it.
17      Q.   What is the purpose of
18  that provision?
19      A.   Which part of it?
20      Q.   The part that applies --
21  at least purports to apply a rule to
22  insurer disputes.
23          MR. FINCH:  Object to
24  form.

Page 227

1           (The witness reviews the
2   document.)
3       A.   The point of this whole
4   provision was to ameliorate a problem
5   that existed under the law of
6   Alabama.  As you know, under the
7   terms of the TDP, no punitive damages
8   are included in the recovery.  As
9   this was all explained to me at the
10  time, in Alabama the recovery for
11  wrongful death is couched in terms of
12  punitive damages.  So that, read
13  literally, there could be no recovery
14  under this document for a wrongful
15  death that would have as its
16  operative jurisdiction the State of
17  Alabama.
18          This provision was inserted to
19  cure that problem, to make it
20  possible for what we would all --
21  what we all regarded as
22  run-of-the-mill ordinary death claims
23  that happened to occur in Alabama to
24  recover under the terms of the trust.

Page 228

1           Whether or not this provision,
2   as it states, also will govern the
3   relationship with insurers is
4   something that I guess the insurers
5   can debate at some point in court.
6       Q.   Is this, therefore,
7   intended to be a carve-out from the
8   insurer neutrality provision of the
9   plan?
10          MR. FINCH:  Object to
11  form, lack of foundation.
12          (The witness reviews the
13  document.)
14      A.   I don't know the answer
15  to that.
16      Q.   You are familiar with
17  the insurance neutrality provision of
18  the plan?
19      A.   Only very generally.
20      Q.   Would reviewing that
21  give you any help in answering this
22  question?
23      A.   No.  That's something
24  you ought to ask Mr. Lockwood.

Page 229

1       Q.   You've represented
2   numerous what have come to be known
3   as asbestos creditors committees, or
4   ACCs, correct?
5       A.   Yes.
6       Q.   And as counsel you are
7   representing the members of that
8   committee, correct?
9           MR. FINCH:  Object to
10  form.
11      A.   Yes.
12      Q.   And those members have
13  fiduciary duties; is that correct?
14      A.   Yes.
15      Q.   To whom do those
16  fiduciary duties run?
17      A.   The entire
18  constituency.
19      Q.   Who is the
20  constituency?
21      A.   All asbestos claimants
22  against the particular debtor.
23      Q.   Irrespective of the
24  validity of their claims; is that

Page 230

1  correct?
2      MR. FINCH: Object to
3  form.
4      A.  Well, when I say "a
5  claimant", I presuppose that they
6  have a claim.
7      Q.  So you operate on the
8  assumption, is it correct, that
9  somebody that is represented by a
10  lawyer that is asserting a claim has
11  a valid claim against that particular
12  debtor?
13      A.  No.  You asked me to
14  whom did the fiduciary duty extend.
15  It extends to those folks who have
16  claims.
17      Q.  Is there a fiduciary
18  duty of the committee to attempt to
19  ferret out those people who have come
20  before the Bankruptcy Court but do
21  not have meritorious claims?
22      A.  No.  The committee's
23  duty is to participate in the
1  preparation of a TDP and a plan that

Page 231

1  will, as best possible, pay claims
2  that are valid and in as an efficient
3  manner as possible.
4      Q.  And as representatives
5  of existing claimants, the ACC wants
6  to get as much money as possible for
7  the existing claimants, correct?
8      A.  First of all, the ACC
9  are the victims who are appointed to
10  the committee.  You seem to be
11  fudging over talking about their
12  lawyers.
13      Q.  I don't think that I am,
14  but please --
15      A.  Okay.  I'm talking about
16  the claimants.  Surely, their job is
17  to see in the debates among the
18  various creditor constituencies how
19  much of the pie that's available to
20  all creditors can be allocated to
21  asbestos claimants.
22      Q.  Okay.  And the FCR has a
23  different constituency.  Those
24  are --

Page 232

1      A.  Yet-to-come claimants.
2      Q.  -- yet-to-come
3  claimants?
4      A.  But he also is
5  interested in seeing to it that as
6  much money as possible goes in the
7  pot.
8      Q.  They have a common
9  interest in maximizing the size of
10  the pot, correct?
11      A.  I believe so.
12      Q.  And it is therefore in
13  the interest of the asbestos
14  creditors committee and the FCR to
15  see as much insurance money paid into
16  that pot as quickly as possible,
17  correct?
18      A.  Sure.
19      Q.  And when the trust is
20  established, the trust owes a
21  fiduciary duty to its beneficiaries,
22  correct?
23      A.  Correct.
24      Q.  And --

