**Deposition Designations for:**
**PETER LOCKWOOD**
**May 4, 2009**

**Deposition Designation Key**

**Arrowood = Arrowood Indem. Co. f/k/a Royal Indem. Co. (Light Green)**

**BNSF = BNSF Railway Co. (Pink)**

**Certain Plan Objectors "CPO" = Government Employees Insurance Co.; Republic Insurance Co. n/k/a Starr Indemnity and Liability Co.; OneBeacon America Insurance Co.; Seaton Insurance Co.; Fireman's Fund Insurance Co.; Allianz S.p.A. f/k/a Riunione Adriatica Di Sicurta; and Allianz SE f/k/a Allianz Aktiengesellschaft; Maryland Casualty Co.; Zurich Insurance Co.; and Zurich International (Bermuda) Ltd.; Continental Casualty Co. and Continental Insurance Co. and related subsidiaries and affiliates; Federal Insurance Co.; and AXA Belgium as successor to Royal Belge SA (Orange)**

**CNA = Continental Cas. Co & Continental Ins. Co. (Red)**

**FFIC = Fireman Funds Ins. Co. (Green)**
**FFIC SC = Fireman Funds Ins. Co. "Surety Claims" (Green)**

**GR = Government Employees Ins. Co.; Republic Ins. Co. n/k/a Starr Indemnity and Liability Co.**

**Libby = Libby Claimants (Black)**

**OBS = OneBeacon America Ins. Co. and Seaton Ins. Co. (Brown)**

**PP = Plan Proponents (Blue)**

**Montana = State of Montana (Magenta)**

**Travelers = Travelers Cas. and Surety Cos. (Purple)**

**UCC & BLG = Unsecured Creditors' Committee & Bank Lenders Group (Lavender)**

**AFNE = Assume Fact Not in Evidence**
**AO = Attorney Objection**
**BE = Best Evidence**
**Cum. = Cumulative**
**Ctr = Counter Designation**
**Ctr-Ctr = Counter-Counter**
**ET = Expert Testimony**
**F = Foundation**
**408 = Violation of FRE 408**
**H = Hearsay**
**IH - Incomplete Hypothetical**
**L = Leading**
**LA = Legal Argument**
**LC = Legal Conclusion**
**LPK - Lacks Personal Knowledge**
**LO = Seeking Legal Opinion**
**NT = Not Testimony**
**Obj: = Objection**
**R = Relevance**
**S = Speculative**
**UP = Unfairly Prejudicial under Rule 403**
**V = Vague**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

\- - -

| | |
|---|---|
| In Re: | : Chapter 11 |
| | : |
| | : Case No. |
| W.R. GRACE & CO., et al, | : 01-01139 JKF |
| | : |
| | : (Jointly |
| Debtors | : Administered) |

\- - -

Monday, May 4, 2009

\- - -

Continuation of oral deposition of PETER VAN N. LOCKWOOD, ESQUIRE, taken pursuant to notice, was held at the offices of CAPLIN & DRYSDALE, One Thomas Circle N.W., Suite 1100, Washington, DC 20005, commencing at 12:05 p.m., on the above date, before Lori A. Zabielski, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

\- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

THE WITNESS: That's unanswerable, because assuming that you are asking about the Grace Trust, which is what we are here to talk about, the Grace Trust, A, doesn't exist; B, doesn't have any operating history; C, hasn't established what the procedures and personnel to handle claims are; and, D, depending upon the complexities of individual claims subject to individual review and the back and forth between the Trust claims handling personnel and the plaintiff and plaintiff's lawyer, there is no set period of time that any individual claim would require for individual review that I am aware of.

BY MR. COHN:

Q. So is it your testimony that the Asbestos PI Committee drafted this TDP and proposed it as part of a Plan

with no expectation whatsoever as to the time frames that it would take to process claims upon individual review?

MR. SCHIAVONI: Objection to form with regard to the term "committee" and whether that's intended to include Mr. Cohn's clients or not.

MR. FINCH: Object to form.

THE WITNESS: I am not aware of any expectations of the committee on that subject that aren't contained in the TDP, and I don't recall seeing any in the TDP. You might want to ask Mr. Inselbuch that question. But I am not aware of any, and I don't think there are any.

I do believe the committee had a general expectation that the trustees, as part of their fiduciary obligations to claimants under this Trust, are expected to create a claims handling structure

that is as efficient in processing claims through individual review or otherwise as is reasonably possible and could be done at a reasonable cost per claim. Beyond that, I really don't know anything more to say.

BY MR. COHN:

Q. If a claimant receives an offer upon individual review and chooses not to accept the offer, what is his next step?

MR. FINCH: Object to form.

THE WITNESS: It's some form of mediation and binding/nonbinding arbitration as the steps set forth in the TDP. I am riffling through the pages at the moment to find it.

Section 5.10 of the TDP addresses ADR procedures that the Trust is to implement, and, to my knowledge, I think that's the next step after there is a failure to

agree in individual review between the claimant and the Trust.

Again, Mr. Inselbuch probably has more familiarity with Trust practices than I do.

CPO

BY MR. COHN:

Q. All right. I think what I will do is there are a whole line of such questions, but I will wait for Mr. Inselbuch, if your testimony is that he would be best equipped to answer those questions.

A. I think it is a fair statement that Mr. Inselbuch has had a more detailed involvement in the drafting of the TDP and more personal experience in the operation of other trusts that, to some extent, this Trust is modeled after. So, to that extent, I think you are probably correct.

MR. FINCH: Can I confer with my client for just a second, Mr. Cohn?

MR. COHN: Sure.

