Page 570

1   THE WITNESS:  I have no
2   idea.
3   BY MR. SPEIGHTS:
4   Q.   As I anticipated, so I want
5   to go back to the question.
6   A.   I don't have any better
7   answer because my recollection was that
8   Grace had put up experts with different
9   numbers at different times based on
10  different assumptions.  The record is
11  publicly available.  It contains whatever
12  it contains.  I just don't remember
13  what -- I don't remember whether -- I
14  don't remember whether Grace had a single
15  number that was proposed by it to be the
16  definitive number or a range of numbers
17  that the judge could have selected,
18  depending upon which set of assumptions
19  the Grace experts were operating on, that
20  she thought were more plausible than what
21  other assumptions.
22  Your question presupposes,
23  as did Mr. Finch's question to you, that
24  there was some landing point in which

Page 571

1   Grace came up with the number.  I don't
2   even know if there was such a number,
3   much less what it was.
4   Q.   Mr. Lockwood, I have had a
5   little difficulty understanding what the
6   number or the range was in reading
7   Mr. Bernick's various presentations at
8   the estimation hearing.
9   Do you have a recollection
10  of some bookend, some general range where
11  Grace was trying to place the PI
12  liability?
13  MR. FINCH:  Objection to the
14  extent that this calls for
15  examination of the 30(b)(6)
16  witness on topics that I don't
17  recall anybody designating.  He
18  certainly wasn't prepared to
19  respond to questions this specific
20  about those topics.
21  I will let him answer that
22  question, but I suggest that his
23  recollection of that is not likely
24  to be any better of that than what

Page 572

1   he testified to a minute ago.
2   THE WITNESS:  Well, I seem
3   to remember numbers as low as
4   maybe in the 400 million plus
5   range and numbers as high as a
6   billion dollars plus or minus.
7   But whatever the numbers
8   were, as I said earlier, they were
9   always a whole lot lower than what
10  thought bore any resemblance to
11  reality.
12  BY MR. SPEIGHTS:
13  Q.   Thank you, Mr. Lockwood.
14  Let me turn to another subject.
15  What is the document -- and
16  you may have already testified about it,
17  but what is the document that first
18  memorialized a settlement?  Was it a term
19  sheet, a memorandum of understanding or
20  something else?
21  A.   My recollection is it was
22  labeled a term sheet, but I am not
23  positive about that.
24  Q.   And I am just going to use

Page 573

1   that term with the understanding that it
2   may actually be called something else.
3   Who was involved in the
4   negotiation of the term sheet on behalf
5   of the ACC?
6   A.   I think I asked and answered
7   this question the other day.  I think it
8   was -- from the ACC's perspective, A, it
9   didn't include me; and, B, it involved
10  Mr. Inselbuch and some or all of four
11  members of the ACC, including Mr. Rice,
12  Mr. Budd, Mr. Weitz, and Mr. Cooney.
13  I do not know who was
14  involved on the Grace side other than I
15  recall generally that it included outside
16  counsel, inside counsel for Grace, and
17  some representative of the Equity
18  Committee or representatives, plural.
19  Q.   And you did testify about
20  that.  I didn't recall Mr. Inselbuch
21  being there, because it's your
22  recollection that Mr. Inselbuch was
23  involved in those negotiations?
24  A.   He was.  But, again, there

Page 590

1  many judgments did PI plaintiffs obtain
2  against Grace?
3        MR. FINCH:  Objection, lack
4     of foundation.
5        THE WITNESS:  I don't really
6     recall.  I recall that there was
7     an exhibit somewhere that we put
8     in in the estimation case that, I
9     believe, reflected judgments and
10    verdicts of PI cases against
11    Grace.  I think it was all of
12    them, but it might have been for
13    some period shorter than all time.
14       It was, I want to say, in
15    the 20s, but my memory is
16    really -- I wouldn't vouch for my
17    memory on something like that.
18 BY MR. SPEIGHTS:
19    Q.   I understand.  We will await
20 Mr. Finch's deposition.
21       Sometime in the 12 or 16
22 hours that I have been listening to you
23 by telephone, Mr. Lockwood, you said
24 something about some PI claimants

Page 591

1  receiving a payment of $300, although
2  technically they, if you followed some
3  formula, might receive only about $100.
4     Does that ring any bells
5  with you?
6     A.   Yes.  I know what you are
7  talking about.
8     Q.   What do we call that group
9  of claimants?
10    A.   I believe they are called
11 Category I, Other Asbestos Disease, Level
12 I, cash discount payment.  They are
13 identified in Section 5.3(a)(3) of the
14 TDP.
15    Q.   And how many such claimants
16 does the ACC anticipate there being?
17    A.   I don't believe the ACC has
18 a real expectation on this.  It is
19 entirely possible Mark Peterson the
20 committee's asbestos claims expert, might
21 have made a projection of what percentage
22 of the claims would be expected to fall
23 within that category.
24       My general recollection

Page 592

1  is -- this type of category, the Level I
2  cash discount payment, which I believe I
3  characterized earlier in my testimony, is
4  akin to a convenience class in sort of
5  standard bankruptcy, has been used in
6  virtually every case in the last ten
7  years.  And my recollection is that it's
8  a relatively small percentage of claims
9  and a vastly smaller percentage of
10 dollars that wind up getting spent that
11 way.
12       But I really can't be more
13 specific than that.  Peterson might have
14 an estimate, and Inselbuch might know
15 more about other Trust experience with
16 this category of claims than I do.
17       MR. FINCH:  Mr. Speights,
18    Dr. Peterson put in an expert
19    report in March of this year that
20    may shed some light on that
21    question.
22       MR. SPEIGHTS:  Thank you,
23    Mr. Finch.
24 BY MR. SPEIGHTS:

Page 593

1     Q.   I will move to what may well
2  be my last category, Trust Distribution
3  Procedures.
4     Was the Debtor involved in
5  the drafting of the Trust Distribution
6  Procedures?
7        MR. FINCH:  Objection, asked
8     and answered.
9        THE WITNESS:  As I testified
10    the other day, the principal
11    draftspersons for that document
12    were the ACC and the FCR, that
13    Grace saw drafts of it, made
14    comments on it.  But I would not
15    consider it to be accurate to
16    describe them as one of the
17    principal drafters of it.
18 BY MR. SPEIGHTS:
19    Q.   Do you have, I think it's,
20 Exhibit-11, the Trust Distribution
21 Procedures in front of you?
22    A.   I do.
23    Q.   If you would turn to page
24 42, Section 5.7(b)(3), Grace exposure.

