In Re: W.R. Grace & Co., et al., Debtors    Case No. 01-1139 (JKF)    Craig Molgaard, Ph.D.
June 25, 2009

Page 97

1  correct?
2  A  Right.
3  Q  Okay. If, hypothetically, the person in Libby
4  developed an asbestos-related disease from that
5  exposure; okay --
6  A  Uh-huh.
7  Q  -- any of them; meso, lung cancer, asbestosis,
8  pleural disease.
9  A  Right.
10  Q  As an epidemiologist -- strike that.
11     If the person in Libby that was loading the
12  concentrate onto the rail car developed an
13  asbestos-related disease from the handling of the
14  vermiculite concentrate onto the rail car, and the
15  individual in Boston developed an asbestos-related
16  disease from his handling of the taking off of the
17  vermiculite concentrate from the rail car in Boston,
18  from an epidemiological standpoint, would there be any
19  reason to believe that the asbestos-related disease that
20  was contracted by the two gentlemen would be a different
21  disease? I maybe asked -- let's say it was
22  mesothelioma. If the gentleman in Libby contracted
23  mesothelioma from that exposure to concentrate and the
24  gentleman in Boston contracted mesothelioma from his
25  exposure to that concentrate that ended up in Boston,

Page 98

1  would you expect the mesothelioma to be different
2  mesothelioma?
3  A  Normally, no, but the environmental exposures
4  would be different. Because the guy loading the stuff
5  onto the train in Libby would, undoubtedly, have more
6  exposures than just the loading of. Because he's living
7  in this town where this stuff's all over and there's
8  clouds of dust and all this.
9  Q  Right.
10  A  The guy in Boston, in theory, is just picking
11  up a bag and dropping it. So maybe that could cause a
12  different type of disease pattern, I don't know, because
13  the exposure is stronger. Maybe you get more or faster
14  problems in Libby.
15  Q  So that the -- you're hypothesizing that it's
16  possible that if -- and your premise is that it is the
17  level of exposure; correct?
18  A  Yeah.
19  Q  Because we can agree that the stuff is the same
20  stuff.
21  A  Yeah; right, right.
22  Q  And from a toxicologically, epidemiologically,
23  everything we know in science, there's no reason to
24  think that the stuff -- if you're exposed to the same
25  stuff in Boston as you're exposed to in Libby, the

Page 99

1  disease that you ultimately get is going to be the same
2  disease; correct?
3  A  Right. The only thing, it might be -- the
4  progression has spread. Might be -- could possibly be
5  faster in Libby if there's a more concentrated exposure.
6  That's a hypothetical.
7  Q  Right; that's a hypothesis that you would agree
8  hasn't been tested.
9  A  Right.
10  Q  To the extent that it's been tested with
11  analytical epidemiology, you would look to the Amandus
12  and McDonald study and the mortality study for -- well,
13  actually, I -- well, I would say the Amandus and
14  McDonald study because you have some understanding of
15  levels of exposure in that study.
16  A  Some. But I would look at the ATSDR stuff too.
17  Q  Okay; the ATSDR Mortality Study?
18  A  Yeah.
19  Q  Okay.
20     To get back to the hypothetical, the point
21  you're making is that if you're exposed -- let's say
22  you're exposed to, you know, a hundred fibers. This
23  would be true whether you were in Libby or somewhere
24  else; correct?
25  A  Uh-huh.

Page 100

1  Q  If you were in Boston and you happened to be
2  the person that takes the stuff off the cart every day,
3  and you're exposed every day for forty years, you might
4  have a different rate of how fast you might develop the
5  disease than the guy that just worked there for two days
6  or the guy that worked there for just a year; correct?
7  A  Right.
8  Q  And did the same thing; right?
9  A  Right.
10  Q  Okay. So the fact that you might get it faster
11  is dependent upon the level of the exposure; correct?
12  A  Partially it's that, and partially, you know,
13  one of the arguments has been made is that the fiber
14  from Libby is different and it causes a different kind
15  of asbestosis. I'm not an expert in that area at all,
16  but that's something that, I think, that has been talked
17  about in some of the literature.
18  Q  No, no, and I totally understand you're talking
19  there about the differences between chrysotile and
20  amphibole asbestos or tremolite asbestos or whatever you
21  might want to call the asbestos at Libby.
22  A  Uh-huh.
23  Q  But I'm asking you, I think, a different
24  question which is that I want you to assume that they're
25  exposed to the exact -- to the Libby fibers, whatever

Page 121

1 conservative fashion. And it's a way of putting a brake
2 on our own theoretical and methodological exercises.
3     MS. HARDING: Is it time for lunch? Break
4 for lunch?
5     VIDEO TECHNICIAN: Off the record, the time
6 is 12:25.
7     (Deposition in recess from 12:25 p.m. to
8 1:12 p.m.)
9     VIDEO TECHNICIAN: We're back on the
10 record. The time is 1:12.
11     Q (By Ms. Harding) Dr. Molgaard, I'm sorry, a
12 couple more questions about the CARD Mortality Study
13 and, really, actually, Dr. Whitehouse's use of it.
14     A Uh-huh.
15     Q And I just want to make the record clear,
16 because I think -- I think it is, but I just want to
17 make sure.
18     On page -- I've written over it, and I think it
19 must be 19 of Dr. Whitehouse's study.
20     MR. FINCH: Report.
21     MS. HARDING: Report, I'm sorry; thank you.
22     Q (By Ms. Harding) Exhibit -- it's the May
23 report, Exhibit 5. Oh, I'm sorry, this is your report;
24 I apologize. This is your report. You have some -- so
25 this is Exhibit 2.

Page 122

1     So on page 19 of your report, you talk about
2 some comparisons and line of reasoning and kinds of
3 conclusions -- well, let me start with comparisons.
4     I think you've already testified, I just want
5 to make sure that it's true with respect to the kinds of
6 things that you say on page 19, that any comparisons
7 that you make, based upon the data or the analysis of
8 Dr. Whitehouse in his CARD Mortality Study, are intended
9 to be hypothesis generating comparisons; correct?
10     A Right.
11     MR. HEBERLING: Objection; confusing and
12 overbroad as to all the comparisons on page 19.
13     Q (By Ms. Harding) Okay. Well, to start with,
14 with respect to the comparison of the CARD Mortality
15 Study to the Markowitz and the Selikoff and Seidman
16 study, I think you already testified that comparisons
17 between CARD Mortality Study and those studies are for
18 the purpose of generating hypothesis --
19     A Yes.
20     Q -- to be later tested by analytical
21 epidemiological studies; correct?
22     A Yes.
23     Q Okay. And the same could be said with respect
24 to the middle paragraph, here, when you talk about
25 conclusions about the entire cohort of Libby; correct?

Page 123

1     A Yes.
2     Q Okay. So that the conclusion -- or the
3 statement "The CARD Mortality Study could be used to
4 draw conclusions about asbestos-related mortality in the
5 entire cohort of Libby, by simply assuming that the
6 entire cohort of Libby there was no additional ARD
7 deaths which were not CARD Mortality Study deaths. This
8 is a very conservative assumption of zero deaths in the
9 rest of the cohort. The conclusion at Dr. Whitehouse's
10 report that 'Libby's mesothelioma rate is certainly the
11 highest in the United States' is a proper conclusion.
12 It is a proper epidemiological conclusion because it
13 rests on comparison with other available mesothelioma
14 rates in the United States. This is how epidemiologists
15 make judgments about excess occurrence of disease and
16 excess occurrence of risk. It is standard of practice
17 in epidemiology and public health." And by that I
18 understand that you mean that it is appropriate to make
19 that comparison and to talk about this possibility as
20 generating a hypothesis that should now be tested with
21 analytical epidemiology; correct?
22     A Right.
23     Q The -- we marked earlier Exhibit 1, I think, is
24 the new data from -- or I'm not sure how new it
25 is -- but data that you just provided from NIOSH, CDC

Page 124

1 National Institute Occupational Safety and Health,
2 Work-Related Lung Diseases (WoRLD) Surveillance System
3 Asbestosis: Mortality; is that right?
4     A That's right.
5     Q And it looks like the -- underneath
6 Work-Related Lung Disease (WoRLD) Surveillance System,
7 it says -- it looks like -- did it come from a website;
8 do you know?
9     A Actually, Jon found it and I did not find it,
10 so I'm not sure where it was from.
11     Q Okay. It looks like it says "Asbestosis and
12 Related Exposures 2007 TO 1-10." Do you see that in
13 kind of a --
14     A I actually don't have it.
15     Q I think it's in the very bottom.
16     A Is it?
17     Q Or maybe not. Maybe -- did we ever give you
18 one?
19     A I don't think I got one.
20     MS. HARDING: You might have the original,
21 Jon. Do you need a copy back?
22     MR. HEBERLING: No.
23     Q (By Ms. Harding) Do you know if this data was
24 generated in 2007 and reported -- first reported in
25 2007?

