**Deposition Designations for:**
**EDWIN ORDWAY**
**August 29, 2008**

**Deposition Designation Key**

Arrowood = Arrowood Indem. Co.
f/k/a Royal Indem. Co. (Light Green)

BNSF = BNSF Railway Co. (Pink)

Certain Plan Objectors "CPO" = Government Employees Insurance Co.; Republic Insurance Co. n/k/a Starr Indemnity and Liability Co.; OneBeacon America Insurance Co.; Seaton Insurance Co.; Fireman's Fund Insurance Co.; Allianz S.p.A. f/k/a Riunione Adriatica Di Sicurta; and Allianz SE f/k/a Allianz Aktiengesellschaft; Maryland Casualty Co.; Zurich Insurance Co.; and Zurich International (Bermuda) Ltd.; Continental Casualty Co. and Continental Insurance Co. and related subsidiaries and affiliates; Federal Insurance Co.; and AXA Belgium as successor to Royal Belge SA (Orange)

CNA = Continental Cas. Co & Continental Ins. Co. (Red)

FFIC = Fireman Funds Ins. Co. (Green)
FFIC SC = Fireman Funds Ins. Co. "Surety Claims" (Green)

GR = Government Employees Ins. Co.; Republic Ins. Co. n/k/a Starr Indemnity and Liability Co.

Libby = Libby Claimants (Black)

OBS = OneBeacon America Ins. Co. and Seaton Ins. Co. (Brown)

PP = Plan Proponents (Blue)

Montana = State of Montana (Magenta)

Travelers = Travelers Cas. and Surety Cos. (Purple)

UCC & BLG = Unsecured Creditors' Committee & Bank Lenders Group (Lavender)

| | |
|---|---|
| AFNE = Assume Fact Not in Evidence | L = Leading |
| AO = Attorney Objection | LA = Legal Argument |
| BE = Best Evidence | LC = Legal Conclusion |
| Cum. = Cumulative | LPK - Lacks Personal Knowledge |
| Ctr = Counter Designation | LO = Seeking Legal Opinion |
| Ctr-Ctr = Counter-Counter | NT = Not Testimony |
| ET = Expert Testimony | Obj: = Objection |
| F = Foundation | R = Relevance |
| 408 = Violation of FRE 408 | S = Speculative |
| H = Hearsay | UP = Unfairly Prejudicial under Rule 403 |
| IH - Incomplete Hypothetical | V = Vague |

Page 1

1       IN THE UNITED STATES BANKRUPTCY COURT
2          FOR THE DISTRICT OF DELAWARE
3
4

    In re:                    ) Chapter 11
5                             ) Case No.
    W.R. GRACE & CO., et al,  ) 01-1139(JFK)
6                             )
              Debtors.        ) Jointly
7   --------------------------) Administered
8
9
10
11          DEPOSITION OF EDWIN N. ORDWAY, JR.
12                  New York, New York
13              Friday, August 29, 2008
14
15
16
17
18
19
20
21
22
23  Reported by:
24  MAYLEEN CINTRON, RMR, CRR
25  JOB NO. 18494

**Page 6**

1  EDWIN N. ORDWAY, JR.,
2      called as a witness, having been duly
3      sworn by a Notary Public, was examined
4      and testified as follows:
5      THE REPORTER: Please state your
6  full name for the record.
7      THE WITNESS: Edwin N. Ordway, Jr.
8  EXAMINATION BY
9  MR. BERNICK:
10     Q. Good afternoon, Mr. Ordway. My
11 name is David Bernick. I think we met briefly
12 before. I'm here representing Grace and I'm
13 here to ask you some questions this afternoon.
14 I hope efficiently, so we can all get on to
15 more important matters on this Friday
16 afternoon.
17     Let me just ask you first: Have you
18 ever given a deposition before?
19     A. Yes.
20     Q. On how many occasions?
21     A. Six or seven.
22     Q. So, you know the basic rules. One
23 of the rules, very important rule, you're
24 under oath and you have an obligation to tell
25 the truth. Do you understand that?

**Page 7**

1      E. Ordway
2      A. Yes.
3      Q. Another rule, equally important, is
4  that we want to be able to count on this
5  transcript as containing answers that you're
6  giving in response to my questions.
7      From that point of view, if at any
8  time you don't understand something that I'm
9  asking you, be sure to let me know and I'll do
10 my best to clarify it.
11     If you don't raise a question about
12 understanding, we'll assume that you
13 understand the questions and that you're
14 giving the answers that you believe are
15 appropriate. Can we proceed on that basis?
16     A. Yes.
17     Q. What's your area of expertise?
18     A. Restructuring, financial
19 restructuring.
20     Q. For how long have you been in that
21 area?
22     A. 18 years.
23     Q. I see from your CV that you have a
24 background in accounting.
25     A. That's correct.

**Page 8**

1      E. Ordway
2      Q. I take it, then, that you are
3  familiar with and are expert in the accounting
4  standards that are relevant to your work in
5  this case; is that correct?
6      A. Yes.
7      Q. Same thing with respect to a
8  financial analysis; are you familiar with the
9  standards and methodologies that are employed
10 by financial analysts insofar as they relate
11 to your work in this case?
12     A. Yes, I do.
13     Q. I got a copy of what I understand
14 to be your declaration in this matter.
15     (Grace Exhibit 1, Declaration,
16     marked for identification, as of this
17     date.)
18     Q. I'm going to show you Exhibit 1 and
19 ask you whether this is a copy of the
20 declaration that you have submitted in
21 connection with this matter?
22     MR. BERNICK: I'll give my esteemed
23     colleagues over here a copy. If you
24     want two, you can have two.
25     A. Yes, it is.

**Page 9**

1      E. Ordway
2      Q. Is Exhibit 1, your declaration,
3  complete and accurate?
4      (Witness reviewing document.)
5      A. Yes, it is.
6      Q. And by "complete and accurate," is
7  your work in this case complete insofar as you
8  have been asked to do work in this case?
9      MR. PASQUALE: Well, object to
10 form. By "this case," do you mean the
11 contested matter?
12     MR. BERNICK: The contested matter.
13     MR. PASQUALE: Okay.
14     A. Yes.
15     Q. And is Exhibit 1, the declaration,
16 a complete and accurate reflection of the work
17 that you have done --
18     A. Yes.
19     Q. -- on this contested matter?
20     A. Yes.
21     Q. I want to turn to the interest
22 calculation that appears on page 4,
23 Paragraph 8, of your declaration.
24     Does that paragraph set forth the
25 results of some interest calculations?

