**Deposition Designations for:**
**ALAN C. WHITEHOUSE**
**October 18, 2007**

**Deposition Designation Key**

**Arrowood = Arrowood Indem. Co.**
**f/k/a Royal Indem. Co. (Light Green)**

**BNSF = BNSF Railway Co. (Pink)**

**Certain Plan Objectors "CPO" = Government Employees Insurance Co.; Republic Insurance Co. n/k/a Starr Indemnity and Liability Co.; OneBeacon America Insurance Co.; Seaton Insurance Co.; Fireman's Fund Insurance Co.; Allianz S.p.A. f/k/a Riunione Adriatica Di Sicurta; and Allianz SE f/k/a Allianz Aktiengesellschaft; Maryland Casualty Co.; Zurich Insurance Co.; and Zurich International (Bermuda) Ltd.; Continental Casualty Co. and Continental Insurance Co. and related subsidiaries and affiliates; Federal Insurance Co.; and AXA Belgium as successor to Royal Belge SA (Orange)**

**CNA = Continental Cas. Co & Continental Ins. Co. (Red)**

**FFIC = Fireman Funds Ins. Co. (Green)**
**FFIC SC = Fireman Funds Ins. Co. "Surety Claims" (Green)**

**GR = Government Employees Ins. Co.; Republic Ins. Co. n/k/a Starr Indemnity and Liability Co.**

**Libby = Libby Claimants (Black)**

**OBS = OneBeacon America Ins. Co. and Seaton Ins. Co. (Brown)**

**PP = Plan Proponents (Blue)**

**Montana = State of Montana (Magenta)**

**Travelers = Travelers Cas. and Surety Cos. (Purple)**

**UCC & BLG = Unsecured Creditors' Committee & Bank Lenders Group (Lavender)**

| | |
|---|---|
| **AFNE = Assume Fact Not in Evidence** | **L = Leading** |
| **AO = Attorney Objection** | **LA = Legal Argument** |
| **BE = Best Evidence** | **LC = Legal Conclusion** |
| **Cum. = Cumulative** | **LPK - Lacks Personal Knowledge** |
| **Ctr = Counter Designation** | **LO = Seeking Legal Opinion** |
| **Ctr-Ctr = Counter-Counter** | **NT = Not Testimony** |
| **ET = Expert Testimony** | **Obj: = Objection** |
| **F = Foundation** | **R = Relevance** |
| **408 = Violation of FRE 408** | **S = Speculative** |
| **H = Hearsay** | **UP = Unfairly Prejudicial under Rule 403** |
| **IH - Incomplete Hypothetical** | **V = Vague** |

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In Re:                          Chapter 11
W.R. Grace & CO., et al,        Case No. 01-01139 (JFK)
                 Debtors.

VIDEOTAPED DEPOSITION OF ALAN C. WHITEHOUSE, M.D.

Deposition upon oral examination of ALAN C. WHITEHOUSE, M.D.,

taken at the request of the Debtors, before Osmund D. Miller,

a Notary Public, RPR, CCR No. 2280, at the offices of Storey

and Miller Court Reporters, 717 West Sprague Avenue, Suite

1520, Spokane, Washington, commencing at or about 9:00 a.m.,

on October 18, 2007 pursuant to the Federal Rules of Civil

Procedure.

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 2

```
 1                    APPEARANCES
 2
 3    FOR THE CLAIMANTS:
                          MCGARVEY, HEBERLING, SULLIVAN &
 4                        MCGARVEY,P.C.
                          By:  Jon L. Heberling
 5                        Attorney at Law
                          745 South Main
 6                        Kalispell, Montana
 7    FOR W.R. Grace:
                          KIRKLAND & ELLIS LLP
 8                        By:  Barbara Harding
                          Attorney at Law
 9                        655 Fifteenth Street, N.W.
                          Washington, D.C. 20005
10                            And
                          Scott A. McMillin
11                        Attorney at Law
                          200 East Randolph Drive
12                        Chicago, Illinois 60601
                              And
13                        DORIS MCCHINSKI
14    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS:
                          Arlene Krieger
15
      FOR THE PROPERTY DAMAGE COMMITTEE:
16                        Matt Kramer
17    FOR THE FUTURE CLAIMANTS REPRESENTATIVE:
                          Emily Somers
18
      FOR THE U.S. ATTORNEY STATE OF MONTANA:
19                        Kris McLean
20    FOR THE EPA'S CRIMINAL DIVISION:
                          Robert Marsden
21
22
23
24
25
```

