**Deposition Designations for:**
**ALAN C. WHITEHOUSE**
**March 19, 2009**

**<u>Deposition Designation Key</u>**

**Arrowood = Arrowood Indem. Co.**
**f/k/a Royal Indem. Co. (Light Green)**

**BNSF = BNSF Railway Co. (Pink)**

**Certain Plan Objectors "CPO" = Government Employees Insurance Co.; Republic Insurance Co. n/k/a Starr Indemnity and Liability Co.; OneBeacon America Insurance Co.; Seaton Insurance Co.; Fireman's Fund Insurance Co.; Allianz S.p.A. f/k/a Riunione Adriatica Di Sicurta; and Allianz SE f/k/a Allianz Aktiengesellschaft; Maryland Casualty Co.; Zurich Insurance Co.; and Zurich International (Bermuda) Ltd.; Continental Casualty Co. and Continental Insurance Co. and related subsidiaries and affiliates; Federal Insurance Co.; and AXA Belgium as successor to Royal Belge SA (Orange)**

**CNA = Continental Cas. Co & Continental Ins. Co. (Red)**

**FFIC = Fireman Funds Ins. Co. (Green)**
**FFIC SC = Fireman Funds Ins. Co. "Surety Claims" (Green)**

**GR = Government Employees Ins. Co.; Republic Ins. Co. n/k/a Starr Indemnity and Liability Co.**

**Libby = Libby Claimants (Black)**

**OBS = OneBeacon America Ins. Co. and Seaton Ins. Co. (Brown)**

**PP = Plan Proponents (Blue)**

**Montana = State of Montana (Magenta)**

**Travelers = Travelers Cas. and Surety Cos. (Purple)**

**UCC & BLG = Unsecured Creditors' Committee & Bank Lenders Group (Lavender)**

| | |
|---|---|
| **AFNE = Assume Fact Not in Evidence** | **L = Leading** |
| **AO = Attorney Objection** | **LA = Legal Argument** |
| **BE = Best Evidence** | **LC = Legal Conclusion** |
| **Cum. = Cumulative** | **LPK - Lacks Personal Knowledge** |
| **Ctr = Counter Designation** | **LO = Seeking Legal Opinion** |
| **Ctr-Ctr = Counter-Counter** | **NT = Not Testimony** |
| **ET = Expert Testimony** | **Obj: = Objection** |
| **F = Foundation** | **R = Relevance** |
| **408 = Violation of FRE 408** | **S = Speculative** |
| **H = Hearsay** | **UP = Unfairly Prejudicial under Rule 403** |
| **IH - Incomplete Hypothetical** | **V = Vague** |

Page 1

1                IN THE UNITED STATES BANKRUPTCY COURT

2                   FOR THE DISTRICT OF DELAWARE

3

4

   In Re:                        )

5                                 )  Chapter 11

   W.R. GRACE & CO., et al,       )

6                                 )  Case No. 01-1139 (JKF)

            Debtors.              )

7   _____ )  Volume I

8

9

10

          VIDEOTAPED DEPOSITION OF ALAN C. WHITEHOUSE, M.D.

11

          Taken at the instance of the Debtors

12

13

14

15

                              March 19, 2009

16

                              8:30 a.m.

17

                              818 W. Riverside Avenue

18

                              Spokane, Washington

19

20

21

22

           BRIDGES REPORTING & LEGAL VIDEO

23            Certified Shorthand Reporters

                1312 N. Monroe Street

24           Spokane, Washington  99201

           (509) 456-0586 - (800) 358-2345

25

Page 34

1  residual volume, what's the total lung capacity. These
2  things don't occur in absentia.
3      Q.    Okay.
4      A.    When you do pulmonary function studies, you
5  don't look at one single number. You look at the whole
6  study as it relates to age. And then in addition to
7  this, you've got a whole bunch of different authors for
8  normal predicted numbers.
9      Q.    All right.
10     A.    So, you have to define who you are going to
11  use. I think there's at least 11, to my latest
12  knowledge, and it keeps changing. So, how are you going
13  to define whose you are going to use?
14     Q.    Okay. I understand that. But just so I am
15  clear, everything you've said just now, you would make
16  that same argument if you were talking about somebody who
17  had been exposed to chrysotile as you would somebody who
18  had been exposed to winchite, richterite, tremolite,
19  correct?
20     A.    I might, that particular argument, yes.
21     Q.    All right. With respect to the diffuse
22  pleural thickening we were speaking of earlier, that's an
23  issue that is more specific to the people that have been
24  exposed to the winchite, richterite, tremolite amphibole,
25  correct?

Page 35

1      A.    Clearly more, because of the extent of the
2  pleural disease --
3      Q.    All right.
4      A.    -- in that group.
5      Q.    I just wanted to make sure we were clear on
6  that. So, the definition of the diffuse pleural
7  thickening, that is something that is much more of a
8  Libby-specific issue, correct?
9      A.    I think generally related to the fact that we
10  have as much pleural disease there, which is not seen
11  nearly to that extent with chrysotile.
12     Q.    Okay. FEV1/FVC issue. We have discussed
13  this. Now, you disagree with the use of this metric, so
14  to speak.  Is that the right way, metric?
15     A.    No.
16     Q.    You would disagree with the use of that lung
17  function measurement as the way --
18     A.    No. We use that measurement. I disagree
19  with putting an absolute number on it in absentia of
20  other aspects of it.
21     Q.    Okay. And that objection you just made is
22  universal across anybody exposed to asbestos?
23     A.    Yes.
24     Q.    It is not Libby-specific?
25     A.    Any competent chest physician is going to

Page 36

1  make that objection.
2      Q.    So is not Libby specific. Let's talk about
3  DLCO. What is DLCO?
4      A.    Diffusion capacity for carbon monoxide in
5  milliliters per minute, per millimeter mercury barometric
6  pressure.
7      Q.    And earlier that was among -- I think that
8  was the fourth list on Exhibit -- fourth item on the list
9  in Exhibit 2, was the "TDP excludes legitimate Libby
10  claims by not permitting the use of DLCO to establish
11  severity impairment of asbestos-related disease."
12           Correct?
13     A.    That's correct.
14     Q.    And you feel very strongly about this,
15  correct?
16     A.    Oh, yeah. Very strong about it.
17     Q.    You think that if somebody has a decrement in
18  DLCO, that that could be attributed to their asbestos
19  disease, correct?
20     A.    Yes.
21     Q.    Now, so, you would suggest using DLCO as one
22  measurement to determine whether somebody has an
23  asbestos-related disease, and more specifically,
24  impairment associated with that disease, correct?
25     A.    Yes.

Page 37

1      Q.    Do you believe that DLCO is a more
2  specific -- Strike that.
3           Do you believe that DLCO is a more effective
4  lung function measurement for assessing lung disease in
5  Libby, amongst people exposed to winchite, richterite and
6  tremolite, as opposed to people exposed to chrysotile?
7      A.    There is no one measurement. There are a
8  number of problems associated with that.
9           We know the reason for why the DLCO's are
10  decreased. Okay? They are due to subpleural fibrosis
11  and they're frequently not present on the plain chest
12  films.
13           You can see lots of stuff in the literature
14  concerning DLCO decreases in pleural disease alone, and
15  some of those articles relate to chrysotile. There's not
16  a huge number of articles on that. But DLCO has been
17  known to be reduced for years, and people for God knows
18  what reason have chosen to ignore it.
19     Q.    Now, the fact that DLCO can be used to assess
20  impairment amongst people exposed to asbestos, you
21  believe that people exposed to winchite, richterite and
22  tremolite are more likely to have a decrement in DLCO
23  than somebody who was exposed to chrysotile?
24     A.    Yeah. I think so.
25     Q.    Okay. So, DLCO, the use of DLCO to determine

10 (Pages 34 to 37)

Page 42

1    Q.    Did he do a fellowship in radiology?
2    A.    No. All of these questions are going to be
3 no, and you know it, even before you ask me.
4    Q.    Well, I just want to make sure, just so he
5 have this understanding.
6    A.    Well, you're making the assumption that
7 because you had all of this particular training, that you
8 can't see things, you know.
9          Competent physicians with an open mind who
10 are inquisitive see these things. And they understand.
11 And it doesn't take them very long. They read the
12 literature. And we have a wealth of literature up there
13 available to us. And they get it.
14    Q.    So, Dr. Heppe has not completed a residency
15 or fellowship in radiology, pulmonology or occupational
16 medicine, correct?
17    A.    No.
18    Q.    Okay. The other physician is Dr. Brad Black,
19 is that correct?
20    A.    That's correct.
21    Q.    And Dr. Brad Black has not completed a
22 residency or a fellowship in radiology, pulmonology or
23 occupational medicine, correct?
24    A.    That's correct.
25    Q.    His primary training is a pediatrician,

Page 43

1 correct?
2    A.    Originally, yes.
3    Q.    Okay. But correct, yes?
4    A.    Yes. That's correct.
5    Q.    Okay. And asbestos disease is not very
6 common in children, is it?
7    A.    I'm not so sure about that anymore. But
8 probably not.
9    Q.    When they --
10    A.    We're going to find that out in about 10
11 years.
12    Q.    We're going to find that out in 10 years.
13 Why is that?
14    A.    Because we've got a ton of children that have
15 been exposed to this stuff.
16    Q.    When? Do you know?
17    A.    All along here.
18    Q.    All along?
19    A.    But particularly, all along from, regardless
20 of when they were born. But in the last 10, 20 years, as
21 well.
22    Q.    Currently, ongoing?
23    A.    Probably. But I don't know the extent of it
24 now.
25    Q.    Do you know anything about the levels of

Page 44

1 exposure?
2    A.    I do in the past, but I don't know now.
3    Q.    Do you know about the levels of past
4 community exposures?
5    A.    Yes, I do.
6    Q.    And what were the highest levels?
7    A.    Well, the levels at the hospital in downtown
8 and around the mill were about, as I recall the highest I
9 saw was a little bit over 1.5 fiber per cc.
10    Q.    Fiber per cubic centimeter, is that correct?
11    A.    That's correct.
12    Q.    And when was that measurement taken?
13    A.    Late '70s.
14    Q.    Late '70s?
15    A.    Or early '80s.
16    Q.    Or early '80s.
17    A.    I think it was the late '70s.
18    Q.    Late '70s. Well, let's say 1980, to be
19 conservative. So, somebody who had been exposed at the
20 age of one to that measurement in 1980 --
21    A.    Uh-huh.
22    Q.    -- would be 30 years old now?
23    A.    Close to it, yeah.
24    Q.    Okay. Do you have any specific measurements
25 post-1980 regarding community exposure?

