# EXHIBIT B

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

---------------------------------------

CHAPTER 11

IN RE:

W.R. GRACE & CO., et al.,

       Debtors.

Case No. 01-1139 (JFK)

Jointly Administered

---------------------------------------

DEPOSITION OF

Professor James B. Shein

May 14, 2009

Chicago, Illinois

Lead:   Peter Van N. Lockwood, Esquire

Firm:   Caplin & Drysdale, Chartered

FINAL COPY

JANE ROSE REPORTING 1-800-825-3341

Page 14

1  Q. You've been teaching at Kellogg since
2  2002, correct?
3  A. That's right.
4  Q. And then before that you taught at Loyola
5  from 1994 to 2001?
6  A. That's correct.
7  Q. It indicates under the Loyola entry that
8  you taught both in the graduate school of business
9  and in the school of law; is that correct?
10 A. That's correct.
11 Q. And in the school of law the courses you
12 indicate that you taught were, quote, Business
13 Concepts For Lawyers, closed quote, and, quote,
14 New Venture Creation, closed quote.
15     Could you describe for us just sort of
16 generally what those two courses were?
17 A. Yes, those courses were the business
18 concepts where lawyers took them through the main
19 aspects of business.
20     In other words, the goal was to teach
21 business concepts to people who were about to go
22 and advise businessmen, and so we took them
23 through marketing concepts, finance, things like
24 that.
25 Q. Was corporation law encompassed within

Page 15

1  that course or?
2  A. No.
3  Q. And what about new venture creation?
4  A. That's where I actually had the students
5  put together business plans for a new business
6  idea, and it was solely devoted to the business
7  aspect, not the legal aspect.
8  Q. Now, during the time that you have been
9  teaching at first Loyola and then Kellogg, your
10 resume indicates that you also from 1997 to the
11 present have been counsel to McDermott, Will &
12 Emery here in Chicago; is that correct?
13 A. That's correct.
14 Q. And in your capacity as counsel at that
15 firm, would you regard yourself as practicing law
16 or advising lawyers on business matters such as
17 the ones you described yourself teaching?
18 A. More the latter.
19 Q. And while you've been at McDermott, Will &
20 Emery, and I don't want to get into anything
21 confidential here, but just as sort of a broad
22 question, have you participated in the firm's
23 representation of Honeywell?
24 A. No.
25 Q. Turning back to the first page of your

Page 16

1  resume, the summary in the fourth bullet point, it
2  states, quote:
3      Deemed and, subquote, expert on corporate
4  governance, subquote, by a federal court, closed
5  quote.
6      Could you tell us, sir, what that refers
7  to?
8  A. That refers to something that a judge said
9  in a case in California where a number of expert
10 reports were presented to the Court, and the judge
11 went through and said:
12     This one's not an expert, this one isn't
13 an expert, this one is, and then when she got to
14 Shein, she said:
15     This one is an expert on governance.
16 Q. And what was that case?
17 A. Thorpe.
18 Q. Thorpe Insulation?
19 A. Yes.
20 Q. And did you in fact testify in that case?
21 A. No.
22 Q. Why not?
23 A. Because I was stopped from testifying by
24 an objection that the insurance carriers who had
25 submitted these expert reports didn't have

Page 17

1  standing in the case.
2  Q. And the Court agreed with that objection?
3  A. Yes.
4  Q. Or sustained it I guess.
5  A. Or sustained.
6  Q. Okay. And is that the only time that you
7  could have testified or sought to testify in a
8  court?
9  A. No.
10 Q. Within the last four years have you
11 testified in other court proceedings?
12 A. No.
13 Q. How extensively I guess prior to the last
14 four years have you testified in court?
15 A. I think three times in my career.
16 Q. And are you able to give a general
17 description of in what capacity you testified
18 those three times or do you need to do it one by
19 one?
20 A. Two times was in my capacity as CEO of a
21 company, one of which was the fact that a customer
22 didn't pay us, and the other one was a few weeks
23 after I arrived at a company it went into
24 bankruptcy, and, of course, I was deposed as well
25 as testifying in court as to the company and its

