EXHIBIT C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                    *

W.R. GRACE & CO., et al.,                 *        Chapter 11

                    Debtors.              *        Case No. 01-01139 (JKF)
                                                   (Jointly Administered)

                                          *        Related Docket Nos. 21020, 21167, 21902


---------------------------------------------------------x

## OBJECTION TO MOTION IN LIMINE BY PLAN PROPONENTS TO STRIKE THE EXPERT REPORTS AND TESTIMONY OF PROFESSORS GEORGE L. PRIEST AND JAMES B. SHEIN

Certain of the Objecting Insurers hereby submit this Objection to the Plan Proponents'

Joint Motion to Strike the Expert Reports and Testimony of Professors George L. Priest and

James B. Shein ("Motion") [Docket No. 21902].[1]  For reasons set forth below, the Motion should

be denied.  First, it makes more sense and would be far more efficient for the Court to hear the

testimony of these witnesses at the Phase I hearing and then make its determination as to

admissibility, rather than rule on an *in limine* motion filed belatedly on the eve of the Phase I

hearing.[2]  This is particularly so given that there is no jury in this matter and thus the Court has

---

[1] The testimony of Professors Shein and Priest is proffered by the following Objecting Insurers:  OneBeacon America Insurance Company, Seaton Insurance Company, Government Employees Insurance Company, and Republic Insurance Company; Arrowood Indemnity Company f/k/a Royal Indemnity Company; Federal Insurance Company; Zurich Insurance Company, Zurich International (Bermuda) Ltd., and Maryland Casualty Company; Continental Casualty Company and Continental Insurance Company and affiliated companies; Fireman's Fund Insurance Company (and possibly other related companies) and Allianz S.p.A., f/k/a Riunione Adriatica Di Sicurta.

[2] As the Court is aware, the Plan Proponents had to move for leave from the Scheduling Order and to shorten the notice period in order to file the Motion [Docket No. 21903].  As CNA pointed out in its limited objection to the motion for relief from the Scheduling Order, the Plan Proponents had known of the proposed testimony for over eight weeks in the case of Professor Priest and ten weeks in the case of Professor Shein, but nonetheless waited until the eve of the Phase I hearing to file their motion to strike [Docket No. 21907].

greater flexibility in hearing expert testimony.  But, whenever the Court rules, it should deny the Motion because it is without merit.

## STATEMENT:  THE PROPOSED TESTIMONY

### A.    The Proposed Testimony of Professor Shein

James B. Shein is Professor of Management and Strategy at the Kellogg School of Business at Northwestern University.[3]  He has a Masters in Business Administration and a Doctorate in BA Organization Behavior from Indiana University.  Shein Report ¶ 1.  Professor Shein has "researched, written and taught courses and seminars on fiduciary duties and organizational behavior of trustees, officers and directors of public companies, private entities, and not-for-profit organizations."  *Id.* ¶ 2.  As a Professor at the Kellogg School since 2002, and as an adjunct professor at Loyola University of Chicago from 1994 to 2001, he has taught business courses that, among other things, deal with concepts of good corporate governance, including designing business structures so that there are no untoward conflicts of interest.  He has advised corporations, pension funds, and not-for-profit companies on such corporate governance principles, including on the "checks and balances needed to protect stakeholders"; and he has "also chaired governance committees for several for-profit and not-for-profit entities."  *Id.*  He also has first-hand experience in running corporations and overseeing pension funds, where he has observed appropriate corporate governance and trust governance procedures.[4]  Finally, in another asbestos bankruptcy case,[5] he was deemed by the Court to be an

---

[3] A copy of Professor Shein's Report ("Shein Report"), along with his Curriculum Vitae ("Shein CV") is appended as Exhibit A.

[4] *E.g.*, Shein CV at l; Deposition of James B. Shein, May 14, 2009 ("Shein Dep.") 87:15-25.  Excerpts from Professor Shein's Deposition are attached as Exhibit B.

[5] *In re Thorpe Insulation Co.*, No. 2:07-19271-BB (Bankr. C.D. Cal.).

