# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

In Re:                        : Chapter 11
                              :
                              : Case No.
W.R. GRACE & CO., et al,      : 01-01139 JKF
                              :
                              : (Jointly
        Debtors               : Administered)

- - -

Thursday, May 7, 2009

- - -

Oral deposition of GEORGE L. PRIEST, taken pursuant to notice, was held at the offices of DRINKER BIDDLE & REATH, Two Logan Square, 18th & Cherry Streets, Philadelphia, Pennsylvania 19103, commencing at 10:18 a.m., on the above date, before Lori A. Zabielski, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103
866.624.6221

Page 2

APPEARANCES:

DRINKER BIDDLE & REATH, LLP
BY: MICHAEL F. BROWN, ESQUIRE
One Logan Square
18th & Cherry Streets
Philadelphia, Pennsylvania 19103-6996
215.988.2988
(brownmf@dbr.com)
(jeffrey.boerger@dbr.com)
Representing OneBeacon America Insurance Company, Seaton Insurance Company, Government Employees Insurance Company, Columbia Insurance Company f/k/a Republic Insurance Company

CAPLIN & DRYSDALE, CHARTERED
BY: PETER VAN N. LOCKWOOD, ESQUIRE
One Thomas Circle N.W.
Suite 1100
Washington, DC 20005
202.862.7801
(pvnl@capdale.com)
Representing Grace, Official Committee of Asbestos Personal Injury Claimants ("ACC")

ANDERSON KILL & OLICK, P.C.
BY: ROBERT M. HORKOVICH, ESQUIRE*
(*VIA TELECONFERENCE)
1251 Avenue of the Americas
New York, New York 10020
212.278.1322
(rhorkorvitz@andersonkill.com)
Representing the ACC

Page 3

APPEARANCES (continued)

CAMPBELL & LEVINE, LLC
BY: MARK T. HURFORD, ESQUIRE*
(*VIA TELECONFERENCE)
800 North King Street, Suite 300
Wilmington, Delaware 19801
302.426.1900
(mhurford@camlev.com)
Representing Official Committee of Asbestos Personal Injury Claimants

KIRKLAND & ELLIS, LLP
BY: LISA G. ESAYIAN, ESQUIRE
300 North LaSalle Street
Chicago, Illinois 60654
312.862.2226
(lisa.esayian@kirkland.com)
Representing the Debtors

SIMPSON THACHER & BARTLETT, LLP
BY: SAMUEL J. RUBIN, ESQUIRE*
(*VIA TELECONFERENCE)
425 Lexington Avenue
New York, New York 10017-3954
212.455.3122
(srubin@stblaw.com)
Representing Travelers Casualty and Surety Company

FORD MARRIN ESPOSITO & WITMEYER & GLESER
BY: ELIZABETH M. DeCRISTOFARO, ESQUIRE*
(*VIA TELECONFERENCE)
Wall Street Plaza
New York, New York 10005-1875
212.269.4900
Representing Continental Casualty Company and Continental Insurance Company

Page 4

APPEARANCES (continued)

BILZIN SUMBERG BAENA PRICE & AXELROD, LLP
BY: JEFFREY I. SNYDER, ESQUIRE*
(*VIA TELECONFERENCE)
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131-5340
305.375.6148
(jsnyder@bilzin.com)
Representing Property Damage Committee

STROOCK & STROOCK & LAVAN, LLP
BY: ARLENE G. KRIEGER, ESQUIRE*
(*VIA TELECONFERENCE)
180 Maiden Lane
New York, New York 10038-4982
212.806.5400
(akrieger@stroock.com)
Representing Official Committee of Unsecured Creditors

STEVENS & LEE, P.C.
BY: MARNIE E. SIMON, ESQUIRE
1818 Market Street, 29th Floor
Philadelphia, Pennsylvania 19103-1702
215.751.2885
(mes@stevenslee.com)
Representing Fireman's Fund Insurance

ALAN B. RICH LAW OFFICES
BY: ALAN B. RICH, ESQUIRE
Elm Place, Suite 4620
1401 Elm Street
Dallas, Texas 75202
214.744.5100
(arich@alanrichlaw.com)
Representing Property Damage FCR

