# EXHIBIT 7

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 01-1139 (JKF) |
| W. R. GRACE & CO., et al., | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date: June 8-11, 2009** |
| Debtors. | ) | **Re: Docket Nos. 20872, 20873, 20874,** |
| | ) | **20864, 20944** |

## OBJECTION OF THE SCOTTS COMPANY LLC TO CONFIRMATION OF FIRST AMENDED JOINT PLAN OF REORGANIZATION (D.I. 20872)

The Scotts Company LLC and certain of its related entities ("Scotts") hereby object to the confirmation of the First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code of W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated February 27, 2009 (D.I. 20872) (the "Joint Plan"), for the reasons set forth herein.[1]

### SUMMARY OF OBJECTION

The Joint Plan is unconfirmable for several reasons.  First, the Joint Plan would improperly enjoin claims and demands of nondebtors against other nondebtors who have not made a substantial financial contribution to the Asbestos PI Trust as required under Section 524(g)(4)(B) of the Bankruptcy Code.  Indeed, the sheer scale on which the Joint Plan would extend Section 524(g) and Section 105(a) protection to non-contributing, nondebtors is unprecedented and unlawful.  The Settled Asbestos Insurance Companies would receive the

---

[1] Capitalized terms not otherwise defined herein are used as defined in the Joint Plan.



protection of a Section 524(g) injunction, but are providing no economic benefit to the Asbestos PI Trust; any arguable benefit the Settled Asbestos Insurance Companies are providing would be to the Debtors. Consequently, while perhaps "fair" to the Debtors, the injunction would be fundamentally unfair and inequitable to the Asbestos PI Trust claimants and would therefore violate Section 524(g).

Further, the Plan Proponents acknowledge that the nonsettling Asbestos Insurance Entities (the "Nonsettling Asbestos Insurance Companies") are providing "*no[thing]*"[2] to the Joint Plan; yet, the Joint Plan currently provides for an Asbestos Entity Injunction that directly benefits the Nonsettling Asbestos Insurance Companies by enjoining claims or demands against them. Even were such a broad application of Section 105(a) permissible notwithstanding its conflict with Section 524(g), the Joint Plan is not confirmable because it purports to enjoin claims against such Nonsettling Asbestos Insurance Companies while failing to channel, treat or otherwise provide for the payment of those enjoined claims.

Additionally, this Court lacks subject matter jurisdiction to issue the Channeling Injunction, the Asbestos Insurance Entity Injunction or Releases to the extent that they contain third party releases outside the scope of the Bankruptcy Code.

The Joint Plan is also unconfirmable because it impermissibly classifies claims within the same class that are not substantially similar, in violation of Section 1129(a)(1) of the Bankruptcy Code. For example, within one class, Class 6, the Joint Plan classifies dissimilar personal injury claims and insurance claims.

Moreover, the impermissible injunctions, releases and claim classifications demonstrate, among other things, that the Joint Plan is not proposed in good faith and is thus unconfirmable.

---

[2] See Depo. of Peter Lockwood, Tr. at 343-344:20-2 (Nonsettling Insurers contributions to the Joint Plan are "none.").

000002

XXX-000750

Scotts incorporates by reference any objections of other parties in interest that are not inconsistent with Scotts' objections.

## FACTS

***WR W. R. Grace sale of vermiculite ore to Scotts and the State Actions***

1.      Beginning in approximately the early 1960s, Scotts purchased vermiculite ore from W. R. Grace, and, except for a period in the 1980s, Scotts continued buying vermiculite ore from W. R. Grace until 2001.  From the early 1960s until 1980, most of the vermiculite ore that W. R. Grace sold to Scotts came from the W. R. Grace mine at Libby, Montana ("Libby"). Over time, the Libby vermiculite ore that W. R. Grace sold to Scotts was discovered to contain some amount of tremolite.

2.      Asbestos-related bodily injury claims have been asserted against Scotts in multiple jurisdictions (the "State Actions").  The State Actions against Scotts, some of which remain currently pending, are based on allegations that Scotts sold W. R. Grace's Libby vermiculite in the marketplace.  Many of the insurance policies purchased by W. R. Grace extended coverage to vendors of W. R. Grace's products (the "Shared Insurance Policies").

3.      Debtors have acknowledged that there is "no doubt that the State Actions [against Scotts] are in fact actions against W. R. Grace and its product."  See Joint Motion to Approve a Temporary Stay to Enjoin the Prosecution of All Claims Against Scotts in the State Actions ("Joint Motion"), Adversary No. 01-AP-0071, D.I. 322 at p. 1.  Debtors have further characterized the State Actions as, "in effect, improper actions against W. R. Grace and its products. . . ."  Id. at p. 2.  Debtors have noted that "the State Actions as to Scotts are really actions about W. R. Grace vermiculite" and "are effectively 'back-door' cases against W. R. Grace".  Id. at p. 10.

- 3 -

4.    In connection with the State Actions, Scotts has incurred and will continue to incur substantial expenses (the "Defense Expenses") in defense of claims alleging bodily injury to third parties based upon allegations concerning the Libby vermiculite ore that W. R. Grace sold to Scotts.

***Background of Chapter 11 Case***

5.    On April 2, 2001 (the "Petition Date"), each of the W. R. Grace-related Debtors filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Since the Petition Date, the Debtors have continued to operate their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

6.    Contemporaneously with the filings of their Chapter 11 petitions, the Debtors filed the adversary proceeding entitled <u>W. R. Grace & Co., et al. v. Margaret Chakarian, et al. and John Does 1-1000</u>, Adversary No. 01-AP-0071. After initially entering a temporary restraining order on April 2, 2001 and a preliminary injunction on May 3, 2001, on January 22, 2002, the Court entered an "Order Granting Modified Preliminary Injunction" (the "Modified Preliminary Injunction"), which, among other things, enjoined the commencement or continuation of certain actions against nondebtor third parties, including actions: (1) that arise from alleged exposure to asbestos, indirectly or directly, allegedly caused by the Debtors, against (a) Fresenius, (b) Sealed Air, (c) Merrill Lynch, (d) Credit Suisse First Boston, (e) certain of the Debtors' insurance carriers, (f) Affiliates of the Debtors that are not filing entities for purposes of the Chapter 11 Cases, and (g) present and former officers, directors and employees of the Debtors; (2) for which there may be coverage under certain of the Debtors' insurance policies; (3) brought against certain of the Debtors' insurance carriers, which allege coverage for asbestos-related liabilities; or (4) against current and former officers, directors or employees of the

- 4 -

**000004**

XXX-000752

Debtors that arise out of such officer's, director's or employee's employment or relationship with the Debtors. See Adversary No. 01-AP-0071, D.I. 31, 87).

7.    On June 24, 2004, Scotts filed its expedited motion ("Expedited Motion") for a stay of the State Actions on the ground that the State Actions were actions for which there may be insurance coverage under certain of Debtors' insurance policies and that the Modified Preliminary Injunction therefore precluded their prosecution. See Adversary No. 01-AP-0071, D.I. 208.

