# EXHIBIT 9

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | x : | **Chapter 11** |
| **W. R. GRACE & CO., et al.,**[1] | : : | **Case No. 01-1139 (JKF)** |
| | : | **(Jointly Administered)** |
| **Debtors.** | : | |
| | : | Objection Deadline: February 6, 2009 at 4:00 p.m. |
| | : | Hearing Date: February 23, 2009 at 10:30 a.m. |
| | x | |

## MOTION OF KANEB PIPE LINE OPERATING PARTNERSHIP, L.P. AND SUPPORT TERMINAL SERVICES, INC. FOR AN ORDER MODIFYING THE AUTOMATIC STAY

Kaneb Pipe Line Operating Partnership. L.P. and Support Terminal Services. Inc. (collectively. "**Kaneb**") hereby move this Court for entry of an order under section 362(d) of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") modifying the automatic stay to allow Kaneb and Debtor Grace Energy Corporation to continue prosecution of their respective cross-appeals in an environmental liability action pending in the Texas Court of Appeals. Resolution of the cross-appeals is critical to protection of Kaneb's rights both within these bankruptcy proceedings and in respect of third-parties, including the United States government. In respect of this Motion, Kaneb respectfully states the following:

### Jurisdiction

1.      This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion is proper in this district pursuant to §§ 1408 and 1409.

2.      The statutory predicate for the relief requested herein is section 362(d)(1) of the Bankruptcy Code.

---

[1] The Debtors consist of 62 entities, including W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.) and the particular debtor involved in this Motion, Grace Energy Corporation.

**EXHIBIT**

PENGAD 800-631-6989

**OS-40**

**000001**

**XXX-001079**

## Background

3.        This motion seeks modification of the automatic stay in order to permit Kaneb and Debtor Grace Energy Corporation ("GEC") to finally resolve a dispute over their respective rights and obligations arising out of a pipeline spill which allegedly occurred more than 35 years ago in Massachusetts. As set forth in detail below, GEC and Kaneb each assert the other is ultimately responsible for the environmental damages sought by state and federal authorities.

4.        The dispute was litigated in the 191st District Court of Dallas County, Texas, from 1997 through 2000. See Exhibit K1[2] (Plaintiffs Third Amended Original Petition) and Exhibit K2 (Defendants' Seventh Amended Original Answer, Verified Denials, Affirmative Defenses, and Counterclaims). After a jury trial, the trial court rendered an Amended Final Judgment on August 30, 2000 ("**State Court Judgment**"). Exhibit K3. Both parties appealed. Exhibit K4 (Kaneb Notice of Appeal) and Exhibit K5 (GEC Notice of Appeal). In 2001, while the cross-appeals were pending in the Court of Appeals for the Fifth District of Texas, in Dallas (the "**Texas Appellate Court**"), GEC filed its voluntary petition in bankruptcy, invoking the automatic stay. The Texas Appellate Court, invoking its rules, suspended the entire appellate proceedings. Exhibit K6 (Abatement Order). No briefing, argument or judgment has occurred in the Texas Appellate Court.

5.        Kaneb seeks modification from the automatic stay now, because after more than seven (7) years of bankruptcy proceedings, GEC and its fellow debtors are attempting to use their proposed plan of reorganization to fix liabilities which should only be determined by the Texas Appellate Court, as mandated by the *Rooker/Feldman* doctrine. Moreover, unless the Texas Appellate Court is freed to decide the issues before it, Kaneb may be subjected to

---

[2] Because of the volume of Exhibits, the Exhibits are only being served on Debtors' counsel, the United States Trustee and Unsecured Creditors' Committee Counsel. If any other parties-in-interest want a copy of the Exhibits, they may obtain them by request to Movants' counsel.

{08088}60165110.1                           - 2 -

000002

XXX-001080

attempted invocation of collateral estoppel[3] in other actions.  Finally, in order to fully participate in GEC's plan, Kaneb must be able to liquidate its rejection damages in connection with an executory contract at the center of the dispute before the Texas Appellate Court.

### The GEC Sale To Kaneb, The Otis Pipeline And The Environmental Liabilities

6.      In 1993, Kaneb purchased certain GEC subsidiaries (the "**Acquired Companies**") pursuant to a purchase agreement and plan of merger (the "**Merger Agreement**" or the "**Transaction**") with GEC.  Exhibit K7 (Merger Agreement, without attachments).  Under the Merger Agreement, GEC first caused the merger of the Acquired Companies into Support Terminal Services, Inc.  Next, Kaneb acquired the stock of Support Terminal Services, Inc., subject to the terms and conditions of the Merger Agreement.

7.      It has been alleged in the Texas Action that prior to the Transaction, one of the Acquired Companies had owned a fuel pipeline which previously served Otis Air Force Base on the Massachusetts Military Reservation in Sandwich, Massachusetts (the "**Otis Pipeline**").  In the early 1970s, approximately 70,000 gallons of aviation gasoline and jet fuel allegedly was accidentally released from the Otis Pipeline, causing environmental damage to nearby property.  In the 1990s, the Commonwealth of Massachusetts and the United States engaged in remediation efforts with respect to the Otis Pipeline fuel release, which was determined to be a Superfund site.

8.      Ownership of the abandoned Otis Pipeline, responsibility for the fuel release, and liability for remediation costs and other liabilities, as between Kaneb and GEC under the Merger Agreement, are at the heart of the disputes which were litigated in the Texas trial court and are now on appeal before the Texas Appellate Court.

---

[3] Movants do not admit, by seeking this relief, that trial court judgment has any collateral estoppel effect, noting that this would be an issue to be decided by another court.

000003

XXX-001081

## The Litigation

9.      The Merger Agreement closed on March 2, 1993.  Under its terms, GEC and
Kaneb exchanged numerous representations, warranties and indemnities.  Among them, GEC
represented and warranted that the Acquired Companies held no liability with respect to, and
were in compliance with, all environmental laws.  GEC also expressly agreed to indemnify
Kaneb in the event such representation and warranty was inaccurate or the Merger Agreement
was breached.

10.      In 1995, the Commonwealth of Massachusetts issued notices to various parties
believed to be liable for the alleged Otis Pipeline release; and in 1997, the United States took
similar action.  Among the parties receiving a notice was Samson Hydrocarbons, which – like
Kaneb — had purchased a company and held an indemnity from GEC.  For a period of time,
Samson was able to enforce its indemnity against GEC for cleanup costs at the Otis Pipeline site.

11.      In 1997, however, GEC filed suit against Kaneb and certain of Kaneb's
subsidiaries seeking, among other things, declaratory relief that Kaneb, not GEC, was
responsible for the alleged liabilities associated with the Otis Pipeline.  Exhibit K1.

12.      Kaneb denied liability and responded with defenses and counter-claims, including
enforcement of GEC's indemnity obligation for the inaccuracy of GEC's representations and
warranties regarding environmental liabilities, and damages for breach of the Merger Agreement.
Exhibit K2.

13.      The case was tried to a jury and the State Court Judgment was entered by the
Texas trial court on August 30, 2000.  The State Court Judgment purports to incorporate prior
summary judgment orders with respect to liability for the Otis Pipeline.  Exhibit K3.  The State
Court Judgment declares that liability for the Otis Pipeline release had transferred from GEC to

000004

XXX-001082

Kaneb, that GEC did not owe indemnity to Kaneb for any liabilities related to the Otis Pipeline, and that neither party was entitled to an award on its affirmative claims.  Exhibit K3.

14.    In October 2000, Kaneb and GEC each filed timely notices of appeal in the Texas Appellate Court, initiating the proceedings styled *Kaneb Pipe Line Operating Partnership, L.P. and Support Terminal Services, Inc., Appellants and Cross-Appellees v. Grace Energy Corporation, Appellee and Cross-Appellant*, Appeal No. 05-00-01592-CV (the "**State Court Appeal**").  Exhibits K4 and K5.

15.    On April 2, 2001, GEC along with its affiliates filed these Chapter 11 bankruptcy cases.  Since then, the automatic stay of 11 U.S.C. § 362(a) and the suspension of the State Court Appeal under Texas Rule of Appellate Procedure 8, as ordered by the Texas Appellate Court, have prohibited Kaneb and GEC from prosecuting their cross-appeals.  Exhibit K6; *American Rice v. Tenzer*, 1998 Tex. App. LEXIS 7319 (Tex. App. — Houston [1st Dist.] 1998) (not designated for publication).

### The Proposed Plan Of Reorganization

16.    On September 19, 2008, debtors filed their disclosure statement and joint plan of reorganization (the "**Disclosure Statement**" and the "**Plan**").  Hearings have been held on the issue of approval of the Disclosure Statement, and it is anticipated that an amended disclosure statement and plan will be filed.

17.    Currently, the Plan provides for payment in full of all allowed general unsecured claims.  *See* Section 3.1.9 of the Plan.  The Plan also provides a discharge for the debtors pursuant to 11 U.S.C. §§ 1141 and 524.  *See* Sections 4.8 of the Disclosure Statement and 8.1 of the Plan.  Although the Merger Agreement is an executory contract under 11 U.S.C. §365, GEC has not yet filed any motion to assume or reject same; as a result, Kaneb has not yet filed a proof

000005

XXX-001083

of claim as to the Otis Pipeline; however, Kaneb will be unable to do so unless and until and the Texas appellate process is completed and the cure costs (in the event of assumption) or Kaneb's rejection damages (in the event of rejection) are subject to calculation.

### The Department Of Justice Claim Against Kaneb

18.    On October 31, 2008, the United States Department of Justice (the "**DOJ**") notified Kaneb of a claim for cleanup costs in connection with the Otis Pipeline. Exhibit K8 (without attachments). The DOJ claim represents a substantial risk to Kaneb that it will be assessed liability while the State Court Appeal remains unresolved. Upon information and belief, Kaneb alleges that the sudden assertion of the DOJ claim against Kaneb, more than 35 years after the Otis Pipeline incident, is based upon the DOJ's reading of the Plan and the fact that the State Court Appeal has not been resolved.

19.    Kaneb hereby moves this Court to modify the automatic stay so that Kaneb and GEC can resolve their cross-appeals in the State Court Appeal. Resolution of the State Court Appeal will benefit both Kaneb and the bankruptcy estates by (a) finally establishing the liabilities, if any, of the estates to Kaneb and third parties arising out the Otis Pipeline fuel release; (b) liquidating Kaneb's damages, if any, arising from rejection of the Merger Agreement (or setting the amount of cure costs in the event of assumption); (c) enabling Kaneb to pursue claims, if any, against insurers that issued policies to GEC pursuant to which Kaneb is a co-insured or otherwise may be entitled to policy proceeds, and (d) enabling Kaneb to establish defenses against the DOJ claim, and to protect itself against other parties seeking to establish rights based upon the State Court Judgment.

000006

XXX-001084

### Argument And Authorities

<u>State Court Appeal</u>

20.    Modification of the automatic stay to allow continuation of the State Court Appeal is authorized because "cause" exists under section 362(d)(1) of the Bankruptcy Code. Modification also is in the best interests of the bankruptcy estates and is in the public interest. Finality and certainty with respect to Otis Pipeline liabilities (which under the *Rooker/Feldman* Doctrine can only be decided by the Texas Appellate Court) will resolve disputed matters under the Plan, liquidate liabilities of the bankruptcy estates (or alternatively, bring funds into the estates), and allocate responsibility for the remediation cost of significant public environmental claims.

21.    Upon the commencement of these bankruptcy cases on April 2, 2001, an automatic stay went into effect pursuant to 11 U.S.C. § 362(a). Accordingly, there is a stay, applicable to all entities, prohibiting the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the bankruptcy case. 11 U.S.C. § 362(a)(1). Relief from the stay is appropriate when there is "cause" to grant such relief. 11 U.S.C. § 362(d)(1).

22.    When a debtor is involved in litigation, causes of actions *against the debtor* are stayed under 11 U.S.C. § 362(a)(1), but causes of action *by the debtor* are not stayed. *Ass'n of St. Croix Condominium Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982) (section 362 by its terms only stays proceedings against the debtor; the statute does not address actions brought by the debtor which would inure to the benefit of the bankruptcy estate); *see also Estate of Michael Angelo Corry Inn, Inc. v. Vega*, 53 Fed. App'x. 205, 207 (3d Cir. 2002).

000007

XXX-001085

23.     Similarly. if an appeal is pending when the automatic stay arises. appeals of matters that were originally brought *against* the debtor are stayed, regardless of whether the debtor is the appellant or appellee.  Thus, whether a case is subject to the automatic stay must be determined based upon how the claims were originally asserted.  *St. Croix*. 682 F.2d at 449. *Maritime Electric Co. v. United Jersey Bank*, 959 F.2d 1194 (3d Cir. 1991) states:

> Within a single case. some actions may be stayed. others not. Multiple claim and multiple party litigation must be disaggregated so that particular claims. counterclaims. crossclaims and third-party claims are treated independently when determining which of their respective proceedings are subject to the bankruptcy stay.  *Thus, within one case, actions against a debtor will be suspended even though closely related claims asserted by the debtor may continue.*  Judicial proceedings resting on counterclaims and third-party claims asserted by a defendant-debtor are not stayed, while same-case proceedings arising out of claims asserted by the [non-debtor] plaintiff are stayed.

959 F.2d at 1204-05. [Emphasis supplied].

24.     Thus. in the State Court Appeal, Kaneb's appeal of the denial of its counterclaims against GEC are stayed by operation of section 362(a). but section 362(a) does not stay GEC's appeal of the denial of its claims against Kaneb (or Kaneb's right to defend against GEC's appeal).   However. GEC's appeal has been abated by Texas Appellate Court under Texas Rules of Appellate Procedure 8.2[4] and the abatement continues until the Texas Appellate Court reinstates.[5]  *See* Exhibit K6.

25.     Sufficient "cause" to justify the modification of the stay exists, as demonstrated in this Motion. "Cause" has no clear definition and is determined on a case-by-case basis with respect to modification of the stay.  *Int'l Business Machines v. Fernstrom Storage & Van Co.*. 938 F.2d 731. 735 (7th Cir. 1991).  In determining "cause," courts generally consider the policies

---

[4] Tex.R.App.P 8.2 provides "[a] bankruptcy suspends the appeal and all periods in these rules from the date when the bankruptcy petition is filed until the appellate court reinstates . . ."
[5] Tex.R.App.P. 8.3(a) provides "[i]f a case has been suspended by a bankruptcy filing, a party may move that the appellate court reinstate the appeal if permitted by federal law or the bankruptcy court. If the bankruptcy court has lifted or terminated the stay. a certified copy of the order must be attached to the motion."

000008
XXX-001086

of the automatic stay and the competing interests of the parties. *In re Continental Airlines, Inc.*, 152 B.R. 420, 424 (D.Del. 1993), including the following:

- prejudice suffered by the debtors or the estates if the stay is lifted;

- balance of hardships facing the parties; and

- probable success on the merits if the stay is lifted.

*Id.* at 424.  In addition, modification of the automatic stay should not unduly interfere with the bankruptcy cases.

26.    In the case at bar, there is no discernible prejudice suffered by GEC or its bankruptcy estate.[6]  Resolution of the liabilities associated with the Otis Pipeline, in fact, will benefit GEC by providing it certainty with respect to its liabilities and assets.  In contrast, failure to modify the stay will cause hardship to Kaneb by leaving it subject to potential liability for the Otis Pipeline damages and potentially without a right to seek indemnity, contribution or insurance benefits from GEC and various insurers.  Since the purpose of the lift stay motion is to achieve certainty through completion of the appellate process – regardless of the outcome on the merits — the probability of success is high.  Moreover, due to the *Rooker/Feldman* doctrine, such success cannot be achieved unless the State Court Appeal is prosecuted.

### The *Rooker/Feldman* Doctrine

27.    Because the *Rooker/Feldman* doctrine prevents this court from deciding state court appellate issues, the State Court Appeal is the only mechanism to obtain review of the state court judgment.  The *Rooker/Feldman* doctrine holds that "federal district courts, as courts of original jurisdiction, lack appellate jurisdiction to review, modify, or nullify final orders of state courts."  *Liedtke v. State Bar of Texas*, 18 F.3d 315, 317 (5th Cir. 1994).  Under the

---

[6] Because this matter is on appeal, there should be no significant fees or costs incurred by the debtors in briefing and arguing the issues before the Texas Appellate Court.  Moreover, debtors' bankruptcy counsel will not be distracted from their duties since this matter will, no doubt, be staffed by other outside counsel.

000009

XXX-001087

*Rooker/Feldman* doctrine, a federal trial court cannot sit in appellate review of a state court final judgment. *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 840 (3d Cir. 1996).

28.    In *In re Wilson*, the Third Circuit reversed a bankruptcy court order denying relief from stay to pursue a state court appeal, noting that, because of the *Rooker/Feldman* doctrine, if the litigant were denied relief from the stay, she would have no opportunity to challenge the adverse state court ruling. *In re Wilson*, 116 F.3d 87, 90 (3rd Cir. 1997). In *In re Moore*, the court granted a non-debtor litigant relief from the stay, stating "[i]n this case 'cause' exists to lift the automatic stay because Johnson's state court appeal is the only method available for judicial review of the Master's order . . . [t]he *Rooker-Feldman* [footnote omitted] doctrine precludes review of the Master's order in this Court." *In re Moore*, 2005 Bankr. LEXIS 2742 (Bankr. D.S.C. 2005). In *Blackford v. Meredith*, a debtor was allowed relief from the stay to pursue an appeal in state court, the court noting that "an appeal of the state court judgment is the only remedy available if [the debtor-movant] wishes to contest the state court judgment because the *Rooker-Feldman* doctrine prevents a lower federal court from sitting in review of state court decisions." *Blackford v. Meredith (In re Meredith)*, 2005 U.S. Dist. LEXIS 40242 (E.D. Va. Aug. 19, 2005). Thus, stay relief is appropriate in light of the *Rooker/Feldman* doctrine.

### Avoidance Of Collateral Estoppel Effect

29.    Cause for modifying the stay also exists because failure to resolve the State Court Appeal leaves Kaneb potentially vulnerable to the collateral estoppel effect of a judgment (which may be reversible) in other litigation, including objections to the Plan, claims against debtors' insurers and with respect to the DOJ claim.

000010

XXX-001088

30.    In *In re Wilson, supra,* the Third Circuit reversed the bankruptcy court's denial of a motion for relief from stay to pursue an appeal because such an appeal was the only way for the movant to attack the collateral estoppel effect of the state court judgment. 116 F.3d at 90 ("if the bankruptcy proceeding continues without modification of the stay, issue preclusion will prevent Baldino from challenging the effect of the state court judgment in the bankruptcy court"). In *Am. College of Dentists Found., Inc. v. Dorris Mktg. Group, Inc. (In re Dorris Mktg. Group, Inc.),* 2005 Bankr. LEXIS 282 (Bankr. E.D. Va. 2005), a plaintiff sued Dorris in arbitration and won, then moved to confirm the arbitration award. Before the arbitration award could be heard, Dorris filed bankruptcy, invoking the automatic stay. *Id.* The court lifted the stay to confirm the award in part to impose the collateral estoppel effect of the arbitration award on the debtor's non-debtor principals. *Id.* at *6, 12.

### Discharge Injunction

31.    If the current Plan is confirmed, it will provide for a discharge for the debtors, including GEC, under 11 U.S.C. §§ 1141 and 524. The discharge of debt in bankruptcy serves to terminate the automatic stay of section 362. 11 U.S.C. § 362(c)(2)(C) (automatic stay expires when a discharge is granted or denied in Chapter 11): *Hazelquist v. Guchi Moochie Tackle Co.,* 437 F.3d 1178, 1180 (Fed. Cir. 2006); *U. S. v. White,* 466 F.3d 1241, 1245 (11th Cir. 2006) (confirmation of plan grants the debtor a discharge that replaces the automatic stay with a permanent injunction pursuant to § 524 of the Bankruptcy Code). To the extent GEC then attempts to rely on the "discharge injunction" to avoid resolution of Kaneb's appeal in the Texas Appellate Court, the *Rooker/Feldman* Doctrine will have been violated because this Court's confirmation order would have usurped the Texas Appellate Court's right to resolve the State Court Appeal.

000011

XXX-001089

32.    Moreover, because the plan discharge will not affect Kaneb's defenses to GEC's claims on appeal (and in fact will effectively terminate the stay as to same), there is no reason not to lift the stay at this point, given that the plan confirmation process is underway.  This is because GEC is entitled only to a discharge of "debt" as a "personal liability."  11 U.S.C. §§ 1141(d); 524(a)(1), 524(a)(2); *see also* 11 U.S.C. § 101(5) and (12)("debt" means liability on claim, and "claim" is a right to payment); *Brown v. General Motors Corp.*, 152 B.R. 935, 939 (W.D. Wis. 1993) (only debts are discharged).  The discharge injunction does not prohibit Kaneb from defending any actions by the debtors.  *See, e.g., In re Black*, 280 B.R. 680, 685-86 (Bankr. N.D. Ala. 2001) (neither setoff nor recoupment barred by discharge); *Brown v. General Motors Corp.*, 152 B.R. 935, 939 (W.D. Wis. 1993) (defense of recoupment not barred by discharge order); *see also Megafoods Stores v. Flagstaff Realty Assocs. (In re Flagstaff Realty Assocs.)*, 60 F.3d 1031, 1036 (3d Cir. 1995) (citing cases where creditor permitted to recoup or setoff despite failure to object to plan confirmation or appeal from the confirmation order).  Thus, matters in the State Court Appeal that do not involve Kaneb seeking a "right to payment" against the debtors, including Kaneb's opportunity to reverse the declaratory relief in GEC's favor, would not be barred by the discharge injunction.

### Relief From Stay to Seek a Right to Payment

33.    There are also aspects of the State Court Appeal, however, where Kaneb seeks a "right to payment" in connection with the Merger Agreement and the Otis Pipeline.  At the trial level, Kaneb sought recovery against GEC for Otis Pipeline expenses pursuant to an indemnity right under the Merger Agreement.  The State Court Judgment denied Kaneb any recovery, but Kaneb filed a notice of appeal.  Because of the *Rooker/Feldman* doctrine, the bankruptcy court cannot finally determine whether GEC is liable for indemnity and for damages.  Therefore, relief from the stay is appropriate.

