# EXHIBIT 26

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADDmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 RdViu+URqVBjBC3UCWzE2pqTAwsCeUbCuU4GIreDRvqgcKkv8yhOMJeA9P8NlSCO
 tno7SglCRQQxVeiBeY/piw==

<SEC-DOCUMENT>0000950123-96-004024.txt : 19960805
<SEC-HEADER>0000950123-96-004024.hdr.sgml : 19960805
ACCESSION NUMBER:         0000950123-96-004024
CONFORMED SUBMISSION TYPE:    S-4
PUBLIC DOCUMENT COUNT:       27
FILED AS OF DATE:           19960802
SROS:               NYSE

FILER:

    COMPANY DATA:
        COMPANY CONFORMED NAME:      GRACE W R & CO /NY/
        CENTRAL INDEX KEY:          0000042872
        STANDARD INDUSTRIAL CLASSIFICATION:  CHEMICALS & ALLIED PRODUCTS [2800]
        IRS NUMBER:               133461988
        STATE OF INCORPORATION:      NY
        FISCAL YEAR END:           1231

    FILING VALUES:
        FORM TYPE:             S-4
        SEC ACT:              1933 Act
        SEC FILE NUMBER:         333-09497
        FILM NUMBER:            96603297

    BUSINESS ADDRESS:
        STREET 1:             ONE TOWN CENTER RD
        CITY:                BOCA RATON
        STATE:               FL
        ZIP:                33486-1010
        BUSINESS PHONE:          4073622000

    FORMER COMPANY:
        FORMER CONFORMED NAME: GRACE W R & CO /CT/
        DATE OF NAME CHANGE:   19900423
</SEC-HEADER>
<DOCUMENT>
<TYPE>S-4
<SEQUENCE>1
<DESCRIPTION>FORM S-4
<TEXT>

<PAGE>   1
```

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON AUGUST 2, 1996
REGISTRATION NO. 33-
- -------------------------------------------------------------------------
- -------------------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
-------------------------

FORM S-4

REGISTRATION STATEMENT UNDER
THE SECURITIES ACT OF 1933
-------------------------

W. R. GRACE & CO.
(TO BE RENAMED FRESENIUS NATIONAL MEDICAL CARE, INC.)

(EXACT NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

NEW YORK
(STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION)

3081
(PRIMARY STANDARD INDUSTRIAL CLASSIFICATION CODE NUMBER)

13-3461988
(I.R.S. EMPLOYER IDENTIFICATION NUMBER)

ONE TOWN CENTER ROAD, BOCA RATON, FLORIDA 33486-1010
TELEPHONE: 407-362-2000
(ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER, INCLUDING
AREA CODE, OF REGISTRANT'S PRINCIPAL EXECUTIVE OFFICES)

ROBERT B. LAMM
ONE TOWN CENTER ROAD, BOCA RATON, FLORIDA 33486-1010
TELEPHONE: 407-362-1645
(NAME, ADDRESS, INCLUDING ZIP CODE, AND TELEPHONE NUMBER,
INCLUDING AREA CODE, OF AGENT OF SERVICE)
-------------------------

PENGAD 800-631-6889

EXHIBIT

OS-50

XXX-001845

```
                          COPIES TO:

<TABLE>
<S>                                      <C>
          DR. ULRICH WAGNER                    ANDREW R. BROWNSTEIN, ESQ.
          O'MELVENY & MYERS                    WACHTELL, LIPTON, ROSEN & KATZ
          153 EAST 53RD STREET                      51 WEST 52ND STREET
        NEW YORK, NEW YORK 10022               NEW YORK, NEW YORK 10019
            (212) 326-2000                          (212) 403-1000
</TABLE>

                    ------------------------

    APPROXIMATE DATE OF COMMENCEMENT OF PROPOSED SALE OF THE SECURITIES TO THE
                                PUBLIC:

   AS SOON AS PRACTICABLE AFTER THE EFFECTIVE DATE OF THIS REGISTRATION STATEMENT
                    ------------------------
```

<TABLE>
<CAPTION>
                    CALCULATION OF REGISTRATION FEE

| TITLE OF EACH CLASS OF SECURITIES TO BE REGISTERED | AMOUNT TO BE REGISTERED | PROPOSED MAXIMUM OFFERING PRICE PER UNIT(1) | PROPOSED MAXIMUM AGGREGATE OFFERING PRICE(1) | AMOUNT OF REGISTRATION FEE(1) |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Class D Preferred Shares, Par Value $.10 Per Share.......................... | Up to 100,000,000 | N/A | N/A | N/A |

</TABLE>

(1) The fee has been calculated under Rule 457(f)(1) and paid in connection with
    the Registration Statement on Form F-4 filed by Fresenius Medical Care AG.
                    ------------------------

    THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATE OR
DATES AS MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL
FILE A FURTHER AMENDMENT WHICH SPECIFICALLY STATES THAT THIS REGISTRATION
STATEMENT SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(a) OF
THE SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME
EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(a),
MAY DETERMINE.

<PAGE>    2

                        W. R. GRACE & CO.

        CROSS REFERENCE SHEET PURSUANT TO ITEM 501(B) OF REGULATION S-K

<TABLE>
<CAPTION>
                                            CAPTION IN JOINT PROXY
            ITEM OF FORM S-4                 STATEMENT-PROSPECTUS

| ITEM OF FORM S-4 | CAPTION IN JOINT PROXY STATEMENT-PROSPECTUS |
|---|---|
| <C> <S> | <C> |
| 1. Forepart of Registration Statement and Outside Front Cover Page of Prospectus............................ | Cover Page of Joint Proxy Statement-Prospectus |
| 2. Inside Front and Outside Back Cover Pages of Prospectus........................... | AVAILABLE INFORMATION; INCORPORATION OF CERTAIN INFORMATION BY REFERENCE; ENFORCEABILITY OF CIVIL LIABILITIES UNDER THE FEDERAL SECURITIES LAWS; TABLE OF CONTENTS |
| 3. Risk Factors, Ratio of Earnings to Fixed Charges and Other Information............ | SUMMARY; RISK FACTORS |
| 4. Terms of the Transaction.................. | THE REORGANIZATION; BACKGROUND AND REASONS; DESCRIPTION OF CAPITAL STOCK OF FRESENIUS MEDICAL CARE; DESCRIPTION OF AMERICAN DEPOSITARY SHARES; DESCRIPTION OF NEW PREFERRED SHARES; THE REORGANIZATION -- Accounting Treatment; CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS TO GRACE AND GRACE SHAREHOLDERS; CERTAIN INCOME TAX CONSEQUENCES OF THE TRANSACTIONS TO HOLDERS OF FRESENIUS USA COMMON STOCK; COMPARISON OF CERTAIN RIGHTS OF SHAREHOLDERS OF GRACE AND FRESENIUS USA; BACKGROUND AND REASONS -- Background of the Reorganization; Reasons for the Recommendation of the Grace Board; BACKGROUND AND REASONS -- Background of the Reorganization; Reasons for the Recommendation of the Fresenius USA Board |
| 5. Pro Forma Financial Information.......... | FRESENIUS MEDICAL CARE AG UNAUDITED PRO |

XXX-001846

FORMA CONDENSED COMBINED FINANCIAL
INFORMATION

6.  Material Contacts with the Company Being
    Acquired.............................    BACKGROUND AND REASONS -- Background of the
                                             Reorganization; Reasons for Recommendations
                                             of the Grace Board; THE
                                             REORGANIZATION -- Continuing Arrangements
                                             between Fresenius Medical Care and Fresenius
                                             AG; BUSINESS OF FRESENIUS MEDICAL
                                             CARE -- Business of Fresenius
                                             USA -- Material Contracts between Fresenius
                                             AG and Fresenius USA; INTERESTS OF CERTAIN
                                             PERSONS

</TABLE>

<PAGE>  3                              i

<TABLE>
<CAPTION>

|                     ITEM OF FORM S-4                     | CAPTION IN JOINT PROXY STATEMENT-PROSPECTUS |
| ------------------------------------------------------- | ------------------------------------------- |
| <C>  <S>                                                | <C>                                         |
| 7.  Additional Information Required for Reoffering by Persons and Parties Deemed to be Underwriters...................... | Not Applicable |
| 8.  Interests of Named Experts and Counsel.... | SECURITY OWNERSHIP; INTERESTS OF CERTAIN PERSONS; EXPERTS |
| 9.  Disclosure of Commission Position on Indemnification for Securities Act Liabilities........................... | Not Applicable |
| 10.  Information with Respect to S-3 Registrants............................ | Not Applicable |
| 11.  Incorporation of Certain Information by Reference............................. | Not Applicable |
| 12.  Information with Respect to S-2 or S-3 Registrants............................ | Not Applicable |
| 13.  Incorporation of Certain Information by Reference............................. | Not Applicable |
| 14.  Information with Respect to Registrants Other Than S-3 or S-2 Registrants....... | BUSINESS OF FRESENIUS MEDICAL CARE; DESCRIPTION OF CAPITAL STOCK OF FRESENIUS MEDICAL CARE -- Exchange Controls and Other Limitations; GRACE SPECIAL-PURPOSE SELECTED FINANCIAL DATA; MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- NMC; SELECTED FINANCIAL DATA OF FRESENIUS WORLDWIDE DIALYSIS; MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- FRESENIUS WORLDWIDE DIALYSIS; SELECTED FINANCIAL DATA OF FRESENIUS USA; MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- FRESENIUS USA |
| 15.  Information with Respect to S-3 Companies............................ | Not Applicable |
| 16.  Information with Respect to S-2 or S-3 Companies............................ | Not Applicable |

</TABLE>

<PAGE>  4                              ii

<TABLE>
<CAPTION>

|                     ITEM OF FORM S-4                     | CAPTION IN JOINT PROXY STATEMENT-PROSPECTUS |
| ------------------------------------------------------- | ------------------------------------------- |
| <C>  <S>                                                | <C>                                         |
| 17.  Information with Respect to Companies Other Than S-2 or S-3 Companies......... | BUSINESS OF FRESENIUS MEDICAL CARE -- Business of Fresenius USA; BUSINESS OF FRESENIUS MEDICAL CARE -- Business of NMC; RISK FACTORS; SUMMARY -- Markets and Market Prices; SELECTED FINANCIAL DATA OF FRESENIUS USA; GRACE SPECIAL-PURPOSE SELECTED FINANCIAL DATA; MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- FRESENIUS USA; MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- NMC; CONSOLIDATED FINANCIAL STATEMENTS OF FRESENIUS USA, INC.; SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS OF W. R. GRACE & CO.; CONSOLIDATED INTERIM FINANCIAL STATEMENTS OF FRESENIUS USA, INC.; SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS OF W. R. GRACE & CO. |
| 18.  Information if Proxies, Consents or Authorizations Are to be Solicited...... | Outside Front Cover of Joint Proxy Statement-Prospectus; AVAILABLE INFORMATION; |

XXX-001847

```
                                        INCORPORATION OF CERTAIN INFORMATION BY
                                        REFERENCE; THE SPECIAL MEETINGS; THE
                                        REORGANIZATION -- Appraisal Rights;
                                        INTERESTS OF CERTAIN PERSONS; SECURITY
                                        OWNERSHIP; MANAGEMENT OF FRESENIUS MEDICAL
                                        CARE

