value offered to the Fresenius USA Public Stockholders in exchange for their
shares of Fresenius USA Common Stock.

On April 16, 1996, Fresenius AG informed the Fresenius USA Independent
Committee that it would offer 1.045 FMC Ordinary Shares for each publicly held
share of Fresenius USA Common Stock (assuming that Fresenius Medical Care would
issue 217,170,000 FMC Ordinary Shares and assuming a maximum of 10,183,123
shares of Fresenius USA Common Stock) (the "Second Proposal"). After
consultation with its advisors, the Fresenius USA Independent Committee rejected
the Second Proposal as providing, in the Fresenius USA Independent Committee's
view, inadequate value for the Fresenius USA Public Stockholders. The Fresenius
USA Independent Committee proposed including cash as a portion of the
consideration paid to the Fresenius USA Public Stockholders and were told that
Fresenius AG would not pay cash for any portion of the Fresenius USA Common
Stock.

On April 18, 1996, Salomon Brothers participated with Ropes & Gray in
further negotiations with representatives of Fresenius AG. On April 21, 1996,
Fresenius AG presented to the Fresenius USA Independent Committee its offer to
exchange 1.15 FMC Ordinary Shares for each share of Fresenius USA Common Stock
held by the Fresenius USA Public Stockholders (assuming that Fresenius Medical
Care would issue 217,170,000 FMC Ordinary Shares and assuming a maximum of
9,253,331 outstanding shares of Fresenius USA Common Stock held by persons other
than Fresenius AG, Grace and their respective subsidiaries), (the "Third
Proposal"). The Fresenius USA Independent Committee sought from and explored
with Fresenius AG the possibility of additional consideration and were informed
by Fresenius AG that the Third Proposal was its highest offer. The Fresenius USA
Independent Committee discussed the Third Proposal with its legal and financial
advisors at a meeting on April 22, 1996. After extensive consultation, the
Fresenius USA Independent Committee, believing that it had negotiated the
highest consideration reasonably attainable for the Fresenius USA Public
Stockholders, determined that the Third Proposal was a strong offer and that it
would make a decision with respect to whether the offer was fair to, and in the
best interests of, the Fresenius USA Public Stockholders when it received a
formal opinion from its financial advisors. On April 25, 1996, Salomon Brothers
gave its oral opinion as to the fairness from a financial point of view of the
Third Proposal. Subsequently, the Fresenius USA Independent Committee was
informed that Fresenius Medical Care would issue 70,000,000 FMC Ordinary Shares
(instead of 217,170,000 as previously anticipated) and that the Third Proposal
was, therefore, equivalent to an exchange of 0.37067735 FMC Ordinary Shares for
each share of Fresenius USA Common Stock held by the Fresenius USA Public
Stockholders.

                                      49

<PAGE>    74

On May 8, 1996, Salomon Brothers delivered its written opinion to the
Fresenius USA Independent Committee that the exchange ratio of 0.37067735 FMC
Ordinary Shares (having given effect to the new capitalization) to be issued in
exchange for each share of Fresenius USA Common Stock was fair to the public
stockholders of Fresenius USA from a financial point of view. After full and
frank discussion, the Fresenius USA Independent Committee determined unanimously
that the Reorganization Agreement and the Fresenius USA Merger were fair to and
in the best interests of the Fresenius USA Public Stockholders. See
"-- Recommendation of the Fresenius USA Independent Committee and the Board of
Directors -- Opinion of Salomon Brothers." The Fresenius USA Independent
Committee then voted unanimously to recommend that the Fresenius USA Board
approve the Reorganization Agreement and the Fresenius USA Merger, and to
recommend to the Fresenius USA Public Stockholders that they vote in favor of
the Reorganization Agreement and the Fresenius USA Merger.

RECOMMENDATION OF THE FRESENIUS USA INDEPENDENT COMMITTEE AND THE BOARD OF
DIRECTORS

At a meeting held on May 8, 1996, the Fresenius USA Independent Committee
recommended unanimously to the full Fresenius USA Board that it approve the
Reorganization Agreement and the Fresenius USA Merger. Immediately thereafter,
the full Fresenius USA Board met and voted unanimously to approve the
Reorganization Agreement and to recommend that the holders of Fresenius USA
Common Stock vote in favor of the Reorganization Agreement and the Fresenius USA
Merger. The Fresenius USA Board, including all of the Fresenius USA Independent
Directors, believes that the transactions contemplated by the Reorganization
Agreement and the Fresenius USA Merger are in the best interests of Fresenius
USA and its stockholders. The terms of the Reorganization are the result of
arm's-length negotiations between Fresenius AG and Grace, each party conducting
its own analysis and acting with the advice of its own legal counsel,
independent accountants and financial advisors. The consideration payable to
Fresenius USA Public Stockholders was determined as a result of arm's-length
negotiations between the Fresenius USA Independent Committee and Fresenius AG.

In reaching their conclusion to recommend approval of the Reorganization
Agreement and the Fresenius USA Merger, the Fresenius USA Independent Committee
took into account a number of factors, including the factors discussed below in
"-- Opinion of Salomon Brothers" and the following:

    - the holders of Fresenius USA Common Stock will hold equity interests in
      the new global dialysis company, Fresenius Medical Care, and will be able
      to benefit from the synergies which the Fresenius USA Independent
      Committee and its advisors believe will result from the Reorganization;

    - the opinion of Salomon Brothers, the Fresenius USA Independent
      Committee's financial advisors, that the consideration per share to be
      received by the holders of Fresenius USA Common Stock in the Fresenius USA
      Merger is fair to such holders (other than Fresenius AG, Grace and their

XXX-001895

respective subsidiaries) from a financial point of view (see "-- Opinion of Salomon Brothers");

- the FMC Ordinary Shares to be issued in the Fresenius USA Merger will trade on the NYSE as ADRs representing ADSs;

- the tax effects of the proposed Reorganization to Fresenius Medical Care and to Fresenius USA and its stockholders, as described under "CERTAIN INCOME TAX CONSEQUENCES OF THE TRANSACTIONS TO HOLDERS OF FRESENIUS USA COMMON STOCK;"

- the Reorganization Agreement expressly provides that nothing in such agreement shall be construed to prevent the Fresenius USA Independent Committee from making a determination with respect to the adequacy of the consideration payable to the Fresenius USA Public Stockholders or the entire fairness of the transaction to the public stockholders of Fresenius USA, consistent with their fiduciary duties;

- the fact that, while Fresenius AG would own a majority of the voting securities of Fresenius Medical Care, Fresenius AG has agreed that at least two members of the FMC Supervisory Board to be elected by the shareholders will be persons who do not have any substantial professional relationship with Fresenius Medical Care, Fresenius AG, or any of their respective affiliates, and has also agreed to

50

<PAGE>   75

certain protections for minority shareholders as set forth under "DESCRIPTION OF THE POOLING AGREEMENT;"

- the belief of the Fresenius USA Independent Committee, based in part on the presentation by representatives of Salomon Brothers which included, among other things, valuation analyses with respect to Fresenius Medical Care and Fresenius USA, that the per share consideration payable to the Fresenius USA Public Stockholders was, on May 8, 1996, worth more than the then current fair market value of a share of Fresenius USA Common Stock; and

- the various risks involved in the Reorganization that are more fully described under "RISK FACTORS."

The negotiations between the Fresenius USA Independent Committee and Fresenius AG dealt solely with the economic terms for the participation of the Fresenius USA Public Stockholders in the Reorganization. The Fresenius USA Independent Committee did not propose or request any changes or revisions to the provisions of the Reorganization Agreement allocating 44.8% of the equity securities of Fresenius Medical Care to Grace and 55.2% of such equity securities to Fresenius AG and the Fresenius USA Public Stockholders, to the requirement of the Reorganization Agreement that Fresenius AG receive not less than 51% of Fresenius Medical Care's outstanding securities on a fully diluted basis, or to any other provisions of the Reorganization Agreement as to Grace and Fresenius AG. However, as a result of those negotiations, Grace agreed that the percentage of FMC Ordinary Shares required to be held by Fresenius AG would be reduced to 50.3%. See "THE REORGANIZATION -- Additional Agreements of Fresenius USA."

The foregoing discussion of the information and factors taken into account by the Fresenius USA Independent Committee, though not exhaustive, includes all the material factors considered by the Fresenius USA Independent Committee. With the exception of the regulatory and governmental investigations relating to the conduct of NMC's business, the Fresenius USA Independent Committee does not believe that any of these factors can generally be characterized as positive or negative, but involve matters of valuation and business judgment. (See -- "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters").

THE FRESENIUS USA BOARD UNANIMOUSLY RECOMMENDS THAT FRESENIUS USA STOCKHOLDERS VOTE FOR APPROVAL AND ADOPTION OF THE REORGANIZATION AGREEMENT AND THE TRANSACTIONS CONTEMPLATED THEREBY, AND FOR APPROVAL OF THE FRESENIUS USA PLAN AMENDMENT.

See "BUSINESS OF FRESENIUS MEDICAL CARE -- Business of Fresenius USA -- Material Contracts between Fresenius AG and Fresenius USA" for a description of certain historical relationships between Fresenius AG and Fresenius USA.

OPINION OF SALOMON BROTHERS

Salomon Brothers was retained subsequent to the execution by Fresenius AG and Grace of the Reorganization Agreement to act as a financial advisor to the Fresenius USA Independent Committee to assist the Fresenius USA Independent Committee in connection with the Reorganization. Salomon Brothers was selected by the Fresenius USA Independent Committee because of its reputation, its experience with similar transactions and its knowledge of the health care industry. Salomon Brothers is an internationally recognized investment banking firm continuously engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, competitive bidding, secondary distributions, and for corporate and other purposes.

On April 25, 1996, Salomon Brothers orally rendered its opinion to the effect subsequently set forth in its written opinion described below. Salomon Brothers has delivered its written opinion, dated May 8, 1996, to the Fresenius USA Independent Committee to the effect that, based upon and subject to various considerations set forth in such opinion, as of that date, the exchange ratio

XXX-001896

(the "Fresenius USA Public Stockholder Exchange Ratio") of 0.37067735 FMC
Ordinary Shares (having given effect to the new capitalization) to be issued in
exchange for each share of Fresenius USA Common Stock held by the Fresenius USA
Public

51

<PAGE>   76

Stockholders in the Fresenius USA Merger, pursuant to the Reorganization
Agreement, was fair from a financial point of view to the holders of Fresenius
USA Common Stock (other than Fresenius AG and Grace and their subsidiaries). In
rendering its opinion Salomon Brothers assumed, with the consent of the
Fresenius USA Independent Committee, that pursuant to the Reorganization
Agreement, immediately after the consummation of the Reorganization there would
be 70,000,000 outstanding FMC Ordinary Shares on a fully diluted basis,
resulting in the Fresenius USA public stockholders owning an aggregate of 4.9%
of FMC Ordinary Shares outstanding on a fully diluted basis immediately
following the Reorganization. Salomon Brothers also assumed that immediately
prior to the Fresenius USA Merger, there would be outstanding no more than
9,253,331 Fresenius USA Common Share Equivalents (i.e., the aggregate number of
shares of Fresenius USA Common Stock (i) outstanding and (ii) underlying
options, warrants and convertible securities of Fresenius USA) as required by
the Reorganization Agreement.

    THE FULL TEXT OF SALOMON BROTHERS' OPINION TO THE FRESENIUS USA INDEPENDENT
COMMITTEE, DATED MAY 8, 1996, WHICH SETS FORTH ASSUMPTIONS MADE, MATTERS
CONSIDERED AND LIMITS ON THE REVIEW UNDERTAKEN BY SALOMON BROTHERS, IS ATTACHED
AS APPENDIX D TO THIS JOINT PROXY STATEMENT-PROSPECTUS AND IS INCORPORATED
HEREIN BY REFERENCE. SALOMON BROTHERS' OPINION DELIVERED TO THE INDEPENDENT
COMMITTEE WAS DIRECTED ONLY TO THE FRESENIUS USA PUBLIC STOCKHOLDER EXCHANGE
RATIO IN THE FRESENIUS USA MERGER AND DOES NOT CONSTITUTE A RECOMMENDATION TO
ANY FRESENIUS USA STOCKHOLDER AS TO HOW SUCH STOCKHOLDER SHOULD VOTE AT THE
FRESENIUS USA SPECIAL MEETING. THE SUMMARY OF THE SALOMON BROTHERS OPINION SET
FORTH IN THIS JOINT PROXY STATEMENT-PROSPECTUS IS QUALIFIED IN ITS ENTIRETY BY
REFERENCE TO THE FULL TEXT OF SUCH OPINION. FRESENIUS USA STOCKHOLDERS ARE URGED
TO READ CAREFULLY SUCH OPINION IN ITS ENTIRETY.

    In arriving at its opinion, Salomon Brothers reviewed and analyzed (i) the
Reorganization Agreement, the Distribution Agreement and the Contribution
Agreement, (ii) a draft of this Joint Proxy Statement-Prospectus, (iii) certain
publicly available information concerning Fresenius USA, Grace, NMC and
Fresenius AG, (iv) certain pro forma financial and other information concerning
Fresenius Worldwide Dialysis furnished to Salomon Brothers by Fresenius AG, (v)
certain other internal information, primarily financial in nature, including
projections, concerning the business and operations of each of Fresenius USA,
NMC and Fresenius Worldwide Dialysis furnished to Salomon Brothers by the
respective companies, (vi) certain estimates of anticipated synergies furnished
to Salomon Brothers by Fresenius USA, NMC, Grace and Fresenius AG, (vii) certain
publicly available information concerning the trading of, and the trading market
for, Fresenius USA Common Stock, Grace Common Stock and Fresenius AG Ordinary
Shares, (viii) certain publicly available information with respect to certain
other companies that Salomon Brothers believed to be comparable to Fresenius
USA, NMC or Fresenius Worldwide Dialysis and the trading markets for certain of
such other companies' securities, and (ix) certain publicly available
information concerning the nature and terms of certain other transactions that
Salomon Brothers considered relevant to its inquiry. The information reviewed by
Salomon Brothers included preliminary versions of the pro forma financial
information of Fresenius Medical Care contained in this Joint Proxy
Statement-Prospectus. Salomon Brothers believes that the differences between the
pro forma financial information of Fresenius Medical Care contained in this
Joint Proxy Statement-Prospectus and the preliminary versions of such financial
information reviewed by Salomon Brothers would not have had a material effect on
Salomon Brothers' analysis. Salomon Brothers also considered such other
information, studies, analyses, and financial, economic, market criteria as it
deemed relevant. In addition, Salomon Brothers discussed the foregoing as well
as other matters it believed relevant to its inquiry with certain officers,
employees and representatives of Fresenius USA, NMC, Fresenius Worldwide
Dialysis, Grace and Fresenius AG.

    In arriving at its opinion, and in its April 25, 1996 presentation to the
Fresenius USA Independent Committee referred to below, Salomon Brothers did not
assume any obligations to verify any of the foregoing information and relied on
such information being complete and accurate in all material respects. With
respect to the projections as to the future financial performances of Fresenius
USA, NMC, Fresenius Worldwide

52

<PAGE>   77

Dialysis and the estimates of synergies for Fresenius Medical Care, Salomon
Brothers assumed they had been reasonably prepared on bases reflecting the best
currently available estimates and judgments of the managements of Fresenius USA,
NMC and Fresenius Worldwide Dialysis, and Salomon Brothers expressed no opinion
with respect to such projections or estimates or the assumptions on which they
were based. Salomon Brothers did not make or obtain or assume any responsibility
for making or obtaining any independent evaluations or appraisals of any of the
properties or facilities of Fresenius USA, NMC or Fresenius Worldwide Dialysis.

    While the Fresenius USA Independent Committee did not perform an
independent review of the financial information, projections and assumptions
provided to Salomon Brothers, Salomon Brothers did review certain financial
information and projections with the Fresenius USA Independent Committee. When
it accepted Salomon Brothers' fairness opinion, the Fresenius USA Independent
Committee was aware of Salomon Brothers' reliance on the information provided by

XXX-001897

the managements of Fresenius USA, NMC and Fresenius AG.

In arriving at its opinion, Salomon Brothers considered such financial and other factors as it deemed appropriate under the circumstances including, among others, the following: (i) the historical and current financial position and results of operations of Fresenius USA, NMC and Fresenius Worldwide Dialysis; (ii) the business prospects of Fresenius USA, NMC, Fresenius Worldwide Dialysis and Fresenius Worldwide Medical Care; (iii) the historical and current market for Fresenius USA Common Stock and for the equity securities of certain other companies that Salomon Brothers believed to be comparable to Fresenius USA, Fresenius Worldwide Dialysis, NMC or Fresenius Medical Care; and (iv) the nature and terms of certain other transactions that Salomon Brothers believed to be relevant. Salomon Brothers also took into account its assessment of general economic, market and financial conditions as well as its experience in connection with similar transactions and securities valuation generally. No limitations were imposed by either Fresenius USA or Fresenius AG with respect to the investigations made or the procedures followed by Salomon Brothers in rendering its opinion. However, since Fresenius AG owns a majority of the fully-diluted outstanding shares of Fresenius USA Common Stock and, pursuant to the Reorganization Agreement, was prohibited from selling such shares, Salomon Brothers was not authorized to, and did not, solicit potential third parties that might have been interested in acquiring Fresenius USA.

In arriving at its opinion, Salomon Brothers understood that NMC is the target of certain governmental and regulatory investigations relating to the conduct of its business, which may result in substantial liabilities and obligations being incurred by NMC in the future, as described in this Joint Proxy Statement-Prospectus under "RISK FACTORS -- Risks Relating to Regulatory Matters." While Salomon Brothers participated with the Fresenius USA Independent Committee in discussions with the special counsel of the Fresenius USA Independent Committee with respect to the potential outcome thereof, it was not possible to predict that outcome and Salomon Brothers expressed no view with respect thereto, although, in conducting its analysis and rendering its opinion, it did, with the consent of the Fresenius USA Independent Committee, make certain assumptions with respect thereto. In addition, in rendering its opinion, Salomon Brothers assumed, with the consent of the Fresenius USA Independent Committee, that (i) the Fresenius USA Merger would qualify as a tax-free transaction under Section 351 of the Code; (ii) the transactions contemplated by the Distribution Agreement would qualify as a tax-free distribution under Section 355 of the Code; (iii) following the transactions contemplated by the Distribution Agreement, Grace would have no material liabilities other than the liabilities of NMC; (iv) Grace Chemicals and Fresenius AG would perform their respective obligations (including indemnification obligations) under the Distribution Agreement and the Contribution Agreement in accordance with their respective terms; and (v) the Reorganization would not constitute a fraudulent conveyance or fraudulent transfer under any applicable law and that the Reorganization would comply with applicable U.S., foreign, federal and state laws, including, without limitation, laws limiting payments of dividends and distributions to stockholders.

Salomon Brothers' opinion was necessarily based upon conditions as they existed upon, and could be evaluated as of, the date of its opinion, and Salomon Brothers assumed no responsibility to update or revise its opinion based upon circumstances or events occurring after the date of its opinion. Salomon Brothers' opinion related solely to the fairness, from a financial point of view, of the Public Stockholder Exchange Ratio to the

53

<PAGE>    78

holders of Fresenius USA Common Stock (other than Fresenius AG and Grace and their subsidiaries) and did not address Fresenius USA's underlying business decision to effect the Fresenius USA Merger or constitute a recommendation to any holder of Fresenius USA Common Stock as to how such holder should vote with respect to the Fresenius USA Merger.

In connection with its opinion, Salomon Brothers made a presentation to the Fresenius USA Independent Committee on April 25, 1996, with respect to certain analyses performed by Salomon Brothers in arriving at its opinion and other considerations. While the Fresenius USA Independent Committee was familiar with the methodologies and analyses performed by Salomon Brothers and believed them to be appropriate, it relied on Salomon Brothers' expertise in such matters with respect to the choice and application of the methodologies used in determining the fairness of the Reorganization. At the time of this presentation, the parties contemplated, and Salomon Brothers assumed, that the exchange ratio in the Fresenius USA Merger would be 1.15 FMC Ordinary Shares to be issued in exchange for each share of Fresenius USA Common Stock and that immediately after the consummation of the Reorganization there would be 217,170,000 outstanding FMC Ordinary Shares, on a fully diluted basis, resulting in the Fresenius USA Public Stockholders owning an aggregate of 4.9% of FMC Ordinary Shares outstanding, on a fully diluted basis, immediately following the Reorganization. Subsequently it was determined by the parties, pursuant to the Reorganization Agreement, that there would be 70,000,000 outstanding FMC Ordinary Shares, on a fully diluted basis, immediately following the Reorganization. The actual Fresenius USA Public Stockholder Exchange Ratio reflects the proportional adjustment of the exchange ratio to reflect this change in the number of outstanding FMC Ordinary Shares. Immediately following the Reorganization the Fresenius USA Public Stockholders will own an aggregate of 4.9% of the FMC Ordinary Shares outstanding, on a fully diluted basis, as assumed at the time of Salomon Brothers' April 25, 1996 presentation. The following is a summary of such Salomon Brothers presentation. The following quantitative information, to the extent it is based on market data, is based on market data as it existed at April 25, 1996, and is not necessarily indicative of current market conditions.

XXX-001898

Estimated Fresenius Medical Care Public Market Valuation.  In order to derive an estimated market valuation range for Fresenius Medical Care common stock Salomon Brothers first established estimates of firm value (which includes both equity and net indebtedness) for each of Fresenius Worldwide Dialysis (including Fresenius USA) and NMC, using both a comparable public market company analysis and a discounted cash flow ("DCF") analysis, and then added them together and made certain adjustments to establish an estimate of firm value for Fresenius Medical Care. Based on a review of certain publicly available information and stock market performance of selected publicly traded domestic and international medical product companies (including firm value as a percentage of 1995 revenues and the ratio of firm value to each of certain price/earnings ratios, 1995 EBITDA, 1995 EBIT, 1995 earnings and certain composite published analyst earnings estimates for 1996), Salomon Brothers established a reference range for the firm value for Fresenius Worldwide Dialysis (including Fresenius USA) of $2.1 billion to $2.5 billion. Applying a similar approach to NMC (except using as comparable companies domestic medical product companies) resulted in a reference range for the firm value of NMC of $3.95 billion to $4.8 billion.

Using a DCF methodology, Salomon Brothers estimated, for each of Fresenius Worldwide Dialysis (including Fresenius USA) and NMC, the present value of its unlevered free cash flows if it were to perform independently in accordance with its management's projections for 1996 through 2000. Unlevered free cash flow represents the amount of cash generated and available for principal, interest and dividend payments after providing for ongoing business operations. For each of Fresenius Worldwide Dialysis and NMC, Salomon Brothers aggregated (x) the present value of the projected unlevered free cash flow through 2000 with (y) the present value of the range of estimated terminal values (representing an estimate of such company's value beyond 2000). Those ranges of terminal values were calculated by applying multiples of 8x to 10x to Fresenius Worldwide Dialysis's estimated EBITDA in 2000 and multiples of 7.5x to 9.5x to NMC's estimated EBITDA in 2000. Using discount rates of 11% to 15% for Fresenius Worldwide Dialysis and 12% to 14% for NMC, Salomon Brothers computed a range of firm values of $2.1 billion to $3.0 billion for Fresenius Worldwide Dialysis and $3.8 billion to $5.0 billion for NMC. Using narrower ranges (8.5x to 9.5x for Fresenius Worldwide Dialysis and 8.0x to 9.0x for NMC) of terminal multiples and a 13% discount rate, Salomon

54

<PAGE>   79

Brothers computed a narrower range of firm values of $2.4 billion to $2.7 billion for Fresenius Worldwide Dialysis and $4.2 billion to $4.6 billion for NMC.

Combining the total firm values of Fresenius Worldwide Dialysis and NMC and adding the present value of all assumed synergies (based on estimates provided by management of Fresenius USA, Fresenius Worldwide Dialysis, Fresenius AG , NMC and Grace, as adjusted by Salomon Brothers) and subtracting net indebtedness and an assumed amount to reflect certain contingent liabilities, resulted in implied ranges of $15.60 to $23.60 ($16.13 to $24.41 per ADS after adjustment to reflect the final determination by the parties pursuant to the Reorganization Agreement as to the aggregate numbers of FMC Ordinary Shares to be outstanding, on a fully diluted basis, immediately following the Reorganization (the "FMC Actual Capitalization Adjustment")), per FMC Ordinary Share using market trading comparables and $18.10 to $23.60 ($18.72 to $24.41 per ADS after the FMC Actual Capitalization Adjustment) per FMC Ordinary Share using the DCF analysis. Based on this, Salomon Brothers estimated a reference range of $18 to $22 ($18.61 to $22.75 per ADS after the FMC Actual Capitalization Adjustment) per FMC Ordinary Share. Salomon Brothers noted however that there could be no assurance as to the actual price at which FMC Ordinary Shares would trade and that such stock price would vary over time and would be affected by various factors including uncertainties and developments with respect to contingent liabilities (see "RISK FACTORS"), the extent and timing of actual synergies, Fresenius Medical Care's actual results and other factors affecting Fresenius Medical Care, its business and economic and market conditions generally. Salomon Brothers noted that at the Fresenius USA Public Stockholder Exchange Ratio, this reference range for FMC Ordinary Shares implied a reference range of $20.70 to $25.30 per share of Fresenius USA Common Stock, compared to a Fresenius USA Common Stock market price of $20.50 on April 19, 1996, $19.75 on January 5, 1995 (one month prior to the announcement of the Reorganization) and a weighted average (by trading volume) market price of $17.15 over the 12 months ended April 23, 1996, representing a range of premium of 1% to 23.4%, 4.8% to 28.1% and 20.7% to 47.5%, respectively.

Fresenius USA Public Market Valuation.  Salomon Brothers reviewed certain publicly available information and stock market performance data of selected publicly traded domestic medical product companies with the financial and stock market performance of Fresenius USA. Based on its review of these selected companies' price/earnings ratios and firm value multiples of sales, EBITDA and EBIT, Salomon Brothers established a reference range of estimated equity values per share for Fresenius USA Common Stock of between $17.30 and $21.40 per share, as compared with the reference range (described above) of $20.70 to $25.30 per share of Fresenius USA Common Stock for the FMC Ordinary Shares to be received in exchange therefor.

Fresenius USA Discounted Cash Flow Analysis.  Using a DCF methodology, Salomon Brothers estimated the present value of unlevered free cash flows of Fresenius USA if Fresenius USA were to perform in accordance with Fresenius USA's management's projections for 1996 through 2000. Salomon Brothers aggregated (x) the present value of the projected unlevered free cash flow through 2000 with (y) the present value of the range of estimated terminal values (representing an estimate of Fresenius USA's value beyond 2000). The range of terminal values was calculated by applying multiples of 10x to 14x to

XXX-001899

Fresenius USA's estimated EBITDA in 2000. Using discount rates of 11% to 15%, Salomon Brothers computed a range of firm values of $538 million to $845 million and, using a narrower terminal value range of 11x to 13x and a discount of 13%, Salomon Brothers computed a narrower range of firm values of $632 million to $729 million. Using these ranges, Salomon Brothers computed a present value per share of Fresenius USA Common Stock of $16.92 to $27.08 (using the broader range) and $20.00 to $23.30 (using the narrower range), as compared with the reference range (described above) of $20.70 to $25.30 per share of Fresenius USA Common Stock for the FMC Ordinary Shares to be received in exchange therefor.

