skilled nurses and other medical personnel, for whom competition is intense, and the ability of its officers and key employees to manage growth successfully. Moreover, Fresenius Medical Care believes that future success in the provider business will be significantly dependent on its ability to attract and retain qualified physicians to serve as Medical Directors of its dialysis centers. The inability of Fresenius Medical Care to obtain the services of key personnel could impair its operations and thereby adversely affect its business and results of operations.

The conditions for coverage under the Medicare ESRD program require that treatment at a dialysis center be under the general supervision of a Medical Director. Generally, the Medical Director must be board certified or board eligible in internal medicine and have at least 12 months of training or experience in the care of patients at ESRD centers. Virtually all of NMC's Medical Directors maintain their own active private practices.

NMC has written agreements with qualified nephrologists or groups of qualified nephrologists to serve as Medical Directors (and associate Medical Directors) for its centers. The U.S. Medical Director agreements entered into by NMC generally have terms of three years, although some have terms of as long as five to ten years. The compensation of Medical Directors and other physicians under contract with NMC is individually negotiated and generally depends upon competitive factors in the local market, the physician's professional qualifications, experience and responsibilities and the size of services provided by the center. Until January 1, 1995, Medical Director compensation typically included a component based on some measure of the financial performance of the clinics under supervision. See "-- Regulatory and Legal Matters -- Legal and Regulatory Proceedings -- OIG Investigation." Since 1995, NMC has entered into new agreements, or amended existing agreements, for substantially all of its Medical Directors. Under the new arrangements, the aggregate compensation of the Medical Directors and other physicians under contract is fixed in advance for a period of one year or more and is based in part on various efficiency and quality incentives. In certain countries other than the U.S., Medical Director and physician compensation may include a component based on some measure of the center's financial performance.

Virtually all of the U.S. Medical Director agreements, as well as the typical contract under which NMC acquires existing dialysis centers, include noncompetition covenants covering specified activities within specified geographic areas for specified periods of time, although they do not prohibit the physicians from providing direct patient care services at other locations and, consistent with law, do not require a physician to refer patients to NMC or particular centers or to buy or use specific medical products. In certain states, non-competition covenants may not be enforceable.

SOURCES OF NET REVENUES

The following table provides information for the periods indicated regarding the percentage of DSD's U.S. dialysis services net revenues (excluding net revenues from DSI) provided by (a) the Medicare ESRD program, (b) private/alternative payors, such as commercial insurance and private funds, (c) Medicaid and other government sources and (d) hospitals.

<TABLE>
<CAPTION>

|  | YEAR ENDED DECEMBER 31, | | | THREE MONTHS ENDED |
| --- | --- | --- | --- | --- |
|  | 1993 | 1994 | 1995 | MARCH 31, 1996 |
| <S> | <C> | <C> | <C> | <C> |
| Medicare ESRD program...................... | 65.4% | 56.7% | 58.1% | 62.4% |
| Private/alternative payors.................... | 24.7 | 34.2 | 32.7 | 28.3 |
| Medicaid and other government sources........ | 5.2 | 4.5 | 4.2 | 4.2 |
| Hospitals.................................. | 4.7 | 4.6 | 5.0 | 5.1 |
| Total................................. | 100.0% | 100.0% | 100.0% | 100.0% |

</TABLE>

109

<PAGE>  134

Under the Medicare ESRD program, Medicare reimburses dialysis providers for the treatment of certain individuals who are diagnosed as having ESRD, regardless of age or financial circumstances. When Medicare assumes responsibility as the primary payor, it pays for dialysis and certain specified related services at 80% of the Composite Rate. In addition, subject to various restrictions and co-payment limitations, Medicare pays separately for certain dialysis-related diagnostic and therapeutic services not included in the Composite Rate. A secondary payor, usually a Medicare supplemental insurer, a state Medicaid program or, to a lesser extent, the patient or the patient's private insurer, is responsible for paying any co-payment (typically 20%), other approved services not paid by Medicare and the annual deductible. Most of the states in which NMC currently operates dialysis centers provide Medicaid benefits to qualified recipients to supplement their Medicare entitlement.

Prior to the time at which Medicare becomes the primary payor, most dialysis treatments are paid for by another third-party payor, such as the patient's private insurer, or by the patient. Each third-party payor makes payments under contractual or regulatory reimbursement arrangements. These arrangements generally provide for higher reimbursement levels from non-governmental payors than from governmental payors, such as Medicare. See "-- Regulatory and Legal Matters -- Reimbursement -- U.S."

XXX-001941

NMC derives a significant portion of its revenues from reimbursement provided by non-governmental third-party payors. A substantial portion of third-party health insurance in the U.S. is now furnished through some type of managed care plan, including HMOs. Managed care plans are increasing their market share, and this trend may accelerate as a result of the merger and consolidation of providers and payors in the health care industry, as well as the discussions among members of Congress and the executive branch regarding ways to increase the number of Medicare and Medicaid beneficiaries served through managed care plans. NMC estimates that approximately 9% of DSD's net revenues for the year ended December 31, 1995 was attributable to managed care plans.

NMC generally is reimbursed for dialysis treatments at higher rates by non-governmental payors than by governmental payors such as Medicare. However, managed care plans are becoming more aggressive in selectively contracting with a smaller number of providers willing to furnish services for lower rates and subject to a variety of service restrictions. For example, managed care plans and traditional indemnity third-party payors increasingly are demanding alternative fee structures, such as capitation arrangements whereby a provider receives a fixed payment per month per enrollee and bears the risk of loss if the costs of treating such enrollee exceed the capitation payment. These market forces are creating downward pressure on the reimbursements NMC receives for its services and products.

NMC's ability to secure favorable rates with indemnity and managed care plans has largely been due to the relatively small number of ESRD patients which any single HMO has enrolled. By regulation, ESRD patients have been prohibited from joining an HMO unless they are otherwise eligible for Medicare coverage, due to age or disability, and are members of a managed care plan when they first experience kidney failure. HCFA has recently announced a pilot project pursuant to which approximately four managed care companies will be allowed to recruit ESRD patients beginning in 1997 which, if successful, could result in the opening of the ESRD treatment market to many managed care companies thereafter. As Medicare HMO enrollments increase and the number of ESRD patients in managed care plans also increases, managed care plans' leverage to negotiate lower rates may become greater. In addition, the HMO may have contracted with another provider, or may have tighter utilization controls with respect to, certain ancillary services typically provided by NMC to ESRD patients, which could limit NMC's future payments for such services.

As managed care programs expand market share and gain greater bargaining power vis-a-vis health care providers, there will be increasing pressure to reduce the amounts paid for services and products furnished by NMC. These trends would be accelerated if future changes to the Medicare ESRD program require private payors to assume a greater percentage of the cost of care given to dialysis patients. NMC is presently seeking to expand the portion of its revenues attributable to non-governmental private payors. However, NMC believes that its historically higher rates of reimbursement paid by non-governmental payors may not be maintained at such levels. If substantially more patients of NMC join managed care plans or such plans reduce reimbursements to NMC, NMC's business and results of operations could be adversely affected,

110

<PAGE>    135

possibly materially. See "-- Regulatory and Legal Matters -- Reimbursement," and "-- Changes in the Health Care Industry" and "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- NMC."

ACQUISITIONS

NMC's growth in revenues and operating earnings in prior years has resulted, in significant part, from NMC's ability to effect acquisitions of health care businesses, particularly dialysis centers, on reasonable terms. The health care industry has experienced significant consolidation in recent years, particularly in the dialysis and homecare service sectors in which NMC competes, resulting, in some cases, in increased costs of acquisitions in these sectors. The entrance into the acquisition arena of new, smaller public dialysis companies, which can make acquisitions using their stock as consideration, has accelerated the increase in costs of acquisitions. Moreover, because of the ongoing consolidation in the dialysis services industry, the availability of acquisitions may decrease. NMC's ability to make acquisitions also will depend, in part, on NMC's available financial resources and the limitations imposed under the NMC Credit Agreement. See "RISK FACTORS -- Risks Relating to the Business of Fresenius Medical Care -- Dependence on Acquisitions." The inability of Fresenius Medical Care to continue to effect acquisitions in the provider business on reasonable terms could have an adverse impact on growth in its business and on its results of operations.

NMC regularly evaluates and holds discussions with various other health care companies and other businesses regarding acquisitions and joint business ventures. Other than the Reorganization, NMC currently does not have any specific plans, understandings or agreements with respect to any material acquisition.

MEDICAL PRODUCTS GROUP

RENAL PRODUCTS DIVISION

General.  RPD distributes disposable products, including its own manufactured products, for hemodialysis and peritoneal dialysis. Most of RPD's customers are kidney dialysis centers. From 1993 to 1995, approximately 41%, 50% and 49%, respectively, of RPD's net revenues were generated through sales to DSD centers. In 1995, sales in the U.S. accounted for approximately 83% of RPD's

XXX-001942

total net revenues.

The principal products manufactured by RPD are hemodialysis concentrate
solutions, dialyzers, bloodlines and accessories. RPD distributes peritoneal
dialysis products, which accounted for approximately 28% of RPD's 1995 net
revenues, under distribution arrangements with third-party manufacturers,
including Fresenius USA. Other products manufactured by third parties and
distributed by RPD include dialyzers, hemodialysis machines, special blood
access needles, heparin (used to prevent blood clotting) and commodity supplies
such as bandages, clamps and syringes. In 1995 and the first three months of
1996, approximately 32% and 50%, respectively, of RPD's net revenues were
attributable to sales of products manufactured by RPD, and approximately 68% and
50%, respectively, of RPD's net revenues were attributable to sales of products
manufactured by third parties. All DSD centers purchase their medical products
through RPD. However, DSD centers are not required to order RPD-manufactured
products.

Sales and Distribution.  RPD markets its products and services in the U.S.
through an experienced direct selling organization consisting of 24 sales
representatives and four regional managers. A staff of 10 clinical nurses
assists in RPD's sales activities and provides clinical support to customers.

Outside the U.S., RPD markets its products through a combination of its own
personnel and outside distributors. At March 31, 1996, RPD had direct sales
operations in ten countries, with a total of 23 field sales representatives.
RPD's network of 31 non-U.S. distributors provides sales coverage in 34 other
countries.

At March 31, 1996, RPD distributed its products through 17 warehouse
facilities (11 in the U.S., three in Europe, two in Latin America and one in
Asia). RPD delivers its products to dialysis providers and, in the U.S. and
United Kingdom, directly to home patients.

Manufacturing.  RPD manufactures dialysis products at 12 plants (five in
the U.S., four in Europe and three located in Latin America). Dialyzers are
produced at NMC's facility in Dublin, Ireland; bloodlines are produced at NMC's
plants in Reynosa, Mexico, McAllen, Texas and Bremervorde, Germany; and concen-

                                111

<PAGE>  136

trates are produced at three facilities in the U.S. and one plant in each of
Brazil, the United Kingdom, Argentina and Germany.

In the third quarter of 1995, NMC recorded nonrecurring charges of
approximately $16.6 million relating to the termination of a dialyzer
development project at its Dublin, Ireland facility. These charges related to a
research project that had previously been supported by Grace. This project was
terminated in connection with the proposed spin-off of NMC by Grace in 1995
because no commercially viable product had been developed by such time. Also in
the third quarter of 1995, NMC recorded nonrecurring charges of approximately
$12.3 million relating to the termination of RPD's German dialysis machine
manufacturing operation when it was determined that such operations could not
produce commercially viable machines. See Note 9 to the Special-Purpose,
Consolidated Financial Statements of Grace.

Raw Materials.  Raw materials used in RPD's manufacturing operations and
medical supplies are purchased worldwide from numerous suppliers. Certain raw
materials used in the production of dialyzers at RPD's Dublin plant are
purchased from a single source. In the U.S., certain raw materials used to
manufacture products distributed by RPD are purchased from single source
suppliers. NMC believes that alternative sources of these raw materials are
generally available. However, an interruption in supply from any such single
source supplier could have an adverse effect on NMC's business or results of
operations.

Quality Systems.  All of RPD's manufactured products are considered medical
devices by the FDA and, as such, are subject to stringent regulatory standards.
Technically trained RPD professionals have developed and implemented quality
assurance procedures that impose stringent specifications for raw materials,
sterilization procedures and manufacturing process control.

LIFECHEM LABORATORY SERVICES

LifeChem is a leading U.S. dialysis clinical laboratory providing blood,
urine and other bodily fluid testing services to assist physicians in
determining whether a dialysis patient's therapy regimen, diet and medicines
remain optimal. LifeChem operates two laboratories, one in New Jersey and one in
southern California. In 1995, LifeChem performed over 16 million tests for more
than 56,000 dialysis patients across the U.S. LifeChem also provides testing
services to clinical research projects and others. LifeChem plans to expand into
related markets, including servicing physician (particularly nephrologist)
office practices. LifeChem markets its services through RPD's domestic sales
organization. In 1995, approximately 29% of LifeChem's patient base was
receiving treatment at dialysis centers not owned or operated by NMC.

LifeChem's clinical laboratory results have been a critical element in
enabling NMC to develop its proprietary PSP database, which contains clinical,
laboratory and demographic data on over 40,000 dialysis patients and laboratory
results and demographic data on an additional 16,000 patients. NMC uses PSP to
assist physicians in providing cost-effective quality care to dialysis patients.
In addition, PSP is a key resource in ongoing research, both within NMC and at
outside research institutions, to decrease mortality rates among dialysis
patients and improve their quality of life.

XXX-001943

In 1995, LifeChem represented approximately 4% of NMC's net revenues and 10% of NMC's operating earnings. Approximately 78% of LifeChem's 1995 net revenues were derived from Medicare. See "-- Regulatory and Legal Matters -- Reimbursement" for a description of certain billing problems relating to LifeChem.

NMC HOMECARE

GENERAL

NMC Homecare is a leading U.S. provider of homecare services, offering comprehensive intravenous infusion (prescription medications and nutrition), respiratory therapies and home health services (primarily skilled and unskilled nursing and personal support services). NMC believes that by providing all three of these key components of home patient care (either directly or through subcontractors), NMC Homecare offers quality care on a cost-effective and integrated basis. NMC Homecare plans to increase, through internal growth, the number of locations at which it offers all three of these components of homecare. At March 31, 1996, NMC Homecare operated from 105 locations in 37 states, providing infusion services from 90 of these

112

<PAGE>    137

locations, home respiratory services from 79 locations and home health services from 20 locations. In 1995, NMC Homecare derived approximately 78% of its net revenues from home infusion therapies, approximately 15% from home respiratory therapies and approximately 7% from home health services.

NMC entered the homecare market in 1978 through the acquisition of a respiratory therapy services business that NMC purchased as part of a diversification strategy. During the 1980s, NMC Homecare expanded into the home infusion market through a series of acquisitions and internal growth. In 1993 and 1994, NMC Homecare significantly expanded its position in the home infusion market through the acquisitions of Home Intensive Care, Inc. ("HIC"), a dialysis clinic business with a large infusion division, and Home Nutritional Services, Inc., ("HNS"). NMC entered the home health services market in 1993 through the acquisition of Personal Care Health Services, Inc. ("PCHS") described below.

In all three of its areas of service, NMC Homecare provides patients with a variety of services and related products and supplies prescribed by a physician as part of, or pursuant to, a patient treatment plan. In addition to patient care, these services include pharmacy compounding of prescription medications and nutritional solutions, training patients and their care givers as to the proper administration of therapies and products in the home, monitoring compliance with the patient's individualized treatment plan, reporting patient status and clinical outcome to the patient's physician and/or managed care organization, maintaining equipment and supplies and processing claims to third-party payors.

A typical NMC Homecare infusion and respiratory therapy location has a fully-equipped pharmacy, offices for administrative, clinical and sales personnel and a small storage warehouse. Location staffs generally include a general manager, licensed pharmacists, registered and licensed nurses, respiratory therapists and sales and administrative personnel. NMC Homecare purchases or leases the products and equipment needed to support the provision of its clinical services.

The homecare industry has experienced rapid growth in recent years as a result of the cost-effectiveness of home treatment as compared to hospital inpatient treatment, continued advances in medical technology that have facilitated the provision of sophisticated care in a home setting, increased acceptance of homecare by the medical community, patients and payors, and the significant increase in the over-65 population. NMC believes that the homecare industry will continue to benefit from health care cost-containment measures that encourage reduced hospital admissions and reduced lengths of stay in hospitals. Additionally, the advent of managed care in the U.S. is transforming the health care delivery system from a fragmented system of providers of discrete services to an integrated continuum of care delivery system. This evolution encourages therapy planning across places of service and levels of care, and is intended to achieve efficiency and cost savings through use of lower cost, less intensive treatment settings. NMC believes that home delivery of services will increasingly become an important component of the evolving integrated health care delivery system.

The evolving homecare marketplace is increasingly requiring the coordination of all homecare clinical services (infusion, respiratory therapy and home health services) under one management. In response, NMC plans to increase, through internal growth, the number of existing locations that can provide infusion, respiratory and home health services. In 1996, NMC plans to add respiratory services to 15 existing locations while introducing home health services in 20 markets and expanding such services in six existing locations. NMC plans to be able ultimately to provide infusion, respiratory and home health services from all locations.

NMC HOMECARE SERVICES

Infusion Therapy.  Home infusion therapy principally involves pharmacy compounding and intravenous administration of an expanding range of medications and nutritional preparations, such as chemotherapy, total parenteral nutrition, antibiotic therapy and drugs for pain management. It usually is a continuation of treatment initiated in an inpatient setting and provides a means of delivering quality patient care more efficiently and in a patient-friendly

XXX-001944

environment. NMC Homecare's clinical employees include licensed pharmacists and registered and licensed nurses who have specialized skills in home infusion therapy.

113

<PAGE>   138

One form of infusion therapy is IDPN, which is furnished at a dialysis clinic during dialysis treatment. NMC Homecare derived approximately 33% of its infusion net revenues in 1995 from the provision of IDPN. Approximately 60% of such IDPN net revenues were derived from patients treated in DSD centers. In recent quarters, the provision of IDPN has accounted for substantially all of NMC Homecare's operating profits. Certain regulatory changes may materially restrict NMC Homecare's ability to continue to obtain reimbursement for the provision of IDPN to dialysis patients. For a discussion of reimbursement issues relating to IDPN, see "-- Regulatory and Legal Matters -- Reimbursement" and "-- Legal and Regulatory Proceedings -- OIG Investigation," and "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- NMC."

Respiratory Therapy.  Respiratory therapy involves the provision of an array of equipment, products and clinical services to treat breathing disorders, including the delivery of oxygen and aerosolized drugs and the use of monitors, nebulizers and ventilators. NMC provides home respiratory services to patients with a variety of conditions, including chronic obstructive pulmonary diseases (such as emphysema, chronic bronchitis and asthma), cystic fibrosis and neurologically related respiratory problems. NMC Homecare employs a clinical staff of respiratory therapy professionals to provide support to its home respiratory therapy patients in accordance with physician-directed treatment plans.

Home Health Services.  Home health services consist of a wide range of clinical care and personal support services, primarily registered and licensed practical nursing, home health aides, physical therapists, speech therapists and occupational therapists and homemaker services. NMC Homecare entered the home health services business in late 1993 through its acquisition of PCHS, which operated nine home health service locations in California. NMC Homecare has internally developed eight additional locations outside of California from which it offers home health services. In 1996, NMC Homecare plans to develop internally a home health care capability in 20 additional U.S. markets.

MARKETING

NMC Homecare markets its services through its own sales force to a wide range of patient referral sources, such as physicians, medical groups, hospital discharge planners, managed care organizations, nursing agencies and case managers for third-party payors. As a result of escalating pressures to contain health care costs, third-party payors are participating to a greater extent in decisions regarding health care alternatives and playing an important role in the homecare referral process. In particular, managed care plans are becoming more aggressive in selectively contracting with a smaller number of providers willing to furnish services for lower rates and subject to a variety of service restrictions. NMC Homecare has implemented a number of initiatives directed at the managed care market, including broadening the range of homecare services provided to facilitate patient management and ease of contracting, creating flexible pricing formulas to meet payor needs for capitation and risk sharing and developing clinical data and outcome reporting systems to support quality assurance and patient management goals. However, managed care plans have been increasingly successful at lowering the number of reimburseable days of treatment and price levels, in certain instances to levels which NMC Homecare believes are below the cost of providing such services. The cost pressures applied by managed care plans have affected NMC Homecare's recent operating performance and are expected to continue at least through 1996. See "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- NMC."

SOURCES OF NET REVENUES

Virtually all of the net revenues of NMC Homecare are derived from third-party payors, including private insurers, managed care organizations such as HMOs, and governmental payors such as Medicare and Medicaid. Similar to other homecare service providers, NMC Homecare experiences lengthy payment collection periods, typically of up to 150 days, as a result of third-party payment procedures.

Medicare has developed a national fee schedule for certain home infusion therapies and home respiratory therapies that provides reimbursement for 80% of the amount of the scheduled fee. The remaining 20% not paid by Medicare is the responsibility of the patient or third-party insurance payors (including Medicaid).

114

<PAGE>   139

Medicare reimburses certified home health agencies for 100% of the lesser of (a) the provider's reasonable charges or (b) preestablished regional Medicare rates, subject to local market cost limitations. See "-- Regulatory and Legal Matters -- Reimbursement."

Historically, private payors have reimbursed providers a greater amount for a given service and offered a broader range of benefits than governmental payors. In order to control costs, however, private payors have established case management and utilization protocols to control the number of services provided. At the same time, a highly fragmented homecare industry has facilitated payor

XXX-001945

efforts to competitively bid for contracts and reduce payment rates. An increasing percentage of NMC's private payor revenue has been derived in recent years from contracts with HMO's and other managed care plans, which provide for reimbursement at negotiated rates. In many markets, NMC has had to accept reimbursement rate decreases to preserve current market share.'

As a result of managed care pricing pressures, which have resulted in reimbursement rate decreases and reduced margins in infusion and other therapies (other than those covered by Medicare), IDPN has accounted for substantially all of NMC Homecare's operating profit in recent quarters because IDPN is predominantly reimbursed by Medicare and has not been as prone to managed care pricing pressures.

The following table sets forth the approximate percentages of NMC Homecare's 1995 net revenues attributable to Medicare, Medicaid and other governmental sources, private insurers and other payors and managed care organizations:

<TABLE>

| <S> | <C> |
|---|---|
| Medicare, Medicaid and other governmental sources................... | 50% |
| Private insurance and other payors................................ | 26 |
| Managed care organizations....................................... | 24 |
| | ---- |
| Total...................................................... | 100% |
| | ==== |

</TABLE>

COMPETITION

DSD

The dialysis industry is highly competitive. Ownership of dialysis centers in the U.S. is fragmented, with a large number of operators owning 25 or fewer centers and a small number of larger multi-center providers, the largest of which is NMC. In urban areas, where many of NMC's dialysis centers are located, there frequently are many competing centers in close proximity to NMC's centers. NMC experiences direct competition from time to time from former Medical Directors or referring physicians who establish their own centers. A number of health care providers, some of which have significant operations, may decide to enter the dialysis business in the future.

Because in most cases the prices of dialysis services and products in the U.S. are directly or indirectly regulated by Medicare, competition for patients is based primarily on quality and accessibility of service and obtaining referrals from physicians and hospitals. However, the growth of managed care has placed greater emphasis on service costs for patients insured by non-governmental payors. NMC believes that DSD competes effectively in all of these areas. In particular, based upon NMC's knowledge and understanding of other providers of kidney dialysis, as well as from information obtained from publicly available sources, NMC believes that DSD is among the most cost-efficient providers of kidney dialysis services. In addition, as a result of its large size relative to most other dialysis service providers, NMC enjoys economies of scale in areas such as purchasing, billing, collections and data processing.

Competition in the dialysis industry is particularly intense in acquiring existing dialysis centers, which has resulted in an increase in the cost of such acquisitions, and in enlisting and retaining qualified physicians to act as Medical Directors.

In most countries other than the U.S., DSD primarily competes against individual centers and hospitals. In many of these countries, especially the developed countries, prices and the opening of new centers are directly or indirectly regulated by governments. Competition in all countries is based primarily on the quality and availability of service and the development and maintenance of relationships with referring physicians.

115

<PAGE>    140

The diagnostic imaging industry is highly fragmented. No single participant has dominant market share beyond a local or regional market. DSI's competition includes mobile diagnostic companies, hospital radiology departments, and independent imaging centers. Key factors for success in this market include convenience for the patient, cost-effectiveness for the payor, breadth of services, and technological and professional expertise in test administration and result interpretation.

Growth in the outpatient diagnostic industry is expected to continue as a result of cost-containment pressures accelerating the shift from expensive inpatient testing to lower cost outpatient testing, and managed care's interest in cost-effective prevention and early diagnosis. Limiting factors on growth include increased utilization management by managed care organizations and continued downward pressure on reimbursement rates.

MPG

The markets in which MPG sells its products and laboratory services are highly competitive in both technology scope and pricing. Among MPG's competitors in the sale of hemodialysis products are Baxter, CGH Medical (an affiliate of Gambro AB), Minntech Corporation (Renal Systems), Althin CD Medical, Inc., Fresenius USA and MediSystems. The dominant competitor in the peritoneal dialysis products field is Baxter. Many of MPG's competitors possess greater

XXX-001946

financial, marketing and research and development resources than MPG.

In the dialysis product market, companies compete on the basis of product performance, cost-effectiveness, product quality, product features, specialized service and technological innovation. NMC believes that most of RPD's products are competitive in these areas.

LifeChem's competitors include large national laboratories, dedicated dialysis laboratories and numerous local and regional laboratories, including hospital laboratories. In the laboratory services market, companies compete on the basis of performance, including quality of laboratory testing, timeliness of reporting test results and cost-effectiveness. NMC believes that LifeChem's services are competitive in these areas. LifeChem's ability to compete has been affected by the ongoing consolidation in the dialysis services marketplace.

NMC HOMECARE

NMC Homecare competes with a large number of companies in all of the geographic areas in which its facilities are located. While the U.S. homecare market is fragmented, consisting of thousands of local providers and a limited number of regional and national providers, several of NMC Homecare's major competitors have recently expanded through acquisition. NMC expects this trend toward consolidation among national providers to continue as providers attempt to provide a greater range of services, to cover a greater number of geographic markets and to increase volumes in each market. To the extent that NMC Homecare is unable to offer the scope of services and cover the range of markets covered by competitors, such inability could represent a competitive disadvantage in the managed care environment.

