support to enable Fresenius USA to obtain the five-year term loan, the short-term lines of credit and the Abbott Letter of Credit. In addition, at December 31, 1995, Fresenius USA had fully drawn the amount available under a $3.6 million short-term line of credit with Fresenius AG, the terms of which are similar to those of the lines of credit with the commercial banks described above. At December 31, 1995, Fresenius USA also had outstanding two interest rate swap agreements with a commercial bank for an aggregate amount of $25.0 million. These agreements effectively change Fresenius USA's rent expense on its variable payment operating lease to fixed rates based on 8.02% and 5.60%, respectively.

As of March 31, 1996, Fresenius USA had outstanding short-term borrowings of $35.9 million under lines of credit with six commercial banks. In March 1995, Fresenius USA replaced a $15.0 million line of credit supported by Fresenius AG with a $20.0 million line of credit secured by Fresenius USA's accounts receivable. As of March 31, 1996, Fresenius USA had borrowed $10.3 million under this $20.0 million line of credit. Fresenius USA's lines of credit provide for a total credit availability of $47.0 million. Fresenius AG has provided credit support to enable Fresenius USA to obtain various term loans and short-term lines of credit. In addition, at March 31, 1996, Fresenius USA had fully drawn the amount available under a $3.1 million short-term line of credit with Fresenius AG, the terms of which are similar to those of the lines of credit with the six commercial banks described above.

At March 31, 1996, Fresenius USA had outstanding two interest rate swap agreements with a commercial bank for an aggregate of $25.0 million. These agreements effectively change Fresenius USA's rent expense on its variable payment operating lease to fixed rates based on 8.02% and 5.60%, respectively.

Fresenius USA believes that its committed and possible future bank or other commercial financing, combined with internally generated funds and the sale of additional debt or equity securities, will be sufficient to fund Fresenius USA's working capital requirements and other obligations.

On May 8, 1996, Fresenius USA entered into the Reorganization Agreement. See "THE REORGANIZATION."

For a discussion of recent accounting pronouncements not yet adopted by Fresenius USA, see Note 3 to Consolidated Financial Statements of Fresenius USA.

169

<PAGE>   194

FRESENIUS MEDICAL CARE AG

UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION

The following unaudited pro forma condensed combined statements of earnings and unaudited pro forma condensed combined balance sheet for Fresenius Medical Care (collectively, the "Pro Forma Condensed Combined Financial Information") have been prepared to illustrate the pro forma effects of the proposed transactions in accordance with US GAAP and are based on the assumptions set forth below and in the notes to the Fresenius Worldwide Dialysis Combined Financial Statements and the W. R. Grace & Co. Special-Purpose, Consolidated Financial Statements included elsewhere in this Joint Proxy Statement-Prospectus. The Fresenius Medical Care unaudited pro forma condensed combined statements of earnings are based on the statements of earnings of Fresenius Worldwide Dialysis and Grace for the year ending December 31, 1995 and the three months ending March 31, 1996 and are prepared as if the Reorganization had occurred as of January 1, 1995 and January 1, 1996, respectively. The Fresenius Medical Care unaudited pro forma condensed combined balance sheet is based on the March 31, 1996 balance sheets of Fresenius Worldwide Dialysis and Grace and is prepared as if the Reorganization occurred as of March 31, 1996. The financial statements of Grace on which the Pro Forma Condensed Combined Financial Information is based represent the National Medical Care, Inc. business of Grace only after completing the spin off of New Grace.

The financial statements of Fresenius Worldwide Dialysis and Grace were prepared as if each entity operated as an independent, stand-alone entity for all periods presented. Neither entity is a legal entity, and, as such, the net assets (equity) for each entity represent the excess of its assets over its liabilities and not the capital structure of its parent and reporting entity. The accompanying unaudited condensed combined pro forma financial information does not present historical earnings per share data since the weighted average number of shares associated with each of these combining segments to support such a calculation does not exist. The capital structure of Fresenius Medical Care will consist of 70,000,000 FMC Ordinary Shares issued to Fresenius AG and the shareholders of Fresenius USA and Grace in consideration for the contribution of Fresenius Worldwide Dialysis and Grace to Fresenius Medical Care. Fresenius AG, the public shareholders of Fresenius USA, and the holders of common stock (and options) of Grace will receive 50.3%, 4.9% and 44.8% of the outstanding FMC Ordinary Shares, respectively, on a fully diluted basis.

The Pro Forma Condensed Combined Financial Information does not give effect to certain restructuring and rationalization costs expected to be incurred following the Reorganization. In addition, although Fresenius Medical Care plans to realize cost reductions from the Reorganization and such restructuring and rationalization, no effect has been given in the Pro Forma Financial Statements to any such benefits. However, such cost reduction will be a function of numerous factors, and no assurance can be given that any such cost reduction will be realized over time.

For accounting purposes, the Reorganization will be treated as a purchase of Grace by Fresenius Medical Care. Accordingly, for the purpose of these Pro

XXX-001988

Forma Condensed Combined Financial Statements, the excess of the purchase price of Grace over the historical costs of Grace's assets is reflected in the pro forma condensed combined balance sheet as "excess purchase price over cost" and has been amortized over an estimated composite life in the unaudited pro forma condensed combined statement of earnings. Fresenius Medical Care intends to obtain a valuation study to value existing assets and liabilities and to appropriately allocate the excess purchase price over the cost of the business acquired. Fresenius Medical Care management believes that the composite life used in the pro forma condensed combined statement of earnings will not vary materially from the amounts charged to operations once a valuation study has been completed and existing assets and liabilities have been recorded at their fair values.

The pro forma adjustments recognize the increase in debt that is incurred immediately prior to the Reorganization and the resultant increase in financing costs in the unaudited pro forma condensed combined statement of earnings. In accordance with the Reorganization Agreement, Grace will borrow an amount sufficient to finance the payment to, and assumption of indebtedness of, Grace Chemicals, such that the Debt of Grace on a consolidated basis at the Effective Time, will not exceed $2.273 billion, subject to adjustment as provided therein. See "THE REORGANIZATION -- The Distribution Agreement."

170

<PAGE>   195

For purposes of the Pro Forma Condensed Combined Financial Statements, the Debt of $2,273,000 is comprised at March 31, 1996 of an off-balance sheet working capital facility of $200,000; historical capital lease obligations of $10,239; cash overdrafts of $6,373; $18,800 related to certain accrued expenses; and new debt of $2,037,588. Interest on the new borrowings ranges from LIBOR plus 1.375% to LIBOR plus 1.75% while interest on the off-balance sheet facility is LIBOR plus .50%. (The average LIBOR was 6.026% and 5.432% for the year ended December 31, 1995 and the three-month period ended March 31, 1996, respectively.) Interest also includes commitment fees related to letters of credit. See "FINANCING -- NMC Credit Agreement."

In addition, the acquisition of the minority interest of Fresenius USA has been recorded in the Pro Forma Condensed Combined Financial Statements and the resultant goodwill has been amortized over 40 years. The pro forma adjustments include the elimination of the intercompany activity between Fresenius Worldwide Dialysis and Grace during the year ended December 31, 1995 and the three-month period ended March 31, 1996 and the reclassification of the assets and liabilities as of March 31, 1996. The assets and liabilities of Rena-Med are reclassified to assets held for disposal. The Schiwa net assets and any gains on the disposition of those assets will be retained by Fresenius AG. Certain pro forma adjustments have been made to reflect the results of operations on a stand-alone basis, including the elimination of Grace Chemicals' overhead allocations and the costs of the Grace Chemicals long-term and other incentive plans, that will not be applicable following the Reorganization. Fresenius Medical Care management believes that the estimated added costs for Fresenius Medical Care to operate on a stand-alone basis are reasonable and has made an adjustment to reflect the estimated expenses for Fresenius National Medical Care to operate as an independent entity.

THE PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION IS PROVIDED FOR ILLUSTRATIVE PURPOSES ONLY AND DOES NOT PURPORT TO REPRESENT WHAT THE FINANCIAL POSITION OR RESULTS OF OPERATIONS OF FRESENIUS MEDICAL CARE WOULD ACTUALLY HAVE BEEN IF THE REORGANIZATION HAD IN FACT OCCURRED AS OF THE DATES INDICATED OR TO PROJECT THE COMBINED FINANCIAL POSITION OR RESULTS OF OPERATIONS FOR ANY FUTURE DATE OR PERIOD. THE PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION SHOULD BE READ IN CONJUNCTION WITH THE NOTES THERETO AND THE FINANCIAL STATEMENTS AND RELATED NOTES THERETO CONTAINED ELSEWHERE HEREIN.

171

<PAGE>   196

FRESENIUS MEDICAL CARE AG

UNAUDITED PRO FORMA CONDENSED COMBINED STATEMENT OF EARNINGS
YEAR ENDED DECEMBER 31, 1995

<TABLE>
<CAPTION>

|  | FWD | GRACE | PRO FORMA ADJUSTMENTS | NOTE REFERENCES | ADJUSTED |
|---|---|---|---|---|---|
|  |  |  | (DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA) |  |  |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Net revenues..................... | $896,540 | $2,032,738 | $ (37,423) | 5 | $2,846,871 |
|  |  |  | (31,578) | 9 |  |
|  |  |  | (13,406) | 10 |  |
| Cost of revenues................. | 514,080 | 1,176,093 | 8,788 | 7 | 1,631,171 |
|  |  |  | (1,423) | 5 |  |
|  |  |  | (32,066) | 5 |  |
|  |  |  | (23,141) | 9 |  |
|  |  |  | (11,160) | 10 |  |
| Gross profit................... | 382,460 | 856,645 |  |  | 1,215,700 |
| Operating expenses: |  |  |  |  |  |
| Selling, general and |  |  |  |  |  |
| administrative.............. | 242,990 | 360,960 | (8,657) | 9 | 587,725 |
|  |  |  | (6,566) | 10 |  |
|  |  |  | (5,801) | 6 |  |
|  |  |  | 2,929 | 7 |  |

XXX-001989

| | | | | |
|---|---|---|---|---|
| | | (130) | 7 | |
| | | 2,000 | 6 | |
| Provision for doubtful accounts..................... | -- | 88,858 | | | 88,858 |
| Depreciation and amortization (Excluding $41,693 for Fresenius Worldwide Dialysis).................... | -- | 113,176 | 60,785 | 3 | 178,104 |
| | | | 5,001 | 8 | |
| | | | (321) | 5 | |
| | | | (537) | 10 | |
| Research and development........ | 17,292 | 3,957 | (82) | 9 | 21,167 |
| Allocation of Grace Chemicals expenses..................... | -- | 29,724 | (29,724) | 6 | -- |
| Operating income............... | 122,178 | 259,970 | | | 339,846 |
| Interest, net.................. | 13,064 | 25,534 | 166,920 | 2 | 183,084 |
| | | | 3,571 | 4 | |
| | | | (1,558) | 10 | |
| | | | (24,447) | 2 | |
| Other, net..................... | (6,289) | -- | 2,450 | 9 | (3,481) |
| | | | 358 | 10 | |
| Reduction of carrying amounts of assets to estimated fair values and restructuring costs...................... | -- | 28,923 | (12,400) | 10 | 16,523 |
| Earnings before income taxes...... | 115,403 | 205,513 | | | 143,720 |
| Provision for income taxes........ | 40,577 | 108,616 | (62,674) | 15 | 85,260 |
| | | | (1,259) | 9 | |
| Earnings before minority interest........................ | 74,826 | 96,897 | | | 58,460 |
| Minority interest................. | 5,111 | -- | (5,111) | 8 | 522 |
| | | | 522 | 11 | |
| Net earnings.................... | $ 69,715 | $  96,897 | $(108,674) | | $  57,938 |
| Earnings per ordinary share....... | | | | 16 | $   .83 |
| Earnings per ADS.................. | | | | 16 | $   .28 |

</TABLE>

See accompanying Notes to Unaudited Pro Forma Condensed Combined Financial Information.

172

<PAGE>   197

FRESENIUS MEDICAL CARE AG

UNAUDITED PRO FORMA CONDENSED COMBINED STATEMENT OF EARNINGS
THREE MONTHS ENDED MARCH 31, 1996

<TABLE>
<CAPTION>

| | FWD | GRACE | PRO FORMA ADJUSTMENTS | NOTE REFERENCES | ADJUSTED |
|---|---|---|---|---|---|
| | | | (DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA) | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| Net revenues...................... | $235,060 | $528,291 | $  (9,952) | 5 | $742,914 |
| | | | (7,430) | 9 | |
| | | | (3,055) | 10 | |
| Cost of revenues.................. | 132,854 | 315,433 | 2,145 | 7 | 434,884 |
| | | | (322) | 7 | |
| | | | (6,956) | 9 | |
| | | | (6,091) | 9 | |
| | | | (2,179) | 10 | |
| Gross profit..................... | 102,206 | 212,858 | | | 308,030 |
| Operating expenses: | | | | | |
| Selling, general and administrative................ | 60,832 | 101,447 | (2,327) | 9 | 158,995 |
| | | | (1,190) | 10 | |
| | | | 500 | 6 | |
| | | | 715 | 7 | |
| | | | (42) | 7 | |
| | | | (940) | 6 | |
| Provision for doubtful accounts..................... | | 21,486 | | | 21,486 |
| Depreciation and amortization.... (Excluding $10,268 for Fresenius Worldwide Dialysis)........... | | 30,628 | 16,084 | 3 | 47,834 |
| | | | 1,250 | 8 | |
| | | | (109) | 5 | |
| | | | (19) | 10 | |
| Research and development......... | 3,647 | 686 | (6) | 9 | 4,327 |
| Allocation of Grace Chemicals expenses..................... | | 2,017 | (2,017) | 6 | -- |
| Operating income................. | 37,727 | 56,594 | | | 75,388 |
| Interest, net.................... | 2,824 | 7,004 | 38,644 | 2 | 42,145 |

| | | | | |
|---|---|---|---|---|
| | | | 893 | 4 |
| | | | (351) | 10 |
| | | | (6,869) | 2 |
| Other, net..................... | (1,523) | | 1,284 | 9 | (221) |
| | | | 18 | 10 |
| | --------- | -------- | | | -------- |
| Earnings before income taxes....... | 36,426 | 49,590 | (17,003) | 15 | 33,464 |
| Provision for income taxes......... | 13,067 | 23,145 | (174) | 9 | 19,035 |
| | -------- | -------- | | | -------- |
| Earnings before minority interest.................... | 23,359 | 26,445 | | | 14,429 |
| Minority interest.................. | 1,694 | | (1,694) | 8 | 131 |
| | | | 131 | 11 | |
| | -------- | -------- | -------- | | -------- |
| Net earnings..................... | $ 21,665 | $ 26,445 | $ (33,812) | | $ 14,298 |
| | ======== | ======== | ======== | | ======== |
| Earnings per ordinary share........ | | | | 16 | $  .20 |
| | | | | | ======== |
| Earnings per ADS.................. | | | | 16 | $  .07 |
| | | | | | ======== |

</TABLE>

See accompanying Notes to Unaudited Pro Forma Condensed Combined Financial
Information.

173

<PAGE>  198

FRESENIUS MEDICAL CARE AG

UNAUDITED PRO FORMA CONDENSED COMBINED BALANCE SHEET
MARCH 31, 1996

<TABLE>
<CAPTION>

| | FWD | GRACE | PRO FORMA ADJUSTMENTS | NOTE REFERENCES | ADJUSTED |
|---|---|---|---|---|---|
| | --------- | ----------- | ----------- | ----------- | -------- |
| | | | (DOLLARS IN THOUSANDS) | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| ASSETS | | | | | |
| Current Assets: | | | | | |
| Cash and cash equivalents..... | $ 31,398 | $  33,855 | $  (65,253) | 1 | $    -- |
| Trade accounts receivable, net..................... | 184,324 | 430,013 | (4,577) | 5 | 587,345 |
| | | | (1,160) | 9 | |
| | | | (1,048) | 10 | |
| | | | (20,207) | 2 | |
| Inventories, net.............. | 187,292 | 72,458 | (3,259) | 9 | 253,396 |
| | | | (3,095) | 10 | |
| Prepaid expenses and other current assets............ | 19,702 | 64,252 | (1,101) | 9 | 77,399 |
| | | | (3,543) | 9 | |
| | | | (1,911) | 10 | |
| Deferred income taxes........ | 4,467 | 90,280 | (25) | 9 | 94,722 |
| | -------- | ---------- | | | --------- |
| Total current assets.............. | 427,183 | 690,958 | | | 1,012,862 |
| Property, plant and equipment, net.......................... | 138,754 | 384,163 | (775) | 9 | 519,466 |
| | | | (2,676) | 10 | |
| Intangible assets, net.......... | 65,636 | 962,831 | 200,073 | 8 | 1,228,534 |
| | | | (6) | 9 | |
| Excess purchase price over cost.......................... | -- | -- | 1,785,813 | 3 | 1,785,813 |
| Investments in affiliates....... | 18,786 | -- | | | 18,786 |
| Deferred taxes................. | 3,409 | -- | | | 3,409 |
| Other assets................... | 24,991 | 21,625 | 25,000 | 4 | 71,616 |
| Assets held for disposal........ | | | 554 | 10 | 554 |
| | -------- | ---------- | --------- | | --------- |
| Total Assets................... | $678,759 | $2,059,477 | 1,902,804 | | $4,641,040 |
| | ======== | ========== | ======== | | ========= |

</TABLE>

See accompanying Notes to Unaudited Pro Forma Condensed Combined Financial
Information.

(Continued)

174

<PAGE>  199

FRESENIUS MEDICAL CARE AG

UNAUDITED PRO FORMA CONDENSED COMBINED BALANCE SHEET
MARCH 31, 1996

<TABLE>
<CAPTION>

| | FWD | GRACE | PRO FORMA ADJUSTMENTS | NOTE REFERENCES | ADJUSTED |
|---|---|---|---|---|---|
| | --------- | ----------- | ----------- | ----------- | ----------- |
| | | | (DOLLARS IN THOUSANDS) | | |

XXX-001991

| <S> | <C> | <C> | <C> | | <C> |
|---|---|---|---|---|---|
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | | |
| Current Liabilities: | | | | | |
| Accounts payable...................... | $36,804 | $110,499 | $ (40,228) | 1 | $  95,811 |
| | | | (4,577) | 5 | |
| | | | (693) | 9 | |
| | | | (5,994) | 10 | |
| Accrued expenses..................... | 62,883 | 190,948 | 25,000 | 4 | 285,382 |
| | | | (3,642) | 9 | |
| | | | (2,107) | 10 | |
| | | | 12,300 | 14 | |
| Short-term borrowings................. | 128,842 | -- | 6,373 | 1 | 135,215 |
| Current portion of long-term debt and | | | | | |
| capital lease obligations........... | 18,544 | 158,202 | (153,932) | 2 | 22,814 |
| Income taxes payable.................. | 2,390 | 13,573 | (402) | 9 | 15,486 |
| | | | (75) | 10 | |
| Other current liabilities............. | 15,727 | -- | (641) | 9 | 15,086 |
| Total current liabilities........ | 265,190 | 473,222 | | | 569,794 |
| Long-term debt and capital lease | | | | | |
| obligations, less current portion...... | 22,614 | 28,290 | (22,321) | 2 | 28,583 |
| New debt.............................. | -- | -- | 2,037,588 | 2 | 2,037,588 |
| Other liabilities..................... | 6,517 | 34,702 | (793) | 9 | 40,426 |
| Pension liabilities................... | 16,904 | -- | (892) | 9 | 16,012 |
| Deferred taxes........................ | 805 | 64,618 | 171,177 | 3 | 236,600 |
| Minority interest.................... | 26,870 | -- | (26,870) | 8 | 17,177 |
| | | | 7,439 | 11 | |
| | | | 9,738 | 12 | |
| Total Liabilities.................... | 338,900 | 600,832 | | | 2,946,180 |
| | | | | | -- |
| Stockholders' Equity: | | | | | |
| Capital stock......................... | | | 236,999 | 13 | 236,999 |
| Additional paid in capital............ | | | 1,457,861 | 13 | 1,457,861 |
| Retained earnings..................... | | | -- | | -- |
| Net assets........................... | 339,859 | 1,458,645 | (31,398) | 1 | -- |
| | | | 1,785,813 | 3 | |
| | | | (171,177) | 3 | |
| | | | 226,943 | 8 | |
| | | | (7,439) | 11 | |
| | | | (9,738) | 12 | |
| | | | (1,881,542) | 2 | |
| | | | (2,806) | 9 | |
| | | | (12,300) | 14 | |
| | | | (1,694,860) | 13 | |
| Total Stockholders' Equity....... | 339,859 | 1,458,645 | | | 1,694,860 |
| Total Liabilities and | | | | | |
| Stockholders' Equity.......... | $678,759 | $2,059,477 | $ 1,902,804 | | $4,641,040 |

  </TABLE>

See accompanying Notes to Unaudited Pro Forma Condensed Combined Financial
Information.

175

<PAGE> 200

FRESENIUS MEDICAL CARE AG

NOTES TO UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION
(AMOUNTS IN THOUSANDS)

(1)  Pursuant to the Reorganization Agreement, all cash and cash equivalents of
     Grace and Fresenius Worldwide Dialysis shall be retained by Grace Chemicals
     and Fresenius AG, respectively. See "THE REORGANIZATION." Accordingly, an
     adjustment has been recorded to return the cash balance of $31,398 to
     Fresenius AG with an offsetting decrease in the net assets of Fresenius
     Worldwide Dialysis. At March 31, 1996, Grace recorded an adjustment for
     $40,228 to reclassify its outstanding checks to accounts payable. An
     adjustment has therefore been recorded to eliminate the Grace financial
     statement cash balance of $33,855; reverse the $40,228 reclassification
     entry to accounts payable, and to reclassify the remaining cash overdraft
     of $6,373 to short-term borrowings.

(2)  For purposes of the Pro Forma Condensed Combined Financial Statements,
     Grace will incur new debt of $2,037,588 prior to the Reorganization to be
     used for payment of the Grace dividend of $1,881,542. Grace's Debt is
     subject to adjustment in accordance with the Reorganization Agreement. See
     "THE REORGANIZATION -- The Distribution Agreement."

     Grace's Debt of $2,273,000 is comprised of an off-balance sheet working
     capital facility of $200,000; historical capital lease obligations of
     $10,239; cash overdrafts of $6,373, $18,800 related to certain accrued
     expenses, and new debt of $2,037,588. See "FINANCING -- NMC Credit
     Agreement." Interest on the new borrowings ranges from LIBOR plus 1.375% to
     LIBOR plus 1.75% while interest on the off-balance sheet facility is LIBOR
     plus .50% (the average LIBOR was 6.026% and 5.432% for the year ended
     December 31, 1995 and the three-month period ended March 31, 1996,
     respectively). Interest also includes commitment fees related to letters of
     credit. See "FINANCING -- NMC Credit Agreement."

     Based upon the above, adjustments to record the new debt of $2,037,588,

XXX-001992

eliminate existing Grace debt (except for capital lease obligations and cash overdrafts) of $176,253, and to reduce the equity of Grace by $1,881,542 for the payment of the Grace dividend have been recorded. In addition, an adjustment has been recorded for $20,207 to reduce accounts receivable for the difference between the off-balance sheet working capital facility of $179,793 at March 31, 1996 and the facility of $200,000 to be established prior to the Reorganization.

Adjustments have also been recorded to eliminate Grace interest expense (less the interest on capital lease obligations retained) of $24,447 and $6,869 for the year ended December 31, 1995 and the three-month period ended March 31, 1996, respectively. Correspondingly, interest expense on the total new debt (including the working capital facility) was recorded at the above noted rates for $166,920 and $38,644 for the year ended December 31, 1995 and the three-month period ended March 31, 1996, respectively.

(3)  Adjustments have been made to record the excess purchase price over the carrying value of the Grace assets and liabilities acquired of $1,785,813 and to establish a deferred tax liability of $171,177, representing the estimated tax effect of specifically identified assets to be increased to fair value. The excess purchase price over the historical cost has not been allocated to specifically identified assets nor has the unidentified portion been treated as goodwill. Fresenius Medical Care management intends to undertake a valuation study to record the assets and liabilities acquired at their fair market value.

Amortization of the excess purchase price in the amounts of $61,005 and $16,139 for the year ended December 31, 1995 and the three-month period ended March 31, 1996, respectively, approximating a composite life of 29.4 years and 27.8 years for the year ended December 31, 1995 and the three-month period ended March 31, 1996, respectively, have been recorded in the unaudited pro forma condensed combined income statements. These amounts were determined by using a recently completed Grace valuation study as an estimate of the amounts that will be recorded upon the completion of the Fresenius Medical Care valuation. Fresenius Medical Care management believes that the amortization recorded in the pro forma financial statements will not vary materially from the amounts that will be recorded once its valuation study is completed.

176

<PAGE>  201

Adjustments were made for $10,735 and $3,038 for the year ended December 31, 1995 and the three-month period ended March 31, 1996, respectively, to reduce income tax expense for the estimated tax effect for amortization of the estimated specifically identified assets that will be recorded at fair value.

(4)  Adjustments have been made to record estimated net financing costs of $25,000 for new debt under the NMC Credit Agreement and to amortize such debt over the seven year life of the financing.

(5)  Adjustments have been made to eliminate intercompany balances and activity between Grace and Fresenius Worldwide Dialysis at March 31, 1996 and for the three-month period then ended and for the year ended December 31, 1995.

(6)  An adjustment has been made for the year ended December 31, 1995 and the three-month period ended March 31, 1996 to eliminate historical overhead allocations from Grace of $29,724 and $2,017; to eliminate the expense of the Grace long term and other incentive plan of $17,940 and $2,100 and to establish an estimate of new replacement incentive compensation arrangements of $7,500 and $1,875; and to record the estimated expenses to operate on a stand-alone basis of $4,639 and $1,160 resulting in net benefits of $5,801 and $940, respectively. Adjustments have also been made to record incremental overhead expenses related to Fresenius Medical Care corporate of $2,000 and $500 for the year ended December 31, 1995 and the three-month period ended March 31, 1996, respectively.

(7)  An adjustment has been made to record expenses under the proposed operating lease for land and buildings in Germany of $11,717 for the year ended December 31, 1995. In addition, a pro rata adjustment of $2,860 has been recorded for the three month period ended March 31, 1996. See "THE REORGANIZATION -- Continuing Arrangements between Fresenius Medical Care and Fresenius AG."

(8)  An adjustment has been made to record the acquisition of the Fresenius USA minority interest and option holders for $226,943. An adjustment has been made to amortize the resultant goodwill of $200,073 over a 40 year life.

(9)  An adjustment has been made to reclassify the assets and liabilities of Schiwa as net assets held for sale at March 31, 1996 and to reverse all income statement activity for the year ended December 31, 1995 and the three-month period ended March 31, 1996. The Schiwa net assets of $2,806 and any gains on the disposition of those assets will be retained by Fresenius AG. Accordingly, the net assets of Schiwa have been removed from Fresenius Medical Care. See "THE REORGANIZATION -- Conditions."

(10)  An adjustment has been made to reclassify the assets and liabilities of Rena-Med as net assets held for sale at March 31, 1996 and to reverse all activity for the three-month period then ended and for the year ended December 31, 1995. See "THE REORGANIZATION -- Conditions."

(11)  Adjustments have been made to record the Grace Preferred Stock existing prior to the Reorganization of $7,439 as a minority interest and to record

XXX-001993

the related dividends of $522 and $131 for the year ended December 31, 1995 and the three-month period ended March 31, 1996, respectively, as minority interest expense.

(12) An adjustment has been made to record the New Preferred Stock to be issued in the Reorganization at its par value of $.10 per share for 97,375 shares outstanding of FNMC in minority interest.

(13) An adjustment has been made to establish the capital structure of Fresenius Medical Care at 70 million shares with a par value per share of $3.39 (DM 5), with the remaining net asset balance recorded as additional paid in capital.

(14) An adjustment has been recorded to accrue $12,300 for transition related expenses, including retention and stock incentive distributions, to be paid to employees subsequent to closing.

(15) Adjustments have been made to reflect the tax effects of the pro forma adjustments described in notes 2, 3, 4, 5, 6 and 7 above. The adjustments to record the costs of incremental Fresenius Medical Care corporate expense and the lease of German land and buildings were given a German tax adjustment of 47%; all other adjustments received tax adjustments of 40%.

(16) Earnings per FMC Ordinary Share and earnings per ADS have been calculated as if all shares of Fresenius Medical Care stock were outstanding as of the beginning of each respective period presented.

