Section 626 of the NYBCL permits actions to be brought in the right of a domestic or foreign corporation by holders of shares or of voting certificates of the corporation or of a beneficial interest in such shares or certificates. In such action, the plaintiff must be such a holder at the time of bringing the action and the plaintiff must have been such a holder at the time of the transaction complained of or who received such shares by operation of law from someone who was such a holder at such time.

FRESENIUS USA

Section 46 of the MBCL permits suits by stockholders owning stock in the corporation at the time of the act or default complained of or by stockholders who received such stock by operation of law from someone who was a stockholder at such time. Courts have interpreted Section 46 of the MBCL as permitting such stockholder derivative suits and breach of fiduciary duty suits.

FRESENIUS MEDICAL CARE

The German Stock Corporation Law does not generally permit shareholder derivative suits, even in the case of breach of duty by the members of the management board or the supervisory board. The shareholders' general meeting, acting by a simple majority of the votes cast, or a minority of the shareholders holding in the aggregate at least 10% of the nominal capital, are entitled to request Fresenius Medical Care to claim damages, but are not entitled to assert any rights on behalf of Fresenius Medical Care. Upon such request, the corporation will prosecute such claim. The general shareholders meeting may appoint any disinterested party

238

<PAGE>   263

as a special representative for these proceedings. To avoid abuse, shareholders exercising the minority right described above must establish that they have held their shares for at least three months prior to the general shareholders meeting in which they make the request. The shareholder group must reimburse Fresenius Medical Care for all costs of litigation if such proceedings are successful.

The German Stock Corporation Law does permit certain shareholder suits, however, if a stock corporation is controlled by another company. According to Sections 309, 317 and 318 of the German Stock Corporation Law, each shareholder of the controlled company may, under certain circumstances, claim that the controlled company's damages are due to breach of duty of the controlling company or due to directives of the controlling company detrimental to the controlled company's interests. Since Fresenius AG will control Fresenius Medical Care through its majority vote, suits by shareholders of Fresenius Medical Care against Fresenius AG would be permitted under German law.

RIGHT TO INSPECT CORPORATE BOOKS AND RECORDS; RIGHT TO INSPECT SHAREHOLDER LISTS

GRACE

Section 624 of the NYBCL provides a right of inspection of a corporation's books, records and shareholders lists to any person who shall have been a shareholder for at least six months immediately preceding his or her demand or any person holding at least 5% of a class of outstanding shares on at least five days written demand.

FRESENIUS USA

Massachusetts law provides that Fresenius USA must keep certain corporate books and records at its principal office in the Commonwealth for inspection by its stockholders. These books and records are competent evidence in any court in the Commonwealth. If any officer or agent of the corporation shall refuse to submit them as evidence, he or she or the corporation shall be liable for actual damages to the stockholder, and the courts of the Commonwealth shall have jurisdiction to require the corporation to exhibit such books and records to the stockholder. It shall be a defense of the corporation that the stockholder intended to inspect the books and records other than in his interest relative to the affairs of the corporation.

The Restated Articles of Organization of Fresenius USA provide that no stockholder shall have any right to examine any property or books, accounts or other writings of Fresenius USA if there is reasonable ground for belief that such examination would be for any reason be adverse to the interests of Fresenius USA. Furthermore, a vote of the directors refusing permission is prima facie evidence that such examination would be adverse to the interests of Fresenius USA. The Restated Articles of Organization of Fresenius USA also provide that every permitted examination of books and records will be subject to such reasonable regulations as the directors may establish with respect to such examination.

FRESENIUS MEDICAL CARE

The German Stock Corporation Law does not permit shareholders to inspect corporate books and records. Section 131 of the German Stock Corporation Law, however, does provide each shareholder with a right to information. German courts have extended this information right to include information about the existence and the scope of minority stock ownership, obligating the management board to give information with respect to ownership of at least 10% of the voting rights or exceeding 10% of the stated capital or if the ownership is large in absolute terms (e.g., DM 100 million for large enterprises).

The right to information is a right only to oral information at a shareholders meeting. Information may be given in writing to shareholders, but

XXX-002039

they are neither entitled to receive written information nor to inspect any
documents of the corporation. As a practical matter, shareholders may receive
certain written information about Fresenius Medical Care through its public
filings with the Commercial Register and the Federal Gazette or the other places
for publications of the company.

239

<PAGE>   264

SEC REPORTING

  GRACE AND FRESENIUS USA

      Each of Grace and Fresenius USA is subject to the informational
requirements of the Exchange Act and, in accordance therewith, each files
periodic reports and other information with the Commission. The reports filed by
Grace and Fresenius USA with the Commission include Annual Reports on Form 10-K
and Quarterly Reports on Form 10-Q. Grace and Fresenius USA are also subject to
the Commission's proxy rules and, when soliciting proxies, are required to
distribute proxy statements in conformity with such rules. Proxy statements for
annual meetings must be accompanied or preceded by an annual report to
shareholders containing certain required disclosures. Officers, directors and
10% beneficial owners of Grace Common Stock and Fresenius USA's equity
securities are subject to the reporting requirements and short-swing profit
recovery provisions of Section 16 of the Exchange Act.

  FRESENIUS MEDICAL CARE

      Fresenius Medical Care will be a "foreign private issuer" as defined in the
Commission's rules and certain disclosure requirements of the Commission's rules
applicable to domestic issuers will not apply to it. Fresenius Medical Care will
not be subject to the Commission's proxy rules or the Commission's rules
requiring the filing of quarterly reports. Annual reports filed by Fresenius
Medical Care with the Commission will contain less detailed disclosure regarding
such matters as management, executive compensation and outstanding options,
beneficial ownership of Fresenius Medical Care's securities and related party
transactions. Also, officers, directors and 10% beneficial owners of Fresenius
Medical Care's equity securities will not be subject to the reporting
requirements and short-swing profit recapture provisions of Section 16 of the
Exchange Act. However, Fresenius Medical Care has agreed that as long as the
Pooling Agreement is in effect, Fresenius Medical Care will file quarterly
reports under cover of Form 6-K, will prepare its annual and quarterly financial
statements in accordance with US GAAP and will file with the Commission and
provide to shareholders (including holders of ADRs) certain materials with
respect to its annual and special meetings of shareholders. See "DESCRIPTION OF
THE POOLING AGREEMENT -- Listing of American Depository Shares; SEC Filings" and
"-- Term."

240

<PAGE>   265

          AMENDMENT TO THE FRESENIUS USA 1987 STOCK OPTION PLAN

      The Fresenius USA Board believes that the granting of stock options is an
effective method of recruiting and retaining valuable management personnel.
Stock options also serve to provide incentive and to strengthen the identity of
interests between key employees, Fresenius USA and the stockholders.

      On July 17, 1995, the Fresenius USA Board, subject to approval by the
stockholders, adopted the Fresenius USA Plan Amendment fixing the maximum number
of shares for which options thereunder may be granted to any individual under
the Fresenius USA Plan at 1,000,000 shares. Also on that date, the Compensation
Committee of the Fresenius USA Board (the "Fresenius USA Compensation
Committee") granted options to Dr. Ben Lipps contingent upon stockholder
approval of the Fresenius USA Plan Amendment. Currently, there are 2,000,000
shares available under the Fresenius USA Plan.

THE FRESENIUS USA PLAN

      The following summary of the material terms of the Fresenius USA Plan is
qualified in its entirety by the terms of the Fresenius USA Plan, a copy of
which, as proposed to be amended by the Fresenius USA Plan Amendment, is
included as Appendix E to this Joint Proxy Statement-Prospectus. The Fresenius
USA Plan provides for granting to key employees options to purchase Fresenius
USA Common Stock by the Fresenius USA Compensation Committee. The Fresenius USA
Compensation Committee administers the Fresenius USA Plan, determining, among
other things the amount and terms of grants. There are outstanding under the
Fresenius USA Plan non-incentive and incentive stock options, all of which vest
over a period of not more than five years from the date of grant, expire not
more than 10 years from the date of grant and are exercisable at prices not less
than 100% of the fair market value of Fresenius USA Common Stock on the date of
grant. Options granted under the Fresenius USA Plan are exercisable on such
terms as are determined by the Fresenius USA Compensation Committee or the
Fresenius USA Board. In 1990, the Fresenius USA Plan was amended to increase the
number of shares of Fresenius USA Common Stock reserved for issuance from
110,000 shares to 500,000 shares, and, in 1994, the Fresenius USA Plan was
amended to increase the number of shares of Fresenius USA Common Stock reserved
for issuance from 500,000 shares to 2,000,000 shares. As of March 31, 1996,
without giving effect to the Fresenius USA Plan Amendment or to the grant of
options made to Dr. Lipps subject to the approval of the stockholders of
Fresenius USA, 1,284,000 shares were subject to outstanding options under the
Fresenius USA Plan at an average per share exercise price of $6.73. All key
employees of Fresenius USA are eligible to be awarded grants of options under
the Fresenius USA Plan, subject to the determination of the Fresenius USA

XXX-002040

Compensation Committee.

The following table summarizes the options granted under the Fresenius USA Plan in 1995, subject to stockholder approval of the Fresenius USA Plan Amendment, to the persons specified:

<TABLE>
<CAPTION>

| NAME AND POSITION | DATE GRANTED | SHARES | EXERCISE PRICE |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Ben J. Lipps............................................ President, Chief Executive Officer and Chief Operating Officer | July 17, 1995 | 450,000 | $12.75 |
| All Current Executive Officers as a Group............. | July 17, 1995 | 450,000 | $12.75 |
| All Current Directors who are not Executive Officers as a Group....................................... | | 0 | |
| All Employees who are not Executive Officers as a Group............................................ | | 0 | |

</TABLE>

Based on the closing price of Fresenius USA Common Stock on the AMEX on July 18, 1996, Dr. Lipps' options have an aggregate value of $2,418,750, equal to the excess of such closing price over the exercise price of the options. However, Dr. Lipps may sell such options to Fresenius USA. See "FRESENIUS USA EXECUTIVE COMPENSATION -- Securities Repurchases."

On May 6, 1996 the Fresenius USA Compensation Committee voted to accelerate the vesting of all outstanding unvested options under the Fresenius USA Plan held by persons subject to Section 16(b) of the Exchange Act (comprising Dr. Lipps and Messrs. Farrell, Schmidt and Walker), thereby making all such options presently exercisable.

                              241

<PAGE>  266

TERMS OF THE GRANT TO DR. LIPPS

On July 17, 1995, subject to stockholder approval of the Fresenius USA Plan Amendment, the Fresenius USA Compensation Committee granted to Dr. Lipps options to purchase 450,000 shares of Fresenius USA Common Stock at $12.75 per share. These options become exercisable over 10 years, with accelerated exercisability if certain targets for the price of Fresenius USA Common Stock are satisfied. Specifically, the options become exercisable as to 50% of these shares on the day that is the 10th consecutive trading day on which the closing price of Fresenius USA Common Stock on the AMEX equals or exceeds $16.00, and as to the remaining 50% on the day that is the 10th consecutive trading day on which such closing price equals or exceeds $20.00. Because these stock price targets have been satisfied, all of such options will be exercisable upon approval of the Fresenius USA Plan Amendment by the stockholders of Fresenius USA. By voting to approve the Fresenius USA Plan Amendment, holders of Fresenius USA Common Stock are voting to approve the grant to Dr. Lipps. Fresenius AG has agreed that it will vote all shares of Fresenius USA Common Stock it beneficially owns in favor of the Fresenius USA Plan Amendment, thus assuring approval of the Fresenius USA Plan Amendment.

Because of certain limitations contained in Section 422 of the Code, and the earlier grants in 1989 and 1993 of other stock options to Dr. Lipps, none of the options granted to Dr. Lipps in July 1995 (subject to stockholder approval of the Fresenius USA Plan Amendment) is an "incentive stock option" as defined in Section 422 of the Code. The tax treatment of options which are not "incentive stock options" is that, at the time of exercise, the holder of such an option recognizes income equal to the excess of the fair market value of the stock received over the exercise price and Fresenius USA has a corresponding deduction.

EFFECT OF THE AMENDMENT

After giving effect to the Fresenius USA Plan Amendment and the grant to Dr. Lipps, the Fresenius USA Plan will essentially be unchanged other than the specification of the maximum number of shares (1,000,000) available for options granted to any individual under the Fresenius USA Plan. For information with respect to the treatment of outstanding options to purchase Fresenius USA Common Stock in the Reorganization, see "THE REORGANIZATION -- Exchange of Certificates."

For information with respect to the repurchase by Fresenius USA of certain options granted under the Fresenius USA Plan and shares of Fresenius USA Common Stock, see "FRESENIUS USA EXECUTIVE COMPENSATION -- Securities Repurchases."

                              242

<PAGE>  267

                           EXPERTS

The special-purpose, consolidated financial statements of Grace as of December 31, 1995 and 1994 and for each of the three years in the period ended December 31, 1995 included in this Joint Proxy Statement-Prospectus have been so included in reliance on the report, which includes explanatory paragraphs describing the purpose of presenting Grace special-purpose, consolidated financial statements, of Price Waterhouse LLP, independent accountants, given on their authority as experts in accounting and auditing.

The consolidated financial statements and financial statement schedule of

XXX-002041

Fresenius USA and subsidiaries as of December 31, 1995 and 1994 and for each of the years in the three-year period ended December 31, 1995 have been included in this Joint Proxy Statement-Prospectus and in the Registration Statement of which it forms a part in reliance upon the report of KPMG Peat Marwick LLP, independent certified public accountants, appearing elsewhere herein, and upon the authority of said firm as experts in accounting and auditing.

The combined financial statements and financial statement schedule of Fresenius Worldwide Dialysis as of December 31, 1995 and 1994, and for the years then ended, have been included in this Joint Proxy Statement-Prospectus and in the Registration Statement of which it forms a part, in reliance upon the report of KPMG Deutsche Treuhand-Gesellschaft Aktiengesellschaft Wirtschaftsprufungsgesellschaft, independent accountants, appearing elsewhere herein, and upon the authority of said firm as experts in accounting and auditing.

The Fresenius USA Board has appointed the firm of KPMG Peat Marwick LLP, certified public accountants, as independent accountants for Fresenius USA for the year 1996.

Representatives of Price Waterhouse LLP and KPMG Peat Marwick LLP are expected to be present at the Grace Special Meeting and the Fresenius USA Special Meeting, respectively. These representatives will have an opportunity to make statements if they so desire and will be available to respond to appropriate questions.

                        VALIDITY OF SHARES

The validity of the FMC Ordinary Shares underlying the ADSs to be issued pursuant to the Reorganization will be passed upon for Fresenius Medical Care by Norr, Stiefenhofer & Lutz, special German counsel for Fresenius Medical Care, and the validity of the ADRs evidencing the ADSs offered hereby will be passed upon by O'Melveny & Myers LLP, special U.S. counsel to Fresenius AG and Fresenius Medical Care. Dr. Dieter Schenk, a member of the firm of Norr, Stiefenhofer & Lutz, will be Deputy Chairman of the FMC Supervisory Board. Ulrich Wagner, a member of the firm of O'Melveny & Myers LLP, is a member of the Fresenius USA Board. Dr. Alfred Stiefenhofer, a member of the firm of Norr, Stiefenhofer & Lutz, is one of the executors of the estate of Mrs. Else Kroner (see "SECURITY OWNERSHIP -- Security Ownership of Certain Beneficial Owners and Management of Fresenius AG") and is the Chairman of the Fresenius AG Supervisory Board. The validity of the New Preferred Shares will be passed upon by Robert H. Beber, Executive Vice President and General Counsel of Grace. Mr. Beber beneficially owns shares of Grace Common Stock, as well as options to acquire Grace Common Stock.

                               243
<PAGE>   268

                   SUBMISSION OF SHAREHOLDER PROPOSALS

Any shareholder wishing to submit a proposal for inclusion in the Proxy Statement for the 1997 Grace Annual Meeting of Shareholders pursuant to the shareholder proposal rules of the Commission must submit the proposal by December 11, 1996 in order for it to be considered for inclusion in the 1997 Proxy Statement.

If the Reorganization is consummated, Fresenius USA will not convene an annual meeting of stockholders. If for any reason this Reorganization is not consummated, stockholder proposals intended to be presented at the Fresenius USA 1997 Annual Meeting of Stockholders must be received at Fresenius USA's principal executive offices no later than February 1, 1997.

                               244
<PAGE>   269

                        INDEX OF DEFINED TERMS
<TABLE>
<CAPTION>

|                            | PAGE |
| -------------------------- | ---- |
| <S>                        | <C>  |
| Abbott...................... | 69   |
| Abbott Acquisition......... | 96   |
| Abbott Letter of Credit... | 169  |
| Abbott Warrant............ | 168  |
| Acquisition Proposal...... | 62   |
| ADRs...................... | C2   |
| ADSs...................... | C2   |
| AMI....................... | 179  |
| Amicon................... | 44   |
| ANDA..................... | 119  |
| Anniversary Date......... | 183  |
| Apria.................... | 116  |
| Approved Capital I....... | 210  |
| Approved Capital II...... | 210  |
| Arrangers................ | 194  |
| AW....................... | 185  |
| Base Rate................ | 194  |
| Baxter................... | 38   |
| Bennett Action........... | 141  |
| Bonds.................... | 183  |
| CAPD..................... | 81   |
| Cash..................... | 218  |
| CCPD..................... | 81   |

XXX-002042

| | |
|---|---|
| Claim Refund Form | 203 |
| CLIA | 121 |
| Code | 29 |
| Commission | i |
| Common Directors | 226 |
| Comparable Companies | 44 |
| Composite Rate | 25 |
| CON | 122 |
| Consent Decree | 25 |
| Contribution | C2 |
| Contribution Agreement | C2 |
| Coordination of benefits period | 126 |
| Counsel | 197 |
| Covered Period | 140 |
| CS First Boston | 7 |
| Court | 75 |
| Custodian | 217 |
| DCF | 54 |
| Debt | 66 |
| Delivery Order | 217 |
| Delmed | 97 |
| Deposit Agreement | 64 |
| Depositary | ii |
| Deposited Securities | 217 |
| Distribution | C2 |
| Distribution Agreement | C2 |

<CAPTION>

| | PAGE |
|---|---|
| <S> | <C> |
| Distribution Payment | 8 |
| Dividend Accrual Period | 206 |
| DKV | 217 |
| DMERCs | 125 |
| DOJ | 66 |
| Dresdner Securities | 47 |
| Drug Law | 120 |
| DSD | 1 |
| dual eligible ESRD patients | 26 |
| DST | 107 |
| EBIT | 43 |
| EBITDA | 28 |
| Effective Date | 9 |
| Effective Time | 9 |
| entitlement waiting period | 126 |
| EPO | 25 |
| ESRD | 24 |
| EU | 120 |
| Excess Shares | 79 |
| Exchange Act | i |
| Exchange Agent | 3 |
| Facilities | 155 |
| Facility 1 | 194 |
| Facility 2 | 194 |
| Facility 3 | 194 |
| FAG Group | 234 |
| False Claims Act | 128 |
| FCO | 10 |
| FDA | 24 |
| FDC Act | 119 |
| FDS08 | 102 |
| First Proposal | 47 |
| Florida Action | 136 |
| FMC Actual Capitalization Adjustment | 55 |
| FMC Management Board | 179 |
| FMC Ordinary Shares | C2 |
| FMC Plan | 183 |
| FMC Preferred Shares | 183 |
| FMC Supervisory Board | 31 |
| FNMC | C1 |
| FNMC Board | 12 |
| FNMC Common Stock | 12 |
| Foundation | 87 |
| Fractional Securities Fund | 79 |
| Fresenius AG | C2 |
| Fresenius AG Management Board | 49 |
| Fresenius AG Ordinary Shares | 87 |
| Fresenius AG Preference Shares | 185 |
| Fresenius AG Supervisory Board | 185 |

</TABLE>

245

<PAGE>    270
<TABLE>
<CAPTION>

| | PAGE |
|---|---|
| <S> | <C> |
| Fresenius Medical Care | C2 |
| Fresenius Parties | 66 |
| Fresenius Tax Indemnification Agreement | 69 |
| Fresenius USA | C1 |

XXX-002043

Fresenius USA Board..................... C1
Fresenius USA Common Stock.............. C1
Fresenius USA Compensation Committee.... 241
Fresenius USA Dissenting Stockholder.... 77
Fresenius USA Independent Committee..... 6
Fresenius USA Merger.................... C2
Fresenius USA Plan...................... C2
Fresenius USA Plan Amendment............ C2
Fresenius USA Record Date............... 5
Fresenius USA Preferred Stock........... 5
Fresenius USA Public Stockholder
    Exchange Ratio...................... 51
Fresenius USA Public Stockholders....... 47
Fresenius USA Special Meetings.......... C1
Fresenius Worldwide Dialysis............ C2
FTC..................................... 10
FUSA Merger Sub......................... C2
FWD Business Subsidiaries............... 69
German GAAP............................. 16
German Securities Law................... 185
GMP..................................... 25
Government Claims....................... 136
Grace................................... C1
Grace Amendment......................... C2
Grace Board............................. C1
Grace Chemicals......................... C2
Grace Common Dissenting Shareholder..... 73
Grace Common Stock...................... C1
Grace Financial Advisors................ 7
Grace Merger............................ C2
Grace Merger Sub........................ C2
Grace Preferred Stock................... C1
Grace Record Date....................... 5
Grace Rights............................ 64
Grace Rights Agreement.................. 64
Grace Special Meeting................... C1
Grace Tax Sharing and Indemnification
    Agreement........................... 68
HCFA.................................... 26
HDS..................................... 133
HHS..................................... 23
HIC..................................... 113
Higher Offer............................ 61
HMOs.................................... 27
HNS..................................... 113
HOF..................................... 186
Holders................................. 217
HSR Act................................. 10
IDPN.................................... 26

<CAPTION>

                                        PAGE
                                        -----
<S>                                     <C>
Interested Transactions................. 214
IRS..................................... 11
Joinder Agreement....................... 69
J.P. Morgan............................. 224
Junior Stock............................ 208
Leases.................................. 70
Lenders................................. 194
Letter of Transmittal................... 78
LIBOR................................... 161
LifeChem................................ 24
Liquidation Preference.................. 12
Loan.................................... 183
LTIP.................................... 184
MBCL.................................... 11
MDS..................................... 101
Medical Devices Act..................... 120
Medical Directors....................... 22
Mergers................................. C2
Merrill Lynch........................... 7
Method I................................ 123
Method II............................... 123
MGLA.................................... 233
minority buyout transactions............ 55
Minority Shareholders................... 214
MPG..................................... 1
MSP..................................... 26
Murphy Action........................... 141
NDA..................................... 119
New Grace............................... C2
New Grace Common Stock.................. i
New Grace Prospectus.................... i
New Grace Registration Statement........ i
New Grace Right......................... 198
New Preferred Shares.................... C2
NLAs.................................... 124
NMC..................................... C2
NMC Credit Agreement.................... 28
NMC Credit Facility..................... 194
NMC Distribution........................ 29
NMC Homecare............................ 1

XXX-002044

```
Non-Exclusive Business...................      71
Non-resident.............................     213
NYBCL....................................      11
NYSE.....................................      C3
OBRA 93..................................      26
Obligations..............................     136
OIG......................................      23
OIG Agreements...........................     136
OIG Investigation........................      23
Old FUSA.................................      97
Opinions.................................     197
```
</TABLE>

246

<PAGE>    271
<TABLE>
<CAPTION>

|  | PAGE |
|---|---|
| <S> | <C> |
| Optional Redemption | 209 |
| Optional Redemption Date | 209 |
| Optional Redemption Price | 209 |
| OSHA | 121 |
| Other Distributions | 219 |
| Other Fresenius AG Business | 71 |
| Other NMC Business | 71 |
| Payment Date | 12 |
| PC | 89 |
| PCHS | 113 |
| PEN | 26 |
| PHC | 205 |
| PIC | 120 |
| Pooling Agreement | 214 |
| Preferred Directors | 226 |
| Pre-released ADRs | 218 |
| Primary Guarantee | 136 |
| Pro Forma Condensed Combined Financial Information | 170 |
| PROPAC | 123 |
| FSP | 85 |
| Public Announcement | 206 |
| PVC | 84 |
| Recapitalization | C2 |
| Registration Statement | 1 |
| Releases | 137 |
| Rena-Med | 10 |
| Renal Business | 70 |
| Reorganization | C2 |
| Reorganization Agreement | C2 |
| Resident | 213 |
| Retained Facilities | 71 |
| Rights | 219 |
| RPD | 25 |

<CAPTION>

|  | PAGE |
|---|---|
| <S> | <C> |
| Salomon Brothers | 7 |
| Schiwa | 10 |
| Schweinfurt Facility | 84 |
| Secondary Guarantee | 136 |
| Second Proposal | 49 |
| Securities Act | 1 |
| Securities Filings | 215 |
| Seratronics | 98 |
| Services Agreements | 72 |
| SG&A | 159 |
| Shared Intellectual Property | 71 |
| Share Distribution | 219 |
| Special Dividend | 206 |
| Special Dividend Amount | 206 |
| Special Meetings | C1 |
| Specified Executives | 189 |
| St. Wendel Facility | 84 |
| Standstill Period | 214 |
| Stark I | 129 |
| Stark II | 129 |
| Supplemental Agreement | 69 |
| Supply Agreements | 72 |
| Third Proposal | 49 |
| Time of Distribution | 2 |
| Transaction Agreements | 41 |
| Transfer | 76 |
| Transferred Facilities | 71 |
| Treaty | 183 |
| US GAAP | ii |
| U.S. Holder | 201 |
| Vivra | 37 |
| Voting Shares | 214 |
</TABLE>

247

XXX-002045

<PAGE>    272

                          INDEX OF FINANCIAL STATEMENTS

<TABLE>
<CAPTION>

|  | PAGE |
|---|---|
| <S> | <C> |
| W. R. GRACE & CO. | |
| SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS OF W. R. GRACE & CO.: | |
| Special-Purpose, Report of Independent Accountants......................... | F-3 |
| Special-Purpose, Consolidated Statements of Earnings for the years ended December 31, 1995, 1994 and 1993........................................... | F-4 |
| Special-Purpose, Consolidated Balance Sheets as of December 31, 1995 and 1994............................................................. | F-5 |
| Special-Purpose, Consolidated Statements of Cash Flows for the years ended December 31, 1995, 1994 and 1993....................................... | F-6 |
| Notes to Special-Purpose, Consolidated Financial Statements.................. | F-7 |
| SPECIAL-PURPOSE, CONSOLIDATED INTERIM FINANCIAL STATEMENTS OF W. R. GRACE & CO.: | |
| Special-Purpose, Consolidated Interim Statements of Earnings for the quarters ended March 31, 1996 and 1995......................................... | F-26 |
| Special-Purpose, Consolidated Interim Balance Sheet for the quarter ended March 31, 1996.......................................................... | F-27 |
| Special-Purpose, Consolidated Interim Statements of Cash Flows for the quarters ended March 31, 1996 and 1995................................... | F-28 |
| Notes to Special-Purpose, Consolidated Interim Financial Statements........... | F-29 |
| FRESENIUS WORLDWIDE DIALYSIS | |
| COMBINED FINANCIAL STATEMENTS OF FRESENIUS WORLDWIDE DIALYSIS: | |
| Independent Auditors' Report....................................... | F-31 |
| Combined Statements of Operations and Net Assets for the years ended December 31, 1995 and 1994................................................... | F-32 |
| Combined Balance Sheets as of December 31, 1995 and 1994..................... | F-33 |
| Combined Statements of Cash Flows for the years ended December 31, 1995 and 1994................................................................ | F-34 |
| Notes to Combined Financial Statements..................................... | F-35 |
| COMBINED INTERIM FINANCIAL STATEMENTS OF FRESENIUS WORLDWIDE DIALYSIS: | |
| Interim Combined Statements of Operations and Net Assets for the three months ended March 31, 1996 and 1995........................................ | F-53 |
| Interim Combined Balance Sheet as of March 31, 1996.......................... | F-54 |
| Interim Combined Statements of Cash Flows for the three months ended March 31, 1996 and 1995.................................................. | F-55 |
| Notes to Interim Combined Financial Statements.............................. | F-56 |
| FRESENIUS USA, INC. | |
| CONSOLIDATED FINANCIAL STATEMENTS OF FRESENIUS USA, INC.: | |
| Independent Auditors' Report....................................... | F-57 |
| Consolidated Balance Sheets as of December 31, 1995 and 1994................. | F-58 |
| Consolidated Statements of Income for the years ended December 31, 1995, 1994 and 1993........................................................... | F-59 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 1995, 1994 and 1993................................................ | F-60 |
</TABLE>

                                   F-1

<PAGE>    273

<TABLE>
<CAPTION>

|  | PAGE |
|---|---|
| <S> | <C> |
| Consolidated Statements of Cash Flows for the years ended December 31, 1995, 1994 and 1993................................................... | F-61 |
| Notes to Consolidated Financial Statements.............................. | F-63 |
| CONSOLIDATED INTERIM FINANCIAL STATEMENTS OF FRESENIUS USA, INC.: | |
| Consolidated Balance Sheet at March 31, 1996.............................. | F-81 |
| Consolidated Statements of Operations for the three months ended March 31, 1996 and 1995............................................................. | F-82 |
| Consolidated Statements of Cash Flows for the three months ended March 31, 1996 and 1995............................................................. | F-83 |
| Notes to Consolidated Financial Statements.............................. | F-84 |
</TABLE>

                                   F-2

<PAGE>    274

              SPECIAL-PURPOSE, REPORT OF INDEPENDENT ACCOUNTANTS

TO THE BOARD OF DIRECTORS AND SHAREHOLDERS OF
W. R. GRACE & CO.

     We have audited the accompanying special-purpose, consolidated balance
sheets of W. R. Grace & Co. and its subsidiary (the "Company") as of December
31, 1995 and 1994, and the related consolidated special-purpose, statements of
earnings and cash flows for each of the three years in the period ended December
31, 1995. These special-purpose, consolidated financial statements are the
responsibility of the Company's management. Our responsibility is to express an
opinion on the special-purpose, consolidated financial statements based on our
audits.

     We conducted our audits in accordance with generally accepted auditing
standards. Those standards require that we plan and perform the audit to obtain

reasonable assurance about whether the special-purpose, consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the special-purpose, consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the special-purpose, consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

The accompanying special-purpose, consolidated financial statements were prepared on the basis of presentation describe in Note 1, and are not intended to be a complete presentation of the assets, liabilities, revenues and expenses of the Company.

In our opinion, the accompanying special-purpose, consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 1995 and 1994, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 1995 pursuant to the basis of presentation described in Note 1, in conformity with generally accepted accounting principles.

