its common shareholders of all of its equity interest in Grace-Conn. (the "Distribution").

E.  The Recapitalization.  Immediately prior to the Effective Time, but following the Distribution, Grace shall be recapitalized (the "Recapitalization") so that each holder of a Grace Common Share shall thereafter hold one Grace Common Share and one one-hundredth of a NY Preferred Share.

F.  The Mergers.  At the Effective Time, the parties intend to effect a merger of a wholly owned New York corporate subsidiary of Newco ("Grace Merger Sub") with and into Grace, with Grace being the surviving corporation (the "Grace Merger"), and that the Certificate of Incorporation of Grace shall be amended (the "Grace Amendment") to change the name of Grace to a name mutually acceptable to the parties hereto. Also at the Effective Time, the parties intend to effect a merger of a wholly owned Massachusetts corporate subsidiary of Newco ("Fresenius USA Merger Sub") with and into Fresenius USA, Inc., a Massachusetts corporation ("Fresenius USA" and, together with Fresenius AG, the "Fresenius Parties"), with Fresenius USA being the surviving corporation (the "Fresenius USA Merger" and, together with the Grace Merger, the "Mergers"), and Fresenius AG has committed to vote its shares of Fresenius USA in favor of the Fresenius USA Merger, as provided herein.

G.  Financing.  It is the intention of the parties hereto that, prior to the Distribution: (i) Grace and Grace-Conn. shall use reasonable efforts to cause NMC to arrange new credit facilities so that the transactions contemplated by the Transaction Agreements may be consummated; (ii) Fresenius AG shall use reasonable efforts to arrange new credit facilities for the FWD Business so that the transactions contemplated by the Transaction Agreements may be consummated; and (iii) the parties shall cooperate with one another with respect to the foregoing.

                                    A-7
<PAGE>   366

H.  Intention of the Parties.  It is the intention of the parties to this Agreement that for United States federal income tax purposes (a) the Contribution shall qualify as a tax-free exchange under the Code, (b) the Distribution shall qualify as a tax-free distribution under the Code, (c) the Recapitalization shall be tax-free to Grace under the Code and (d) each of the Mergers shall qualify as a "reorganization" within the meaning of Section 368(a) of the Code.

I.  Approvals.  The Board of Directors of each party hereto has determined that this Agreement is in the best interests of such party and its shareholders and has duly approved this Agreement and authorized its execution and delivery.

                                    A-8
<PAGE>   367

NOW, THEREFORE, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties hereto hereby agree as follows:

                                 ARTICLE I

               THE REORGANIZATION; CLOSING; EFFECTIVE TIME

SECTION 1.1. The Distribution, Newco and the Contribution.  (a) Subject to the terms and conditions of the Distribution Agreement, prior to the Effective Time, the parties thereto shall effect the various transactions contemplated thereby including, immediately prior to the Effective Time, the Distribution.

(b) Prior to the Effective Time, Fresenius AG shall cause Newco to adopt the Newco Charter Documents (which shall be satisfactory to the other parties hereto), shall cause Newco to adopt other organizational documents as may be necessary or advisable (which shall be satisfactory to the other parties hereto) and shall enter into, and shall cause Newco to enter into, the Newco Pooling Agreement (which shall be satisfactory to the other parties hereto).

(c) Subject to the terms and conditions of the Contribution Agreement, prior to the Effective Time, Fresenius AG shall effect the various transactions contemplated by the Contribution Agreement including the Contribution.

SECTION 1.2. The Recapitalization and the Mergers.  (a) Subject to the terms and conditions of this Agreement, immediately prior to the Effective Time, but following the Distribution, Grace shall consummate the Recapitalization.

(b) At the Effective Time, Grace and Grace Merger Sub shall consummate the Grace Merger in which Grace Merger Sub shall be merged with and into Grace and the separate corporate existence of Grace Merger Sub shall thereupon cease. Grace shall be the surviving corporation of the Grace Merger (the "Grace Surviving Corporation") and shall continue to be governed by the laws of the State of New York.

(c) Subject to the terms and conditions of this Agreement, at the Effective Time, Fresenius USA and Fresenius USA Merger Sub shall consummate the Fresenius USA Merger in which Fresenius USA Merger Sub shall be merged with and into Fresenius USA and the separate corporate existence of Fresenius USA Merger Sub shall thereupon cease. Fresenius USA shall be the surviving corporation of the Fresenius USA Merger (the "Fresenius USA Surviving Corporation") and shall continue to be governed by the laws of the Commonwealth of Massachusetts.

XXX-002108

SECTION 1.3. Effective Time. Fresenius USA and Fresenius USA Merger Sub shall cause a certificate of merger to be submitted to the Department of State of the Commonwealth of Massachusetts as provided in the MBCL (the "Massachusetts Certificate"). The Fresenius USA Merger shall become effective at such time as the Massachusetts Certificate has been filed by the Department of State of the Commonwealth of Massachusetts in accordance with the provisions of the MBCL or at such other time as may be specified in the Massachusetts Certificate in accordance with applicable law. The date and time when the Fresenius USA Merger shall become effective is referred to herein as the "Effective Time." Grace and Grace Merger Sub shall cause articles of merger to be submitted to the Department of State of the State of New York as provided in the NYBCL (the "New York Certificate "). The New York Certificate shall provide that the Grace Merger shall become effective at the Effective Time in accordance with applicable law.

SECTION 1.4. Closing. The closing of the Reorganization (the "Closing") shall take place at the offices of Wachtell, Lipton, Rosen & Katz, New York, New York, at 10:00 A.M. on the first business day on which all the conditions set forth in Article VII can be fulfilled or are waived, or at such other place and/or time as the parties hereto may agree. The date upon which the Closing shall occur is herein called the "Closing Date."

A-9

<PAGE>  368

## ARTICLE II

### CERTIFICATE OF INCORPORATION AND BY-LAWS

SECTION 2.1. Grace Certificate of Incorporation. The certificate of incorporation of Grace, as in effect at the Effective Time and taking into account the Grace Amendment, shall be the certificate of incorporation of the Grace Surviving Corporation (the "Grace Certificate of Incorporation"), until duly amended in accordance with the terms thereof and the NYBCL.

SECTION 2.2. Grace By-laws. The By-laws of Grace, as in effect at the Effective Time, shall continue as the By-laws of the Grace Surviving Corporation until duly amended in accordance with the terms thereof, the Grace Certificate of Incorporation and the NYBCL.

SECTION 2.3. Fresenius USA Articles of Organization. The articles of organization of Fresenius USA, as in effect at the Effective Time, shall be the articles of organization of the Fresenius USA Surviving Corporation (the "Fresenius USA Articles of Organization"), until duly amended in accordance with the terms thereof and the MBCL.

SECTION 2.4. Fresenius USA By-laws. The By-laws of Fresenius USA, as in effect at the Effective Time, shall continue as the By-laws of the Fresenius USA Surviving Corporation, until duly amended in accordance with the terms thereof, the Fresenius USA Articles of Organization and the MBCL.

## ARTICLE III

### DIRECTORS AND OFFICERS

SECTION 3.1. Grace Directors. Immediately after the Effective Time, the directors of Grace Merger Sub shall be the directors of the Grace Surviving Corporation.

SECTION 3.2. Grace Officers. Immediately after the Effective Time, the officers of Grace Merger Sub shall be the officers of the Grace Surviving Corporation.

SECTION 3.3. Fresenius USA Directors. Immediately after the Effective Time, the directors of Fresenius USA Merger Sub shall be the directors of the Fresenius USA Surviving Corporation.

SECTION 3.4. Fresenius USA Officers. Immediately after the Effective Time, the officers of Fresenius USA Merger Sub shall be the officers of the Fresenius USA Surviving Corporation.

## ARTICLE IV

### MERGER CONSIDERATION; CONTRIBUTION CONSIDERATION;
### CONVERSION OR CANCELLATION OF SHARES IN THE MERGERS

SECTION 4.1. Grace Merger Consideration; Conversion or Cancellation of Grace Capital Stock. At the Effective Time, by virtue of the Grace Merger and without any action on the part of the holder of any capital stock of Grace:

(a) Subject to Section 4.4(c), each Grace Common Share issued and outstanding immediately prior to the Effective Time (other than any Grace Common Share owned by Fresenius AG or its subsidiaries or Fresenius USA or its subsidiaries or any Grace subsidiaries or held in Grace's treasury or any Grace Common Dissenting Share) shall be converted at the Effective Time into the right to receive the Grace Consideration Per Share.

(b) Each Grace Preferred Share and each NY Grace Preferred Share issued and outstanding immediately prior to the Effective Time shall remain issued and outstanding and shall be unchanged by the Grace Merger.

(c) All Grace Common Shares shall cease to be outstanding, shall be cancelled and retired and shall cease to exist, and each holder of an Old Grace Common Certificate (other than holders of Old

XXX-002109

A-10

<PAGE>  369

Grace Common Certificates representing Grace Common Dissenting Shares) shall there after cease to have any rights with respect to such Old Grace Common Certificates, except the right to receive, without interest, upon exchange of such Old Grace Common Certificates in accordance with Section 4.4, the Newco Ordinary Share Certificates and payments to which such holder is entitled pursuant to this Article IV.

(d) Each Grace Common Share issued and outstanding immediately prior to the Effective Time and owned by Fresenius AG or its subsidiaries or Fresenius USA or its subsidiaries or any Grace subsidiary or held in Grace's treasury shall cease to be outstanding, shall be cancelled and retired without payment of any consideration therefor and shall cease to exist.

(e) Each share of Grace Merger Sub common stock issued and outstanding immediately prior to the Effective Time shall be converted into and become one share of common stock of the Grace Surviving Corporation.

SECTION 4.2. Fresenius USA Merger Consideration; Conversion or Cancellation of Fresenius USA Capital Stock. At the Effective Time, by virtue of the Fresenius USA Merger and without any action on the part of the holder of any capital stock of Fresenius USA:

(a) Subject to Section 4.4(c), each Fresenius USA Common Share issued and outstanding immediately prior to the Effective Time (other than any Fresenius USA Common Share owned by Fresenius AG or its subsidiaries or Grace or its subsidiaries or any Fresenius USA subsidiary or held in Fresenius USA's treasury or any Fresenius USA Common Dissenting Share) shall be converted at the Effective Time into the right to receive the Fresenius USA Consideration Per Share.

(b) All Fresenius USA Common Shares and Fresenius USA Preferred Shares shall cease to be outstanding, shall be cancelled and retired and shall cease to exist, and each holder of an Old Fresenius USA Common Certificate (other than holders of Old Fresenius USA Common Certificates representing Fresenius USA Common Dissenting Shares) shall thereafter cease to have any rights with respect to such Old Fresenius USA Common Certificates, except the right to receive, without interest, upon exchange of such Old Fresenius USA Common Certificates in accordance with Section 4.4, the Newco Ordinary Share Certificates and payments to which such holder is entitled pursuant to this Article IV.

(c) Each Fresenius USA Common Share issued and outstanding immediately prior to the Effective Time and owned by Grace or its subsidiaries or Fresenius AG or its subsidiaries or Newco or any Fresenius USA subsidiary or held in Fresenius USA's treasury, and each Fresenius USA Preferred Share, shall cease to be outstanding, shall be cancelled and retired without payment of any consideration therefor (except, as provided in Section 4.3) and shall cease to exist.

(d) Each share of Fresenius USA Merger Sub capital stock issued and outstanding immediately prior to the Effective Time shall be converted into and become one share of common stock of the Fresenius USA Surviving Corporation.

(e) Prior to the vote of holders of Fresenius USA Common Shares to be held with respect to the Fresenius USA Merger, Fresenius AG shall advise Grace in writing as to the aggregate consideration to be given to Fresenius USA shareholders (other than Fresenius AG and its subsidiaries) in the Fresenius USA Merger (the "Aggregate Fresenius USA Common Share Consideration"); provided that (i) to the extent that the Aggregate Fresenius USA Common Share Consideration includes any Newco Ordinary Shares, such shares shall be allocated to the holders of Fresenius USA Common Share Equivalent (other than Fresenius AG and its subsidiaries) in lieu of Newco Ordinary Shares which would otherwise have been allocated to Fresenius AG under Section 4.3; (ii) holders of Grace Common Share Equivalents shall be allocated in the Reorganization, in the aggregate, 44.8% of Newco's equity securities outstanding immediately following the Reorganization on a fully diluted basis; (iii) Fresenius AG shall be allocated in the Reorganization, in the aggregate, no less than 51% of Newco's equity securities outstanding immediately following the Re organization on a fully diluted basis; (iv) such transaction shall not adversely affect the tax-free nature of the Distribution, the Contribution or the Grace Merger; and (v) no additional costs or expenses (including applicable taxes) shall be borne by Grace, Fresenius USA or

A-11

<PAGE>  370

Newco as a result thereof, other than costs and expenses for which Fresenius AG has agreed to reimburse Grace, Fresenius USA or Newco, as applicable, at the Closing.

SECTION 4.3. Fresenius AG Consideration. At the Effective Time, in consideration of the Contribution and the contribution to Newco of the Fresenius USA Common Shares and the Fresenius USA Preferred Shares owned by Fresenius AG and its subsidiaries (as provided in the Contribution Agreement), and in consideration of the Fresenius USA Merger, Fresenius AG shall be allocated 55.2% of the Newco Ordinary Shares that will be outstanding immediately following consummation of the Reorganization on a fully diluted basis.

XXX-002110

SECTION 4.4. Exchange of Old Certificates for New Certificates. (a) Appointment of Exchange Agent. From and after the Effective Time until the end of the six-month period following the Effective Time, the Surviving Corporations shall make available or cause to be made available to an exchange agent appointed prior to the Effective Time by Newco with the approval of each of Grace and Fresenius AG (the "Exchange Agent") Newco Ordinary Share Certificates and cash in amounts sufficient to allow the Exchange Agent to make all deliveries of Newco Ordinary Share Certificates and payments that may be required in exchange for Old Certificates pursuant to this Article IV.

(b) Exchange Procedures. Promptly after the Effective Time, the Surviving Corporations shall cause the Exchange Agent to mail or deliver to each person (other than any party hereto or its subsidiaries and any holder of Dissenting Shares) who was, at the Effective Time, a holder of record of Grace Common Shares or, if applicable, Fresenius USA Common Shares a form (the terms of which shall be mutually agreed upon by the parties hereto prior to the Effective Time) of letter of transmittal containing instructions for use in effecting the surrender of the Old Certificates in exchange for ADRs or Newco Ordinary Share Certificates and payments pursuant to this Article IV. Upon surrender to the Exchange Agent of an Old Certificate for cancellation together with such letter of transmittal, duly executed and completed in accordance with the instructions thereto, the holder of such Old Certificate shall be entitled to receive in exchange therefor ADRs or a Newco Ordinary Share Certificate representing the Newco Ordinary Shares, and a check in the amount to which such holder is entitled pursuant to this Article IV, and the Old Certificate so surrendered shall forthwith be cancelled. No interest shall be paid or shall accrue on the amount payable upon surrender of Old Certificates. If any ADR or Newco Ordinary Share Certificate is to be issued in a name other than that in which the Old Certificate surrendered in exchange therefor is registered, it shall be a condition of such exchange that the person requesting such exchange shall pay any transfer or other taxes required by reason of the issuance of such ADR or Newco Ordinary Share Certificate in a name other than that of the registered holder of the Old Certificate surrendered, or shall establish to the satisfaction of the applicable Surviving Corporation that any such taxes have been paid or are not applicable. Six months after the Effective Time, each Surviving Corporation shall be entitled to cause the Exchange Agent to deliver to it any applicable ADRs or Newco Ordinary Share Certificates and cash (including any interest thereon) made available to the Exchange Agent that are unclaimed by the former shareholders of its constituent corporations. Any such former shareholders who have not theretofore exchanged their Old Certificates for ADRs or Newco Ordinary Share Certificates and cash pursuant to this Article IV shall thereafter be entitled to look exclusively to the applicable Surviving Corporation and only as general creditors thereof for the Newco Ordinary Shares and cash to which they become entitled upon exchange of their Old Certificates pursuant to this Article IV. Each Surviving Corporation shall pay all applicable charges and expenses, including its applicable share of those of the Exchange Agent, in connection with the exchange of ADRs or Newco Ordinary Share Certificates and cash for Old Certificates as contemplated hereby.

(c) Fractional Shares. No fractional ADRs or Newco Ordinary Shares shall be issued in the Reorganization. In lieu of any such fractional shares, each person who would otherwise have been entitled to a fraction of an ADR or Newco Ordinary Share upon surrender of an Old Certificate for exchange pursuant to this Article IV shall be paid an amount in cash (without interest) equal to such holder's proportionate interest in the net proceeds from the sale or sales in the open market by the Exchange Agent, on behalf of all such holders, of the aggregate fractional ADRs or Newco Ordinary Shares issued pursuant to this Article IV. As soon as practicable following the Effective Time, the Exchange Agent

A-12

<PAGE>    371

shall determine the excess of (i) the number of full ADRs or Newco Ordinary Shares delivered to the Exchange Agent over (ii) the aggregate number of full ADRs or Newco Ordinary Shares to be distributed in respect of Grace Common Shares or Fresenius USA Common Shares (such excess being herein called the "Excess Shares"), and the Exchange Agent, as agent for the former holders of such shares, shall sell the Excess Shares at the prevailing prices on the open market. The sale of the Excess Shares by the Exchange Agent shall be executed on a public exchange through one or more firms and shall be executed in round lots to the extent practicable; and, at the discretion of the Exchange Agent, the Excess Shares may be exchanged for ADRs pursuant to the ADR Facility and such ADRs shall be sold on the Exchange as aforesaid in lieu of the Excess Shares. Newco shall pay all commissions, transfer taxes and other out-of-pocket transaction costs, including the expenses and compensation of the Exchange Agent, incurred in connection with such sale of Excess Shares. Until the net proceeds of such sale or sales have been distributed, the Exchange Agent shall hold such proceeds in trust for such former stockholders (the "Fractional Securities Fund"). As soon as practicable after the determination of the amount of cash to be paid in lieu of any fractional interests, the Exchange Agent shall make available in accordance with this Agreement such amounts to such former stockholders.

(d) Distributions with Respect to Unexchanged Shares. Notwithstanding any other provisions of this Agreement, no dividends shall be paid to any person holding an Old Certificate until such Old Certificate is surrendered for exchange as provided herein. Subject to the effect of applicable laws, following surrender of any such Old Certificate by any holder thereof other than an Old Certificate representing Dissenting Shares, there shall be paid to the holder of the Newco Ordinary Share Certificate issued in exchange

XXX-002111

therefor, without interest, (i) at the time of such surrender, the amount of dividends or other distributions with a record date after the Effective Time theretofore payable with respect to the Newco Ordinary Shares represented thereby and not paid, less the amount of any withholding taxes which may be required thereon, and (ii) at the appropriate payment date, the amount of dividends or other distributions with a record date after the Effective Time but prior to the time of such surrender and a payment date subsequent to the time of such surrender payable with respect to the Newco Ordinary Shares represented thereby, less the amount of any withholding taxes which may be required thereon.

(e) No Transfers. At or after the Effective Time, there shall be no transfers on the stock transfer books of either Surviving Corporation of Grace Common Shares, Fresenius USA Common Shares or Fresenius USA Preferred Shares which were outstanding immediately prior to the Effective Time.

(f) No Liability. If any Old Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such Old Certificate to be lost, stolen or destroyed and, if required by the applicable Surviving Corporation, the posting by such person of a bond in such reasonable amount as the applicable Surviving Corporation may direct as indemnity against any claim that may be made against it with respect to such Old Certificate, the applicable Surviving Corporation shall, in exchange for such lost, stolen or destroyed Old Certificates, issue or cause to be issued the Newco Ordinary Shares and pay or cause to be paid the amounts deliverable in respect thereof pursuant to this Article IV. None of any party hereto, the Exchange Agent, Newco or any Surviving Corporation shall be liable to any holder of Grace Common Shares or Fresenius USA Common Shares for any cash from the payment fund delivered to a public official pursuant to any applicable abandoned property, escheat or similar law.

(g) Withholding Rights. The Surviving Corporations shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any holder of Grace Common Shares or Fresenius USA Common Shares such amounts as may be required to be deducted and withheld with respect to the making of such payment under the Code, or under any provision of state, local or foreign tax law. To the extent that amounts are so withheld and paid over to the appropriate taxing authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the Grace Common Shares or Fresenius USA Common Shares in respect of which such deduction and withholding was made.

A-13

<PAGE>    372

(h) Transfer Taxes. Except as provided above, Fresenius USA and Grace shall pay or cause to be paid any transfer or gains tax (including, without limitation, any real property gains or transfer tax), other than any income tax, imposed in connection with or as a result of the Contribution or Fresenius USA Merger, on the one hand, or the Distribution or Grace Merger, on the other hand, respectively.

(i) Stock Options and Warrants. At the Effective Time, each option, warrant or other security convertible into, exchangeable for or exercisable for the purchase of Grace Common Shares, after taking into account adjustments pursuant to the Distribution Agreement (each, a "Grace Option"), and each option, warrant or other security convertible into, exchangeable for or exercisable for the purchase of Fresenius USA Common Shares (each, a "Fresenius USA Option") which is outstanding and unconverted, unexchanged or unexercised, as the case may be, shall cease to represent a right to acquire Grace Common Shares or Fresenius USA Common Shares, as the case may be, and shall be converted automatically into an option, warrant or other security, as the case may be, to purchase Newco Ordinary Shares in an amount and at an exercise price determined as provided below:

(A) The number of Newco Ordinary Shares to be subject to the new option, warrant or other security shall be equal to the product of the number of shares subject to the original option, warrant or other security and the Grace Exchange Ratio (in the case of a Grace Option) or the Fresenius USA Exchange Ratio (in the case of a Fresenius USA Option), rounded down to the nearest whole number of shares; and

(B) The exercise price per share of Newco Ordinary Shares under the new option, warrant or other security shall be equal to the exercise price per share of Grace Common Shares or Fresenius USA Common Shares under the original Grace Option or Fresenius USA Option, as the case may be, divided by the Grace Exchange Ratio (in the case of a Grace Option) or the Fresenius USA Exchange Ratio (in the case of a Fresenius USA Option), rounded up to the nearest whole cent.

The duration and other terms of the new option, warrant or other security shall be the same as the remaining duration and other terms of the original Grace Option or Fresenius USA Option, as the case may be, except that all references to Grace or Fresenius USA shall be deemed to be references to Newco. The adjustment provided herein with respect to any options which are "incentive stock options" (as defined in Section 422 of the Code) shall be, and is intended to be, effected in a manner which is consistent with Section 424(a) of the Code.

SECTION 4.5. Dissenters' Rights. If any holder of Grace Common Shares or Fresenius USA Common Shares shall file written objection or provide notice to Grace or Fresenius USA, respectively, in order to seek appraisal with respect to such shares, pursuant to applicable statutory procedures, Grace or Fresenius

XXX-002112

USA, as applicable, shall give the other notice thereof. If any such holder of Grace Common Shares or Fresenius USA Common Shares shall fail to perfect or shall have effectively withdrawn such objection or notice or lost the right to appraisal with respect to such shares, such shares shall thereupon be treated as though such shares had been converted pursuant to Section 4.1 or Section 4.2, as applicable.

ARTICLE V

REPRESENTATIONS AND WARRANTIES

SECTION 5.1. Representations and Warranties of Grace. Grace hereby represents and warrants to Fresenius AG that, except as set forth in a letter (the "Grace Disclosure Letter") delivered to Fresenius AG simultaneously with the execution and delivery of this Agreement (provided that, as used herein, all references to Grace (and/or its Affiliates) shall be deemed to refer to Grace and its Affiliates which conduct the NMC Business, consistent with Section 9.8 hereof, except as otherwise specifically provided):

(a) Capital Stock. The authorized capital stock of Grace consists of 300,000,000 Grace Common Shares, par value $1.00 per share, of which 97,375,339 were outstanding as of December 31, 1995, and 5,130,000 Grace Preferred Shares, par value $1.00 per share (consisting of 40,000 authorized Grace 6% Preferred Shares, 50,000 authorized Class A Preferred Shares, 40,000 authorized Class B Preferred

A-14

<PAGE>   373

Shares and 5,000,000 authorized Class C Preferred Shares), of which 36,460 were outstanding as Grace 6% Preferred Shares, 16,356 were outstanding as Grace Class A Preferred Shares, 21,577 were outstanding as Grace Class B Preferred Shares and none were outstanding as Grace Class C Preferred Shares, in each case as of December 31, 1995. As of December 31, 1995, 53,153 Grace Common Shares were held by Grace and its subsidiaries (other than any shares held in a fiduciary capacity and beneficially owned by a third party). As of December 31, 1995, there were outstanding under the Grace 1994 Stock Incentive Plan, the Grace 1989 Stock Incentive Plan, the Grace 1986 Stock Incentive Plan, the Grace 1981 Stock Incentive Plan and the Grace 1994 Stock Retainer Plan for Non-Employee Directors (collectively, the "Grace Stock Plans") options to acquire an aggregate of 5,694,196 Grace Common Shares (subject to adjustment on the terms set forth in the Grace Stock Plans). As of the date of this Agreement, there are no Grace Common Shares reserved for issuance, other than 105,083,951 Grace Common Shares reserved for issuance in connection with the Grace Rights and 7,655,459 Grace Common Shares reserved for issuance pursuant to the Grace Stock Plans. All outstanding Grace Common Shares and Grace Preferred Shares have been duly authorized and validly issued and are fully paid and nonassessable. Except for the Grace Common Shares and Grace Preferred Shares, Grace has outstanding no bonds, debentures, notes or other obligations the holders of which have the right to vote (or are convertible or exchangeable into or exercisable for securities having the right to vote) with the shareholders of Grace on any matter. Each of the outstanding shares of capital stock of each of Grace's subsidiaries has been duly authorized and validly issued and is fully paid and nonassessable and, except for an immaterial number of shares held by officers and directors of Grace and its subsidiaries as nominees and for the benefit of Grace or any of its subsidiaries, is owned, either directly or indirectly, by Grace free and clear of all liens, pledges, security interests, claims, proxies, preemptive or subscriptive rights or other encumbrances or restrictions of any kind. Except as set forth above and except for Grace Common Shares issued after December 31, 1995 pursuant to the terms of options, securities or plans referred to above and except for certain preemptive rights of certain Grace Preferred Shares as set forth in the Grace Certificate of Incorporation, there are no shares of capital stock of Grace authorized, issued or outstanding and there are no preemptive rights or any outstanding subscriptions, options, puts, calls, warrants, rights, convertible or exchangeable securities or other agreements or commitments of Grace or any of its significant subsidiaries of any character relating to the issued or unissued capital stock or other securities of Grace or any of its subsidiaries (including, without limitation, the issuance, sale, purchase, redemption, conversion, exchange, redemption, voting or transfer thereof). Exhibit 21 to its Annual Report on Form 10-K for the year ended December 31, 1994, as filed with the SEC, is an accurate and correct statement of all of the information required to be set forth therein by the regulations of the SEC and is an accurate and correct list of all Grace subsidiaries as of the date hereof having a book value as of December 31, 1995 or net income for the fiscal year ended December 31, 1995 in excess of $25,000,000. Except as set forth in such Exhibit, as of the date hereof, Grace does not, directly or indirectly, own any capital stock or other ownership interest in any corporation, partnership, joint venture or other entity having a book value as of December 31, 1995 or net income for the fiscal year ended December 31, 1995 in excess of $25,000,000.

