EXHIBIT E TO APPENDIX A

CONTRIBUTION AGREEMENT

BY AND AMONG

FRESENIUS AG,

STERIL PHARMA GMBH

AND

W. R. GRACE & CO.-CONN.

DATED FEBRUARY 4, 1996

<PAGE>    434

TABLE OF CONTENTS

<TABLE>
<CAPTION>

| | | PAGE |
|---|---|---|
| <S> | <C> | <C> |
| I. | Definitions.................................................... | EE-3 |
| | 1.01  General................................................. | EE-3 |
| II. | Certain Transactions Prior to the Contribution Date........... | EE-6 |
| | 2.01  Certain Transfers....................................... | EE-6 |
| | 2.02  Termination of Agreements............................... | EE-6 |
| | 2.03  Other Agreements........................................ | EE-6 |
| III. | [Intentionally Omitted]....................................... | EE-7 |
| IV. | Survival and Indemnification.................................. | EE-7 |
| | 4.01  Survival of Agreements.................................. | EE-7 |
| | 4.02  Indemnification......................................... | EE-7 |
| | 4.03  Procedures for Indemnification for Third-Party Claims... | EE-8 |
| | 4.04  Remedies Cumulative..................................... | EE-8 |
| V. | Certain Additional Covenants.................................. | EE-8 |
| | 5.01  Notices to Third Parties................................ | EE-8 |
| | 5.02  Licenses and Permits.................................... | EE-8 |
| | 5.03  Intercompany Agreements................................. | EE-9 |
| | 5.04  Guarantee Obligations................................... | EE-9 |
| | 5.05  Further Assurances...................................... | EE-9 |
| VI. | Access to Information......................................... | EE-10 |
| | 6.01  Provision of Corporate Records.......................... | EE-10 |
| | 6.02  Access to Information................................... | EE-10 |
| | 6.03  Production of Witnesses................................. | EE-11 |
| | 6.04  Retention of Records.................................... | EE-11 |
| | 6.05  Confidentiality......................................... | EE-11 |
| | 6.06  Cooperation with Respect to Government Reports and Filings.. | EE-12 |
| VII. | No Representations or Warranties.............................. | EE-12 |
| | 7.01  No Representations or Warranties........................ | EE-12 |
| VIII. | Miscellaneous................................................. | EE-12 |
| | 8.01  Use of Fresenius AG Name and Mark....................... | EE-12 |
| | 8.02  Complete Agreement...................................... | EE-13 |
| | 8.03  Expenses................................................ | EE-13 |
| | 8.04  Jurisdiction and Forum.................................. | EE-13 |
| | 8.05  Notices................................................. | EE-13 |
| | 8.06  Amendment and Modification.............................. | EE-14 |
| | 8.07  Successors and Assigns; No Third-Party Beneficiaries.... | EE-14 |
| | 8.08  Counterparts............................................ | EE-14 |
| | 8.09  Interpretation.......................................... | EE-14 |
| | 8.10  Severability............................................ | EE-14 |
| | 8.11  References; Construction................................ | EE-15 |
| SIGNATURES................................................................ | | EE-15 |

</TABLE>

EE-1

<PAGE>    435

CONTRIBUTION AGREEMENT

This CONTRIBUTION AGREEMENT (this "Agreement"), dated February 4, 1996, by and between Fresenius AG, an Aktiengesellschaft organized under the laws of the Federal Republic of Germany ("Fresenius AG"), Steril Pharma GmbH, a wholly owned Gesellschaft mit beschrankter Haftung of Fresenius AG ("GmbH" or "SP"), and W. R. Grace & Co.-Conn., a Connecticut corporation ("Grace-Conn.").

W I T N E S S E T H :

A. The Reorganization Agreement.  Simultaneously herewith, Grace and Fresenius AG are entering into an Agreement and Plan of Reorganization (the "Reorganization Agreement") and, prior to the Effective Time, intend to consummate the transactions contemplated hereby.

B. The Contribution.  Prior to the Effective Time, Fresenius AG intends to contribute its worldwide dialysis business to SP, as provided herein, and to retain and lease to Newco certain real property and buildings in the Federal Republic of Germany pursuant to a lease consistent with the terms set forth in Exhibit B hereto and to retain and license to Newco its name and certain derived marks pursuant to a license consistent with the terms set forth in Exhibit C hereto.

C. Newco.  In connection with the Contribution, Fresenius AG intends that SP shall convert to an Aktiengesellschaft, pursuant to German law, and to become

XXX-002159

"Newco," consistent with the terms of the Reorganization Agreement.

D. The Distribution.  Immediately prior to the Effective Time, Grace intends to transfer to (or retain in) Grace-Conn. all non-healthcare assets and liabilities, its interests in the Amicon bioseparations business and GN Holdings, Inc. and certain other assets, as contemplated by this Agreement, and to effect a distribution to its common shareholders of all of its equity interest in Grace-Conn.

E. The Recapitalization.  Following the Distribution and immediately prior to the Effective Time, Grace intends to consummate the Recapitalization in which each holder of a Grace Common Share shall hold, immediately thereafter, a Grace Common Share and one one-hundredth of a NY Preferred Share.

F. The Mergers.  At the Effective Time, the parties intend to effect a merger of a wholly owned New York corporate subsidiary of Newco with and into Grace, with Grace being the surviving corporation. Also at the Effective Time, the parties intend to effect a merger of a wholly owned Massachusetts corporate subsidiary of Newco with and into Fresenius USA, with Fresenius USA being the surviving corporation.

G. Financing.  It is the intention of the parties hereto that, prior to the Distribution: (i) Grace and Grace-Conn. shall use reasonable efforts to cause NMC to arrange new credit facilities so that the transactions contemplated by the Transaction Agreements may be consummated; (ii) Fresenius AG shall use reasonable efforts to arrange new credit facilities for the FWD Business so that the transactions contemplated by the Transaction Agreements may be consummated; and (iii) the parties shall cooperate with one another with respect to the foregoing.

H. Intention of the Parties.  It is the intention of the parties to the Reorganization Agreement that for United States federal income tax purposes (a) the Distribution shall qualify as a tax-free distribution under the Code, (b) each of the Mergers shall qualify as a "reorganization" under the Code, (c) the Contribution shall qualify as a tax-free exchange under the Code and (d) the Recapitalization shall be tax-free to Grace under the Code.

EE-2

<PAGE>  436

NOW, THEREFORE, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties hereto hereby agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01 General.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

Affiliate:  with respect to any specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person; provided, however, that for purposes of this Agreement, no member of either Group shall be deemed to be an Affiliate of any member of the other Group.

Agreement:  as defined in the preamble to this Agreement.

Asset:  any and all assets and properties, tangible or intangible, including, without limitation, the following: (i) cash, notes and accounts and notes receivable (whether current or non-current); (ii) certificates of deposit, banker's acceptances, stock, debentures, evidences of indebtedness, certificates of interest or participation in profit-sharing agreements, collateral-trust certificates, preorganization certificates or subscriptions, transferable shares, investment contracts, voting-trust certificates, fractional undivided interests in oil, gas or other mineral rights, puts, calls, straddles, options and other securities of any kind; (iii) intangible property rights, inventions, discoveries, know-how, patents and patent applications, trade secrets, confidential information, registered and unregistered trademarks, service marks, service names, trade styles and trade names and associated goodwill; statutory, common law and registered copyrights; applications for any of the foregoing, rights to use the foregoing and other rights in, to and under the foregoing; (iv) rights under leases, contracts, licenses, permits, distribution arrangements, sales and purchase agreements, other agreements and business arrangements; (v) real estate and buildings and other improvements thereon; (vi) leasehold improvements, fixtures, trade fixtures, machinery, equipment (including transportation and office equipment), tools, dies and furniture; (vii) office supplies, production supplies, spare parts, other miscellaneous supplies and other tangible property of any kind; (viii) computer equipment and software; (ix) raw materials, work-in-process, finished goods, consigned goods and other inventories; (x) prepayments or prepaid expenses; (xi) claims, causes of action, choses in action, rights under express or implied warranties, rights of recovery and rights of set-off of any kind; (xii) the right to receive mail, payments on accounts receivable and other communications; (xiii) lists of customers, records pertaining to customers and accounts, personnel records, lists and records pertaining to customers, suppliers and agents, and books, ledgers, files and business records of every kind; (xiv) advertising materials and other printed or written materials; (xv) goodwill as a going concern and other intangible properties; (xvi) employee contracts, including any rights thereunder to restrict an employee from competing in certain respects; and (xvii) licenses and authorizations issued by any governmental authority.

XXX-002160

Business:  the Fresenius AG Business or the FWD Business.

Contribution:  as defined in the Reorganization Agreement.

Contribution Date:  the date on which the Effective Time occurs.

CTC-DE:  as defined in Section 8.04(b) of this Agreement.

CTC-NY:  as defined in Section 8.04(b) of this Agreement.

Debt:  as defined in the Reorganization Agreement.

Effective Time:  as defined in the recitals to this Agreement.

Foreign Exchange Rate:  with respect to any currency other than United
States dollars as of any date, the rate on such date at which such currency may
be exchanged for United States dollars as quoted in The Wall Street Journal.

<center>EE-3</center>

<PAGE>  437

Fresenius AG:  as defined in the preamble to this Agreement.

Fresenius AG Assets:  all Assets owned by any member of the Fresenius AG
Group immediately prior to the Contribution Date, other than FWD Business Assets
and other than any stock or assets of Fresenius USA.

Fresenius AG Business:  all of the business and operations conducted at any
time, whether prior to, on or after the Contribution Date, by any member of the
Fresenius AG Group, other than the FWD Business.

Fresenius AG Group:  Fresenius AG and the Fresenius AG Subsidiaries, other
than any member of the FWD Business Group.

Fresenius AG Indemnitees:  Fresenius AG, each Affiliate of Fresenius AG and
each of their respective Representatives and each of the heirs, executors,
successors and assigns of any of the foregoing.

Fresenius AG Subsidiaries:  all direct and indirect Subsidiaries of
Fresenius AG, other than FWD Business Subsidiaries and other than Fresenius USA
and its Subsidiaries; provided, however, that for purposes of this Agreement,
GmbH and the FWD Business Subsidiaries shall not be deemed to be Subsidiaries of
Fresenius AG.

Fresenius Tax Indemnification Agreement:  a tax sharing agreement between
Fresenius AG and GmbH substantially in the form attached hereto as Exhibit B,
with such changes as may be mutually satisfactory to Fresenius AG, GmbH, and
Grace-Conn.

Fresenius USA:  Fresenius USA, Inc., a Massachusetts Corporation.

Fresenius USA Merger:  as defined in the Reorganization Agreement.

FWD Business:  as defined in the Reorganization Agreement, but including
all business and operations of Fresenius USA.

FWD Business Assets:  as defined in the Reorganization Agreement, but
including all Assets of Fresenius USA.

FWD Business Group:  GmbH and each other FWD Business Subsidiary.

FWD Business Indemnitees:  Grace-Conn., Newco, GmbH, each Affiliate of GmbH
and each of their respective Representatives and each of the heirs, executors,
successors and assigns of any of the foregoing.

FWD Business Subsidiary:  (i) all FWD Business Subsidiaries (as defined in
the Reorganization Agreement), (ii) Fresenius USA and (iii) all corporations,
partnerships or other business entities in which any member of the FWD Business
Group has owned or will own any equity interest or other investment and which
predominantly relates to the FWD Business.

FWD Indemnitor:  as defined in Section 2.01 of this Agreement.

GmbH:  as defined in the preamble to this Agreement.

G-GmbH:  as defined in Section 2.01 of this Agreement.

Grace:  as defined in the Reorganization Agreement.

Grace-Conn.:  as defined in the preamble to this Agreement.

Group:  the Fresenius AG Group or the FWD Business Group.

Indemnifiable Losses:  all losses, Liabilities, damages, claims, demands,
judgments or settlements of any nature or kind, known or unknown, fixed,
accrued, absolute or contingent, liquidated or unliquidated, including all
reasonable costs and expenses (legal, accounting or otherwise as such costs are
incurred) relating thereto, suffered (and not actually reimbursed by insurance
proceeds) by an Indemnitee, including any reasonable costs or expenses of
enforcing any indemnity hereunder.

Indemnifying Party:  a Person who or which is obligated under this
Agreement to provide indemnification.

XXX-002161

EE-4

Indemnitee:  a Person who or which may seek indemnification under this Agreement.

Indemnity Payment:  an amount that an Indemnifying Party is required to pay to or in respect of an Indemnitee pursuant to Article IV.

Information:  all records, books, contracts, instruments, computer data and other data and information.

Liabilities:  all debts, liabilities and obligations, whether absolute or contingent, matured or unmatured, liquidated or unliquidated, accrued or unaccrued, known or unknown, whenever arising, and whether or not the same would properly be reflected on a balance sheet.

Litigation Matters:  actual, threatened or future litigations, investigations, claims or other legal matters that have been or may be asserted against, or otherwise adversely affect, Fresenius AG and/or GmbH (or members of either Group).

NMC:  National Medical Care, Inc., a Delaware corporation and an indirect wholly owned subsidiary of Grace.

Newco:  as defined in the Reorganization Agreement.

NY Preferred Registration Statement:  as defined in the Reorganization Agreement.

Other Agreements:  an employee benefits agreement, restructuring agreements, an insurance procedures agreement, a lease consistent with the terms set forth in Exhibit B hereto, a license consistent with the terms set forth in Exhibit C hereto, the Fresenius Tax Indemnification Agreement and the other agreements entered into or to be entered into in connection with the Contribution referred to in any of the foregoing as contemplated by Section 2.03.

Person:  an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization or a government or any department or agency thereof.

Privileged Information:  with respect to either Group, Information regarding a member of such Group, or any of its operations, Assets or Liabilities (whether in documents or stored in any other form or known to employees or agents) that is or may be protected from disclosure pursuant to the attorney-client privilege, the work product doctrine or other applicable privileges, that a member of the other Group may come into possession of or obtain access to pursuant to this Agreement or otherwise.

Recapitalization:  as defined in the Reorganization Agreement.

Registration Statement:  a registration statement to effect the registration of the Newco capital stock (or depositary receipts therefor) to be issued pursuant to the Reorganization Agreement under the Securities Act.

Reorganization Agreement:  as defined in the recitals to this Agreement.

Representative:  with respect to any Person, any of such Person's directors, officers, employees, agents, consultants, advisors, accountants, attorneys and representatives.

Securities Act:  the Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder.

SP:  as defined in the preamble to this Agreement.

Subsidiary:  with respect to any specified Person, (i) any corporation or other legal entity of which such Person or any of its subsidiaries controls or owns, directly or indirectly, more than 50% of the stock or other equity interest entitled to vote on the election of members to the board of directors or similar governing body, and (ii) any corporation, partnership or other business entity, in which such person has owned or shall own any equity interest or other investment and which predominantly relates to the business and operations conducted by such person's Group.

Tax:  as defined in the Fresenius Tax Indemnification Agreement.

EE-5

Third-Party Claim:  any claim, suit, derivative suit, arbitration, inquiry, proceeding or investigation by or before any court, any governmental or other regulatory or administrative agency or commission or any arbitration tribunal asserted by a Person who or which is neither a party hereto nor an Affiliate of a party hereto.

ARTICLE II

CERTAIN TRANSACTIONS PRIOR TO THE CONTRIBUTION DATE

SECTION 2.01 Certain Transfers.  As promptly as practicable following the date hereof (and in any event prior to the Contribution Date), Fresenius AG shall contribute the FWD Business and all FWD Business Assets to Newco. In

XXX-002162

furtherance of the foregoing:

(a) Fresenius AG shall identify all existing Subsidiaries engaged solely in the FWD Business and contribute the capital stock of such Subsidiaries to SP.

(b) Fresenius AG shall identify all German FWD Business Assets (other than any capital stock, which is to be contributed pursuant to (a) above) and shall contribute such assets to a newly formed GmbH ("G-GmbH").

(c) Fresenius AG shall contribute all capital stock of G-GmbH to SP.

(d) Fresenius AG shall use reasonable best efforts to cause each remaining Subsidiary which conducts part of the FWD Business to divest itself of all Assets which are not FWD Business Assets; and, immediately thereafter, Fresenius AG shall contribute the capital stock of each such Subsidiary to SP; provided, however, that in no event shall Fresenius AG take any action which causes any representation set forth in the Fresenius AG Tax Matters Certificate to be untrue.

(e) To the extent that any FWD Business Assets remain in Fresenius AG Subsidiaries other than SP (or its direct Subsidiaries) and G-GmbH, Fresenius AG shall cause each such Subsidiary to divest itself of such FWD Business Assets and then shall cause such FWD Business Assets to be contributed to other Subsidiaries, which may be newly formed, and shall then contribute all of the capital stock of such Subsidiaries to SP.

(f) Fresenius AG shall contribute all capital stock of Fresenius USA held by it to SP.

(g) The Subsidiaries contributed to SP shall collectively be "FWD Indemnitor," on a joint and several basis, and none of such Subsidiaries shall be a direct or indirect parent of Grace.

(h) Fresenius AG shall undertake such transactions as may be necessary for SP to become Newco, consistent with the terms of the Reorganization Agreement.

(i) The foregoing shall be effectuated pursuant to transfer documents and agreements acceptable to Grace-Conn.

SECTION 2.02 Termination of Agreements. Except as agreed by Grace in writing prior to the Contribution Date, Fresenius AG shall terminate all agreements between any member of the Fresenius AG Group and any member of the FWD Business Group except as specifically provided herein or in the Other Agreements.

SECTION 2.03 Other Agreements. Each of Fresenius AG and GmbH shall enter into, or cause the appropriate members of the Group of which it is a member, to enter into, the Tax Indemnification Agreement and Other Agreements as may be advisable in connection with the Distribution including, without limitation, agreements with respect to employee benefits, restructuring, insurance procedures and other matters, all such other agreements to be on terms acceptable to Grace-Conn. prior to the Distribution Date.

ARTICLE III

[INTENTIONALLY OMITTED.]

EE-6

<PAGE>    440

ARTICLE IV

SURVIVAL AND INDEMNIFICATION

SECTION 4.01 Survival of Agreements. All covenants and agreements of the parties hereto contained in this Agreement shall survive the Contribution Date.

SECTION 4.02 Indemnification. (a) Except as specifically otherwise provided in the Other Agreements, FWD Indemnitor shall indemnify, defend and hold harmless the Fresenius AG Indemnitees from and against (1) all Indemnifiable Losses arising from or relating to the FWD Business or the FWD Business Assets, whether such Indemnifiable Losses relate to events, occurrences or circumstances occurring or existing, or whether such Indemnifiable Losses are asserted, before or after the Contribution Date; and (2) all Indemnifiable Losses arising out of or based upon any untrue statement or alleged untrue statement of a material fact, or omission or alleged omission to state a material fact required to be stated, in the Registration Statement, NY Preferred Registration Statement or the Proxy Statement supplied by Grace or its subsidiaries or any preliminary or final form thereof or any amendment thereto, or necessary to make the statements therein not misleading.

(b) Except as specifically otherwise provided in the Other Agreements, Fresenius AG shall indemnify, defend and hold harmless the FWD Business Indemnitees from and against (1) all Indemnifiable Losses of or relating to the Fresenius AG Group (including, without limitation, relating to Fresenius USA or its shareholders or the Fresenius AG Business), whether such Indemnifiable Losses relate to events, occurrences or circumstances occurring or existing, or whether such Indemnifiable Losses are asserted, before or after the Contribution Date, other than those Indemnifiable Losses arising from the FWD Business; (2) all Indemnifiable Losses arising from or relating to all litigation brought by Fresenius USA shareholders acting in such capacity relating to the Reorganization; and (3) all Indemnifiable Losses arising out of or based upon

XXX-002163

any untrue statement or alleged untrue statement of a material fact, or omission or alleged omission to state a material fact required to be stated, in the Registration Statement, NY Preferred Registration Statement or the Proxy Statement or any preliminary or final form thereof or any amendment thereto, or necessary to make the statements therein not misleading, except that such indemnifications shall not apply to any Indemnifiable Losses that arise out of or are based upon any statement or omission, or alleged statement or omission, in any portion of the Registration Statement, NY Preferred Registration Statement or the Proxy Statement, or any preliminary or final form thereof or any amendment thereto, supplied by Grace or its Subsidiaries.

(c) Notwithstanding anything to the contrary set forth herein, indemnification relating to any arrangements between any member of the Fresenius AG Group and any member of the FWD Business Group for the provision after the Contribution of goods and services in the ordinary course shall be governed by the terms of such arrangements and not by this Section 4.02.

SECTION 4.03 Procedures for Indemnification for Third-Party Claims. (a) GmbH shall, and shall cause the other FWD Business Indemnitees to, notify Fresenius AG in writing promptly after learning of any Third-Party Claim for which any FWD Business Indemnitee intends to seek indemnification from Fresenius AG under this Agreement. Fresenius AG shall, and shall cause the other Fresenius AG Indemnitees to, notify GmbH in writing promptly after learning of any Third-Party Claim for which any Fresenius AG Indemnitee intends to seek indemnification from FWD Indemnitor under this Agreement. The failure of any Indemnitee to give such notice shall not relieve any Indemnifying Party of its obligations under this Article except to the extent that such Indemnifying Party or its Affiliate is actually prejudiced by such failure to give notice. Such notice shall describe such Third-Party Claim in reasonable detail considering the information provided to the Indemnitee.

(b) Except as otherwise provided in subsection (c) of this Section 4.03, an Indemnifying Party may, by notice to the Indemnitee and to FWD Indemnitor, if Fresenius AG is the Indemnifying Party, or to the indemnitees and Fresenius AG, if FWD Indemnitor is the Indemnifying Party, at any time after receipt by such Indemnifying Party of such Indemnitee's notice of a Third-Party Claim, undertake (itself or through another member of the Group of which the Indemnifying Party is a member) the defense or settlement of such Third-Party Claim. If an Indemnifying Party undertakes the defense of any Third-Party Claim, such

EE-7

<PAGE>   441

Indemnifying Party shall thereby admit its obligation to indemnify the Indemnitee against such Third-Party Claim, and such Indemnifying Party shall control the investigation and defense or settlement thereof, and the Indemnitee may not settle or compromise such Third-Party Claim, except that such Indemnifying Party shall not require any Indemnitee, without its prior written consent, to take or refrain from taking any action in connection with such Third-Party Claim, or make any public statement, which such Indemnitee reasonably considers to be against its interests, nor shall the Indemnifying Party, without the prior written consent of the Indemnitee and of FWD Indemnitor, if the Indemnitee is a FWD Business Indemnitee, or of the Indemnitee and of Fresenius AG, if the Indemnitee is a Fresenius AG Indemnitee, consent to any settlement that does not include as a part thereof an unconditional release of the Indemnitees from liability with respect to such Third-Party Claim or that requires the Indemnitee or any of its Representatives or Affiliates to make any payment that is not fully indemnified under this Agreement or to submit to any non-monetary remedy; and subject to the Indemnifying Party's control rights, as specified herein, the Indemnitees may participate in such investigation and defense, at their own expense. Following the provision of notice to the Indemnifying Party, until such time as an Indemnifying Party has undertaken the defense of any Third-Party Claim, as provided herein, such Indemnified Party shall control the investigation and defense or settlement thereof, without prejudice to its right to seek indemnification hereunder.

(c) If an Indemnitee reasonably determines that there may be legal defenses available to it that are different from or in addition to those available to its Indemnifying Party which make it inappropriate for the Indemnifying Party to undertake the defense or settlement thereof, then such Indemnifying Party shall not be entitled to assume undertake the defense or settlement of such Third-Party Claim; and counsel for the Indemnifying Party shall be entitled to conduct the defense of such Indemnifying Party and counsel for the Indemnitee shall be entitled to conduct the defense of such Indemnitee, it being understood that both such counsel shall cooperate with each other to conduct the defense or settlement of such action as efficiently as possible.

(d) In no event shall an Indemnifying Party be liable for the fees and expenses of more than one counsel for all Indemnitees in connection with any one action, or separate but similar or related actions, in the same jurisdiction arising out of the same general allegations or circumstances.

(e) FWD Indemnitor shall, and shall cause the other FWD Business Indemnitees to, and Fresenius AG shall, and shall cause the other Fresenius AG Indemnitees to, make available to each other, their counsel and other Representatives, all information and documents reasonably available to them which relate to any Third-Party Claim, and otherwise cooperate as may reasonably be required in connection with the investigation, defense and settlement thereof. Any joint defense agreement entered into by Fresenius AG or FWD Indemnitor with any third party relating to any Third-Party Claim shall provide that Fresenius AG or FWD Indemnitor may, if requested, provide information obtained through any such agreement to the Fresenius AG Indemnitees or the FWD Business Indemnitees.

XXX-002164

SECTION 4.04 Remedies Cumulative. The remedies provided in this Article IV shall be cumulative and shall not preclude assertion by any Indemnitee of any other rights or the seeking of any other remedies against any Indemnifying Party. However, the procedures set forth in Section 4.03 shall be the exclusive procedures governing any indemnity action brought under this Agreement or otherwise and relating to a Third-Party Claim, except as otherwise specifically provided in any of the Other Agreements.

ARTICLE V

CERTAIN ADDITIONAL COVENANTS

SECTION 5.01 Notices to Third Parties. In addition to the actions described in Section 5.02, the members of the Fresenius AG Group and the members of the FWD Business Group shall cooperate to make all other filings and give notice to and obtain consents from all third parties that may reasonably be required to consummate the transactions contemplated by this Agreement and the Other Agreements.

SECTION 5.02 Licenses and Permits. Each party hereto shall cause the appropriate members of its Group to prepare and file with the appropriate licensing and permitting authorities applications for the transfer

EE-8

<PAGE>    442

or issuance as may be necessary or advisable in connection with the Contribution to its Group of all material governmental licenses and permits required for the members of its Group to operate its Business after the Contribution. The members of the Fresenius AG Group and the members of the FWD Business Group shall cooperate and use all reasonable efforts to secure the transfer or issuance of the licenses and permits.

SECTION 5.03 Intercompany Agreements. All contracts, licenses, agreements, commitments or other arrangements, formal or informal, between any member of the Fresenius AG Group, on the one hand, and any member of the FWD Business Group (or any unit of the FWD Business), on the other hand, in existence as of the Contribution Date, pursuant to which any member of either Group provides to any member of the other Group services (including, without limitation, management, administrative, legal, financial, accounting, data processing, insurance, or technical support), or the use of any Assets of any member of the other Group, or the secondment of any employee, or pursuant to which rights, privileges or benefits are afforded to members of either Group as Affiliates of the other Group, shall terminate as of the close of business on the day prior to the Contribution Date, except as specifically provided herein or in the Other Agreements. From and after the Contribution Date, no member of either Group shall have any rights under any such contract, license, agreement, commitment or arrangement with any member of the other Group, except as specifically provided herein or in the Other Agreements.

SECTION 5.04 Guarantee Obligations. (a) Fresenius AG and FWD Indemnitor shall cooperate, and shall cause their respective Groups to cooperate, to terminate, or to cause a member of the FWD Business Group to be substituted in all respects for any member of the Fresenius AG Group in respect of, all obligations of any member of the Fresenius AG Group under any loan, financing, lease, contract, or other obligation in existence as of the Contribution Date pertaining to the FWD Business for which such member of the Fresenius AG Group may be liable, as guarantor, original tenant, primary obligor or otherwise. If such a termination or substitution is not effected by the Contribution Date, (1) FWD Indemnitor shall indemnify and hold harmless the Fresenius AG Indemnitees for any Indemnifiable Loss arising from or relating thereto, and (2) without the prior written consent of the Chief Financial Officer, Treasurer or any Assistant Treasurer of Fresenius AG, from and after the Contribution Date, FWD Indemnitor shall not, and shall not permit any member of the FWD Business Group or any of its Affiliates to, renew or extend the term of, increase its obligations under, or transfer to a third party, any loan, lease, contract or other obligation for which any member of the Fresenius AG Group is or may be liable unless all obligations of the Fresenius AG Group with respect thereto are thereupon terminated by documentation reasonably satisfactory in form and substance to the Chief Financial Officer, Treasurer or any Assistant Treasurer of Fresenius AG.

