York, as depositary.

EFFECTIVE TIME: the date and time when the Mergers shall become effective.

EXTRAORDINARY TRANSACTION: (a) any merger, consolidation, sale of all or substantially all assets, recapitalization, other business combination, liquidation, or other similar action out of the ordinary course of business of FMC, (b) any issuance of FMC Voting Securities representing more than 10% of the total FMC Voting Securities outstanding, or (c) any amendment of the organizational documents of FMC which adversely affects any holder of FMC Ordinary Shares, in such capacity.

FMC: as defined in the introductory paragraph hereof.

FMC BOARD: the Supervisory Board (Aufsichtsrat) of FMC.

FMC ORDINARY SHARES: ordinary shares of FMC.

FMC DIRECTOR: a member of the FMC Board.

FMC VOTING SECURITIES: at any time, any equity or debt securities of FMC which are then entitled to vote generally in the election of FMC Directors.

FRESENIUS AG: as defined in the introductory paragraph hereof.

GRACE: as defined in the Preamble hereof.

INDEPENDENT DIRECTOR: an FMC Director without a substantial business or professional relationship with either FMC, Fresenius AG or any Affiliate of either of the foregoing, other than as an FMC Director.

INTERESTED TRANSACTION: any transaction or series of related transactions between Fresenius AG or any of its Affiliates (other than FMC or a Controlled Affiliate of FMC), on the one hand, and FMC or any of its Controlled Affiliates, on the other hand.

2

<PAGE>    3

MERGERS: as defined in the Preamble hereof.

MINORITY SHAREHOLDER: all Persons from time to time Beneficially Owning FMC Ordinary Shares or ADSs other than Fresenius AG and its Affiliates.

NON-EMPLOYEE DIRECTOR: an FMC Director other than a Director representing employees pursuant to German co-determination laws or works council constitution laws.

PERSON: any individual, corporation, partnership, limited liability company, joint venture, trust, group, unincorporated organization, other form of business or legal entity or governmental authority.

SEC: as defined in Section 6.1.4.

SECURITIES FILINGS: as defined in Section 6.1.2.

US GAAP: as defined in Section 6.1.3.

STANDSTILL PERIOD: the three-year period commencing at the Effective Time.

TRANSFER: any sale, assignment, transfer or other disposition.

ARTICLE 2

PURPOSE; ENFORCEMENT

Section 2.1    Fresenius AG shall not exercise its voting rights in, nor effect any transaction in FMC Voting Securities in violation of the undertakings and obligations as set forth in this Agreement.

Section 2.2    This Agreement is made for the benefit of, and shall be enforceable by, each Minority Shareholder, each holder of ADRs and each Agent.

ARTICLE 3

INDEPENDENT DIRECTORS; COMPLIANCE WITH LAWS

Section 3.1    During the term of this Agreement, the ratio of Independent Directors to Non-Employee Directors shall not be less than one-third, and there shall be at least two Independent Directors at all times; provided that, if any person serving as an Independent Director shall resign, be removed or otherwise be unable or unwilling to serve in such capacity, a new person shall be appointed to serve as an Independent Director in accordance

XXX-002222

with the provisions of the Articles of Association of FMC and this Agreement

3

<PAGE>    4

if, as a result of such resignation or removal, the number of Independent Directors falls below the aforementioned minimum number of directors. Each Independent Director shall be afforded all rights of information, access and participation with respect to the business and affairs of FMC as are afforded any other Director of FMC and shall be afforded contemporaneous English translations of minutes of all meetings of the FMC Board (or any committee thereof) and such other documents as may be advisable or requested in connection with the performance of their duties.

            Section 3.2    During the term of this Agreement, if the FMC Board shall establish any committees thereof, Fresenius AG will use its best efforts as the majority shareholder to cause the ratio of Independent Directors to Non-Employee Directors appointed to any such committee to be not less than one-third and to cause at least one Independent Director to be appointed at all times to any such committee; it being understood that committees shall be formed by the FMC Board in its sole discretion.

            Section 3.3    During the term of this Agreement, Fresenius AG agrees and undertakes to exercise all voting rights with respect to FMC Voting Securities in a manner consistent with, and in order to effect the provisions of, Section 3.1.

            Section 3.4    During the term of this Agreement, Fresenius AG and its Affiliates shall comply with all provisions of German law applicable to Extraordinary Transactions.

ARTICLE 4

INTERESTED TRANSACTIONS

            Section 4.1    During the term of this Agreement, neither Fresenius AG nor any Affiliate of Fresenius AG (other than FMC and its Controlled Affiliates) shall enter into any contract or other transaction or series of related contracts or transactions with FMC or any Controlled Affiliate of FMC involving aggregate payments or other consideration in any year in an amount in excess of DM 10 million, without the approval of a majority of the Independent Directors (or all of the Independent Directors if there shall be less than three Independent Directors), unless such transaction or series of related contracts or transactions has been described in a business plan or budget of FMC or any Controlled Affiliate of FMC that has been previously approved by a majority of the Independent Directors (or all of the Independent Directors if there shall be less than three Independent Directors); provided, that once the aggregate payments or other consideration to be payable in any year under all such contracts or other transactions or series of related contracts or transactions that require approval in such year (or that would have required approval in such year but for the fact that such payment or other consideration did not exceed DM 10 million) exceeds DM 50 million, neither Fresenius AG nor any Affiliate of Fresenius AG (other than FMC and its Controlled Affiliates) shall enter into any such contract or other transaction or series of related transactions involving aggregate payments or other consideration in any year in

4

<PAGE>    5

an amount in excess of DM 5 million, without the approval of a majority of the Independent Directors (or all of the Independent Directors if there shall be less than three Independent Directors), unless such transaction or series of related transactions has been described in a business plan or budget of FMC or any Controlled Affiliate of FMC that has been previously approved by a majority of the Independent Directors (or all of the Independent Directors if there shall be less than three Independent Directors).

ARTICLE 5

POSITION IN FMC SHARES

            Section 5.1    During the Standstill Period, neither Fresenius AG nor any of its Affiliates shall Transfer any FMC Voting Securities except:

            5.1.1    to Controlled Affiliates (other than FMC) of Fresenius AG; or

            5.1.2    in a sale in which all Minority Shareholders are offered the opportunity to participate with Fresenius AG and its Affiliates on a pro rata basis, at the same price and on substantially the same terms as Fresenius AG and its Affiliates.

XXX-002223

Notwithstanding the foregoing, during the Standstill Period, for so long as Fresenius AG Beneficially Owns any FMC Voting Securities, Fresenius AG shall not effect any Transfer which would result in Fresenius AG Beneficially Owning less than 50.3% of all outstanding FMC Voting Securities.

Section 5.2    During the Standstill Period, Fresenius AG and its Affiliates shall not Beneficially Own FMC Voting Securities representing more than 57% of the vote of all outstanding FMC Voting Securities, except in a transaction approved by a majority of the Independent Directors and pursuant to which all FMC Voting Securities not then owned by Fresenius AG are acquired by Fresenius AG or its Affiliates at the same price and other terms and pursuant to procedures (including applicable disclosures) complying with the 1934 Act.

Section 5.3    Neither Fresenius AG nor any of its Affiliates shall effect any acquisition of FMC Voting Securities if the FMC Voting Securities to be acquired in such acquisition, together with all other FMC Voting Securities acquired by Fresenius AG and its Affiliates during the immediately preceding 90 day period, would represent more than 5% of the vote of all FMC Voting Securities then outstanding, unless (i) Fresenius AG shall have announced its intention to effect such acquisitions at least two days prior to the commencement of such 90-day period and reports the result of such acquisitions promptly following the end of such 90-day period or (ii) Fresenius AG shall acquire such shares in an offering in which all holders of FMC Ordinary Shares (including holders of ADSs) shall have pre-emptive rights.

5

<PAGE>    6

Section 5.4    After the Standstill Period, neither Fresenius AG nor any of its Affiliates shall effect any acquisition of FMC Voting Securities of any class if the FMC Voting Securities to be acquired in such acquisition, together with all other FMC Voting Securities acquired by Fresenius AG and its Affiliates during the immediately preceding 90 day period, would represent more than 15% of the vote of all FMC Voting Securities then outstanding, except (i) pursuant to a tender offer made to all holders of the class or classes of FMC Voting Securities to be acquired (subject to proration) made in compliance with the 1933 Act and the 1934 Act (including without limitation Sections 13 and 14 of the 1934 Act or any successor sections thereto) and the rules and regulations promulgated thereunder or (ii) pursuant to an offering in which all holders of FMC Ordinary Shares (including holders of ADSs) shall have pre-emptive rights.

Section 5.5    After the Standstill Period, neither Fresenius AG nor any of its Affiliates shall effect any Transfer, in a single transaction or in a series of related transactions, of more than 50% of the aggregate voting power of FMC Voting Securities then outstanding, other than to a Controlled Affiliate of Fresenius AG that agrees to be bound by the terms of this Agreement or in a widely distributed public offering, without offering to each other holder of FMC Voting Securities of the same class as the class to be so Transferred, the opportunity to participate on a pro rata basis on the same terms and conditions.

Section 5.6    Neither Fresenius AG nor any of its Affiliates shall (i) pledge or otherwise encumber any FMC Voting Securities held by it or (ii) enter into any pooling agreement or other similar agreement with any third party, if, in the case of either clause (i) or (ii), such action or agreement would prevent Fresenius AG from fulfilling its obligations under this Agreement.

Section 5.7    Anything in this Article 5 to the contrary notwithstanding, the provisions of this Article 5 shall not apply to Fresenius AG or its Affiliates in connection with the acquisition, ownership or Transfer of FMC Voting Securities pursuant to the terms of ___._____ [the Roll-Over Option Agreement.]

ARTICLE 6

LISTING OF AMERICAN DEPOSITARY SHARES;
FILINGS WITH THE SECURITIES AND EXCHANGE COMMISSION

Section 6.1    During the term of this Agreement, Fresenius AG shall use its best efforts as the majority shareholder of FMC to cause FMC to, and FMC shall:

6.1.1    maintain the effectiveness of the Deposit Agreement (or a similar successor agreement) and the listing of the ADSs on either the New York Stock Exchange or the Nasdaq Stock Market;

6

<PAGE>    7

6.1.2    file all reports required by the exchange on which the ADSs are listed, and the 1933 Act, the 1934 Act and other applicable laws ("SECURITIES FILINGS");

XXX-002224

6.1.3   prepare all financial statements required for any Securities Filing in accordance with U.S. generally accepted accounting principles ("US GAAP");

6.1.4   on an annual basis, prepare audited consolidated financial statements including, without limitation, a balance sheet, a statement of operations and a statement of cash flows, and all appropriate notes, all in accordance with US GAAP, and, on a quarterly basis, prepare and file with the Securities and Exchange Commission (the "SEC") consolidated financial statements prepared in accordance with US GAAP under cover of Form 6-K or a comparable successor form; and

6.1.5   file materials with the SEC relating to the solicitation of voting instructions from holders of ADSs with respect to annual and special shareholder meetings under cover of Form 6-K, which materials will also be made available to the Depositary for distribution to holders of ADRs and which materials will include information generally comparable to that which would be provided to shareholders of a United States corporation required to file proxy statements with the SEC; provided that any materials filed by FMC pursuant to this Section 6.1.5 need only include such information concerning (i) the beneficial ownership of FMC's outstanding voting securities, (ii) the trading market for and prices of such securities, (iii) the directors and officers of FMC, (iv) compensation of directors and officers of FMC and any compensation plans relating thereto, (v) options to purchase securities of FMC of a class registered under the 1934 Act, and (vi) material transactions between FMC and its subsidiaries and directors and officers of FMC, controlling persons of FMC, and relatives or spouses of such directors, officers and controlling persons as would be required to be provided by the relevant items of Form 20-F under the 1934 Act, or any successor form, as in effect from time to time; and

6.1.6   make available to the Depositary for distribution to holders of ADRs on an annual basis, a copy of any report prepared by the FMC Board and provided to the shareholders of FMC generally pursuant to Section 3.14(2) of the German Stock Corporation law (or any successor provision) concerning the results of its examination of the managing board report on the relations of FMC with connected enterprises.

ARTICLE 7

DIRECTORS AND OFFICERS INSURANCE

Section 7.1   FMC shall obtain directors and officers insurance for its Directors in respect of all liabilities arising from or relating to their service as members of the Supervisory Board of FMC, in accordance with customary and usual practices followed

7

<PAGE>   8

by public corporations in the United States, to the extent such insurance is available at commercially reasonable rates and on commercially reasonable terms and conditions.

ARTICLE 8

DURATION; AMENDMENT

Section 8.1   This Agreement shall be effective as of the Effective Time.

Section 8.2   This Agreement shall terminate:

8.2.1   upon the acquisition of all FMC Voting Securities by Fresenius AG or its Affiliates in a manner permitted under the terms hereof;

8.2.2   upon the reduction of Fresenius AG's Beneficial Ownership of FMC Voting Securities to less than 25% in voting power of the outstanding FMC Voting Securities; or

8.2.3   at such time as FMC no longer meets the minimum threshold for obligatory registration of the FMC Ordinary Shares or ADSs under Section 12(g)(1) of the 1934 Act and Rule 12g-1 thereunder.

Section 8.3   Fresenius AG and the Agents may terminate or amend this Agreement by mutual consent, provided that Minority Shareholders Beneficially Owning more than 75% of the FMC Ordinary Shares Beneficially Owned by the Minority Shareholders also consent to such termination and/or amendment. Any such amendment or termination shall be binding on all Minority Shareholders as if they were signatories thereto.

XXX-002225

## ARTICLE 9

### GENERAL PROVISIONS

Section 9.1    All amendments or supplements to this Agreement (including any amendment to this provision) must be in writing and signed by or on behalf of Fresenius AG and the Agents and approved as provided in Section 8.3.

Section 9.2    In case any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

8

<PAGE>   9

## ARTICLE 10

### GOVERNING LAW, LANGUAGE
### AND PLACE OF JURISDICTION

Section 10.1    This Agreement is made and shall be governed by and construed in all respects in accordance with New York law, without regard to the principles of conflicts of law thereof, except to the extent that certain matters are governed as a matter of controlling law by the law of the jurisdiction of organization of FMC.

Section 10.2    Each of FMC and Fresenius AG irrevocably submits to and accepts the jurisdiction of any court of competent jurisdiction in the State of New York in any action arising out of or under this Agreement and, in connection therewith, waives any defense of forum non conveniens and agrees to be bound by any judgment rendered in such courts.

Section 10.3    This Agreement and any amendment hereto may be executed in one or more counterparts and by different parties in separate counterparts. All of such counterparts shall constitute one and the same agreement.

Section 10.4    Each of FMC and Fresenius AG acknowledges that, in view of the uniqueness of arrangements contemplated by this Agreement, the Agents and the Minority Shareholders would not have an adequate remedy at law for money damages in the event that this Agreement were not performed in accordance with its terms, and therefore agree that the Agents and the Minority Shareholders shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which such Agents and the Minority Shareholders may be entitled at law or in equity.

Section 10.5    This Agreement shall be executed in the English language and such form of this Agreement shall prevail over any translation of this Agreement.

9

<PAGE>   10

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed as of the date first written above.

FRESENIUS AG

By:    ----------------------------
       Name:
       Title:


By:    ----------------------------
       Name:
       Title:


FRESENIUS MEDICAL CARE AG

By:    ----------------------------
       Name:
       Title:

XXX-002226

```
                                By:
                                     -----------------------------
                                     Name:
                                     Title:



                    10

<PAGE>   11

                                AGENTS


                                     -------------------------------------
                                     Name:


                                     -------------------------------------
                                     Name:



                    11
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.2
<SEQUENCE>7
<DESCRIPTION>LEASE AGREEMENT
<TEXT>

<PAGE>    1
                                                    [EXHIBIT 10.2]


               LEASE AGREEMENT FOR OFFICE BUILDINGS


This Agreement made and entered into by and between


Fresenius Aktiengesellschaft,

Borkenberg 14,
61440 Oberursel


                                          - Landlord -


and


Fresenius Medical Care Dialysetechnik GmbH, Bad Homburg
v.d.H.

Borkenberg 14
61440 Oberursel


                                          - Tenant -


witnesseth:



Article 1 - Leased Buildings


1.        This lease relates to the office buildings (the "Leased
          Space") as described in Exhibit A.

          The address of the Leased Space is [Oberursel,
          Borkenberg 14] [Bad Homburg, Daimler Str. 15].

          The Leased Space is outlined in the layout plan attached hereto as
          Exhibit B.
```

XXX-002227

2.    This lease includes all fixtures which is part of the
      Leased Space by virtue of law and which is available at
      the commencement of the lease.

3.    The keys shall be delivered to the Tenant, for the term
      of the lease, when the Tenant moves in.

<PAGE>  2
                              -2-

      The Tenant shall acknowledge in writing receipt of the keys and the
      proper condition of the Leased Space.

4.    The Landlord warrants that the Leased Space (i) meets
      the general technical requirements which may apply to
      the purpose of the lease and (ii) complies with all
      statutory provisions and/or all directives of
      authorities, further that there are no material defects
      affecting the Leased Space or its intended use by the
      Tenant. The Landlord shall, at its own cost and expense,
      fulfill any conditions imposed by authorities or by
      statutory provisions as of the effective date of this
      Lease Agreement; any future modifications relating to
      its operations in the leased premises are to be made at
      the Tenant's cost and expense.

      The Leased Space may not be used for purposes other than the purposes
      permitted according to the regulations of authorities applicable from
      time to time.

5.    Applies only to "Am Borkenberg 14, Oberursel":
      The parties hereto are aware of the fact that the
      Landlord is presently preparing to move to new
      headquarters. The Tenant shall have the right and the
      obligation to vacate the present location and to move
      to the new headquarters. The Tenant shall use the same
      space and pay the same rent at the new headquarters,
      subject to mutually acceptable modifications. The Tenant
      shall not be entitled to claim compensation for moving
      costs, changes of the equipment etc.]

Article 2 - Term and Termination

1.    The lease relationship shall become effective on the
      Closing of the Plan and Reorganization Agreement (the
      "Agreement"). Notwithstanding Article 3 of this Lease
      Agreement, from the Closing through December 31, 1996,
      the Tenant shall be entitled to use the Leased Space
      free of any rent; the incidental expenses according to
      Article 4 of this Lease Agreement have to be borne by
      the Tenant on a pro rata basis.

      This Lease Agreement shall terminate on December 31, 2006.

2.    In the event of termination of this Lease Agreement
      before the agreed date for which termination the Tenant
      is responsible, the Tenant shall be liable for any and
      all damage caused thereby, in particular, but not
      limited to, loss of rent, incidental expenses and other
      charges relating to the period for which the lease has
      been entered into. The same shall apply vice versa
      should the Landlord be responsible for the termination.

<PAGE>  3
                              - 3 -

Article 3 - Rent and Advances on Incidental Expenses

1.    The yearly rent shall be DM *]_____ (_____ German Marks)
      plus the legal VAT applicable from time to time. The yearly rent has
      to be paid in twelve equal instalments.

2.    As advance on incidental expenses (Article 4), an amount
      of

      DM _____

      plus legal VAT is currently payable each month in addition to and
      together with the rent.

Article 4 - Incidental Expenses

1.    The Landlord shall be entitled to charge all operating

XXX-002228

costs within the meaning of Appendix 3 to Section 27
para. 1 of the "Zweite Berechnungsverordnung" [Second
Computation Ordinance] to the Tenant. This Appendix 3
is attached hereto as Exhibit D.

2.       The Tenant shall directly settle accounts for these incidental
         expenses with the individual recipients if and to the extent that this
         is possible . This applies, in particular, without limitation, to the
         costs for:

         - heating including maintenance costs
         - chimney cleaning
         - hot water, water consumption
         - waste water and use of the sewerage system
         - garbage disposal
         - electricity consumption
         - gas consumption.

3.       If and to the extent that the incidental expenses are
         not directly settled by the Tenant, they shall be ap-
         portioned by the Landlord in the proportion which the
         Leased Space bears to the total space to which the
- -------

   *)Oberursel:   DM  2,250,000.00
   Bad Homburg:   DM  1,100,000.00
<PAGE>  4
                                    - 4 -

respective operating costs relate. This will apply, in
particular, to fire insurance and ground tax.

4.       The Landlord shall prepare statements of account for the
         operating costs on an "as needed" basis, but at least
         once each year. In the event of termination of this
         Lease Agreement during an accounting period, the
         operating costs shall be apportioned in the statement
         of account next due in the proportion which the lease
         period bears to the accounting period. Additional claims
         resulting from a statement of account shall be settled
         with the rent payment next due. In case of termination
         of this Lease Agreement, the Landlord has to repay any
         excess - if any - of the advance without delay.

5.       The Landlord shall be entitled to reasonably reassess
         the advance on the incidental expenses from time to
         time, if he can demonstrate changes of the cost.
         [Instand of 5.1. through 5.5. for Oberursel: Am
         Borkenberg: Incidental Expenses will be governed by
         service agreements between the parties.]

Article 5 - Manner of Payment

1.       The rent and the advances on the incidental expenses shall be payable
         in advance for each month no later than on the third working day of
         each month. The rent shall be remitted at no cost to the Landlord's
         account no.
              with Bank                      bank  code

2.       The receipt of the amount and/or the credit entry on the
         Landlord's account shall be decisive for timely payment.

3.       If and when the Tenant is in arrears with any payment, the Tenant
         shall owe dunning costs, if any and default interest at a rate of four
         percent (4%) above the discount rate of the Deutsche Bundesbank, but
         no less than an amount equal to six percent (6%) of the respective
         amount in arrears. The right to assert further damage claims shall
         remain unaffected.

Article 6 - Escalator Clause

In the event that the cost of living index for households consisting of 4
persons (employees with average income) determined by the Federal Statistical
Office on the federal average (basis: 1991 = 100) increases or decreases in
relation to its state as of December 1996, the rent shall be changed in the same
proportion.

<PAGE>  5
                                    - 5 -

XXX-002229

An adjustment shall, in each case, be made as of January 01 of a year in
accordance with the state of the index in December of the preceding year.

The calculation shall be made on the basis of the following formula:

$$new\ rent = \frac{former\ rent \times new\ index\ (December\ in\ each\ case)}{index\ December\ 1996}$$

The Landlord shall be responsible for obtaining the authorization of the
respective "Landeszentralbank" which is required for the validity of this
escalator clause.

Article 7 - Maintenance and Repair, Improvements

The Landlord shall bear the costs of maintenance and repair of the outer walls
and the roof of the building. Insofar, the Landlord shall hold the roof and the
outer walls in good repair and condition. Furthermore, the Landlord shall be
responsible for and shall repair all structural defects of the building as well
as plumbing, electricity, HVAC and the like.

The Tenant shall be responsible for all other mechanical problems. As well, the
Tenant shall bear the costs of maintenance and repair and interior decorative
repairs of the leased building.

Tenant can make improvements with Landlord's consent which shall not be
unreasonably withheld and at the end of the lease Tenant has the option to leave
or remove if Tenant repairs resulting damage.

Article 8 - Setoff, Reduction of Rent

The Tenant may offset a claim against the rent or the incidental expenses, or
exercise a right of retention, only if the counterclaim is uncontested or has
become res judicata.

The Tenant may reduce the rent payments because of a defect of the Leased Space
or its use only if and when he notifies the Landlord in writing of its intention
to reduce the rent one (1) month before the first rent payment to be reduced is
due and payable and the Tenant is not in arrears with any payments.

<PAGE>   6

                          - 6 -

Article 9 - Subleasing

The Landlord's consent shall be required for any subleasing or other permission
to use the Leased Space granted to third parties.

Such consent to subleasing may not be unreasonably withheld. The Tenant shall be
liable for any and all acts or omissions of the sublessee. The Tenant, here and
now, assigns to the Landlord the Tenant's receivables from the sublessee,
including the lien, for security purposes, however, the Tenant remains entitled
to collect such rent.

Article 10 - Advertising Measures

Subject to the Landlord's consent, the Tenant shall be entitled to install
advertising signs at the places designated by the Landlord. The Tenant shall be
responsible for obtaining permissions from authorities, if any. The consent may
be withheld only if it is to be feared that the building will be disfigured or
damaged as a result of the advertising measure.

Article 11 - Entry of Leased Space by Landlord

The Landlord or its designees shall be entitled to enter the Leased Space during
business hours in order to check the state and condition after timely advance
notice. If and when the Landlord intends to sell the real property or notice of
termination of this Agreement has been given, the Landlord or its designees may
inspect the Leased Space together with the potential purchaser or tenant after
timely advance notice.

XXX-002230

Article 12 - Security, Landlord's Lien

1.        The Tenant shall pay an amount of DM *}_____
          (_____ German Marks) as security for any
          and all payment obligations hereunder including costs
          of legal remedies and vacation. The Landlord has to
          arrange for the best possible interest on the security,
          to which the Tenant is entitled. This security may be
          provided also in the form of an irrevocable, directly
          enforceable, unconditional guaranty, unlimited in time,
          of a major German bank. Payment by the guarantor shall
          be made upon first request of the Landlord.

- --------
  *) Oberursel:    DM    562,500.00
  Bad Homburg:     DM    275,000.00

<PAGE>   7
                              - 7 -

          The Tenant shall be released from the aforementioned obligation as
          long as Fresenius Aktiengesellschaft or one of its affiliates is owner
          of the property.

2.        The guaranty as security will be returned only, but then without undue
          delay, after fulfillment of all obligations of the Tenant, in
          particular, but not limited to, the obligation to pay rent, incidental
          expenses and repair costs and after vacation of the leased premises
          and repossession thereof by the Landlord.

          The guaranty will expire six (6) months after termination or
          expiration of this Lease Agreement if the Landlord has not used the
          guaranty by such point in time. The Landlord shall, however, be
          obligated to determine any claims under the guaranty and notify the
          Tenant thereof without delay.

3.        The Tenant knows that the Landlord has a statutory lien on the
          Tenant's property which the Tenant brought into the leased premises,
          and that the Tenant shall not be entitled to remove this property
          without the Landlord's consent, except in the ordinary course of
          business. The ordinary course includes disposal of obsolete or
          replaced equipment.

Article 13 - Termination or Expiration of the Term of this
Lease Agreement

Upon termination or expiration of the term of this Lease Agreement, the Tenant
shall return to the Landlord the leased building cleaned, together
with all keys, including those obtained by the Tenant, without the Tenant having
any claim for compensation by the Landlord. Tenant is obliged to repair damages
if caused by him, ordinary wear and tear excepted.

In the event that, during the term of the lease, work for which the Tenant is
responsible hereunder has not been executed, the Landlord may, at its choice,
upon termination or expiration of the term of this Lease Agreement, cause such
work to be executed at the Tenant's cost and expense, or claim payment of the
estimated costs of such work by the Tenant.

<PAGE>   8
                              - 8 -

Article 14 - Insurances and Duty to ensure Safety
(Verkehrssicherungspflicht)

1.        To the extent permitted by law, the Tenant shall have the duty to make
          the Leased Space and the surroundings, if any, safe for persons and
          vehicles (Verkehrssicherungspflicht).

2.        The Tenant shall be obligated, at its cost and expense,
          to contract and maintain

          -         a liability insurance [Betriebshaftpflichtver-
                    sicherung]

          -         fire insurance

          -         business interruption insurance

XXX-002231

to cover damage to the leased building.