Page 233

1      A.  The trustees do.
2      Q.  The trustees.
3  And the beneficiaries of the
4  trust --
5      A.  Yes.
6      Q.  -- are existing and
7  future claimants against that debtor
8  who's established a trust, correct?
9      A.  Correct.
10      Q.  And the trust has a
11  fiduciary duty to maximize the
12  compensation to its beneficiaries,
13  correct?
14      MR. FINCH: Object to
15  form.  Mischaracterizes the
16  document.
17      A.  Sure.
18      Q.  And the main issue
19  between the current claimants and the
20  future claimants is ensuring that
21  enough money is available going out
22  in time to assure as much as possible
23  the non-preferential treatment of
24  each claim.  Is that correct?

PP
Obj:
R;
BE

Page 234

1    A.   You could -- that's
2  fair.  That's a fair way to put it.
3    Q.   And the trust,
4  similarly, shares an interest in
5  getting as much money into the trust
6  from whatever source as quickly as
7  possible.  Is that correct?
8        MR. FINCH:  Object to
9  form.
10    A.   Yes.  The trustees also
11  have a fiduciary responsibility in
12  addition to the futures rep to see to
13  it that all claimants that come
14  before the trust are treated more or
15  less equitably.
16    Q.   Do the trustees have any
17  duty at all to the insurers?
18    A.   As insurers?
19    Q.   Yes.
20    A.   Not that I can think
21  of.
22    Q.   In fact, with respect to
23  the insurance relationship, typically
24  insurers are in an adversarial

Page 235

1  position with the trust, correct?
2    A.   Yes.
3    Q.   You've been involved, as
4  you said, as counsel for what we
5  could colloquially call the Manville
6  TAC, correct?
7    A.   Correct, yes.  Still
8  am.
9    Q.   Are you familiar with
10  the Manville trust's having issued
11  pronouncements that it will no longer
12  honor claims that are submitted based
13  upon the diagnosis of certain doctors
14  whose reliability has been called
15  into question?
16    A.   I am.
17    Q.   Would you take a look at
18  page 40 of the TDPs, please,
19  5.7(a)(2), regarding the credibility
20  of medical evidence?
21    A.   Correct.
22    Q.   There's no reference to
23  the doctors who have been
24  discredited -- strike that.

Page 236

1    There's no reference in these
2  TDPs to the doctors who the Manville
3  trust will no longer consider paying
4  claims based upon their diagnosis, is
5  there?
6    A.   That's correct.
7    Q.   Do you know why those
8  doctors are not identified here?
9    A.   Because it's for the
10  trustees to decide whether or not
11  they will list one or another
12  facility as being a facility whose
13  evidence they will not credit.
14    Q.   And the trustees are
15  supposed to consult with TAC members
16  about that; is that correct?
17        MR. FINCH:  Object to
18  form.
19    A.   Not necessarily.
20    Q.   In Manville, is there a
21  cap on the contingent fee that
22  plaintiffs' attorneys can recover?
23    A.   There is.
24    Q.   And that is how much?

Page 237

1    A.   25 percent.
2    Q.   Is the rationale for
3  that because it's a lot easier to
4  recover from a trust than it is to
5  recover from a defendant in the tort
6  system?
7    A.   No.
8        MR. FINCH:  Objection.
9    Q.   Is there a rationale for
10  that?
11    A.   Jack Weinstein insisted
12  on it.
13    Q.   To your knowledge, has
14  any trust, other than the one that
15  the judge insisted upon imposing a
16  fee cap, ever imposed a contingent
17  fee cap on the recovery of
18  plaintiffs' attorneys?
19    A.   No.  And remember that
20  Weinstein was sitting over the
21  question of the fairness of a class
22  action settlement.  He was not
23  sitting as a bankruptcy judge.
24    Q.   Is that fair to say that

Page 238

1  you were the most responsible --
2  sorry -- the ACC is the most
3  responsible for preparing the TDPs;
4  is that right?
5        MR. FINCH:  Object to
6  form.
7     A.   As among what group?
8     Q.   Well --
9     A.   We were more responsible
10  than the New York City Police
11  Department.
12     Q.   Well, in the course of
13  negotiating TDPs and plans generally
14  when you are representing --
15     A.   Yes.
16     Q.   -- ACCs, is it typical
17  for the ACC's counsel to draft the
18  first draft?
19     A.   Of the TDP?
20     Q.   Yes.
21     A.   Yes.
22     Q.   And then it's typical
23  that the FCR would do further comment
24  on it?