Page 482

MR. FINCH: Let's go off the record.
(There was a discussion held off the record at this time.)
MR. FINCH: Back on the record.
THE WITNESS: Mr. Finch reminded me that, as I testified on Friday, there are certain provisions of the TDP that are unique to this TDP and, therefore, have not been the subject of prior experience with other trusts and, in particular, Sections 5.12 and 5.13, which I testified about at some length.
I have probably had at least as great, if not a greater, role in the creation of those sections that Mr. Inselbuch did. So I don't know -- to suggest that there are no questions that you can ask about the TDP, that I might not have as much or more

Page 483

knowledge than Mr. Inselbuch. But, by and large, the provisions, such as Section 5.10, that we were just discussing that are fairly what I would call standard TDP provisions, my answer stands, that he would be more knowledgeable on those than I would.
BY MR. COHN:
Q. Thank you.
In that case, let's turn to insurance. Have you had occasion to familiarize yourself with Grace's insurance coverage for asbestos PI claims?
A. Only at a pretty general level as was demonstrated on Friday.
Q. Are you generally familiar with comprehensive general liability insurance?
A. In the course of my work in these bankruptcy cases over the last 15 or 20 years, I have had occasion to learn in a non-expert capacity a fair amount of

Page 484

what I would regard as insurance law, including a fair amount about comprehensive or CGL policies.
Q. And do you understand, at least in general terms, the distinction between products/completed operations claims, on the one hand, and non-products/non-completed operations claims, on the other?
MR. FINCH: Object to form.
MS. DeCRISTOFARO: Object to form.
MR. FINCH: Why don't you define it so he knows exactly what you are talking about.
You can answer. Object to form.
THE WITNESS: If you are using those terms as they are used in comprehensive general liability policies, I think I have a general understanding of that, but I certainly would not profess to be an expert on the subject.

Page 485

BY MR. COHN:
Q. And would you mind if when I refer to products/completed operations claims under a standard CGL policy, if I just use the term "products claims"?
A. That's fine.
Q. And would you mind if when I refer to non-products/non-completed operations claims under a standard CGL policy, if I just call them "non-products claims"?
A. That's fine.
MR. SCHIAVONI: We will object, though, Dan.
BY MR. COHN:
Q. Is it your understanding -- strike that.
Is it the understanding of the Asbestos PI Committee that the Libby claims hold non-products claims?
A. I don't think the Asbestos Claimants Committee has an understanding on that subject. We understand that the Libby claimants contend that they have

Libby

PP Obj:F

non-products claims.

Q. Is it the committee's understanding that other asbestos PI claimants besides the Libby claimants hold non-products claims?

MR. SCHIAVONI: I object to form; again, vague and ambiguous with regard to the committee.

Mr. Cohn, are you asking whether your own clients understand this or by majority vote or before -- how?

MR. COHN: Thank you, Mr. Schiavoni.

You may answer the question.

THE WITNESS: It is the committee's understanding that there are an unknown number of present and future claimants whose --

MR. SCHIAVONI: We also object, that the question calls for waiver of the attorney-client privilege and any common interest

privilege.

MR. FINCH: We disagree with that assertion. He didn't ask about communications with the committee or its counsel.

Read back the question.

(The reporter read from the record as requested.)

MR. FINCH: To the extent you can answer that without revealing privileged communications, you may do so. I don't think it calls for privileged communications on its face.

MR. SCHIAVONI: Again, we take the position that this constitutes the comprehensive waiver, to the extent you are testifying about the understanding of the committee.

MR. FINCH: No. He's testifying about the position of the committee and what the

committee knows from public sources. He is not testifying about the committee's work product or what communications may be privileged between the committee members, on the one hand, and counsel, on the other.

MR. SCHIAVONI: He's testifying about -- he's a lawyer. He's testifying about what a lawyer thinks and what a group of lawyers think --

MR. FINCH: No, he is not.

MR. SCHIAVONI: -- about a legal issue.

MR. FINCH: No, he is not.

MR. SCHIAVONI: All right. We can brief it later.

THE WITNESS: The committee's position, to my knowledge, on this subject has been expressed in briefs filed in the court, and I will reiterate that position as expressed in

briefs filed in the court, which is that at some theoretical level, since the committee has not undertaken to any sort of specific factual investigation on this subject, that there are or could be claims that under CGL non-products limits would be for insurance purposes covered by the same CGL coverage that Libby claimants' claims are, i.e. under non-products coverage if the Libby claimants' claims are covered by non-products coverage.

The point being that the committee's position is that whatever the Libby claimants assert to be the unique or identifying characteristics of their claims that would bring them under the, quote, non-products, close quote, coverage of certain Grace CGL policies, that there are other claimants who either have or

Libby

Q. I hand you a document that has been marked as ACC 30(b)(6)-18, and for the information of those in the room and on the telephone, this is Exhibit-8 from the Plan Exhibit Book, namely the Best Interest Analysis.
A. I have it.
Q. Now, in that document, Grace places a value of $500 million on Grace's unsettled insurance rights.
Does the asbestos personal injury -- strike that.

Libby

Does the Asbestos PI Committee agree with that figure?
MR. FINCH: Object to form.
MS. BAIER: Objection.
MR. FINCH: And object on privilege grounds and instruct witness not to answer to the extent that that would divulge the disclosure of privileged communications for or work product communications.
If you have an understanding

independent of that based on things that you have learned or the committee has learned from sources not protected by the privilege, you can answer.
MS. BAIER: I will object to form. It assumes things not in the record.