Page 602

1  nature of the general objection?
2      MR. FREEDMAN:  The nature of
3  the general objection is that they
4  are presenting hypotheticals,
5  which the witness can't answer
6  and, as a result, require him to
7  set forth opinions about things
8  that are beyond what he should be
9  testifying to in the 30(b)(6)
10  deposition.
11      MR. SCHIAVONI:  That's been
12  90 percent of the testimony,
13  hypotheticals.
14      MR. FREEDMAN:  Well, I am
15  stating this objection to this
16  line of questions.  You have done
17  well on everything else.
18  BY MR. SPEIGHTS:
19      Q.    Mr. Lockwood, I am going to
20  try to wind up in less than ten minutes.
21      MR. FINCH:  Mr. Speights,
22  before you wind up, can we take a
23  two-minute break?
24      MR. SPEIGHTS:  That will be

Page 603

1  fine, if it's two minutes.
2      MR. FINCH:  It's two
3  minutes.  Off the record.
4      (There was a break from 3:17
5  p.m. to 3:20.)
6  BY MR. SPEIGHTS:
7      Q.    Mr. Lockwood, has trustees
8  been selected for the PI Trust?
9      A.    Yes.
10      Q.    Have they been revealed?
11      A.    Their names are set forth at
12  the end of the PI Trust Agreement.  The
13  second-to-last page is a signature page
14  which names three individuals, Harry
15  Huge, Lewis Sifford, and Dean Trafelet,
16  as the three prospective trustees.
17      Q.    Did the ACC choose these
18  three people?
19      A.    The ACC and the FCR
20  consulted each other on these three
21  prospective individuals and then proposed
22  them to the co-proponents and the
23  co-proponents accepted them.
24      Q.    Had the ACC or the FCR

Page 604

1  proposed any other person to the
2  co-proponent which they did not accept?
3      A.    Not that I recall.
4      Q.    Has the ACC chosen an entity
5  to administer the Trust?
6      A.    Not to my knowledge.
7  Indeed, I don't believe the ACC is
8  capable of making that choice.  I believe
9  under the Trust Agreement, the trustees
10  are the only parties with the authority
11  to make that decision.
12      Q.    Is statute of limitations a
13  legal defense in the Trust Distribution
14  Procedures?
15      A.    To the extent --
16      Q.    To any claim?
17      A.    Yes, to the extent so
18  provided in the TDPs.  What I mean by
19  that is there are one or more provisions
20  that address that subject in which the
21  statute of limitations is made
22  applicable.
23      Q.    And if I sit down tonight
24  and very carefully review again this

Page 605

1  Trust Distribution Procedure for the
2  Grace PI Trust, I will find statute of
3  limitations somewhere?
4      A.    Somewhere in there, it is my
5  best recollection that there is a
6  provision, one or more provisions, that
7  address statute of limitations.
8          I might be able to find it,
9  if you really wanted me to root around in
10  it for a while here.  I can't from memory
11  remember exactly where it shows up, but I
12  am --
13      Q.    Well, I actually don't want
14  you to do that.
15      A.    Okay.
16      Q.    But I would request you or
17  your attorney --
18      A.    Okay.  It's Section
19  5.1(a)(2) of the TDP is at least one
20  place.  It's captioned Effect of Statutes
21  of Limitation and Repose.  It starts at
22  page 16 of the TDP and extends over to
23  page 17.  There may be possibly other
24  places where statute of limitations

Page 606

1  provisions occur, but this is the one I
2  was thinking of.
3         MR. SPEIGHTS:  Thank you,
4  Mr. Lockwood.
5         That's all I have subject to
6  reserving my position, as others
7  have done, that Anderson should be
8  permitted to fully explore the
9  negotiations of the Plan of
10  Reorganization.  And I understand
11  from Friday's session, that
12  counsel will not permit
13  Mr. Lockwood to answer those
14  questions, and that will be a
15  continuing objection on our part.
16         MR. FINCH:  Thank you,
17  Mr. Speights.  I think Mr. Plevin
18  has requested that he go next.
19              - - -
20      EXAMINATION
21              - - -
22  BY MR. PLEVIN:
23      Q.    Good afternoon,
24  Mr. Lockwood.

Page 607

FFIC SC
1      A.    Good afternoon.
2      Q.    As you know, I am
3  representing Fireman's Fund in this case
4  for the limited purpose of addressing
5  issues relating to the surety bond that
6  Fireman's Fund issued to Grace with
7  respect to the Edwards appeal in Texas.
8         Are you familiar generally
9  with the Edwards appeal in Texas?
10      A.    Generally, yes.
11      Q.    And you understand that
12  that's a case that in which the
13  plaintiffs obtained a judgment against
14  W.R. Grace at the trial court?
15      A.    Correct.
16      Q.    Grace then took an appeal,
17  correct?
18      A.    Correct.
19      Q.    The appeal -- withdrawn.
FFIC SC
20         With respect to the appeal,
21  Fireman's Fund issued a supersedeas bond?
22      A.    That's my understanding.
23      Q.    And are you also familiar
24  with the fact that in connection with the

Page 608

FFIC SC
1  issuance of the supersedeas bond, W.R.
2  Grace signed an indemnity agreement with
3  Fireman's Fund with respect to the bond?
4      A.    I am generally aware that
5  Grace has an indemnity on that bond,
6  that's correct.
7      Q.    Okay.  And are you aware
8  that Fireman's Fund has filed a proof of
9  claim on a contingent basis with respect
10  to any amounts it is required to pay with
11  respect to the supersedeas bond?
12      A.    Yes.
13      Q.    Does the Plan classify the
14  Fireman's Fund claim in any way?
15      A.    The answer is yes.  I am
16  hesitating only because I can't remember
17  whether the Plan actually singles the
18  Fireman's Fund out by name for
19  classification or whether it only
20  classifies it because of the way of the
21  definitions in the Plan work.  But one or
22  the other of those ways, the Plan
23  classifies Fireman's Fund surety bond
24  claim.