In Re: W.R. Grace & Co., et al., Debtors    Case No. 01-1139 (JKF)    Craig Molgaard, Ph.D.
June 25, 2009

Page 125

1  A  I don't know.
2  Q  Don't know; okay. But if you just turn to the
3  page of the data, it's got six columns; is that right?
4  A  I have -- yes, there are six.
5  Q  County is the first column, State is the second
6  column.
7  A  Right.
8  Q  Okay; Age-Adjusted Rate, Crude Rate, Number of
9  Deaths, and Percent Female; is that right?
10 A  Right.
11 Q  Okay. What I wanted to ask you is, there is a
12 difference between the rate of disease in a population
13 and the number of cases of disease in a population;
14 correct?
15 A  Right.
16 Q  And just -- it's also true that a particular
17 geographical location may have the highest rate of
18 disease, but that same geographic location may not have
19 the highest number of cases of disease; correct?
20 A  That's correct.
21 Q  Okay. And, indeed, that's the case on this
22 chart here; right? It lists Lincoln County as having
23 the highest rate of disease --
24 A  Right.
25 Q  -- for asbestosis; is that right?

Page 126

1  A  That's right.
2  Q  Okay. And -- but in terms of the numbers of
3  cases of asbestosis in a given county, it's not the
4  highest; correct?
5  A  That's correct.
6  Q  Indeed, it's -- I can't tell exactly where. It
7  may be somewhere in the middle?
8  A  Yeah, that sounds fair.
9  Q  Okay. It's got 44 cases of asbestosis listed
10 in number of deaths; is that correct?
11 A  That's right.
12 Q  And the highest number of cases of disease in
13 any county is Camden County, New Jersey; correct?
14 A  That's right.
15 Q  And that's 152 cases.
16 A  That's right.
17 Q  And then the second highest, looks like it's
18 Mobile County, Alabama with -- oh, no, that's not right;
19 I'm sorry. The second highest would be Jefferson
20 County, Texas.
21 A  Texas, yeah.
22 Q  With 151 cases.
23 A  Right.
24 Q  Okay; of asbestosis. The third highest is
25 Somerset County, New Jersey with 143 cases of

Page 127

1  asbestosis; is that right?
2  A  Yeah, that's right.
3  Q  And the fourth is Mobile County, Alabama with
4  137 cases of asbestosis. And then, looks like the
5  fifth, I think, is Kitsap County, Washington with 107
6  cases. Do you see that?
7  A  Uh-huh; yes.
8  Q  Now, in this case in which you've been asked to
9  testify on behalf of the Libby Claimants, you are
10 not -- or haven't been asked, I don't think -- you can
11 correct me if I'm wrong -- to testify about the number
12 of claims that will be presented to a hypothetical trust
13 if Grace emerges from bankruptcy; is that correct?
14 A  I have not had that discussion with anybody.
15 Q  Okay. And the fact that Lincoln County has the
16 highest rate of asbestosis does not necessarily mean
17 that Lincoln County will present to the trust, after
18 it's formed if it's formed, the highest number of cases;
19 correct? You don't know the answer to that; correct?
20 A  I don't, no.
21 Q  Okay. And it's -- well, that's fine. And you
22 aren't going to be presenting any testimony on that
23 issue; correct?
24     MR. HEBERLING: Objection; unclear as to
25 what issue?

Page 128

1  Q  (By Ms. Harding) Okay; on the issue of how
2  many cases from any particular jurisdiction and eventual
3  trust will be presented with from any particular county.
4  A  Yeah, I wouldn't be addressing that.
5  Q  Okay.
6     The next thing I wanted to ask about is there
7  are a number of -- there's a place in Dr. Whitehouse's
8  report where he calculates a rate of mesothelioma in
9  Libby. Do you recall that?
10 A  Uh-huh.
11 Q  And there's also a place where he calculates a
12 rate of asbestosis in Libby.
13 A  Right.
14 Q  Okay. Now, if you're going to calculate a rate
15 of disease in a given geographic location, it is
16 Epidemiology 101 that your denominator must be the
17 population that gives rise to your numerator of cases;
18 is that right?
19 A  It can be done that way. I mean, it's usually
20 done that way, but you can also crank rates the same way
21 that Whitehouse did which is basically it's a rate
22 within his own case series. There's nothing wrong with
23 doing that. But it's not -- normally, you're going to
24 work the way you suggested.
25 Q  Okay. But just to be clear, the rates that he

In Re: W.R. Grace & Co., et al., Debtors    Case No. 01-1139 (JKF)    Craig Molgaard, Ph.D.
June 25, 2009

**Page 145**

1 makes it into an analytic epidemiological -- designed,
2 at least, to attempt to --
3   A  They're attempting to bridge it into -- from
4 descriptive to an analytical effort, yeah.
5   Q  You had mentioned earlier that you would -- I
6 think I asked you if you were trying to understand the
7 rate of disease in the Libby population, this would be
8 one of the studies you would look at; correct?
9   A  Uh-huh, yeah.
10   Q  Along with the work by Dr. Amandus and NIOSH
11 and their studies in the '80s, Dr. Sullivan's follow-up
12 of that work, and the McDonald studies, both in the '80s
13 and the follow-up in 2004; right?
14   A  Right.
15   Q  Okay. The -- if you turn to page 25 of the
16 document, table 7 -- you know, actually, before --
17       MR. HEBERLING: Got an extra over there?
18 That's all right; I've got one.
19   Q  (By Ms. Harding) You had a criticism of
20 Dr. Moolgavkar. I think Dr. Moolgavkar had a criticism
21 of the study, and you had a criticism of his criticism.
22 And it related to whether the additional lung cancers
23 that they added to the observed cases in this study was
24 appropriate or not; correct?
25   A  Uh-huh.

**Page 146**

1   Q  Okay. And Dr. Moolgavkar thought that it was
2 not appropriate, and you thought that it was okay to do
3 it; correct?
4   A  Yeah.
5   Q  Leaving that aside, just looking at table 7,
6 for Combined Respiratory Mortality in Lincoln County --
7   A  Right.
8   Q  -- Using the Montana and US Population
9 References, 1979 to 1998 --
10   A  Uh-huh.
11   Q  -- would you agree that this provides the rate
12 of disease in Lincoln County during -- for these
13 diseases, during the period of time described, 1979 to
14 1998?
15   A  Yeah, I would assume that's true.
16   Q  Okay. And as far as you know -- well, let me
17 ask the next question. In table 8, would you agree that
18 it is the rate of disease for the diseases listed in
19 table 8 in Lincoln County, from 1979 to 1998, excluding
20 cases that had worked formerly for W.R. Grace at the
21 mine?
22   A  That appears to be what it is, yeah.
23   Q  Okay. And to your -- in your opinion, are you
24 aware of any other analytic epidemiological study that's
25 been published that provides this kind of information

**Page 147**

1 for these diseases in the published literature?
2   A  For Libby or just in general?
3   Q  I'm sorry; for Libby, for Lincoln County.
4   A  No, I think this is, by and large, the one that
5 has it like this.
6   Q  Okay. And so is it fair to say that this is
7 the best analytic epidemiological evidence on the rates
8 of disease in Lincoln County for the period 1979 to
9 1988 -- 1998?
10   A  I would say it's certainly one of the stronger
11 ones; okay? I don't know if it's the best, but it's
12 certainly one of the better ones.
13   Q  Okay. What -- if there are -- there aren't
14 any -- would you agree with me that there
15 aren't -- well, there certainly are rates of disease in
16 the workers that are published in other places --
17   A  Right.
18   Q  -- that are analytic epidemiology.
19   A  Right.
20   Q  Okay. Are there any other published analytic
21 epidemiologic studies designed to be able to test causal
22 hypotheses about disease rates in Lincoln County that
23 you're aware of?
24   A  Um --
25   Q  Not just of workers.