### Page 26

```
 1           E. Ordway
 2      Q.  Okay.  So to be fair, then, it was
 3  counsel who came up with the idea of looking
 4  at the amount of interest at issue, correct?
 5      A.  Yes.
 6      Q.  It was counsel that came up with
 7  the idea of making that determination using
 8  the comparison between the default rate and
 9  the proposed plan rate, correct?
10          MR. PASQUALE:  Objection to form.
11  Misstates prior testimony.
12          MR. BERNICK:  I think it is exactly
13  what he said.
14          MR. PASQUALE:  I don't think it is.
15      Q.  It was counsel who decided, came up
16  with the idea of using those particular
17  elements -- that is, proposed plan versus
18  default rate -- to define the interest at
19  issue, correct?
20      A.  I'm not sure if it was our idea or
21  their idea--
22      Q.  And it is certainly --
23      A.  -- to frame it in any manner.
24      Q.  And it was certainly, Counsel, then
25  who asked you to determine whether that was
```

### Page 27

```
 1           E. Ordway
 2  'di minimus', correct?
 3      A.  Yes.
 4      Q.  Now, because there is no standard
 5  for what's 'di minimus', did counsel give you
 6  any suggestions about what would be
 7  'di minimus'?
 8      A.  No.
 9      Q.  Now, you ultimately end up saying
10  it's 'di minimus' by making a comparison to, I
11  think as you put it, "the benefit now
12  available to all stakeholders," right?
13      A.  Yes.
14      Q.  Whose idea was it to talk about
15  what was available to all stakeholders?  What
16  does stakeholders even mean?
17      A.  Stakeholders are all the -- in our
18  context, the way we wrote this, were all the
19  parties in interest associated with the
20  Debtor's cases.
21      Q.  Whose idea was it to determine
22  whether the amount at issue was 'di minimus'
23  by reference to the benefit available to all
24  stakeholders?
25          MR. PASQUALE:  Objection to form.
```

### Page 28

```
 1           E. Ordway
 2      Q.  Whose idea was that?
 3      A.  I believe that was our thought to
 4  include that in the affidavit.
 5      Q.  So, your point of reference, it was
 6  you who decided that the point of reference
 7  for making a comparison and determining
 8  'di minimus', that the right point of
 9  reference would be "benefit available to
10  stakeholders"?
11      A.  As well -- yes.
12      Q.  And it's true, is it not, that
13  there is no accounting standard, convention,
14  or methodology that tells you to make that
15  comparison?
16      A.  That's correct.
17      Q.  It's true that there is no
18  financial analysis, standard or methodology or
19  convention that tells you to make that
20  comparison, correct?
21      A.  Correct.
22      Q.  If somebody else were to make a
23  different comparison or to determine what was
24  'di minimus', you would have no basis using a
25  standard, or method or convention to say what
```

### Page 29

```
 1           E. Ordway
 2  they are, correct?
 3      A.  It would be their judgment versus
 4  my judgment.
 5      Q.  And to decide between your judgment
 6  versus their judgment, there is no objective
 7  standard or reliable method that you could
 8  point to right now that would enable you to
 9  make the decision, correct?
10      A.  That's correct.
11      Q.  Now, it's true, is it not, that
12  when you make the comparison between the
13  interest at issue and the benefit available to
14  the stakeholders, you're really talking about
15  a comparison of the interest at issue and the
16  value that's been generated at Grace, correct?
17      A.  Yes.
18      Q.  And it is true, is it not, that the
19  value that has been generated in Grace is
20  reflected, according to your work, in the
21  stock price, right?
22          MR. PASQUALE:  Objection to form.
23      A.  Yes.
24      Q.  And basically, the comparison that
25  you draw in determining the significance of
```

[Handwritten margin note: UCC+ BLG Ctr]

|     Page 30 | Page 31 |
| --- | --- |

```
                Page 30
 1         E. Ordway
 2  the interest at issue, are comparisons between
 3  the interest that has accrued to the debt on
 4  which you're opining by comparison to the
 5  value that's accreted to equity, correct?
 6         MR. PASQUALE:  I'm going to object
 7     to form.  The affidavit goes into more
 8     than just that, David, as you well
 9     know.
10     A.  It's one of the examples that we
11  use.
12     Q.  Right, you got comparisons to
13  EBITDA, you got comparisons to revenues.  At
14  the end of the day, EBITDA and revenue are
15  also reflected in equity value, correct, or
16  not?
17     A.  One would assume that the market
18  value contemplates operating performance, so
19  the answer would be yes.
20     Q.  So fundamentally, at the heart of
21  your determination that the interest at issue
22  is 'di minimus', is a comparison between the
23  interest at issue on the one hand and the
24  value of Grace equity on the other, correct?
25     A.  Not only the value of Grace, but
```

```
                Page 31
 1         E. Ordway
 2  also the total value of the Company and the
 3  operating performance of the Company.
 4     Q.  Operating performance, generally
 5  speaking, is reflected in equity; or not?
 6     A.  Generally speaking.
 7     Q.  But, is it true that equity value,
 8  that is stock price, can reflect many, many
 9  things other than company performance; true?
10     A.  Correct.
11     Q.  And in fact you provide no
12  methodology in your declaration here that
13  enables us to relate stock price to actual
14  company performance, correct?
15     A.  Correct.
16     Q.  Now, it's true, is it not, that the
17  debt that you're talking about here and the
18  equity securities that you're talking about
19  here, are two totally different kinds of
20  securities?
21     A.  Correct.
22     Q.  Debt accretes value based upon
23  interest, correct?
24     A.  Correct.
25     Q.  Equity accretes value based upon
```

```
                Page 32
 1         E. Ordway
 2  performance, not interest, correct?
 3     A.  Can I change an answer?
 4     Q.  Depends on which one you want to
 5  change.
 6         MR. PASQUALE:  Yes, you could --
 7     Q.  I tell you what, if you want to ask
 8  me whether you could change an answer, I
 9  appreciate that.  But you probably have the
10  prerogative at some point in this process to
11  change it on your own.
12         So what answer do you want to
13  change?
14     A.  The one from -- the prior question
15  you asked me about the debt instrument, that
16  it accretes value according to its contract
17  rate of interest.
18         In this instance, too, the debt is
19  traded, there's a market for trading the debt,
20  and the debt improved in value since the
21  filing of the bankruptcy, albeit there were
22  some ups and down, based on the performance of
23  the Company as well.
24     Q.  Sure.  As a matter of the debt
25  contract, the security agreement or the
```

```
                Page 33
 1         E. Ordway
 2  agreement that underpins the debt security,
 3  the value of that debt security, in the sense
 4  of the obligation to repay that security, is
 5  driven solely by the interest rate and
 6  principal amount, correct?
 7     A.  And other fees that are contained
 8  in the terms of the agreement.
 9     Q.  The value of the debt security, in
10  the sense of what is owed to the creditor is
11  not contingent upon how the Company performs,
12  correct?
13     A.  The obligation is not contingent
14  upon the Company's performance, that's
15  correct.
16     Q.  Where in the case of equity, equity
17  does not accrete interest under contract,
18  correct?
19     A.  Correct.
20     Q.  Or under law, correct?
21     A.  Correct.
22     Q.  And equity, by contrast to debt,
23  accretes value based upon the performance of
24  the Company and how that performance then is
25  reflected in the stock price, correct?
```