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 3

```
 1              THIS IS A CONFIDENTIAL DEPOSITION
 2
 3         (Ex. Nos. 1 through 4, marked.)
 4         VIDEOGRAPHER:  My name is Bonnie Hamada, NCRA Certified
 5    Legal Videographer of LVS Productions.  I am the videographer
 6    in the pending matter.  It is Thursday, October 18, 2007.
 7    The time is now 9:11 a.m.  We are at the office of Storey &
 8    Miller, 717 West Sprague Avenue, 15th Floor, Spokane,
 9    Washington.
10         We are here to take the deposition both stenographically
11    and by videotape of Dr. Alan Whitehouse, M.D., filed in the
12    U.S. Bankruptcy Court, District of Delaware, Case Number
13    01-01139 JFK, entitled, W.R. Grace & Co., et al.
14         Notice of this videotaped deposition was given by Barbara
15    Harding.
16         Would Counsel please now voice identify yourself and whom
17    you represent.
18         MR. HEBERLING:  John Heberling for the Libby Claimants.
19         MS. HARDING:  Barbara Harding on behalf of W.R. Grace.
20         MR. MCMILLIN:  Scott McMillin also on behalf of W.R.
21    Grace.
22         MS. MCCHINSKI:  Doris McChinski on behalf of W.R. Grace.
23         MS. KRIEGER:  Arlene Krieger on behalf of the Official
24    Committee of Unsecured Creditors.
25         MR. KRAMER:  Matt Kramer on behalf of the Property Damage
```