Page 45

1    A.    No. I know there are some, but I don't have
2 them. I haven't seen them.
3    Q.    So, you sitting here, you can't offer an
4 opinion about the levels of exposure, correct?
5    A.    No. You know, we went through in the
6 criminal trial about all of this, you know.
7    Q.    Right.
8    A.    What is, is.
9    Q.    What is, is.
10    A.    What is, is. If you have the disease, you
11 were exposed -- and you lived in Libby, you did get the
12 exposure.
13    Q.    If you have which disease?
14          MR. HEBERLING: Objection. Please let
15 him finish. That was one of the agreements at the
16 beginning.
17          THE WITNESS: If you were exposed to --
18 If you have asbestos changes in your radiograph and you
19 have -- you lived in Libby, you were exposed to asbestos.
20          Now, you have to do a good exposure history.
21          But you may not be able to find out exactly
22 which exposure was the worst, whether it was the track,
23 piles of stuff that were left around somebody's attic,
24 whatever. I mean, this stuff is still in attics all
25 over Libby.

12 (Pages 42 to 45)

Page 50

1 that correct?
2    A.    Yeah.
3    Q.    What about Dr. Pistorese, and I'll help you
4 with the spelling, I believe it's P-I-S-T-O-R-E-S-E, in
5 Kalispell?
6    A.    You know, you're asking me to make statements
7 about physicians who are actively in private practice.
8 And I'm not going to do that.  Okay?  I don't mind
9 talking about Shipley.
10        But I'm not going to make comments like that
11 in a public purview concerning physicians who are
12 sometimes doing what they think are right, but with whom
13 many of us disagree.
14        And, so, I'm not willing to say anything
15 other than the fact that we frequently disagree with him.
16    Q.    Okay.  Well, I'm not asking you to use the
17 word incompetent.  That was your word with respect to Dr.
18 Shipley.
19    A.    I know it was.  That's right.
20    Q.    With respect to Dr. Pistorese, and this is
21 not a pejorative inquiry, but simply a question as to
22 whether Dr. Pistorese recognizes this subpleural fibrotic
23 change that you were discussing --
24    A.    I don't --
25    Q.    If I could finish.

Page 51

1        -- that causes the decrement in DLCO.
2    A.    I have no idea, because I don't know that
3 he's even seen any of these.  He hasn't seen any of the
4 Libby patients for a number of years.  For whatever
5 reason, we have not seen his name on things for a long
6 time.
7    Q.    What about Dr. Obermiller, also in Kalispell?
8 Same question.
9    A.    I don't know whether he does or not.
10    Q.    So, you do not know whether he is capable of
11 recognizing this subpleural change that --
12    A.    Oh, I am sure he is capable of it.
13    Q.    Let me just finish.
14    A.    All right.
15    Q.    You do not know whether Dr. Obermiller
16 recognizes this subpleural change that causes the
17 decrement in DLCO?
18    A.    I think he probably does.  But I can't give
19 you a specific example.  I don't -- I haven't seen very
20 much from him either recently.
21    Q.    Okay.
22    A.    Although I must admit he almost tends to
23 disagree with everything that's done in the CARD Clinic
24 all the time.
25    Q.    Okay.  Now, just to kind of wrap up the DLCO

Page 52

1 point for now.
2    A.    Uh-huh.
3    Q.    It is, in your opinion, the decrement in DLCO
4 can be caused either by fibrotic changes of the pleura,
5 or subpleural interstitial changes that you often
6 recognize on CT but not on x-ray --
7    A.    Yes.
8    Q.    -- that occur in connection with the diffuse
9 pleural thickening, is that correct?
10    A.    Yes.  And there are other causes for a
11 decreased DLCO that we haven't gotten into, though.
12    Q.    Non-asbestos-related causes, or asbestos-
13 related causes?
14    A.    Non-asbestos-related causes.  But they
15 coexist.
16    Q.    Okay.  So, there are certainly other causes
17 in decrement in DLCO that have nothing to do with
18 asbestos?
19    A.    Yes.  That's right.
20    Q.    Such as smoking?  Correct?
21    A.    Well, assuming that you have -- Usually that
22 occurs with very severe obstructive airway disease in the
23 absence of any asbestos disease, yeah.
24    Q.    What else can cause a decrement in DLCO?
25    A.    All kinds of other interstitial lung

Page 53

1 diseases.  I mean, there's only about, I think there's
2 probably 500 or so listed in causes of interstitial lung
3 disease.
4    Q.    So, there's potentially 500 different causes
5 of a decrement in DLCO?
6    A.    Who knows?  I don't know what the actual
7 number is.  It may not be that many.  But there's a very
8 large number of interstitial lung diseases, all of which
9 are capable of producing a decrease in DLCO.
10    Q.    So, certainly a decrement in DLCO is not
11 dispositive for the presence of an asbestos-related
12 disease, correct?
13    A.    Well, not by itself, no.
14    Q.    And this phenomena that we've discussed
15 earlier with respect to either the pleural change or the
16 subpleural interstitial change causing the decrement in
17 DLCO, is that a specific finding with respect to those
18 exposed to winchite, richterite and tremolite, or is that
19 a general finding for people exposed to chrysotile
20 asbestos, as well?
21    A.    I can't answer your question, because I have
22 not looked at large numbers of high resolution CT-scans
23 on people that are just solely chrysotile exposed.
24    Q.    Do you believe that people who have
25 chrysotile exposures -- Let me start that over.

14 (Pages 50 to 53)

Page 54

1    Do you believe that people with chrysotile
2 exposures who develop pleural changes have a decrement in
3 DLCO?
4    A.    I have seen that --
5    Q.    Okay.
6    A.    -- in some patients with chrysotile exposure,
7 but not a large number.
8    Q.    If you treat somebody who has a chrysotile
9 exposure and they have normal FVC, normal TLC, but a
10 decreased DLCO, with fibrotic changes of the pleura, and
11 no changes apparent on x-ray, would you believe that the
12 decrement in DLCO was caused by the asbestos pleural
13 disease?
14    A.    Yes.
15    Q.    Okay.  So, this is not necessarily a Libby
16 specific issue?  Again, just like FEV1/FVC, we are not
17 seeing some unique phenomenon in Libby which makes DLCO
18 an applicable lung function measurement whereas it would
19 not be with respect to other exposed cohorts, correct?
20    A.    Probably not.  Although I think the frequency
21 and the extent of it in Libby is far more than what has
22 been seen elsewhere.
23    Now, to partly answer your question, also
24 there's been a recent article in the last couple of years
25 from Australia, from Wittenoom, of DLCO decreases that

Page 55

1 basically is along the same line of things that I am
2 saying about DLCO.
3    Q.    Who wrote that article?
4    A.    Oh, God.  I knew you were going to ask me
5 that.  I was trying to remember who it was.  It's in
6 there.
7    Q.    It is in your expert report?
8    A.    It is in there.  Somewhere in there.
9    Q.    Okay.  So, just to summarize, the FEV1/FVC
10 issue, that is not a Libby-specific issue?  That is a
11 general issue that is applicable to those exposed to
12 winchite, richterite and tremolite, as well as
13 chrysotile, correct?
14    A.    But I think you need to put that into the
15 perspective of the extents of severe pleural disease in
16 chrysotile and the frequency with which it's seen, which
17 is considerably less.  And in addition to the fact that
18 an awful lot of layouts in academic centers just have
19 never bothered to do DLCO's.
20    Q.    Well, I was speaking more about the FEV1/FVC
21 issue, not the DLCO issue.
22    A.    Oh.  Well, then you had better repeat the
23 question again.
24    Q.    Sure.  Sure.  The FEV1/FVC ratio was more of
25 a general criticism, not necessarily a Libby-specific

Page 56

1 one, correct?
2    A.    Yeah.  I think so.
3    Q.    The DLCO one certainly is applicable to both
4 those exposed to winchite, richterite, tremolite, as well
5 as those exposed to chrysotile, but the frequency and
6 extent with which you observed this phenomenon is greater
7 in those exposed to winchite, richterite and tremolite --
8    A.    Correct.
9    Q.    -- correct?  That's correct?
10    A.    Yes.  I would agree.
11    Q.    Okay.  And again, the DPT issue, the diffuse
12 pleural thickening issue, that is much more of a Libby-
13 specific issue, correct, insofar as those exposed to
14 winchite, richterite, tremolite develop --
15    A.    Do you mean as far as the --
16    MR. HEBERLING:  Objection.  Objection,
17 unclear as to what the DPT issue is.
18    Q.    (BY MR. STANSBURY:)  Let me rephrase that for
19 you.  The issues we discussed earlier with respect to
20 diffuse pleural thickening, and those would be including
21 requiring of the blunting of the costophrenic angle,
22 coverage of over 25 percent of the pleura, and three
23 millimeter thickness.
24    Those were much more applicable, those
25 concerns are much more applicable to those who have been

Page 57

1 exposed to winchite, richterite and tremolite as opposed
2 to chrysotile, correct?
3    A.    Yes.
4    Q.    Okay.  Now, I believe these were the five
5 issues we discussed in Exhibit 2 at the very beginning.
6    Now I want to ask what your basis for this
7 belief is.  And I think throughout the course of our
8 discussion it became somewhat clear, but just so we are
9 on the same page, is it fair to say that these opinions
10 that you have are based in large part on your experience
11 as a pulmonologist who has treated individuals exposed to
12 winchite, richterite and tremolite?
13    A.    In large part, it is.
14    Q.    Okay.  So, in large part this is based on
15 your diagnostic practice, correct?
16    A.    Well, it's a diagnostic practice, but also
17 gathering all of the data together and looking at it in
18 large groups, and looking at people who died from it as
19 well.  So --
20    But, yes, it comes from my experience.  Where
21 else would you get the experience?  I mean, except for
22 having seen, you know, 1500 or more of these people.
23    Q.    Okay.  Let's kind of unpack that statement.
24 So, it's based in part on just the day in, day out
25 experiences of being a diagnostic -- Strike that.