Page 30

1  BY MR. LOCKWOOD:
2    Q.  And as part of your background and
3  experience in which you just testified about your
4  belief of what the trustees would or wouldn't do,
5  do you know anything about how the various trusts
6  with these kind of provisions in them have in fact
7  operated over the years?
8    A.  No.
9    Q.  So your opinion in this matter is based on
10 some judgment by you of human behavior?
11   A.  That's part of it.
12   Q.  And what's the rest of it?
13   A.  That this thing is designed with what I
14 would describe as perverse incentives to not treat
15 everybody equally.
16   Q.  And just to be complete about this
17 particular topic that we are talking about, I take
18 it you also have read Section 7.13 of the Trust
19 agreement which is referred to in Section
20 5.7(b)(3)?
21       MR. GIANNOTTO:  What page is that?
22       MR. LOCKWOOD:  It's on page 46.
23       MR. GIANNOTTO:  Thank you.
24       THE WITNESS:  Yes.
25 BY MR. LOCKWOOD:

Page 31

1    Q.  And that provides specifically, does it
2  not, for dispute resolution of disputes that could
3  arise as a result of the consent provisions set
4  forth in Section 5.7(b) in the case of the TAC of
5  this trust agreement?
6    A.  It does have that.
7    Q.  So if I understand you correctly, you're
8  basically of the view that 5.7(b)(2) and (3) and
9  7.13 are in effect window dressing.
10   A.  That's a good description.
11   Q.  And, as I said earlier, you're aware of no
12 instances in which any trustees have ever invoked
13 similar provisions in similar trust agreements to
14 actually compel TACs to agree to things that they
15 didn't want to agree to.
16   A.  Not in asbestos cases, no.
17   Q.  And just to be absolutely sure, you're
18 unaware of that because you've made no effort to
19 learn anything about it, inquire into it or
20 otherwise become knowledgeable about it.
21   A.  No, because -- the answer's no.
22   Q.  Moving to paragraph 11?
23   A.  Of which --
24   Q.  Of your report.
25       At the end of that you make the general

Page 32

1  statement, quote:
2        The choice of certain claimants' outside
3  counsel as TAC members will create incentives for
4  unfair and unequal treatment, closed quote.
5        Are the incentives that you refer to there
6  spelled out in subsequent portions of your report?
7    A.  I believe so.
8    Q.  In paragraph 13 of your report you start
9  out by saying, quote:
10       Based upon my review of the Bankruptcy
11 Rule 2019 statements filed by the proposed members
12 of the TAC or their law firms attached as Appendix
13 B, you understand various things.
14       Could you tell us generally what the scope
15 of your review of the bankruptcy 2019 statements
16 was that you refer to in that language?
17   A.  I wasn't looking at the bankruptcy rule
18 itself, the purpose of doing that.
19       My purpose of doing that was I asked
20 Mr. Giannotto in fact, I said:
21       I'm going through here understanding that
22 the people who are involved in this are also
23 plaintiffs' counsel for quite a few asbestos
24 litigants.
25       I said:

Page 33

1        How do I know that?  And so he sent me the
2  2019 statements to answer that question.
3    Q.  And just so the record is clear on this,
4  the 2019 statements that you referred to are
5  listed in Exhibit B to your expert report in
6  paragraphs 4, 5, 6 and 7; is that correct?
7    A.  I believe so, yes.
8    Q.  And you were able to identify the law
9  firms referenced in those four paragraphs as being
10 the proposed members of the TAC by looking at the
11 last page of the Trust agreement which is Exhibit
12 2 to the exhibit book.
13   A.  Where are you?
14   Q.  The last page -- right there to your left.
15       Is that how you identified those four law
16 firms as being the proposed TAC?
17   A.  Yes.
18   Q.  Okay.  Now, when you looked at those 2019
19 statements, what exactly did you look for?  And by
20 that I meant did you look to see how many
21 claimants each one of the law firms represented
22 that were set forth in the 2019 statements?
23   A.  Basically.
24   Q.  Did you do anything more such as trying to
25 identify what kind of claims those claimants were