"expert on corporate governance" in connection with testimony proffered by insurers that the asbestos bankruptcy trust in that case — like the one in this case — lacked adequate checks and balances and contained perverse incentives.[6]

Professor Shein is not proffered by the Objecting Insurers to provide legal opinions, such as whether the structure of the Trust passes legal muster under Delaware trust laws or relevant Rules of Professional Conduct.[7]  Rather, based upon his experience overseeing, teaching about, and writing about corporate governance in a wide variety of contexts, his testimony is offered to show that, as a policy matter, the structure of the Trust is inappropriate, because it creates "perverse incentives" for certain fiduciaries to act contrary to the duties they owe, under the Trust Agreement, to a wide variety of claimants who are not their individual clients. Specifically, Professor Shein would testify that "the structure of the Trust creates a potential for abuse" and for the Trustees and Trust Advisory Committee ("TAC") "to act contrary to the governing principle in the Trust Agreement that all claimants be treated fairly and equitably in connection with claims made against the Trust and that the Trust not deplete its assets by paying undeserving claims."  Shein Report ¶ 5.

This is so, Professor Shein will testify, because the members of the TAC are all prominent asbestos plaintiffs' attorneys who will be representing thousands, if not tens of thousands, of claimants seeking recoveries from the Trust, and will be receiving contingency fees from their clients for their work in this regard.  As such, they will have duties of loyalty to

---

[6] Shein Dep. 15:25 to 16:19.  As Professor Shein testified at his deposition, he was ultimately not allowed to testify in the Thorpe case, based upon the Court's ruling that the insurers lacked standing to raise the issues as to which his testimony was directed.  *Id.* 16:20 to 17:3.

[7] References to the "Trust," "Trust Agreement," "TAC," "TDP," "Trust Agreement," and "FCR" are, respectively, to the Asbestos PI Trust, Asbestos PI Trust Agreement, Asbestos PI Trust Advisory Committee, Asbestos PI TDP, Asbestos PI Trust Agreement, and Asbestos PI Future Claimants' Representative, as all are defined in Plan § 1.1.

those clients.  At the same time, however, the TAC members, in their capacity as TAC members, will have fiduciary duties to oversee the Trust for the benefit of all claimants — not just their clients — and in their capacity as TAC members, they "will be able to influence, and potentially control, the administration of the Trust, including amending the procedures for reviewing and paying claims of PI Claimants, some but not all of whom are or will be clients of the TAC members."  Shein Report ¶ 6.  This is because the consent of the TAC is required before there can be any change of significance to the Trust or TDP,[8] because the Trustees must consult with the TAC concerning the general implementation and administration of the Trust and TDP, and because the TAC, along with the FCR, has the authority to influence the Trustees' compensation, seek the removal of a Trustee, and influence who is chosen as a replacement.  *Id.* ¶ 9.

According to Professor Shein, "the choice of certain claimants' outside counsel as TAC members will create incentives for unfair and unequal treatment."  *Id.* ¶ 11.  "The Trust Agreement states that the members of the TAC serve in a fiduciary capacity representing all holders of present Trust Claims …" (*id.* ¶ 12 (citing Trust Agreement § 5.2)), yet the TAC members "owe separate fiduciary duties to their claimant-clients."  *Id.* ¶ 14.  As a result, the "Trust Agreement establishes built-in conflicts of interest."  *Id.* ¶ 17.  Among other things, "the TAC members have clear incentives not to have the Trust defend against the claims of their individual clients," even if those claims are "invalid or meritless."  *Id.* ¶ 20.

---

[8] As Professor Shein notes, the TAC (along with the FCR) must consent, *inter alia*, to:  amendments to the PI Trust Bylaws, the Trust Agreement, and the TDP (Trust Agreement §§ 2.2(f)(xi), (xii)); changes in the Claim Payment Ratio between amounts paid (i) for claims for severe asbestosis, severe disabling pleural disease, and cancer and (ii) claims for asbestosis or pleural disease (Trust Agreement § 2.2(f)(ii); TDP § 2.5); amendments to the Medical/Exposure Criteria for payable claims (Trust Agreement § 2.2(f)(iii); TDP § 5.3(a)(3)); and requirements that claimants to provide additional kinds of medical evidence (Trust Agreement § 2.2f(v); TDP § 7.1).  Shein Report ¶ 7.

These conflicts are exacerbated by the broad exculpatory provisions in the Plan and Trust Agreement. *Id.* ¶¶ 29-30 (citing Plan § 11.9; Trust Agreement § 4.4). "Exculpatory clauses are generally not looked at with favor in the area of corporate governance — particularly when there is evidence of overreaching or abuse of duties by a fiduciary." *Id.* ¶ 34. "The Trust Agreement effectively eliminates the checks and balances need for fair and impartial corporate or entity governance." *Id.* ¶ 37.