Page 5

APPEARANCES (continued)

ECKERT SEAMANS CHERIN & MELLOTT, LLC
BY: LAURA G. STOVER, ESQUIRE
1747 Pennsylvania Avenue, NW
12th Floor
Washington, DC 20006
202.659.6619
(lstover@eckertseamans.com)
Representing Maryland Casualty and Zurich

WILEY REIN, LLP
BY: KARALEE C. MORELL, ESQUIRE*
(*VIA TELECONFERENCE)
1776 K Street NW
Washington, DC 20006
202.719.7520
(kmorell@wileyrein.com)
Representing Maryland Casualty and Zurich

COZEN O'CONNOR
BY: ILAN ROSENBERG, ESQUIRE*
(*VIA TELECONFERENCE)
1900 Market Street
Philadelphia, Pennsylvania 19103-3508
215.665.2147
(irosenberg@cozen.com)
Representing Federal Insurance Company

ORRICK HERRINGTON & SUTCLIFFE, LLP
BY: PERI N. MAHALEY, ESQUIRE
Columbia Center
1152 15th Street, N.W.
Washington, DC 20005-1706
202.339.8427
(pmahaley@orrick.com)
Representing Future Claimants Representative

Page 6

APPEARANCES (continued)

CUYLER BURK, P.C.
BY: EDWARD V. COLLINS, ESQUIRE*
(*VIA TELECONFERENCE)
4 Century Drive
Parsippany, New Jersey 07054
973.734.3200
(ecollins@cuyler.com)
Representing Allstate Insurance Company

WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
BY: CARL PERNICONE, ESQUIRE*
(*VIA TELECONFERENCE)
150 East 42nd Street
New York, New York 10017-5639
212.915.5656
(carl.pernicone@wilsonelser.com)
Representing Arrowood Indemnity Company

GOODWIN PROCTER, LLP
BY: MICHAEL S. GIANNOTTO, ESQUIRE*
(*VIA TELECONFERENCE)
901 New York Avenue, N.W.
Washington, DC 20001
202.346.4124
(mgiannotto@goodwinprocter.com)
Representing CNA Insurance

KRAMER LEVIN NAFTALIS & FRANKEL, LLP
BY: GREGORY A. HOROWITZ, ESQUIRE*
(*VIA TELECONFERENCE)
1177 Avenue of the Americas
New York, New York 10036
212.715.9571
(ghorowitz@kramerlevin.com)
Representing Official Committee of Equity Holders

Page 7

INDEX

Testimony of: GEORGE L. PRIEST

By Mr. Lockwood    Page 09, 239
By Ms. Esayian     Page 213
By Mr. Brown       Page 233
By Mr. Pernicone   Page 234

EXHIBITS

NO.      DESCRIPTION                              PAGE
Priest-1 Exhibit Book to First
         Amended Joint Plan of
         Reorganization and
         Disclosure Statement as
         of February 27, 2009        09
Priest-2 Debtors' Disclosure
         Statement for the First
         Amended Joint Plan of
         Reorganization under
         Chapter 11...               09
Priest-3 Certain Insurers' Notice
         of Filing of the Expert
         Report of Professor
         George L. Priest            09

Page 8

DEPOSITION SUPPORT INDEX

Direction to Witness Not to Answer:
Page  Line       Page   Line
NONE

Request for Production of Documents:
Page  Line       Page   Line
NONE

Stipulations:
Page  Line       Page   Line
09    02

Area(s) Marked Confidential:
Page  Line       Page   Line
NONE

Page 9

(It is hereby stipulated and agreed by and among counsel for the respective parties that the filing, sealing and certification of the deposition are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

- - -

(Exhibits Priest-1, 2, and 3 premarked for identification.)