8.    On July 6, 2004, the Court conducted a hearing on the Expedited Motion. Among other things, Debtors conveyed their support for the motion, adding, "We believe that [Scotts has] set forth a plausible claim for coverage." See July 6, 2004 Tr. at p. 14, D.I. 6012.

9.    On July 22, 2004, the Court entered an order denying Scotts' Expedited Motion (the "July 22, 2004 Order"). Id. at D.I. 253. The Expedited Motion was denied with the following condition, among others: "the Insurance Carriers [as that term is defined in the Modified Preliminary Injunction] as to which Scotts makes a claim on shared insurance are prohibited from paying those claims until the issue of coverage is litigated in an appropriate forum." Id. at p. 2, ¶2. This limited relief was granted in part because, at that time, Debtors stated that it was not their intention to devote any insurance policy proceeds to fund a plan, and therefore Scotts would not be prejudiced by deferring its claims to coverage under those policies.

10.    On September 2, 2004, Scotts filed its Complaint for Declaratory and Other Relief against American Employers Insurance, Boston Old Colony Insurance Company, Continental Casualty Company, Employers Commercial Union n/k/a OneBeacon America Insurance Company, Maryland Casualty Company, Unigard Insurance Company, and Debtors (the

000005

XXX-000753

"Declaratory Judgment Action").  See Adversary No. 04-AP-55083, D.I. 1.  Prosecution of the Declaratory Judgment Action against these insurer-defendants has remained stayed by this Court.

11.    On November 15, 2004, Debtors and Scotts filed a Joint Motion to Approve a Temporary Stay to Enjoin the Prosecution of All Claims Against Scotts in the State Actions ("Joint Motion").  See Adversary No. 01-AP-0071, D.I. 322.  In the Joint Motion, Debtors stated that there was "no doubt that the State Actions are in fact actions against W. R. Grace and its product." Id. at p. 1.  This Court subsequently denied the Joint Motion.  Id. at D.I. 353.

12.    On November 15, 2006, Scotts served on the Debtors' claims agent a protective, personal injury proof of claim, in compliance with the August 24, 2006 Order as to All Pre-Petition Asbestos PI Litigation Claims, Including Settled Claims, (I) Establishing Bar Dates; (II) Approving Proof of Claim Form; and (III) Approving Notice of Pre-Petition Asbestos Personal-Injury Claims Bar Date.  See Case No. 01-01139, D.I. 13061.  Scotts also timely submitted the W. R. Grace Personal Injury Asbestos Questionnaire.

13.    On September 19, 2008, Debtors filed their Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code of WR W. R. Grace & Co., et al., the Official Committee of Asbestos Personal Injury Claimants, the Asbestos PI Future Claimants' Representative, and the Official Committee of Equity Security Holders Dated as of September 19, 2008.  See Case No. 01-01139, D.I. 19579.

14.    On February 27, 2009, Debtors filed the Joint Plan.  See Case No. 01-01139, D.I. 20872.

15.    The stated purpose of the Joint Plan is to provide for the treatment of all holders of claims against W. R. Grace, including Asbestos PD Claims, CDN ZAI PD Claim and general

000006

XXX-000754

unsecured claims.  The Joint Plan also seeks to resolve all Asbestos PI Claims against the Debtors.

16.     The Joint Plan classifies the claims against the Debtors into nine classes. "Asbestos PI Claims" are in Class 6.  Joint Plan § 3.1.  Section 1.1 (paragraph 33) of the Joint Plan defines "Asbestos PI Claims" to include, among other things, Claims, Indirect Claims or Demands against any of the Debtors or the Asbestos Protected Parties based on, arising out of, resulting from, or attributable to, directly or indirectly, death or personal or bodily injury caused by the presence of or exposure to asbestos, any products or materials containing asbestos, or asbestos-containing vermiculite that was mined, processed, manufactured, sold, supplied, distributed or marketed by the Debtors.  Joint Plan § 1.1.33.

17.     Pursuant to the Joint Plan, Asbestos PI Claims are to be resolved in accordance with the terms, provisions, and procedures contained in the Asbestos PI Trust Agreement (the "PI Trust Agreement") and the Asbestos PI Trust Distribution Procedures (the "TDP").  Joint Plan § 3.1.6.  Pursuant to the PI Trust Agreement and TDP, all Asbestos PI Claims shall be paid by the Asbestos PI Trust (the "PI Trust") solely from the Asbestos PI Trust Assets.  Joint Plan § 3.1.6.

18.     The stated purpose of the PI Trust is: (i) to assume the liability for all Asbestos PI Claims; (ii) to process, liquidate and pay all Asbestos PI Trust Claims in accordance with the Joint Plan and the TDP; and (iii) to hold and manage the Asbestos PI Trust Assets for use in paying and satisfying the Asbestos PI Claims.  Asbestos PI Trust § 1.2.  The PI Trust Agreement shall be funded by the Debtors' and other parties' transfer of the Asbestos PI Trust Assets to the PI Trust.  Asbestos PI Trust § 1.3.  The Asbestos PI Trust Assets are identified in Section 7.2.2 of the Joint Plan and include $250 million cash, the Insurance Contributors' rights under the

000007

XXX-000755

Asbestos Insurance Transfer Agreement, and the Insurance Contributors' Asbestos Insurance

Rights. Joint Plan § 7.2.2. Notably, Section 3.2.8.2 of the Disclosure Statement states that under

the Joint Plan, "the Debtors are transferring their insurance rights to the Asbestos PI Trust.

However, the Debtors are not transferring any alleged insurance rights Scotts may have."[3]

Disclosure Statement § 3.2.8.2.

19.     Under the Joint Plan, the Asbestos PI Claims would be treated in accordance with

the provisions of the TDP. Joint Plan § 3.1.6. The TDP purports to provide a fair and equitable

process for the treatment of all Asbestos PI Claims. TDP § 1.1. The TDP sets forth procedures

for the processing and payment of all Asbestos PI Claims. TDP § 2.1. According to the TDP,

Asbestos PI Claims shall be processed based on their place in the FIFO Processing Queue. TDP

§ 2.2. This means that the claims shall be processed and paid on a first-in-first-out basis.

20.     The TDP also provides that Asbestos PI Trust Claims can be liquidated under the

Expedited Review Process. TDP § 2.2.[4] An Asbestos PI Claimant may instead elect to have his

or her Asbestos PI Claim reviewed under the Individual Review Process. TDP § 2.2.[5] The TDP

includes procedures for binding and non-binding arbitration. TDP § 2.2.[6] Asbestos PI Claimants

who elect non-binding arbitration and then reject the arbitrator's award have the right to institute

a lawsuit in the tort system against the PI Trust. TDP § 2.2. If an Asbestos PI Claimant receives

---

[3] Of course, to the extent that the Plan Proponents may seek to transfer or otherwise affect property rights of third parties, due process concerns would arise.

[4] The Expedited Review Process is purportedly designed to provide an expeditious, efficient and inexpensive method for liquidating all Asbestos PI Claims. TDP § 5.3(a)(1). The claims that undergo the Expedited Review Process and meet the presumptive medical and exposure criteria are to be paid the Scheduled Value provided in the TDP for the claimant's disease level. TDP § 2.2.