000012

XXX-001090

**Recoupment Defense Not Subject to the Stay**

34.     Even if the Kaneb indemnity claims are not treated as an executory contract claim, and Kaneb's right to payment against GEC would be barred, Kaneb seeks relief from stay to pursue such indemnity claims in the State Court Appeal as a defense of recoupment, against any claims by GEC under the Merger Agreement, because both side's claims arise out of the same transaction. *See University Med. Ctr. v. Sullivan (In re University Med. Ctr.)*, 973 F.2d 1065, 1079-80 (3d Cir. 1992) (recoupment is the setting up of a demand arising from the same transaction as the plaintiff's claim, strictly for the purpose of abatement or reduction of such claim; it is not subject to the automatic stay).

**Relief From Stay To Seek Insurance Recovery**

35.     Kaneb also seeks relief from the stay to prosecute the state court litigation in order to establish liability for GEC for the purposes of recovering on any insurance policies that may provide coverage to GEC for these claims, including policies issued to GEC pursuant to which Kaneb is a co-insured or is has its own separate right to policy proceeds.  The Policies pursuant to which Kaneb presently seeks permission to pursue coverage rights are identified in Exh. K9 hereto.[7]  *See also* Affidavit of Ellen Presby at ¶¶ 4-5.

a.  **Coverage Sought as Potential Judgment Creditors of GEC, to Recover Under Policies Covering GEC's Liability**

36.     Kaneb first seeks relief so that, in the event GEC is held liable for the Otis Pipeline release, Kaneb may seek recovery under policies that provide coverage to GEC insurers for such insurance.

---

[7] Because of the large volume of documents involved, complete copies of Kaneb's copies of the policies have not been submitted with this motion.  An Appendix of complete policy documents has been created has been served on debtors' counsel, the United States Trustee and counsel to the unsecured creditors' committee.  A copy of the Appendix will be available at the hearing for the Court's review.

000013

XXX-001091

37.    Kaneb's right to proceed against GEC's insurer derives from the established principle that a discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt. *In re Conston Inc.*, 181 B.R. 769, 773 (D. Del. 1995).

38.    This right to proceed against other entities includes the right to proceed against any insurers of the debtor.  For example, in *Houston v. Edgeworth (In re Edgeworth)*, Dr. Edgeworth allegedly committed malpractice, injuring the plaintiff.  993 F.2d 51, 53 (5th Cir. 1993).  Dr. Edgeworth then filed a chapter 7 bankruptcy. *Id.*  The plaintiff did not participate in the bankruptcy. *Id.*  Dr. Edgeworth received a discharge. *Id.*  The plaintiff then sought to lift the stay[8] to proceed only against the debtor nominally in order to collect from the insurance policy. The Fifth Circuit held in favor of the plaintiffs, noting that the scope of the section 524 discharge injunction does not prevent establishing the insurer's liability by proceeding against a discharged debtor. *Id.* at 54.[9]  In sum, stay relief is appropriate where the debtor is sued nominally in order to recover against insurance proceeds.

---

[8] Technically, the lift stay motion was improper because the discharge injunction of 11 U.S.C. § 524 replaced the stay, but the court did not dwell on that issue. *Id.* at 53, n.2.

[9] *See also In re Fernstrom Storage and Van Company*, 938 F.2d 731, 734 (7th Cir. 1991) ("The failure to file a proof of claim does not preclude an action against the debtor to establish liability that will be satisfied by a third party."); *see also Id.* at 736-737 (failure to file proof of claim for equipment destroyed in a fire at debtor's premises did not preclude creditor from proceeding with civil action for declaration of debtor's liability solely for purpose of recovering under debtor's insurance policies; *In re Jet Florida Systems*, 883 F.2d 970 (11th Cir. 1989) (notwithstanding failure to file proof of claim, and entry of § 524(a) permanent injunction, former employee allowed to proceed with defamation claim against debtor to establish debtor's liability in order to recover from debtor's insurer; *Ranger Ins. Co. v. Wolcott (In re TLI, Inc.)*, 1998 U.S. Dist. LEXIS 15488 (N.D. Tex. 1998) (the discharge was not an impediment to proceeding against the debtor; *Frazier v. McInnis*, 1996 Tex. App. LEXIS 4226 (Tex. App.—San Antonio 1996, no pet.) (unpublished) (bankruptcy only acts as an injunction against seeking personal liability against him on the debt, but it does not extinguish the debt nor does it prevent the Fraziers from establishing McInnis' liability in a state proceeding in order to recover from McInnis' insurer; *Am. College of Dentists v. Dorris Mktg. Group*, 2005 Bankr. LEXIS 282 at *5 (stay relief is appropriate when the debtor is a nominal defendant and recovery is only being sought against third parties or insurance policies); *In re Turner*, 55 B.R. 498 (Bankr. N.D. Ohio 1985) (modifying stay to permit creditors' RICO action against debtor to proceed where judgment would be satisfied under fidelity bond, despite lack of proof of claim).

000014

XXX-001092

39.     The right to proceed against GEC's insurers also is established by the language of the primary and umbrella insurance policies issued to GEC. These policies include provisions (either explicitly or by following form to underlying policies) that require the insurer (a) to pay claims "on behalf of" GEC, *see, e.g.*, Exh. K10 at GEC029632, and (b) to pay such claims even if GEC becomes insolvent or bankrupt. *See id.* at GEC029645 (typical anti-insolvency language reads as follows: "Bankruptcy or insolvency of the Insured or of the Insured's estate shall not relieve the Company of any of its legal obligations hereunder.").[10]

40.     It is also important to note that GEC will not be harmed if Kaneb is permitted to proceed against these policies to recover amounts nominally owed by GEC. Except for claims involving "products liability/ completed operations" (which are not involved in the Otis Pipeline case), all of the primary policies, and all or nearly all of the excess/umbrella policies, provide coverage on a "per occurrence" basis, without any "aggregate limit." *See id.* at Exhibit K10 at GEC029631; Exhibit K11 at GEC029747; Exhibit K12 at GEC030188).[11]

41.     The absence of "aggregate" limits for so-called "premises-operations" claims means that no matter how many "per occurrence" limits are paid out under the policy, the policy limits remain available to pay for other occurrences involving premises-operations claims. Thus, payment of claims relating to the Otis Pipeline release would not diminish the amount of insurance coverage available to GEC with respect to other claims.

---

[10] Kaneb has attached relevant policy excerpts as exhibits to this motion. In addition, Kaneb has filed an Appendix of Policies containing complete copies of the policy documents that it has for each of the Policies for which it seeks relief from stay. *See also* Affidavit of Ellen Presby.

[11] Kaneb has identified only one policy that appears to have an aggregate limit applicable to premises-operations claims of the type involving the Otis Pipeline claim. See Northbrook Policy No. 63 001 172, Exhibit K24. (Because Kaneb has not undertaken any discovery or other investigation of this Northbrook policy, it does not concede that it has an aggregate limit.) However, notwithstanding the possible existence of an aggregate limit in that policy good cause exists to permit Kaneb to proceed against Northbrook Policy No. 63 001 172. *See, e.g., In re Cybermedica, Inc.,* 280 B.R. 12, 18 (Bankr. D. Mass. 2002) (cause existed to lift stay to permit directors and officers of debtor to seek payment of defense costs under D&O policy and harm to estate "speculative"); *In re Arter & Hadden,* L.L.P., 335 B.R. 666, 674 (Bankr. N.D. Ohio 2005) (same).

000015

XXX-001093

42.     Relief from a stay is appropriate where, as here, the recovery of insurance proceeds by a non-debtor would not reduce or eliminate the debtor's right to collect under that same policy. *See In re Spaulding Composites Co., Inc.*, 207 B.R. 899 (9th Cir. BAP 1997) (insurance claim did not violate automatic stay where payment of non-debtor's claim would not impair insurer's ability to satisfy policy obligations to debtor); *cf. In re Circle K Corp.*, 121 B.R. 257 (Bankr.. D. Ariz. 1990) (policy proceeds deemed asset of estate where liability policies were "wasting" or "burning candle" policies, *i.e.*, payment of defense costs or judgments eroded or exhausted policy limits); *In re Metropolitan Mortgage & Securities Co., Inc.*, 325 B.R. 851, 857 (Bankr., E.D. Wash. 2005) (automatic stay prohibits non-debtor action that would diminish limits available to debtor under insurance policies).  Because the pursuit of claims under the Policies would not diminish rights available to the debtor, Kaneb should be granted relief from the stay.

43.     Finally, it bears noting that the insurance assets involved in this portion of the motion cannot be considered part of the debtor's estate, and therefore should not be subject to the automatic stay.  If Kaneb establishes in the Texas Court of Appeals that GEC is liable. then the insurance policies issued to GEC would require payment of proceeds "on behalf of" GEC to a non-debtor (Kaneb).  Because the policy *proceeds* payable on behalf of the debtor (*i.e.*, in the event Kaneb establishes the debtor's nominal liability in the Texas Court of Appeals) would be paid to a third party other than the debtor. the law does not deem those *proceeds* to be assets of the debtor's estate:

> The overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim.  When a payment by the insurer cannot inure to the debtor's pecuniary benefit, then that payment should neither enhance nor increase the bankruptcy estate.  In other words, when the debtor has

000016

XXX-001094

no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate.

. . . [U]nder the typical liability policy, the debtor will not have a cognizable interest in the proceeds of the policy. Those proceeds will normally be payable only for the benefit of those harmed by the debtor under the terms of the insurance contract.

*In the Matter of Edgeworth*, 993 F.2d 51, 55-56 (5th Cir. 1993). Because the policy proceeds are

not assets of the debtor estate. Kaneb is entitled to relief from the automatic stay to pursue those

proceeds.

**b.  Coverage Sought on the Basis that Kaneb is a Co-Insured Under These Policies**

44.     Kaneb also seeks relief from the stay in order to pursue its direct rights as a *co-

insured* under the Policies.  The insurance policies (either expressly or by following form)

broadly define the "Named Insured" to include W.R. Grace and all of its subsidiary, associated,

and affiliated companies. See. e.g., Exhibit K11 at GEC029747 ("Named Insured: W.R. Grace &

Co. and/or any subsidiary, organization, or company, including subsidiaries of a subsidiary

company, owned, controlled or coming under the active management of W.R. Grace & Co.");

Exhibit K65 at GEC028845 ("W.R. Grace & Co. and/or subsidiary, associated. affiliated

companies and/or organizations. owned. controlled and/or managed companies as now or

hereinafter constituted").

45.     Thus, Kaneb, by virtue of its status as a successor-by-statutory-merger to a former

Grace subsidiary, has rights under the liability policies that covered this subsidiary at the time it

(allegedly) owned the pipeline. This includes policies effective from 1978 (the year in which

Grace Petroleum Corporation internally transferred pipeline assets to a newly-created Grace

subsidiary. Standard TransPipe Corporation) through 1993 (the year in which Kaneb acquired

Standard TransPipe Corporation), since Standard TransPipe Corporation met the definition of

named insured under the policies. In addition. by reason of the alleged 1978 internal transfer of

000017
XXX-001095

pipeline assets and liabilities from Grace to Standard TransPipe, Kaneb (as successor-by-merger to Standard TransPipe) would qualify as a co-insured and/or an assignee of rights under policies issued to GEC and its predecessors prior to the 1978 internal transfer of pipeline assets.

46.    GEC will not be harmed if Kaneb is permitted to proceed against policies as to which it is a co-insured and/or an assignee of rights. As noted *supra*, the policies are not subject to aggregate limits, and therefore payment of claims will not reduce the amounts available to the debtor for payment of other claims.

47.    Further, to the extent Kaneb incurs defense costs in connection with the DOJ action or other actions relating to the Otis Pipeline, these defense costs are payable under the primary policies without reduction or erosion of the limits of liability of those policies. *See* Exh. K10 at GEC029638); Exhibit K11 at GEC029754-55; Exhibit K12 at GEC030195 (primary policies). Further, because there are no "aggregate limits" applicable to the type of general liability claims that Kaneb would bring under these primary and excess/umbrella policies, payment of Kaneb's insurance claims relating to the Otis Pipeline release would not diminish the amount of insurance coverage available to the debtor with respect to other claims.

48.    Finally, and also as noted above, the *proceeds* of the insurance policies are not assets of the debtor estate because they would not be payable to the debtor but, instead, would be payable to a non-debtor third party. In the case of defense costs, the proceeds would be payable to Kaneb for its attorney's fees and costs incurred in defending against the DOJ action. In the case of indemnity, the policy proceeds would be payable to the Department of Justice in satisfaction of any settlement or judgment obtained against Kaneb in connection with the Otis Pipeline release.

000018

XXX-001096

## Other Factors

49.    Bankruptcy courts also regularly consider other factors to lift the stay to allow

state court litigation to proceed. *See, e.g., In re Sonnax Indus.,* 907 F.2d 1280 (2d Cir. 1990);

*Prindle v. Countryside Manor (In re Countryside Manor),* 188 B.R. 489 (Bankr. D. Conn. 1995);

and *In re Curtis,* 40 B.R. 795 (Bankr. D. Utah 1984), discussed below:

- *Whether relief would result in partial or complete issue resolution.* Resolution of the State Court Appeal will completely resolve the issues that are the subject of those actions.

- *Lack of connection with or interference with bankruptcy case.* Resolution of the State Court Appeal will help, not hinder, the resolution of the bankruptcy case, since the State Court Appeal must ultimately be resolved by the Texas Appellate Court, under the *Rooker/Feldman* Doctrine, in any event.

- *Whether other proceeding involves debtor as fiduciary.* Not applicable.

- *Whether specialized tribunal with necessary expertise has been established to hear the cause of action.* As discussed above, because of the *Rooker/Feldman* doctrine, only the Texas Appellate Court may hear the State Court Appeal.

- *Whether debtor's insurer has assumed full defense responsibility.* Kaneb contends that insurance coverage for GEC is available, although it is unknown whether the insurer will assume full responsibility.

- *Whether the action primarily involves third parties.* To the extent that the State Court Appeal is being prosecuted to avoid the possible collateral estoppel effect of the State Court Judgment, the action primarily involves third parties.

- *Whether litigation in another forum would prejudice interests of other creditors.* Kaneb contends that the other creditors will not be prejudiced by the relief requested.

- *Whether judgment claim arising from other action is subject to equitable subordination.* Not applicable.

- *Whether movant's success in other proceeding would result in a judicial lien avoidable by debtor.* Not applicable.

- *Interests of judicial economy and expeditious and economical resolution of litigation.* As discussed above, because of the *Rooker/Feldman* Doctrine, only the Texas Appellate Court may hear the State Court Appeal, and if the action is remanded, it is much more efficient that the

**000019**

**XXX-001097**

state court and the state court attorneys deal with the matter in Texas. Further, there is no valid basis for further delay of the resolution of the underlying dispute.

- *Whether parties are ready for trial in other proceeding.* Kaneb is prepared to file its appellate briefs within the Texas Appellate Court deadlines. There is no valid reason why debtors' counsel could not meet such deadlines.

- *Impact of stay on parties and balance of harms.* This is discussed above.

### Prayer

WHEREFORE, pursuant to 11 U.S.C. § 362(d)(1), Movants Kaneb Pipe Line Operating Partnership, L.P. and Support Terminal Services, Inc. pray for relief from the automatic stay of 11 U.S.C. § 362(a) to allow all parties, courts, and court personnel to take all actions necessary and appropriate to litigate causes of actions and defenses, to otherwise prosecute and defend, and to administer (1) the State Court Appeal, including the filing of briefs, motions, argument, entering of opinions, orders, judgments, and mandates, and the prosecution of any post appellate proceedings, including proceedings before the Texas Supreme Court and any trial court proceedings on remand, and (2) any claims by Kaneb under the Policies (as previously defined) for insurance coverage relating to the Otis Pipeline release, and for all other relief to which Movants shows themselves justly entitled.

000020

XXX-001098

Dated: January 16, 2009

Respectfully submitted,

SMITH KATZENSTEIN & FURLOW LLP

Kathleen M. Miller (I.D. No. 2898)
Etta R. Wolfe (I.D. No. 4164)
The Corporate Plaza
800 Delaware Avenue, 10th Floor
P.O. Box 410 (Courier 19801)
Wilmington, De 19899
Telephone: (302) 652-8400
Facsimile: (302) 652-8405
Email: kmiller@skfdelaware.com
      erw@skfdelaware.com

Steve A. Peirce, Bar No. 15731200
FULBRIGHT & JAWORSKI L.L.P.
300 Convent Street, Suite 2200
San Antonio, TX 78205-3792
Telephone: (210) 224-5575
Facsimile: (210) 270-7205
Email: speirce@fulbright.com

Toby L. Gerber, Bar No. 07813700
FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Telephone: (214) 855-8000
Facsimile: (214) 855-8200
Email: tgerber@fulbright.com

**ATTORNEYS FOR KANEB PIPE LINE
OPERATING PARTNERSHIP, L.P. AND
SUPPORT TERMINAL SERVICES, INC.**

{08088}{60165110.1}

000021

XXX-001099

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | X | Chapter 11 |
| | : | |
| W. R. GRACE & CO., et al., | : | Case No. 01-1139 (JKF) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | Objection Deadline: February 6, 2009 at 4:00 p.m. |
| | X | Hearing Date: February 23, 2009 at 10:30 a.m. |

## NOTICE OF KANEB PIPE LINE OPERATING PARTNERSHIP, L.P. AND SUPPORT TERMINAL SERVICES, INC.'S MOTION FOR AN ORDER MODIFYING THE AUTOMATIC STAY

PLEASE TAKE NOTICE that on January 16, 2009, Kaneb Pipe Line Operating Partnership, L.P. and Support Terminal Services, Inc. filed a Motion for an Order Modifying the Automatic Stay (the "Motion").

PLEASE TAKE FURTHER NOTICE that any party wishing to oppose the entry of an order approving the Motion must file a response or an objection to the Motion with the Court ON OR BEFORE February 6, 2009 at 4:00 p.m. (EST). At that same time, you must also serve a copy of the response upon the undersigned counsel.

PLEASE TAKE FURTHER NOTICE THAT A HEARING ON THE MOTION WILL BE HELD ON February 23, 2009 AT 10:30 A.M. (EST) BEFORE THE HONORABLE JUDITH K. FITZGERALD AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE. 824 N. MARKET STREET, WILMINGTON, DE 19801.

000022

XXX-001100

IF YOU FAIL TO RESPOND TO THE OBJECTION IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED THEREIN WITHOUT FURTHER NOTICE OR A HEARING.

January 16, 2009

SMITH, KATZENSTEIN & FURLOW LLP

Kathleen M. Miller (I.D. No. 2898)
Etta R. Wolfe (I.D. No. 4164)
The Corporate Plaza
800 Delaware Avenue, 10th Floor
P.O. Box 410 (Courier 19801)
Wilmington, De 19899
Telephone: (302) 652-8400
Facsimile: (302) 652-8405
Email: kmiller@skfdelaware.com

Steve A. Peirce, Bar No. 15731200
FULBRIGHT & JAWORSKI L.L.P.
300 Convent Street, Suite 2200
San Antonio, TX  78205-3792
Telephone: (210) 224-5575
Facsimile: (210) 270-7205
Email: speirce@fulbright.com

000023

XXX-001101

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | x | Chapter 11 |
| | : | |
| W. R. GRACE & CO., et al.,[1] | : | Case No. 01-1139 (JKF) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |
| | : | |
| | x | |

AFFIDAVIT OF ELLEN A. PRESBY, ESQ. IN SUPORT OF KANEB PIPE LINE
OPERATING PARTNERSHIP, L.P. AND SUPPORT TERMINAL SERVICES, INC.'S
MOTION FOR AN ORDER MODIFYING THE AUTOMATIC STAY

| | | |
|---|---|---|
| STATE OF TEXAS | ) | |
| | ) | SS: |
| COUNTY OF DALLAS | ) | |

I, Ellen A. Presby, being duly sworn according to law, do depose and say:

1.      I am a practicing attorney and sole proprietor at the Presby Law Office, of

Dallas, Texas. I am authorized to make this affidavit. Unless otherwise stated, I make

this affidavit based on firsthand personal knowledge acquired as trial counsel to Kaneb

Pipe Line Operating Partnership, L.P. and Support Terminal Services, Inc. (collectively,

"Kaneb") in litigation in the 191st District Court of Dallas County, Texas (the "State

Court Litigation") against Grace Energy Corporation ("GEC"). I was lead counsel for

Kaneb in the State Court Litigation through the development of the case until after the

verdict was rendered. I acquired firsthand personal knowledge of the documents

produced by GEC in the State Court Litigation through that process.

2.      I submit this Affidavit in support of Kaneb's Motion for an Order

Modifying the Automatic Stay (the "Motion").

---

[1] The Debtors consist of 62 entities, including W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.)
and the particular debtor involved in this Motion, Grace Energy Corporation.

### The GEC Liability Policies

3. I represented Kaneb in State Court Litigation, which matter is now on appeal before the Court of Appeals for the Fifth District of Texas. Debtor Grace Energy Corporation ("GEC") is a party in the State Court Litigation.

4. In support of its Motion, Kaneb is submitting an appendix (in electronic PDF format) of the insurance policies as to which it seeks relief from stay. Each such policy is identified by carrier, date, policy number and bates-number on Attachment A to this affidavit (the "Policies").

5. I have reviewed the disk containing electronic copies of the Policies. Each Policy is identified with a range of bates-numbering that includes the prefix, "GEC." This is the same prefix utilized by GEC in its production of documents, including copies of insurance policies, during the State Court Litigation. GEC's counsel in the State Court Litigation represented to me that documents bearing such bates prefixes were accurate copies of such documents exist in GEC's corporate records. I have no reason to believe that these documents are anything other than accurate copies of the GEC insurance policies as produced in the State Court Litigation.