19.  Information if Proxies, Consents or
     Authorizations Are Not to be Solicited
     in an Exchange Offer.................  Not Applicable
</TABLE>
```

                                        iii

<PAGE>   5

                        W. R. Grace Letterhead

                                        August 2, 1996

Dear Shareholders:

    You are cordially invited to attend a Special Meeting of Shareholders of
Grace, to be held at 10:00 a.m., local time, on September 16, 1996 at our
headquarters in Boca Raton, Florida. I hope that you will attend this important
meeting in person or by proxy.

    On February 4, 1996, Grace and Fresenius AG, a German health care
corporation, entered into an Agreement and Plan of Reorganization (as
supplemented or modified from time to time, the "Reorganization Agreement," and
the transactions contemplated thereby, the "Reorganization") to combine Grace's
principal health care subsidiary, National Medicare Care, Inc., with Fresenius
AG's worldwide dialysis business to form a company to be named "Fresenius
Medical Care AG." The Reorganization will be a momentous event in the history of
Grace. It will form the world's largest renal treatment and products company,
which will be well positioned to compete in today's global marketplace. In the
Reorganization, holders of Grace Common Stock and options will be allocated an
aggregate of 44.8% of the ordinary shares of Fresenius Medical Care, on a fully
diluted basis. Immediately prior to the combination, Grace will spin off its
packaging and specialty chemicals businesses to the holders of its Common Stock.
This spun-off company will retain the "W. R. Grace & Co." name.

    The Reorganization is described in greater detail in the enclosed Joint
Proxy Statement-Prospectus. Attached as Annex A to the Joint Proxy
Statement-Prospectus is a Prospectus describing the business of the company that
will be spun off.

    The enclosed Joint Proxy Statement-Prospectus asks you to approve the
transactions described above, as a result of which you will receive, for each
share of Grace Common Stock you own, based upon the number of shares of, and
options with respect to, Grace Common Stock outstanding as of July 15, 1996,

    (a) approximately 1.013 American Depositary Shares represented by American
Depositary Receipts, each representing one-third of an ordinary share of
Fresenius Medical Care,

    (b) one share of common stock of the packaging and specialty chemicals
company and

    (c) one share of a new series of Grace preferred stock, which may pay a
one-time special dividend based on Fresenius Medical Care's performance.

    Adoption and approval of the Reorganization Agreement and the transactions
contemplated thereby requires the vote of two-thirds (and, in the case of a
related amendment to
<PAGE>   6

Grace's Certificate of Incorporation, a majority) of the total voting power of
Grace's outstanding capital stock. Shareholders are entitled to vote all shares
of Grace Common Stock and all shares of all classes of Grace Preferred Stock
held by them on July 29, 1996, which is the record date for the Special Meeting.
YOUR BOARD OF DIRECTORS RECOMMENDS THAT YOU VOTE FOR THE PROPOSALS. In order to
ensure that your vote is represented at the meeting, please indicate your choice
on the proxy, date and sign it, and return it in the enclosed envelope. A prompt
response will be appreciated.

                                        Sincerely,

                                        /s/ A.J. Costello
                                        ----------------------------------
                                        Albert J. Costello
                                        Chairman, President and Chief
                                        Executive Officer

<PAGE>   7

                            W. R. GRACE & CO.
                          ONE TOWN CENTER ROAD
                       BOCA RATON, FLORIDA 33486-1010

                  NOTICE OF SPECIAL MEETING OF SHAREHOLDERS
                               TO BE HELD
                          ON SEPTEMBER 16, 1996

    NOTICE HEREBY IS GIVEN that a Special Meeting of Shareholders of W. R.
Grace & Co., a New York corporation ("Grace"), will be held at Grace's
headquarters at One Town Center Road, Boca Raton, Florida at 10:00 a.m., local

XXX-001848

time, on September 16, 1996 to consider and vote upon the following matters, which are more fully described in the accompanying Joint Proxy Statement-Prospectus:

    1. To consider and vote upon a proposal to adopt and approve (a) the Agreement and Plan of Reorganization, dated as of February 4, 1996, between Grace and Fresenius AG, a German corporation, together with the agreements that are exhibits thereto, all as supplemented or modified from time to time (the "Reorganization Agreement"), and (b) the transactions contemplated thereby (collectively, the "Reorganization"), including, without limitation, the Grace Merger and the Distribution (each as defined in the Reorganization Agreement).

    2. To consider and vote upon a proposal to adopt and approve an amendment to Grace's Certificate of Incorporation, as set forth in the Certificate of Amendment attached to the accompanying Joint Proxy Statement-Prospectus as Appendix B.

    3. To transact such other business as may properly come before the meeting or any adjournments or postponements thereof.

    Only holders of record of Grace Common Stock and all classes of Grace Preferred Stock at the close of business on July 29, 1996 (the "Record Date") are entitled to notice of and to vote at such meeting or any adjournments or postponements thereof. Approval of the Reorganization requires the affirmative vote of two-thirds, and adoption and approval of the amendment to Grace's Certificate of Incorporation requires the affirmative vote of a majority, of the total voting power of Grace Common Stock and Grace Preferred Stock, voting together as one class.

    Any holder of shares of Grace Common Stock as of the Record Date who does not assent to the Reorganization has the right, upon compliance with specific procedures, to demand from Grace payment of the fair value of such holder's shares. Reference is made to "THE REORGANIZATION -- Appraisal Rights" in the Joint Proxy Statement-Prospectus for a more complete discussion thereof and to Sections 623 and 910 of the New York Business Corporation Law, copies of which are attached to the Joint Proxy Statement-Prospectus as Appendix F.

                                        By Order of the Board of Directors,

                                        /s/ R. B. Lamm
                                        Robert B. Lamm
                                        Secretary

August 2, 1996
<PAGE>   8

                              IMPORTANT NOTICES

PLEASE MARK, SIGN, DATE AND RETURN THE ENCLOSED PROXY PROMPTLY, WHETHER OR NOT YOU PLAN TO ATTEND THE GRACE SPECIAL MEETING. YOUR PROXY WILL BE REVOCABLE, EITHER IN WRITING OR BY VOTING IN PERSON AT THE SPECIAL MEETING, AT ANY TIME PRIOR TO ITS EXERCISE.

THE BOARD OF DIRECTORS OF GRACE RECOMMENDS THAT SHAREHOLDERS VOTE TO APPROVE THE MATTERS TO BE CONSIDERED AT THE SPECIAL MEETING.

PLEASE DO NOT SEND IN ANY SHARE CERTIFICATES AT THIS TIME.
<PAGE>   9

                                   LOGO

                                                    August 2, 1996

Dear Stockholder:

    You are cordially invited to attend a Special Meeting of Stockholders of Fresenius USA, Inc. to be held at 10:00 a.m., local time on September 16, 1996 at the 52nd floor conference center of O'Melveny & Myers LLP, 153 East 53rd Street, New York, New York 10022 (the "Fresenius USA Special Meeting"). I hope that you will be present or represented in person or by proxy at this important meeting.

    On February 4, 1996, Fresenius AG, the majority stockholder of Fresenius USA, Inc. ("Fresenius USA"), and W. R. Grace & Co. ("Grace") entered into an Agreement and Plan of Reorganization (as supplemented or modified from time to time, the "Reorganization Agreement") to combine Fresenius AG's worldwide dialysis business, including Fresenius USA, with Grace's health care operations, including National Medical Care, Inc., Grace's principal health care subsidiary ("NMC"), to form a company to be named "Fresenius Medical Care AG" (the "Reorganization"). On May 8, 1996, the Reorganization Agreement was approved and adopted on behalf of Fresenius USA by its Board of Directors.

    The combination of Fresenius AG's worldwide dialysis business with NMC will form the world's largest integrated dialysis company. Fresenius Medical Care AG will be well-positioned to compete vigorously in today's global marketplace. In less than 10 years since the original investment by Fresenius AG in Fresenius USA, we have grown from a struggling peritoneal dialysis company to a profitable business that is a significant competitor in all aspects of the dialysis products business in North America. The strategic combination of Fresenius AG's worldwide dialysis business (including Fresenius USA) with NMC will provide our stockholders with an opportunity to participate in the growth of a newly formed health care company.

    Under the Reorganization Agreement, Fresenius AG will contribute its

XXX-001849

worldwide dialysis business, including its equity interest in Fresenius USA, to Fresenius Medical Care AG. Fresenius USA will merge with a subsidiary of Fresenius Medical Care AG (the "Fresenius USA Merger") and, after spinning off its non-health care businesses, Grace will merge with another Fresenius Medical Care AG subsidiary (the "Grace Merger").

The enclosed Joint Proxy Statement-Prospectus asks you and your fellow stockholders to approve the transactions described above, as a result of which you will receive, for each share of Common Stock of Fresenius USA, par value $.01 per share (the "Fresenius USA Common Stock"), you own, approximately 1.112 American Depositary Shares ("ADSs") represented by American Depositary Receipts of Fresenius Medical Care AG. Each ADS represents the right to receive one-third of an ordinary share, nominal value DM 5 per
<PAGE>   10

share, of Fresenius Medical Care AG ("FMC Ordinary Shares"). The Reorganization is described in greater detail in the enclosed Joint Proxy Statement-Prospectus. The Joint Proxy Statement-Prospectus is also a prospectus of Fresenius Medical Care AG, and contains detailed information concerning the FMC Ordinary Shares and the ADSs.

A special committee of independent directors of Fresenius USA (the "Fresenius USA Independent Committee") has reviewed the Reorganization on behalf of its stockholders (other than Fresenius AG and W. R. Grace & Co. and their subsidiaries) and has recommended that such stockholders vote in favor of the Reorganization. The Fresenius USA Independent Committee has also received an opinion from Salomon Brothers Inc, its financial advisor, that the exchange ratio for the exchange of Fresenius USA Common Stock for FMC Ordinary Shares by stockholders of Fresenius USA (other than Fresenius AG and W. R. Grace & Co. and their respective subsidiaries) is fair, from a financial point of view, to such stockholders.

Approval of the Reorganization requires a favorable vote of two-thirds of the outstanding shares of Fresenius USA Common Stock. Stockholders are entitled to vote all shares of Fresenius USA Common Stock held of record on July 29, 1996, which is the record date for the Fresenius USA Special Meeting. A vote in favor of the proposals authorizing the Reorganization is assured because Fresenius AG, the majority stockholder of Fresenius USA, has agreed to vote for such proposals.

The Fresenius USA Special Meeting will also consider a proposed amendment to the Fresenius USA 1987 Stock Option Plan described in the Joint Proxy Statement-Prospectus under the heading "AMENDMENT TO THE FRESENIUS USA 1987 STOCK OPTION PLAN," which has already been approved by the Board of Directors. Approval of such amendment requires the favorable vote of a majority of the shares of Fresenius USA Common Stock entitled to vote at the Fresenius USA Special Meeting. Fresenius AG, the majority stockholder, intends to vote for such proposal.

YOUR BOARD OF DIRECTORS, INCLUDING THE FRESENIUS USA INDEPENDENT COMMITTEE CREATED TO EVALUATE THE REORGANIZATION, UNANIMOUSLY RECOMMENDS THAT YOU VOTE FOR THE PROPOSALS.

We urge you to consider carefully these important matters, which are described in the attached Joint Proxy Statement-Prospectus. In order to ensure that your vote is represented at the meeting, please indicate your choice on the proxy, date and sign it, and return it in the enclosed envelope. A prompt response will be appreciated. You may revoke your proxy at any time before exercise.

                                   Sincerely,

                                   /s/ Ben J. Lipps

                                   Ben J. Lipps, Ph.D.
                                   President and Chief Executive Officer
<PAGE>   11

                          FRESENIUS USA, INC.
                          2637 SHADELANDS DRIVE
                       WALNUT CREEK, CALIFORNIA 94598

                 NOTICE OF SPECIAL MEETING OF STOCKHOLDERS
                    TO BE HELD ON SEPTEMBER 16, 1996

NOTICE HEREBY IS GIVEN that a Special Meeting of Stockholders of Fresenius USA, Inc., a Massachusetts corporation ("Fresenius USA"), will be held at the 52nd floor conference center of O'Melveny & Myers LLP, 153 East 53rd Street, New York, New York 10022 at 10:00 a.m. local time on September 16, 1996 to consider and vote upon the following matters described in the accompanying Joint Proxy Statement-Prospectus.

1. To consider and vote upon a proposal to adopt and approve (a) the Agreement and Plan of Reorganization, dated as of February 4, 1996, as it may be supplemented or modified from time to time (the "Reorganization Agreement"), among W. R. Grace & Co., a New York corporation, Fresenius AG, a German corporation ("Fresenius AG") and Fresenius USA and any exhibits thereto to which Fresenius USA is a party, (b) the transactions contemplated thereby (the "Reorganization"), including, without limitation, the merger of FUSA Merger Sub, Inc., a Massachusetts corporation and a wholly owned subsidiary of Fresenius Medical Care AG (a German corporation and a wholly owned subsidiary of Fresenius AG) with and into Fresenius USA.

2. To consider and vote upon a proposal to amend Fresenius USA's 1987 Stock

XXX-001850

Option Plan to fix the maximum number of shares for which options may be granted under such plan to any individual at 1,000,000 shares.

3. To transact any and all other business that may properly come before the meeting or any adjournments or postponements thereof.

Only holders of record of Fresenius USA common stock, par value $.01 per share (the "Fresenius USA Common Stock"), at the close of business on July 29, 1996 (the "Record Date"), are entitled to notice of and to vote at such meeting or any adjournments or postponements thereof. Approval of the matters to be voted upon in connection with the Reorganization requires the affirmative vote of two-thirds of the outstanding shares of Fresenius USA Common Stock and approval of the amendment of Fresenius USA's 1987 Stock Option Plan requires the affirmative vote of a majority of the outstanding shares of Fresenius USA Common Stock.

In accordance with Section 87, Chapter 156B of the General Laws of Massachusetts, holders of Fresenius USA Common Stock are advised as follows with respect to the proposal to approve the Reorganization Agreement and the Reorganization:

If the action proposed is approved by the stockholders at the meeting and effected by Fresenius USA, any stockholder (1) who files with Fresenius USA before the taking of the vote on the approval of such action, written objection to the proposed action stating that he intends to demand payment for his shares if the action is taken and (2) whose shares are not voted in favor of such action has or may have the right to demand in writing from Fresenius USA, within twenty days after the date of mailing to the stockholder of notice in writing that the corporate action has become effective, payment for his shares and an appraisal of the value thereof. Fresenius USA and any such stockholder shall in such case have the rights and duties and shall follow the procedure set forth in sections 88 to 98, inclusive, of chapter 156B of the General Laws of Massachusetts.

Reference is made to "THE REORGANIZATION -- Appraisal Rights" in the Joint Proxy Statement-Prospectus and to Sections 85 through 98 of Chapter 156B of the General Laws of Massachusetts, copies of which are attached to the Joint Proxy Statement-Prospectus as Appendix G.

By Order of the Board of Directors

Robert E. Farrell
Clerk

August 2, 1996
<PAGE>   12

IMPORTANT NOTICES

PLEASE MARK, SIGN, DATE AND RETURN THE ENCLOSED PROXY PROMPTLY, WHETHER OR NOT YOU PLAN TO ATTEND THE SPECIAL MEETING. YOUR PROXY WILL BE REVOCABLE, EITHER IN WRITING OR BY VOTING IN PERSON AT THE SPECIAL MEETING, AT ANY TIME PRIOR TO ITS EXERCISE.

THE BOARD OF DIRECTORS OF FRESENIUS USA, INCLUDING ALL OF THE MEMBERS OF A SPECIAL COMMITTEE OF INDEPENDENT DIRECTORS OF FRESENIUS USA, UNANIMOUSLY RECOMMENDS THAT STOCKHOLDERS VOTE TO APPROVE THE MATTERS TO BE VOTED UPON AT THE SPECIAL MEETING.

PLEASE DO NOT SEND IN ANY SHARE CERTIFICATES AT THIS TIME.
<PAGE>   13

JOINT PROXY STATEMENT

OF

W. R. GRACE & CO.
AND

FRESENIUS USA, INC.
------------------------

FRESENIUS MEDICAL CARE AG
W. R. GRACE & CO. (TO BE RENAMED FRESENIUS NATIONAL MEDICAL CARE, INC.)
PROSPECTUS

UP TO 210,000,000 AMERICAN DEPOSITARY SHARES, EACH REPRESENTING ONE-THIRD OF AN ORDINARY SHARE, NOMINAL VALUE DM 5 PER SHARE, OF FRESENIUS MEDICAL CARE AG

UP TO 100,000,000 SHARES, PAR VALUE $.10 PER SHARE, OF CLASS D PREFERRED STOCK OF W. R. GRACE & CO. (TO BE RENAMED FRESENIUS NATIONAL MEDICAL CARE, INC.)
------------------------

This Joint Proxy Statement-Prospectus is being furnished to the shareholders of W. R. Grace & Co., a New York corporation ("Grace"), which will be renamed "Fresenius National Medical Care, Inc." ("FNMC"), in connection with the solicitation of proxies by Grace's Board of Directors (the "Grace Board") from holders of shares of Grace common stock ("Grace Common Stock"), and from holders of shares of all classes of Grace preferred stock, par value $100 per share ("Grace Preferred Stock"), for use at a special meeting of shareholders of Grace to be held on September 16, 1996 and at any adjournments or postponements thereof (the "Grace Special Meeting").

This Joint Proxy Statement-Prospectus also is being furnished to the stockholders of Fresenius USA, Inc., a Massachusetts corporation ("Fresenius USA"), in connection with the solicitation of proxies by Fresenius USA's Board of Directors (the "Fresenius USA Board") from holders of shares of Fresenius USA common stock, par value $.01 per share ("Fresenius USA Common Stock"), for use at a special meeting of stockholders of Fresenius USA to be held on September 16, 1996 and at any adjournments or postponements thereof (the "Fresenius USA Special Meeting" and, together with the Grace Special Meeting, the "Special Meetings").

<div align="right">(Continued on next page)</div>

------------------------

ATTACHED AS ANNEX A TO THE VERSION OF THIS JOINT PROXY STATEMENT-PROSPECTUS BEING FURNISHED TO GRACE SHAREHOLDERS IS THE NEW GRACE PROSPECTUS. SEE THE NEW GRACE PROSPECTUS FOR CERTAIN MATTERS RELEVANT TO OWNERSHIP OF NEW GRACE SECURITIES.

SEE "RISK FACTORS" AT PAGE 21 FOR A DISCUSSION OF CERTAIN RISKS RELATING TO THE SECURITIES OFFERED HEREBY. SEE "SUMMARY--THE REORGANIZATION" AND "--CONSIDERATION TO SHAREHOLDERS" AT PAGE 2 FOR A SUMMARY OF THE REORGANIZATION.

THE SECURITIES TO BE ISSUED PURSUANT TO THIS JOINT PROXY STATEMENT-PROSPECTUS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS JOINT PROXY STATEMENT-PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

------------------------

The date of this Joint Proxy Statement-Prospectus is August 2, 1996.
<PAGE>   14

(Continued from front cover)

This Joint Proxy Statement-Prospectus relates to, among other matters, proposals that the shareholders of Grace and Fresenius USA adopt and approve the Agreement and Plan of Reorganization, dated February 4, 1996 and the agreements that are exhibits thereto (all as supplemented or modified from time to time, the "Reorganization Agreement"), by and between Grace, Fresenius AG ("Fresenius AG"), a German corporation and the beneficial owner of approximately 70.6% of the outstanding Fresenius USA Common Stock, and Fresenius USA, and the transactions contemplated thereby. This Joint Proxy Statement - Prospectus also relates to certain related matters, including, in the case of Grace, proposed amendments to Grace's Certificate of Incorporation (the "Grace Amendment") to change its name from "W. R. Grace & Co." to "Fresenius National Medical Care, Inc." and to establish a new class of Grace Preferred Stock (the "New Preferred Shares"); and, in the case of Fresenius USA, a proposed amendment (the "Fresenius USA Plan Amendment") to the Fresenius USA 1987 Stock Option Plan (the "Fresenius USA Plan").

The Reorganization Agreement provides for the combination of the worldwide dialysis business of Fresenius AG, including Fresenius USA ("Fresenius Worldwide Dialysis"), and the health care business of Grace conducted by Grace's wholly owned subsidiary, National Medical Care, Inc., a Delaware corporation ("NMC"), to form Fresenius Medical Care AG, a German corporation ("Fresenius Medical Care"). The combination to be effected pursuant to the Reorganization Agreement and the other transactions contemplated thereby are collectively referred to in this Joint Proxy Statement-Prospectus as the "Reorganization."

The Reorganization will be effected as follows.

The Contribution of FWD.  Pursuant to the Contribution Agreement, dated February 4, 1996 (the "Contribution Agreement"), among Fresenius AG, Sterilpharma GmbH, a wholly owned subsidiary of Fresenius AG and the predecessor of Fresenius Medical Care AG, and W. R. Grace & Co.--Conn., a wholly owned subsidiary of Grace ("Grace Chemicals"), Fresenius AG will contribute its worldwide dialysis business, including its entire direct and indirect ownership interest in Fresenius USA (the "Contribution"), to Fresenius Medical Care in consideration of the issuance of approximately 35,210,000 ordinary shares, nominal value DM 5 per share, of Fresenius Medical Care ("FMC Ordinary Shares").

The Distribution of New Grace.  On the date of the Reorganization, pursuant to the Distribution Agreement, dated February 4, 1996, among Grace, Grace Chemicals and Fresenius AG (the "Distribution Agreement"), Grace will spin off Grace Holding, Inc., a Delaware corporation and a wholly owned subsidiary of Grace ("New Grace"), which will hold all of Grace's assets and liabilities other than those of NMC (the "Distribution").

The Recapitalization.  Immediately following the Distribution, Grace will be recapitalized so that each holder of shares of Grace Common Stock will receive one New Preferred Share for each share of Grace Common Stock (the "Recapitalization"). Following the Reorganization, all shares of Grace Preferred Stock, including the New Preferred Shares, will remain outstanding as shares of FNMC.

The Mergers.  On the date of the Reorganization, a wholly owned New York subsidiary of Fresenius Medical Care ("Grace Merger Sub") will be merged with and into Grace, with Grace the surviving corporation (the "Grace Merger"); and a wholly owned Massachusetts subsidiary of Fresenius

XXX-001852

Medical Care ("FUSA Merger Sub") will be merged with and into Fresenius USA, with Fresenius USA the surviving corporation (the "Fresenius USA Merger" and, collectively with the Grace Merger, the "Mergers"). In the Grace Merger, all shares of Grace Common Stock outstanding will be cancelled and the holders of Grace Common Stock (other than any Grace Common Stock owned by Fresenius AG, Fresenius USA, Grace or their respective subsidiaries, and other than Grace Common Stock as to which appraisal rights have been asserted and not withdrawn or otherwise lost) will receive approximately 1.013 American Depositary Shares ("ADSs") represented by American Depositary Receipts ("ADRs"), each representing one-third of an FMC Ordinary Share, for each share of Grace Common Stock held by them based upon the number of shares of, and options with respect to, Grace Common Stock outstanding as of July 15, 1996; Grace Preferred Stock will not be exchanged for FMC Ordinary Shares in the Grace Merger. In the Fresenius USA Merger, all shares of Fresenius USA Common Stock outstanding will be cancelled and the holders of Fresenius USA Common Stock (other than Fresenius USA Common Stock owned by Fresenius AG, Fresenius USA, Grace or their respective subsidiaries, and other than Fresenius USA Common Stock as to which appraisal rights have been asserted and not withdrawn or otherwise lost) will receive approximately 1.112 ADSs, represented by ADRs, each representing one-third of an FMC Ordinary Share, per share of Fresenius USA Common Stock held by them.
<PAGE>    15


(Continued from front cover)
        The Contribution of Fresenius USA.  As promptly as practicable following the Mergers, Fresenius Medical Care will contribute Fresenius USA to FNMC.


        Grace does not intend to effect the Distribution in the event that the Reorganization (including the Distribution and the Grace Merger) is not approved at the Grace Meeting. Following the Reorganization, it is expected that shares of New Grace Common Stock will be listed on the New York Stock Exchange, Inc. (the "NYSE"). It is also expected that the ADSs will be listed on the NYSE. Following the Reorganization, FNMC intends to seek to list the New Preferred Shares on a national stock exchange. However, no assurance can be given that the New Preferred Shares will satisfy the listing criteria of any such exchange. The Reorganization Agreement, the text of the Grace Amendment and the text of the Fresenius USA Plan, as amended by the proposed Fresenius USA Plan Amendment are attached to this Joint Proxy Statement-Prospectus as Appendices A, B and E, respectively.

        The following table summarizes what the shareholders of Grace and Fresenius USA will receive in the Reorganization:

<TABLE>
    <S>                                         <C>
    one share of:                               will be entitled to receive:
    Grace Common Stock, which had a             Approximately 1,013 ADSs, each ADS
        closing price on August 1,                  representing one-third
        1996 in NYSE composite                      of an FMC Ordinary Share
        trading of $63 1/4                       (based upon the number of
                                                    shares of, and options with
                                                    respect to, Grace Common Stock
                                                    outstanding as of July 15, 1996)
                                                One New Preferred Share
                                                One share of New Grace Common Stock
    Fresenius USA Common Stock, which           Approximately 1.112 ADSs, each
        had a closing price on                      ADS representing one-third of an
        August 1, 1996 in AMEX                      FMC Ordinary Share
        composite trading of $19
</TABLE>

        Shares of Grace Preferred Stock will remain outstanding following the Reorganization.


        In connection with approval of the Reorganization by the Grace Board, the Grace Board received opinions from CS First Boston and Merrill Lynch to the effect that, in the opinion of such firms, as of February 4, 1996, the terms of the Distribution Payment and the Grace Merger, taken together, were fair, from a financial point of view, to the holders of Grace Common Stock. In connection with these opinions, these firms performed a variety of financial and comparative analyses which included, among other things, valuation analyses with respect to Fresenius Medical Care and NMC and made a presentation to the Grace Board. Such opinions and presentation are based on certain assumptions and are subject to certain limitations. Such opinions and presentation are described herein under "BACKGROUND AND REASONS" at pages 37 through 57, and the opinions of CS First Boston and Merrill Lynch are set forth in full in Appendix C hereto.

        In connection with approval of the Reorganization by the Fresenius USA Board, the Fresenius USA Independent Committee received an opinion from Salomon Brothers to the effect that, in the opinion of such firm, as of May 8, 1996, the exchange ratio of 0.37067735 FMC Ordinary Shares to be issued in exchange for each share of Fresenius USA Common Stock held by the stockholders of Fresenius USA (other than Fresenius AG and Grace and their respective subsidiaries) was fair, from a financial point of view, to the holders of Fresenius USA Common Stock (other than Fresenius AG and Grace and their respective subsidiaries). In connection with this opinion, Salomon Brothers performed a variety of financial and comparative analyses which included, among other things, valuation analyses with respect to Fresenius
<PAGE>    16

Medical Care and Fresenius USA and made a presentation to the Fresenius USA Independent Committee. Such opinion and presentation are based on certain

XXX-001853

assumptions and are subject to certain limitations. Such opinion and presentation are described herein under "BACKGROUND AND REASONS" at pages 47 through 57, and the opinion of Salomon Brothers is set forth in full in Appendix D hereto.

See the "INDEX OF DEFINED TERMS" at page 245 for the locations of the definitions of capitalized terms used in this Joint Proxy Statement-Prospectus.
(End of front cover)
<PAGE>    17

## AVAILABLE INFORMATION

Each of Grace and Fresenius USA is (and, following the Reorganization, FNMC and Fresenius Medical Care will be) subject to the informational requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and, in accordance therewith, each files (and FNMC and Fresenius Medical Care will file) reports and other information with the Securities and Exchange Commission (the "Commission"). The reports and other information filed by Grace and Fresenius USA (and to be filed by FNMC and Fresenius Medical Care) with the Commission can be inspected and copied at the Commission's public reference room located at 450 Fifth Street, N.W., Room 1024, Washington, D.C. 20549, and at the public reference facilities in the Commission's regional offices located at: 7 World Trade Center, 13th Floor, New York, New York 10048; and at Northwest Atrium Center, 500 West Madison Street, Suite 1400, Chicago, Illinois 60661. Copies of such material can be obtained at prescribed rates by writing to the Securities and Exchange Commission, Public Reference Section, 450 Fifth Street, N.W., Washington, D.C. 20549. In addition, reports, proxy statements, and other information concerning Fresenius USA may be inspected at the offices of the AMEX, 86 Trinity Place, New York, New York 10005. Reports and other information concerning Grace prior to the Reorganization (and, following the Reorganization, Fresenius Medical Care) may be inspected at the offices of the NYSE, 20 Broad Street, New York, New York 10005.

Registration Statements have been filed pursuant to the Securities Act of 1933, as amended (the "Securities Act"), covering the ADSs representing FMC Ordinary Shares issuable in the Reorganization and the New Preferred Shares issuable in the Recapitalization (including exhibits and amendments thereto, collectively, the "Registration Statement"). This Joint Proxy Statement-Prospectus constitutes both the Joint Proxy Statement of Grace and Fresenius USA relating to the solicitation of proxies for use at their respective Special Meetings and the Prospectus for the ADSs and the New Preferred Shares filed as part of the Registration Statement. All information in the Registration Statement regarding Grace and its subsidiaries has been provided by Grace, all information regarding Fresenius USA has been provided by Fresenius USA, and all information regarding Fresenius AG or its worldwide dialysis business other than Fresenius USA has been provided by Fresenius AG. New Grace has filed with the Commission a registration statement on Form S-1 (including exhibits and amendments thereto, the "New Grace Registration Statement"), which includes a Prospectus (the "New Grace Prospectus"), pursuant to the Exchange Act covering the shares of common stock, par value $.01 per share (the "New Grace Common Stock"), issuable in the Distribution. The New Grace Prospectus is attached as Annex A to the version of this Joint Proxy Statement-Prospectus being furnished to Grace shareholders. None of Fresenius AG, Fresenius USA or Fresenius Medical Care has participated in the preparation of the New Grace Prospectus, has any independent knowledge of the matters set forth therein (except to the extent such documents contain excerpts from this Joint Proxy Statement-Prospectus without material change) or takes any responsibility for any information contained therein. This Joint Proxy Statement-Prospectus and the proxies are first being provided to shareholders of Grace and Fresenius USA on or about August 5, 1996.

This Joint Proxy Statement-Prospectus does not contain all of the information set forth in the Registration Statements covering the securities offered hereby which Fresenius Medical Care and Grace have filed with the Commission, certain portions of which have been omitted pursuant to the rules and regulations of the Commission, and to which portions reference is hereby made for further information with respect to Fresenius Medical Care, Grace and the securities offered hereby, but all material terms of each such document are described herein. Statements contained herein concerning any documents are not necessarily complete; in each instance, reference is made to the copies of such documents filed as exhibits to the Registration Statement, and each such statement is qualified in its entirety by such reference. This Joint Proxy Statement-Prospectus also does not contain all of the information regarding New Grace set forth in the New Grace Registration Statement. See "ADDITIONAL INFORMATION" in the New Grace Prospectus attached as Annex A to the version of this Joint Proxy Statement-Prospectus being furnished to Grace shareholders.

FOLLOWING THE REORGANIZATION, FRESENIUS MEDICAL CARE WILL PREPARE ANNUAL AND QUARTERLY REPORTS WHICH WILL BE DISTRIBUTED TO ITS SHAREHOLDERS. FRESENIUS MEDICAL CARE'S ANNUAL REPORTS WILL CONTAIN FINANCIAL STATEMENTS EXAMINED AND REPORTED UPON, WITH OPINIONS EXPRESSED, BY FRESENIUS MEDICAL CARE'S AUDITORS. THE CONSOLIDATED FINANCIAL STATEMENTS OF FRESENIUS MEDICAL CARE INCLUDED IN SUCH ANNUAL AND QUARTERLY REPORTS

<PAGE>    18

WILL BE PREPARED IN CONFORMITY WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("US GAAP"), AND SUCH OPINIONS OF FRESENIUS MEDICAL CARE'S AUDITORS WILL BE AS TO PREPARATION IN CONFORMITY WITH US GAAP. See "DESCRIPTION OF THE POOLING AGREEMENT." Fresenius Medical Care will also file annual reports with the Commission on Form 20-F, which will be made available to Morgan Guaranty Trust Company of New York, as depositary (the "Depositary") with respect to the ADSs and ADRs evidencing such ADSs. The first such report is expected to be

issued with regard to the fiscal year ending December 31, 1996. Fresenius Medical Care will file its quarterly reports with the Commission under cover of Form 6-K.

Fresenius Medical Care will also furnish the Depositary with all notices of shareholder meetings and other reports and communications that are made generally available to shareholders of Fresenius Medical Care. The Depositary will, to the extent permitted by law, arrange for the transmittal to the registered holders of ADRs of all notices, reports and communications provided by Fresenius Medical Care, and will make such notices, reports and communications, together with the governing instruments affecting the FMC Ordinary Shares and amendments thereto, available for inspection by registered holders of ADRs at the principal office of the Depositary in New York, presently located at 60 Wall Street, New York, New York 10260.

Following the Reorganization, in addition to Annual Reports on Form 20-F and quarterly reports, Fresenius Medical Care intends to file with the Commission materials with respect to its annual meeting of shareholders and any special meeting of shareholders under cover of Form 6-K. Such materials will also be made available to the Depositary which will forward such materials with requests for voting instructions to all registered holders of ADRs in accordance with the terms of the Deposit Agreement described under "DESCRIPTION OF AMERICAN DEPOSITARY RECEIPTS." See "DESCRIPTION OF THE POOLING AGREEMENT." Fresenius Medical Care intends to provide in such materials information generally comparable to that which would be provided to shareholders of a U.S. corporation in a proxy statement filed with the Commission, except that certain information including information relating to Fresenius Medical Care's management, executive compensation and options, beneficial ownership of Fresenius Medical Care securities and certain related party transactions will be provided in accordance with the disclosure requirements applicable to "foreign private issuers," as defined in the Commission's rules.

Following the completion of the Reorganization, by virtue of the issuance of the New Preferred Shares pursuant to the Recapitalization, FMNC will continue to be subject to the informational requirements of the Exchange Act, and, in accordance therewith, will continue to file reports, proxy statements and other information with the Commission and any stock exchange on which such shares are listed or quoted.

NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION ON BEHALF OF FRESENIUS MEDICAL CARE, FRESENIUS USA, FRESENIUS AG, GRACE OR NEW GRACE CONCERNING THE FMC ORDINARY SHARES, THE ADSS, THE NEW PREFERRED SHARES, THE NEW GRACE COMMON STOCK OR ANY OF THE MATTERS BEING CONSIDERED AT EITHER SPECIAL MEETING IF NOT CONTAINED IN OR APPENDED TO THIS JOINT PROXY STATEMENT-PROSPECTUS, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION SHOULD NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED. THIS JOINT PROXY STATEMENT-PROSPECTUS DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO PURCHASE, THE SECURITIES OFFERED BY THIS JOINT PROXY STATEMENT-PROSPECTUS OR THE NEW GRACE PROSPECTUS WHICH IS ATTACHED AS ANNEX A TO THE VERSION OF THIS JOINT PROXY STATEMENT-PROSPECTUS BEING FURNISHED TO GRACE SHAREHOLDERS, OR THE SOLICITATION OF A PROXY, BY ANY PERSON IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER, OR SOLICITATION OF AN OFFER, OR PROXY SOLICITATION.

NOTICE PURSUANT TO NEW HAMPSHIRE LAW: NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON,

<center>ii</center>

<PAGE>   19

SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT, ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

<center>INCORPORATION OF CERTAIN INFORMATION BY REFERENCE</center>

THIS JOINT PROXY STATEMENT-PROSPECTUS AND THE NEW GRACE PROSPECTUS INCORPORATE BY REFERENCE DOCUMENTS NOT INCLUDED HEREIN OR DELIVERED HEREWITH OR THEREWITH. DOCUMENTS RELATING TO FRESENIUS USA, EXCLUDING EXHIBITS UNLESS SPECIFICALLY INCORPORATED HEREIN, ARE AVAILABLE WITHOUT CHARGE UPON WRITTEN REQUEST TO THE CLERK, FRESENIUS USA, INC., 2637 SHADELANDS DRIVE, WALNUT CREEK, CALIFORNIA 94598. TELEPHONE REQUESTS MAY BE DIRECTED TO (510) 295-0200. DOCUMENTS RELATING TO GRACE AND NEW GRACE, EXCLUDING EXHIBITS UNLESS SPECIFICALLY INCORPORATED HEREIN OR IN THE NEW GRACE PROSPECTUS, ARE AVAILABLE WITHOUT CHARGE UPON REQUEST IN WRITING TO W. R. GRACE & CO. CORPORATE COMMUNICATIONS, ONE TOWN CENTER ROAD, BOCA RATON, FLORIDA 33486-1010. TELEPHONE REQUESTS MAY BE DIRECTED TO (407) 362-2300. IN ORDER TO ENSURE TIMELY DELIVERY OF THE DOCUMENTS, ANY REQUEST SHOULD BE MADE BY SEPTEMBER 9, 1996.

The following documents filed with the Commission by Fresenius USA (File No. 1-8350) are incorporated herein by reference: (a) Fresenius USA's Annual Report on Form 10-K for the fiscal year ended December 31, 1995 and (b) Fresenius USA's Quarterly Report on Form 10-Q for the quarter ended March 31, 1996.

XXX-001855

The following documents filed with the Commission by Grace (File No. 1-3720) are incorporated herein by reference: (a) Grace's Annual Report on Form 10-K for the fiscal year ended December 31, 1995, (b) Grace's Current Reports on Form 8-K dated April 15, May 6 and July 11, 1996 and (c) Grace's Quarterly Report on Form 10-Q for the quarter ended March 31, 1996.

All documents filed by either Fresenius USA or Grace pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act subsequent to the date hereof and prior to the termination of the offering of the securities offered hereby shall be deemed to be incorporated herein by reference and to be a part hereof from the date of such filing. Any statement contained herein or in a document incorporated or deemed to be incorporated herein by reference shall be deemed to be modified or superseded for purposes hereof to the extent that a statement contained herein or in any other subsequently filed document which also is, or is deemed to be, incorporated herein by reference modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed to constitute a part hereof, except as so modified or superseded.

ENFORCEABILITY OF CIVIL LIABILITIES
UNDER THE FEDERAL SECURITIES LAWS

Fresenius Medical Care is a corporation organized under the laws of Germany. Certain of Fresenius Medical Care's directors and executive officers and certain of the experts named herein are residents of Germany. A substantial portion of the assets of Fresenius Medical Care and of such individuals is located outside the U.S. As a result, it may be difficult or impossible for investors to effect service of process upon such persons within the U.S. with respect to matters arising under the U.S. federal securities laws or to enforce against them in U.S. courts judgments of such courts predicated upon the civil liability provisions of such federal securities laws. Fresenius Medical Care has been advised by its German counsel, Norr, Stiefenhofer & Lutz, that there may be doubt as to the enforceability in Germany, in original actions, of liabilities predicated on the U.S. federal securities laws and that in Germany both recognition and enforcement of court judgments with respect to civil liability provisions of U.S. federal securities laws are solely governed by the provisions of the German Civil Procedure Code (Zivilprozessordnung or ZPO). In some cases, especially when according to the German statutory provisions the international jurisdiction of the U.S. court will not be recognized or the judgment conflicts with basic principles (e.g., the restriction to compensatory damages and limited pre-trial discovery) of German law, the U.S. judgment might not be recognized by a German court. The service of process in U.S. proceedings on persons in Germany is regulated by a multilateral treaty guaranteeing service of writs and other legal documents in civil cases if the current address of the defendant is known.

iii

<PAGE>  20

TABLE OF CONTENTS

<TABLE>
<CAPTION>

|                                                                      | PAGE |
| --- | --- |
| <S>                                                                  | <C> |
| AVAILABLE INFORMATION.................................................| i |
| INCORPORATION OF CERTAIN INFORMATION BY REFERENCE....................| iii |
| ENFORCEABILITY OF CIVIL LIABILTIES UNDER THE FEDERAL SECURITIES LAWS.| iii |
| SUMMARY..............................................................| 1 |
| The Companies.......................................................| 1 |
| The Reorganization.................................................| 1 |
| Consideration to Shareholders......................................| 2 |
| The Special Meetings...............................................| 2 |
| Recommendations of the Boards of Directors.........................| 5 |
| The Reorganization Agreement.......................................| 6 |
| Certain Federal Income Tax Consequences............................| 8 |
| Appraisal Rights...................................................| 11 |
| New Preferred Shares...............................................| 11 |
| Certain Effects of the Reorganization on the Rights of Grace Shareholders and Fresenius USA Stockholders.................| 12 |
| Certain Considerations.............................................| 12 |
| Markets and Market Prices..........................................| 13 |
| Summary Selected Special-Purpose, Consolidated Financial Information of Grace.......| 15 |
| Summary Selected Historical Financial Information of Fresenius Worldwide Dialysis...| 16 |
| Summary Selected Historical Financial Information of Fresenius USA.................| 17 |
| Summary Selected Unaudited Pro Forma Financial Information of Fresenius Medical Care.| 18 |
| Comparative Per Share Data.........................................| 18 |
| RISK FACTORS.........................................................| 19 |
| Risks Relating to the Business of Fresenius Medical Care...........| 21 |
| Risks Relating to Regulatory Matters...............................| 21 |
| Other Risks........................................................| 23 |
| THE SPECIAL MEETINGS.................................................| 28 |
| General............................................................| 33 |
| Date, Place and Time...............................................| 33 |
| Record Dates.......................................................| 33 |
| Votes Required.....................................................| 33 |
| Voting and Revocation of Proxies...................................| 34 |
| Solicitation of Proxies............................................| 35 |
| Grace Amendment....................................................| 36 |
| BACKGROUND AND REASONS...............................................| 36 |
| Background of the Reorganization; Reasons for the Recommendation of the Grace Board..| 37 |
| Background of the Reorganization; Reasons for the Recommendation of the Fresenius USA Board..| 37 |
|                                                                      | 47 |

XXX-001856

```
    Recommendation of the Fresenius USA Independent Committee and the Board of
      Directors                                                                      50
  THE REORGANIZATION..............................................................    50
    The Reorganization Agreement                                                     58
    Consideration to Shareholders                                                    58
    Effective Time                                                                   60
    Recommendation of the Grace Board; Non-Solicitation.........................     61
    Termination Fees                                                                 61
    Expenses                                                                         62
    Termination.................................................................     62
    Conduct of Business Prior to Effective Time; Certain Covenants..............     63
    Employee Benefits                                                                63
    Conditions..................................................................     65
    Waiver and Amendment                                                             65
    The Contribution Agreement                                                       67
    The Distribution Agreement                                                       67
    The Grace Tax Sharing and Indemnification Agreement.........................     68
    The Fresenius Tax Indemnification Agreement                                      68
    Additional Agreements of Fresenius USA......................................     69
    Continuing Arrangements between Fresenius Medical Care and Fresenius AG.....     69
    Accounting Treatment........................................................     70
    Appraisal Rights                                                                 73
  </TABLE>                                                                           73
```

```
                                      iv
  <PAGE>   21

  <TABLE>
  <CAPTION>
                                                                              PAGE
                                                                              ----
  <S>                                                                         <C>
    Exchange of Certificates..................................................   78
  BUSINESS OF FRESENIUS MEDICAL CARE...........................................   80
    General...................................................................   80
    Renal Industry Overview...................................................   80
    Strategy..................................................................   83
    Business of Fresenius Worldwide Dialysis..................................   86
      Fresenius AG............................................................   86
      Fresenius Worldwide Dialysis............................................   87
      Fresenius Worldwide Dialysis Products...................................   88
      Marketing, Distribution and Service.....................................   91
      Manufacturing Operations and Sources of Supply..........................   92
      International Development...............................................   93
      Research and Development................................................   93
      Patents, Trademarks and Licenses........................................   94
      Competition.............................................................   94
      Employees...............................................................   95
      Properties..............................................................   95
      Litigation..............................................................   96
    Business of Fresenius USA.................................................   96
      Fresenius USA...........................................................   96
      History.................................................................   97
      Fresenius USA Products..................................................   98
      Marketing, Distribution and Service.....................................   99
      Manufacturing Operations and Sources of Supply..........................  100
      Research and Development................................................  101
      Patents, Trademarks and Licenses........................................  102
      Competition.............................................................  102
      Employees...............................................................  102
      Properties..............................................................  103
      Material Contracts between Fresenius AG and Fresenius USA................  103
    Business of NMC...........................................................  105
      W. R. Grace & Co........................................................  105
      Overview................................................................  105
      DSD Operations..........................................................  106
      Medical Products Group..................................................  111
      NMC Homecare............................................................  112
      Competition.............................................................  115
      Employees...............................................................  117
      Properties..............................................................  117
    Regulatory and Legal Matters..............................................  117
      Regulatory Overview.....................................................  118
      Product Regulation......................................................  118
      Facilities and Operational Regulation...................................  119
      Reimbursement...........................................................  121
      Anti-Kickback Statute, False Claims Act, Stark Law and Fraud and Abuse Laws..  122
      Legal and Regulatory Proceedings........................................  127
      Health Care Reform......................................................  130
      Changes in the Health Care Industry.....................................  142
  GRACE SPECIAL-PURPOSE SELECTED FINANCIAL DATA................................  142
  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
    -- NMC...................................................................   144
      Overview................................................................  145
      Results of Operations...................................................  145
      Liquidity and Capital Resources.........................................  146
  SELECTED FINANCIAL DATA OF FRESENIUS WORLDWIDE DIALYSIS......................  149
  SUMMARY OF CERTAIN SIGNIFICANT DIFFERENCES BETWEEN GERMAN AND U.S. GENERALLY ACCEPTED  152
    ACCOUNTING PRINCIPLES.....................................................
      Goodwill and Business Acquisitions......................................  153
      Capitalization of Interest..............................................  153
      Leasing.................................................................  153
      Recording of Provisions, Reserves, Valuation Adjustments................  153
      Pensions and Similar Obligations........................................  154
```

XXX-001857