Precedent Minority Buyout Transactions.  Salomon Brothers reviewed selected transactions since 1984 in which the majority owner of a publicly traded subsidiary corporation acquired the remaining public interest either for stock of the parent corporation, cash or for mixed consideration ("minority buyout transactions"). Salomon Brothers analyzed the premiums of the consideration paid to the market price of the subsidiary's stock one month prior to announcement for each of the three types of consideration. Salomon Brothers noted, among other things, the median and mean premiums in the stock-for-stock minority buyouts were 22.9% and

<center>55</center>

&lt;PAGE&gt;  80

26.0% respectively. Applying a range of market premiums from 22.9% to 26.0% to the April 19, 1996 market price, the January 5, 1996 market price (one month prior to the announcement of the Reorganization Agreement) and the weighted average trading price for the 12 months, 6 months and 3 months ending April 23, 1996, implied stock-for-stock minority buyout prices of $25.19 to $25.83, $24.27 to $24.89, $21.08 to $21.61, $24.17 to $24.78 and $24.75 to $25.38, respectively. From this, Salomon Brothers established a minority buyout reference range for Fresenius USA of $22.00 to $25.00, as compared with the reference range (described above) of $20.70 to $25.30 per share of Fresenius USA Common Stock for the FMC Ordinary Shares to be received in exchange therefor.

The foregoing is a summary of the terms of the presentation by Salomon Brothers to the Fresenius USA Independent Committee on April 25, 1996, including all material valuation analyses performed by Salomon Brothers in connection therewith, and does not purport to be a complete description of such presentation or of the analyses performed by Salomon Brothers in connection with the preparation of its opinion. The preparation of a fairness opinion is a complex process involving subjective judgments and is not necessarily susceptible to partial analysis or summary description. In arriving at its opinion Salomon Brothers did not attribute any particular weight to any analysis or factor considered by it, but rather made qualitative judgments as to the significance and relevance of each. Salomon Brothers believes that its analyses must be considered as a whole and that selecting portions of such analyses and the factors considered therein, without considering all factors and analyses, could create an incomplete view of the analyses and the processes underlying Salomon Brothers' opinion. The projections prepared by the management of each of Fresenius USA, Fresenius Worldwide Dialysis, NMC and Grace, and the estimates of synergies, underlying Salomon Brothers' analyses are not necessarily indicative of future results or values, which may be significantly more or less favorable than such projections and estimates. With regard to the comparable public market trading company analyses summarized above, Salomon Brothers selected comparable public companies on the basis of various factors, including the size of the public market trading company and similarity of the line of business; however, no public market trading company utilized as a comparison is identical to Fresenius Worldwide Dialysis, Fresenius or NMC and no other transaction is identical to the Reorganization. Salomon Brothers' evaluation of the results of its analyses, and the selection of ratios, multiples and discount rates to use in its analyses are not mathematical; rather, they involve complex considerations and judgments concerning differences in financial and operating characteristics of the comparable companies and other factors that could affect the public trading value of the comparable companies to which Fresenius Worldwide Dialysis, Fresenius USA and NMC are being compared. Estimates of values of companies do not purport to be appraisals or constitute a prediction of the prices at which companies or their securities actually may be sold. As noted under "BACKGROUND AND REASONS -- Background of the Reorganization; Reasons for the Recommendation of the Fresenius USA Board," the fairness opinion of Salomon Brothers was only one of many factors considered by the Fresenius USA Independent Committee in determining to approve the Reorganization. Salomon Brothers has consented to the inclusion in this Joint Proxy Statement-Prospectus of its opinion delivered to the Independent Committee, a copy of which is attached as Appendix D hereto, and to the references to it and its presentation and analyses as set forth herein. Salomon Brothers' opinion delivered to the Independent Committee was directed only to the Fresenius USA Public Stockholder Exchange Ratio in the Fresenius USA Merger and does not constitute a recommendation to any Fresenius USA stockholder as to how such stockholder should vote at the Fresenius USA Special Meeting.

Salomon Brothers has provided and continues to provide financial advisory and investment banking services to Grace, for which it has received and expects to receive customary compensation. In the ordinary course of business, Salomon Brothers or its affiliates may actively trade the securities of Fresenius USA, Grace and Fresenius AG for its own account and for the accounts of its customers and, accordingly, may at any time hold a long or short position in such securities.

FINANCIAL ADVISORY FEES

Pursuant to a letter agreement dated February 13, 1996, Salomon Brothers was engaged by the Fresenius USA Independent Committee to advise it and assist it in connection with the Reorganization. Pursuant to such engagement letter, Fresenius USA agreed to pay Salomon Brothers the following fees for its

XXX-001900

services: (a)

56

<PAGE>    81

an initial fee of $100,000 (b) unless the Reorganization shall have been
terminated or withdrawn, or a fee paid pursuant to clause (c) of this paragraph,
a fee of $300,000 per month (less, in the case of the first month, the amount of
the initial fee) payable in arrears for up to five months; plus (c) upon
submission of Salomon Brothers' opinion to the Fresenius USA Independent
Committee or, if the Reorganization were terminated or withdrawn or Salomon
Brothers was not otherwise requested to render its opinion, upon Salomon
Brothers having substantially completed the work that was appropriate to prepare
it to render its opinion, an amount equal to $1,500,000 (less all amounts
previously paid pursuant to clauses (a) and (b) of this paragraph). As a result,
Salomon Brothers has become entitled to receive aggregate fees of $1,500,000.
Fresenius USA has also agreed to reimburse Salomon Brothers for its
out-of-pocket expenses, including reasonable fees and disbursements of counsel.
Fresenius USA has agreed to indemnify Salomon Brothers and certain related
persons against certain liabilities, including certain liabilities under the
federal securities laws, relating to or arising out of its engagement.

57

<PAGE>    82

THE REORGANIZATION

     The following describes the material aspects of the proposed
Reorganization. The following summaries of certain aspects of the Reorganization
Agreement, and the agreements attached hereto as Appendices H and I, the Grace
Tax Sharing and Indemnification Agreement and the Fresenius Tax Indemnification
Agreement do not purport to be complete and are qualified in their entirety by
reference to such agreements, which are attached as Appendices to this Joint
Proxy Statement-Prospectus and/or filed as exhibits to the Registration
Statement and are incorporated herein by reference. ALL SHAREHOLDERS ARE URGED
TO READ THE REORGANIZATION AGREEMENT AND THE OTHER AGREEMENTS IN THEIR ENTIRETY.

THE REORGANIZATION AGREEMENT

     The following transactions are to be consummated in connection with the
Reorganization:

     - Fresenius AG will contribute Fresenius Worldwide Dialysis, including its
       shares of Fresenius USA, to Fresenius Medical Care.

     - NMC will enter into the NMC Credit Agreement and, on the Effective Date,
       borrow an amount sufficient to finance the payment to, and the assumption
       of indebtedness of, Grace Chemicals such that the Debt of Grace on a
       consolidated basis, at the Effective Time, will not exceed $2.263
       billion, subject to adjustment as provided in the Reorganization
       Agreement.

     - Grace Chemicals will then distribute the capital stock of NMC to Grace,
       as a result of which Grace Chemicals and NMC will be sister companies.

     - Immediately thereafter, Grace will contribute the capital stock of Grace
       Chemicals to New Grace and effect the Distribution.

     - Immediately following the Distribution, Grace will effect the
       Recapitalization, in which each holder of Grace Common Stock will hold
       thereafter one share of Grace Common Stock and one New Preferred Share
       for each share of Grace Common Stock held.

     - Immediately following the Recapitalization, each of Grace and Fresenius
       USA will merge with wholly owned subsidiaries of Fresenius Medical Care.

     - As promptly as practicable following the Mergers, Fresenius Medical Care
       will contribute Fresenius USA to FNMC.

58

<PAGE>    83

The following chart represents the corporate organization of the parties to the
Reorganization on both pre-transaction and post-transaction bases:

                              [CHART]

59

<PAGE>    84

CONSIDERATION TO SHAREHOLDERS

     In the Reorganization, Fresenius AG and shareholders of Grace and Fresenius
USA will receive the following consideration:

  Fresenius AG

     - Fresenius Worldwide Dialysis, including all Fresenius USA Common Stock
       held by Fresenius AG or its subsidiaries, will be contributed to
       Fresenius Medical Care in exchange for 35,210,000 FMC Ordinary Shares
       representing approximately 50.3% of all FMC Ordinary Shares outstanding,
       on a fully diluted basis, immediately following the Reorganization.

XXX-001901

Grace Common Shareholders

- The closing price of Grace Common Stock in NYSE composite trading on
  August 1, 1996 was $63 1/4 per share.

- Each holder of Grace Common Stock issued and outstanding at the Time of
  Distribution will receive one share of New Grace Common Stock in the
  Distribution.

- Each holder of Grace Common Stock issued and outstanding after the Time
  of Distribution will receive one New Preferred Share.

- Holders of shares of Grace Common Stock issued and outstanding
  immediately prior to the Effective Time (other than any shares of Grace
  Common Stock owned by Fresenius AG or its subsidiaries, Fresenius USA or
  its subsidiaries or any Grace subsidiary, any shares of Grace Common
  Stock held in Grace's treasury or any shares of Grace Common Stock
  dissenting from the Reorganization) and options with respect to Grace
  Common Stock held by employees of NMC will be allocated 44.8% of the FMC
  Ordinary Shares outstanding on a fully diluted basis. As of July 15,
  1996, there were outstanding 92,001,176 shares of Grace Common Stock, and
  options with respect to 231,006 shares of Grace Common Stock held by
  employees of NMC (none of whom is an officer or director of Grace). On
  this basis, assuming that there are no Grace Common Dissenting
  Shareholders and that each option with respect to Grace Common Stock held
  by employees of NMC is converted to an option with respect to 3.7 ADSs,
  each share of Grace Common Stock will be converted in the Grace Merger
  into the right to receive approximately 1.013 ADSs, each such ADS
  representing one-third of an FMC Ordinary Share.

Grace Preferred Stockholders

- Each share of Grace Preferred Stock and each New Preferred Share issued
  and outstanding immediately prior to the Effective Time and will remain
  issued and outstanding as FNMC stock.

Fresenius USA Common Stockholders

- The closing price of Fresenius USA Common Stock in AMEX composite trading
  on August 1, 1996 was $19 per share.

- Each share of Fresenius USA Common Stock issued and outstanding
  immediately prior to the Effective Time (other than any shares of
  Fresenius USA Common Stock owned by Grace or its subsidiaries or by
  Fresenius AG or its subsidiaries, any shares of Fresenius USA Common
  Stock held in Fresenius USA's treasury or any shares of Fresenius USA
  Common Stock dissenting from the Reorganization) will be converted in the
  Fresenius USA Merger into the right to receive approximately 1.112 ADSs,
  each such ADS representing one-third of an FMC Ordinary Share, and each
  holder of options or warrants to purchase Fresenius USA Common Stock
  (other than Grace or its subsidiaries or Fresenius AG or its
  subsidiaries) will receive options or warrants to purchase approximately
  1.112 ADSs for each share of Fresenius USA Common Stock issuable upon
  exercise of such options or warrants. As of July 29, 1996, there were
  outstanding 26,374,218 shares of Fresenius USA Common Stock and options
  or warrants with respect to 2,636,626 shares of Fresenius USA Common
  Stock. On this basis, assuming that there are no Fresenius USA Dissenting

                                   60

<PAGE>  85

   Stockholders and that each option with respect to Fresenius USA Common
   Stock is converted into an option with respect to FMC Ordinary Shares,
   and that Fresenius USA effects certain securities repurchases (see "--
   Additional Agreements of Fresenius USA"), holders of shares of (and
   options and warrants with respect to) Fresenius USA Common Stock will be
   allocated approximately 4.9% of the FMC Ordinary Shares.

GENERAL

- In lieu of fractional FMC Ordinary Shares or ADSs, each person who would
  otherwise have been entitled to a fraction of an FMC Ordinary Share or
  ADS will be paid an amount in cash (without interest) equal to such
  holder's proportionate interest in the net proceeds from the sale in the
  open market by the Exchange Agent appointed by Fresenius Medical Care
  with the approval of Grace and Fresenius AG, on behalf of all such
  holders, of the aggregate fractional FMC Ordinary Shares or ADSs issued.

- Each share of Grace Common Stock owned by Fresenius AG or its
  subsidiaries, Fresenius USA or its subsidiaries or any Grace subsidiary,
  or held in Grace's treasury, will be cancelled and retired without
  payment of any consideration therefor and will cease to exist. As of July
  26, 1996, Fresenius USA owned one share of Grace Common Stock.

- Each share of Fresenius USA Common Stock owned by Grace or its
  subsidiaries, Fresenius AG or its subsidiaries, or any Fresenius USA
  subsidiary, or held in Fresenius USA's treasury, will be cancelled and
  retired without payment of any consideration therefor (except for the
  consideration set forth above) and will cease to exist. As of July 15,
  1996, Grace owned no shares of Fresenius USA Common Stock.

EFFECTIVE TIME

XXX-001902

The Reorganization Agreement provides that the Fresenius USA Merger will become effective on the date and at the time on which articles of merger respecting the Fresenius USA Merger containing the provisions required by, and executed in accordance with, Massachusetts law are accepted for filing with the Office of the Secretary of State of the Commonwealth of Massachusetts (or such later date and time as may be specified in the articles of merger in accordance with applicable law). The Reorganization Agreement provides that the Grace Merger will become effective at the Effective Time in accordance with New York law. Subject to shareholder approval and other conditions, it is intended that the Reorganization will be consummated as promptly as practicable following the Special Meetings. While it is contemplated that such consummation will occur following the date of the Special Meetings and prior to October 1, 1996, there can be no assurance as to whether or when the Reorganization will occur. See "-- Conditions."

RECOMMENDATION OF THE GRACE BOARD; NON-SOLICITATION

    RECOMMENDATION

    The Reorganization Agreement provides that the Grace Board will recommend approval and adoption of the Reorganization Agreement and the transactions contemplated thereby and will take all lawful action to solicit such approval and adoption by shareholders. However, the Reorganization Agreement provides that the Grace Board may fail to make such a recommendation, or withdraw, modify or change any such recommendation, or recommend any other offer or proposal, if the Grace Board, based on the opinion of its outside counsel, determines that making such recommendation, or the failure to recommend any other offer or proposal, or the failure to so withdraw, modify or change its recommendation, or the failure to recommend any other offer or proposal, could reasonably be deemed to cause the members of the Grace Board to breach their fiduciary duties under applicable law in connection with a written offer or written proposal which, based upon the identity of the person or entity making such offer or proposal and the terms thereof, and the availability of adequate financing therefor, the Grace Board believes, in the good faith exercise of its business judgment and based upon advice of its outside legal and financial advisors, could reasonably be expected to be consummated and represents a transaction more favorable to its shareholders than the Reorganization (a "Higher Offer").

                                    61

<PAGE>    86

In such event, notwithstanding anything contained in the Reorganization Agreement to the contrary, any such failure to recommend, or any withdrawal, modification, or change of recommendation or any recommendation of such other offer or proposal, or the entering by Grace into an agreement with respect to a Higher Offer (provided that Grace provided Fresenius AG with at least 72 hours' notice of its intention to enter into such an agreement and the identity of the other party thereto), will not constitute a breach of the Reorganization Agreement by Grace but may obligate Grace to pay a termination fee to Fresenius AG. See "-- Termination Fees."

    NON-SOLICITATION

    The Reorganization Agreement provides that each of Grace and Fresenius AG will not, and will use its best efforts to cause its employees, agents and representatives not to, initiate, solicit or encourage, directly or indirectly, any inquiries or the making or implementation of any proposal or offer with respect to a merger, acquisition, consolidation or similar transaction involving, or any purchase of all or any significant portion of the assets or any equity securities of, it or any of its subsidiaries (an "Acquisition Proposal") or engage in any negotiations concerning, or provide any confidential information or data to, or have any discussions with, any person relating to an Acquisition Proposal. However, the Grace Board may furnish or cause to be furnished information (pursuant to confidentiality arrangements) and may participate in such discussions and negotiations directly or through its representatives if (a) the failure to provide such information or participate in such negotiations and discussions could, in the opinion of the Grace Board, reasonably be deemed to cause the members of the Grace Board to breach their fiduciary duties under applicable law, or (b) another corporation, partnership, person or other entity or group makes a Higher Offer. The foregoing restriction does not apply to an Acquisition Proposal exclusively involving all or part of the stock or assets of Grace Chemicals.

TERMINATION FEES

    The Reorganization Agreement provides that in the event that: (a) the Reorganization Agreement is terminated (i) by the Grace Board on grounds that the Grace Board fails to recommend approval, or withdraws, modifies or changes its recommendation, or (ii) after Grace enters into an agreement with respect to a Higher Offer, or (iii) because Grace shareholders do not approve the Reorganization at the Grace Special Meeting and, at or prior to the time of the Grace Special Meeting, the Grace Board failed to recommend approval to its shareholders, or withdraws, modifies or changes such recommendation, or (iv) because Grace shareholders do not approve the transaction at the Grace Special Meeting and, at or prior to the time of the Grace Special Meeting, an Acquisition Proposal was made that became public and, within six months following such termination, Grace enters into a definitive agreement with respect to the sale of Grace's health care business; and (b) at the time of such termination, neither Fresenius AG nor Fresenius USA is in material breach of the Reorganization Agreement; then, Grace will pay Fresenius AG a fee of $75 million plus actual out-of-pocket expenses incurred after signing (although Grace will not be responsible for the expenses of Fresenius USA). Pursuant to an agreement between Fresenius AG and Fresenius USA, Fresenius USA is entitled to 34% of any such termination fee.

XXX-001903

EXPENSES

    Except as set forth above, the Reorganization Agreement provides that,
whether or not the Reorganization is consummated, all costs and expenses
incurred in connection therewith will be paid by the party incurring such
expense, except that, if the Reorganization shall be consummated, certain
enumerated costs and expenses will be borne by Fresenius Medical Care. Pursuant
to the terms of the Supplemental Agreement, if the Reorganization is not
consummated, Fresenius USA shall bear 34% of the aggregate costs and expenses of
Fresenius AG and Fresenius USA. The foregoing expense sharing arrangement shall
be void if immediately prior to the Effective Time, the number of Fresenius USA
Common Share Equivalents exceeds 9,253,331. On July 29, 1996, the number of
Fresenius USA Common Share Equivalents was 10,572,299. See "-- Additional
Agreements of Fresenius USA" for the anticipated number of Fresenius USA Common
Share Equivalents immediately prior to the Effective Date.

                                    62

<PAGE>    87

TERMINATION

    The Reorganization Agreement may be terminated, and the Reorganization may
be abandoned, at any time prior to the Effective Time, before or after the
approval and adoption by the shareholders of Grace, Fresenius AG and/or
Fresenius USA, by the mutual consent of Grace and Fresenius AG, by action of
their respective Boards of Directors.

    The Reorganization Agreement may be terminated, and the Reorganization may
be abandoned, by action of the Board of Directors of Grace or Fresenius AG, if
(a) the Reorganization is not consummated by October 1, 1996 or, (b) at the
Grace Special Meeting or at any adjournment thereof, the approval of Grace's
shareholders, or, at a meeting of Fresenius AG shareholders or any adjournment
thereof, the approval of Fresenius AG's shareholders, is not obtained. On April
11, 1996, approval of the shareholders of Fresenius AG was obtained.

    The Reorganization Agreement may be terminated and the Reorganization may
be abandoned at any time prior to the Effective Time, before or after the
approval and adoption by shareholders of Grace, by action of the Grace Board, if
(a) either Fresenius AG or Fresenius USA fails to comply in any material respect
with any of the covenants or agreements contained in the Reorganization
Agreement to be performed by Fresenius AG or Fresenius USA at or prior to the
time of termination, which failure is not cured or capable of being cured within
30 days after notice thereof, or (b) the Grace Board fails to recommend to its
shareholders the approval of the transactions contemplated by the Reorganization
Agreement, or withdraws, modifies or changes such recommendation, in either case
in a manner permitted by the Reorganization Agreement, or (c) Grace enters into
an agreement with respect to a Higher Offer.

    The Reorganization Agreement may be terminated and the Reorganization may
be abandoned at any time prior to the Effective Time by action of the Fresenius
AG Board of Directors, if (a) Grace fails to comply in any material respect with
any of the covenants or agreements contained in the Reorganization Agreement to
be performed by it at or prior to the time of termination, which failure is not
cured or capable of being cured within 30 days after notice thereof, or (b) the
Grace Board fails to recommend to its shareholders the approval of the
transactions contemplated by the Reorganization Agreement or withdraws, modifies
or changes in a manner materially adverse to Fresenius AG or Fresenius USA its
approval or recommendation of the Reorganization Agreement.

    In the event of termination of the Reorganization Agreement and the
abandonment of the Reorganization as set forth above, other than as set forth
above regarding termination fees, neither Grace nor Fresenius AG (or any of
their respective directors or officers) will have any liability or further
obligation to any other party, except that the Reorganization Agreement does not
relieve any party from liability for any material and willful breach of any
covenant.

CONDUCT OF BUSINESS PRIOR TO EFFECTIVE TIME; CERTAIN COVENANTS

    INTERIM OPERATIONS

    The Reorganization Agreement provides that each of Grace (only with respect
to the operations of NMC) and Fresenius AG (for itself and on behalf of
Fresenius USA) through the Effective Time, subject to certain exceptions, will
conduct its business in the ordinary and usual course, consistent with past
practice and existing business plans, and use all reasonable efforts to preserve
its business organization intact and maintain existing relations with customers,
suppliers, employees and business associates. In addition, the Reorganization
Agreement contains certain covenants on behalf of such parties governing
operations through the Effective Time as are customary for transactions of such
nature.

    CERTAIN TRANSACTIONS

    The Reorganization Agreement provides that: (a) prior to the Distribution,
(i) Grace and Grace Chemicals will use reasonable efforts to cause NMC to
arrange new credit facilities so that the Reorganization may be consummated,
(ii) Fresenius AG will use reasonable efforts to arrange new credit facilities
for Fresenius Worldwide Dialysis so that the Reorganization may be consummated,
and (iii) the parties will cooperate with respect to the foregoing; (b) prior to
or concurrent with the Reorganization, Grace and Fresenius AG will use
reasonable efforts to satisfy the conditions to the Reorganization Agreement;
(c) at the

XXX-001904

63

<PAGE>  88

Effective Time, none of Grace, Fresenius Worldwide Dialysis or Fresenius USA will have cash or marketable securities, it being contemplated that, in connection with the Reorganization, such cash and marketable securities will be transferred to Grace Chemicals and Fresenius AG, respectively, and that new working capital facilities to finance working capital needs will be obtained; (d) it is the intention of the parties that (i) Fresenius Medical Care will pay dividends to the holders of its outstanding ordinary shares beginning in 1997, subject to the approval of such dividends by the shareholders of Fresenius Medical Care, and (ii) Fresenius Medical Care (or its subsidiary) will lease real property and buildings located in Germany from Fresenius AG, for a total rental of $12 million per year beginning in January 1997; and (e) following the Reorganization, it is the intention of the parties that Fresenius Medical Care will seek to refinance up to $700 million of credit facilities through the sale of preferred securities which will be primarily "mezzanine" capital, which could be classified as equity under German GAAP and the interest on which would be tax deductible, but the sale (or commitments for sale) of such preferred securities are not a condition to the consummation of the Reorganization.

   FILINGS; OTHER ACTIONS

      The Reorganization Agreement contains certain covenants regarding making required securities laws filings, and otherwise cooperating, with respect to regulatory notifications and approvals. Each of Grace and Fresenius AG will cooperate with each other and promptly take or cause to be taken all actions and do or cause to be done all things necessary, proper or advisable to obtain favorable review of the proposed transaction under the HSR Act and any foreign antitrust or competition laws, which efforts will include, without limitation, undertaking litigation and/or agreeing to hold aside or divest, or enter into any conduct restriction with respect to, any asset or business to be part of Fresenius Medical Care after the Effective Time (all such decisions to be made by the parties in consultation with one another, taking into consideration the effect on Fresenius Medical Care). However, the foregoing does not require that any action be taken with respect to (or by) Grace Chemicals or its businesses. In addition, Grace is not required to commit to any action that is to be taken prior to the Effective Time.

      The Reorganization Agreement contains certain covenants regarding mutual access to properties and records, notification of certain matters and consultation respecting publicity.

   RIGHTS AGREEMENT AND ANTI-TAKEOVER STATUTES

      The Grace Board will take all requisite action in order to render the Amended and Restated Rights Agreement between Grace and Manufacturers Hanover Trust Company, dated June 7, 1990 (the "Grace Rights Agreement"), which provides holders of Grace Common Stock with common stock purchase rights ("Grace Rights"), and any applicable state anti-takeover statute inapplicable to the Grace Merger and the other transactions contemplated by the Reorganization Agreement and the Distribution Agreement and to extinguish the Grace Rights in connection with the Reorganization.

   SECURITIES ACT COMPLIANCE

      As soon as practicable after the Special Meetings, each party to the Reorganization Agreement will identify to Fresenius Medical Care all persons who were, at the time of the Special Meetings, possible Affiliates (as defined in the Reorganization Agreement), will use its reasonable efforts to obtain a written agreement in the usual and customary form from each person who is so identified as a possible Affiliate and will deliver such written agreements to Fresenius Medical Care as soon as practicable after the Special Meetings.

   STOCK EXCHANGE LISTING

      Prior to the Effective Time, Fresenius AG will use reasonable efforts to cause the Deposit Agreement, between Fresenius Medical Care, the holders of ADRs and the Depositary (including any exhibits thereto, the "Deposit Agreement") and the listing of the ADSs on the NYSE or the Nasdaq Stock Market to become effective.

64

<PAGE>  89

EMPLOYEE BENEFITS

      The Reorganization Agreement provides that all Grace employees who are actively employed by NMC or its subsidiaries at the Effective Time (including any NMC employees who are receiving long-term disability as of the Effective Time) will receive compensation and benefits (including, without limitation, severance benefits and retiree benefits) substantially the same as those provided to such employees prior to the Effective Time. In addition, the Reorganization Agreement provides that Grace employees will be given service credit for all periods of employment with Grace or its affiliates prior to the Effective Date for purposes of eligibility and vesting (but not for benefit accrual) under any plan adopted by Fresenius Medical Care or any of its subsidiaries or affiliates with respect to such employees to provide retirement or welfare benefits. The Reorganization Agreement provides that, following the Effective Time, NMC and FNMC, and not New Grace or Grace Chemicals, will bear any costs and expenses associated with the termination of employees involved in NMC's business.

XXX-001905

As of July 15, 1996, there were outstanding employee stock options to purchase approximately 4.7 million shares of Grace Common Stock. Of these, options to purchase approximately 231,000 shares are held by persons who are employees of NMC or a subsidiary, and the balance is held by individuals who will become employees of New Grace or a subsidiary. Employee stock options with respect to Grace Common Stock held by individuals who will be employees of New Grace or a subsidiary thereof following the Distribution will be converted in the Distribution into employee stock options with respect to New Grace Common Stock, with the numbers of shares subject to such options, and the exercise prices thereof, adjusted to preserve the value of such options; and employee stock options with respect to Grace Common Stock held by persons who are employees of NMC or a subsidiary thereof following the Distribution will remain employee stock options with respect to Grace Common Stock (and, in turn, will become options with respect to FMC Ordinary Shares), with the numbers of shares subject to such options, and the exercise prices thereof, adjusted to preserve the value of such options. As of July 23, 1996 there are outstanding employee stock options and certain other options to purchase 886,626 shares of Fresenius USA Common Stock. Such Grace options and such Fresenius USA options (other than options issued under the Fresenius USA Non-Employee Directors Stock Option Plan, which will lapse if not exercised prior to the closing of the Reorganization) will be exchanged in the Grace Merger and the Fresenius USA Merger into equivalent options with respect to FMC Ordinary Shares. In the case of options to purchase Fresenius USA Common Stock and options to purchase Grace Common Stock held by employees of Fresenius USA or NMC, respectively, FMC Ordinary Shares cannot, under German corporate law, be reserved by Fresenius Medical Care and issued upon the exercise of the options, as is done by U.S. corporations. Instead, the FMC Ordinary Shares issuable upon exercise of the options will be issued to Fresenius AG upon the closing of the Reorganization, which will hold the shares pending exercise of the options. Fresenius AG has agreed that it will not exercise voting power, and will return any dividends paid, with respect to the FMC Ordinary Shares underlying options formerly relating to Grace Common Stock. Upon exercise of any of these options, the option exercise price will be paid to Fresenius Medical Care and Fresenius AG will deliver the FMC Ordinary Shares to the Depositary against issuance of ADRs representing ADSs in the name of the option holder. Upon cancellation or expiration without exercise of options formerly relating to Grace Common Stock, the underlying FMC Ordinary Shares held by Fresenius AG will be transferred to Fresenius Medical Care at no cost to it. Upon cancellation or expiration without exercise of options formerly relating to Fresenius USA Common Stock, the underlying FMC Ordinary Shares will revert to Fresenius AG.