NMC Homecare's principal competitors include major national and regional infusion and respiratory therapy and home health service companies, hospital-owned programs, physician groups and networks and numerous local companies. In addition, other companies, hospitals and health care organizations that have not serviced the homecare market, historically, have entered the market and expanded the variety of therapies offered. There are relatively few barriers to entry in the homecare markets that NMC Homecare serves. Principal national competitors for home infusion services include Apria Healthcare, Inc. ("Apria") and Coram Healthcare Corporation, principal national competitors in home respiratory therapy include Apria and Lincare Holdings Inc., and the largest national provider of home health services is Olsten Corporation. Several of NMC Homecare's major competitors are larger and some have greater financial resources than NMC Homecare. Certain of these integrated national competitors have used lower pricing on infusion services as a means of obtaining contracts to provide a full range of homecare services. Such a trend, if it continues, could have a material adverse effect on NMC Homecare's business and results of operations.

116

<PAGE> 141

NMC Homecare competes on the basis of a number of factors, including quality of care and service, reputation within the medical community, geographical scope and, particularly as a result of the growth of managed care, cost-effectiveness. NMC Homecare believes that the ability to develop and maintain contractual relationships with managed care organizations also is an important competitive factor.

EMPLOYEES

As of March 31, 1996, NMC had approximately 23,400 full-time, part-time or per diem employees, of which approximately 200 full-time employees were employed in corporate and administrative functions. The remaining employees are employed by NMC's three principal business units as follows: DSD -- approximately 14,300 full-time, 2,000 part-time and 1,300 per diem employees; MPG -- approximately 2,000 full-time; and NMC Homecare -- approximately 2,000 full-time, 100 part-time and 1,500 per diem employees. Medical Directors of NMC's dialysis centers are generally retained as independent contractors. Approximately 1,700 of NMC's employees are covered by union agreements. NMC considers its employee relations to be good.

PROPERTIES

NMC leases its executive offices in Waltham, Massachusetts under a lease covering approximately 120,000 square feet of space. The lease expires on December 31, 1996. NMC has entered into a new lease with respect to a new corporate headquarters in Lowell, Massachusetts. The Lowell, Massachusetts lease expires on December 31, 2006 and has two five-year renewal options, and certain expansion options. Upon consummation of the Reorganization, NMC may consolidate its headquarters with Fresenius USA at a new site in Lexington, Massachusetts, with respect to which Fresenius USA has entered into a lease contingent upon consummation of the Reorganization. In such event, NMC would attempt to sublet the Lowell, Massachusetts space.

NMC leases most of the dialysis centers, NMC Homecare locations and manufacturing, laboratory, distribution and administrative and sales facilities in the U.S. and foreign countries on terms which NMC believes are customary in the industry. NMC owns those dialysis centers and manufacturing facilities that it does not lease.

117

<PAGE> 142

REGULATORY AND LEGAL MATTERS

XXX-001947

REGULATORY OVERVIEW

The operations of Fresenius Worldwide Dialysis, Fresenius USA and NMC are subject to extensive governmental regulation by virtually every nation in which those companies operate, including, most notably for NMC and Fresenius USA, in the U.S. at the federal, state and local levels. Although such regulations differ from country to country, in general, non-U.S. regulations are designed to accomplish the same objectives as U.S. regulations regarding the operation of dialysis centers, laboratories and manufacturing facilities, the provision of quality health care for patients, the maintenance of occupational, health, safety and environmental standards and the provision of accurate reporting and billing for governmental payments and/or reimbursement. In addition, each country has its own payment and reimbursement rules and procedures, and some countries prohibit ownership of health care providers by foreign interests or establish other regulatory barriers to direct ownership by foreign companies. In those countries, Fresenius Worldwide Dialysis and NMC work within the framework of local laws to establish alternative contractual arrangements for the management of facilities.

Any failure by Fresenius Worldwide Dialysis, Fresenius USA or NMC to receive required licenses, certifications or other approvals, significant delays in such receipt, loss by NMC of its various federal certifications in the U.S., termination of NMC's licenses under the laws of any state or other governmental authority or changes resulting from health care reform or other government actions that reduce reimbursement or reduce or eliminate coverage for particular services rendered by NMC or Fresenius USA could have a material adverse effect on the business and results of operations of Fresenius Medical Care, Fresenius Worldwide Dialysis or NMC.

Fresenius Worldwide Dialysis, Fresenius USA and NMC must comply with all U.S. and non-U.S. legal and regulatory requirements under which they operate, including the illegal remuneration provisions of the Social Security Act of 1935, as amended (sometimes referred to as the "anti-kickback statute"), the federal restrictions on certain physician referrals (commonly known as the "Stark Law") and other fraud and abuse laws and similar state statutes, as well as similar laws in other countries. Certain of NMC's activities are subject to the OIG Investigation. See " -- Legal and Regulatory Proceedings" for information about the OIG Investigation and about additional regulatory, investigatory and legal proceedings with respect to NMC and Fresenius USA. Moreover, there can be no assurance that applicable laws, or the regulations thereunder, will not be amended, or that enforcement agencies or the courts will not make interpretations inconsistent with those of Fresenius Worldwide Dialysis, Fresenius USA or NMC, any one of which could have a material adverse effect on their (and Fresenius Medical Care's) businesses, reputations and results of operations. Sanctions for violations of these statutes may include criminal or civil penalties, such as imprisonment or fines, or denial of payments, or suspension or exclusion from the Medicare and the Medicaid programs. In the U.S., these laws have been broadly interpreted by a number of courts, and significant government funds have been devoted to their enforcement because such enforcement has become a high priority for the federal government and some states. Fresenius Medical Care, Fresenius Worldwide Dialysis, Fresenius USA, NMC and the health care industry in general will continue to be subject to extensive federal, state and foreign regulation, the scope of which cannot be predicted.

NMC historically has employed certain mechanisms to monitor its compliance with relevant laws, rules, regulations and business standards. Such compliance-related policies and activities have included periodic reaffirmations of business ethics standards, internal audit reviews and legal reviews. Additionally, a hotline accessible to NMC employees has been maintained by Grace to report violations or suspected violations of applicable laws or NMC policies. NMC intends to establish its own hotline following the Reorganization. To increase its compliance program's effectiveness, NMC has undertaken a program to review and enhance its compliance systems and has secured the services of a nationally recognized consulting firm to review and enhance its existing compliance program and policies.

118

<PAGE>    143

PRODUCT REGULATION

U.S.

In the U.S., the FDA and comparable state regulatory agencies impose requirements on Fresenius Worldwide Dialysis, Fresenius USA and NMC as manufacturers and sellers of medical products and supplies under its jurisdiction. These require that products be manufactured in accordance with GMP and that NMC and Fresenius USA comply with FDA requirements regarding the design, safety, advertising, labeling, recordkeeping and reporting of adverse events related to the use of their products. In addition, in order to clinically test, produce and market certain medical products and supplies (including hemodialysis and peritoneal dialysis equipment and solutions, dialyzers, bloodlines and cell separators) for human use, NMC and Fresenius USA must satisfy mandatory procedures and safety and efficacy requirements established by the FDA or comparable state and foreign governmental agencies. Such rules generally require that products be approved by the FDA as safe and effective for their intended use prior to being marketed.

A "510(k)" pre-market notification or pre-market approval application is required before any new FDA-regulated device may be sold or marketed in the U.S. The FDA generally classifies medical devices as class I devices, which are subject to general controls (e.g., labeling, pre-marketing notification and adherence to GMP); class II devices, which are subject to special controls (e.g., performance standards, post-marketing surveillance, patient registries

XXX-001948

and FDA guidelines); and class III devices, which include life-sustaining, life-supporting and implantable devices, or new devices which are not substantially equivalent to devices in interstate commerce prior to 1976 and which require pre-market approvals. The FDA will generally grant 510(k) clearance if the submitted data establish that the proposed device is "substantially equivalent" to a legally marketed class I or class II medical device, or a class III medical device for which the FDA does not require pre-marketing approval. The FDA may request additional data or require pre-marketing approval for any device. The approval process is expensive, time consuming and subject to unanticipated delays. There can be no assurance that NMC or Fresenius USA will obtain necessary regulatory approvals or clearances within reasonable time frames, if at all. Any such delay or failure to obtain regulatory approval or clearances could have a materially adverse effect on the business, financial condition and results of operation of Fresenius Medical Care, Fresenius USA or NMC.

Fresenius USA's peritoneal dialysis solutions have been designated as drugs by the FDA and, as such, are subject to additional FDA regulation under the Food, Drug and Cosmetic Act of 1938 ("FDC Act"). In order for a new drug to receive marketing approval in the U.S., Fresenius USA must follow a series of steps which may include: (a) pre-clinical laboratory and animal tests in accordance with good laboratory practices, (b) an Investigational New Drug application which must become effective before human clinical trials may begin, (c) well-controlled human clinical trials to establish the safety and efficacy of the new drug product, (d) a New Drug Application ("NDA") or an Abbreviated New Drug Application ("ANDA") and (e) approval of the NDA or ANDA prior to any commercial sale or shipment of the drug. FDA approval must be obtained for each product designated as a drug. Generally, approval of an NDA, if obtained, takes one and a half or more years and may take longer should the FDA raise questions or have concerns about a new drug.

The FDA may also prohibit the sale or importation of products, order product recalls or require post-marketing testing and surveillance programs to monitor a product's effects. Fresenius Worldwide Dialysis, Fresenius USA and NMC believe that they have filed for or obtained all necessary approvals for the manufacture and sale of their products in jurisdictions in which those products are currently produced or sold.

See "-- Legal and Regulatory Proceedings -- FDA Matters" for information about certain FDA matters, including warning letters and import alerts that the FDA issued from 1991 through 1993 with respect to certain products assembled by NMC and the Consent Decree entered into thereafter; 1994 and 1995 FDA audits of certain of Fresenius USA's manufacturing facilities; and a District of New Jersey federal grand jury investigation into NMC's activities in connection with the lifting of a 1991 import hold with respect to its Dublin, Ireland manufacturing facility.

119

<PAGE>   144

NON-U.S.

Most countries maintain different regulatory regimes for pharmaceutical products and for medical devices. In each regime, there are regulations governing manufacturers and distributors, as well as regulations governing the final products manufactured and distributed. Individual country regulations may be supplemented or superceded by treaties or other international law and by standards and guidelines issued thereunder.

Some of Fresenius Worldwide Dialysis' products, such as peritoneal dialysis solutions, are considered pharmaceuticals. The European Union ("EU") has issued a directive on pharmaceuticals, No. 65/65/EWG (26 January 1965), as amended. Each member of the EU is responsible for conforming local law to comply with this directive. In Germany, pharmaceutical products are primarily regulated by the German Drug Law, as amended (Arzneimittelgesetz) (the "Drug Law") which implements EU requirements.

The provisions of the Drug Law are typical of the legal standards in other European countries. The Drug Law sets forth the requirements for the authorization of a company to manufacture pharmaceuticals. One such requirement is that a manufacturer appoint pharmacists or physicians to be responsible for the manufacture of the pharmaceuticals. At least three such responsible persons must be appointed: a quality assurance manager, a head of the manufacturing department and a person responsible for notifying authorities of any reported side effects and authorized to recall the products in question. Each such person may be held personally liable under German criminal laws for violations of the Drug Law.

International guidelines also govern the manufacture of pharmaceuticals and, in many cases, overlap with national requirements. In particular, the Pharmaceutical Inspection Convention, an international treaty ("PIC"), sets forth rules which are binding on most countries in which pharmaceuticals are manufactured. Among other things, PIC establishes requirements for GMP which are then adopted at the national level. Another international guideline, which is non-binding, is the ISO 9000-9004 system for assuring quality control. This system is more detailed than GMP. Compliance entitles the manufacturer to a certification of quality control. As of July 1993, the first Fresenius Worldwide Dialysis plants obtained certificates for successfully running full quality management systems (ISO 9001).

In addition to the regulation of the manufacture of pharmaceuticals, countries directly regulate the pharmaceuticals produced. A drug needs to be registered and authorized in every country in which it is distributed. EU rules govern the conditions for a registration, such as pre-clinical and clinical testing.

XXX-001949

Historically, medical devices have not been regulated as strictly as pharmaceuticals, but more stringent regulatory schemes are now being adopted. The EU began to harmonize national regulations comprehensively for the control of medical products in Europe in 1993, when it adopted Medical Devices Directive (93/42/EEC, 12 July 1993). In 1995, Germany implemented this directive when it adopted the Medical Devices Act (Medizinproduktegesetz) (the "Medical Devices Act"), which is similar in many ways to the Drug Law. The EU directive applies to both the manufacturer's quality control system and the products' technical design. Depending on the class of medical devices, there are alternative regulatory modules to be chosen by a manufacturer to demonstrate compliance with EU provisions. To assure and demonstrate the high quality standards and performance of its operations, Fresenius Worldwide Dialysis has subjected its plants to the most comprehensive procedural module, which is also the fastest way to launch a new product in the EU. This module requires the certification of a full quality management system by a "notified body" (i.e., a group accredited and monitored by governmental agencies that inspects manufacturing facilities and quality control systems at regular intervals and is authorized to carry out unannounced inspections) charged with supervising the quality management system.

Upon receipt of an EU certificate for the quality management system of a particular facility, a company is permitted to assess if products developed and manufactured in the facility satisfy EU requirements. EU requirements for products are laid down in harmonized EU standards and include conformity to safety requirements, physical and biological properties, construction and environmental properties, and information supplied by the manufacturer. Conformity to these requirements must be demonstrated by pre-clinical tests, biocompatibility tests, qualification of products and packaging, risk analysis and well-conducted clinical evaluations approved by ethics committees.

120

<PAGE>  145

A manufacturer having an EU-certified full quality management system has to declare and document conformity of its products to the harmonized standards and, if able to do so, to put a "CE" mark on the products. The "CE" mark demonstrates compliance with the relevant EU requirements. Products subject to these provisions that do not bear the "CE" mark cannot be imported, sold or distributed within the EU.

The Medical Device Directive became effective on June 29, 1993. However, for a period of five years after the adoption of the Medical Device Directive, member states may authorize the distribution of products which comply with the legal provisions applicable within their territory as in effect on December 31, 1994. The latest generations of Fresenius Worldwide Dialysis machines (Series 4008, 4008B, 4008E and its therapy modifications, and PD-NIGHT(TM)), as well as dialysis filters and dialysis tubing systems, already bear the "CE" mark. Fresenius Worldwide Dialysis expects to continue to obtain additional certificates as they are required. MPG's manufacturing facilities have been awarded a "CE" mark and have received ISO certifications, and it is anticipated that all NMC products will be labelled with a "CE" mark by the end of 1996.

FACILITIES AND OPERATIONAL REGULATION

U.S.

The Clinical Laboratory Improvement Amendments of 1988 ("CLIA") subject virtually all clinical laboratory testing facilities, including those of NMC, to the jurisdiction of HHS. CLIA establishes national standards for assuring the quality of laboratories based upon the complexity of testing performed by a laboratory. The operations of NMC and Fresenius USA are also subject to federal laws governing the repackaging and dispensing of drugs (including oxygen) and the maintenance and tracking of certain life-sustaining and life-supporting equipment.

The U.S. operations of NMC and Fresenius USA are subject to various U.S. Department of Transportation, Nuclear Regulatory Commission and Environmental Protection Agency requirements and other federal, state and local hazardous waste disposal laws. As currently in effect, laws governing the disposal of hazardous waste do not classify most of the waste produced in connection with the provision of dialysis, laboratory or homecare services as hazardous, although disposal of nonhazardous medical waste is subject to specific state regulation. LifeChem and DSI both generate hazardous waste which is subject to specific disposal requirements. In addition, certain chemotherapy services provided by NMC Homecare are subject to specific disposal requirements. The operations of NMC and Fresenius USA are also subject to various air emission and wastewater discharge regulations.

Federal, state and local regulations require NMC and Fresenius USA to meet various standards relating to, among other things, the management of facilities, personnel qualifications and licensing, maintenance of proper records, equipment, quality assurance programs, the operation of pharmacies, and dispensing of controlled substances. All of the operations of NMC and Fresenius USA are subject to periodic inspection by federal and state agencies and other governmental authorities to determine if the operations, premises, equipment, personnel and patient care meet applicable standards. To receive Medicare reimbursement, NMC's dialysis centers, home health services locations and laboratories must be certified by HCFA. All of NMC's dialysis centers, home health services locations and laboratories that furnish Medicare services are so certified. In addition, all of the locations operated by NMC Homecare are accredited by the Joint Commission for the Accreditation of Health Care Organizations.

Certain facilities of NMC and Fresenius USA and certain of their employees

XXX-001950

are also subject to state licensing statutes and regulations. These statutes and regulations are in addition to federal and state rules and standards that must be met to qualify for payments under Medicare, Medicaid and other government reimbursement programs. Licenses and approvals to operate these centers and conduct certain professional activities are customarily subject to periodic renewal and to revocation upon failure to comply with the conditions under which they were granted. See "-- Legal and Regulatory Proceedings -- FDA Matters" for information about 1995 FDA audits of Fresenius USA's facilities.

The Occupational Safety and Health Administration ("OSHA") regulations require employers to provide employees who work with blood or other potentially infectious materials with prescribed protections

121

<PAGE>   146

against blood-borne pathogens. The regulatory requirements apply to all health care facilities, including dialysis centers, laboratories and homecare providers, and require employers to make a determination as to which employees may be exposed to blood or other potentially infectious materials and to have in effect a written exposure control plan. In addition, employers are required to provide hepatitis B vaccinations, personal protective equipment, blood-borne pathogens training, post-exposure evaluation and follow-up, waste disposal techniques and procedures, engineering and work practice controls and other OSHA-mandated programs.

Some states in which NMC operates have Certificate of Need ("CON") laws that require any person or entity seeking to establish a new health care service or to expand an existing service to apply for and receive an administrative determination that the service is needed. NMC currently operates in 13 states and the District of Columbia and Puerto Rico that have CON laws applicable to dialysis centers. These requirements may provide a barrier to entry to new companies seeking to provide services in these states, but also may constrain NMC's ability to expand its operations in these states.

NON-U.S.

Countries outside of the U.S. possess a wide variety of operational regulation at disparate levels. Accordingly, NMC's and Fresenius Worldwide Dialysis' operations are subject to very different regulations in different countries. Most countries regulate the conditions under which manufacturing is conducted and dialysis centers are operated.

Fresenius Worldwide Dialysis and NMC are subject to a broad spectrum of regulation. Their operations must comply with various environmental and transportation regulations in the various countries in which they operate. Their manufacturing facilities and dialysis centers are also subject to various standards relating to, among other things, the management of facilities, personnel qualifications and licensing, maintenance of proper records, equipment, quality assurance programs, the operation of pharmacies, the protection of workers from blood-borne diseases and the dispensing of controlled substances. All of the operations of Fresenius Worldwide Dialysis and NMC are subject to periodic inspection by various governmental authorities to determine if the operations, premises, equipment, personnel and patient care meet applicable standards. The operation of dialysis centers and conduct of related activities by Fresenius Worldwide Dialysis and its subsidiaries and joint ventures and by NMC generally requires licenses, which are subject to periodic renewal and the possibility of revocation for violation of applicable regulatory requirements.

In addition, many countries impose various investment restrictions on foreign companies. For instance, China requires government approval to enter into a joint venture with a local partner. Certain countries do not permit foreign investors to own a majority interest in local companies or require that companies organized under their laws have at least one local shareholder. Investment restrictions therefore impact the corporate structure, operating procedures and other characteristics of Fresenius Worldwide Dialysis' subsidiaries and joint ventures in these and other countries.

Fresenius Worldwide Dialysis and NMC believe their respective facilities are currently in compliance in all material respects with the applicable national and local requirements in the jurisdictions in which they operate.

REIMBURSEMENT

U.S.

Dialysis Services.  NMC's dialysis centers provide outpatient hemodialysis treatment for ESRD patients. In addition, some of NMC's centers offer services for the provision of peritoneal dialysis treatment at home. Neither Fresenius Worldwide Dialysis nor Fresenius USA provides dialysis treatment in the U.S.

The Medicare program is the primary source of DSD's revenues from dialysis treatment. For example, in 1995, approximately 58% of DSD's revenues resulted from Medicare's ESRD program. As described below, DSD is reimbursed by the Medicare program in accordance with the Composite Rate for certain products and services rendered at NMC's dialysis centers, as described in the next paragraph, other payment methodologies apply to Medicare reimbursement for other products and services provided at NMC's dialysis centers and for products (such as those sold by Fresenius USA and by MPG) and support services furnished to ESRD patients receiving dialysis treatment at home (such as those of RPD). Medicare reimbursement rates are fixed

122

XXX-001951

<PAGE>  147

in advance and are subject to adjustment from time to time by the U.S. Congress. Although this form of reimbursement limits the allowable charge per treatment, it provides NMC with predictable and recurring per treatment revenues and allows NMC to retain any profit earned.

When Medicare assumes responsibility as primary payor (see "-- Coordination of Benefits"), Medicare is responsible for payment of 80% of the Composite Rate set by HCFA for dialysis treatments. The Composite Rate governs the Medicare reimbursement available for a designated group of dialysis services, including the dialysis treatment, supplies used for such treatment, certain laboratory tests and certain medications. The Composite Rate consists of labor and non-labor components with adjustments made for regional wage costs, subject to a national payment floor and ceiling currently ranging from $117 to $139 per treatment, with exceptions based on specified criteria. In certain instances, products sold by Fresenius USA and RPD are included in the non-labor component of the Composite Rate as described below.

The method under which NMC is reimbursed for home dialysis is based on which supplier is selected to provide dialysis supplies and equipment. If the center is designated as the supplier ("Method I") the center provides all dialysis treatment related services, including equipment and supplies, and is reimbursed using a methodology based on the Composite Rate. If RPD is designated as the direct supplier ("Method II"), RPD provides the patient directly with all necessary equipment and supplies and is reimbursed by Medicare at a monthly capitated rate. Clinics provide home support services to Method II patients and these services are reimbursed at a monthly fee for service basis subject to a capitated ceiling. The reimbursement rates under Method I and Method II differ, although both are prospectively determined and are subject to adjustment from time to time by Congress. Approximately 3% of Fresenius USA's peritoneal dialysis product sales (approximately 1% of total sales) are billed to Medicare pursuant to Method II reimbursement.

Certain items and services that NMC furnishes at its dialysis centers are not included in the Composite Rate and are eligible for separate Medicare reimbursement, typically on the basis of established fee schedule amounts. Such items and services include certain drugs (such as EPO), blood transfusions and certain diagnostic tests. The rate of utilization by NMC facilities of items and services that are not included in the Composite Rate is a subject of the OIG Investigation. See "-- Legal and Regulatory Proceedings -- OIG Investigation."

Medicare payments are subject to change by legislation and pursuant to deficit reduction measures. The Composite Rate was unchanged from commencement of the ESRD program in 1972 until 1983. From 1983 through December 1990, numerous congressional actions resulted in a net reduction of the average reimbursement rate from $138 per treatment in 1983 to approximately $125 per treatment in 1990. Congress increased the ESRD reimbursement rate, effective January 1, 1991, to an average rate of $126 per treatment.

In 1990, Congress required that the Prospective Payment Assessment Commission ("PROPAC") study dialysis costs and reimbursement and make reports annually to Congress with a recommendation as to the appropriateness of changes to the ESRD reimbursement rates. In 1993, PROPAC recommended a 2.5% increase in the Composite Rate for independent freestanding dialysis facilities, which was not implemented by Congress. In March 1994 and again in 1995, PROPAC recommended that no changes be made in the reimbursement rate. In March 1996, PROPAC recommended a 2% increase in the Composite Rate for independent freestanding dialysis facilities. However, Congress is not required to implement PROPAC recommendations and could establish a different reimbursement rate. NMC is unable to predict what, if any, future changes may occur in the rate of Medicare reimbursement. Any significant decreases in the Medicare reimbursement rates could have a material adverse effect on NMC and, because the demand for Fresenius USA's products is affected by Medicare reimbursement, on Fresenius USA. Increases in operating costs that are affected by inflation, such as labor and supply costs, without a compensating increase in reimbursement rates, also may adversely affect NMC's and Fresenius Worldwide Dialysis' businesses and results of operations.

The patient or third-party insurance payors, including employer-sponsored health insurance plans, commercial insurance carriers and the Medicaid program, are responsible for paying any co-payment amounts for approved services not paid by Medicare (typically the annual deductible and 20% co-insurance), subject to the specific coverage policies of such payors. The extent to which NMC is actually paid the full co-payment

123

<PAGE>  148

amounts depends on the particular responsible party. Each third-party payor, including Medicaid, makes payment under contractual or regulatory reimbursement provisions which may or may not cover the full 20% co-payment or annual deductible. Where the patient has no third-party insurance and is not eligible for Medicaid, the patient is responsible for paying the co-payments, which NMC frequently does not collect fully despite reasonable collection efforts. In certain cases, NMC pays, or provides loans for the payment of, premiums for supplemental medical insurance (under which Medicare Part B coverage is provided) and/or for Medigap insurance (which covers co-payment amounts) on behalf of financially needy patients. NMC believes that this practice is lawful. The practice of providing loans or grants for the payment of supplemental medical insurance premiums is one of the subjects of review by the government as part of the OIG Investigation. See "-- Legal and Regulatory Proceedings -- OIG Investigation." Private payors reimburse NMC for dialysis and dialysis-related services not covered by Medicare, Medicaid or other government programs at

XXX-001952

contractually set amounts or at NMC's usual and customary rates.

Laboratory Tests.  A substantial portion of LifeChem's net revenues (78% in 1995) are derived from Medicare, which pays for clinical laboratory services provided to dialysis patients in two ways. Payment for certain routine tests is included in the Composite Rate paid to the centers. As to such services, the dialysis centers obtain the services from a laboratory and pay the laboratory for such services. In accordance with industry practice, LifeChem usually provides such testing services under capitation agreements with its customers pursuant to which LifeChem bills a fixed amount per patient per month irrespective of the amount of testing actually furnished. In October 1994, the OIG issued a special fraud alert in which it stated its view that the industry practice of providing tests covered by the Composite Rate at below fair market value coupled with an agreement by an ESRD facility to refer all or most of its non-Composite Rate tests to the laboratory violated the anti-kickback statute. See "-- Anti-kickback Statute, False Claims Act, Stark Law and Fraud and Abuse Laws" for a description of this statute. LifeChem's use of capitation rates in billing for tests in the Composite Rate is a subject of the OIG Investigation. See "-- Legal and Regulatory Proceedings -- OIG Investigation."