177

<PAGE>   202

## MANAGEMENT OF FRESENIUS MEDICAL CARE

GENERAL

In accordance with the German Stock Corporation Law, Fresenius Medical Care has a Supervisory Board and a Management Board. The two Boards are separate and no individual may simultaneously be a member of both Boards.

THE SUPERVISORY BOARD

Following consummation of the Reorganization, the FMC Supervisory Board will consist of six members. Pursuant to the Pooling Agreement described under "DESCRIPTION OF THE POOLING AGREEMENT," at least one-third (but no fewer than two) of the members of the FMC Supervisory Board elected by the shareholders are required to be "Independent Directors," i.e., persons with no substantial business or professional relationship with either of Fresenius Medical Care, Fresenius AG or any affiliate of either of them. For a discussion of the terms of the Fresenius Medical Care Pooling Agreement, see "DESCRIPTION OF THE POOLING AGREEMENT."

The term of a member of the FMC Supervisory Board will expire at the end of the general meeting of shareholders after the fourth fiscal year following the year in which such member was elected, but not counting the fiscal year in which such member's term begins. Any member of the FMC Supervisory Board elected by the shareholders in a general meeting may be removed by three-fourths of the votes cast by the shareholders in a general meeting. The FMC Supervisory Board ordinarily acts by simple majority vote and the Chairman has a casting vote (i.e., the deciding vote) in case of any deadlock.

The principal function of the FMC Supervisory Board is to appoint and to supervise the FMC Management Board and to approve the mid-term planning and certain matters which are not in the ordinary course of business and are of fundamental importance to Fresenius Medical Care. For additional information with respect to the functions of the FMC Supervisory Board, see "COMPARISON OF CERTAIN RIGHTS OF SHAREHOLDERS OF GRACE AND FRESENIUS USA."

MEMBERS OF THE FMC SUPERVISORY BOARD

Set forth below are names, ages, and principal occupations of the persons who as of the Effective Time are expected to be the members of the FMC Supervisory Board.

<TABLE>
<CAPTION>

| NAME | AGE |
| --- | --- |
| <S> | <C> |
| Dr. Matthias Schmidt, Chairman.................................. | 37 |
| Dr. Dieter Schenk, Deputy Chairman............................. | 44 |
| Dr. Eckart O. Ebner............................................ | 58 |
| Donald L. Staheli(1)........................................... | 64 |
| Bernhard Walter................................................ | 54 |
| Walter L. Weisman(1)........................................... | 61 |

</TABLE>

- ---------------
(1) Independent Director

Dr. Matthias Schmidt has served as president of the Pharmaceuticals Division of Fresenius AG since October 1986 and a member of the Management Board of Fresenius AG since July 1987. Dr. Schmidt is also director of Hemosol Inc., a Canadian development-stage biopharmaceutical company listed on the Toronto Stock Exchange and engaged in development of a human blood substitute and stem cell research.

XXX-001994

Dr. Dieter Schenk is an attorney and tax advisor and has been a partner in the law firm of Norr, Stiefenhofer & Lutz since 1986. Dr. Schenk is also a member and vice-chairman of the Supervisory Board of Greiffenberger AG. Greiffenberger AG is a German corporation listed on the Munich Stock Exchange that manufactures specialty steel and machine tools.

178

<PAGE>   203

Dr. Eckart O. Ebner is a public accountant and tax advisor and has been a partner in the accounting firm of Dr. Ebner, Dr. Stolz and Partner, Stuttgart, since 1974. Dr. Ebner is also a member of the advisory board of Drescher GmbH, Ruteshelm. Drescher is an internationally operating communication company. He is also a member of the advisory committee with Georg Thieme Verlag, Stuttgart, an international publishing company.

Donald L. Staheli is Chairman of the Board and Chief Executive Officer of Continental Grain Company, an international agribusiness and financial services concern. Mr. Staheli joined Continental Grain Company in 1969, and was elected President in 1984, Chief Executive Officer in 1988 and Chairman of the Board in 1994. Mr. Staheli serves as a Director of Prudential Life Insurance Company of America, Bankers Trust New York Corporation and ContiFinancial Corporation. He is Chairman of the U.S.-China Business Council, a Director of the New York City Partnership, a member of the Council on Foreign Relations, and a member of the Board of Trustees for the American Graduate School of International Business.

Bernhard Walter has been a member of the Board of Managing Directors of Dresdner Bank AG since prior to 1991. Mr. Walter is also a member of the Supervisory Boards of various companies in Germany and other European countries.

Walter L. Weisman is a private investor and a former Chairman and Chief Executive Officer of American Medical International, Inc. ("AMI"). Mr. Weisman joined AMI in 1972, was elected President in 1979 and served as Chief Executive Officer from 1985 to 1988. Mr. Weisman is a Vice-Chairman of the Board of the California Institute of Technology and Chairman of its Institute Relations Committee, a Trustee of Harvey Mudd College, a Trustee of the Los Angeles County Museum of Art, Chairman of the Board of the Sundance Institute, a Trustee of the Ashland Shakespeare Festival, and a Director of Price REIT, Inc. and Clinical Micro Sensors, Inc.

FMC SUPERVISORY BOARD COMPENSATION

The members of the FMC Supervisory Board will receive no compensation from Fresenius Medical Care until the Effective Time. Fresenius Medical Care will pay an annual retainer fee of DM 60,000 to each member of the FMC Supervisory Board, with the Chairman to be paid twice that amount and the Deputy Chairman to be paid 150% of that amount. All FMC Supervisory Board members will be compensated for their reasonable travel and accommodation expenses incurred with respect to their duties as FMC Supervisory Board members.

FMC MANAGEMENT BOARD AND CERTAIN OTHER EXECUTIVE OFFICERS

Each member of the management board of Fresenius Medical Care (the "FMC Management Board") is appointed by the FMC Supervisory Board for a maximum term of five years and is eligible for reappointment thereafter.

Set forth below are names, ages, positions and terms of office of the persons who as of the Effective Time are expected to be the members of the FMC Management Board.

<TABLE>
<CAPTION>

| NAME | AGE | POSITION | YEAR TERM EXPIRES |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| Dr. Gerd Krick...................... | 57 | Chairman of the FMC Management Board; Chief Executive Officer | 2001 |
| Mathias R. Klingler................. | 43 | Chief Executive Officer for Europe, Asia Pacific and Latin America | 2001 |
| Dr. Ben J. Lipps.................... | 55 | Chief Executive Officer for North America | 2001 |
| Udo Werle........................... | 51 | Chief Financial Officer | 2001 |

</TABLE>

Dr. Gerd Krick has been Chairman of the Fresenius AG Management Board since 1992. Prior to 1992, he was a Director of the Medical Systems Division of Fresenius AG and Deputy Chairman of the Fresenius

179

<PAGE>   204

AG Management Board. Dr. Krick was elected as a director of Fresenius USA in October 1987, became Chairman of the Fresenius USA Board in October 1989 and continues to serve in that capacity. Dr. Krick is also a director of Gull Laboratories, Inc., a publicly-held manufacturer and distributor of diagnostic test products.

Mathias R. Klingler has been President of the Dialysis System Division of Fresenius AG since April 1993. From 1992 to April 1993 he held the position of Executive Vice President of Dialysis Systems International at Fresenius AG. From

XXX-001995

1987 to 1992 he was General Manager of Pacesetter Systems GmbH and of Siemens AG after it acquired Pacesetter Systems GmbH. Mr. Klingler is a director of Fresenius USA.

Dr. Ben J. Lipps has served as President, Chief Executive Officer, Chief Operating Officer and a director of Fresenius USA since October 1989, and in various capacities with Old FUSA since 1985. Dr. Lipps joined Dow Chemical Company in 1966 and led the research team that developed the first hollow fiber dialyzer between 1967 and 1969. Prior to joining Old FUSA, Dr. Lipps was a Vice President of research and development for Cordis Dow Corporation.

Mr. Udo Werle has been Chief Financial Officer and Labor Relations Director of Fresenius AG since January 1994. Mr. Werle was previously a member of the Management Board of ABB Kraftwerke AG, Mannheim. In his last position as President of ABB Power Ventures Ltd., Zurich/Mannheim, he was responsible for all cooperation and joint ventures for the Power Generation segment. Mr. Werle joined ABB Power Ventures Ltd. in 1970.

Set forth below are the names, ages and positions of the present executive officers of Fresenius AG's Dialysis Systems Division, Fresenius USA and NMC. It is expected that the officers of these companies will be substantially the same following the Reorganization.

| NAME | AGE | POSITION |
|------|-----|----------|
| FRESENIUS AG -- DIALYSIS SYSTEMS DIVISION | | |
| Matthias Klingler | 43 | President and Chief Operating Officer |
| FRESENIUS USA | | |
| Dr. Gerd Krick | 57 | Chairman of the Board |
| Dr. Ben J. Lipps | 55 | President, Chief Executive Officer and Chief Operating Officer |
| Robert E. Farrell | 46 | Corporate Group Vice President -- Administration, General Counsel and Clerk |
| Heinz J. Schmidt | 44 | Corporate Group Vice President -- Finance and Treasurer |
| Scott Walker | 47 | Corporate Group Vice President -- Regulatory Affairs |
| NMC | | |
| Geoffrey W. Swett | 47 | President of the Dialysis Services Division |
| John S. Walker | 55 | President of the Medical Products Group |
| Peter F. Spears | 49 | President of NMC Homecare |
| Robert W. Armstrong, III | 46 | Vice President and Controller |
| A. Miles Nogelo | 52 | Vice President and Treasurer |
| Christopher T. Ford | 46 | President of International Dialysis Services |
| Philip J. Glassanos | 44 | Vice President -- Managed Care |
| William F. Grieco | 42 | Senior Vice President and General Counsel |

180

| NAME | AGE | POSITION |
|------|-----|----------|
| Richard K. Hayden | 57 | Vice President of Corporate Information Services |
| John Michael Lazarus, M.D. | 58 | Senior Vice President and Medical Director |
| Thomas L. Saltonstall | 47 | Vice President for Human Resources |
| Edward E. Berger | 50 | Vice President for Government Relations and External Affairs |

Robert Farrell joined Fresenius USA as Chief Financial Officer, General Counsel, Treasurer and Clerk in April 1991. In March 1992, he became Vice President -- Administration of Fresenius USA and ceased serving as Chief Financial Officer and Treasurer. In October 1995, he was promoted to Corporate Group Vice President -- Administration of Fresenius USA. From December 1985 until joining Fresenius USA, he served as Vice President -- Corporate Finance of Genstar Corporation, a Canadian corporation involved in the building products, food service and financial services industries. He holds a Bachelor of Arts degree from the University of Notre Dame and a Juris Doctor degree from Hastings College of Law, University of California. Mr. Farrell is a member of the California bar.

Heinz Schmidt joined Fresenius USA as Vice President -- Finance and Treasurer in March 1992. In October 1995, he was promoted to Corporate Group Vice President -- Finance and continues to serve as Treasurer. Since March 1988, he has served as Vice President -- Finance and Administration for Old FUSA (and continues to serve in that office). Mr. Schmidt also served as Vice President -- Finance and Administration for Seratronics from August 1986 to February 1988. Mr. Schmidt holds a Bachelor of Arts degree from California State University, Dominguez Hills, and a Masters Degree in Finance from Loyola Marymount University of California.

XXX-001996

Scott Walker joined Old FUSA in 1988 as Director of Quality Assurance, later served as Product Manager, Reuse Systems, became Vice President -- Regulatory Affairs of Fresenius USA in March 1992, and was promoted to Corporate Group Vice President -- Regulatory Affairs in October 1995. Since 1982, Mr. Walker has also worked with Seratronics, and is currently Vice President -- Technical Services for Seratronics. From 1970 to 1982, Mr. Walker held various positions with Dow Chemical relating to research and production of hollow fiber dialyzers and other medical products. Mr. Walker holds a Bachelor of Science degree from the University of California at Berkeley.

Geoffrey W. Swett has spent over 16 years with NMC. He is currently President of the Dialysis Services Division. Prior to his current position, he was a Senior Vice President in DSD. Before joining NMC, Mr. Swett worked in various administration positions within various hospitals. Mr. Swett received his undergraduate degree from Harvard College.

John S. Walker has spent four years with NMC and is currently the President of the Medical Products Group. Prior to his current appointment, Mr. Walker served as the Executive Vice President of the Medical Products Group. Previously, Mr. Walker served as President of Anaquest Pharmaceuticals and Group Vice President of Ohmeda Patient Monitoring System Group, both operating divisions of BOC Group, plc and as the Director of Corporate Strategic Planning for the Health Technologies Group of Warner Lambert. Mr. Walker received his undergraduate degree from Harvard College and an MBA degree from Columbia University.

Peter F. Spears has spent seven years with NMC as the President of NMC Homecare. Prior to joining NMC, Mr. Spears spent 17 years in the medical products industry in various marketing, sales and general management positions with Baxter International, Johnson & Johnson, C.R. Bard and Bristol-Meyers Squibb. Mr. Spears received his undergraduate degree from the University of Massachusetts and his MBA degree from Harvard University.

Robert W. Armstrong, III has spent over 15 years with NMC and is currently the Vice President and Controller of NMC. Prior to his current appointment, Mr. Armstrong served as NMC's Audit Manager and as the Director, Financial Reporting & Budgeting. Prior to joining NMC, Mr. Armstrong worked as an Audit

181

<PAGE>    206

Supervisor with Deloitte & Touche and as a Materials Manager with ATI, Inc. Mr. Armstrong received his undergraduate degree from Bowdoin College and his MBA degree from the University of Pennsylvania.

A. Miles Nogelo has spent 15 years with NMC and is currently the Vice President and Treasurer of NMC. From 1985-1995 Mr. Nogelo also served as NMC's Chief Financial Officer. Prior to joining NMC, Mr. Nogelo worked in financial management with General Foods and as a Partner with Paul Dean Investments. He also served as the Assistant Treasurer at the Ludlow Corporation. Mr. Nogelo received his undergraduate degree from Tufts University and his MBA degree from Harvard University.

Christopher T. Ford has spent 25 years with NMC and is currently President of International Dialysis Services. Prior to his current appointment, Mr. Ford served as Director, Vice President of Operations and Senior Vice President for the Domestic Dialysis Services Division. Mr. Ford received an undergraduate degree from Northeastern University.

Philip J. Glassanos joined NMC in October 1995 as the Vice President -- Managed Care of NMC. From June 1992 to September 1995, Mr. Glassanos was Executive Vice President of Braintree Hospital and Vice President of Braintree Rehabilitation Ventures, Inc., and from April 1987 to June 1992 Mr. Glassanos was Senior Vice President -- Marketing, Planning and Development of South Shore Hospital, Inc. Mr. Glassanos received his undergraduate degree and his graduate degree in Public Health from Tufts University and his Masters of Public Health from the University of Michigan.

William F. Grieco joined NMC in October 1995 as Senior Vice President and General Counsel. Prior to that, Mr. Grieco was a partner in the law firm of Choate, Hall & Stewart, where he maintained a diversified health care practice. Mr. Grieco received his undergraduate degree and his law degree from Boston College, and a graduate degree in health policy and management from Harvard University.

Richard K. Hayden has spent three years at NMC and is currently the Vice President of Corporate Information Services. From 1990 to 1993, Mr. Hayden was Senior Vice President of Industrial Operations for Metcalf & Eddy, Inc., an environmental engineering firm. Previously he held positions in information services and operations with Cabot Corporation, a chemical manufacturer, GSX Corporation and SCA Services, waste services companies, and Finast Supermarkets. Mr. Hayden received undergraduate degrees from Northeastern University and Bentley College and an MBA degree from Boston College.

John Michael Lazarus, M.D. has been affiliated with NMC in a professional capacity for 23 years and has served as a consultant to NMC since 1982. Dr. Lazarus joined NMC as Senior Vice President and Medical Director on April 1, 1996. Dr. Lazarus received his undergraduate degree from the University of North Carolina and his medical degree from Tulane University. Prior to joining NMC, Dr. Lazarus was an Associate Professor of Medicine at Harvard Medical School and Senior Physician and Director of Clinical Services for Nephrology at the Brigham and Women's Hospital.

Thomas L. Saltonstall joined NMC in 1994 and is currently the Vice

XXX-001997

President for Human Resources. From 1992 to 1993, Mr. Saltonstall worked as a Vice President, Human Resources with The Boston Company, a financial services corporation, and from 1988 to 1992 he served in similar positions with Fleet Bank of Massachusetts and the Bank of New England. Mr. Saltonstall received an undergraduate degree from Harvard College and an MPA degree from Harvard University.

Edward E. Berger has spent 12 years with NMC and is currently the Vice President for Government Relations and External Affairs. Prior to joining NMC, Mr. Berger was a health care management and policy consultant, and an administrator and faculty member at Boston University. Mr. Berger received an undergraduate degree from Harvard College and a Ph.D. in Political Science from Boston University.

COMPENSATION OF THE FMC MANAGEMENT BOARD AND CERTAIN OTHER EXECUTIVE OFFICERS

The members of the FMC Management Board and the executive officers named above will receive no compensation from Fresenius Medical Care until the Effective Time. Certain of the members of the FMC Management Board are presently members of Fresenius AG management or directors and officers of Fresenius USA, and are entitled to compensation and certain other employment benefits from their respective

182

<PAGE>    207

companies. See "-- Historical Compensation" for a discussion of such matters. It is anticipated that Dr. Krick and Mr. Werle will continue to hold their positions with Fresenius AG and to receive compensation for their services to that company.

Fresenius Medical Care intends to implement appropriate long-term, performance-based executive compensation plans for the management of Fresenius Medical Care, consistent with industry practices. In this regard, Fresenius Medical Care has engaged a benefits consulting firm to consider and recommend appropriate plans to Fresenius Medical Care.

STOCK OPTION PLAN

Fresenius Medical Care intends to implement a Stock Option Plan (the "FMC Plan") pursuant to which certain Fresenius USA and NMC management and executive employees would be issued rights to acquire ADSs representing non-voting preferred bearer shares of Fresenius Medical Care (the "FMC Preferred Shares"). Each ADS will represent one-third of a non-voting FMC Preferred Share. It is anticipated that rights to purchase an average of approximately 800,000 ADSs per year would be issued over a five-year period to eligible FMC Plan participants, currently approximately 350 employees, although such annual amount may increase or decrease in any year, depending on the performance of Fresenius Medical Care's North American operations. Certain management employees would receive initial grants intended to cover a three-year period; other grants would be made annually. Grants under the FMC Plan would be in the form of convertible bonds (the "Bonds"). The FMC Plan would be adopted, and the initial issuance of Bonds would be made, subject to the receipt of a ruling from the IRS that the Bonds are the equivalent of nonqualified employee stock options for U.S. federal income tax purposes.

The Bonds would be convertible into ADSs at a price equal to the fair market value of the underlying FMC Preferred Shares as of the day following the day on which the right to purchase the Bonds is granted (the "Anniversary Date"). For Bonds issued before the FMC Preferred Shares are traded, fair market value on the Anniversary Date will be determined by an investment banking firm. The Bonds, which are expected to be Deutschemark denominated, would have a face amount equal to the nominal value of the FMC Preferred Shares multiplied by the number of FMC Preferred Shares represented by the ADSs into which the Bonds may be converted and would bear interest at a rate per year to be determined. It is contemplated that the right to convert the Bonds would vest over a period of three years following the Anniversary Date. Upon vesting, the Bonds would be convertible in whole or in part, subject to appropriate adjustment in the event of partial conversion.

Fresenius Medical Care would lend to each FMC Plan participant wishing to purchase Bonds the amount of the purchase price of the Bonds (the "Loan"), which Loan would bear interest at the same rate as the interest rate on the Bonds. The Bonds would be non-assignable and non-transferrable during the employee's lifetime, and would be convertible during employment for 10 years. Upon termination of employment on account of retirement, disability or death, an employee or his or her representative would have an additional year to convert. Generally, upon termination for any other reason, the employee would have 90 days to convert. If the Bonds were not converted, Fresenius Medical Care would mandatorily redeem the Bonds by cancelling the Loan.

At the time of conversion, the employee would be subject to U.S. income taxes equal to the value of the ADSs less the conversion price and would be required to remit to his or her employer company any required withholding taxes. Employees may also be required to file with Fresenius Medical Care or its designated agent as a protective measure, a form sufficient under German law to elect benefits under the U.S.-German income tax treaty (the "Treaty") if the German taxing authorities take the position that the interest on the Bonds is otherwise subject to German withholding tax.

Employment and Consulting Agreements

Following the Reorganization, it is expected that Fresenius Medical Care will have employment agreements with Dr. Gerd Krick, Mathias R. Klingler, Dr.

XXX-001998

Ben J. Lipps and Udo Werle.

183

<PAGE>    208

In June 1996, Dr. Constantine L. Hampers resigned all offices and
directorships he held with Grace and its subsidiaries, including NMC. Under the
terms of an agreement providing for his resignation, Dr. Hampers will continue
to receive salary (at the annual rate of $875,270), as well as specified
benefits, until December 31, 1996, at which time he will become eligible to
commence receiving the pension benefit provided under his previous employment
agreement with Grace Chemicals. He will also be entitled to participate in
Grace's Annual Incentive Compensation Program for 1996 and to receive any awards
earned under Grace's Long-Term Incentive Program (the "LTIP") for the 1994-1996
and 1995-1997 performance periods (with the award for the 1995-1997 performance
period to be paid on a pro rata basis). In connection with Dr. Hampers'
resignation, a five-year consulting agreement between Dr. Hampers and Grace,
under which Dr. Hampers would have received consulting fees of approximately
$500,000 per year, was cancelled, subject to the execution of the agreement
described below. In addition, as contemplated by his former employment agreement
with a Grace subsidiary, Dr. Hampers was granted the right to purchase a
corporate aircraft from Grace for its fair market value (subject to certain
adjustments), as well as an automobile previously provided for his use. Dr.
Hampers has subsequently agreed to purchase the aircraft from Grace for
approximately $19,000,000.

Dr. Hampers has reached an agreement to serve, following the
Reorganization, as a consultant to Fresenius Medical Care, reporting to Dr. Gerd
Krick, who is the chief executive officer of Fresenius AG and who will serve as
the chief executive officer of Fresenius Medical Care following the
Reorganization. Under the terms of the agreement, Dr. Hampers will receive a $6
million fee from Fresenius Medical Care conditioned upon the successful
completion of the Reorganization as well as a consulting fee of $500,000 per
year for two years.

   Historical Compensation

The aggregate amount of compensation paid by Fresenius AG to the members of
Fresenius AG management who, as of the Effective Time, are expected to be
members of the FMC Management Board, during the year ended December 31, 1995,
was approximately $2,377,500. For a discussion of the historical compensation of
Dr. Lipps, see "FRESENIUS USA EXECUTIVE COMPENSATION."

184

<PAGE>    209

                              SECURITY OWNERSHIP

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT OF FRESENIUS
MEDICAL CARE

The outstanding share capital of Fresenius Medical Care consists of FMC
Ordinary Shares which are issued only in bearer form. Accordingly, except
insofar as Fresenius Medical Care may be informed of the acquisition of
beneficial ownership of FMC Ordinary Shares through reports filed under Section
13 of the Exchange Act or through the German statutory requirements referred to
herein, Fresenius Medical Care has no way of determining who its shareholders
are or how many shares any particular shareholder owns. Under the new German
Securities Exchange Law, which became effective on January 1, 1995 (the "German
Securities Law"), holders of voting securities of a German company listed on a
stock exchange within the EU are required to notify the company of the level of
their holding whenever such holding reaches, exceeds or falls below certain
thresholds, which have been set at 5%, 10%, 25%, 50% and 75% of a company's
outstanding voting rights. In addition, all persons holding 51 or more of the
voting rights of a German listed stock corporation were required to provide the
corporation with an initial notification of the level of their holding prior to
the first annual general meeting of such company held after April 1, 1995. In
addition, under the German Stock Corporation Law, notification to a company is
required upon acquisition of 25% and 50% of the voting securities of the
company.

To the best knowledge of Fresenius Medical Care, the only person that will
beneficially own more than 10% of the FMC Ordinary Shares outstanding upon
consummation of the Reorganization will be Fresenius AG. To the best knowledge
of Fresenius Medical Care, upon consummation of the Reorganization, members of
the FMC Supervisory Board and the FMC Management Board, as a group, will not
hold any FMC Ordinary Shares or ADRs evidencing ADSs, except that, Dr. Gerd
Krick will receive approximately 364 ADSs in respect of shares of Grace Common
Stock held by him, and to the extent that Dr. Lipps does not sell all of the
options held by him to purchase 450,000 shares of Fresenius USA Common Stock, he
will receive ADSs with respect to any shares of Fresenius USA Common Stock
acquired upon exercise of such options and options to purchase FMC Ordinary
Shares in exchange for any unexercised options.

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT OF FRESENIUS AG

The share capital of Fresenius AG consists of Fresenius AG Ordinary Shares
and non-voting preference shares, nominal value DM 5 per share ("Fresenius AG
Preference Shares"), both of which are issued only in bearer form. Accordingly,
Fresenius AG has no way of determining who its shareholders are or how many
shares any particular shareholder owns. However, under the German Stock
Corporation and Securities Law, holders of voting securities of a German company
listed on a stock exchange within the EU are obligated to notify the company of
certain levels of holdings, as described above.

XXX-001999

Fresenius AG has been informed that the Foundation owns 55.96% of the Fresenius AG Ordinary Shares. The Foundation serves to promote medical science, primarily in the fields of research and treatment of illnesses, including the development of apparatuses and preparations. The Foundation may promote only those research projects the results of which will be generally accessible to the public. The Foundation further serves to promote the education of physicians or of others concerned with the treatment and care of sick persons, primarily those working in the field of dialysis, as well as to promote the education of particularly gifted pupils and students. Effective May 1, 1996, the administrative board of the Foundation consists of Mr. Hans Kroner (Chairman), Mr. Hans Goring (Vice Chairman), Frankfurt/Main and Professor Dr. Volker Lang, Gauting. Until May 1, 1996, Mr. Kroner was a member of the Supervisory Board of Fresenius AG (the "Fresenius AG Supervisory Board"). Pursuant to the terms of the will of the late Mrs. Else Kroner, under which the Foundation acquired most of its shares, Mrs. Kroner's executors exercise voting and dispositive power over the shares held by the Foundation. The executors under Mrs. Kroner's will are Mr. Kroner and Dr. Alfred Stiefenhofer. Mr. Kroner's address is Dipl. Volkswirt Hans Kroner, Postfach. 1852, 61288 Bad Homburg v.d.H., Germany. Dr. Stiefenhofer's address is Norr, Stiefenhofer & Lutz, Brienner Strasse 28, 80333 Munich, Germany. Dr. Stiefenhofer is Chairman of the Fresenius AG Supervisory Board. In addition, on March 28, 1995, "AW-Beteiligungs-GmbH ("AW") informed Fresenius AG that it owns 9% of the Fresenius AG Ordinary Shares and 15% of the Fresenius AG Preference Shares, and on May 4, 1995, H.O.F.-Beteiligungs-

<div align="center">185</div>

<PAGE>  210

GmbH ("HOF") informed Fresenius AG that it owns 22.4% of the Fresenius AG Ordinary Shares. According to published reports, HOF is 50%-owned by Dresdner Bank AG and 50%-owned by the Foundation. Pursuant to a pooling agreement relating to the shares held by AW and HOF, the Foundation has voting power over the shares held by AW and HOF. Accordingly, through (i) their dispositive power over the shares of Fresenius AG held by the Foundation and (ii) their power to direct the vote of the shares held by the Foundation (including the shares subject to the pooling agreement), Dr. Stiefenhofer and Mr. Kroner may be deemed to beneficially own (under the rules of the Commission, as distinguished from the German concept of beneficial ownership), 87.36% of the voting shares of Fresenius AG.

To the best knowledge of Fresenius AG, as of December 31, 1995, members of the Fresenius AG Supervisory Board and the Fresenius AG Management Board, as a group, did not hold any Fresenius AG Ordinary Shares or any Fresenius AG Preference Shares, other than the shares beneficially owned by Dr. Stiefenhofer and Mr. Kroner.

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT OF FRESENIUS USA

The following table sets forth, as of July 23, 1996, certain information with respect to each person who is known by Fresenius USA to own beneficially more than 5% of each class of the voting securities of Fresenius USA, each director of Fresenius USA, certain executive officers, and all directors and officers of Fresenius USA as a group. For information with respect to the sale of Fresenius USA Common Stock and options and warrants to purchase Fresenius USA Common Stock to Fresenius USA by certain of the persons listed in the table below, see "FRESENIUS USA EXECUTIVE COMPENSATION -- Securities Repurchases."