PRICE WATERHOUSE LLP
Boston, Massachusetts
March 29, 1996

F-3

<PAGE>   275

W. R. GRACE & CO.
SPECIAL-PURPOSE, CONSOLIDATED STATEMENTS OF EARNINGS
(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

<TABLE>
<CAPTION>

|  | YEAR ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
|  | 1995 | 1994 | 1993 |
| <S> | <C> | <C> | <C> |
| NET REVENUES |  |  |  |
| Health care services............................. | $1,884,748 | $1,681,039 | $1,292,951 |
| Medical supplies................................. | 147,990 | 137,165 | 162,644 |
|  | 2,032,738 | 1,818,204 | 1,455,595 |
| EXPENSES |  |  |  |
| Cost of health care services..................... | 1,067,906 | 915,887 | 723,374 |
| Cost of medical supplies......................... | 108,187 | 110,932 | 116,691 |
| General and administrative expenses.............. | 360,960 | 329,795 | 238,506 |
| Provision for doubtful accounts.................. | 88,858 | 73,052 | 59,436 |
| Depreciation and amortization.................... | 113,176 | 95,882 | 77,790 |
| Research and development......................... | 3,957 | 2,299 | 5,910 |
| Allocation of Grace Chemicals expenses........... | 29,724 | 32,604 | 31,766 |
| Interest expense, net, and related financing costs... | 25,534 | 15,873 | 11,505 |
| Reduction of carrying amounts of assets to estimated fair values and restructuring costs.............. | 28,923 | 27,441 | 0 |
|  | 1,827,225 | 1,603,765 | 1,264,978 |
| EARNINGS BEFORE INCOME TAXES..................... | 205,513 | 214,439 | 190,617 |
| PROVISION FOR INCOME TAXES....................... | 108,616 | 112,222 | 86,845 |
| NET EARNINGS..................................... | $   96,897 | $  102,217 | $  103,772 |
| Earnings per share.............................. | $     1.01 | $     1.08 | $     1.12 |

</TABLE>

See accompanying Notes to Special-Purpose, Consolidated Financial Statements.

F-4

<PAGE>   276

W. R. GRACE & CO.

SPECIAL-PURPOSE, CONSOLIDATED BALANCE SHEETS
(DOLLARS IN THOUSANDS)

<TABLE>
<CAPTION>

|  | DECEMBER 31, | |
| --- | --- | --- |
|  | 1995 | 1994 |
| <S> | <C> | <C> |
| ASSETS |  |  |
| Current Assets: |  |  |
| Cash and cash equivalents........................ | $   33,530 | $   39,758 |
| Accounts receivable, less allowances of $119,914 and $91,449...... | 406,682 | 294,283 |
| Inventories...................................... | 72,491 | 81,667 |
| Deferred income taxes............................ | 81,192 | 71,230 |
| Other current assets............................. | 51,835 | 51,547 |
| Total Current Assets......................... | 645,730 | 538,485 |

</TABLE>

| | | |
|---|---|---|
| Properties and equipment, net.................................... | 377,328 | 312,823 |
| Other Assets: | | |
| Excess of cost over the fair value of net assets acquired and other intangible assets, net of accumulated amortization of $247,644 and $201,657................................... | 954,811 | 765,747 |
| Other assets and deferred charges............................. | 20,275 | 26,759 |
| Total Other Assets....................................... | 975,086 | 792,506 |
| Total Assets....................................................... | $1,998,144 | $1,643,814 |
| **LIABILITIES AND EQUITY** | | |
| Current Liabilities: | | |
| Current portion of long-term debt and capitalized lease obligations.............................................. | $ 183,488 | $ 66,784 |
| Accounts payable............................................ | 104,586 | 92,810 |
| Accrued liabilities......................................... | 220,771 | 215,162 |
| Accrued income taxes........................................ | 12,555 | 18,596 |
| Total Current Liabilities................................ | 521,400 | 393,352 |
| Long-term debt................................................. | 27,903 | 12,382 |
| Capitalized lease obligations.................................. | 7,516 | 4,323 |
| Deferred income taxes.......................................... | 48,109 | 57,422 |
| Other liabilities.............................................. | 30,441 | 17,049 |
| Total Liabilities....................................... | 635,369 | 484,528 |
| Commitments and Contingencies (Note 15) | | |
| Equity: | | |
| Equity:.................................................... | 1,365,901 | 1,162,014 |
| Cumulative translation adjustment.......................... | (3,126) | (2,728) |
| Total Equity............................................. | 1,362,775 | 1,159,286 |
| Total Liabilities and Equity....................................... | $1,998,144 | $1,643,814 |

</TABLE>

See accompanying Notes to Special-Purpose, Consolidated Financial Statements.

F-5

<PAGE>  277

W. R. GRACE & CO.

SPECIAL-PURPOSE, CONSOLIDATED STATEMENTS OF CASH FLOWS
(DOLLARS IN THOUSANDS)

<TABLE>
<CAPTION>

| | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| <S> | 1995 | 1994 | 1993 |
| | <C> | <C> | <C> |
| Cash Flows Provided by Operating Activities: | | | |
| Net earnings............................................. | $ 96,897 | $ 102,217 | $ 103,772 |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | | |
| Depreciation and amortization........................ | 113,176 | 95,882 | 77,790 |
| Provision for doubtful accounts...................... | 88,858 | 73,052 | 59,436 |
| Provision for deferred income taxes.................. | (11,028) | (9,575) | (2,454) |
| Loss on disposal of properties and equipment......... | 5,295 | 4,317 | 853 |
| Reduction of carrying amounts of assets to estimated fair values....................................... | 18,003 | 27,441 | --- |
| Changes in operating assets and liabilities, net of effects of purchase acquisitions and foreign exchange: | | | |
| Increase in accounts receivable...................... | (176,444) | (139,585) | (85,525) |
| Decrease (increase) in inventories................... | 11,358 | (13,637) | (4,561) |
| Decrease (increase) in other current assets.......... | 3,309 | (5,951) | (15,875) |
| Increase in accounts payable......................... | 849 | 7,771 | 11,175 |
| Decrease in accrued income taxes..................... | (23,533) | (3,912) | 11,794 |
| (Decrease) increase in accrued liabilities........... | (8,798) | 56,099 | (30,297) |
| Increase (decrease) in other long-term liabilities... | 12,709 | 6,693 | (7,476) |
| Decrease (increase) in other assets and deferred charges.......................................... | 1,636 | (22,469) | (2,069) |
| Other, net........................................... | (2,808) | (1,242) | (4,013) |
| Net cash provided by operating activities............... | 129,479 | 177,101 | 88,962 |
| Cash Flows from Investing Activities: | | | |
| Capital expenditures................................... | (102,894) | (84,498) | (77,944) |
| Payments for acquisitions, net of cash acquired........ | (252,158) | (246,742) | (236,481) |
| Payments for physicians' contract agreements........... | --- | (69) | (1,981) |
| Other, net............................................. | --- | 628 | 493 |
| Net cash used in investing activities................... | (355,052) | (330,681) | (315,913) |
| Cash Flows from Financing Activities: | | | |
| Advances from Grace Chemicals, net..................... | 106,990 | 176,849 | 245,320 |
| Proceeds on issuance of debt........................... | 382,783 | 33,407 | 17,298 |
| Payments on debt and capitalized leases................ | (269,683) | (36,392) | (27,592) |

```
Net cash provided by financing activities...............    220,090       173,864       235,026
                                                          ----------    ----------    ----------
Effects of changes in foreign exchange rates...............    (745)       (3,080)        2,011
                                                          ----------    ----------    ----------
(Decrease) increase in cash and cash equivalents..........    (6,228)       17,204        10,086
Cash and cash equivalents at beginning of period..........    39,758        22,554        12,468
                                                          ----------    ----------    ----------
Cash and cash equivalents at end of period................ $  33,530    $  39,758    $  22,554
                                                          ==========    ==========    ==========
Supplemental disclosures of cash flow information:
  Cash paid during the period for:
    Interest.............................................. $  26,787    $  12,750    $   9,472
    Income taxes.........................................     28,637        18,814        21,541
</TABLE>
```

See accompanying Notes to Special-Purpose, Consolidated Financial Statements.

F-6

<PAGE>  278

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS
(DOLLARS IN THOUSANDS)

NOTE 1. BASIS OF PRESENTATION

General

The special-purpose, consolidated financial statements of W. R. Grace & Co. ("Grace New York") and National Medical Care, Inc. and its subsidiaries ("NMC" and together with Grace New York, the "Company") have been prepared pursuant to Section 6.7(a) of the Agreement and Plan of Reorganization, dated as of February 4, 1996 by and between Grace New York and Fresenius AG (the "Reorganization Agreement"). The Reorganization Agreement contemplates that the following transactions (the "Reorganization") will occur: (1) NMC, presently a wholly owned subsidiary of W. R. Grace & Co. -- Conn. ("Grace Chemicals"), a wholly owned subsidiary of Grace New York, will borrow, or assume, debt in an amount such that, at the time of the Reorganization, the debt of Grace New York and NMC, on a consolidated basis, will not exceed $2.36 billion, as adjusted pursuant to the Reorganization Agreement; (2) the stock of NMC will be transferred to Grace New York, so that NMC and Grace Chemicals will be sibling subsidiaries of Grace New York; (3) the stock of Grace Chemicals will be transferred to a newly formed Delaware subsidiary of Grace New York ("New Grace") and the shares of New Grace will be spun-off to the Grace New York shareholders in a pro rata distribution; (4) Grace New York will be recapitalized such that each Grace New York shareholder will receive one share of Class D Preferred Stock of Grace New York (the "Class D Preferred Stock") for each share of Grace New York common stock held; and (5) Grace New York, with NMC as its sole business, will merge with a wholly owned subsidiary of Fresenius Medical Care AG ("FMC"), and Fresenius AG's worldwide dialysis business ("FWD") will be contributed as separate subsidiaries of FMC with the result that 44.8% of the common stock of FMC will be exchanged for the stock held by Grace New York common shareholders in the merger transaction, and the balance of the common stock of FMC will be owned by Fresenius AG and the shareholders of Fresenius USA, Inc., its principal U.S. subsidiary, in consideration of the contribution of FWD to FMC. After the Reorganization, all the Grace New York common stock will be held by FMC, while the Class D Preferred Stock (which entitles its holders to a contingent dividend based on the consolidated performance of FMC in the years 1997-2001) and other previously issued classes of Grace New York preferred stock will remain outstanding.

The special-purpose, consolidated financial statements exclude all the assets, liabilities (including contingent liabilities), revenues and expenses of Grace New York and its subsidiaries other than the assets, liabilities, revenues and expenses of the Grace New York health care business operated by NMC (the "NMC Business") prior to the transactions contemplated by the Reorganization described above. However, the NMC Business does not include certain businesses owned or investments held partly by Grace Chemicals and partly by NMC, and previously under the oversight of NMC, that are being retained by Grace Chemicals in the Reorganization. Grace Chemicals has agreed to indemnify Grace New York and its affiliates against non-NMC liabilities, which include but are not limited to liabilities for asbestos litigation, borrowed funds, taxes, employee-related liabilities, environmental matters, and shareholder suits filed prior to the Reorganization or attributable to the Reorganization and related events. See Note 14.

The NMC Business is primarily engaged in (i) providing kidney dialysis services, (ii) manufacturing and distributing products and equipment for dialysis treatment and performing clinical laboratory testing and other medical services, and (iii) providing home infusion therapy, home respiratory and home health services.

Basis of Consolidation

The special-purpose, consolidated financial statements have been prepared as if the NMC Business had operated as an independent, stand alone entity for all periods presented. Such financial statements have been prepared using the historical basis of accounting and include all of the assets, liabilities, revenues, expenses and related taxes on income of the NMC Business previously included in the consolidated financial statements of Grace New York and its subsidiaries prior to the Reorganization (the "Grace Consolidated Group"). Consequently, these special-purpose, consolidated financial statements include balances for goodwill and other

XXX-002049

F-7

<PAGE>    279

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
(DOLLARS IN THOUSANDS)

assets and liabilities related to the NMC Business that were previously included
in the financial statements of the Grace Consolidated Group, except that there
is no allocation to the NMC Business of Grace Chemicals' borrowings and related
interest expense. These special-purpose, consolidated financial statements
reflect only the borrowings and interest expense of NMC. In accordance with
Securities and Exchange Commission Staff Accounting Bulletin No. 55 ("SAB 55"),
the financial statements have also been adjusted to include certain expenses
incurred by Grace Chemicals on the NMC Business's behalf. Also, these
special-purpose, consolidated financial statements exclude dividends paid by
Grace New York to its common and preferred shareholders as such dividends were a
use of funds incurred by the Grace Consolidated Group and not by the NMC
Business on a stand-alone basis.

    See Note 12 for a discussion of Equity.

    These special-purpose, consolidated financial statements do not necessarily
indicate the financial position and results of operations that would have
occurred if the NMC Business were a stand-alone entity on the dates, and for the
periods indicated.

NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

    Use of Estimates

    The preparation of financial statements in conformity with generally
accepted accounting principles requires management to make estimates and
assumptions affecting the reported amounts of assets and liabilities (including
disclosed amounts of contingent assets and liabilities) at the dates of the
consolidated financial statements and the reported revenues and expenses during
the reporting periods. Actual amounts could differ from those estimates.

    Cash Equivalents

    Cash equivalents consist of highly liquid instruments with maturities of
three months or less when purchased.

    Financial Instruments

    The Company enters into forward foreign exchange contracts to manage
exposure to fluctuations in currency exchange rates arising from borrowings.
Gains and losses arising from the retranslation of contracts that hedge specific
borrowings are deferred and recorded in net income in the period in which the
related transaction is consummated. Gains and losses arising from the interest
differential on contracts that hedge specific borrowings are recorded as a
component of interest expense over the life of the contract.

    Revenue Recognition

    Revenues are recognized on the date services and related products are
provided and are recorded at amounts estimated to be received under
reimbursement arrangements with a large number of third-party payors, including
Medicare and Medicaid. The Company establishes appropriate allowances based upon
factors surrounding credit risks of specific third party payors, historical
trends and other information.

    Inventories

    Inventories are stated at the lower of cost (first-in, first-out method) or
market.

    Properties and Equipment

    Properties and equipment are stated at cost. Significant improvements are
capitalized; repairs and maintenance costs that do not extend the lives of the
assets are charged to expense as incurred. The cost and

F-8

<PAGE>    280

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
(DOLLARS IN THOUSANDS)

accumulated depreciation of assets sold or otherwise disposed of are removed
from the accounts, and any resulting gain or loss is included in income when the
assets are disposed.

    The cost of properties and equipment is depreciated over estimated useful
lives on a straight-line basis as follows: buildings -- 20 to 50 years,
equipment and furniture -- 3 to 10 years, and leasehold improvements -- the
shorter of the lease term or useful life. For income tax purposes, depreciation
is calculated using accelerated methods to the extent permitted.

    Excess of Cost Over the Fair Value of Net Assets Acquired and Other

XXX-002050

Intangible Assets

The Company has adopted the following useful lives and methods to amortize intangible assets: goodwill -- 40 years on a straight-line basis; patient relationships and other intangible assets -- over the estimated period to be benefited, generally from 7 to 25 years; and certain contractual arrangements -- over the life of the agreements on a straight-line basis.

Impairment

In accordance with Statement of Financial Accounting Standards No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of", the Company reviews the carrying value of its investments for impairment whenever events or changes in circumstances indicate that the carrying amount of assets may not be recoverable. The Company considers various valuation factors including discounted cash flows, fair values and replacement costs to assess any impairment of goodwill and other long lived assets.

Foreign Currency Translation

The Company follows the provisions of Statement of Financial Accounting Standards No. 52, "Foreign Currency Translation". The local currency, in all locations other than Ireland and Mexico, is considered to be the functional currency. As a result, the balance sheets of the Company's foreign operations, other than Ireland and Mexico, are translated at the current exchange rate and statements of earnings are translated at the average exchange rate for the applicable period. Management has determined that the functional currency of the Company's Irish and Mexican manufacturing plants is the U.S. dollar since the majority of their transactions are effected in U.S. dollars. Assets and liabilities of the Company's Irish and Mexican manufacturing plants are translated at the current exchange rate, except that properties and equipment and inventory are translated at historical exchange rates. Statements of earnings items are translated at average rates of exchange prevailing during the period, except that depreciation is translated at historical rates.

Net exchange losses resulting from the translation of the Irish and Mexican manufacturing plant financial statements amounted to $595, $234, and $510 in 1995, 1994, and 1993 respectively, and are included in general and administrative expenses.

Income Taxes

The results of certain of the companies within the Grace Consolidated Group have been included in the federal and certain state consolidated income tax returns of the Company. Income tax expense and certain other tax-related information included in these financial statements have been calculated as if the Company were a stand-alone tax payer.

Deferred income taxes are provided for temporary differences between the reporting of income and expense for financial reporting and tax return purposes. Deferred tax liabilities or assets at the end of each period are determined using the tax rates then in effect for the periods when taxes are actually expected to be paid or recovered. Accordingly, income tax expense provisions will increase or decrease in the period in which a change in tax rates is enacted.

F-9

<PAGE>   281

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
(DOLLARS IN THOUSANDS)

Research and Development

Research and development costs are expensed as incurred.

Earnings per Share

Primary earnings per share are computed on the basis of the weighted average number of common shares outstanding. Fully diluted earnings per share assume the issuance of common stock equivalents related to employee stock options and, prior to 1994, the conversion of convertible debt (with an increase in net income for the after-tax interest savings).

NOTE 3. ACQUISITIONS

The Company acquired certain health care service facilities for total consideration of $252,753 in 1995, $248,123 in 1994, and $240,178 in 1993. These acquisitions have been accounted for as purchase transactions and, accordingly, are included in the results of operations from the dates of acquisition. The excess of the total acquisition costs over the fair value of net assets acquired was $215,837 in 1995, $210,845 in 1994, and $199,416 in 1993.

Had the acquisitions that occurred during the year ended December 31, 1995 been consummated on January 1, 1994, unaudited pro forma net revenues for 1995 and 1994 would have been $2,102,157 and $1,943,317, respectively, and unaudited pro forma net earnings would have been $113,676 and $110,706, respectively.

Had the acquisitions that occurred during the year ended December 31, 1994 been consummated on January 1, 1993, unaudited pro forma net revenues for 1994 and 1993 would have been $1,889,069 and $1,673,389, respectively, and unaudited pro forma net earnings would have been $119,102 and $105,264, respectively.

XXX-002051

NOTE 4. OTHER BALANCE SHEET ITEMS

<TABLE>
<CAPTION>

|  | DECEMBER 31, | |
| --- | --- | --- |
| <S> | 1995 | 1994 |
| | <C> | <C> |
| Inventories | | |
| Raw materials.................................................... | $  9,023 | $ 10,016 |
| Manufactured goods in process................................... | 3,035 | 3,911 |
| Manufactured and purchased inventory available for sale.............. | 32,980 | 36,249 |
| | 45,038 | 50,176 |
| Health care supplies............................................. | 27,453 | 31,491 |
| Total.......................................................... | $ 72,491 | $ 81,667 |
| Other Current Assets | | |
| Miscellaneous accounts receivable................................ | $ 20,984 | $ 26,182 |
| Deposits and prepaid expenses.................................... | 30,851 | 25,365 |
| Total.......................................................... | $ 51,835 | $ 51,547 |

</TABLE>

F-10

<PAGE>   282

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
(DOLLARS IN THOUSANDS)

<TABLE>
<CAPTION>

|  | DECEMBER 31, | |
| --- | --- | --- |
| <S> | 1995 | 1994 |
| | <C> | <C> |
| Excess of Cost Over the Fair Value of Net Assets Acquired and Other Intangible Assets | | |
| Goodwill, less accumulated amortization of $54,236 and $35,400....... | $597,486 | $462,265 |
| Patient relationships, less accumulated amortization of $106,169 and $83,341......................................................... | 122,863 | 144,642 |
| Other intangible assets, less accumulated amortization of $87,239 and $82,916........................................................... | 234,462 | 158,840 |
| Total.......................................................... | $954,811 | $765,747 |
| Accrued Liabilities | | |
| Accrued salaries and wages....................................... | $ 31,970 | $ 28,742 |
| Accrued physician compensation................................... | 22,460 | 47,700 |
| Accounts receivable credit balances.............................. | 37,084 | 37,760 |
| Accrued operating expenses....................................... | 38,378 | 31,374 |
| Accrued insurance................................................ | 53,124 | 34,601 |
| Accrued bonus and incentive compensation......................... | 11,391 | 14,264 |
| Other............................................................ | 26,364 | 20,721 |
| Total.......................................................... | $220,771 | $215,162 |

</TABLE>

    Accounts receivable credit balances principally reflect overpayments from
third party payors in the process of repayment.

NOTE 5. SALE OF ACCOUNTS RECEIVABLE

    During 1991, NMC entered into an agreement to sell up to $180,000 of an
undivided interest in a designated pool of accounts receivable. At December 31,
1995 and 1994, $179,793 had been received pursuant to such sales; these amounts
are reflected as reductions to accounts receivable. Under the terms of the
agreement, new interests in accounts receivable are sold as collections reduce
previously sold accounts receivable. If certain accounts receivable in the pool
prove to be uncollectible, other accounts receivable are submitted (to the
extent available). The costs related to such sales are expensed as incurred and
recorded as interest expense and related financing costs. There were no gains or
losses on these transactions.

NOTE 6. DEBT

    Long-term debt consists of:

<TABLE>
<CAPTION>

|  | DECEMBER 31, | |
| --- | --- | --- |
| <S> | 1995 | 1994 |
| | <C> | <C> |
| Third-party debt, primarily bank borrowings, at variable interest rates | | |

XXX-002052

```
    (1% - 14%) with various maturities.....................................  $207,004    $77,704
Less amounts classified as current......................................   179,101     65,322
                                                                           --------    -------
                                                                           $ 27,903    $12,382
                                                                           ========    =======
```

</TABLE>

F-11

<PAGE>  283

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
(DOLLARS IN THOUSANDS)

Maturities of long-term debt are as follows:

<TABLE>
<CAPTION>

|  | DECEMBER 31, |
| --- | --- |
| <S> | <C> |
| 1996........................................................................ | $179,101 |
| 1997........................................................................ | 25,006 |
| 1998........................................................................ | 1,233 |
| 1999........................................................................ | 518 |
| 2000........................................................................ | 477 |
| 2001 and beyond............................................................. | 669 |
|  | -------- |
| Total.................................................................... | $207,004 |
|  | ======== |

</TABLE>

In August 1995, NMC signed an agreement with a bank for a $100,000 line of
credit facility bearing interest at prime rate minus an applicable margin or
LIBOR plus an applicable margin. At December 31, 1995, NMC had an available
balance of $73,500. The line of credit expires on the earlier of April 15, 1996
or the date on which NMC is no longer a subsidiary of Grace Chemicals.

NOTE 7. INCOME TAXES

Earnings were taxed as follows:

<TABLE>
<CAPTION>

|  | YEAR ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
|  | 1995 | 1994 | 1993 |
|  | -------- | -------- | -------- |
| <S> | <C> | <C> | <C> |
| Domestic.................................................... | $237,225 | $247,488 | $194,202 |
| Foreign.................................................... | (31,712) | (33,049) | (3,585) |
|  | -------- | -------- | -------- |
| Total.................................................... | $205,513 | $214,439 | $190,617 |
|  | ======== | ======== | ======== |
| The provision for income taxes was as follows: | | | |
| Current tax expense | | | |
| Federal................................................... | $ 91,012 | $ 90,557 | $ 68,917 |
| State.................................................... | 23,271 | 26,526 | 17,776 |
| Foreign.................................................... | 5,361 | 4,714 | 2,606 |
|  | -------- | -------- | -------- |
| Total current.................................... | 119,644 | 121,797 | 89,299 |
| Deferred tax (benefit) expense | | | |
| Federal................................................... | (9,287) | (4,867) | (2,887) |
| State.................................................... | (3,271) | (4,725) | 661 |
| Foreign.................................................... | 1,530 | 17 | (228) |
|  | -------- | -------- | -------- |
| Total deferred.................................... | (11,028) | (9,575) | (2,454) |
|  | -------- | -------- | -------- |
| Total provision.................................... | $108,616 | $112,222 | $ 86,845 |
|  | ======== | ======== | ======== |

</TABLE>

F-12

<PAGE>  284

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
(DOLLARS IN THOUSANDS)

Deferred tax liabilities (assets) are comprised of the following:

<TABLE>
<CAPTION>

|  | DECEMBER 31, | |
| --- | --- | --- |
|  | 1995 | 1994 |
|  | -------- | -------- |
| <S> | <C> | <C> |
| Allowance for doubtful accounts........................................ | $ (35,365) | $(29,534) |
| Insurance liability.................................................... | (15,220) | (10,604) |
| Deferred compensation................................................. | (17,072) | (19,032) |
| Pension and benefit accruals.......................................... | (4,061) | (1,803) |

<TABLE>

| | | |
|---|---|---|
| Accrued interest | (4,792) | (4,237) |
| Inventory/general reserves | (8,606) | (6,646) |
| Investment basis difference | (9,235) | -- |
| Loss carryforwards | (10,265) | (6,467) |
| | --------- | --------- |
| Gross deferred tax assets | (104,616) | (78,323) |
| Deferred tax assets valuation allowance | 19,500 | 6,467 |
| | --------- | --------- |
| Deferred tax assets | (85,116) | (71,856) |
| | --------- | --------- |
| Depreciation and amortization | 50,830 | 55,724 |
| Other temporary differences | 1,203 | 2,324 |
| | --------- | --------- |
| Gross deferred tax liabilities | 52,033 | 58,048 |
| | --------- | --------- |
| Net deferred tax assets | $ (33,083) | $(13,808) |
| | ========= | ========= |

</TABLE>

The provision for income taxes differs from the amount of income taxes determined by applying the applicable statutory Federal income tax rate to pretax earnings as a result of the following differences:

<TABLE>
<CAPTION>

| | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 1995 | 1994 | 1993 |
| | ---- | ---- | ---- |
| <S> | <C> | <C> | <C> |
| Statutory federal tax rate | 35.0% | 35.0% | 35.0% |
| State income taxes, net of Federal tax benefit | 6.3 | 6.6 | 6.3 |
| Amortization of goodwill | 2.0 | 3.3 | 2.8 |
| Foreign goodwill impairment | -- | 4.5 | -- |
| Foreign taxes | 2.4 | 0.6 | 0.3 |
| Increase in valuation allowance | 6.3 | 2.0 | 0.9 |
| Other | 0.9 | 0.3 | 0.3 |
| | ---- | ---- | ---- |
| | - | - | - |
| Effective tax rate | 52.9% | 52.3% | 45.6% |
| | ==== | ==== | ==== |

</TABLE>

The net increases in the valuation allowance for deferred tax assets were $13,033, $4,257, and $2,210 in 1995, 1994, and 1993, respectively. These increases relate to a reduction in the carrying amounts of assets, and loss carryforwards of certain foreign subsidiaries for which related deferred tax benefits are not expected to be utilized and for which full valuation allowances have been provided.

Provision has not been made for additional federal, state or foreign taxes on $20,648 of undistributed earnings of foreign subsidiaries. Those earnings have been and will continue to be reinvested. The earnings could become subject to additional tax if they were remitted as dividends, if foreign earnings were loaned to the Company or a U.S. affiliate, or if the Company should sell its stock in the subsidiaries. The Company estimates that the distribution of these earnings would result in $4,398 of additional foreign withholding taxes and additional federal income taxes to the extent they are not offset by foreign tax credits.

F-13

<PAGE> 285

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
(DOLLARS IN THOUSANDS)

The Company increased its federal and state deferred tax liability in 1993 as a result of legislation enacted during 1993 increasing the federal corporate tax rate from 34% to 35% commencing in 1993.

At December 31, 1995 there were approximately $68,634 of foreign net operating loss carryforwards, the majority of which have no expiration period.

NOTE 8. PROPERTIES AND EQUIPMENT

<TABLE>
<CAPTION>

| | DECEMBER 31, | |
|---|---|---|
| | 1995 | 1994 |
| | --------- | --------- |
| <S> | <C> | <C> |
| Land and improvements | $ 8,167 | $ 7,997 |
| Buildings | 28,033 | 27,917 |
| Capitalized lease property | 13,098 | 6,708 |
| Leasehold improvements | 161,282 | 134,422 |
| Equipment and furniture | 389,626 | 312,392 |
| Construction in progress | 15,743 | 15,435 |
| | --------- | --------- |
| | 615,949 | 504,871 |
| Accumulated depreciation and amortization | (238,621) | (192,048) |

XXX-002054

| | | |
|---|---|---|
| Properties and equipment, net...................... | $ 377,328 | $ 312,823 |

</TABLE>

Depreciation and amortization expense relating to properties and equipment amounted to $62,686, $53,011, and $43,856 in 1995, 1994 and 1993 respectively.

Leases

Future minimum payments under noncancelable leases (principally for clinics and offices) as of December 31, 1995 are as follows:

<TABLE>
<CAPTION>

| | OPERATING LEASES | CAPITAL LEASES | TOTAL |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| 1996.................................................. | $ 37,611 | $ 5,318 | $ 42,929 |
| 1997.................................................. | 34,190 | 4,246 | 38,436 |
| 1998.................................................. | 27,451 | 2,095 | 29,546 |
| 1999.................................................. | 20,312 | 1,235 | 21,547 |
| 2000.................................................. | 15,448 | 500 | 15,948 |
| 2001 and beyond...................................... | 34,771 | 1,401 | 36,172 |
| Total minimum payments................................ | $169,783 | 14,795 | $184,578 |
| Less interest and operating costs..................... | | 2,892 | |
| Present value of minimum lease payments ($4,387 payable in 1996).......................................... | | $11,903 | |

</TABLE>

Rental expense for operating leases was $80,356 in 1995, $56,712 in 1994 and $46,229 in 1993. Amortization of properties under capital leases amounted to $2,872 in 1995, $1,005 in 1994 and $1,057 in 1993.

Lease agreements frequently include renewal options and require that the Company pay for utilities, taxes, insurance and maintenance expenses. Options to purchase are also included in some lease agreements, particularly capital leases.

F-14

<PAGE>  286

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
(DOLLARS IN THOUSANDS)

NOTE 9. IMPAIRMENT OF ASSETS AND RESTRUCTURING COSTS

During the year ended December 31, 1994, the Company reviewed its investment in its German renal products manufacturing facilities and determined that goodwill resulting from this 1993 acquisition was permanently impaired. Accordingly, a charge of $27,441 was recorded during the fourth quarter to reflect this impairment. During 1995, following several periods of operating losses, management decided to discontinue its German dialysis machine manufacturing operation and therefore reviewed the carrying value of its related investment. This review indicated that its investment was permanently impaired. Such impairment was recognized one year after the acquisition after the discovery that misrepresentations were made by the seller. Management considered the future cash flows resulting from the use of the related assets and determined that the entire carrying value of such assets, amounting to $7,313, should be written off. In addition, as a result of this decision, a charge of $5,000 was recorded in 1995, comprising inventory write-offs, employee termination benefits and grant repayments. The charge in respect of employee termination benefits amounted to $910 and primarily represents severance pay and other benefits associated with the termination of all remaining 35 employees.

Similarly, during 1995 the Company recorded a charge of $16,610, after management decided to cease its investment in the polysulfone dialyzer development operations in Ireland. As a result, the carrying value of the fixed assets used in developing the new dialyzer product line of $10,690, was fully written off and accruals in the amount of $5,920 for employee termination benefits, inventory adjustments, grant repayments and other items were made. Employee termination benefits amounted to $716 and were primarily in respect of statutory and voluntary termination payments associated with the termination of 17 employees. At December 31, 1995, the remaining net investment of the operations in Ireland was approximately $4,600. These remaining operations continue to manufacture and distribute other non-polysulfone product lines and other NMC products.