(b) Corporate Organization and Qualification. Each of Grace and its subsidiaries is a corporation duly organized, validly existing and in good standing under the laws of its or such subsidiary's jurisdiction of organization and is in good standing as a foreign corporation in each jurisdiction where the properties owned, leased or operated, or the business conducted, by it or such subsidiary require such qualification, except for any such failure to so qualify or be in good standing which, when taken together with all other such failures, is not reasonably likely to have a Material Adverse Effect with respect to Grace. Each of Grace and its subsidiaries has the requisite corporate power and authority to carry

XXX-002113

on its businesses as they are now being conducted. Grace has made available
to the other parties hereto a complete and correct copy of its Certificate
of Incorporation and By-laws (or similar organizational documents), each as
amended to date and currently in full force and effect.

    (c) Corporate Authority.  Subject only to the receipt of the requisite
approval of its shareholders, Grace has the requisite corporate power and
authority and has taken all corporate action necessary in order to execute,
deliver and perform each Transaction Agreement to which it is a party and
to

                                  A-15
<PAGE>    374

consummate the transactions contemplated hereby and thereby including,
without limitation, the approval of the Board of Directors of Grace and the
resolution of the Board of Directors of Grace to recommend the transactions
contemplated hereby and thereby for approval by Grace shareholders, subject
to their fiduciary duties. Each Transaction Agreement to which Grace is a
party is, or when executed and delivered shall be, a valid and binding
agreement of Grace enforceable in accordance with its terms.

    (d) Governmental Filings; No Violations.  (i) Other than the filings
provided for in the Transaction Agreements, and other than as may be
required under the HSR Act and similar statutes in other countries, the
Exchange Act, the Securities Act, and state securities laws, no notices,
reports or other filings are required to be made by Grace or any subsidiary
with, nor are any consents, registrations, approvals, permits or
authorizations required to be obtained by it or any subsidiary from, any
governmental or regulatory authority, agency, court, commission or other
entity, domestic or foreign ("Governmental Entity"), in connection with the
execution, delivery or performance of each Transaction Agreement to which
it or any subsidiary is a party by it or any subsidiary and the
consummation by it of the transactions contemplated hereby and thereby, the
failure to make or obtain any or all of which, individually or in the
aggregate, is reasonably likely to have a Material Adverse Effect with
respect to Grace or enable any person to enjoin or prevent or materially
delay consummation of the transactions contemplated hereby and thereby.

    (ii) The execution, delivery and performance by Grace or any
subsidiary of each Transaction Agreement to which it is a party does not or
will not, and the consummation by it of any of the transactions
contemplated hereby and thereby will not, constitute or result in (A) a
breach or violation of, or a default under, its Certificate of
Incorporation or By-laws, or the comparable governing instruments of any of
its subsidiaries, or (B) assuming receipt of any consents and the
occurrence of any events disclosed in the Grace Disclosure Letter as
contemplated in the last sentence of this paragraph, a breach or violation
of, or a default under, or the acceleration of or the creation of a lien,
pledge, security interest or other encumbrance on assets of it, Newco or
the Surviving Corporations or any of their respective subsidiaries (with or
without the giving of notice, the lapse of time or both) pursuant to, any
provision of any agreement, lease, contract, note, mortgage, indenture,
arrangement or other obligation or commitment ("Contracts") of it or any of
its subsidiaries or any law, rule, ordinance or regulation or judgment,
decree, order, award or governmental or non-governmental permit or license
to which it or any of its subsidiaries is subject, or any change in the
rights or obligations of any party under, or give rise to any rights of
termination under, any of the Contracts, except, in the case of clause (B)
above, for such breaches, violations, defaults, accelerations or changes
that are disclosed in the Grace Disclosure Letter or, individually and in
the aggregate, are not reasonably likely to have a Material Adverse Effect
with respect to Grace. The Grace Disclosure Letter sets forth a list of all
consents required under any Contracts to be obtained by it or any
subsidiary or events required to occur prior to consummation of the
Reorganization (other than consents the failure to obtain of which,
individually and in the aggregate, is not reasonably likely to have a
Material Adverse Effect with respect to Grace).

    (e) SEC Documents; Financial Statements; No Undisclosed
Liabilities.  (i) Grace has delivered to the other parties hereto each SEC
Document prepared and filed with the SEC by it or its subsidiaries since
December 31, 1994, including, without limitation, (A) its Annual Report on
Form 10-K for the year ended December 31, 1994, and (B) its Quarterly
Reports on Form 10-Q for the periods ended March 31, June 30 and September
30, 1995. As of its filing date, each such SEC Document filed, and each SEC
Document that will be filed by it or its subsidiaries prior to the
Effective Time, as amended or supplemented, if applicable, pursuant to the
Exchange Act (A) complied or will comply in all material respects with the
applicable requirements of the Exchange Act and (B) did not or will not
contain any untrue statement of a material fact or omit to state any
material fact necessary in order to make the statements made therein, in
the light of the circumstances under which they were made, not misleading.
Each of Grace's consolidated balance sheets included in or incorporated by
reference into its SEC Documents (including the related notes and
schedules) fairly presents in all material respects the consolidated
financial position of it and its subsidiaries as of its date and each of
the consolidated

                                  A-16
<PAGE>    375

statements of income, cash flows and shareholders' equity included in or
incorporated by reference into its SEC Documents (including any related

XXX-002114

notes and schedules) fairly presents in all material respects the consolidated results of operations, retained earnings and cash flows, as the case may be, of it and its subsidiaries for the periods set forth therein (subject, in the case of unaudited statements, to normal year-end audit adjustments), in each case in accordance with US GAAP.

(ii) Each SEC Document which is a final registration statement filed, and each final registration statement that will be filed by it or any subsidiary prior to the Effective Time, as amended or supplemented, if applicable, pursuant to the Securities Act, as of the date such statement or amendment became or will become effective (A) complied or will comply in all material respects with the applicable requirements of the Securities Act and (B) did not or will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading (in the case of any prospectus, in light of the circumstances under which they were made).

(iii) Included in the Grace Disclosure Letter are a special purpose consolidated balance sheet as of, and special purpose consolidated statements of income, cash flows and shareholders' equity for Grace for the year ended, December 31, 1995, for Grace, in each case exclusive of the Grace-Conn. Business and the assets, liabilities, income, cash flows and shareholders' equity thereof (such financial statements, the "Grace Disclosure Letter Financial Statements" and the balance sheet as of December 31, 1995 included therein, the "Grace Disclosure Letter Balance Sheet"). The Grace Disclosure Letter Balance Sheet (including any related notes and schedules) fairly presents in all material respects, and the special purpose consolidated balance sheet to be included in the Grace Audited Financial Statements (including any related notes and schedules) shall fairly present in all material respects, the consolidated financial position of Grace and its included subsidiaries as of its date; and each of the special purpose consolidated statements of income, cash flows and shareholders' equity included in the Grace Disclosure Letter Financial Statements (including any related notes and schedules) fairly presents in all material respects, and each such statement to be included in the Grace Audited Financial Statements (including any related notes and schedules) shall fairly present in all material respects, the consolidated results of operations, retained earnings and cash flows, as the case may be, of Grace and its included subsidiaries for the periods set forth therein, in each case in accordance with US GAAP and in each case exclusive of the Grace-Conn. Business and the assets, liabilities, income, cash flows and shareholders' equity thereof.

(iv) Except as disclosed in the Grace Disclosure Letter Balance Sheet or the notes thereto or in its SEC Documents filed with the SEC prior to the date hereof, neither Grace nor its subsidiaries has any liabilities, whether or not accrued, contingent or otherwise, that, individually or in the aggregate, are reasonably likely to have a Material Adverse Effect with respect to Grace.

(f) Absence of Certain Events and Changes.  Except as disclosed in its SEC Documents filed with the SEC prior to the date hereof, since September 30, 1995, Grace and its subsidiaries have conducted their respective businesses only in the ordinary and usual course of such businesses and there has not been any change or development or combination of changes or developments (including any worsening of any condition currently existing) which, individually and in the aggregate, is reasonably likely to result in a Material Adverse Effect with respect to Grace.

(g) Compliance with Laws.  Except as disclosed in its SEC Documents filed with the SEC prior to the date hereof, Grace and its subsidiaries have complied, in the conduct of their respective businesses, with all applicable federal, state, local and foreign statutes, laws, regulations, ordinances, rules, judgments, orders or decrees applicable thereto, except where the failure to comply is not reasonably likely, individually and in the aggregate, to have a Material Adverse Effect with respect to Grace. To the knowledge of its executive officers, each of Grace and its subsidiaries has, and, immediately after the Grace Merger, will have, all permits, licenses, certificates of authority, orders, and approvals of, and has made all filings, applications, and registrations with, federal, state, local, and foreign governmental or regulatory bodies that are required in order to permit it or such subsidiary to carry on its business as it is presently conducted, except for such permits, licenses, certificates, orders, filings, applications and

A-17

<PAGE>   376

registrations, the failure to have or make which, individually and in the aggregate, are not reasonably likely to have a Material Adverse Effect with respect to Grace.

(h) Title to Assets.  Grace and its subsidiaries have and, immediately after the Grace Merger, the NMC Group will have, good and, with respect to real property, marketable title to its properties and assets (other than property as to which it is lessee), except for those defects in title which are not, individually and in the aggregate, reasonably likely to have a Material Adverse Effect with respect to Grace. Grace and its subsidiaries have, and immediately after the Grace Merger, the NMC Group will either own or have adequate rights to use (on the same basis as currently owned or used by Grace or such subsidiaries), all assets predominantly used or useful in the NMC Business as currently conducted and all assets reflected on the Grace Disclosure Letter Balance Sheet, except for assets disposed of in accordance with this Agreement and except for those failures to own or

XXX-002115

have which are not, individually and in the aggregate, reasonably likely to have a Material Adverse Effect with respect to Grace.

(i) Litigation. Except as disclosed in Grace's SEC Documents filed with the SEC prior to the date hereof, there are no civil, criminal or administrative actions, suits, claims, hearings or proceedings pending or, to the knowledge of its executive officers, threatened, or investigations pending, against it or any of its subsidiaries that, individually or in the aggregate, are reasonably likely to have a Material Adverse Effect with respect to Grace. There are no judgments or outstanding orders, writs, injunctions, decrees, stipulations or awards (whether rendered or issued by a court or Governmental Entity, or by arbitration) against Grace or any of its subsidiaries or their respective properties or businesses, which are reasonably likely, individually or in the aggregate, to have a Material Adverse Effect with respect to Grace.

(j) Taxes. Except as disclosed in its SEC Documents filed with the SEC prior to the date hereof, all material federal, state, local and foreign tax returns required to be filed by or on behalf of Grace or any of its subsidiaries have been timely filed or requests for extensions have been timely filed and any such extension shall have been granted and not have expired, and all such filed returns are complete and accurate in all material respects. Except as disclosed in its SEC Documents filed with the SEC prior to the date hereof, all material taxes required to be shown on returns filed by Grace, as of the date of such SEC Document, have been paid in full or have been recorded as a liability on its consolidated balance sheet (in accordance with US GAAP). Except as disclosed in its SEC Documents filed with the SEC prior to the date hereof, there is no outstanding audit examination, deficiency, or refund litigation with respect to any taxes of Grace that, individually or in the aggregate, is reasonably likely to have a Material Adverse Effect with respect to Grace. Except as disclosed in its SEC Documents filed with the SEC prior to the date hereof, all material taxes, interest, additions, and penalties due with respect to completed and settled examinations or concluded litigation relating to Grace have been paid in full or have been recorded as a liability on its balance sheet (in accordance with US GAAP). Except as disclosed in its SEC Documents filed with the SEC prior to the date hereof, neither Grace nor any of its subsidiaries is a party to a tax sharing or similar agreement or any agreement pursuant to which it or any of its subsidiaries has indemnified another party with respect to taxes (other than the tax sharing agreement attached to the Distribution Agreement), except for any such agreement under which the liabilities of Grace and its subsidiaries would not be reasonably likely to have a Material Adverse Effect with respect to Grace. Except as set forth in SEC Documents filed prior to the date hereof, neither Grace nor its subsidiaries have waived any applicable statute of limitations with respect to federal income taxes or any material state income taxes.

(k) Employee Benefits. (i) Grace's SEC Documents filed prior to the date hereof disclose all material information required under the applicable rules and regulations of the SEC with respect to Grace's bonus, deferred compensation, pension, retirement, profit sharing, thrift, savings, employee stock ownership, stock bonus, stock purchase, restricted stock and stock option plans, all material employment or severance Contracts, all other material employee benefit plans and all applicable "change of control" or similar provisions in any material plan, Contract or arrangement which covers employees or former employees of Grace or its subsidiaries ("Grace Compensation Plans"). True and complete copies of the Grace Compensation Plans and all other benefit plans, Contracts or arrangements (regardless of whether

A-18

<PAGE>   377

they are funded or unfunded or foreign or domestic) covering employees or former employees of Grace and its subsidiaries (the "Grace Employees"), including, but not limited to, "employee benefit plans" within the meaning of Section 3(3) of ERISA, and all amendments thereto, have been made available to each other party hereto.

(ii) All Grace Compensation Plans that are "employee benefit plans", other than "multiemployer plans" within the meaning of Sections 3(37) or 4001(a)(3) of ERISA, covering Grace Employees (the "Grace Plans"), to the extent where the failure to be so would not reasonably be expected to have a Material Adverse Effect with respect to Grace. There is no pending or, to the knowledge of executive officers, threatened litigation relating to any Grace Plan which is reasonably likely to have a Material Adverse Effect with respect to Grace.

(iii) No material liability that has not previously been fully satisfied under Subtitle C or D of Title IV of ERISA, under Section 412 of the Code or under Section 302 of ERISA has been or is expected to be incurred by Grace or any of its subsidiaries with respect to any "single-employer plan," within the meaning of Section 4001(a)(15) of ERISA, currently or formerly maintained by any of them, or the single-employer plan of any entity which is considered one employer with it under Section 4001 of ERISA or Section 414 of the Code (a "Grace ERISA Affiliate"). Grace and its subsidiaries and the Grace ERISA Affiliates have not incurred and do not expect to incur any material withdrawal liability with respect to a multiemployer plan under Subtitle E of Title IV of ERISA. No notice of a "reportable event," within the meaning of Section 4043 of ERISA, for which the 30-day reporting requirement has not been waived, has been required to be filed for any of the Grace Plans or by any of the Grace ERISA Affiliates

XXX-002116

within the 12-month period ending on the date hereof.

(iv) As of January 1, 1995, the "full-funding limitation" (as defined in Section 412(c)(9) of the Code) has been satisfied with respect to each Grace Pension Plan which is a single-employer plan (within the meaning of Section 4001(a)(15) of ERISA), and there has been no change in the financial condition of any such Grace Pension Plan since that date that is reasonably likely to have a Material Adverse Effect with respect to Grace. The withdrawal liability of Grace and its subsidiaries under each Grace Plan which is a multiemployer plan to which Grace, its subsidiaries or its ERISA Affiliates has contributed during the preceding 12 months, determined as if a "complete withdrawal," within the meaning of Section 4203 of ERISA, had occurred as of the date hereof, is not reasonably likely to have a Material Adverse Effect with respect to Grace.

(v) Except as disclosed in its SEC Documents filed prior to the date hereof, neither Grace nor its subsidiaries have any material obligations for retiree health and life benefits under any Grace Plan. Except as disclosed in its SEC Documents filed prior to the date hereof, there are no restrictions on the right of Grace to amend or terminate any Grace Plan that provides retiree health or life benefits to Grace Employees without Grace incurring any material liability thereunder as a result of such amendment or termination.

(vi) All Grace Compensation Plans covering foreign Employees comply with applicable local law except when the failure to so comply, individually and in the aggregate, would not have a Material Adverse Effect with respect to Grace. Grace and its subsidiaries have no unfunded liabilities with respect to any Grace Pension Plan which cover foreign Employees in an amount which is reasonably likely to have a Material Adverse Effect with respect to Grace.

(vii) Except as disclosed in its SEC Documents filed prior to the date hereof or as provided in this Agreement, the transactions contemplated by this Agreement will not result in the vesting or acceleration of any material amounts under any Grace Compensation Plan, any material increase in benefits under any Grace Compensation Plan or payment of any severance or similar compensation under any Grace Compensation Plan, and the amounts, if any, payable under the Grace Compensation Plans and not deductible by it by reason of Section 280G of the Code will not exceed the maximum amount previously disclosed to the other parties hereto. Except as disclosed in its SEC Documents filed prior to the date

A-19

<PAGE> 378

hereof, Grace and its subsidiaries have not entered into any change-of-control agreement under which Grace will be obligated to make change-of-control payments following the Closing.

(1) Environmental Matters.  Except as disclosed in its SEC Documents filed prior to the date hereof and except for such matters that, individually and in the aggregate, are not reasonably likely to have a Material Adverse Effect with respect to Grace, to the knowledge of its executive officers, (i) Grace and its subsidiaries are in compliance with all applicable Environmental Laws; and (ii) neither Grace nor any of its subsidiaries has any outstanding notices, demand letters or requests for information from any Government Entity or any third party that assert that Grace or any of its subsidiaries may be in violation of, or liable under, any Environmental Law and none of Grace, its subsidiaries or its properties are subject to any court order, administrative order or decree arising under any Environmental Law.

(m) Rights Plan.  After giving effect to any amendments that will be made prior to the Effective Time, execution, delivery and performance of this Agreement and consummation of the transactions contemplated hereby will not cause or permit shareholders to exercise rights under the Grace Rights Agreement or the Grace Rights issued pursuant thereto and the Grace Rights will not become unredeemable or exercisable as a result of the execution, delivery or performance of this Agreement or the consummation of the transactions contemplated hereby.

(e) Takeover Statutes.  Execution, delivery and performance of this Agreement and consummation of the transactions contemplated hereby will not cause to be applicable to Grace any "fair price," "moratorium," "control share acquisition" or other similar antitakeover statute or regulation enacted under state or federal laws in the United States or any foreign jurisdiction (each a "Takeover Statute") (after giving effect to any actions that will be taken prior to the Effective Time).

(o) Brokers and Finders.  Neither it nor any of its officers, directors or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions contemplated herein except pursuant to arrangements disclosed in writing to the other parties hereto prior to the date hereof.

(p) Tax Matters.  At the Effective Time, the representations set forth in the numbered paragraphs of the form of Tax Matters Certificate of Grace attached hereto as Exhibit G (the "Grace Tax Matters Certificate") will be true and correct in all respects, and such representations are hereby incorporated herein by reference with the same effect as if set forth herein in their entirety.

(q) Information in Disclosure Documents and Registration Statements. None of the information supplied or to be supplied by Grace for inclusion or incorporation by reference in any Registration Statement will, at the time such Registration Statement becomes effective under the Securities Act and at the Effective Time, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; and the Grace Proxy Statement will not, at the date mailed to Grace shareholders and at the time of the Grace Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. The Grace Proxy Statement will comply as to form in all material respects with the provisions of the Exchange Act and the rules and regulations thereunder, except that no representation is made by Grace with respect to statements made therein based on information supplied by Fresenius AG or Fresenius USA or their respective subsidiaries.

(r) Trademarks, Patents and Copyrights. Grace and its subsidiaries own or possess adequate licenses or other rights to use, all patents, trademarks, trade names, service marks, copyrights, licenses and product licenses or registrations (including applications for any of the foregoing), as are used or useful predominantly in connection with the NMC Business (the "NMC Business Intellectual Property") the lack of which would reasonably be expected to have a Material Adverse Effect with respect to Grace; and none of Grace or any of its subsidiaries has any knowledge of any conflict with the proprietary intellectual property rights of any of Grace or its subsidiary therein or any knowledge of any conflict by

A-20

<PAGE>    379

Grace or its subsidiary with the rights of others therein which would have a Material Adverse Effect with respect to Grace. Immediately after the Grace Merger, Newco or its subsidiaries will own or possess adequate licenses or other rights to use (on substantially the same basis as currently owned or possessed by Grace and its subsidiaries) all of the NMC Business Intellectual Property. There are no Contracts, agreements and licenses pursuant to which Grace or any of its subsidiaries which will not be subsidiaries of Newco after the Grace Merger will retain rights or interests of any kind in or affecting the NMC Business Intellectual Property.

(s) Assets. Except as contemplated herein, at the Effective Time, the NMC Group will contain the worldwide health care business of Grace and all assets and services predominantly used in the conduct of Grace's worldwide health care business as presently conducted.

(t) Disclosure. Neither the representations and warranties of Grace contained in this Agreement nor in any written instrument, list, exhibit or certificate furnished or to be furnished by Grace to Fresenius AG pursuant hereto or in connection herewith contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements not misleading.

SECTION 5.2. Representations and Warranties of Fresenius USA. Subject to Section 9.13, Fresenius AG hereby represents and warrants to Grace that, except as set forth in a letter (the "Fresenius USA Disclosure Letter") delivered to Grace simultaneously with the execution and delivery of this Agreement:

(a) Capital Stock. The authorized capital stock of Fresenius USA consists of 40,000,000 Fresenius USA Common Shares, par value $.01 per share, of which 21,464,874 were outstanding as of December 31, 1995, and 600,000 Fresenius USA Preferred Shares, par value $1.00 per share, of which 200,000 were outstanding as Fresenius USA Series F Preferred Shares as of such date. Fresenius USA Series F Preferred Shares are convertible into an aggregate of 3,129,883 Fresenius USA Common Shares. No Fresenius USA Common Shares were held by Fresenius USA and its subsidiaries (other than any shares held in a fiduciary capacity and beneficially owned by a third party) as of December 31, 1995. As of December 31, 1995, there were outstanding under the Fresenius USA 1976 Stock Option Plan, the Fresenius USA 1985 Special Stock Option Plan, the Fresenius USA 1987 Stock Option Plan, the Fresenius USA 1989 Special Stock Option Plan and the Fresenius USA Directors' Stock Option Plan (collectively, the "Fresenius USA Stock Plans") options to acquire an aggregate of 2,146,395 Fresenius USA Common Shares (subject to adjustment on the terms set forth in the Fresenius USA Stock Plans). As of the date of this Agreement, there are no Fresenius USA Common Shares reserved for issuance, other than 155,550 Fresenius USA Common Shares reserved for issuance upon exercise of stock options, 4,512,500 Fresenius USA Common Shares reserved for issuance pursuant to outstanding warrants and 1,990,845 Fresenius USA Common Shares reserved for issuance pursuant to the Fresenius USA Stock Plans. All outstanding Fresenius USA Common Shares and Fresenius USA Preferred Shares have been duly authorized and validly issued and are fully paid and nonassessable. Except for the Fresenius USA Common Shares and the Fresenius USA Preferred Shares, Fresenius USA has outstanding no bonds, debentures, notes or other obligations the holders of which have the right to vote (or are convertible or exchangeable into or exercisable for securities having the right to vote) with the shareholders of Fresenius USA on any matter. Each of the outstanding shares of capital stock of each of Fresenius USA's subsidiaries has been duly authorized and validly issued and is fully paid and nonassessable, and, except for an immaterial number of shares held by officers and directors of Fresenius USA and its subsidiaries as nominees

XXX-002118

and for the benefit of Fresenius USA or any of its subsidiaries, is owned,
either directly or indirectly, by Fresenius USA free and clear of all
liens, pledges, security interests, claims, proxies, preemptive or
subscriptive rights or other encumbrances or restrictions of any kind.
Except as set forth above and except for Fresenius USA Common Shares issued
after December 31, 1995 pursuant to the terms of options, securities or
plans referred to above, there are no shares of capital stock of Fresenius
USA authorized, issued or outstanding and there are no preemptive rights or
any outstanding subscriptions, options, puts, calls, warrants, rights,
convertible or exchangeable securities or other agreements or commitments
of Fresenius USA or any of its subsidiaries of any character relating to
the issued or unissued capital stock or other securities of Fresenius USA
or any of its subsidiaries (including, without

                              A-21

<PAGE>   380

limitation, the issuance, sale, purchase, redemption, conversion, exchange,
redemption, voting or transfer thereof). Exhibit 21 to Fresenius USA's
Annual Report on Form 10-K for the year ended December 31, 1994, as filed
with the SEC, contains an accurate and correct statement of all of the
information required to be set forth therein by the regulations of the SEC
and is an accurate and correct list of all Fresenius USA subsidiaries as of
the date hereof, other than subsidiaries not engaged in an active business.
Except as set forth in such exhibit, as of the date hereof, Fresenius USA
does not, directly or indirectly, own any capital stock or other ownership
interest in any corporation, partnership, joint venture or other entity,
other than subsidiaries not engaged in an active business.

        (b) Corporate Organization and Qualification. Each of Fresenius USA
and its subsidiaries is a corporation duly organized, validly existing and
in good standing under the laws of its or such subsidiary's jurisdiction of
organization and is in good standing as a foreign corporation in each
jurisdiction where the properties owned, leased or operated, or the
business conducted, by it or such subsidiary require such qualification,
except for any such failure so to qualify or be in good standing which,
when taken together with all other such failures, is not reasonably likely
to have a Material Adverse Effect with respect to Fresenius USA. Each of
Fresenius USA and its subsidiaries has the requisite corporate power and
authority to carry on its businesses as they are now being conducted.
Fresenius USA has made available to the other parties hereto a complete and
correct copy of its Certificate of Incorporation and By-laws, each as
amended to date and currently in full force and effect.

        (c) Corporate Authority. Except as contemplated by Section 9.13
hereof, Fresenius USA has the requisite corporate power and authority and
has taken all corporate action necessary in order to execute, deliver and
perform each Transaction Agreement to which it is a party and to consummate
the transactions contemplated hereby and thereby. Each Transaction
Agreement to which Fresenius USA is a party is, or when executed and
delivered shall be, a valid and binding agreement of Fresenius USA
enforceable in accordance with its terms.

        (d) Governmental Filings; No Violations. (i) Other than the filings
provided for in the Transaction Agreements, and other than as may be
required under the HSR Act and similar statutes in other countries, the
Exchange Act, the Securities Act, and state securities laws, no notices,
reports or other filings are required to be made by Fresenius USA or any
subsidiary with, nor are any consents, registrations, approvals, permits or
authorizations required to be obtained by it or any subsidiary from, any
Governmental Entity in connection with the execution, delivery or
performance of each Transaction Agreement to which it or any subsidiary is
a party by it or any subsidiary and the consummation by it or any
subsidiary of the transactions contemplated hereby and thereby, the failure
to make or obtain any or all of which, individually or in the aggregate, is
reasonably likely to have a Material Adverse Effect with respect to
Fresenius USA or enable any person to enjoin or prevent or materially delay
consummation of the transactions contemplated hereby and thereby.