(b) Fresenius AG and FWD Indemnitor shall cooperate, and shall cause their respective Groups to cooperate, to terminate, or to cause a member of the Fresenius AG Group to be substituted in all respects for any member of the FWD Business Group in respect of, all obligations of any member of the FWD Business Group under any loan, financing, lease, contract or other obligation in existence as of the Contribution Date pertaining to the Fresenius AG Business for which such member of the FWD Business Group may be liable, as guarantor, original tenant, primary obligor or otherwise. If such a termination or substitution is not effected by the Contribution Date, (1) Fresenius AG shall indemnify and hold harmless the FWD Business Indemnitees for any Indemnifiable Loss arising from or relating thereto, and (2) without the prior written consent of the Chief Financial Officer, Treasurer or any Assistant Treasurer of FWD Indemnitor, from and after the Contribution Date, Fresenius AG shall not, and shall not permit any member of the Fresenius AG Group to, renew or extend the term of, increase its obligations under, or transfer to a third party, any loan, lease, contract or other obligation for which any member of the FWD Business Group is or may be liable unless all obligations of the FWD Business Group with respect thereto are thereupon terminated by documentation reasonably satisfactory in form and substance to the Chief Financial Officer, Treasurer or any Assistant Treasurer of FWD Indemnitor.

SECTION 5.05 Further Assurances. In addition to the actions specifically provided for elsewhere in this Agreement, each of the parties hereto shall use

XXX-002165

reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable laws, regulations and agreements to consummate and make effective the transactions contemplated by this Agreement including, without limitation, the Asset transfers and debt and cash balances of the other party

EE-9

<PAGE>   443

contemplated thereby following the Contribution. Without limiting the foregoing, each party hereto shall cooperate with the other party, and execute and deliver, or use reasonable efforts to cause to be executed and delivered, all instruments, and to make all filings with, and to obtain all consents, approvals or authorizations of, any governmental or regulatory authority or any other Person under any permit, license, agreement, indenture or other instrument, and take all such other actions as such party may reasonably be requested to take by any other party hereto from time to time, consistent with the terms of this Agreement and the Other Agreements, in order to effectuate the provisions and purposes of this Agreement. Without limiting the foregoing the parties will as promptly as practicable (and in the case of this Agreement and the Reorganization Agreement within one week after the signing hereof in Germany or Switzerland) apply for any notarial or similar registrations with respect to the transactions contemplated hereby in foreign jurisdictions.

ARTICLE VI

ACCESS TO INFORMATION

SECTION 6.01 Provision of Corporate Records.  Prior to or as promptly as practicable after the Contribution Date, Fresenius AG shall deliver to GmbH all corporate books and records of the FWD Business Group in its possession and copies of the relevant portions of all corporate books and records of the Fresenius AG Group relating directly and primarily to the FWD Business Assets, the FWD Business, or the Liabilities of the FWD Business Group, including, in each case, all active agreements, active litigation files and government filings. From and after the Contribution Date, all such books, records and copies shall be the property of GmbH. Prior to or as promptly as practicable after the Contribution Date, GmbH shall deliver to Fresenius AG all corporate books and records of the Fresenius AG Group in its possession and copies of the relevant portions of all corporate books and records of the Fresenius AG Group relating directly and primarily to the Fresenius AG Assets, the Fresenius AG Business, or the Liabilities of the Fresenius AG Group, including, in each case, all active agreements, active litigation files and government filings. From and after the Contribution Date, all such books, records and copies shall be the property of Fresenius AG.

SECTION 6.02 Access To Information.  From and after the Contribution Date, each of Fresenius AG and GmbH shall afford to the other and to the other's Representatives reasonable access and duplicating rights during normal business hours to all Information within the possession or control of such party's Group relating to the other party's Group's pre-Contribution business, Assets or Liabilities or relating to or arising in connection with the relationship between the Groups on or prior to the Contribution Date, insofar as such access is reasonably required for a reasonable purpose, subject to the provisions below regarding Privileged Information. Without limiting the foregoing, Information may be requested under this Section 6.02 for audit, accounting, claims, litigation and Tax purposes, as well as for purposes of fulfilling disclosure and reporting obligations.

In furtherance of the foregoing:

(a) Each party hereto acknowledges that: (1) Each of Fresenius AG and GmbH (and the members of the Fresenius AG Group and the FWD Business Group, respectively) has or may obtain Privileged Information; (2) there are a number of Litigation Matters affecting each or both of Fresenius AG and GmbH; (3) both Fresenius AG and GmbH have a common legal interest in Litigation Matters, in the Privileged Information, and in the preservation of the confidential status of the Privileged Information, in each case relating to pre-Contribution business of the Fresenius AG Group or the FWD Business Group or relating to or arising in connection with the relationship between the Groups on or prior to the Contribution Date; and (4) both Fresenius AG and GmbH intend that the transactions contemplated hereby and by the Reorganization Agreement and the Other Agreements and any transfer of Privileged Information in connection therewith shall not operate as a waiver of any potentially applicable privilege.

(b) Each of Fresenius AG and GmbH agrees, on behalf of itself and each member of the Group of which it is a member, not to disclose or otherwise waive any privilege attaching to any Privileged Information relating to pre-Contribution business of the FWD Business Group or the Fresenius AG Group, respectively, or relating to or arising in connection with the relationship between the Groups on or

EE-10

<PAGE>   444

prior to the Contribution Date, without providing prompt written notice to and obtaining the prior written consent of the other, which consent shall not be unreasonably withheld and shall not be withheld if the other party certifies that such disclosure is to be made in response to a likely threat of suspension or debarment or similar action; provided, however, that Fresenius AG and GmbH may make such disclosure or waiver with respect to Privileged Information if such Privileged Information relates solely to the pre-Contribution business of the Fresenius AG Group in the case of

XXX-002166

Fresenius AG or the FWD Business Group in the case of GmbH. In the event of a disagreement between any member of the Fresenius AG Group and any member of the FWD Business Group concerning the reasonableness of withholding such consent, no disclosure shall be made prior to a resolution of such disagreement by a court of competent jurisdiction.

(c) Upon any member of the Fresenius AG Group or any member of the FWD Business Group receiving any subpoena or other compulsory disclosure notice from a court, other governmental agency or otherwise which requests disclosure of Privileged Information, in each case relating to pre-Contribution business of the FWD Business Group or the Fresenius AG Group, respectively, or relating to or arising in connection with the relationship between the Groups on or prior to the Contribution Date, the recipient of the notice shall promptly provide to the other Group (following the notice provisions set forth herein) a copy of such notice, the intended response, and all materials or information relating to the other Group that might be disclosed. In the event of a disagreement as to the intended response or disclosure, unless and until the disagreement is resolved as provided in subsection (b), the parties shall cooperate to assert all defenses to disclosure claimed by either party's Group, and shall not disclose any disputed documents or information until all legal defenses and claims of privilege have been finally determined.

SECTION 6.03 Production of Witnesses.  Subject to Section 6.02, after the Contribution Date, each of Fresenius AG and GmbH shall, and shall cause each member of the Fresenius AG Group and the FWD Business Group, respectively, to, make available to Fresenius AG or GmbH or any member of the Fresenius AG Group or of the FWD Business Group, as the case may be, upon written request, such Group's directors, officers, employees and agents as witnesses to the extent that any such Person may reasonably be required in connection with any Litigation Matters, administrative or other proceedings in which the requesting party may from time to time be involved and relating to pre-Contribution business of the Fresenius AG Group or the FWD Business Group or relating to or in connection with the relationship between the Groups on or prior to the Contribution Date.

SECTION 6.04 Retention of Records.  Except as otherwise agreed in writing, or as otherwise provided in the Other Agreements, each of Fresenius AG and GmbH shall, and shall cause the members of the Group of which it is a member to, retain all Information in such party's Group's possession or under its control relating directly and primarily to the pre-Contribution business, Assets or Liabilities of the other party's Group that is less than ten years old until such Information is at least ten years old except that if, prior to the expiration of such period, any member of either party's Group wishes to destroy or dispose of any such Information that is at least three years old, prior to destroying or disposing of any of such Information, (1) the party whose Group is proposing to dispose of or destroy any such Information shall provide no less than 30-days' prior written notice to the other party, specifying the Information proposed to be destroyed or disposed of, and (2) if, prior to the scheduled date for such destruction or disposal, the other party requests in writing that any of the Information proposed to be destroyed or disposed of be delivered to such other party, the party whose Group is proposing to dispose of or destroy such Information promptly shall arrange for the delivery of the requested Information to a location specified by, and at the expense of, the requesting party.

SECTION 6.05 Confidentiality.  Subject to Section 6.02, which shall govern Privileged Information, from and after the Contribution Date, each of Fresenius AG and GmbH shall hold, and shall use its reasonable efforts to cause its Affiliates and Representatives to hold, in strict confidence all Information concerning the other party's Group obtained by it prior to the Contribution Date or furnished to it by such other party's Group pursuant to this Agreement or the Other Agreements and shall not release or disclose such Information to any other Person, except its Affiliates and Representatives, who shall be bound by the provisions of this Section 6.05, and each party shall be responsible for a breach by any of its Affiliates or Representatives; provided, however, that any member of the Fresenius AG Group or the FWD Business

EE-11

<PAGE>  445

Group may disclose such Information to the extent that (a) disclosure is compelled by judicial or administrative process or, in the opinion of such Person's counsel, by other requirements of law, or (b) such party can show that such Information was (1) available to such Person on a nonconfidential basis (other than from a member of the other party's Group) prior to its disclosure by the other party's Group, (2) in the public domain through no fault of such Person or (3) lawfully acquired by such Person from another source after the time that it was furnished to such Person by the other party's Group, and not acquired from such source subject to any confidentiality obligation on the part of such source, or on the part of the acquiror, known to the acquiror. Notwithstanding the foregoing, each of Fresenius AG and GmbH shall be deemed to have satisfied its obligations under this Section 6.05 with respect to any Information (other than Privileged Information) if it exercises the same care with regard to such Information as it takes to preserve confidentiality for its own similar Information.

SECTION 6.06 Cooperation With Respect To Government Reports and Filings.  Fresenius AG, on behalf of itself and each member of the Fresenius AG Group, agrees to provide any member of the FWD Business Group, and GmbH, on behalf of itself and each member of the FWD Business Group, agrees to provide any member of the Fresenius AG Group, with such cooperation and Information as may be reasonably requested by the other in connection with the preparation or filing of any government report or other government filing contemplated by this

XXX-002167

Agreement or in conducting any other government proceeding relating to pre-Contribution business of the Fresenius AG Group or the FWD Business Group, Assets or Liabilities of either Group or relating to or in connection with the relationship between the Groups on or prior to the Contribution Date. Such cooperation and Information shall include, without limitation, promptly forwarding copies of appropriate notices and forms or other communications received from or sent to any government authority which relate to the Fresenius AG Group, in the case of the Fresenius AG Group, or the FWD Business Group, in the case of the Fresenius AG Group. Each party shall make its employees and facilities available during normal business hours and on reasonable prior notice to provide explanation of any documents or Information provided hereunder.

ARTICLE VII

NO REPRESENTATIONS OR WARRANTIES

SECTION 7.01 No Representations Or Warranties.  Fresenius AG acknowledges that, prior to the date of this Agreement, it has had primary responsibility for the operation and management of the FWD Business Assets. GmbH understands and agrees that no member of the Fresenius AG Group is, in this Agreement or in any other agreement or document, representing or warranting to GmbH or any member of the FWD Business Group in any way as to the FWD Business Assets, the FWD Business or the Liabilities of the FWD Business Group or as to any consents or approvals required in connection with the consummation of the transactions contemplated by this Agreement, it being agreed and understood that GmbH and each member of the FWD Business Group shall take all of the FWD Business Assets "as is, where is". GmbH and each member of the FWD Business Group shall bear the economic and legal risk that conveyances of the FWD Business Assets shall prove to be insufficient, that the title of any member of the FWD Business Group to any FWD Business Assets, shall be other than good and marketable and free from encumbrances or that results from the failure of GmbH or any member of the FWD Business Group to obtain any consents or approvals relating to the FWD Business required in connection with the consummation of the transactions contemplated by this Agreement. The foregoing shall be without prejudice to any rights under Section 4.02 or Section 5.05 of this Agreement.

ARTICLE VIII

MISCELLANEOUS

SECTION 8.01 Use of Fresenius AG Name and Mark.  Prior to the Contribution Date, Fresenius AG shall enter into a license agreement consistent with the terms set forth in Exhibit C hereto, providing for the use of certain of Fresenius AG's names and marks.

EE-12

<PAGE>   446

SECTION 8.02 Complete Agreement.  This Agreement, the exhibits and schedules hereto and the agreements and other documents referred to herein shall constitute the entire agreement between the parties hereto with respect to the subject matter hereof (other than the Reorganization Agreement and the schedules and exhibits thereto) and shall supersede all previous negotiations, commitments and writings with respect to such subject matter.

SECTION 8.03 Expenses.  Fresenius AG shall bear all costs with respect to the transactions contemplated hereby and by the Other Agreements, except as otherwise specifically provided in the Reorganization Agreement and the Other Agreements.

SECTION 8.04 Jurisdiction and Forum.  (a) The parties hereto agree that the appropriate forum for any disputes between any of the parties hereto arising out of this Agreement or the transactions contemplated hereby shall be any state or federal court in the State of New York or the State of Delaware provided that the foregoing shall not limit the rights of any person to obtain execution of judgment in any other jurisdiction. The parties hereto further agree, to the extent permitted by law, that final and unappealable judgment against any of them in any action or proceeding contemplated above shall be conclusive and may be enforced in any other jurisdiction within or outside the United States by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and amount of such judgment.

(b) By the execution and delivery of this Agreement, each of the parties hereto (i) irrevocably designates and appoints The Corporation Trust Company ("CTC-NY") care of CT Corporation System, at 1633 Broadway, 23rd floor, in the City of New York, County of New York, State of New York, 10019, or The Corporation Trust Company ("CTC-DE") care of Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware, 19801, as its authorized agent upon which process may be served in any action or proceeding arising out of or relating to this Agreement, (ii) submits to the personal jurisdiction of any state or federal court in the State of New York or the State of Delaware in any such action or proceeding, and (iii) agrees that service of process upon CTC-NY or upon CTC-DE shall be deemed in every respect effective service of process upon such person in any such action or proceeding. Each of the parties hereto further agrees to take any and all action, including the execution and filing of any and all such documents and instruments, as may be necessary to continue such designation and appointment of CTC-NY or CTC-DE in full force and effect so long as this Agreement shall be in effect. The foregoing shall not limit the rights of any party to serve process in any other manner permitted by law.

(c) To the extent that either of the parties hereto has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its

XXX-002168

property, such person hereby irrevocably waives such immunity in respect of its obligations with respect to this Agreement.

SECTION 8.05 Notices.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by cable, telegram, telex or other standard form of telecommunications, or by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Fresenius AG or any member of the Fresenius AG Group:

    Fresenius AG
    Borkenberg 14
    61440 Oberursel
    61343 Bad Homburg
    Germany
    Attention: Mr. Udo Werle
    Fax: 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-60-2104

                              EE-13
<PAGE>    447

with a copy to:

    O'Melveny & Myers
    Citicorp Center
    153 East 53rd Street
    New York, NY 10022-4611
    Attention: Dr. Ulrich Wagner
    Fax: (212) 326-2061

If to GmbH or any member of the FWD Business Group

    GmbH
    c/o Fresenius AG
    Borkenberg 14
    61440 Oberursel
    61343 Bad Homburg
    Germany
    Attention: Mr. Udo Werle
    Fax: 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-60-2104

with a copy to:

    W. R. Grace & Co.-Conn.
    One Town Center Road
    Boca Raton, Florida 33486-1010
    Attention: Secretary
    Fax: (407) 362-1635

with a copy to:

    Wachtell, Lipton, Rosen & Katz
    51 West 52nd Street
    New York, New York 10019
    Attention: Andrew R. Brownstein, Esq.
    Fax: (212) 403-2000

or to such other address as any party hereto may have furnished to the other parties by a notice in writing in accordance with this Section 8.05.

SECTION 8.06 Amendment and Modification.  This Agreement may be amended, modified or supplemented only by a written agreement signed by all of the parties hereto.

SECTION 8.07 Successors and Assigns; No Third-Party Beneficiaries.  This Agreement and all of the provisions hereof, shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns, but neither this Agreement nor any of the rights, interests and obligations hereunder shall be assigned by any party hereto without the prior written consent of the other party. Except for the provisions of Sections 4.02 and 4.03 relating to indemnities, which are also for the benefit of the Indemnitees, this Agreement is solely for the benefit of the parties hereto and their Subsidiaries and Affiliates and is not intended to confer upon any other Persons any rights or remedies hereunder.

SECTION 8.08 Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

SECTION 8.09 Interpretation.  The Article and Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties hereto and shall not in any way affect the meaning or interpretation of this Agreement.

SECTION 8.10 Severability.  If any provision of this Agreement or the application thereof to any person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable,

                              EE-14
<PAGE>    448

the remaining provisions hereof, or the application of such provision to persons

XXX-002169

or circumstances other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.

SECTION 8.11 References; Construction.  References to any "Article," "Exhibit," "Schedule" or "Section," without more, are to Articles, Exhibits, Schedules and Sections to or of this Agreement. Unless otherwise expressly stated, clauses beginning with the term "including" set forth examples only and in no way limit the generality of the matters thus exemplified.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

FRESENIUS AG

By: /s/  GERD KRICK

-----------------------------------
Name:
Title:

STERIL PHARMA GMBH

By: /s/  GERD KRICK

-----------------------------------
Name:
Title:

W. R. GRACE & CO.-CONN.

By: /s/  ALBERT J. COSTELLO

-----------------------------------
Name:
Title:

EE-15

<PAGE>  449

APPENDIX B

FORM OF
CERTIFICATE OF AMENDMENT OF
THE CERTIFICATE OF INCORPORATION
OF W. R. GRACE & CO.
UNDER SECTION 805 OF THE BUSINESS
CORPORATION LAW

The undersigned, being the President and the Secretary, respectively, of W. R. Grace & Co., hereby certify that:

1. The name of the corporation is W. R. GRACE & CO. (the "Corporation").

2. The Certificate of Incorporation of the Corporation was filed by the Department of State on the 23rd day of March, 1988.

3. This Certificate of Amendment has been duly authorized, pursuant to Section 803 of the Business Corporation Law of the State of New York, by a vote of the Board of Directors of the Corporation, followed by the vote of the holders of a majority of all outstanding shares entitled to vote thereon at a meeting of shareholders duly called for such purpose.

4. Article FIRST of the Certificate of Incorporation of the Corporation is hereby amended to be as follows:

The name of the Corporation is

FRESENIUS NATIONAL MEDICAL CARE, INC.

5. Article FOURTH, paragraphs (a) and (b) of the Certificate of Incorporation of the Corporation are hereby amended to be as follows:

(a) The Corporation shall have authority to issue an aggregate of 600,000,000 shares of capital stock, divided into classes as set forth in this Article.

(b) The designation of each class of shares which the Corporation shall be authorized to issue, the authorized number of shares of each class, and the par value thereof per share, shall be as follows:

<TABLE>
<CAPTION>

| DESIGNATION OF CLASS | PAR VALUE PER SHARE | AUTHORIZED NUMBER OF SHARES |
|---|---|---|
| <S> | <C> | <C> |
| 6% Preferred.................................... | $ 100 | 40,000 |
| Class A Preferred............................... | $ 100 | 50,000 |
| Class B Preferred............................... | $ 100 | 40,000 |
| Class C Preferred............................... | $ 1 | 5,000,000 |

XXX-002170

```
Class D Preferred............................... $ .10    100,000,000
Common......................................... $  1    300,000,000
</TABLE>
```

6. Article FOURTH, paragraph (c) of the Certificate of Incorporation of the Corporation is hereby amended by the addition of new subparagraphs 5 through 9, replacing the current subparagraphs 5 through 7, to be as follows:

5. CLASS D PREFERRED STOCK.

SECTION 1. DESIGNATION; NUMBER; LIQUIDATION PREFERENCE.

(a) The shares of such series shall be designated as Class D Preferred Stock, and such series shall also be known as the "Class D Special Dividend Preferred Stock". The number of shares authorized may be decreased (but not increased) by the Board of Directors without a vote of shareholders; provided, however,

<PAGE>    450                        B-1

that such number may not be decreased below the number of then outstanding shares of Class D Special Dividend Preferred Stock.

(b) Subject to Section 7, the Class D Special Dividend Preferred Stock shall have, with respect to rights on liquidation, dissolution or winding up, a liquidation preference of $.10 per share and with respect to dividend rights and rights on liquidation, dissolution or winding up, shall rank, subsequent to all shares of the 6% Preferred Stock, Class A Preferred Stock and Class B Preferred Stock of the Corporation issued and outstanding as of the Issue Date, and prior to all other shares of capital stock of the Corporation now or hereafter authorized including, without limitation, the Class C Preferred Stock and the Common Stock of the Corporation (collectively, the "Junior Stock").

SECTION 2. DIVIDENDS AND DISTRIBUTIONS.

(a) The holders of shares of Class D Special Dividend Preferred Stock, in preference to holders of shares of Junior Stock, shall be entitled to receive, when, as and if declared by the Board of Directors, out of the assets of the Corporation at the time legally available therefor, a special dividend (the "Special Dividend") equal, in the aggregate with respect to all shares of Class D Special Dividend Preferred Stock, to the Special Dividend Amount ("Special Dividend Amount") determined pursuant to the formula set forth below. Upon such a declaration, and subject to paragraph (d) below, the Special Dividend shall be payable in cash in annual installments on October 1, 2002 and, thereafter, on October 1 in each of the following years, if applicable (each such date, a "Payment Date"); and the aggregate amount payable on any Payment Date shall be equal to the lesser of (i) $100 million or (ii) the amount of the Special Dividend Amount then remaining unpaid in accordance with the provisions hereof. Subject to the requirements of applicable law, the Special Dividend shall be declared in a single declaration irrespective of the number of installments in which it will be paid. The Special Dividend Amount shall be publicly announced by Fresenius Medical Care on or before May 1, 2002 (such announcement, the "Public Announcement").

(b) Calculation of the Special Dividend Amount.

(i) The Special Dividend Amount shall be equal to the Target Face Amount plus the Special Differential, if the Special Differential is a positive number, and less the absolute value of the Special Differential, if the Special Differential is a negative number.

(ii) The Special Differential shall be equal to (A) the Applicable Percentage of the excess of the cumulative actual Adjusted Cash Flow of Fresenius Medical Care on a consolidated basis for the five-year period beginning on January 1, 1997 and ending on December 31, 2001 (the "Dividend Accrual Period"), above $3.7 billion less (B) $200 million.

(iii) The Adjusted Cash Flow of Fresenius Medical Care on a consolidated basis shall be equal to net income to common shareholders (without regard to the Special Dividend), plus depreciation and amortization, plus non-cash restructuring charges, provisions for impairment in the value of long-term assets, and similar recorded reserves as of December 31, 2001, as reflected on Fresenius Medical Care's consolidated audited financial statements prepared in accordance with U.S. GAAP, less any after-tax cash expenditures paid to third parties incurred in connection with the matters underlying the investigations of NMC and its subsidiaries by the OIG referenced in the five subpoenas received by NMC from the OIG on October 17, 1995 not reflected in net income to common shareholders during the Dividend Accrual Period.

(iv) The Applicable Percentage shall be 44.8%, which percentage shall be increased and decreased proportionally to reflect issuances or repurchases (to the extent that no Special Dividend is payable with respect to such repurchased shares) of Class D Special Dividend Preferred Stock following the Reorganization.

(v) Accompanying payment of the Special Dividend shall be a Certificate of the Chief Financial Officer of Fresenius Medical Care certifying that the amount of the Special Dividend has been calculated in accordance with the provisions hereof, together with an opinion of Fresenius Medical Care's independent public accountant to the same effect.

B-2

XXX-002171

<PAGE>   451

(c) The Special Dividend payable pursuant to Section 2(b) shall begin to accrue and shall be cumulative from January 1, 1997, and shall accrue on a quarterly basis, in each case, whether or not declared, subject to decrease in future periods to the extent that the Special Differential decreases after any accrual. Any payment of the Special Dividend made in an amount less than the total amount of such Special Dividend at the time payable shall be allocated pro rata on a share-by-share basis among all such shares of Class D Special Dividend Preferred Stock at the time outstanding. The Board of Directors may fix a record date for the determination of holders of shares of Class D Special Dividend Preferred Stock entitled to receive payment of a dividend declared thereon, which record date shall be no more than 60 days or less than 10 days prior to the date fixed for the payment thereof.

(d) The Special Dividend shall be paid in cash, except that if the Common Stock is listed on the NYSE or quoted on the Nasdaq Stock Market, the Special Dividend, or any installment thereof, may be paid, in the sole discretion of the Corporation, either (i) in cash, (ii) in Common Stock, based upon the Market Price as of the record date for such payment, or (iii) any combination of cash and Common Stock, based upon the Market Price as of the record date for such payment. All Common Stock issued as a dividend with respect to the Class D Special Dividend Preferred Stock shall thereupon be duly authorized, validly issued, fully paid and nonassessable.

(e) If at any time after May 1, 2002 any portion of the Special Dividend is not declared, or is not paid on the applicable Payment Date, the Corporation shall not make any Restricted Payment.

SECTION 3. ADJUSTMENTS.

The Board of Directors of the Corporation, with the concurrence of all of the Independent Directors of Fresenius Medical Care, or a majority of such Independent Directors if there are three or more, shall make appropriate adjustments to the provisions of Section 2 hereof to preserve their intended economic effect, in the light of changes in capitalization, accounting policy and extraordinary transactions (including without limitation mergers, consolidations or sales of assets). No adjustments of such provisions on account of the foregoing or otherwise shall be made without the concurrence of a majority of the Independent Directors of Fresenius Medical Care.

SECTION 4. VOTING RIGHTS.

In addition to any voting rights provided by law, the holders of shares of Class D Special Dividend Preferred Stock shall have the following voting rights:

(a) Except as otherwise required by applicable law, each share of Class D Special Dividend Preferred Stock shall entitle the holder thereof to vote, in person or by proxy, at each special or annual meeting of shareholders, on all matters voted on by holders of Common Stock voting together as a single class with other shares entitled to vote thereon. With respect to any such vote, each share of Class D Special Dividend Preferred Stock shall entitle the holder thereof to cast 1/10(one-tenth) of a vote.

(b) If on any date after the earlier of (x) the Public Announcement or (y) May 1, 2002, the Corporation shall have failed to declare, or shall have failed to pay on the applicable Payment Date, the full amount of the installment of the Special Dividend then payable on the Class D Special Dividend Preferred Stock, then the number of directors constituting the Board of Directors shall, without further action, be increased by two and the holders of shares of Class D Special Dividend Preferred Stock shall have, in addition to the other voting rights set forth herein with respect to the Class D Special Dividend Preferred Stock, the exclusive right, voting separately as a single class, to elect two directors of the Corporation to fill such newly created directorships, by written consent as provided herein, or at a special meeting of such holders called as provided herein. Any such additional directors shall continue as directors (subject to reelection or removal as provided in Section 4(c)(ii)) and the holders of Class D Special Dividend Preferred Stock shall have such additional voting rights until such time as all installments of the Special Dividend then payable on the Class D Special Dividend Preferred Stock shall have been declared and paid in full at which time such additional directors shall cease to be directors, the number of directors constituting the Board of Directors shall be reduced by two and such additional voting rights of the holders of Class D Special Dividend Preferred Stock shall terminate, subject to revesting in the event of each and every subsequent event of the character indicated above.

B-3

<PAGE>   452

(c) (i) The foregoing right of holders of shares of Class D Special Dividend Preferred Stock to take any action as provided in Section 4(b) may be exercised at any annual meeting of shareholders in New York or at a special meeting of holders of shares of Class D Special Dividend Preferred Stock in New York, held for such purpose as hereinafter provided or at any adjournment thereof, or by the written consent, delivered to the Secretary of the Corporation, of the holders of the minimum number of shares required to take such action. So long as such right to vote, as provided in Section 4(b), continues (and unless such right has been exercised by written consent of the minimum number of shares required to take such action), the President of the Corporation may call, and upon the written request of holders of record of at least 10% of the aggregate outstanding shares of Class D Special Dividend Preferred Stock addressed to the Secretary of the Corporation at the principal office of the Corporation, shall call, a special meeting of the holders of shares of Class D Special Dividend Preferred Stock entitled to vote as provided

XXX-002172

herein. Such meeting shall be called within 30 days after delivery of such request to the Secretary, and held within 60 days of delivery after such request or as soon thereafter as practicable at the place and upon the notice provided by law and in the by-laws of the Corporation for the holding of meetings of shareholders.