2.       The Tenant shall be responsible for insurance coverage
         for the risk resulting from the business operation.

Article 15 - Miscellaneous

1.       No agreements other than those contained herein have
         been made. Modifications of and supplements to this
         Agreement shall be valid only if in writing.

2.       If any provision of this Agreement or of supplementary agreements is
         or will be invalid, this shall not affect the validity of the
         remaining provisions hereof and thereof. The parties undertake to
         replace the invalid provision by a legally effective provision with
         the same purpose.

3.       This Lease Agreement shall be governed by German law.
         Exclusive place of jurisdiction is Bad Homburg v.d.H.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands the day and
year hereinafter written.

[Place], [Date]
         -----------

- -------------------------                    ------------------------
[Landlord]                                     [Tenant]

<PAGE>   9
              PREEMPTIVE RIGHT IN LIMITED PARTNER'S SHARES

Fresenius AG is the owner of the entire limited-liability partnership capital in
Fresenius Immobilien-Verwaltungs- GmbH & Co Objekt St. Wendel KG [Objekt
Schweinfurt KG]. Fresenius AG hereby grants Fresenius Medical Care AG a
preemptive right for each case of a sale with respect to the limited partner's
share, whether this share is sold in portions or in its entirety.

The right of Fresenius AG to amend the limited partnership agreement will not be
affected by said preemptive right except insofar as such an amendment would
adversely affect the rights of Tenant.
<PAGE>   10
                         RIGHT OF PREEMPTION
                    WITH RESPECT TO REAL PROPERTY

[Notarial preamble, land record description etc.]

The owner of the real property (Grantor of Preemptive Right) hereby grants
Fresenius Medical Care Aktiengesellschaft (Preemptor) a right of preemption in
rem for any sale of the aforementioned real property. This right of preemption
will, however, not exist in cases where a sale occurs between the owner of the
real property and companies affiliated with the owner of the real property - in
any direction whatsoever within the meaning of Section 15 AktG [German
Corporation Law]; in addition, the right of preemption may not be exercised if
and when the owner of the real property or an affiliated company of the owner of
the real property within the meaning of Section 15 AktG transfers the real
property to a third company and a right of purchase is granted simultaneously in
favor of Fresenius Aktiengesellschaft or an affiliated company of Fresenius
Aktiengesellschaft within the meaning of Section 15 AktG.
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.3
<SEQUENCE>8
<DESCRIPTION>LEASE AGREEMENT
<TEXT>

<PAGE>   1
                                                        [EXHIBIT 10.3]

          LEASE AGREEMENT FOR MANUFACTURING FACILITIES

This Agreement made and entered into by and between

[Fresenius Aktiengesellschaft]

[Fresenius Immobilien-Verwaltungs-GmbH & Co. Objekt St. Wendel
KG]

[Fresenius Immobilien-Verwaltungs-GmbH & Co. Objekt
Schweinfurt KG]

Borkenberg 14,
61440 Oberursel

- Landlord -

and

Fresenius Medical Care Dialysetechnik GmbH, Bad Homburg
v.d.H.,

Borkenberg 14,
61440 Oberursel

- Tenant -

witnesseth:

Article 1 - Leased Buildings

1.       This lease relates to the manufacturing facilities (the
         "Leased Space") as described in Exhibit A.

                                          1
<PAGE>   2
                              - 2 -

         The address of the Leased Space is [Ober-Erlenbach,
         Steinmuhlweg 24] [St. Wendel, Frankfurter Strasse 6-8]
         [Schweinfurt, Hafenstrasse 9]

         The Leased Space is outlined in the layout plan attached hereto as
         Exhibit B.

2.       This lease includes all fixtures which is part of the
         Leased Space by virtue of law and which is available at
         the commencement of the lease.

3.       The keys shall be delivered to the Tenant, for the term of
         the lease, when the Tenant moves in.

         The Tenant shall acknowledge in writing receipt of the keys and the
         proper condition of the Leased Space.

4.       The Landlord warrants that the Leased Space (i) meets the
         general technical requirements which may apply to the
         purpose of the lease and (ii) complies with all statutory
         provisions and/or all directives of authorities, further
         that there are no material defects affecting the Leased
         Space or its intended use by the Tenant. The Landlord
         shall, at its own cost and expense, fulfill any conditions
         imposed by authorities or by statutory provisions as of
         the effective date of this Lease Agreement; any future
         modifications relating to its operations in the leased
         premises are to be made at the Tenant's cost and expense.

         The Leased Space may not be used for purposes other than the purposes
         permitted according to the regulations of authorities applicable from
         time to time.

Article 2 - Term and Termination

XXX-002233

1.      The lease relationship shall become effective on the Closing of the
        Plan and Reorganization Agreement (the "Agreement"). Notwithstanding
        Article 3 of this Lease Agreement, from the Closing through December
        31, 1996, the Tenant shall be entitled to use the Leased Space free of
        any rent; the incidental expenses according to Article 4

<PAGE>   3
                                    - 3 -

        of this Lease Agreement have to be borne by the Tenant on
        a pro rata basis.

        This Lease Agreement shall terminate on December 31, 2006.

2.      The Tenant shall be entitled to exercise two (2)  options
        of a period of ten (10) years each, provided that he
        exercises the respective rights simultaneously  with
        regard to all three (3) contracts listed in Exhibit C. The
        options must be exercised in writing and not later than on
        December 31, 2004 with regard to the first option and not
        later than on December 31, 2014 with regard to the second
        option. [If the Tenant does not exercise any of the
        aforementioned options, the Landlord shall be entitled to
        a lump sum compensation in an amount equal to the rent for
        twelve (12) months on the basis of the rent for the month
        directly preceding the end of the lease contract, plus
        VAT.]

3.      In the event of termination of this Lease Agreement before
        the agreed date for which termination the Tenant is
        responsible, the Tenant shall be liable for any and all
        damage caused thereby, in particular, but not limited to,
        loss of rent, incidental expenses and other charges
        relating to the period for which the lease has been
        entered into. The same shall apply vice versa should the
        Landlord be responsible for the termination.

Article 3 - Rent and Advances on Incidental Expenses


1.      The yearly rent shall be DM *)_____ (_____ German Marks)
        plus the legal VAT applicable from time to time. The yearly rent has
        to be paid in twelve equal instalments.

2.      As advance on incidental expenses (Article 4), an amount
        of

        DM
             --------------------------
- -------------------
    *) Ober-Erlenbach: DM 1,375,000.00
     St. Wendel:       DM 8,900,000.00
     Schweinfurt:      DM 3,175,000.00
<PAGE>   4
                                    - 4 -


        plus legal VAT is currently payable each month in addition to and
        together with the rent.


Article 4 - Incidental Expenses


1.      The Landlord shall be entitled to charge all operating
        costs within the meaning of Appendix 3 to Section 27 para.
        1 of the "Zweite Berechnungsverordnung" [Second
        Computation Ordinance] to the Tenant. This Appendix 3 is
        attached hereto as Exhibit D.

2.      The Tenant shall directly settle accounts for these incidental
        expenses with the individual recipients if and to the extent that this
        is possible . This applies, in particular, without limitation, to the
        costs for:

        - heating including maintenance costs
        - chimney cleaning
        - hot water, water consumption
        - waste water and use of the sewerage system
        - garbage disposal
        - electricity consumption

XXX-002234

- gas consumption.

3.     If and to the extent that the incidental expenses are not directly
       settled by the Tenant, they shall be apportioned by the Landlord in
       the proportion which the Leased Space bears to the total space to
       which the respective operating costs relate. This will apply, in
       particular, to fire insurance and ground tax.

4.     The Landlord shall prepare statements of account for the
       operating costs on an "as needed" basis, but at least once
       each year. In the event of termination of this Lease
       Agreement during an accounting period, the operating costs
       shall be apportioned in the statement of account next due
       in the proportion which the lease period bears to the
       accounting period. Additional claims resulting from a
       statement of account shall be settled with the rent
       payment next due. In case of termination of this Lease
       Agreement, the Landlord has to repay any excess - if any -
       of the advance without delay.

5.     The Landlord shall be entitled to reasonably reassess the
       advance on the incidental expenses from time to time, if
       he can demonstrate changes of the cost.

<PAGE>   5
                                  - 5 -


Article 5 - Manner of Payment

1.     The rent and the advances on the incidental expenses shall be payable
       in advance for each month no later than on the third working day of
       each month. The rent shall be remitted at no cost to the Landlord's
       account no.
        with Bank                          bank   code

2.     The receipt of the amount and/or the credit entry on the
       Landlord's account shall be decisive for timely payment.

3.     If and when the Tenant is in arrears with any payment, the Tenant
       shall owe dunning costs, if any and default interest at a rate of four
       percent (4%) above the discount rate of the Deutsche Bundesbank, but
       no less than an amount equal to six percent (6%) of the respective
       amount in arrears. The right to assert further damage claims shall
       remain unaffected.

Article 6 - Escalator Clause


In the event that the cost of living index for households consisting of 4
persons (employees with average income) determined by the Federal Statistical
Office on the federal average (basis: 1991 = 100) increases or decreases in
relation to its state as of December 1996, the rent shall be changed in the same
proportion.

An adjustment shall, in each case, be made as of January 01 of a year in
accordance with the state of the index in December of the preceding year.

The calculation shall be made on the basis of the following formula:


            former rent x new index (December in each case)
new rent ==========================================================
                      index December 1996


The Landlord shall be responsible for obtaining the authorization of the
respective "Landeszentralbank" which is required for the validity of this
escalator clause.

Article 7 - Maintenance and Repair, Improvements
<PAGE>   6
                                  - 6 -



The Landlord shall bear the costs of maintenance and repair of the outer walls
and the roof of the building. Insofar, the Landlord shall hold the roof and the
outer walls in good repair and condition. Furthermore, the Landlord shall be
responsible for and shall repair all structural defects of the building as well
as plumbing, electricity, HVAC and the like.

XXX-002235

The Tenant shall be responsible for all other mechanical problems. As well, the Tenant shall bear the costs of maintenance and repair and interior decorative repairs of the leased building.

Tenant can make improvements with Landlord's consent which shall not be unreasonably withheld and at the end of the lease Tenant has the option to leave or remove if Tenant repairs resulting damage.

Article 8 - Setoff, Reduction of Rent

The Tenant may offset a claim against the rent or the incidental expenses, or exercise a right of retention, only if the counterclaim is uncontested or has become res judicata.

The Tenant may reduce the rent payments because of a defect of the Leased Space or its use only if and when he notifies the Landlord in writing of its intention to reduce the rent one (1) month before the first rent payment to be reduced is due and payable and the Tenant is not in arrears with any payments.

Article 9 - Subleasing

The Landlord's consent shall be required for any subleasing or other permission to use the Leased Space granted to third parties.

Such consent to subleasing may not be unreasonably withheld. The Tenant shall be liable for any and all acts or omissions of the sublessee. The Tenant, here and now, assigns to the Landlord the Tenant's receivables from the sublessee, including the lien, for security purposes, however, the Tenant remains entitled to collect such rent.

Article 10 - Advertising Measures

<PAGE>    7

- 7 -

Subject to the Landlord's consent, the Tenant shall be entitled to install advertising signs at the places designated by the Landlord. The Tenant shall be responsible for obtaining permissions from authorities, if any. The consent may be withheld only if it is to be feared that the building will be disfigured or damaged as a result of the advertising measure.

Article 11 - Entry of Leased Space by Landlord

The Landlord or its designees shall be entitled to enter the Leased Space during business hours in order to check the state and condition after timely advance notice. If and when the Landlord intends to sell the real property or notice of termination of this Agreement has been given, the Landlord or its designees may inspect the Leased Space together with the potential purchaser or tenant after timely advance notice.

Article 12 - Security, Landlord's Lien

1.      The Tenant shall pay an amount of DM *)_____
        (_____ German Marks) as security for any and
        all payment obligations hereunder including costs of legal
        remedies and vacation. The Landlord has to arrange for the
        best possible interest on the security, to which the
        Tenant is entitled. This security may be provided also in
        the form of an irrevocable, directly enforceable,
        unconditional guaranty, unlimited in time, of a major
        German bank. Payment by the guarantor shall be made upon
        first request of the Landlord.

        The Tenant shall be released from the aforementioned obligation as
        long as Fresenius Aktiengesellschaft or one of its affiliates is owner
        of the property.

2.      The guaranty as security will be returned only, but then
        without undue delay, after fulfillment of all obligations
        of the Tenant, in particular, but not limited to, the
        obligation to pay rent, incidental expenses and repair
- --------
  *) Ober-Erlenbach: DM   343,750.00
   St. Wendel:       DM 2,225,000.00
   Schweinfurt:      DM   793,750.00
<PAGE>    8
                         - 8 -

XXX-002236

costs and after vacation of the leased premises and
repossession thereof by the Landlord.

The guaranty will expire six (6) months after termination or
expiration of this Lease Agreement if the Landlord has not used the
guaranty by such point in time. The Landlord shall, however, be
obligated to determine any claims under the guaranty and notify the
Tenant thereof without delay.

3.     The Tenant knows that the Landlord has a statutory lien on the
       Tenant's property which the Tenant brought into the leased premises,
       and that the Tenant shall not be entitled to remove this property
       without the Landlord's consent, except in the ordinary course of
       business. The ordinary course includes disposal of obsolete or
       replaced equipment.

Article 13 - Termination or Expiration of the Term of this Lease
Agreement

Upon termination or expiration of the term of this Lease Agreement, the Tenant
shall return to the Landlord the leased building cleaned, together with all
keys, including those obtained by the Tenant, without the Tenant having any
claim for compensation by the Landlord. Tenant is obliged to repair damages if
caused by him, ordinary wear and tear excepted.

In the event that, during the term of the lease, work for which the Tenant is
responsible hereunder has not been executed, the Landlord may, at its choice,
upon termination or expiration of the term of this Lease Agreement, cause such
work to be executed at the Tenant's cost and expense, or claim payment of the
estimated costs of such work by the Tenant.

Article 14 - Insurances and Duty to ensure Safety
(Verkehrssicherungspflicht)

1.     To the extent permitted by law, the Tenant shall have the duty to make
       the Leased Space and the surroundings, if any, safe for persons and
       vehicles (Verkehrssicherungspflicht).

2.     The Tenant shall be obligated, at its cost and expense, to
       contract and maintain

<PAGE>    9

                                - 9 -

       -       a liability insurance (Betriebshaftpflichtver-
               sicherung]

       -       fire insurance

       -       business interruption insurance

       to cover damage to the leased building.

2.     The Tenant shall be responsible for insurance coverage for
       the risk resulting from the business operation.

Article 15 - Miscellaneous

1.     No agreements other than those contained herein have been
       made. Modifications of and supplements to this Agreement
       shall be valid only if in writing.

2.     If any provision of this Agreement or of supplementary agreements is
       or will be invalid, this shall not affect the validity of the
       remaining provisions hereof and thereof. The parties undertake to
       replace the invalid provision by a legally effective provision with
       the same purpose.

3.     This Lease Agreement shall be governed by German law.
       Exclusive place of jurisdiction is Bad Homburg v.d.H.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands the day and

XXX-002237

year hereinafter written.


[Place], [Date]
        -----------



- -------------------------                      ----------------------
[Landlord]                                       [Tenant]
<PAGE>   10
            PREEMPTIVE RIGHT IN LIMITED PARTNER'S SHARES


Fresenius AG is the owner of the entire limited-liability partnership capital in
Fresenius Immobilien-Verwaltungs- GmbH & Co Objekt St. Wendel KG [Objekt
Schweinfurt KG]. Fresenius AG hereby grants Fresenius Medical Care AG a
preemptive right for each case of a sale with respect to the limited partner's
share, whether this share is sold in portions or in its entirety.


The right of Fresenius AG to amend the limited partnership agreement will not be
affected by said preemptive right except insofar as such an amendment would
adversely affect the rights of Tenant.
<PAGE>   11
                        RIGHT OF PREEMPTION
                     WITH RESPECT TO REAL PROPERTY


[Notarial preamble, land record description etc.]


The owner of the real property (Grantor of Preemptive Right) hereby grants
Fresenius Medical Care Aktiengesellschaft (Preemptor) a right of preemption in
rem for any sale of the aforementioned real property. This right of preemption
will, however, not exist in cases where a sale occurs between the owner of the
real property and companies affiliated with the owner of the real property - in
any direction whatsoever within the meaning of Section 15 AktG [German
Corporation Law]; in addition, the right of preemption may not be exercised if
and when the owner of the real property or an affiliated company of the owner of
the real property within the meaning of Section 15 AktG transfers the real
property to a third company and a right of purchase is granted simultaneously in
favor of Fresenius Aktiengesellschaft or an affiliated company of Fresenius
Aktiengesellschaft within the meaning of Section 15 AktG.
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.4
<SEQUENCE>9
<DESCRIPTION>TRANSITION SERVICES AGREEMENT
<TEXT>

<PAGE>   1
                                                       [EXHIBIT 10.4]

                    TRANSITION SERVICES AGREEMENT

               TRANSITION SERVICES AGREEMENT, dated _____, 1996 (the
"AGREEMENT"), by and between FRESENIUS AG, an Aktiengesellschaft organized under
the laws of the Federal Republic of Germany ("FAG"), and FRESENIUS MEDICAL CARE
AG, an Aktiengesellschaft organized under the laws of the Federal Republic of
Germany ("FMC").


                         R E C I T A L S

               WHEREAS, FAG, Fresenius USA, Inc., a Massachusetts
corporation, and W. R. Grace & Co., a New York corporation ("GRACE"), have
entered into an Agreement and Plan of Reorganization, dated as of February 4,
1996 (as amended, the "REORGANIZATION AGREEMENT"), pursuant to which FMC will
acquire the FWD Business (as defined in the Reorganization Agreement) from FAG
and the healthcare business of Grace; and

               WHEREAS, the execution and delivery of this Agreement by the
parties hereto is a condition to the consummation of the Reorganization (as such
term is defined in the Reorganization Agreement);

               NOW, THEREFORE, in consideration of the mutual agreements,
provisions and covenants contained in this Agreement, and the above recited
consideration and other good and valuable consideration, the parties hereto
agree as follows:

               1. TRANSITION SERVICES. The Provider (as such term is
hereinafter defined) shall provide, or shall cause its subsidiaries to provide,
the Services to the Recipient (as such term is hereinafter defined) and its
subsidiaries. In each case, the Provider will do so upon the written request
from time to time of the Recipient and on the other terms and conditions
hereinafter set forth. As used herein, the term "PROVIDER" shall mean the party
required to provide the Services, the term "RECIPIENT" shall mean the party to
receive the Services; and the term "SERVICES" shall mean, in the case of FAG as
the Provider and FMC as the Recipient, services of the type set forth on Annex A

XXX-002238

and, in the case of FMC as the Provider and FAG as the Recipient, Services of the type set forth on Annex B.

2. TERM. Except as provided in the immediately following sentence, the term of this Agreement shall commence at the Effective Time (as such term is defined in the Reorganization Agreement) of the Reorganization and terminate as to each of the Services as set forth on Annex A or Annex B. The parties hereto may agree from time to time to extend the term with respect to any or all Services for an additional period or periods to be agreed upon, on the same terms (other than duration) and conditions as those prevailing during the initial period for the applicable Services as set forth on Annex A and B. Each of the parties hereto
<PAGE>    2
agree to use commercially reasonable efforts to assist the other to end its use of the Services as soon as reasonably possible.

3. SERVICE FEE. The Recipient shall pay to the Provider for each of the Services a fee determined in accordance with Annex A or Annex B hereto, as the case may be (a "FEE").

4. BILLING AND PAYMENT. (a) Each Fee, except for any portion thereof that is variable, shall be due and payable in advance on the first day of each month during the term of this Agreement. Any variable portion of a Fee shall be due and payable twenty (20) days after Recipient's receipt from Provider of an invoice therefor showing in reasonable detail the calculation thereof.

(b) All amounts not paid in full within ten (10) days after they are due shall bear interest at a rate equal to 1 1/2% per month.

5. OBLIGATIONS OF RECIPIENT. The Recipient shall (i) provide to the Provider all information necessary to the performance by the Provider of the Services hereunder, (ii) cooperate with the Provider in all reasonable respects in the performance by the Provider of the Services and (iii) respond promptly to the Provider's requests for consents of or other communication from the Recipient. If the Recipient does not respond to any request by the Provider for consent or direction, the Provider shall have no liability for any action taken or failed to be taken by it in good faith.

6. TAXES. The Recipient shall be responsible for all sales, use, VAT and other taxes, levies and charges (other than taxes based on net income or net profits of the Provider) imposed by applicable taxing authorities on the provision of Services to the Recipient hereunder. If the Provider is required to pay such taxes, levies or charges, the Recipient shall promptly reimburse the Provider therefor.

7. WARRANTIES. The Provider shall use all commercially reasonable efforts to provide Services hereunder that are of substantially the same type and quality, and at substantially the same relative levels of effort and response time, as those rendered between the FWD Business and the other FAG operations during the twelve month period immediately preceding the Effective Time. THERE ARE NO OTHER REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE PROVISION OF SERVICES HEREUNDER, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE.

8. LIMITATION OF LIABILITY. Neither the Provider nor any of its officers, directors, affiliates, employees or agents shall have any liability relating to or in connection with this Agreement or the provision of the Services other than for acts of gross negligence or willful misconduct, and, then, the liability of the Provider and its officers, directors, affiliates,

2

<PAGE>    3
employees and agents shall be limited to the amounts paid hereunder. IN NO EVENT SHALL THE PROVIDER BE LIABLE TO THE RECIPIENT FOR INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL LOSSES OR DAMAGES OF ANY KIND.

9. VALIDITY OF DOCUMENTS. The parties hereto shall be entitled to rely upon the genuineness, validity or truthfulness of any document, instrument or other writing presented in connection with this Agreement unless such document, instrument or other writing appears on its face to be fraudulent, false or forged.

10. COOPERATION. Representatives of FMC and FAG shall consult with each other regularly and FMC and FAG shall cooperate with each other in all reasonable respects in order to effect an efficient transition and to minimize the disruption therefrom to the business of both parties.

11. FORCE MAJEURE. If the Provider is prevented from performing any of its obligations hereunder due to unforeseeable and unavoidable causes beyond its reasonable control and without its fault or negligence, including but not limited to fire, explosion, floods, or any act or order of any governmental agency, such party shall not be liable to the other party for breach of or default under this Agreement, and the Recipient shall have no right to terminate this Agreement by virtue thereof, provided the Provider gives prompt notice of such cause to the other party and exercises due diligence to remove the cause as soon as reasonably practicable.

12. NOTICES. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by cable, telegram, telex or other standard form of telecommunications, or by registered or certified mail, postage prepaid, return receipt requested, addressed as

XXX-002239

follows:

          a.     if to FAG:

                Fresenius AG
                Borkenberg 14
                61440 Oberursel
                Germany
                Attention: _____
                Fax: 49-6171-60-____

3

<PAGE>   4

          b.     If to FMC:

                Fresenius Medical Care AG
                Borkenberg 14
                61440 Oberursel
                Germany
                Attention: _____
                Fax:  49-6171-60-_____

      13. COUNTERPARTS. This Agreement may be executed in any number of separate counterparts signed by one or more of the parties hereto, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

      14. BINDING EFFECT; ASSIGNABILITY. This Agreement shall be binding on and inure solely to the benefit of the parties hereto, their respective successors and permitted assigns. This Agreement and the rights and obligations hereunder may not be assigned by either party hereto, whether by operation of law or otherwise, without the written consent of the other party and any such attempt at assignment shall be void and unenforceable; provided however, that FMC and FAG each have the right to delegate to its subsidiaries its obligations to perform hereunder, and each subsidiary of FMC and FAG shall have the right to exercise the rights of its parent hereunder; provided further, however, that no such exercise or delegation shall relieve the parties from their obligations hereunder.

      15. GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the laws of the Federal Republic of Germany, without giving effect to the conflict of laws rules thereof.

      16. ENTIRE AGREEMENT. This Agreement constitutes the entire agreement between the parties hereto relating to the subject matter hereof and supersedes all prior or contemporaneous agreements and understandings of the parties relating thereto.

      17. MODIFICATION AND AMENDMENT. Neither this Agreement nor any of the terms hereof may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing signed by the party against which the enforcement of such termination, amendment, supplement, waiver or modification is sought. No failure on the part of either party to exercise, no delay in exercising, no partial exercise of, and no course of dealing with respect to, any right, power or privilege under this Agreement shall operate as a waiver thereof.

      18. SEVERABILITY. Every section, paragraph, clause and sub-clause of this Agreement shall as far as possible be deemed to be severable from every other section, paragraph, clause and sub-clause. If for any reason any such section, paragraph, clause or sub-

4

<PAGE>   5

clause is held by a court of competent jurisdiction or a competent administrative body to be illegal, unlawful, void, voidable, invalid or unenforceable, then (i) such holding shall not (unless it expressly provides to the contrary) render illegal, unlawful, void, voidable, invalid or unenforceable any other such section, paragraph, clause or sub-clause, and (ii) the parties hereby agree to negotiate in good faith to replace the section, paragraph, clause or sub-clause that is the subject matter of the holding with a similar but permissible provision.

      19. INDEPENDENT CONTRACTOR. With respect to all matters relating to this Agreement, the parties hereto shall be deemed to be independent contractors and shall bear their own expenses in connection with this Agreement. Neither party shall represent itself or its organization as having any relationship to the other party other than that of an independent contractor for the limited purposes described in this Agreement. Neither party shall have, and shall not hold itself out as having, the power to make contracts in the name of or binding on, nor shall it have the power to pledge credit or extend credit in the name of, the other party.