Page 239

1     A.   Have to, yes.
2     Q.   Is it fair to say that
3  the FCR and the ACC are the
4  constituencies that are most
5  concerned with the contents of a
6  TDP?
7        MR. FINCH:  Object to
8  form.
9     A.   Yes.
10     Q.   Is it fair to say that
11  once a debtor has cut an economic
12  deal with the asbestos constituencies
13  that its interest in the TDPs are
14  primarily to ensure that they will
15  garner the necessary supermajority
16  vote and comply with 524g so that a
17  plan could be confirmed?
18        MR. FINCH:  Objection to
19  form.
20        MS. BAER:  Objection.
21  Objection to form, lack of
22  foundation.
23     A.   You'd have to ask
24  them.

Page 240

1     Q.   Is that your experience,
2  however?
3        MS. BAER:  Objection.
4        MR. FINCH:  Object to
5  form, foundation.
6     A.   I don't read their
7  minds.
8     Q.   Typically, is the
9  involvement of debtors in such
10  situations in the negotiation of TDPs
11  limited to the issues that I've just
12  mentioned?
13        MS. BAER:  Objection.
14        MR. FINCH:  Object to
15  form.
16        MS. BAER:  Form,
17  foundation.
18     A.   No, no.  The debtors
19  have an interest in dealing with
20  objectors that might have objections
21  to the TDP and they'll address those
22  issues with us and with the futures
23  rep, and it would depend on the
24  particular case.

Page 241

1        MR. J. COHN:  I pass the
2  witness.  Thank you.
3        THE WITNESS:  Anybody
4  else?
5        MR. FINCH:  Anybody
6  else?
7
8  EXAMINATION BY
9  MS. ABRAVANEL:
10     Q.   Mr. Inselbuch, my name
11  is Karen Abravanel.  I'm from Simpson
12  Thacher and I represent Travelers
13  Casualty & Surety.
14     You said that you haven't
15  reviewed any of the insurance
16  policies at issue in these
17  procedures.  Is that right?
18     A.   That's my best
19  recollection.
20     Q.   Have you reviewed any of
21  the settlement agreements entered
22  into between Grace and its insurers
23  pre-petition?
24     A.   I do not believe so.

Page 242

1    Q.   Okay.  Are you aware
2  that the plan places these settlement
3  agreements entered into between Grace
4  and insurers into different
5  categories?
6        MS. BAER:  Objection.
7  Foundation, form.
8        MS. ABRAVANEL:  I'll
9  rephrase.
10    Q.   Are you aware that there
11  are different types of settlement
12  agreements at issue in these
13  proceedings?
14    A.   No.
15    Q.   Are you aware that
16  certain types of settlement
17  agreements are referred to as
18  asbestos insurance reimbursement
19  agreements?
20    A.   There must be, because
21  there are provisions that deal with
22  something that looks like that in the
23  TDP.
24    Q.   Okay.  What do you

*Trav.*

*PP Obj: R; BE; F*

*Trav.*

*Trav.*

Page 243

1  understand an asbestos insurance
2  reimbursement to be?
3    A.   I don't know.
4    Q.   What provisions in the
5  TDP would you say address asbestos
6  insurance reimbursement agreements?
7    A.   I'm looking at Section
8  2.5 and at -- let's see.
9    Q.   Section 2.5 is --
10    A.   Just a minute.
11    Q.   Sorry.
12    A.   In 2.5 which deals with
13  the claims payment ratio, there's
14  something that talks about
15  insurance-related TDP claims and I
16  think there's another place where
17  they talk about this in the
18  definitional provisions of what order
19  things get paid in.
20    Q.   Okay.
21    A.   But that's the context
22  in which I would know something about
23  this.  I'm not entirely clear what
24  they are or how they arise, but I