Libby

THE WITNESS: All the committee knows about this is set forth in Note D to this exhibit, which specifies that the insurance recovery is based on the current book value of the insurance asset ($500 million). The Note goes on to say that the ultimate amount of the insurance received will depend on a number of factors, and then lists the factors.
This is a document that was prepared by Grace, and the committee has accepted it from Grace as being what it purports to be, Grace's analysis of the

Libby

application of a Bankruptcy Chapter 7 liquidation test.
BY MR. COHN:
Q. Would the Asbestos PI Committee agree that that figure, namely the $500 million value, represents the best available figure for purposes of Plan confirmation?
MR. FINCH: Object to form, mischaracterizes prior testimony.
THE WITNESS: I don't even know what you mean for purposes of Plan confirmation.
It's proffered, as I understand it, for a very limited purpose, determining what would happen in the event of a hypothetical Chapter 7 liquidation as compared with what is projected to happen in this proposed Chapter 11 reorganization.
As proposed as a projection for that purpose and given that the committee is a Plan proponent,

I take it, it is fair to say that the committee has accepted that number as described for that purpose.
BY MR. COHN:
Q. Who drafted the Asbestos Insurance Entity Injunction?
A. That was the product of a group effort along with the rest of the Plan. I don't recall who crafted the first draft of what is ultimately in the Plan.

Libby

Q. What is the purpose of the Asbestos Insurance Entity Injunction?
A. My understanding of the purpose is that its principal rationale is that there is a variety of types of insurance rights that are being transferred to the Trust for the benefit of all Trust beneficiaries as part of what I will call the deal reflected in this Plan.
In order to prevent individual Trust beneficiaries from

Libby
Libby
Libby
PP Obj: R; BE
PP Obj: R; BE

seeking disproportionate shares of insurance through direct actions or otherwise, the injunction was crafted in, I might add, many earlier cases than this one, perhaps not in precisely the same language, but the concept has been around for a while, to protect the Trust and its beneficiaries from having people do what I would call jumping the queue in getting disproportionate or attempting to get disproportionate shares of insurance that should be shared by all.

MR. COHN: Let's go off the record for a second.

(There was a discussion held off the record at this time.)

BY MR. COHN:

Q. Directing your attention to what has been marked ACC 30(b)(6) Exhibit-4.

A. Yes.

Q. Namely, the Asbestos Insurance Transfer Agreement?

A. Yes.

Q. Which is Exhibit-6 to the Plan Exhibit Book.

A. Yes.

Q. Does that agreement assign to the Asbestos PI Trust the claims of individual asbestos PI claimants against insurers for their own misconduct?

MR. FINCH: Object to form.

MR. SCHIAVONI: Objection to form.

THE WITNESS: I don't believe this agreement assigns claims to the Trust at all. This agreement assigns insurance rights, according to my understanding of the agreement. How claims wind up in the Trust is by the Asbestos Permanent Channelling Injunction.

BY MR. COHN:

Q. So --

A. And the Asbestos Insurance Injunction indirectly, perhaps. But primarily Asbestos Permanent Channelling

Injunction.

Q. So the Asbestos PI Trust will not end up holding -- strike that.

Would the committee agree that the Asbestos PI Trust will not end up holding claims of individual asbestos PI claimants against insurers for their own misconduct?

MS. BAIER: Objection to form.

MR. SCHIAVONI: Objection to form, and, in addition, I would say that the question calls for the waiver of privilege. And I would also ask Mr. Cohn that you identify the topic of on your 30(b)(6) notice that this is responsive to.

MS. BAIER: I would also object to form, especially to the word "holding."

I think it mischaracterizes what the testimony has been and confuses the issue by asking what

the Trust holds. I don't think the Trust holds things.

MR. FINCH: I object to form. I disagree that it calls for privileged information.

MR. COHN: With that, would the witness do his best.

THE WITNESS: The Trust certainly isn't going to hold any claims. It's going to have claims asserted against it. The people that hold the claims are the claimants.

With respect to this, the question about whether claims involving the, quote, I think you phrased it, independent tort liability of insurers, close quote, the problem I have answering that question is that it attempts to summarize in a single phrase, which does not necessarily have a precise legal meaning, a complicated set of questions

Page 506

having to do with how the Asbestos Permanent Channelling Injunction works.

The provisions in the Asbestos Permanent Channelling Injunction are very complex. As a general proposition, however, I would say that the claims that are being channelled to the Asbestos Personal Injury Trust are claims that are against the Debtors or against various other entities defined as asbestos-protected parties that arise in the manner that satisfies the requirements of Section 524(g), which has very specific language about what can and cannot be channelled to an Asbestos Personal Injury Trust under that section.

What you are, in effect, trying to ask is does the phrase you have used fit within or without the terminology of Section

Page 507

524(g) where the term as such is not used. So I can't really answer the question yes or no as stated.

All I can tell you is that the Asbestos Permanent Channelling Injunction, in my understanding, is not intended to channel to the Trust claims that Section 524(g) does not authorize to be channelled to the Trust.

BY MR. COHN:

Q. All right. We have gone a little afield from the question, so if I can go back and ask what I meant to, and let's try it again.

MR. SCHIAVONI: Again, Mr. Cohn, we would ask you to identify in the notice where it is you identify this as a topic, because to the extent Mr. Lockwood is not designated by the committee on it, it's not really a proper question to pose to him by another

Page 508

committee member.

MR. COHN: It's covered by several of the topics, and I would really like to just go on.

BY MR. COHN:

Q. So the question is, will claims of individual asbestos PI claimants against insurers for their own misconduct be an asset of the Asbestos PI Trust?

MS. BAIER: Objection.

MR. FINCH: Objection to form.

MR. SCHIAVONI: I would object, asked and answered.

And I would remind Mr. Lockwood he has addressed this issue in other cases like Pittsburgh Corning and to the extent you need to go any further here, I think it raises a whole host of issues about waiver.

MS. DeCRISTOFARO: Note my objection, too.

Page 509

THE WITNESS: Would you read back the question, please?