Page 609

FFIC SC
1      Q.    And what is your
2  understanding or recollection of the
3  classification of the Fireman's Fund
4  claim?
5      A.    That it is a Class 6 claim
6  that is channelled to the Trust.
7      Q.    And as a Class 6 claim, how
8  is the claim to be paid or treated?
9      A.    Well, after satisfying
10  itself that there is, in fact, a valid
11  Grace indemnity of the surety bond and
12  assuming, of course, hypothetically that
13  the surety bond has been drawn down on
14  because the plaintiffs prevailed on an
15  appeal, the trustees would treat it, I
16  believe, as a pre-petition liquidated
17  claim with respect to its value and would
18  pay the applicable payment percentage on
19  it.
20      Q.    Okay.  And if the Edwards
21  plaintiffs were to prevail on their
22  appeal, what kind of claim would they
23  have against the estate, what class?
24      A.    If the Edwards claimants

FF Obj:
R; BE;
F; LO



FFIC SC                                          PP Obj: R; BE; LO; F    Page 610

1    were to prevail on their claim?
2        Q.    Yes.
3        A.    Well, under the provisions
4    of the TDP, which require marshalling,
5    the Edwards claim, I believe, would have
6    to be pursued initially against the bond.
7    To the extent that it fully satisfied the
8    bond, they wouldn't have any claim
9    anymore.
10       Q.    If I could ask you to look
11   at Exhibit-11, ACC Exhibit-11, and the
12   TDPs.
13       A.    I have them.
14       Q.    Page 20 contains Section
15   5.2(b).  Do you see that?
16       A.    I do.
17       Q.    Is that the marshalling
18   provision you had in mind when you just
19   gave that previous answer?
20       A.    That is correct.
21       Q.    And that marshalling
22   provision applies to holders of
23   pre-petition liquidated claims that are
24   secured by letters of credit, appeal

FFIC SC                                          PP Obj: R; BE; LO; F    Page 612

1    pre-petition liquidated claims for that
2    purpose.
3            So the Edwards claimants
4    have two choices, I suppose.  And maybe
5    my first answer was a little bit too
6    fast.  The Edwards claimants could either
7    finish their appeal, at which point they
8    would have a pre-petition liquidated
9    claim, that would be a final judgment.
10   Romanette (ii) only excludes non-final
11   judgments.  So they couldn't avoid the
12   appeal by saying to the Trust and
13   Fireman's Fund, oh, we have a
14   pre-petition liquidated claim, you have
15   got to pay it.
16           So they have got a choice.
17   They have either got to pursue -- let me
18   rephrase this.
19       Q.    They have got to defend the
20   appeal.
21       A.    Let me phrase.  They either
22   got to defend the appeal, or they would
23   have to somehow or another withdraw it,
24   dismiss it, whatever, and then seek to

FFIC SC                                          PP Obj: R; BE; LO; F    Page 611

1    bonds, or other security, correct?
2        A.    Correct.
3        Q.    If I could ask you to turn
4    back two pages to page 18, do you see
5    that there is a definition in bold type
6    partway through the first paragraph of
7    Section 5.2(a) defining pre-petition
8    liquidating claims?
9        A.    I do.
10       Q.    I want to go through with
11   you the four subparts here and try to
12   figure out where the Edwards claim would
13   qualify as a pre-petition liquidated
14   claim.
15       A.    It wouldn't.
16       Q.    Okay.  So explain to me --
17       A.    In Romanette (ii), the
18   Edwards claim as opposed to Fireman's
19   Fund's claim is excluded because,
20   although it is a non-final judgment in
21   the tort system obtained prior to the
22   petition date, there is a supersedeas
23   bond associated with it, which means that
24   it is not within the definition of

FFIC SC                                          PP Obj: R; BE; LO; F    Page 613

1    pursue what would then be an unliquidated
2    claim, I guess, against the Trust.
3            But at that point, Fireman's
4    Fund would, as I understand it, no longer
5    have any liability on the surety bond
6    because Fireman's Fund liability is
7    dependent on the entry of a final
8    judgment on the matter that was bonded
9    which was the specific appeal, not some
10   generic bonding of the claim as a whole.
11           That's my understanding.  I
12   don't profess to be an expert on this.
13   But that's my understanding of it.
14       Q.    And your understanding is
15   that if Grace prevailed on the appeal and
16   that ruling became final, either because
17   it was affirmed by the Texas Supreme
18   Court or was not further appealed, that
19   the Edwards claimants would have a claim
20   against the Trust pursuant to the TDPs,
21   just like every other claimant who did
22   not have a pre-petition liquidated claim?
23       MR. GUY:  Objection,
24   compound.



**Page 614**

1　THE WITNESS:  Actually, the
2　answer to that depends on
3　precisely what the Texas appeal at
4　courts decided.  If they decided
5　that they were going to remand for
6　a new trial, then your question is
7　correct, they would have an
8　unliquidated claim.
9　If somehow or another -- I
10　don't think this possible based
11　on the nature of the appeal, but
12　if, for some reason or another,
13　they would decide that the claim
14　was invalid, then I don't think
15　the Edwards claimants would have a
16　claim against the Trust, either,
17　because I think res adjudicata
18　would apply to the Trust as much
19　as it would apply to Grace or
20　Fireman's Fund, for that matter.
21　BY MR. PLEVIN:
22　Q.　Okay.  If you could look at
23　Section 5.6 on page 35.
24　Does this section have any

**Page 615**

1　impact on the classification of the
2　Fireman's Fund claim or the treatment of
3　the Fireman's Fund claim?
4　MR. FINCH:  Objection,
5　compound.
6　THE WITNESS:  Well, I don't
7　think it has any impact on the
8　classification of the claim,
9　because, as footnote 8 points out,
10　the classification occurs in the
11　Plan, and this simply incorporates
12　the Plan definition.
13　On the treatment, this, in
14　effect, is what the Plan provides
15　for the treatment of claims
16　falling within this definition.
17　So assuming that Fireman's Fund's
18　surety bond claim is an indirect
19　PI Trust claim, this would be the
20　section that would provide for its
21　treatment.
22　Although, I want to make
23　clear, treatment is a technical
24　term in the bankruptcy law.  And I

**Page 616**

1　am using treatment in a more
2　generic sense because the Plan
3　provides for the treatment, which
4　is to channel it to the Trust, and
5　this is the detail of how the
6　Trust is going to deal with it
7　once it gets there.
8　BY MR. PLEVIN:
9　Q.　If you look at the footnote
10　8 that you referenced on page 35, an
11　allowed claim by Fireman's Fund would be
12　classified as an indirect PI Trust claim
13　pursuant to subclause (y); is that your
14　understanding?
15　A.　Well, actually, you got to
16　strike the word "allow" because there
17　won't be any allowance.
18　Q.　I understand.  You have
19　explained that before.
20　A.　A quick look at this
21　suggests to me that (y) is the correct
22　place for it.
23　Q.　Can you think of any other
24　TDPs or plans in asbestos bankruptcies