**Page 148**

1   A  But in general, in the general population?
2   Q  In the general population in Lincoln County.
3       MR. HEBERLING: Objection; unclear as to
4 time.
5       MS. HARDING: I think I said from 1979 to
6 1998.
7       THE WITNESS: I think -- this is the one I
8 guess I know of.
9   Q  (By Ms. Harding) Okay. Are there any others
10 that I should look to or be aware of? I'm just not
11 aware of any others. I just want to make sure we're not
12 missing something.
13   A  I think not.
14   Q  Would you agree that in table 8, when the ATSDR
15 authors exclude the workers from the Libby mine from the
16 analysis, that the statistical -- that the statistical
17 significance of the relationships reported disappears in
18 all categories in table 8?
19   A  Disappears, but it's very close in a couple of
20 places. But it is not apparent in table 8.
21   Q  Okay.
22       Dr. Molgaard, I was going to ask you a bunch of
23 questions about Dr. Whitehouse's impression study, but
24 because my colleague here needs to go ask questions
25 next, I do just want to confirm that the Whitehouse

In Re: W.R. Grace & Co., et al., Debtors    Case No. 01-1139 (JKF)    Craig Molgaard, Ph.D.
June 25, 2009

Page 149

1 progression study, which we marked as Exhibit 7, is a
2 descriptive study that's not designed to test
3 hypotheses; right? We already talked about that.
4   A  Right.
5   Q  Okay. And you and the experts that prepared
6 reports for Grace had some disagreements about some of
7 the techniques that were used by Dr. Whitehouse in that
8 paper; correct?
9   A  Yeah.
10  Q  Okay. But the -- the -- you don't disagree
11 with the Grace -- any of the Grace experts that have
12 reviewed the study that it is not an analytic study
13 intended to test causal hypotheses. It's not designed
14 to do that; correct?
15  A  It's a descriptive study, yes, with
16 what -- descriptive epidemiology as defined by Last in
17 spite of me.
18  Q  The only other -- you had mentioned
19 that -- actually, it doesn't matter.
20      And then the same -- I just have the same
21 question with respect to the Peipins study which is
22 Exhibit 8. Again, there was some disagreement amongst
23 you and some of the Grace experts about -- I can't
24 remember, but some points about Peipins. But you agree
25 that it is a descriptive study not designed to test

Page 150

1 causal hypotheses; correct?
2   A  To me, it's a classic example of a
3 population-based descriptive epidemiology study.
4   Q  Okay. And the associations that are
5 reported -- well, it's kind of interesting. The
6 associations that are reported in the study are exactly
7 what you were talking about at the beginning of the day.
8 They are designed to, if you find an association there,
9 to say Okay, let's go -- let's go find out what's really
10 going on and do a proper epidemiological study and test
11 whether the association is causal; correct?
12  A  Not so much a proper epidemiological study as
13 one that's more sophisticated.
14  Q  Yes; an analytic study designed to test the
15 hypothesis that the association is actually causal as
16 opposed to just there by chance.
17  A  Right.
18  Q  Okay. In epidemiological studies where
19 the -- in descriptive studies, like the ones we've been
20 talking about today where they look for associations,
21 where they don't find associations in the study, I guess
22 that is something that if you don't find an association,
23 you typically don't follow up and try to test whether
24 it's causal or not because it's not there. Is
25 that -- I'm just trying to -- is that fair?

Page 151

1   A  Yeah, it's fair.
2       MS. HARDING: Nate, I'm sorry for taking so
3 long.
4       MR. FINCH: Why don't we take a five-minute
5 break.
6       VIDEO TECHNICIAN: Off the record, the time
7 is 2:01.
8       (Deposition in recess from 2:01 p.m. to
9 2:05 p.m.)
10      VIDEO TECHNICIAN: We're on the record.
11 The time is 2:05.
12           EXAMINATION
13 BY MR. FINCH:
14  Q  Dr. Molgaard, my name is Nathan Finch. I
15 represent the Official Committee of Asbestos Personal
16 Injury Claimants in the Grace bankruptcy.
17      Would you agree with me that a descriptive
18 epidemiological study does not test any kind of a
19 hypothesis, not just causal hypotheses?
20  A  No, I don't think I would agree with that.
21  Q  Well, what do you mean by "causal hypotheses"?
22  A  I mean, if you have a specific agent that you
23 think is causing a specific disease, okay, but you can
24 use descriptive studies to test other things, like are
25 the rates for breast cancer in Iowa higher than they are

Page 152

1 elsewhere in the United States? It's a research
2 question. It is a hypothesis, but it's not an
3 etiological hypothesis, per se.
4   Q  It's not -- it's not an analytical
5 epidemiological study that would allow you to say that
6 exposure to a particular type of asbestos is more likely
7 to cause an asbestos-related disease than exposure to a
8 different type of asbestos; right?
9   A  Right. And part of the distinction is that
10 when you get into the analytical types of studies,
11 usually there will be some explication of biological
12 process or plausibility; okay? So exposure to this kind
13 of an agent causes these sorts of things to happen
14 biologically and results in this kind of a disease.
15 Descriptive studies don't usually do that.
16  Q  You are not a medical doctor; correct?
17  A  Correct.
18  Q  You're not an expert on pulmonology?
19  A  No.
20  Q  You're not board certified in either internal
21 or occupational medicine?
22  A  Correct.
23  Q  You have, I counted, 150-some-odd publications
24 listed on your CV.
25  A  Correct.

In Re: W.R. Grace & Co., et al., Debtors  Case No. 01-1139 (JKF)  Craig Molgaard, Ph.D.
June 25, 2009

Page 153

1  Q  Is that correct?
2  A  Yeah.
3  Q  Not a single one of them relates to
4  asbestos-related disease?
5  A  Actually, there are -- there is one that
6  relates to asbestos-related disease, but it may not be
7  on that copy of the CV that you've got.
8  Q  Okay. Have you ever published an article on
9  the epidemiology of asbestos-related disease in a peer
10  review refereed journal?
11  A  Yes.
12  Q  What was the title of the article and what was
13  it about?
14  A  After 150, it gets hard to remember titles
15  exactly. But it's like it was a comparison of the
16  experience in Minamata Bay, Japan where they had a very
17  bad outbreak of mercury poisoning with the experience in
18  Libby, Montana, in terms of the asbestos problems; okay?
19  And basically what I was doing -- it was a journal
20  that -- it was a sustainability journal. It's an
21  environmental health kind of journal. And basically
22  what I was doing there was just trying to say Here you
23  have this pattern in this population. How did the
24  community respond to it in Japan? How did the community
25  respond to it in Libby? Are there any parallels? And

Page 154

1  that was the thrust of the paper.
2  Q  Okay; but it wasn't an analytic study where
3  you're trying to assess causation of asbestos-related
4  disease; correct?
5  A  No, no.
6  Q  You weren't trying to compare the rate of
7  asbestos disease seen in a Libby cohort compared to the
8  rate of asbestos disease existing anywhere else;
9  correct?
10  A  No. I was really looking at a community
11  response to environmental perturbations.
12  Q  Okay.
13     Are you familiar with the Environmental
14  Protection Agency Science Advisory Board process?
15  A  Just in general.
16  Q  What is your general understanding of that?
17  A  That it exists and there is a process. That's
18  about it.
19  Q  I believe you testified that you read
20  Dr. Frank's deposition in preparation for your
21  deposition today.
22  A  Yeah.
23  Q  Did you recall the discussion with him about
24  the EPA Science Advisory Board process last summer where
25  the question that they were asked to analyze was whether

Page 155

1  there was differences in potency between different types
2  of asbestos?
3  A  I don't remember that discussion. But if you
4  say it was in there, it's in there, I'm sure.
5  Q  You certainly haven't reviewed all of the
6  analytical epidemiology literature that exists out there
7  in the world about asbestos disease; correct?
8  A  Right.
9  Q  As part of your work in this case, you have not
10  attempted to analyze whether amphibole asbestos is more
11  likely to cause mesothelioma than chrysotile asbestos;
12  correct?
13  A  Correct.
14  Q  The -- would you agree with me that nothing
15  that Dr. Whitehouse has done can stand up, as a matter
16  of analytic epidemiology, or support the hypothesis that
17  Libby asbestos is more likely to cause mesothelioma than
18  chrysotile asbestos?
19     MR. HEBERLING: Objection; compound.
20     THE WITNESS: In the sense that his studies
21  are descriptive, they are not making -- they're not
22  supporting one or another etiological position.
23  Q  (By Mr. Finch) In order to know whether Libby
24  amphibole asbestos is more likely to cause mesothelioma
25  than chrysotile asbestos on a fiber-for-fiber basis,

Page 156

1  you'd have to have accurate exposure data for the
2  cohorts; correct?
3  A  You could -- there are a couple of ways you
4  could do it. One would be that way. The other way
5  would be to look at -- to do basically what NIOSH did
6  recently where they were looking at that document 1 I
7  think we looked at, where they were really
8  making -- setting up a situation where you could do
9  ecological comparisons between different counties in the
10  United States. And the assumption there is that the
11  counties that have high rates, not numbers but rates,
12  are the ones that have some issues around asbestos,
13  et cetera.
14  Q  But this Exhibit 1, this CDC NIOSH data, is
15  descriptive epidemiology. It doesn't analyze whether or
16  not -- it doesn't say anything at all about fiber type;
17  correct?
18  A  Correct.
19  Q  And it doesn't analyze whether or not exposure
20  to amphibole asbestos is more likely to cause
21  mesothelioma than exposure to chrysotile asbestos;
22  correct?
23  A  Correct.
24  Q  There's no data at all in here about whether
25  people in Camden County or Sagadahoc County, Maine are

In Re: W.R. Grace & Co., et al., Debtors    Case No. 01-1139 (JKF)    Craig Molgaard, Ph.D.
June 25, 2009

**Page 157**

1 exposed to chrysotile asbestos, amphibole asbestos or
2 Libby asbestos; right?
3    A  Yeah. And the assumption would be that you
4 would have some extra information that you would know
5 that, for example, in Libby that there is this kind of a
6 fiber and elsewhere there's some other kind of a fiber.
7 And then you could say Well, in general, ecologically,
8 we can make this comparison. Ecological studies are not
9 considered a tremendously strong research design, but
10 you could make a comparison like that.
11        It would be difficult -- I would not argue that
12 it was especially analytic to do that, but you could
13 look at a table like that and make some hypotheses.
14    Q  You could make some hypotheses, but you
15 certainly couldn't prove that hypothesis to a table like
16 what's in Exhibit 1; correct?
17    A  Correct.
18    Q  You would not testify, to a reasonable degree
19 of certainty as an epidemiologist, that exposure to
20 Libby asbestos is more likely to cause mesothelioma than
21 exposure to chrysotile asbestos.
22    A  Probably would not.
23    Q  You haven't done the work to make that
24 assessment; correct?
25    A  That's correct.