Page 34

```
               E. Ordway
 2      A.  Among other factors, yes.
 3      Q.  In fact, independently of market
 4  price, you could add private equity that
 5  accretes value simply based upon the
 6  performance of the Company, correct?
 7      A.  Correct.
 8      Q.  If you wanted to make a different
 9  comparison using your own work here -- put it
10  differently.
11          If we look at the work that you've
12  done here, you choose to determine whether the
13  interest at issue is 'di minimus' by comparing
14  it to the value that has accreted to Grace's
15  operations, among other things, correct?
16          MR. PASQUALE:  Thank you, David.
17      A.  Yes, among other things.
18      Q.  But if we just wanted to talk about
19  what was owed under the debt instruments,
20  would you say that the amount at issue here is
21  'di minimus' in relationship to the amounts
22  that may or may not be owed under the debt
23  agreements themselves?
24          In other words, you compare the
25  debt to the equity.  I'm asking you:  If you
```

Page 35

```
               E. Ordway
 2  just focused on the debt, the amount of
 3  interest at issue here is not 'di minimus'
 4  compared to what is owed on the debt, correct?
 5      A.  Correct.
 6      Q.  In fact, is it true that if we
 7  compare the highest number, which is the
 8  default interest calculation that you've done,
 9  to the base interest rate, even assuming that
10  that base interest rate extends beyond the
11  event of Grace filing for bankruptcy, you're
12  talking about as much as a 40 percent
13  difference in the amount of interest it's
14  owing, correct?
15      A.  I think that calculation is right.
16      Q.  And that certainly would not be
17  'di minimus', correct?
18      A.  The statement of being 'di minimus'
19  was in the context of other financial
20  information.  But in the context of the debt
21  itself and the interest itself, I would not
22  call that 'di minimus', if that were the
23  comparison.
24      Q.  Excuse me, what?
25      A.  If that were the comparison we were
```

Page 36

```
               E. Ordway
 2  making.
 3      Q.  Have you ever done an opinion on
 4  solvency?
 5      A.  Yes.
 6      Q.  Is that something that's ordinarily
 7  done by people within your field of expertise?
 8          MR. PASQUALE:  David, I'm going to
 9  raise an objection.  We had an
10  agreement that questioning would be
11  limited to the declaration.
12          MR. BERNICK:  I'm not going to
13  stray from that agreement.  You'll see.
14          MR. PASQUALE:  But solvency is not
15  in here.
16          MR. BERNICK:  That's what I wanted
17  to get you to say, really.
18      Q.  You know about solvency opinions,
19  correct?
20      A.  Yes, I do.
21      Q.  You do not express here an opinion
22  -- in your declaration, you do not express an
23  opinion about solvency, nor do you do a
24  solvency calculation, correct?
25      A.  Correct.
```

Page 37

```
               E. Ordway
 2          MR. BERNICK:  Did I abide by my
 3  agreement?
 4          MR. PASQUALE:  Well, you did.  But
 5  you asked about solvency questions, and
 6  now I feel compelled to say for the
 7  record that the judge has deferred any
 8  issues of solvency until after the
 9  hearing.  So we will reserve the right
10  to deal with that issue later if we
11  need to.
12          MR. BERNICK:  I don't want to argue
13  about it.  I'm making such progress
14  here.
15          MR. COBB:  On the record for bank
16  lenders, the judge has deferred certain
17  questions with regard to solvency,
18  calculations thereof, until a later
19  date.
20          MR. PASQUALE:  That's more
21  accurate.
22          MR. BERNICK:  I'm glad we are in
23  agreement with respect to that.
24  BY MR. BERNICK:
25      Q.  Now, you have looked also in your
```

```
                                Page 38
 1              E. Ordway
 2   declaration at certain factors that you
 3   believe have been responsible, at least in
 4   part, for the performance of Grace's stock,
 5   correct?
 6       A.  Correct.
 7       Q.  You made some observations of
 8   what's contributed to what you believe to be
 9   the dramatic increase in Grace's stock
10   performance, correct?
11       A.  Correct.
12       Q.  I found a total of three things
13   that you identify as being contributors to
14   Grace's stock performance. One, which appears
15   at Paragraph 5 of your declaration, is
16   earnings generation, correct?
17       A.  Paragraph 6.
18       MR. PASQUALE: Paragraph 6, right?
19       MR. BERNICK: No, it's before that.
20       Q.  "Debtors' strong ongoing earnings
21   generation." Tail-end of 5.
22       A.  Yes.
23       Q.  Another factor that you identify as
24   being a contributor to Grace's stock
25   performance, you have a Paragraph 6 in which
```