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 4

```
 1    Committee.
 2         MS. SOMERS:  Emily Somers on behalf of Future Claimants
 3    Representative.
 4         MR. MCLEAN:  Kris McLean.  I am an Assistant United
 5    States Attorney for Montana.
 6         MR. MARSDEN:  Robert Marsden, I am a special agent with
 7    EPA's criminal division.
 8         VIDEOGRAPHER:  Present to make the official record of the
 9    proceeding is a Certified Court Reporter, Osmund D. Miller of
10    Storey and Miller, who will now swear the witness.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 201

1   A.   That was in error.

2   Q.   I understand it was in error.  But why did you report

3   that in your paper?

4   A.   Well --

5   Q.   What I mean is, what's the importance of having the same

6   technician throughout the entire process?

7   A.   Well, basically, it should have read that the same

8   technician supervised the entire laboratory, with the

9   exception of a couple studies that were done up in Libby.  It

10  would have been a more accurate statement in there.

11       I have had one technician that's worked for me for

12  24 years, until I retired, who basically looked after the

13  entire lab and was there every day, and anything that was

14  done by anybody else, she supervised.

15       So, yeah, you are right.  That's a misstatement.  I am

16  not quite sure how I arrived at that in the process of doing

17  it.

18       On the other hand, I was trying to take care of lots and

19  lots of patients at the same time I am writing a paper like,

20  and that's difficult to do.

21  Q.   Were you reviewing the PFT tests at the time you were

22  writing the paper?

23  A.   Was I doing what?

24  Q.   You had the PFT tests of your patients at the time you

25  were doing the paper, correct?

STOREY &  MILLER  717 W.  SPRAGUE AVE, STE 1520, SPOKANE WA      (509)455.6931

---

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 202

1   A.   Yes.

2   Q.   And the individuals who take the test are written on

3   the --

4   A.   Yes.

5   Q.   -- on the papers, correct?

6   A.   I probably didn't even pay much attention to that as I

7   was doing it.

8   Q.   So your testimony is, at the time you were writing the

9   paper, you did not know about all the different technicians

10  that actually administered your PFT tests.  Is that right?

11  A.   I wasn't paying any attention to it, obviously.  I mean,

12  I was well aware that we were getting reliable results.  I

13  have run pulmonary function laboratories since 1965, and, so,

14  I am quite well aware of them.  We have good studies and bad

15  studies.

16  Q.   Are there any other corrections that you need to make to

17  the paper at this point, Dr. Whitehouse?

18  A.   None that you don't already know about, people have

19  written about.  I haven't made any other corrections, no.

20  Q.   There are other misstatements in the paper, correct?

21  A.   Any other misstatements in the paper?

22  Q.   Yes.

23  A.   I don't think there is any misstatements, no.

24  Q.   Well, you indicate that you removed patients that had the

25  presence of a significant non-asbestos-related condition such

STOREY &  MILLER  717 W.  SPRAGUE AVE, STE 1520, SPOKANE WA      (509)455.6931

---

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 203

1   as sarcoidosis or congestive heart failure.  Correct?

2   A.   That's not really a misstatement.  There is all forms of

3   sarcoid.  In fact, many of the people that we have with

4   sarcoid up there are absolute quiescent.  It doesn't affect

5   their lung function at all.  If congestive heart failure is

6   totally under control, there is no reason why I would remove

7   it, as long as it didn't particularly change during the

8   course of the thing.  There is no reason to say that's a

9   misstatement.

10  Q.   Even though you didn't remove some patients that had

11  those conditions, correct?

12  A.   But I did remove any of the active sarcoids in people

13  that -- people that had bypasses between first and second

14  study, they were removed.  Unfortunately, I cannot provide

15  you with the 130 that were removed, because they were removed

16  from that box of charts there, and I don't even know who they

17  are now, at this point, because of that.  And they were

18  removed in Libby.

19  Q.   There is also an indication that, on Page 220, that

20  patients were either referred by internists and family

21  practitioners or were self-referred?

22  A.   That's correct.

23  Q.   So, none of your patients in the study were referred by

24  Mr. Heberling?

25  A.   I don't think they were.  Not in that study.  Those

STOREY &  MILLER  717 W.  SPRAGUE AVE, STE 1520, SPOKANE WA      (509)455.6931

---

WR GRACE BANKRUPTCY    ALAN C WHITEHOUSE M.D.      October 18, 2007

Page 204

1   patients were patients that most of whom I had been seeing

2   for quite a while.  It's conceivable they did, but they,

3   basically, came on their own volition.  They may have talked

4   to a lawyer beforehand.  I don't recall that.  But they were

5   -- these were people that -- most of the people there were

6   people that I had been seeing for quite a while.

7   Q.   You reported in your paper that they were all

8   self-referred.  Correct?

9   A.   Pretty much they were.  Yeah.

10  Q.   The patients were either referred by internists and

11  family practitioners or were self-referred.  Correct?

12  A.   That's true.  And if there were people that the lawyers

13  had told us to see, they still came on their own volition.

14  So I still consider that a self-referral.  I didn't get

15  referral letters from lawyers sending patients to me at all.

16  Q.   This is a document that we originally received from the

17  CARD Clinic in connection with one of the first productions.

18  We can mark that as Exhibit -- wherever we are.

19       (Ex. No. 13, marked.)

20  Q.   (BY MS. HARDING)  This was in connection with the first

21  production that -- I think the CARD Clinic actually made the

22  redactions on the paper of the medical information.