15 (Pages 54 to 57)

Page 66

1  that, no, they aren't going to be -- there's no way that
2  they're going to fall through that -- they're going to
3  fall out when it comes time to request compensation for
4  their asbestos disease.
5      Q.    I understand.  But that goes back again to
6  your diagnostic practices, right?
7      A.    It goes back to my diagnostic practice, yes.
8      Q.    I'm just trying to make sure I understand.
9  So, the diagnostic practice, once again, critical to
10  these opinions.
11         The 2004 paper also is informative to these
12  opinions.  The 2007 CARD Mortality Analysis is also
13  informative for your opinions on DPT, DLCO and the
14  FEV1/FVC ratio.
15         Just so we're clear, are there any other
16  analyses that you have done that are supportive of those
17  opinions?
18      A.    There are so many analyses over the years of
19  one sort or another, most of which don't get published.
20         Certainly I have looked at an awful lot of
21  people with obstructive changes who would fall out of
22  compensation and who's obstructive disease is solely
23  related to their asbestosis, but they don't meet the 65
24  percent requirement for FEV1/FVC ratio.  They have low
25  residual volumes.  Normal total lung capacities.  Things

Page 67

1  like that.  They do not meet the criteria.  And we have a
2  lot of those.  And they have a lot of interstitial
3  disease.
4      Q.    Once again, but that is an opinion you have
5  reached based upon your diagnostic practice.
6         What I am trying to do, understand here, Dr.
7  Whitehouse, is identify the various sources of
8  information.
9         There is this broad category, your diagnostic
10  practice, your many years of working as a pulmonologist,
11  that is very fundamental to your opinions, correct?
12      A.    That's true.
13      Q.    The CARD Mortality Study, the 2004 published
14  paper.  Anything else that forms the basis of these
15  opinions?
16      A.    Well, the basis of the opinions concerning
17  radiology.  We've done comparison studies not only with
18  HNA but also with Dr. Weill, studies that he had done.
19      Q.    But, again, as you mentioned earlier, that
20  does provide information on how you're doing in terms of
21  recognizing radiographic impairment.
22         But as you said, that was tangential to the
23  fundamental questions of the definition of pleural
24  disease, use of DLCO and the use of the FEV1/FVC
25  criteria, correct?

Page 68

1      A.    That's correct.
2      Q.    Okay.  So, it's fair to say that what we've
3  identified, then, that is what's forming the basis of
4  your opinion?
5         MR. HEBERLING:  Objection, vague.
6         THE WITNESS:  Your tone and the way you
7  say that tends to minimize what the private practitioners
8  do.
9      Q.    (BY MR. STANSBURY:)  I'm not attempting to
10  minimize it.  All I'm trying to do is just get a list.
11  At this point I just want to make sure I understand what
12  the bases are.
13         And the diagnostic practice incudes your
14  analyses of how many individuals?
15      A.    What do you mean?  In the total clinic --
16      Q.    Yes.
17      A.    -- that I have seen?  I don't know the exact
18  number.  We've got 1800 cases.  I have seen most of them.
19      Q.    So, there are 1800 people whose patient care
20  over the years is relevant to your opinions in this case?
21      A.    Yes.
22      Q.    Okay.  And do you know how many of those
23  individuals for whom you have produced medical records in
24  this case?
25      A.    Basically, how many -- It's however many are

Page 69

1  involved in the lawsuit for the bankruptcy -- before the
2  bankruptcy was filed.  I assume that's the number.
3      Q.    Okay.
4      A.    And I think there's seven or eight hundred,
5  something like that.
6      Q.    Seven or eight hundred.  But you mentioned
7  1800 people, correct?
8      A.    Oh, yes.  There's an awful lot of people.
9  And we continue to diagnose people on a regular basis.
10      Q.    And in your mind you don't segment these
11  seven or eight hundred people and think, this is the
12  basis of my opinion.  You look at all 1800 --
13      A.    We look at them all, yeah.
14      Q.    Right.  So, all of them are relevant to your
15  opinion?
16      A.    Yes.
17      Q.    Okay.  Just want to make sure we are clear on
18  that.
19         So, the diagnostic history of these 1800
20  people, the 2004 study, the CARD Mortality Analysis,
21  those are the fundamental bases of your opinions,
22  correct?
23      A.    Yes.  I guess.
24      Q.    Okay.
25      A.    That's fair enough.

18 (Pages 66 to 69)

Page 90

1  regard. He's done his job.
2      It doesn't matter to me whether he reads it
3  as extensive or subtle. And in fact some of the ones he
4  will read as negative, and I disagree with him. And
5  there have rarely been occasions where I thought the
6  thing was negative and he's read something.
7      I mean, that's the way it goes in this
8  business.
9      Q.   I understand. However, if you as a
10 pulmonologist get this read back from the radiologist,
11 and the first three exhibits that we looked at, what I'm
12 calling category A, we see much more, I would say, clear
13 reads in terms of the finding of an asbestos-related
14 abnormality on x-ray or CT than we saw in these category
15 B reads.
16     A.   If you think that --
17          MR. HEBERLING: Objection. Asked and
18 answered.
19          THE WITNESS: If you think that makes any
20 difference on how I deal with anything, you're absolutely
21 wrong.
22     Q.   (BY MR. STANSBURY:) Why?
23     A.   It makes absolutely no difference.
24     Q.   Why?
25     A.   Because I read my own x-rays, and I have

Page 91

1  pulmonary functions, I have a patient in front of me, and
2  I have their symptoms and their chest exam, and their
3  complaints of pleurisy, and I have all of these other
4  things that I have to use.
5      All he's done -- You know, if he didn't read
6  these x-rays at all, it wouldn't make a darn bit of
7  difference to us. When I was reading for my group, which
8  I did for, you know, God knows, 20-some odd years, along
9  with my partner, we read all of them for a group that
10 finally wound up being 27 doc's, we'd read a lot of
11 x-rays every day. We didn't have a radiologist being
12 involved at all. We were considered competent to read
13 x-rays in their own right, as a board-certified
14 pulmonologist.
15     So, whether he read these or not probably
16 doesn't make a whole lot of difference.
17     Q.   So, you, as a medical professional, are not
18 interested in what the radiologist across the street has
19 to say?
20     A.   I'm interested in it only because of the fact
21 of the possibility he may see something that I didn't
22 see. And I think it's always a good idea, if there's
23 something available, to look at it. I mean, I just don't
24 file it. I do look at it. Okay? He's required, the
25 hospital's required by law to have a radiologist read all

Page 92

1  of these. Okay?
2      Q.   You mentioned the possibility of him seeing
3  something you did not see.
4      A.   Possibly.
5      Q.   What about the possibility of him not seeing
6  something that you believe that you saw?
7      A.   That may happen, too.
8      Q.   Okay.
9      A.   So what? I mean, that really doesn't make a
10 whole lot of difference to me.
11     Q.   It makes no difference if a radiologist does
12 not read a x-ray or a CT the same way you do?
13     A.   No. It doesn't make any difference to me at
14 all.
15     Q.   Why not?
16     A.   Because I am better at it.
17     Q.   You are better than Dr. Becker?
18     A.   Yeah. You are damn right I am.
19     Q.   Okay. What about Dr. Lynch?
20     A.   I don't know Dr. Lynch. He's a good
21 radiologist. I know that. But he's spotty, too. If you
22 look at his reports, you'll see that he may have read
23 four different films in that screening program from
24 ATSDR, and read changes on two and not on two other ones.
25 Okay?

Page 93

1      So, technique may go into it. There's all
2  kinds of things that could go into this.
3      Q.   Who is better than you at reading x-rays or
4  CT's?
5      A.   I'm sure there are pulmonologists that are a
6  whole hell of a lot better than me. And there's also
7  pulmonary radiologists that may be better. Gordon Teel's
8  a good example of that.
9      Q.   So, you would trust a Gordon Teel read? If
10 he did not see something you saw, you would second-guess
11 your original read?
12     A.   Well, of course, what I do, and used to do
13 all the time, was I'd give Gordon a call, or I on several
14 occasions have taken x-rays up to the hospital and said,
15 "I'm not sure what we're talking about here. What I'm
16 seeing and what you're seeing seem to be different." And
17 then we'll hash it out.
18     Q.   How often do you do that with Dr. Becker?
19 How often do you call Dr. Becker and say, "I'm not seeing
20 this," or "You're not seeing this, let's have a meeting
21 of the minds"?
22     A.   Well, when he doesn't see something, I don't
23 really pursue it particularly. If he sees something that
24 I don't see, and particularly if I'm having some problems
25 really seeing it, I get on the phone. And we both have

24 (Pages 90 to 93)

Page 94

1  it on computer.  So we can look at the same thing, same
2  x-ray at the same time.
3      Q.    Now, these asbestos diseases, these are life-
4  threatening diseases, correct?
5      A.    In the long run, yes.
6      Q.    So, if another medical doctor, in this case,
7  a radiologist, reads a piece of radiology such that he
8  does not find an abnormality --
9      A.    Uh-huh.
10     Q.    -- suggesting that this person does not have
11  a life-threatening disease --
12     A.    Uh-huh.
13     Q.    -- you wouldn't call him up to ask about
14  that?
15     A.    No, I probably would not.
16     Q.    Why not?
17     A.    Because of the fact that I've got all of the
18  other information.  I've probably even got old films that
19  may have shown things and he doesn't see them on the CARD
20  film, or he is very little experienced in reading this
21  sort of stuff.
22     Q.    Do you tell your patients that, that "Dr.
23  Becker disagreed with me"?
24     A.    Oh, sometimes I do, sometimes I don't.
25     Q.    Why wouldn't you tell a patient that another

Page 95

1  medical professional did not think you have a life-
2  threatening disease?
3      A.    You know, that's probably -- would be the
4  very best way to confuse an issue.  Because basically if
5  there is minimal changes that are hard to see, that I see
6  them and he doesn't, I explain that to the patient.  I
7  explain it.  I say, "Look, these look a little bit
8  equivocal, and I'm not sure whether -- what we're
9  seeing," and then I get a CT-scan.
10           And then I sit down with the patient with the
11  CT-scan and I show him what I see.
12           And if you look through a large series of
13  things that we've done that way, you will find that the
14  CT-scans more often than not show changes on the CT that
15  I read as equivocal on the x-ray and the radiologist read
16  as negative.
17     Q.    Nonetheless, don't you think the patient is
18  entitled to know that another medical professional does
19  not think that they have disease?
20     A.    You know, you're asking a question that, you
21  know, I'm the one that's the person that a buck stops
22  with me, okay?  You know, what are we talking about here?
23           We're talking about somebody that may have a
24  minimal disease at this point, when we are talking about
25  where we disagree, like there may or may not be a plaque

Page 96

1  here.  Okay?
2      And, yeah, maybe sometimes I have said,
3  "Well, Dr. Becker didn't see this.  I think this is here.
4  I'm going to get a CT and we'll talk about it."  There's
5  nothing wrong with that.
6      Q.    But there are --
7      A.    You're trying to make -- you're really --
8  you're trying to make this into something as a wrong way
9  of practicing medicine.  And it is not.  This is very
10  appropriate in medicine.  And I think that -- especially
11  when you are talking about minimal disease.
12      So, don't try to put me on the defensive by
13  saying that I didn't follow through or do care properly
14  because I didn't necessarily tell the patient in the same
15  terms exactly what Becker wrote.
16     Q.    I am just --
17     A.    That is wrong.
18     Q.    Well, I'm just trying to understand why that
19  is wrong.
20     A.    I've told you why it's wrong.  Because I
21  follow through with them.
22     Q.    All right.
23     A.    And I've got another visit that's coming up
24  that I may go over it with the patient, too.
25     Q.    But don't you believe a patient has a right