Page 38

1    You can answer.
2    THE WITNESS: Right. I don't purport to
3 be a legal expert on this.
4 BY MR. LOCKWOOD:
5    Q.  Well, you are an expert on corporate
6 governance, right?
7    A.  Okay.
8    Q.  And in that capacity -- well, strike that.
9    You also purport to be an expert on
10 governance of trusts if I understand it; is that
11 correct?
12    A.  Yes.
13    Q.  Is it your opinion that as a matter of
14 either corporate or trust law there is something
15 improper about trying to limit -- well, let me
16 back up. I'm getting ahead of myself.
17    We have three categories of trust
18 fiduciaries in this Trust, don't we? Trustees,
19 the TAC and the futures representative.
20    A.  Yes.
21    Q.  The trustees have fiduciary obligations to
22 everybody, correct?
23    A.  Correct.
24    Q.  I mean all the Trust beneficiaries,
25 correct?

Page 39

1    A.  Correct.
2    Q.  The TAC purports to have fiduciary duties
3 only to present claimants under the agreement,
4 correct?
5    A.  Correct.
6    Q.  And the futures representative purports to
7 have only fiduciary duties to the future
8 claimants, correct?
9    A.  Correct.
10    Q.  Are you saying that that division of
11 responsibility between the TAC and the futures
12 representative in this document is in some manner
13 or another is in consistent with corporate or
14 trust law?
15    A.  I don't know. I don't know what the trust
16 law is.
17    Q.  Well, okay, let's assume then -- since
18 you're an expert I can ask you hypotheticals.
19    Let's assume the trust law in the context
20 of this kind of a trust.
21    A.  Um-hmm.
22    Q.  Would permit you to have separate
23 fiduciaries for these two categories of Trust
24 beneficiaries.
25    Is it your opinion that, notwithstanding

Page 40

1 that, the TAC would have a fiduciary duty to
2 future claimants that extends beyond what the
3 Trust document itself purports to create?
4    A.  Yes.
5    Q.  And why is that?
6    A.  Because they effectively are stepping in
7 the shoes of the trustee by ordering control of
8 the trustee.
9    Q.  And since we try and keep this in an
10 orderly fashion, with respect to your reference to
11 their control of the trustee, is it fair that
12 subsequent portions of this report identify the
13 nature and scope of the control that you're just
14 referring to?
15    MR. GIANNOTTO: Objection as to form.
16    You may answer.
17    THE WITNESS: I believe it's all through
18 the report.
19 BY MR. LOCKWOOD:
20    Q.  We'll come to that then.
21    In the discussion contained in paragraphs
22 14 through 17 of your report, is it fair to say
23 that you view there's a conflict of interest on
24 the part of TAC because, on the one hand, you view
25 them as having fiduciary obligations to all Trust

Page 41

1 beneficiaries, and, on the other hand, because
2 they or their law firms represent individual
3 claimants against the Trust, they have a
4 potentially conflicting set of fiduciary duties to
5 the individual claimants that they or their firms
6 represent?
7    A.  I think it's more than potentially.
8    Q.  Putting aside the word "potentially," that
9 is the conflict between duties to Trust
10 beneficiaries as a whole and duties to individual
11 clients for whom they serve as counsel presenting
12 claims to the Trust.
13    A.  Yeah, this is a conflict.
14    Q.  Is the nature of the conflict as you see
15 it described in paragraph 16 of your report?
16    A.  I believe so. It may be mentioned
17 elsewhere.
18    Q.  But this paragraph 16 is sort of the
19 fundamental conflict that you see?
20    MR. GIANNOTTO: Object. Objection as to
21 form.
22    You may answer.
23    THE WITNESS: Again, it may be throughout
24 here, but, yeah, it does talk about it here.
25 BY MR. LOCKWOOD:

Page 82

1  could you possibly hypothesize that the trustees
2  would have such an involvement in them that they
3  would be motivated to or could give special
4  treatment to the claims represented by TAC
5  members?
6     A.  I'd have to look at the details.
7     Q.  The TAC operates as a multimember group,
8  doesn't it?
9     A.  I believe so.
10    Q.  Indeed, we established earlier there were
11 like four members of the TAC, correct?
12    A.  That's what the documents show, yes.
13    Q.  And as far as you know, each member of the
14 TAC has their own clients as compared with being
15 shared with other members of the TAC, correct?
16    A.  The last phrase threw me.
17    Q.  Well, you don't understand the TAC members
18 to all share the same clients, do you?
19    A.  I assume not.
20    Q.  And so to the extent that one TAC member
21 has a client or some clients who, to use your
22 phrase, are putting forth unqualified claims to
23 the Trust to be paid, what incentive do you posit
24 that the other TAC members have to support that
25 such as to cause the trustees to violate their

Page 83

1  fiduciary duties to the claimants as a whole in
2  the processing of those claims?
3     A.  Again, a long sentence, but, if I
4  understand it, first of all, let me pull out that
5  last phrase, which is what they do with each other
6  may not cause, it may not be a given that would
7  cause the trustee to violate their fiduciary
8  duties as they see it.
9        Let's start with the important part, which
10 is what would have them not objecting to each
11 other I think was what you're starting with, which
12 is:
13       I don't object to yours, you don't object
14 to mine.  That's very human behavior.
15    Q.  So you posit a situation in which the TAC
16 members as a group sort of conclude that as
17 compared with all the other lawyers out there and
18 the other clients that make up the universe of
19 present claimants that the four TAC members get
20 together, identify among themselves categories of
21 claims that would otherwise be noncompensable
22 under this thing, enter into an agreement that
23 basically says:
24       We're going to try and force the trustees
25 to pay these unqualified claims, and if your

Page 84

1  claims are a little different from my claims and
2  don't have the same deficiencies, you'll agree
3  that I get to submit a different kind of
4  unqualified claim from the one that you're asking
5  for payment on.
6     A.  I doubt that that specific conversation
7  would take place.
8     Q.  But what you're saying is the substance of
9  that conduct communicated, however it's
10 communicated, is reasonably possible to take place
11 in your view.
12    A.  Yes.
13    Q.  And the basis for that hypothesis is what?
14    A.  I assume we're talking about human beings,
15 one.
16       Two, I assume these folks are in it for
17 money, and if what they do is legal, I think it's
18 just human nature that they do it.  There's just
19 too many perverse incentives in this.
20    Q.  What would make you believe that
21 conspiring among the TAC members to get the
22 trustees to pay unqualified claims under the Trust
23 agreement is, to your phrase, quote, legal, closed
24 quote?
25    A.  Well, I assume they aren't going to be

Page 85

1  violating the law.  If there's an incentive there
2  and they take it, and it's written into the
3  documents, the kind of incentives that are here,
4  and they're not violating any law, and if they're
5  not violating the Trust agreement, it's human
6  nature to take those incentives.
7     Q.  Doesn't your definition of an unqualified
8  claim encompass the notion that the claim is not
9  permissible to be paid under the Trust documents?
10    A.  It could be a matter of either not
11 permissible or more likely in any of the gray
12 areas in terms of being permissible or is it in,
13 you know, this category or a higher category.
14 Life is not black and white as much as a legal
15 document would purport it to be.
16    Q.  So you said in a different category, so if
17 a claimant comes in with a claim that only meets
18 the requirements for let's say Category 2 claims
19 and his lawyer conspires with the other TAC
20 members to try and compel the trustees to treat it
21 as a Category 3 claim, that's not violating the
22 Trust agreement.
23    A.  Because I suspect, given the number of
24 these that are coming in, there's going to be
25 quite a few of them that aren't clearly -- it's