As Professor Shein made clear in his deposition, he is not attempting to assert legal opinions. Rather, he "looks past the legality … [to] see what the impact of any perverse incentives are that may be legal, but, really, under good governance practices shouldn't be allowed to go on." Shein Dep. at 154:8-12. He has not urged the elimination of the TAC: "The point is to eliminate the conflicts, not to eliminate the positions" (*id.* at 94:21-23), by providing for disinterested TAC members. *Id.* at 95:7-23.

### B.    The Proposed Testimony of Professor Priest

George L. Priest is a Professor of Law and Economics at Yale Law School.[9]  His background includes the study and knowledge of insurance, the regulation of insurance, and insurance practices. He has taught and published in the fields of insurance and the economics of insurance for many years. Many of his articles have appeared in economics journals; others, in insurance journals. Priest Report ¶ 4. For many years, he has conducted a regular course on economics subjects, including insurance, for federal appellate judges and bankruptcy judges in a federal judicial instruction program managed by George Mason University. *Id*. ¶ 10. He has presented testimony on insurance and other economics subjects at trial, in deposition, or by

---

[9] A copy of Professor Priest's Report ("Priest Report") is appended as Exhibit C.

expert report in many courts, *id*. ¶ 13, including in the Manville bankruptcy before Judge Lifland.[10]

Professor Priest has studied and written extensively on the economic determinants of the terms of property/casualty insurance policies. Priest Report ¶ 14. In particular, he has studied how insurance policies are structured to provide appropriate incentives to insurers and to policyholders toward their shared goal of reducing losses suffered in society. *Id*. His expertise is based on (a) his study and research for over 35 years of the economic principles of risk transfer, (b) his study over the same period of the customs and practices in the field of insurance and his understanding of the bases upon which insurance can be offered, (c) his years of teaching economic principles of insurance, in particular property/casualty insurance, and the regulation of the property/casualty insurance industry, and (d) his study of the history of the development of commercial general liability policies, umbrella and excess policies, as well as of the economic basis for the allocation of rights and responsibilities in such policies. *Id*. ¶15.

Professor Priest addresses the economic effects and implications of various features of Grace's Plan of Reorganization. Priest Report ¶ 18. He explains how the terms of the Plan, along with the Asbestos PI Trust Agreement, Asbestos Insurance Transfer Agreement, and Trust Distribution Procedures, fundamentally upset the economic structure of the Debtors' insurance policies and overturn central contractual rights established in those policies in ways that severely impact the economic ability of the Insurers to manage the financial risks that they assumed in issuing the policies. *Id*. ¶ 19. He explains in detail the economic structure of liability insurance, the economic relationships among insurers, the policyholder, and liability claimants, and the

---

[10] *See In re Johns-Manville Corp.*, 2004 WL 1876046, at *1 (Bankr. S.D.N.Y. Aug. 17, 2004), *aff'd as modified*, 340 B.R. 49 (S.D.N.Y. 2006), *rev'd* 517 F.3d 52 (2d Cir. 2008), *cert. granted sub nom. Travelers Indem. Co. v. Bailey*, 129 S. Ct. 761 (2008).

economic significance of the terms contained in modern liability insurance policies, including Grace's policies. *Id*. ¶¶ 20-32. He explains the economic structure of insurance in the context of policyholder bankruptcy, especially an asbestos bankruptcy. *Id*. ¶¶ 33-38.

Professor Priest then addresses the problematic features of Grace's Plan, from the standpoint, not of the law, but of economics and the insurer-insured relationship. Priest Report ¶¶ 39-55. In particular, from an economic standpoint, the procedures under the Plan for the resolution of asbestos claims violate the central allocation of rights and responsibilities in Grace's insurance policies. *Id*. ¶ 42-51. That problem is not cured by the "Insurance Neutrality" provision of the Plan. *Id*. ¶¶ 52-55. Professor Priest concludes, for the economic reasons set forth in his report, that the provisions of the Plan and associated documents "substantially overturn the economic structure of incentives created by Grace's insurance policies to the severe economic prejudice of the insurers." *Id*. ¶ 56.