- - -

GEORGE L. PRIEST, after having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. LOCKWOOD:
Q. Good morning, Professor Priest.
A. Good morning.
Q. You have been deposed

Page 18

1 review transcripts after depositions, but
2 I just don't recall in terms of this
3 transcript. I could find an answer for
4 that in my office, but I don't know
5 myself.
6     Q. So I take it, without
7 wasting all of your and our time by
8 reading through it, you have no
9 particular recollection of the testimony
10 that you gave that's embodied in that
11 transcript; is that fair?
12     A. Well, not exactly. As you
13 know, as I presume you know, I testified
14 in a number of cases involving
15 asbestos-related bankruptcies, and my
16 testimony has been pretty much the same
17 in all of them. So that I would be -- I
18 can't imagine there is anything that's
19 going to surprise me in this document.
20 But I am surprised that I didn't put it
21 in the list of testimony. That's the
22 best I can tell you. I do not believe
23 that the basic ideas are any different.
24     Q. Well, let me be more

Page 19

1 specific about what I am trying to do
2 here.
3     The report that you rendered
4 in the Federal-Mogul case, much of the
5 first half or two-thirds of it, contains
6 statements that are similar to or even
7 identical to statements that are
8 contained in your expert report in this
9 case. I am just representing that to
10 you. I am not asking you to agree or
11 not.
12     And, in general, that's the
13 portion of the report that discusses sort
14 of the non-Grace-specific portions of
15 what I will say the first half or so of
16 this report.
17     And what I was wanting to
18 ask you is whether or not you recalled
19 reading that transcript at any point and
20 saying to yourself that some answer that
21 you gave to a question that was asked of
22 you in that deposition was incorrect or
23 materially incomplete or in some manner
24 or another something that you felt that

Page 20

1 hadn't captured what you intended to say?
2 And if you don't remember, that's the
3 answer.
4     MR. BROWN: I believe he's
5 already answered that, while he
6 typically reviewed transcripts, he
7 couldn't state that he reviewed
8 this one.
9     MR. LOCKWOOD: I am pressing
10 him on this one question to see if
11 he remembers anything. If he
12 doesn't, he doesn't.
13     THE WITNESS: I really don't
14 recall any major change to a
15 deposition transcript in recent
16 times, but I can't precisely
17 recall the Federal-Mogul
18 deposition.
19 BY MR. LOCKWOOD:
20     Q. Okay. I am going to start
21 then on your expert report here and get
22 into some specifics, if that's okay.
23     Just to confirm some general
24 aspects of this report, in paragraph 18

Page 21

1 in the very first sentence, your report
2 states, quote, I have been asked to
3 address the economic effects and
4 implications of various features of the
5 First Amended Joint Plan of
6 Reorganization, et cetera.
7     Is it correct then that your
8 report is intended by you not to contain
9 any of opinions on legal matters as
10 opposed to economic matters?
11     A. Exactly. I have tried in
12 the report to make clear that the opinion
13 given here, presented here is an economic
14 opinion based upon my understanding of
15 custom and practice in the industry but
16 is it not in any respect a legal opinion.
17 And I hope throughout this deposition to
18 continue to maintain that distinction.
19     Q. So despite the fact that you
20 are a law professor and have a law
21 degree, you are not utilizing or
22 proffering that professional expertise as
23 a basis for any legal views that might be
24 deemed or considered or thought to be

Page 22

1  expressed in this report?
2      A.  Correct. I believe there
3  are no legal opinions given here. I
4  meant to write a report that was based on
5  economics or custom and practice only.
6      Q.  Just for the record, what is
7  your economic training in the field of
8  economics?
9      A.  I attended the University of
10  Chicago Law School. I took economics
11  courses that were taught in the law
12  school, and I also audited economic
13  courses taught in the economics
14  department. I have studied the field of
15  economics extensively since then. That's
16  the basic training.
17      But it's been reflected in
18  publication and peer review economic
19  journals. I serve as a peer reviewer for
20  various economics journals. My title at
21  Yale is Professor of Law and Economics.
22  I don't teach in the economics
23  department, but I have an economics
24  background.