[5] One stated purpose for electing the Individual Review Process is to determine whether the liquidated value of the claim exceeds the Scheduled Value for the claimant's disease level. TDP § 2.2. If a claimant elects to undergo the Individual Review Process, his or her claim may be liquidated up to the amount of the Maximum Value provided in the TDP for the claimant's disease level. TDP § 2.2.

[6] The arbitration procedures are available to an Asbestos PI Claimant who disputes the results of the Individual Review Process. TDP § 5.10(a). However, the TDP caps any arbitrator's award at the Maximum Value provided by the TDP for the claimant's disease level. TDP § 5.10(c).

- 8 -

a judgment in the tort system, the claim shall be placed in the FIFO Payment Queue based upon the date on which the judgment becomes final.  TDP § 7.7.  Such claim shall be paid as provided in Section 7.7 of the TDP.  TDP § 7.7.

21.    The TDP provides special procedures for Insurance-Related TDP Claims.  TDP § 5.12.  While not defined in the Joint Plan, Insurance-Related TDP Claims are defined in the TDP as any claim of The Scotts Company LLC, BNSF Railway and any other Entity against any Settled Asbestos Insurance Company.  TDP § 5.12.  A Settled Asbestos Insurance Company is any Asbestos Insurance Entity that has entered into an Asbestos Insurance Settlement Agreement prior to the conclusion of the plan confirmation hearing.  Joint Plan § 1.1.200.  Exhibit 5 attached to the Joint Plan provides a current schedule of Settled Asbestos Insurance Companies.  As defined, Insurance-Related TDP Claims do not include claims against any Nonsettling Asbestos Insurance Company.  Cf. TDP § 5.12.

22.    Under the TDP, each Insurance-Related TDP Claim shall be reviewed individually by the PI Trust to determine the validity and amount of such claim.  TDP § 5.12.  Any dispute between the PI Trust and an Insurance-Related Claimant concerning the validity or amount of an Insurance-Related TDP Claim shall be subject to the ADR Procedures.  TDP § 5.12.  If the dispute is not resolved through the ADR Procedures, the Insurance-Related Claimant may litigate its Insurance-Related TDP Claim against the PI Trust by filing suit in any federal or state court with jurisdiction over the PI Trust and over such claim.  TDP § 5.12.  Section 5.12 of the TDP contains provisions describing the process and timing for the payment of resolved Insurance-Related TDP Claims.  TDP § 5.12.

23.    At least four releases, injunctions, and waivers contained in the Joint Plan are designed to protect the Asbestos Insurance Entities, including Nonsettling Asbestos Insurance

000009

XXX-000757

Companies.  First, the Asbestos Insurance Entity Injunction seeks to enjoin actions against *all* Asbestos Insurance Entities relating to Asbestos PI Claims and Asbestos Insurance Rights.  The operative language of the Joint Plan reads:

> All Entities that have held or asserted, that hold or assert, or that may in the future hold or assert, any claim or cause of action against any Asbestos Insurance Entity, based upon, or arising out of, any Asbestos PI Claim against the Debtors or any Asbestos Insurance Rights, whenever and wherever arisen or asserted (including all claims in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty) shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly claiming, collecting, recovering, or receiving any payment, recovery, satisfaction, or any other relief whatsoever on, of, or with respect to any such claim or cause of action. . . .

Joint Plan § 8.4.1.1.  The term Asbestos Insurance Entity is defined as including "*any* Entity . . . that has or had actual or potential liability, duties or obligations under or with respect to, any Asbestos Insurance Policy," not just those Entities that have entered Asbestos Insurance Settlement Agreements with the Debtors.  Joint Plan § 1.1.10 (emphasis added).

24.     The Joint Plan also contemplates injunctions in favor of certain parties (the Settled Asbestos Insurance Companies) that are in addition to the statutory bankruptcy discharge contained in Section 1141 of the Bankruptcy Code.  For example, Section 8.2 of the Joint Plan seeks to impose an Asbestos PI Channeling Injunction (the "Channeling Injunction").  Joint Plan § 8.2.  This injunction provides, in relevant part, that the sole recourse of an Asbestos PI Claimant shall be to the PI Trust pursuant to the provisions of the Channeling Injunction and the TDP.  The Channeling Injunction prohibits a claimant from asserting an Asbestos PI Claim against the Debtors, the Reorganized Debtors *and any Asbestos Protected Party.*  Asbestos Protected Parties are defined in the Joint Plan to include Settled Asbestos Insurance Companies

000010

XXX-000758

but does not include Nonsettling Asbestos Insurance Companies.  Joint Plan § 1.1.50.  The Joint

Plan defines "Settled Asbestos Insurance Company" as follows:

> **"Settled Asbestos Insurance Company"** shall mean any Asbestos
> Insurance Entity that has entered into an Asbestos Insurance
> Settlement Agreement prior to the conclusion of the Confirmation
> Hearing; *but only* with respect to, and only to the extent of, any
> Asbestos Insurance Policy (or any portion thereof) identified as the
> subject of an Asbestos Insurance Settlement Agreement in Exhibit
> 5 in the Exhibit Book; *provided, however,* that (i) each such
> Asbestos Insurance Settlement Agreement is listed by the Joint
> Plan Proponents, acting together, in Exhibit 5 and (ii) the Asbestos
> Insurance Settlement Agreement is approved by the Court as
> sufficiently comprehensive to warrant treatment under section
> 524(g) of the Bankruptcy Code; and *further provided,* for the
> avoidance of doubt, that an Asbestos Insurance Entity is a Settled
> Asbestos Insurance Company to the fullest extent, but only to the
> extent, provided by section 524(g) in respect of any claim that
> arises by reason of one of the activities enumerated in section
> 524(g)(4)(A)(ii).

Joint Plan § 1.1.200.  Asbestos Insurance Settlement Agreement, in turn, means the following:

> any settlement agreement between or among any of the Debtors,
> the Reorganized Debtors, the Nondebtor Affiliates, or any of them
> or their predecessors, and any Asbestos Insurance Entity involving
> any Asbestos Insurance Policy, *provided, however,* that the term
> "Asbestos Insurance Settlement Agreement" shall not include
> Asbestos In-Place Insurance Coverage.

Joint Plan § 1.1.14.

25.    Exhibit 5 lists the Settled Asbestos Insurance Companies.  Exhibit 5 details each

Asbestos Insurance Policy under which the Debtors' rights were or will be transferred via an

Asbestos Insurance Settlement Agreement.  However, neither Exhibit 5 nor any other Plan

Document ascribes a value to the rights so transferred.  Additionally, although some of the

settlements between the Debtors and its insurers have occurred since the filing of this case, most

have not; in fact, the majority of settlements occurred in 1995 or earlier.

26.    Other injunctions contained in the Joint Plan are the Discharge described in

Section 8.1, the Asbestos PD Channeling Injunction described in Section 8.3, the Successor

000011

XXX-000759

Claims Injunction described in Section 8.5, Injunctions and Releases Related to the Sealed Air

Indemnified Parties and Fresenius Indemnified Parties described in Section 8.6, and Additional

Releases and Indemnification described in Section 8.8 (collectively, the "Releases"). See Joint

Plan §§ 8.1, 8.3, 8.5, 8.6, 8.8.