_Ellen A. Presby_

Ellen A. Presby, Esq.

Sworn to and subscribed before me this 5th day of January, 2009

_Peggy Williams_

Notary Public

PEGGY WILLIAMS
NOTARY PUBLIC
STATE OF TEXAS
Comm. Exp. 10-09-2010

**000025**

XXX-001103

ATTACHMENT "A-1" TO AFFIDAVIT OF ELLEN PRESBY

**THE GEC POLICIES**
**June 30, 1971 – June 30, 1988**

## PRIMARY LIABILITY POLICIES
**Continental Casualty**
CCP 902-36-70 (6/30/73-6/30/76): Tab 1 (Bates Nos. GEC 029630 - GEC 029746)
CCP 248-3440 (6/30/76-6/30/83): Tab 2 (Bates Nos. GEC 029747 - GEC 030020)
CCP 248-3440 (6/30/83-6/30/88): Tab 3 (Bates Nos. GEC 030188 - GEC 030301)

## EXCESS/UMBRELLA EXCESS LIABILITY POLICIES
**Admiral**
75 DD 0164 (SCX 0369) (6/30/75-6/30/76): Tab 10D (Bates Nos. GEC 025038 - GEC 025045)

**American Employers' Insurance Company**
EY-8220-005 (6/30/71-6/30/74): Tab 4 (Bates Nos. GEC 024585 - GEC 024629)

**California Union**
ZCX 0001391 (Cover Sheet 34078) (6/30/75-6/30/76): Tab 11D (Bates Nos. GEC 025070 - GEC 025071)

**Central National Insurance Company of Omaha**
CNU 12-33-83 (6/30/75-6/30/76): Tab 10C (Bates Nos. GEC 025032 - GEC 025037)

**Continental Casualty**
RDX 893-68-33 (8/9/73-6/30/74): Tab 6B (Bates Nos. GEC 024648 - GEC 024649)
RDX 033 915 66 45 (6/30/74-6/30/77): Tab 8 (Bates Nos. GEC 024736 - GEC 024742)
RDX 178-45-29 (6/30/84-6/30/85): Tab 29D (Bates Nos. GEC 028842 - GEC 028852)

**First State Insurance Company**
922099 (6/30/75-6/30/76): Tab 11C (Bates Nos. GEC 025063 - GEC 025069)

**Gerling-Konzern**
01/49/99/6282 (6/30/78-6/30/79): Tab 19D (Bates No. GEC 026197)

**Granite State Insurance Company**
6178-0491 (6/30/78-6/30/79): Tab 19C (Bates Nos. GEC 026189 - GEC 026196)
6179-1383 (6/30/79-6/30/80): Tab 21C (Bates Nos. GEC 026615 - GEC 026622)
6480-5013 (6/30/80-6/30/81): Tab 22C (Bates Nos. GEC 027050 - GEC 027058)
6481-5220 (6/30/81-6/30/82): Tab 23A (Bates Nos. GEC 027464 - GEC 027472)
6482-5442 (6/30/82-6/30/83): Tab 25C (Bates Nos. GEC 028005 - GEC 028015)
6483-5666 (6/30/83-6/30/84): Tab 27B (Bates Nos. GEC 028402 - GEC 028411)
6484-5867 (6/30/84-6/30/85): Tab 29A (Bates Nos. GEC 028819 - GEC 028824)

XXX-001104

**Home Insurance Company**
HEC 9 91 99 45 (6/30/71-6/30/74): Tab 5 (Bates Nos. GEC 024630 - GEC 024638)

**Insurance Company of North America (INA)**
XCP 37 45 (6/30/71-6/30/74): Tab 6A (Bates Nos. GEC 024639 - GEC 024647)

**Lexington Insurance Company**
550-63-39 (6/30/77-6/30/78): Tab 18B (Bates Nos. GEC 025776 - GEC 025784)
5510442 (6/30/78-6/30/79): Tab 19B (Bates Nos. GEC 026179 - GEC 026188)
5514585 (6/30/79-6/30/80): Tab 21B (Bates Nos. GEC 026604 - GEC 026614)
5540469 (6/30/80-6/30/82): Tab 22B (Bates Nos. GEC 027042 - GEC 027049)

**Lloyd's**
76 DD 1594C (6/30/76-6/30/79): Tab 13A (Bates Nos. GEC 026053 - GEC 026098)
76 DD 1595C (6/30/76-6/30/79): Tabs 14A1 and 14A2 (Bates Nos. GEC 025379 - GEC 025400, and GEC 026115 - GEC 026136)
77 DD 1631C (6/30/77-6/30/78): Tab 18A (Bates Nos. GEC 025740 - GEC 025775)
78 DD 1417C (6/30/78-6/30/79): Tab 19A (Bates Nos. GEC 026137 - GEC 026178)
79 DD 1633C (6/30/79-6/30/82): Tab 20A (Bates Nos. GEC 026497 - GEC 026549)
79 DD 1634C (6/30/79-6/30/80): Tab 21A (Bates Nos. GEC 026554 - GEC 026603)
80 DD 1643C (6/30/80-6/30/82): Tab 22A (Bates Nos. GEC 027017 - GEC 027041)
KYO 17582 (6/30/82-6/30/85): Tab 24A (Bates Nos. GEC 028307 - GEC 028360)
KYO 17782 (6/30/82-6/30/85): Tabs 25A1, 25A2 and 25A3 (Bates Nos. GEC 027963 - GEC 027995, GEC 028373 - GEC 028391, and GEC 028794 - GEC 028818)

**New Hampshire Insurance Company**
5175-0444 (6/30/75-6/30/76): Tab 10B (Bates Nos. GEC 025025 - GEC 025031)
5175-0445 (6/30/75-6/30/76): Tab 11B (Bates Nos. GEC 025056 - GEC 025062)

**Northbrook Insurance Company**
63-001-170 (6/30/75-6/30/76): Tab 9 (Bates Nos. GEC 024988 - GEC 025014)
63-001-171 (6/30/75-6/30/76): Tab 10A (Bates Nos. GEC 025015 - GEC 025024)
63-001-172 (6/30/75-6/30/76): Tab 11A (Bates Nos. GEC 025046 - GEC 025055)
63-002-048 (6/30/76-6/30/79): Tabs 13B1, 13B2 and 13B3 (Bates Nos. GEC 025356 - GEC 025378, GEC 025715 - GEC 025730, and GEC 026099 - GEC 026114)
63-005-793 (6/30/79-6/30/82): Tabs 20B1 and 20B2 (Bates Nos. GEC 026550 - GEC 026553, and GEC 027007 - GEC 027016)
63-005-794 (6/30/79-6/30/80): Tab 21D (Bates Nos. GEC 026623 - GEC 026629)
63-006-854 (6/30/80-6/30/81): Tab 22D (Bates Nos. GEC 027059 - GEC 027063)
63-008-153 (6/30/81-6/30/82): Tab 23B (Bates Nos. GEC 027473 - GEC 027483)

**Pacific Employers Group**
XMO 01 72 04 (6/30/84-6/30/85): Tab 28 (Bates Nos. GEC 028785 - GEC 028793)
XCC 01 22 83 (6/30/84-6/30/85): Tab 29B (Bates Nos. GEC 028825 - GEC 028831)
XMO 017211 (6/30/85-6/30/86): Tab 30 (Bates Nos. GEC 029337 - GEC 029344)

2

XCC 012315 (6/30/85-6/30/86): Tab 31 (Bates Nos. GEC 029358 - GEC 029360)

**Prudential Reinsurance Company**
DXC 901145 (6/30/76-6/30/77): Tab 14B (Bates Nos. GEC 025401 - GEC 025407)
DXC DX 0250 (6/30/77-6/30/78): Tab 17 (Bates Nos. GEC 025731 - GEC 025739)
DXC DX 0251 (6/30/77-6/30/78): Tab 18C (Bates Nos. GEC 025785 - GEC 025794)

**Transit Casualty**
SCU 955-565 (6/30/80-6/30/81): Tab 22E (Bates Nos. GEC 027064 - GEC 027069)
SCU 955-978 (6/30/81-6/30/82): Tab 23C (Bates Nos. GEC 027484 - GEC 027492)
UMB 950-239 (6/30/82-6/30/85): Tabs 24B and 26 (Bates Nos. GEC 027951 - GEC 027962, and GEC 028361 - GEC 028372)
SCU 956-259 (6/30/82-6/30/83): Tab 25B (Bates Nos. GEC 027996 - GEC 028004)
SCU 956-535 (6/30/83-6/30/84): Tab 27A (Bates Nos. GEC 028392 - GEC 028401)
SCU 956-881 (6/30/84-6/30/85): Tab 29C (Bates Nos. GEC 028832 - GEC 028841)

**Unigard Mutual Insurance Company**
1-2517 (6/30/74-6/30/75): Tab 7 (Bates Nos. GEC 024722 - GEC 024735)

000028

XXX-001106

ATTACHMENT "A-2" TO AFFIDAVIT OF ELLEN PRESBY

**THE GEC POLICIES**
**CHRONOLOGICALLY, BY LAYER**
**June 30, 1971 – June 30, 1986**

| Primary Layer | Disk, Tab # | Primary Policies |
|---|---|---|
| 6/30/73 – 6/30/76 | Tab 1 | Continental Casualty Company CCP 902-36-70 (GEC029630 – GEC029746) |
| 6/30/76 – 6/30/83 | Tab 2 | Continental Casualty Company CCP 248-3440 (GEC029747 – GEC030020) |
| 6/30/83 – 6/30/88 | Tab 3 | Continental Casualty Company CCP 248-3440 (GEC030188 – GEC030301) |

| Excess Layers | Disk, Tab # | Excess Policies |
|---|---|---|
| | | **6/30/71–6/30/74** |
| First Layer Excess | Tab 4 | American Employers  EY-8220-005 (5M) (GEC024585 – GEC024629) |
| Second Layer Excess | Tab 5 | Home Insurance  HEC 9 91 99 45 (5M) (GEC024630 – GEC024638) |
| Third Layer Excess | Tab 6A Tab 6B | INA  XCP 37 45 (10M) (GEC024639 – GEC024647) Continental  RDX 893-68-33 (10M) (8/9/73-6/30/74) (GEC024648 – GEC024649) |
| | | **6/30/74 – 6/30/75** |
| First Layer Excess | Tab 7 | Unigard Mutual Insurance Company  1-2517  (10M) (GEC024722 – GEC024735) |
| Second Layer Excess | Tab 8 | Continental  RDX 033 915 66 45  (10M) (GEC024736 – GEC024742) |
| | | **6/30/75–6/30/76** |
| First Layer Excess | Tab 9 | Northbrook  63-001-170  (1M) (GEC024988 – GEC025014) |

_ 1

000029

XXX-001107

| Excess Layers | Disk, Tab # | Excess Policies |
|---|---|---|
| Second Layer Excess | Tab 10A | Northbrook  63-001-171  (1.5M) (GEC025015 – GEC025024) |
| | Tab 10B | New Hampshire  5175-0444  (1M) (GEC025025 – GEC025031) |
| | Tab 10C | Central National  CNU 12-33-83  (1M) (GEC025032 – GEC025037) |
| | Tab 10D | Admiral  75 DD 0164 (SCX 039)  (0.5M) (GEC025038 – GEC025045) |
| Third Layer Excess | Tab 11A | Northbrook  63 001 172  (3.5M) (GEC025046 – GEC025055) |
| | Tab 11B | New Hampshire  5175-0445  (0.625M (GEC025056 – GEC025062) |
| | Tab 11C | First State  922099  (0.625M) (GEC025063 – GEC025069) |
| | Tab 11D | California Union  ZCX 0001391 (0.25M) (Bowring  Cover Note 34078) (GEC025070 – GEC025071) |
| Fourth Layer Excess | Tab 12 | Continental  RDX 033 915 66 45  (10M) (GEC025072 – 025078) |
| 6/30/76–6/30/77 | | |
| First Layer Excess | Tab 13A | Lloyd's  76 DD 1594C  (4M) (GEC026053 – GEC026098) |
| | Tab 13B1 | Northbrook  63-002-048  (1M) (GEC025356 – GEC025378) |
| Second Layer Excess | Tab 14A1 | Lloyd's  76 DD 1595C  (4M) (GEC025379 – GEC025400) |
| | Tab 14B | Prudential Re   DXC 901145  (1M) (GEC025401 – GEC025407) |
| Third Layer Excess | Tab 15 | Continental RDX 033 915 66 45  (10M) (GEC025408 – GEC025414) |
| 6/30/77–6/30/78 | | |
| First Layer Excess | Tab 13A | Lloyd's  76 DD 1594C  (4M) (GEC026053 – GEC026098) |
| | Tab 13B2 | Northbrook  63-002-048  (1M) (GEC025715 – GEC025730) |
| Second Layer Excess | Tab 14A1 | Lloyd's  76 DD 1595C  (5M) (GEC025379 – GEC025400) |
| Third Layer Excess | Tab 17 | Prudential Re  DXC DX 0250  (5M) (GEC025731 – GEC025739) |

– 2 –

| Excess Layers | Disk, Tab # | Excess Policies |
|---|---|---|
| Fourth Layer Excess | Tab 18A | Lloyd's 77 DD 1631C (8M) (GEC025740 – GEC025775) |
| | Tab 18B | *Lexington 550-63-39 (914mm as specified in Lloyd's 77 DD 1631C) (GEC025776 – GEC025784) |
| | Tab 18C | Prudential Re  DXC DX 0251  (2M) (GEC025785 – GEC025794) |
| **6/30/78–6/30/79** | | |
| First Layer Excess | Tab 13A | Lloyd's 76 DD 1594C  (4M) (GEC026053 – GEC026098) |
| | Tab 13B3 | Northbrook 63-002-048  (1M) (GEC026099 – GEC026114) |
| Second Layer Excess | Tab 14A2 | Lloyd's 76 DD 1595C  (5M) (GEC026115 – GEC026136) |
| Third Layer Excess | Tab 19A | Lloyd's  78 DD 1417C  (9M) (GEC026137 – GEC026178) |
| | Tab 19B | *Lexington  5510442 (773,100 as specified in Lloyd's 78 DD 1417C) (GEC026179 – GEC026188) |
| | Tab 19C | Granite State  6178-0491  (5M) (GEC026189 – GEC026196) |
| | Tab 19D | Gerling Konzern  01/49/99/6282  (1M) (GEC026197) |
| **6/30/79–6/30/80** | | |
| First Layer Excess | Tab 20A | Lloyd's  79 DD 1633C  (4M) (GEC026497 – GEC026549) |
| | Tab 20B1 | Northbrook 63-005-793  (1M) (GEC026550 – GEC026553) |
| Second Layer Excess | Tab 21A | Lloyd's 79 DD 1634C  (7.5M) (GEC026554 – GEC026603) |
| | Tab 21B | *Lexington 5514585 (803,250 as specified in Lloyd's 79 DD 1634C) (GEC026604 – GEC026614) |
| | Tab 21C | Granite State  6179-1383  (3.75M) (GEC026615 – GEC026622) |
| | Tab 21D | Northbrook 63-005-794  (3.75M) (GEC026623 – GEC026629) |
| **6/30/80–6/30/81** | | |

- 3

000031

XXX-001109

| Excess Layers | Disk, Tab # | Excess Policies |
|---|---|---|
| First Layer Excess | Tab 20A | Lloyd's 79 DD 1633C (4M) (GEC026497 – GEC026549) |
| | Tab 20B2 | Northbrook 63-005-793 (1M) (GEC027007 – GEC027016) |
| Second Layer Excess | Tab 22A | Lloyd's 80 DD 1643C (11.25M) (GEC027017 – GEC027041) |
| | Tab 22B | *Lexington 5540469 (1,201,500 as specified by Lloyd's 80 DD1643C) (GEC027042 – GEC027049) |
| | Tab 22C | Granite State 6480-5013 (4M) (GEC027050 – GEC027058) |
| | Tab 22D | Northbrook 63-006-854 (3.75M) (GEC027059 – GEC027063) |
| | Tab 22E | Transit SCU 955-565 (1M) (GEC027064 – GEC027069) |
| **6/30/81–6/30/82** | | |
| First Layer Excess | Tab 20A | Lloyd's 79 DD 1633C (4M) (GEC026497 – GEC026549) |
| | Tab 20B2 | Northbrook 63 005 793 (1M) (GEC027007 – GEC027016) |
| Second Layer Excess | Tab 22A | Lloyd's 80 DD 1643C (11.25M) (GEC027017 – GEC027041) |
| | Tab 22B | *Lexington 5540469 (1,201,500 as specified by Lloyd's 80 DD 1643C) (GEC027042 – GEC027049) |
| | Tab 23A | Granite State 6481-5220 (4M) (GEC027464 – GEC027472) |
| | Tab 23B | Northbrook 63 008 153 (3.75M) (GEC027473 – GEC027483) |
| | Tab 23C | Transit SCU 955-978 (1M) (GEC027484 – GEC027492) |
| **6/30/82–6/30/83** | | |
| First Layer Excess | Tab 24A | Lloyd's KYO 17582 (4M) (GEC028307 – GEC028360) |
| | Tab 24B | Transit UMB 950-239 (1M) (GEC027951 – GEC027962) |
| Second Layer Excess | Tab 25A1 | Lloyd's KYO 17782 (11.25M) (GEC027963 – GEC027995) |
| | Tab 25B | Transit SCU 956-259 (4.75M) (GEC027996 – GEC028004) |
| | Tab 25C | Granite State 6482-5442 (4M) (GEC028005 – 028015) |

– 4 –

000032

XXX-001110

| Excess Layers | Disk, Tab # | Excess Policies |
|---|---|---|
| | | **6/30/83–6/30/84** |
| First Layer Excess | Tab 24A | Lloyd's KYO 17582 (4M) (GEC028307 – GEC028360) |
| | Tab 26 | Transit UMB 950–239 (1M) (GEC028361 – GEC028372) |
| Second Layer Excess | Tab 25A2 | Lloyd's KYO 17782 (11.25M) (GEC028373 – GEC028391) |
| | Tab 27A | Transit SCU 956–535 (4.75M) (GEC028392 – GEC028401) |
| | Tab 27B | Granite State 6483–5666 (4M) (GEC028402 – GEC028411) |
| | | **6/30/84–6/30/85** |
| First Layer Excess | Tab 24A | Lloyd's KYO 17582 (4M) GEC028307 – GEC028360) |
| | Tab 26 | Transit UMB 950–239 (0.75M) (GEC028361 – GEC028372) |
| | Tab 28 | Pacific XMO 01 72 04 (0.25M) (GEC028785 – GEC028793) |
| Second Layer Excess | Tab 25A3 | Lloyd's KYO 17782 (11.25M) (GEC028794 – GEC028818) |
| | Tab 29A | Granite State 6484–5867 (4.75) (GEC028819 – GEC028824) |
| | Tab 29B | Pacific XCC 01 22 83 (1.75M) (GEC028825 – GEC028831) |
| | Tab 29C | Transit SCU 956–881 (1.25M) (GEC028832 – GEC028841) |
| | Tab 29D | Continental RDX 178–45–29 (1M) (GEC028842 – GEC028852) |
| | | **6/30/85 – 6/30/86** |
| First Layer Excess | Tab 30 | Pacific XMO 017211 (1M) (GEC029337 – GEC029344) |
| Second Layer Excess | Tab 31 | Pacific XCC 012315 (1M) (GEC029358 – GEC029360) |

– 5

000033

XXX-001111

ATTACHMENT "A-1" TO AFFIDAVIT OF ELLEN PRESBY

### THE GEC POLICIES
June 30, 1971 – June 30, 1988

## PRIMARY LIABILITY POLICIES

**Continental Casualty Company (CNA)**
CCP 902-36-70 (6/30/73-6/30/76): Tab 1 (Bates Nos. GEC 029630 - GEC 029746)
CCP 248-3440 (6/30/76-6/30/83): Tab 2 (Bates Nos. GEC 029747 - GEC 030020)
CCP 248-3440 (6/30/83-6/30/88): Tab 3 (Bates Nos. GEC 030188 - GEC 030301)

## EXCESS/UMBRELLA LIABILITY POLICIES

**Admiral Insurance Company**
75 DD 0164 (SCX 0369) (6/30/75-6/30/76): Tab 10D (Bates Nos. GEC 025038 - GEC 025045)

**American Employers' Insurance Company**
EY-8220-005 (6/30/71-6/30/74): Tab 4 (Bates Nos. GEC 024585 - GEC 024629)

**California Union Insurance Company**
ZCX 0001391 (Cover Sheet 34078) (6/30/75-6/30/76): Tab 11D (Bates Nos. GEC 025070 - GEC 025071)

**Central National Insurance Company of Omaha**
CNU 12-33-83 (6/30/75-6/30/76): Tab 10C (Bates Nos. GEC 025032 - GEC 025037)

**Continental Casualty Company (CNA)**
RDX 893-68-33 (8/9/73-6/30/74): Tab 6B (Bates Nos. GEC 024648 - GEC 024649)
RDX 033 915 66 45 (6/30/74-6/30/77): Tabs 8, 12 and 15 (Bates Nos. GEC 024736 - GEC 024742, GEC 025072 – GEC 025078, and GEC 025408 – GEC 025414)
RDX 178-45-29 (6/30/84-6/30/85): Tab 29D (Bates Nos. GEC 028842 - GEC 028852)

**First State Insurance Company**
922099 (6/30/75-6/30/76): Tab 11C (Bates Nos. GEC 025063 - GEC 025069)

**Gerling-Konzern**
01/49/99/6282 (6/30/78-6/30/79): Tab 19D (Bates No. GEC 026197)

**Granite State Insurance Company**
6178-0491 (6/30/78-6/30/79): Tab 19C (Bates Nos. GEC 026189 - GEC 026196)
6179-1383 (6/30/79-6/30/80): Tab 21C (Bates Nos. GEC 026615 - GEC 026622)
6480-5013 (6/30/80-6/30/81): Tab 22C (Bates Nos. GEC 027050 - GEC 027058)