```
  </TABLE>

  <PAGE>   22                            v

  <TABLE>
  <CAPTION>
```

```
                                                                    PAGE
                                                                    ----
  <S>                                                               <C>
            Foreign Currency...............................................  154
            Deferred Taxes.................................................  154
  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
    -- FRESENIUS WORLDWIDE DIALYSIS........................................  155
            Overview.......................................................  155
            Results of Operations..........................................  157
            Liquidity and Capital Resources................................  160
  SELECTED FINANCIAL DATA OF FRESENIUS USA.................................  163
  MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
    -- FRESENIUS USA.......................................................  164
            Overview.......................................................  164
            Results of Operations..........................................  166
            Liquidity and Capital Resources................................  168
  FRESENIUS MEDICAL CARE AG UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL
    INFORMATION.............................................................  170
  MANAGEMENT OF FRESENIUS MEDICAL CARE.....................................  178
            General........................................................  178
            The Supervisory Board..........................................  178
            Members of the FMC Supervisory Board...........................  178
            FMC Supervisory Board Compensation.............................  178
            FMC Management Board and Certain Other Executive Officers.......  179
            Compensation of the FMC Management Board and Certain Other Executive Officers....  182
            Stock Option Plan..............................................  183
  SECURITY OWNERSHIP.......................................................  185
            Security Ownership of Certain Beneficial Owners and Management of Fresenius Medical
              Care..........................................................  185
            Security Ownership of Certain Beneficial Owners and Management of Fresenius AG.....  185
            Security Ownership of Certain Beneficial Owners and Management of Fresenius USA.....  186
  INTERESTS OF CERTAIN PERSONS.............................................  188
            Other Interests in the Reorganization..........................  188
  FRESENIUS USA EXECUTIVE COMPENSATION.....................................  189
            Summary Compensation...........................................  189
            Securities Repurchases.........................................  191
            Compensation Committee Interlocks and Insider Participation......  193
            Indemnification Agreements.....................................  193
  FINANCING................................................................  194
            NMC Credit Agreement...........................................  194
            Other Indebtedness.............................................  196
  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS TO GRACE AND GRACE
    SHAREHOLDERS............................................................  197
            Consequences of the Distribution...............................  197
            Consequences of the Recapitalization...........................  198
            Consequences of the Grace Merger...............................  199
  CERTAIN INCOME TAX CONSEQUENCES OF THE TRANSACTIONS TO HOLDERS OF FRESENIUS USA COMMON
    STOCK...................................................................  201
            U.S. Federal Income Tax Consequences of the Merger.............  201
            U.S. and German Tax Consequences of Holding FMC Ordinary Shares or ADSs.............  201
            Other Tax Consequences.........................................  204
  DESCRIPTION OF NEW PREFERRED SHARES......................................  206
            General........................................................  206
            Dividends......................................................  206
            Adjustments....................................................  206
            Voting Rights..................................................  208
            Optional Redemption............................................  208
            Preemptive Rights..............................................  209
  DESCRIPTION OF CAPITAL STOCK OF FRESENIUS MEDICAL CARE...................  209
            General........................................................  210
            Absence of a Public Market.....................................  210
            Dividend Rights................................................  210
            Liquidation Rights.............................................  210
            Preemptive Rights..............................................  211
  </TABLE>                                                          211
```