CONDITIONS

The respective obligations of the parties to consummate the Reorganization are subject to a number of conditions, including the following: (a) approval by the Grace shareholders of the Reorganization Agreement and the transactions contemplated thereby, (b) approval by the Fresenius AG shareholders of the Reorganization Agreement and the transactions contemplated thereby, (c) expiration or termination of the waiting period applicable to the Reorganization under the HSR Act, (d) receipt of all material governmental, regulatory and third-party consents, approvals and authorizations, (e) there being in effect no statute, rule, regulation, judgment, decree, injunction or other order of a federal or state court or other Governmental Entity (as

65

<PAGE>  90

defined in the Reorganization Agreement) which prevents the consummation of the transactions contemplated by the Reorganization Agreement, (f) the receipt by Grace of certain legal opinions related to tax matters, (g) the effectiveness of the Registration Statement and the New Grace Prospectus and no stop order suspending such effectiveness being in effect, (h) receipt of necessary financing on terms satisfactory to Grace and Fresenius AG, (i) the Distribution of New Grace having been consummated, (j) the Deposit Agreement and the listing of ADSs on the NYSE or the Nasdaq Stock Market each becoming effective, and (k) the Debt of Fresenius Worldwide Dialysis and Grace being at levels not in excess of the levels set forth in the Reorganization Agreement. All conditions to the Reorganization may be waived by the relevant party, but neither Grace nor Fresenius AG expects to waive any material conditions.

For purposes of the Reorganization Agreement, "Debt" means: (a) all obligations for borrowed money, whether or not represented by a note, bond or debenture, (b) off balance sheet financing including, without limitation, off balance sheet receivables financing at NMC, (c) any obligation created or arising under any conditional sale agreement or other title retention agreement that is treated as a liability on a balance sheet prepared in accordance with US GAAP, (d) the portion of the obligations with respect to capital leases that is properly classified as a liability on a balance sheet prepared in accordance with US GAAP, (e) a reasonable estimate, to be agreed by Fresenius AG and Grace of the amounts payable in respect of dissenting shares of Fresenius USA or Grace, as the case may be, (f) any obligation owed in respect of the deferred purchase price of property (excluding any obligations incurred in the ordinary course of business), and (g) the liquidation preference of, and accrued dividends on, shares of Grace Preferred Stock outstanding at the Effective Time (other than the New Preferred Shares).

The obligation of Grace to consummate the Reorganization is also subject to the fulfillment or waiver by Grace, prior to the Closing Date (as defined in the Reorganization Agreement), of each of the following conditions: (a) the truthfulness and correctness in all material respects of the representations and warranties of each of Fresenius AG and Fresenius USA (the "Fresenius Parties") set forth in the Reorganization Agreement, (b) the performance by each Fresenius Party in all material respects of all obligations required to be performed by it under the Reorganization Agreement at or prior to the Closing Date, (c)

XXX-001906

Fresenius AG having entered into the Pooling Agreement, and Grace having received an opinion of nationally recognized counsel, dated the Closing Date, to the effect that it is valid, binding and enforceable, (d) the receipt by Grace of an opinion, dated the Closing Date, to the effect that Fresenius Medical Care has no liability with respect to the restructuring of Fresenius AG and the Contribution under the Code and applicable German law, and (e) there not having occurred any change or any development or combination of developments which, individually or in the aggregate, resulted or is reasonably likely to result in a material adverse effect on the properties, business, financial condition, results of operations or prospects of New Grace and its subsidiaries taken as a whole, or any condition to the Distribution contained in the Distribution Agreement failing to be satisfied.

     In addition, the obligation of Fresenius AG to consummate the Reorganization is also subject to the fulfillment or waiver by Fresenius AG, prior to the Closing Date, of each of the following conditions: (a) the truthfulness and correctness in all material respects of the representations and warranties of Grace set forth in the Reorganization Agreement, (b) the performance by each of Grace and New Grace in all material respects of all obligations required to be performed by it under the Reorganization Agreement or the Distribution Agreement at or prior to the Closing Date, and (c) Fresenius AG having entered into the Pooling Agreement, and Fresenius USA having received an opinion of nationally recognized counsel, dated the Closing Date, to the effect that the Pooling Agreement is valid, binding and enforceable.

     It is a condition to the consummation of the Reorganization that the waiting period under the HSR Act, shall have expired or terminated. Under the HSR Act, certain transactions, including the Reorganization, may not be consummated unless certain notification and waiting period requirements have been satisfied. On March 11, 1996, each of Grace and Fresenius AG filed a Premerger Notification and Report Form pursuant to the HSR Act with the U.S. Department of Justice (the "DOJ") and the FTC. The required waiting period for the Reorganization under the HSR Act was extended by a Request for Additional Information and Documentary Material issued by the FTC on April 10, 1996. On July 25, 1996, the FTC accepted for public comment an Agreement Containing Consent Order with Fresenius AG and Fresenius USA, and the HSR Act waiting period terminated on July 26, 1996. Following the public comment period, the FTC may either take

                              66

<PAGE>    91

steps to enter a final order or withdraw acceptance of the Agreement Containing Consent Order. Unless acceptance is withdrawn by the FTC, the Agreement Containing Consent Order will require the divestiture of Fresenius USA's dialysate concentrate manufacturing facility in Lewisberry, Pennsylvania. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Business of Fresenius USA -- Properties." At any time before or after the Effective Time, the FTC, the DOJ or others could take action under the antitrust laws with respect to the Mergers, including seeking to enjoin the consummation of the Mergers, to rescind the Mergers, or to require divestiture of substantial assets of Grace, Fresenius USA or Fresenius Medical Care. There can be no assurance that the Mergers will not be challenged on antitrust grounds, or, if such a challenge is made, that it would not be successful. See " -- Conditions." Further, under the antitrust and competition laws of other jurisdictions, including Germany, the Reorganization will be subject to approval by national authorities.

     Under Germany's Law Against Restraints of Competition, Fresenius AG and NMC have filed for premerger clearance with the FCO. The FCO has granted clearance subject to the divestiture prior to the consummation of the Reorganization of Schiwa and Rena-Med, German subsidiaries of Fresenius AG and Grace, respectively, whose products include dialysate concentrates. Efforts are underway to divest Schiwa and Rena-Med. The costs and proceeds of the disposition of Rena-Med will be for the account of Fresenius Medical Care. The costs of the disposition of Schiwa will be for the account of Fresenius AG, and the Schiwa net assets of $2.806 million and any gains on the disposition of those assets will be retained by Fresenius AG. See Note 9 to the Fresenius Medical Care AG Unaudited Pro Forma Condensed Combined Financial Information.

     Grace and Fresenius AG have agreed in the Reorganization Agreement, subject to certain exceptions, promptly to take all actions and do all things necessary, proper or advisable to obtain favorable review of the Reorganization and related transactions under the HSR Act and under any foreign antitrust or competition laws. There can be no assurance that such approvals will be obtained. See "THE REORGANIZATION -- Conditions."

     Other.  It is a condition to the Reorganization that all filings, consents, approvals and authorizations required to be made or obtained in connection with the Reorganization be made or obtained from the applicable governmental or regulatory authority, agency, court or other entity, domestic or foreign, prior to the Effective Time. In this regard, it should be noted that certain regulatory approvals may be required by state and local authorities and by certain government agencies which regulate the health care business. NMC and Fresenius Worldwide Dialysis are working toward obtaining all such consents and approvals and expect that such consents and approvals will be obtained.

WAIVER AND AMENDMENT

     The conditions to each party's obligation to consummate the Reorganization are for the sole benefit of such party and may be waived by such party, in whole or in part, to the extent permitted by applicable law. Subject to the applicable provisions of the NYBCL and the MBCL, at any time prior to the Effective Time, the parties to the Reorganization Agreement may modify or amend the Reorganization Agreement by written agreement executed and delivered by duly

XXX-001907

authorized officers of the respective parties.

THE CONTRIBUTION AGREEMENT

The Contribution Agreement provides, among other things, that prior to the
Effective Time, Fresenius AG will contribute its worldwide dialysis business to
Fresenius Medical Care, retain and lease to Fresenius Medical Care certain real
property and buildings in Germany, and license to Fresenius Medical Care the
"Fresenius" name and mark and the "F" logo. Subject to certain limitations, the
Contribution Agreement also provides that Fresenius AG will indemnify, defend
and hold harmless New Grace from and against losses other than losses arising
from Fresenius Worldwide Dialysis, losses arising from or relating to litigation
brought by Fresenius USA stockholders relating to the Reorganization and certain
losses relating to this Joint Proxy Statement-Prospectus.

The Contribution Agreement provides that Fresenius AG will contribute to
Fresenius Medical Care all the property and assets (including intangible assets,
goodwill and leaseholds) of its worldwide dialysis business

                                  67

<PAGE>   92

which are reflected on its consolidated balance sheet, prepared according to US
GAAP, contained in the Fresenius Worldwide Dialysis audited financial statements
(including any related notes and schedules) or otherwise predominately relating
to or predominately used or useful in the business and operations of Fresenius
Worldwide Dialysis (other than the property subject to the Lease), plus (i) all
property and assets which have been or will be acquired in the ordinary course
of business since the date of the balance sheet, less (ii) any property and
assets which have been or will be disposed of or consumed in the ordinary course
of business since the date of the balance sheet.

THE DISTRIBUTION AGREEMENT

Grace and Grace Chemicals have entered into the Distribution Agreement
which provides for, among other things, the principal corporate transactions
required to effect the Distribution, the conditions thereto and certain other
agreements governing the Reorganization.

Subject to certain exceptions, the Distribution Agreement provides for
certain cross-indemnities designed principally to place financial responsibility
for the liabilities of Grace's health care businesses with NMC (including,
without limitation, all liabilities relating to compliance or non-compliance
with U.S. food and drug law, medical and Medicare billing and reimbursement law,
other health care matters, and all liabilities relating to the OIG
Investigation); and to place financial responsibility for the liabilities of
Grace and its other subsidiaries with Grace Chemicals (including, without
limitation, liabilities relating to the manufacture or sale of
asbestos-containing materials by any Grace Chemicals business). The Distribution
Agreement also provides for cross-indemnities in respect of losses arising out
of or based on any untrue or allegedly untrue statement or omission of a
material fact required to be stated in certain registration statements. In
addition, the Distribution Agreement provides for cross-indemnities respecting
losses arising out of or relating to the new credit facilities, debt instruments
and securities obtained in connection with the Reorganization. Under the
Distribution Agreement, NMC, and the members of its group, may not settle or
compromise any matters relating to NMC's business, including any aspect of the
OIG investigation, unless the terms of such settlement or compromise include an
unconditional release of Grace Chemicals, and the members of its group, from all
liability in respect thereof.

In connection with the Distribution, the Distribution Agreement provides
that Grace and Grace Chemicals will cooperate, and will cause their respective
groups to cooperate, to terminate, to cause Grace to be substituted in all
respects for Grace Chemicals, and to cause Grace Chemicals to be substituted in
all respects for Grace, in respect of all obligations, if any, under any loan,
financing, lease, contract, or other obligation in existence as of the Time of
Distribution pertaining to Grace or Grace Chemicals for which Grace or Grace
Chemicals may be liable, as guarantor, original tenant, primary obligor or
otherwise. The failure to do so will require cross-indemnification with respect
to any losses arising from or relating thereto.

THE GRACE TAX SHARING AND INDEMNIFICATION AGREEMENT

Pursuant to a tax sharing and indemnification agreement (the "Grace Tax
Sharing and Indemnification Agreement"), each of Grace, Grace Chemicals and NMC
will be responsible for its allocable share of tax liabilities before and after
the Grace Merger. The Grace Tax Sharing and Indemnification Agreement provides
that Grace Chemicals will be entitled to receive and retain all refunds of taxes
with respect to periods beginning after the Time of Distribution which are
attributable to the New Grace businesses. The Grace Tax Sharing and
Indemnification Agreement further provides that NMC will be entitled to receive
and retain all refunds of taxes with respect to periods beginning after the Time
of Distribution which are attributable to the NMC businesses. Grace Chemicals
and Grace will also indemnify each other from and against any payment required
to be made as a result of a breach of the Grace Tax Sharing and Indemnification
Agreement. In particular, Grace Chemicals will indemnify FNMC and its affiliates
against any tax liability resulting from the Distribution's failure to qualify
under Section 355 of the Code or the Grace Merger's failure to qualify under
Section 368 of the Code, unless such failure is due to either a breach by
Fresenius AG or FNMC of any obligations under the Grace Tax Sharing and
Indemnification Agreement or an impermissible transaction in the stock or assets
of FNMC or its subsidiaries (including NMC and its subsidiaries.)

XXX-001908

68

<PAGE>   93

THE FRESENIUS TAX INDEMNIFICATION AGREEMENT

     Pursuant to a tax indemnification agreement (the "Fresenius Tax
Indemnification Agreement"), Fresenius AG will agree to indemnify, defend and
hold harmless Grace, Grace Chemicals, Fresenius Medical Care and Fresenius
Medical Care's subsidiaries from and against certain tax liabilities resulting
from the Contribution or the Fresenius USA Merger, or arising out of, relating
to or associated with any business or assets of Fresenius AG or its subsidiaries
other than Fresenius Worldwide Dialysis assets or FWD Business Subsidiaries.
"FWD Business Subsidiaries" means all subsidiaries of Fresenius AG and all other
entities in which Fresenius AG holds any direct or indirect equity interest
other than Fresenius USA and its subsidiaries, which conduct any of Fresenius
Worldwide Dialysis' business.

ADDITIONAL AGREEMENTS OF FRESENIUS USA

     At the time of the Fresenius USA Board's approval of the Reorganization and
the transactions contemplated thereby, Fresenius USA entered into two
agreements. Pursuant to an agreement among Fresenius AG, Fresenius USA and Grace
(the "Joinder Agreement"), Fresenius USA undertook the obligations of a party to
the Reorganization Agreement and, for itself, made directly to Grace certain
representations and warranties, including the representations and warranties in
the Reorganization Agreement with respect to Fresenius USA. Under the Joinder
Agreement, Fresenius USA's undertaking and its representations and warranties
made therein shall be null and void if, immediately prior to the effective time
of the Fresenius USA Merger, the number of Fresenius USA Common Share
Equivalents exceeds 9,253,331. On the Fresenius USA Record Date, the number of
Fresenius USA Common Share Equivalents was 10,572,299. Effective July 10, 1996,
Fresenius AG and Fresenius USA entered into a letter of intent with Abbott
Laboratories ("Abbott") providing for the repurchase by Fresenius USA of
warrants to purchase 875,000 shares of Fresenius USA Common Stock held by
Abbott. See "FRESENIUS USA EXECUTIVE COMPENSATION -- Securities Repurchases."
Upon consummation of the repurchase of such warrants from Abbott and the
repurchase of additional options held by Dr. Ben J. Lipps, President and Chief
Executive Officer of Fresenius USA (which Fresenius USA expects will occur prior
to closing), the number of Fresenius USA Common Share Equivalents will be
9,253,331 or less. The Joinder Agreement also reduced the minimum percentage of
FMC Ordinary Shares required to be held by Fresenius AG upon consummation of the
Reorganization from 51% to 50.3%.

     Pursuant to a separate agreement between Fresenius AG and Fresenius USA
(the "Supplemental Agreement"), Fresenius USA and Fresenius AG agreed that
liquidated damages payable to Fresenius AG under the Reorganization Agreement
(see "THE REORGANIZATION -- Termination Fees") would be payable $49.5 million to
Fresenius AG and $25.5 million to Fresenius USA and that, if the Reorganization
is not consummated, Fresenius AG and Fresenius USA will bear 66% and 34%,
respectively, of their aggregate costs and expenses. The Supplemental Agreement
also confirms certain understandings of Fresenius USA and Fresenius AG relating
to the determination of the exchange ratio of FMC Ordinary Shares for Fresenius
USA Common Stock, including Fresenius USA's intention to repurchase sufficient
vested and unvested stock purchase options held by Fresenius USA employees and
other equity securities of Fresenius USA so that, immediately prior to the
Fresenius USA Merger, there shall be no more than 9,253,331 Fresenius USA Common
Share Equivalents. Such sharing arrangements and understandings will also be
null and void if immediately prior to the Effective Time, the number of
Fresenius USA Common Share Equivalents exceeds 9,253,331.

     The summaries of the Joinder Agreement and the Supplemental Agreement set
forth above are qualified in their entirety by reference to such agreements,
which are attached as Appendices H and I, respectively, to this Joint Proxy
Statement-Prospectus. All shareholders are urged to read such agreements in
their entirety.

     The invalidation of Fresenius USA's obligations under the Joinder Agreement
and the Supplemental Agreement would not affect Fresenius AG's obligations under
the Reorganization Agreement to cause the Fresenius USA Board to adopt, approve
and ratify the Reorganization Agreement and the other Transaction Agreements, to
submit the Fresenius USA Merger to a vote of holders of Fresenius USA Common
Stock and to vote its shares of Fresenius USA Common Stock in favor of the
Fresenius USA Merger.

69

<PAGE>   94

CONTINUING ARRANGEMENTS BETWEEN FRESENIUS MEDICAL CARE AND FRESENIUS AG

     In connection with the Reorganization, Fresenius Medical Care and Fresenius
AG will enter into several agreements for the purpose of giving effect to the
Reorganization and defining their ongoing relationship. These agreements were
negotiated between Fresenius AG and Grace. The following sets forth the material
aspects of certain agreements, arrangements and transactions between Fresenius
Medical Care and Fresenius AG. Certain of these agreements have been filed as
exhibits to the Registration Statement. The following descriptions are not
complete and are qualified in their entirety by reference to such exhibits. For
a description of certain other continuing arrangements set forth in the
Contribution Agreement among Fresenius AG, Fresenius Medical Care and Grace
Chemicals and in the Distribution Agreement among Grace, Grace Chemicals and
Fresenius AG, see "-- The Contribution Agreement" and " -- The Distribution
Agreement." Fresenius AG intends that the Lease, the Supply Agreements and the
Services Agreements shall be no less favorable to Fresenius Medical Care and
Fresenius AG than would have been obtained in arm's-length bargaining between

XXX-001909

independent parties. The trademark and other intellectual property agreements
summarized below were negotiated as part of the overall Reorganization, and,
taken independently, are not necessarily indicative of market terms.

REAL PROPERTY LEASE

The land and buildings in Germany used by Fresenius Worldwide Dialysis will
not be transferred to Fresenius Medical Care. Fresenius AG will lease certain of
such real property to Fresenius Medical Care (or its affiliates) directly and
will transfer the remainder of such real property to two limited partnerships,
the sole limited partner of each of which, and sole shareholder of the general
partner of each of which, will be Fresenius AG (such leases collectively are
referred to as the "Leases"). These limited partnerships, as landlords, will
lease such properties to Fresenius Medical Care and to Fresenius AG, as
applicable, for use in their respective businesses. The aggregate annual rent
payable by Fresenius Medical Care under the Leases will be 16.8 million
Deutschemarks (which was approximately $11,273,000 as of July 23, 1996),
exclusive of maintenance and other costs, and will be subject to escalation
based upon the German cost of living index for a four-person employee household.
The Leases for manufacturing facilities will have a ten-year term, followed by
two successive optional renewal terms of ten years each at the election of
Fresenius Medical Care. The Leases for the other facilities will have a term of
ten years. Based upon an appraisal, Fresenius AG believes that the rents under
the Leases represent fair market value for such properties. For information with
respect to Fresenius AG's principal properties in Germany, see "BUSINESS OF
FRESENIUS MEDICAL CARE -- Business of Fresenius Worldwide
Dialysis -- Properties."

COVENANTS NOT TO COMPETE

On or before the Effective Date, each of Fresenius AG and Grace will agree
that, for a period of ten years after the consummation of the Reorganization, it
will not compete with Fresenius Medical Care in any aspect of the business of
supplying renal care-related goods and services, including laboratories (the
"Renal Business"), as interpreted by reference to the Reorganization Agreement,
the Distribution Agreement and the Contribution Agreement; provided, that in any
event Fresenius AG may continue its home care business. The interpretation of
the meaning of "Renal Business" by reference to the Reorganization Agreement,
the Distribution Agreement and the Contribution Agreement will also apply to the
licenses of intellectual property for use in the Renal Business that are
described below (see "-- Trademarks" and "-- Other Intellectual Property").

TRADEMARKS

After the Reorganization, Fresenius AG will continue to own the name and
mark "Fresenius" and the "F" logo. On or before the Effective Date, Fresenius AG
and Fresenius Medical Care will enter into agreements containing the following
provisions. Fresenius AG will grant to Fresenius Medical Care an exclusive,
worldwide, royalty-free, perpetual license (i) to use "Fresenius Medical Care"
in its corporate names, and (ii) to use the Fresenius marks (including certain
combination marks containing the Fresenius name that are used by Fresenius
Worldwide Dialysis), and the Fresenius Medical Care name as a trade name,

70

<PAGE>  95

in all aspects of the Renal Business (see "-- Covenants Not to Compete").
Fresenius Medical Care will also be granted a worldwide, royalty-free, perpetual
license (i) to use the "Fresenius Medical Care" mark in the current NMC business
other than the Renal Business (the "Other NMC Business") if it is used as part
of "Fresenius Medical Care" together with one or more descriptive words (for
example, "Fresenius Medical Care Home Care" or "Fresenius Medical Care
Diagnostics"), (ii) to use the "F" logo mark in the Other NMC Business with the
consent of Fresenius AG, which consent will not be unreasonably withheld if the
mark includes one or more additional descriptive words or symbols, and (iii) to
use "Fresenius Medical Care" as a trade name in both the Renal Business and the
Other NMC Business. Fresenius Medical Care will have the right to use "Fresenius
Medical Care" as a trade name in other medical businesses only with the consent
of Fresenius AG, which consent will not be unreasonably withheld. In the U.S.
and Canada, Fresenius AG will not use "Fresenius" or the "F" logo as a trademark
or service mark, except that it (i) will be permitted to use "Fresenius" in
combination with one or more additional words such as "Pharma Home Care" as a
service mark in connection with its home care business and (ii) may use the "F"
logo as a service mark with the consent of Fresenius Medical Care, which consent
will not be unreasonably withheld if the service mark includes one or more
additional descriptive words or symbols. Similarly, in the U.S. and Canada,
Fresenius AG will have the right to use "Fresenius" as a trade name (but not as
a mark) only in connection with its home care and other medical businesses other
than the Renal Business (the "Other Fresenius AG Business") and only in
combination with one or more other descriptive words, provided that such name is
not confusingly similar to the Fresenius Medical Care marks and trade names.
After the expiration of Fresenius AG's ten-year covenant not to compete with
Fresenius Medical Care (see "-- Covenants Not to Compete"), Fresenius AG may use
"Fresenius" in its corporate names if it is used in combination with one or more
additional descriptive word or words, provided that such name is not confusingly
similar to the Fresenius Medical Care marks or corporate or trade names.

OTHER INTELLECTUAL PROPERTY

Certain of the patents, patent applications, inventions, know-how and trade
secrets used by Fresenius Worldwide Dialysis are also used by other divisions of
Fresenius AG (the "Shared Intellectual Property"). In the case of Biofine(TM),
Fresenius AG's PVC-free packaging material (see "BUSINESS OF FRESENIUS MEDICAL
CARE -- Business of Fresenius Worldwide Dialysis -- Fresenius Worldwide Dialysis

XXX-001910

Products -- Peritoneal Dialysis Products"), Fresenius AG will grant to Fresenius Medical Care an exclusive license for the Renal Business (see "-- Covenants Not to Compete") and a non-exclusive license for all other fields except the Other Fresenius AG Business (the "Non-Exclusive Business"). Any royalties from licenses of the Biofine(TM) intellectual property by either Fresenius Medical Care or Fresenius AG to third parties outside the Renal Business and the Other Fresenius AG Business will be shared equally by Fresenius Medical Care and Fresenius AG. In addition, Fresenius AG will transfer to Fresenius Medical Care the other Shared Intellectual Property that is used predominantly in Fresenius Worldwide Dialysis. With respect to the other Shared Intellectual Property in which Fresenius Worldwide Dialysis and the other FAG divisions as a whole each paid a significant part of the development costs, (i) such Shared Intellectual Property transferred to Fresenius Medical Care will be licensed back to Fresenius AG exclusively in the Other Fresenius AG Business and non-exclusively in the Non-Exclusive Business, and (ii) such Shared Intellectual Property retained by Fresenius AG will be licensed to Fresenius Medical Care exclusively in the Renal Business and non-exclusively in the Non-Exclusive Business.

   SUPPLY AGREEMENTS

      Following the Reorganization, Fresenius Medical Care will own or lease the facilities in which most of its product sales volume is manufactured. However, certain products (principally concentrates) are manufactured at facilities that will be retained by Fresenius AG (the "Retained Facilities"). The Retained Facilities are located in Brazil, France (Sevres) and the United Kingdom. Conversely, a facility in Italy that will be transferred to Fresenius Medical Care in the Reorganization will produce products for the Pharmaceuticals Division and Intensive Care and Diagnostics Division of Fresenius AG (the "Transferred Facilities"). For 1995, the aggregate costs that were allocated to Fresenius Worldwide Dialysis for products manufactured at the Retained Facilities were approximately $24.4 million, while the aggregate costs that were allocated to the

                                      71

<PAGE>  96

Pharmaceuticals Division and Intensive Care and Diagnostics Division for products manufactured at the Transferred Facilities were approximately $11.8 million.

      Prior to the Reorganization, Fresenius Medical Care and Fresenius AG will negotiate and enter into agreements (the "Supply Agreements") for the purchase and sale of products from the Retained Facilities and the Transferred Facilities. Prices under the Supply Agreements will include a unit cost component for each product and an annual fixed cost charge for each facility. The unit cost component, which will be subject to annual review by the parties, is intended to compensate the supplier for variable costs such as costs of materials, variable labor and utilities. The fixed cost component generally will be based on an allocation of the 1995 fixed costs of such facility, such as rent, depreciation, production scheduling and quality control. The fixed cost component will be subject to adjustment by good-faith negotiation every twenty-four months. If the parties cannot agree upon an appropriate adjustment, the adjustment will be made based on an appropriate consumer price index in the country in which the facility is located.

      Each Supply Agreement will have a term that is approximately equal to the estimated average life of the relevant production assets as of the Effective Date. It is expected that this will result in an average term of approximately five years. Each Supply Agreement may be terminated by the purchasing party after a specified notice period, subject to a compensation payment reflecting a portion of the relevant fixed costs. The terms and conditions of the Supply Agreements will be subject to review by Grace prior to the Effective Time. It is the intention of Fresenius AG that the terms and conditions of the Supply Agreements shall be no less favorable to Fresenius Medical Care and Fresenius AG than would have been obtained in arm's-length bargaining with independent parties.