Most laboratory tests performed by LifeChem for Medicare beneficiaries that are not included in the Composite Rate are separately billable directly to Medicare. Such tests are paid at 100% of the Medicare fee schedule amounts, which are limited by national ceilings on payment rates, called National Limitation Amounts ("NLAs"). Congress has periodically reduced the fee schedule rates and the NLAs, with the most recent reductions in the NLAs occurring in January 1996. It cannot be predicted whether or to what extent Congress will further reduce the NLAs or make other reimbursement changes that could have an adverse effect on LifeChem's business and results of operations.

A Medicare carrier has recently proposed a new policy for diagnostic coding of certain clinical laboratory services for dialysis patients. The proposed policy would restrict coverage for certain tests based on medical necessity criteria, and subject other tests to additional payment review. If implemented in its proposed form, the policy would reduce the number of covered services and, as a result, could materially adversely affect LifeChem's revenues.

See "-- Legal and Regulatory Proceedings -- OIG Investigation" for information relating to LifeChem's voluntary disclosure of, and repayments associated with, certain billing problems and related proceedings.

IDPN.  Among its other services, NMC Homecare administers IDPN to chronic dialysis patients who suffer from severe gastrointestinal malfunctions. These services are covered by the Medicare program under the PEN benefit, which requires extensive documentation and individual physician certification of medical necessity for each patient. Treatment by IDPN has been shown to increase the body content of vital, high biologic value proteins like albumin. Deficiency of such proteins has been shown to be associated with substantially higher risk of death, both long-term and short-term (one year), among dialysis patients.

NMC has continued to provide IDPN therapy to severely malnourished dialysis patients because NMC believes that to be the only clinically and ethically responsible course of action. Analyses of data from NMC's PSP database, both internal and as published in peer-reviewed medical journals, indicates that malnutrition measured by a serum albumin value of 3.4 g/dl or less is associated with significantly increased mortality risk in the chronic dialysis population and that IDPN is effective in increasing serum albumin and moderating

124

<PAGE>   149

mortality risk for such malnourished patients. These studies show that when these initial albumin levels were 3.0 g/dl or less, IDPN treatment was accompanied by a 70% improvement in survival. Similarly, when the initial albumin was 3.4 g/dl or less, survival with IDPN treatment was improved by about 15%. IDPN treatment is therefore associated with improved odds of survival at albumin concentration lower than 3.4 g/dl and the amount of improvement increases as albumin concentrates falls. Recent statistics (March 1996) suggest that about 5% of dialysis patients suffer from albumin concentration that is 3.0 g/dl or less.

Because the management of NMC has believed that the obligation of medical professionals and companies that support medical care to ESRD patients extends beyond the mere provision of paid-for-service to advocacy for needed treatment, NMC has accepted increasing financial risk by continuing to offer IDPN.

Prior to September 1993, IDPN claims were processed by two regional Medicare specialty PEN carriers, which are private companies under contract with HCFA responsible for processing claims and implementing certain Medicare benefits. In late 1993, administration of Medicare PEN claims was transferred to four newly created regional Durable Medical Equipment Regional Carriers ("DMERCs"). The DMERCs implemented policies for IDPN reimbursement that resulted in a sharp reduction in the number of IDPN claims approved for payment. As a result of these payment reductions, several competitors of NMC Homecare have ceased providing IDPN. Some of these competitors' patients have subsequently become NMC Homecare patients for IDPN.

NMC believes that the reduction in IDPN claims paid by Medicare represents an unauthorized policy coverage change. Accordingly, NMC, along with other IDPN providers, is pursuing various administrative and legal avenues, including administrative appeals and a declaratory judgment action, to address this problem. Although NMC contends that its IDPN claims are consistent with published Medicare coverage guidelines and ultimately will be approved for payment, there can be no assurance that the claims on appeal will be approved

XXX-001953

for payment. See "-- Legal and Regulatory Proceedings" for information about a declaratory judgment action filed by NMC challenging the legality of these restrictions on reimbursement.

In April 1996, HCFA published new medical review policies which restrict substantially the number of patients for whom IDPN would be reimbursed by Medicare. The new policies are final and effective for claims submitted on or after July 1, 1996. NMC and other PEN providers continue to review whether and to what extent possible modifications to the new policies might be obtained in legislative, judicial or administrative forums.

While the new policy permits continued coverage of IDPN and other PEN therapies, and while the potential impact of the new policy is subject to further analysis, NMC believes that the new policy will make it substantially more difficult to qualify patients for future coverage by, among other things, requiring certain patients to undergo onerous and/or invasive tests in order to qualify for coverage. The new policy also eliminates all reimbursement for infusion pumps. NMC, together with other interested parties, may seek to effect certain changes in the new policy (other than with respect to the elimination of pump revenues), and NMC has developed changes to its patient qualification procedures in order to comply with the policy. However, if NMC is unable to achieve meaningful change in the new policy, if physicians and patients fail to accept the new qualification procedures and/or if patients fail to qualify under such procedures, the policy could significantly reduce the number of patients eligible for Medicare coverage of IDPN and other PEN therapies. The new DMERC policy eliminates reimbursement for infusion pumps, which may adversely impact revenue by approximately $11 million on an annualized basis. For purposes of financial and operational planning, NMC estimates that as much as 50% of NMC's current patient level may no longer qualify for continued IDPN coverage under the new policies, which would adversely impact revenues by up to $42 million annually.

If NMC is unable to collect its IDPN accounts receivable or if IDPN/PEN coverage is reduced or eliminated, Fresenius Medical Care's business, financial position and results of operations could be materially adversely affected.

See "-- Legal and Regulatory Proceedings -- OIG Investigation" for information on issues raised by the OIG with respect to the provision of IDPN by NMC Homecare and related billing practices.

125

<PAGE>    150

EPO.  Since June 1, 1989, the Medicare program has provided coverage for the administration of EPO to dialysis patients, with reimbursement made separately from the Composite Rate. Medicare reimbursement for EPO was reduced from $11.00 to $10.00 per 1,000 units, effective January 1, 1994. Future changes in the EPO reimbursement rate, inclusion of EPO in the Composite Rate, changes in the typical dosage per administration or increases in the cost of EPO purchased by NMC could adversely affect NMC's business and results of operations, possibly materially. See "-- Business of NMC -- DSD Operations."

Non-Dialysis-Related Services.  NMC Homecare and DSI provide a variety of non-dialysis-related services. Subject to various restrictions and co-payment limitations, Medicare typically pays for such non-dialysis-related services on the basis of established fee schedule amounts or, with respect to home health services, on the basis of reasonable costs. Private payors reimburse NMC for such non-dialysis-related services at contractually established amounts or at NMC's usual and customary rates. Certain Medicare carriers are imposing or considering the imposition of restrictions on diagnostic providers, such as DSI, that limit the category of tests they can perform or require direct personal physician supervision of technicians performing certain tests.

Coordination of Benefits.  The commencement date of Medicare benefits for eligible ESRD patients is determined by several factors. In general, Medicare entitlement begins three months after the initiation of chronic dialysis treatments at a dialysis center. During this three-month period (the "entitlement waiting period"), the patient, Medicaid and/or the patient's private insurer are responsible for payment.

For dual eligible ESRD patients, Medicare benefits commence, and Medicare assumes primary payor responsibility, at the beginning of the fourth month. ESRD patients under age 65 who are covered by an employer health plan must wait 21 months (consisting of the three-month entitlement waiting period described above and an additional 18-month "coordination of benefits period") before Medicare becomes the primary payor. During this 21-month period, the employer health plan is responsible for payment as primary payor at its negotiated rate or, in the absence of such a rate, at NMC's usual and customary rates (which generally are higher than the Composite Rate), and Medicare is the secondary payor. For patients beginning dialysis at age 65 or over who are not covered by an employer health plan, Medicare coverage under the age entitlement program is already in place, and there is no coordination of benefits period for coverage of dialysis services.

In the case of ESRD patients age 65 and over who are dual eligible ESRD patients, OBRA 93 amended the MSP provisions affecting the coordination of benefits between Medicare and the employer health plans. The vast majority of NMC's patients affected by this amendment were retirees eligible for Medicare on the basis of age, whose employer group health plan had been the supplemental payor to Medicare, and who subsequently became eligible for Medicare on the basis of ESRD. HCFA's initial implementation of OBRA 93, confirmed in a Program Memorandum dated July 15, 1994, was that all employer health plans must recognize an 18-month coordination of benefits period during which the employer

XXX-001954

health plans are the primary payor, regardless of prior Medicare eligibility on account of age and even if the employer health plan covered the enrollee as a retiree, rather than as an active employee. This implementation of the MSP provision of OBRA 93 for such dual eligible ESRD patients had a positive impact on DSD's revenues because during the 18-month coordination of benefits period, the employer health plan was responsible for payment at its negotiated rate or, in the absence of such a rate, at NMC's usual and customary rate (which, as noted above, is generally higher than the Composite Rate). Upon implementation of the OBRA 93 provisions with respect to dual eligible ESRD patients, NMC adopted a procedure for rebilling private payors for certain amounts previously billed to Medicare and for crediting Medicare for overpayments. The process by which NMC notified Medicare intermediaries with respect to overpayments received as a result of amounts rebilled to employer health plans is a subject of the OIG Investigation. See "-- Legal and Regulatory Proceedings -- OIG Investigation."

In a second Program Memorandum dated April 24, 1995, HCFA reversed its implementation of the OBRA 93 MSP change in a manner which would substantially diminish the positive revenue effect on DSD of the original implementation. Under the new policy, no new 18-month coordination of benefits period would arise for an individual who was already age-eligible for Medicare when ESRD entitlement arose and who was

126

<PAGE>   151

covered under the employer health plan as a retiree, rather than as an active employee. HCFA further proposed that its new policy be effective retroactive to August 10, 1993, the effective date of OBRA 93. See "-- Legal and Regulatory Proceedings -- OBRA 93" for information about a complaint filed by NMC seeking to preclude HCFA from enforcing its new policy. If HCFA's revised interpretation is upheld, NMC's business, financial position and results of operations would be materially adversely affected, particularly if the revised interpretation is applied retroactively. See "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- NMC."

Possible Changes in Medicare.  Because the Medicare program represents a substantial portion of the federal budget, in order to reduce the federal government deficit, and for other reasons, the U.S. Congress takes action in almost every legislative session to modify the Medicare program by refining the amounts payable to health care providers. Legislation or regulations may be enacted in the future that could substantially modify or reduce the amounts paid for services and products offered by Fresenius Medical Care and its subsidiaries. In this regard, both the executive branch and members of Congress from both parties have recently proposed significant reductions in the Medicare program as part of initiatives to reduce the federal government deficit. It is also possible that statutes may be adopted or regulations may be promulgated in the future that impose additional eligibility requirements for participation in the federal and state health care programs. Such new legislation or regulations may adversely affect Fresenius Medical Care's, Fresenius USA's and NMC's business and results of operations.

NON-U.S.

Reimbursement arrangements outside the U.S. vary significantly from country to country. In developed areas, such as Western Europe, national health insurance programs frequently provide coverage for dialysis treatments and, in some cases, provide reimbursement at rates higher than those available in the U.S. In less developed countries, reimbursement programs often do not exist, and patients then bear the entire cost of dialysis treatment. Some developing countries, especially in the Asia/Pacific region and South America, are moving toward national health insurance programs modelled after those in Europe.

ANTI-KICKBACK STATUTE, FALSE CLAIMS ACT, STARK LAW AND FRAUD AND ABUSE LAWS

Various operations of Fresenius USA and NMC are subject to federal and state statutes and regulations governing financial relationships between health care providers and potential referral sources and reimbursement for services and items provided to Medicare and Medicaid patients. Such laws include the anti-kickback statute, the False Claims Act, the Stark Law, other federal fraud and abuse laws and similar state laws. These laws may apply because NMC's Medical Directors and other physicians with whom NMC has financial relationships refer patients to, and order diagnostic and therapeutic services from, NMC's dialysis centers and other operations. As is generally true in the dialysis industry, at each DSD center a small number of physicians account for all or a significant portion of the patient referral base. An ESRD patient generally seeks treatment at a center that is convenient to the patient and at which the patient's nephrologist has staff privileges. Virtually all of NMC's centers maintain open staff privileges for local nephrologists. The ability of NMC to provide quality dialysis care and to otherwise meet the needs of patients and local physicians is central to its ability to attract nephrologists to DSD centers and to receive referrals from such physicians.

The federal government, many states and private third-party insurance payors have made combating health care fraud and abuse one of their highest enforcement priorities, resulting in increasing resources devoted to this problem. Consequently, the OIG and other enforcement authorities are increasing scrutiny of arrangements between physicians and health care providers for possible violations of the anti-kickback statute or other federal laws. Certain competitors of NMC who have faced federal criminal charges under these statutes have entered into settlement agreements under which they have agreed to pay substantial fines and penalties. See "-- Legal and Regulatory Proceedings -- OIG Investigation" for information concerning the OIG Investigation of NMC's activities under these provisions.

XXX-001955

NMC has undertaken a program to review and enhance its compliance system. The review is multifaceted and includes internal review of current practices company-wide to determine whether any

127

<PAGE>    152

changes in existing policies are advisable and use of a nationally recognized consulting firm to review and enhance existing compliance programs and policies. NMC expects that such review efforts will be ongoing as part of NMC's compliance efforts. NMC took measures to review internally certain matters addressed in the OIG Investigation before the investigation was announced as part of its ongoing compliance efforts. Such efforts included a review of contractual arrangements prior to and in anticipation of the Stark Law in January 1995 and periodic reviews of other contractual arrangements and policies. NMC does not expect these changes to have a material impact on its financial position or results of operations.

ANTI-KICKBACK STATUTE

The anti-kickback statute generally prohibits the knowing and willful solicitation, receipt, offer or payment of any remuneration, whether direct or indirect, in return for or to induce the referral of patients or the ordering or purchasing of items or services payable in whole or in part under Medicare, Medicaid or state health care programs. Certain federal courts have interpreted the anti-kickback statute broadly, for example as prohibiting payments to induce the referral of Medicare business, irrespective of any other legitimate motives. However, one federal appellate court has found that a violation of the anti-kickback statute requires specific knowledge of the anti-kickback statute and specific intent to disobey the law. Sanctions for violations of the anti-kickback statute include criminal and civil penalties, such as imprisonment or fines of up to $25,000 per violation, and exclusion from the Medicare or Medicaid programs. In addition, certain provisions of federal criminal law that may be applicable provide that if a corporation is found guilty of a criminal offense it may be fined no more than twice any pecuniary gain to the corporation, or, in the alternative, no more than $500,000 per offense.

Because of the breadth of the anti-kickback statute, substantial uncertainty has resulted regarding which practices violate the statute and which practices are legitimate. Two methods the OIG uses periodically to give guidance to providers about the anti-kickback statute are "safe harbor" regulations and special fraud alerts. The safe harbor regulations, which were first promulgated in final form on July 29, 1991 and have subsequently been amended, create exceptions or safe harbors, in addition to the statutory exceptions, for certain business arrangements that would otherwise be prohibited by the anti-kickback statute. An arrangement that satisfies all of the standards of the applicable safe harbors is deemed not to violate the anti-kickback statute. Arrangements that fall outside of the safe harbors do not necessarily violate the anti-kickback statute; rather, such arrangements are not afforded protection from prosecution and may be subject to scrutiny by enforcement agencies. Special fraud alerts are intended to inform providers of the OIG's enforcement priorities and to identify suspect practices the OIG believes violate the anti-kickback statute. See "-- Legal and Regulatory Proceedings -- OIG Investigation" for information concerning the OIG Investigation of certain of NMC's activities, including Medical Director contracts and compensation.

Some states also have enacted statutes similar to the anti-kickback statute, which may include criminal penalties, apply to referrals of patients regardless of payor source or contain exceptions different from each other and from those contained in the anti-kickback statute.

FALSE CLAIMS ACT AND RELATED CRIMINAL PROVISIONS

The U.S. federal False Claims Act (the "False Claims Act") imposes civil penalties for making false claims with respect to governmental programs, such as Medicare and Medicaid, for services not rendered, or for misrepresenting actual services rendered, in order to obtain higher reimbursement. Moreover, private individuals may bring qui tam or "whistle blower" suits against providers under the False Claims Act, which authorizes the payment of a portion of any recovery to the individual bringing the suit. Such actions are initially required to be filed under seal pending their review by the DOJ. A few federal district courts have recently interpreted the False Claims Act as applying to claims for reimbursement that violate the anti-kickback statute under certain circumstances. The False Claims Act generally provides for the imposition of civil penalties of $5,000 to $10,000 per claim and for treble damages, resulting in the possibility of substantial financial penalties for small billing errors that are replicated in a large number of claims, as each individual claim could be deemed to be a separate violation of the False Claims Act. Criminal provisions that are similar to the False Claims Act provide that if a corporation is convicted of presenting a claim or making a statement

128

<PAGE>    153

that it knows to be false, fictitious or fraudulent to any federal agency it may be fined not more than twice any pecuniary gain to the corporation, or, in the alternative, no more than $500,000 per offense.

Some states also have enacted statutes similar to the False Claims Act which may include criminal penalties, substantial fines, and treble damages.

STARK LAW

The original Stark Law, known as "Stark I" and enacted as part of the

XXX-001956

Omnibus Budget Reconciliation Act of 1989, prohibits a physician from referring Medicare patients for clinical laboratory services to entities with which the physician (or an immediate family member) has a prohibited financial relationship, unless certain exceptions apply. A financial relationship is defined as an ownership or investment interest in the entity or a compensation arrangement between the physician and the entity. The statutory exceptions in many cases are similar to the OIG's safe harbors applicable to the anti-kickback statute. For example, a provider may not bill for clinical laboratory services referred by a physician with a prohibited financial relationship. Sanctions for violations of the Stark Law may include denial of payment, refund obligations, civil monetary penalties or exclusion of the provider from the Medicare or Medicaid program.

Provisions of OBRA 93, known as "Stark II," amended Stark I to revise and expand upon various statutory exceptions, to expand the services regulated by the statute to a list of "Designated Health Services", and to prohibit Medicaid referrals where a prohibited financial relationship exists. The additional Designated Health Services include: physical therapy services; occupational therapy services; radiology services, including magnetic resonance imaging, computer axial tomography scans and ultrasound services; durable medical equipment and supplies; parenteral and enteral nutrients, equipment and supplies; home health services; outpatient prescription drugs; and inpatient and outpatient hospital services. Although dialysis services are not listed as a Designated Health Service, NMC has determined that the Stark Law may apply to dialysis-related Designated Health Services not paid for under the Composite Rate as well as to certain services provided by DSI, LifeChem and NMC Homecare. Fresenius USA believes that the Stark Law may apply to Fresenius USA's sales of peritoneal dialysis products for home use.

The provisions of Stark II generally became effective on January 1, 1995. Prior to the effective date of Stark II, NMC had reimbursed the substantial majority of its Medical Directors on the basis of a percentage of net pre-tax earnings of the facilities. In response to Stark II, since January 1, 1995, DSD has compensated its Medical Directors on a fixed fee arrangement to comply with the requirements of Stark II. As part of such arrangement, approximately 25% of the Medical Director's compensation is held back and earned by the Medical Director on the basis of the Medical Director's achievement of quality and cost containment goals. The compensation of Medical Directors is a subject of the OIG Investigation. See "-- Legal and Regulatory Proceedings -- OIG Investigation."

On August 14, 1995, HCFA promulgated a final regulation implementing Stark I and the restrictions on referrals for clinical laboratory services. One of the provisions of the regulation significantly affecting dialysis providers is HCFA's interpretation that the Stark Law applies to dialysis-related laboratory services. However, HCFA promulgated a regulatory exception for clinical laboratory services paid for as part of the Composite Rate. Although this regulation did not implement the provisions of Stark II applicable to the additional list of Designated Health Services, which would be subject to a separate yet to be issued Stark II regulation, HCFA indicated that a majority of its interpretations in the Stark I regulation would apply to the Stark II regulation. HCFA has not formally stated when it plans to issue the Stark II regulation.

Several states in which NMC operates have enacted self-referral statutes similar to the Stark Law. Such state self-referral laws typically apply to referrals of patients regardless of payor source and may contain exceptions different from each other and from those contained in the Stark Law.

                                    129

<PAGE>   154

OTHER FRAUD AND ABUSE LAWS

   NMC's and Fresenius USA's operations are also subject to a variety of other federal and state fraud and abuse laws, principally designed to ensure that claims for payment to be made with public funds are complete, accurate and fully comply with all applicable program rules.

   The civil monetary provisions of the anti-kickback statute are triggered by violations of numerous rules under the statute, including the filing of a false or fraudulent claim and billing in excess of the amount permitted to be charged for a particular item or service. Monetary penalties of up to $2,000 plus twice the amount of the claim for each item or service for which an improper claim for payment was made, may be imposed, resulting in the possibility of substantial financial penalties for small billing errors that are replicated in a large number of claims. Violations may also result in suspension of payments or exclusion from the Medicare and Medicaid programs.

   In addition to the statutes described above, other criminal statutes may be applicable to conduct that is found to violate any of the statutes described above.

LEGAL AND REGULATORY PROCEEDINGS

   As discussed in greater detail below, NMC is the subject of investigations by several federal agencies and authorities, the outcome of which cannot be predicted. If the government were successfully to pursue claims arising from any of these investigations, NMC or one or more of its subsidiaries could be subject to civil or criminal penalties, including substantial fines, suspension of payments or exclusion from the Medicare program. Any such result could have a material adverse effect on NMC's business, financial condition and results of operation. In addition, as discussed below, NMC has become aware that it is the subject of a qui tam or "whistleblower" action with respect to some or all of the issues raised by the government investigations; and NMC may be the subject

XXX-001957

of other "whistleblower" actions.

OIG INVESTIGATION

On October 17, 1995, NMC received five investigative subpoenas from the OIG. The subpoenas were issued in connection with an investigation being conducted by the OIG, the U.S. Attorney for the District of Massachusetts and others concerning possible violations of federal laws, including the anti-kickback statute and the False Claims Act. The subpoenas call for extensive document production relating to various aspects of NMC's business.

The five subpoenas cover the following areas: (a) NMC's corporate management, personnel and employees, organizational structure, financial information and internal communications; (b) NMC's dialysis services business, principally relating to its Medical Director contracts and compensation; (c) NMC's treatment of credit balances resulting from overpayments received under the Medicare ESRD program, its billing for home dialysis services, and its payment of supplemental medical insurance premiums on behalf of indigent patients; (d) LifeChem's laboratory business, including documents relating to testing procedures, marketing, customers, competition and certain over-payments totaling approximately $4.9 million that were received by LifeChem from the Medicare program with respect to laboratory services rendered between 1989 and 1993; and (e) NMC Homecare and, in particular, information concerning IDPN billing practices related to various services, equipment and supplies and payments made to third parties as compensation for administering IDPN therapy.

NMC is cooperating with the OIG investigation and has made, and is expected to continue to make, extensive document production in response to the subpoenas. Because of the breadth of the subpoenas, the government has identified and is continuing to identify specific categories of documents that it is requiring NMC to produce and has deferred compliance with substantial portions of the subpoenas at this time. NMC has received another OIG subpoena requiring the production of limited categories of additional documents relating to subject matters covered by the original subpoenas and may receive additional such subpoenas from time to time.

130

<PAGE>    155

The government has identified a number of particular areas of its inquiry. The government has indicated that the areas identified are not exclusive, and that it may pursue additional areas. As noted, the penalties applicable under the anti-kickback statute, the False Claims Act and other federal and state statutes and regulations applicable to NMC's business can be substantial. See "-- Anti-Kickback Statute, False Claims Act, Stark Law and Fraud and Abuse Laws." While NMC asserts that it is able to offer legal and/or factual defenses with respect to the areas the government has identified, there can be no assurance that the federal government and/or one or more state agencies will not claim that NMC has violated statutory or regulatory provisions. Additionally, it is possible that one or more qui tam actions alleging that NMC submitted false claims to the government may have been filed under seal by former or current NMC employees or other individuals who may have familiarity with one or more of the issues under investigation. As noted, under the False Claims Act, any such private plaintiff could pursue an action against NMC in the name of the U.S. at his or her own expense if the government declines to do so. It is also possible that one or more private payors will claim that NMC received excess payments and will seek reimbursement and other damages from NMC.

An adverse determination with respect to any of the issues addressed by the subpoenas, or any of the other issues that have been or may be identified by the government, could have a material adverse impact on NMC and could result in the payment of substantial fines, penalties and reimbursements or the suspension of payments or exclusion of NMC or one or more of its subsidiaries from the Medicare program. Under the terms of the Reorganization, any potential resulting liability will be retained by NMC, and New Grace will be indemnified by FNMC against all potential liability arising from or relating to the OIG Investigation. See "THE REORGANIZATION -- The Distribution Agreement." The particular areas identified by the government to date are as follows.

Medical Director Compensation

The government is investigating whether DSD's compensation arrangements with its Medical Directors constitute payments to induce referrals, which would be illegal under the anti-kickback statute, rather than payment for services rendered. DSD compensated the substantial majority of its Medical Directors on the basis of a percentage of the earnings of the dialysis center for which the Medical Director was responsible from the inception of NMC's predecessor in 1972 until January 1, 1995, the effective date of Stark II. Under the arrangements in effect prior to January 1, 1995, the compensation paid to Medical Directors was adjusted to include "add backs," which represented a portion of the profit earned by MPG on products purchased by the Medical Director's facility from MPG and (until January 1, 1992) a portion of the profit earned by LifeChem on laboratory services provided to patients at the Medical Director's facility. These adjustments were designed to allocate a profit factor to each dialysis center relating to the profits that could have been realized by the center if it had provided the items and services directly rather than through a subsidiary of NMC. The percentage of profits paid to any specific Medical Director was reached through negotiation, and was typically a provision of a multi-year consulting agreement.

Since January 1, 1995, DSD has compensated its Medical Directors on a fixed fee arrangement to comply with the requirements of Stark II. As part of the arrangement, approximately 25% of the Medical Director's compensation is held back and earned by the Medical Director on the basis of the Medical Director's

XXX-001958

achievement of quality and cost containment goals. In renegotiating its Medical
Director compensation arrangements in connection with Stark II, DSD took account
of the compensation levels paid to its Medical Directors in prior years.

Certain government representatives have expressed the view in meetings with
counsel for NMC that arrangements where the Medical Director was or is paid
amounts in excess of the "fair market value" of the services rendered may
evidence illegal payments to induce referrals, and that hourly compensation is a
relevant measure for evaluating the "fair market value" of the services. DSD
does not compensate its Medical Directors on an hourly basis and has asserted to
the government that hourly compensation and "fair market value" are not relevant
factors in determining whether the anti-kickback statute has been violated.
Because of the wide variation in the profitability of its facilities, and the
variation in the profit percentage contractually negotiated between DSD and its
Medical Directors, there is a wide variation in the amounts that have been

<PAGE>   156

131

paid to Medical Directors. The Medical Director contracts negotiated in
connection with the requirements of Stark II also have a wide variation in
Medical Director compensation.