<TABLE>
<CAPTION>

| NAME AND ADDRESS OF BENEFICIAL OWNERS | SHARES BENEFICIALLY OWNED(1) | PERCENTAGE OF CLASS |
|---|---|---|
| <S> | <C> | <C> |
| FRESENIUS USA COMMON STOCK | | |
| 5% Stockholders | | |
| Fresenius Aktiengesellschaft.......................... Borkenberg 14. 61343 Bad Homburg v.d.H. Germany | 18,673,324(2) | 70.6% |
| Fresenius Securities, Inc............................. 2637 Shadelands Drive Walnut Creek, CA 94598 | 7,833,202(3) | 29.6% |
| Abbott Laboratories.................................. One Abbott Park Road Abbott Park, IL 60064-3500 | 1,750,000(4) | 6.3% |
| Directors | | |
| Ben J. Lipps......................................... 2637 Shadelands Drive Walnut Creek, CA 94598 | 450,000(5) | 1.7% |
| Robert S. Ehrlich.................................... 2637 Shadelands Drive Walnut Creek, CA 94598 | 123,166 | * |
| James F. Marten...................................... 2637 Shadelands Drive Walnut Creek, CA 94598 | 111,871(6) | * |
| Francis E. Baker..................................... 2637 Shadelands Drive Walnut Creek, CA 94598 | 15,000 | * |
| Mathias R. Klingler.................................. Borkenberg 14 61343 Bad Homburg v.d.H. Germany | 0 | 0 |

</TABLE>

XXX-002000

186

<PAGE>  211

<TABLE>
<CAPTION>

| NAME AND ADDRESS OF<br>BENEFICIAL OWNERS | SHARES<br>BENEFICIALLY<br>OWNED(1) | PERCENTAGE<br>OF CLASS |
|---|---|---|
| <S> | <C> | <C> |
| Gerd Krick................................................<br>Borkenberg 14<br>61343 Bad Homburg v.d.H.<br>Germany | 0 | 0 |
| Ulrich Wagner...........................................<br>54th Floor<br>153 East 53rd Street<br>New York, New York 10022<br>Executive Officers | 30,000(7) | * |
| Robert E. Farrell.......................................<br>2637 Shadelands Drive<br>Walnut Creek, CA 94598 | 46,000 | * |
| Heinz J. Schmidt........................................<br>2637 Shadelands Drive<br>Walnut Creek, CA 94598 | 27,600 | * |
| Scott Walker............................................<br>2637 Shadelands Drive<br>Walnut Creek, CA 94598 | 26,300(8) | * |
| All directors and executive officers as a group.......... | 829,937(9) | 3.1% |

</TABLE>

- ---------------

  * Less than 1%

(1) Except as otherwise indicated, the named owner has sole voting and
    investment power with respect to the shares set forth. The figures in this
    table are calculated in accordance with Rule 13d-3 under the Exchange Act.

(2) Includes 184,779 shares issuable upon the exercise of warrants issued to
    Fresenius AG in connection with the Abbott Acquisition and 50,000 shares
    issuable upon exercise of a warrant issued to Fresenius AG in consideration
    for its providing credit support. Also includes 7,833,202 shares owned by
    Fresenius Securities, Inc., a wholly owned subsidiary of Fresenius AG. For
    information with respect to the beneficial ownership of the securities of
    Fresenius AG, see "-- Security Ownership of Certain Beneficial Owners and
    Management of Fresenius AG."

(3) These shares are also beneficially owned by Fresenius AG. See Note 2.

(4) Represents shares issuable upon exercise of a warrant issued to Abbott
    Laboratories in connection with the Abbott Acquisition. See "FRESENIUS USA
    EXECUTIVE COMPENSATION -- Securities Repurchases."

(5) Includes 450,000 shares issuable upon exercise of options granted subject
    to stockholder approval of the Fresenius USA Plan Amendment. See "AMENDMENT
    TO THE FRESENIUS USA 1987 STOCK OPTION PLAN."

(6) Includes 61,971 shares issuable upon exercise of presently exercisable
    options.

(7) Includes 30,000 shares issuable upon exercise of presently exercisable
    options.

(8) Includes 25,800 shares issuable upon exercise of presently exercisable
    options.

(9) The amount shown includes any shares owned of record or issuable upon
    exercise of presently exercisable options by the directors and all
    executive officers.

187

<PAGE>  212

### INTERESTS OF CERTAIN PERSONS

    See "THE REORGANIZATION -- Continuing Arrangements between Fresenius
Medical Care and Fresenius AG" for a discussion of certain arrangements with
Fresenius AG which will apply if the Reorganization is consummated and
"MANAGEMENT OF FRESENIUS MEDICAL CARE" for a discussion of certain employment
and other arrangements with executives and a former executive of Fresenius AG,
Fresenius USA and Grace which will apply if the Reorganization is consummated
and a discussion of the stock option plan to be adopted by Fresenius Medical
Care.

    For a discussion of certain material contracts between Fresenius AG and
Fresenius USA, see "BUSINESS OF FRESENIUS MEDICAL CARE -- Business of Fresenius
USA -- Material Contracts between Fresenius AG and Fresenius USA."

OTHER INTERESTS IN THE REORGANIZATION

    Dr. Matthias Schmidt, who will be chairman of the FMC Supervisory Board, is
a member of the Management Board of Fresenius AG.

XXX-002001

In connection with the Reorganization, Fresenius AG has agreed to pay to Dresdner Securities a financial advisory fee equal to (a) a retainer of $150,000, (b) a transaction fee of $3,000,000 plus, (c) an additional amount up to $1 million if the Transaction Value (as defined in the agreement between Fresenius AG and Dresdner Securities) equals or exceeds $2 billion. Fresenius AG has also agreed to reimburse Dresdner Securities for its reasonable out of pocket expenses and to indemnify Dresdner Securities for losses and liabilities arising out of Dresdner Securities' engagement by Fresenius AG, including liabilities arising under the federal securities laws. In addition, Dresdner Securities is currently in discussions with Fresenius Medical Care to act as an underwriter of securities of Fresenius Medical Care, the proceeds of which may be used to refinance a portion of NMC's bank debt following consummation of the Reorganization. See "FINANCING -- Refinancing." Dresdner Securities is a wholly owned subsidiary of Dresdner Bank AG. Dresdner Bank AG is also providing financial advisory services to Fresenius Medical Care in connection with the listing of the FMC Ordinary Shares on the Frankfurt Stock Exchange. Dresdner Bank AG has proposed that its fee for such services equal 1% of the nominal value of the listed shares. Such fee is currently under negotiation between Fresenius Medical Care and Dresdner Bank AG. In addition, Dresdner Bank AG is the lender to Fresenius AG and to Fresenius USA under a $25 million five-year term loan. See "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- FRESENIUS USA -- Liquidity and Capital Resources" for a summary of certain terms of such loan. An affiliate of Dresdner Bank AG is also an owner of certain Fresenius AG Ordinary Shares. See "SECURITY OWNERSHIP -- Security Ownership of Certain Beneficial Owners and Management of Fresenius AG." Dresdner Bank AG will be one of four co-arrangers of the NMC Credit Agreement. See "FINANCING." The Executive Manager of Dresdner Bank AG is a member of the Fresenius AG Supervisory Board and Mr. Bernhard Walter, who will become a member of the FMC Supervisory Board, is a member of the Management Board of Dresdner Bank AG. Dresdner Bank AG will also act as Custodian under the Deposit Agreement. See "DESCRIPTION OF AMERICAN DEPOSITARY RECEIPTS."

See "THE REORGANIZATION -- Conduct of Business Prior to Effective Time; Certain Covenants" and "DESCRIPTION OF CAPITAL STOCK OF FRESENIUS MEDICAL CARE -- Dividend Rights" for a discussion of certain matters relating to Fresenius Medical Care's dividend policy.

Ulrich Wagner, a member of the Fresenius USA Board, is a partner in the law firm of O'Melveny & Myers LLP, which represents Fresenius AG as U.S. counsel in connection with the Reorganization and other matters and has, from time to time, provided legal services to Fresenius USA. Dr. Alfred Stiefenhofer is a partner in the law firm of Norr, Stiefenhofer & Lutz, German counsel to Fresenius AG in connection with the Reorganization and other matters. See "SECURITY OWNERSHIP -- Security Ownership of Certain Beneficial Owners and Management of Fresenius AG." Dr. Dieter Schenk, who will become Deputy Chairman of the FMC Supervisory Board, is also a partner in Norr, Stiefenhofer & Lutz.

<div align="center">188</div>

<PAGE>   213

See "FRESENIUS USA EXECUTIVE COMPENSATION" for information with respect to the compensation of the Fresenius USA Independent Committee.

See "FRESENIUS USA EXECUTIVE COMPENSATION -- Securities Repurchases" for information regarding the acceleration of options to purchase Fresenius USA Common Stock and the sale of Fresenius USA Common Stock and options and warrants to purchase Fresenius USA Common Stock to Fresenius USA by certain directors, executive officers, employees and beneficial owners of Fresenius USA Common Stock.

In connection with the Reorganization, Grace has implemented a bonus and severance plan for NMC executives and employees providing for payments to such persons in the event that they remain in the employ of NMC following the Reorganization or in the event that they are terminated within a certain period of time following the Reorganization.

<div align="center">FRESENIUS USA EXECUTIVE COMPENSATION</div>

SUMMARY COMPENSATION

The following table summarizes the total compensation paid or to be paid by Fresenius USA for services rendered during 1993, 1994 and 1995 to the Chief Executive Officer of Fresenius USA and to Mr. Robert Farrell, Mr. Heinz Schmidt and Mr. Scott Walker, the only executive officers of Fresenius USA who had 1995 compensation in excess of $100,000 (the "Specified Executives"):

<div align="center">SUMMARY COMPENSATION TABLE</div>

<TABLE>
<CAPTION>

| | | ANNUAL COMPENSATION | | LONG-TERM COMPENSATION |
| | | ------------ | | ------------ |
| | | | | SECURITIES UNDERLYING |
| NAME AND PRINCIPAL POSITION | YEAR | SALARY ($) | BONUS ($) | OPTIONS (SHARES) (1) |
| --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> |
| Ben J. Lipps(2).................................. | 1995 | 225,000 | 200,000 | 450,000 |
| President, Chief Executive Officer | 1994 | 202,500 | 200,000 | -- |
| and Chief Operating Officer | 1993 | 180,000 | 200,000 | 125,000 |
| Robert E. Farrell............................... | 1995 | 119,203 | 41,665 | -- |

XXX-002002

<TABLE>

| | | 1994 | 113,597 | 55,900 | -- |
| Corporate Group Vice President -- | | | | | |
| Administration, General Counsel and Clerk | | 1993 | 104,230 | 67,039 | 40,000 |
| Heinz Schmidt.................... | | 1995 | 89,274 | 54,150 | -- |
| Corporate Group Vice President -- Finance | | 1994 | 84,835 | 78,000 | -- |
| and Treasurer | | 1993 | 78,075 | 65,961 | 40,000 |
| Scott Walker..................... | | 1995 | 102,890 | 70,772 | -- |
| Corporate Group Vice President -- | | 1994 | 90,729 | 57,600 | -- |
| Regulatory Affairs | | 1993 | 85,355 | 39,727 | 40,000 |

</TABLE>

- ---------------

(1) Options shown as granted in 1995 to Dr. Lipps were granted by the
    Compensation Committee of the Fresenius USA Board, subject to approval by
    the stockholders of Fresenius USA of the Fresenius USA Plan Amendment. See
    "AMENDMENT TO THE FRESENIUS USA 1987 STOCK OPTION PLAN" and Fresenius USA
    1987 Stock Option Plan attached as Appendix E.

(2) Includes amounts paid to Dr. Lipps by Seratronics, which decreased the
    annual salary and bonus payable by Fresenius USA to Dr. Lipps. In each year
    listed above, Seratronics paid $66,500 and $0 of salary and bonus,
    respectively, to Dr. Lipps. See the description below of Dr. Lipps'
    employment arrangement with Fresenius USA.

                                       189

<PAGE>   214

    The following table summarizes the stock options granted by Fresenius USA,
subject to stockholder approval, during 1995 to the Specified Executives:

                        OPTION GRANTS IN LAST FISCAL YEAR

<TABLE>
<CAPTION>

| | | | | | POTENTIAL REALIZABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM | |
| | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED (SHARES) | % OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE PRICE PER SHARE ($) | EXPIRATION DATE | 5% ($) | 10% ($) |
| NAME | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> |
| Ben J. Lipps.......... | 450,000 | 98 | 12.75 | July 17, 2005 | 3,609,000 | 9,144,000 |

</TABLE>

    The following table summarizes the stock options held at December 31, 1995
by the Specified Executives:

                        FISCAL YEAR-END OPTION VALUES

<TABLE>
<CAPTION>

| NAME | SHARES ACQUIRED ON EXERCISE | VALUE REALIZED | NUMBER OF SECURITIES UNDERLYING UNEXERCISED OPTIONS AT DECEMBER 31, 1995 EXERCISABLE/UNEXERCISABLE(#) | VALUE OF UNEXERCISED IN-THE-MONEY OPTIONS AT DECEMBER 31, 1995 EXERCISABLE/UNEXERCISABLE($) |
| --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> |
| Ben J. Lipps........... | -- | -- | 420,000/275,000 | 4,569,375/2,240,625 |
| Robert E. Farrell...... | 10,250 | $126,312 | 28,750/ 12,000 | 364,688/ 150,000 |
| Heinz Schmidt.......... | -- | -- | 34,000/ 12,000 | 449,250/ 150,000 |
| Scott Walker.......... | 3,000 | $ 46,125 | 31,000/ 12,000 | 400,500/ 150,000 |

</TABLE>

    Pursuant to an employment agreement between Fresenius USA and Dr. Lipps,
which became effective as of January 1, 1992, Dr. Lipps is required to devote
substantially all of his business efforts and time to serving as the President
of Fresenius USA, subject to his also serving as the President and Chief
Executive Officer of Seratronics. Dr. Lipps receives from Fresenius USA an
annual base salary of $225,000, together with bonuses up to a maximum of
$200,000 based on the attainment of certain sales and profits targets set
annually by management and reviewed by the Fresenius USA Board. Fresenius USA
and Dr. Lipps have agreed that Fresenius USA's obligations in respect of such
salary and bonus are decreased by amounts payable to Dr. Lipps by Seratronics.
Seratronics is wholly owned by Andersen Group, Inc. Mr. Francis E. Baker, a
member of the Fresenius USA Board, is the President of Andersen Group, Inc. Dr.
Lipps also has been granted stock options with respect to 120,000 shares of
Fresenius USA Common Stock at an exercise price of $3.125 per share, which were
fully vested as of December 31, 1995. Dr. Lipps' employment agreement is
terminable upon 30 days' advance notice to Fresenius USA, in which event Dr.
Lipps is owed one year's base salary payable over the year following such
termination plus $100,000 payable upon such termination. The agreement may also
be terminated by Dr. Lipps upon one year's notice, as well as by Fresenius USA
upon termination for cause and under certain other circumstances. Upon any such
termination, Fresenius USA may require that Dr. Lipps refrain, for up to two
years, from carrying on a business in competition with Fresenius USA's business,
in which event Fresenius USA must pay an additional annual amount to Dr. Lipps
equal to his annual salary (or, if greater, the aggregate premiums on certain
life and disability policies carried by Dr. Lipps). During 1993, Dr. Lipps was
granted options for an additional 125,000 shares at $7.125 per share, vesting

XXX-002003

over five years, and, in 1995, Dr. Lipps was granted options for an additional 450,000 shares at $12.75 per share, subject to satisfaction of certain vesting criteria, which have been satisfied and subject to stockholder approval of the Fresenius USA Plan Amendment. Fresenius AG has indicated that it will vote its shares of Fresenius USA Common Stock in favor of the Fresenius USA Plan Amendment. See "AMENDMENT TO THE FRESENIUS USA 1987 STOCK OPTION PLAN" and the Fresenius USA 1987 Stock Option Plan attached as Appendix E. In June 1996, Dr. Lipps exercised the 245,000 options exercisable at $3.125 and $7.125 per share and immediately sold those shares to Fresenius USA. See "-- Securities Repurchases."

    Dr. Wagner, Dr. Marten, Mr. Ehrlich, Mr. Baker and Mr. Klingler each receive directors fees of $25,000 per annum. Commencing in 1996, non-employee members of the Executive, Audit and Compensation Committees of the Fresenius USA Board each received $1,875 per meeting for each such committee meeting attended. Dr. Krick receives $75,000 annually for serving as Chairman of the Fresenius USA Board. In June

                          190
<PAGE>   215

1994, the stockholders of Fresenius USA approved the Non-Employee Directors Stock Option Plan, pursuant to which each current non-employee director of Fresenius USA received a grant of options for 30,000 shares of Fresenius USA Common Stock vesting at a rate of 10,000 options per year in each of 1994, 1995 and 1996. In June 1995, the stockholders of Fresenius USA approved an amendment to the Non-Employee Directors Stock Option Plan permitting participating directors to receive all directors' fees in the form of options to purchase shares of Fresenius USA Common Stock rather than cash. Only Dr. Marten made an election to receive fees in the form of options in 1995 and 1996. On July 3, 1996 the Fresenius USA Compensation Committee determined that the provisions of that plan under which Dr. Marten made his election did not contemplate an extraordinary transaction such as the Reorganization and that his election is not applicable to his compensation subsequent to January 25, 1996 (the date on which the Fresenius USA Board was informed of the Reorganization), which includes his compensation as a member of the Independent Committee. If the Reorganization is not consummated, future non-employee directors will receive a grant of options for 30,000 shares of Fresenius USA Common Stock upon their election. The options will vest at a rate of 10,000 options per year on each of the first, second and third anniversaries of the directors' initial election. Dr. Krick and Mr. Klingler declined to accept any options under the Non-Employee Directors Stock Option Plan. In January 1996, in connection with the Reorganization, the Fresenius USA Board elected Messrs. Ehrlich and Baker and Dr. Marten to serve on the Fresenius USA Independent Committee. As compensation for their services as members of the Fresenius USA Independent Committee, Messrs. Ehrlich and Baker and Dr. Marten will each receive a retainer fee of $25,000 and an additional per diem of $1,500 for each meeting attended or each substantial expenditure of time on Fresenius USA Independent Committee business, which fees to each member will range between $50,000 and $75,000, and will be reimbursed for out-of-pocket expenses incurred in connection with Fresenius USA Independent Committee business or related matters.

    In June 1994 the Fresenius USA Board approved the extension of the expiration date for options to acquire 31,000 shares of Fresenius USA Common Stock held by Dr. Marten. The expiration date was extended from August 6, 1994 to October 1, 1996, for 6,000 shares, and from June 28, 1994 to October 1, 1996 for 25,000 shares.

    Fresenius USA and Mr. Ehrlich were parties to a consulting agreement pursuant to which Mr. Ehrlich received $10,000 annually. The agreement terminated in June 1996.

SECURITIES REPURCHASES

    On May 6, 1996, the Fresenius USA Compensation Committee voted to accelerate the vesting of all outstanding unvested options under the Fresenius USA Plan held by officers subject to Section 16(b) of the Exchange Act (comprising Dr. Lipps and Messrs. Farrell, Schmidt and Walker), resulting in the acceleration of the vesting of 50,000 options held by Dr. Lipps and 12,000 options held by each of Messrs. Farrell, Schmidt and Walker. In June 1996, Fresenius USA purchased from Dr. Lipps, Mr. Schmidt and Mr. Walker 325,000 shares, 18,400 shares and 17,200 shares, respectively, of Fresenius USA Common Stock at an aggregate purchase price of $5,850,000, $359,536 and $366,088, respectively. Except for 80,000 shares sold by Dr. Lipps, all of such shares were acquired upon the exercise of options issued to Dr. Lipps, Mr. Schmidt and Mr. Walker under the Fresenius USA Plan. Dr. Lipps also expects to sell on comparable terms to Fresenius USA, subsequent to August 15, 1996 but prior to the closing of the Reorganization, options to purchase up to 450,000 shares of Fresenius USA Common Stock, constituting, together with the 245,000 options exercised by Dr. Lipps prior to his sale of the underlying shares to Fresenius USA, substantially all of the options to purchase Fresenius USA Common Stock held by him. No shares were purchased from Mr. Farrell.

    Fresenius USA purchased such shares from Dr. Lipps and Messrs. Schmidt and Walker, and may purchase additional options from Dr. Lipps, as a result of the condition in the Supplemental Agreement that the number of Fresenius USA Common Share Equivalents be no higher than 9,253,331. See "THE REORGANIZATION -- Additional Agreements of Fresenius USA." In connection therewith, Fresenius USA in June 1996 also purchased from other Fresenius USA employees 15,200 shares of Fresenius USA Common Stock at $18.00 per share and a total of 555,045 options to purchase Fresenius USA Common Stock at a purchase price equal to the excess of $18.00 over the relevant option exercise price, for an aggregate purchase price of $6,181,820. Funds for the purchase of such shares and options were obtained by Fresenius

XXX-002004

191

<PAGE>  216

USA from the proceeds of the price paid by Fresenius AG for the exercise of
warrants to purchase Fresenius USA Common Stock. See "BUSINESS OF FRESENIUS
MEDICAL CARE -- Business of Fresenius USA -- Material Contracts Between
Fresenius AG and Fresenius USA -- Financial Support."

On July 3, 1996, the Fresenius USA Compensation Committee reviewed the
provisions of the Fresenius USA Non-Employee Directors Stock Option Plan, and
confirmed that, pursuant to the provisions of that plan, the pendency of the
Reorganization has caused acceleration of the vesting of options granted
thereunder, resulting in the vesting of 10,000 options held by each of Dr.
Wagner and Messrs. Baker, Marten and Ehrlich. Options granted under that plan
that are not exercised prior to the closing of the Reorganization will
terminate. Such accelerated options are included in the table under the caption
"-- Security Ownership of Certain Beneficial Owners and Management of Fresenius
USA."

As a result of the foregoing transactions, the directors and officers of
Fresenius USA will receive in the Reorganization, ADSs in the amounts set forth
below. The receipt of such ADSs will be in addition to the cash payments made
and to be made to them as described above.

<TABLE>
<CAPTION>

| NAME | NO. OF ADSS(1) |
|------|---------------|
| <S> | <C> |
| Gerd Krick............................................... | 364(2) |
| Ulrich Wagner............................................ | 33,360 |
| Francis E. Baker......................................... | 16,680 |
| James F. Marten.......................................... | 124,400 |
| Robert E. Ehrlich........................................ | 136,960 |
| Robert G. Farrell........................................ | 51,152 |
| Heinz Schmidt............................................ | 30,691 |
| Scott Walker............................................. | 29,245 |

</TABLE>

- ---------------

(1) The figures in the table assume that all options to purchase Fresenius USA
    Common Stock held by the person named in the table are exercised prior to
    the closing of the Reorganization. If such options are not exercised, they
    will become options to purchase FMC Ordinary Shares, except that options to
    purchase 30,000 shares and 31,971 shares, respectively, held by Ulrich
    Wagner and James Marten issued under the Fresenius USA Non-Employee
    Directors Stock Option Plan will lapse if not exercised prior to the
    closing. In addition, if Dr. Lipps does not sell all of the options held by
    him to purchase 450,000 shares of Fresenius USA Common Stock, he will
    receive ADSs with respect to any shares of Fresenius USA Common Stock
    acquired upon exercise of such options and options to purchase FMC Ordinary
    Shares in exchange for any unexercised options.

(2) The actual number will depend on the final exchange ratio of ADSs for Grace
    Common Stock.

It is also expected that Dr. Krick, Dr. Lipps and Mr. Klingler will enter
into employment agreements with Fresenius Medical Care. See "MANAGEMENT OF
FRESENIUS MEDICAL CARE -- Compensation of the FMC Management Board and Certain
Other Executive Officers -- Employment Agreements."

Fresenius USA and Fresenius AG have entered into a letter of intent with
Abbott contemplating the following arrangements with respect to the Abbott
Warrants held by Abbott to purchase 1,750,000 shares of Fresenius USA Common
Stock. Contemporaneously with the closing of the Reorganization, Abbott will
surrender Abbott Warrants to purchase 875,000 shares to Fresenius USA, and
Fresenius USA will pay Abbott the sum of $11,812,500 (equal to the product of
such number of shares and the excess of $21.50 over $8.00, the exercise price of
the Abbott Warrants). FMC Ordinary Shares underlying the ADSs issuable in
respect of the remaining shares of Fresenius USA Common Stock issuable upon
exercise of such Abbott Warrants (comprising approximately 324,333 FMC Ordinary
Shares) will be issued to Fresenius AG in connection with its contribution of
Fresenius Worldwide Dialysis to Fresenius Medical Care. Fresenius AG will agree
that upon Abbott's exercise of the warrants, Fresenius AG will deliver to Abbott
the FMC Ordinary Shares (or, at Abbott's election, Fresenius AG will deliver
such FMC Ordinary Shares to the Depositary against issuance of ADRs evidencing
the appropriate number of ADSs) issuable in accordance with the terms of such
Abbott Warrants. The exercise price payable upon exercise of the Abbott Warrants
will be retained by Fresenius AG

192

<PAGE>  217

and, if the Abbott Warrants expire unexercised, Fresenius AG will retain the FMC
Ordinary Shares issued to it in respect of such Abbott Warrants. It is also
expected that Fresenius Medical Care will assume Fresenius USA's obligations
under the Registration Rights Agreement between Fresenius USA and Abbott, as a
result of which Abbott will be entitled to require Fresenius Medical Care to
register under the Securities Act the ADSs issued to Abbott upon the exercise of
such Abbott Warrants.

COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

XXX-002005

The members of the Compensation Committee of the Fresenius USA Board during 1995 were Mr. Ehrlich, Dr. Krick and Dr. Wagner. Dr. Krick served as the Chairman of the Fresenius AG Board during 1995, and Mr. Ehrlich was formerly the Chairman and the President of Fresenius USA. Dr. Krick is the Chairman of the Fresenius AG Management Board. During 1992, Fresenius USA agreed to purchase certain stock options held by Mr. Ehrlich, and to issue new options to him in exchange for other options held by him, and, in 1994, Fresenius USA made a secured loan to Mr. Ehrlich to allow him to exercise certain stock options. The loan was repaid during the first quarter of 1996. Dr. Wagner is a partner in the law firm of O'Melveny & Myers, which, from time to time, provides legal services to Fresenius USA and which also represents Fresenius AG.

INDEMNIFICATION AGREEMENTS

Fresenius USA will enter into indemnification agreements with each of its directors. Such agreements provide contractual rights to indemnification identical to the rights provided under Fresenius USA's by-laws; the only material difference being a right to advancement of expenses incurred in connection with any indemnifiable proceedings.

<div align="center">193</div>

<PAGE>   218

<div align="center">FINANCING</div>

The following summary describes the anticipated material terms of the NMC Credit Agreement and other instruments and agreements pertaining to NMC's indebtedness. The receipt of necessary financing on terms satisfactory to Grace and Fresenius AG is a condition to the consummation of the Reorganization. See "THE REORGANIZATION."

NMC CREDIT AGREEMENT

General. Grace, on behalf of NMC, has obtained a commitment letter from The Bank of Nova Scotia, The Chase Manhattan Bank, Dresdner Bank and NationsBank N.A. (the "Arrangers") concerning the provision of credit to NMC in connection with the Reorganization. The following is a summary of the anticipated material terms on which such credit is to be provided, as contemplated by such commitment letter. There can be no assurance that such credit will ultimately be provided to NMC or that the terms and rates of such credit will conform to those contemplated by the commitment letter. Completion of the financing on terms satisfactory to each of Grace and Fresenius AG is a condition to their respective obligations to consummate the Reorganization.

NMC Credit Agreement -- General Terms. Immediately prior to the Distribution, NMC expects to enter into the NMC Credit Agreement with the Arrangers and certain other lenders (collectively, the "Lenders"), pursuant to which the Lenders will make available to NMC and certain specified subsidiaries and affiliates an aggregate of approximately $2.50 billion through three credit facilities (collectively, the "NMC Credit Facility"): (i) a revolving credit facility of up to $1.0 billion (of which up to $250 million will be available for letters of credit, up to $450 million will be available for borrowings in certain non-U.S. currencies, up to $20 million will be available as swing lines in U.S. dollars and up to $20 million will be available as swing lines in certain non-U.S. currencies) for up to seven years ("Facility 1"); (ii) a term loan facility of $1.0 billion for up to seven years ("Facility 2"); and (iii) a term loan facility of $500 million for up to two years ("Facility 3").