Through December 31, 1995, the Company did not make any payments against its restructuring reserves.

NOTE 10. EMPLOYEE INCENTIVES

Long Term Incentive Programs

The Company has established long-term incentive programs under which certain key executives of NMC are eligible to receive payments based upon the

XXX-002055

cumulative earnings before interest and taxes of NMC, and, in the case of one executive, the Grace Consolidated Group and the total shareholder return on the Company's common stock over three-year periods. Provisions for the incentive pools are made annually and awards are paid to participants at the end of each three-year period. The earnings for 1995, 1994 and 1993 included charges of $13,000, $3,500, and $1,876 respectively for costs associated with these programs.

NMC has an additional long-term incentive program for key executives which will be terminated as of the effective date of the Reorganization. Under the terms of the program, payments will be made at the end of each five-year period commencing in 1994 and ending in 1998 based on a multiple of the average earnings before interest and taxes of NMC, as adjusted. The earnings for 1995, 1994 and 1993 included charges of $2,914, $3,266 and $6,921 respectively for costs associated with this program.

Annual Incentive Compensation Plan

NMC has an annual incentive compensation plan under which key employees of NMC are eligible to receive bonuses if certain corporate objectives are attained. Normally, awards will not exceed 20% of the eligible employee's base compensation, but discretionary awards for outstanding contributions are authorized under the plan. Awards under the plan totaled $2,931, $5,890 and $5,393 in 1995, 1994 and 1993, respectively.

F-15

<PAGE>   287

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
(DOLLARS IN THOUSANDS)

NOTE 11. PENSION

Substantially all domestic employees are covered by NMC's non-contributory, defined benefit pension plan. Each year NMC contributes at least the minimum required by the Employee Retirement Income Security Act of 1974, as amended. Plan assets consist primarily of publicly traded common stock, fixed income securities and cash equivalents.

Total pension expense includes the following components:

|  | YEAR ENDED DECEMBER 31, | | |
| --- | --- | --- | --- |
|  | 1995 | 1994 | 1993 |
| Service cost -- benefits earned during the period............. | $ 3,649 | $ 5,495 | $ 4,654 |
| Interest cost on projected benefit obligation................. | 2,891 | 2,829 | 2,470 |
| Actual return on plan assets................................. | (3,721) | (3,873) | (3,423) |
| Net amortization and deferral................................ | (557) | (557) | (332) |
| Net pension expense.......................................... | $ 2,262 | $ 3,894 | $ 3,369 |

The funded status of NMC's plan was as follows:

|  | DECEMBER 31, | |
| --- | --- | --- |
|  | 1995 | 1994 |
| Actuarial present value of: |  |  |
| Vested benefit obligation.................................... | $ 32,800 | $ 20,952 |
| Nonvested benefit obligation................................. | 3,540 | 2,954 |
| Accumulated benefit obligation............................... | $ 36,340 | $ 23,906 |
| Projected benefit obligation................................. | $(49,271) | $(37,269) |
| Plan assets at fair value.................................... | 43,760 | 41,577 |
| Plan assets in excess of projected benefit obligation........ | (5,511) | 4,308 |
| Unrecognized prior service cost.............................. | (224) | (273) |
| Unrecognized net (gain) loss................................. | 6,656 | (125) |
| Unamortized net transition asset............................. | (3,071) | (3,563) |
| (Accrued)prepaid pension cost................................ | $ (2,150) | $   327 |

The projected benefit obligation was determined using an assumed discount rate of 7.25% in 1995 and 7.5% in 1994, and an assumed long-term rate of compensation increase of 5% in 1995 and 6% in 1994. The assumed long-term rate of return on plan assets was 9.0% in 1995 and 1994.

NMC does not provide any postretirement benefits to its employees other than those provided under its pension plan.

XXX-002056

F-16

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
(DOLLARS IN THOUSANDS)

NOTE 12. EQUITY

Because NMC operated as a wholly owned subsidiary of Grace Chemicals, its
equity accounts have been combined and presented as Equity. Subsequent to Grace
Chemicals' acquisition of NMC, NMC operations were largely funded by means of
intercompany accounts with Grace Chemicals. Therefore, Equity also includes
intercompany balances due to Grace Chemicals arising from the funding of NMC as
well as balances related to transactions and other charges and credits between
the NMC Business and Grace Chemicals as more fully described in Note 14. These
special-purpose, consolidated Grace New York financial statements include equity
balances related only to NMC. Therefore, changes within the equity accounts of
Grace New York related to the declaration and payment of dividends to its common
and preferred shareholders, the addition of capital contributions and activity
related to the granting and exercising of stock options and the purchase of
treasury stock have been excluded since such movements related to the entire
Grace Consolidated Group and not to the NMC Business on a stand-alone basis.
Similarly, due to the above transactions, it has not been possible to present
separately within Equity the retained earnings of Grace New York related to NMC.
A summary of changes in Equity is as follows:

<TABLE>
<CAPTION>

| | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 1995 | 1994 | 1993 |
| <S> | <C> | <C> | <C> |
| Beginning balance.................................... | $1,162,014 | $ 882,948 | $533,856 |
| Net earnings......................................... | 96,897 | 102,217 | 103,772 |
| Advances from Grace Chemicals, net................... | 106,990 | 176,849 | 245,320 |
| Ending Balance....................................... | $1,365,901 | $1,162,014 | $882,948 |

</TABLE>

Cumulative translation adjustments for the three years ended December 31,
1995 were as follows:

<TABLE>
<CAPTION>

| | YEAR ENDED DECEMBER 31, | | |
|---|---|---|---|
| | 1995 | 1994 | 1993 |
| <S> | <C> | <C> | <C> |
| Balance, beginning of year........................... | (2,728) | (2,956) | (459) |
| Translation adjustments.............................. | (398) | 228 | (2,497) |
| Balance, end of year................................. | (3,126) | (2,728) | (2,956) |

</TABLE>

At December 31, 1995, the components of Grace New York's Equity, excluding
Cumulative Translation Adjustment and Retained Earnings, which will remain with
Grace New York after the Reorganization described in Note 1, were as follows:

<TABLE>

| <S> | <C> |
|---|---|
| Preferred Stocks, $100 par value | |
| -- 6% Cumulative (1); 40,000 shares authorized; 36,460 outstanding........ | $3,646 |
| -- 8% Cumulative Class A (2); 50,000 shares authorized; 16,356 outstanding............................................................... | 1,636 |
| -- 8% Noncumulative Class B (2); 40,000 shares authorized; 21,577 outstanding............................................................... | 2,157 |
| | 7,439 |
| Common Stock, $1 par value; 300,000,000 shares authorized; 97,375,000 outstanding............................................................... | 97,375 |
| Paid in Capital...................................................... | 459,807 |
| Treasury Stock, 53,000 common shares, at cost............................... | (2,389) |
| | $562,232 |

</TABLE>

- ---------------
(1) 160 votes per share.
(2) 16 votes per share.

F-17

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
(DOLLARS IN THOUSANDS)

XXX-002057

The weighted average number of shares of common stock outstanding during 1995, 1994 and 1993 was 95,822,000, 93,936,000 and 91,461,000, respectively.

Stock Options

Stock options are granted under the stock incentive plans of companies within the Grace Consolidated Group. At December 31, 1995, options for 5,694,196 shares were outstanding with an average exercise price of $40.45 (of which 4,172,391 were exercisable) and 1,913,163 shares were available for additional grants. Currently outstanding options expire on various dates between February 1996 and July 2005.

Grace will adopt the disclosure requirements of SFAS No. 123, "Accounting for Stock-Based Compensation" in 1996. However, Grace anticipates that it will continue to follow the measurement principles of Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," as permitted by SFAS No. 123.

NOTE 13. FINANCIAL INSTRUMENTS

Fair Value of Financial Instruments

At December 31, 1995 and 1994, the carrying value of financial instruments such as cash, cash equivalents, accounts receivable, accounts payable and the current portion of long-term debt approximated their fair values, based on the short-term maturities of these instruments. At December 31, 1995 and 1994, the fair value of long-term debt which approximated carrying value was determined based on expected future cash flows, discounted at market interest rates.

Foreign Currency Contracts

Beginning in 1995, NMC financed working capital requirements for its Portuguese operations by means of borrowings denominated in currencies other than the operational currency. NMC hedges its exposure to the foreign exchange risk associated with these borrowings through the use of forward purchase contracts, whereby NMC contracts with the same counterparty as the original borrowing to purchase the currency in which the loan is denominated and sell the operational currency with a maturity date equivalent to the maturity date of the underlying borrowings. The value of these borrowings and associated forward exchange contracts at December 31, 1995 and 1994 amounted to approximately $48,000 and $14,000, respectively. Management estimates that these transactions had a favorable impact on NMC's net interest expense for the year ended December 31, 1995 and 1994 of $288 and $24, respectively. Forward purchases of foreign currency are used solely to manage exposure to fluctuations in foreign currency rates. The carrying value at December 31, 1995, which equalled fair value based on exchange rates at December 31, 1995 and 1994 was a liability of $1,078 and $127, respectively.

Credit Risk

The Company is exposed to credit risk to the extent of potential nonperformance by counterparties on financial instruments. The counterparties to the Company's currency exchange contracts comprise a diversified group of major financial institutions, all of which are rated investment grade. As of December 31, 1995, the Company's credit exposure was insignificant and limited to the fair value stated above; the Company believes the risk of incurring losses due to credit risk is remote.

Market Risk

Exposure to market risk on financial instruments results from fluctuations in currency rates during the periods in which the contracts are outstanding. The mark-to-market valuations of foreign currency agreements and of associated underlying exposures are closely monitored at all times. The Company uses portfolio

F-18

<PAGE> 290

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
(DOLLARS IN THOUSANDS)

sensitivities and stress tests to monitor risk. Overall financial strategies and the effects of using derivatives are reviewed periodically.

NOTE 14. RELATED PARTY TRANSACTIONS AND ALLOCATIONS

Cash

NMC has utilized Grace Chemicals' centralized cash management services. Under such service arrangements, excess domestic cash generated by NMC was invested centrally by Grace Chemicals. Additionally, disbursing operations were funded centrally by Grace Chemicals.

Corporate Services

In accordance with SAB 55, Grace Chemicals has allocated a portion of its domestic corporate expenses to its business units, including NMC. These expenses have included management and corporate overhead; benefit administration; risk management/insurance administration; tax and treasury/cash management services; environmental services; litigation administration services; and other support

XXX-002058

and executive functions. Allocations and charges were based on either a direct cost pass through or a percentage allocation for such services provided based on factors such as net sales, management time, or headcount. Such allocations and charges totaled $13,782, $10,853 and $9,423 for the years ended December 31, 1995, 1994 and 1993, respectively.

Domestic research and development expenses of Grace Chemicals related to NMC's business and allocated to NMC in accordance with SAB 55 totaled $15,942, $21,751 and $22,343 for 1995, 1994 and 1993, respectively.

Management believes that the basis used for allocating corporate services is reasonable and that the terms of these transactions would not materially differ from those that would result from transactions among unrelated parties.

Grace Chemicals has also charged NMC for its share of domestic workers' compensation, employee life, medical and dental, and other general business liability insurance premiums and claims which have all been handled by Grace Chemicals on a corporate basis. These charges have been based on NMC's actual and expected future experience, including actual payroll expense, and totaled $34,784, $41,871 and $40,177 for 1995, 1994 and 1993, respectively, and have been included in either cost of health care services or general and administrative expenses, depending upon the nature of the employee's or insured asset's function.

NOTE 15. COMMITMENTS AND CONTINGENCIES

Contingent Non-NMC Liabilities of Grace New York

In connection with the Reorganization, Grace Chemicals has agreed to indemnify Grace New York and NMC against all liabilities of Grace New York, whether relating to events occurring before or after the Reorganization, other than liabilities arising from or relating to NMC operations. After the Reorganization, Grace New York will remain contingently liable for certain liabilities with respect to pre-Reorganization matters that are not related to NMC operations. Grace New York believes that in view of the nature of the non-NMC liabilities and the expected impact of the Reorganization on Grace Chemicals' financial position, the risk of significant loss from non-NMC liabilities is remote.

OIG Investigative Subpoenas

In October 1995, NMC received five investigative subpoenas from the Office of Inspector General of the U.S. Department of Health and Human Services (the "OIG"). The subpoenas were issued in connection

F-19

<PAGE>  291

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
(DOLLARS IN THOUSANDS)

with an investigation being conducted by the OIG, the U.S. Attorney for the District of Massachusetts and others concerning possible violations of federal laws, including the Anti-kickback Statute and the False Claims Act. The subpoenas call for extensive document production relating to various aspects of NMC's business.

The five subpoenas cover the following areas: (a) NMC's corporate management, personnel and employees, organizational structure, financial information and internal communications; (b) NMC's dialysis services business, principally medical director contracts and compensation; (c) NMC's treatment of credit balances resulting from overpayments received under the Medicare and end stage renal disease (ESRD) program, NMC's billing for home dialysis services and payment of supplemental medical insurance premiums on behalf of indigent patients; (d) NMC's LifeChem laboratory business ("LifeChem"), including documents relating to testing procedures, marketing, customers, competition and certain overpayments totalling approximately $4,900 that were received by LifeChem from the Medicare program with respect to laboratory services rendered between 1989 and 1993; and (e) NMC's Homecare Division and, in particular, information concerning the intradialytic parenteral nutrition ("IDPN") business described below, including billing practices related to various services, equipment and supplies and payments made by third parties as compensation for administering IDPN therapy.

The results of the investigation and its impact, if any, cannot be predicted at this time. In the event that a U.S. government agency believes that any wrongdoing has occurred, civil and/or criminal proceedings could be instituted, and if any such proceedings were to be instituted and the outcome were unfavorable, NMC could be subject to substantial fines, penalties and damages or could become excluded from government reimbursement programs. Any such result could have a material adverse effect on NMC's financial position or the results of operations of the Company.

Omnibus Budget Reconciliation Act of 1993

The Omnibus Budget Reconciliation Act of 1993 ("OBRA 93") affected the payment of benefits under Medicare and employer health plans for certain eligible ESRD patients. In July 1994, the Health Care Financing Administration ("HCFA") issued an instruction to Medicare claims processors to the effect that Medicare benefits for the patients affected by OBRA 93 would be subject to a new 18- month "coordination of benefits" period. This instruction had a positive impact on NMC's dialysis revenues because, during the 18-month coordination of

XXX-002059

benefits period, the patient's employer health plan was responsible for payment,
which was generally at a rate higher than that provided under Medicare.

In April 1995, HCFA issued a new instruction, reversing its original
instruction in a manner that would substantially diminish the positive effect of
the original instruction on NMC's dialysis business. Under the new instruction,
no 18-month coordination of benefits period would arise and Medicare would
remain the primary payor. HCFA further proposed that its new instruction be
effective retroactive to August 1993, the effective date of OBRA 93.
Consequently, NMC may be required to refund payments received from employer
health plans for services provided after August 1993 under HCFA's original
instruction and to re-bill Medicare for the same services, which would result in
a cumulative reduction of net revenues to NMC totalling approximately $120,000
as of December 31, 1995. NMC believes that the April 1995 instruction letter
issued by HCFA does not constitute a proper notice of final rulemaking and,
accordingly, NMC continued to recognize revenues through the end of June 1995.
If HCFA's instruction letter is adjudged by the courts to be the equivalent of a
notice of proposed rulemaking, then NMC believes that a 60-day comment period
would be required before the rule could become effective. Therefore, NMC
believes that it would be allowed to recognize the higher reimbursement rate on
dual eligible ESRD patients for 60 days subsequent to the HCFA instruction
letter, or approximately through July 1, 1995. Effective July 1, 1995, NMC
ceased to recognize the incremental revenue realized under the original
instruction, which has resulted in a material reduction in

                                  F-20
<PAGE>  292

                            W. R. GRACE & CO.

     NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
                         (DOLLARS IN THOUSANDS)

NMC's operating earnings in comparison to prior periods in which NMC recognized
such incremental revenue. However, NMC continued to bill the employer health
plans as primary payors through December 31, 1995, at which time NMC commenced
billing Medicare for the patients affected by OBRA 93.

     In May 1995, NMC filed suit in the U.S. District Court for the District of
Columbia seeking a declaratory judgment with respect to HCFA's instructions
relating to OBRA 93. In June 1995, the court granted NMC's motion for a
preliminary injunction to preclude HCFA from retroactively enforcing its new
instruction. The litigation is continuing with respect to NMC's request to
permanently enjoin HCFA's new instruction, both retroactively and prospectively.
While there can be no assurance that a permanent injunction will be issued, NMC
believes that it will ultimately prevail in its claim that the retroactive
reversal by HCFA of its original instruction relating to OBRA 93 was
impermissible under applicable law. If HCFA's revised instruction is upheld and
applied retroactively, NMC's business, financial position and results of
operations would be materially adversely affected.

     Intradialytic Parenteral Nutrition

     NMC administers IDPN therapy to chronic dialysis patients who suffer from
severe gastrointestinal malfunctions. Since late 1993, Medicare claims
processors have sharply reduced the number of IDPN claims approved for payment
as compared to prior periods. NMC believes that the reduction in the IDPN claims
currently being paid by Medicare represents an unauthorized policy coverage
change. Accordingly, NMC and other IDPN providers are pursuing various
administrative and legal remedies, including administrative appeals, to address
this reduction. In November 1995, NMC filed a complaint in the U.S. District
Court for the Middle District of Pennsylvania seeking a declaratory judgment and
injunctive relief to prevent the implementation of this policy coverage change.

     NMC management believes that its IDPN claims are consistent with published
Medicare coverage guidelines and ultimately will be approved for payment. Such
claims represent substantial accounts receivable of NMC, amounting to
approximately $93,000 (net of a reserve of $21,000) and $28,000 (net of a
reserve of $6,000) as of December 31, 1995 and 1994, respectively, and currently
increasing at the rate of approximately $6,000 per month. If NMC is unable to
collect its IDPN receivable, or if IDPN coverage is reduced or eliminated,
depending on the amount of the receivable that is not collected and/or the
nature of the coverage change, NMC's business, financial position and results of
operations could be materially adversely affected.

     In May 1995 the Medicare claims processors circulated a draft coverage
policy which, if implemented in the form proposed, would have limited or
precluded continued coverage of parenteral and enteral nutrition ("PEN")
therapies, including IDPN therapy. In April 1996, NMC received a copy of a
revised final version of the new coverage policy, which is expected to become
effective for services billed on and after July 1, 1996. While the new policy
permits continued coverage of IDPN and other PEN therapies, and while the
potential impact of the new policy is subject to further analysis, NMC believes
that the new policy would make it substantially more difficult to qualify
patients for future coverage by, among other things, requiring certain patients
to undergo onerous and/or invasive tests in order to qualify for coverage. NMC,
together with other interested parties, plans to seek to effect certain changes
in the new policy and NMC is developing changes to its patient qualification
procedures in order to comply with the policy. However, if NMC is unable to
achieve changes in the new policy, if physicians and patients fail to accept the
new qualification procedures and/or if patients fail to qualify under such
procedures, the policy could significantly reduce the number of patients
eligible for Medicare coverage of IDPN and other PEN therapies, which would have
a material adverse effect on NMC's financial position and its results of

XXX-002060

operations.

F-21

<PAGE>   293

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
(DOLLARS IN THOUSANDS)

Other Legal Proceedings

NMC has received multiple subpoenas from a federal grand jury in the
District of New Jersey investigating, among other things, NMC's efforts to
persuade the U.S. Food and Drug Administration to lift a January 1991 import
hold issued with respect to NMC's Dublin, Ireland facility, whether NMC sold
defective products, the manner in which NMC handled customer complaints and the
development of a new dialyzer product line. Grace has also received two
subpoenas relating to this investigation. In February 1996, the U.S. Attorney
for the District of New Jersey notified NMC that it is a target of the New
Jersey grand jury investigation, insofar as it relates to possible violations of
federal criminal law in connection with efforts to affect the January 1991
import hold referred to above; the material element of the import hold was
lifted in 1992. In June 1996, NMC received a letter from the U.S. Attorney for
the District of New Jersey indicating that the U.S. Attorney had declined to
prosecute NMC with respect to a submission related to NMC's effort to lift the
import ban. The letter added that NMC remains a subject of a federal grand
jury's investigation into other matters. In addition, in December 1994, a
subsidiary of NMC received a subpoena from a federal grand jury in the Eastern
District of Virginia investigating the contractual relationships between
subsidiaries of NMC that provide dialysis services and third parties that
provide medical directorship and related services to those subsidiaries. Legal
and consulting compliance costs relating to the U.S. Food and Drug
Administration warning letter and import alerts were approximately $6.9 million
in 1994. The outcome of these investigations and their impact, if any, on NMC's
business, financial condition and results of operations cannot be predicted at
this time. However, the Company believes that neither the Company nor any of its
employees committed any violations of law. Accordingly, the Company does not
believe that the results of these investigations will have a material adverse
effect on the Company's financial position and results of operations.

The Company also is subject to claims and suits arising in the ordinary
course of business, such as malpractice claims, the ultimate resolution of which
would not, in the Company's opinion, have a material adverse effect on the
Company's financial condition or results of operations.

Insurance

The Company is largely self-insured through an arrangement with Grace
Chemicals for group health, workers compensation, medical malpractice, auto and
general liability. Provisions for losses expected under these programs are
recorded currently based upon Grace Chemicals' and NMC's estimates of the
aggregate liability for claims incurred.

NOTE 16. SIGNIFICANT CUSTOMER RELATIONS

Approximately 62% of the Company's net revenues are paid by and subject to
regulations under governmental programs, primarily Medicare and Medicaid. The
Company maintains reserves for losses related to these programs, including
uncollectible accounts receivable, and such losses have been within management's
expectations.

F-22

<PAGE>   294

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
(DOLLARS IN THOUSANDS)

NOTE 17. INDUSTRY SEGMENTS AND INFORMATION ABOUT FOREIGN OPERATIONS

The table below provides information pertaining to the Company's operations
by geographic area.

<TABLE>
<CAPTION>

| | | UNITED STATES | EUROPE | OTHER | TOTAL |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Net revenues...................... | 1995 | $ 1,868,882 | $125,153 | $ 38,703 | $2,032,738 |
| | 1994 | 1,724,508 | 79,569 | 14,127 | 1,818,204 |
| | 1993 | 1,395,552 | 58,598 | 1,445 | 1,455,595 |
| Earnings before income taxes....... | 1995 | 234,860 | (32,415) | 3,068 | 205,513 |
| | 1994 | 247,361 | (36,654) | 3,732 | 214,439 |
| | 1993 | 197,958 | (8,296) | 955 | 190,617 |
| Assets............................ | 1995 | 1,675,667 | 242,393 | 80,084 | 1,998,144 |
| | 1994 | 1,440,866 | 178,749 | 24,199 | 1,643,814 |
| | 1993 | 1,114,260 | 123,145 | 7,920 | 1,245,325 |

</TABLE>

The table below provide information pertaining to the Company's two
industry segments.

XXX-002061

<TABLE>
<CAPTION>

| <S> | <C> | HEALTH CARE SERVICES <C> | MEDICAL SUPPLIES <C> | LESS: INTERSEGMENT SALES <C> | TOTAL <C> |
|---|---|---|---|---|---|
| Net Revenues | 1995 | 1,884,748 | 300,001 | 152,011 | 2,032,738 |
| | 1994 | 1,681,039 | 279,474 | 142,309 | 1,818,204 |
| | 1993 | 1,292,951 | 279,927 | 117,283 | 1,455,595 |
| Earnings before income taxes | 1995 | 223,094 | (17,581) | -- | 205,513 |
| | 1994 | 254,772 | (40,333) | -- | 214,439 |
| | 1993 | 188,271 | 2,346 | -- | 190,617 |
| Assets | 1995 | 1,855,907 | 142,237 | | 1,998,144 |
| | 1994 | 1,484,753 | 159,061 | | 1,643,814 |
| | 1993 | 1,065,230 | 180,095 | | 1,245,325 |
| Capital expenditures | 1995 | 99,905 | 2,989 | | 102,894 |
| | 1994 | 78,538 | 5,960 | | 84,498 |
| | 1993 | 68,712 | 9,232 | | 77,944 |
| Depreciation and amortization of properties and equipment | 1995 | 57,783 | 4,903 | | 62,686 |
| | 1994 | 47,769 | 5,242 | | 53,011 |
| | 1993 | 38,504 | 5,352 | | 43,856 |

</TABLE>

W. R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)
(DOLLARS IN THOUSANDS)

NOTE 18. QUARTERLY SUMMARY (UNAUDITED)

<TABLE>
<CAPTION>

| <S> | 1ST QTR. <C> | 2ND QTR. <C> | 3RD QTR. <C> | 4TH QTR. <C> |
|---|---|---|---|---|
| 1995 | | | | |
| Net revenues | $478,058 | $506,683 | $505,459 | $542,538 |
| Cost of health care services and medical supplies | 276,601 | 289,008 | 290,409 | 320,075 |
| Operating expenses | 147,884 | 145,733 | 167,549 | 164,432 |
| Interest expense, net | 5,750 | 5,791 | 5,387 | 8,606 |
| Total expenses | 430,235 | 440,532 | 463,345 | 493,113 |
| Earnings before Income Taxes | 47,823 | 66,151 | 42,114 | 49,425 |
| Provision for Income Taxes | 21,807 | 30,111 | 21,865 | 34,833 |
| Net earnings | $ 26,016 | $ 36,040 | $ 20,249 | $ 14,592 |
| 1994 | | | | |
| Net revenues | $390,618 | $443,177 | $479,121 | $505,288 |
| Cost of health care services and medical supplies | 234,149 | 255,189 | 262,990 | 274,491 |
| Operating expenses | 116,224 | 136,504 | 137,810 | 170,535(1) |
| Interest expense, net | 3,394 | 3,197 | 3,233 | 6,049 |
| Total expenses | 353,767 | 394,890 | 404,033 | 451,075 |
| Earnings before Income Taxes | 36,851 | 48,287 | 75,088 | 54,213 |
| Provision for Income Taxes | 17,931 | 23,227 | 34,215 | 36,849 |
| Net earnings | $ 18,920 | $ 25,060 | $ 40,873 | $ 17,364 |

</TABLE>

- ---------------

(1) Includes a charge of $27,441 to reflect the impairment of the goodwill in the Company's German renal products manufacturing facilities (Note 9).

NOTE 19. SUBSEQUENT EVENT -- GUARANTEE (UNAUDITED)

Fresenius Medical Care and Grace New York have agreed to provide the United States government, upon consummation of the Reorganization described in Note 1, with a joint and several guarantee of payment of the obligations, if any, arising out of the investigation by the OIG described in Note 15. In support of this guarantee, NMC has agreed to deliver to the government, on or prior to the consummation of the Reorganization, an irrevocable standby letter of credit in the amount of $150 million.

THIS PAGE INTENTIONALLY OMITTED

W. R. GRACE & CO.
SPECIAL-PURPOSE, CONSOLIDATED INTERIM STATEMENTS OF EARNINGS
(UNAUDITED)
(DOLLARS IN THOUSANDS, EXCEPT PER SHARE DATA)

<TABLE>
<CAPTION>

|  | THREE MONTHS ENDED MARCH 31, | |
| --- | --- | --- |
|  | 1996 | 1995 |
| <S> | <C> | <C> |
| NET REVENUES |  |  |
| Health care services............................................... | $488,371 | $444,480 |
| Medical supplies.................................................... | 39,920 | 33,578 |
|  | 528,291 | 478,058 |
| EXPENSES |  |  |
| Cost of health care services....................................... | 287,531 | 251,788 |
| Cost of medical supplies............................................ | 27,902 | 24,813 |
| General and administrative expenses................................. | 101,447 | 92,251 |
| Provision for doubtful accounts..................................... | 21,486 | 19,399 |
| Depreciation and amortization....................................... | 30,628 | 25,915 |
| Research and development............................................ | 686 | 771 |
| Allocation of Grace Chemicals expenses.............................. | 2,017 | 9,548 |
| Interest expense, net, and related financing costs................. | 7,004 | 5,750 |
|  | 478,701 | 430,235 |
| EARNINGS BEFORE INCOME TAXES........................................ | 49,590 | 47,823 |
| PROVISION FOR INCOME TAXES.......................................... | 23,145 | 21,807 |
| NET EARNINGS........................................................ | $ 26,445 | $ 26,016 |
| Earnings per share................................................. | $    0.27 | $    0.27 |

</TABLE>

See accompanying Notes to Special-Purpose, Consolidated Interim Financial
Statements.

F-26

<PAGE>   298

W. R. GRACE & CO.

SPECIAL-PURPOSE, CONSOLIDATED INTERIM BALANCE SHEET
(UNAUDITED)
(DOLLARS IN THOUSANDS)

<TABLE>
<CAPTION>

|  | MARCH 31, 1996 |
| --- | --- |
| <S> | <C> |
| ASSETS |  |
| Current Assets: |  |
| Cash and cash equivalents........................................... | $   33,855 |
| Accounts receivable, less allowances of $122,249.................... | 430,013 |
| Inventories......................................................... | 72,458 |
| Deferred income taxes............................................... | 90,280 |
| Other current assets................................................ | 64,252 |
| Total Current Assets........................................... | 690,858 |
| Properties and equipment, net....................................... | 384,163 |
| Other Assets: |  |
| Excess of cost over the fair value of net assets acquired and other intangible assets, net of accumulated amortization of $260,599............ | 962,831 |
| Other assets and deferred charges................................... | 21,625 |
| Total Other Assets............................................. | 984,456 |
| Total Assets........................................................ | $2,059,477 |
| LIABILITIES AND EQUITY |  |
| Current Liabilities: |  |
| Current portion of long-term debt and capitalized lease obligations.......... | $  158,202 |
| Accounts payable.................................................... | 110,499 |
| Accrued liabilities................................................. | 190,948 |
| Accrued income taxes................................................ | 13,573 |
| Total Current Liabilities...................................... | 473,222 |
| Long-term debt...................................................... | 22,321 |
| Capitalized lease obligations....................................... | 5,969 |
| Deferred income taxes............................................... | 64,618 |
| Other liabilities................................................... | 34,702 |
| Total Liabilities............................................. | 600,832 |

</TABLE>

Commitments and Contingencies (Note 3)

```
Equity:
  Equity.....................................................  1,461,714
  Cumulative translation adjustment..........................     (3,069)
                                                             -----------
    Total Equity.............................................  1,458,645
                                                             -----------
Total Liabilities and Equity.................................  $2,059,477
                                                             ===========
```

</TABLE>

See accompanying Notes to Special-Purpose, Consolidated Interim Financial Statements.