        (ii) The execution, delivery and performance by Fresenius USA or any
subsidiary of each Transaction Agreement to which it is a party does not or
will not, and the consummation by it of any of the transactions
contemplated hereby and thereby will not, constitute or result in (A) a
breach or violation of, or a default under, its Certificate of
Incorporation or By-laws, or the comparable governing instruments of any of
its subsidiaries, or (B) assuming receipt of any consents and the
occurrence of any events disclosed in the Fresenius USA Disclosure Letter
as contemplated in the last sentence of this paragraph, a breach or
violation of, or a default under, or the acceleration of or the creation of
a lien, pledge, security interest or other encumbrance on assets of it,
Newco or the Surviving Corporations or any of their respective subsidiaries
(with or without the giving of notice, the lapse of time or both) pursuant
to, any provision of any Contracts of it or any of its subsidiaries or any
law, rule, ordinance or regulation or judgment, decree, order, award or
governmental or non-governmental permit or license to which it or any of
its subsidiaries is subject, or any change in the rights or obligations of
any party under, or give rise to any rights of termination under, any of
the Contracts, except, in the case of clause (B) above, for such breaches,
violations, defaults, accelerations or changes that are disclosed in the
Fresenius USA Disclosure Letter or, individually and in the aggregate, are
not reasonably likely to have a Material Adverse Effect with respect to
Fresenius USA. The Fresenius USA Disclosure Letter sets forth a list of

                              A-22

XXX-002119

all consents required under any Contracts to be obtained by it or events required to occur prior to consummation of the Reorganization (other than consents the failure to obtain of which, individually and in the aggregate, is not reasonably likely to have a Material Adverse Effect with respect to Fresenius USA).

(e) SEC Documents; Financial Statements; No Undisclosed Liabilities.  (i) Fresenius USA has delivered to the other parties hereto each SEC Document prepared and filed with the SEC by it or its subsidiaries since December 31, 1994, including, without limitation, (A) its Annual Report on Form 10-K for the year ended December 31, 1994, and (B) its Quarterly Reports on Form 10-Q for the periods ended March 31, June 30 and September 30, 1995.

As of its filing date, each such SEC Document filed, and each SEC Document that will be filed by Fresenius USA or its subsidiaries prior to the Effective Time, as amended or supplemented, if applicable, pursuant to the Exchange Act (A) complied or will comply in all material respects with the applicable requirements of the Exchange Act and (B) did not or will not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. Each of Fresenius USA's consolidated balance sheets included in or incorporated by reference into its SEC Documents fairly presents in all material respects the consolidated financial position of it and its subsidiaries as of its date and each of the consolidated statements of income, cash flows and shareholders' equity included in or incorporated by reference into its SEC Documents (including any related notes and schedules) fairly presents in all material respects the consolidated results of operations, retained earnings and cash flows, as the case may be, of Fresenius USA and its subsidiaries for the periods set forth therein (subject, in the case of unaudited statements, to normal year-end audit adjustments), in each case in accordance with US GAAP.

(ii) Each SEC Document which is a final registration statement filed, and each final registration statement that will be filed by it or any subsidiary prior to the Effective Time, as amended or supplemented, if applicable, pursuant to the Securities Act, as of the date such statement or amendment became or will become effective (A) complied or will comply in all material respects with the applicable requirements of the Securities Act and (B) did not or will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading (in the case of any prospectus, in light of the circumstances under which they were made).

(iii) Included in the Fresenius USA Disclosure Letter are a consolidated balance sheet as of, and consolidated statements of income, cash flows and shareholders' equity for the year ended, December 31, 1995 for Fresenius USA (such financial statements, the "Fresenius USA Disclosure Letter Financial Statements"), and the balance sheet as of December 31, 1995 included therein, (the "Fresenius USA Disclosure Letter Balance Sheet"). The Fresenius USA Disclosure Letter Balance Sheet (including any related notes and schedules) fairly presents in all material respects, and the consolidated balance sheet to be included in the Fresenius USA Audited Financial Statements (including any related notes and schedules) shall fairly present in all material respects, the consolidated financial position of Fresenius USA and its subsidiaries as of its date; and each of the consolidated statements of income, cash flows and shareholders' equity included in the Fresenius USA Disclosure Letter Financial Statements (including any related notes and schedules) fairly presents in all material respects, and each such statement to be included in the Fresenius USA Audited Financial Statements (including any related notes and schedules) shall fairly present in all material respects, the consolidated results of operations, retained earnings and cash flows, as the case may be, of Fresenius USA, and its subsidiaries for the periods set forth therein, in each case in accordance with US GAAP.

(iv) Except as disclosed in the Fresenius USA Disclosure Letter Balance Sheet or the notes thereto or in its SEC Documents filed with the SEC prior to the date hereof, neither Fresenius USA nor its subsidiaries has any liabilities, whether or not accrued, contingent or otherwise, that, individually or in the aggregate, are reasonably likely to have a Material Adverse Effect with respect to Fresenius USA.

A-23

(f) Absence of Certain Events and Changes.  Except as disclosed in its SEC Documents filed with the SEC prior to the date hereof, since September 30, 1995, Fresenius USA and its subsidiaries have conducted their respective businesses only in the ordinary and usual course of such businesses and there has not been any change or development or combination of changes or developments (including any worsening of any condition currently existing) which, individually and in the aggregate, is reasonably likely to result in a Material Adverse Effect.

(g) Compliance with Laws.  Except as disclosed in its SEC Documents filed with the SEC prior to the date hereof, Fresenius USA and its subsidiaries have complied, in the conduct of their respective businesses, with all applicable federal, state, local and foreign statutes, laws, regulations, ordinances, rules, judgments, orders or decrees applicable thereto, except where the failure to comply is not reasonably likely,

XXX-002120

individually and in the aggregate, to have a Material Adverse Effect with respect to Fresenius USA. To the knowledge of its executive officers, each of Fresenius USA and its subsidiaries has, and, immediately after the Fresenius USA Merger, will have, all permits, licenses, certificates of authority, orders, and approvals of, and has made all filings, applications, and registrations with, federal, state, local, and foreign governmental or regulatory bodies that are required in order to permit it or such subsidiary to carry on its business as it is presently conducted, except for such permits, licenses, certificates, orders, filings, applications and registrations, the failure to have or make which, individually and in the aggregate, are not reasonably likely to have a Material Adverse Effect with respect to Fresenius USA.

(h) Title to Assets.  Fresenius USA or its subsidiaries have and, immediately after the Fresenius USA Merger, will have, good and, with respect to real property, marketable title to its properties and assets (other than property as to which it is lessee), except for those defects in title which are not, individually and in the aggregate, reasonably likely to have a Material Adverse Effect with respect to Fresenius USA. Fresenius USA and its subsidiaries have, and immediately after the Fresenius USA Merger, will either own or have adequate rights to use (on the same basis as currently owned or used by Fresenius USA or such subsidiaries), all assets used or useful in Fresenius USA's business as currently conducted and all assets reflected on the Fresenius USA Disclosure Letter Balance Sheet, except for assets disposed of in accordance with this Agreement and except for those failures to own or have which are not, individually and in the aggregate, reasonably likely to have a Material Adverse Effect with respect to Fresenius USA.

(i) Litigation.  Except as disclosed in Fresenius USA's SEC Documents filed with the SEC prior to the date hereof, there are no civil, criminal or administrative actions, suits, claims, hearings or proceedings pending or, to the knowledge of its executive officers, threatened, or investigations pending, against Fresenius USA or any of its subsidiaries that, individually or in the aggregate, are reasonably likely to have a Material Adverse Effect with respect to Fresenius USA. There are no judgments or outstanding orders, writs, injunctions, decrees, stipulations or awards (whether rendered or issued by a court or Governmental Entity, or by arbitration) against Fresenius USA or any of its subsidiaries or their respective properties or businesses, which are reasonably likely, individually or in the aggregate, to have a Material Adverse Effect with respect to Fresenius USA.

(j) Taxes.  Except as disclosed in Fresenius USA's SEC Documents filed with the SEC prior to the date hereof, all material federal, state, local and foreign tax returns required to be filed by or on behalf of Fresenius USA or any of its subsidiaries have been timely filed or requests for extensions have been timely filed and any such extension shall have been granted and not have expired, and all such filed returns are complete and accurate in all material respects. Except as disclosed in its SEC Documents filed with the SEC prior to the date hereof, all material taxes required to be shown on returns filed by Fresenius USA, as of the date of such SEC Document, have been paid in full or have been recorded as a liability on its consolidated balance sheet (in accordance with US GAAP). Except as disclosed in its SEC Documents filed with the SEC prior to the date hereof, there is no outstanding audit examination, deficiency, or refund litigation with respect to any taxes of Fresenius USA that, individually or in the aggregate, is reasonably likely to have a Material Adverse Effect with respect to Fresenius USA. Except as disclosed in its SEC Documents filed with the SEC prior to the date hereof, all material taxes, interest,

A-24

<PAGE>   383

additions, and penalties due with respect to completed and settled examinations or concluded litigation relating to Fresenius USA have been paid in full or have been recorded as a liability on its balance sheet (in accordance with US GAAP). Except as disclosed in its SEC Documents filed with the SEC prior to the date hereof, neither Fresenius USA nor any of its subsidiaries is a party to a tax sharing or similar agreement or any agreement pursuant to which it or any of its subsidiaries has indemnified another party with respect to taxes (other than the tax sharing agreement attached to the Contribution Agreement), except for any such agreement under which the liabilities of Fresenius USA and its subsidiaries would not be reasonably likely to have a Material Adverse Effect with respect to Fresenius USA. Except as set forth in SEC Documents filed prior to the date hereof, neither Fresenius USA nor its subsidiaries have waived any applicable statute of limitations with respect to federal income taxes or any material state income taxes.

(k) Employee Benefits.  (i) Fresenius USA's SEC Documents filed prior to the date hereof disclose all material information required under the applicable rules and regulations of the SEC with respect to Fresenius USA's bonus, deferred compensation, pension, retirement, profit sharing, thrift, savings, employee stock ownership, stock bonus, stock purchase, restricted stock and stock option plans, all material employment or severance Contracts, all other material employee benefit plans and all applicable "change of control" or similar provisions in any material plan, Contract or arrangement which covers employees or former employees of Fresenius USA or its subsidiaries ("Fresenius USA Compensation Plans"). True and complete copies of the Fresenius USA Compensation Plans and all other benefit plans, Contracts or arrangements (regardless of whether they are funded or unfunded or foreign or domestic) covering employees or former employees of Fresenius USA and its subsidiaries (the "Fresenius USA Employees"),

XXX-002121

including, but not limited to, "employee benefit plans" within the meaning of Section 3(3) of ERISA, and all amendments thereto, have been made available to each other party hereto.

(ii) All Fresenius USA Compensation Plans that are "employee benefit plans", other than "multiemployer plans" within the meaning of Sections 3(37) or 4001(a)(3) of ERISA, covering Fresenius USA Employees (the "Fresenius USA Plans"), to the extent subject to ERISA, are in substantial compliance with ERISA, except where the failure to be so would not reasonably be expected to have a Material Adverse Effect with respect to Fresenius USA. There is no pending or, to the knowledge of executive officers, threatened litigation relating to any Fresenius USA Plan which is reasonably likely to have a Material Adverse Effect with respect to Fresenius USA.

(iii) No material liability that has not previously been fully satisfied under Subtitle C or D of Title IV of ERISA, under Section 412 of the Code or Section 302 of ERISA has been or is expected to be incurred by Fresenius USA or any of its subsidiaries with respect to any "single-employer plan," within the meaning of Section 4001(a)(15) of ERISA, currently or formerly maintained by any of them, or the single-employer plan of any entity which is considered one employer with it under Section 4001 of ERISA or Section 414 of the Code (a "Fresenius USA ERISA Affiliate"). Fresenius USA and its subsidiaries and the Fresenius USA ERISA Affiliates have not incurred and do not expect to incur any material withdrawal liability with respect to a multiemployer plan under Subtitle E of Title IV of ERISA. No notice of a "reportable event," within the meaning of Section 4043 of ERISA, for which the 30-day reporting requirement has not been waived, has been required to be filed for any of the Fresenius USA Plans or by any of the Fresenius USA ERISA affiliates within the 12-month period ending on the date hereof.

(iv) As of January 1, 1995, the "full-funding limitation" (as defined in Section 412(c)(9) of the Code) has been satisfied with respect to each Fresenius USA Pension Plan which is a single-employer plan (within the meaning of Section 4001(a)(15) of ERISA), and there has been no change in the financial condition of any such Fresenius USA Pension Plan since that date that is reasonably likely to have a Material Adverse Effect with respect to Fresenius USA. The withdrawal liability of Fresenius USA and its subsidiaries under each Fresenius USA Plan which is a multiemployer plan to which Fresenius USA, its subsidiaries or its ERISA Affiliates has contributed during the preceding 12 months, determined as if a "complete withdrawal," within the meaning of Section 4203 of ERISA, had occurred

A-25

<PAGE>   384

as of the date hereof, is not reasonably likely to have a Material Adverse Effect with respect to Fresenius USA.

(v) Except as disclosed in its SEC Documents filed prior to the date hereof, neither Fresenius USA nor its subsidiaries have any obligations for retiree health and life benefits under any Fresenius USA Plan. Except as disclosed in its SEC Documents filed prior to the date hereof, there are no restrictions on the right of Fresenius USA to amend or terminate any Fresenius USA Plan that provides retiree health or life benefits to Fresenius USA Employees without Fresenius USA incurring any material liability thereunder as a result of such amendment or termination.

(vi) All Fresenius USA Compensation Plans covering foreign Employees comply with applicable local law except when the failure to so comply, individually and in the aggregate, would not have a Material Adverse Effect with respect to Fresenius USA. Fresenius USA's and its subsidiaries have no unfunded liabilities with respect to any Fresenius USA Pension Plan which cover foreign Employees in an amount which is reasonably likely to have a Material Adverse Effect with respect to Fresenius USA.

(vii) Except as disclosed in its SEC Documents filed prior to the date hereof or as provided in this Agreement, the transactions contemplated by this Agreement will not result in the vesting or acceleration of any material amounts under any Fresenius USA Compensation Plan, any material increase in benefits under any Fresenius USA Compensation Plan or payment of any severance or similar compensation under any Fresenius USA Compensation Plan, and the amounts, if any, payable under the Fresenius USA Compensation Plans and not deductible by it by reason of Section 280G of the Code will not exceed the maximum amount previously disclosed to the other parties hereto. Except as disclosed in its SEC Documents filed prior to the date hereof, Fresenius USA and its subsidiaries have not entered into any change-of-control agreement under which Fresenius USA will be obligated to make change-of-control payments following the Closing.

(l) Environmental Matters. Except as disclosed in its SEC Documents filed prior to the date hereof and except for such matters that, individually and in the aggregate, are not reasonably likely to have a Material Adverse Effect with respect to Fresenius USA, to the knowledge of its executive officers, (A) Fresenius USA and its subsidiaries are in compliance with all applicable Environmental Laws; and (B) neither Fresenius USA nor any of its subsidiaries has received any outstanding notices, demand letters or requests for information from any Government Entity or any third party that assert that Fresenius USA or any of its subsidiaries may be in violation of, or liable under, any Environmental Law and none of Fresenius USA, its subsidiaries or its properties are subject to any court order, administrative order or decree arising under any Environmental Law.

XXX-002122

(m) Takeover Statutes.  Execution, delivery and performance of this Agreement and consummation of the transactions contemplated hereby will not cause to be applicable to Fresenius USA any Takeover Statute (after giving effect to any actions that will be taken prior to the Effective Time).

(n) Brokers and Finders.  Neither it nor any of its officers, directors or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions contemplated herein except pursuant to arrangements disclosed in writing to the other parties hereto prior to the date hereof.

(o) Information in Disclosure Documents and Registration Statements.  None of the information supplied or to be supplied by Fresenius USA for inclusion or incorporation by reference in any Registration Statement will, at the time such Registration Statement becomes effective under the Securities Act and at the Effective Time, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; and the Fresenius USA Proxy Statement will not, at the date mailed to Fresenius USA shareholders and at the time of the meeting of Fresenius USA shareholders to be held in connection with the Fresenius USA Merger, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not

                                    A-26
<PAGE>  385

misleading. The Fresenius USA Proxy Statement will comply as to form in all material respects with the provisions of the Exchange Act and the rules and regulations thereunder, except that no representation is made by Fresenius USA with respect to statements made therein based on information supplied by Grace or its subsidiaries.

(p) Trademarks, Patents and Copyrights.  Fresenius USA and its subsidiaries own or possess adequate licenses or other rights to use, all patents, trademarks, trade names, service marks, copyrights, licenses and product licenses or registrations (including applications for any of the foregoing), as are used or useful in connection with its business (the "Fresenius USA Intellectual Property") the lack of which would reasonably be expected to have a Material Adverse Effect with respect to Fresenius USA; and none of Fresenius USA or any of its subsidiaries has any knowledge of any conflict with the proprietary intellectual property rights of any of Fresenius USA or its subsidiary therein or any knowledge of any conflict by Fresenius USA or its subsidiary with the rights of others therein which would have a Material Adverse Effect with respect to Fresenius USA. Immediately after the Fresenius USA Merger, Newco and its subsidiaries will own or possess adequate licenses or other rights to use (on substantially the same basis as currently owned or possessed by Fresenius USA and its subsidiaries) all of the Fresenius USA Intellectual Property. Except as disclosed in its SEC Documents filed with the SEC prior to the date hereof, there are no Contracts, agreements and licenses pursuant to which Fresenius USA or any subsidiaries of Fresenius USA which will not be subsidiaries of Newco after the Fresenius USA Merger will retain rights or interests of any kind in or affecting the Fresenius USA Intellectual Property.

(q) Disclosure.  Neither the representations and warranties of Fresenius USA or Fresenius AG contained in this Agreement nor in any written instrument, list, exhibit or certificate furnished or to be furnished by Fresenius USA or Fresenius AG to Grace pursuant hereto or in connection herewith contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements not misleading.

SECTION 5.3. Representations and Warranties of Fresenius AG.  Fresenius AG hereby represents and warrants to Grace that, except as set forth in a letter (the "Fresenius AG Disclosure Letter") delivered to Grace simultaneously with the execution and delivery of this Agreement:

(a) Corporate Organization and Qualification.  Fresenius AG is an Aktiengesellschaft duly organized, validly existing and in good standing under the laws of the Federal Republic of Germany and is in good standing as a foreign corporation in each jurisdiction where the properties owned, leased or operated, or the business conducted, by it require such qualification, except for any such failure so to qualify or be in good standing which, when taken together with all other such failures, is not reasonably likely to have a Material Adverse Effect with respect to the FWD Business. Fresenius AG has the requisite corporate power and authority to carry on its businesses as they are now being conducted. Fresenius AG has made available to the other parties hereto a complete and correct copy of its Certificate of Incorporation and By-laws (or similar organizational documents), each as amended to date and currently in full force and effect.

(b) Corporate Authority.  Subject only to the receipt of the requisite approval of its shareholders (and, with respect to Fresenius USA, as contemplated by Section 9.13 hereof), Fresenius AG and its subsidiaries have the requisite corporate power and authority and have taken all corporate action necessary in order to execute, deliver and perform each Transaction Agreement to which any of them are a party and to consummate the transactions contemplated hereby and thereby including, without limitation, the approval of the Fresenius AG Supervisory Board and the

XXX-002123

affirmative vote of all shareholder representatives thereon. Each
Transaction Agreement to which Fresenius AG or its subsidiary is a party
is, or when executed and delivered shall be, a valid and binding agreement
of Fresenius AG or such subsidiary enforceable in accordance with its
terms. Fresenius AG is the legal and beneficial owner of 18,673,324
Fresenius USA Common Shares (13,793,441 of which are owned beneficially and
of record by Fresenius AG or its subsidiaries, 3,129,883 of which are
issuable upon conversion of Fresenius USA Series F Preferred Shares and
1,750,000 of which are issuable upon the exercise of currently exercisable
warrants) and 200,000 Fresenius USA Series F Preferred Shares.

<div align="center">A-27</div>

&lt;PAGE&gt;    386

(c) Governmental Filings; No Violations. (i) Other than the filings
provided for in the Transaction Agreements, and other than as may be
required under the HSR Act and similar statutes in other countries, the
Exchange Act, the Securities Act, and state securities laws, except as set
forth in the Fresenius AG Disclosure Letter, no notices, reports or other
filings are required to be made by Fresenius AG or any subsidiary with, nor
are any consents, registrations, approvals, permits or authorizations
required to be obtained by it or any subsidiary from, any Governmental
Entity in connection with the execution, delivery or performance of each
Transaction Agreement to which it is a party by it or any subsidiary and
the consummation by it or any subsidiary of the transactions contemplated
hereby and thereby, the failure to make or obtain any or all of which,
individually or in the aggregate, is reasonably likely to have a Material
Adverse Effect with respect to the FWD Business or enable any person to
enjoin or prevent or materially delay consummation of the transactions
contemplated hereby and thereby.

(ii) The execution, delivery and performance by Fresenius AG or any
subsidiary of each Transaction Agreement to which it is a party does not or
will not, and the consummation by it of any of the transactions
contemplated thereby will not, constitute or result in (A) a breach or
violation of, or a default under, its Certificate of Incorporation or
By-laws, or the comparable governing instruments of any of its
subsidiaries, or (B) assuming receipt of any consents and the occurrence of
any events disclosed in the Fresenius AG Disclosure Letter as contemplated
in the last sentence of this paragraph (ii), a breach or violation of, or a
default under, or the acceleration of or the creation of a lien, pledge,
security interest or other encumbrance on assets of it, Newco or the
Surviving Corporations or any of their respective subsidiaries (with or
without the giving of notice, the lapse of time or both) pursuant to, any
provision of any Contract of it or any of its subsidiaries or any law,
rule, ordinance or regulation or judgment, decree, order, award or
governmental or non-governmental permit or license to which it or any of
its subsidiaries is subject, or any change in the rights or obligations of
any party under, or give rise to any rights of termination under, any of
the Contracts, except, in the case of clause (B) above, for such breaches,
violations, defaults, accelerations or changes that are disclosed in the
Fresenius AG Disclosure Letter or, individually and in the aggregate, are
not reasonably likely to have a Material Adverse Effect with respect to the
FWD Business. The Fresenius AG Disclosure Letter sets forth a list of all
consents required under any Contracts to be obtained by it or any
subsidiary or events required to occur prior to consummation of the
Reorganization (other than consents the failure to obtain of which,
individually and in the aggregate, is not reasonably likely to have a
Material Adverse Effect with respect to the FWD Business).

(d) Takeover Statutes. Execution, delivery and performance of this
Agreement and consummation of the transactions contemplated hereby will not
cause to be applicable to Fresenius AG any Takeover Statute (after giving
effect to any actions that will be taken prior to the Effective Time).

(e) Brokers and Finders. Neither it nor any of its officers,
directors or employees has employed any broker or finder or incurred any
liability for any brokerage fees, commissions or finders' fees in
connection with the transactions contemplated herein except pursuant to
arrangements disclosed in writing to the other parties hereto prior to the
date hereof.

(f) Contribution. Except for the shares of capital stock of Fresenius
USA, the FWD Business Assets, which are to be contributed pursuant to the
Contribution, represent the worldwide dialysis business of Fresenius AG and
all assets and services predominantly used in the conduct of Fresenius AG's
worldwide dialysis business as presently conducted.

(g) Tax Matters. At the Effective time, the representations set forth
in the numbered paragraphs of the form of Tax Matters Certificate of
Fresenius AG attached hereto as Exhibit G (the "Fresenius AG Tax Matters
Certificate") will be true and correct in all respects, and such
representations are hereby incorporated herein by reference with the same
effect as if set forth herein in their entirety.

(h) Information in Disclosure Documents and Registration
Statements. None of the information supplied or to be supplied by
Fresenius AG for inclusion or incorporation by reference in any
Registration Statement will, at the time such Registration Statement
becomes effective under the Securities Act and at the Effective Time,
contain any untrue statement of a material fact or omit to state any
material fact required to be stated therein or necessary to make the
statements therein, in light of the circumstances

XXX-002124

A-28

<PAGE>  387

under which they were made, not misleading; and the Fresenius USA Proxy Statement will not, at the date mailed to Fresenius USA shareholders and at the time of the Fresenius USA Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. The Fresenius USA Proxy Statement will comply as to form in all material respects with the provisions of the Exchange Act and the rules and regulations thereunder, except that no representation is made by Fresenius AG with respect to statements made therein based on information supplies by Grace or its subsidiaries.

(i) Disclosure.  Neither the representations and warranties of Fresenius USA or Fresenius AG contained in this Agreement nor in any written instrument, list, exhibit or certificate furnished or to be furnished by Fresenius USA or Fresenius AG to Grace pursuant hereto or in connection herewith contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements not misleading.

(j) Assets.  Except as contemplated herein, at the Effective Time, the FWD Business Group will contain the worldwide dialysis business of Fresenius AG and all assets and services predominantly used in the conduct of Fresenius AG's worldwide dialysis business as presently conducted.

Section 5.4. Representations and Warranties for the FWD Business.  Fresenius AG hereby represents and warrants to Grace that, except as set forth in a letter (the "FWD Business Disclosure Letter") delivered to Grace simultaneously with the execution and delivery of this Agreement:

(a) Corporate Organization and Qualification.  A true and complete list of all FWD Business Subsidiaries, together with the jurisdiction of organization of each such FWD Business Subsidiary, is set forth in the FWD Business Disclosure Letter. Each FWD Business Subsidiary is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and is in good standing (if recognized in such jurisdiction, or, if not, duly qualified) as a foreign corporation in each jurisdiction where the properties owned, leased or operated, or the business conducted, by such FWD Business Subsidiary require such qualification, except for any such failure so to qualify or be in good standing which, when taken together with all other such failures, is not reasonably likely to have a Material Adverse Effect with respect to the FWD Business. Each FWD Business Subsidiary has the requisite corporate power and authority to carry on its business as now being conducted. Fresenius AG has made available to the other parties hereto a complete and correct copy of the Certificate of Incorporation and By-laws (or similar organizational documents) of each FWD Business Subsidiary, each as amended to date and currently in full force and effect.

(b) Corporate Authority.  Each FWD Business Subsidiary has the requisite corporate power and authority and has taken all corporate action necessary in order to consummate the transactions contemplated hereby and by the other Transaction Agreements.