(ii) At each meeting of shareholders at which the holders of shares of Class D Preferred Stock shall have the right, voting separately as a single class, to elect two directors of the Corporation as provided in Section 4(b) or to take any action, the presence in person or by proxy of holders of record of one-third of the total aggregate number of shares of Class D Special Dividend Preferred Stock then outstanding and entitled to vote on the matter shall be necessary and sufficient to constitute a quorum. At any such meeting or at any adjournment thereof:

(A) the absence of a quorum of the holders of shares of Class D Special Dividend Preferred Stock shall not prevent the election of directors other than those to be elected by the holders of shares of Class D Special Dividend Preferred Stock, and the absence of a quorum of the holders of shares of any other class or series of capital stock shall not prevent the election of directors to be elected by the holders of shares of Class D Special Dividend Preferred Stock or the taking of any action as provided in Section 4(b); and

(B) in the absence of a quorum of the holders of shares of Class D Special Dividend Preferred Stock, a majority of the holders of such shares present in person or by proxy shall have the power to adjourn the meeting as to the actions to be taken by the holders of shares of Class D Special Dividend Preferred Stock from time to time and place to place without notice other than announcement at the meeting until a quorum shall be present.

For taking of any action as provided in Section 4(b) by the holders of shares of Class D Special Dividend Preferred Stock each such holder shall have one vote for each share of such stock standing in his name on the transfer books of the Corporation as of any record date fixed for such purpose or, if no such date be fixed, at the close of business on the Business Day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the Business Day next preceding the day on which the meeting is held; provided, however, that shares of Class D Special Dividend Preferred Stock held by the Corporation or any Subsidiary of the Corporation shall not be deemed to be outstanding for purposes of taking any action as provided in this Section 4.

Each director elected by the holders of shares of Class D Special Dividend Preferred Stock, as provided in Section 4(b) shall, unless his term shall expire earlier in accordance with the provisions thereof, or unless he shall be removed as provided in this Section 4(c)(ii), hold office until the annual meeting of shareholders next succeeding his election or until his successor, if any, is elected and qualified.

If any director so elected by the holders of Class D Special Dividend Preferred Stock shall cease to serve as a director before his term shall expire (except by reason of the termination of the voting rights accorded to the holders of Class D Special Dividend Preferred Stock in accordance with Section 4(b)), the holders of the Class D Special Dividend Preferred Stock then outstanding and entitled to vote for such director may, by written consent as provided herein or at a special meeting of such holders called as provided herein, elect a successor to hold office for the unexpired term of the director whose place shall be vacant.

B-4

<PAGE>   453

Any director elected by the holders of shares of Class D Special Dividend Preferred Stock, voting together as a separate class, may be removed from office with or without cause by the vote or written consent of the holders of at least a majority of the aggregate outstanding shares of Class D Special Dividend Preferred Stock at the time of removal. A special meeting of the holders of shares of Class D Special Dividend Preferred Stock for such purpose may be called in accordance with the procedures set forth in Section 4(c)(i).

SECTION 5. OPTIONAL REDEMPTION.

(a) (i) The Corporation shall not have any right to redeem any shares of Class D Special Dividend Preferred Stock prior to the Public Announcement. Thereafter, the Corporation shall have the right, at its sole option and election, to redeem (an "Optional Redemption") all or a portion of the shares of Class D Special Dividend Preferred Stock, on not less than 30 days' notice of the date of redemption (any such date an "Optional Redemption Date"), at a price per share (the "Optional Redemption Price") equal to the greater of (A) the Liquidation Preference of such share, or (B) an amount per share equal to any unpaid portion of the Special Dividend, whether or not declared or payable, on the applicable Optional Redemption Date. The Optional Redemption Price shall be paid in cash, except that if the Common Stock is listed on the NYSE or quoted on the Nasdaq Stock Market, the Optional Redemption Price may be paid, in the sole discretion of the Corporation, either in (I) cash, (ii) Common Stock, based upon the Market Price as of the record date for such Optional Redemption, or (iii) any combination of cash and Common Stock, based upon the Market Price as of the record date for such Optional Redemption. All Common Stock issued as a redemption amount with respect to the Class D Special Dividend Preferred Stock shall thereupon be duly authorized, validly issued, fully paid and nonassessable.

(ii) If the Corporation shall determine to redeem less than all the shares

XXX-002173

of Class D Special Dividend Preferred Stock then outstanding pursuant to Section 5 (a)(i) of this subparagraph 5, the shares to be redeemed shall be selected pro rata (as nearly as may be) so that the number of shares redeemed from each holder shall be the same proportion of all the shares to be redeemed that the total number of shares of Class D Special Dividend Preferred Stock then held by such holder bears to the total number of shares of Class D Special Dividend Preferred Stock then outstanding.

(b) Notice of any Optional Redemption shall specify the Optional Redemption Date, the Optional Redemption Price, the place or places of payment, that payment (including the amount and terms thereof) will be made upon presentation and surrender of the shares of Class D Special Dividend Preferred Stock, and shall be given by publication in a newspaper of general circulation in the Borough of Manhattan, the City of New York (if such publication shall be required by applicable law, rule, regulation or securities exchange requirement), not less than 30, nor more than 45, days prior to the Optional Redemption Date; and, in any case, a similar notice shall be mailed at least 30, but not more than 45, days prior to the Optional Redemption Date to each holder of shares of Class D Special Dividend Preferred Stock, at such holder's address as it appears on the transfer books of the Corporation. In order to facilitate the redemption of shares of Class D Special Dividend Preferred Stock, the Board of Directors may fix a record date for the determination of shares of Class D Special Dividend Preferred Stock to be redeemed, not more than 60 days or less than 45 days prior to the Optional Redemption Date.

(c) On the date of any Optional Redemption that is specified in a notice given pursuant to Section 5(b), the Corporation shall, and at any time after such notice shall have been mailed and before the Optional Redemption Date the Corporation may, deposit for the benefit of the holders of shares of Class D Special Dividend Preferred Stock the funds necessary for such redemption with a bank or trust company in the Borough of Manhattan, the City of New York, having a capital and surplus of at least $100,000,000. Any moneys so deposited by the Corporation and unclaimed at the end of two years from the Optional Redemption Date shall revert to the general funds of the Corporation. After such reversion, any such bank or trust company shall, upon demand, pay over to the Corporation such unclaimed amounts and, thereupon, such bank or trust company shall be relieved of all responsibility in respect thereof and any holder of shares of Class D Special Dividend Preferred Stock to be redeemed shall look only to the Corporation for the payment of the Optional Redemption Price.

B-5

<PAGE>    454

(d) Notice of redemption having been given as aforesaid, upon the deposit of funds pursuant to Section 5(c) in respect of shares of Class D Special Dividend Preferred Stock to be redeemed pursuant to Section 5(a), notwithstanding that any certificates for such shares shall not have been surrendered for cancellation, from and after the Optional Redemption Date, (i) the shares represented thereby shall no longer be deemed outstanding, (ii) the rights to receive dividends thereon shall cease to accrue, and (iii) all rights of the holders of shares of Class D Special Dividend Preferred Stock to be redeemed shall cease and terminate, excepting only the right to receive the Optional Redemption Price therefor; provided, however, that, if the Corporation shall default in the payment of the Optional Redemption Price, the shares of Class D Special Dividend Preferred Stock shall thereafter be deemed to be outstanding and the holders thereof shall have all of the rights of a holder of Class D Special Dividend Preferred Stock until such time as such default shall no longer be continuing or shall have been waived by holders of at least 66-2/3% of the then outstanding shares of Class D Special Dividend Preferred Stock.

(e) Any notice that is mailed as herein provided shall be conclusively presumed to have been duly given, whether or not the holder of shares of Class D Special Dividend Preferred Stock receives such notice, and failure to give such notice by mail, or any defect in such notice, to the holders of any shares designated for redemption shall not affect the validity of the proceedings for the redemption of any other shares of Class D Special Dividend Preferred Stock. On or after the Optional Redemption Date, each holder of the shares called for redemption shall surrender the certificate evidencing such shares to the Corporation at the place designated in such notice and shall thereupon be entitled to receive payment of the Optional Redemption Price. If less than all the shares evidenced by any such surrendered certificate are redeemed, a new certificate shall be issued evidencing the unredeemed shares.

SECTION 6. ACQUIRED SHARES.

Any shares of Class D Special Dividend Preferred Stock acquired by the Corporation or any of its Subsidiaries in any manner whatsoever shall be retired and cancelled promptly after the acquisition thereof. All such shares of Class D Special Dividend Preferred Stock shall upon their cancellation become authorized but unissued shares of Preferred Stock of the Corporation.

SECTION 7. LIQUIDATION, DISSOLUTION OR WINDING UP.

(a) If the Corporation shall commence a voluntary case or proceeding under the United States bankruptcy laws or any applicable bankruptcy, insolvency or similar law of any state or other country, or consent to the entry of an order for relief in an involuntary case under any such law or to the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Corporation or of any substantial part of its property, or make an assignment for the benefit of its creditors, or admit in writing its inability to pay its debts generally as they become due, or if a decree or order for relief or similar decree or order in respect of the Corporation shall be entered by a court having jurisdiction in the premises in an involuntary case under the United States bankruptcy laws or any applicable bankruptcy, insolvency

XXX-002174

or similar law of any other country, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or other similar official) of the Corporation or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and on account of any such event the Corporation shall liquidate, dissolve or wind up, or if the Corporation shall otherwise liquidate, dissolve or wind up, no distribution shall be made to the holders of shares of Junior Stock unless, prior thereto, the holders of shares of Class D Special Dividend Preferred Stock shall have received the Optional Redemption Price.

(b) Neither the consolidation or merger of the Corporation with or into any other Person nor the sale or transfer of all or any part of the Corporation's assets for cash, securities or other property shall be deemed to be a liquidation, dissolution or winding up of the Corporation for purposes of this Section 7.

<div align="center">B-6</div>

<PAGE>    455

SECTION 8. DEFINITIONS.

For the purposes of this Certificate of Amendment, the following terms shall have the meanings indicated:

"Adjusted Cash Flow" shall have the meaning ascribed to such term in Section (2)(b)(iii).

"Affiliate" shall have the meaning ascribed to such term in Rule 12b-2 of the General Rules and Regulations under the Exchange Act.

"Applicable Percentage" shall have the meaning ascribed to such term in Section 2(b)(iv).

"Board of Directors" shall mean the Board of Directors of the Corporation.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which commercial banks in the City of New York are authorized or required by law or executive order to close.

"Common Stock" shall have the meaning ascribed to such term in Section 1(a) of this Article FOURTH.

"Effective Time" shall have the meaning ascribed to such term in the Reorganization Agreement.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Securities and Exchange Commission thereunder.

"Fresenius Medical Care" shall mean Fresenius Medical Care AG, an Aktiengesellschaft organized under the laws of the Federal Republic of Germany.

"Independent Directors" shall mean individuals without a substantial business or professional relationship with the Corporation.

"Issue Date" shall mean the date of first issue of Class D Special Dividend Preferred Stock.

"Junior Stock" shall have the meaning ascribed to such term in Section 1(b) of this article FOURTH.

"Liquidation Preference," with respect to a share of Class D Special Dividend Preferred Stock, shall mean $.10.

"Market Price" shall mean, per share of Common Stock, on any date specified herein, the closing price per share of the Common Stock on such date published in The Wall Street Journal or, if no such closing price on such date is published in The Wall Street Journal, the average of the closing bid and asked prices on such date, as officially reported on the principal national securities exchange on which the Common Stock is then listed or admitted to trading, or, if the Common Stock is not then listed or admitted to trading on any national securities exchange, as quoted by the Nasdaq Stock Market.

"NASD" shall mean the National Association of Securities Dealers, Inc.

"Nasdaq Stock Market" shall mean the National Market System of the National Association of Securities Dealers, Inc. Automated Quotations System.

"NMC" shall mean National Medical Care, Inc., a Delaware corporation.

"NYSE" shall mean the New York Stock Exchange.

"OIG" shall mean the Office of the Inspector General of the United States Department of Health and Human Services.

"Optional Redemption" shall have the meaning ascribed to such term in Section 5(a) of this Article FOURTH.

"Optional Redemption Date" shall have the meaning ascribed to such term in Section 5(a) of this Article FOURTH.

<div align="center">B-7</div>

<PAGE>    456

XXX-002175

"Optional Redemption Price" shall have the meaning ascribed to such term in Section 5(a) of this Article FOURTH.

"Payment Date" shall have the meaning ascribed to such term in Section 2(a) of this Article FOURTH.

"Person" shall mean any individual, firm, corporation, partnership, trust, incorporated or unincorporated association, joint venture, joint stock company, government (or an agency or political subdivision thereof) or other entity of any kind, and shall include any successor (by merger or otherwise) of such entity.

"Preferred Stock" shall mean any preferred stock of the Corporation.

"Public Announcement" shall have the meaning ascribed to such term in Section 2(a) of this ARTICLE FOURTH.

"Reorganization" shall have the meaning ascribed to such term in the Reorganization Agreement.

"Reorganization Agreement" shall mean the Agreement and Plan of Reorganization dated as of February 4, 1996 by and between the Corporation and Fresenius AG.

"Restricted Payment" shall mean any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities by the Corporation on account of any shares of Junior Stock or the purchase, redemption or other acquisition for value by the Corporation or any Subsidiary of the Corporation of any shares of Junior Stock, except for distributions or purchases paid exclusively in other Junior Stock.

"Special Differential" shall have the meaning ascribed to such term in Section 2(b)(ii).

"Special Dividend" shall have the meaning ascribed to such term in Section 2(a).

"Special Dividend Amount" shall have the meaning ascribed to such term in Section 2(a).

"Subsidiary" of any Person shall mean any corporation or other entity of which a majority of the voting power of the voting equity securities or equity interest is owned, directly or indirectly, by such Person.

"Target Face Amount" shall mean the sum of $200 million, in the aggregate with respect to all shares of Class D Special Dividend Preferred Stock.

"U.S. GAAP" shall mean United States Generally Accepted Accounting Principles.

"Voluntary Liquidation Event" shall have the meaning ascribed to such term in Section 7(a).

SECTION 9. PREEMPTIVE RIGHTS.

The holders of Class D Special Dividend Preferred Stock shall not be entitled to any preemptive or subscription rights in respect of any securities of the Corporation.

6. In the event of the liquidation, dissolution or winding up (whether voluntary or involuntary) of the Corporation, after payment to the holders of the 6% Preferred Stock, the Class A Preferred Stock, the Class B Preferred Stock, the Class C Preferred Stock and the Class D Preferred Stock of the amounts to which such holders shall be entitled, the remaining assets of the Corporation shall be distributed ratably to the holders of the Common Stock.

7. Except as may be otherwise required by the laws of the State of New York, in voting upon all questions each holder of capital stock of the Corporation shall be entitled to one hundred sixty votes for every share of 6% Preferred Stock, sixteen votes for every share of Class A Preferred Stock, sixteen votes for every share of Class B Preferred Stock, and one vote for every share of Common Stock held by such holder, and except as may be otherwise required by such laws, or specified by the Board of Directors with respect to any series of the Class C Preferred Stock, all shares of stock shall vote as a single class.

8. Before any stock authorized under this Certificate of Incorporation but unissued is otherwise offered for sale, it shall first be offered to the shareholders of the Corporation as follows: holders of 6% Preferred Stock, Class A Preferred Stock and Class B Preferred Stock shall have the right to take at par in proportion to their holdings all such additional 6% Preferred Stock; any increase in Class A Preferred Stock shall be offered

<PAGE>    457

B-8

at the issue price to the holders of Class A Preferred Stock and to the holders of Class B Preferred Stock in proportion to their holdings; any increase in Class B Preferred Stock shall be offered at the issue price to the holders of Class A Preferred Stock and to the holders of Class B Preferred Stock in proportion to their holdings. No holder of any class of capital stock shall be entitled as a matter of right to be offered any shares of Class C Preferred Stock, Class D Preferred Stock or Common Stock, or any options, warrants or rights to acquire Class C Preferred Stock, Class D Preferred Stock or Common

XXX-002176

Stock, or any securities convertible into Class C Preferred Stock, Class D
Preferred Stock or Common Stock, which the Corporation may propose to issue.

    IN WITNESS WHEREOF, we have signed this Certificate of Amendment on this
    day of        , 1996.

                                    ------------------------------------
                                    Name:
                                              President

                                    ------------------------------------
                                    Name:
                                              Secretary

                                    B-9

<PAGE>    458

                                                        APPENDIX C

            [LETTERHEAD OF MERRILL LYNCH]

                                                February 4, 1996

Board of Directors
W.R. Grace & Co.
One Town Center Rd.
Boca Raton, FL 33486-1010

Dear Sirs and Mesdames:

    We understand that W.R. Grace & Co. (the "Company") has entered into an
Agreement and Plan of Reorganization (the "Agreement") with Fresenius
Aktiengesellschaft ("Fresenius AG") and Fresenius USA, Inc. ("FUSA"), and the
Company, Fresenius AG and/or certain of their respective affiliates have entered
or will enter into certain related agreements, including a Contribution
Agreement (the "Contribution Agreement") by and between Fresenius AG, Fresenius
GmbH and W.R. Grace (Connecticut) Inc. ("Grace-CT"), and a Distribution
Agreement (the "Distribution Agreement") by and between the Company, Grace-CT
and Fresenius AG.

    Pursuant to these agreements, among other things: (i) Fresenius AG will
contribute its worldwide dialysis businesses, including its interest in FUSA
(collectively, "FWD"), to a subsidiary ("Newco") and FUSA will merge with a
subsidiary of Newco; (ii) National Medical Care, Inc., a wholly owned subsidiary
of Grace-CT ("NMC"), will retain or assume $2.263 billion of indebtedness and
will distribute all of its cash and marketable securities to Grace-CT
(collectively, the "Distribution"); (iii) Grace-CT will distribute to the
Company the stock of NMC, and the Company will distribute to the holders of
common stock of the Company all of the outstanding shares of capital stock of
Grace-CT; and (iv) a subsidiary of Newco will merge into the Company (the
"Merger"), pursuant to which the outstanding shares of common stock and common
stock equivalents of the Company will be converted into the right to receive
American Depositary Receipts (the "ADRs") representing 44.8% of the ordinary
shares of Newco. The transactions contemplated by the Merger Agreement, the
Contribution Agreement and the Distribution Agreement are collectively referred
to herein as the "Transactions."

    You have asked us to advise you with respect to the fairness to the holders
of the common stock of the Company, from a financial point of view, of the terms
of the Distribution and the Merger, taken together.

    In arriving at our opinion, we have:

        (i) reviewed the Company's Annual Reports, Forms 10-K and related
    financial information for the five fiscal years ended December 31, 1994 and
    the Company's Forms 10-Q and the related unaudited financial information
    for the quarterly periods ending March 31, 1995, June 30, 1995 and
    September 30, 1995;

        (ii) reviewed certain historical financial information with respect to
    NMC furnished to us by the Company and reviewed NMC's Form 10 filed with
    the SEC on September 25, 1995 which included audited financial information
    for the three fiscal years ended December 31, 1994 and unaudited financial
    information for the six month period ending June 30, 1995 and June 30,
    1994;

        (iii) reviewed certain historical financial information with respect
    to Fresenius AG and FWD furnished to us by Fresenius and reviewed FUSA's
    Annual Reports, Forms 10-K and related financial information for the five
    fiscal years ended December 31, 1994 and FUSA's Forms 10-Q and the related
    unaudited financial information for the quarterly periods ending March 31,
    1995, June 30, 1995 and September 30, 1995;

        (iv) reviewed certain information, including financial forecasts,
    relating to the business, earnings, cash flow, assets and prospects of NMC,
    FWD and FUSA, furnished to us by the Company, Fresenius

                                    C-1

<PAGE>    459

    AG and FUSA, including certain information with respect to potential
    synergies which may result from the Merger;

        (v) conducted discussions with members of senior management of the

Company and NMC, and with Fresenius AG and FUSA, with respect to the businesses, operations and prospects of NMC, FWD and FUSA, respectively;

(vi) compared the results of operations of NMC and FWD with those of certain other companies which we deemed to be reasonably similar to NMC and FWD;

(vii) considered certain terms of the documents which govern the rights of stockholders of Newco, including certain governance provisions applicable to Fresenius AG and Newco;

(viii) compared the proposed financial terms of the Transactions with the financial terms of certain other mergers and acquisitions which we deemed relevant;

(ix) reviewed the financial terms and conditions of the proposed forms of the Agreement, the Contribution Agreement and the Distribution Agreement;

(x) reviewed the terms of the letter from Baxter International Inc. ("Baxter") to the Company dated January 31, 1996, setting forth a proposal for the acquisition by Baxter of NMC; and

(xi) reviewed such other financial studies and analyses and performed such other investigations and took into account such other matters as we deemed necessary.

In preparing our opinion, we have relied on the accuracy and completeness of all information supplied or otherwise made available to us by the Company and Fresenius AG, and we have not independently verified such information or undertaken an independent appraisal of the assets of the Company or FWD. With respect to the financial forecasts furnished by the Company and Fresenius AG, we have assumed that they have been reasonably prepared and reflect the best currently available estimates and judgment of the Company's and NMC's or Fresenius AG's management as to the expected future financial performance of the Company, NMC or FWD, as the case may be. We have also relied upon the views of the Company's and Fresenius AG's managements concerning the business, operational and strategic benefits and implications of the Merger, including financial forecasts provided to us by the Company and Fresenius AG relating to synergistic benefits to FWD and NMC. Our opinion is necessarily based upon financial, economic, market and other conditions as they exist and can be evaluated on the date hereof. We are not expressing any opinion as to what the value of the ADRs actually will be when issued to the Company's stockholders pursuant to the Merger or the prices at which the ADRs will trade subsequent to Merger. In addition, we understand that NMC is the target of certain governmental and regulatory investigations relating to the conduct of its business, which may result in substantial liabilities and obligations being incurred by NMC in the future, the amount of which management of the Company is presently unable to predict. We also understand that the financial statements, pro forma financial statements and registration statement of Newco have not yet been prepared.

We have assumed, with your consent, that the Transactions will comply with applicable United States, foreign, federal and state laws, including, without limitation, laws relating to the payment of dividends, bankruptcy, insolvency, reorganization, fraudulent conveyance, fraudulent transfer or other similar laws now or hereafter in effect affecting creditors' rights generally. We have assumed, with your consent, that receipt of the ADRs will be tax-free for federal income tax purposes to the stockholders of the Company and that none of the Company, NMC, FWD, FUSA and Newco will recognize income, gain or loss as a result of the Transactions. In addition, we have assumed, with your consent, that Grace-CT and Fresenius AG will perform their respective indemnification obligations which may arise under the Distribution Agreement and the Contribution Agreement in accordance with their respective terms.

We have acted as financial advisor to the Company in connection with the Transactions and certain other past and current transactions and will receive a fee for our services in connection with the Transactions, a significant portion of which is contingent upon the consummation of the Transactions.

C-2

<PAGE>   460

In the ordinary course of our business, Merrill Lynch and its affiliates may actively trade the debt and equity securities of the Company and Fresenius AG for their own account and for the accounts of customers and, accordingly, may at any time hold a long or short position in such securities.

It is understood that this letter is for the information of the Board of Directors of the Company in connection with its consideration of the Transactions, does not constitute a recommendation to any stockholder as to how such stockholder should vote on the Merger, and is not to be quoted or referred to, in whole or in part, in any registration statement, prospectus or proxy statement, or in any other document used in connection with the offering or sale of securities, nor shall this letter be used for any other purposes, without Merrill Lynch's prior written consent.

Based upon and subject to the foregoing, it is our opinion that, as of the date hereof, the terms of the Distribution and the Merger, taken together, are fair, from a financial point of view, to the holders of the common stock of the Company.

Very truly yours,

MERRILL LYNCH, PIERCE,
FENNER & SMITH INCORPORATED

By: /s/ Douglas W. Squires
--------------------------------------
Managing Director
Investment Banking

C-3

<PAGE>    461

[LETTERHEAD OF CS FIRST BOSTON]

February 4, 1996

Board of Directors
W. R. Grace & Co.
One Town Center Rd.
Boca Raton, FL 33486-1010

Dear Sirs and Mesdames:

        We understand that W. R. Grace & Co. (the "Company") has entered into an
Agreement and Plan of Reorganization (the "Agreement") with Fresenius
Aktiengesellschaft ("Fresenius AG") and Fresenius USA, Inc. ("FUSA"), and the
Company, Fresenius AG and/or certain of their respective affiliates have entered
or will enter into certain related agreements, including a Contribution
Agreement (the "Contribution Agreement") by and between Fresenius AG, Fresenius
GmbH and W.R. Grace (Connecticut) Inc. ("Grace-CT"), and a Distribution
Agreement (the "Distribution Agreement") by and between the Company, Grace-CT
and Fresenius AG.

        Pursuant to these agreements, among other things: Fresenius AG will
contribute its worldwide dialysis businesses, including its interest in FUSA
(collectively, "FWD"), to a subsidiary ("Newco") and FUSA will merge with a
subsidiary of Newco; (ii) National Medical Care, Inc., a wholly owned subsidiary
of Grace-CT ("NMC"), will retain or assume $2.263 billion of indebtedness and
will distribute all of its cash and marketable securities to Grace-CT
(collectively, the "Distribution"); (iii) Grace-CT will distribute to the
Company the stock of NMC, and the Company will distribute to the holders of
common stock of the Company all of the outstanding shares of capital stock of
Grace-CT; and (iv) a subsidiary of Newco will merge into the Company (the
"Merger"), pursuant to which the outstanding shares of common stock and common
stock equivalents of the Company will be converted into the right to receive
American Depositary Receipts (the "ADRs") representing 44.8% of the ordinary
shares of Newco. The transactions contemplated by the Agreement, the
Contribution Agreement and the Distribution Agreement are collectively referred
to herein as the "Transactions."

        You have asked us to advise you with respect to the fairness to the holders
of the common stock of the Company, from a financial point of view, of the terms
of the Distribution and the Merger, taken together.

        In arriving at our opinion, we have reviewed certain publicly available
business and financial information relating to the Company, NMC and FWD, as well
as the Agreement, the Contribution Agreement and the Distribution Agreement. We
have also reviewed certain other information, including financial forecasts and
certain information with respect to potential synergies which may result from
the Merger, provided to us by the Company and Fresenius AG, and have met with
management of the Company, Fresenius AG and FUSA to discuss the business and
prospects of NMC, FWD and FUSA.

        We have also considered certain financial data of NMC, FWD and FUSA and we
have compared that data with similar data for other publicly held companies in
businesses similar to those of NMC, FWD and FUSA and we have considered the
financial terms of certain other business combinations and other transactions.
We have also considered such other information, financial studies, analyses and
investigations and financial, economic and market criteria which we deemed
relevant.

        In connection with our review, we have not assumed any responsibility for
independent verification of any of the foregoing information and have relied on
its being complete and accurate in all material respects. With respect to the
financial forecasts, we have assumed that they have been reasonable prepared on
bases reflecting the best currently available estimates and judgments of the
Company's and Fresenius AG's managements as to the future financial performance
of NMC and FWD. We have also relied upon the views of the Company's and
Fresenius AG's managements concerning the business, operational and strategic
benefits and implications of the Merger, including financial forecasts provided
to us by the Company and Fresenius AG relating to synergistic benefits to FWD
and NMC. We have not made an independent evaluation or appraisal of the assets
or liabilities (contingent or otherwise) of NMC or FWD, nor have we been
furnished with any such evaluations or appraisals. Our opinion is necessarily
based upon financial, economic, market and other

C-4

<PAGE>    462

conditions as they exist and can be evaluated on the date hereof. We are not
expressing any opinion as to what the value of the ADRs actually will be when
issued to the Company's stockholders pursuant to the Merger or the prices at
which the ADRs will trade subsequent to Merger. In addition, we understand that
NMC is the target of certain governmental and regulatory investigations relating
to the conduct of its business, which may result in substantial liabilities and

XXX-002179

obligations being incurred by NMC in the future, the amount of which management
of the Company is presently unable to predict. We also understand that the
financial statements, pro forma financial statements and registration statement
of Newco have not yet been prepared.

We have assumed, with your consent that the Transactions will Comply with
applicable United States, foreign, federal and state laws, including, without
limitation, laws relating to the payment of dividends, bankruptcy, insolvency,
reorganization, fraudulent conveyance, fraudulent transfer or other similar laws
now or hereafter in effect affecting creditors' rights generally. We have
assumed, with your consent, that receipt of the ADRs will be tax-free for
federal income tax purposes to the stockholders of the Company and that none of
the Company, NMC, FWD, FUSA and Newco will recognize income, gain or loss as a
result of the Transactions. In addition, we have assumed, with your consent,
that Grace-CT and Fresenius AG will perform their respective indemnification
obligations which may arise under the Distribution Agreement and the
Contribution Agreement in accordance with their respective terms.