      20. HEADINGS. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

      21. COUNTERPARTS. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.

XXX-002240

5

```
<PAGE>    6
                    IN WITNESS WHEREOF, the parties have signed this Agreement on
the date first set forth above.
```

FRESENIUS AG

By
   -----------------------------------------
     Name:
     Title:

By
   -----------------------------------------
     Name:
     Title:

FRESENIUS MEDICAL CARE AG

By
   -----------------------------------------
     Name:
     Title:

By
   -----------------------------------------
   Name:
   Title:

S-1

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.5
<SEQUENCE>10
<DESCRIPTION>SUPPLY AGREEMENT
<TEXT>

<PAGE>    1
                                                    [EXHIBIT 10.5]
```

SUPPLY AGREEMENT

         SUPPLY AGREEMENT, dated _____, 1996 (the
"AGREEMENT"), by and between _____, organized under the laws of
_____, a subsidiary of FRESENIUS AG (the "SUPPLIER"), and
_____, organized under the laws of _____, a
subsidiary of FRESENIUS MEDICAL CARE AG (the "BUYER").

                    R E C I T A L S

         WHEREAS, the Supplier, Fresenius USA, Inc., a Massachusetts
corporation, and W. R. Grace & Co., a New York corporation, have entered into an
Agreement and Plan of Reorganization, dated as of February 4, 1996 (as amended,
the "REORGANIZATION AGREEMENT"), pursuant to which Buyer will acquire the FWD
Business (as defined in the Reorganization Agreement) from FAG and the
healthcare business of Grace;

         WHEREAS, this Agreement is intended to be on terms that would
be available to the parties on an arms-length basis; and

         WHEREAS, the execution and delivery of this Agreement by the
parties hereto is a condition to the consummation of the Reorganization (as such
term is defined in the Reorganization Agreement);

         NOW, THEREFORE, in consideration of the mutual agreements,
provisions and covenants contained in this Agreement, and the above recited
consideration and other good and valuable consideration, the parties hereto
agree as follows:

                    ARTICLE I

                    DEFINITIONS

         Capitalized terms used herein shall have the meanings
specified below. Terms defined in the singular or plural, as the case may be,
shall have the same respective meaning mutatis mutandis when used in the plural

XXX-002241

or singular, as the case may be.

        "AGREEMENT" shall have the meaning specified in the
introductory paragraph hereof.

        "BUYER" shall have the meaning specified in the introductory
paragraph hereof.
<PAGE>    2
        "BUYER'S PRODUCT CHANGES" shall mean changes, if any, to a
particular Product made by Buyer after delivery of such Product by Supplier,
including, without limitation, relabeling of Products to comply with applicable
regulatory requirements.

        "BUYER'S PRODUCT SPECIFICATIONS" shall mean product
specifications pursuant to which a particular Product is manufactured and/or
packaged by Supplier on the date hereof, as modified in writing from time to
time by Buyer with Supplier's written approval, which approval shall not be
unreasonably withheld.

        "FACILITY" shall mean Supplier's manufacturing facility
located in

        "FIXED COST ADJUSTMENT FACTOR" shall mean the percentage
change in the Index as last published prior to the date of the determination of
the Fixed Cost Adjustment Factor from the Index as published 12 months earlier.

        "FIXED COST AMOUNT" shall mean $_____ per month; provided
that at the end of each successive 24 month period commencing on the date
hereof, the parties shall negotiate with each other in good faith a new Fixed
Cost Amount that reflects changed actual fixed costs at the Facility (any such
changed Fixed Cost Amount to be effective for all periods commencing as of the
end of such 24 month period); provided further, however, that as of the end of
each successive 12 month period commencing on the date hereof (unless a new
Fixed Cost Amount shall have then been agreed to pursuant to the immediately
preceding proviso), the Fixed Cost Amount then in effect shall be increased or
decreased, as the case may be, by the Fixed Cost Adjustment Factor.

        "FORCE MAJEURE" shall have the meaning specified in Section
4.2(a).

        "INDEMNITEE" shall have the meaning specified in Section
3.2(a).

        "INDEMNITOR" shall have the meaning specified in Section
3.2(a).

        "INDEX" shall mean the generally accepted consumer price index
for the country of the Facility that is comparable to the cost of living index
for all private households determined by the German Federal Statistical Office.

        "LOSSES" shall have the meaning specified in Section 3.1.

        "PRODUCTS" shall mean the products listed on Exhibit A, plus
all modifications and improvements made by Supplier in respect thereof during
the Term.

                                    2

<PAGE>    3
        "SUPPLIER" shall have the meaning specified in the
introductory paragraph hereof.

        "TERM" shall have the meaning specified in Section 4.1.

        "THREE-MONTH FORECAST" shall have the meaning specified in
Section 2.2(b).

        "UNIT PRICE" shall have the meaning specified in Section
2.4(a).

                              ARTICLE II

                             PRODUCT SUPPLY

        2.1. PURCHASE AND SALE OF PRODUCTS. During the Term, and
subject to the terms and conditions hereof, Supplier shall sell to Buyer, and
Buyer shall purchase from Supplier, such quantities of the Products manufactured
at the Facility as Buyer shall from time to time specify in firm purchase
orders.

        2.2. FORECASTS. (a) Within ten days of the date hereof, Buyer
shall deliver to Supplier a written, non-binding, good-faith estimate of its
anticipated purchases of Products for the remainder of 1996. On the first
business day of October of each year, Buyer shall deliver to Supplier a written,
non-binding, good-faith estimate of its anticipated quarterly purchases of
Products for the next succeeding calendar year.

        (b) On the first business day of each month, Buyer shall
deliver to Supplier a monthly forecast of its anticipated requirements of
Products for the three calendar-month period beginning with the month after
the month in which such forecast is due (the "THREE-MONTH FORECAST"). Such
Three-Month Forecast shall be accompanied by a firm purchase order for the

XXX-002242

amount of required Products forecasted for the first month of the Three-Month
Forecast. Without Supplier's written consent, actual purchases for the second
month of each Three-Month Forecast may not deviate from the purchases forecasted
for such month in such Three-Month Forecast; provided that Supplier shall be
deemed to have consented to a deviation of not more than 20% from the purchases
forecasted for such month unless Supplier shall give notice of objection thereto
within 10 days following receipt of the applicable firm purchase order. Each
Three-Month Forecast shall contain a non-binding, good-faith estimate of Buyer's
anticipated purchases of Products for the third month of such Three-Month
Forecast.

        2.3. PURCHASE ORDERS AND SHIPMENTS. All firm purchase orders
for Products shall be in writing, and shall specify (i) the type of Products to
be purchased,

                                      3

<PAGE>    4
(ii) the quantity of each such Product (in accordance with Section 2.2(b)),
(iii) the desired shipment date, (iv) requirements as to packing and delivery,
in accordance with standard industry practice, and (v) shipping instructions, in
accordance with customary industry practice. Supplier shall promptly deliver to
Buyer a written acknowledgement of each firm purchase order, which shall include
an estimate of the delivery date in respect thereof, and shall fill such firm
purchase orders in accordance with the provisions hereof and thereof. Products
shall be shipped by Supplier to a location designated by Buyer, FOB point of
shipment (INCOTERMS 1990). Supplier shall have the right to reject any portion
of a firm purchase order that, under objective data and taken together with all
other orders that Supplier is committed to fill when it receives Buyer's order
(including internal orders), exceeds Supplier's maximum manufacturing capacity.
In the event of such a rejection, at Buyer's request, Supplier shall deliver to
Buyer a pro rata portion of the amount of the Products that Supplier is able to
manufacture (allocated in the proportion that the amount of the Products
delivered to Buyer during the immediately preceding 12-month period bears to the
amount of the entire production of the Supplier at the Facility during such
12-month period).

        2.4. PRICE. (a) Unit Price. With respect to each Product, the
purchase price (the "UNIT PRICE") to be paid by Buyer to Supplier for the
Products sold and purchased pursuant hereto shall be the amounts set forth on
Exhibit A hereto opposite the name of such Products. The parties hereto shall
consult with each other in good faith on or about each anniversary of the date
of this Agreement for the purpose of determining whether the Unit Price for any
Product should be adjusted to reflect changed manufacturing or market
conditions; provided that no such change shall be effected without the consent
of both parties.

        (b) Fixed Cost. In addition to the Unit Price, Buyer will pay
Supplier the Fixed Cost Amount each month during the term of this Agreement on
account of fixed costs at the Facility.

        2.5. PAYMENT. Payment of the Fixed Cost Amount shall be due
and payable in advance on or before the fifth (5th) day of each month during the
term of this Agreement. Payment of the Unit Price for all Products purchased by
Buyer hereunder shall be due and payable 30 days after the later of the date of
(i) receipt by Buyer of the invoice relating thereto or (ii) delivery of the
Products to the carrier at the point of shipment in accordance with Buyer's
shipping instructions. Any amounts not paid when due shall bear interest at the
rate of 1 1/2% per month or portion thereof from such due date until paid.

        2.6. PRODUCT SPECIFICATIONS AND CHANGES. (a) The Products to
be sold and purchased hereunder shall be manufactured and packaged by Supplier
in accordance with

                                      4

<PAGE>    5
Buyer's Product Specifications. Buyer shall have the right to make Buyer's
Product Changes with respect to any Products before offering them for sale to
Buyer's customers.

        (b) In the event that any regulatory or other changes in the
laws of any jurisdiction in which the Products are manufactured or sold
necessitate a change in the manufacturing specifications of any Product, the
parties will cooperate in good faith with each other in timely effecting such
changes.

        2.7. LABELING, ETC. Buyer shall be responsible for the
accuracy, truthfulness and other legal compliance of all labeling of the
Products. Supplier shall include on the labeling of all the Products any
information reasonably requested by Buyer. To the extent required by applicable
law, all labeling of Products shall identify Supplier as the manufacturer and
Buyer as the distributor of the Products and their respective addresses.

        2.8. REPRESENTATIONS AND WARRANTIES. Supplier hereby
represents and warrants to Buyer that at the time of delivery of Products to
Buyer, such Products shall comply with applicable Buyer's Product
Specifications.

        2.9. QUALITY ASSURANCE AND RELATED DOCUMENTATION. The parties
hereto will cooperate with each other in all reasonable respects to comply with
all legal requirements applicable to the Products in the jurisdictions in which
the Products are manufactured or sold and shall negotiate with each other in

XXX-002243

good faith to develop and implement satisfactory quality assurance procedures applicable to specific Products and to specific jurisdictions.

2.10. REGULATORY COMPLIANCE. Buyer shall be solely responsible for applying for and obtaining any and all approvals necessary for exporting, importing, marketing and selling the Products, including such approvals as may be required from the United States Food and Drug Administration and other comparable agencies or governmental entities. Supplier will cooperate with Buyer in good faith in connection with Buyer's efforts to obtain such approvals, including promptly providing all information in respect of the Products required by any governmental authority to obtain such approvals.

2.11. INSURANCE. (a) Supplier shall obtain and maintain throughout the term of this Agreement, commercial general liability insurance (including Products/Completed Operations, Hazard, Advertising, Personal Injury and Blanket Contractual Liability) from an insurer (or insurers) acceptable to Buyer. The amount of such insurance required shall be no less than the following limits of insurance: General Aggregate (other than Products/Completed Operations): $______________, Products Completed Operations Aggregate: $_______________; Each Occurrence: $___________________. The policy shall provide thirty (30) days written notice to the Buyer from the insurer in the event of any

cancellation or termination. The Supplier agrees to furnish a certificate of insurance providing such coverage within thirty (30) days after the date of this Agreement.

(b) Buyer shall obtain and maintain throughout the term of this Agreement, commercial general liability insurance (including Products/Completed Operations, Hazard, Advertising, Personal Injury and Blanket Contractual Liability) from an insurer (or insurers) acceptable to Supplier. The amount of such insurance required shall be no less than the following limits of insurance: General Aggregate (other than Products/Completed Operations): $_______________, Products Completed Operations Aggregate: $_______________; Each Occurrence: $___________________. The policy shall provide thirty (30) days written notice to the Supplier from the insurer in the event of any cancellation or termination. The Buyer agrees to furnish a certificate of insurance providing such coverage within thirty (30) days after the date of this Agreement.

(c) Nothing in this Section 2.11 shall be deemed to limit in any way the indemnification provisions of Article III below.

2.12. REJECTION AND RETURN. If any Product sold and delivered hereunder, or the tender of delivery thereof, shall fail to conform to the provisions of this Agreement, or to meet Buyer's Product Specifications for such Product, Buyer shall have the right to notify Supplier of such failure within a reasonable time of the receipt thereof and Buyer may elect to return such Product to Supplier, at Supplier's expense, either for a full credit of the purchase price therefor or in exchange for conforming Product, after Supplier's receipt of Buyer's notification of the nonconformity.

ARTICLE III

INDEMNIFICATION

3.1. INDEMNIFICATION. (a) Buyer agrees to indemnify, defend and hold harmless Supplier and each of its directors, officers, employees, agents, representatives and affiliates from and against any and all demands, claims, actions, suits, proceedings, liabilities, obligations, damages, losses, costs and expenses (including reasonable attorneys' fees and disbursements) of every kind, nature or description (collectively, "LOSSES") asserted by a third party to the extent that such Losses arise out of, result from or relate to Buyer's Product Specifications (including label information for which Buyer is responsible under Section 2.7), Buyer's Product Changes, the storage and distribution of Products after delivery to Buyer or the negligence or intentional misconduct of Buyer in connection with the performance of this Agreement.

(b) Supplier agrees to indemnify, defend and hold harmless Buyer and each of its directors, officers, employees, agents, representatives and affiliates from and against any and all Losses asserted by a third party to the extent that such Losses arise out of, result from or relate to any inaccuracy or failure to conform with Supplier's representations and warranties contained in Section 2.8, or the negligence or intentional misconduct of Supplier in connection with the performance of this Agreement.

3.2. INDEMNIFICATION PROCEDURES. (a) In the event of any claim under Section 3.1, the person or entity claiming the right to indemnity hereunder (the "INDEMNITEE") shall promptly notify the indemnifying party (the "INDEMNITOR") of such claim; provided that the failure to provide such notice shall not release the Indemnitor from any of its indemnification obligations hereunder except to the extent the Indemnitor shall be materially prejudiced thereby. The Indemnitor will undertake the defense thereof by counsel of Indemnitor's own choosing (which in the absence of a conflict of interest may be

counsel to the Indemnitor), which counsel shall be reasonably satisfactory to Indemnitee. The Indemnitee shall provide Indemnitor with such information reasonably requested by Indemnitor and shall cooperate with Indemnitor in defending such claim, but any expense incurred by the Indemnitee in connection therewith shall be paid by Indemnitor. The Indemnitee may, at its sole option and expense, participate in such defense through separate counsel of its own choosing.

        (b) In the event that the Indemnitor, within a reasonable time after notice of any such claim, fails to undertake the defense of such claim, the Indemnitee (upon further notice to the Indemnitor) shall have the right to undertake the defense, compromise or settlement of such claim for the account of the Indemnitor, subject to the right of the Indemnitor to assume the defense of such claim with counsel reasonably satisfactory to the Indemnitee at any time prior to settlement, compromise or final determination thereof.

        (c) Anything in this Article III to the contrary notwithstanding, the Indemnitor shall not, without the Indemnitee's written consent, (x) settle or compromise any claim other than for money damages or consent to entry of any judgment with respect to any such claim, which settlement, compromise or judgment would have any adverse effect on the Indemnitee, or (y) settle or compromise any claim for money damages or consent to entry of any judgment with respect to any such claim, unless such settlement, compromise or judgment includes as an unconditional term thereof the release of the Indemnitee from all liability in respect of such claim.

ARTICLE IV

MISCELLANEOUS

7

<PAGE>   8
        4.1. TERM. (a) The term of this Agreement shall commence on the date hereof and shall continue for a period of [five] years (the "TERM").

        (b) This Agreement may be terminated prior to the expiration of the Term by the Buyer on any anniversary of the date hereof, upon not less than [one] years' notice and payment of compensation to the Supplier in an amount agreed upon by the parties hereto on account of an appropriate portion of fixed costs.

        4.2. FORCE MAJEURE. (a) If either party is prevented from performing any of its obligations hereunder due to unforeseeable and unavoidable causes beyond its reasonable control and without its fault or negligence, including but not limited to fire, explosion, floods, the inability of a vendor to supply approved raw materials or any act or order of any governmental agency (a "Force Majeure"), such party shall not be liable to the other party for breach of or default under this Agreement, and the other party shall have no right to terminate this Agreement by virtue thereof, provided the party so affected gives prompt notice of such cause to the other party.

        (b) Buyer's obligation to pay the Fixed Cost Amount in accordance with Section 2.4(b) shall be ratably abated in the event that Supplier is unable to perform its obligations hereunder for any period of time due to a Force Majeure.

        4.3. DEFAULTS AND TERMINATION. (a) If either party hereto shall breach any provision hereof or default in the performance of any of its obligations hereunder, the non-defaulting party shall have the right to give the defaulting party notice reasonably identifying the nature of the breach or default. The defaulting party shall promptly remedy such breach or default and notify the other party in writing thereof. If the defaulting party shall fail to do so, the non-defaulting party shall have the right thereupon to avail itself of any remedy at law or in equity to which it may be entitled.

        (b) The respective rights and obligations of the parties and each Indemnitee under the second sentence of Section 2.10 and Article III shall survive any termination of this Agreement.

        4.4. NOTICES. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by cable, telegram, telex or other standard form of telecommunications, or by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

8

<PAGE>   9
            (i)     if to the Supplier

                    Fresenius AG
                    Borkenberg 14
                    61440 Oberursel
                    Germany
                    Attention: _____
                    Fax:  49-6171-60-____

            (ii)    If to the Buyer:

XXX-002245

```
Fresenius Medical Care AG
Borkenberg 14
61440 Oberursel
Germany
Attention: _____
Fax:  49-6171-60-_____
```

4.5. COUNTERPARTS. This Agreement may be executed in any number of separate counterparts signed by one or more of the parties hereto, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

4.6. BINDING EFFECT; ASSIGNABILITY. This Agreement shall be binding on and inure solely to the benefit of the parties hereto, their respective successors and permitted assigns, and the Indemnitees. This Agreement and the rights and obligations hereunder may not be assigned by either party hereto, whether by operation of law or otherwise, without the written consent of the other party and any such attempt at assignment shall be void and unenforceable; provided however, that subsidiaries of the Buyer shall have the right to exercise the rights of Buyer hereunder, and Supplier shall have the right to delegate to its subsidiaries its obligations to perform hereunder; provided, further, however, that no such exercise or delegation shall relieve the parties from their obligations hereunder.

4.7. GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the laws of the Federal Republic of Germany, without giving effect to the conflict of laws rules thereof. Pursuant to Article 6 of the United Nations Convention on Contracts for the International Sale of Goods (the "UN Convention"), the parties hereto agree that the UN Convention shall not apply to this Agreement.

<center>9</center>

<PAGE>   10

4.8. ENTIRE AGREEMENT. This Agreement constitutes the entire agreement between the parties hereto relating to the subject matter hereof and supersedes all prior or contemporaneous agreements and understandings of the parties relating thereto.

4.9. MODIFICATION AND AMENDMENT. Neither this Agreement nor any of the terms hereof may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing signed by the party against which the enforcement of such termination, amendment, supplement, waiver or modification is sought. No failure on the part of either party to exercise, no delay in exercising, no partial exercise of, and no course of dealing with respect to, any right, power or privilege under this Agreement shall operate as a waiver thereof.

4.10. SEVERABILITY. Every section, paragraph, clause and sub-clause of this Agreement shall as far as possible be deemed to be severable from every other section, paragraph, clause and sub-clause. If for any reason any such section, paragraph, clause or sub-clause is held by a court of competent jurisdiction or a competent administrative body to be illegal, unlawful, void, voidable, invalid or unenforceable, then (i) such holding shall not (unless it expressly provides to the contrary) render illegal, unlawful, void, voidable, invalid or unenforceable any other such section, paragraph, clause or sub-clause, and (ii) the parties hereby agree to negotiate in good faith to replace the section, paragraph, clause or sub-clause that is the subject matter of the holding with a similar but permissible provision.

4.11. HEADINGS. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

4.12. COUNTERPARTS. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.

<center>10</center>

<PAGE>   11

IN WITNESS WHEREOF, the parties hereto have caused their respective authorized officers to execute and deliver this Agreement as of the date first above written.

<center>SUPPLIER</center>

```
By:
   --------------------------------
       Name:
       Title:



By:
   --------------------------------
       Name:
       Title:
```

BUYER

By:
    ------------------------------
        Name:
        Title:


By:
    ------------------------------
        Name:
        Title:

                            11

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.6
<SEQUENCE>11
<DESCRIPTION>TRADEMARK LICENSE AGREEMENT
<TEXT>
```

<PAGE>  1

                                                    EXHIBIT 10.6

                    TRADEMARK LICENSE AGREEMENT


        TRADEMARK LICENSE AGREEMENT, dated as of _____, 1996 (the
"Agreement"), between FRESENIUS AG, an Aktiengesellschaft organized under the
laws of the Federal Republic of Germany (the "Licensor"), and FRESENIUS MEDICAL
CARE AG, an Aktiengesellschaft organized under the laws of the Federal Republic
of Germany (the "Licensee").

        This License Agreement is being entered into pursuant to the
terms and conditions set forth in the Agreement and Plan of Reorganization
dated as of February 4, 1996, as amended (the "Reorganization Agreement"),
between the Licensor, Fresenius USA, Inc., a Massachusetts corporation, and W.
R. Grace & Co., a New York corporation ("Grace").

        The Reorganization Agreement requires as a condition to
Grace's obligation to consummate the Reorganization (as defined in the
Reorganization Agreement) that the Licensor shall have executed a trademark
license agreement with the Licensee.

        The Licensee acknowledges the reputation and quality of goods
and services heretofore sold or provided under the Licensed Marks and the
Licensor's desire to safeguard, promote and enhance that reputation by ensuring
the future quality of the goods and services produced, manufactured, sold,
marketed, promoted, advertised, provided or distributed under the Licensed
Marks.

        The parties hereto agree as follows:

        SECTION 1.      DEFINITIONS.

        Capitalized terms used herein and not otherwise defined shall
have the meanings specified in the Reorganization Agreement.  Terms defined in
the singular or plural, as the case may be, shall have the same respective
meaning mutatis mutandis when used in the plural or singular, as the case may
be.

        "Affiliate" as used herein shall mean with respect to any
Person, any entity which directly or indirectly (i) controls not less than 50%
of the equity securities of the specified Person, (ii) not less than 50% of the
equity securities of which entity are controlled by the specified Person, or
(iii) not less than 50% of the equity securities of which entity and not less
than 50% of the equity securities of the specified Person are under common
control; provided, however, that for purposes of this License Agreement no
Licensee Entity shall be deemed to be an Affiliate of any Licensor Entity and
no Licensor Entity shall be deemed an Affiliate of any Licensee Entity.

        "Agreement" as used herein shall have the meaning set forth in
the introductory paragraph hereof.
<PAGE>  2

        "Approved Sublicense" as used herein shall have the meaning
set forth in Section 2(h) below.

        "'F' Logo" as used herein shall mean the trademark and service
mark "F" in a stylized logo as used by Licensor on or after the date hereof,
and all current and future registrations thereof and pending and future
applications for any such registration, including without limitation, those
listed on Exhibit A hereto.

        "FMC Marks" as used herein shall mean any trademark or service
mark containing the words "Fresenius Medical Care," plus one or more additional

XXX-002247

descriptive words (which, for this purpose, shall not include words indicating corporate, limited liability or other legal status or words indicating geographic location).

"FMC Medical Business" as used herein shall mean the Renal Business, the Non-Renal NMC Business and the Other Medical Business, collectively.

"Fresenius Mark" as used herein shall mean the trademark and service mark "Fresenius" and all registrations thereof and applications for any such registration pending including, without limitation, those listed on Exhibit B hereto.

"Governmental Authority" as used herein shall mean any federal, state, county, local, foreign or other governmental department, regulatory body, commission, board, bureau, agency or instrumentality in any country in the world.

"Grace-Conn." as used herein shall mean W. R. Grace & Co.-Conn., a Connecticut corporation.

"Indemnified Party" as used herein shall have the meaning set forth in Section 9.

"Indemnifying Party" as used herein shall have the meaning set forth in Section 9.

"Licensed Goods and Services" as used herein shall mean the goods and services produced, manufactured, sold, marketed, promoted, advertised, provided or distributed by, for, or on behalf or under the direct or indirect authority of, the Licensee which bear, are sold or provided under, or with respect to which the Licensee otherwise utilizes, a Licensed Mark as authorized hereunder.

"Licensed Marks" as used herein shall mean the Fresenius Mark, the "F" Logo, those elements of the FMC Marks that are owned by Licensor, and the Mixed Use Trademarks, collectively.

"Licensee Entities" shall mean Licensee and its subsidiaries.

2

<PAGE>   3

"Licensor Entities" shall mean Licensor and its subsidiaries, excluding the Licensee Entities.

"Losses" as used herein shall have the meaning set forth in Section 9.

"Mixed Use Marks" as used herein shall mean the marks listed on Exhibit C hereto, and all current and future registrations thereof and pending and future applications for any such registration, including, without limitation, those listed on Exhibit C hereto.

"Mixed Use Products" as used herein shall mean the products sold on the date hereof by Licensor under the Mixed Use Trademarks.

"Non-Renal NMC Business" as used herein shall mean the business conducted by National Medical Care, Inc., a Delaware corporation, immediately prior to the date hereof, other than the Renal Business.

"North American Territory" as used herein shall mean the United States of America and Canada.

"Other Medical Business" as used herein shall mean the medical services or medical products business as conducted by the Licensee from time to time, other than the Renal Business and the Non-Renal NMC Business.

"Person" as used herein shall mean an individual, a corporation, a partnership, an association, a trust, a Governmental Authority, or any other entity or organization.

"Related Parties" as used herein shall have the meaning set forth in Section 11 below.

"Renal Business" as used herein shall mean the business of supplying renal care related goods and services, including laboratories; provided, that for purposes of interpreting the foregoing clause, the parties shall be guided by the Reorganization Agreement, including the Contribution Agreement, dated February 4, 1996, among the Licensor, the Licensee (then known as Steril Pharma GmbH) and W. R. Grace & Co.-Conn, and the Distribution Agreement, dated February 4, 1996, among Grace, W. R. Grace & Co.-Conn., and the Licensor; provided, further, that it is expressly acknowledged by the Licensee that the home care business of the Licensor is not, and shall not be deemed to be, a Renal Business.

"Third Party Rights" as used herein shall mean the rights of third parties in and to the Licensed Marks under the agreements set forth on Exhibit D hereto.

XXX-002248

"Worldwide Territory" as used herein shall mean the entire world.

3

<PAGE>   4

            SECTION 2.        GRANT TO THE LICENSEE AND RELATED MATTERS.

        (a)        Renal Business.  Except as otherwise provided herein
and subject to the Third Party Rights, the Licensor hereby grants to the
Licensee and its Affiliates an exclusive, royalty-free license to use the
Fresenius Mark and the "F" Logo in the Worldwide Territory on or in connection
with the production, manufacture, sale, marketing, promotion, advertising,
provision and distribution of goods and services in the Renal Business.

        (b)        Non-Renal NMC Business.

            (i)        Except as otherwise provided herein and
        subject to the Third Party Rights, the Licensor hereby grants to the
        Licensee and its Affiliates, a non-exclusive, royalty-free license to
        use the Fresenius Mark, but only as an element of an FMC Mark, in the
        Worldwide Territory on or in connection with the production,
        manufacture, sale, marketing, promotion, advertising, provision and
        distribution of goods and services in the Non-Renal NMC Business.

            (ii)        If the Licensee and its Affiliates desire a
        license to use the "F" Logo in the Non-Renal NMC Business in all or
        any portion of the Worldwide Territory, the Licensee shall notify the
        Licensor in writing requesting a non-exclusive, royalty-free license
        and specifying in reasonable detail the goods and services it desires
        to be covered by such license and the manner in which Licensee intends
        to use the "F" Logo in connection with such goods and services.
        Promptly upon receipt of such notice from Licensee, Licensor shall
        notify Licensee whether or not Licensor consents to such license;
        provided, however, that if Licensee undertakes in its notice to
        Licensor to use the "F" Logo only in connection with one or more
        descriptive words or symbols that would differentiate such use from
        the use of the "F" Logo by Licensor, Licensor shall not unreasonably
        withhold its consent to such license.

        (c)        Other Medical Business.  If the Licensee and its
Affiliates desire a license to use the Fresenius Mark as an element of an FMC
Mark in connection with its Other Medical Business in all or any portion of the
Worldwide Territory, the Licensee shall notify the Licensor in writing
requesting a non-exclusive, royalty-free license and specifying in reasonable
detail the goods or services it desires to be covered by such license and the
manner in which Licensee intends to use the FMC Mark in connection with such
goods and services.  Promptly upon receipt of such notice from Licensee,
Licensor shall notify Licensee whether or not it consents to such license,
which consent shall not be unreasonably withheld.