*Trav.*

*PP Obj: R; BE; F*

*Trav.*

Page 244

1  know that the TDP has to decide in
2  what traunch they get paid.
3    Q.   Okay.  Can I refer you
4  to the TDPs at Section 5.6 on page
5  35?
6    A.   Okay.  Yeah, I've got
7  it.
8    Q.   Okay.  Do you understand
9  that under the certain asbestos
10  insurance reimbursement agreements
11  Grace has an obligation to indemnify
12  insurers against claims brought by
13  third parties?
14        MR. FINCH:  Objection,
15  foundation.
16        MS. BAER:  I join in
17  that objection.
18    A.   I don't know anything
19  about those documents.
20    Q.   Okay.  I will represent
21  to you that under certain asbestos
22  reimbursement agreements Grace has an
23  obligation to indemnify the insurers
24  against claims asserted by third

*Trav.*

*PP Obj: R; BE; F*

*PP Obj: R; BE; F; LO*

Page 245

1  parties.
2    A.   Yes.
3    Q.   Okay.  Turning your
4  attention to Section 5.6, would you
5  say that this section applies to
6  indemnification claims that might be
7  brought by insurers under asbestos
8  insurance reimbursement agreements?
9        MR. FINCH:  Objection.
10  Form, lack of foundation, calls
11  for a legal opinion.
12        MS. BAER:  The debtor
13  joins in the objection.
14    A.   I don't know.  I'd have
15  to go back and learn what the
16  so-called claims are and whether they
17  fit within the rubric of indirect PI
18  trust claims.  You have a definition
19  here, I guess, at Footnote 8 and if
20  they're in there, they're in there.
21    Q.   Okay.  Can you tell me,
22  according to the TDPs, how the PI
23  trust were to calculate its
24  obligations for an indirect PI trust

*Trav.*

*PP Obj: R; BE; F; LO*

*PP Obj: R; BE; F; LO*

Page 246

1   claim?
2           MR. FINCH: Objection.
3   Form, foundation, calls for
4   speculation, hypothetical.
5       A.   As a general
6   proposition, an indirect claimant
7   steps into the shoes of the claimant
8   because the basis for the indirect
9   claim is that he have absolved the
10  trust from the direct claimant's
11  claim. So they could step into the
12  shoes of the claimant, they could
13  proceed as an expedited claim, they
14  could proceed as an individual review
15  claim. If there were an entitlement
16  to extraordinary treatment, that
17  would apply.
18      Q.   Okay.
19      A.   Whatever -- whatever the
20  rules that would apply to the direct
21  claimant would apply to the indirect
22  claimant.
23      Q.   Okay. And let me just
1   be a little bit more specific. Would

Page 247

1   the PI -- will the PI trust apply the
2   payment percentage of a payment --
3       A.   Yes.
4       Q.   -- on an indirect PI
5   trust claim?
6       A.   Yes.
7       Q.   Okay. Can you tell me,
8   on the flip side, if the plan is
9   confirmed how will the asbestos PI
10  trust calculate an insurer's payment
11  obligation under an asbestos
12  reinsurance agreement?
13      A.   I have no idea.
14          MR. FINCH: Objection.
15      Q.   Sorry, sorry. Asbestos
16  reimbursement agreement.
17          MR. FINCH: Objection to
18  form and foundation.
19      A.   I have no idea.
20          MS. ABRAVANEL: Okay, I
21  have no further questions.
22  Thank you.
23          THE WITNESS: Anybody
24  else?

Page 248

1           MR. DEMMY: I'll do them
2   from down here. If you can't
3   hear me, just let me know.
4           THE WITNESS: I can hear
5   you.
6           MR. FINCH: Who are you
7   and who do you represent? I
8   know who you are. Who do you
9   represent?
10          MR. DEMMY: I will do
11  that.
12
13  EXAMINATION BY
14  MR. DEMMY:
15      Q.   My name is John Demmy
16  and I represent Firemen's Fund
17  Insurance Company and some other
18  related insurers.
19          In the Grace case, does the
20  committee conduct its business
21  through periodic meetings?
22      A.   Yes.
23      Q.   Do you participate in
24  those meetings?

Page 249

1       A.   I do.
2       Q.   Who typically
3   participates in those meetings?
4       A.   Counsel for each of the
5   individual committee members, counsel
6   for the committee, and whoever else
7   in a particular situation might be
8   asked to participate.
9       Q.   Do the appointed
10  committee members, the holders of
11  claims, ever participate in the
12  committee meetings?
13      A.   Not usually.
14      Q.   Do they ever?
15      A.   There have been an
16  occasion where they did but it's --
17  it would be most unusual.
18          MR. DEMMY: Okay, that's
19  all the questions I have.
20  Thank you.
21          THE WITNESS: Anybody
22  else?
23          MR. FINCH: Next?
24          MR. DOWNEY: Phil