(The reporter read from the record as requested.)

MS. DeCRISTOFARO: Objection.

MR. FINCH: Objection.

THE WITNESS: As phrased, the answer to that question is unequivocally no.

MR. COHN: Thank you.

BY MR. COHN:

Q. Now, directing your attention to the Asbestos Insurance Entity Injunction, if an asbestos PI claimant has a claim against an insurer based on the insurer's own alleged misconduct, does the Asbestos Insurance Entity Injunction bar him from asserting that claim?

MR. FINCH: Objection.

MR. SCHIAVONI: Objection, calls for a legal conclusion and objection to form and the other

Page 518

litigation concerning the applicability of and injunction similar to the Asbestos Insurance Entity Injunction in any other case?

MR. WISLER: Can you repeat that? I didn't hear you, Dan.

BY MR. COHN:

Q. Are you aware of any litigation concerning the scope of the asbestos or an injunction similar to the Asbestos Insurance Entity Injunction in any other case?

A. The only litigation that I am aware of that's remotely similar -- and I don't profess to know all the litigation that might be floating around out there -- is actually litigation over an entity that is closer to the Asbestos Permanent Channelling Injunction. And it's the Travelers injunction that's presently before the United States Supreme Court. To be more specific, it's the Manville injunction that Travelers is litigating about.

Page 519

Q. Has Maryland Casualty Company paid or agreed to pay any money or other consideration in order to be covered by the Asbestos PI Channelling Injunction?

A. Well, that depends on how you use the term "pay."

The basis, which I take it which is what you are asking for, for Maryland Casualty being a protected party to this Plan is that in the past, Maryland Casualty Company has paid a lot of money to Grace and entered into a settlement agreement with Grace which releases that coverage and which Grace indemnifies it against claims.

As I testified, I believe, on Friday, Grace, as part of this deal, Grace has had two positions that it has taken that we have -- we being the committee and its representative -- accepted. Number one is a claim for indemnity from a settled insurer based on claims against that insurer that are

Page 520

asbestos personal injury claims against or arising out of Grace is something that has to be channelled to the Trust because it fits within the definition of an asbestos personal injury claim under 524(g), and that in order that Grace be protected from such indemnity claims, the roughly $3 billion that Grace and various related parties are paying to this Plan is, in part, on behalf of those settled insurers.

So if the question means, is Maryland Casualty Company paying something over and above what Grace is paying, the answer is not to my knowledge.

Q. Is there a benefit to the Grace Bankruptcy Estate or to the Asbestos PI Trust from having the Asbestos PI Channelling Injunction protect Maryland Casualty Company?

MR. FINCH: Object to that question to the extent that it calls for speculation.

Page 521

Mr. Wisler: Could you read the question back, please?

MR. SCHIAVONI: Objection to form; objection, calls for waiver; objection, calls for legal conclusion.

MR. FINCH: I disagree that it calls for waiver.

But you can answer.

THE WITNESS: Could you reread the question?

MR. COHN: Let's go off the record for a second.

(There was a discussion held off the record at this time.)

(The reporter read from the record as requested.)

Mr. Wisler: I object to form.

THE WITNESS: Yes.

BY MR. COHN:

Q. What is that benefit?

MR. FINCH: You can answer the question to the extent that it

BNSF Libby PP Obj: R

Page 522

doesn't reveal privileged or work product information.

THE WITNESS: The benefit to the Grace Estate is that it eliminates potential claims by Maryland Casualty Company against the Debtor and its Estate. That's the benefit.

BY MR. COHN:

Q. Is there any agreement between Grace and Maryland Casualty Company which requires Grace to indemnify Maryland Casualty Company for its own misconduct?

MR. FINCH: Objection to the extent that calls for a legal opinion. And object to the extent that there is information responsive to this question that's privileged, I instruct you not to answer if it would reveal privileged communications.

If you can answer the question without revealing

Page 523

privileged communications, you can do so --

MR. SCHIAVONI: Mr. Lockwood, I think --

MR. FINCH: Tank, let me finish.

MR. SCHIAVONI: Oh, I am sorry.

MR. FINCH: But I still object to the extent that it calls for a legal opinion.

MS. BAIER: I also object. You have asked Mr. Lockwood whether he knows about -- you haven't asked him about whether he knows. You asked him is there an agreement between Grace and Maryland Casualty Company. I object to the form. You are now asking Mr. Lockwood to get into the head of W.R. Grace.

MR. SCHIAVONI: I am sorry, Mr. Finch. I didn't mean to interrupt you before.

Page 524

Mr. Schiavoni for Arrowood. We join your objection, and we would also say this is outside the scope of the designation and that Mr. Lockwood doesn't have to answer every single question no matter what it is. This is not in the designation.

MR. FINCH: Can we hear back the question?

(The reporter read from the record as requested.)

THE WITNESS: In my understanding, there is an agreement between Grace and Maryland casualty company which contains indemnification provisions. I am not in a position to express an opinion on what the scope of that indemnification is, much less whether or not Grace and Maryland Casualty agree on what the scope of that indemnification is.

Page 525

BY MR. COHN:

Q. Is it the position of the Asbestos PI Committee that if the indemnification provisions are construed to protect Maryland Casualty from its own misconduct, that such provisions would be enforceable?

MR. FINCH: Object to form, calls for a legal conclusion.

THE WITNESS: It actually calls for speculation.

MR. FINCH: That, too.

THE WITNESS: In addition. The committee's understanding of the way this Plan works, which is what expresses the committee's position, is that it's a legal question which, assuming that a dispute on this subject arises at some point in the future, will be determined by litigation over, A, what exactly is the basis for the claim against Maryland Casualty, legal and

Page 530

can't, he will say he can't answer the question.