**Page 617**

1　that provided that claims by entities
2　that had issued supersedeas bonds or
3　letters of credit would be treated as
4　indirect asbestos claims subject to the
5　payment percentage?
6　A.　Not off the top of my head.
7　I could go back and look at a bunch of
8　TDPs to see whether there are any such,
9　but I don't remember off the top -- I
10　have to say, my recollection is that the
11　Edwards claim is somewhat unique in my
12　experience in terms of its size and
13　components and status in the bankruptcy
14　case.
15　So it wouldn't necessarily
16　surprise me if the magnitude of that
17　claim was such that it caused us to focus
18　on this question for the first time
19　explicitly in this Plan.  But, again, I
20　would really have to go back and look at
21　the TDPs to testify confidently about
22　that.
23　Q.　Do you recall that subclause
24　(y), as shown on footnote 8, was inserted

FFIC SC

PP Obj: R, BE, F

Page 618

1  into the Plan specifically for the
2  purpose of addressing a contingent claim
3  by Fireman's Fund under the indemnity
4  agreement?
5       A.   I can't say that that was
6  the sole reason that it was put in there,
7  but I can't say that it wasn't.  I really
8  don't remember at this point the drafting
9  history of the TDP sufficiently to be
10  able to say yeah or nay on that.
11       Fireman's Fund was certainly
12  contemplated -- I mean, the
13  Edwards/Fireman's Fund situation was
14  certainly contemplated as being within
15  that provision.  But whether it was the
16  only thing or whether we said to
17  ourselves, gee, there might be other
18  things or this is the way we need to
19  spell this out, I just don't remember at
20  this point in time.
21       Q.   Can you recall any of the
22  back and forth between your committee and
23  anybody that your committee negotiated
24  with about --

Page 619

1       MS. BAIER:  Objection.  I
2  will stop you right there because
3  now you are getting into the
4  territory of the negotiations
5  among the co-proponents of the
6  Plan or negotiations that are work
7  product and privileged and the
8  like.  And we have made it very
9  clear in this deposition that
10  those are not going to be
11  responded to.
12       MR. PLEVIN:  Just so I
13  understand, because I wasn't here
14  for the deposition on Friday,
15  that's a position in an objection
16  you are asserting as opposed to
17  something that's already been
18  ruled on?
19       MR. FINCH:  Yes.
20       MS. BAIER:  Yes.
21       THE WITNESS:  But unlike
22  many of the other objections, it's
23  one that I am being instructed not
24  to answer the question subject to

Page 620

1  the objection.
2       MR. PLEVIN:  Okay.
3       THE WITNESS:  A lot of other
4  things, as Mr. Schiavoni is fond
5  of pointing out, I have answered
6  notwithstanding the interposition
7  of an objection.
8       MR. PLEVIN:  Just so I am
9  clear, is the witness being
10  instructed not to answer?
11       MR. FINCH:  Yes, the witness
12  is being instructed not to answer
13  questions that get into the
14  details of Plan negotiations of a
15  particular Plan provisions, which
16  is a position we took in our
17  objections to 30(b)(6) notice
18  generally, and that objection will
19  stand.  I will instruct him not to
20  answer on, on reliance on prior
21  orders of Judge Fitzgerald in
22  other cases where exactly that
23  topic was presented.
24       MR. PLEVIN:  Just so I am

Page 621

1  clear, the question I just asked
2  or, I would say, mostly asked --
3       MR. FINCH:  The question you
4  asked --
5       THE WITNESS:  You tried to
6  ask.
7       MR. FINCH:  -- went far
8  enough down the line that it had
9  the objection.
10       MR. PLEVIN:  And you are
11  instructing him on that question?
12       MR. FINCH:  Yes.
13  BY MR. PLEVIN:
14       Q.   Mr. Lockwood, has the
15  committee taken the position with respect
16  to the question of whether in the event
17  that -- let me back up a minute and ask a
18  foundational question.
19       Are you aware that Fireman's
20  Fund issued insurance liability coverage
21  to W.R. Grace?
22       A.   Yes.
23       Q.   And are you aware of the
24  fact that W.R. Grace and/or other

Page 622

1 constituencies in the case are making a
2 claim on Fireman's Fund for payment
3 pursuant to those policies?
4       MR. FINCH:  Object to form.
5       THE WITNESS:  Well, my
6 awareness of that is that the
7 rights under those policies are
8 being assigned to the Trust under
9 the Plan.  And my expectation is,
10 therefore, that any such demands
11 that you just described would be
12 made on behalf of the Trust, not
13 on behalf of Grace.
14       But subject to that caveat
15 or correction, if you will, I am
16 aware that there have been
17 discussions of a possible
18 resolution of that insurance.
19 BY MR. PLEVIN:
20       Q.    Does the committee have a
21 position as to the right of Fireman's
22 Fund to set-off against any amounts it is
23 obligated to pay as coverage under the
24 policies for asbestos liabilities any

*Arrowood*

Page 624

1 have no further questions.  Thank
2 you.
3                 - - -
4             EXAMINATION
5                 - - -
6 BY MR. SCHIAVONI:
7       Q.    Mr. Lockwood, I have a
8 couple of softballs for you.
9       Did you review the
10 description of the status of the coverage
11 that Grace claims that Royal issued to
12 Zonolite in the Disclosure Statement?
13       A.    Do you mean did I review the
14 portions of the Disclosure Statement
15 purporting to describe that?
16       Q.    Yes.
17       A.    I think I did, yes.
18       Q.    Okay.  Did you review the
19 description of the January 5, 1995
20 settlement agreement between Grace and
21 Royal in the Disclosure Statement?
22       A.    If you could refer me to the
23 particular provision in the Disclosure
24 Statement to which you are referring, it