**Page 158**

1    Q  And to the extent that the EPA Science Advisory
2 Board, last summer, looked at every piece of analytic
3 epidemiology that existed in the world on exposure to
4 different asbestos fiber types and concluded that it was
5 impossible to quantify the difference between amphibole
6 asbestos and chrysotile asbestos in causing mesothelioma
7 or lung cancer, you would not be in a position to say
8 that they were wrong.
9    A  No, I would not.
10    Q  Have you ever heard of Les Stayner?
11    A  No.
12    Q  Ever heard of Julian Peto?
13    A  Yeah.
14    Q  I take it you weren't involved in the Science
15 Advisory Board project at all.
16    A  No.
17         MR. FINCH: Okay. Why don't we mark these
18 as the next two exhibits.
19         (Deposition Exhibit Nos. 17 and 18 marked for
20 identification.)
21    Q  (By Mr. Finch) Handing you what's been marked
22 as Exhibit 17 and Exhibit 18, and ask you some
23 questions, first, about Number 18 and then we'll move
24 back to Number 17.
25    A  Just in terms of housekeeping, I don't seem to

**Page 159**

1 have an Exhibit 15 in this stack.
2         MS. HARDING: Did I take it back? I'll
3 find it.
4         THE WITNESS: Okay.
5         MR. HEBERLING: What's the number on the
6 new one?
7         MR. FINCH: 17 and 18.
8         THE WITNESS: 17 and 18.
9         MR. HEBERLING: I have one exhibit here. I
10 have the EPA November 14th.
11         MR. FINCH: Yep, here it is; 17.
12    Q  (By Mr. Finch) Exhibit 18 is the report from
13 the Science Advisory Board to the EPA. Do you see that,
14 sir?
15    A  Yes, sir.
16    Q  And if you look to the third page of the
17 document that begins Enclosure 1, that lists the members
18 of the Science Advisory Board Asbestos Committee.
19    A  Okay.
20    Q  Do you see that?
21    A  Yep.
22    Q  And you see that you have toxicologists -- a
23 toxicologist on that list?
24    A  Uh-huh.
25    Q  You have a couple of epidemiologists on that

**Page 160**

1 list?
2    A  Uh-huh.
3    Q  When say "uh-huh" you mean yes?
4    A  I'm sorry; yes, I mean yes.
5    Q  You have medical doctors on that list?
6    A  Yes, you do.
7    Q  You have statistics professors on that list?
8    A  Yes.
9    Q  You have industrial hygienists on that list?
10    A  Yes.
11    Q  You have someone who is a professor of soils
12 who is an expert in mineralogy on that list?
13    A  Right.
14    Q  In short, you have a group of people that, if
15 you wanted to test the hypothesis of whether or not
16 amphibole asbestos is more likely to cause mesothelioma
17 or lung cancer than is -- or other type of asbestos
18 fibers, would have the background to make that
19 assessment; correct?
20    A  They have the background to make an assessment.
21    Q  Yes. And neither you nor Dr. Whitehouse has
22 done the type of analytical work that would be necessary
23 to make the epidemiological determination that exposure
24 to Libby asbestos is more likely to cause mesothelioma
25 than exposure to chrysotile asbestos.

In Re: W.R. Grace & Co., et al., Debtors    Case No. 01-1139 (JKF)    Craig Molgaard, Ph.D.
June 25, 2009

**Page 161**

1  A  I could make an assessment that was
2  epidemiologic in nature.
3  Q  But you haven't done it; correct?
4  A  I have not done it.
5  Q  Neither has Dr. Whitehouse; correct?
6  A  Not to my knowledge.
7  Q  Okay. And you have not made an assessment as
8  to whether or not exposure to Libby asbestos is more
9  likely to cause lung cancer than exposure to chrysotile
10  or any other type of asbestos.
11  A  Correct.
12  Q  And you can't say, as a matter of expert
13  epidemiological opinion, that exposure to Libby asbestos
14  is more likely to cause any asbestos-related disease
15  than exposure to chrysotile asbestos; correct?
16  A  I have not said that.
17  Q  You have not said that, and Dr. Whitehouse has
18  not said that.
19  A  Correct.
20  Q  And based on the work you have seen thus far in
21  the case, no one has done the analysis to be able to
22  say, as a matter of epidemiology, that exposure to Libby
23  asbestos is more likely to produce asbestos-related
24  disease in humans than exposure to other types of
25  asbestos.

**Page 162**

1  A  I don't believe that exists.
2  Q  You mean you don't believe that -- nobody has
3  done the work to say that; correct?
4  A  Right; yeah.
5  Q  Now, Exhibit 17 is -- this is a document that
6  you signed; correct?
7  A  Yes.
8  Q  This is an expert report that you prepared in
9  connection with evaluating whether consumption of
10  products containing ephedra is a cause of stroke?
11  A  Yes.
12  Q  What's ephedra?
13  A  It's a dietary supplement.
14  Q  Okay.
15  A  An ingredient in a dietary supplement.
16  Q  Okay.
17  You -- in one of your responses to
18  Mrs. Harding's questions, you described the CARD
19  Mortality Study as a case series?
20  A  Yes.
21  Q  Is that correct?
22  A  Yeah.
23  Q  You believe the CARD Mortality Study is a case
24  series?
25  A  I do believe that.

**Page 163**

1  Q  Is the -- Dr. Whitehouse's paper on
2  mesothelioma in Libby, the 2008 paper, that's also a
3  case series?
4  A  Yes.
5  Q  The 2004 paper on progression of asbestos
6  disease, that's also a case series?
7  A  Yes.
8  Q  None of them are -- well, let me back up.
9  On page three of this expert report that you
10  signed in 2003 --
11  A  Uh-huh.
12  Q  -- paragraph 15, you refer to something called
13  a controlled epidemiological study.
14  A  Uh-huh.
15  Q  Do you see that?
16  A  Yes.
17  Q  What is a controlled epidemiological study?
18  A  That would be one where you either have a
19  formal control group or you have a comparison population
20  of some kind where you are trying to look at the
21  background rate of occurrence and compare it to the rate
22  of disease in the population. So you have a bunch of
23  people who have used ephedra, for example. What's the
24  rate of disease in that group compared to the normal
25  naturally-occurring rate of occurrence of the disease.

**Page 164**

1  And then you can do the -- observe the expected thing if
2  you're just doing comparison of populations or you can
3  have a formal -- formal controlled group.
4  Q  Okay. Would you agree with me that the work
5  that Dr. Whitehouse has done in connection with this
6  case, none of it is a controlled epidemiological study?
7  A  Correct.
8  Q  Okay. In paragraph 16, second sentence, you
9  write "A proper study design must precisely define the
10  hypothesis to be tested and the background rate of
11  disease at issue." Do you see that?
12  A  Yep.
13  Q  Do you agree with that?
14  A  Uh-huh.
15  Q  Is that a "yes"?
16  A  That is a yes.
17  Q  All right; on the next page, there is a table
18  Levels of Evidence and Grading of Recommendations. Oh,
19  sorry, Levels of Evidence and Grading of
20  Recommendations. Do you see that?
21  A  Yes.
22  Q  The lowest level of data is data from anecdotal
23  case series.
24  A  Right.
25  Q  And would you agree with me that data from a

In Re: W.R. Grace & Co., et al., Debtors    Case No. 01-1139 (JKF)    Craig Molgaard, Ph.D.
June 25, 2009

**Page 165**

1  case series cannot be used to prove hypotheses about
2  risk of disease in a population?
3  **A** That's what John Last says. And I've agreed
4  with that multiple times today. However, the American
5  Heart Association table here actually is a stronger
6  statement about the use of case series than the Last
7  thing. I mean, they actually include it as --
8  **Q** They include it as --
9  **A** -- at the very bottom of the barrel.
10  **THE COURT REPORTER:** Whoa; I'm sorry.
11  **MR. FINCH:** Sorry.
12  **THE WITNESS:** I think they include it as
13  the weakest kind of evidence which is actually stronger
14  than what Last says, which I've agreed to 14 times
15  today. So --
16  **Q** Right.
17  **A** So --
18  **Q** So you basically followed the Last, L-a-s-t,
19  this guy's book --
20  **A** Yeah.
21  **Q** -- that you can't make statements about the
22  risk of disease in a population based on a case series;
23  correct?
24  **A** That's -- that's right.
25  **Q** That's your view as an expert in the field of