(margin annotation: UCC + BLG Ctr)

```
                                Page 39
 1              E. Ordway
 2   you refer to the "creditor's support of the
 3   Debtors' use of such cash to fund numerous
 4   strategic acquisitions and otherwise reinvest
 5   in their businesses"; do you see that?
 6       A.  Yes.
 7       Q.  That's another factor that you say
 8   contributed to Grace's stock performance,
 9   correct?
10       A.  Yes.
11       Q.  And then in Paragraph 7 you
12   identify a third contributor, where you say
13   that the equity holders of the Debtors had
14   benefited substantially as compared to the
15   lenders in part from the use of the lender's
16   cash, right?
17       A.  Correct.
18       Q.  So in taking a look at Grace's
19   stock performance, we have you identifying
20   three factors: I don't see any others here,
21   but you can tell me if they are. But three
22   factors which you say contributed to that
23   performance; one is earnings generation, the
24   other is creditors' support for Grace's
25   strategic acquisition and reinvestment, and
```

(margin annotation: UCC & BLG Ctr)

```
                                Page 40
 1              E. Ordway
 2   the third is use of the lender's cash,
 3   correct?
 4       A.  Correct.
 5       Q.  It's true, is it not, that in
 6   expressing those opinions, you relied upon no
 7   documents, correct?
 8       A.  Well, I relied on historical
 9   financial information to draw that conclusion.
10       Q.  Did you or did you not rely upon
11   documents?
12       A.  I relied upon documentss.
13       Q.  Well, I've got a statement from
14   Mr. Pasquale. I asked to be furnished "by the
15   close of business tomorrow any documents
16   Ordway has relating to the reasons for Grace's
17   stock performance." And the answer that I got
18   back was that Mr. Pasquale checked with you
19   and Capstone and there are no documents of the
20   type and subject requested that were relied
21   upon in preparing the declaration.
22           That's why I simply ask you: When
23   it came to the analysis that you performed and
24   the factors that contributed to Grace's stock
25   performance, isn't it a fact that you relied
```

```
                                Page 41
 1              E. Ordway
 2   upon no documents in preparing your
 3   declaration?
 4       MR. PASQUALE: Well, let me jump in
 5   here. I understood from your one-line
 6   e-mail, because we did not have a
 7   discussion about it, that you were
 8   asking for any documents that they
 9   relied upon in preparing the
10   declaration, that's how I answered you,
11   that bear upon the reason for the
12   market price.
13       MR. BERNICK: Yes.
14       MR. PASQUALE: Okay.
15       MR. BERNICK: And I'm just asking
16   the witness.
17       Q.  In preparing this declaration,
18   isn't it a fact that the declaration offers
19   the view that these factors contributed to
20   stock performance? And I'm saying: Isn't it
21   true that in preparing this declaration, you
22   relied upon no documents relating to the facts
23   or reasons for Grace's stock performance?
24       A.  I relied upon historical financial
25   statements and 10-Qs, 10-Ks and monthly
```

Page 42

```
1           E. Ordway
2  operating reports to do the analysis that led
3  me to conclude the three points that you
4  raised.
5     Q.  But you didn't rely upon those
6  documents in preparing your declaration which
7  you said was complete and accurate?
8        MR. BERNICK:  I don't understand
9     the difference.  How can he rely upon
10    the documents in doing the analysis
11    that's in the declaration, but not rely
12    upon those documents in doing the
13    declaration.
14       MR. PASQUALE:  Because you're
15    trying to get the witness to say what
16    you want him to say, and you're not
17    listening to the answer.
18       There is a difference between
19    reasons for the market price moving and
20    the fact of the market price.  What the
21    witness is telling you is that he
22    looked at those documents to draw the
23    conclusions he did, based on fact.
24    Q.  I'll just read it to you.
25       "Please furnish by close of
```

Page 43

```
1           E. Ordway
2  business tomorrow any documents Ordway has
3  relating to the reasons for Grace's stock
4  performance."
5        I'm just asking you:  Were there
6  any documents that you had relating to the
7  reasons for Grace's stock performance which
8  you relied upon in preparing the declaration?
9     A.  Well, I guess the answer would have
10 to be yes, simply because I inferred that the
11 stock performance was related to the operating
12 performance of the Company.  And I learned
13 what the operating performance of the Company
14 was based on reviewing historical financial
15 information.
16    Q.  What about, let's take this second
17 factor that you identified.  Help me go
18 through it.
19       The observations that you made in
20 your declaration as to the contribution that
21 these three factors made -- that is, earnings
22 generation, creditors' support and lender's
23 money -- can you point to any standard, test,
24 or stated methodology that you used in
25 determining that each one of these factors
```

Page 44

```
1           E. Ordway
2  did, in fact, contribute to Grace's stock
3  performance?
4     A.  Could you repeat the question?  Or
5  clarify it for me?
6     Q.  I guess it's a little more
7  cumbersome than it really has to be.  Let me
8  get at it this way:
9        Is it true that you nowhere
10 quantify the contribution of these three
11 factors -- that is, earnings generation,
12 creditors' support and lender's money -- you
13 nowhere quantify the contribution that any one
14 of those factors made to Grace's stock price,
15 correct?
16    A.  That's correct.
17    Q.  Is it also true that nowhere do you
18 say that the general Unsecured Creditors at
19 issue here, the bank creditors, nowhere do you
20 say that those creditors made any other
21 contribution to Grace stock performance, that
22 is contribution beyond creditors' support for
23 acquisitions and reinvestments and their cash?
24    A.  I don't say anything else other
25 than those two in this affidavit.
```

Page 45

```
1           E. Ordway
2     Q.  Were you aware, when you put
3  together this declaration, that there was a
4  Plan of Reorganization that was originally
5  proposed by Grace in the fall of 2004?
6     A.  Yes.
7     Q.  Do you know who the proponents were
8  of that plan?
9        MR. PASQUALE:  I think you need to
10    put a more precise date on it.  You're
11    talking about the first plan, the very
12    first?
13       MR. BERNICK:  The second one.  The
14    second one.
15    A.  The Creditors Committee and the
16 Debtor.
17    Q.  Is it true that you nowhere
18 identify in this declaration the creditors'
19 support for Grace's second Plan of
20 Reorganization as being a factor that
21 contributed to the performance of its stock?
22       MR. COBB:  Object to form, the word
23    "creditors."
24    Q.  Go ahead.
25    A.  I have no mention in here.
```