23       Do you recall the process?

24  A.   I recall that they had a scanner up there, and they were

25  redacting charts like mad.  And now you are telling me that

STOREY &  MILLER  717 W.  SPRAGUE AVE, STE 1520, SPOKANE WA      (509)455.6931

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 229

1   Q.   For both of the phases of research, how were the patients
2   to be identified?
3   A.   Well, in the pilot study?
4   Q.   In the pilot study, right.  Well, actually --
5   A.   They basically asked me, Aubrey Miller did, how many
6   cases I had that I thought were environmental cases.  This
7   was very early on, probably even before I knew about all the
8   exposure pathways and things like that.  So I came up with
9   27 cases for them.
10  Q.   This is in 2000, correct?
11  A.   In 2000.  Right after this whole thing broke.  And I sat
12  down with him, and we got releases from all these people, and
13  then we sat down in a very large conference and want over the
14  x-rays with him, and they took -- made copies or we gave them
15  copies of the x-rays which they took so some of the NIOSH B
16  readers.  And what they did when they went through the whole
17  thing was that they found a few other exposures like some
18  family stuff and things like that that I wasn't aware of, and
19  basically it may have been my naivetT, but there were eight
20  of them that were clearly purely environmental.
21  Q.   Right.  So, at the beginning of the study, you provided
22  them with 27 cases that were environmental, that you believed
23  to be environmentally exposed individuals that had developed
24  disease in Libby, correct?
25  A.   Correct.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA     (509)455.6931

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 230

1   Q.   At the end of the process the ATSDR determined out of the
2   27 only eight were environmentally exposed cases with disease
3   in Libby, correct?
4   A.   That's correct.  They had found another pathway that I
5   didn't know about which was related to work or whatever,
6   family, or something else.
7   Q.   They had found within the exposure histories of the
8   individuals that you had provided, that they had other
9   asbestos exposures, correct?
10  A.   Yes.  Actually what they did, they interviewed all these
11  people very extensively to find out if there were other
12  exposure pathways.  And there was that I didn't know at the
13  time.
14  Q.   I understood previously this morning you talked about
15  first seeing environmental, what you believe to be
16  environmentally exposed people with disease in 1995 or '96, I
17  think you said.  That was when you first saw it.  And, so, as
18  I understand it, between then and --
19  A.   Well, I can't really remember when I first, you know,
20  when my brain said, you know, these are not miners or family
21  members.  It was probably somewhere around there.  It may
22  have been as late as 1998.
23  Q.   And then between either '96 or '98 when you first
24  believed that you saw that, and around 2000, is when you
25  believed you had discovered about 27 cases.  Correct?

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA     (509)455.6931

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 231

1   A.   That's right.
2   Q.   And you don't disagree with the ATSDR's reclassification
3   of the from 27 to eight of the environmental exposures,
4   correct?
5   A.   I have to go back over them again.  But I wasn't arguing
6   with them about them particularly at all, no.  I just
7   accepted what they said at the time.
8   Q.   And you were listed as a collaborator and were involved
9   in the creation of the posters that were created by the
10  ATSDR?
11  A.   Yes.
12  Q.   Do you recall those?
13  A.   I still have that.  The only problem, it covered half
14  this wall.  Here you go.
15  Q.   I have a couple questions that I would like to ask you
16  relating to autopsies.  Typically, why are autopsies
17  performed in medical cases or when people die?
18  A.   That's a really good question, because most physicians in
19  the general practice of internal medicine or chest disease,
20  we don't even ask for autopsies because we know what they
21  died of.  We know more than the pathologist can tell us for
22  the most part.  And I really sincerely mean that.  We've
23  looked at them and have all the physiologic things, and also
24  autopsies aren't needed.  So autopsies generally don't help
25  us very much with a cause of death.

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA     (509)455.6931

---

WR GRACE BANKRUPTCY     ALAN C WHITEHOUSE M.D.     October 18, 2007

Page 232

1        We have -- I don't know, you may have some specific
2   questions concerning asbestos and go ahead and shoot on
3   those.
4   Q.   I have a -- they can help you identify what kind of
5   disease somebody really had, correct?
6   A.   They can.  In the case of asbestos diseases, the ability
7   to spot asbestos bodies is very patchy, and particularly in
8   pleural disease you normally don't see them.  And in many of
9   the cases that have severe interstitial disease you don't
10  even see asbestos bodies.  And there are a lot of factors
11  related to things that are being digested and coughed out,
12  and particularly with chrysotile.  So, it is spotty and it's
13  not a reliable evidence of -- that the disease was for or not
14  -- well, it is for disease probably, but not against -- not
15  saying that they didn't have it.  And not only that, but you
16  can get asbestos bodies in normal people.
17  Q.   Well, as I understand your answer, you are talking about
18  kind of attribution of disease that is seen to asbestos.
19  That was your answer?
20  A.   I figured that's where you were headed.
21  Q.   Actually, the question that I was trying to get at is
22  just in determining what disease an individual actually has,
23  autopsies can be very useful, correct?
24       MR. HEBERLING:  Objection, answered.
25       THE WITNESS:  There are times when it's very useful and

STOREY & MILLER 717 W. SPRAGUE AVE, STE 1520, SPOKANE WA     (509)455.6931