Page 97

1  to know if another medical professional has disagreed
2  with your opinion?
3           MR. HEBERLING:    Objection, asked and
4  answered.
5           THE WITNESS:    Yeah.  I'm not even going
6  to answer.
7      Q.    (BY MR. STANSBURY:)  Why not?
8      A.    Because I have answered it.  Okay?
9      Q.    You've said --
10     A.    You're pushing me to say that I'm practicing
11  wrongly because I don't tell a patient when Dr. Becker
12  doesn't see something.  Sometimes there are obvious
13  things that he doesn't see.  Okay?
14           There's obvious things that a number of other
15  radiologists have not seen as well, that are very
16  apparent when I look at it.
17           I've got other people in that clinic that I
18  can show x-rays to.  I've got people all over the place
19  that I can show it to.
20     Q.    And that's --
21     A.    There's no reason why I have to tell them
22  that Dr. Becker didn't read this when there's something
23  that's there and it's apparent.  And I can show it to the
24  patient that it's there, and I can show it to Brad Black
25  or to Mark Heppe, and if they agree with it, or if they

25 (Pages 94 to 97)

Page 134

1   A.   I have no idea.  Maybe they moved away.  A
2   lot of those people died and they were signed out on
3   their death certificates a COPD.  We know that.  But I
4   don't know the answer to that.
5   Q.   Okay.  Now, who is Aubrey Miller?
6   A.   He's a gentleman who worked for the EPA.
7   Q.   And who is Dan Middleton?
8   A.   He's a gentleman that works for ATSDR.
9   Q.   And what is ATSDR?
10   A.   What is it?  It's toxic disease registry.
11   What are the first two?
12   Q.   I think it's the agency for --
13   A.   Agency for toxic disease.
14   Q.   Just so we have it clear.
15   A.   Right.
16   Q.   Agency for Toxic Substances and Disease
17   Registry, is that correct?
18   A.   That's right.  You've got it.
19   Q.   And you are aware of the mortality analysis
20   that they did for 1979 to 1998, is that correct?
21   A.   Yes.
22   Q.   What is your opinion of that study?
23   A.   It's a very flawed study.
24   Q.   Why is it flawed?
25   A.   Well, if you show me the --

Page 135

1   Q.   Sure.
2   A.   -- the chart in there.
3   Q.   Yeah.  I'll give it to you right now.
4   A.   Where is mine?
5   Q.   Here is your copy right here.
6   A.   You've got mine.
7   Q.   Sure.  Sure.  I'll give this back to you.
8   No.  I will hand you what has been marked as Exhibit 25,
9   which is mortality in Libby, Montana, 1979 to 1998.
10   A.   Right.
11        (Pause in the proceedings).
12        MR. HEBERLING:  Does that have an Exhibit
13   Number?
14        MR. STANSBURY:  25.
15        THE WITNESS:  It's got the whole thing in
16   here.  I will see where the one page I want is.
17   Q.   (BY MR. STANSBURY:)  Okay.  You go to the
18   page you want and I'll go to the pages I want.
19   A.   Well, go ahead.
20   Q.   Can you flip back, there are some tables in
21   the --
22   A.   It's on page 25, is probably what you're
23   going to want me to look at.
24   Q.   All right.  Well, Table 8.
25   A.   Yep.

Page 136

1   Q.   So, are you familiar with this table?
2   A.   Oh, I'm very familiar with it, yes.
3   Q.   Now, are you familiar with confidence
4   intervals?
5   A.   Yeah.  And to begin with, it's a very flawed
6   study.  They have one case of asbestosis.
7        And this was a death certificate study.
8   That's all.  They didn't look at charts or anything else.
9   Q.   Okay.  I understand, sir.
10   A.   And the doctors in Libby signed everybody out
11   as COPD.  I mean, it's garbage in, garbage out.
12   Q.   Let's look at that COPD line within Table 8.
13   A.   I know that.  I know that.
14   Q.   And against the Montana SMR and U.S.SMR, and
15   in both incidents the confidence intervals include a
16   range of a value of less than 1, is that correct?  Is
17   that correct?
18   A.   You know, I'll stick to what I said.  It's
19   garbage in, garbage out.
20   Q.   Dr. Whitehouse, is that correct, though?
21   A.   Yes.  For what it says, yeah, what it says
22   there.  But it's garbage.
23   Q.   It's garbage because they only looked at
24   death certificates?
25   A.   Yeah.  And the way the death certificates

Page 137

1   were coded, which was mostly COPD.  And I've looked at
2   those, and they are the same death certificates, and have
3   the charts.
4   Q.   And based on that notion, that they are
5   mostly COPD, we should probably see some of the
6   asbestosis deaths classified as COPD, then, correct?
7   A.   A huge number of them.
8   Q.   Right.  So we have 73 observed COPD deaths.
9   Is that correct?
10   A.   Yes.
11   Q.   In the Montana expected was 86.1, is that
12   correct?
13   A.   Yes.
14   Q.   The U.S. expected was 63.2, is that correct?
15   A.   That's what it says.
16   Q.   Now, the confidence intervals for the SMR's
17   for both include a value of less than one, correct?
18   A.   Yes.
19   Q.   Okay.  So, that suggests that there is no
20   statistically significant elevation in COP death rate
21   within the nonworking population in Libby from 1979 to
22   1998, correct?
23   A.   No.
24   Q.   Why?
25   A.   Because the study is so badly flawed that it

35 (Pages 134 to 137)

Page 142

1    have dealt with, working with on your pilot study. This
2    is a government agency. And I am asking about what they
3    find based upon a review of death certificates.
4          MR. HEBERLING: Objection, asked and
5    answered. You're asking again if he thinks it's
6    accurate. He's answered that --
7    Q.   (BY MR. STANSBURY) Dr. --
8          MR. HEBERLING: -- three or four times.
9    Q.   (BY MR. STANSBURY) Dr. Whitehouse, I'm not
10   asking you for anything other than what the table says.
11   And by combined causes of death, we see no statistically
12   significant elevated level of death in the non-working
13   population from 1979 to 1998, correct?
14         MR. HEBERLING: Objection, asked and
15   answered.
16   Q.   (BY MR. STANSBURY:) Correct, sir?
17         MR. HEBERLING: Objection. Asked and
18   answered.
19   Q.   (BY MR. STANSBURY:) Correct, sir?
20         MR. HEBERLING: Objection, asked and
21   answered.
22   Q.   (BY MR. STANSBURY:) You may answer the
23   question.
24   A.   In reviewing very flawed deaths -- very
25   flawed data, that's what it says.

Page 143

1    Q.   Okay. We have come to agreement on that,
2    then. You do not agree.
3          What analysis have you done to determine that
4    the data was flawed?
5    A.   You know, I haven't done an analysis myself.
6    But I'm very tuned to what goes on in Libby and what is
7    said about this by a variety of people.
8          And I'm not even going to try to repeat or go
9    through everything. But I've been known -- I've known
10   for a long time that this was flawed data.
11   Q.   Let me unpack what you've just said. You
12   haven't reviewed this data systematically to analyze
13   whether it's --
14   A.   No.
15   Q.   -- valid, correct?
16   A.   No. That information came from people that
17   were in the know about the study and how it was done in
18   the first place.
19   Q.   Who were these people in the know?
20   A.   I don't know. I can't even remember who it
21   was, it's been so darn long ago. This came about in
22   meetings and things like that that I have been to.
23   Q.   But just so I am clear, you haven't analyzed
24   this data yourself, then?
25   A.   No, I haven't. Why would I?

Page 144

1    Q.   Well, because you are sitting here, trying to
2    not answer a question, based on --
3          MR. HEBERLING: Objection, argumentative.
4          MR. SCHIAVONI: I would move on.
5          MR. STANSBURY: May I finish the
6    question?
7          MR. HEBERLING: No. You can't finish a
8    question like that.
9    Q.   (BY MR. STANSBURY:) Dr. Whitehouse, you have
10   criticized this data and are refusing to answer questions
11   about the data in this study, but you yourself have not
12   analyzed this data, have you?
13         MR. HEBERLING: Objection, argumentative.
14   He has not refused to answer your questions. Ask him a
15   proper question.
16         Don't answer that question.
17         MR. STANSBURY: Dr. -- Excuse me. Mr.
18   Heberling --
19         MR. HEBERLING: Go ask a proper question.
20         MR. STANSBURY: -- please do not instruct
21   your witness.
22         THE WITNESS: He has instructed me not
23   to answer the question. I am not going to answer.
24   Q.   (BY MR. STANSBURY:) Is he your lawyer?
25   A.   What?

Page 145

1    Q.   Does he represent you?
2    A.   He represents the Libby people.
3    Q.   Okay. I am asking you a question. You are
4    not answering questions about --
5          Did you refuse to answer any more questions
6    about this?
7    A.   No, not about the other. But I am not going
8    to answer that question.
9    Q.   About the table?
10   A.   Yeah. You are going to ask me whether or
11   not I reviewed the data myself.
12         No, I didn't review the data myself. You
13   already know the answer to that.
14   Q.   Okay. Good. I just wanted to make sure we
15   are clear on that.
16   A.   So, why ask?
17   Q.   Because you were refusing to answer other
18   questions --
19         MR. HEBERLING: Objection. He has not
20   refused. The record will show that he has not refused to
21   answer other questions.
22         MR. STANSBURY: Allow me to state my
23   questions before stating your objections.
24         MR. HEBERLING: It's not a proper
25   question.