Page 86

1  probably 2 1/2 versus a 3.  Could it be a 2, could
2  it be a 3 therefore?  Which way do we round?
3     Q.  And the decision of this by the trustees
4  is going to be implemented by saying that this
5  intermediate category for the clients of TAC
6  member X will be paid, but the same intermediate
7  category for everybody else won't be paid.
8     A.  I'm just saying that the incentive is to
9  pay certain ones and not others.
10    Q.  I hate to sound like a broken record, but
11 I thought we had agreed earlier that incentive had
12 to be coupled with opportunity before bad things
13 could happen, isn't that true?
14    A.  Yes.
15    Q.  And I'm asking you do you know of anything
16 in this Trust document that presents the
17 opportunity for the TAC members to do this middle
18 category gets bumped up for my claims but left
19 down at the lower category for everybody else's
20 claims that you just posited in a previous answer?
21    A.  Well, it's everything from that, you know,
22 they can influence what medical evidence is
23 needed, they can influence anything for the
24 proof-of-claim forms, the kind of things that I've
25 got throughout my report.

Page 87

1     Q.  But the medical evidence and the
2  proof-of-claim forms apply to all present
3  claimants, don't they?
4     A.  True, but they have their forms that they
5  use, and they're saying:
6         Well, you didn't use the right form.
7     Q.  Do you have any experience about claims
8  resolution at all in terms of the forms and
9  proof-of-claims and processing?
10    A.  For bankruptcy, yes.
11    Q.  No, no, no.  For asbestos trusts.
12    A.  I'm sorry.  No.
13    Q.  For any kind of trust?
14    A.  Yes, but not for asbestos.
15    Q.  Okay.  What kind of trusts do you have
16 personal experience with observing the processing
17 of tort claims?
18    A.  Probably the closest that I've had is when
19 I was on the board, pension board for a steel
20 company where we had all these disability claims
21 that came in.
22    Q.  And your experience with that was that --
23    A.  It was incredibly gray areas.  We debated
24 forever as to whether or not the person really was
25 disabled or not.

Page 88

1     Q.  So in that facility, you, as a trustee,
2  were personally and directly involved with the
3  resolution of the claim that was being considered;
4  is that correct?
5     A.  Well, there were intermediaries.  We were
6  the final decider.
7     Q.  Are you aware of anything in this trust
8  agreement that creates a structure under which the
9  trustees would be the final decider of individual
10 claim resolution similar to what you just
11 described?
12    A.  Their decisions could certainly affect
13 that, yes.
14    Q.  Decisions about individual claims or
15 decisions about broad categories of claims?
16    A.  But by the decisions of the individual
17 claims can affect the -- the broad category rather
18 can influence the individual.
19    Q.  So what you're saying is that if a TAC
20 member had some individual claims that might not
21 qualify, that would motivate him to get the
22 trustees to amend the document in some way or
23 another so that all claims of that sort would get
24 better treatment as opposed to just his own
25 specific clients' claims.

Page 89

1     A.  If I understand the hypothetical, yes.
2     Q.  And the trustees would not -- well, and
3  the trustees would not pass on that proposal using
4  their own fiduciary judgment, but, rather, they
5  would be influenced to come up with a different
6  result because of the control and influence that
7  you say the TAC members have over the trustees in
8  the various ways you identify in your report?
9     A.  It could happen.
10       MR. GIANNOTTO:  Do you want lunch?
11       MR. LOCKWOOD:  Yeah.  How about if we take
12 a lunch break.
13       MR. GIANNOTTO:  How long of a break for
14 the people on the phone so they know?
15       We're off the record by the way.
16          (Whereupon a discussion was had
17           off the record.)
18          (Whereupon a recess was had from
19           1:06 p.m. to 1:55 p.m.)
20       MR. LOCKWOOD:  Folks on the phone?
21       MS. ORR:  I'm ready.
22       MR. LOCKWOOD:  Okay.  We're about to get
23 restarted here.
24       A MALE TELEPHONE VOICE:  Sure.
25 BY MR. LOCKWOOD:

Page 94

1  between the individual interests of a member of a
2  group and the collective interest of the member of
3  the group can't be eliminated as a practical
4  matter?
5     A.  Well, it's probably never eliminated.  The
6  question is is are there mechanisms or ways you
7  could deal with it.
8     Q.  Well, here I take it the way you would
9  propose to deal with the conflicts you've
10 identified here is by preventing personal injury
11 lawyers who help asbestos claimants from being
12 members of a TAC?
13    A.  That's probably the cleanest way.
14    Q.  What is your understanding of the function
15 of a TAC in a case like this?
16    A.  The things that are set out in the
17 documents.
18    Q.  But why not just have a trust with
19 trustees and no TAC and no futures representative?
20    A.  I think you could have a TAC, and you can
21 have a futures representative.  The point is to
22 eliminate the conflicts, not to eliminate the
23 positions.
24    Q.  Well, what I'm asking you is what your
25 understanding of the rationale, if you will, is

Page 95

1  for having a TAC and a futures rep to look over
2  the shoulder of trustees in the first place is.
3     A.  Because there's two different groups who
4  can take from that trust, and you're effectively I
5  assume putting on representative of the two most
6  important groups.
7     Q.  So if you accepted the notion that you
8  just expressed, then are you saying that when you
9  select people to represent the interests of
10 present claimants, it would be the conflicts that
11 you have identified are so severe that you would
12 be better off picking people that have no
13 involvement in or experience of asbestos tort
14 litigation on the TAC in preference to people that
15 do.
16    A.  If they don't have the -- if that's the
17 only way to get rid of a conflict, but I'm sure
18 there's other qualified smart people who can get
19 up to speed fast.
20    Q.  Do you think you would be a good TAC
21 member?
22    A.  I'd probably randomly choose quite a few
23 of my fellow professors to be good TAC members.
24    Q.  And that's because you know all sorts of
25 professors that are familiar with the prosecution

Page 96

1  and evaluation of asbestos personal injury cases
2  in the state tort systems?
3     A.  Because I think they can come up to speed
4  very fast.
5     Q.  Let's break it down a little bit.
6         Putting aside for a moment the learning
7  curve on law professors who have never practiced
8  as a litigator in a tort case in a tort system.
9     A.  I'm not talking about law professors.  I'm
10 talking about business professors.
11    Q.  Oh, business professors.  Better yet.  Who
12 aren't even lawyers.
13    A.  That aren't even lawyers.
14    Q.  And putting aside the learning curve for
15 those folks?
16    A.  Um-hmm.
17    Q.  If we ignore what you identified as the
18 conflict problems and just sort of focus solely on
19 who would be the most capable, informed, qualified
20 person to represent the interests of personal
21 injury claimants against a trust that's supposed
22 to be liquidating and valuing their claims, would
23 you actually say that your hypothetical, a smart
24 business professor, would be preferable to a
25 hypothetical equally smart personal injury lawyer?

Page 97

1     A.  If it was a personal injury lawyer who had
2  nothing to do with any claimants in this case,
3  then I could go with that.
4     Q.  So it's a trade-off.
5         The experience or expertise of the
6  asbestos personal injury claimants in dealing with
7  claims resolution which includes settlements and
8  litigation and what have you on the one hand, and
9  the conflict if you will between their interests
10 in the collective and their interests in
11 individual claimants.  Is that fair?
12        THE WITNESS:  Want to read that one back
13 to me?
14        (Whereupon the record was read as
15        requested.)
16        THE WITNESS:  Could you rephrase that?
17 BY MR. LOCKWOOD:
18    Q.  Well, what I'm positing is there's a
19 reason to have asbestos plaintiffs' lawyers on the
20 committee because of knowledge and experience, and
21 there's a reason that you posit not to have them
22 on there, and if you don't put them on there
23 because of the conflicts, then you lose the
24 knowledge and the experience, and that's what I
25 characterize as is that a trade-off.  You can't