## ARGUMENT

I.    **IN VIEW OF THE FACT THAT THIS IS A NON-JURY MATTER, THERE IS NO GOOD REASON FOR THE COURT TO DETERMINE THE ADMISSIBILITY OF THE TESTIMONY OF PROFESSORS PRIEST AND SHEIN BEFORE THE HEARING.**

The Plan Proponents spend several pages of their Motion emphasizing that, under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), this Court must serve as a "gatekeeper" in determining the admissibility of proffered expert testimony, and they imply that this Court must make that determination *in limine*. Motion 2-4. But this lengthy exposition ignores the fact that there is no jury in this proceeding. As Judge Posner (sitting by designation) put it: "The primary purpose of the *Daubert* filter is to protect juries from being bamboozled by technical evidence of dubious merit ...." *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003), *aff'd on other grounds*, 403 F.3d 1331 (Fed.

Cir. 2005); *see also Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1301 (Fed. Cir. 2000) ("A concern underlying the rule in *Daubert* is that without this screening function, the jury might be exposed to confusing and unreliable expert testimony."). Thus, "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case … where a … judge sits as the trier of fact …." *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000).

Moreover, this Court will learn of the content of the challenged testimony whether it determines its admissibility *in limine* or at the hearing. As the Seventh Circuit put it, in a bankruptcy hearing, "the court's gatekeeping role is necessarily different. Where the gatekeeper and the factfinder are one and the same — that is, the judge — the need to make such decisions prior to hearing the testimony is lessened." *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006). As a result, "the court can hear the evidence and make its reliability determination during, rather than in advance of, trial.… [W]here the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." *Id.*

In this case, it makes eminent sense for the Court to hear the testimony of Professors Shein and Priest at the hearing and then determine whether to exclude it or give it such weight as the Court determines it is worth. This will be more efficient than requiring the Court to review the legal memoranda, the expert reports, and deposition excerpts prior to a hearing that is scheduled to start eleven days from now. This is particularly so given that the gravamen of the Motion is that the testimony of Professors Shein and Priest consists of "impermissible legal opinions." Motion at 8, 10 (section headings). As will be shown below, that assertion is wrong; but in any event, if there is any form of expert opinion that this Court is perfectly capable of assessing on its own, it is testimony regarding legal concepts. Even if not admissible before a

jury, such testimony surely will not unfairly prejudice the Plan Proponents in a non-jury hearing.[11]

In short, rather than rule on the Plan Proponents' Motion *in limine*, the Court would be better served by taking the Motion under advisement and ruling on the admissibility of the testimony of Professors Shein and Priest after hearing that testimony at the Phase I hearing.

## II.    THE MOTION TO EXCLUDE THE TESTIMONY OF PROFESSORS SHEIN AND PRIEST SHOULD BE DENIED ON THE MERITS.

### A.    The Motion to Exclude the Testimony of Professor Shein Should Be Denied.

The Plan Proponents make three arguments as to why Professor Shein's testimony should be excluded.  They assert that his report "consists entirely of impermissible legal opinions," that he "has no specialized knowledge on the issues he addresses and is not qualified to testify as an expert witness," and that his report "fails to meet the evidentiary standard of reliability."  Motion at 10, 12, 13 (section headings).  None of these contentions has merit.[12]

#### 1.    Professor Shein's Testimony Does Not "Consist Entirely of Impermissible Legal Opinions."

The Plan Proponents argue that Professor Shein's testimony "impermissibly usurp[s] this Court's essential function" and that it is "legal advocacy at its core."  Motion at 11.  Among other things, they rely on the fact that Professor Shein candidly admitted in his deposition that he had to read the Trust Agreement and interpret what it says to determine whether the Trust Agreement satisfied good governance standards.  The Plan Proponents fail to explain how

---

[11] *See Flores v. Arizona*, 516 F.3d 1140, 1166 (9th Cir. 2008) (no prejudicial error in admitting testimony on education law in bench trial "where there was no danger that a jury might give too much credence to a legal expert"), *cert. granted on other issues sub nom. Horne v. Flores*, 129 S.Ct. 893 (2009).

[12] While not germane to the Motion to Strike, the Insurers strongly disagree with the contention (Motion at 10 n.5) that Professor Shein's testimony would only be admissible in Phase II.  As shown in the Phase I Trial Brief for the CNA Companies [Docket No. 21938], the operation of the Asbestos PI Trust can implicate CNA's contractual obligations as an insurer, especially given that the Plan Proponents have failed to make the clarifications necessary to ensure insurance neutrality.