Page 23

1      Q.  But you don't have an
2  advanced degree in the field of
3  economics; is that correct?
4      A.  That's correct.
5      Q.  And in paragraph 7 of your
6  report, you say you have held
7  appointments as a visiting professor in
8  the Department of Economics at the
9  University of Miami and the Department of
10  Economics, University of Toronto.
11      Could you tell us what sort
12  of professorships those were in --
13  visiting professor, I take it, means that
14  it wasn't a permanent employment. But,
15  beyond that, in the Department of
16  Economics, you were teaching law in
17  economics or what were you doing in those
18  capacities?
19      A.  A visiting professor is
20  basically someone brought in to teach a
21  course, one or more courses, and I taught
22  at the University of Miami in one of the
23  subdivisions of the Department of
24  Economics, courses on industrial

Page 24

1  organization. I don't know if I taught
2  an insurance course or not. I taught
3  there for two or three summers. And I
4  know there was an industrial organization
5  course, which was mostly economics, but I
6  did discuss some antitrust cases. But it
7  was mostly economics. I may have taught
8  a course on the economics of tort law --
9  I am not sure -- at Miami sometime ago.
10      In the Department of
11  Economics of the University of Toronto, I
12  taught a course on general principles of
13  insurance with application to private
14  insurance and governmental insurance. It
15  was a course jointly listed in the
16  Department of Economics and the law
17  school.
18      Q.  With respect to the subject
19  of insurance, do you have any
20  professional degrees or licenses or
21  titles in that field?
22      A.  No, I don't. It's simply
23  been a subject of my study and research
24  for a long period of my career.

Page 25

1      Q.  Would it be fair to say that
2  your involvement in the field of
3  insurance has been either principally or
4  exclusively -- and you tell us which --
5  from the perspective of an academic role?
6      A.  I would say yes with the --
7  certainly, all of my -- I am an academic,
8  and so all of my activities have been
9  basically academic in nature. On the
10  other hand, I have had, in my work in the
11  insurance field, various assignments at
12  one point or another that were more
13  practical. And they were academic,
14  though certainly I think my academic
15  training and research and study was
16  brought to bear on those tasks.
17      Q.  Well, just to be a little
18  bit more specific, have you ever worked
19  directly for an insurance company?
20      A.  I have worked as a
21  consultant for an insurance company. I
22  have not worked as an employee in a W-2
23  sense for an insurance company.
24      Q.  Have you worked, let's say,

Page 62

1  paragraph 27 is meant to address primary
2  insurers who have a right and duty to
3  defend, because it includes the cause to
4  perform these functions, which refers to
5  the functions described in the previous
6  sentence.
7       Although, as you know, at
8  later points in the report, I present
9  this incentive point as it affects
10 umbrella and excess carriers who
11 typically would not have the right or
12 duty to perform the functions that I am
13 referring to in this paragraph.
14      Q.  Well, I am trying to figure
15 out -- and maybe you can help me with
16 this -- which sentences in paragraph 27
17 are limited to the duties, rights,
18 obligations of primary insurers and which
19 ones are intended to cover the rights,
20 obligations, duties of excess and
21 umbrella insurers.
22      Because there is, certainly
23 in the last sentence, a reference to
      excess policies, and I had trouble,

Page 63

1  reading this, to know where you were
2  moving from describing primary coverage
3  to either all coverage or excess
4  coverage.
5       So could you look at that
6  paragraph and see if there is a dividing
7  line there?
8       A.  No, there is not a dividing
9  line, because, again, this is not a legal
10 opinion and is not meant to address legal
11 claims. It's trying to explain economic
12 incentives and the economic structure.
13      So when I make the point
14 about -- I start with a reference to the
15 primary insurer that has a duty to defend
16 claims. I then state that the insurer is
17 in a superior -- this is to go on through
18 the paragraph -- the insurer, and here I
19 am referring to the primary insurer -- is
20 in the superior position to perform these
   functions, meaning the functions of
22 controlling the defense because it must
23 ultimately pay the indemnity.
24      But that sentence itself

Page 64

1  refers to primary insurers who have a
2  right and duty to defend. But the point
3  about the superior position of an insurer
4  that must ultimately pay the indemnity
5  from its funds is a broader economic
6  point. I then go on to apply that
7  economic point more broadly.
8       Q.  Okay. So keeping in mind
9  that this expert report is being tendered
10 in the W.R. Grace bankruptcy case as
11 opposed to some sort of academic
12 exercise, if, in fact, W.R. Grace was
13 paying two-thirds of all indemnity costs
14 out of its own pocket as of the date it
15 entered bankruptcy, do any of two
16 sentences that you just referred to, the
17 third and fourth sentence of the
18 paragraph 27, have any application
19 whatsoever to W.R. Grace?
20      A.  Sure, because it has
21 application to W.R. Grace's policies.
22 What I am trying to do in this Section is
23 to explain the policies and the structure
24 of the policies.