### OBJECTIONS TO CONFIRMATION OF THE JOINT PLAN

27.     In order to be confirmed, a plan must comply with all the requirements of Section

1129(a) of the Bankruptcy Code.  In addition, a plan that includes a channeling injunction

pursuant to Section 524(g) must comply with that subsection's requirements.  The proponent has

the burden of establishing that the requirements for a confirmable chapter 11 plan are met. See,

e.g., In re H.H. Distributions, L.P., 400 B.R. 44, 50 (Bankr. E.D. Pa. 2009).  As explained in

detail below, the Plan Proponents have not met this burden, and confirmation of the Joint Plan

should be denied.


I.    **THE JOINT PLAN IS UNCONFIRMABLE BECAUSE IT IMPROPERLY SEEKS TO ENJOIN CLAIMS AND DEMANDS AGAINST NONDEBTOR THIRD PARTIES THAT HAVE NOT MADE AND WILL NOT MAKE A SUBSTANTIAL FINANCIAL CONTRIBUTION TO THE PI TRUST.**

28.     Generally, a bankruptcy injunction cannot bar actions against nondebtor third

parties.  Section 524(e) of the Bankruptcy Code expressly states that the "discharge of a debt of

the debtor does not affect the liability of any other entity or the property of any other entity for

such debt." 11 U.S.C. § 524(e).  Section 524(g) provides a *limited* exception to Section 524(e).

Specifically, Section 524(g)(4)(A)(ii) explains that notwithstanding Section 524(e), a Section

524(g) injunction "may bar any action directed against a third party" but only (1) if the third

party "is identifiable from the terms of such injunction"; (2) if the third party "is alleged to be

000012

XXX-000760

directly or indirectly liable for the conduct of, claims against, or demands on the debtor"; and (3) "to the extent such alleged liability of such third party arises by reason of [certain enumerated relationships]." 11 U.S.C. § 524(g)(4)(A)(ii).  A nondebtor insurer is eligible for protection by a Section 524(g) injunction, provided that the insurer's liability "arises by reason of . . . the third party's provision of insurance to the debtor." 11 U.S.C. § 524(g)(4)(A)(ii)(III).  Finally, and most importantly, such injunction can validly enjoin actions against the nondebtor third party *only if* the injunction is "fair and equitable *with respect to the persons that might subsequently assert [] demands*, in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third party." 11 U.S.C. § 524(g)(4)(B)(ii) (emphasis added).

   29.    The Channeling Injunction, Asbestos Insurance Entity Injunction and Releases are impermissible as they purport to protect nondebtor parties that have not made the required substantial financial contribution under the Joint Plan.  It is well settled that any nondebtor third party that will be protected by a Section 524(g) channeling injunction (or any third-party injunction in bankruptcy) must make a substantial contribution to the debtor's asbestos personal injury trust.  See, e.g., In re Burns & Roe Enters., Inc., 2009 WL 438694, *33, 35 (D.N.J. Feb. 23, 2009); In re Congoleum Corp., 362 B.R. 167, 179-80 (Bankr. D.N.J. 2007); In re ABB Lummus Global, Inc., 2006 WL 2052409, * 20 (Bankr. D. Del. 2006); In re Kaiser Alum. Corp., 2006 WL 616243, *17 (Bankr. D. Del. 2006).  The touchstone of a substantial contribution is that it must "allow for distributions *that would not otherwise be available* but for the contribution made by such nondebtor parties." In re ABB Lummus Global, 2006 WL 2052409, * 20 (emphasis added).

000013
XXX-000761

**A.**     ***The Asbestos PI Channeling Injunction Amounts to an Unlawful Bankruptcy Discharge in Favor of the Settled Asbestos Insurance Companies, Which Are Not Contributing to the PI Trust.***

30.     The Joint Plan is unconfirmable because the Channeling Injunction provides a de facto bankruptcy discharge to nondebtors, namely, the Settled Asbestos Insurance Companies, which are not contributing to the PI Trust.  For a Settled Asbestos Insurance Company to be protected by the Channeling Injunction, the Joint Plan only requires that the Settled Asbestos Insurance Company be party to an Asbestos Insurance Settlement Agreement and be listed by the Plan Proponents in Exhibit 5.  Joint Plan § 1.1.200.  The Plan Proponents, who have the burden of establishing all elements for plan confirmation, have failed to establish that any of the Settled Asbestos Insurance Companies are contributing to the PI Trust.  To the contrary, the ACC's representative testified at his deposition that the Settled Asbestos Insurance Companies "are not being asked for any new money," acknowledging that any monies previously paid by such insurers to W. R. Grace had been paid "in the past," was "fungible," and "went into W. R. Grace's coffers, went out or didn't go out, et cetera." Depo. of Peter Lockwood, Tr. at 132:8-13.

31.     The Plan Proponents' suggestion[7] that a debtor can gratuitously designate a portion of its own contribution to the Section 524(g) trust "on behalf of" a nondebtor, and thereby extend the channeling injunction to that nondebtor, is inconsistent with the Bankruptcy Code.  While the statute does use the phrase "on behalf of," see 11 U.S.C. § 524(g)(4)(B)(ii), such language simply means "by."  See ABB Lummus Global, 2006 WL 2052409, *20.  Any other reading would allow a debtor to arbitrarily include *any* third party as a "designee" of a portion of the debtor's contribution and thus clearly subvert the universally accepted intent of Section 524(g)(4)(B)(ii), namely, to provide for distributions to future claimants that would not be available absent "the contribution made *by* such nondebtor parties." Id. (emphasis added).

---

[7] See, e.g., Depo. of Peter Lockwood, Tr. at 534-35.

000014

XXX-000762

32.     Significantly, the benefit required by Section 524(g)(4)(B)(ii) is a benefit *to the trust*, not to the postconfirmation debtors.  11 U.S.C. § 524(g)(4)(B)(ii) ("fair and equitable . . . **in light of the benefits provided, or to be provided, to such trust**") (emphasis added).  Such a benefit is absent here.  The Plan Proponents have asserted that the PI Trust would benefit because, they maintain, the Channeling Injunction would absolve the Settled Asbestos Insurance Companies of liability to nondebtor third parties that may give rise to indemnification claims against the Reorganized Debtors or the PI Trust.  Depo. of Peter Lockwood, Tr. at 132.  For a series of reasons, this flawed logic does not support any cognizable "benefit" to the PI Trust.