6481-5220 (6/30/81-6/30/82): Tab 23A (Bates Nos. GEC 027464 - GEC 027472)
6482-5442 (6/30/82-6/30/83): Tab 25C (Bates Nos. GEC 028005 - GEC 028015)
6483-5666 (6/30/83-6/30/84): Tab 27B (Bates Nos. GEC 028402 - GEC 028411)
6484-5867 (6/30/84-6/30/85): Tab 29A (Bates Nos. GEC 028819 - GEC 028824)

**Home Insurance Company**
HEC 9 91 99 45 (6/30/71-6/30/74): Tab 5 (Bates Nos. GEC 024630 - GEC 024638)

**Insurance Company of North America (INA)**
XCP 37 45 (6/30/71-6/30/74): Tab 6A (Bates Nos. GEC 024639 - GEC 024647)

**Lexington Insurance Company**
550-63-39 (6/30/77-6/30/78): Tab 18B (Bates Nos. GEC 025776 - GEC 025784)
5510442 (6/30/78-6/30/79): Tab 19B (Bates Nos. GEC 026179 - GEC 026188)
5514585 (6/30/79-6/30/80): Tab 21B (Bates Nos. GEC 026604 - GEC 026614)
5540469 (6/30/80-6/30/82): Tab 22B (Bates Nos. GEC 027042 - GEC 027049)

**Lloyd's**
76 DD 1594C (6/30/76-6/30/79): Tab 13A (Bates Nos. GEC 026053 - GEC 026098)
76 DD 1595C (6/30/76-6/30/79): Tabs 14A1 and 14A2 (Bates Nos. GEC 025379 - GEC 025400, and GEC 026115 - GEC 026136)
77 DD 1631C (6/30/77-6/30/78): Tab 18A (Bates Nos. GEC 025740 - GEC 025775)
78 DD 1417C (6/30/78-6/30/79): Tab 19A (Bates Nos. GEC 026137 - GEC 026178)
79 DD 1633C (6/30/79-6/30/82): Tab 20A (Bates Nos. GEC 026497 - GEC 026549)
79 DD 1634C (6/30/79-6/30/80): Tab 21A (Bates Nos. GEC 026554 - GEC 026603)
80 DD 1643C (6/30/80-6/30/82): Tab 22A (Bates Nos. GEC 027017 - GEC 027041)
KYO 17582 (6/30/82-6/30/85): Tab 24A (Bates Nos. GEC 028307 - GEC 028360)
KYO 17782 (6/30/82-6/30/85): Tabs 25A1, 25A2 and 25A3 (Bates Nos. GEC 027963 - GEC 027995, GEC 028373 - GEC 028391, and GEC 028794 - GEC 028818)

**New Hampshire Insurance Company**
5175-0444 (6/30/75-6/30/76): Tab 10B (Bates Nos. GEC 025025 - GEC 025031)
5175-0445 (6/30/75-6/30/76): Tab 11B (Bates Nos. GEC 025056 - GEC 025062)

**Northbrook Excess and Surplus Insurance Company**
63-001-170 (6/30/75-6/30/76): Tab 9 (Bates Nos. GEC 024988 - GEC 025014)
63-001-171 (6/30/75-6/30/76): Tab 10A (Bates Nos. GEC 025015 - GEC 025024)
63-001-172 (6/30/75-6/30/76): Tab 11A (Bates Nos. GEC 025046 - GEC 025055)
63-002-048 (6/30/76-6/30/79): Tabs 13B1, 13B2 and 13B3  (Bates Nos. GEC 025356 - GEC 025378, GEC 025715 - GEC 025730, and GEC 026099 - GEC 026114)
63-005-793 (6/30/79-6/30/82): Tabs 20B1 and 20B2 (Bates Nos. GEC 026550 - GEC 026553, and GEC 027007 - GEC 027016)
63-005-794 (6/30/79-6/30/80): Tab 21D (Bates Nos. GEC 026623 - GEC 026629)
63-006-854 (6/30/80-6/30/81): Tab 22D (Bates Nos. GEC 027059 - GEC 027063)
63-008-153 (6/30/81-6/30/82): Tab 23B (Bates Nos. GEC 027473 - GEC 027483)

000035

XXX-001113

**Pacific Employers Group**
XMO 01 72 04 (6/30/84-6/30/85): Tab 28 (Bates Nos. GEC 028785 - GEC 028793)
XCC 01 22 83 (6/30/84-6/30/85): Tab 29B (Bates Nos. GEC 028825 - GEC 028831)
XMO 017211 (6/30/85-6/30/86): Tab 30 (Bates Nos. GEC 029337 - GEC 029344)
XCC 012315 (6/30/85-6/30/86): Tab 31 (Bates Nos. GEC 029358 - GEC 029360)

**Prudential Reinsurance Company**
DXC 901145 (6/30/76-6/30/77): Tab 14B (Bates Nos. GEC 025401 - GEC 025407)
DXC DX 0250 (6/30/77-6/30/78): Tab 17 (Bates Nos. GEC 025731 - GEC 025739)
DXC DX 0251 (6/30/77-6/30/78): Tab 18C (Bates Nos. GEC 025785 - GEC 025794)

**Transit Casualty Company**
SCU 955-565 (6/30/80-6/30/81): Tab 22E (Bates Nos. GEC 027064 - GEC 027069)
SCU 955-978 (6/30/81-6/30/82): Tab 23C (Bates Nos. GEC 027484 - GEC 027492)
UMB 950-239 (6/30/82-6/30/85): Tabs 24B and 26 (Bates Nos. GEC 027951 - GEC 027962, and GEC 028361 - GEC 028372)
SCU 956-259 (6/30/82-6/30/83): Tab 25B (Bates Nos. GEC 027996 - GEC 028004)
SCU 956-535 (6/30/83-6/30/84): Tab 27A (Bates Nos. GEC 028392 - GEC 028401)
SCU 956-881 (6/30/84-6/30/85): Tab 29C (Bates Nos. GEC 028832 - GEC 028841)

**Unigard Mutual Insurance Company**
1-2517 (6/30/74-6/30/75): Tab 7 (Bates Nos. GEC 024722 - GEC 024735)

000036

XXX-001114

**ATTACHMENT "A-2" TO AFFIDAVIT OF ELLEN PRESBY**

**THE GEC POLICIES**
**CHRONOLOGICALLY, BY LAYER**
**June 30, 1971 – June 30, 1988**

| Primary Layer | Disk, Tab # | Primary Policies |
|---|---|---|
| 6/30/73 – 6/30/76 | Tab 1 | Continental Casualty CCP 902-36-70 (GEC 029630 – GEC 029746) |
| 6/30/76 – 6/30/83 | Tab 2 | Continental Casualty CCP 248-3440 (GEC 029747 – GEC 030020) |
| 6/30/83 – 6/30/88 | Tab 3 | Continental Casualty CCP 248-3440 (GEC 030188 – GEC 030301) |

| Excess Layers | Disk, Tab # | Excess Policies |
|---|---|---|
| | | **6/30/71-6/30/74** |
| First Layer Excess | Tab 4 | American Employers  EY-8220-005 (5M) (GEC 024585 – GEC 024629) |
| Second Layer Excess | Tab 5 | Home Insurance  HEC 9 91 99 45 (5M) (GEC 024630 – GEC 024638) |
| Third Layer Excess | Tab 6A Tab 6B | INA  XCP 37 45 (10M) (GEC 024639 – GEC 024647) Continental Casualty  RDX 893-68-33 (10M) (8/9/73-6/30/74) (GEC 024648 – GEC 024649) |
| | | **6/30/74 – 6/30/75** |
| First Layer Excess | Tab 7 | Unigard Mutual Insurance Company  1-2517 (10M) (GEC 024722 – GEC 024735) |
| Second Layer Excess | Tab 8 | Continental Casualty RDX 033 915 66 45  (10M) (GEC 024736 – GEC 024742) |
| | | **6/30/75-6/30/76** |
| First Layer Excess | Tab 9 | Northbrook  63-001-170  (1M) (GEC 024988 – GEC 025014) |

**000037**

**XXX-001115**

| Excess Layers | Disk, Tab # | Excess Policies |
|---|---|---|
| Second Layer Excess | Tab 10A | Northbrook  63-001-171  (1.5M) (GEC 025015 – GEC 025024) |
| | Tab 10B | New Hampshire  5175-0444  (1M) (GEC 025025 – GEC 025031) |
| | Tab 10C | Central National  CNU 12-33-83  (1M) (GEC 025032 – GEC 025037) |
| | Tab 10D | Admiral  75 DD 0164 (SCX 039)  (0.5M) (GEC 025038 – GEC 025045) |
| Third Layer Excess | Tab 11A | Northbrook  63 001 172  (3.5M) (GEC 025046 – GEC 025055) |
| | Tab 11B | New Hampshire  5175-0445  (0.625M) (GEC 025056 – GEC 025062) |
| | Tab 11C | First State  922099  (0.625M) (GEC 025063 – GEC 025069) |
| | Tab 11D | California Union  ZCX 0001391 (0.25M) (Bowring  Cover Note 34078) (GEC 025070 – GEC 025071) |
| Fourth Layer Excess | Tab 12 | Continental Casualty  RDX 033 915 66 45  (10M) (GEC 025072 – GEC 025078) |
| 6/30/76-6/30/77 | | |
| First Layer Excess | Tab 13A | Lloyd's  76 DD 1594C  (4M) (GEC 026053 – GEC 026098) |
| | Tab 13B1 | Northbrook  63-002-048  (1M) (GEC 025356 – GEC 025378) |
| Second Layer Excess | Tab 14A1 | Lloyd's  76 DD 1595C  (4M) (GEC 025379 – GEC 025400) |
| | Tab 14B | Prudential Re  DXC 901145  (1M) (GEC 025401 – GEC 025407) |
| Third Layer Excess | Tab 15 | Continental Casualty RDX 033 915 66 45  (10M) (GEC 025408 – GEC 025414) |
| 6/30/77-6/30/78 | | |
| First Layer Excess | Tab 13A | Lloyd's 76 DD 1594C  (4M) (GEC 026053 – GEC 026098) |
| | Tab 13B2 | Northbrook  63-002-048  (1M) (GEC 025715 – GEC 025730) |
| Second Layer Excess | Tab 14A1 | Lloyd's 76 DD 1595C  (5M) (GEC 025379 – GEC 025400) |
| Third Layer Excess | Tab 17 | Prudential Re  DXC DX 0250  (5M) (GEC 025731 – GEC 025739) |

2                                    2

000038

XXX-001116

| Excess Layers | Disk, Tab # | Excess Policies |
|---|---|---|
| Fourth Layer Excess | Tab 18A | Lloyd's 77 DD 1631C (8M) (GEC 025740 – GEC 025775) |
|  | Tab 18B | *Lexington 550-63-39 (914mm as specified in Lloyd's 77 DD 1631C) (GEC 025776 – GEC 025784) |
|  | Tab 18C | Prudential Re  DXC DX 0251  (2M) (GEC 025785 – GEC 025794) |
| **6/30/78-6/30/79** | | |
| First Layer Excess | Tab 13A | Lloyd's  76 DD 1594C (4M) (GEC 026053 – GEC 026098) |
|  | Tab 13B3 | Northbrook 63-002-048 (1M) (GEC 026099 – GEC 026114) |
| Second Layer Excess | Tab 14A2 | Lloyd's  76 DD 1595C  (5M) (GEC 026115 – GEC 026136) |
| Third Layer Excess | Tab 19A | Lloyd's 78 DD 1417C (9M) (GEC 026137 – GEC 026178) |
|  | Tab 19B | *Lexington  5510442 (773,100 as specified in Lloyd's 78 DD 1417C) (GEC 026179 – GEC 026188) |
|  | Tab 19C | Granite State  6178-0491  (5M) (GEC 026189 – GEC 026196) |
|  | Tab 19D | Gerling Konzern  01/49/99/6282  (1M) (GEC 026197) |
| **6/30/79-6/30/80** | | |
| First Layer Excess | Tab 20A | Lloyd's  79 DD 1633C  (4M) (GEC 026497 – GEC 026549) |
|  | Tab 20B1 | Northbrook 63-005-793  (1M) (GEC 026550 – GEC 026553) |
| Second Layer Excess | Tab 21A | Lloyd's 79 DD 1634C (7.5M) (GEC 026554 – GEC 026603) |
|  | Tab 21B | *Lexington 5514585 (803,250 as specified in Lloyd's 79 DD 1634C) (GEC 026604 – GEC 026614) |
|  | Tab 21C | Granite State  6179-1383  (3.75M) (GEC 026615 – GEC 026622) |
|  | Tab 21D | Northbrook 63-005-794  (3.75M) (GEC 026623 – GEC 026629) |
| **6/30/80-6/30/81** | | |
| First Layer Excess | Tab 20A | Lloyd's  79 DD 1633C  (4M) (GEC 026497 – GEC 026549) |
|  | Tab 20B2 | Northbrook 63-005-793  (1M) (GEC 027007 – GEC 027016) |

3

3

**000039**

XXX-001117

| Excess Layers | Disk, Tab # | Excess Policies |
|---|---|---|
| Second Layer Excess | Tab 22A | Lloyd's 80 DD 1643C (11.25M) (GEC 027017 – GEC 027041) |
| | Tab 22B | *Lexington 5540469 (1,201,500 as specified by Lloyd's 80 DD1643C) (GEC 027042 – GEC 027049) |
| | Tab 22C | Granite State 6480-5013 (4M) (GEC 027050 – GEC 027058) |
| | Tab 22D | Northbrook 63-006-854 (3.75M) (GEC 027059 – GEC 027063) |
| | Tab 22E | Transit SCU 955-565 (1M) (GEC 027064 – GEC 027069) |
| | | **6/30/81-6/30/82** |
| First Layer Excess | Tab 20A | Lloyd's 79 DD 1633C (4M) (GEC 026497 – GEC 026549) |
| | Tab 20B2 | Northbrook 63 005 793 (1M) (GEC 027007 – GEC 027016) |
| Second Layer Excess | Tab 22A | Lloyd's 80 DD 1643C (11.25M) (GEC 027017 – GEC 027041) |
| | Tab 22B | *Lexington 5540469 (1,201,500 as specified by Lloyd's 80 DD 1643C) (GEC 027042 – GEC 027049) |
| | Tab 23A | Granite State 6481-5220 (4M) (GEC 027464 – GEC 027472) |
| | Tab 23B | Northbrook 63 008 153 (3.75M) (GEC 027473 – GEC 027483) |
| | Tab 23C | Transit SCU 955-978 (1M) (GEC 027484 – GEC 027492) |
| | | **6/30/82-6/30/83** |
| First Layer Excess | Tab 24A | Lloyd's KYO 17582 (4M) (GEC 028307 – GEC 028360) |
| | Tab 24B | Transit UMB 950-239 (1M) (GEC 027951 – GEC 027962) |
| Second Layer Excess | Tab 25A1 | Lloyd's KYO 17782 (11.25M) (GEC 027963 – GEC 027995) |
| | Tab 25B | Transit SCU 956-259 (4.75M) (GEC 027996 – GEC 028004) |
| | Tab 25C | Granite State 6482-5442 (4M) (GEC 028005 – GEC 028015) |

4                                      4

**000040**

XXX-001118

| Excess Layers | Disk, Tab # | Excess Policies |
|---|---|---|
| **6/30/83-6/30/84** | | |
| First Layer Excess | Tab 24A<br><br>Tab 26 | Lloyd's KYO 17582 (4M)<br>(GEC 028307 – GEC 028360)<br>Transit UMB 950-239 (1M)<br>(GEC 028361 – GEC 028372) |
| Second Layer Excess | Tab 25A2<br><br>Tab 27A<br><br>Tab 27B | Lloyd's KYO 17782 (11.25M)<br>(GEC 028373 – GEC 028391)<br>Transit SCU 956-535 (4.75M)<br>(GEC 028392 – GEC 028401)<br>Granite State 6483-5666 (4M)<br>(GEC 028402 – GEC 028411) |
| **6/30/84-6/30/85** | | |
| First Layer Excess | Tab 24A<br><br>Tab 26<br><br>Tab 28 | Lloyd's KYO 17582 (4M)<br>GEC 028307 – GEC 028360)<br>Transit UMB 950-239 (0.75M)<br>(GEC 028361 – GEC 028372)<br>Pacific XMO 01 72 04 (0.25M)<br>(GEC 028785 – GEC 028793) |
| Second Layer Excess | Tab 25A3<br><br>Tab 29A<br><br>Tab 29B<br><br>Tab 29C<br><br>Tab 29D | Lloyd's KYO 17782 (11.25M)<br>(GEC 028794 – GEC 028818)<br>Granite State 6484-5867 (4.75)<br>(GEC 028819 – GEC 028824)<br>Pacific XCC 01 22 83 (1.75M)<br>(GEC 028825 – GEC 028831)<br>Transit SCU 956-881 (1.25M)<br>(GEC 028832 – GEC 028841)<br>Continental Casualty RDX 178-45-29 (1M)<br>(GEC 028842 – GEC 028852) |
| **6/30/85 – 6/30/86** | | |
| First Layer Excess | Tab 30 | Pacific XMO 017211 (1M)<br>(GEC 029337 – GEC 029344) |
| Second Layer Excess | Tab 31 | Pacific XCC 012315 (1M)<br>(GEC 029358 – GEC 029360) |

000041
XXX-001119

## SUMMARY OF EXHIBITS

| Exhibit No. | Summary |
|---|---|
| K1 | Plaintiff's Third Amended Original Petition |
| K2 | Defendants' Seventh Amended Original Answer, Verified Denials, Affirmative Defenses, and Counterclaims |
| K3 | Amended Final Judgment |
| K4 | Notice of Appeal of Kaneb Pipe Line Operating Partnership, LP and Support Terminal Services |
| K5 | Plaintiff's Notice of Appeal |
| K6 | Abatement Order |
| K7 | Merger Agreement (w/out attachments) |
| K8 | Letter from Dept. of Justice (w/out attachments) |
| K9 | List of Policies |
| K10 | Relevant pages from Continental Casualty CCP 902-36-70 (6/30/73-6/30/76) |
| K11 | Relevant pages from Continental Casualty CCP 248-3440 (6/30/76-6/30/83) |
| K12 | Relevant pages from Continental Casualty CCP 248-3440 (6/30/83-6/30/88) |
| K13 | Relevant pages from American Employers' EY-8220-005 (6/30/71-6/30/74) |
| K14 | Relevant pages from The Home HEC 9 91 99 45 (6/30/71-6/30/74) |
| K15 | Relevant pages from INA XCP 37 45 (6/30/71-6/30/74) |
| K16 | Relevant pages from Continental Casualty RDX 893-68-33 (8/9/73-6/30/74) |
| K17 | Relevant pages from Unigard 1-2517 (6/30/74-6/30/75) |
| K18 | Relevant pages from Continental Casualty RDX 033 915 66 45 |
| K19 | Relevant pages from Northbrook 63-001-170 (6/30/75-6/30/76) |
| K20 | Relevant pages from Northbrook 63-001-171 (6/30/75-6/30/76) |
| K21 | Relevant pages from New Hampshire 5175-0444 (6/30/75-6/30/76) |
| K22 | Relevant pages from Central National CNU 12-33-83 (6/30/75-6/30/76) |
| K23 | Relevant pages from Admiral Insurance Company 75 DD 0164 (SCX 0369) (6/30/75-6/30/76) |
| K24 | Relevant pages from Northbrook 63-001-172 (6/30/75-6/30/76) |
| K25 | Relevant pages from New Hampshire 5175-0445 (6/30/75-6/30/76) |
| K26 | Relevant pages from First State 922099 (6/30/75-6/30/76) |
| K27 | Relevant pages from California Union ZCX 0001391 (Cover Sheet 34078) (6/30/75-6/30/76) |
| K28 | Relevant pages from Lloyd's 76 DD 1594C (6/30/76-6/30/79) |
| K29 | Relevant pages from Northbrook 63-002-048 (6/30/76-6/30/79) |
| K30 | Relevant pages from Lloyd's 76 DD 1595C (6/30/76-6/30/79) |
| K31 | Relevant pages from Prudential DXC 901145 (6/30/76-6/30/77) |
| K32 | Relevant pages from Prudential DXC DX 0250 (6/30/77-6/30/78) |
| K33 | Relevant pages from Lloyd's 77 DD 1631C (6/30/77-6/30/78) |
| K34 | Relevant pages from Lexington 550-63-39 (6/30/77-6/30/78) |
| K35 | Relevant pages from Prudential DXC DX 0251 (6/30/77-6/30/78) |
| K36 | Relevant pages from Lloyd's 78 DD 1417C (6/30/78-6/30/79) |

000042

XXX-001120

| Exhibit No. | Summary |
| --- | --- |
| K37 | Relevant pages from Lexington 5510442 (6/30/78-6/30/79) |
| K38 | Relevant pages from Granite State 6178-0491 (6/30/78-6/30/79) |
| K39 | Relevant pages from Gerling-Konzern 01/49/99/6282 (6/30/78-6/30/79) |
| K40 | Relevant pages from Lloyd's 79 DD 1633C (6/30/79-6/30/82) |
| K41 | Relevant pages from Northbrook 63-005-793 (6/30/79-6/30/82) |
| K42 | Relevant pages from Lloyd's 79 DD 1634C (6/30/79-6/30/80) |
| K43 | Relevant pages from Lexington 5514585 (6/30/79-6/30/80) |
| K44 | Relevant pages from Granite State 6179-1383 (6/30/79-6/30/80) |
| K45 | Relevant pages from Northbrook 63-005-794 (6/30/79-6/30/80) |
| K46 | Relevant pages from Lloyd's 80 DD 1643C (6/30/80-6/30/82) |
| K47 | Relevant pages from Lexington 5540469 (6/30/80-6/30/82) |
| K48 | Relevant pages from Granite State 6480-5013 (6/30/80-6/30/81) |
| K49 | Relevant pages from Northbrook 63-006-854 (6/30/80-6/30/81) |
| K50 | Relevant pages from Transit SCU 955-565 (6/30/80-6/30/81) |
| K51 | Relevant pages from Granite State 6481-5220 (6/30/81-6/30/82) |
| K52 | Relevant pages from Northbrook 63-008-153 (6/30/81-6/30/82) |
| K53 | Relevant pages from Transit SCU 955-978 (6/30/81-6/30/82) |
| K54 | Relevant pages from Lloyd's KYO 17582 (6/30/82-6/30/85) |
| K55 | Relevant pages from Transit UMB 950-239 (6/30/82-6/30/85) |
| K56 | Relevant pages from Lloyd's KYO 17782 (6/30/82-6/30/85) |
| K57 | Relevant pages from Transit SCU 956-259 (6/30/82-6/30/83) |
| K58 | Relevant pages from Granite State 6482-5442 (6/30/82-6/30/83) |
| K59 | Relevant pages from Transit SCU 956-535 (6/30/83-6/30/84) |
| K60 | Relevant pages from Granite State 6483-5666 (6/30/83-6/30/84) |
| K61 | Relevant pages from Pacific XMO 01 72 04 (6/30/84-6/30/85) |
| K62 | Relevant pages from Granite State 6484-5867 (6/30/84-6/30/85) |
| K63 | Relevant pages from Pacific XCC 01 22 83 (6/30/84-6/30/85) |
| K64 | Relevant pages from Transit SCU 956-881 (6/30/84-6/30/85) |
| K65 | Relevant pages from Continental Casualty RDX 178-45-29 (6/30/84-6/30/85) |
| K66 | Relevant pages from Pacific XMO 017211 (6/30/85-6/30/86) |
| K67 | Relevant pages from Pacific XCC 012315 (6/30/85-6/30/86) |

000043

XXX-001121

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                         X        Chapter 11
                                               :
W. R. GRACE & CO., et al.,                     :        Case No. 01-1139 (JKF)
                                               :        (Jointly Administered)
        Debtors.                               :
                                               :        Objection Deadline: February 6, 2009 at 4:00 p.m.
                                               :        Hearing Date: February 23, 2009 at 10:30 a.m.
                                               X

ORDER GRANTING KANEB PIPE LINE OPERATING PARTNERSHIP, L.P. AND
SUPPORT TERMINAL SERVICES, INC.'S MOTION FOR AN
ORDER MODIFYING THE AUTOMATIC STAY

On this day came on to be considered the Motion for an Order Modifying the Automatic

Stay ("Motion") filed by Kaneb Pipe Line Operating Partnership, L.P. and Support Terminal

Services, Inc. The Court, having considered the Motion and the pleadings on file, is of the

opinion and finds that the Motion should be and hereby is in all things **GRANTED**. It is

therefore,

ORDERED, that the automatic stay of 11 U.S.C § 362(a) be and hereby is modified to

allow all parties, courts, and court personnel to take all actions necessary or convenient to litigate

causes of actions and defenses, to otherwise prosecute and defend and to administer Appeal No.