```
  <PAGE>   23                            vi

  <TABLE>
  <CAPTION>
```

```
                                                                    PAGE
                                                                    ----
  <S>                                                               <C>
            Voting Rights..................................................  211
            FMC Preferred Shares...........................................  211
            Exchange Controls and Other Limitations........................  212
  DESCRIPTION OF THE POOLING AGREEMENT.....................................  213
            General........................................................  214
            Independent Directors..........................................  214
            Extraordinary Transactions.....................................  214
            Interested Transactions........................................  214
            Disposition of Voting Shares; Take-along Rights.................  214
            Listing of American Depositary Shares; SEC Filings..............  214
            Term............................................................  215
            Amendment......................................................  216
            Enforcement; Governing Law.....................................  216
```

Directors and Officers.................................................. 216
DESCRIPTION OF AMERICAN DEPOSITARY RECEIPTS................................. 217
  Deposit, Transfer and Withdrawal....................................... 217
  Distributions on Deposited Securities.................................. 218
  Disclosure of Interests............................................... 220
  Record Dates.......................................................... 220
  Voting of Deposited Securities........................................ 220
  Inspection of Transfer Books.......................................... 221
  Reports and Other Communications...................................... 221
  Changes Affecting Deposited Securities................................ 221
  Amendment and Termination of Deposit Agreement........................ 222
  Charges of Depositary................................................. 222
  Liability of Holders for Taxes........................................ 223
  General Limitations................................................... 223
  Governing Law......................................................... 223
  Morgan Guaranty Trust Company of New York............................. 224
COMPARISON OF CERTAIN RIGHTS OF SHAREHOLDERS OF GRACE AND FRESENIUS USA..... 225
  Duties of Directors................................................... 225
  Size and Classification of the Board of Directors..................... 226
  Removal of Directors; Filling Vacancies on the Board of Directors..... 227
  Shareholder Nominations............................................... 228
  Action by Written Consent............................................. 229
  Meetings of Shareholders.............................................. 229
  Shareholder Proposals................................................. 230
  Required Vote for Authorization of Certain Actions.................... 230
  Amendment of Corporate Charter and By-laws............................ 230
  Appraisal Rights...................................................... 231
  Fair Price and Anti-Greenmail Provisions.............................. 231
  Stock Rights Plan..................................................... 232
  State Anti-takeover Statutes.......................................... 232
  Limitation on Directors' Liability.................................... 233
  Indemnification of Officers and Directors............................. 234
  Cumulative Voting..................................................... 235
  Conflict-of-Interest Transactions.................................... 235
  Dividends and Other Distributions..................................... 236
  Issuance of Rights or Options to Purchase Shares to Directors, Officers and
    Employees........................................................... 237
  Loans to Directors.................................................... 237
  Class Action Suits.................................................... 238
  Shareholder Derivative and Breach of Fiduciary Duty Suits............. 238
  Right to Inspect Corporate Books and Records; Right to Inspect Shareholder Lists.... 239
  SEC Reporting......................................................... 240
AMENDMENT TO THE FRESENIUS USA 1987 STOCK OPTION PLAN...................... 240
  The Fresenius USA Plan................................................ 241
  Terms of the Grant to Dr. Lipps....................................... 242
  Effect of the Amendment............................................... 242
EXPERTS.................................................................... 242
VALIDITY OF SHARES........................................................ 243
SUBMISSION OF SHAREHOLDER PROPOSALS....................................... 243
</TABLE>                                                                     244

<PAGE>   24

<TABLE>
<CAPTION>

                                                              PAGE
                                                              ----
<S>                                                           <C>
INDEX OF DEFINED TERMS......................................... 245
INDEX OF FINANCIAL STATEMENTS................................. F-1
Appendix A  -  Reorganization Agreement
Appendix B  -  Form of Certificate of Amendment of the Certificate of Incorporation of W. R.
               Grace & Co.
Appendix C  -  Merrill Lynch and CS First Boston Fairness Opinions
Appendix D  -  Salomon Brothers Fairness Opinion
Appendix E  -  Fresenius USA 1987 Stock Option Plan
Appendix F  -  Sections 910 and 623 of the NYBCL
Appendix G  -  Sections 85 through 98 of the MBCL
Appendix H  -  Letter Agreement, dated May 8, 1996, among Fresenius AG, Fresenius USA and
               Grace
Appendix I  -  Agreement, dated May 8, 1996 between Fresenius AG and Fresenius USA
Annex A        Grace Holding, Inc. Prospectus (included only with copies of this Joint Proxy
               Statement-Prospectus being furnished to shareholders of Grace)
</TABLE>

<PAGE>   25                              viii

SUMMARY

     The following summary is not intended to be complete and is qualified in
all respects by the more detailed information included in this Joint Proxy
Statement-Prospectus, the Appendices hereto and the documents incorporated
herein by reference. Shareholders are urged to read carefully this Joint Proxy
Statement-Prospectus, including the Appendices hereto and the documents
incorporated herein by reference, in their entirety. In addition, Grace
shareholders are urged to read the New Grace Prospectus attached as Annex A to
the version of this Joint Proxy Statement-Prospectus furnished to Grace
shareholders.

THE COMPANIES

  GRACE

XXX-001859

Grace, through its subsidiaries, is primarily engaged in the packaging and specialty chemicals businesses on a worldwide basis and, through NMC, in specialized health care activities. In the Reorganization, Grace will spin off New Grace, containing all of its businesses other than NMC. At such time, Grace's name will be changed to "Fresenius National Medical Care, Inc." and New Grace's name will be changed to "W. R. Grace & Co."

NMC is primarily engaged in (a) providing kidney dialysis services, (b) manufacturing and distributing products and equipment for dialysis treatment and performing clinical laboratory testing and other medical services, and (c) providing home infusion, home respiratory therapy and home health services. NMC operates through three principal business units: the Dialysis Services Division ("DSD"), the Medical Products Group ("MPG"), and the NMC Homecare Division ("NMC Homecare"). NMC's address is Reservoir Place, 1601 Trapelo Road, Waltham, Massachusetts 02154, and its telephone number is (617) 466-9850.

Grace's address is One Town Center Road, Boca Raton, Florida 33486-1010 and its telephone number is (407) 362-2000. Following the Reorganization, FNMC's address and telephone number will become those of NMC listed above.

FRESENIUS AG

Fresenius AG is a German corporation which develops, manufactures and distributes pharmaceuticals and medical systems products and services on a global basis. Fresenius AG conducts business in four operating divisions: Fresenius Worldwide Dialysis, Pharmaceuticals Division, Intensive Care and Diagnostics Division, and Project Business Division. Fresenius Worldwide Dialysis develops, manufactures and distributes dialysis systems products for the treatment of patients suffering from kidney failure, including dialysis machines, dialyzers, bloodlines, hemodialysis concentrates and peritoneal dialysis solutions. Fresenius AG's address is Borkenberg 14, 61440 Oberursel, Germany (near Frankfurt), and its telephone number is 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-600.

FRESENIUS USA

Fresenius USA is a manufacturer and the exclusive North American distributor of Fresenius Worldwide Dialysis' products. Fresenius AG is the beneficial owner of approximately 70.6% of the outstanding Fresenius USA Common Stock. See "SECURITY OWNERSHIP." Fresenius USA's address is 2637 Shadelands Drive, Walnut Creek, California 94598, and its telephone number is (510) 295-0200.

FRESENIUS MEDICAL CARE

Fresenius Medical Care will be the world's largest integrated dialysis products and services company. Fresenius Medical Care will combine Fresenius Worldwide Dialysis, a leading international provider of a complete line of dialysis products with a commitment to technological superiority and innovation, with NMC, a leading provider of dialysis services which has a commitment to quality clinical treatment. Following consummation of the Reorganization, Fresenius Medical Care will have its corporate headquarters at Borkenberg 14, 61440 Oberursel, Germany (near Frankfurt).

1

<PAGE>   26

THE REORGANIZATION

The following transactions are to be consummated in connection with the Reorganization:

- Fresenius AG will contribute Fresenius Worldwide Dialysis including its shares of Fresenius USA, to Fresenius Medical Care.

- The Reorganization Agreement provides that NMC will enter into the NMC Credit Agreement and, on the Effective Date, borrow an amount sufficient to finance the payment to, and the assumption of indebtedness of, Grace Chemicals such that the Debt of Grace on a consolidated basis, at the Effective Time, will not exceed $2.263 billion, subject to adjustment as provided in the Reorganization Agreement.

- Grace Chemicals will then distribute the capital stock of NMC to Grace, as a result of which Grace Chemicals and NMC will be sister companies.

- Immediately thereafter, Grace will contribute the capital stock of Grace Chemicals to New Grace and effect the Distribution.

- Immediately following the Distribution, Grace will effect the Recapitalization, in which each holder of Grace Common Stock will hold thereafter one share of Grace Common Stock and one New Preferred Share for each share of Grace Common Stock held.

- Immediately following the Recapitalization, each of Grace and Fresenius USA will merge with wholly owned subsidiaries of Fresenius Medical Care.

- As promptly as practicable following the Mergers, Fresenius Medical Care will contribute Fresenius USA to FNMC.

CONSIDERATION TO SHAREHOLDERS

In the Reorganization, Fresenius AG and shareholders of Grace and Fresenius USA will receive the following consideration:

XXX-001860

FRESENIUS AG

- Fresenius Worldwide Dialysis, including all Fresenius USA Common Stock
  held by Fresenius AG or its subsidiaries, will be contributed to
  Fresenius Medical Care in exchange for FMC Ordinary Shares representing
  approximately 50.3% of all FMC Ordinary Shares outstanding, on a fully
  diluted basis, immediately following the Reorganization.

GRACE COMMON SHAREHOLDERS

- The closing price of Grace Common Stock in NYSE composite trading on
  August 1, 1996 was $63 1/4 per share.

- Each holder of Grace Common Stock issued and outstanding at the time of
  Distribution (the "Time of Distribution") will receive one share of New
  Grace Common Stock in the Distribution.

- Each holder of Grace Common Stock issued and outstanding after the Time
  of Distribution will receive one New Preferred Share.

- Holders of shares of Grace Common Stock issued and outstanding
  immediately prior to the Effective Time (other than any shares of Grace
  Common Stock owned by Fresenius AG or its subsidiaries, Fresenius USA or
  its subsidiaries or any Grace subsidiary, any shares of Grace Common
  Stock held in Grace's treasury or any shares of Grace Common Stock
  dissenting from the Reorganization), and NMC employees who are holders of
  options with respect to Grace Common Stock will be allocated 44.8% of the
  FMC Ordinary Shares outstanding on a fully diluted basis. As of July 15,
  1996, there were outstanding 92,001,176 shares of Grace Common Stock, and
  options with respect to approximately 231,000 shares of Grace Common
  Stock held by employees of NMC (none of whom is an officer or

2

<PAGE>   27

director of Grace). On this basis, assuming that there are no Grace
Common Dissenting Shareholders and that each option with respect to Grace
Common Stock is converted to an option with respect to 3.7 ADSs, each
share of Grace Common Stock will be converted in the Grace Merger into
the right to receive 1.013 ADSs, each such ADS representing one-third of
an FMC Ordinary Share.

GRACE PREFERRED SHAREHOLDERS

- Each share of Grace Preferred Stock and each New Preferred Share issued
  and outstanding immediately prior to the Effective Time will remain
  issued and outstanding as FNMC stock.

FRESENIUS USA COMMON STOCKHOLDERS

- The closing price of Fresenius USA Common Stock in AMEX composite trading
  on August 1, 1996 was $19 per share.

- Each share of Fresenius USA Common Stock issued and outstanding
  immediately prior to the Effective Time (other than any shares of
  Fresenius USA Common Stock owned by Grace or its subsidiaries or by
  Fresenius AG or its subsidiaries, any shares of Fresenius USA Common
  Stock held in Fresenius USA's treasury or any shares of Fresenius USA
  Common Stock dissenting from the Reorganization) will be converted in the
  Fresenius USA Merger into the right to receive approximately 1.112 ADSs,
  each such ADS representing one-third of an FMC Ordinary Share, and each
  holder of options or warrants to purchase Fresenius USA Common Stock
  (other than Grace or its subsidiaries or Fresenius AG or its
  subsidiaries) will receive options or warrants to purchase approximately
  1.112 ADSs for each share of Fresenius USA Common Stock issuable upon
  exercise of such options or warrants. As of July 29, 1996, there were
  outstanding 26,374,218 shares of Fresenius USA Common Stock and options
  or warrants with respect to 2,636,626 shares of Fresenius USA Common
  Stock. On this basis, assuming that there are no Fresenius USA Dissenting
  Stockholders and that each option with respect to Fresenius USA Common
  Stock is converted into an option with respect to FMC Ordinary Shares,
  and that Fresenius USA effects certain securities repurchases (see "THE
  REORGANIZATION -- Additional Agreements of Fresenius USA"), holders of
  shares of (and options and warrants with respect to) Fresenius USA Common
  Stock will be allocated approximately 4.9% of the FMC Ordinary Shares.

GENERAL

- In lieu of fractional FMC Ordinary Shares or ADSs, each person who would
  otherwise have been entitled to a fraction of an FMC Ordinary Share or
  ADS will be paid an amount in cash (without interest) equal to such
  holder's proportionate interest in the net proceeds from the sale in the
  open market by an exchange agent appointed by Fresenius Medical Care with
  the approval of Grace and Fresenius AG (the "Exchange Agent"), on behalf
  of all such holders, of the aggregate fractional FMC Ordinary Shares or
  ADSs issued.

- Each share of Grace Common Stock owned by Fresenius AG or its
  subsidiaries, Fresenius USA or its subsidiaries or any Grace subsidiary,
  or held in Grace's treasury, will be cancelled and retired without
  payment of any consideration therefor and will cease to exist. Each share
  of Fresenius USA Common Stock owned by Grace or its subsidiaries,
  Fresenius AG or its subsidiaries, or any Fresenius USA subsidiary, or
  held in Fresenius USA's treasury, will be cancelled and retired without

XXX-001861

payment of any consideration therefor (except for the consideration set forth above) and will cease to exist. As of July 15 , 1996, Grace owned no shares of Fresenius USA Common Stock, and Fresenius USA owned one share of Grace Common Stock.

3

<PAGE> 28
The following charts represent the corporate organization of the parties to the Reorganization on both pre-transaction and post-transaction bases:

[CHART]

4

<PAGE> 29

THE SPECIAL MEETINGS

GRACE

The Grace Special Meeting to consider and vote on approval and adoption of the Reorganization Agreement and the transactions contemplated thereby, as well as the Grace Amendment, will be held on September 16, 1996 at 10:00 a.m. local time at Grace's headquarters at One Town Center Road, Boca Raton, Florida. Only holders of record of Grace Common Stock and Grace Preferred Stock at the close of business on July 29, 1996 (the "Grace Record Date") will be entitled to notice of and to vote at the Grace Special Meeting. As of July 15, 1996, the following shares of the following classes of Grace's capital stock were outstanding and entitled to the following votes:

<TABLE>
<CAPTION>

| CLASS | SHARES OUTSTANDING | VOTES PER SHARE |
|---|---|---|
| <S> | <C> | <C> |
| Grace 61 Preferred Stock................................... | 36,460 | 160 |
| Grace Class A Preferred Stock............................... | 16,256 | 16 |
| Grace Class B Preferred Stock............................... | 21,577 | 16 |
| Grace Common Stock.......................................... | 92,001,176 | 1 |
</TABLE>

Holders of Grace Common Stock and Grace Preferred Stock will vote together as one class.

Votes Required. Adoption and approval of the Reorganization Agreement and the transactions contemplated thereby requires the affirmative vote of two-thirds (and, in the case of the Grace Amendment, a majority) of the total voting power (or 65,626,736 shares as of July 15, 1996) of Grace's outstanding capital stock. As a result, failing to vote in person or by proxy on any such proposal or abstaining on any such proposal has the same effect as voting against the proposal.

Beneficial Ownership of Management. At June 15, 1996, Grace's directors and executive officers and their affiliates beneficially owned in the aggregate Grace Common Stock and Grace Preferred Stock representing less than 1% of the total voting power of Grace's outstanding capital stock. Each of the directors and executive officers of Grace is expected to vote in favor of the proposals to be voted on at the Grace Special Meeting.

FRESENIUS USA

The Fresenius USA Special Meeting to consider and vote on the approval and adoption of the Reorganization Agreement and the transactions contemplated thereby, as well as on the Fresenius USA Plan Amendment, will be held on September 16, 1996 at 10:00 a.m. local time, at the 52nd floor conference center of O'Melveny & Myers LLP, 153 East 53rd Street, New York NY 10022. Only holders of record of Fresenius USA Common Stock at the close of business on July 29, 1996 (the "Fresenius USA Record Date") will be entitled to notice of and to vote at the Fresenius USA Special Meeting. At July 22, 1996, there were outstanding and entitled to vote 26,374,218 shares of Fresenius USA Common Stock. Each share of Fresenius USA Common Stock is entitled to one vote.

The affirmative vote of the holders of record of at least two-thirds of the outstanding shares of Fresenius USA Common Stock is necessary to approve and adopt the Reorganization Agreement and the transactions contemplated thereby. The affirmative vote of the holders of record of a majority of the shares of Fresenius USA Common Stock is necessary to approve the Fresenius USA Plan Amendment. As a result, failing to vote by person or proxy on any such proposal at the Fresenius USA Special Meeting or abstaining on any such proposal has the same effect as voting against the proposal.

Fresenius AG is currently the beneficial owner of 18,438,545 shares of Fresenius USA Common Stock, including 3,129,883 shares of Fresenius USA Common Stock which were acquired upon conversion of the Fresenius USA Series F Series Preferred Stock ("Fresenius USA Preferred Stock") previously owned by Fresenius AG and including 1,515,221 shares which were acquired upon exercise of

<PAGE> 30
5

warrants to purchase Fresenius USA Common Stock. Fresenius AG has informed

XXX-001862

Fresenius USA that it has agreed to vote all of its shares of Fresenius USA Common Stock in favor of the Reorganization and intends to vote all such shares in favor of the Fresenius USA Plan Amendment. Such 18,438,545 shares represent approximately 70.3% of the outstanding shares of Fresenius USA Common Stock. ACCORDINGLY, SUCH AFFIRMATIVE VOTE BY FRESENIUS AG WILL RESULT IN THE APPROVAL OF THE REORGANIZATION AND THE TRANSACTIONS CONTEMPLATED THEREBY AND THE FRESENIUS USA PLAN AMENDMENT. In addition, directors and executive officers of Fresenius USA, who beneficially owned as of July 23, 1996, in the aggregate, 262,166 shares of Fresenius USA Common Stock, or approximately 1% of the Fresenius USA Common Stock then outstanding, are expected to vote the shares they own in favor of the Reorganization and the Fresenius USA Plan Amendment. See "SECURITY OWNERSHIP -- Security Ownership of Certain Beneficial Owners and Management of Fresenius USA."

Shareholders of Fresenius AG have already approved the Reorganization at an Extraordinary General Meeting held on April 11, 1996.

For information with respect to certain interests of the directors and executive officers of Fresenius USA in the Reorganization, see "INTERESTS OF CERTAIN PERSONS" and "FRESENIUS USA EXECUTIVE COMPENSATION."

For additional information relating to the Special Meetings, see "THE SPECIAL MEETINGS."

RECOMMENDATIONS OF THE BOARDS OF DIRECTORS

The Grace Board has unanimously approved the Reorganization Agreement and the transactions contemplated thereby. Based in part on the recommendations of the Grace Financial Advisors summarized under "BACKGROUND AND REASONS - - Background of the Reorganization; Reasons for the Recommendation of the Grace Board," the members of the Grace Board believe that the Reorganization Agreement and the transactions contemplated thereby are fair to, and in the best interests of, the Grace shareholders, and recommend a vote FOR approval of the Reorganization and the Grace Amendment.

The Fresenius USA Board, by unanimous vote, including the votes of all of the independent directors of Fresenius USA (the "Fresenius USA Independent Committee"), has approved the Reorganization Agreement and the transactions contemplated thereby, including without limitation, the Fresenius USA Merger. Based in part on the recommendations of the Fresenius USA Independent Committee's financial advisors summarized under "BACKGROUND AND REASONS -- Background of the Reorganization; Reasons for the Recommendation of the Fresenius USA Board," the members of the Fresenius USA Board unanimously believe that such transactions are fair to, and in the best interests of, the stockholders of Fresenius USA. The Fresenius USA Board, by unanimous vote, including the vote of all of the members of the Fresenius USA Independent Committee, has also approved the Fresenius USA Plan Amendment. The Fresenius USA Board, including all of the members of the Fresenius USA Independent Committee, unanimously recommend a vote FOR approval of the Reorganization and the Fresenius USA Plan Amendment.

In connection with approval of the Reorganization by the Grace Board, the Grace Board received opinions from CS First Boston and Merrill Lynch to the effect that, in the opinion of such firms, as of February 4, 1996, the terms of the Distribution Payment and the Grace Merger, taken together, were fair, from a financial point of view, to the holders of Grace Common Stock. In connection with these opinions, these firms performed a variety of financial and comparative analyses which included, among other things, valuation analyses with respect to Fresenius Medical Care and NMC and made a presentation to the Grace Board. Such opinions and presentation are based on certain assumptions and are subject to certain limitations. Such opinions and presentation are described herein under "BACKGROUND AND REASONS" at pages 37 through 57, and the opinions of CS First Boston and Merrill Lynch are set forth in full in Appendix C hereto.

In connection with approval of the Reorganization by the Fresenius USA Board, the Fresenius USA Independent Committee received an opinion from Salomon Brothers to the effect that, in the opinion of such

6

<PAGE>    31

firm, as of May 8, 1996, the exchange ratio of 0.37067735 FMC Ordinary Shares to be issued in exchange for each share of Fresenius USA Common Stock held by the stockholders of Fresenius USA (other than Fresenius AG and Grace and their respective subsidiaries) was fair, from a financial point of view, to the holders of Fresenius USA Common Stock (other than Fresenius AG and Grace and their respective subsidiaries). In connection with this opinion, Salomon Brothers performed a variety of financial and comparative analyses which included, among other things, valuation analyses with respect to Fresenius Medical Care and Fresenius USA and made a presentation to the Fresenius USA Independent Committee. Such opinion and presentation are based on certain assumptions and are subject to certain limitations. Such opinion and presentation are described herein under "BACKGROUND AND REASONS" at pages 47 through 57, and the opinion of Salomon Brothers is set forth in full in Appendix D hereto.

The determinations of the Grace Board and Fresenius USA Board with respect to the Reorganization are based upon a number of factors. For a discussion of certain factors considered by the Grace Board and the Fresenius USA Board, see "BACKGROUND AND REASONS -- Background of the Reorganization; Reasons for the Recommendation of the Grace Board" and "-- Background of the Reorganization; Reasons for the Recommendation of the Fresenius USA Board."

INTERESTS OF CERTAIN PERSONS IN THE TRANSACTIONS

XXX-001863

In considering the recommendations of the Grace Board and the Fresenius USA Board with respect to the Reorganization, shareholders of Grace and Fresenius USA should be aware that Fresenius AG and certain current and former members of the respective boards of directors of Grace and Fresenius USA have certain interests in the Reorganization in addition to the interests of shareholders of Grace and Fresenius USA generally. These interests include certain contractual relationships relating to the supply of products and the sharing of intellectual property, among other things, between Fresenius AG and Fresenius Medical Care (discussed under "THE REORGANIZATION -- Continuing Arrangements Between Fresenius Medical Care and Fresenius AG"), various employment and consulting agreements (discussed under "MANAGEMENT OF FRESENIUS MEDICAL CARE -- Compensation of the FMC Management Board and Certain Other Executive Officers -- Employment and Consulting Agreements"), indemnification agreements (discussed under "PRESENIUS USA EXECUTIVE COMPENSATION -- Indemnification Agreements"), payments in the aggregate amount of $15,035,119 in respect of shares of, and stock options with respect to, Fresenius USA Common Stock (discussed under "FRESENIUS USA EXECUTIVE COMPENSATION -- Securities Repurchases") and supplemental compensation ranging between $50,000 and $75,000 per person to members of the Fresenius USA Independent Committee for services rendered thereon (discussed under "INTERESTS OF CERTAIN PERSONS -- Other Interests in the Reorganization"). No Grace insiders will receive any material benefits as a result of the Reorganization.

  OPINIONS OF FINANCIAL ADVISORS

   Grace.  CS First Boston Corporation ("CS First Boston") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), financial advisors to Grace ("Grace Financial Advisors"), have issued their respective written opinions to the Grace Board that, as of February 4, 1996, the date of approval of the Reorganization Agreement by the Grace Board, the terms of the Distribution Payment and the Grace Merger, taken together, were fair, from a financial point of view, to the holders of the Grace Common Stock. Such written opinions are reproduced in their entirety as Appendix C to this Joint Proxy Statement-Prospectus, and holders of Grace Common Stock are urged to read such opinions and confirmations carefully in their entirety for a description of the procedures followed, assumptions and qualifications made, matters considered, and limitations on the review undertaken by such firms.

    Fresenius USA.  Salomon Brothers Inc ("Salomon Brothers"), the financial advisor to the Fresenius USA Independent Committee, has issued its written opinion to the Fresenius USA Independent Committee that, as of May 8, 1996, the exchange ratio for the exchange of Fresenius USA Common Stock for FMC Ordinary Shares by the stockholders of Fresenius USA (other than Fresenius AG and Grace and their

                                     7

<PAGE>   32

respective subsidiaries) in the Fresenius USA Merger is fair, from a financial point of view, to such holders. The written opinion of Salomon Brothers is reproduced in its entirety as Appendix D to this Joint Proxy Statement-Prospectus, and holders of Fresenius USA Common Stock are urged to read such opinion carefully in its entirety for a description of the procedures followed, assumptions and qualifications made, matters considered, and limitations on the review undertaken by Salomon Brothers.

THE REORGANIZATION AGREEMENT

   On February 4, 1996, Fresenius AG and Grace executed and delivered agreements which provide for the transactions described below.

  FORMATION OF FRESENIUS MEDICAL CARE

   Fresenius AG has changed the name of Sterilpharma GmbH to "Fresenius Medical Care GmbH" and will convert it into a German stock corporation, changing its name to "Fresenius Medical Care AG."

  THE CONTRIBUTION

   Prior to the Effective Time, Fresenius AG will contribute Fresenius Worldwide Dialysis to Fresenius Medical Care. However, Fresenius AG will retain and lease (either directly or through an affiliate) to Fresenius Medical Care (or an affiliate) certain real property and buildings in Germany, as described under "THE REORGANIZATION -- Continuing Arrangements between Fresenius Medical Care and Fresenius AG -- Real Property Lease." Fresenius AG will also retain and license to Fresenius Medical Care the "Fresenius" name and mark and the "F" logo as described under "THE REORGANIZATION -- Continuing Arrangements between Fresenius Medical Care and Fresenius AG -- Trademarks."

  THE DISTRIBUTION

   Prior to the Effective Time, New Grace will hold all assets of Grace (other than NMC). Immediately prior to the Recapitalization, Grace will effect the Distribution whereby Grace will spin off New Grace.

  THE DISTRIBUTION PAYMENT

   In connection with the Distribution, NMC will borrow and/or will retain or assume Debt (as defined in the Reorganization Agreement) in an aggregate amount of approximately $2.263 billion (as adjusted pursuant to the Reorganization Agreement) and will distribute the net cash proceeds to Grace Chemicals as a dividend (such assumption and dividend, the "Distribution Payment"). It is expected that NMC will borrow funds for such Distribution Payment pursuant to

XXX-001864

the NMC Credit Agreement, as a result of which, on a pro forma basis, NMC would
have had annual debt service obligation under such Agreement and its other
obligations of approximately $170.0 million in 1995. See Note 2 of Notes to
Unaudited Pro Forma Combined Condensed Financial Information. Grace intends that
a portion of such net cash proceeds will be applied to further reduce Grace
Chemicals' debt and the remaining net cash proceeds received from NMC will be used to
purchase shares of New Grace Common Stock and to invest in core businesses.

    In connection with the NMC Credit Agreement, Grace Chemicals has agreed to
guarantee Facility 3 (which provides for $500 million of available credit) and
under Facility 2 up to a maximum of $450 million. The NMC Credit Agreement is
expected to provide that these guarantees will be released as to $800 million
upon the occurrence of certain events after 45 days, but within 60 days,
following the Effective Date, including (a) the receipt of an unconditional
joint and several guarantee from Fresenius Medical Care and certain of its
subsidiaries for the full amount of the NMC Credit Facility; or (b) the receipt
of a letter of credit or other acceptable financial accommodation for the
account of Grace Chemicals or Fresenius Medical Care in form and substance
satisfactory to the Lenders; or (c) a prepayment in certain specified amounts
under the NMC Credit Facility guaranteed by Grace Chemicals. If such guarantees
are not released within 60 days following

                                        8

<PAGE>   33

the Effective Date, demand for payment will be made on Grace Chemicals under
such guarantees as to $800 million. It is the intention of Fresenius Medical
Care to provide the unconditional joint and several guarantees referred to in
the preceding sentence in a manner so as to cause the release of Grace
Chemicals' guarantees as to $800 million not before 46 days, but on or prior to
50 days, following the Effective Date. However, no assurance can be given that
such guarantees as to $800 million will be provided or that either or both of
Grace Chemicals' guarantees will be released. In the event that Fresenius
Medical Care does not provide such guarantees or otherwise effect the release of
the Grace Chemicals guarantees as to $800 million, Grace Chemicals would be
required to provide the letters of credit or repay the amounts specified in the
NMC Credit Agreement and, thereafter, be subrogated to the rights of Lenders
with respect to such repaid amounts after the Lenders under the respective
facilities have been repaid in full; and Grace Chemicals has undertaken to the