      Following the Reorganization, the parties may modify existing or enter into additional supply agreements, arrangements and transactions. Any such future modifications, agreements, arrangements and transactions will be negotiated between the parties and will be subject to the approval provisions of the Pooling Agreement discussed under "DESCRIPTION OF THE POOLING AGREEMENT -- Interested Transactions" and the regulatory provisions of German law regarding dominating enterprises discussed under "COMPARISON OF CERTAIN RIGHTS OF SHAREHOLDERS OF GRACE AND FRESENIUS USA -- State Anti-takeover Statutes -- Fresenius Medical Care."

   SERVICES AGREEMENTS

      As a division of Fresenius AG, Fresenius Worldwide Dialysis has obtained administrative and other services from Fresenius AG headquarters and from other divisions and subsidiaries of Fresenius AG. These services relate to, among other things, data processing, financial and management accounting and audit, human resources, legal, risk management, quality control, production management, research and development, marketing and logistics. For 1995, approximately $51.2 million was allocated to Fresenius Worldwide Dialysis for those services. Conversely, Fresenius Worldwide Dialysis has provided certain services to other divisions and subsidiaries of Fresenius AG relating to research and development, plant administration, patent administration and warehousing. For 1995, approximately $20.1 million was allocated to the other divisions and subsidiaries for services rendered to them by Fresenius Worldwide Dialysis.

      Prior to the Reorganization, Fresenius Medical Care and Fresenius AG intend to enter into transitional agreements for continuation of many of the services

XXX-001911

described above (the "Services Agreements"). The Services Agreements may also
include agreements for services currently provided as part of corporate overhead
and allocated to Fresenius Worldwide Dialysis in its combined financial
statements included in this Joint Proxy Statement-Prospectus. The Services
Agreements are expected to be short-term, because each party intends to develop
its organization to provide most of the services for itself within 12 to 18
months after the Reorganization. The terms and conditions of the Services
Agreements will be subject to review by Grace prior to the Effective Time. It is
the intention of Fresenius AG that the terms and conditions of the Services
Agreements shall be no less favorable to Fresenius Medical Care and Fresenius AG
than would have been obtained in arm's length bargaining with independent
parties.

Following the Reorganization, the parties may modify existing or enter into
additional services agreements, arrangements and transactions. Any such future
modifications, agreements, arrangements and transactions will be negotiated
between the parties and will be subject to the approval provisions of the
Pooling Agreement discussed under "DESCRIPTION OF THE POOLING
AGREEMENT -- Interested Transac-

                                    72

<PAGE>   97

tions" and the regulatory provisions of German law regarding dominating
enterprises discussed under "COMPARISON OF CERTAIN RIGHTS OF SHAREHOLDERS OF
GRACE AND FRESENIUS USA -- State Anti-takeover Statutes -- Fresenius Medical
Care."

ACCOUNTING TREATMENT

Each of the Grace Merger and the Fresenius USA Merger will be accounted for
under US GAAP as purchases by Fresenius Medical Care. In accordance therewith,
the assets and liabilities acquired will be recorded at their fair values; any
remaining excess of the purchase prices over the fair values of the assets and
liabilities acquired will be recorded as goodwill.

APPRAISAL RIGHTS

  GRACE

Holders of Grace Common Stock are entitled to appraisal rights under
Sections 623 and 910 of the NYBCL. The following summary of the applicable
provisions of Sections 623 and 910 of the NYBCL is not intended to be a complete
statement of such provisions and is qualified in its entirety by reference to
the full text of Sections 623 and 910 of the NYBCL, copies of which are attached
to this Joint Proxy Statement-Prospectus as Appendix F. A PERSON HAVING A
BENEFICIAL INTEREST IN SHARES OF GRACE COMMON STOCK THAT IS HELD OF RECORD IN
THE NAME OF ANOTHER PERSON, SUCH AS A BROKER OR NOMINEE, MUST ACT PROMPTLY TO
CAUSE THE RECORD HOLDER TO FOLLOW THE STEPS SUMMARIZED BELOW PROPERLY AND IN A
TIMELY MANNER TO PERFECT WHATEVER APPRAISAL RIGHTS THE BENEFICIAL OWNER MAY
HAVE. THIS DISCUSSION AND APPENDIX F SHOULD BE REVIEWED CAREFULLY BY ANY
SHAREHOLDER OF GRACE WHO WISHES TO EXERCISE STATUTORY APPRAISAL RIGHTS OR WHO
WISHES TO PRESERVE THE RIGHT TO DO SO BECAUSE FAILURE STRICTLY TO COMPLY WITH
ANY OF THE PROCEDURAL REQUIREMENTS OF SECTION 623 OR SECTION 910 OF THE NYBCL
MAY RESULT IN A TERMINATION OR WAIVER OF APPRAISAL RIGHTS UNDER SECTION 623 AND
SECTION 910 OF THE NYBCL.

A holder of Grace Common Stock as of the Grace Record Date for the Grace
Special Meeting who elects to dissent from the approval and adoption of the
Reorganization Agreement and the transactions contemplated thereby and who has
not voted in favor thereof ("Grace Common Dissenting Shareholder") is entitled,
under the provisions of Sections 623 and 910 of the NYBCL, as an alternative to
receiving the applicable consideration for such holder's Grace Common Stock, to
a judicial determination of the fair value in cash of such holder's Grace Common
Stock. The Reorganization Agreement provides that if any Grace Common Dissenting
Shareholder fails to perfect or effectively withdraws or loses the right to
dissent, the Grace Common Stock held by such Grace Common Dissenting Shareholder
will thereupon be treated as though such shares had been converted pursuant to
the Reorganization Agreement.

Any holder of Grace Common Stock who elects to exercise such holder's
appraisal rights with respect to the Reorganization Agreement must file a
written objection to the Reorganization with Grace before the Grace Special
Meeting, or at the Grace Special Meeting but before the vote on the
Reorganization is taken, which objection must include (a) a notice of such
holder's election to dissent, (b) such holder's name and residence address, (c)
the number of shares of Grace Common Stock as to which such holder dissents, and
(d) a demand for payment of the fair value of such holder's Grace Common Stock
if the Reorganization is consummated. Such objection is not required from any
holder of Grace Common Stock to whom Grace did not give notice of the Grace
Special Meeting in accordance with the applicable provisions of the NYBCL. For
purposes of perfecting appraisal rights pursuant to Section 623 of the NYBCL,
the written objection of a holder of Grace Common Stock, which is addressed as
provided below, will be deemed filed with Grace upon receipt of such objection
by Grace. Neither voting against nor failure to vote for the Reorganization
Agreement will constitute the written objection required to be filed by a Grace
Common Dissenting Shareholder. Failure to vote against the Reorganization
Agreement, however, will not constitute a waiver of rights under Sections 623
and 910 of the NYBCL, provided that a written objection has been properly filed.
A shareholder voting to approve the Reorganization will be deemed to have waived
such shareholder's appraisal rights. Any proxy may be revoked before it is voted
by filing with the Secretary of Grace a written notice of revocation or a duly
executed proxy bearing a later date or by attending the Grace Special Meeting

XXX-001912

and voting in person. The return of a signed proxy without instructions as to the Reorganization will be deemed a vote in

73

favor of the Reorganization Agreement. See "THE SPECIAL MEETINGS -- Voting and Revocation of Proxies."

A shareholder may not dissent as to less than all the Grace Common Stock held of record that such holder beneficially owns. A nominee or fiduciary may not dissent on behalf of any beneficial owner as to less than all the Grace Common Stock of such beneficial owner, as to which such nominee or fiduciary has a right to dissent, held of record by such nominee or fiduciary. Furthermore, if the Grace Common Stock is owned of record in a fiduciary capacity, such as by a trustee, guardian, or custodian, the demand must be made in that capacity, and, if the Grace Common Stock is owned of record by more than one person, as in a joint tenancy or tenancy in common, the demand must be made by or for all owners of record. An authorized agent, including one of two or more joint owners, may execute the demand for appraisal for a holder of record; however, such agent must identify the record owner or owners and expressly state, in such demand, that the agent is acting as agent for the record owner or owners of such Grace Common Stock.

A record holder, such as a broker or an agent, who holds Grace Common Stock as a nominee for beneficial owners, some of whom desire to demand appraisal, must exercise appraisal rights on behalf of such beneficial owners who desire to demand appraisal with respect to the Grace Common Stock held for such beneficial owners.

All notices of election to dissent should be addressed to W. R. Grace & Co., One Town Center Road, Boca Raton, Florida 33486-1010, Attention: Secretary.

Within 10 days after the date of the shareholders' vote approving the Reorganization, FNMC, as the surviving corporation, will give written notice of such approval by registered mail to each holder of Grace Common Stock who timely filed a written objection to the Reorganization, or from whom written objection was not required, and who did not vote in favor of the Reorganization.

At the time of filing a notice of election to dissent or within one month thereafter, a Grace Common Stock Dissenting Shareholder must submit the certificate or certificates representing such holder's Grace Common Stock to Grace, or its transfer agent, with a conspicuous notation thereon of the election to dissent, after which such certificates will be returned to such holder or other person who submitted them on behalf of such holder. Chemical Mellon Shareholder Services, L.L.C. serves as the transfer agent for the Grace Common Stock, and its address is 450 West 33rd Street, New York, New York 10001. Any holder who fails to submit such certificates for notation will, at the election of FNMC exercised by written notice to such holder within 45 days from the date of filing of the notice to dissent, lose such holder's appraisal rights unless a court, for good cause shown, otherwise directs.

Within 15 days after the expiration of the period within which holders of Grace Common Stock may file their notices of election to dissent, or within 15 days after the Effective Time, whichever is later (but in no case later than 90 days after the shareholders' vote approving the Reorganization), Grace or the surviving corporation, as the case may be, is required to make a written offer by registered mail to each Grace Common Stock Dissenting Shareholder to pay for such holder's Grace Common Stock at a specified price which Grace or the surviving corporation, as the case may be, considers to be their fair value. Such offer will be accompanied by a statement setting forth the aggregate number of shares of Grace Common Stock with respect to which notices of election to dissent from approval and adoption of the Reorganization Agreement have been received and the aggregate number of Grace Common Dissenting Shareholders. If the Reorganization has been consummated at the time such offer is made, such offer will also be accompanied by (a) advance payment to each Grace Common Dissenting Shareholder who has submitted such holder's certificates to Grace for notation thereon of such holder's election to dissent, of an amount equal to 80% of the amount of such offer, or (b) as to each Grace Common Dissenting Shareholder who has not yet submitted such certificates for such notation, a statement that advance payment to such holder of an amount equal to 80% of the amount of such offer will be made by FNMC promptly upon submission of such certificates. If the Reorganization has not been consummated at the time of such offer, such advance payment or statement as to advance payment will be sent to each holder entitled thereto forthwith upon consummation of the Reorganization. Every advance payment or statement as to advance payment will include advice to such holder that acceptance of such advance payment will not constitute a waiver of such holder's appraisal rights. If the Reorganization has not

74

been consummated by the expiration of the above-mentioned 90-day period, Grace's offer may be conditioned upon the consummation of the Reorganization. If within 30 days after the making of such a written offer, FNMC and any Grace Common Dissenting Shareholder agree upon the price to be paid for such shareholder's Grace Common Stock, payment therefor will be made within 60 days after the making of such offer or the Effective Time, whichever is later, upon the surrender of the certificates representing such Grace Common Stock. From and after the Effective Time, any payments with respect to any demands for appraisal or in settlement of any such demands will be made by the surviving corporation in all circumstances, but only to the extent not prohibited by Section 623(j) of the NYBCL, which is described below.

XXX-001913

If FNMC fails to make such an offer within the 15-day period described in the preceding paragraph, or if it makes such an offer but FNMC and a Grace Common Dissenting Shareholder do not agree within 30 days of the making of the offer upon the price to be paid for such holder's Grace Common Stock, FNMC must, within 20 days of such 15- or 30-day period, as the case may be, institute a special proceeding in the New York Supreme Court, New York County (the "Court"), to determine the rights of Grace Common Dissenting Shareholders and fix the fair value of their Grace Common Stock. It is the current intention that FNMC will institute any such proceeding within the 20-day period; however, if FNMC does not institute such proceeding within the 20-day period, any Grace Common Dissenting Shareholder may, within 30 days after the expiration of such 20-day period, institute a proceeding for the same purpose. If such proceeding is not instituted within such 30-day period, Grace Common Dissenting Shareholders who have not agreed with FNMC as the case may be, as to the price to be paid for their shares of Grace Common Stock will lose their appraisal rights, unless the Court, for good cause shown, otherwise directs.

All Grace Common Dissenting Shareholders, other than those who will have agreed with FNMC as the case may be, as to the price to be paid for their Grace Common Stock, will be made parties to such appraisal proceeding. The Court will determine whether each Grace Common Dissenting Shareholder, as to whom FNMC requests the Court to make such determination, is entitled to receive payment for such holder's shares of Grace Common Stock. If FNMC does not request any such determination or if the Court finds that such Grace Common Dissenting Shareholder is so entitled, the Court will then determine the fair value of such holder's Grace Common Stock as of the close of business on the day prior to the date the Reorganization Agreement was approved by Grace shareholders. In fixing the fair value of the shares of Grace Common Stock, the Court will consider the nature of the transaction giving rise to the Grace Common Dissenting Shareholder's right to receive payment for such holder's Grace Common Stock under the NYBCL, the effects of such transaction on Grace and its shareholders, the concepts and methods then customary in the relevant securities and financial markets for determining the fair value of shares of a corporation engaging in a similar transaction under comparable circumstances, and all other relevant factors. Within 60 days after the final determination of any such Court proceeding, FNMC will be required to pay to each Grace Common Dissenting Shareholder the amount found to be due such holder, with interest thereon at such rate as the Court finds to be equitable, from the date the Reorganization is consummated to the date of payment, upon surrender to FNMC by such holder of the certificates representing such shares of Grace Common Stock. If the Court finds that the refusal of any Grace Common Dissenting Shareholder to accept the offer of Grace was arbitrary, vexatious or otherwise not in good faith, no interest will be allowed to such Grace Common Dissenting Shareholder. From and after the Effective Time, any amount found to be due to Grace Common Dissenting Shareholders, and any interest allowed thereon, will be paid by the FNMC unless prohibited by Section 623(j) of the NYBCL.

Each party to such appraisal proceeding will bear its own costs and expenses, including the fees and expenses of its counsel and any experts employed by it, except that the Court, in its discretion, (a) may apportion and assess all or any part of the costs, expenses, and fees incurred by Grace Common Dissenting Shareholders against FNMC, if, among other things, the Court finds that the fair value of the Grace Common Stock materially exceeds the offer by Grace or the surviving corporation, as the case may be, or (b) may apportion and assess all or any part of the costs, expenses, and fees incurred by FNMC, against all of the Grace Common Dissenting Shareholders, including any Grace Common Dissenting Shareholders who have withdrawn their notices of election to dissent from the Reorganization, who the Court finds were arbitrary, vexatious or otherwise not acting in good faith in refusing any offer of payment FNMC may have made.

<PAGE>   100
75

Any shareholder who has filed a notice of election to dissent will not, after the Effective Time, have any of the rights of a shareholder with respect to such holder's shares of Grace Common Stock, other than the right to be paid the fair value of such shares of Grace Common Stock under the NYBCL and any other right provided under the NYBCL for shareholders who have filed such a notice. Any notice of election to dissent may be withdrawn by a Grace Common Dissenting Shareholder at any time prior to such shareholder's acceptance in writing of an offer made by Grace or the surviving corporation, as the case may be, as described above, but in no case later than 60 days after the Effective Time (or if Grace or the surviving corporation, as the case may be, fails to make a timely offer to pay such shareholder the fair value of such holder's Grace Common Stock as described above, at any time within 60 days after any date such an offer is made), or thereafter with the written consent of the surviving corporation. In order to be effective, withdrawal of a notice of election to dissent must be accompanied by the return to FNMC of any advance payment to the Grace Common Dissenting Shareholder made by FNMC as described above. Any Grace Common Dissenting Shareholder who withdraws such holder's notice of election to dissent or otherwise loses such holder's appraisal rights will thereupon have only the right to receive the applicable consideration for each of such holder's shares of Grace Common Stock.

Under Section 623(j) of the NYBCL, no payment may be made to Grace Common Dissenting Shareholders by FNMC if FNMC is to be insolvent or if such payment would render FNMC insolvent. In that event, each Grace Common Dissenting Shareholder would be required to either (a) withdraw such shareholder's notice of election to dissent, or (b) retain such shareholder's status as a claimant against the surviving corporation. If a Grace Common Dissenting Shareholder were to elect to remain a claimant against FNMC, such Grace Common Dissenting Shareholder's rights would be subordinated to the rights of FNMC's creditors but would be superior to those of non-dissenting shareholders, should the surviving

XXX-001914

corporation be liquidated. If the surviving corporation were not liquidated, the Grace Common Dissenting Shareholder would retain such holder's right to payment for such shareholder's Shares of Grace Common Stock, which obligation FNMC would be required to satisfy once it was no longer insolvent and if such payment would not render FNMC insolvent. If a Grace Common Dissenting Shareholder fails to exercise either of such options within 30 days after FNMC has given such holder written notice that payment cannot be made because of the restrictions of Section 623(j) of the NYBCL, FNMC would be required to exercise such option by written notice to such holder within 20 days after the expiration of such period of 30 days. For purposes of NYBCL Section 623(j), an "insolvent corporation" is a corporation that is unable to pay its debts as they come due in the usual course of its business.

If a court in a lawsuit by an unpaid creditor or representative of creditors, such as a trustee in bankruptcy, were to find that, at the time FNMC makes any payment in respect of fair value of any dissenting shares (each, a "Transfer"), FNMC (a) made the Transfer with intent to hinder, delay or defraud creditors or (b) received less than a reasonably equivalent value or fair consideration for the Transfer and (i) was insolvent at the time of the Transfer, (ii) was rendered insolvent by reason of the Transfer, (iii) was engaged or about to engage in a business or transaction for which the assets remaining with the surviving corporation constituted unreasonably small capital to carry on its business, or (iv) intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured, the court could find that the Transfer constituted a "fraudulent conveyance" under applicable federal or state law. If the Transfer were determined to be a fraudulent conveyance, there is a risk that Grace Common Dissenting Shareholders, as recipients of the Transfers, would be ordered to turn over to the surviving corporation, its creditors or its trustee in bankruptcy, all or a portion of the payments made to Grace Common Dissenting Shareholders. The measure of insolvency for purposes of the foregoing will vary depending upon the law of the jurisdiction that is being applied. Generally, however, FNMC would be considered insolvent if, at the time of the Transfer in question, the fair value (or fair saleable value) of its assets was less than the amount required to pay its total debts and liabilities (including contingent liabilities) as they become absolute and matured, or if the sum of FNMC's debts (including any contingent liabilities) at the time of the Transfer is greater than the fair value of all of FNMC's properties. The Transfers could be deemed to be a fraudulent conveyance even if FNMC is not deemed to be an insolvent corporation for purposes of Section 623(j) of the NYBCL.

76

<PAGE>  101

FRESENIUS USA

Set forth below is a summary of the procedure which a dissenting Fresenius USA stockholder ("Fresenius USA Dissenting Stockholder") must follow in order to seek to exercise appraisal rights. The information contained below with respect to stockholders' appraisal rights is qualified in its entirety by reference to the applicable sections of the MBCL, which are attached to this Joint Proxy Statement-Prospectus as Appendix G. A PERSON HAVING A BENEFICIAL INTEREST IN SHARES OF FRESENIUS USA THAT ARE HELD OF RECORD IN THE NAME OF ANOTHER PERSON, SUCH AS A BROKER OR NOMINEE, MUST ACT PROMPTLY TO CAUSE THE RECORD HOLDER TO FOLLOW THE STEPS SUMMARIZED BELOW PROPERLY AND IN A TIMELY MANNER TO PERFECT WHATEVER APPRAISAL RIGHTS THEY MAY HAVE. THIS DISCUSSION AND APPENDIX G SHOULD BE REVIEWED CAREFULLY BY ANY FRESENIUS USA COMMON STOCKHOLDER WHO WISHES TO EXERCISE STATUTORY APPRAISAL RIGHTS OR WHO WISHES TO PRESERVE THE RIGHT TO DO SO. FAILURE STRICTLY TO COMPLY WITH ANY OF THE PROCEDURAL REQUIREMENTS OF SECTIONS 85 THROUGH 98 OF THE MBCL COULD RESULT IN A TERMINATION OR WAIVER OF APPRAISAL RIGHTS UNDER SECTIONS 85 THROUGH 98 OF THE MBCL.

Section 85 and Sections 86 through 98, inclusive, of the MBCL contain provisions which, in the case of a merger of a corporation organized under Massachusetts law, grant to dissenting stockholders who comply with the procedures specified in these sections the right to receive payment in cash equal to the "fair value" of their shares. The principal provisions of the statute are summarized below. This summary is qualified in its entirety by the provisions of Sections 85 through 98 of the MBCL, which are annexed as Appendix G to this Joint Proxy Statement-Prospectus and should be carefully reviewed by holders of Fresenius USA Common Stock.

To claim appraisal rights, a stockholder must (a) file a written objection to the Reorganization and the transactions contemplated thereby prior to the stockholder vote on the Fresenius USA Merger, stating that such Fresenius USA Dissenting Stockholder intends to demand payment for his or her shares of Fresenius USA Common Stock if the Fresenius USA Merger is consummated, (b) not vote such Fresenius USA Dissenting Stockholder's shares in favor of approval of the Reorganization and the transactions contemplated thereby, and (c) in the event the Reorganization and the transactions contemplated thereby is approved by Fresenius USA's stockholders and consummated, demand in writing payment for such shares of Fresenius USA Common Stock from Fresenius USA within 20 days after the date of mailing to the Fresenius USA Dissenting Stockholder of a notice that the Fresenius USA Merger has become effective. Such notice is to be mailed by registered or certified mail by Fresenius USA within 10 days of the effective date of the Fresenius USA Merger to all stockholders who have complied with the requirements described in (a) and (b) above.

A vote against the Reorganization and the transactions contemplated thereby will not be deemed to satisfy the requirement that a written objection be filed with Fresenius USA prior to the taking of the stockholder vote on the Reorganization and the transactions contemplated thereby. However, a stockholder who has filed a written objection to the Reorganization and the transactions contemplated thereby as provided in (a) above will not be deemed to have waived

XXX-001915

such Fresenius USA Dissenting Stockholder's appraisal rights by failing to vote against the Reorganization and the transactions contemplated thereby so long as such Fresenius USA Dissenting Stockholder does not actually vote in favor of it.

Fresenius USA is required to make payment of the fair market value of the shares of Fresenius USA Common Stock owned by each Fresenius USA Dissenting Stockholder within 30 days after the expiration of the 20-day period during which a demand for payment for shares may be made. If, during such 30-day period, Fresenius USA and a Fresenius USA Dissenting Stockholder fail to agree as to the fair value of such Fresenius USA Dissenting Stockholder's shares, either Fresenius USA or the Fresenius USA Dissenting Stockholder may, within four months after the expiration of such 30-day period, request a court determination of the fair value of the shares of all shares held by the Fresenius USA Dissenting Stockholders by filing a bill in equity in the Superior Court of Middlesex County in the Commonwealth of Massachusetts. The cost of such an action, other than counsel fees and fees of experts retained by a party, will be determined by the court and apportioned in such a manner as appears to the court to be equitable; however, all costs of giving notice to the stockholders entitled to notice of the filing of such an action will be paid by Fresenius USA. Amounts

                                                77

<PAGE>    102

required to be paid to Fresenius USA Dissenting Stockholders will be included in the $170 million limit on indebtedness of Fresenius Worldwide Dialysis permitted to exist at the Effective Time. In any such action, the fair value of the shares of Fresenius USA Common Stock of the stockholder parties to the action will be determined as of the day preceding the date that the Reorganization and the transactions contemplated thereby were approved by the stockholders of Fresenius USA, and will not include any element of value arising from the expectation or consummation of the Fresenius USA Merger. Fresenius USA has not yet determined whether it will file such a bill in equity and, therefore, any stockholder who desires such a bill in equity to be filed is advised to file it on a timely basis. Unless Fresenius USA files such a bill in equity, the failure by a Fresenius USA Dissenting Stockholder to file such a bill could nullify all written demands for appraisal.

Any Fresenius USA stockholder contemplating the exercise of the rights summarized above is urged to consult with counsel. The failure by a stockholder to follow precisely all of the steps required by Sections 85 through 98 of the MBCL will result in the loss of those rights. Under Section 98 of the MBCL, the enforcement by a stockholder of the right to receive payment for his or her or its shares of Fresenius USA Common Stock is an exclusive remedy, except that such provisions do not exclude the right of a stockholder to bring or maintain an appropriate proceeding to obtain relief on the ground that the Fresenius USA Merger will be or is fraudulent or illegal as to him or her.

EXCHANGE OF CERTIFICATES

Promptly after the Effective Time, the Exchange Agent will mail a letter of transmittal (the "Letter of Transmittal") to each former holder of record of shares of Grace Common Stock or Fresenius USA Common Stock (other than Grace, Fresenius AG, Fresenius USA or the subsidiaries thereof or any Grace Common Dissenting Shareholder or Fresenius USA Dissenting Stockholder), together with instructions for the exchange of Grace stock certificates or Fresenius USA stock certificates for the consideration into which such stock has been converted in the Reorganization. The Letter of Transmittal will specify that delivery shall be effected and risk of loss and title to certificates previously representing Grace Common Stock or Fresenius USA Common Stock will pass only upon receipt of such certificates by the Exchange Agent. It is contemplated that the Exchange Agent will also serve as the distribution Agent for the New Preferred Shares to be issued in the Recapitalization, which shares will be distributed to each former holder of record of Grace Common Stock without the need for any letter of transmittal. GRACE SHAREHOLDERS AND FRESENIUS USA STOCKHOLDERS SHOULD NOT SEND IN THEIR CERTIFICATES UNTIL THEY RECEIVE THE LETTER OF TRANSMITTAL AND INSTRUCTIONS.

Upon surrender to the Exchange Agent of one or more certificates for shares of Grace Common Stock or Fresenius USA Common Stock, together with a properly completed Letter of Transmittal, there will be issued and mailed to the holder thereof (a) ADRs representing ADSs to which such holder is entitled, unless the holder complies with the procedures set forth in the Deposit Agreement and requests that certificates for FMC Ordinary Shares be delivered in lieu thereof, and (b) in the case of a surrender of certificates for shares of Grace Common Stock, a certificate or certificates representing New Preferred Shares. ADRs, or certificates representing New Preferred Shares, or any check representing cash in lieu of fractional shares, may be issued in a name other than the name in which the surrendered certificate is registered only if (i) the certificate surrendered is properly endorsed, accompanied by a guaranteed signature if required by the Letter of Transmittal, and otherwise in proper form for transfer, and (ii) the person requesting the issuance of such certificate either pays to the Exchange Agent any transfer or other taxes required by reason of the issuance of a certificate for such shares in a name other than the registered holder of the certificate surrendered or establishes to the satisfaction of the Exchange Agent that such tax has been paid or is not applicable. Six months after the Effective Time, each of FNMC and Fresenius USA will be entitled to cause the Exchange Agent to deliver to it any applicable ADSs and cash (including any interest thereon) made available to the Exchange Agent that are unclaimed by their respective former shareholders. Any such former shareholders who have not theretofore exchanged their certificates will thereafter be entitled to look exclusively to FNMC or Fresenius USA, as the case may be, and only as general creditors thereof, for the consideration to which they become entitled upon exchange of their certificates pursuant to the Reorganization

XXX-001916

Agreement. Each of

<PAGE>    103

78

FNMC and Fresenius USA will pay all applicable charges and expenses, including its applicable share of those of the Exchange Agent, in connection with the exchange of certificates and cash for certificates of Grace Common Stock or Fresenius USA Common Stock.