The compensation that DSD has paid and is continuing to pay to a material
number of its Medical Directors could be viewed as being in excess of "fair
market value," both in absolute terms and in terms of hourly compensation. NMC
has asserted to the government that its compensation arrangements do not
constitute illegal payments to induce referrals. NMC has also asserted to the
government that OIG auditors repeatedly reviewed NMC's compensation arrangements
with its Medical Directors in connection their audits of the costs claimed
by DSD; that the OIG stated in its audit reports that, with the exception of
certain technical issues, NMC had complied with applicable Medicare laws and
regulations pertaining to the ESRD program; and that NMC reasonably relied on
these audit reports in concluding that its program for compensating Medical
Directors was lawful. There has been no indication that the government will
accept NMC's assertions concerning the legality of its arrangements generally or
NMC's assertion that it reasonably relied on OIG audits, or that the government
will not focus on specific arrangements that DSD has made with one or more
Medical Directors and claim that those specific arrangements were or are
unlawful.

The government is also investigating whether DSD's profit sharing
arrangements with its Medical Directors influenced them to order unnecessary
ancillary services and items. NMC has asserted to the government that the rate
of utilization of ancillary services and items by its Medical Directors is
reasonable and that it did not provide illegal inducements to Medical Directors
to order ancillary services and items.

Credit Balances

In the ordinary course of business, Medicare providers like DSD receive
overpayments from Medicare intermediaries for services that they provide to
Medicare patients. Medicare intermediaries commonly direct such providers to
notify them of the overpayment and not remit such amounts to the intermediary by
check or otherwise unless specifically requested to do so. In 1992, HCFA adopted
a regulation requiring certain Medicare providers, including dialysis centers,
to file a quarterly form listing unrecouped overpayments with the Medicare
intermediary responsible for reimbursing the provider. The first such filing was
required to be made as of June 30, 1992 for the period beginning with the
initial date that the provider participated in the Medicare program and ending
on June 30, 1992.

The government is investigating whether DSD intentionally understated the
Medicare credit balance reflected on its books and records for the period ending
June 30, 1992 by reversing entries out of its credit balance account and taking
overpayments into income in anticipation of the new filing requirement. DSD's
policy was to notify Medicare intermediaries in writing of overpayments upon
receipt and to maintain unrecouped Medicare overpayments as credit balances on
the books and records of DSD for four years; overpayments not recouped by
Medicare within four years would be reversed from the credit balance
account and would be available to be taken into income. NMC asserts that
Medicare overpayments that have not been recouped by Medicare within four years
are not subject to recovery under applicable regulations. NMC also asserts that
its initial filing with the intermediaries disclosed the credit balance on the
books and records of DSD as shown in accordance with its policy.

The government is also investigating whether DSD failed to disclose
Medicare overpayments that resulted from DSD's obligation to rebill commercial
payors for amounts originally billed to Medicare under HCFA's initial
implementation of the "OBRA 93" amendments to the secondary payor provisions of
the Medicare Act. See "-- OBRA 93." DSD experienced delays in reporting a
material amount of overpayments after the implementation of the OBRA 93
amendments. NMC asserts that most of these delays were the result of the
substantial administrative burdens placed on DSD as a consequence of the
changing and inconsistent instructions issued by HCFA with respect to the OBRA
93 amendments and were not intentional. Substantially all overpayments resulting
from the rebilling effort associated with the OBRA 93 amendments have now been
reported. Procedures are in place that are designed to ensure that subsequent
overpayments resulting from the OBRA 93 amendments will be reported on a timely
basis.

132

<PAGE>   157

XXX-001959

Supplemental Medical Insurance

DSD provides grants or loans for the payment of premiums for supplemental medical insurance (under which Medicare Part B coverage is provided) on behalf of a small percentage of its patients who are financially needy. The government is investigating this practice. NMC asserts that the practice is lawful.

Overpayments for Home Dialysis Services

NMC acquired HIC, an in-center and home dialysis service provider, in 1993. At the time of the acquisition, HIC was the subject of a claim by HCFA that HIC had received payments for home dialysis services in excess of the Medicare reasonable charge for services rendered prior to February 1, 1990. NMC settled the HCFA claim against HIC in 1994. The government is investigating whether the settlement concerning the alleged overpayments made to HIC resolved all issues relating to such alleged overpayments. The government is also investigating whether an NMC subsidiary, Home Dialysis Services, Inc. ("HDS"), received payments similar to the payments that HIC received, and whether HDS improperly billed for home dialysis services in excess of the monthly cost cap for services rendered on or after February 1, 1990. The government is investigating whether NMC was overpaid for services rendered. NMC asserts that the billings by HDS were proper.

LifeChem

Overpayments.  On September 22, 1995, LifeChem voluntarily disclosed certain billing problems to the government that had resulted in LifeChem's receipt of approximately $4.9 million in overpayments from the Medicare program for laboratory services rendered between 1989 and 1993. LifeChem asserts that most of these overpayments relate to errors caused by a change in LifeChem's computer systems and that the remainder of the overpayments were the result of the incorrect practice of billing for a complete blood count with differential when only a complete blood count was ordered and performed, and of the incorrect practice of billing for a complete blood count when only a hemoglobin or hematocrit test was ordered. LifeChem asserts that the overpayments it received were not caused by fraudulent activity.

LifeChem made these disclosures to the government as part of an application to be admitted to a voluntary disclosure program begun by the government in mid-1995. At the time of the disclosures, LifeChem tendered repayment to the government of the $4.9 million in overpayments. After the OIG investigation was announced, the government indicated that LifeChem had not been accepted into its voluntary disclosure program. The government has deposited the $4.9 million check with NMC's approval. The matters disclosed in LifeChem's September 22, 1995 voluntary disclosure are a subject of the OIG Investigation.

On June 7, 1996, LifeChem voluntarily disclosed an additional problem to the government that had resulted in LifeChem's receipt of between $40,000 and $160,000 in overpayments for laboratory services rendered in 1991. LifeChem advised the government that this overpayment resulted from the submission for payment of a computer billing tape that had not been subjected to a "billing rules" program designed to eliminate requests for payments for laboratory tests that are included in the composite rate and that were not eligible for separate reimbursement. LifeChem also advised the government that there may have been additional instances during the period from 1990 to 1992 when other overpayments were received as a result of the submission of computer billing tapes containing similar errors and that it was in the process of determining whether such additional overpayments were received. On June 21, 1996, LifeChem advised the government that the 1991 billing problem disclosed on June 7, 1996 resulted in an overpayment of approximately $112,000. LifeChem also advised the government that certain records suggest instances in July 1990 and August 31 through September 11, 1990, when billing tapes may have been processed without rules processing. LifeChem is continuing its effort to determine whether any other overpayments occurred.

Capitation for routine tests and panel design.  In October 1994, the OIG issued a special fraud alert in which it stated its view that the industry practice of offering to perform or performing the routine tests covered by the Composite Rate at a price below fair market value, coupled with an agreement by a dialysis center to refer all or most of its non-Composite Rate tests to the laboratory, violates the anti-kickback statute. See "-- Reimbursement." In response to this alert, LifeChem changed its practices with respect to testing covered

133

<PAGE>  158

by the Composite Rate to increase the amount charged to both DSD and third-party dialysis centers and reduce the number of tests provided for the fixed rate. The government is investigating LifeChem's practices with respect to these tests.

Benefits provided to dialysis centers and persons associated with dialysis centers.  The government is investigating whether any DSD or third-party dialysis center or any person associated with any such center was provided with benefits in order to induce them to use LifeChem services. Such benefits could include, for example, discounts on RPD supplies, the provision of computer equipment, the provision of money for the purchase of computer equipment, and the provision of research grants. NMC has identified certain instances in which benefits were provided to MPG customers who purchased medical products from RPD and used LifeChem's laboratory services. The government may claim that the provision of such benefits violates, among other things, the anti-kickback statute.

Business and testing practices.  As noted above, the government has

XXX-001960

identified a number of specific categories of documents that it is requiring NMC to produce at this time. In addition to documents relating to the areas discussed above, the government has also required LifeChem to produce at this time documents relating to the equipment and systems used by LifeChem in performing and billing for clinical laboratory blood tests, the design of the test panels offered and requisition forms used by LifeChem, the utilization rate for certain tests performed by LifeChem, recommendations concerning diagnostic codes to be used in ordering tests for patients with given illnesses or conditions, and internal and external audits and investigations relating to LifeChem's billing and testing. These areas of inquiry are similar to inquiries that the OIG has made to other Medicare and Medicaid providers in the clinical laboratory industry within the past several years.

   IDPN

   Administration kits.  As discussed above, one of the principal activities of NMC Homecare is to provide IDPN therapy to dialysis patients at both NMC-owned facilities and at facilities owned by other providers. See "-- Business of NMC -- NMC Homecare." IDPN therapy is typically provided to the patient 12-13 times per month during dialysis treatment. Bills are submitted to Medicare on a monthly basis and include separate claims for reimbursement for supplies, including, among other things, nutritional solutions, administration kits and infusion pumps. In February 1991, the Medicare carrier responsible for processing NMC Homecare's IDPN claims issued a Medicare advisory to all parenteral and enteral nutrition suppliers announcing a coding change for reimbursement of administration kits provided in connection with IDPN therapy for claims filed for items provided on or after April 1, 1991. The Medicare allowance for administration kits during this period was approximately $625 per month per patient. The advisory stated that IDPN providers were to indicate the "total number of actual days" when administration kits were "used," instead of indicating that a one-month supply of administration kits had been provided. In response, NMC Homecare billed for administration kits on the basis of the number of days that the patient was on an IDPN treatment program during the billing period, which typically represented the entire month, as opposed to the number of days the treatment was actually administered. During the period from April 1991 to June 1992, NMC Homecare had an average of approximately 1,200 IDPN patients on service.

   In May 1992, the carrier issued another Medicare advisory to all PEN suppliers in which it stated that it had come to the carrier's attention that some IDPN suppliers had not been prorating their billing for administration kits used by IDPN patients and that providers should not bill for administration kits on the basis of the number of days that the patient was on an IDPN treatment program during the billing period. The advisory stated further that the carrier would be conducting "a special study to determine whether or not overpayments have occurred as a result of incorrect billing" and that "[i]f overpayments have resulted, providers that have incorrectly billed" would "be contacted so that refunds can be recovered." NMC Homecare revised its billing practices in response to this advisory for claims filed for items provided on or after July 1, 1992. NMC Homecare was not asked to refund any amounts relating to its billings for administration kits following the issuance of the second advisory.

   The government is investigating whether NMC submitted false claims for administration kits during the period from April 1, 1991 to June 30, 1992. NMC asserts that the claims submitted in connection with billing

                                    134

<PAGE>  159

for administration kits were proper. The government may claim that NMC Homecare's billing for administration kits during this period violates, among other things, the False Claims Act.

   Infusion Pumps and IV Poles.  During the time period covered by the subpoenas, Medicare regulations permitted IDPN providers to bill Medicare for the infusion pumps and, until 1992, for IV poles provided to IDPN patients in connection with the administration of IDPN treatments. These regulations do not expressly specify that a particular pump and IV pole be dedicated to a specific patient, and NMC asserts that these regulations permitted NMC Homecare to bill Medicare for an infusion pump and IV pole so long as the patient was infused using a pump and IV pole. Despite the absence of an express regulatory specification, NMC Homecare developed a policy to deliver to a dialysis center a dedicated infusion pump and IV pole for each patient, although NMC cannot represent that it followed this policy in every instance. The government is investigating the propriety of NMC Homecare's billings for infusion pumps and IV poles.

   As noted above, under the new policies published by HCFA with respect to IDPN therapy, NMC will not be able to bill for infusion pumps after July 1, 1996. The government discontinued reimbursement for IV poles in 1992.

   "Hang fees" and other payments.  IDPN therapy is typically provided to the patient during dialysis by personnel employed by the dialysis center treating the patient with supplies provided and billed to Medicare by NMC Homecare in accordance with the Medicare parenteral nutrition supplier rules. In order to compensate dialysis centers for the costs incurred in administering IDPN therapy and monitoring the patient during therapy, NMC Homecare followed the industry-wide practice of paying a "hang fee" to such center. Dialysis centers are responsible for reporting such fees to HCFA on their cost reports. For DSD dialysis centers, the fee was $30 per administration, based upon internal DSD cost calculations. For third-party dialysis centers, the fee was negotiated with each center, typically pursuant to a written contract, and ranged from $15 to $65 per administration. NMC has identified instances in which other payments and amounts beyond that reflected in a contract were paid to these third-party

XXX-001961

centers.

In July 1993, the OIG issued a management advisory alert to HCFA in which it stated that "hang fees" and other payments made by suppliers of IDPN to dialysis centers "appear to be illegal as well as unreasonably high." The government is investigating the nature and extent of the "hang fees" and other payments made by NMC Homecare as well as payments by NMC Homecare to physicians whose patients have received IDPN therapy. The government may claim that the payments by NMC Homecare to dialysis centers violate, among other things, the anti-kickback statute.

Utilization of IDPN. Since 1984, when HCFA determined that Medicare should cover IDPN and other parenteral nutrition therapies, NMC has been an industry leader in identifying situations in which IDPN therapy is beneficial to ESRD patients. It is the policy of NMC Homecare to seek Medicare reimbursement for IDPN therapy only when it is prescribed by a patient's treating physician and when it believes that the circumstances satisfy the requirements published by HCFA and its carrier agents. Prior to 1994, HCFA and its carriers approved for payment more than 90% of the IDPN claims submitted by NMC Homecare. Since 1994, the rate of approval for Medicare reimbursement for IDPN claims submitted by NMC Homecare for new patients, and by the infusion industry in general, has fallen to approximately 9%. NMC contends that the reduction in rates of approval has occurred because HCFA and its carriers have implemented an unauthorized change in coverage policy without giving notice to providers. See "-- IDPN Coverage Issues." While NMC Homecare has continued to offer IDPN to patients pursuant to the prescription of the patients' treating physicians and to submit claims for Medicare reimbursement when it believes the requirements stated in HCFA's published regulations are satisfied, other providers have responded to the drop in the approval rate for new Medicare IDPN patients by abandoning the Medicare IDPN business, cutting back on the number of Medicare patients to whom they provide IDPN, or declining to add new Medicare patients. The number of patients to whom NMC Homecare provides IDPN has thus increased.

The government is investigating the utilization rate of IDPN therapy among NMC patients and whether NMC submitted IDPN claims to Medicare for patients who were not eligible for coverage or with inadequate documentation of eligibility. NMC asserts that the utilization rate of IDPN therapy among its dialysis patients, which, in 1995, averaged less than 3.5%, is the result of the factors discussed above and that it is the policy of NMC Homecare to seek Medicare reimbursement for IDPN therapy prescribed by the patient's

135

<PAGE>   160

treating physician in accordance with the requirements published by HCFA and its carrier agents. There can be no assurance that the government will accept NMC's view or that the government will not claim that NMC Homecare submitted IDPN claims for individuals who were not eligible for coverage or with inadequate documentation of eligibility.

QUI TAM ACTION

Grace and NMC have recently become aware that a qui tam action has been filed in the United States District Court for the Southern District of Florida, Southern Division (the "Florida Action"). The original complaint in the Florida Action was filed under seal in 1994. The Relator filed an Amended Complaint under seal on July 8, 1996. The seal with respect to the Amended Complaint was partially lifted pursuant to court order to permit the government to provide Grace and NMC with a copy of the Amended Complaint. Grace and NMC received copies of the Amended Complaint on July 10, 1996. Pursuant to a court order dated July 26, 1996, the seal was further modified to permit Grace to provide copies of the Amended Complaint to Fresenius AG, lenders involved in the NMC credit facility and their respective counsel and to permit Grace and NMC to describe the allegations of the Amended Complaint in its securities filings with respect to the Reorganization.

The Amended Complaint alleges, among other things, that Grace, Grace Chemicals and NMC violated the False Claims Act in connection with certain billing practices regarding IDPN and the administration of EPO. The Amended Complaint alleges that as a result of this allegedly wrongful conduct, the United States suffered actual damages in excess of $200 million and alleges that the defendants are liable to the United States for three times the amount of the alleged damages plus fines of up to $10,000 per false claim. The Amended Complaint also seeks the imposition of a constructive trust on the proceeds of the NMC dividend to Grace Chemicals for the benefit of the United States on the ground that the Reorganization constitutes a fraudulent conveyance that will render NMC unable to satisfy the claims asserted in the Amended Complaint. As noted under "-- OIG Agreements," the United States has agreed to release any such claims.

OIG AGREEMENTS

As a result of discussions with representatives of the United States in connection with the OIG investigation, certain agreements (the "OIG Agreements") have been entered into to guarantee the payment of any obligations of NMC to the United States relating to or arising out of the OIG investigation and the Florida Action (the "Government Claims"). For the purposes of the OIG Agreements, an Obligation is (a) a liability or obligation of NMC to the United States in respect of a Government Claim pursuant to a court order (i) which is final and nonappealable or (ii) the enforcement of which has not been stayed pending appeal or (b) a liability or obligation agreed to be an Obligation in a settlement agreement executed by Fresenius Medical Care, Grace or NMC, on the one hand, and the United States, on the other hand. As stated elsewhere herein, the outcome of the OIG investigation cannot be predicted. The entering into of

XXX-001962

the OIG Agreements is not an admission of liability by any party with respect to the OIG investigation, nor does it indicate the liability, if any, which may result therefrom.

Under the OIG Agreements, effective upon consummation of the Reorganization, the United States will be provided by Fresenius Medical Care and Grace with a joint and several guarantee of payment when due of all Obligations (the "Primary Guarantee"). As credit support for this guarantee, NMC will deliver, on or prior to the Effective Date, an irrevocable standby letter of credit in the amount of $150 million. The United States will return such letter of credit (or any renewal or replacement) for cancellation when all Obligations have been paid in full or it is determined that NMC has no liability in respect of the Government Claims. In addition, under the OIG Agreements, effective upon consummation of the Reorganization, the United States will be provided with a guarantee by Grace Chemicals of the obligations of Fresenius Medical Care under the Primary Guarantee in respect of Government Claims for acts and transactions that took place at any time up to the consummation of the Reorganization (the "Secondary Guarantee"). Under the Secondary Guarantee, payment will be required only if, and to the extent that, Obligations have become due and payable and remain uncollected for 120 days. Grace Chemicals is a third party beneficiary of the Primary Guarantee and may institute suit to enforce its terms.

136

<PAGE>  161

Under the OIG Agreements, the United States has agreed, solely in its capacity as holder of the Government Claims: (a) to not take any action whatsoever to impede, prohibit, enjoin, delay or otherwise interfere with consummation of the Reorganization on grounds that the Reorganization constitutes a fraudulent conveyance or other similarly avoidable transfer as to the United States; (b) to represent to the court in the Florida Action or any other court presented with an attempt by a relator in any qui tam action relating in substantial part to matters that are the subject of the Florida Action or the OIG investigation to impede, prohibit, enjoin, delay or otherwise interfere with consummation of the Reorganization that the OIG Agreements satisfy the concerns of the United States with respect to the Reorganization and; (c) effective upon consummation of the Reorganization, to release and discharge Grace Chemicals, Grace, NMC, Fresenius Medical Care, and certain other parties (collectively, the "Releasees") from claims to the effect that the Reorganization (or any transaction comprising a part thereof) constitutes a fraudulent conveyance or other similarly avoidable transfer as to the United States.

Fresenius Medical Care and the United States state in the OIG Agreements that they will negotiate in good faith to attempt to arrive at a consensual resolution of the Government Claims and, in the context of such negotiations, will negotiate in good faith as to the need for any restructuring of the payment of any obligations arising under such resolution, taking into account the ability of Fresenius Medical Care to pay the Obligations. The OIG Agreements state that the foregoing statements shall not be construed to obligate any person to enter into any settlement of the Government Claims or to agree to a structured settlement. Moreover, the OIG Agreements state that the statements described in the first sentence of this paragraph are precatory and statements of intent only and that (a) compliance by the United States with such provisions is not a condition or defense to the obligations of Fresenius Medical Care, Grace or Grace Chemicals under the OIG Agreements and (b) breach of such provisions by the United States cannot and will not be raised by Fresenius Medical Care, Grace New York or Grace Chemicals to excuse performance of their respective obligations under the OIG Agreements.

If the Reorganization in not consummated on or before October 1, 1996, the OIG Agreements will terminate and be of no further force and effect unless all parties thereto agree otherwise in writing. If the Reorganization Agreement is amended, modified or supplemented after the date of this Joint Proxy Statement-Prospectus, Fresenius Medical Care will provide the United States with written notice describing the nature of such amendment, modification or supplement. If the United States determines that such amendment, modification or supplement is adverse to its interests, the United States will have the right to terminate the OIG Agreements by delivering written notice of such termination within 10 business days of its actual receipt of notice of such amendment, modification or supplement.

The foregoing describes the material terms of the OIG Agreements, copies of which have been filed as exhibits to the Registration Statements. The foregoing description does not purport to be complete and is qualified in its entirety by reference to such exhibits.

EASTERN DISTRICT OF VIRGINIA

In December 1994, a subsidiary of NMC received a subpoena from a federal grand jury in the Eastern District of Virginia investigating the contractual relationships between subsidiaries of NMC that provide dialysis services and third parties that provide medical directorship and related services to those subsidiaries. NMC cooperated with the grand jury and produced documents in response to the subpoena, and there has been no further communication from the government.

DISTRICT OF NEW JERSEY INVESTIGATION

NMC has received multiple subpoenas from a federal grand jury in the District of New Jersey investigating, among other things, whether NMC sold defective products, the manner in which NMC handled customer complaints and certain matters relating to the development of a new dialyzer product line. NMC

XXX-001963

is cooperating with this investigation and has provided the grand jury with
extensive documents. On February 12, 1996, NMC received a letter from the U.S.
Attorney for the District of New Jersey indicating that it is the target of a
federal grand jury investigation into possible violations of criminal law in
connection with its efforts to persuade the FDA to lift a January 1991 import
hold issued with respect to NMC's Dublin, Ireland

137

<PAGE>    162

manufacturing facility. In June 1996, NMC received a letter from the U.S.
Attorney for the District of New Jersey indicating that the U.S. Attorney had
declined to prosecute NMC with respect to NMC's effort to lift the import hold. The letter added that NMC remains a subject of a
federal grand jury's investigation into other matters. NMC also received a
subpoena in June 1996 from the federal grand jury requesting certain documents
in connection with NMC's imports of the FOCUS(R) dialyzer from January 1991 to
November 1995. The outcome of this investigation and its impact, if any, on
NMC's business or results of operations cannot be predicted at this time.

   FDA MATTERS

      Since 1993, NMC has engaged in a number of voluntary recalls of products
that it manufactured or that were manufactured by third parties and distributed
by NMC. None of these product recalls has resulted in fines or penalties for
NMC. In 1995, Fresenius USA completed a voluntary action with respect to the
Optum(R) exchange device that Fresenius USA acquired from Abbott, which was
classified by the FDA as a recall. The FDA reviewed Fresenius USA's actions with
respect to this device and determined that they were adequate.

      During the period from 1991 through 1993, the FDA issued warning letters
concerning four of the six RPD facilities in the U.S., as well as import alerts
concerning hemodialysis bloodlines manufactured at NMC's Reynosa, Mexico
facility and Focus(R) brand hemodialyzers manufactured at NMC's Dublin, Ireland
facility. As a result of the import alerts, NMC was prohibited from importing
the products covered by the alerts into the U.S. until the FDA confirmed
compliance with GMP requirements at the facilities where such products were
manufactured.

      In January 1994, NMC and certain members of its senior management entered
into the Consent Decree providing that the importation of bloodlines and
hemodialyzers could resume upon certification by NMC that the relevant
manufacturing facility complied with GMP requirements and successful completion
of an FDA inspection at the relevant facility to confirm compliance. The Consent
Decree also required NMC to certify, and be inspected for, GMP compliance at all
of RPD's manufacturing facilities in the U.S. Under the Consent Decree, RPD
committed to maintaining ongoing compliance with GMP and related requirements at
both U.S. and non-U.S. manufacturing facilities. As a result of the Consent
Decree, NMC's U.S. facilities were required to undertake significant GMP
improvements.

      NMC submitted all required certifications for its U.S. and non-U.S.
facilities in accordance with timetables specified in the Consent Decree, and
the bloodline import alert was lifted in March 1994. During the course of 1994
and 1995, NMC also worked with the FDA and demonstrated that its other
manufacturing facilities in the U.S. were in compliance with GMP requirements.
The hemodialyzer manufacturing facility in Dublin, Ireland was inspected by the
FDA in April and December 1994 but did not pass inspection. NMC completed all
remaining corrective actions, and in December 1995 the FDA determined that the
Dublin facility was in compliance with GMP requirements and lifted the import
alert. No fines or penalties have been imposed on NMC as a result of the FDA's
actions or in connection with the Consent Decree. By policy, however, the FDA
generally will undertake more frequent and more rigorous inspections of
facilities that have been subject to consent decrees. For a discussion of the
effects of the warning letters and import alerts issued by the FDA on NMC's
business, see "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
RESULTS OF OPERATIONS -- NMC."

      On January 24, 1995, the FDA issued a warning letter and import alert
relating to NMC's manufacture of Diafilter(R) products at its Limerick, Ireland
facility. That facility was not expressly named in the Consent Decree described
above. Because NMC voluntarily ceased importing Diafilters(R) into the U.S. in
December 1994, and, for business reasons, decided to shut down the Diafilter(R)
business at the Limerick facility on January 23, 1995, no subsequent compliance
review was deemed necessary by the FDA. NMC was not restricted from importing
into the U.S. the other products manufactured at the Limerick facility.

      In 1994 and 1995, the FDA inspected Fresenius USA's manufacturing
facilities in Maumee, Ohio, Ogden, Utah and Walnut Creek, California. At each
location, violations of certain GMP were found. At the Walnut Creek facility,
violations of pre-market notification filing requirements were also found,
although these findings were subsequently reversed when the devices in question
were determined to be covered by

138

<PAGE>    163

appropriate filings. The FDA issued warning letters with respect to each
facility, as a result of which the issuance of new 510(k) notices and new export
clearances was placed on administrative hold. Fresenius USA responded to the
inspection findings at Maumee in a manner it believes addresses the FDA's
findings. Fresenius USA subsequently closed the Maumee facility in connection
with the relocation of production from that facility to a facility in
Lewisberry, Pennsylvania. Fresenius USA undertook an exhaustive review of the

XXX-001964

FDA's findings relating to Walnut Creek and submitted a detailed response to those findings. The Ogden plant was reinspected in 1995 and the administrative holds have been lifted from both Ogden and Walnut Creek. The Walnut Creek facility was inspected again in January and February of 1996 and Fresenius USA was advised that all GMP issues raised by the FDA have been resolved. Fresenius USA believes that its facilities are currently in compliance in all material respects with applicable state, local and federal requirements.