The NMC Credit Agreement is expected to provide that the proceeds of loans under the NMC Credit Facility may be used by NMC (i) to finance the payment of dividends and other amounts (including the Distribution Payment) to Grace Chemicals and Grace, (ii) to refinance outstanding debt, (iii) to finance existing and future letters of credit and (iv) for the general corporate purposes of NMC and certain of its subsidiaries and affiliates, including working capital and acquisitions. Loans under the NMC Credit Facility will bear interest at one of the following rates, to be chosen by the borrower for each period during which interest accrues: (i) LIBOR plus an applicable margin or (ii) a base rate (the "Base Rate") equal to the higher from time to time of (A) the prime rate of NationsBank, N.A. or (B) the federal funds rate plus 0.50%. A fee will be payable to the Arrangers equal to a percentage of the entire NMC Credit Facility. In addition, a fee will be payable to the Lenders equal to a percentage per annum (initially 0.375) of the portion of the NMC Revolving Credit Facility not used for dollar borrowings from time to time.

No principal payments will be due under the NMC Credit Facility for the first 24 months of its term. Thereafter, principal payments of $500 million will be due at the end of the second year and $0 in the third year; principal payments will be due in equal quarterly installments aggregating $180 million in the fourth year; $200 million in the fifth year; $200 million in the sixth year; $200 million in the seventh year, together with an additional payment of $220 million at the end of the seventh year. In addition to the foregoing mandatory principal payments, the NMC Credit Facility will be reduced by certain portions of the net cash proceeds from certain sales of assets, sales of accounts receivable and the issuance of debt and equity securities. All payments outstanding under Facility 1 are due and payable at the end of the seventh year. Prepayment will be permitted at any time without penalty, except in certain defined periods. The NMC Credit Agreement will contain customary covenants with respect to NMC and its subsidiaries, including but not limited to: the provision of information; the maintenance of properties, insurance and legal existence; the conduct of business; compliance with laws; access to property and books; the absence of liens on or other security interests in NMC's properties (including stock and assets); limitations on consolidations, mergers and sales of assets above specified amounts; limitations on subsidiary debt and uses of proceeds;

XXX-002006

financial covenants; limitations on restricted payments; the requirement of
arm's-length transactions with affiliates; and

194

<PAGE>   219

limitations on acquisitions and capital expenditures. The NMC Credit Agreement
will contain customary provisions with respect to defaults, representations and
warranties, and conditions to borrowing.

Security.  The NMC Credit Agreement will provide that borrowings under the
NMC Credit Facility will be secured by a pledge of NMC common stock (to secure
the guarantee of Grace), a pledge of 100% of the stock of NMC's material
domestic subsidiaries and 66% of the stock of its material foreign subsidiaries
and, if and at such time as Fresenius Medical Care becomes a guarantor as to
Facility 2 and/or Facility 3, a pledge of the stock of the direct and indirect
material subsidiaries of Fresenius Medical Care (to secure such guarantee). The
collateral is to be released upon NMC's (or, if Fresenius Medical Care is
guarantor of the NMC Credit Facility, then Fresenius Medical Care's) receipt of
investment grade ratings for its long-term senior unsecured debt from both
Moody's Investor Services, Inc. and Standard and Poor's Corporation or upon the
achievement of certain financial ratios.

Guarantees.  The NMC Credit Agreement is expected to provide that
obligations thereunder will be guaranteed by Grace. In addition, Grace Chemicals
has agreed to guarantee Facility 2 up to a maximum of $450 million and has
agreed to guarantee Facility 3 (which provides for a maximum of $500 million of
available credit).

The NMC Credit Agreement is expected to provide that the guarantee of Grace
Chemicals under Facility 2 will be released as to $300 million upon the
occurrence of any of the following events not earlier than 45 days, but not
later than 60 days, following the Effective Date: (a) the receipt of an
unconditional joint and several guarantee from Fresenius Medical Care and
certain of its subsidiaries for the full amount of the NMC Credit Facility (the
form of such guarantee and related documentation to be agreed upon prior to the
Effective Date); or (b) the receipt of a letter of credit or other acceptable
financial accommodation for the account of Grace Chemicals or Fresenius Medical
Care, in form and substance satisfactory to the Lenders, covering $300 million
in principal amount of borrowing under Facility 2, plus 90 days of interest
thereon; or (c) the prepayment of $300 million in principal amount of borrowings
under Facility 2. The balance of the Grace Chemicals guarantee under Facility 2
will be released upon NMC (or Fresenius Medical Care, if Fresenius Medical Care
guarantees the NMC Credit Facility), on a consolidated basis, achieving a ratio
of senior debt to EBITDA of equal to or less than 3.5.

The NMC Credit Agreement is expected to provide that the guarantee of Grace
Chemicals under Facility 3 will be released upon the occurrence of any of the
following events after 45 days, but within 60 days, following the Effective
Date: (a) the receipt of an unconditional joint and several guarantee from
Fresenius Medical Care and certain of its subsidiaries for the full amount of
the NMC Credit Facility (the form of such guarantee and related documentation to
be agreed to prior to the Effective Date); or (b) the receipt of a letter of
credit or other acceptable financial accommodation for the account of Grace
Chemicals or Fresenius Medical Care in form and substance satisfactory to the
Lenders covering a principal amount of $500 million plus 90 days of interest
thereon under Facility 3; or (c) the repayment in full of Facility 3.

If such guarantees are not released within 60 days following the Effective
Date, demand for payment will be made on Grace Chemicals under such guarantees,
other than with respect to $150 million guaranteed under Facility 2. While it is
the intention of Fresenius Medical Care to provide the unconditional joint and
several guarantees referred to in clauses (a) of each of the preceding two
paragraphs in a manner so as to cause the release of the Grace Chemicals'
guarantees as to $800 million not before 46 days, but on or prior to 60 days,
following the Effective Date, no assurance can be given that such guarantees
will be provided or that either or both Grace Chemicals guarantees will be
released. In the event that Fresenius Medical Care does not provide such
guarantees, or otherwise effect the release of Grace Chemicals' guarantees as
provided in clauses (b) or (c) of the preceding two paragraphs, Grace Chemicals
would be required to provide the letters of credit referred to in clauses (b) of
each of the preceding two paragraphs or repay the amounts referred to in clause
(c) of each of the preceding two paragraphs and, thereafter, be subrogated to
the rights of the Lenders with respect to such repaid amounts after the Lenders
under the respective facilities have been repaid in full; and Grace Chemicals
has undertaken to the Lenders to maintain unused available credit in an amount
to be determined while the Grace Chemicals guarantees are outstanding in order
to facilitate such actions. If such events occur, Grace Chemicals would have a
substantial cash outlay at such time and could have, thereafter, substantial new
indebtedness.

195

<PAGE>   220

In connection with Grace Chemicals' agreement to extend guarantees under
the NMC Credit Agreement, to provide a significant inducement for the release of
such guarantees as to $800 million on or prior to the 50th day following the
Effective Date, Fresenius Medical Care and Grace Chemicals intend to enter into
an agreement providing that, if such Grace Chemicals guarantees, other than with
respect to $150 million guaranteed under Facility 2, have not been released
prior to the close of business on the 50th day following the Effective Date,
Fresenius Medical Care will, at such time, make a $300 million payment to W. R.
Grace Foundation, Inc. (which contribution may not be used to satisfy any legal
obligation of Grace Chemicals). In addition, it is intended that Fresenius

XXX-002007

Medical Care will agree that (i) it will contribute the capital stock of Fresenius USA to Grace promptly following the Effective Date and (ii) during the 49-day period following the Effective Date, (a) it will not engage, or permit NMC to engage, in any settlement discussions regarding OIG matters without Grace Chemicals' participation and consent and (b) it will cause the respective businesses of NMC and Fresenius USA to be conducted in the ordinary course, without incurring additional debt (other than indebtedness permitted under the NMC Credit Agreement), relinquishing or modifying contracts with affiliates of Fresenius AG and without making cash distributions other than to a subsidiary of Grace.

In connection with the above, it is intended that Fresenius Medical Care will also agree that, during the 45-day period following the Effective Date, it will not (except as required by the Reorganization Agreement or the agreement described in the preceding paragraph): (i) make, or cause to be made, a capital contribution to Grace (or its subsidiaries) or take, or cause to be taken, any action which would cause a capital contribution to any such entity to be required under the NMC Credit Agreement; (ii) provide, or cause to be provided, any guarantee of any debt of Grace (or its subsidiaries), or procure or provide, or cause to be procured or provided, any letter of credit or other credit support of any such debt; (iii) take, or cause to be taken, any other action that has the effect, directly or indirectly, of rendering any assets of Fresenius Medical Care (other than Grace (or its subsidiaries)) to support the debt of NMC.

Under this agreement, it is intended that Fresenius Medical Care will consent to jurisdiction and enforceability in the states of New York and Florida by Grace Chemicals and W.R. Grace Foundation, Inc., will agree that all costs of enforcement of the agreement will be borne by Fresenius Medical Care, will agree that W. R. Grace Foundation, Inc. will be a third-party beneficiary of the agreement and will agree that any provision of the agreement that is invalid or unenforceable shall only be so to the extent of such invalidity or unenforceability without in any way affecting any remaining provisions.

Refinancing.  Not earlier than 45 days following the closing of the Reorganization, Fresenius Medical Care intends to issue up to $600 million in debt and equity securities, the proceeds of which will be used to refinance Facility 3 and other indebtedness. It is presently expected that such securities will consist of up to $350 million of subordinated debt and up to $250 million of FMC Preferred Shares. Fresenius Medical Care is currently conducting discussions with investment bankers with respect to a possible offering of such securities within 60 days following the closing. There can be no assurance, however, that such refinancing will be successfully completed on the foregoing or any other terms.

OTHER INDEBTEDNESS

In December 1991, NMC entered into a five-year receivables purchase program under which it may offer to sell, on a non-recourse basis, up to $120 million of an undivided ownership interest in a defined pool of receivables. To accommodate the growth of NMC, the program was increased to $180 million in June 1994. As of December 31, 1995, NMC had sold approximately $180 million of receivables under this program. The net cash proceeds are reported as operating cash flow, and the sale of accounts receivable is reflected as a reduction of receivables on NMC's balance sheet. Grace and NMC are attempting to amend the terms of such program to increase its size to $200 million and to accommodate NMC as a stand-alone entity by removing the current Grace obligations thereunder.

196

<PAGE>   221

CERTAIN FEDERAL INCOME TAX
CONSEQUENCES OF THE TRANSACTIONS
TO GRACE AND GRACE SHAREHOLDERS

In the opinion of special counsel to Grace, Wachtell, Lipton, Rosen & Katz, and tax counsel to Grace, Miller & Chevalier (collectively, "Counsel"), the following discussion is an accurate description of the material federal income tax consequences expected to result to Grace and Grace shareholders as a result of the Reorganization. Such opinions have been filed as exhibits to the Registration Statement. This discussion is based on the current provisions of the Code, applicable Treasury regulations, judicial authority and administrative rulings and practice. There can be no assurance that the IRS will not take a contrary view. No ruling from the IRS has been or will be sought with respect to any aspect of the transactions described herein. Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to shareholders.

The tax treatment applicable to a shareholder may vary depending upon the shareholder's particular situation, and certain shareholders (including insurance companies, tax-exempt organizations, financial institutions or broker-dealers, and persons who are not citizens or residents of the United States or who are foreign corporations, foreign partnerships or foreign estates or trusts as to the United States) may be subject to special rules not discussed below. EACH SHAREHOLDER IS URGED TO CONSULT HIS OR HER OWN TAX ADVISOR AS TO THE PARTICULAR TAX CONSEQUENCES TO HIM OR HER OF THE TRANSACTIONS DESCRIBED HEREIN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF CHANGES IN APPLICABLE TAX LAWS.

CONSEQUENCES OF THE DISTRIBUTION

The obligation of Grace to consummate the Distribution is conditioned,

XXX-002008

among other things, upon the delivery of satisfactory tax opinions (the "Opinions") from Counsel. Counsel currently expects that the Opinions will state that the Distribution will qualify as a tax-free distribution under Section 355 of the Code. Assuming that the Distribution so qualifies, the following is a summary of the material federal income tax consequences of the Distribution:

(a) A Grace shareholder will not recognize any income, gain or loss as a result of the Distribution.

(b) A Grace shareholder will apportion the tax basis of his or her Grace Common Stock between such Grace Common Stock and New Grace Common Stock received in the Distribution in proportion to the relative fair market values of such Grace Common Stock and New Grace Common Stock on the Effective Date.

(c) A Grace shareholder's holding period for the New Grace Common Stock received in the Distribution will include the period during which such shareholder held the Grace Common Stock with respect to which the Distribution was made, provided that such Grace Common Stock is held as a capital asset by such shareholder as of the time of Distribution.

(d) The earnings and profits of Grace will be allocated between Grace and New Grace.

(e) No gain or loss will be recognized to Grace as a result of the Distribution.

Current Treasury regulations require each Grace shareholder who receives New Grace Common Stock pursuant to the Distribution to attach to his or her federal income tax return for the year in which the Distribution occurs a detailed statement setting forth such data as may be appropriate in order to show the applicability of Section 355 of the Code to the Distribution. Grace (or New Grace on its behalf) will convey the appropriate information to each Grace shareholder of record as of the Grace Record Date.

197

<PAGE>   222

A preferred share purchase right ("New Grace Right") will attach to each share of New Grace Common Stock distributed in the Distribution. While the distribution of the New Grace Rights should not be taxable to shareholders or to Grace or New Grace, shareholders may, depending upon the circumstances, recognize taxable income in the event that the New Grace Rights become exercisable for New Grace Junior participating preferred stock, par value $.01 per share (or other consideration) or for common stock of an acquiring company.

CONSEQUENCES OF THE RECAPITALIZATION

The obligation of Grace to consummate the Recapitalization is conditioned, among other things, upon the delivery of the Opinions. Counsel currently expects that the Opinions will state that, among other things, the Recapitalization will be a tax-free transaction to Grace. Assuming the Recapitalization so qualifies, the following is a summary of the material federal income tax consequences of the Recapitalization:

(a) No gain or loss will be recognized by Grace as a result of the Recapitalization.

(b) No gain or loss will be recognized by Grace shareholders upon the receipt of the New Preferred Shares.

(c) A Grace shareholder will apportion the tax basis of his or her Grace Common Stock between such Grace Common Stock and the New Preferred Shares received in the Recapitalization in proportion to the relative fair market values of such Grace Common Stock and the New Preferred Shares on the Effective Date.

(d) A Grace shareholder's holding period for the New Preferred Shares received in the Recapitalization will include the period during which such shareholder held the Grace Common Stock with respect to which the New Preferred Shares were distributed, provided that such Grace Common Stock is held as a capital asset by such shareholder as of the time of Recapitalization.

(e) Under certain circumstances, Section 305(c) of the Code requires that any excess of the redemption price of preferred stock over its fair market value on the date of issuance be included in income, prior to receipt, by holders of such stock as a constructive dividend to the extent of the issuing corporation's earnings and profits. Grace believes that as a result of recently promulgated Treasury regulations, it is unlikely that holders of the New Preferred Shares will be required to include the redemption price of such stock in income as a constructive dividend.

(f) The New Preferred Shares may be deemed to be "Section 306 stock" for federal income tax purposes. A shareholder that receives "Section 306 stock" within the meaning of Section 306(c) of the Code may be required to recognize as ordinary income, in the case of a taxable disposition of such stock, or as dividend income, in the case of a redemption of such stock, all or a portion of the proceeds received by such shareholder from such disposition or redemption, without regard to the shareholder's tax basis in its shares, and may not recognize any loss therefrom. The portion of the proceeds so treated is the amount realized not in excess of the amount that would have been a dividend if, instead of the preferred stock, the issuing corporation had distributed cash in an amount equal to the fair market

XXX-002009

value of the stock, up to the amount of earnings and profits of the corporation available for distribution (i.e., an amount equal to the fair market value of the New Preferred Shares). If the proceeds of such disposition or redemption exceed the amount that would have been a dividend, the remainder would be treated as gain from the sale of the preferred stock to the extent that it exceeds the adjusted basis of such stock.

(g) Dividends paid on the New Preferred Shares may constitute "extraordinary dividends" under Section 1059(c) of the Code, in which case corporate shareholders will be required to reduce their basis in their New Preferred Shares by the non-taxed portion of such dividends.

198

<PAGE>    223

CONSEQUENCES OF THE GRACE MERGER

The respective obligations of Grace and Fresenius AG to consummate the Reorganization is conditioned, among other things, upon the delivery of the Opinions. Counsel currently expects that the Opinions will state that, among other things, the Grace Merger will qualify as a tax-free transaction to Grace and its shareholders under Sections 367 and 368(a) of the Code. Assuming the Grace Merger so qualifies, the following is a summary of the material federal income tax consequences of the Grace Merger:

(a) The Grace Merger will be treated for federal income tax purposes as a reorganization within the meaning of Section 368 (a) of the Code.

(b) No gain or loss will be recognized by Grace as a result of the Grace Merger.

(c) No gain or loss will be recognized by Grace shareholders upon the receipt of FMC Ordinary Shares in exchange for Grace Common Stock pursuant to the Grace Merger, except that holders of Grace Common Stock who receive cash upon exercise of any available appraisal rights or cash in lieu of fractional shares will recognize gain or loss equal to the difference between such cash and the tax basis in their shares subject to appraisal rights or the tax basis allocated to their fractional shares of Grace Common Stock, and such gain or loss will constitute capital gain or loss if such Grace Common Stock is held as a capital asset.

(d) The tax basis of the FMC Ordinary Shares received by Grace shareholders who exchange their Grace Common Stock for FMC Ordinary Shares in the Grace Merger will be the same as the tax basis of Grace Common Stock surrendered in exchange therefor.

(e) The holding period for the shares of FMC Ordinary Shares received in the Grace Merger will include the period during which the shares of Grace Common Stock surrendered in exchange therefor were held, provided that such shares of Grace Common Stock were held as capital assets at the Effective Date.

In rendering the Opinions, Counsel will receive, rely on and assume the accuracy of certain representations by Grace, NMC and Fresenius AG and certain other information, data, documentation and other materials deemed necessary, including representations that, to the best knowledge of the management of Grace and NMC as of the date of the transaction: (a) there is no plan or intention by the shareholders of Grace to sell, exchange, transfer by gift or otherwise dispose of any of their stock in, or securities of, either Fresenius Medical Care or New Grace subsequent to the Reorganization; (b) there is no plan or intention to liquidate New Grace subsequent to the Distribution, to sell or otherwise dispose of a substantial amount of the assets of New Grace or its subsidiaries (except in the ordinary course of business), to redeem shares of New Grace Common Stock (with certain enumerated exceptions), to cause New Grace to merge with any other corporation or to cease to conduct New Grace's business; and (c) there is no plan or intention to liquidate Fresenius Medical Care subsequent to the Reorganization, to sell or otherwise dispose of a substantial amount of the assets of Fresenius Medical Care or its subsidiaries (except in the ordinary course of business), to redeem FMC Ordinary Shares, to cause Fresenius Medical Care to merge with any other corporation (other than pursuant to the Reorganization) or to cease to conduct its business. These representations address, among other things, the requirements for tax-free treatment of the Distribution and the Grace Merger that (a) Grace shareholders retain a continuity of interest in both Grace (through their equity interest in Fresenius Medical Care) and New Grace after the Distribution and (b) Grace's historic businesses continue after the Distribution.

There will be no material federal income tax consequences to the holders of Grace Preferred Stock as a result of the Distribution, the Recapitalization or the Grace Merger.

For a description of the consequences to Grace, NMC and Grace shareholders if the Distribution or the Grace Merger were not to qualify as tax-free, see "RISK FACTORS -- Other Risks -- Certain U.S. Tax Considerations Related to the Distribution."

199

<PAGE>    224

On or prior to the Effective Date, Grace and NMC will enter into the Grace Tax Sharing and Indemnification Agreement providing for various tax matters, see "THE REORGANIZATION -- The Grace Tax Sharing and Indemnification Agreement."

XXX-002010

See also "CERTAIN INCOME TAX CONSEQUENCES OF THE TRANSACTIONS TO HOLDERS OF FRESENIUS USA COMMON STOCK -- U.S. and German Tax Consequences of Holding FMC Ordinary Shares or ADSs" and "-- Other Tax Consequences."

EACH SHAREHOLDER SHOULD CONSULT HIS OR HER OWN TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF THE REORGANIZATION, INCLUDING THE APPLICABILITY AND EFFECT OF STATE, LOCAL AND FOREIGN TAX LAWS, AND OF PROPOSED CHANGES IN APPLICABLE TAX LAWS.

200

<PAGE>  225

CERTAIN INCOME TAX
CONSEQUENCES OF THE TRANSACTIONS TO
HOLDERS OF FRESENIUS USA COMMON STOCK

The discussion below is a summary of all material U.S. federal and German tax consequences generally applicable to U.S. Holders of Fresenius USA Common Stock upon the receipt of the FMC Ordinary Shares, ADSs or (in the case of Fresenius USA Dissenting Stockholders) cash in the Fresenius USA Merger. A "U.S. Holder" is (a) any citizen or resident of the U.S., (b) a corporation, partnership, or other entity created or organized in or under the laws of the U.S. or any political subdivision thereof, or (c) an estate or trust the income of which is subject to U.S. federal income taxation regardless of source of income.

This discussion is based on the Code, Treasury regulations promulgated thereunder, IRS rulings, interpretations and judicial decisions, and German tax law, as currently in effect, all of which are subject to change at any time, which change may be applied retroactively to the transactions described herein. A ruling from the IRS regarding the U.S. federal income tax consequences of the Fresenius USA Merger on the Fresenius USA stockholders was not requested. Instead, Fresenius Medical Care and Fresenius USA are relying on the opinion of KPMG Peat Marwick LLP, tax advisors to Fresenius AG, with respect to the matters addressed herein solely as they relate to Fresenius USA stockholders. Such opinion has been filed as an exhibit to the Registration Statement.

The discussion below is not a complete analysis of all of the potential U.S. federal and German tax consequences of the Fresenius USA Merger or of holding FMC Ordinary Shares or ADSs. In addition, the U.S. federal tax consequences to particular U.S. Holders of Fresenius USA Common Stock (such as insurance companies, tax-exempt entities, financial institutions and dealers in securities), and to non-U.S. Holders may be different from that discussed herein. FRESENIUS USA STOCKHOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE PARTICULAR U.S. FEDERAL AND GERMAN TAX CONSEQUENCES APPLICABLE TO PARTICIPATING IN THE FRESENIUS USA MERGER AND HOLDING FMC ORDINARY SHARES OR ADSs.

U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE MERGER

Stockholders of Fresenius USA who exchange their shares of Fresenius USA Common Stock for FMC Ordinary Shares or ADSs in the Fresenius USA Merger will not be subject to federal income tax on the exchange, except to the extent that cash is received in lieu of fractional shares. Provided that the shares of Fresenius USA Common Stock have been held as capital assets, such cash will be treated as capital gain, and as long-term capital gain if the shares of Fresenius USA Common Stock have been held for more than one year. Such an exchanging stockholder will have a basis in the FMC Ordinary Shares or the ADSs received in the exchange equal to the basis of the shares of Fresenius USA Common Stock given up, decreased by the cash received and increased by the amount of gain recognized. The holding period of the FMC Ordinary Shares or ADSs to such an exchanging stockholder will include the holding period of the shares of Fresenius USA Common Stock given up in the exchange.

Fresenius USA Dissenting Stockholders who exchange their shares of Fresenius USA Common Stock entirely for cash will be treated as having sold their shares of Fresenius USA Common Stock in a transaction in which gain or loss is recognized. Such gain or loss will be capital gain or loss, provided that the shares of Fresenius USA Common Stock have been held as capital assets. Such gain will be long-term capital gain if the shares of Fresenius USA Common Stock were held for more than one year.

Fresenius Medical Care will recognize no gain or loss upon receipt of Fresenius USA Common Stock in exchange for FMC Ordinary Shares or ADSs.

U.S. AND GERMAN TAX CONSEQUENCES OF HOLDING FMC ORDINARY SHARES OR ADSS

TAX TREATMENT OF DIVIDENDS

Under German law, German corporations are required to withhold tax on dividends in an amount equal to 25% of the gross amount paid to resident and non-resident shareholders. A partial refund of this 25%

201

<PAGE>  226

withholding tax can be obtained by U.S. Holders under the Treaty. For U.S. federal income tax purposes, U.S. Holders are taxable on dividends paid by German corporations subject to a foreign tax credit for certain German income taxes paid. The amount of the refund of German withholding tax and the determination of the foreign tax credit allowable against U.S. income tax depend on whether the U.S. Holder is a corporation owning at least 10% of the voting stock of the German corporation.

XXX-002011

In the case of any U.S. Holder, other than a U.S. corporation owning FMC Ordinary Shares or ADSs representing at least 10% of the FMC Ordinary Shares, the German withholding tax is partially refunded under the Treaty to reduce the withholding tax to 15% of the gross amount of the dividend. In addition, for so long as the German imputation system continues to provide German resident individual shareholders with a tax credit of corporate taxes with respect to dividends paid by German corporations, the Treaty provides that U.S. Holders (other than a U.S. corporation that owns FMC Ordinary Shares or ADSs representing at least 10% of the FMC Ordinary Shares) are entitled to a further refund equal to 5% of the gross amount of the dividend. For U.S. federal income tax purposes, the benefit resulting from this refund is treated as a refund received by the U.S. Holder with respect to German corporate taxes equal to 5.88% of the gross amount of the dividend, subject to a withholding tax of 0.88% (15% of 5.88%).

Thus, for each $100 of gross dividend paid by Fresenius Medical Care to a U.S. Holder (other than a U.S. corporation owning FMC Ordinary Shares or ADSs representing at least 10% of the FMC Ordinary Shares), the dividend after partial refund of the 25% withholding tax under the Treaty will be subject to a German withholding tax of $15. If the U.S. Holder also applies for the additional 5% refund, German withholding tax is effectively reduced to $10; the cash received per $100 of gross dividend is $90. For U.S. federal income tax purposes, the U.S. Holder is treated as receiving a total dividend of $105.88 (to the extent paid out of the current and accumulated earnings and profits of Fresenius Medical Care as determined for U.S. federal income tax purposes), consisting of the $100 gross dividend and the deemed refund of German corporate tax of $5.88. The notional $105.88 dividend is deemed to have been subject to German withholding tax of $15.88. Thus, for each $100 of gross dividend, the U.S. Holder will include $105.88 in gross income and will be entitled to a foreign tax credit of $15.88, subject to the general limitations on foreign tax credits for U.S. federal income tax purposes.

In the case of a corporate U.S. Holder owning FMC Ordinary Shares or ADSs representing at least 10% of the FMC Ordinary Shares, the 25% German withholding tax is reduced under the Treaty to 5% of the gross amount of the dividend. Such a corporate U.S. Holder may, therefore, apply for a refund of German withholding tax in the amount of 20% of the gross amount of the dividends. The corporate U.S. Holder is entitled to a foreign tax credit equal to 5% of the gross amount of the dividends. Furthermore, such a corporate U.S. Holder is allowed a foreign tax credit for the portion of the total income taxes (trade income tax and corporation income tax including any surtax) paid by the German corporation attributable to the distributed profits, subject to the general limitations on foreign tax credits for U.S. federal income tax purposes.

Dividends paid in Deutschemarks to a U.S. Holder of FMC Ordinary Shares or ADSs will be included in income in a dollar amount calculated by reference to the exchange rate in effect on the date the dividends (including the deemed refund of German corporate tax) are received by such U.S. Holder. If dividends paid in Deutschemarks are converted into dollars on the date received, U.S. Holders generally should not be required to recognize foreign currency gain or loss in respect of the dividend income.

Effective January 1, 1995, a 7.5% surtax on the German withholding tax is being levied on dividend distributions paid by a German resident company. The surtax amounts to 1.875% (7.5% x 25%) of the gross dividend amount. Because the Treaty reduces the German withholding tax, U.S. Holders are entitled to a full refund of this surtax.

Under the Treaty, the refund of German tax (including the withholding tax, Treaty payment and surtax) will not be granted when the FMC Ordinary Shares or the ADSs (a) are part of the business property of a U.S. Holder's permanent establishment located in Germany or (b) are part of the assets of an individual U.S. Holder's fixed base located in Germany and used for the performance of independent personal services.