F-27

<PAGE>   299

W. R. GRACE & CO.

SPECIAL-PURPOSE, CONSOLIDATED INTERIM STATEMENTS OF CASH FLOWS
(UNAUDITED)
(DOLLARS IN THOUSANDS)

<TABLE>
<CAPTION>

|  | THREE MONTHS ENDED MARCH 31, | |
| --- | --- | --- |
|  | 1996 | 1995 |
| <S> | <C> | <C> |
| Cash Flows Provided by Operating Activities: | | |
| Net earnings....................................................... | $ 26,445 | $ 26,016 |
| Adjustments to reconcile net earnings to net cash provided by operating activities: | | |
| Depreciation and amortization................................... | 30,629 | 25,915 |
| Provision for doubtful accounts................................. | 21,486 | 19,399 |
| Provision for deferred income taxes............................. | (1,911) | (5,918) |
| Loss on disposal of properties and equipment................... | 1,136 | 399 |
| Changes in operating assets and liabilities, net of effects of purchase acquisitions and foreign exchange: | | |
| Increase in accounts receivable................................. | (43,070) | (19,864) |
| Decrease (increase) in inventories............................. | 249 | (4,505) |
| Increase in other current assets............................... | (12,347) | (13,043) |
| Increase (decrease) in accounts payable........................ | 5,764 | (17,231) |
| Increase in accrued income taxes............................... | 10,350 | 10,781 |
| Decrease in accrued liabilities................................ | (30,841) | (21,116) |
| Increase in other long-term liabilities........................ | 4,261 | 4,103 |
| Increase in other assets and deferred charges.................. | (1,930) | (1,495) |
| Other, net..................................................... | 361 | (3,410) |
|  | --------- | --------- |
| Net cash provided by operating activities...................... | 10,582 | 31 |
|  | --------- | --------- |
| Cash Flows from Investing Activities: | | |
| Capital expenditures............................................ | (24,584) | (27,682) |
| Payments for acquisitions, net of cash acquired................ | (24,681) | (40,117) |
| Payments for physicians' contract agreements................... | -- | (2,900) |
|  | --------- | --------- |
| Net cash used in investing activities.......................... | (49,265) | (70,699) |
|  | --------- | --------- |
| Cash Flows from Financing Activities: | | |
| Advances from Grace Chemicals, net............................. | 69,367 | 44,127 |
| Proceeds on issuance of debt................................... | 94,332 | 18,192 |
| Payments on debt and capitalized leases........................ | (126,746) | (4,364) |
|  | --------- | --------- |
| Net cash provided by financing activities...................... | 36,953 | 57,955 |
|  | --------- | --------- |
| Effects of changes in foreign exchange rates.................... | 2,055 | (3,619) |
|  | --------- | --------- |
| Increase (decrease) in cash and cash equivalents............... | 325 | (16,332) |
| Cash and cash equivalents at beginning of period............... | 33,530 | 39,758 |
|  | --------- | --------- |
| Cash and cash equivalents at end of period..................... | $ 33,855 | $ 23,426 |
|  | ========= | ========= |
| Supplemental disclosures of cash flow information: | | |
| Cash paid during the period for: | | |
| Interest....................................................... | $ 6,828 | $ 5,944 |
| Income taxes................................................... | 3,665 | 3,574 |

</TABLE>

See accompanying Notes to Special-Purpose, Consolidated Interim Financial Statements.

F-28

<PAGE>   300

W.R. GRACE & CO.

NOTES TO SPECIAL-PURPOSE, CONSOLIDATED INTERIM FINANCIAL STATEMENTS
(UNAUDITED)
(DOLLARS IN THOUSANDS)

NOTE 1. BASIS OF PRESENTATION

The Special-Purpose, Consolidated Interim Financial Statements of W. R.

XXX-002064

Grace & Co. ("Grace New York") and National Medical Care, Inc. and its subsidiaries ("NMC" and together with Grace New York, the "Company") have been prepared by the Company in accordance with the accounting policies stated in the historical Special-Purpose, Consolidated Financial Statements and should be read in conjunction with the Notes to Special-Purpose, Consolidated Financial Statements appearing therein. In the opinion of the Company, all adjustments (consisting only of normal recurring adjustments) necessary for a fair presentation have been included in the interim financial statements. The results for the three month period ended March 31, 1996 may not necessarily be indicative of the results for the fiscal year ending December 31, 1996.

NOTE 2. INVENTORIES

<TABLE>
<CAPTION>

| | MARCH 31, 1996 |
|---|---|
| <S> | <C> |
| Raw materials | $ 9,127 |
| Manufactured goods in process | 2,354 |
| Manufactured and purchased inventory available for sale | 32,472 |
| | 43,953 |
| Health care supplies | 28,505 |
| Total | $ 72,458 |

</TABLE>

NOTE 3. COMMITMENTS AND CONTINGENCIES

See Note 15 to the historical Special-Purpose, Consolidated Financial Statements.

THIS PAGE INTENTIONALLY OMITTED

INDEPENDENT AUDITORS' REPORT

To the Board of Directors
Fresenius Aktiengesellschaft
Bad Homburg v.d. Hohe, Germany:

We have audited the accompanying combined balance sheets of Fresenius Worldwide Dialysis, a business unit of Fresenius Aktiengesellschaft, Bad Homburg v.d. Hohe, Germany, as of December 31, 1995 and 1994 and the related combined statements of operations and net assets and cash flows for the years then ended. In connection with our audits of the combined financial statements, we have also audited the accompanying financial statement schedule. These combined financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these combined financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with generally accepted auditing standards in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the combined financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the combined financial statements referred to above present fairly, in all material respects, the combined financial position of Fresenius Worldwide Dialysis as of December 31, 1995 and 1994 and the results of its operations and its cash flows for the years then ended in conformity with generally accepted accounting principles in the United States of America. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic combined financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

KPMG Deutsche Treuhand-Gesellschaft
Aktiengesellschaft
Wirtschaftsprufungsgesellschaft

April 25, 1996
Frankfurt am Main, Germany

FRESENIUS WORLDWIDE DIALYSIS

COMBINED STATEMENTS OF OPERATIONS AND NET ASSETS
YEARS ENDED DECEMBER 31, 1995 AND 1994
(THOUSANDS, UNLESS OTHERWISE INDICATED)

<TABLE>
<CAPTION>

|  | 1995 | 1994 |
|---|---|---|
| <S> | <C> | <C> |
| Net sales.................................................. | $896,540 | $719,843 |
| Cost of sales.............................................. | 514,080 | 419,378 |
| Gross profit........................................... | 382,460 | 300,465 |
| Operating expenses: |  |  |
| Selling, general and administrative.................. | 242,990 | 195,227 |
| Research and development............................. | 17,292 | 16,937 |
| Operating income...................................... | 122,178 | 88,301 |
| Other (income) expense: |  |  |
| Interest income...................................... | (1,252) | (1,446) |
| Interest expense..................................... | 14,316 | 12,009 |
| Other, net........................................... | (6,289) | (6,084) |
| Income before income taxes............................ | 115,403 | 83,822 |
| Income tax expense......................................... | 40,577 | 29,179 |
| Income before minority interest...................... | 74,826 | 54,643 |
| Minority interest......................................... | 5,111 | 2,550 |
| Net income............................................ | 69,715 | 52,093 |
| Net assets at beginning of the year....................... | 261,337 | 200,030 |
| Foreign currency translation adjustments.................. | 13,797 | 16,153 |
| Gain on sales of stock by subsidiary...................... | -- | 6,805 |
| Net activity with Fresenius............................... | (39,224) | (13,744) |
| Net assets at end of the year............................. | $305,625 | $261,337 |

</TABLE>

See accompanying notes to combined financial statements.

F-32

<PAGE>  304

FRESENIUS WORLDWIDE DIALYSIS

COMBINED BALANCE SHEETS
DECEMBER 31, 1995 AND 1994
(THOUSANDS, UNLESS OTHERWISE INDICATED)

<TABLE>
<CAPTION>

| ASSETS | 1995 | 1994 |
|---|---|---|
| <S> | <C> | <C> |
| Current assets: |  |  |
| Cash and cash equivalents.................................. | $ 12,091 | $ 11,973 |
| Trade accounts receivable, less allowance for doubtful accounts of $12,718 in 1995 and $12,702 in 1994............................. | 183,878 | 157,218 |
| Inventories, net........................................... | 182,738 | 150,495 |
| Prepaid expenses and other current assets.................. | 15,048 | 14,435 |
| Deferred taxes............................................. | 2,019 | 2,183 |
| Total current assets.................................. | 395,774 | 336,304 |
| Property, plant and equipment, net......................... | 134,767 | 116,807 |
| Intangible assets, net..................................... | 67,260 | 68,014 |
| Investments in affiliates.................................. | 19,121 | 9,398 |
| Deferred taxes............................................. | 2,710 | -- |
| Other assets............................................... | 24,386 | 12,518 |
|  | $644,018 | $543,041 |

| LIABILITIES AND NET ASSETS (EQUITY) |  |  |
|---|---|---|
| Current liabilities: |  |  |
| Accounts payable.......................................... | $ 38,360 | $ 27,813 |
| Accrued expenses.......................................... | 63,194 | 55,147 |
| Short-term borrowings..................................... | 109,444 | 85,678 |
| Current portion of long-term debt and capital lease obligations...... | 20,195 | 19,146 |
| Income taxes payable...................................... | 922 | 3,225 |
| Other current liabilities................................. | 21,312 | 16,356 |
| Total current liabilities............................. | 253,427 | 207,365 |
| Long-term payable, less current portion................... | 1,275 | 1,861 |
| Long-term debt and capital lease obligations, less current portion... | 38,812 | 34,522 |
| Non-current borrowing from affiliate...................... | 274 | 274 |
| Other liabilities......................................... | 3,322 | 4,323 |
| Pension liability......................................... | 16,767 | 13,286 |
| Deferred taxes............................................ | -- | 878 |
| Minority interest......................................... | 24,516 | 19,195 |
| Total liabilities.................................... | 338,393 | 281,704 |
| Net assets............................................... | 305,625 | 261,337 |

</TABLE>

```
                                                        $644,018      $543,041
                                                        ========      ========
```

</TABLE>

      See accompanying notes to combined financial statements.

               F-33

<PAGE>  305

FRESENIUS WORLDWIDE DIALYSIS
COMBINED STATEMENTS OF CASH FLOWS
DECEMBER 31, 1995 AND 1994
(THOUSANDS, UNLESS OTHERWISE INDICATED)

<TABLE>
<CAPTION>

|                                                                    | 1995 | 1994 |
|---|---|---|
| <S>                                                                | <C>  | <C>  |
| Cash flows from operating activities:                              |      |      |
| Net income.......................................................... | $ 69,715 | $ 52,093 |
| Adjustments to reconcile net income to net cash and                |      |      |
| cash equivalents provided by operating activities:                 |      |      |
| Depreciation and amortization...................................... | 41,693 | 34,945 |
| Change in deferred tax............................................. | (3,398) | 3,996 |
| Gain on sale of fixed assets....................................... | (997) | 152 |
| Changes in assets and liabilities:                                 |      |      |
| Trade accounts receivable, net.................................... | (18,948) | (12,198) |
| Inventories, net.................................................. | (25,014) | (15,808) |
| Prepaid expenses and other current assets........................ | 292 | (2,939) |
| Other assets..................................................... | (10,815) | (6,061) |
| Accounts payable and accrued expenses............................ | 16,728 | 13,783 |
| Other current and non-current liabilities........................ | 2,399 | (3,928) |
| Income taxes payable............................................. | (2,507) | (683) |
|                                                                    | -------- | -------- |
| Net cash provided by operating activities........................ | 69,148 | 63,352 |
|                                                                    | -------- | -------- |
| Cash flows from investing activities:                              |      |      |
| Purchases of property, plant and equipment........................ | (92,906) | (59,545) |
| Proceeds from sale of property, plant and equipment............... | 42,673 | 1,803 |
| Acquisitions and capital increases in affiliates................. | (10,087) | (5,972) |
|                                                                    | -------- | -------- |
| Net cash used in investing activities............................ | (60,320) | (63,714) |
|                                                                    | -------- | -------- |
| Cash flows from financing activities:                              |      |      |
| Proceeds from short-term borrowings............................... | $149,405 | $123,208 |
| Repayments of short-term borrowings............................... | (129,052) | (119,672) |
| Decrease in long-term payable..................................... | (586) | (556) |
| Proceeds from long-term debt and capital lease obligations........ | 20,163 | 15,058 |
| Principal payments of long-term debt and capital lease obligations | (20,264) | (21,750) |
| Proceeds from issuance of common stock........................... | 1,939 | 16,322 |
| Net activity with Fresenius...................................... | (36,894) | (14,727) |
| Change in minority interest...................................... | 6,229 | 2,550 |
|                                                                    | -------- | -------- |
| Net cash used in financing activities............................ | (9,060) | 433 |
|                                                                    | -------- | -------- |
| Net (decrease) increase in cash and cash equivalents.............. | (232) | 71 |
| Effect of exchange rates on cash and cash equivalents............. | 350 | 511 |
| Cash and cash equivalents at beginning of year................... | 11,973 | 11,391 |
|                                                                    | -------- | -------- |
| Cash and cash equivalents at end of year......................... | $ 12,091 | 11,973 |
|                                                                    | ======== | ======== |
| Supplementary cash flow information:                               |      |      |
| Cash paid for interest............................................ | $ 17,109 | 13,684 |
|                                                                    | ======== | ======== |
| Cash paid for income taxes........................................ | $ 38,070 | 28,496 |
|                                                                    | ======== | ======== |
| Supplementary schedule of non-cash financing activities:           |      |      |
| Acquisition of equipment through obligations under capital leases. | $ 9,071 | 7,383 |
|                                                                    | ======== | ======== |
| Disposal of assets under capital leases.......................... | $ 255 | 135 |
|                                                                    | ======== | ======== |
| Acquisition of license technology in exchange for inventory and debt | $ -- | $ 908 |
|                                                                    | ======== | ======== |

</TABLE>

      See accompanying notes to combined financial statements.

               F-34

<PAGE>  306

FRESENIUS WORLDWIDE DIALYSIS

NOTES TO COMBINED FINANCIAL STATEMENTS
(THOUSANDS, UNLESS OTHERWISE INDICATED)

1.  BASIS OF PRESENTATION

    On February 4, 1996, Fresenius Aktiengesellschaft, Bad Homburg v.d. Hohe,
Germany, ("Fresenius") and W. R. Grace & Co. ("Grace") entered into an Agreement
and Plan of Reorganization (the "Reorganization Agreement") under which they
agreed to combine Fresenius' Worldwide Dialysis businesses ("FWD" or the
"Company") with the health care business of Grace conducted by its subsidiary
National Medical Care, Inc. ("NMC"). Pursuant to the Reorganization Agreement,

XXX-002067

Fresenius will contribute FWD into a wholly owned dormant subsidiary, Sterilpharma GmbH, which will, thereafter, change its name to "Fresenius Medical Care AG" ("FMC"). The Reorganization Agreement further provides that, subsequent to the spin-off to Grace's common shareholders of the subsidiaries comprising Grace's non-health care business, a subsidiary of FMC will be merged into Grace (whose name will be changed to "Fresenius National Medical Care, Inc.") and the common stock of Grace will be exchanged for ordinary shares of FMC.

Under the terms of the Reorganization Agreement, Fresenius will contribute FWD's operations located principally in the following countries to FMC:

<TABLE>
| <S> | <C> |
|-----|-----|
| Germany | Austria |
| Belgium | Brazil(2) |
| France(1)(2) | Italy(1) |
| Japan | The Netherlands |
| Spain | Switzerland |
| United Kingdom(2) | United States of America |
</TABLE>

    (1) Includes Fresenius shared production facilities which will be transferred to FMC and at which FMC will manufacture products for Fresenius. See Shared Production Facilities below.

    (2) Excludes Fresenius shared production facilities at which Fresenius will manufacture products for FWD under contractual arrangements. See Shared Production Facilities below.

The accompanying combined financial statements have been prepared in accordance with United States generally accepted accounting principles ("U.S. GAAP") on a basis which reflects the combined historical financial statements of FWD, including Sterilpharma GmbH, assuming that the Company, currently a business unit of Fresenius, was organized for all periods presented as follows as a separate legal entity, owning certain net assets and certain subsidiaries and associated companies of Fresenius.

  (a) Shared Production Facilities

The Company shares certain manufacturing facilities with Fresenius' non-FWD businesses. In connection with the Reorganization Agreement, in each situation where facilities are currently shared (see above), post-Reorganization Agreement ownership of the location or manufacturing facility (collectively, the "Facility") will be retained by Fresenius or contributed to FWD. The accompanying combined balance sheets include, for those Facilities which will be retained by FWD, land, buildings, related manufacturing assets; raw materials and work-in-process inventories; and accounts payable and accrued expenses related to those fixed assets and inventory. In addition, the balance sheets exclude the land, buildings, related manufacturing assets; raw materials and work-in-process inventories; and accounts payable and accrued expenses related to those fixed assets and inventory for Facilities which will be retained by Fresenius.

Production and related services rendered by FWD at shared facilities to Fresenius are effectively allocated to Fresenius at fully absorbed cost and, accordingly, are accounted for as an inventory transfer through the statement of operations. Such production rendered by Fresenius at shared Facilities on behalf of FWD are also effectively allocated to FWD at fully absorbed cost. For the years ended December 31, 1995 and 1994, the aggregate costs that were allocated to Fresenius by FWD for production and related services at shared facilities were $14,628 and $13,417, respectively, while the aggregate production costs that were

<div align="center">F-35</div>

<PAGE>  307

<div align="center">FRESENIUS WORLDWIDE DIALYSIS

NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)</div>

allocated to FWD from Fresenius for the years ended December 31, 1995 and 1994 were $35,700 and $33,001, respectively. Prior to the transaction contemplated by the Reorganization Agreement, the Company will enter into contractual agreements with Fresenius to commit to sell to and purchase from Fresenius production at amounts to be negotiated.

  (b) Real Estate Located in Germany

Under the terms of the Reorganization Agreement, certain land and manufacturing and office buildings located in Germany will be retained by Fresenius and leased to FWD under operating lease agreements. Accordingly, such land and buildings have been excluded from the accompanying combined balance sheets. The accompanying combined statements of operations include for the year ended December 31, 1995 and 1994, $1,575 and $1,025, respectively, of depreciation expense related to such facilities representing an assumed charge to FWD from Fresenius for the use of the land and buildings. Subsequent to consummation of the transaction contemplated by the Reorganization Agreement, FWD will pay Fresenius $12,000 per year, escalated annually based upon the German commercial practices for similar real estate, representing a fair market value rental for such properties.

  (c) Shared Services

XXX-002068

Fresenius has provided services to and incurred costs on behalf of the Company. In addition, FWD has provided certain services to Fresenius. The costs of such services, including, but not limited to, administrative services, management information services, employee benefit administration, legal and environmental consultation and administration, insurance, central purchasing, tax services, treasury services, and accounting and reporting have been allocated to the Company. The allocation of the costs and expenses for services from Fresenius to FWD's operations was $51,203 and $45,529 for the years ended December 31, 1995 and 1994, respectively. The allocation of the costs and expenses for services from FWD to Fresenius was $20,093 and $13,405 for the years ended December 31, 1995 and 1994, respectively. The foregoing amounts include Fresenius AG's charges to Fresenius USA, Inc. ("FUSA") for services provided for the years ended December 31, 1995 and 1994 of $2,020 and $107, respectively. These allocations were based upon service contracts between the relevant parties as well as upon methods that management believes are reasonable, including the use of time estimates, headcount and transaction statistics, and similar activity-based data. In the opinion of management of the Company, such expenses are indicative of the actual expenses that would have been incurred if the Company had been operating as an independent entity. Prior to consummation of the transaction contemplated by the Reorganization Agreement, the Company is expecting to enter into service agreements with Fresenius to continue to receive the foregoing services at amounts to be negotiated.

(d) Intercompany Receivables and Payables and Cash and Cash Equivalents

In accordance with the terms of the Reorganization Agreement, intercompany receivables and payables between FWD and Fresenius will not be contributed to FMC but will remain with Fresenius. Accordingly, in the accompanying combined balance sheets, intercompany receivables and payables between FWD and Fresenius have been accounted for within net assets.

In addition, under the terms of the Reorganization Agreement, cash and cash equivalents will not be transferred to FWD but will remain with Fresenius. Accordingly, except in situations where 100% of a legal entity is being contributed into FMC, no cash or cash equivalents have been included in the accompanying combined statement of net assets. In connection with the transaction contemplated by the Reorganization Agreement, the remaining cash included in the accompanying statement of net assets will be transferred to Fresenius.

F-36

<PAGE>  308

FRESENIUS WORLDWIDE DIALYSIS

NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)

2.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

(a) Business

The business of the Company is the development, manufacture and distribution of equipment and related products for all forms of kidney dialysis treatment and the providing of kidney dialysis treatment and related services.

(b) Principles of Combination

The combined financial statements include the accounts of FWD as described in Note 1. All significant intercompany transactions and balances have been eliminated. The equity method of accounting is used for investments in associated companies (20% to 50% owned).

(c) Cash and Cash Equivalents

Cash and cash equivalents represent cash and certificates of deposit with original maturity dates of three months or less at origination.

(d) Inventories

Inventories are stated at the lower of cost (determined by using the average or first-in, first-out method) or market value.

(e) Property, Plant and Equipment

Property, plant, and equipment are stated at cost. Property and equipment under capital leases are stated at the present value of future minimum lease payments at the inception of the lease.

Deprecation on property, plant and equipment is calculated using the straight-line method over the estimated useful lives of the assets ranging from 10 to 50 years for buildings and improvements and 3 to 15 years for machinery and equipment. Equipment held under capital leases and leasehold improvements are amortized using the straight-line method over the shorter of the lease term or the estimated useful life of the asset.

The Company capitalizes interest on borrowed funds during construction periods. Interest capitalized during 1995 and 1994 was $1,069 and $779, respectively.

(f) Other Assets

In 1995, FUSA completed construction of a dialyser plant addition to its manufacturing facility in Ogden, Utah. Included in other assets are $6,375 of

XXX-002069

validation costs, net of accumulated amortization of $267, incurred to qualify the products and the associated manufacturing processes for approval by the U.S. Food and Drug Administration. Such costs are being amortized on a straight-line basis over an estimated useful life of 3 years upon commencement of manufacturing.

(g) Intangible Assets

Intangible assets consist of goodwill (the excess of cost over net assets acquired), manufacturing technology, patents, distribution rights, licenses and other intangible assets. Intangible assets are amortized on a straight-line basis over the estimated useful lives of the assets ranging from four to twenty-five years.

The Company assesses the recoverability of intangible assets by determining whether the amortization of the asset's balance over its remaining useful life can be recovered through projected undiscounted cash flows.

F-37

<PAGE>   309

FRESENIUS WORLDWIDE DIALYSIS

NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)

(h) Derivative Financial Instruments

Forward currency contracts -- Gains and losses on forward currency contracts that are designated and effective as hedges of existing assets, liabilities and firm commitments are deferred and recognized along with the effects of the hedged transaction. Gains and losses on other forward currency contracts are recognized at each reporting period.

Interest rate swaps -- Interest rate agreements that are designated as a hedge of a debt or other long-term obligations are accounted for on an accrual basis. That is, the interest payable and interest receivable under the swaps terms are accrued and recorded as an adjustment to the interest or rent expense of the designated liability or obligations.

Amounts due from and payable to the counterparties of interest rate swaps are recorded on an accrual basis at each reporting date on amounts computed by reference to the respective interest rate swap contract. Realized gains and losses that occur from the early termination or expiration of contracts are recorded in income over the remaining period of the original swap agreement.

(i) Foreign Currency Translation

For purposes of these combined financial statements, the U.S. Dollar has been used as the reporting currency. The financial statements of entities in other currencies than U.S. Dollars have been translated into U.S. Dollars in accordance with Statement of Financial Accounting Standards ("SFAS") No. 52, "Foreign Currency Translation". Assets and liabilities of entities with "functional" currencies other than the U.S. Dollar are translated at the year end rate of exchange. Income and expense and cash flow items are translated at the average exchange rate for the year. The resulting translation adjustments are recorded directly to Net Assets.

(j) Revenue Recognition Policy

Revenues are recognized when title to the product has passed to the buyer, either at the time of shipment or upon receipt by the customer.

(k) Research and Development Expenses

Research and development expenses are expensed as incurred.

(l) Income Taxes

The Company represents a business unit of Fresenius. In Germany the Company is a division of Fresenius and as such does not file separate income tax returns. This is also true in Austria, Great Britain, Belgium, Japan and Brazil. In such cases, the Company's income tax provision is computed as if it were a separate company. In the United States, Switzerland, France, Italy, the Netherlands and Spain, the Company operates as a separate subsidiary of Fresenius and, as such, files income tax returns in such countries. Income taxes payable in the accompanying balance sheets relates solely to tax liabilities of the Company's subsidiaries in countries where the subsidiary files an income tax return.

In accordance with SFAS No. 109, "Accounting for Income Taxes", deferred tax assets and liabilities are recognized for the future consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. Current taxes in Germany are computed on the basis of the

F-38

<PAGE>   310

FRESENIUS WORLDWIDE DIALYSIS

XXX-002070

NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)

assumption that all current earnings are distributed currently. Deferred taxes in Germany are calculated using the "undistributed earnings" tax rate.

(m) Sale of Stock by Subsidiaries

The excess or deficiency of the proceeds from the sales of shares of a subsidiary and the Company's basis in the shares of the subsidiary is recognized by the Company as a capital transaction directly in net assets.

(n) Use of Estimates

The preparation of combined financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the combined financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

(o) Concentration of Credit Risk

The Company is engaged in the manufacture and sale of products for all forms of kidney dialysis equipment principally to health care providers throughout the world. The Company performs ongoing credit evaluations of its customers' financial condition and, generally, requires no collateral from its customers.

(p) Minority Interest

Minority interest represents the separate public ownership of the outstanding shares of FUSA of 29.1%.

(q) Net Assets

At each balance sheet date presented, net assets represent the excess of assets over liabilities to unrelated third-parties of the business units included in FWD discussed in Note 1 to these combined financial statements. Intercompany transactions and charges between FWD and Fresenius have also, effectively, been accounted for within net activity with Fresenius. For the years ended December 31, 1995 and 1994 the net activity with Fresenius resulting from intercompany transactions and charges was credits of $9,960 and $19,321, respectively.

3.  RELATED PARTY TRANSACTIONS

(a) Sales to Non-FWD Businesses

During the years ended December 31, 1994 and 1995, FWD recognized $19,112 and $10,954 of sales to non-FWD businesses of Fresenius.

(b) Financial Support

Fresenius has provided substantial financial support to FUSA, a majority owned entity included within FWD. This support has included guarantees of letters of credit in connection with FUSA's previously outstanding industrial revenue bonds, providing credit support to assist in securing lines of credit, participating in and assisting with foreign exchange contracts as well as various miscellaneous general management assistance.

F-39

<PAGE>  311

FRESENIUS WORLDWIDE DIALYSIS

NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)

(c) Registration Rights Agreement

Fresenius and FUSA are party to a Registration Rights Agreement, dated February 24, 1993. This agreement grants Fresenius demand registration rights with respect to all shares of FUSA common stock held by Fresenius on February 24, 1993 or issuable to Fresenius upon conversion of shares of FUSA Series F preferred stock or exercise of a warrant for 1,700,000 shares issued to Fresenius in connection with an acquisition (collectively, the "Registrable Shares"). FUSA is to pay all expenses in connection with the first such registration. A holder of Registrable Shares may also request that FUSA include its Registrable Shares in registration statements filed by FUSA in connection with a public offering of common stock on behalf of FUSA and/or another holder of FUSA common stock.

(d) Note Payable to FNA

In 1991, FUSA used the $11,900 proceeds from the exercise of stock options by Fresenius to reduce its original indebtedness to Fresenius North America, Inc. ("FNA"), a wholly owned subsidiary of Fresenius, to $7,874. During 1992, FUSA issued additional shares of common stock to Fresenius for $7,600, the proceeds of which were used to further reduce FUSA's note payable to FNA. The balances outstanding on the note payable to FNA was $274 at December 31, 1995 and 1994.

(e) Other

FUSA provides various administrative services and advances to Fresenius Pharma U.S.A., Inc. ("Fresenius Pharma"), another wholly owned subsidiary of Fresenius. There were no receivables related to these services from Fresenius Pharma at December 31, 1995 and 1994. During 1992, FUSA acquired from Fresenius Pharma the rights to distribute within North America certain transplantation pharmaceutical products of Fresenius. FUSA incurred no costs for the distribution rights under this agreement.

Pursuant to a series of agreements with Seratronics, Inc. ("Seratronics") and Andersen Group, Inc., entered into in 1985 and extended and amended in 1995, FUSA manages, and acts as sole distributor for the dialyzer reuse business of Seratronics. These arrangements required FUSA to make minimum net payments of $100 per year to Seratronics through February 1995, and starting in March 1995 require FUSA to make minimum payments of $50 per quarter through February 29, 2000. As of February 1995, FUSA has the right to acquire the assets and liabilities of the dialyzer reuse business for a nominal purchase price and, if it exercises this option, its obligation to make the quarterly payments discussed above ends. During 1995 FUSA, also purchased dialyzer reuse systems and supplies from Seratronics for an aggregate purchase price of approximately $1,600. The results of operations and the assets and liabilities of the Seratronics' reuse business are included in FUSA's combined financial statements. The President and Chief Executive Officer of FUSA is also the President and Chief Executive Officer of Seratronics. A director of FUSA is the President of Andersen Group, Inc. which owns a majority of the outstanding capital stock of Seratronics. A portion of the salary of the President and Chief Executive Officer of FUSA is paid each year by Seratronics.

A member of FUSA's Board of Directors is also a partner in a law firm which provided certain legal services for FUSA and Fresenius. FUSA paid the law firm approximately $259 and $6 in 1995 and 1994, respectively.

F-40

<PAGE>   312

FRESENIUS WORLDWIDE DIALYSIS

NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)

4.  INVENTORIES

As of December 31, inventories consisted of the following:

| | 1995 | 1994 |
|---|---|---|
| Raw materials and purchased components................ | $ 69,102 | $ 53,216 |
| Work in process....................................... | 33,667 | 22,687 |
| Finished goods........................................ | 84,546 | 77,888 |
| | 187,315 | 153,791 |
| Reserves.............................................. | (4,577) | (3,296) |
| Inventories, net.............................. | $182,738 | $150,495 |

5.  PROPERTY, PLANT AND EQUIPMENT

As of December 31, property, plant and equipment consisted of the following:

| | 1995 | 1994 |
|---|---|---|
| Land.................................................. | $   1,025 | $   1,392 |
| Buildings and improvements............................ | 38,252 | 26,452 |
| Machinery and equipment............................... | 198,412 | 157,821 |
| Machinery, equipment and rental equipment under capitalized leases........................... | 36,376 | 37,044 |
| Rental equipment...................................... | 20,919 | 19,751 |
| Loaned equipment...................................... | 2,784 | 2,353 |
| Construction in progress.............................. | 17,069 | 25,633 |
| | 314,837 | 270,446 |
| Accumulated depreciation and amortization............ | (180,070) | (153,639) |
| Property, plant and equipment, net......... | $ 134,767 | $ 116,807 |

Depreciation and amortization expense for property, plant and equipment, including amounts related to the real estate in Germany (see Note 1), amounted to $38,218 and $32,554 for the years ended December 31, 1995 and 1994, respectively.