(c) Capitalization.  The authorized capital stock, and the number of shares of such capital stock issued and outstanding, of each FWD Business Subsidiary is set forth in the FWD Business Disclosure Letter, and all such issued and outstanding shares of capital stock are owned of record and beneficially by Fresenius AG or another FWD Business Subsidiary, free and clear of all liens, pledges, security interests, claims, proxies, preemptive or subscriptive rights or other encumbrances or restrictions of any kind. There are no options, warrants or other rights, agreements, arrangements or commitments of any character relating to the issued or unissued capital stock of any FWD Business Subsidiary or obligating any FWD Business Subsidiary to issue or sell any share of capital stock of, or other equity interests in, any FWD Business Subsidiary. There are no outstanding contractual obligations of any FWD Business Subsidiary to repurchase, redeem or otherwise acquire any capital stock of any FWD Business Subsidiary or to provide funds to make any investment (in the form of a loan, capital contribution or otherwise) in any FWD Business Subsidiary or any other entity. Each of the outstanding shares of capital stock of each FWD Business Subsidiary is duly authorized, validly issued, fully paid and nonassessable.

A-29

<PAGE>  388

(d) Financial Statements; No Undisclosed Liabilities.  (i) Included in the FWD Business Disclosure Letter are a consolidated balance sheet as of December 31, 1995, and consolidated statements of income, cash flows and shareholders' equity for the years ended December 31, 1995 for the FWD Business (such financial statements, the "FWD Business Disclosure Letter Financial Statements," and the balance sheet as of December 31, 1995 included therein, the "FWD Business Disclosure Letter Balance Sheet"). The FWD Business Disclosure Letter Balance Sheet (including any related notes and schedules) fairly presents in all material respects, and the consolidated balance sheet to be included in the FWD Business Audited Financial Statements (including any related notes and schedules) shall fairly present in all material respects, the consolidated financial position of the FWD Business as of its date; and each of the consolidated statements of income, cash flows and shareholders' equity included in the

XXX-002125

FWD Business Disclosure Letter Financial Statements (including any related notes and schedules) fairly presents in all material respects, and each such statement to be included in the FWD Business Audited Financial Statements (including any related notes and schedules) shall fairly present in all material respects, the consolidated results of operations, retained earnings and cash flows, as the case may be, of the FWD Business for the periods set forth therein, in each case in accordance with US GAAP.

(ii) Except as disclosed on the FWD Business Disclosure Letter Balance Sheet or the notes thereto, neither the FWD Business nor any FWD Business Subsidiary has any liabilities, whether or not accrued, contingent or otherwise, that, individually or in the aggregate are reasonably likely to have a Material Adverse Effect with respect to the FWD Business.

(e) Absence of Certain Events and Changes.  Except as disclosed in the FWD Business Disclosure Letter, since September 30, 1995, Fresenius AG, with respect to the FWD Business, and the FWD Business Subsidiaries, have conducted their respective businesses only in the ordinary and usual course of such businesses and there has not been any change or development or combination of changes or developments (including any worsening of any condition currently existing) which, individually and in the aggregate, is reasonably likely to result in a Material Adverse Effect with respect to the FWD Business.

(f) Compliance with Laws.  Fresenius AG has complied, in the conduct of the FWD Business, and each FWD Business Subsidiary has complied, in the conduct of its respective business, with all applicable federal, state, local and foreign statutes, laws, regulations, ordinances, rules, judgments, orders or decrees applicable thereto, except where the failure to comply is not reasonably likely, individually and in the aggregate, to have a Material Adverse Effect with respect to the FWD Business. To the knowledge of the executive officers of Fresenius AG, Fresenius AG has, with respect to the FWD Business, each FWD Business Subsidiary has, and, immediately after the Contribution, an FWD Business Subsidiary will have, all permits, licenses, certificates of authority, orders, and approvals of, and has made all filings, applications, and registrations with, federal, state, local, and foreign governmental or regulatory bodies that are required in order to permit such party to carry on its business as it is presently conducted, except for such permits, licenses, certificates, orders, filings, applications and registrations, the failure to have or make which, individually and in the aggregate, are not reasonably likely to have a Material Adverse Effect with respect to the FWD Business.

(g) Title to Assets.  Fresenius AG and the FWD Business Subsidiaries have and, immediately after the Contribution, the FWD Business Subsidiaries will have, good and, with respect to real property, marketable title to its properties and assets (other than property as to which it is lessee), except for those defects in title which are not, individually and in the aggregate, reasonably likely to have a Material Adverse Effect with respect to the FWD Business. Fresenius AG and the FWD Business Subsidiaries have, and immediately after the Contribution, the FWD Business Subsidiaries will either own or have adequate rights to use (on the same basis as currently owned or used by the FWD Business), all assets predominantly used or useful in the FWD Business as currently conducted and all assets reflected on the FWD Business Balance Sheet, except for those properties subject to the Lease and assets disposed of in accordance with this Agreement and except for those failures to own or have which are not, individually and in the aggregate, reasonably likely to have a Material Adverse Effect with respect to the FWD Business.

A-30

<PAGE>    389

(h) Litigation.  There are no civil, criminal or administrative actions, suits, claims, hearings or proceedings pending or, to the knowledge of its executive officers, threatened, or investigations pending, against Fresenius AG or its subsidiaries (other than Fresenius USA) with respect to the FWD Business, or any FWD Business Subsidiary that, individually or in the aggregate, are reasonably likely to have a Material Adverse Effect with respect to the FWD Business. There are no judgments or outstanding orders, writs, injunctions, decrees, stipulations or awards (whether rendered or issued by a court or Governmental Entity, or by arbitration) against Fresenius AG or its subsidiaries (other than Fresenius USA) with respect to the FWD Business, or any FWD Business Subsidiary, or any of their respective properties or businesses, which are reasonably likely, individually or in the aggregate, to have a Material Adverse Effect with respect to the FWD Business.

(i) Taxes.  All material federal, state, local and foreign tax returns required to be filed with respect to the FWD Business or any FWD Business Subsidiary have been timely filed or requests for extensions have been timely filed and any such extension shall have been granted and not have expired, and all such filed returns are complete and accurate in all material respects. All material taxes required to be shown on returns filed with respect to the FWD Business or any FWD Business Subsidiary, have been paid in full or have been recorded as a liability on the FWD Business Disclosure Letter Balance Sheet. There is no outstanding audit examination, deficiency, or refund litigation with respect to any taxes with respect to the FWD Business or any FWD Business Subsidiary that, individually or in the aggregate, is reasonably likely to have a Material Adverse Effect with respect to the FWD Business. All material taxes, interest, additions, and penalties due with respect to completed and settled examinations or concluded litigation relating to the FWD Business or any FWD Business Subsidiary have been paid in full or have been recorded as a liability on

XXX-002126

the FWD Business Balance Sheet (in accordance with US GAAP). Neither Fresenius AG nor any FWD Business Subsidiary is a party to a tax sharing or similar agreement or any agreement with respect to the FWD Business or any FWD Business Subsidiary, except for any such agreement under which the liabilities of FWD Business and its subsidiaries would not be reasonably likely to have a Material Adverse Effect with respect to the FWD Business. Neither Fresenius AG (with respect to the FWD Business) nor the FWD Business Subsidiaries have waived any applicable statute of limitations with respect to German tax or any material German state income taxes.

(j) Environmental Matters.  Except for such matters that, individually and in the aggregate, are not reasonably likely to have a Material Adverse Effect with respect to the FWD Business, to the knowledge of its executive officers (i) Fresenius AG, with respect to the FWD Business, and the FWD Business Subsidiaries are in compliance with all applicable Environmental Laws; and (ii) neither Fresenius AG with respect to the FWD Business, nor any of the FWD Business Subsidiaries has any outstanding notices, demand letters or requests for information from any Government Entity or any third party that assert that Fresenius AG, with respect to the FWD Business, or any of the FWD Business Subsidiaries may be in violation of, or liable under, any Environmental Law and none of Fresenius AG with respect to the FWD Business, the FWD Business Subsidiaries or its properties are subject to any court order, administrative order or decree arising under any Environmental Law.

(k) Governmental Filings; No Violations.  (i) Other than the filings provided for in the Transaction Agreements, and other than as may be required under the HSR Act and similar statutes in other countries, the Exchange Act, the Securities Act, and state securities laws, no notices, reports or other filings are required to be made by any FWD Business Subsidiaries with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by it from, any Governmental Entity, in connection with the execution, delivery or performance of each Transaction Agreement to which Fresenius AG is a party by it and the consummation by it of the transactions contemplated hereby and thereby, the failure to make or obtain any or all of which, individually or in the aggregate, is reasonably likely to have a Material Adverse Effect with respect to the FWD Business or enable any person to enjoin or prevent or materially delay consummation of the transactions contemplated hereby and thereby.

(ii) The execution, delivery and performance by each FWD Business Subsidiary of each Transaction Agreement to which Fresenius AG is a party does not or will not, and the consummation by it of any

                              A-31

<PAGE>   390

of the transactions contemplated hereby and thereby will not, constitute or result in (A) a breach or violation of, or a default under, its Certificate of Incorporation or By-laws (or similar organizational document), or the comparable governing instruments of any of its subsidiaries, or (B) assuming receipt of any consents and the occurrence of any events disclosed in the FWD Business Disclosure Letter as contemplated in the last sentence of this paragraph, a breach or violation of, or a default under, or the acceleration of or the creation of a lien, pledge, security interest or other encumbrance on assets of it, Newco or the Surviving Corporations or any of their respective subsidiaries (with or without the giving of notice, the lapse of time or both) pursuant to, any provision of any Contract of it or any of its subsidiaries or any law, rule, ordinance or regulation or judgment, decree, order, award or governmental or non-governmental permit or license to which it or any of its subsidiaries is subject, or any change in the rights or obligations of any party under, or give rise to any rights of termination under, any of the Contracts, except, in the case of clause (B) above, for such breaches, violations, defaults, accelerations or changes that are disclosed in the FWD Business Disclosure Letter or, individually and in the aggregate, are not reasonably likely to have a Material Adverse Effect with respect to the FWD Business. The FWD Business Disclosure Letter sets forth a list of all consents required under any Contracts to be obtained by any FWD Business Subsidiary or events required to occur prior to consummation of the Reorganization (other than consents the failure to obtain of which, individually and in the aggregate, is not reasonably likely to have a Material Adverse Effect with respect to the FWD Business).

(l) Contracts and Commitments.  Except as set forth in the FWD Business Disclosure Letter, none of Fresenius AG or any of its subsidiaries, with respect to the FWD Business, nor any FWD Business Subsidiary is a party to any Contract that would be required to be filed as an exhibit to a registration statement for the FWD Business and Fresenius USA, taken as a whole, under the Exchange Act.

(m) Employee Benefit Plans.  (i) The FWD Business Disclosure Letter lists each material employee benefit plan, program, policy, practice and arrangement and all material bonus, stock option, stock purchase, restricted stock, incentive, deferred compensation, retiree medical or life insurance, supplemental retirement, severance or other benefit plans, programs or arrangements, and all material employment, termination, severance or other contracts or agreements, whether legally enforceable or not, to which Fresenius AG, its subsidiaries or any of the FWD Business Subsidiaries is a party, with respect to which Fresenius AG, its subsidiaries or any of the FWD Business Subsidiaries has or could incur any obligation or which are maintained, contributed to or sponsored by Fresenius AG, its subsidiaries or any of the FWD Business Subsidiaries for

XXX-002127

the benefit of any current or former employee, officer or director of
Fresenius AG, its subsidiaries or any of the FWD Business Subsidiaries,
(collectively, the "Fresenius AG Plans"). With respect to each Fresenius AG
Plan, Fresenius AG has caused to be made available to the other parties
hereto a true, correct and complete copy of: (A) each writing constituting
a part of such Fresenius AG Plan, including without limitation all plan
documents, benefit schedules, participant agreements, trust agreements, and
insurance contracts and other funding vehicles; (B) the current summary
plan description, if any; (C) the most recent annual financial report and
actuarial valuations, if any; and (D) the most recent determination letter
from the relevant governmental authority, if any. All financial statements
and actuarial reports for each Fresenius AG Plan have been prepared in
accordance with applicable accounting principles and actuarial principles,
applied on a uniform and consistent basis.

    (ii) In all material respects, each Fresenius AG Plan complies with,
and has been managed in accordance with, all applicable laws, regulations
and requirements. Each Fresenius AG Plan required to be registered has been
registered and has been maintained in good standing with applicable legal
and regulatory authorities. Where Fresenius AG Plans are funded or insured,
all contributions and other amounts due to or in respect of them or any
state pension arrangements by Fresenius AG, its subsidiaries or any of the
FWD Business Subsidiaries have been fully paid at the Effective Time. The
fair market value of the assets of each such funded Fresenius AG Plan, or
the liability of each insurer for any Fresenius AG Plan funded through
insurance or the book reserve established for any such Fresenius AG Plan on
the FWD Business Balance Sheet, together with any accrued contributions, is
sufficient to procure or provide for the accrued benefit obligations, as of
the Closing Date, with respect to all current

                                   A-32

<PAGE>    391

and former participants in such Fresenius AG Plan according to the
actuarial assumptions utilized in the actuary's report described in Section
5.4(m)(i) above, and no transaction contemplated by this Agreement shall
cause such assets, book reserves or insurance obligations to be less than
such benefit obligations, and nothing has happened since the date of that
information which would have a Material Adverse Effect on the funding
position of the Fresenius AG Plans. Where Fresenius AG Plans are unfunded
or underfunded, appropriate reserves are established therefore on the FWD
Business Balance Sheet. Fresenius AG, its subsidiaries and the FWD Business
Subsidiaries have not by any act or omission, direct or indirect,
materially increased their liabilities or obligations to the Fresenius AG
Plans since the date of the last actuary's report described in Section
5.4(m)(i) above.

    (iii) There is no dispute about the entitlements or benefits payable
under the Fresenius AG Plans, no claim by or against the managers or
administrators of the Fresenius AG Plans, Fresenius AG, its subsidiaries or
any of the FWD Business Subsidiaries has been made or threatened, and there
are no circumstances which might give rise to any such claim except where
any such event could not have, individually and in the aggregate, a
Material Adverse Effect with respect to the FWD Business. Except as set
forth in the FWD Business Disclosure Letter Balance Sheet, there exists no
liability (contingent or otherwise), and no event has occurred, with
respect to any Fresenius AG Plan which could reasonably be expected to have
a Material Adverse Effect with respect to the FWD Business.

    (n) Lease.  The Lease, pursuant to which Newco (or its subsidiary)
shall lease certain real property in Germany from Fresenius AG, as provided
therein, when executed and delivered, shall be a valid and binding
agreement of Fresenius AG, enforceable in accordance with the terms
thereof; and the total rental to be paid pursuant to such Lease of the
equivalent of $12,000,000 per year beginning January 1, 1997 (subject to
adjustment, as provided therein) is a fair market rental for such property.

    (o) Trademarks, Patents and Copyrights.  Fresenius AG or a FWD
Business Subsidiary owns or possesses adequate licenses or other rights to
use, all patents, trademarks, trade names, service marks, copyrights,
licenses and product licenses or registrations (including applications for
any of the foregoing), technology, know-how, tangible or intangible
proprietary intellectual property rights, information or material (whether
conceived, reduced to practice or under development), formulae, inventions
and new and investigational applications (including all options or other
rights to acquire any of the foregoing) as are necessary, used or useful in
connection with the FWD Business (the "FWD Business Intellectual
Property"), the lack of which would reasonably be expected to have a
Material Adverse Effect with respect to the FWD Business; and none of
Fresenius AG or any of its subsidiaries has any knowledge of any conflict
with the proprietary intellectual property rights of any of Fresenius AG or
any FWD Business Subsidiary therein or any knowledge of any conflict by
Fresenius AG or any FWD Business Subsidiary with the rights of others
therein which would have a Material Adverse Effect with respect to the FWD
Business. Immediately after the Contribution, Newco or its Subsidiary will
own or possess adequate licenses or other rights to use (on substantially
the same basis as currently owned or possessed by the FWD Business) all of
the FWD Business Intellectual Property. There are no Contracts, agreements
and licenses pursuant to which Fresenius AG or any subsidiaries of
Fresenius AG which are not FWD Business Subsidiaries will retain rights or
interests of any kind in or affecting the FWD Business Intellectual
Property.

    SECTION 5.5. Certain Definitions Relating to the FWD Business.  (a) "FWD

XXX-002128

Business" means the dialysis and renal medical products business conducted
worldwide by Fresenius AG (including, without limitation, the FWD Business
Subsidiaries), other than the dialysis business of Fresenius USA.

    (b) "FWD Business Assets" means all the property and assets (including
intangible assets, goodwill and leaseholds) of the FWD Business which are
reflected on the FWD Business Balance Sheet or otherwise predominately relating
to or predominately used or useful in the business and operations of the FWD
Business (other than the property subject to the Lease), plus (i) all property
and assets which have been or will be acquired in the ordinary course of
business since the date of the FWD Business Balance Sheet, less (ii) any
property and assets which have been or will be disposed of or consumed in the
ordinary course of business since the date of the FWD Business Balance Sheet
consistent with the terms hereof.

                                 A-33

<PAGE>   392

    (c) "FWD Business Subsidiaries" means all subsidiaries of Fresenius AG and
all other entities in which Fresenius AG holds any direct or indirect equity
interest, other than Fresenius USA and its subsidiaries, which conduct any of
the FWD Business (it being agreed and understood that (i) as of the date hereof,
the FWD Business is conducted, and the FWD Business Assets are held, by
Fresenius AG and certain of its subsidiaries (all such entities, the "Current
Subsidiaries"), (ii) as of the Contribution, by virtue of the Fresenius AG
Restructuring, the FWD Business will be conducted, and the FWD Business Assets
will be held, by certain Fresenius AG subsidiaries which may include the Current
Subsidiaries as well as other subsidiaries (all such entities, the "Closing
Subsidiaries", and (iii) all references herein to FWD Business Subsidiaries
shall be deemed to refer to the Current Subsidiaries as of the date hereof and
to the Closing Subsidiaries as of the Contribution).

    (d) "Fresenius AG Restructuring" means the actions taken and proposed to be
taken by Fresenius AG and its subsidiaries to restructure the FWD Business so
that, at or prior to Contribution, the FWD Business Subsidiaries shall own all
FWD Business Assets.

                               ARTICLE VI

                                COVENANTS

    SECTION 6.1. Interim Operations.  Each of Grace and Fresenius AG (for
itself and on behalf of Fresenius AG) covenants and agrees as to itself and its
subsidiaries that, from and after the date hereof until the Effective Time,
except insofar as the other parties shall otherwise consent or except as
otherwise contemplated by this Agreement, the Contribution Agreement, the
Distribution Agreement or its Disclosure Letter (provided that, as used herein,
all references to Grace (and/or its Affiliates) shall be deemed to refer to
Grace and its Affiliates which conduct the NMC Business, consistent with Section
9.8 hereof, except as otherwise specifically provided):

    (a) To the extent reasonably practicable, taking into account any
operational matters that may arise that are primarily attributable to the
pendency of the Reorganization, the business of it and its subsidiaries
will be conducted only in the ordinary and usual course consistent with
past practice and existing business plans previously disclosed to the other
parties and, to the extent consistent therewith, it and its subsidiaries
will use all reasonable efforts to preserve their business organization
intact and maintain their existing relations with customers, suppliers,
employees and business associates.

    (b) It will not (i) sell or pledge or agree to sell or pledge any
stock owned by it in any of its subsidiaries or, in the case of Fresenius
AG, any FWD Business Subsidiary; (ii) amend its Certificate of
Incorporation or By-laws (or similar organizational document); (iii) split,
combine or reclassify any outstanding capital stock; or (iv) declare, set
aside or pay any dividend payable in stock or property with respect to any
of its capital stock.

    (c) Neither Grace, Fresenius USA, nor any of their respective
subsidiaries or, Fresenius AG, solely with respect to any FWD Business
Subsidiary, will issue, sell, pledge, dispose of or encumber, or authorize
or propose the issuance, sale, pledge, disposition or encumbrance of, any
shares of, or securities convertible or exchangeable for, or options, puts,
warrants, calls, commitments or rights of any kind to acquire, any shares
of its capital stock of any class other than common shares issuable
pursuant to options, warrants and other convertible securities outstanding
on the date hereof and disclosed in its Disclosure Letter, and employee
stock options granted after the date hereof in the ordinary course of
business.

    (d) None of Grace, Fresenius USA or Fresenius AG, with respect to the
FWD Business, will (i) transfer, lease, license, guarantee, sell, mortgage,
pledge or dispose of any property or assets encumber any property or assets
other than in the ordinary and usual course of business; (ii) authorize or
make capital expenditures; (iii) make any acquisition of, or investment in,
assets, stock or other securities of any other person or entity other than
its wholly owned subsidiaries or (iv) make any divestiture.

                                 A-34

<PAGE>   393

    (e) Except as required by agreements or arrangements disclosed in its
SEC Documents or its Disclosure Letter, neither it nor any of its

XXX-002129

subsidiaries or, in the case of Fresenius AG, any FWD Business Subsidiary, will grant any severance or termination pay to, or enter into, extend or amend any employment, consulting, severance or other compensation agreement with, any director, officer or other of its employees, except to other employees in the ordinary course in a manner consistent with past practice, which would bind Newco (or its subsidiary) after the Reorganization.

(f) Except as may be required to satisfy contractual obligations existing as of the date hereof (and disclosed to the other parties hereto) and the requirements of applicable law, and except in the ordinary course of business, neither it nor any of its subsidiaries or, in the case of Fresenius AG, any FWD Business Subsidiary, will establish, adopt, enter into, make, amend or make any elections under any collective bargaining, bonus, profit sharing, thrift, compensation, stock option, restricted stock, pension, retirement, employee stock ownership, deferred compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any directors, officers or employees which would affect Newco (or its subsidiary), except in a manner consistent with past practice.

(g) It will not implement any change in its accounting principles, practices or methods, other than as may be required by German GAAP, in the case of Fresenius AG, or US GAAP, in the case of Grace and Fresenius USA, other than as may be necessary or advisable in connection with the Distribution.

(h) Neither it nor any of its subsidiaries will authorize or enter into an agreement to take any of the actions referred to in paragraphs (a) through (g) above.

SECTION 6.2. Certain Transactions. (a) Prior to the Distribution: (i) Grace and Grace-Conn. shall use reasonable efforts to cause NMC to arrange new credit facilities so that the transactions contemplated by the Transaction Agreements may be consummated; (ii) Fresenius AG shall use reasonable efforts to arrange new credit facilities for the FWD Business so that the transactions contemplated by the Transaction Agreements may be consummated; and (iii) the parties hereto shall cooperate with respect to the foregoing.

(b) Prior to or concurrent with the Reorganization, the parties hereto shall use reasonable efforts to satisfy the conditions set forth in Sections 7.1(j) and 7.1(k).

(c) It is understood and agreed by the parties hereto that, at the time of the Reorganization, none of Grace, Fresenius USA and the FWD Business shall have cash or marketable securities, it being contemplated that, in connection with the Reorganization, such cash and marketable securities shall be provided to Grace-Conn. and Fresenius AG, respectively, and that new working capital facilities to finance working capital needs shall be obtained.

(d) It is the intention of the parties hereto that (i) Newco shall pay dividends to the holders of its outstanding ordinary shares in the amounts set forth in the business plan previously disclosed to the parties hereto beginning in January 1997, subject to the declaration of such dividends by the Newco Board, and (ii) Newco (or its subsidiary) shall lease real property and buildings in Germany from Fresenius AG, for a total rental of the equivalent $12 million per year beginning January 1997 pursuant to the Lease to be consistent with the terms set forth in Exhibit D to the Contribution Agreement.

(e) It is the intention of the parties hereto that, following the Reorganization, Newco shall seek to refinance up to $700 million of credit facilities through the sale of preferred securities which would be primarily "mezzanine" capital, which could be classified as equity under German generally accepted accounting principles and whose interest stream would be tax deductible. The sale (or commitments for sale) of such preferred securities shall not be a condition to the consummation of the Reorganization.

(f) It is the intention of the parties hereto that, to the extent that it is not possible to obtain the credit facilities and/or arrange for the sale of the preferred securities contemplated by paragraphs (a) and (e) above on terms which will permit the payment of cash pursuant to the lease and dividends pursuant to paragraph (d) above, prior to the Effective Time, the parties shall endeavor to restructure the transactions contemplated

A-35

<PAGE>    394

hereby so that, commencing in January 1997, Fresenius AG shall receive cash flow from Newco in the amount that otherwise would have been received pursuant to paragraph (d) above.

SECTION 6.3. Acquisition Proposals. Each party hereto agrees that neither it nor any of its subsidiaries nor any of its respective officers and directors or the officers and directors of its subsidiaries shall, and it shall each direct and use its best efforts to cause its employees, agents and representatives (including, without limitation, any investment banker, attorney or accountant retained by it or any of its subsidiaries) not to, initiate, solicit or encourage, directly or indirectly, any inquiries or the making or implementation of any proposal or offer with respect to a merger, acquisition, consolidation or similar transaction involving, or any purchase of all or any significant portion of the assets or any equity securities of, it or any of its subsidiaries (any such proposal or offer being hereinafter referred to as an "Acquisition Proposal") or engage in any negotiations concerning, or provide any confidential information or data to, or have any discussions with, any person relating to an Acquisition Proposal; provided, however, that the Grace Board may

XXX-002130

furnish or cause to be furnished information (pursuant to confidentiality arrangements) and may participate in such discussions and negotiations directly or through its representatives if (i) the failure to provide such information or participate in such negotiations and discussions could, in the opinion of its outside counsel, reasonably be deemed to cause the members of the Grace Board to breach their fiduciary duties under applicable law or (ii) another corporation, partnership, person or other entity or group makes a written offer or written proposal which, based upon the identity of the person or entity making such offer or proposal and the terms thereof, and the availability of adequate financing therefor, the Grace Board believes, in the good faith exercise of its business judgment and based upon advice of its outside legal and financial advisors, could reasonably be expected to be consummated and represents a transaction more favorable to its shareholders than the Reorganization (a "Higher Offer"); provided further, however, that the foregoing restriction shall not apply to an Acquisition Proposal exclusively involving all or part of the stock or assets of Grace-Conn. Grace shall notify the other parties hereto as soon as practicable if any such inquiries or proposals are received by, any such information is requested from, or any such negotiations or discussions are sought to be initiated or continued with it.

SECTION 6.4. Information Supplied.  Each of parties hereto agrees that none of the information supplied or to be supplied by it for inclusion or incorporation by reference in any Registration Statement, Proxy Statement or Schedule 14A, or any amendment or supplement thereto, will, in the case of a Registration Statement, at the time such Registration Statement and each amendment and supplement thereto becomes effective under the Securities Act, or, in the case of a Proxy Statement or Schedule 14A, at the time such Proxy Statement or Schedule 14A and each amendment and supplement thereto is filed in definitive form with the SEC or mailed to shareholders and at the time of the applicable Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading.