We have acted as financial advisor to the Company in connection with the
Transactions and will receive a fee for our services, a significant portion of
which is contingent upon the consummation of the Transactions.

In the ordinary course of our business, CS First Boston and its affiliates
may actively trade the debt and equity securities of the Company and Fresenius
AG for their own account and for the accounts of customers and, accordingly, may
at any time hold a long or short position in such securities.

It is understood that this letter is for the information of the Board of
Directors of the Company in connection with its consideration of the
Transactions, does not constitute a recommendation to any stockholder as to how
such stockholder should vote on the Merger, and is not to be quoted or referred
to, in whole or in part, in any registration statement, prospectus or proxy
statement, or in any other document used in connection with the offering or sale
of securities, nor shall this letter be used for any other purposes, without CS
First Boston's prior written consent.

Based upon and subject to the foregoing, it is our opinion that, as of the
date hereof, the terms of the Distribution and the Merger, taken together, are
fair, from a financial point of view, to the holders of the common stock of the
Company.

                              Very truly yours,

                              CS FIRST BOSTON CORPORATION

                              By: /s/  Charles H. Thomas
                                 ------------------------------

                              C-5
<PAGE>    463

                                                              APPENDIX D

               [LETTERHEAD OF SALOMON BROTHERS INC]

                                                              May 8, 1996

Independent Committee of the Board of Directors
Fresenius USA, Inc.
2637 Shadelands Drive
Walnut Creek, California 94598

Members of the Independent Committee:

You have requested our opinion as investment bankers as to the fairness,
from a financial point of view, to the holders (other than Fresenius AG and W.
R. Grace & Co. and their subsidiaries) of shares of common stock, par value
$0.01 per share (the "Company Common Stock"), of Fresenius USA, Inc., a
Massachusetts corporation (the "Company"), of the exchange ratio (the "Fresenius
USA Public Stockholder Exchange Ratio") of 0.37067735 ordinary shares, nominal
value DM 5 per share (the "FMC Ordinary Shares") of Fresenius Medical Care AG
("Fresenius Medical Care"), to be represented by American Depositary Shares (the
"FMC ADSs"), for each share of Company Common Stock, pursuant to the Agreement
and Plan of Reorganization the "Reorganization Agreement") dated as of February
4, 1996, between W. R. Grace & Co. ("Grace") and Fresenius AG ("Fresenius"), and
the proposed letter agreement between Fresenius, Grace and the Company to be
dated May 8, 1996 and the proposed agreement between Fresenius and the Company
to be dated May 8, 1996, which set forth the Fresenius USA Public Stockholder
Exchange Ratio and the number of FMC Ordinary Shares that will be outstanding
following the Reorganization (together, the "Exchange Ratio Agreements").
Pursuant to the Reorganization Agreement, among other things, (i) Fresenius, the
owner of a majority of the fully diluted shares of Common Stock will
contribute (the "Contribution") all shares of Company Common Stock, warrants on
Company Common Stock and (unless theretofore converted into Company Common
Stock) shares of preferred stock of the Company it owns and the remainder of its
worldwide dialysis business ("FWD") to Fresenius Medical Care pursuant to the
Contribution Agreement (the "Contribution Agreement") attached as an exhibit to
the Reorganization Agreement, (ii) pursuant to a Distribution Agreement (the
"Distribution Agreement") attached as an exhibit to the Reorganization
Agreement, National Medical Care, Inc. ("NMC"), a wholly-owned subsidiary of W.
R. Grace (Connecticut) Inc. ("Grace-CT"), which is itself a wholly-owned
subsidiary of Grace, will borrow or otherwise assume approximately $2.3 billion
of indebtedness, and will distribute all of its cash and marketable securities

XXX-002180

to Grace-CT, Grace-CT will distribute to Grace all of the stock of NMC, and Grace will distribute to its stockholders all of the outstanding stock of Grace-CT (with Grace-CT or its subsidiaries holding all of the assets, and having retained or assumed all of the liabilities, of Grace and its subsidiaries other than the assets and liabilities of NMC and its subsidiaries) (collectively, the "Spin-Off Transactions"), (iii) subsequent to the Spin-Off Transactions, Grace will be recapitalized (the "Recapitalization") and each holder of common stock, $1.00 par value per share, of Grace (the "Grace Common Stock") will receive shares of a new series of Grace preferred stock (the "Grace New Preferred Shares"), (iv) subsequent to the Spin-Off Transactions and the Recapitalization, a wholly-owned subsidiary of Fresenius Medical Care will merge with and into Grace (the "Grace Merger"), and (v) pursuant to the Reorganization Agreement and the Exchange Ratio Agreements, and subsequent to the Spin-Off Transactions and the Recapitalization, a wholly-owned subsidiary of Fresenius Medical Care will merge (the "Merger") with and into the Company (collectively, the "Proposed Transactions"). In the Merger, each outstanding share of Company Common Stock (other than shares owned by Fresenius or Grace and their subsidiaries and shares as to which appraisal rights are exercised) will be exchanged for FMC Ordinary Shares at the Fresenius USA Public Stockholder Exchange Ratio (except that cash will be paid in lieu of fractional shares). Prior to the Merger, as contemplated by the Exchange Ratio Agreements, approximately 1.4 million of the Company's outstanding employee options will be canceled in exchange for a combination of cash and promissory notes of the Company in an aggregate amount of approximately $14 million. In the Grace Merger (a) each outstanding share of Grace Common Stock (other than shares as to which appraisal rights are exercised) will be exchanged for FMC Ordinary Shares as determined pursuant to the Reorganization Agreement and (b) all

<center>D-1</center>

<PAGE>    464

outstanding shares of Grace preferred stock (including the Grace New Preferred Shares) will remain outstanding. Pursuant to the Contribution Agreement and the Exchange Ratio Agreements, in consideration of the Contribution, Fresenius will receive FMC Ordinary Shares representing not less than 50.3% of the FMC Ordinary Shares that will be outstanding on a fully diluted basis immediately following the Proposed Transactions. We have assumed, with your consent, that pursuant to the Reorganization Agreement, immediately after the consummation of the Proposed Transactions there will be 70,000,000 outstanding FMC Ordinary Shares on a fully diluted basis, resulting in the Fresenius USA public stockholders owning an aggregate of 4.9% of the FMC Ordinary Shares outstanding on a fully diluted basis immediately following the Proposed Transactions. We have assumed that immediately prior to the Fresenius USA Merger, there will be outstanding no more than 9,253,331 Fresenius USA Common Share Equivalents (as defined in the Reorganization Agreement) as required by the Exchange Ratio Agreements.

As you are aware, Salomon Brothers Inc has acted as financial advisor to a committee of the Company's independent directors (the "Independent Committee") in connection with the Proposed Transactions and will receive a fee for our services. We have provided and continue to provide financial advisory and investment banking services to Grace, for which we have received and expect to receive customary compensation. In addition, in the ordinary course of our business, we (or our affiliates) may actively trade the securities of the Company, Grace and Fresenius for our own account and for the accounts of customers and, accordingly, may at any time hold a long or short position in such securities.

In connection with rendering our opinion, we have reviewed and analyzed, among other things, the following: (i) the Reorganization Agreement, the Distribution Agreement and the Contribution Agreement; (ii) the proposed forms of the Exchange Ratio Agreements; (iii) a draft, dated May 7, 1996, of the Joint Proxy Statement-Prospectus relating to the Proposed Transactions; (iv) certain publicly available information concerning the Company, Grace, NMC and Fresenius; (v) certain pro forma financial and other information concerning FWD furnished to us by Fresenius; (vi) certain other internal information, primarily financial in nature, including projections, concerning the business and operations of each of the Company, NMC and FWD furnished to us by the respective companies; (vii) certain estimates of anticipated synergies furnished to us by the Company, NMC, Grace and Fresenius; (viii) certain publicly available information concerning the trading of, and the trading market for, the Company Common Stock, Grace Common Stock and Fresenius Ordinary Shares; (ix) certain publicly available information with respect to certain other companies that we believe to be comparable to the Company, NMC or FWD and the trading markets for certain of such other companies' securities; and (x) certain publicly available information concerning the nature and terms of certain other transactions that we consider relevant to our inquiry. We have also considered such other information, financial studies, analyses, and financial, economic and market criteria as we have deemed relevant. We have also met with certain officers, employees and representatives of the Company, NMC, FWD, Grace and Fresenius, to discuss the foregoing as well as other matters we believe relevant to our inquiry.

In our review and analysis and in arriving at our opinion, we have assumed and relied upon the accuracy and completeness of all of the financial and other information provided us or publicly available and have not assumed responsibility for verifying any of such information. We have not made or obtained, or assumed any responsibility for making or obtaining, any independent evaluations or appraisals of any of the properties or facilities of the Company, NMC or FWD. With respect to the projections as to the future financial performances of the Company, NMC and FWD and the estimates of synergies for Fresenius Medical Care, we have assumed that they have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the managements of the Company, NMC and FWD, and we express no view with respect to such projections or estimates or the assumptions on which they were based.

XXX-002181

In conducting our analysis and arriving at our opinion as expressed herein, we have considered such financial and other factors as we have deemed appropriate under the circumstances including, among others, the following: (i) the historical and current financial position and results of operations of the Company, NMC and FWD; (ii) the business prospects of the Company, NMC, FWD and Fresenius Medical Care; (iii) the historical and current market for the Company Common Stock and for the equity securities of certain other companies that we believe to be comparable to the Company, FWD, NMC or Fresenius Medical Care; and

D-2

<PAGE> 465

(iv) the nature and terms of certain other transactions that we believe to be relevant. We have also taken into account our assessment of general economic, market and financial conditions as well as our experience in connection with similar transactions and securities valuation generally. As you know, Fresenius owns a majority of the fully-diluted outstanding shares of the Company Common Stock and, pursuant to the Reorganization Agreement, was prohibited from selling such shares. Accordingly, we were not authorized to, and we did not, solicit potential third parties that might have been interested in acquiring the Company.

We understand that NMC is the target of certain governmental and regulatory investigations relating to the conduct of its business, which may result in substantial liabilities and obligations being incurred by NMC in the future. While we have participated with you in discussions by your special counsel with respect to the potential outcome thereof, it is not possible to predict that outcome and we express no view with respect thereto although, in conducting our analysis and rendering our opinion we have, with your consent, made certain assumptions with respect thereto.

In addition, in rendering our opinion we have assumed, with your consent, that the Merger will qualify as a tax-free transaction under Section 351 of the Internal Revenue Code of 1986, as amended (the "Code") and that the Spin-Off Transactions will qualify as a tax-free distribution under Section 355 of the Code. We have also assumed, with your consent, that following the Spin-Off Transactions Grace will have no material liabilities other than the liabilities of NMC. We have also assumed, with your consent, that Grace-CT and Fresenius will perform their respective obligations (including indemnification obligations) under the Distribution Agreement and the Contribution Agreement in accordance with their respective terms. Furthermore, we have assumed, with your consent, that none of the Proposed Transactions will constitute a fraudulent conveyance or fraudulent transfer under any applicable law and that the Proposed Transactions will comply with all applicable United States, foreign, federal and state laws, including, without limitation, laws limiting payments of dividends and distributions to stockholders.

Our opinion necessarily is based upon conditions as they exist and can be evaluated on the date hereof and we assume no responsibility to update or revise our opinion based upon circumstances or events occurring after the date hereof. Our opinion is, in any event, limited to the fairness, from a financial point of view, of the Fresenius USA Public Stockholder Exchange Ratio to the holders of the Company Common Stock (other than Fresenius and Grace and their subsidiaries) in the Proposed Transactions and does not address the Company's underlying business decision to effect the Proposed Transactions or constitute a recommendation to any holder of Company Common Stock as to how such holder should vote with respect to the Merger.

Based upon and subject to the foregoing, we are of the opinion as investment bankers that, as of the date hereof, the Fresenius USA Public Stockholder Exchange Ratio is fair, from a financial point of view, to the holders of Common Stock of the Company (other than Fresenius and Grace and their subsidiaries).

Very truly yours,

SALOMON BROTHERS INC

D-3

<PAGE> 466

APPENDIX E

FRESENIUS USA, INC.

1987 STOCK OPTION PLAN

1. PURPOSE

The purpose of this 1987 Stock Plan (the "Plan") is to advance the interests of Fresenius USA, Inc. (the "Company") by enhancing the ability of the Company (a) to attract and retain employees who are in a position to make significant contributions to the success of the Company; (b) to reward employees for such contributions; and (c) to encourage employees to take into account the long-term interests of the Company through ownership of shares of the Company's Common Stock (the "Stock").

Options granted pursuant to the Plan may be incentive stock options as defined in section 422 of the Internal Revenue Code of 1986 (as it may from time to time be amended) (the "Code") (any option that is intended so to qualify as an incentive stock option being referred to herein as an "incentive option"), or options that are not incentive options, or both.

2. ADMINISTRATIVE

The Plan shall be administered by the Board of Directors of the Company (the "Board").

The Board may, in its discretion, delegate its powers with respect to the Plan to a committee (the "Committee"), in which event all references herein to the Board shall be deemed to be references to the Committee. The Committee shall consist of at least three Directors. A majority of the members of the Committee shall constitute a quorum, and all determinations of the Committee shall be made by a majority of its members. Any determination of the Committee shall be made by a majority of its members. Any determination of the Committee under the Plan may be made without notice or meeting of the Committee by a writing signed by a majority of the Committee members. All members of the Committee shall be disinterested persons within the meaning of Rule 16b-3 under the Act.

The Board shall have authority, not inconsistent with the express provisions of the Plan, (a) to grant options to such eligible employees as the Board may select; (b) to determine the time or times when options shall be granted and the number of shares of Stock subject to each option; (c) to determine which options are, and which options are not, incentive options; (d) to determine the terms and conditions of each option; (e) to prescribe the form or forms of instruments evidencing options and any other instruments required under the Plan and to change such forms from time to time; (f) to adopt, amend and rescind rules and regulations for the administration of the Plan; and (g) to interpret the Plan and to decide any questions and settle all controversies and disputes that may arise in connection with the Plan. Subject to Section 8 the Board shall also have the authority, both generally and in particular instances, to waive compliance by an employee with any obligation to be performed by him under an option and to waive any condition or provision of an option, except that the Board may not take any action with respect to an outstanding award that would adversely affect the rights of a participant under such award without such participants consent. Nothing in the preceding sentence shall be construed as limiting the power of the Board to make adjustments required by Section 4(c).

3. EFFECTIVE DATE AND TERM OF PLAN

The Plan shall become effective on the date on which the Plan is approved by the shareholders of the Company. Grants of options under the Plan may be made prior to that date (but after adoption of the Plan by the Board of Directors), subject to approval of the Plan by such shareholders.

No option shall be granted under the Plan after the completion of ten years from the date on which the Plan was adopted by the Board of Directors, but options previously granted may extend beyond that date.

E-1

<PAGE>   467

4. SHARES SUBJECT TO THE PLAN

(a) Number of Shares; Maximum Number of Options.  Subject to adjustment as provided in Section 4(c), the maximum aggregate number of shares of Stock that may be delivered upon the exercise of options granted under the Plan shall be 2,000,000. If any option granted under the Plan terminates without having been exercised in full, the number of shares of Stock as to which such option was not exercised shall be available for future grants within the limits set forth in this Section 4(a).

Subject to adjustment as provided in Section 4(c), the maximum number of shares for which options may be granted under the Plan to any one individual over the period beginning on the date of the shareholder meeting held in 1996 and ending on the last day, determined under Section 3 above, on which options may be granted under the Plan is 1,000,000. For purposes of the preceding sentence, the repricing of an option shall be treated as an additional grant. Solely for purposes of applying the 1,000,000 share option-grant limit described in this paragraph, the grant of options made subject to approval by the shareholders and approved by the shareholders at the meeting held in 1996 shall be treated as subject to such limit.

(b) Shares to be Delivered.  Shares delivered under the Plan shall be authorized but unissued Stock or, if the Board so decides in its sole discretion, previously issued Stock acquired by the Company and held in treasury. No fractional shares of Stock shall be delivered under the Plan.

(c) Changes in Stock.  In the event of a stock dividend, stock split or combination of shares, recapitalization or other change in the company's capital stock, the number and kind of shares of stock or securities of the Company subject to options then outstanding or subsequently granted under the Plan, the maximum number of shares or securities that may be delivered under the Plan, the exercise price, and other relevant provisions shall be approximately adjusted by the Board, whose determination shall be binding on all persons.

The Board may also adjust the number of shares subject to outstanding options, the exercise price of outstanding options and the terms of outstanding options, to take into consideration material changes in accounting practices or principles, consolidations or mergers, acquisitions or dispositions of stock or property or any other event if it is determined by the Board that such adjustment is appropriate to avoid distortion in the operation of the Plan, provided that no such adjustment shall be made in the case of an incentive option, without the consent of the participant, if it would constitute a modification, extension or renewal of the option within the meaning of section 424(h) of the Code, and further provided that no such adjustment shall affect the maximum per-individual grant limitation set forth in the second paragraph of Section 4(a) except to the extent consistent with continued qualification of

XXX-002183

awards under the Plan for the performance-based compensation exception under
section 162(m) of the Code.

    (d) Replacement Options.  The Board may grant options under the Plan in
substitution for options held by employees of another corporation who
concurrently become employees of the Company or a subsidiary as the result of a
merger or consolidation of the employing corporation with the Company or a
subsidiary or the acquisition by the Company or a subsidiary of property or
stock of the employing corporation. The Board may direct that the replacement
options be granted on such terms and conditions as the Board considers
appropriate in the circumstances.

5.  ELIGIBILITY FOR OPTIONS

    Employees eligible to receive options under the Plan shall be those key
employees of the Company and its subsidiaries who, in the opinion of the Board,
are in a position to make a significant contribution to the success of the
Company or such subsidiaries. A subsidiary for the purpose of the Plan shall be
a corporation in which the Company owns, directly or indirectly, stock
possessing 50% or more of the total combined voting power of all classes of
stock.

    Directors who are not employees shall not be eligible to participate in the
Plan. Incentive options shall be granted only to "employees" as defined in the
provisions of the code or regulations thereunder applicable to incentive stock
options. Receipt of options under the Plan or of awards under any other employee
benefit plan

                                    E-2

<PAGE>    468

of the Company or any of its subsidiaries shall not preclude an employee from
receiving options or additional options under the Plan.

6.  TERMS AND CONDITIONS OF OPTIONS

    (a) Exercise Price.  The exercise price of each option shall be determined
by the Board but in the case of an incentive option shall not be less than 100%
(110%, in the case of an incentive option granted to a ten-percent shareholder)
of the fair market value per share of the Stock at the time the incentive option
is granted; nor shall the exercise price of any option be less, in the case of
an original issue of authorized stock, than par value per share. For this
purpose, "Fair market value" in the case of incentive options shall have the
same meaning as it does in the provisions of the Code and the regulations
thereunder applicable to incentive options; and "ten-percent shareholder" shall
mean any employee who at the time of grant owns directly, or is deemed to own by
reason of the attribution rules set forth in section 424(d) of the Code, stock
possessing more than 10% of the total combined voting power of all classes of
stock of the Company or of any of its parent or subsidiary corporations.

    (b) Duration of Options.  In no case shall an option be exercisable more
than ten years (five years, in the case of an incentive option granted to a
"ten-percent shareholder" as defined in (a) above) from the date the option was
granted.

    (c) Exercise of Options.

        (1) Each option shall be made exercisable at such time or times,
whether or not in installments, as the Board shall prescribe at the time an
option is granted. In the case of an option not immediately exercisable in
full, the Board may at any time accelerate the time at which all or any
part of the option may be exercised.

        (2) The award forms or other instruments evidencing incentive options
shall contain such provisions relating to exercise and other matters as are
required of incentive options under the applicable provisions of the Code
and the regulations thereunder, as from time to time in effect.

        (3) Any exercise of an option shall be in writing, signed by the
proper person and delivered or mailed to the Company, accompanied by (a)
the option certificate and any other documents required by the Board and
(b) payment in full for the number of shares for which the option is
exercised.

        (4) In the case of an option that is not an incentive option, the
Board shall have the right to require that the individual exercising the
option remit to the Company an amount sufficient to satisfy any federal,
state, or local withholding tax requirements (or make other arrangements
satisfactory to the Company with regard to such taxes) prior to the
delivery of any Stock pursuant to the exercise of the option. In the case
of an incentive option, if at the time the option is exercised the Board
determines that under applicable law and regulations the company could be
liable for the withholding of any federal or state tax with respect to a
disposition of the Stock received upon exercise, the Board may require as a
condition of exercise that the individual exercising the option agree (i)
to inform the company promptly of any disposition (within the meaning of
section 424(c) of the Code and the regulations thereunder) of Stock
received upon exercise, and (ii) to give such security as the Board deems
adequate to meet the potential liability of the Company for the withholding
of tax, and to augment such security from time to time in any amount
reasonably deemed necessary by the Committee to preserve the adequacy of
such security.

        (5) If an option is exercised by the executor or administrator of a

deceased employee, or by the person or persons to whom the option has been transferred by the employee's will or the applicable laws of descent and distribution, the Company shall be under no obligation to deliver Stock pursuant to such exercise until the Company is satisfied as to the authority of the person or persons exercising the option.

(d) Payment for and Delivery of Stock.  Stock purchased under the Plan shall be paid for as follows: (i) in cash or by certified check, bank draft or money order payable to the order of the Company or (ii) if so permitted by the terms of the option, (A) through the delivery of shares of Stock having a fair market value on the last business day preceding the date or exercise equal to the purchase price or (B) by a combination of

E-3

<PAGE>   469

cash and Stock as provided in clauses (i) and (ii)(A) above or (iii) if so permitted by the terms of the option, by delivery of a promissory note of the employee containing such terms and conditions, including without limitation interest rate and maturity, as the Board may specify in the option (except that the option may provide that the rate of interest on the note will be such rate as is sufficient at all times to avoid the imputation of any interest under the applicable provisions of the Code), or by a combination of cash (or cash and Stock) and such a promissory note; provided, that if the Stock delivered upon exercise of the option is an original issue or authorized Stock, at least so much of the exercise price as represents the par value of such Stock shall be paid in cash or by a combination of cash and Stock.

An option holder shall not have the rights of a shareholder with regard to awards under the Plan except as to Stock actually received by him under the Plan.

The Company shall not be obligated to deliver any shares of Stock (a) until, in the opinion of the Company's counsel, all applicable federal and state laws and regulations have been complied with, and (b) if the outstanding Stock is at the time listed on any stock exchange, until the shares to be delivered have been listed or authorized to be listed on such exchange upon official notice of issuance, and (c) until all other legal matters in connection with the issuance and delivery of such shares have been approved by the Company's counsel. If the sale of Stock has not been registered under the Securities Act of 1933, as amended, the Company may require, as a condition to exercise of the option, such representations or agreements as counsel for the Company may consider appropriate to avoid violation of such Act and may require that the certificates evidencing such Stock bear an appropriate legend restricting transfer.

(e) Nontransferability of Options.  No option may be transferred other than by will or by the laws of descent and distribution, and during an employee's lifetime an option may be exercised only by him.

(f) Death.  If an employee's employment with the Company and its subsidiaries terminates for any reason other than death, all options held by the employee that are not then exercisable shall terminate. Options that are exercisable on the date of termination shall continue to be exercisable for a period of three months (subject to Section 6(b)) unless the employee was discharged for cause which in the opinion of the Board casts such discredit on him as to justify termination of his options. After completion of that three-month period such options shall terminate to the extent not considered terminated (i) in the case of sick leave or other bona fide leave of absence approved for purposes of the Plan by the Board, so long as the employee's right to reemployment is guaranteed either by statute or by contract, or (ii) in the case of a transfer of employment between the Company and a subsidiary or between subsidiaries, or to the employment of a corporation (or a parent or subsidiary corporation of such corporation) issuing or assuming an option in a transaction to which section 424(a) of the Code applies.

(g) Other Termination of Employment.  If an employee's employment with the Company and its subsidiaries terminates for any reason other than death, all options held by the employee that are not then exercisable shall terminate. Options that are exercisable on the date of termination shall continue to be exercisable for a period of three months (subject to Section 6(b) unless the employee was discharged for cause which in the opinion of the Board casts such discredit on him as to justify termination of his options. After completion of that three-month period such options shall terminate to the extent not previously exercised, expired or terminated. For purposes of this Section 6(g), employment shall not be considered terminated (i) in the case of sick leave or other bona fide leave of absence approved for purposes of the Plan by the Board, so long as the employee's right to reemployment is guaranteed either by statute or by contract, or (ii) in the case of a transfer of employment between the Company and a subsidiary or between subsidiaries, or to the employment of a corporation (or a parent or subsidiary corporation of such corporation) issuing or assuming an option in a transaction to which Section 424(a) of the Code applies.

7.  EMPLOYMENT RIGHTS

Neither the adoption of the Plan nor the grant of options shall confer upon any employee any right to continued employment with the Company or any parent or subsidiary or affect in any way the right of the company or parent or subsidiary to terminate the employment of an employee at any time. Except as specifically provided by the Board in any particular case, the loss of existing or potential profit in options

E-4

XXX-002185

<PAGE>    470

granted under this Plan shall not constitute an element of damages in the event
of termination of the employment of an employee even if the termination is in
violation of an obligation of the Company to the employee by contract or
otherwise.

8. EFFECTS OF DISCONTINUANCE, CANCELLATION, AMENDMENT AND TERMINATION

    Neither adoption of the Plan nor the grant of options to an employee shall
affect the Company's right to grant to such employee options that are not
subject to the Plan, to issue to such employees Stock as a bonus or otherwise,
or to adopt other plans or arrangements under which Stock may be issued to
employees.

    The Board may at any time discontinue granting options under the Plan. With
the consent of the employee, the Board may at any time cancel an existing option
in whole or in part and grant the employee another option for such number of
shares as the Board specifies. The Board may at any time or times amend the Plan
for the purpose of satisfying the requirements of section 422 of the Code or of
any changes in applicable laws or regulations and the Board of Directors may
amend the Plan for any other purpose which may at the time be permitted by law
or may at any time terminate the Plan as to any further grants of options,
provided that (except to the extent expressly required or permitted herein
above) no such amendment shall, without the approval of the shareholders of the
Company, (a) increase the maximum number of shares available under the Plan, (b)
change the group of employees eligible to receive options under the Plan, (c)
reduce the price at which incentive options may be granted, (d) extend the time
within which options may be granted, (e) alter the Plan in such a way that
incentive options already granted hereunder would not be considered incentive
stock options under section 422 of the Code, or (f) amend the provisions of this
Section 8, and no such amendment shall adversely affect the rights of any
employee (without his consent) under an option previously granted.

                                    E-5

<PAGE>    471

                                                                    APPENDIX F

    910 RIGHT OF SHAREHOLDER TO RECEIVE PAYMENT FOR SHARES UPON MERGER OR
CONSOLIDATION, OR SALE, LEASE, EXCHANGE OR OTHER DISPOSITION OF ASSETS, OR SHARE
EXCHANGE. -- (a) A shareholder of a domestic corporation shall, subject to and
by complying with section 623 (Procedure to enforce shareholder's right to
receive payment for shares), have the right to receive payment of the fair value
of his shares and the other rights and benefit provided by such section, in the
following cases:

        (1) Any shareholder entitled to vote who does not assent to the taking
of an action specified in subparagraphs (A), (B) and (C).

        (A) Any plan of merger or consolidation to which the corporation is
    a party; except that the right to receive payment of the fair value of
    his shares shall not be available:

            (i) To a shareholder of the parent corporation in a merger
        authorized by section 905 (Merger of parent and subsidiary
        corporations), or paragraph (c) of section 907 (Merger or
        consolidation of domestic and foreign corporations); and

            (ii) To a shareholder of the surviving corporation in a merger
        authorized by this article, other than a merger specified in
        subparagraph (i), unless such merger effects one or more of the
        changes specified in subparagraph (b)(6) of section 806 (Provisions
        as to certain proceedings) in the rights of the shares held by such
        shareholder.

        (B) Any sale, lease, exchange or other disposition of all or
    substantially all of the assets of a corporation which requires
    shareholder approval under section 909 (Sale, lease, exchange or other
    disposition of assets) other than a transaction wholly for cash where
    the shareholders' approval thereof is conditioned upon the dissolution
    of the corporation and the distribution of substantially all its net
    assets to the shareholders in accordance with their respective interests
    within one year after the date of such transaction.