        (d)        Licensee's Corporate Name.  Subject to the Third
Party Rights, the Licensor hereby grants to the Licensee in the Worldwide
Territory the exclusive right to use the name "Fresenius Medical Care AG" for
Licensee's corporate name and the nonexclusive right to use the name
"Fresenius" in other corporate names approved by Licensor under which the
Licensee or its Affiliates conduct the FMC Medical Business.  Nothing contained
in this

4

<PAGE>   5

Section 2(d) is intended, or shall be construed, to give Licensee or any
Affiliate of Licensee any additional right to use the name "Fresenius" as a
trademark or service mark beyond the rights provided elsewhere in this
Agreement.

        (e)        Mixed Use Trademarks.  Subject to the terms of
Section 4(a) hereof, the Licensor hereby grants to the Licensee a royalty-free
license to use each of the Mixed Use Marks in the Worldwide Territory on or in
connection with the production, manufacture, sale, marketing, promotion,
advertising, provision and distribution of Mixed Use Products, which license
shall be exclusive in, and limited to, the Renal Business.

        (f)        Licensor's Retained Rights and Restrictions.

            (i)        Subject to the terms of paragraph (ii) of
        this Section 2(f) and to the Third Party Rights, (A) Licensor and its
        Affiliates shall not use or license third parties to use the Fresenius
        Mark or the "F" Logo in the Renal Business in the Worldwide Territory;
        (B) Licensor and its Affiliates shall not use the Fresenius Mark alone
        or in combination with any other words in the North American
        Territory, except in combination with one or more additional words
        such as "Pharma Home Care" as a service mark in connection with its
        home care business; and (C) Licensor and its Affiliates shall not use
        or license third parties to use the "F" Logo alone or in combination
        with any other words in the North American Territory, except as a

XXX-002249

service mark on the terms and conditions set forth in the immediately following two sentences. If Licensor desires to use the "F" Logo as a service mark in the North American Territory, Licensor shall notify Licensee in writing specifying in reasonable detail the services for which it desires to use the "F" Logo and the manner in which Licensor intends to use the "F" Logo in connection with such services. Promptly upon receipt of such notice from Licensor, Licensee shall notify Licensor whether or not it consents to such use; provided, however, that if Licensor undertakes in its notice to Licensee to use the "F" Logo in the North American Territory only in connection with one or more words or symbols (such as "Pharma") that would differentiate such use from the use by Licensee, Licensee shall not unreasonably withhold its consent to such use.

       (ii)    Neither Licensor nor any of its Affiliates shall use or license third parties to use the "Fresenius" name alone or in combination with any other words in its corporate name in (A) the North American Territory, or (B) the Renal Business in the Worldwide Territory (including the North American Territory), except, in either case of clause (A) or (B), in combination with one or more additional words that, together, are distinctive from "Fresenius Medical Care AG." If Licensor desires to use the "Fresenius" name in its corporate name pursuant to the terms of the immediately preceding sentence, Licensor shall give Licensee not less than 60 days' prior written notice of its adoption of any such corporate name and consult with Licensee about whether or not the additional words are distinctive from "Fresenius Medical Care AG."

<center>5</center>

&lt;PAGE&gt;  6

       (iii)    All rights in the Licensed Marks and the name "Fresenius" other than those specifically granted herein are reserved to the Licensor.

       (g)    Ownership. The parties acknowledge and agree that as between the Licensor and the Licensee, the name "Fresenius" and the Licensed Marks are the sole and exclusive property of the Licensor. The Licensee acknowledges and agrees that it shall not acquire any right, title or interest in or to the name "Fresenius" or the Licensed Marks as a result of this Agreement (other than the licenses expressly granted it hereunder), or the Licensee's use of the name "Fresenius" or the Licensed Marks, or as a result of any other act or thing, that the Licensee will not attack the Licensor's title to or ownership of the name "Fresenius" or the Licensed Marks, and that all use of the name "Fresenius" or the Licensed Marks by the Licensee and all goodwill generated thereby shall inure to the benefit of the Licensor.

       (h)    Sublicenses. Licensee shall not grant any sublicense to use the Licensed Marks or any other rights licensed hereunder without the express prior written approval of the Licensor. Any sublicense granted pursuant to the express prior written approval of the Licensor, to a third party, is hereinafter referred to as an "Approved Sublicense." In the event of any Approved Sublicense, the Licensee shall remain primarily obligated under all of the provisions of this Agreement and shall cause each sublicensee to enter into a written sublicense agreement in form and substance satisfactory to the Licensor which shall include provisions, stated in such agreement to be for the express benefit of the Licensor, consistent with the provisions of this Agreement. The Licensee shall provide prompt written notice to the Licensor of the execution of each such sublicense agreement. No Approved Sublicense shall contain any terms or conditions, and the Licensee shall not take or authorize any actions in connection with any Approved Sublicense, inconsistent with the terms and conditions hereof. The Licensee shall, upon reasonable request by the Licensor, provide the Licensor with reasonable evidence that each Approved Sublicense entered into pursuant hereto complies with the requirements hereof. The Licensor hereby appoints the Licensee its agent solely for the purpose of exercising quality control as provided herein over any such sublicensee, and the Licensor retains the right to revoke such appointment at any time if the Licensor reasonably believes that the Licensee is not adequately exercising such quality control, and to reinstate such appointment at any time. Notwithstanding any such appointment, the Licensor shall have the independent right to exercise quality control directly over all sublicensees; provided, however, that Licensor shall not independently act unless it is in good faith believes that the Licensee is not adequately exercising such quality control. The Licensor shall have the right to require the Licensee to terminate any agreement purported to be entered into with a sublicensee in violation of the terms hereof, and the Licensor shall have the right to pursue all other rights or remedies available to it in connection therewith. The Licensee will take all steps reasonably necessary or desirable to enforce the terms of this Agreement against its sublicensees. As between the Licensor and the Licensee, the Licensee shall be responsible for, and shall indemnify, defend and hold harmless the Licensor from, and shall pay all costs, fees and expenses (including reasonable attorneys'

<center>6</center>

&lt;PAGE&gt;  7

XXX-002250

fees and court costs) incurred by the Licensee or the Licensor in connection
with Approved Sublicenses granted hereunder.

        (i)        Compensation.  The Licenses granted herein are
royalty-free and fully paid up.  Notwithstanding the foregoing, the Licensee,
at the option of the Licensor, shall pay or reimburse Licensor for all
royalties, license fees and the similar costs or expenses paid or payable to
third parties on account of any grant herein of any rights in any Licensed
Intellectual Property within the control of Licensor or any exercise by
Licensee of any such rights.  Any such amount shall be paid when due to the
third party provided that Licensor shall have given the Licensee reasonable
notice of the due date thereof or, if requested by Licensor, due and payable to
the Licensor within 30 days after receipt by Licensee of an invoice therefor,
showing in reasonable detail the calculation thereof.

        SECTION 3.        METHOD OF USE OF THE LICENSED MARKS.

        (a)        Use.  The Licensee acknowledges that the Licensed
Marks have acquired a valuable secondary meaning, goodwill with the public,
prestige and world-wide public acceptance and that goods and services bearing
or sold under the Licensed Marks have acquired a reputation of the highest
quality.  Accordingly, the Licensee undertakes and agrees not to use the
Licensed Marks in any manner whatsoever which, directly or indirectly, would
dilute, or demean, ridicule or otherwise tarnish the image of, the Licensed
Marks or the Licensor.

        (b)        Form and Manner.  The Licensee shall use the
Fresenius Mark and "F" Logo only in such form and manner as currently used by
the Licensor as of the date hereof, or as otherwise consented to in writing by
the Licensor, in compliance with all applicable laws.  The Licensee shall
notify the Licensor in writing of any desired change in the form of any such
Licensed Mark and request the Licensor's approval thereof.  The Licensor shall
give such approval or decline to give such approval as soon as practicable.
The Licensee shall not use such Licensed Marks in any changed form which has
not been approved by the Licensor.  If the Licensor fails to approve any such
requested change in form, the Licensor will upon request of the Licensee
specify in writing the reasons for such disapproval.  No partial version of the
Licensed Marks may be used by the Licensee at any time for any purpose without
the express prior written approval of the Licensor in each instance.  Except as
provided in Section 2(d) above, the Licensee shall not have the right to use
the "Fresenius" name or the Licensed Marks as, or as part of, any trade or
company name.  The Licensee shall not combine the Licensed Marks with any other
marks to form a new composite mark without the express prior written approval
of the Licensor.  The Licensor shall own any approved composite mark (excluding
any element thereof owned by the Licensee or a third party) but the Licensee
shall have the exclusive right to the use thereof solely on or in connection
with the Licensed Goods and Services during the term hereof and subject to and
in accordance with the terms and conditions of this Agreement.

                                7

<PAGE>   8

        (c)        Display.  The Licensee shall at its expense apply
such trademark notices, copyright notices or other markings in connection with
each and every use of the Licensed Marks by or under the authority of the
Licensee as may be required under the laws or regulations of each territory and
country where such Licensed Mark is used.

        SECTION 4.        QUALITY STANDARDS.

        (a)        Quality.  Neither the Licensee nor anyone authorized
by it directly or indirectly shall sell or provide any Licensed Goods and
Services that shall fail to meet a level of quality consistent with all
applicable laws, rules and regulations of Governmental Authority and applicable
industry standards [and the highest quality standards and specifications
employed by other producers or providers of such goods or services].  Except
with the prior written consent of Licensor, all Mixed Use Products manufactured
or sold under the Mixed Use Marks shall be manufactured to the specifications
and formulations (including without limitation, the articles used as
components, composition, and methods used in and controls used for manufacture
and packaging) used by Licensor on the date hereof for each Mixed Use Products.
The Licensee represents, warrants and agrees that its internal quality control
procedures will include reasonable procedures for confirming compliance with
the terms of this Section 4(a).

        (b)        Samples.  The Licensee shall, at the reasonable
request of the Licensor, submit to the Licensor for its inspection, testing and
quality evaluation representative samples of the Licensed Goods and Services
and tags, labels, packaging, advertising, display and promotional material
related thereto, and any other printed matter of any kind bearing or sold under
a Licensed Mark, as may reasonably be requested by the Licensor for purposes of
determining compliance with the terms of this Agreement.  Such submissions
shall be made at such times as the Licensor may reasonably request upon thirty
(30) days prior written notice, but no more frequently than annually (unless
the Licensor reasonably believes or determines that any of the Licensed Goods
and Services or other items set forth above may not meet the required standards
of quality or other requirements set forth in this Agreement).  All shipping
and packing costs in connection with such inspection, testing and quality
evaluation shall be borne by the Licensor.

XXX-002251

(c)     On Site Inspections.  Upon reasonable notice, once
per year, or at other times if the Licensor reasonably believes or determines
that any of the Licensed Goods and Services do not meet the required standards
of quality or other requirements set forth in this Section 4, the Licensor
shall have reasonable access for inspection purposes to the premises wherein
the Licensed Goods and Services are produced, manufactured or held for
distribution or sale (or as to the Licensed Goods and Services which are
services, the premises where such services are provided) during regular
business hours at such time or times as not to unduly interfere with the
operations of the Licensee.  At the Licensor's request, the Licensee shall
provide the Licensor with copies of formulas, specifications, standards and
procedures used by the Licensee in connection with the Licensed Goods and
Services and of all tests of the Licensed Goods and Services conducted by or on
behalf of the Licensee to determine compliance with

<div align="center">8</div>

<PAGE>   9

quality control standards.  In addition, the Licensor shall have access to the
Licensee's books and records relating to such formulas, specifications,
standards and procedures and the implementation thereof.  The sole purpose of
such inspection and obtaining such information shall be to determine whether
the Licensee has complied with the quality standards or other requirements of
this Section 4.  In the event that any inspection of any premises or records
reveals that the Licensee has failed to comply with the quality standards or
other requirements of this Section 4, the Licensor may reinspect such premise
or records upon the earlier to occur of the Licensor's receipt of notice of
cure by the Licensee or the expiration of any applicable cure period set forth
herein.  All expenses of conducting such inspections shall be borne by the
Licensor, unless such inspection reveals that the Licensed Goods and Services
do not comply in any material respect with the standards of quality or other
requirements set forth herein, in which case the Licensee shall pay all
reasonable costs and expenses of carrying out the inspection of the class of
goods and services that did not comply.

(d)     Governmental Inquiries.  The Licensee shall
immediately notify the Licensor in writing of any investigation, inquiry, claim
or sanction by any Governmental Authority, and of any medical device report or
other similar report filed with any Governmental Authority, regarding any
quality, labeling, advertising or other regulatory matter relating to the
Licensed Goods and Services and shall keep the Licensor advised of the progress
and findings of such investigation or inquiry, and of any response to any such
report.

(e)     Deficiency Procedures.

(i)     If the Licensor reasonably determines that
any particular Licensed Goods and Services do not meet the required
standards of quality set forth in this Section 4, the Licensor shall
notify the Licensee in writing of such defect (a "Deficiency Notice"),
providing the Licensee with reasonable detail regarding the deficiency
therein.  If the Licensee disputes the Licensor's determination of
deficiency and the parties are not able to resolve the dispute between
themselves, they shall refer the dispute to a mutually agreed upon
third party for resolution; provided, however, that the foregoing
shall not apply with respect to any notice from Licensor of a
deficiency involving a risk to public health or safety.  Upon receipt
of such Deficiency Notice, if the Licensee or, if applicable, the
mutually agreed upon third party, concurs in the determination of
deficiency, the Licensee shall cure such deficiency within a
commercially reasonable amount of time, and shall provide the Licensor
with evidence of such cure including samples of such Licensed Goods
and Services; provided, however, that in the event that any deficiency
poses a risk to public health or safety, the Licensee shall
immediately take all steps necessary to cure the deficiency or
otherwise eliminate the risk to public health or safety.  If any
deficiency is not cured within the applicable time period set forth
herein, the Licensee shall cease all use of the Licensed Marks in
connection with the production, manufacture, distribution, sale,
advertising and promotion of the Licensed Goods and Services in issue
unless and until such cure is achieved.

<div align="center">9</div>

<PAGE>   10

(ii)    If any deficiency is such that any such
Licensed Goods and Services are subject to the likelihood of market
withdrawal, recall or correction based on failure to conform to
applicable Governmental Authority guidelines, the Licensee agrees to
implement promptly such withdrawal, recall or correction procedures at
the Licensee's sole cost and expense and shall coordinate and
cooperate with the Licensor in connection therewith, including with
respect to all press releases and other public relations aspects
thereof.  Similarly, if the Licensee is otherwise required or
determines to withdraw from market, recall or correct any such
Licensed Goods and Services, the Licensee shall give the Licensor

XXX-002252

prior notice of such withdrawal, recall or correction as soon as practicable and the parties shall coordinate and cooperate with each other in connection therewith, including with respect to all press releases and other public relations aspects thereof.

(f)    Compliance; Fitness for Use.  The Licensee shall be solely responsible for and shall comply with all laws, rules and regulations, if any, of Governmental Authorities in connection with the production, manufacture, provision, distribution, sale, labeling, packaging, advertising and promotion of the Licensed Goods and Services.  The Licensee represents and warrants that the Licensed Goods and Services (i) shall be in all respects non-injurious (if used as intended), merchantable (in the case of goods) and fit for the purposes for which such items are intended to be used, (ii) shall not be adulterated or misbranded within the meaning of any applicable laws, rules or regulations of any Governmental Authority, (iii) shall not be packaged or sold in damaged containers, which damage causes such Licensed Goods and Services to be adulterated or misbranded or in any way in violation of any such applicable laws, rules or regulations, and (iv) shall not violate the rights of any other Person.

SECTION 5.    TERM.

The initial term of this Agreement shall commence as of the date hereof and shall, unless sooner terminated as provided herein, terminate on the 20th anniversary of such date; provided, that the term of this Agreement shall be automatically extended for successive 20 year periods, unless the Licensee gives to the Licensor written notice of termination at least 365 days prior to the scheduled termination of the then-current term.

SECTION 6.    PROTECTION OF THE LICENSED MARKS.

(a)    Existing and Pending Registrations.  The Licensor shall use reasonable efforts to prosecute the existing pending applications for the Licensed Marks and shall maintain at its expense each and every one of the existing registrations for the Licensed Marks with respect to the Licensed Goods and Services in full force and effect, in each case to such extent as Licensor deems appropriate as long as this Agreement continues in effect (provided that Licensor shall not knowingly permit or cause the termination of the registration of any Licensed Mark in any country if it shall continue the registration of such mark in such country for goods and services other than the Licensed Goods and Services), and Licensee agrees to provide such  assistance and documentation as is required for such prosecution and maintenance.  In the event

10

<PAGE>    11

the Licensor chooses not to prosecute or maintain in force and effect registrations for any of the Licensed Marks with respect to the Licensed Goods and Services, either at all or as to any particular country, the Licensor, at the Licensee's request, shall use reasonably diligent efforts to maintain or register in the Licensor's name at the Licensee's expense such Licensed Marks with respect to the Licensed Goods and Services.

(b)    New Registrations.  At the Licensee's request, the Licensor agrees to file and use reasonable efforts to prosecute in the Licensor's name, at the Licensee's expense, new applications for any of the Licensed Marks in any country to the extent that any such Licensed Marks are not already registered or applied for in such country with respect to such Licensed Goods and Services; provided, however, that the Licensor shall not be required to take any action pursuant hereto which Licensor determines in the exercise of its reasonable good faith judgment would adversely affect in any material respect the Licensor's rights in the Licensed Marks.  At the Licensee's request, the Licensor shall use reasonable efforts to maintain, at the Licensee's expense, any registrations obtained pursuant to this subparagraph (b).

(c)    Infringement of Licensed Marks.

(i)    Each of the Licensor and the Licensee shall notify the other of any actual or threatened opposition, invalidation or cancellation action with respect to the Licensed Marks (collectively, "Opposition"), or any actual or threatened infringement of, or act of unfair competition or other harmful or wrongful activities of third parties with respect to the Licensed Marks (collectively, "Infringement"), as to which it has notice, and Licensor and Licensee shall consult and cooperate with each other with respect to any action to be taken (including the settlement of litigation) with respect thereto.  Subject to the terms of this Section, the Licensor will have the right in its sole discretion to take whatever steps it deems necessary or desirable to enforce the Licensed Marks or protect the Licensed Marks against any Opposition or Infringement and shall have the right to control any litigation or other legal or arbitral proceeding ("Legal Action") undertaken by it for such purpose.  Such steps may include defending any Opposition or the filing and prosecution of (A) litigation against any Infringement, (B) opposition or interference proceedings against applications for trademark or service mark registrations for marks that are confusingly similar to any of the Licensed Marks, and (C) proceedings to cancel registration of or have declared invalid trademarks or service marks

XXX-002253

that are confusingly similar to any of the Licensed Marks.  The
Licensor will provide the Licensee with prior notice of any Legal
Action it takes to assert or protect the Licensed Marks and upon
reasonable request of the Licensee, shall notify the Licensee of the
status of such Legal Action.  If the Licensor elects not to bring
Legal Action against any apparent Infringement of the Licensed Marks,
the Licensee, upon prior notice to the Licensor, shall have the right
to bring such Legal Action at its option and expense, unless the
Licensor determines in its reasonable good faith judgment that such
action or proceeding would materially adversely affect the Licensor's
rights in the Licensed Marks.

                              11

<PAGE>   12

The Licensor shall notify the Licensee of such election sufficiently
in advance to permit the Licensee to act within applicable time
limits.

          (ii)     The party that commences and prosecutes any
Legal Action to enforce or protect the Licensed Marks pursuant to this
Section shall bear the costs of such Legal Action and be entitled to
all monetary damages received as the result thereof; provided,
however, that (A) to the extent that the Licensor receives
compensation that is based on the lost sales and profits of the
Licensee, then the Licensor shall pay such compensation to the
Licensee, but only if the Licensee reimburses the Licensor for a pro
rata portion of the costs of such Legal Action; and (B) to the extent
that the Licensee receives compensation in a Legal Action that is
based on the lost sales and profits of the Licensor, then the Licensee
shall pay such compensation to the Licensor, but only if the Licensor
reimburses the Licensee for a pro rata portion of the costs of such
Legal Action.

          (iii)    Each party shall cooperate with the other in
the prosecution of any Legal Action provided for in this Section and
keep the other informed about the prosecution of such proceedings.
Notwithstanding anything to the contrary contained in this Section, no
party shall enter into any agreement, consent order or other
resolution of a claim by or against a third party that materially
adversely affects any rights of any other party with respect to the
Licensed Marks without the prior written consent of such other party.

     (d)     Third-party Allegations of Infringement, etc.

          (i)      If any Legal Action is threatened or
commenced by a third party against one of the parties or any of their
customers on the ground that any Licensed Goods and Services infringe
any patent or other intellectual property right of such third party,
the party or the party whose customer is so threatened or sued shall
promptly notify the other party hereto.  Except as otherwise provided
in Section 9, the Licensor may at its sole option elect to defend any
such Legal Action that is brought against the Licensee, provided that
in such event the Licensor shall indemnify, defend and hold harmless
the Licensee and its Affiliates from and against and in respect of any
and all Losses incurred by them arising out of or resulting from such
Legal Action.  If the Licensor elects not to bring such a Legal
Action, the Licensor shall notify the Licensee of such election
sufficiently in advance to permit the Licensee to act within
applicable time limits, and the Licensor shall not be required to
indemnify or hold harmless the Licensee and its Affiliates pursuant to
the terms of this Section 6(d).

          (ii)     Each party shall cooperate with the other in
the prosecution of any Legal Action provided for in this Section and
keep the other informed about the prosecution of such proceedings.
Notwithstanding anything to the contrary contained in this Section,
neither party shall enter into any agreement, consent order or other

                              12

<PAGE>   13

resolution of a claim by or against a third party that materially
adversely affects any rights of any other party with respect to the
Licensed Marks without the prior written consent of the other party.

     SECTION 7.     RECORDATION OF AGREEMENT.

          The parties shall cooperate to determine and comply with
applicable laws or regulations throughout the world with respect to the
recordation or validation of, or otherwise to render effective this Agreement.
In countries having registered user or license recordation requirements, the
parties shall execute all documents which may be necessary to record the
Licensee as a registered user or licensee for all Licensed Marks and all costs
of preparing and recording any necessary documents or other costs in connection
therewith shall be borne by the Licensee.

XXX-002254

SECTION 8.       REPRESENTATIONS; DISCLAIMER.

Licensor represents that it is granting Licensee rights in and to the Licensed Marks upon, and subject to, the terms and conditions of this Agreement, to the extent that Licensor owns such rights. Except as expressly set forth in the immediately preceding sentence, Licensor makes no, and hereby expressly disclaims any and all, representations and warranties, express or implied, in connection with the Licensed Marks and the licenses granted hereunder with respect thereto, or otherwise in connection with this Agreement.

SECTION 9.       INDEMNIFICATION.

(a)    Obligation.

(i)    The Licensee shall indemnify, defend and hold harmless the Licensor and its Affiliates from and against and in respect of any and all claims, losses, damages, expenses, obligations, penalties, demands, suits, proceedings, assessments, judgments, costs and liabilities (including costs of collection, investigation, reasonable attorney's fees and other costs of defense) ("LOSSES") incurred by them, arising out of or resulting from:  (A) any use by the Licensee, its Affiliates, or its sublicensees of the name "Fresenius" or the Licensed Marks; (B) death or injury to persons or damages or loss to property in any way arising out of or connected with the production, manufacture, marketing, promotion, advertising, sale, provision or distribution by or through the Licensee of any Licensed Goods and Services; and (C) any breach of any representation, warranty or agreement made by the Licensee herein.

(ii)    The Licensor shall indemnify, defend and hold harmless the Licensee and its Affiliates from and against and in respect of all Losses incurred by Licensee arising out of or resulting from:  (A) any use by Licensor or its Affiliates of the name "Fresenius" or the Licensed Marks; (B) death or injury to persons or damages

13

<PAGE>   14

or loss to property in any way arising out of or connected with the production, manufacture, marketing, promotion, advertising, sale, provision or distribution by or through the Licensor of any Licensed Goods and Services; and (C) any breach of any representation, warranty or agreement made by the Licensor herein.

(b)    Procedure.  If a claim by a third party is made against the Licensor or its Affiliates or Licensee or its Affiliates (the "Indemnified Party"), the Indemnified Party shall in writing notify the other party (the "Indemnifying Party") of such claim, within a reasonable period of time, describing the same in reasonable detail considering all information then known to the Indemnifying Party.  Failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of any liability which the Indemnifying Party might have, except to the extent that such failure materially prejudices the Indemnifying Party's legal rights.  The Indemnifying Party shall have thirty (30) days after receipt of such notice to undertake, conduct and control, through counsel of its own choosing (subject to the consent of the Indemnified Party, such consent not to be unreasonably withheld) and at its expense, the settlement or defense of such claim, and the Indemnified Party shall cooperate with the Indemnifying Party in connection therewith.  If the Indemnifying Party undertakes the defense of any claim, the Indemnifying Party shall thereby admit its obligation to indemnify the Indemnified Party against such claim and the Indemnifying Party shall control the investigation and defense or settlement thereof, and the Indemnified Party may not settle or compromise such claim, except that the Indemnifying Party shall not require any Indemnified Party, without its prior written consent, to take or refrain from taking any action in connection with such claim, or make any public statement, which such Indemnified Party reasonably considers to be against its interest, nor shall the Indemnifying Party, without the prior written consent of the Indemnified Party, consent to any settlement that adversely affects any rights of the Indemnified Party with respect to the Licensed Marks, or that does not include as a part thereof an unconditional release of the Indemnified Party from liability with respect to such claim, or that requires the Indemnified Party to make any payment that is not fully indemnified under this Agreement or to submit to any non-monetary remedy; and subject to the Indemnifying Party's control rights, as specified herein, the Indemnified Party may participate in such investigation and defense, at its own expense.  If the Indemnifying Party does not notify the Indemnified Party within thirty days after receipt of the Indemnified Party's notice of a claim of indemnity hereunder that it elects to undertake the defense thereof, or so notifies the Indemnified Party but fails to undertake or maintain such defense promptly and in good faith, the Indemnified Party shall have the right to contest, settle or compromise the claim in the exercise of its reasonable judgment and without prejudice to the rights of the Indemnified Party to indemnification hereunder.  If an Indemnified Party reasonably determines that there may be legal defenses available to it that are different from or are in addition to those available to the Indemnifying Party which make it inappropriate for the Indemnifying Party to undertake the defense or settlement thereof, then such Indemnifying Party shall not be entitled to undertake the defense or settlement of such third party claim; and counsel for the

XXX-002255

Indemnifying Party shall be entitled to conduct the defense of the Indemnifying
Party and counsel for the Indemnified Party shall be entitled to conduct the
defense of such Indemnified Party, it being understood that counsel for the
Licensor shall be primary

                                    14
<PAGE>   15
counsel and that counsel for both parties shall cooperate with each other to
conduct the defense or settlement of such action as efficiently as possible.

            (c)      Survival.  The provisions of this Section 9 shall
survive the termination or expiration of this Agreement.

            SECTION 10.      INSURANCE.