MR. SCHIAVONI: If the answer is please refer to docket number blankety-blank, then I agree with you. If the answer is, as the answers have been to the other questions, then he's obviously waived it, because there is no file.

MR. WISLER: Objection.

MR. COHN: Would you like the question read again?

THE WITNESS: No. I can remember the question. Are you still pressing?

MR. COHN: Sure.

THE WITNESS: The committee has not filed either a joinder in the objection or a response in opposition to the objection, and I have no idea whether the committee is ever going to take a position on the objection.

Page 531

MR. COHN: Thank you, Mr. Lockwood. No further questions. I will pass the witness to whoever is next.

Mr. Wisler: I think Maryland Casualty will be next. Can we have a 15-minute break, please?

MR. FINCH: I prefer you not have a 15-minute break. I will give you five minutes. I would like you to come down here so we can hear you better.

MR. WISLER: Off the record.

(There was a discussion held off the record at this time.)

(There was a break from 1:37 p.m. to 1:56 p.m.)

\- - -

EXAMINATION

\- -

BY MR. WISLER:

Q. Mr. Lockwood, my name is Jeffrey Wisler. I represent Maryland

Page 532

Casualty Company and Zurich in this bankruptcy case.

Mr. Lockwood, what is the ACC's position as to the viability of this Plan if the bankruptcy court finds that one or more of the settled asbestos insurance companies are not entitled to 524(g) protection?

MR. FINCH: Objection, calls for speculation.

I instruct the witness not to answer the question to the extent it would reveal privileged or work product-protected communications or information. To the extent you can answer the question without so doing, you can do so.

THE WITNESS: Well, it's a hypothetical question, and it really is unanswerable because it would depend upon what the reason that the court gave for denying the protection. A lot of reasons

Page 533

that the court might conceivably give, if it gave such, might have the effect of blowing up the Plan, effectively. I mean, there would be conditions to confirmation that could not be satisfied nor waived.

On the other hand -- I don't know. I haven't thought enough about the permutations and combinations to know whether there could be some ground on which the court could deny a particular settled insurer the right to be a protected party for some reason that wouldn't apply sort of generally to the Plan but which could, somehow or another, either the parties could waive that that -- I really don't know.

The committee certainly doesn't have a position on it, because the committee, as my answer has demonstrated so far, hasn't thought through the

Page 534

hypothetical circumstances that might produce the result that you posit.

BY MR. WISLER:

Q. Well, in your answer, you said that there are certainly scenarios where such a ruling could, I think you used the word, blowup the Plan.

What would be some examples of that?

MR. FINCH: Objection, form.

MS. BAIER: Objection, calls for speculation.

THE WITNESS: The Plan provides that a list in Exhibit-5 of settled insurers are entitled to be protected parties under the Plan. The rationale for that, as I said earlier, was that they had potential indemnity claims against W.R. Grace.

If, hypothetically, the court interpreted the statute to say that the on-behalf-of, that

Page 535

Grace somehow or another couldn't make a contribution on behalf of those settled insurers because they weren't putting in fresh money into the Plan so that Grace was left with no protection against indemnity claims because no claims against those insurers were being brought, that would go pretty far way to blowing up the Plan. At a minimum, it would require a whole renegotiation of the Plan, in my opinion, as to that hypothetical.

BY MR. WISLER:

Q. Because if an insurer -- let me make sure I understand what you are saying.

You said that would go a long way towards destroying the Plan. Is that because, for instance, if a settled asbestos insurer with indemnity rights were not protected, then their indemnity claims would no longer be properly listed

Page 536

as Class 6 claims or no longer properly channelled?

MR. FINCH: Object to form.

THE WITNESS: Let me back up. Under bankruptcy law, a bankruptcy court doesn't have a line item veto under which they can exercise particular provisions in the Plan that they don't like but go ahead and confirm the rest of it. The Plan is an integrated whole. Judge Fitzgerald will either confirm the Plan or she will deny confirmation of the Plan.

The scenario you posit, she would deny confirmation of the Plan because it purported to grant protected party status to entities that she said couldn't be protected, for whatever reason. At that point, everybody involved in this bankruptcy would have to sit down and figure out how to

Page 537

deal with the problem that was created by that. And I have no idea how we would deal with the problem that would be created by that outcome.

We certainly haven't -- we don't -- if the question is have we got a backstop Plan in the hopper that we can lay on the table, the answer is no.

BY MR. WISLER:

Q. What if the ruling was not so global per the example you gave, but individual, to say that one settled asbestos insurance company, for whatever reason, had not given or provided or there was not adequate consideration provided on behalf of that settled asbestos settled insurer?

MR. FINCH: Objection to form, speculation.

MS. BAIER: Objection. He's just answered that one.

THE WITNESS: Yeah, I don't

understand how -- Grace's consideration is a lump sum of stuff, notes, cash, warrants, insurance, what have you.

And, as I analyzed it earlier, it's the committee's stated position that the statute allows Grace under those circumstances to designate insurers that it settled with and have indemnity claims for protection against asbestos personal injury claims in the future.

I don't know any basis on which a court could say that, these 12 asbestos settled insurers are just okeydoke to get protection under that approach, but Insurer Y, for some reason or another, isn't. So I can't even speculate what your hypothetical would entail, much less what its consequences would be.

BY MR. WISLER:

Q. So in the ACC's view, all the settled asbestos insurance companies sort of ride together in terms of whether they are entitled to 524(g) protection?

MR. FINCH: Objection, mischaracterizes prior testimony; object to the form.

MR. WISLER: If I mischaracterize it, please clarify.