Page 623

1 amounts owing from Grace to Fireman's
2 Fund under the indemnity agreement in the
3 event that Fireman's Fund pays under the
4 bond for the Edwards claim?
5       MS. BAIER:  Objection to the
6 extent you are asking for a legal
7 opinion or conclusion from a fact
8 witness.
9       MR. FINCH:  I join in that.
10       THE WITNESS:  As of now, the
11 answer to that question is not
12 yet.
13 BY MR. PLEVIN:
14       Q.    Okay.  Do you know when --
15 do you have an expectation, rather, as to
16 when the committee will have a position
17 on that?
18       A.    Well, all I can say is that
19 that question is being analyzed, to my
20 understanding, in connection with
21 discussions that insurance counsel are having with
22 the committee and others are having with
23 representatives of Fireman's Fund.
24       MR. PLEVIN:  All right.  I

*Arrowood*

Page 625

1 would probably expedite this.
2       I think I probably did, if
3 it's in the Disclosure Statement, but it
4 would be easier to answer the question
5 definitively if I could look at the
6 Disclosure Statement, which I have
7 available.
8       MR. SCHIAVONI:  Carl, if you
9 could hand a copy of the
10 Disclosure Statement to
11 Mr. Lockwood.
12       MR. PERNICONE:  I just did.
13       THE WITNESS:  Could you give
14 the page or section number?
15 BY MR. SCHIAVONI:
16       Q.    The provision I have on mine
17 is on page 41.  I believe it's 2.10.2.2.
18       A.    I see that provision.
19       Q.    All right.  Let me just ask
20 you the question clean again that I just
21 asked you.
22       A.    Okay.
23       Q.    Did you review the
24 description of the January 5, 1995

Page 626

1  settlement agreement between Grace and
2  Royal that's in the Disclosure Statement?
3      A.   Yes.
4      Q.   Okay.  Is it fair to say
5  that it's the committee's position that
6  the Disclosure Statement accurately
7  describes the January 5, 1995 settlement
8  agreement between Grace and Royal?
9      A.   The answer to that is yes
10  subject to the qualification that the
11  committee is to an significant extent
12  relying on Grace as the source of the
13  information that is contained in that.
14          But the committee is
15  certainly not challenging that statement
16  or disagreeing with it.  And it's in a
17  document that the committee is a
18  co-proponent of.  So, in effect, the
19  committee is adopting it.
20      Q.   Is it fair to say,
21  Mr. Lockwood, that it is also the
22  committee's position that the Disclosure
23  Statement accurately describes the status
24  of the coverage that Grace alleges that

Page 627

1  Royal issued to Zonolite?
2      A.   As far as the committee is
3  aware, that description is accurate, for
4  the same reasons I described in my answer
5  to the previous question.
6      Q.   And that is, that you are
7  relying to some extent on Grace having
8  provided you information?
9      A.   That's correct.  I mean, the
10  only -- we get documents; we get
11  descriptions.  The only conceivable
12  source of those documents to us, short of
13  going out and doing discovery of Royal
14  and what have you, was Grace.
15          So if they, for example,
16  left out a document that was relevant or
17  something like that, then we wouldn't
18  necessarily know about it.  But we don't
19  have any reason to believe that that's
20  the case.
21      Q.   Let me ask it that way.  Is
22  it fair to say that, sitting here today,
23  the committee doesn't have any reason to
24  believe that the Disclosure Statement in

Page 628

1  any way inaccurately describes the
2  January 5, 1995 settlement agreement
3  between Grace and Royal?
4      A.   Correct.
5      Q.   Is it also fair to say that,
6  sitting here today, the committee doesn't
7  have any reason to believe that the
8  Disclosure Statement inaccurately
9  describes the status of the coverage that
10  Grace alleges that Royal issued to
11  Zonolite?
12      A.   That is also correct.
13      Q.   Are the Libby claimants that
14  are represented by Mr. Cohn a member of
15  the Asbestos PI Committee?
16      A.   No.  One Libby claimant that
17  is represented by Mr. Heberling is a
18  member of the committee.  To my
19  knowledge, the balance of the so-called
20  Libby claimants are represented by
21  primarily, if not exclusively, two
22  plaintiffs firms in Montana, one of which
23  is Mr. Heberling's, the other which is
24  not, and that Mr. Cohn has been employed

Page 629

1  by those two firms to act as bankruptcy
2  counsel for their collective clients.
3          But as far as I am aware,
4  Mr. Cohn is not a member of the ACC.
5      Q.   All right.  Is Mr. Heberling
6  a member of the Asbestos PI Committee?
7      A.   Mr. Heberling, like the
8  other lawyers that are the personal
9  injury lawyers for members of the
10  committee, my understanding, has been
11  delegated by his client who is on the
12  committee to act in the client's stead on
13  most, if not all, matters coming before
14  the committee.
15      Q.   Did either Mr. Heberling or
16  his client, that is, a member of the
17  committee, object to your designation as
18  a 30(b)(6) witness for the committee?
19      A.   Not to my knowledge.
20      Q.   Did the Libby claimants --
21  strike that.
22          Did either Mr. Heberling or
23  his client that's a member of the
24  committee object to you offering

Arrowood

Page 630

1  testimony on behalf of the committee with
2  respect to any of the topics on which the
3  committee's designated you as a 30(b)(6)
4  witness?
5          A.    Not that I recall.
6          Q.    Did either Mr. Heberling or
7  his client, which is a member of the
8  committee, convey any position to the
9  committee concerning the treatment of
10  asbestos PI claims that's in any way
11  inconsistent with the testimony that you
12  have offered today?
13          MR. FINCH:  Objection, form,
14  foundation.  To the extent that
15  calls for privileged
16  communications, I instruct the
17  witness not to answer.  To the
18  extent that calls for settlement
19  communications, I instruct the
20  witness not to answer.
21          If you can answer subject to
22  either of those instructions, you
23  can do so.
24          THE WITNESS:  Mr. Cohn and

Page 631

1  his clients have filed voluminous
2  papers in this case expressing
3  positions with which the majority
4  of the committee is in
5  disagreement, and the committee
6  has filed papers in opposition or
7  otherwise in response to those
8  papers.
9          You have asked me whether or
10  not anything I have said in the
11  course of a day and a half of
12  testimony is inconsistent with the
13  positions expressed by the Libby
14  claimants in those papers.  I
15  would have to say it strikes me as
16  probable that I have said things
17  that were inconsistent with those
18  positions.  But for me to go back
19  and recite from memory everything
20  that I might have said that might
21  be so inconsistent, I could not
22  begin to accomplish.
23  BY MR. SCHIAVONI:
24          Q.    Have Mr. Heberling and his