**Page 166**

1  epidemiology.
2  **A** That's my view.
3  **Q** Now, paragraph 27 of the same document. You
4  there Dr. Molgaard?
5  **A** Uh-huh.
6  **Q** Is that a "yes"?
7  **A** Yes.
8  **Q** I don't mean to keep pestering you, but it
9  makes it easier on the record.
10  **A** That's all right; I understand.
11  **Q** You write "Similarly, while anecdotal"
12  evidence -- "adverse events reports and/or case reports
13  may give rise to a hypothesis that must be tested, they
14  cannot be used to quantify any possible risk or to
15  determine who in a population may be at risk." I take
16  it you agree with that?
17  **A** Yes.
18  **Q** So a case series cannot be used to quantify the
19  risk of disease; is that correct?
20  **A** Well, I think what I was trying to talk about
21  here was a single case report, not a case series; okay?
22  A single case report, often you'll see in the medical
23  literature someone will have a case they found that has
24  some obscure happening in it, and they'll write it up as
25  a case study and claim that there's probably etiological

**Page 167**

1  significance to whatever happened; okay? Those I do not
2  have faith in.
3  But a case series which is a bunch of them
4  strung together through somebody's clinic, there is
5  something you can learn from those, I believe, because
6  it's more than one simple case.
7  **Q** It's more than one simple case, but it
8  is -- again, a case series is something that you use to
9  create a hypothesis, but it doesn't test the hypothesis
10  or confirm the hypothesis; correct?
11  **A** Correct.
12  **Q** So if the hypothesis is that exposure to Libby
13  asbestos is -- strike that.
14  If the hypothesis is that if you have
15  asbestos -- pleural disease caused by exposure to Libby
16  asbestos --
17  **A** Uh-huh.
18  **Q** -- that you have a quantifiable risk of dying
19  from that disease, a case series cannot be used to make
20  a -- to prove that hypothesis.
21  **A** Right; correct.
22  **Q** Okay. So, for example, let's talk about the
23  definition of hypotheses and whether or not
24  Dr. Whitehouse's work or your work has either tested a
25  particular hypothesis or proven a particular hypothesis.

**Page 168**

1  Can we do that?
2  **A** Sure.
3  **Q** Okay. Would you agree with me that a
4  hypothesis is an assertion or a thought that may or may
5  not turn out to be true?
6  **A** Yeah, I can agree with that.
7  **Q** Okay.
8  One hypothesis we talked about here today is
9  that Libby asbestos is more likely to cause mesothelioma
10  than chrysotile asbestos. That's a hypothesis.
11  **A** Right.
12  **Q** And so far, neither you nor Dr. Whitehouse has
13  done the work to establish whether or not that assertion
14  is true.
15  **A** Correct.
16  **Q** Okay.
17  Another hypothesis that -- or assertion that
18  one could have is that mesothelioma caused by exposure
19  to Libby asbestos is more likely to lead to death than
20  mesothelioma caused by exposure to some other type of
21  asbestos.
22  **A** Yes.
23  **Q** That's a hypothesis.
24  **A** Yes.
25  **Q** And I don't think anybody has even asserted

In Re: W.R. Grace & Co., et al., Debtors    Case No. 01-1139 (JKF)    Craig Molgaard, Ph.D.
June 25, 2009

**Page 169**

1  that. But whether they've asserted it or not, neither
2  you nor Dr. Whitehouse has done the work to prove the
3  truth of that hypothesis; correct?
4  A  Correct.
5  Q  Okay.
6     Another hypothesis you could have is that lung
7  cancer caused by exposure to Libby asbestos is more
8  likely to lead to death than lung cancer caused by
9  exposure to some other type of asbestos; correct?
10  A  Correct.
11  Q  And neither you nor Dr. Whitehouse has done the
12  work to prove the hypothesis that lung cancer caused by
13  exposure to Libby asbestos is more likely to lead to
14  death than lung cancer caused by other forms of
15  asbestos.
16  A  Correct.
17  Q  Okay.
18     Another hypothesis you could have is that
19  asbestosis caused by exposure to Libby asbestos
20  is -- strike that; let me back up.
21     Another hypothesis that one could have is that
22  Libby asbestos is more likely to cause asbestosis than
23  exposure to a similar amount of chrysotile asbestos.
24  That's a hypothesis one could have; correct?
25  A  Correct.

**Page 170**

1  Q  And neither you nor Dr. Whitehouse, or any
2  other expert in this case, has done the work to prove
3  that that hypothesis is true; correct?
4  A  Correct.
5  Q  Okay.
6     Another -- another hypothesis that one could
7  have is that asbestosis that is caused by exposure to
8  Libby asbestos is more likely to lead to death than
9  asbestosis caused by exposure to some other type of
10  asbestos.
11  A  Correct.
12  Q  And neither you nor Dr. Whitehouse have done
13  the epidemiological or analytical work in order to prove
14  that hypothesis; correct?
15  A  Correct.
16  Q  Nor has Dr. Frank; correct? Nobody in this
17  case that you've seen has done that work.
18  A  I don't believe so.
19  Q  Okay. And that would be true of my questions
20  about mesothelioma, my questions about lung cancer;
21  correct?
22  A  Correct; yeah.
23  Q  Okay.
24     Another hypothesis that one could have is that
25  exposure to Libby asbestos is more likely to cause

**Page 171**

1  pleural disease than is exposure to chrysotile asbestos.
2  A  Correct.
3  Q  And neither you nor Dr. Whitehouse, nor anybody
4  else, has done the analytic epidemiological work to
5  prove the validity of that hypothesis; correct?
6  A  Correct.
7  Q  Another hypothesis that one could have -- first
8  of all, would you agree with me that if you're going to
9  talk about risk of death from a disease or severity of a
10  disease, it's important to distinguish between different
11  types of diseases?
12  A  Yeah, given the state of the art at the time
13  that you're making the distinction.
14  Q  Okay. Let's just talk about smoking, for
15  example.
16  A  Uh-huh.
17  Q  Smoking is associated with and probably causes
18  a variety of different diseases; correct?
19  A  Yes.
20  Q  One of the things that smoking is well
21  established that it causes lung cancer; correct?
22  A  Yes.
23  Q  Another thing that smoking causes is emphysema;
24  correct?
25  A  Yes.

**Page 172**

1  Q  Another thing that smoking causes is chronic
2  obstructive pulmonary disease; correct?
3  A  Yes.
4  Q  Okay. And so if you're going to make
5  epidemiological assertions about whether smoking is more
6  likely to lead to death by a particular disease, would
7  you agree with me that it's important to define and
8  describe and differentiate between the different
9  diseases that you might be talking about; correct?
10  A  Yes.
11  Q  So, for example, the risk of dying from lung
12  cancer is different than the risk of dying from
13  emphysema; correct?
14  A  Correct.
15  Q  And the risk of dying from chronic -- COPD.
16  Can we just say COPD to mean chronic obstructive
17  pulmonary disease?
18  A  Sure.
19  Q  Is different than the risk of dying from either
20  emphysema or lung cancer; correct?
21  A  Correct.
22  Q  So it's important to distinguish between the
23  diseases that you're talking about if you're trying to
24  test or prove hypothesis about probability of death or
25  severity of disease. Would you agree with that?

In Re: W.R. Grace & Co., et al., Debtors    Case No. 01-1139 (JKF)    Craig Molgaard, Ph.D.
June 25, 2009

Page 173

1  A  Yes.
2  Q  Okay.
3     Would you agree with me that asbestosis, at
4  least as defined by the American Thoracic Society, is a
5  different disease than is pleural disease?
6  A  I don't know. I don't know if I would agree
7  with that, actually.
8     MR. FINCH: Okay; why don't we get the 2004
9  ATS statement and go through it.
10    Can we mark this as the next exhibit? I think
11 it's already been marked as Exhibit 19.
12    (Deposition Exhibit No. 19 marked for
13 identification.)
14 Q  (By Mr. Finch) Before we turn to the 2004 ATS
15 statement, you had mentioned very early today something
16 called a Frye hearing?
17 A  Yes.
18 Q  My understanding is -- of a Frye hearing is a
19 hearing designed to test whether or not an expert's
20 opinion about a subject matter is supported by sound
21 scientific principles; is that correct?
22 A  Yeah. My understanding is it's an evaluation
23 of the scientific issues in a legal matter. I think
24 it's the same thing.
25 Q  And so, for example, if someone is going to

Page 174

1  testify to -- would you agree with me that the
2  hypothesis that exposure to Libby asbestos is more
3  likely to cause mesothelioma than exposure to chrysotile
4  asbestos is a -- is a proposition that, in order to
5  evaluate it, you have to apply the scientific principles
6  of epidemiology? At least you should.
7  A  It would be useful to, yeah.
8  Q  Okay. And so if someone were to testify that
9  Libby -- exposure to Libby asbestos is more likely to
10 cause mesothelioma than exposure to some other type of
11 asbestos, and they hadn't done the analytical
12 epidemiological work to prove that, it would be your
13 view, as an expert epidemiologist, that that was not a
14 supportable statement; correct?
15 A  Yeah.
16 Q  Okay.
17    Now, I put before you the 2004 ATS statement.
18 A  Yes.
19 Q  Do you see that it says -- first of all, the
20 title of it is Diagnosis and Initial Management of
21 Nonmalignant Diseases Related to Asbestos.
22 A  Yes.
23 Q  And "Diseases" is plural. It's more than one
24 disease; correct?
25 A  Yes.