PP (bracket marking lines 9-16 of Page 44)
PP (bracket marking lines 17-25 of Page 44)

Page 46

```
 1        E. Ordway
 2    Q.  Have you determined what other, if
 3  any, contribution the general Unsecured
 4  Creditors at issue here, what other
 5  contribution, if any, those creditors made to
 6  the bankruptcy case?
 7        MR. COBB:  Objection to form again.
 8    A.  Am I aware of other ones?
 9    Q.  Yes.
10    A.  Yes.
11        MR. PASQUALE:  Let's be clear.
12  Your objection is well taken.
13        MR. COBB:  Objection as to form.
14  I'll be precise.  The "general
15  Unsecured Creditors at issue here."
16  You can answer if you can.
17        MR. PASQUALE:  Do you mean the
18  Committee, David or do you mean the
19  creditor body?  I think that's the
20  issue.
21        MR. BERNICK:  I make no such
22  distinction.  If you want to object to
23  form on the grounds that the Committee
24  is different from the lenders, feel
25  free.
```

Page 47

```
 1        E. Ordway
 2    Q.  My question is whether you have
 3  looked to see whether the unsecured lenders in
 4  this case made any other contribution to the
 5  bankruptcy case itself other than being
 6  co-proponents of Grace's Plan of
 7  Reorganization?
 8    A.  Is the question the unsecured
 9  lenders or the Creditors Committee?  I guess
10  you said --
11    Q.  Either or both.
12    A.  The Committee, I believe, has
13  provided substantial contribution to the case
14  in terms of, as the case has progressed, since
15  its onset with being cooperative with the
16  Debtor.
17    Q.  Is there anywhere in the
18  declaration where you state that those
19  activities in any way, shape, or form
20  contributed to Grace's stock price?
21    A.  No.
22    Q.  Let's talk a little bit about
23  creditors' support.  Creditor's support for
24  Grace acquisitions and reinvestments is one of
25  the two contributions which you say that the
```

Page 48

```
 1        E. Ordway
 2  Unsecured Creditors made to Grace's stock
 3  price, correct?
 4    A.  Correct.
 5    Q.  I don't see anywhere in your
 6  declaration where you cite any evidence to
 7  support the proposition that the creditors
 8  support for acquisition and reinvestment had
 9  any effect on stock price.  Would you agree
10  with me that there is nothing in the
11  declaration that provides that evidence?
12    A.  I agree.
13    Q.  Isn't it true that Grace had to
14  bring proposed acquisitions before the
15  Bankruptcy Court for approval?
16    A.  Correct.
17    Q.  Isn't it true that none of those
18  acquisitions were contested by anybody?
19    A.  They weren't contested by us as a
20  result of our review and analysis, and belief
21  that it was the appropriate course of action.
22    Q.  But they weren't contested by any
23  of the other stakeholders in the case, were
24  they?
25    A.  Not that I recall.
```

Page 49

```
 1        E. Ordway
 2    Q.  In fact, all of Grace's
 3  acquisitions, everybody agreed, were prudent
 4  and appropriate acquisitions to make, correct?
 5    A.  I'm not sure what the other party's
 6  conclusions were, but they didn't object.
 7    Q.  So, is what you're saying that the
 8  contribution of general Unsecured Creditors
 9  when it comes to creditors' support, is that
10  they decided not to object?
11    A.  They decided to not object.
12    Q.  What about reinvestment?  Are you
13  aware of any reinvestment that Grace made?
14  All Grace's financial, including CapEx, were
15  made available to the Committee and different
16  stakeholders, correct?
17    A.  Correct.
18    Q.  Are you aware of any issue that was
19  ever raised with respect to the reinvestment
20  of Grace earnings into the Grace business?
21    A.  There were issues raised, but I
22  think concluded to our satisfaction over time.
23    Q.  But did anyone at any point in the
24  bankruptcy ever object to any of Grace's
25  reinvestments?
```

Page 50

E. Ordway
1
2  A.  Not that I recall.
3  Q.  So they were essentially
4  noncontroversial, weren't they?
5  A.  I think it was controversial in the
6  sense of the Company making acquisitions
7  during a bankruptcy, but we accepted that they
8  were appropriate in the circumstances.
9  Q.  So again, the contributions that
10 the creditors made, insofar as reinvestment
11 was concerned, was simply a decision not to
12 object, correct?
13 A.  Correct.
14 Q.  So when we're sitting here today,
15 you say that the creditors' support with
16 respect to acquisitions and reinvestment
17 created a positive contribution to stock
18 value, all you're really referring to is that
19 you might have had an impact on Grace's stock
20 value if you had decided to object to the
21 acquisitions or the reinvestments, correct?
22     MR. PASQUALE:  Objection to form.
23 A.  It would have been detrimental to
24 the value of the Company, highly likely, if we
25 objected to some of these acquisitions.

Page 51

E. Ordway
1
2  Q.  And you regard that as being a
3  favorable contribution to the case, that you
4  simply failed to get in the way?
5      MR. PASQUALE:  Objection to form.
6  A.  Yes, I do.
7  Q.  Let's talk about money, the use of
8  cash, which appears on, I think, the next
9  page.
10     It says, "The equity holders of the
11 Debtors have benefited substantially as
12 compared to the lenders, in part from the use
13 of lender's cash."  Do you see that?
14 A.  Yes.
15 Q.  Now, that has got two components,
16 one is that there was a benefit to the equity
17 holders, and the second, that the benefit was
18 substantial, right?
19 A.  Yes.
20 Q.  Incidentally, whose idea was it to
21 take a look at whether the general Unsecured
22 Creditors had created a positive contribution
23 to Grace's stock performance?  Was that your
24 idea or counsel's idea?
25 A.  I think it may have been counsel's

Page 52

E. Ordway
1
2  idea.
3  Q.  Who decided how that analysis
4  should be done; you or counsel?
5  A.  I believe it was our idea as to how
6  this calculation and presentation should be --
7  should be made to illustrate that point.
8  Q.  Well, but when it came to
9  creditors' support, what we just got done
10 talking about, was it your idea to identify
11 creditors support as a potential contributor
12 to stock price or counsel's idea?
13 A.  The creditors' support as it
14 relates to the reinvestments and acquisitions?
15 Q.  Yes.
16 A.  That was my idea.
17 Q.  And the use of lender's cash, was
18 that your idea or counsel's idea?
19 A.  That may have been counsel's idea.
20 I don't recall.
21 Q.  Now, in neither instance, that is
22 neither in respect to creditors' support nor
23 in respect to use of lender's cash, in neither
24 case do we see any quantification of the
25 contribution, correct?