37 (Pages 142 to 145)

Page 146

1    Q.    (BY MR. STANSBURY:)  Dr. Whitehouse, you
2  didn't want to answer any more questions about Table 8,
3  did you?  And because, the reason you stated was, you
4  didn't like the data in this study, correct?  Garbage in,
5  garbage out?
6    A.    That's correct.
7    Q.    Okay.  Garbage in, garbage out, but you never
8  analyzed the data yourself, did you?
9    A.    I did not.
10    Q.    Okay.  Thank you.  I'm handing you what's
11  been marked as Exhibit 26.  And this is entitled Review
12  of Asbestos-Related Abnormalities Among a Group of
13  Patients from Libby, Montana, A Pilot Study of
14  Environmental Cases, Final Report, August 2002.
15    A.    I'm aware of this.
16    Q.    Okay. And in fact you weren't just aware of
17  this, you were involved in this, weren't you, sir?
18    A.    Yeah.  I provided the cases.
19    Q.    And you worked with Dan Middleton on this,
20  correct?
21    A.    Well, basically, I provided the cases that I
22  thought were environmental cases.
23    Q.    Okay.
24    A.    And then they took it from there.
25    Q.    Okay.  Did you have any involvement with them

Page 147

1  after they took it from there, as you put it?
2    A.    No.
3    Q.    Okay.
4    A.    None at all.
5    Q.    I hand you what has been marked as Exhibit
6  27.  It is a letter dated March 21st, 2001, from you to
7  Jon Heberling, attorney.
8        And that is Jon Heberling sitting next to
9  you, correct?
10    A.    Uh-huh.
11    Q.    Yes, sir?
12    A.    Yes.
13    Q.    And focusing on the second -- third
14  paragraph, "The second issue that came up concerning,"
15  and this name has been redacted, "is that the EPA has
16  asked me about patients I might have that have asbestos
17  only from insulation and having worked outside of Libby.
18  I guess this is of some importance to them as far as
19  their getting funds for their continuing investigation.
20  I would wonder how you feel about releasing data on a
21  confidential basis to the EPA concerning" blank.  "It
22  would be all right with" blank "to do so but I thought I
23  would check with you first."
24        Do you remember writing this letter, sir?
25    A.    No.

Page 148

1    Q.    Okay.  Is that your signature at the bottom,
2  sir?
3    A.    Yes.
4    Q.    Okay.  Now, is this in any way related to the
5  ATSDR pilot study?
6    A.    No, I don't think so.
7    Q.    Okay.  This is about providing materials to
8  EPA.
9    A.    Yes.
10    Q.    Was there ever a study that came from this?
11    A.    I don't think so.
12    Q.    Did you provide any information to EPA?
13    A.    I don't know.  I don't think so.  I doubt I
14  did.
15    Q.    Okay.
16    A.    But I don't know.
17    Q.    Why would you be seeking Jon Heberling's
18  permission to send patient records, your patients, to
19  EPA?
20        MR. HEBERLING:  Objection, misstates the
21  letter.  It doesn't necessarily mean patient records.
22        THE WITNESS:  I'm not even -- I don't
23  even recall what this was about.
24            (Pause in the proceedings).
25        THE WITNESS:  I have no idea.  I can't

Page 149

1  even recall.
2    Q.    (BY MR. STANSBURY:)  Okay.  Well, I'm handing
3  you what has been marked as Exhibit 28.  This is a
4  deposition of Dan Middleton, taken in the cost recovery
5  action.
6        You mentioned that Dan Middleton was one of
7  the individuals you had worked with on the ATSDR pilot
8  study.  You provided him with cases, correct?
9    A.    Yeah.
10    Q.    Okay.  I'd like to direct you to page 13 of
11  his sworn testimony.  And if you look right here where my
12  finger is pointing, which doesn't have line numbers, but
13  about a fourth of the way down the page.
14        "QUESTION:  When you made this request of
15  Dr. Whitehouse, how many people did he identify?
16        "ANSWER:  27.
17        "QUESTION:  27?  At any time did he tell
18  you there were more than 27?
19        "ANSWER:  I think that there was a cutoff
20  point.  I think that he gave us -- I would have to go
21  back to the protocol, but I believe there were up
22  through -- well, I don't remember exactly what it was to
23  be honest with you, but it was sometime between when we
24  started in 2000 and the report.  But, there was a cutoff
25  point and he did indicate that there were more, but I

Page 170

1  from vermiculite, correct?
2      MR. HEBERLING: Objection. Unclear as to
3  who "he" might be.
4      Q.   (BY MR. STANSBURY:) Dr. Roggli. Is that
5  correct, sir?
6      A.   Well, of course -- Okay. You're talking
7  about tremolite. Are you talking about South Carolina,
8  vermiculite processing plant, or are you making the
9  assumption it was Libby?
10      Because there is indeed two tremolite
11  vermiculite processing plants that W.R. Grace owns in
12  South Carolina to my knowledge. Is that where it came
13  from?
14      Because, you know, if they are analyzing all
15  of this stuff, they would have found that it wasn't
16  tremolite to begin with.
17      Q.   And if you would turn to page 2009_08077, I
18  believe it is actually two pages earlier than where you
19  are now.
20      A.   Uh-huh.
21      Q.   The paragraph underneath the table, do you
22  see where I am at?
23      A.   Uh-huh.
24      Q.   Yes, sir?
25      A.   I see it.

Page 171

1      Q.   I guess it's the second full sentence, "The
2  diagnosis of asbestosis was confirmed by one of the
3  authors using the histologic criteria set forth by the
4  Pneumoconiosis Committee of the College of American
5  Pathologists and the National Institute for Occupational
6  Safety and Health, which defines the minimum criteria
7  permitting the diagnosis of asbestosis as 'demonstration
8  of discrete foci of fibrosis in the wall of respiratory
9  bronchioles associated with accumulations of asbestos
10  bodies.'"
11      Do I have that correct, sir?
12      A.   Uh-huh.
13      Q.   Yes?
14      A.   Yes.
15      Q.   And the cite is the Craighead?
16      A.   What?
17      Q.   The cite is the Craighead?
18      A.   Yes.
19      Q.   That is defining asbestosis based on
20  interstitial fibrosis, correct?
21      A.   Yeah. Basically, yes.
22      Q.   Not fibrosis of the pleura, correct?
23      A.   Well, all he's talking about right there is
24  defining diagnosis related to foci in the respiratory
25  bronchioles. Yeah. That's fine. That's an okay

Page 172

1  definition for asbestosis. But it doesn't say anything
2  about anything else.
3      Q.   That's right. There's no mention of pleural
4  asbestosis as a means of diagnosing asbestosis, correct?
5      A.   Why would there have to be?
6      Q.   Why would there be if it wasn't asbestosis?
7      A.   Well, you know, I have no idea why he
8  selected that, why he doesn't deal with anything else at
9  the time, except that at that time that was the same time
10  people thought that plaques were not a disease and were
11  pretty much ignoring pleural disease, and were also in
12  this article talking about tremolite and not about what
13  was going on at Libby.
14      So, I am not quite sure how this fits in.
15      Q.   So, you are not aware of whether that
16  tremolite was from South Carolina or Libby?
17      A.   I have no idea.
18      Q.   But that would be relevant to Dr. Roggli's
19  understanding of disease from tremolite in Libby,
20  correct?
21      A.   It might be. It might not be.
22      Q.   Again, though, Dr. Roggli is signatory of the
23  Helsinki criteria, who at least had experience with
24  asbestosis caused by exposure to tremolite, made no
25  reference in the Helsinki criteria to a different

Page 173

1  criteria for looking at pleural disease in Libby,
2  correct?
3      A.   No.
4      Q.   Okay. I'm handing you what's been marked as
5  Exhibit 36. Do you recognize this document, sir?
6      (Pause in the proceedings).
7      A.   Well, this is the old ATS one, I take it,
8  isn't it?
9      Q.   Yes, sir. The 1986 ATS statement. And if
10  you could turn to page 2, which is 2009_00054.
11      A.   Uh-huh.
12      Q.   On the far left column, second to last
13  paragraph, under the heading "Pulmonary Asbestosis,
14  Definition." I am going to read, and please tell me if I
15  read this correctly. "The term asbestosis should be
16  reserved for the interstitial fibrosis of the pulmonary
17  parenchyma in which asbestos bodies or fibers may be
18  demonstrated. While pleural abnormalities are commonly
19  associated with parenchymal disease, they should be
20  separately classified as there are differences between
21  pleural and parenchymal fibrosis in epidemiology,
22  clinical features and prognosis."
23      Did I read that correctly?
24      A.   Yeah. You read it right. Except it has been
25  18 years until the next ATS study. Clinical thinking has

44 (Pages 170 to 173)

Page 174

1  changed.
2      Q.    Okay.  But as of 1986, the 1986 study, based
3  on the 1986 ATS statement, asbestosis was defined as
4  parenchymal disease, correct?
5      A.    Oh, yes.  It had been for years before that.
6      Q.    Okay.  And when you were examining people in
7  Libby pre-2004, this was the most authoritative document
8  by the American Thoracic Society on the diagnosis of
9  asbestos disease, correct?
10     A.    Yeah.  Although I don't know that I had ever
11 seen that at the time.  I was following through with what
12 Selikoff was saying.
13     Q.    So, while you were diagnosing people prior to
14 2004, you were not following the ATS guidelines for
15 diagnosing asbestos disease?
16     A.    I was using the term asbestosis for both,
17 because it was real clear, and Selikoff backed that up,
18 that you could call it pleural asbestosis, but when you
19 became logical about the whole thing, they were all part
20 of the same spectrum.
21     Q.    So, just so -- I think you said earlier, you
22 weren't familiar with this back then?
23     A.    Oh, I may have seen it a long time ago.  I
24 haven't looked at it for years, though, if I have.  I'm
25 not sure I ever looked at it.  I know what was in it.

Page 175

1      Q.    But this document, and the contents of this
2  document, did not guide your diagnostic practices,
3  correct?
4      A.    Not at all.
5      Q.    Okay.  I am handing you what has been marked
6  as Exhibit 37.  Do you recognize this document?
7      A.    Yeah.  This is the 2004 statement.
8      Q.    This is the 2004 American Thoracic Society
9  statement on "Diagnosis and Initial Management of
10 Nonmalignant Diseases Related to Asbestos."
11     A.    That's right.
12     Q.    Okay.  And if you would turn to 2009_00667,
13 and there's two columns.  The right column, we have the
14 heading halfway down the page, "Nonmalignant Disease
15 Outcomes," and we have "Asbestosis."
16            (Pause in the proceedings).
17     A.    Where is this?
18     Q.    Sure.  2009_00667.  Are you there, sir?
19     A.    667.  Okay.
20     Q.    Okay.  Good.  Far right column.
21     A.    Uh-huh.
22     Q.    Halfway down the page.  "Nonmalignant Disease
23 Outcomes."
24     A.    Uh-huh.
25     Q.    "Asbestosis."  Are you with me?