38 (Pages 146 to 149)

Page 146

1  MR. GIANNOTTO: Is that not on the report?
2  THE WITNESS: No.
3  BY MR. SMITH:
4  Q. What was the date of your law degree?
5  A. Law degree was 1997.
6  Q. Okay. And after you graduated from law
7  school, you immediately started working at
8  McDermott, Will & Emery; is that right?
9  A. Yes, as counsel.
10  Q. And would the opinions you're giving in
11  this case be similar to the type of work you did
12  at McDermott?
13  A. Not really.
14  Q. Okay. And your business school degree
15  before that, do you have any recollection of about
16  when that was?
17  A. Sounds like it was more -- longer than it
18  was.
19  Q. I didn't mean this to be a difficult
20  exam-type question.
21  A. I got the, let's see, my undergrad was
22  '64, my MBA was '66 and my doctorate was '68.
23  That's 19, not 18.
24  Q. Okay. And before you were teaching as a
25  professor at Northwestern, you were listed as an

Page 147

1  adjunct professor; is that correct?
2  A. That's right.
3  Q. What's the distinction in the type of
4  position you have now?
5  A. One's part time, one's full time.
6  Q. Okay. And how did it come about that you
7  were teaching full time?
8  A. I was asked to.
9  Q. Okay. Are you a tenured track professor?
10  A. No.
11  Q. Okay. There's no possibility you could be
12  eligible for tenure?
13  A. There is if I'm willing to undertake a
14  tremendous part of my life in researching.
15  Q. Okay. But you don't have tenure and
16  you're not willing to undertake the research to
17  get tenure; is that right?
18  A. That's correct.
19  Q. And the Loyola law degree, were you
20  working full time while you were getting that?
21  A. No.
22  Q. Okay. Were you in law school full time at
23  that time?
24  A. Yes, but I was working part time.
25  Q. Have you ever worked for any of the

Page 148

1  lawyers in this case before?
2  A. No.
3  Q. Okay. How did you get retained in the
4  case?
5  A. Mr. Giannotto called me.
6  Q. Okay. How did he find out about you?
7  MR. GIANNOTTO: Objection, lack of
8  foundation.
9  THE WITNESS: I have no idea.
10  BY MR. SMITH:
11  Q. Okay. You list some documents that you've
12  considered, such as the Trust agreement and things
13  like that in your report. Who provided you with
14  those documents?
15  A. I think I got some on-line or -- and then
16  I asked Mr. Giannotto to send me copies.
17  Q. Okay. Were the majority of the documents
18  you've relied on provided by the lawyers in this
19  case?
20  A. I think so, yes.
21  Q. Okay. And in order to render your
22  opinions in this case, is it fair to say that you
23  had to interpret various legal documents that are
24  at issue in the case?
25  A. I guess "interpret" is the right word.

Page 149

1  Q. Okay. And, in addition, in order to
2  render your opinions in this case, you had to
3  interpret various rules and statutory provisions
4  you cite in your report; is that right?
5  A. Right. Well, wait. Wait. You know, when
6  you say I had to -- use your words again.
7  Q. Well, why don't I ask another question.
8  Is it fair to say that ultimately these
9  Plan documents, the Trust documents will be
10  interpreted by the Court. Is that fair to say?
11  A. Everything's going to get interpreted by
12  the Court.
13  Q. Okay. And the Court may disagree with the
14  interpretations that you've given to the
15  documents, right?
16  A. Well, I hope the Court sees them in a new
17  light from a business and behavioral standpoint
18  instead of just a legal standpoint because all
19  these documents may be perfectly legal --
20  Q. That's not what I'm asking. I was sitting
21  here today, and I heard, would it be fair to say,
22  there were a lot of disagreements about
23  interpretation of the documents between yourself
24  and Mr. Lockwood. Would that be fair to say?
25  A. I think the disagreement wasn't an