Professor Shein could have determined whether the Plan satisfies good governance principles, or contains unnecessary conflicts of interest, without reading the Trust Agreement and deciding what it means.  This is not usurping the Court's function to decide legal issues; rather, it is reading the relevant materials in order to provide a basis for his opinion.

In a like manner, the Plan Proponents also claim that Professor Shein is giving a legal opinion, because his report contains citations to the Delaware Lawyers' Rules of Professional Conduct and Delaware Trust Code.  Motion at 11-12.  While true, the Plan Proponents ignore the central thrust of Professor Shein's opinion — that it would be bad policy as a matter of trust governance, even if otherwise lawful, to approve a Plan where the TAC members have conflicting duties, yet will possess great influence over the Trust.  As Professor Shein put it at deposition, "[t]he incentives are there to do mischief sooner or later.  Why have them in there in the first place?"  Shein Dep. 167:16-18.  Professor Shein freely admitted that "[e]verything's going to get interpreted by the Court," but hoped that "the Court sees them in a new light from a business and behavioral standpoint instead of just a legal standpoint because all these documents may be perfectly legal …."  Shein Dep. 149:11-12, 16-19.  Professor Shein's testimony is plainly relevant to issues this Court must decide, and the Plan Proponents' assertion that Professor Shein's testimony is merely legal advocacy is flatly mistaken.  Professor Shein admitted at his deposition that he was not an expert in the various legal rules, and that he was not attempting to opine as to the legality of anything — merely as to whether, as a matter of policy, the Trust was structured in such a way as to accomplish its goals.

Moreover, contrary to what the Plan Proponents assert, there is no hard-and-fast rule that expert testimony based in part on legal concepts is invariably impermissible.  As the Tenth Circuit stated:  "We do not exclude all testimony regarding legal issues.  We recognize that a

witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible." *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988). *Accord, Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1246 (10th Cir. 2000) (court upholds expert's testifying about meaning of hedonic damages on the ground that there is no "per se rule" against "expert testimony which happens to touch upon the law").

In that regard, the Third Circuit has on several occasions upheld the admission of expert testimony that touches upon the law. In *Berckeley Investment Group, Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006), it upheld the admission of expert testimony concerning the custom of the securities industry to support the defendant's claim that it lacked the necessary *scienter* because it reasonably believed that its actions were lawful. *Id.* at 216-18. Similarly, in *United States v. Leo*, 941 F.2d 181 (3d Cir. 1991), the Court upheld admission of expert testimony concerning the custom and practice of the defense industry under the Armed Services Procurement Act because it "was relevant both to explain the practice of the industry … and to establish what someone with Leo's extended background in the industry probably would know." *Id.* at 197. Finally, in *First National State Bank of N.J. v. Reliance Elec. Co.*, 668 F.2d 725 (3d Cir. 1981), the Court upheld the admission of the testimony of Homer Kripke, "acknowledged as … a foremost expert on the Uniform Commercial Code[] to testify as to trade usage 'in light of the clear unambiguous nature of the documents' …" in a case arising under the UCC. *Id.* at 731. Professor Shein's proposed expert testimony fits well within these Third Circuit precedents allowing expert testimony that touches upon legal concepts, but does not purport to offer legal opinions.[13]

---

[13] None of the cases cited by the Plan Proponents (Motion at 5-6) are to the contrary, for none of them adopt any sort of per se rule against expert testimony that touches upon legal issues. As noted in the text, the Third Circuit actually upheld the admission of the expert testimony in the *Leo* case, 941 F.2d at 196-97. Similarly, in *Peschko v. City of Camden*, 2006 WL 1798001, at *4 n.13 (D.N.J. June 28, 2006), the court stated it "was inclined to allow" in a § 1983 action expert testimony regarding the "reasonableness of the officers' police procedures in effecting

(Continued)

Finally, the Plan Proponents also note that Professor Shein testified that he is not aware of "'any instance' in which 'an expert has been allowed to give testimony in court such as [his] regarding the propriety of an asbestos trust." They urge that "[f]or this reason alone, his opinions should be excluded." Motion at 12. The fact, however, that an expert witness is or is not aware of whether other experts have been allowed to give opinions similar to his is wholly irrelevant to whether that testimony is admissible under Rule 702. Moreover, the Plan Proponents' contention is in any event misleading. As the Plan Proponents are aware from Professor Shein's deposition testimony, he was in fact deemed a qualified expert on corporate governance in connection with the asbestos trust established in the Thorpe Insulation bankruptcy, but he was ultimately not allowed to testify due to that Court's ruling that the insurers who proffered his testimony did not have standing. *See* note 6 *supra*.