Page 65

1       If, in fact, W.R. Grace was
2  able to enter agreements with its primary
3  carriers to take over -- I don't know how
4  it takes over two-thirds of the indemnity
5  as opposed to all of it, or whatever; I
6  don't know what those agreements are, and
7  I will take your hypothetical -- that's
8  great. The insurers agreed on some terms
9  to shift -- to concede the right and duty
10 to defend to Grace. That's fine. I am
11 not against settlement in any regard.
12      But the incentive question
13 is still applicable with regard, as you
14 asked me before, with regard to those
15 insurers who had not reached agreements
16 with Grace. And so I think there is -- I
17 think the paragraph, as it's written, is
18 analytically applicable to some set of
19 situations that we are trying to address
20 here.
21      Q.  So we are absolutely clear
22 on this, W.R. Grace -- let me rephrase
23 this.
24      For the purpose of this

Page 74

1  THE WITNESS: That's fine.
2  That wouldn't affect my answer.
3  BY MR. LOCKWOOD:
4  Q. Similarly, with respect to
5  paragraph 30 -- strike that.
6  You address a requirement of
7  insurer consent to assignment of policy
8  rights in paragraph 30 of your report,
9  correct?
10  A. I do.
11  Q. You are aware that the
12  extent of which that right which on its
13  face in the policy is asserted to be
14  absolute is, in fact, the subject of
15  varying state law decisions in
16  jurisdictions over the circumstances
17  under which assignments can be made by
18  insureds without the consent of insurers,
19  are you?
20  A. Yes, I am aware of that.
21  Q. So as to this paragraph, you
22  are simply -- let me ask it this way:
23  First, this paragraph is not intended by
24  you to contain legal opinions about the

Page 75

1  extent to which these provisions in CGL
2  policies are or are not enforceable as a
3  matter of state law; is that correct?
4  A. Absolutely.
5  Q. And, indeed, this
6  discussion, as you have indicated
7  earlier, has to do with your views as to
8  the economic impact of the provision and
9  the perceived need for it to be
10  enforceable; is that correct?
11  A. I view the question of
12  enforceability as a legal question. What
13  I am trying to explain here is the
14  economic basis for the assignment of
15  responsibilities in the way that the
16  policy assigns them.
17  So it's economic analysis,
18  but I don't reach the question of what's
19  enforceable and what isn't enforceable.
20  That's a legal opinion. That would be
21  calling for a legal opinion.
22  Q. Well, you have a sentence in
23  here, the second sentence in paragraph 30
24  that talks about or states, quote,

Page 76

1  Requiring insurer consent to assignment
2  ensures that the risks undertaken by the
3  insurer under the policy not be increased
4  by a policyholder's action without the
5  insurer's consent.
6  Have I read that correctly?
7  A. Yes, you have.
8  Q. What risks undertaken by the
9  insurer under the policy are you
10  referring to?
11  A. The risks of paying out
12  liability payments, the risk of paying
13  indemnity.
14  Q. So it's the risk to the
15  insurer as opposed to the risk to the
16  insured that you are discussing here?
17  A. Exactly. It says that, the
18  risks undertaken by the insurer, in the
19  sentence you read.
20  Q. Well, is it not true that
21  one of the purposes of CGL liability
22  policies is that the insured, in exchange
23  for the payment of a premium, is getting
24  the insurer to agree to, in effect,