33.     First, any contractual indemnification claim of the Settled Asbestos Insurance Company against W. R. Grace arising from a pre-petition settlement agreement must be either a *pre-petition* general unsecured claim or an "asbestos" claim.  Thus, no "deal"[8] is required for the Plan Proponents to treat the insurers' indemnity claims under the Joint Plan, either as channeled asbestos claims or Class 9 claims.  See 11 U.S.C. § 524(g); see also Avellino & Bienes v. M. Frenville Co., Inc. (In re M. Frenville Co., Inc.), 744 F.2d 332 (3d Cir. 1984).[9]  Whether such a claim is an asbestos claim or merely a contract claim, it could never properly be asserted against the Reorganized Debtors.  If such claims are properly characterized as asbestos claims, they are already channeled to the injunction without the need to extend the Channeling Injunction to benefit those Settled Asbestos Insurance Companies.  If, instead, such pre-petition contractual indemnification claims are general unsecured claims, they can be treated and paid as a Class 9 Claim, also without the need to extend the Channeling Injunction to those nondebtors.  Thus, the

---

[8] See Depo of Peter Lockwood, Tr. at 132-133:22-5 ("So the deal is channel any such claim that might give rise to the asbestos indemnity claim to the Trust, and in exchange for that, part of what W. R. Grace is paying you is to get rid of asbestos PI claims which include indirect asbestos PI claims for indemnity or direct asbestos PI claims for indemnity.")

[9] Even if one were to argue that such contractual indemnification claims could be post-confirmation claims against the Reorganized Debtors that would not fall within the Bankruptcy Code's definition of "demand," the only benefit of extending the Channeling Injunction in such an instance would be to the Reorganized Debtors—not to the PI Trust as required by Section 524(g)(4)(B)(ii).

- 15 -

000015

XXX-000763

potential existence of certain indemnification claims of the Settled Asbestos Insurance Companies against the Debtors provides no foundation for the extension of the Channeling Injunction to those insurance companies.

34.    Second, whether the Settled Asbestos Insurance Companies are protected by an injunction or not, the net effect to the PI Trust would be the same, because Insurance-Related TDP Claims will eventually be asserted against the PI Trust, either by the Insurance-Related Claimants or the Settled Asbestos Insurance Companies. If the Insurance-Related Claimants are enjoined from asserting claims against Settled Asbestos Insurance Companies, those claims would be channeled and therefore payable by the PI Trust. If, on the other hand, the Insurance-Related TDP Claims are not enjoined, the Insurance-Related Claimants would pursue them against the Settled Asbestos Insurance Companies, and the Settled Asbestos Insurance Companies would assert their indemnification claims against the PI Trust in the same amount. In either event, there would be one claim against the Asbestos PI Trust, and in no event would the Settled Asbestos Insurance Companies have a right to assert a claim against the Reorganized Debtors. This demonstrates that, contrary to the Plan Proponents' assertions, the PI Trust will derive no economic benefit from extending the Channeling Injunction to the Settled Asbestos Insurance Companies.

35.    Additionally, the Plan Proponents have not satisfied their burden of showing that a portion of Debtors' contribution to the PI Trust is actually made on behalf of the Settled Asbestos Insurance Companies. Certainly, the Plan Proponents' uncorroborated and self-serving statements that they are doing so is not persuasive evidence that any such contribution is being made. Cf. Depo. of Peter Lockwood, Tr. at 534-35. Further, nothing in the record demonstrates that the Debtors' contribution has been or will be increased by extending the Channeling

000016

XXX-000764

Injunction to cover the nondebtor Settled Asbestos Insurance Companies. In fact, the Plan Proponents have not even attempted to apportion Debtors' contributions to the PI Trust among the parties on whose behalf they are allegedly being made. Depo. of Peter Lockwood, Tr. at 562. The most plausible inference from this dearth of evidentiary support is that the Debtors are really only making a contribution for their own account, and yet, for reasons unrelated to increasing the distribution to future claimants, are asking this Court to enjoin claims against nondebtors who are not giving value to the Asbestos PI Trust—much less, value in an amount proportional to the benefit those nondebtors would receive.

36. Furthermore, many of the Settled Asbestos Insurance Companies settled their liability to W. R. Grace more than 15 years ago. Joint Plan Ex. 5. Now, the Settled Asbestos Insurance Companies are seeking a windfall bankruptcy injunction without adding a penny of their own money to the PI Trust. Depo. of Peter Lockwood, Tr. at 132. As discussed above, therefore, adding them to the Asbestos Protected Party list would not benefit the PI Trust or the Debtors.

37. To comply with Section 524(g), any injunction must be limited to named entities that this Court, after notice and an opportunity for all interested parties to be heard, determines are making a *substantial* financial contribution to the PI Trust. Section 524(g) requires the Plan Proponents to prove that the consideration provided to the PI Trust by each proposed protected party is so substantial that the injunction in its favor is fair and equitable in light of that consideration. Since the Channeling Injunction and the Asbestos Insurance Entities Injunction appear to protect insurers regardless of whether they are substantially contributing to the PI Trust, these provisions render the Joint Plan unconfirmable as a matter of law, and any nondebtor claims against Settled Asbestos Insurance Companies cannot be enjoined.

- 17 -

XXX-000765

**B.**     ***The Asbestos Insurance Entity Injunction Is Improper Under Section 105 of the Bankruptcy Code.***

38.     The Joint Plan is further unconfirmable because it would create a second channeling injunction, the Asbestos Insurance Entity Injunction, purportedly under the authority of Section 105, and contrary to Section 524(g)'s requirements.   The United States Court of Appeals for the Third Circuit has clearly ruled that Section 105 cannot be used to create a second channeling injunction that would enjoin actions that cannot be enjoined under Section 524(g):

> Because Section 524(g) expressly contemplates the inclusion of third parties' liability within the scope of a channeling injunction – and sets out the specific requirements that must be met in order to permit inclusion – **the general powers of § 105(a) cannot be used to achieve a result not contemplated by the more specific provisions of § 524(g)**.

In re Combustion Engineering, Inc., 391 F.3d 190, 237 (3d Cir. 2004) (emphasis added).

39.     Nevertheless, the Plan Proponents ask this Court to approve a channeling injunction under Section 105 that does not meet the specific requirements of Section 524(g).   Under the Asbestos Insurance Entity Injunction:

> All Entities that have held or asserted, that hold or assert, or that may in the future hold or assert, any claim or cause of action against any Asbestos Insurance Entity, based upon, or arising out of, any Asbestos PI Claim against the Debtors or any Asbestos Insurance Rights, whenever and wherever arisen or asserted . . . shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly claiming, collecting, recovering, or receiving any payment, recovery, satisfaction, or any other relief whatsoever on, of, or with respect to any such claim or cause of action. . . .

Joint Plan § 8.4.1.1.  The Asbestos Insurance Entity Injunction applies to "*any* Entity . . . that has or had actual or potential liability, duties or obligations under or with respect to, any Asbestos Insurance Policy."  Joint Plan § 1.1.10 (definition of Asbestos Insurance Entity) (emphasis added).  By definition, the Asbestos Insurance Entity Injunction not only enjoins third-party

- 18 -

**000018**

XXX-000766

actions against nondebtor Settled Asbestos Insurance Companies, but also enjoins such actions against Nonsettling Asbestos Insurance Companies. Contrary to the Joint Plan's statement that "[t]he Asbestos Insurance Entity Injunction is not issued for the benefit of any Asbestos Insurance Entity," Joint Plan § 8.4.1.1(c), this injunction necessarily—and improperly—would include the Nonsettling Asbestos Insurance Companies within its scope, despite their failure to satisfy the requirements for inclusion in the Section 524(g) injunction.