05-00-01592-CV, in the Fifth District Court of Appeals, Dallas, Texas, including the filing of

briefs, motions, argument, entering of opinions, orders, judgments, and mandates, and the

prosecution of any post appellate proceedings, including proceedings before the Texas Supreme

Court and any trial court proceedings on remand. It is further,

ORDERED that the automatic stay of 11 U.S.C § 362(a) be and hereby is modified to

allow all parties, courts, and court personnel to take all actions necessary or convenient to litigate

causes of actions and defenses, to otherwise prosecute and defend and to administer any claims

by Kaneb Pipe Line Operating Partnership, L.P. and Support Terminal Services, Inc. under the

{08008160164874.1}

**000044**

Policies (as defined in the Motion) for insurance coverage relating to the Otis Pipeline release.

Dated this ___ day of _____, 2009.

_____
HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY JUDGE

{08008}60164874.1

# EXHIBIT K1

Plaintiff's Third Amended Original Petition

**000046**

**XXX-001124**

NO. 97-05135-J

| | | |
|---|---|---|
| **GRACE ENERGY CORPORATION** | § | **IN THE DISTRICT COURT** |
| | § | |
| **vs.** | § | |
| | § | |
| **KANEB PIPE LINE OPERATING** | § | **DALLAS COUNTY, TEXAS** |
| **PARTNERSHIP, L.P.; SUPPORT** | § | |
| **TERMINAL SERVICES, INC.; and** | § | |
| **SUPPORT TERMINALS OPERATING** | § | |
| **PARTNERSHIP, L.P.** | § | **191ST JUDICIAL DISTRICT** |

## PLAINTIFF'S THIRD AMENDED ORIGINAL PETITION

Grace Energy Corporation brings this declaratory judgment action against Kaneb Pipe Line Operating Partnership, L.P.; Support Terminal Services, Inc.; and Support Terminal Operating Partnership, L.P. (collectively "Defendants") and respectfully shows as follows:

### PARTIES

1. Grace Energy Corporation ("GEC") is a Delaware corporation with its principal place of business in Dallas, Texas.

2. Kaneb Pipe Line Operating Partnership, L.P. ("OLP") is a Delaware limited partnership. OLP has been served and has made an appearance in this case.

3. Support Terminal Services, Inc. ("STS") is a Delaware corporation. STS has been served and has made an appearance in this case.

4. Support Terminals Operating Partnership, L.P. ("STOP") is a Delaware limited partnership. STOP has been served and has made an appearance in this case.

### JURISDICTION AND VENUE

1. The Court has jurisdiction over Defendants (headquartered in Dallas County) and the subject matter (a contract performable in Dallas County and governed by Texas law). The amount in controversy is within the jurisdictional limits of this Court.

**PLAINTIFF'S THIRD AMENDED ORIGINAL PETITION – Page 1**
DOC #: 826690

003862

000047

XXX-001125

2.    Venue is proper because: (a) all or part of the causes of action asserted herein arose in Dallas County, Texas; (b) that is where the contract between the parties was and is to be performed; and (c) Defendants' principal business offices are in Dallas County, Texas.

## SUMMARY OF DISPUTE

1.    Federal officials have asserted that fuel has leaked from a pipe line in Massachusetts which used to be owned by the Standard Transmission division of Grace Petroleum Corporation ("GPC"), a corporation formerly owned by GEC. The federal government has given notice that it may seek response cost reimbursement. In addition, Massachusetts officials have asserted that past and potential pipe line leaks necessitated response action. GPC was sold to Samson Investment Company ("Samson"), which still owns GPC. Samson has made demand that GEC indemnify it for the state and federal government requirements to date and in the future, pursuant to the terms of the purchase and sale agreement between GEC and Samson.

2.    The pipe line and associated liability in question were transferred in 1978 from GPC to another GEC entity, Standard Transpipe Corp., which was merged into a subsidiary of OLP in the transaction discussed in paragraph 15, below. If the pipe line and associated liability were not transferred to Standard Transpipe Corp., then they were transferred to Standard Transmission Division of W. R. Grace & Co.-Conn. and then to S.T.C. Corp., which was renamed Support Terminal Services, Inc. and which also was merged into a subsidiary of OLP in the transaction discussed in paragraph 13 below. Defendants refused to discuss these governmental requirements and refused to take responsibility for the response actions or response costs, thereby necessitating this action. GEC seeks a declaratory judgment as to Defendants' liability for the pipe line response costs, and GEC seeks to recover from Defendants for the time and money which has been spent responding to the governmental action pursuant to

Samson's indemnification demands.  Defendants are liable for these response costs and GEC is not.

## FACTS

1.      In 1965, Standard Transmission Corporation built a facility in the Upper Cape Cod area of Massachusetts to transport jet fuel and aviation gas to Otis Air Force Base.  The pipe line is approximately 16.5 miles long and is referred to herein as the Otis Pipeline.

2.      In 1971, Standard Transmission Corporation was merged into Cleary Petroleum Corporation ("Cleary").    After the merger, Standard Transmission's fuel terminal and supply business continued to be carried out by Standard Transmission, which was operated as a separate division of Cleary.   In 1973, Cleary was acquired by a subsidiary of W. R. Grace & Co.-Conn., the owner of all the issued and outstanding stock of GEC, and continued to operate under the Cleary name.  The Standard Transmission Division continued to be a separate division of Cleary, with separate headquarters, management, and business from the remainder of Cleary.

3.      In 1973, before Cleary was merged with a Grace subsidiary, the Otis Pipeline was taken out of service due to reduced demand for fuel at Otis Air Force Base.  In 1976, the terminal facility connected to the Otis Pipeline, but not the pipe line itself, was sold to a company called Northeast Petroleum Corporation of Cape Cod, Inc.

4.      In 1978, Cleary changed its name to GPC.  At approximately the same time, all of the Standard Transmission military pipeline assets and liabilities, including the Otis Pipeline, were transferred into Standard TransPipe Corp., a Delaware corporation, and all of the remaining assets and liabilities of the Standard Transmission Division were transferred from Cleary/GPC into the newly-created Standard Transmission Division of W. R. Grace & Co.-Conn. This "push down" was accomplished orally and was also memorialized in a memorandum to Felix Larkin

000049

XXX-001127

from Hal Logan dated July 24, 1978, a General Bill of Sale, and other written memoranda and agreements.

5.    The memoranda, agreements, and General Bill of Sale were not intended to be final, integrated writings of all intentions and agreements of the parties relating to the "push down" transaction.  The documents do evidence an intent and agreement to transfer all Standard Transmission assets and liabilities, including the Otis Pipeline, out of Cleary/GPC and into the new entities, especially in light of the surrounding circumstances.  In the event, however, that the Court is not convinced that the Otis Pipeline potential liabilities were transferred by virtue of these writings, then GEC pleads, in the alternative, that Standard TransPipe Corp. is estopped from claiming the Otis Pipeline was transferred to it and Standard TransPipe Corp. has made binding admission of its ownership of the Otis Pipeline assets and liabilities.  Pleading further in the alternative, GEC alleges that if the Court is not convinced that the Otis Pipeline potential liabilities were transferred as a result of the aforementioned writings, and there is no estoppel or admission binding upon Defendants in view of Standard TransPipe Corp.'s acceptance of the Otis Pipeline and its tax benefits, then such writings are ambiguous and their meaning must be resolved by the trier of fact.

6.    The "push down" agreement was fully performed by the parties.   Standard TransPipe Corp. assumed all liabilities and assets that ever related to military pipeline business and activities of Standard Transmission.  With respect to the Otis Pipeline in particular, Standard TransPipe Corp. has specifically recognized and admitted its ownership of the Otis Pipeline and associated liabilities and potential liabilities after the 1978 "push down" and has taken federal tax depreciation deductions on the Otis Pipeline for a number of years after 1978 and continued to maintain the tax basis for that asset all the way through 1992, when Standard TransPipe Corp. was sold to Defendants.  After the 1978 transfer, GPC transferred all tax basis in the Otis

Pipeline to Standard TransPipe Corp. and GPC ceased taking depreciation deductions with respect to the Otis Pipeline in reliance on Standard TransPipe Corp.'s assumption of this asset/liability. In 1980, the Standard Transmission Division of W. R. Grace & Co.-Conn. became S.T.C. Corp. The following year, 1981, S.T.C. Corp. changed its name to Support Terminal Services, Inc. The stock of Standard TransPipe Corp. and Support Terminal Services, Inc. was later transferred to Grace Energy Corporation, a wholly-owned subsidiary of W. R. Grace & Co.-Conn.

7.    On January 21, 1993, GEC sold the stock of its GPC subsidiary to Samson. On March 2, 1993, GEC sold the stock of Support Terminal Services, Inc. and Standard TransPipe Corp. to OLP by a series of forward mergers. The mergers were made pursuant to the STS Agreement And Plan of Merger ("Agreement") dated December 21, 1992, a true and correct copy of which, without the voluminous schedules, is attached hereto.

8.    After Samson purchased GPC, Samson changed the name of GPC to SNG Production Co. ("SNG"). In March 1994, the Air Force asserted there had been past fuel spills from the Otis Pipeline and terminated the 1965 Consent Agreement between it and Standard Transmission Corporation. The Consent Agreement was the agreement pursuant to which the Air Force gave permission to Standard Transmission to install and operate the Otis Pipeline. In July 1994, the Air Force filed of record a letter demanding removal of the Otis Pipeline pursuant to the terms of the 1965 Consent Agreement. On November 28, 1995, the Massachusetts Department of Environmental Protection sent a notice of responsibility ("DEP NOR") to SNG. The DEP NOR asserted that there were fuel leaks or threatened fuel leaks from the Otis Pipeline and mandated that SNG provide an Immediate Response Action Plan to evaluate the presence of product, perform on site discovery along the Otis Pipeline, and remove the Otis Pipeline. Samson referred the DEP NOR to GEC for response on SNG's behalf, and GEC undertook an

initial response.  Subsequent to the DEP NOR, GEC has had to prepare an IRA Completion Report, a Partial Response Outcome Statement and perform other work pursuant to demands on SNG by the DEP.  Time and resources have been spent responding to the DEP demands on SNG and SNG's indemnity demands on GEC, for which GEC seeks recovery from Defendants in this lawsuit.

9.      Samson subsequently changed the name of SNG to Samson Hydrocarbons Company ("Samson Hydrocarbons").  On January 9, 1997, the United States Department of Justice ("DOJ") sent a letter to Samson Hydrocarbons asserting that the Defense Department had incurred expenses in responding to two fuel spills allegedly coming from the Otis Pipeline and inviting Samson Hydrocarbons to discuss its potential liability with DOJ.  Samson again referred the correspondence to Grace.  Without acknowledging Samson Hydrocarbons has any liability in connection with the claims made by DOJ, Grace has attempted to cooperate with Samson in providing such response and has conducted a review of the ownership of the Otis Pipeline.

10.      Under the Agreement, OLP acquired the stock and all of the attendant liabilities of Standard TransPipe Corp. and Support Terminal Services, Inc.  Because all of the assets and liabilities of Standard TransPipe Corp. and Support Terminal Services, Inc., including those relating to the Otis Pipeline, were transferred to OLP under the Agreement, the environmental liabilities being asserted by the Massachusetts DEP and the DOJ are the responsibility of the OLP entity that is the successor to Standard TransPipe Corp. or Support Terminal Services, Inc.  STS acquired the Otis Pipeline liability and cross-conveyed it among OLP and STOP.  The business of the original Standard Transmission Corporation is still being carried on today by the same personnel with the same management, in the same offices and facilities, in the same manner, and under the same "ST" trade name as it always was through the various different ownerships.

000867

000052

XXX-001130

11.    The Agreement contains indemnity provisions in Section 13.03 that require GEC to indemnify OLP and save and hold OLP harmless from and against damages and liabilities caused by or arising out of: (i) GEC's failure to perform or fulfill an agreement or covenant to be performed by it under the Agreement; or (ii) an inaccuracy in any representation or breach of any warranty of GEC in Article 6.  GEC has not failed to perform or fulfill an agreement or covenant under the Agreement, and GEC did not make any inaccurate representation or breach any warranty under Article 6, with respect to the Otis Pipeline.  Therefore GEC has no indemnity obligation to any of the Defendants with respect to the Otis Pipeline.  The indemnity provisions of Section 13.03 as limited by the terms and conditions of Section 13.04 are the sole remedy for OLP for the breach, if any, of Article 6, or any other claim relating to the Otis Pipeline.

12.    In April 1997, GEC discussed the foregoing facts with Defendants and their counsel.  GEC offered to meet with Defendants to discuss the matter further and to attempt to reach agreement on the effect of the governmental claims under the Agreement.  Defendants refused to acknowledge that they have any responsibility for the Otis Pipeline and refused to meet with GEC to discuss the matter further.  There is, therefore, a present controversy between the parties concerning the meaning and effect of the Agreement which can only be resolved by a judgment of this Court declaring the rights, status, or other legal relations of the parties under the Agreement.

## CAUSES OF ACTION

1.    GEC seeks a declaratory judgment that one or more of Defendants hold all present and future liabilities associated with the Otis Pipeline.  The Otis Pipeline was pushed down to Standard TransPipe Corp. or Support Terminal Services, Inc. in the late 1970s.  Even if it were found that the Otis Pipeline was not pushed down, the doctrines of estoppel, quasi-estoppel, ratification, binding admission, waiver, assumption of liability, assumption of the risk,

000053
XXX-001131

and acceptance of the benefits preclude Defendants from now denying their ownership of the Otis Pipeline and all liabilities or burdens associated with it. Under the Agreement and pursuant to the Texas Business Corporations Act, Defendants have stepped into the shoes of Standard TransPipe Corp. and Support Terminal Services, Inc. and hold all of their liabilities and burdens.

2.     GEC seeks a further declaration that GEC has no indemnity obligation to any of Defendants with respect to the Otis Pipeline, contractual or otherwise, or, alternatively, that any applicable indemnity clause of the Agreement is unenforceable. Among other things, the indemnity obligations, if any, of GEC under Sections 13.03 and 13.04 and any applicable limitations of Section 13.02(c), if any, are unenforceable due to the express indemnity doctrine, repudiation, prior material breach, contractual limitation of remedies and damages, failure of consideration, statutory and contractual limitations, failure of conditions precedent, and unclean hands. If the Court finds a breach of Article 6 by GEC with respect to the Otis Pipeline, and compliance with the terms and conditions of the Article 13 by Defendants, then Defendants' sole remedy against GEC is the 40/60 cost-sharing specified in Sections 13.03 and 13.04 with a maximum exposure of $10 million for GEC. The limitations on GEC's cross-indemnity rights under Section 13.02(c) are not applicable in this case. If the Court finds that they are, then GEC pleads, in the alternative, that Defendants are precluded from asserting Section 13.02(c) limitations due to Defendants' repudiation and prior material breach of the Merger Agreement. If that does not preclude Defendants from relying on Section 13.02(c), then GEC pleads, in the alternative, that the manner in which Defendants are attempting to use Section 13.02(c) in this case creates an ambiguity and causes Section 13.02(c) to be in irreconcilable conflict with Sections 13.03 and 13.04. The Court should rule that the specific provisions of Sections 13.03 and 13.04 concerning the handling of environmental liabilities are controlling over Section 13.02(c) if there is any arguable applicability of Section 13.02(c). GEC is entitled to

recover all of its costs and reasonable and necessary attorneys fees incurred in connection with this action pursuant to Chapter 37.009 of the Civil Practice and Remedies Code.

3.      GEC has expended in excess of $3.0 million to date responding to the DEP NOR and the DOJ letter.  Defendants have failed and refused to cooperate in the handling of these claims.  These response costs have been reasonable and have benefited Defendants.  Defendants' refusal to acknowledge their liability for the Otis Pipeline and the response costs associated therewith is a violation of state law and repudiation and breach of Agreement.  GEC is entitled to recover from Defendants all expenditures GEC has made in responding to the DEP NOR and the DOJ letter, together with costs of court, prejudgment interest, postjudgment interest, and attorneys fees and expenses.  GEC is entitled to recover its attorneys fees under the Agreement and pursuant to Chapter 38 of the Civil Practice and Remedies Code.  Presentment of GEC's claim has been made and all conditions precedent to the recovery of attorneys' fees have occurred.

## PRAYER

1.      GEC prays for a declaratory judgment that one or more of Defendants hold the liabilities associated with the Otis Pipeline.  GEC seeks a further declaration that GEC has no indemnity obligation to any of Defendants with respect to the Otis Pipeline, contractual or otherwise, or, alternatively, that any applicable indemnity clause of the Agreement is unenforceable.  In the alternative, if the Court declares that GEC has indemnification liability, then it is subject to the conditions and limitations contained in Sections 13.03 and 13.04 of the Agreement.  The Court should further declare, and enter judgment, that Defendants are jointly and severally liable to GEC for all of GEC's costs and reasonable and necessary attorneys fees, together with postjudgment interest.  GEC seeks a judgment against OLP for all of GEC's actual damages, for breach of contract or in equity (such as *quantum meruit*), plus costs, prejudgment

interest, postjudgment interest, and reasonable and necessary attorneys fees.    GEC prays for

such other relief, at law or in equity, to which it may be entitled.

Respectfully submitted,

COWLES & THOMPSON, P.C.

By: _____

JOHN M. PEASE
State Bar No. 15698050

901 Main Street, Suite 4000
Dallas, Texas 75202
(214) 672-2000
(214) 672-2020 Fax

CRADY, JEWETT & McCULLEY, L.L.P.

Ross Spence
State Bar No. 18918400
909 Fannin, Suite 1400
Houston, Texas 77010-1006
(713) 739-7007
(713) 739-8403 Fax

ATTORNEYS FOR GRACE ENERGY
CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has

been served on the following counsel of record in this cause of action on this the 21st day of

May, 1999.

Ms. Ellen A. Presby
Mills ★ Presby and Associates, L.L.P.
5910 N. Central Expressway, Suite 900
Dallas, Texas 75206

_____

JOHN M. PEASE

**PLAINTIFF'S THIRD AMENDED ORIGINAL PETITION – Page 10**
DOC #: 826690

003871

**000056**

XXX-001134

# EXHIBIT K2

Defendants' Seventh Amended Original Answer,
Verified Denials, Affirmative Defenses, and
Counterclaims

**000057**

**XXX-001135**

ORIGINAL

Cause No. 97-05135-J

| | |
|---|---|
| GRACE ENERGY CORPORATION    * | IN THE DISTRICT COURT OF |
| v. | DALLAS COUNTY, TEXAS |
| KANEB PIPE LINE OPERATING PARTNERSHIP, L.P. ET AL. | 191ST JUDICIAL DISTRICT |

*[FILED stamp: FILED MAY 2000 JIM HAMLIN DIST. CLERK, DALLAS CO, TEXAS DEPUTY]*

## DEFENDANTS' SEVENTH AMENDED ORIGINAL ANSWER, VERIFIED DENIALS, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS

Defendants Kaneb Pipe Line Operating Partnership, L.P. ("Kaneb") and Support Terminal Services, Inc. ("STS") file this Defendants' Seventh Amended Original Answer, Verified Denials, Affirmative Defenses, and Counterclaims.[1]

### Answer

Pursuant to Rule 92 of the Texas Rules of Civil Procedure, Kaneb and STS (sometimes collectively referred to as "Defendants"), deny all allegations contained in Plaintiff's latest amended original petition and demand strict proof of each.