Lenders to maintain unused available credit in an amount to be determined while
the Grace Chemicals guarantees are outstanding in order to facilitate such
actions. In connection with Grace Chemicals' agreement to extend guarantees
under the NMC Credit Agreement, Fresenius Medical Care and Grace Chemicals
intend to enter into an agreement to induce Fresenius Medical Care to cause such
guarantees to be released as to $800 million not later than the 50th day
following the Effective Date. The balance of the Grace Chemicals guarantees
under Facility 2 will be released upon NMC (or Fresenius Medical Care, if
Fresenius Medical Care guarantees the NMC Credit Facility), on a consolidated
basis, achieving a ratio of senior debt to EBITDA of equal to or less than 3.5.
See "FINANCING -- NMC Credit Agreement."

    THE RECAPITALIZATION

    Immediately following the Distribution and immediately prior to the
Effective Time, the Recapitalization of Grace will be effected so that each
holder of Grace Common Stock will receive one New Preferred Share for each share
of Grace Common Stock held.

    THE MERGERS

    At the Effective Time, Grace Merger Sub will merge with and into Grace,
with Grace the surviving corporation, and Grace's name will be changed to
"Fresenius National Medical Care, Inc." and FUSA Merger Sub will merge with and
into Fresenius USA, with Fresenius USA being the surviving corporation; and as
promptly as practicable following the Mergers, Fresenius USA will be contributed
to FNMC. As a result of the Mergers, holders of Grace Common Stock (together
with holders of options to purchase Grace Common Stock who are employees of NMC)
at the Effective Time will be allocated 44.8% of the FMC Ordinary Shares
outstanding immediately thereafter, on a fully diluted basis, and Fresenius AG
will be allocated approximately 50.3% of the FMC Ordinary Shares outstanding
immediately thereafter, on a fully diluted basis. Holders of Fresenius USA
Common Stock (together with holders of options and warrants to purchase
Fresenius USA Common Stock) will be allocated, in the aggregate, approximately
4.9% of the FMC Ordinary Shares outstanding immediately thereafter, on a fully
diluted basis, based on an exchange ratio of approximately 1.112 ADSs for each
share of Fresenius USA Common Stock.

    OTHER TERMS OF THE REORGANIZATION AGREEMENT

    Effective Time. The Fresenius USA Merger and the Grace Merger will become
effective on the date and time on which articles of merger respecting the
Fresenius USA Merger are filed with the Secretary of State for the Commonwealth
of Massachusetts and the certificate of merger respecting the Grace Merger is
filed by the Department of State for the State of New York (or such later date
and time as may be specified therein (the date thereof the "Effective Date," and
the time thereof, the "Effective Time").

    Accounting Treatment. Each of the Grace Merger and the Fresenius USA
Merger will be accounted for as a purchase by Fresenius Medical Care under US
GAAP. See "THE REORGANIZATION -- Accounting Treatment."

<PAGE>   34

                                        9

XXX-001865

CONDITIONS

Financing.  It is a condition to the consummation of the Reorganization that Grace and Fresenius AG have obtained the financing necessary to consummate the Reorganization, including the Distribution Payment, on terms satisfactory to the parties.

Antitrust.  It is a condition to the consummation of the Reorganization that the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules promulgated thereunder (the "HSR Act"), shall have expired or terminated. On July 25, 1996, the U.S. Federal Trade Commission (the "FTC") accepted for public comment an Agreement Containing Consent Order with Fresenius AG and Fresenius USA, and the HSR Act waiting period terminated on July 26, 1996. Following the public comment period, the FTC may either take steps to enter a final order or withdraw acceptance of the Agreement Containing Consent Order. Unless acceptance is withdrawn by the FTC, the Agreement Containing Consent Order will require the divestiture of Fresenius USA's dialysate concentrate manufacturing facility in Lewisberry, Pennsylvania. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Business of Fresenius USA -- Properties" and "THE REORGANIZATION -- Conditions."

Under Germany's Law Against Restraints of Competition, Fresenius AG and NMC have filed for pre-merger clearance with the German Federal Cartel Office ("FCO"). The FCO has granted clearance, subject to the divestment prior to the consummation of the Reorganization of Schiwa GmbH ("Schiwa") and Rena-Med GmbH and its affiliates ("Rena-Med"), German subsidiaries of Fresenius AG and Grace, respectively, whose products include dialysate concentrates. Efforts are underway to divest Schiwa and Rena-Med. Discussions are in progress with the FCO regarding the conditions and timing of the divestment and clearance. See "THE REORGANIZATION -- Conditions."

Litigation.  It is a condition to the consummation of the Reorganization that no governmental entity shall have issued any judgment, decree, injunction or other order which is in effect and prohibits consummation of the Reorganization.

Other Approvals.  It is a condition to the Reorganization that all material filings, consents, approvals and authorizations required to be made or obtained in connection with the Reorganization be made or obtained from the applicable governmental or regulatory authority, agency, court or other entity, domestic or foreign, prior to the Effective Time. In this regard, it should be noted that certain regulatory approvals may be required by state and local authorities and by certain government agencies which regulate the health care business. NMC and Fresenius Worldwide Dialysis are working toward obtaining all such consents and approvals and expect that such consents and approvals will be obtained.

Waiver.  All conditions to the Reorganization may be waived by the relevant party, but neither Grace nor Fresenius AG expects to waive any material conditions.

TERMINATION

The Reorganization Agreement may be terminated and the Reorganization abandoned at any time prior to the Effective Time under certain circumstances described in the Reorganization Agreement, including in connection with a Higher Offer. If the Reorganization Agreement is terminated under certain specified conditions, $75 million plus actual out-of-pocket expenses will become payable by Grace to Fresenius AG (although Grace will not be responsible for the expenses of Fresenius USA). Pursuant to an agreement between Fresenius AG and Fresenius USA, Fresenius USA is entitled to 34% of any such termination fee. See "THE REORGANIZATION -- Conditions," "-- Termination Fees" and "-- Termination." In the event of termination of the Reorganization Agreement, no party to the Reorganization Agreement will have any liability or future obligation to any other party, except for liability for any material and willful breach of any covenant.

10

<PAGE>   35.

CERTAIN FEDERAL INCOME TAX CONSEQUENCES

TAX CONSEQUENCES TO GRACE AND GRACE SHAREHOLDERS

The obligations of Grace to consummate the Distribution and the Recapitalization, and the obligations of Grace, Fresenius AG and Fresenius USA to consummate the Reorganization, are conditioned, among other things, on the receipt of opinions from special counsel and tax counsel to Grace that: (a) the Distribution will qualify as a tax-free distribution such that a Grace shareholder will not recognize any income, gain or loss as a result of the Distribution; (b) the Recapitalization will be a tax-free transaction to Grace such that no gain or loss will be recognized by Grace as a result of the Recapitalization; and (c) the Grace Merger will qualify as a tax-free transaction to Grace and its shareholders such that Grace will recognize no gain or loss as a result of the Grace Merger, and no gain or loss will be recognized by Grace shareholders upon receipt of ADSs representing FMC Ordinary Shares in exchange for Grace Common Stock pursuant to the Grace Merger, except that holders of Grace Common Stock who exercise their appraisal rights or who receive cash in lieu of fractional shares will recognize gain or loss. It is also expected that the Recapitalization will be tax free to the Grace shareholders. No ruling from the Internal Revenue Service ("IRS") has or will be sought with respect to any aspect of the Reorganization. See "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS TO GRACE AND GRACE SHAREHOLDERS."

TAX CONSEQUENCES TO FRESENIUS USA STOCKHOLDERS AND FRESENIUS MEDICAL CARE

XXX-001866

Stockholders of Fresenius USA who exchange their shares of Fresenius USA Common Stock for FMC Ordinary Shares or ADSs will not be subject to federal income tax except to the extent cash is received in lieu of fractional shares. The exchange of shares of Fresenius USA Common Stock entirely for cash by Fresenius USA Dissenting Stockholders will be a taxable transaction on which gain or loss will be recognized.

For a more complete summary of the material U.S. federal and German income tax consequences of exchanging shares of Fresenius USA Common Stock for FMC Ordinary Shares and of holding the FMC Ordinary Shares, see "CERTAIN INCOME TAX CONSEQUENCES OF THE TRANSACTIONS TO HOLDERS OF FRESENIUS USA COMMON STOCK."

Fresenius Medical Care will recognize no gain or loss upon receipt of Fresenius USA Common Stock in exchange for FMC Ordinary Shares or ADSs.

APPRAISAL RIGHTS

Holders of Grace Common Stock have the right to dissent from the approval and adoption of the Reorganization Agreement and the transactions contemplated thereby and, subject to strict compliance with Sections 623 and 910 of the New York Business Corporation Act (the "NYBCL"), as an alternative to receiving the applicable consideration for their Grace Common Stock, to a judicial determination of the fair value of their Grace Common Stock. Sections 623 and 910 of the NYBCL are described under "THE REORGANIZATION -- Appraisal Rights" and are attached as Appendix F to this Joint Proxy Statement-Prospectus.

Holders of Fresenius USA Common Stock have the right to dissent from approval and adoption of the Reorganization Agreement and the transactions contemplated thereby, and, subject to strict compliance with certain requirements of the Massachusetts Business Corporation Law (the "MBCL"), to receive payment for the "fair value," as defined in the MBCL, of their Fresenius USA Common Stock. These requirements are described under "THE REORGANIZATION -- Appraisal Rights" and in the provisions of Sections 85 through 98 of the MBCL, which are attached as Appendix G to this Joint Proxy Statement-Prospectus.

11

<PAGE>  36

NEW PREFERRED SHARES

Prior to the Effective Time, but following the Distribution, the Recapitalization of Grace will be effected so that holders of Grace Common Stock will receive one New Preferred Share for each share of Grace Common Stock held. The New Preferred Shares will have a liquidation preference of $0.10 per share (the "Liquidation Preference") and will have no dividend rights and no dividend preference except with respect to the Special Dividend described below. The New Preferred Shares will have no class voting rights (except as provided by law or in the FNMC certificate of incorporation, as described below). The New Preferred Shares will have one-tenth of a vote per share. The holders of the New Preferred Shares will be entitled to receive, when and if declared by the board of directors of FNMC (the "FNMC Board"), the Special Dividend, payable in cash in annual installments beginning on October 1, 2002 and in each subsequent year until the dividend is fully paid, in an amount based on adjusted cash flow of Fresenius Medical Care from January 1, 1997 to December 31, 2001. Under certain circumstances, FNMC may pay the Special Dividend in shares of Common Stock of FNMC ("FNMC Common Stock"). If the Special Dividend is payable, but not declared, or if any installment of the Special Dividend is not paid on October 1, 2002 and, thereafter, on October 1 in each of the following years, if applicable (each such date, a "Payment Date"), FNMC may not pay any other dividends on FNMC Common Stock and the holders of the New Preferred Shares will have a right to vote as a class to elect two directors to the FNMC Board. However, failure of FNMC to pay dividends on the New Preferred Shares will not preclude Fresenius Medical Care from paying dividends on FMC Ordinary Shares. The New Preferred Shares are redeemable after the date of the Public Announcement (which is required to be made no later than May 1, 2002) for the greater of the Liquidation Preference or any unpaid Special Dividend Amount. See "DESCRIPTION OF NEW PREFERRED SHARES" for a more complete description of the New Preferred Shares as well as hypothetical examples of how the Special Dividend would be calculated. The text of the Grace Amendment providing the terms of the New Preferred Shares is set forth in Appendix B hereto.

CERTAIN EFFECTS OF THE REORGANIZATION ON THE RIGHTS OF GRACE SHAREHOLDERS AND FRESENIUS USA STOCKHOLDERS

Upon consummation of the Mergers, the holders of shares of Grace Common Stock and of Fresenius USA Common Stock will become holders of ADRs representing ADSs evidencing FMC Ordinary Shares. Certain differences exist between the rights of a shareholder of a Massachusetts or New York corporation, on the one hand, and holders of ADRs representing ADSs evidencing ordinary shares of a German stock corporation, on the other hand. The internal affairs of Fresenius Medical Care will be governed by German law and by Fresenius Medical Care's Articles of Association. The Reorganization will result in certain differences in the rights of Grace shareholders and Fresenius USA stockholders from the rights they currently possess. Shareholders of Fresenius Medical Care will have the benefit of certain provisions pursuant to German law, Fresenius Medical Care's Articles of Association, and a pooling agreement for the benefit of the shareholders of Fresenius Medical Care, other than Fresenius AG, as more particularly described under "DESCRIPTION OF THE POOLING AGREEMENT."

CERTAIN CONSIDERATIONS

In deciding whether to approve and adopt the Reorganization Agreement and

XXX-001867

the transactions contemplated thereby, shareholders should carefully evaluate
the matters set forth under "RISK FACTORS" and "BUSINESS OF FRESENIUS MEDICAL
CARE," and, in the case of Grace shareholders, in the New Grace Prospectus
attached as Annex A to the version of this Joint Proxy Statement-Prospectus
being furnished to Grace shareholders, in addition to the other matters
described herein and therein. In addition, see "BUSINESS OF FRESENIUS MEDICAL
CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings --
Shareholder Litigation" for a summary of a purported class action filed in
February 1996 relating to the Reorganization. The plaintiff in such action has
not taken any steps to prosecute such action since it was filed, and the
defendants believe such action is without merit.

                                    12

<PAGE>   37

MARKETS AND MARKET PRICES

     Grace Common Stock is listed under the symbol "GRA" on the NYSE. Fresenius
USA Common Stock is listed under the symbol "FRN" on the AMEX. On July 15, 1996,
there were approximately 18,000 holders of record of Grace Common Stock and
approximately 4,200 holders of record of Fresenius USA Common Stock. On February
2, 1996, the last trading date prior to the joint public announcement by Grace
and Fresenius AG of the signing of the Reorganization Agreement, the last
reported sale price on the NYSE Composite Tape was $69.25 per share for Grace
Common Stock and the last reported sale price on the AMEX was $21.50 per share
for Fresenius USA Common Stock. On August 1, 1996, the last reported sale price
on the NYSE Composite Tape was $63 1/4 per share for Grace Common Stock and the
last reported sale price on the AMEX was $19 per share for Fresenius USA
Common Stock.

     Application will be made by New Grace to list the New Grace Common Stock on
the NYSE. Application will be made by Fresenius Medical Care to list the FMC
Ordinary Shares on the Frankfurt Stock Exchange and the ADSs on the NYSE.
Following the Reorganization, FNMC intends to seek to list the New Preferred
Shares on a national stock exchange. However, no assurance can be given that the
New Preferred Shares will satisfy the listing criteria of any such exchange.
Unless orderly markets in FMC Ordinary Shares, the ADSs and the New Preferred
Shares develop, the trading prices of such securities may fluctuate
significantly.

     The following table sets forth, for the fiscal quarters indicated (ended
March 31, June 30, September 30 and December 31), the range of high and low sale
prices of Grace Common Stock as reported on the NYSE Composite Tape and of
Fresenius USA Common Stock as reported on the AMEX. Grace has paid a quarterly
dividend on Grace Common Stock of $0.125 per share since December 1995. Prior to
that date, Grace paid a quarterly dividend of $0.35 per share. Fresenius USA has
never paid a dividend on Fresenius USA Common Stock.

                                   GRACE

<TABLE>
<CAPTION>

| DATE | HIGH | LOW | CLOSE |
|------|------|-----|-------|
| <S> | <C> | <C> | <C> |
| Third Quarter 1996 (through August 1, 1996).............. | 73 | 60 1/2 | 63 1/4 |
| Second Quarter 1996.................................... | 82 3/4 | 70 7/8 | 70 7/8 |
| First Quarter 1996.................................... | 81 3/4 | 53 5/8 | 78 1/4 |
| Fourth Quarter 1995.................................... | 66 7/8 | 53 | 59 1/8 |
| Third Quarter 1995.................................... | 71 5/8 | 61 | 66 3/4 |
| Second Quarter 1995.................................... | 65 1/4 | 51 | 61 3/8 |
| First Quarter 1995.................................... | 55 1/4 | 38 1/4 | 53 1/4 |
| Fourth Quarter 1994.................................... | 43 3/8 | 35 1/4 | 38 5/8 |
| Third Quarter 1994.................................... | 42 1/2 | 38 1/8 | 41 1/2 |
| Second Quarter 1994.................................... | 43 1/4 | 38 3/8 | 39 7/8 |
| First Quarter 1994.................................... | 46 3/4 | 39 7/8 | 41 1/4 |

</TABLE>

                                    13

<PAGE>   38

                               FRESENIUS USA

<TABLE>
<CAPTION>

| DATE | HIGH | LOW | CLOSE |
|------|------|-----|-------|
| <S> | <C> | <C> | <C> |
| Third Quarter 1996 (through August 1, 1996)............. | 21 7/8 | 17 3/4 | 19 |
| Second Quarter 1996.................................... | 24 7/8 | 19 1/8 | 21 1/2 |
| First Quarter 1996.................................... | 22 5/8 | 17 1/4 | 20 3/8 |
| Fourth Quarter 1995.................................... | 19 7/8 | 15 1/8 | 19 7/8 |
| Third Quarter 1995.................................... | 16 1/2 | 12 | 15 5/8 |
| Second Quarter 1995.................................... | 13 1/8 | 9 1/2 | 13 1/8 |
| First Quarter 1995.................................... | 11 | 8 5/8 | 10 1/2 |
| Fourth Quarter 1994.................................... | 8 7/8 | 7 | 8 3/8 |
| Third Quarter 1994.................................... | 9 | 5 7/8 | 8 5/8 |
| Second Quarter 1994.................................... | 7 1/2 | 5 3/8 | 6 1/4 |
| First Quarter 1994.................................... | 8 1/4 | 6 5/8 | 6 7/8 |

</TABLE>

     SHAREHOLDERS ARE ADVISED TO OBTAIN CURRENT MARKET QUOTATIONS FOR GRACE
COMMON STOCK AND FRESENIUS USA COMMON STOCK.

XXX-001868

14

<PAGE> 39

SUMMARY SELECTED SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL INFORMATION OF GRACE

    The following Summary Special-Purpose, Consolidated Financial Information
of Grace includes only the assets, liabilities, revenues and expenses of the
Grace health care business operated by NMC prior to the Reorganization. However,
certain health care-related assets owned or investments held in part by Grace
Chemicals and in part by NMC, and previously under the oversight of NMC, are
being retained by Grace Chemicals in the Reorganization and are excluded from
this Summary Special-Purpose, Consolidated Financial Information. The following
Summary Special-Purpose, Consolidated Financial Information of Grace should be
read in conjunction with the Special-Purpose, Consolidated Financial Statements
of Grace and "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
RESULTS OF OPERATIONS -- NMC" included elsewhere in this Joint Proxy
Statement-Prospectus, as well as Grace's 1995 Annual Report on Form 10-K
incorporated herein by reference. The following Summary Special-Purpose,
Consolidated Financial Information for the years ended December 31, 1993, 1994
and 1995 has been derived from Special-Purpose, Consolidated Financial
Statements audited by Price Waterhouse LLP, independent accountants, except for
Balance Sheet Data at December 31, 1993. Special-Purpose, Consolidated Balance
Sheets at December 31, 1994 and 1995 and the related Special-Purpose,
Consolidated Statements of Earnings and of Cash Flows for the three years ended
December 31, 1995 and notes thereto appear elsewhere herein. The report of Price
Waterhouse LLP which also appears elsewhere herein contains an explanatory
paragraph relating to the basis of presentation described in Note 1 to such
Special-Purpose, Consolidated Financial Statements. The Summary Special-Purpose,
Consolidated Financial Information for the three months ended March 31, 1995 and
1996, and the years ended December 31, 1991 and 1992 and the Balance Sheet Data
at December 31, 1993 has been derived from Grace's Unaudited Special-Purpose,
Consolidated Financial Statements. For additional information, see "GRACE
SPECIAL-PURPOSE SELECTED FINANCIAL DATA."

<TABLE>
<CAPTION>

|  | YEAR ENDED DECEMBER 31, | | | | | THREE MONTHS ENDED MARCH 31, | |
| --- | --- | --- | --- | --- | --- | --- | --- |
|  | 1991 | 1992 | 1993 | 1994 | 1995 | 1995 | 1996 |
|  | (IN MILLIONS) | | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| SUMMARY OF OPERATING DATA: |  |  |  |  |  |  |  |
| Net revenues.................... | $1,010 | $1,214 | $1,456 | $1,818 | $2,033 | $ 478 | $ 528 |
| Earnings before income taxes....... | 114 | 140 | 191 | 214 | 206 | 48 | 49 |
| Net earnings..................... | 63 | 80 | 104 | 102 | 97 | 26 | 26 |
| BALANCE SHEET DATA (AT END OF PERIOD): |  |  |  |  |  |  |  |
| Total assets..................... | $ 853 | $ 900 | $1,245 | $1,644 | $1,998 |  | $2,059 |
| Total long-term debt and capitalized lease obligations... | 7 | 6 | 14 | 17 | 35 |  | 28 |
| Total liabilities................. | 253 | 367 | 365 | 485 | 635 |  | 601 |
| Total equity..................... | 600 | 533 | 880 | 1,159 | 1,363 |  | 1,458 |

</TABLE>

15

<PAGE> 40

SUMMARY SELECTED HISTORICAL FINANCIAL INFORMATION OF FRESENIUS WORLDWIDE
DIALYSIS

    The following summary combined financial information of Fresenius Worldwide
Dialysis should be read in conjunction with the combined financial statements of
Fresenius Worldwide Dialysis and "MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- FRESENIUS WORLDWIDE DIALYSIS"
included elsewhere in this Joint Proxy Statement-Prospectus. The summary
financial information prepared in accordance with US GAAP as of and for the
years ended December 31, 1994 and 1995 has been derived from combined financial
statements of Fresenius Worldwide Dialysis prepared in accordance with US GAAP
and audited by KPMG Deutsche Treuhand-Gesellschaft Aktiengesellschaft
Wirtschaftsprufungsgesellschaft, independent accountants. The selected combined
financial data as of and for the three months ended March 31, 1995 and 1996 have
been derived from the Fresenius Worldwide Dialysis unaudited interim combined
financial statements prepared in accordance with US GAAP, and, in the opinion of
management of Fresenius AG have been prepared on a basis substantially
consistent with that of the audited US GAAP combined financial statements of
Fresenius Worldwide Dialysis as of and for each of the years ended December 31,
1994 and 1995. The German GAAP summary combined financial data as of and for
each of the years in the five-year period ended December 31, 1995 have been
derived from Fresenius Worldwide Dialysis' unaudited combined financial
statements, prepared in accordance with German generally accepted accounting
principles ("German GAAP"), and, in the opinion of management of Fresenius AG,
have been prepared on a basis substantially consistent with that of the audited
German GAAP consolidated financial statements of Fresenius AG as of and for such
periods. US GAAP information for Fresenius Worldwide Dialysis as of and for the
years ended December 31, 1991, 1992 and 1993 is not available. For additional
information, see "SELECTED FINANCIAL DATA OF FRESENIUS WORLDWIDE DIALYSIS."

    The reporting currency of Fresenius Worldwide Dialysis is the U.S. dollar.
In accordance with US GAAP, the assets and liabilities of Fresenius Worldwide
Dialysis subsidiaries whose "functional" currency is other than the U.S. dollar
are translated at the year end rate of exchange. Income and expense and cash

XXX-001869

flow items are translated at the average exchange rate for the year.

<TABLE>
<CAPTION>

|  | YEAR ENDED DECEMBER 31, | | | | | | | THREE MONTHS ENDED MARCH 31, | |
|  | 1991 | 1992 | 1993 | 1994 | 1995 | 1994 | 1995 | 1995 | 1996 |
|  | GERMAN GAAP | | | | | U.S. GAAP | | | |
|  | (UNAUDITED) | | | | | | | (UNAUDITED) | |
|  | | | | (IN MILLIONS) | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| SUMMARY OF OPERATING DATA: | | | | | | | | | |
| Net sales........................ | $377 | $519 | $611 | $719 | $895 | $720 | $897 | $208 | $235 |
| Operating income................. | 28 | 34 | 73 | 84 | 121 | 88 | 122 | 35 | 38 |
| Net income....................... | 7 | 11 | 41 | 51 | 72 | 52 | 70 | 19 | 22 |
| BALANCE SHEET DATA (AT END OF PERIOD): | | | | | | | | | |
| Total assets..................... | $284 | $356 | $452 | $481 | $568 | $543 | $644 |  | $679 |
| Total long-term debt and capitalized lease obligations................... | 21 | 20 | 51 | 33 | 35 | 37 | 40 |  | 22 |
| Net assets....................... | 88 | 133 | 200 | 231 | 261 | 261 | 306 |  | 340 |

</TABLE>

   German GAAP differs in certain significant respects from US GAAP. For a discussion of certain significant differences between German GAAP and US GAAP, see "SUMMARY OF CERTAIN SIGNIFICANT DIFFERENCES BETWEEN GERMAN AND U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES."

16

<PAGE> 41

SUMMARY SELECTED HISTORICAL FINANCIAL INFORMATION OF FRESENIUS USA

   The following summary combined and consolidated financial information of Fresenius USA should be read in conjunction with the consolidated financial statements of Fresenius USA and "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- FRESENIUS USA" included elsewhere in this Joint Proxy Statement-Prospectus. The summary financial information has been prepared from consolidated financial statements as of and for each of the years in the five-year period ended December 31, 1995 audited by KPMG Peat Marwick LLP, independent accountants, and from the unaudited interim consolidated financial statements as of March 31, 1996 and for the three months ended March 31, 1995 and 1996. For additional information, see "SELECTED FINANCIAL DATA OF FRESENIUS USA."

<TABLE>
<CAPTION>

|  | YEAR ENDED DECEMBER 31, | | | | | THREE MONTHS ENDED MARCH 31, | |
|  | 1991 | 1992 | 1993 | 1994 | 1995 | 1995 | 1996 |
|  | (IN MILLIONS, EXCEPT PER SHARE AMOUNTS) | | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| SUMMARY OF OPERATING DATA: | | | | | | | |
| Net sales................................ | $ 101 | $ 129 | $ 206 | $ 254 | $ 305 | $ 68 | $ 81 |
| Operating income (loss).................. | (1) | 3 | 9 | 12 | 18 | 4 | 7 |
| Net income (loss)........................ | (3) | 1 | 4 | 7 | 16 | 3 | 5 |
| Net income (loss) per common and common equivalent share: | | | | | | | |
| Primary................................ | $(0.16) | $0.03 | $0.18 | $0.32 | $0.61 | $ .13 | $ .19 |
| Fully diluted.......................... | $(0.16) | $0.03 | $0.18 | $0.31 | $0.59 | $ .13 | $ .19 |
| BALANCE SHEET DATA (AT END OF PERIOD): | | | | | | | |
| Total assets........................... | $ 78 | $ 89 | $ 159 | $ 185 | $ 225 | $ | $ 227 |
| Total debt and capital lease obligations... | 29 | 22 | 68 | 66 | 75 | | 72 |
| Total stockholders' equity................. | 23 | 31 | 37 | 61 | 79 | | 85 |

</TABLE>

17

<PAGE> 42

SUMMARY SELECTED UNAUDITED PRO FORMA FINANCIAL
INFORMATION OF FRESENIUS MEDICAL CARE

   The following summary selected unaudited pro forma financial data illustrate the pro forma effects of the Reorganization. The pro forma income statement data are based on the income statements of Grace and Fresenius Worldwide Dialysis, including Fresenius USA, for the year ended December 31, 1995, and the three month period ended March 31, 1996 and assume that the Reorganization occurred as of January 1 of each respective period. The pro forma balance sheet data are based on the balance sheets of Grace and Fresenius Worldwide Dialysis, including Fresenius USA, as of March 31, 1996, and assume that the Reorganization occurred as of March 31, 1996. The selected unaudited pro forma financial data should be read in conjunction with the Fresenius

Medical Care Pro Forma Financial Statements, together with the historical annual
and interim financial statements and other financial information of Grace,
Fresenius USA and Fresenius Worldwide Dialysis included elsewhere in this Joint
Proxy Statement-Prospectus. The Pro Forma Condensed Combined Financial
Statements from which the following selections are taken have been prepared in
accordance with US GAAP under which the Reorganization has been accounted for as
a purchase of Grace by Fresenius Medical Care. THE PRO FORMA CONDENSED COMBINED
FINANCIAL STATEMENTS FROM WHICH THE INFORMATION HAS BEEN TAKEN DO NOT PURPORT TO
REPRESENT WHAT THE FINANCIAL POSITION OR RESULTS OF OPERATIONS OF FRESENIUS
MEDICAL CARE, GRACE, FRESENIUS WORLDWIDE DIALYSIS OR FRESENIUS USA WOULD
ACTUALLY HAVE BEEN IF THE REORGANIZATION HAD IN FACT OCCURRED AS OF JANUARY 1,
1995 OR JANUARY 1, 1996, OR TO PROJECT THE FINANCIAL POSITION OR RESULTS OF
OPERATIONS FOR ANY FUTURE DATE OR PERIOD.

<TABLE>
<CAPTION>

|  | YEAR ENDED DECEMBER 31, 1995 | THREE MONTHS ENDED MARCH 31, 1996 |
|---|---|---|
|  | (IN MILLIONS, EXCEPT PER SHARE AMOUNTS) | |
| <S> | <C> | <C> |
| SUMMARY OF PRO FORMA OPERATING INFORMATION: |  |  |
| Net revenues........................... | $2,847 | $ 743 |
| Earnings before income taxes.................. | 144 | 33 |
| Net earnings................................... | 58 | 14 |
| Earnings per share............................. | $ .83 | $ .20 |
| PRO FORMA BALANCE SHEET INFORMATION: |  |  |
| Total assets................................... |  | $4,641 |
| Total borrowings(1)............................ |  | 2,224 |
| Total liabilities.............................. |  | 2,946 |
| Total stockholders' equity..................... |  | 1,695 |

</TABLE>

- ---------------
1. Excludes $200 million for the off-balance sheet financing arrangement of
   Grace. See "FINANCING."

   Fresenius Medical Care pro forma revenues for the year ended December 31,
1995 and the three-month period ended March 31, 1996 were $2,847 million and
$743 million, respectively. Of such amounts, prior to intercompany elimination
entries, $2,020 million and $525 million, respectively, was generated by Grace
and $865 million and $228 million, respectively, was generated by Fresenius
Worldwide Dialysis. Included in total Fresenius Worldwide Dialysis revenues
(prior to intercompany elimination entries) are Fresenius USA revenues for the
year ended December 31, 1995 and three-month period ended March 31, 1996 of $305
million and $81 million, respectively.

   Fresenius Medical Care pro forma net earnings for the year ended December
31, 1995 and the three-month period ended March 31, 1996 were $58 million and
$14 million. Of such amounts, prior to intercompany elimination entries, $2
million and $(7) million, respectively, was generated by Grace and $64 million
and $23 million, respectively, was generated by Fresenius Worldwide Dialysis.
Included in total Fresenius Worldwide Dialysis net earnings (prior to
intercompany elimination entries) are Fresenius USA net earnings for the year
ended December 31, 1995 and three-month period ended March 31, 1996 of $16
million and $5 million, respectively.

                                       18
<PAGE>  43

   Immediately subsequent to consummation of the Reorganization, the
outstanding ordinary shares of Fresenius Medical Care will be owned
approximately 44.8% by the former shareholders of Grace, approximately 50.3% by
Fresenius AG and approximately 4.9% by the former holders of Fresenius USA
common stock other than Grace or its subsidiaries and Fresenius AG or its
subsidiaries.

COMPARATIVE PER SHARE DATA

   HISTORICAL NET EARNINGS, BOOK VALUE AND DIVIDENDS PER SHARE

   Set forth below are historical net earnings from continuing operations, net
earnings, book value and dividends per share of New Grace, Grace, and Fresenius
USA. The information set forth below should be read in conjunction with the
historical consolidated financial statements of W. R. Grace & Co., incorporated
herein by reference and the special-purpose, consolidated financial statements
of Grace and the consolidated financial statements of Fresenius USA appearing
elsewhere in this Joint Proxy Statement-Prospectus.

<TABLE>
<CAPTION>

|  | YEAR ENDED DECEMBER 31, 1995 | | | THREE MONTHS ENDED MARCH 31, 1996 | | |
|---|---|---|---|---|---|---|
|  | NEW GRACE(1) | GRACE(2) | FRESENIUS USA | NEW GRACE(1) | GRACE(2) | FRESENIUS USA |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Net (loss)/earnings from continuing |  |  |  |  |  |  |
| operations........................... | $(2.05) | $ 1.01 | $0.61 | $ 0.42 | $ 0.27 | $0.19 |
| Net (loss)/earnings................... | (3.40) | 1.01 | 0.61 | 0.65 | 0.27 | 0.19 |
| Book value............................ | 12.57 | 13.92 | 3.65 | 13.44 | 14.73 | 3.92 |
| Dividends............................. | 1.18 | -- | -- | 0.13 | -- | -- |

</TABLE>

XXX-001871

PRO FORMA NET EARNINGS, BOOK VALUE AND DIVIDENDS PER SHARE

Set forth below are pro forma net earnings from continuing operations, book value and dividends per share for Fresenius Medical Care and New Grace. The information set forth below should be read in conjunction with the Fresenius Medical Care AG Pro Forma Condensed Combined Financial Information appearing elsewhere in this Joint Proxy Statement-Prospectus and, for Grace shareholders, the New Grace Pro Forma Financial Information contained in the New Grace Prospectus.