No dividends in respect of ADSs will be paid to any person holding a certificate representing Grace Common Stock or Fresenius USA Common Stock until such certificate is surrendered for exchange. Subject to the effect of applicable laws, following surrender of any such certificate by any holder thereof, other than a certificate representing shares as to which appraisal rights have been asserted, there will be paid to the holder of the ADS issued in exchange therefor, without interest, (a) at the time of such surrender, the amount of dividends or other distributions with a record date after the Effective Time theretofore payable with respect to the ADSs represented thereby and not paid, less the amount of any withholding taxes which may be required thereon, and (b) at the appropriate payment date, the amount of dividends or other distributions with a record date after the Effective Time but prior to the time of such surrender and a payment date subsequent to the time of such surrender payable with respect to the ADSs represented thereby, less the amount of any withholding taxes which may be required thereon. Upon the Effective Time, there will be no transfers on the transfer books of Grace or Fresenius USA of the shares of Grace Common Stock or Fresenius USA Common Stock that were outstanding immediately prior to the Effective Time, respectively.

If any certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such certificate to be lost, stolen or destroyed and, if required by FNMC or Fresenius USA, as the case may be, the posting by such person of a bond in such reasonable amount as FNMC or Fresenius USA, as applicably may direct as indemnity against any claim that may be made against it with respect to such certificate, FNMC or Fresenius USA, as the case may be, will, in exchange for such lost, stolen or destroyed certificates, cause to be issued the ADSs and pay or cause to be paid the amounts deliverable in respect thereof pursuant to the Reorganization Agreement. None of FNMC, Fresenius AG, Fresenius USA, the Exchange Agent, Fresenius Medical Care, Grace Chemicals or New Grace shall be liable to any holder of Grace Common Stock or Fresenius USA Common Stock for any cash delivered to a public official pursuant to any applicable abandoned property, escheat or similar law.

The Exchange Agent, on behalf of FNMC or Fresenius USA, as the case may be, will be entitled to deduct and withhold from the consideration otherwise payable to any holder of Grace Common Stock or Fresenius USA Common Stock such amounts as may be required to be deducted and withheld with respect to the making of such payment under any provision of state, local or foreign tax law. To the extent that amounts are so withheld and paid over to the appropriate taxing authority, such withheld amounts will be treated as having been paid to the holder of the Grace Common Stock or Fresenius USA Common Stock in respect of which such deduction and withholding was made.

No fractional ADSs will be issued in the Reorganization. In lieu of any such fractional shares, each person who would otherwise have been entitled to a fraction of an ADS will be paid an amount in cash (without interest) equal to such holder's proportionate interest in the net proceeds from the sale or sales in the open market by the Exchange Agent, on behalf of all such holders, of the aggregate fractional ADSs issued. As soon as practicable following the Effective Time, the Exchange Agent will determine the excess of (a) the number of full ADSs delivered to the Exchange Agent over (b) the aggregate number of full ADSs to be distributed in respect of Grace Common Stock or Fresenius USA Common Stock (such excess being herein called the "Excess Shares"), and the Exchange Agent, as agent for the former holders of such shares, will sell the Excess Shares at the prevailing prices on the open market. The sale of the Excess Shares by the Exchange Agent will be executed on a public exchange through one or more firms and shall be executed in round lots to the extent practicable; and, at the discretion of the Exchange Agent, the Excess Shares may be exchanged for ADSs pursuant to the Deposit Agreement and such ADSs will be sold on the Exchange as aforesaid in lieu of the Excess Shares. Fresenius Medical Care will pay all commissions, transfer taxes and other out-of-pocket transaction costs, including the expenses and compensation of the Exchange Agent, incurred in connection with such sale of Excess Shares. Until the net proceeds of such sale or sales have been distributed, the Exchange Agent will hold such proceeds in trust for such former stockholders (the "Fractional Securities Fund"). As soon as practicable after the determination of the amount of cash to be paid in lieu of any fractional interests, the Exchange Agent will make available such amounts to such former stockholders.

<PAGE>    104

79

BUSINESS OF FRESENIUS MEDICAL CARE

GENERAL

Fresenius Medical Care will be the world's largest integrated dialysis products and services company. Fresenius Medical Care will combine Fresenius Worldwide Dialysis, a leading international provider of dialysis products with a commitment to technological superiority and innovation, with NMC, a leading provider of dialysis services with a commitment to quality clinical treatment. Fresenius AG expects that the combination of these complementary businesses will allow it to develop and utilize more effectively its products and therapies and to gain significant advantages and efficiencies in the manufacture and

XXX-001917

distribution of dialysis products and the delivery of dialysis services on a worldwide basis. Through these strategies, Fresenius Medical Care hopes to improve the lives of dialysis patients, continue and accelerate its international growth, and create value for shareholders over the long term. Fresenius Medical Care will be a holding company, and all of its business will be conducted through direct and indirect operating subsidiaries. Following the Reorganization, each of FNMC and Fresenius USA will be wholly owned subsidiaries of Fresenius Medical Care, and Fresenius USA will continue to manufacture and distribute products for the treatment of ESRD in North America.

Fresenius Medical Care's global operations will be organized in four regions: North America (in which 1995 sales were $2.14 billion on a pro forma basis); Europe/Africa/Middle East (in which 1995 sales were $660 million on a pro forma basis); Asia/Pacific (in which 1995 sales were $40 million on a pro forma basis); and South America (in which 1995 sales were $50 million on a pro forma basis).

Fresenius Medical Care was originally incorporated as "Sterilpharma GmbH", a wholly owned subsidiary of Fresenius AG organized under German law. Sterilpharma GmbH's name has been changed to "Fresenius Medical Care GmbH," and, prior to the Reorganization, it will be converted into a German stock corporation (Aktiengesellschaft) and renamed "Fresenius Medical Care AG." Prior to the contribution of Fresenius Worldwide Dialysis by Fresenius AG, Fresenius Medical Care will have conducted no business for the preceding five years. After consummation of the Reorganization, Fresenius Medical Care will have its corporate headquarters at Borkenberg 14, 61440 Oberursel, Germany (near Frankfurt).

RENAL INDUSTRY OVERVIEW

  KIDNEY DISEASE AND TREATMENT MODALITIES

    A normally functioning human kidney removes waste products and excess water from the blood, preventing toxin buildup, eventual poisoning of the body and water overload. Chronic kidney disease is a progressive disease culminating in ESRD, which is characterized by the total and irreversible loss of kidney function. Chronic kidney disease can be caused by a number of conditions, primarily nephritis, inherited diseases, hypertension and diabetes. Nearly 60% of all people with ESRD acquire the disease as a complication of one or more of these primary conditions. However, a high percentage of kidney disease is caused by unknown factors. Unlike acute renal failure (a sudden interruption of kidney function caused by trauma, acute infection, blockage or other causes which are generally temporary and permit the kidneys to return to normal function in 40% to 60% of the cases after the failure is treated), ESRD cannot be reversed, and all those affected eventually require artificial dialysis or kidney transplantation.

    Since 1972, patients with ESRD in the U.S. have generally been entitled to Medicare benefits regardless of age or financial circumstances. Based on information published by HCFA, the number of patients in the U.S. who received chronic dialysis grew from approximately 66,000 in 1982 to approximately 187,000 at December 31, 1994. Fresenius Medical Care believes that, over the next five to ten years, the number of patients suffering from ESRD in the U.S. will continue to grow at approximately the same rate. According to data published by HCFA and the European Dialysis Transplantation Society, outside of the U.S., the number of chronic dialysis patients is growing at annual rates of 8% for patients receiving hemodialysis and 10% for patients receiving peritoneal dialysis. Total worldwide dialysis patients (including the U.S.) were estimated to exceed 700,000 in 1995. Fresenius Medical Care attributes the continuing growth in the number of dialysis patients principally to the aging of the general population, better treatment and survival of patients with

                                    80

<PAGE>  105

hypertension, diabetes and other illnesses that lead to ESRD, and increases in reimbursements for treatments in many countries. Moreover, improved technology has enabled older patients and those who previously could not tolerate dialysis due to other illnesses to benefit from this life-prolonging treatment.

    There are presently only two methods for the treatment of ESRD: dialysis and kidney transplantation. Transplants, although a viable form of treatment for some patients, are limited by the scarcity of compatible kidneys. Therefore, most patients suffering from ESRD must rely on dialysis, which is the removal of toxic waste products and excess fluids from the body by artificial means. There are two major dialysis modalities (i.e., methods of treatment) commonly in use today, hemodialysis and peritoneal dialysis. Generally, the method of treatment used by an ESRD patient is chosen by the physician in consultation with the patient, and is based on the patient's abilities, medical conditions and needs.

    Hemodialysis.  Hemodialysis is the process by which waste products and excess fluids are removed from the blood extracorporeally. Hemodialysis is generally performed at a dialysis center or hospital. According to HCFA, as of December 31, 1994, hemodialysis patients represented 83% of all dialysis patients in the U.S. and, according to published reports, as of December 1994, approximately 85% of all dialysis patients worldwide.

    In hemodialysis, the blood flows outside the body by means of plastic tubes known as bloodlines into a specially designed filter -- a dialyzer -- which separates waste products and excess water from the blood by diffusion and ultrafiltration. In the dialyzer, which functions as an artificial kidney, the patient's blood flows past a semipermeable membrane, which is, in turn, surrounded by dialysis solution, the cleansing liquid. Toxic substances pass through the semipermeable membrane by diffusion. Through ultrafiltration, excess

XXX-001918

water and dissolved electrolytes also pass from the blood through the membrane into the dialysis solution. The dialysis solution carries away the waste products and excess water, and the cleansed blood is returned to the patient. The movement of the blood and dialysis solution is controlled by a hemodialysis machine, which pumps blood, adds anti-coagulants, regulates the purification process and controls the mixing of dialysis solution and the rate of its flow through the system. This machine may also monitor and record the patient's vital signs.

Hemodialysis treatments are generally administered to a patient three times per week and typically last from two and one-half to four hours or longer. A hemodialysis patient must follow a restricted diet and take a variety of medications and vitamin supplements. Complications suffered by patients being treated by hemodialysis include anemia, malnutrition, fluid imbalance and calcium deficiency. In addition, because of the buildup of toxins and fluid in the blood on days in which no treatment occurs, a patient tends to feel worse on these days. However, hemodialysis is the only form of treatment (other than transplantation) currently available to patients who have very low residual or nonexistent renal function and are inadequately dialyzed using peritoneal dialysis.

To permit close physician monitoring, patients with medical complications are sometimes hemodialyzed in the hospital. However, the majority of hemodialysis patients are referred to outpatient dialysis centers, such as those which will be operated by Fresenius Medical Care, where hemodialysis treatments are performed with the assistance of a nurse or dialysis technician under the general supervision of a physician. A small number of patients who have capable assistants and who undergo training are hemodialyzed at home.

Peritoneal Dialysis. Peritoneal dialysis removes waste products from the blood by use of the peritoneum, the membrane lining covering the internal organs located in the abdominal area. Most peritoneal dialysis treatments are self-administered by patients in their own homes and workplaces, either by a treatment known as continuous ambulatory peritoneal dialysis ("CAPD") or by a treatment introduced by Fresenius USA in 1980 known as continuous cycling peritoneal dialysis ("CCPD"). In both of these treatments, the patient has a catheter surgically implanted to provide access to the peritoneal cavity. Using this catheter, a sterile dialysis solution is introduced into the peritoneal cavity and the peritoneum operates as the dializing membrane.

A typical CAPD peritoneal dialysis program involves the daily introduction and disposal of approximately eight liters of solution, two liters at a time. A patient using CAPD drains, by use of gravity, the dialysis solution then contained in his or her peritoneum into a disposable drainage bag at several points during the

81

<PAGE>   106

day. A new solution bag is connected to the drainage set and the new solution fills the peritoneum by gravity. The patient then manually disconnects from the drainage tubing, caps the catheter and discards the waste solution and used drainage set. With CCPD the patient connects the implanted catheter to a disposable "cycler" tubing set that is connected to one or more bags containing a prescribed amount of sterile dialysis solution. A machine is used to "cycle" solution to and from the patient's peritoneum during sleep.

In both CAPD and CCPD the patient undergoes dialysis daily, and typically does not experience the buildup of toxins and fluids experienced by hemodialysis patients on the days they are not treated. In addition, because the patient is not required to make frequent visits to a hemodialysis clinic, and because the solution exchanges can be accomplished at convenient (although more frequent) times, a patient on peritoneal dialysis may experience much less disruption to his or her life than a patient on hemodialysis. Peritoneal dialysis patients may also face fewer dietary and fluid intake restrictions than hemodialysis patients. Two aspects of peritoneal dialysis, however, limit its use as a long-term therapy for some patients. First, certain patients cannot effect sterile connections of the peritoneal dialysis tubing to the catheter, leading to excessive episodes of peritonitis, a bacterial infection of the peritoneum which can result in serious adverse health consequences, including death. Second, treatment by current forms of peritoneal dialysis may not be as effective in removing wastes and fluids as hemodialysis; therefore, patients using peritoneal dialysis must have some residual renal function (which may deteriorate over time) or the amount of therapy must be increased. As residual renal function decreases, peritoneal dialysis is less effective. Therefore, in general, ESRD patients require hemodialysis treatments for some period during the term of their disease.

According to HCFA, as of December 31, 1994, there were approximately 2,600 outpatient dialysis centers in the U.S. Ownership of these centers is extremely fragmented; published reports estimate that approximately 36% are owned by multi-center providers, approximately 34% are physician-owned private treatment centers and approximately 30% are affiliated with hospitals. According to HCFA, as of December 31, 1994, approximately 82% of the dialysis patients in the U.S. received in-center hemodialysis treatment and approximately 18% were treated at home. Of those treated at home, more than 90% received peritoneal dialysis.

Outside the U.S., ratios of patients using hemodialysis versus peritoneal dialysis vary significantly from country to country. Regionally, according to published reports, the percentages are as follows:

<TABLE>
<CAPTION>

                                                              PERITONEAL

XXX-001919

| AREA | HEMODIALYSIS | DIALYSIS |
|------|--------------|----------|
| <S> | <C> | <C> |
| Western Europe........................................... | 84% | 16% |
| Japan................................................... | 93 | 7 |
| Latin America........................................... | 69 | 31 |
| Asia (excluding Japan).................................. | 78 | 22 |
| Other areas............................................. | 90 | 10 |

</TABLE>

Alternative Therapies.  The only generally recognized alternative treatment for ESRD is kidney transplantation. According to HCFA, an average of approximately 8,700 dialysis patients received kidney transplants annually in the U.S. during the period from 1989 through 1994. Although this option, when successful, may be the most desirable form of therapeutic intervention, the shortage of suitable donors of compatible kidneys limits the availability of this surgical procedure. Medical advances, including advances in the field of xenografting, which involves the use of animal organs for human transplantation, may ultimately lead to other treatment options for patients with ESRD, but such options are not expected to be available in the foreseeable future.

New medical therapies that cure or mitigate the primary causative diseases linked to kidney failure could potentially reduce the ESRD patient population growth rate. Such new medical therapies include diet control, intensive diabetes therapy, improved control of hypertension, improved treatment of causative primary infections, pancreas transplants and techniques for widening blocked renal arteries. Fresenius Medical Care believes, however, that most of these therapies will only provide benefits over an extended time horizon and, therefore, will not significantly reduce the growth of the ESRD patient population in the near term.

                                        82

<PAGE>   107

STRATEGY1

Following the Reorganization, Fresenius Medical Care will combine Fresenius Worldwide Dialysis' expertise in dialysis products with NMC's experience in dialysis services, with a commitment to providing high-quality patient care. By offering both innovative products and cost-effective services, Fresenius Medical Care believes that it will be well positioned to compete in the challenging health care environment. Key elements of Fresenius Medical Care's strategy will be to:

   - offer complete hemodialysis and peritoneal dialysis product lines;

   - extend Fresenius Worldwide Dialysis' position as a technology innovator
     in the dialysis products industry, utilizing NMC's expertise in patient
     treatment and its clinical data;

   - enhance production technologies, improve the efficiency of production
     processes, and expand international manufacturing operations;

   - expand Fresenius Worldwide Dialysis' current global market position in
     the products business;

   - provide high standards of patient care and quality in dialysis services,
     laboratory services and home health care;

   - enhance NMC's market position in the provider business through strategic
     expansion and acquisitions, particularly in those regions where Fresenius
     Worldwide Dialysis already maintains strong product sales and contacts;
     and

   - establish a presence for Fresenius Medical Care in selected new
     geographic markets through a fully integrated and market-tailored
     approach to dialysis treatment.

In order to meet local customer preferences and adapt to differences in the health care systems of different countries, Fresenius Medical Care will be organized in four regions: North America, Europe/Africa/Middle East, Asia/Pacific and South America. It is intended that each region eventually will have a single chief executive officer responsible for all Fresenius Medical Care business in the region. It is intended that such business will be organized into three operating segments -- a hemodialysis business, a peritoneal dialysis business and a provider business, each with a single head. Marketing will also be organized on a regional basis, with global strategic marketing based in Germany. Fresenius Medical Care will facilitate the exchange of products, process technology and expertise among the regions.

   DIALYSIS PRODUCTS AND PRODUCTION

Fresenius Medical Care intends to continue to offer Fresenius Worldwide Dialysis' broad and competitive hemodialysis and peritoneal dialysis product lines. These product lines enjoy broad market acceptance and enable customers to purchase all of their dialysis machines and disposable products from a single source. In particular, Fresenius Medical Care believes that Fresenius Worldwide Dialysis' leading hemodialysis product, the Fresenius Polysulfone(R) dialyzer, is the best-performing, mass-produced low-, medium- and high-flux dialyzer on the market. Fresenius AG was the first company to produce dialyzers in high volumes utilizing the polysulfone membrane and has over 12 years of experience in the production of polysulfone dialyzers. Polysulfone is widely regarded as being more biocompatible and higher performing than most commonly used alternative fibers. Fresenius Medical Care will also offer a variety of durable

XXX-001920

products, such as its modular hemodialysis machines, the components of which can
be tailored to individual therapeutic practices and local preferences. Fresenius
Medical Care also believes that it offers innovative systems for peritoneal
dialysis treatments which can create further opportunities for growth in new and
existing peritoneal dialysis markets.

- ---------------

1 The discussion under this "Strategy" section contains forward-looking
  statements. These forward-looking statements are made based on management's
  expectations and beliefs concerning future events impacting Fresenius Medical
  Care, but no assurance can be given that such events will occur or that
  results will be as anticipated.

                                       83
<PAGE>   108

     Fresenius Medical Care's strategy will be to strengthen its technological
leadership position in dialysis products through continued product development.
For example, Fresenius Medical Care intends to introduce a non-polyvinyl
chloride ("PVC") system for peritoneal dialysis and to develop new generations
of hemodialysis machines offering improved physiological monitoring. See
"-- Business of Fresenius Worldwide Dialysis -- Fresenius Worldwide Dialysis
Products."

     Fresenius Medical Care intends to continue to operate a state-of-the-art
production facility for disposable dialysis products in St. Wendel, Germany (the
"St. Wendel Facility"). The St. Wendel Facility is fully automated, achieving
significant production efficiencies as well as a high level of quality control
and reliability. In addition, the central research and development activities of
Fresenius Worldwide Dialysis for disposable dialysis products will continue to
be based at the St. Wendel Facility. Fresenius Medical Care believes that this
proximity helps to integrate product research and development with manufacturing
process engineering, and fosters continuous product and process innovation and
cost reduction. Recent process innovations in the production of disposable
dialysis products include the automation of steam sterilization and a new laser
welding technology for producing non-PVC products. See "-- Business of Fresenius
Worldwide Dialysis -- Fresenius Worldwide Dialysis Products." Fresenius Medical
Care will continue to emphasize innovations in production process technology in
order to reduce costs and improve product quality.

     Fresenius Medical Care plans to continue to develop and employ the know-how
developed in the St. Wendel Facility in other plants for disposable products
around the world. For example, Fresenius USA's plant in Ogden, Utah and the
manufacturing facilities of Fresenius Worldwide Dialysis' joint ventures in
Japan and Belarus are based on the St. Wendel Facility.

     Fresenius Medical Care intends to continue to produce and develop durable
products such as dialysis machines and peritoneal dialysis cyclers at the
Fresenius Worldwide Dialysis production facility in Schweinfurt, Germany (the
"Schweinfurt Facility"). The centralization of the production of machine
components at the Schweinfurt Facility creates production efficiencies.
Components that need to be tailored to local preferences will be produced and
assembled locally in facilities around the world. For servicing durable
products, Fresenius Medical Care intends to build on the established
international organization of Fresenius Worldwide Dialysis. The Schweinfurt
Facility will provide training and education in equipment set-up, installation
and calibration and will act as a support center for Fresenius Medical Care's
regional service centers.

     Fresenius Medical Care plans to expand its international sales of dialysis
products in new and existing markets. This strategy includes building new
production facilities for disposable products in new and existing markets around
the world by setting up additional subsidiaries and local sales forces and by
entering into joint venture agreements with local partners. Fresenius Medical
Care anticipates that it will continue to make capital expenditures for its
dialysis products business at a level of magnitude comparable to the combined
expenditures of Fresenius Worldwide Dialysis and MPD prior to the
Reorganization, or approximately $400 to $500 million over the next five years.
This expansion will be funded primarily from internally generated funds, as well
as from Fresenius Medical Care's credit facilities and possible future debt and
equity offerings.

     PROVIDER BUSINESS

     In its provider business, Fresenius Medical Care plans to continue to
follow the basic principles that have guided NMC over the past two decades.
These principles include: a commitment to high standards of clinical quality in
the provision of health care services; identification and implementation of
innovations and new management systems to control or reduce costs and enhance
quality; growth through strategic expansion and acquisitions around the world;
affiliation with leading health care practitioners and institutions; use of
economies of scale and scope to achieve administrative efficiencies; and
promotion of complementary products and services to achieve diversification as
well as cost management and quality enhancement.

     In the dialysis services area, Fresenius Medical Care's strategy will be to
expand further in the U.S. through the continued development of new dialysis
centers and the acquisition of existing dialysis centers, thereby combining
Fresenius USA's extensive relationships in the U.S. with NMC's experience,
systems and resources over an expanded patient base. Outside the U.S., Fresenius
Medical Care plans to expand its service

                                       84

XXX-001921

<PAGE>  109

operations in Europe, South America and the Asia/Pacific region utilizing the global experience and contacts of both Fresenius Worldwide Dialysis and NMC.

Worldwide, many dialysis centers that are potential acquisition or joint venture candidates of Fresenius Medical Care are owned by physicians. In the U.S., doctors may be motivated to sell their centers to obtain relief from day-to-day administrative responsibilities and changing governmental regulations, to focus on patient care and to realize a return on their investment. Outside of the U.S., doctors may be motivated to sell and/or enter into joint ventures or other relationships with Fresenius Medical Care to achieve the same goals and to gain a partner with extensive expertise in dialysis products and services. While price is typically the key factor in securing acquisitions, Fresenius Medical Care believes that it will be an attractive acquiror or partner to many dialysis center owners due to its reputation for patient treatment, its proprietary Patient Statistical Profile ("PSP") database (which contains clinical and demographic data on over 40,000 dialysis patients), its comprehensive clinical and administrative systems, manuals and policies and its ability to provide ancillary services for dialysis centers and patients and its reputation for technologically advanced products. Fresenius Medical Care believes that these factors will also be advantages in expanding by opening new centers. Fresenius Medical Care's ability to acquire existing centers and open new centers will depend, among other things, on Fresenius Medical Care's available financial resources. See "RISK FACTORS -- Risks Relating to the Business of Fresenius Medical Care -- Dependence on Acquisitions." Fresenius Medical Care anticipates that expenditures for expansion of its provider business will average approximately $200 million per year over the next five years and that such expenditures will be funded primarily from internally generated funds, as well as from Fresenius Medical Care's credit facilities and possible future debt and equity offerings.

Fresenius Medical Care plans to expand its provider business to countries (other than Germany) where Fresenius Worldwide Dialysis currently has a strong position in product sales and where privately owned dialysis centers can be established. Additionally, Fresenius Medical Care plans to expand, on a selected basis, both its products and provider businesses to regions of the world where dialysis treatment currently is not yet universally available.

Fresenius Medical Care's ability to expand internationally will be dependent, in large part, on the availability and level of local governmental support of dialysis treatment. In a limited number of countries, reimbursement rates are higher than in the U.S., and certain hemodialysis treatments, such as hemodiafiltration with high-flux membranes, are sometimes reimbursed at premium rates. In other countries, however, government payment or reimbursement rates for dialysis treatment are significantly lower than U.S. reimbursement rates. In addition, the legal and regulatory framework in certain countries may be more restrictive and cumbersome than in the U.S. International operations may also involve certain additional risks, including fluctuations in exchange rates and delays in payment. Fresenius Medical Care's management believes that its vertical integration will enable it to compete successfully in international markets.

Fresenius Medical Care also believes that vertically integrated enterprises like Fresenius Medical Care will be able to realize efficiencies that may lower patient care costs and help it compete in a managed care environment. In the U.S., managed care exists in a variety of forms, ranging from traditional fee-for-service insurance with cost and utilization controls to capitation-based HMOs, which pay providers a fixed amount per member per month, with the provider bearing the risk of loss if the costs of services exceed the capitated payment. Fresenius Medical Care believes that its core strategic principles, particularly its commitment to maintaining clinical quality, cost management and control and to developing superior cost-effective products, are key elements in sustaining profitability in the face of the trend toward managed care. Fresenius Medical Care believes that its strengths in clinical data systems, its professional affiliations with broad networks of providers and institutions, extensive geographic market coverage in dialysis services and products and ongoing internal development of an integrated care capability should afford Fresenius Medical Care attractive partnering opportunities with managed care enterprises. Fresenius Medical Care believes that the vertical integration of Fresenius Medical Care will provide opportunities for cost savings that are essential to competing in a managed care environment. Fresenius Medical Care believes that these cost savings, together with NMC's extensive clinical information database and large dialysis center network, should allow Fresenius Medical Care to benefit from the trend toward managed care and may enable Fresenius Medical Care to improve patient care and therefore contain hospitalization and overall treatment costs of ESRD patients.

85

<PAGE>  110

INTEGRATION OF FRESENIUS WORLDWIDE DIALYSIS AND NMC

In order to implement its strategic plans, management of Fresenius Medical Care has been reviewing and will continue to review the operations of Fresenius Worldwide Dialysis and NMC in order to achieve potential synergies, and will refine and implement plans regarding, among other things, the integration or combination of certain research and development efforts, production facilities and other operations of Fresenius Worldwide Dialysis and NMC. Management of Fresenius Medical Care also believes that economies of scale are realizable through sourcing efficiencies, coordination of manufacturing and distribution activities and rationalization and consolidation of corporate staffs and sales forces. In addition, some or all of the gross margin which would otherwise have gone to distributors will remain with Fresenius Medical Care in those countries

XXX-001922

where either of Fresenius Worldwide Dialysis or NMC previously used distributors and, following the Reorganization, will be able to use the sales organization of Fresenius Medical Care.

Fresenius Medical Care management believes that new market opportunities may become available as a result of the Reorganization. In 1995, approximately 17% of all purchases of dialysis machines and related products by NMC in the U.S. were from Fresenius USA, the remainder were from other third-party producers. Management of Fresenius Medical Care believes that significant cost savings and economies of scale may be achieved in the future as a result of an increase in the percentage of Fresenius Worldwide Dialysis products purchased and used in NMC dialysis centers, without compromising the physician's freedom to prescribe as they choose, and a consolidation of their previously separate distribution networks. Furthermore, at December 31, 1995, approximately 85% of the centers operated by NMC were located in the United States and over 90% of NMC's revenues were generated in the United States. As previously discussed, management of Fresenius Medical Care believes that significant opportunities exist for Fresenius Medical Care to effect acquisitions and/or joint ventures through the combination of Fresenius Worldwide Dialysis' international presence with NMC's experience in operating dialysis centers. In addition, Fresenius Medical Care intends to make peritoneal dialysis available in NMC dialysis centers where currently only hemodialysis is offered.