In addition, the FDA may inspect facilities in the ordinary course of business to ensure compliance with GMP and other applicable regulations.

INTERNATIONAL REGULATORY CLAIMS

As discussed above, as a general matter, licenses and certifications are required in connection with the operation of dialysis clinics outside the United States, and NMC is dependent upon its ability to obtain and maintain such licenses and certifications. NMC lacks certain licenses and certifications technically required to operate its facilities in Portugal. However, based on discussions with regulatory officials in Portugal, NMC management does not believe that the absence of such licenses will have a material adverse effect on NMC or materially affect its ability to operate such facilities.

MEDICARE CERTIFICATION ISSUES

As discussed above, licenses and certification for participation in the Medicare and Medicaid programs are regulated at the federal, state and local levels. The Medicare carriers serving Florida, New Jersey and Pennsylvania have implemented coverage policies that may restrict the ability of nuclear-imaging providers, such as DSI, to qualify as a provider for this service. If DSI is not permitted to bill for these services as a Medicare provider, it may be able to bill physicians for the services DSI provides.

DSI participates as a provider under the Medicare Part B program in all states where applicable, primarily as an independent physiological laboratory. DSI's Medicare provider number is currently administratively suspended or temporarily revoked in Rhode Island, Connecticut, and Colorado, due largely to transitional issues related to the timely completion of applications in connection with recent acquisitions. The Medicare carrier in Connecticut has verbally advised DSI that the provider number will be reinstated and applications are pending in Rhode Island and Colorado. If the provider numbers are not reinstated retroactively, DSI may not be able to bill for services rendered during the periods in which the numbers were administratively suspended or temporarily revoked.

IDPN

In November 1995, NMC filed a complaint in the United States District Court for the Middle District of Pennsylvania (NMC Homecare, Inc. v. Shalala) seeking declaratory judgment and injunctive relief to prevent application of a 1993 interpretation of Medicare's coverage guidelines that results in a sharp reduction in the reimbursement rate for IDPN services provided by NMC. On May 17, 1996, the Magistrate Judge assigned to the case issued a Report to the District Court Judge recommending grant of the government's motion and dismissal of the action. NMC has filed objections to the Report, and the government is expected to respond to those objections in July 1996. The District Court Judge will issue an order granting or denying the government's motion to dismiss following completion of the briefing. See "-- Reimbursement -- U.S. -- IDPN." NMC Homecare's unpaid IDPN claims represent substantial accounts receivable of NMC Homecare (approximately $103 million as of March 31, 1996, currently increasing at a rate of approximately $6 million per month). NMC believes that the reduction in IDPN coverage by Medicare is an unauthorized policy coverage change. The outcome of this proceeding cannot be predicted. If NMC is not successful in its effort to obtain payment for its IDPN accounts receivable, NMC's business, financial position and results of operations could be adversely affected.

139

<PAGE>  164

OBRA 93

OBRA 93 affected the payment of benefits under Medicare and employer health plans for certain eligible ESRD patients. In July 1994, HCFA issued an instruction to Medicare claims processors to the effect that Medicare benefits for the patients affected by OBRA 93 would be subject to a new 18-month "coordination of benefits" period. This instruction had a positive impact on NMC's dialysis revenues because, during the 18-month coordination of benefits period, patients' employer health plans were responsible for payment, which was generally at rates higher than that provided under Medicare.

In April 1995, HCFA issued a new instruction, reversing its original instruction in a manner that would substantially diminish the positive effect of the original instruction on NMC's dialysis business. Under the new instruction, no 18-month coordination of benefits period would arise, and Medicare would remain the primary payor. HCFA further proposed that its new instruction be effective retroactive to August 1993, the effective date of OBRA 93.

If HCFA's reversal of its original implementation of the provisions of OBRA 93 that relate to ESRD patients for whom Medicare is the secondary payor (see "-- Reimbursement -- U.S. -- Coordination of Benefits") is upheld, NMC may be required to refund the payments received from employer health plans for services provided after August 10, 1993 under HCFA's original implementation, and to re-bill Medicare for the same services, which would result in a net loss to DSD of approximately $120 million as of June 30, 1995. NMC ceased to recognize the

XXX-001965

incremental revenue realized under the original Program Memorandum as of July 1, 1995, but it continued to bill employer health plans as primary payors for patients affected by OBRA 93 through December 31, 1995. As of January 1, 1996, NMC commenced billing Medicare as primary payor for dual eligible ESRD patients effected by OBRA 93, and has recently begun to rebill in compliance with the revised policy for services rendered between April 24 and December 31, 1995.

On May 5, 1995, NMC filed a complaint in the U.S. District Court for the District of Columbia (National Medical Care, Inc. and Bio-Medical Applications of Colorado, Inc. d/b/a Northern Colorado Kidney Center v. Shalala, C.A. No. 95-0860 (WBB)) seeking to preclude HCFA from retroactively enforcing its April 24, 1995 implementation of the OBRA 93 provisions relating to the coordination of benefits for dual eligible ESRD patients. See "-- Reimbursement -- U.S. -- Coordination of Benefits." On May 9, 1995, NMC moved for a preliminary injunction to preclude HCFA from enforcing its new policy retroactively, that is, to billings for services provided between August 10, 1993 and April 23, 1995. On June 6, 1995, the court granted NMC's request for a preliminary injunction. The litigation is continuing with respect to NMC's request to enjoin HCFA's new policy, both retroactively and prospectively, on a permanent basis. While there can be no assurance that a permanent injunction will be issued, NMC believes that it will ultimately prevail in its claim that the retroactive reversal by HCFA of its original implementation of OBRA 93 was impermissible under applicable law. Pending the outcome of the litigation, HCFA's new policy remains effective for services provided after April 23, 1995. If HCFA's revised interpretation is upheld, NMC's business, financial position and results of operations would be materially adversely affected, particularly if the revised interpretation is applied retroactively. See "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- NMC."

SECURITIES AND EXCHANGE COMMISSION INVESTIGATION

In April 1996, Grace received a formal order of investigation issued by the Commission directing an investigation into, among other things, whether Grace violated the federal securities laws by filing periodic reports with the Commission that contained false and misleading financial information. Pursuant to this formal order of investigation, Grace received a subpoena from the Southeast Regional Office of the Commission requiring Grace to produce documents relating to reserves (net of applicable taxes) established by Grace and NMC during the period from January 1, 1990 to the date of the subpoena (the "Covered Period"). Grace believes that all financial statements filed by Grace with the Commission during the Covered Period, including the financial statements of NMC included in the NMC Form 10 filed with the Commission on September 25, 1995, and the consolidated financial statements of Grace filed in Grace's Annual Report on Form 10-K for the year ended December 31, 1995 (all of which financial statements, other than unaudited quarterly financial statements, were covered by unqualified opinions issued by Price Waterhouse LLP,

                                   140

<PAGE>   165

independent certified public accountants), have been fairly stated, in all material respects, in conformity with US GAAP. Grace is cooperating with the Commission. The outcome of this investigation and its impact, if any, on Grace or NMC cannot be predicted at this time.

IDPN COVERAGE ISSUES

NMC Homecare administers IDPN therapy to chronic dialysis patients who suffer from severe gastrointestinal malfunctions. Since late 1993, Medicare claims processors have sharply reduced the number of IDPN claims approved for payment as compared to prior periods. NMC believes that the reduction in IDPN claims currently being paid by Medicare represents an unauthorized policy coverage change. Accordingly, NMC and other IDPN providers are pursuing various administrative and legal remedies, including administrative appeals, to address this reduction.

In November 1995, NMC filed a complaint in the U.S. District Court for the Middle District of Pennsylvania seeking a declaratory judgment and injunctive relief to prevent the implementation of this policy coverage change. (National Medical Care, Inc. v. Shalala, 3:CV-95-1922 (RPC)). The government has filed a motion to dismiss on grounds of failure to exhaust administrative remedies. NMC has filed a cross-motion for summary judgment. The motions are pending. On May 17, 1996, the Magistrate Judge assigned to the case issued a Report to the District Court Judge recommending grant of the government's motion and dismissal of the action. NMC has filed objections to the Report, and the government is expected to respond to those objections in July 1996. The District Court Judge will issue an order granting or denying the government's motion to dismiss following completion of the briefing.

NMC management believes that its IDPN claims are consistent with published Medicare coverage guidelines and ultimately will be approved for payment. Such claims represent substantial accounts receivable of NMC, amounting to approximately $103 million as of March 31, 1996, respectively, and currently increasing at the rate of approximately $6 million per month. If NMC is unable to collect its IDPN receivable or if IDPN coverage is reduced or eliminated, depending on the amount of the receivable that is not collected and/or the nature of the coverage change, NMC's business, financial position and results of operations could be materially adversely affected.

SHAREHOLDER LITIGATION

In 1995, nine purported class action lawsuits were brought against Grace and certain of its officers and directors in various federal courts. These lawsuits have been consolidated in a case entitled Murphy, et al. v. W. R. Grace

XXX-001966

& Co., et al. No. 95-CV-9003(JFK) (the "Murphy Action"), which is pending in the U.S. District Court for the Southern District of New York. The first amended class action complaint in this lawsuit, which purports to be a class action on behalf of all persons and entities who purchased publicly traded securities of Grace during the period from March 13, 1995 through October 17, 1995, generally alleges that the defendants violated federal securities laws by concealing information and issuing misleading public statements and reports concerning NMC's financial position and business prospects, a proposed spin-off of NMC, and the matters that are the subject of the OIG Investigation and the investigation by the federal grand jury in the District of New Jersey. See "-- OIG Investigation" and "-- District of New Jersey Investigation." The Murphy Action seeks unspecified damages, attorneys' and experts' fees and costs and such other relief as the court deems proper.

In October 1995, a purported derivative lawsuit was filed in the U.S. District Court for the Southern District of Florida, Northern Division against Grace, certain of its directors and its former President and Chief Executive Officer, alleging that such individuals breached their fiduciary duties by failing to properly supervise the activities of NMC in the conduct of its business (Bennett v. Bolduc, et al. 95-8638-CIV-MORENO). In December 1995, the plaintiff in this action filed a new action, based on similar allegations, in the U.S. District Court for the Southern District of New York (Bennett v. Bolduc, et al. 95-CV-10737 (AGS) (the "Bennett Action"). The action in Florida has been dismissed in favor of the Bennett Action. A second action making similar allegations was filed in October 1995 in New York State Supreme Court, New York County (Bauer v. Bolduc, et al. 95-125751). This action has been stayed in favor of the Bennett Action, which has been

141

<PAGE>   166

consolidated, for discovery purposes only, with the Murphy Action described above. The complaint in the Bennett Action seeks unspecified damages, attorneys' and experts' fees and costs and such other relief as the court deems proper. These actions are at early stages and their outcomes cannot be predicted, although Grace, NMC and the individual defendants believe that they have substantial defenses to the claims asserted.

In February 1996, a purported class action was filed in New York State Supreme Court, New York County, against Grace and certain of its current and former directors, alleging that the defendants breached their fiduciary duties, principally by failing to provide internal financial data concerning NMC to Vivra and by failing to negotiate with Baxter in connection with a business combination involving NMC (Rosman v. W. R. Grace, et al. 96-102347). The lawsuit seeks injunctive relief ordering defendants to carry out their fiduciary duties and preventing or rescinding the Reorganization or any related transactions with Fresenius AG, unspecified monetary damages, an award of plaintiff's attorneys' and experts' fees and costs, and such other relief as the court may deem just and proper. The plaintiff has not taken any steps to prosecute the action since it was filed. The defendants believe this lawsuit is without merit.

OTHER LITIGATION AND EXPOSURES

In recent years, physicians, hospitals and other participants in the health care industry have become subject to an increasing number of lawsuits alleging professional negligence, malpractice, product liability, workers' compensation or related claims, many of which involve large claims and significant defense costs. Fresenius USA and NMC have been, and can be expected to continue from time to time to be, subject to such suits due to the nature of their business. Additionally, NMC, in connection with its diagnostics business, has been the subject of a "wrongful life" lawsuit. Although Fresenius USA and NMC maintain insurance at a level which they believe to be prudent, there can be no assurance that the coverage limits will be adequate or that all asserted claims will be covered by insurance. In addition, there can be no assurance that liability insurance will continue to be available at acceptable costs. A successful claim against Fresenius USA or NMC in excess of insurance coverage could have a material adverse effect upon Fresenius Medical Care, Fresenius USA or NMC and the results of their operations. Any claims, regardless of their merit or eventual outcome, also may have a material adverse effect on the reputation and business of Fresenius Medical Care, Fresenius USA or NMC. NMC has identified two instances in which a low level employee and/or an agent engaged in illegal billing practices. In such instances, NMC has terminated its affiliation with such persons and advised the appropriate law enforcement authority. The illegal actions of such persons may subject NMC to liability under the False Claims Act, among other laws. In addition, Fresenius USA and NMC assert claims and suits arising in the ordinary course of business, the ultimate resolution of which would not, in the opinion of Fresenius Medical Care and NMC, have a material adverse effect on their financial condition.

HEALTH CARE REFORM

Health care reform is considered by many in the U.S. to be a national priority. In November 1993, the Clinton Administration proposed legislation that would have effected sweeping changes in the health care industry. Although these proposals were not enacted into law, members of Congress from both parties and the executive branch are continuing to consider many health care proposals, some of which are comprehensive and far-reaching in nature. Several states are currently considering similar proposals. It cannot be predicted what action, if any, the federal government or any state may ultimately take with respect to health care reform or when any such action will be taken. Health care reform may bring radical changes in the financing and regulation of the health care industry, which could have a material adverse effect on the business of Fresenius Medical Care or its subsidiaries and the results of their operations.

XXX-001967

CHANGES IN THE HEALTH CARE INDUSTRY

Significant changes in the health care industry are occurring as a result of market driven forces that are creating significant downward pressure on reimbursement rates that Fresenius Medical Care and its subsidiaries will receive for their services and products. A substantial portion of third-party health insurance is now furnished through some type of managed care plan, including HMOs.

142

<PAGE>   167

Managed care plans are increasing their market share, and this trend may accelerate as a result of the merger and consolidation of providers and payors in the health care industry and as a result of the discussions among members of Congress and the executive branch regarding ways to increase the number of Medicare and Medicaid beneficiaries served through such managed care plans. At the same time, private purchasing cooperatives and the government are attempting to limit premium increases for these plans. In such an environment, controlling underlying medical costs is the only vehicle for ensuring satisfactory managed care plan margins. Managed care plans have been aggressive in seeking lower reimbursement levels for virtually all providers. For some populations, plans have sought to limit their own financial risk by negotiating capitation agreements under which providers assume responsibility for delivering a range of services at a fixed payment amount. Capitation effectively "locks in" a base of patients for providers who accept such arrangements. If substantially more patients of NMC join managed care plans or if such plans reduce reimbursements or capitate competitor companies, NMC's (and Fresenius Medical Care's) business and results of operations could be adversely affected, possibly materially.

143

<PAGE>   168

GRACE SPECIAL-PURPOSE SELECTED FINANCIAL DATA

The following Selected Special-Purpose, Consolidated Financial Information of Grace includes only the assets, liabilities, revenues and expenses of the Grace health care business operated by NMC prior to the Reorganization. However, certain health care-related assets owned or investments held in part by Grace Chemicals and in part by NMC, and previously under the oversight of NMC, are being retained by Grace Chemicals in the Reorganization and are excluded from this Selected Special-Purpose, Consolidated Financial Information. The following Selected Special-Purpose, Consolidated Financial Information of Grace should be read in conjunction with the Special-Purpose, Consolidated Financial Statements of Grace and "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- NMC" included elsewhere in this Joint Proxy Statement-Prospectus, as well as Grace's 1995 Annual Report on Form 10-K incorporated herein by reference. The following Selected Special-Purpose, Consolidated Financial Information for the years ended December 31, 1993, 1994 and 1995 has been derived from Special-Purpose, Consolidated Financial Statements audited by Price Waterhouse LLP, independent accountants, except for Balance Sheet Data at December 31, 1993. Special-Purpose, Consolidated Balance Sheets at December 31, 1994 and 1995 and the related Special-Purpose, Consolidated Statements of Earnings and of Cash Flows for the three years ended December 31, 1995 and notes thereto appear elsewhere herein. The report of Price Waterhouse LLP which also appears elsewhere herein contains an explanatory paragraph relating to the basis of presentation described in Note 1 to such Special-Purpose, Consolidated Financial Statements. The Selected Special-Purpose, Consolidated Financial Information for the three months ended March 31, 1995 and 1996, and the years ended December 31, 1991 and 1992 and the Balance Sheet Data at December 31, 1993 has been derived from Grace's unaudited Special-Purpose, Consolidated Financial Statements.

<TABLE>
<CAPTION>

| | YEAR ENDED DECEMBER 31, | | | | | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|---|---|---|---|---|
| | 1991 | 1992 | 1993 | 1994 | 1995 | 1995 | 1996 |
| | (DOLLARS IN MILLIONS, EXCEPT SHARES AND PER SHARE DATA) | | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| STATEMENT OF EARNINGS DATA | | | | | | | |
| Net revenues.......... | $1,010 | $1,214 | $1,456 | $1,818 | $2,033 | $478 | $528 |
| Cost of health care services and medical supplies............ | 592 | 700 | 840 | 1,027 | 1,176 | 277 | 315 |
| Gross profit.......... | 418 | 514 | 616 | 791 | 857 | 201 | 213 |
| Operating expenses..... | 287 | 362 | 413 | 561 | 625 | 147 | 157 |
| Interest expense, net................... | 17 | 12 | 12 | 16 | 26 | 6 | 7 |
| Earnings before income taxes............... | 114 | 140 | 191 | 214 | 206 | 48 | 49 |
| Provision for income taxes............... | 51 | 60 | 87 | 112 | 109 | 22 | 23 |
| Net earnings.......... | $ 63 | $ 80 | $ 104 | $ 102 | $ 97 | $ 26 | $ 26 |
| Earnings per share..... | $ 0.71 | $ 0.89 | $ 1.12 | $ 1.08 | $ 1.01 | $ 0.27 | $ 0.27 |
| Weighted number of shares of common | | | | | | | |

XXX-001968

| | | | | | | |
|---|---|---|---|---|---|---|
| stock................ | 87,236,000 | 89,543,000 | 91,974,000 | 93,936,000 | 95,822,000 | 94,137,000 | 97,888,000 |

**BALANCE SHEET DATA (AT PERIOD END DATE):**

| | | | | | | |
|---|---|---|---|---|---|---|
| Total assets........... | $853 | $900 | $1,245 | $1,644 | $1,998 | $2,059 |
| Total long-term debt and capitalized lease obligations.......... | 7 | 6 | 14 | 17 | 35 | 28 |
| Total liabilities...... | 253 | 367 | 365 | 485 | 635 | 601 |
| Total equity........... | 600 | 533 | 880 | 1,159 | 1,363 | 1,458 |

</TABLE>

144

<PAGE>   169

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- NMC

For purposes of the following discussion, NMC has been treated as Grace's sole continuing operation and Grace's packaging and specialty chemical businesses have been excluded. The following is a discussion of the financial condition and results of operations of NMC. The discussion should be read in conjunction with the financial statements included elsewhere in this Joint Proxy Statement-Prospectus.

This section contains certain forward-looking statements. These forward-looking statements are made based on management's expectations and beliefs concerning future events impacting NMC, but no assurance can be given that such events will occur or that the results will be as anticipated. Such statements include, without limitation, discussions concerning the outlook of NMC, government reimbursement, future plans and management's expectations regarding future performance.

### OVERVIEW

NMC is primarily engaged in (a) providing kidney dialysis services, (b) manufacturing and distributing products and equipment for dialysis treatment and performing clinical laboratory testing and other medical services, and (c) providing home infusion therapy, home respiratory therapy and home health services. Throughout NMC's history, a significant portion of NMC's growth has resulted from the development of new dialysis centers and the acquisition of existing dialysis centers, as well as from the acquisition and development of complementary businesses in the health care field.

NMC derives a significant portion of its net revenues from Medicare, Medicaid and other government health care programs (approximately 62% in 1995). The reimbursement rates under these programs, including the Composite Rate, the reimbursement rate for EPO (which accounted for approximately 21% of DSD's total net revenues in 1995), and the reimbursement rate for other dialysis and non-dialysis related services and products, as well as other material aspects of these programs, have in the past and may in the future be changed as a result of deficit reduction and health care reform measures. In connection with its consideration of the fiscal year 1997 federal budget, Congress is considering proposals to amend the Medicare ESRD legislation to extend the coordination of benefits period during which a patient's employer health plan is the primary payor and Medicare is the secondary payor. If enacted, such legislation could favorably affect NMC's results of operations. For example, if a six-month extension of the coordination of benefits period had been in effect for the full 1995 fiscal year, it would have resulted in an increase of DSD's annual revenues and pretax profits by approximately $65 million, assuming no reduction in reimbursement rates paid by non-government payors. There can be no assurance as to whether or when any proposed legislation will be enacted. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters."

NMC's business, financial position and results of operations would be materially adversely affected by an adverse outcome in the pending litigation concerning the implementation of certain provisions of OBRA 93 relating to the coordination of benefits between Medicare and employer health plans in the case of certain dual eligible ESRD patients. NMC's business, financial position and results of operations also could be materially adversely affected by the pendency of, or an adverse outcome in, the OIG Investigation, the pending challenge by NMC of changes effected by Medicare in approving reimbursement claims relating to the administration of IDPN or by the recent adoption of a new coverage policy that will change IDPN coverage prospectively. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters" and "RISK FACTORS -- Risks Relating to Regulatory Matters -- Potential Loss of IDPN Reimbursement" and "-- Risks Relating to OBRA 93 Dispute."

NMC also derives a significant portion of its net revenues from reimbursement by non-government payors. Historically, reimbursement rates paid by these non-government payors generally have been higher than Medicare and other government program rates in all areas except for certain services provided by NMC Homecare. However, non-government payors are imposing cost containment measures that are creating significant downward pressure on reimbursement levels that NMC receives for its services and products. See "RISK FACTORS -- Risks Relating to Regulatory Matters -- Health Care Reform."

145

<PAGE>   170

DSD operated or managed dialysis centers in 14 foreign countries at March 31, 1996. In certain countries, NMC experiences lower reimbursement rates per treatment for dialysis services than are generally realized in the U.S. NMC's international dialysis services operations currently generate less operating profit per treatment than domestic dialysis operations due to both the lower

XXX-001969

reimbursement rates in some countries and the start-up nature of many of the centers in foreign countries.

RESULTS OF OPERATIONS

The following tables summarize certain operating results of NMC by principal business unit for the periods indicated. Intercompany eliminations primarily reflect sales of medical supplies by MPG to DSD.

<TABLE>
<CAPTION>

|  | (DOLLARS IN MILLIONS) | | | THREE MONTHS ENDED MARCH 31, | |
| | 1993 | 1994 | 1995 | 1995 | 1996 |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Net Revenues: | | | | | |
| DSD........................................... | $1,027 | $1,309 | $1,496 | $348 | $394 |
| MPG........................................... | 345 | 354 | 387 | 91 | 105 |
| NMC Homecare.................................. | 217 | 318 | 327 | 82 | 78 |
| Intercompany Eliminations..................... | (133) | (163) | (177) | (43) | (49) |
| Total Net Revenues........................... | $1,456 | $1,818 | $2,033 | $478 | $528 |
| | | | | | |
| Operating Earnings: | | | | | |
| DSD........................................... | $ 192 | $ 250 | $ 254 | $ 62 | $ 52 |
| MPG........................................... | 42 | 3 | 22 | 10 | 18 |
| NMC Homecare.................................. | 37 | 49 | 42 | 12 | 7 |
| | 271 | 302 | 318 | 84 | 77 |
| | | | | | |
| Other Expenses: | | | | | |
| General Corporate, including Grace Allocations...... | 40 | 48 | 66 | 23 | 20 |
| Research and Development, including Grace Allocations.................................. | 28 | 24 | 20 | 7 | 1 |
| Interest Expense, Net......................... | 12 | 16 | 26 | 6 | 7 |
| Total Other Expenses......................... | 80 | 88 | 112 | 36 | 28 |
| | | | | | |
| Earnings Before Income Taxes................. | 191 | 214 | 206 | 48 | 49 |
| Provision for Income Taxes................... | 87 | 112 | 109 | 22 | 23 |
| Net Earnings................................. | $ 104 | $ 102 | $ 97 | $ 26 | $ 26 |

</TABLE>

1995 COMPARED TO 1994

Net revenues for 1995 increased by 12% ($215 million) over 1994, with DSD accounting for most of the increase. Net earnings for 1995 decreased 5% ($5 million) as compared to 1994 as increased operating earnings were offset by higher general corporate and interest expenses.

DSD. DSD's net revenues for 1995 increased by 14% ($187 million) over 1994, primarily as a result of a 15% increase in the number of treatments provided worldwide and a $39 million increase in revenues in DSI. The treatment increase was largely due to an increase in the number of dialysis centers (681 at December 31, 1995 as compared to 590 at December 31, 1994). The growth in DSI was primarily due to three acquisitions consummated in 1995. DSD revenues were adversely affected by the decision, effective July 1, 1995, to discontinue the recognition of the incremental revenue that had been previously recorded relating to certain dual eligible ESRD patients. See "RISK FACTORS -- Risks Relating to Regulatory Matters -- Risks Relating to OBRA 93 Dispute."

DSD's operating earnings for 1995 increased by 2% ($4 million) over 1994, primarily as a result of the increase in profits from international dialysis operations and from DSI, due to the acquisitions consummated

146

<PAGE>   171

in 1995, partially offset by a 6% decline in domestic dialysis profits due to the aforementioned change in revenue recognition for certain dual eligible ESRD patients.

MPG. MPG's net revenues for 1995 increased by 9% ($33 million) as compared to 1994 due to increases at both RPD and LifeChem. RPD's net revenues for 1995 increased 6% ($17 million), primarily due to revenues from acquired businesses in Brazil and Argentina as well as from greater revenues from other international operations and domestic DSD facilities. Domestic revenues were essentially unchanged from 1994. LifeChem net revenues increased as a result of increased billable testing volume.