                                202

<PAGE>   227

  REFUND PROCEDURES

To claim the 5% Treaty refund, the reduction of the German withholding tax from 25% to 15% (5% for U.S. Holders that are corporations owning FMC Ordinary Shares or ADSs representing at least 10% of the FMC Ordinary Shares) and the refund of the 7.5% German surtax when applicable, the U.S. Holder must submit (either directly or, as described below, through the Depositary) a claim for refund to the German tax authorities, with the original bank voucher (or certified copy thereof) issued by the paying entity documenting the tax withheld within four years from the end of the calendar year in which the dividend is received. Claims for refund are made on a special German claim for refund form ("Claim Refund Form"), which must be filed with the German tax authorities: Bundesamt fur Finanzen, 53221 Bonn-Beuel, Germany. The Claim Refund Forms may be obtained from the German tax authorities at the same address where the applications are filed, or from the Embassy of the Federal Republic of Germany, 4645 Reservoir Road, N.W., Washington, D.C. 20007-1998, or from the Office of International Operations, Internal Revenue Service, 1325 K Street, N.W., Washington, D.C. 20225, Attention: Taxpayer Service Division, Room 900.

U.S. Holders must also submit to the German tax authorities certification of their last filed U.S. federal income tax return. Certification is obtained from the office of the Director of the IRS Center by filing a request for certification with the Internal Revenue Service Center in Philadelphia, Pennsylvania, Foreign Certificate Request, P.O. Box 16347, Philadelphia, PA 19114-0447. Requests for certification are to be made in writing and must include the U.S. Holder's name, address, phone number, social security number or

XXX-002012

employer identification number, tax return form number, and tax period for which certification is requested. The IRS will send the certification (IRS Form 6166) back to the U.S. Holder for filing with the German tax authorities. This certification is valid for three years and need only be resubmitted in a fourth year in the event of a subsequent application for refund.

In accordance with arrangements under the Deposit Agreement, the Depositary (or a custodian as its designated agent) will hold the FMC Ordinary Shares and receive and distribute dividends to U.S. Holders of ADSs, and perform administrative functions necessary to obtain the 5% treaty refund, the reduction in German withholding tax and the refund of the German surtax when applicable. These arrangements are provided by the German tax authorities and may be amended or revoked at any time in the future.

Under the arrangements currently in effect, in order for the Depositary to file the Claim Refund Forms, the Depositary will mail to eligible U.S. Holders, which U.S. Holders will be requested to sign and return to the Depositary, (a) a statement authorizing the Depositary to perform these procedures and agreeing that the German tax authorities may inform the IRS of any refunds of German taxes, and (b) a written authorization to remit the refund of withholding to another account than that of the U.S. Holder. The Depositary will attach the signed statement, the IRS Form 6166, the Claim Refund Form and a certified statement issued by the bank or broker paying the dividend to the U.S. Holder, documenting the dividend paid and the tax withheld and file them with the German tax authorities. The Depositary will also file the signed request for certification with the appropriate IRS Center. The Depositary will charge a fee to the U.S. Holder for provision of these services.

To the extent U.S. Holders hold ADSs registered with brokers participating in the Depository Trust Company, it is expected that such brokers will assist the Depositary in performing the procedures described above, and, in particular, prepare and forward the Claim Refund Forms together with the required documentation to the Depositary. The Depositary will then file the Claim Refund Forms and any attachments thereto with the German tax authorities.

The German tax authorities will issue the refunds which will be denominated in Deutschemarks in the name of the Depositary. The Depositary will convert the refunds to dollars and issue corresponding refund checks to the U.S. Holders of ADSs and brokers. The brokers, in turn, will remit corresponding refund amounts to the U.S. Holders holding ADSs registered with such brokers. U.S. Holders of FMC Ordinary Shares or ADSs who receive a refund attributable to reduced withholding taxes under the Treaty may be required to recognize foreign currency gain or loss, which will be treated as ordinary income or loss, to the extent that the dollar value of the refund received by the U.S. Holders differs from the dollar equivalent of the

<div align="center">203</div>

&lt;PAGE&gt;    228

refund on the date the dividend on which such withholding taxes were imposed was received by the Depositary or the U.S. Holder, as the case may be.

TAXATION OF CAPITAL GAINS

Under the Treaty, a U.S. Holder who is not a resident of Germany for German tax purposes will not be liable for German tax on capital gains realized or accrued on the sale or other disposition of FMC Ordinary Shares or ADSs unless the FMC Ordinary Shares or ADSs (a) are part of the business property of a permanent establishment located in Germany or (b) are part of the assets of a fixed base of an individual located in Germany and used for the performance of independent personal services.

Upon a sale or other disposition of the FMC Ordinary Shares or ADSs, a U.S. Holder will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between the amount realized and the U.S. Holder's tax basis in the FMC Ordinary Shares or ADSs. Such gain or loss will generally be capital gain or loss if the Ordinary Shares or ADSs are held by the U.S. Holder as a capital asset, and will be long-term capital gain or loss if the U.S. Holder's holding period for the FMC Ordinary Shares or ADSs exceeds one year.

GIFT AND INHERITANCE TAXES

The U.S.-Germany estate tax treaty provides that an individual whose domicile is determined to be in the U.S. for purposes of the estate tax treaty will not be subject to German inheritance and gift tax (the equivalent of the U.S. federal estate and gift tax) on the individual's death or making of a gift unless the FMC Ordinary Shares or ADSs (a) are part of the business property of a permanent establishment located in Germany or (b) are part of the assets of a fixed base of an individual located in Germany and used for the performance of independent personal services. An individual's domicile in the U.S., however, does not prevent imposition of German inheritance and gift tax with respect to an heir, donee, or other beneficiary who is domiciled in Germany at the time the individual died or the gift was made.

The U.S.-Germany estate tax treaty also provides a credit against U.S. federal estate and gift tax liability for the amount of inheritance and gift tax paid in Germany, subject to certain limitations, in a case where the FMC Ordinary Shares or ADSs are subject to German inheritance or gift tax and U.S. federal estate or gift tax.

GERMAN CAPITAL TAX

The Treaty provides that a person resident in the U.S. will not be subject

XXX-002013

to German capital tax with respect to the FMC Ordinary Shares or ADSs unless the FMC Ordinary Shares or ADSs (a) are part of the business property of a permanent establishment located in Germany or (b) are part of the assets of a fixed base of an individual located in Germany and used for the performance of independent personal services.

OTHER GERMAN TAXES

There are no German transfer, stamp or other similar taxes that would apply to U.S. Holders who purchase or sell FMC Ordinary Shares or ADSs.

OTHER TAX CONSEQUENCES

In connection with the formation of Fresenius Medical Care, Fresenius AG will contribute stock of various subsidiaries owning Fresenius Worldwide Dialysis assets located in many countries. These Fresenius Worldwide Dialysis assets are not all currently owned by these subsidiaries or may be owned in addition to other assets that will not be retained by these subsidiaries. It is the intention of Fresenius AG to incorporate Fresenius Worldwide Dialysis assets on a country-by-country basis prior to the Contribution to Fresenius Medical Care, which will require transferring assets (including by distribution, spin-off, merger and liquidation) to accomplish its intention. Such transfers may give rise to tax liabilities in these foreign countries for which the subsidiaries being contributed may be liable. In the opinion of KPMG Peat Marwick LLP, neither Fresenius Medical Care nor any of its subsidiaries will have any U.S. federal or German income tax liability as a result of any of the transfers of the Fresenius Worldwide Dialysis assets or the contribution of the stock of Fresenius AG's subsidiaries holding such assets to Fresenius Medical Care.

<center>204</center>

<PAGE>   229

Based on the currently available information of the stock ownership of Fresenius AG and Grace and the anticipated ownership of the FMC Ordinary Shares at the Effective Time, because five or fewer individuals do not own more than 50% of FMC Ordinary Shares (measured by value), Fresenius Medical Care should not currently be classified as a "personal holding company" ("PHC"), as such term is defined in the Code. It is currently not expected that Fresenius Medical Care will become a PHC in the foreseeable future. No assurance can be given, however, that such stock ownership will not change in the future.

If Fresenius Medical Care were classified as a PHC, it would be taxed on its U.S. source passive income, including dividends received from NMC and Fresenius USA, and would avoid this tax (currently imposed at a 39.6% rate) on such passive income only to the extent it paid dividends to its shareholders.

<center>205</center>

<PAGE>   230

<center>DESCRIPTION OF NEW PREFERRED SHARES</center>

The following summary of the material provisions of the New Preferred Shares does not purport to be complete and is qualified in its entirety by reference to the provisions of the Certificate of Amendment which is attached hereto as Appendix B. ALL SHAREHOLDERS ARE URGED TO READ THE CERTIFICATE OF AMENDMENT IN ITS ENTIRETY.

GENERAL

In the Recapitalization, holders of Grace Common Stock will receive one New Preferred Share for each share of Grace Common Stock held. Neither the stated value nor the Liquidation Preference of the New Preferred Shares is necessarily indicative of the price at which the New Preferred Shares will actually trade at or after the time of the issuance, and the New Preferred Shares may trade at prices below their stated value. The market price of the New Preferred Shares can be expected to fluctuate with changes in the market and economic conditions, the financial condition and prospects of FNMC and other factors that generally affect the market prices of securities. FNMC intends to seek to list the New Preferred Shares on a national securities exchange. However, no assurance can be given that the New Preferred Shares will satisfy the listing criteria of any such exchange.

The number of New Preferred Shares authorized will be equal to the number of shares of Grace Common Stock issued and outstanding at the Effective Time. The Liquidation Preference of the New Preferred Shares will be $.10 per share. The New Preferred Shares will rank, with respect to dividend rights and rights on liquidation, dissolution or winding up, subsequent to all shares of Grace 6% Preferred Stock, Grace Class A Preferred Stock and Grace Class B Preferred Stock outstanding as of the Effective Time, and prior to all other shares of Grace capital stock, including Grace Class C Preferred Stock and Grace Common Stock.

DIVIDENDS

The holders of the New Preferred Shares will be entitled to receive, when, as and if declared by the FNMC Board, out of assets legally available therefor, dividends on the New Preferred Shares (the "Special Dividend") equal, in the aggregate, to the Special Dividend Amount (the "Special Dividend Amount") calculated as indicated below. Subject to the requirements of applicable law, the Special Dividend will be declared in a single declaration, irrespective of the number of installments in which it will be paid, and will be publicly announced by Fresenius Medical Care on or before May 1, 2002 (such announcement, the "Public Announcement"). Upon such declaration, the Special Dividend will be payable in cash in annual installments on the Payment Date; and the aggregate

XXX-002014

amount payable on any Payment Date will be equal to the lesser of (a) $100 million or (b) the amount of the Special Dividend Amount remaining unpaid.

The Special Dividend Amount will be equal to $200 million (a) plus the Special Differential, if the Special Differential is a positive number, and (b) less the absolute value of the Special Differential, if the Special Differential is a negative number. The Special Differential will be equal to (a) the Applicable Percentage of the excess of the cumulative actual adjusted cash flow of Fresenius Medical Care on a consolidated basis for the five-year period beginning on January 1, 1997 and ending on December 31, 2001 (the "Dividend Accrual Period"), above $3.7 billion less (b) $200 million. The adjusted cash flow of Fresenius Medical Care on a consolidated basis will be equal to net income to common shareholders (without regard to the Special Dividend), plus depreciation and amortization, plus non-cash charges, provisions for impairment in the value of long-term assets, and similar recorded reserves as of December 31, 2001, as reflected on Fresenius Medical Care's consolidated audited financial statements prepared in accordance with US GAAP, less any after-tax cash expenses paid to third parties incurred with respect to the matters underlying the OIG Investigation regarding NMC and its subsidiaries referenced in the five subpoenas received by NMC from the OIG on October 17, 1995 not reflected in net income to common shareholders during the Dividend Accrual Period. The Applicable Percentage will be 44.8%, which percentage will be increased and decreased proportionately to reflect issuances or repurchases of New Preferred Shares following the Reorganization. The Special Dividend Amount is not subject to any maximum or minimum limitation.

206

&lt;PAGE&gt;  231

Set forth below are two hypothetical examples of the computation of the Special Dividend Amount. Shareholders should note that all amounts used to compute "Adjusted Cash Flow" in the examples are hypothetical amounts selected for illustrative purposes only, and are not intended and should not be treated as estimates or forecasts of future performance by Fresenius Medical Care or of the likelihood of payment of the Special Dividend or of the Special Dividend Amount. For a discussion of certain factors which may affect the payment of the Special Dividend, see "RISK FACTORS -- Other Risks -- Special Dividend."

| | 1997-2001 CUMULATIVE |
|---|---|
| HYPOTHETICAL CASE 1 | |
| Net Income to Common Shareholders | $2,100 |
| Plus: Depreciation & Amortization | 1,500 |
| Less: After Tax Charges related to OIG Investigation not reflected in net income during the dividend accrual period | -- |
| Plus: Other Defined Non Cash Charges & Reserves | -- |
| = Adjusted Cash Flow to Common Shareholders | $3,600 |
| Calculation of the "Special Differential" | |
| Adjusted Cash Flow during "Dividend Accrual Period" | $3,600 |
| Less: Target Cash Flow | 3,700 |
| Excess Cash Flow above Target Cash Flow | 0 |
| x 44.8% (Applicable Percentage) | 0 |
| Less: 200 million | (200) |
| Special Differential | $ (200) |
| Special Dividend Payable | |
| Target Face Amount | $ 200 |
| Plus: Special Differential | (200) |
| Special Dividend Amount | $ 0 |
| HYPOTHETICAL CASE 2 | |
| Net Income to Common Shareholders | $2,700 |
| Plus: Depreciation & Amortization | 1,300 |
| Less: After Tax Charges related to OIG Investigation not reflected in net income during the dividend accrual period | -- |
| Plus: Other Defined Non Cash Charges & Reserves | -- |
| = Adjusted Cash Flow to Common Shareholders | $4,000 |
| Calculation of the "Special Differential" | |
| Adjusted Cash Flow during "Dividend Accrual Period" | $4,000 |
| Less: Target Cash Flow | 3,700 |
| Excess Cash Flow above Target Cash Flow | 300 |
| x 44.8% (Applicable Percentage) | 135 |
| Less: $200 million | (200) |
| Special Differential | $ (65) |

207

&lt;PAGE&gt;  232

&lt;TABLE&gt;
&lt;CAPTION&gt;

1997-2001

XXX-002015

| | CUMULATIVE |
|---|---|
| <S> | <C> |
| Special Dividend Payable | |
| Target Face Amount........................................................ | $ 200 |
| Plus: Special Differential................................................. | (65) |
| | --------- |
| Special Dividend Amount.................................................... | $ 135 |
| New Preferred Shares Outstanding........................................... | 98.1 |
| Special Dividend Payable per share to New Preferred Shareholders on Oct. 1, 2002 | |
| ($100 million / 98.1 shares)........................................... | $ 1.0 |
| Special Dividend Payable per share to New Preferred Shareholders on Oct. 1, 2003 | |
| ($35 million / 98.1 shares)............................................ | $ 0.36 |

</TABLE>

The Special Dividend will begin to accrue from January 1, 1997, and will accrue on a quarterly basis, in each case, whether or not declared, subject to decrease in future periods to the extent that the Special Differential decreases after any accrual. Any payment of the Special Dividend made in an amount less than the total amount of the Special Dividend at the time payable will be allocated pro rata on a share-by-share basis among all New Preferred Shares outstanding at the time.

The Special Dividend must be paid in cash, except that if FNMC Common Stock is listed on the NYSE or quoted on the Nasdaq Stock Market, the Special Dividend, or any installment thereof, may be paid, in the sole discretion of FNMC, either in (a) cash, (b) FNMC Common Stock, based upon the market price as of the record date for such payment, or (c) any combination of cash and FNMC Common Stock, based upon the market price as of the record date for such payment.

If, at any time after May 1, 2002, any portion of the Special Dividend is not declared, or if any installment thereof is not paid on the applicable Payment Date, FNMC may not make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any shares of capital stock which rank below the New Preferred Shares ("Junior Stock"), or purchase, redeem or otherwise acquire for value any shares of Junior Stock, except for distributions or purchases paid exclusively in other Junior Stock.

The New Preferred Shares are not entitled to receive any other dividends or payments other than the Special Dividend. If no Special Dividend is payable on the New Preferred Shares, the New Preferred Shares will still be entitled to a $.10 Liquidation Preference per share, to the voting rights described below under the first paragraph of "-- Voting Rights" and to the Optional Redemption Price as described under "-- Optional Redemption."

ADJUSTMENTS

The FNMC Board, with the concurrence of all of the Independent Directors of Fresenius Medical Care, or a majority of such Independent Directors if there are three or more, shall make appropriate adjustments to the provisions of the New Preferred Shares respecting dividends and distributions therein in order to preserve their intended economic effect, in the light of changes in capitalization, accounting policy and extraordinary transactions (including without limitation mergers, consolidations or sales of assets). No adjustments of such provisions on account of the foregoing or otherwise shall be made without the concurrence of the Independent Directors of Fresenius Medical Care.

VOTING RIGHTS

In addition to any voting rights provided by law, holders of the New Preferred Shares will be entitled to vote, in person or by proxy, on all matters voted on by holders of FNMC Common Stock voting together as a single class with other shares entitled to vote thereon. With respect to any such vote, each New Preferred Share shall entitle the holder thereof to cast one-tenth of a vote.

If, on any date after the Public Announcement, FNMC has failed to declare, or has failed to pay on the applicable Payment Date, the full amount of the installment of the Special Dividend payable on the New

208

<PAGE>  233

Preferred Shares, then the number of directors constituting the FNMC Board will, without further action, be increased by two and the holders of shares of the New Preferred Shares will receive, in addition to their other voting rights, the exclusive right, voting separately as a single class, to elect two directors to fill such newly created directorship. Any such additional directors will continue as directors, and the holders of the New Preferred Shares will have such additional voting rights until such time as all installments of the Special Dividend then payable have been declared and paid in full, at which time such additional directors will cease to be directors, the number of directors constituting the FNMC Board will be reduced by two and the additional voting rights of the holders of the New Preferred Shares will terminate.

Each director elected by the holders of the New Preferred Shares will, unless his or her term expires earlier or unless he or she is removed, hold office until the annual meeting of shareholders next succeeding his or her election or until his or her successor, if any, is elected and qualified.

If any director so elected by the holders of the New Preferred Shares ceases to serve as a director before his or her term expires (except by reason

XXX-002016

of the termination of the voting rights accorded to the holder of the New
Preferred Shares), the holders of the New Preferred Shares then outstanding and
entitled to vote for such director may elect a successor to hold office for the
unexpired term of the director whose place shall be vacant.

OPTIONAL REDEMPTION

     FNMC will not have any right to redeem any of the New Preferred Shares
prior to the Public Announcement. Thereafter, FNMC may, at its sole option and
election, redeem all or a portion of outstanding New Preferred Shares (an
"Optional Redemption"), on not more than 45 nor less than 30 days' notice of the
date of redemption (any such date an "Optional Redemption Date"), at a price per
share (the "Optional Redemption Price") equal to the greater of (a) the
Liquidation Preference or (b) an amount per share equal to any unpaid portion of
the Special Dividend, whether or not declared or payable, on the applicable
Optional Redemption Date. The Optional Redemption Price shall be paid in cash,
except that if FNMC Common Stock is listed on the NYSE or quoted on the Nasdaq
Stock Market, the Optional Redemption Price may be paid, in the sole discretion
of FNMC, either in (a) cash, (b) FNMC Common Stock, based upon the market price
as of the record date for such Optional Redemption, or (c) any combination of
cash and FNMC Common Stock, based upon the market price as of the record date
for such Optional Redemption. If FNMC redeems less than all the New Preferred
Shares then outstanding, the New Preferred Shares to be redeemed shall be
selected pro rata.

PREEMPTIVE RIGHTS

     The holders of New Preferred Shares are not entitled to any preemptive or
subscription rights.

                                     209
<PAGE>   234

               DESCRIPTION OF CAPITAL STOCK OF FRESENIUS MEDICAL CARE

     The following description of the material terms of the capital stock of
Fresenius Medical Care does not purport to be complete and is qualified in its
entirety by reference to Fresenius Medical Care's organizational documents. For
information with respect to the Deposit Agreement pursuant to which the FMC
Ordinary Shares will be held on behalf of U.S. shareholders, see "DESCRIPTION OF
AMERICAN DEPOSITARY RECEIPTS."

GENERAL

     The outstanding share capital of Fresenius Medical Care after the
Reorganization will consist of approximately 70,000,000 FMC Ordinary Shares, all
of which will be issued in bearer form and will be freely transferable.

     The FMC Management Board will be authorized in the Articles of Association
with the approval of the Supervisory Board, to increase the capital of Fresenius
Medical Care by issuing FMC Preferred Shares to be known as Approved Capital.
The Articles of Association will also authorize the issuance of FMC Preferred
Shares as Conditional Capital, which will not require Supervisory Board consent.
Such authorization will be provided by Fresenius AG as sole shareholder of
Fresenius Medical Care following the Contribution and prior to the
Reorganization. The issuance of Approved Capital pursuant to such shareholder
authorization is limited to a period not exceeding five years from the date of
shareholder authorization. No further consent of shareholders is required in
connection with the issuance of FMC Preferred Shares as Approved Capital or
Conditional Capital.

     FMC Preferred Shares issued as Approved Capital may be issued for cash up
to a total of DM 70 million nominal amount (14 million shares), to be known as
"Approved Capital I" or for non-cash consideration up to a total of DM 105
million nominal amount (21 million shares), to be known as "Approved Capital II"
in connection with acquisitions by Fresenius Medical Care. Conditional Capital
may be used to issue FMC Preferred Shares in connection with acquisitions, or as
part of equity-based employee compensation arrangements. See "MANAGEMENT OF
FRESENIUS MEDICAL CARE -- Compensation of FMC Management Board and Certain Other
Executive Officers -- Stock Option Plan." However, certain issues of Conditional
Capital as employee compensation may be subject to legal challenge. See
"COMPARISON OF CERTAIN RIGHTS OF SHAREHOLDERS OF GRACE AND FRESENIUS USA."
Fresenius Medical Care and Fresenius AG may enter into a pooling agreement for
the benefit of the holders of FMC Preferred Shares which may contain certain
provisions similar to those of the Pooling Agreement. See "DESCRIPTION OF THE
POOLING AGREEMENT."

ABSENCE OF A PUBLIC MARKET

     Prior to the consummation of the Reorganization, there will have been no
public market for the ADSs or the FMC Ordinary Shares. Application will be made
to list the ADSs on the NYSE and to list the FMC Ordinary Shares on the
Frankfurt Stock Exchange as soon as possible following the Reorganization.
However, there can be no assurance that such FMC Ordinary Shares or such ADSs
will be listed on the Frankfurt Stock Exchange or the NYSE, respectively, or
that a public market for such FMC Ordinary Shares or such ADSs will develop.

DIVIDEND RIGHTS

     Dividends, if any, are declared at the annual general meeting of
shareholders, which must be held within eight months from the end of a fiscal
year, and are paid once a year. Shareholders may present a dividend coupon
(Dividendenschein) to receive such dividends at any time within a four-year
period which commences at the end of the year during which the dividend became

XXX-002017

due. If a shareholder has presented a dividend coupon to Fresenius Medical Care
for payment within such four-year period, the statute of limitations for
enforcing the right to receive such dividend payment is two years from the end
of such four-year period. When a shareholder has presented the last outstanding
dividend coupon in order to receive the dividend payable in respect of that
dividend coupon, such shareholder is required to submit to Fresenius Medical
Care the renewal

                                    210
<PAGE>   235

coupon (Erneuerungsschein) attached at the bottom of each sheet of dividend
coupons in order to obtain the next series of dividend coupons to be issued by
Fresenius Medical Care.

        Pursuant to the Deposit Agreement, the Depositary will receive all such
dividends and distributions on all Deposited Securities and will, as promptly as
practicable, distribute such dividends and distributions to the holders of ADRs
entitled thereto. See "DESCRIPTION OF AMERICAN DEPOSITARY RECEIPTS --
Distributions on Deposited Securities."

        For each fiscal year, the treatment of all unappropriated profits,
including the amount of net profits of Fresenius Medical Care which will be
distributed by way of dividends is proposed by the FMC Management Board and the
FMC Supervisory Board, and is subject to the approval of the shareholders. The
FMC Management Board and the FMC Supervisory Board may allocate up to 50% of
unappropriated profits to the free reserve of Fresenius Medical Care (that is,
not distribute such profits) without shareholder approval, in which case the
shareholders approve the treatment of the balance of such profits. For a
discussion of the intended dividend policy of Fresenius Medical Care, see "THE
REORGANIZATION -- Conduct of Business Prior to Effective Time -- Certain
Covenants -- Certain Transactions." Failure or inability of FNMC to pay the
Special Dividend on the New Preferred Shares does not prevent Fresenius Medical
Care from paying dividends on the FMC Ordinary Shares.

LIQUIDATION RIGHTS

        In accordance with the German Stock Corporation Law (Aktiengesetz), upon a
liquidation of Fresenius Medical Care, any liquidation proceeds remaining after
paying all of Fresenius Medical Care's liabilities would be distributed among
the holders of FMC Ordinary Shares and the holders of any outstanding non-voting
preferred shares in proportion to the total nominal value of the shares held by
each holder.

PREEMPTIVE RIGHTS

        Under the German Stock Corporation Law, an existing stockholder in a stock
corporation has a preferential right to subscribe for any issue by such
corporation of shares, debt instruments convertible into shares and
participating debt instruments in proportion to the shares held by such
stockholder in the existing capital of such corporation. The German Stock
Corporation Law provides that this preferential right can only be excluded by a
stockholder resolution passed at the same time as the resolution authorizing the
capital increase. A supermajority of at least three quarters of the votes
present at the meeting, as well as a "special justification" by the corporation
stating that the goal pursued by the corporation with the issuance of the new
security could not reasonably be achieved without the elimination of preemptive
rights, is required for the exclusion. The Approved Capital and Conditional
Capital described under "-- General" will exclude preemptive rights. Such
exclusion will be authorized by Fresenius AG in its capacity as sole shareholder
of Fresenius Medical Care prior to the Reorganization, and probably does not
need justification in issuances thereafter.

VOTING RIGHTS

        Each FMC Ordinary Share entitles the holder thereof to one vote at general
meetings of the shareholders of Fresenius Medical Care for every DM 5 of nominal
value. Resolutions are passed at a general or special meeting of the
shareholders of Fresenius Medical Care by a majority of the votes cast, unless a
higher vote is required by law or the Articles of Association of Fresenius
Medical Care. The German Stock Corporation Law and the organizational documents
of Fresenius Medical Care require that the following significant resolutions be
passed by a majority of at least 75% of the capital represented in connection
with the vote taken on such resolution: changes or amendments to the scope of
business; changes or amendments to Fresenius Medical Care's Articles of
Association; certain capital increases; capital decreases; a dissolution of
Fresenius Medical Care; a merger of Fresenius Medical Care into or a
consolidation of Fresenius Medical Care with another company, a transfer of all
of Fresenius Medical Care's assets; a change of Fresenius Medical Care's
corporate form; and the elimination of preemptive rights.

                                    211
<PAGE>   236

        A general or special meeting of the shareholders of Fresenius Medical Care
may be called by the FMC Management Board, the FMC Supervisory Board or by
shareholders holding in the aggregate at least 5% in nominal value of Fresenius
Medical Care's issued share capital. The right to attend and vote at a
shareholders' meeting is only accorded to those shareholders who, not later than
five days before the meeting, deposit their shares until the end of the meeting
with Fresenius Medical Care, with a German notary, with a bank serving as a
depositary for such securities or at any other place of deposit specified in the
notice of the general meeting. Shares are also deemed to have been deposited if,
with the consent of a depositee, they are blocked in the bank account in which

XXX-002018

they are held until the end of the general meeting. In order to exercise the right to attend and vote at the general meeting, shareholders must provide Fresenius Medical Care at the general meeting with appropriate documentation which evidences the deposit of FMC Ordinary Shares as described above. Following such deposit of FMC Ordinary Shares or the blocking of the account in which they are held, a holder of FMC Ordinary Shares may still sell or otherwise dispose of his FMC Ordinary Shares; provided, however, that any voting instructions such shareholder may have given with respect to such FMC Ordinary Shares will be invalidated and any admission cards such shareholder may have received that would entitle him or her to attend and vote at the meeting must be returned to the deposit bank or Fresenius Medical Care. Notice of shareholder meetings must be published in the German Federal Gazette (Bundesanzeiger) at least one month prior to the last day on which the FMC Ordinary Shares must be deposited, which is required to be not later than the fifth business day prior to the date of the general meeting. Pursuant to the Articles of Association of Fresenius Medical Care, notice of shareholder meetings will also be published in two U.S. newspapers, which initially will be The New York Times and The Wall Street Journal.