Included in property, plant and equipment as of December 31, 1995 and 1994, was $14,619 and $11,521, respectively, of peritoneal dialyses cycler machines which the Company leases to customers with end-stage renal disease on a

XXX-002072

month-to-month basis and $3,888 and $2,591, respectively of hemodialyses
machines which the Company leases to physicians under operating leases. Rental
income for the peritoneal dialyses cycler machines was $2,203 and $1,586 for the
years ended December 31, 1995 and 1994, respectively. Identification of the
rental income from the Company's leasing of hemodialyses machines is not
practicable as the Company's return on the machines is received through
contractual arrangements whereby a premium is charged for other support
equipment sold during the life of the lease.

    Accumulated depreciation related to machinery, equipment and rental
equipment under capital leases was $18,601 and $23,148 at December 31, 1995 and
1994, respectively.

<div align="center">F-41</div>

<PAGE>   313

<div align="center">

FRESENIUS WORLDWIDE DIALYSIS

NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)
</div>

6.  INTANGIBLE ASSETS

    As of December 31, intangible assets consisted of the following:

| | 1995 | 1994 |
|---|---|---|
| | --------- | --------- |
| <S> | <C> | <C> |
| Goodwill.......................................... | $ 60,417 | $ 56,283 |
| Manufacturing technology.......................... | 15,629 | 15,629 |
| Patents........................................... | 6,211 | 6,009 |
| Distribution rights.............................. | 2,356 | 1,876 |
| Other............................................. | 6,212 | 5,792 |
| | --------- | --------- |
| | 90,825 | 85,589 |
| Accumulated amortization.......................... | (23,565) | (17,575) |
| | --------- | --------- |
| Intangible assets, net........................... | $ 67,260 | $ 68,014 |
| | ========= | ========= |

    Amortization expense for intangible assets amounted to $5,052 and $3,415
for the years ended December 31, 1995 and 1994, respectively.

7.  SHORT-TERM BORROWINGS

    Short-term borrowings of $109,444 and $85,678 at December 31, 1995 and
1994, respectively, represent amounts borrowed by certain of the Company's
subsidiaries under lines of credit with commercial banks of $84,206 and $85,678,
respectively, and, in 1995, an amount borrowed by a subsidiary from Fresenius of
$25,238. The external borrowings bear interest at prevailing interest rates in
the country of the borrowing. The borrowing from Fresenius bears interest at
4.25% per annum.

    At December 31, 1995 FWD had available lines of credit, principally
short-term, of approximately $93,000, of which $73,000 was utilized and $20,000
was unused. These lines of credit are generally secured by the Company's
accounts receivable and contain various covenants including, but not limited to,
requirements for maintaining defined levels of working capital, net worth,
capital expenditures and various financial ratios.

8.  LONG-TERM PAYABLE

    In connection with a 1993 acquisition, FUSA entered into an obligation
relating to the purchase of Optum(R) devices. During 1993, FUSA fulfilled this
obligation by taking possession of these Optum(R) devices and entering into a
long-term payable agreement. This long-term payable is recorded at its net
present value with an imputed interest rate of 5.68%. As of December 31, 1995,
the long-term portion of the note payable was $1,275 due over the next three
years.

<div align="center">F-42</div>

<PAGE>   314

<div align="center">

FRESENIUS WORLDWIDE DIALYSIS

NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)
</div>

9.  LONG-TERM DEBT AND CAPITAL LEASE OBLIGATIONS

    As of December 31, long-term debt and capital lease obligations consisted
of the following:

| | 1995 | 1994 |
|---|---|---|
| | --------- | --------- |
| <S> | <C> | <C> |
| Term loan(a)...................................... | $ 18,750 | $ 25,000 |
| Note payable, discounted to present value(b)........... | 6,724 | 8,731 |
| Allocation of Fresenius corporate debt(c)............. | 4,116 | -- |

XXX-002073

```
Other..........................................      5,695         4,603
Capital leases(d)..............................     23,722        15,334
                                                   --------      --------
                                                    59,007        53,668
Less current maturities........................    (20,195)      (19,146)
                                                   --------      --------
                                                   $ 38,812      $ 34,522
                                                   ========      ========
```

</TABLE>

- ---------------

(a) In connection with the purchase of certain assets, FUSA entered into a term
    loan agreement with a commercial bank to borrow $25,000 at an interest rate
    of 5.68% per annum. The loan is repayable in annual installments of $6,250
    through February 1998. The loan is guaranteed by Fresenius.

(b) In consideration for proprietary technology acquired, FUSA issued a note
    payable due in annual installments of $2,500 through 1998. The obligation
    has been recorded at its net present value, using an imputed interest rate
    of 5.68%. The note is secured by a standby letter of credit expiring March
    31, 1998, totaling $10,000. FUSA pays a commitment fee of 0.5% per annum on
    the outstanding letter of credit.

(c) Under the terms of the Reorganization Agreement, as of December 31, 1995,
    the Company was permitted $170,000 of total long-term and short-term debt,
    as defined in the Agreement. Accordingly, at December 31, 1995 the Company
    had outstanding $165,884 of long-term and short-term debt specifically
    identified to FWD and $4,116 of allocated debt of Fresenius. Interest
    expense for the allocated debt has been recorded based upon Fresenius'
    intercompany borrowing rate of 4.25%.

(d) Future minimum lease payments under capital leases as of December 31, 1995
    are:

    For the years ended December 31:

<TABLE>
```
         <S>                                                       <C>
         1996................................................     $ 12,091
         1997................................................        8,459
         1998................................................        5,164
         1999................................................        1,406
         2000................................................            3
                                                                  --------
                                                                    27,123
         Amounts representing interest.......................       (3,401)
                                                                  --------
         Present value capital lease obligations.............       23,722
         Current portion of capital lease obligations........      (10,008)
                                                                  --------
         Capital lease obligations, less current portion.....     $ 13,714
                                                                  ========
```
</TABLE>

    Interest rates on the capital lease obligations at December 31, 1995, range
from 9% to 12% and were imputed based on the lower of the Company's incremental
borrowing rate at the inception of the lease or the lessor's implicit rate.

                                      F-43
<PAGE>  315

                        FRESENIUS WORLDWIDE DIALYSIS

                NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)
                    (THOUSANDS, UNLESS OTHERWISE INDICATED)

    Aggregate annual payments applicable to the term loan, note payable and
other borrowings for the five years subsequent to December 31, 1995 are:

<TABLE>
```
         <S>                                                       <C>
         1996................................................     $ 9,947
         1997................................................       9,622
         1998................................................       9,162
         1999................................................         392
         2000................................................         211
         Thereafter.........................................       1,835
                                                                  -------
                                                                  $31,169
                                                                  =======
```
</TABLE>

10. NET ASSETS

    During 1994 the Company's subsidiary FUSA successfully completed a public
offering of 3,450,000 shares of its common stock, realizing net proceeds of
approximately $15,989, after expenses. As a result of such offering the
Company's ownership percentage in FUSA declined from 79.69% to 70.9%. In
connection with such transaction the Company recorded a gain of $6,805 directly
against Net Assets (Equity).

11. COMMITMENTS

  Operating Leases

XXX-002074

The Company leases facility space and machinery and equipment under various lease agreements expiring at dates through 1998.

In March 1995, FUSA entered into a sale leaseback arrangement with a bank which covers the sale by FUSA of approximately $19.0 million of certain new equipment of FUSA's dialyzer manufacturing facility at its Ogden, Utah plant to the bank, and the leaseback of the equipment under a four year operating lease that has renewal options and a purchase option at fair market value. Although the rent payments on the lease are variable based on the three-month LIBOR, FUSA has effectively fixed its rent expense through the use of interest rate swap agreements (see Note 12). In December 1995, an additional $8.0 million of similar new equipment which was sold and leased back under the above referenced four-year renewable lease. If FUSA elects not to purchase the equipment or renew the lease at the end of the lease term, FUSA will be obligated to pay a termination fee of up to $20,250, to be offset by sales proceeds from FUSA remarketing the equipment.

Future minimum rental payments under noncancelable operating leases as of December 31, 1995 are:

For the years ended December 31:

<TABLE>

| <S> | <C> |
|---|---|
| 1996............................................... | $ 9,444 |
| 1997............................................... | 7,840 |
| 1998............................................... | 6,143 |
| 1999............................................... | 4,656 |
| 2000............................................... | 3,468 |

</TABLE>

In addition, upon consummation of the transaction contemplated by the Reorganization Agreement, FWD will be obligated for lease payments of $12,000 per year in connection with the German real estate (see Note 1).

F-44

<PAGE>  316

FRESENIUS WORLDWIDE DIALYSIS

NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)

Purchase Commitments

Under the terms of purchase agreements, the Company is obligated to purchase certain raw materials. The minimum purchase commitments under the agreements are:

<TABLE>

| <S> | <C> |
|---|---|
| 1996............................................... | $29,337 |
| 1997............................................... | 24,242 |
| | ------- |
| | $53,579 |
| | ======= |

</TABLE>

The Company has commitments at December 31, 1995 to expend approximately $15,400 to complete the construction of a production facility.

12.  FINANCIAL INSTRUMENTS

Foreign Exchange Contracts

The Company uses foreign exchange contracts as a hedge against foreign exchange risks associated with the settlement of foreign currency denominated payables and firm commitments.

At December 31, 1995 the Company had purchased foreign exchange contracts for the sale of currencies for Deutschemarks of $67,876 and the purchase of U.S. Dollars for Deutsche Marks of $10,394. The fair value of the Company's foreign exchange contract is not material.

Interest Rate Swap Agreements

At December 31, 1995 and 1994, FUSA had interest rate swap agreements outstanding with a commercial bank for notional amounts of $17,400 and $7,634, respectively. These agreements effectively change FUSA's interest rate exposure on its operating lease payments to fixed rates of 8.02% and 5.60%, respectively. The interest rate swap agreements outstanding as of December 31, 1995 expire in March 1999. While neither the Company nor FUSA anticipates nonperformance by counterparties, FUSA is exposed to credit loss in the event of nonperformance by the other parties to the interest rate swap agreements.

The fair value of the interest rate swaps is the estimated amount that FUSA would receive or pay to terminate the swap agreements. This estimate is subjective in nature and involves uncertainties and matters of significant judgment and therefore cannot be determined with precision. Changes in assumptions could significantly affect the estimates. As of December 31, 1995, the cost to terminate the swap agreements is estimated to be $1,190.

13.  COMMON STOCK OPTIONS

XXX-002075

FUSA has stock option plans (the "Plans") which grant employees and officers the option to purchase FUSA common stock. At December 31, 1995, a total of 2,764,420 shares of FUSA common stock is reserved for issuance of stock options already granted or available for future grant. During 1995, all stock options were granted with an exercise price equal to fair market value on the date of grant.

The 1976 Plan

FUSA's 1976 Stock Option Plan (the "1976 Plan") provided for the purchase of FUSA common stock by officers and key employees of FUSA. The 1976 Plan provided for non-incentive stock options, all of which vested over a period not to exceed four years from the date of grant and expire not more than ten years from the date of grant. No options have been granted under the 1976 Plan after December 1986.

F-45

<PAGE>    317

FRESENIUS WORLDWIDE DIALYSIS

NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)

The 1985 Plan

FUSA's 1985 Special Stock Option Plan (the "1985 Plan") provided for the grant of non-incentive options to certain employees as compensation for an unanticipated two-week shutdown which occurred in 1985. All options under the 1985 Plan were granted in 1985, vested in 1986. The 1985 Plan expired in 1995.

The 1987 Plan

FUSA's 1987 Stock Option Plan (the "1987 Plan") currently provides for granting non-incentive and incentive stock options to key employees of FUSA. The stock options outstanding under the 1987 Plan vest in a period not to exceed four years and expire not more than ten years from the date of grant. Options granted under the 1987 Plan are exercisable on such other terms as determined by the Compensation Committee of the FUSA Board of Directors or by the FUSA Board of Directors.

In July, the Board of Directors of FUSA granted options to the President of FUSA to purchase 450,000 shares of FUSA common stock under the 1987 Plan. These options vest upon the earlier of (a) FUSA common stock attaining certain market prices, or (b) on June 30, 2002. As of December 31, 1995, options to purchase 225,000 shares of the total 450,000 shares of FUSA common stock have vested.

The 1989 Plan

In 1989, the Board of Directors approved the 1989 Special Stock Option Plan (the "1989 Plan"). All options granted under the 1989 Plan expire starting in August 1996 through May 1997 and are immediately exercisable upon issuance. No options were granted under the 1989 Plan after 1991.

The Directors' Plan

In June 1994, the stockholders of FUSA approved a Directors' Stock Option Plan (the "Directors' Plan"), pursuant to which each current non-employee director of FUSA received a grant of options for 30,000 shares of common stock vesting at a rate of 10,000 per year in each of 1994, 1995 and 1996. Two directors who are also either officers and/or directors of Fresenius declined to accept any options under the Directors' Plan.

Future non-employee directors will receive a grant of options for 30,000 shares of FUSA common stock upon their election. The options will vest at a rate of 10,000 per year on the first, second, and third anniversaries of the director's initial election.

During 1995, the Directors' Plan was amended to permit each director to elect whether to receive all or none of the directors' fees due to that director during a calendar year in the form of options. All options received in lieu of directors' fees vest 100% upon grant. With respect to each directors' fee payable in options, a non-employee director will receive an option for a number of shares of the Company's common stock determined by the following formula: (amount of directors' fee otherwise payable in cash) divided by (60% of the exercise price of the option), where the exercise price of the option is the closing price of FUSA's stock on the date the directors' fee would otherwise be paid. The options will expire ten years from the date of grant.

In connection with the Reorganization Agreement, it is anticipated that the FUSA stock options will be transferred into FMC options.

F-46

<PAGE>    318

FRESENIUS WORLDWIDE DIALYSIS

NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)

Stock option transactions are summarized as follows:

<TABLE>

XXX-002076

| | SHARES (IN THOUSANDS) | AVERAGE PRICE RANGE |
|---|---|---|
| Balance at December 31, 1993.................... | 1,930 | $1.88- 9.38 |
| Granted...................................... | 135 | 7.38- 7.50 |
| Exercised.................................... | 118 | 3.63- 7.13 |
| Canceled or expired......................... | 19 | 5.63- 7.50 |
| Balance at December 31, 1994.................... | 1,928 | 1.88- 9.38 |
| Granted...................................... | 461 | 12.75-17.25 |
| Exercised.................................... | 260 | 1.88- 9.38 |
| Balance at December 31, 1995.................... | 2,129 | $3.13-17.25 |
| Exercisable at December 31, 1995............... | 1,362 | $3.13-15.25 |

Stock option balances at December 31, 1995 and 1994, respectively and exercisable at December 31, 1995 do not include 20,500 options with options prices ranging from $32.00 to $88.70 These options expire August 4, 1996.

14.  COMMON STOCK WARRANTS

During 1993, FUSA issued a stock warrant for the purchase of 1,750,000 shares of FUSA common stock, at an exercise price of $8 per share expiring in 2003, as partial consideration for the acquisition of a renal dialysis business. In addition FUSA issued a warrant to Fresenius for the purchase of 1,700,000 shares of FUSA's common stock, at an exercise price of $8 per share expiring in 2003, as compensation for providing credit support to FUSA. In 1994, FUSA issued a second warrant to Fresenius for the purchase of 50,000 shares of FUSA's common stock, at an exercise price of $10.5685 per share expiring in 2004, as compensation for providing credit support to the Company. At December 31, 1995, FUSA had 3,500,000 shares of common stock reserved for the exercise of stock warrants.

15.  INCOME TAXES

Income before income taxes is attributable to the following geographic locations:

| | 1995 | 1994 |
|---|---|---|
| Germany............................................. | $ 88,007 | $57,532 |
| United States...................................... | 12,953 | 7,877 |
| Other.............................................. | 14,443 | 18,413 |
| | $115,403 | $83,822 |

F-47

<PAGE>  319

FRESENIUS WORLDWIDE DIALYSIS

NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)

Income tax expense (benefit) for the years ended December 31 consisted of the following:

| | 1995 | 1994 |
|---|---|---|
| Current: | | |
| German corporation and trade income taxes.............. | $38,503 | $24,003 |
| United States income taxes............................ | 1,304 | 846 |
| | $39,807 | 24,849 |
| Deferred: | | |
| Germany.............................................. | 667 | (2,041) |
| United States....................................... | (4,666) | -- |
| | (3,999) | (2,041) |
| Other............................................... | 4,769 | 6,371 |
| | $40,577 | $29,179 |

German corporation tax law applies a split rate, imputation system to the income taxation of a corporation and its shareholders. Upon distribution of retained earnings in the form of a dividend, shareholders subject to German tax receive an income tax credit for taxes paid by the corporation on such distributed earnings. In addition, the corporation receives a tax refund to the extent such earnings had been initially subjected to a corporation income tax in

excess of 30%. The tax refund is also distributed to the shareholder.

In general, retained German corporate income is initially subject to a federal corporation income tax of 45% (the "undistributed earnings rate"). Effective January 1, 1995, a surcharge of 7.5% on the federal corporate tax rate of 45% was introduced. Giving effect to the surcharge, the federal corporate tax rate for 1995 increases to 48.375%.

Upon distribution of retained earnings to stockholders, the German corporate income tax rate on the distributed earnings is adjusted to 30% (the "distributed earnings rate") by receiving a refund for taxes previously paid on income in excess of 30%. This refund is passed on to the shareholders through a gross up of the dividend from the corporation. For 1995, the distributed earnings rate is increased to 32.25% as a result of the surcharge.

For purposes of computing income tax expense for the Company's German operations, a complete distribution of each year's earnings is assumed. As such, the refund of tax described above is reflected in the income tax expense reconciliation presented below.

F-48

<PAGE>  320

FRESENIUS WORLDWIDE DIALYSIS

NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)

For the years ended December 31, 1995 and 1994, income tax expense differed from the amounts computed by applying the German federal corporation income tax rates of 48.375% and 45%, respectively, to income before income taxes as a result of the following:

| | 1995 | 1994 |
|---|---|---|
| Computed "expected" income tax expense at the undistributed earnings rate | $ 55,826 | $37,720 |
| Increase (decrease) in income taxes resulting from: | | |
| Items not deductible for tax purposes | 319 | 183 |
| Tax credit for assumed dividend distributions of each years earnings | (12,183) | (6,470) |
| Trade income taxes, net of German federal corporation income tax benefit | 7,220 | 3,818 |
| Foreign tax rate differential | (11,246) | (6,208) |
| Other | 641 | 136 |
| Provision for Income Taxes | $ 40,577 | $29,179 |
| Effective Tax Rate | 35.2% | 34.8% |

The tax effects of the temporary differences that give rise to deferred tax assets and liabilities at December 31 are presented below:

| | 1995 | 1994 |
|---|---|---|
| Deferred tax assets: | | |
| Inventory, primarily due to additional costs inventoried for tax purposes and inventory reserve accounts | $ 2,705 | $ 2,394 |
| Reserves for financial accounting purposes, not currently tax deductible | -- | 981 |
| Capital leases, principally due to capitalization of costs for tax purposes | 5,079 | 6,181 |
| Net operating loss carryforwards | 13,075 | 17,336 |
| Other | 3,029 | 2,642 |
| Total gross deferred tax assets | $ 23,888 | $ 29,534 |
| Less: Valuation allowance | (14,740) | (23,471) |
| Net deferred tax assets | $ 9,148 | $ 6,063 |
| Deferred tax liabilities: | | |
| Accounts receivable, primarily due to allowance for doubtful accounts | $ (664) | $ (1,192) |
| Reserves for financial accounting purposes, not currently taxable | (21) | -- |
| Plant and equipment, principally due to differences in depreciation | (3,734) | (3,566) |
| Total gross deferred tax liabilities | $ (4,419) | $ (4,758) |
| Net deferred tax asset (liability) | $ 4,729 | $ (1,305) |

XXX-002078

The valuation allowance at December 31, 1995 and 1994 decreased by $8,731 and $2,625, respectively. During 1995, the valuation allowance was reduced to reflect the deferred tax asset utilized to reduce current

F-49

<PAGE>    321

FRESENIUS WORLDWIDE DIALYSIS

NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)

income taxes and to recognize a deferred tax asset of $4,594 for one of the Company's subsidiaries. The recognized deferred tax asset is based upon expected utilization of net operating loss carryforwards that the Company expects will more likely than not be realized through the results of future operations.

At December 31, 1995, the Company has net operating losses ("NOL's") and tax credit carryforwards available to certain subsidiaries amounting to approximately $38,445. The majority of the NOL's expire in varying amounts beginning in 1998 through 2006. The NOL's are also subject to certain annual cumulative limitations.

16.  EMPLOYEE BENEFIT PLANS

The Company participates in various Fresenius pension plans. Plan benefits are generally based on employee years of service and final salary. Consistent with normal business custom in the Federal Republic of Germany, Fresenius' pension obligations are unfunded.

The combined pension expense for 1995 and 1994 for the principal pension plans included the following components:

<TABLE>
<CAPTION>

|  | 1995 | 1994 |
| --- | --- | --- |
| <S> | <C> | <C> |
| Service cost -- benefits earned during the period.......... | $1,347 | $1,045 |
| Interest cost on projected benefit obligation.............. | 938 | 741 |
| Net amortization and deferral............................. | 111 | 98 |
| Net pension expense....................................... | $2,396 | $1,884 |

</TABLE>

The following table sets forth the combined funded status of the Company's position in Fresenius' principal pension plans recognized in Fresenius' balance sheets as of December 31, 1995 and 1994..

<TABLE>
<CAPTION>

|  | ACCUMULATED BENEFITS IN EXCESS OF ASSETS | |
| --- | --- | --- |
|  | 1995 | 1994 |
| <S> | <C> | <C> |
| Actuarial present value of benefit obligations: |  |  |
| Vested benefit obligation............................ | $ 7,667 | $ 5,891 |
| Non-vested benefit obligation........................ | 4,560 | 3,776 |
| Accumulated benefit obligation....................... | $12,227 | $ 9,667 |
| Projected benefit obligation......................... | 15,657 | 12,409 |
| Unrecognized net gain................................ | 552 | 486 |
| Unrecognized transition asset (obligation)........... | (866) | (922) |
| Accrued pension cost................................. | $15,343 | $11,973 |

</TABLE>

The actuarial information was determined in 1995 and 1994 using an assumed discount rate of 7.0% and an assumed long-term rate of compensation increase of 4.0% (for employees older than the age of 35 a compensation increase rate of 5.0% was used).

In addition to the principal pension plans of Fresenius certain of the Company's combined affiliates offer separate retirement plans. The total accrued pension cost for these plans was $1,424 and $1,313 at December 31, 1995 and 1994, respectively.

FUSA employees are eligible to join FUSA's 401(k) Savings Plan once they have achieved a minimum of one year of service, 1,000 hours of service and attained the age of 18. Under the provisions of FUSA's

F-50

<PAGE>   322

FRESENIUS WORLDWIDE DIALYSIS

NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)

XXX-002079

(THOUSANDS, UNLESS OTHERWISE INDICATED)

401(k) Plan, FUSA contributes 2% of eligible employee base salary to the FUSA
401(k) Plan. FUSA's obligation to the FUSA 401(k) Plan was approximately $420
and $540, respectively, for the years ended December 31, 1995 and 1994.

17. LEGAL PROCEEDINGS

In the ordinary course of business, the Company is involved in various
legal actions. In the opinion of management, based upon the advice of counsel,
the resolution of these legal matters will not have a material effect upon the
Company or its financial condition.

18. RECENT ACCOUNTING PRONOUNCEMENTS

SFAS 121

In March 1995, the Financial Accounting Standards Board (the "FASB") issued
SFAS No. 121, "Accounting for Impairment of Long-Lived Assets and for Long-Lived
Assets to be Disposed Of". SFAS No. 121 is effective for financial statements
for fiscal years beginning after December 31, 1995. SFAS No. 121 requires that
long-lived assets and certain identifiable intangibles to be held and used by
the Company be reviewed for impairment whenever events or changes in
circumstances indicate that the carrying amount of an asset may not be
recoverable. In performing the review for recoverability, the Company estimates
the future cash flows expected to result from the use of the asset and its
eventual disposition. If the sum of the expected future cash flows is less than
the carrying amount of the asset, an impairment loss is recognized.

Measurement of an impairment loss for long-lived assets and identifiable
intangibles that the Company expects to hold and use should be based on the fair
value of the asset. Adoption of this statement in 1996 is not expected to affect
the Company's accounting treatment for long-lived assets.

SFAS 123

In October 1995, the FASB issued SFAS No. 123, "Accounting for Stock-Based
Compensation". SFAS No. 123 is effective beginning January 1, 1996 and applies
to all transactions in which an entity acquires goods or services by issuing
equity instruments such as common stock, except for employee stock ownership
plans. SFAS No. 123 establishes a new method of accounting for stock-based
compensation arrangements with employees which is fair value based. The
statement encourages (but does not require) employers to adopt the new method in
place of the provisions of Accounting Principles Board Opinion ("APB") No. 25,
"Accounting for Stock Issued to Employees". Companies may continue to apply the
accounting provisions of APB No. 25 in determining net income, however, they
must apply the disclosure requirements of SFAS No. 123.

If the Company adopts the fair value based method of SFAS No. 123, a higher
compensation cost would result for the Company's contingent or variable stock
options plans. The Company will adopt the disclosure provisions of SFAS No. 123
on January 1, 1996. Such adoption is not expected to impact operating results.

F-51

<PAGE>  323

FRESENIUS WORLDWIDE DIALYSIS

NOTES TO COMBINED FINANCIAL STATEMENTS -- (CONTINUED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)

19. BUSINESS SEGMENT INFORMATION

The Company operates in three general geographic areas. Information on the
Company's geographic operations is set forth in the table below:

<TABLE>
<CAPTION>

| 1995 | GERMANY | UNITED STATES | REST OF THE WORLD | ELIMINATION | TOTAL |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |
| <S> | <C> | <C> | <C> | <C> | <C> |
| REVENUES | | | | | |
| Third parties.............. | 375,793 | 302,447 | 218,300 | -- | 896,540 |
| Transfers between geographic areas................ | 168,186 | 2,517 | 41,022 | (211,725) | -- |
| TOTAL REVENUES............... | 543,979 | 304,964 | 259,322 | (211,725) | 896,540 |
| Export sales from Germany..... | 127,544 | -- | -- | -- | 127,544 |
| Net income................... | 48,837 | 11,204 | 9,674 | -- | 69,715 |
| Identifiable assets.......... | 230,373 | 232,778 | 180,867 | -- | 644,018 |

</TABLE>

<TABLE>
<CAPTION>

| 1994 | GERMANY | UNITED STATES | REST OF THE WORLD | ELIMINATION | TOTAL |
|---|---|---|---|---|---|

XXX-002080

| | $ | $ | $ | $ | $ |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| REVENUES | | | | | |
| Third parties............... | 279,626 | 250,314 | 189,903 | -- | 719,843 |
| Transfers between geographic areas................... | 136,175 | 4,029 | 33,835 | (174,039) | -- |
| TOTAL REVENUES................ | 415,801 | 254,343 | 223,738 | (174,039) | 719,843 |
| Export sales from Germany..... | 88,238 | -- | -- | -- | 88,238 |
| Net income................... | 35,570 | 4,481 | 12,042 | -- | 52,093 |
| Identifiable assets........... | 197,404 | 193,700 | 151,937 | -- | 543,041 |

</TABLE>

F-52

<PAGE>    324

FRESENIUS WORLDWIDE DIALYSIS

INTERIM COMBINED STATEMENTS OF OPERATIONS AND NET ASSETS

THREE MONTHS ENDED MARCH 31, 1996 AND 1995
(UNAUDITED)

(THOUSANDS, UNLESS OTHERWISE INDICATED)

<TABLE>
<CAPTION>

| | 1996 | 1995 |
|---|---|---|
| <S> | <C> | <C> |
| Net sales............................................... | $235,060 | $207,961 |
| Cost of sales.......................................... | 132,854 | 115,729 |
| Gross profit....................................... | 102,206 | 92,252 |
| Operating expenses: | | |
| Selling, general and administrative........................... | 60,832 | 54,299 |
| Research and development..................................... | 3,647 | 3,349 |
| Operating income........................................ | 37,727 | 34,604 |
| Other (income) expense: | | |
| Interest income........................................... | (1,153) | (749) |
| Interest expense.......................................... | 3,977 | 3,329 |
| Other, net............................................... | (1,523) | (700) |
| Income before income taxes................................... | 36,426 | 32,724 |
| Income tax expense........................................... | 13,067 | 12,462 |
| Income before minority interest.............................. | 23,359 | 20,262 |
| Minority interest........................................... | 1,694 | 1,102 |
| Net income................................................ | 21,665 | 19,160 |
| Net assets at beginning of the period......................... | 305,625 | 261,337 |
| Foreign currency translation adjustments...................... | (5,873) | 16,568 |
| Net activity with Fresenius................................... | 18,442 | (18,640) |
| Net assets at end of the period................................ | $339,859 | $278,425 |

</TABLE>

See accompanying notes to combined interim financial statements.

F-53

<PAGE>    325

FRESENIUS WORLDWIDE DIALYSIS

INTERIM COMBINED BALANCE SHEET

MARCH 31, 1996
(UNAUDITED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)

<TABLE>

| <S> | <C> |
|---|---|
| ASSETS | |
| Current assets: | |
| Cash and cash equivalents..................................... | $  31,398 |
| Trade accounts receivable, less allowance for doubtful accounts of $12,718 in 1995 and $11,917 in 1996.................................... | 184,324 |
| Inventories, net............................................. | 187,292 |
| Prepaid expenses and other current assets.................... | 19,702 |
| Deferred taxes............................................... | 4,467 |
| Total current assets................................... | 427,183 |
| Property, plant and equipment, net............................. | 138,754 |
| Intangible assets, net....................................... | 65,636 |
| Investments in affiliates.................................... | 18,786 |
| Deferred Taxes............................................... | 3,409 |
| Other assets................................................. | 24,991 |

```
                                                                          $ 678,759
                                                                          =========
LIABILITIES AND NET ASSETS (EQUITY)
Current liabilities:
     Accounts payable........................................................  $  36,804
     Accrued expenses........................................................     62,883
     Short-term borrowings...................................................    128,842
     Current portion of long-term debt and capital lease obligations.........     18,544
     Income taxes payable....................................................      2,390
     Other current liabilities...............................................     15,727
                                                                                ---------
          Total current liabilities..........................................    265,190
Long-term payable, less current portion......................................      1,275
Long-term debt and capital lease obligations, less current portion...........     21,065
Non-current borrowing from affiliate.........................................        274
Other liabilities............................................................      6,517
Pension liability............................................................     16,904
Deferred taxes...............................................................        805
Minority interest............................................................     26,870
                                                                                ---------
          Total liabilities..................................................    338,900
                                                                                ---------
Net assets...................................................................    339,859
                                                                                ---------
                                                                               $ 678,759
                                                                               =========
```

</TABLE>

See accompanying notes to interim combined financial statements.