SECTION 6.5. Shareholder Approvals. (a) Each of Grace and Fresenius AG (on behalf of Fresenius USA) agrees to take, in accordance with applicable law and its Certificate of Incorporation and By-laws, all action necessary to convene a meeting of holders of Grace Common Shares and Grace Preferred Shares and Fresenius USA Common Shares and Fresenius USA Preferred Shares, respectively, as promptly as practicable after the Newco Registration Statement and the ADR Registration Statement are declared effective (and, in the case of Grace, the NY Preferred Registration Statement and the Grace-Conn. Registration Statement are declared effective), and its Proxy Statement is cleared, by the SEC, to consider and vote upon the approval of the transactions contemplated by the Transaction Agreements (including, without limitation, the Grace Amendment). Subject to the remainder of this Section 6.5, each of the Grace Board and the Fresenius USA Board shall recommend such adoption and approval and shall take all lawful action to solicit such approval by shareholders. The Grace Board may fail to make such a recommendation, or withdraw, modify, or change any such recommendation, or recommend any other offer or proposal, if the Grace Board, based on the opinion of its outside counsel, determines that making such recommendation, or the failure to recommend any other offer or proposal, or the failure to so withdraw, modify, or change its recommendation, or the failure to recommend any other offer or proposal, could reasonably be deemed to cause the members of the Grace Board to breach their fiduciary duties under applicable law in connection

A-36

<PAGE>  395

with a Higher Offer. In such event, notwithstanding anything contained in this Agreement to the contrary, any such failure to recommend, withdrawal, modification, or change of recommendation or recommendation of such other offer or proposal, or the entering by Grace into an agreement with respect to a Higher Offer (provided that Grace shall have provided Fresenius AG with at least 72 hours notice of its intention to so enter and the identity of the other party thereto), shall not constitute a breach of this Agreement by Grace.

(b) Fresenius AG agrees to take, in accordance with applicable law and its organizational documents, all action necessary to convene a meeting of Fresenius AG shareholders as promptly as practicable after the date hereof to consider and vote upon the approval of the transactions contemplated hereby. The Fresenius AG Management Board shall recommend such adoption and approval and shall take all lawful action to solicit such approval by Fresenius AG shareholders.

SECTION 6.6. Filings; Other Actions. (a) Subject to the obligations of consultation contained herein, Grace shall promptly prepare for filing with the SEC the Grace Proxy Statement, the Grace Schedule 14A and the Grace-Conn. Registration Statement, Fresenius USA shall promptly prepare for filing with the SEC the Fresenius USA Proxy Statement and Fresenius USA Schedule 14A, and the parties hereto shall cooperate to promptly prepare for filing with the SEC the Newco Registration Statement, the NY Preferred Registration Statement and the ADR Registration Statement (including all required financial statements). In connection with the foregoing, Fresenius AG shall prepare audited financial statements prepared in accordance with US GAAP for the FWD Business and such financial statement shall be included in the Newco Registration Statement (and in such other Registration Statements and Proxy Statements as may be appropriate). Each party hereto shall use its reasonable efforts, after consultation with the other parties hereto, to respond promptly to any comments made by the SEC with respect to such filings, to have such filings declared effective or cleared, as the case may be, and cause such filings to be mailed at the earliest reasonably practicable time. Each party hereto and its counsel shall be given a reasonable opportunity to review and comment on each version of such filings prior to the filing thereof with the SEC. Each party hereto also shall use its reasonable efforts to obtain all necessary state securities law or

XXX-002131

blue sky permits and approvals required to carry out the transactions contemplated hereby and shall furnish all information as may be reasonably requested in connection with any such action.

(b) Each party hereto shall cooperate with the other parties hereto, subject to the terms and conditions set forth herein, use its reasonable efforts promptly to prepare and file all necessary documentation, to effect all necessary applications, notices, petitions, filings and other documents, and to obtain as promptly as reasonably practicable all necessary permits, consents, orders, approvals and authorizations of, or any exemption by, all third parties and Governmental Entities necessary or advisable to consummate the transactions contemplated hereby. Each party hereto shall consult with the other parties hereto with respect to the obtaining of all permits, consents, approvals and authorizations of all third parties and Governmental Entities necessary or advisable to consummate the transactions contemplated hereby and each party shall keep the other parties hereto apprised of the status of matters relating to completion of the transactions contemplated hereby.

(c) Each party hereto shall, upon reasonable request and except as otherwise may be required by applicable law, furnish the other parties hereto with all information concerning itself, its subsidiaries, directors, officers and shareholders and other Affiliates and such other matters as may be reasonably necessary or advisable in connection any statement, filing, notice or application made by or on behalf of such other party or any of its Affiliates to any Governmental Entity in connection with any transactions contemplated by this Agreement.

(d) Each party hereto shall, subject to applicable laws relating to the disclosure and exchange of information, promptly furnish the other parties hereto with copies of written communications received by such party or any of its subsidiaries, from, or delivered by any of the foregoing to, any Governmental Entity in respect of the transactions contemplated hereby.

(e) Each party hereto shall cooperate with each other party hereto and promptly take or cause to be taken all actions and do or cause to be done all things necessary, proper or advisable to obtain favorable review of the proposed transaction under the HSR Act and any foreign antitrust or competition laws, which efforts

A-37

<PAGE>   396

shall include, without limitation, undertaking litigation and/or agreeing to hold aside or divest, or enter into any conduct restriction with respect to, any asset or business to be part of Newco after the Effective Time (all such decisions to be made by the parties in consultation with one another taking into consideration the effect on Newco); provided, however, that the foregoing shall not require that any action be taken with respect to (or by) Grace-Conn. or its business; provided further, however, that Grace shall not be required to commit to any action that is to be taken prior to the Effective Time.

SECTION 6.7. Audited Financial Statements. (a) Not later than March 31, 1996, Grace shall deliver to the other parties hereto an audited special purpose consolidated balance sheet as of, and audited special purpose consolidated statements of income, cash flows and shareholders' equity for the year ended December 31, 1995, in each case for Grace and exclusive of the Grace-Conn. Business and the assets, liabilities, income cash flows and shareholders' equity thereof (such financial statements, the "Grace Audited Financial Statements"), together with the unqualified opinion of Grace's independent accountants thereon to the effect that such special purpose consolidated balance sheet fairly presents in all material respects the consolidated financial position of Grace and its included subsidiaries as of its date and such special purpose consolidated statements of income, cash flows and shareholders' equity fairly present in all material respects the consolidated results of operations, retained earnings and cash flows, as the case may be, of Grace and its included subsidiaries for the periods set forth therein, in each case in accordance with US GAAP and exclusive of the Grace-Conn. Business and the assets, liabilities, income, cash flows and shareholders' equity thereof.

(b) Not later than March 31, 1996, Fresenius USA shall deliver to the other parties hereto an audited consolidated balance sheet as of, and audited consolidated statements of income, cash flows and shareholders' equity for Fresenius USA for the year ended December 31, 1995 (such financial statements, the "Fresenius USA Audited Financial Statements"), together with the unqualified opinion of Fresenius USA's independent accountants thereon to the effect that such consolidated balance sheet fairly presents in all material respects the consolidated financial position of Fresenius USA and its subsidiaries as of its date and such consolidated statements of income, cash flows and shareholders' equity fairly present in all material respects the consolidated results of operations, retained earnings and cash flows, as the case may be, of Fresenius USA and its subsidiaries for the periods set forth therein, in each case in accordance with US GAAP.

(c) Not later than March 31, 1996, Fresenius AG shall deliver to the other parties hereto: (i) an audited consolidated balance sheet as of, and audited consolidated statements of income, cash flows and shareholders' equity for the FWD Business for the years ended December 31, 1994 and December 31, 1995 showing consolidating adjustments made in connection with the consolidation of Fresenius USA with the FWD Business (such financial statements, the "FWD Business Audited Financial Statements"), together with the unqualified opinion of Fresenius AG's independent accountants thereon to the effect that such consolidated balance sheet fairly presents in all material respects the consolidated financial position of the FWD Business as of its date and such consolidated statements of income, cash flows and shareholders' equity fairly presents in all material

XXX-002132

respects the consolidated results of operations, retained earnings and cash flows, as the case may be, of the FWD Business for the periods set forth therein, in each case in accordance with US GAAP, (ii) an audited consolidated balance sheet as of, and audited consolidated statements of income, cash flows and shareholders' equity for Fresenius AG for the year ended December 31, 1994 and December 31, 1995 (such financial statements, the "Fresenius AG Audited Financial Statements"), together with the unqualified opinion of Fresenius AG's independent accountants thereon to the effect that such consolidated balance sheet fairly presents in all material respects the consolidated financial position of Fresenius AG as of its date and such consolidated statements of income, cash flows and shareholders' equity fairly presents in all material respects the consolidated results of operations, retained earnings and cash flows, as the case may be, of Fresenius AG for the periods set forth therein, in each case in accordance with German GAAP, and (iii) a reconciliation showing, with such level of detail provided to support each of the adjustments made to the 1995 Fresenius AG Audited Financial Statements to derive the 1995 FWD Business Audited Financial Statements.

    (d) If (i) there exists any material difference between the Grace Audited Financial Statements, the Fresenius USA Audited Financial Statements or the FWD Business Audited Financial Statements, on the one hand, and the Grace Disclosure Letter Financial Statements, the Fresenius USA Disclosure Letter

A-38

<PAGE>    397

Financial Statements or the FWD Business Disclosure Letter Financial Statements, respectively, on the other hand, and such material difference adversely affects a party hereto (other than the party the financial statements of which contain such material difference, and treating, for purposes of this parenthetical, Fresenius AG and Fresenius USA as a single party) (such party, the "Affected Party"), and such Affected Party notifies the other parties hereto of such difference within 10 days following receipt of the applicable Audited Financial Statements, or (ii) if Grace believes in good faith that the Fresenius USA Audited Financial Statements and the FWD Business Audited Financial Statements, or if Fresenius AG believes in good faith that the Grace Audited Financial Statements, reflect a material adverse change in the prospects of the business of Fresenius USA and the FWD Business or Grace, as the case may be, from the business plans previously disclosed by the parties hereto and not otherwise disclosed in connection with this Agreement (a party so believing being a "Change Party"), and such Change Party notifies the other parties hereto of such change within 10 days following receipt of the applicable Audited Financial Statements, then the parties hereto shall negotiate in good faith to adjust the relative economics of the transactions contemplated hereby, in consultation with financial and accounting advisors, in light of the foregoing. If the parties do not reach agreement on such an adjustment within 14 days of notice, this Agreement shall be terminable by an Affected Party or a Change Party.

    (e) After delivery of the Audited Financial Statements as contemplated by this Section 6.7 (if there is no material difference or material adverse change as contemplated by the immediately preceding paragraph) or after the reaching of agreement as contemplated by the immediately preceding paragraph (if there is a material difference or material adverse change as contemplated by the immediately preceding paragraph), all references herein to the Disclosure Letter Financial Statements shall be deemed to refer to the Audited Financial Statements.

    (f) Each party hereto shall use all reasonable efforts to cause to be delivered to the other party is, as appropriate, and its directors a letter of its independent accountants, dated (i) the date on which each Registration Statement shall become effective and (ii) a date shortly prior to the Effective Date, and addressed to such other party and its directors, in form and substance customary for "comfort" letters delivered by independent accountants in connection with registration statements.

    (g) Time shall be of the essence with respect to the delivery of the Audited Financial Statements.

    SECTION 6.8. Access.  Upon reasonable notice, and except as may otherwise be required by applicable law, each party hereto shall afford each other party's Representatives access, during normal business hours throughout the period until the Effective Time to its properties, books, Contracts and records and, during such period, shall (and shall cause each of its subsidiaries to) furnish promptly to the other party all information concerning its business, properties and personnel as may reasonably be requested; provided that no investigation pursuant to this Section 6.8 shall affect or be deemed to modify any representation or warranty made by the party furnishing such information; provided further that with respect to the work papers of independent accountants, the provision of access shall be subject to the permission of such independent accountants, and each party hereto shall use reasonable best efforts to secure such permission for the other. Each party hereto shall not, and shall cause its respective Representatives not to, use any information obtained pursuant to this Section for any purpose unrelated to the consummation of the transactions contemplated by this Agreement. All information obtained pursuant to this paragraph shall be subject to the provisions of the written confidentiality arrangements existing among the parties hereto.

    SECTION 6.9. Notification of Certain Matters.  Each party shall give prompt notice to the other party of any change that is reasonably likely to result in any Material Adverse Effect to the knowledge of the executive officers.

    SECTION 6.10. Publicity.  The initial press release relating hereto shall be a joint press release and, thereafter, each party hereto shall consult with each other party hereto prior to issuing any press releases or otherwise making

XXX-002133

public statements with respect to the transactions contemplated hereby and prior
to making any filings with any Governmental Entity or stock exchange with
respect thereto; provided that if a party shall be advised by counsel that any
such press release, statement or filing is required by applicable law and it
shall not be practicable to consult with the other parties prior to the time
such press release, statement or filing is

<div align="center">A-39</div>

<PAGE>  398

required, a party may make such press release, statement or filing and shall
promptly notify the other parties thereof.

        SECTION 6.11. [Intentionally omitted.]

        SECTION 6.12. Employee Benefits.  (i) All Grace Employees who are actively
employed by Grace or its subsidiaries on the Effective Time (including any Grace
Employees who are receiving long-term disability as of the Effective Time) shall
be provided with compensation and benefits (including, without limitation,
severance benefits and retiree benefits) substantially the same as those
benefits provided to Grace Employees as of the date hereof. In addition, Grace
Employees shall be given service credit for all periods of employment with Grace
or its Affiliates prior to the Effective Date for purposes of eligibility and
vesting (but not for benefit accrual) under any plan adopted by Newco or any of
their respective subsidiaries or Affiliates with respect to Grace Employees to
provide retirement or welfare benefits. Following the Effective Time, NMC and
Grace, and not Grace-Conn., shall bear any costs and expenses associated with
the termination of employees involved in the NMC Business. It is the intention
of Fresenius AG to consider the adoption by Newco of a broad based equity
incentive program for employees in the United States.

        (ii) Upon the request of Fresenius AG, prior to the Effective Time, Grace
shall amend or cause to be amended each Grace Pension Plan which is a
single-employer plan within the meaning of Section 4001(a)(15) of ERISA (and
which covers employees in the NMC Business) to delete any provision that would
become applicable on or after a Change of Control (as defined in such Pension
Plan), requiring (i) that Grace fund the Pension Plan on a termination basis,
and/or (ii) that benefit accruals under the Plan become nonforfeitable as of the
date of a Change of Control.

        SECTION 6.13. Expenses and Liquidated Damages. (a) Except as set forth in
paragraph (b) below, whether or not the Reorganization is consummated, all costs
and expenses incurred in connection with this Agreement and the transactions
contemplated hereby shall be paid by the party incurring such expense; provided,
however, that the costs and expenses of printing and mailing the Grace Proxy
Statement, Fresenius USA Proxy Statement, the NY Preferred Registration
Statement and the Newco Registration Statement, and all filing and other fees
paid to the SEC or antitrust authorities in connection with the Reorganization,
shall be borne by Newco.

        (b) In the event that:

        (A) (1) this Agreement shall be terminated pursuant to either Section
8.3(ii) or Section 8.3(iii) or (2) this Agreement shall be terminated
pursuant to Section 8.2(ii) (due to a failure to obtain Grace shareholder
approval) and, at the time of the meeting called for the approval of Grace
shareholders referred to in Section 7.1(a), the Grace Board shall have
failed to recommend to its shareholders the approval of the transactions
contemplated hereby, or shall have withdrawn, modified or changed such
recommendation, or (3) this Agreement shall be terminated pursuant to
Section 8.2(ii) (due to a failure to obtain Grace shareholder approval)
and, at the time of the meeting called for the approval of Grace
shareholders referred to in Section 7.1(a), there shall have been made an
Acquisition Proposal that has become public and, within six months
following such termination, Grace shall enter into a definitive agreement
with respect to the sale of Grace's health care business; and

        and (B), at the time of such termination, neither Fresenius Party
shall be in material breach of its covenants or agreements contained in
this Agreement;

then, Grace shall pay to Fresenius AG, as liquidated damages, in exchange for a
complete release of any liabilities of Grace hereunder, the amount of $35
million plus actual out of pocket expenses incurred to third parties in
connection with the transactions contemplated hereby after the date of this
Agreement, payable by wire transfer of immediately available funds within 24
hours to the account specified by Fresenius AG in writing; provided that, if the
approval of the transactions contemplated hereby by the shareholders of
Fresenius AG, as contemplated by Section 6.5, or an irrevocable written
commitment to vote in favor of such transactions from the holder of an amount of
Fresenius AG capital stock sufficient under applicable law to give such
approval, shall have been obtained, the amount of liquidated damages payable
pursuant to this

<div align="center">A-40</div>

<PAGE>  399

Section 6.13 shall be $75 million plus actual out of pocket expenses incurred to
third parties in connection with the transactions contemplated hereby after the
date of this Agreement.

        SECTION 6.14. Grace Rights Agreement.  The Grace Board shall take all
requisite action in order to render the Grace Rights inapplicable to the Grace
Merger and the other transactions contemplated by this Agreement and the

XXX-002134

Distribution Agreement and to extinguish the Grace Rights in connection with the Reorganization.

SECTION 6.15. Antitakeover Statutes.  If any Takeover Statute is or may become applicable to the transactions contemplated hereby, each of the parties hereto and the members of its Board of Directors shall grant such approvals and take such actions as are necessary so that the transactions contemplated by this Agreement may be consummated as promptly as practicable on the terms contemplated hereby and otherwise act to eliminate or minimize the effects of any Takeover Statute on any of the transactions contemplated by this Agreement.

SECTION 6.16. Securities Act Compliance.  As soon as practicable after the date of the Meetings, each party hereto shall identify to Newco all persons who were, at the time of the Meetings, possible Affiliates, shall use its reasonable efforts to obtain a written agreement in the usual and customary form from each person who is so identified as a possible Affiliate and shall deliver such written agreements to Newco as soon as practicable after the Meetings.

SECTION 6.17. Stock Exchange Listing.  Prior to the Effective Time, Fresenius AG shall use reasonable efforts to cause the ADR Facility and the listing of the ADRs on the Exchange to become effective.

SECTION 6.18. Transaction Agreements.  (a) Prior to the Effective Time, the parties shall consummate any transactions to be consummated prior to the Effective Time pursuant to the Distribution Agreement or the Contribution Agreement.

(b) The parties shall not waive or amend any terms of the Distribution Agreement or the Contribution Agreement without the consent of the other parties hereto, which consent shall not be unreasonably withheld.

(c) The parties hereto acknowledge that the indemnities of Grace-Conn. and of Fresenius AG contained in the Distribution Agreement and the Contribution Agreement, respectively, shall inure to the benefit of each other and to the benefit of Newco.

SECTION 6.19. Tax Matters.  Each party agrees to report the Distribution as a tax-free distribution under the Code and the Grace Merger as a tax-free reorganization under the Code on all tax returns and other filings, and take no position inconsistent therewith, except where, in the opinion of nationally recognized tax counsel to such party, there is not "substantial authority," as defined in Section 6662 of the Code, to support such a position.

ARTICLE VII

CONDITIONS

SECTION 7.1. Conditions to Each Party's Obligation.  The respective obligation of each party hereto to consummate the Reorganization is subject to the fulfillment of each of the following conditions:

(a) Shareholder Approval.  To the extent required by law or stock exchange regulations, the transactions contemplated by the Transaction Agreements shall have been duly approved by the holders of Grace Common Shares and Grace Preferred Shares in accordance with the NYBCL, other applicable law and the Certificate of Incorporation and By-laws of Grace, and by the shareholders of Fresenius AG in accordance with applicable law.

(b) Governmental and Regulatory Consents.  The waiting periods applicable to the consummation of the transactions contemplated by the Transaction Agreements under the HSR Act shall have expired

A-41

<PAGE>    400

or been terminated; and all filings required to be made prior to the Closing by any party hereto or any of its respective subsidiaries with, and all consents, approvals and authorizations required to be obtained prior to the Closing by any party hereto or any of its respective subsidiaries from, any Governmental Entity in connection with the execution and delivery of the Transactions Agreements and the consummation of the transactions contemplated by the Transaction Agreements shall have been made or obtained, except where the failure to obtain such consents is not reasonably likely to have a Material Adverse Effect and could not reasonably be expected to subject the parties hereto or their Affiliates or any directors or officers of any of the foregoing to the risk of criminal liability.

(c) Third-Party Consents.  All consents or approvals of all persons (other than Governmental Entities) required for or in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by the Transaction Agreements shall have been obtained and shall be in full force and effect, except for those the failure to obtain of which would not have a Material Adverse Effect with respect to all parties and Newco.

(d) Litigation.  No United States or state court or other Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, judgment, decree, injunction or other order (whether temporary, preliminary or permanent) which is in effect and prohibits consummation of the transactions contemplated by the Transaction Agreements.

(e) Grace Tax Opinion.  Grace shall have received opinions of

XXX-002135

Wachtell, Lipton, Rosen & Katz and of Miller & Chevalier, Chartered, dated the Effective Date, substantially in the form of Exhibit H hereto. In rendering such opinions, such firms may receive and rely upon representations contained in certificates of the Grace, Fresenius AG, Newco and others, including, without limitation, the Grace Tax Matters Certificate and the Fresenius AG Tax Matters Certificate.

(f) Registration Statements. The Registration Statements shall have become effective under the Securities Act or Exchange Act (as applicable), and no stop order suspending the effectiveness of any Registration Statement shall have been issued and no proceedings for that purpose shall have been initiated or threatened by the SEC.

(g) Financing. The parties hereto shall have obtained the financing necessary to consummate the transactions contemplated by the Transaction Agreements on terms satisfactory to the parties.

(h) The Distribution. The Distribution shall have been consummated.

(i) Stock Exchange Listing. The ADR Facility and the listing of the ADRs on the Exchange shall have become effective; provided, however, that the foregoing shall not apply to obligations of Fresenius USA and Fresenius AG unless Fresenius AG has satisfied the obligations contained in Section 6.18 hereof.

(j) Fresenius AG Debt. As of the Effective Time, Fresenius USA and the FWD Business and their respective subsidiaries (taken together, on a consolidated basis) shall have no Debt other than Debt not in excess of an aggregate amount of $170 million.

(k) Grace Debt. As of the Effective Time, Grace and its subsidiaries (on a consolidated basis) shall have no Debt, other than Debt not in excess of an aggregate amount of (i) $2.263 billion plus (ii) any amounts incurred to finance capital expenditures or acquisitions permitted to be made hereunder.

SECTION 7.2. Conditions to Obligation of Grace. The obligation of Grace to consummate the Reorganization is also subject to the fulfillment or waiver by Grace prior to the Closing of each of the following conditions:

(a) Representations and Warranties. The representations and warranties of each Fresenius Party set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except that representations and warranties that by their terms speak as of the date of this Agreement or some other

A-42

<PAGE>  401

date shall be true and correct as of such date), and Grace shall have received certificates signed on behalf of each Fresenius Party by an officer to such effect.

(b) Performance of Obligations. Each Fresenius Party shall have performed in all material respects all obligations required to be performed by it under this Agreement or the Contribution Agreement at or prior to the Closing Date, and Grace shall have received a certificate signed on behalf of each Fresenius Party by an officer to such effect.

(c) Pooling Agreement. Fresenius AG and Newco shall have entered into the Newco Pooling Agreement; and Grace shall have received an opinion of nationally recognized counsel, dated the Closing Date, to the effect that the Newco Pooling Agreement is a valid and binding agreement, enforceable against Newco and Fresenius AG in accordance with the terms thereof, under the laws of the Federal Republic of Germany, respectively. Such opinion shall be reasonably acceptable to the other parties hereto.

(d) Fresenius AG Tax Opinion. Grace shall have received the opinion of nationally recognized tax counsel (which may be, for purposes of this provision, KPMG Deutsche Treuhand-Gesellschaft AG and/or KPMG Peat Marwick LLP), dated the Closing Date, substantially in the form of Exhibit I hereto, to the effect that Newco shall have no liability with respect to the Fresenius AG Restructuring and the Contribution under the relevant provisions of the Code and applicable law of the Federal Republic of Germany.

SECTION 7.3. Conditions to Obligation Concerning Fresenius USA. The obligation of Fresenius AG to cause Fresenius USA to consummate the Reorganization is also subject to the fulfillment or waiver by Fresenius USA prior to the Closing Date of each of the following conditions:

(a) Representations and Warranties. The representations and warranties of Grace set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except that representations and warranties that by their terms speak as of the date of this Agreement or some other date shall be true and correct as of such date) and Fresenius USA shall have received a certificate signed on behalf of Grace by an officer to such effect.

(b) Performance of Obligations. Grace shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing Date, and Fresenius USA shall have

XXX-002136

received a certificate signed on behalf of Grace by an officer to such effect.

    (c) Pooling Agreement Opinion.  Fresenius AG and Newco shall have entered into the Newco Pooling Agreement; and Fresenius USA shall have received an opinion of nationally recognized counsel, dated the Closing Date, to the effect that the Newco Pooling Agreement is a valid and binding agreement, enforceable against Newco and Fresenius AG in accordance with the terms thereof, under the laws of the Federal Republic of Germany, respectively. Such opinion shall be reasonably acceptable to the other parties hereto.

    SECTION 7.4.  Conditions to Obligation of Fresenius AG.  The obligation of Fresenius AG to consummate the Reorganization is also subject to the fulfillment or waiver by Fresenius AG prior to the Closing of each of the following conditions:

    (a) Representations and Warranties.  The representations and warranties of Grace set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made on and as of the Closing Date (except that representations and warranties that by their terms speak as of the date of this Agreement or some other date shall be true and correct as of such date) and Fresenius AG shall have received a certificate signed on behalf of Grace by an officer to such effect.

    (b) Performance of Obligations.  Grace shall have performed in all material respects all obligations required to be performed by it under this Agreement or the Distribution Agreement at or prior to

<div align="center">A-43</div>

&lt;PAGE&gt;    402

the Closing Date, and Fresenius AG shall have received a certificate signed on behalf of Grace by an officer to such effect.

<div align="center">ARTICLE VIII</div>

<div align="center">TERMINATION</div>

    SECTION 8.1.  Termination by Mutual Consent.  This Agreement may be terminated, and the Reorganization may be abandoned, at any time prior to the Effective Time, before or after the approval by the shareholders of Grace, Fresenius AG and/or Fresenius USA, by the mutual consent of each party hereto, which consent shall be effected by action of its Board of Directors.

    SECTION 8.2. Termination by any Party Hereto.  This Agreement may be terminated, and the Reorganization may be abandoned, by action of the Board of Directors of any party hereto, if (i) the Reorganization shall not have been consummated by October 1, 1996 or (ii) at the Grace Meeting or at any adjournment thereof, the approval of Grace's shareholders, or, at a meeting of Fresenius AG shareholders or any adjournment thereof, the approval of Fresenius AG's shareholders, each as referred to in Section 7.1(a), shall not have been obtained or (iii) pursuant to Section 6.7.