        (C) Any share exchange authorized by section 913 in which the
    corporation is participating as a subject corporation; except that the
    right to receive payment of the fair value of his shares shall not be
    available to a shareholder whose shares have not been acquired in the
    exchange.

    (2) Any shareholder of the subsidiary corporation in a merger
authorized by section 905 or paragraph (c) of section 907, or in a share
exchange authorized by paragraph (g) of section 913, who files with the
corporation a written notice of election to dissent as provided in
paragraph (c) of section 623. (Last amended by Ch. 390, L.'91, eff.
7-15-91.)

                                    F-1

<PAGE>    472

    623 PROCEDURE TO ENFORCE SHAREHOLDER'S RIGHT TO RECEIVE PAYMENT FOR SHARES.
- -- (a) A shareholder intending to enforce his right under a section of this
chapter to receive payment for his shares if the proposed corporate action

XXX-002186

referred to therein is taken shall file with the corporation, before the meeting of shareholders at which the action is submitted to a vote, or at such meeting but before the vote, written objection to the action. The objection shall include a notice of his election to dissent, his name and residence address, the number and classes of shares as to which he dissents and a demand for payment of the fair value of his shares if the action is taken. Such objection is not required from any shareholder to whom the corporation did not give notice of such meeting in accordance with this chapter or where the proposed action is authorized by written consent of shareholders without a meeting.

(b) Within ten days after the shareholders' authorization date, which term as used in this section means the date on which the shareholders' vote authorizing such action was taken, or the date on which such consent without a meeting was obtained from the requisite shareholders, the corporation shall give written notice of such authorization or consent by registered mail to each shareholder who filed written objection or from whom written objection was not required, excepting any shareholder who voted for or consented in writing to the proposed action and who thereby is deemed to have elected not to enforce his right to receive payment for his shares.

(c) Within twenty days after the giving of notice to him, any shareholder from whom written objection was not required and who elects to dissent shall file with the corporation a written notice of such election, stating his name and residence address, the number and classes of shares as to which he dissents and a demand for payment of the fair value of his shares. Any shareholder who elects to dissent from a merger under section 905 (Merger of subsidiary corporation) or paragraph (c) of section 907 (Merger or consolidation of domestic and foreign corporations) or from a share exchange under paragraph (g) of section 913 (Share exchanges) shall file a written notice of such election to dissent within twenty days after the giving to him of a copy of the plan of merger or exchange or an outline of the material features thereof under section 905 or 913.

(d) A shareholder may not dissent as to less than all of the shares, as to which he has a right to dissent, held by him of record, that he owns beneficially. A nominee or fiduciary may not dissent on behalf of any beneficial owner as to less than all of the shares of such owner, as to which such nominee or fiduciary has a right to dissent, held of record by such nominee or fiduciary.

(e) Upon consummation of the corporate action, the shareholder shall cease to have any of the rights of a shareholder except the right to be paid the fair value of his shares and any other rights under this section. A notice of election may be withdrawn by the shareholder at any time prior to his acceptance in writing of an offer made by the corporation, as provided in paragraph (g), but in no case later than sixty days from the date of consummation of the corporate action except that if the corporation fails to make a timely offer, as provided in paragraph (g), the time for withdrawing a notice of election shall be extended until sixty days from the date an offer is made. Upon expiration of such time, withdrawal of a notice of election shall require the written consent of the corporation. In order to be effective, withdrawal of a notice of election must be accompanied by the return to the corporation of any advance payment made to the shareholder as provided in paragraph (g). If a notice of election is withdrawn, or the corporate action is rescinded, or a court shall determine that the shareholder is not entitled to receive payment for his shares, or the shareholder shall otherwise lose his dissenter's rights, he shall not have the right to receive payment for his shares and he shall be reinstated to all his rights as a shareholder as of the consummation of the corporate action, including any intervening preemptive rights and the right to payment of any intervening dividend or other distribution or, if any such rights have expired or any such dividend or distribution other than in cash has been completed, in lieu thereof, at the election of the corporation, the fair value thereof in cash as determined by the board as of the time of such expiration or completion, but without prejudice otherwise to any corporate proceedings that may have been taken in the interim.

(f) At the time of filing the notice of election to dissent or within one month thereafter the shareholder of shares represented by certificates shall submit the certificates representing his shares to the corporation, or to its transfer agent, which shall forthwith note conspicuously thereon that a notice of election has been filed and shall return the certificates to the shareholder or other person who submitted them on his behalf. Any

F-2

<PAGE>    473

shareholder of shares represented by certificates who fails to submit his certificates for such notation as herein specified shall, at the option of the corporation exercised by written notice to him within forty-five days from the date of filing of such notice of election to dissent, lose his dissenter's rights unless a court, for good cause shown, shall otherwise direct. Upon transfer of a certificate bearing such notation, each new certificate issued therefor shall bear a similar notation together with the name of the original dissenting holder of the shares and a transferee shall acquire no rights in the corporation except those which the original dissenting shareholder had at the time of the transfer.

(g) Within fifteen days after the expiration of the period within which shareholders may file their notices of election to dissent, or within fifteen days after the proposed corporate action is consummated, whichever is later (but in no case later than ninety days from the shareholders' authorization date), the corporation or, in the case of a merger or consolidation, the surviving or new corporation, shall make a written offer by registered mail to each shareholder who has filed such notice of election to pay for his shares at a

XXX-002187

specified price which the corporation considers to be their fair value. Such
offer shall be accompanied by a statement setting forth the aggregate number of
shares with respect to which notices of election to dissent have been received
and the aggregate number of holders of such shares. If the corporate action has
been consummated, such offer shall also be accompanied by (1) advance payment to
each such shareholder who has submitted his certificates representing his shares
to the corporation, as provided in paragraph (f), of an amount equal to eighty
percent of the amount of such offer, or (2) as to each shareholder who has not
yet submitted his certificates a statement that advance payment to him of an
amount equal to eighty percent of the amount of such offer will be made by the
corporation promptly upon submission of his certificates. If the corporate
action has not been consummated at the time of the making of the offer, such
advance payment or statement as to advance payment shall be sent to each
shareholder entitled thereto forthwith upon consummation of the corporate
action. Every advance payment or statement as to advance payment shall include
advice to the shareholder to the effect that acceptance of such payment does not
constitute a waiver of any dissenters' rights. If the corporate action has not
been consummated upon the expiration of the ninety day period after the
shareholders' authorization date, the offer may be conditioned upon the
consummation of such action. Such offer shall be made at the same price per
share to all dissenting shareholders of the same class, or if divided into
series, of the same series and shall be accompanied by a balance sheet of the
corporation whose shares the dissenting shareholder holds as of the latest
available date, which shall not be earlier than twelve months before the making
of such offer, and a profit and loss statement or statements for not less than a
twelve month period ended on the date of such balance sheet or, if the
corporation was not in existence throughout such twelve month period, for the
portion thereof during which it was in existence. Notwithstanding the foregoing,
the corporation shall not be required to furnish a balance sheet or profit and
loss statement or statements to any shareholder to whom such balance sheet or
profit and loss statement or statements were previously furnished, nor if in
connection with obtaining the shareholders' authorization for or consent to the
proposed corporate action the shareholders were furnished with a proxy or
information statement, which included financial statements, pursuant to
Regulation 14A or Regulation 14C of the United States Securities and Exchange
Commission. If within thirty days after the making of such offer, the
corporation making the offer and any shareholder agree upon the price to be paid
for his shares, payment therefor shall be made within sixty days after the
making of such offer or the consummation of the proposed corporate action,
whichever is later, upon the surrender of the certificates for any such shares
represented by certificates.

    (h) The following procedure shall apply if the corporation fails to make
such offer within such period of fifteen days, or if it makes the offer and any
dissenting shareholder or shareholders fail to agree with it within the period
of thirty days thereafter upon the price to be paid for their shares:

        (1) The corporation shall, within twenty days after the expiration of
    whichever is applicable of the two periods last mentioned, institute a
    special proceeding in the supreme court in the judicial district in which
    the office of the corporation is located to determine the rights of
    dissenting shareholders and to fix the fair value of their shares. If, in
    the case of merger or consolidation, the surviving or new corporation is a
    foreign corporation without an office in this state, such proceeding shall
    be brought in the county where the office of the domestic corporation,
    whose shares are to be valued, was located.

                                    F-3
<PAGE>    474

        (2) If the corporation fails to institute such proceeding within such
    period of twenty days, any dissenting shareholder may institute such
    proceeding for the same purpose not later than thirty days after the
    expiration of such twenty day period. If such proceeding is not instituted
    within such thirty day period, all dissenter's rights shall be lost unless
    the supreme court, for good cause shown, shall otherwise direct.

        (3) All dissenting shareholders, excepting those who, as provided in
    paragraph (g), have agreed with the corporation upon the price to be paid
    for their shares, shall be made parties to such proceeding, which shall
    have the effect of an action quasi in rem against their shares. The
    corporation shall serve a copy of the petition in such proceeding upon each
    dissenting shareholder who is a resident of this state in the manner
    provided by law for the service of a summons, and upon each nonresident
    dissenting shareholder either by registered mail and publication, or in
    such other manner as is permitted by law. The jurisdiction of the court
    shall be plenary and exclusive.

        (4) The court shall determine whether each dissenting shareholder, as
    to whom the corporation requests the court to make such determination, is
    entitled to receive payment for his shares. If the corporation does not
    request any such determination or if the court finds that any dissenting
    shareholder is so entitled, it shall proceed to fix the fair value of the
    shares, which, for the purposes of this section, shall be the fair value as
    of the close of business on the day prior to the shareholders'
    authorization date. In fixing the fair value of the shares, the court shall
    consider the nature of the transaction giving rise to the shareholder's
    right to receive payment for shares and its effects on the corporation and
    its shareholders, the concepts and methods then customary in the relevant
    securities and financial markets for determining fair value of shares of a
    corporation engaging in a similar transaction under comparable
    circumstances and all other relevant factors. The court shall determine the
    fair value of the shares without a jury and without referral to an
    appraiser or referee. Upon application by the corporation or by any

XXX-002188

shareholder who is a party to the proceeding, the court may, in its
discretion, permit pretrial disclosure, including, but not limited to,
disclosure of any expert's reports relating to the fair value of the shares
whether or not intended for use at the trial in the proceeding and
notwithstanding subdivision (d) of section 3101 of the civil practice law
and rules.

     (5) The final order in the proceeding shall be entered against the
corporation in favor of each dissenting shareholder who is a party to the
proceeding and is entitled thereto for the value of his shares so
determined.

     (6) The final order shall include an allowance for interest at such
rate as the court finds to be equitable, from the date the corporate action
was consummated to the date of payment. In determining the rate of
interest, the court shall consider all relevant factors, including the rate
of interest which the corporation would have had to pay to borrow money
during the pendency of the proceeding. If the court finds that the refusal
of any shareholder to accept the corporate offer of payment for his shares
was arbitrary, vexatious or otherwise not in good faith, no interest shall
be allowed to him.

     (7) Each party to such proceeding shall bear its own costs and
expenses, including the fees and expenses of its counsel and of any experts
employed by it. Notwithstanding the foregoing, the court may, in its
discretion, apportion and assess all or any part of the costs, expenses and
fees incurred by the corporation against any or all of the dissenting
shareholders who are parties to the proceeding, including any who have
withdrawn their notices of election as provided in paragraph (e), if the
court finds that their refusal to accept the corporate offer was arbitrary,
vexatious or otherwise not in good faith. The court may, in its discretion,
apportion and assess all or any part of the costs, expenses and fees
incurred by any or all of the dissenting shareholders who are parties to
the proceeding against the corporation if the court finds any of the
following: (A) that the fair value of the shares as determined materially
exceeds the amount which the corporation offered to pay; (B) that no offer
or required advance payment was made by the corporation; (C) that the
corporation failed to institute the special proceeding within the period
specified therefor; or (D) that the action of the corporation in complying
with its obligations as provided in this section was arbitrary, vexatious
or otherwise not in good faith. In making any determination as

                                   F-4

<PAGE>   475

provided in clause (A), the court may consider the dollar amount or the
percentage, or both, by which the fair value of the shares as determined
exceeds the corporate offer.

     (8) Within sixty days after final determination of the proceeding, the
corporation shall pay to each dissenting shareholder the amount found to be
due him, upon surrender of the certificate for any such shares represented
by certificates.

     (i) Shares acquired by the corporation upon the payment of the agreed value
therefor or of the amount due under the final order, as provided in this
section, shall become treasury shares or be cancelled as provided in section 515
(Reacquired shares), except that, in the case of a merger or consolidation, they
may be held and disposed of as the plan of merger or consolidation may otherwise
provide.

     (j) No payment shall be made to a dissenting shareholder under this section
at a time when the corporation is insolvent or when such payment would make it
insolvent. In such event, the dissenting shareholder shall, at his option:

     (1) Withdraw his notice of election, which shall in such event be
deemed withdrawn with the written consent of the corporation; or

     (2) Retain his status as a claimant against the corporation and, if it
is liquidated, be subordinated to the rights of creditors of the
corporation, but have rights superior to the non-dissenting shareholders,
and if it is not liquidated, retain his right to be paid for his shares,
which right the corporation shall be obliged to satisfy when the
restrictions of this paragraph do not apply.

     (3) The dissenting shareholder shall exercise such option under
subparagraph (1) or (2) by written notice filed with the corporation within
thirty days after the corporation has given him written notice that payment
for his shares cannot be made because of the restrictions of this
paragraph. If the dissenting shareholder fails to exercise such option as
provided, the corporation shall exercise the option by written notice given
to him within twenty days after the expiration of such period of thirty
days.

     (k) The enforcement by a shareholder of his right to receive payment for
his shares in the manner provided herein shall exclude the enforcement by such
shareholder of any other right to which he might otherwise be entitled by virtue
of share ownership, except as provided in paragraph (e), and except that this
section shall not exclude the right of such shareholder to bring or maintain an
appropriate action to obtain relief on the ground that such corporate action
will be or is unlawful or fraudulent as to him.

     (l) Except as otherwise expressly provided in this section, any notice to
be given by a corporation to a shareholder under this section shall be given in

XXX-002189

the manner provided in section 605 (Notice of meetings of shareholders).

(m) This section shall not apply to foreign corporations except as provided in subparagraph (e)(2) of section 907 (Merger or consolidation of domestic and foreign corporations). (Last amended by Ch. 117, L. '86, eff. 9-1-86.)

F-5

<PAGE>  476

APPENDIX G

85  [PAYMENT FOR STOCK OF DISSENTING STOCKHOLDER]. -- A stockholder in any corporation organized under the laws of Massachusetts which shall have duly voted to consolidate or merge with another corporation or corporations under the provisions of sections seventy-eight or seventy-nine who objects to such consolidation or merger may demand payment for his stock from the resulting or surviving corporation and an appraisal in accordance with the provisions of sections eighty-six to ninety-eight, inclusive, and such stockholder and the resulting or surviving corporation shall have the rights and duties and follow the procedure set forth in those sections. This section shall not apply to the holders of any shares of stock of a constituent corporation surviving a merger if, as permitted by subsection (c) of section seventy-eight, the merger did not require for its approval a vote of the stockholders of the surviving corporation.

86  [RIGHT OF APPRAISAL]. -- If a corporation proposes to take a corporate action as to which any section of this chapter provides that a stockholder who objects to such action shall have the right to demand payment for his shares and an appraisal thereof, sections eighty-seven to ninety-eight, inclusive, shall apply except as otherwise specifically provided in any section of this chapter. Except as provided in sections eighty-two and eighty-three, no stockholder shall have such right unless (1) he files with the corporation before the taking of the vote of the shareholders on such corporate action, written objection to the proposed action stating that he intends to demand payment for his shares if the action is taken and (2) his shares are not voted in favor of the proposed action.

87  [NOTICE OF STOCKHOLDERS MEETING TO CONTAIN STATEMENT AS TO APPRAISAL RIGHTS]. -- The notice of the meeting of stockholders at which the approval of such proposed action is to be considered shall contain a statement of the rights of objecting stockholders. The giving of such notice shall not be deemed to create any rights in any stockholder receiving the same to demand payment for his stock, and the directors may authorize the inclusion in any such notice of a statement of opinion by the management as to the existence or non-existence of the right of the stockholders to demand payment for their stock on account of the proposed corporate action. The notice may be in such form as the directors or officers calling the meeting deem advisable, but the following form of notice shall be sufficient to comply with this section:

"If the action proposed is approved by the stockholders at the meeting and effected by the corporation, any stockholder (1) who files with the corporation before the taking of the vote on the approval of such action, written objection to the proposed action stating that he intends to demand payment for his shares if the action is taken and (2) whose shares are not voted in favor of such action has or may have the right to demand in writing from the corporation (or, in the case of a consolidation or merger, the name of the resulting or surviving corporation shall be inserted), within twenty days after the date of mailing to him of notice in writing that the corporate action has become effective, payment for his shares and an appraisal of the value thereof. Such corporation and any such stockholder shall in such cases have the rights and duties and shall follow the procedure set forth in sections 88 to 98, inclusive, of chapter 156B of the General Laws of Massachusetts."

88  [NOTICE OF OBJECTING STOCKHOLDER THAT CORPORATE ACTIONS HAS BECOME EFFECTIVE]. -- The corporation taking such action, or in the case of a merger or consolidation the surviving or resulting corporation, shall, within ten days after the date on which such corporate action became effective, notify each stockholder who filed written objection meeting the requirements of section eighty-six and whose shares were not voted in favor of the approval of such action, that the action approved at the meeting of the corporation of which he is a stockholder has become effective. The giving of such notice shall not be deemed to create any rights in any stockholder receiving the same to demand payment for his stock. The notice shall be sent by registered or certified mail, addressed to the stockholder at his last known address as it appears in the records of the corporation.

89  [DEMAND FOR PAYMENT BY OBJECTING STOCKHOLDER]. -- If within twenty days after the date of mailing of a notice under subsection (e) of section eighty-two, subsection (f) of section eighty-three, or section eighty-eight any stockholder to whom the corporation was required to give such notice shall demand in writing from the corporation taking such action, or in the case of a consolidation or merger

G-1

<PAGE>  477

from the resulting or surviving corporation, payment for his stock, the corporation upon which such demand is made shall pay to him the fair value of his stock within thirty days after the expiration of the period during which such demand may be made.

90  [DETERMINATION OF VALUE OF STOCK BY SUPERIOR COURT]. -- If during the period of thirty days provided for in section eighty-nine the corporation upon which such demand is made and any such objecting stockholder fail to agree as to

the value of such stock, such corporation or any such stockholder may within
four months after the expiration of such thirty-day period demand a
determination of the value of the stock of all such objecting stockholders by a
bill in equity filed in the superior court in the county where the corporation
in which such objecting stockholder held stock had or has its principal office
in the commonwealth.

91  BILL IN EQUITY TO DETERMINE VALUE OF STOCK OF OBJECTING STOCKHOLDERS ON
FAILURE TO AGREE ON VALUE THEREOF ETC; PARTIES TO BILL ETC; SERVICE OF BILL ON
CORPORATION; NOTICE TO STOCKHOLDER PARTIES ETC. -- If the bill is filed by the
corporation, it shall name as parties respondent all stockholders who have
demanded payment for their shares and with whom the corporation has not reached
agreement as to the value thereof. If the bill is filed by a stockholder, he
shall bring the bill in his own behalf and on behalf of all other stockholders
who have demanded payment for their shares and with whom the corporation has not
reached agreement as to the value thereof, and service of the bill shall be made
upon the corporation by subpoena with a copy of the bill annexed. The
corporation shall file with its answer a duly verified list of all such other
stockholders, and such stockholders shall thereupon be deemed to have been added
as parties to the bill. The corporation shall give notice in such form and
returnable on such date as the court shall order to each stockholder party to
the bill by registered or certified mail, addressed to the last known address of
such stockholder as shown in the records of the corporation, and the court may
order such additional notice by publication or otherwise as it deems advisable.
Each stockholder who makes demand as provided in section eighty-nine shall be
deemed to have consented to the provisions of this section relating to notice,
and the giving of notice by the corporation to any such stockholder in
compliance with the order of the court shall be a sufficient service of process
on him. Failure to give notice to any stockholder making demand shall not
invalidate the proceedings as to other stockholders to whom notice was properly
given, and the court may at any time before the entry of a final decree make
supplementary orders of notice.

92  BILL IN EQUITY TO DETERMINE VALUE OF STOCK OF OBJECTING STOCKHOLDERS ON
FAILURE TO AGREE ON VALUE THEREOF, ETC; ENTRY OF DECREE DETERMINING VALUE OF
STOCK; DATE ON WHICH VALUE IS TO BE DETERMINED. -- After hearing the court shall
enter a decree determining the fair value of the stock of those stockholders who
have become entitled to the valuation of and payment for their shares, and shall
order the corporation to make payment of such value, together with interest, if
any, as hereinafter provided, to the stockholders entitled thereto upon the
transfer by them to the corporation of the certificates representing such stock
if certificated or if uncertificated, upon receipt of an instruction
transferring such stock to the corporation. For this purpose, the value of the
shares shall be determined as of the day preceding the date of the vote
approving the proposed corporate action and shall be exclusive of any element of
value arising from the expectation or accomplishment of the proposed corporate
action.

93  BILL IN EQUITY TO DETERMINE VALUE OF STOCK OF OBJECTING STOCKHOLDERS ON
FAILURE TO AGREE ON VALUE THEREOF, ETC.; COURT MAY REFER BILL, ETC., TO SPECIAL
MASTER TO HEAR PARTIES, ETC. -- The court in its discretion may refer the bill
or any question arising thereunder to a special master to hear the parties, make
findings and report the same to the court, all in accordance with the usual
practice in suits in equity in the superior court.

94  BILL IN EQUITY TO DETERMINE VALUE OF STOCK OF OBJECTING STOCKHOLDERS ON
FAILURE TO AGREE ON VALUE THEREOF, ETC.; STOCKHOLDER PARTIES MAY BE REQUIRED TO
SUBMIT THEIR STOCK CERTIFICATES FOR NOTATION THEREON OF PENDENCY OF BILL,
ETC. -- On motion the court may order stockholder parties to the bill to submit
their certificates of stock to the corporation for notation thereon of the
pendency of the bill, and may order the

                                    G-2

<PAGE>   478

corporation to note such pendency in its records with respect to any
uncertificated shares held by such stockholder parties, and may on motion
dismiss the bill as to any stockholder who fails to comply with such order.

95  BILL IN EQUITY TO DETERMINE VALUE OF STOCK OF OBJECTING STOCKHOLDERS ON
FAILURE TO AGREE ON VALUE THEREOF, ETC.; TAXATION OF COSTS, ETC.; INTEREST ON
AWARD, ETC. -- The costs of the bill, including the reasonable compensation and
expenses of any master appointed by the court, but exclusive of fees of counsel
or of experts retained by any party, shall be determined by the court and taxed
upon the parties to the bill, or any of them, in such manner as appears to be
equitable, except that all costs of giving notice to stockholders as provided in
this chapter shall be paid by the corporation. Interest shall be paid upon any
award from the date of the vote approving the proposed corporate action, and the
court may on application of any interested party determine the amount of
interest to be paid in the case of any stockholder.

96  STOCKHOLDER DEMANDING PAYMENT FOR STOCK NOT ENTITLED TO NOTICE OF
STOCKHOLDERS' MEETINGS OR TO VOTE STOCK OR TO RECEIVE DIVIDENDS, ETC.;
EXCEPTIONS. -- Any stockholder who has demanded payment for his stock as
provided in this chapter shall not thereafter be entitled to notice of any
meeting of stockholders or to vote such stock for any purpose and shall not be
entitled to the payment of dividends or other distribution on the stock (except
dividends or other distributions payable to stockholders of record at a date
which is prior to the date of the vote approving the proposed corporate action)
unless:

    (1) A bill shall not be filed within the time provided in section ninety;

    (2) A bill, if filed, shall be dismissed as to such stockholder; or

XXX-002191

(3) Such stockholder shall with the written approval of the corporation, or in the case of a consolidation or merger, the resulting or surviving corporation, deliver to it a written withdrawal of his objections to and an acceptance of such corporate action.

Notwithstanding the provisions of clauses (1) to (3), inclusive, said stockholder shall have only the rights of a stockholder who did not so demand payment for his stock as provided in this chapter.

97  CERTAIN SHARES PAID FOR BY CORPORATION TO HAVE STATUS OF TREASURY STOCK, ETC. -- The shares of the corporation paid for by the corporation pursuant to the provisions of this chapter shall have the status of treasury stock or in the case of a consolidation or merger the shares or the securities of the resulting or surviving corporation into which the shares of such objecting stockholder would have been converted had he not objected to such consolation or merger shall have the status of treasury stock or securities.

98  ENFORCEMENT BY STOCKHOLDER OF RIGHT TO RECEIVE PAYMENT FOR HIS SHARES TO BE EXCLUSIVE REMEDY; EXCEPTION. -- The enforcement by a stockholder of his right to receive payment for his shares in the manner provided in this chapter shall be an exclusive remedy except that this chapter shall not exclude the right of such stockholder to bring or maintain an appropriate proceeding to obtain relief on the ground that such corporate action will be or is illegal or fraudulent as to him.

<center>G-3</center>

<PAGE>  479

<div align="right">APPENDIX H</div>

<center>FRESENIUS AG
FRESENIUS USA, INC.</center>

<div align="right">May 8, 1996</div>

W. R. Grace & Co.
One Town Center Road
Boca Raton, FL 33486-1010

Ladies and Gentlemen:

We refer to the Agreement and Plan of Reorganization dated as of February 4, 1996 (the "Agreement") by and between W. R. Grace & Co. ("Grace") and Fresenius AG ("Fresenius AG") and confirm our agreement as follows:

1. In each of (a) clause (iii) of the proviso to paragraph (e) of Section 4.2 of the Agreement and (b) the second sentence of section 2.3(a) of Exhibit D to the Agreement, the figure "50.3%" shall be substituted for the figure "51%."

2. Subject to the terms of paragraph 6 hereof, and on the condition that no more than 70 million Newco Ordinary Shares are outstanding immediately following consummation of the Reorganization, in accordance with Section 4.2(e) of the Agreement, Fresenius AG hereby notifies Grace that the Fresenius USA Consideration Per Share shall be equal to 0.37067735 Newco Ordinary Shares.

3. Subject to the terms of paragraph 6 hereof and Section 9.1 of the Agreement, in accordance with Section 9.13 of the Agreement, Fresenius USA hereby undertakes the obligations contained therein as a party and, for itself, makes directly to Grace the representations and warranties contained in the Agreement with respect to itself.

4. Subject to the terms of Section 9.1 of the Agreement, Fresenius USA hereby represents and warrants to Grace that subject only to the receipt of the requisite approval of its shareholders, Fresenius USA has the requisite corporate power and authority and has taken all corporate action necessary in order to execute, deliver and perform each Transaction Agreement to which it is a party and to consummate the transactions contemplated by the Agreement and the Transaction Agreements including, without limitation, the approval of the Board of Directors of Fresenius USA and the resolution of the Board of Directors of Fresenius USA to recommend the transactions contemplated by the Agreement and the Transaction Agreements for approval by Fresenius USA shareholders, subject to their fiduciary duties.

5. All notices, requests, claims, demands and other communications to Fresenius USA under the Agreement shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in the manner set forth in the Agreement, addressed as follows:

Fresenius USA, Inc.
2637 Shadelands Drive
Walnut Creek, CA 94598
Attn: Dr. Ben Lipps
Fax: (510) 988-1941

with copies to:

Ropes & Gray
One International Place
Boston, MA 02110-2624
Attn: Winthrop G. Minot, Esq.
Fax: (617) 951-7051

XXX-002192

H-1

<PAGE>    480

W. R. Grace & Co.
May 8, 1996
Page 2

          and

          O'Melveny & Myers
          Citicorp Center
          153 East 53rd Street
          New York, NY 10022-4611
          Attn: Dr. Ulrich Wagner
          Fax: (212) 326-2061

     6. If there shall be in excess of 9,253,331 Fresenius USA Common Share
Equivalents outstanding immediately prior to the effective time of the
Fresenius USA Merger, the terms of paragraphs 2, 3 and 4 hereof shall be
automatically void and of no further force or effect, without any action on
the part of any party hereto.

     7. Terms capitalized but not defined in this letter shall have the
meanings ascribed to them in the Agreement.

     8. This letter agreement may be executed in several counterparts, each
of which shall be an original and all of which shall be deemed to be one
and the same Agreement.