            The Licensee shall obtain and shall maintain, at its sole cost
and expense, throughout the term of this Agreement and renewals thereof,
commercial general liability insurance (including Products/Completed
Operations, Hazard, Advertising, Personal Injury and Blanket Contractual
Liability) from an insurer (or insurers) acceptable to the Licensor.  The
insurance policy(ies) shall name the Licensor as an additional insured and
coverage provided by such insurance policy(ies) shall be primary with respect
to the additional insured.  The amount of insurance required shall be no less
than the following limits of insurance:  General Aggregate (other than
Products/Completed Operations): [$_____]; Products Completed Operations
Aggregate:  [$_____]; Each Occurrence:  [$_____].  The policy shall
provide thirty (30) days written notice to the Licensor from the insurer in the
event of any cancellation or termination.  The Licensee agrees to furnish a
certificate of insurance providing such coverage within thirty (30) days after
the date of this Agreement.  In no event shall the Licensee market or provide
any Licensed Goods and Services prior to receipt by the Licensor of such
evidence of insurance.  Nothing in this Section 10 shall be deemed to limit in
any way any indemnification provisions contained in this Agreement.

            SECTION 11.      CONFIDENTIALITY.

            The parties expressly acknowledge and agree that this
Agreement and its terms and all technical and/or commercial information
(including without limitation all quality standards and specifications),
whether written or oral, furnished by either party to the other or any
affiliate, subsidiary, parent company, related company, officer, director,
employee, agent or representative (the "Related Parties") of the other pursuant
to this Agreement ("Confidential Information") shall be maintained by such
party and their respective Related Parties in confidence.  Except as authorized
in writing by the other party, neither party shall at any time disclose or
permit to be disclosed any such Confidential Information to any Person, (i)
except as may reasonably be required in connection with the performance of this
Agreement by the Licensee or the Licensor, as the case may be, and (ii) except
to the parties' agents or representatives who are informed by the parties of
the confidential nature of such Confidential Information and are bound to
maintain its confidentiality.  The obligation not to disclose any Confidential
Information shall not apply to information that (i) is or becomes generally
available to the public other than as a result of disclosure by the recipient
or any of its Related Parties, (ii) was readily available to the recipient or
any of its Related Parties on a non-confidential basis prior to its disclosure
to such party by the other party, (iii) was in the recipient's or its Related
Parties' lawful possession as evidenced by records kept in the ordinary course
of business or by

                                    15
<PAGE>   16
proof of actual possession prior to its disclosure to such party by the other
party, (iv) becomes available to the recipient or any of its Related Parties on
a non-confidential basis from a source other than the other party, provided
that such source is not known by the recipient to be bound by confidentiality
agreements with the other party or its Related Parties or by legal, fiduciary
or ethical constraints on disclosure of such information or (v) is required to
be disclosed pursuant to a Governmental Authority order or decree or other
legal requirement.  Nothing in this Section 11 shall limit in any respect
either party's ability to disclose information in connection with the
enforcement by such party of its rights under this Agreement; provided that the
party desiring to disclose such information shall give the other party prompt
notice thereof prior to such disclosure and at the request of the other party
shall cooperate in all reasonable respects in maintaining the confidentiality
of such information, including without limitation obtaining an appropriate
protective order or other similar order.  This Section shall survive the
termination of this Agreement.

            SECTION 12.      TERMINATION; RIGHTS ON TERMINATION.

            (a)      Licensor shall have the right to terminate this
Agreement and any and all of Licensee's rights hereunder in the event of a
material breach of this Agreement by Licensee or any of its Affiliates which
Licensee or such Affiliate shall fail to cure within sixty (60) days after

XXX-002256

written notice thereof from the Licensor; provided, however, that if the period of time reasonably required to cure such breach exceeds sixty (60) days and the Licensee or such Affiliate promptly commences and diligently exercises its best efforts to cure such breach, and such delay in cure will not materially increase any adverse effect of such breach on the "Fresenius" name, Licensed Marks or the Licensor, then such sixty (60) day period shall be extended to such longer period of time as is reasonable under the circumstances. Notwithstanding anything contained herein, the Licensor agrees that except as expressly provided in Sections 12(b) and (c) below, in view of the uniqueness of the circumstances giving rise to this Agreement in connection with the Renal Business, Licensor shall not be entitled to terminate the rights of Licensee under Section 2(a) of this Agreement, except in the event of a willful breach or willful violation of an order granting specific performance of, or an injunction against a breach of, this Agreement, which order or injunction is not reversed or vacated on appeal.

(b)    The Licensor may terminate this Agreement in the event that the Licensee abandons its use of all of the Licensed Marks by ceasing bona fide use thereof in commerce in the ordinary course of trade for a period of three (3) consecutive years.

(c)    In addition, this Agreement shall terminate in the event of insolvency or adjudication in bankruptcy of the Licensee or the filing of a voluntary petition of bankruptcy of the Licensee or the making of an assignment for the benefit of creditors by the Licensee, which insolvency, bankruptcy or assignment results in the liquidation of Licensee or of substantially all of its assets.

16

<PAGE>  17

(d)    The rights of any Affiliate of Licensee hereunder, including without limitation, all licenses granted to such Affiliate hereunder, shall automatically terminate without any action on the part of Licensor, if and when such Affiliate ceases to be an Affiliate of Licensee.

(e)    On the termination of this Agreement pursuant to this Section 12, except as otherwise expressly provided herein all the rights of the Licensee hereunder shall forthwith terminate and automatically revert to the Licensor and the Licensee shall forthwith discontinue and shall cause any Affiliate and sublicensee to forthwith discontinue all use of the Licensed Marks and the name "Fresenius" and shall no longer have the right to use such name or the Licensed Marks or any variation or simulation thereof.  The Licensee shall and shall cause any Affiliate and sublicensee to thereupon immediately discontinue any and all goods or services using the Licensed Marks and shall, at the Licensee's election, either destroy (and evidence such destruction by an appropriate Certification of Destruction executed by an authorized officer of Licensee) or deliver to the Licensor, free of charge, all packaging, labels, tags, brochures, advertising materials, original art, mechanicals, film, plates, screens and other design and production, manufacturing or other materials of any kind or nature in its possession with the Licensed Marks or the name "Fresenius" thereon.  Notwithstanding the foregoing, the Licensee may, and may authorize sublicensees to, for twelve (12) months immediately following the termination of this Agreement, sell or otherwise dispose of or provide any Licensed Goods and Services or packaging or advertising or promotional materials therefor in its inventory at the date of termination, or which are produced in the ordinary course of business pursuant to a binding, non-cancelable commitment which the Licensee entered into prior to the termination date, utilizing the Licensed Marks, provided that such Licensed Goods and Services comply with the Licensor's quality standards and other requirements set forth in Section 4 and subject to all of the other terms and conditions of this Agreement.

Upon termination of this Agreement, the parties shall perform all other acts which may be necessary or useful to render effective the termination of the interest of the Licensee in the Licensed Marks, and the Licensee shall execute any assignment, conveyance, acknowledgment or other document that the Licensor may reasonably require, relinquishing or conveying to the Licensor any and all rights or interests to use the Licensed Marks that the Licensee has, and any goodwill associated therewith.  Without limiting the foregoing, the Licensee hereby consents to any application which the Licensor may make, upon termination of this Agreement, to limit or terminate the Licensee's status as a registered user (effective upon expiration of the twelve (12) month phaseout period provided for in this Section) and hereby irrevocably agrees not to contest, oppose or dispute such application.

SECTION 13.    MISCELLANEOUS.

(a)    Notices.  Except as otherwise provided herein, all notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered

17

<PAGE>  18

XXX-002257

personally or by overnight courier with delivery charges prepaid, or by
certified or registered mail, postage prepaid, receipt requested, or by
telecopy, as follows:

          If to the Licensor, to it at:

          Fresenius AG
          Borkenberg 14
          61440 Oberursel
          Germany
          Attention:  Mr. Udo Werle
          Telecopy No.:  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-60-2104

          with a copy to:

          O'Melveny & Myers LLP
          Citicorp Center
          153 East 53rd Street
          New York, New York  10022-4611
          Attention:  Dr. Ulrich Wagner
          Telecopy No.:  (212) 326-2061

          If to Licensee, to it at:

          Fresenius Medical Care AG
          Borkenberg 14
          61440 Oberursel
          Germany
          Attention:
          Telecopy No.:  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-

          with a copy to:


or to such other person or address as either party shall specify by notice in
writing to the other party.  All such notices, requests, demands, waivers and
communications shall be deemed to have been received on the date of delivery.

          (b)     Binding Effect; Benefit.  This Agreement shall inure
to the benefit of and be binding upon the Licensor and its successors and
assigns and the Licensee and its successors and permitted assigns.  Nothing in
this Agreement, expressed or implied, is intended to confer on any Person other
than Licensor and its successors and assigns and the Licensee and its



                              18
<PAGE>   19

successors and permitted assigns, any rights, remedies, obligations or
liabilities under or by reason of this Agreement.

          (c)     Entire Agreement.  This Agreement (including the
Exhibits and Schedules hereto) constitutes the entire agreement between the
parties hereto with respect to the subject matter hereof and supersedes all
other prior agreements and understandings, oral and written, between the
parties hereto with respect to the subject matter hereof.

          (d)     Assignability.  Neither this Agreement nor any rights
granted the Licensee hereunder may be assigned by the Licensee except to the
prior written consent of the Licensor except to an Affiliate of such Licensee;
provided, however, that no such permitted assignment shall relieve the Licensee
of its obligations or liabilities hereunder.  The Licensee shall give the
Licensor written notice of any such assignment referred to in the prior
sentence as promptly as reasonably possible following the occurrence thereof.
This Agreement shall be freely assignable by the Licensor.

          (e)     Relationship of the Parties.  This Agreement shall in
no way constitute or give rise to a partnership, joint venture or agency
between the parties, it being acknowledged and agreed that the relationship
created hereby is strictly that of licensor and licensee.  Except as may be
expressly provided to the contrary herein, nothing in this Agreement shall
constitute or be deemed to constitute either party as the legal representative
or agent of the other, nor shall either party have the right or authority to
assume, create, or incur any liability or any obligation of any kind, expressed
or implied, in the name of or on behalf of the other party.

          (f)     Amendment and Modification; Waiver.  Subject to
applicable law, this Agreement and any Exhibits and Schedules attached hereto
may only be amended, modified and supplemented by written instrument expressly
identified as an amendment hereto authorized and executed by the Licensor and
the Licensee at any time prior to the termination hereof with respect to any of
the terms contained herein.  No waiver by any party of any of the provisions
hereof shall be effective unless explicitly set forth in writing and executed
by the party so waiving.  The waiver by any party hereto of a breach of any
provision of this Agreement shall not operate or be construed as a waiver of
any other or subsequent breach.  No failure on the part of either party hereto
to exercise, and no delay in exercising, any right hereunder shall operate as a
waiver thereof.  The remedies herein are cumulative and not exclusive of any
remedies provided by law.

XXX-002258

(g)    Further Assurances.  From time to time, pursuant to
the request of the Licensee delivered to the Licensor, the Licensor, at the
Licensee's expense, will execute and deliver such instruments and documents and
take such actions as the Licensee may reasonably request in order to allow the
Licensee the use of the Licensed Marks contemplated hereby or otherwise to
carry out the purposes and intent of this Agreement.  From time to time,
pursuant to the request of the Licensor delivered to the Licensee, the Licensee
and its Affiliates, at the Licensor's expense, will execute and deliver such
instruments and documents and take such

                                    19
<PAGE>    20

actions as the Licensor may reasonably request to carry out the purposes and
intent of this Agreement.

        (h)    Section Headings.  The section headings contained in
this Agreement are inserted for reference purposes only and shall not affect
the meaning or interpretation of this Agreement.

        (i)    Counterparts.  This Agreement may be executed in
several counterparts, each of which shall be an original, and all of which
shall be deemed to be one and the same agreement.

        (j)    Applicable Law.  This Agreement and the legal
relations between the parties hereto shall be governed by and construed in
accordance with the laws of Germany without regard to choice of laws or
principles thereof.

        (k)    Severability of Provisions.  Any provision of this
Agreement which is prohibited or unenforceable in any jurisdiction shall, as to
such jurisdiction, be ineffective to the extent of such prohibition or
enforceability without invalidating the remaining provisions hereof or
affecting the validity or enforceability of such provisions in any other
jurisdiction.

        (l)    Specific Performance; Remedies.  The Licensor and the
Licensee each acknowledge that, in view of the uniqueness of the transactions
contemplated by this Agreement, the other party would suffer irreparable harm
and would not have an adequate remedy at law for money damages if this
Agreement has not been performed in accordance with its terms.  Each party
therefore agrees that the other party shall be entitled to specific performance
of the terms hereof and injunctive relief in respect of any material breach of
the terms hereof in addition to any other remedy to which it may be entitled
hereunder or at law or in equity.  All remedies provided for herein shall be
cumulative and the exercise of any particular remedy by a party shall not limit
or preclude the exercise of any other remedy available to such party.

        (m)    Attorneys' Fees.  If any claim, action, suit or
proceeding is brought by a party hereto against the other in connection with
this Agreement, the prevailing party in such claim, action, suit or proceeding
shall, in addition to all other rights and remedies to which such party is
entitled, be entitled to recover from the non-prevailing party all costs and
expenses (including without limitation court costs and reasonable attorneys'
fees) incurred in connection with such claim, action, suit or proceeding.

        (n)    Affiliates.  Licensee shall cause each of its
Affiliates, and each such Affiliate of Licensee by its exercise of any rights
hereunder thereby agrees, to be bound by and comply with the terms of this
Agreement as if such Affiliate were named as the Licensee hereunder, and any
breach of this Agreement by an Affiliate of Licensee shall constitute a breach
of this Agreement by Licensee.  At the request of Licensor, Licensee shall
cause each of its Affiliates to execute and deliver to Licensor an agreement of
such Affiliate to be bound by the

                                    20
<PAGE>    21

terms of this Agreement for the benefit of the Licensor, as if such Affiliate
were the Licensee hereunder.

                                    21
<PAGE>    22

        IN WITNESS WHEREOF, the parties hereto have executed this
License Agreement as of the date first above written.

                            FRESENIUS AG


                            By:

XXX-002259

```
                              ------------------------------
                              Name:
                              Title:


                         FRESENIUS MEDICAL CARE AG


                              By:
                              ------------------------------
                              Name:
                              Title:




                         22
```

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.7
<SEQUENCE>12
<DESCRIPTION>BIOFINE LICENSE AGREEMENT
<TEXT>

<PAGE>   1
```

EXHIBIT 10.7

BIOFINE LICENSE AGREEMENT

BIOFINE LICENSE AGREEMENT, dated as of _____, 1996 (the "AGREEMENT"), between FRESENIUS AG, an Aktiengesellschaft organized under the laws of the Federal Republic of Germany (the "LICENSOR"), and FRESENIUS MEDICAL CARE AG, an Aktiengesellschaft organized under the laws of the Federal Republic of Germany (the "LICENSEE").

W I T N E S E T H :

WHEREAS, Licensor has entered into an Agreement and Plan of Reorganization dated as of February 4, 1996, as amended (the "REORGANIZATION AGREEMENT"), among Licensor, Fresenius USA, Inc., a Massachusetts corporation, and W. R. Grace & Co., a New York corporation ("GRACE"), pursuant to which Licensor has contributed its worldwide dialysis and renal medical products business to Licensee;

WHEREAS, certain intellectual property, including that relating to the multi-layered polyolefin foil or film developed by Licensor and generally known under the name "Biofine," (the "BIOFINE FILM") is used or intended to be used both in Licensor's and Licensee's business; and

WHEREAS, Licensor desires to grant to Licensee a license of such intellectual property relating to the Biofine Film;

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

Capitalized terms used herein and not otherwise defined shall have the meanings specified in the Reorganization Agreement. Terms defined in the singular or plural, as the case may be, shall have the same respective meaning mutatis mutandis when used in the plural or singular, as the case may be.

"AFFILIATE" shall mean, with respect to any Person, any entity which directly or indirectly (i) controls not less than 50% of the equity securities of the specified Person, (ii) not