THE WITNESS: The only caveat I would say to that is the one that we spent some time dancing around with Mr. Cohn earlier, that if there was some sort of ruling that some certain claims couldn't properly be channelled against a particular insurer while other claims could be , i.e. his notional independent tort claims versus claims that are clearly asbestos PI claim that says the coverage isn't exhaustive

or wasn't properly settled or whatever, at that point, I don't -- the Plan does not purport to provide blanket protection.

It provides protection for claims that fit within the definitions of the Plan, and if somehow or another the court determines that some particular claim doesn't fit within the definitions of the claims that either are or legally can be under 524(g) channelled to the Trust, then, in my opinion, that would not result in the Plan failing a condition of the sort I talked about earlier. Whether or not there could be other consequences of such a ruling is a different matter.

BY MR. WISLER:

Q. Let's talk about that because you just described the possibility that the court could rule

that some certain claims, in your words, were not properly channelled.

Is it the ACC's position that indemnity claims of a settled asbestos insurance company would result from those some certain claims would then no longer be classified as Class 6 and channelled to the Trust?

MR. FINCH: Objection, form.

MS. BAIER: Can you read that over, please?

(The reporter read from the record as requested.)

MS. BAIER: Objection as to form.

THE WITNESS: If I understand the question and speaking at a somewhat high level of generality, if a claim against a settled insurer were ruled not to be channelled to the Trust in the first instance, because it didn't fit within -- because of one of two reasons: Either it

PP Obj:
R; LO; BE; F
CPO
Libby
CPO
PP Obj:
R;
LO; BE
CPO
PP Obj:
R; LO;
BE; F
CPO
PP Obj:
R;
LO;
BE

Page 542

didn't fit within the definition or, alternatively, even though it might be read to fit within the definition, it could not be under Section 524(g) so channelled, you just weren't legally permitted to do so, and the claim went forward, and an indemnity claim were to arise out of that claim, then it is the position of the ACC that that indemnity claim would not be a Class 6 claim, because, by definition, it didn't arise out of an asbestos personal injury claim. It arose out of something that the court had decided since it wasn't channelled was, by definition, not an asbestos personal injury claim.

BY MR. WISLER:

Q. Is the ACC in agreement with Exhibit-5 of the exhibit book? Are you familiar with that exhibit?

A. I am generally familiar with it. The ACC, as a Plan proponent, is --

Page 543

if what you mean by is in agreement with it, we are sponsoring a Plan of which it's an exhibit. So I guess you could say we are in agreement with it.

MR. WISLER: That's all I have. Thank you, Mr. Lockwood.

MR. MANGAN: Hello. This is Kevin Mangan on the phone.

MR. WISLER: One second, please.

MR. MANGAN: Sure, Jeff.

MR. WISLER: I am sorry. Just one follow-up. I apologize.

BY MR. WISLER:

Q. Mr. Lockwood, in response to my next-to-the-last question, you testified that the claim we were discussing -- and I am not going to try to repeat all the words -- would not be a Class 6 claim.

Is it the ACC's position that it would then under this Plan be a Class 9 claim?

MR. FINCH: Object to form.

Page 544

You can answer.

THE WITNESS: I don't know that the ACC has a position on what kind of claim it would be at that point.

MR. WISLER: Okay. Thank you.

\- - -

EXAMINATION

\- - -

BY MR. MANGAN:

Q. Mr. Lockwood, Kevin Mangan on behalf of the State of Montana. I have a few follow-up questions from Mr. Cohn.

Specifically, I am going to refer you to ACC Document 11, which is Exhibit-4. It's the TDP.

A. Yes, sir.

Q. If you could flip to Section 5.7?

A. Section 5.7 of the TDP.

Q. Correct.

A. Evidentiary Requirements?

Page 545

Q. Right. Specifically, 5.7(a)(1).

A. Correct.

Q. If you could take a second and take a look at that.

A. Including the subsections (a), (b) and (c) or just the lead in (a)(1)?

Q. Just (a)(1).

A. Okay.

Q. You see the (a)(1) requires a ten-year latency period.

A. Correct.

Q. The period between the first exposure and diagnosis.

Why a ten-year latency period?

A. It's my understanding that that is generally considered by the medical profession to be the minimum latency period for asbestos-related diseases to manifest themselves.

Q. And is that how that number came up with, to the best of your

Linda Casey. I am with Pepper Hamilton. I represent BNSF Railway Corporation.

Mr. Lockwood, are you aware that BNSF asserts that Grace purchased insurance policies that named BNSF as the at that name insurer upon which Grace was not also a named insured?

MR. FINCH: Object to form, foundation.

THE WITNESS: I believe I recall seeing Grace make such an assertion.

MS. BAIER: Objection.

THE WITNESS: I am not sure, frankly, however, whether it was Grace that made the assertion or BNSF made the assertion. I know somebody has made the assertion.

BY MS. CASEY:

Q. Okay. The follow-up question I have on that is, is it the ACC's position that as to settled insurance companies, settled asbestos insurance companies, to the extent that

they had, in fact, issued policies to be in BNSF where BNSF is the named insurer, that the channelling injunction will enjoin BNSF post-confirmation from asserting coverage claims against the settled asbestos insurance company under those policies?

MR. FINCH: Objection --

MS. BAIER: Objection to form.

MR. PERNICONE: Objection.

MR. FINCH: -- form, speculation.

To the extent you can answer the question without revealing privileged communications or work product, you can do so.

MR. SCHIAVONI: This is Schiavoni. I object to form, and I also object to this being outside the scope of the designation, and calling for a legal conclusion.

THE WITNESS: As I hear the question and as I interpret the Plan, an insurance policy purchased by Grace for BNSF, which did not provide coverage to Grace, only provided coverage to BNSF, claims by BNSF would not be enjoined unless Grace had somehow or another indemnified that settled insurer against claims by BNSF.