Page 632

1  client taken positions inconsistent with
2  the other committee members with regard
3  to the Plan that's now on file?
4          A.    Yes.
5          Q.    And has that been the case
6  for the last year?
7          A.    Probably, I would say so, at
8  least.
9          Q.    Would you tell us what
10  positions the Libby claimants took in
11  meetings with the other ACC members with
12  regard to the insurance coverage that's
13  alleged to be issued to Grace?
14          MR. FINCH:  Objection.  To
15  the extent he is calling for
16  discussions between committee
17  members in the presence of
18  committee counsel that would
19  reveal privileged communications
20  or work product communications, I
21  instruct you not to answer the
22  question.
23          I think on its face, the
24  question invades the privilege,

Page 633

1  but if you can answer the question
2  without so doing, you may do so,
3  although I tend to doubt it.
4          THE WITNESS:  Read the
5  question back.
6          (The reporter read from the
7  record as requested.)
8          THE WITNESS:  I have been
9  instructed not to answer that
10  question by my understanding my
11  instructions.
12          MR. SCHIAVONI:  And, Nate, I
13  don't want to belabor the point,
14  but this would be the case with
15  regard to other questions about
16  what positions the Libby claimants
17  had communicated to the other
18  committee members in which they
19  are in opposition to the other
20  committee members, right?
21          THE WITNESS:  Any
22  communication that happened that
23  wasn't as a result of them filing
24  something in court, I would take

Page 634

1    the same position and give the
2    same instruction.
3        If you ask about questions
4    that Libby claimants have taken in
5    papers filed in the court, for
6    example, in a Disclosure Statement
7    objections and the bullet point
8    Plan objections and the
9    committee's responses made to that
10    in open court, I will permit
11    Mr. Lockwood certainly to answer
12    those questions.
13        But anything that gets into
14    communications with between the
15    Libby claimants with the rest of
16    the ACC or counsel for the ACC
17    about their respective views of
18    insurance coverage, I am going to
19    take the position as privileged.
20        And so I think you have to
21    do it on a question-by-question
22    basis, but that's my general
23    position.
24    BY MR. SCHIAVONI:

Page 635

1    Q.    Okay.  Mr. Lockwood, I just
2    have one other brief topic.  And here is
3    the first question on that:  Does the
4    Plan purport to release claims that may
5    exist between insurers and Non-Debtors?
6        MR. FINCH:  Objection, form,
7    broad, vague.
8        THE WITNESS:  Phrased as
9    broadly as you have, I think the
10    answer is yes.
11        MR. SCHIAVONI:  Okay.  Thank
12    you.  I have no further questions.
13        MR. FINCH:  Is there anyone
14    else in the room who has
15    questions?
16        MR. BROWN:  I have some
17    follow-ups.
18        MR. FINCH:  Is there anyone
19    else on the telephone who has not
20    asked questions yet who has
21    questions?
22        (No response.)
23        MR. FINCH:  Hearing no
24    affirmative response, I will let

Page 636

1    you have follow-up until we run
2    out of time.
3        (There was a discussion held
4    off the record at this time.)
5        (There was a break from 3:55
6    p.m. to 4:03 p.m.)
7                -  -  -
8            EXAMINATION
9                -  -  -
10    BY MR. BROWN:
11    Q.    Mr. Lockwood, just a couple
12    of follow-ups.  The court reporter is
13    actually going to read back a question
14    and answer.  I think it's probably easier
15    to do that, and then I will ask my
16    follow-up question.  It was end of
17    Mr. Wisler's questioning of you.
18    A.    Okay.
19        (The reporter read from the
20    record as requested.)
21    BY MR. BROWN:
22    Q.    And after that,
23    Mr. Lockwood, Mr. Wisler asked you a
24    follow-up as to what type of claim it

Page 637

1    would be.
2        And is it correct that the
3    ACC does not have a position on what type
4    of claim it would be if it's not a Class
5    6 claim?
6    A.    Well, the ACC doesn't, as
7    such, have positions on hypothetical
8    questions.  So, yes, the ACC doesn't have
9    a position on that issue.  The ACC --
10    well, I will leave it at that.
11    Q.    On Friday, Mr. Cohn asked
12    you a question, who drafted the TDP.
13    That was the question, and you gave an
14    answer which I am happy to show you the
15    full answer.  But I WANT to repeat a
16    portion of your answer.  You said:  "The
17    participants that did it were basically
18    counsel for the ACC, counsel for the FCR,
19    and members of the ACC itself in terms of
20    reviewing and commenting on things, and
21    the FCR himself."
22        When you said the ACC
23    itself, what did you mean?
24    A.    I meant --

Page 638

1  Q.    I am sorry.  When you said
2  members of the ACC itself, what members
3  are you talking about?
4       A.    Well, I was referring to the
5  personal injury counsel who were the
6  delegated representatives of the
7  individual ACC members, if that's what
8  you are driving at.
9       Q.    That's what I am driving at.
10        And who specifically were
11  they?
12       A.    As far as I know -- well,
13  the way in which the process works, in
14  general, is sometimes the ACC has
15  in-person meetings, sometimes it has
16  telephonic meetings, sometimes documents
17  get sent to it by email as PDF
18  attachments or whatever, and the ACC has
19  asked do you want to have a meeting or is
20  this good enough for you.  So there is a
21  variety of ways in which the ACC views an
22  input as obtained.
23        And my answer was simply
24  that at the conclusion of a process, the

Page 639

1  members of the ACC had weighed in one
2  or more of the ways in which I had
3  described some of them had; they all had
4  the opportunity to express their views;
5  and, therefore, the final product was the
6  product of their input.  And there was a
7  final vote to go forward with the
8  document.
9       Q.    Okay.  And when you say the
10  members, you are talking about their
11  actual personal injury counsel?
12       A.    As far as I know.  But,
13  again, I couldn't tell you whether an
14  individual personal injury lawyer might
15  have consulted with his client, the
16  member, on one or more aspects of the TDP
17  or, for that matter, even sent the client
18  a copy of the entire TDP and had a
19  discussion with him about it.  I
20  certainly couldn't exclude that.
21       Q.    Can you tell me the list of
22  counsel that you are talking about, the
23  actual names?
24       A.    They would be -- as a