Page 175

1  Q  Okay. And the -- on page 697, the ATS talks
2  about different nonmalignant disease outcomes. Do you
3  see that?
4  A  Yes.
5  Q  Okay. And would you agree with me that
6  asbestosis is defined as interstitial pneumonitis and
7  fibrosis caused by inhalation of asbestos fibers.
8  A  That's what it says there; right.
9  Q  Okay. And that's treated as one distinct
10 diagnostic entity by the American Thoracic Society;
11 correct?
12 A  I'm not sure. Because on page -- the first
13 page they say "Nonmalignant asbestos related disease
14 refers to the following conditions: asbestosis, pleural
15 thickening, or asbestos-related pleural fibrosis,
16 (plaques or diffuse fibrosis), 'benign' (nonmalignant)
17 pleural effusion, and airflow obstruction."
18 Q  And you don't understand that as describing
19 different diseases?
20 A  Well, it's singular. It says "This statement
21 presents guidance for the diagnosis of nonmalignant
22 asbestos-related disease. Nonmalignant asbestos-related
23 disease," singular, "refers to the following
24 conditions:" so --
25 Q  You have not spent your career studying

Page 176

1  asbestos-related disease; correct?
2  A  Correct.
3  Q  And you are not going to be able to testify as
4  an expert on asbestos medicine that asbestosis is the
5  same disease as pleural disease; correct?
6  A  Not unless I -- not unless I quote this thing
7  here which seems to be saying it's the same thing; a
8  series of conditions that are --
9  Q  You're just reading the language. You haven't
10 spent your career treating people with asbestos-related
11 disease; correct?
12 A  No, no.
13 Q  You don't know the difference -- you haven't
14 reviewed -- you certainly haven't -- would you agree
15 with me there are literally thousands of articles in the
16 medical literature about asbestos-related disease?
17 A  Yes.
18 Q  And you certainly haven't gone out and done a
19 review of all the literature out there that exists about
20 asbestos-related anomaly disease?
21 A  Absolutely not.
22 Q  Would you agree with me that there are
23 different -- that mesothelioma, for example, and lung
24 cancer are different cancers that are caused by
25 asbestos?

In Re: W.R. Grace & Co., et al., Debtors    Case No. 01-1139 (JKF)    Craig Molgaard, Ph.D.
June 25, 2009

**Page 177**

1  A  Yes.
2  Q  And do you have a view, based on a career
3  in -- in -- do you have a view, based on anything other
4  than just reading this document, as to whether or not
5  asbestosis is a different disease than pleural plaques,
6  for example?
7  A  My view, from what I have read, and I am not an
8  expert -- not an expert in this field. But from what I
9  have read, pleural plaques are a type of asbestosis.
10 Q  That's your view.
11 A  Yeah.
12 Q  What about diffuse pleural thickening? Is that
13 a type of asbestosis?
14 A  Of nonmalignant asbestos -- yeah, it says it
15 right here. It's pleural thickening. It says it right
16 here in this expert report.
17 Q  So it's your view that diffuse pleural
18 thickening is the same disease as asbestosis.
19 A  I can agree with what's stated here, okay, that
20 "Nonmalignant asbestos-related disease refers to the
21 following conditions: asbestosis, pleural thickening,
22 asbestos-related pleural fibrosis." That, to me, makes
23 some sense. But I totally give to you I am not an
24 expert in this field.
25 Q  Okay; will you at least agree with me that on

**Page 178**

1  page 697 there is a definition of asbestosis that says
2  "Asbestosis is the interstitial pneumonitis and fibrosis
3  caused by inhalation of asbestosis fibers"?
4  A  There is a definition that says that; yeah.
5  Q  Then on page 702 there is a definition of
6  nonmalignant pleural or abnormalities associated with
7  asbestos.
8  A  Okay.
9  Q  Do you see that?
10 A  Yep.
11 Q  And it says "Pleural abnormalities associated
12 with asbestos exposure are the result of collagen
13 deposition resulting in subpleural thickening, which may
14 subsequently calcify, and which in the visceral pleura
15 may be associated with parenchymal fibrosis in adjacent
16 subpleural alveoli."
17 A  Uh-huh.
18 Q  "Pleural thickening, as a marker of asbestos
19 exposure, has continued to be a prominent feature of
20 exposure to asbestos while other outcomes, such as
21 asbestosis, have become less frequent due to declining
22 exposure levels." Do you see that?
23 A  Yep.
24 Q  You would agree with me that at least for
25 purposes of definition, the definition of asbestosis in

**Page 179**

1  the 2004 ATS statement, is different than the definition
2  of pleural disease, what I just read to you.
3  MR. HEBERLING: Objection; misstatement of
4  the document. It's not an answerable question. That
5  isn't the definition of pleural disease.
6  THE WITNESS: Yeah, I can't really answer
7  that. Could you rephase that?
8  Q  (By Mr. Finch) Sure. Would you agree with me
9  that there is a definition of asbestosis in the document
10 that does not include pleural thickening or pleural
11 plaque?
12 A  There is such a definition, to my way of
13 thinking, in the first item that you pointed out on --
14 Q  On 697?
15 A  Yeah.
16 Q  That defines asbestosis as a particular
17 diagnostic entity; correct?
18 A  Yeah, I guess.
19 Q  And that is talking about interstitial fibrosis
20 in the parenchyma of the lung; correct?
21 A  Right.
22 Q  You understand that the parenchyma of the lung
23 is the inside of the lung and the pleura is the outside
24 of the lung.
25 A  Right.

**Page 180**

1  Q  And so that the definition of asbestosis
2  doesn't include disease that occurs on the outside of
3  the lung.
4  A  Well, I think what I'm beginning to understand
5  is that this document has internal contradictions in it.
6  Because what it said on the second paragraph does not
7  appear to agree with what is said on page 697. I could
8  be misunderstanding it, but it does not seem to be
9  consistent.
10 Q  If you were to assume that pleural disease is a
11 different -- that asbestos-related pleural disease is a
12 different disease than asbestosis -- I want you to
13 assume that those are two different diagnostic entities
14 for the purpose of my questions.
15 A  Yes.
16 Q  Would you agree with me that if you were going
17 to test the hypothesis of whether or not pleural disease
18 caused by exposure to Libby asbestos is more severe than
19 pleural disease caused by exposure to other types of
20 asbestos, it's important to define and distinguish
21 between pleural disease as compared to asbestosis?
22 A  If that distinction is -- is the one that the
23 American Thoracic Society is operating with. Though
24 from this document, it's very hard to tell that, though
25 I have not read the entire thing.

In Re: W.R. Grace & Co., et al., Debtors    Case No. 01-1139 (JKF)    Craig Molgaard, Ph.D.
June 25, 2009

**Page 181**

Q All right.
One hypothesis that one could test is whether or not pleural disease caused by exposure to Libby asbestos is more likely to lead to death than pleural disease caused by exposure to other types of asbestos; correct?

A Correct.

Q And neither you nor Dr. Whitehouse nor anybody else have done the analytical epidemiological work to prove whether or not that hypothesis is true; correct?

A Correct.

Q So you couldn't say, for example, that someone who has pleural disease caused by exposure to Libby asbestos is more likely to die than someone who has pleural disease caused by some other asbestos; right? You couldn't say that, as a matter of epidemiological science.

A I could not.

Q And Dr. Whitehouse's work doesn't support that hypothesis either. You wouldn't agree that, as a matter of analytical epidemiology --

A Yeah.

Q -- that -- that his work would support that hypothesis.

A Yes, I agree.

**Page 182**

Q Okay.
And in his CARD Mortality Study, did you understand that of the 76 nonmalignant deaths, Dr. Whitehouse included people who both had pleural disease as well as people who had asbestosis?

A My understanding was that he was looking at asbestosis-related disease, however that is defined.

Q However he defined it, it included both parenchymal disease and pleural disease in his 76 deaths.

A I believe he did.

Q Okay.
Would you agree with me that in order to draw a conclusion from a smaller population and apply it to a larger population, the smaller population has to be representative of the larger population?

A I'm not sure if I understand your question.

Q Let me strike that question and re-ask it.
One hypothesis that Dr. Whitehouse has raised is that pleural disease caused by exposure to Libby asbestos is different, in terms of severity of lung function loss, than pleural disease caused by other forms of asbestos. That's a hypothesis that he has; correct?