Page 53

E. Ordway
1
2  A.  I don't have it calculated in here
3  in this paragraph, but it's a half a million
4  dollars worth of lending, plus 400 and change
5  of interest that hasn't been paid.
6  Q.  I just asked you whether we see
7  anywhere in here a methodology that you used
8  in determining what contribution, if any, that
9  cash had?
10 A.  No.
11 Q.  Now, if we wanted to determine --
12 with respect to creditors' support, if we
13 wanted to determine the impact that that had
14 on stock price, can you point to any
15 accounting or financial analysis, methodology
16 or standard that you used in determining the
17 creditors' support did have a positive impact
18 on stock price?
19 A.  I don't have a calculation to
20 demonstrate that.
21 Q.  Do you have any kind of standard,
22 methodology, or stated methodology to
23 demonstrate it, on creditors' support?
24 A.  There isn't a standard methodology
25 for determining a precise quantification of

Page 54

```
 1            E. Ordway
 2   the benefit of the stock price from the
 3   lender's cash.
 4       Q.  I'm talking about creditors'
 5   support.
 6           MR. PASQUALE: More generally.
 7       Q.  Creditors' support for acquisitions
 8   and reinvestments.
 9       A.  There isn't a precise methodology
10   for determining that.
11       Q.  There isn't any methodology for
12   determining that, correct, this is a question
13   of your judgment?
14       A.  It would be a question of judgment.
15       Q.  When it comes to lender's cash. I
16   want to go through lender cash a little bit.
17           First of all, we don't see here the
18   deployment of any standard, methodology or
19   objective test in saying the use of lender's
20   cash benefited the equity holders or the
21   Debtor, correct?
22       A.  Correct.
23       Q.  Same thing with regard to the word
24   "substantially," it says that the equity
25   holders benefited substantially. Was that
```

Page 55

```
 1            E. Ordway
 2   your word or counsel's word?
 3       A.  My word.
 4       Q.  Is that a word that was derived
 5   from the accounting literature or the
 6   financial analysis literature, or that's just
 7   a general word in your vocabulary?
 8       A.  It's a general word in my -- it is
 9   my judgment to use that word.
10       Q.  That there is no objective measure
11   or test that you used to determining
12   substantial or insubstantial, correct?
13       A.  No.
14       Q.  Is my statement correct, that there
15   was no objective test that you used?
16       A.  Sorry. Yes.
17       Q.  Now, when we talk about the money,
18   the cash that the lenders provided to Grace
19   that Grace used, we have the principal of $503
20   million, principal plus accrued interest as of
21   the date of filing, correct?
22       A.  Correct.
23       Q.  Now, the loan documents call for
24   compensation for the use of that principal
25   with simple interest, correct?
```

Page 56

```
 1            E. Ordway
 2       A.  Correct.
 3       Q.  And we know that the compensation
 4   for the use of that principal with simple
 5   interest, would be about the $287 million
 6   number, right?
 7       A.  That sounds correct. That sounds
 8   about right.
 9       Q.  Now, if we deal with default,
10   default has got two components to it, one is a
11   different rate, and the other is compounded,
12   correct?
13       A.  Correct.
14       Q.  If we just talk about the default
15   rate applying before we get to interest on
16   interest, just apply the higher default rate,
17   am I right that that would take the interest
18   up approximately $15 to $18 million to about
19   $304 million?
20       A.  I don't know that calculation, if
21   that's right or wrong.
22       Q.  So, if we have principal of
23   $500 million, and the unpaid interest on the
24   principal, not interest on interest, but
25   interest on the principal, that would be
```

Page 57

```
 1            E. Ordway
 2   something in the area of between $280 and
 3   $300 million approximately?
 4           MR. PASQUALE: Object to form.
 5       A.  I'm not sure of your calculation.
 6   But it sounds order of magnitude, like it
 7   might be good for this discussion.
 8       Q.  What I'm getting at is: When we
 9   talk about use of lender's cash, we have
10   principal, we have interest on the principal
11   and we have interest on interest. Those are
12   three different things, correct?
13       A.  Correct.
14       Q.  And all I'm trying to do is get a
15   rough idea of the three tranches: The
16   principal plus accrued interest as of the date
17   of the filing is roughly $500 million, the
18   unpaid interest on principal -- simple
19   interest, not interest on interest, interest
20   on principal -- is another 300-odd-million
21   dollars, and then we have the interest on
22   interest component which takes you as high up
23   as the $414 million, right?
24           MR. PASQUALE: Objection. Asked
25   and answered.
```

## Page 58

E. Ordway

1
2  A.  I can't confirm precisely your
3  number other than the 414 and the
4  500-and-three-and-a-half, which is the
5  principal plus pre-petition interest.
6  Q.  So when you say that really it is
7  the equity holders and the Debtors used the
8  lender's cash, how do you know that they used
9  unpaid interest on principal?
10  A.  I don't understand the question.
11  Q.  Well, unpaid interest on principal,
12  you have the principal of $500 million, you
13  then have monies above that all the way up to
14  another $400 million, what portion of that
15  $400 million that you say would be owing to
16  the Unsecured Creditors as interest, either
17  interest on principal or interest on interest,
18  how much of that do you know that the Debtor
19  actually used in its operations?
20  A.  It would be -- I suppose we can
21  calculate it by looking at change in cash
22  balances from the beginning of the case
23  through now, for example.  The difference --
24  first of all, cash is fungible, but presumably
25  the balance -- the difference between that