Page 176

1      A.    I've got it.
2      Q.    Second paragraph.  Tell me if I have read
3  this correctly.  "Asbestosis specifically refers to
4  interstitial fibrosis caused by the deposition of
5  asbestos fibers in the lung.  It does not refer to
6  visceral pleural fibrosis, the subpleural extensions of
7  fibrosis into the interlobular septae or lesions of the
8  membranous bronchioles."
9            Did I read that correctly, sir?
10     A.    You did.
11     Q.    And you recognize this document, the 2004 ATS
12 statement, as being of great value in guiding your
13 diagnostic practice, correct?
14     A.    Well, not of great value.  It is like all
15 other documents that are published.  It produces
16 guidelines for people, but that's all.  I mean, it
17 doesn't really change what you do.
18     Q.    But the American Thoracic Society, this is
19 their authoritative statement as of 2004, correct?
20     A.    Yeah, basically.
21     Q.    And in this statement it says that asbestosis
22 specifically refers to interstitial fibrosis, correct?
23     A.    It also says in here it refers to pleural
24 asbestosis, in another area in here, by the way.
25     Q.    Where?  Where does it say pleural asbestosis?

Page 177

1      A.    I'm not sure where it is.  I would have to
2  find it.
3      Q.    Take a second.
4            (Pause in the proceedings).
5      A.    Well, it's going to be more than a second.
6            MR. STANSBURY:  We can go off the record.
7  Let's go off the record and take a break.  You can look
8  for it.  Then we will go back on the record.
9            THE VIDEOGRAPHER:  We are going to go off
10 the record.  The time is approximately 11:33.
11            (Short recess).
12            THE VIDEOGRAPHER:  We are going back on
13 the record.  The time is approximately 11:40.
14            THE WITNESS:  I actually can't find that
15 in this article.  And I've been reading a bunch of other
16 articles that I know it's in recently.  And I suspect
17 that's where I mixed it up.
18     Q.    (BY MR. STANSBURY:)  So just so the record is
19 clear, the 2004 ATS statement says "Asbestosis
20 specifically refers to interstitial fibrosis caused by
21 the deposition of asbestos fibers in the lungs," and it
22 does not use the term pleural asbestosis, is that
23 correct, sir?
24     A.    That's correct.
25     Q.    Okay.  Let's move on at this time.  Well,

45 (Pages 174 to 177)

Page 194

1    It begins with "Two or more."
2        A.    Uh-huh.
3        Q.    I'm going to read, and tell me if I read this
4    correctly.  "Two or more sets of pulmonary functions were
5    available on 153 patients.  These subjects are
6    representative of the Libby area population and the
7    practice group of 491 patients.  All had lived in Libby
8    the majority of their life prior to 1990."
9        A.    Yes.
10       Q.    "The majority of the 123 patients were
11   ex-smokers with eight of 123 (7 percent) being current
12   smokers."
13           Do I have that correct?
14       A.    Yes.
15       Q.    I want to go back up to that first statement.
16   Second sentence I read.  "These subjects are
17   representative of the Libby area population and the
18   practice group of 491 patients."
19           Is that correct?
20       A.    Yes.
21       Q.    Okay.  Now, this is published in the American
22   Journal of Industrial Medicine, correct?
23       A.    Correct.
24       Q.    And if I go online and find this article in
25   that journal, I'm going to read this and it's going to

Page 195

1    say, these subjects are representative of the Libby area
2    population, correct?
3        A.    Correct.
4        Q.    Okay.  I'm handing you what's marked as
5    Exhibit 46.  This is the Libby expert response to the Dr.
6    Weill report by Dr. Alan C. Whitehouse, Dr. Arthur L.
7    Frank, May 8, 2007.
8        A.    Okay.
9        Q.    Do you recognize this report, sir?
10          (Pause in the proceedings).
11       Q.    And specifically I wanted to direct you --
12       A.    Where's the signature page?
13       Q.    You know, I don't see the signature page on
14   this copy.
15       A.    I don't either.
16       Q.    Well, I'll ask you a question about it.  If
17   you don't agree with what I say here, and you question
18   the validity of the document, we can address that.  But
19   if you look on 2009_01115, which is page 12 of the
20   document.
21          (Pause in the proceedings).
22       A.    Okay.
23       Q.    Halfway down the page, 10.4.
24       A.    Uh-huh.
25       Q.    I'm going to read from this.  Tell me if I

Page 196

1    read this correctly.  "The statement at Whitehouse
2    (2004), page 221, is clarified to read as follows.
3    'These subjects are representative of the Libby area
4    (asbestos disease) population and the practice group of
5    491 patients.'"
6            Did I read that correctly?
7        A.    Yes.
8        Q.    Do you agree with that statement?
9        A.    Actually, I do.  He put in here, I did, or
10   Arthur did, the disease population in parentheses, and
11   that's for asbestos disease.  And that's reasonable.
12       Q.    Okay.  So, is it fair to say that what is in
13   your paper where it says that these people are
14   representative of the Libby area population, is not true?
15   In fact, these people are representative of the people in
16   Libby who have disease, is that correct?
17       A.    Well, that's a matter of splitting hairs.
18   But, yeah, it's probably true.
19       Q.    Well, I think it's important.  I think the
20   idea of something being representative is certainly an
21   important concept, correct, sir?
22       A.    Well, except that everything deals with the
23   491 patients in the practice who had changes.  So, you
24   can do it any way you want to.
25       Q.    Well --

Page 197

1        A.    It is representative of it.  I think, you
2    know, I think his criticism is wrong.  I think it's
3    overkill.
4        Q.    Well, let's back up.  Putting aside the issue
5    of whether it's representative of the 491 people, you say
6    in your paper, "These people are representative of the
7    Libby area population," meaning that what occurred in
8    this cohort represents what's happening in the Libby area
9    population.
10          Correct?
11       A.    Well, in a sense, it is certainly related to
12   the asbestos disease population, which includes about now
13   a third of the population.  So, maybe I am splitting
14   hairs a little bit.
15          But I don't think that's a big fault that's
16   in there.  It may have been better written, but it's not
17   worth arguing over.
18       Q.    But you are now recognizing it should have
19   read "asbestos disease population"?
20       A.    Yes.  It might have been better to read it
21   that way.
22       Q.    Did you alert the Journal of this change?
23       A.    No, I didn't alert the Journal of the change.
24   Why would I?  You've come up with this long after this
25   thing was written, you know.  People understand things

50 (Pages 194 to 197)

Page 218

1 lack of foundation. None of this is in the record.
2 (Pause in the proceedings.)
3 THE WITNESS: Whose copy is this
4 (indicating)?
5 Q. (BY MR. STANSBURY:) That was a copy I pulled
6 out.
7 A. I see.
8 MR. SCHIAVONI: I've never in my career
9 seen someone intervene in a bankruptcy and not say who
10 they are as a client. And I have a standing objection to
11 that process taking place here. None of the other --
12 I don't know what's happened with Grace, but
13 no creditor in this case has consented to people
14 appearing in the bankruptcy secretly.
15 To the extent we can't cross-examine them
16 because their names are blotted out, I'm being
17 substantially prejudiced.
18 Q. (BY MR. STANSBURY:) Just so the record is
19 clear, Exhibit 57, a letter that was produced and marked
20 LP072, December 14, 1995, thanking Mr. Heberling for a
21 referral, is the same letter as Exhibit 65, December 14,
22 1995, in which it's clear that the recipient of this
23 letter was Jon Heberling. It was redacted in Exhibit 57.
24 It isn't here.
25 Do you still stand by your statement --

Page 219

1 MR. HEBERLING: Objection.
2 MR. STANSBURY: Allow me to finish my
3 yes.
4 Q. Do you still stand by your previous statement
5 that none of the individuals in your study were referred
6 to you by Mr. Heberling?
7 MR. HEBERLING: Objection, compound.
8 There are three or four issues there. Misstates the
9 record.
10 THE WITNESS: There may have been a
11 couple in there.
12 Q. (BY MR. STANSBURY:) Okay.
13 A. And I may have made a mistake on that. So,
14 what?
15 Q. Well, you make a statement in your paper
16 which is consistent.
17 A. Okay. But, you know, how many years is that
18 before I even started to work on that paper? That's six
19 years before that.
20 Q. So, six years before Mr. Heberling is already
21 bringing you the people who are going to be in this
22 study?
23 A. He is not bringing me people because they are
24 going to be in the study.
25 Q. He is bringing you people because he wants

Page 220

1 clients, is he not?
2 A. No, he is not, particularly. He is bringing
3 them because he -- I think if he sent people to me, it is
4 because they trust me to make, you know, honest
5 representations of what's wrong with them, make diagnoses
6 appropriately. It had nothing to do with the study.
7 Q. Is Jeff Swennes somebody who is a Libby
8 claimant?
9 A. Yeah. I don't know that I knew that at the
10 time. How did I know that? I see all kinds of people
11 that I don't know whether they are claimants or what they
12 are.
13 Q. But this individual who you believe is in
14 your study --
15 A. Yes.
16 Q. -- was referred by Mr. Heberling six years
17 before you wrote the study?
18 A. You know, what may have happened in some of
19 these things also is that the patient comes in and they
20 tell me that Mr. Heberling thought that he could come in,
21 or there's a guy in Great Falls that occasionally sends
22 stuff over, too.
23 And, so, I ask him, "Do you want me to send a
24 letter to your attorney about that?"
25 And they say, "Yes."

Page 221

1 So, I send them a letter. So, some of them
2 may have been referred. Some of them may have just told
3 me that that was their attorney and they wanted me to
4 send a letter. And I'll send a letter, like it is a
5 referral letter. It's just common decency in the medical
6 practice, you know. So, there may be a couple. So what?
7 Q. Is Mr. Heberling in the medical practice?
8 A. No. He's not in the medical practice.
9 You've missed the point. Okay? The point was, that I do
10 send referral letters to people, sometimes even if they
11 are not referred, as a common courtesy, if the patient
12 wants me to do it. Okay?
13 Q. But you specifically say, thank you for
14 referring him for an evaluation, correct?
15 A. I just answered that. Okay? I said,
16 sometimes I send referral letters to the doc's that
17 didn't refer it, as a common courtesy because the patient
18 wants me to do it.
19 Q. But that's not Mr. Heberling, is it?
20 A. Well, but it doesn't matter whether it's
21 doc's, lawyers, insurance companies, whatever. I mean,
22 that's just the way I dictate sometimes.
23 I don't know for sure that he had actually
24 said -- Maybe he did. He might very well have sent him.
25 But, you know, you're making an issue out of

Page 246

1  A.  May we have a break for a minute?

2  Q.  Sure.

3      MR. STANSBURY:  We can go off the record.

4      THE VIDEOGRAPHER:  We are going off the

5  record.  The time is approximately 1:23.

6      (Short recess).

7      THE VIDEOGRAPHER:  We are going back on

8  the record.  The time is approximately 1:31.