Page 154

1  it.
2      THE WITNESS: As best as I understand the
3  question, the Court is probably going to rule on
4  the legality.
5  BY MR. SMITH:
6    Q. Okay.
7    A. I am asking the Court to look at:
8      Wait a minute. You got to look past the
9  legality sometimes and see what the impact of any
10 perverse incentives are that may be legal, but,
11 really, under good governance practices shouldn't
12 be allowed to go on.
13   Q. Okay. So you agree with me that the
14 Court's going to make determinations regarding
15 interpretation of the documents you've relied on,
16 right?
17   A. The Court will interpret the legality of
18 those documents.
19   Q. Okay. And also the Court's going to
20 interpret what those documents mean, is that fair?
21   A. From a legal standpoint, yes.
22   Q. Okay. Now, you're not holding yourself
23 out as an expert on a medical expert on asbestos
24 disease, right?
25   A. That's correct.

Page 155

1    Q. And you're not an expert on what claims
2  have merit or don't have merit?
3    A. That's correct.
4    Q. And you're not an expert on medical
5  criteria that might be used in paying claims.
6    A. No.
7    Q. And you're not I suppose holding yourself
8  out as an expert on the interpretation of legal
9  documents.
10     MR. GIANNOTTO: I'm going to object. I
11 don't even know what that means.
12     Each of these documents are legal
13 document, and he's read them and said what he
14 thinks they said. If the point you're making --
15     MR. SMITH: You're making a speaking
16 objection.
17     MR. GIANNOTTO: I understand because we
18 can't understand what you're talking about.
19     MR. SMITH: He didn't say that. You said
20 that.
21 BY MR. SMITH:
22   Q. Are you holding yourself out as an expert
23 on this case on interpretation of legal documents?
24     MR. GIANNOTTO: And I'm going to object
25 because that question makes no sense.

Page 156

1      If you can understand it, answer it.
2      THE WITNESS: I'm not interpreting
3  anything.
4      What I'm saying is I read these documents
5  and I say:
6      This is the mischief it could cause.
7  BY MR. SMITH:
8    Q. Okay. So you're not holding yourself out
9  as an expert on the interpretation of legal
10 documents, correct?
11   A. That's correct.
12   Q. Okay.
13   A. If I understand your question.
14   Q. Now, you're not a psychologist, correct?
15   A. I have a Ph.D. in organizational behavior,
16 which we had to get into a lot of psychology and
17 sociology under a business setting.
18   Q. Okay. Are you holding yourself out as an
19 expert in psychology?
20   A. Only as that part of the motivational part
21 in a business setting.
22   Q. Have you ever done any empirical research
23 where you've collected data from subjects
24 regarding human behavior?
25   A. Yes.

Page 157

1    Q. What was that?
2    A. For my dissertation.
3    Q. And since your dissertation have you ever
4  done any empirical research on human behavior?
5    A. No, having read substantial amounts.
6    Q. Have you ever published any research on
7  human behavior in a peer review publication?
8    A. No.
9    Q. You've never held yourself out as an
10 expert in litigation on Trust procedures, correct?
11   A. That's correct.
12   Q. And you've never held yourself out as an
13 expert in litigation on trust governance, correct?
14     MR. GIANNOTTO: I'm going to object. I
15 don't know what "litigation on trust governance"
16 as opposed to "trust governance" means.
17 BY MR. SMITH:
18   Q. In a lawsuit have you ever held yourself
19 out as an expert on trust governance before?
20   A. No.
21     MR. GIANNOTTO: Wait, wait, wait, wait.
22 I'm going to object to that. He already testified
23 that he --
24     MR. SMITH: You're telling us what his
25 testimony is, not objecting.