### 2.    Professor Shein Is Qualified to Render His Opinions.

Even more without merit is the assertion of the Plan Proponents that Professor Shein somehow lacks the qualifications to testify as an expert. As the Third Circuit has stated, "Qualification refers to the requirement that the witness possess specialized expertise. *We have interpreted this requirement liberally*, holding that 'a broad range of knowledge, skills, and

---

(Continued)

[plaintiff's] arrest." In *United States v. Articles of Banned Hazardous Substances*, 34 F.3d 91 (2d Cir 1991), the excluded testimony involved a pure question of law: whether paints with certain characteristics were covered by a regulation. In *Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Plan & Trust Agreement*, 812 F. Supp. 1376 (E.D. Pa. 1992), the proffered testimony was excluded, not because it represented a legal opinion, but because the testimony was not relevant to the legal question before the court. The expert report excluded in *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 281 (S.D. Ala. 2006), was a 48-page, single-spaced report that "read like the fact section of a brief, not the report of an expert witness." In contrast, Professor Shein's report is concerned with one limited issue of the many before the Court — structuring the Trust and TDP to avoid unnecessary conflicts of interest. Finally, in *Burkhart v. Washington Metropolitan Area Transit Authority*, 112 F.3d 1207 (D.C. Cir. 1997) (cited Motion at 12), the expert witness gave impermissible legal conclusions about the Americans with Disabilities Act that actually misstated the law. 112 F.3d at 1213. There is no similar contention by Plan Proponents in their Motion to the effect that Professor Shein has misstated the law.

training qualify as expert.'"  *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (emphasis added; citation omitted).

As noted in his report, Professor Shein has "researched, written and taught courses and seminars on fiduciary duties and organizational behavior of trustees, officers and directors of public companies, private entities, and not-for-profit organizations."  Shein Report ¶ 2.  He has "advised corporate and not-for-profit boards on checks and balances needed to protect stakeholders," and has "also chaired governance committees for several for-profit and not-for-profit entities."  *Id.*  Thus, Professor Shein plainly has specialized knowledge and expertise in framing governing structures of entities to avoid unnecessary conflicts of interests.

The Plan Proponents' assertions to the contrary are baseless.  Motion at 13.  They assert that Professor Shein has never been asked to participate in the design of an asbestos trust, but that has nothing to do with whether he is qualified to opine on minimizing conflicts of interest in the design of the proposed Trust in this case.  Nor is the fact that Professor Shein does not hold himself out as an "expert in litigation on Trust procedures …" (Shein Dep. 157:12-13) at all relevant, because the operative word in that statement is "litigation."  Professor Shein is not opining how a court would rule in the event of litigation.  Finally, the fact that Professor Shein is not a psychologist is not germane.  He is an expert in Organizational Behavior.  One need not be a psychologist to understand that avarice is one of the prevailing human motivations and, as Professor Shein opines, that one ought to structure Trusts in a manner that minimizes incentives that encourage breaches of fiduciary duty.

### 3.    Professor Shein's Report Satisfies the Evidentiary Standard for Reliability.

Finally, the Plan Proponents argue that Professor Shein's Report is "fundamentally flawed and unreliable."  Motion at 13.  None of the conclusory assertions made in support of this

contention are valid.  All of them in one way or another go to the merits of whether this Court should accept Professor Shein's opinion that the Trust and TDP should be reframed to avoid unnecessary conflicts of interests — not to whether his opinion is reliable.  Admissibility is not determined by whether an opinion that is otherwise sufficiently reliable is ultimately accepted by the finder of fact.  *See*, *e.g. In re TMI Litigation*, 193 F.3d 613, 665 (3d Cir. 1999).  Moreover, the fact that Professor Shein is not aware of any instances in which asbestos trusts and TDPs like those proposed have been found to be improper merely shows that the issue has not been previously raised by entities with standing, not that his opinion is unreliable.  There is a first time for everything.  Likewise, the fact that Professor Shein is not aware of any other experts that share his concern does not show unreliability as much as the fact that organizational experts have not previously studied the perverse incentives for rewarding conflicts of interest contained in asbestos trusts like the one proposed.  Finally, the fact that Professor Shein is not personally aware of any instances of fiduciary abuse in asbestos trusts does not detract from, or render unreliable, the point that Trusts ought to be designed to avoid or minimize the possibility of such abuse.