Page 77

1  assume the risks of the insured with
2  respect to whatever activities are
3  covered by that policy?
4  A. Yes.
5  Q. So, essentially, we have got
6  two kinds of risks: We have got the risk
7  to the insured that the insurer
8  undertakes to cover; and we have got the
9  risk to the insurer that the agreement to
10  cover the first set of risks will cause
11  the insurer to have to pay money.
12  Is that a fair breakdown of
13  the risks?
14  A. No, I don't think it's fair.
15  The first part -- I would
16  say the first part of your sentence was
17  fair. The risk, as I have it -- this is
18  not exact, but the risk to the policy
19  that had insurer has undertaken to cover.
20  That's the risk I am talking about.
21  So it's a risk to the
22  policy, although, which if it's covered,
23  becomes a risk to the insurer. It's the
24  same risk. It's not a different risk. I

Case 01-01139-AMC    Doc 23012-2    Filed 08/28/09    Page 9 of 9

30 (Pages 114 to 117)

**Page 114**

1  Contracts Disputes in paragraph 38, I
2  take it, notwithstanding that fact, that
3  you are not in paragraph 38 testifying
4  that as a matter of fact or insurance law
5  the Grace Plan of Reorganization is
6  collusion between Grace and the asbestos
7  claimants representatives as that term is
8  used in insurance law?
9      A.   I am not making a legal
10 conclusion or drawing a legal conclusion
11 at all.
12       I refer to this policyholder
13 treatise because the prohibition of
14 collusion between a policyholder and a
15 claimant is not a specific term -- it has
16 to be inferred from an insurance policy.
17 It is not a specific term of the
18 insurance policy, but it has been
19 inferred universally by courts.
20       But I am not rendering a
21 legal conclusion or attempting to render
22 a legal conclusion here. That's for the
23 court to decide.
24     Q.   Well, what is it about the

**Page 115**

1  Grace Reorganization Plan, if anything,
2  that you regard from an economic point of
3  view indicative of, quote, collusion,
4  close quote?
5      A.   Well, basically, the Debtor
6  in the Grace Plan has agreed to a Plan
7  which places substantial control of the
8  Plan in the hands of claimants and
9  representatives of the claimants.
10       The claimants or their
11 representatives are in the first position
12 to name the trustees. Its explicit
13 representatives of the claimants indeed,
14 not only representatives but fiduciary by
15 the terms of the Plan, fiduciaries of the
16 claimants are appointed to the Trust
17 Advisory Committee and, of course, the
18 Futures Representative is a fiduciary of
19 future claimants.
20       So that is an agreement and
21 a method of distributing the resources
22 that has been agreed to between Grace and
23 the claimants. That's what I mean.
24       Now, whether that's

**Page 116**

1  collusion in a legal sense is not for me
2  to say. From an economic standpoint,
3  that is contrary to the economic, what
4  I -- the point of this entire report is
5  that's contrary to the economic structure
6  established by Grace's insurance policies
7  and other CGL policies.
8      Q.   You said the involvement of
9  the claimants with respect to the Plan in
10 that answer. Do.
11       You really mean the creation
12 of the Trust and the funding of the Trust
13 with various types of insurance rights?
14       In other words, what I am
15 driving at is the Plan itself has all
16 kinds of provisions in it, many of which
17 have nothing to do with asbestos. I am
18 trying to ask you whether there is some,
19 other than sort of the particular
20 subparts that you referred to in your
21 previous answer with respect to the
22 TDPs -- I am going to start over.
23       If the Plan didn't transfer
24 insurance rights to the Trust, would it

**Page 117**

1  be your view that the creation of the
2  Trust by itself was evidence by
3  collusion?
4      A.   I am not quite sure what
5  that means, but I would say, as I
6  understand your question, the answer
7  would be no.
8       Well, you know, I can't say.
9  What happens to the -- if it doesn't
10 transfer the insurance proceeds, what
11 happens to the insurance? If they make
12 no claim against the insurance, then I
13 would say the collusion point is no
14 important. If it's simply a settlement
15 between -- let's say Grace has released
16 all of its insurers through some process
17 and has now entered an agreement with the
18 claimants against it, that's not
19 collusive in the economic sense that I am
20 using it here.
21       The concept of collusion
22 that I am addressing, although not a
23 legal concept, is the reference to the
24 interest of the policyholder, aligning