40.    The proposed Asbestos Insurance Entity Injunction purports to protect third parties that a Section 524(g) injunction could not protect. It would enjoin Asbestos PI Claims against the Nonsettling Asbestos Insurance Companies even though they are not making any contribution to the PI Trust. Nor do the Debtors contend that they are making any contribution on these insurers' behalf (which they do contend with respect to the Settled Asbestos Insurance Companies, albeit wrongly). Consequently, the Asbestos Insurance Entity Injunction would be invalid under Section 524(g), which, as noted, requires that a channeling injunction be "fair and equitable with respect to the persons that might subsequently assert [] demands, in light of the benefits provided, or to be provided, to such trust on behalf of . . . such third party." 11 U.S.C. § 524(g)(4)(B)(ii). As discussed in greater detail above (with regard to the Settled Asbestos Insurance Companies), a third party that makes no contribution cannot be protected by a channeling injunction under Section 524(g). If the Joint Plan is confirmed with the broad Asbestos Insurance Entity Injunction, insurers who have not settled—whom the Plan Proponents have acknowledged have contributed "no[thing]"[10] to the Joint Plan—would unlawfully obtain the benefit of an injunction that effectively releases them from liability to any third party.[11]

---

[10] See Depo. of Peter Lockwood, Tr. at 343-344:20-2 (Nonsettling Insurers contributions to the Joint Plan are "none").

[11] One of the Plan Proponents (Richard Finke on behalf of W. R. Grace) testified that "if" a claim against a Nonsettling Asbestos Insurance Companies qualifies as an "Asbestos PI Claim", then it would be processed and paid

- 19 -

XXX-000767

41.    Another fatal flaw with the Joint Plan is that, while the Asbestos Insurance Entity Injunction expressly *enjoins* claims against Nonsettling Asbestos Insurance Companies, the Joint Plan fails to make any provision for the channeling, treatment or payment of such enjoined claims.  Cf. TDP § 5.12.  Indeed, the TDP is silent on how claims against the Nonsettling Asbestos Insurance Companies purportedly enjoined and channeled by the Asbestos Insurance Entity Injunction would be adjudicated or paid.  In contrast, the TDP explains in detail how claims of Scotts and others against *Settled* Asbestos Insurance Companies will be treated, giving them *sui generis* status.  TDP § 5.12.  However, claims against *Nonsettling Asbestos Insurance Companies* would apparently be channeled to a black hole.[12]  Enjoining future demands against a Nonsettling Asbestos Insurance Company without making a provision for its payment violates the express terms of the Section 524(g), and Section 105 cannot be used to circumvent that requirement.  See 11 U.S.C. § 524(g)(5)(C) (a demand for future payment that is enjoined "is to be paid" by the trust).  In short, the Asbestos Insurance Entity Injunction would improperly enjoin claims against such Nonsettling Asbestos Insurance Companies with no provision for resolving such claims through the Joint Plan or PI Trust assets.

42.    Under <u>Combustion Engineering</u> and Section 524(g) of the Bankruptcy Code, the Asbestos Insurance Entity Injunction cannot be part of a confirmed plan.  That injunction would

---

by the PI Trust as such.  However, the definition of Asbestos PI Claim does not include claims against Nonsettling Asbestos Insurance Companies; rather, it states that Asbestos PI Claims are limited to claims against Debtors or "Asbestos Protected Parties," and Nonsettling Asbestos Insurance Companies fall into neither category.

[12]  The Plan Proponents may argue that Scotts' claims against Nonsettling Asbestos Insurance Companies are garden variety Asbestos PI Claims, a/k/a PI Trust Claims.  Even if so, however, the TDP does not implement procedures for addressing such claims by Scotts.  The TDP assumes that PI Trust Claims are made by physically injured parties themselves, not claimants such as Scotts: "claimants seeking resolution of unliquidated PI Trust Claims must first file a proof of claim form, together with the required supporting documentation. . . . The proof of claim form shall require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing."  TDP § 5.3.  Of course, Scotts does not have or qualify for a Disease Level, nor is it likely to have the documentation the PI Trust requires a claimant to file with its proof of claim form.  The TDP recognizes these differences between Scotts and a direct personal injury claimant in establishing treatment for claims against the Settled Asbestos Insurance Companies, but – with no rational distinction – does not do so for claims against the Nonsettling Asbestos Insurance Companies.

- 20 -

improperly enjoin asbestos-related actions that a channeling injunction under Section 524(g) could not enjoin. As a matter of settled Third Circuit law and Section 524(g), therefore, confirmation of the Joint Plan must be denied and any claims against Nonsettling Asbestos Insurance Companies cannot be enjoined.

43.   Even were this Court to permit the use of Section 105(a) in conflict with Section 524(g) to justify the Asbestos Insurance Entity Injunction, at a minimum, the Joint Plan must provide a mechanism to channel and pay any enjoined claims or demands against the Nonsettling Asbestos Insurance Companies in addition to the existing provisions for the channeling and payment of claims or demands against the Settled Asbestos Insurance Companies.

> **C.   *This Court Lacks Subject Matter Jurisdiction to Issue the Channeling Injunction to Enjoin Claims Against the Settled Asbestos Insurance Companies or to Issue the Asbestos Insurance Entity Injunction.***

44.   For the above stated reasons, this Court lacks subject matter jurisdiction to issue the Channeling Injunction to the extent that it would enjoin claims of nondebtors against the Settled Asbestos Insurance Companies. Further, this Court lacks subject matter jurisdiction to issue the Asbestos Insurance Entity Injunction. Specifically, a bankruptcy court has no jurisdiction to confirm a plan that contains third party releases outside the scope of the Bankruptcy Code. See, e.g., Combustion Engineering, 391 F.3d at 237; In re Forty-Eight Insulations, Inc., 133 B.R. 973, 978 (Bankr. N.D. Ill. 1991), aff'd, 149 B.R. 860 (N.D. Ill. 1992).

> **D.   *The Releases are Improper to the Extent that the Releases Seek to Release Nondebtors Beyond the Scope Permitted Under the Bankruptcy Code.***

45.   Further, for the reasons discussed more fully above, the Joint Plan is not confirmable to the extent that the Releases likewise seek to improperly release nondebtors beyond the scope permitted under the Bankruptcy Code, including, but not limited to, Sections 524(e) and 524(g) of the Bankruptcy Code.

000021

XXX-000769

II.    **THE JOINT PLAN IS UNCONFIRMABLE BECAUSE IT IMPROPERLY
CLASSIFIES MATERIALLY DIFFERENT CLAIMS IN CLASS 6 AND
THEREFORE VIOLATES SECTION 1129(A)(1) OF THE BANKRUPTCY CODE.**

46.    A chapter 11 plan must classify claims within the boundaries established by
Section 1122 of the Bankruptcy Code. Section 1129(a)(1) of the Bankruptcy Code requires that
a plan comply with other applicable Bankruptcy Code provisions. One such "applicable
provision" is Section 1122. To satisfy Section 1122, a classification scheme must have a
reasonable basis for its structure, and the claims or interests within each particular class must be
substantially similar. In re Armstrong World Indus., Inc., 348 B.R. 136, 158 (D. Del. 2006). "A
proper determination of whether claims are 'substantially similar' focuses on the nature of the
claims," that is, "the legal attributes of the claims and not upon the status or circumstances of the
claimant." In re Coram Healthcare Corp., 315 B.R. 321, 349 (Bankr. D. Del. 2004).