### Verified Denials

Pursuant to Rule 93(2), Defendants state that Kaneb and STOP are not liable in the capacity in which they have been sued.

### Affirmative Defenses

Pursuant to Rule 94, without waiving the foregoing general denial and by way of further answer, if such is necessary, Defendants would show this Honorable Court as follows:

---

[1]Pursuant to the Court's Order, Support Terminals Operating Partnership, L.P. ("STOP") is no longer a party to this case, the Court having ruled that STOP was improperly sued. To the extent that STOP remains a party, this pleading is filed on its behalf.

**DEFENDANTS' SEVENTH AMENDED ORIGINAL ANSWER, VERIFIED DENIALS, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS - PAGE 1**

005135

000058

XXX-001136

1.    Plaintiff fails to state a cause of action against Defendants for which relief can be granted, in that the pipeline in question is neither, nor ever has been, owned or controlled by Defendants. The pipeline was not conveyed or transferred to Standard TransPipe Corporation, or any other company acquired by the Defendants in the STS Agreement and Plan of Merger, dated December 21, 1992 ("Agreement") or, alternatively, the pipeline was abandoned in 1976 or earlier, as Plaintiff has judicially admitted, and therefore Grace/Cleary Petroleum Corporation did not have title to the pipeline to convey it to Standard TransPipe Corporation, or any other entity, in 1978. Alternatively, the Otis pipeline and terminal facility was sold to Northeast Petroleum Corporation in 1976, and therefore Grace/Cleary Petroleum Corporation did not have title to the pipeline to convey it to Standard TransPipe Corporation or any other entity. Defendants owe no duty nor breached any legal duty to Plaintiff, its parent companies, subsidiaries, or other related entities with respect to the pipeline in question. Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

2.    Plaintiff's breach of contract claims are barred by the four-year statute of limitations, pursuant to § 16.004, Tex. Civ. Prac. & Rem. Code Ann. (Vernon 1990). Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

3.    Defendants are not legally responsible for any liability for the pipeline in question, and Plaintiff's resulting damages, which are not admitted and are expressly denied, are the direct and proximate cause of the acts or omissions of Plaintiff and/or third parties or instrumentalities over which these Defendants have or had no control. Defendants specifically deny allegations that the pipeline and/or any liability associated therewith was ever purchased, conveyed, or otherwise transferred to Defendants, by or through any agreement, including but not limited to the Agreement. Both the Comprehensive Environmental Response Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601-9675) (1995) and the Massachusetts Oil and Hazardous Material Release Prevention Act, Mass. Gen. Laws Ann. ch. 21E (West 1990) specifically prohibit any transfer of environmental liabilities. Defendants further affirmatively plead that the statute of frauds prohibits any oral

agreement to transfer the assets or assume the liabilities associated with the pipeline in 1978 when Plaintiff alleges that the assets and liabilities associated with the pipeline were transferred to Standard TransPipe Corporation. Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

4.      Plaintiff has failed to mitigate its damages, if any. Any costs or damages related to the investigation and/or clean up of the pipeline are the result of inappropriate and/or improper pipeline investigative and/or remediation efforts. Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

5.      Plaintiff is estopped (promissorily, quasi-, and by contract) from recovering for any liabilities associated with the pipeline in question from Defendants, including costs and attorneys' fees. Plaintiff represented in the Agreement that the companies sold to Defendants were in compliance with, and had no liability under, any environmental laws and standards. Plaintiff further represented that the pipeline was previously owned, owned by a third-party and abandoned, and cannot now take a different position. Defendants relied upon Plaintiff's representations. Plaintiff, years after the agreement, took actions consistent with ownership, and exercised dominion and control over the Otis pipeline and its liabilities by, among other things, giving authority to others to take action with respect to the pipeline and its liabilities. Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

6.      Plaintiff's claims are barred by laches because Plaintiff unreasonably delayed and made a stale demand upon Defendants to assume responsibility for the environmental investigation and clean up of the pipeline. To allow Plaintiff to pursue its claims against Defendants at this late date, and in light of the circumstances outlined herein, would result in unconscionable prejudice to Defendants. Plaintiff delayed in asserting allegations that Defendants allegedly owned the Otis pipeline and allegedly held its liabilities after Plaintiff received the Massachusetts and United States Department of Justice environmental inquiries concerning the pipeline in 1994, 1995 and 1997. Also, Plaintiff agreed to and paid for the environmental investigation and/or

**DEFENDANTS' SEVENTH AMENDED ORIGINAL ANSWER, VERIFIED DENIALS,
AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS - PAGE 3**

005137

000060
XXX-001138

clean up on behalf of Samson/SNG Production Company for over a year and a half; and Plaintiff's agents, employees, representatives and environmental investigation and remediation experts, including but not limited to Mary Ellen Johns, Susan Cooke and Woodard & Curran, stated in correspondence and formal reports for an extended period of time that the pipeline was owned by Samson/SNG Production Company.

The unconscionable prejudice which would be suffered by Defendants if Plaintiff were allowed to pursue its claims at this late date include, but are not limited to: (a) loss of the opportunity to enforce various representations, warranties and covenants in the Agreement; the time period for enforcement of such representations, warranties and covenants having expired due to Plaintiff's delay in asserting that the Otis pipeline was included in the Agreement; and (b) loss of the opportunity to investigate and/or remediate the pipeline more efficiently and less expensively than have Plaintiff and its agents, assuming but expressly denying that Defendants, currently or ever, owned the pipeline or held its liabilities.  Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

7.        Plaintiff's claims are barred by waiver for the same reasons as those asserted in the immediately preceding paragraph.

8.        Defendants have no successor liability for the acts of any party relating to the pipeline in question, and they assumed no liabilities of any party relating to the pipeline.  Defendants are not successors of Cleary/Grace Petroleum Corporation and therefore hold no environmental liabilities of either entity or any related entity. Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

9.        Defendants are excused from performance of any executory obligations of the Agreement, including but not limited to indemnification of Plaintiff, because Plaintiff committed material breaches of the Agreement, including but not limited to those expressed in Defendants' breach of contract counterclaim below. Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

**DEFENDANTS' SEVENTH AMENDED ORIGINAL ANSWER, VERIFIED DENIALS, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS - PAGE 4**

000061
XXX-001139

10.    Plaintiff's initial breach of the Agreement precludes further performance by Defendants, and constitutes a failure of consideration. Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

11.    Defendants are entitled to reformation of the Agreement, in the event the Court determines that the Agreement conveyed the Otis pipeline and any associated liabilities to one or more Defendants, because: (a) a prior enforceable agreement concerning the sale and merger of various companies by Plaintiff to Defendants was reached prior to reducing the agreement to writing; and/or (b) there was a mutual mistake among the parties concerning whether the Otis pipeline was part of the Agreement; or, in the alternative, a unilateral mistake by Defendants coupled with fraud committed by Plaintiff, as described more fully below in Defendants' counterclaims, or other inequitable conduct on the part of Plaintiff (including but not limited to the fact that Plaintiff failed to disclose the existence of the Otis pipeline as an asset being conveyed as part of the Agreement; Plaintiff represented the pipeline was "previously owned" and abandoned; that any associated liability was not disclosed on Schedule 6.11 to the Agreement; and Plaintiff represented that the "previously owned" asset and any liabilities were not part of the Agreement). Defendants are entitled to reformation of the Agreement to insert specific language to the effect that the pipeline was and is not part of the Agreement. In the alternative, Defendants are entitled to a reformation of Article 13 to reflect that Plaintiff must fully indemnify Defendants for any costs and/or liability associated with the pipeline. Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

12.    In the event liability is found to exist against Defendants, Defendants are entitled to indemnification from Plaintiff pursuant to the terms of the Agreement. Plaintiff is not entitled to indemnification from Defendants. The Otis pipeline environmental liabilities were not held by the companies affected by the Agreement, and thus Defendants have no indemnity obligation to Plaintiff. Further, even if the Otis pipeline or its liabilities were conveyed in 1978, which Defendants do not admit and expressly deny, neither the 1978 draft bill of sale, the 1978 Larkin memoranda, nor any other document includes any language or agreement to indemnify for future

**DEFENDANTS' SEVENTH AMENDED ORIGINAL ANSWER, VERIFIED DENIALS,**
**AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS - PAGE 5**

**000062**

**XXX-001140**

contingent environmental liabilities. Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

13.     Mutual and unilateral mistake are applicable to the facts of this case. Specifically, Plaintiff represented to Defendants that the Otis pipeline was a "previously owned" and abandoned facility or asset, and that it was owned by a third-party. Moreover, there was no meeting of the minds of the parties that the Otis pipeline or its liabilities would be included in the Agreement. The fact that it was left off applicable Agreement schedules and no reference was made to it in the books, records, and other financial data and files made available to Defendants in connection with the Agreement shows that it was not intended to be part of the Agreement and that the parties agreed the Otis pipeline and liabilities would not be part of the Agreement (or, alternatively, that it was part of Plaintiff's deception). Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

14.     The discovery rule and fraudulent concealment are applicable in response to Plaintiff's statute of limitations affirmative defense. Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

15.     Defendants assert that the Otis pipeline was abandoned in 1976 or earlier, as a result of the absence of any pipeline business since 1973 and the sale of the Otis terminal (including the pipeline pumps) in 1976. With such sale, the Otis pipeline could no longer physically receive petroleum products, nor have the pumping power to move them. As a result of the abandonment of the pipeline in 1976 or earlier, Grace/Cleary Petroleum Corporation did not have title to or ownership rights in the pipeline to enable it to transfer the pipeline to Standard TransPipe Corporation or any other entity in 1978 or thereafter. Moreover, once Plaintiff, on behalf of Samson/SNG Production Company, began to exercise dominion and control over the pipeline by actions, including but not limited to the segmentation of the pipeline and other investigative/remediation conduct, Plaintiff acquired title to and possession of the pipeline and any attendant liabilities. Plaintiff, years after the Agreement, took actions consistent with ownership, and exercised dominion and control over the Otis pipeline,

DEFENDANTS' SEVENTH AMENDED ORIGINAL ANSWER, VERIFIED DENIALS,
AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS - PAGE 6

005140

by, among other things, giving authority to others to take action with respect to the pipeline and its liabilities. Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

16.    Plaintiff assumed the risk and associated liabilities of the pipeline and is now estopped from taking a position inconsistent with its prior assumption.  Plaintiff assumed the risk and associated liabilities of the pipeline by exercising dominion and control over the pipeline in Plaintiff's investigation and remediation of the pipeline since December 1995.  Plaintiff is estopped from denying ownership of the pipeline for the same reasons stated herein.  Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

17.    Plaintiff accepted the benefits of the Agreement and cannot now, among other things, attempt to change the terms and effect of the Agreement solely to Plaintiff's benefit.  The benefits of the Agreement are the $63,847,801.96 paid by Defendants to Plaintiff for the companies purchased in the Agreement.  The companies did not include the Otis pipeline.  Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

**Counterclaims**

1.    **Breach of Contract**

In the unlikely event that it is determined that the pipeline and/or any associated liability was conveyed or transferred to one or more of the companies acquired by Defendants, pursuant to the terms of the Agreement, Defendants contend that Plaintiff committed various breaches of the Agreement.  The breaches include, but are not limited to, breach of Section 6.11 of the Agreement.  That section was breached by: (1) the existence of environmental law liability with respect to the Otis pipeline at the time of the execution of the Agreement; and (2) Plaintiff's failure to disclose its knowledge of the environmental liabilities associated with the Otis pipeline at the time of the execution of the Agreement.

Other breaches of the Agreement include, but are not limited to: (1) Plaintiff's breach of Section 6.03 of the Agreement, because ". . . the execution and delivery by each of GEC and the Corporations of this

**Defendants' Seventh Amended Original Answer, Verified Denials, Affirmative Defenses, and Counterclaims - Page 7**

005141

**000064**

**XXX-001142**

Agreement . . . [should have] require[d] it to . . . make . . . [a] filing with, any . . . Governmental Authority .

. . [i.e., filing the Otis pipeline easements and rights of way in the name of Standard TransPipe Corporation

or whatever entity GEC contends received the Otis pipeline, in the Sandwich, Barnstable County,

Massachusetts Deed Records];" (2) Plaintiff's breach of Section 9.01 of the Agreement to the extent that,

although Plaintiff may have allowed Defendants access to certain books, records, relevant purchasing and other

financial data and files of Plaintiff, none of that information revealed that the Otis pipeline and/or any

associated liability were part of the transaction contemplated in the Agreement (and in fact revealed only that

they were not part of the transaction), and all of the oral representations were that the Otis pipeline and liability

were not part of the deal, therefore rendering such access meaningless and effectively useless with respect to

assessing the value and any associated liability of the Otis pipeline; (3) Plaintiff's breach of Section 9.05 of

the Agreement by failing to disclose that the Otis pipeline and its known environmental liability were part of

the Agreement - this constituted a "Material Adverse Effect," as defined in the Agreement, for which Plaintiff

was contractually obligated to advise Defendants but failed to do so; (4) Plaintiff's breach of Section 6.06 of

the Agreement because GEC executives were obligated to remove the abandoned pipeline and were aware of

the Town of Sandwich and National Guard investigations and possible threatened actions which have extended

beyond violations of environmental laws; (5) Plaintiff's failure to list the Otis pipeline real property, i.e., rights

of way and easements, in Exhibit A, under Section 6.18 of the Agreement, which was Plaintiff's list of the real

property, including pipeline rights of way and easements owned or leased by the corporations being sold to

Defendants; (6) Plaintiff's failure to disclose the existence of the Otis pipeline and liabilities in Schedule 5.02

of the Agreement, the schedule of consolidated balance sheets for the entities acquired; (7) Plaintiff's breach

of Section 6.09 by failing to disclose that the Consent Agreement between Standard Transmission Corporation

and the U. S. Department of the Air Force covering part of the Otis pipeline rights of way contains a currently

effective provision for indemnification by the Corporation for environmental matters; (8) Plaintiff's failure to

disclose the existence of any liabilities associated with the Otis pipeline as an exception to the representations

**DEFENDANTS' SEVENTH AMENDED ORIGINAL ANSWER, VERIFIED DENIALS,
AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS - PAGE 8**

000065
XXX-001143

and warranties of Section 6.14 that the corporations being sold to Defendants had no liability except as specifically disclosed, the schedule of liabilities which were required to be reflected in the notes to the consolidated balance sheet; and (9) Plaintiff's failure to disclose the existence of the Otis pipeline in Schedule 6.22 to the Agreement, the schedule of personal property owned by the corporations being sold to Defendants.

Defendants have suffered damages (including but not limited to the attorneys' fees and expenses incurred, and which continue to occur and will occur through trial and any appeals) and have been exposed to liability (contingent environmental liability at this point, which may become an actual liability depending upon court or administrative rulings) as a proximate result of Plaintiff's breaches, discussed above. As the full extent of the environmental liability associated with the pipeline is currently unknown, Defendants cannot state the maximum amount of damages sought from Plaintiff in the unlikely event that the Court rules that Plaintiff transferred the pipeline and its associated liabilities to a company acquired by Defendants pursuant to the terms of the Agreement. Defendants seek from Plaintiff indemnification, or contribution in the alternative, pursuant to both common law and Article 13 of the Agreement, for any associated liability and clean up costs related to the pipeline, to date and in the future, and recovery of their attorneys' fees incurred in prosecuting this counterclaim for breach of contract, as allowed by Texas Civil Practice and Remedies Code Annotated, Section 38.001. Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

2.    **Fraud - Intentional Misrepresentation**

Defendants contend that Plaintiff and its representatives made material misrepresentations, including but not limited to those referenced in the immediately preceding paragraph, concerning the Agreement. The misrepresentations included, but were not limited to, the environmental representations and warranties contained in Section 6.11 of the Agreement, Plaintiff's references to the Otis pipeline as "previously owned," owned by a third-party and "abandoned," and Plaintiff's representation that neither the pipeline nor any liabilities were part of the Agreement. Assuming for pleading purposes only, and without admitting that

**DEFENDANTS' SEVENTH AMENDED ORIGINAL ANSWER, VERIFIED DENIALS,**
**AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS - PAGE 9**

000066
XXX-001144

Defendants acquired the Otis pipeline and any of its attendant liabilities in the Agreement, Plaintiff represented that the Otis pipeline did not have environmental liabilities. Specifically, Plaintiff represented in Section 6.11 of the Agreement that, with the exception of the properties and facilities listed in Schedule 6.11 of the Agreement, none of the property or facilities conveyed from Plaintiff to Defendants in the Agreement had any environmental liability. The Otis pipeline had environmental liability based upon leaks in the pipeline which occurred in the early 1970's. The misrepresentations were made with knowledge of their falsity or made recklessly without any knowledge of the truth and as a positive assertion. The misrepresentations were made with the intention that they be acted upon by one or more Defendants and Defendants acted in reliance on the misrepresentations and thereby proximately suffered injury for which Defendants now sue. Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

3.    **Fraudulent Inducement/Concealment or Failure to Disclose**

Defendants contend that Plaintiff, acting through its representatives, concealed or failed to disclose material facts, including but not limited to those referenced in paragraphs 1 and 2 above, addressing Defendants' breach of contract and fraud counterclaims, and Plaintiff's representations to Defendants during negotiations of the Agreement that the Otis pipeline was "previously owned," a "third-party facility," "abandoned," and not part of the Agreement. Such material facts were within the knowledge of Plaintiff and its representatives. Defendants further contend that Plaintiff, acting through its representatives, knew that Defendants and their representatives were ignorant of certain material facts, and did not have an equal opportunity to discover the truth concerning those facts. Plaintiff, acting through its representatives, intended to induce Defendants into executing the Agreement by concealing or failing to disclose various material facts, and Defendants suffered injury as a result of acting without knowledge of the undisclosed material facts for which Defendants seek recovery from Plaintiff. Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

005144

000067

XXX-001145

4.    **Statutory Fraud - Factual Misrepresentations and False Promises**

Pursuant to Texas Business and Commerce Code Annotated, Section 27.01(a)(1), Defendants contend that Plaintiff, acting through its representatives, made false representations of a past or existing material fact or facts, including but not limited to those referenced in paragraphs 1-3 above, addressing Defendants' breach of contract and fraud counterclaims, which material facts were within the knowledge of Plaintiff and its representatives.  Defendants further contend that Plaintiff, acting through its representatives, made the false representation(s) to Defendants and their representatives for the purpose of inducing Defendants to enter into the Agreement.  Defendants relied upon the false representation(s) of Plaintiff and its representatives by entering into the Agreement and suffered injury as a proximate result thereof.  To the extent that Plaintiff is now taking the position that the Otis pipeline or liability was part of the assets or liability transferred by the Merger Agreement, Plaintiff had actual awareness of the falsity of the representation(s).

Defendants seek their actual damages, exemplary damages, attorneys' fees, expert witness fees, costs for copies of depositions and costs of court from Plaintiff as allowed by Section 27.01(e) of the Texas Business and Commerce Code.  Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

5.    **Negligent Misrepresentation**

Defendants contend that Plaintiff, acting through its representatives, made representation(s), including but not limited to those referenced in paragraphs 1-3, above, addressing Defendants' breach of contract and fraud counterclaims, in the course of Plaintiff's business and in conjunction with the Agreement, in which Plaintiff had a pecuniary interest.  The representation(s) supplied false information for the guidance of Defendants, and their representatives, in their business. Moreover, Plaintiff, acting through its representatives, did not exercise reasonable care or competence in obtaining or communicating the information to Defendants and their representatives, resulting in injuries proximately resulting from the above referenced representation(s)

**DEFENDANTS' SEVENTH AMENDED ORIGINAL ANSWER, VERIFIED DENIALS,**
**AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS - PAGE 11**

005145

**000068**
**XXX-001146**

for which Defendants seek recovery from Plaintiff. Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

## 6.   Reformation of Contract

Defendants are entitled to reformation of the Agreement, in the event the Court determines that the Agreement conveyed the pipeline and any associated liabilities to one or more Defendants, because: (a) a prior enforceable agreement concerning the sale and merger of various companies by Plaintiff to Defendants was reached prior to reducing the agreement to writing; (b) the prior agreement was enforceable; (c) there was a mutual mistake among the parties concerning whether the Otis pipeline or liabilities were part of the Agreement; or, in the alternative, a unilateral mistake by Defendants coupled with fraud committed by Plaintiff, as described more fully above in Defendants' counterclaims, or other inequitable conduct on the part of Plaintiff (including but not limited to the fact that Plaintiff failed to disclose the existence of the pipeline as an asset or liability being conveyed as part of the Agreement; that Plaintiff represented the pipeline was "previously owned," owned by a third-party, and abandoned; that Plaintiff represented neither the pipeline nor any liabilities were part of the Agreement; and that Plaintiff did not disclose any Otis pipeline liabilities on Schedule 6.11 to the Agreement). Defendants are entitled to reformation of the Agreement to insert specific language to confirm that neither the pipeline nor its liabilities were or are part of the Agreement. In the alternative, Defendants are entitled to a reformation of Article 13 to reflect that Plaintiff must fully indemnify Defendants for any environmental-related costs and/or liability associated with the pipeline. Defendants also refer Plaintiff to Ed Doherty and Fred Johnson's previous deposition testimony on this issue.

WHEREFORE, PREMISES CONSIDERED, Defendants pray that Plaintiff take nothing against them and that Defendants recover their attorneys' fees and costs. In the alternative, and in the event the finder of fact determines that the pipeline and/or its liability was transferred or conveyed to one or more of Defendants, Defendants pray that they prevail upon their counterclaim(s) and be awarded the relief available to a prevailing party under such counterclaim(s), including but not limited to (1) actual and exemplary damages, attorneys'

005146

000069
XXX-001147

fees, expert witness fees, costs for copies of depositions and court costs recoverable for breach of Section 27.01 of the Texas Business and Commerce Code Annotated; (2) attorneys' fees and court costs pursuant to Texas Civil Practice and Remedies Code Annotated, Section 38.001; (3) reformation of the Agreement to confirm that the Otis pipeline assets and liabilities were not conveyed to Defendants, or (4) a reformation of the remedies available under the Agreement. Defendants further pray for such other and further relief to which they may show themselves justly entitled.