```
<TABLE>
<CAPTION>
```

|  | YEAR ENDED DECEMBER 31, 1995 | | THREE MONTHS ENDED MARCH 31, 1996 | |
|  | NEW GRACE | FRESENIUS MEDICAL CARE | NEW GRACE | FRESENIUS MEDICAL CARE |
| --- | --- | --- | --- | --- |
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` |
| Net earnings/(loss) from continuing operations.......... | $ (2.05) | $ 0.83 | $ 0.39 | $ 0.20 |
| Book value.............................................. |  |  | 17.02 | 24.21 |
| Dividends............................................... | -- | -- | -- | -- |

```
</TABLE>
```

- ----------------

(1) Represents per share data derived from the historical financial statements of W. R. Grace & Co. as filed on Form 10-K and 10-Q. These financial statements include the packaging and specialty chemical businesses as continuing operations and NMC and certain other businesses as discontinued operations.
(2) Represents per share data derived from the special-purpose consolidated financial statements of W. R. Grace & Co. restated to reflect NMC as the only continuing operation and excluding all other businesses of W. R. Grace & Co.

<center>19</center>

`<PAGE>`  44

PRO FORMA EQUIVALENT NET EARNINGS, BOOK VALUE AND DIVIDENDS PER SHARE

Set forth below are equivalent pro forma net earnings from continuing operations, book value and dividends per share for W. R. Grace & Co. and Fresenius USA. The equivalent pro forma data for W. R. Grace & Co. are based upon the exchange of one share of Grace Common Stock for one share of New Grace Common Stock and 1.013 ADSs. The equivalent pro forma data for Fresenius USA are based upon the exchange of one share of Fresenius USA Common Stock for 1.112 ADSs and the assumption that there will be 9,253,331 Fresenius USA Common Share Equivalents on the Effective Date. Each ADS represents one-third of an FMC Ordinary Share.

```
<TABLE>
<CAPTION>
```

|  | YEAR ENDED DECEMBER 31, 1995 | | THREE MONTHS ENDED MARCH 31, 1996 | |
|  | W. R. GRACE & CO. | FRESENIUS USA | W. R. GRACE & CO. | FRESENIUS USA |
| --- | --- | --- | --- | --- |
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` |
| Net earnings/(loss) from continuing operations |  |  |  |  |
| Fresenius Medical Care............................. | $ 0.28 | $ 0.31 | $ 0.07 | $ 0.07 |
| New Grace.......................................... | (2.05) | -- | 0.39 | -- |
| Totals....................................... | $(1.77) | $ 0.31 | $ 0.46 | 0.07 |
| Book value |  |  |  |  |
| Fresenius Medical Care............................. |  |  | $ 8.17 | $ 8.97 |
| New Grace.......................................... |  |  | 17.02 | -- |
| Totals....................................... |  |  | 25.19 | $ 8.97 |
| Dividends |  |  |  |  |
| Fresenius Medical Care............................. | $ 0.40 | -- | $ 0.04 | -- |
| New Grace.......................................... | 1.18 | -- | 0.13 | -- |
| Totals....................................... | $ 1.58 | -- | $ 0.17 | -- |