Vertical integration on the scale represented by Fresenius Medical Care has not been tried previously in the renal industry. Accordingly, there can be no assurance, that any of the foregoing potential synergies will be realized or that they will be material to Fresenius Medical Care. Furthermore, independent dialysis centers and those operated by other chains that are presently customers of Fresenius Worldwide Dialysis may elect to limit or terminate their purchases of Fresenius Medical Care dialysis products in order to avoid purchasing products manufactured by a competitor. Fresenius Medical Care believes that customers will continue to consider its long-term customer relationships and reputation for product quality in making product purchasing decisions and intends to compete vigorously for such customers.

                    BUSINESS OF FRESENIUS WORLDWIDE DIALYSIS

FRESENIUS AG

    Fresenius AG is a German corporation, listed on the Frankfurt, Dusseldorf and Munich stock exchanges, which develops, manufactures and distributes pharmaceuticals and medical systems products and services on a global basis. Fresenius AG conducts business in four operating divisions: Fresenius Worldwide Dialysis, Pharmaceuticals Division, Intensive Care and Diagnostics Division, and Project Business Division. The Pharmaceuticals Division manufactures and distributes, among other things, solutions for infusion therapy and enteral and parenteral nutrition, and specialty pharmaceuticals. The Intensive Care and Diagnostics Division manufactures and distributes products for hemotherapy and intensive medicine, diagnostic products, specialty membranes and transplantation medicine. Fresenius AG's Project Business Division, through its subsidiaries, Pharmaplan GmbH and Hospitalia GmbH, makes scientific and manufacturing know-how available for planning and construction of pharmaceutical and medical systems manufacturing facilities and for equipping of hospitals. For the year ended December 31, 1995, the sales of Fresenius Worldwide Dialysis represented 58% of Fresenius AG's consolidated sales. Fresenius AG's corporate headquarters are located in Oberursel, Germany (near Frankfurt).

                                    86
<PAGE>  111

    A majority of Fresenius AG's ordinary shares, nominal value DM 5 per share ("Fresenius AG Ordinary Shares") are held by the Else Kroner-Fresenius-Stiftung (the "Foundation"), a charitable foundation founded to promote medical science, particularly in the fields of research and treatment of diseases, and the education and training of physicians and other persons primarily engaged in dialysis. See "SECURITY OWNERSHIP" for more information regarding the Foundation.

FRESENIUS WORLDWIDE DIALYSIS

    Fresenius Worldwide Dialysis is the global dialysis business of Fresenius AG, including the business conducted through Fresenius USA. Based on 1995 revenues, Fresenius Worldwide Dialysis is currently the world's second largest manufacturer and distributor of equipment and related products for each of hemodialysis and peritoneal dialysis. Fresenius Worldwide Dialysis operates in Germany and in more than 20 other countries through 32 subsidiaries and joint ventures. Fresenius Worldwide Dialysis' products are sold in more than 100 countries. As of March 31, 1996, Fresenius Worldwide Dialysis also provided kidney dialysis treatment and related services at nine treatment centers located in Argentina, Brazil, Hungary, Italy and the United Kingdom.

    Fresenius Worldwide Dialysis manufactures a comprehensive line of renal dialysis equipment and related products for each of the hemodialysis and peritoneal dialysis markets. Such products include hemodialysis machines, peritoneal dialysis cyclers and related equipment, dialyzers, peritoneal dialysis solutions in flexible plastic bags, hemodialysis concentrates and solutions, granulate mixes, bloodlines, and disposable tubing assemblies and equipment for water treatment in dialysis centers. During 1995 and the three-month period ended March 31, 1996, hemodialysis machines and related disposable products accounted for 70.9% and 72.0% of Fresenius Worldwide Dialysis' total revenues, and revenues from peritoneal dialysis solutions and machines and equipment accounted for approximately 19.9% and 20.9% of total revenues. The balance of revenues, approximately 9.2% and 7.1%, respectively, primarily represents technical service. During 1995 and the three-month period

XXX-001923

ended March 31, 1996, 59.8% and 59.7%, respectively, of total Fresenius Worldwide Dialysis revenues were generated within Europe/Africa/Middle East (including 28.0% and 26.0%, respectively, generated in Germany), 33.8% and 34.3%, respectively, of total revenues were generated in North America by Fresenius USA, and the balance, 6.4% and 6.0%, respectively, of total revenues, was generated in other parts of the world.

The combined financial statements of Fresenius Worldwide Dialysis contained elsewhere in this Joint Proxy Statement-Prospectus include Fresenius USA and, except as otherwise noted, the information set forth below with respect to Fresenius Worldwide Dialysis includes Fresenius USA. For information specific to Fresenius USA, see "-- Business of Fresenius USA."

Fresenius Worldwide Dialysis began business with the distribution of dialysis machines and dialyzers made by other manufacturers in 1966. In 1977, Fresenius Worldwide Dialysis began the production of cuprophane dialyzers at the St. Wendel Facility and, in following years, began manufacturing the other elements of its product line. In 1978, Fresenius Worldwide Dialysis began the development of the polysulfone membrane for a new generation of dialyzers. These development efforts were realized in 1983, with the commencement by Fresenius Worldwide Dialysis of large-scale production of synthetic hollow-fiber polysulfone dialyzer membranes at the St. Wendel Facility. In Germany, Fresenius Worldwide Dialysis currently manufactures polysulfone membranes and dialyzers, bloodlines and peritoneal dialysis bags at the St. Wendel Facility and hemodialysis machines and peritoneal dialysis cyclers at the Schweinfurt Facility. Fresenius Worldwide Dialysis also has manufacturing and assembly facilities in North America, other parts of Europe, Asia and South America.

<div align="center">87</div>

<PAGE>    112

The following table shows, for each of the past three years, Fresenius Worldwide Dialysis' total revenues by region:

<TABLE>
<CAPTION>

|  | YEAR ENDED DECEMBER 31, | | | | | | THREE-MONTH PERIOD ENDED MARCH 31, | |
|  | 1993 | | 1994 | | 1995 | | 1996 | |
|  | TOTAL REVENUES | % OF TOTAL | TOTAL REVENUES | % OF TOTAL | TOTAL REVENUES | % OF TOTAL | TOTAL REVENUES | % OF TOTAL |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
|  | (DOLLARS IN THOUSANDS) | | | | | | | |
| Europe/Africa/Middle East................ | $ 384,874 | 63.0% | $426,033 | 59.2% | $535,755 | 59.8% | $140,285 | 59.7% |
| North America.......... | 200,414 | 32.8 | 250,369 | 34.8 | 302,725 | 33.8 | 80,529 | 34.3 |
| South America.......... | 15,435 | 2.5 | 19,607 | 2.7 | 25,373 | 2.8 | 7,700 | 3.2 |
| Asia/Pacific........... | 10,558 | 1.7 | 23,834 | 3.3 | 32,687 | 3.6 | 6,546 | 2.8 |
| Total........ | $ 611,281 | 100.0% | $719,843 | 100.0% | $896,540 | 100.0% | $235,060 | 100.0% |

</TABLE>

FRESENIUS WORLDWIDE DIALYSIS PRODUCTS

OVERVIEW

Fresenius Worldwide Dialysis' products include machines and related disposable products for hemodialysis and cyclers, solutions and related disposable products for peritoneal dialysis treatment. Fresenius Worldwide Dialysis' product catalogs contain over 3,000 different items. The following table shows, for each of the past three years, total revenues related to hemodialysis products, peritoneal dialysis products and other activities, principally technical service:

<TABLE>
<CAPTION>

|  | YEAR ENDED DECEMBER 31, | | | | | | THREE-MONTH PERIOD ENDED MARCH 31, | |
|  | 1993 | | 1994 | | 1995 | | 1996 | |
|  | TOTAL REVENUES | % OF TOTAL | TOTAL REVENUES | % OF TOTAL | TOTAL REVENUES | % OF TOTAL | TOTAL REVENUES | % OF TOTAL |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
|  | (DOLLARS IN THOUSANDS) | | | | | | | |
| Hemodialysis Products............ | $ 429,071 | 70.2% | $504,850 | 70.1% | $636,000 | 70.9% | $169,228 | 72.0% |
| Peritoneal Dialysis Products............ | 130,929 | 21.4 | 153,422 | 21.3 | 178,307 | 19.9 | 49,197 | 20.9 |
| Other................ | 51,281 | 8.4 | 61,571 | 8.6 | 82,233 | 9.2 | 16,635 | 7.1 |
| Total........ | $ 611,281 | 100.0% | $719,843 | 100.0% | $896,540 | 100.0% | $235,060 | 100.0% |

</TABLE>

HEMODIALYSIS PRODUCTS

Fresenius Worldwide Dialysis management believes that it is a leader in the hemodialysis product field and continually strives to extend and improve the

XXX-001924

capabilities of its hemodialysis systems to offer an advanced treatment mode at reasonable cost. Fresenius Worldwide Dialysis offers a comprehensive hemodialysis product line, consisting of hemodialysis machines, modular accessories for dialysis machines, polysulfone and cuprophane dialyzers, bloodlines, dialysis solutions and concentrates, fistula needles, connectors, devices for water treatment, data management systems, dialysis chairs, machines and supplies for the reuse of dialyzers and other similar supplies.

Dialysis Machines. All Fresenius Worldwide Dialysis hemodialysis machines provide a unique volumetric dialysate balancing and ultrafiltration control system. This system, first developed and introduced by Fresenius AG in 1977, provides for the safe and more efficient use of highly permeable dialyzers. Fresenius Worldwide Dialysis hemodialysis machines are available in North America in Series 2008 models and, elsewhere, in both its Series 2008 and its newer Series 4008 models, which were introduced in 1992. Fresenius Worldwide Dialysis also provides machine upgrade kits to allow for advanced therapy modes, thus offering the customer maximum performance with highly permeable polysulfone dialyzers.

88

<PAGE>   113

Since 1990, Fresenius Worldwide Dialysis periodically has introduced "intelligent" modules for machines, which actively monitor and respond to selected biophysical patient parameters (such as body temperature, relative blood volume, electrolyte balance, and so forth). This concept, known as "physiological dialysis," permits hemodialysis treatments with lower incidence of a variety of intradialytic symptoms, which still occur frequently in standard hemodialysis. The modularity of Fresenius Worldwide Dialysis dialysis machines ensures that this modern technology can be applied to all Series 4008 machines and to many Series 2008 machines.

All models in the newer Series 4008 comprise a sophisticated, microprocessor-controlled monitor in combination with an improved and extended version of the proven Fresenius AG hydraulic system, allowing for a high degree of treatment and service flexibility. Modular design allows Fresenius Worldwide Dialysis' machines to be upgraded by substituting modules instead of replacing the entire machine. Modular design also permits Fresenius Worldwide Dialysis to offer dialysis centers a broad range of options to meet specific patient or regional treatment requirements. The display panel can also be adapted using different modules to meet local language requirements. All machines have battery backup, permitting operation of the blood circuit and all protective systems for 15 to 20 minutes in the event of a power failure.

Fresenius Worldwide Dialysis also offers a computer interface module (FINESSE), which performs on-line data collection during dialysis, automatic entry of nursing records at the bedside, and prescribed therapy monitoring and assessment. The FINESSE system allows a large number of hemodialysis machines and other peripheral devices, such as patient scales, blood chemistry analyzers and blood pressure monitors, to be hooked up to a standard personal computer ("PC") network. This system makes it possible to register automatically the various parameters of each individual dialysis treatment for documentation and billing purposes, as well as to analyze medium- and long-term trends to assess the quality of the treatment and the patient's health. This hardware system and the related software are further important factors enabling treatment in the hospital or center with Fresenius Worldwide Dialysis products to be individually adapted to the patient. FINESSE is designed as an "open" system to allow adaptability to new devices and future trends in PC development.

Dialyzers. Most dialyzers sold by Fresenius Worldwide Dialysis use hollow fiber polysulfone membranes, a synthetic material. Fresenius Worldwide Dialysis developed the technology to mass-produce polysulfone dialyzers. Fresenius Medical Care believes that polysulfone has superior performance characteristics compared to other materials used in dialyzers, because polysulfone dialyzers are highly biocompatible and have superior clearing capacities for uremic toxins. Fresenius Worldwide Dialysis' polysulfone dialyzer line consists of a complete range of permeability (high, medium and low flux) to allow tailoring of the dialysis therapy to the individual patient. Fresenius Polysulfone(R) dialyzers are also available in an ultra-flux version for acute dialysis. While competitors of Fresenius Worldwide Dialysis currently sell polysulfone membranes in the market, Fresenius Worldwide Dialysis is the only manufacturer with more than 12 years' experience in applying the technology required to manufacture polysulfone membranes. Fresenius Worldwide Dialysis also manufactures cuprophane low-flux dialyzers. Dialyzer sales accounted for approximately 28% of Fresenius Worldwide Dialysis' revenues in each of 1995 and the three-month period ended March 31, 1996.

Other Hemodialysis Products. Fresenius Worldwide Dialysis manufactures and distributes arterial, venous, single needle and pediatric bloodlines. Fresenius Worldwide Dialysis produces both liquid and dry dialysate concentrates. Liquid dialysate concentrate is mixed with purified water by the hemodialysis machine to produce dialysis solution, which is used in hemodialysis treatment to remove the waste products and excess water from the patient's blood. Dry concentrate, developed more recently, is less labor-intensive to use, requires less storage space and may be less prone to bacterial growth than liquid solutions. Fresenius Worldwide Dialysis also produces dialysis solutions in bags, including solutions for priming and rinsing hemodialysis bloodlines, as well as connection systems for central concentrate supplies and devices for mixing dialysis solutions and supplying them to hemodialysis machines. Other Fresenius Worldwide Dialysis products include solutions for disinfecting and decalcifying hemodialysis machines, fistula needles, hemodialysis catheters, and products for acute renal treatment.

89

XXX-001925

<PAGE>   114

New Hemodialysis Products.  Fresenius Worldwide Dialysis has recently developed the Acu-men(TM), a compact dialysis machine for use in acute dialysis therapy. This machine is used together with a self-contained disposable cartridge, the Acu-cart(TM), comprising a dialyzer, a blood pump and a dialysis fluid chamber, and includes a battery for operation during patient movement from the intensive care unit (where acute dialysis is generally commenced) to a patient's hospital room or ward. Fresenius Worldwide Dialysis expects to complete the regulatory compliance process in the fall of 1996 and to conduct a multi-center field evaluation prior to product launch in 1997. For a discussion of the regulatory steps necessary to bring new products to market in Europe, see "-- Regulatory and Legal Matters -- Product Regulation -- Non-U.S."

PERITONEAL DIALYSIS PRODUCTS

Fresenius Worldwide Dialysis offers a full product line for peritoneal dialysis patients. In 1995, approximately 80% of Fresenius Worldwide Dialysis' global peritoneal dialysis product sales represented sales of solutions; the balance comprised peritoneal dialysis systems and components. Fresenius Worldwide Dialysis' peritoneal dialysis products include peritoneal dialysis cycling machines for CCPD and disposable products for both CAPD and CCPD, such as tubing, sterile solutions and sterile kits to prepare patients for dialysis.

CAPD Systems.  Fresenius Worldwide Dialysis manufactures standard and specialized peritoneal dialysis solutions. Fresenius Worldwide Dialysis believes that its peritoneal solution products with Safe-Lock(R) connection systems offer significant advantages for CAPD and CCPD home patients, including ease of use and greater protection against touch contamination than other peritoneal dialysis systems presently available. The Safe-Lock(R) system involves the connection procedure of introducing and draining the dialysis solution into and from the abdominal cavity through the use of the same bag for introduction and drainage. To use Safe-Lock(R) products, a catheter that has been surgically implanted in the patient is fitted with one part of the Safe-Lock(R) connector, and the peritoneal dialysis solution bag and tubing are fitted with the other part of the Safe-Lock(R) connector. Fresenius Worldwide Dialysis also manufactures the A.N.D.Y. and A.N.D.Y. Plus systems (A Non-Disconnect Y-system). These are disposable double bag systems utilizing a special drainage bag and a snap-off Y-shaped piece that is connected to the Safe-Lock(R) connector at the catheter. A.N.D.Y. double bag systems further reduce possible entry of contaminants during peritoneal dialysis. Fresenius Worldwide Dialysis has recently developed a new Stay-Safe(TM) system which Fresenius Medical Care believes will offer additional improvements over the Safe-Lock(R) system. See "-- New Peritoneal Dialysis Products."

Cyclers.  Although CAPD is the predominant form of peritoneal dialysis therapy, Fresenius Worldwide Dialysis believes that CCPD therapy offers patients benefits over CAPD therapy for patients who need more therapy due to body size, ultrafiltration loss or any other reason. In a standard CAPD program, a patient undergoes four manual two-liter exchanges of peritoneal dialysis solution over a 24-hour period, with treatment occurring seven days per week. CAPD must be performed by the patient when he or she is awake. With CCPD therapy, peritoneal dialysis cyclers provide automated dialysis solution exchange. The cycler delivers a prescribed volume of dialysis solution into the peritoneal cavity through an implanted catheter, allows the solution to dwell for a specified time, and completes the process by draining the solution. Cycling may be performed by patients at home throughout the night while sleeping. CCPD delivers more effective therapy than CAPD due to the supine position of the patient during the night, higher volume exchanges and preferable cycle management. With nighttime cycling, the patient has complete daytime freedom, wearing only the surgically-implanted catheter and capping device. In addition, Fresenius Worldwide Dialysis believes that CCPD reduces the risk of peritonitis due to less frequent handling of the catheter.

Fresenius USA introduced the first CCPD machine in 1980 and, in 1994, introduced a new variant on CCPD therapy, PD-Plus(R), that is now offered by Fresenius Worldwide Dialysis in Europe. See "-- Business of Fresenius USA -- Fresenius USA Products -- Peritoneal Dialysis Products."

Other Peritoneal Dialysis Products.  Fresenius Worldwide Dialysis also manufactures and distributes pediatric treatment systems for administration of low volumes of dialysis solutions, assist devices to facilitate automated bag exchange for handicapped patients, catheters, catheter implantation instruments, silicon glue, Pack-PD (a computer program which analyzes patient and peritoneal characteristics to present a range of

90

<PAGE>   115

treatment options for individual therapies), disinfectants, adapters, and products to assist and enhance connector sterility. Fresenius Worldwide Dialysis also provides scientific and patient information products, including support materials, such as brochures, slides, videos, instructional posters and training manuals.

New Peritoneal Dialysis Products.  Fresenius Worldwide Dialysis has recently developed a new CAPD system, comprising tubing, connectors and a peritoneal dialysis double bag, together with the process technology for the manufacture of the system. The Fresenius Stay-Safe(TM) peritoneal dialysis system utilizes a single switching mechanism that replaces the three tubing clamps to control drainage of solution, flushing of tubes that connect solution bags to catheters and introduction of new solution. The control device also further reduces the possibility of catheter contamination during connection and disconnection by sealing the catheter access and surrounding the catheter

XXX-001926

adapter with a disinfectant solution.

The entire Stay-Safe(TM) system is expected to be the first mass-produced PVC-free peritoneal dialysis system. The Stay-Safe(TM) system is made with Biofine(TM), a new foil developed by Fresenius AG and manufactured from multi-layered polyolefins. Fresenius Worldwide Dialysis management believes that the use of Biofine(TM) offers substantial advantages over PVC, which is currently in use. Biofine(TM) provides higher biocompatibility because it contains no plasticisers, which are known to leach into solutions. In addition, it is less gas permeable and interacts less with peritoneal dialysis solutions, thereby permitting a wider range of solutions (including bicarbonates) to be administered to peritoneal dialysis patients. Biofine(TM) foils may be disposed of with less harm to the environment than foils made with PVC because they require less material and, when burned, release only harmless carbon dioxide and water, and no Dioxine or Furane, as do foils made with PVC. Fresenius AG's management believes this will make its products more attractive, especially in Europe, where the disposal of PVC materials is heavily regulated.

European regulatory filings have been made in various countries for Biofine(TM). See "--Regulatory and Legal Matters -- Product Regulation -- Non-U.S." Following the conclusion of clinical trials and regulatory approval for Biofine(TM) materials, Fresenius Worldwide Dialysis expects to introduce its new peritoneal dialysis products featuring the Stay-Safe(TM) system in Europe. Thereafter, Fresenius Worldwide Dialysis expects to seek regulatory approval for these products in the U.S. Such approval is anticipated to take at least five years to obtain.

MARKETING, DISTRIBUTION AND SERVICE

Most of Fresenius Worldwide Dialysis' products are sold to hospitals, clinics and specialized treatment centers. Fresenius Worldwide Dialysis' sales and marketing operations are coordinated through separate strategic marketing centers for hemodialysis products and for peritoneal dialysis products, each based in Oberursel, Germany, which formulate global marketing strategies emphasizing therapy and product development. Regional marketing centers for hemodialysis products and for peritoneal dialysis products develop and implement regional marketing strategies and provide product management, training and support for local marketing offices. In addition to direct customer calls and advertising, Fresenius Worldwide Dialysis also sponsors medical conferences and scientific symposia as a means for disseminating product information.

With its comprehensive product line and years of experience in dialysis, Fresenius Worldwide Dialysis believes that it has been able to establish and maintain very close relationships with its clinic customer base on a global basis. Close interaction among Fresenius Worldwide Dialysis' sales force and research and development personnel enables concepts and ideas that develop in the field to be considered and integrated into product development.

In Fresenius Worldwide Dialysis' basic distribution system, products are shipped from factories to central warehouses which are frequently located near the factories. From this central warehouse, peritoneal dialysis products are distributed to regional warehouses, from which the product is distributed to the patient at home, and hemodialysis products are shipped directly to dialysis centers and other customers. All products are sold by local sales forces, independent distributors, dealers and sales agents.

Fresenius Worldwide Dialysis offers customer service, training and education in the applicable local language, and technical support such as field service, repair shops, maintenance, and warranty regulation for

91

<PAGE>  116

each country in which it sells dialysis products. In its main training and education center at the Schweinfurt Facility, Fresenius Worldwide Dialysis performed 62 training sessions for 300 technicians from 50 countries around the world in 1995. Additionally, in 1995 and 1996, Fresenius Worldwide Dialysis organized regional service centers which are now responsible for day-to-day international service support. The Schweinfurt Facility also provides training and acts as a backup for the regional service centers. Fresenius Worldwide Dialysis management believes its service organizations have a reputation for reliability and high quality service. Fresenius Worldwide Dialysis employs more than 250 employees worldwide, including approximately 150 customer service engineers, to serve its installed base of hemodialysis machines. In addition, Fresenius Worldwide Dialysis provides technical training to employees of hospitals and other health care providers in the use of Fresenius Worldwide Dialysis products.

MANUFACTURING OPERATIONS AND SOURCES OF SUPPLY

Fresenius Worldwide Dialysis operates a state-of-the-art production facility for disposable products at the St. Wendel Facility. More than 71% of all dialyzers containing the Fresenius Polysulfone(R) membrane produced worldwide were manufactured at the St. Wendel Facility in 1995 (67% in the three-month period ended March 31, 1996). Fresenius Worldwide Dialysis has invested significantly in developing proprietary processes, technologies and manufacturing equipment which Fresenius Worldwide Dialysis believes provide a competitive advantage in the manufacture of its products. Fresenius Medical Care intends to use the St. Wendel Facility as a center of competence for development and manufacturing and to implement similar technologies at its other facilities. See "THE REORGANIZATION -- Continuing Arrangements between Fresenius Medical Care and Fresenius AG -- Real Property Lease." In addition to the St. Wendel Facility, Fresenius Worldwide Dialysis' dialyzers and polysulfone membranes are produced in Ogden, Utah, and by joint ventures in Belarus and Japan. Cuprophane

XXX-001927

dialyzers are manufactured at a plant in France.

    Fresenius Worldwide Dialysis develops and manufactures hemodialysis machines in the Schweinfurt Facility, and also in Walnut Creek, California, and maintains facilities in Argentina, Egypt, France, Italy, The Netherlands, China, Brazil and Russia for the testing and calibration of dialysis machines manufactured or assembled elsewhere. Fresenius Worldwide Dialysis manufactures peritoneal dialysis cyclers in Germany (Schweinfurt), the U.S. (Walnut Creek, California) and France. Peritoneal dialysis solutions are manufactured in Germany (St. Wendel), the U.S. (Ogden, Utah), Brazil, Spain, and England. Hemodialysis bloodlines and peritoneal dialysis tubing sets are manufactured in Germany (St. Wendel), Belarus, France and Italy. Fresenius Worldwide Dialysis also manufactures hemodialysis concentrates and solutions in Germany, the U.S., Austria, Australia, France and Great Britain and hemodialysis concentrates and peritoneal dialysis solutions at a facility in Brazil. The facilities in Austria, Brazil, France (Sevres), and Great Britain are predominantly used by Fresenius AG's Pharmaceuticals Division. Following the Reorganization, the facilities predominately used by Fresenius AG's Pharmaceuticals Division will remain with Fresenius AG, and Fresenius Medical Care will enter into the Supply Agreements with Fresenius AG for the products used by Fresenius Worldwide Dialysis that are produced at these facilities. For a description of the terms of these supply contracts, see "THE REORGANIZATION -- Continuing Arrangements between Fresenius Medical Care and Fresenius AG -- Supply Agreements."

    Raw materials essential to Fresenius Worldwide Dialysis' business are purchased worldwide from numerous suppliers and no serious shortages or delays in obtaining raw materials have been encountered. To assure continuous high quality, Fresenius Worldwide Dialysis has single supplier agreements for many of its polymers, including polysulfone, polyvinylpyrrolidone, and polyurethane for dialyzer production and for polypropylene for polyolefin resins used to produce Biofine(TM). Wherever single supplier agreements exist, an alternative supplier is available whose material has already been tested in manufacturing processes and, Fresenius Medical Care management believes, can be introduced without major delays. However, use of raw materials obtained from alternative suppliers could cause costs to rise due to necessary adjustments in the production process.

    Each step in the manufacture of Fresenius Worldwide Dialysis' products, from the initial processing of raw materials through the final packaging of the completed product, is carried out under controlled quality assurance procedures required by law and under GMP, as well as under comprehensive quality management

                                      92

<PAGE>    117

systems, such as the internationally recognized ISO 9000-9004 standards, which are mandated by regulatory authorities in the countries in which Fresenius Worldwide Dialysis operates. In addition, the St. Wendel Facility periodically undergoes FDA inspection. The St. Wendel Facility was last inspected in December 1992 and no adverse findings were made.

    Incoming raw materials for solutions are subjected to infrared, ultraviolet and physical and chemical analyses to assure quality and consistency. During the production cycle, sampling and testing are performed in accordance with established quality assurance procedures. Pressure, temperature and time for various processes are monitored to assure consistency of semifinished goods. Environmental conditions are monitored to assure that particulate and bacteriological levels do not exceed specified maximums. Sampling and testing are done in accordance with physical and chemical procedures required to insure sterility, safety and potency of finished products. Fresenius Worldwide Dialysis maintains continuing quality control and GMP education and training programs for its employees. See "-- Regulatory and Legal Matters."