MPG's operating earnings improved by 633% ($19 million) as compared to 1994, due primarily to the increased net revenues at LifeChem and RPD in 1995, improved capacity utilization at domestic manufacturing plants and decreased compliance costs, primarily legal and consulting expenses, incurred in 1995 versus those incurred in 1994 in connection with FDA warning letters and import alerts. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal Matters -- Legal and Regulatory Proceedings" and "RISK FACTORS -- Risks Relating to Regulatory Matters -- Operations Subject to and Potential Effects of Governmental Regulation." This improvement was partially offset by a repayment

XXX-001970

in 1995 by LifeChem to the government of $4.9 million in overpayments received
from Medicare during the period 1989 to 1993 and certain other related charges.
See "RISK FACTORS -- Risks Relating to Regulatory Matters -- Pending
Investigations" and "BUSINESS OF FRESENIUS MEDICAL CARE -- Regulatory and Legal
Matters -- Legal and Regulatory Proceedings -- OIG Investigation." In addition,
1994 operating earnings of MPG were adversely impacted by a charge of $27
million for the impairment of all of the goodwill recognized from the 1993
acquisition of a German renal products manufacturing and distribution operation.
In 1995, operating earnings were also adversely impacted by a charge of $29
million for the write-off of the German dialysis machine manufacturing operation
($12 million) acquired in the 1993 German acquisition and the write-off of the
carrying value of the assets used in developing a new dialyzer product line in
Ireland and other related charges ($17 million).

    NMC Homecare.  NMC Homecare's net revenues for 1995 increased by 3% ($9
million) over 1994, primarily as a result of the full-year effect of the April
1994 acquisition of HNS, and growth in the respiratory therapy and home health
care business.

    NMC Homecare's operating earnings for 1995 decreased by 14% ($7 million)
from 1994, primarily as a result of a $5 million increase in the provision for
bad debts and increased managed care pricing pressure.

    Other Expenses.  NMC's other expenses for 1995 increased by 27% ($24
million) over 1994. General corporate expenses increased by 38% ($18 million)
over 1994 due to higher allocations of corporate expenses by the Grace
consolidated group, as well as increased NMC corporate expenses (reflecting the
growth of NMC), costs related to the OIG investigative subpoenas (discussed
above) and foreign exchange translation adjustments. Following the
Reorganization, NMC, as part of Fresenius Medical Care, will not be allocated
Grace consolidated group corporate expenses, but will incur corporate expenses
as part of Fresenius Medical Care; which may be higher or lower than those
allocated by Grace. Research and development expenses decreased by 17% ($4
million) in 1995 versus 1994 due primarily to a reduction in the allocation of
these expenses by the Grace consolidated group. NMC plans to discontinue most of
the ongoing research projects that resulted in these allocations from the Grace
consolidated group ($16 million) during 1996 and after the Reorganization,
thereby incurring significantly lower research and development expenses.
Interest expense increased by 63% ($10 million) in 1995 over 1994 due to higher
financing charges under NMC's accounts receivable securitization program and
increased borrowings used to finance growth in international operations, as well
as the interest charges associated with a temporary $100 million bank line of
credit which was in place during the last four months of 1995.

    Income Tax Rate.  The effective tax rate was 53% for 1995 as compared with
52% for 1994. The effective income tax rates for 1995 and 1994 were
significantly higher than the combined statutory rates due primarily to
nondeductible losses in a number of foreign countries. For 1995, the most
significant components were the costs associated with the discontinuance of the
Irish dialyzer manufacturing process, as well as continuing operating losses of
the German renal products manufacturing operation. The major portion of these

                                      147

<PAGE>  172

losses for 1994 relates to the write-off of goodwill, as well as operating
losses of the German renal products manufacturing and distribution operation.

  1994 COMPARED TO 1993

    Net revenues for 1994 increased by 25% ($362 million) over 1993, with DSD
accounting for most of the increase. Net earnings for 1994 decreased by $2
million as compared to 1993, as increased operating earnings were offset by the
write-off of goodwill related to RPD's German renal products manufacturing
operation and higher general corporate and interest expenses.

    DSD.  DSD's net revenues for 1994 increased by 27% ($282 million) over
1993, primarily as a result of a 15% increase in the number of treatments
provided worldwide and the beneficial effect of the initial implementation of
HCFA's initial instruction under OBRA 93. The treatment increase was largely due
to an increase in the number of dialysis centers (590 at December 31, 1994 as
compared to 471 at December 31, 1993), reflecting both acquisitions and new
center openings. As a result of HCFA's initial instruction under OBRA 93, DSD
began to collect full private insurance plans (which generally pay at a higher rate) in
January 1994 for treatment of certain patients previously billed to Medicare.

    DSD's operating earnings for 1994 increased by 30% ($58 million) over 1993,
primarily as a result of the impact of OBRA 93 and the increased number of
treatments provided. The rate of operating earnings growth exceeded the rate of
net revenue growth because the effect of OBRA 93 was to increase net revenues
without a corresponding increase in associated costs and because of the increase
in treatment volume without a corresponding increase in fixed overhead expenses.

    MPG.  MPG's net revenues increased 3% ($9 million) in 1994 as compared to
1993, primarily due to an increase in LifeChem net revenues. RPD net revenues
for 1994 were essentially unchanged from the 1993 level, in significant part
because of the effects of the warning letters and import alerts issued by the
FDA in the second quarter of 1993. These actions by the FDA raised concerns in
the renal products market, particularly among unaffiliated customers, as to the
availability of products from RPD; however, in many cases, NMC was able to
substitute products manufactured by third parties for RPD products subject to
the FDA actions in order to fill orders from DSD and unaffiliated customers.
LifeChem net revenues increased as a result of increased billable testing
volumes.

XXX-001971

MPG operating earnings for 1994 decreased by 93% ($39 million) as compared to 1993, primarily due to legal and compliance costs arising as a result of the FDA warning letters and import alerts coupled with related cutbacks in production that were not accompanied by commensurate reductions in fixed costs. During 1994, NMC reviewed its investment in its German renal products manufacturing facilities and determined that goodwill resulting from this 1993 acquisition was permanently impaired. Accordingly, a charge of $27 million was recorded to reflect this impairment.

NMC Homecare.  NMC Homecare's net revenues for 1994 increased by 47% ($101 million) over 1993 primarily as a result of the full year effect of the June 1993 acquisition of the infusion therapy operations of HIC, the April 1994 acquisition of HNS and the full year effect of the December 1993 acquisition of a home health services company, PCHS.

NMC Homecare's operating earnings for 1994 increased by 32% ($12 million) over 1993, primarily as a result of the three acquisitions described above. The rate of operating earnings growth lagged the rate of net revenue growth due primarily to the effect of managed care pricing pressure.

Other Expenses.  NMC's other expenses for 1994 increased by 10% ($8 million) over 1993. General corporate expenses increased by 20% ($3 million) due to higher allocations of corporate expenses from Grace and to the growth of NMC. Interest expense increased by 33% ($4 million) over 1993 due to increased borrowings for international operations and higher financing charges under NMC's accounts receivable securitization program. The effective income tax rate was 52% for 1994 as compared to 46% for 1993. The increase in the effective income tax rate was due primarily to the write-off of goodwill and operating losses associated with the German renal products manufacturing operation.

148

<PAGE>    173

THREE MONTHS ENDED MARCH 31, 1996 COMPARED TO THREE MONTHS ENDED MARCH 31, 1995

Net revenues for the first three months of 1996 increased by 10% ($50 million) over the comparable period in 1995, with DSD accounting for 92% of the increase. Net earnings for the first three months of 1996 remained the same as the comparable period in 1995, primarily due to a reduction in the allocation of expenses by the Grace group, partially offset by the absence of the comparable profit contribution of DSD from OBRA 93 and continuing price competition from managed care at NMC Homecare.

DSD.  DSD's net revenues for the first three months of 1996 increased by 13% ($46 million) over the comparable period in 1995, primarily as a result of a 13% increase in the number of treatments provided worldwide and a $16 million increase in revenues in DSI. The treatment increase was largely due to an increase in the number of dialysis centers (693 at March 31, 1996 as compared to 610 at March 31, 1995). The growth of DSI was primarily due to a significant increase in the number of primary care treatments resulting from acquisitions in 1995. DSD revenues were adversely affected by the decision, effective July 1, 1995, to discontinue the recognition of the incremental revenue that had been previously recorded relating to certain dual eligible ESRD patients. See "RISK FACTORS -- Risks Relating to Regulatory Matters -- Risks Relating to OBRA 93 Dispute."

DSD's operating earnings for the first three months of 1996 decreased by 16% ($10 million) over the comparable period in 1995, primarily as a result of the absence of the comparable profit contribution from OBRA 93 ($17 million), somewhat offset by profits on increased treatment volume.

MPG.  MPG's net revenues for the first three months of 1996 increased by 15% ($14 million) over the comparable period in 1995, due to increases at both RPD and LifeChem. RPD's net revenues for the first three months of 1996 increased by 17% ($12 million) over the comparable period in 1995, primarily as a result of a 10% increase in sales of medical supplies to DSD as well as greater revenues from international operations due to increased market penetration in Europe. LifeChem net revenues increased as a result of increased billable testing volume.

MPG's operating earnings for the first three months of 1996 increased by 80% ($8 million) over the comparable period in 1995, primarily due to higher revenues, increased capacity utilization and lower manufacturing costs.

NMC Homecare.  NMC Homecare's net revenues for the first three months of 1996 decreased by 5% ($4 million) over the comparable period in 1995, primarily due to a 9% decrease in infusion therapy revenues ($6 million) and continued price compression from managed care, partially offset by an increase in respiratory therapy revenues ($2 million).

NMC Homecare's operating earnings for the first three months of 1996 decreased by 42% ($5 million) over the comparable period in 1995, primarily due to a decline in base infusion revenue and margin pressures from continuing managed care price competition.

Other Expenses.  NMC's other expenses for the first three months of 1996 decreased by 22% ($8 million) over the comparable period in 1995, primarily due to a reduction of allocations of corporate ($3 million) and research and development expenses ($6 million) by the Grace consolidated group, partially offset by OIG subpoena expenses ($5 million) and higher foreign exchange losses. Following the Reorganization, NMC, as part of Fresenius Medical Care, will not be allocated Grace consolidated group corporate expenses, but will incur

XXX-001972

additional expenses of its own. Interest expense increased 17% ($1 million) for the first three months of 1996 over the comparable period in 1995, primarily due to increased bank borrowings.

LIQUIDITY AND CAPITAL RESOURCES

    NMC requires significant capital resources to pursue its growth strategy of developing new dialysis centers, acquiring existing dialysis centers, expanding the number of facilities at which its homecare services are offered, making other strategic acquisitions and expanding its international operations. NMC made acquisitions totalling $25 million and $43 million in the first three months of 1996 and 1995, respectively, and $253 million, $248 million and $240 million in 1995, 1994 and 1993, respectively. NMC made capital expenditures for internal expansion, improvements, new furnishings and equipment of $25 million and $28

                                        149

<PAGE>    174

million in the first three months of 1996 and 1995, respectively, and $103 million, $84 million and $78 million in 1995, 1994 and 1993, respectively.

    NMC also requires capital resources for working capital purposes. NMC used cash to fund increases in accounts receivable of $43 million and $20 million in the first three months of 1996 and 1995, respectively, and $176 million, $140 million and $86 million in 1995, 1994 and 1993, respectively. The increases in accounts receivable reflect growth in NMC's business operations and, beginning in 1994, the sharp reduction in IDPN claims approved for payment. NMC's accounts receivable also increased in 1995 because many of the private third-party payors billed by NMC in respect of dual eligible ESRD patients are withholding payment pending the outcome of the litigation over OBRA 93.

    NMC has historically funded its acquisitions and capital expenditures with cash advances from the Grace consolidated group and cash from operations supplemented by financing programs, including the accounts receivable securitization program. NMC generated net cash from operations of $11 million in the first three months of 1996 and $129 million, $177 million and $89 million in 1995, 1994 and 1993, respectively. There were no significant cash flows generated from operations in the first three months of 1995. NMC received net cash advances from Grace of $69 million and $44 million in the first three months of 1996 and 1995, respectively, and $107 million, $177 million and $245 million for 1995, 1994 and 1993, respectively.

    Effective July 1, 1995, NMC ceased to recognize the incremental revenue provided under HCFA's initial instruction under OBRA 93, although it continued to bill private third-party payors for these amounts through December 31, 1995. If NMC's position with respect to the retroactive application of OBRA 93 is not sustained, it may be required to refund amounts previously collected from private third-party payors (approximately $190 million through June 30, 1995) and rebill Medicare for these services, which would result in an estimated net cash and operating earnings loss of approximately $120 million as of December 31, 1995. The amount of the potential net loss for financial reporting purposes is not expected to increase subsequent to June 30, 1995 because, as described above, NMC did not recognize the incremental OBRA 93 revenue; the amount of the potential cash loss subsequent to June 30, 1995 is not significantly increasing because many of the private payors are withholding payment pending the outcome of the litigation. NMC began billing Medicare as the primary payor for the dual eligible ESRD patients affected by OBRA 93 effective January 1, 1996 and has begun to rebill Medicare as the primary payor for services rendered to dual eligible ESRD patients from January 23, 1995 through December 31, 1995 for whom payment had not yet been rendered by their third-party insurance payors. If HCFA's revised instruction under OBRA 93 is permanently enjoined on a prospective basis, or if such revised instruction is sustained but given an effective date of later than June 30, 1995, NMC may be able to rebill such services to third-party payors and, as a result, NMC's future results of operations and financial position would be favorably affected by the incremental revenue that NMC would recognize.

    NMC plans to enter into the NMC Credit Agreement, with an available aggregate principal amount of approximately $2.50 billion. The NMC Credit Agreement will be used to fund a payment to Grace Chemicals, refinance existing outstanding debt, finance existing and future letters of credit and for general corporate purposes, future capital requirements and acquisitions. It is expected that NMC will have significant indebtedness under the NMC Credit Agreement. See "RISK FACTORS -- Other Risks -- Effects of Indebtedness."

    NMC is party to a $180 million receivables financing arrangement. At March 31, 1996, $179 million was outstanding under this agreement.

    NMC also is a party to various international loan arrangements, most of which are short-term in nature. At March 31, 1996, an aggregate of $172 million was outstanding under these arrangements. Some or all of these arrangements may be refinanced through borrowings under the NMC Credit Agreement.

    Beginning in 1995, NMC financed working capital requirements for certain overseas operations by means of borrowings denominated in currencies other than the operational currency. NMC hedges its exposure to the foreign exchange risk associated with these borrowings through the use of forward purchase contracts, whereby NMC contracts with the same counterparty as the original borrowing to purchase the currency in

                                        150

<PAGE>    175

XXX-001973

which the loan is denominated and sell the operational currency with a maturity date equivalent to the maturity date of the underlying borrowings. The value of these borrowings and associated forward exchange contracts at December 31, 1995 and 1994 amounted to approximately $48 million and $14 million, respectively. NMC estimates that these transactions had a favorable impact on NMC's net interest expense for the year ended December 31, 1995 and 1994 of $0.3 million and $0.0 million, respectively. Forward purchases of foreign currency are used solely to manage exposure to fluctuations in foreign currency exchange rates.

The liquidity of NMC is contingent upon a number of factors, principally NMC's future operating results and the contingencies referred to below. If existing sources of funds are not sufficient to provide liquidity, NMC may need to sell assets or obtain debt or equity financing from additional external sources. There can be no assurance that NMC will be able to do so on satisfactory terms, if at all.

IMPACT OF INFLATION

A substantial portion of NMC's net revenue is subject to reimbursement rates which are regulated by the federal government and do not automatically adjust for inflation. Non-governmental payors also are exerting downward pressure on reimbursement levels. Increased operating costs that are subject to inflation, such as labor and supply costs, without a compensating increase in reimbursement rates, may adversely affect NMC's business and results of operations, possibly materially.

CONTINGENCIES

NMC is the subject of investigations by several federal agencies and authorities, is a plaintiff in litigation against the federal government with respect to the implementation of OBRA 93 and coverage for IDPN therapy, and is seeking to change a proposed revision to IDPN coverage policies. See "BUSINESS OF FRESENIUS MEDICAL CARE -- Legal and Regulatory Proceedings." An adverse outcome in any of these matters could have a material adverse effect on NMC's business, financial condition and results of operations.

151

<PAGE>  176

SELECTED FINANCIAL DATA OF FRESENIUS WORLDWIDE DIALYSIS

The following selected combined financial data of Fresenius Worldwide Dialysis should be read in conjunction with the combined financial statements of Fresenius Worldwide Dialysis and "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- FRESENIUS WORLDWIDE DIALYSIS" included elsewhere in this Joint Proxy Statement-Prospectus. The U.S. GAAP selected financial information as of and for the years ended December 31, 1994 and 1995 has been derived from combined financial statements prepared in accordance with US GAAP and audited by KPMG Deutsche Treuhand-Gesellschaft Aktiengesellschaft Wirtschaftsprufungsgesellschaft, independent accountants. The US GAAP selected combined financial data as of March 31, 1996 and for the three months ended March 31, 1995 and 1996 have been derived from the Fresenius Worldwide Dialysis unaudited interim combined financial statements, prepared in accordance with US GAAP, and, in the opinion of management of Fresenius AG have been prepared on a basis substantially consistent with that of the audited US GAAP financial statements of Fresenius Worldwide Dialysis as of and for the years ended December 31, 1994 and 1995. The German GAAP selected combined financial data as of and for each of the years in the five-year period ended December 31, 1995 have been derived from the Fresenius Worldwide Dialysis unaudited combined financial statements, prepared in accordance with German GAAP and, in the opinion of management of Fresenius AG have been prepared on a basis substantially consistent with that of the audited German GAAP financial statements of Fresenius AG as of and for such periods. US GAAP information for Fresenius Worldwide Dialysis as of and for the years ended December 31, 1991, 1992 and 1993 is not available. German GAAP differs in certain significant respects from US GAAP. For a description of certain of these significant differences, see "SUMMARY OF CERTAIN SIGNIFICANT DIFFERENCES BETWEEN GERMAN AND U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES."

<TABLE>
<CAPTION>

| | | | | YEAR ENDED DECEMBER 31, | | | | THREE MONTHS ENDED MARCH 31, | |
| | 1991 | 1992 | 1993 | 1994 | 1995 | 1994 | 1995 | 1995 | 1996 |
| | | | GERMAN GAAP | | | | U.S. GAAP | | |
| | | | (UNAUDITED) | | | | | (UNAUDITED) | |
| | | | | | (IN MILLIONS) | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| SELECTED OPERATING DATA: | | | | | | | | | |
| Net sales...................... | $377 | $519 | $611 | $719 | $895 | $720 | $897 | $208 | $235 |
| Cost of sales................. | 223 | 311 | 357 | 423 | 516 | 419 | 514 | 116 | 133 |
| Gross profit.................. | 154 | 208 | 254 | 296 | 379 | 300 | 382 | 92 | 102 |
| Selling, general and administrative.............. | 112 | 159 | 165 | 195 | 241 | 195 | 243 | 54 | 60 |

XXX-001974

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Research and development........ | 14 | 15 | 16 | 17 | 17 | 17 | 17 | 3 | 4 |
| Operating income............... | 28 | 34 | 73 | 84 | 121 | 88 | 122 | 35 | 38 |
| Net income..................... | 7 | 11 | 41 | 51 | 72 | 52 | 70 | 19 | 22 |

BALANCE SHEET DATA (AT END OF PERIOD):

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Total assets................... | 284 | 356 | 452 | 481 | 568 | 543 | 644 | | 679 |
| Total long-term debt and capitalized lease obligations.................. | 21 | 20 | 51 | 33 | 35 | 37 | 40 | | 22 |
| Net assets..................... | 88 | 133 | 200 | 231 | 267 | 261 | 306 | | 340 |

</TABLE>

152

<PAGE>   177

## SUMMARY OF CERTAIN SIGNIFICANT DIFFERENCES BETWEEN GERMAN AND U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES

Certain of the Fresenius Worldwide Dialysis summary and selected financial data as of and for each of the years in the five-year period ended December 31, 1995, included in this Joint Proxy Statement-Prospectus, have been prepared in accordance with the German Commercial Code which represents German GAAP. German GAAP differs in certain significant respects from US GAAP. Fresenius Worldwide Dialysis has not determined its financial position or results of operations for such periods under US GAAP.

The following represents a summary of certain of the significant differences between German GAAP and US GAAP. The summary has been prepared to assist a reader in understanding the nature of the differences between German GAAP and US GAAP as they would relate to a multinational corporation. This summary may not provide a description of all of the significant differences between German GAAP and US GAAP which would arise when preparing the financial statements of a multinational corporation. Further, the following differences may not represent differences or all of the differences which would affect the financial position or results of operations of Fresenius Worldwide Dialysis as of and for such periods referred to above.

GOODWILL AND BUSINESS ACQUISITIONS

In accordance with German GAAP, the difference between the purchase price and fair value of net assets acquired as part of a business combination (goodwill) may be charged directly to additional paid in capital or retained earnings or capitalized and amortized through the statement of operations over its useful life, generally ranging from 5 to 15 years. Under US GAAP, goodwill must be capitalized and amortized through the statement of operations over its useful life not to exceed 40 years.

CAPITALIZATION OF INTEREST

Under German GAAP only under limited circumstances is the capitalization of interest on capital expenditures permitted. Under US GAAP, interest incurred as part of the cost of constructing fixed assets is required to be capitalized and amortized over the life of the assets.

LEASING

Under German GAAP, lease transactions are generally, in practice, recorded as operating leases without balance sheet impact. Under US GAAP, leases which meet certain prescriptive criteria designed to determine whether substantially all of the risks and rewards of ownership of the leased assets are transferred to the lessee are accounted for as capital leases. Under a capital lease, the leased assets and obligations of the lessee are recorded on the lessee's balance sheet. Conversely, on a lessor's balance sheet assets under capital lease are not recorded as leased assets but as capital lease receivables.

RECORDING OF PROVISIONS, RESERVES, VALUATION ADJUSTMENTS

Since under German law a company's financial statements prepared for commercial purpose are also the basis of its tax accounts, tax considerations heavily influence their preparation. Companies therefore tend to apply more conservative valuation methods in their financial statements than they might otherwise report. German GAAP permits the recognition of accruals or provisions for uncertain liabilities and loss contingencies. The amount of such accruals or provisions represents the anticipated expense to the group. Accruals for losses on open production orders take into consideration all internal costs, including indirect selling and administrative expenses. Restructuring accruals for obligations to third parties are recorded at the earliest time that an expense is known and reasonably possible. In addition, accruals may also be established for expenses which are known by type of expense and are reasonably possible at the balance sheet date but uncertain in respect of the amount or the timing of when this accrual will be paid. Under US GAAP, an accrual for loss contingency is recorded by a charge to income if it is both probable that an asset has been impaired or a liability has been incurred and the minimum amount of loss can be reasonably estimated. Unspecified liability reserves for future losses, costs or risks do not meet the condition for accrual under US GAAP. Application of

153

<PAGE>   178

German GAAP may lead to higher accrual balances and reserves for possible risks than allowed under US GAAP. However, under German GAAP, provisions, reserves and valuation adjustments previously established may also be released in subsequent periods with a resultant increase in reported profits in the period released.

XXX-001975

PENSIONS AND SIMILAR OBLIGATIONS

    Under German GAAP, pension costs and similar obligations including
post-retirement benefits are accrued over the service lives of the employees
based upon actuarial studies using the entry age method as defined in the German
tax code. US GAAP is more prescriptive particularly as to the use of actuarial
assumptions and requires that a different actuarial method (the projected unit
credit method) be used.

FOREIGN CURRENCY

    Under German GAAP, receivables and payables stated in foreign currency are
translated at each balance sheet date into the respective local currency at the
lower of the currency exchange rate on the transaction date or the balance sheet
date, in the case of receivables, and the higher of the currency exchange rate
on the transaction date or the balance sheet date, in the case of payables.
Under US GAAP, assets and liabilities denominated in a foreign currency are
recorded at balance sheet rates with any resulting gain or loss recognized in
the income statement.

DEFERRED TAXES

    Under German GAAP, deferred tax assets and liabilities are generally
recognized on a net basis and to the extent that the entity is in a net deferred
tax asset position the deferred tax asset is not required to be recognized.
Under US GAAP, deferred taxes are provided in the period of origination for all
temporary differences, including net operating loss carryforwards where it is
more likely than not that the tax benefit will be realized in future periods,
based upon enacted tax rates.

                                    154
<PAGE>   179
              MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
                RESULTS OF OPERATIONS -- FRESENIUS WORLDWIDE DIALYSIS

    Certain sections of this Joint Proxy Statement-Prospectus contain
forward-looking statements. These forward-looking statements are made based on
management's expectations and beliefs concerning future events impacting
Fresenius Worldwide Dialysis, but no assurance can be given that such events
will occur or that the results will be as anticipated. Such sections include,
without limitation, discussions concerning the outlook of Fresenius Worldwide
Dialysis, future plans and management's expectations regarding future
performance.

OVERVIEW

  BASIS OF PRESENTATION OF FRESENIUS WORLDWIDE DIALYSIS FINANCIAL INFORMATION

    Fresenius Worldwide Dialysis currently operates as a business unit of
Fresenius AG. In connection with the Reorganization Agreement, Fresenius AG
intends to contribute Fresenius Worldwide Dialysis, including Fresenius USA, to
a wholly owned inactive subsidiary which will, thereafter, change its name to
"Fresenius Medical Care AG." The combined historical financial statements of
Fresenius Worldwide Dialysis included elsewhere in this Joint Proxy
Statement-Prospectus have been prepared on a basis which reflects the combined
historical financial statements of Fresenius Worldwide Dialysis assuming that it
was organized as a separate legal entity, owning certain net assets and certain
subsidiaries and associated companies of Fresenius AG for all periods presented.
Fresenius Worldwide Dialysis' combined financial information has been prepared
in accordance with US GAAP.

  SHARED PRODUCTION AND SERVICES

    Fresenius Worldwide Dialysis shares certain manufacturing facilities with
Fresenius AG's other businesses. In connection with the Reorganization
Agreement, in each situation where facilities are currently shared,
post-Reorganization Agreement ownership of the location or manufacturing
facility (collectively, the "Facilities") will be retained by Fresenius AG or
contributed to Fresenius Worldwide Dialysis as described under "THE
REORGANIZATION -- Continuing Arrangements between Fresenius Medical Care and
Fresenius AG."