Although notice of each shareholder meeting (whether the annual general meeting or a special meeting) is required to be given as described above, neither the German Stock Corporation Law nor the organizational documents of Fresenius Medical Care have any minimum quorum requirement applicable to such meetings.

Amendments of the organizational documents of Fresenius Medical Care may be proposed either jointly by the FMC Supervisory Board and the FMC Management Board or by a shareholder or group of shareholders holding a minimum of 5% of the nominal value of Fresenius Medical Care's issued share capital. A resolution amending the articles of association of Fresenius Medical Care must be passed by at least 75% of the capital represented at the meeting of shareholders at which the resolution is considered.

For a discussion of the procedures to be followed by the Depositary to enable holders of ADRs to give voting instructions with respect to the FMC Ordinary Shares represented by their ADSs, see "DESCRIPTION OF AMERICAN DEPOSITARY RECEIPTS -- Voting of Deposited Securities."

FMC PREFERRED SHARES

Under German law, the annual dividend paid on the FMC Preferred Shares must, in all cases, be paid before payment on the FMC Ordinary Shares is paid. The minimum annual dividend payable on the FMC Preferred Shares will be 4% of the shares' nominal value or 20 pfennigs per year. In addition, the dividend on the preferred shares of a German corporation is generally greater than the dividend on ordinary shares. Accordingly, Fresenius Medical Care's Articles of Association also provide that the annual dividend paid on the FMC Preferred Shares must exceed the annual dividend on the FMC Ordinary Shares by 2% of the FMC Preferred Shares' nominal value or 10 pfennigs. The FMC Preferred Shares will not be entitled to a preference in liquidation.

The FMC Preferred Shares will not have any voting rights, except as described in this paragraph. If (i) the minimum annual dividend payable on the FMC Preferred Shares is not paid in any year, and (ii) both the dividend arrearage and the dividend payable on the FMC Preferred Shares for the following year are not paid in full, in the following year, then the FMC Preferred Shares shall have the same voting rights as the FMC Ordinary Shares until all FMC Preferred Share dividend arrearages are fully paid up.

Fresenius Medical Care believes that the FMC Preferred Shares may provide flexibility in structuring and executing future financing and acquisitions, and in meeting other corporate needs such as providing employee compensation plans that may involve the issuance of equity securities. Where advisable, the FMC

212

<PAGE>   237

Preferred Shares can be given economic and other terms (other than voting rights) comparable to those of the FMC Ordinary Shares.

EXCHANGE CONTROLS AND OTHER LIMITATIONS

At the present time, Germany does not restrict the export or import of capital, except for investments in areas like Iraq, Serbia or Montenegro. However, for statistical purposes only, every individual or corporation residing in Germany (a "Resident") must report to the German Central Bank (Deutsche Bundesbank), subject only to certain immaterial exceptions, any payment received from or made to an individual or a corporation resident outside of Germany (a "Non-resident") if such payment exceeds DM 5,000 (or the equivalent in a foreign currency). In addition, Residents must report any claims against, or any liabilities payable to, Non-residents, if such claims or liabilities, in the aggregate, exceed DM 500,000 (or the equivalent in a foreign currency) at the end of any month. Residents must also report any direct investment made or received from outside Germany if such investment exceeds DM 100,000.

There are no limitations imposed by German law or the Articles of Association (Satzung) of Fresenius Medical Care on the right of a Non-resident to hold or vote the FMC Ordinary Shares or the ADSs.

213

<PAGE>   238

DESCRIPTION OF THE POOLING AGREEMENT

XXX-002019

The following is a summary of the material provisions of the Pooling
Agreement, to be dated as of the Effective Date, among Fresenius Medical Care,
Fresenius AG and the Independent Directors as agents of the Minority
Shareholders (the "Pooling Agreement"). This summary does not purport to be
complete and is qualified in its entirety by reference to the Pooling Agreement
which will be filed as an Exhibit to the Registration Statement. Terms used
herein and not otherwise defined shall have the respective meanings set forth in
the Pooling Agreement.

GENERAL

The Pooling Agreement shall be for the benefit of all persons ("Minority
Shareholders") from time to time beneficially owning shares or ADRs of Fresenius
Medical Care, other than Fresenius AG and its affiliates or their agents and
representatives.

INDEPENDENT DIRECTORS

During the term of the Pooling Agreement, no less than one third of all
members of the FMC Supervisory Board to be elected by shareholders must be
Independent Directors (i.e., persons without a substantial business or
professional relationship with Fresenius Medical Care, Fresenius AG, or any
Affiliate of either, other than as a director of Fresenius Medical Care);
provided that there must be at least two Independent Directors at all times
during the term of the Pooling Agreement; and provided that if an Independent
Director resigns, is removed, or is otherwise unable or unwilling to serve in
such capacity, a new person will be appointed to serve as an Independent
Director in accordance with the provisions of the Fresenius Medical Care
articles of association and the Pooling Agreement, if as a result of the
resignation or removal the number of Independent Directors falls below the
aforementioned minimum.

EXTRAORDINARY TRANSACTIONS

During the term of the Pooling Agreement, Fresenius Medical Care and its
affiliates and Fresenius AG and its affiliates must comply with all provisions
of German law regarding (a) any merger, consolidation, sale of all or
substantially all assets, recapitalization, other business combination,
liquidation or other similar action not of the ordinary course of business of
Fresenius Medical Care, (b) any issuance of shares of voting capital stock of
Fresenius Medical Care ("Voting Shares") representing more than 10% of the total
Voting Shares outstanding on a fully diluted basis and (c) any amendment to the
Articles of Association of Fresenius Medical Care which adversely affects any
holder of FMC Ordinary Shares.

INTERESTED TRANSACTIONS

During the term of the Pooling Agreement, Fresenius AG and Fresenius
Medical Care have agreed that any transaction or contract (or a series of
related transactions or contracts) between Fresenius AG or any of its
affiliates, on the one hand, and Fresenius Medical Care or its affiliates, on
the other hand, which transaction or contract (or a series of related
transactions or contracts) involves aggregate payments in any year in excess of
10 million DM for each individual transaction or contract (or a related series
of transactions or contracts) ("Interested Transactions") must be approved by a
majority of the Independent Directors unless such transaction or contract (or
series of related transactions or contracts) has been described in a business
plan or budget of Fresenius Medical Care that has been previously approved by a
majority of Independent Directors. In any year in which the aggregate amount of
transactions that require approval (or that would have required approval in such
year but for the fact that such payment or other consideration did not exceed DM
10 million) has exceeded DM 50 million, all further Interested Transactions
involving more than DM 5 million must be approved by a majority of the
Independent Directors unless such transaction or contract (or series of related
transactions or contracts) has been described in a business plan or budget of
Fresenius Medical Care that has been previously approved by a majority of
Independent Directors.

DISPOSITION OF VOTING SHARES; TAKE-ALONG RIGHTS

During the three-year period following the Effective Date (the "Standstill
Period") Fresenius AG and its affiliates may not sell, assign, transfer or
otherwise dispose of any Voting Shares except (a) to any person or entity over
which Fresenius AG has control (other than Fresenius Medical Care) or (b)
pursuant to a sale in which all Minority Shareholders are offered the
opportunity to participate on a pro rata basis with

214

<PAGE>  239

Fresenius AG. During the Standstill Period, Fresenius AG, must at all times own
at least 50.3% of all Voting Shares outstanding on a fully diluted basis, but
may not own more than 57% of all Voting Shares outstanding on a fully diluted
basis (unless such greater ownership percentage is approved by a majority of the
Independent Directors on behalf of the Minority Shareholders and all outstanding
Voting Shares not then owned by Fresenius AG are acquired by Fresenius AG at the
same price and terms in compliance with the Exchange Act).

During any remaining term of the Pooling Agreement following the Standstill
Period, (a) Fresenius AG (and its affiliates) may not acquire Voting Shares
during any 90-day period representing more than 5% of the outstanding Voting
Shares on a fully diluted basis unless (i) Fresenius AG announces its intention
to effect such acquisitions at least two days prior to the commencement of such
90-day period and reports the result of such acquisitions promptly following

XXX-002020

such 90-day period or (ii) Fresenius AG shall acquire such shares in an offering in which all holders of FMC Ordinary Shares (including holders of ADSs) shall have preemptive rights; and (b) Fresenius AG and its affiliates may not acquire Voting Shares, during any such 90-day period representing more than 15% of the outstanding Voting Shares on a fully diluted basis except (i) pursuant to a tender offer for all Voting Shares (subject to proration) made in compliance with the Exchange Act and the Securities Act or (ii) pursuant to an offering in which all holders of FMC Ordinary Shares (including holders of ADSs) shall have preemptive rights.

During any remaining term of the Pooling Agreement after the Standstill Period, Fresenius AG and its affiliates may not sell, assign, transfer or otherwise dispose of any Voting Shares representing more than 50% of the aggregate voting power of FMC Voting Shares (other than to a person or entity over which Fresenius AG has control that agrees to be bound by the terms of this Agreement or in a widely distributed public offering), without offering all other holders of Voting Shares the opportunity to participate on a pro rata basis on the same terms and conditions.

During the term of the Pooling Agreement, Fresenius AG and its affiliates may not pledge or encumber the Voting Shares held by them in such a way that any voting rights may be exercised by the pledgee and may not enter into any other pooling agreement with respect to such Voting Shares, in each case if such action would prevent Fresenius AG from fulfilling its obligations under the Pooling Agreement.

The foregoing will not apply to FMC Voting Shares held by Fresenius AG which are subject to options as described under "THE REORGANIZATION -- Employee Benefits."

LISTING OF AMERICAN DEPOSITARY SHARES; SEC FILINGS

During the term of the Pooling Agreement, Fresenius AG has agreed to use its best efforts to exercise its rights as the majority shareholder to cause Fresenius Medical Care to and Fresenius Medical Care has agreed to (a) maintain the effectiveness of the Deposit Agreement (or a similar agreement) and to assure that the ADSs are listed on either the NYSE or the Nasdaq Stock Market; (b) file all reports, required by the NYSE or the Nasdaq Stock Market, as applicable, the Securities Act, the Exchange Act and all other applicable laws ("Securities Filings"); (c) prepare all financial statements required for any Securities Filing in accordance with US GAAP; (d) on an annual basis, prepare audited consolidated financial statements including, without limitation, a balance sheet, a statement of income and retained earnings, and a statement of changes in financial position, and all appropriate notes, all in accordance with US GAAP, and, on a quarterly basis, prepare and file consolidated financial statements prepared in accordance with US GAAP, (e) file materials with the Commission with respect to annual and special shareholder meetings under cover of Form 6-K which materials will also be made available to the Depositary for distribution to holders of ADRs, and (f) make available to the Depositary for distribution to holders of ADRs on an annual basis, a copy of any report prepared by the Supervisory Board and provided to the shareholders of Fresenius Medical Care generally pursuant to Section 3.14(2) of the German Stock Corporation Law (or any successor provision) concerning the results of its examination of the managing board report on the relation of Fresenius Medical Care with connected enterprises. Fresenius Medical Care intends to provide in the materials referred to in clause (e) information generally comparable to that which would be provided to shareholders of a U.S. corporation in a proxy statement filed with the Commission, except that certain information, including information relating to

215

<PAGE>   240

Fresenius Medical Care's management, executive compensation and options, beneficial ownership of Fresenius Medical Care securities and certain related party transactions will be provided in accordance with the disclosure requirements applicable to "foreign private issuers," as defined in the Commission's rules.

TERM

The Pooling Agreement will terminate upon (a) the acquisition of all Voting Shares by Fresenius AG or its affiliates; (b) the reduction of Fresenius AG's beneficial ownership in Fresenius Medical Care to less than 25% of the voting power of the outstanding FMC Voting Securities or (c) Fresenius Medical Care no longer meeting the minimum threshold for obligatory registration of the FMC Ordinary Shares or ADSs under Section 12(g)(1) of the Exchange Act and Rule 12g-1 thereunder.

AMENDMENT

The Pooling Agreement may be amended by written consent of Fresenius AG and a majority of the Independent Directors; provided that Minority Shareholders beneficially owning more than 75% of the FMC Ordinary Shares held by Minority Shareholders approve such amendment.

ENFORCEMENT; GOVERNING LAW

The Pooling Agreement is governed by New York law and may be enforced in the state and federal courts of New York. Fresenius Medical Care and Fresenius AG have confirmed their intention to abide by the terms of the Pooling Agreement as described herein.

DIRECTORS AND OFFICERS

XXX-002021

Subject to any mandatory restrictions imposed by German law, Fresenius
Medical Care intends to obtain directors and officers insurance in respect of
all liabilities arising from or relating to the service of the members of the
FMC Supervisory Board and the officers of Fresenius Medical Care in accordance
with customary and usual policies followed by public corporations in the U.S. if
available at commercially reasonable rates and on commercially reasonable terms
and conditions.

216

<PAGE>   241

### DESCRIPTION OF AMERICAN DEPOSITARY RECEIPTS

The following is a summary of the material provisions of the Deposit
Agreement to be entered into among Fresenius Medical Care, Morgan Guaranty Trust
Company of New York, as Depositary, and the registered holders from time to time
of the ADRs issued thereunder. This summary does not purport to be complete and
is qualified in its entirety by reference to the Deposit Agreement. Copies of
the Deposit Agreement are available for inspection at the principal office of
the Depositary in New York, which is presently located at 60 Wall Street, New
York, New York 10260. Terms used herein and not otherwise defined shall have the
respective meanings set forth in the Deposit Agreement.

ADRs evidencing ADSs are issuable by the Depositary pursuant to the terms
of the Deposit Agreement. Each ADS represents, as of the date hereof, the right
to receive one-third of a FMC Ordinary Share deposited under the Deposit
Agreement (together with any additional shares deposited thereunder and all
other securities, property and cash received and held thereunder at any time in
respect of or in lieu of such deposited FMC Ordinary Shares, the "Deposited
Securities") with the Custodian, currently the Frankfurt office of Dresdner Bank
AG (together with any successor or successors thereto, the "Custodian"). An ADR
may evidence any number of ADSs. Only persons in whose names ADRs are registered
on the books of the Depositary will be treated by the Depositary and Fresenius
Medical Care as registered holders ("Holders").

DEPOSIT, TRANSFER AND WITHDRAWAL

FMC Ordinary Shares may be deposited under the Deposit Agreement by
delivery thereof to the Custodian, at the account maintained by the Custodian
for such purpose at the Deutscher Kassenverein AG (the "DKV"). In connection
with the deposit of FMC Ordinary Shares thereunder, the Depositary or the
Custodian may require the following in form satisfactory to it: (a) a written
order directing the Depositary to execute and deliver to, or upon the written
order of, the person or persons designated in such order an ADR or ADRs
evidencing the number of ADSs representing such deposited FMC Ordinary Shares (a
"Delivery Order"); (b) proper endorsements or duly executed instruments of
transfer in respect of any such deposited FMC Ordinary Shares in registered
form; (c) instruments assigning to the Custodian or its nominee any distribution
on or in respect of such deposited FMC Ordinary Shares or indemnity therefor;
and, (d) proxies entitling the Custodian to vote any such deposited FMC Ordinary
Shares in registered form. As soon as practicable after the Custodian receives
Deposited Securities pursuant to any such deposit or pursuant to paragraph (10)
or (13) of the form of ADR, the Custodian shall present such Deposited
Securities for registration of transfer into the name of the Custodian or its
nominee, to the extent such registration is practicable, at the cost and expense
of the person making such deposit (or for whose benefit such deposit is made)
and shall obtain evidence satisfactory to it of such registration. Deposited
Securities shall be held by the Custodian for the account and to the order of
the Depositary at such place or places and in such manner as the Depositary
shall determine. Deposited Securities may be delivered by the Custodian to any
person only under the circumstances expressly contemplated in the Deposit
Agreement. To the extent that the provisions of or governing the FMC Ordinary
Shares make delivery of certificates therefor impracticable, FMC Ordinary Shares
may be deposited by such delivery thereof as the Depositary or the Custodian may
reasonably accept, including, without limitation, by causing them to be credited
to an account maintained by the Custodian for such purpose with Fresenius
Medical Care or an accredited intermediary, such as a bank, acting as a
registrar for the FMC Ordinary Shares, together with delivery of the documents,
payments and Delivery Order referred to in the Deposit Agreement to the
Custodian or the Depositary.

After any such deposit of FMC Ordinary Shares, the Custodian shall notify
the Depositary of such deposit and of the information contained in any related
Delivery Order by letter, first class airmail postage prepaid, or, at the
request, risk and expense of the person making the deposit, by cable, telex or
facsimile transmission. After receiving such notice from the Custodian, the
Depositary, subject to the Deposit Agreement, shall as promptly as practicable
execute and deliver at the Transfer Office which is presently located at the
principal New York Office of the Depositary, to or upon the order of any person
named in such notice, an ADR or ADRs registered as requested and evidencing the
aggregate ADSs to which such person is entitled.

217

<PAGE>   242

Subject to provisions of the Deposit Agreement, the Depositary may so issue
ADRs for delivery at the Transfer Office only against deposit with the Custodian
of: (a) Shares in form satisfactory to the Custodian; (b) rights to receive
Shares from Fresenius Medical Care or any registrar or transfer agent of
Fresenius Medical Care or other entity recording Share ownership or transactions
on behalf of Fresenius Medical Care; or, (c) unless requested in writing by
Fresenius Medical Care to cease doing so at least two business days in advance
of the proposed deposit, other rights to receive FMC Ordinary Shares (until such

XXX-002022

FMC Ordinary Shares are actually deposited pursuant to (a) or (b) above, ("Pre-released ADRs") only if (i) Pre-released ADRs are fully collateralized (marked to market daily) with cash or U.S. government securities held by the Depositary for the benefit of Holders (but such collateral shall not constitute "Deposited Securities"), (ii) each recipient of Pre-released ADRs represents and agrees in writing with the Depositary that such recipient or its customer (a) beneficially owns such FMC Ordinary Shares, (b) assigns all beneficial right, title and interest therein to the Depositary for the benefit of the Holders, (c) holds such FMC Ordinary Shares in trust for the account of the Depositary and (d) will deliver such FMC Ordinary Shares to the Custodian as soon as practicable and promptly upon demand therefor and (iii) all Pre-released ADRs evidence not more than 20% (twenty percent) of all ADSs (excluding those evidenced by Pre-released ADRs). The Depositary may retain for its own account any earnings on collateral for Pre-released ADRs and its charges for issuance thereof. FMC Ordinary Shares or evidence of rights to receive FMC Ordinary Shares may be deposited through (x) the electronic transfer of such FMC Ordinary Shares to the account maintained by the Custodian for such purpose at the DKV, (y) evidence satisfactory to the Custodian of irrevocable instructions to cause such FMC Ordinary Shares to be transferred to such account or (z) delivery of certificates representing such FMC Ordinary Shares. If use of the DKV book-entry system in connection with the ADSs is discontinued at any time for any reason, Fresenius Medical Care shall make such other book-entry arrangements (if any) that it determines, after consultation with the Depositary, are reasonable. At the request, risk and expense of the person depositing FMC Ordinary Shares, the Depositary may accept deposits for forwarding to the Custodian and may deliver ADRs at a place other than its office.

Subject to the terms and conditions of the Deposit Agreement and to the provisions of or governing Deposited Securities (including Fresenius Medical Care's Articles of Association (Satzung) or applicable law), upon surrender of an ADR in form satisfactory to the Depositary at the Transfer Office, the Holder thereof is entitled to delivery at the Custodian's office of the whole number of Deposited Securities at the time represented by the ADSs evidenced by the ADR so surrendered. At the request, risk and expense of the Holder thereof, the Depositary may deliver such Deposited Securities at such other place as may have been requested by the Holder. Delivery of such Deposited Securities may be made by delivery of (a) FMC Ordinary Shares to an account in the DKV specified by the Holder thereof and (b) any other securities, property and cash to which such Holder is then entitled in respect of an ADR to, or upon the order of, such Holder. Notwithstanding any other provision of the Deposit Agreement, the withdrawal of Deposited Securities may be restricted only for the reasons set forth in General Instruction I.A.(1) of Form F-6 (as such instructions may be amended from time to time) under the Securities Act.

DISTRIBUTIONS ON DEPOSITED SECURITIES

Subject to the terms and provisions of the Deposit Agreement, to the extent practicable, the Depositary will, as promptly as practicable, distribute by mail to each Holder entitled thereto on the record date set by the Depositary therefor at such Holder's address shown on the ADR Register, in proportion to the number of Deposited Securities (on which the following distributions on Deposited Securities are received by the Custodian) represented by ADSs evidenced by such Holder's ADRs:

(a) Cash: Any U.S. dollars available to the Depositary resulting from a cash dividend or other cash distribution or the net proceeds of sales of any other distribution or portion thereof ("Cash"), on an averaged or other practicable basis, subject to appropriate adjustments for (i) taxes or other governmental charges withheld, (ii) such distribution being impermissible or impracticable with respect to certain Holders, and (iii) deduction of the Depositary's expenses in (1) converting any foreign currency to U.S. dollars by sale or in such other manner as the Depositary may determine to the extent that it determines that such conversion may be made on a reasonable basis, (2) transferring foreign currency or U.S. dollars to the U.S. by such means as

218

<PAGE>   243

the Depositary may determine to the extent that it determines that such transfer may be made on a reasonable basis, (3) obtaining any approval or license of any governmental authority required for such conversion or transfer, which is obtainable at a reasonable cost and within a reasonable time and (4) making any sale by public or private means in any commercially reasonable manner. Whenever the Depositary or the Custodian shall receive foreign currency, as a cash dividend or other cash distribution or as the net proceeds from the sale of securities, property or rights, which, in the judgment of the Depositary can then be converted on a reasonable basis into U.S. dollars and distributed to Holders entitled thereto in the U.S., the Depositary shall convert or cause to be converted, as promptly as practicable, by sale or in any other manner that it may determine, such foreign currency into U.S. dollars and shall transfer the resulting U.S. dollars (net of its reasonably and customary charges and expenses in effecting such conversion) to the U.S. If at any time the Depositary shall, after consultation with Fresenius Medical Care if practicable, determine that in its reasonable judgment any foreign currency received by the Depositary is not convertible on a reasonable basis into U.S. dollars transferable to the U.S., or if any approval or license of any governmental authority or agency thereof that is required for such conversion is denied or in the opinion of the Depositary is not obtainable at a reasonable cost or within a reasonable period, the Depositary shall, subject to applicable laws and regulations, (A) to the extent requested to do so in writing by Holders entitled to receive the same, distribute the foreign currency (or an appropriate document evidencing the right to receive such foreign currency) to such Holders or, to the extent not so requested, (B) hold such foreign currency (without liability for interest thereon or the investment thereof) for the respective accounts of the other

XXX-002023

Holders entitled to receive the same. If at the time the Depositary shall
determine that in its judgment any U.S. dollars received by the Depositary upon
conversion of foreign currency are not transferable into the U.S., or if any
approval or license of any governmental authority or agency thereof that is
required for such transfer is denied or in the opinion of the Depositary is not
obtainable at a reasonable cost or within a reasonable period, the Depositary
shall hold such U.S. dollars (without liability for interest thereon or
investment thereof) for the respective accounts of the Holders entitled to
receive the same. If any such conversion of foreign currency and transfer into
U.S. dollars, in whole or in part, can be effected for distribution to some but
not all of the Holders entitled thereto, the Depositary may, in its reasonable
discretion make such conversion and distribution in U.S. dollars to the extent
permissible to the Holders entitled thereto and may distribute the balance of
the foreign currency received by the Depositary to, or hold such balance
(without liability for interest thereon or investment thereof) for the
respective accounts of, the Holders entitled thereto for whom such conversion
and distribution is not practicable;

     (b) Shares: (i) Additional ADRs evidencing whole ADSs representing any FMC
Ordinary Shares available to the Depositary resulting from a dividend or free
distribution on Deposited Securities consisting of FMC Ordinary Shares (a "Share
Distribution") and (ii) U.S. dollars available to it resulting from the net
proceeds of sales of FMC Ordinary Shares received in a Share Distribution, which
FMC Ordinary Shares would give rise to fractional ADSs if additional ADRs were
issued therefor, as in the case of Cash;

     (c) Rights: (i) Warrants or other instruments in the discretion of the
Depositary representing rights to acquire additional ADRs in respect of any
rights to subscribe for additional FMC Ordinary Shares or rights of any nature
available to the Depositary as a result of a distribution on Deposited
Securities ("Rights"), only if and to the extent that Fresenius Medical Care
timely furnishes to the Depositary evidence satisfactory to the Depositary that
the Depositary may lawfully distribute the same (Fresenius Medical Care has no
obligation to so furnish such evidence), or (ii) to the extent Fresenius Medical
Care does not so furnish such evidence and sales of Rights are practicable, any
U.S. dollars available to the Depositary from the net proceeds of sales of
Rights as in the case of Cash, or (iii) to the extent Fresenius Medical Care
does not so furnish such evidence and such sales cannot practicably be
accomplished by reason of the nontransferability of the Rights, limited markets
therefor, their short duration or otherwise, nothing (and any Rights may lapse).
Fresenius Medical Care shall have no obligation to register the Rights or any
such securities under the Securities Act of 1933.

     (d) Other Distributions: (i) Securities or property available to the
Depositary resulting from any distribution on Deposited Securities other than
Cash, Share Distributions and Rights ("Other Distributions"), by any means that
the Depositary may deem equitable and practicable, or (ii) to the extent the
Depositary deems distribution of such securities or property not to be equitable
and practicable, any U.S. dollars available

                                    219

<PAGE>    244

to the Depositary from the net proceeds of sales of other Distributions as in
the case of Cash. Distributions of U.S. dollars will be by checks drawn on a
bank in the U.S. for whole dollars and cents (any fractional cents being
withheld without liability for interest and added to future distributions of
U.S. dollars).

     To the extent that the Depositary determines in its discretion, after
consultation with Fresenius Medical Care to the extent practicable, that any
distribution is not practicable with respect to any Holder, the Depositary may
make such distribution as it so determines is equitable and practicable,
including the distribution of foreign currency, securities or property (or
appropriate documents evidencing the right to receive foreign currency,
securities or property) or the retention thereof as Deposited Securities with
respect to such Holder's ADRs (without liability for interest thereon or the
investment thereof).

     There can be no assurance that the Depositary will be able to effect any
currency conversion or to sell or otherwise dispose of any distributed or
offered property, subscription or other rights, FMC Ordinary Shares or other
securities in a timely manner or at a specified rate or price, as the case may
be.

DISCLOSURE OF INTERESTS

     Each Holder of an ADR and all persons holding ADRs or beneficial interests
in ADRs agree to comply with all applicable provisions of German law and
Fresenius Medical Care's Articles of Association (Satzung) regarding the
notification of such person's interest in FMC Ordinary Shares, which provisions
at the date of the Deposit Agreement include Sections 21 and 22 of the German
Securities Trading Act (Wertpapierhandelsgesetz) and Section 20 of the German
Stock Corporation Law (Aktiengesetz). At the date of the Deposit Agreement, (i)
the statutory notification obligations of the Securities Trading Act apply to
anyone whose holding, either directly or by way of imputation pursuant to the
provisions of Section 22 of the German Securities Trading Act, of voting rights
in Fresenius Medical Care reaches or exceeds 5%, 10%, 25%, 50% or 75% or, after
having reached or exceeded any such threshold, falls below that threshold and
(ii) the statutory notification obligations of the German Stock Corporation Law
apply to any enterprise that, either directly or by way of imputation pursuant
to the provisions of Section 20(2), the German stock corporation owns more than
25% or 50% of FMC Ordinary Shares or, after having exceeded either of these
thresholds, no longer owns such percentage of shares. Each Holder and all

XXX-002024

persons holding ADRs or beneficial interests in ADRs acknowledge that failure to provide on a timely basis any required notification of an interest in FMC Ordinary Shares may result in withholding of certain rights, including voting and dividend rights, in respect of the FMC Ordinary Shares in which such Holder or owner of a beneficial interest has an interest. All persons holding ADRs or beneficial interests in ADRs agree to comply with all such disclosure requirements and ownership limitations and to cooperate with the Depositary in the Depositary's compliance with any instructions from Fresenius Medical Care in respect thereof, and the Depositary shall use its best efforts to comply, to the extent practicable, with such instructions.