F-54

<PAGE>  326

FRESENIUS WORLDWIDE DIALYSIS

INTERIM COMBINED STATEMENTS OF CASH FLOWS

THREE MONTHS ENDED MARCH 31, 1996 AND 1995
(UNAUDITED)
(THOUSANDS, UNLESS OTHERWISE INDICATED)

<TABLE>
<CAPTION>

|  | 1996 | 1995 |
|---|---|---|
| <S> | <C> | <C> |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net income....................................... | $ 21,665 | $ 19,160 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization.................... | 10,268 | 9,020 |
| Change in deferred tax........................... | (2,963) | (1,642) |
| Gain on sale of fixed assets..................... | (222) | (352) |
| Changes in assets and liabilities: | | |
| Trade accounts receivable, net................... | (2,918) | (9,904) |
| Inventories, net................................. | (7,423) | (5,748) |
| Prepaid expenses and other current assets........ | (4,922) | 1,461 |
| Other assets..................................... | (1,072) | (4,134) |
| Accounts payable and accrued expenses............ | 478 | 5,637 |
| Other current and non-current liabilities........ | (1,642) | (1,154) |
| Income taxes payable............................. | 1,502 | 694 |
|  | -------- | -------- |
| Net cash provided by operating activities........ | 12,751 | 13,038 |
|  | -------- | -------- |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Purchases of property, plant and equipment....... | (17,792) | (14,250) |
| Proceeds from sale of property, plant and equipment | 2,429 | 13,909 |
| Acquisitions and capital increases in affiliates. | (191) | (1,025) |
|  | -------- | -------- |
| Net cash used in investing activities............ | (15,554) | (1,366) |
|  | -------- | -------- |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Proceeds from short-term borrowings.............. | 48,433 | 58,626 |
| Repayments of short-term borrowings.............. | (27,823) | (47,301) |
| Proceeds from long-term debt and capital lease obligations...... | 5,682 | 6,389 |
| Principal payments of long-term debt and capital lease obligations............................... | (24,792) | (12,622) |
| Proceeds from issuance of common stock........... | 851 | 276 |
| Net activity with Fresenius...................... | 18,252 | (18,661) |
| Change in minority interest..................... | 1,694 | 1,102 |
|  | -------- | -------- |
| Net cash used in financing activities............ | 22,297 | (12,191) |
|  | -------- | -------- |
| Net increase (decrease) in cash and cash equivalents | 19,494 | (519) |
| Effect of exchange rates on cash and cash equivalents | (187) | 653 |
| Cash and cash equivalents at beginning of period. | 12,091 | 11,973 |
|  | -------- | -------- |
| Cash and cash equivalents at end of period....... | $ 31,398 | $ 12,107 |
|  | ======== | ======== |

</TABLE>

See accompanying notes to interim combined financial statements.

F-55

XXX-002082

FRESENIUS WORLDWIDE DIALYSIS

NOTES TO INTERIM COMBINED FINANCIAL STATEMENTS

1. BASIS OF PRESENTATION

The accompanying combined financial statements have been prepared in accordance with United States generally accepted accounting principles ("U.S. GAAP") on a basis which reflects the combined historical financial statements of Fresenius Worldwide Dialysis businesss ("FWD" or the "Company"), including Sterilpharma GmbH, assuming that the Company, currently a business unit of Fresenius AG, was organized for all periods presented as a separate legal entity, owning certain net assets and certain subsidiaries and associated companies of Fresenius. The accompanying interim combined financial statements as of March 31, 1996 and 1995 should be read in conjunction with the combined financial statements for the years ended December 31, 1995 and 1994, respectively, and the notes thereto contained elsewhere in this Joint Proxy Statement-Prospectus.

2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

(a) Business

The business of the Company is the development, manufacture and distribution of equipment and related products for all forms of kidney dialysis treatment and the providing of kidney dialysis treatment and related services.

(b) Inventories

Inventories are stated at the lower of cost (determined by using the average or first-in first-out method) or market value.

The inventories consisted of the following:

<TABLE>
<CAPTION>

|  | MARCH 31, 1996 |
| --- | --- |
| <S> | <C> |
| Raw Materials and purchased components................................... | $ 62,337 |
| Work in process......................................................... | 23,633 |
| Finished goods.......................................................... | 106,441 |
|  | ------- |
|  | 192,411 |
| Reserves................................................................ | (5,119) |
|  | ------- |
| Inventories, net........................................................ | $ 187,292 |
|  | ======= |

</TABLE>

(c) Other Assets

In 1995, Fresenius USA, Inc. completed construction of a dialysis plant addition to its manufacturing facility in Ogden, Utah. Included in other assets are $7,989 of validation costs, net of accumulated amortization of $557, incurred to qualify the products and the associated manufacturing processes for approval by the U.S. Food and Drug Administration. Such costs are being amortized on a straight-line basis over an estimated useful life of 3 years upon commencement of manufacturing.

(d) Management Representation

The accompanying interim combined financial statements which are unaudited have been prepared by the Company, pursuant to the rules and regulations of the Securities and Exchange Commission, and reflect all adjustments (consisting only of normal recurring adjustments) which, in the opinion of management, are necessary for a fair statement of the results for the interim period presented. Operating results for the three month period ended March 31, 1996 are not necessarily indicative of the results to be expected for the year.

F-56

INDEPENDENT AUDITORS' REPORT

The Board of Directors
  and Stockholders Fresenius USA, Inc. and Subsidiaries:

We have audited the accompanying consolidated balance sheets of Fresenius USA, Inc. and subsidiaries as of December 31, 1995 and 1994 and the related consolidated statements of income, stockholders' equity and cash flows for each of the years in the three-year period ended December 31, 1995. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes

XXX-002083

assessing the accounting principles used and significant estimates made by
management, as well as evaluating the overall financial statement presentation.
We believe that our audits provide a reasonable basis for our opinion.

   In our opinion, the consolidated financial statements referred to above
present fairly, in all material respects, the financial position of Fresenius
USA, Inc. and subsidiaries as of December 31, 1995 and 1994 and the results of
their operations and their cash flows for each of the years in the three-year
period ended December 31, 1995, in conformity with generally accepted accounting
principles.

                              KPMG PEAT MARWICK LLP

San Francisco, California
February 2, 1996

                              F-57

<PAGE>  329

                  FRESENIUS USA, INC. AND SUBSIDIARIES

                     CONSOLIDATED BALANCE SHEETS
          (DOLLARS AND SHARES IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

<TABLE>
<CAPTION>

|  |  DECEMBER 31, | |
| --- | --- | --- |
|  | 1995 | 1994 |
| <S> | <C> | <C> |
| ASSETS | | |
| Current assets: | | |
| Cash........................................................ | $ 2,330 | $ 2,315 |
| Trade accounts receivable, less allowance for doubtful accounts of $1,324 | | |
| in 1995 and $1,744 in 1994..................................... | 57,052 | 42,671 |
| Inventories, net............................................. | 65,706 | 52,704 |
| Prepaid expenses and other current assets.................... | 3,258 | 1,893 |
| Deferred taxes............................................... | 4,594 | -- |
| Total current assets........................................ | 132,940 | 99,583 |
| Property, plant and equipment, net.......................... | 48,492 | 45,956 |
| Intangible assets, net...................................... | 36,863 | 39,498 |
| Other assets, net........................................... | 6,626 | 311 |
|  | $224,921 | $185,348 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
| Current liabilities: | | |
| Accounts payable............................................ | $ 16,276 | $ 13,128 |
| Accounts payable to affiliates, net........................ | 41,229 | 33,361 |
| Accrued expenses........................................... | 13,577 | 12,214 |
| Short-term borrowings...................................... | 33,149 | 22,330 |
| Short-term borrowings from Fresenius AG.................... | 3,650 | 4,380 |
| Current portion of long-term debt and capital lease obligations...... | 11,703 | 9,496 |
| Income taxes payable....................................... | 365 | 95 |
| Total current liabilities.................................. | 119,949 | 95,004 |
| Note payable, less current portion........................ | 1,275 | 1,861 |
| Note payable to FNA........................................ | 274 | 274 |
| Long-term debt and capital lease obligations, less current portion..... | 24,821 | 27,637 |
| Total liabilities......................................... | 146,319 | 124,776 |
| Commitments and contingencies (notes 12, 13, 16, 19 and 21) | | |
| Stockholders' equity: | | |
| Series F preferred stock, authorized 600 shares, $1.00 par value, 200 shares issued and outstanding......................... | 200 | 200 |
| Common stock, authorized 40,000 shares, $.01 par value, issued and outstanding 21,465 shares in 1995 and 21,205 shares in 1994...... | 215 | 212 |
| Capital in excess of par value............................. | 141,136 | 139,510 |
| Currency translation adjustment........................... | (80) | (94) |
| Accumulated deficit........................................ | (62,869) | (79,256) |
| Total stockholders' equity................................. | 78,602 | 60,572 |
|  | $224,921 | $185,348 |

</TABLE>

        See accompanying notes to consolidated financial statements.

                              F-58

<PAGE>  330

                  FRESENIUS USA, INC. AND SUBSIDIARIES

                  CONSOLIDATED STATEMENTS OF INCOME
          (DOLLARS AND SHARES IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

<TABLE>

XXX-002084

<CAPTION>

|  | YEARS ENDED DECEMBER 31, | | |
|---|---|---|---|
|  | 1995 | 1994 | 1993 |
| <S> | <C> | <C> | <C> |
| Net sales.................................................. | $304,964 | $254,344 | $205,960 |
| Cost of sales............................................. | 212,102 | 175,766 | 140,960 |
| Gross profit.............................................. | 92,862 | 78,578 | 65,000 |
| Operating expenses: |  |  |  |
|   Selling, general and administrative...................... | 72,547 | 64,643 | 54,213 |
|   Research and development................................. | 2,289 | 1,846 | 1,500 |
|     Operating income.................................... | 18,026 | 12,089 | 9,287 |
| Other expense (income): |  |  |  |
|   Interest income.......................................... | (218) | (303) | (204) |
|   Interest expense......................................... | 5,142 | 4,498 | 4,835 |
|   Equity in earnings of Fresenius Brent................... | -- | -- | (86) |
|   Other, net............................................... | 149 | 17 | 149 |
|     Income before income taxes.......................... | 12,953 | 7,877 | 4,593 |
| Income tax expense (benefit)............................... | (3,434) | 723 | 900 |
|     Net income.......................................... | $ 16,387 | $ 7,154 | $ 3,693 |
| Net income per common and common equivalent share: |  |  |  |
|   Primary.................................................. | $.61 | $.32 | $.18 |
|   Fully diluted............................................ | $.59 | $.31 | $.18 |
| Weighted average number of shares of common stock and common stock equivalents used to compute net income per common and common equivalent share: |  |  |  |
|   Primary.................................................. | 26,647 | 23,926 | 20,660 |
|   Fully diluted............................................ | 27,844 | 23,926 | 20,660 |

</TABLE>

See accompanying notes to consolidated financial statements.

F-59

<PAGE> 331

FRESENIUS USA, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
YEARS ENDED DECEMBER 31, 1995, 1994 AND 1993
(IN THOUSANDS)

<TABLE>
<CAPTION>

|  | PREFERRED STOCK | | COMMON STOCK | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | NUMBER OF SHARES | AMOUNT | NUMBER OF SHARES | AMOUNT | CAPITAL IN EXCESS OF PAR VALUE | CURRENCY TRANSLATION ADJUSTMENT | ACCUMULATED DEFICIT | TOTAL STOCKHOLDERS' EQUITY |
| <S> | <C> | <C> | <C> | <C> | <C> | <C> | <C> | <C> |
| Balances, December 31, 1992............ | 200 | $200 | 17,169 | $172 | $ 120,796 | $ (28) | $ (90,103) | $ 31,037 |
| Conversion of note receivable into common stock....................... | -- | -- | 468 | 4 | 1,705 | -- | -- | 1,709 |
| Issuance of common stock warrants.... | -- | -- | -- | -- | 449 | -- | -- | 449 |
| Proceeds from issuance of common stock................................ | -- | -- | -- | -- | 162 | -- | -- | 162 |
| Currency translation adjustment...... | -- | -- | -- | -- | -- | (44) | -- | (44) |
| Net income........................... | -- | -- | -- | -- | -- | -- | 3,693 | 3,693 |
| Balances, December 31, 1993............ | 200 | 200 | 17,637 | 176 | 123,112 | (72) | (86,410) | 37,006 |
| Proceeds from issuance of common stock in public offering............ | -- | -- | 3,450 | 35 | 16,142 | -- | -- | 16,177 |
| Proceeds from issuance of common stock through exercise of options........................... | -- | -- | 118 | 1 | 511 | -- | -- | 512 |
| Loan receivable for exercise of stock option............................. | -- | -- | -- | -- | (255) | -- | -- | (255) |
| Currency translation adjustment...... | -- | -- | -- | -- | -- | (22) | -- | (22) |
| Net income........................... | -- | -- | -- | -- | -- | -- | 7,154 | 7,154 |
| Balances, December 31, 1994............ | 200 | 200 | 21,205 | 212 | 139,510 | (94) | (79,256) | 60,572 |
| Common stock offering costs........... | -- | -- | -- | -- | (188) | -- | -- | (188) |
| Proceeds from issuance of common stock through exercise of options........................... | -- | -- | 260 | 3 | 1,605 | -- | -- | 1,608 |
| Repayment of loan receivable for exercise of stock option........... | -- | -- | -- | -- | 209 | -- | -- | 209 |
| Currency translation adjustment...... | -- | -- | -- | -- | -- | 14 | -- | 14 |
| Net income........................... | -- | -- | -- | -- | -- | -- | 16,387 | 16,387 |
| Balances, December 31, 1995............ | 200 | $200 | 21,465 | $215 | $ 141,136 | $ (80) | $ (62,869) | $ 78,602 |

</TABLE>

XXX-002085

See accompanying notes to consolidated financial statements.

F-60

<PAGE> 332

FRESENIUS USA, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS
(IN THOUSANDS)

<TABLE>
<CAPTION>

| | YEARS ENDED DECEMBER 31, | | |
| | 1995 | 1994 | 1993 |
| <S> | <C> | <C> | <C> |
| Cash flows from operating activities: | | | |
| Net income.................................................... | $ 16,387 | $ 7,154 | $ 3,693 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | |
| Depreciation and amortization...................... | 10,591 | 8,772 | 6,893 |
| Equity in earnings of Fresenius Brent................. | -- | -- | (86) |
| Deferred tax benefit................................. | (4,666) | -- | -- |
| Gain on sale of fixed assets......................... | -- | (46) | (75) |
| Stock warrant issued to Fresenius AG as compensation for credit support................................. | -- | -- | 75 |
| Changes in operating assets and liabilities: | | | |
| Trade accounts receivable, net....................... | (14,381) | (2,679) | (14,090) |
| Accounts receivable from affiliated companies, net.................................................. | -- | -- | 1,820 |
| Inventories, net..................................... | (13,410) | (9,199) | (6,800) |
| Other current and non-current assets................. | (1,219) | 696 | (837) |
| Accounts payable and accrued expenses................ | 4,511 | (299) | 12,514 |
| Income taxes payable................................. | 270 | (358) | 453 |
| Increase in net operating assets resulting from the acquisition of Fresenius Brent.................... | -- | -- | 782 |
| Net cash (used in) provided by operating activities................................... | (1,917) | 4,041 | 4,342 |
| Cash flows from investing activities: | | | |
| Purchase of Abbott's renal dialysis business............. | -- | -- | (31,000) |
| Expenditures for the direct costs of acquisitions........ | -- | -- | (737) |
| Purchases of property, plant and equipment............... | (37,106) | (25,963) | (8,226) |
| Dispositions of property, plant and equipment............ | 1,312 | 429 | -- |
| Proceeds from sale of property, plant and equipment...... | -- | 46 | 128 |
| Validation cost expenditures............................. | (6,642) | -- | -- |
| Net cash used in investing activities............ | (42,436) | (25,488) | (39,835) |

</TABLE>

See accompanying notes to consolidated financial statements.

F-61

<PAGE> 333

FRESENIUS USA, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS -- (CONTINUED)
(IN THOUSANDS)

<TABLE>
<CAPTION>

| | YEARS ENDED DECEMBER 31, | | |
| | 1995 | 1994 | 1993 |
| <S> | <C> | <C> | <C> |
| Cash flows from financing activities: | | | |
| Changes in accounts payable to affiliates, net........... | $ 7,868 | $ 5,083 | $ 5,386 |
| Proceeds from short-term borrowings...................... | 55,949 | 17,911 | 10,264 |
| Proceeds from capital lease financing.................... | 9,103 | -- | -- |
| Proceeds from sale/leaseback of equipment................ | 26,970 | -- | -- |
| Repayment of short-term borrowings....................... | (45,130) | (9,785) | (2,430) |
| (Repayments of) proceeds from long-term payable.......... | (586) | (556) | 2,417 |
| Proceeds from long-term borrowings....................... | -- | -- | 25,000 |
| Principal payments of long-term debt and capital lease obligations.................................... | (11,435) | (10,877) | (1,178) |
| Proceeds from issuance of common stock................... | 1,629 | 16,689 | 162 |
| Loan receivable for exercise of stock option............. | -- | (255) | -- |
| Net cash provided by financing activities........ | 44,368 | 18,210 | 39,621 |
| Net increase (decrease) in cash.......................... | 15 | (3,237) | 4,128 |
| Cash at beginning of year................................ | 2,315 | 5,552 | 1,424 |
| Cash at end of year...................................... | $ 2,330 | $ 2,315 | $ 5,552 |
| Supplementary cash flow information: | | | |
| Cash paid for interest, net of amounts capitalized....... | $ 4,848 | $ 2,793 | $ 3,237 |
| Cash paid for income taxes............................... | $ 966 | $ 1,126 | $ 477 |

</TABLE>

Supplementary schedule of non-cash activities:

| | | | |
|---|---|---|---|
| Acquisition of equipment through obligations under capital leases.......................................... | $ 1,248 | $ 1,094 | $ 1,231 |
| Disposal of assets under capital leases................. | $ 255 | $ 135 | $ -- |
| Acquisition of license technology in exchange for inventory and debt.......................................... | $ -- | $ 908 | $ -- |
| Note payable issued as partial consideration for the Abbott acquisition................................... | $ -- | $ -- | $ 10,629 |
| Issuance of common stock warrants....................... | $ -- | $ -- | $ 449 |
| Common stock issued upon conversion of the note receivable from Fresenius Brent...................... | $ -- | $ -- | $ 1,709 |

</TABLE>

See accompanying notes to consolidated financial statements.

F-62

<PAGE> 334

FRESENIUS USA, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
DECEMBER 31, 1995, 1994 AND 1993
(DOLLARS IN THOUSANDS, EXCEPT PER SHARE AMOUNTS)

1. DESCRIPTION OF BUSINESS

Fresenius USA, Inc. and subsidiaries (the "Company") is a manufacturer and distributor of medical products and systems for sale primarily in the United States and Canada for the treatment of kidney failure by hemodialysis and by peritoneal dialysis. The Company is one of only two companies in the United States offering a full line of both hemodialysis and peritoneal dialysis machines and disposable products. These products are used to cleanse a patient's blood of waste products and fluids normally eliminated by properly functioning kidneys. The Company also sells cell separation products designed for the therapeutic removal of diseased blood components as well as collection of donor blood components for transfusion.

2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

(a) Principles of Consolidation

The consolidated financial statements include the accounts of Fresenius USA, Inc. and its wholly owned subsidiaries. All significant intercompany balances and transactions have been eliminated in consolidation.

(b) Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

(c) Inventories

Inventories are stated at the lower of cost (determined by using the first-in, first-out method) or market value.

(d) Property, Plant and Equipment

Property, plant, and equipment are stated at cost. Property and equipment under capital leases are stated at the present value of future minimum lease payments at the inception of the lease.

Depreciation on property, plant and equipment is calculated using the straight-line method over the estimated useful lives of the assets ranging from three to thirty years. Property and equipment held under capital leases and leasehold improvements are amortized using the straight-line method over the shorter of the lease term or estimated useful life of the asset.

The Company capitalizes interest on borrowed funds during construction periods. Interest capitalized during 1995, 1994 and 1993 was $526, $481, and $22, respectively.

(e) Intangible Assets

Intangible assets consist of goodwill (the excess cost over net assets acquired), manufacturing technology, patents, distribution rights, licenses and other intangible assets. Intangible assets are amortized on a straight-line basis over the estimated useful lives of the assets ranging from four to twenty-five years.

The Company assesses the recoverability of intangible assets by determining whether the amortization of the asset's balance over its remaining life can be recovered through projected undiscounted future cash flows.

XXX-002087

F-63

<PAGE>   335

FRESENIUS USA, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

(f) Other Assets

     In 1995, the Company completed construction of a dialyzer plant addition to
its manufacturing facility in Ogden, Utah. Included in other assets are $6,375
of validation costs, net of accumulated amortization of $267, incurred to
qualify the products and the associated manufacturing processes for approval by
the U.S. Food and Drug Administration. Such costs are being amortized on a
straight-line basis over an estimated useful life of 3 years upon commencement
of manufacturing.

(g) Derivative Financial Instruments

     Forward currency contracts -- Gains and losses on forward currency
contracts that are designated and effective as hedges of existing assets,
liabilities and firm commitments are deferred and recognized along with the
effects of the hedged transaction.

     Interest rate swaps -- Interest rate agreements that are designated as a
hedge of debt or other long-term obligations are accounted for on an accrual
basis. That is, the interest payable and interest receivable under the swaps
terms are accrued and recorded as an adjustment to the interest or rent expense
of the designated liability or obligation.

     Amounts due from and payable to the counterparties of interest rate swaps
are recorded on an accrual basis at each reporting date based on amounts
computed by reference to the respective interest rate swap contract. Realized
gains and losses that occur from the early termination or expiration of
contracts are recorded in income over the remaining period of the original swap
agreement.

(h) Foreign Currency Translation

     The financial statements of the Company's foreign subsidiaries are
translated into U.S. dollars in accordance with Statement of Financial
Accounting Standards No. 52. Net assets of the subsidiaries with "functional"
currencies other than the U.S. dollar are translated at the year-end rate of
exchange. Income and expense items are translated at the average exchange rate
for the year. The resulting translation adjustments are recorded as a separate
component of stockholders' equity.

(i) Revenue Recognition Policy

     Revenues are recognized when title to the product has passed to the buyer,
either at the time of shipment or upon receipt by the customer.

(j) Research and Development Expenses

     Research and development expenses are expensed as incurred.

(k) Income Taxes

     Deferred tax assets and liabilities are recognized for the future
consequences attributable to differences between the financial statement
carrying amounts of existing assets and liabilities and their respective tax
basis. Deferred tax assets and liabilities are measured using enacted tax rates
expected to apply to taxable income in the years in which those temporary
differences are expected to be recovered or settled.

(l) Net Income Per Common and Common Equivalent Share

     Net income per common share was computed by dividing net income by the
weighted average number of shares of common stock and common stock equivalents
outstanding during each year based on the modified treasury stock method. Stock
options, common stock warrants, and the Series F preferred stock are considered
to be common stock equivalents.

F-64

<PAGE>   336

FRESENIUS USA, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

     The application of the treasury stock method is modified when the
outstanding number of common shares which would be issued if all outstanding
options and warrants and their equivalents were exercised exceeds 20% of the
number of common shares outstanding at the end of the period. When this 20% test
is met, the treasury stock method is first applied to purchase no more than 20%
of the number of common shares outstanding at the end of the period. The balance
of any proceeds remaining is then applied to reduce debt with appropriate
recognition given for any interest expense savings net of income tax expense.
These calculations are aggregated to determine whether the effect on net income
per common share is dilutive or antidilutive. When dilutive, all of the
calculations are utilized when computing net income per common share.

     The computation of fully diluted income per common share would also include
the effect of converting other outstanding securities such as convertible debt,

XXX-002088

when the effect is dilutive, and the additional dilution related to stock
options when the market price at the end of the period is higher than the
average price for the period.

(m) Major Customers and Concentrations of Credit Risk

Trade receivables are financial instruments which potentially expose the
Company to concentrations of credit risk. As of December 31, 1995, approximately
10% of the recorded trade receivables were concentrated with a major customer.
To reduce credit risk, the Company performs ongoing credit evaluations of its
customers' financial condition. The Company does not require collateral on
credit sales to its customers. Revenues from the major customer constituted 12%
of total revenues for the year ended December 31, 1995.

(n) Reclassifications

Certain reclassifications not affecting the Company's net income have been
made to the 1994 and 1993 consolidated financial statements to conform to the
1995 presentation.

3.  RECENT ACCOUNTING PRONOUNCEMENTS

SFAS No. 123

In October 1995, the Financial Accounting Standards Board issued Statement
of Financial Accounting Standards (SFAS) No. 123, "Accounting for Stock-Based
Compensation". SFAS No. 123 is effective beginning January 1, 1996 and applies
to all transactions in which an entity acquires goods or services by issuing
equity instruments such as common stock, except for employee stock ownership
plans. SFAS No. 123 establishes a new method of accounting for stock-based
compensation arrangements with employees which is fair value based. The
statement encourages (but does not require) employers to adopt the new method in
place of the provisions of Accounting Principles Board Opinion ("APB") No. 25,
"Accounting for Stock Issued to Employees". Companies may continue to apply the
accounting provisions of APB No. 25 in determining net income, however, they
must apply the disclosure requirements of SFAS No. 123. If the Company adopts
the fair value based method of SFAS No. 123, a higher compensation cost would
result for fixed stock option plans and a different compensation cost will
result for the Company's contingent or variable stock option plans. The Company
will adopt the disclosure provisions of SFAS No. 123 on January 1, 1996. Such
adoption is not expected to impact operating results.

SFAS No. 121

In March 1995, the Financial Accounting Standards Board issued SFAS No.
121, "Accounting for Impairment of Long-Lived Assets and for Long-Lived Assets
to be Disposed Of ". SFAS No. 121 is effective for financial statements for
fiscal years beginning after December 31, 1995. SFAS No. 121 requires that long-
lived assets and certain identifiable intangibles to be held and used by the
Company be reviewed for impairment whenever events or changes in circumstances
indicate that the carrying amount of an asset may

                                      F-65

<PAGE>   337

                      FRESENIUS USA, INC. AND SUBSIDIARIES

                NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

not be recoverable. In performing the review for recoverability, the Company
estimates the future cash flows expected to result from the use of the asset and
its eventual disposition. If the sum of the expected future cash flows is less
than the carrying amount of the asset, an impairment loss is recognized.
Measurement of an impairment loss for long-lived assets and identifiable
intangibles that the Company expects to hold and use should be based on the fair
value of the asset. Adoption of this statement in 1996 is not expected to effect
the Company's accounting treatment for long-lived assets.

4.  INVESTMENTS AND ACQUISITIONS

Investment in Fresenius Brent

On January 17, 1990, the Company formed a joint venture ("Fresenius Brent")
with Medihold Ltd. to market and sell the Company's medical products in Canada.
The Company's initial investment in Fresenius Brent, a Canadian operation, was
$200 Canadian dollars (approximately $168 U.S.). This investment was accounted
for using the equity method through May 1993. The Company's 1992 investment
balance differed from the Company's 50% underlying equity in Fresenius Brent due
to the elimination of intercompany profits remaining in Fresenius Brent's ending
inventories.

During May 1993, the Company purchased the remaining 50% equity in
Fresenius Brent from Medihold Ltd. in exchange for a $1,709 convertible note.
The excess of the purchase price over the fair value of the net assets acquired
of $1,318 has been recorded as goodwill and is being amortized on a
straight-line basis over 20 years. In July 1993, the note was converted into
434,000 shares of the Company's common stock.

The balance sheet of Fresenius Brent has been included in the Company's
consolidated financial statements as of December 31, 1995 and 1994. The results
of operations of Fresenius Brent have been included in the consolidated
financial statements since May 1, 1993. All significant intercompany balances
and transactions have been eliminated.

XXX-002089

Critikon(R) Purchase

    On July 15, 1992, the Company purchased from Critikon(R), Inc., a
subsidiary of Johnson and Johnson, certain patents, inventory and other assets
used in connection with its RATEMINDER(R) fluid delivery product line for
approximately $3,700. The $3,700 purchase price included a cash payment of $500
and an obligation of $3,200 paid as inventory is used. At December 31, 1995, the
Company owed $1,565 to be paid as inventory is used. The acquisition has been
accounted for using the purchase method of accounting.

    Abbott Acquisition

    On February 24, 1993, the Company purchased from Abbott Laboratories
("Abbott") certain assets used in connection with its renal dialysis business in
the United States, Australia and New Zealand for a total purchase price of
$41,857. As consideration for the purchase, the Company paid $31,000 in cash,
issued a term note payable for $10,629, and granted a common stock warrant for
the purchase of 1,750,000 shares of the Company's common stock which was valued
at $228. The common stock issuable upon exercise of the warrant is subject to
certain registration rights. The acquisition has been accounted for using the
purchase method of accounting and, accordingly, the results of operations from
the acquisition have been included in the Company's consolidated financial
statements from February 24, 1993 (see Note 23). The excess of the purchase
price over the fair value of the net identifiable assets acquired of $19,378 has
been recorded as

                                       F-66

<PAGE>    338

                        FRESENIUS USA, INC. AND SUBSIDIARIES

               NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

goodwill and is being amortized on a straight-line basis over 25 years. The
assets acquired from Abbott consisted of the following:

<TABLE>

| | |
|---|---|
| Rental equipment.................................................. | $ 3,000 |
| Manufacturing technology.......................................... | 15,629 |
| Patents........................................................... | 2,500 |
| Distribution rights............................................... | 1,250 |
| Covenant not to compete........................................... | 100 |
| Goodwill.......................................................... | 19,378 |
| | -------- |
| | $41,857 |
| | ======== |

</TABLE>

    With respect to the products acquired from Abbott, the Company has retained
the exclusive rights in the United States (the rights to Canada and Mexico were
retained by Abbott), has granted Fresenius Aktiengesellschaft (Fresenius AG) a
non-exclusive sublicense with respect to these products in Central and South
America, Australia and New Zealand and an exclusive (with respect to the
Company) sublicense with respect to all other areas acquired from Abbott,
including Europe in exchange for the credit support provided by Fresenius AG to
finance the acquisition.

5.  INVENTORIES

    As of December 31, inventories consisted of the following:

<TABLE>
<CAPTION>

| | 1995 | 1994 |
|---|---|---|
| Raw materials and purchased components.................. | $ 32,192 | $ 23,071 |
| Work in process........................................ | 10,504 | 4,237 |
| Finished goods......................................... | 25,707 | 27,464 |
| | -------- | -------- |
| | 68,403 | 54,772 |
| Reserves............................................... | (2,697) | (2,068) |
| | -------- | -------- |
| Inventories, net....................................... | $ 65,706 | $ 52,704 |
| | ======== | ======== |

</TABLE>

    Depreciation expense for demo and evaluation inventory was $408 for the
year ended December 31, 1995 which was charged to the inventory reserve. There
was no depreciation expense for this inventory in 1994 or 1993.