    SECTION 8.3. Termination by Grace.  This Agreement may be terminated and the Reorganization may be abandoned at any time prior to the Effective Time, before or after the adoption and approval by shareholders of Grace referred to in Section 7.1(a), by action of the Grace Board, if (i) either Fresenius Party shall have failed to comply in any material respect with any of the covenants or agreements contained herein to be performed by such Fresenius Party at or prior to the time of termination, which failure is not cured or capable of being cured within 30 days after notice thereof, or (ii) the Grace Board shall have failed to recommend to its shareholders the approval of the transactions contemplated hereby, or shall have withdrawn, modified or changed such recommendation, in a manner permitted by Section 6.5, or (iii) Grace shall have entered into an agreement respect to a Higher Offer in a manner permitted by Section 6.5.

    SECTION 8.4. Termination by Fresenius AG.  This Agreement may be terminated and the Reorganization may be abandoned at any time prior to the Effective Time by action of the Board of Directors of Fresenius AG, if (i) Grace shall have failed to comply in any material respect with any of the covenants or agreements contained herein to be performed by it at or prior to the time of termination, which failure is not cured or capable of being cured within 30 days after notice thereof, or (ii) the Grace Board shall have failed to recommend to its shareholders the approval of the transactions contemplated hereby or shall have withdrawn, modified or changed in a manner materially adverse to such Fresenius Party its approval or recommendation of this Agreement.

    SECTION 8.5. Effect of Termination and Abandonment.  In the event of termination of this Agreement and the abandonment of the Reorganization pursuant to this Article VIII, other than as set forth in Section 6.13, no party hereto (or any of its directors or officers) shall have any liability or further obligation to any other party, except that nothing herein will relieve any party from liability for any material and willful breach of any covenant contained herein.

<div align="center">ARTICLE IX</div>

<div align="center">MISCELLANEOUS AND GENERAL</div>

    SECTION 9.1. Survival.  Only those agreements and covenants of the parties which by their express terms apply in whole or in part after the Effective Time shall survive the Effective Time. All other representations, warranties,

XXX-002137

agreements and covenants shall be deemed only to be conditions of the
Reorganization and shall not survive the Effective Time.

SECTION 9.2. Modification or Amendment.  Subject to the applicable
provisions of the NYBCL and the MBCL, at any time prior to the Effective Time,
the parties hereto may modify or amend this Agreement, by written agreement
executed and delivered by duly authorized officers of the respective parties.

A-44

<PAGE>   403

SECTION 9.3. Waiver of Conditions.  The conditions to each party's
obligation to consummate the Reorganization are for the sole benefit of such
party and may be waived by such party in whole or in part to the extent
permitted by applicable law.

SECTION 9.4. Counterparts.  For the convenience of the parties hereto, this
Agreement may be executed in any number of separate counterparts signed by one
or more of the parties hereto, each such counterpart being deemed to be an
original instrument, and all such counterparts shall together constitute the
same agreement.

SECTION 9.5. Governing Law.  This Agreement shall be governed by and
construed in accordance with the laws of the State of New York.

SECTION 9.6. Notices.  All notices, requests, claims, demands and other
communications hereunder shall be in writing and shall be given (and shall be
deemed to have been duly given upon receipt) by delivery in person, by cable,
telegram, telex or other standard form of telecommunications, or by registered
or certified mail, postage prepaid, return receipt requested, addressed as
follows:

        (a)  If to Grace and Grace-Conn.:

             W. R. Grace & Co.
             One Town Center Road
             Boca Raton, Florida 33486-1010
             Attention: Secretary
             Fax: (407) 362-1635

             with copies to:

             Wachtell, Lipton, Rosen & Katz
             51 West 52nd Street
             New York, N.Y. 10019
             Attention: Andrew R. Brownstein, Esq.
             Fax: (212) 403-2000

        (b)  If to Fresenius AG:

             Fresenius AG
             Borkenberg 14
             61440 Oberursel
             61343 Bad Homburg
             Germany
             Attention: Mr. Udo Werle
             Fax: 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-60-2104

             with copies to:

             O'Melveny & Myers
             Citicorp Center
             153 East 53rd Street
             New York, NY 10022-4611
             Attention: Dr. Ulrich Wagner
             Fax: (212) 326-2061

or to such other address as any party hereto may have furnished to the other
parties by a notice in writing in accordance with this Section.

SECTION 9.7. Entire Agreement, etc.  This Agreement (and the Exhibits and
Disclosure Letters hereto) (a) constitute the entire agreement, and supersede
all other prior agreements, understandings, representations and warranties, both
written and oral, among the parties, with respect to the subject matter

A-45

<PAGE>   404

hereof other than the written confidentiality arrangements existing among the
parties hereto, which shall survive, and (b) shall not be assignable by
operation of law or otherwise.

SECTION 9.8. Definitions of "Subsidiary" and "Significant Subsidiary."  (a)
When a reference is made in this Agreement to a subsidiary of a party, the term
"subsidiary" means any corporation or other organization whether incorporated or
unincorporated of which at least a majority of the securities or interests
having by the terms thereof ordinary voting power to elect at least a majority
of the board of directors or others performing similar functions with respect to
such corporation or other organization is directly or indirectly owned or
controlled by such party or by any one or more of its subsidiaries, or by such
party and one or more of its subsidiaries; provided, however, that except in the
context of references herein to financial statements of Grace and its
subsidiaries or as otherwise specified herein, (i) no member of the Grace-Conn.
Group shall be deemed to be a subsidiary of Grace, (ii) each member of the

Grace-Conn. Group (other than Grace-Conn.) shall be deemed to be a subsidiary of Grace-Conn., (iii) no member of the NMC Group shall be deemed to be a subsidiary of Grace-Conn. and (iv) each member of the NMC Group (other than Grace) shall be deemed to be a subsidiary of Grace.

(b) When a reference is made in this Agreement to a significant subsidiary of a party, the term "significant subsidiary" shall mean a subsidiary of such party meeting the standards specified in clause (1) or (2) of the definition of such term in Rule 1-02 of the SEC's Regulation S-X.

SECTION 9.9. Captions. The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

SECTION 9.10. Specific Performance. In the event of any actual or threatened default in, or breach of, any of the terms, conditions and provisions of this Agreement, the party or parties who are or are to be thereby aggrieved shall have the right of specific performance and injunctive relief giving effect to its or their rights under this Agreement, in addition to any and all other rights and remedies at law or in equity, and all such rights and remedies shall be cumulative. The parties agree that the remedies at law for any breach or threatened breach, including monetary damages, are inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is waived.

SECTION 9.11. Severability. If any provision of this Agreement or the application thereof to any person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.

SECTION 9.12. No Third-Party Beneficiaries. Nothing contained in this Agreement, expressed or implied, is intended to confer upon any person or entity other than the parties hereto and Grace-Conn., any benefit, right or remedies, other than the provisions of Section 6.11 hereof.

SECTION 9.13. Fresenius AG Covenant. (i) As between Fresenius AG and Grace, prior to the Effective Time, Fresenius AG shall cause the Fresenius USA Board to adopt, approve and ratify this Agreement and the other Transaction Agreements and to submit the Fresenius USA Merger to a vote of Fresenius USA shareholders. As a result of the foregoing, without limiting any obligations of Fresenius AG with respect to Fresenius USA hereunder, Fresenius USA will undertake the obligations contained herein as a "party" hereto and make the representations and warranties contained herein with respect to itself directly to Grace. Fresenius AG will vote its shares of Fresenius USA in favor of the Fresenius USA Merger.

(ii) All obligations of Fresenius USA herein shall also be obligations of Fresenius AG.

(iii) Notwithstanding the foregoing, nothing in this provision shall be construed to prevent the Special Committee of the Board of Directors of Fresenius USA or any similar committee evaluating the Fresenius USA Merger from making a determination with respect to the adequacy of the Aggregate Fresenius USA

A-46

<PAGE>  405

Common Share Consideration and the entire fairness of the transaction to the shareholders of Fresenius USA consistent with their fiduciary duties.

SECTION 9.14. Further Assurances. In addition to the actions specifically provided for elsewhere in this Agreement, but subject to Section 9.1 hereof, each of the parties hereto shall use reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable laws, regulations and agreements to consummate and make effective the transactions contemplated by this Agreement. Without limiting the foregoing the parties will as promptly as practicable (and in the case of this Agreement and the Contribution Agreement within one week after the signing hereof in Germany or Switzerland) apply for any notarial or similar registrations with respect to the transactions contemplated hereby in foreign jurisdictions.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto on the date first hereinabove written.

W. R. GRACE & CO.

By: /s/  Albert J. Costello

------------------------------------
Name:
Title:

FRESENIUS AG

By: /s/  Gerd Krick

XXX-002139

```
------------------------------------
Name:
Title:
```

A-47

ANNEX A

DEFINED TERMS

Acquisition Proposal: as defined in Section 6.3 hereof.

ADR: an American depositary receipt for Newco Ordinary Shares issued pursuant to the ADR Facility.

ADR Facility: a facility for exchanging Newco Ordinary Shares for American depositary receipts suitable for listing on the Exchange in form and substance satisfactory to Grace and Fresenius AG.

ADR Registration Statement: the registration statement filed in connection with the ADR Facility.

Affected Party: as defined in Section 6.7(d) hereof.

Affiliate: as defined in Rule 12b-2 under the Exchange Act.

Aggregate Fresenius USA Common Share Consideration: as defined in Section 4.2(e).

Aggregate Grace Common Share Consideration: Newco Ordinary Shares in an amount that represents 44.8% of the number of Newco Ordinary Shares that will be outstanding immediately following consummation of the Reorganization on a fully diluted basis.

Agreement: as defined in the Preamble hereof.

Audited Financial Statements: the Grace Audited Financial Statements, the Fresenius USA Audited Financial Statements and the FWD Business Audited Financial Statements.

Change Party: as defined in Section 6.7(d) hereof.

Closing: as defined in Section 1.4 hereof.

Closing Date: as defined in Section 1.4 hereof.

Closing Subsidiaries: as defined in Section 5.5(c)(ii) hereof.

Code: the Internal Revenue Code of 1986, as amended.

Contracts: as defined in Section 5.1(d)(ii).

Contribution: as defined in Recital C hereof.

Contribution Agreement: as defined in Recital C hereof.

Current Subsidiaries: as defined in Section 5.5(c)(ii) hereof.

Debt: (a) all obligations for borrowed money, whether or not represented by a note, bond or debenture, (b) off balance sheet financing including, without limitation, off balance sheet receivables financings at NMC, (c) any obligation created or arising under any conditional sale agreement or other title retention agreement that is treated as a liability under a balance sheet prepared in accordance with US GAAP, (d) the portion of the obligations with respect to capital leases that is properly classified as a liability on a balance sheet in accordance with US GAAP, (e) a reasonable estimate, to be agreed by Fresenius and Grace, of the amounts payable in respect of Dissenting Shares of Fresenius USA or Grace, as the case may be, (f) any obligation owed in respect of the deferred purchase price of property (excluding any obligations incurred in the ordinary course of business), and (g) the liquidation preference of, and accrued dividends on, preferred stock outstanding at the Effective Time (other than NY Preferred Shares).

Disclosure Letters: the Fresenius AG Disclosure Letter, the Fresenius USA Disclosure Letter and the Grace Disclosure Letter.

Disclosure Letter Financial Statements: the Grace Disclosure Letter Financial Statements, the Fresenius USA Disclosure Letter Financial Statements and the FWD Business Disclosure Letter Financial Statements.

Dissenting Shares: Grace Common Dissenting Shares and Fresenius USA Common Dissenting Shares.

A-i

Distribution: as defined in Recital D hereof.

Distribution Agreement: as defined in Recital D hereof.

Effective Time: as defined in Section 1.3 hereof.

XXX-002140

Employees: the Grace Employees and the Fresenius USA Employees.

Environmental Law: any federal, state, foreign or local law, statute, ordinance, rule, regulation, code, license, permit, authorization, approval, consent, common law, legal doctrine, order, judgment, decree, injunction, requirement or agreement with any governmental entity, (a) relating to the protection, preservation or restoration of the environment (including, without limitation, air, water vapor, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or to human health or safety, or (b) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of Hazardous Substances, in each case as amended and as now in effect.

ERISA: the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

ERISA Affiliates: the Grace ERISA Affiliates and the Fresenius USA ERISA Affiliates.

Excess Shares: as defined in Section 4.4(c) (ii) hereof.

Exchange: the New York Stock Exchange, Inc. or the NASDAQ Stock Market.

Exchange Act: the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

Exchange Agent: as defined in Section 4.4(a) hereof.

Fractional Securities Fund: as defined in Section 4.4(c) (ii) hereof.

Fresenius AG: as defined in the Preamble hereof.

Fresenius AG Disclosure Letter: as defined in Section 5.3 hereof.

Fresenius AG Plans: as defined in Section 5.4(m)(i) hereof.

Fresenius AG Restructuring: as defined in Section 5.5(d) hereof.

Fresenius AG Tax Matters Certificate: as defined in Section 5.3(g) hereof.

Fresenius Parties: as defined in Recital F hereof.

Fresenius USA: as defined in Recital F hereof.

Fresenius USA Articles of Organization: as defined in Section 2.3 hereof.

Fresenius USA Audited Financial Statements: as defined in Section 6.7(b) hereof.

Fresenius USA Board: the Board of Directors of Fresenius USA.

Fresenius USA Common Dissenting Shares: Fresenius USA Common Shares as to which rights of appraisal have been perfected pursuant to the MBCL.

Fresenius USA Common Share Equivalents: at any time, (i) the aggregate number of Fresenius USA Common Shares outstanding at such time (other than any Fresenius USA Common Share owned by Fresenius AG or its subsidiaries or Newco or Fresenius USA or its subsidiaries or any Fresenius USA subsidiary or held in Fresenius USA's treasury or any Fresenius USA Common Dissenting Share) plus (ii) the aggregate number of Fresenius USA Options (other than any Fresenius USA Option on an outstanding Fresenius USA Common Share).

Fresenius USA Common Shares: shares of common stock, par value $.01 per share, of Fresenius USA.

A-ii

<PAGE> 408

Fresenius USA Compensation Plans: as defined in Section 5.2(k)(i).

Fresenius USA Consideration Per Share: the amount into which each Fresenius USA Common Share will be converted in the Fresenius USA Merger, to be calculated as the quotient of the Aggregate Fresenius USA Common Share Consideration divided by the number of Fresenius USA Common Share Equivalents immediately prior to the Fresenius USA Merger.

Fresenius USA Disclosure Letter: as defined in Section 5.2 hereof.

Fresenius USA Disclosure Letter Balance Sheet: as defined in Section 5.2(e)(iii) hereof.

Fresenius USA Disclosure Letter Financial Statements: as defined in Section 5.2(e)(iii) hereof.

Fresenius USA Employees: as defined in Section 5.2(k)(i) hereof.

Fresenius USA ERISA Affiliate: as defined in Section 5.2(k)(iii) hereof.

Fresenius USA Exchange Ratio: the Fresenius USA Consideration Per Share, expressed as the numerical ratio of Newco Ordinary Shares per Fresenius USA Common Share.

Fresenius USA Intellectual Property: as defined in Section 5.2(p) hereof.

XXX-002141

Fresenius USA Meeting: a duly convened meeting of holders of Fresenius USA Common Shares and Fresenius USA Preferred Shares called to vote on and approve the transactions contemplated hereby.

Fresenius USA Merger: as defined in Recital F hereof.

Fresenius USA Merger Sub: as defined in Recital F hereof.

Fresenius USA Option: as defined in Section 4.4(i) hereof.

Fresenius USA Plans: as defined in Section 5.2(k)(ii) hereof.

Fresenius USA Preferred Shares: shares of preferred stock, par value $1.00 per share, of Fresenius USA.

Fresenius USA Proxy Statement: the proxy statement (including all proxy solicitation materials constituting a part thereof) to be mailed to the holders of Fresenius USA Common Shares and Fresenius USA Preferred Shares in connection with the Fresenius USA Meeting.

Fresenius USA Schedule 14A: the Schedule 14A filed by Fresenius USA with the SEC including the Fresenius USA Proxy Statement.

Fresenius USA Series F Preferred Shares: Fresenius USA Preferred Shares designated as Series F Series Convertible Preferred Stock.

Fresenius USA Stock Plans: as defined in Section 5.2(a) hereof.

Fresenius USA Surviving Corporation: as defined in Section 1.2(c) hereof.

FWD Business: as defined in Section 5.5(a) hereof.

FWD Business Assets: as defined in Section 5.5(b) hereof.

FWD Business Audited Financial Statements: as defined in Section 6.7(c) hereof.

FWD Business Disclosure Letter: as defined in Section 5.4 hereof.

FWD Business Disclosure Letter Balance Sheet: as disclosed in Section 5.4(d)(i) hereof.

FWD Business Disclosure Letter Financial Statements: as defined in Section 5.4(d)(i) hereof.

FWD Business Intellectual Property: as defined in Section 5.4(o) hereof.

FWD Business Subsidiary: as defined in Section 5.5(c) hereof.

German GAAP: German generally accepted accounting principles consistently applied.

A-iii

<PAGE>  409

Governmental Entity: as defined in Section 5.1(d)(i) hereof.

Grace: as defined in the Preamble hereof.

Grace Amendment: as defined in Recital F hereof.

Grace Audited Financial Statements: as defined in Section 6.7(a) hereof.

Grace Board: the Board of Directors of Grace.

Grace Certificate of Incorporation: as defined in Section 2.1 hereof.

Grace Class A Preferred Shares: Grace Preferred Shares designated as Class A.

Grace Class B Preferred Shares: Grace Preferred Shares designated as Class B.

Grace Class C Preferred Shares: Grace Preferred Shares designated as Class C.

Grace Common Dissenting Shares: Grace Common Shares as to which rights of appraisal have been perfected pursuant to the NYBCL.

Grace Common Share Equivalents: at any time, (i) the aggregate number of Grace Common Shares outstanding at such time (other than any Grace Common Share owned by Grace AG or its subsidiaries or Fresenius USA or its subsidiaries or any Grace subsidiary or held in Grace's treasury or any Grace Common Dissenting Share) plus (ii) the aggregate number of Grace Options (other than any Grace Option on an outstanding Grace Common Share).

Grace Common Shares: shares of common stock, par value $1.00 per share, of Grace (including the associated Grace Rights).

Grace Compensation Plans: as defined in Section 5.1(k)(i) hereof.

Grace-Conn.: as defined in Recital D hereof.

XXX-002142

Grace-Conn. Business: as defined in the Distribution Agreement.

Grace-Conn. Group: as defined in the Distribution Agreement.

Grace-Conn. Registration Statement: the registration statement filed by Grace-Conn. with the SEC in connection with the Distribution.

Grace Consideration Per Share: Newco Ordinary Shares in the amount into which each Grace Common Share (and associated Grace Right) will be converted in the Grace Merger, to be calculated as the quotient of the Aggregate Grace Common Share Consideration divided by the number of Grace Common Share Equivalents outstanding immediately prior to the Grace Merger after giving effect to the Distribution.

Grace Disclosure Letter: as defined in Section 5.1 hereof.

Grace Disclosure Letter Balance Sheet: as defined in Section 5.1(e)(iii) hereof.

Grace Disclosure Letter Financial Statements: as defined in Section 5.1(e)(iii) hereof.

Grace Employees: as defined in Section 5.1(k)(i) hereof.

Grace ERISA Affiliate: as defined in Section 5.1(k)(iii) hereof.

Grace Exchange Ratio: the Grace Consideration Per Share, expressed as the numerical ratio of Newco Ordinary Shares per Grace Common Share.

Grace Meeting: a duly convened meeting of holders of Grace Common Shares and Grace Preferred Shares called to vote on and approve the transactions contemplated hereby.

Grace Merger: as defined in Recital F hereof.

Grace Merger Sub: as defined in Recital F hereof.

A-iv

<PAGE>   410

Grace Option: as defined in Section 4.4(i) hereof.

Grace Preferred Shares: shares of preferred stock, par value $1.00 per share, of Grace (other than NY Preferred Shares).

Grace Proxy Statement: the proxy statement (including all proxy solicitation materials constituting a part thereof) to be mailed to the holders of Grace Common Shares and Grace Preferred Shares in connection with the Grace Meeting.

Grace Rights: the common stock purchase rights of Grace issued pursuant to the Rights Agreement.

Grace Rights Agreement: the Amended and Restated Rights Agreement, dated as of June 7, 1990, between Grace and Manufacturers Hanover Trust Company, as supplemented and amended.

Grace Schedule 14A: the Schedule 14A filed by Grace with the SEC including the Grace Proxy Statement.

Grace 6% Preferred Shares: Grace Preferred Shares designated as 6%.

Grace Stock Plans: as defined in Section 5.1(a) hereof.

Grace Surviving Corporation: as defined in Section 1.2(b) hereof.

Grace Tax Matters Certificate: as defined in Section 5.1(p) hereof.

Hazardous Substance: any substance presently listed, defined, designated or classified as hazardous, toxic, radioactive or dangerous, or otherwise regulated, under any Environmental Law, whether by type or by quantity, including any substance containing any such substance as a component.

Higher Offer: as defined in Section 6.3 hereof.

HSR Act: the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

IRS: the United States Internal Revenue Service.

Lease: as defined in Recital D hereof.

knowledge of executive officers: shall mean, in the case of Grace, the knowledge of each officer of Grace subject to Section 16 of the Exchange Act pursuant to Rule 16a-2 under the Exchange Act.

Massachusetts Certificate: as defined in Section 1.3 hereof.

material: with respect to any party, material to such party and its subsidiaries, taken as a whole; provided, however, that when determining materiality with respect to Grace, only that property, business, financial condition, results of operations or prospects which are included in or exclusively related to the NMC Business shall be included.

XXX-002143

Material Adverse Effect: with respect to any party, an effect which would be materially adverse to the properties, business, financial condition, results of operations or prospects of such party and its subsidiaries taken as a whole; provided, however, that when determining Material Adverse Effect with respect to Grace, only that property, business, financial condition, results of operations or prospects which are included in or exclusively relate to the NMC Business shall be included.

MBCL: the Massachusetts Business Corporation Law.

Meetings: the Grace Meeting and the Fresenius USA Meeting.

Mergers: as defined in Recital F hereof.

NMC: National Medical Care, Inc., a Delaware corporation and an indirect wholly owned subsidiary of Grace.

NMC Business: as defined in the Distribution Agreement.

NMC Business Intellectual Property: as defined in Section 5.1(r) hereof.

A-v

<PAGE>  411

NMC Group: as defined in the Distribution Agreement.

Newco Board: the Supervisory Board of Newco.

Newco Charter Documents: as defined in Recital B hereof.

Newco Ordinary Share Certificate: certificates for Newco Ordinary Shares.

Newco Ordinary Shares: ordinary shares in the capital of Newco.

Newco Pooling Agreement: as defined in Recital B hereof.

Newco Registration Statement: the registration statement filed with the SEC in connection with the issuance of Newco Ordinary Shares in the Mergers.

New York Certificate: as defined in Section 1.3 hereof.

NYBCL: the New York Business Corporation Law.

NY Preferred Registration Statement: the registration statement filed with the SEC in connection with the issuance of NY Preferred Shares in the Recapitalization.

NY Preferred Shares: shares of a new series of preferred stock of Grace to be issued in the Recapitalization having the terms set forth in Exhibit C hereto.

Old Certificates: Old Grace Certificates and Old Fresenius USA Certificates.

Old Fresenius USA Certificate: a certificate for Fresenius USA Common Shares or Fresenius USA Preferred Shares.

Old Grace Certificate: a certificate for Grace Common Shares.

Other Agreements: (i) as defined in the Contribution Agreement plus (ii) as defined in the Distribution Agreement.

Proxy Statements: the Fresenius USA Proxy Statement and the Grace Proxy Statement.

Recapitalization: as defined in Recital E hereof.

Registration Statements: the Newco Registration Statement, the Grace-Conn. Registration Statement, the NY Preferred Registration Statement and the ADR Registration Statement.

Reorganization: the Contribution, the Recapitalization, the Distribution and the Mergers.

Reorganization Agreement: as defined in the Preamble hereof.

Representatives: with respect to any party, such party's officers, employees, counsel, accountants and other authorized representatives.

Schedules 14A: the Grace Schedule 14A and the Fresenius USA Schedule 14A.

SEC: the Securities and Exchange Commission.

SEC Documents: with respect to any party, all filings made by such party or its Subsidiaries with the SEC since December 31, 1994, including notes, schedules, amendments and exhibits thereto.

Securities Act: the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

significant subsidiary: as defined in Section 9.9(b) hereof.

subsidiary: as defined in Section 9.9(a) hereof.

XXX-002144

        Surviving Corporations: the Grace Surviving Corporation and the Fresenius
USA Surviving Corporation.

        Takeover Statute: as defined in Section 5.1(n) hereof.

                                    A-vi
<PAGE>   412

        Transaction Agreements: the Reorganization Agreement, the Newco Pooling
Agreement, the Distribution Agreement, the Contribution Agreement and the Other
Agreements.

        US GAAP: United States generally accepted accounting principles
consistently applied.

                                    A-vii
<PAGE>   413

                        EXHIBIT A TO APPENDIX A

                    DISTRIBUTION AGREEMENT

                        BY AND AMONG

                    W. R. GRACE & CO.,

                 W. R. GRACE & CO.-CONN.,

                            AND

                      FRESENIUS AG

                DATED AS OF FEBRUARY 4, 1996
<PAGE>   414

                    TABLE OF CONTENTS

<TABLE>
<CAPTION>

                                                                PAGE
                                                                -----
<S>    <C>                                                         <C>
I.      Definitions..................................................... AA-4
        1.01    General................................................ AA-4
        1.02    References to Time..................................... AA-7
II.     Certain Transactions Prior to the Distribution Date............ AA-7
        2.01    Certificate of Incorporation; By-laws; Rights Plan..... AA-7
        2.02    Issuance of Stock..................................... AA-7
        2.03    Other Agreements...................................... AA-8
        2.04    Capital Structure..................................... AA-8
        2.05    Registration and Listing.............................. AA-8
        2.06    Grace-Conn. Board..................................... AA-8
        2.07    Mergers and Transfers................................. AA-8
        2.08    Intercompany Accounts and Distribution Payments....... AA-8
III.    The Distribution............................................... AA-9
        3.01    Record Date and Distribution Date..................... AA-9
        3.02    The Agent............................................. AA-9
        3.03    Delivery of Share Certificates to the Agent........... AA-9
        3.04    The Distribution...................................... AA-9
IV.     Survival and Indemnification.................................. AA-9
        4.01    Survival of Agreements................................ AA-9
        4.02    Indemnification....................................... AA-9
        4.03    Procedures for Indemnification for Third-Party Claims.. AA-10
        4.04    Remedies Cumulative................................... AA-11
        4.05    Compromise of Investigations.......................... AA-11
V.      Certain Additional Covenants.................................. AA-11
        5.01    Notices to Third Parties.............................. AA-11
        5.02    Licenses and Permits.................................. AA-11
        5.03    Intercompany Agreements............................... AA-11
        5.04    Guarantee Obligations................................. AA-12
        5.05    Further Assurances.................................... AA-12
        5.06    Representations and Warranties of Grace-Conn.......... AA-12
VI.     Access to Information......................................... AA-13
        6.01    Provision of Corporate Records........................ AA-13
        6.02    Access to Information................................. AA-13
        6.03    Production of Witnesses............................... AA-14
        6.04    Retention of Records.................................. AA-14
        6.05    Confidentiality....................................... AA-14
        6.06    Cooperation with Respect to Government Reports and Filings........... AA-15
VII.    No Representations or Warranties.............................. AA-15
        7.01    No Representations or Warranties...................... AA-15
VIII.   Miscellaneous................................................. AA-16
        8.01    Conditions to Obligations............................. AA-16
        8.02    Use of Grace Name and Mark............................ AA-16
        8.03    Complete Agreement.................................... AA-16
        8.04    Expenses.............................................. AA-16
</TABLE>

                                    AA-1
<PAGE>   415

<TABLE>
<CAPTION>

                                                                PAGE

XXX-002145

```
<S>      <C>                                                          -----
                                                                     <C>
         8.05    Governing Law..............................................  AA-16
         8.06    Notices....................................................  AA-16
         8.07    Amendment and Modification.................................  AA-17
         8.08    Successors and Assigns; No Third-Party Beneficiaries.......  AA-17
         8.09    Counterparts...............................................  AA-18
         8.10    Interpretation.............................................  AA-18
         8.11    Severability...............................................  AA-18
         8.12    References; Construction...................................  AA-18
         8.13    Termination................................................  AA-18
SIGNATURES.........................................................................  AA-19
</TABLE>
```

AA-2

<PAGE>   416

DISTRIBUTION AGREEMENT

This DISTRIBUTION AGREEMENT (this "Agreement"), dated February 4, 1996, by
and between W. R. Grace & Co., a New York corporation ("Grace"), and W. R. Grace
& Co.-Conn., a Connecticut corporation and a wholly owned subsidiary of Grace
("Grace-Conn."), and Fresenius AG, an Aktiengesellschaft organized under the
laws of the Federal Republic of Germany ("Fresenius AG").