     9. This letter agreement shall be governed by and construed in
accordance with the laws of the State of New York.

H-2

<PAGE>    481

     Please confirm your agreement to the foregoing by executing duplicate
copies of this letter and returning one executed copy to each of Fresenius AG
and Fresenius USA.

                         Very truly yours,

                         FRESENIUS AG

                         By: /s/  GERD KRICK
                             -------------------------------------
                             Name: Gerd Krick
                             Title: Chief Executive Officer

                         By: /s/ MATHIAS KLINGLER
                             -------------------------------------
                             Name: Mathias Klingler
                              Title: President and Chief
                              Operating
                                 Officer -- Dialysis Systems
                              Division

                         FRESENIUS USA, INC. (with
                         respect only to paragraphs 3
                         through 9, inclusive)

                         By: /s/  BEN LIPPS
                             -------------------------------------
                             Name: Ben Lipps
                             Title: President

AGREED

W. R. Grace & Co.

By: /s/  Paul McMahon
    -------------------------------------
    Name: Paul McMahon
    Title: Vice President

H-3

<PAGE>    482

                                              APPENDIX I

                         AGREEMENT

     Agreement dated as of May 8, 1996, between Fresenius AG, an
Aktiengesellschaft organized under the laws of the Federal Republic of Germany
("Fresenius AG"), and Fresenius USA, Inc., a Massachusetts corporation
("Fresenius USA").

                         RECITALS

     WHEREAS, Fresenius AG and W. R. Grace & Co., a New York Corporation
("Grace") have entered into an Agreement and Plan of Reorganization, dated as of
February 4, 1996 (as amended, the "Reorganization Agreement"); and

     WHEREAS, the Reorganization Agreement contemplates that Fresenius USA will

XXX-002193

join in the Reorganization Agreement as a party and agree to be bound by the
terms of the Reorganization Agreement; and

WHEREAS, the board of directors of Fresenius USA and a special committee of
independent directors of Fresenius USA approved and ratified the Reorganization
Agreement and the other Transaction Agreements (as such term is defined in the
Reorganization Agreement) and, by letter agreement of even date herewith,
Fresenius USA has undertaken the obligations contained therein as a party and
desires to submit the Reorganization, including the Fresenius USA Merger (as
such terms are defined in the Reorganization Agreement) to a vote of its
stockholders; and

WHEREAS, Fresenius AG and Fresenius USA desire to set forth their agreement
with respect to certain matters under the Reorganization Agreement;

NOW, THEREFORE, the parties hereto agree as follows:

1. Any liquidated damages payable pursuant to Section 6.13 of the
Reorganization Agreement shall be payable $49.5 million to Fresenius AG and
$25.5 million to Fresenius USA. Fresenius AG and Fresenius USA agree that
if the Reorganization is not consummated, Fresenius AG and Fresenius USA
shall bear 66% and 34%, respectively, of the aggregate costs and expenses
of the Fresenius Parties, and shall make such payments between themselves
as may be necessary to effect such allocation.

2. (a) It is currently anticipated that 70,000,000 Newco Ordinary
Shares (the "Actual Anticipated Number of Outstanding Newco Shares") will
be outstanding immediately following the consummation of the
Reorganization, and it was previously anticipated that there would be
217,170,000 such shares (the "Previously Anticipated Number of Outstanding
Newco Shares") so outstanding, each on a fully diluted basis. The
Independent Committee of the Board of Directors of Fresenius USA (the
"Fresenius USA Independent Committee"), based on the Previously Anticipated
Number of Outstanding Newco Shares, acting upon advice from their advisors,
approved Fresenius USA Consideration Per Share equal to 1.15 Newco Ordinary
Shares as being fair to the holders (other than Fresenius AG, Grace and
their subsidiaries) of the common stock of Fresenius USA. Based on the
Actual Anticipated Number of Outstanding Newco Shares, the equivalent
Fresenius USA Consideration Per Share to be allocated among holders of
Fresenius USA Common Share Equivalents is equal to 0.37067735 Newco
Ordinary Shares, which shall also be the maximum number of Newco Ordinary
Shares issuable in respect of each Fresenius USA Common Share underlying
Fresenius USA Options assumed by or otherwise rolled over into Newco.

(b) Fresenius AG and Fresenius USA confirm that, prior to the
Fresenius USA Merger, Fresenius USA intends to repurchase (the
"Repurchase") certain vested and nonvested options held by employees of
Fresenius USA and certain other securities of Fresenius USA so that,
immediately prior to the Fresenius USA Merger, there shall be outstanding
no more than 9,253,331 Fresenius USA Common Share Equivalents (the
"Specified Maximum Number of Fresenius USA Common Share Equivalents"), and
that such repurchase shall be for a combination of cash and promissory
notes of Fresenius USA.

                              I-1
<PAGE>   483

(c) If the Specified Maximum Number of Fresenius USA Common Share
Equivalents were to be outstanding at the time of the Fresenius USA Merger,
the Aggregate Fresenius USA Common Share Consideration would be 4.9% of the
Newco Shares that will be outstanding immediately following the
consummation of the Reorganization on a fully diluted basis.

3. If there shall be in excess of the Specified Maximum Number of
Fresenius USA Common Share Equivalents outstanding immediately prior to the
effective time of the Fresenius USA Merger, the terms of paragraphs 1 and 2
hereof shall be automatically void and of no further force or effect,
without any action on the part of any party hereto.

4. Terms capitalized but not defined in this Agreement shall have the
meanings ascribed to them in the Reorganization Agreement.

5. This Agreement shall be governed by and construed in accordance
with the laws of the State of New York.

6. All notices, requests, claims, demands and other communications
hereunder shall be in writing and shall be given (and shall be deemed to
have been duly given upon receipt) by delivery in person, by cable,
telegram, telex or other standard form of telecommunications, or by
registered or certified mail, postage prepaid, return receipt requested,
addressed as follows:

        If to Fresenius AG:

                As provided in the Reorganization Agreement; and

                If to Fresenius USA:

                Fresenius USA, Inc.
                2637 Shadelands Drive
                Walnut Creek, CA 94598
                Attn.: Dr. Ben Lipps
                Fax: (510) 988-1941

XXX-002194

with copies to:

Ropes & Gray
One International Place
Boston, MA 02110-2624
Attn.: Winthrop G. Minot, Esq.
Fax: (617) 951-7050

7. This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall be deemed to be one and the same agreement.

8. Nothing in this Agreement, expressed or implied, is intended to confer upon any person or entity other than the parties hereto, any benefit, right or remedies.

I-2

<PAGE>  484

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

                              FRESENIUS AG

                              By: /s/  GERD KRICK
                                 ------------------------------------
                                 Name: Gerd Krick
                                 Title: Chief Executive Officer

                                    /s/  MATHIAS KLINGLER
                                 ------------------------------------
                                 Name: Mathias Klingler
                                 Title: President and Chief
                                 Operating Officer --Dialysis
                                 Systems Division

                              FRESENIUS USA, INC.

                              By: /s/  BEN LIPPS
                                 ------------------------------------
                                 Name: Ben Lipps
                                 Title: President

I-3

<PAGE>  485

PART II

INFORMATION NOT REQUIRED IN PROSPECTUS

ITEM 20.  INDEMNIFICATION OF DIRECTORS AND OFFICERS

The information required by this item is incorporated by reference to the information in the Joint Proxy Statement-Prospectus forming part of this Registration Statement set forth under the caption "COMPARISON OF CERTAIN RIGHTS OF SHAREHOLDERS OF GRACE AND FRESENIUS USA -- Indemnification of Officers and Directors -- Grace."

ITEM 21.  EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(A) EXHIBITS

<TABLE>
<CAPTION>

| EXHIBIT NO. | DESCRIPTION |
| --- | --- |
| <C> | <S> |
| 2.1 | Agreement and Plan of Reorganization dated as of February 4, 1996 between W. R. Grace & Co. and Fresenius AG (Included as Appendix A to the Joint Proxy Statement-Prospectus forming part of this Registration Statement) |
| 2.2 | Distribution Agreement by and among W. R. Grace & Co., W. R. Grace & Co.-Conn. and Fresenius AG dated as of February 4, 1996 (Included as Exhibit A to Appendix A to the Joint Proxy Statement-Prospectus forming part of this Registration Statement) |
| 2.3 | Contribution Agreement by and among Fresenius AG, Sterilpharma GmbH and W. R. Grace & Co.-Conn. dated February 4, 1996 (Included as Exhibit E to Appendix A to the Joint Proxy-Statement Prospectus forming part of this Registration Statement) |
| 3.1 | Certificate of Incorporation of W. R. Grace & Co., incorporated herein by reference to Exhibit 3 to the Current Report on Form 8-K dated May 25, 1988 |
| 3.2 | By-Laws of W. R. Grace & Co., incorporated herein by reference to Exhibit 3.02 to the Annual Report on Form 10-K for the 1994 fiscal year |
| 4.1 | Commitment Letter for the NMC Credit Agreement |
| 5.1 | Opinion of Robert H. Beber, Esq. re New Preferred Shares |
| 8.1 | Opinion of Wachtell, Lipton, Rosen & Katz re Tax Matters |
| 8.2 | Opinion of Miller & Chevalier, Chartered re Tax Matters |
| 10.1 | Form of FMC Pooling Agreement by and between Fresenius AG and the individuals acting from time to time as Independent Directors |
| 10.2 | Form of Lease Agreement for Office and Warehouse Buildings by and between Fresenius AG and Fresenius Medical Care AG |
| 10.3 | Form of Lease Agreement for Manufacturing Facilities by and between Fresenius AG and Fresenius Care AG |
| 10.4 | Form of Transition Services Agreement between Fresenius AG and Fresenius Medical Care |

XXX-002195

| 10.5 | Form of Supply Agreement |
| 10.6 | Form of Trademark License Agreement by and between Fresenius AG and Fresenius Medical Care AG |
| 10.7 | Form of Biofine License Agreement by and between Fresenius AG and Fresenius Medical Care AG |
| 10.8 | Form of Cross-License Agreement by and between Fresenius AG and Fresenius Medical Care AG |
| 10.9 | Form of Post-Closing Covenants Agreement among Fresenius AG, W. R. Grace & Co., W. R. Grace & Co.-Conn., and Fresenius Medical Care AG |

</TABLE>

II-1

<PAGE>   486
<TABLE>
<CAPTION>

| EXHIBIT NO. | DESCRIPTION |
| ----------- | ----------- |
| <C> | <S> |
| 10.10 | Purchase Agreement, effective January 1, 1995, between Baxter Health Care Corporation and NMC, including the addendum thereto, incorporated herein by reference to Exhibit 10.19 of the Registration Statement on Form F-4 of Fresenius Medical Care Aktiengesellschaft filed on the date hereof* |
| 10.11 | Agreement, dated November 25, 1992, between Bergen Brunswig Drug Company and National Medical Care, Inc., including the addendum thereto, incorporated herein by reference to Exhibit 10.20 of the Registration Statement on Form F-4 of Fresenius Medical Care Aktiengesellschaft filed on the date hereof* |
| 10.12 | Product Purchase Agreement, effective January 1, 1996, between Amgen, Inc. and NMC, incorporated herein by reference to Exhibit 10.21 of the Registration Statement on Form F-4 of Fresenius Medical Care Aktiengesellschaft filed on the date hereof* |
| 10.13 | Form of Employee Benefits and Compensation Agreement by and among W. R. Grace & Co., National Medical Care, Inc., and W. R. Grace & Co. -- Conn. |
| 10.15 | Primary Guarantee dated July 31, 1996 |
| 10.16 | Secondary Guarantee dated July 31, 1996 |
| 10.17 | Letter Agreement dated July 31, 1996 |
| 11.1 | Weighted Average Number of Shares and Earnings Used in Per Share Computations -- W.R. Grace & Co. Special-Purpose, Consolidated Financial Statements |
| 21.1 | Subsidiary List |
| 23.1 | Independent Auditors' Report on Schedule and Consent of KPMG Peat Marwick LLP |
| 23.2 | Independent Auditors' Report on Schedule and Consent of KPMG Deutsche Treuhandgesellschaft Aktiengesellschaft Wirtschaftsprufungsgesellschaft |
| 23.3 | Consent of Price Waterhouse LLP |
| 23.4 | Consent of CS First Boston Corporation |
| 23.5 | Consent of Merrill Lynch, Pierce, Fenner & Smith Incorporated |
| 23.6 | Consent of Wachtell, Lipton, Rosen & Katz (included in Exhibit 8.1) |
| 23.7 | Consent of Miller & Chevalier, Chartered (included in Exhibit 8.2) |
| 23.8 | Consent of Salomon Brothers Inc |
| 24.1 | Powers of Attorney |
| 99.1 | Opinion of CS First Boston Corporation (Included as Appendix C to the Joint Proxy Statement-Prospectus forming part of this Registration Statement) |
| 99.2 | Opinion of Merrill Lynch, Pierce, Fenner & Smith Incorporated (Included as Appendix C to the Joint Proxy Statement-Prospectus forming part of this Registration Statement) |

</TABLE>

- ---------------

* Portions of this Agreement have been omitted and filed separately with the Commission pursuant to a request for confidential treatment.

     (b) FINANCIAL STATEMENT SCHEDULES

        (i) Schedule II -- Fresenius Worldwide Dialysis -- Consolidated Valuation and Qualifying Accounts

        (ii) Schedule II -- Fresenius USA, Inc. -- Consolidated Valuation and Qualifying Accounts

        (iii) Schedule II -- W. R. Grace & Co. -- Valuation and Qualifying Accounts

II-2

<PAGE>   487

ITEM 22.  UNDERTAKINGS

     (1) The undersigned registrant hereby undertakes to respond to requests for information that is incorporated by reference into the prospectus pursuant to Item 4, 10(b), 11 or 13 of this form, within one business day of receipt of such request, and to send the incorporated documents by first class mail or other equally prompt means. This includes information contained in documents filed subsequent to the effective date of the registration statement through the date of responding to the request.

     (2) The undersigned registrant hereby undertakes to supply by means of a post-effective amendment all information concerning a transaction, and the company being acquired involved therein, that was not the subject of and included in the registration statement when it became effective.

     (3) Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange

XXX-002196

Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

II-3

<PAGE>  488

SCHEDULE II

FRESENIUS WORLDWIDE DIALYSIS

CONSOLIDATED VALUATION AND QUALIFYING ACCOUNTS
YEARS ENDED DECEMBER 31, 1995 AND 1994
(IN THOUSANDS)

<TABLE>
<CAPTION>

| | BALANCE AT BEGINNING OF PERIOD | (REDUCTION) CHARGE TO COSTS AND EXPENSES | DEDUCTIONS/ WRITE-OFFS/ RECOVERIES | BALANCE AT END OF PERIOD |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Allowance for doubtful accounts: | | | | |
| Year ended December 31, 1995.............. | $ 12,702 | $ 2,089 | $ 1,084 | $ 13,707 |
| Year ended December 31, 1994.............. | 11,267 | 2,280 | 845 | 12,702 |
| Inventory reserves: | | | | |
| Year ended December 31, 1995.............. | 3,296 | 1,281(1) | | 4,577 |
| Year ended December 31, 1994.............. | 4,262 | (966)(1) | | 3,296 |

</TABLE>

- ---------------
(1) Information with respect to write-offs/recoveries is not available.
<PAGE>  489

SCHEDULE II

FRESENIUS USA, INC. AND SUBSIDIARIES

CONSOLIDATED VALUATION AND QUALIFYING ACCOUNTS
YEARS ENDED DECEMBER 31, 1995, 1994 AND 1993
(IN THOUSANDS)

<TABLE>
<CAPTION>

| | BALANCE AT BEGINNING OF PERIOD | CHARGED TO COSTS AND EXPENSES | DEDUCTIONS/ WRITE-OFFS/ RECOVERIES | BALANCE AT END OF PERIOD |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Allowance for doubtful accounts: | | | | |
| Year ended December 31, 1995.............. | $1,744 | $  -- | $ (420) | $ 1,324 |
| Year ended December 31, 1994.............. | 1,718 | 79 | (53) | 1,744 |
| Year ended December 31, 1993.............. | 923 | 875 | (80) | 1,718 |

</TABLE>

<TABLE>
<CAPTION>

| | BALANCE AT BEGINNING OF PERIOD | CHARGED TO COSTS AND EXPENSES | DEDUCTIONS/ WRITE-OFFS/ RECOVERIES | BALANCE AT END OF PERIOD |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| Inventory reserves: | | | | |
| Year ended December 31, 1995.............. | $2,068 | $2,476 | $(1,847) | $ 2,697 |
| Year ended December 31, 1994.............. | 2,832 | 813 | (1,577) | 2,068 |
| Year ended December 31, 1993.............. | 1,473 | 2,291 | (932) | 2,832 |

</TABLE>
<PAGE>  490

SCHEDULE II

W. R. GRACE & CO.

VALUATION AND QUALIFYING ACCOUNTS
(IN THOUSANDS)

<TABLE>
<CAPTION>

| | FOR THE YEAR 1995 ADDITIONS (DEDUCTIONS) | | | |
|---|---|---|---|---|
| DESCRIPTION | BALANCE AT BEGINNING OF YEAR | CHARGED COSTS AND EXPENSES | OTHER NET(*) | BALANCE AT END OF PERIOD |
| - ---------- | ---------- | ---------- | -------- | ---------- |

XXX-002197

```
<S>                                                     <C>         <C>         <C>         <C>
VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS:
  Allowances for notes and accounts receivable........  $ 91,449    $ 88,858    $(60,393)   $ 119,914
  Valuation allowances for deferred tax assets.........  $  6,467    $ 13,033    $      0    $  19,500
</TABLE>
```

```
<TABLE>
<CAPTION>
                                                             FOR THE YEAR 1994
                                                          ADDITIONS (DEDUCTIONS)
                                                     ----------------------------------------
                                                     BALANCE AT   CHARGED                 BALANCE AT
                                                     BEGINNING   COSTS AND    OTHER        END OF
                      DESCRIPTION                     OF YEAR     EXPENSES     NET(*)       PERIOD
- -------------------------------------------------  ----------  ---------   --------     ----------
<S>                                                     <C>         <C>         <C>         <C>
VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS:
  Allowances for notes and accounts receivable........  $ 39,559    $ 73,052    $(21,162)   $ 91,449
  Valuation allowances for deferred tax assets.........  $  2,210    $  4,257    $      0    $  6,467
</TABLE>
```

```
<TABLE>
<CAPTION>
                                                             FOR THE YEAR 1993
                                                          ADDITIONS (DEDUCTIONS)
                                                     ----------------------------------------
                                                     BALANCE AT   CHARGED                 BALANCE AT
                                                     BEGINNING   COSTS AND    OTHER        END OF
                      DESCRIPTION                     OF YEAR     EXPENSES     NET(*)       PERIOD
- -------------------------------------------------  ----------  ---------   --------     ----------
<S>                                                     <C>         <C>         <C>         <C>
VALUATION AND QUALIFYING ACCOUNTS DEDUCTED FROM ASSETS:
  Allowances for notes and accounts receivable........  $ 28,973    $ 59,436    $(48,850)   $ 39,559
  Valuation allowances for deferred tax assets.........  $      0    $  2,210    $      0    $  2,210
</TABLE>
```

```
- ---------------
* Consists of additions and deductions applicable to businesses acquired, bad
  debt write-offs, reclassifications and miscellaneous other adjustments.
<PAGE>  491
```

                                SIGNATURES

     PURSUANT TO THE REQUIREMENTS OF THE SECURITIES ACT OF 1933, THE REGISTRANT
HAS DULY CAUSED THIS REGISTRATION STATEMENT TO BE SIGNED ON ITS BEHALF BY THE
UNDERSIGNED, THEREUNTO DULY AUTHORIZED, IN THE CITY OF BOCA RATON, STATE OF
FLORIDA, ON AUGUST 2, 1996.

                              W. R. GRACE & CO.

                          By: /s/ Peter D. Houchin
                              -------------------------------
                              P. D. HOUCHIN,
                              (SENIOR VICE PRESIDENT AND CHIEF
                              FINANCIAL OFFICER)

Date: August 2, 1996

     PURSUANT TO THE REQUIREMENTS OF THE SECURITIES ACT OF 1933, THIS
REGISTRATION STATEMENT HAS BEEN SIGNED BY THE FOLLOWING PERSONS IN THE
CAPACITIES INDICATED ON AUGUST 2, 1996.

```
<TABLE>
<CAPTION>
            SIGNATURE                                    TITLE
- -------------------------------------    ----------------------------------------------
<S>                                        <C>
        /s/ Albert J. Costello*            Chairman, President and Chief Executive Officer;
                                           Director (Principal Executive Officer)
        /s/ Harold A. Eckmann*    /s/ Virginia A. Kamsky*
        /s/ Marye Anne Fox*       /s/ John E. Phipps*
        /s/ James W. Frick*       /s/ Thomas A. Vanderslice*
        /s/ Thomas A. Holmes*
                                           Senior Vice President and Chief Financial Officer
    /s/ Peter D. Houchin                   (Principal Financial Officer)
- -------------------------------------
        PETER D. HOUCHIN
                                           Vice President and Controller (Principal
    /s/ Kathleen A.Browne                  Accounting Officer)
- -------------------------------------
        KATHLEEN A. BROWNE
</TABLE>
```

```
- ---------------
```

* By signing his name hereto, Robert B. Lamm is signing this document on behalf
  of each of the persons indicated above pursuant to powers of attorney duly
  executed by such persons.

                          By: /s/ Robert B. Lamm
                              -------------------------------
                              ROBERT B. LAMM, ATTORNEY-IN-FACT
                              Directors
```
<PAGE>  492
```

                              EXHIBIT INDEX

XXX-002198

```
<TABLE>
<CAPTION>
                                                                      SEQUENTIALLY
                                                                        NUMBERED
EXHIBIT NO.                      DESCRIPTION                              PAGE
- -----------   ------------------------------------------------------ ------------
<C>             <S>                                                     <C>
   2.1          Agreement and Plan of Reorganization dated as of February 4, 1996
                between W. R. Grace & Co. and Fresenius AG (Included as Appendix A to
                the Joint Proxy Statement-Prospectus forming part of this
                Registration Statement)..............................................
   2.2          Distribution Agreement by and among W. R. Grace & Co., W. R. Grace &
                Co.-Conn. and Fresenius AG dated as of February 4, 1996 (Included as
                Exhibit A to Appendix A to the Joint Proxy Statement-Prospectus
                forming part of this Registration Statement).........................
   2.3          Contribution Agreement by and among Fresenius AG, Sterilpharma GmbH
                and W. R. Grace & Co.-Conn. dated February 4, 1996 (Included as
                Exhibit E to Appendix A to the Joint Proxy-Statement Prospectus
                forming part of this Registration Statement).........................
   3.1          Certificate of Incorporation of W. R. Grace & Co., incorporated
                herein by reference to Exhibit 3 to the Current Report on Form 8-K
                dated May 25, 1988..................................................
   3.2          By-Laws of W. R. Grace & Co., incorporated herein by reference to
                Exhibit 3.02 to the Annual Report on Form 10-K for the 1994 fiscal
                year.................................................................
   4.1          Commitment Letter for the NMC Credit Agreement.......................
   5.1          Opinion of Robert H. Beber, Esq. re New Preferred Shares.............
   8.1          Opinion of Wachtell, Lipton, Rosen & Katz re Tax Matters.............
   8.2          Opinion of Miller & Chevalier, Chartered re Tax Matters..............
  10.1          Form of FMC Pooling Agreement by and between Fresenius AG and the
                individuals acting from time to time as Independent Directors........
  10.2          Form of Lease Agreement for Office and Warehouse Buildings by and
                between Fresenius AG and Fresenius Medical Care AG....................
  10.3          Form of Lease Agreement for Manufacturing Facilities by and between
                Fresenius AG and Fresenius Medical Care AG...........................
  10.4          Form of Transition Services Agreement between Fresenius AG and
                Fresenius Medical Care..............................................
  10.5          Form of Supply Agreement............................................
  10.6          Form of Trademark License Agreement by and between Fresenius AG and
                Fresenius Medical Care AG...........................................
  10.7          Form of Biofine License Agreement by and between Fresenius AG and
                Fresenius Medical Care AG...........................................
  10.8          Form of Cross-License Agreement by and between Fresenius AG and
                Fresenius Medical Care AG...........................................
  10.9          Form of Post-Closing Covenants Agreement among Fresenius AG, W. R.
                Grace & Co., W. R. Grace & Co.-Conn., and Fresenius Medical Care
                AG..................................................................
  10.10         Purchase Agreement, effective January 1, 1995, between Baxter Health
                Care Corporation and NMC, including the addendum thereto,
                incorporated herein by reference to Exhibit 10.19 of the Registration
                Statement on Form F-4 of Fresenius Medical Care Aktiengesellschaft
                filed on the date hereof............................................
</TABLE>
<PAGE>   493
<TABLE>
<CAPTION>
                                                                      SEQUENTIALLY
                                                                        NUMBERED
EXHIBIT NO.                      DESCRIPTION                              PAGE
- -----------   ------------------------------------------------------ ------------
<C>             <S>                                                     <C>
  10.11         Agreement, dated November 25, 1992, between Bergen Brunswig Drug
                Company and National Medical Care, Inc., including the addendum
                thereto, incorporated herein by reference to Exhibit 10.20 of the
                Registration Statement on Form F-4 of Fresenius Medical Care
                Aktiengesellschaft filed on the date hereof.........................
  10.12         Product Purchase Agreement, effective January 1, 1996, between Amgen,
                Inc. and NMC, incorporated herein by reference to Exhibit 10.21 of
                the Registration Statement on Form F-4 of Fresenius Medical Care
                Aktiengesellschaft filed on the date hereof.........................
  10.13         Form of Employee Benefits and Compensation Agreement by and among W.
                R. Grace & Co., National Medical Care, Inc., and W. R. Grace &
                Co. -- Conn........................................................
  10.15         Primary Guarantee dated July 31, 1996..............................
  10.16         Secondary Guarantee dated July 31, 1996............................
  10.17         Letter Agreement dated July 31, 1996...............................
  11.1          Weighted Average Number of Shares and Earnings Used in Per Share
                Computations -- W.R. Grace & Co. Special-Purpose, Consolidated
                Financial Statements...............................................
  21.1          Subsidiary List....................................................
  23.1          Independent Auditors' Report on Schedule and Consent of KPMG Peat
                Marwick LLP.........................................................
  23.2          Independent Auditors' Report on Schedule and Consent of KPMG Deutsche
                Treuhandgesellschaft Aktiengesellschaft
                Wirtschaftsprufungsgesellschaft....................................
  23.3          Consent of Price Waterhouse LLP....................................
  23.4          Consent of CS First Boston Corporation.............................
  23.5          Consent of Merrill Lynch, Pierce, Fenner & Smith Incorporated.......
  23.6          Consent of Wachtell, Lipton, Rosen & Katz (included in Exhibit
                8.1)...............................................................
  23.7          Consent of Miller & Chevalier, Chartered (included in Exhibit 8.2)...
  23.8          Consent of Salomon Brothers Inc....................................
  24.1          Powers of Attorney.................................................
```

| 99.1 | Opinion of CS First Boston Corporation (Included as Appendix C to the Joint Proxy Statement-Prospectus forming part of this Registration Statement).................................................... |
| 99.2 | Opinion of Merrill Lynch, Pierce, Fenner & Smith Incorporated (Included as Appendix C to the Joint Proxy Statement-Prospectus forming part of this Registration Statement)...................... |

```
</TABLE>
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-4.1
<SEQUENCE>2
<DESCRIPTION>COMMITMENT LETTER
<TEXT>

<PAGE>   1
```

July 30, 1996

W. R. Grace & Co.
W. R. Grace & Co. - Conn.
National Medical Care, Inc.
One Town Center Road
Boca Raton, FL 33486-1010
Attn:  Peter Houchin
       Chief Financial Officer

RE:     Financing for National Medical Care, Inc.