```
<PAGE>   2
```

less than 50% of the equity securities of which entity are controlled by the specified Person, or (iii) not less than 50% of the equity securities of which entity and not less than 50% of the equity securities of the specified Person are under common control; provided, however, that for purposes of this Agreement no Licensee Entity shall be deemed to be an Affiliate of any Licensor Entity and no Licensor Entity shall be deemed an Affiliate of any Licensee Entity.

"AGREEMENT" shall have the meaning specified in the

XXX-002260

introductory paragraph hereof.

"BIOFINE FILM" shall have the meaning specified in the Recitals.

"DEFICIENCY NOTICE" shall have the meaning specified in Section 2.6(e).

"EXCLUDED FIELD" shall mean (i) the development, manufacture and distribution of pharmaceuticals (which for the purposes of this Agreement shall not include solutions and concentrates used in the Licensed Field), including without limitation, solutions for infusion therapy and enteral and parenteral nutrition, and specialty pharmaceuticals; (ii) the development, manufacture and distribution of products for hemotherapy and intensive medicine, diagnostic products, specialty membranes and transplantation medicine; and (iii) the provision of scientific and manufacturing know-how for planning and construction of pharmaceutical and medical systems manufacturing facilities and for equipping of hospitals.

"GOVERNMENTAL AUTHORITY" shall mean any federal, state, county, local, foreign or other governmental department, regulatory body, commission, board, bureau, agency or instrumentality in any country in the world.

"INDEMNIFIED PARTY" shall have the meaning specified in Section 3.2.

"INDEMNIFYING PARTY" shall have the meaning specified in Section 3.2.

"KNOW-HOW LICENSE" shall have the meaning specified in Section 2.1.

"KNOW-HOW LICENSE TERM" shall have the meaning specified in Section 2.3.

"LICENSE" shall mean the Patent License, the Know-How License or the Trademark License.

"LICENSED FIELD" shall mean the business of supplying renal care-related goods and services, including laboratories; provided, that for purposes of interpreting the foregoing clause, the parties shall be guided by the Reorganization Agreement, including the Contribution Agreement, dated February 4, 1996, among Licensor, Licensee (then known as Steril Pharma GmbH) and W. R. Grace & Co.-Conn., and the Distribution Agreement, dated February 4, 1996, among Grace, W. R. Grace & Co.-Conn., and Licensor; provided, further, that it is

2

<PAGE>    3

expressly acknowledged by Licensee that the home care business of Licensor is not, and shall not be deemed to be, within the Licensed Field.

"LICENSED INTELLECTUAL PROPERTY" shall mean the Licensed Patents, the Licensed Know-How and the Licensed Trademarks.

"LICENSED KNOW-HOW" shall mean all know-how, whether or not patented, and other proprietary developmental records, trade secrets, proprietary information, manufacturing technology and other intangible property, owned or controlled (in the sense of having the right to grant a license, whether with or without the payment of royalties) by Licensor on the date hereof and used or useful in connection with the manufacture, use or sale of Biofine Film and products made therefrom, including without limitation the items listed on Exhibit A; provided, however, that in no event shall Licensed Patents constitute Licensed Know-How.

"LICENSED PATENTS" shall mean (i) all letters patents, patents and patent applications owned or controlled (in the sense of having the right to grant a license, whether with or without the payment of royalties) by Licensor on the date hereof and used or useful in connection with the manufacture, use or sale of Biofine Film and products made therefrom, including without limitation those listed on Exhibit B, (ii) any additional patents that may issue hereafter as to Licensed Know-How and (iii) any and all amendments, continuations, continuations-in-part, divisions, reissues and extensions of such letters patent, patents and patent applications.

"LICENSED PRODUCTS" shall mean goods, products and services embodying or utilizing the Licensed Intellectual Property.

"LICENSED TRADEMARKS" shall mean the mark "Biofine" and all registrations and applications for registration thereof, including without limitation those listed on Exhibit C.

"LICENSEE" shall have the meaning specified in the introductory paragraph hereof.

"LICENSEE ENTITIES" shall mean Licensee and its subsidiaries.

"LICENSOR" shall have the meaning specified in the

XXX-002261

introductory paragraph hereof.

"LICENSOR ENTITIES" shall mean Licensor and its subsidiaries, excluding the Licensee Entities.

"LOSSES" shall have the meaning specified in Section 3.2.

"NON-EXCLUSIVE FIELD" shall mean all businesses not included in the Licensed Field or the Excluded Field.

3

<PAGE>    4

"PATENT LICENSE" shall have the meaning specified in Section 2.1.

"PATENT LICENSE TERM" shall have the meaning specified in Section 2.3.

"PERSON" shall mean an individual, a corporation, a partnership, an association, a trust, a Governmental Authority, or any other entity or organization.

"REORGANIZATION AGREEMENT" shall have the meaning specified in the Recitals.

"SUBLICENSEE" shall have the meaning specified in Section 2.4.

"TERRITORY" shall mean the entire world.

"TRADEMARK LICENSE" shall have the meaning specified in Section 2.1.

"TRADEMARK LICENSE TERM" shall have the meaning specified in Section 2.3.

ARTICLE II

LICENSE

2.1    License. Licensor hereby grants to Licensee and its Affiliates, in the Territory, the following licenses:

(a)    (i)    the exclusive license (to the exclusion of all other Persons, including Licensor) under the Licensed Patents to provide, make, have made, use and sell goods, products and services in the Licensed Field, and (ii) the non-exclusive license under the Licensed Patents to provide, make, have made, use and sell goods, products and services in the Non-Exclusive Field (collectively, the "PATENT LICENSE");

(b)    (i)    the exclusive license (to the exclusion of all other Persons, including Licensor) under the Licensed Know-How to provide, make, have made, use and sell goods, products and services in the Licensed Field, and (ii) the non-exclusive license under the Licensed Know-How to provide, make, have made, use and sell goods, products and services in the Non-Exclusive Field (collectively, the "KNOW-HOW LICENSE");

(c)    (i)    the exclusive license (to the exclusion of all other Persons, including Licensor) to use the Licensed Trademarks in connection with the provision, manufacture, use, advertising and sale of goods, products and services in the Licensed Field, and (ii) the non-exclusive license to use the Licensed Trademarks in connection with the provision, manufacture, use, advertising and sale of goods, products and services in the Non-Exclusive Field (collectively, the "TRADEMARK LICENSE").

4

<PAGE>    5

2.2    Compensation. The Licenses granted herein are royalty-free and fully paid up. Notwithstanding the foregoing, the Licensee, at the option of the Licensor, shall pay or reimburse Licensor for all royalties, license fees and the similar costs or expenses paid or payable to third parties on account of any grant herein of any rights in any Licensed Intellectual Property within the control of Licensor or any exercise by Licensee of any such rights. Any such amount shall be paid when due to the third party provided that Licensor shall have given the Licensee reasonable notice of the due date thereof or, if requested by Licensor, due and payable to the Licensor within 30 days after receipt by Licensee of an invoice therefor, showing in reasonable detail the calculation thereof.

2.3    License Terms.

(a)    The term of the Patent License shall extend (i) with respect to each country in the Territory that is a member of the European Union or the European Economic Area and in which any Licensed Patent is registered or for which a patent application is currently pending, until the expiration of

XXX-002262

the last to expire of the Licensed Patents registered or for which a patent
application is currently pending in that country, and (ii) with respect to each
country in the Territory that is neither a member of the European Union nor a
member of the European Economic Area, until the expiration of the last to
expire of the Licensed Patents registered or for which an application is
pending in the Territory (the "PATENT LICENSE TERM").

(b)    The term of the Know-How License (i) shall be
perpetual in countries in which such a perpetual license is permitted by law;
(ii) shall be limited in accordance with law so as not to impair the validity
of this Agreement in countries in which a perpetual license is not permitted by
law (other than member countries of the European Union and the European
Economic Area); and (iii) shall extend in each member country of the European
Union and the European Economic Area until all of the Licensed Know-How becomes
public knowledge in such country (collectively, the "KNOW-HOW LICENSE TERM").

(c)    Subject to the terms of Section 3.1(b) hereof, the
term of the Trademark License shall be perpetual (the "TRADEMARK LICENSE
TERM").

2.4    Sublicensing.

(a)    Licensee shall have the exclusive right to sublicense
the Licensed Patents and Licensed Know- How to make, have made, use or sell
Licensed Products in the Licensed Field in the Territory, subject to the terms
and conditions of this Agreement.

(b)    Licensee shall have the non-exclusive right to
sublicense the Licensed Patents and Licensed Know-How in fields other than the
Licensed Field and the Excluded Field with the prior consent of Licensor, which
consent shall not unreasonably be withheld.

5

<PAGE>    6

(c)    Each sublicensee of Licensee hereunder is referred to
herein as a "Sublicensee." Each sublicense granted pursuant to the terms of
this Section 2.4 shall contain the agreement of the Sublicensee thereunder to
maintain the confidentiality of all proprietary nonpublic know-how or
information constituting a part of the Licensed Know-How on substantially the
same terms and conditions as those applicable to Licensee under Section 2.7(b).

(d)    All royalties or other payments received by Licensee
from any Sublicensee in connection with a sublicense granted in a field other
than the Licensed Field or the Excluded Field shall be applied by Licensee,
first, to reimburse Licensee for all reasonable out-of-pocket expenses incurred
in connection with the negotiation of such sublicense, and, then, one-half of
the balance shall be paid to Licensor, quarterly, in the manner set forth in
Section 2.5 hereof.

2.5    Royalties; Reporting Procedures.

(a)    Amounts payable under Section 2.4(d) or 2.14(b) with
respect to payments received by Licensee or Licensor, respectively, in any
calendar quarter shall be accounted for and paid by the party required to make
the payment to the party entitled to receive the payment (at such address as
the party entitled to receive the payment shall from time to time designate in
writing) within sixty (60) days after the close of such quarterly period. Each
payment shall be accompanied by a statement describing in reasonable detail the
calculation of the amounts payable for the quarterly period in question.

(b)    Each party shall keep complete and accurate books of
account and records containing such information as shall be necessary to verify
the statements submitted to the other party hereunder; provided, however, that
neither party shall be required to maintain records with respect to any
particular transaction for more than five (5) years from the date of delivery
to the other party of the particular statement relating to such transaction.
Each party or a certified public accountant designated by such party shall have
the right at any reasonable time during business hours to examine the other
party's books, records and other documents and material in the possession or
under the control of such other party with respect to the subject matter of
this License Agreement and to make copies and extracts thereof.

2.6    Use and Quality Standards.

[(a)    Neither the Licensee nor anyone authorized by it
directly or indirectly shall sell or provide any Licensed Products that shall
fail to meet a level of quality consistent with all applicable laws, rules and
regulations of Governmental Authority and applicable industry standards [and
the highest quality standards and specifications employed by other producers or
providers of such goods or services]. The Licensee represents, warrants and
agrees that its internal quality control procedures will include reasonable
procedures for confirming compliance with the terms of this Section 2.6(a).

6

<PAGE>    7

XXX-002263

(b)      The Licensee shall, at the reasonable request of the Licensor, submit to the Licensor for its inspection, testing and quality evaluation representative samples of the Licensed Products bearing, sold or provided under the Licensed Trademark and tags, labels, packaging, advertising, display and promotional material related thereto, and any other printed matter of any kind bearing, sold or provided under a Licensed Trademark as may reasonably be requested by the Licensor for purposes of determining compliance with the terms of this Agreement. Such submissions shall be made at such times as the Licensor may reasonably request upon thirty (30) days prior written notice, but no more frequently than annually (unless the Licensor reasonably believes or determines that any of the Licensed Products bearing, sold or provided under the Licensed Trademark or other items set forth above may not meet the required standards of quality or other requirements set forth in this Agreement). All shipping and packing costs in connection with such inspection, testing and quality evaluation shall be borne by the Licensor.

(c)      Upon reasonable notice, once per year, or at other times if the Licensor reasonably believes or determines that any of the Licensed Products bearing, sold or provided under the Licensed Trademark do not meet the required standards of quality or other requirements set forth in this Section 2.6, the Licensor shall have access for inspection purposes to the premises wherein the Licensed Products bearing, sold or provided under the Licensed Trademarks are produced, manufactured or held for distribution or sale (or as to the Licensed Products which are services, the premises where such services are provided) during regular business hours at such time or times as not to unduly interfere with the operations of the Licensee. The Licensee shall provide the Licensor with copies of formulas, specifications, standards and procedures used by the Licensee in connection with the Licensed Products bearing, sold or provided under the Licensed Trademarks and of all tests of the Licensed Products bearing, sold or provided under the Licensed Trademarks conducted by or on behalf the Licensee to determine compliance with quality control standards. In addition, the Licensor shall have access to the Licensee's books and records relating to such formulas, specifications, standards and procedures and the implementation thereof. The sole purpose of such inspection shall be to determine whether the Licensee has complied with the quality standards or other requirements of this Section 2.6. In the event that any inspection of any premises or records reveals that the Licensee has failed to comply with the quality standards or other requirements of this Section 2.6, the Licensor may reinspect such premise or records upon the earlier to occur of the Licensor's receipt of notice of cure by the Licensee or the expiration of any applicable cure period set forth herein. All expenses of conducting such inspections shall be borne by the Licensor, unless such inspection reveals that the Licensed Products bearing, sold or provided under the Licensed Trademarks do not comply in any material respect with the standards of quality or other requirements set forth herein, in which case the Licensee shall pay all reasonable costs and expenses of carrying out the inspection of the class of goods and services that did not comply.

(d)      The Licensee shall immediately notify the Licensor in writing of any investigation, inquiry, claim or sanction by any Governmental Authority, and of any medical

7

<PAGE>    8

device report or other similar report filed with any Governmental Authority, regarding any quality, labeling, advertising or other regulatory matter relating to the Licensed Products bearing, sold or provided under the Licensed Trademarks and shall keep the Licensor advised of the progress and findings of such investigation or inquiry, and of any response to any such report.

(e)    (i)    If the Licensor reasonably determines that any particular Licensed Products bearing, sold or provided under the Licensed Trademarks do not meet the required standards of quality set forth in this Section 2.6, the Licensor shall notify the Licensee in writing of such defect (a "DEFICIENCY NOTICE"), providing the Licensee with reasonable detail regarding the deficiency therein. If the Licensee disputes the Licensor's determination of deficiency and the parties are not able to resolve the dispute between themselves, they shall refer the dispute to a mutually agreed upon third party for resolution; provided, however, that the foregoing shall not apply with respect to any notice from Licensor of a deficiency involving a risk to public health or safety. Upon receipt of such Deficiency Notice, if the Licensee or, if applicable, the mutually agreed upon third party, concurs in the determination of deficiency, the Licensee shall cure such deficiency within a commercially reasonable amount of time, and shall provide the Licensor with evidence of such cure including samples of such Licensed Products; provided, however, that in the event that any deficiency poses a risk to public health or safety, the Licensee shall immediately take all steps necessary to cure the deficiency or otherwise eliminate the risk to public health or safety. If any deficiency is not cured within the applicable time period set forth herein, the Licensee shall cease all use of the Licensed Trademark in connection with the production, manufacture, distribution, sale, advertising and promotion of the Licensed Products in issue unless and until such cure is achieved.

(ii)    If any deficiency is such that any such Licensed Products bearing, sold or provided under the Licensed

XXX-002264

Trademark are subject to the likelihood of market withdrawal, recall or correction based on failure to conform to applicable Governmental Authority guidelines, the Licensee agrees to implement promptly such withdrawal, recall or correction procedures at the Licensee's sole cost and expense and shall coordinate and cooperate with the Licensor in connection therewith, including with respect to all press releases and other public relations aspects thereof. Similarly, if the Licensee is otherwise required or determines to withdraw from market, recall or correct any such Licensed Products bearing, sold or provided under the Licensed Trademark, the Licensee shall give the Licensor prior notice of such withdrawal, recall or correction as soon as practicable and the parties shall coordinate and cooperate with each other in connection therewith, including with respect to all press releases and other public relations aspects thereof.

(f)    The Licensee shall be solely responsible for and shall comply with all laws, rules and regulations, if any, of Governmental Authorities in connection with the production,

8

<PAGE>  9

manufacture, provision, distribution, sale, labeling, packaging, advertising and promotion of the Licensed Products. The Licensee represents and warrants that the Licensed Products bearing, sold or provided under the Licensed Trademark (i) shall be in all respects non-injurious (if used as intended), merchantable (in the case of goods) and fit for the purposes for which such items are intended to be used, (ii) shall not be adulterated or misbranded within the meaning of any applicable laws, rules or regulations of any Governmental Authority, (iii) shall not be packaged or sold in damaged containers, which damage causes such Licensed Products bearing, sold or provided under the Licensed Trademark to be adulterated or misbranded or in any way in violation of any such applicable laws, rules or regulations, and (iv) shall not violate the rights of any other Person.

(g)    Each sublicense granted by Licensee under Section 2.4 shall contain the agreement of the Sublicensee thereunder to be bound by the terms of this Section 2.6 for the benefit of the Licensor, as if such Sublicensee were named as the Licensee herein.]

2.7    Licensor's Ownership Unimpaired; Confidentiality.

(a)    Subject to the terms of this Agreement, as between the parties, Licensee acknowledges Licensor's exclusive right, title and interest in and to the Licensed Intellectual Property and acknowledges that the use of the Licensed Trademarks by Licensee and its Affiliates shall inure solely to Licensor's benefit as the owner thereof.

(b)    The term "Confidential Information" means Licensed Know-How, except for Licensed Know-How that is (i) in the public domain; (ii) published or otherwise becomes part of the public domain through no fault of the receiving party or any of its Affiliates; (iii) received by a party or any of its Affiliates from a third party that is legally in possession of the same and not under any obligation of confidentiality to the party owning such information with respect thereto; and (iv) independently developed by or on behalf of a party or any of its Affiliates by Persons not having access to Confidential Information. However, none of the foregoing exceptions shall apply to information that constitutes a combination that can be reconstructed from multiple sources in the public domain or in the possession of the receiving party, none of which shows the whole combination or such information. During the Know-How License Term, the parties and their Affiliates shall not disclose or make available Confidential Information to any third party without the express written consent of the owning party. The parties and their Affiliates will disseminate or permit access to Confidential Information only to such of their officers and employees whose duties justify their need to know such information, will inform such officers and employees of the proprietary nature of the Confidential Information and of the terms and conditions of this Agreement, and will insure compliance therewith by each such officer or employee. Notwithstanding the foregoing, (a) Licensee shall have the right to disclose Confidential Information to (i) the extent reasonably necessary to provide, make, have made, use and sell Licensed Products pursuant to the terms of this Agreement and (ii) pursuant to a sublicense complying with the terms of Section 2.4; and (b) Licensor shall have the right to (i) disclose Confidential Information to the extent reasonably necessary to provide, make,

9

<PAGE>  10

have made, use and sell products (provided that such action does not violate the rights of Licensee under Article 2), (ii) file patent applications on Confidential Information, and (iii) pursuant to a license complying with the terms of Section 2.14.

2.8    Disclaimer. The Licensor makes no, and hereby expressly disclaims any and all, representations and warranties, express or implied, in connection with the Licensed Intellectual Property and the licenses

XXX-002265

granted hereunder with respect thereto, or otherwise in connection with this Agreement.

2.9     Maintenance of Licensed Intellectual Property, etc.

(a)     The Licensor shall use reasonable efforts to prosecute the existing pending applications for the Licensed Patents and Licensed Trademarks and shall maintain at its expense each and every one of the existing registrations for the Licensed Patents and Licensed Trademarks with respect to the Licensed Products in full force and effect in each case to such extent as Licensor deems appropriate as long as this Agreement continues in effect (provided that Licensor shall not knowingly permit or cause the termination of the registration of any Licensed Trademark in any country if it shall continue the registration of such mark in such country for goods and services other than the Licensed Products), and Licensee agrees to provide such assistance and documentation as is required for such prosecution and maintenance. In the event the Licensor chooses not to prosecute or maintain in force and effect registrations for any of the Licensed Patents and Licensed Trademarks with respect to the Licensed Products, either at all or as to any particular country, the Licensor, at the Licensee's request, shall use reasonably diligent efforts to maintain or register in the Licensor's name at the Licensee's expense such Licensed Patents and Licensed Trademarks with respect to the Licensed Products.

(b)     At the Licensee's request, the Licensor agrees to file and use reasonable efforts to prosecute in the Licensor's name, at the Licensee's expense, new applications for any of the Licensed Trademarks in any country to the extent that any such Licensed Trademarks are not already registered or applied for in such country with respect to such Licensed Products; provided, however, that the Licensor shall not be required to take any action pursuant hereto which Licensor determines in the exercise of its reasonable good faith judgment would adversely affect in any material respect the Licensor's rights in the Licensed Trademarks. At the Licensee's request, the Licensor shall use reasonable efforts to maintain, at the Licensee's expense, any registrations obtained pursuant to this Section 2.9(b).

(c)     Licensee covenants to Licensor that, during the Know-How License Term, Licensee will not disclose to any third party any proprietary nonpublic know-how or information constituting a part of the Licensed Know- How, except, on a confidential basis, to prospective or actual Sublicensees, or upon Licensor's prior written consent, or as otherwise expressly provided herein.

2.10     Infringement of Licensed Intellectual Property.


                                    10
<PAGE>   11

(a)     Each of the Licensor and the Licensee shall notify the other of any actual or threatened opposition, invalidation or cancellation action with respect to the Licensed Intellectual Property (collectively, "OPPOSITION"), or any actual or threatened infringement of, or act of unfair competition or other harmful or wrongful activities of third parties with respect to the Licensed Intellectual Property (collectively, "INFRINGEMENT"), as to which it has notice, and Licensor and Licensee shall consult and cooperate with each other with respect to any action to be taken (including the settlement of litigation) with respect thereto. Subject to the terms of this Section, the Licensor will have the right in its sole discretion to take whatever steps it deems necessary or desirable to enforce the Licensed Intellectual Property or protect the Licensed Intellectual Property against any Opposition or Infringement and shall have the right to control any litigation or other legal or arbitral proceeding ("LEGAL ACTION") undertaken by it for such purpose. Such steps may include defending any Opposition or the filing and prosecution of (i) litigation against any Infringement, (ii) opposition or interference proceedings against applications for patents that could infringe upon or otherwise interfere with the Licensed Patents, or against trademark or service mark registrations for marks that are confusingly similar to any of the Licensed Trademarks, and (iii) proceedings to cancel registration of or have declared invalid patents that could infringe upon or otherwise interfere with the Licensed Patents, or trademarks or service marks that are confusingly similar to any of the Licensed Trademarks. The Licensor will provide the Licensee with prior notice of any Legal Action it takes to assert or protect the Licensed Intellectual Property and upon reasonable request of the Licensee, shall notify the Licensee of the status of such Legal Action. If the Licensor elects not to bring Legal Action against any apparent Infringement of the Licensed Intellectual Property, the Licensee, upon prior notice to the Licensor, shall have the right to bring such Legal Action at its option and expense, unless the Licensor determines in its reasonable good faith judgment that such action or proceeding would materially adversely affect the Licensor's rights in the Licensed Intellectual Property. The Licensor shall notify the Licensee of such election sufficiently in advance to permit the Licensee to act within applicable time limits.

(b)     The party that commences and prosecutes any Legal Action to enforce or protect the Licensed Intellectual Property pursuant to this Section shall bear the costs of such Legal Action and be entitled to all monetary damages received as the result thereof; provided, however, that (i) to the extent that the Licensor receives compensation that is based on the lost sales and profits of the Licensee, then the Licensor shall pay such compensation to the Licensee, but only if the Licensee reimburses the Licensor

XXX-002266

for a pro rata portion of the costs of such Legal Action; (ii) to the extent
that the Licensee receives compensation in a Legal Action that is based on the
lost sales and profits of the Licensor, then the Licensee shall pay such
compensation to the Licensor, but only if the Licensor reimburses the Licensee
for a pro rata portion of the costs of such Legal Action; provided further,
however, that if the Licensor or the Licensee receives compensation in
connection with a Legal Action relating to the Non-Exclusive Field, such
compensation shall be applied first to reimburse the parties for the costs of
such action, and the balance shall be shared equally by the parties.

11

<PAGE>   12

       (c)      Each party shall cooperate with the other in the
prosecution of any Legal Action provided for in this Section and keep the other
informed about the prosecution of such proceedings. Notwithstanding anything to
the contrary contained in this Section, no party shall enter into any
agreement, consent order or other resolution of a claim by or against a third
party that materially adversely affects any rights of any other party with
respect to the Licensed Intellectual Property without the prior written consent
of such other party.

       2.11     Third-party Allegations of Infringement, etc.

       (a)      If any Legal Action is threatened or commenced by a
third party against one of the parties or any of their customers on the ground
that any Licensed Product infringes any patent or other intellectual property
right of such third party, the party or the party whose customer is so
threatened or sued shall promptly notify the other party hereto. Except as
otherwise provided in Section 3.2, the Licensor may at its sole option elect to
defend any such Legal Action that is brought against the Licensee, provided
that in such event the Licensor shall indemnify, defend and hold harmless the
Licensee and its Affiliates from and against and in respect of any and all
Losses incurred by them arising out of or resulting from such Legal Action. If
the Licensor elects not to bring such a Legal Action, the Licensor shall notify
the Licensee of such election sufficiently in advance to permit the Licensee to
act within applicable time limits, and the Licensor shall not be required to
indemnify or hold harmless the Licensee and its Affiliates pursuant to the
terms of this Section 2.11.

       (b)      Each party shall cooperate with the other in the
prosecution of any Legal Action provided for in this Section and keep the other
informed about the prosecution of such proceedings. Notwithstanding anything to
the contrary contained in this Section, neither party shall enter into any
agreement, consent order or other resolution of a claim by or against a third
party that materially adversely affects any rights of any other party with
respect to the Licensed Intellectual Property without the prior written consent
of the other party.

       2.12     No Assumption of Liability by Licensor. Licensor does
not, by virtue of the license hereunder of the Licensed Intellectual Property
or the use thereof by Licensee, its Affiliates or its Sublicensees, assume any
liability to Licensee, its Affiliates or its Sublicensees or third parties with
respect to the business of Licensee, its Affiliates or such Sublicensees or the
conduct thereof by them.

       2.13     Use of Licensed Intellectual Property After
Termination. Upon termination of this Agreement pursuant to Section 3.2 prior
to the end of the last to expire of the Patent License Term, the Know-How
License Term or the Trademark License Term, Licensee, its Affiliates and its
Sublicensees shall cease and desist from all use of the Licensed Intellectual
Property, except that for a period of one year after the date of such
termination, to the extent of the Licensed Field, Licensee, its Affiliates and
its Sublicensees may sell or otherwise dispose of Licensed Products
manufactured prior to such termination or being manufactured at the time of
such termination, and may use the Licensed Trademarks in the Licensed Field in
accordance

12

<PAGE>   13

with the terms of this Agreement (including, without limitation, the terms of
Section 2.6 hereof) in connection with the sale or disposition of such Licensed
Products. Notwithstanding the preceding sentence, upon termination of the
license to Licensee to use a Licensed Trademark, Licensee shall cease and
desist from all use of such Licensed Trademark in a manner which violates the
terms of Section 2.5 hereof. The expiration of the Patent License Term pursuant
to Section 2.3 or of any Licensed Patent shall not impair any rights that
Licensee, its Affiliates and its Sublicensees shall have thereafter under
applicable law to conduct any activity that was previously licensed under the
Patent License or such Licensed Patent, respectively, and Licensor shall not
exclude or attempt to exclude Licensee, its Affiliates or any of its
Sublicensees from conducting any such activity, or interfere or attempt to
interfere with the conduct by Licensee, its Affiliates or any of its
Sublicensees of any such activity.

XXX-002267

2.14    Licensor's Covenants. Licensor covenants that prior to the expiration of the later to expire of the Patent License Term and the Know-How License Term:

(a)    without the consent of Licensee, Licensor shall neither use, nor license others to use, Licensed Intellectual Property to make, have made or sell Licensed Products in the Licensed Field; and

(b)    if Licensor shall license to another the Licensed Intellectual Property in fields other than the Licensed Field and the Excluded Field, all royalties or other payments received by Licensor from any licensee in connection with such license granted in a field other than the Licensed Field or the Excluded Field shall be applied by Licensor, first, to reimburse Licensor for all reasonable out-of-pocket expenses incurred in connection with the negotiation of such license, and, then, one-half of the balance shall be paid to Licensee, quarterly, in the manner set forth in Section 2.5 hereof.

ARTICLE III

MISCELLANEOUS

3.1    Specific Performance; Termination; Remedies.

(a)    The Licensor and the Licensee each acknowledge that, in view of the uniqueness of the transactions contemplated by this Agreement, the other party would suffer irreparable harm and would not have an adequate remedy at law for money damages if this Agreement has not been performed in accordance with its terms. Each party therefore agrees that the other party shall be entitled to specific performance of the terms hereof and injunctive relief in respect of any material breach of the terms hereof in addition to any other remedy to which it may be entitled hereunder or at law or in equity. All remedies provided for herein shall be cumulative and the exercise of any particular remedy by a party shall not limit or preclude the exercise of any other remedy available to such party.

13

<PAGE>    14

(b)    Licensor shall have the right to terminate this Agreement and any and all of Licensor's rights hereunder in the event of a material breach of this Agreement by Licensee or any of its Affiliates which Licensee or such Affiliate shall fail to cure within sixty (60) days after written notice thereof from the Licensor; provided, however, that if the period of time reasonably required to cure such breach exceeds sixty (60) days and the Licensee or such Affiliate promptly commences and diligently exercises its best efforts to cure such breach, and such delay in cure will not materially increase any adverse effect of such breach on the Licensed Intellectual Property or the Licensor, then such sixty (60) day period shall be extended to such longer period of time as is reasonable under the circumstances. Notwithstanding anything contained herein, the Licensor agrees that except as expressly provided in Sections 3.1(d) and (e) below, in view of the uniqueness of the circumstances giving rise to this Agreement in connection with the Licensed Field, Licensor shall not be entitled to terminate the rights of Licensee in the Licensed Field under Section 2.1 of this Agreement, except in the event of a willful breach or willful violation of an order granting specific performance of, or an injunction against a breach of, this Agreement, which order or injunction is not reversed or vacated on appeal.

(c)    The rights of any Affiliate of Licensee hereunder, including without limitation, all licenses granted to such Affiliate hereunder, shall automatically terminate without any action on the part of Licensor, if and when such Affiliate ceases to be an Affiliate of Licensee.

(d) .   The Licensor may terminate the Trademark License in the event that the Licensee abandons its use of all of the Licensed Trademarks by ceasing bona fide use thereof in commerce in the ordinary course of trade for a period of three (3) consecutive years.

(e)    In addition, this License Agreement shall terminate in the event of insolvency or adjudication in bankruptcy of the Licensee or the filing of a voluntary petition of bankruptcy of the Licensee or the making of an assignment for the benefit of creditors by the Licensee, which insolvency, bankruptcy or assignment results in the liquidation of Licensee or of substantially all of its assets.

(f)    If any claim, action, suit or proceeding is brought by a party hereto against the other in connection with this Agreement, the prevailing party in such claim, action, suit or proceeding shall, in addition to all other rights and remedies to which such party is entitled, be entitled to recover from the non-prevailing party all costs and expenses (including without limitation court costs and reasonable attorneys' fees) incurred in connection with such claim, action, suit or proceeding.

3.2    Indemnification.

(a)    The Licensee shall indemnify, defend and hold harmless the Licensor and its Affiliates from and against and in respect of any and all claims, losses, damages, expenses,

XXX-002268

<PAGE>  15

14

obligations, penalties, demands, suits, proceedings, assessments, judgments,
costs and liabilities (including costs of collection, investigation, reasonable
attorney's fees and other costs of defense) ("LOSSES") incurred by them,
arising out of or resulting from: (i) any use by the Licensee, its Affiliates
or its sublicensees of the Licensed Intellectual Property; (ii) death or injury
to persons or damages or loss to property in any way arising out of or
connected with the production, manufacture, marketing, promotion, advertising,
sale, provision or distribution by or through the Licensee of any Licensed
Products; and (iii) any breach of any representation, warranty or agreement
made by the Licensee herein.

        (b)     The Licensor shall indemnify, defend and hold
harmless the Licensee and its Affiliates from and against and in respect of all
Losses incurred by Licensee arising out of or resulting from: (i) any use by
Licensor or its Affiliates of the Licensed Intellectual Property; (ii) death or
injury to persons or damages or loss to property in any way arising out of or
connected with the production, manufacture, marketing, promotion, advertising,
sale, provision or distribution by or through the Licensor of any Licensed
Products; and (iii) any breach of any representation, warranty or agreement
made by the Licensor herein.

        (c)     If a claim by a third party is made against the
Licensor or its Affiliates or Licensee or its Affiliates (the "Indemnified
Party"), the Indemnified Party shall in writing notify the other party (the
"Indemnifying Party") of such claim, within a reasonable period of time,
describing the same in reasonable detail considering all information then known
to the Indemnifying Party. Failure to so notify the Indemnifying Party shall
not relieve the Indemnifying Party of any liability which the Indemnifying
Party might have, except to the extent that such failure materially prejudices
the Indemnifying Party's legal rights. The Indemnifying Party shall have thirty
(30) days after receipt of such notice to undertake, conduct and control,
through counsel of its own choosing (subject to the consent of the Indemnified
Party, such consent not to be unreasonably withheld) and at its expense, the
settlement or defense of such claim, and the Indemnified Party shall cooperate
with the Indemnifying Party in connection therewith. If the Indemnifying Party
undertakes the defense of any claim, the Indemnifying Party shall thereby admit
its obligation to indemnify the Indemnified Party against such claim and the
Indemnifying Party shall control the investigation and defense or settlement
thereof, and the Indemnified Party may not settle or compromise such claim,
except that the Indemnifying Party shall not require any Indemnified Party,
without its prior written consent, to take or refrain from taking any action in
connection with such claim, or make any public statement, which such
Indemnified Party reasonably considers to be against its interest, nor shall
the Indemnifying Party, without the prior written consent of the Indemnified
Party, consent to any settlement that adversely affects any rights of the
Indemnified Party with respect to the Licensed Intellectual Property, or that
does not include as a part thereof an unconditional release of the Indemnified
Party from liability with respect to such claim, or that requires the
Indemnified Party to make any payment that is not fully indemnified under this
Agreement or to submit to any non-monetary remedy; and subject to the
Indemnifying Party's control rights, as specified herein, the Indemnified Party
may participate in such investigation and defense, at its own expense. If the
Indemnifying Party does not notify the Indemnified Party within thirty

<PAGE>  16

15

days after receipt of the Indemnified Party's notice of a claim of indemnity
hereunder that it elects to undertake the defense thereof, or so notifies the
Indemnified Party but fails to undertake or maintain such defense promptly and
in good faith, the Indemnified Party shall have the right to contest, settle or
compromise the claim in the exercise of its reasonable judgment and without
prejudice to the rights of the Indemnified Party to indemnification hereunder.
If an Indemnified Party reasonably determines that there may be legal defenses
available to it that are different from or are in addition to those available
to the Indemnifying Party which make it inappropriate for the Indemnifying
Party to undertake the defense or settlement thereof, then such Indemnifying
Party shall not be entitled to undertake the defense or settlement of such
third party claim; and counsel for the Indemnifying Party shall be entitled to
conduct the defense of the Indemnifying Party and counsel for the Indemnified
Party shall be entitled to conduct the defense of such Indemnified Party, it
being understood that counsel for the Licensor shall be primary counsel and
that counsel for both parties shall cooperate with each other to conduct the
defense or settlement of such action as efficiently as possible.

        3.3     Notices. Except as otherwise provided herein, all
notices, requests, demands, waivers and other communications required or
permitted to be given under this Agreement shall be in writing and shall be
deemed to have been duly given if delivered personally or by overnight courier
with delivery charges prepaid, or by certified or registered mail, postage
prepaid, receipt requested, or by telecopy, as follows:

        If to the Licensor, to it at:

XXX-002269

Fresenius AG
Borkenberg 14
61440 Oberursel
Germany
Attention: Mr. Udo Werle
Telecopy No.: 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-60-2104

with a copy to:

O'Melveny & Myers LLP
Citicorp Center
153 East 53rd Street
New York, New York 10022-4611
Attention: Dr. Ulrich Wagner
Telecopy No.: (212) 326-2061

16

<PAGE>    17

If to Licensee, to it at:

Fresenius Medical Care AG
Borkenberg 14
61440 Oberursel
Germany
Attention: _____
Telecopy No.: 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-____

17

<PAGE>    18

with a copy to:

or to such other person or address as either party shall specify by notice in
writing to the other party. All such notices, requests, demands, waivers and
communications shall be deemed to have been received on the date of delivery.

     3.4    Binding Effect; Benefit. This Agreement shall inure
to the benefit of and be binding upon the Licensor and its successors and
assigns and the Licensee and its successors and permitted assigns. Nothing in
this Agreement, expressed or implied, is intended to confer on any Person other
than Licensor and its successors and assigns and the Licensee and its
successors and permitted assigns, any rights, remedies, obligations or
liabilities under or by reason of this Agreement.

     3.5    Survival. The respective rights and obligations of
the parties hereto, their Affiliates and each Sublicensee under Section 2.5,
Section 2.7, Section 2.13 and Section 3.2 shall survive any termination of this
Agreement.

     3.6    Entire Agreement. This Agreement (including the
Exhibits and Schedules hereto) constitutes the entire agreement between the
parties hereto with respect to the subject matter hereof and supersedes all
other prior agreements and understandings, oral and written, between the
parties hereto with respect to the subject matter hereof.

     3.7    Assignability. Neither this Agreement nor any rights
granted the Licensee hereunder may be assigned by the Licensee without the
prior written consent of the Licensor; provided, however, that no such
permitted assignment shall relieve the Licensee of its obligations or
liabilities hereunder. The Licensee shall give the Licensor written notice of
any such assignment referred to in the prior sentence as promptly as reasonably
possible following the occurrence thereof. This Agreement shall be freely
assignable by the Licensor.

     3.8    Relationship of the Parties. This Agreement shall in
no way constitute or give rise to a partnership, joint venture or agency
between the parties, it being acknowledged and agreed that the relationship
created hereby is strictly that of licensor and licensee. Except as may be
expressly provided to the contrary herein, nothing in this Agreement shall
constitute or be deemed to constitute either party as the legal representative
or agent of the other, nor shall either party have the right or authority to
assume, create, or incur any liability or any obligation of any kind, expressed
or implied, in the name of or on behalf of the other party.

     3.9    Amendment and Modification; Waiver. Subject to
applicable law, this Agreement and any Exhibits and Schedules attached hereto
may only be amended, modified and supplemented by written instrument expressly
identified as an amendment hereto authorized and executed by the Licensor and
the Licensee at any time prior to the termination hereof with respect to any of
the terms contained herein. No waiver by any party of any of the provisions

XXX-002270

<PAGE>  19

18

hereof shall be effective unless explicitly set forth in writing and executed
by the party so waiving. The waiver by any party hereto of a breach of any
provision of this Agreement shall not operate or be construed as a waiver of
any other or subsequent breach. No failure on the part of either party hereto
to exercise, and no delay in exercising, any right hereunder shall operate as a
waiver thereof. The remedies herein are cumulative and not exclusive of any
remedies provided by law.

        3.10    Further Assurances. From time to time, pursuant to
the request of the Licensee delivered to the Licensor, the Licensor, at the
Licensee's expense, will execute and deliver such instruments and documents and
take such actions as the Licensee may reasonably request in order to allow the
Licensee the use of the Licensed Intellectual Property contemplated hereby or
otherwise to carry out the purposes and intent of this Agreement. From time to
time, pursuant to the request of the Licensor delivered to the Licensee, the
Licensee and its Affiliates, at the Licensor's expense, will execute and
deliver such instruments and documents and take such actions as the Licensor
may reasonably request to carry out the purposes and intent of this Agreement.

        3.11    Section Headings. The section headings contained in
this Agreement are inserted for reference purposes only and shall not affect
the meaning or interpretation of this Agreement.

        3.12    Counterparts. This Agreement may be executed in
several counterparts, each of which shall be an original, and all of which
shall be deemed to be one and the same agreement.

        3.13    Applicable Law. This Agreement and the legal
relations between the parties hereto shall be governed by and construed in
accordance with the laws of Germany without regard to choice of laws or
principles thereof.

        3.14    Severability of Provisions. Any provision of this
Agreement which is prohibited or unenforceable in any jurisdiction shall, as to
such jurisdiction, be ineffective to the extent of such prohibition or
enforceability without invalidating the remaining provisions hereof or
affecting the validity or enforceability of such provisions in any other
jurisdiction.

        3.15    Affiliates. Licensee shall cause each of its
Affiliates, and each such Affiliate of Licensee by its exercise of any rights
hereunder thereby agrees, to be bound by and comply with the terms of this
Agreement as if such Affiliate were named as the Licensee hereunder and any
breach of this Agreement by an Affiliate of Licensee shall constitute a breach
of this Agreement by Licensee. At the request of Licensor, Licensee shall cause
each of its Affiliates to execute and deliver to Licensor an agreement of such
Affiliate to be bound by the terms of this Agreement for the benefit of the
Licensor, as if such Affiliate were the Licensee hereunder.

<PAGE>  20

19

        IN WITNESS WHEREOF, the parties hereto have caused their
respective authorized officers to execute and deliver this Agreement as of the
date first above written.

                                FRESENIUS AG


                                By:
                                   ---------------------------
                                   Name:
                                   Title:



                                By:
                                   ---------------------------
                                   Name:
                                   Title:


                                FRESENIUS MEDICAL CARE AG


                                By:
                                   ---------------------------
                                   Name:
                                   Title:



                                By:
                                   ---------------------------
                                   Name:
                                   Title:

XXX-002271