And then in that hypothetical situation, since I haven't seen the policies and have no idea what, if any, indemnifications they have in them, there might be a situation in which if the claim by BNSF against that policy was an asbestos personal injury claim and Grace had indemnified that insurer against that claim, then under those circumstances, as I understand the Plan, that claim

might well be channelled to the Trust. But, as I said before, I have no idea whether any such indemnification provision exists or not.

BY MS. CASEY:

Q. I am not sure if I understand your answer.

The claim that BNSF would have against the insurer would be channelled or the claim the insurer would have against Grace for indemnification would be channelled, or both?

MS. BAIER: Objection as to form. It's a hypothetical, speculative question.

MR. SCHIAVONI: Also, I think it calls for speculation given the nature of the answer that was given.

THE WITNESS: Well, it clearly calls for speculation.

The answer is, in theory, both; in reality, only the first,

BNSF

PP Obj: R; LO; BE; F

Arrowood Obj: F; LC; S; H

as my colloquy with Mr. Brown on Friday, I believe, expressed, which is that if the claim were, in fact, an asbestos personal injury claim that was indemnified by Grace, then the claim by BNSF against the insurer would be enjoined.

Once the claim is enjoined, there will be no opportunity for the insurer to in turn. Have an indemnity claim against Grace.

If the claim is somehow or another not enjoined, then it wouldn't be channelled to the Trust because the only basis on which it could not be enjoined was that it was not an asbestos personal injury claim in the first place. And the Trust picks up indemnity liabilities with respect to Grace for claims that arise out of asbestos personal injury claims.

BNSF

PP Obj: R; LO; BE; F

Arrowood Obj: F; LC; S; H

But, again, I have no idea what kind of claims we are talking about here, so this is purely at a theoretical level of how the Plan would work on unspecified facts and unspecified contractual undertakings.

BY MS. CASEY:

Q. Let me ask it a different way then.

Is it the ACC's position that the Plan under any circumstances can enjoin BNSF from asserting its contract rights against the insurers where Grace purchased the policy but has not been a beneficiary under the policy?

MR. FINCH: Objection, form.

MS. DeCRISTOFARO: Objection to form.

MR. SCHIAVONI: Objection to form, calls for a legal conclusion, calls for speculation.

THE WITNESS: It is very hard for me to imagine that

BNSF

Arrowood Obj: LC; S; F; H

PP Obj: R; LO; BE; F

scenario, but I cannot flatly say that there is no conceivable combination of facts that might preclude that result from taking place.

BNSF is suing, by hypothesis, for coverage of a claim against BNSF. What is that claim? If somehow or another that claim fell within the definition of asbestos personal injury claim, as defined in the Plan, which I don't know whether it would or wouldn't, but theoretically it might, and if BNSF were held liable on that asbestos personal injury claim, brought a suit against that insurer on the separate policy, the insurer somehow or another produces what seems to me to be highly unlikely, which is an indemnity from Grace, saying that not only did we purchase this insurance policy for

BNSF

Arrowood Obj: LC; S; LF; H

PP Obj: R; LO; BE; F

BNSF's benefit but we gave the insurer an indemnity that it would never have to pay any money on the policy, then it's possible that that claim could wind up being enjoined because it gave rise to an indemnity or would give rise to an indemnity claim against Grace for an asbestos personal injury claim.

The problem is it is so inconceivable to me that Grace could give an indemnity to an insurer for a policy that didn't cover Grace but was purchased for BNSF and which hypothesis had never been exhausted. I can't imagine how that could come about.

So you are forcing me, when you give me these hypotheticals, to dream up scenarios under which the hypothetical might possibly apply, no matter how unrealistic the scenario appears to me to be.

Page 558

And that scenario to me appears to be extraordinarily unrealistic, if not impossible.

BY MS. CASEY:

Q. I would like you to turn to Exhibit ACC Exhibit-11.

MR. FINCH: The TDP?

MS. CASEY: Yes, the TDP.

THE WITNESS: Okay. I have it.

BY MS. CASEY:

Q. And specifically 5.12.

A. I have it.

Q. Okay. 5.12 by its terms applies to claims that BNSF and others would have against settled asbestos insurance companies. Let me ask an initial question.

It is the ACC's position that the Asbestos Insurance Entity Injunction also enjoins asbestos claims as defined by the Plan from being asserted against unsettled asbestos insurance companies, correct?

Page 559

A. In general, that's true. The language is very specific as to what kind of claims that it enjoins against non-settled insurers, but subject to the caveat that you have to look at the definition to know exactly which kind of claims you are talking about, yes.

Q. Does the TDP have a provision by which BNSF Railway can assert its enjoined claims against the unsettled asbestos insurance companies?

MR. SCHIAVONI: Objection to form.

THE WITNESS: At the moment, I can't think of anything.

BY MS. CASEY:

Q. Okay. My final questions concern the contribution that Grace is allegedly providing to the Plan on behalf of the insurance companies for the benefit of the 524(g) injunction.

I understand the cash portion -- at least I understand the argument that the ACC is present

Page 560

regarding cash portion. I am not sure I understand the basis for saying that the channelling of the indemnification claims constitutes a substantial contribution to the Plan or a benefit to the Plan, to the asbestos claimants.

Can you explain how that constitutes a benefit?

MR. FINCH: Objection, mischaracterizes prior testimony.

THE WITNESS: I don't believe I testified that that was a benefit to the Trust.

The channelling of the claims, the indemnity claims, against Grace, I testified was a benefit to the Grace Estate.

The statute, in general, says that a protected party has to have something contributed on its behalf to the Trust in exchange for the injunction. That's a very broad paraphrase to the statute.