Page 640

1  general proposition, I believe they are
2  in the Disclosure Statement.  If they
3  are, it's a hell of a lot better
4  description of them than my memory.  I
5  just --
6        MR. FINCH:  There is also an
7        order entered by the U.S. Trustee
8        that identifies the 11 individual
9        members of the ACC and their
10        counsel, care of their firms.
11  BY MR. BROWN:
12       Q.    That's what I am driving at.
13  I would like to know who the individuals
14  were at their firms that were involved.
15       A.    Well, let me just see.  I am
16  somewhat surprised.  The Disclosure
17  Statement does not appear to contain the
18  members of the ACC.  It just lists the
19  counsel representing the committee as a
20  whole.  I had misremembered.  I had
21  thought that it did.
22        I can't really remember.  I
23  mean, I know the four -- I identified
24  four earlier as being involved in the

Page 641

1  discussions with Grace.  They are
2  included.  I think there is at least nine
3  members of the ACC.  I do not recall, as
4  I sit here, who the other five members of
5  the ACC are.  I mean, they are of
6  record -- strike that.  I do not recall
7  who the other five lawyers for the
8  members of the ACC are.  They are of
9  record.
10       Q.    But the four to which you
11  are referring is Mr. Budd, Mr. Rice,
12  Mr. Cooney, and Mr. Weitz?
13       A.    Correct.
14       Q.    You were talking about the
15  Trust Distribution Procedures and who
16  drafted them.
17        Would your answer be the
18  same with respect to the Trust Agreement?
19       A.    On the Trust Agreement, I
20  think there was more input from Grace,
21  and, indeed, I think there may have been
22  some from counsel from Sealed Air, as I
23  think about it.  And, indeed, now that I
24  think about it, I think there may have

Page 642

1  even been a little input from the Sealed
2  Air counsel on the TDP.  But, again, the
3  primary draftspersons were counsel for
4  the ACC and the FCR.
5      Q.   Okay.  Can I direct your
6  attention to the Plan, which I guess is
7  ACC-5, and specifically it's page 70 on
8  my copy.  It's under Section 7.7
9  Conditions to Occurrence of the
10 Confirmation Date, specifically condition
11 (j).
12     A.   I see it.
13     Q.   Can you just take a moment
14 to read that?  I have one question on
15 that.
16     A.   I have read it.
17     Q.   In the portion of that
18 condition dealing with asbestos PD
19 claims, second-to-the last line, you will
20 see the words "if any" appear there, but
21 the same language doesn't appear for
22 asbestos PI claims.
23          Why?
24          MR. FINCH:  Objection,

Page 643

1  foundation.
2      THE WITNESS:  I need to talk
3  to my counsel about this one.
4      (There was a discussion held
5  off the record between the witness
6  and counsel at this time.)
7      MR. FINCH:  The discussion
8  was with respect to whether I need
9  to instruct him not to answer the
10 question.  He is allowed to answer
11 the question as long as doing so
12 doesn't reveal privileged
13 communication.
14     I think you can answer.
15     THE WITNESS:  Barely.
16     The "if any" is in there, as
17 best I can recall, because the
18 Plan proponents -- in contrast of
19 PI, "if any" is under PD.  Because
20 the Plan proponents are quite
21 confident that there is going to
22 be lots of future PI demands and
23 are less confident that there is
24 going to be lots of future PD

Page 644

1  demands, or if there are, they
2  will be valid.
3      MR. BROWN:  Okay.  That's
4  all I have.
5      MR. FINCH:  Could you go
6  back to the question I asked you
7  to find and read that question and
8  read the answer, and I will see if
9  I have got any redirect.
10     Does anybody else have any
11 questions?
12     (No response.)
13     MR. FINCH:  Hearing none,
14 let me just hear that back.
15     (The reporter read from the
16 record as requested.)
17     MR. FINCH:  No questions.
18     I think that is the end of
19 the deposition.
20     (The deposition concluded at
21 4:19 p.m.)
22
23
24

Page 645

1          CERTIFICATE
2
3
4      I HEREBY CERTIFY that the witness
5  was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10
11
12
13     Lori A. Zabielski
14     Registered Professional Reporter
15     Dated:  May 5, 2009
16
17
18
19
20     (The foregoing certification
21 of this transcript does not apply to any
22 reproduction of the same by any means,
23 unless under the direct control and/or
24 supervision of the certifying reporter.)

```
1           ACKNOWLEDGEMENT OF DEPONENT

2      I, Peter Van N. Lockwood            , do

3    hereby certify that I have read the

4    foregoing pages,    1-     PGS, and that

5    the same is a correct transcription of

6    the answers given by me to the questions

7    therein propounded, except for the

8    correction or changes in form or

9    substance, if any, noted in the attached

10   Errata Sheet

11

12   _____  6/1/09_____

     WITNESS NAME                   DATE

13

14

15

16

17   Subscribed and sown

18   to before me this

19   _1st_ day of _June_____, 20_09_.

20   My commission expires:

21        Jeanne G. Katz
          Notary Public, District of Columbia
          My Commission Expires 12/14/2012

22

23   _____

     Notary Public

24
```

```
 1                     —   —   —   —   —

 2                   E  R  R  A  T  A

 3                     —   —   —   —   —

 4     PAGE      LINE    CHANGE
```

CPO

| PAGE | LINE | CHANGE |
|---|---|---|
| 17 | 5 | "to" to "to be" |
| 17 | 21 | "here in" to "herein" |
| 21 | 21 | "are" to "are not" |
| 37 | 16 | "is" to "are" |
| 38 | 10 | "My" to "When I" |
| 41 | 12 | "representative" to "representatives" |
| 69 | 21-22 | "combuston engineering" to "Combustion Engineering" |
| 80 | 13 | "pre-petitioned" to "pre-petition" |
| 80 | 22 | "consultancy and cleaning" to "Consultancy and Cleaning" |
| 82 | 2 | "alterego" to "alter ego" |
| 84 | 18 | "178" to "Definition 178" |
| 84 | 21 | "insurers" to "insureds" |
| 85 | 15 | "punitive" to "putative" |
| 90 | 7 | "the" to "an" |
| 96 | 19 | "engineering" to "Engineering" |
| 98 | 1 | "is" to "are" |
| 98 | 19-20 | "and insurance protection" to "any insurance injunction" |
| 100 | 14 | "is" to "in" |
| 104 | 18 | "or" to "or its" |
| 107 | 13 | "-vie" to "-vis" |

CPO (margin annotations appear at lines 5-6, 8-10, 15-17, 23-24)

Page 647

1           —   —   —   —   —

2               E R R A T A

3           —   —   —   —   —

4   PAGE    LINE   CHANGE

5   111     20     delete "or"