A Correct.

**Page 183**

Q And neither he nor you have done the analytical epidemiological work to determine whether that hypothesis is true.

A Correct.

Q The -- you certainly haven't -- you certainly are not prepared to give an opinion, to a reasonable degree of certainty as a epidemiology -- as an epidemiologist, that the pleural disease caused by exposure to Libby asbestos is more severe, in terms of loss of lung function, than pleural disease caused by other forms of asbestos outside of Libby.

A Correct.

Q And in your view as an expert epidemiologist, none of the work done by Dr. Whitehouse or Dr. Frank, or any other expert in this case, would allow you to prove that hypothesis.

A Not that I'm aware of.

Q In your expert report, I believe it's Exhibit 2 to your deposition, do you have that, Dr. Molgaard?

A Not yet.

Q If you go to page nine of that report --

A Uh-huh.

Q -- you're responding to one of -- is it Mr. or Dr. -- Dr. Moolgavkar's comments on Whitehouse's 2004 paper about progressive loss of lung function. Do you

**Page 184**

see that?

A Yeah.

MR. HEBERLING: What page is that?

MR. FINCH: Page nine of Molgaard's report.

Q (By Mr. Finch) You write "First, the study is on 123 subjects who are representative of the asbestos disease population." Do you see that?

A Yeah.

Q You didn't make any independent assessment of whether the 123 patients in the progression study were representative of the -- all the people in Libby, Montana who have asbestos-related disease, did you?

A No.

Q So if, for example, the 123 subjects in the 2004 paper were, on average, exposed to far more asbestos than the average level of exposure for all 1,800 people in the Libby patient population, then they wouldn't be representative -- the 123 wouldn't be representative of the disease population of the whole; correct?

A Yes, if you're saying the selection bias code still exists.

Q Okay. You just used a term "selection bias."

A Yeah.

Q Explain to me what is selection bias.

In Re: W.R. Grace & Co., et al., Debtors   Case No. 01-1139 (JKF)   Craig Molgaard, Ph.D.
June 25, 2009

**Page 185**

1  A  That is the people who get into, say in this
2  situation, perhaps these people who come to the doctor's
3  attention and get into his clinical series, select
4  themselves somehow or other. That is, there is -- they
5  show up because they feel worse. They show up because
6  they're closer to the doctor's office. They show up
7  because they've known the doctor who's treated other
8  people who have had the disease. Anything that produces
9  a pressure or bias on people who get to a place, enter a
10 study or enter an analysis, for reasons that you would
11 not normally expect. And bias is defined as any
12 systematic deviation from the truth. So if it's a
13 systematic selection pressure that gets people to his
14 clinical series, you know, then it could be -- it could
15 be that there is such a bias.
16   Q  Okay; in addition to a selection bias, there
17 can also be things that make the 123 people
18 unrepresentative of the bigger patient population;
19 correct?
20   A  And the selection bias is what would drive that
21 lack, if it was there. The selection bias would be one
22 of the things that could drive a lack of
23 generalizability.
24   Q  Okay. But I mean, as I understood when you
25 were saying "selection bias," the example you used was

**Page 186**

1  people felt worse or they were closer to Whitehouse's
2  office. That's one example of a selection bias;
3  correct?
4   A  Sure.
5   Q  Another example of selection bias could be if,
6  for example, the 123 patients in the study were far
7  heavier smokers at some point in their life than the
8  1,800 patients that you might want to extrapolate it to,
9  then the 123 wouldn't necessarily be representative at
10 all to what you might expect in the 1,800; correct?
11   A  It could be.
12   Q  And if, for example, the 123 patients in the
13 progression study were, on average, exposed to -- would
14 you agree with me that asbestos diseases are dose
15 responsive?
16   A  By and large, they appear to be.
17   Q  Meaning that the more asbestos you're exposed
18 to, the more likely you are to contract an
19 asbestos-related disease; correct?
20   A  Correct.
21   Q  And that's true for both nonmalignant diseases
22 and asbestos-related cancers.
23   A  I believe that is true.
24   Q  Although, for mesothelioma, there is -- they
25 haven't really defined a threshold below which there is

**Page 187**

1  no -- which there is no safe exposure.
2   A  Right; there are some exceptions, yes.
3   Q  So the math gets squirrelly when you start
4  putting infinity -- one over zero you get to infinity.
5   A  It does, yeah.
6   Q  So leaving mesothelioma aside, the other -- the
7  other asbestos-related diseases are dose response in
8  that the more asbestos you're exposed to, the more
9  likely you are to get an asbestos-related disease;
10 correct?
11   A  It appears to be that way.
12   Q  And would you also agree with the proposition
13 that, generally speaking, the more heavily you are
14 exposed, the more severe your nonmalignant disease tend
15 to be. People look at, for example, the insulator as
16 compared to lower exposed coworkers.
17   A  I guess I would say to that that there
18 are -- the whole arena of exposure in environmental
19 health has been really worked a lot in the last few
20 years. It appears that, you know, a lot of what happens
21 with different kinds of diseases is maybe not the size
22 of the dose, but maybe it's when you are dosed, when in
23 your life span are you dosed. Are you dosed, you know,
24 as an adolescent?
25   Q  You mean, earlier exposures might be more

**Page 188**

1  dangerous than later exposures.
2   A  Yeah, exactly. So it may not be just the
3  cumulative exposure, it may be when. A fair amount of
4  study coming out of the National Study of Environmental
5  Health is showing fairly persuasively that a lot of
6  chronic diseases appear to be related to in utero
7  exposures. So it's like, you know, are you exposed in
8  utero, and that could be something that drives the
9  disease pattern of diabetes in your thirties.
10   Q  Um --
11   A  So that's a long answer. Because really what
12 I'm just trying to say is it's more than just dose.
13 Dose itself is very important. But it could be when you
14 are dosed.
15   Q  Okay. But if, for example, the 123 patients in
16 the progression study, if the vast majority of them were
17 miners who were exposed to a lot more asbestos on
18 average than the rest of the 1,800 patient population,
19 it may well be that the progression of lung function
20 decline you saw in the 123 would not be predictive of
21 what you would see in the bigger population.
22      MR. HEBERLING: Objection; outside his area
23 of expertise.
24      THE WITNESS: I didn't really understand
25 the question anyway, so....

In Re: W.R. Grace & Co., et al., Debtors    Case No. 01-1139 (JKF)    Craig Molgaard, Ph.D.
June 25, 2009

**Page 189**

1  Q (By Mr. Finch) Okay. In order for the -- in
2  order for you to make any extrapolation from the 123 to
3  the bigger patient population, you would have to -- the
4  123 would have to be representative of the bigger
5  patient population on every variable that matters for
6  lung function decline; correct?
7  A Ideally, yes.
8  Q Okay. And you haven't done anything to assess
9  whether there are variables about those 123 subjects
10 that are different as it relates to the things that
11 might cause lung function decline. You haven't done
12 that.
13 A No, I have not.
14 Q Okay.
15 Last defines the power of a study as the
16 ability of a study to demonstrate an association, if one
17 exists.
18 A Right.
19 Q Could you put that into layman's terms? What
20 does that mean?
21 A It's the amount of surety you have that you
22 have actually found something and that there really is
23 something going on in your study and it's not just
24 something could happen by chance; okay? It's -- it has
25 to do with type one, type two errors when you're doing

**Page 190**

1  inferential testing. And power is one minus beta or one
2  minus type two error. And it's rather complicated and
3  boring. But basically what it amounts to is that there
4  is -- it gives you a probability that what you are
5  finding is really there.
6  Most studies of analytic type will look
7  at -- will want a power of one minus beta probability of
8  80 to 90 percent. And so you then generate a sample
9  that gives you that much power.
10 Q I've sort of always thought it was power as a
11 statistical concept in the sense that if you have an
12 observation of ten events, that's a much less powerful
13 study than if you have an observation of a thousand
14 similar events; correct?
15 A Yeah.
16 Q So, for example, if you wanted to -- if you
17 wanted to make conclusions about the probability of
18 flipping a coin and how often it's going to be heads
19 versus how often it's going to be tails, if you did a
20 study with only ten flips, that's far less powerful than
21 a study that has a thousand flips; correct?
22 A That's a good way -- yeah, that's fine.
23 Q So, for example, if you flip a coin ten times,
24 you might come up seven heads and three tails. Whereas
25 if you did it a thousand times, the odds are you're not

**Page 191**

1  going to come up 70 percent heads and 30 percent tails;
2  correct?
3  A Yeah.
4  Q And so with a study that has much less
5  statistical power, you might draw invalid conclusions
6  just because the study doesn't have enough power to weed
7  out random events; correct?
8  A Yeah.
9  Q Okay.
10 Dr. Whitehouse's progression study was looking
11 at a subset of his total patient population. His total
12 patient population is 1,800 people; right?
13 A Right.
14 Q And of those 1,800, we've got the medical
15 records of about a thousand of them that were produced;
16 correct?
17 MR. HEBERLING: Objection; misstatement of
18 the record.
19 MR. FINCH: Have you produced the medical
20 records for all 1,800 people?
21 MR. HEBERLING: You're talking about the
22 Whitehouse progression study.
23 MR. FINCH: Yes.
24 MR. HEBERLING: The client number at that
25 time was 491.