## Page 59

E. Ordway

1
2  would have been used in operations, to support
3  operations.
4  Q.  But that's what I'm asking:  Do you
5  know how much of the lender's interest, unpaid
6  interest, actually got used in operations?
7  Does that anywhere appear in the affidavit?
8  A.  No.
9  Q.  It's true, is it not, that Grace
10  has had substantial cash balances, correct?
11  A.  Yes.
12  Q.  That cash balance as of the end of
13  June of this year is about $400 million and
14  that's after some very substantial payments,
15  correct?
16  A.  Yes.
17  Q.  Do you know that Grace's cash
18  balance ever was lower than the unpaid
19  interest on interest?
20  A.  I don't know.
21  Q.  Well, if you don't know, how do you
22  know that Grace actually used the lender's --
23  not the principal, but actually used unpaid
24  interest in order to fund its growth?
25  A.  I know that taken over time, this

## Page 60

E. Ordway

1
2  is a significant amount of money and that it
3  exceeds the change in the cash on-hand from
4  the beginning of the case till now.  So it is
5  implicit that that difference, a portion was
6  used to fund operations.  And certainly during
7  the case it was used to fund operations.
8  Q.  I'm not talking about just the
9  interest on principal or interest on interest.
10  Not the original $500 million.
11  MR. PASQUALE:  So he is going
12  outside the declaration to ask you that
13  question.
14  MR. BERNICK:  To the contrary.
15  MR. PASQUALE:  That's what he
16  wrote.
17  MR. BERNICK:  It is all embedded.
18  That's what I'm trying to find out.
19  Q.  You said that the equity holders
20  used the lender's cash.  I'm construing
21  lender's cash to be the broadest it could
22  possibly be, which is principal, interest on
23  principal and interest on interest.
24  I'm simply asking whether you know
25  that statement to be true with respect to

## Page 61

E. Ordway

1
2  interest on principal or interest on interest,
3  based on what is in your declaration?
4  A.  I don't have a calculation to
5  precisely demonstrate how much of the unpaid
6  interest, whether it's interest on interest,
7  was, in effect, used for operations other than
8  generally it had to have been.
9  Q.  No quantification at all appears in
10  the declaration, correct?
11  A.  No.
12  Q.  You can't tell whether it was
13  substantial or "di minimus", correct, as an
14  expert?
15  A.  The reason that we're used the word
16  "substantial" is because the sum is $414
17  million, that's a substantial number.
18  Q.  Fair enough.  But you cannot, as an
19  expert, say "substantial" when it comes to the
20  actual cash that was actually used in
21  operations because you don't know how much
22  that was, correct?
23  A.  I don't know how much that was at
24  this point in time, although that's
25  determinable, certainly.

**Page 62**

1  E. Ordway
2  Q. But today you can't say
3  "substantial" because you don't know as an
4  expert, correct?
5  MR. PASQUALE: Objection to form.
6  A. I believe that, again, cash is
7  fungible and that it -- you know, the cash
8  that otherwise would have been paid for
9  interest over the course of almost seven years
10 is $414 million, and certainly a fair amount
11 of that would have certainly -- certainly must
12 have benefited the Company.
13 Q. Fair amount, that's as much as you
14 can say?
15 A. I can't be precise, okay.
16 Q. Okay. Let's talk about interest on
17 interest. That would be the top $100 million.
18 Can you say, as you sit here today,
19 that any of the interest on interest was
20 actually used in operations?
21 A. I haven't done that determination.
22 Q. In Paragraph 10, you use another
23 word. You say, "The amount at issue, $91
24 million, represents a small percentage of all
25 the above metrics."

**Page 63**

1  E. Ordway
2  Then you go on to say, "In
3  particular, the value each shareholder would
4  need to provide to the lenders to ensure
5  payment of post-petition interest at ABR plus
6  the two percent default rate, is an immaterial
7  $1.26 per share, i.e., approximately five
8  percent of shareholder value." Do you see
9  that?
10 A. Yes.
11 Q. Now, that word "immaterial," was
12 that your word or --
13 A. It's my word.
14 Q. Your word.
15 And the comparison between the
16 amount at issue to the stock price, was that
17 your idea, that comparison, or counsel's idea?
18 A. I think that might have been our
19 idea.
20 Q. Do you know?
21 A. I don't recall.
22 Q. Now, materiality has meaning to
23 accountants, does it not?
24 A. Yes.
25 Q. Materiality has meanings under the

**Page 64**

1  E. Ordway
2  securities law and to financial analysts, does
3  it not?
4  A. Yes.
5  Q. Now, when you say that a five
6  percent change in stock price is immaterial,
7  that's not true in an accounting sense, is it?
8  A. No.
9  Q. That's not true in the securities
10 law sense, is it?
11 A. No.
12 Q. That's not true under any standard
13 of financial analysis of equity value, that a
14 five percent swing in equity value is
15 "immaterial," correct?
16 A. Could you ask the question again?
17 Q. Yes. That's not true under any
18 standard of financial analysis of equity
19 value, that a five percent swing in equity
20 value is "immaterial," correct?
21 A. I think it could be considered
22 immaterial in valuing equity securities.
23 Q. Could be?
24 A. Depending on the circumstances.
25 Q. Well, if today we knew there was