9  Q.  (BY MR. STANSBURY:)  Dr. Whitehouse, if we

10 could look at your study on page 220, please, and the tag

11 at the bottom is 2009_01097.  The second column.  The

12 first full paragraph beginning with "Normal values."

13 About seven or eight lines down, that is discussion about

14 30 patients who were excluded.

15 A.  Yes.

16 Q.  I am going to read this outloud, and tell me

17 if I get this correct, sir.  "In total, 30 patients were

18 removed from the study for the following reasons:

19 Chronic obstructive pulmonary disease with elevated

20 residual volumes (14)," I think that's a comma, "previous

21 thoracic surgery (1), unacceptable pulmonary function

22 tests because of patient unreliability and inability to

23 meet ATS acceptability criteria (9), and/or the presence

24 of a significant non-asbestos related condition such as

25 sarcoidosis or congestive heart failure (9)."

Page 247

1      Dr. Whitehouse, would it be fair to say that

2  this is a portion of your selection criteria for your

3  study?

4  A.  I don't understand what you mean, a portion.

5  Q.  Well, you have criteria for who is and is not

6  in the study, correct?

7  A.  Well, basically, everybody was in the study

8  until I excluded them.

9  Q.  Everybody who had two or more PFT's, correct?

10 A.  And then I excluded the ones which shouldn't

11 be in there.

12 Q.  I am referring to the selection criteria as,

13 you know, the method by which you determined who is and

14 is not in the study.

15 A.  All right.

16 Q.  If I understand that correctly, people with

17 two or more PFT's, and excluding people with other

18 conditions which may affect pulmonary function, is that a

19 fair statement?

20 A.  Yeah.  There's one other thing that I

21 probably should have clarified, when I said previous

22 thoracic surgery, because we did not throw out the people

23 with cabbages.

24 Q.  Could you explain what that term means,

25 cabbages?

Page 248

1  A.  Bypasses.

2  Q.  Bypasses.  So, again, fair to say, then, that

3  people with previous thoracic surgery may have been in

4  the study after all?

5  A.  Well, not people that have resections or

6  anything like that.  But people, there could have been

7  somebody that had something miner done in the distant

8  pass, or a bypass.  Nothing that would have affected the

9  things in the middle.

10     And if somebody had any kind of thoracic

11 procedure in the middle of the study, they weren't used.

12 Q.  Okay.  So, let me unpack this.  That is not

13 obviously what that paragraph reads.

14 A.  It doesn't say that, but that's what was

15 done.

16 Q.  Do you think it is important for the paper to

17 accurately reflect what was done?

18 A.  Not necessarily -- well, I don't know that --

19 You know, I guess I could have clarified it, but I

20 didn't.  So . . .

21 Q.  Is that something you would ever notify the

22 Journal about?

23 A.  No, I'm not going to notify the Journal about

24 it.  This thing was published a long time ago, and the

25 data is accurate.

Page 249

1  Q.  Okay.

2  A.  I'm not going to notify the Journal about

3  something unless -- The end results of this were very

4  accurate.

5  Q.  But this portion of the selection criteria as

6  stated does not reflect what was done, correct?

7  A.  Well, it does, basically.  It probably should

8  have said previous interim thoracic surgery, is what it

9  really should have said.

10 Q.  Okay.  I'm handing you Exhibit 66.  It is for

11 LP098.  It is dated 2-4 -- Excuse me.  It is dated

12 February 14th, 2001.  This was among the records produced

13 in March of 2006.

14     Under "Exam," I guess the second paragraph,

15 could you read -- Well, I will read it.  "His chest x-ray

16 shows only the changes of a lobectomy and some

17 irregularity of the diaphragm related to some fluid but

18 there is no pneumothorax and the fluid around the apex is

19 also involved."

20     Did I read that correctly, sir?

21 A.  Yes.  I was also referring to the post-

22 operative care, is what I was referring to.

23 Q.  What is a lobectomy?

24 A.  Removal of a lobe.

25 Q.  So this individual had a portion of a lobe of

63 (Pages 246 to 249)

Page 254

1    Q.    Again, we will have to revisit it to see
2  whether it is the actual person, but LP029, I am reading
3  from a medical record, this is Exhibit Number 69, and it
4  says as follows -- Well, actually why don't you read,
5  where it says, under 4-24-89.
6              (Pause in the proceedings).
7    A.    Oh. This is the one that had a positive
8  methacholine challenge very distantly in the past.
9    Q.    Uh-huh.
10    A.    And then probably was, by the time it was
11  actually in the study, had it totally controlled.
12    Q.    So, I am going to read this. Let me know if
13  I have read this correctly. "The methacholine results
14  were returned and it is apparent that the patient does
15  indeed have severe asthma, which is manifested as a
16  refractory restrictive defect."
17          Did I read that correctly?
18    A.    Uh-huh.
19    Q.    Yes, sir?
20    A.    Yeah.
21    Q.    Okay. Was this person in your study?
22    A.    I don't know. I think probably actually it
23  may have been, but I think it was many, many years later,
24  after the asthma was no longer a factor.
25    Q.    Okay. Let's deal with some more unredacted

Page 255

1  records. How's that sound?
2    A.    Whatever you want to do.
3    Q.    Okay. Well, first, ultimately you find a
4  loss of lung function of 3 percent annually in DLCO
5  across the cohort, correct?
6    A.    Uh-huh.
7    Q.    Yes, sir?
8    A.    Yes.
9    Q.    Okay. And what was the measurement for FVC?
10    A.    2.2.
11    Q.    Okay. And what was the measurement for TLC?
12    A.    2.3.
13    Q.    Okay. I'm handing you what's been marked as
14  Exhibit 70. Here you go. And it is the "2005 ATS/ERS
15  Task Force: Standardisation of Lung Function Testing.
16  Interpretive Strategies for Lung Function Tests."
17          Are you familiar with this document, sir?
18    A.    Yes, sir, I am.
19    Q.    And again this is an ATS statement, correct,
20  along with the European Respiratory Society?
21    A.    Yes.
22    Q.    If you would look, and let's look at the 2009
23  numbers at the bottom right, 2009_08404.
24              (Pause in the proceedings).
25    Q.    Are you there, sir?

Page 256

1    A.    Yep.
2    Q.    Let's look at table 12 on the bottom right.
3  "Reported significant changes in forced vital capacity
4  (FVC), forced expiratory volume in one second (FEV1),
5  mid-expiratory flow (MEF 25 to 75 percent) and carbon
6  monoxide diffusing capacity (DLCO) over time."
7          Did I read that correctly, sir?
8    A.    Yes.
9    Q.    Yes, sir?
10    A.    Yeah.
11    Q.    And if you look at year-to-year on that
12  table, and, again, this is reporting significant changes,
13  greater than 15 percent for FVC, is that correct?
14    A.    Reported significant changes, year-to-year.
15  Whose numbers are those, under what circumstances?
16    Q.    Well, this would be the ATS and the ERS's
17  numbers.
18    A.    What do they mean?
19    Q.    Well, I believe that would be 15 percent loss
20  of lung function.
21    A.    Not necessarily. You lose 30 cc's a year.
22  Are those absolute numbers or percentage of predicted?
23    Q.    Well, let's see here. Hopefully they have
24  explained that.
25    A.    It doesn't look like.

Page 257

1              (Pause in the proceedings).
2    Q.    Have you reviewed this document before, sir?
3    A.    Oh, I have seen it. I don't know that I
4  have read it very carefully before.
5    Q.    You are not aware of whether that is
6  referring to absolute numbers, 4 percent?
7    A.    I haven't really paid that much attention to
8  it. And it's way out of line with what I know is the
9  case.
10    Q.    You know, you've mentioned earlier that
11  people have had to have two or more PFT's to be in this
12  study, correct?
13    A.    Yes.
14    Q.    And you used the first and last PFT, correct?
15    A.    Randomly used the first and last study that I
16  had available.
17    Q.    So, you used two data points per person,
18  correct?
19    A.    Right.
20    Q.    Okay. Let's look at, right above that table,
21  the text that begins, "It is more." I will read this.
22  "It is more likely that a real change has occurred when
23  more than two measurements are performed over time. As
24  shown in table 12, significant changes, whether
25  statistical or biological, vary by parameter, time period

65 (Pages 254 to 257)

Page 258

1 and the type of patient. When there are only two tests
2 available to evaluate change, the large variability
3 necessities relatively large changes to be confident that
4 a significant change has occurred over -- has in fact
5 occurred."
6        Do you see that, sir?
7    A.    Now, you are talking about a single
8 individual patient. When you have 123 patients, you have
9 such a large number of people in there that you've
10 eliminated a great deal of the variability. The
11 statisticians will tell you that.
12    Q.    They recommend using more than two data
13 points, don't they?
14    A.    No.    They are talking about for a single
15 person. They are not talking about a group of people.
16 They are talking about a single person.
17    Q.    I don't believe it says that.
18    A.    Well, I know they do, because that is exactly
19 what I do when I am looking at a single person. I see
20 one study, and then I see another one, and if it's
21 changed a lot, I don't really make a big thing out of it
22 until I see it changed a lot the next time.
23    Q.    Let's go down --
24    A.    But on a study like this, some of these
25 people had eight or 10, but it's arbitrarily the first

Page 259

1 one, and the last one, and that's a very highly thought
2 of statistical way to deal with something like that,
3 because it is a random selection in a large number of
4 people.
5        And that's why I did it that way. And it was
6 checked out with some of the people that were my peer
7 reviewers.
8    Q.    But if you had more data points, clearly that
9 could be better, correct?
10    A.    No.
11    Q.    No?
12    A.    No.    Not when you are doing first and last.
13 No. Which one do you take? Do you take the one that
14 shows what you want it to show?
15    Q.    Why not use all the data points?
16    A.    Oh, come on. You are talking about a huge
17 study, if you do all of the data points. Do you know **PP**
18 what the statistics are like in that sort of thing?
19    Q.    It's a lot of work.
20    A.    Yeah. You're right. I was trying to
21 practice medicine.
22    Q.    I understand.
23    A.    Okay.
24    Q.    However, you would agree, though, if you have
25 the time, using five, six, all available data points will

Page 260

1 give you a more accurate picture of what this person's
2 lung function is over time, correct?
3    A.    I'm not doing this on an individual. This is
4 group. And you are wrong, flat wrong in your discussion
5 of it. And you don't understand the fact that when
6 you've got a large group, like 123, you eliminate those
7 various errors.
8    Q.    So, you think that it is not the right
9 approach, when you're dealing with a large group, to use
10 as many data points as possible for each person?
11    A.    This is a satisfactory approach to it, and it
12 was checked by -- it was thought to be by the Journal, by
13 the peer reviewers of the Journal, and the peer reviewers
14 that I had peer review it here.
15    Q.    Putting aside the time constraints,
16 recognizing that, would it have produced a more robust
17 data set to use all available data points?
18    A.    No, it probably wouldn't. It probably
19 wouldn't have been any better than to do it this way. I
20 doubt it.
21    Q.    Do you have any literature, are you aware of
22 any study in which they specifically stated it is better
23 to use first and last, rather than all data points?
24    A.    I don't. But I'm sure I'll find one.
25    Q.    Okay. Let's move down on this same document.