### B.    The Motion To Exclude the Testimony of Professor Priest Should Be Denied.

The Plan Proponents make two arguments as to why Professor Priest's testimony should be excluded.  They assert that his report fails to meet the evidentiary standard of reliability.  They also assert that Professor Priest offers impermissible legal opinions.  Motion at 6, 8.  Neither of those contentions has any merit.

### 1.    Professor Priest's Report Satisfies the Evidentiary Standard of Reliability.

The Plan Proponents contend that Professor Priest's report is "fundamentally flawed and unreliable."  Motion at 6.  None of the conclusory assertions made in support of that contention

are valid.  All of them go to the merits of whether the Court should accept Professor Priest's opinion that Grace's Plan and associated documents "substantially overturn the economic structure of incentives created by Grace's insurance policies to the severe economic prejudice of the insurers" (Priest Report ¶ 56) — not to whether his opinion is reliable.  However, as set forth above, admissibility is not determined by whether an opinion that is reliable is ultimately accepted by the trier of fact.

The Plan Proponents contend that Professor Priest employed "no methodology" to reach his conclusions.  That is plainly incorrect.  Professor Priest's observations and conclusions are based on the economic principles of risk transfer and the economic principles of insurance, his study of the customs and practices in the field of insurance, and his study of the history of the development of commercial general liability policies, umbrella and excess policies, as well as the economic basis for the allocation of rights and responsibilities in such policies, as fully explained in his report.  Priest Report ¶ 15.  The Plan Proponents do not contend that the field of economics is unreliable.  They simply disagree with Professor Priest's observations and conclusions.  That disagreement does not bar his expert testimony.

The Plan Proponents complain that Professor Priest has not reviewed any evidence as to how Grace "and its insurers" were handling claims in the tort system before bankruptcy.  Motion at 6-7.  The issue before the Court, however, in Phase I is whether the insurers' rights are impaired, modified, or changed in any way by the Plan.  Professor Priest is qualified to offer testimony on the economic effect and implications of Grace's Plan, especially on the as-yet untapped policies of higher level insurers.  Professor Priest's testimony identifying the ways in which Grace's plan impairs, modifies or changes impacts the economic interests of the insurers is admissible and directly relevant to the issues to be addressed in Phase I.

The Plan Proponents also complain that, while Professor Priest opines that the Plan works to the "severe economic prejudice of its insurers" (Priest Report ¶ 56), he makes no attempt at further quantification of this "severe economic prejudice." Motion at 7-8. The Plan Proponents cite no authority that would require further quantification. It is sufficient that Professor Priest's opinion is based on reliable economic principles.

The Plan Proponents assert that Professor Priest "offers absolutely no foundational basis" for his opinions. Motion at 8. To the contrary, Professor Priest's opinions are grounded on his experience and his study of the principles of economics. As set forth above, the Plan Proponents do not assert that any of those principles are unreliable. Rather, they simply disagree with Professor Priest's observations and conclusions. Whether his observations and conclusions are correct is ultimately for the Court to determine, after they have been admitted into evidence. "The evidentiary requirement of reliability is lower than the merits standard of correctness." *See In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994). The evidentiary requirement is satisfied here.

### 2.    Professor Priest's Testimony Does Not Consist of Impermissible Legal Opinions.

Professor Priest is not proffered by the Objecting Insurers to provide legal opinions, such as whether the Plan passes legal muster under the laws governing insurance. Professor Priest testified repeatedly at his deposition that he is not offering legal opinions but rather his observations and opinions from the standpoint of economics. Deposition of George B. Priest, May 7, 2009 ("Priest Dep.") 21:12-16 ("the opinion ... presented here is an economic opinion based on my understanding of custom and practice in the industry but it is not in any respect a legal opinion"); 22:2-5 ("there are no legal opinions given here. I meant to write a report that was based on economics or custom and practice only"); 63:9-12 ("this is not a legal opinion and

is not meant to address legal claims.  It's trying to explain economic incentives and the economic structure"); 75:11-19 ("I view the question of enforceability as a legal question.  What I am trying to explain here is the economic basis for the assignment of responsibilities in the way that the policy assigns them.  So it's the economic analysis, but I don't reach the question of what's enforceable and what isn't enforceable").[14]