47.    Here, the Plan improperly classifies materially different claims into one class,
Class 6. The "PI Trust Claims" channeled to the PI Trust include Asbestos PI Claims, Indirect
PI Trust Claims, Insurance-Related TDP Claims, and Indemnified Insurer PI Trust Claims.

48.    While Asbestos PI Trust Claims may all hinge on the *factual* underpinning of W.
R. Grace vermiculite, the *legal* bases for these claims are not substantially similar, because the
coinsured parties have property rights while the other three categories of claimants do not. A
coinsured, named or unnamed, is an intended third party beneficiary of an insurance policy and
therefore has a property interest in its proceeds. See, e.g., State Farm Fire & Cas. Co. v.
Nationwide Mut. Ins. Co., 596 F. Supp. 2d 940, 946 (E.D. Va. 2009). Unlike an unsecured
claimant whose claim for damages against a debtor is guaranteed by a nondebtor, a coinsured has
a direct claim against insurance policies (a property right). Cf., e.g., In re Frascella Enters., Inc.,
360 B.R. 435, 443 (Bankr. E.D. Pa. 2007) (finding that "the existence of a third party guarantee

- 22 -

does not require separate classification"). A claim against property is legally dissimilar from a general unsecured claim.

### III.    THE JOINT PLAN IS NOT CONFIRMABLE BECAUSE IT IS NOT PROPOSED IN GOOD FAITH.

49.    Section 1129(a)(3) of the Bankruptcy Code provides that a plan must be proposed in good faith. Here, for the reasons set forth above, the Joint Plan is unconfirmable because it is not proposed in good faith.

### CONCLUSION

For the foregoing reasons, Scotts objects to confirmation of the Joint Plan and requests that the Court deny such confirmation.

000023

XXX-000771

DATED:  May 20, 2009

Respectfully submitted,

/s/Tiffany Strelow Cobb
Robert J. Sidman (OH Bar No. 0017390)
(admitted *pro hac vice*)
Tiffany Strelow Cobb (OH Bar No. 0067516)
(admitted *pro hac vice*)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH  43215
Telephone: (614) 464-6400
Facsimile: (614) 719-4663

-and-

Robert J. Stearn, Jr. (No. 2915)
Cory D. Kandestin (No. 5025)
One Rodney Square
P.O. Box 551
Wilmington, DE  19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for The Scotts Company LLC and
certain of its related entities*

- 24 -

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
-   -   -

In Re:                    : Chapter 11
                          :
                          : Case No.
W.R. GRACE & CO., et al,  : 01-01139 JKF
                          :
                          : (Jointly
          Debtors         : Administered)


-   -   -

Friday, May 1, 2009

-   -   -

Oral deposition of PETER VAN

N. LOCKWOOD, ESQUIRE, taken pursuant to

notice, was held at the offices of CAPLIN

& DRYSDALE, One Thomas Circle N.W., Suite

1100, Washington, DC  20005, commencing

at 9:43 a.m., on the above date, before

Lori A. Zabielski, a Registered

Professional Reporter and Notary Public

in and for the Commonwealth of

Pennsylvania.


-   -   -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

**EXHIBIT A**

Page 130

1    form.
2        THE WITNESS:
3    Hypothetically, probably yes.  It
4    would be more difficult, but,
5    hypothetically, yes.  You could
6    have -- we have had some plans
7    that had coverage in place
8    agreements with insurers, for
9    example, that we felt satisfied
10    524(g).  But you have to get the
11    insurers' agreement to have a
12    coverage in place agreement.
13    BY MR. BROWN:
14        Q.    Okay.  Let's go now to
15    condition (r) -- I am sorry.  Condition
16    (s).
17        A.    Yes.
18        Q.    Now, for purposes of my
19    question, I want you to assume that when
20    I use the term "settled asbestos
21    insurance companies," I want you to
22    assume that that are pre-petition.
23        A.    Okay.
24        Q.    And my question is a very

Page 131

1    general one, because I have heard
2    different views, and that is, what
3    benefits are being provided by or on
4    behalf of settled asbestos insurance
5    companies listed on Exhibit-5?
6        A.    It is the position of the
7    ACC that Grace is paying close to
8    $3 billion of value to the Trust on
9    behalf of not only itself but a variety
10    of other protected parties, including
11    Non-Debtor affiliates and, in this
12    particular case, settled asbestos
13    insurers.
14        And it is doing so on behalf
15    of settled asbestos insurers because
16    those insurers have indemnity claims
17    against Grace, which are being, if they
18    hypothetically could ever occur, are
19    being channelled to the Trust as a means
20    of protecting Grace against such -- well,
21    let me back up.
22        The purpose of putting
23    settled asbestos insurers in here is not
24    to provide a gratuitous asbestos insurers

Page 132

1    because we think they are nice folks.
2        Q.    I didn't think so.
3        A.    Settled asbestos insurers,
4    by definition, are insurers that have
5    indemnity rights against Grace.
6        Q.    They have also paid a lot of
7    money?
8        A.    And they paid a lot of money
9    in the past.  But the past money -- money
10    is fungible.  The past money went into
11    Grace's coffers, went out or didn't go
12    out, et cetera.  But they are not being
13    asked for any new money.
14        But Grace has an economic
15    interest in not having asbestos PI claims
16    brought against those insurers that could
17    then trigger an indemnity obligation of
18    Grace to the insurer against which that
19    asbestos PI claim was asserted.  They
20    have an economic interest in preventing
21    that.
22        So the deal is channel any
23    such claim that might give rise to the
24    asbestos indemnity claim to the Trust,

Page 133

1    and in exchange for that, part of what
2    Grace is paying you is to get rid of
3    asbestos PI claims which include indirect
4    asbestos PI claims for indemnity or
5    direct asbestos PI claims for indemnity.
6        Q.    Okay.
7        A.    And that's the basis.
8        Q.    I think you said at the very
9    beginning of either the last question or
10    the one before that Grace was
11    contributing 3 million?
12        A.    Billion.
13        Q.    That's what I thought.
14    Okay.  I just wanted to make sure I had
15    the number correct.
16        A.    I mean, that's our view of
17    the approximate amount of what they were
18    contributing at the time we made the
19    deal, I guess would be a better way to
20    put it.  There are other people that
21    might value it differently.
22        Some of things that were
23    worth more at the time the deal was made
24    are worth less today but hopefully will