Respectfully submitted,

Ellen A. Presby
State Bar No. 16249600

John M. Frick
State Bar No. 07455200

Lisa A. Schumacher
State Bar No. 17851450

Jonathan M. Spigel
State Bar No. 18934760

MILLS ✯ PRESBY AND ASSOCIATES, L.L.P.
5910 N. Central Expressway, Suite 900
Dallas, Texas  75206-5141
Telephone:  (214) 265-9265
Facsimile:  (214) 363-3167

ATTORNEYS FOR DEFENDANTS
KANEB PIPE LINE OPERATING PARTNERSHIP, L.P.;
AND SUPPORT TERMINAL SERVICES, INC.

005147

000070

XXX-001148

## VERIFICATION

THE STATE OF TEXAS      §
                       §
COUNTY OF DALLAS     §

        BEFORE ME, the undersigned authority, on this day personally appeared Edward D. Doherty, who, after being duly sworn by me, upon his oath stated the following:

        "I am the Chairman and Chief Executive Officer for Kaneb Pipe Line Company, the general partner of defendant Kaneb Pipe Line Operating Partnership, L.P. I have personal knowledge of the facts in this verification, and they are true and correct. In my capacity as Chairman and Chief Executive Officer for Kaneb Pipe Line Company, the general partner of defendant Kaneb Pipe Line Operating Partnership, L.P., I have knowledge of the 1992 STS Agreement and Plan of Merger. I am knowledgeable of the organizational structure of Kaneb Pipe Line Operating Partnership, L.P. Kaneb Pipe Line Operating Partnership, L.P. and Support Terminal Operating Partnership, L.P. are not liable in the capacity in which they have been sued. No Grace entity merged with either of the two partnerships."

                               KANEB PIPE LINE COMPANY

                               _____
                               Edward D. Doherty
                               Chairman and Chief Executive Officer

      SUBSCRIBED AND SWORN TO before me on this 4th day of May, 2000.

                               _____
                               Notary Public, State of Texas



SHARON K. MCCURRY
MY COMMISSION EXPIRES
April 11, 2002

                                                  005148

**000071**

**XXX-001149**

## CERTIFICATE OF SERVICE

On the ___4th___ day of May, 2000, a true and correct copy of the foregoing Defendants' Seventh

Amended Original Answer, Verified Denials, Affirmative Defenses, and Counterclaims was served via

facsimile on the following attorneys of record:

John M. Pease
**COWLES & THOMPSON, P.C.**
901 Main Street, Suite 4000
Dallas, Texas 75202

Ross Spence
**CRADY, JEWETT & MCCULLEY, L.L.P.**
909 Fannin Street, Suite 1400
Houston, Texas 77010-1006


_____
Ellen A. Presby

\1005.gra

**DEFENDANTS' SEVENTH AMENDED ORIGINAL ANSWER, VERIFIED DENIALS,
AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS - PAGE 15**

005149

**000072**

**XXX-001150**

# EXHIBIT K3

Amended Final Judgment

000073

XXX-001151

NO. 97-05135

2775147

| GRACE ENERGY CORPORATION | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| KANEB PIPE LINE OPERATING | § | |
| PARTNERSHIP, L.P. and | § | |
| SUPPORT TERMINAL SERVICES, INC. | § | 191st JUDICIAL DISTRICT |

## AMENDED FINAL JUDGMENT

On May 8, 2000, came on to be heard the above-entitled and numbered cause. Plaintiff Grace Energy Corporation ('Grace") and Defendants Kaneb Pipe Line Operating Partnership, L.P. ("Kaneb") and Support Terminal Services, Inc. ("STS") appeared by and through their representatives and attorneys and announced ready for trial. A jury having been previously demanded, a jury consisting of twelve qualified jurors was duly empaneled and the case proceeded to trial.

At the conclusion of all the evidence, the Court submitted the questions of fact in the case to the jury which returned a verdict on May 19, 2000, which verdict is incorporated by reference herein. The Court thereafter heard the parties' post-verdict motions and issued a ruling thereupon by letter dated June 15, 2000 as supplemented by letter dated July 17, 2000. Based upon the Court's rulings both before and after trial and the jury's verdict, the Court found that a judgment should be entered as set forth in the Final Judgment dated July 17, 2000. By timely motion to modify, Plaintiff requested modification of the amount of attorneys' fees awarded and the compounding of postjudgment interest. The Court finds that those requests should be granted, and issues this amended final judgment, supplanting the prior final judgment, accordingly. Except as specifically granted herein, Defendant's Motion for New Trial, Defendant's Motion to Modify, Correct or

AMENDED FINAL JUDGMENT                                    Page 1

00845

000074

XXX-001152

Reform, Plaintiff's Motion to Modify Judgment, Plaintiff's Motion for New Trial and Plaintiff's Second Motion to Disregard are denied. Accordingly,

IT IS ORDERED, ADJUDGED AND DECREED that the previous summary judgment orders signed by the Court including, but not limited to the Order of Partial Summary Judgment signed July 2, 1999, are now made final by this judgment and incorporated by reference herein;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Court declares that Grace does not owe indemnity to Kaneb and STS for any liabilities related to the Otis Pipeline[1];

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Grace is awarded its attorneys' fees (the reasonableness and necessity of which was stipulated to by the parties) as follows: (1) through trial: $1,764,286; (2) in the event of an appeal to the Dallas Court of Appeals in which Grace is ultimately successful, an additional $200,000; (3) in the event a petition for review is filed in the Texas Supreme Court and Grace is ultimately successful, an additional $25,000; and (4) in the event the petition for review is granted, but Grace is ultimately successful, an additional $25,000.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that, except to the extent specifically set forth herein or in orders incorporated herein, Grace takes nothing from Kaneb and STS on its claims asserted herein, and Kaneb and STS take nothing from Grace on their counterclaims asserted herein.

---

[1]    The term "Otis Pipeline" refers to a 4" steel pipeline of approximately 11.2 miles in length stretching from the former Standard Transmission terminal near the Cape Cod Canal in the town of Sandwich, Massachusetts to the Otis Air Force Base.

AMENDED FINAL JUDGMENT                                                      Page 2

008455

All sums awarded herein shall bear interest at the rate of ten percent per annum, compounded annually, from the date of judgment until paid. All writs and processes for enforcement and collection of this judgment shall be issued.

All costs are taxed against Kaneb and STS. All relief not expressly granted herein or in orders incorporated herein is denied.

Signed this 30th day of August, 2000.

JUDGE PRESIDING

The counsel or party receiving this order from the court is responsible for serving it promptly on all other counsel of record and pro se parties.

AMENDED FINAL JUDGMENT

008456

000076

XXX-001154

# EXHIBIT K4

Notice of Appeal of Kaneb Pipe Line Operating
Partnership, LP and Support Terminal Services

NO. 97-05135-J

| | | |
|---|---|---|
| GRACE ENERGY CORP. | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | |
| | § | |
| KANEB PIPE LINE OPERATING PART- | § | OF DALLAS COUNTY, TEXAS |
| NERSHIP, L.P.; SUPPORT TERMINAL | § | |
| SERVICES, INC.; AND SUPPORT TER- | § | |
| MINALS OPERATING PARTNERSHIP, | § | |
| L.P. | § | 191ST JUDICIAL DISTRICT |

## NOTICE OF APPEAL OF
## KANEB PIPE LINE OPERATING PARTNERSHIP, L.P. AND
## SUPPORT TERMINAL SERVICES, INC.

Defendants Kaneb Pipe Line Operating Partnership, L.P. and Support Terminal

Services, Inc. desire to appeal from the Amended Final Judgment signed on August 30, 2000

by the 191st District Court, Dallas County, Texas, in Cause No. 97-05135-J, styled *Grace*

*Energy Corp. v. Kaneb Pipe Line Operating Partnership, L.P. and Support Terminal*

*Services, Inc.* This appeal is taken to the Fifth Court of Appeals sitting at Dallas, Texas.

MILLS ☆ PRESBY & ASSOCIATES

By: _____

Ellen A. Presby
State Bar No. 16249600
5910 North Central Expressway
Dallas, TX 75206-5142
Telephone:    (214) 265-9265
Telecopier:    (214) 363-3167

**NOTICE OF APPEAL OF KANEB PIPE LINE OPERATING PARTNERSHIP, L.P. AND SUPPORT TERMINAL SERVICES, INC.**
Page 1
noa.gra

XXX-001156

FULBRIGHT & JAWORSKI L.L.P.
Joy M. Soloway
State Bar No. 18838700
1301 McKinney, Suite 5100
Houston, TX  77010-3095
Telephone: (713) 651-5151
Telecopier: (713) 651-5246

Attorneys for KANEB PIPE LINE OPERATING
PARTNERSHIP, L.P. and SUPPORT
TERMINAL SERVICES, INC.

**NOTICE OF APPEAL OF KANEB PIPE LINE OPERATING PARTNERSHIP, L.P. AND SUPPORT
TERMINAL SERVICES, INC.**
Page 2
noa.gra

006493

**000079**

**XXX-001157**

## CERTIFICATE OF SERVICE

In compliance with Tex. R. App. P. 9.5 and 25.1(e), and the Texas Rules of Civil

Procedure, I served a copy of the above and foregoing Notice of Appeal on the following

parties on the 2nd day of October, 2000:

Mr. John M. Pease
Cowles & Thompson, P.C.
901 Main Street, Suite 4000
Dallas, TX 75202
Attorneys for Plaintiff,
GRACE ENERGY CORP.
**Via Certified Mail,**
**Return Receipt Requested**

Mr. Ross Spence
Crady, Jewett & McCulley L.L.P.
909 Fannin, Suite 1400
Houston, TX 77010-1006
Attorneys for Plaintiff,
GRACE ENERGY CORP.
**Via Certified Mail,**
**Return Receipt Requested**

Ms. Lisa Matz, Clerk
Fifth Court of Appeals
2nd Floor, George L. Allen Sr. Building
600 Commerce Street
Dallas, TX 75204
**Via Hand Delivery**

_____
Ellen A. Presby

**NOTICE OF APPEAL OF KANEB PIPE LINE OPERATING PARTNERSHIP, L.P. AND SUPPORT TERMINAL SERVICES, INC.**
Page 3
noa.gra

# EXHIBIT K5

Plaintiff's Notice of Appeal

**000081**

**XXX-001159**

NO. 97-05135-J

| | | |
|---|---|---|
| GRACE ENERGY CORPORATION | § | IN THE DISTRICT COURT OF |
| | § | |
| v. | § | |
| | § | |
| KANEB PIPE LINE OPERATING | § | DALLAS COUNTY, TEXAS |
| PARTNERSHIP, L.P.; SUPPORT | § | |
| TERMINAL SERVICES, INC.; AND | § | |
| SUPPORT TERMINALS OPERATING | § | 191ST JUDICIAL DISTRICT |
| PARTNERSHIP, L.P. | § | |

## PLAINTIFF'S NOTICE OF APPEAL

TO THE HONORABLE JUDGE OF SAID COURT:

1. Plaintiff Grace Energy Corporation ("Plaintiff") gives notice of its desire to appeal, pursuant to Rules 25.1 and 26.1(d) of the Texas Rules of Appellate Procedure, from the Amended Final Judgment signed August 30, 2000, in this cause. Defendants filed a notice of appeal on October 2, 2000.

2. Plaintiff is appealing to the Court of Appeals for the Fifth District of Texas at Dallas.

Respectfully Submitted,

COWLES & THOMPSON, P.C.

By: _____
John M. Pease
State Bar Card No. 15698050
Charles T. Frazier, Jr.
State Bar Card No. 07403100

901 Main Street, Suite 4000
Dallas, TX 75202
(214) 672-2000
(214) 672-2020 (Fax)

008511

000082

XXX-001160

**CRADY, JEWETT & McCULLEY, L.L.P.**
Ross Spence
State Bar Card No. 18918400
909 Fannin Street, Suite 1400
Houston, Texas 77010-1006
(713) 739-7007
(713) 739-8403 (Fax)

**ATTORNEYS FOR PLAINTIFF
GRACE ENERGY CORPORATION**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent by

certified mail, return receipt requested, to the following counsel of record on the 16th day of

October, 2000:

Ellen A. Presby
Jonathan Spigel
Mills * Presby and Associates, L.L.P.
5910 N. Central Expressway, Suite 900
Dallas, Texas 75206

_____
Charles T. Frazier, Jr.

005512

**000083**

XXX-001161

# EXHIBIT K6

Abatement Order

XXX-001162

Order issued May  7   , 2001



In The

## Court of Appeals
## Fifth District of Texas at Dallas

#### No. 05-00-01592-CV

KANEB PIPE LINE OPERATING PARTNERSHIP, L.P.
AND SUPPORT TERMINAL SERVICES, INC., Appellants/Cross-Appellees

V.

GRACE ENERGY CORPORATION, Appellee/Cross-Appellant

V.

SUPPORT TERMINALS OPERATING PARTNERSHIP, L.P., Appellee

## ORDER

The Court has been notified that appellee/cross-appellant Grace Energy Corporation is currently the subject of a proceeding under Chapter 11 of the United States Bankruptcy Code, Case No. 01-1166, pending in the United States Bankruptcy Court for the District of Delaware. Pursuant to Texas Rule of Appellate Procedure 8.2, appellee/cross-appellant's bankruptcy suspends the appeal until the appellate court reinstates or severs the appeal in accordance with federal law.

Accordingly, for administrative purposes, we **ABATE** this appeal and will treat the case as closed. If permitted by federal law or the bankruptcy court, the appeal may be reinstated on prompt

XXX-001163

motion by any party showing that the appeal is not subject to a stay and specifying what further action, if any, is required from this Court.

In the event the appeal is not reinstated, the parties are **ORDERED** to file with the Court, upon completion of appellee/cross-appellant's bankruptcy proceeding, either a motion to dismiss or a letter informing the Court of the completion of the bankruptcy proceeding.

MARK WHITTINGTON
JUSTICE

XXX-001164

# EXHIBIT K7

Merger Agreement (without attachments)

000087

XXX-001165



GRA 01550

STS AGREEMENT AND PLAN OF MERGER
dated
DECEMBER 21, 1992

PLAINTIFF'S
EXHIBIT

23
97-05135

KPOP 0040

**STS AGREEMENT AND PLAN OF MERGER**
dated
**DECEMBER 21, 1992**

<u>**INDEX OF CLOSING DOCUMENTS**</u>

1.  STS Agreement and Plan of Merger dated December 21, 1992 among Grace Energy Corporation, Support Terminal Services, Inc., StanTrans, Inc., Standard Transpipe Corp. and Kaneb Pipe Line Operating Partnership, L.P., NSTS, Inc. and NSTI, Inc.

2.  Exhibits and Schedules to STS Agreement and Plan of Merger:

| | |
|---|---|
| Exhibit A - | Owned and Leased Real Property |
| Exhibit B - | Opinion of Counsel for GEC |
| Exhibit C - | Opinion of Kaneb General Counsel |
| Schedule 4.02(m) - | Inventory Custody Transfer |
| Schedule 5.02 - | Unaudited Consolidated Balance Sheet on a Legal Entity Basis as of November 30, 1992 |
| Schedule 6.01(b) - | Jurisdiction of Incorporation and Qualifications of Each Corporation |
| Schedule 6.03 - | Consents and Approvals |
| Schedule 6.04(a) - | Capitalization of Each Corporation |
| Schedule 6.05(a) - | Management Reports - Unaudited Balance Sheets as of 12/31/89-90-91 and Unaudited Income Statements for each of the three years ended 12/31/91 |
| Schedule 6.05(b) - | Management Reports - Unaudited Balance Sheets as of 11/30/91 and Unaudited Income Statements for each of the 11 months ended 11/30/91-92. |
| Schedule 6.05(c) - | Exceptions |
| Schedule 6.05(d) - | Reconciliation of 11/30/92 Legal Entity Balance Sheet to 11/30/92 Management Report |
| Schedule 6.06 - | Litigation |
| Schedule 6.07(a) - | Union Contracts |
| Schedule 6.07(b) - | Employment Agreements |
| Schedule 6.07(c) - | Labor Practices |
| Schedule 6.08 - | Insurance |
| Schedule 6.09 - | Contracts |
| Schedule 6.10 - | Employee Benefit Plans |
| Schedule 6.11 - | Environmental Matters |
| Schedule 6.12 - | Exceptions to Ordinary Course of Operations of Corporations |
| Schedule 6.13 - | Liens and Encumbrances |

KPOP 0041

000089

XXX-001167

**STS AGREEMENT AND PLAN OF MERGER**
**dated**
**DECEMBER 21, 1992**

**INDEX OF CLOSING DOCUMENTS**

Schedule 6.14 -   Liabilities
Schedule 6.15 -   Trademarks & Tradenames; Intellectual Property
Schedule 6.16 -   Compliance with Applicable Law
Schedule 6.17 -   Customers
Schedule 6.19 -   Properties, Licenses & Permits
Schedule 6.22 -   Personal Property
Schedule 6.23 -   Audits and Claims
Schedule 14.05 -  Guaranteed Agreements

3.   Guaranty Agreement dated December 21, 1992 among W. R. Grace & Co.-Conn. and Kaneb Pipe Line Operating Partnership, L.P., NSTS, Inc., and NSTI, Inc.

4.   Employee Benefits Agreement dated December 21, 1992 among W. R. Grace & Co., W. R. Grace & Co.-Conn., Grace Energy Corporation, Kaneb Pipe Line Operating Partnership, L.P., NSTS, Inc. and NSTI, Inc.

5.   Tax Procedures Agreement dated December 21, 1992 among W. R. Grace & Co., W. R. Grace & Co.-Conn., Kaneb Pipe Line Operating Partnership, L.P., NSTS, Inc. and NSTI, Inc.

6.   Insurance Procedures Agreement dated December 21, 1992 among W. R. Grace & Co., W. R. Grace & Co.-Conn., Kaneb Pipe Line Operating Partnership, L.P., NSTS, Inc. and NSTI, Inc.

KPOP 0042

000090

XXX-001168



KPOP 0043

000091

XXX-001169

STS AGREEMENT AND PLAN OF MERGER

KPOP 0044

000092

XXX-001170

## TABLE OF CONTENTS

### ARTICLE 1
#### Definitions . . . . . . . . . .    1

### ARTICLE 2
#### STI Merger and STS Merger; Consideration . . . .    8
2.01    STV Merger . . . . . . . . . . . . . .    8
2.02    STP Merger . . . . . . . . . . . . . .    10
2.03    STI Merger . . . . . . . . . . . . . .    12
2.04    STS Merger . . . . . . . . . . . . . .    14
2.05    Consideration . . . . . . . . . . . .    16

### ARTICLE 3
#### Closing Date; Termination . . . . . . .    18
3.01    Scheduled Closing Date . . . . . . . . .    18
3.02    Termination . . . . . . . . . . . . .    18

### ARTICLE 4
#### Actions at Closing; Discharge of Certain Obligations;
#### Further Assurances . . . . . . .    19
4.01    Closing . . . . . . . . . . . . . . .    19
4.02    Actions at the Closing . . . . . . . .    19
4.03    Effectiveness of Closing . . . . . . .    21
4.04    Discharge    of    Certain    Intercompany
Liabilities. . . . . . . . . . . . . . .    21
4.05    Further Assurances . . . . . . . . . .    22

### ARTICLE 5
#### Adjustment of Purchase Price; Other Post-Closing
Adjustments . . . . . . . . . . . . . . . . . .    22
5.01    Procedure . . . . . . . . . . . . . .    22
5.02    Preparation of Closing Statement . . . .    22
5.03    Dispute Resolution . . . . . . . . . .    24
5.04    Fees and Expenses of Arbitrator . . . .    24
5.05    Adjusting Payment . . . . . . . . . . .    25
5.06    Transactions with Grace Entities . . . .    26

### ARTICLE 6
#### Representations and Warranties by GEC . . . . .    26
6.01    Incorporation . . . . . . . . . . . .    27
6.02    Authorization . . . . . . . . . . . .    27
6.03    No Conflict or Consents . . . . . . . .    28
6.04    Capitalization . . . . . . . . . . . .    29
6.05    Financial Statements . . . . . . . . .    29
6.06    Litigation and Claims . . . . . . . . .    31
6.07    Labor and Employment . . . . . . . . .    31
6.08    Insurance . . . . . . . . . . . . . .    32
6.09    Contracts . . . . . . . . . . . . . .    32
6.10    Employees; Benefit Plans . . . . . . .    33
6.11    Environmental Compliance . . . . . . .    35
6.12    Operation in Ordinary Course . . . . .    35

i

KPOP 0045

000093

XXX-001171

6.13    Absence of Liens and Encumbrances . . . . . .    35
6.14    Liabilities . . . . . . . . . . . . . . . .    36
6.15    Trademarks   and   Tradenames;   Intellectual
Property . . . . . . . . . . . . . . . . . . .    36
6.16    Compliance with Applicable Law. . . . . . .    37
6.17    Customers . . . . . . . . . . . . . . . .    37
6.18    Real Property . . . . . . . . . . . . . . .    37
6.19    Property, Licenses and Permits . . . . . . .    38
6.20    Grace and Grace-Conn . . . . . . . . . . . .    38
6.21    Consents . . . . . . . . . . . . . . . . .    38
6.22    Personal Property. . . . . . . . . . . . . .    38
6.23    Taxes . . . . . . . . . . . . . . . . . .    38

ARTICLE 7
Representations and Warranties by OLP . . . . .    40
7.01    Incorporation . . . . . . . . . . . . . . .    40
7.02    Authorization . . . . . . . . . . . . . . .    40
7.03    No Conflict . . . . . . . . . . . . . . . .    41