```
</TABLE>
```

<center>20</center>

`<PAGE>`  45

<center>RISK FACTORS</center>

The following risk factors, in addition to the other information contained in this Joint Proxy Statement-Prospectus, should be carefully considered. Grace shareholders should also consider the information in the New Grace Prospectus attached as Annex A to the version of this Joint Proxy Statement-Prospectus furnished to Grace shareholders. As used herein, the name "Fresenius Medical Care" refers to the health care businesses conducted by Fresenius Worldwide Dialysis and NMC prior to the Effective Time, and to be conducted by Fresenius Medical Care following the Effective Time.

XXX-001872

RISKS RELATING TO THE BUSINESS OF FRESENIUS MEDICAL CARE

COST PRESSURES AND OPERATING MARGINS

Fresenius Medical Care's costs are subject to increases as a result of
rising labor and supply costs. At the same time, reimbursement rates (both
governmental and non-governmental) for dialysis treatments and other services
offered by Fresenius Medical Care are generally fixed and may remain at current
levels or be reduced. See "-- Risks Relating to Regulatory Matters -- Dependence
on Government Reimbursement" and "-- Health Care Reform." Although Fresenius
Medical Care will seek to maintain or improve operating margins through cost
efficiencies, there can be no assurance that Fresenius Medical Care's operating
margins will not decline in the future. See "MANAGEMENT'S DISCUSSION AND
ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- NMC," "MANAGEMENT'S
DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS
- -- FRESENIUS USA" and "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
CONDITION AND RESULTS OF OPERATIONS -- FRESENIUS WORLDWIDE DIALYSIS."

COMPETITION

Fresenius Medical Care faces and is likely to face numerous competitors,
some of which may possess substantial financial, marketing or research and
development resources. There can be no assurance that such competition will not
materially adversely affect the future pricing or sale of Fresenius Medical
Care's products and/or services. In particular, technological innovation has
historically been a significant competitive factor in the dialysis products
business. There can be no assurance that the introduction of new products by
competitors will not render one or more of Fresenius Medical Care's products
obsolete.

Fresenius Medical Care will be a vertically integrated company which will
compete in the provider business with many of the customers of its products
business. As a result, independent dialysis centers and those operated by other
chains that are presently customers of Fresenius Worldwide Dialysis may elect to
limit or terminate their purchases of Fresenius Medical Care dialysis products
so as to avoid purchasing products manufactured by a competitor. Fresenius
Medical Care will continue to compete vigorously for the business of such
customers. However, there can be no assurance that any such possible purchase
reductions will not have a material adverse effect on Fresenius Medical Care's
business, financial position or results of operations.

PRODUCTS LIABILITY AND OTHER CLAIMS

Health care companies are subject to claims alleging negligence, products
liability, breach of warranty, malpractice and other legal theories that may
involve large claims and significant defense costs whether or not such liability
is imposed. Products manufactured by such companies may also be subject to
recall. Although such claims and recalls have not had a material adverse effect
on the businesses of Fresenius Medical Care in the past, there can be no
assurance that Fresenius Medical Care will not suffer one or more significant
claims or product recalls in the future, which could materially adversely affect
its business, financial position or results of operations.

While NMC, Fresenius USA and Fresenius AG have been able to obtain
liability insurance in the past, it is possible that such insurance may not be
available in the future on terms acceptable to Fresenius Medical Care, if at
all. A successful claim in excess of the limits of Fresenius Medical Care's
insurance coverage could have a material adverse effect on Fresenius Medical
Care's results of operations or financial condition. Such

21

<PAGE>    46

claims, regardless of their merit or eventual outcome, also may have a material
adverse effect on Fresenius Medical Care's business and reputation. See
"BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and
Regulatory Proceedings."

DEPENDENCE ON ACQUISITIONS

NMC's growth in revenues and operating earnings in prior years has
resulted, in significant part, from its ability to consummate acquisitions of
health care businesses, particularly dialysis centers, on reasonable terms. The
health care industry has experienced significant consolidation in recent years,
particularly in the dialysis and homecare service sectors in which Fresenius
Medical Care will compete, resulting, in some cases, in increased costs of
acquisitions in these sectors. Moreover, because of this ongoing consolidation,
the availability of acquisition candidates has decreased in dialysis and
homecare services. Fresenius Medical Care's ability to make acquisitions also
will depend, in part, on Fresenius Medical Care's available financial resources
and the limitations imposed under the NMC Credit Agreement. See "-- Other
Risks-- Effects of Indebtedness" and "FINANCING." Fresenius Medical Care's
ability to continue to effect acquisitions may also depend on its ability to use
its capital stock as consideration in such transactions, which ability may be
limited. See "DESCRIPTION OF CAPITAL STOCK OF FRESENIUS MEDICAL
CARE -- General." The inability of Fresenius Medical Care to continue to be able
to effect acquisitions on reasonable terms could have a material adverse impact
on growth of its business and its future financial position and results of
operations.

Fresenius Medical Care believes that its committed credit lines, combined
with internally generated funds, will be sufficient to finance its acquisition
and expansion plans. In addition, Fresenius Medical Care may use a new class of

XXX-001873

non-voting preferred shares with common stock-like features to effect acquisitions or other transactions in the future. See "DESCRIPTION OF CAPITAL STOCK OF FRESENIUS MEDICAL CARE -- FMC Preferred Shares."

DEPENDENCE ON PHYSICIAN AND OTHER REFERRALS

The provider business of Fresenius Medical Care will be dependent upon referrals of dialysis patients by physicians specializing in nephrology who practice in the communities served by Fresenius Medical Care's dialysis centers. At most centers, a few physicians account for all or a significant portion of the patient referral base, and such physicians may move their patients to competing centers at any time, including centers established by such physicians. The loss of a significant number of referring physicians at Fresenius Medical Care's centers could have a material adverse effect on the operations of those centers and could materially adversely affect Fresenius Medical Care's overall operations. Fresenius Medical Care's operations are also affected by referrals from hospitals, managed care plans and other sources. Financial arrangements with physicians and other referral sources in the U.S. and many other countries, and decisions with respect to purchases of supplies, are highly regulated. NMC is the subject of a government investigation with respect to these matters in the U.S. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings -- OIG Investigation." The decision to purchase Fresenius Medical Care or competing dialysis products will be made by medical directors ("Medical Directors") and other referring physicians at Fresenius Medical Care centers and by the managing medical personnel and referring physicians at other centers. A decline in physician recommendations and/or purchases of Fresenius Medical Care products could materially adversely affect the business and operations of Fresenius Medical Care. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Business of NMC -- DSD Operations" and "-- Competition."

INTERNATIONAL OPERATIONS

Fresenius Medical Care intends to expand its international presence. As a result, Fresenius Medical Care expects that revenues from countries other than the U.S. and Germany will account for an increasing portion of future revenues.

22

<PAGE>  47

Revenues from international operations are subject to a number of risks, including the following: fluctuations in exchange rates could adversely affect profitability; agreements may be difficult to enforce and accounts receivable difficult to collect under certain countries' legal systems; local regulations may restrict Fresenius Medical Care's ability to obtain a direct ownership interest in dialysis centers or other operations; lack of governmental funding may limit the demand for Fresenius Medical Care's services and products; certain customers and governments may have longer payment cycles; and some countries could impose additional withholding taxes or otherwise tax Fresenius Medical Care's income, impose tariffs or adopt other restrictions on foreign trade affecting Fresenius Medical Care products. There can be no assurance that these factors will not have a material adverse effect on Fresenius Medical Care's business, financial position and results of operations. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Strategy" and "-- Business of NMC -- DSD Operations -- International Dialysis Services."

RISKS RELATING TO REGULATORY MATTERS

PENDING INVESTIGATIONS

In October 1995, NMC received five investigatory subpoenas from the Office of the Inspector General ("OIG") of the Department of Health and Human Services ("HHS"). The subpoenas call for the production of extensive documents and were issued in conjunction with an investigation being conducted by the OIG, the U.S. Attorney for the District of Massachusetts and others concerning possible violations of federal laws relating to health care payments and reimbursements (the "OIG Investigation"). NMC is cooperating with the OIG Investigation and has made and expects to continue to make extensive document production in response to the subpoenas. The results of the OIG Investigation and its impact, if any, cannot be predicted at this time. However, the costs of responding to the government's requests are substantial and the pendency of, and any adverse resolution of, the OIG Investigation could have an adverse effect on Fresenius Medical Care's reputation, including, among other things, its relationships in the medical community. In the event that a U.S. government agency or a state agency believes that any wrongdoing has occurred, civil and/or criminal proceedings could be instituted and if such proceedings were to be instituted and the outcome were to be unfavorable, NMC or one or more of its subsidiaries could be excluded from government reimbursement programs or have their payments suspended. Such result would have a material adverse effect on the business, financial position and results of operations of NMC and Fresenius Medical Care. In addition, in the event that a U.S. government or state agency attempts to recover a significant amount of revenues of NMC for prior periods which such agency believes were improperly received, Fresenius Medical Care could suffer a material adverse effect on its business, financial condition and results of operations. In this regard, it should be noted that applicable laws authorize the imposition of penalties of significant magnitude even if the underlying claim is for a relatively immaterial amount. Further, any restrictions on NMC's future operations resulting from the resolution of the OIG Investigation could adversely affect Fresenius Medical Care's profitability in future periods. In addition, any or all of the subjects of the OIG Investigation could be the subject of civil claims by private parties, such as patients or insurers or other private payors, seeking to recoup payments made to NMC, or seeking other remedies, including, without limitation, suspension or exclusion from reimbursement programs and punitive damages. Such claims, if adversely

XXX-001874

determined, could have a material adverse effect on Fresenius Medical Care's
business, financial position and results of operations. This matter is discussed
further under "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal
Matters -- Legal and Regulatory Proceedings -- OIG Investigation" and that
section should be carefully reviewed. See "BUSINESS OF FRESENIUS MEDICAL
CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings -- OIG
Agreements" for information regarding agreements relating to the OIG
investigation among NMC, Grace Chemicals, Fresenius Medical Care and the United
States entered into relative to the Reorganization.

     In December 1994, a subsidiary of NMC received a subpoena from a federal
grand jury in the Eastern District of Virginia investigating the contractual
relationships between subsidiaries of NMC that provide dialysis services and
third parties that provide medical directorship and related services to those
subsidiaries. The outcome of these investigations and their effect, if any, on
NMC cannot be predicted at this time. See

                                       23

<PAGE>   48

"BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and
Regulatory Proceedings -- Eastern District of Virginia."

     On September 22, 1995, June 7, 1996, and June 21, 1996, NMC's LifeChem
laboratory subsidiary ("LifeChem") voluntarily disclosed certain billing
problems, which NMC believes have been corrected. The matters disclosed in
LifeChem's voluntary disclosure of September 22, 1995 are also a subject of the
OIG Investigation. For a further discussion of this matter, see "BUSINESS OF
FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory
Proceedings -- OIG Investigation."

     NMC has received multiple subpoenas from a federal grand jury in the
District of New Jersey investigating a number of issues. On February 12, 1996,
NMC received a letter from the U.S. Attorney for the District of New Jersey
indicating that it is the target of a federal grand jury investigation into
possible violations of criminal law in connection with its efforts to persuade
the U.S. Food and Drug Administration (the "FDA") to lift a January 1991 import
hold issued with respect to NMC's Dublin, Ireland manufacturing facility. In
June 1996, NMC received a letter from the U.S. Attorney for the District of New
Jersey indicating that the U.S. Attorney had declined to prosecute NMC with
respect to a submission related to NMC's effort to lift the import hold. The
letter added that NMC remains a subject of a federal grand jury's investigation
into other matters. The outcome of this investigation and its impact, if any, on
NMC's business or results of operations cannot be predicted at this time. See
"BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and
Regulatory Proceedings -- District of New Jersey Investigation."

HEALTH CARE REFORM

     Proposals to modify the current health care system in the U.S. to improve
access and control costs are being considered by the federal and certain state
governments. Fresenius Medical Care anticipates that the U.S. Congress and state
legislatures will continue to review and assess alternative health care reforms,
and Fresenius Medical Care cannot predict whether any such reform proposals will
be adopted, when they may be adopted or what impact they may have on Fresenius
Medical Care. Such legislation could, among other things, restrict Fresenius
Medical Care's ability to establish prices and to contract independently with
health care providers in the U.S., thereby having a material adverse effect on
the business and operations of Fresenius Medical Care.

     In the U.S., Medicare reimbursement is currently available for dialysis
equipment and/or treatment for most end-stage renal disease ("ESRD") patients at
approximately the same dollars per treatment level that prevailed in 1983
(representing a significant decrease in real dollars per treatment). Health care
reform proposals are intended, among other things, to reduce Medicare spending
growth significantly as part of an effort to reduce the federal budget deficit.
Because the demand for Fresenius Medical Care's products and the profitability
of its services are affected by the availability and level of Medicare
reimbursement, any spending decreases or other significant changes in the
Medicare program could have a material adverse effect on the business and
operations of Fresenius Medical Care.

     Other countries, especially those in Western Europe, have also considered
health care reform proposals and could materially alter their
government-sponsored health care programs by reducing reimbursement payments.
Such reductions could affect the pricing of the products of Fresenius Medical
Care and the profitability of its services, and therefore could have a material
adverse effect on the business, financial position and results of operations of
Fresenius Medical Care. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory
and Legal Matters -- Reimbursement -- Non-U.S."

  OPERATIONS SUBJECT TO AND POTENTIAL EFFECTS OF GOVERNMENTAL REGULATION

     The operations of Fresenius Medical Care will be subject to extensive
governmental regulation in virtually every nation in which it operates. The
applicable regulations, which differ from country to country, relate in general
to the safety and efficacy of medical products and supplies, the operation of
manufacturing facilities, laboratories and dialysis centers, and the rate of,
and accurate reporting and billing for, government and third-party
reimbursement.

                                       24

<PAGE>   49

XXX-001875

Any inability to obtain material required licenses, certifications, or other approvals, or significant delays in obtaining such items, loss of any significant licenses and certifications required to operate, or termination of Fresenius Medical Care's authorization to participate in the Medicare or Medicaid programs under the laws of any other governmental authority from which a substantial portion of its revenues is derived, would have a material adverse effect on the business, financial position and results of operations of Fresenius Medical Care. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters."

RISKS RELATING TO FDA MATTERS

The FDA is the U.S. agency that regulates the testing, manufacturing and marketing of medical products and supplies. From 1991 through 1993, the FDA issued warning letters concerning four of NMC's six renal products division ("RPD") facilities in the U.S., as well as import alerts concerning hemodialysis bloodlines manufactured at NMC's Reynosa, Mexico facility and Focus(R) brand hemodialyzers manufactured at NMC's Dublin, Ireland facility. Under the import alerts, NMC was prohibited from importing the products covered by the alerts into the U.S. until the FDA confirmed compliance with Good Manufacturing Practices ("GMP") at the facilities where such products were manufactured. In January 1994, NMC and certain members of its senior management entered into a consent decree providing, among other things, that when such import prohibition would be lifted (the "Consent Decree"). As a result of the warning letters and the Consent Decree, NMC's U.S. facilities were required to undertake significant GMP improvements, but production continued at all U.S. facilities. Violation of the Consent Decree could result in civil enforcement actions, such as seizure and injunctive actions; administrative proceedings, such as civil penalties and mandatory recalls; and/or criminal contempt proceedings, any of which could have a material adverse effect on Fresenius Medical Care's business, financial position and results of operations. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings."

DEPENDENCE ON GOVERNMENT REIMBURSEMENT

A significant portion of Fresenius Medical Care's revenues will be derived directly or indirectly from reimbursement payments received under the Medicare and Medicaid programs. For example, in 1995 approximately 62% of NMC's total net revenues, including approximately 62% of the revenues of DSD, approximately 78% of the revenues of LifeChem, and approximately 50% of the revenues of NMC Homecare, resulted from Medicare and Medicaid reimbursement. In addition, a significant portion of the net revenues of Fresenius USA and RPD are derived from Medicare, either indirectly by selling renal products to dialysis centers, which in turn seek Medicare reimbursement, or by furnishing products to patients receiving treatment at home and directly seeking Medicare reimbursement.

Reimbursement under the Medicare program for chronic dialysis services provided to ESRD patients at NMC's dialysis centers is paid in accordance with a payment methodology commonly referred to as the composite rate method (the "Composite Rate"). All Medicare reimbursement rates, including the Composite Rate, Medicare rates for other dialysis-related services such as the administration of Erythropoietin ("EPO"), and Medicare rates for other services provided by Fresenius Medical Care, as well as the scope of Medicare coverage, are subject to legislative change as a result of deficit reduction and other measures. Deficit reduction measures have resulted in reimbursement rate reductions in the past and may result in further rate reductions in the future. Congress is actively considering proposals to reduce materially the amounts spent under the Medicare and Medicaid programs. Medicare has also recently proposed a new policy restricting coverage for clinical laboratory tests furnished to dialysis patients. A change in Medicare rates or other terms and conditions of Medicare and Medicaid reimbursement could have a material adverse effect on the business, financial position and results of operations of Fresenius Medical Care as would the result of a regulatory proceeding or investigation excluding NMC or one or more of its subsidiaries from participating in the Medicare reimbursement program. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Reimbursement."

25

<PAGE>   50

POTENTIAL LOSS OF IDPN REIMBURSEMENT

As discussed under "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Reimbursement -- U.S. -- IDPN," the number of claims by NMC Homecare for reimbursement relating to the administration of Intradialytic Parenteral Nutrition ("IDPN") that have been approved by Medicare has been sharply reduced since late 1993. Under the Medicare Parenteral and Enteral Nutrition ("PEN") program NMC believes that the reduction in IDPN claims paid by Medicare represents an unauthorized coverage policy change. Accordingly, NMC is pursuing various administrative and legal avenues, including legal action for injunctive and declaratory relief and administrative appeals, to address this problem. No assurance can be given that NMC will prevail in pursuing such remedies or that the claims on appeal will be approved for payment.

Medicare claims are processed by private companies under contract with the federal government. In April 1996, the Medicare claims processors issued a new coverage policy, which is effective for services billed on and after July 1, 1996. While the new policy permits continued coverage of PEN therapies, including IDPN therapy, and while the potential impact of the new policy is subject to further analysis, NMC believes that the new policy will make it substantially more difficult to qualify patients for future coverage by, among other things, requiring certain patients to undergo onerous and/or invasive tests in order to qualify for coverage. The new policy also eliminates all

XXX-001876

reimbursement for infusion pumps used to administer IDPN therapy. NMC, together
with other interested parties, may seek to effect certain changes in the new
policy, other than with respect to the elimination of reimbursement for infusion
pumps, and NMC has developed changes to its patient qualification procedures in
order to comply with the policy. However, if NMC is unable to effect changes in
the new policy, or, if NMC is unable to change its operating procedures to
conform to changes in the new policy, if physicians and patients fail to accept
the new qualification procedures and/or if patients fail to qualify under such
procedures, the policy could significantly reduce the number of patients
eligible for Medicare coverage of IDPN and other PEN therapies, which would have
a material adverse effect on NMC's financial position and results of operations.
IDPN claims represent substantial accounts receivable of NMC Homecare
(approximately $103 million as of March 31, 1996, with the receivables
increasing at a rate of approximately $6 million per month) and substantially
all of NMC Homecare's operating income in recent quarters. The new policy
eliminates reimbursement for infusion pumps, which may adversely impact revenue
by approximately $11 million on an annualized basis. For purposes of financial
and operational planning, NMC estimates that as much as 50% of NMC's current
patient level may no longer qualify for continued IDPN coverage under the new
policy, which would adversely impact revenues by up to $42 million annually.

        If NMC is unable to collect its IDPN accounts receivable, or if IDPN/PEN
coverage is reduced or eliminated, Fresenius Medical Care's business, financial
position and results of operations could be materially adversely affected. The
use of IDPN by NMC and certain of its billing practices related to IDPN are also
a subject of the OIG Investigation. See "BUSINESS OF FRESENIUS MEDICAL
CARE -- Regulatory and Legal Matters -- Reimbursement" and "-- Legal and
Regulatory Proceedings," and "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL
CONDITION AND RESULTS OF OPERATIONS -- NMC."

    RISKS RELATING TO OBRA 93 DISPUTE

        The Omnibus Budget Reconciliation Act of 1993 ("OBRA 93") amended the
statutory ESRD Medicare Secondary Payor ("MSP") provisions affecting the
coordination of benefits between Medicare and employer health plans in the case
of ESRD patients age 65 and over who are also eligible for Medicare and also covered
by an employer health plan ("dual eligible ESRD patients"). The vast majority of
NMC's patients affected by this amendment were retirees eligible for Medicare on
the basis of age who subsequently became eligible for Medicare on the basis of
ESRD and whose employer group health plan had been the supplemental payor to
Medicare. The original implementation of this provision of OBRA 93 by the Health
Care Financing Administration ("HCFA") of HHS, which administers the Medicare
and Medicaid programs, required all employer health plans to recognize a new
18-month coordination of benefits period during which such

                                    26

<PAGE>    51

employer health plans would be the primary payors for dialysis treatment for
such dual eligible ESRD patients. Under that interpretation, primary Medicare
coverage begins only after the 18-month coordination of benefits period, even if
Medicare was the primary payor for an affected retiree before ESRD entitlement
arose. Upon implementation of these OBRA 93 provisions with respect to dual
eligible ESRD patients, NMC adopted a procedure for rebilling private payors for
certain amounts previously billed to Medicare and crediting Medicare with an
overpayment. NMC's treatment of the overpayments relating to implementation of
OBRA 93 is a subject of the OIG Investigation. See "BUSINESS OF FRESENIUS
MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory
Proceedings."

        On April 24, 1995, HCFA reversed its original interpretation of the OBRA 93
provisions by taking the new position that primary Medicare coverage begins
immediately (rather than after an 18-month coordination of benefits period) in
the case of individuals who are already age eligible for Medicare when ESRD
entitlement arises. HCFA proposed that the reversal be effective retroactively
for services provided after August 10, 1993, the effective date of OBRA 93. On
May 5, 1995, NMC filed a complaint in the U.S. District Court for the District
of Columbia seeking to preclude HCFA from enforcing its new policy. NMC moved
for a preliminary injunction to preclude HCFA from enforcing its new policy
retroactively (i.e., to billings for services provided between August 10, 1993
and April 23, 1995), which injunction was granted on June 6, 1995. The
litigation is continuing with respect to NMC's request to enjoin HCFA's new
policy, both retroactively and prospectively, on a permanent basis. Pending the
outcome of the litigation, HCFA's new policy remains effective for services
provided after April 23, 1995. See "BUSINESS OF FRESENIUS MEDICAL
CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings."

        HCFA's initial interpretation of the MSP provisions of OBRA 93 had a
positive impact on DSD's revenues because during the 18-month coordination of
benefits period, the employer health plan was responsible for payment at its
negotiated rate or, in the absence of such a rate, at NMC's usual and customary
rate (which is generally in excess of the Medicare rate). If HCFA's retroactive
implementation of its revised interpretation of OBRA 93 is upheld, NMC may be
required to refund the payments received from employer health plans for services
provided after August 10, 1993 under HCFA's original implementation and to
rebill Medicare for the same services, which would result in a net loss to NMC
of approximately $120 million as of December 31, 1995. As of July 1, 1995, NMC
ceased to recognize the incremental revenue realized under the original
implementation, but continued to bill employer health plans as primary payors
until December 31, 1995. If HCFA's revised interpretation is upheld, NMC's and
Fresenius Medical Care's business, financial position and results of operations
would be materially adversely affected, particularly if the revised
interpretation is applied retroactively. See "MANAGEMENT'S DISCUSSION AND
ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- NMC" and "BUSINESS

XXX-001877

OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters."

  RISKS RELATING TO NON-GOVERNMENTAL PAYORS

      Fresenius Medical Care derives a significant portion of its revenues from
reimbursement provided by non-governmental third-party payors in the U.S. A
substantial portion of third-party health insurance is now furnished through
some form of managed care, including health maintenance organizations ("HMOs").
Managed care plans are increasing their market share, and this trend may
accelerate as a result of the consolidation in the health care industry as well
as the interest of members of Congress and the executive branch in ways to
increase the number of Medicare and Medicaid beneficiaries served through
managed care plans.

      Reimbursement by non-governmental payors is generally at higher rates than
reimbursement by governmental payors such as Medicare. However, managed care
plans are becoming more aggressive in selectively contracting with a smaller
number of health care providers willing to furnish services for lower rates and
subject themselves to a variety of service restrictions. For example, managed
care plans and traditional indemnity third-party payors are increasingly
demanding alternative fee structures, such as capitation, pursuant to which a
health care provider receives a fixed payment per month per enrollee and bears
the risk of loss if the costs of treating such enrollee exceed the capitation
payment. These market-driven changes are

                                        27

<PAGE>   52

creating significant downward pressure on the reimbursement NMC receives for
services and products, particularly at NMC Homecare.

      As managed care programs increase market share and gain greater bargaining
power vis-a-vis health care providers, there will be increasing pressure to
reduce the amounts paid for services and products furnished by Fresenius Medical
Care. These trends will be accelerated if future changes to the Medicare ESRD
program require private payors to assume a greater percentage of the total cost
of care given to dialysis patients over the term of their illness. Although
Fresenius Medical Care intends to seek to increase the portion of its revenues
attributable to non-governmental private payors, the historically higher rates
of reimbursement paid by non-governmental payors may not be maintained at such
levels. For example, with respect to homecare services, managed care programs
are currently providing levels of reimbursement below those of Medicare. If
substantially more patients of Fresenius Medical Care join managed care plans or
such plans reduce reimbursements, Fresenius Medical Care's business, financial
position and results of operations could be materially adversely affected. See
"BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and
Regulatory Proceedings" and "-- Changes in the Health Care Industry," and
"MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF
OPERATIONS -- NMC."

  OTHER RISKS

      EFFECTS OF INDEBTEDNESS

      After the Reorganization and as a result of the incurrence of debt under a
new credit agreement to be entered into by NMC (the "NMC Credit Agreement") and
the making of the Distribution Payment, NMC (and, therefore, Fresenius Medical
Care, on a consolidated basis) will have substantial debt. Assuming the
Reorganization had been consummated as of March 31, 1996, on a pro forma basis,
Fresenius Medical Care would have had consolidated total debt of approximately
$2.224 billion and consolidated total shareholders' equity of $1.695 billion as
of such date, resulting in a consolidated ratio of total debt to equity of
approximately 1.31 to 1. On a pro forma basis, assuming the Reorganization had
been consummated as of January 1, 1995, Fresenius Medical Care would have had
coverage ratios of earnings before interest, taxes, depreciation and
amortization ("EBITDA") to interest expense of approximately 2.98 to 1 for the
year ended December 31, 1995 and 3.17 to 1 for the three months ended March 31,
1996. Included are $41,693 and $10,268, respectively, of depreciation and
amortization classified as cost of sales and selling, general and administrative
expenses in the Fresenius Worldwide Dialysis Combined Financial Statements. See
"FRESENIUS MEDICAL CARE AG UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL
INFORMATION."

      NMC will have significant interest expense and principal repayment
obligations under the NMC Credit Agreement. While management of Fresenius
Medical Care believes that such obligations will be paid as they become due, if
NMC's operating cash flow is not sufficient to satisfy its cash requirements,
including debt service, Fresenius Medical Care may be required to supplement
NMC's operating cash flow, or Fresenius Medical Care and/or NMC may be required
to effect capital spending reductions or limit or defer acquisition and
expansion plans. There can be no assurance that Fresenius Medical Care would
supplement NMC's cash flow or would do so in an amount sufficient to satisfy the
cash requirements of NMC.

      The NMC Credit Agreement is expected to include covenants which,
among other things, may restrict or have the effect of restricting the ability
of NMC and its subsidiaries to dispose of assets, incur debt, pay dividends,
create liens or make capital expenditures, investments or acquisitions, and
which may otherwise limit activities of NMC and its subsidiaries. The NMC Credit
Agreement also is expected to include certain covenants that will require NMC to
maintain certain financial ratios. The breach of any of the covenants could
result in a default under the NMC Credit Agreement. See "FINANCING." As
described under "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal
Matters -- Legal and Regulatory Proceedings -- OIG Agreements", NMC has agreed

XXX-001878

to deliver to the United States a letter of credit in the principal amount of
$150 million in connection with the OIG investigation.

In connection with the NMC Credit Agreement, Grace Chemicals has agreed to
guarantee Facility 3 (which provides for a maximum of $500 million of available
credit) and Facility 2 up to a maximum of

<center>28</center>

<PAGE>    53

$450 million. The NMC Credit Agreement is expected to provide that these
guarantees will be released as to $800 million upon the occurrence of certain
events after 45 days, but within 60 days, following the Effective Date,
including (a) the receipt of an unconditional joint and several guarantee from
Fresenius Medical Care and certain of its subsidiaries for the full amount of
the NMC Credit Facility; or (b) the receipt of a letter of credit or other
acceptable financial accommodation for the account of Grace Chemicals or
Fresenius Medical Care in form and substance satisfactory to the Lenders; or (c)
a prepayment in certain specified amounts under the NMC Credit Facility. If such
guarantees are not released within 60 days following the Effective Date, demand
for payment will be made on Grace Chemicals under such guarantees as to $800
million. It is the intention of Fresenius Medical Care to provide the
unconditional joint and several guarantees referred to in the preceding sentence
in a manner so as to cause the release of Grace Chemicals' guarantees as to $800
million not before 46 days, but on or prior to 50 days, following the Effective
Date. However, no assurance can be given that such guarantees will be provided
or that either or both of Grace Chemicals' guarantees will be released. In the
event that Fresenius Medical Care does not provide such guarantees or otherwise
effect the release of the Grace Chemicals guarantees as to $800 million, Grace
Chemicals would be required to provide the letters of credit or repay the
amounts specified in the NMC Credit Agreement and, thereafter, be subrogated to
the rights of Lenders with respect to such repaid amounts after the Lenders
under the respective facilities have been repaid in full; and Grace Chemicals
has undertaken to the Lenders to maintain unused available credit in an amount
to be determined while the Grace Chemicals guarantees are outstanding in order
to facilitate such actions. In connection with Grace Chemicals' agreement to
extend guarantees under the NMC Credit Agreement, Fresenius Medical Care and
Grace Chemicals intend to enter into an agreement to induce Fresenius Medical
Care to cause such guarantees to be released as to $800 million not later than
the 50th day following the Effective Date. The balance of the Grace Chemicals
guarantees under Facility 2 will be released upon NMC (or Fresenius Medical
Care, if Fresenius Medical Care guarantees the NMC Credit Facility), on a
consolidated basis, achieving a ratio of senior debt to EBITDA of equal to or
less than 3.5. See "FINANCING -- NMC Credit Agreement."

CERTAIN U.S. TAX CONSIDERATIONS RELATED TO THE DISTRIBUTION

Prior to the Distribution, the stock of NMC will be distributed by Grace
Chemicals to Grace (the "NMC Distribution"). If the NMC Distribution were not to
qualify as a tax-free spin-off under Section 355 of the Internal Revenue Code of
1986, as amended (the "Code"), Grace Chemicals would recognize taxable gain upon
consummation of the Distribution in an amount equal to the excess of the fair
market value of the NMC stock over Grace Chemicals' tax basis in such stock
immediately prior to the NMC Distribution. This tax would be payable by Grace
Chemicals. If the Distribution were not to qualify as a tax-free spin-off under
Section 355 of the Code, then, in general, Grace would recognize taxable gain in
an amount equal to the excess of the fair market value of the New Grace Common
Stock over Grace's tax basis in the New Grace Common Stock immediately prior to
the Distribution. This tax would be payable by FNMC. Although, pursuant to the
Grace Tax Sharing and Indemnification Agreement to be entered into upon the
closing of the Reorganization, Grace Chemicals will, under certain
circumstances, indemnify FNMC for such tax liability, there can be no assurance
that Grace Chemicals' indemnification obligation will be applicable or that
Grace Chemicals will be able to satisfy any such obligation. See "THE
REORGANIZATION -- The Grace Tax Sharing and Indemnification Agreement."

Additionally, if the Distribution were not to qualify as a tax-free
spin-off, each holder of Grace Common Stock as of the Time of Distribution would
be treated as having received a taxable dividend equal to the fair market value
of the New Grace Common Stock received, if and to the extent that Grace (as
expected) has sufficient current and accumulated earnings and profits as of the
end of the taxable year in which the Distribution takes place. If and to the
extent that the fair market value of the New Grace Common Stock exceeds Grace's
earnings and profits as so determined, each such shareholder would first reduce
such shareholder's tax basis in such shareholder's Grace Common Stock (but not
below zero) to the extent that the value of the New Grace Common Stock received
exceeds such shareholder's pro rata share of such earnings and profits, and then
recognize gain from the Distribution to the extent that the value of the New
Grace Common Stock received exceeds both such shareholder's pro rata share of
earnings and profits and tax basis in such shareholder's Grace Common Stock. See
"CERTAIN FEDERAL INCOME TAX CONSE-

<center>29</center>

<PAGE>    54

QUENCES OF THE TRANSACTIONS TO GRACE AND GRACE SHAREHOLDERS -- Consequences of
the Distribution."

CERTAIN LIABILITIES FOR OBLIGATIONS OF GRACE CHEMICALS

As of March 31, 1996, Grace was the guarantor of approximately $2 billion
of indebtedness of Grace Chemicals. Although Grace Chemicals has agreed to seek
releases from such guarantees, such releases may not be obtained and the receipt
of such releases is not a condition to the consummation of the Reorganization.

XXX-001879

In addition, Grace Chemicals has had, and is expected to continue to have, significant liabilities arising out of asbestos-related litigation and other claims. If Grace Chemicals were unable to (or otherwise did not) satisfy such liabilities, an unpaid claimant of Grace Chemicals might seek to assert such liabilities against Fresenius Medical Care, FNMC and/or NMC. Although Grace Chemicals has agreed to indemnify Fresenius Medical Care, FNMC and NMC against such guarantees and asbestos claims, there can be no assurance that Grace Chemicals will be able to fulfill its indemnity obligation.

FRAUDULENT TRANSFER AND RELATED CONSIDERATIONS

It is a condition to the Grace Merger that the NMC Distribution shall have occurred. Under applicable law, the NMC Distribution would constitute a "fraudulent transfer" if (a) New Grace or Grace Chemicals is insolvent, (b) the effect of the NMC Distribution would render New Grace or Grace Chemicals insolvent, (c) the NMC Distribution would leave New Grace or Grace Chemicals engaged in a business or transaction for which its remaining assets constituted unreasonably small capital, or (d) New Grace or Grace Chemicals intended to incur, or believed it would incur, debts beyond its ability to pay as such debts mature. Generally, an entity is considered insolvent if it is unable to pay its debts as they come due or if the fair value of its assets is less than the amount of its actual and expected liabilities. In addition, the NMC Distribution may be made only out of surplus (net assets minus capital) and not out of capital.

Grace believes that, based on the factors considered in connection with the NMC Distribution, the NMC Distribution will not be a fraudulent transfer and will be made out of surplus in accordance with applicable law. There is no certainty, however, that a court would reach the same conclusions in determining that New Grace and Grace Chemicals have satisfied the applicable standards. In this regard, it should be noted that Grace Chemicals has had, and is expected to continue to have, significant liabilities arising out of asbestos-related litigation and claims. For more information regarding such liabilities, see Item 3 of Grace's 1995 Annual Report on Form 10-K and note 2 to the consolidated financial statements included in such Report. See also "BACKGROUND AND REASONS -- Background of the Reorganization; Reasons for the Recommendation of the Grace Board."

If, in a lawsuit filed by an unpaid creditor or a representative of unpaid creditors or a trustee in bankruptcy, a court were to find that, at the time the NMC Distribution was consummated or after giving effect thereto, either New Grace or Grace Chemicals, as the case may be, (a) was insolvent, (b) was rendered insolvent by reason of the NMC Distribution, (c) was engaged in a business or transaction for which its remaining assets constituted unreasonably small capital, or (d) intended to incur, or believed it would incur, debts beyond its ability to pay as such debts matured, then such court might require FNMC or NMC to fund certain liabilities of New Grace or Grace Chemicals, as the case may be, for the benefit of New Grace's or Grace Chemicals' creditors. The same consequences would also apply were a court to find that the NMC Distribution was not made out of the surplus of Grace Chemicals.

It is a condition to the Reorganization that the Distribution and the Distribution Payment shall have occurred. Under applicable law, the Distribution and the Distribution Payment could be challenged if either were a fraudulent conveyance or were not made out of surplus. Grace believes that, based on the factors considered in connection with the Reorganization, each of the Distribution and the Distribution Payment will not be a fraudulent transfer and will be made out of surplus in accordance with applicable law. There is no certainty, however, that a court would reach the same conclusions in determining that Grace or NMC have satisfied the applicable standards. In this regard, it should be noted that Grace or NMC may have significant liabilities relating to regulatory matters. For more information regarding such potential liabilities, see

30

<PAGE>    55

"BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings."

Under the OIG Agreements, the United States has granted certain releases with respect to possible fraudulent transfer claims to Grace Chemicals, NMC, Fresenius Medical Care and others. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings -- OIG Agreements."

CONTROL BY FRESENIUS AG; ANTI-TAKEOVER EFFECT

Fresenius AG will hold at least 50.3% of Fresenius Medical Care's voting securities immediately following the Reorganization. Accordingly, Fresenius AG will possess the ability, through its voting power and its power to elect the members of the Supervisory Board (Aufsichtsrat) of Fresenius Medical Care (the "FMC Supervisory Board"), to control many of the actions of Fresenius Medical Care and to approve many actions requiring the vote of Fresenius Medical Care's shareholders. This controlling ownership has the effect of, among other things, preventing a change in control of, or the declaration or payment of dividends by, Fresenius Medical Care without the agreement of Fresenius AG. In addition, ultimate control of Fresenius Medical Care would pass upon a change of control of Fresenius AG without the requirement of a vote of, or a premium for, Fresenius Medical Care shareholders. See "SECURITY OWNERSHIP -- Security Ownership of Certain Beneficial Owners and Management of Fresenius Medical Care's" with regard to control of Fresenius AG.

Fresenius AG has agreed that one-third of the members of the FMC

XXX-001880

Supervisory Board (but not less than two such members) will be persons who do not have any substantial business or professional relationship with Fresenius AG or Fresenius Medical Care, or any of their affiliates. Fresenius AG has agreed to cause Fresenius Medical Care to provide certain protections for minority shareholders in certain provisions of Fresenius Medical Care's Articles of Association and in the Pooling Agreement. These protections include FMC Supervisory Board approval for certain transactions between Fresenius AG and Fresenius Medical Care, a standstill protections for a period of three years following the Reorganization and other restrictions on the disposition of FMC Ordinary Shares by Fresenius AG. The Pooling Agreement provides that it will be enforceable in the state and federal courts in New York. See "DESCRIPTION OF THE POOLING AGREEMENT." However, there can be no assurance that these protections will be adequate or that German courts, applying German conflicts of law rules, will enforce these provisions or New York judgments obtained with respect to these provisions. See "DESCRIPTION OF THE POOLING AGREEMENT" and "COMPARISON OF CERTAIN RIGHTS OF SHAREHOLDERS OF GRACE AND FRESENIUS USA."

NO CURRENT MARKET

     There is currently no public market for the ADSs, the FMC Ordinary Shares or the New Preferred Shares. While Fresenius Medical Care will apply to list the ADSs on the NYSE and the FMC Ordinary Shares on the Frankfurt Stock Exchange and, after the Reorganization, FNMC intends to seek to list the New Preferred Shares on a national stock exchange, there can be no assurance that applicable listing criteria will be satisfied, as to the volume of trading and liquidity that will develop or as to the prices at which the FMC Ordinary Shares, the ADSs or the New Preferred Shares will trade after the Reorganization. Moreover, until the ADSs, FMC Ordinary Shares and the New Preferred Shares are fully distributed and orderly markets develop, the prices at which trading in such securities occurs may fluctuate significantly.

SPECIAL DIVIDEND

     The New Preferred Shares are not entitled to receive any dividend payments from FNMC other than the Special Dividend, the accrual of which will be contingent upon the aggregate amount of adjusted cash flow generated by Fresenius Medical Care during the period from January 1, 1997 to December 31, 2001. See "DESCRIPTION OF NEW PREFERRED SHARES" for a discussion of such requirements. FNMC also

31

<PAGE>   56

must have adequate surplus in order for the payment of the Special Dividend to be lawful under New York corporate law. Fresenius Medical Care's ability to generate cash flow is subject to many factors, including the risk factors set forth herein. There can be no assurance that Fresenius Medical Care will generate sufficient cash flow to require accrual of the Special Dividend on the New Preferred Shares or that FNMC will have adequate surplus for the payment of the Special Dividend. The terms of the New Preferred Shares do not obligate Fresenius Medical Care to make a capital contribution to FNMC in order to provide FNMC with adequate surplus to make such payments. The failure or inability of FNMC to pay the Special Dividend does not prevent Fresenius Medical Care from paying dividends on FMC Ordinary Shares. However, if the Special Dividend is payable but not declared by the FNMC Board, or if any installment of the Special Dividend is not paid on the applicable Payment Date, FNMC may not pay dividends on FNMC Common Stock, which, in turn, might limit Fresenius Medical Care's ability to pay dividends on the FMC Ordinary Shares. The amount of the Special Dividend would be reduced by certain amounts payable in connection with the matters underlying the OIG Investigation. In addition, the Special Dividend will only begin to accrue after payment of interest on amounts outstanding under the NMC Credit Agreement and other indebtedness and will be subject to limitation by covenants regarding restricted payments contained in such debt. Therefore, such indebtedness will have a negative impact on the likelihood and size of any payment of the Special Dividend. See "DESCRIPTION OF NEW PREFERRED SHARES."

VALUE OF NEW PREFERRED SHARES

     The New Preferred Shares are not entitled to receive any dividend payments other than the Special Dividend, the accrual of which will be dependent on Fresenius Medical Care having an adjusted operating performance from January 1, 1997 through December 31, 2001 in excess of an established target amount for such period. In addition, certain expenses incurred in connection with regulatory investigations are included in determining such operating performance levels. Aside from the Special Dividend, the New Preferred Shares have only a nominal liquidation preference. Therefore, the Special Dividend may never be paid and the New Preferred Shares may have minimal or no value. In addition, the market price of the New Preferred Shares can be expected to fluctuate with changes in the market and economic conditions, the financial condition and prospects of FNMC and Fresenius Medical Care and other factors that generally affect the market prices of securities.

ORGANIZATION UNDER GERMAN LAW

     Fresenius Medical Care will be organized under German law. The preferences, rights and privileges of shareholders under German law, as well as the rights of minority shareholders and other substantive provisions, differ materially from those that shareholders of Grace and Fresenius USA currently possess under New York and Massachusetts law, respectively. See "COMPARISON OF CERTAIN RIGHTS OF SHAREHOLDERS OF GRACE AND FRESENIUS USA."

     Fresenius Medical Care will be a "foreign private issuer," as defined in the Commission's rules, and consequently will not be subject to certain

XXX-001881

disclosure requirements applicable to domestic issuers. Fresenius Medical Care will not be subject to the Commission's proxy rules or the Commission's rules requiring the filing of quarterly reports, and annual reports filed by Fresenius Medical Care with the Commission will contain less detailed disclosure than reports of domestic issuers regarding such matters as management, executive compensation and outstanding options, beneficial ownership of Fresenius Medical Care's securities and certain related party transactions. Also, officers, directors and 10% beneficial owners of Fresenius Medical Care's equity securities will not be subject to the reporting requirements and short-swing profit recovery provisions of Section 16 of the Exchange Act. However, Fresenius Medical Care has agreed that as long as the Pooling Agreement is in effect, Fresenius Medical Care will file quarterly reports under cover of Form 6-K, will prepare its annual and quarterly financial statements in accordance with US GAAP and will file with the Commission and provide to shareholders (including holders of ADRs) certain materials with respect to its annual and special meetings of shareholders. See "DESCRIPTION OF THE POOLING AGREEMENT -- Listing of American Depository Shares; SEC Filings" and "-- Term."

<center>32</center>

<PAGE>    57

<center>THE SPECIAL MEETINGS</center>

GENERAL

    This Joint Proxy Statement-Prospectus is being furnished to holders of Grace Common Stock and Grace Preferred Stock in connection with the solicitation of proxies by the Grace Board for use at the Grace Special Meeting, to be held on September 16, 1996. The purposes of the Grace Special Meeting are to consider and vote upon a proposal to approve and adopt the Reorganization Agreement and the transactions contemplated thereby (including the Grace Merger and the Distribution), to approve and adopt the Grace Amendment and to transact such other business as may properly come before the Grace Special Meeting.

    This Joint Proxy Statement-Prospectus is being furnished to holders of Fresenius USA Common Stock in connection with the solicitation of proxies by the Fresenius USA Board for use at the Fresenius USA Special Meeting to be held on September 16, 1996. The purposes of the Fresenius USA Special Meeting are to consider and vote upon a proposal to approve and adopt the Reorganization Agreement and the transactions contemplated thereby, including, without limitation, the Fresenius USA Merger, to approve and adopt the Fresenius USA Plan Amendment and to transact such other business as may properly come before the Fresenius USA Special Meeting.

    Each copy of this Joint Proxy Statement-Prospectus mailed to shareholders of Grace is accompanied by a form of proxy for use at the Grace Special Meeting, and has attached as Annex A the New Grace Prospectus. Each copy of this Joint Proxy Statement-Prospectus mailed to stockholders of Fresenius USA is accompanied by a form of proxy for use at the Fresenius USA Special Meeting.

    This Joint Proxy Statement-Prospectus is also being furnished to holders of Grace Common Stock and Fresenius USA Common Stock as a Prospectus of Fresenius Medical Care in connection with the issuance of FMC Ordinary Shares represented by ADSs in connection with the Reorganization and to holders of Grace Common Stock as a Prospectus of Grace in connection with the issuance of the shares of the New Preferred Shares by Grace in connection with the Recapitalization. See "AVAILABLE INFORMATION."

DATE, PLACE AND TIME

    The Grace Special Meeting will be held at Grace's headquarters at One Town Center Road, Boca Raton, Florida, on September 16, 1996, at 10:00 a.m. local time.

    The Fresenius USA Special Meeting will be held at the 52nd floor conference center of O'Melveny & Myers LLP, 153 East 53rd Street, New York, New York, 10022, on September 16, 1996, at 10:00 a.m. local time.

RECORD DATES

  GRACE

    The Grace Board has fixed the close of business on July 29, 1996 as the Grace Record Date for the determination of the holders of Grace Common Stock and Grace Preferred Stock entitled to receive notice of and to vote at the Grace Special Meeting.

  FRESENIUS USA

    The Fresenius USA Board has fixed the close of business on July 29, 1996 as the Fresenius USA Record Date for the determination of the holders of Fresenius USA Common Stock entitled to receive notice of and to vote at the Fresenius USA Special Meeting.

<center>33</center>

<PAGE>    58

VOTES REQUIRED

  GRACE

    As of July 15, 1996, the following shares of the following classes of Grace's capital stock were outstanding and entitled to the following votes:

XXX-001882