INTERNATIONAL DEVELOPMENT

    In 1971, Fresenius AG founded its first non-German subsidiaries in France and Switzerland, and, between 1976 and 1995, subsidiaries were established or acquired in Austria, Australia, Spain, Brazil, the Netherlands, Great Britain, Hungary, Russia, Italy, the Czech Republic, Belgium, Portugal, Japan, Argentina and Colombia. In 1985, Fresenius AG commenced distribution of hemodialysis machines and other hemodialysis products in the U.S. through a wholly owned subsidiary and, in 1987, Fresenius AG acquired effective control of Fresenius USA. See "-- Business of Fresenius USA  -- History." In 1987, Fresenius AG also acquired Laboratoires SMAD, a French company based in L'Arbresle (near Lyon).

    In 1989, Fresenius AG formed a joint venture in Borisov, Belarus with the Borisov Collective Combine for the production of disposable dialysis products for global sale. Fresenius AG holds a 21.7% stake in this venture. In 1990, Fresenius AG entered into a 50/50 joint venture with Kawasumi of Japan to produce (in Kyushyu, Japan) and sell polysulfone dialyzers for the Japanese market.

    In 1994, Fresenius AG formed Ningbo Fresenius Medical Equipment Co. Ltd., a joint venture in China, in which Fresenius AG holds an 80% share. Plans for this venture, while still under development, include assembly of filters and manufacture of bloodlines. In the same year, Fresenius AG founded the joint venture Fresenius Tunisie S.A., in which Fresenius AG has a 51% beneficial ownership interest, which will initially manufacture hemodialysis and irrigation solutions in Tunisia. Fresenius AG also acquired a 39% share of Medical Dialyzer Corporation Ltd. in Jeddah, Saudi Arabia, thereby extending Fresenius AG's distribution capabilities in the Middle East.

    The subsidiaries and joint venture interests described above are all included in Fresenius Worldwide Dialysis. Certain of the joint venture agreements referred to above require the consent of the other party for a

XXX-001928

transfer of the joint venture interest to Fresenius Medical Care. Consents with respect to the joint ventures in Japan, Belarus, China, Saudi Arabia and Tunisia have been obtained. Certain of Fresenius Worldwide Dialysis' joint venture agreements include non-competition clauses applicable during the term of, and for a specific period after termination of, the joint venture and provide the parties with first refusal rights in connection with the transfer of interests in the venture.

RESEARCH AND DEVELOPMENT

Current research and development activities of Fresenius Worldwide Dialysis are strongly focused on the development of new products, technologies and treatment concepts to optimize the quality of treatment for dialysis patients, and on process technology for the manufacture of Fresenius Worldwide Dialysis products. Research and development is conducted through the Innovation & Technology Group which is divided into hemodialysis and peritoneal dialysis segments. These units work closely with the respective marketing and medical departments in each dialysis segment.

In addition to the Stay-Safe(TM) system described under "-- Fresenius Worldwide Dialysis Products -- Peritoneal Dialysis Products -- New Peritoneal Dialysis Products," recent innovations include the

93

<PAGE>   118

PD-NIGHT(TM) cycler, which has been developed for overnight cycling peritoneal dialysis treatments. Clinical trials have commenced for various peritoneal dialysis solutions with new compounds. Additional developments include various hemodialysis machine modules which will allow the continuous measurement and control of dialysis dosage during treatment.

Fresenius Worldwide Dialysis employs approximately 130 persons in research and development (including medical doctors, engineers, technicians and research scientists), and conducts its activities at three locations in Germany (at the St. Wendel Facility, the Schweinfurt Facility and the Bad Homburg facility), and in Walnut Creek, California. Fresenius Worldwide Dialysis' research and development expenses were $17.3 million, $16.9 million and $15.9 million in 1995, 1994 and 1993, respectively and $3.6 million and $3.3 million for the three-month periods ended March 31, 1996 and 1995, respectively.

Fresenius Worldwide Dialysis seeks to maintain its profile in scientific circles through articles in scientific and medical journals, participation in academic symposia, relationships with scientists and physicians in relevant fields and the organization of scientific meetings and workshops. Fresenius Worldwide Dialysis also establishes scientific advisory boards and works with medical and other consultants.

PATENTS, TRADEMARKS AND LICENSES

As the owner of or licensee under patents and trademarks throughout the world, Fresenius AG holds rights under more than 600 patents and patent applications relating to dialysis technology in major markets. Patented technologies of Fresenius AG that relate to dialyzers include Fresenius Worldwide Dialysis' polysulfone hollow fiber, Fresenius Worldwide Dialysis' in-line sterilization method, and sterile closures for in-line sterilized medical devices. For dialysis machines, Fresenius AG patents include the process for volumetric mixing of concentrate with water, the location for a filter device for sterile filtering dialysate in the dialysis machine circuit, and conductivity sensor devices and a mathematical algorithm for using such devices. Pending patents include the safety concept for the control of the ultrafiltration rate in a dialysis machine used for high flux dialysis and the connector system for the Fresenius Worldwide Dialysis' biBag(TM) bicarbonate concentrate powder container.

For peritoneal dialysis, Fresenius AG holds patents on the Safe-Lock(R) system, the double bag for bicarbonate peritoneal dialysis solution, and its orientation of the two compartments. Pending patents include non-PVC film (Biofine(TM)) for general use in intravenous and peritoneal dialysis applications and a special film for a peelable, non-PVC double bag for peritoneal dialysis solutions. In connection with the Reorganization, Fresenius Medical Care and its subsidiaries will acquire or license all intellectual property rights of Fresenius AG relating to Fresenius Worldwide Dialysis. See "THE REORGANIZATION -- Continuing Arrangements between Fresenius Medical Care and Fresenius AG -- Trademarks" and "-- Other Intellectual Property" for a summary of the terms of the licensing arrangements.

The patent family covering Fresenius Polysulfone(R) high flux membranes has been subject to opposition by competitors in Europe and Japan. While Fresenius AG believes that these patents are valid in the relevant jurisdictions, a successful opposition could have a material adverse effect on Fresenius Medical Care.

Fresenius AG believes that the success of Fresenius Worldwide Dialysis will depend, in large part, on its technology. While Fresenius Worldwide Dialysis, as a standard practice, obtains such legal protections it believes are appropriate for its intellectual property, such intellectual property is subject to infringement or invalidation claims. In addition, technological developments in ESRD therapy could reduce the value of Fresenius Worldwide Dialysis' existing intellectual property, which reduction could be rapid and unanticipated.

COMPETITION

The markets in which Fresenius Worldwide Dialysis sells its products are

XXX-001929

highly competitive. Among Fresenius Worldwide Dialysis' competitors in the sale
of hemodialysis and peritoneal dialysis products are CGH Medical (an affiliate
of Gambro AB), Baxter, Althin CD Medical, Inc., NMC, Asahi Medical Co., Ltd.,
Bellco S.p.A. (a subsidiary of Sorin Biomedica S.p.A.), Bieffe Medital S.p.A.,
Braun Melsungen AG,

94

<PAGE>  119

Nissho Corporation (including Nissho Nipro Corporation Ltd.), Nikkiso Co., Ltd.,
Terumo Medical Corporation and Toray Medical Co., Ltd. Some of Fresenius
Worldwide Dialysis' competitors possess greater financial, marketing and
research and development resources than Fresenius Worldwide Dialysis.

    Fresenius Worldwide Dialysis believes that in the dialysis product market,
companies compete primarily on the basis of product performance,
cost-effectiveness, reliability, assurance of supply and service and continued
technological innovation. Fresenius Worldwide Dialysis believes its products are
highly competitive in all of these areas.

EMPLOYEES

    At March 31, 1996, Fresenius Worldwide Dialysis employed approximately
4,360 people worldwide, of whom approximately 1,900 were employed in Germany,
approximately 1,660 were employed in the U.S. and approximately 800 were
employed in other countries. Fresenius AG is a member of the Chemical Industry
Employers Association in Germany and is bound by an industry-wide employment
agreement negotiated with union representatives in that industry. Fresenius AG
is also a party to additional labor agreements negotiated with works councils at
individual facilities relating to those facilities. Management believes that
Fresenius Worldwide Dialysis' relations with its employees are good.

PROPERTIES

    The table below describes Fresenius Worldwide Dialysis' principal
facilities as of the date hereof, other than those of Fresenius USA. The land
and buildings comprising Fresenius Worldwide Dialysis' principal facilities in
Germany will not be acquired by Fresenius Medical Care, but, rather, will be
leased by Fresenius AG or a Fresenius AG affiliate to Fresenius Medical Care or
a Fresenius Medical Care affiliate. For a description of the terms of this lease
see "THE REORGANIZATION -- Continuing Arrangements between Fresenius Medical
Care and Fresenius AG." For information relating to the principal facilities of
Fresenius USA, see "-- Business of Fresenius USA -- Properties."

<TABLE>
<CAPTION>

| LOCATION | FLOOR AREA (APPROXIMATE SQUARE METERS) | CURRENTLY OWNED OR LEASED BY FRESENIUS AG | USE |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Oberursel, Germany............ | 6,629 | owned | Corporate headquarters and administration. |
|  | 4,193 | 99-year lease |  |
| St. Wendel, Germany.......... | 100,543 | owned | Manufacture of polysulfone membranes and dialyzers, blood lines, and peritoneal dialysis solutions; research and development. |
| Schweinfurt, Germany......... | 32,496 | owned | Manufacture of hemodialysis machines and peritoneal dialysis cyclers; research and development. |
| L'Arbresle, France........... | 57,290 | owned | Manufacture of cuprophane dialyzers and special filters, dry hemodialysis concentrates and bloodlines. |
| Saumur, France.............. | 10,000 | owned | Assembly of peritoneal dialysis cyclers and manufacturing of components. |

</TABLE>

95

<PAGE>  120

<TABLE>
<CAPTION>

| LOCATION | FLOOR AREA (APPROXIMATE SQUARE METERS) | CURRENTLY OWNED OR LEASED BY FRESENIUS AG | USE |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Kyushyu, Japan................ (Owned by a joint venture 50% owned by Fresenius AG) | 24,083 | owned | Manufacture of polysulfone membranes and dialyzers, dialysis solutions, dialysis machine components and assembly of dialysis machines. |
| Palazzo Pignano, Italy........ | 66,550 | owned | Manufacture of bloodlines and tubing. |

</TABLE>

XXX-001930

LITIGATION

In the ordinary course of business, Fresenius Worldwide Dialysis asserts claims against others and defends claims asserted by others against it. Fresenius Worldwide Dialysis believes that its obligations, if any, with respect to all of such claims will not have a material adverse effect on the financial position or results of operations of Fresenius Worldwide Dialysis.

Fresenius Worldwide Dialysis' insurance is currently provided through the insurance program of Fresenius AG. The insurance coverage is maintained with third-party carriers and selected as part of a comprehensive risk management process, involving risk analysis and risk minimization. Fresenius Worldwide Dialysis maintains insurance which Fresenius AG management believes is adequate for the risks involved. In addition to local policies which meet local needs and characteristics, international policies cover those risks which could threaten the existence of Fresenius Worldwide Dialysis. Special focus in this context is directed at coverage which relates to product liability, property damage, pollution and business income.

BUSINESS OF FRESENIUS USA

FRESENIUS USA

Fresenius USA manufactures and distributes equipment and disposable products for the treatment of kidney failure by hemodialysis and by peritoneal dialysis. Fresenius USA offers a full line of hemodialysis machines, peritoneal dialysis cyclers and disposable products. Fresenius USA has exclusive North American distribution rights for Fresenius Worldwide Dialysis' products.

On February 24, 1993, Fresenius USA acquired the renal dialysis business (other than the Calcijex(R) product line and certain other excluded assets) of Abbott in the U.S., Australia and New Zealand (the "Abbott Acquisition"). Among other things, the Abbott Acquisition gave Fresenius USA rights in and access to Abbott's patents, trademarks, know-how, manufacturing technology and other intangible rights and property used by Abbott in the renal dialysis business. Abbott also agreed to manufacture certain peritoneal dialysis products for Fresenius USA for five years, after which time Fresenius USA intends to manufacture these products itself. With the Abbott Acquisition, Fresenius USA obtained rights to peritoneal dialysis products utilizing connection systems that are compatible with those of Baxter, its primary competitor, thereby enhancing the breadth and marketability of Fresenius USA's peritoneal dialysis product line and giving Fresenius USA a larger base of potential peritoneal dialysis patients. As a result of the Abbott Acquisition, Fresenius USA became the second largest producer and supplier of peritoneal dialysis products in the U.S.

In 1995, Fresenius USA completed the expansion of its plant in Ogden, Utah (modeled on the St. Wendel Facility) and commenced production of polysulfone dialyzers (previously purchased by Fresenius USA exclusively from Fresenius AG). Fresenius USA intends to utilize this plant's expanded capacity further to include the production of certain additional peritoneal dialysis products (currently manufactured for Fresenius USA by Abbott) and the plastic film used in the manufacture of Fresenius USA's peritoneal

96

<PAGE>  121

dialysis solution plastic bags (currently imported from The Netherlands). This expansion reflects the increasing globalization of Fresenius Medical Care's manufacturing activities. See "-- Strategy." The management of Fresenius USA believes that this expansion also will help to integrate Fresenius USA's manufacturing processes vertically and thereby enable Fresenius USA to become less dependent on other manufacturers, and, in the case of the polysulfone dialyzers and the plastic film, to reduce significantly the pricing, allocation and currency risks to which Fresenius USA is currently subject.

HISTORY

Fresenius USA comprises the combined operations of two businesses, which have been owned or effectively controlled by Fresenius AG since October 1987, and the assets of which were formally combined on December 31, 1991. One was Fresenius USA itself which, prior to December 31, 1991, operated under the name Delmed, Inc. ("Delmed") and manufactured peritoneal dialysis solutions and systems. The other was Fresenius U.S.A., Inc., a California corporation ("Old FUSA") and a wholly owned subsidiary of Fresenius AG, which engaged in the manufacture and sale of hemodialysis machines and related equipment and supplies.

In October 1987, Fresenius AG acquired effective control of Delmed by purchasing Delmed's Series F Series Preferred Stock and certain other securities of Delmed, such that Fresenius AG then beneficially owned approximately 49% of Delmed's outstanding common stock. Following this acquisition, Delmed continued to operate independently of Old FUSA, with NMC as its exclusive distributor. The exclusive distribution arrangement between Delmed and NMC expired in March 1990 and, in April 1990, Old FUSA began to act as the exclusive distributor of Delmed's peritoneal dialysis products. During 1990 and 1991, Old FUSA made significant expenditures to establish a sales and distribution network for Delmed's peritoneal dialysis products. On December 30, 1991, Delmed changed its name to "Fresenius USA, Inc." and effected a one-for-ten reverse split of its common stock. Effective December 31, 1991, Fresenius USA acquired substantially all of Old FUSA's assets, which included the exclusive North American distribution rights for certain Fresenius AG products and the distribution network for Delmed's peritoneal dialysis products established by Old FUSA, subject to substantially all of Old FUSA's liabilities. These transactions

XXX-001931

resulted in an increase in Fresenius AG's beneficial ownership of Fresenius USA Common Stock to approximately 80%. A public offering by Fresenius USA of Fresenius USA Common Stock in 1994 reduced Fresenius AG's beneficial ownership to approximately 71%.

97

<PAGE>  122

FRESENIUS USA PRODUCTS

OVERVIEW

Fresenius USA's products include machines and related disposables for hemodialysis and peritoneal dialysis treatment of ESRD. Fresenius USA's product catalogs contain over 2,500 different items. The following table shows, for each of the past three years and the three month period ended March 31, 1996, total revenues related to hemodialysis products and peritoneal dialysis products, as well as total revenues related to all other products:

<TABLE>
<CAPTION>

| | YEAR ENDED DECEMBER 31, | | | | | | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|---|---|---|
| | 1993 | | 1994 | | 1995 | | 1996 | |
| | TOTAL REVENUES | % OF TOTAL | TOTAL REVENUES | % OF TOTAL | TOTAL REVENUES | % OF TOTAL | TOTAL REVENUES | % OF TOTAL |
| <S> | <C> | <C> | <C> | <C> | (DOLLARS IN THOUSANDS) <C> | <C> | <C> | <C> |
| Hemodialysis........... | $134,117 | 65% | $170,579 | 67% | $206,875 | 68% | $ 55,706 | 69% |
| Peritoneal Dialysis(1).......... | 65,073 | 32 | 77,331 | 30 | 89,561 | 29 | 23,038 | 28 |
| Other Products......... | 6,770 | 3 | 6,434 | 3 | 8,528 | 3 | 2,318 | 3 |
| Total........ | $205,960 | 100% | $254,344 | 100% | $304,964 | 100% | $ 81,062 | 100% |

</TABLE>

- ----------------

(1) On February 24, 1993, Fresenius USA consummated the Abbott Acquisition, which is included in the above figures only from and after this date. If the Abbott Acquisition had occurred on January 1, 1993, Fresenius USA's pro forma total revenues from peritoneal dialysis in 1993 would have been $69.8 million.

HEMODIALYSIS PRODUCTS

Fresenius USA offers a full line of products for hemodialysis, consisting of: four different hemodialysis machines; high, medium and low flux dialyzers; bloodlines; dialysis solutions and concentrates; needles, connectors and other similar supplies; and machines and supplies for the reuse of dialyzers.

Fresenius USA assembles, tests and calibrates hemodialysis machines and sells these machines in the U.S., Canada and Mexico. Components for these machines are purchased from Fresenius AG and other vendors. Hemodialysis machines sold by Fresenius USA employ the same modular design as the Fresenius Worldwide Dialysis dialysis machines described under "-- Business of Fresenius Worldwide Dialysis -- Fresenius Worldwide Dialysis Products -- Hemodialysis Products," but are tailored to local markets. Fresenius USA has extended the Fresenius Series 2008 hemodialysis machines for the North American market through development of the model 2008H, which combines the reliable hydraulic system of the Series 2008 with electronic systems developed by Fresenius USA. Fresenius USA's hemodialysis machines are capable of operating with dialyzers manufactured by all manufacturers, and are compatible with a wide variety of bloodlines and dialysis solutions.

All dialyzers produced by Fresenius USA use hollow fiber polysulfone membranes. Fresenius USA's polysulfone dialyzer line consists of a complete range of permeability (high, medium and low flux) to allow tailoring of the dialysis therapy to the individual patient. Until 1995, all polysulfone dialyzers sold by Fresenius USA were manufactured by Fresenius AG in Germany. Fresenius USA commenced manufacturing of certain polysulfone dialyzers at its plant in Ogden, Utah in August, 1995, but plans to continue to import certain dialyzers manufactured in Germany.

Fresenius USA distributes disposable bloodlines which carry a hemodialysis patient's blood from the patient to the hemodialysis machine and dialyzer and then back to the patient. These bloodlines are manufactured abroad by a third party. Fresenius USA produces both liquid and dry dialysate concentrate.

Fresenius USA also sells dialyzer reuse and rinse machines manufactured by Fresenius USA for Seratronics, Inc. ("Seratronics"). These machines cleanse dialyzers after dialysis, permitting multiple usage for the same patient before disposal of the dialyzer. The Seratronics machines facilitate the reuse of disposable

98

<PAGE>  123

dialyzers and, therefore, permit hemodialysis providers to reduce operating costs. The reuse business of Seratronics is managed by Fresenius USA.

XXX-001932

PERITONEAL DIALYSIS PRODUCTS

Fresenius USA offers a full product line for peritoneal dialysis patients. Fresenius USA's peritoneal dialysis products include four different peritoneal dialysis cycling machines for CCPD and more than 90 disposable products for both CAPD and CCPD, such as tubing, sterile solutions and sterile kits to prepare patients for dialysis.

Fresenius USA believes that its Delflex(R) solution products with Safe-Lock(R) connectors offer significant advantages for CAPD and CCPD home patients, including ease of use and greater protection against touch contamination than other peritoneal dialysis systems. The Inpersol(R) line of peritoneal dialysis products acquired from Abbott is interchangeable and competitive with the peritoneal dialysis products offered by Baxter, Fresenius USA's major competitor in this field. Therefore, the addition of the Inpersol(R) product line to Fresenius USA's other products enables Fresenius USA to expand the potential customer base for which it competes, because Fresenius USA now supplies peritoneal dialysis products usable by all peritoneal dialysis patients in the U.S.

In March 1996, Fresenius USA received FDA approval of its new Premier twin bag CAPD system. This system comprises a single product, the Delflex(R) solution bag and the tubing and drainage set necessary for CAPD exchanges. The Premier bag system also utilizes Safe-Lock(R) connectors and, because fewer connections are required, may help to reduce patient complications associated with peritoneal dialysis therapy. The Premier bag system also includes new fill volumes which offer the physician the ability to prescribe larger dosages without requiring the patient to do more exchanges during the day. Fresenius USA expects to begin its market launch of the Premier twin bag system during July 1996.

Fresenius USA introduced the first CCPD machine in 1980. Fresenius USA's peritoneal dialysis cycling equipment incorporates microprocessor technology that can be easily programmed by the patient, hospital or clinic staff to perform specific, prescribed therapy for a given patient. Since all components are monitored and programmable, these machines allow the physician to prescribe any of a number of current therapy procedures, including CCPD, intermittent peritoneal dialysis and tidal peritoneal dialysis.

In 1994, Fresenius USA introduced a new variant on CCPD therapy called PD-Plus(R), which is now also being offered by Fresenius Worldwide Dialysis in Europe. Normally, a CCPD patient undergoes five or six two-liter solution exchanges at night, and carries no solution during the day. PD-Plus(R) therapy provides a more tailored therapy using a simpler nighttime cycler, and, where necessary, one exchange during the day. Compared with typical CCPD therapy, Fresenius USA believes that PD-Plus(R) therapy will be less costly and easier to administer. In addition, compared with CAPD therapy, Fresenius USA believes that PD-Plus(R) therapy will improve toxin removal by more than 40% and therefore will be attractive to patients and physicians alike. By increasing the effectiveness of peritoneal dialysis treatments, at an acceptable increase in cost over CAPD therapy, PD-Plus(R) therapy may also effectively prolong the time period during which a patient will be able to remain on peritoneal dialysis before requiring hemodialysis. PD-Plus(R) therapy, as developed by Fresenius USA, can only be performed using Fresenius' Freedom Cycler and special tubing using Safe-Lock(R) connectors.

MARKETING, DISTRIBUTION AND SERVICE

Fresenius USA maintains a national direct sales force of trained salespersons, organized on a regional basis and engaged in the sale of both hemodialysis and peritoneal dialysis products. Each member of Fresenius USA's sales force has extensive sales experience. This sales force engages in direct promotional efforts, including visits to physicians, clinical specialists, hospitals, clinics and dialysis centers, and represents Fresenius USA at industry trade shows. Fresenius USA also maintains a clinical support group primarily composed of registered nurses to train and assist its customers and facilitate the introduction of new products. Technical support is also available to customers on a 24-hour basis through a toll-free telephone number.

99

<PAGE>   124

Fresenius USA's service department provides technical support, spare parts and field service on a nationwide basis.

All of Fresenius USA's machines are shipped from its facilities in Walnut Creek, California. Fresenius USA's dialyzers and other hemodialysis disposable products are shipped to regional distribution centers from Fresenius USA's facilities in Ogden, Utah and, until March 31, 1996, from Maumee, Ohio. At the end of the first quarter of 1996, Fresenius USA closed the Maumee facility and relocated its operations to Lewisberry, Pennsylvania. Fresenius USA's disposable peritoneal dialysis products are shipped from its facility in Ogden, Utah or from Abbott facilities to regional distribution centers, and, from these regional distribution centers, the products are delivered directly to the customer, in most cases the patient, by Fresenius USA's drivers. Fresenius USA's drivers store deliveries in the location desired by the patient, rotate disposable products so that the oldest products are used first, and generally provide continuity of contact between Fresenius USA and patients who use Fresenius USA's peritoneal dialysis products.

At the time of the Abbott Acquisition, Abbott had agreements with numerous hospitals pursuant to which these hospitals could order the full line of Abbott products, including renal dialysis products, from Abbott. Abbott has agreed to act as Fresenius USA's distributor for the continued sale of Inpersol(R)

XXX-001933

products to hospitals until 1998. Following the Abbott Acquisition, Fresenius USA consolidated the distribution outlets used by Abbott with Fresenius USA's distribution outlets, eliminating or consolidating certain locations and introducing Fresenius USA's products into many of the public warehouses previously used by Abbott.

Fresenius USA's products are distributed in Canada by a wholly owned Canadian subsidiary. Fresenius USA acquired the remaining interest in this subsidiary held by an unaffiliated third party during 1993 for consideration of a convertible note which was subsequently converted to 434,000 shares of Fresenius USA Common Stock. Fresenius USA currently distributes its products in Mexico via independent distributors. Inpersol(R) products are not distributed by Fresenius USA in Canada or Mexico, where a subsidiary of Abbott retains exclusive rights to these products.

MANUFACTURING OPERATIONS AND SOURCES OF SUPPLY

Fresenius USA assembles equipment, including hemodialysis machines, dialyzer reuse devices and peritoneal dialysis cyclers, at its facility in Walnut Creek, California. Components of Fresenius USA's hemodialysis machines are supplied by Fresenius AG as well as other suppliers, and Fresenius USA has experienced no difficulties in obtaining sufficient quantities of such components. In connection with the sale and installation of the machines, Fresenius USA's technicians and engineers calibrate the machines and add computer software for record keeping and monitoring.

Fresenius USA owns a 344,000 square-foot facility in Ogden, Utah for the manufacture of disposable products, including polysulfone dialyzers, peritoneal dialysis solutions, other sterile solutions, plastic tubing and medical devices. This facility uses automated equipment for the production of polysulfone dialyzers and sterile solutions in flexible plastic containers. The design of Fresenius USA's Ogden facility is based on the design of the St. Wendel Facility, and was constructed in consultation with Fresenius AG. While Fresenius USA obtains the film used in the manufacture of its plastic bags from one supplier located in The Netherlands, Fresenius USA believes that there are readily available alternative sources of supply for which the FDA could grant expedited approval. Fresenius USA also intends to manufacture its own plastic film for peritoneal dialysis solution bags.

Prior to 1995, all polysulfone dialyzers sold by Fresenius USA were manufactured by Fresenius AG in Germany. In April 1994, Fresenius AG granted Fresenius USA an exclusive license in the U.S., Canada, Mexico and Puerto Rico for the proprietary technology for the manufacture of polysulfone dialyzers and agreed to provide required technical support and assistance in return for a 4.5% royalty on sales of Fresenius USA-manufactured dialyzers for 10 years, beginning January 1, 1996, at the conclusion of which Fresenius USA will have a paid-up exclusive license in North America. Fresenius USA completed an expansion of its Ogden facility for the manufacture of polysulfone dialyzers and commenced such manufacturing in the second quarter of 1995. While Fresenius USA began manufacturing dialyzers at that time, Fresenius USA has also

100

<PAGE>    125

continued to purchase dialyzers and polysulfone bundles from Fresenius AG. Fresenius USA believes that it is the principal manufacturer of polysulfone dialyzers in the U.S.

Over the next two years, Fresenius USA intends to transfer the production of the products acquired from Abbott to Fresenius USA's facility in Ogden, Utah. During this period, Fresenius USA has agreed to purchase products at contractually-established prices, and Abbott has agreed to manufacture and sell to Fresenius USA stated quantities of Inpersol(R) dialysis products. Fresenius USA's license agreement with Abbott also provides Fresenius USA with access to Abbott's manufacturing technology used in connection with Abbott's production of peritoneal dialysis solution in plastic bags, related tubing assemblies and other products used in the dialysis field (other than Abbott's Calcijex(R) product line). Abbott will assist Fresenius USA in establishing Fresenius USA's manufacturing capability for these products. Fresenius USA intends to use this technology to develop the ability to manufacture several components that it now purchases from third parties. In March 1996, Fresenius USA received FDA approval to manufacture Abbott Inpersol(R) dialysis solutions with Safe-Lock(R) connectors and twin-bag systems.