    The combined balance sheets included elsewhere in this Joint Proxy
Statement-Prospectus include, for those Facilities which will be retained by
Fresenius Worldwide Dialysis, land, buildings, related manufacturing assets; raw
materials and work-in-process inventories; and accounts payable and accrued
expenses related to those fixed assets and inventory. In addition, the balance
sheets exclude the land, buildings, related manufacturing assets; raw materials
and work-in-process inventories; and accounts payable and accrued expenses
related to those fixed assets and inventory for Facilities which will be
retained by Fresenius AG.

    Production and related services rendered by Fresenius Worldwide Dialysis at
shared Facilities to Fresenius AG are effectively allocated to Fresenius AG at
fully absorbed cost and, accordingly, are accounted for as an inventory transfer
through the statement of operations. Such production rendered by Fresenius AG at
shared Facilities on behalf of Fresenius Worldwide Dialysis are also effectively
allocated to Fresenius Worldwide Dialysis at fully absorbed cost.

    Prior to the Reorganization, Fresenius Medical Care and Fresenius AG will
negotiate and enter into the Supply Agreements for the purchase and sale of
products from the Retained Facilities and the Transferred Facilities. See "THE

XXX-001976

REORGANIZATION -- Continuing Arrangements between Fresenius Medical Care and
Fresenius AG."

    As a division of Fresenius AG, Fresenius Worldwide Dialysis has obtained
administrative and other services from Fresenius AG headquarters and from other
divisions and subsidiaries of Fresenius AG. Conversely, Fresenius Worldwide
Dialysis has provided certain services to other divisions and subsidiaries of
Fresenius AG. Prior to the Reorganization, Fresenius Medical Care and Fresenius
AG intend to enter into transitional agreements for continuation of many of such
services. For a discussion of allocation of such costs

                                      155

<PAGE>   180

and arrangements for such services in the future, see "THE
REORGANIZATION -- Continuing Arrangements between Fresenius Medical Care and
Fresenius AG."

    REAL ESTATE LOCATED IN GERMANY

    Certain land and manufacturing and office buildings located in Germany will
be retained by Fresenius AG and leased by Fresenius AG (or an affiliate) to
Fresenius Worldwide Dialysis (or an affiliate) under operating lease agreements.
Accordingly, such land and buildings have been excluded from the combined
balance sheets included elsewhere in this Joint Proxy Statement-Prospectus. The
combined statements of operations included elsewhere in this Joint Proxy
Statement-Prospectus include, for the years ended December 31, 1994 and 1995,
$1,025,000 and $1,575,000, respectively, and for the three months ended March
31, 1995 and 1996, include $383,518 and $365,468, respectively, of depreciation
expense related to such facilities representing an assumed charge to Fresenius
Worldwide Dialysis from Fresenius AG for the use of the land and buildings.
Under such Lease, subsequent to consummation of the transaction contemplated by
the Reorganization Agreement, Fresenius Worldwide Dialysis will pay Fresenius AG
DM 16.8 million per year, escalated annually based upon German commercial
practices. See "THE REORGANIZATION -- Continuing Arrangements between Fresenius
Medical Care and Fresenius AG -- Real Property Lease."

    CURRENCY EXCHANGE RATES

    Fresenius Worldwide Dialysis conducts its business internationally,
although its principal operations are located in Germany and the United States.
For financial reporting purposes, Fresenius Worldwide Dialysis has chosen the
U.S. dollar as its reporting currency. Therefore, changes in the rate of
exchange between the U.S. dollar and the local currencies in which the financial
statements of its international operations, including those in Germany, are
maintained affect Fresenius Worldwide Dialysis' results of operations and
financial position as reported in its financial statements. Fresenius Worldwide
Dialysis has combined the balance sheets of its non-U.S. dollar denominated
operations into U.S. dollars at the exchange rates prevailing at the balance
sheet date. Revenues and expenses are translated at the average exchange rates
for the period.

    The Deutschemark accounted for approximately 41.3% of Fresenius Worldwide
Dialysis' revenues in 1995 and approximately 41.8% in the three months ended
March 31, 1996. During 1994 and 1995 the dollar generally depreciated against
the Deutschemark and certain other currencies. This resulted in increased
reported sales, translated into dollars, for sales which are denominated
Deutschemarks or other currencies that appreciated against the U.S. dollar. For
example, if Fresenius Worldwide Dialysis had computed its 1995 sales using
average 1994 rather than 1995 exchange rates, net sales would have increased
16.6% as compared to a reported increase of 24.5%. A strengthening of the dollar
against other currencies would have had an opposite effect on Fresenius
Worldwide Dialysis' net sales.

    MANAGEMENT OF CURRENCY RISK

    Fresenius Worldwide Dialysis sells significant amounts of products from its
manufacturing facilities in Germany to its other international operations. In
general, Fresenius Worldwide Dialysis' intercompany sales are denominated in
Deutschemarks. Accordingly, Fresenius Worldwide Dialysis' subsidiaries are
exposed to fluctuations in the rate of exchange between the Deutschemark and the
currency in which its local operations are conducted. A decrease in the value of
the local currency relative to the Deutschemark will increase a subsidiary's
costs for products and supplies from Fresenius Worldwide Dialysis. Fresenius
Worldwide Dialysis' subsidiaries employ, to a limited extent, forward contracts
and currency options to hedge their currency exposures when they arise,
typically at the time that product is purchased. Fresenius Worldwide Dialysis'
policy, which has been consistently followed, is that forward currency contracts
and options be utilized only for purposes of hedging foreign currency exposures.
Fresenius Worldwide Dialysis has not used such instruments for purposes other
than hedging. On average, during each of the years ended December 31, 1995 and
1994, the currencies in which Fresenius Worldwide Dialysis' local operations
were conducted depreciated relative to the Deutschemark. Accordingly, Fresenius
Worldwide Dialysis subsidiaries' costs for products and supplies were favorably
affected by its hedging activities. At December 31, 1995, Fresenius Worldwide
Dialysis had purchased forward exchange contracts for the sale of currencies for
Deutschemarks of $67 million and the

                                      156

<PAGE>   181

purchase of U.S. dollars for Deutschemarks of $10 million. At March 31, 1996,
Fresenius Worldwide Dialysis had purchased forward exchange contracts for the
sale of currencies for Deutschemarks of $66 million and the purchase of dollars

XXX-001977

for Deutschemarks of $7 million. Fresenius Worldwide Dialysis' average level of purchases of derivative financial instruments during 1995 and 1994 was not materially different than the amounts held as of the end of those years. A summary of the high and low exchange rates for Deutschemarks to U.S. dollars and the average exchange rates for the last five years is set forth below:

| YEAR ENDING DECEMBER 31, | YEAR'S HIGH | YEAR'S LOW | YEAR'S AVERAGE | YEAR'S CLOSE |
|---|---|---|---|---|
| 1991 | 0.6925 | 0.5449 | 0.6051 | 0.6586 |
| 1992 | 0.7185 | 0.5959 | 0.6421 | 0.6176 |
| 1993 | 0.6377 | 0.5736 | 0.6051 | 0.5759 |
| 1994 | 0.6703 | 0.5663 | 0.6182 | 0.6452 |
| 1995 | 0.7384 | 0.6415 | 0.6989 | 0.6987 |

INFLATION

The effects of inflation during the periods covered by the combined financial statements have not been significant to Fresenius Worldwide Dialysis' results of operations. However, a significant portion of Fresenius Worldwide Dialysis' net revenues, including revenues from the U.S., is received from customers whose revenues are subject to reimbursement rates which are regulated by governmental authorities. Non-governmental payors are also exerting downward pressure on reimbursement rates. Increased operating costs that are subject to inflation, such as labor and supply costs, may not be recoverable through price increases in the absence of a compensating increase in reimbursement rates payable to customers of Fresenius Worldwide Dialysis, and could materially adversely affect Fresenius Worldwide Dialysis' business and results of operations.

RESULTS OF OPERATIONS

The following table sets forth certain items from the Fresenius Worldwide Dialysis Combined Statements of Operations as a percent of net sales and the percentage increase (decrease) in the U.S. dollar amount of those items as compared to the prior period.

| | PERCENTAGE OF NET SALES | | PERCENTAGE INCREASE | PERCENTAGE OF NET SALES THREE MONTHS ENDED MARCH 31, | | PERCENTAGE INCREASE THREE MONTHS ENDED MARCH 31, |
|---|---|---|---|---|---|---|
| | 1994 | 1995 | 1995 VS. 1994 | 1995 | 1996 | 1995 VS. 1996 |
| Net Sales............ | 100% | 100% | 25 | 100% | 100% | 13 |
| Cost of Sales........ | 58 | 57 | 23 | 56 | 57 | 15 |
| Gross Profit......... | 42 | 43 | 27 | 44 | 43 | 11 |
| Selling, general and administrative expense........... | 27 | 27 | 24 | 26 | 26 | 12 |
| Research and development expense........... | 2 | 2 | 2 | 1 | 2 | 9 |
| Operating income...... | 13 | 14 | 38 | 17 | 16 | 9 |
| Interest expense, net.............. | 1 | 1 | 24 | 1 | 1 | (31) |
| Income before income taxes.............. | 12 | 13 | 38 | 16 | 15 | 11 |
| Provision for income taxes.............. | 5 | 5 | 12 | 7 | 6 | 5 |
| Net income........... | 7 | 8 | 34 | 9 | 9 | 13 |

157

<PAGE>  182

1995 COMPARED TO 1994

Net Sales. Net Sales increased 24.5% to $897 million in 1995 from $720 million in 1994. 1995 net sales benefited by 7.9% from the significant appreciation of the Deutschemark relative to the U.S. dollar, Fresenius Worldwide Dialysis' financial statement reporting currency. In local currency terms, Fresenius Worldwide Dialysis' sales increased, on a weighted average basis, by 16.6%.

In 1995, Fresenius Worldwide Dialysis' operations in Germany experienced significant sales growth, including export sales, of 34%, or 19% in local currency, compared to 1994. Sales growth was also substantial in the U.S., totalling 21%. Sales by Fresenius Worldwide Dialysis' other operations in the rest of the world increased 15%, or 8% in local currency, compared to 1994. On the basis of location of customers, sales by geographic region increased in 1995 by 25% in Germany, 21% in the U.S. and 28% in the rest of the world. Translated into local currency, sales to customers in these geographic regions increased in 1995 by 12% in Germany, 21% in the U.S. and 17% in the rest of the world, compared to 1994.

XXX-001978

Strong growth in Germany and the U.S. was mainly attributable to increased sales of hemodialysis machines due to a high replacement rate by dialysis centers in those markets and increased sales of dialyzers due to increased production capacity. In addition, Fresenius Worldwide Dialysis' net sales benefited from strong demand in the growing markets of Eastern Europe. The sales increase is also attributable to growth in the number of dialysis patients in Fresenius Worldwide Dialysis' principal markets. The increase in sales resulted primarily from higher unit volumes, since Fresenius Worldwide Dialysis' selling prices in local currencies were virtually unchanged in 1995.

Fresenius Worldwide Dialysis undertook a reorganization in 1995 to strengthen its international sales and marketing organization by separating the hemodialysis and peritoneal dialysis businesses to focus its marketing efforts on the distinct needs of each product market better. In addition, Fresenius Worldwide Dialysis set up regionalized marketing structures to serve the needs of customers in different geographic markets better, resulting in the creation of independent hemodialysis regions and peritoneal dialysis regions. Management believes that this new organizational structure has improved market penetration of new products and enhanced its traditionally strong customer contacts, leading to higher product volumes sold.

During 1995, hemodialysis machines and related disposable products accounted for 70.9% of Fresenius Worldwide Dialysis' total net sales compared to 70.1% in 1994. Sales of peritoneal dialysis solutions, machines and rented equipment accounted for approximately 19.9% of Fresenius Worldwide Dialysis' sales in 1995 compared to 21.3% in 1994. Sales of technical services associated with Fresenius Worldwide Dialysis' hemodialysis product line accounted for 9.2% of sales in 1995 and 8.6% in 1994.

In 1995, net sales of hemodialysis machines and related disposable products, including dialyzers, grew 26.0% to $636.0 million from $504.9 million in 1994. Net sales of hemodialysis machines increased 34.4% to $140 million from $104 million in 1994, which was due principally to the increase in demand due to high machine replacement rates by dialysis centers and the increase in market acceptance of Fresenius Worldwide Dialysis' products. Sales of dialyzers increased 29.1% to $248 million in 1995 from $192 million in 1994. Before 1995, demand for Fresenius Polysulfone(R) dialyzers exceeded available capacity. As a result of expanded production capacity in 1995 at several manufacturing locations, Fresenius Worldwide Dialysis was better able to meet market demand. This result can be attributed mainly to increased capacity at Fresenius Worldwide Dialysis' production facilities in Germany, the U.S. and Belarus. See "-- Liquidity and Capital Resources." Production of Fresenius cuprophane dialyzers produced at Fresenius/SMAD, Fresenius Worldwide Dialysis' French subsidiary, representing less than 10% of dialyzer sales, was below capacity in 1995.

Sales of peritoneal dialysis products and machines increased 16.2% to $178.3 million in 1995 from $153.4 million in 1994. The increase in sales of peritoneal dialysis products resulted in part from the introduction of PD-NIGHT(TM) in the last quarter of 1995 and from higher sales volumes of existing products.

Gross Profit. Gross profit for 1995 was $382 million, an increase of 27% from gross profit for 1994 of $300 million. In local currency terms, however, the increase in gross profit was 17.4%. As a percentage of net sales, gross profit increased to 42.7% in 1995 compared to 41.7% in 1994. The increase in gross profit in 1995 reflects increased net sales as well as Fresenius Worldwide Dialysis' continuous improvement of the

                                    158
<PAGE>   183

efficiency of its production processes and successful efforts to reduce manufacturing costs. Gross profit from the sale of disposable products increased as a result of lower raw material costs, higher production speeds, changes in product components and increased automation. In the dialysis machine production facility in Schweinfurt, Germany, a new logistics system was implemented to optimize the flow of goods and reduce logistics costs. Successful cost reduction measures were also implemented at the Fresenius/SMAD plant in France. Gross profit was negatively affected by start-up costs due to a loss of efficiency at the Ogden, Utah manufacturing facility, which was expanded in 1995 to commence manufacturing of polysulfone dialyzers.

Selling, General and Administrative Expenses. Selling, general and administrative ("SG&A") expenses totalled $243 million in 1995, an increase of 24.4% from the prior year total of $195 million. As a percentage of net sales, SG&A expenses remained constant at 27.1% in 1995 and 1994. SG&A expenses were significantly affected by currency exchange rates. In terms of local currency, SG&A expenses increased by 15.7%. The increase in SG&A expenses resulted principally from the higher sales volume.

Research and Development Expenses. Research and development expenses in 1995 increased to $17.3 million compared to $16.9 million in 1994. In local currency terms, however, research and development expenses declined 7.8%. Research and development expenses do not include $4.3 million of research and development expenses charged by Fresenius AG to Fresenius Worldwide Dialysis as corporate overhead, which were incurred by Fresenius AG in developing Biofine(TM), a PVC-free packaging material for peritoneal dialysis systems and intravenous solutions. If such overhead charges were taken into account, research and development expenses would have increased by 12.3% in 1995 compared to 1994. Research and development costs represent principally personnel wages and benefits as well as fixed overhead costs.

XXX-001979

Operating Income.  Operating income for 1995 was $122 million, an increase of $34 million from an operating income of $88 million in 1994. As a percentage of net sales, operating income increased to 13.6% in 1995 from 12.2% in 1994.

Interest Expense.  Interest expense was $14 million in 1995 compared to $12 million in 1994. The higher level of interest expense resulted from a higher level of borrowings in 1995 compared to 1994.

Income Tax Expense.  Expenses for income taxes were $41 million in 1995 compared to $29 million in 1994. Fresenius Worldwide Dialysis' effective tax rate increased slightly from 34.8% in 1994 to 35.2% in 1995. The increase in Fresenius Worldwide Dialysis' effective rate resulted principally from a higher percentage of Fresenius Worldwide Dialysis' combined pre-tax income being earned in Germany where the fully distributed earnings federal statutory tax rate plus trade (state) income taxes, net of federal benefit approximates 47%. As a result of the utilization and recognition of net operating loss carryforwards of its U.S. subsidiary, for which no tax benefit had previously been recognized, Fresenius Worldwide Dialysis' income tax provisions in 1995 and 1994 were lower than the German statutory rate. See Note 15 of Notes to Combined Financial Statements of Fresenius Worldwide Dialysis.

THREE MONTHS ENDED MARCH 31, 1996 COMPARED TO THREE MONTHS ENDED MARCH 31, 1995

Net Sales.  Net Sales increased 13.0% to $235 million in the first quarter 1996 from $208 million in the first quarter 1995.

In the first quarter of 1996, Fresenius Worldwide Dialysis' operations in Germany experienced sales growth, including export sales, of 9.2% compared to the first quarter of 1995. Sales growth was also substantial in the U.S., totalling 19.2%. Sales by Fresenius Worldwide Dialysis' operations in the rest of the world increased 11.6% compared to the first quarter of 1995. The increase in sales resulted primarily from higher unit volumes. Fresenius Worldwide Dialysis' selling prices in local currencies were virtually unchanged. The sales increase was also attributable to growth in the number of dialysis patients in each of Fresenius Worldwide Dialysis' principal markets.

Strong sales growth in Germany and the U.S. was mainly attributable to increased sales of hemodialysis machines due to a high replacement rate by dialysis centers in those markets and increased sales of dialyzers due to increased production capacity. In addition, Fresenius Worldwide Dialysis' net sales benefited from strong demand in the growing markets of Eastern Europe.

159

<PAGE>  184

In the first quarter of 1996, net sales of hemodialysis machines and related disposable products, including dialyzers, grew 13.7% to $169.2 million from $148.9 million in the first quarter of 1995. The increase resulted from higher machine replacement rates and increased sales of dialyzers as a result of the availability of additional manufacturing capacity.

Sales of peritoneal dialysis products and machines increased 18.1% to $49.2 million in the first quarter of 1996 compared to $41.7 million in the first quarter of 1995. The increase in sales of peritoneal dialysis products resulted in part from the introduction of PD-NIGHT(TM) in the last quarter of 1995 and from higher sales volumes of existing products.

Gross Profit.  Gross profit for the first quarter of 1996 was $102.2 million, an increase of 10.7% from gross profit for the first quarter of 1995. As a percentage of net sales, gross profit decreased slightly to 43% in the first quarter 1996 from 44% in the first quarter of 1995.

The gross margin was negatively impacted by the increase in the Deutschemark/U.S. dollar exchange rate which resulted in higher costs for Deutschemark denominated purchases and came into full effect only later during 1995 as certain subsidiaries benefitted from favorable forward exchange rate contracts which were closed during the first quarter of 1995.

Selling, General and Administrative Expenses.  SG&A expenses totalled $60.8 million in the first quarter 1996, an increase of 12.0% from the first quarter of 1995 of $54.3 million. As a percentage of net sales, SG&A expenses remained substantially constant at 26% in the first quarters of 1996 and 1995.

Research and Development Expenses.  Research and development expenses in the first quarter of 1996 increased to $3.6 million compared to $3.3 million in the first quarter of 1995. Research and development costs represent principally personnel wages and benefits as well as fixed overhead costs.

Operating Income.  Operating income for the first quarter of 1996 was $37.7 million, an increase of $3.1 million from an operating income of $34.6 million in the first quarter of 1995.

Interest Expense.  Interest expense was $4.0 million in the first quarter of 1996 compared to $3.3 million in the first quarter of 1995. The higher level of interest expense resulted from a higher level of borrowings in 1996 compared to 1995.

Income Tax Expense.  Expenses for income taxes were $13.1 million in the first quarter of 1996 compared to $12.5 million in the first quarter of 1995. Fresenius Worldwide Dialysis' effective tax rate decreased from 38.1% in the first quarter of 1995 to 35.9% in the first quarter of 1996. The decrease in Fresenius Worldwide Dialysis' effective tax rate resulted primarily from lower

XXX-001980

deferred tax expenses in Germany which are calculated at the higher tax rate for undistributed earnings.

LIQUIDITY AND CAPITAL RESOURCES

1995 COMPARED TO 1994

During 1994 and 1995, Fresenius Worldwide Dialysis utilized cash flow from operations and, to a lesser extent, bank borrowings, principally to fund investments in property, plant and equipment. During 1995 and 1994 Fresenius Worldwide Dialysis' cash provided by operating activities was $69.1 million and $63.4 million, respectively and was generated principally from net income plus non-cash depreciation charges of $41.7 million in 1995 and $34.9 million in 1994 and less increases in working capital requirements of $37.9 million and $27.8 million, respectively. At December 31, 1995, Fresenius Worldwide Dialysis had cash of $12.1 million.

Fresenius Worldwide Dialysis had capital expenditures in 1995 and 1994 of $92.9 million and $59.5 million, respectively. The expenditures in each year were principally in Germany and the United States. At the production facility in St. Wendel, Germany, $13.2 million was expended during 1995 for the construction and installation of a new production line for PVC-free bags. An additional $9.9 million was expended to further automate the production processes and increase the production capacity at the St. Wendel and Schweinfurt, Germany manufacturing facilities. Further capital expenditures in Germany included $10.0 million for rental equipment, of which $7.8 million were additions to capital leases. The rental

160

<PAGE>    185

equipment consisted of hemodialysis machines leased to hospitals and dialysis centers. To finance the rental equipment Fresenius Worldwide Dialysis enters into sale/leaseback agreements with a leasing company which cover the sale and leaseback of rental equipment under a three year capital lease.

To strengthen its international operations further, in 1995 Fresenius Worldwide Dialysis made acquisitions and capital investments of $8.4 million in subsidiaries in Argentina, Australia, Colombia, and Germany, as well as in dialysis centers in Brazil, Hungary and Italy.

In addition, Fresenius Worldwide Dialysis' U.S. subsidiary completed construction of a 104,000 square foot addition to its Ogden, Utah manufacturing facility for the manufacture of polysulfone dialyzers. Fresenius USA had expended $39.5 million for the construction and equipping of the expanded facility as of December 31, 1995. On March 31, 1995 Fresenius USA entered into a sale/leaseback arrangement with a bank which, as amended, covers the sale of approximately $27.0 million of certain new equipment of its dialyzer manufacturing facility to the bank and leaseback of the equipment under a four-year operating lease that has renewal options and purchase options at fair value. Although the rent payments on the lease are variable based on the London interbank offered rate ("LIBOR") for three-months, Fresenius USA has effectively fixed its rent expense through the use of interest rate swap agreements. If Fresenius USA elects not to purchase the equipment or renew the lease at the end of the lease term, it will be obligated to pay a termination fee of up to $20.25 million, to be offset by sale proceeds from Fresenius USA remarketing the equipment.

At December 31, 1994 and 1995, Fresenius Worldwide Dialysis had short-term borrowings of $80 million and $109 million, respectively. The borrowings were principally under lines of credit with commercial banks and, in 1995, $25.2 million was borrowed from Fresenius AG. At December 31, 1995, Fresenius Worldwide Dialysis had short-term unused lines of credit of $20 million. Fresenius Medical Care believes that its internally generated funds, as well as its credit facilities and possible future debt and equity offerings, will be sufficient to fund its internal expenditures and anticipated acquisitions after the Reorganization.

Fresenius Worldwide Dialysis' net assets represent the excess of assets over liabilities to unrelated third parties of the business units included in Fresenius Worldwide Dialysis, as discussed in Note 1 to the Fresenius Worldwide Dialysis combined financial statements. Intercompany transactions and charges between Fresenius Worldwide Dialysis and Fresenius AG have also effectively been accounted for within net activity with Fresenius AG. For the years ended December 31, 1995 and 1994, the net activity with Fresenius AG resulting from intercompany transactions and charges was credits of $10.0 million and $19.3 million, respectively. Subsequent to the transactions contemplated by the Reorganization Agreement, such activity will be accounted for as related party transactions by Fresenius Medical Care.

Further, in connection with the transactions contemplated by the Reorganization Agreement, Fresenius AG will contribute the net assets of Fresenius Worldwide Dialysis, including Fresenius USA, to Fresenius Medical Care in return for approximately 50.3% of the outstanding FMC Ordinary Shares. Such transaction will be accounted for at cost as it represents a transaction between entities under common control.

THREE MONTHS ENDED MARCH 31, 1996 COMPARED TO THREE MONTHS ENDED MARCH 31, 1995

During the first quarter 1995 and 1996, Fresenius Worldwide Dialysis utilized cash flow from operations and, to a lesser extent, bank borrowings to fund investments in property, plant and equipment. During the first quarter of 1996 and of 1995, Fresenius Worldwide Dialysis' cash provided by operating

XXX-001981

activities was $12.8 million and $13.0 million, respectively, and was generated
principally from net income plus non-cash depreciation charges of $10.3 million
in the first quarter of 1996 and $9.0 million in the first quarter of 1995 and
less an increase in working capital requirements of $16.0 million and $13.1
million, respectively. At March 31, 1996, Fresenius Worldwide Dialysis had cash
of $31.4 million.

    Fresenius Worldwide Dialysis had capital expenditures in the first quarter
of 1996 and of 1995 of $17.8 million and $14.3 million, respectively. The
expenditures in each year were principally in Germany and the U.S. Expenditures
in Germany were incurred to further automate the production processes and
increase the production capacity at the St. Wendel Facility and the Schweinfurt
Facility.

                                       161
<PAGE>  186

    Further capital expenditures in Germany included $1.5 million for rental
equipment, of which $1.0 million were additions to capital leases. The rental
equipment consisted of hemodialysis machines leased to hospitals and dialysis
centers. To finance the rental equipment Fresenius Worldwide Dialysis enters
into sale/leaseback agreements with a leasing company which cover the sale and
leaseback of rental equipment under three-year capital leases.

    In addition in 1995, Fresenius Worldwide Dialysis' U.S. subsidiary
completed construction of a 104,000 square foot addition to its manufacturing
facility for the manufacture of polysulfone dialyzers. Fresenius USA had
expended $39.5 million for the construction and equipping of the expanded
facility as of March 31, 1996. On March 31, 1995, Fresenius USA entered into a
sale/leaseback arrangement with a bank which covers the sale of approximately
$19.0 million of certain new equipment of its dialyzer manufacturing facility to
the bank and leaseback of the equipment under a four-year operating lease that
has renewal options and purchase options at fair value. Although the rent
payments on the lease are variable based on the four-month LIBOR, Fresenius USA
has effectively fixed its rent expense through the use of interest rate swap
agreements. In December 1995, an additional $8.0 million of similar new
equipment was sold and leased back under the above-referenced four-year
renewable lease. If Fresenius USA elects not to purchase the equipment or renew
the lease at the end of the lease term, it will be obligated to pay a
termination fee of up to $20.25 million, to be offset by sale proceeds from
Fresenius USA remarketing the equipment.