RECORD DATES

    The Depositary shall, after consultation with Fresenius Medical Care if practicable, fix a record date (which shall be as near as practicable to any corresponding record date set by Fresenius Medical Care) for the determination of the Holders who shall be entitled to receive any distribution on or in respect of Deposited Securities or the net proceeds thereof, to give instructions for the exercise of any voting rights in respect of Deposited Securities, to receive any notice or to act in respect of other matters and only such Holders at the close of business on such record date shall be so entitled.

VOTING OF DEPOSITED SECURITIES

    As soon as practicable after receipt from Fresenius Medical Care of notice of any meeting or solicitation of consents or proxies of holders of FMC Ordinary Shares or other Deposited Securities, unless Fresenius Medical Care informs the Depositary otherwise in order to comply with applicable law, the Depositary shall mail to Holders a notice stating (a) such information as is contained in such notice and any solicitation materials (or a summary thereof in English provided by Fresenius Medical Care), (b) that each Holder at the close of business on the record date set by the Depositary therefor will be entitled, subject to any applicable

                                  220

<PAGE>  245

provisions of German law and Fresenius Medical Care's Articles of Association (Satzung), to instruct the Depositary as to the exercise of the voting rights, if any, pertaining to the Deposited Securities represented by the ADSs evidenced by such Holder's ADRs and (c) the manner in which such instructions may be given, including instructions to give a proxy to a person designated by Fresenius Medical Care. Upon receipt of instructions of a Holder on such record date in the manner and on or before the date established by the Depositary for such purpose, the Depositary shall endeavor insofar as practicable and permitted under the provisions of or governing Deposited Securities to vote or cause to be voted the Deposited Securities represented by the ADSs evidenced by such Holder's ADRs in accordance with such instructions. Deposited Securities represented by ADSs with respect to which no voting instructions are given will not be voted or counted as present at a shareholders meeting. The Depositary will not itself exercise any voting discretion in respect of any Deposited Securities.

INSPECTION OF TRANSFER BOOKS

    The Deposit Agreement provides that the Depositary will keep books at its Transfer Office for the registration, registration of transfer, combination and split-up of ADRs, which at all reasonable times will be open for inspection by the Holders and Fresenius Medical Care for the purpose of communicating with Holders in the interest of the business of Fresenius Medical Care or a matter related to the Deposit Agreement.

REPORTS AND OTHER COMMUNICATIONS

    The Depositary shall make available for inspection by Holders at the Transfer Office any reports and communications received from Fresenius Medical Care which are both (a) received by the Depositary or the Custodian as the holder of the Deposited Securities and (b) made generally available to the holders of such Deposited Securities by Fresenius Medical Care. The Depositary shall also send to the Holders copies of such reports when furnished by Fresenius Medical Care. Any such reports and communications furnished to the Depositary by Fresenius Medical Care shall be furnished in English.

    On or before the first date on which Fresenius Medical Care makes any communication available to holders of Deposited Securities or any securities regulatory authority or stock exchange on a non-confidential basis, by publication or otherwise, Fresenius Medical Care shall transmit to the Depositary a copy thereof in English or with an English translation or summary. In connection with any registration statement under the Securities Act relating to the ADRs or with any undertaking contained therein, Fresenius Medical Care and the Depositary shall each furnish to the other and to the Commission or any successor governmental agency such information as shall be required to make such filings or comply with such undertakings. Fresenius Medical Care has delivered to the Depositary, the Custodian and any Transfer Office, a copy of its Articles of Association (Satzung) and any other provisions adopted by it governing the FMC Ordinary Shares and any other Deposited Securities issued by Fresenius Medical Care or any affiliate of Fresenius Medical Care and, promptly upon any change thereto, Fresenius Medical Care shall deliver to the Depositary, the Custodian and any Transfer Office, a copy (in English or with an English translation) of such provisions as so changed. The Depositary and its agents may rely upon Fresenius Medical Care's delivery thereof for all purposes of the Deposit Agreement.

CHANGES AFFECTING DEPOSITED SECURITIES

XXX-002025

Upon any change in nominal or par value, split-up, consolidation, cancellation or any other reclassification of Deposited Securities, or upon any recapitalization, reorganization, merger, consolidation, liquidation or sale of all or substantially all of the assets of Fresenius Medical Care or to which it is a party, any securities, cash or other property that shall be received by the Depositary in exchange for, or in conversion or replacement of, Deposited Securities shall be treated as Deposited Securities under the Deposit Agreement, and the ADRs shall thenceforth evidence ADSs representing the right to receive the Deposited Securities as so reconstituted, subject to the provisions of the following sentence. In any such case the Depositary may with Fresenius Medical Care's approval (which approval shall not be unreasonably withheld), and shall if Fresenius Medical Care shall so reasonably request, subject to the Deposit Agreement, distribute any part of the

<div align="center">221</div>

<PAGE>  246

securities, cash or other property so received or execute and deliver additional ADRs as in the case of a dividend of FMC Ordinary Shares and thereafter the Depositary may, in its discretion but with the prior approval of Fresenius Medical Care (which approval shall not be unreasonably withheld), call for the surrender of outstanding ADRs to be exchanged for new ADRs specifically describing such newly received Deposited Securities to the extent not so distributed.

AMENDMENT AND TERMINATION OF DEPOSIT AGREEMENT

The ADRs and the Deposit Agreement may be amended by Fresenius Medical Care and the Depositary, provided that any amendment that imposes or increases any fees or charges (other than stock transfer or other taxes and other governmental charges, transfer or registration fees, cable, telex or facsimile transmission costs, delivery costs or other such expenses), or that shall otherwise prejudice any substantial existing right of Holders, shall become effective 30 days after notice of such amendment shall have been given to the Holders. Every Holder of an ADR at the time any amendment to the Deposit Agreement so becomes effective shall be deemed, by continuing to hold such ADR, to consent and agree to such amendment and to be bound by the Deposit Agreement as amended thereby. In no event shall any amendment impair the right of the Holder of any ADR to surrender such ADR and receive the Deposited Securities represented thereby, except in order to comply with mandatory provisions of applicable law.

The Depositary shall at the written direction of Fresenius Medical Care, terminate the Deposit Agreement and the ADRs by mailing notice of such termination to the Holders at least 30 days prior to the date fixed in such notice for such termination. The Depositary may terminate this Deposit Agreement, after giving the notice set forth in the preceding sentence at any time after 45 days has elapsed after the Depositary shall have delivered to Fresenius Medical Care its written resignation, provided that no successor depositary shall have been appointed and accepted its appointment before the end of such 45 days. After the date so fixed for termination, the Depositary and its agents will perform no further acts under the Deposit Agreement and the ADRs, except to advise Holders of such termination, receive and hold (or sell) distributions on Deposited Securities and deliver Deposited Securities being withdrawn together with any such distributions on Deposited Securities (without liability for interest) and any net proceeds of the sale of any Rights or other property, without liability for interest, as the Depositary may reasonably effect. As soon as practicable after the expiration of six months from the date so fixed for termination, the Depositary shall sell the Deposited Securities and shall thereafter (as long as it may lawfully do so) hold in a segregated account the net proceeds of such sales, together with any other cash then held by it under the Deposit Agreement, without liability for interest, in trust for the pro rata benefit of the Holders of ADRs not theretofore surrendered. After making such sale, the Depositary shall be discharged from all obligations in respect of the Deposit Agreement and such ADR, except to account for such net proceeds and other cash and for its obligations under Section 16 of the Deposit Agreement. After the date so fixed for termination, Fresenius Medical Care shall be discharged from certain of its obligations under the Deposit Agreement.

CHARGES OF DEPOSITARY

The Depositary may to the extent permitted by applicable law and the rules of any securities exchange on which the ADSs are admitted for trading, charge each person to whom ADRs are issued against deposits of Shares, including deposits in respect of Share Distributions, Rights and Other Distributions, and each person surrendering ADRs for withdrawal of Deposited Securities, up to U.S. $5.00 for each 100 ADSs (or portion thereof) evidenced by the ADRs delivered or surrendered. The Depositary may sell (by public or private sale), after consultation with Fresenius Medical Care to the extent practicable, sufficient securities and property received in respect of Share Distributions, Rights and Other Distributions prior to such deposit to pay such charge. Fresenius Medical Care will pay all other charges and expenses of the Depositary and any agent of the Depositary (except the Custodian) pursuant to agreements from time to time between Fresenius Medical Care and the Depositary, except (a) stock transfer or other taxes and other governmental charges (which are payable by Holders or persons depositing FMC Ordinary Shares), (b) cable, telex and facsimile transmission and delivery charges incurred at the request of persons depositing, or Holders delivering, FMC Ordinary Shares, ADRs or Deposited Securities (which are payable by such persons or Holders), (c) transfer

<div align="center">222</div>

<PAGE>  247

or registration fees for the registration of transfer of Deposited Securities on

XXX-002026

any applicable register in connection with the deposit or withdrawal of Deposited Securities (which are payable by persons depositing FMC Ordinary Shares or Holders withdrawing Deposited Securities; there are no such fees in respect of the FMC Ordinary Shares as of the date of the Deposit Agreement) and (d) expenses of the Depositary in connection with the conversion of foreign currency into U.S. dollars and in compliance with foreign exchange regulations (which are paid out of such foreign currency). These charges may be changed in the manner provided in the Deposit Agreement.

LIABILITY OF HOLDERS FOR TAXES

If any tax or other governmental charge shall become payable by or on behalf of the Custodian, the Depositary or Fresenius Medical Care, with respect to the ADRs, any Deposited Securities represented by the ADSs evidenced thereby or any distribution thereon, such tax or other governmental charge shall be paid by the Holder thereof to the Depositary. The Depositary may refuse to effect any registration, registration of transfer, split-up or combination thereof or, subject to the terms and conditions of the Deposit Agreement, any withdrawal of such Deposited Securities until such payment is made. The Depositary may also deduct from any distributions on or in respect of Deposited Securities, or may sell by public or private sale for the account of the Holder of an ADR any part or all of such Deposited Securities (after attempting by reasonable means to notify the Holder hereof prior to such sale), and may apply such deduction or the proceeds of any such sale in payment of such tax or other governmental charge, the Holder hereof remaining liable for any deficiency, and shall reduce the number of ADSs evidenced hereby to reflect any such sales of FMC Ordinary Shares. In connection with any distribution to Holders, Fresenius Medical Care will remit to the appropriate governmental authority or agency all amounts (if any) required to be withheld and owing to such authority or agency by Fresenius Medical Care; and the Depositary and the Custodian will remit to the appropriate governmental authority or agency all amounts (if any) required to be withheld and owing to such authority or agency by the Depositary or the Custodian. If the Depositary determines that any distribution in property other than cash (including FMC Ordinary Shares or Rights) on Deposited Securities is subject to any tax that the Depositary or the Custodian is obligated to withhold, the Depositary may dispose of all or a portion of such property in such amounts and in such manner as the Depositary deems necessary and practicable to pay such taxes, by public or private sale, and the Depositary shall distribute the net proceeds of any such sale or the balance of any such property after deduction of such taxes to the Holders entitled thereto. The Depositary shall work with Fresenius Medical Care to establish and maintain arrangements with the relevant tax authorities that assist holders and persons holding beneficial interests in ADRs in claiming tax refunds, credits or other benefits (pursuant to treaty or otherwise) relating to distributions on the ADSs. For a description of the current arrangements, see "CERTAIN INCOME TAX CONSEQUENCES OF THE TRANSACTIONS TO HOLDERS OF FRESENIUS USA COMMON STOCK -- U.S. and German Tax Consequences of Holding FMC Ordinary Shares or ADSs -- Refund Procedures."

GENERAL LIMITATIONS

The Depositary, Fresenius Medical Care, their respective officers, directors and agents and each of them shall: (a) incur no liability (i) if law, rule or regulation of the U.S., the Federal Republic of Germany or any other country or of any other governmental or regulatory authority or stock exchange or Fresenius Medical Care's Articles of Association (Satzung), the provisions of or governing any Deposited Security, the issuance of any securities by Fresenius Medical Care, any act of God, war or other circumstance beyond its control shall prevent, delay or subject to any civil or criminal penalty any act which the Deposit Agreement or the ADRs provide shall be done or performed by it, or (ii) by reason of any exercise or failure to exercise any discretion given it in the Deposit Agreement or the ADRs, (b) assume no liability except to perform its obligations to the extent they are specifically set forth in the ADRs and the Deposit Agreement without gross negligence or bad faith, (c) be under no obligation to appear in, prosecute or defend any action, suit or other proceeding in respect of any Deposited Securities or the ADRs, or (d) not be liable for any action or inaction by it in reliance upon the advice of or information from legal counsel, accountants, any person presenting FMC Ordinary Shares for deposit, any Holder, or any other person believed by it in good faith to be competent to give such advice or information. The Depositary, Fresenius Medical Care and each of their respective

223

<PAGE>   248

agents may rely and shall be protected in acting upon any written notice, request, direction or other document believed by them in good faith to be genuine and to have been signed or presented by the proper party or parties. The Depositary may rely upon instructions from Fresenius Medical Care or its German counsel in respect of any approval or license of the government of Germany or any agency thereof required for any currency conversion, transfer or distribution. The Depositary and its agents will not be responsible for any failure to carry out any instructions to vote any of the Deposited Securities, for the manner in which any such vote is cast or for the effect of any such vote, provided that such action or inaction is in good faith. The Depositary and its agents may own and deal in any class of securities of Fresenius Medical Care and its affiliates and in ADSs. Fresenius Medical Care has agreed to indemnify the Depositary and its agents under certain circumstances and the Depositary has agreed to indemnify Fresenius Medical Care against losses incurred by Fresenius Medical Care under certain circumstances.

Prior to the issue, registration, registration of transfer, split-up or combination of any ADR, the delivery of any distribution in respect thereof, or, the withdrawal of any Deposited Securities, Fresenius Medical Care, the Depositary or the Custodian may require: (a) payment with respect thereto of (i)

XXX-002027

any stock transfer or other tax or other governmental charge, (ii) any stock transfer or registration fees in effect for the registration of transfers of FMC Ordinary Shares or other Deposited Securities upon any applicable register and (iii) any applicable charges as provided in the Deposit Agreement; (b) the production of proof satisfactory to it of (i) the identity and genuineness of any signature and (ii) such other information, including, without limitation, information as to citizenship, residence, exchange control approval, beneficial ownership of ADRs, Deposited Securities or other securities, compliance with applicable law, regulations, provisions of or governing Deposited Securities and terms of the Deposit Agreement and the ADR, as it may deem necessary or proper; and (c) compliance with such regulations as the Depositary may establish consistent with the Deposit Agreement. The issuance of ADRs, the acceptance of deposits of FMC Ordinary Shares, the registration, registration of transfer, split-up or combination of ADRs or, subject to the requirements of General Instruction I.A.(1) of Form F-6 (as such instructions may be amended from time to time) under the Securities Act, the withdrawal of Deposited Securities may be suspended, generally or in particular instances, when the ADR Register or any register for Deposited Securities (including the DKV) is closed or when any such action is deemed necessary or advisable by the Depositary or Fresenius Medical Care.

GOVERNING LAW

   The Deposit Agreement and the ADRs are governed by and will be construed in accordance with the laws of the State of New York.

MORGAN GUARANTY TRUST COMPANY OF NEW YORK

   The Depositary is Morgan Guaranty Trust Company of New York, a New York banking corporation, which has its principal office located in New York, New York. Morgan Guaranty Trust Company of New York is a commercial bank offering a wide range of banking and trust services to its customers in the New York metropolitan area, throughout the U.S. and around the world.

   The Consolidated Balance Sheets of J.P. Morgan, the parent corporation of Morgan Guaranty Trust Company of New York ("J.P. Morgan"), are set forth in the most recent Annual Report and Form 10-Q. The Annual Report, Form 10-K and Form 10-Q of J.P. Morgan are on file with the Commission.

   The Articles of Association and By-Laws of Morgan Guaranty Trust Company of New York, together with the annual report, Form 10-K and Form 10-Q of J.P. Morgan will be available for inspection at the Principal New York Office of the Depositary.

                                     224
<PAGE>   249

                      COMPARISON OF CERTAIN RIGHTS OF
                    SHAREHOLDERS OF GRACE AND FRESENIUS USA

   As a result of the Reorganization, holders of record of Grace Common Stock and Fresenius USA Common Stock, at the Effective Time, will own ADSs evidencing FMC Ordinary Shares represented by ADRs. Holders of Grace Common Stock will also own the New Preferred Shares. The following is a summary of material significant differences between the rights of holders of Grace Common Stock and Fresenius USA Common Stock, on the one hand, and the rights of holders of FMC Ordinary Shares, on the other. These differences arise from differences between the corporate laws of New York, Massachusetts and Germany, as well as from differences between Grace's Certificate of Incorporation and By-laws and Fresenius USA's Restated Articles of Organization and By-laws, on the one hand, and the Articles of Association (Satzung) of Fresenius Medical Care, on the other. For a description of the rights of the holders of the New Preferred Shares, see "DESCRIPTION OF NEW PREFERRED SHARES." Copies of the Certificate of Incorporation and By-laws of Grace and Articles of Association (Satzung) of Fresenius Medical Care have been filed as exhibits to the Registration Statement. Reference is also made to the Grace Amendment attached to this Joint Proxy Statement-Prospectus as Appendix B. All summaries of such documents set forth herein are qualified in their entirety by reference to the full documents. For further information as to where these and other exhibits to the Registration Statement, as well as Fresenius USA's Restated Articles of Organization and By-laws, may be obtained, see "AVAILABLE INFORMATION" and "INCORPORATION OF CERTAIN INFORMATION BY REFERENCE."

DUTIES OF DIRECTORS

   GRACE

      Section 717(a) of the NYBCL provides that a director shall perform his duties as director, including his duties as a member of any committee of the board upon which he may serve, in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances.

      Section 717(b) of the NYBCL permits a board of directors to consider, including in connection with a change or potential change in control of the corporation, both the long-term and short-term effects of the decision on the corporation and, specifically, the effects on: (a) the potential growth, development, productivity and profitability of the corporation; (b) current employees; (c) retired employees and other beneficiaries of the corporation still entitled to receive, directly or indirectly, benefits from the corporation; (d) customers and creditors of the corporation; and (e) the ability of the corporation to continuously provide goods, services, employment opportunities and benefits and make any other contributions to the communities in which it does business.

XXX-002028

FRESENIUS USA

    Section 65 of the MBCL provides that a director or officer shall perform his or her duties in good faith and in a manner he or she reasonably believes to be in the best interests of the corporation and with such care as an ordinarily prudent person in a like position would use under similar circumstances. For limitations on the liability of directors, see "-- Limitation on Directors' Liability -- Fresenius USA." The MBCL does not specifically set out permissible considerations for directors evaluating a potential change in control of the corporation.

FRESENIUS MEDICAL CARE

    According to the German Stock Corporation Law, the members of a management board (Vorstand) manage the stock corporation within their sole responsibility.

    Under German law, members of the supervisory board must act in the interest of the corporation in fulfilling its duties to: (a) appoint and dismiss members of the management board; (b) approve transactions between the corporation and members of the management board or their relatives; (c) supervise the management board; and (d) exercise other approval rights.

                                    225
<PAGE>   250

    The members of the management board must act with the diligence of an orderly and conscientious manager and have the burden of proving that they did so if it is ever contested. Members of the management board also have a duty to maintain the confidentiality of corporate information. Members of the management board who violate their duties may be held jointly and severally liable by the corporation for any resulting damages, unless their actions were validly approved by resolution at a shareholders' meeting. The members of the supervisory board have similar liabilities if they violate their duties. For limitations on the liability of directors, see "-- Limitation on Directors' Liability -- Fresenius Medical Care."

SIZE AND CLASSIFICATION OF THE BOARD OF DIRECTORS

GRACE

    Pursuant to the Grace Certificate of Incorporation, the Grace Board is divided into three classes, and directors are elected to serve staggered three-year terms. The Grace Certificate of Incorporation provides that the number of directors of Grace will be not less than nine and not more than 50, as determined by a majority of the Grace Board, provided that the number of directors may not be reduced to shorten the term of any incumbent director.

FRESENIUS USA

    The Fresenius USA By-laws provide that the number of directors of Fresenius USA shall be not more than 11 nor less than three. Such number may be increased by the stockholders or a majority of the directors then in office. Such number may be decreased, but not below three, by the stockholders or a majority of the directors then in office, but only to eliminate vacancies existing by reason of death, resignation or removal.

    Until June 26, 1996, the date on which Fresenius AG converted all 200,000 shares of Fresenius USA Series F Preferred Stock into Fresenius USA Common Stock, the By-laws provided that the Fresenius USA Board consist of an odd number of directors, and that a majority of such directors be elected by the holders of the Fresenius USA Series F Preferred Stock ("Preferred Directors") and the remaining directors be elected by the holders of Fresenius USA Common Stock ("Common Directors"). Preferred Directors, or directors elected to serve as a committee by the Preferred Directors, were required to constitute a majority of all Fresenius USA Board committees (except as otherwise required by law), and action by the Fresenius USA Board or any committee thereof required the affirmative vote of at least one Preferred Director or other director elected to serve by the Preferred Directors.

FRESENIUS MEDICAL CARE

    The German Stock Corporation Law provides for two separate bodies: the management board (Vorstand) and the supervisory board (Aufsichtsrat). The management board (Vorstand) is the legal representative of the stock corporation and is responsible for its management. According to Fresenius Medical Care's Articles of Association, the FMC Management Board consists of at least two members designated by the FMC Supervisory Board.

    For certain matters, as determined in the Articles of Association (Satzung) and the Rules of Procedure of the Management Board (Geschaftsordnung) of Fresenius Medical Care, a decision of the FMC Management Board requires the express prior approval by the FMC Supervisory Board.

    The FMC Supervisory Board is responsible for the supervision of the FMC Management Board and represents the stock corporation with respect to the FMC Management Board.

    The FMC Supervisory Board consists of six members, all of whom are to be elected by a vote of the majority of the votes cast at a general meeting in accordance with the German Stock Corporation Law. If and when either (i) Fresenius Medical Care itself has more than 500 employees or (ii) Fresenius Medical Care enters into a domination agreement with a German subsidiary having more than 500 employees, or if such subsidiary is integrated into Fresenius

XXX-002029

Medical Care, then one-third of the members of the FMC Supervisory Board will be elected by the German employees of Fresenius Medical Care and its German subsidiaries. If and when the aggregate number of employees of Fresenius Medical Care and its German subsidiaries exceeds

<center>226</center>

<PAGE>  251

2,000, the FMC Supervisory Board will be increased to 12 persons, six of whom will be elected by the holders of FMC Ordinary Shares, and six of whom will be elected by the German employees of Fresenius Medical Care and its German subsidiaries. In such case, the Chairman of the FMC Supervisory Board will be selected from the members elected by the shareholders and will have a casting (tie-breaking) vote.

    The maximum term of office for members of the FMC Management Board is limited to five years according to the German Stock Corporation Law. According to the Articles of Association of Fresenius Medical Care, the term of office for members of the FMC Supervisory Board is limited to four fiscal years. Under German law, a member of the supervisory board may not be a member of the management board. The German Stock Corporation Law disregards the fiscal year in which the term of office begins and extends the term until the shareholders' meeting in the year following the fourth fiscal year. Accordingly, members of the FMC Supervisory Board will have a term of nearly five years. Members of both the FMC Management Board and the FMC Supervisory Board may be re-elected for additional terms, and there is no limit on the number of such additional terms.

REMOVAL OF DIRECTORS; FILLING VACANCIES ON THE BOARD OF DIRECTORS

    GRACE

    Directors of Grace may be removed only for cause and only upon the affirmative vote of a majority of the voting power of all shares of capital stock of Grace. The Grace By-laws provide that, if a vacancy occurs in any class of directors, it may be filled by the vote of a majority of the directors remaining in office, or by the sole remaining director. Any vacancy in the Grace Board resulting from an increase in the number of directors may be filled by a vote of directors constituting a majority of the entire Grace Board prior to such increase. Any director elected by the Grace Board is required to stand for election at the next annual meeting of shareholders.

    FRESENIUS USA

    Directors of Fresenius USA may be removed (a) with or without cause by a majority vote of stockholders, except that directors elected by a class of stockholders may only be removed by majority vote of such class, or (b) for cause by a majority of the directors then in office. In case (b), when Fresenius USA Series F Preferred Stock was outstanding, a Preferred Director could only be removed by a vote of the Preferred Directors and a Common Director by a vote of the Common Directors.

    If a vacancy occurs in the Fresenius USA Board, such vacancy may be filled by the stockholders or by a vote of a majority of the directors then in office. When Fresenius USA Series F Preferred Stock was outstanding, a vacancy among the Preferred Directors could only be filled by holders of Fresenius USA Series F Preferred Stock or by the Preferred Directors and a vacancy among the Common Directors could only be filled by the holders of Fresenius USA Common Stock or by the Common Directors.

    FRESENIUS MEDICAL CARE

    The members of the FMC Management Board may be removed by the FMC Supervisory Board only for reasons amounting to good cause, such as gross breach of duty, inability to duly fulfill their responsibilities or revocation of confidence by the shareholders, by a majority vote, at the general or special meeting. Members of the FMC Supervisory Board elected by the shareholders at the general meeting may be removed upon the affirmative vote of a majority of at least 75% of all votes cast by the shareholders at the general or a special meeting. Any member of the FMC Supervisory Board can be removed for good cause, including gross breach of duty, by a court decision upon request of the FMC Supervisory Board. In such case, the FMC Supervisory Board's determination to take such action requires a simple majority vote with the member affected having no voting power.

    The Articles of Association of Fresenius Medical Care provide that the shareholders' meeting may appoint substitute members for the FMC Supervisory Board and may determine the order in which such substitute members will serve (and which FMC Supervisory Board members they will replace) in case of a

<center>227</center>

<PAGE>  252

vacancy. If and when a vacancy occurs in the FMC Supervisory Board, such vacancy will automatically be filled by a substitute member, who will serve until the next shareholders' meeting, at which meeting an election shall be held to fill the vacancy. The FMC Supervisory Board member elected at such shareholders' meeting holds office until the expiration of the term of the member whose resignation or removal created the vacancy. If there are no substitute members, or all substitute members are already serving on the FMC Supervisory Board, the FMC Management Board, a member of the FMC Supervisory Board or a shareholder, can ask a court to appoint a FMC Supervisory Board member if (a) there is no possibility of a quorum because more than half of the FMC Supervisory Board positions are vacant, or (b) for more than three months, the FMC Supervisory Board has had fewer members than Fresenius Medical Care's Articles of

XXX-002030

Association provide.

SHAREHOLDER NOMINATIONS

GRACE

The Grace By-laws establish procedures that must be followed for shareholders to nominate individuals for election to the Grace Board. Nominations by shareholders of individuals for election to the Grace Board must be made by delivering written notice of such nomination to the Secretary of Grace not less than 60 days nor more than 90 days prior to the annual meeting at which directors will be elected, unless the annual meeting takes place on a date other than the ordinary date specified in the Grace By-laws, in which case notice by a shareholder to be timely must be so received not later than the close of business on the 10th day following the date on which notice or disclosure of the date of the meeting was first given. The nomination notice must set forth certain information about the shareholder making the nomination, including name and address, number of shares of capital stock of Grace beneficially owned, a representation that the shareholder will be a holder of record of stock entitled to vote at the meeting and intends to appear in person or by proxy, and a description of any material interest of the shareholder and each proposed nominee and between proposed nominees. The nomination notice must set forth certain information about the persons to be nominated, including information concerning the nominees' principal occupation or employment and the class and number of shares of Grace that are beneficially owned by such person. If the presiding officer at the shareholders' meeting determines that a nomination was not made in accordance with these procedures, the presiding officer may so declare at the meeting and the nomination will not be acted upon.

FRESENIUS USA

The By-laws of Fresenius USA do not establish procedures that must be followed for stockholders to nominate individuals for election to the Fresenius USA Board.