                                       F-67

<PAGE>    339

                        FRESENIUS USA, INC. AND SUBSIDIARIES

               NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

6.  PROPERTY, PLANT AND EQUIPMENT

    As of December 31, property, plant and equipment consisted of the
following:

XXX-002090

| | 1995 | 1994 |
|---|---|---|
| Land.............................................. | $    344 | $    325 |
| Buildings and improvements........................ | 19,013 | 10,353 |
| Machinery and equipment........................... | 29,071 | 14,596 |
| Machinery, equipment and rental equipment under | | |
|   capital leases.................................. | 9,816 | 11,429 |
| Rental equipment.................................. | 17,031 | 17,160 |
| Loaned equipment.................................. | 2,784 | 2,353 |
| Construction in progress.......................... | 2,693 | 16,286 |
| | 80,752 | 72,502 |
| Accumulated depreciation and amortization......... | (32,260) | (26,546) |
| Property, plant and equipment, net................. | $ 48,492 | $ 45,956 |

Depreciation and amortization expense for property, plant and equipment amounted to $7,281, $6,541 and $5,140 for the years ended December 31, 1995, 1994 and 1993, respectively.

Included in property, plant and equipment as of December 31, 1995 and 1994, was $14,619 and $11,521, respectively, of net rental equipment. The rental equipment consists of peritoneal dialysis cycler machines which the Company leases to customers with end stage renal disease on a month-to-month basis. Rental income for this equipment was $1,767, $2,203 and $1,586 for the years ended December 31, 1995, 1994 and 1993, respectively.

Included in property, plant and equipment as of December 31, 1995 were approximately $2 million of engineering charges from Fresenius AG associated with construction of the dialyzer plant in Odgen, Utah.

Accumulated depreciation related to machinery, equipment and rental equipment under capital leases was $2,588 and $9,094 at December 31, 1995 and 1994, respectively.

7. INTANGIBLE ASSETS

As of December 31, intangible assets consisted of the following:

| | 1995 | 1994 |
|---|---|---|
| Goodwill.......................................... | $20,795 | $20,795 |
| Manufacturing technology.......................... | 15,629 | 15,629 |
| Patents........................................... | 3,421 | 3,421 |
| Distribution rights............................... | 1,250 | 1,250 |
| Other............................................. | 2,927 | 2,927 |
| | 44,022 | 44,022 |
| Accumulated amortization.......................... | (7,159) | (4,524) |
| Intangible assets, net............................ | $36,863 | $39,498 |

Amortization expense for intangible assets amounted to $2,635, $2,231 and $1,753 for the years ended December 31, 1995, 1994 and 1993, respectively.

F-68

FRESENIUS USA, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

8. SHORT-TERM BORROWINGS

Short-term borrowings of $33,149 and $22,330 at December 31, 1995 and 1994, respectively, represent amounts borrowed under lines of credit with six commercial banks. The Company pays commitment fees ranging from 1/8% - 1/4% per annum on the unused portion of the commitments. The weighted average interest rate on short-term borrowings outstanding as of December 31, 1995 and 1994 was 6.55% and 5.48%, respectively. The lines of credit at December 31, 1995 expire through May 1996 and are expected to be renewed by the Company. In March 1995, the Company replaced a $15.0 million line of credit supported by Fresenius AG with a $20.0 million line of credit from a commercial bank independent of support from Fresenius AG. This line of credit is secured by the Company's accounts receivable and contains various covenants including, but not limited to, requirements for maintaining defined levels of working capital, net worth, capital expenditures and various financial ratios.

The Company had lines of credit totaling $47,000 of which $13,851 remains available to be borrowed at December 31, 1995. Fresenius AG has provided credit support for $27,000 of these lines of credit (see Note 19).

9. SHORT-TERM BORROWINGS FROM FRESENIUS AG

XXX-002091

At December 31, 1995 and 1994, short-term borrowings under a line of credit from Fresenius AG consist of $3,650 and $4,380, respectively. As of December 31, 1995, the total borrowing available under the line of credit is $3,650 with a weighted average interest rate of 7.563%. The line expires in the first quarter of 1996 and is expected to be renewed by the Company.

10.  NOTE PAYABLE

In connection with the Abbott acquisition, the Company entered into an obligation relating to the purchase of Optum(R) devices. During 1993, the Company fulfilled this obligation by taking possession of these Optum(R) devices and entering into a note payable agreement. This note payable was discounted with an imputed interest rate of 5.68%. As of December 31, 1995, the long-term portion of the discounted note payable was $1,275 due over the next three years.

11.  LONG-TERM DEBT AND CAPITAL LEASE OBLIGATIONS

As of December 31, long-term debt consisted of the following:

|  | 1995 | 1994 |
|---|---|---|
| Term loan(a).......................................... | $ 18,750 | $25,000 |
| Note payable, discounted to present value(b).......... | 6,724 | 8,731 |
| Capital leases(c)..................................... | 10,562 | 2,814 |
| Other, discounted to present value.................... | 488 | 588 |
|  | 36,524 | 37,133 |
| Less current maturities............................... | (11,703) | (9,496) |
|  | $ 24,821 | $27,637 |

(a) In connection with the purchase of certain assets from Abbott, the Company entered into a term loan with a commercial bank to borrow $25,000 at 5.68% per annum, due quarterly. The loan is due in annual installments of $6,250 beginning February 1995 and each year thereafter through February 1998. The term loan is guaranteed by Fresenius AG.

F-69

FRESENIUS USA, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

(b) In consideration for proprietary technology acquired from Abbott, the Company paid $5,000 to Abbott in cash at closing and issued a note to Abbott for $12,500 due in annual installments of $2,500 beginning February 1994 through February 1998. The remaining obligation has been discounted with an imputed interest rate of 5.68%. This note is secured by a standby letter of credit expiring March 31, 1998, totaling $10,000. The Company must pay a commitment fee of 0.5% per annum due quarterly on the outstanding letter of credit.

(c) Future minimum lease payments under capital leases as of December 31, 1995 are:

| For the years ended December 31: |  |
|---|---|
| 1996................................................... | $ 4,143 |
| 1997................................................... | 3,647 |
| 1998................................................... | 3,210 |
| 1999................................................... | 1,406 |
| 2000................................................... | 3 |
|  | 12,409 |
| Amount representing interest (at 9% - 10%)............. | (1,847) |
| Present value of capital lease obligations............ | 10,562 |
| Current portion of capital lease obligations.......... | (3,203) |
| Capital lease obligations, less current portion....... | $ 7,359 |

Aggregate annual payments applicable to long-term debt for the three years subsequent to December 31, 1995 are:

| For the years ended December 31: |  |
|---|---|
| 1996................................................... | $ 8,500 |
| 1997................................................... | 8,673 |
| 1998................................................... | 8,789 |
|  | $25,962 |

XXX-002092

12.  COMMITMENTS

Operating Leases

The Company leases facility space and machinery and equipment under various lease agreements expiring at dates through 1998.

On March 31, 1995, the Company entered into a sale leaseback arrangement with a bank which covers the sale by the Company of approximately $19.0 million of certain new equipment of the Company's dialyzer manufacturing facility at its Ogden, Utah plant to the bank and the leaseback of the equipment under a four year operating lease that has renewal options and a purchase option at fair market value. Although the rent payments on the lease are variable based on the three-month LIBOR, the Company has effectively fixed its rent expense through the use of interest rate swap agreements (see Note 13). On December 29, 1995, an additional $8.0 million for similar new equipment was sold and leased back under the above referenced four year renewable lease. If the Company elects not to purchase the equipment or renew the lease at the end of the lease term, the Company will be obligated to pay a termination fee of up to $20,250 to be offset by sales proceeds from the Company remarketing the equipment.

F-70

<PAGE>   342

FRESENIUS USA, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

Rental expense under operating leases was $2,626, $1,462 and $2,428 for the years ended December 31, 1995, 1994 and 1993, respectively. Future minimum rental payments under noncancelable operating leases, including the effective fixed payments under the above leaseback, as of December 31, 1995 are:

For the years ended December 31:

| | |
|---|---:|
| 1996............................................................ | $ 3,801 |
| 1997............................................................ | 2,909 |
| 1998............................................................ | 2,429 |
| 1999............................................................ | 1,104 |
| 2000............................................................ | 257 |
| | -------- |
| | $10,500 |
| | ======== |

Purchase Commitments

Under the terms of the purchase agreement with Abbott, the Company is obligated to purchase stated quantities of Inpersol(R) dialysis solutions, saline solutions and other renal dialysis ancillary products. Over the next two years, the minimum purchase commitments under the agreement are approximately $22 million annually.

13.  FINANCIAL INSTRUMENTS

Foreign Exchange Contracts

The Company has entered into foreign exchange contracts as a hedge against foreign currency exchange risks associated with the settlement of deutschemark denominated trade payables to Fresenius AG. Gains and losses on these contracts are offset against foreign exchange gains or losses realized on the settlement of those payables.

At December 31, 1995, the Company had contracts to purchase 48.0 million Deutschemarks at a fixed rate on the date of settlement. The contracts mature at various dates through 1996. The fair value of the foreign exchange contracts is the estimated amount that the Company would receive or pay to terminate the agreements. As of December 31, 1995, the cost to terminate the foreign exchange contracts is estimated to be insignificant.

Interest Rate Swap Agreements

At December 31, 1995, the Company had two interest rate swap agreements outstanding with a commercial bank for notional amounts of $17,400 and $7,634, respectively. These agreements effectively change the Company's rent expense on its variable payment operating lease to fixed rates based on 8.02% and 5.60%, respectively. The interest rate swap agreements outstanding as of December 31, 1995 expire in March, 1999. While the Company does not anticipate nonperformance by counterparties, the Company is exposed to credit loss in the event of nonperformance by the other parties to the interest rate swap agreement.

The fair value of the interest rate swaps is the estimated amount that the Company would receive or pay to terminate the swap agreements. This estimate is subjective in nature and involves uncertainties and matters of significant judgment and therefore cannot be determined with precision. Changes in assumptions could significantly affect the estimates. As of December 31, 1995, the cost to terminate the swap agreements is estimated to be $1,190.

F-71

<PAGE>   343

XXX-002093

FRESENIUS USA, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

14. STOCKHOLDERS' EQUITY

Common Stock Offering

During 1994, the Company successfully completed a public offering of 3,450,000 shares of its common stock, realizing proceeds, after payment of expenses, of approximately $16,177. During the first quarter of 1995, the Company paid an additional $188 of expenses related to the cost of the public offering.

Preferred Stock

The 200,000 shares of Series F preferred stock were issued to Fresenius AG in October 1987 and is presently convertible into 3,129,883 shares of common stock. The holder is entitled to elect a majority of the Company's directors and is entitled to preference in liquidation over common stockholders of $100 per Series F share, but is not entitled to receive dividends. The holder is entitled to an adjustment in the number of common shares into which the Series F preferred stock is convertible under certain circumstances.

15. COMMON STOCK OPTIONS

The Company has four stock option plans (the "Plans") which grant employees and officers the option to purchase the Company's common stock. At December 31, 1995, a total of 2,764,420 shares of the Company's common stock were reserved for issuance of stock options already granted or available for future grant, of which 635,525 shares were available for future issuance. During 1995, all stock options were granted with an exercise price equal to fair market value on the date of grant.

The 1976 Plan

The Company's 1976 Stock Option Plan (the "1976 Plan") provided for the purchase of the Company's common stock by officers and key employees of the Company. The 1976 Plan provided for non-incentive stock options, all of which vested over a period not to exceed four years from the date of grant and expire not more than ten years from the date of grant. No options were granted under the 1976 Plan after December 1986.

The 1985 Plan

The Company's 1985 Special Stock Option Plan (the "1985 Plan") provided for the grant of non-incentive options to certain employees as compensation for an unanticipated two-week shutdown which occurred in 1985. All options under the 1985 Plan were granted in 1985 and vested in 1986. The 1985 Plan expired in 1995.

The 1987 Plan

The Company's 1987 Stock Option Plan (the "1987 Plan") currently provides for granting non-incentive and incentive stock options to key employees of the Company. In general the stock options outstanding under the 1987 Plan vest in a period not to exceed four years and expire not more than ten years from the date of grant. However, certain options granted under the 1987 Plan are exercisable on such other terms as determined by the Compensation Committee or the Board of Directors of the Company.

In July 1995, the Board of Directors of the Company granted options to the President of the Company to purchase 450,000 shares of the Company's common stock under the 1987 plan subject to shareholder approval of an amendment to the 1987 Plan to provide that the maximum number of shares for which options maybe granted under the 1987 Plan to any individual during the remaining term of the 1987 Plan shall be limited to 1,000,000 shares. These options vest upon the earlier of (a) the Company's common stock attaining certain market prices, or (b) on June 30, 2002. As of December 31, 1995, options to purchase 225,000 shares of the total 450,000 shares of the Company's common stock have vested.

F-72

<PAGE>    344

FRESENIUS USA, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

The 1989 Plan

In 1989, the Board of Directors approved the 1989 Special Stock Option Plan (the "1989 Plan") effectively replacing another plan which has since terminated. All options granted under the 1989 Plan expire starting in August 1996 through May 1997 and are immediately exercisable upon issuance. No options were granted under the 1989 Plan after 1991.

The Directors' Plan

In June 1994, the stockholders of the Company approved a Directors' Stock Option Plan (the "Directors' Plan"), pursuant to which each current non-employee director of the Company received a grant of options for 30,000 shares of common stock vesting at a rate of 10,000 per year in each of 1994, 1995, and 1996. Two directors who are also either officers and/or directors of Fresenius AG declined to accept any options under the Directors' Plan. Future non-employee directors

will receive a grant of options for 30,000 shares of common stock upon their election. The options will vest at a rate of 10,000 per year on the first, second, and third anniversaries of the director's initial election.

During 1995, the Directors' Plan was amended to permit each director to elect whether to receive all or none of the directors' fees due to that director during a calendar year in the form of options. All options received in lieu of directors' fees vest 100% upon grant. With respect to each directors' fee payable in options, a non-employee director will receive an option for a number of shares of the Company's common stock determined by the following formula: (Amount of directors' fee otherwise payable in cash) divided by (60% of the exercise price of the option), where the exercise price of the option is the closing price of the Company's stock on the date the directors' fee would otherwise be paid. The number of shares determined by application of this formula will be rounded to the nearest whole share. The options will expire ten years from the date of grant.

Stock option transactions are summarized as follows:

| | SHARES (IN THOUSANDS) | AVERAGE PRICE RANGE |
|---|---|---|
| Balance at December 31, 1992..................... | 964 | $ 1.88-$9.38 |
| Granted..................................... | 1,232 | 5.25- 7.38 |
| Exercised.................................... | 32 | 3.63- 7.13 |
| Canceled or expired......................... | 234 | 6.25- 9.38 |
| Balance at December 31, 1993..................... | 1,930 | 1.88- 9.38 |
| Granted..................................... | 135 | 7.38- 7.50 |
| Exercised.................................... | 118 | 3.63- 7.13 |
| Canceled or expired......................... | 19 | 5.63- 7.50 |
| Balance at December 31, 1994..................... | 1,928 | 1.88- 9.38 |
| Granted..................................... | 461 | 12.75-17.25 |
| Exercised.................................... | 260 | 1.88- 9.38 |
| Balance at December 31, 1995..................... | 2,129 | $ 3.13-$17.25 |
| Exercisable at December 31, 1995................ | 1,362 | $ 3.13-$15.25 |

Stock option balances for the years ended December 31, 1995, 1994 and 1993, respectively and exercisable at December 31, 1995 do not include options to purchase 20,500 shares with options prices ranging from $32.00 to $88.70 per share. These options expire August 4, 1996.

F-73

<PAGE>   345

FRESENIUS USA, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

16.  COMMON STOCK WARRANTS

During 1993, the Company issued a stock warrant for the purchase of 1,750,000 shares of the Company's common stock, at an exercise price of $8 per share expiring in 2003, to Abbott as partial consideration for the acquisition of Abbott's renal dialysis business. In addition, the Company issued a warrant to Fresenius AG for the purchase of 1,700,000 shares of the Company's common stock, at an exercise price of $8 per share expiring in 2003, as consideration for certain past comfort letters given on certain short-term borrowings and Fresenius AG's commitment to provide up to $40 million of credit support in connection with the Abbott acquisition. In 1994, the Company issued a second warrant to Fresenius AG for the purchase of 50,000 shares of the Company's common stock, at an exercise price of $10.5685 per share expiring in 2004, as consideration for providing credit support to the Company. At December 31, 1995, the Company had 3,500,000 shares of common stock reserved for the exercise of stock warrants.

17.  INCOME TAXES

Income tax expense (benefit) for the years ended December 31 consisted of the following:

| | 1995 | 1994 | 1993 |
|---|---|---|---|
| Current: | | | |
| Federal income taxes...................... | $  313 | $ 226 | $212 |
| Foreign income taxes...................... | (72) | (123) | 88 |
| State income taxes........................ | 991 | 620 | 600 |
| Deferred.................................. | (4,666) | -- | -- |
| Total............................ | $(3,434) | $ 723 | $900 |

http://edgar.sec.gov/Archives/edgar/data/42872/0000950123-96-004024.txt                    4/29/2009

XXX-002095

For the years ended December 31, 1995, 1994 and 1993, income tax expense differed from the amounts computed by applying the federal income tax rate of 34% to income before income taxes as a result of the following:

<TABLE>
<CAPTION>

|  | 1995 | 1994 | 1993 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Computed "expected" tax expense............... | $ 4,404 | $ 2,678 | $ 1,562 |
| Increase (decrease) in income taxes resulting from: |  |  |  |
| Items not deductible for tax purposes....... | 287 | 610 | 1,239 |
| Change in valuation allowance.............. | (4,404) | -- | -- |
| Utilization of net operating loss carryforwards for which no tax benefit had previously been recognized........... | (4,332) | (2,920) | (2,385) |
| State taxes, net of federal income tax benefit.................................. | 683 | 478 | 396 |
| Foreign income taxes....................... | (72) | (123) | 88 |
|  | $(3,434) | $ 723 | $ 900 |

</TABLE>

F-74

<PAGE> 346

FRESENIUS USA, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

The tax effects of the temporary differences that give rise to deferred tax assets and liabilities at December 31 are presented below:

<TABLE>
<CAPTION>

|  | 1995 | 1994 |
|---|---|---|
| <S> | <C> | <C> |
| Deferred tax assets (liabilities): |  |  |
| Inventory, primarily due to additional costs inventoried for tax purposes pursuant to the Tax Reform Act of 1986 and inventory reserve accounts................................... | $ 1,248 | $ 1,069 |
| Accounts receivable, primarily due to allowance for doubtful accounts............................... | 516 | 679 |
| Compensated absences, principally due to accrual for financial accounting reporting purposes........... | 330 | 326 |
| State taxes........................................... | 337 | 185 |
| Product warranty, principally due to accrual for financial accounting reporting purposes........... | 135 | 135 |
| Capital leases, principally due to capitalization of costs for tax purposes........................... | (138) | 346 |
| Alternative minimum tax credit carryforward.......... | 721 | 388 |
| Net operating loss carryforwards..................... | 13,055 | 17,336 |
| Plant and equipment, principally due to differences in depreciation.................................. | 1,429 | 1,466 |
| Intangibles, principally due to amortization pursuant to Tax Reform Act of 1993............................ | 1,547 | 1,454 |
| Other................................................ | 134 | 87 |
| Total gross deferred tax assets.............. | 19,314 | 23,471 |
| Less: Valuation allowance........................... | (14,720) | (23,471) |
| Net deferred tax assets..................... | $ 4,594 | $ -- |

</TABLE>

The valuation allowance for the years ended December 31, 1995 and 1994 decreased by $8,751 and $2,625, respectively. During 1995, the Company reduced the valuation allowance to reflect the deferred tax asset utilized in 1995 to the extent of current income taxes and to recognize a deferred tax asset of $4,594. The recognized deferred tax asset is based upon expected utilization of net operating loss carryforwards that the Company expects will more likely than not be realized through the results of future operations.

At December 31, 1995, the Company had net operating loss carryforwards of approximately $38,397 for federal income tax reporting purposes. The net operating losses expire in varying amounts beginning in 1998 through 2006. The ability of the Company to use the carryforwards to offset taxes on its future income is also subject to certain annual cumulative limitations.

18. EMPLOYEE BENEFIT PLANS

Employees are eligible to join the Company's 401(k) Savings Plan once they have achieved a minimum of one year of service, 1,000 hours of service, and attained the age 18. Under the provisions of the Company's 401(k) Savings Plan, the Company contributes 2% of eligible employee base salary to the Company's 401(k) Savings Plan. The Company's obligation to the Company's 401(k) Savings Plan was approximately $420, $540 and $376, respectively for the years ended December 31, 1995, 1994 and 1993.

XXX-002096

F-75

<PAGE> 347

FRESENIUS USA, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

19. RELATED PARTY TRANSACTIONS

RELATIONSHIP WITH FRESENIUS AG

Majority Stockholder

Fresenius AG and Fresenius Securities, Inc. ("FSI") currently hold 13,793,442 shares of the Company's common stock; 200,000 shares of the Company's Series F preferred stock which are convertible into 3,129,883 shares of common stock; and warrants to purchase 1,750,000 shares of the Company's common stock. As of December 31, 1995, Fresenius AG beneficially owned 70.9% of the Company's common stock.

Distribution Agreement

The Company has a paid-up license to Fresenius AG's know-how relating to certain peritoneal dialysis products, including those incorporating the Safe-Lock(R) technology, in the United States, Canada and Mexico. The Company and Fresenius AG are also parties to an agreement pursuant to which Fresenius AG has confirmed that the Company acts as the sole North American distributor for Fresenius AG products related to end-stage renal disease treatment by hemodialysis and to intensive medicine and infection control applications, excluding pharmaceutical and certain other products, and has granted to the Company first negotiation rights with respect to products covered by the agreement which Fresenius AG proposes to have manufactured in North America.

In the ordinary course of the Company's business, the Company and Fresenius AG and certain subsidiaries of Fresenius AG enter into various transactions involving the purchase and sale of dialysis systems and supplies for distribution by the Company. The prices charged to the Company under the distribution agreement are negotiated each year by the Company and Fresenius AG based on Fresenius AG's estimated costs and desired profit margins, and generally have not exceeded the average of the prices charged to Fresenius AG's other affiliated distributors (except for costs attributable to the manufacture of products for sale primarily in the United States). The Company believes that these prices are no less favorable to the Company than the Company could obtain with unaffiliated third parties. However, the only source of supply for several of the Company's products is Fresenius AG, and there can be no assurance that the prices negotiated will enable the Company to maintain its profit margins on these products.

Under its distribution agreement with Fresenius AG, Fresenius AG indemnifies the Company for any claims of bodily injury or property damage alleged to have arisen from the possession, use or operation of Fresenius AG's products purchased pursuant to the agreement, and while the Company is obligated to provide installation, training, repair, warranty and maintenance services for these products, Fresenius AG reimburses the Company for material costs associated with warranty repairs. The distribution agreement is stated to terminate on the earlier of December 31, 2011 or the date that Fresenius AG ceases to be able to elect 51% of the Company's board of directors, unless a cause for early termination arises.

Intensive Care Agreement

The Company and Fresenius AG are parties to a distribution and manufacturing agreement for certain of Fresenius AG's intensive care and diagnostic products, including the Fresenius AS 104 Cell Separator. The Intensive Care Agreement was entered into during 1994 for an initial term of five years and will continue thereafter from year to year unless terminated. The company is given both exclusive and non-exclusive rights to manufacture and distribute certain products in North and South America. If the Company fails to meet certain sales goals during the five year initial term, Fresenius AG has the option to terminate the agreement with respect to one or more products or to convert the Company's exclusive rights with respect to one or more products to a non-exclusive right. It will be decided before the Effective Date (as defined in the Joint Proxy Statement-Prospectus) whether such agreement will be continued in connection with the Reorganization (as defined in the Joint Proxy Statement-Prospectus).

F-76

<PAGE> 348

FRESENIUS USA, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

Technology License Agreement

Pursuant to a technology license and know-how agreement, Fresenius AG has granted the Company an exclusive North American license for the technology, processes and know-how necessary to manufacture polysulfone dialyzers. Beginning January 1, 1996, the Company will pay a royalty to Fresenius AG of 4.5% of the Company's net sales of the dialyzers so produced by the Company for a ten-year period, after which the Company will have a paid-up exclusive license. Fresenius AG may make this license non-exclusive if it ceases to own a majority of the Company's common stock. The agreement may be terminated by Fresenius AG upon specified defaults, and in addition, may be terminated if a majority of the

XXX-002097

voting power of the Company is acquired by a company engaged in the treatment, research, development, manufacture or sale of products for treatment of renal disease.

Financial Support

Fresenius AG has provided substantial financial support to the Company. This support has included participating in letters of credit in connection with the Company's previously outstanding industrial revenue bonds, providing credit support in the form of letters of support and guarantees to the banks to assist the Company in securing lines of credit and other debt, participating in and assisting with the Company's foreign exchange contracts as well as various miscellaneous general management assistance.

As full consideration for these services, the Company granted Fresenius AG certain warrants (see Note 16) and agreed to pay Fresenius AG a quarterly fee of $42 for the period from July 1992 to June 1994.

Registration Rights Agreement

Fresenius AG and the Company are party to a Registration Rights Agreement, dated February 24, 1993. This agreement grants Fresenius AG demand registration rights with respect to all shares of common stock held by Fresenius AG or certain of its subsidiaries on February 24, 1993 or issuable to them upon conversion of shares of Series F preferred stock or exercise of a warrant for 1,700,000 shares issued to Fresenius AG in connection with the Abbott acquisition (collectively, the "Registrable Shares"). The Company is to pay all expenses in connection with the first such registration; the holder(s) is responsible for the expenses of subsequent registrations. A holder of Registrable Shares may also request that the Company include its Registrable Shares in registration statements filed by the Company in connection with a public offering of common stock on behalf of another holder and/or another holder of common stock.

Trade Transactions with Fresenius AG

As of December 31, net amounts due to Fresenius AG and affiliates, were as follows:

<TABLE>
<CAPTION>

|  | 1995 | 1994 |
|---|---|---|
| <S> | <C> | <C> |
| Trade accounts payable................................. | $41,847 | $34,588 |
| Trade accounts receivable.............................. | (618) | (1,227) |
| Accounts payable to affiliates, net..................... | $41,229 | $33,361 |

</TABLE>

Effective January 1, 1992, trade payables to Fresenius AG and its wholly owned subsidiaries were due in 150 days. Amounts not paid in 150 days bear interest at an annual rate of 5.5%. During 1995 and 1994, the Company paid no interest related to the trade payables.

F-77

<PAGE>  349

FRESENIUS USA, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

For the years ended December 31, the Company had the following trade transactions with Fresenius AG:

<TABLE>
<CAPTION>

|  | 1995 | 1994 | 1993 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Purchases from Fresenius AG................... | $90,627 | $63,507 | $52,442 |
| Sales to Fresenius AG......................... | 2,517 | 4,029 | 4,197 |
| Warranty costs charged by the Company to Fresenius AG for purchased materials........ | 911 | 836 | 343 |
| Miscellaneous charges by the Company to Fresenius AG................................ | 54 | 107 | 322 |

</TABLE>

In 1995, 1994 and 1993, Fresenius AG granted the Company purchase price credits of $8.4 million, $1.4 million, and $0, respectively, which were credited against cost of goods sold throughout the year.

Note Payable to FNA

In 1991, the Company used the proceeds of $11,900 from the exercise of stock options by Fresenius AG and FSI to reduce its original indebtedness to Fresenius North America, Inc. ("FNA"), a wholly owned subsidiary of Fresenius AG, from $19,774 to $7,874. During 1992, the Company issued additional shares of common stock to Fresenius AG for $7,600, the proceeds of which were used to further reduce the Company's note payable to FNA. The balance outstanding on the note payable to FNA was $274 at December 31, 1995 and 1994.

Other

XXX-002098

The Company provides various administrative services and advances to Fresenius Pharma U.S.A., Inc. ("Fresenius Pharma"), another wholly owned subsidiary of Fresenius AG. There were no receivables related to these services from Fresenius Pharma at December 31, 1995 and 1994. During 1992, the Company acquired from Fresenius Pharma the rights to distribute within North America certain transplantation pharmaceutical products of Fresenius AG. The Company incurred no costs for the distribution rights under this agreement.

Pursuant to a series of agreements with Seratronics, Inc. ("Seratronics") and Andersen Group, Inc., entered into in 1985 and extended and amended in 1995, the Company manages, and acts as sole distributor for the dialyzer reuse business of Seratronics. These arrangements require the Company to make minimum net payments of $100 per year to Seratronics through February 1995, and starting in March 1995 require the Company to make minimum payments of $50, per quarter through February 29, 2000, when the agreements expire by their terms. As of February 1995, the Company has the right to acquire the assets and liabilities of the reuse business for a nominal purchase price and, if it exercises this option, its obligation to make the quarterly payments discussed above ends. During 1995 and 1994, the Company, as distributor, purchased dialyzer reuse systems and supplies from Seratronics totaling approximately $1.9 million and $1.6 million, respectively. The results of operations and the assets and liabilities of the Seratronics' reuse business are included in the Company's consolidated financial statements. The President and Chief Executive Officer of the Company is also the President and Chief Executive Officer of Seratronics. A director of the Company is the President of Andersen Group, Inc. which owns a majority of the outstanding capital stock of Seratronics. A portion of the salary of the President and Chief Executive Officer of the Company is paid each year by Seratronics.

A member of the Company's Board of Directors is also a partner in a law firm which provided certain legal services for the Company and Fresenius AG. The Company paid the law firm approximately $259, $6, and $52 in 1995, 1994 and 1993, respectively.

                                    F-78

<PAGE>   350

               FRESENIUS USA, INC. AND SUBSIDIARIES

          NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

20. SELECTED QUARTERLY FINANCIAL DATA (UNAUDITED)

|  | FOR THE YEAR ENDED DECEMBER 31, 1995 | | | |
|---|---|---|---|---|
|  | 1ST QUARTER | 2ND QUARTER | 3RD QUARTER | 4TH QUARTER |
| Net sales | $68,176 | $76,744 | $78,933 | $81,111 |
| Gross profit | 21,136 | 22,956 | 23,331 | 25,439 |
| Operating income | 4,088 | 4,180 | 4,622 | 5,136 |
| Net income | 3,318 | 3,473 | 3,747 | 5,849 |
| Net income per common share | $ .13 | $ .13 | $ .14 | $ .21 |
| Weighted average number of shares of primary and fully dilutive common stock and common stock equivalents | 25,872 | 26,694 | 27,215 | 27,925 |

The Company recognized additional income tax benefit in the fourth quarter resulting from an adjustment to its deferred tax asset valuation allowance.

|  | FOR THE YEAR ENDED DECEMBER 31, 1994 | | | |
|---|---|---|---|---|
|  | 1ST QUARTER | 2ND QUARTER | 3RD QUARTER | 4TH QUARTER |
| Net sales | $59,689 | $61,139 | $65,370 | $68,146 |
| Gross profit | 18,552 | 19,222 | 19,708 | 21,096 |
| Operating income | 3,036 | 3,047 | 3,291 | 2,715 |
| Net income | 1,537 | 1,519 | 1,978 | 2,120 |
| Net income per common share | $ .07 | $ .07 | $ .08 | $ .09 |
| Weighted average number of shares of primary and fully dilutive common stock and common stock equivalents | 20,953 | 21,525 | 24,745 | 25,542 |

Increased demand in the fourth quarter for hemodialysis products necessitated additional air freight and overtime expenses resulting in lower operating income in the fourth quarter. In addition, adjustments were recorded in the fourth quarter to decrease income taxes and interest expense as estimates were revised based on new information.