RECITALS

A. The Reorganization Agreement.  Simultaneously herewith, Grace and
Fresenius AG are entering into an Agreement and Plan of Reorganization (the
"Reorganization Agreement") and, prior to the Effective Time, intend to
consummate the transactions contemplated hereby.

B. The Contribution.  Prior to the Effective Time, Fresenius AG intends to
contribute its worldwide dialysis business to SP, as provided in the
Contribution Agreement, and to retain and lease to SP certain real property and
buildings in the Federal Republic of Germany pursuant to a lease consistent with
the terms set forth in Exhibit B to the Contribution Agreement and to retain and
license to Newco its name and certain derived marks pursuant to a license
consistent with the terms set forth in Exhibit C to the Contribution Agreement.

C. Newco.  In connection with the Contribution, Fresenius AG intends that
SP shall convert to an Aktiengesellschaft, pursuant to German law, and to become
"Newco," consistent with the terms of the Reorganization Agreement.

D. The Distribution.  Immediately prior to the Effective Time, Grace
intends to transfer to (or retain in) Grace-Conn. all non-healthcare assets and
liabilities, its interests in the Amicon bioseparations business and GN
Holdings, Inc. and certain other assets, as contemplated by this Agreement, and
to effect a distribution to its common shareholders of all of its equity
interest in Grace-Conn.

E. The Recapitalization.  Following the Distribution and immediately prior
to the Effective Time, Grace intends to consummate the Recapitalization in which
each holder of a Grace Common Share shall hold, immediately thereafter, a Grace
Common Share and one one-hundredth of a NY Preferred Share.

F. The Mergers.  At the Effective Time, the parties intend to effect a
merger of a wholly owned New York corporate subsidiary of Newco with and into
Grace, with Grace being the surviving corporation. Also at the Effective Time,
the parties intend to effect a merger of a wholly owned Massachusetts corporate
subsidiary of Newco with and into Fresenius USA, with Fresenius USA being the
surviving corporation.

G. Financing.  It is the intention of the parties hereto that, prior to the
Distribution: (i) Grace and Grace-Conn. shall use reasonable efforts to cause
NMC to arrange new credit facilities so that the transactions contemplated by
the Transaction Agreements may be consummated; (ii) Fresenius AG shall use
reasonable efforts to arrange new credit facilities for the FWD Business so that
the transactions contemplated by the Transaction Agreements may be consummated;
and (iii) the parties shall cooperate with one another with respect to the
foregoing.

H. Intention of the Parties.  It is the intention of the parties to the
Reorganization Agreement that for United States federal income tax purposes (a)
the Distribution shall qualify as a tax-free distribution under the Code, (b)
each of the Mergers shall qualify as a "reorganization" within the meaning of
Section 368(a) of the Code, (c) the Contribution shall qualify as a tax-free
exchange under the Code and (d) the Recapitalization shall be tax-free to Grace
under the Code.

AA-3

<PAGE>   417

NOW, THEREFORE, in consideration of the premises, and of the
representations, warranties, covenants and agreements set forth herein, the
parties hereto hereby agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01 General. As used in this Agreement, the following terms shall
have the following meanings (such meanings to be equally applicable to both the
singular and plural forms of the terms defined):

XXX-002146

Affiliate: with respect to any specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person; provided, however, that for purposes of this Agreement, no member of either Group shall be deemed to be an Affiliate of any member of the other Group.

Agent: the distribution agent to be appointed by Grace to distribute the shares of Grace-Conn. Common Stock pursuant to the Distribution.

Agreement: as defined in the preamble hereof.

Asset: any and all assets and properties, tangible or intangible, including, without limitation, the following: (i) cash, notes and accounts and notes receivable (whether current or non-current); (ii) certificates of deposit, banker's acceptances, stock, debentures, evidences of indebtedness, certificates of interest or participation in profit-sharing agreements, collateral-trust certificates, preorganization certificates or subscriptions, transferable shares, investment contracts, voting-trust certificates, fractional undivided interests in oil, gas or other mineral rights, puts, calls, straddles, options and other securities of any kind; (iii) intangible property rights, inventions, discoveries, know-how, U.S. and foreign patents and patent applications, trade secrets, confidential information, registered and unregistered trademarks, service marks, service names, trade styles and trade names and associated goodwill; statutory, common law and registered copyrights; applications for any of the foregoing, rights to use the foregoing and other rights in, to and under the foregoing; (iv) rights under leases, contracts, licenses, permits, distribution arrangements, sales and purchase agreements, other agreements and business arrangements; (v) real estate and buildings and other improvements thereon; (vi) leasehold improvements, fixtures, trade fixtures, machinery, equipment (including transportation and office equipment), tools, dies and furniture; (vii) office supplies, production supplies, spare parts, other miscellaneous supplies and other tangible property of any kind; (viii) computer equipment and software; (ix) raw materials, work-in-process, finished goods, consigned goods and other inventories; (x) prepayments or prepaid expenses; (xi) claims, causes of action, choses in action, rights under express or implied warranties, rights of recovery and rights of setoff of any kind; (xii) the right to receive mail, payments on accounts receivable and other communications; (xiii) lists of customers, records pertaining to customers and accounts, personnel records, lists and records pertaining to customers, suppliers and agents, and books, ledgers, files and business records of every kind; (xiv) advertising materials and other printed or written materials; (xv) goodwill as a going concern and other intangible properties; (xvi) employee contracts, including any rights thereunder to restrict an employee from competing in certain respects; and (xvii) licenses and authorizations issued by any governmental authority.

Business: the Grace-Conn. Business or the NMC Business.

Code: the Internal Revenue Code of 1986, as amended, or any successor legislation.

Contribution: as defined in the Reorganization Agreement.

Contribution Agreement: as defined in the Reorganization Agreement.

Debt: as defined in the Reorganization Agreement.

Distribution: the distribution of Grace-Conn. Common Stock to holders of shares of Grace Common Stock to be effected pursuant to Article III on the basis of one share of Grace-Conn. Common Stock for each share of Grace Common Stock held of record as of the Record Date.

AA-4

<PAGE>    418

Distribution Date: the date as of which the Distribution shall be effected, to be determined by the Board of Directors of Grace consistent with the Reorganization Agreement.

Effective Time: as defined in the Reorganization Agreement.

Environmental Law: as defined in the Reorganization Agreement.

Exchange Act: the Securities Exchange Act of 1934, as amended, together with the rules and regulations promulgated thereunder.

Foreign Exchange Rate: with respect to any currency other than United States dollars as of any date, the rate on such date at which such currency may be exchanged for United States dollars as quoted in The Wall Street Journal.

Fresenius: each of Fresenius AG and Fresenius USA.

Fresenius AG: as defined in the preamble to this Agreement.

Fresenius USA: as defined in the Reorganization Agreement.

FWD Business: as defined in the Reorganization Agreement.

Grace: as defined in the preamble to this Agreement.

Grace Common Stock: the common stock, par value $1.00 per share, of Grace.

Grace-Conn.: as defined in the preamble to this Agreement.

XXX-002147

Grace-Conn. Assets: all of the Assets owned by Grace or its Subsidiaries immediately prior to the Distribution Date, other than any NMC Assets.

Grace-Conn. Business: all of the businesses and operations conducted by Grace and its Subsidiaries at any time, whether prior to, on or after the Distribution Date, other than the NMC Business.

Grace-Conn. Common Stock: the common stock of Grace-Conn., together with the Grace-Conn. Rights.

Grace-Conn. Group: Grace-Conn. and the Grace-Conn. Subsidiaries.

Grace-Conn. Indemnitees: Grace-Conn., each Affiliate of Grace-Conn. and each of their respective Representatives and each of the heirs, executors, successors and assigns of any of the foregoing.

Grace-Conn. Rights: stock purchase rights of Grace-Conn.

Grace-Conn. Subsidiaries: all direct and indirect Subsidiaries of Grace, other than NMC and any NMC Subsidiary, and all Transferred Companies.

Grace Tax Sharing Agreement: a tax sharing agreement between Grace and Grace-Conn. substantially in the form attached hereto as Exhibit B, with such changes as may be mutually satisfactory to Grace, Grace-Conn. and Fresenius.

Group: the NMC Group or the Grace-Conn. Group.

Indemnifiable Losses: all losses, Liabilities, damages, claims, demands, judgments or settlements of any nature or kind, known or unknown, fixed, accrued, absolute or contingent, liquidated or unliquidated, including all reasonable costs and expenses (legal, accounting or otherwise as such costs are incurred) relating thereto, suffered (and not actually reimbursed by insurance proceeds) by an Indemnitee, including any reasonable costs or expenses of enforcing any indemnity hereunder.

Indemnifying Party: a Person who or which is obligated under this Agreement to provide indemnification.

Indemnitee: a Person who or which may seek indemnification under this Agreement.

Indemnity Payment: an amount that an Indemnifying Party is required to pay to or in respect of an Indemnitee pursuant to Article IV.

AA-5
<PAGE>   419

Information: all records, books, contracts, instruments, computer data and other data and information.

Information Statement: the information statement to be included in the Registration Statement and sent to Grace shareholders in connection with the Distribution.

Liabilities: all debts, liabilities and obligations, whether absolute or contingent, matured or unmatured, liquidated or unliquidated, accrued or unaccrued, known or unknown, whenever arising, and whether or not the same would properly be reflected on a balance sheet.

Litigation Matters: actual, threatened or future litigations, investigations, claims or other legal matters that have been or may be asserted against, or otherwise adversely affect, NMC and/or Grace-Conn. (or members of either Group).

Material Adverse Effect: as defined in the Reorganization Agreement.

NMC: National Medical Care, Inc., a Delaware corporation and an indirect wholly owned subsidiary of Grace.

NMC Assets: (i) all of the Assets owned by Grace or its Subsidiaries immediately prior to the Distribution Date and predominantly used or useful in or predominantly relating to the NMC Business, excluding items to be retained by or transferred to any member of the Grace-Conn. Group pursuant to the Reorganization Agreement or any Other Agreement, and (ii) all Assets that have been or are to be transferred to any member of the NMC Group pursuant to the Reorganization Agreement or any Other Agreement; provided that all cash and marketable securities held by any member of the NMC Group prior to the Distribution shall be Grace-Conn. Assets.

NMC Business: all of the worldwide health care businesses and operations conducted by Grace and its Subsidiaries at any time, whether prior to, on or after the Distribution Date, other than the Transferred Operations.

NMC Group: Grace, NMC and the NMC Subsidiaries.

NMC Indemnitees: Newco, Grace, NMC, each Affiliate of NMC and each of their respective Representatives and each of the heirs, executors, successors and assigns of any of the foregoing.

NMC Subsidiaries: all direct and indirect Subsidiaries of Grace through which Grace conducts the NMC business, other than Transferred Companies.

Newco: as defined in the Reorganization Agreement.

XXX-002148

NY Preferred Registration Statement: as defined in the Reorganization Agreement.

NY Preferred Share: as defined in the Reorganization Agreement.

Other Agreements: an employee benefits agreement, restructuring agreements, an insurance procedures agreement, the Grace Tax Sharing Agreement and the other agreements entered into or to be entered into in connection with the Distribution as contemplated by Section 2.03.

Person: an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization or a government or any department or agency thereof.

Privileged Information: with respect to either Group, Information regarding a member of such Group, or any of its operations, Assets or Liabilities (whether in documents or stored in any other form or known to its employees or agents) that is or may be protected from disclosure pursuant to the attorney-client privilege, the work product doctrine or other applicable privileges, that a member of the other Group may come into possession of or obtain access to pursuant to this Agreement or otherwise.

Proxy Statement: the Grace proxy statement provided for in the Reorganization Agreement.

Recapitalization: as defined in the Reorganization Agreement.

AA-6

<PAGE>    420

Record Date: the moment immediately prior to the close of business on the date to be determined by the Board of Directors of Grace consistent with the Reorganization Agreement as the record date for determining shareholders of Grace entitled to receive the Distribution.

Registration Statement: a registration statement on Form 10 to effect the registration of the Grace-Conn. Common Stock pursuant to the Exchange Act.

Reorganization Agreement: as defined in the recitals to this Agreement.

Representative: with respect to any Person, any of such Person's directors, officers, employees, agents, consultants, advisors, accountants, attorneys and representatives.

SEC: the Securities and Exchange Commission.

Securities Act: the Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder.

SP: as defined in the Contribution Agreement.

Subsidiary: with respect to any specified Person, (i) any corporation or other legal entity of which such Person or any of its subsidiaries controls or owns, directly or indirectly, more than 50% of the stock or other equity interest entitled to vote on the election of members to the board of directors or similar governing body and (ii) any corporation, partnership or other business entity, in which such Person has owned or shall own any equity interest or other investment and which predominantly relates to the business and operations conducted by such Person's Group.

Tax: as defined in the Grace Tax Sharing Agreement.

Third-Party Claim: any claim, suit, derivative suit, arbitration, inquiry, proceeding or investigation by or before any court, any governmental or other regulatory or administrative agency or commission or any arbitration tribunal asserted by a Person who or which is neither a party hereto nor an Affiliate of a party hereto.

Transferred Companies: Amicon, Inc., GN Holdings, Inc. and its Subsidiaries and the other Subsidiaries of Grace which conduct the business of Amicon.

Transferred Operations: the businesses, operations, Assets and Liabilities of the Transferred Companies.

SECTION 1.02 References To Time.  All references in this Agreement to times of the day shall be to New York City time.

ARTICLE II

CERTAIN TRANSACTIONS PRIOR TO THE DISTRIBUTION DATE

SECTION 2.01 Certificate of Incorporation; By-laws; Rights Plan.  Prior to the Distribution Date, Grace-Conn. may be reorganized (through merger, asset transfer or other reorganization transaction) such that Grace-Conn. shall be a Delaware corporation or a subsidiary of a Delaware holding company or its Assets transferred in their entirety to a Delaware corporation, in which case all references to Grace-Conn. herein shall include any such successor corporation or holding company. In addition, prior to the Distribution Date, the parties hereto shall take all action necessary so that, at the Distribution Date, Grace-Conn.'s name shall be "W. R. Grace & Co."; the Certificate of Incorporation and By-laws of Grace-Conn. shall be amended as specified by Grace prior to the Distribution Date; and Grace-Conn. shall adopt a rights plan in the form as specified by Grace prior to the Distribution Date.

XXX-002149

SECTION 2.02 Issuance of Stock.  Prior to the Distribution Date, the parties hereto shall take all steps necessary so that, prior to the Distribution, the number of shares of Grace-Conn. Common Stock outstanding and held by Grace shall equal the number of shares of Grace Common Stock outstanding on the Record Date.

AA-7

<PAGE>   421

SECTION 2.03 Other Agreements.  Each of Grace and Grace-Conn. shall enter into, or cause the appropriate members of the Group or each as a member to enter into, the Tax Sharing Agreement and Other Agreements as may be advisable in connection with the Distribution including, without limitation, agreements with respect to employee benefits, restructuring, insurance procedures and other matters, all such Other Agreements to be on terms acceptable to Grace and Fresenius prior to the Distribution Date.

SECTION 2.04 Capital Structure.  (a) It is intended that, prior to the Distribution, each of Grace and/or the NMC Group, on the one hand, and the Grace-Conn. Group, on the other hand, shall obtain new credit facilities or issue new debt instruments or securities on terms satisfactory to Grace, and to the extent necessary to permit and enable the Distribution and the other transactions contemplated hereby, including, without limitation, the transactions contemplated by this Section and Section 2.08 below, to be consummated consistent with the Reorganization Agreement; and each of the parties hereto agrees that it shall use reasonable efforts, and shall cooperate with the other party's efforts, to effect the foregoing.

(b) Prior to or concurrent with the Distribution, Grace and/or NMC shall take all action including, without limitation, the incurrence of additional debt to be arranged in connection with the Reorganization and the payment of cash, as provided in Section 2.08, so that, upon and giving effect to the consummation of the Distribution, Grace's consolidated Debt shall be of an aggregate amount consistent with the Reorganization Agreement.

SECTION 2.05 Registration and Listing.  Prior to the Distribution Date:

(a) The parties shall take such efforts regarding the Registration Statement and the Proxy Statement, as is provided in the Reorganization Agreement. After the Registration Statement becomes effective, Grace shall cause the Information Statement to be delivered to all holders of record of Grace Common Stock as of the Record Date.

(b) The parties hereto shall use reasonable efforts to take all such action as may be necessary or appropriate under state securities and blue sky laws in connection with the transactions contemplated by this Agreement.

(c) Grace-Conn. shall prepare, and Grace-Conn. shall file and seek to make effective, an application for the listing of the Grace-Conn. Common Stock on the NYSE, subject to official notice of issuance, or for the inclusion of quotations for the Grace-Conn. Common Stock on the Nasdaq Stock Market.

(d) The parties hereto shall cooperate in preparing, filing with the SEC and causing to become effective any registration statements or amendments thereto which are necessary or appropriate in order to effect the transactions contemplated hereby or to reflect the establishment of, or amendments to, any employee benefit plans contemplated hereby or by the Employee Benefits Agreement requiring registration under the Securities Act.

SECTION 2.06 Grace-Conn. Board.  Prior to the Distribution Date, the parties hereto shall take all steps necessary so that, effective immediately after the Distribution, the Board of Directors of Grace-Conn. shall be comprised of those individuals so named in the Information Statement.

SECTION 2.07 Mergers and Transfers.  Prior to or as of the Distribution Date, Grace and Grace-Conn. shall cause to be consummated the transactions that are to take place prior to or as of the Distribution Date pursuant to the Other Agreements and internal reorganization transactions as may be necessary or advisable, and consistent with the Reorganization Agreement, in connection with the Distribution (including, without limitation, the transfer to Grace-Conn. of the Grace-Conn. Preferred Stock currently held by Grace) so that, at the Effective Time, all NMC Assets and the NMC Business are owned by the NMC Group.

SECTION 2.08 Intercompany Accounts and Distribution Payments.  Prior to or as of the Distribution Date, the parties shall pay or otherwise settle intercompany accounts between members of the Grace-Conn. Group and members of the NMC Group, and Grace or its Subsidiary shall make a cash payment to Grace-Conn., all as more specifically provided in Schedule 2.08.

AA-8

<PAGE>   422

ARTICLE III

THE DISTRIBUTION

SECTION 3.01 Record Date and Distribution Date.  Subject to the satisfaction of the conditions set forth in Section 8.01(a), the Board of Directors of Grace, in its sole discretion and consistent with the Reorganization Agreement, shall establish the Record Date and the Distribution

XXX-002150

Date and any appropriate procedures in connection with the Distribution.

SECTION 3.02 The Agent.  Prior to the Distribution Date, Grace shall enter into an agreement with the Agent providing for, among other things, the payment of the Distribution to the holders of Grace Common Stock in accordance with this Article III.

SECTION 3.03 Delivery of Share Certificates to the Agent.  Prior to the Distribution Date, Grace shall deliver to the Agent a share certificate representing all of the outstanding shares of Grace-Conn. Common Stock to be distributed in connection with the payment of the Distribution. After the Distribution Date, upon the request of the Agent, Grace-Conn. shall provide all certificates for shares of Grace-Conn. Common Stock that the Agent shall require in order to effect the Distribution.

SECTION 3.04 The Distribution.  Subject to the terms and conditions of this Agreement, Grace shall instruct the Agent to distribute, as of the Distribution Date, one share of Grace-Conn. Common Stock in respect of each share of Grace Common Stock held by holders of record of Grace Common Stock on the Record Date.

ARTICLE IV

SURVIVAL AND INDEMNIFICATION

SECTION 4.01 Survival of Agreements.  All covenants and agreements of the parties hereto contained in this Agreement shall survive the Distribution Date.

SECTION 4.02 Indemnification. (a) Except as specifically otherwise provided in the Other Agreements, Grace-Conn. shall indemnify, defend and hold harmless the NMC Indemnitees from and against (1) all Indemnifiable Losses of Grace (including, without limitation, Indemnifiable Losses of the Grace-Conn. Group), whether such Indemnifiable Losses relate to events, occurrences or circumstances occurring or existing, or whether such Indemnifiable Losses are asserted, before or after the Distribution Date, including, without limitation, Indemnifiable Losses relating to the manufacture or sale of asbestos-containing materials by any Grace-Conn. business or relating to any liability of the Grace-Conn. Business under Environmental Law, other than those Indemnifiable Losses arising from or relating to the NMC Business; (2) all Indemnifiable Losses arising out of or based upon any untrue statement or alleged untrue statement of a material fact, or omission or alleged omission to state a material fact required to be stated, in the Registration Statement, the NY Preferred Registration Statement or the Proxy Statement or any preliminary or final form thereof or any amendment thereto, or necessary to make the statements therein not misleading, except that such indemnifications shall not apply to any Indemnifiable Losses that arise out of or are based upon any statement or omission, or alleged statement or omission, in any of the portions of the Registration Statement, the NY Preferred Registration Statement or the Proxy Statement, or any preliminary or final form thereof or any amendment thereto, that are supplied by Fresenius; (3) all Indemnifiable Losses arising from or relating to all existing litigation brought by pre-Reorganization shareholders of Grace acting in such capacity and all litigation to be brought by pre-Reorganization shareholders of Grace acting in such capacity and relating to the Reorganization; and (4) all Indemnifiable Losses arising out of or relating to the new credit facilities, debt instruments and securities of the Grace-Conn. Group referred to in Section 2.04 above.

(b) Except as specifically otherwise provided in the Other Agreements, Grace shall indemnify, defend and hold harmless the Grace-Conn. Indemnitees from and against (1) all Indemnifiable Losses arising from or relating to the NMC Business, whether such Indemnifiable Losses relate to events, occurrences or circumstances occurring or existing, or whether such Indemnifiable Losses are asserted, before or after the Distribution Date, including, without limitation, all Indemnifiable Losses relating to compliance or non-

AA-9

<PAGE>    423

compliance with United States food and drug law, medical and medicare billing and reimbursement law and other health care matters and all Indemnifiable Losses arising from or relating to all aspects of any ongoing investigations of the NMC Business by the Office of the Inspector General of the United States Department of Health and Human Services (and the various United States Attorneys' Offices), by the United States Attorney's Office for the District of New Jersey, by the United States Attorney's Office for the District of Virginia and by the United States Food and Drug Administration; (2) all Indemnifiable Losses arising out of or based upon any untrue statement or alleged untrue statement of a material fact, or omission or alleged omission to state a material fact required to be stated, in any portion of the Registration Statement, the NY Preferred Registration Statement or the Proxy Statement supplied by Fresenius, or any preliminary or final form thereof or any amendment thereto, or necessary to make the statements therein not misleading; and (3) all Indemnifiable Losses arising out of or relating to the new credit facilities, debt instruments and securities of Grace and the NMC Group referred to in Section 2.04 above.

(c) If any Indemnity Payment required to be made hereunder or under any Other Agreement is denominated in a currency other than United States dollars, such payment shall be made in United States dollars and the amount thereof shall be computed using the Foreign Exchange Rate for such currency determined as of the date that notice of the claim with respect to which such Indemnity Payment is made is given by or on behalf of the Indemnitee to Grace or Grace-Conn., as the case may be.

(d) Notwithstanding anything to the contrary set forth herein, indemnification relating to any arrangements between any member of the NMC Group

XXX-002151

and any member of the Grace-Conn. Group (or any unit of the Grace-Conn. Business) for the provision after the Distribution of goods and services in the ordinary course shall be governed by the terms of such arrangements and not by this Section.

SECTION 4.03 Procedures For Indemnification For Third-Party Claims. (a) Grace-Conn. shall, and shall cause the other Grace-Conn. Indemnitees to, notify Grace in writing promptly after learning of any Third-Party Claim for which any Grace-Conn. Indemnitee intends to seek indemnification from Grace under this Agreement. Grace shall, and shall cause the other NMC Indemnitees to, notify Grace-Conn. in writing promptly after learning of any Third-Party Claim for which any NMC Indemnitee intends to seek indemnification from Grace-Conn. under this Agreement. The failure of any Indemnitee to give such notice shall not relieve any Indemnifying Party of its obligations under this Article except to the extent that such Indemnifying Party or its Affiliate is actually prejudiced by such failure to give notice. Such notice shall describe such Third-Party Claim in reasonable detail considering the Information provided to the Indemnitee.