Ladies and Gentlemen:

You have advised us that National Medical Care, Inc. ("NMC"), a wholly-owned indirect subsidiary of W.R. Grace & Co. ("WRG-NY") wishes to obtain $2.5 billion in senior bank financing (the "Senior Credit Facilities").  The proceeds of the Senior Credit Facilities will be used by NMC (i) to make a cash distribution of approximately $2.1 billion to W.R. Grace & Co. - Conn. ("WRG-Conn.") the parent of NMC, which distribution shall be used by WRG-Conn. to retire certain existing indebtedness and for general corporate purposes, and (ii) for refinancing existing debt, working capital and general corporate purposes of NMC.  You have further advised us that subsequent to the closing of the Senior Credit Facilities, (i) WRG-NY will distribute the shares of NMC to WRG-NY, (ii) WRG-NY will contribute the shares of WRG-Conn. to Grace Holding, Inc. ("Grace Holding"), (iii) WRG-NY will spin-off the shares of Grace Holding to its public shareholders, and (iv) the public shareholders will exchange the shares of WRG-NY for shares of a newly created company called Fresenius Medical Care AG ("Holdings"), after which Holdings will own, through separate chains of ownership, NMC and the worldwide dialysis business of Fresenius AG (such business of Fresenius AG ("Fresenius") being hereafter referred to as "FWD").

In connection with the foregoing, each of the institutions listed below is pleased to advise you of its respective commitment to provide a portion of the Senior Credit Facilities as set forth in the table below, in each case as described in the term sheet

```
<PAGE>   2
```

July 30, 1996
Page 2

attached hereto as Annex I (the "Term Sheet") and subject to the conditions set forth below and in the Term Sheet:

```
<TABLE>
<CAPTION>
```

| Lender | Facility | Commitment Amount | Commitment Percentage |
|--------|----------|-------------------|----------------------|
| <S> | <C> | <C> | <C> |
| The Bank of Nova Scotia ("BNS") | 1 | $283,333,333 | 28.33% |
|  | 2 | $283,333,333 | 28.33% |
|  | 3 | $166,666,667 | 33.33% |
| The Chase Manhattan Bank ("Chase") | 1 | $283,333,333 | 28.33% |
|  | 2 | $283,333,333 | 28.33% |
|  | 3 | $166,666,666 | 33.33% |
| Dresdner Bank AG, New York and Grand Cayman Branches ("Dresdner") | 1 | $150,000,000 | 15.31% |
|  | 2 | $150,000,000 | 15.79% |
| NationsBank, N.A. ("NationsBank") | 1 | $283,333,334 | 28.34% |

XXX-002200

|   | 2 | $283,333,334 | 28.34% |
|   | 3 | $166,666,667 | 33.34% |

</TABLE>

The commitments of BNS, Chase, Dresdner and NationsBank set forth above are
several (and not joint) obligations of such entities.  All capitalized terms
used and not otherwise defined herein shall have the meanings set forth in the
Term Sheet.

It is agreed that NationsBank will act as Paying and Issuing Agent for the
Senior Credit Facilities (in such capacity, the "Paying and Issuing Agent") and
that BNS, Chase, Dresdner and NationsBank will act as Managing Agents for the
Senior Credit Facilities.  It is further agreed that BNS, Chase Securities,
Inc. ("CSI"), Dresdner and NationsBanc Capital Markets, Inc. ("NCMI") will each
act as a Co-Arranger for Facility 1 and Facility 2 of the Senior Credit
Facilities and that BNS, CSI and NCMI will each act as a Co-Arranger for
Facility 3 of the Senior Credit Facilities.  Hereinafter, in such capacity BNS,
CSI, Dresdner and NCMI may be referred to individually as a "Co-Arranger" and
collectively as the "Co-Arrangers".  No additional

<PAGE>    3

July 30, 1996
Page 3

agents or arrangers will be appointed or roles or titles granted without the
prior approval of the Managing Agents and the Co-Arrangers.

The commitments and agreements of the Managing Agents and the Co-Arrangers
hereunder are subject to the satisfaction of each of the following conditions
precedent in a manner acceptable to each of the Managing Agents and each of
the Co-Arrangers in their sole discretion:

          (a)      each of the terms and conditions set forth herein;

          (b)      each of the terms and conditions set forth in the
Term Sheet;

          (c)      completion by the Managing Agents and the
Co-Arrangers of due diligence with respect to the financial condition,
business and management of WRG-NY, WRG-Conn., NMC, Fresenius, Holdings
and FWD in such detail as is deemed appropriate by, and with results
satisfactory to, the Managing Agents and the Co-Arrangers in their
sole discretion;

          (d)      (i) completion by the Managing Agents and the
Co-Arrangers of due diligence with respect to the current
investigation of NMC by the Office of the Inspector General of the
U.S. Department of Health and Human Services (the "OIG Investigation")
in such detail as is deemed appropriate by, and with results
satisfactory to, the Managing Agents and the Co-Arrangers in their
sole discretion (it being understood and agreed that the Managing
Agents and the Co-Arrangers will engage Jones, Day, Reavis & Pogue as
a third party advisor at the expense of NMC in connection with the
completion of such due diligence), and (ii) there shall be no material
change in the status of the OIG Investigation (or material change in
the position of the applicable governmental authorities with respect
thereto) subsequent to the completion of the due diligence referred to
in subclause (i), which change in status or position could reasonably
be expected to either (A) have a material adverse effect on the
condition (financial or otherwise) operations, business, assets,
liabilities or prospects of NMC or its subsidiaries, or (B) cause a
significant disruption in the syndication of the Senior Credit
Facilities, in each case as determined by the Managing Agents in their
sole discretion;

          (e)      completion by the Managing Agents and the
Co-Arrangers of due diligence with respect to (i) the potential tax
issues related to the distribution to be made by NMC to WRG-Conn., the
spin-off of Grace Holdings to the shareholders of WRG-NY and the
exchange of shares of WRG-NY for shares in Holdings and (ii) the
potential environmental

<PAGE>    4

July 30, 1996
Page 4

          liability of WRG-NY, WRG-Conn. and/or NMC with respect to certain
chemical businesses owned, directly or indirectly, by WRG-NY, in each
case in such detail as is deemed appropriate by, and with results
satisfactory to, the Managing Agents and the Co-Arrangers in their
sole discretion (it being understood and agreed that the Managing
Agents and the Co-Arrangers shall have the right to engage third party
advisors at the expense of NMC in connection with the completion of
the due diligence referred to in this subparagraph (e));

XXX-002201

             (f)      execution of a fee letter among WRG-NY, WRG-Conn., NMC, the Managing Agents and the Co-Arrangers prior to or concurrently with the acceptance by WRG-NY, WRG-Conn. and NMC of this letter;

             (g)      the negotiation, execution and delivery of definitive documentation with respect to the Senior Credit Facilities consistent with the Term Sheet and otherwise satisfactory to the Managing Agents and the Co-Arrangers; and

             (h)      there not having occurred and be continuing since the date hereof a material adverse change in the market for syndicated bank credit facilities as determined by the Managing Agents and the Co-Arrangers in their sole discretion.

Furthermore, the commitments and agreements of the Managing Agents and the Co-Arrangers hereunder are based upon the financial and other information regarding WRG-NY, WRG-Conn., NMC and their respective subsidiaries previously provided to the Managing Agents and/or the Co-Arrangers and are subject to the condition, among others, that there shall not have occurred after the date of such information, in the opinion of the Managing Agents and the Co-Arrangers, any material adverse change in the business, assets, liabilities (actual or contingent), operations, condition (financial or otherwise) or prospects of WRG-NY, WRG-Conn. or NMC.

As you have informed us, subsequent to the closing of the Senior Credit Facilities, a transaction will be occurring in which WRG-NY will be acquired by Holdings.  As a result of that transaction, you have informed us that NMC will become an indirect subsidiary of Holdings, and Holdings will own FWD through a separate chain of ownership.  Because of the transaction, and the possibility that NMC and FWD may be combined under Holdings, the commitments and agreements of the Managing Agents and the Co-Arrangers hereunder also are subject to the satisfaction of each of the following conditions in a manner

&lt;PAGE&gt;    5

July 30, 1996
Page 5

acceptable to each of the Managing Agents and each of the Co-Arrangers in their sole discretion:

             (a)      receipt by the Managing Agents and Co-Arrangers of financial and other information regarding Holdings and Fresenius; and

             (b)      there not having occurred after the date of such information, in the opinion of the Managing Agents and Co-Arrangers, any material adverse change in the business, assets, liabilities (actual or contingent), operations, condition (financial or otherwise) or prospects of Holdings or Fresenius.

If the continuing review by the Managing Agents and the Co-Arrangers of the information referred to in the immediately preceding two paragraphs discloses conditions or events not previously disclosed to the Managing Agents and the Co-Arrangers or relating to new information or additional developments concerning conditions or events previously disclosed to the Managing Agents and the Co-Arrangers which the Managing Agents and the Co-Arrangers in their sole discretion believe could reasonably be expected to have a material adverse effect on the condition (financial or otherwise), assets, properties, business, operations or prospects of WRG-NY, WRG-Conn., NMC, Fresenius or Holdings, then the Managing Agents and the Co-Arrangers may, in their sole discretion, suggest alternative financing amounts or structures that ensure adequate protection for the Lenders or decline to participate in the proposed financing.

You agree to actively assist the Managing Agents and the Co-Arrangers in achieving a syndication of the Senior Credit Facilities that is satisfactory to the Managing Agents, the Co-Arrangers and you.  In the event that such syndication cannot be achieved in a manner satisfactory to the Managing Agents and the Co-Arrangers and you under the structure outlined in the Term Sheet you agree to negotiate in good faith with the Managing Agents and the Co-Arrangers with respect to any changes in the structure or terms of the Senior Credit Facilities reasonably requested by the Managing Agents and the Co-Arrangers to facilitate a successful syndication of the Senior Credit Facilities; provided, however, it is understood and agreed that (i) the aggregate principal amount of the Senior Credit Facilities shall not be reduced below $2.5 billion, and (ii) each of the Managing Agents shall remain obligated to provide the amount of each Senior Credit Facility committed by such Managing Agent pursuant to the terms of (and subject to the conditions set forth in) this letter. Syndication of the Senior Credit Facilities will be accomplished by a variety of means, including direct contact during the syndication between the proposed lenders and senior management and advisors of WRG-NY, WRG-Conn.,

&lt;PAGE&gt;    6

July 30, 1996
Page 6

XXX-002202

NMC, Fresenius, Holdings and FWD.  To assist the Managing Agents and the
Co-Arrangers in the syndication efforts, you hereby agree to (a) provide and
cause your advisors to provide the Managing Agents and the Co-Arrangers and the
other Lenders upon request with all information reasonably deemed necessary by
the Managing Agents and the Co-Arrangers to complete syndication, including but
not limited to information and evaluations (i) prepared by WRG-NY, WRG-Conn.
and NMC, and their advisors, or on their behalf, relating to the businesses of
NMC and WRG-Conn., and (ii) prepared by Fresenius and FWD and their advisors,
or on their behalf, relating to the businesses of FWD, (b) assist the Managing
Agents and the Co-Arrangers upon their request in the preparation of an
Information Memorandum to be used in connection with the syndication of the
Senior Credit Facilities and (c) otherwise assist the Managing Agents and the
Co-Arrangers in their syndication efforts, including by making available from
time to time officers and advisors of WRG-NY, WRG-Conn.  and NMC and their
subsidiaries, and if NMC and FWD are to be combined under Holdings, officers
and advisors of Fresenius and FWD and their subsidiaries, to attend and make
presentations regarding the business and prospects of WRG-NY, WRG-Conn., NMC,
Holdings and FWD and their subsidiaries, as appropriate, at a meeting or
meetings of prospective Lenders.  You further agree to refrain from engaging in
any additional financings during such syndication process for WRG-NY, WRG-Conn.
or NMC, and (if it is to be combined with NMC under Holdings) for FWD (except
as described in this letter and except as described in the Term Sheet) unless
otherwise agreed to by the Managing Agents and the Co-Arrangers.

It is understood and agreed that the Co-Arrangers, after consultation with you,
will manage and control all aspects of the syndication, including decisions as
to the selection of proposed Lenders (who shall be reasonably acceptable to the
Borrower) and any titles or roles offered to proposed Lenders, when commitments
will be accepted and the final allocations of the commitments among the
Lenders.  The Co-Arrangers will determine among the Co-Arrangers the allocation
of prospective Lenders to be contacted by each Co-Arranger.  It is understood
that no Lender participating in the Senior Credit Facilities will receive
compensation from you outside the terms contained herein and in the Term Sheet
in order to obtain its commitment.  It is also understood and agreed that the
amount and distribution of the fees among the Lenders will be at the sole
discretion of the Co-Arrangers and that any syndication prior to execution of
definitive documentation will reduce the commitments of the Managing Agents in
their sole discretion (it being understood and agreed that the Managing Agents
will continue to be obligated to the Borrower for their commitments hereunder
until the execution of such definitive documentation).


<PAGE>   7

July 30, 1996
Page 7

You hereby represent, warrant and covenant that (i) all information, other than
Projections (as defined below), which has been or is hereafter made available
to the Managing Agents, the Co-Arrangers and/or the Lenders by you or any of
your representatives in connection with the transactions contemplated hereby
("Information") is and will be complete and correct in all material respects
and does not and will not contain any untrue statement of a material fact or
omit to state a material fact necessary to make the statements contained
therein not misleading and (ii) all financial projections concerning WRG-NY,
WRG-Conn., NMC, Holdings or FWD that have been or are hereafter made available
to the Managing Agents, the Co-Arrangers or the Lenders by you, NMC, WRG-NY,
WRG-Conn., Holdings, FWD or Fresenius or any of your or their representatives
(the "Projections") have been or will be prepared in good faith based upon
reasonable assumptions.  You agree to furnish us with such Information and
Projections as we may reasonably request and to supplement the Information and
the Projections from time to time until the closing date for the Senior Credit
Facilities so that the representation and warranty in the preceding sentence is
correct on the such date.  In arranging and syndicating the Senior Credit
Facilities, the Managing Agents and the Co-Arrangers will be using and relying
on the Information and the Projections without independent verification
thereof.

By executing this letter agreement, you agree to reimburse the Managing Agents
and the Co-Arrangers from time to time on demand for all reasonable
out-of-pocket fees and expenses (including, but not limited to, fees and
expenses related to the completion of due diligence, the syndication of the
Senior Credit Facilities (without duplication with respect to the commitment
fees required to be paid pursuant to the fee letter hereafter described) and
the reasonable fees, disbursements and other charges of Moore & Van Allen,
PLLC, as counsel to the Co-Arrangers, the Managing Agents and the other
Lenders) incurred in connection with the Senior Credit Facilities and the
preparation of the definitive documentation for the Senior Credit Facilities
and the other transactions contemplated hereby.

In the event that any Agent or Co-Arranger becomes involved in any capacity in
any action, proceeding or investigation in connection with any matter
contemplated by this letter, you agree to reimburse such Agent or Co-Arranger
for its legal and other expenses (including the cost of any investigation and
preparation) as they are incurred by such Agent or Co-Arranger.  By executing
this letter you also agree to indemnify and hold harmless each Agent, each
Co-Arranger and their respective affiliates, directors, officers, employees and
agents (the "Indemnified Parties") from and against any and all losses, claims,
damages and liabilities, joint or several, related to or arising out of any
matters contemplated by this letter, unless

XXX-002203

<PAGE>    8

July 30, 1996
Page 8

and only to the extent that such losses, claims, damages or liabilities
resulted primarily from the gross negligence or willful misconduct of the Agent
or Co-Arranger seeking indemnification.

The provisions of the immediately preceding two paragraphs shall remain in full
force and effect regardless of whether definitive financing documentation shall
be executed and delivered and notwithstanding the termination of this letter
agreement or the commitments of the Managing Agents and the Co-Arrangers
hereunder.

As described herein and in the Term Sheet, the Co-Arrangers will act as
Co-Arrangers for the Senior Credit Facilities.  Each Agent reserves the right
to allocate, in whole or in part, to its affiliate that is acting as a
Co-Arranger hereunder certain fees payable to such Agent in such manner as such
Agent and Co-Arranger agree in their sole discretion.  You acknowledge and
agree that the Managing Agents may share with any of their affiliates
(including specifically their affiliate acting as a Co-Arranger hereunder) any
information relating to the Senior Credit Facilities, WRG-NY, WRG-Conn., NMC,
Fresenius, Holdings and their subsidiaries and affiliates; provided that the
Managing Agents and such affiliates shall hold any such information that is not
public in confidence in accordance with their respective customary policies
relating to non-public information.

This letter agreement may not be assigned by you without the prior written
consent of the Managing Agents and the Co-Arrangers.

If you are in agreement with the foregoing, please execute and return the
enclosed copy of this letter agreement no later than the close of business on
August 2, 1996.  This letter agreement will become effective upon your delivery
to us of executed counterparts of this letter agreement, the fee letter among
the Co-Arrangers, the Managing Agents, NMC, WRG- Conn. and WRG-NY (the "Fee
Letter").  In addition, without limiting the more specific terms hereof and of
the Term Sheet, you agree upon acceptance of this commitment to pay the
underwriting and other fees in the amounts and on the dates set forth in the
Fee Letter.  This commitment shall terminate if not so accepted by you prior to
that time.  Following acceptance by you, this commitment will terminate on
September 30, 1996, unless the Senior Credit Facilities are closed by such
time.

Except as required by applicable law, this letter and the contents hereof shall
not be disclosed by you to any third party without the prior consent of the
Managing Agents and the Co-Arrangers other than to your respective officers,
directors, employees, agents, attorneys, financial advisors and accountants

<PAGE>    9

July 30, 1996
Page 9

and to the management of Fresenius, in each case to the extent necessary in
your reasonable judgment.  In addition, after acceptance by you of this letter
you shall be permitted to disclose this letter to the Securities and Exchange
Commission in connection with the transactions referred to herein.  Without
limiting the foregoing, in the event that you disclose the contents of this
letter in contravention of the preceding sentence, you shall be deemed to have
accepted the terms of this letter.

This letter may be executed in counterparts which, taken together, shall
constitute an original.  This letter, together with the Term Sheet, embodies
the entire agreement and understanding among the Managing Agents, the
Co-Arrangers, WRG-NY and NMC with respect to the specific matters set forth
herein and supersedes any prior agreements and understandings relating to the
subject matter hereof.  No party has been authorized by the Managing Agents or
the Co-Arrangers to make any oral or written statements inconsistent with this
letter.  THIS LETTER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE
LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ITS PRINCIPLES OF CONFLICTS OF
LAW.

                              Very truly yours,

                              THE BANK OF NOVA SCOTIA


                              By: _____
                              Title:_____


                              THE CHASE MANHATTAN BANK

XXX-002204

By: _____
Title: _____


CHASE SECURITIES, INC.


By: _____
Title: _____


<PAGE>    10

July 30, 1996
Page 10

DRESDNER BANK AG, New York and
Grand Cayman Branches

By: 
       ------------------------------
Title: 
       ------------------------------
By: 
       ------------------------------
Title: 
       ------------------------------

NATIONSBANK, N.A.

By: 
       ------------------------------
Title: 
       ------------------------------

NATIONSBANC CAPITAL MARKETS, INC.

By: 
       ------------------------------
Title: 
       ------------------------------

ACCEPTED AND AGREED TO:

W.R. GRACE & CO.

By: 
       ------------------------------
Title: 
       ------------------------------
Date: 
       ------------------------------


NATIONAL MEDICAL CARE, INC.

By: 
       ------------------------------
Title: 
       ------------------------------
Date: 
       ------------------------------


W.R. GRACE & CO.-CONN.

By: 
       ------------------------------
Title: 
       ------------------------------
Date: 
       ------------------------------


<PAGE>    11

ANNEX I

SUMMARY OF TERMS AND CONDITIONS FOR

NATIONAL MEDICAL CARE, INC.

JULY 30, 1996

XXX-002205

```
SENIOR CREDIT FACILITIES:                    An aggregate principal amount
                                             of up to $2.5 billion will be
                                             available as follows:

        FACILITY 1:

        Borrower:                            National Medical Care, Inc.
                                             ("NMC") together with (i) the
                                             subsidiaries of NMC listed on
                                             Schedule 2 hereto (ii) such
                                             other direct or indirect
                                             subsidiaries of NMC as may be
                                             hereafter approved in writing
                                             by the Required Lenders and
                                             (iii) if guarantees are
                                             delivered by Holdings and
                                             certain of its subsidiaries
                                             as described below, the
                                             direct and indirect
                                             subsidiaries of Holdings as
                                             may be hereafter approved in
                                             writing by the Required
                                             Lenders.

        Amount and Structure:                $1,000,000,000 Revolving
                                             Credit Facility with (i) a
                                             swingline of $20,000,000 for
                                             same day borrowings in U.S.
                                             dollars (the "Domestic
                                             Swingline"), (ii) a swingline
                                             of $20,000,000 for same day
                                             borrowings in other freely
                                             tradable eurocurrencies (the
                                             "Multi-Currency Swingline")
                                             and (iii) a sublimit of
                                             $250,000,000 for the issuance
                                             of letters of credit

        Maturity Date:                       Seventh anniversary of the
                                             Closing Date

        Guarantors:                          W.R. Grace & Co. ("WRG-NY")
                                             and the material domestic
                                             subsidiaries of the Borrower

<PAGE>   12
        FACILITY 2:

        Borrower:                            National Medical Care, Inc.
                                             ("NMC")

        Amount and Structure:                $1,000,000,000 Term Loan
                                             Facility

        Maturity Date:                       Seventh anniversary of the
                                             Closing Date

        Mandatory Repayments
        Under Facility 2:                    Quarterly principal
                                             payments aggregating (on an
                                             annual basis) the amounts
                                             indicated below, to be
                                             applied to Facility 2 as
                                             follows:

<TABLE>
<CAPTION>
                                   Year      Reduction Amounts
                                   ----      -----------------
<S>                                <C>
                                    4        $180 million
                                    5        $200 million
                                    6        $200 million
                                    7        $200 million
                                   End of
                                   Year 7    $220 million
</TABLE>

        Guarantors:                          W.R. Grace & Co. ("WRG-NY"),
                                             W.R. Grace & Co.-Conn.
                                             ("WRG-Conn.") and the
                                             material domestic
                                             subsidiaries of the Borrower;
                                             provided, however that the
                                             guaranty of WRG-Conn. shall
                                             be limited to $450 million
                                             and will be structured as two
                                             separate guaranty agreements,
                                             one for $300 million (the
```

XXX-002206

"$300 Million Guaranty") and
one for $150 million (the
"$150 Million Guaranty").

WRG-Conn. Guaranty
Release Triggers:

The $300 Million Guaranty of
WRG-Conn. with respect to
Facility 2 will be released
upon the occurrence of any of
the following events within
sixty (60) days (but not
sooner than forty-six (46)
days) after the Closing Date:
(a) the receipt of an
unconditional joint and
several guarantee from
Fresenius Medical Care AG
("Holdings") and the
subsidiaries of Holdings
named on Schedule 3 hereto
(with Holdings to be the
holding company that will
directly or indirectly own
NMC and the worldwide
dialysis business of

-2-

<PAGE>    13

Fresenius AG) for the full
amount of Facility 1,
Facility 2 and
(if not repaid in full)
Facility 3 (in each case to
the extent permitted by
applicable law and consistent
with customary practices for
lenders, guarantors and
borrowers in the applicable
jurisdiction), which guaranty
shall contain financial and
other covenants acceptable to
the Lenders, calculated on a
pro forma consolidated basis
at Holdings and shall be
accompanied by an acceptable
legal opinion regarding the
validity and enforceability
of such guaranty (it being
understood that the form of
such guarantee and related
documentation shall be agreed
to prior to the Closing
Date), or (b) receipt of a
letter of credit (or other
acceptable financial
accommodation) in form and
substance satisfactory to the
Lenders covering a principal
amount of $300,000,000 plus
90 days of interest thereon,
together with an acceptable
legal opinion regarding the
enforceability of such letter
of credit (or other
acceptable financial
accommodation) or (c) the
prepayment of $300,000,000 in
principal amount of Facility
2.  If the $300 Million
Guaranty of WRG-Conn. is not
released within sixty (60)
days after the Closing Date
in accordance with either
subparagraph (a), (b) or (c)
above, then demand for
payment shall be made on the
$300 Million Guaranty of
WRG-Conn.  The letter of
credit (or other acceptable
financial accommodation)
referred to in subparagraph
(b) must (1) be issued on the
date that is sixty (60) days
after the Closing Date if the
conditions set forth in
subparagraph (a) are not
satisfied prior to such date,
(2) be issued for the account
of WRG-Conn. or Holdings, (3)
in the case of a letter of

XXX-002207

credit, be issued by a
domestic financial
institution with a commercial
paper rating of at least A-1
by S&P and at least P-1 by
Moody's and (4) in the case
of a letter of credit, have
an expiry date that is either
(y) at least 90

-3-

<PAGE>    14

days after the maturity date
of Facility 2 or (z) at least
364 days after the issue date
(as extended) of such letter
of credit, with a provision
allowing the beneficiary to
draw if the letter of credit
would otherwise expire
(giving effect to extensions)
prior to a date that is at
least 90 days after the
maturity date of Facility 2.

The $150 Million Guaranty of
WRG-Conn. with respect to
Facility 2 will be released
if at any time during the
term of Facility
2: the Borrower (or Holdings
if Holdings guarantees the
Senior Credit Facilities)
on a consolidated basis,
achieves a ratio of Senior
Debt to EBITDA of equal
to or less than 3.5 to 1.0.

FACILITY 3:

Borrower:                      National Medical Care, Inc.

Amount and Structure:         $500,000,000 Term Loan
                              Facility

Maturity Date:                Second anniversary of the
                              Closing Date

Amortization:                 None

Guarantors:                   WRG-NY, WRG-Conn. and the
                              material domestic
                              subsidiaries of the Borrower.

WRG-Conn. Guaranty
Release Triggers:             The guaranty of WRG-Conn.
                              with respect to Facility 3
                              will be released upon the
                              occurrence of any of the
                              following events within sixty
                              (60) days (but not sooner
                              than forty-six (46) days)
                              after the Closing Date:
                              either (a) repayment in full
                              of Facility 3, or (b) receipt
                              of a letter of credit (or
                              other acceptable financial
                              accommodation) in form and
                              substance satisfactory to the
                              Lenders covering a principal
                              amount of $500,000,000 plus
                              90 days of interest

-4-

<PAGE>    15

thereon, together with an
acceptable legal opinion
regarding the enforceability
of such letter of credit (or
other acceptable financial
accommodation), or (c) the
receipt of an unconditional
joint and several guarantee
from Holdings and the
subsidiaries of Holdings
named on Schedule 3 hereto
(to the extent permitted by

XXX-002208

applicable law and consistent with customary practices for lenders, guarantors and borrowers in the applicable jurisdiction), which guaranty shall contain financial and other covenants acceptable to the Lenders, calculated on a pro forma, consolidated basis at Holdings and be accompanied by an acceptable legal opinion regarding the validity and enforceability of such guaranty agreement (it being understood that the form of such guarantee and related documentation shall be agreed to prior to the Closing Date). If the guaranty of WRG-Conn. is not released within sixty (60) days after the Closing Date in accordance with either subparagraph (a), (b) or (c) above, then demand for payment shall be made on the guaranty of WRG-Conn.  The letter of credit (or other acceptable financial accommodation) referred to in subparagraph (b) must (1) be issued on the date that is sixty (60) days after the Closing Date if the conditions set forth in either subparagraph (a) or in subparagraph (c) are not satisfied prior to such date, (2) be issued for the account of WRG-Conn. or Holdings, (3) in the case of a letter of credit, be issued by a domestic financial institution with a commercial paper rating of at least A-1 by S&P and at least P-1 by Moody's, and (4) in the case of a letter of credit, have an expiry date that is either (y) at least 90 days after the maturity date of Facility 3 or (z) at least 364 days after the issue date (as extended) of such letter of credit, with a provision allowing the beneficiary to draw if the letter of credit would expire (giving effect to extensions)

-5-

<PAGE>   16

prior to a date that is 90 days after the maturity date of Facility 2.

TERMS COMMON TO ALL FACILITIES

PURPOSE:

To finance the distribution and payment of other amounts to WRG-Conn. and WRG-NY, to refinance existing outstanding debt of the Borrower, to finance existing and future letters of credit of the Borrower, and for general corporate purposes of the Borrower and its subsidiaries (and Holdings and its subsidiaries if guarantees of Holdings and the subsidiaries of Holdings named on Schedule 3 are hereafter provided), including working capital and permitted acquisitions.  Use of proceeds by non-guarantor subsidiaries of the Borrower and Holdings will be limited

XXX-002209

by basket amounts to be
agreed upon.