```
                              S-1
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.8
<SEQUENCE>13
<DESCRIPTION>CROSS-LICENSE AGREEMENT
<TEXT>

<PAGE>   1
```

EXHIBIT 10.8

CROSS-LICENSE AGREEMENT

      CROSS-LICENSE AGREEMENT, dated as of _____, 1996 (the "AGREEMENT"), between FRESENIUS AG, an Aktiengesellschaft organized under the laws of the Federal Republic of Germany ("FAG"), and FRESENIUS MEDICAL CARE AG, an Aktiengesellschaft organized under the laws of the Federal Republic of Germany ("FMC").

W I T N E S S E T H :

      WHEREAS, FAG has entered into an Agreement and Plan of Reorganization dated as of February 4, 1996, as amended (the "REORGANIZATION AGREEMENT"), among FAG, Fresenius USA, Inc., a Massachusetts corporation, and W. R. Grace & Co., a New York corporation ("GRACE"), pursuant to which FAG has contributed its worldwide dialysis and renal medical products business to FMC;

      WHEREAS, certain intellectual property is used or intended to be used in both FAG's and FMC's businesses; and

      WHEREAS, each of the parties hereto desire to grant to the other a license of such intellectual property to the extent that it relates to the business of the other;

      NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

      Capitalized terms used herein and not otherwise defined shall have the meanings specified in the Reorganization Agreement.  Terms defined in the singular or plural, as the case may be, shall have the same respective meaning mutatis mutandis when used in the plural or singular, as the case may be.

      "AFFILIATE" shall mean, with respect to any Person, any entity which directly or indirectly (i) controls not less than 50% of the equity securities of the specified Person, (ii) not less than 50% of the equity securities of which entity are controlled by the specified Person, or (iii) not less than 50% of the equity securities of which entity and not less than 50% of the equity securities of the specified Person are under common control; provided, however, that for

```
<PAGE>   2
```

purposes of this Agreement no FMC Entity shall be deemed to be an Affiliate of any FAG Entity and no FAG Entity shall be deemed an Affiliate of any FMC Entity.

      "AGREEMENT" shall have the meaning specified in the introductory paragraph hereof.

  "FAG ENTITIES" shall mean FAG and its subsidiaries, excluding the FMC Entities.

      "FAG FIELD" shall mean (i) the development, manufacture and distribution of pharmaceuticals (which for the purposes of this Agreement shall not include solutions and concentrates used in the FMC Field), including without limitation, solutions for infusion therapy and enteral and parenteral nutrition, and specialty pharmaceuticals; (ii) the development, manufacture and distribution of products for hemotherapy and intensive medicine, diagnostic products, specialty membranes and transplantation medicine; and (iii) the provision of scientific and manufacturing know-how for planning and construction of pharmaceutical and medical systems manufacturing facilities and for equipping of hospitals.

      "FMC ENTITIES" shall mean FMC and its subsidiaries.

XXX-002272

"FMC FIELD" shall mean the business of supplying renal care-related goods and services, including laboratories; provided, that for purposes of interpreting the foregoing clause, the parties shall be guided by the Reorganization Agreement, including the Contribution Agreement, dated February 4, 1996, among FAG, FMC (then known as Steril Pharma GmbH) and Grace-Conn., and the Distribution Agreement, dated February 4, 1996, among Grace, Grace-Conn., and FAG; provided, further, that it is expressly acknowledged by FMC that the home care business of FAG is not, and shall not be deemed to be, within the FMC Field.

"FWD" shall mean the worldwide dialysis and renal medical products business contributed by FAG to FMC.

"GOVERNMENTAL AUTHORITY" shall mean any federal, state, county, local, foreign or other governmental department, regulatory body, commission, board, bureau, agency or instrumentality in any country in the world.

"GRACE-CONN." shall mean W. R. Grace & Co.-Conn., a Connecticut corporation.

"INDEMNIFIED PARTY" shall have the meaning specified in Section 3.2.

"INDEMNIFYING PARTY" shall have the meaning specified in Section 3.2.

"KNOW-HOW LICENSE" shall have the meaning specified in Section 2.1.

"KNOW-HOW LICENSE TERM" shall have the meaning specified in Section 2.3.

"LICENSE" shall mean the Patent License or the Know-How License.

2

<PAGE>    3

"LICENSED FIELD" shall mean (i) in the case of FMC as the Licensee, the FMC Field; (ii) in the case of FAG as the Licensee, the FAG Field.

"LICENSED INTELLECTUAL PROPERTY" shall mean the Licensed Patents and the Licensed Know-How.

"LICENSED KNOW-HOW" shall mean all know-how, whether or not patented, and other proprietary developmental records, trade secrets, proprietary information, manufacturing technology and other intangible property, owned or controlled (in the sense of having the right to grant a license, whether with or without the payment of royalties) by Licensor on the date hereof and used or useful (i) in the case of FAG as the Licensee, in the FAG Field and used in the FAG Field or the Non-Exclusive Field, or (ii) in the case of FMC as the Licensee, in the FMC Field or the Non-Exclusive Field; provided, however, that with respect to the Non-Exclusive Field, "Licensed Know-how" shall include only those items as to whose development (x) in the case of FMC as the Licensee, FWD made a substantial contribution, and (y) in the case of FAG as the Licensee, FAG's business other than FWD made a substantial contribution.

"LICENSED PATENTS" shall mean (a) all letters patents, patents and patent applications (i) in the case of FAG as the Licensor, listed on Exhibit A, and (ii) in the case of FMC as the Licensor, listed on Exhibit B, (b) any additional patents that may issue hereafter as to Licensed Know-How and (c) any and all amendments, continuations, continuations-in-part, divisions, reissues and extensions of such letters patent, patents and patent applications.

"LICENSED PRODUCTS" shall mean goods, products and services embodying or utilizing the Licensed Intellectual Property.

"LICENSEE" shall mean FMC or FAG, as the case may be.

"LICENSOR" shall mean FAG or FMC, as the case may be.

"LOSSES" shall have the meaning specified in Section 3.2.

"NON-EXCLUSIVE FIELD" shall mean all businesses not included in the FAG Field or the FMC Field.

"PATENT LICENSE" shall have the meaning specified in Section 2.1.

"PATENT LICENSE TERM" shall have the meaning specified in Section 2.3.

"PERSON" shall mean an individual, a corporation, a partnership, an association, a trust, a Governmental Authority, or any other entity or organization.

XXX-002273

"REORGANIZATION AGREEMENT" shall have the meaning specified in the Recitals.

"SUBLICENSEE" shall have the meaning specified in Section 2.4.

3

<PAGE>    4

"TERRITORY" shall mean the entire world.

ARTICLE II

LICENSE

2.1    License.    The Licensor hereby grants to the Licensee and its Affiliates, in the Territory, the following licenses:

(a)    (i) the exclusive license (to the exclusion of all other Persons, including the Licensor) under the Licensed Patents to provide, make, have made, use and sell goods, products and services in the Licensed Field; and (ii) the non-exclusive license under the Licensed Patents to provide, make, have made, use and sell goods, products and services in the Non-Exclusive Field (collectively, the "PATENT LICENSE");

(b)    (i)    the exclusive license (to the exclusion of all other Persons, including the Licensor) under the Licensed Know-How to provide, make, have made, use and sell goods, products and services in the Licensed Field; and (ii) the non-exclusive license under the Licensed Know-How to provide, make, have made, use and sell goods, products and services in the Non-Exclusive Field (collectively, the "KNOW-HOW LICENSE").

2.2    Compensation.    The Licenses granted herein are royalty-free and fully paid up.    Notwithstanding the foregoing, the Licensee, at the option of the Licensor, shall pay or reimburse Licensor for all royalties, license fees and the similar costs or expenses paid or payable to third parties on account of any grant herein of any rights in any Licensed Intellectual Property within the control of Licensor or any exercise by Licensee of any such rights.    Any such amount shall be paid when due to the third party provided that Licensor shall have given the Licensee reasonable notice of the due date thereof or, if requested by Licensor, due and payable to the Licensor within 30 days after receipt by Licensee of an invoice therefor, showing in reasonable detail the calculation thereof.

2.3    License Terms.

(a)    As to each of FAG and FMC as Licensor, separately, the term of the Patent License from such party shall extend (i) with respect to each country in the Territory that is a member of the European Union or the European Economic Area and in which any Licensed Patent held by such party is registered or for which a patent application is currently pending, until the expiration of the last to expire of the Licensed Patents held by such party registered or for which a patent application is currently pending in that country, and (ii) with respect to each country in the Territory that is a neither a member of the European Union nor a member of the European Economic Area, until the expiration of the last to expire of the Licensed Patents held

4

<PAGE>    5

by such party registered or for which an application is pending in the Territory (the "PATENT LICENSE TERM").

(b)    As to each of FAG and FMC as Licensor, separately, the term of the Know-How License from such party (i) shall be perpetual in countries in which such a perpetual license is permitted by law; (ii) shall be limited in accordance with law so as not to impair the validity of this Agreement in countries in which a perpetual license is not permitted by law (other than member countries of the European Union and the European Economic Area); and (iii) shall extend in each member country of the European Union and the European Economic Area until all of the Licensed Know-How held by such party becomes public knowledge in such country (collectively, the "KNOW-HOW LICENSE TERM").

2.4    Sublicensing.

(a)    Licensee shall have the right to sublicense to its Affiliates the Licensed Patents and Licensed Know-How to provide, make, have made, use or sell products or services in the Territory, subject to the terms and conditions of this Agreement, with the prior consent of Licensor.

(b)    Each sublicensee of Licensee hereunder is referred to herein as a "Sublicensee." Each sublicense granted pursuant to the terms of this Section 2.4 shall contain the agreement of the Sublicensee thereunder to maintain the confidentiality of all proprietary nonpublic know-how or

XXX-002274

information constituting a part of the Licensed Know-How on substantially the
same terms and conditions as those applicable to Licensee under Section 2.5(b).

2.5    Licensor's Ownership Unimpaired; Confidentiality.

(a)    Subject to the terms of this Agreement, as between
the Licensor and the Licensee, Licensee acknowledges Licensor's exclusive
right, title and interest in and to the Licensed Intellectual Property.

(b)    The term "Confidential Information" means Licensed
Know-How, except for Licensed Know-How that is (i) in the public domain; (ii)
published or otherwise becomes part of the public domain through no fault of
the receiving party or any of its Affiliates; (iii) received by a party or any
of its Affiliates from a third party that is legally in possession of the same
and not under any obligation of confidentiality to the party owning such
information with respect thereto; and (iv) independently developed by or on
behalf of a party or any of its Affiliates by Persons not having access to
Confidential Information.  However, none of the foregoing exceptions shall
apply to information that constitutes a combination that can be reconstructed
from multiple sources in the public domain or in the possession of the
receiving party, none of which shows the whole combination of such information.
During the Know-How License Term, Licensee and its Affiliates shall not
disclose or make available Confidential Information to any third party without
the express written consent of Licensor.  The parties and

5

<PAGE>   6

their Affiliates will disseminate or permit access to Confidential Information
only to such of their officers and employees whose duties justify their need to
know such information, will inform such officers and employees of the
proprietary nature of the Confidential Information and of the terms and
conditions of this Agreement, and will insure compliance therewith by each such
officer or employee.  Notwithstanding the foregoing, Licensee shall have the
right to disclose Confidential Information to (i) the extent reasonably
necessary to provide, make, have made, use and sell Licensed Products pursuant
to the terms of this Agreement and (ii) pursuant to a sublicense complying with
the terms of Section 2.4.

2.6    Disclaimer.  The Licensor makes no, and hereby
expressly disclaims any and all, representations and warranties, express or
implied, in connection with the Licensed Intellectual Property and the licenses
granted hereunder with respect thereto, or otherwise in connection with this
Agreement.

2.7    Maintenance of Licensed Intellectual Property, etc.
The Licensor shall use reasonable efforts to prosecute the existing pending
applications for the Licensed Patents and shall maintain at its expense each
and every one of the existing registrations for the Licensed Patents with
respect to the Licensed Products in full force and effect, in each case to such
extent as Licensor deems appropriate as long as this Agreement continues in
effect, and Licensee agrees to provide such assistance and documentation as is
required for such prosecution and maintenance.  In the event the Licensor
chooses not to prosecute or maintain in force and effect registrations for any
of the Licensed Patents with respect to the Licensed Products, either at all or
as to any particular country, the Licensor, at the Licensee's request, shall
use reasonably diligent efforts to maintain or register in the Licensor's name
at the Licensee's expense such Licensed Patents with respect to the Licensed
Products.

2.8    Infringement of Licensed Intellectual Property.

(a)    Each of the Licensor and the Licensee shall notify
the other of any actual or threatened opposition, invalidation or cancellation
action with respect to the Licensed Intellectual Property (collectively,
"OPPOSITION"), or any actual or threatened infringement of, or act of unfair
competition or other harmful or wrongful activities of third parties with
respect to the Licensed Intellectual Property (collectively, "INFRINGEMENT"),
as to which it has notice, and Licensor and Licensee shall consult and
cooperate with each other with respect to any action to be taken (including the
settlement of litigation) with respect thereto.  Subject to the terms of this
Section, the Licensor will have the right in its sole discretion to take
whatever steps it deems necessary or desirable to enforce the Licensed
Intellectual Property or protect the Licensed Intellectual Property against any
Opposition or Infringement and shall have the right to control any litigation
or other legal or arbitral proceeding ("LEGAL ACTION") undertaken by it for
such purpose.  Such steps may include defending any Opposition or the filing
and prosecution of (i) litigation against any Infringement, (ii) opposition or
interference proceedings against applications for patents that could infringe

6

<PAGE>   7

upon or otherwise interfere with the Licensed Patents, and (iii) proceedings to
cancel registration of or have declared invalid patents that could infringe
upon or otherwise interfere with the Licensed Patents.  The Licensor will

XXX-002275

provide the Licensee with prior notice of any Legal Action it takes to assert or protect the Licensed Intellectual Property and upon reasonable request of the Licensee, shall notify the Licensee of the status of such Legal Action. If the Licensor elects not to bring Legal Action against any apparent Infringement of the Licensed Intellectual Property, the Licensee, upon prior notice to the Licensor, shall have the right to bring such Legal Action at its option and expense, unless the Licensor determines in its reasonable good faith judgment that such action or proceeding would materially adversely affect the Licensor's rights in the Licensed Intellectual Property. The Licensor shall notify the Licensee of such election sufficiently in advance to permit the Licensee to act within applicable time limits.

         (b)      The party that commences and prosecutes any Legal Action to enforce or protect the Licensed Intellectual Property pursuant to this Section shall bear the costs of such Legal Action and be entitled to all monetary damages received as the result thereof; provided, however, that (i) to the extent that the Licensor receives compensation that is based on the lost sales and profits of the Licensee, then the Licensor shall pay such compensation to the Licensee, but only if the Licensee reimburses the Licensor for a pro rata portion of the costs of such Legal Action; (ii) to the extent that the Licensee receives compensation in a Legal Action that is based on the lost sales and profits of the Licensor, then the Licensee shall pay such compensation to the Licensor, but only if the Licensor reimburses the Licensee for a pro rata portion of the costs of such Legal Action; provided further, however, that if the Licensor or the Licensee receives compensation in connection with a Legal Action relating to the Non-Exclusive Field, such compensation shall be applied first to reimburse the parties for the costs of such action, and the balance shall be shared equally by the parties.

         (c)      Each party shall cooperate with the other in the prosecution of any Legal Action provided for in this Section and keep the other informed about the prosecution of such proceedings. Notwithstanding anything to the contrary contained in this Section, no party shall enter into any agreement, consent order or other resolution of a claim by or against a third party that materially adversely affects any rights of any other party with respect to the Licensed Intellectual Property without the prior written consent of such other party.

         2.9      Third-party Allegations of Infringement, etc.

         (a)      If any Legal Action is threatened or commenced by a third party against one of the parties or any of their customers on the ground that any Licensed Product infringes any patent or other intellectual property right of such third party, the party or the party whose customer is so threatened or sued shall promptly notify the other party hereto. Except as otherwise provided in Section 3.2, the Licensor may at its sole option elect to defend any such Legal Action that is brought against the Licensee, provided that in such event the Licensor shall indemnify, defend and hold harmless the Licensee and its Affiliates from and against and in respect of any and all Losses incurred by them arising out of or resulting from such Legal Action. If the Licensor elects not to bring such a Legal Action, the Licensor shall notify the

                                   7

<PAGE>   8

Licensee of such election sufficiently in advance to permit the Licensee to act within applicable time limits, and the Licensor shall not be required to indemnify or hold harmless the Licensee and its Affiliates pursuant to the terms of this Section 2.9.

         (b)      Each party shall cooperate with the other in the prosecution of any Legal Action provided for in this Section and keep the other informed about the prosecution of such proceedings. Notwithstanding anything to the contrary contained in this Section, neither party shall enter into any agreement, consent order or other resolution of a claim by or against a third party that materially adversely affects any rights of any other party with respect to the Licensed Intellectual Property without the prior written consent of the other party.

         2.10     No Assumption of Liability by Licensor. Licensor does not, by virtue of the license hereunder of the Licensed Intellectual Property or the use thereof by Licensee, its Affiliates or its Sublicensees, assume any liability to Licensee, its Affiliates, or its Sublicensees or third parties with respect to the business of Licensee, its Affiliates or such Sublicensees or the conduct thereof by them.

         2.11     Use of Licensed Intellectual Property After Termination. Upon termination of this Agreement pursuant to Section 3.2 prior to the end of the last to expire of the Patent License Term and the Know-How License Term, Licensee, its Affiliates and its Sublicensees shall cease and desist from all use of the Licensed Intellectual Property, except that for a period of one year after the date of such termination Licensee, its Affiliates and its Sublicensees may sell or otherwise dispose of Licensed Products manufactured prior to such termination or being manufactured at the time of such termination. The expiration of the Patent License Term pursuant to Section 2.3 or of any Licensed Patent shall not impair any rights that Licensee, its Affiliates and its Sublicensees shall have thereafter under applicable law to conduct any activity that was previously licensed under the Patent License or such Licensed Patent, respectively, and Licensor shall not

XXX-002276

exclude or attempt to exclude Licensee, its Affiliates or any of its
Sublicensees from conducting any such activity, or interfere or attempt to
interfere with the conduct by Licensee, its Affiliates or any of its
Sublicensees of any such activity.

                          ARTICLE III

                         MISCELLANEOUS

        3.1      Specific Performance; Termination; Remedies.

        (a)      FAG and FMC each acknowledge that, in view of the
uniqueness of the transactions contemplated by this Agreement, the other party
would suffer irreparable harm and would not have an adequate remedy at law for
money damages if this Agreement has not been performed in accordance with its
terms.  Each party therefore agrees that the other party shall be entitled to
specific performance of the terms hereof and injunctive relief in respect of
any material breach of the terms hereof in addition to any other remedy to
which it may be entitled

                              8

<PAGE>   9

hereunder or at law or in equity.  All remedies provided for herein shall be
cumulative and the exercise of any particular remedy by a party shall not limit
or preclude the exercise of any other remedy available to such party.

        (b)      Each party to this Agreement, as Licensor, shall have
the right to terminate the rights of the other party to this Agreement, as
Licensee, and any and all of such Licensee's rights hereunder in the event of a
material breach of this Agreement by such Licensee or any of its Affiliates
which such Licensee or such Affiliate shall fail to cure within sixty (60) days
after written notice thereof from the Licensor; provided, however, that if the
period of time reasonably required to cure such breach exceeds sixty (60) days
and such Licensee or such Affiliate promptly commences and diligently exercises
its best efforts to cure such breach, and such delay in cure will not
materially increase any adverse effect of such breach on the Licensed
Intellectual Property or the Licensor, then such sixty (60) day period shall be
extended to such longer period of time as is reasonable under the
circumstances.  Notwithstanding anything contained herein, each party to this
Agreement, as Licensor, agrees that except as expressly provided in Sections
3.1(d) below, in view of the uniqueness of the circumstances giving rise to
this Agreement in connection with the Licensed Field, neither party, as
Licensor, shall be entitled to terminate the rights of Licensee under Section
2.1 of this Agreement in the Licensed Field, except in the event of s willful
breach or willful violation of an order granting specific performance of, or an
injunction against a breach of, this Agreement, which order or injunction is
not reversed or vacated on appeal.

        (c)      The rights of any Affiliate of either party, as
Licensee hereunder, including without limitation, all licenses granted to such
Affiliate hereunder, shall automatically terminate without any action on the
part of Licensor, if and when such Affiliate ceases to be an Affiliate of
Licensee.

        (d)      In addition, the rights of a party to this Agreement,
as Licensee, shall terminate in the event of insolvency or adjudication in
bankruptcy of such party or the filing of a voluntary petition of bankruptcy of
such party or the making of an assignment for the benefit of creditors by such
party, which insolvency, bankruptcy or assignment results in the liquidation of
such party or of substantially all of its assets.

        (e)      If any claim, action, suit or proceeding is brought
by a party hereto against the other in connection with this Agreement, the
prevailing party in such claim, action, suit or proceeding shall, in addition
to all other rights and remedies to which such party is entitled, be entitled
to recover from the non-prevailing party all costs and expenses (including
without limitation court costs and reasonable attorneys' fees) incurred in
connection with such claim, action, suit or proceeding.

                              9

<PAGE>   10

        3.2      Indemnification.

        (a)      FMC shall indemnify, defend and hold harmless FAG and
its Affiliates from and against and in respect of any and all claims, losses,
damages, expenses, obligations, penalties, demands, suits, proceedings,
assessments, judgments, costs and liabilities (including costs of collection,
investigation, reasonable attorney's fees and other costs of defense)
("LOSSES") incurred by them, arising out of or resulting from:  (i) any use by
FMC, its Affiliates or its sublicensees of the Licensed Intellectual Property;
(ii) death or injury to persons or damages or loss to property in any way
arising out of or connected with the production, manufacture, marketing,
promotion, advertising, sale, provision or distribution by or through FMC of
any Licensed Products; and (iii) any breach of any representation, warranty or

XXX-002277

agreement made by FMC herein.

(b)     FAG shall indemnify, defend and hold harmless FMC and
its Affiliates from and against and in respect of all Losses incurred by FMC
arising out of or resulting from: (i) any use by FAG or its Affiliates of the
Licensed Intellectual Property; (ii) death or injury to persons or damages or
loss to property in any way arising out of or connected with the production,
manufacture, marketing, promotion, advertising, sale, provision or distribution
by or through FAG of any Licensed Products; and (iii) any breach of any
representation, warranty or agreement made by FAG herein.

(c)     If a claim by a third party is made against FAG or
its Affiliates or FMC or its Affiliates (the "Indemnified Party";, the
Indemnified Party shall in writing notify the other party (the "Indemnifying
Party") of such claim, within a reasonable period of time, describing the same
in reasonable detail considering all information then known to the Indemnifying
Party.  Failure to so notify the Indemnifying Party shall not relieve the
Indemnifying Party of any liability which the Indemnifying Party might have,
except to the extent that such failure materially prejudices the Indemnifying
Party's legal rights.  The Indemnifying Party shall have thirty (30) days after
receipt of such notice to undertake, conduct and control, through counsel of
its own choosing (subject to the consent of the Indemnified Party, such consent
not to be unreasonably withheld) and at its expense, the settlement or defense
of such claim, and the Indemnified Party shall cooperate with the Indemnifying
Party in connection therewith.  If the Indemnifying Party undertakes the
defense of any claim, the Indemnifying Party shall thereby admit its obligation
to indemnify the Indemnified Party against such claim and the Indemnifying
Party shall control the investigation and defense or settlement thereof, and
the Indemnified Party may not settle or compromise such claim, except that the
Indemnifying Party shall not require any Indemnified Party, without its prior
written consent, to take or refrain from taking any action in connection with
such claim, or make any public statement, which such Indemnified Party
reasonably considers to be against its interest, nor shall the Indemnifying
Party, without the prior written consent of the Indemnified Party, consent to
any settlement that adversely affects any rights of the Indemnified Party with
respect to the Licensed Intellectual Property, or that does not include as a
part thereof an unconditional release of the Indemnified Party from liability
with respect to such claim, or that requires the Indemnified Party to make any
payment

10

<PAGE>    11

that is not fully indemnified under this Agreement or to submit to any
non-monetary remedy; and subject to the Indemnifying Party's control rights, as
specified herein, the Indemnified Party may participate in such investigation
and defense, at its own expense.  If the Indemnifying Party does not notify the
Indemnified Party within thirty days after receipt of the Indemnified Party's
notice of a claim of indemnity hereunder that it elects to undertake the
defense thereof, or so notifies the Indemnified Party but fails to undertake or
maintain such defense promptly and in good faith, the Indemnified Party shall
have the right to contest, settle or compromise the claim in the exercise of
its reasonable judgment and without prejudice to the rights of the Indemnified
Party to indemnification hereunder.  If an Indemnified Party reasonably
determines that there may be legal defenses available to it that are different
from or are in addition to those available to the Indemnifying Party which make
it inappropriate for the Indemnifying Party to undertake the defense or
settlement thereof, then such Indemnifying Party shall not be entitled to
undertake the defense or settlement of such third party claim and counsel for
the Indemnifying Party shall be entitled to conduct the defense of the
Indemnifying Party and counsel for the Indemnified Party shall be entitled to
conduct the defense of such Indemnified Party, it being understood that counsel
for the Indemnifying Party shall be primary counsel and that counsel for both
parties shall cooperate with each other to conduct the defense or settlement of
such action as efficiently as possible.

3.3     Notices.  Except as otherwise provided herein, all
notices, requests, demands, waivers and other communications required or
permitted to be given under this Agreement shall be in writing and shall be
deemed to have been duly given if delivered personally or by overnight courier
with delivery charges prepaid, or by certified or registered mail, postage
prepaid, receipt requested, or by telecopy, as follows:

If to FAG, to it at:

Fresenius AG
Borkenberg 14
61440 Oberursel
Germany
Attention: Mr. Udo Werle
Telecopy No.: 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-60-2104

with a copy to:

O'Melveny & Myers LLP
Citicorp Center
153 East 53rd Street
New York, New York  10022-4611
Attention:  Dr. Ulrich Wagner
Telecopy No.:  (212) 326-2061

XXX-002278

11
<PAGE>    12

                    If to FMC, to it at:

                    Fresenius Medical Care AG
                    Borkenberg 14
                    61440 Oberursel
                    Germany
                    Attention:_____
                    Telecopy No.:  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-_____

                    with a copy to:


or to such other person or address as either party shall specify by notice in
writing to the other party.  All such notices, requests, demands, waivers and
communications shall be deemed to have been received on the date of delivery.

          3.4      Binding Effect; Benefit.  This Agreement shall inure
to the benefit of and be binding upon FAG and its successors and permitted
assigns and FMC and its successors and permitted assigns.  Nothing in this
Agreement, expressed or implied, is intended to confer on any person other than
FAG and its successors and permitted assigns and FMC and its successors and
permitted assigns, any rights, remedies, obligations or liabilities under or by
reason of this Agreement.

          3.5      Survival.  The respective rights and obligations of
the parties hereto, their Affiliates and each Sublicensee under Section 2.5,
Section 2.11, and Section 3.2 shall survive any termination of this Agreement.

          3.6      Entire Agreement.  This Agreement (including the
Exhibits and Schedules hereto) constitutes the entire agreement between the
parties hereto with respect to the subject matter hereof and supersedes all
other prior agreements and understandings, oral and written, between the
parties hereto with respect to the subject matter hereof.

          3.7      Assignability.  Neither this Agreement nor any rights
granted either party as Licensee, hereunder, may be assigned without the prior
written consent of the other party.  The rights of either party, as Licensor
hereunder, shall be freely assignable.

          3.8      Relationship of the Parties.  This Agreement shall in
no way constitute or give rise to a partnership, joint venture or agency
between the parties, it being acknowledged and agreed that the relationship
created hereby is strictly that of licensor and licensee.  Except as may be
expressly provided to the contrary herein, nothing in this Agreement shall
constitute or be deemed to constitute either party as the legal representative
or agent of the other, nor shall either party have the right or authority to
assume, create, or incur any liability or any obligation of any kind, expressed
or implied, in the name of or on behalf of the other party.




12
<PAGE>    13

          3.9      Amendment and Modification; Waiver.  Subject to
applicable law, this Agreement and any Exhibits and Schedules attached hereto
may only be amended, modified and supplemented by written instrument expressly
identified as an amendment hereto authorized and executed by FAG and FMC at any
time prior to the termination hereof with respect to any of the terms contained
herein.  No waiver by any party of any of the provisions hereof shall be
effective unless explicitly set forth in writing and executed by the party so
waiving.  The waiver by any party hereto of a breach of any provision of this
Agreement shall not operate or be construed as a waiver of any other or
subsequent breach.  No failure on the part of either party hereto to exercise,
and no delay in exercising, any right hereunder shall operate as a waiver
thereof.  The remedies herein are cumulative and not exclusive of any remedies
provided by law.

          3.10     Further Assurances.  From time to time, pursuant to
the request of either party delivered to the other party, such other party, at
the requesting party's expense, will execute and deliver such instruments and
documents and take such actions as the requesting party may reasonably request
in order to allow the requesting party the use of the Licensed Intellectual
Property contemplated hereby or otherwise to carry out the purposes and intent
of this Agreement.

          3.11     Section Headings.  The section headings contained in
this Agreement are inserted for reference purposes only and shall not affect
the meaning or interpretation of this Agreement.

          3.12     Counterparts.  This Agreement may be executed in
several counterparts, each of which shall be an original, and all of which
shall be deemed to be one and the same agreement.

XXX-002279

        3.13    Applicable Law.  This Agreement and the legal relations between the parties hereto shall be governed by and construed in accordance with the laws of Germany without regard to choice of laws or principles thereof.

        3.14    Severability of Provisions.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or enforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provisions in any other jurisdiction.

        3.15    Affiliates.  Licensee shall cause each of its Affiliates, and each such Affiliate of Licensee by its exercise of any rights hereunder thereby agrees, to be bound by and comply with the terms of this Agreement as if such Affiliate were named as the Licensee hereunder and any breach of this Agreement by an Affiliate of Licensee shall constitute a breach of this Agreement by Licensee.  At the request of Licensor, Licensee shall cause each of its Affiliates to execute and deliver to Licensor an agreement of such Affiliate to be bound by the

13

<PAGE>    14

terms of this Agreement for the benefit of the Licensor, as if such Affiliate were the Licensee hereunder.

14

<PAGE>    15

        IN WITNESS WHEREOF, the parties hereto have caused their respective authorized officers to execute and deliver this Agreement as of the date first above written.

                FRESENIUS AG

           By:
              -----------------------------
              Name:
              Title:

           By:
               -----------------------------
              Name:
               Title:

                FRESENIUS MEDICAL CARE AG

           By:
               -----------------------------
               Name:
               Title:

           By:
               -----------------------------
               Name:
               Title:

        S-1

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.9
<SEQUENCE>14
<DESCRIPTION>POST-CLOSING COVENANTS AGREEMENT
<TEXT>

<PAGE>    1

                                   EXHIBIT 10.9

                POST-CLOSING COVENANTS AGREEMENT

        POST-CLOSING COVENANTS AGREEMENT dated as of _____ ___, 1996 (the "AGREEMENT"), among FRESENIUS AG, an Aktiengesellschaft organized

under the laws of the Federal Republic of Germany ("FAG"), W. R. GRACE & CO., a
Delaware corporation ("GRACE-DEL."), W. R. GRACE & CO.-CONN., a Connecticut
corporation ("GRACE-CONN." and together with Grace-Del., the "GRACE PARTIES"),
and FRESENIUS MEDICAL CARE AG, an Aktiengesellschaft organized under the laws
of the Federal Republic of Germany ("FMC").

R E C I T A L S

WHEREAS, FAG and W. R. Grace & Co., a New York corporation,
have entered into an Agreement and Plan of Reorganization dated as of February
4, 1996 (the "REORGANIZATION AGREEMENT");

WHEREAS, the execution and delivery of this Agreement by the
parties hereto is a condition to the willingness of the parties to the
Reorganization Agreement to consummate the Reorganization (as such term is
defined in the Reorganization Agreement).

NOW, THEREFORE, in consideration of the mutual agreements,
provisions and covenants contained in this Agreement, and the above recited
consideration and other good and valuable consideration, the parties hereto
agree as follows:

SECTION 1.    DEFINITIONS.  Capitalized terms used in this
Agreement without definitions will have the meanings ascribed to such terms in
the Reorganization Agreement).

"AFFILIATE" shall mean with respect to any Person, any entity
which directly or indirectly (i) controls not less than 50% of the equity
securities of the specified Person, (ii) not less than 50% of the equity
securities of which entity are controlled by the specified Person, or (iii) not
less than 50% of the equity securities of which entity and not less than 50% of
the equity securities of the specified Person are under common control;
provided, however, that for purposes of this Agreement neither FMC nor any of
its subsidiaries (collectively, the "FMC ENTITIES") shall be deemed to be an
Affiliate of FAG or any of its subsidiaries, other than the FMC Entities
(collectively, the "FAG ENTITIES"), and no FAG Entity shall be deemed an
Affiliate of any FMC Entity.

"RENAL BUSINESS" as used herein means the business of
supplying renal care related goods and services, including laboratories;
provided, that for purposes of interpreting the foregoing clause, the parties
shall be guided by the Reorganization Agreement, including the Contribution
Agreement, dated February 4, 1996, among FAG, FMC (then known as Steril Pharma
GmbH) and Grace-Conn., and the Distribution Agreement, dated February 4, 1996,

<PAGE>    2

among W. R. Grace & Co., a New York corporation ("Grace-NY"), Grace-Conn., and
FAG; provided, further, that it is expressly acknowledged by the parties hereto
that the home care business of FAG is not, and shall not be deemed to be, a
Renal Business.

SECTION 2.    NONCOMPETITION.  Until the tenth anniversary
of the Effective Time, neither FAG or any Affiliate of FAG, on the one hand,
nor either of the Grace Parties or any Affiliate of either of the Grace
Parties, on the other hand, shall compete with FMC in the Renal Business, or
own, manage, operate, control or have an aggregate interest equal to greater
than 5% of the voting stock or 25% of the total equity in any enterprise which
competes with FMC in the Renal Business; provided, however, that nothing
contained herein shall prohibit FAG, either of the Grace Parties, any Affiliate
of FAG or either of the Grace Parties or such other enterprise from (A)
manufacturing and selling any products or rendering any services to FMC or any
of its subsidiaries, (B) manufacturing and selling any products or rendering
any services which are used in the Renal Business, but which also are used in
other businesses, so long as such products and services are not sold or
rendered by FAG, either of the Grace Parties, such Affiliates or such other
enterprise, as the case may be, in the Renal Business in competition with FMC,
or (C) acquiring and then engaging in the business of a corporation or other
entity or affiliated group of corporations or other entities (an "ACQUIRED
PERSON") that in the twelve month period ending on the last day of the month
immediately preceding the date of such acquisition did not earn more than 50%
of its consolidated revenues from the Renal Business, so long as promptly
following such acquisition the acquiring Person offers to FMC, at the acquiring
Person's election, either the right to acquire for fair market value that
portion of the assets and liabilities of the Acquired Person that are used
predominantly in the Renal Business or the right to enter into supply
agreements or other appropriate agreements relating the Renal Business of the
Acquired Person, which supply agreements or other appropriate agreements shall
be at cost, plus a reasonable amount to cover overhead expenses.

SECTION 3.    RIGHT OF FIRST NEGOTIATION.  If, at any time
prior to the tenth anniversary of the date hereof, either FAG or Grace-Conn.
shall develop any new technology whether patented or a trade secret (such party
developing such new technology, hereinafter referred to as the "INVENTOR")  and
the Inventor intends to sell or license such technology to a third party for
applications in, or with a material special relationship to, the Renal
Business, the Inventor shall first advise FMC of its intent to sell or license
such technology and shall negotiate with FMC in good faith for the purpose of
agreeing with FMC on either the terms of a sale to FMC of such technology or of
a license granting FMC rights to use such technology in the Renal Business.  If

the Inventor and FMC are unable to agree on mutually satisfactory terms of such sale or license, as the case may be, after good faith negotiations, FMC shall have no further rights in or to such technology and the Inventor shall be free to sell or license such technology to third parties free and clear of any rights of FMC therein.

SECTION 4.    VALIDITY.  If any provision of this Agreement should, for any reason whatsoever, be declared invalid or unenforceable by a court of competent jurisdiction, the validity or enforcement of the remainder of the Agreement shall not thereby be adversely

2

<PAGE>    3

affected and such provision shall be deemed deleted herefrom with respect, and only with respect, to the operation of such provision in the particular jurisdiction in which such adjudication was made; provided, however, that to the extent any such provision may be made valid and enforceable in such jurisdiction by limitations on the scope of the activities, geographical area or time period covered, the parties agree that such provision instead shall be deemed limited to the extent, and only to the extent, necessary to make such provision enforceable to the fullest extent permissible under the laws and public policies applied in such jurisdiction, and any court of competent jurisdiction is hereby authorized to enforce such provision as so limited.

SECTION 5.    SPECIFIC PERFORMANCE.  In the event of any actual or threatened breach of any of the terms and provisions of this Agreement, the party or parties who are or are to be thereby aggrieved shall have the right of specific performance and injunctive relief giving effect to its or their rights under this Agreement, in addition to any and all other rights and remedies at law or in equity, and all such rights and remedies shall be cumulative.  The parties agree that the remedies at law for any breach or threatened breach, including monetary damages, are inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is waived.

SECTION 6.    NOTICES.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by fax or other standard form of telecommunications, or by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

    (i)    if to FAG:

            Fresenius AG
            Borkenberg 14
            61440 Oberursel
            Germany
            Attention: Mr. Udo Werle
            Fax: 49-6171-60-2104

            with a copy to:

            O'Melveny & Myers
            153 East 53rd Street
            New York, New York  10022
            Attention:  Dr. Ulrich Wagner
            Fax: (212) 326-2061

3

<PAGE>    4

    (ii)    if to FMC:

            Fresenius Medical Care AG
            Borkenberg 14
            61440 Oberursel
            Germany
            Attention: _____
            Fax: _____


            with a copy to:

            _____


    (iii)    if to either of the Grace Parties:

            W. R. Grace & Co.
            One Town Center Road
            Boca Raton, Florida  33486-1010
            Attention: Secretary

XXX-002282