So the protection for the

Page 561

settled insurance company is the injunction. The benefit to the Trust, which if it, in effect, purchases that protection, is the Grace contribution, which Grace is making on behalf of itself and multiple other entities.

BY MS. CASEY:

Q. The cash contribution?

A. Well, the entirety of the contribution. There is cash; there is notes; there is warrant; there is insurance; and there is the Grace Estate's claim against Fresenius and Sealed Air.

You will recall that Fresenius and -- the committee -- the two committees, the PI and the PD committees, brought claims against Sealed Air and Fresenius on behalf of the Grace Estate. So when those claims were settled, they were not only settled by the entities against which they were brought, namely, Sealed Air and Fresenius, but, to the

BNSF

PP Obj: R; BE; LO

extent that the proceeds of those settlements wind up in the Grace Trust as opposed to the Grace Estate for distribution to other people, they are a settlement part of Grace's contribution to the Trust.

Q. Has the ACC attempted to apportion or value those portions of the contributions made by Grace that are upon Grace's behalf versus upon the insurer's behalf?

MR. FINCH: You can answer that yes or no.

THE WITNESS: Well, I will answer it no and add I am not sure how anybody could go about doing that. It's what is known as a lump sum deal.

MS. CASEY: I have no further questions.

MR. SCHIAVONI: Actually, could we let Mr. Speights from South Carolina go first.

MR. FINCH: You are up, Dan.

\- - -

EXAMINATION

\- - -

BY MR. SPEIGHTS:

Q. Mr. Lockwood, were you involved in the negotiation of the 524 -- strike that.

Were you involved in the --

MS. BAIER: Dan, can you speak up or come closer to the phone or something?

THE WITNESS: Nobody can hear you.

MR. SPEIGHTS: I picked up the phone. I am not on speaker.

MR. FINCH: Now we can hear you.

THE WITNESS: That's better.

MR. FINCH: That's better.

BY MR. SPEIGHTS:

Q. Let me start over again. Mr. Lockwood, were you involved in the negotiation of the 524(g) statute?

A. Me personally?

MR. FINCH: Objection, foundation.

BY MR. SPEIGHTS:

Q. Yes, you personally.

A. No.

Q. Was your law firm?

MR. FINCH: Objection, form, foundation, relevance.

THE WITNESS: It depends on how you define negotiations when it comes to dealing with a congressional enactment. My partner, Mr. Inselbuch, to my knowledge, had at least one meeting with Senator Heflin on the subject of the statute.

What other discussions, either in committee or outside committee or whatever, Mr. Inselbuch might have been involved with, I really don't know. But he's being deposed on June 12th, and I guess you could ask him.

CPO

PP Obj: R; BE; F

BY MR. SPEIGHTS:

Q. Would you agree with me that the 524(g) statute always refers to the word "Trust" in singular rather than plural?

A. I would have to go back and look at the statute to be sure of that. If you tell me it does, I am not going to argue with you about it.

Q. Well, I am actually not going to tell you anything. But if you don't recall without looking at the statute, I certainly would accept that answer.

A. I do not specifically recall without looking at the statute.

Q. Do you recall any bankruptcy that was contested and provides for two asbestos trusts, two or more asbestos trusts?

A. Do you mean a bankruptcy where the Plan proposed to create two trusts, and somebody said there could only be one and that was the contest and

CPO

PP Obj.: R, BE, F

Page 566

the court ruled on that?

Q. I will accept that.

A. I don't think I do recall any such bankruptcy.

Q. How many bankruptcies do you recall where there had been separate trusts of property damage and personal injury?

A. As I sit here right now, I can't think of one. I believe there have been some, but I am hard-pressed to identify one from memory. This was not a topic I was prepared to deal with:

My recollection, however, is there were a number of bankruptcies in which there was no property damage trust at all, whether separate or as part of a single trust to which PI trusts were also channelled.

Q. Mr. Lockwood, what was the status of the PI estimation proceedings when the ACC agreed, at least in principle, with the Debtors to resolve this bankruptcy?

Page 567

A. There are others that are probably better equipped to be precise about that than I, but my general recollection was that I believe that Grace had basically completed putting on its case. And it was before the PI and FCR were putting on their case.

But I really was not -- unlike Mr. Finch, who is sitting here next to me, who actually was involved in trying that case, I wasn't. So I could be wrong about that.

Q. Well, maybe you could represent Mr. Finch, and I could question him.

Regardless -- and by the way --

A. Suffice it to say, there had been a lot of witnesses put on by Grace at the time the case was over -- excuse me -- was postponed.

Q. What was your understanding of Grace's position of the total amount that should be paid to asbestos PI

Page 568

claimants, both present and future, whenever it ended its presentation of the estimation?

MS. BAIER: Objection as to form.

MR. FINCH: Object to form.

THE WITNESS: My recollection is that Grace had various numbers on the table from various witnesses, but they were all way too low.

BY MR. SPEIGHTS:

Q. Well, what is your recollection of the last number they were using before you settled?

MS. BAIER: Objection as to form.

MR. FINCH: Object form and lack of -- well, maybe not lack of foundation but lack of recall.

THE WITNESS: When you say "they were using," using in what context?

BY MR. SPEIGHTS:

Page 569

Q. Well, what is your understanding of Grace's last position of the total amount that should be paid to asbestos present and future PI claimants before the deal was negotiated with the ACC?

MS. BAIER: Objection to form.

MR. FINCH: Mr. Speights, are you asking for his recollection of what is the estimate of the total present and future liability for asbestos PI claims put forward through the testimony of Tom Florence in his expert report and testimony that occurred on March 31st, 2008, two days before the company rested its case?

MR. SPEIGHTS: Well, that wasn't my question, but I will ask that. If Mr. Lockwood knows the answer to that, maybe that will suffice.