6   112     2      "cutoff" to "cut off"

7   115     12     "is" to "are"

8   117     24     "C363B" to "section 363(b)"

9   118     3      "you" to "you've"

10  118     8      "have" to "to have"

11  119     24     "in" to "an"

12  131     24     "gratuitous" to "gratuitous benefit to"

13  134     14     "indirectly" to "indirect"

14  142     16     "transfers" to "transfer"

15  143     1      "adjoining" to "enjoining"

16  158     9      "does" to "the"

17  171     6 & 11 "race" to "res"

18  178     11     "channel" to "channeled"

19  178     12     "Trust" to "Trust claims"

20  183     4      "an all set" to "a null set"

21  192     5      "of" to "or"

22  193     5      "we" to "they"

23  194     3      "claims" to "policies"

24  205     16     "it finds" to "they find"

CPO

CPO

CPO

CPO

1

2                                E R R A T A

3

| PAGE | LINE | CHANGE |
|---|---|---|
| 220 | 3 | "trusts by the Trust" to "Trusts, by the Trust" |
| 220 | 10 | "Trust" to "court" |
| 223 | 19 | delete "skied" |
| 224 | 12 | "did" to "the" |
| 226 | 14 | "insurer" to "insurers" |
| 226 | 18 | "reviewed" to "viewed" |
| 232 | 2 | "to" to "the" |
| 238 | 17 | "PI" to "indirect PI" |
| 249 | 13 | delete "is" |
| 249 | 13 | "liability is" to "liabilities" |
| 250 | 5 | "omission" to "admission" |
| 258 | 24 | delete "it" |
| 266 | 12 | delete "a" |
| 266 | 22 | insert "The" after "worded." |
| 267 | 12 | "-vie" to "-vis" |
| 269 | 19 | "Pi" to "PI" |
| 270 | 11 | "evaluate" to "evaluates" |
| 272 | 7 | "the fact of law" to "fact and law" |
| 272 | 14 | delete "of" |
| 272 | 21 | insert "were" before "in force" |

| | PAGE | LINE | CHANGE |
|---|---|---|---|
| 1 | | — — — — — | |
| 2 | | E R R A T A | |
| 3 | | — — — — — | |
| 4 | PAGE | LINE | CHANGE |
| 5 | 279 | 5 | "sure that" to "sure" |
| 6 | 279 | 6 | "subject." to "subject," |
| 7 | 288 | 8 | "Grace's had" to "Grace's, had" |
| 8 | 289 | 8 | insert "Grace" before "has" |
| 9 | 294 | 24 | delete "position" |
| 10 | 297 | 1 | "IN" to "In" |
| 11 | 297 | 6 | "rights" to "right" |
| 12 | 297 | 16 | "gray" to "Grace" |
| 13 | 308 | 3 | "agreement" to "agreements" |
| 14 | 310 | 8 | "injunction. It" to "injunction if" |
| 15 | 310 | 11 | "then" to "than" |
| 16 | 324 | 13 | insert "that" before "are" |
| 17 | 338 | 1 | "COBB" to "FINCH" |
| 18 | 346 | 18 | insert "it" before "depends" |
| 19 | 361 | 20 | "liable" to "liability" |
| 20 | 366 | 2 | "punitive" to "putative" |
| 21 | 368 | 6 | "a Payne" to "obtaining" |
| 22 | 377 | 7 | "pre-filed" to "previously filed" |
| 23 | 379 | 8 | "is" to "are" |
| 24 | 385 | 21 | "committees" to "committee's" |

CPO (rows 13, 16 marked in red)

| | | |
|---|---|---|
| 1 | — — — — — |
| 2 | E R R A T A |
| 3 | — — — — — |

| | PAGE | LINE | CHANGE |
|---|---|---|---|
| 4 | | | |
| 5 | 388 | 2' | "history" to "historical" |
| 6 | 402 | 12 | "about" to "with" |
| 7 | 403 | 24 | delete "for" |
| 8 | 416 | 3 | "entitled" to "entitle" |
| 9 | 416 | 8 | "or" to "on" |
| 10 | 419 | 3 | "to" to "at" |
| 11 | 419 | 23-24 | "in all" to "a null" |
| 12 | 425 | 18 | "Indiana" to "Inselbuch" |
| 13 | 425 | 20 | "arguably" to "arguable" |
| 14 | 435 | 9 | "met" to "me" |
| 15 | 468 | 13 | "is" to "has" |
| 16 | 469 | 24 | "errors" to "criteria" |
| 17 | 471 | 8 | "pressed" to "met" |
| 18 | 472 | 13 | "to" to "of" |
| 19 | 491 | 16 | "respected" to "respective" |
| 20 | 491 | 17 | "conference" to "categories" |
| 21 | 492 | 8 | "obtain" to "obtained" |
| 22 | 493 | 19 | ~~direct~~ "by" to "from" |
| 23 | 526 | 22 | "combustion engineering" to "Combustion Engineering" |
| 24 | 535 | 9 | insert "a" after "go" |

CPO

```
1                    -    -    -    -    -
2                    E  R  R  A  T  A
3                    -    -    -    -    -
4      PAGE      LINE      CHANGE
```

CPO

| PAGE | LINE | CHANGE |
|------|------|--------|
| 536 | 8 | "exercise" to "excise" |
| 539 | 23 | "claim that" to "claims, that" |
| 539 | 24 | "exhaustion" to "exhausted" |
| 546 | 17 | delete "as" after "by" |
| 550 | 6 | "at that name insurer" to "named insured" |
| 551 | 1-2 | delete "be in" before "BNSF" |
| 554 | 1 | "turn, have" to "turn have" |
| 557 | 16 | insert "by" before "hypothesis" |
| 559 | 24 | "present" to "presenting" |
| 572 | 9 | insert "we" after "what" |
| 581 | 15 | insert "of" after "Plan" |
| 588 | 6 | "have" to "as" |
| 594 | 8 | insert "to" before "deal" |
| 614 | 17 | "adjudicata" to "judicata" |
| 626 | 11 | "an" to "a" |
| 633 | 10 | insert "of" before "my" |
| 633 | 21 | "THE WITNESS" to "MR. FINCH" |
| 634 | 3 | "questions" to "positions" |
| 638 | 18 | insert "been" after "has" |
| 644 | 1 | "are;" to "are, that" |

CPO