**Page 192**

1  MR. FINCH: I understand that.
2  Q (By Mr. Finch) But of the -- there are 1,800
3  people who live in and around Libby who have been
4  diagnosed with asbestos-related disease, correct,
5  Dr. Molgaard? That's your understanding?
6  A Yeah.
7  Q The 123 patients are -- obviously, it's a much
8  smaller number of people than either 900 or 1,800;
9  correct?
10 A Right.
11 Q So would you agree with me that if you -- and
12 would you agree with me that what Whitehouse did in the
13 2004 paper was what some -- he did an analysis of change
14 in lung function over time between point A and point B?
15 A Right.
16 Q And the time period was about three years, on
17 average?
18 A Right.
19 Q Okay. Would you agree with me that, as a
20 matter of statistics, a study that analyzes lung
21 function decline in 123 people over a three-month (sic)
22 period of time is much less powerful than a study that
23 would examine lung function decline in 900 people with
24 asbestos-related disease over a five-to-seven-year
25 period of time?

In Re: W.R. Grace & Co., et al., Debtors    Case No. 01-1139 (JKF)    Craig Molgaard, Ph.D.
June 25, 2009

Page 193

 1    A  I would not agree with you, because the issue
 2  is where does the concept of statistical power apply.
 3  And by and large, it does not apply to descriptive
 4  studies. It applies to analytical studies or clinical
 5  trials.
 6    Q  Okay; I'm glad you mentioned that. A
 7  descriptive -- you could not use the results of a
 8  descriptive study to say -- to make predictions about
 9  the outcomes of a disease in a larger population;
10  correct?
11    A  Could not use it to do what?
12    Q  To make a prediction about the disease
13  progression in a bigger population.
14    A  I would not think so, because I think that
15  that's -- what you're really doing is you're
16  using -- you are explaining what's going on within this
17  case series.
18    Q  Right; you're explaining -- you're saying
19  you've got these 123 people, and 76 percent of them
20  showed a lung function decline over a three-year period
21  of time; correct?
22    A  Right.
23    Q  You could not, as a matter of analytic
24  epidemiology, say that because I observed that in these
25  123 people, therefore, there is a 76-percent chance that

Page 194

 1  anybody who has an asbestos-related disease in Libby
 2  will also suffer a lung function decline.
 3    A  That would be a hypothesis to be tested, I
 4  believe.
 5    Q  And nobody's done the work in this case to
 6  prove the hypothesis that every -- or anybody with
 7  asbestos disease in Libby has a 76-percent chance to
 8  have a loss of lung function.
 9    A  Not to my knowledge.
10    Q  Okay.
11       And nobody has done the epidemiological work to
12  prove the hypothesis that anybody who has an
13  asbestos-related disease in Libby has a 59-percent
14  chance of dying; correct?
15    A  Done the work in terms of analytic
16  epidemiology, no, not to my knowledge.
17       MR. FINCH: Okay; this would be a good time
18  to take a little break. I'm getting close to done.
19       VIDEO TECHNICIAN: Off the record, then,
20  it's 3:06.
21       (Deposition in recess from 3:06 p.m. to
22  3:10 p.m.)
23       VIDEO TECHNICIAN: We're back on the
24  record. The time is 3:10.
25    Q  (By Mr. Finch) Dr. Molgaard, I didn't see

Page 195

 1  anywhere in your expert witness report any analysis or
 2  discussion or criticism of the W.R. Grace bankruptcy
 3  trust distribution procedures.
 4    A  I know almost nothing about that.
 5    Q  Okay. You said you reviewed Dr. Whitehouse's
 6  report and you commented on certain aspects of his
 7  report --
 8    A  Uh-huh.
 9    Q  -- but am I correct that you have not been
10  asked to analyze or review or have any opinions about
11  the medical or exposure criteria in the Grace TDP?
12    A  That's correct.
13    Q  So you're not vouching for Dr. Whitehouse's
14  views -- you're not vouching for or critiquing the
15  medical and exposure criteria in the TDP in any way.
16    A  That's correct.
17    Q  Okay.
18       And then Mr. Whitehouse -- excuse me. I've
19  been traveling a lot lately. I just slandered
20  Dr. Whitehouse and Mr. Heberling as to which I'm both
21  sorry.
22       But Mr. Heberling --
23       MR. HEBERLING: I don't -- well, anyway,
24  you said "Mr. Whitehouse." You didn't say anything
25  about Dr. Heberling which would be slander.

Page 196

 1       MR. FINCH: I was thinking about you and
 2  I -- Whitehouse is a doctor, obviously. Mr. Heberling
 3  is a very fine lawyer.
 4    Q  (By Mr. Finch) Mr. Heberling sent me an
 5  e-mail, along with other people, on Saturday that talks
 6  about paragraphs 44, 45, and 48 of Dr. Whitehouse's May
 7  2009 report. And I think that report was marked as one
 8  of --
 9    A  That's 5, Exhibit 5.
10    Q  -- Exhibit 5. And this is where he's
11  describing the mesothelioma cases in Libby as compared
12  to the Libby's average population versus the
13  mesothelioma cases around the Manville plant.
14    A  Uh-huh.
15    Q  Again, this analysis in paragraphs 44 and 45 is
16  a matter of descriptive epidemiology; correct?
17    A  Correct.
18    Q  So you cannot, from that, make any causal
19  connection as to whether exposure to amphiboles in Libby
20  is more or more -- more or less likely the cause of
21  mesothelioma than exposure to asbestos around Manville,
22  New Jersey; correct?
23    A  Um --
24    Q  Let me withdraw that question and rephrase it.
25       You don't know what kind of asbestos

Page 197

PP

1 exposures -- the paragraphs 44 and 45 do not allow one
2 to test the hypothesis as to whether exposure to Libby
3 asbestos is more or less likely to cause mesothelioma
4 than exposure to other types of asbestos; correct?
5   A   Correct.
6   Q   And similarly, paragraph 48, this is describing
7 the ATSDR study and mortality in Libby, Montana?
8   A   Yes.
9   Q   Do you see that?
10  A   Uh-huh.
11  Q   This paragraph doesn't attempt to make any
12 comparison between the ability of amphibole asbestos
13 from Libby to cause asbestosis as compared to other
14 types of asbestos fibers that cause asbestosis.
15  A   Correct.
16      MR. FINCH: I believe I'm done; pass the
17 witness.
18      MR. HEBERLING: All yours, Dale.
19      MR. COCKRELL: No questions.
20      MR. FINCH: Does anybody on the telephone
21 have any questions?
22      MR. HEBERLING: Is anyone on the telephone?
23 I think we woke somebody up. I heard something.
24      THE WITNESS: I heard a choking noise.
25      MR. HEBERLING: So I will reserve my

Page 198

1 questions to the time of trial.
2      MR. FINCH: Okay.
3      You have the right to read and sign. I'm sure
4 you know all about that. So this deposition is
5 concluded.
6      **VIDEO TECHNICIAN:** This ends the
7 deposition. The time is 3:15.
8      (Deposition concluded at 3:15 p.m.; witness
9 excused, signature reserved.)

Page 199

1           CERTIFICATE OF WITNESS
2 PAGE      LINE         CORRECTION

15      I, CRAIG MOLGAARD, Ph.D., have read the
foregoing transcript of my testimony and believe the
16 same to be true, except for the corrections noted above.
17      DATED this         day of           , 2009.

19                          Deponent
20      SUBSCRIBED AND SWORN to before me this       day
22 of              , 2009.

24      Notary Public for the State of Montana
        Residing at              , Montana
25      My Commission expires:

Page 200

1           REPORTER'S CERTIFICATE
2      I, BAMBI A. GOODMAN, CSR, RPR, CRR and Notary
3 Public in and for the State of Montana, residing in
4 Whitefish, Montana, do hereby certify:
5      That I did report the foregoing videotaped
6 deposition after having duly sworn CRAIG MOLGAARD, Ph.D.
7 to the truth; that the deposition was taken at the time
8 and place stated on the caption hereto; that the
9 testimony of the witness was taken in shorthand by me
10 and subsequently reduced to writing under my direction;
11 that the foregoing is a true and correct transcript of
12 the testimony given by the witness;
13      I further certify that I am not counsel,
14 attorney nor relative or employee of any party, nor
15 otherwise interested in the event of this suit.
16      IN WITNESS WHEREOF, I have hereunto subscribed
17 my name and affixed my seal of office this 29th day of
18 June, 2009.

23                 BAMBI A. GOODMAN, CSR, RPR, CRR and
                   Notary Public, State of Montana
24                 Residing at Whitefish, Montana
                   My Commission expires 3/21/10