**Page 65**

1  E. Ordway
2  going to be a permanent drop in the stock, a
3  New York Stock Exchange company was going to
4  go down five percent, once and for all, had to
5  change because money was going to go out the
6  door, you're saying from an equity valuation
7  point of view, that doesn't make a difference,
8  it is immaterial?
9  A. In your example, that would be
10 material.
11 Q. But what we're talking about here
12 is a nonperformance driven, one time,
13 non-recoverable hit to stock value, never
14 comes back, correct?
15 A. No, it never comes back.
16 Q. And you're saying that is
17 immaterial in terms of looking at the value of
18 the equity itself?
19 A. I would say it is not material in
20 the context of the total case, and in
21 particular the substantial increase in the
22 value of the stock since the inception of the
23 case.
24 Q. Well, we'll talk about the case in
25 a minute. I'm just talking about from the

```
                                    Page 66                                    Page 67
 1          E. Ordway                              1          E. Ordway
 2   point of view of valuing equity securities.   2   context of all the money that has accrued to
 3         There is no way a change or a           3   equity during the course of this case, five
 4   permanent decrement of five percent in the    4   percent is not a lot?
 5   value of an equity security outside a         5      A.   Correct.
 6   bankruptcy case would be immaterial, correct? 6      Q.   Is that what you meant here?
 7         MR. PASQUALE: Objection to form.        7      A.   Correct.
 8   He already told you what he meant by          8      Q.   Every one of those equity people
 9   "immaterial".                                 9   are going to say, what if it's a shareholder
10         MR. BERNICK: We are going to get      10    who bought in at 95 percent of the current
11   to that.                                    11    stock price; five percent would mean a total
12         MR. PASQUALE: You just want to ask    12    loss of any profit on his investment, correct?
13   your questions your way.                    13       A.   Sure. Yes.
14      A.   Yes.                                14       Q.   And that's not material to people
15      Q.   Yes what?                           15    like that?
16      A.   Maybe not. Can you ask the          16       A.   My comment is in the context of the
17   question?                                   17    growth of the stock since the inception of the
18      Q.   It's no way it would be immaterial  18    bankruptcy.
19   outside of a bankruptcy, correct?           19       Q.   What about the debt securities, the
20      A.   Correct.                            20    general unsecured lenders who are at issue
21      Q.   Now, in the context of a            21    here who bought in at five percent off the
22   bankruptcy, we can look at a bankruptcy as  22    current market price of those debt securities
23   being a lot of different stakeholders worth 23    today?
24   lots of values and you can say, because I'm 24          A five percent drop in the value of
25   supposing that you are saying, that in the  25    their debt securities, would that be

                                    Page 68                                    Page 69
 1          E. Ordway                              1          E. Ordway
 2   immaterial?                                   2   back.
 3      A.   I don't think that would be           3      Q.   So, it's really in light of the
 4   immaterial.                                   4   Company's obligation to pay the debt that you
 5      Q.   So, it matters for the debt guys     5    consider a change of five percent in the debt
 6   but not the equity guys?                     6    securities to be more material than it would
 7         MR. PASQUALE: Objection to form.        7    be in the case of the equity securities,
 8   Misstates the testimony.                      8    correct?
 9      Q.   Let me just ask you: An equity       9       A.   I thought you were asking me about
10   player who comes in at 95 percent of current 10   a current transaction, if to from one week to
11   market price around a debt player who comes in 11 another there is a five percent drop in the
12   at 95 percent of current debt price, for both 12  debt securities, and I said yes, that would be
13   of them, a five percent drop would be        13    material.
14   material; true or not?                       14       Q.   So five percent during the last
15      A.   It's true, but your context is a     15    week is more important than five percent
16   current transaction, not since the onset of  16    during the last year or the last five years?
17   the bankruptcy, which is my approach here.   17       A.   Yes.
18      Q.   Oh, but since the onset of the       18       Q.   And that's true because the five
19   bankruptcy, if you want to go back to the    19    percent is just the money is not worth as
20   onset of the bankruptcy, the onset of the    20    much, or it's a smaller amount? How do you
21   bankruptcy, these general Unsecured Creditors 21   justify to somebody taking away five percent
22   had securities that were trading at numbers  22    just because they happened to be buyers
23   that were way below par value, correct?      23    earlier in the game rather than later in the
24      A.   Nevertheless, the Company had an     24    game?
25   obligation to pay par, you know, pay that debt 25     A.   I justify it by the extraordinary
```


### Page 70

1  E. Ordway
2  gains that they've incurred, and in that
3  context, from the beginning of the case.
4     Q.  So the essence you're saying that
5  it is immaterial to the shareholders is
6  because some of them who happened to be in
7  early have made so much money, five percent is
8  not material, whereas it might be very
9  material to debt or to equity holders who just
10 got into the game, correct?
11    A.  Correct.
12    Q.  And yet, under this analysis,
13 you're saying that it doesn't make any
14 difference, it's immaterial even to the person
15 who bought in the last week?
16    MR. PASQUALE: Objection to form.
17 That is not what he has said
18 repeatedly.  Go ahead.
19    A.  Should I repeat it? I mean, it's
20 the $1.26 and the five percent, my view that
21 that's immaterial, my judgment is in the
22 context of the change of the value of the
23 stock since the inception of the bankruptcy.
24    Q.  And there is no accounting or
25 financial analysis standard, methodology,

### Page 71

1  E. Ordway
2  convention on the basis of which you can say
3  that five percent is immaterial, correct?
4     A.  Just my judgment, yes.
5     Q.  Now, in this case, we have a case
6  here and one of the predicates for your
7  analysis, am I correct, is the proposed plan;
8  that is, when you talk about all these
9  different things happening and all the value
10 that's there, that's affected by developments
11 in the case, correct?
12    A.  To some extent, yes.
13    Q.  And today there is a proposed plan,
14 correct?
15    A.  Yes.
16    MR. PASQUALE:  I don't know, is
17 there?
18    MR. BERNICK:  Well, he said --
19    MR. PASQUALE:  Talking about the
20 term sheet.
21    MR. BERNICK:  Okay.  It's actually
22 contract.  But he says "proposed plan,"
23 so I wanted to use his terminology.
24    MR. PASQUALE:  Okay.  Fair enough.
25    A.  Well, we defined Plan in

### Page 72

1  E. Ordway
2  paragraph -- you didn't ask me a question.
3     Q.  That's okay.  I don't want to get
4  involved.  Your lawyer was quibbling, I
5  wasn't.  He's okay.  He almost never quibbles.
6        Are you saying that the five
7  percent decrement in equity value is
8  immaterial to the progress of the case?  Are
9  you expressing any opinion that says that this
10 five percent difference will not make a
11 difference to the ultimate outcome of the case?
12
13
14    (Continued on next page to include jurat.)

### Page 73

1  E. Ordway
2     A.  I'm not expressing that opinion in
3  this affidavit.
4     MR. BERNICK:  I have no further
5  questions.
6     MR. O'NEIL:  Nothing.
7     MR. COBB:  Nothing.
8     MR. PASQUALE:  We're done.
9     (Time noted: 3:18 p.m.)

_____
EDWIN N. ORDWAY, JR.

Subscribed and sworn to before me,
this ____ day _____ of 2008.

_____
Notary Public