Page 261

1 We're on page 2009_08405.
2    A.    Okay.
3    Q.    I guess it's this paragraph that begins with
4 "Test variability." Do you see that, sir?
5    A.    Uh-huh.
6    Q.    Continuing in that paragraph, last
7 sentence, "However, establishing an accelerated rate of
8 loss in an individual is very difficult, and requires
9 many measurements over several years with meticulous
10 quality control of the measurements."
11        Did I read that correctly?
12    A.    Yes. Except this was not an individual.
13 This was 123 individuals.
14    Q.    I understand. But do you recognize it is
15 better just to have more data points when doing this?
16    A.    No. I already explained that to you, and I
17 already answered that.
18    Q.    Let's move on, in the same document, "DLCO
19 Interpretation." And this speaks to what we were
20 discussing earlier. I want to make sure we are on the
21 same page. Second column. First full paragraph,
22 beginning with "Interpreting."
23    A.    Yes.
24    Q.    "Interpreting the DLCO, in conjunction with
25 spirometry and lung volumes assessment, may assist in

66 (Pages 258 to 261)

Page 262

1  diagnosing the underlying disease. For instance, normal
2  spirometry and lung volumes associated with decreased
3  DLCO may suggest anaemia, pulmonary vascular disorders,
4  early ILD or early emphysema."
5      Did I read that correctly, sir?
6  A.   Yes.
7  Q.   So, that would suggest that when somebody has
8  abnormal DLCO but normal lung volumes and spirometry, it
9  would suggest anaemia, pulmonary vascular disease, early
10  ILD, or early emphysema.
11      Did I read that correctly?
12  A.   You read it correctly. And you know what,
13  it's just off of the wall as far as all the things that
14  can cause abnormal DLCO's I could add 30 things to that.
15  Q.   Oh, I agree with you on that, sir.
16  A.   You know, it's not something that has any
17  bearing on what we're doing here, okay?
18  Q.   I think it does, though.
19  A.   No, it doesn't. Because we have enough
20  documentary evidence over a long period of time of people
21  with isolated DLCO decreases with reasonable spirometry
22  over very, very long periods of time now, for eight
23  years, that we really are very well aware of the fact
24  that a decreased diffusion capacity and isolation is a
25  manifestation of asbestos pleural disease. And it's in

Page 263

1  the literature and it's been written up that way in the
2  literature. So, all you're doing is producing a smoke
3  screen here.
4  Q.   Well, this is actually not a smoke screen,
5  but rather an ATS --
6      MR. HEBERLING: Objection. Argumenta-
7  tive.
8  Q.   (BY MR. STANSBURY:) Dr. Whitehouse, is this
9  not --
10      MR. HEBERLING: Just ask him the
11  question.
12  Q.   (BY MR. STANSBURY:) Is this not an ATS/ERS
13  statement on lung function testing?
14  A.   You know, you could probably quote and find
15  anything you want to out of these studies.
16      I really am an expert in pulmonary function
17  testing. Starting in 1965 when I was in the Air Force
18  and set up my own diffusion laboratory. I really
19  understand this stuff. And I understand how to do it
20  right. And I understand -- I understand what it means
21  under these circumstances.
22      You can find whatever you want to, quotes in
23  here.
24      You haven't told me what kind of spirometers
25  they are using. Are they using computerized stuff, body

Page 264

1  boxes? Are they using nitrogen? What are they using for
2  the studies? None of that is mentioned in here.
3  Q.   My question was, is the ATS/ERS statement a
4  smoke screen?
5  A.   I didn't say it was a smoke screen. This is
6  European, by the way.
7  Q.   ATS/ERS, correct?
8  A.   Yes. ATS/ERS.
9  Q.   That's the American Thoracic Society?
10  A.   Done with the European Respiratory Society.
11  Q.   Oh, it is a joint ATS/ERS statement, correct?
12  A.   Yeah. I assume so.
13  Q.   Okay. That's not a smoke screen. That's an
14  authoritative document, correct?
15  A.   You know, I haven't read there enough to even
16  say very much about it. I know I'm on very solid ground
17  concerning pulmonary function testing. I know I'm on
18  solid ground about it.
19  Q.   Could we move back to 2009_08400, because I
20  think we're going to clarify an earlier point now.
21  A.   08400?
22  Q.   Yes, sir.
23      (Pause in the proceedings.)
24  A.   All right.
25  Q.   The table in the bottom left corner, and it

Page 265

1  says, "percent predicted," "percent predicted," do you
2  see that, sir?
3  A.   Yes.
4  Q.   And then if you go back to 2009_08404 --
5  A.   What are you referring to here? Severity
6  classification?
7  Q.   Well, I am answering your question about what
8  the measurements were earlier. I think the answer is
9  that it is percent predicted. Because as we see the
10  variables that they are using here are percent predicted.
11  And if you look --
12  A.   No. They are using percent FEV1 over -- Oh.
13  I guest it is FEV1, percent predicted.
14  Q.   That's my point. If you go back to table 12,
15  it mentions in the text, the variables are the same as in
16  tables 6 and 8.
17  A.   You know, those numbers don't even make
18  sense. That doesn't happen in our lab in Libby. And I
19  don't think it's ever happened in any lab I've ever been
20  involved with.
21  Q.   I just wanted to clarify that table 12 does
22  in fact refer to percent predicted, and in order for it
23  to be considered significant for an FVC, according to the
24  ATS/ERS statement, it must be greater than 15 percent per
25  year, and for DLCO, greater than 10 percent, that's my

67 (Pages 262 to 265)

Page 266

1  point. Is that correct, sir?
2       A.    It still does not know.  It doesn't say.
3       Q.    That is what the document says, but you don't
4  agree with it, correct?
5       A.    No.  It doesn't say.  Because I don't know
6  what you're talking -- I don't know what the percentage
7  is.  Percentage of what?  Absolute number of the FEV1?
8  FEV1 percentage?  FEV1, FVC predicted?  Or FEV1 -- FVC
9  over FEV1 percentage?  It is not real clear.
10      Q.    But going back to the page we were just on,
11 we were looking at the DLCO issue.
12      A.    The other thing is, they were talking about
13 six units, and the Europeans do some things differently
14 with DLCO than we do in this country, and I don't know
15 what six units are.  It should be identified if it's
16 milliliters per minute per millimeter of mercury, which
17 it is not identified as such.  None of it's identified.
18      Q.    So, as you stated earlier, you didn't
19 necessarily agree with the statement on 2009_08405
20 regarding what low DLCO in connection with normal FVC and
21 lung volumes mean, correct?  You did not agree with that
22 statement?
23      A.    Oh, I don't disagree with it.  It's just that
24 it's pretty small.  I mean, it's such a narrow amount of
25 diseases, because there are so many diseases that cause

Page 267

1  this --
2       Q.    Well, ILD, that means --
3       A.    -- that have pulmonary function otherwise.
4       Q.    Well, ILD is interstitial lung disease,
5  right?
6       A.    That's correct.
7       Q.    And there are numerous types of interstitial
8  lung disease, correct?
9       A.    150 or so, that's right.
10      Q.    Although that's just a sentence, that's well
11 over a hundred potential conditions in which you could
12 have normal FVC, normal TLC, and a decrement in DLCO.  But
13 you do not see pleural abnormalities listed here,
14 correct?
15      A.    No, they do not, but they are in many other
16 articles.  You're just sort of cherry picking things that
17 you can use to give me problems with this.
18      Q.    Okay.
19      A.    Suggest anaemia, requires very severe
20 anaemia.  I would disagree with the DLCO being decreased
21 in early emphysema.  In early emphysema, the FEV1/FVC
22 ratio is decreased long before the DLCO goes down.
23      Q.    So, is it fair to say that in formulating the
24 opinions that you will offer at the confirmation hearing,
25 particularly with respect to DLCO and whether pleural

Page 268

1  disease causes DLCO, that you did not take into account
2  the statements in this ATS statement, this ATS/ERS
3  statement regarding lung function?
4       A.    No.  Do you want me to take into account
5  every statement that you've come up relative to this?
6            This is something that I'm not intimately
7  familiar with.  So, you can read a statement out of that
8  and I'm supposed to agree or disagree with it, when I've
9  got another statement that may be contrary with that.
10 And that's basically what you're doing here.
11      Q.    Well, let's continue with the rest of this
12 paragraph.
13      A.    And, you know, I'm tired, and I don't feel
14 very well, and I'm going to end this deposition now.
15 Okay.
16      Q.    Dr. Whitehouse, we have not gotten through
17 all of the material.  I still have more time.
18      A.    I don't care whether you have or not.  You
19 are going to have another chance, another crack at me.
20 I'm done.  Okay?
21      Q.    Dr. Whitehouse --
22            MR. HEBERLING:  I'm sorry, Brian --
23      Q.    (BY MR. STANSBURY:) -- let's take a break.
24 Are you walking out of this deposition?
25      A.    I'm walking out.

Page 269

1            MR. HEBERLING:  He's already gone beyond
2  probably what he should have.  Now, he's not been well.
3            MR. STANSBURY:  This is not what we
4  agreed to.
5            MR. HEBERLING:  You can't agree on what
6  his condition's going to be at the time of deposition.
7            MR. STANSBURY:  We will depose you again.
8            MR. HEBERLING:  Oh, yes.  You may do
9  that.
10           THE WITNESS:  You'll get your other crack
11 at me.  But we're done for today.  That's all there is
12 to it.
13           MR. HEBERLING:  When you're 71 years old,
14 maybe you will understand this.  I mean, you've been at
15 him since 8:30 this morning.
16           THE VIDEOGRAPHER:  Are we going --
17           MR. STANSBURY:  Stay on the record.
18           MR. SCHIAVONI:  John, I don't need to go
19 on.  I will just reserve my rights.  Is that acceptable?
20           MR. HEBERLING:  Certainly you may reserve
21 your rights.  You'll get another chance.  But, you know,
22 I'll bet we've gone farther than we should have gone
23 already.
24           MR. STANSBURY:  And what is the time,
25 sir?

68 (Pages 266 to 269)