The Plan Proponents contend that Professor Priest's opinion concerning the "Insurance Neutrality" provision of the Plan is an inadmissible legal conclusion.  Motion at 8-10.  To the contrary, Professor Priest opines that the provision reflects "the sensitivity of the drafters to the extent to which the Plan overturns the economic structure of Grace's insurance."  Priest Report ¶ 52.  Moreover, as set forth above, there is no hard-and-fast rule that expert testimony based partly on legal precepts is invariably impermissible.  Professor Priest's proposed testimony fits well within the precedents allowing expert testimony that touches upon legal concepts, but does not purport to offer legal opinions.

## CONCLUSION

The Plan Proponents' Joint Motion in Limine to Strike the Expert Reports and Testimony of Professors George L. Priest and James B. Shein should be denied.

June 11, 2009                                            Respectfully submitted,

*[Signature block on following pages]*

---

[14] Excerpts from Professor Priest's Deposition are attached as Exhibit D.

DRINKER BIDDLE & REATH LLP

By: /s/
Warren T. Pratt (*Bar No. 4334*)
David P. Primack (*Bar No. 4449*)
1100 N. Market Street, Suite 1000
Wilmington, DE 19801-1254
Telephone: 302-467-4200
-- and --
Michael F. Brown (*pro hac vice*)
Jeffrey M. Boerger (*pro hac vice*)
One Logan Square
Philadelphia, PA 19103-6996
Telephone: 215-988-2700

*Counsel for Government Employees Insurance
Company, Republic Insurance Company, Seaton
Insurance Company, and OneBeacon America
Insurance Company*

STEVENS & LEE, P.C.

By: /s/
John D. Demmy (*Bar No. 2802*)
1105 North Market Street, 7th Floor
Wilmington, DE 19801
Telephone: (302) 425-3308
-- and --
Leonard P. Goldberger
Marnie E. Simon
1818 Market Street, 29th Floor
Philadelphia, PA 19103-1702
Telephone:  (215) 751-2864/2885

*Counsel for Fireman's Fund Insurance
Company, Allianz S.P.A., f/k/a Riunione
Adriatica Di Sicurta, and Allianz SE, f/k/a
Allianz Aktiengesellschaft*

ROSENTHAL, MONHAIT & GODDESS,
P.A.

By: /s/
Edward B. Rosenthal (*Bar No. 3131*)
P.O. Box 1070
Wilmington, Delaware 19899
Telephone: (302) 656-4433x6
Facsimile: (302) 658-7567

GOODWIN PROCTER LLP
Daniel M. Glosband (*pro hac vice*)
Brian H. Mukherjee (*pro hac vice*)
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts 02109
Telephone: (617) 570-1000
-- and --
Michael S. Giannotto (*pro hac vice*)
901 New York Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 346-4000

FORD MARRIN ESPOSITO WITMEYER
& GLESER, L.L.P.
Elizabeth DeCristofaro (*pro hac vice*)
Wall Street Plaza, 23rd Floor
New York, New York 10005-1875
Telephone: (212) 269-4900

WILDMAN, HARROLD, ALLEN &
DIXON LLP
Jonathan W. Young
Jeff Chang
225 West Wacker Drive
Chicago, Illinois 60606-1229
Telephone:  (312) 201-2662

*Counsel for Continental Casualty Company,
Transportation Insurance Company
and their American insurance affiliates*

CONNOLLY BOVE LODGE & HUTZ LLP


By: /s/_____
Jeffrey C. Wisler (*Bar No. 2795*)
Marc J. Phillips (*Bar No. 4445*)
1220 Market Street
P.O. Box 2207
Wilmington, DE  19899
Telephone:  (302) 658-9141

Of Counsel:
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
Edward J. Longosz, II
Laura G. Stover
1747 Pennsylvania Avenue, N.W.,
Suite 1200
Washington, DC  20006
Telephone:  (202) 659-6600

WILEY REIN LLP
Richard A. Ifft
Karalee C. Morell
1776 K Street, N.W.
Washington, D.C.  20006
Telephone:  (202) 719-7170

*Counsel for Zurich Insurance Company,*
*Zurich International (Bermuda) Ltd., and*
*Maryland Casualty Company*