EXHIBIT A
000026

XXX-000774

Page 342

1    conclusions.
2         If I understand the question
3    -- and I don't purport to be an
4    expert, and I don't actually
5    recall considering this question
6    before -- it's my understanding
7    that so-called unlimited defense
8    rights don't survive the
9    exhaustion of the indemnity
10   limits, if any, on a policy.
11        And so the question, as
12   stated, is, I think, unanswerable
13   because the answer would depend on
14   whether the indemnity rights of
15   whatever policy you are asking
16   about were or would be exhausted.
17   BY MS. COBB:
18       Q.   But if the policy is not
19   exhausted and defense costs for one
20   insured does not erode the policy limits,
21   would you agree that as to another
22   insured it doesn't affect that insured's
23   property interest?
24        MS. HARDING:  Object to

Page 343

1    form, and speculation and legal
2    conclusion.
3         MR. FINCH:  Same set of
4    objections.
5         THE WITNESS:  Well,
6    moreover, when you say it doesn't
7    affect the other property
8    interest, I don't know the answer
9    to that.  I am not competent to
10   answer that question, frankly.  I
11   am already skating on the edge of
12   my competence, and I think that
13   one takes me past it.
14   BY MS. COBB:
15       Q.   Okay.  Peter, I would like
16   to ask you a few questions about the
17   non-settled insurance companies as
18   defined in the Plan.
19       A.   Okay.
20       Q.   What contributions have the
21   non-settled insurance companies made to
22   the Plan?
23        MR. FINCH:  Objection, asked
24   and answered.

Page 344

1         THE WITNESS:  As far as I
2    know, none.
3    BY MS. COBB:
4        Q.   If the non-settled insurance
5    companies are not making a contribution
6    to the Plan, would you agree then that
7    they are not entitled to 524(g)
8    protection?
9         MS. HARDING:  Object to
10   form.
11        THE WITNESS:  Well, if they
12   are not making a contribution and
13   nobody else is making a
14   contribution on their behalf, then
15   I would agree that under the
16   statute, it would be hard to see
17   how they would be entitled to
18   protection under Section 524(g).
19   BY MS. COBB:
20       Q.   Are the non-settled
21   insurance companies getting a benefit
22   from the asbestos insurance entity
23   injunction to the extent that the claims
24   against them are enjoined by that

Page 345

1    injunction?
2         MS. HARDING:  Object to
3    form.
4         MR. FINCH:  Object the form.
5         THE WITNESS:  I guess
6    benefit is in the mind of the
7    beholder.  I mean, the purpose of
8    the asbestos insurance entity
9    injunction, as I said earlier, is
10   to preserve insurance assets for
11   the benefit of the collective
12   beneficiaries of the Trust and not
13   allow them to be obtained
14   disproportionately and piecemeal
15   by individual claimants.
16        There may be a collateral
17   benefit to the insurers from
18   preventing such direct action
19   claims.  On the other hand, the
20   insurers might well prefer to deal
21   with those than to have to deal
22   with the Trust under the
23   assignment that creates the
24   rationale for having that

EXHIBIT A

000027

XXX-000775

```
            IN THE UNITED STATES BANKRUPTCY COURT
               FOR THE DISTRICT OF DELAWARE
                       -   -   -


    In Re:                   : Chapter 11
                             :
                             : Case No.
    W.R. GRACE & CO., et al, : 01-01139 JKF
                             :
                             : (Jointly
                Debtors      : Administered)



                       -   -   -


               Monday, May 4, 2009

                       -   -   -


             Continuation of oral

    deposition of PETER VAN N. LOCKWOOD,

    ESQUIRE, taken pursuant to notice, was

    held at the offices of CAPLIN & DRYSDALE,

    One Thomas Circle N.W., Suite 1100,

    Washington, DC  20005, commencing at

    12:05 p.m., on the above date, before

    Lori A. Zabielski, a Registered

    Professional Reporter and Notary Public

    in and for the Commonwealth of

    Pennsylvania.
                       -   -   -
                MAGNA LEGAL SERVICES
                  Seven Penn Center
                 1635 Market Street
                      8th Floor
          Philadelphia, Pennsylvania 19103
```

**EXHIBIT A**

**000028**

XXX-000776

Page 534

1    hypothetical circumstances that
2    might produce the result that you
3    posit.
4    BY MR. WISLER:
5        Q.    Well, in your answer, you
6    said that there are certainly scenarios
7    where such a ruling could, I think you
8    used the word, blowup the Plan.
9        What would be some examples
10    of that?
11        MR. FINCH: Objection, form.
12        MS. BAIER: Objection, calls
13    for speculation.
14        THE WITNESS: The Plan
15    provides that a list in Exhibit-5
16    of settled insurers are entitled
17    to be protected parties under the
18    Plan. The rationale for that, as
19    I said earlier, was that they had
20    potential indemnity claims against
21    W.R. Grace.
22        If, hypothetically, the
23    court interpreted the statute to
24    say that the on-behalf-of, that

Page 535

1    Grace somehow or another couldn't
2    make a contribution on behalf of
3    those settled insurers because
4    they weren't putting in fresh
5    money into the Plan so that Grace
6    was left with no protection
7    against indemnity claims because
8    no claims against those insurers
9    were being brought, that would go
10    pretty far way to blowing up the
11    Plan. At a minimum, it would
12    require a whole renegotiation of
13    the Plan, in my opinion, as to
14    that hypothetical.
15    BY MR. WISLER:
16        Q.    Because if an insurer -- let
17    me make sure I understand what you are
18    saying.
19        You said that would go a
20    long way towards destroying the Plan. Is
21    that because, for instance, if a settled
22    asbestos insurer with indemnity rights
23    were not protected, then their indemnity
24    claims would no longer be properly listed

Page 536

1    as Class 6 claims or no longer properly
2    channelled?
3        MR. FINCH: Object to form.
4        THE WITNESS: Let me back
5    up. Under bankruptcy law, a
6    bankruptcy court doesn't have a
7    line item veto under which they
8    can exercise particular provisions
9    in the Plan that they don't like
10    but go ahead and confirm the rest
11    of it. The Plan is an integrated
12    whole. Judge Fitzgerald will
13    either confirm the Plan or she
14    will deny confirmation of the
15    Plan.
16        The scenario you posit, she
17    would deny confirmation of the
18    Plan because it purported to grant
19    protected party status to entities
20    that she said couldn't be
21    protected, for whatever reason.
22    At that point, everybody involved
23    in this bankruptcy would have to
24    sit down and figure out how to

Page 537

1    deal with the problem that was
2    created by that. And I have no
3    idea how we would deal with the
4    problem that would be created by
5    that outcome.
6        We certainly haven't -- we
7    don't -- if the question is have
8    we got a backstop Plan in the
9    hopper that we can lay on the
10    table, the answer is no.
11    BY MR. WISLER:
12        Q.    What if the ruling was not
13    so global per the example you gave, but
14    individual, to say that one settled
15    asbestos insurance company, for whatever
16    reason, had not given or provided or
17    there was not adequate consideration
18    provided on behalf of that settled
19    asbestos settled insurer?
20        MR. FINCH: Objection to
21    form, speculation.
22        MS. BAIER: Objection. He's
23    just answered that one.
24        THE WITNESS: Yeah, I don't

**EXHIBIT A**

**000029**

XXX-000777