ARTICLE 8
Disclaimer of Additional and Implied Warranties . .    41
8.01    Investigation and Evaluation . . . . . . . .    41
8.02    Forecasts, Projections, etc . . . . . . . .    43
8.03    Effect of Contemplated Transactions . . . . .    43

ARTICLE 9
Covenants of GEC and OLP . . . . . . . . . .    44
9.01    Access and Inquiry . . . . . . . . . . . .    44
9.02    Hart-Scott-Rodino Act . . . . . . . . . . .    44
9.03    Permits and Licenses . . . . . . . . . . .    45
9.04    Notices to Third Parties . . . . . . . . . .    45
9.05    Material Adverse Effect . . . . . . . . . .    45
9.06    Reasonable Efforts . . . . . . . . . . . .    46
9.07    Tax Matters . . . . . . . . . . . . . . . .    46

ARTICLE 10
Conduct of Business Prior to the Closing . . . .    47
10.01    Operation in Ordinary Course . . . . . . .    47
10.02    Disposition of Assets . . . . . . . . . .    47
10.03    Material Agreements . . . . . . . . . . .    47
10.04    Business Organization and Customer Relations .    47
10.05    Dividends . . . . . . . . . . . . . . . .    48

ARTICLE 11
Conditions Precedent to the Obligations of OLP . .    48
11.01    Accuracy of Representations and Warranties . .    48
11.02    Performance of Covenants and Agreements . . .    48
11.03    Hart-Scott-Rodino Act . . . . . . . . . . .    48
11.04    Permits, Consents, etc . . . . . . . . . .    49
11.05    Litigation . . . . . . . . . . . . . . . .    49
11.06    Certificate of GEC . . . . . . . . . . . .    50
11.07    Opinion of GEC's Counsel . . . . . . . . .    50

ii

11.08    No Material Adverse Effect . . . . . . . . .    50
11.09    Recorded Liens . . . . . . . . . . . . . .    50
11.10    Financing . . . . . . . . . . . . . . . . .    51

ARTICLE 12
Conditions Precedent to the Obligations of GEC    . .    51
12.01    Accuracy of Representations and Warranties . .    51
12.02    Performance of Covenants and Agreements    . .    51
12.03    Hart-Scott-Rodino Act . . . . . . . . . .    51
12.04    Permits, Consents, etc . . . . . . . . . .    52
12.05    Litigation . . . . . . . . . . . . . . .    52
12.06    Certificate of OLP . . . . . . . . . . .    53
12.07    Opinion of OLP's Counsel . . . . . . . .    53

ARTICLE 13
Indemnification; Survival of Representations    . . .    53
13.01    Definitions . . . . . . . . . . . . . . .    53
13.02    Indemnification by OLP . . . . . . . . .    54
13.03    Indemnification by GEC . . . . . . . . .    55
13.04    Limitations . . . . . . . . . . . . . . .    56
13.05    Defense of Third Party Claims . . . . . .    58
13.06    Consequential and Lost Profit Damages . . . .    60
13.07    Indemnification Payments . . . . . . . .    60

ARTICLE 14
Cooperation in Various Matters    . . . . . .    60
14.01    Mutual Cooperation . . . . . . . . . . .    60
14.02    Preservation of OLP's Files and Records    . .    61
14.03    Preservation of GEC's Files and Records    . .    61
14.04    Preparation of Reports, etc . . . . . . .    62
14.05    Amendment of Guaranteed Agreements, etc    . . .    62

ARTICLE 15
Expenses; Termination of Services;
Broker's Fees; Guaranty Agreement . . . . . .    63
15.01    Expenses . . . . . . . . . . . . . . . .    63
15.02    Termination of GEC Services . . . . . . .    63
15.03    Broker's Fees . . . . . . . . . . . . . .    64
15.04    Guaranty Agreement . . . . . . . . . . .    64

ARTICLE 16
Notices    . . . . . . . .    64
16.01    Procedure and Addresses . . . . . . . . .    64
16.02    Change of Notice Address . . . . . . . . .    65

ARTICLE 17
General . . . . . .    65
17.01    Entire Agreement . . . . . . . . . . . .    65
17.02    No Other Representations, etc . . . . . .    65
17.03    Headings . . . . . . . . . . . . . . . .    66
17.04    Governing Law . . . . . . . . . . . . . .    66
17.05    Counterparts;    Telecopy    Execution    and

KPOP 0047

000095

XXX-001173

         **Delivery** . . . . . . . . . . . . . . . . . . **66**
17.06    **Binding Agreement; Assignment** . . . . . . . . **67**
17.07    **Amendment** . . . . . . . . . . . . . . . . . **67**
17.08    **No Waiver** . . . . . . . . . . . . . . . . . **67**

**Exhibit A**          **List of Properties**
**Exhibit B**          **Opinion of Counsel for GEC**
**Exhibit C**          **Opinion of Counsel for OLP**

**Schedule 4.02(m)**   **Inventory Custody Transfer**
**Schedule 5.02**      **November 30, 1992 Balance Sheet**
**Schedule 6.01(b)**   **Jurisdictions of incorporation and**
                       **qualification of each Corporation**
**Schedule 6.03**      **Consents and Approvals**
**Schedule 6.04(a)**   **Capitalization of each Corporation**
**Schedule 6.05**      **Management Reports**
**Schedule 6.06**      **Litigation**
**Schedule 6.07(a)**   **Union contracts**
**Schedule 6.07(b)**   **Employment agreements**
**Schedule 6.07(c)**   **Labor Practices**
**Schedule 6.08**      **Insurance**
**Schedule 6.09**      **Contracts**
**Schedule 6.10**      **Employee benefit plans**
**Schedule 6.11**      **Environmental matters**
**Schedule 6.12**      **Exceptions to ordinary course operation of**
                       **Corporations**
**Schedule 6.13**      **Liens and encumbrances**
**Schedule 6.14**      **Liabilities**
**Schedule 6.15**      **Trademarks and Tradenames**
**Schedule 6.16**      **Legal compliance**
**Schedule 6.17**      **Customers**
**Schedule 6.19**      **Properties, Licenses and Permits**
**Schedule 6.22**      **Personal Property**
**Schedule 6.23**      **Taxes**

iv

**KPOP 0048**

**000096**

XXX-001174

<u>STS AGREEMENT AND PLAN OF MERGER</u>

STS AGREEMENT AND PLAN OF MERGER dated December 21, 1992 by and between GRACE ENERGY CORPORATION, a Delaware corporation having executive offices at Two Galleria Tower, Suite 1500, 13455 Noel Road, Dallas, Texas 75240-6681, SUPPORT TERMINAL SERVICES, INC., a Delaware corporation, STANTRANS, INC., a Delaware corporation, STANDARD TRANSPIPE CORP., a Delaware corporation, each having executive officers at 17304 Preston Road, Suite 1000, Dallas, Texas 75252, and KANEB PIPE LINE OPERATING PARTNERSHIP, L.P., a Delaware limited partnership, NSTS, INC., a Delaware corporation, and NSTI, INC., a Delaware corporation, each having executive offices at 2400 Lakeside Boulevard, Suite 600, Richardson, Texas 75082.

In consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

ARTICLE 1

<u>Definitions</u>

As used in this Agreement, the following terms have the meanings set forth in this Article 1. All Article, Section, Exhibit and schedule numbers and references used herein refer to Articles and Sections of this Agreement and Exhibits and schedules attached hereto or delivered simultaneously herewith, unless otherwise specifically described.

1.1 "Affiliate" or "affiliate" of a specified person or entity means any officer, director, employee or agent of, or person

KPOP 0049

XXX-001175

2

or entity controlling, controlled by, or under common control with such specified person or entity.

1.2 "This Agreement" or "this Agreement" means this STS Agreement and Plan of Merger.

1.3 "Ancillary Agreements" means the following agreements:

      (a)   Employee Benefits Agreement;

      (b)   Tax Procedures Agreement; and

      (c)   Insurance Procedures Agreement.

1.4 "Arbitrator" has the meaning specified in Section 5.03(b).

1.5 "Closing" means the consummation of the transactions contemplated by this Agreement.

1.6 "Closing Date" means the date on which the Closing occurs.

1.7 "Closing Statement" has the meaning specified in Section 5.02.

1.8 "Code" has the meaning specified in Section 6.10.

1.9 "Commonly Controlled Entity" has the meaning specified in Section 6.10.

1.10 "Confidential Information Memorandum" and "Supplemental Information I" means the Confidential Information Memorandum and Supplemental Information I, each dated August 1992, prepared by Kidder, Peabody & Co. Incorporated regarding the sale of STS.

KPOP 0050

XXX-001176

3

1.11 "Confidentiality Agreement" means the letter agreement dated September 21, 1992, between the General Partner and GEC and Grace regarding the keeping confidential of certain information furnished to the General Partner in connection with its evaluation of an acquisition of STS.

1.12 "Corporation Executives" has the meaning set forth in the first paragraph of Article 6 hereof.

1.13 "Corporations" means STS and the STS Subsidiaries.

1.14 "DGCL" means the General Corporation Law of the State of Delaware.

1.15 "DOJ" means the United States Department of Justice.

1.16 "Employee Benefits Agreement" means the Employee Benefits Agreement of even date herewith entered into between GEC and OLP relating to retirement, employee benefit and similar plans and programs for the Corporations' employees, and other personnel matters related to the Corporations.

1.17 "Environmental Law" means any law, regulation, rule, ordinance, by-law, or order of any Governmental Authority, which relates to or otherwise imposes liability, obligations, or standards with respect to pollution or the protection of the environment.

1.18 "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

1.19 "Estimated Purchase Price" has the meaning set forth in Section 4.02(h).

KPOP 0051

000099

XXX-001177

4

1.20 "Facilities" means the liquid storage facilities, pipelines, buildings and improvements owned or leased by the Corporations.

1.21 "FTC" means the Federal Trade Commission.

1.22 "GEC" means Grace Energy Corporation, a Delaware corporation.

1.23 "GEC Executives" has the meaning set forth in the first paragraph of Article 6 hereof.

1.24 "General Partner" means Kaneb Pipe Line Company, a Delaware corporation and the sole general partner of OLP.

1.25 "Governmental Authority" means the government of the United States of America, any state of the United States of America, or any political subdivision thereof, or any agency, board, bureau, department or commission of any of the foregoing.

1.26 "Grace" means W. R. Grace & Co., a New York corporation.

1.27 "Grace Accounting Principles" means the principles contained in Grace's Financial Accounting Policy Statements manual, which has been provided for review by OLP and Price Waterhouse, its independent public accountants.

1.28 "Grace-Conn." means W.R. Grace & Co.-Conn., a Connecticut corporation.

1.29 "Grace Entity" means Grace or any of its subsidiaries or affiliates, except for the Corporations.

KPOP 0052

000100

XXX-001178

5

1.30 "Guaranty Agreement" means the Guaranty Agreement of even date herewith by Grace-Conn. in favor of OLP and the OLP Corporations.

1.31 "HSR" or "HSR Act" means the Hart-Scott-Rodino Anti-trust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

1.32 "Insurance Procedures Agreement" means the Insurance Procedures Agreement of even date herewith between Grace, Grace-Conn., GEC and OLP regarding certain insurance matters.

1.33 "Legal Entity Balance Sheet" has the meaning specified in Section 5.02.

1.34 "LIBOR Based Rate" means (a) the London Interbank Offered Rate for three months published in The Wall Street Journal, Southwest Edition, for the date hereof, plus (b) 50 basis points.

1.35 "Material Adverse Effect" means a material adverse effect upon the business, financial condition or results of operations of the Corporations taken as a whole.

1.36 "NSTI" means NSTI, Inc., a Delaware corporation and a wholly owned subsidiary of OLP.

1.37 "NSTS" means NSTS, Inc., a Delaware corporation and a wholly owned subsidiary of OLP.

1.38 "OLP" means Kaneb Pipe Line Operating Partnership, L.P., a Delaware limited partnership.

1.39 "OLP Corporations" means NSTS and NSTI.

KPOP 0053

**000101**

XXX-001179

6

1.40 "Operations" means the liquid storage, pipeline and related operations presently conducted by the Corporations at the Facilities.

1.41 "Plan" has the meaning specified in Section 6.10.

1.42 "Properties" means the real property owned and leased by the Corporations, as described in Exhibit A.

1.43 "Purchase Price" means (i) $63,000,000 plus (ii) the Working Capital Amount less (iii) $100,000.

1.44 "Reasonable Efforts" shall mean the taking by a party of such action as would be in accordance with reasonable commercial practices as applied to the particular matter in question.

1.45 "Recorded Liens" has the meaning specified in Section 6.13.

1.46 "Scheduled Closing Date" has the meaning specified in Section 3.01.

1.47 "Shares" means the STI Shares, the STP Shares, the STS Shares and the STV Shares.

1.48 "STI" means StanTrans, Inc., a Delaware corporation and a wholly owned subsidiary of STS.

1.49 "STI Effective Time" has the meaning specified in Section 2.03(a).

1.50 "STI Merger" has the meaning specified in Section 2.03.

1.51 "STI Shares" means the issued and outstanding shares of capital stock of STI.

KPOP 0054

**000102**

XXX-001180

7

1.52 "STP Shares" means the issued and outstanding shares of capital stock of STP.

1.53 "STP" means Standard TransPipe Corp., a Delaware corporation and a wholly owned subsidiary of STS.

1.54 "STP Effective Time" has the meaning specified in Section 2.02(a).

1.55 "STP Merger" has the meaning specified in Section 2.02.

1.56 "STS" means Support Terminal Services, Inc., a Delaware corporation and a wholly owned subsidiary of GEC.

1.57 "STS Effective Time" has the meaning specified in Section 2.04(a).

1.58 "STS Merger" has the meaning specified in Section 2.04.

1.59 "STS Shares" means the issued and outstanding shares of capital stock of STS.

1.60 "STS Subsidiaries" means STI, STP and STV.

1.61 "STV" means Standard TransPipe (Virginia) Inc., a Virginia corporation and a wholly owned subsidiary of STP.

1.62 "STV Effective Time" has the meaning specified in Section 2.01(a).

1.63 "STV Merger" has the meaning specified in Section 2.01.

1.64 "STV Shares" means the issued and outstanding shares of capital stock of STV.

8

1.65 "Surviving Intercompany Accounts" has the meaning set forth in Section 5.06.

1.66 "Tax" means any federal, state, local, foreign or other governmental tax, levy, withholding, assessment or other similar governmental charge, including import duties, whether or not measured (in whole or in part) by or imposed upon income, and any interest, penalties, additions to tax and fines assessed on any such tax, levy, withholding, assessment, governmental charge or import duties.

1.67 "Tax Procedures Agreement" means the Tax Procedures Agreement of even date herewith between Grace, Grace-Conn., GEC, OLP and the OLP Corporations regarding certain tax matters.

1.68 "Tax Returns" has the meaning specified in Section 6.23(a).

1.69 "Working Capital Amount" has the meaning specified in Section 5.02.

## ARTICLE 2

### STI Merger and STS Merger: Consideration

2.01 _STV Merger_. Upon the terms and subject to the conditions of this Agreement, STV shall merge with and into STP (the "STV Merger").

(a) At the time the STV Merger becomes effective (the "STV Effective Time"):

(i) STV shall be merged with and into STP and the separate existence of STV shall cease.

KPOP 0056

9

(ii) STP shall be the surviving corporation, and shall continue for all purposes whatsoever.

(iii) The Certificate of Incorporation and By-laws of the surviving corporation shall be the Certificate of Incorporation and By-laws of STP in effect at the STV Effective Time which shall remain unchanged and unaffected by the STV Merger.

(iv) The persons who are the directors of STP at the STV Effective Time shall continue as directors of the surviving corporation until their respective successors are duly elected and qualified.

(v) The persons who are officers of STP at the STV Effective Time shall continue as such officers of the surviving corporation until the Board of Directors of the surviving corporation shall otherwise determine.

(vi) The capital stock of each of the constituent corporations shall be treated as follows:

(A) The shares of capital stock of STP issued and outstanding immediately prior to the STV Effective Time, and all rights in respect thereof, shall be unaffected by the STV Merger.

(B) The shares of capital stock of STV issued and outstanding immediately prior to the STV Effective Time shall be cancelled and shall no longer be deemed issued or outstanding for any purpose.

KPOP 0057

000105

XXX-001183

10

(b)  At the STV Effective Time the constituent corporations shall become a single corporation and STP shall continue to exist as the surviving corporation and shall thereupon and thereafter possess all the rights, privileges, immunities and franchises, as well of a public as of a private nature, and be subject to all the liabilities and obligations of each of the constituent corporations; all property, real, personal, and mixed, belonging to each of the constituent corporations shall be vested in STP without further act or deed and without any transfer or assignment having occurred, and all debts due on whatever account, and all other choses in action, and all and every other interest, of or belonging to or due to each of the constituent corporations shall thenceforth be taken and deemed to be vested in STP (not pursuant to contract but by operation of law), without further act or deed and without any transfer or assignment having occurred.

2.02    STP Merger.  Pursuant to Section 253 of the DGCL, upon the terms and subject to the conditions of this Agreement, immediately after the STV Effective Time, STP shall merge with and into STS (the "STP Merger").

(a) At the time the STP Merger becomes effective (the "STP Effective Time"):

(i)  STP shall be merged with and into STS and the separate existence of STP shall cease.

(ii) STS shall be the surviving corporation, and shall continue for all purposes whatsoever.

KPOP 0058

000106

XXX-001184

11

(iii) The Certificate of Incorporation and By-laws of the surviving corporation shall be the Certificate of Incorporation and By-laws of STS in effect at the STP Effective Time which shall remain unchanged and unaffected by the STP Merger.

(iv) The persons who are the directors of STS at the STP Effective Time shall continue as directors of the surviving corporation until their respective successors are duly elected and qualified.

(v) The persons who are officers of STS at the STP Effective Time shall continue as such officers of the surviving corporation until the Board of Directors of the surviving corporation shall otherwise determine.

(vi) The capital stock of each of the constituent corporations shall be treated as follows:

(A) The shares of capital stock of STS issued and outstanding immediately prior to the STP Effective Time, and all rights in respect thereof, shall be unaffected by the STP Merger.

(B) The shares of capital stock of STP issued and outstanding immediately prior to the STP Effective Time shall be cancelled and shall no longer be deemed issued or outstanding for any purpose.

(b) At the STP Effective Time the constituent corporations shall become a single corporation and STS shall continue to exist as the surviving corporation and shall thereupon and there-

KPOP 0059

12

after - possess all the rights, privileges, immunities and franchises, as well of a public as of a private nature, and be subject to all the liabilities and obligations of each of the constituent corporations; all property, real, personal, and mixed, belonging to each of the constituent corporations shall be vested in STS without further act or deed and without any transfer or assignment having occurred, and all debts due on whatever account, and all other choses in action, and all and every other interest, of or belonging to or due to each of the constituent corporations shall thenceforth be taken and deemed to be vested in STS (not pursuant to contract but by operation of law), without further act or deed and without any transfer or assignment having occurred.

2.03   STI Merger.   Upon the terms and subject to the conditions of this Agreement immediately after the STP Effective Time, STI shall merge with and into NSTI (the "STI Merger").

(a) At the time the STI Merger becomes effective (the "STI Effective Time"):

(i) STI shall be merged with and into NSTI and the separate existence of STI shall cease.

(ii) NSTI shall be the surviving corporation, and shall continue for all purposes whatsoever.

(iii) The Certificate of Incorporation and By-laws of the surviving corporation shall be the Certificate of Incorporation and By-laws of NSTI in effect at the STI Effective Time which shall remain unchanged and unaffected by the Merger, except that Article 1 of the Certificate of

KPOP 0060

000108

XXX-001186

13

Incorporation of the surviving corporation shall be amended at the STI Effective Time to read as follows:

"The name of the Corporation is StanTrans, Inc."

(iv) The persons who are the directors of NSTI at the STI Effective Time shall continue as directors of the surviving corporation until their respective successors are duly elected and qualified.

(v) The persons who are officers of NSTI at the STI Effective Time shall continue as such officers of the surviving corporation until the Board of Directors of the surviving corporation shall otherwise determine.

(vi) The capital stock of each of the constituent corporations shall be treated as follows:

(A) The shares of capital stock of NSTI issued and outstanding immediately prior to the STI Effective Time, and all rights in respect thereof, shall be unaffected by the STI Merger.

(B) In lieu of and in exchange for the issued and outstanding shares of capital stock of STI held by STS immediately prior to the STI Effective Time, OLP shall pay to GEC consideration as set forth in Section 2.05.

(b)  At the STI Effective Time the constituent corporations shall become a single corporation and NSTI shall continue to exist as the surviving corporation and shall thereupon and thereafter possess all the rights, privileges, immunities and franchises, as well of a public as of a private nature, and be

KPOP 0061

14

subject to all the liabilities and obligations of each of the constituent corporations; all property, real, personal, and mixed, belonging to each of the constituent corporations shall be vested in NSTI without further act or deed and without any transfer or assignment having occurred, and all debts due on whatever account, and all other choses in action, and all and every other interest, of or belonging to or due to each of the constituent corporations shall thenceforth be taken and deemed to be vested in NSTI (not pursuant to contract but by operation of law), without further act or deed and without any transfer or assignment having occurred.

(c) In the manner prescribed by Section 228 of the DGCL, STS as the sole stockholder of STI, and OLP as the sole stockholder of NSTI, hereby approve this Agreement as the agreement of merger for the STI Merger as required by Section 251(c) of the DGCL.

2.04    STS Merger.    Upon the terms and subject to the conditions of this Agreement, immediately after the STI Effective Time, STS shall merge with and into NSTS (the "STS Merger").

(a) At the time the STS Merger becomes effective (the "STS Effective Time"):

(i) STS shall be merged with and into NSTS and the separate existence of STS shall cease.

(ii) NSTS shall be the surviving corporation, and shall continue for all purposes whatsoever.

(iii) The Certificate of Incorporation and By-laws of the surviving corporation shall be the Certificate of Incorporation and By-laws of NSTS in effect at the STS

KPOP 0062

XXX-001188