```
<TABLE>
<CAPTION>
                                                          SHARES        VOTES PER
                        CLASS                           OUTSTANDING       SHARE
                                                        -----------     ---------
<S>                                                         <C>            <C>
Grace 6% Preferred Stock.................................    36,460         160
Grace Class A Preferred Stock............................    16,256          16
Grace Class B Preferred Stock............................    21,577          16
Grace Common Stock.......................................  92,001,176         1
</TABLE>
```

In addition to the classes of stock listed above, Grace has authorized
Class C Preferred Stock. There currently are no shares of Grace Class C
Preferred Stock outstanding.

Votes Required.  Holders of Grace Common Stock and Grace Preferred Stock
will vote together as one class. Approval of the Reorganization Agreement and
the transactions contemplated thereby requires the affirmative vote of
two-thirds (and, in the case of the Grace Amendment, a majority) of the total
voting power of Grace's outstanding capital stock. As a result, failing to vote
or abstaining on any such proposal has the same effect as voting against the
proposal.

Beneficial Ownership of Management.  At June 15, 1996, Grace's directors
and executive officers and their affiliates beneficially owned in the aggregate
Grace Common Stock and Grace Preferred Stock representing less than 1% of the
total voting power of all of Grace's stock entitled to vote at the Grace Special
Meeting. Each of the directors and executive officers of Grace is expected to
vote in favor of the proposals to be voted at the Grace Special Meeting.

The presence in person or by proxy at the Grace Special Meeting of the
holders of a majority of the total voting power of Grace's outstanding capital
stock is necessary to constitute a quorum for the transaction of business. Under
the rules of the NYSE, brokers who hold shares in street name for customers will
not have the authority to vote on the Reorganization unless they receive
specific instructions from beneficial owners. Under the NYBCL, such a broker
non-vote will not be counted as present for purposes of a quorum and will
otherwise have the same effect as a vote against the Reorganization.

At July 23, 1996, the directors and executive officers of Fresenius USA
beneficially owned 360 shares of Grace Common Stock and no shares of Grace
Preferred Stock.

FRESENIUS USA

At the Fresenius USA Record Date, there were 26,374,218 shares of Fresenius
USA Common Stock outstanding. Each share of Fresenius USA Common Stock
outstanding on the Fresenius USA Record Date is entitled to one vote upon each
matter properly submitted at the Fresenius USA Special Meeting.

The affirmative vote of the holders of record of at least two-thirds of the
outstanding shares of Fresenius USA Common Stock entitled to vote at the
Fresenius USA Special Meeting is necessary to approve the Reorganization
Agreement and the transactions contemplated thereby. The affirmative vote of the
holders of record of a majority of the shares of Fresenius USA Common Stock
entitled to vote at the Fresenius USA Special Meeting is necessary to approve
the Fresenius USA Plan Amendment.

The presence in person or by proxy at the Fresenius USA Special Meeting of
holders of a majority of the outstanding shares of Fresenius USA Common Stock is
necessary to constitute a quorum for the transaction of business. Abstentions
will be counted as present for the purposes of determining whether a quorum is
present. Since the Reorganization requires the approval of two-thirds of the
outstanding shares of Fresenius USA Common Stock, and the Fresenius USA Plan
Amendment requires the approval of a majority of the outstanding shares of
Fresenius USA Common Stock, abstentions will have the same effect as negative
votes. Under the rules of the AMEX, brokers who hold shares in street name for
customers will not have the

                                       34

<PAGE>  59

authority to vote on the Reorganization or the Fresenius USA Plan Amendment
unless they receive specific instructions from beneficial owners. Such non-votes
will have the same effect as negative votes.

Fresenius AG is currently the beneficial owner of 18,438,545 shares of
Fresenius USA Common Stock including 3,129,883 shares of Fresenius USA Common
Stock acquired upon conversion of the Fresenius USA Series F Preferred Stock and
1,515,221 shares of Fresenius USA Common Stock acquired upon the exercise of
certain warrants to purchase Fresenius USA Common Stock. Fresenius AG has
informed Fresenius USA of its intention to vote all of its 18,438,545 shares of
Fresenius USA Common Stock in favor of the Reorganization Agreement and the
transactions contemplated thereby and the Fresenius USA Plan Amendment. Such
shares represent approximately 70.3% of the total shares entitled to vote on
such matters at the Fresenius USA Special Meeting. Accordingly, such affirmative
vote by Fresenius AG will result in the approval of the Reorganization and the
Fresenius USA Plan Amendment. In addition, directors and executive officers of
Fresenius USA who beneficially owned a total of 262,166 shares of Fresenius USA
Common Stock at July 23, 1996 (excluding shares which may be acquired upon
exercise of employee or director stock options), or approximately 1% of the
Fresenius USA Common Stock then outstanding, are expected to vote such shares in
favor of the Reorganization and the Fresenius USA Plan Amendment. See "SECURITY

OWNERSHIP -- Security Ownership of Certain Beneficial Owners and Management of
Fresenius USA."

    At July 15, 1996, the directors and executive officers of Grace owned no
shares of Fresenius USA Common Stock.

VOTING AND REVOCATION OF PROXIES

    Shares of Grace Common Stock, Grace Preferred Stock and Fresenius USA
Common Stock represented by a proxy properly signed and received at or prior to
the appropriate Special Meeting, unless subsequently revoked, will be voted in
accordance with the instructions thereon. IF A PROXY IS SIGNED AND RETURNED
WITHOUT INDICATING ANY VOTING INSTRUCTIONS, SHARES OF GRACE COMMON STOCK AND
GRACE PREFERRED STOCK REPRESENTED BY THE PROXY WILL BE VOTED FOR THE PROPOSAL TO
ADOPT AND APPROVE THE REORGANIZATION AGREEMENT AND THE TRANSACTIONS CONTEMPLATED
THEREBY, AND FOR THE PROPOSAL TO APPROVE AND ADOPT THE GRACE AMENDMENT, AND
SHARES OF FRESENIUS USA COMMON STOCK REPRESENTED BY THE PROXY WILL BE VOTED FOR
THE PROPOSAL TO APPROVE AND ADOPT THE REORGANIZATION AGREEMENT AND THE
TRANSACTIONS CONTEMPLATED THEREBY, AND FOR THE PROPOSAL TO APPROVE AND ADOPT THE
FRESENIUS USA PLAN AMENDMENT. Both Grace and Fresenius USA proxy holders may, in
their discretion, vote shares to adjourn the Grace Special Meeting or the
Fresenius USA Special Meeting, respectively, to solicit additional proxies in
favor of such proposals. However, shares of Grace Common Stock, Grace Preferred
Stock and Fresenius USA Common Stock with respect to which a proxy is signed and
returned indicating a vote against any proposal will not be so voted to adjourn.
Any proxy given pursuant to this solicitation may be revoked by the person
giving it at any time before the proxy is voted by the filing of an instrument
revoking it or of a duly executed proxy bearing a later date with the Secretary
of Grace, for Grace shareholders, or with the Clerk of Fresenius USA, for
Fresenius USA stockholders, prior to or at the appropriate Special Meeting, or
by voting in person at the appropriate Special Meeting. All written notices of
revocation and other communications with respect to revocation of Grace proxies
should be addressed to W. R. Grace & Co., One Town Center Road, Boca Raton,
Florida 33486-1010, Attention: Secretary. All written notices of revocation and
other communications with respect to revocation of Fresenius USA proxies should
be addressed to Fresenius USA, Inc., 2637 Shadelands Drive, Walnut Creek,
California 94598, Attention: Clerk. Attendance at a Special Meeting will not in
and of itself constitute a revocation of a proxy.

    The Grace Board and the Fresenius USA Board are not currently aware of any
business to be acted upon at the Special Meeting of their respective
shareholders other than as described herein. If, however, other matters are
properly brought before either Special Meeting, the persons appointed as proxies
will have discretion to vote or act thereon according to their best judgment.

    Neither shareholders of Grace nor stockholders of Fresenius USA will be
entitled to present any matters for consideration at either Special Meeting.

                                   35

    <PAGE>    60

SOLICITATION OF PROXIES

    In addition to solicitation by mail, directors, officers and employees of
Grace and Fresenius USA, who will not be specifically compensated for such
services, may solicit proxies from the shareholders of Grace and Fresenius USA,
respectively, personally or by telephone, telecopy or telegram or other forms of
communication. Brokers, nominees, fiduciaries and other custodians will be
requested to forward soliciting materials to beneficial owners and will be
reimbursed for their reasonable expenses incurred in sending proxy materials to
beneficial owners.

    In addition, Grace has retained D. F. King & Co. to assist in the
solicitation of proxies. The fees to be paid to such firm for such services by
Grace are not expected to exceed $15,000, plus reasonable out-of-pocket costs
and expenses. Services also will be provided to Fresenius USA by American Stock
Transfer and Trust Company in soliciting banks and brokers holding stock in
their names or in custody or in the names of nominees for others. Fresenius USA
does not anticipate paying any additional fee for such services. Grace and
Fresenius USA each will bear its own expenses in connection with the
solicitation of proxies for its Special Meeting, except that, if the
Reorganization is consummated, Fresenius Medical Care will pay the costs
incurred in printing this Joint Proxy Statement-Prospectus.

GRACE AMENDMENT

    At the Grace Meeting, Grace shareholders will consider and vote upon a
proposal (proposal 2 in the Grace Notice of Special Meeting of Shareholders
mailed herewith) to adopt the Grace Amendment which will establish authority for
the issuance of the New Preferred Shares and will change the legal name of Grace
to "Fresenius National Medical Care, Inc." Approval of such Grace Amendment is
being sought to establish the New Preferred Shares, and, therefore, indirectly,
to consummate the Recapitalization, and to permit Grace's historical name to
continue to be used by Grace's chemicals businesses. However, in the event that
the Grace Amendment is not approved at the Grace Meeting, the sequence of the
transactions comprising the Reorganization and/or certain immaterial terms of
the New Preferred Shares may be changed so that the Reorganization may be
consummated without effecting the Grace Amendment. For information with respect
to the New Preferred Shares, see "DESCRIPTION OF NEW PREFERRED SHARES." The
Grace Amendment is set forth in Appendix B hereto.

                                   36

    <PAGE>    61

XXX-001884

BACKGROUND AND REASONS

BACKGROUND OF THE REORGANIZATION; REASONS FOR THE RECOMMENDATION OF THE GRACE
BOARD

On May 4, 1995, Mr. Albert J. Costello, the President and Chief Executive
Officer of Grace, was advised by Dr. Constantine L. Hampers, the Chief Executive
Officer of NMC, that, in order to solve certain management issues (such as the
desire for greater independence by NMC management, and NMC management's concern
that, as part of a diversified conglomerate, NMC's abilities to achieve its
potential could be constrained) at NMC, Grace should undertake a 100% spin-off
or sale of NMC and offered that NMC management would be willing to buy NMC for
$3.5 billion if a sale were to be considered. Grace management, together with
its financial and legal advisors, evaluated Dr. Hampers' proposals in light of
other alternatives available with respect to NMC.

On June 14, 1995, the Grace Board met to consider Grace's options regarding
NMC. Following presentations by Grace's management and its financial and legal
advisors, the Grace Board authorized management to proceed with a plan pursuant
to which Grace would spin off NMC to Grace shareholders on a
one-share-for-one-share basis. In connection with its review and determination
that the spin-off of NMC was the best alternative for Grace and its
shareholders, the Grace Board considered, among other things, a proposal by
Vivra Incorporated ("Vivra") that NMC be merged with Vivra in a stock-for-stock
transaction in connection with a proposed NMC spin-off. Vivra suggested that such
merger would offer an unspecified premium to Vivra shareholders over the current
market price and would result in certain operational synergies. The Grace Board
had reservations about the achievability of the operational synergies Vivra
suggested, given Vivra's relatively small size. Moreover, the Grace Board felt
that the proposal contained contingencies and uncertainties not present in a
pure spin-off, and considered that Vivra itself had recognized that the bulk of
the value created through the Vivra proposal would be through the spin-off, and
not through the merger with Vivra. Since the Vivra proposal would add, at best,
a marginal benefit to the spin-off transaction, the Grace Board felt that it
would not be prudent to jeopardize the spin-off to pursue that possible marginal
benefit. In addition, the Grace Board considered that NMC would not be precluded
from pursuing any synergistic transactions, such as a merger with Vivra, after
the spin-off. The Grace Board took into account that Grace's financial advisors
had made discrete solicitations of interest in NMC and that, despite such
solicitations and the publicized nature of the transaction, no third party other
than Vivra had made a proposal for NMC.

During the summer and early fall of 1995, Grace management, together with
Grace's financial and legal advisors, took steps toward the consummation of the
spin-off. On October 17, 1995, NMC received five subpoenas from the OIG, the
United States Attorney's Office for the District of Massachusetts and others, as
discussed herein under "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and
Legal Matters -- Legal and Regulatory Proceedings -- OIG Investigation." On
October 18, 1995, Grace announced that, in light of the subpoenas, completion of
the previously announced spin-off of NMC was expected to occur in the first
quarter of 1996, rather than in the fourth quarter of 1995.

In the fall of 1995, representatives of Fresenius AG notified
representatives of Grace that Fresenius AG was interested in pursuing a
transaction in which NMC would be combined with Fresenius Worldwide Dialysis and
were advised by Grace representatives that, as a result of the delay in the
proposed spin-off, Grace might be receptive to alternatives to the previously
announced spin-off. On October 20, 1995, Grace and Fresenius AG entered into a
confidentiality agreement (which included standstill provisions) and began to
exchange certain information in connection with their evaluation of a
transaction. More advanced discussions respecting a possible transaction began
in late November 1995. At the onset of such discussions, Grace informed
Fresenius AG that its primary objective was to maximize the value of NMC for the
benefit of the Grace shareholders, and that it also had a strong preference for
a transaction structure in which (i) Grace could separate its non-health care
businesses from NMC in a tax-free spin-off, simultaneously combining NMC with
another dialysis business through a merger, (ii) there would be a substantial
tax-free distribution of cash (or assumption of debt) for the benefit of Grace
Chemicals and (iii) NMC would be responsible for all of its liabilities,
including any regulatory liabilities, Grace Chemicals would be responsible only
for non-health care liabilities, and each party would indemnify the other with
respect to its respective liabilities. Fresenius AG indicated that, subject to
its completion of due diligence, it was willing to pursue a transaction
structured in this manner. Discussions with Fresenius AG continued through the
remainder of 1995 and January 1996.

37

<PAGE>  62

By mid-January 1996, Fresenius AG informed Grace that its preliminary due
diligence investigation had been completed and asked that both parties focus
their efforts in an attempt to reach closure with respect to open issues. Grace
management determined that discussions with respect to a transaction with
Fresenius AG had significantly advanced and could likely be reduced to
definitive agreements. Therefore, on January 13, 1996, Grace and Fresenius AG
agreed that, until February 4, 1996, Grace would negotiate exclusively with
Fresenius AG with a view toward entering into definitive agreements respecting a
transaction along the lines of Grace's preferred structure, provided that if any
third party submitted a proposal to Grace, Grace would be free to consider and
evaluate such proposal (including by way of discussions with such third party
and its representatives). If Grace management believed that such proposal would
reasonably be expected to be more attractive to Grace and its shareholders,
Grace agreed to offer Fresenius AG the opportunity to improve its proposal
reasonably promptly to be satisfactory to Grace; and, if Grace management

XXX-001885

determined that Fresenius AG had not sufficiently improved its proposal, it would so advise Fresenius AG and Grace could then negotiate with such third party. However, Fresenius AG agreed that Grace would not be precluded in any way from making (or not making) any recommendation to the Grace Board or from accepting any proposal for NMC that it considered to be in the best interest of Grace and its shareholders. Negotiations between Grace and Fresenius AG proceeded intensively thereafter on the basis of this agreement. Dr. Hampers played virtually no role in Grace's negotiations with Fresenius AG. Such negotiations involved a structure in which, following the Reorganization, New Grace would retain its interests in GN Holdings, Inc. and the Amicon filtration business, which historically were managed, but only partly owned, by NMC, with the remainder owned by Grace Chemicals. Although such businesses had a reporting relationship to NMC, the revenues of such businesses were immaterial to NMC, and NMC believes that such assets are not integral to its business. The decision to exclude such assets was made by Grace and Fresenius AG as part of the negotiation of the debt and equity levels, and the Distribution Payment, resulting from the Reorganization.

On January 31, 1996, Baxter International, Inc. ("Baxter") sent Grace a proposal involving a spin-off of NMC and a subsequent merger with a Baxter subsidiary that Baxter valued at $3.8 billion. Baxter had indicated interest in NMC on a sporadic basis during the fall and winter of 1995-96, had met with Grace management and its advisors on several occasions and had made various proposals to Grace for investments in NMC coupled with supply arrangements. Baxter had been unwilling to sign a confidentiality agreement with Grace containing terms similar to those agreed to by Fresenius AG and, therefore, was not provided with confidential information regarding NMC. Under Baxter's January 31 proposal, NMC would borrow $1.275 billion and dividend such amount, together with a $300 million pay-in-kind note (the payment of which would be due in full on completion of the subsequent merger) to Grace; Baxter would guarantee $450 million of such borrowing if the subsequent merger occurred or, otherwise, commit to purchase $450 million of NMC stock; NMC would enter into a long-term supply agreement with Baxter; and Grace would spin off NMC to Grace's shareholders. Following 35 days of public trading in NMC stock after the spin-off, NMC shareholders would vote on a merger of NMC with a Baxter subsidiary in which NMC shareholders would receive $1.8 billion of Baxter stock. Following such merger, Grace would be responsible for all governmental and regulatory liabilities or undiscounted liabilities of NMC in excess of $100 million. Baxter's proposal stated that it was subject to the negotiation of definitive agreements and due diligence. Baxter's proposal also stated that consummation of the merger would be subject to certain conditions and that Baxter would be entitled to a termination fee of 3% of the total transaction value (which Baxter had stated was $3.8 billion) in the event that the transaction was not consummated.

Grace management, together with its legal and financial advisors, evaluated Baxter's January 31 proposal and concluded that the proposal was less attractive to Grace and its shareholders than the Fresenius AG proposal in several respects: (a) the total transaction value was lower than the estimated Fresenius AG proposal; (b) Grace Chemicals would be responsible for any regulatory and other liabilities of NMC in excess of $100 million following the spin-off, which could create uncertainty over the valuation of Grace Chemicals and frustrate the separation of the businesses on an ongoing basis; (c) the proposal presented a risk that the long-term supply agreement (which, together with the 3% termination fee, might deter other buyers of NMC) and the spin-off might be consummated without certainty that the subsequent merger would be consummated, thereby depriving the Grace shareholders of the opportunity to achieve maximum value; and (d) the structure outlined in the proposal was more novel from a tax perspective than the "Morris Trust" structure

38

<PAGE>  63

contemplated by the Fresenius AG proposal. In addition, the Fresenius AG proposal under discussion (a) was close to final agreement and (b) was on terms which did not preclude termination to enter into a more favorable transaction with another party.

On February 2, 1996, Baxter publicly announced that it had made the January 31 proposal.

In December 1995, representatives of Vivra informed representatives of Grace that Vivra was still interested in a transaction substantially the same as the transaction proposed in June 1995. In addition, Grace was aware that at this time other dialysis companies even smaller than Vivra were willing to pursue such a transaction. However, no such transactions were pursued because Grace believed, and was advised by its financial advisors, that greater value would be available from a transaction with Fresenius AG or Baxter.

At a meeting of the Grace Board held on February 4, 1996, the Grace Board considered the Reorganization and the proposed agreements relating thereto as well as the January 31 Baxter proposal. At the meeting, Grace's management and its legal and financial advisors made detailed presentations concerning the proposed transaction. The Grace Board concluded that a transaction with a third party was preferable at the time to the previously proposed spin-off of NMC, which involved execution risks in light of the difficulties in obtaining financing during the pendency of the OIG Investigation. As noted above, the Grace Board was advised that the most likely third-party candidates for a transaction were Baxter and Fresenius AG. The Grace Board concluded that the Fresenius AG proposal (which, as described in detail under "-- Presentation by Grace Financial Advisors -- Comparison of Baxter Proposal," the Grace Financial Advisors estimated provided between approximately $3.675 billion and approximately $3.975 billion of value to Grace on a tax-free basis plus entitled Grace to retain certain cash flows of NMC prior to the Reorganization and

XXX-001886

provided for the issuance of the New Preferred Shares) was preferable to the
January 31 Baxter proposal (which Baxter had stated was valued at $3.8 billion)
for the reasons described in the third preceding paragraph. After such
presentations, and taking into account the alternatives available the Grace
Board unanimously determined that the Reorganization and the proposed agreements
relating thereto were fair to and in the best interests of Grace and its
shareholders, authorized Grace to enter into the agreements and to consummate
the transactions contemplated thereby, and resolved to recommend that Grace
shareholders approve such agreements and the transactions contemplated thereby.

In connection with its approval and recommendation, the Grace Board
considered, among other things, the following factors:

(a) the terms of the proposed transactions and the proposed agreements
relating thereto, including, among other things, the requirement for Grace
shareholder approval and the other conditions to consummation, the
circumstances under which the agreements could be terminated and the
termination fees payable in connection therewith;

(b) the "Morris Trust" structure and the tax treatment of the
transaction;

(c) other available alternatives, including the Baxter proposal, and
the ability to enter into an agreement respecting a higher offer under
certain circumstances under the Fresenius AG transaction;

(d) the presentation by representatives of CS First Boston and Merrill
Lynch which included, among other things, valuation analyses with respect
to Fresenius Medical Care and NMC and each such firm's opinion that the
Distribution Payment and the Grace Merger, taken together, were fair, from
a financial point of view, to holders of Grace Common Stock, such opinion
and presentations being based on certain assumptions and subject to certain
limitations (see "-- Financial Advisors to Grace");

(e) the business rationales for the transaction, including that the
combination of NMC and Fresenius Worldwide Dialysis had the potential to
enhance shareholder value through operating synergies as an integrated
dialysis products and services company, although there can be no assurance
that synergies will be achieved or as to the amount thereof, and that
Fresenius Medical Care could take advantage of unique marketplace strengths
in the U.S. and other markets, notwithstanding the competitive and other
risks associated with combining a products company and a services company;

<center>39</center>

<PAGE>   64

(f) the operating and financial strength of the combined entity,
although the Grace Board did consider the substantial goodwill charges
which would be associated with the Reorganization;

(g) the impact of the transaction on Grace's remaining specialty
chemicals businesses, including that the transaction would result in the
payment of a significant amount of cash to Grace Chemicals and enable Grace
Chemicals (or New Grace) to use such cash to reduce debt, repurchase stock
and/or invest in core specialty chemical operations;

(h) the retention by NMC of all health care liabilities, including any
regulatory liability relating to the governmental investigations, the
indemnity to be provided to Grace's specialty chemicals businesses with
respect to such liabilities and the concern that such liabilities would
impact the valuation of Fresenius Medical Care which might affect the
trading market for FMC Ordinary Shares; and

(i) the arrangements which had been made with respect to corporate
governance of Fresenius Medical Care and related issues; and

(j) the unfamiliarity of Fresenius Worldwide Dialysis to U.S.
investors.

The foregoing discussion of the information and factors considered and
given weight by the Grace Board is not intended to be exhaustive but includes
all material factors considered by the Grace Board. In addition, in reaching the
determination to approve and recommend the Reorganization, the Grace Board did
not assign any relative or specific weights to the foregoing factors.

THE GRACE BOARD RECOMMENDS THAT GRACE SHAREHOLDERS VOTE FOR APPROVAL OF THE
REORGANIZATION AGREEMENT AND THE TRANSACTIONS CONTEMPLATED THEREBY.

FINANCIAL ADVISORS TO GRACE

CS First Boston and Merrill Lynch were retained to act as the Grace
Financial Advisors in connection with Grace's exploration of strategic
alternatives for NMC. CS First Boston and Merrill Lynch were selected by Grace
because of their familiarity with Grace and NMC and their respective businesses
and their qualifications and expertise in providing advice to companies in the
businesses in which Grace and NMC are engaged, as well as their reputations as
internationally recognized investment banking firms. Each of CS First Boston and
Merrill Lynch has consented to the reprinting of its fairness opinion and the
summary of such firm's activities included herein.

Opinions of Grace Financial Advisors.  At the request of the Grace Board,
on February 4, 1996, each of CS First Boston and Merrill Lynch delivered a
written opinion to the Grace Board that, based upon and subject to the matters
set forth in its written opinion, as of such date, the terms of the Distribution

XXX-001887

Payment and the Grace Merger, taken together, were fair, from a financial point of view, to the holders of Grace Common Stock. In preparing these opinions, these firms performed a variety of financial and comparative analyses and made a detailed presentation to the Grace Board with respect to, among other things, the valuations of Fresenius Medical Care and NMC. The Grace Board, in accepting the opinions of the Grace Financial Advisors, was aware that the Grace Financial Advisors relied upon certain financial information, projections and other information provided by Grace management and that the opinions of such firms relied, in part, on certain assumptions and are subject to certain limitations. While the Grace Board did not perform an independent review of the financial information, projections and other information provided to the Grace Financial Advisors, the Grace Financial Advisors and management did review certain financial information and projections with the Grace Board. The Grace Board relied on the Grace Financial Advisors, whom it considered to be experts in such matters, to select the appropriate methodologies to determine fairness. No updates of such opinions have been requested because such opinions were provided solely in connection with the decisions of the Grace Board taken on February 4, 1996. While the pro forma financial information included herein was not available on February 4, 1996, Grace believes that such pro forma financial information is not materially different from the information available on February 4, 1996 so as to impact on fairness.

<div align="center">40</div>

<PAGE>   65

    THE FULL TEXTS OF THE WRITTEN OPINIONS OF CS FIRST BOSTON AND MERRILL LYNCH ARE SET FORTH IN APPENDIX C TO THIS JOINT PROXY STATEMENT-PROSPECTUS AND DESCRIBE THE ASSUMPTIONS MADE, MATTERS CONSIDERED AND LIMITS ON THE REVIEW UNDERTAKEN. THE OPINIONS OF CS FIRST BOSTON AND MERRILL LYNCH WERE FURNISHED FOR THE INFORMATION OF THE GRACE BOARD IN CONNECTION WITH ITS CONSIDERATION OF THE REORGANIZATION, AND DO NOT CONSTITUTE A RECOMMENDATION TO ANY GRACE SHAREHOLDER AS TO HOW SUCH SHAREHOLDER SHOULD VOTE ON THE REORGANIZATION. GRACE SHAREHOLDERS ARE URGED TO READ THE OPINIONS IN THEIR ENTIRETY.

    Opinion of CS First Boston.  In connection with its opinion, CS First Boston reviewed certain publicly available business and financial information relating to Grace, NMC and Fresenius Worldwide Dialysis, as well as the Reorganization Agreement, the Contribution Agreement and the Distribution Agreement (collectively, the "Transaction Agreements"). CS First Boston also reviewed certain other information, including financial forecasts and certain information with respect to potential synergies which may result from the Reorganization, provided to CS First Boston by Grace and Fresenius AG, and met with the managements of Grace, Fresenius AG and Fresenius USA to discuss the business and prospects of NMC, Fresenius Worldwide Dialysis and Fresenius USA. CS First Boston also considered certain financial data of NMC, Fresenius Worldwide Dialysis and Fresenius USA and compared that data with similar data for other publicly held companies in businesses similar to those of NMC, Fresenius Worldwide Dialysis and Fresenius USA and considered the financial terms of certain other business combinations and other transactions. CS First Boston also considered such other information, financial studies, analyses and investigations and financial, economic and market criteria which it deemed relevant.

    In connection with its review, CS First Boston did not assume any responsibility for independent verification of any of the foregoing information and relied on its being complete and accurate in all material respects. With respect to the financial forecasts, CS First Boston assumed that such forecasts were reasonably prepared on bases reflecting the best currently available estimates and judgments of Grace's and Fresenius AG's managements as to the future financial performance of NMC and Fresenius Worldwide Dialysis. CS First Boston also relied upon the views of Grace's and Fresenius AG's managements concerning the business, operational and strategic benefits and implications of the Reorganization, including financial forecasts provided to CS First Boston by Grace and Fresenius AG relating to synergistic benefits to Fresenius Worldwide Dialysis and NMC. CS First Boston did not make an independent evaluation or appraisal of the assets or liabilities (contingent or otherwise) of NMC or Fresenius Worldwide Dialysis, nor was CS First Boston furnished with any such evaluations or appraisals. CS First Boston's opinion was necessarily based upon financial, economic, market and other conditions as they existed and could be evaluated on the date of its opinion. CS First Boston did not express any opinion as to what the value of the ADSs actually would be when issued to holders of Grace Common Stock or the prices at which the ADSs would trade subsequent to the Reorganization. In addition, CS First Boston understood that NMC was the target of certain governmental and regulatory investigations relating to the conduct of its business, which could result in substantial liabilities and obligations being incurred by NMC in the future, the amount of which the management of Grace was unable to predict. CS First Boston also understood that the financial statements, pro forma financial statements and registration statement of Fresenius Medical Care had not yet been prepared.

    CS First Boston assumed, with Grace's consent, that the transactions contemplated by the Transaction Agreements would comply with applicable U.S., foreign, federal and state laws, including, without limitation, laws relating to the payment of dividends, bankruptcy, insolvency, reorganization, fraudulent conveyance, fraudulent transfer or other similar laws affecting creditors' rights generally. CS First Boston assumed, with Grace's consent, that receipt of the ADSs would be tax-free for federal income tax purposes to holders of Grace Common Stock and that none of Grace, NMC, Fresenius Worldwide Dialysis, Fresenius USA and Fresenius Medical Care would recognize income, gain or loss as a result of the transactions contemplated by the Transaction Agreements. In addition, CS First Boston assumed, with Grace's consent, that Grace Chemicals and Fresenius AG would perform their respective indemnification obligations which may arise under the Distribution Agreement and the Contribution Agreement in accordance with their respective terms.

XXX-001888

41

<PAGE>    66

Based upon and subject to the foregoing, CS First Boston rendered its
opinion that, as of the date of such opinion, the terms of the Distribution
Payment and the Grace Merger, taken together, were fair, from a financial point
of view, to the holders of Grace Common Stock.

Opinion of Merrill Lynch.  In connection with its opinion, Merrill Lynch
reviewed Grace's Annual Reports, Forms 10-K and related financial information
for the five fiscal years ended December 31, 1994 and its Forms 10-Q and the
related unaudited financial information for the quarterly periods ending March
31, 1995, June 30, 1995 and September 30, 1995; reviewed certain historical
financial information with respect to NMC furnished to Merrill Lynch by Grace
and reviewed NMC's Form 10 filed with the Commission on September 25, 1995 which
included audited financial information for the three fiscal years ended December
31, 1994 and unaudited financial information for the six month periods ending
June 30, 1995 and June 30, 1994; reviewed certain historical financial
information with respect to Fresenius AG and Fresenius Worldwide Dialysis
furnished to Merrill Lynch by Fresenius AG and reviewed Fresenius USA's Annual
Reports, Forms 10-K and related financial information for the five fiscal years
ended December 31, 1994 and its Forms 10-Q and the related unaudited financial
information for the quarterly periods ending March 31, 1995, June 30, 1995 and
September 30, 1995; reviewed certain information, including financial forecasts,
relating to the business, earnings, cash flow, assets and prospects of NMC,
Fresenius Worldwide Dialysis and Fresenius USA, furnished to Merrill Lynch by
Grace, Fresenius AG and Fresenius USA, including certain information with
respect to potential synergies which may result from the Reorganization;
conducted discussions with members of senior management of Grace and NMC, and
with Fresenius AG and Fresenius USA, with respect to the businesses, operations
and prospects of NMC, Fresenius Worldwide Dialysis and Fresenius USA,
respectively; compared the results of operations of NMC and Fresenius Worldwide
Dialysis with those of certain other companies which Merrill Lynch deemed to be
reasonably similar to NMC and Fresenius Worldwide Dialysis; considered certain
terms of the documents which govern the rights of stockholders of Fresenius
Medical Care, including certain governance provisions applicable to Fresenius AG
and Fresenius Medical Care; compared the proposed financial terms of the
Reorganization with the financial terms of certain other mergers and
acquisitions which Merrill Lynch deemed relevant; reviewed the financial terms
and conditions of the proposed forms of the Transaction Agreements; reviewed the
terms of the letter from Baxter to Grace dated January 31, 1996, setting forth a
proposal for the acquisition by Baxter of NMC; and reviewed such other financial
studies and analyses and performed such other investigations and took into
account such other matters as Merrill Lynch deemed necessary.

In preparing its opinion, Merrill Lynch relied on the accuracy and
completeness of all information supplied or otherwise made available to it by
Grace and Fresenius AG, and did not independently verify such information or
undertake an independent appraisal of the assets of Grace or Fresenius Worldwide
Dialysis. With respect to the financial forecasts furnished by Grace and
Fresenius AG, Merrill Lynch assumed that such forecasts were reasonably prepared
and reflected the best currently available estimates and judgments of the
managements of Grace and NMC or Fresenius AG as to the expected future financial
performance of Grace, NMC or Fresenius Worldwide Dialysis, as the case may be.
Merrill Lynch also relied upon the views of Grace's and Fresenius AG's
managements concerning the business, operational and strategic benefits and
implications of the Reorganization, including financial forecasts provided to
Merrill Lynch by Grace and Fresenius AG relating to synergistic benefits to
Fresenius Worldwide Dialysis and NMC. Merrill Lynch's opinion was necessarily
based upon financial, economic, market and other conditions as they existed and
could be evaluated on the date of such opinion. Merrill Lynch did not express
any opinion as to what the value of the ADSs actually would be when issued to
Grace shareholders pursuant to the Reorganization or the prices at which the
ADSs would trade subsequent to the Reorganization. In addition, Merrill Lynch
understood that NMC was the target of certain governmental and regulatory
investigations relating to the conduct of its business, which could result in
substantial liabilities and obligations being incurred by NMC in the future, the
amount of which management of Grace was unable to predict. Merrill Lynch also
understood that the financial statements, pro forma financial statements and
registration statement of Fresenius Medical Care had not yet been prepared.

Merrill Lynch assumed, with Grace's consent, that the transactions
contemplated by the Transaction Agreements would comply with applicable U.S.,
foreign, federal and state laws, including, without limitation,

42

<PAGE>    67

laws relating to the payment of dividends, bankruptcy, insolvency,
reorganization, fraudulent conveyance, fraudulent transfer or other similar laws
affecting creditors' rights generally. Merrill Lynch assumed, with Grace's
consent, that receipt of the ADSs would be tax-free for federal income tax
purposes to the shareholders of Grace and that none of Grace, NMC, Fresenius
Worldwide Dialysis and Fresenius USA and Fresenius Medical Care would recognize
income, gain or loss as a result of the transactions contemplated by the
Transaction Agreements. In addition, Merrill Lynch assumed, with Grace's
consent, that Grace Chemicals and Fresenius AG would perform their respective
indemnification obligations which may arise under the Distribution Agreement and
the Contribution Agreement in accordance with their respective terms.

Based upon and subject to the foregoing, Merrill Lynch rendered its opinion
that, as of the date of such opinion, the terms of the Distribution Payment and
the Grace Merger, taken together, were fair, from a financial point of view, to

XXX-001889

the holders of Grace Common Stock.

In preparing their opinions to the Grace Board, the Grace Financial Advisors performed a variety of financial and comparative analyses, including those described under "-- Presentation by Grace Financial Advisors." The summary of the Grace Financial Advisors' analyses set forth below does not purport to be a complete description of the analyses underlying the Grace Financial Advisors' opinions, but includes a summary of all material valuation methodologies performed by the Grace Financial Advisors. The preparation of a fairness opinion is a complex analytic process involving various determinations as to the most appropriate and relevant methods of financial analyses and the application of those methods to the particular circumstances and, therefore, such an opinion is not readily susceptible to summary description. In arriving at their opinions, the Grace Financial Advisors made qualitative judgments as to the significance and relevance of each analysis and factor considered by it. Accordingly, the Grace Financial Advisors believe that their analyses must be considered as a whole and that selecting portions of their analyses and factors, without considering all analyses and factors, could create a misleading or incomplete view of the processes underlying such analyses and their opinions. In their analyses, the Grace Financial Advisors made numerous assumptions with respect to Grace, NMC, Fresenius Worldwide Dialysis, Fresenius USA and Fresenius Medical Care, industry performance, regulatory, general business, economic, market and financial conditions and other matters, many of which are beyond the control of Grace, NMC, Fresenius Worldwide Dialysis, Fresenius USA and Fresenius Medical Care. No company, transaction or business used in such analyses as a comparison is identical to Grace, NMC, Fresenius Worldwide Dialysis, Fresenius USA and Fresenius Medical Care or the Reorganization, nor is an evaluation of the results of such analyses entirely mathematical; rather, it involves complex considerations and judgments concerning financial and operating characteristics and other factors that could affect the acquisition, public trading or other values of the companies, business segments or transactions being analyzed. The estimates contained in such analyses and the ranges of valuations resulting from any particular analysis are not necessarily indicative of actual values or predictive of future results or values, which may be significantly more or less favorable than those suggested by such analyses. In addition, analyses relating to the value of businesses or securities do not purport to be appraisals or to reflect the prices at which businesses or securities actually may be sold. Accordingly, because such estimates are inherently subject to substantial uncertainty, none of Grace, NMC, Fresenius AG, Fresenius Worldwide Dialysis, Fresenius USA, Fresenius Medical Care, the Grace Financial Advisors or any other person assumes responsibility for their accuracy.

PRESENTATION BY GRACE FINANCIAL ADVISORS

At the meeting of the Grace Board on February 4, 1996, the Grace Financial Advisors made a presentation to the Grace Board of their analyses as of such date delivered in connection with their opinions, a summary of which appears below.

The following quantitative information, to the extent it is based on market data, is based on market data as it existed at February 4, 1996, and is not necessarily indicative of current market conditions.

Historical and Pro Forma Financial Data. The Grace Financial Advisors reviewed historical revenues, EBITDA and earnings before interest and taxes ("EBIT") of each of NMC and Fresenius Worldwide Dialysis and analyzed pro forma revenues, EBITDA, EBIT and net income of Fresenius Medical Care based on certain forecasted financial information and certain information with regard to possible synergies resulting

43

<PAGE>  68

from the Reorganization provided by management of Grace, NMC, Fresenius USA and Fresenius Worldwide Dialysis. Assuming that the closing of the Reorganization occurred on January 1, 1996, such analysis indicated that, on a pro forma basis, for the year ending December 31, 1996, Fresenius Medical Care would have revenues of approximately $3.415 billion, EBITDA of approximately $794.1 million, EBIT of approximately $525.6 million and net income of approximately $156.3 million.

The Grace Financial Advisors also analyzed certain pro forma credit statistics for Fresenius Medical Care giving effect to the Reorganization, based upon certain forecasted financial information and certain information with regard to possible synergies resulting from the Reorganization provided by management of Grace, NMC, Fresenius USA and Fresenius Worldwide Dialysis. These credit statistics consisted of ratio of EBIT to net interest expense, ratio of EBITDA to net interest expense, total debt as a percentage of capitalization, ratio of total debt to EBITDA, total debt, shareholders' equity and total capitalization. Assuming that the closing of the Reorganization occurred on January 1, 1996, such analysis indicated that, on a pro forma basis, as of and for the year ending December 31, 1996, such credit statistics for Fresenius Medical Care would be as follows: ratio of EBIT to net interest expense, 2.8x; ratio of EBITDA to net interest expense, 4.2x; total debt as a percentage of capitalization, 52.7%; ratio of total debt to EBITDA, 3.1x; total debt, approximately $2.425 billion; shareholders' equity, approximately $2.173 billion; and total capitalization, approximately $4.598 billion.

Comparable Company Analysis. The Grace Financial Advisors analyzed the ratio of stock price to estimated 1996 earnings for six renal care companies, consisting of Fresenius USA, Fresenius AG, Gambro AB, Vivra, Total Renal Care Inc. and Renal Treatment Centers Inc. (the "Comparable Companies"). The price/estimated 1996 earnings ratios for the Comparable Companies were 20.5x, 25.4x, 19.5x, 18.5x, 35.0x and 28.1x, respectively. The Grace Financial Advisors

XXX-001890

estimated that the FMC Ordinary Shares would trade at a price/estimated 1996 earnings ratio ranging from 19.0x to 23.0x.

Valuation of Distribution Payment and Grace Merger.  The Grace Financial Advisors analyzed the value to Grace shareholders of the Grace Merger assuming estimated pro forma 1996 net income of Fresenius Medical Care of $156.3 million and a stock price to estimated 1996 earnings ratio for Fresenius Medical Care of 19.0x to 23.0x. Based upon the foregoing assumptions, the Grace Financial Advisors estimated that the total equity trading value of Fresenius Medical Care would range from approximately $2.97 billion to approximately $3.595 billion (of which Grace shareholders' ownership interest would be 44.8% or between approximately $1.331 billion and approximately $1.611 billion). In addition, the Grace Financial Advisors noted that NMC would retain or assume approximately $2.263 billion of indebtedness, resulting in an aggregate value to Grace shareholders of between approximately $3.594 billion and $3.874 billion. Further, the Grace Financial Advisors noted that NMC would distribute to New Grace its Amicon Bioseparations Division ("Amicon") and other assets, with an estimated value of between $75 million and $100 million, and that Grace Chemicals would be entitled to retain certain cash flows of NMC prior to the Reorganization, which Grace management estimated would range from approximately $150 million to approximately $200 million. Accordingly, the Grace Financial Advisors estimated that the aggregate value to be received in connection with the Distribution Payment and the Grace Merger ranged from approximately $3.819 billion to approximately $4.174 billion. The Grace Financial Advisors also noted that holders of Grace Common Stock would also receive the New Preferred Shares in the Recapitalization which would remain outstanding following the Grace Merger and that, under certain circumstances, the holders of the New Preferred Shares could receive certain special dividend payments in the future. See "DESCRIPTION OF NEW PREFERRED SHARES."

Discounted Cash Flow Analysis of Fresenius Medical Care.  The Grace Financial Advisors analyzed the discounted cash flow value of the equity of Fresenius Medical Care using discount rates ranging from 12.5% to 13.5% and terminal EBITDA multiples ranging from 7.5x to 8.5x. Based upon the foregoing, the Grace Financial Advisors estimated that the discounted cash flow value of the equity of Fresenius Medical Care ranged from approximately $3.742 billion to approximately $4.792 billion (as compared with the trading valuation of the equity of Fresenius Medical Care of between approximately $2.97 billion and approximately $3.595 billion described under "-- Valuation of Distribution Payment and Grace Merger").

44

<PAGE>  69

NMC Stand-Alone Valuation.  The Grace Financial Advisors performed analyses of the enterprise value of NMC on a stand-alone basis (excluding the value of Amicon and other assets to be transferred to or retained by New Grace) based upon the trading values of the Comparable Companies, comparable acquisition transactions and discounted cash flow (using discount rates ranging from 12.5% to 13.5% and terminal EBITDA multiples ranging from 7.0x to 8.0x). Such analyses resulted in the following ranges of enterprise value for NMC on a stand-alone basis: comparable company analysis -- between approximately $3.175 billion and approximately $3.5 billion; comparable acquisitions analysis -- between approximately $3.35 billion and approximately $4.0 billion; and discounted cash flow analysis -- between approximately $3.15 billion and approximately $3.725 billion (as compared with the estimated total value of the Grace shareholders' interest in the equity of Fresenius Medical Care and the Distribution Payment of between approximately $3.594 billion and approximately $3.875 billion described under "-- Valuation of Distribution Payment and Grace Merger").

Comparison of Baxter Proposal.  The Grace Financial Advisors compared the terms of the Distribution Payment and the Grace Merger with the proposal letter received by Grace from Baxter on January 31, 1996. The Grace Financial Advisors noted that the Fresenius AG transaction was a fully negotiated transaction with limited conditions to closing which provided, in their opinion, between approximately $3.675 billion and approximately $3.975 billion of value to Grace on a tax-free basis, that Grace Chemicals would be entitled to retain certain cash flows of NMC prior to the Reorganization, estimated by Grace management to be between approximately $150 million and approximately $200 million, that holders of Grace Common Stock would also receive the New Preferred Shares, and that financing commitments for the Fresenius AG transaction had been received. Furthermore, NMC would retain all liabilities, if any, arising out of the OIG Investigation. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings -- OIG Investigation."

The Grace Financial Advisors noted that the Baxter proposal stated that it provided $3.8 billion of value on a tax-free basis (although the Grace Financial Advisors understood, based upon the advice of counsel to Grace, that some of such consideration could potentially be deemed taxable consideration unless Baxter were to accept the "Morris Trust" structure agreed to by Fresenius AG or otherwise modify the form of its proposed transaction). The Grace Financial Advisors also noted that, under the terms of its proposal, Baxter would assume undisclosed liabilities, including any liability related to the OIG Investigation only up to $100 million. Moreover, the Baxter proposal was subject to negotiation, due diligence and documentation.

New Preferred Shares.  In the Reorganization, holders of Grace Common Stock will receive the New Preferred Shares, which shares will remain outstanding following the Grace Merger. As described under "DESCRIPTION OF NEW PREFERRED SHARES," holders of the New Preferred Shares may receive certain Special Dividend payments beginning in 2002, based upon the adjusted cash flow of Fresenius Medical Care for the five-year period from January 1, 1997 to December 31, 2001. Apart from such Special Dividend rights, the New Preferred Shares have no dividend rights, and such shares have a Liquidation Preference of $.10 per

XXX-001891

share. Because there is substantial uncertainty whether any Special Dividend payments will become payable on the New Preferred Shares, the Grace Financial Advisors valued the New Preferred Shares at zero for the purpose of their analyses. Accordingly, any amounts ultimately realized by holders of Grace Common Stock in respect of the New Preferred Shares held by them would represent additional value above the value taken into account by the Grace Financial Advisors in rendering their opinions as to the fairness of the Distribution Payment and the Grace Merger.

OIG Investigation.  As described under "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings -- OIG Investigation," NMC is the target of certain governmental and regulatory investigations relating to the conduct of its business, which could result in substantial liabilities and obligations being incurred by NMC in the future. The Grace Financial Advisors took into account the uncertainty regarding such investigations in their estimate of the range of price/earnings ratios for the FMC Ordinary Shares described under "-- Comparable Company Analysis" and "-- Valuation of Distribution Payment and Grace Merger." In their analyses described under "-- Discounted Cash Flow Analysis of Fresenius Medical Care" and "-- NMC Stand-Alone Valuation," the Grace Financial Advisors took into account, solely for the purpose of their analyses, payments to the federal government in connection

<div align="center">45</div>

<PAGE>  70

with previous settlements of regulatory investigations of companies in the health care industry. This did not, and was not intended to, reflect a judgment as to the potential outcome of the investigations, the comparability of the NMC investigations to said previous investigations or the merits of any aspect of such investigations. The Grace Financial Advisors were advised by management of Grace and NMC that management was unable to predict the amount of liabilities and obligations which may be incurred by NMC arising out of the foregoing investigations. The Grace Financial Advisors noted that, depending upon the actual amount of liabilities and obligations incurred by NMC, the resolution of these issues could have a material adverse impact on NMC in the future (although, by reason of the Reorganization, only 44.8% of such impact would be borne by Grace shareholders).

The foregoing is a summary of the material terms of the presentation by the Grace Financial Advisors to the Grace Board on February 4, 1996, and does not purport to be a complete description of such presentation. The analyses by the Grace Financial Advisors in connection with such presentation do not purport to be appraisals or necessarily reflect the prices at which businesses or securities actually may be sold. As described above, the opinions of the Grace Financial Advisors and their presentation to the Grace Board were one of a number of factors considered by the Grace Board in connection with its approval of the Reorganization.

FINANCIAL ADVISORY FEES

For their financial advisory services in connection with the Reorganization, each of CS First Boston and Merrill Lynch will receive a fee equal to 0.225% of the Aggregate Consideration in connection with the Reorganization. For this purpose, "Aggregate Consideration" means the total fair market value (at the time of closing) of all consideration (including cash, securities, property, all debt for borrowed money remaining on NMC's financial statements at closing and any other form of consideration) paid or payable, or otherwise to be distributed, directly or indirectly, to Grace, NMC or Grace's shareholders in connection with the Reorganization. In addition, since September 1, 1995, each of CS First Boston and Merrill Lynch has been receiving a financial advisory fee of $500,000, payable on a quarterly basis in arrears, which will be fully creditable against the fee described above. Grace has also agreed to reimburse each of CS First Boston and Merrill Lynch for its reasonable out-of-pocket expenses, including the fees and expenses of legal counsel and any other advisors retained by them, and to indemnify each of CS First Boston and Merrill Lynch and certain of their related persons against certain liabilities in connection with their engagement, including certain liabilities under the federal securities laws. Based upon the aggregate value to be received in connection with the Distribution Payment and the Grace Merger (between approximately $3.819 billion and approximately $4.174 billion, as estimated by the Grace Financial Advisors as of February 4, 1996 and described under "-- Valuation of Distribution Payment and Grace Merger"), the "Aggregate Consideration" for purposes of calculating the fee payable to each of the Grace Financial Advisors would be between approximately $3.819 billion and approximately $4.174 billion and the fee payable to each of the Grace Financial Advisors would be between approximately $8,592,750 and approximately $9,391,500, against which the quarterly financial advisory fees of $500,000 received by each of the Grace Financial Advisors beginning September 1, 1995 would be credited. The foregoing is provided solely as an illustration and does not constitute an estimate with respect to either the actual value to be received by Grace or the holders of Grace Common Stock in connection with the Distribution Payment and the Merger or the actual amount of the fees payable to the Grace Financial Advisors. The actual amount of the Aggregate Consideration can only be calculated by reference to the actual date of consummation of the Reorganization and will be based upon, among other things, closing market prices for the FMC Ordinary Shares over a 20-trading day period beginning with the commencement of regular-way trading. In addition, there may be material changes with respect to Fresenius Medical Care and NMC and financial market, industry and general economic conditions between February 4, 1996 and the date of the Reorganization. For these reasons, the actual amount of the Aggregate Consideration and the fees payable to the Grace Financial Advisors may be materially greater or less than the amounts described in the foregoing illustration.

XXX-001892

In the ordinary course of their respective businesses, CS First Boston and
Merrill Lynch may actively trade in the debt and equity securities of Grace,
Fresenius AG and Fresenius USA (and, after the Reorganization, Fresenius Medical
Care) for their own account or for the accounts of their customers and,

46

<PAGE>   71

accordingly, may at any time hold long or short positions in such securities. In
addition, CS First Boston is currently in discussions with Fresenius Medical
Care to act as an underwriter of securities of Fresenius Medical Care, the
proceeds of which may be used to refinance a portion of NMC's bank debt
following consummation of the Reorganization. See "FINANCING -- Refinancing."

BACKGROUND OF THE REORGANIZATION; REASONS FOR THE RECOMMENDATION OF THE
FRESENIUS USA BOARD

     The following discussion regarding the reasons for the recommendation of
the Fresenius USA Board reflects the initial proposed capitalization for
Fresenius Medical Care of 217,170,000 FMC Ordinary Shares (with each ADS
evidencing one FMC Ordinary Share) and has not been adjusted to reflect the
final capitalization of 70,000,000 FMC Ordinary Shares (or the fact that three
ADSs represent one FMC Ordinary Share).

     The Fresenius USA Board has unanimously approved the Reorganization and the
transactions contemplated thereby, including the Fresenius USA Merger and the
Fresenius USA Plan Amendment, and has determined that such transactions are fair
to, and in the best interests of, the stockholders of Fresenius USA. The
Fresenius USA Board unanimously recommends that Fresenius USA stockholders vote
for approval of the Reorganization Agreement including the Fresenius USA Merger,
and the Fresenius USA Plan Amendment.

     At a meeting of the Fresenius USA Board on January 25, 1996, Fresenius AG
informed the Fresenius USA Board of the proposed Reorganization. After a
discussion concerning the structure of the proposed Reorganization, the
Fresenius USA Board voted unanimously to establish the Fresenius USA Independent
Committee comprised of the three Fresenius USA independent directors, Robert S.
Ehrlich, James F. Marten and Francis E. Baker, and delegated to the Fresenius
USA Independent Committee the authority to consider, negotiate, and authorize
the economic terms of the participation of the public stockholders of Fresenius
USA, other than Fresenius AG, Grace and their respective subsidiaries (the
"Fresenius USA Public Stockholders") in the proposed Reorganization. The
Fresenius USA Board further authorized the Fresenius USA Independent Committee
to retain, at Fresenius USA's expense, necessary advisors, including an
investment banking firm and legal counsel.

     The Fresenius USA Independent Committee met later that day by telephone to
discuss the selection of financial and legal advisors. The Fresenius USA
Independent Committee discussed the importance of retaining a financial advisor
with the experience and expertise appropriate to review whether the proposed
Reorganization was fair to the public stockholders of Fresenius USA from a
financial viewpoint, and also agreed that experience in the health care industry
was a significant consideration. The Fresenius USA Independent Committee decided
to retain Ropes & Gray as its legal advisor because of its experience
representing Fresenius USA and in particular its experience representing
Fresenius USA's public minority in previous arm's-length negotiations between
Fresenius USA and Fresenius AG. Ropes & Gray informed the Fresenius USA
Independent Committee that, in connection with its role as counsel to Fresenius
USA, Ropes & Gray has, from time to time, rendered advice to directors and
officers of Fresenius USA regarding how to structure certain personal
transactions involving securities of Fresenius USA. The Fresenius USA
Independent Committee met again several times during the ensuing week, during
which time it elected Mr. Ehrlich Chairman and conferred with, and received
legal advice from, Ropes & Gray.

     After the execution of the Reorganization Agreement by Fresenius AG and
Grace on February 4, 1996, Fresenius AG orally conveyed a proposal to the
Fresenius USA Independent Committee to exchange 3.8% of the equity of Fresenius
Medical Care, or .77 of an FMC Ordinary Share per share of Fresenius USA Common
Stock, on a fully diluted basis, as the consideration to the Fresenius USA
Public Stockholders in the proposed Fresenius USA Merger (the "First Proposal").
Fresenius USA issued a press release on February 5, 1996, announcing its receipt
of the First Proposal.

     On February 12, 1996, Fresenius AG's financial advisor, Dresdner Securities
(USA) Inc. ("Dresdner Securities"), presented the First Proposal and explained
the calculation thereof to the Fresenius USA Independent Committee and its legal
counsel. Dresdner Securities and Fresenius AG also summarized the terms of the
Reorganization and the Reorganization Agreement, and responded to questions from
the

47

<PAGE>   72

Fresenius USA Independent Committee and its counsel concerning the structure of
the Reorganization, the future financing needs of Fresenius Medical Care, the
debt to be assumed by Fresenius Medical Care in the Reorganization, and the
value of the FMC Ordinary Shares.

     On February 13, 1996, after considering proposals and interviewing numerous
prospective financial advisors, the Fresenius USA Independent Committee retained
Salomon Brothers as its financial advisor, and signed an engagement letter,
dated February 13, 1996, to that effect. The Committee directed Salomon Brothers
to undertake an evaluation of the Reorganization and to communicate with

XXX-001893

Fresenius AG's financial advisors in order to assist the Fresenius USA
Independent Committee in its negotiations with Fresenius AG. In addition,
Salomon Brothers was charged with evaluating the fairness, from a financial
point of view, of the proposals made by Fresenius AG with regard to the exchange
ratio for the exchange of Fresenius USA Common Stock for FMC Ordinary Shares
held by the Fresenius USA Public Stockholders under the terms of the proposed
Reorganization.

On February 13, 1996, Dresdner Securities explained to Salomon Brothers the
financial terms of the First Proposal and described the methodology and basis
for calculating the share exchange ratio underlying the First Proposal. Dresdner
Securities and Fresenius AG also summarized the terms of the Reorganization and
the Reorganization Agreement.

Between February 13 and March 19, 1996, the Fresenius USA Independent
Committee and its legal and financial advisors met on a regular basis to discuss
the First Proposal and the transactions contemplated by the Reorganization
Agreement. Ropes & Gray and Salomon Brothers performed an extensive due
diligence review of Fresenius AG, NMC and the proposed transactions, and Salomon
Brothers conducted comprehensive and detailed economic valuations of Fresenius
USA, Fresenius Worldwide Dialysis, NMC and Fresenius Medical Care. In addition,
during this time, Mr. Ehrlich met several times with Salomon Brothers and
discussed in detail the economic models that Salomon Brothers would use for
valuing Fresenius USA, NMC, Fresenius Worldwide Dialysis, and Fresenius Medical
Care.

The Fresenius USA Independent Committee met on March 19, 1996 with its
legal and financial advisors. Ropes & Gray presented the Fresenius USA
Independent Committee with the results of its review of Fresenius AG and NMC,
tax issues implicated by the transaction, the OIG Investigation and other
government investigations of NMC and the potential asbestos liability of New
Grace. Salomon Brothers then presented its analysis. As described below in
"-- Recommendation of the Fresenius USA Independent Committee and the Board of
Directors -- Opinion of Salomon Brothers," this analysis included a preliminary
valuation of Fresenius Medical Care (based on the component parts -- NMC and
Fresenius Worldwide Dialysis) and Fresenius USA. This analysis included but was
not limited to the following methodologies to value the business: the historical
and current market for the Fresenius USA Common Stock and for the equity
securities of certain other companies comparable to Fresenius USA, Fresenius
Worldwide Dialysis, NMC or Fresenius Medical Care; discounted cash flow analysis
of each of Fresenius USA, NMC and Fresenius Worldwide Dialysis; and the nature
and terms of certain other transactions believed to be relevant. This analysis
also included a revision of the First Proposal. Salomon Brothers explained that,
in evaluating the offer made to the Fresenius USA Public Stockholders, Salomon
Brothers' analysis focused on the future prospects of each of the component
companies of Fresenius Medical Care. Salomon Brothers described the various
methodologies used in valuing Fresenius Medical Care and the possible synergies
created by the Reorganization, and advised the Fresenius USA Independent
Committee that the First Proposal was below market value and that the Fresenius
USA Independent Committee should continue to negotiate to maximize stockholder
value.

Between March 19 and the end of April 1996, the Fresenius USA Independent
Committee met at least twice weekly by telephone conference call to receive
advice from and give direction to its legal and financial advisors in connection
with its review of the Reorganization. At the request of the Fresenius USA
Independent Committee, Salomon Brothers met with Dresdner Securities on March
21, 1996, to discuss Fresenius AG's First Proposal. Salomon Brothers informed
Dresdner Securities that Salomon Brothers disagreed, as an economic matter, with
Dresdner Securities' valuation assumptions, methodologies, and conclusions, and
further stated that Salomon Brothers believed that the First Proposal was
inadequate and that

<center>48</center>

&lt;PAGE&gt;   73

the Fresenius USA Independent Committee would require the best price reasonably
available to the Fresenius USA Public Stockholders. Salomon Brothers stated that
the Fresenius USA Independent Committee was flexible as to how the consideration
could be structured.

The Fresenius USA Independent Committee informed Fresenius AG on March 26
that the Fresenius USA Independent Committee believed that the public
stockholders of Fresenius USA should receive a premium above the current market
value. The Fresenius USA Independent Committee asked Fresenius AG to meet with
representatives of Salomon Brothers so that they could present their valuations
of the Reorganization and the entities created thereby. Salomon Brothers
presented its valuation to Dr. Gerd Krick, Chairman of the Management Board of
Fresenius AG (the "Fresenius AG Management Board"), on March 29, 1996. Salomon
Brothers informed Fresenius AG that the Fresenius USA Independent Committee
believed the First Proposal was inadequate. Between April 3 and April 11, 1996,
Salomon Brothers and Dresdner Securities met on several occasions and explored
different means of providing the Fresenius USA Public Stockholders with the
greatest consideration reasonably available, including the use of consideration
other than FMC Ordinary Shares.

At a meeting on April 11, 1996, Salomon Brothers informed the Fresenius USA
Independent Committee that Fresenius AG was exploring the possibility of
offering Fresenius USA's stockholders a non-voting preferred stock instead of
FMC Ordinary Shares and advised that such a security would trade at a discount
to FMC Ordinary Shares. A discussion ensued regarding the value of different
forms of consideration and the strengths and weaknesses of each form for the
Fresenius USA Public Stockholders. Salomon Brothers advised that the Fresenius
USA Independent Committee negotiate further with Fresenius AG to maximize the

XXX-001894