Each step in the manufacture of Fresenius USA's products, from the initial processing of raw materials through the final packaging of the completed product, is carried out under controlled quality assurance procedures and under GMP mandated by the FDA. Incoming raw materials for solutions are subjected to infrared, ultraviolet and physical and chemical analysis to assure quality and consistency. During the production cycle, sampling and testing are done in accordance with established quality assurance procedures. Pressure, temperature and time for various processes are monitored to assure consistency of semifinished goods. Environmental conditions are monitored to assure that particulate and bacteriological levels do not exceed specified maximums. Sampling and testing are done in accordance with physical and chemical procedures required to insure sterility, safety and potency of finished products. Fresenius USA maintains continuing quality control and GMP education and training programs for its employees.

In 1992, Fresenius USA began producing liquid dialysate concentrate at a facility in Maumee, Ohio. Fresenius USA moved this operation to its facility in Lewisberry, Pennsylvania at the end of the first quarter of 1996. On March 26, 1996, Fresenius USA entered into a non-binding letter of intent with an unaffiliated third party to sell its assets comprising the concentrate

XXX-001934

production facility in Lewisberry, Pennsylvania. The letter of intent provides that any obligation of Fresenius USA to sell the assets is contingent upon consummation of the Reorganization.

Fresenius USA obtains its bloodlines under an agreement with Medisystems Corporation ("MDS"), whose principal source of bloodlines is a single FDA-approved plant located in Thailand. The agreement has an eight-year term ending in September 1999 and is automatically extended thereafter for successive three-year terms unless one-year's notice of termination is given prior to the expiration of the term or any extension thereof. Fresenius USA is required to make minimum annual purchase commitments (currently approximately 11.9 million bloodline sets) which increase by a minimum of 8% per year. The agreement includes guaranteed price provisions, subject to permitted increases reflecting cost increases beyond the supplier's control. In March 1996, Fresenius USA and MDS released each other from the exclusivity provisions of the supply agreement. Such release was effective immediately, with exclusivity to be reinstated if the Reorganization is not consummated, except that MDS will continue to have the right to sell bloodlines to customers who became such prior to the termination or abandonment of the Reorganization.

RESEARCH AND DEVELOPMENT

Fresenius USA's product development staff works closely with Fresenius AG's research and development group to coordinate the development of new products and product modifications for the U.S. market. In addition, Fresenius USA's research and development staff coordinates its efforts with its sales force on an ongoing basis. Fresenius USA relies primarily on the research and development efforts of Fresenius AG, negotiating distribution arrangements for new products from Fresenius AG when Fresenius AG and Fresenius USA believe that there is market potential for these products in the U.S. and when the products fit Fresenius USA's business strategy.

101

<PAGE> 126

During 1995, 1994 and 1993 and the three-month periods ended March 31, 1996 and 1995, Fresenius USA spent approximately $2.3 million, $1.8 million, $1.5 million, $600,000 and $500,000, respectively, on research and development activities. Fresenius USA believes that, in the absence of its access to the research and development efforts of Fresenius AG, Fresenius USA would have had to spend significantly more on research and development. Fresenius USA and Fresenius AG from time to time negotiate the basis on which Fresenius USA will have access to these efforts on an arm's-length basis including, in some cases, payment of royalties by Fresenius USA to Fresenius AG.

Fresenius USA maintains a product development group comprised of engineers and other technical personnel. This group has created the operational software for much of the equipment marketed by Fresenius USA, and currently has under development a variety of new products and improvements to existing products including: new monitoring devices for hemodialysis machines, methods to prevent recirculation during hemodialysis, software programs to monitor therapy delivery, further development of both the Safe-Lock(R) and the Inpersol(R) peritoneal dialysis product lines, new peritoneal dialysis solution formulations, and more environmentally compatible disposables and production procedures. It is also conducting research on improved treatment delivery and treatment modalities. Recent developments include the Fresenius Data System FDS08(TM) ("FDS08") computerized treatment monitoring and documentation system. The FDS08 can automatically monitor and record machine and treatment information from as many as 32 hemodialysis machines. The FDS08 is a PC-based system which has found many applications for improving record keeping and increasing staff efficiency. The FDS08 system has been used to pioneer new therapies such as remote monitoring of patients during nightly home hemodialysis, which enables a patient to be dialyzed at home while a staff caregiver monitors the machine performance via a modem link. Additionally the FDS08 system can be linked to Fresenius USA's new Hypercare(TM) Medical Records System. The Hypercare(TM) Medical Records System is a fully-integrated medical records system which can record and analyze trends in medical outcome factors in hemodialysis patients.

PATENTS, TRADEMARKS AND LICENSES

As a subsidiary of Fresenius AG, Fresenius USA uses the tradename "Fresenius," which is material to its business, and additionally has obtained rights to certain patents, trademarks, know-how and other intellectual property owned by Fresenius AG. Fresenius USA negotiates access to Fresenius AG's technology, proprietary processes and know-how on a case-by-case basis. See "THE REORGANIZATION -- Continuing Arrangements between Fresenius Medical Care and Fresenius AG." In addition to the Fresenius AG intellectual property, Fresenius USA's intellectual property includes the Inpersol(R) trademark and rights to certain manufacturing know-how Fresenius USA obtained from Abbott, and a paid-up non-exclusive global sublicense from Baxter to certain CAPD and connector technology.

COMPETITION

The markets in which Fresenius USA sells its products are highly competitive. Among Fresenius USA's competitors in the sale of hemodialysis products are Baxter, CGH Medical (an affiliate of Gambro AB), NMC, Minntech Corporation (Renal Systems) and Althin CD Medical, Inc. The major competitor in the peritoneal dialysis field is Baxter. Many of Fresenius USA's competitors possess greater financial, marketing and research and development resources than Fresenius USA.

Fresenius USA believes that companies in the dialysis product market compete primarily on the basis of product performance, cost-effectiveness,

XXX-001935

reliability, assurance of supply and service and continued technological innovation. Fresenius USA believes its products are competitive in all of these areas.

EMPLOYEES

At March 31, 1996, Fresenius USA employed approximately 1,660 people. Management believes that Fresenius USA's relations with its employees are generally good. During the third quarter of 1995, certain of Fresenius USA's employees at the Maumee, Ohio facility voted in favor of being represented by the International Longshoremen's Association. Subsequent to that election, for business reasons unrelated to the

102

<PAGE> 127

election, Fresenius USA decided to close the Maumee, Ohio facility and transfer its production of dialysate concentrate to a facility in Lewisberry, Pennsylvania. Fresenius USA entered into a settlement agreement with union representatives with respect to the effect of the closing on the 35 employees (of approximately 50 employees at the facility) represented by the union. The amount of the settlement was not material. None of Fresenius USA's employees at any other location is represented by labor unions.

PROPERTIES

The following table describes Fresenius USA's principal manufacturing facilities:

<TABLE>
<CAPTION>

| LOCATION | FLOOR AREA (APPROXIMATE SQUARE FEET) | OWNED OR LEASED | USE |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Walnut Creek, California...... | 85,000 | Leased | Corporate headquarters; warehousing; machine manufacture and assembly; and customer service. |
| Ogden, Utah.................. | 334,000 | Owned | Production of disposable products. |
| Lewisberry, Pennsylvania...... | 64,000 | Leased | Production and warehousing of dialysate concentrate. |

</TABLE>

The lease on the Fresenius USA's Walnut Creek, California facility was scheduled to expire in June 1996. During 1995, Fresenius USA exercised its option to extend this lease for six years, with a rent adjustment. The lease on the Lewisberry, Pennsylvania facility expires in November, 2000. On March 26, 1996, Fresenius USA entered into a non-binding letter of intent with an unaffiliated third party to sell its assets comprising the concentrate production facility in Lewisberry, Pennsylvania. The letter of intent provides that any obligation of Fresenius USA to sell the assets is contingent upon consummation of the Reorganization. Fresenius USA owns one warehouse and also leases 14 warehouses in various locations throughout the U.S. These warehouses are used as regional distribution centers for Fresenius USA's peritoneal dialysis products. All such warehouses are subject to leases with remaining terms not exceeding four years. As a result of the Abbott Acquisition, Fresenius USA has added distribution capacity at an additional 22 public warehouses, substantially all of which were formerly used by Abbott.

Fresenius USA's Ogden, Utah facility was subject to a mortgage securing Fresenius USA's obligation under the industrial revenue bond which financed the development of this facility. Fresenius USA prepaid this obligation in full during 1994 with a portion of the proceeds of a public offering of Fresenius USA Common Stock.

MATERIAL CONTRACTS BETWEEN FRESENIUS AG AND FRESENIUS USA

Fresenius AG and Fresenius USA are parties to numerous contracts and transactions with each other, both in the ordinary course of business and otherwise. Fresenius Medical Care will acquire all of Fresenius AG's rights under such contracts and transactions. The following summarizes such contracts and transactions during the three years ended December 31, 1995.

TECHNOLOGY

Fresenius AG and Fresenius USA are parties to a technology license and know-how agreement, dated April 22, 1994, pursuant to which Fresenius AG granted Fresenius USA an exclusive North American license for the technology, processes and know-how for the manufacture of polysulfone dialyzers, and Fresenius USA agreed to pay Fresenius AG royalties of 4.5% on Fresenius USA's net sales of dialyzers produced by it for a 10-year period beginning January 1, 1996. Fresenius USA also has the contractual right to Fresenius AG's know-how relating to certain peritoneal dialysis products incorporating the Safe-Lock(R) technology in the U.S., Canada and Mexico.

103

<PAGE> 128

PRODUCTS

During 1995, 1994 and 1993 Fresenius USA purchased $90.6 million, $63.5

XXX-001936

million and $52.4 million, respectively, of hemodialysis equipment and supplies from Fresenius AG. Such products were purchased pursuant to a distribution agreement entered into in 1991 and under which Fresenius AG has confirmed that Fresenius USA acts as sole North American distributor for Fresenius AG products for treatment of ESRD by hemodialysis. Prices charged under that agreement are negotiated each year by the parties based on Fresenius AG's estimated costs and desired profit margins, taking into account the competitive environment in the U.S. market, and are not to exceed the average of the prices charged to Fresenius AG's other affiliated distributors. By its terms, this distribution agreement terminates on the earlier of December 31, 2011 or the date Fresenius AG loses the power to elect 51% of the Fresenius USA Board. Fresenius AG will assign this distribution agreement to Fresenius Medical Care or terminate this agreement in connection with the Reorganization. In 1994, Fresenius USA and Fresenius AG entered into a distribution agreement for certain of Fresenius AG's intensive care and diagnostic products, including the Fresenius AS 104 Cell Separator. Fresenius AG and Fresenius USA intend to terminate this relationship in connection with the Reorganization. Also during 1995 and 1994, Fresenius USA sold products to Fresenius AG and certain of its subsidiaries having aggregate sales prices of approximately $2.5 million and $4 million, respectively.

FINANCIAL SUPPORT

Fresenius AG has provided substantial financial support to Fresenius USA. Fresenius AG provided support for a letter of credit obtained in connection with the Abbott Acquisition, currently provides credit support to assist Fresenius USA in obtaining short-term lines of credit and participates in and assists with Fresenius USA's foreign exchange contracts. Fresenius AG also participated in letters of credit in connection with Fresenius USA's industrial revenue bonds until these bonds were prepaid in 1994.

As compensation for these services, Fresenius USA paid Fresenius AG an aggregate fee of $336,000, the final installment of which was paid in 1994. In addition, in February 1993, as consideration for certain past comfort letters given in support of certain short-term borrowings and Fresenius AG's commitment to provide up to $40 million of credit support in connection with the Abbott Acquisition, Fresenius USA issued Fresenius AG a warrant to purchase 1,700,000 shares of Fresenius USA Common Stock at an exercise price of $8.00 per share, and granted Fresenius AG a sublicense with respect to Abbott peritoneal dialysis products for Europe, Central and South America, Australia and New Zealand. In April 1994, in exchange for its agreement to provide support for a $25 million long-term line of credit for use in completing and equipping Fresenius USA's dialyzer manufacturing facility in Ogden, Utah, Fresenius USA issued to Fresenius AG a 10-year warrant for the purchase of 50,000 shares of Fresenius USA Common Stock at an exercise price of $10.57 per share. If Fresenius USA had actually utilized this line of credit, this warrant would have become exercisable for an additional 1,012,500 shares of Fresenius USA Common Stock at the same price per share. This line of credit is no longer available to Fresenius USA.

In June 1996, Fresenius AG exercised warrants it acquired in connection with the Abbott Acquisition to purchase 1,515,221 shares of Fresenius USA Common Stock at $8.00 per share, for an aggregate purchase price of $12,121,768. The proceeds were used by Fresenius USA to repurchase options to purchase Fresenius USA Common Stock and shares of Fresenius USA Common Stock from certain employees and executive officers of Fresenius USA, including Dr. Ben Lipps, President and Chief Executive Officer of Fresenius USA, and will be used to purchase up to 450,000 options granted to him subject to approval of the Fresenius USA Plan Amendment. See "FRESENIUS USA EXECUTIVE COMPENSATION -- Securities Repurchases."

ELECTION OF DIRECTORS

Until June 26, 1996, Fresenius AG was the beneficial owner of all 200,000 outstanding shares of the Fresenius USA Series F Preferred Stock. Under the terms of the 1987 agreement under which such stock was purchased and the Restated Articles of Organization and By-laws of Fresenius USA, holders of the Fresenius USA Series F Preferred Stock had certain special rights, including the right to elect a majority of

104

<PAGE>   129

the Fresenius USA Board and the right reasonably to object to any nominee for director to be elected by the holders of Fresenius USA Common Stock. Pursuant to the rights granted to the holders of the Fresenius USA Series F Preferred Stock, a majority of the directors of Fresenius USA have, since 1989, been elected solely by Fresenius AG. Fresenius AG converted the Fresenius USA Series F Preferred Stock into 3,129,883 shares of Fresenius USA Common Stock on June 26, 1996.

BUSINESS OF NMC

W. R. GRACE & CO.

As discussed under "THE REORGANIZATION," immediately prior to the Reorganization, Grace will spin off New Grace, which will contain all of its operations other than NMC, following which Grace's only remaining business operations will be those conducted by NMC. In connection with the Reorganization, Grace will be renamed "Fresenius National Medical Care, Inc." and will issue the New Preferred Shares. See "RISK FACTORS -- Other Risks -- Effects of Indebtedness," "THE REORGANIZATION -- The Distribution Agreement" and "FINANCING."

OVERVIEW

XXX-001937

NMC is primarily engaged in (a) providing kidney dialysis services, (b) manufacturing and distributing products and equipment for dialysis treatment and performing clinical laboratory testing and other medical services, and (c) providing home infusion, home respiratory therapy and home health services. NMC combines clinical quality and cost-effectiveness in providing specialized health care services and products to targeted patient populations. NMC operates through three principal units: DSD, MPG and NMC Homecare.

DSD is the largest provider in the U.S. of kidney dialysis and related services to patients suffering from chronic kidney disease; and has dialysis business operations overseas. At March 31, 1996, DSD owned or managed 693 outpatient dialysis centers in the U.S. and 14 foreign countries, treating approximately 51,500 patients, and provided inpatient dialysis services including acute dialysis treatments at approximately 525 hospitals. DSD includes DSI, which provides diagnostic testing services to the outpatient market (physicians, clinics and hospitals) and also serves dialysis facilities (DSD and non-DSD). DSI testing services include ultrasound, nuclear medicine, magnetic resonance imaging, computerized axial tomography, bone densitometry, nerve conduction velocity, mammography and other tests. DSI conducts testing in 296 DSD dialysis facilities and provides outpatient testing to the non-dialysis market in 25 states.

MPG is comprised of RPD and LifeChem. Through RPD, NMC manufactures disposable bloodlines, dialysis concentrates and dialyzers, and distributes dialysis supplies and equipment and other medical products manufactured by others for use in its dialysis centers and for sale to unaffiliated dialysis providers and home dialysis patients. LifeChem provides laboratory services for dialysis patients in the U.S. and Puerto Rico. In addition, laboratory services for dialysis and non-dialysis patients in Portugal are provided by DSD's international division.

NMC Homecare is a provider of integrated homecare services, offering comprehensive intravenous infusion (prescription medications and nutrition), respiratory therapies and home health services (primarily skilled and unskilled nursing and personal support services) in the U.S. At March 31, 1996, NMC Homecare operated 105 locations in 37 states.

                                         105

<PAGE>  130

The following table sets forth the approximate contribution to net revenues (in dollars and as a percentage of total net revenues) attributable to each of NMC's three business units for the periods indicated:

<TABLE>
<CAPTION>

|  | YEAR ENDED DECEMBER 31, | | | | | | THREE MONTHS ENDED MARCH 31, 1996 | |
|  | 1993 | | 1994 | | 1995(1) | | | |
|  | (DOLLARS IN THOUSANDS) | | | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| DSD...................... | $1,010,984 | 69% | $1,288,116 | 71% | $1,471,148 | 73% | $387,209 | 73% |
| MPG(2)................... | 227,750 | 16 | 212,366 | 12 | 234,984 | 11 | 62,038 | 12 |
| NMC Homecare............. | 216,861 | 15 | 317,722 | 17 | 326,606 | 16 | 78,444 | 15 |
| Total............... | $1,455,595 | 100% | $1,818,204 | 100% | $2,032,738 | 100% | $527,691 | 100% |

</TABLE>

- ---------------
(1) NMC estimates that, in 1995, Medicare, Medicaid and other governmental
    health care programs accounted for approximately 62% of NMC's net revenues.

(2) Does not reflect intercompany sales. See "MANAGEMENT'S DISCUSSION AND
    ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- NMC."

NMC commenced operations in 1970 with five dialysis centers. Grace acquired a 49.9% common equity interest in NMC in 1984 and subsequently increased its ownership interest over time, reaching 100% ownership in 1990. NMC's principal executive offices are located at Reservoir Place, 1601 Trapelo Road, Waltham, Massachusetts 02154, and its telephone number is (617) 466-9850.

DSD OPERATIONS

At March 31, 1996, NMC owned or managed 693 outpatient dialysis centers located in 34 states, the District of Columbia, Puerto Rico and 14 foreign countries. Thirty-five of such centers are managed by NMC, of which two are located in the U.S. and 33 are located outside of the U.S. The centers are generally concentrated in areas of high population density and their surrounding areas. Substantially all of these centers are leased, and they average approximately 5,600 square feet in size. From January 1, 1993 through December 31, 1995, NMC acquired 187 existing centers, developed 115 new centers and closed or sold 28 centers. The number of patients treated at DSD centers has increased from approximately 30,400 at December 31, 1991 to approximately 51,500 at March 31, 1996.

At NMC's centers, hemodialysis treatments are provided at individual "stations" through the use of dialysis machines. A registered nurse or dialysis technician attaches the necessary tubing to the patient and monitors the dialysis equipment and the patient's vital signs. The capacity of a center is a function of the number of stations and such factors as the type of treatment, patient requirements, length of time per treatment, and local operating practices and ordinances regulating hours of operation. Most of NMC's centers

XXX-001938

operate two or three patient shifts per day.

Each of NMC's dialysis centers is under the general supervision of a Medical Director and, in some cases, one or more associate Medical Directors, who are physicians. See "-- Physician and Other Relationships." Each dialysis center also has an administrator who supervises the day-to-day operations of the facility and the staff. The staff typically consists of registered nurses, licensed practical nurses, patient care technicians, a social worker, a registered dietician, a unit clerk and bio-medical technicians.

NMC engages in systematic efforts to measure, maintain and improve the quality of the services that it delivers at its dialysis centers. Each center collects and analyzes quality assurance and patient data, which in turn is regularly reviewed by division and corporate management. At each center, a quality assurance committee is responsible for reviewing quality of care reports generated by NMC's PSP system, setting goals for quality enhancement and monitoring the progress of quality assurance initiatives. NMC believes that it enjoys a reputation of providing high quality care to dialysis patients.

DSD's centers also offer services for home dialysis patients, the majority of whom are treated with peritoneal dialysis. For such patients, DSD's centers provide certain materials, training and patient support services, including clinical monitoring, supply of EPO and follow-up assistance. Supplies for peritoneal dialysis

106

<PAGE>  131

patients are supplied by RPD, which is also responsible for delivery of the supplies to the patient's residence. See "-- Regulatory and Legal Matters -- Legal and Regulatory Proceedings" and "-- Reimbursement -- U.S." for a discussion of NMC's billing for such products and services.

The manner in which each center conducts its business is dependent, in large part, upon applicable laws, rules and regulations of the jurisdiction in which the center is located, as well as NMC's clinical policies. However, a patient's attending physician (who may be the center's Medical Director or an unaffiliated physician with staff privileges at the center) has medical discretion as to the particular treatment modality and medications to be prescribed for that patient. Similarly, the attending physician has discretion in selecting the particular medical products prescribed for a patient, although equipment and supplies, regardless of brand, are typically purchased by the center through MPG.

NMC also provides dialysis services under contract to over 525 hospitals on an "as needed" basis for patients suffering from acute kidney failure and for ESRD patients who are hospitalized. NMC services these patients either at their bedside, using portable dialysis equipment, or at a dialysis site maintained by the hospital. Contracts with hospitals provide for payment at negotiated rates that generally are higher than the Medicare reimbursement rates for chronic in-center treatments.

NMC provides various ancillary medications and services to ESRD patients at its dialysis centers, the most significant of which is the administration of EPO, a bioengineered protein that stimulates the production of red blood cells. EPO is used to treat anemia, a medical complication frequently experienced by ESRD patients, and is administered to most of DSD's patients. Revenues from EPO (the substantial majority of which are reimbursed through the Medicare and Medicaid programs) accounted for approximately 21% of DSD's total net revenues in 1995 and materially contribute to DSD's operating earnings in the U.S. EPO is produced by a single source manufacturer, Amgen Inc., and any interruption of supply could materially adversely affect NMC's business and results of operations. NMC has entered into a long-term supply relationship with Amgen Inc. covering the period from 1996 to 1998 with price protection and volume discounts.

Other ancillary services provided by NMC to ESRD patients include the administration of Calcijex(R) (calcium), INFED(R) (iron) and hepatitis vaccine; the provision, through NMC Homecare, of IDPN, in which nutrients are added to the patient's blood during hemodialysis; the provision, through LifeChem, of clinical laboratory testing; the provision by DSI of studies to test the degree of bone deterioration; electrocardiograms; nerve conduction studies to test the degree of deterioration of nerves; doppler flow testing of the effectiveness of the patient's vascular access for dialysis; and blood transfusions. These tests and other ancillary services are provided by specific prescription of the patient's attending physician.

DSD employs a centralized approach with respect to certain administrative functions common to its operations. For example, DSD has standardized operating and billing procedures which are contained in proprietary manuals used by each dialysis center. In addition, DSD has developed a billing management system pursuant to which bills are generated from regional billing centers. NMC believes that the centralization and standardization of these functions enhance its ability to perform services on a cost-effective basis.

DIAGNOSTIC SERVICES

NMC's Diagnostic Services Division ("DSI") provides diagnostic testing services to the primary care market and is the largest dialysis diagnostic testing supplier in the U.S. DSI provides diagnostic testing services to patients at DSD centers and unaffiliated dialysis facilities and provides outpatient diagnostic services at physicians' offices, clinics and hospitals through mobile equipment and DSI imaging centers. DSI conducts testing at 296 DSD facilities and provides outpatient testing to the non-dialysis market in 25

XXX-001939

states. DSI's range of services include: nerve conduction velocity testing, bone densitometry, holter monitoring, sleep apnea studies, and imaging studies that include color flow doppler, arterial scans, carotids, peripheral studies, echocardiography, obstetrical and gynecological ultrasound, nuclear medicine, nuclear magnetic resonance, computerized axial tomography, mammography and x-ray. Of DSI's approximately $24 million of revenues for the quarter ended March 31, 1996, approximately $21 million was related to patients other than dialysis

<div align="center">107</div>

<PAGE>   132

patients. DSI has grown recently through its acquisitions of the diagnostic services businesses of Mediq Imaging Services, Inc., MedAlliance, Inc. and PML, Inc. (a Park Medical company).

Growth in the outpatient diagnostic industry is expected to continue as a result of cost-containment pressures accelerating the shift from expensive inpatient testing to lower cost outpatient testing, and managed care's interest in prevention and early diagnosis. Limiting factors on growth include increased utilization management by managed care organizations and continued downward pressure on reimbursement rates.

INTERNATIONAL DIALYSIS SERVICES

At March 31, 1996, NMC operated and/or managed 112 dialysis centers in 14 countries outside of the U.S. (Portugal, Spain, Brazil, Taiwan, Argentina, Hungary, Venezuela, Czech Republic, Germany, United Kingdom, South Korea, China, Colombia and Thailand), an increase from 35 dialysis centers in six countries at the end of 1993, as well as 12 clinical testing laboratories in Portugal. Approximately 8% of DSD's 1995 net revenues were attributable to foreign operations. NMC's first renal care program outside the U.S. was established in Portugal in 1980, and Portugal is NMC's largest non-U.S. market.

Fresenius Medical Care's ability to expand internationally will be dependent, in large part, on the availability and level of local governmental funding of dialysis treatment. See "-- Regulatory and Legal Matters -- Reimbursement -- Non-U.S." While in certain countries, government reimbursement or payment for dialysis services is higher than the U.S. reimbursement rate, in other countries, it is at a level significantly below the U.S. reimbursement rate. In addition, the legal and regulatory framework in certain countries is more restrictive and cumbersome than U.S. regulations. For example, in some countries, foreign companies are not permitted to own dialysis centers, but are limited to operating centers for local owners or developing alternative operational methodologies, such as joint ventures, partnerships or servicing arrangements.

International revenues are expected to account for an increasing portion of revenues in the future. Revenues generated from international markets are subject to a number of risks, including the following: fluctuations in exchange rates could adversely affect profitability; agreements may be difficult to enforce and receivables difficult to collect through a local country's legal system; local regulations may restrict Fresenius Medical Care's ability to obtain a direct ownership interest in dialysis centers or other operations located overseas; lack of governmental funding for services provided by Fresenius Medical Care may limit the demand for Fresenius Medical Care's services; certain customers and governments may have longer payment cycles; and some countries could impose additional withholding taxes or otherwise tax Fresenius Medical Care's income, impose tariffs or adopt other restrictions on foreign trade. There can be no assurance that these risks will not have a material adverse effect on Fresenius Medical Care's business and results of operations. See "RISK FACTORS -- Risks Relating to the Business of Fresenius Medical Care -- International Operations."

PHYSICIAN AND OTHER RELATIONSHIPS

NMC believes that its success in establishing and maintaining dialysis centers, both in the U.S. and in other countries, depends in significant part upon its ability to obtain the acceptance of and referrals from local physicians, hospitals and managed care plans. As is generally true in the dialysis industry, at many DSD centers, a small number of physicians account for all or a significant portion of the patient referral base. The impairment of NMC's relationships with any particular group of physicians in a local market could adversely affect its centers in such local market. In this regard, NMC is and will be dependent upon the relationships established with the medical community and its own Medical Directors by its clinical and operations staff. Financial relationships between referral sources and NMC in the U.S. are subject to extensive regulation. See "-- Regulatory and Legal Matters -- Anti-kickback Statute, False Claims Act, Stark Law and Fraud and Abuse Laws."

A dialysis patient generally seeks treatment at a center that is convenient to the patient and at which the patient's nephrologist has staff privileges. Virtually all of NMC's clinics maintain open staff privileges for local nephrologists. NMC's ability to provide quality dialysis care and otherwise to meet the needs of local

<div align="center">108</div>

<PAGE>   133

physicians is central to its ability to attract nephrologists to NMC's centers and to receive referrals from such physicians.

Fresenius Medical Care's continued growth in the provider business will depend upon its ability to attract and retain skilled employees, such as highly

XXX-001940