    At March 31, 1996 and December 31, 1995, Fresenius Worldwide Dialysis had
short-term borrowings of $128.8 million and $109.4 million, respectively. The
borrowings were principally under lines of credit with commercial banks and, in
1996, $25.2 million was borrowed from Fresenius AG.

                                       162
<PAGE>  187

                  SELECTED FINANCIAL DATA OF FRESENIUS USA

    The following table summarizes certain financial data with respect to
Fresenius USA and is qualified in its entirety by the consolidated financial
statements of Fresenius USA contained elsewhere in this Joint Proxy
Statement-Prospectus. The selected data as of and for the years ended December
31, 1991, 1992, 1993, 1994 and 1995 have been derived from the consolidated
financial statements of Fresenius USA audited by KPMG Peat Marwick LLP,
independent accountants.

    The Abbott Acquisition has been accounted for as a purchase. Because the
Abbott Acquisition occurred on February 24, 1993, the statements below include
the results of operations, assets and liabilities of this acquired business only
for periods and dates occurring on or after February 24, 1993.

<TABLE>
<CAPTION>

| | YEAR ENDED DECEMBER 31, | | | | | THREE MONTH PERIOD ENDED MARCH 31, | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 1991 | 1992 | 1993 | 1994 | 1995 | 1995 | 1996 |
| | (DOLLARS AND SHARES IN THOUSANDS, EXCEPT PER SHARE DATA) | | | | | | |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| STATEMENT OF OPERATIONS DATA: | | | | | | | |
| Net sales.................................. | $101,436 | $128,607 | $205,960 | $254,344 | $304,964 | $68,176 | $81,062 |
| Cost of sales.............................. | 71,812 | 92,575 | 140,960 | 175,766 | 212,102 | 47,040 | 55,566 |
| Gross profit............................... | 29,624 | 36,032 | 65,000 | 78,578 | 92,862 | 21,136 | 25,496 |
| Selling, general and administrative and research and development........................ | 28,865 | 32,964 | 55,713 | 66,489 | 74,836 | 17,048 | 18,949 |
| Litigation settlements..................... | 1,300 | (400) | -- | -- | -- | -- | -- |
| Operating income (loss)................... | (541) | 3,468 | 9,287 | 12,089 | 18,026 | 4,088 | 6,547 |
| Interest expense (net).................... | (2,167) | (2,447) | (4,631) | (4,195) | (4,924) | 1,274 | 1,401 |
| Equity in earnings of Fresenius Brent Medical Inc...................................... | 84 | 70 | 86 | -- | -- | -- | -- |
| Other income (expense), net............... | (191) | (341) | (149) | (17) | (149) | 25 | 62 |
| Income (loss) before income taxes and extraordinary items....................... | (2,815) | 750 | 4,593 | 7,877 | 12,953 | 2,789 | 5,084 |
| Income tax expense (benefit)................. | 15 | 111 | 900 | 723 | (3,434) | (529) | (262) |

XXX-001982

```
Income (loss) before extraordinary items........   (2,830)       639     3,693     7,154    16,387    3,318     5,346
Extraordinary items............................      255        --        --        --        --       --        --
                                                   --------   --------  --------  --------  --------  -------   -------
Net income (loss)..............................   $ (2,575)  $    639  $  3,693  $  7,154  $ 16,387  $ 3,318  $ 5,346
                                                   ========   ========  ========  ========  ========  =======  =======
Net Income (Loss) Per Common and Common Equivalent
 Share:
Income (loss) before extraordinary items........   $  (.18)  $    .03  $    .18  $    .32  $    .61  $  0.13  $  0.19
Extraordinary items............................       .02        --        --        --        --    $   --        --
                                                   --------   --------  --------  --------  --------  -------   -------
Net income (loss) per common and common
 equivalent share:
   Primary.....................................    $  (.16)  $    .03  $    .18  $    .32  $    .61  $  0.13  $  0.19
                                                   ========   ========  ========  ========  ========  =======  =======
   Fully diluted...............................    $  (.16)  $    .03  $    .18  $    .31  $    .59  $  0.13  $  0.19
                                                   ========   ========  ========  ========  ========  =======  =======
Weighted average number of shares of common
 stock and common stock equivalents:
   Primary.....................................     15,543    18,692    20,660    23,926    26,647   25,717    27,884
   Fully diluted...............................     15,543    18,692    20,660    23,926    27,844   25,872    27,936
Pro Forma:(1)
   Net sales...................................             $154,694  $210,642
   Gross profit................................               49,024    67,424
   Operating income............................                6,838    10,162
   Net income..................................                1,617     4,160
   Net income per common share.................             $    .09  $    .20
   Weighted average number of shares of common
    stock and common stock equivalents.........               18,692    20,660
</TABLE>

<TABLE>
<CAPTION>
                                                              DECEMBER 31,
                                            ---------------------------------------------------   MARCH 31,
                                             1991      1992      1993      1994      1995          1996
                                            -------   -------   --------  --------  --------      ------------
                                                     (DOLLARS AND SHARES IN THOUSANDS)
<S>                                         <C>       <C>       <C>       <C>       <C>           <C>
BALANCE SHEET DATA:
Working capital.............................$ 22,604  $ 18,739  $ 15,525  $  4,579  $ 12,991      $ 13,503
Total assets................................  78,144    88,961   159,216   185,348   224,921       226,806
Total debt and capital lease obligations....  29,039    21,905    68,291    66,073    75,237        72,283
Stockholders' equity........................  22,752    31,037    37,006    60,572    78,602        84,792
</TABLE>
```

- ---------------

(1) Pro forma operating data give effect to the Abbott Acquisition as if this
    acquisition were consummated on January 1, 1992. See Note 23 of Notes to
    Consolidated Financial Statements of Fresenius USA.

                              163

<PAGE>  188

            MANAGEMENT'S DISCUSSION AND ANALYSIS
    OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- FRESENIUS USA

OVERVIEW

    Certain sections of this Joint Proxy Statement-Prospectus contain
forward-looking statements. These forward-looking statements are made based on
management's expectations and beliefs concerning future events impacting
Fresenius USA, but no assurance can be given that such events will occur or that
the results will be as anticipated. Such sections include, without limitation,
discussions concerning the outlook of Fresenius USA, future plans and
management's expectations regarding future performance.

    There are certain important factors that could cause results to differ
materially from those anticipated. These factors include:

    RELIANCE ON FRESENIUS AG

    Fresenius USA is dependent on Fresenius AG in a variety of ways for
technology, products, and, to some degree, financial support. Fresenius AG's
direct and indirect ownership of Fresenius USA Common Stock has the practical
effect of giving Fresenius AG an absolute majority of the voting power of
Fresenius USA with respect to all matters.

    COMPETITION AND TECHNOLOGICAL CHANGE

    The markets in which Fresenius USA sells its products are highly
competitive. Some of Fresenius USA's principal competitors in the hemodialysis
and peritoneal dialysis fields possess greater financial, marketing and research
and development resources than Fresenius USA. There can be no assurance that
competition, innovation or introduction of new products from this or other
sources will not materially adversely affect sales of Fresenius USA's products
or render one or more of Fresenius USA's present or proposed products obsolete.

    RELIANCE ON SUPPLIERS; PURCHASE COMMITMENTS

    The supplies for certain of Fresenius USA's products are purchased from
single suppliers, including Fresenius AG, located outside of the United States.
If a particular source of supply becomes unavailable, there can be no assurance
that Fresenius USA would be able to find an acceptable substitute supplier in a
timely fashion. The loss of such a source of supply could have a material

XXX-001983

adverse effect on Fresenius USA's revenues and profits, as well as its ability to supply its products to its customers and retain its customer base.

### FDA AND OTHER GOVERNMENT REGULATION

The manufacturing and marketing of Fresenius USA's products are subject to regulation by the FDA, pursuant to the FDC Act, and numerous other federal, state and foreign governmental authorities. Fresenius USA believes it has obtained all necessary clearances for the manufacture and sale of the products that Fresenius USA currently produces and sells in the jurisdictions where these products are currently sold. Products developed in the future are likely to require approval by the FDA and other authorities before they may be sold in the U.S. or elsewhere. While Fresenius USA believes that it is generally in compliance with applicable FDA and other requirements, there can be no assurance that Fresenius USA will be able to continue such compliance, that one or more of Fresenius USA's products will not be the subject of a recall, or that changes in regulations or interpretations made by the FDA or other regulatory bodies will not adversely affect Fresenius USA.

### POTENTIAL PRODUCT LIABILITY; LITIGATION

Fresenius USA faces an inherent business risk of exposure to product liability claims. Although Fresenius USA maintains product liability insurance at a level which it believes to be prudent, there can be no assurance that such coverage will be adequate, or that adequate insurance coverage will continue to be available at acceptable costs. Although Fresenius USA has not been subject to significant product liability

164

<PAGE>   189

claims in the past, there can be no assurance that Fresenius USA can avoid a significant product liability claim or recall in the future, which could have a material adverse effect on the business, financial condition or prospects of Fresenius USA.

### HEALTH CARE REFORM

Presently, Medicare reimbursement is available for dialysis equipment and/or treatment for most ESRD patients at approximately the same nominal dollars-per-treatment level that prevailed in 1983 (representing a significant decrease in real dollars-per-treatment). Because the demand for Fresenius USA's products is affected by the availability and level of Medicare reimbursement, any spending decreases or significant changes in the Medicare program could have a material adverse effect on Fresenius USA.

### CURRENCY RISK

Products and supplies purchased from Fresenius AG must be paid for by Fresenius USA in Deutschemarks and, therefore, a decrease in the value of the U.S. dollar relative to the Deutschemark will increase Fresenius USA's costs for these products and supplies. Fresenius USA attempts to protect itself from short-term currency fluctuations using various hedging techniques, but there can be no assurance that such techniques will continue to be available to Fresenius USA or that, even if available, they will successfully protect Fresenius USA from these currency fluctuations. Fresenius USA is unable to protect itself from long-term changes in exchange rates. If there are long-term changes in exchange rates, or if Fresenius USA is not successful in protecting itself against short-term currency fluctuations, Fresenius USA's cost of sales could increase substantially, which could have a material adverse effect on Fresenius USA's financial results.

A significant portion of Fresenius USA's products, and components used in its products, are manufactured outside of the U.S. by Fresenius AG and other suppliers. As a result, fluctuations in exchange rates of the U.S. dollar against foreign currencies, particularly the Deutschemark, may affect Fresenius USA's cost of sales. Fresenius USA engages in foreign currency hedging arrangements as an effort to minimize the effect of short-term currency fluctuations on its results of operations. Fresenius USA's policy, which has been consistently followed, is that forward currency contracts and options be utilized only for purposes of hedging foreign currency exposures resulting from purchases made from Fresenius AG in Deutschemarks. Fresenius USA has not used such instruments for purposes other than hedging. On average during each of the years ended December 31, 1995 and 1994 the U.S. dollar depreciated relative to the Deutschemark. The adverse effects of such depreciation on Fresenius USA's Deutschemark denominated purchases of products and supplies were mitigated by its hedging activities. At December 31, 1995, Fresenius USA had contracts to purchase DM 46 million at a fixed rate on the date of settlement. Fresenius USA's average level of purchases of foreign currency contracts during each of the years ended December 31, 1995 and 1994 approximated the average purchases of products and supplies from Fresenius AG during each of the respective years. In order to minimize the effect of longer-term currency fluctuations, Fresenius USA is increasingly producing components for the products it sells, or the products themselves, in the U.S. In 1995, Fresenius USA began producing polysulfone dialyzers at its expanded facility in Ogden, Utah.

Fresenius USA undertakes no obligation to publicly release the result of any revisions to these forward-looking statements which may be made to reflect events or circumstances after the date hereof.

### SUBSEQUENT EVENT

During the quarter ended June 30, 1996, Fresenius USA recorded approximately $9.8 million in additional compensation expense in connection

XXX-001984

with the repurchase from certain employees of shares of Fresenius USA Common
Stock and options to purchase Fresenius USA Common Stock. See "FRESENIUS USA
EXECUTIVE COMPENSATION -- Securities Repurchases." Fresenius USA expects that
its operating income for the three-month and six-month periods ended June 30,
1996 will be approximately $7,594 and $14,141, respectively, and that, as a
result of the additional compensation expense incurred in connection with the
securities repurchases, it expects that its net income (loss) for the
three-month and six-month periods will be ($2,164) and $4,383, respectively.

165

<PAGE>  190

RESULTS OF OPERATIONS

     The following table sets forth certain items from the Fresenius USA
Consolidated Statements of Operations as a percent of net sales and the
percentage increase (decrease) in the dollar amount of those items as compared
to the prior period.

<TABLE>
<CAPTION>

|  | PERCENTAGE OF NET SALES | | | THREE MONTHS ENDED MARCH 31, | | PERCENTAGE INCREASE (DECREASE) | | INCREASE (DECREASE) THREE MONTHS ENDED MARCH 31 1996 VS. 1995 |
|---|---|---|---|---|---|---|---|---|
|  | 1993 | 1994 | 1995 | 1995 | 1996 | 1994 VS. 1993 | 1995 VS. 1994 |  |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Net sales..................... | 100% | 100% | 100% | 100% | 100% | 23% | 20% | 19% |
| Cost of sales................ | 68 | 69 | 70 | 69 | 69 | 25 | 21 | 18 |
| Gross profit................. | 32 | 31 | 30 | 31 | 31 | 21 | 18 | 21 |
| Selling, general and administrative expense...... | 26 | 25 | 24 | 24 | 23 | 19 | 12 | 11 |
| Research and development expense.................... | 1 | 1 | 1 | 1 | 1 | 23 | 24 | 20 |
| Operating income............. | 5 | 5 | 6 | 6 | 8 | 30 | 49 | 60 |
| Interest expense, net........ | 2 | 2 | 2 | 2 | 2 | (9) | 17 | 10 |
| Income before income taxes.... | 2 | 3 | 4 | 4 | 6 | 72 | 64 | 82 |
| Net income................... | 2 | 3 | 5 | 5 | 7 | 94 | 129 | 61 |
</TABLE>

     Fresenius USA's net sales have continued to grow over the last three years,
from $206.0 million in 1993 to $305.0 million in 1995. Fresenius USA's net sales
are derived from sales of dialysis machines, which accounted for approximately
29% of 1995 net sales, and disposable products, which accounted for
approximately 71% of 1995 net sales. Fresenius USA attributes the growth in net
sales during this period principally to increased penetration in both the
hemodialysis and peritoneal dialysis markets, growth in the number of people
with ESRD and the introduction of new products. Improved market penetration was
partly attributable to enhanced sales and marketing programs and, in the case of
peritoneal dialysis products, primarily to the Abbott Acquisition.

     1995 COMPARED TO 1994

     Net Sales.  Net sales were $305.0 million in 1995, an increase of $50.7
million, or 19.9%, compared with net sales of $254.3 million in 1994. The
increase in 1995 net sales primarily reflects higher unit sales volumes in all
major product categories from 1994 levels. Average net sales price per unit in
each major product category did not change significantly during 1995 as compared
with 1994.

     Net sales of hemodialysis products were $206.0 million, an increase of
$36.3 million, or 21.3%, compared to 1994 net sales. The sales increase in
hemodialysis products was due to the increased acceptance of Fresenius USA's
products and growth in the number of hemodialysis patients in the U.S.

     Net sales of peritoneal products was $89.6 million, an increase of $12.2
million, or 15.8%, compared to 1994 net sales. The increase in net sales of
peritoneal dialysis products was primarily attributable to growth in the number
of peritoneal dialysis patients in the U.S., as well as to acceptance by the
medical community of new peritoneal dialysis therapies introduced by Fresenius
USA.

     Gross Profit.  Gross profit was $92.9 million in 1995, an increase of $14.3
million, or 18.2%, compared with gross profit of $78.6 million in 1994. Gross
profit margin decreased from 30.9% in 1994 to 30.5% in 1995, primarily due to a
loss of efficiency at the Ogden, Utah manufacturing facility due to the start-up
of dialyzer production, and due to increased costs of products purchased from
Germany, as a result of the continued weakness of the U.S. dollar.

     Selling, General and Administrative Expense and Research and Development
Expense.  SG&A expense and research and development expense were $74.8 million
in 1995, an increase of $8.3 million, or 12.6%, compared with 1994. SG&A expense
and research and development expense as a percentage of sales decreased to 24.5%
in 1995 from 26.1% in 1994. Research and development expense was $2.3 million in
1995 compared to $1.8 million in 1994, virtually unchanged as a percentage of
sales.

166

<PAGE>  191

     Interest Expense (Net).  Interest expense (net) was $4.9 million in 1995,

XXX-001985

an increase of $0.7 million, or 17.4%, over 1994. This increase is primarily the result of Fresenius USA's increased short-term borrowings during 1995.

Income Tax Expense (Benefit). During 1995, Fresenius USA recognized a portion of its deferred tax asset related to the utilization of net operating loss carry-forwards from previous years and reduced the valuation allowance on its deferred tax asset based on Fresenius USA's belief that it is more likely than not to be realized through the results of future operations. The net amount of this tax benefit recognized during 1995 was $3.4 million compared to tax expense of $0.7 million in 1994. Fresenius USA's income tax provisions for 1995 and 1994 were substantially lower than statutory rates. See Note 17 to Consolidated Financial Statements of Fresenius USA.

Net Income. Net income was $16.4 million in 1995, an increase of $9.2 million, or 129.1%, from 1994. Net income in 1995 included a tax benefit of $4.6 million, which Fresenius USA recognized during 1995. Excluding the tax benefit, net income was $11.8 million in 1995, an increase of $4.6 million or 64.8% from 1994.

1994 COMPARED TO 1993

Net Sales. Net sales were $254.3 million in 1994, an increase of $48.3 million, or 23.4%, compared with net sales of $206.0 million in 1993. The increase in 1994 net sales primarily reflects higher unit sales volumes in all major product categories from 1993 levels. Average net sales price per unit in each major product category did not change significantly during 1994 as compared with 1993.

Net sales of hemodialysis products were $170.6 million, an increase of $36.5 million, or 27.2%, compared to 1993 net sales. The sales increase in hemodialysis products was due to the increased acceptance of Fresenius USA's products and growth in the number of hemodialysis patients in the U.S.

Net sales of peritoneal products was $77.3 million, an increase of $12.3 million, or 18.8%, compared to 1993 net sales. The increase in net sales of peritoneal dialysis products was primarily attributable to growth in the number of peritoneal dialysis patients in the U.S., as well as acceptance by the medical community of new peritoneal dialysis therapies introduced by Fresenius USA.

Gross Profit. Gross profit was $78.6 million in 1994, an increase of $13.6 million, or 20.9%, compared with gross profit of $65.0 million in 1993. Gross profit margin decreased from 31.6% in 1993 to 30.9% in 1994. However, gross margin in 1993 included a $3.9 million refund related to U.S. import duties on dialyzers and hemodialysis machine components. Excluding this refund, gross margin in 1993 was 29.7%, compared to 30.9% in 1994.

Selling, General and Administrative Expense and Research and Development Expense. SG&A expense and research and development expense were $66.5 million in 1994, an increase of $10.8 million, or 19.3%, compared with 1993. SG&A expense and research and development expense as a percentage of sales decreased to 26.1% in 1994 from 27.1% in 1993. Research and development expense was $1.8 million in 1994 compared to $1.5 million in 1993, virtually unchanged as a percentage of sales.

Interest Expense (Net). Interest expense (net) was $4.2 million in 1994, a decrease of $0.4 million, or 9.4%, over 1993, primarily as a result of Fresenius USA's full redemption of all of its 10 1/2% convertible debentures and the payment of the outstanding principal balance of its industrial revenue bonds issued in connection with its Ogden, Utah facility, all in June 1994.

Income Tax Expense. Income tax expense was $0.7 million, a decrease of $0.2 million over 1993, primarily as a result of tax credits from Fresenius USA's wholly owned Canadian subsidiary. As a result of utilization of net operating loss carryforwards for which no tax benefit had previously been recognized, Fresenius USA's income tax provisions for 1994 and 1993 were substantially lower than statutory rates. See Note 17 to Consolidated Financial Statements of Fresenius USA.

Net Income. Net income was $7.2 million in 1994, an increase of $3.5 million, or 93.7%, from 1993.

167

<PAGE>   192

THREE MONTHS ENDED MARCH 31, 1996 COMPARED TO THREE MONTHS ENDED MARCH 31, 1995

Net Sales. Net sales were $81.1 million for the first quarter of 1996, an increase of $12.9 million or 18.9% compared with net sales of $68.2 million for the first quarter of 1995. The increase in sales for the first quarter of 1996 is the result of continued higher unit sales volumes for both hemodialysis and peritoneal dialysis products.

Gross Profit. Gross profit was $25.5 million for the first quarter of 1996, an increase of $4.4 million or 20.6% compared with gross profit of $21.1 million for the first quarter of 1995. Gross profit margin increased from 31.0% for the first quarter of 1995 to 31.5% for the first quarter of 1996.

Selling, General and Administrative Expense and Research and Development Expense. Selling, general and administrative expense and research and development expense were $18.9 million for the first quarter of 1996, an increase of $1.9 million or 11.2% compared with $17.0 million for the first quarter of 1995. These expenses as a percentage of net sales were 23.4% for the

XXX-001986

first quarter of 1996 compared to 25.0% for the first quarter of 1995.

Interest Expense (Net).  Interest expense (net) was $1.4 million for the first quarter of 1996 compared to $1.3 million for the same period of 1995.

Income Tax Expense (Benefit).  Income tax benefit in the first quarter of 1996 was $0.3 million compared to income tax benefit of $0.5 million for the same period in 1995. During the first quarter of 1996, Fresenius USA recognized a tax benefit of approximately $1.0 million compared with $0.8 million during the first quarter of 1995 related to Fresenius USA's net operating loss carryforwards from previous years.

Net Income.  Net income was $5.3 million for the first quarter of 1996, an increase of $2.0 million or 61.1% compared to net income of $3.3 million for the first quarter of 1995. Net income for the first quarter of 1996 and of 1995 included the above tax benefit which resulted from recognition of a portion of Fresenius USA's deferred tax asset related to Fresenius USA's net operating loss carryforwards from previous years.

LIQUIDITY AND CAPITAL RESOURCES

Fresenius USA has historically financed its operations, working capital and capital expenditures through bank borrowings obtained with credit support from Fresenius AG, private placements of Fresenius USA Series F Preferred Stock and Fresenius USA Common Stock to Fresenius AG and internally generated funds. During 1995, Fresenius USA obtained a $20.0 million line of credit from a commercial bank independent of support by Fresenius AG and entered into a sale/leaseback arrangement with a bank without support from Fresenius AG. In addition, during 1994, Fresenius USA successfully completed a public offering of 3,450,000 shares of Fresenius USA Common Stock, realizing proceeds, after payment of expenses, of approximately $16.2 million. Since 1990, Fresenius USA has realized $19.5 million in net proceeds from private placements of Fresenius USA Preferred Stock and Fresenius USA Common Stock to Fresenius AG, all of which was utilized to reduce outstanding obligations to Fresenius AG and affiliated companies.

During 1995, Fresenius USA had a negative cash flow from operations of $1.9 million compared to a positive cash flow of $4.1 million in 1994 and $4.4 million in 1993. This change from prior years is primarily due to the increase of current assets from operations over current liabilities from operations. Current assets increased primarily due to strong fourth quarter sales. As of December 31, 1995, Fresenius USA had cash balances of $2.3 million, and working capital of $13.0 million.

The consideration for the acquired assets in the Abbott Acquisition was (a) $31.0 million cash paid at the closing, (b) $12.5 million payable in installments of $2.5 million each in the years 1994 through 1998 inclusive, discounted to $10.6 million using an imputed interest rate of 5.68%, the first of which was paid in the first quarter of 1994 and (c) a ten-year warrant to purchase 1,750,000 shares of Fresenius USA Common Stock at an exercise price of $8.00 per share (the "Abbott Warrant"), which was valued at $228,000. In addition, Fresenius USA agreed to purchase from Abbott, and Abbott agreed to supply, a stated amount of certain Abbott peritoneal dialysis products in each 12-month period following the Abbott Acquisition closing

168

<PAGE>   193

and ending in February 1998. Over the next two years, the minimum purchase commitments under the agreement are approximately $22.0 million annually.

Fresenius USA obtained funds for the payment at closing of the Abbott Acquisition by borrowing $6.0 million under existing short-term lines of credit and by borrowing $25.0 million under a new, five-year term loan due February 17, 1998 with Dresdner Bank, which carries an interest rate of 5.68% per annum. Repayment is required under this loan at $6.25 million per annum commencing February 15, 1995. Fresenius USA's future acquisition payment obligations to Abbott, as well as additional amounts due for products supplied by Abbott to Fresenius USA, are partially secured by a $10.0 million letter of credit (the "Abbott Letter of Credit").

In 1995, Fresenius USA completed construction of a 104,000 square-foot addition to its manufacturing facility in Ogden, Utah for the manufacture of polysulfone dialyzers. Fresenius USA expended $39.5 million for the construction and equipping of the expanded facility as of March 31, 1996. On March 31, 1995, Fresenius USA entered into a sale/leaseback arrangement with a bank which, as amended, covers the sale by Fresenius USA of approximately $27.0 million of certain new equipment of Fresenius USA's dialyzer manufacturing facility at its Ogden, Utah plant to the bank and the leaseback of the equipment under a four-year operating lease that has renewal options and a purchase option at fair market value. Although the rent payments on the lease are variable based on LIBOR, Fresenius USA has effectively fixed its rent expense through the use of interest rate swap agreements. If Fresenius USA elects not to purchase the equipment or renew the lease at the end of the lease term, Fresenius USA will be obligated to pay a termination fee of up to $20.25 million to be offset by sales proceeds from Fresenius USA remarketing the equipment.

As of December 31, 1995, Fresenius USA had outstanding short-term borrowings of $33.1 million under lines of credit with six commercial banks. In March 1995, Fresenius USA replaced a $15.0 million line of credit supported by Fresenius AG with a $20.0 million line of credit secured by Fresenius USA's accounts receivable. As of December 31, 1995, Fresenius USA had outstanding $7.5 million under this $20.0 million line of credit. These lines of credit provide for total credit availability of $47.0 million. Fresenius AG provided credit

XXX-001987