FRESENIUS MEDICAL CARE

If a shareholder wants to nominate individuals for election to the FMC Supervisory Board other than those recommended by the existing FMC Supervisory Board, such shareholder can communicate this motion to Fresenius Medical Care within one week after the publication of the call of the shareholders' meeting in the German Federal Gazette (Bundesanzeiger). The nomination must contain the name, the profession and the domicile of the individual. If such communication is given to the company, the FMC Management Board must, within 12 days after the publication of the call of the shareholders general meeting in the Federal Gazette, notify the banks and the shareholders' associations which at the last general shareholders meeting have exercised voting rights for shareholders or who have requested such notification, of the calling in of the general shareholder meeting, the notification of the agenda as well as of the applications and proposals for elections of shareholders, including the names of the shareholders and a possible response by the FMC Management Board. The same notification has to be submitted by the FMC Management Board to shareholders who have deposited a share with Fresenius Medical Care or who have after the publication of the call of the general shareholder meeting in the Federal Gazette requested such notification. In addition, any shareholder can nominate individuals for the FMC Supervisory Board at the shareholders' general meeting.

228

<PAGE>  253

ACTION BY WRITTEN CONSENT

GRACE

Under the NYBCL, whenever shareholders are required or permitted to take any action by vote, such action may be taken without a meeting on written consent signed by the holders of all outstanding shares entitled to vote thereon unless the articles of incorporation authorize written consent of the holders of less than all outstanding shares. The Grace Certificate of Incorporation does not authorize action by less than all such holders and, as a practical matter, since action by written consent must be unanimous, shareholders of Grace cannot act by written consent.

FRESENIUS USA

The MBCL and the By-laws of Fresenius USA provide that any action required or permitted to be taken by the stockholders may be taken without a meeting if all the stockholders entitled to vote consent in writing and such consents are filed with the records of the meetings of stockholders. Accordingly, as a practical matter, since action by written consent must be unanimous, stockholders of Fresenius USA cannot act by written consent.

FRESENIUS MEDICAL CARE

The German Stock Corporation Law does not permit shareholders to act by written consent outside of the shareholders' general meeting.

MEETINGS OF SHAREHOLDERS

GRACE

A special meeting of shareholders of Grace may be called only by the Grace Board, the Chairman or the President.

XXX-002031

A quorum for a meeting of the shareholders of Grace generally consists of the holders of shares constituting a majority of the voting power of the outstanding shares of Grace entitled to vote. A majority of the votes cast is generally required for an action by the shareholders of Grace. The NYBCL provides that these quorum requirements may be increased or decreased by a change to the Certificate of Incorporation or By-laws of Grace (which may be effected by the Grace Board), so long as the requirement for a quorum does not fall below one-third of the shares entitled to vote.

FRESENIUS USA

A special meeting of stockholders of Fresenius USA may be called only by the President of Fresenius USA or the directors.

A quorum for a meeting of the stockholders of Fresenius USA generally consists of a majority in interest of all stock issued and outstanding and entitled to vote at the meeting, except that when the Fresenius USA Series F Preferred Stock was outstanding, a quorum required a majority of the outstanding shares of each class of stock. A plurality of the votes cast is required to elect an officer or director and a majority is generally required to decide other questions. When the Fresenius USA Series F Preferred Stock was outstanding, except for (a) the election of directors and (b) certain extraordinary actions, in which cases the Fresenius USA Common Stock and the Fresenius USA Series F Preferred Stock voted as separate classes, the Fresenius USA Common Stock and the Fresenius USA Series F Preferred Stock voted as a single class on all matters submitted to the stockholders, with each share of Fresenius USA Series F Preferred Stock having a number of votes equal to the number of shares of Fresenius USA Common Stock into which it could then be converted.

<center>229</center>

<PAGE>  254

FRESENIUS MEDICAL CARE

A special meeting of shareholders of Fresenius Medical Care may be called by the FMC Management Board or the FMC Supervisory Board. A special meeting of shareholders must be called by the FMC Management Board upon request of shareholders holding in the aggregate shares of at least 5% of the nominal value of all shares outstanding. The written request stating the purpose and reasons for the special meeting must be forwarded to the FMC Management.

There are no quorum requirements for Fresenius Medical Care. Additionally, resolutions are passed at a general meeting of the shareholders of Fresenius Medical Care by a majority of the votes cast, unless a higher vote is required by law or the Articles of Association of Fresenius Medical Care.

SHAREHOLDER PROPOSALS

GRACE

The By-laws of Grace establish procedures that must be followed for a shareholder to submit a proposal at an annual meeting of the shareholders of Grace (other than a proposal submitted under the Commission's shareholder proposal rules). No proposal for a vote may be submitted to the shareholders by a shareholder unless such submitting shareholder has timely filed with the Secretary of Grace a written statement setting forth specified information, including the name and address of the person making the proposal, the class and number of shares of capital stock of Grace beneficially owned by such person, a description of the proposal and the reasons for bringing such business before the annual meeting, a representation that such person is or will be a holder of record of stock of Grace entitled to vote at such meeting and intends to appear in person or by proxy to make the proposal, and any material interest of the shareholder in such business. If the presiding officer at any shareholders' meeting determines that any such proposal was not made in accordance with these procedures or is otherwise not in accordance with the law, he or she will so declare at the meeting and such defective proposal will not be acted upon.

FRESENIUS USA

The By-laws of Fresenius USA do not establish procedures that must be followed for a stockholder to submit a proposal at an annual meeting of the stockholders of Fresenius USA.

FRESENIUS MEDICAL CARE

According to the German Stock Corporation Law, shareholders holding in the aggregate at least 5% of the nominal value of all outstanding shares or holding in the aggregate shares totalling the nominal value of at least 1 million Deutschemarks are entitled to require the FMC Management Board to submit a proposal at the shareholders' general meeting and to publish this proposal in the German Federal Gazette (Bundesanzeiger). The articles of association of Fresenius Medical Care provide that a proposal must also be published in The Wall Street Journal and The New York Times. The request must be made in writing stating the purpose and the reasons thereof. Proposals duly published may be submitted to the shareholders' general meeting for decision. In addition, if the agenda for the meeting is duly published, then shareholders may propose individuals for election at the general shareholder meeting, even if they have not availed themselves of the possibility to have this proposal for election notified by the FMC Management Board.

REQUIRED VOTE FOR AUTHORIZATION OF CERTAIN ACTIONS

GRACE

XXX-002032

Under the NYBCL, subject to the provisions of the NYBCL described under "-- State Anti-takeover Statutes -- Grace," the recommendation of the Grace Board and the approval of two-thirds of the outstanding voting power of Grace is required to effect a merger or consolidation, or to sell, lease or exchange substantially all of Grace's assets. The NYBCL provides that holders of Grace Preferred Stock are entitled to vote as a class on a merger or consolidation if the merger or consolidation would have certain adverse effects on such

230

<PAGE>   255

holders, such as limiting their voting rights, changing their shares into different shares, altering their rights, preferences or limitations, or subordinating their rights by authorizing shares with superior rights.

FRESENIUS USA

Under the MBCL, the vote of two-thirds of the shares of each class of stock outstanding and entitled to vote is required to effect a consolidation or merger or a sale, lease or exchange of all or substantially all the corporation's property and assets. When it was outstanding, the Fresenius USA Series F Preferred Stock was entitled to vote separately as a class on such transactions. Since there are no longer shares of Fresenius USA Series F Preferred Stock issued and outstanding, a two-thirds vote of the holders of the Fresenius USA Common Stock is required to effect such transactions.

FRESENIUS MEDICAL CARE

According to German law and the Articles of Association of Fresenius Medical Care, the following resolutions may be passed only by a majority of at least 75% of the capital represented and a simple majority of the votes cast at a shareholders meeting: amendments of the Articles of Association, certain capital increases, capital decreases, a dissolution of Fresenius Medical Care, a merger of Fresenius Medical Care into or a consolidation of Fresenius Medical Care with another stock corporation, a transfer of all Fresenius Medical Care's assets, a change of Fresenius Medical Care's corporate form, and the elimination of preemptive rights.

AMENDMENT OF CORPORATE CHARTER AND BY-LAWS

GRACE

An amendment to the Certificate of Incorporation of Grace requires the approval of both the Grace Board and the majority of voting power of all outstanding shares of capital stock of Grace. Holders of Grace Preferred Stock may be entitled to vote as a class on amendments to the Certificate of Incorporation that would have certain adverse effects on such holders, such as limiting their voting rights. Except as prohibited by the NYBCL, the Grace Board may adopt, amend or repeal the Grace By-laws without the assent or vote of the shareholders. The shareholders may amend or repeal the Grace By-laws by an affirmative vote of the holders of a majority of the voting power of shares entitled to vote in the election of directors.

FRESENIUS USA

An amendment to the Restated Articles of Organization of Fresenius USA may be made upon the vote of a majority of each class of stock outstanding and entitled to vote, except that an amendment which would impair or diminish the preferences, voting powers, restrictions, qualifications, special or relative rights or privileges of any outstanding shares would require a two-thirds vote. When it was outstanding, the Fresenius USA Series F Preferred Stock voted separately as a class on most amendments to the Restated Articles of Organization.

The directors of Fresenius USA may make, amend or repeal the Fresenius USA By-laws, in whole or in part, except with respect to any provision thereof which by law or by the Fresenius USA By-laws requires action by the stockholders.

FRESENIUS MEDICAL CARE

An amendment to the Articles of Association of Fresenius Medical Care must be passed by at least 75% of the capital represented at a meeting of shareholders.

APPRAISAL RIGHTS

GRACE

The NYBCL provides appraisal rights to holders entitled to vote thereon for (a) certain mergers and consolidations, (b) dispositions of assets requiring shareholder approval, and (c) certain amendments to the Certificate of Incorporation which adversely affects the rights of such holders.

231

<PAGE>   256

FRESENIUS USA

A stockholder of Fresenius USA who objects to a duly approved consolidation, merger or sale, lease, or exchange of all or substantially all of Fresenius USA's property and assets is entitled to appraisal rights upon following the procedure set out by the MBCL. Such appraisal rights may also be triggered by an amendment of the Restated Articles of Organization of Fresenius

USA which adversely affects a stockholder.

FRESENIUS MEDICAL CARE

For certain transactions, appraisal rights are provided to Fresenius
Medical Care's shareholders under the German Stock Corporation Law and the
German Transformation Act (Umwandlungsgesetz). These transactions include (a) a
merger, certain asset sales or a change of corporate form if the shareholder
requesting appraisal rights objected to the transaction at the shareholders'
meeting at which the transaction was approved and thereafter filed a claim
requesting adequate compensation; (b) a control and profit transfer agreement
between a controlling shareholder (e.g., Fresenius AG) and its dependent company
(e.g., Fresenius Medical Care) if the (non-controlling) shareholder files a
claim for adequate compensation within two months after publication of the
registration of the agreement; and (c) the forced withdrawal of minority
shareholders from a corporation upon the corporation's integration with its
parent corporation holding shares representing at least 95% of the par value of
the corporation to be integrated if the shareholder files a claim for adequate
compensation within two months after publication of the registration of the
integration.

FAIR PRICE AND ANTI-GREENMAIL PROVISIONS

GRACE

The NYBCL prohibits, subject to certain exceptions, a corporation that is
subject to Section 912 of the NYBCL from purchasing or agreeing to purchase more
than 10% of its stock from a shareholder for more than the market value thereof
unless such purchase or agreement is approved by shareholders. See "-- State
Anti-takeover Statutes -- Grace."

FRESENIUS USA

Neither the Restated Articles of Organization nor the By-laws of Fresenius
USA contain fair price or anti-greenmail provisions.

FRESENIUS MEDICAL CARE

Neither the German Stock Corporation Law nor Fresenius Medical Care's
organizational documents contain any fair price or anti-greenmail provisions.
However, under the German Stock Corporation Law, a stock corporation like
Fresenius Medical Care is generally prohibited from acquiring its own shares,
except for certain defined purposes; for example, to prevent an immediate and
severe damage to the company.

STOCK RIGHTS PLAN

GRACE

Each share of Grace Common Stock has an attendant Grace Right. The Grace
Rights may have certain anti-takeover effects, but are not, and will not become,
exercisable unless and until certain events occur.

The Grace Rights may be redeemed by Grace at $.025 per Grace Right (payable
in cash, Grace Common Stock or any other form of consideration deemed
appropriate by the Grace Board) at any time through the 10th business day (or
such later business day as may be fixed by the Grace Board) after a public
announcement that a person or group has become an "interested shareholder," as
defined in the Grace Rights Agreement; this right of redemption may be
reinstated if all interested shareholders reduce their holdings to 10% or less
of the outstanding Grace Common Stock. The Grace Rights will expire in January
1997. In contemplation of the Reorganization, the Grace Board authorized the
amendment of the Grace Rights so as to prevent the Grace Rights from becoming
exercisable as a result of such transaction and the other transactions
contemplated by the Reorganization Agreement.

232

<PAGE>  257

FRESENIUS USA

Fresenius USA does not have a stock rights plan.

FRESENIUS MEDICAL CARE

Fresenius Medical Care does not intend to adopt a stock rights plan.

STATE ANTI-TAKEOVER STATUTES

GRACE

Section 912 of the NYBCL prohibits a "business combination" (as defined in
Section 912 of the NYBCL, generally including mergers, sales and leases of
assets, issuances of securities and similar transactions) by Grace or a Grace
subsidiary with an "interested shareholder" (as defined in Section 912 of the
NYBCL, generally the beneficial owner of 20% or more of Grace's voting stock)
within five years after the person or entity becomes an interested shareholder,
unless (a) prior to the person or entity becoming an interested shareholder, the
business combination or the transaction pursuant to which such person or entity
became an interested shareholder has been approved by the Grace Board, or (b)
the business combination is approved by the holders of a majority of the
outstanding voting power of Grace, excluding shares held by the interested
shareholder, at a meeting called for such purpose no earlier than five years
after such interested shareholder's stock acquisition date. In addition, Section

XXX-002034

912 specifies certain minimum consideration that must be paid in a business combination. In connection with approving the Reorganization Agreement, the Grace Board approved the Reorganization, so that it is not subject to the limitations set forth in Section 912 of the NYBCL.

FRESENIUS USA

Chapter 110F of the Massachusetts General Laws Annotated ("MGLA") regarding business combinations with interested stockholders provides that a corporation may not engage in any business combination with interested stockholder for a period of three years following the date such stockholder became an interested stockholder unless (a) the board of directors approved the combination or transaction which resulted in the stockholder becoming an "interested stockholder", (b) the interested stockholder owned at least 90% of the voting stock at the time the transaction commenced or (c) the business combination is approved by the board of directors and authorized by the vote of at least two-thirds of the outstanding voting stock which is not owned by the interested stockholder. Fresenius AG became an interested stockholder of Fresenius USA (then called Delmed, Inc.) in 1987 when it acquired more than 5% of the outstanding voting stock of Fresenius USA, so that the Reorganization is not subject to the restrictions set forth in Section 1 of Chapter 110F of the MGLA.

Massachusetts law contains certain other anti-takeover statutes regarding the regulation of takeover bids in the acquisition of corporations and the regulation of control share acquisitions. These statutes are inapplicable to the Reorganization.

FRESENIUS MEDICAL CARE

German law does not specifically regulate business combinations with interested stockholders; however, special provisions apply to "dominating enterprises." An enterprise holding a majority in interest is presumed to dominate the company in which such interest is held. If no "contract of domination" (i.e., an agreement pursuant to which the majority shareholder effectively assumes management of the majority held company and, as a consequence, takes liability for its obligations) exists, then a dominating enterprise may not use its influence to cause a dependent stock corporation to enter into transactions disadvantageous to it or to take or fail to take measures to its disadvantage except when the disadvantages are compensated for, and the dominating corporation may be held liable to the dependent corporation for failure to observe this restriction. Unless a contract of domination is in effect, the management board (Vorstand) of a dependent corporation must prepare an annual report on the relations of the corporation with the dominating enterprise. This report

233

<PAGE>  258

must be examined by both the auditors of the dependent corporation and its supervisory board (Aufsichtsrat). Fresenius AG has no present intention to enter into a contract of domination with Fresenius Medical Care. Such a contract of domination would require approval of 75% of the share capital represented at a meeting. Such report is required to specify all transactions entered into by Fresenius Medical Care during the previous fiscal year with Fresenius AG or any of its affiliates (the "FAG Group"), or at the instruction or in the interest of any of the FAG Group and all other acts which Fresenius Medical Care has undertaken or refrained from undertaking at the instruction or in the interest of any of the FAG Group. Such report is required, in the case of a transaction, to specify any consideration given or received, and in the case of acts undertaken to state the reasons for such acts and the advantages and disadvantages for Fresenius Medical Care. Such report is further required, in the case of a compensation for disadvantages, specify the manner in which such compensation was made during the fiscal year and for which measures Fresenius Medical Care has been granted an entitlement. Generally, such report must comply with the principles of conscientious and accurate accounting. Moreover, the Fresenius Medical Care Management Board shall, at the end of such report, comment on whether Fresenius Medical Care, under the circumstances known to the Fresenius Medical Care Management Board at the date on which Fresenius Medical Care entered into such transaction or undertook or refrained from undertaking such act, received adequate consideration for each such transaction or suffered any disadvantage by reason of undertaking or refraining from undertaking such act. As a general matter, subject to certain exceptions, as long as Fresenius AG holds a majority of the capital stock or the voting rights in Fresenius Medical Care and has the right to determine the composition of the supervisory board of such company, the FMC Management Board will be required to prepare and provide such a report and provide such an examination.

LIMITATION ON DIRECTORS' LIABILITY

GRACE

Under Section 402 of the NYBCL, a corporation may limit or eliminate the personal liability of directors to the corporation or its shareholders for damages for breach of duty in such capacity. This limitation on liability is not available for acts or omissions by a director which (a) were in bad faith, (b) involved intentional misconduct or a knowing violation of law, (c) involved financial profit or other advantage to which the director was not entitled or (d) resulted in a violation of a statute prohibiting certain dividend declarations, certain payments to shareholders after dissolution and particular types of loans. The Grace Certificate of Incorporation provides for the limitation on directors' liability as permitted by this statute.

FRESENIUS USA

XXX-002035

Section 65 of the MBCL provides that a director or officer must perform his or her duties in good faith and in a manner he or she reasonably believes to be in the best interests of the corporation and with such care as an ordinarily prudent person in a like position would use under similar circumstances. The fact that a director or officer so performs his or her duties must be a complete defense to any claim asserted against him or her, whether under Sections 61-64 of the MBCL concerning illegal distributions, certain loans, certain false material representations and certain false statements, or otherwise, except as expressly provided by statute, by reason of his or her being or having been a director or officer.

The Restated Articles of Organization of Fresenius USA provide that, except to the extent provided by the MBCL, no directors shall be liable for any breach of fiduciary duty.

FRESENIUS MEDICAL CARE

Under compulsory provisions of the German Stock Corporation Law, a stock corporation is not allowed to limit or eliminate the personal liability of the members of either the management board (Vorstand) or the supervisory board (Aufsichtsrat) for damages due to breach of duty in their official capacity. For a discussion of the standard of conduct of the management board and the supervisory board, see "-- Duties of Directors -- Fresenius Medical Care." Fresenius Medical Care may, however, waive its claims for damages due to a breach of duty or reach a settlement with regard to such claims if more than three years have passed after such claims

234

<PAGE>  259

have arisen, but only with the approval of the general shareholder meeting, provided that such waiver may not be granted and such settlement may not be reached if shareholders holding in the aggregate at least 10% of the nominal capital file an objection to the protocol. If the claim for damages is based upon the allegation that the members of the FMC Management Board have, in violation of their duties, not listed a transaction of Fresenius Medical Care with Fresenius AG in the dependency report required to be listed therein or have not stated therein that the transaction with Fresenius AG was detrimental to Fresenius Medical Care and Fresenius Medical Care was not compensated therefor, then the above waiver or settlement of the claim is only permitted if the necessary shareholder approval has been granted by a special vote of the minority shareholders.

INDEMNIFICATION OF OFFICERS AND DIRECTORS

GRACE

Sections 722 and 723 of the NYBCL provide that a corporation may indemnify its officers and directors party to any action, suit or proceeding by reason of the fact that he or she was a director, officer or employee of the corporation by, among other things, a majority vote of directors who were not parties to such action, suit, or proceeding, provided that such officers and directors acted in good faith and in a manner they reasonably believed to be in or not opposed to the best interests of the corporation. The Grace By-laws provide for indemnification of officers and directors as permitted by this statute.

FRESENIUS USA

Section 67 of the MBCL provides that a corporation may indemnify its directors, officers, employees or other agents to the extent specified in the articles of organization, by-laws, or by a majority vote of the stockholders. The By-laws of Fresenius USA provide for indemnification, to the extent legally permissible, of each of its directors and officers against all liabilities and expenses reasonably incurred in connection with his or her defense or disposition of any action, suit or proceeding in which he or she may be involved or with which he or she may be threatened by reason being or having been a director or officer unless such director or officer did not act in good faith in the reasonable belief that his or her action was in the best interests of the corporation. Compromise payments pursuant to consent decrees are excluded from such indemnification under certain circumstances.

FRESENIUS MEDICAL CARE

Under German law, Fresenius Medical Care may indemnify its officers and, under certain circumstances, German labor law requires a stock corporation to do so. However, Fresenius Medical Care may not, as a general matter, indemnify members of the FMC Management Board or the FMC Supervisory Board. A stock corporation may, however, purchase directors and officers insurance, and Fresenius Medical Care intends to do so if available at commercially reasonable rates and on commercially reasonably terms and conditions. Such insurance may be subject to any mandatory restrictions imposed by German law. In addition, German law may permit a corporation to indemnify a member of the management or supervisory board for attorneys fees incurred if such member is the successful party in a suit in a country such as the U.S., where winning parties are required to bear their own costs, if German law would have required the losing party to pay such member's attorneys' fees had the suit been brought in Germany.

CUMULATIVE VOTING

GRACE

Grace does not permit cumulative voting.

XXX-002036

FRESENIUS USA

Fresenius USA does not permit cumulative voting.

235

<PAGE> 260

FRESENIUS MEDICAL CARE

The German Stock Corporation Law does not allow cumulative voting without the approval of the relevant authority in the German state of the stock corporation's domicile. The Articles of Association of Fresenius Medical Care will not provide for cumulative voting.

CONFLICT-OF-INTEREST TRANSACTIONS

GRACE

Section 713 of the NYBCL permits contracts or transactions between a corporation and an interested director if the material facts as to such director's interest are disclosed in good faith or known to the board or a committee thereof and the board approves the contract or transaction by a vote sufficient for such purpose without counting the interested director, or, if such a vote is not possible, by unanimous vote of disinterested directors. The NYBCL also provides that such contracts or transactions are also permitted if the material facts as to such director's interest are disclosed in good faith or known to the shareholders and are approved by a vote of the shareholders.

FRESENIUS USA

The MBCL does not specifically address "interested party" transactions other than loans made to directors and officers. See "-- Loans to Directors -- Fresenius USA." The Restated Articles of Organization of Fresenius USA permit certain transactions in which directors, officers or stockholders have certain interests, provided that there has been disclosure of the nature of the interest and authorization or ratification of the transaction by a majority of the disinterested directors or by a majority of each class of stockholders entitled to vote.

FRESENIUS MEDICAL CARE

In any transactions and contracts between Fresenius Medical Care and any member of the FMC Management Board, Fresenius Medical Care is represented by the FMC Supervisory Board. Under German statutory law, for as long as Fresenius AG holds a majority in interest of the FMC Ordinary Shares and Fresenius Medical Care is dependent on Fresenius AG within the meaning of the applicable German law (which will be the case immediately following the Reorganization), the FMC Management Board will be required to prepare an annual dependency report for the FMC Supervisory Board on the transactions between Fresenius Medical Care and its majority shareholder Fresenius AG. See "-- State Anti-takeover Statutes." Under the Pooling Agreement, subject to certain exceptions, transactions between Fresenius Medical Care and Fresenius AG (or their respective affiliates) will require the consent of a majority of the Independent Directors on the FMC Supervisory Board. See "-- State Anti-takeover Statutes."

DIVIDENDS AND OTHER DISTRIBUTIONS

GRACE

The NYBCL generally allows dividends to be paid out of surplus of the corporation only, so that the net assets of the corporation remaining after such payment shall be at least equal to the amount of its stated capital.

FRESENIUS USA

Section 61 of the MBCL holds directors jointly and severally liable for the authorization of dividends in violation of a corporation's articles of organization or which render the corporation insolvent or is made while the corporation is insolvent. This liability is subject to certain limitations. See "-- Limitation on Directors' Liability -- Fresenius USA." The Fresenius USA Restated Articles of Organization specify that all paid-in-surplus will be available for any corporate purpose, including the payment of dividends.

236

<PAGE> 261

FRESENIUS MEDICAL CARE

According to the German Stock Corporation Law dividends may be paid out of surplus of the corporation provided that the net assets of the corporation remaining after such payment are at least equal to the amount of its stated capital.

ISSUANCE OF RIGHTS OR OPTIONS TO PURCHASE SHARES TO DIRECTORS, OFFICERS AND EMPLOYEES

GRACE

The NYBCL requires that the issuance to directors, officers and/or employees of rights or options to purchase shares must be authorized by a majority of the total voting power of all of Grace's outstanding capital stock.

FRESENIUS USA

XXX-002037

Neither the MBCL nor the Restated Articles of Organization of Fresenius USA specifically provide for stockholder authorization of the issuance of rights or options to directors, officers and/or employees.

FRESENIUS MEDICAL CARE

Fresenius Medical Care intends to provide the equivalent of stock options to Fresenius Medical Care management and employees by issuance of convertible bonds that would be exercisable for FMC Preferred Shares issued under Conditional Capital. See "MANAGEMENT OF FRESENIUS MEDICAL CARE -- Compensation of the FMC Management Board and Certain Other Executive Officers -- Stock Option Plan." However, Fresenius AG knows of no such program that has ever been implemented by a German corporation or been subject to court review in Germany. Therefore, no assurance can be given that such program will be accepted by the courts, particularly because FMC Preferred Shares issued under Conditional Capital are not subject to preemptive rights of existing shareholders, who may contest such elimination of preemptive rights. See "DESCRIPTION OF CAPITAL STOCK OF FRESENIUS MEDICAL CARE -- General."

Stock option plans for employees can also be effected by the acquisition of the company's own shares by Fresenius Medical Care; such acquisitions are restricted to 10% of the share capital outstanding at the time of the acquisition and the shares thus acquired must be issued to the employees within one year from the date of the acquisition by Fresenius Medical Care. Such acquired shares cannot be issued to management.

LOANS TO DIRECTORS

GRACE

The NYBCL requires that any loan made by a corporation to any director be authorized by a vote of the shareholders. For purposes of this authorization, the shares held by the director who would be the borrower are not entitled to vote. A loan made in violation of the above conditions shall be a violation of the duty to the corporation of the directors approving it, but the obligation of the borrower with respect to the loan shall not be affected thereby.

FRESENIUS USA

Section 62 of the MBCL provides that the directors who vote for, and the officers who knowingly participate in, any loan from the corporation to an officer or director will be jointly and severally liable to the corporation for any portion of such loan which is not repaid unless a majority of disinterested directors or the holders of a majority of shares entitled to vote for such directors will have approved and ratified the loan as in the corporate interest. Section 65 of the MBCL limits the imposition of liability under Section 62 of the MBCL. See "-- Limitation on Directors' Liability -- Fresenius USA."

237

<PAGE>   262

FRESENIUS MEDICAL CARE

The German Stock Corporation Law requires that any loan made by Fresenius Medical Care exceeding a month's salary to any director or general manager or to their spouses or minor children must be authorized by a resolution of the FMC Supervisory Board. Loans made by Fresenius Medical Care to a member of the FMC Supervisory Board require an affirmative vote of the FMC Supervisory Board. For purposes of this resolution, the member of the FMC Supervisory Board who would be the borrower is not entitled to vote.

CLASS ACTION SUITS

GRACE

New York law permits class actions in cases where (a) class is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable, (b) there are questions of law or fact common to the class which predominate over any questions affecting only individual members, (c) the claims or defenses of the representative parties are typical of the claims or defenses of the class, (d) the representative parties will fairly and adequately protect the interests of the class, and (e) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

FRESENIUS USA

Massachusetts law permits class action suits if (a) the class is so numerous that joinder of all members is impracticable, (b) there are common questions of law or fact, (c) the claims or defenses of the representative parties are typical of the claims or defenses of the class and (d) the representative parties will fairly and adequately protect the interests of the class. A court will permit an action to be maintained as a class action if it finds that the above requirements are satisfied, common questions of law or fact predominate over questions affecting only individual members, and a class action is superior to other methods of adjudication of the controversy.

FRESENIUS MEDICAL CARE

German law does not provide for class actions.

SHAREHOLDER DERIVATIVE AND BREACH OF FIDUCIARY DUTY SUITS

GRACE

XXX-002038