21. LEGAL PROCEEDINGS

In the ordinary course of business, the Company is involved in various legal actions. In the opinion of management, based upon the advice of counsel, the resolution of these legal actions will not have a material effect upon the Company's results of operations or liquidity or its financial condition.

XXX-002099

22. SUBSEQUENT EVENT

In February 1996, the Company announced that Fresenius AG had entered into a definitive agreement (the "Agreement") with W.R. Grace & Co. ("Grace") to combine Fresenius AG's worldwide dialysis business, including the Company, with Grace's National Medical Care, Inc. to create a fully integrated dialysis company. The Agreement provides that an aggregate of 55.2% of the shares of the combined company, to be called "Fresenius Medical Care AG", will be issued to Fresenius AG and the Company's public shareholders provided that Fresenius AG must retain at least 51% of the shares of the combined company and that Grace shareholders will acquire the remaining 44.8%. Fresenius AG agreed with Grace that the Company would become a wholly owned subsidiary of Fresenius Medical Care AG and that, when the economic terms of the participation of the Company's minority shareholders in the transaction have been established, Fresenius AG will vote its shares of the Company in favor of the transaction.

F-79

<PAGE>  351

FRESENIUS USA, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS -- (CONTINUED)

23. ABBOTT ACQUISITION PRO FORMA CONSOLIDATED STATEMENT OF OPERATIONS

The following unaudited pro forma consolidated statement of operations is presented for the year ended December 31, 1993 and gives effect to the Abbott acquisition transaction as if it occurred on January 1, 1993, after giving effect to certain adjustments, including amortization of intangible assets, additional depreciation expense, increased interest expense on debt related to the acquisition, and related income tax effects. The pro forma consolidated statement of operations should be read in conjunction with the related notes that follow and are not necessarily indicative of what the actual results of operations of the Company would have been had the transaction occurred on January 1, 1993, nor does it purport to indicate the future results of operations of the Company.

<TABLE>
<CAPTION>

| | YEAR ENDED DECEMBER 31, 1993 | | |
| | BEFORE PRO FORMA ADJUSTMENTS | PRO FORMA ADJUSTMENTS | ADJUSTED |
| | (UNAUDITED) | | |
| | (DOLLARS AND SHARES IN THOUSANDS, EXCEPT PER SHARE AMOUNTS) | | |
|<S>|<C>|<C>|<C>|
| Net sales........................................ | $ 205,960 | $ 4,682(a) | $210,642 |
| Cost of sales.................................... | 140,960 | 2,258(b) | 143,218 |
| Gross profit........................... | 65,000 | 2,424 | 67,424 |
| Operating expenses: | | | |
| Selling, general and administrative............ | 54,213 | 1,549(c) | 55,762 |
| Research and development....................... | 1,500 | -- | 1,500 |
| Litigation settlements......................... | -- | -- | -- |
| Operating income...................... | 9,287 | 875 | 10,162 |
| Other income: | | | |
| Interest income............................... | 204 | -- | 204 |
| Interest expense.............................. | (4,835) | (358)(d) | (5,193) |
| Other, net................................... | (63) | -- | (63) |
| Income before income taxes............ | 4,593 | 517 | 5,110 |
| Income tax expense............................. | (900) | (50)(e) | (950) |
| Net income........................... | $ 3,693 | $ 467 | $ 4,160 |
| Net income per common share................... | $ .18 | | $ .20 |
| Weighted average number of shares of common stock and common stock equivalents................. | 20,660 | | 20,660 |

</TABLE>

- ---------------

(a)  Net Sales
     To reflect the estimated increase in sales as a result of the purchase transaction.

(b)  Cost of Sales
     To reflect the estimated increase in cost of sales as a result of the purchase transaction.

(c)  Selling, General and Administrative Expenses
     To reflect the estimated increase in selling, general and administrative expenses resulting from the purchase.

(d)  Interest Expense
     To reflect increase in interest expense for additional debt financing.

(e)  Income Tax Expense
     To reflect increase in income tax expense as a result of projected

XXX-002100

additional net income.

F-80

<PAGE>   352

FRESENIUS USA, INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEET

MARCH 31, 1996
(UNAUDITED)
(DOLLARS IN THOUSANDS)

<TABLE>
<CAPTION>

| ASSETS | MARCH 31, 1996 |
|---|---|
| <S> | <C> |
| **Current assets:** | |
| Cash.................................................................... | $ 2,352 |
| Trade accounts receivable, net.......................................... | 52,306 |
| Inventories............................................................. | 67,282 |
| Prepaid expenses and other current assets............................... | 6,522 |
| Deferred income taxes................................................... | 5,611 |
| Total current assets............................................ | 134,073 |
| Property, plant, and equipment, net..................................... | 48,985 |
| Intangible assets....................................................... | 36,175 |
| Other assets............................................................ | 7,573 |
| Total assets.................................................... | $ 226,806 |

| LIABILITIES AND STOCKHOLDERS' EQUITY | |
|---|---|
| **Current liabilities:** | |
| Accounts payable........................................................ | $ 14,668 |
| Accounts payable to affiliates, net..................................... | 40,581 |
| Accrued expenses........................................................ | 13,650 |
| Short-term borrowings................................................... | 35,949 |
| Short-term borrowings -- Fresenius AG................................... | 3,102 |
| Current portion long-term debt and capital lease obligations............ | 11,788 |
| Income taxes payable.................................................... | 832 |
| Total current liabilities....................................... | 120,570 |
| Long-term payable, less current portion................................. | 1,275 |
| Note payable to Fresenius North America................................. | 274 |
| Long-term debt and capital lease obligations, less current portion...... | 19,895 |
| Total liabilities............................................... | 142,014 |
| **Stockholders' equity:** | |
| Series F preferred stock, $1.00 par value............................... | 200 |
| Common stock, $.01 par value............................................ | 216 |
| Capital in excess of par value.......................................... | 141,986 |
| Currency translation adjustment......................................... | (87) |
| Accumulated deficit..................................................... | (57,523) |
| Total stockholders' equity...................................... | 84,792 |
| | $ 226,806 |

</TABLE>

See accompanying notes to consolidated financial statements.

F-81

<PAGE>   353

FRESENIUS USA, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS

THREE MONTHS ENDED MARCH 31, 1996 AND 1995
(UNAUDITED)
(IN THOUSANDS, EXCEPT PER SHARE DATA)

<TABLE>
<CAPTION>

| | THREE MONTHS ENDED | |
|---|---|---|
| | MARCH 31, 1996 | MARCH 31, 1995 |
| <S> | <C> | <C> |
| Net sales.................................................. | $81,062 | $68,176 |
| Cost of sales.............................................. | 55,566 | 47,040 |
| Gross profit.......................................... | 25,496 | 21,136 |
| **Operating expenses:** | | |
| Selling, general, administrative, and research and development....... | 18,949 | 17,048 |
| Operating income..................................... | 6,547 | 4,088 |

XXX-002101

```
Other expenses (income):
    Interest income........................................        (17)          (7)
    Interest expenses......................................      1,418        1,281
    Other, net.............................................         62           25
                                                              --------     --------
        Income before income taxes.........................      5,084        2,789
Income tax benefit.........................................       (262)        (529)
                                                              --------     --------
        Net income.........................................    $ 5,346      $ 3,318
                                                              ========     ========
Net income per common and common equivalent share:
    Primary................................................    $    .19     $    .13
                                                              ========     ========
    Fully diluted..........................................    $    .19     $    .13
                                                              ========     ========
Weighted average number of shares of common stock and common stock
    equivalents used to compute net income per common and common
    equivalent share:
    Primary................................................     27,884       25,717
                                                              ========     ========
    Fully diluted..........................................     27,936       25,872
                                                              ========     ========
```

</TABLE>

        See accompanying notes to consolidated financial statements.

                                  F-82

<PAGE>   354

                       FRESENIUS USA, INC. AND SUBSIDIARIES

                  CONSOLIDATED STATEMENTS OF CASH FLOWS

                  THREE MONTHS ENDED MARCH 31, 1996 AND 1995
                                 (UNAUDITED)
                               (IN THOUSANDS)

<TABLE>
<CAPTION>

| | THREE MONTHS ENDED | |
| --- | --- | --- |
| | MARCH 31, 1996 | MARCH 31, 1995 |
| <S> | <C> | <C> |
| Net cash provided by (used in) operating activities................... | $ 5,523 | $ (4,659) |
| Cash flows from investing activities: | | |
|     Purchases of property, plant and equipment.......................... | (1,760) | (9,297) |
|     Proceeds from sales/leaseback of property, plant and equipment....... | -- | 11,768 |
|     Validation cost expenditures........................................ | (1,347) | -- |
| Net cash provided by (used in) investing activities................. | (3,107) | 2,471 |
| Cash flows from financing activities: | | |
|     Principal payments under debt and capital lease obligations.......... | (8,994) | (8,458) |
|     Proceeds from capital lease financing arrangement.................... | 4,153 | 4,000 |
|     Change in accounts payable to affiliates, net....................... | (648) | 5,524 |
|     Proceeds from short-term borrowings................................. | 10,000 | 18,280 |
|     Change in short-term borrowings -- Fresenius AG..................... | (548) | 70 |
|     Repayment of short-term borrowings.................................. | (7,200) | (16,880) |
|     Proceeds from issuance of common stock, net......................... | 851 | 276 |
| Net cash provided by (used in) financing activities................. | (2,386) | 2,812 |
| Effect of exchange rates on cash........................................ | (8) | 2 |
| Net increase in cash and cash equivalents........................... | 22 | 626 |
| Cash and cash equivalents at beginning of period.................... | 2,330 | 2,315 |
| Cash and cash equivalents at end of period.......................... | $ 2,352 | $ 2,941 |

</TABLE>

        See accompanying notes to consolidated financial statements.

                                  F-83

<PAGE>   355

                       FRESENIUS USA, INC. AND SUBSIDIARIES

                  NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

                       MARCH 31, 1996 AND 1995
                               (UNAUDITED)

(1) DESCRIPTION OF BUSINESS

        Fresenius USA, Inc. and subsidiaries (the "Company") is a manufacturer and
distributor of medical products and systems for sale primarily in the United
States and Canada for the treatment of kidney failure by hemodialysis and by
peritoneal dialysis. The Company is one of only two companies in the United
States offering a full line of both hemodialysis and peritoneal dialysis
machines and disposable products. These machines and products are used to
cleanse a patient's blood of waste products and fluids normally eliminated by
properly functioning kidneys. The Company also sells cell separation products
designed for the therapeutic removal of diseased blood components as well as

XXX-002102

collection of donor blood components for transfusion.

(2) INVENTORIES

Inventories are stated at the lower of cost (determined by using first-in, first-out method) or market value, and consist of the following as of March 31, 1996 (in thousands):

<TABLE>
<CAPTION>

|  | MARCH 31, 1996 |
| --- | --- |
| <S> | <C> |
| Raw materials..................................................... | $32,870 |
| Work in process.................................................. | 9,733 |
| Finished goods................................................... | 27,835 |
|  | 70,438 |
| Reserves......................................................... | (3,156) |
| Inventories, net................................................. | $67,282 |

</TABLE>

(3) OTHER ASSETS

In 1995, the Company completed construction of a dialyzer plant addition to its manufacturing facility in Ogden, Utah. At March 31, 1996, included in other assets are $7,989 of validation costs, net of accumulated amortization of $557, incurred to qualify the products and the associated manufacturing processes for approval by the U.S. Food and Drug Administration. Such costs are being amortized on a straight-line basis over an estimated useful life of 3 years upon commencement of manufacturing.

(4) INCOME TAXES

At December 31, 1995, the Company had net operating loss carryforwards of approximately $38.4 million for federal income tax reporting purposes. The net operating losses expire in varying amounts beginning in 1998 through 2006. The ability of the Company to use carryforwards to offset taxes on its future income is also subject to certain annual cumulative limitations. The Company believes that it has sufficient net loss carryforwards to offset any 1996 net income for federal income tax reporting purposes.

(5) NET INCOME PER COMMON AND COMMON EQUIVALENT SHARE

Net income per common share was computed by dividing net income by the weighted average number of shares of common stock and common stock equivalents outstanding during each period based on the treasury stock method or the modified treasury stock method. Stock options, common stock warrants, and the Series F preferred stock are considered to be common stock equivalents.

F-84

<PAGE>   356

FRESENIUS USA, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

MARCH 31, 1996 AND 1995
(UNAUDITED)

The application of the treasury stock method is modified when the outstanding number of the common shares which would be issued if all outstanding options and warrants and their equivalents were exercised exceeds 20% of the number of common shares outstanding at the end of the period. When this 20% test is met, the treasury stock method is first applied to purchase no more than 20% of the number of common shares outstanding at the end of the period. The balance of any proceeds remaining is then applied to reduce debt with appropriate recognition given for any interest expense savings net of income tax expense. These calculations are aggregated to determine whether the effect on net income per common share is dilutive or antidilutive. When dilutive, all of the calculations are utilized when computing net income per common share.

The computation of fully diluted income per share would also include the effect of converting other outstanding securities, when the effect is dilutive, and the additional dilution related to stock options when the market price at the end of the period is higher than the average price for the period.

(6) RECENT DEVELOPMENT

On February 4, 1996, W. R. Grace & Co. ("Grace") and Fresenius AG entered into a definitive agreement (the "Reorganization Agreement") to combine Grace's National Medical Care, Inc. ("NMC") with Fresenius AG's worldwide dialysis business, including the Company (the "Reorganization"). The Reorganization Agreement provides that an aggregate of 55.2% of the shares of the combined company, to be called Fresenius Medical Care AG, will be issued to Fresenius AG and the Company's public shareholders provided that Fresenius AG must retain at least 51% of the shares of the combined company, and that Grace shareholders will acquire the remaining 44.8%. Fresenius AG agreed with Grace that a wholly owned subsidiary of Fresenius Medical Care AG would be merged with and into the Company, with the Company the surviving Corporation (the "Company Merger"), as a result of which the Company would become a wholly-owned subsidiary of Fresenius

XXX-002103

Medical Care AG and that, when the economic terms of the participation of the
Company's minority shareholders in the transaction have been established,
Fresenius AG will vote its shares of the Company in favor of the transaction.

On May 8, 1996, Fresenius AG and the Company jointly announced that an
agreement had been reached between Fresenius AG and a committee of independent
directors of the Company (the "Independent Committee") on the terms on which the
public stockholders of the Company will participate in the Reorganization and
the Company Merger. The Reorganization and the Company Merger were approved by
the Board of Directors of the Company on May 8, 1996.

Under the terms of the agreement with the Independent Committee, the public
shareholders of the Company were to receive the equivalent of 1.15 ordinary
shares of Fresenius Medical Care AG, based on the assumption that Fresenius
Medical Care AG would have 217,170,000 shares outstanding. It is currently
intended that Fresenius Medical Care AG will have an aggregate of 70,000,000
ordinary shares outstanding (instead of 217,170,000 as originally proposed) and
that U.S. stockholders will receive American Depository Shares ("ADSs") each
evidencing one-third of an ordinary share of Fresenius Medical Care AG. Thus,
the public shareholders of the Company will receive, on a fully diluted basis,
approximately 1.112 ADSs of Fresenius Medical Care AG for each share of Company
Common Stock. The agreement with the Independent Committee also assumes that the
Company will reacquire outstanding stock options or other equity securities,
such that Fresenius AG's fully diluted interest in Fresenius Medical Care AG is
not reduced below 50.3%. Accordingly, the public stockholders of the Company, on
a fully diluted basis, will receive 4.9% of Fresenius Medical Care AG's shares
outstanding after the closing.

                                  F-85
<PAGE>   357

                    FRESENIUS USA, INC. AND SUBSIDIARIES

                NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

                         MARCH 31, 1996 AND 1995
                                (UNAUDITED)

(7)  MANAGEMENT REPRESENTATION

        The accompanying unaudited consolidated condensed financial statements have
been prepared by the Company, pursuant to the rules and regulations of the
Securities and Exchange Commission, and reflect all adjustments which, in the
opinion of management, consist only of normal and recurring adjustments that are
necessary for a fair statement of the results for the interim periods presented.
Operating results for the three month period ended March 31, 1996 are not
necessarily indicative of the results to be expected for the year.

        Certain information in footnote disclosures normally included in financial
statements prepared in accordance with generally accepted accounting principles
has been condensed or omitted pursuant to such rules and regulations. It is
suggested that these consolidated condensed financial statements be read in
conjunction with the consolidated financial statements and the notes thereto
contained in the Company's Form 10-K for the year ended December 31, 1995.

                                  F-86
<PAGE>   358

                                                               APPENDIX A

                AGREEMENT AND PLAN OF REORGANIZATION

                      DATED AS OF FEBRUARY 4, 1996

                            BY AND BETWEEN

                           W. R. GRACE & CO.

                                  AND

                              FRESENIUS AG
<PAGE>   359

                           TABLE OF CONTENTS

<TABLE>
<CAPTION>
                                                                   PAGE
                                                                   ----
<S>                                                                <C>
                              RECITALS
A.  Defined Terms..............................................  A-7
B.  Newco.....................................................  A-7
C.  The Contribution..........................................  A-7
D.  The Distribution..........................................  A-7
E.  The Recapitalization......................................  A-7
F.  The Mergers...............................................  A-7
G.  Financing.................................................  A-7
H.  Intention of the Parties..................................  A-8
I.  Approvals.................................................  A-8
                              ARTICLE I
                THE REORGANIZATION; CLOSING; EFFECTIVE TIME
Section 1.1.  The Distribution, Newco and the Contribution....  A-9
Section 1.2.  The Recapitalization and the Mergers............  A-9

```
Section 1.3.  Effective Time.............................................  A-9
Section 1.4.  Closing....................................................  A-9
                              ARTICLE II
                CERTIFICATE OF INCORPORATION AND BY-LAWS
Section 2.1.  Grace Certificate of Incorporation.........................  A-10
Section 2.2.  Grace By-laws..............................................  A-10
Section 2.3.  Fresenius USA Articles of Organization.....................  A-10
Section 2.4.  Fresenius USA By-laws......................................  A-10
                              ARTICLE III
                         DIRECTORS AND OFFICERS
Section 3.1.  Grace Directors............................................  A-10
Section 3.2.  Grace Officers.............................................  A-10
Section 3.3.  Fresenius USA Directors....................................  A-10
Section 3.4.  Fresenius USA Officers.....................................  A-10
                              ARTICLE IV
              MERGER CONSIDERATION; CONTRIBUTION CONSIDERATION;
         CONVERSION OR CANCELLATION OF SHARES IN THE MERGERS
Section 4.1.  Grace Merger Consideration; Conversion or Cancellation of Grace Capital
              Stock......................................................  A-10
Section 4.2.  Fresenius USA Merger Consideration; Conversion or Cancellation of
              Fresenius USA Capital Stock................................  A-11
Section 4.3.  Fresenius AG Consideration.................................  A-12
Section 4.4.  Exchange of Old Certificates for New Certificates..........  A-12
              (a)  Appointment of Exchange Agent.........................  A-12
              (b)  Exchange Procedures...................................  A-12
              (c)  Fractional Shares.....................................  A-12
              (d)  Distributions with Respect to Unexchanged Shares......  A-13
              (e)  No Transfers..........................................  A-13
</TABLE>

                                 A-1

<PAGE>  360

<TABLE>
<CAPTION>
                                                                   PAGE
                                                                   ----
<S>                                                                <C>
              (f)  No Liability.........................................  A-13
              (g)  Withholding Rights...................................  A-13
              (h)  Transfer Taxes.......................................  A-14
              (i)  Stock Options and Warrants...........................  A-14
Section 4.5.  Dissenters' Rights........................................  A-14
                              ARTICLE V
                     REPRESENTATIONS AND WARRANTIES
Section 5.1.  Representations and Warranties of Grace...................  A-14
              (a)  Capital Stock........................................  A-14
              (b)  Corporate Organization and Qualification.............  A-15
              (c)  Corporate Authority..................................  A-15
              (d)  Governmental Filings; No Violations..................  A-16
              (e)  SEC Documents; Financial Statements; No Undisclosed Liabilities....  A-16
              (f)  Absence of Certain Events and Changes................  A-17
              (g)  Compliance with Laws.................................  A-17
              (h)  Title to Assets......................................  A-18
              (i)  Litigation...........................................  A-18
              (j)  Taxes................................................  A-18
              (k)  Employee Benefits....................................  A-18
              (l)  Environmental Matters................................  A-20
              (m)  Rights Plan..........................................  A-20
              (n)  Takeover Statutes....................................  A-20
              (o)  Brokers and Finders..................................  A-20
              (p)  Tax Matters..........................................  A-20
              (q)  Information in Disclosure Documents and Registration Statements....  A-20
              (r)  Trademarks, Patents and Copyrights...................  A-20
              (s)  Assets...............................................  A-21
              (t)  Disclosure...........................................  A-21
Section 5.2.  Representations and Warranties of Fresenius USA...........  A-21
              (a)  Capital Stock........................................  A-21
              (b)  Corporate Organization and Qualification.............  A-22
              (c)  Corporate Authority..................................  A-22
              (d)  Governmental Filings; No Violations..................  A-22
              (e)  SEC Documents; Financial Statements; No Undisclosed Liabilities....  A-23
              (f)  Absence of Certain Events and Changes................  A-24
              (g)  Compliance with Laws.................................  A-24
              (h)  Title to Assets......................................  A-24
              (i)  Litigation...........................................  A-24
              (j)  Taxes................................................  A-24
              (k)  Employee Benefits....................................  A-25
              (l)  Environmental Matters................................  A-26
              (m)  Takeover Statutes....................................  A-26
              (n)  Brokers and Finders..................................  A-26
</TABLE>

                                 A-2

<PAGE>  361

<TABLE>
<CAPTION>
                                                                   PAGE
                                                                   ----
<S>                                                                <C>
              (o)  Information in Disclosure Documents and Registration Statements....  A-26
              (p)  Trademarks, Patents and Copyrights...................  A-27
              (q)  Disclosure...........................................  A-27
```

| | | | PAGE |
|---|---|---|---|
| Section 5.3. | Representations and Warranties of Fresenius AG | | A-27 |
| | (a) | Corporation Organization and Qualification | A-27 |
| | (b) | Corporate Authority | A-27 |
| | (c) | Governmental Filings; No Violations | A-28 |
| | (d) | Takeover Statutes | A-28 |
| | (e) | Brokers and Finders | A-28 |
| | (f) | Contribution | A-28 |
| | (g) | Tax Matters | A-28 |
| | (h) | Information in Disclosure Documents and Registration Statements | A-28 |
| | (i) | Disclosure | A-29 |
| | (j) | Assets | A-29 |
| Section 5.4. | Representations and Warranties for the FWD Business | | A-29 |
| | (a) | Corporate Organization and Qualification | A-29 |
| | (b) | Corporate Authority | A-29 |
| | (c) | Capitalization | A-29 |
| | (d) | Financial Statements; No Undisclosed Liabilities | A-30 |
| | (e) | Absence of Certain Events and Changes | A-30 |
| | (f) | Compliance with Laws | A-30 |
| | (g) | Title to Assets | A-30 |
| | (h) | Litigation | A-31 |
| | (i) | Taxes | A-31 |
| | (j) | Environmental Matters | A-31 |
| | (k) | Governmental Filings; No Violations | A-31 |
| | (l) | Contracts and Commitments | A-32 |
| | (m) | Employee Benefit Plans | A-32 |
| | (n) | Lease | A-33 |
| | (o) | Trademarks, Patents and Copyrights | A-33 |
| Section 5.5. | Certain Definitions Relating to the FWD Business | | A-33 |
| | (a) | FWD Business | A-33 |
| | (b) | FWD Business Assets | A-33 |
| | (c) | FWD Business Subsidiaries | A-34 |
| | (d) | Fresenius AG Restructuring | A-34 |

ARTICLE VI
COVENANTS

| | | PAGE |
|---|---|---|
| Section 6.1. | Interim Operations | A-34 |
| Section 6.2. | Certain Transactions | A-35 |
| Section 6.3. | Acquisition Proposals | A-36 |
| Section 6.4. | Information Supplied | A-36 |
| Section 6.5. | Shareholder Approvals | A-36 |
| Section 6.6. | Filings; Other Actions | A-37 |
| Section 6.7. | Audited Financial Statements | A-38 |

</TABLE>

A-3

<PAGE>  362

<TABLE>
<CAPTION>

| | | PAGE |
|---|---|---|
| <S> | | <C> |
| Section 6.8. | Access | A-39 |
| Section 6.9. | Notification of Certain Matters | A-39 |
| Section 6.10. | Publicity | A-39 |
| Section 6.11. | [Intentionally Omitted] | A-40 |
| Section 6.12. | Employee Benefits | A-40 |
| Section 6.13. | Expenses and Liquidated Damages | A-40 |
| Section 6.14. | Grace Rights Agreement | A-41 |
| Section 6.15. | Antitakeover Statutes | A-41 |
| Section 6.16. | Securities Act Compliance | A-41 |
| Section 6.17. | Stock Exchange Listing | A-41 |
| Section 6.18. | Transaction Agreements | A-41 |
| Section 6.19. | Tax Matters | A-41 |

ARTICLE VII
CONDITIONS

| | | PAGE |
|---|---|---|
| Section 7.1. | Conditions to Each Party's Obligation | A-41 |
| | (a) | Shareholder Approval | A-41 |
| | (b) | Governmental and Regulatory Consents | A-41 |
| | (c) | Third-Party Consents | A-42 |
| | (d) | Litigation | A-42 |
| | (e) | Grace Tax Opinion | A-42 |
| | (f) | Registration Statements | A-42 |
| | (g) | Financing | A-42 |
| | (h) | The Distribution | A-42 |
| | (i) | Stock Exchange Listing | A-42 |
| | (j) | Fresenius AG Debt | A-42 |
| | (k) | Grace Debt | A-42 |
| Section 7.2. | Conditions to Obligation of Grace | A-42 |
| | (a) | Representations and Warranties | A-42 |
| | (b) | Performance of Obligations | A-43 |
| | (c) | Pooling Agreement | A-43 |
| | (d) | Fresenius AG Tax Opinion | A-43 |
| Section 7.3. | Conditions to Obligation Concerning Fresenius USA | A-43 |
| | (a) | Representations and Warranties | A-43 |
| | (b) | Performance of Obligations | A-43 |
| | (c) | Pooling Agreement Opinion | A-43 |
| Section 7.4. | Conditions to Obligation of Fresenius AG | A-43 |
| | (a) | Representations and Warranties | A-43 |
| | (b) | Performance of Obligations | A-43 |

</TABLE>

A-4

<PAGE>  363

```
<TABLE>
<CAPTION>
                                                                  PAGE
                                                                  ----
<S>                                                               <C>
                            ARTICLE VIII
                            TERMINATION
Section 8.1.   Termination by Mutual Consent........................  A-44
Section 8.2.   Termination by any Party Hereto......................  A-44
Section 8.3.   Termination by Grace.................................  A-44
Section 8.4.   Termination by Fresenius AG..........................  A-44
Section 8.5.   Effect of Termination and Abandonment................  A-44
                            ARTICLE IX
                     MISCELLANEOUS AND GENERAL
Section 9.1.   Survival.............................................  A-44
Section 9.2.   Modification or Amendment............................  A-44
Section 9.3.   Waiver of Conditions................................  A-45
Section 9.4.   Counterparts........................................  A-45
Section 9.5.   Governing Law.......................................  A-45
Section 9.6.   Notices.............................................  A-45
Section 9.7.   Entire Agreement, etc...............................  A-45
Section 9.8.   Definitions of "Subsidiary" and "Significant Subsidiary"......  A-46
Section 9.9.   Captions............................................  A-46
Section 9.10.  Specific Performance................................  A-46
Section 9.11.  Severability........................................  A-46
Section 9.12.  No Third-Party Beneficiaries........................  A-46
Section 9.13.  Fresenius AG Covenant...............................  A-46
Section 9.14.  Further Assurances..................................  A-47
</TABLE>
```

                                  A-5

<PAGE>   364

```
<TABLE>
<CAPTION>
   ANNEX A
- ----------
<S>                     <C>
Exhibit A               Distribution Agreement
Exhibit B               [Intentionally omitted]
Exhibit C               [Intentionally omitted]
Exhibit D               [Intentionally omitted]
Exhibit E               Contribution Agreement
Exhibit F               [Intentionally omitted]
Exhibit G               [Intentionally omitted]
Exhibit H               [Intentionally omitted]
Exhibit I               [Intentionally omitted]
</TABLE>
```

                                  A-6

<PAGE>   365

     AGREEMENT AND PLAN OF REORGANIZATION, dated as of February 4, 1996, as
amended, (this "Agreement" or the "Reorganization Agreement"), by and between W.
R. GRACE & CO., a New York corporation ("Grace"), and FRESENIUS AG, an
Aktiengesellschaft organized under the laws of the Federal Republic of Germany
("Fresenius AG").

                                  RECITALS

     A.  Defined Terms.  Certain capitalized terms used herein shall have the
meanings set forth in Annex A hereto.

     B.  Newco.  Prior to the Effective Time, Fresenius AG intends (a) to
convert a wholly owned GmbH subsidiary into an Aktiengesellschaft organized
under the laws of the Federal Republic of Germany ("Newco"), having charter
documents (the "Newco Charter Documents") and other organizational documents
consistent with the terms set forth in Exhibit D hereto and subject to the
approval of each party hereto, and (b) to enter into a Pooling Agreement
consistent with the terms set forth in Exhibit D hereto and subject to the
approval of each party hereto (the "Newco Pooling Agreement").

     C.  The Contribution.  Prior to the Effective Time, Fresenius AG intends to
contribute its worldwide dialysis business (including its shares of capital
stock of Fresenius USA) to Newco ("Contribution") pursuant to the
Contribution Agreement attached hereto as Exhibit E (the " Contribution
Agreement"), and shall retain and lease to Newco its real property and buildings
in the Federal Republic of Germany to the extent used in connection with the FWD
Business pursuant to a lease (or leases) (the "Lease") consistent with the terms
set forth in Exhibit B to the Contribution Agreement, and subject to the
approval of each party hereto, and shall retain and license to Newco its name
and certain related marks pursuant to a license consistent with the terms set
forth in Exhibit C to the Contribution Agreement, and subject to the approval of
each party hereto.

     D.  The Distribution.  Simultaneously herewith, W. R. Grace & Co.-Conn., a
Connecticut corporation ("Grace-Conn."), are entering into the Distribution
Agreement attached hereto as Exhibit A (the "Distribution Agreement") and, prior
to the Effective Time, intend to consummate the transactions contemplated
thereby. Prior to the Effective Time, Grace intends to transfer to (or retain
in) Grace-Conn. all non-healthcare assets and liabilities, its interests in the
Amicon bioseparations business and GN Holdings, Inc. and certain other assets,
as contemplated by the Distribution Agreement, and to effect a distribution to

XXX-002107