(b) Except as otherwise provided in subsection (c) of this Section, an Indemnifying Party may, by notice to the Indemnitee and to Grace-Conn., if Grace is the Indemnifying Party, or to the Indemnitee and Grace, if Grace-Conn. is the Indemnifying Party, at any time after receipt by such Indemnifying Party of such Indemnitee's notice of a Third-Party Claim, undertake (itself or through another member of the Group of which the Indemnifying Party is a member) the defense or settlement of such Third-Party Claim. If an Indemnifying Party undertakes the defense of any Third-Party Claim, such Indemnifying Party shall thereby admit its obligation to indemnify the Indemnitee against such Third-Party Claim, and such Indemnifying Party shall control the investigation and defense or settlement thereof, and the Indemnitee may not settle or compromise such Third-Party Claim, except that such Indemnifying Party shall not require any Indemnitee, without its prior written consent, to take or refrain from taking any action in connection with such Third-Party Claim, or make any public statement, which such Indemnitee reasonably considers to be against its interests, nor shall the Indemnifying Party, without the prior written consent of the Indemnitee and of Grace-Conn., if the Indemnitee is a Grace-Conn. Indemnitee, or the Indemnitee and of Grace, if the Indemnitee is a NMC Indemnitee, consent to any settlement that does not include as a part thereof an unconditional release of the Indemnitees from liability with respect to such Third-Party Claim or that requires the Indemnitee or any of its Representatives or Affiliates to make any payment that is not fully indemnified under this Agreement or to submit to any non-monetary remedy; and subject to the Indemnifying Party's control rights, as specified herein, the Indemnitees may participate in such investigation and defense, at their own expense. Following the provision of notices to the Indemnifying Party, until such time as an Indemnifying Party has undertaken the defense of any Third-Party Claim as provided herein, such Indemnified Party shall control the investigation and defense or settlement thereof, without prejudice to its right to seek indemnification hereunder.

AA-10

<PAGE>   424

(c) If an Indemnitee reasonably determines that there may be legal defenses available to it that are different from or in addition to those available to its Indemnifying Party which make it inappropriate for the Indemnifying Party to undertake the defense or settlement thereof, then such Indemnifying Party shall not be entitled to undertake the defense or settlement of such Third-Party Claim; and counsel for the Indemnifying Party shall be entitled to conduct the defense of such Indemnifying Party and counsel for the Indemnified Party shall be entitled to conduct the defense of such Indemnitee, it being understood that both such counsel shall cooperate with each other to conduct the defense or settlement of such action as efficiently as possible.

(d) In no event shall an Indemnifying Party be liable for the fees and expenses of more than one counsel for all Indemnitees in connection with any one action, or separate but similar or related actions, in the same jurisdiction arising out of the same general allegations or circumstances.

(e) Grace-Conn. shall, and shall cause the other Grace-Conn. Indemnitees to, and Grace shall, and shall cause the other NMC Indemnitees to, make available to each other, their counsel and other Representatives, all information and documents reasonably available to them which relate to any Third-Party Claim, and otherwise cooperate as may reasonably be required in connection with the investigation, defense and settlement thereof. Any joint defense agreement entered into by Grace-Conn. or Grace with any third party relating to any Third-Party Claim shall provide that Grace-Conn. or Grace may, if requested, provide information obtained through any such agreement to the Grace-Conn. Indemnitees or the Grace Indemnitees.

SECTION 4.04 Remedies Cumulative. The remedies provided in this Article IV shall be cumulative and shall not preclude assertion by any Indemnitee of any other rights or the seeking of any other remedies against any Indemnifying Party. However, the procedures set forth in Section 4.03 shall be the exclusive procedures governing any indemnity action brought under this Agreement or otherwise and relating to a Third-Party Claim, except as otherwise specifically provided in any of the Other Agreements.

SECTION 4.05 Compromise of Investigations. NMC and the members of the NMC Group shall not settle or compromise any of the matters referred to in Section 4.02(b)(1) above on terms that do not include as a part thereof an unconditional release of the members of the Grace-Conn. Group from all liability with respect thereto.

XXX-002152

ARTICLE V

CERTAIN ADDITIONAL COVENANTS

SECTION 5.01 Notices to Third Parties.  In addition to the actions described in Section 5.02, the members of the NMC Group and the members of the Grace-Conn. Group shall cooperate to make all other filings and give notice to and obtain consents from all third parties that may reasonably be required to consummate the transactions contemplated by this Agreement and the Other Agreements.

SECTION 5.02 Licenses and Permits.  Each party hereto shall cause the appropriate members of its Group to prepare and file with the appropriate licensing and permitting authorities applications for the transfer or issuance, as may be necessary or advisable in connection with the Distribution, to its Group of all material governmental licenses and permits required for the members of its Group to operate its Business after the Distribution. The members of the Grace-Conn. Group and the members of the NMC Group shall cooperate and use all reasonable efforts to secure the transfer or issuance of the licenses and permits.

SECTION 5.03 Intercompany Agreements.  All contracts, licenses, agreements, commitments or other arrangements, formal or informal, between any member of the NMC Group, on the one hand, and any member of the Grace-Conn. Group, on the other, in existence as of the Distribution Date, pursuant to which any member of either Group provides to any member of the other Group services (including, without limitation, management, administrative, legal, financial, accounting, data processing, insurance, or technical support), or the use of any Assets of any member of the other Group, or the secondment of any employee, or pursuant to which rights, privileges or benefits are afforded to members of either Group as Affiliates of the other Group, shall terminate as of the close of business on the day prior to the Distribution Date, except as specifically provided herein or in the Other Agreements. From and after the Distribution Date, no member of

AA-11

<PAGE>  425

either Group shall have any rights under any such contract, license, agreement, commitment or arrangement with any member of the other Group, except as specifically provided herein or in the Other Agreements.

Section 5.04 Guarantee Obligations.  (a)  Grace and Grace-Conn. shall cooperate, and shall cause their respective Groups to cooperate, to terminate, or to cause a member of the NMC Group to be substituted in all respects for any member of the Grace-Conn. Group in respect of, all obligations of any member of the Grace-Conn. Group under any loan, financing, lease, contract, or other obligation in existence as of the Distribution Date pertaining to the NMC Business for which such member of the Grace-Conn. Group may be liable, as guarantor, original tenant, primary obligor or otherwise. If such a termination or substitution is not effected by the Distribution Date, (1) Grace shall indemnify and hold harmless the Grace-Conn. Indemnitees for any Indemnifiable Loss arising from or relating thereto, and (2) without the prior written consent of the Chief Financial Officer, Treasurer or any Assistant Treasurer of Grace-Conn., from and after the Distribution Date, Grace shall not, and shall not permit any member of the NMC Group or any of its Affiliates to, renew or extend the term of, increase its obligations under, or transfer to a third party, any loan, lease, contract or other obligation for which any member of the Grace-Conn. Group is or may be liable unless all obligations of the Grace-Conn. Group with respect thereto are thereupon terminated by documentation reasonably satisfactory in form and substance to the Chief Financial Officer, Treasurer or any Assistant Treasurer of Grace-Conn.

(b)  Grace and Grace-Conn. shall cooperate, and shall cause their respective Groups to cooperate, to terminate, or to cause a member of the Grace-Conn. Group to be substituted in all respects for any member of the NMC Group in respect of, all obligations of any member of the NMC Group under any loan, financing, lease, contract or other obligation in existence as of the Distribution Date pertaining to the Grace-Conn. Business for which such member of the NMC Group may be liable, as guarantor, original tenant, primary obligor or otherwise. If such a termination or substitution is not effected by the Distribution Date, (1) Grace-Conn. shall indemnify and hold harmless the NMC Indemnitees for any Indemnifiable Loss arising from or relating thereto, and (2) without the prior written consent of the Chief Financial Officer, Treasurer or any Assistant Treasurer of NMC, from and after the Distribution Date, Grace-Conn. shall not, and shall not permit any member of the Grace-Conn. Group to, renew or extend the term of, increase its obligations under, or transfer to a third party, any loan, lease, contract or other obligation for which any member of the NMC Group is or may be liable unless all obligations of the NMC Group with respect thereto are thereupon terminated by documentation reasonably satisfactory in form and substance to the Chief Financial Officer, Treasurer or any Assistant Treasurer of NMC.

SECTION 5.05 Further Assurances.  In addition to the actions specifically provided for elsewhere in this Agreement, each of the parties hereto shall use reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable laws, regulations and agreements to consummate and make effective the transactions contemplated by this Agreement including, without limitation, Asset transfers and debt and cash balances of the other party contemplated thereby. Without limiting the foregoing, each party hereto shall cooperate with the other party, and execute and deliver, or use reasonable efforts to cause to be executed and delivered, all instruments, and to make all filings with, and to obtain all consents, approvals or authorizations of, any governmental or regulatory authority or any other Person under any permit, license, agreement,

XXX-002153

indenture or other instrument, and take all such other actions as such party may reasonably be requested to take by any other party hereto from time to time, consistent with the terms of this Agreement and the Other Agreements, in order to effectuate the provisions and purposes of this Agreement.

SECTION 5.06 Representations and Warranties of Grace-Conn.  Grace-Conn. hereby represents and warrants to Fresenius AG that:

(a) Corporate Organization and Qualification.  Grace-Conn. is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and is in good standing as a foreign corporation in each jurisdiction where the properties owned, leased or operated, or the business conducted, by it requires such qualification, except for any such failure so to qualify or be in good standing which, when taken together with all other such failures, is not reasonably likely to have a Material Adverse Effect with respect to Grace-Conn.

<div align="center">AA-12</div>

<PAGE>   426

Grace-Conn. has the requisite corporate power and authority to carry on its business as it is now being conducted.

(b) Corporate Authority.  Grace-Conn. has the requisite corporate power and authority and has taken all corporate action necessary in order to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby. This Agreement is a valid and binding agreement of Grace-Conn. enforceable in accordance with its terms.

(c) No Violations.  The execution, delivery and performance by Grace-Conn. of this Agreement does not or will not, and the consummation by it of any of the transactions contemplated hereby will not, constitute or result in a breach or violation of, or a default under, its Certificate of Incorporation or By-laws.

<div align="center">ARTICLE VI</div>

<div align="center">ACCESS TO INFORMATION</div>

SECTION 6.01 Provision of Corporate Records.  Prior to or as promptly as practicable after the Distribution Date, Grace shall deliver to Grace-Conn. all corporate books and records of the Grace-Conn. Group in its possession and copies of the relevant portions of all corporate books and records of the NMC Group relating directly and primarily to the Grace-Conn. Assets, the Grace-Conn. Business, or the Liabilities of the Grace-Conn. Group, including, in each case, all active agreements, active litigation files and government filings. From and after the Distribution Date, all such books, records and copies shall be the property of Grace-Conn. Prior to or as promptly as practicable after the Distribution Date, Grace-Conn. shall deliver to Grace all corporate books and records of the NMC Group in its possession and copies of the relevant portions of all corporate books and records of the Grace-Conn. Group relating directly and primarily to the NMC Assets, the NMC Business, or the Liabilities of the NMC Group, including, in each case, all active agreements, active litigation files and government filings. From and after the Distribution Date, all such books, records and copies shall be the property of Grace.

SECTION 6.02 Access to Information.  From and after the Distribution Date, each of Grace and Grace-Conn. shall afford to the other and to the other's Representatives reasonable access and duplicating rights during normal business hours to all Information within the possession or control of such party's Group relating to the other party's Group's pre-Distribution business, Assets or Liabilities or relating to or arising in connection with the relationship between the Groups on or prior to the Distribution Date, insofar as such access is reasonably required for a reasonable purpose, subject to the provisions below regarding Privileged Information. Without limiting the foregoing, Information may be requested under this Section 6.02 for audit, accounting, claims, litigation and Tax purposes, as well as for purposes of fulfilling disclosure and reporting obligations.

In furtherance of the foregoing:

(a) Each party hereto acknowledges that: (i) Each of Grace and Grace-Conn. (and the members of the NMC Group and the Grace-Conn. Group, respectively) has or may obtain Privileged Information; (ii) there are a number of Litigation Matters affecting each or both of Grace and Grace-Conn.; (iii) both Grace and Grace-Conn. have a common legal interest in Litigation Matters, in the Privileged Information, and in the preservation of the confidential status of the Privileged Information, in each case relating to pre-Distribution business of the NMC Group or the Grace-Conn. Group or relating to or arising in connection with the relationship between the Groups on or prior to the Distribution Date; and (iv) both Grace and Grace-Conn. intend that the transactions contemplated hereby and by the Reorganization Agreement and the Other Agreements and any transfer of Privileged Information in connection therewith shall not operate as a waiver of any potentially applicable privilege.

(b) Each of Grace and Grace-Conn. agrees, on behalf of itself and each member of the Group of which it is a member, not to disclose or otherwise waive any privilege attaching to any Privileged Information relating to pre-Distribution business of the Grace-Conn. Group or the NMC Group,

<div align="center">AA-13</div>

<PAGE>   427

XXX-002154

respectively, or relating to or arising in connection with the relationship
between the Groups on or prior to the Distribution Date, without providing
prompt written notice to and obtaining the prior written consent of the
other, which consent shall not be unreasonably withheld and shall not be
withheld if the other party certifies that such disclosure is to be made in
response to a likely threat of suspension or debarment or similar action;
provided, however, that Grace and Grace-Conn. may make such disclosure or
waiver with respect to Privileged Information if such Privileged
Information relates solely to the pre-Distribution business of the NMC
Group in the case of Grace or the Grace-Conn. Group in the case of
Grace-Conn. In the event of a disagreement between any member of the NMC
Group and any member of the Grace-Conn. Group concerning the reasonableness
of withholding such consent, no disclosure shall be made prior to a
resolution of such disagreement by a court of competent jurisdiction.

(c) Upon any member of the NMC Group or any member of the Grace-Conn.
Group receiving any subpoena or other compulsory disclosure notice from a
court, other governmental agency or otherwise which requests disclosure of
Privileged Information, in each case relating to pre-Distribution business
of the Grace-Conn. Group or the NMC Group, respectively, or relating to or
arising in connection with the relationship between the Groups on or prior
to the Distribution Date, the recipient of the notice shall promptly
provide to the other Group (following the notice provisions set forth
herein) a copy of such notice, the intended response, and all materials or
information relating to the other Group that might be disclosed. In the
event of a disagreement as to the intended response or disclosure, unless
and until the disagreement is resolved as provided in subsection (b), the
parties shall cooperate to assert all defenses to disclosure claimed by
either party's Group, and shall not disclose any disputed documents or
information until all legal defenses and claims of privilege have been
finally determined.

SECTION 6.03 Production of Witnesses.  Subject to Section 6.02, after the
Distribution Date, each of Grace and Grace-Conn. shall, and shall cause each
member of the NMC Group and the Grace-Conn. Group, respectively, to, make
available to Grace or Grace-Conn. or any member of the NMC Group or of the
Grace-Conn. Group, as the case may be, upon written request, such Group's
directors, officers, employees and agents as witnesses to the extent that any
such Person may reasonably be required in connection with any Litigation
Matters, administrative or other proceedings in which the requesting party may
from time to time be involved and relating to the pre-Distribution business of
the NMC Group or the Grace-Conn. Group or relating to or in connection with the
relationship between the Groups on or prior to the Distribution Date.

SECTION 6.04 Retention of Records.  Except as otherwise agreed in writing,
or as otherwise provided in the Other Agreements, each of Grace and Grace-Conn.
shall, and shall cause the members of the Group of which it is a member to,
retain all Information in such party's Group's possession or under its control
relating directly and primarily to the pre-Distribution business, Assets or
Liabilities of the other party's Group that is less than ten years old until
such Information is at least ten years old except that if, prior to the
expiration of such period, any member of either party's Group wishes to destroy
or dispose of any such Information that is at least three years old, prior to
destroying or disposing of any of such Information, (1) the party whose Group is
proposing to dispose of or destroy any such Information shall provide no less
than 30 days' prior written notice to the other party, specifying the
Information proposed to be destroyed or disposed of, and (2) if, prior to the
scheduled date for such destruction or disposal, the other party requests in
writing that any of the Information proposed to be destroyed or disposed of be
delivered to such other party, the party whose Group is proposing to dispose of
or destroy such Information promptly shall arrange for the delivery of the
requested Information to a location specified by, and at the expense of, the
requesting party.

SECTION 6.05 Confidentiality.  Subject to Section 6.02, which shall govern
Privileged Information, from and after the Distribution Date, each of Grace and
Grace-Conn. shall hold, and shall use reasonable efforts to cause its Affiliates
and Representatives to hold, in strict confidence all Information concerning the
other party's Group obtained by it prior to the Distribution Date or furnished
to it by such other party's Group pursuant to this Agreement or the Other
Agreements and shall not release or disclose such Information to any other
Person, except its Affiliates and Representatives, who shall be bound by the
provisions of this Section 6.05, and each party shall be responsible for a
breach by any of its Affiliates or Representatives; provided, however, that any
member of the NMC Group or the Grace-Conn. Group may disclose such Information
to the extent that (a) disclosure is compelled by judicial or administrative
process or, in the

AA-14

<PAGE>    428

opinion of such Person's counsel, by other requirements of law, or (b) such
party can show that such Information was (i) available to such Person on a
nonconfidential basis (other than from a member of the other party's Group)
prior to its disclosure by the other party's Group, (ii) in the public domain
through no fault of such Person or (iii) lawfully acquired by such Person from
another source after the time that it was furnished to such Person by the other
party's Group, and not acquired from such source subject to any confidentiality
obligation on the part of such source, or on the part of the acquiror, known to
the acquiror. Notwithstanding the foregoing, each of Grace and Grace-Conn. shall
be deemed to have satisfied its obligations under this Section 6.05 with respect
to any Information (other than Privileged Information) if it exercises the same
care with regard to such Information as it takes to preserve confidentiality for
its own similar Information.

XXX-002155

SECTION 6.06 Cooperation with Respect to Government Reports and Filings.  Grace, on behalf of itself and each member of the NMC Group, agrees to provide any member of the Grace-Conn. Group, and Grace-Conn., on behalf of itself and each member of the Grace-Conn. Group, agrees to provide any member of the NMC Group, with such cooperation and Information as may be reasonably requested by the other in connection with the preparation or filing of any government report or other government filing contemplated by this Agreement or in conducting any other government proceeding relating to pre-Distribution business of the NMC Group or the Grace-Conn. Group, Assets or Liabilities of either Group or relating to or in connection with the relationship between the Groups on or prior to the Distribution Date.  Such cooperation and Information shall include, without limitation, promptly forwarding copies of appropriate notices and forms or other communications received from or sent to any government authority which relate to the NMC Group, in the case of the Grace-Conn. Group, or the Grace-Conn. Group, in the case of the NMC Group. Each party shall make its employees and facilities available during normal business hours and on reasonable prior notice to provide explanation of any documents or Information provided hereunder.

ARTICLE VII

NO REPRESENTATIONS OR WARRANTIES

SECTION 7.01 No Representations or Warranties.  Grace-Conn. acknowledges that, prior to the date of this Agreement, it has had primary responsibility for the operation and management of the Grace-Conn. Business (other than with respect to CCHP, as to which NMC has had responsibility for the management of the investment therein and the exercise of any rights attendant thereto, and the "Amicon" membrane filtrations system and chromatography equipment business, for the operation and management of which NMC has had primary responsibility since 1992); and Grace acknowledges that, prior to the date of this Agreement, NMC has had primary responsibility for the operation and management of the NMC Business. Grace-Conn. understands and agrees that no member of the NMC Group is, in this Agreement or in any other agreement or document, representing or warranting to Grace-Conn. or any member of the Grace-Conn. Group in any way as to the Grace-Conn. Assets, the Grace-Conn. Business or the Liabilities of the Grace-Conn. Group or as to any consents or approvals required in connection with the consummation of the transactions contemplated by this Agreement, it being agreed and understood that Grace-Conn. and each member of the Grace-Conn. Group shall take all of the Grace-Conn. Assets "as is, where is." Grace-Conn. and each member of the Grace-Conn. Group shall bear the economic and legal risk that conveyances of the Grace-Conn. Assets shall prove to be insufficient, that the title of any member of the Grace-Conn. Group to any Grace-Conn. Assets, Grace-Conn. Transferred Companies or Grace-Conn. Transferred Operations shall be other than good and marketable and free from encumbrances or that results from the failure of Grace-Conn. or any member of the Grace-Conn. Group to obtain any consents or approvals relating to the Grace-Conn. Business required in connection with the consummation of the transactions contemplated by this Agreement. Grace understands and agrees that no member of the Grace-Conn. Group is, in this Agreement or in any other agreement or document, representing or warranting to Grace or any member of the NMC Group in any way as to the NMC Assets, the NMC Business or the Liabilities of the NMC Group or as to any consents or approvals required in connection with the consummation of the transactions contemplated by this Agreement or the Reorganization Agreement, it being agreed and understood that Grace, NMC and each other member of the NMC Group shall take all of the NMC Assets "as is, where is." Grace and each member of the NMC Group shall bear the

AA-15

<PAGE>    429

economic and legal risk that conveyances of the NMC Assets shall prove to be insufficient, that the title of any member of the NMC Group to any NMC Assets or NMC Transferred Operations shall be other than good and marketable and free from encumbrances, or that results from the failure of Grace or any member of the NMC Group to obtain any consents or approvals relating to the NMC Business required in connection with the consummation of the transactions contemplated by this Agreement. The foregoing shall be without prejudice to any rights under Section 4.02 or Section 5.05 of this Agreement.

ARTICLE VIII

MISCELLANEOUS

SECTION 8.01 Conditions to Obligations.  (a) The obligations of the parties hereto to consummate the payment of the Distribution are subject to the satisfaction of each of the following conditions:

(i) To the extent required by applicable law and stock exchange regulations, the transactions contemplated hereby shall have been duly approved by Grace shareholders;

(ii) All conditions to the Reorganization set forth in the Reorganization Agreement shall have been satisfied or waived contemporaneously with the Effective Time; and

(iii) The transactions contemplated hereby shall be in compliance with all applicable federal and state securities laws.

(b) Any determination made by the Board of Directors of Grace on behalf of either party hereto prior to the Distribution Date concerning the satisfaction or waiver of any or all of the conditions set forth in this Section shall be conclusive.

XXX-002156

SECTION 8.02 Use of Grace Name and Mark. Grace acknowledges that Grace-Conn. shall own all rights in the "Grace" name and logo and related tradenames and marks. Effective at the Distribution Date, Grace shall change its name to a name that does not use the word "Grace" or any variation thereof and shall itself, and shall cause each member of the NMC Group to, cease all use of the "Grace" name as part of any corporate name. Within 90 days after the Distribution Date, Grace shall, and shall cause each member of the NMC Group to, cease all other use of the "Grace" name and logo and related tradenames and marks. Grace shall cause the NMC Group to use such names, logos and marks during such 90-day period only to the extent that it is not practical to change or replace any existing signs, letterheads, business cards, invoices or other business forms, telephone directory listings or promotional material, and shall cause the NMC Group to maintain the same standards of quality with respect to such names, logos and marks as previously exercised.

SECTION 8.03 Complete Agreement. This Agreement, the Exhibits and Schedules hereto and the agreements and other documents referred to herein shall constitute the entire agreement between the parties hereto with respect to the subject matter hereof (other than the Reorganization Agreement and the Schedules and Exhibits thereto) and shall supersede all previous negotiations, commitments and writings with respect to such subject matter.

SECTION 8.04 Expenses. Grace-Conn. shall bear all costs with respect to the transactions contemplated hereby and by the Other Agreements, except as otherwise specifically provided in the Reorganization Agreement or the Other Agreements.

SECTION 8.05 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (other than the laws regarding choice of laws and conflicts of laws that would apply the substantive laws of any other jurisdiction) as to all matters, including matters of validity, construction, effect, performance and remedies.

SECTION 8.06 Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery

AA-16

<PAGE>    430

in person, by cable, telegram, telex or other standard form of telecommunications, or by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Grace or any member of the NMC Group:

    W. R. Grace & Co.
    c/o National Medical Care, Inc.
    1601 Trapelo Road
    Reservoir Place
    Waltham, MA 02154
    Attention: Chief Financial Officer
    Fax: (617) 890-6993

    with a copy to:

    Fresenius AG
    Borkenberg 14
    61440 Oberursel
    61343 Bad Homburg
    Germany
    Attention: Mr. Udo Werle
    Fax: 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-60-2104

    and

    O'Melveny & Myers
    Citicorp Center
    153 East 53rd Street
    New York, NY 10022-4611
    Attention: Dr. Ulrich Wagner
    Fax: (212) 326-2061

If to Grace-Conn. or any member of the Grace-Conn. Group:

    W. R. Grace & Co.-Conn.
    One Town Center Road
    Boca Raton, Florida 33486-1010
    Attention: Secretary
    Fax: (407) 362-1635

    with a copy to:

    Wachtell, Lipton, Rosen & Katz
    51 West 52nd Street
    New York, New York 10019
    Attention: Andrew R. Brownstein, Esq.
    Fax: (212) 403-2000

or to such other address as any party hereto may have furnished to the other parties by a notice in writing in accordance with this Section.

SECTION 8.07 Amendment and Modification. This Agreement may be amended,

XXX-002157

modified or supplemented only by a written agreement signed by all of the parties hereto.

SECTION 8.08 Successors and Assigns; No Third-Party Beneficiaries.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns, but neither this Agreement nor any of the rights, interests and obligations hereunder shall be assigned by any party hereto without the prior written consent of the other party. Except for the provisions of Sections 4.02 and 4.03 relating to indemnities, which are also for the benefit of the Indemnitees, this

                              AA-17

<PAGE>    431

Agreement is solely for the benefit of the parties hereto and their Subsidiaries and Affiliates and is not intended to confer upon any other Persons any rights or remedies hereunder.

SECTION 8.09 Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

SECTION 8.10 Interpretation.  (a) The Article and Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties hereto and shall not in any way affect the meaning or interpretation of this Agreement.

(b) The parties hereto intend that the Distribution shall be a distribution pursuant to the provisions of Section 355 of the Code, so that no gain or loss shall be recognized for federal income tax purposes as a result of such transaction, and all provisions of this Agreement shall be so interpreted. The parties hereto do not intend to submit the Distribution to the Internal Revenue Service for a private letter ruling with respect to such nonrecognition, and any ultimate ruling or decision that any gain or loss should be recognized for federal income Tax purposes shall not permit a rescission or reformation of this Agreement or transactions contemplated hereby.

SECTION 8.11 Severability.  If any provision of this Agreement or the application thereof to any person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.

SECTION 8.12 References; Construction.  References to any "Article," "Exhibit," "Schedule" or "Section," without more, are to Articles, Exhibits, Schedules and Sections to or of this Agreement. Unless otherwise expressly stated, clauses beginning with the term "including" set forth examples only and in no way limit the generality of the matters thus exemplified.

SECTION 8.13 Termination.  Notwithstanding any provision hereof, following termination of the Reorganization Agreement, this Agreement may be terminated and the Distribution abandoned at any time prior to the Distribution Date by and in the sole discretion of the Board of Directors of Grace without the approval of any other party hereto or of Grace's shareholders. In the event of such termination, no party hereto or to any Other Agreement shall have any Liability to any Person by reason of this Agreement or any Other Agreement.

                              AA-18

<PAGE>    432

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

                         W. R. GRACE & CO.

                         By: /s/ Albert J. Costello

                         ------------------------------------
                             Name:
                             Title:

                         W. R. GRACE & CO.-CONN.

                         By: /s/ Albert J. Costello

                         ------------------------------------
                             Name:
                             Title:

                         FRESENIUS AG

                         By: /s/ Gerd Krick

                         ------------------------------------
                             Name:
                             Title:

                              AA-19

<PAGE>    433

XXX-002158