SECURITY:

A pledge of the
stock of the Borrower (to
secure the guaranty of
WRG-NY), a pledge of 100% of
the stock of the material
domestic subsidiaries of the
Borrower and a pledge of 66%
of the stock of the material
foreign subsidiaries of the
Borrower (to secure the
obligations of the Borrower)
and, if Holdings is a
guarantor of Facility 1,
Facility 2 or Facility 3 as
described above, a pledge of
100% of the stock owned
directly or indirectly by
Holdings in its material
subsidiaries (to secure the
guaranty by Holdings of
Facility 1, Facility 2 and/or
Facility 3, as applicable),
which pledge by Holdings
shall be subject to
applicable law and consistent
with customary practices for
lenders and pledgors in the
applicable jurisdiction.  The
documentation will provide
for a release of all
collateral if NMC (or, if
Holdings is a guarantor of
the Senior Credit Facilities,
then Holdings) shall either
(i) obtain an investment
grade rating for its long
term senior unsecured

- 6 -

<PAGE>   17

debt from both Moody's and
S&P, or (ii) satisfy certain
financial ratios to be
negotiated (including Debt
to EBITDA of less than or
equal to 2.0 to 1.0 and
EBITDA to Interest of greater
than or equal to 4.0 to 1.0).

CO-ARRANGERS:

The Bank of Nova Scotia
("BNS"), Chase Securities,
Inc.  ("CSI"), Dresdner Bank
AG, New York and Grand Cayman
Branches ("Dresdner") and
NationsBanc Capital Markets
Inc. ("NCMI").

PAYING AND ISSUING AGENT:

NationsBank, N.A. (the
"Paying and Issuing Agent").

DOMESTIC SWINGLINE LENDER:

NationsBank, N.A.

MULTI-CURRENCY SWINGLINE LENDER:

Dresdner Bank AG,
New York and Grand Cayman
Branches.

MANAGING AGENTS:

Collectively, The
Bank of Nova Scotia, The
Chase Manhattan Bank,
Dresdner Bank AG, New York
and Grand Cayman Branches and
NationsBank, N.A.

L/C ISSUING BANK:

NationsBank or such
other Lender under the Senior
Credit Facilities as may be
selected by the Borrower.

LENDERS:

Syndicate of
lenders acceptable to the
Borrower and the Co-
Arrangers.

BORROWING OPTIONS:

LIBOR (determined
by reference to the
appropriate page of the Dow
Jones Telerate Screen) and

XXX-002210

Base Rate.

LIBOR adjustments for
Reg D will be charged by
Lenders individually.

Base Rate means the
higher of the prime rate of
NationsBank or the federal
funds rate + 0.50%.

INTEREST RATE MARGINS:                  As set forth on Schedule 1
                                        attached hereto.

UNUSED FEE:                             As set forth on Schedule 1
                                        attached hereto.

- 7 -

<PAGE>    18

FACILITY FEE:                           As set forth on Schedule 1
                                        attached hereto.

LETTER OF CREDIT
ISSUANCE FEE:                           As set forth on Schedule 1
                                        attached hereto.

LETTER OF CREDIT
FRONTING FEE:                           To be determined by
                                        the Borrower and the L/C
                                        Issuing Bank.

LETTERS OF CREDIT AVAILABILITY:         Up to $250,000,000 will be
                                        available for letters of
                                        credit as a subfacility under
                                        Facility 1.  Letters of
                                        credit will be issued by the
                                        L/C Issuing Bank.  Letters of
                                        credit will expire no later
                                        than the fifth business day
                                        prior to the maturity date of
                                        Facility 1.  Drawings under
                                        any letter of credit will be
                                        reimbursed by the Borrower on
                                        the same business day.
                                        Letters of Credit outstanding
                                        under Facility 1 shall be
                                        deemed usage of Facility 1
                                        for the purpose of fees and
                                        availability.

MULTI-CURRENCY AVAILABILITY:            Up to $450,000,000
                                        of Facility 1 will be
                                        available for bilateral U.S.
                                        dollar borrowings or
                                        borrowings in other freely
                                        tradable eurocurrencies for
                                        certain of the foreign
                                        subsidiaries of the Borrower
                                        (and foreign subsidiaries of
                                        Holdings if Holdings is a
                                        guarantor of the Senior
                                        Credit Facilities), such
                                        loans to be provided by the
                                        Lenders pro rata based on
                                        their respective commitment
                                        percentages.

MULTI-CURRENCY BID OPTION:              The documentation
                                        for Facility 1 will also
                                        allow the Borrower to obtain
                                        loans in foreign currencies
                                        from the Lenders on a
                                        non-prorata basis (from the
                                        Lender(s) selected by the
                                        Borrower and in currencies
                                        and at interest rates agreed
                                        to by such Lender(s) and the
                                        Borrower) through a borrowing
                                        procedure to be administered
                                        by NationsBank; provided,
                                        however, any such non-prorata
                                        borrowings will not be
                                        considered Facility 1 usage
                                        for purposes of calculating
                                        the Unused Fee for Facility
                                        1.

XXX-002211

- 8 -

<PAGE>   19

| | |
|---|---|
| INTEREST PAYMENTS: | At the end of each applicable Interest Period or quarterly, if earlier. |
| INTEREST PERIODS: | Base Rate Loans - 30 days. LIBOR Loans - 1, 2, 3, 6 months or longer, as mutually agreed upon. |
| DRAWDOWNS: | Facility 2 and Facility 3 will be fully drawn on the Closing Date. Advances under Facility 1 will be in minimum amounts of $10,000,000 for loans and any amount for letters of credit with additional increments of $5,000,000 for loans (provided, however, that loans under the swingline may be obtained in minimum amounts of $500,000 and loans under the multi-currency bid option shall be in such amount agreed to by the applicable Lender and Borrower). Advances under Facility 1 will be at the Borrower's option with same day notice for Base Rate Loans, and three business days' notice for LIBOR Loans. |
| MANDATORY PREPAYMENTS: | Mandatory prepayments of the Senior Credit Facilities will be required as follows: 1. The net cash proceeds of any equity or subordinated debt issued by Holdings (or an acceptable subsidiary of Holdings) within ninety (90) days of the Closing Date will be applied to Facility 3 until Facility 3 is paid in full as more specifically set forth in the description of Facility 3 hereinabove. 2. 50% of net after-tax cash proceeds from asset sales greater than $10 million and not reinvested in similar assets within twelve (12) months. 3. 100% of net cash proceeds from sale of accounts receivable (excluding the proceeds of the accounts receivable securitization required to be completed on or before the Closing Date). 4. Subject to the terms of paragraph (1) above, 50% of net cash proceeds from (i) the issuance of equity not used in |

-9-

<PAGE>   20

connection with an acquisition and (ii) the issuance of additional subordinated debt; provided, however, that up to $100 million in excess equity proceeds received in conjunction with the issuance of equity and subordinated debt used to repay Facility 3 in full as described in paragraph 1 above shall not be subject to this mandatory prepayment requirement.

Mandatory prepayments will be applied first to Facility 3

XXX-002212

until Facility 3 is paid in full, then to Facility 2 until Facility 2 is paid in full and last to Facility 1 until Facility 1 is paid in full. Amounts applied to Facility 1, Facility 2 and Facility 3 will result in a permanent reduction of the commitments/loans thereunder and amounts applied to Facility 2 shall be applied pro rata to each scheduled principal installment under Facility 2.  The mandatory prepayment requirements will be modified if NMC (or, if Holdings is a guarantor of the Senior Credit Facilities, then Holdings) shall either (i) obtain an investment grade rating for its long term senior debt from both Moody's and S&P, or (ii) satisfy certain financial ratios to be negotiated (including Debt to EBITDA of greater than or equal to 2.0 to 1.0 and EBITDA to Interest of greater than or equal to 4.0 to 1.0].

VOLUNTARY PREPAYMENTS:

The Borrower may prepay the Senior Credit Facilities and/or reduce the available commitments under Facility 1 by an aggregate amount of at least $10,000,000 at any time on three business days' notice. Base Rate Loans may be prepaid at any time on same day's notice.  LIBOR Loans may not be prepaid before the end of an Interest Period unless compensation for funding losses is provided to the Lenders.

REPRESENTATIONS AND WARRANTIES:

Customary for credit agreements of this nature, with respect to the Guarantors, the

- 10 -

&lt;PAGE&gt;   21

Borrower and their respective subsidiaries, including but not limited to the following (except that the representations and warranties of WRG-Conn. while WRG-Conn. is a guarantor shall be the same as the representations and warranties contained in its existing credit facilities):

1.  Corporate existence.
2.  Corporate and governmental authorization; no contravention; binding effect.
3.  Financial information.
4.  No material adverse change since December 31, 1995 with respect to the Borrower and its subsidiaries taken as a whole.
5.  Environmental matters.
6.  Compliance with laws, including ERISA.
7.  No material litigation (except for the OIG investigation)
8.  Existence, incorporation, etc. of subsidiaries.
9.  Payment of taxes.

XXX-002213

```
                                        10. Full disclosure.
                                        11. Usual representations as
                                            to collateral.
                                        12. No required governmental
                                            or required third party
                                            approvals in connection
                                            with the transaction.
                                        13. Status under Investment
                                            Company Act
```

                            - 11 -

<PAGE>    22

CONDITIONS TO CLOSING:                      Those customarily found in
                                            credit facilities of this
                                            nature, including but not
                                            limited to:

                                        1.  Satisfactory closing
                                            documentation, including
                                            receipt and perfection of
                                            security in form and
                                            substance satisfactory to
                                            the Lenders.
                                        2.  No material adverse
                                            change shall have
                                            occurred since December
                                            31, 1995.
                                        3.  Receipt and approval of
                                            all financial information
                                            regarding WRG-NY, NMC,
                                            WRG-Conn. and each of
                                            their subsidiaries as may
                                            be requested by the
                                            Managing Agents.
                                        4.  Because of the
                                            transactions in which
                                            WRG-NY will be acquired by
                                            Holdings, receipt of all
                                            financial information
                                            regarding Holdings and
                                            each of its subsidiaries
                                            as may be requested by the
                                            Managing Agents.
                                        5.  Opinions of counsel in
                                            form and substance
                                            satisfactory to the
                                            Lenders.
                                        6.  Receipt of required
                                            regulatory approvals and
                                            third party approvals, if
                                            any.
                                        7.  Review of environmental
                                            matters, with respect to
                                            all real property owned or
                                            leased by the Borrower and
                                            its subsidiaries and
                                            WRG-Conn. and its
                                            subsidiaries, satisfactory
                                            to the Lenders in form and
                                            substance.
                                        8.  Review of and
                                            satisfaction with
                                            (i) tax aspects of the
                                            transactions, (ii) all
                                            documentation to be
                                            entered into by the
                                            Borrower and its
                                            subsidiaries in connection
                                            with the transaction and
                                            (iii) capital and
                                            ownership structure of
                                            WRG-Conn. and its
                                            subsidiaries taken as a
                                            whole after the spin-off
                                            and the Borrower and its
                                            subsidiaries after the
                                            acquisition by Holdings of
                                            WRG-NY.
                                        9.  Absence of any change in
                                            any pending investigation
                                            and the

                            - 12 -

<PAGE>    23

XXX-002214

absence of any other action, suit, investigation or proceeding in any court or before any arbitrator or governmental instrumentality, in either case that could reasonably be expected to have a material adverse effect on the financial condition, business or prospects of WRG-NY, NMC, WRG-Conn. or Holdings and their subsidiaries or on the transaction that will result in the combination of NMC with the worldwide dialysis business of Fresenius AG or any other transaction contemplated hereby.

10. Execution of acceptable agreements with the U.S. government in connection with the OIG investigation relating to (i) the guarantees required by Holdings and WRG-Conn., (ii) the letter of credit required of NMC and (iii) the agreement by the U.S. government (in connection with the OIG investigation) to allow the combination of NMC with the worldwide dialysis business of Fresenius AG.

11. Receipt of a solvency opinion for the Borrower.

12. Receipt from WRG-Conn. of a satisfactory indemnity for potential tax and environmental liabilities of the Borrower.

13. Evidence satisfactory to the Lenders that WRG-Conn. has sufficient committed credit capacity to obtain the letters of credit referred to in connection with the release of the WRG-Conn. guaranty agreements executed with respect to Facility 2 and Facility 3.

14. Evidence that the Borrower has closed a $180 million to $200 million securitization of certain accounts receivable of the Borrower and its subsidiaries, such

- 13 -

<PAGE>   24

transaction to be in form and substance (including advance rate percentages) satisfactory to the Managing Agents. The securitization facility will be considered as debt for purposes of calculating any financial tests.

CONDITIONS TO EACH BORROWING:                Customary in credit agreements of this nature, including but not limited to the following (except that the representations and warranties required to be accurate with respect to WRG-Conn. while WRG-Conn. is a guarantor shall be the same as those required to be

XXX-002215

accurate in connection with
borrowings by WRG-Conn. under
its existing credit
facilities):

1. Absence of default.
2. Accuracy of
   representations and
   warranties except, in the
   case of refunding
   borrowings, the
   representations relating
   to no material adverse
   change.

BORROWER COVENANTS:

Customary in credit
agreements of this nature
with respect to the Borrower,
the Guarantors and their
respective subsidiaries,
including but not limited to
the following (except that the
covenants of WRG-Conn. while
WRG-Conn. is a guarantor shall
be the same as the covenants
contained in its existing
credit facilities):

1. Information.
2. Maintenance of property;
   insurance coverage.
3. Conduct of business;
   maintenance of existence.
4. Compliance with laws,
   including ERISA and
   environmental
   regulations.
5. Inspection of property,
   books and equipment.
6. Negative pledge (including
   subsidiary stock and
   assets), with

- 14 -

normal exclusion baskets
to be negotiated.
7. Consolidations, mergers
   and sale of assets above a
   threshold amount.
8. Limitation on subsidiary
   and affiliate debt, to
   include a basket for
   intercompany debt. Because
   of the transaction in
   which WRG-NY will be
   acquired by Holdings, the
   basket will include (a)
   debt of up to $200 million
   incurred or outstanding at
   subsidiaries of Holdings
   (which debt may be
   guaranteed by Holdings and
   the subsidiaries of
   Holdings (other than NMC
   and its subsidiaries)
   which guarantee the Senior
   Credit Facilities);
   provided, however, that no
   more than $180 million of
   such indebtedness may be
   outstanding at the time
   Holdings guarantees the
   Senior Credit Facilities
   (if such guarantees are
   provided by Holdings) and,
   if such guarantees are
   provided by Holdings, no
   more than $170 million of
   such indebtedness shall
   have been outstanding at
   the time NMC was combined
   with the worldwide
   dialysis business of
   Fresenius AG, (b)
   subordinated debt of
   Holdings (or an acceptable
   subsidiary of Holdings) on
   terms and conditions

XXX-002216

acceptable to the Required
Lenders (which
subordinated debt, if
issued, will be used to
repay Facility 3), and (c)
intercompany debt.

9. Use of proceeds.
10. Limitation on acquisitions
and capital expenditures
($400 million per year
plus proceeds of any asset
sales retained by the
Borrower; $100 million per
acquisition and including
separate sublimit amounts
to be agreed upon for the
acquisition of wholly-
owned, majority-owned and
minority-owned
businesses).
11. Minimum consolidated net
worth.
12. Leverage ratio (initially
calculated at NMC and, if
Holdings guarantees the
Senior Credit

- 15 -

<PAGE>   26

Facilities, then
calculated at Holdings on
a consolidated basis):
The ratio of debt to
EBITDA shall not exceed a
level to be determined
(with step-downs over
time).
13. Coverage ratio (initially
calculated at NMC and, if
Holdings guarantees the
Senior Credit Facilities,
then calculated at
Holdings on a consolidated
basis): The ratio of
EBITDAR minus capital
expenditures to interest
plus dividends plus rents
plus scheduled
amortization plus taxes,
calculated on a rolling
four quarters basis, shall
not be less than a level
to be determined (with
step-ups over time).
14. Limitations on restricted
payments
15. Transactions with
affiliates on arms-length
basis.
16. Other transaction specific
items.

EVENTS OF DEFAULT:                  Customary in credit
agreements of this nature,
including but not limited to
the following (except that
the defaults related to
WRG-Conn. while WRG-Conn. is
a guarantor shall be the same
as the defaults contained in
its existing credit
facilities):

1. Failure to pay any
principal or
reimbursement obligations
payable under the credit
agreement when due;
failure to pay interest or
fees within three business
days.
2. Failure to meet covenants
(with grace periods, where
appropriate).
3. Representations or
warranties false in any
material respect when

XXX-002217

                                          made.
                                       4. Cross default to other
                                          debt of a minimum of $10
                                          million in principal
                                          amount which is
                                          triggered by an event
                                          which, with the giving of
                                          notice or lapse of time or
                                          both,

                              - 16 -

<PAGE>    27

                                          permits the holder to
                                          accelerate its debt or
                                          terminate its commitment.
                                       5. Change of ownership or
                                          control.
                                       6. Other usual
                                          defaults with respect to
                                          the Borrower and its
                                          subsidiaries, and, while
                                          it is a guarantor,
                                          WRG-Conn. and its
                                          subsidiaries, including
                                          but not limited to
                                          insolvency, bankruptcy,
                                          ERISA, and judgment
                                          defaults.

INCREASED COSTS/CHANGE OF
CIRCUMSTANCES:                            The credit agreement will
                                          contain customary provisions
                                          protecting the Lenders in the
                                          event of unavailability of
                                          funding, illegality,
                                          increased costs, capital
                                          adequacy and funding losses.

INDEMNIFICATION:                          The Borrower will indemnify
                                          the Lenders against
                                          all losses, liabilities,
                                          claims, damages, or expenses
                                          relating to their loans, the
                                          Borrower's use of loan
                                          proceeds or the commitments,
                                          including but not limited to
                                          reasonable attorneys' fees
                                          and settlement costs (except
                                          such as result from the
                                          indemnitee's gross negligence
                                          or willful misconduct).

TRANSFERS AND PARTICIPATIONS:             The Lenders will have
                                          the right to transfer or
                                          sell participations in their
                                          loans or commitments with the
                                          transferability of voting
                                          rights on amendments and
                                          waivers to be limited to
                                          changes in principal, rate,
                                          fees and term.  Assignments,
                                          which must be in amounts of
                                          at least $10,000,000, will be
                                          allowed with the consent of
                                          the Borrower and the Paying
                                          and Issuing Agent, such
                                          consents not to be
                                          unreasonably withheld.

REQUIRED LENDERS:                         Lenders holding
                                          more than 50% of the
                                          aggregate amount of loans and
                                          commitments under the Senior
                                          Credit Facilities.

GOVERNING LAW:                            State of New York.

                              - 17 -

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-5.1
<SEQUENCE>3
<DESCRIPTION>OPINION OF ROBERT H. BEBER, ESQ
<TEXT>

XXX-002218

<PAGE>    1

                                    EXHIBIT 5.1


[LOGO]                              Robert H. Beber
                                    Executive Vice President and
                                    General Counsel

                                    W. R. Grace & Co.
                                    One Town Center Road
                                    Boca Raton, FL 33486-1010

                                    Tel: (407) 362-1959
                                    Fax: (407) 362-1970

                                    July 29, 1996

W. R. Grace & Co.
One Town Center Road
Boca Raton, Florida 33486-1010

Gentlemen:

        You have asked me, as General Counsel of W. R. Grace & Co. ("Company"),
to render my opinion regarding certain matters in connection with a
Registration Statement on Form S-4 ("Registration Statement"), to be filed by
the Company with the Securities and Exchange Commission under the Securities
Act of 1933, covering shares ("Shares") of Class D Preferred Stock, par value
$.10 per share, of the Company.

        I have examined, or caused to be examined, the Certificate of
Incorporation and By-laws of the Company, as amended to date, the form of
amendment to the Company's Certificate of Incorporation filed as appendix to
the Registration Statement ("Amendment"), the records of the Company's
corporate proceedings, the Registration Statement and such other documents as I
have deemed necessary in connection with the opinion hereinafter expressed.

        Based on the foregoing, I am of the opinion that, upon the approval of
the Amendment by a majority of the total voting power of the Company's
outstanding capital stock, the filing of the Amendment with the Department of
State of the State of New York, the issuance and delivery of the Shares in the
manner prescribed in the Registration Statement, and the taking of other
appropriate corporate action by the Company's Board of Directors, the Shares
will be validly issued, fully paid and nonassessable shares of the Company's
Class D Preferred Stock.

        I express no opinion as to any laws other than those of the states of
Delaware and New York and the federal laws of the United States.

        I hereby consent to the filing of this opinion as an exhibit to the
Registration Statement and to the reference to me appearing under the caption
"Validity of Shares" in the Prospectus included therein.

                                    Very truly yours,

                                    /s/ Robert H. Beber

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-8.1
<SEQUENCE>4
<DESCRIPTION>OPINION OF WACHTELL, LIPTON, ROSEN, & KATZ
<TEXT>

<PAGE>    1

                                    EXHIBIT 8.1


            [WACHTELL, LIPTON, ROSEN & KATZ LETTERHEAD]

                        Dated as of the Effective Date of the
                        Joint Proxy Statement-Prospectus

W.R. Grace & Co.
1 Town Center Road
Boca Raton, FL 33486-1010

Ladies and Gentlemen:

        We have acted as special counsel to W. R. Grace & Co. ("Grace"), a New
York corporation, in connection with the Agreement and Plan of Reorganization,
dated February 4, 1996 (as supplemented or modified as of the date hereof), by
and between Grace and Fresenius AG, a German corporation ("Fresenius AG"), and
the Distribution Agreement dated February 4, 1996 (as supplemented or modified
as of the date hereof), by and between Grace, W. R. Grace & Co.-Conn., and
Fresenius AG (the "Agreements"), and the transactions that are contemplated
thereby (the "Reorganization").

        In connection with this opinion, we have examined the Agreements, the
final Joint Proxy Statement-Prospectus prepared in connection with the
Reorganization (the "Joint Proxy Statement-Prospectus") and such other documents
and corporate records as we have deemed necessary or appropriate for purposes of
this opinion. In addition, we have assumed (i) the Reorganization will be

XXX-002219

consummated in the manner described in the Joint Proxy Statement-Prospectus and in accordance with the provisions of the Agreements and (ii) the statements concerning the Reorganization set forth in the Joint Proxy Statement-Prospectus are accurate and complete.

Based upon the foregoing, we confirm our opinion set forth in the first paragraph under the heading "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS TO GRACE AND GRACE SHAREHOLDERS," subject to the qualifications in the first two paragraphs under that heading.

We hereby consent to the filing of this opinion as an exhibit to the Registration Statements to be filed with the Securities and Exchange Commission by you on Form S-4 and by Fresenius Medical Care AG on Form F-4 in connection with the Reorganization, and to the reference to this opinion under the caption "SUMMARY -- Certain Federal Income Tax Consequences -- Tax Consequences to Grace and Grace Shareholders" and under the caption "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS TO GRACE AND GRACE SHAREHOLDERS." In giving this consent we do not hereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, as amended, or the rules and regulations of the Securities and Exchange Commission thereunder.

<PAGE>   2
W.R. Grace & Co.
Page 2

We are furnishing this opinion to you and solely in connection with the Reorganization, and it is not to be relied upon, used, circulated, quoted, or otherwise referred to for any other purpose or by any other party without our consent, except as specifically set forth herein.

                              Very truly yours,


                              WACHTELL, LIPTON, ROSEN & KATZ


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-8.2
<SEQUENCE>5
<DESCRIPTION>OPINION OF MILLER & CHEVALIER
<TEXT>

<PAGE>   1
                                                            EXHIBIT 8.2


                     [MILLER & CHEVALIER LETTERHEAD]


                                                         August 2, 1996


W. R. Grace & Co.
1 Town Center Road
Boca Raton, FL 33486-1010

Ladies and Gentlemen:

We have acted as tax counsel to W. R. Grace & Co. ("Grace"), a New York corporation, in connection with the Agreement and Plan of Reorganization, dated February 4, 1996 (as supplemented or modified as of the date hereof), by and between Grace and Fresenius AG, a German corporation ("Fresenius AG"), and the Distribution Agreement dated February 4, 1996 (as supplemented or modified as of the date hereof), by and between Grace, W. R. Grace & Co.-Conn., and Fresenius AG (the "Agreements"), and the transactions that are contemplated thereby (the "Reorganization").

In connection with this opinion, we have examined the Agreements, the final Joint Proxy Statement-Prospectus prepared in connection with the Reorganization (the "Joint Proxy Statement-Prospectus") and such other documents and corporate records as we have deemed necessary or appropriate for purposes of this opinion. In addition, we have assumed (i) the Reorganization will be consummated in the manner described in the Joint Proxy Statement-Prospectus and in accordance with the provisions of the Agreements and (ii) the statements concerning the Reorganization set forth in the Joint Proxy Statement-Prospectus are accurate and complete.

Based upon the foregoing, we confirm our opinion set forth in the first paragraph under the heading "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS TO GRACE AND GRACE SHAREHOLDERS," subject to the qualifications in the first two paragraphs under that heading.

We hereby consent to the filing of this opinion as an exhibit to the Registration Statements to be filed with the Securities and Exchange Commission by you on Form S-4 and by Fresenius Medical Care AG on Form F-4 in connection with the Reorganization, and to the reference to this opinion under the caption "SUMMARY -- Certain Federal Income Tax Consequences -- Tax Consequences to Grace and Grace Shareholders" and under the caption "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS TO GRACE AND GRACE SHAREHOLDERS." In giving this consent we do not hereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, as

XXX-002220

amended, or the rules and regulations of the Securities and Exchange Commission thereunder.

<PAGE>    2
W.R. Grace & Co.
Page 2

     We are furnishing this opinion to you solely in connection with the Reorganization, and it is not to be relied upon, used, circulated, quoted, or otherwise referred to for any other purpose or by any other party without our consent, except as specifically set forth herein.

                 Very truly yours,

                 MILLER & CHEVALIER, CHARTERED

                 By: /s/ Thomas W. Mahoney, Jr.
                      ------------------------------

                    /s/ A. John Gabig
                    ------------------------------

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.1
<SEQUENCE>6
<DESCRIPTION>FMC POOLING AGREEMENT
<TEXT>

<PAGE>    1
                                EXHIBIT 10.1

                    POOLING AGREEMENT

               POOLING AGREEMENT dated as of _____, 1996 (the "POOLING AGREEMENT"), by and among FRESENIUS MEDICAL CARE AG, an Aktiengesellschaft organized under the laws of the Federal Republic of Germany ("FMC"), FRESENIUS AG, an Aktiengesellschaft organized under the laws of the Federal Republic of Germany ("FRESENIUS AG"), and the individuals acting, from time to time, as the Independent Directors (as hereinafter defined), as agents and representatives of the Minority Shareholders (as hereinafter defined) (the "AGENTS").

                    PREAMBLE

               Fresenius AG, Fresenius USA, Inc., a Massachusetts corporation ("FUSA"), and W. R. Grace & Co., a New York corporation ("GRACE"), have entered into an Agreement and Plan of Reorganization dated as of February 4, 1996 (as amended, the "REORGANIZATION AGREEMENT"). In accordance with the Reorganization Agreement, Fresenius AG and Grace intend to effect a merger of (i) a wholly owned New York corporate subsidiary of FMC with and into Grace and (ii) a wholly owned Massachusetts corporate subsidiary of FMC with and into FUSA (the "MERGERS"). As a result of the Mergers, the FMC Ordinary Shares (as hereinafter defined) shall be owned by Fresenius AG, the other holders of FUSA common stock and the holders of Grace common stock as contemplated by the Reorganization Agreement.

               In order to provide certain rights and protections to the Minority Shareholders, FMC, Fresenius AG and the Agents hereby agree as follows:

                    ARTICLE 1

                   DEFINITIONS

               1933 ACT: the Securities Act of 1933, as amended.

               1934 ACT: the Securities Exchange Act of 1934, as amended.

               ADRS: American Depositary Receipts evidencing ADSs.

               ADSS: American Depositary Shares representing FMC Ordinary Shares.

               AFFILIATE: as defined in Rule 12b-2 promulgated under the 1934 Act.

               AGENTS: as defined in the introductory paragraph hereof.
<PAGE>    2
               BENEFICIALLY OWN: with respect to any security, having direct or indirect (including through any Affiliate) "BENEFICIAL OWNERSHIP" of such security, as determined pursuant to Rule 13d-3 under the 1934 Act, including pursuant to any agreement, arrangement or understanding, whether or not in writing.

               CONTROLLED AFFILIATE: with respect to any Person, an Affiliate of such Person over which such Person has control as defined in Rule 12b-2 promulgated under the 1934 Act.

               DEPOSIT AGREEMENT: the Deposit Agreement dated _____ ___, 1996 among FMC, the holders of ADRs, and Morgan Guaranty Trust Company of New