```
                    Fax: (561) 362-1635

                    with a copy to:

                    Wachtell, Lipton, Rosen & Katz
                    51 West 52nd Street
                    New York, New York  10019
                    Attention:  Andrew R. Brownstein, Esq.
                    Fax: (212) 403-2000
```

SECTION 7.        GOVERNING LAW.  This agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of laws thereof.

SECTION 8.        PARTIES IN INTEREST.  This Agreement shall be binding upon and inure solely to the benefit of each party hereto, and nothing contained in this Agreement, expressed or implied, is intended to confer upon any other person or entity other than the parties hereto any benefit, right, or remedies.

4

<PAGE>   5

SECTION 9.        COUNTERPARTS.  For the convenience of the parties hereto, this Agreement may be executed in any number of separate counterparts signed by one or more of the parties hereto, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

5

<PAGE>   6

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto on the date first hereinabove written.

```
                            FRESENIUS AG


                            By:
                               ---------------------------------
                               Name:
                               Title:


                            By:
                               ---------------------------------
                               Name:
                               Title:

                            W. R. GRACE & CO.


                            By:
                               ---------------------------------
                               Name:
                               Title:

                            W. R. GRACE & CO.-CONN.


                            By:
                               ---------------------------------
                               Name:
                               Title:

                            FRESENIUS MEDICAL CARE AG


                            By:
                               ---------------------------------
                               Name:
                               Title:


                            By:
                               ---------------------------------
                               Name:
                               Title:
```

S-1

XXX-002283

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.13
<SEQUENCE>15
<DESCRIPTION>EMPLOYEE BENEFITS AND COMPENSATION AGREEMENT
<TEXT>

<PAGE>   1
```

EXHIBIT 10.13

EMPLOYEE BENEFITS AND COMPENSATION AGREEMENT

EMPLOYEE BENEFITS AND COMPENSATION AGREEMENT (the "Agreement") dated as of          , 1996 by and among W. R. Grace & Co., a New York corporation ("Grace"), National Medical Care, Inc., a Delaware corporation ("NMC") which, as of the date hereof, is a wholly owned, indirect subsidiary of Grace, and W. R. Grace & Co.-Conn., a Connecticut corporation ("Grace-Conn."), which as of the date hereof, is a wholly owned direct subsidiary of Grace.

WHEREAS, Grace and Fresenius AG, an Aktiengellschaft organized under the laws of the Federal Republic of Germany ("Fresenius AG"), have entered into an Agreement and Plan of Reorganization dated February 4, 1996 (the "Reorganization Agreement");

WHEREAS, immediately prior to the Effective Time (as defined in the Reorganization Agreement), Grace intends to transfer to (or retain in) Grace-Conn. all non-healthcare assets and liabilities, its interests in the Amicon bioseparations business and GN Holdings, Inc. and certain other assets, and to effect a distribution (the "Distribution") to its common shareholders of all of its equity interest in a Delaware corporation ("Grace Delaware") which will own all the outstanding stock of Grace-Conn. in a transaction intended to qualify under section 355 of the Internal Revenue Code of 1986, as amended (the "Code");

```
<PAGE>   2
```
WHEREAS, Grace, Grace-Conn. and Fresenius AG have entered into a Distribution Agreement, dated February 4, 1996 (the "Distribution Agreement") that, together with the exhibits thereto, among other things, sets forth the principal corporate transactions required to effect the Distribution and sets forth other agreements that will govern certain other matters following the Distribution; and

WHEREAS, in anticipation of the Distribution, Grace, NMC and Grace-Conn. desire to set forth their agreement with respect to certain matters related to employees and employee benefit plans and compensation arrangements, this agreement constituting an Other Agreement as contemplated in section 2.03 of the Distribution Agreement;

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained in this Agreement, the parties hereby agree as follows:

SECTION 1    DEFINITIONS.

Capitalized terms used but not defined herein shall have the respective meanings assigned to them in the Distribution Agreement or the Reorganization Agreement. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

- 2 -
```
<PAGE>   3
```
AGREEMENT: has the meaning assigned to it in the preamble hereof.

AMICON EMPLOYEE: has the meaning assigned to it in Section 12(a) hereof.

AMICON MIRROR SELF-INSURED WELFARE PLAN: has the meaning assigned to it in Section 12(a) hereof.

BENEFIT PLAN: any Plan established, sponsored or maintained by any member of the NMC Group, any member of the Grace-Conn. Group, or any predecessor or affiliate of any of the foregoing, existing as of the Distribution Date or prior thereto, to which any member of the NMC Group or the Grace-Conn. Group contributes, has contributed, is required to contribute or has been required to contribute, on behalf of any employee of a member of the NMC Group or a member of the Grace-Conn. Group, or under which any employee of a member of the NMC Group or a member of the Grace-Conn. Group, former employee of a member of the NMC Group or a member of the Grace-Conn. Group, or any beneficiary or dependent thereof, is covered, is eligible for coverage or has benefits rights.

CODE: the Internal Revenue Code of 1986, as amended.

CURRENT PERFORMANCE PERIOD: either of the following "performance periods" under the Grace LTIP: 1994-1996 and 1995-1997.

- 3 -
```
<PAGE>   4
```

XXX-002284

DISTRIBUTION AGREEMENT: has the meaning assigned to it in the fourth paragraph hereof.

ERISA: the Employee Retirement Income Security Act of 1974, as amended.

FINAL PERFORMANCE UNIT AWARD: has the meaning assigned to it in Section 4(a) hereof.

FRESENIUS MEDICAL CARE ADS: has the meaning assigned to it in Section 3(a) hereof.

GRACE: has the meaning assigned to it in the first paragraph hereof.

GRACE-CONN. BENEFIT PLAN: any Benefit Plan, other than any NMC Free-Standing Plan, that is maintained by Grace, a member of the NMC Group or the Grace-Conn. Group, including without limitation life insurance, medical and nonqualified retirement plans.

GRACE-CONN. PARTICIPANT: any individual who (i) is an employee of any member of the Grace-Conn. Group, (ii) immediately after the Distribution Date is a former employee of any member of the Grace-Conn. Group or Grace who has not been an employee of the NMC Group since such individual's latest period of employment with Grace-Conn. Group or Grace, or (iii) is a beneficiary or dependent of any individual described in clause (i) or (ii).

- 4 -

<PAGE>   5

GRACE DELAWARE: has the meaning assigned to it in the third paragraph hereof.

GRACE LTIP: the Grace Long-Term Incentive Program.

GRACE OPTION: an option to purchase shares of Grace Common Stock granted pursuant the Grace 1994 Stock Incentive Plan, the Grace 1989 Stock Incentive Plan, the Grace 1986 Stock Incentive Plan, or the Grace 1981 Stock Incentive Plan.

HAMPERS EMPLOYMENT AGREEMENT: has the meaning assigned to it in Section 8(b) hereof.

HAMPERS NON-QUALIFIED PENSION BENEFIT: has the meaning assigned to it in Section 8(b) hereof.

IRS: the Internal Revenue Service.

LTIP AWARDS: has the meaning assigned to it in Section 4(a) hereof.

NMC: has the meaning assigned to it in the first paragraph hereof.

NMC FREE-STANDING PLAN: any Benefit Plan that is sponsored or maintained by Grace, a member of the NMC Group or the Grace-Conn. Group exclusively for the benefit of NMC Participants, including but not limited to (i) the National Medical Care, Inc. Retirement Plan; (ii) the NMC Employees Savings and Investment Plan;

- 5 -

<PAGE>   6

(iii) the National Medical Care, Inc. Deferred Compensation Plan; (iv) the National Medical Care, Inc. Supplemental Executive Retirement Plan; and (v) the National Medical Care, Inc. Medical Plan. In addition to the Plans described in the immediately preceding sentence, any Benefit Plan that is sponsored or maintained by the NMC Group that covers Amicon Employees, as well as NMC Participants, but no other Grace-Conn. Participants, shall also be regarded as an "NMC Free-Standing Plan".

NMC INSURED WELFARE PLAN: A Welfare Plan maintained by NMC or any NMC Subsidiary that provides benefits through an insurance policy or contract with one or more insurance companies.

NMC PARTICIPANT: any individual who (i) immediately before and after the Distribution Date, is an employee of NMC or any NMC Subsidiary, (ii) immediately after the Distribution Date is a former employee of NMC or any NMC Subsidiary who has not been an employee of the Grace-Conn. Group since such individual's latest period of employment with NMC or an NMC Subsidiary, or (iii) is a beneficiary or dependent of any individual described in clause (i) or (ii).

NMC SELF-INSURED WELFARE PLAN: A Welfare Plan maintained by NMC or any NMC Subsidiary that provides benefits directly from employer assets, and not through an insurance policy or contract with one or more insurance companies.

- 6 -

<PAGE>   7

PENSION PLAN: any Benefit Plan that is an "employee pension benefit plan" (within the meaning of section 3(2) of ERISA), whether or not that Plan is intended to qualify under section 401(a) of the Code.

XXX-002285

          PLAN: any bonus, incentive compensation, deferred compensation,
pension, profit sharing, retirement, stock purchase, stock option, stock
ownership, stock appreciation rights, phantom stock, company car, fringe
benefit, leave of absence, layoff, vacation, day or dependent care, legal
services, cafeteria, life, health, medical, accident, disability, workman's
compensation or other insurance, severance, separation or other employee benefit
plan, practice, policy or arrangement of any kind (including, but not limited
to, any "employee benefit plan" (within the meaning of section 3(3) of ERISA)).

          RATIO: the amount obtained by dividing (i) the average of the
arithmetic mean of the highest and lowest sales prices per share of the Grace
Common Stock on the New York Stock Exchange Composite Tape on each of the ten
trading days immediately preceding the Distribution Date, by (ii) the average of
the arithmetic mean (divided by 1.112) of the highest and lowest sales prices
per share of the Fresenius USA Common Stock on the American Stock Exchange

                                   - 7 -

<PAGE>    8
Composite Tape on each of the ten trading days immediately preceding
the Distribution Date.

          TERMINATION BENEFITS: has the meaning assigned to it in Section
2(a) hereof.

          WELFARE PLAN: any Benefit Plan that is an "employee welfare
benefit plan" (within the meaning of section 3(1) of ERISA).

SECTION 2    TERMINATION BENEFITS.

          (a) No employee of the Grace-Conn. Group and no employee of the
NMC Group shall be deemed, as a result of the Distribution or Reorganization, to
have terminated employment (voluntarily or involuntarily) from either Group for
purposes of any Plan, program, contract, agreement or other arrangement that
provides for the payment of severance pay, salary continuation, pay in lieu of
notice, unused vacation pay, or similar benefits in connection with actual or
constructive termination or alleged actual or constructive termination of
employment (collectively, "Termination Benefits").

          (b) The NMC Group shall assume or retain, as appropriate, shall
be solely responsible for, and shall indemnify the Grace-Conn. Indemnities
against, all Indemnifiable Losses relating to or arising out of claims made by
or on behalf of NMC Participants for, or with respect to, Termination Benefits
relating to the actual or constructive termination or alleged actual or
constructive ter-

                                   - 8 -

<PAGE>    9
mination of employment of any NMC Participant with any member of the NMC Group,
whether before, on or after the Distribution Date.

          (c) The Grace-Conn. Group shall assume or retain, as appropriate,
shall be solely responsible for, and shall indemnify the NMC Indemnitees
against, all Indemnifiable Losses relating to or arising out of claims made by
or on behalf of Grace-Conn. Participants for, or with respect to, Termination
Benefits relating to the actual or constructive termination or alleged actual or
constructive termination of employment of any Grace-Conn. Participant with any
member or the Grace-Conn. Group, whether before, on or after the Distribution
Date.

SECTION 3    GRACE OPTIONS.

          (a) As soon as practicable after the Distribution Date, each Grace
Option held by NMC Participants as of the Distribution Date shall be converted
into options for American Depository Shares of Fresenius Medical Care AG
("Fresenius Medical Care ADSs") by applying the following procedure: each NMC
Participant (who has received one or more grants of Grace Options) shall be
credited with options for the number of Fresenius Medical Care ADSs that equal
the number of shares of Grace Common Stock covered by outstanding Grace Options
that were awarded to the NMC Participant as part of a specific grant at a
specific option price, multiplied by the Ratio;

                                   - 9 -

<PAGE>    10
and the option price of the options for Fresenius Medical Care ADSs shall be
equal to the option price of the specific grant of Grace Options from which the
options for the Fresenius Medical Care ADSs were derived, divided by the Ratio.
The options for Fresenius Medical Care ADSs that result from the conversion
described in this Section 3(a) shall become vested at the same time and in the
same manner as would apply to the Grace Options from which the options for the
ADSs were derived; provided that, Fresenius Medical Care AG may accelerate the
vesting schedule regarding any option for Fresenius Medical Care ADSs, if such
change is consistent with applicable law. NMC Participants shall have no right,
title or claim to Grace Options from which options for Fresenius Medical Care
ADSs were derived in accordance with this Section 3(a).

          (b) From and after the Distribution Date, the NMC Group shall
assume or retain, as appropriate, shall be solely responsible for, and shall
indemnify the Grace-Conn. Indemnities against, all Indemnifiable Losses relating
to or arising out of claims made by or in behalf of NMC Participants for, or
with respect to, Grace Options awarded to NMC Participants and/or options with
respect to Fresenius Medical Care ADSs held by or awarded to NMC Participants.

XXX-002286