on New Sealed Air after the Reorganization and Merger;

o  make any changes in accounting policies (other than those required by
   accounting rules or necessary or advisable in connection with the
   Reorganization and Merger); conduct their cash management and intercompany
   transactions in a manner other than in the ordinary and usual course of
   business consistent with past practices;

o  intentionally take any action knowing that it would cause a breach of a
   representation or warranty in the Merger Agreement; or

o  authorize or agree to any of the foregoing.

     No Solicitation. Grace and Sealed Air have each agreed in the
Merger Agreement that it and its subsidiaries, and their officers and directors
will not, and that it will use its best efforts to cause its employees,
investment bankers, attorneys, accountants and other agents and representatives
not to, directly or indirectly, initiate, solicit or encourage any inquiries or
the making or implementation of any Acquisition Proposal (as defined below) or
provide any confidential information to or have any discussions or engage in any
negotiations with, any person relating to an Acquisition Proposal.
Notwithstanding these restrictions, the Grace Board and the Sealed Air Board may
furnish information (pursuant to confidentiality arrangements) and may
participate directly or indirectly in discussions and negotiations if the
failure to do so would breach their fiduciary duties, in the opinion of the
Board's counsel, or if another person makes a Higher Offer (as defined below).
Grace and Sealed Air have agreed to notify the other as soon as practicable if
any inquiries or proposals are received, any confidential information is
requested or any negotiations or discussions relating to an Acquisition Proposal
are sought to be initiated or continued, and to keep the other reasonably
informed of the status and details of any such inquiry, request for information,
offer or proposal, discussions or negotiations.

     "Acquisition Proposal" means a proposal or offer regarding a
merger, acquisition, consolidation, business combination, recapitalization or
similar transaction involving, or a purchase of all or any significant portion
of the assets or any equity securities of, the company or any of its
subsidiaries (but excluding a proposal exclusively involving all or part of the
stock or assets of New Grace, unless the proposal or consummation of the
proposal will adversely affect the Reorganization and Merger).

     "Higher Offer" means a written offer or proposal that the Board
believes (in good faith and based upon the advice of its outside advisors) could
reasonably be expected to be consummated and represents a transaction more
favorable to its stockholders than the Reorganization and Merger, but only if
the offer or proposal was not solicited and did not result from a breach of the
prohibitions against soliciting inquiries, providing confidential information
and engaging in negotiations relating to an Acquisition Proposal.

     Special Meetings of Stockholders. Grace and Sealed Air have
agreed in the Merger Agreement to hold their special meetings as promptly as
practicable and to proceed promptly to ensure that the disclosure documents
required in connection with the Reorganization and Merger are filed with and
declared effective or otherwise cleared by the SEC.

     Grace has agreed that its Board will recommend to its
stockholders that they approve the Reorganization and Merger. Sealed Air has
agreed that its Board will recommend to its stockholders that they approve the
Merger. Notwithstanding these agreements, the Grace Board or the Sealed Air
Board may elect not to make such a recommendation, or to withdraw or modify its
recommendation or recommend another offer or proposal, if the failure to do so
would breach its fiduciary duties, in the opinion of the board's counsel, or if
a Higher Offer is made.

     Certain Employee Benefits Matters. After the Effective Time, New
Sealed Air must maintain employee benefits plans and programs for the employees
of Grace Packaging that are, in the aggregate, at least substantially comparable
to the plans and programs in effect for employees of Grace Packaging at the
Effective Time or other plans that are, in the aggregate, at least substantially
comparable to the plans and programs in effect from time to time with respect to
comparable employees of Sealed Air.

     Certain Other Covenants. Sealed Air and Grace have agreed to
certain other customary covenants in the Merger Agreement, including covenants
relating to ensuring that the registration statement relating to the issuance of
shares in the Recapitalization and Merger (the "New Sealed Air Registration
Statement"), the registration statement relating to the issuance of the New
Grace common stock in the Spin-off (the "New Grace Registration Statement"), and
this Joint Proxy Statement/Prospectus do not contain any untrue statements of
material fact and are not otherwise misleading; obtaining necessary consents and
approvals; cooperating with each other to obtain antitrust clearances; providing
access to and furnishing information; providing notices of certain events and
consulting with each other regarding public statements and filings; compliance
with takeover statutes; using reasonable efforts to obtain agreements from
affiliates; consummating the transactions that must be consummated prior to the
Effective Time; and reporting the Spin-off and Merger as tax-free transactions.

     Certain Representations and Warranties

     The Merger Agreement contains, subject to certain exceptions,
substantially reciprocal representations and warranties by Grace and Sealed Air
as to the following, among other things: capitalization; due organization and
good standing; corporate authorization to effect the Reorganization and Merger;
governmental approvals required in connection with the Reorganization and
Merger; absence of any breach of organizational documents, agreements and court

XXX-002373

orders as a result of the Reorganization and Merger; filings with the SEC;
financial statements; absence of certain undisclosed liabilities; absence of
certain changes since December 31, 1996; compliance with takeover statutes;
brokerage fees, commissions and finders' fees; tax matters; and accuracy of
representations and warranties made in the Merger Agreement or other documents
related to the Reorganization and Merger.

In addition, Grace has made representations and warranties to
Sealed Air in the Merger Agreement with respect to Grace Packaging as to the
following, among other things: the capital stock of the packaging subsidiaries;
due organization and good standing; corporate authorization to effect the
Reorganization and Merger; financial statements; absence of certain undisclosed
liabilities; absence of certain changes since December 31, 1996; compliance with
laws; title to and adequacy of assets; absence of certain litigation; tax
matters; environmental matters; absence of agreements that will materially limit
the ability of New Sealed Air and its subsidiaries to compete after the Merger;
absence of breach of certain agreements; employee benefits matters; and
intellectual property matters.

Sealed Air has made certain additional representations and
warranties to Grace in the Merger Agreement as to the following, among other
things: compliance with laws; title to and adequacy of assets; absence of
certain litigation; absence of agreements that will materially limit the ability
of New Sealed Air and its subsidiaries to compete after the Merger; absence of
breach of certain agreements; employee benefits matters; environmental matters;
and intellectual property matters.

The representations and warranties in the Merger Agreement do not
survive the Effective Time.

Conditions to the Reorganization and Merger

Conditions to Each Party's Obligations. The obligations of Grace
and Sealed Air to consummate the Reorganization and Merger are subject to the
satisfaction of the following conditions:

o  the receipt of approvals of the stockholders of Grace and Sealed Air;

o  the expiration of the applicable waiting period under the HSR Act and
   receipt of all governmental and other consents and approvals required in
   connection with the consummation of the Reorganization and Merger, except
   where the failure to obtain such consents or approvals is not likely to
   have a material adverse effect;

o  the absence of any law, judgment, decree, injunction or other order
   prohibiting the consummation of the Reorganization and Merger;

o  the receipt by Grace of a tax opinion from Wachtell, Lipton, Rosen & Katz
   and by Sealed Air of a tax opinion from Davis Polk & Wardwell;

o  the effectiveness of the New Sealed Air Registration Statement and the New
   Grace Registration Statement, with no stop order suspending their
   effectiveness and no proceedings for that purpose known to be initiated or
   threatened by the SEC;

o  the receipt of approval for listing on the New York Stock Exchange of
   shares of New Sealed Air common and convertible preferred stock and New
   Grace common stock, subject to official notice of issuance; and

o  the consummation of the Reorganization (including the consummation in
   all material respects, to the extent required prior to the Spin-off, of
   the separation of Grace Packaging, the Cash Transfer, the
   Recapitalization and related transactions; the Spin-off; the election of
   the Board of Directors of New Grace, with a majority of independent
   directors; the execution of the Other Agreements (as defined below); and
   receipt of solvency opinions and compliance with the requirements of
   applicable federal and state laws).

Additional Conditions to the Obligations of Grace. The
obligations of Grace to consummate the Reorganization and Merger are subject to
the satisfaction or waiver by Grace of the following additional conditions:

o  the representations and warranties of Sealed Air in the Merger Agreement
   must be true in all material respects as of the date of the Merger
   Agreement and as of the Effective Time as though made at and as of the
   Effective Time (or as of a different date as specified in the Merger
   Agreement); and

o  the performance in all material respects by Sealed Air of its obligations
   under the Merger Agreement and the other Transaction Agreements at or
   prior to the Effective Time.

Additional Conditions to Obligations of Sealed Air. The
obligations of Sealed Air to consummate the Reorganization and Merger are
subject to the satisfaction or waiver by Sealed Air of the following additional
conditions:

o  the representations and warranties of Grace in the Merger Agreement must
   be true in all material respects as of the date of the Merger Agreement
   and as of the Effective Time as though made at and as of the Effective
   Time (or as of a different date as specified in the Merger Agreement);

o  the performance in all material respects by Grace of its obligations under
   the Merger Agreement and the other Transaction Agreements at or prior to
   the Effective Time;

XXX-002374

o   the issuance of the Letter of Credit for the benefit of New Sealed Air if
    the outstanding Public Debt exceeds $50 million; and

o   the receipt by the Sealed Air Board of a solvency opinion with respect to
    Grace, New Grace and certain other Grace entities.

Termination of the Merger Agreement and Distribution Agreement

    Rights to Terminate.  At any time prior to the Effective Time,
the Merger Agreement may be terminated and the Reorganization and Merger may
be abandoned as follows:

o   by the mutual consent of Grace and Sealed Air;

o   by either Grace or Sealed Air if:

    o   the Merger is not consummated by April 30, 1998, (however, this right
        is not available to any party if its own breach is the reason the
        Merger is not consummated by that date);

    o   Grace stockholders fail to approve the Reorganization and Merger or
        Sealed Air stockholders fail to approve the Merger; or

    o   Grace or Sealed Air enters into an agreement with respect to a Higher
        Offer;

o   by Grace if:

    o   Sealed Air fails to comply in any material respect with its obligations
        under the Merger Agreement, and such failure cannot, after notice, be
        cured by April 30, 1998;

    o   the Sealed Air Board fails to make or withdraws or modifies, in a
        manner that is materially adverse to Grace, its recommendation that its
        stockholders approve the Merger; or

    o   the average closing sales price of a share of Sealed Air common stock
        for the 20 trading days immediately prior to the Effective Time is less
        than $37.00 per share; and

o   by Sealed Air if:

    o   Grace fails to comply in any material respect with its obligations
        under the Merger Agreement, and such failure cannot, after notice, be
        cured by April 30, 1998;

    o   the Grace Board fails to make or withdraws or modifies, in a manner
        that is materially adverse to Sealed Air, its recommendation that its
        stockholders approve the Reorganization and Merger; or

    o   the average closing sales price of a share of Grace common stock for
        the 20 trading days immediately prior to the Effective Time is less
        than $45 3/8 per share.

    If the Merger Agreement is terminated, no provision of the Merger
Agreement will survive (other than the provisions relating to payment of
expenses and confidentiality), and termination will be without any liability on
the part of any party, other than liability for a material and willful breach of
a covenant in the Merger Agreement.

    The Distribution Agreement may be terminated only after the
Merger Agreement is terminated.

    Termination Fees and Expenses Payable by Grace.  Grace has
agreed to pay Sealed Air:

(1) $150 million plus Sealed Air's out-of-pocket expenses if the Merger
    Agreement is terminated because:

    o   Grace enters into an agreement with respect to a Higher Offer; or

    o   the Grace Board fails to make or withdraws or modifies, in a
        manner that is materially adverse to Sealed Air, its
        recommendation that its stockholders approve the Merger, and
        within one year after termination of the Merger Agreement, Grace
        consummates or enters into a written agreement to consummate an
        Acquisition Proposal for at least 20% of its assets or equity
        securities or a person or group acquires at least 35% of Grace's
        outstanding common stock;

(2) if the Merger Agreement is terminated because Grace's stockholders do
    not approve the Reorganization and Merger after an Acquisition
    Proposal for Grace has been publicly disclosed:

    o   $25 million, and

    o   an additional $125 million plus Sealed Air's out-of-pocket expenses
        if, within one year after termination of the Merger Agreement,
        Grace consummates or enters into a written agreement to consummate
        an Acquisition Proposal for at least 20% of its assets or equity
        securities or a person or group acquires at least 35% of Grace's
        outstanding common stock; or

(3) $25 million if the Merger Agreement is terminated because Grace's

XXX-002375

stockholders do not approve the Reorganization and Merger other than
in circumstances described in (2) above.

Termination Fees and Expenses Payable by Sealed Air.  Sealed
Air has agreed to pay Grace:

(1) $75 million plus Grace's out-of-pocket expenses incurred in connection
    with the Reorganization and Merger if the Merger Agreement is
    terminated because:

    o  Sealed Air enters into an agreement with respect to a Higher
       Offer; or

    o  the Sealed Air Board fails to make or withdraws or modifies, in a
       manner that is materially adverse to Grace, its recommendation
       that its stockholders approve the Merger, and within one year
       after termination of the Merger Agreement, Sealed Air consummates
       or enters into a written agreement to consummate an Acquisition
       Proposal for at least 20% of its assets or equity securities or a
       person or group acquires at least 35% of Sealed Air's outstanding
       common stock;

(2) if the Merger Agreement is terminated because Sealed Air's
    stockholders do not approve the Merger after an Acquisition Proposal
    for Sealed Air has been publicly disclosed:

    o  $25 million, and

    o  an additional $50 million plus Grace's out-of-pocket expenses if,
       within one year after termination of the Merger Agreement, Sealed
       Air consummates or enters into a written agreement to consummate an
       Acquisition Proposal for at least 20% of its assets or equity
       securities or a person or group acquires at least 35% of Sealed
       Air's outstanding common stock; or

(3) $25 million if the Merger Agreement is terminated because Sealed Air's
    stockholders do not approve the Merger other than in circumstances
    described in (2) above.

Expenses

New Grace has agreed to pay all costs and expenses incurred by
Grace (and New Sealed Air after the Merger), New Grace and their subsidiaries in
connection with the Reorganization, except that New Sealed Air will pay:

    o  the lesser of $50 million and 37% of the aggregate amount of (i) costs
       incurred in connection with a tender offer, defeasance, retirement or
       other acquisition of the Public Debt, the costs associated with
       terminating or renegotiating related interest rate swaps and the costs
       of the Letter of Credit, (ii) certain tax costs associated with
       terminating or renegotiating related interest rate swaps and the costs
       separation of Grace Packaging from its other businesses outside of the
       U.S. and (iii) the costs associated with terminating employees located
       at Grace's corporate headquarters in connection with the Reorganization
       and Merger;

    o  the lesser of $10 million and 37% of the aggregate amount of all other
       costs associated with the Reorganization; and

    o  the fees and expenses incurred in connection with the New Credit
       Agreements.

New Grace and Sealed Air will pay their own Merger-related fees and expenses
(including the fees and expenses of financial advisors, accountants and
counsel), and each will pay 50% of the costs and expenses of printing and
mailing this Joint Proxy Statement/Prospectus, the New Sealed Air Registration
Statement and the associated SEC filing fees.

Amendments

Subject to Delaware Law (which may require stockholder approval
to amend the Merger Agreement under certain circumstances), the Merger Agreement
may be amended prior to the Effective Time only if the amendment is in writing
and signed by each of the parties to the agreement.

The Distribution Agreement may be amended only if the amendment
is in writing and signed by each of the parties to the agreement, subject to the
reasonable consent of Sealed Air.

RELATIONSHIP BETWEEN NEW SEALED AIR AND NEW GRACE
AFTER THE REORGANIZATION AND MERGER

Sealed Air and Grace, or their respective subsidiaries, will
enter into various agreements that will govern their ongoing relationships and
provide for an orderly transition after the Reorganization and Merger.
Certain of these agreements are summarized below.

Tax Sharing Agreement

Prior to the Merger, Grace and Sealed Air will enter into a tax
sharing agreement (the "Tax Sharing Agreement") which will provide, among other
things, that (i) New Grace and its subsidiaries will be responsible for paying
substantially all of the taxes of Grace and its subsidiaries (and entitled to
receive and retain substantially all refunds of taxes relating thereto) for
periods, or portions thereof, ending prior to or on the Distribution Date, and

XXX-002376

(ii) New Sealed Air will be responsible for paying all taxes of New Sealed Air and its subsidiaries (and entitled to receive and retain all refunds of taxes relating thereto) with respect to periods, or portions thereof, after the Distribution Date.

The Tax Sharing Agreement will also prohibit New Sealed Air and New Grace from engaging in certain transactions for two years following the Distribution Date. See "Certain Risk Factors--Restrictions on New Sealed Air and New Grace to Protect Tax-free Treatment" on page 22. New Sealed Air and New Grace will also agree that, in general, they will indemnify each other (on an after-tax basis) against any tax liability resulting from either party's breach of any covenant or representation contained in the Tax Sharing Agreement. Additionally, New Grace will indemnify New Sealed Air and its affiliates against any tax liability resulting from a failure of the Spin-off to qualify as a tax-free transaction under Section 355 of the Code (other than any failure resulting from a breach of any representation or covenant by New Sealed Air). New Sealed Air will indemnify New Grace and its affiliates against any tax liability resulting from a breach of any representation or covenant by New Sealed Air that causes the Spin-off to fail to qualify as a tax-free transaction under Section 355 of the Code.

The Tax Sharing Agreement will not be binding on the IRS or any other taxing authority and will not affect the several liability of New Grace and New Sealed Air and their respective subsidiaries to the IRS for U.S. federal and certain state income taxes of the Grace consolidated group relating to periods ending on or prior to the Distribution Date (including any tax liability resulting from a failure of the Spin-off to qualify as a tax-free transaction under Section 355 of the Code). See "Certain Risk Factors--U.S. Federal Income Tax Consequences if Reorganization and Merger Do Not Qualify for Tax-Free Treatment" on page 24.

Employee Benefits Agreement

Prior to the Merger, New Sealed Air and New Grace will enter into an employee benefits allocation agreement (the "Employee Benefits Agreement") that will allocate the assets and liabilities under Grace's employee benefit plans and other employment-related liabilities between New Sealed Air and New Grace. After the Merger, New Sealed Air will be responsible for providing compensation and other employee benefits for active employees of Grace Packaging, and New Grace will be responsible for providing compensation and other employee benefits for Grace's specialty chemicals employees and all former Grace employees (including former Grace Packaging employees).

New Sealed Air will agree to maintain benefits for the Grace Packaging employees that are at least substantially comparable (in the aggregate) either to those established by Grace for the Grace Packaging employees prior to the Merger or to those provided by New Sealed Air to similarly situated Sealed Air employees. In addition, New Sealed Air will agree that, for one year after the Merger, it will maintain a severance plan for Grace Packaging's U.S. employees that will provide severance payments equal to 13 weeks' pay plus an additional 1 1/2 weeks' pay for each year of employment.

Employees of Grace Packaging will retain their vested benefits under Grace's U.S. defined benefit pension plans, although most employees will cease to accrue additional benefits under these plans at the time of the Merger. New Sealed Air will agree to implement a program designed substantially to make up for any anticipated material adverse impact on employees of Grace Packaging that results from the termination of their participation in Grace's principal U.S. pension plan. After the Merger, most New Sealed Air employees in the U.S. (other than those covered by certain collective bargaining agreements) will be eligible to participate in Sealed Air's Profit-Sharing Plan, a defined contribution plan in which most of Sealed Air's U.S. employees currently participate. New Sealed Air will also establish or assume certain 401(k) plans for Grace Packaging's U.S. employees.

New Grace generally will retain responsibility for Grace's U.S. defined benefit pension plans, although New Sealed Air will assume certain defined benefit plans for several small groups of Grace Packaging's U.S. employees. Outside of the U.S., certain pension plan assets and liabilities will be transferred to New Sealed Air. Any excess or shortfall in the allocation of certain pension plan assets and liabilities will be reflected in the Cash Transfer. See "The Distribution and Merger Agreements-- Reorganization of Grace" on page 68.

New Grace will be responsible for providing active employees of Grace Packaging with certain other employee benefits that accrue prior to the Merger, such as bonus compensation, long-term incentive program benefits and supplemental executive retirement plan benefits. New Grace will also retain responsibility for providing post-retirement health and life insurance benefits for retired Grace Packaging employees and for active Grace Packaging employees who would be eligible under the current post-retirement benefit plan to receive such benefits within one year after the Merger. New Sealed Air will adopt a postretirement benefit plan for other employees of New Sealed Air under which retirees who elect to participate will pay the entire cost of such benefits.

Other Agreements

Other Agreements Between New Sealed Air and Grace. Before the Merger occurs, Grace, New Grace and their subsidiaries will enter into other agreements in connection with the Reorganization and Merger (the "Other Agreements"). The Other Agreements will include (i) an agreement regarding insurance policies, coverage, procedures, benefits, costs and other insurance matters; (ii) agreements governing interim services to be provided by New Grace or New Sealed Air to each other; (iii) the Shared Facilities Agreements (as defined below); (iv) the Intellectual Property Licenses (as defined below); and

XXX-002377

(v) other agreements regarding other matters as may be advisable. The Other Agreements must be on terms acceptable to Grace, New Grace and Sealed Air.

Shared Facilities Agreements. Certain of Grace's properties, including certain production, manufacturing, sales office and other facilities, are used by both Grace Packaging and the specialty chemicals businesses (the "Shared Facilities"). Although most of the Shared Facilities will be divided, New Grace subsidiaries and New Sealed Air subsidiaries may continue to require the use of some of the same Shared Facilities and of certain related services (such as waste disposal, utilities, security and other matters) after the Merger. Before the Merger occurs, the companies that will continue to share facilities will enter into appropriate agreements regarding the use of such Shared Facilities, the services to be provided in connection with the Shared Facilities and the allocation of related costs (the "Shared Facilities Agreements").

Intellectual Property Licenses. The Distribution Agreement provides that intellectual property rights that are used or held for use only by Grace Packaging will be owned by New Sealed Air, and that intellectual property rights that are used or held for use only in Grace's other businesses will be owned by New Grace. Certain of Grace's intellectual property rights are used or held for use in both its packaging business and its other businesses. With minor exceptions, title to such rights will be owned by New Grace, and New Sealed Air will have an exclusive, worldwide, fully paid, perpetual, royalty-free license to use such intellectual property rights (the "Intellectual Property Licenses"). The field of use for such licenses will be the businesses engaged in by Grace Packaging prior to the Merger, the businesses engaged in by Sealed Air prior to the Merger, and reasonable extensions thereof in both cases. The field of use will not include the business engaged in by Grace's container sealants and coatings business prior to the Merger (i.e., the business of closures, closure sealant compositions, multifunctional can ends used on or with containers, coatings, sealants, compositions and equipment used or held for use in the manufacture of cans and other rigid containers,) and reasonable extensions thereof. To the extent there is overlap between reasonable extensions of the businesses of Grace Packaging and Sealed Air and reasonable extensions of the container business, the license will be non-exclusive. The Intellectual Property Licenses will not affect any other intellectual property rights of New Sealed Air.

THE NEW CREDIT AGREEMENTS

Grace has received a commitment letter in which ABN AMRO Bank N.V. ("ABN AMRO"), BT Alex Brown Incorporated, BancAmerica Robertson Stephens and NationsBanc Montgomery Securities, Inc. (collectively the "Arrangers") have agreed, subject to certain conditions, to use their best efforts to arrange a syndicate of banks that will enter into two credit agreements with Grace (one for the Long-Term Facility and one for the Short-Term Facility, each referred to below and each a "New Credit Agreement") in connection with the Reorganization and Merger. Following the execution of the New Credit Agreements and the satisfaction of the conditions to borrowings, the banks would make available up to $1.6 billion of loans to Grace (and New Sealed Air after the Merger) and certain of its subsidiaries (collectively, the "Borrowers"). These loans would provide the funds that would be needed for the Cash Transfer, to pay certain fees and expenses relating to the Reorganization and Merger, to refinance certain existing debt and to meet the working capital and other general corporate needs of New Sealed Air and its subsidiaries after the Merger. In the commitment letter, ABN AMRO, Bankers Trust Company, Bank of America National Trust and Savings Association and NationsBank, N.A. (collectively, the "Agent Banks") have agreed to provide $1.05 billion of the loans under the New Credit Agreements.

The following summary describes the anticipated material terms of the New Credit Agreements based upon the commitment letter from the Arrangers and the Agent Banks. There can be no assurance that the New Credit Agreements will be successfully syndicated, entered into or become effective, that the terms and conditions in the New Credit Agreements will conform to those contemplated by the commitment letter or that the conditions to borrowings under the New Credit Agreements can be satisfied.

The execution of the New Credit Agreements and the borrowing of sufficient funds to enable Grace and Cryovac, Inc. to make the Cash Transfer to New Grace and W. R. Grace & Co.-Conn. are conditions to the Reorganization and Merger. See "The Distribution and Merger Agreements--Reorganization of Grace--Spin-off" on page 70 for an explanation of the Cash Transfer, and "The Distribution and Merger Agreements--Merger of Sealed Air and Grace Packaging--Conditions to the Reorganization and Merger" on page 74 for a description of the conditions to the Reorganization and Merger.

General Terms

Under the New Credit Agreements, the banks would provide a total of $1.6 billion in loans (and letters of credit, subject to a sub-limit to be determined) to the Borrowers through two credit facilities: a $1.0 billion revolving credit facility that would be available for five years (the "Long-Term Facility") and a $0.6 billion revolving credit facility that would be available until 364 days after the execution of the New Credit Agreements (the "Short-Term Facility"). Loans under the New Credit Agreements would be available in U.S. Dollars and in certain other currencies. All loans outstanding under the Long-Term Facility would be payable on the fifth anniversary of the execution of the New Credit Agreements, and all loans outstanding under the Short-Term Facility would be payable 364 days after the execution of the New Credit Agreements, in each case without any interim amortization requirements. All of the loans and letter of credit obligations will be guaranteed by Grace and all of its material U.S. subsidiaries (including Cryovac, Inc. but excluding New

XXX-002378

Grace and its subsidiaries). After completion of the Merger, at the option of New Sealed Air, Sealed Air Packaging, Inc. may become a co-obligor with New Sealed Air and assume joint and several liability for all of New Sealed Air's obligations under the New Credit Agreements.

Interest Rates and Fees

The interest rate on loans outstanding under the New Credit Agreements generally would be (at the Borrowers' option): (1) the "London Interbank Offered Rate" ("LIBOR") for interest periods of 1, 2, 3 or 6 months, plus a margin that may range from 0.19% to 0.55% for loans under the Short Term Facility and from 0.17% to 0.50% for loans under the Long-Term Facility, with the actual margins depending on a ratio measuring Grace's (and, after the Merger, New Sealed Air's) financial leverage or the rating for its senior unsecured long-term debt at the time, or (2) ABN AMRO's "Base Rate". An additional utilization fee of 0.05% will be added to the margin at any time the outstanding amounts under the New Credit Agreements exceed $800 million. The Borrowers also would be permitted to borrow separately from individual banks under the New Credit Agreements, at fixed interest rates for periods of 1 to 180 days as determined by competitive bid auctions. In addition, the Borrowers may negotiate separate foreign currency loans with individual banks, the interest rates on which would be separately negotiated. The fee for letters of credit will be the applicable LIBOR margin under the Long-Term Facility.

Grace (and, after the Merger, New Sealed Air) will be required under the New Credit Agreements to pay an annual facility fee that would range from 0.06% to 0.20% of the amount of the Short-Term Facility and from 0.08% to 0.25% of the amount of the Long-Term Facility, also depending on a ratio measuring its financial leverage or the rating for its senior unsecured long-term debt at the time. In addition, Grace has agreed to pay the Agent Banks a customary upfront agency fee for their commitments and to pay ABN AMRO customary additional fees for administration of the New Credit Agreements. Grace will also be obligated to pay any participation or similar fees that, in connection with the syndication of the New Credit Agreements, must be paid to the banks that make commitments to participate in them. These fees will be paid by Grace or New Sealed Air, and not by New Grace, and any fees paid by Grace prior to the Reorganization will be reimbursed through the Cash Transfer. Grace or New Sealed Air will also pay the reasonable expenses that ABN AMRO incurs in connection with the New Credit Agreements (including its reasonable legal fees and expenses), and will give customary indemnities to the banks under the New Credit Agreements.

Covenants and Other Provisions of the New Credit Agreements

The New Credit Agreements will contain a variety of operating and financial covenants that will restrict New Sealed Air and its subsidiaries after the Merger. These covenants are expected to restrict (in each case subject to certain exceptions) (1) liens and other security interests; (2) mergers, consolidations and dispositions of material assets; (3) subsidiary debt; (4) asset transfers to foreign subsidiaries; and (5) changes in New Sealed Air's business. In addition, New Sealed Air will be required to maintain specified financial ratios (measuring New Sealed Air's interest and preferred stock dividend coverage and leverage).

The New Credit Agreements will also contain customary affirmative operating covenants, conditions to borrowings, representations and warranties and event of default provisions (including a change of control other than as a result of the Merger), as well as a covenant that the Merger must occur within five days of the first borrowing.

MANAGEMENT OF NEW SEALED AIR

General

The seven directors of Sealed Air, plus four individuals who are currently serving as outside directors of Grace, will become the directors of New Sealed Air. The Grace directors who will join the New Sealed Air Board are Hank Brown, Christopher Cheng, Virginia A. Kamsky and John E. Phipps.

The officers of New Sealed Air will be the existing officers of Sealed Air, including T.J. Dermot Dunphy (Chairman of the Board and Chief Executive Officer) and William H. Hickey (President and Chief Operating Officer), joined by J. Gary Kaenzig, Jr. (currently a Senior Vice President of Grace and President of Grace Packaging), Leonard R. Byrne and Alan S. Weinberg (currently executives of Grace Packaging), and any others who may be appointed by the New Sealed Air Board.

Directors and Executive Officers

Information regarding the directors and executive officers of Sealed Air and Grace is set forth in documents filed with the SEC by Sealed Air and Grace. See "Where You Can Find More Information" on page 100.

Messrs. Byrne and Weinberg are not currently officers of Grace, but they are expected to become vice presidents of New Sealed Air following the Merger. Leonard R. Byrne, age 56, has been Executive Vice President of Grace Packaging's North American operations since July 1997, and has been an executive of Grace Packaging for more than five years. Alan S. Weinberg, age 55, has been Vice President of Global Technology for Grace Packaging since July 1996, and has been an executive of Grace Packaging for more than five years.

INTERESTS OF CERTAIN PERSONS

XXX-002379

Members of Sealed Air's management and Board of Directors may be deemed to have interests in the Merger that are different from, or in addition to, the interests of Sealed Air's stockholders generally. The Sealed Air Board was aware of these interests and considered them, among other matters, in approving the Merger Agreement and the transactions contemplated thereby. In addition, members of Grace's management and Board of Directors may be deemed to have interests in the Reorganization and Merger that are different from, or in addition to, the interests of Grace's stockholders generally. The Grace Board was aware of these interests and considered them, among other matters, in approving the Merger Agreement and the transactions contemplated thereby. These interests are described below.

Existing Officers and Directors Who Will Join New Sealed Air and New Grace at the Effective Time

        At the Effective Time, all of the existing directors of Sealed Air and four of the current outside directors of Grace are expected to become members of the New Sealed Air Board. All of the existing officers of Sealed Air, an officer of Grace and certain executives of Grace Packaging are expected to become officers of New Sealed Air. See "Management of New Sealed Air--General."

        At the Effective Time, the existing officers and directors of Grace, except those joining New Sealed Air, will hold the same positions with New Grace.

Indemnification of Officers and Directors

        The Distribution Agreement provides that New Grace will indemnify, defend and hold harmless (including the payment of reasonable fees and expenses of legal counsel) New Sealed Air and its officers and directors for:

        o losses arising from the failure of New Grace to pay the liabilities that it agreed to pay, or to perform obligations it agreed to perform, under the Distribution Agreement;

        o losses arising from any untrue statement or alleged untrue statement of material fact, or any omission or alleged omission of a material fact required to be stated, in this Joint Proxy Statement/Prospectus, the New Sealed Air Registration Statement or the New Grace Registration Statement, in preliminary or final form, other than with respect to information in those documents relating to and provided by Sealed Air specifically for use therein or relating to New Sealed Air after the Merger; and

        o losses arising from or related to litigation brought by pre-Merger stockholders of Grace in such capacity and related to any events or transactions occurring prior to the Effective Time or to the transactions contemplated by any of the Transaction Agreements.

        The Distribution Agreement also provides that New Sealed Air will indemnify and hold harmless (including the payment of reasonable fees and expenses of legal counsel) New Grace and its officers and directors for:

        o losses arising from the failure of New Sealed Air to pay the liabilities that it agreed to pay, or to perform obligations it agreed to perform, under the Distribution Agreement; and

        o losses arising from any untrue statement or alleged untrue statement of material fact, or any omission or alleged omission of a material fact required to be stated, in this Joint Proxy Statement/Prospectus, the New Sealed Air Registration Statement or the New Grace Registration Statement, in preliminary or final form, related to Sealed Air and provided by Sealed Air specifically for use therein or relating to New Sealed Air after the Merger.

        Under the Grace Charter and the Sealed Air Charter, officers and directors will also be indemnified by their respective corporations to the fullest extent permitted under Delaware Law. In addition, under the Grace Charter, no director of Grace will be personally liable for monetary damages for breach of fiduciary duty as a director except for: (i) any breach of the duty of loyalty to Grace or its stockholders; (ii) acts or omissions in bad faith or which involve intentional misconduct or knowing violation of the law; (iii) liabilities under Section 174 of the Delaware Law, which creates liability for directors for unlawful payment of dividends or unlawful stock purchases or redemptions; and (iv) any transaction from which the director derived an improper personal benefit. The certificate of incorporation and by-laws of New Grace and New Sealed Air are expected to contain similar provisions.

Sealed Air Officers' and Directors' Interests under Stock Plans

        Certain members of Sealed Air's management and Board of Directors own shares issued under Sealed Air's Contingent Stock Plan or its Restricted Stock Plan for Non-Employee Directors that continue to be subject to restrictions on transfer and, under the Contingent Stock Plan, subject to repurchase options. Under the provisions of those plans as in effect prior to the approval of the Merger, the transfer restrictions and repurchase options would cease to apply upon consummation of the Merger. The Sealed Air Board has amended those plans so that the transfer restrictions and repurchase options will continue, notwithstanding the Merger.

Grace Officers' Ownership of Grace Stock Options

XXX-002380

Officers of Grace own options to purchase Grace common stock that are exercisable prior to the Reorganization and Merger. If these options are exercised prior to the Reorganization and Merger, the shares acquired upon exercise will be treated the same as shares owned by other Grace stockholders. If they are not exercised, these options will be converted into options to purchase common stock of the company that the officer will join following the Merger, as described on page 71. As a result, officers holding Grace options that are exercisable prior to the Reorganization and Merger may choose whether to invest in both New Sealed Air and New Grace, or only in the company that they will join after the Merger, among other factors that may influence their decision to exercise options.

### THE SPECIAL MEETINGS

This Joint Proxy Statement/Prospectus is furnished in connection with the solicitation of proxies (i) from the holders of Sealed Air common stock by the Sealed Air Board for use at the Sealed Air Special Meeting; and (ii) from the holders of Grace common stock by the Grace Board for use at the Grace Special Meeting. This Joint Proxy Statement/Prospectus and accompanying form of proxy are first being mailed to the respective stockholders of Sealed Air and Grace on or about February 17, 1998.

Times and Places; Purposes

The Sealed Air Special Meeting will be held at Saddle Brook Marriott, Garden State Parkway at I-80, Saddle Brook, New Jersey 07663, on March 23, 1998, starting at 11:00 a.m. local time. At the Sealed Air Special Meeting (and any adjournment or postponement thereof), Sealed Air's stockholders will be asked to consider and vote upon the approval and adoption of the Merger Agreement (the "Sealed Air Merger Proposal"). Representatives from KPMG Peat Marwick LLP, independent certified public accountants for Sealed Air, are expected to be present at the Sealed Air Special Meeting, to have the opportunity to make a statement if they so desire, and to be available to respond to appropriate questions.

The Grace Special Meeting will be held at Grace's offices, located at One Town Center Road, Boca Raton, Florida 33486, on March 20, 1998, starting at 10:00 a.m. local time. At the Grace Special Meeting (and any adjournment or postponement thereof), Grace's stockholders will be asked to consider and vote upon:

       (1) the approval and adoption of the Merger Agreement (which will constitute approval of the Reorganization, Merger and other transactions contemplated thereby, including the Spin-off of New Grace, the amendment and restatement of the Grace Charter (other than the repeal of the Supermajority Provisions), the Recapitalization of Grace common stock and the issuance of shares of New Sealed Air common stock in the Merger) (collectively, the "Grace Merger Proposal"),

       (2) the approval and adoption of an amendment repealing the Supermajority Provisions (the "Grace Special Charter Proposal", and together with the Grace Merger Proposal, the "Grace Proposals").

Representatives from Price Waterhouse LLP, independent certified public accountants for Grace, are expected to be present at the Grace Special Meeting, to have the opportunity to make a statement if they so desire, and to be available to respond to appropriate questions.

Record Date; Voting Rights; Votes Required for Approval

       Sealed Air

The Sealed Air Board has fixed the close of business on February 17, 1998 (the "Sealed Air Record Date") as the record date for Sealed Air's stockholders entitled to notice of and to vote at the Sealed Air Special Meeting.

Only holders of record of shares of Sealed Air common stock on the Sealed Air Record Date are entitled to notice of and to vote at the Sealed Air Special Meeting. Each holder of record of Sealed Air common stock as of the Sealed Air Record Date is entitled to cast one vote per share on all matters submitted to Sealed Air's stockholders.

On February 13, 1998, there were 42,624,246 shares of Sealed Air common stock outstanding and entitled to vote at the Sealed Air Special Meeting.

The presence, in person or by proxy, of the holders of a majority of the outstanding shares of Sealed Air common stock entitled to vote is necessary to constitute a quorum at the Sealed Air Special Meeting. The affirmative vote of the holders of a majority of the outstanding shares of Sealed Air common stock is required to approve and adopt the Sealed Air Merger Proposal.

The directors and officers of Sealed Air beneficially own approximately 6.3% of Sealed Air's outstanding common stock. For additional information on the ownership of Sealed Air common stock by Sealed Air directors and executive officers, see "Security Ownership of Certain Beneficial Owners" on page 87.

       Grace

XXX-002381

The Grace Board has fixed the close of business on February 11, 1998 as the record date (the "Grace Record Date") for Grace's stockholders entitled to notice of and to vote at the Grace Special Meeting.

Only holders of record of shares of Grace common stock on the Grace Record Date are entitled to notice of and to vote at the Grace Special Meeting. Each holder of record of Grace common stock as of the Grace Record Date is entitled to cast one vote per share on all matters submitted to Grace's stockholders.

On the Grace Record Date, there were 74,796,863 shares of Grace common stock outstanding and entitled to vote at the Grace Special Meeting.

The presence, in person or by proxy, of the holders of a majority of the outstanding shares of Grace common stock entitled to vote is necessary to constitute a quorum for purposes of voting on the Grace Proposals. The affirmative vote of the holders of a majority of the outstanding shares of Grace common stock is required to approve the Grace Merger Proposal. The affirmative vote of the holders of 80% of the outstanding shares of Grace common stock is required to approve and adopt the Grace Special Charter Proposal.

The directors and officers of Grace beneficially own less than 1% of Grace's outstanding common stock. For additional information on the ownership of Grace common stock by Grace directors and executive officers, see "Security Ownership of Certain Beneficial Owners" on page 87.

Proxies

All shares of common stock of Sealed Air and Grace represented by properly executed proxies received prior to or at the applicable Special Meeting and not revoked will be voted in accordance with the instructions indicated in such proxies. If no instructions are indicated on a properly executed returned proxy, such proxies will be voted FOR the approval of the Sealed Air Merger Proposal or the Grace Proposals, as the case may be.

Abstentions may be specified on all proposals. A properly executed proxy marked "ABSTAIN" with respect to any proposal will be counted as present for purposes of determining whether there is a quorum and for purposes of determining the aggregate voting power and number of shares represented and entitled to vote at the applicable Special Meeting with respect to the indicated proposal. Because the affirmative votes described above are required for approval of the Sealed Air Merger Proposal and the Grace Proposals, a proxy marked "ABSTAIN" with respect to any such proposal will have the effect of a vote against such proposal. In addition, the failure of a stockholder of Sealed Air or Grace to return a proxy will have the effect of a vote against the Sealed Air Merger Proposal or the Grace Proposals, respectively.

Under New York Stock Exchange rules, brokers who hold shares in street name for customers have the authority to vote on certain "routine" proposals when they have not received instructions from beneficial owners. Under New York Stock Exchange rules, such brokers are precluded from exercising their voting discretion with respect to proposals for non-routine matters such as the Sealed Air Merger Proposal and the Grace Proposals. Thus, absent specific instructions from the beneficial owner of such shares, brokers are not empowered to vote such shares with respect to the approval and adoption of the Sealed Air Merger Proposal or the Grace Proposals (i.e., "broker non-votes"). Since the affirmative votes described above are required for approval of the Sealed Air Merger Proposal and the Grace Proposals, a "broker non-vote" with respect to such proposals will have the effect of a vote against such proposals.

A stockholder may revoke his or her proxy at any time prior to its use by delivering to the Secretary of Sealed Air or Grace, as the case may be, a signed notice of revocation or a later-dated, signed proxy or by attending the applicable Special Meeting and voting in person. Attendance at the Sealed Air Special Meeting or the Grace Special Meeting will not in itself constitute the revocation of a proxy.

The cost of solicitation of proxies will be paid by Sealed Air for Sealed Air proxies and by Grace for Grace proxies. In addition to solicitation by mail, arrangements will be made with brokerage houses and other custodians, nominees and fiduciaries to send the proxy materials to beneficial owners; and Sealed Air or Grace, as the case may be, will, upon request, reimburse such brokerage houses and custodians for their reasonable expenses in so doing. Sealed Air has retained Morrow and Co., Inc., for a fee of $7,500 (plus expenses) and Grace has retained D.F. King & Co., Inc. for a fee of $13,000 (plus expenses) to aid in the solicitation of proxies and to verify certain records related to the solicitations. To the extent necessary in order to ensure sufficient representation at its Special Meeting, Sealed Air, Grace or their proxy solicitors may request the return of proxy cards by personal interview, mail, telephone, facsimile or other means of electronic transmission. The extent to which this will be necessary depends entirely upon how promptly proxy cards are returned. Stockholders are urged to send in their proxies without delay.

Stockholders should not send in any stock certificates with their proxy cards. As soon as practicable after the consummation of the Merger, a transmittal form will be sent to former stockholders of Sealed Air with instructions for receiving New Sealed Air common stock, and a transmittal form will be sent to former stockholders of Grace with instructions for surrendering Grace common stock certificates in exchange for New Sealed Air common and convertible preferred stock. Stockholders will receive uncertificated shares of New Sealed Air stock recorded in book-entry form unless they request certificated shares. New Grace common stock certificates will be sent to former stockholders of Grace as soon as practicable after the Spin-off without any action on their part.

XXX-002382

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS

Security Ownership of Sealed Air

The following table sets forth the number and percentage of outstanding shares of Sealed Air common stock beneficially owned, directly or indirectly, as of February 4, 1998 by: (i) each person known to Sealed Air to be the beneficial owner of more than five percent of the then outstanding shares of Sealed Air common stock, (ii) each director of Sealed Air and each executive officer of Sealed Air named in the Summary Compensation Table set forth in the Sealed Air 1997 Proxy Statement (other than those who have since resigned as executive officers), and (iii) all directors and executive officers of Sealed Air as a group. Except as indicated below, none of the directors or executive officers listed below beneficially owns more than 1% of the outstanding shares of Sealed Air common stock.

| Beneficial Owner | Shares of Sealed Air Common Stock Beneficially Owned | % of Outstanding Common Stock |
| --- | --- | --- |
| The Equitable Companies Incorporated (1)........ <br> 787 Seventh Avenue <br> New York, New York 10019 | 4,391,465 | 10.3 |
| Janus Capital Corporation (2)................... <br> 100 Fillmore Street, Suite 300 <br> Denver, Colorado 80206-4923 | 3,495,100 | 8.2 |
| FMR Corp. (3)................................... <br> 82 Devonshire Street <br> Boston, Massachusetts 02109 | 4,746,500 | 11.1 |
| Travelers Group Inc. (4)....................... <br> 388 Greenwich Street <br> New York, New York 10013 | 2,325,086 | 5.5 |
| John K. Castle................................. | 12,936 | * |
| Lawrence R. Codey.............................. | 5,800 | * |
| T. J. Dermot Dunphy............................ | 1,096,647 (5)(6) | 2.6 |
| Charles F. Farrell, Jr......................... | 24,600 (6) | * |
| David Freeman.................................. | 5,600 | * |
| William V. Hickey.............................. | 286,894 (5) | * |
| Alan H. Miller................................. | 502,710 (6) | 1.2 |
| Robert L. San Soucie........................... | 11,400 (6) | * |
| All directors and executive officers as a group (20 persons).............. | 2,694,029 (7) | 6.3 |

* Less than 1%.

(1) The ownership information set forth in the table is based in its entirety on material contained in a Schedule 13G, dated November 7, 1997, filed with the SEC by The Equitable Companies Incorporated ("Equitable Companies"), AXA-UAP, which beneficially owns a majority interest in Equitable Companies, and Mutuelles AXA, which as a group beneficially own a majority interest in AXA-UAP. The Schedule 13G stated that the shares were not acquired for the purpose of changing or influencing the control of Sealed Air. The shares are owned by the following subsidiaries of Equitable Companies in the amounts indicated: The Equitable Life Assurance Society of the United States, 36,600; Alliance Capital Management L.P., 4,350,565; DLJ, 100; and Wood, Struthers & Winthrop Management Corp., 4,200.

(2) The ownership information set forth in the table is based in its entirety on material contained in Amendment No. 1 to Schedule 13G, dated February 10, 1997, filed with the SEC by Janus Capital Corporation ("Janus"), which stated that the shares were not acquired for the purpose of changing or influencing the control of Sealed Air and indicated that Janus beneficially owned such shares, with shared voting and dispositive power as to such shares. Such Schedule 13G states that Thomas H. Bailey may be deemed to control Janus Capital Corporation and to be a beneficial owner of such shares, which beneficial ownership Mr. Bailey specifically disclaims.

(3) The ownership information set forth in the table is based in its entirety on material contained in Amendment No. 3 to Schedule 13G, dated February 14, 1997, filed with the SEC by FMR Corp. ("FMR"), which stated that the shares were not acquired for the purpose of changing or influencing the control of Sealed Air and indicated that FMR had sole voting power as to 25,500 shares and sole dispositive power as to 4,746,500 shares. Such Schedule 13G indicates that Fidelity Management & Research Company ("Fidelity"), a wholly-owned subsidiary of FMR, beneficially owns 4,630,400 of such shares (as to which shares Edward C. Johnson 3d, chairman of FMR, and Fidelity Funds each have sole power of disposition). The power to vote these shares

XXX-002383

resides with the Board of Trustees of Fidelity Funds. Of the shares beneficially owned by FMR, Fidelity Management Trust Company, a wholly owned subsidiary of FMR, is the beneficial owner of 116,100 shares, of which Mr. Johnson and FMR have sole dispositive power over 116,100 shares and sole voting power over 25,500 shares. Such Schedule 13G states that members of the family of Mr. Johnson may be deemed to control FMR.

(4) The ownership information set forth in the table is based in its entirety on material contained in a Schedule 13G, dated February 6, 1998, filed with the SEC by Travelers Group Inc. ("Travelers"), and its wholly owned subsidiary Saloman Smith Barney Holdings Inc. ("SSB Holdings"). The Schedule 13G stated that Travelers has shared voting power and shared dispositive power as to 2,325,086 shares, of which 2,308,286 are held by SSB Holdings, and that the shares were not acquired for the purpose of changing or influencing the control of Sealed Air.

(5) This figure includes approximately 67,297, 13,294 and 139,962 shares of common stock held in Sealed Air's Profit-Sharing Plan trust fund with respect to which Messrs. Dunphy and Hickey and the executive officers of Sealed Air who participate in such Plan as a group, respectively, may, by virtue of their participation in such Plan, be deemed to be beneficial owners. The participants in such Plan include, in general, all full-time employees of Sealed Air except employees who are covered by collective bargaining agreements that do not provide for their participation. As of February 4, 1997, approximately 2,172,125 shares of Sealed Air common stock were held in the trust fund under such Plan, constituting approximately 5.1% of the outstanding shares of Sealed Air common stock. Sealed Air has been advised that Bankers Trust Company, the trustee of such Plan, does not deem itself the beneficial owner of the shares of Sealed Air common stock held as trustee of such Plan.

(6) The number of shares held by Mr. Dunphy includes 81,600 shares held by him as custodian for certain of his children and 34,250 shares held by a charitable foundation for which he shares voting and investment power. The number of shares held by Mr. Farrell includes 11,200 shares held in a revocable retirement trust of which he is the trustee and sole beneficiary. All but 1,200 of the shares held by Mr. Miller are held indirectly through a limited partnership for which he shares voting and investment power. Mr. San Soucie shares investment and voting power as to 3,120 of the shares beneficially owned by him with his wife.

(7) This figure includes, without duplication, all of the outstanding shares referred to in notes 4 and 5 above as well as 12,400 shares for which voting and investment power is shared by an executive officer of Sealed Air and 3,580 shares held by or for family members of executive officers of Sealed Air who are not named in the above table.

### Security Ownership of Grace

The following table sets forth the Grace common stock beneficially owned, directly or indirectly, as of December 31, 1997 by: (i) each person known to Grace to be the beneficial owner of more than five percent of the then outstanding shares of Grace common stock; (ii) current directors and each of the executive officers named in the Summary Compensation Table set forth in the Grace 1997 Proxy Statement (other than those who have resigned); and (iii) all directors and executive officers of Grace as a group. The table includes shares owned by (1) those persons and their spouses, minor children and certain relatives, (2) trusts and custodianships for their benefit and (3) trusts and other entities as to which the persons have the power to direct the voting or investment of securities (including shares as to which the persons disclaim beneficial ownership). The table also includes shares in accounts under Grace's Savings and Investment Plan and shares covered by currently exercisable stock options; it does not reflect shares covered by unexercisable stock options. The Grace common stock owned by directors and executive officers as a group (excluding option shares) as of December 31, 1997 represents less than 1% of the Grace common stock outstanding as of that date.

| Beneficial Owner | Shares of Grace Common Stock Beneficially Owned | |
| --- | --- | --- |
| FMR Corp(+)..................................... 82 Devonshire Street Boston Massachusetts 02109 | 7,379,887 | |
| Lincoln Capital Management Company(++)........... 200 South Wacker Drive, Suite 2100 Chicago, Illinois 60606 | 7,332,200 | |
| J.F. Akers...................................... | 1,205 | |
| | 504 | (T) |
| R.H. Beber...................................... | 7,673 | |
| | 198,338 | (O) |
| H. Brown........................................ | 1,139 | |
| | 153 | (T) |
| C. Cheng........................................ | 139 | |
| | 140 | (T) |
| A.J. Costello................................... | 32,776 | |
| | 31,123 | (T) |
| | 336,375 | (O) |
| H.A. Eckmann.................................... | 3,690 | |
| | 1,997 | (T) |

XXX-002384

| | | |
|---|---|---|
| L. Ellberger..................................... | 1,662 | |
| | 14,502 | (T) |
| | 91,132 | (O) |
| M.A. Fox ....................................... | 964 | |
| | 135 | (T) |
| J.W. Frick...................................... | 3,489 | |
| | 76 | (T) |
| T.A. Holmes..................................... | 4,421 | |
| | 1,261 | (T) |
| J.R. Hyde....................................... | 9,090 | |
| | 184,127 | (O) |
| V.A. Kamsky..................................... | 2,931 | |
| J.J. Murphy..................................... | 1,139 | |
| | 414 | (T) |
| J.E. Phipps..................................... | 11,921 | |
| | 17,450 | (T)(S) |
| | 3,860 | (T) |
| T.A. Vanderslice................................ | 1,731 | |
| | 1,058 | (T) |
| Various directors, executive officers and others, as Trustees...................... | 2,696 | (T)(S) |
| Directors and executive officers as a group.................................. | 89,911 | |
| | 65,244 | (T) |
| | 20,146 | (T)(S) |
| | 965,123 | (O) |

(+) The shares owned by FMR Corp. represent 9.9% of the Grace common stock outstanding as of December 1, 1997. The ownership information set forth in the table is based in its entirety on material contained in a Schedule 13G, dated August 8, 1997, filed with the SEC by FMR Corp., which stated that the securities were not acquired for the purpose of changing or influencing the control of Grace. With respect to the shares held, such shareholder stated in such Schedule 13G that it has sole voting power as to 64,107 shares and sole dispositive power as to 7,379,887.

(++) The shares owned by Lincoln Capital Management Company represent approximately 9.9% of the Grace common stock outstanding as of December 1, 1997. The ownership information set forth in the table is based in its entirety on material contained in a Schedule 13G, dated April 28, 1997, filed with the SEC by Lincoln Capital Management Company, which stated that the securities were not acquired for the purpose of changing or influencing the control of Grace. With respect to the shares held, such shareholder stated in such Schedule 13G that it has sole voting power as to 3,583,300 shares and sole dispositive power as to 7,332,200.

(T) Shares owned by trusts and other entities as to which the person either has the power to direct voting and/or investment or is a beneficiary.

(O) Shares covered by stock options exercisable on or within 60 days after December 31, 1997.

(S) Shares as to which the person shares voting and/or investment power with others.

### DESCRIPTION OF CAPITAL STOCK OF NEW SEALED AIR

        The following summary of the material terms of the capital stock of New Sealed Air does not purport to be complete and is qualified by reference to the New Sealed Air Charter and the bylaws of New Sealed Air (the "New Sealed Air Bylaws"). The form of the New Sealed Air Charter is attached as Annex E to this Joint Proxy Statement/Prospectus. The New Sealed Air Bylaws will be substantially the same as Sealed Air's existing bylaws, which are incorporated by reference herein and will be sent to Sealed Air and Grace stockholders upon request. See "Where You Can Find More Information" on page 100.

Authorized Capital Stock

        Under the New Sealed Air Charter, the authorized capital stock will consist of 400 million shares of common stock, par value $0.10 per share, and 50 million shares of preferred stock, par value $0.10 per share.

New Sealed Air Common Stock

        Each share of New Sealed Air common stock will be entitled to one vote on all matters submitted to a vote of stockholders. Dividends on shares of New Sealed Air common stock may be declared by the New Sealed Air Board from the surplus or net profits of New Sealed Air to the extent such funds are legally available for the payment of dividends. New Sealed Air common stock will have no preemptive, conversion or similar rights, nor will it have cumulative voting rights. Outstanding shares of New Sealed Air common stock will not be subject to any calls or assessments. There will be no redemption rights.

        In the event of the liquidation of New Sealed Air, holders of New Sealed Air common stock will be entitled to share on a pro rata basis in all of its remaining assets and funds available for distribution under such liquidation, subject to the payment in full of all claims of creditors and prior rights of any class or series of preferred stock then outstanding. The rights of holders of New Sealed Air common stock may only be modified by a vote of a majority of the shares outstanding or through the issuance of preferred stock as authorized in the New Sealed Air Charter.

XXX-002385

New Sealed Air Preferred Stock

General

Under the New Sealed Air Charter, preferred stock may be issued from time to time in one or more series. Preferred stock will have the powers, designations, preferences and other rights and qualifications, limitations and restrictions stated in the New Sealed Air Charter and otherwise as fixed by the New Sealed Air Board. Except as otherwise fixed by the New Sealed Air Board or as required by law, the New Sealed Air Charter provides that holders of preferred stock of any series are entitled to one vote per share held, are entitled to vote share for share with the holders of New Sealed Air common stock without distinction as to class and are not entitled to vote separately as a class or series of a class. Unless otherwise fixed by the New Sealed Air Board, all series of preferred stock will rank equally and will be identical in all respects. All shares of any one series of preferred stock must be identical with each other in all respects, except that shares of any one series issued at different times may differ as to the dates on which dividends thereon accumulate. The number of shares of preferred stock authorized to be issued may be increased or decreased from time to time by the affirmative vote of the holders of a majority of the stock of New Sealed Air entitled to vote, and the holders of the preferred stock will not be entitled to vote separately as a class or series of a class on any such increase or decrease.

Convertible Preferred Stock

As part of the Recapitalization, Grace stockholders will be issued an aggregate of 36 million shares of voting convertible preferred stock, which will become (with the consummation of the Merger) series A preferred stock of New Sealed Air. The convertible preferred stock's powers, designations, preferences and other rights and qualifications, limitations and restrictions are summarized below.

Dividends

Holders of convertible preferred stock will be entitled to receive a cash dividend at an annual rate of $2.00 per share, payable quarterly in arrears. Dividends on the convertible preferred stock are fully cumulative, accruing, without interest, from the most recent date on which dividends have been paid, or if none have been paid, from the date of original issuance of the convertible preferred stock.

The convertible preferred stock will have priority as to dividends over New Sealed Air common stock and any other series or class of New Sealed Air preferred stock that ranks junior to it ("Junior Securities"). The convertible preferred stock will rank on a parity with all classes or series of capital stock (other than common stock) of New Sealed Air that do not by their terms expressly provide that they rank senior or junior to the convertible preferred stock ("Parity Securities").

So long as the convertible preferred stock is outstanding, no dividends (other than dividends payable solely in common stock, other Junior Securities, or warrants or other rights to acquire such common stock or other Junior Securities) may be paid or declared and set apart for payment on, and no purchase, redemption or other acquisition will be made by New Sealed Air of any common stock or other Junior Securities unless and until all accrued and unpaid dividends on the convertible preferred stock, including the full dividend for the current quarterly dividend period, is paid or declared and set apart for payment.

In general, New Sealed Air may not pay dividends on Parity Securities unless it has paid or declared and set apart for payment (or contemporaneously pays or declares and sets apart for payment) all accrued and unpaid dividends on the convertible preferred stock, for all prior dividend payment periods, and New Sealed Air may not pay dividends on the convertible preferred stock unless it has paid or declared and set apart for payment (or contemporaneously pays or declares and sets apart for payment) all accrued and unpaid dividends on Parity Securities, for all prior dividend periods. However, until all accrued dividends in respect of prior dividend payment periods are paid in full on the convertible preferred stock and on all Parity Securities, New Sealed Air may declare and pay dividends on the convertible preferred stock and the Parity Securities, but only if the dividends are declared and paid ratably in proportion to the respective amounts of accrued and unpaid dividends on the convertible preferred stock and the Parity Securities.

New Sealed Air may not, directly or indirectly, purchase or redeem any shares of Parity Securities (except for consideration payable in common stock or other Junior Securities) unless all accrued and unpaid dividends on the convertible preferred stock for all prior dividend periods have been paid or declared and set apart for payment.

If New Sealed Air issues any series or class of stock that ranks senior to the convertible preferred stock ("Senior Securities"), New Sealed Air may not pay or declare and set apart for payment any dividends on the convertible preferred stock unless and until all accrued and unpaid dividends on the Senior Securities, including the full dividends for the then current dividend period, have been paid or declared and set apart for payment (except to the extent allowed by the terms of the Senior Securities).

Liquidation Rights

The liquidation value of the convertible preferred stock, in the case of a voluntary or involuntary liquidation, dissolution or winding-up of New Sealed Air, is $50.00 per share, plus an amount equal to the accrued and unpaid dividends, whether or not declared, to (but not including) the payment date (the

XXX-002386

"Liquidation Value").

If there is a voluntary or involuntary liquidation, dissolution or winding up of New Sealed Air, holders of convertible preferred stock will not be entitled to receive the Liquidation Value of their shares until the liquidation preference of all Senior Securities, if any, and any creditors of New Sealed Air have been paid in full. Subject to the payment in full, or provision for the payment in full, of all claims of creditors of New Sealed Air, and the liquidation preference of all Senior Securities, holders of convertible preferred stock will be entitled to receive the Liquidation Value of the convertible preferred stock before any payment or distribution is made to the holders of New Sealed Air common stock or any other Junior Securities. Once payment in full of the Liquidation Value of the convertible preferred stock is made to holders thereof, the holders of convertible preferred stock will not be entitled to any further participation in any distribution of assets of New Sealed Air. The holders of convertible preferred stock and any Parity Securities will be entitled to share ratably, in accordance with the respective liquidation preferences payable on their stock, in any distribution (after payment of all claims of creditors and the liquidation preference on any Senior Securities) that is not sufficient to pay in full the aggregate liquidation preference on both the convertible preferred stock and on any Parity Securities.

Voting Rights

The holders of the convertible preferred stock will be entitled to vote on all matters submitted to a vote of the holders of New Sealed Air common stock, voting together with the holders of New Sealed Air common stock as one class, and will be entitled to notice of any stockholders' meeting in accordance with the New Sealed Air Charter and the New Sealed Air Bylaws. Each share of convertible preferred stock will be entitled to the number of votes equal to the number of shares of New Sealed Air common stock into which such share of convertible preferred stock could be converted on the record date for determining the stockholders entitled to vote.

If dividends payable on the convertible preferred stock are in arrears and unpaid for six quarterly periods, or if New Sealed Air fails to redeem the convertible preferred stock on the twentieth anniversary of the Effective Time, the number of directors serving on the New Sealed Air Board will be increased by two and the holders of shares of convertible preferred stock, voting as a single class with the holders of shares of all other series of preferred stock upon which like voting rights have been conferred and are exercisable, will have the right to vote for the election of the two additional directors to serve on the New Sealed Air Board. The right of the holders of convertible preferred stock and such other series of preferred stock to vote for the election of two directors will, when vested, continue until all dividends in arrears on the convertible preferred stock and such other series of preferred stock have been paid in full or declared and set aside for payment (or the mandatory redemption obligation has been satisfied, as the case may be), at which time the term of office of all directors so elected shall terminate and the number of directors on the New Sealed Air Board will be reduced accordingly.

In addition, for so long as any shares of convertible preferred stock are outstanding, (1) the written consent or affirmative vote of at least two-thirds of the outstanding shares of convertible preferred stock, voting as a single class, will be necessary to amend, alter or repeal any provision of the New Sealed Air Charter in a manner that materially and adversely affects the preferences, rights or powers of the convertible preferred stock (provided that any such amendment, alteration or repeal that would create, authorize or issue any Junior Securities or Parity Securities, or any security convertible into, or exchangeable or exercisable for, shares of Junior Securities or Parity Securities is deemed not to have any such material adverse effect); (2) the written consent or affirmative vote of at least two-thirds of the outstanding shares of convertible preferred stock and all other series of preferred stock upon which like voting rights have been conferred and are exercisable, voting as a single class regardless of series, will be necessary to create, authorize or issue any Senior Securities, or any security convertible into, or exchangeable or exercisable for, shares of Senior Securities; and (3) the written consent or affirmative vote of a majority of the outstanding shares of convertible preferred stock and all other series of preferred stock upon which like voting rights have been conferred and are exercisable, voting as a single class regardless of series, will be necessary to create, authorize or issue any new class of Parity Securities (provided that requirement will not limit the right of New Sealed Air to issue Parity Securities in connection with any merger in which New Sealed Air is the surviving entity). Notwithstanding the consent or voting requirements summarized in this paragraph, no such consent or vote of holders of the convertible preferred stock will be required if provision is made for the redemption of all shares of convertible preferred stock at the time outstanding.

The holders of convertible preferred stock will not have any voting rights except as summarized above or as required by law.

Redemption at Option of New Sealed Air

The convertible preferred stock may not be redeemed before the third anniversary of the Effective Time. From the third anniversary until the fifth anniversary of the Effective Time, New Sealed Air may redeem shares of convertible preferred stock only if the last reported sales price of a share of New Sealed Air common stock in its principal trading market for any 20 trading days within a period of 30 consecutive trading days ending on the trading day before the date of mailing the notice of redemption is at least $70.6563. Subject to this restriction, New Sealed Air may redeem for cash the convertible preferred stock, in whole or in part at its option, after the third anniversary of the Effective Time at the applicable Redemption Price shown below, plus accrued but unpaid dividends to (but not including) the payment date.

XXX-002387

| Redemption Between Anniversaries | Redemption Price |
|---|---|
| 3 and 4 | $51.40 |
| 4 and 5 | $51.20 |
| 5 and 6 | $51.00 |
| 6 and 7 | $50.80 |
| 7 and 8 | $50.60 |
| 8 and 9 | $50.40 |
| 9 and 10 | $50.20 |
| Thereafter | $50.00 |

### Mandatory Redemption

The convertible preferred stock is subject to mandatory redemption (subject to contractual and other restrictions and to the legal availability of funds therefor) in whole on the twentieth anniversary of the Effective Time, at a price of $50.00 per share in cash, plus accrued and unpaid dividends to (but not including) the payment date.

### Conversion Rights

Each holder of convertible preferred stock will have the right, at the holder's option, to convert any or all shares of convertible preferred stock into New Sealed Air common stock at any time at a conversion price (subject to customary antidilution adjustments) of $56.525 per share of underlying common stock of New Sealed Air. Accordingly, each share of convertible preferred stock will be convertible into 0.8845644 shares of New Sealed Air common stock, subject to certain adjustments. Cash will be paid in lieu of any fractional shares. If the convertible preferred stock is called for redemption, the conversion right with respect to the called shares of convertible preferred stock will terminate at the close of business on the business day preceding the redemption date.

## Transfer Agent and Registrar

First Chicago Trust Company of New York will be the transfer agent and registrar for the New Sealed Air common and convertible preferred stock.

## Stock Exchange Listing; Delisting and Deregistration of Sealed Air Common Stock

It is a condition to the Merger that the shares of New Sealed Air common and convertible preferred stock to be issued in the Recapitalization and Merger must be approved for listing on the New York Stock Exchange prior to the Effective Time, subject to official notice of issuance. If the Merger is consummated, Sealed Air common stock will cease to be listed on the New York Stock Exchange and will be deregistered under the Securities Exchange Act of 1934, as amended.

## COMPARISON OF STOCKHOLDER RIGHTS

### General

The rights of Sealed Air stockholders are currently governed by Delaware Law, the Sealed Air Charter and the bylaws of Sealed Air (the "Sealed Air Bylaws"). The rights of Grace's stockholders are currently governed by the Delaware Law, the Grace Charter and the by-laws of Grace (the "Grace By-laws"). As a condition to the Merger and as a transaction contemplated by the Merger Agreement, Grace's stockholders have been asked to approve and adopt the New Sealed Air Charter (for further information concerning the Grace Charter Proposal, see "The New Sealed Air Charter" on page 37). Also, following the Merger, the New Sealed Air Board will repeal the Grace By-laws and adopt the New Sealed Air Bylaws.

Accordingly, following the Merger, the rights of Sealed Air stockholders and Grace stockholders who become stockholders of New Sealed Air in the Merger will be governed by Delaware Law, the New Sealed Air Charter and the New Sealed Air Bylaws. The following is a summary of the principal differences between the current rights of Grace stockholders and those of New Sealed Air stockholders following the Merger. Because the New Sealed Air Charter and Bylaws are substantially the same as the Sealed Air Charter and Bylaws, the rights of Sealed Air's stockholders will not substantially change. To the extent Sealed Air's stockholders will have different rights following the Merger, the differences are also summarized below.

The following discussions are not intended to be complete and are qualified by reference to Delaware Law, the Sealed Air Charter, the Sealed Air Bylaws, the Grace Charter, the Grace By-laws and the proposed New Sealed Air Charter. Copies of the Sealed Air Charter, the Sealed Air Bylaws, the Grace Charter and the Grace By-laws are incorporated by reference herein and will be sent to Sealed Air and Grace stockholders upon request. See "Where You Can Find More Information" on page 100. The form of the New Sealed Air Charter is attached as Annex E to this Joint Proxy Statement/Prospectus. The New Sealed Air Bylaws will be substantially the same as the Sealed Air Bylaws.

Following the Spin-off, the rights of New Grace stockholders will be governed by Delaware Law, the Certificate of Incorporation of New Grace and the by-laws of New Grace, which are described in the New Grace Information Statement.

Comparison of Current Sealed Air Stockholder Rights and Current Grace

XXX-002388

Stockholder Rights with the Rights of New Sealed Air Stockholders Following the Merger

The rights of Sealed Air stockholders under the Sealed Air Charter and Sealed Air Bylaws prior to the Merger, and the rights of Grace stockholders under the Grace Charter and Grace By-laws prior to the Merger, will be substantially the same as the rights of New Sealed Air stockholders (including Sealed Air's stockholders and Grace stockholders who become New Sealed Air's stockholders as a result of the Merger) under the New Sealed Air Charter and New Sealed Air Bylaws after the Merger, with the following principal exceptions.

Authorized Capital Stock. The authorized capital stock of Grace consists of 300 million shares of common stock and 53 million shares of preferred stock, par value $0.01 per share. The authorized capital stock of Sealed Air consists of 125 million shares of common stock, par value $0.01 per share, and 1 million shares of preferred stock, no par value. The authorized capital of New Sealed Air will be 400 million shares of common stock and 50 million shares of preferred stock, each with a par value of $0.10 per share.

Board of Directors. Under the New Sealed Air Bylaws and the Sealed Air Bylaws, the number of directors may be fixed by an ordinary resolution of the board of directors, which requires a majority vote by a quorum of directors. A quorum is a majority of all directors in office at the time. The New Sealed Air Board will not be classified, and directors will have one-year terms. There will be no age limitation and no for-cause requirement for removing directors.

Under the Grace Charter and the Grace By-laws, the number of directors is fixed by resolution adopted by a majority of the entire board of directors, counting vacancies towards the total number of directors required for a majority. The board is divided into three classes, with each class having a staggered three-year term, and, subject to certain exceptions, no person may be nominated for election as a director after reaching age 70 or if such nominee would reach age 70 during his or her term. In accordance with Delaware Law, directors may not be removed by stockholders except for cause.

Indemnification; Breach of Fiduciary Duty by Directors. The New Sealed Air Charter and the Grace Charter provide that directors of the corporation will be indemnified by the corporation to the fullest extent permitted by Delaware Law. In addition, a director will not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability: (i) for breach of the director's duty of loyalty; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under Section 174 of the Delaware Law, which creates liability for a director for unlawful payment of dividends and unlawful stock purchases or redemptions; or (iv) for any transaction from which the director derives an improper personal benefit.

The Sealed Air Charter provides that a director will not be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, to the full extent permitted by law.

Interested Director or Officer Transactions. The New Sealed Air Charter and the Sealed Air Charter provide that a director or officer of the corporation may not be disqualified, by virtue of being a director or officer, from dealing or contracting with the corporation either as a vendor, purchaser or otherwise on the basis that the director or officer or any firm of which that director or officer is a member, or any corporation of which that director or officer is a stockholder, officer or director, is in any way interested in such transaction or contract, provided that such transaction or contract is or shall be authorized, ratified or approved either by a vote of (i) a majority of a quorum of the board of directors or of a committee thereof, without counting the interested director in such majority (although the interested director may be included in the quorum), or (ii) a majority of a quorum of the stockholders entitled to vote at any meeting. The New Sealed Air Charter further provides that no director or officer will be liable to the corporation for any profits realized from any transaction or contract authorized, ratified or approved by the board or stockholders solely because the director, or any firm of which the director is a member, or any corporation of which he or she is a stockholder, officer or director, was interested in such transaction or contract. Interested transactions may also be ratified or approved in any other manner permitted by law.

The Grace Charter has no similar provision, although interested transactions are governed by Delaware Law. Delaware Law provides that transactions will not be void or voidable solely due to the conflicting interest of directors or officers, so long as the transactions are ratified or approved by the board or stockholders, in the same manner as described in the preceding paragraph. Delaware Law does not prevent corporations from enacting bylaws or policies disqualifying an interested director or officer from transacting or contracting with the company.

Stockholder Rights Plan. Unlike Grace, Sealed Air does not have, and New Sealed Air does not currently intend to have, a stockholder rights plan.

Grace has entered into a Rights Agreement (the "Rights Agreement") with The Chase Manhattan Bank, as rights agent. Pursuant to the Rights Agreement, Grace has issued preferred share purchase rights (each, a "Right") to Grace's stockholders. One Right trades together with each outstanding share of Grace common stock, and entitles the registered holder, among other things, to purchase hundredths of a share of Grace Series A Junior Participating Preferred Stock (the "Junior Preferred Stock") from Grace at a price per hundredth of a share equal to 50% of the then current market price for

XXX-002389

Grace common stock if a person becomes an "Acquiring Person" (as defined in the Rights Agreement) and certain other events occur. The dividend, liquidation and voting rights of the Junior Preferred Stock are designed to give a hundredth of a share of Junior Preferred Stock a value approximately equal to the value of one share of Grace common stock. The Rights are redeemable by Grace in whole, but not in part, at $0.01 per Right. The Rights expire in 2006.

It is a condition to the Merger that the Grace Board must take such action as shall be required to render the Rights inapplicable to the Reorganization and Merger, and to terminate or redeem the Rights at or prior to the Effective Time.

Inspection of Books and Accounts. Under the New Sealed Air Charter and the Sealed Air Charter, the board of directors or the bylaws may determine the conditions under which stockholders may inspect the books and accounts of the corporation. Under the Grace Charter, the Grace Board may determine when, where and under what other conditions stockholders may inspect the books and accounts of the corporation. Stockholders only have such rights of inspection to the extent required by law, and additional rights may only be provided through a charter amendment.

Stockholder Proposals. No notice procedures are designated in the New Sealed Air Charter or Bylaws or the Sealed Air Charter or Bylaws for stockholder proposals.

Under the Grace By-laws, stockholder proposals at annual meetings may only be made by a stockholder of record at the time of the giving of the notice for the meeting who is eligible to vote at the meeting and who follows the notice procedures set forth in the Grace By-laws. The notice procedures require the stockholder to notify the Secretary of Grace in writing of his or her nominations for directors or other business to be brought before the annual meeting. The stockholder notice to the Secretary must be delivered between 60 and 90 days before the anniversary of the prior year's annual meeting, unless the annual meeting will be held more than 30 days before or 60 days after the date of the prior year's annual meeting, in which case the notice must be delivered between 60 and 90 days before the date of the annual meeting, or by the 10th day following public announcement of the date of the annual meeting. Such stockholder notice must set forth, as applicable, information concerning the persons to be nominated as directors, a description of the business to be brought before the annual meeting, the name and address of the stockholder or beneficial owner giving the notice, and share ownership information. Under similar notice procedures, stockholders may also nominate persons for election to the board when elections are called for at special meetings of the stockholders.

Special Meetings of Stockholders. Under the New Sealed Air Bylaws and the Sealed Air Bylaws, special meetings of the stockholders may be called by the Chairman of the Board, by the Chief Executive Officer, by resolution of the Board of Directors, or by the request in writing of stockholders owning a majority of the entire capital stock issued and outstanding and entitled to vote.

Under the Grace By-laws, special meetings of stockholders may only be called by the Chairman of the Board of Directors, the President or the Board of Directors pursuant to a resolution adopted by a majority of the entire board of directors, counting vacancies towards the total number of directors required for a majority.

Stockholder Action by Written Consent. The New Sealed Air Charter and the Sealed Air Charter permit stockholders to act by written consent on any corporate action on which a vote of stockholders at a stockholder meeting is required or permitted. The written consent for such action must be signed by holders of at least a majority of the stock that would have been entitled to vote upon such corporate action if a meeting were held, or higher minimum percentage approval, if required by the New Sealed Air Charter or by statute for the proposed corporate action. All stockholders must be given prompt notice of any corporate action taken that was authorized without a meeting and by less than unanimous written consent.

Under the Grace Charter, stockholder action may not be taken by written consent.

Amendment of Corporate Charter and Bylaws. Any amendment to the New Sealed Air Charter and the Sealed Air Charter requires approval by a majority of the board and the holders of at least a majority of the voting power of the issued and outstanding stock entitled to vote thereon. Any amendment of the New Sealed Air Bylaws or the Sealed Air Bylaws will require either the approval by the majority of the entire board of directors or the approval of a majority of all the stock issued and outstanding and entitled to vote thereon. The board of directors may amend any bylaw adopted by the stockholders, but the stockholders may specify that certain provisions of the bylaws may not be amended by the board of directors. The New Sealed Air Charter and Sealed Air Charter do not require that any charter amendment be approved by more than a majority of the voting power of the issued and outstanding stock entitled to vote.

Generally, any amendment of the Grace Charter requires approval by a majority of the entire board of directors, counting vacancies toward the total number of directors required for a majority, and the holders of a majority of the voting power of the issued and outstanding stock entitled to vote thereon. Any amendment of the Grace By-laws requires either the approval of a majority of a quorum of the board of directors, a quorum being a majority of the entire board of directors, counting vacancies toward the total number of directors, or the approval of 80% of the voting power of the issued and outstanding stock entitled to vote thereon ("Supermajority Approval"). The Grace

XXX-002390

Charter requires Supermajority Approval for three types of amendments to the charter: (i) those amending, repealing or adopting provisions inconsistent with the charter provision requiring Supermajority Approval for stockholder amendment to the bylaws, (ii) those amending, repealing or adopting provisions inconsistent with the charter provision prohibiting stockholder action by written consent; and (iii) those amending, repealing or adopting provisions inconsistent with Article VIII of the Grace Charter. Article VIII provides that (a) the number of directors may be changed from time to time and in the manner prescribed in the Grace By-laws; (b) the election of directors need not be by written ballot unless the Grace By-laws so require; (c) the board must be classified into three classes, with each class holding a staggered three-year term; and (d) any director may be removed from office at any time by the stockholders, but only for cause.

Compromise or Arrangement Between Corporation and Creditors or Stockholders. The New Sealed Air Charter and the Sealed Air Charter incorporate the provisions described in Section 102(b)(2) of the Delaware Law, which provides for compromises or arrangements between the corporation and its creditors or stockholders. Section 102(b)(2) states that whenever a compromise or arrangement is proposed between the corporation and its creditors or any class of them and/or between the corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of the corporation or any of its creditors or stockholders or on the application of any receiver or receivers appointed for the corporation under the provisions of Section 291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for the corporation under the provisions of Section 279 of Title 8 of the Delaware Code, order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the corporation, as the case may be, to be summoned in such manner as the court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of the corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of the corporation as a consequence of such compromise or arrangement, the compromise or arrangement and the reorganization shall, if sanctioned by the court to which the application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of the corporation, as the case may be, and also on the corporation.

The Grace Charter does not incorporate Section 102(b)(2) of the Delaware Law.

Certain Rights Under the New Sealed Air Charter if the Grace Special Charter Proposal is Not Approved. If the Grace Special Charter Proposal is not approved, the Supermajority Provisions will not be repealed. In this case, the stockholder rights under the New Sealed Air Charter would differ from the rights described above in the following respects:

    (1)  Instead of having annual terms, the directors of New Sealed Air would be divided into three classes, with each class having a staggered three-year term.

    (2)  Stockholder action by written consent would not be permitted.

    (3)  Stockholder amendments to the New Sealed Air Bylaws would require Supermajority Approval.

    (4)  Supermajority Approval would be required to amend, repeal or adopt any charter provisions inconsistent with the charter provisions providing for (1), (2) and (3) above.

### LEGAL MATTERS

The validity of the New Sealed Air common stock and convertible preferred stock to be issued to Sealed Air's stockholders and Merger will be passed upon by Wachtell, Lipton, Rosen & Katz, special counsel to Grace, located at 51 West 52nd Street, New York, New York 10019. It is a condition to the consummation of the Merger that Sealed Air receive an opinion from Davis Polk & Wardwell, located at 450 Lexington Avenue, New York, New York 10017, with respect to the tax treatment of the Merger and that Grace receive an opinion from Wachtell, Lipton, Rosen & Katz with respect to the tax treatment of the Reorganization. See "The Reorganization and Merger--Certain United States Federal Income Tax Consequences" and "The Distribution and Merger Agreements--Conditions to the Reorganization and Merger" on pages 34 and 74, respectively.

### EXPERTS

The Grace Packaging special-purpose combined financial statements included in this Joint Proxy Statement/Prospectus have been audited by Price Waterhouse LLP, independent certified public accountants, as set forth in their report thereon (which includes explanatory paragraphs describing the purpose of presenting the Grace Packaging special-purpose combined financial statements), which is included herein. The consolidated financial statements and financial statement schedule of Grace and its subsidiaries incorporated in this Joint Proxy Statement/ Prospectus by reference to the Grace 10-K have also been audited by Price Waterhouse LLP, independent certified public accountants, as set forth in their report thereon, which is incorporated herein by reference. The Grace Packaging special-purpose combined financial statements and the consolidated financial statements and financial statement schedule of Grace and its subsidiaries are included or incorporated herein by reference in reliance upon such reports, given upon the authority of such firm as experts in

XXX-002391

accounting and auditing.

The consolidated financial statements and financial statement schedule of Sealed Air and its subsidiaries as of December 31, 1996 and 1995, and for each of the years in the three-year period ended December 31, 1996, incorporated in this Joint Proxy Statement/Prospectus by reference to the Sealed Air 10-K, have been incorporated by reference herein in reliance upon the reports of KPMG Peat Marwick LLP, independent certified public accountants, and upon the authority of such firm as experts in accounting and auditing.

FUTURE STOCKHOLDER PROPOSALS

If the Merger is consummated, New Sealed Air expects to hold an annual meeting of stockholders in the second or third quarter of 1998. Stockholder proposals intended to be included in New Sealed Air's proxy materials for the 1998 annual meeting of stockholders must be received by New Sealed Air a reasonable time before the solicitation of proxies for the meeting is made. If the merger is not consummated, Sealed Air expects to hold an annual meeting of stockholders in the second quarter of 1998. Any Sealed Air stockholder who intended to submit a proposal for inclusion in the proxy materials for the 1998 annual meeting of Sealed Air was required to submit such proposal to the Secretary of Sealed Air by November 26, 1997.

Due to the contemplated consummation of the Merger, neither Grace (as it currently exists) nor New Grace intends to hold a 1998 annual meeting of stockholders. New Grace's 1999 annual meeting of stockholders is expected to be held in May 1999. Any New Grace stockholder who intends to submit a proposal for inclusion in the proxy materials for the 1999 annual meeting must submit such proposal to the Secretary of New Grace by December 8, 1998.

SEC rules set forth standards as to what stockholder proposals are required to be included in a proxy statement for an annual meeting.

WHERE YOU CAN FIND MORE INFORMATION

Sealed Air and Grace file annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy any reports, statements or other information we file at the SEC's public reference rooms in Washington, D.C., New York, New York and Chicago, Illinois. Please call the SEC at 1-800-SEC-0330 for further information on the public reference rooms. Our SEC filings are also available to the public from commercial document retrieval services and at the world wide web site maintained by the SEC at "http://www.sec.gov".

Grace has filed the New Sealed Air Registration Statement on Form S-4 with the SEC to register the New Sealed Air common and convertible preferred stock to be issued in the Merger and Recapitalization. This Joint Proxy Statement/Prospectus is a part of the New Sealed Air Registration Statement and constitutes a prospectus of Grace/New Sealed Air in addition to being a proxy statement of Grace and Sealed Air for the Special Meetings. In addition, Grace has filed the New Grace Registration Statement on Form 10 with the SEC to register the New Grace common stock to be distributed to Grace's stockholders in the Spin-off. The New Grace Information Statement is a part of the New Grace Registration Statement. The New Grace Information Statement is being furnished to Grace stockholders as supplemental proxy material.

As allowed by SEC rules, this Joint Proxy Statement/Prospectus does not contain all the information you can find in the New Sealed Air Registration Statement or the exhibits to the New Sealed Air Registration Statement. Similarly, the New Grace Information Statement does not contain all the information that stockholders can find in the New Grace Registration Statement or the exhibits to the New Grace Registration Statement.

The SEC allows us to "incorporate by reference" information into this Joint Proxy Statement/Prospectus, which means that we can disclose important information to you by referring you to another document filed separately with the SEC. The information incorporated by reference is deemed to be part of this Joint Proxy Statement/Prospectus, except for any information superseded by information in this Joint Proxy Statement/Prospectus. This Joint Proxy Statement/Prospectus incorporates by reference the documents set forth below that have previously been filed with the SEC. These documents contain important information about our companies and their finances.

<TABLE>
<CAPTION>
<S>                                                          <C>

| Sealed Air SEC Filings (File No. 1-7834) | Period |
| --- | --- |
| Annual Report on Form 10-K | Year ended December 31, 1996 (amended by Form 10-K/A filed on March 26, 1997) |
| Quarterly Reports on Form 10-Q | Quarters ended March 31, 1997, June 30, 1997, and September 30, 1997 |
| Current Report on Form 8-K | Filed on August 18, 1997 (amended by Form 8-K/A filed on August 21, 1997) |
| Description of convertible preferred stock as set forth in Form 8-K/A | Filed on August 21, 1997 |
| Description of Sealed Air | Filed on May 1, 1979 |

XXX-002392

common stock as set forth in
Registration Statement on
Form 8-A

Proxy Statement on Schedule 14A        Filed on March 26, 1997
for 1997 Annual Meeting


| Grace SEC Filings (File No. 1-12139) | Period |
| --- | --- |
| Annual Report on Form 10-K | Year ended December 31, 1996 |
| Quarterly Reports on Form 10-Q | Quarters ended March 31, 1997, June 30, 1997, and September 30, 1997 |
| Current Reports on Form 8-K | Filed on January 8, 1997, February 14, 1997, March 4, 1997, March 12, 1997, May 1, 1997, August 5, 1997, August 18, 1997 (amended by Form 8-K/A filed on August 21, 1997), October 17, 1997, November 4, 1997 and February 9, 1998. |
| Description of Grace common stock as set forth in Registration Statement on Form S-1 (Registration No. 333-09495) | Filed on August 2, 1996 |
| Proxy Statement on Schedule 14A for 1997 Annual Meeting | Filed on April 7, 1997 |

</TABLE>

        We are also incorporating by reference additional documents that
we file with the SEC between the date of this Joint Proxy Statement/Prospectus
and the dates of the Special Meetings.

        Sealed Air has supplied all information contained or
incorporated by reference in this Joint Proxy Statement/

Prospectus relating to Sealed Air, and Grace has supplied all such information
relating to Grace and Grace Packaging.

        If you are a stockholder, we may have sent you some of the
documents that are incorporated by reference, but you can obtain any of them
through us or the SEC. Documents incorporated by reference are available from us
without charge, excluding all exhibits unless we have specifically incorporated
by reference an exhibit in this Joint Proxy Statement/Prospectus. Stockholders
may obtain documents that we referred to or that we incorporated by reference in
this Joint Proxy Statement/Prospectus by requesting them in writing or by
telephone from the appropriate party at the following address:

        Sealed Air Corporation          W. R. Grace & Co.
        Park 80 East                    One Town Center Road
        Saddle Brook, New Jersey 07663  Boca Raton, Florida 33486
        Tel: (800) 350-9512             Tel: (800) 354-8917

        If you would like to request documents from us, please do so by
March 13, 1998 to receive them before the Special Meetings.

        You should rely only on the information contained or incorporated
by reference in this Joint Proxy Statement/Prospectus to vote on the Sealed Air
Merger Proposal and the Grace Proposals. We have not authorized anyone to
provide you with information that is different from what is contained in this
Joint Proxy Statement/Prospectus. This Joint Proxy Statement/Prospectus is dated
February 13, 1998. You should not assume that the information contained in this
Joint Proxy Statement/Prospectus is accurate as of any date other than such
date, and neither the mailing of this Joint Proxy Statement/Prospectus to
stockholders nor the issuance of New Sealed Air common and convertible preferred
stock in the Recapitalization and Merger shall create any implication to the
contrary.


                        LIST OF DEFINED TERMS

Term                            Page

Acquiring Person.................96
Acquisition Proposal............73
Antitrust Division..............36
Base Case.......................42
Base Rate.......................80
Bemis...........................47
Borrowers.......................80
Cash Transfer...................26
Code............................34
Common Consideration............70
Comparable Companies............47
Conservative Case...............42
Credit Suisse First Boston......28

XXX-002393

DCF..............................42
Delaware Law.....................36
Distribution Agreement...........26
Distribution Date................69
DLJ Opinion......................28
DLJ..............................28
EBITDA...........................41
Effective Time...................27
Engelhard........................48
EPS..............................42
Equitable Companies..............87
Expected Efficiencies............45
Fidelity.........................88
Financial Advisors Engagement
     Letters.....................49
FMR..............................88
FTC..............................36
Grace 10-K......................100
Grace By-laws....................95
Grace Financial Advisors.........39
Grace Merger Proposal............84
Grace New York...................21
Grace Packaging...................1
Grace Proposals..................84
Grace Record Date................84
Grace Share Price................71
Grace Special Charter Proposal...84
Higher Offer.....................73
HSR Act..........................36
IBES.............................47
Index Companies..................48
Intellectual Property Licenses...79
IRS..............................23
Janus............................88
Junior Preferred Stock...........96
Junior Securities................91
Letter of Credit.................69
LIBOR............................80
Liquidation Value................92
London Interbank Offered Rate....80
Long-Term Facility...............80
Merger Agreement.................26
Merger...........................26
Merrill Lynch....................28
Net Increase in Sealed Air
     Shares......................70
Net Option Number................70
New Credit Agreements............80
New Grace Registration
     Statement...................73
New Sealed Air Bylaws............90
New Sealed Air Charter...........37
New Sealed Air Ratio.............71
New Sealed Air Registration
     Statement...................73
Option Shares....................70
Other Agreements.................79
Outstanding Grace Shares.........70
P/E Multiples....................47
Parity Securities................91
Preferred Consideration..........70
Public Debt......................69
Recapitalization.................26
Record Date......................70
Reorganization...................27
Rights Agreement.................96
Right............................96
Sealed Air 10-K..................52
Sealed Air Bylaws................95
Sealed Air Charter...............37
Sealed Air Merger Proposal.......83
Sealed Air Record Date...........84
Securities Act...................24
SEC..............................23
Senior Securities................92
Shared Facilities
     Agreements..................79
Shared Facilities................79
Short-Term Facility..............80
Specialty Chemical
     Comparable Companies........40
Specialty Packaging
     Comparable Companies........40
Spin-off.........................26
Supermajority Approval...........98
Supermajority Provisions.........36
Synergies........................40
Tax Sharing Agreement............78
Transaction Agreements...........26
Transaction Fee..................49

INDEX TO FINANCIAL STATEMENTS
AND FINANCIAL STATEMENT SCHEDULES

http://edgar.sec.gov/Archives/edgar/data/1012100/0000950103-98-000147.txt          4/29/2009

XXX-002394

```
<TABLE>
<S>                                                                              <C>
                                                                                 Page
W. R. GRACE & CO. -- GRACE PACKAGING                                              ----

Special-Purpose Combined Financial Statements
        Special-Purpose Report of Independent Certified Public Accountants....... F-2
        Special-Purpose Combined Statement of Earnings for the years ended December 31, 1996, 1995
           and 1994.......................................................        F-3
        Special-Purpose Combined Balance Sheet at December 31, 1996 and 1995.....  F-4
        Special-Purpose Combined Statement of Cash Flows for the years ended December 31, 1996,
           1995 and 1994..................................................        F-5
        Notes to Special-Purpose Combined Financial Statements................... F-6

Unaudited Special-Purpose Combined Interim Financial Statements
        Special-Purpose Combined Interim Statement of Earnings for the nine months ended September
           30, 1997 and 1996.............................................        F-23
        Special-Purpose Combined Interim Balance Sheet at September 30, 1997......  F-24
        Special-Purpose Combined Interim Statement of Cash Flows for the nine months ended
           September 30, 1997 and 1996...................................        F-25
        Notes to Special-Purpose Combined Interim Financial Statements........... F-26
</TABLE>
```

Special-Purpose Report of Independent Certified Public Accountants

November 3, 1997

To the Board of Directors and Shareholders of
W. R. Grace & Co.

We have audited the accompanying special-purpose combined balance sheet of W. R. Grace & Co. and its packaging business, excluding the Darex Container Products business (the "Company"), as of December 31, 1996 and 1995, and the related special-purpose combined statements of earnings and cash flows for each of the three years in the period ended December 31, 1996. These special-purpose combined financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the special-purpose combined financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the special-purpose combined financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

The accompanying special-purpose combined financial statements were prepared on the basis of presentation described in Note 1, and are not intended to be a complete presentation of the consolidated assets, liabilities, revenues and expenses of W. R. Grace & Co.

As disclosed in Note 14 to the accompanying special-purpose combined financial statements, the packaging business has engaged in various transactions and relationships with affiliated entities. The terms of these transactions may differ from those that would result from transactions among unrelated parties.

In our opinion, the accompanying special-purpose combined financial statements audited by us present fairly, in all material respects, the financial position of the Company as of December 31, 1996 and 1995, and its earnings and cash flows for each of the three years in the period ended December 31, 1996 pursuant to the basis of presentation described in Note 1, in conformity with generally accepted accounting principles.

Price Waterhouse LLP
Ft. Lauderdale, Florida

W. R. Grace & Co.
Grace Packaging
SPECIAL-PURPOSE COMBINED STATEMENT OF EARNINGS
(Dollars in thousands)

| | 1996 | 1995 | 1994 |
|---|---|---|---|
| Net sales | $1,741,602 | $1,705,642 | $1,428,459 |
| Cost of sales | 1,151,006 | 1,078,100 | 883,146 |
| Gross profit | 590,596 | 627,542 | 545,313 |
| Marketing, administrative and development expenses | 342,149 | 361,735 | 301,943 |
| Restructuring costs and asset impairments | 74,947 | 17,745 | 6,021 |
| Operating profit | 173,500 | 248,062 | 237,349 |
| Other expenses, net | 3,678 | 12,589 | 9,597 |
| Earnings before income taxes | 169,822 | 235,473 | 227,752 |
| Income taxes | 69,992 | 94,581 | 88,241 |

XXX-002395

```
                                                    ------------  ------------  ------------
    Net earnings.........................................   $99,830     $140,892     $139,511
                                                    ============  ============  ============
```
</TABLE>
See accompanying Notes to Special-Purpose Combined Financial Statements.

                    W. R. Grace & Co.
                    Grace Packaging
            SPECIAL-PURPOSE COMBINED BALANCE SHEET
                  (Dollars in thousands)

<TABLE>
<CAPTION>

| December 31, | 1996 | 1995 |
|---|---|---|
| <S> | <C> | <C> |
| **Assets** | | |
| **Current Assets** | | |
| Cash and cash equivalents............................................ | $      -- | $      -- |
| Notes and accounts receivable, net of allowances for doubtful accounts of | | |
| $5,734 in 1996 and $4,259 in 1995................................... | 262,392 | 223,577 |
| Inventories......................................................... | 219,311 | 253,211 |
| Deferred income taxes............................................... | 22,409 | 17,204 |
| Other current assets................................................ | 10,981 | 10,859 |
| | ------------ | ------------ |
| Total Current Assets........................................ | 515,093 | 504,851 |
| Properties and equipment, net.......................................... | 1,121,762 | 918,968 |
| Goodwill, less accumulated amortization of $88 in 1996 and $1,596 in 1995..... | 8,650 | 6,732 |
| Deferred income taxes................................................. | 956 | 473 |
| Other assets.......................................................... | 56,427 | 46,336 |
| | ------------ | ------------ |
| Total Assets................................................ | $1,702,888 | $1,477,360 |
| | ============ | ============ |
| **Liabilities and Equity** | | |
| **Current Liabilities** | | |
| Accounts payable.................................................... | $130,855 | $140,652 |
| Other current liabilities........................................... | 106,655 | 74,594 |
| | ------------ | ------------ |
| Total Current Liabilities................................... | 237,510 | 215,246 |
| Other liabilities.................................................... | 83,588 | 88,152 |
| | ------------ | ------------ |
| Total Liabilities.......................................... | 321,098 | 303,398 |
| Commitments and contingencies (Notes 7 and 15) | | |
| **Equity** | | |
| Equity.............................................................. | 1,428,925 | 1,227,613 |
| Cumulative translation adjustments.................................. | (47,135) | (47,265) |
| Adjustment for minimum pension liability (inclusive of tax benefit)........... | -- | (6,386) |
| | ------------ | ------------ |
| Total Equity............................................... | 1,381,790 | 1,173,962 |
| | ------------ | ------------ |
| Total Liabilities and Equity................................ | $1,702,888 | $1,477,360 |
| | ============ | ============ |

</TABLE>
See accompanying Notes to Special-Purpose Combined Financial Statements.

                    W. R. Grace & Co.
                    Grace Packaging
        SPECIAL-PURPOSE COMBINED STATEMENT OF CASH FLOWS
                  (Dollars in thousands)

<TABLE>
<CAPTION>

| | 1996 | 1995 | 1994 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| **Cash Flows from Operating Activities:** | | | |
| Net earnings........................................ | $  99,830 | $ 140,892 | $ 139,511 |
| Adjustments to reconcile net earnings to cash provided by operating activities: | | | |
| Depreciation and amortization of property and equipment............ | 90,914 | 75,578 | 58,165 |
| Other depreciation and amortization................ | 3,466 | 4,779 | 3,759 |
| Restructuring...................................... | 47,947 | 11,145 | 6,021 |
| Asset impairment................................... | 27,000 | 6,600 | -- |
| Deferred tax provisions............................ | (9,754) | (8,838) | 1,520 |
| Net (gain)/loss on disposals of property and equipment............ | (929) | 2,071 | 2,056 |
| Changes in operating assets and liabilities, net of assets and liabilities acquired | | | |
| Notes and accounts receivable..................... | (36,758) | (25,156) | (59,574) |
| Inventories....................................... | 38,784 | (43,516) | (21,712) |
| Other current assets.............................. | 507 | 3,784 | (2,775) |
| Other assets...................................... | (22,754) | (14,765) | (6,280) |
| Accounts payable.................................. | (18,761) | (7,892) | 41,065 |
| Other accrued liabilities......................... | (16,550) | 1,301 | 18,020 |
| Other liabilities................................. | 4,659 | 11,046 | (690) |
| | ----------- | ----------- | ----------- |
| Net cash provided by operating activities............... | 207,601 | 156,679 | 179,086 |
| | ----------- | ----------- | ----------- |

XXX-002396

| | | | |
|---|---|---|---|
| Cash Flows from Investing Activities: | | | |
| Capital expenditures for property and equipment......................... | (294,503) | (293,272) | (185,940) |
| Proceeds from sales of property and equipment........................... | 1,457 | 246 | 680 |
| Businesses acquired in purchase transactions, net of cash acquired and debt assumed.......................................................... | (16,037) | -- | (7,090) |
| Net cash used in investing activities......................... | (309,083) | (293,026) | (192,350) |
| Cash Flows from Financing Activities: | | | |
| Principal payments on long-term debt.................................... | -- | -- | (28,811) |
| Net advances from W. R. Grace & Co.-Conn................................ | 101,482 | 136,347 | 42,075 |
| Net cash provided by financing activities..................... | 101,482 | 136,347 | 13,264 |
| Effect of exchange rate changes on cash and cash equivalents............ | -- | -- | -- |
| Cash and Cash Equivalents: | | | |
| Net change during the period........................................... | -- | -- | -- |
| Balance, beginning of period........................................... | -- | -- | -- |
| Balance, end of period................................................. | $ -- | $ -- | $ -- |
| Supplemental Disclosures of Cash Flow Information: | | | |
| Cash paid during the year for income taxes.............................. | $ 79,746 | $ 103,419 | $ 86,721 |
| Debt assumed on acquisition of business................................ | $ -- | $ -- | $ 28,811 |

</TABLE>
    See accompanying Notes to Special-Purpose Combined Financial Statements.

                    W. R. GRACE & CO. Grace Packaging
            NOTES TO SPECIAL-PURPOSE COMBINED FINANCIAL STATEMENTS
                (Dollars in thousands, except per share data)

Note 1. Basis of Presentation

        General.  W. R. Grace & Co. ("WRG"), through its subsidiaries,
is a leading manufacturer of packaging and specialty chemicals. The assets and
liabilities of WRG's packaging and specialty chemicals businesses are currently
owned by W. R. Grace & Co.-Conn. ("Grace Specialty Chemicals"), a direct
wholly owned subsidiary of WRG, and its subsidiaries.

        In August 1997, WRG and Sealed Air Corporation ("Sealed Air")
entered into a definitive agreement ("Merger Agreement," and, together with
related agreements, "Transaction Agreements") to combine WRG's packaging
business, excluding the Darex Container Products business, with the business of
Sealed Air. Under the Transaction Agreements, WRG will separate its packaging
business and its specialty chemicals businesses into two separate groups of
subsidiaries (the "Separation"); WRG will contribute the stock of Grace
Specialty Chemicals to another wholly owned subsidiary, which will be renamed
"W. R. Grace & Co." ("New Grace"), and will spin off New Grace to WRG's
shareholders (the "Spin-off"); WRG (which, after the Spin-off, will own only
WRG's packaging business) will be recapitalized (the "Recapitalization"); and a
subsidiary of WRG will merge with Sealed Air (the "Merger"). The Separation,
Spin-off and Recapitalization are collectively referred to as the
"Reorganization". Upon consummation of the Reorganization and Merger, WRG will
be renamed "Sealed Air Corporation" ("New Sealed Air").

        The special-purpose combined financial statements of WRG and its
packaging business, excluding the Darex Container Products business ("Grace
Packaging," and, together with WRG, the "Company"), have been prepared pursuant
to Section 6.7(a) of the Merger Agreement, and exclude all the assets,
liabilities (including contingent liabilities), revenues and expenses of WRG
other than the assets, liabilities, revenues and expenses of Grace Packaging. As
used herein, "Grace" refers to the consolidated businesses of W. R. Grace & Co.
prior to the consummation of the Reorganization.

        Grace Packaging is Grace's largest product line and includes the
following trademarked products: Cryovac{{Registered}} flexible packaging
systems, Formpac[Trademark] rigid foam trays, and Omicron[Trademark] rigid
plastic cups and tubs. Grace Packaging is primarily engaged in producing
flexible packaging materials used in food processing and industrial and consumer
products, as well as packaging equipment.

        Basis of Combination. The special-purpose combined financial
statements have been prepared using Grace's historical basis of accounting and
include the assets, liabilities, revenues, expenses and related taxes on income
of Grace Packaging previously included in the consolidated financial statements
of Grace, and, as such, include certain assets and liabilities of Grace
Packaging that will be retained by New Grace following the Reorganization, as
contemplated by the Transaction Agreements. Additionally, in accordance with
Securities and Exchange Commission Staff Accounting Bulletin No. 55 ("SAB 55"),
the special-purpose combined financial statements have been adjusted to include
certain expenses incurred by Grace on behalf of Grace Packaging. See Note 14 for
a discussion of these corporate allocations.

        The special-purpose combined financial statements do not include
an allocation of Grace's debt and related interest expense (except for interest
capitalized as a component of properties and equipment). Therefore, the
special-purpose combined financial statements may not necessarily reflect the
financial position and results of operations that would have occurred had Grace
Packaging been a stand-alone entity on the dates, and for the periods,
indicated. All transactions between and among Grace Packaging entities have been
eliminated.

XXX-002397

The special-purpose combined financial statements also exclude dividends paid by Grace to its shareholders, as the obligation to pay such dividends was incurred by Grace and not by Grace Packaging on a stand-alone basis. See Note 12 for a discussion of equity.

Note 2. Summary of Significant Accounting Policies

Use of Estimates. The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions affecting the reported amounts of assets and liabilities (including contingent assets and liabilities) at the dates of the special-purpose combined financial statements and the reported revenues and expenses during the periods presented. Actual amounts could differ from those estimates.

Financial Instruments. Gains and losses on contracts that hedge firmly committed foreign currency transactions are deferred and recorded in income or as adjustments of carrying amounts in the period in which the related transactions are consummated.

Inventories. Inventories are stated at the lower of cost or market. The costs of most U.S. inventories are determined on a last-in, first-out ("LIFO") basis, while the costs of other inventories are determined on a first-in, first-out ("FIFO") basis.

Properties and Equipment. Properties and equipment are stated at cost, except for properties and equipment that have been impaired, for which the carrying amount is reduced to estimated fair value. Significant improvements are capitalized; repairs and maintenance costs that do not extend the lives of the assets are charged to expense as incurred. The cost and accumulated depreciation of assets sold or otherwise disposed of are removed from the accounts, and any resulting gain or loss is included in income when the assets are disposed of.

The cost of properties and equipment is depreciated over estimated useful lives on a straight-line basis as follows: buildings - 20 to 40 years, and machinery and other property and equipment - three to 20 years.

Goodwill and Other Intangible Assets. Goodwill arises from certain purchase transactions and is amortized on a straight-line basis, generally over 40 years; other intangible assets are amortized over their estimated lives on a straight-line basis.

Impairment of Long-Lived Assets. In accordance with Statement of Financial Accounting Standards No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of," the Company reviews the carrying value of its assets for impairment whenever events or changes in circumstances indicate that the carrying amount of assets may not be fully recoverable. The Company considers various valuation factors, including discounted cash flows, fair values and replacement costs, to assess any impairment of goodwill and other long-lived assets.

Stock-Based Compensation. The Company adopted Statement of Financial Accounting Standards No. 123, "Accounting for Stock Based Compensation" ("SFAS No. 123"), in 1996. As permitted by SFAS No. 123, the Company continues to follow the measurement provisions of Accounting Principles Board Opinion No. 25, "Accounting For Stock Issued to Employees," and does not recognize stock compensation expense with respect to its stock-based incentive plans, because it is the Company's practice to grant options at an exercise price that is equal to the market value of the Company's stock on the grant date.

Foreign Currency Translation. The Company follows the provisions of Statement of Financial Accounting Standards No. 52, "Foreign Currency Translation" ("SFAS No. 52"). In locations that are not considered highly inflationary under SFAS No. 52, the local currency is considered to be the functional currency. As a result, the balance sheets of the Company's foreign operations are translated at the current exchange rate and statements of earnings are translated at the average exchange rate during the applicable period (except where a country has a highly inflationary economy). Assets and liabilities of the Company's operations in countries with highly inflationary economies are translated at the current exchange rate, except that properties and equipment and inventories are translated at historical exchange rates. Items included in statements of earnings of the Company's operations in countries with highly inflationary economies are translated at average rates of exchange prevailing during the period, except that depreciation and costs of sales are translated at historical rates.

Income Taxes. The Company's U.S. operations are included in Grace's U.S. federal and state income tax returns. Grace's consolidated income tax provision has generally been allocated to the Company as if the Company filed separate income tax returns. The allocated current provision is settled with Grace on a current basis. No liability for potential future income tax assessments relating to prior years is included in the special-purpose combined financial statements.

Deferred tax assets and liabilities are recognized with respect to the future tax consequences attributable to differences between the financial statement amounts for existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. A valuation allowance is provided when it is more likely than not that all or some portion of a deferred tax asset will not be realized. Deferred tax liabilities or assets at the end of each period are determined using the tax rates then in effect.

Research and Development. Research and development costs are expensed as incurred and amounted to $42,255, $36,926 and $33,727 in 1996, 1995

XXX-002398

and 1994, respectively, including corporate allocations. See Note 14 for further information.

          Other Expenses, Net. Other expenses, net consists primarily of losses on the sale of receivables (see Note 5), realized foreign exchange gains and losses, gains and losses on the disposal of fixed assets and equity interest in the gains and losses of affiliated companies.

          Earnings per Share. For the periods presented, the Company was a business unit of Grace and did not have a separate identifiable capital structure upon which a calculation of earnings per share could be based. Historical earnings per share of Grace Packaging calculated on an equivalent share basis (i.e., using the weighted average number of shares of WRG common stock outstanding) were $1.09, $1.47 and $1.49 for the years ended December 31, 1996, 1995 and 1994, respectively. The equivalent earnings per share of Grace Packaging are not necessarily indicative of the results that would have occurred had Grace Packaging been a stand-alone entity for the periods presented.

          The weighted average number of common shares used to compute equivalent earnings per share amounts were 92.0 million for 1996, 95.8 million for 1995 and 93.9 million for 1994.

Note 3. Acquisitions

          In 1996, the Company acquired Cypress Packaging, Inc., a U.S. manufacturer of flexible packaging primarily for the retail pre-cut produce market segment, for net cash consideration of $16,838. In 1994, the Company acquired Schur Multiflex, a manufacturer of laminated packaging products, for $32,687 (including assumed debt). These transactions have been accounted for as purchases and resulted in goodwill of $8,738 in 1996 and $7,103 in 1994.

Note 4. Other Balance Sheet Items

          The Company's other balance sheet items consist of the following:

|  | December 31, | |
| --- | --- | --- |
|  | 1996 | 1995 |
| Inventories (at FIFO, which approximates current cost): | | |
|     Raw materials............................... | $40,853 | $48,996 |
|     Work in process............................. | 54,781 | 59,155 |
|     Finished goods.............................. | 140,908 | 162,804 |
|  | 236,542 | 270,955 |
| Reduction of certain inventories to LIFO basis......... | (17,231) | (17,744) |
|     Total.......................................... | $219,311 | $253,211 |

          Inventories accounted for on a LIFO basis represented approximately 27% and 22% of total inventories at December 31, 1996 and 1995, respectively. The liquidation of prior years' LIFO inventory layers in 1996 did not materially affect the Company's results of operations.

| Other Assets: | | |
| --- | --- | --- |
| Leased equipment, net......................... | $30,905 | $11,384 |
| Long-term lease receivables.................... | 11,086 | 14,075 |
| Investment in joint ventures and affiliates..... | 4,784 | 5,184 |
| Intangible assets, net......................... | 5,343 | 8,837 |
| Other.......................................... | 4,309 | 6,856 |
|     Total...................................... | $56,427 | $46,336 |

          Leased equipment consists of equipment held for lease or equipment at customer locations under no-charge operating lease arrangements. Leased equipment is recorded at cost less accumulated amortization. Amortization is calculated over a term relevant to the agreement, generally from three to 10 years.

          The Company recorded $4,832 and $5,124 of current lease receivables, and $11,086 and $14,075 in long-term lease receivables, related to sales-type lease arrangements at December 31, 1996 and 1995, respectively.

          Intangibles consist mainly of patents and licenses and non-compete agreements. Intangibles are amortized over the useful life or the shorter of the term of the related agreement or four years.

          Total amortization expense related to leased equipment and intangible assets was $3,466, $4,779 and $3,759 during the years ended December 31, 1996, 1995 and 1994, respectively.

|  | December 31, | |
| --- | --- | --- |
|  | 1996 | 1995 |

Other Current Liabilities:

```
Accrued restructuring costs.............    $38,921    $12,980
Accrued incentive compensation and
   other employee benefits................    25,993     25,486
Accrued salaries, wages and
   related taxes.........................    16,094     11,281
Accrued operating expenses...............    11,937     11,675
Other....................................    13,710     13,172
                                          ----------  ---------
      Total............................   $106,655    $74,594
                                          ==========  =========


Other Liabilities:
   Other postretirement benefits..........   $59,600    $59,400
   Long-term incentive program............     7,100      8,100
   Pensions...............................     4,200     10,700
   Statutory social security..............     3,577      3,688
   Deferred income........................     1,636      2,076
   Other..................................     7,475      4,188
                                          ----------  ---------
      Total............................    $83,588    $88,152
                                          ==========  =========
```

Unfunded statutory social security obligations represent the present value of the Company's future social security obligations for certain eligible, active employees in France based on actuarial calculations.

See Notes 8, 10 and 11 for information concerning restructuring, pension and other postretirement benefit obligations, respectively.

Note 5. Sale of Accounts Receivable

During 1995, Grace entered into agreements to sell up to $120,000 of interests in designated pools of accounts receivable. At December 31, 1995, $116,000 had been received pursuant to such sales, including $47,068 relating to accounts receivable of Grace Packaging. The amounts sold have been reflected as reductions to accounts receivable. Under the terms of the agreements, new interests in accounts receivable were sold as collections reduced previously sold accounts. The losses related to such sales were expensed as incurred. These agreements were terminated as to Grace Packaging during September 1996 with no gain or loss incurred on termination.

Note 6. Income Taxes

The components of earnings before income taxes were as follows:

<TABLE>
<CAPTION>

| | 1996 | 1995 | 1994 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Domestic......... | $101,012 | $117,100 | $139,538 |
| Foreign.......... | 68,810 | 118,373 | 88,214 |
| Total........ | $169,822 | $235,473 | $227,752 |

</TABLE>

The components of the provision for income taxes were as follows:

<TABLE>
<CAPTION>

| | 1996 | 1995 | 1994 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Current tax expense | | | |
| Federal................... | $41,986 | $46,550 | $46,323 |
| State and local............ | 7,245 | 9,872 | 10,411 |
| Foreign.................... | 30,515 | 46,997 | 29,987 |
| Total current.......... | 79,746 | 103,419 | 86,721 |
| Deferred tax (benefit)/expense | | | |
| Federal.................... | (8,891) | (8,011) | (216) |
| State and local............ | (328) | (826) | 33 |
| Foreign.................... | (535) | (1) | 1,703 |
| Total deferred......... | (9,754) | (8,838) | 1,520 |
| Total provision........ | $69,992 | $94,581 | $88,241 |

</TABLE>

Deferred tax assets/(liabilities) consist of the following:

<TABLE>
<CAPTION>

| | December 31, | |
|---|---|---|
| <S> | <C> 1996 | <C> 1995 |
| Reserves not yet deductible for tax purposes..... | $13,541 | $5,190 |
| Research and development expenses................. | 24,306 | 20,724 |

XXX-002400

| | | |
|---|---|---|
| Postretirement benefits other than pensions...... | 20,860 | 20,790 |
| Employee benefit items......................... | 6,004 | 9,781 |
| Capitalized inventory costs and inventory reserves..................................... | 4,367 | 5,768 |
| Foreign net operating loss carryforwards and investment tax allowances.................. | 33,422 | 12,186 |
| Other.......................................... | 6,826 | 5,748 |
| Gross deferred tax assets.................. | 109,326 | 80,187 |
| Valuation allowance............................ | (18,599) | (190) |
| Total deferred tax assets.................. | 90,727 | 79,997 |
| Depreciation and amortization.................... | (52,175) | (46,656) |
| Capitalized interest............................ | (14,384) | (12,067) |
| Other.......................................... | (803) | (3,597) |
| Total deferred tax liabilities............. | (67,362) | (62,320) |
| Net deferred tax assets.................... | $23,365 | $17,677 |

</TABLE>

The U. S. federal statutory corporate tax rate reconciles to the Company's effective tax rate as follows:

<TABLE>
<CAPTION>

| | 1996 | 1995 | 1994 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Statutory U.S. federal tax rate................ | 35.0% | 35.0% | 35.0% |
| State income taxes, net of federal tax benefit. | 2.4 | 2.3 | 3.0 |
| U.S. and foreign taxes on foreign operations... | 3.4 | 2.6 | (1.1) |
| Other.......................................... | 0.4 | 0.3 | 1.8 |
| Effective tax rate............................. | 41.2% | 40.2% | 38.7% |

</TABLE>

The Company has concluded that it is more likely than not that the remaining balance of deferred tax assets of $90,727, after consideration of the valuation allowance at December 31, 1996, will be realized based upon anticipated future results. The valuation allowance of $18,599 at December 31, 1996 has been recorded due to the uncertainty of the realization of certain foreign deferred tax assets, primarily relating to foreign investment tax allowances that arose during 1996.

Provision has not been made for additional federal, state or foreign taxes on undistributed earnings of foreign subsidiaries. It is management's intent that these earnings will continue to be reinvested indefinitely. The distribution of these earnings would result in additional foreign withholding taxes and additional U.S. federal income taxes to the extent they are not offset by foreign tax credits. It is not practicable to estimate the total tax liability that would be incurred upon such distribution.

At December 31, 1996, there were $39,205 of foreign net operating loss carryforwards ($15,182 tax effected) and $60,800 of investment tax allowances ($18,240 tax effected), the majority of which have no expiration period. In accordance with the Transaction Agreements, New Grace will receive cash from New Sealed Air equivalent to the tax benefit of such tax attributes as realized.

Note 7. Properties and Equipment

<TABLE>
<CAPTION>

| | December 31, | |
|---|---|---|
| | 1996 | 1995 |
| <S> | <C> | <C> |
| Land and improvements........................ | $14,940 | $8,775 |
| Buildings.................................... | 280,982 | 214,689 |
| Machinery and equipment...................... | 1,026,876 | 874,842 |
| Other property and equipment................. | 127,512 | 96,884 |
| Construction in progress..................... | 327,925 | 308,770 |
| | 1,778,235 | 1,503,970 |
| Accumulated depreciation and amortization... | (656,473) | (585,002) |
| Properties and equipment, net.......... | $1,121,762 | $918,968 |

</TABLE>

Depreciation and amortization expense relating to properties and equipment amounted to $90,914, $75,578 and $58,165 in 1996, 1995 and 1994, respectively.

Interest cost capitalized during 1996, 1995 and 1994 was $17,650, $15,071 and $8,455, respectively.

Leases. Future minimum payments for operating leases as of December 31, 1996 are as follows:

XXX-002401

| | |
|---|---|
| 1997............................................ | $11,460 |
| 1998............................................ | 9,534 |
| 1999............................................ | 8,233 |
| 2000............................................ | 6,610 |
| 2001............................................ | 4,069 |
| 2002 and beyond.............................. | 1,906 |
| Total minimum payments................... | $41,812 |

Rental expense for operating leases was $12,036, $11,560 and $9,435 in 1996, 1995 and 1994, respectively.

Note 8. Restructuring Costs and Asset Impairments

Restructuring Costs. The Company began implementing a worldwide program in 1995 focused on streamlining processes and reducing general and administrative expenses and factory administration costs. Under this program, the Company has continued to implement additional cost reductions and efficiency improvements, as it has further evaluated and reengineered its operations. In connection with these programs, the Company recorded restructuring charges of $47,947 in 1996 and $11,145 in 1995. These charges primarily related to headcount reductions and the restructuring of the Company's European operations (in areas such as working capital management, manufacturing and sales).

In 1994, the Company recorded restructuring charges of $6,021 related to the closing of certain facilities in connection with efforts to reduce costs and implement efficiency improvements.

The components of the 1996, 1995 and 1994 restructuring charges, spending and other activity during 1996, 1995 and 1994, and the remaining reserve balances at December 31, 1996 were as follows:

| | Employee Termination Benefits | Plant/Office Closures | Other Costs | Total |
|---|---|---|---|---|
| Restructuring provisions recorded in 1994........ | $5,515 | $506 | $ -- | $6,021 |
| Cash payments during 1994........................ | (2,678) | -- | -- | (2,678) |
| Restructuring reserve at December 31,1994.. | 2,837 | 506 | -- | 3,343 |
| Restructuring provisions recorded in 1995........ | 9,845 | 500 | 800 | 11,145 |
| Cash payments during 1995........................ | (1,008) | -- | (500) | (1,508) |
| Restructuring reserve at December 31, 1995. | 11,674 | 1,006 | 300 | 12,980 |
| Restructuring provisions recorded in 1996........ | 41,328 | 4,400 | 2,219 | 47,947 |
| Cash payments during 1996........................ | (19,971) | (200) | (1,835) | (22,006) |
| Restructuring reserve at December 31,1996.. | $33,031 | $5,206 | $684 | $ 38,921 |

Employee termination benefits primarily represent severance pay and other benefits (including benefits under long-term incentive programs paid over time) associated with the elimination of approximately 400 positions worldwide. Through December 31, 1996, approximately 250 positions had been eliminated.

Subsequent to the Reorganization, certain restructuring obligations (for which approximately $1,900 was accrued as of December 31, 1996) will be retained by New Grace. As of the date of the Reorganization, the Company's liability with respect to such restructuring obligations retained by New Grace, including related deferred income taxes, will be reversed and accounted for as an equity contribution from Grace.

Asset Impairments. During 1996 and 1995, the Company determined that, due to certain market demand shifts and manufacturing capacity strategies, certain long-lived assets and related goodwill were impaired. As a result, in 1996 and 1995 the Company recorded noncash pretax charges of approximately $27,000 and $6,600, respectively. The components of the 1996 and 1995 charges were as follows:

| | 1996 | 1995 |
|---|---|---|
| Goodwill and other intangible assets....... | $11,100 | $300 |
| Properties and equipment................... | 9,000 | 1,900 |
| Long-term investments...................... | 4,200 | 4,400 |
| Other assets............................... | 2,700 | -- |
| | $27,000 | $6,600 |

Note 9. Long-Term Incentive Program

XXX-002402

Certain Grace Packaging employees participate in Grace's Long-Term Incentive Program ("LTIP"), which provides that employees can earn performance units based upon the achievement of targeted earnings and shareholder value creation goals over a three-year period. These performance units are equivalent in value to a share of Grace common stock at the end of the three-year period. Awards are paid to participants following the end of each three-year period.

Provisions for the LTIP awards are made quarterly based upon progress toward meeting the targets described above. LTIP expense included in the special-purpose combined financial statements related to Grace Packaging employees was $1,900, $7,000 and $1,000 for 1996, 1995 and 1994, respectively.

In accordance with SAB 55, the special-purpose combined financial statements also reflect an allocation of LTIP expense related to Grace corporate employees that performed services on behalf of Grace Packaging. See Note 14 for a discussion of corporate allocations. The provision included in the special-purpose combined financial statements for allocated LTIP expenses was $9,293, $10,811 and $2,538 for 1996, 1995 and 1994, respectively.

Subsequent to the Reorganization, LTIP liabilities related to Grace Packaging and Grace corporate employees (for which approximately $7,100 was accrued as of December 31, 1996) will be retained by New Grace. As of the date of the Reorganization, the Company's liability with respect to LTIP obligations retained by New Grace, including related deferred income taxes, will be reversed and accounted for as an equity contribution from Grace.

Note 10. Pension Plans

Substantially all of the Company's U.S. employees are covered by non-contributory defined benefit plans sponsored by Grace. Benefits are generally based on final average salary and years of service. Grace funds its U.S. pension plans in accordance with U.S. federal laws and regulations. Plan assets consist primarily of publicly traded common stocks, fixed income securities and cash equivalents.

Separate calculations of Grace Packaging's net pension cost and funded status within Grace's U.S. pension plans have been performed. Grace Packaging's total pension expense consists of the following components:

| | 1996 | 1995 | 1994 |
|---|---|---|---|
| Service cost on benefits earned during the year | $6,400 | $5,200 | $5,800 |
| Interest cost on benefits earned in prior years | 12,100 | 10,800 | 10,000 |
| Actual (return)/loss on plan assets | (18,800) | (22,200) | 2,500 |
| Deferred gain/(loss) on plan assets | 5,800 | 10,600 | (14,900) |
| Amortization of net gains and prior service costs | (200) | (1,300) | (1,300) |
| Net pension cost | $5,300 | $3,100 | $2,100 |

Grace Packaging's funded status within Grace's U.S. plans was as follows:

| | December 31, | |
|---|---|---|
| | 1996 | 1995 |
| Actuarial present value of benefit obligation: | | |
| Vested | $150,000 | $156,800 |
| Accumulated benefit obligation | $152,400 | $158,200 |
| Total projected benefit obligation | $163,000 | $170,600 |
| Plan assets at fair value | 158,700 | 147,500 |
| Plan assets less than projected benefit obligation | (4,300) | (23,100) |
| Unamortized net gain at initial adoption | (7,500) | (9,000) |
| Unamortized prior service cost | 6,100 | 5,700 |
| Unrecognized net loss | 1,500 | 26,000 |
| Accrued pension cost | (4,200) | (400) |
| Adjustment required to recognize minimum liability | -- | (10,300) |
| Accrued pension cost liability recognized in the balance sheet | $(4,200) | $(10,700) |

The following significant assumptions were used in calculating the Company's U.S. pension cost and funded status:

| | 1996 | 1995 | 1994 |
|---|---|---|---|

XXX-002403

| | | | |
|---|---|---|---|
| Discount rate at December 31,........ | 8.0% | 7.3% | 8.5% |
| Expected long-term rate of return.... | 9.0% | 9.0% | 9.0% |
| Rate of compensation increase........ | 4.5% | 4.5% | 4.5% |

</TABLE>

The Company's non-U.S. employees participate in various Grace-sponsored retirement plans. Net pension cost for these plans has been allocated annually to the Company by Grace. Total pension costs (benefits) allocated to the Company in connection with these plans were $3,000, $500 and $(1,600) in 1996, 1995 and 1994, respectively. No portion of the non-U.S. pension assets or liabilities has been allocated to the Company, on the basis that non-U.S. employees are considered to have participated in a multiemployer pension plan as defined in Statement of Financial Accounting Standards No. 87, "Employer's Accounting for Pensions."

Separate calculations for the components of net pension cost for the Company and the Company's funded status within the Grace-sponsored non-U.S. plans are not available. The following tables reflect the components of net pension cost and the funded status of the non-U.S., Grace-sponsored pension plans for all Grace businesses:

<TABLE>
<CAPTION>

| | 1996 | 1995 | 1994 |
|---|---|---|---|
| Service cost on benefits earned during the year.............. | $10,700 | $10,500 | $13,400 |
| Interest cost on benefits earned in prior years.............. | 23,100 | 21,400 | 19,300 |
| Actual (return)/loss on plan assets.......................... | (39,100) | (52,000) | 10,600 |
| Deferred gain/(loss) on plan assets.......................... | 8,200 | 26,200 | (37,400) |
| Amortization of net gains and prior service costs............ | (300) | (800) | (1,600) |
| Net curtailment and settlement gain.......................... | (2,400) | -- | -- |
| Net pension cost............................................. | $200 | $5,300 | $4,300 |

<CAPTION>

| | Assets Exceed Accumulated Benefits December 31, | | Accumulated Benefits Exceed Assets December 31, | |
|---|---|---|---|---|
| | 1996 | 1995 | 1996 | 1995 |
| Actuarial present value of benefit obligation: | | | | |
| Vested................................................ | $161,800 | $133,500 | $75,200 | $67,500 |
| Accumulated benefit obligation........................ | $162,500 | $133,900 | $82,800 | $75,100 |
| Total projected benefit obligation.................... | $183,200 | $189,400 | $103,300 | $92,400 |
| Plan assets at fair value............................. | 313,400 | 302,500 | 6,100 | 7,300 |
| Plan assets in excess of/(less than) projected benefit obligation............................................ | 130,200 | 113,100 | (97,200) | (85,100) |
| Unamortized net (gain)/loss at initial adoption........ | (4,700) | (6,300) | 3,800 | 4,500 |
| Unamortized prior service cost........................ | 4,100 | 3,600 | -- | -- |
| Unrecognized net (gain)/loss.......................... | (17,300) | (16,000) | 15,000 | (3,200) |
| Prepaid/(accrued) pension cost........................ | $112,300 | $94,400 | $(78,400) | $(83,800) |

</TABLE>

The following significant assumptions were used in calculating the pension cost and funded status for the non-U.S. Grace-sponsored pension plans for all Grace businesses:

<TABLE>
<CAPTION>

| | 1996 | 1995 | 1994 |
|---|---|---|---|
| Discount rate at December 31...... | 3.4 – 8.7% | 5.1 – 11.6% | 5.0 – 12.0% |
| Expected long-term rate of return. | 6.0 – 10.5% | 6.0 – 10.5% | 6.0 – 10.5% |
| Rate of compensation increase..... | 2.5 – 7.5% | 4.0 – 7.5% | 4.0 – 7.5% |

</TABLE>

The Company's participants historically comprised approximately 65% of the total participants in the non-U.S. Grace-sponsored pension plans.

Subsequent to the Reorganization, the pension obligations relating to substantially all of the Company's U.S. employees will be retained by New Grace. As of the date of the Reorganization, the Company's liability with respect to such employees to be retained by New Grace, including related deferred income taxes, will be reversed and accounted for as an equity contribution from Grace.

Subsequent to the Reorganization, it is expected that New Sealed Air will assume substantially all of the pension obligations related to the Company's non-U.S. employees and will also receive a corresponding amount of assets from the non-U.S. Grace plans. However, differences, if any, between the non-U.S. projected benefit obligations assumed by New Sealed Air and the value of the assets transferred related to such obligations will be accounted for as a

XXX-002404

contribution to, or distribution from, Grace Packaging.

Note 11. Other Postretirement Benefit Plans

The Company's U.S. retired employees receive certain postretirement health care and life insurance benefits under plans established by Grace. Those retiree medical and life insurance plans provide for various levels of benefits to employees (depending on their dates of hire) who retire from the Company after age 55 with at least 10 years of service. The plans are unfunded.

The Company applies Statement of Financial Accounting Standards No. 106, "Employer's Accounting for Postretirement Benefits Other than Pensions," which requires the accrual method of accounting for the future costs of postretirement health care and life insurance benefits over the employees' years of service. Grace pays the costs of postretirement benefits as they are incurred.

Actuarial calculations of net postretirement benefit costs and accrued obligations for Grace Packaging participants within the Grace retiree medical and life insurance plans were performed as if Grace Packaging were a stand-alone entity. Included in other liabilities are the following:

|  | December 31, | |
|---|---|---|
|  | 1996 | 1995 |
| Accumulated postretirement benefit obligation: | | |
| Retirees.................................... | $23,500 | $34,400 |
| Fully eligible participants................. | 2,500 | 5,500 |
| Active ineligible participants.............. | 19,300 | 12,200 |
|  | 45,300 | 52,100 |
| Unrecognized net loss....................... | -- | (11,300) |
| Unrecognized prior service benefit.......... | 14,300 | 18,600 |
| Accrued postretirement benefit obligation | $59,600 | $59,400 |

Net periodic postretirement benefit cost for 1996, 1995 and 1994 consists of the following components:

|  | 1996 | 1995 | 1994 |
|---|---|---|---|
| Service cost................................................... | $800 | $600 | $700 |
| Interest cost on accumulated postretirement benefit obligation......... | 3,400 | 3,900 | 3,500 |
| Amortization of net loss....................................... | -- | -- | 300 |
| Amortization of prior service benefit.............................. | (1,600) | (1,800) | (1,800) |
| Net periodic postretirement benefit cost....................... | $2,600 | $2,700 | $2,700 |

Medical care cost trend rates were projected at 9.2% in 1996, declining to 6.0% through 2001 and remaining level thereafter. An increase of one percentage point in each year's assumed medical care cost trend rate, holding all other assumptions constant, would increase the annual net periodic postretirement benefit cost by $200 and the accumulated postretirement benefit obligation by $2,000. The discount rates at December 31, 1996, 1995 and 1994 were 8.0%, 7.3% and 8.5%, respectively.

Subsequent to the Reorganization, the postretirement obligation related to all retired Grace Packaging employees, and those active Grace Packaging employees who would be eligible to receive postretirement benefits if they should retire at any time on or before the first anniversary of the Reorganization, will be retained by New Grace. As of the date of the Reorganization, the Company's liability to be retained by New Grace, including related deferred income taxes, will be reversed and accounted for as an equity contribution from Grace.

Note 12. Equity

Because Grace Packaging operations have been conducted by divisions or subsidiaries of Grace Specialty Chemicals, rather than by a distinct consolidated legal entity, there are no customary equity and capital accounts. Grace Packaging's operations are funded by means of intercompany accounts with Grace Specialty Chemicals. Therefore, equity also includes intercompany balances due to Grace Specialty Chemicals arising from the funding of Grace Packaging, as well as balances related to transactions and other charges and credits between Grace Packaging and Grace, as more fully described in Note 14. The special-purpose combined financial statements include equity balances related only to Grace Packaging. Therefore, changes within the equity accounts of Grace related to the declaration and payment of dividends to its shareholders, the addition of capital contributions, the granting and exercising of stock options and the purchase of treasury stock have been excluded, since such movements related to Grace and not to Grace Packaging on a stand-alone basis. Similarly, due to the above factors, it has not been possible to state separately within equity the retained earnings of Grace related to Grace

XXX-002405

Packaging. A summary of changes in equity follows:

<TABLE>
<CAPTION>

|  | 1996 | 1995 | 1994 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Balance, beginning of year............................ | $1,227,613 | $950,374 | $768,788 |
| Net earnings......................................... | 99,830 | 140,892 | 139,511 |
| Advances from Grace Specialty Chemicals, net........... | 101,482 | 136,347 | 42,075 |
| Balance, end of year................................. | $1,428,925 | $1,227,613 | $950,374 |

</TABLE>

Cumulative translation adjustments for the three years ended December 31, 1996 were as follows:

<TABLE>
<CAPTION>

|  | 1996 | 1995 | 1994 |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Balance, beginning of year.... | $(47,265) | $(52,613) | $(69,069) |
| Translation adjustment........ | 130 | 5,348 | 16,456 |
| Balance, end of year.......... | $(47,135) | $(47,265) | $(52,613) |

</TABLE>

Stock Options. Certain of the Company's employees participate in WRG's stock incentive plans. Options granted under these plans have an exercise price equal to the market value of WRG's common stock on the date of grant, become exercisable at the time or times determined by a committee of WRG's Board of Directors and have terms of up to ten years and one month. Options to purchase approximately 6.1 million shares of WRG common stock were outstanding as of December 31, 1996, at an average exercise price of approximately $31.00. Options held by current and former employees of Grace Packaging represent approximately 10% of the 6.1 million options outstanding as of December 31, 1996.

Concurrent with the Reorganization, the outstanding options to purchase WRG common stock that are held by Grace Packaging employees will be converted to options to purchase common stock of New Sealed Air. All other options will be converted to options to purchase common stock of New Grace. The number of shares that can be purchased when the options are exercised, and the exercise price, will be adjusted using formulas designed to maintain the approximate economic value of the options at the time of the Reorganization.

The pro forma effects on earnings of applying SFAS No. 123 for those options granted during 1996 and 1995 to employees of Grace Packaging were $600 in 1996 and $500 in 1995. The fair value of option grants were estimated using the Black-Scholes option pricing model, with the following historical weighted-average assumptions applied to grants in 1996 and 1995:

<TABLE>
<CAPTION>

|  | 1996 | 1995 |
|---|---|---|
| <S> | <C> | <C> |
| Dividend yields...................... | 1% | 3% |
| Expected volatility.................. | 26% | 25% |
| Risk-free interest rates............. | 6% | 7% |
| Expected life (in years)............. | 4 | 4 |

</TABLE>

Based on the above assumptions, the weighted-average fair value per share of options granted during 1996 and 1995 was $14.00 and $7.00, respectively.

Note 13. Financial Instruments

Fair Value of Financial Instruments. At December 31, 1996 and 1995, the carrying value of financial instruments such as accounts receivable, other assets, accounts payable, and accrued liabilities approximated their fair values, based on the short-term maturities of these instruments.

Foreign Currency Contracts. Grace Packaging enters into forward foreign exchange sales and purchase contracts with Grace in order to hedge foreign currency exposures related to firm commitments to purchase inventory and fixed assets, as well as firm commitments to sell products. Gains and losses associated with these forward currency exchange contracts are deferred and included in the measurement of the related foreign currency transaction. However, losses are not deferred if it is estimated that deferral would result in the recognition of losses in later periods.

The notional principal amounts of forward foreign currency exchange contracts at December 31, 1996 and 1995 were $37,600 and $16,100, respectively. Fair market values were not significant. The Company may be exposed to foreign exchange loss in the event of nonperformance by Grace, but considers the likelihood of nonperformance remote.

Concentrations of Risk. Financial instruments that potentially expose the Company to concentrations of credit risk consist primarily of trade accounts receivable. A significant portion of the Company's sales are to

XXX-002406

customers in the food processing or distribution industry and, as such, the Company is directly affected by economic factors impacting that industry. The Company does not require collateral; however, the credit risk associated with trade receivables is minimal due to the Company's large customer base. Historically, the Company has not experienced significant losses on trade receivables.

The Company relies on certain vendors to supply its primary raw material needs; however, the Company believes that other suppliers could provide for the Company's needs on comparable terms. Adverse changes in the supply flow could, however, cause delays in manufacturing.

Note 14. Related Party Transactions and Allocations

Cash. Grace Packaging has used Grace's centralized cash management services. Under such service arrangements, excess domestic cash was invested, and disbursements were funded, centrally by Grace on behalf of Grace Packaging.

Shared Services. Grace has allocated a portion of its domestic and overseas regional corporate expenses to its business units, including Grace Packaging. These expenses have reflected corporate overhead; benefit administration; risk management/insurance administration; tax and treasury/cash management services; environmental services; litigation administration services; general legal services, including intellectual property; and other support and executive functions. Allocations and charges are based on either a direct cost pass-through or a percentage allocation for services provided, based on factors such as net sales, management effort, or headcount.

Domestic corporate expenses of Grace allocated to Grace Packaging in accordance with SAB 55 totaled $15,175, $22,542 and $19,201 for 1996, 1995 and 1994, respectively, and are included in marketing, administrative and development expenses.

Domestic research and development expenses of Grace allocated to Grace Packaging in accordance with SAB 55 totaled $5,074, $6,851 and $6,234 for 1996, 1995 and 1994, respectively, and are included in marketing, administrative and development expenses.

Management believes that the basis used for allocating corporate services is reasonable and that the terms of these transactions would not materially differ from those among unrelated parties.

Additionally, the accompanying statement of earnings includes allocations of costs for general and administrative services and maintenance services for shared facilities as well as data processing services provided by Grace's European central data processing facility. The allocated costs and expenses related to general and administrative functions, maintenance, data processing and other facility support functions were $84,005, $99,437 and $77,153 for 1996, 1995 and 1994, respectively. Of these amounts, $15,226 has been included in cost of sales and $68,779 has been included in marketing, administrative and development expenses in 1996 ($15,236 and $84,201 in 1995, and $12,942 and $64,211 in 1994). The cost allocations for these services were determined based on methods that management considers to be reasonable.

Prior to the Reorganization, New Grace and the Company expect to enter into short-term administrative and support service agreements, as necessary.

Grace has also charged Grace Packaging for its share of domestic workers' compensation, automobile and other general business liability insurance premiums and claims, which have all been handled by Grace on a corporate basis. These charges have been based on Grace Packaging's actual and expected future experience, including actual payroll expense, and have not been significant to the Company's results of operations.

Shared Facilities. The Company shares certain sales, manufacturing and administration facilities with Grace. Subsequent to the Reorganization, ownership of these shared facilities will either be retained by the Company, retained by New Grace or physically divided between the Company and New Grace. In certain locations where the ownership of facilities cannot be legally divided in accordance with the business needs of Grace Packaging and New Grace, the two parties will enter into lease or similar agreements under which one of the parties will retain ownership of land and buildings and lease space to the other.

The property and equipment included in the accompanying balance sheet have been allocated in accordance with the expected ownership of such assets subsequent to the Reorganization.

Note 15. Commitments and Contingencies

Contingent Non-Grace Packaging Liabilities. New Grace has agreed to indemnify the Company against all liabilities of Grace, whether relating to events occurring before or after the Reorganization, other than liabilities arising from or relating to Grace Packaging operations (unless otherwise retained by New Grace under the terms of the Transaction Agreements). After the Reorganization, the Company may remain contingently liable with respect to pre-Reorganization liabilities that are not related to Grace Packaging operations. Management believes that in view of the nature of the non-Grace Packaging liabilities, New Grace's agreement to indemnify the Company and the expected impact of the Reorganization on New Grace's financial position, the risk of loss to the Company from non-Grace Packaging liabilities is remote.

Environmental. The Company is subject to loss contingencies

XXX-002407

resulting from environmental laws and regulations. The Company accrues for anticipated costs associated with investigatory and remediation efforts when an assessment has indicated that a loss is probable and can be reasonably estimated. These accruals do not take into account any discounting for the time value of money and are not reduced by potential insurance recoveries, if any. The Company's liabilities for environmental investigatory and remediation costs totaled approximately $4,800 and $5,300 at December 31, 1996 and 1995, respectively, and are included in other current liabilities in the accompanying special-purpose combined balance sheet.

 The Company's environmental liabilities are reassessed whenever circumstances become better defined and/or remediation efforts and their costs can be better estimated. These liabilities are currently evaluated periodically, based on available information, including the progress of remedial investigation at each site, the current status of discussions with regulatory authorities regarding the methods and extent of remediation and the apportionment of costs among potentially responsible parties. As some of these issues are decided (the outcomes of which are subject to uncertainties) and/or new sites are assessed and costs can be reasonably estimated, the Company will continue to review and analyze the need for adjustments to the recorded accruals. However, the Company believes that it is adequately reserved for all probable and estimable environmental exposures.

 Subsequent to the Reorganization, certain Grace Packaging environmental liabilities (for which approximately $4,200 was accrued as of December 31, 1996) will be retained by New Grace. As of the date of the Reorganization, the Company's liability with respect to such environmental obligations retained by New Grace, including related deferred income taxes, will be reversed and accounted for as an equity contribution from WRG.

 Guarantee of New Grace Outstanding Public Debt. WRG currently is the guarantor of the outstanding public debt (approximately $757,184 at December 31, 1996) of Grace Specialty Chemicals, which will be owned by New Grace upon completion of the Reorganization. WRG will continue as the guarantor of any of such debt remaining outstanding following the Reorganization. New Grace will indemnify New Sealed Air against any liability arising from the guarantee. To the extent that more than $50,000 of such debt remains outstanding after the Reorganization, New Sealed Air will receive a letter of credit to be obtained by New Grace to cover any payments it must make under its guarantee.

Note 16. Information About Foreign Operations

 The table below provides information pertaining to Grace Packaging's operations by geographic area. Interregion sales, eliminated in combination, were not significant.

<TABLE>
<CAPTION>

| | | United States and Canada | Europe | Asia Pacific | Latin America | Total |
|---|---|---|---|---|---|---|
| <S> | | <C> | <C> | <C> | <C> | <C> |
| Net sales................ | 1996 | $864,254 | $530,328 | $202,560 | $144,460 | $1,741,602 |
| | 1995 | 859,223 | 520,571 | 194,836 | 131,012 | 1,705,642 |
| | 1994 | 750,921 | 400,571 | 164,447 | 112,520 | 1,428,459 |
| Earnings before income | | | | | | |
| taxes(1) ............... | 1996 | 95,543 | 16,987 | 26,557 | 30,735 | 169,822 |
| | 1995 | 108,283 | 63,222 | 38,057 | 25,911 | 235,473 |
| | 1994 | 108,838 | 57,425 | 36,603 | 24,886 | 227,752 |
| Identifiable Assets....... | 1996 | 873,754 | 452,272 | 258,563 | 118,299 | 1,702,888 |
| | 1995 | 726,243 | 454,607 | 193,544 | 102,966 | 1,477,360 |
| | 1994 | 563,357 | 387,598 | 140,200 | 88,782 | 1,179,937 |

</TABLE>

- -----------
(1) Includes 1996, 1995 and 1994 pretax charges of $74,947, $17,745 and $6,021, respectively, relating to restructuring costs and asset impairments (see Note 8).

Note 17. Quarterly Summary (Unaudited)

<TABLE>
<CAPTION>

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| 1996 | | | | |
| Net sales............. | $409,141 | $426,340 | $436,131 | $469,990 |
| Cost of sales........ | 265,534 | 286,270 | 288,530 | 310,672 |
| Net earnings.......... | 29,780 | 7,975 | 41,058 | 21,017 |
| 1995 | | | | |
| Net sales............. | $390,831 | $423,445 | $437,217 | $454,149 |
| Cost of sales........ | 241,556 | 266,085 | 277,809 | 292,650 |
| Net earnings.......... | 36,759 | 38,658 | 41,560 | 23,915 |

</TABLE>

W. R. Grace & Co.
Grace Packaging
SPECIAL-PURPOSE COMBINED INTERIM STATEMENT OF EARNINGS
(Unaudited)
(Dollars in thousands)

<TABLE>

XXX-002408

```
<CAPTION>
                                                 Nine Months Ended
                                                   September 30,
                                                 ---------------------
                                                  1997          1996
                                                 ----------   ----------
<S>                                              <C>          <C>
Net sales......................................  $1,347,739   $1,271,612
Cost of sales..................................     873,856      840,334
                                                 ----------   ----------
       Gross profit............................     473,883      431,278
Marketing, administrative and development expenses. 273,594      255,202
Restructuring costs............................       8,371       36,970
                                                 ----------   ----------
       Operating profit........................     191,918      139,106
Other expenses, net............................       2,215        5,036
                                                 ----------   ----------
Earnings before income taxes...................     189,703      134,070
Income taxes...................................      78,158       55,257
                                                 ----------   ----------
       Net earnings............................    $111,545      $78,813
                                                 ==========   ==========
</TABLE>
```

W. R. Grace & Co.
Grace Packaging
SPECIAL-PURPOSE COMBINED INTERIM BALANCE SHEET
(Unaudited)
(Dollars in thousands)

```
<TABLE>
<CAPTION>
                                                 September 30,
                                                     1997
                                                 ---------------
<S>                                              <C>
Assets
Current Assets
    Cash and cash equivalents..................  $        --
    Notes and accounts receivable, net of allowances
      for doubtful accounts of $6,519..........         272,807
    Inventories................................         228,874
    Deferred income taxes......................          13,223
    Other current assets.......................          14,521
                                                 ---------------
       Total Current Assets....................         529,425
Properties and equipment, net..................       1,082,356
Goodwill, less accumulated amortization of $294.         13,118
Other assets...................................          58,533
                                                 ---------------
       Total Assets............................      $1,683,432
                                                 ===============

Liabilities and Equity
Current Liabilities
    Accounts payable...........................        $111,108
    Other current liabilities..................          94,807
                                                 ---------------
       Total Current Liabilities...............         205,915
Other liabilities..............................          93,580
Deferred income taxes..........................           2,119
                                                 ---------------
       Total Liabilities.......................         301,614
                                                 ---------------
Commitments and contingencies (Note 3)

Equity
    Equity.....................................       1,468,825
    Cumulative translation adjustments.........         (87,007)
                                                 ---------------
       Total Equity............................       1,381,818
                                                 ---------------
       Total Liabilities and Equity............      $1,683,432
                                                 ===============
</TABLE>
```

See accompanying Notes to Special-Purpose Combined Interim Financial Statements.

W. R. Grace & Co.
Grace Packaging
SPECIAL-PURPOSE COMBINED INTERIM STATEMENT OF CASH FLOWS
(Unaudited)
(Dollars in thousands)

```
<TABLE>
<CAPTION>
                                                              Nine Months Ended
                                                                September 30,
                                                            ---------------------
                                                             1997          1996
                                                            ----------   ----------
<S>                                                         <C>          <C>
Cash Flows from Operating Activities:
    Net earnings..........................................   $111,545      $78,813
```

| | | |
|---|---:|---:|
| Adjustments to reconcile net earnings to cash provided by operating activities: | | |
| Depreciation and amortization of property and equipment.......................... | 78,701 | 69,586 |
| Other depreciation and amortization............................................. | 8,371 | 36,970 |
| Restructuring................................................................... | -- | -- |
| Asset impairment................................................................ | 12,261 | (305) |
| Deferred tax provisions......................................................... | 594 | 504 |
| Net loss on disposals of property and equipment................................. | | |
| Changes in operating assets and liabilities net of assets and liabilities acquired | | |
| Notes and accounts receivable, net............................................ | (5,161) | (31,354) |
| Inventories.................................................................. | (2,355) | 27,764 |
| Other current assets......................................................... | (2,910) | (285) |
| Other assets................................................................. | (5,150) | (15,032) |
| Accounts payable............................................................. | (20,170) | (30,545) |
| Other accrued liabilities.................................................... | (19,998) | 27,677 |
| Other liabilities............................................................ | 7,318 | 1,680 |
| Net cash provided by operating activities.................................... | 163,046 | 165,481 |
| | | |
| **Cash Flows from Investing Activities:** | | |
| Capital expenditures for property and equipment................................. | (77,952) | (232,719) |
| Proceeds from sales of property and equipment................................... | 260 | 109 |
| Businesses acquired in purchase transactions, net of cash acquired and debt assumed............................................................................ | (13,709) | (16,037) |
| Net cash used in investing activities........................................ | (91,401) | (248,647) |
| | | |
| **Cash Flows from Financing Activities:** | | |
| Net advances (to)/from W. R. Grace & Co.-Conn................................... | (71,645) | 83,166 |
| Net cash provided by/(used for) financing activities......................... | (71,645) | 83,166 |
| | | |
| Effect of exchange rate changes on cash and cash equivalents.................... | -- | -- |
| | | |
| **Cash and Cash Equivalents:** | | |
| Net change during the period.................................................... | -- | -- |
| Balance, beginning of period.................................................... | -- | -- |
| Balance, end of period.......................................................... | $ -- | $ -- |
| Supplemental Disclosures of Cash Flow Information: | | |
| Cash paid during the year for income taxes...................................... | $65,897 | $55,562 |

</TABLE>

See accompanying Notes to Special-Purpose Combined Interim Financial Statements.

W. R. GRACE & CO.
Grace Packaging
NOTES TO SPECIAL-PURPOSE COMBINED INTERIM FINANCIAL STATEMENTS

Note 1. Basis of Presentation

The interim special-purpose combined financial statements have been prepared by the Company in accordance with the accounting policies stated in the December 31, 1996 special-purpose combined financial statements, except as noted below, and should be read in conjunction with the notes to special-purpose combined financial statements appearing therein. These interim financial statements are presented on a combined basis as described in Note 1 to the December 31, 1996 historical combined financial statements appearing elsewhere herein. In the opinion of the Company, all adjustments (consisting of normal recurring adjustments) necessary for a fair presentation have been included in the interim combined financial statements. The interim combined financial statements are based in part on approximations and have not been audited by independent accountants.

Note 2. Inventories

The Company's inventories consist of the following:

<TABLE>
<CAPTION>

| | September 30, 1997 |
|---|---:|
| Inventories (at FIFO, which approximates current cost): | |
| Raw materials.................................... | $44,236 |
| Work in process................................. | 69,575 |
| Finished goods.................................. | 132,911 |
| | 246,722 |
| Reduction of certain inventories to LIFO basis............ | (17,848) |
| Total............................................. | $228,874 |

</TABLE>

Note 3. Commitments and Contingencies

See Notes 7 and 15 of the Notes to the Special-Purpose Financial Statements for details regarding commitments and contingencies.

Note 4. Quarterly Summary (Unaudited)

XXX-002410

```
<TABLE>
<CAPTION>
                    First Quarter      Second Quarter      Third Quarter
                   ----------------    ----------------    ----------------
<S>                     <C>                 <C>                 <C>
1997
Net sales........       $422,693            $463,211            $461,835
Cost of sales....        274,629             299,528             299,699
Net earnings.....         37,260              38,259              36,026
</TABLE>
```

ANNEX A

==============================================================================

AGREEMENT AND PLAN OF MERGER

dated as of August 14, 1997

by and among

W. R. GRACE & CO.,

PACKCO ACQUISITION CORP.

and

SEALED AIR CORPORATION

==============================================================================

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| | RECITALS | |
| A. | Defined Terms | 1 |
| B. | The Contribution | 1 |
| C. | The Distribution | 1 |
| D. | The Recapitalization | 1 |
| E. | The Merger | 1 |
| F. | Intention of the Parties | 2 |
| G. | Approvals | 2 |

ARTICLE I

THE REORGANIZATION; CLOSING; EFFECTIVE TIME

| Section 1.1. | The Contribution, the Distribution, and the Recapitalization | 2 |
| Section 1.2. | The Merger | 2 |
| Section 1.3. | Effective Time | 2 |
| Section 1.4. | Closing | 3 |

ARTICLE II

CERTIFICATE OF INCORPORATION AND BY-LAWS

| Section 2.1. | Certificates of Incorporation | 3 |
| Section 2.2. | Surviving Corporation By-laws | 3 |

ARTICLE III

DIRECTORS AND OFFICERS

| Section 3.1. | Newco Directors | 3 |
| Section 3.2. | Newco Officers | 3 |
| Section 3.3. | Surviving Corporation Directors | 4 |
| Section 3.4. | Surviving Corporation Officers | 4 |

ARTICLE IV.

MERGER CONSIDERATION; CONVERSION OR
CANCELLATION OF SHARES IN THE MERGER

| Section 4.1. | Merger Consideration; Conversion or Cancellation of Capital Stock of Sealed Air and Merger Sub | 4 |
| Section 4.2. | Exchange of Old Certificates for New Certificates | 4 |
| | (a)  Appointment of Exchange Agent | 4 |
| | (b)  Exchange Procedures | 5 |
| | (c)  No Transfers | 6 |

XXX-002411

```
                    (d)  No Liability....................................   6
                    (e)  Withholding Rights..............................   6
                    (f)  Sealed Air Contingent Stock and Restricted
                          Stock Plans...................................   6


                              ARTICLE V

                    REPRESENTATIONS AND WARRANTIES

Section 5.1.        Representations and Warranties of Grace...............   7
                    (a)  Capital Stock...................................   7
                    (b)  Corporate Organization and Qualification........   9
                    (c)  Corporate Authority.............................   9
                    (d)  Governmental Filings; No Violations.............  10
                    (e)  SEC Documents; Financial Statements;
                          No Undisclosed Liabilities....................  11
                    (f)  Absence of Certain Events and Changes...........  11
                    (g)  Takeover Statutes; Rights Plan..................  12
                    (h)  Brokers and Finders.............................  12
                    (i)  Contribution....................................  12
                    (j)  Tax Matters.....................................  12
                    (k)  Disclosure......................................  13
Section 5.2.        Representations and Warranties for the
                    Packaging Business..................................  13
                    (a)  Corporate Organization and Qualification........  13
                    (b)  Corporate Authority.............................  13
                    (c)  Capitalization..................................  14
                    (d)  Financial Statements; No Undisclosed
                          Liabilities...................................  14
                    (e)  Absence of Certain Events and Changes...........  15
                    (f)  Compliance with Laws............................  15
                    (g)  Title to Assets.................................  16
                    (h)  Litigation......................................  16
                    (i)  Taxes...........................................  17
                    (j)  Environmental Matters...........................  17
                    (k)  Contracts and Commitments.......................  18
                    (l)  Employee Benefit Plans..........................  19
                    (m)  Trademarks, Patents and Copyrights..............  22
Section 5.3.        Representations and Warranties of Sealed Air.........  23
                    (a)  Capital Stock...................................  23
                    (b)  Corporate Organization and
                          Qualification..................................  24
                    (c)  Corporate Authority.............................  24
                    (d)  Governmental Filings; No Violations.............  25
                    (e)  SEC Documents; Financial Statements; No
                          Undisclosed Liabilities........................  26
                    (f)  Absence of Certain Events and Changes...........  26
                    (g)  Compliance with Laws............................  27
                    (h)  Title to Assets.................................  27
                    (i)  Litigation......................................  28
                    (j)  Taxes...........................................  28
                    (k)  Contracts and Commitments.......................  29
                    (l)  Employee Benefits...............................  29
                    (m)  Environmental Matters...........................  32
                    (n)  Takeover Statutes; Rights Plans.................  32
                    (o)  Brokers and Finders.............................  32
                    (p)  Trademarks, Patents and Copyrights..............  33
                    (q)  Tax Matters.....................................  33
                    (r)  Disclosure......................................  33


                              ARTICLE VI

                              COVENANTS

Section 6.1.        Interim Operations...................................  34
Section 6.2.        Certain Transactions.................................  36
Section 6.3.        Acquisition Proposals................................  36
Section 6.4.        Information Supplied.................................  38
Section 6.5.        Shareholder Approvals................................  38
Section 6.6.        Filings; Other Actions..............................  39
Section 6.7.        Audited Financial Statements; Comfort
                    Letters.............................................  40
Section 6.8.        Access..............................................  40
Section 6.9.        Notification of Certain Matters.....................  41
Section 6.10.       Publicity...........................................  41
Section 6.11.       Employee Benefits; Headquarters Employees...........  41
Section 6.12.       Expenses............................................  42
Section 6.13.       Antitakeover Statutes...............................  45
Section 6.14.       Securities Act Compliance...........................  45
Section 6.15.       Transaction Agreements..............................  45
Section 6.16.       Tax Matters.........................................  45


                              ARTICLE VII

                              CONDITIONS

Section 7.1.        Conditions to Each Party's Obligation...............  46
                    (a)  Shareholder Approval............................  46
                    (b)  Governmental and Regulatory Consents............  46
                    (c)  Third-Party Consents............................  46
                    (d)  Governmental Matters............................  47
                    (e)  Tax Opinions....................................  47
```

XXX-002412

|              |     |                                                        |    |
|--------------|-----|--------------------------------------------------------|----|
|              | (f) | Registration Statements                                | 47 |
|              | (g) | The Contribution, the Distribution and                 |    |
|              |     | the Recapitalization                                   | 47 |
|              | (h) | Stock Exchange Listing                                  | 47 |
| Section 7.2. |     | Conditions to Obligation of Grace                      | 48 |
|              | (a) | Representations and Warranties                          | 48 |
|              | (b) | Performance of Obligations                             | 48 |
| Section 7.3. |     | Conditions to Obligation of Sealed Air                 | 48 |
|              | (a) | Representations and Warranties                          | 48 |
|              | (b) | Performance of Obligations                             | 49 |
|              | (c) | Letter of Credit                                       | 49 |
|              | (d) | Solvency Opinion                                       | 49 |

ARTICLE VIII

TERMINATION

| Section 8.1. | Termination by Mutual Consent......................... | 49 |
|--------------|-------------------------------------------------------|----|
| Section 8.2. | Termination by any Party Hereto...................... | 49 |
| Section 8.3. | Termination by Grace................................. | 50 |
| Section 8.4. | Termination by Sealed Air............................ | 50 |
| Section 8.5. | Effect of Termination and Abandonment................ | 51 |

ARTICLE IX

MISCELLANEOUS AND GENERAL

| Section 9.1.  | Survival                                | 51 |
|---------------|-----------------------------------------|----|
| Section 9.2.  | Modification or Amendment                | 51 |
| Section 9.3.  | Waiver of Conditions                    | 51 |
| Section 9.4.  | Counterparts                            | 51 |
| Section 9.5.  | Governing Law                           | 52 |
| Section 9.6.  | Notices                                 | 52 |
| Section 9.7.  | Entire Agreement; Assignment.           | 52 |
| Section 9.8.  | Definition of "Subsidiary"              | 53 |
| Section 9.9.  | Captions                                | 53 |
| Section 9.10. | Specific Performance                    | 53 |
| Section 9.11. | Severability                            | 53 |
| Section 9.12. | Third-Party Beneficiaries               | 54 |
| Section 9.13. | Further Assurances                      | 54 |

| Annex A | Defined Terms |
|---------|---------------|

| Exhibit A | Form of Distribution Agreement                    |
|-----------|---------------------------------------------------|
| Exhibit B | Forms of Tax Matters Certificates                 |
| Exhibit C | Form of Grace Tax Opinion                         |
| Exhibit D | Form of Sealed Air Tax Opinion                    |
| Exhibit E | Terms of Newco Convertible Preferred Stock        |
| Exhibit F | Terms of Newco Amendment                          |

Grace Disclosure Letter
Packaging Business Disclosure Letter
Sealed Air Disclosure Letter

AGREEMENT AND PLAN OF MERGER, dated as of August 14, 1997
(this "Agreement"), by and among W. R. GRACE & CO., a Delaware corporation
("Grace"), Packco Acquisition Corp., a Delaware corporation and a wholly-owned
subsidiary of Grace ("Merger Sub"), and Sealed Air Corporation, a Delaware
corporation ("Sealed Air").

RECITALS
--------

A.  Defined Terms.  Certain capitalized terms used herein shall
have the meanings set forth in Annex A hereto.

B. The Contribution. Prior to the Effective Time, and pursuant to
the Distribution Agreement, a form of which is attached hereto as Exhibit A (the
"Distribution Agreement"), Grace intends to contribute (the "Contribution") its
worldwide packaging business (other than the container business group) to an
indirect, newly-formed Delaware subsidiary of Grace ("Packco").

C. The Distribution. Prior to the Effective Time, Grace, New Grace
(as defined in the Distribution Agreement) and W. R. Grace & Co.-Conn.
("Grace-Conn.") intend to consummate the transactions contemplated by the
Distribution Agreement, including the distribution by Grace to the holders of
Grace Common Shares all of the common stock of New Grace (the "Distribution").

D. The Recapitalization. Immediately prior to the Effective Time,
but following the Distribution, Grace shall be recapitalized (as defined in the
Distribution Agreement, the "Recapitalization") so that the holders of Grace
Common Shares shall thereafter hold Newco Common Shares and Newco Convertible
Preferred Shares, all as provided in the Distribution Agreement.

E. The Merger. At the Effective Time, the parties intend to effect a
merger of Merger Sub with and into Sealed Air, with Sealed Air being the
surviving corporation (the "Merger"), the Certificate of Incorporation of Sealed
Air shall be amended to change the name of Sealed Air to a different name as
determined by Sealed Air, and the Certificate of Incorporation of Grace shall be
amended (the "Newco Amendment") to change the name of Grace to "Sealed Air
Corporation" (such corporation, from and after the Effective Time, is sometimes

XXX-002413

hereinafter referred to as "Newco") and to effect the other amendments described in Exhibit F hereto.

F. Intention of the Parties. It is the intention of the parties to this Agreement that, for United States federal income tax purposes, the Distribution, Recapitalization and related transactions shall be tax-free to Grace and its shareholders under the Code and the Merger shall qualify as a "reorganization" within the meaning of Section 368 of the Code and the Merger will be tax-free under the Code to Grace, Sealed Air and their respective shareholders.

G. Approvals. The Board of Directors of each party hereto has determined that this Agreement is in the best interests of such party and its shareholders and has duly approved this Agreement and authorized its execution and delivery.

NOW, THEREFORE, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties hereto hereby agree as follows:

## ARTICLE I

### THE REORGANIZATION; CLOSING; EFFECTIVE TIME

1.1. The Contribution, the Distribution, and the Recapitalization. Subject to the terms and conditions of the Distribution Agreement, prior to the Effective Time, the parties thereto shall effect the various transactions contemplated thereby, including the Contribution, the Distribution and the Recapitalization.

1.2. The Merger. At the Effective Time, Sealed Air and Merger Sub shall consummate the Merger in which Merger Sub shall be merged with and into Sealed Air and the separate corporate existence of Merger Sub shall thereupon cease. Sealed Air shall be the surviving corporation of the Merger (the "Surviving Corporation") and shall continue to be governed by the laws of the State of Delaware.

1.3. Effective Time. Provided that this Agreement shall not have been terminated in accordance with its terms, as promptly as practicable after all of the conditions to the Merger shall have been satisfied or waived (or on such later date as the parties hereto may agree in writing), the parties hereto shall cause the Merger to be consummated by filing a certificate of merger (the "Merger Certificate") with the Secretary of State of the State of Delaware in such form as required by, and executed in accordance with, Section 251 of the Delaware General Corporation Law (the "DGCL"). The Merger shall become effective upon the date and at the time (the "Effective Time") on which the Merger Certificate has been duly filed with the Secretary of State of the State of Delaware, or at such later date and time as set forth therein.

1.4. Closing. The closing of the Reorganization (the "Closing") shall take place at the offices of Wachtell, Lipton, Rosen & Katz, New York, New York, at 10:00 A.M. on the first business day on which all the conditions set forth in Article VII can be fulfilled or are waived, or at such other place and/or time as the parties hereto may agree. The date upon which the Closing shall occur is herein called the "Closing Date."

## ARTICLE II

### CERTIFICATE OF INCORPORATION AND BY-LAWS

2.1. Certificates of Incorporation. The certificate of incorporation of Merger Sub, as in effect at the Effective Time, shall be the certificate of incorporation of the Surviving Corporation (the "S.C. Certificate of Incorporation"), until duly amended in accordance with the terms thereof and the DGCL. At the Effective Time, the Certificate of Incorporation of Grace (the "Grace Certificate of Incorporation") shall be amended as set forth in the Newco Amendment.

2.2. Surviving Corporation By-laws. The By-laws of Merger Sub, as in effect at the Effective Time, shall be the By-laws of the Surviving Corporation until duly amended in accordance with the terms thereof, the S.C. Certificate of Incorporation and the DGCL.

## ARTICLE III

### DIRECTORS AND OFFICERS

3.1. Newco Directors. Immediately after the Effective Time, the directors of Newco shall be the seven directors of Sealed Air immediately prior to the Effective Time and four independent directors selected by Grace from the existing Grace Board.

3.2. Newco Officers. Immediately after the Effective Time, the officers of Newco shall be the Chief Executive Officer of Sealed Air, the Chief Operating Officer of Sealed Air, the current President of Grace Packaging and such other officers as may be named in the Joint Proxy Statement or duly appointed or elected by the Board of Directors of Newco.

3.3. Surviving Corporation Directors. Immediately after the Effective Time, the directors of the Surviving Corporation shall be as designated by Newco.

XXX-002414

3.4. Surviving Corporation Officers.  Immediately after the Effective Time, the officers of Sealed Air shall be the officers of the Surviving Corporation.

ARTICLE IV

MERGER CONSIDERATION; CONVERSION OR
CANCELLATION OF SHARES IN THE MERGER

4.1. Merger Consideration; Conversion or Cancellation of Capital Stock of Sealed Air and Merger Sub. At the Effective Time, by virtue of the Merger and without any action on the part of the holder of any capital stock of Sealed Air or Merger Sub:

(a) Each Sealed Air Common Share issued and outstanding immediately prior to the Effective Time (other than any Sealed Air Common Share owned by Grace or its subsidiaries or any Sealed Air subsidiary or held in Sealed Air's treasury) shall be converted into and become at the Effective Time one Newco Common Share.

(b) Each Newco Common Share and each Newco Convertible Preferred Share issued and outstanding immediately prior to the Effective Time shall remain issued and outstanding and shall be unchanged by the Merger.

(c) All Sealed Air Common Shares shall cease to be outstanding, shall be cancelled and retired and shall cease to exist.

(d) Each Sealed Air Common Share issued and outstanding immediately prior to the Effective Time and owned by Grace or its subsidiaries or any Sealed Air subsidiary or held in Sealed Air's treasury shall cease to be outstanding, shall be cancelled and retired without payment of any consideration therefor and shall cease to exist.

(e) Each share of Merger Sub Common Stock issued and outstanding immediately prior to the Effective Time shall be converted into and become one share of common stock of the Surviving Corporation.

4.2. Exchange of Old Certificates for New Certificates. (a) Appointment of Exchange Agent. From and after the Effective Time until the end of the six-month period following the Effective Time, Newco shall make available or cause to be made available to an exchange agent appointed prior to the Effective Time with the approval of each of Grace and Sealed Air (the "Exchange Agent") Newco Certificates in amounts sufficient to allow the Exchange Agent to make all deliveries of Newco Certificates that are requested by holders of Old Sealed Air Certificates in exchange for Old Sealed Air Certificates pursuant to this Article IV. In its discretion, Newco may elect to evidence ownership of Newco Common Shares through a book-entry transfer agent, in which case the Exchange Agent shall deliver, upon compliance by a former Sealed Air shareholder with the provisions of Section 4.2(b), a book-entry account statement evidencing the ownership of Newco Common Shares (or, at the request of a former Sealed Air shareholder, a Newco Certificate evidencing such ownership). In the event Newco so elects, references herein to Newco Certificates shall be deemed to include references to the book-entry account statements relating to the ownership of Newco Common Shares.

(b) Exchange Procedures. Promptly after the Effective Time, Newco shall cause the Exchange Agent to mail or deliver to each person who was, at the Effective Time, a holder of record of Sealed Air Common Shares a letter of transmittal (the terms of which shall be mutually agreed upon by the parties hereto prior to the Effective Time) containing instructions for use by holders of Sealed Air Common Shares who may, in their discretion, desire to surrender their Old Sealed Air Certificates in exchange for Newco Certificates pursuant to this Article IV. Upon surrender to the Exchange Agent of an Old Sealed Air Certificate for cancellation together with such letter of transmittal, duly executed and completed in accordance with the instructions thereto, the holder of such Old Sealed Air Certificate shall be entitled to receive in exchange therefor a Newco Certificate representing the Newco Common Shares and the Old Sealed Air Certificate so surrendered shall forthwith be cancelled. If any Newco Certificate is to be issued in a name other than that in which the Old Sealed Air Certificate surrendered in exchange therefor is registered, it shall be a condition of such exchange that the person requesting such exchange shall pay any transfer or other taxes required by reason of the issuance of such in a name other than that of the registered holder of the Old Sealed Air Certificate surrendered, or shall establish to the satisfaction of Newco that any such taxes have been paid or are not applicable. Six months after the Effective Time, Newco shall be entitled to cause the Exchange Agent to deliver to it any applicable Newco Certificates made available to the Exchange Agent that are unclaimed by the former shareholders of Sealed Air. Any such former shareholders who have not theretofore exchanged their Old Sealed Air Certificates for Newco Certificates pursuant to this Article IV who desires to do so shall thereafter be entitled to look exclusively to Newco and only as general creditors thereof to obtain Newco Certificates to which they become entitled upon exchange of their Old Sealed Air Certificates pursuant to this Article IV. Newco shall pay all applicable charges and expenses in connection with the exchange of Newco Certificates for Old Sealed Air Certificates as contemplated hereby.

(c) No Transfers. At or after the Effective Time, there shall be no transfers on the stock transfer books of the Surviving Corporation of Sealed Air Common Shares which were outstanding immediately prior to the Effective Time.

(d) No Liability. If any Old Sealed Air Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such Certificate to be lost, stolen or destroyed and, if required by Newco, the posting by such person of a bond in such reasonable

XXX-002415

amount as Newco may direct as indemnity against any claim that may be made against it with respect to such Old Sealed Air Certificate, Newco snall, in exchange for such lost, stolen or destroyed Old Sealed Air Certificates, issue or cause to be issued the Newco Certificate deliverable in respect thereof pursuant to this Article IV. No party hereto, nor the Exchange Agent, shall be liable to any holder of former Sealed Air Common Shares for any cash delivered to a public official pursuant to any applicable abandoned property, escheat or similar law.

(e) Withholding Rights. Newco shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any holder of former Sealed Air Common Shares such amounts as may be required to be deducted and withheld with respect to the making of such payment under the Code, or under any provision of state, local or foreign tax law. To the extent that amounts are so withheld and paid over to the appropriate taxing authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the holder of the former Sealed Air Common Shares in respect of which such deduction and withholding was made.

(f) Sealed Air Contingent Stock and Restricted Stock Plans. The Sealed Air Stock Plans shall be amended in accordance with their terms and applicable law, with the effect that as of the Effective Time, among other things, (i) all of the rights and obligations of Sealed Air under the Sealed Air Stock Plans, including with respect to awards outstanding at the Effective Time, shall be rights and obligations of Newco following the Effective Time and (ii) each unexercised right granted under the Sealed Air Stock Plans to purchase a Sealed Air Common Share shall constitute a right to purchase a Newco Common Share in accordance with the terms and conditions of the applicable Sealed Air Stock Plans, as amended from time to time.

ARTICLE V

REPRESENTATIONS AND WARRANTIES

5.1. Representations and Warranties of Grace. Grace hereby represents and warrants to Sealed Air that, except as set forth in a letter delivered to Sealed Air simultaneously with the execution and delivery of this Agreement (the "Grace Disclosure Letter"):

(a) Capital Stock. (i) Grace. The authorized capital stock of Grace consists of 300,010,165 Grace Common Shares, par value $.01 per share, of which 73,409,932 were outstanding as of August 1, 1997, and 53,000,000 Grace Preferred Shares, par value $.01 per share, of which, as of August 1, 1997, none was outstanding. As of August 1, 1997, 6,224,234 Grace Common Shares were held in the treasury of Grace. As of the Effective Time, there will be no Grace Common Shares held in the treasury of Grace. As of August 1, 1997, there were outstanding under the Grace 1996 Stock Incentive Plan, the Grace 1994 Stock Incentive Plan, the Grace 1989 Stock Incentive Plan, the Grace 1986 Stock Incentive Plan, the Grace 1981 Stock Incentive Plan, and the Grace 1997 Stock Retainer Plan for Nonemployee Directors and any other plan for employees or directors of Grace (collectively, the "Grace Stock Plans") options to acquire an aggregate of 5,655,954 Grace Common Shares (subject to adjustment on the terms set forth in the Grace Stock Plans) at an average exercise price of $34.65 per share (the "Grace Options"). Such Grace Options include options to acquire an aggregate of 669,887 Grace Common Shares at an average exercise price of $40.81 per share held by Packco Employees (based on information regarding the identity of such employees as of the date hereof and as defined in the Benefits Agreement). As of August 1, 1997, there were no shares of capital stock of Grace reserved for issuance, other than 3,000,000 Grace Preferred Shares reserved for issuance in connection with the Grace Rights and 12,189,285 Grace Common Shares reserved for issuance under the Grace Stock Plans. All outstanding Grace Common Shares have been duly authorized and validly issued and are fully paid and nonassessable, and all Grace Common Shares issuable under the Grace Stock Plans have been duly authorized and will, upon issuance in accordance with the Grace Stock Plans and any agreements thereunder, be validly issued, fully paid and nonassessable. Except for the Grace Common Shares, Grace has outstanding no bonds, debentures, notes or other obligations or securities the holders of which have the right to vote (or are convertible or exchangeable into or exercisable for securities having the right to vote) with the shareholders of Grace on any matter. Except as set forth above, except for Grace Common Shares issued after August 1, 1997 pursuant to the terms of options, securities or plans referred to above and except in connection with the Transaction Agreements, there are no shares of capital stock of Grace authorized, issued or outstanding and there are no preemptive rights or any outstanding subscriptions, options, puts, calls, warrants, rights, convertible or exchangeable securities or other agreements or commitments of Grace or any of its subsidiaries of any character relating to the issued or unissued capital stock or other securities of Grace or any of its subsidiaries (including, without limitation, the issuance, sale, purchase, redemption, conversion, exchange, redemption, voting or transfer thereof). The Newco Common Shares to be issued in the Recapitalization and the Merger or upon exercise of the Grace Options after the Recapitalization and the Newco Preferred Shares to be issued in the Recapitalization will, upon such issuance, be duly authorized, fully paid, validly issued and nonassessable.

(ii) Merger Sub. The authorized capital stock of Merger Sub consists of 1,000 shares of common stock, par value $.01 per share, of Merger Sub (the "Merger Sub Common Stock"). As of the date of this Agreement, 1,000 shares of Merger Sub Common Stock are issued and outstanding, all of which are duly authorized, validly issued, fully paid and nonassessable. Each issued and outstanding share of Merger Sub Common Stock is owned by Grace,

XXX-002416

free and clear of all liens, pledges, security interests, claims, proxies, preemptive or subscriptive rights and or other encumbrances or restrictions of any kind. No shares of Merger Sub Common Stock are held in the treasury of Merger Sub. There are no options, warrants or other rights, agreements, arrangements or commitments of any character relating to the issued or unissued capital stock of Merger Sub or obligating Grace or any of its subsidiaries to issue or sell any shares of capital stock, or other equity interest in, Merger Sub. As of the Effective Time, all of the outstanding shares of capital stock of the Surviving Corporation will be duly authorized, validly issued, fully paid and nonassessable, and will be owned by Grace, free and clear of all liens, pledges, security interests, claims, proxies, preemptive or subscriptive rights and or other encumbrances or restrictions of any kind. Merger Sub was formed for the purpose of effecting the Merger and has no other business activity.

(b) Corporate Organization and Qualification. Each of Grace and Merger Sub is a corporation duly organized, validly existing and in good standing under the laws of Delaware and is in good standing (if recognized in such jurisdiction, or, if not, duly qualified) as a foreign corporation in each jurisdiction where the properties owned, leased or operated, or the business conducted, by it or its subsidiaries require such qualification, except for any such failure so to qualify or be in good standing which, when taken together with all other such failures, is not reasonably likely to have a Material Adverse Effect with respect to Grace. Each of Grace and Merger Sub has the requisite corporate power and authority and all material governmental licenses and approvals to carry on its businesses as they are now being conducted. Grace has made available to Sealed Air a complete and correct copy of the Certificate of Incorporation and By-laws of Grace and Merger Sub, each as amended to date and currently in full force and effect.

(c) Corporate Authority. Subject only to the receipt of the requisite approval of its shareholders necessary to consummate the Reorganization, each of Grace, Merger Sub and each other subsidiary of Grace that is or will be a party to a Transaction Agreement has the requisite corporate power and authority and has taken all corporate action necessary in order to execute, deliver and perform each Transaction Agreement to which it is a party and to consummate the transactions contemplated hereby and thereby, including, without limitation, the approval of the Grace Board and the resolution of the Grace Board to recommend, subject to their fiduciary duties, the transactions contemplated hereby and thereby for approval by Grace shareholders. Each Transaction Agreement to which Grace, Merger Sub or any of Grace's subsidiaries is a party is, or when executed and delivered shall be, a valid and binding agreement of such person enforceable in accordance with its terms. The affirmative votes of the holders of a majority of the outstanding Grace Common Shares in favor of the Merger and related transactions (including the amendments to the Grace Certificate of Incorporation) and the Distribution are the only votes of the holders of Grace's capital stock necessary in connection with the consummation of the Reorganization.

(d) Governmental Filings; No Violations. (i) Other than as may be required under the HSR Act and similar statutes in other countries, the Exchange Act, the Securities Act, state securities laws, no notices, reports or other filings are required to be made by Grace or any Grace subsidiary with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by it or any such subsidiary from, any governmental or regulatory authority, agency, court, commission or other entity, domestic or foreign ("Governmental Entity"), in connection with the execution, delivery or performance of each Transaction Agreement to which it or any such subsidiary is a party and the consummation by it or any such subsidiary of the transactions contemplated hereby and thereby, except for such matters as would not, individually or in the aggregate, have a Material Adverse Effect with respect to the New Grace Group or the Packco Group or prevent or materially delay or enable any person to enjoin consummation of the transactions contemplated hereby and thereby.

(ii) The execution, delivery and performance by Grace or any Grace subsidiary of each Transaction Agreement to which it is a party does not or will not, and the consummation by it of any of the transactions contemplated hereby and thereby, will not, constitute or result in (with or without the giving of notice, the lapse of time or both) (A) a breach or violation of, or a default under, its certificate of incorporation or by-laws or comparable governing instruments, or (B) a breach or violation of, or a default under, or an acceleration or termination of or change in the rights or obligations of any party under, or the creation of a lien, pledge, security interest or other encumbrance on any assets pursuant to, any provision of any agreement, lease, contract, note, mortgage, indenture, arrangement or other obligation or commitment ("Contracts") of it or any of its subsidiaries or any law, rule, ordinance or regulation or judgment, decree, order, award or governmental or non-governmental permit or license to which it or any of its subsidiaries is subject, except, in the case of clause (B) above, for such breaches, violations, defaults, accelerations or changes that are disclosed in the Grace Disclosure Letter or, individually or in the aggregate, are not reasonably likely to have a Material Adverse Effect with respect to the New Grace Group or the Packco Group or prevent or materially delay or enable any person to enjoin consummation of the Reorganization.

(e) SEC Documents; Financial Statements; No Undisclosed Liabilities. (i) Grace has filed all forms, reports and documents required to be filed by it under the Exchange Act or the Securities Act since December 31, 1994. As of its filing date, each SEC Document filed, and each SEC

XXX-002417

Document that will be filed by it or its subsidiaries prior to the Effective Time, as amended or supplemented, if applicable, pursuant to the Exchange Act or the Securities Act (A) complied or will comply in all material respects with the applicable requirements of the Exchange Act or the Securities Act and (B) did not or will not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. Each of Grace's consolidated balance sheets included in or incorporated by reference into its SEC Documents (including the related notes and schedules) fairly presents in all material respects the consolidated financial position of it and its subsidiaries as of the dates set forth therein and each of the consolidated statements of operations, cash flows and shareholders' equity included in or incorporated by reference into its SEC Documents (including any related notes and schedules) fairly presents in all material respects the consolidated results of operations, cash flows and retained earnings, as the case may be, of it and its subsidiaries for the periods set forth therein (subject, in the case of unaudited statements, to normal year-end audit adjustments), in each case in accordance with US GAAP (applied on a consistent basis).

(ii) Except as disclosed in its SEC Documents filed with the SEC prior to the date hereof, neither Grace nor any of its subsidiaries has any liabilities of any kind whatsoever, whether or not accrued, contingent or otherwise, that, individually or in the aggregate, are reasonably likely to have a Material Adverse Effect with respect to the Packco Group or the New Grace Group.

(f) Absence of Certain Events and Changes. Except (i) as disclosed in its SEC Documents filed with the SEC prior to the date hereof, and (ii) as contemplated by the Transaction Agreements, since December 31, 1996, Grace and its subsidiaries have conducted their respective businesses only in the ordinary and usual course of such businesses, and there has not been any change or development or combination of changes or developments (including any worsening of any condition currently existing) which, individually or in the aggregate, is reasonably likely to result in a Material Adverse Effect with respect to the New Grace Group.

(g) Takeover Statutes; Rights Plan. The execution, delivery and performance of this Agreement and consummation of the transactions contemplated hereby will not cause to be applicable to Grace, Section 203 of the DGCL or any similar provision (a "Takeover Statute") (after giving effect to any actions that will be taken prior to the Effective Time). The Grace Board has taken, or prior to the Effective Time will take, all requisite action in order to amend the Grace Rights Agreement so as to render the Grace Rights inapplicable to the Merger, the Recapitalization, and the Distribution and to terminate or redeem the Grace Rights at or prior to the Effective Time.

(h) Brokers and Finders. Neither Grace nor any of its subsidiaries or any of their respective officers, directors or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions contemplated herein, except pursuant to arrangements disclosed in writing to the other parties hereto prior to the date hereof.

(i) Contribution. The Packco Assets represent the worldwide Packaging Business of Grace and its subsidiaries and all of their assets used or held for use in the conduct of Grace's worldwide Packaging Business as presently conducted or as conducted at the Effective Time, as the case may be.

(j) Tax Matters. Except as reflected in its SEC Documents filed with the SEC prior to the date hereof and except for such matters that, individually or in the aggregate, are not reasonably likely to have a Material Adverse Effect with respect to the Packco Group or the New Grace Group: (i) all federal, state, local and foreign tax returns required to be filed by or on behalf of Grace or any of its subsidiaries have been timely filed, or requests for extensions have been timely filed and have been granted and have not expired, and all such filed returns are complete and accurate in all respects; (ii) all taxes shown as due and payable on returns filed by Grace or any of its subsidiaries have been paid in full; (iii) there is no outstanding audit examination, deficiency or refund litigation with respect to any taxes of Grace; (iv) all taxes, interest, additions, and penalties due with respect to completed and settled examinations or concluded litigation relating to Grace have been paid in full or have been recorded as a liability on its balance sheet (in accordance with US GAAP); (v) neither Grace nor any of its subsidiaries is a party to any tax sharing or similar agreement pursuant to which it or any of its subsidiaries has indemnified another party with respect to taxes; and (vi) neither Grace nor any of its subsidiaries has waived any applicable statute of limitations with respect to any taxes. At the Effective Time, the representations set forth in the Tax Matters Certificates of Grace-Conn., substantially in the form of Exhibit B (the "Grace Tax Matters Certificate"), will be true and correct in all respects, and such representations are hereby incorporated herein by reference with the same effect as if set forth herein in their entirety.

(k) Disclosure. The representations and warranties of Grace contained in this Agreement or in any written instrument, exhibit or certificate furnished or to be furnished by Grace to Sealed Air pursuant hereto or in connection herewith, do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading.

XXX-002418

5.2. Representations and Warranties for the Packaging Business. Grace hereby represents and warrants to Sealed Air that, except as set forth in a letter delivered to Sealed Air simultaneously with the execution and delivery of this Agreement (the "Packaging Business Disclosure Letter"):

(a) Corporate Organization and Qualification. At the Effective Time, Packco and each Packco Subsidiary will be duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and will be in good standing (if recognized in such jurisdiction, or, if not, duly qualified) as a foreign corporation in each jurisdiction where the properties owned, leased or operated, or the business conducted, by Packco or such Packco Subsidiary require such qualification, except for any such failure so to qualify or be in good standing which, when taken together with all other such failures, is not reasonably likely to have a Material Adverse Effect with respect to the Packco Group or the Packaging Business. At the Effective Time, Packco and each Packco Subsidiary will have the requisite corporate power and authority and all material governmental licenses and approvals to carry on its business as now being conducted.

(b) Corporate Authority. At the Effective Time, Packco and each Packco Subsidiary will have the requisite corporate power and authority and will have taken all corporate action necessary in order to consummate the transactions contemplated hereby and by the other Transaction Agreements.

(c) Capitalization. All issued and outstanding shares of capital stock of Packco and each Packco Subsidiary (except for an immaterial number of shares held by officers and directors of Grace and its subsidiaries as required by applicable law) will, as of the Effective Time, be owned of record and beneficially by Grace, Packco or another Packco Subsidiary, free and clear of all liens, pledges, security interests, claims, proxies, preemptive or subscriptive rights or other encumbrances or restrictions of any kind. There are no options, warrants or other rights, agreements, arrangements or commitments of any character relating to the issued or unissued capital stock of Packco or any Packco Subsidiary or obligating Packco or any Packco Subsidiary to issue or sell any shares of capital stock of, or other equity interests in, Packco or any Packco Subsidiary. There are no outstanding contractual obligations of Packco or any Packco Subsidiary to repurchase, redeem or otherwise acquire any capital stock of Packco or any Packco Subsidiary or to provide funds to make any investment (in the form of a loan, capital contribution or otherwise) in Packco or any Packco Subsidiary or any other entity. As of the Effective Time, each of the outstanding shares of capital stock of Packco, and each Packco Subsidiary will be duly authorized, validly issued, fully paid and nonassessable.

(d) Financial Statements; No Undisclosed Liabilities. (i) Included in the Packaging Business Disclosure Letter are unaudited special purpose consolidated and combined balance sheets as of December 31, 1995 and 1996 and June 30, 1997, and special purpose consolidated and combined statements of earnings before interest and taxes for the three years ended December 31, 1996 and the six months ended June 30, 1997 for the Packaging Business (such financial statements, the "Packaging Business Disclosure Letter Financial Statements," and the balance sheet as of December 31, 1996 included therein, the "Packaging Business Disclosure Letter Balance Sheet"). The balance sheets included in the Packaging Business Disclosure Letter Financial Statements (including and subject to the Basis of Presentation) fairly present in all material respects, and the special purpose consolidated and combined balance sheet to be included in the Packaging Business Financial Statements (including any related notes and schedules) shall fairly present in all material respects, the consolidated financial position of the Packaging business, in each case as of the dates set forth therein; and each of the special purpose consolidated and combined statements of earnings before interest and taxes included in the Packaging Business Disclosure Letter Financial Statements (including and subject to the Basis of Presentation) fairly presents in all material respects, and each consolidated statement of operations, cash flows and shareholders' equity to be included in the Packaging Business Financial Statements (including any related notes and schedules) shall fairly present in all material respects, the consolidated results of operations, cash flows and retained earnings, as the case may be, of the Packaging Business for the periods set forth therein, in each case in accordance with US GAAP applied on a consistent basis (subject, in the case of interim financial statements, to normal year-end adjustments).

(ii) Except as disclosed on the Packaging Business Disclosure Letter Balance Sheet or in the Basis of Presentation thereto, the Packco Group does not have any liabilities of any kind whatsoever, whether or not accrued, contingent or otherwise, that, individually or in the aggregate, are reasonably likely to have a Material Adverse Effect with respect to the Packco Group or the Packaging Business (other than liabilities to be incurred in connection with the Grace Credit Agreement).

(e) Absence of Certain Events and Changes. Except (i) as disclosed in the Packaging Business Disclosure Letter, and (ii) as contemplated by the Transaction Agreements, since December 31, 1996, the Packaging Business has been conducted only in the ordinary and usual course of business and there has not been any change or development or combination of changes or developments (including any worsening of any condition currently existing) which, individually or in the aggregate, is reasonably likely to result in a Material Adverse Effect with respect to the Packco Group or the Packaging Business.

(f) Compliance with Laws. Grace and its subsidiaries (with respect

XXX-002419

to the Packaging Business) have complied with all applicable federal, state, local and foreign statutes, laws, regulations, ordinances, rules, judgments, orders or decrees applicable thereto, except where the failure to comply is not reasonably likely, individually and in the aggregate, to have a Material Adverse Effect with respect to the Packco Group or the Packaging Business. Grace and its subsidiaries (with respect to the Packaging Business) have, and immediately after the Contribution will have, all permits, licenses, certificates of authority, orders, and approvals of, and has and will have made all filings, applications, and registrations with, federal, state, local, and foreign Governmental Entities that are required in order to permit the Packco Group to carry on the Packaging Business as it is presently conducted by Grace and its subsidiaries, except for such permits, licenses, certificates, orders, filings, applications and registrations, the failure to have or make which, individually or in the aggregate, are not reasonably likely to have a Material Adverse Effect with respect to the Packco Group or the Packaging Business.

(g) Title to Assets. Effective as of the Distribution Date and subject to the provisions of Article II of the Distribution Agreement or as disclosed in the Packaging Business Disclosure Letter, one or more members of the Packco Group will:

(i) have good and valid title to the Packco Assets (as defined in the Distribution Agreement) (including, without limitation, all assets reflected on the Packaging Business Disclosure Letter Balance Sheet or Packco Assets acquired after December 31, 1996, except for such assets as were sold since December 31, 1996 in the ordinary course of business and not in violation of this Agreement), free and clear of any Liens; and

(ii) own or have adequate rights to use all assets used or held for use in the Packaging Business as conducted by Grace and its subsidiaries as of the Distribution Date, and such rights are sufficient to permit the Packco Group to continue to operate the Packaging Business as conducted by Grace and its subsidiaries as of the Distribution Date;

in each case except for such matters as would not, individually or in the aggregate, have a Material Adverse Effect on the Packaging Business or the Packco Group. As used herein, "Lien" shall mean, with respect to any asset, any mortgage, lien, pledge, charge, security interest, encumbrance or other adverse claim of any kind in respect of such asset.

(h) Litigation. There are no civil, criminal or administrative actions, suits, claims, hearings or proceedings pending or, to the knowledge of its executive officers, threatened, or investigations pending, against Grace or its subsidiaries with respect to the Packaging Business, Packco or any Packco Subsidiary that, individually or in the aggregate, are reasonably likely to have a Material Adverse Effect with respect to the Packco Group or the Packaging Business. There are no judgments or outstanding orders, writs, injunctions, decrees, stipulations or awards (whether rendered or issued by a court or Governmental Entity, or by arbitration) against Grace or its subsidiaries with respect to the Packaging Business, Packco or any Packco Subsidiary, or any of their respective properties or businesses, which are reasonably likely, individually or in the aggregate, to have a Material Adverse Effect with respect to the Packco Group or the Packaging Business.

(i) Taxes. Except as reflected in Grace's SEC Documents filed with the SEC prior to the date hereof and except for such matters that, individually or in the aggregate, are not reasonably likely to have a Material Adverse Effect with respect to the Packco Group or the Packaging Business: (i) all federal, state, local and foreign tax returns required to be filed with respect to the Packaging Business, Packco or any Packco Subsidiary have been timely filed or requests for extensions have been timely filed and any such extension shall have been granted and not expired, and all such filed returns are complete and accurate in all material respects; (ii) all taxes shown as due and payable on returns filed with respect to the Packaging Business, Packco or any Packco Subsidiary have been paid in full; (iii) there is no outstanding audit examination, deficiency or refund litigation with respect to any taxes with respect to the Packaging Business, Packco or any Packco Subsidiary; (iv) all taxes, interest, additions, and penalties due with respect to completed and settled examinations or concluded litigation with respect to the Packaging Business, Packco or any Packco Subsidiary have been paid in full or have been recorded as a liability on the Packaging Business Disclosure Letter Balance Sheet (in accordance with the Basis of Presentation set forth therein); (v) neither Grace, Packco nor any Packco Subsidiary is a party to any tax sharing or similar agreement pursuant to which the Packaging Business has indemnified another party with respect to taxes; and (vi) neither Grace (with respect to the Packaging Business), Packco nor any of the Packco Subsidiaries has waived any applicable statute of limitations with respect to any taxes.

(j) Environmental Matters. Except as disclosed in the Grace SEC Documents filed prior to the date hereof and except for such matters that, individually and in the aggregate, are not reasonably likely to have a Material Adverse Effect with respect to the Packco Group or the Packaging Business, (i) Grace and its subsidiaries, with respect to the Packaging Business, Packco and the Packco Subsidiaries are and have been in compliance with all applicable Environmental Laws; (ii) Grace and its subsidiaries, with respect to the Packaging Business, Packco and the Packco Subsidiaries hold and have held all permits under any Environmental Law required for the operation of the Packaging Business as presently

XXX-002420

conducted and are in compliance with the terms of such permits; and (iii) neither Grace nor any of its subsidiaries, with respect to the Packaging Business, Packco, nor any of the Packco Subsidiaries has received any outstanding written notices, demand letters, claims or requests for information, nor has any complaint been filed, penalty assessed, nor is any investigation, action, claim, suit, proceeding or review pending (with respect to which Grace has provided notice), or, to the knowledge of the executive officers of Grace, threatened by any Governmental Entity or any third party that assert that Grace or any of its subsidiaries, with respect to the Packaging Business, Packco, or any of the Packco Subsidiaries may be in violation of, or liable under, any Environmental Law (including as an indemnitor in connection with any threatened or asserted claim by any third party indemnitee, which indemnity claim may be a Packco Liability (as defined in the Distribution Agreement)), and none of Grace or any of its subsidiaries, with respect to the Packaging Business, Packco, the Packco Subsidiaries or its properties is subject to any citation, court order, administrative order or decree arising under any Environmental Law. None of the real property owned or leased by Grace (with respect to the Packaging Business) or any of its subsidiaries (with respect to any Packco Asset), Packco or any Packco Subsidiary is listed on, or, to the knowledge of the executive officers of Grace, proposed for listing on the "National Priorities List" under CERCLA, or any similar state, local or foreign list of sites requiring investigation or cleanup.

(k) Contracts and Commitments. Except as set forth in the Packaging Business Disclosure Letter, and except for matters that would not, individually or in the aggregate, have a Material Adverse Effect with respect to the Packaging Business or the Packco Group, (i) Grace, Packco and the Packco Subsidiaries will not, as of the Effective Time, be parties to or bound by any Contract that materially limits the ability of Grace after the Merger, Packco, the Surviving Corporation or any of their respective subsidiaries to compete in any line of business or with any person or in any geographic area, in each case with respect to the Packaging Business or the business of Sealed Air as presently conducted; (ii) neither Grace nor any of its subsidiaries is (with or without the lapse of time or the giving of notice, or both) in breach or default in any material respect under any Contract that is material to the operation of the Packaging Business; (iii) to the knowledge of the executive officers of Grace, none of the other parties to any Contract that is material to the operation of the Packaging Business is (with or without the lapse of time or the giving of notice, or both) in breach or default in any material respect thereunder and (iv) neither Grace nor any of its subsidiaries has received any written notice of the intention of any party to terminate any Contract whether as a termination for convenience or for default of Grace or any of its subsidiaries thereunder.

(l) Employee Benefit Plans. (i) The Packaging Business Disclosure Letter includes a complete list of all material employee benefit plans, programs, policies, practices and other arrangements (regardless of whether they are funded or unfunded or foreign or domestic, but excluding any such plans, programs, policies, practices and arrangements mandated or sponsored by a Governmental Entity with respect to foreign Packco Employees) providing benefits to any current or former Packco Employee or beneficiary or dependent thereof, sponsored or maintained by Grace or any of its subsidiaries, with respect to the Packaging Business, Packco or any of the Packco Subsidiaries, or to which Grace or any of its subsidiaries, with respect to the Packaging Business, Packco or any of the Packco Subsidiaries contributes or is obligated to contribute (the "Packaging Business Plans"). Without limiting the generality of the foregoing, the term "Packaging Business Plans" includes all employee welfare benefit plans within the meaning of Section 3(1) of ERISA and all employee pension benefit plans within the meaning of Section 3(2) of ERISA; provided, that such list may not be complete as of the date hereof as to Packaging Business Plans providing benefits to foreign Packco Employees, but such list shall be updated so as to be complete as to such Packaging Business Plans promptly following the date hereof. The Packaging Business Disclosure Letter also specifically identifies those Packaging Business Plans that are sponsored, maintained or contributed to exclusively by Packco or any of the Packco Subsidiaries exclusively for the benefit of Packco Employees (the "Packaging Business-Only Plans").

(ii) With respect to each Packaging Business Plan providing benefits to U.S. Packco Employees, Grace has delivered or made available to Sealed Air and, with respect to each Packaging Business Plan providing benefits to foreign Packco Employees, promptly following the date hereof, Grace will deliver or make available to Sealed Air, a true, correct and complete copy of each of the following: (A) all plan documents and the current summary plan descriptions (if any); (B) all benefit schedules, trust agreements and insurance contracts and other funding vehicles, if any; (C) the most recent Annual Report (Form 5500 Series) and accompanying schedule, if any, or any similar filing made with any foreign authority; (D) the most recent annual financial report, if any; (E) the most recent actuarial report, if any; and (F) the most recent determination letter from the IRS or similar document issued by any other taxing authority, if any. Except as specifically provided in the foregoing documents delivered or made available to Sealed Air, there are no amendments to any Packaging Business Plan that have been adopted or approved, nor has Grace or Packco undertaken to make any such amendments.

(iii) The Packaging Business Disclosure Letter identifies each Packaging Business Plan that is intended to be a "qualified plan" within the meaning of Section 401(a) of the Code (the "Packco Qualified Plans"). The IRS has issued a favorable determination letter with respect to each Packco Qualified Plan, in each case that has not been revoked, or an application for such a letter has been or will be filed before the

XXX-002421

expiration of the remedial amendment period, and Grace knows of no
existing circumstances nor any events that have occurred that could
adversely affect the qualified status of any such plan or the related
trust. No Packaging Business-Only Plan is intended to meet the
requirements of Section 501(c)(9) of the Code.

(iv) Grace and its subsidiaries and Packco and the Packco Subsidiaries
have complied, and are now in compliance, in all material respects, with
all provisions of ERISA, the Code and all other laws and regulations
applicable to the Packaging Business-Only Plans. There is not now, nor do
any circumstances exist that could give rise to, any requirement for the
posting of security with respect to any Packaging Business-Only Plan or
the imposition of any lien on the assets of Packco or a Packco Subsidiary
under ERISA or the Code. No prohibited transaction (as defined in ERISA)
has occurred with respect to any Packaging Business-Only Plan.

(v) No Packaging Business-Only Plan is a "multi-employer plan" within
the meaning of Section 4001(a)(3) of ERISA (a "Multiemployer Plan") or a
plan that has two or more contributing sponsors at least two of whom are
not under common control within the meaning of Section 4063 of ERISA (a
"Multiple Employer Plan"). There does not now exist, nor do any
circumstances exist that could result in, any liability under (A) Title IV
of ERISA, (B) Section 302 of ERISA, (C) Sections 412 and 4971 of the Code,
(D) the continuation coverage requirements of Section 601 et seq. of ERISA
and Section 4980B of the Code, or (E) corresponding or similar provisions
of foreign laws or regulations, that would be a liability of Newco, Packco
or a Packco Subsidiary following the Effective Time, other than such
liabilities that arise solely out of, or relate solely to, the Packaging
Business-Only Plans.

(vi) All contributions required to be made to any Packaging Business
Plan by applicable law or regulation or by any plan document or other
contractual undertaking, and all premiums due or payable with respect to
insurance policies funding any Packaging Business Plan, have been timely
made or paid in full. Without limiting the generality of the foregoing,
all contributions to the Hourly SIP and the Salaried SIP (each as defined
in the Benefits Agreement) have been timely made in accordance with past
practice.

(vii) All Packaging Business Plans covering foreign Packco Employees
comply with applicable local law, except when the failure to so comply,
individually or in the aggregate, would not have a Material Adverse Effect
with respect to the Packco Group or the Packaging Business.

(viii) Neither the execution and delivery of this Agreement nor the
consummation of the transactions contemplated hereby will (either alone or
in conjunction with any other event) result in, cause the accelerated
vesting or delivery of, or increase the amount or value of, any payment or
benefit to any Packco Employee. Without limiting the generality of the
foregoing, no amount paid or payable in connection with the transactions
contemplated hereby (either solely as a result thereof or as a result of
such transactions in conjunction with any other event) will be an "excess
parachute payment" within the meaning of Section 280G of the Code.

(ix) To the knowledge of the executive officers of Grace, Grace has,
and, after the Effective Time, Packco will have, the right to amend or
terminate any Packaging Business Plan to the extent it provides
post-retirement medical and life insurance benefits under U.S. Welfare
Plans (as defined in the Benefits Agreement), other than such benefits
that the New Grace Group is responsible for providing pursuant to the
Benefits Agreement, and except as may be required by any applicable
collective bargaining agreement.

(m) Trademarks, Patents and Copyrights. Grace, Packco or a Packco
Subsidiary owns or possesses adequate licenses or other rights to use all
patents, trademarks, trade names, service marks, copyrights, licenses and
product licenses or registrations (including applications for any of the
foregoing), technology, know-how, tangible or intangible proprietary
intellectual property rights, information or material (whether conceived,
reduced to practice or under development), formulae, inventions and new
and investigational applications (including all options or other rights to
acquire any of the foregoing) as are necessary, used or held for use in
connection with the Packaging Business (the "Packaging Business
Intellectual Property"), the lack of which would reasonably be expected to
have a Material Adverse Effect with respect to the Packco Group or the
Packaging Business. None of Grace, Packco or any of its subsidiaries has
received any adverse claim by any other person with respect to the
Packaging Business Intellectual Property or is aware, to the knowledge of
the executive officers of Grace, Packco and the Packco Subsidiaries, of
any infringements with respect thereto, and there is no infringement by
Grace, Packco or any Packco Subsidiary of the intellectual property rights
of others, which, in each case, would, individually or in the aggregate,
reasonably be expected to have a Material Adverse Effect with respect to
the Packco Group or the Packaging Business. Except for matters that would
not, individually or in the aggregate, have a Material Adverse Effect with
respect to the Packaging Business, immediately after the Contribution,
Grace, Packco or a Packco Subsidiary will own or possess adequate licenses
or other rights to use (subject to the terms of the Distribution
Agreement, on substantially the same basis as currently owned or possessed
by Grace and its Subsidiaries) all of the Packaging Business Intellectual
Property. Except as contemplated by Section 2.01(d) of the Distribution
Agreement, there are no Contracts, agreements or licenses pursuant to
which Grace or any subsidiaries of Grace which are not a member of the
Packco Group will retain rights or interests of any kind in or affecting
the Packaging Business Intellectual Property.

XXX-002422

5.3. Representations and Warranties of Sealed Air. Sealed Air hereby represents and warrants to Grace that, except as set forth in a letter delivered to Grace simultaneously with the execution and delivery of this Agreement (the "Sealed Air Disclosure Letter"):

(a) Capital Stock. The authorized capital stock of Sealed Air consists of 125,000,000 Sealed Air Common Shares, par value $.01 per share, of which 42,624,246 were outstanding as of August 14, 1997, and 1,000,000 Sealed Air Preferred Shares, no par value, none of which was outstanding as of such date. 157,858 Sealed Air Common Shares were held in treasury by Sealed Air and its subsidiaries as of August 14, 1997. As of August 14, 1997, there were outstanding under the Sealed Air Amended Contingent Stock Plan and the Sealed Air Amended Restricted Stock Plan for Non-Employee Directors and any other plan for employees or directors of Sealed Air (collectively, the "Sealed Air Stock Plans") no awards granting rights to acquire Sealed Air Common Shares (subject to adjustment on the terms set forth in the Sealed Air Stock Plans). As of August 14, 1997, there are no shares of capital stock of Sealed Air reserved for issuance, other than 547,050 Sealed Air Common Shares reserved for issuance pursuant to the Sealed Air Stock Plans. All outstanding Sealed Air Common Shares have been duly authorized and validly issued and are fully paid and nonassessable. Except for the Sealed Air Common Shares, Sealed Air has outstanding no bonds, debentures, notes or other obligations the holders of which have the right to vote (or are convertible or exchangeable into or exercisable for securities having the right to vote) with the shareholders of Sealed Air on any matter. Each of the outstanding shares of capital stock of each of Sealed Air's subsidiaries has been duly authorized and validly issued and is fully paid and nonassessable and, except for an immaterial number of shares held by officers and directors of Sealed Air and its subsidiaries as required by applicable law, is owned, either directly or indirectly, by Sealed Air free and clear of all liens, pledges, security interests, claims, proxies, preemptive or subscriptive rights or other encumbrances or restrictions of any kind. Except as set forth above and except for awards and Sealed Air Common Shares issued after August 14, 1997 pursuant to the terms of the Sealed Air Profit Sharing Plan in accordance with Section 6.1(c), there are no shares of capital stock of Sealed Air authorized, issued or outstanding and there are no preemptive rights or any outstanding subscriptions, options, puts, calls, warrants, rights, convertible or exchangeable securities or other agreements or commitments of Sealed Air or any of its subsidiaries of any character relating to the issued or unissued capital stock or other securities of Sealed Air (including, without limitation, the issuance, sale, purchase, redemption, conversion, exchange, redemption, voting or transfer thereof). As of the Effective Time, the number of Sealed Air Common Shares outstanding (including any awards pursuant to the Sealed Air Stock Plans) shall not exceed the number outstanding as of August 14, 1997, except to the extent that such excess is reflected in an adjustment to the Per Share Common Consideration (as defined in the Distribution Agreement) as provided in the definition thereof.

(b) Corporate Organization and Qualification. Each of Sealed Air and its subsidiaries is a corporation duly organized, validly existing and in good standing under the laws of its or such subsidiary's jurisdiction of organization and is in good standing (if recognized in such jurisdiction, or, if not, duly qualified) as a foreign corporation in each jurisdiction where the properties owned, leased or operated, or the business conducted, by it or such subsidiary require such qualification, except for any such failure so to qualify or be in good standing which, when taken together with all other such failures, is not reasonably likely to have a Material Adverse Effect with respect to Sealed Air. Each of Sealed Air and its subsidiaries has the requisite corporate power and authority and all material governmental licenses and approvals to carry on its businesses as they are now being conducted. Sealed Air has made available to the other parties hereto a complete and correct copy of its Certificate of Incorporation and By-laws, each as amended to date and currently in full force and effect.

(c) Corporate Authority. Subject only to the receipt of the requisite approval of its shareholders to consummate the Merger, Sealed Air has the requisite corporate power and authority and has taken all corporate action necessary in order to execute, deliver and perform each Transaction Agreement to which it is a party and to consummate the transactions contemplated hereby and thereby, including, without limitation, the approval of the Sealed Air Board and the resolution of the Sealed Air Board to recommend, subject to their fiduciary duties, the transactions contemplated hereby and thereby for approval by Sealed Air shareholders. Each Transaction Agreement to which Sealed Air is a party is, or when executed and delivered shall be, a valid and binding agreement of Sealed Air enforceable in accordance with its terms. The affirmative vote of the holders of a majority of outstanding Sealed Air Common Shares in favor of the Merger is the only vote of the holders of Sealed Air's capital stock necessary in connection with the consummation of the Merger.

(d) Governmental Filings; No Violations. (i) Other than as may be required under the HSR Act and similar statutes in other countries, the Exchange Act, the Securities Act, and state securities laws, no notices, reports or other filings are required to be made by Sealed Air or any of its subsidiaries with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by it or any such subsidiary from, any Governmental Entity in connection with the execution, delivery or performance of each Transaction Agreement to which Sealed Air is a party and the consummation by Sealed Air of the transactions contemplated hereby and thereby, except for such matters as would not,

XXX-002423

individually or in the aggregate, have a Material Adverse Effect with
respect to Sealed Air or prevent or materially delay or enable any person
to enjoin consummation of the transactions contemplated hereby and
thereby.

(ii) The execution, delivery and performance by Sealed Air of each
Transaction Agreement to which it is a party does not or will not, and the
consummation by it of any of the transactions contemplation hereby and
thereby will not, constitute or result in (with or without the giving of
notice, the lapse of time or both) (A) a breach or violation of, or a
default under, its Certificate of Incorporation or By-laws, or (B) a
breach or violation of, or a default under, or an acceleration or
termination of or change in the rights or obligations of any party under,
or the creation of a lien, pledge, security interest or other encumbrance
on any assets pursuant to, any provision of any Contracts of it or any of
its subsidiaries or any law, rule, ordinance or regulation or judgment,
decree, order, award or governmental or non-governmental permit or license
to which it or any of its subsidiaries is subject, except, in the case of
clause (B) above, for such breaches, violations, defaults, accelerations
or changes that are disclosed in the Sealed Air Disclosure Letter or,
individually and in the aggregate, are not reasonably likely to have a
Material Adverse Effect with respect to Sealed Air or prevent or
materially delay or enable any person to enjoin consummation of the
Reorganization.

(e) SEC Documents; Financial Statements; No Undisclosed Liabilities.
(i) Sealed Air has filed all forms, reports and documents required to be
filed by it under the Exchange Act or the Securities Act since December
31, 1994. As of its filing date, each such SEC Document filed, and each
SEC Document that will be filed by Sealed Air or its subsidiaries prior to
the Effective Time, as amended or supplemented, if applicable, pursuant to
the Exchange Act or the Securities Act (A) complied or will comply in all
material respects with the applicable requirements of the Exchange Act or
the Securities Act and (B) did not or will not contain any untrue
statement of a material fact or omit to state any material fact necessary
in order to make the statements made therein, in the light of the
circumstances under which they were made, not misleading. Each of Sealed
Air's consolidated balance sheets included in or incorporated by reference
into its SEC Documents fairly presents in all material respects the
consolidated financial position of it and its subsidiaries as of the dates
set forth therein, and each of the consolidated statements of earnings,
cash flows and shareholders' equity included in or incorporated by
reference into its SEC Documents (including any related notes and
schedules) fairly presents in all material respects the consolidated
results of operations, cash flows and shareholders' equity, as the case
may be, of Sealed Air and its subsidiaries for the periods set forth
therein (subject, in the case of unaudited statements, to normal year-end
audit adjustments), in each case in accordance with US GAAP (applied on a
consistent basis).

(ii) Except as disclosed in its SEC Documents filed with the SEC prior
to the date hereof, neither Sealed Air nor any of its subsidiaries has any
liabilities of any kind whatsoever, whether or not accrued, contingent or
otherwise, that, individually or in the aggregate, are reasonably likely
to have a Material Adverse Effect with respect to Sealed Air.

(f) Absence of Certain Events and Changes. Except as disclosed in
its SEC Documents filed with the SEC prior to the date hereof, since
December 31, 1996, Sealed Air and its subsidiaries have conducted their
respective businesses only in the ordinary course of such businesses, and
there has not been any change or development or combination of changes or
developments (including any worsening of any condition currently existing)
which, individually or in the aggregate, is reasonably likely to result in
a Material Adverse Effect with respect to Sealed Air.

(g) Compliance with Laws. Except as disclosed in its SEC Documents
filed with the SEC prior to the date hereof, Sealed Air and its
subsidiaries have complied with all applicable federal, state, local and
foreign statutes, laws, regulations, ordinances, rules, judgments, orders
or decrees applicable thereto, except where the failure to comply is not
reasonably likely, individually and in the aggregate, to have a Material
Adverse Effect with respect to Sealed Air. Sealed Air and its subsidiaries
have, and, immediately after the Merger, will have, all permits, licenses,
certificates of authority, orders, and approvals of, and has and will have
made all filings, applications, and registrations with, federal, state,
local, and foreign Governmental Entities that are required in order to
permit it or such subsidiary to carry on its business as it is presently
conducted, except for such permits, licenses, certificates, orders,
filings, applications and registrations, the failure to have or make
which, individually or in the aggregate, are not reasonably likely to have
a Material Adverse Effect with respect to Sealed Air.

(h) Title to Assets. Except as disclosed in its SEC Documents filed
with the SEC prior to the date hereof, Sealed Air or its subsidiaries have
and, immediately after the Merger, will:

(i) have good and valid title to its properties and assets
(including, without limitation, all assets reflected on the audited
1996 balance sheet of Sealed Air, except for such assets as were
sold since December 31, 1996 in the ordinary course of business and
not in violation of this Agreement), free and clear of any Liens;
and

(ii) own or have adequate rights to use all assets currently
used or held for use by Sealed Air and its subsidiaries, and such

XXX-002424

rights are sufficient to permit Sealed Air to continue to operate Sealed Air's business as currently conducted by Sealed Air and its subsidiaries;

in each case except for such matters as would not, individually or in the aggregate, have a Material Adverse Effect on Sealed Air.

(i) Litigation. Except as disclosed in Sealed Air's SEC Documents filed with the SEC prior to the date hereof, there are no civil, criminal or administrative actions, suits, claims, hearings or proceedings pending or, to the knowledge of its executive officers, threatened, or investigations pending, against Sealed Air or any of its subsidiaries that, individually or in the aggregate, are reasonably likely to have a Material Adverse Effect with respect to Sealed Air. There are no judgments or outstanding orders, writs, injunctions, decrees, stipulations or awards (whether rendered or issued by a court or Governmental Entity, or by arbitration) against Sealed Air or any of its subsidiaries or their respective properties or businesses, which are reasonably likely, individually or in the aggregate, to have a Material Adverse Effect with respect to Sealed Air.

(j) Taxes. Except as reflected in Sealed Air's SEC Documents filed with the SEC prior to the date hereof, and except for such matters that, individually or in the aggregate, are not reasonably likely to have a Material Adverse Effect with respect to Sealed Air, (i) all federal, state, local and foreign tax returns required to be filed by or on behalf of Sealed Air or any of its subsidiaries have been timely filed, or requests for extensions have been timely filed and have been granted and not expired, and all such filed returns are complete and accurate; (ii) all taxes shown as due and payable on returns filed by Sealed Air or any of its subsidiaries have been paid in full; (iii) there is no outstanding audit examination, deficiency, or refund litigation with respect to any taxes of Sealed Air or any of its subsidiaries; (iv) all taxes, interest, additions and penalties due with respect to completed and settled examinations or concluded litigation relating to Sealed Air or any of its subsidiaries have been paid in full or have been recorded as a liability on the balance sheet of Sealed Air (in accordance with US GAAP); (v) neither Sealed Air nor any of its subsidiaries is a party to a tax sharing or similar agreement or any agreement pursuant to which it or any of its subsidiaries has indemnified another party with respect to taxes; and (vi) neither Sealed Air nor any of its subsidiaries has waived any applicable statute of limitations with respect to any taxes.

(k) Contracts and Commitments. Except as set forth in the Sealed Air Disclosure Letter, and except for matters that would not, individually or in the aggregate, have a Material Adverse Effect with respect to Sealed Air, (i) Sealed Air and its subsidiaries will not, as of the Effective Time, be parties to or bound by any Contract that materially limits the ability of Grace after the Merger, Packco, the Surviving Corporation or any of their respective subsidiaries to compete in any line of business or with any person or in any geographic area; (ii) neither Sealed Air nor any of its subsidiaries is (with or without the lapse of time or the giving of notice, or both) in breach or default in any material respect under any Contract that is material to the operation of Sealed Air; (iii) none of the other parties to any Contract that is material to the operation of Sealed Air is (with or without the lapse of time or the giving of notice, or both) in breach or default in any material respect thereunder; and (iv) neither Sealed Air nor any of its subsidiaries has received any written notice of the intention of any party to terminate any such Contract whether as a termination for convenience or for default of Sealed Air or any of its subsidiaries thereunder.

(l) Employee Benefits. (i) The Sealed Air Disclosure Letter includes a complete list of all material employee benefit plans, programs, policies, practices and other arrangements (regardless of whether they are funded or unfunded or foreign or domestic, but excluding any such plans, programs, policies, practices and arrangements mandated or sponsored by a Governmental Entity with respect to foreign employees) providing benefits to any current or former employee of Sealed Air or any of its subsidiaries (collectively, "Sealed Air Employees") or beneficiary or dependent thereof, sponsored or maintained by Sealed Air or any of its subsidiaries, or to which Sealed Air or any of its subsidiaries contributes or is obligated to contribute (the "Sealed Air Plans"); provided, that such list may not be complete as of the date hereof as to Sealed Air Plans providing benefits to foreign Sealed Air Employees, but such list shall be updated so as to be complete as to such Sealed Air Plans promptly following the date hereof. Without limiting the generality of the foregoing, the term "Sealed Air Plans" includes all employee welfare benefit plans within the meaning of Section 3(1) of ERISA and all employee pension benefit plans within the meaning of Section 3(2) of ERISA.

(ii) With respect to each Sealed Air Plan providing benefits to U.S. Sealed Air Employees, Sealed Air has delivered or made available to Grace, and with respect to each Sealed Air Plan providing benefits to foreign Sealed Air Employees, promptly following the date hereof, Sealed Air will deliver or make available to Grace, a true, correct and complete copy of each of the following: (A) all plan documents; (B) all benefit schedules, trust agreements and insurance contracts and other funding vehicles, and the current summary plan descriptions (if any); (C) the most recent Annual Report (Form 5500 Series) and accompanying schedule, if any, or any similar filing made with any foreign authority; (D) the most recent annual financial report, if any; (E) the most recent actuarial report, if any; and (F) the most recent determination letter from the IRS or similar document issued by any other taxing authority, if any. Except as specifically provided in the foregoing documents delivered or made

XXX-002425

available to each of the parties hereto, there are no amendments to any Sealed Air Plan that have been adopted or approved, nor has Sealed Air undertaken to make any such amendments.

(iii) The Sealed Air Disclosure Letter identifies each Sealed Air Plan that is intended to be a "qualified plan" within the meaning of Section 401(a) of the Code ("Sealed Air Qualified Plans"). The IRS has issued a favorable determination letter with respect to each Sealed Air Qualified Plan, in each case that has not been revoked, or application for such a letter has been or will be filed before the expiration of the remedial amendment period, and Sealed Air knows of no existing circumstances nor any events that have occurred that could adversely affect the qualified status of any such plan or the related trust. No Sealed Air Plan is intended to meet the requirements of Section 501(c)(9) of the Code.

(iv) Sealed Air and its subsidiaries have complied, and are now in compliance, in all material respects with all provisions of ERISA, the Code and all other laws and regulations applicable to the Sealed Air Plans. There is not now, nor do any circumstances exist that could give rise to, any requirement for the posting of security with respect to any Sealed Air Plan or the imposition of any lien on the assets of Sealed Air under ERISA or the Code. No prohibited transaction (as defined in ERISA) has occurred with respect to any Sealed Air Plan.

(v) All contributions required to be made to any Sealed Air Plan by applicable law or regulation or by any plan document or other contractual undertaking, and all premiums due or payable with respect to insurance policies funding any Sealed Air Plan, have been timely made or paid in full.

(vi) No Sealed Air Plan currently sponsored or maintained by Sealed Air, any of its subsidiaries or any of their respective ERISA Affiliates is subject to Title IV or Section 302 of ERISA or Section 412 or 4971 of the Code. Without limiting the generality of the foregoing, no Sealed Air Plan is a Multiemployer Plan or a Multiple Employer Plan, nor has Sealed Air or any ERISA Affiliate of Sealed Air, at any time since September 2, 1974, contributed to or been obligated to contribute to any Multiemployer Plan or Multiple Employer Plan. There does not now exist, nor do any circumstances exist that could result in, any liability under (A) Title IV of ERISA, (B) Section 302 of ERISA, (C) Sections 412 and 4971 of the Code, (D) the continuation coverage requirements of Section 601 et seq. of ERISA and Section 4980B of the Code, or (E) corresponding or similar provisions of foreign laws or regulations, that would be a liability of Sealed Air or any of its subsidiaries following the Effective Time, other than such liabilities that arise solely out of, or relate solely to, the Sealed Air Plans.

(vii) Neither Sealed Air nor any of its subsidiaries has any obligations for retiree health and life benefits under any Sealed Air Plan.

(viii) All Sealed Air Plans covering foreign Sealed Air Employees comply with applicable local law, except when the failure to so comply, individually or in the aggregate, would not have a Material Adverse Effect with respect to Sealed Air.

(ix) Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in conjunction with any other event) result in, cause the accelerated vesting or delivery of, or increase the amount or value of, any payment or benefit to any Sealed Air Employee. Without limiting the generality of the foregoing, no amount paid or payable in connection with the transactions contemplated hereby (either solely as a result thereof or as a result of such transactions in conjunction with any other event) will be an "excess parachute payment" within the meaning of Section 280G of the Code. Sealed Air and its subsidiaries have not entered into any change-of-control agreements under which Sealed Air will be obligated to make change-of-control payments following the Merger.

(m) Environmental Matters. Except as disclosed in its SEC Documents filed prior to the date hereof and except for such matters that, individually and in the aggregate, are not reasonably likely to have a Material Adverse Effect with respect to Sealed Air, (i) Sealed Air and its subsidiaries are and have been in compliance with all applicable Environmental Laws; (ii) Sealed Air and its subsidiaries hold and have held all permits under any Environmental Law required for the operation of their respective businesses as presently conducted and are in compliance with the terms of such permits; and (iii) neither Sealed Air nor any of its subsidiaries has received any outstanding written notices, demand letters, claims or requests for information, nor has any complaint been filed, penalty assessed, nor is any investigation, action, claim, suit, proceeding or review pending (with respect to which Sealed Air has been provided notice), or, to the knowledge of the executive officers of Sealed Air, threatened by any Governmental Entity or any third party that assert that Sealed Air or any of its subsidiaries may be in violation of, or liable under, any Environmental Law (including as an indemnitor in connection with any threatened or asserted claim by any third party indemnitee), and none of Sealed Air, its subsidiaries or its properties is subject to any citation, court order, administrative order or decree arising under any Environmental Law. None of the real property owned or leased by Sealed Air or any of its subsidiaries is listed on, or, to the knowledge of Sealed Air's executive officers, proposed for listing on the "National Priorities List" under CERCLA, or any similar state, local or foreign list of sites requiring investigation or cleanup.

XXX-002426

(n) Takeover Statutes; Rights Plans. The execution, delivery and performance of this Agreement and consummation of the transactions contemplated hereby will not cause to be applicable to Sealed Air any Takeover Statute (after giving effect to any actions that will be taken prior to the Effective Time). Sealed Air does not have any preferred share purchase rights plan or similar rights plan in effect.

(o) Brokers and Finders. Neither Sealed Air nor any of its subsidiaries or any of their respective officers, directors or employees has employed any broker or finder or incurred any liability for any brokerage fees, commissions or finders' fees in connection with the transactions contemplated herein, except pursuant to arrangements disclosed in writing to the other parties hereto prior to the date hereof.

(p) Trademarks, Patents and Copyrights. Sealed Air and its subsidiaries own or possess adequate licenses or other rights to use all patents, trademarks, trade names, service marks, copyrights, licenses and product licenses or registrations (including applications for any of the foregoing), technology, know-how, tangible or intangible proprietary intellectual property rights, information or material (whether conceived, reduced to practice or under development), formulae, inventions and new and investigational applications (including all options or rights to acquire any of the foregoing) as are necessary, used or held for use in connection with its business (the "Sealed Air Intellectual Property"), the lack of which would reasonably be expected to have a Material Adverse Effect with respect to Sealed Air. None of Sealed Air or any of its subsidiaries has received any adverse claim by any other person with respect to the Sealed Air Intellectual Property or is aware, to the knowledge of the executive officers of Sealed Air and its subsidiaries, of any infringement with respect thereto, and there is no infringement by Sealed Air or its subsidiaries of the intellectual property rights of others, which, in each case, would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect with respect to Sealed Air. Except for matters that would not, individually or in the aggregate, have a Material Adverse Effect with respect to Sealed Air, immediately after the Merger, the Surviving Corporation and its subsidiaries will own or possess adequate licenses or other rights to use (on substantially the same basis as currently owned or possessed by Sealed Air and its subsidiaries) all of the Sealed Air Intellectual Property.

(q) Tax Matters. At the Effective Time, the representations set forth in the Tax Matters Certificates of Sealed Air, substantially in the form of Exhibit B (the "Sealed Air Tax Matters Certificate"), will be true and correct in all respects, and such representations are hereby incorporated herein by reference with the same effect as if set forth herein in their entirety.

(r) Disclosure. The representations and warranties of Sealed Air contained in this Agreement or in any written instrument, exhibit or certificate furnished or to be furnished by Sealed Air to Grace pursuant hereto or in connection herewith do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading.

ARTICLE VI

COVENANTS

6.1. Interim Operations. Each of Grace and Sealed Air covenants and agrees as to itself and its subsidiaries that, from and after the date hereof until the Effective Time, except insofar as the other parties shall otherwise consent or except as otherwise contemplated by this Agreement, the Transaction Agreements or its Disclosure Letters (provided that, as used in this Section, all references to Grace (and/or its Affiliates) shall be deemed to refer to Grace and all of the Subsidiaries of Grace (in each case only with respect to the Packaging Business), the Packco Group and the Packaging Business except as otherwise specifically provided):

(a) The business of it and its subsidiaries will be conducted only in the ordinary and usual course and it and its subsidiaries will use all reasonable efforts to preserve their business organization intact and maintain their existing relations with customers, suppliers, employees and business associates.

(b) It will not (i) sell or pledge or agree to sell or pledge any stock owned, directly or indirectly, by it in any of its subsidiaries, (ii) amend its Certificate of Incorporation or By-laws (or similar organizational document); (iii) split, combine or reclassify any outstanding capital stock; or (iv) declare, set aside or pay any dividend payable in stock or property with respect to any of its capital stock (other than, in the case of Grace, regular quarterly cash dividends consistent with Grace's current practice, and intercompany dividends).

(c) Neither it nor any of its subsidiaries will issue, sell, pledge, dispose of or encumber, or authorize or propose the issuance, sale, pledge, disposition or encumbrance of, any shares of, or securities convertible or exchangeable for, or options, puts, warrants, calls, commitments or rights of any kind to acquire, any shares of its capital stock of any class other than common shares issuable pursuant to options, awards, warrants and other convertible securities outstanding on the date hereof and disclosed herein, provided that notwithstanding the foregoing (A) Grace may grant options to acquire Grace Common Shares so long as such options will not, after the Recapitalization, be or become options to

XXX-002427

purchase capital stock or other securities of Newco or any of its subsidiaries, and (B) in the ordinary course of business, Sealed Air may grant awards to acquire Sealed Air Common Shares or make all or part of its contribution to the Sealed Air Profit Sharing Plan in the form of Sealed Air Common Shares.

(d) Neither it nor any of its subsidiaries will (i) other than in the ordinary course of business, transfer, lease, license, guarantee, sell, mortgage, pledge or dispose of any property or assets or encumber any property or assets, or make any material acquisition of, or investment in, assets, stock or other securities of any other person or entity (other than its wholly-owned subsidiaries); or (ii) transfer, license, sell, pledge or dispose of any material Intellectual Property rights.

(e) Except as required or contemplated by agreements or arrangements disclosed in its SEC Documents or its Disclosure Letter, neither it nor any of its subsidiaries will grant any severance or termination pay to, or enter into, extend or amend any employment, consulting, severance or other compensation agreement with, any director or officer or, other than in the ordinary course of business consistent with past practices, other employees, except that the foregoing shall not prohibit Grace from entering into any such agreement or arrangement that will not be binding upon Newco or any of its subsidiaries after the Reorganization.

(f) Except as may be required to satisfy contractual obligations existing as of the date hereof (and disclosed in its Disclosure Letter) and the requirements of applicable law, and except in the ordinary and usual course of business, neither it nor any of its subsidiaries will establish, adopt, enter into, make, amend or make any elections under any collective bargaining, bonus, profit sharing, thrift, compensation, stock option, restricted stock, pension, retirement, employee stock ownership, deferred compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any directors, officers or employees that would be binding on Newco or any of its subsidiaries after the Reorganization.

(g) It will not implement any change in its accounting principles, practices or methods, other than as may be required by US GAAP, and other than as may be necessary or advisable in connection with the Reorganization.

(h) Neither Sealed Air nor Grace will adopt or propose any change in its certificate of incorporation or bylaws.

(i) Grace agrees to use its reasonable best efforts to cause each person that holds any shares of a Packco Subsidiary constituting directors qualifying shares to deliver at the Effective Time such shares at the direction of Sealed Air.

(j) Neither it nor any of its subsidiaries (including in the case of Grace, all members of the New Grace Group) shall intentionally take any action knowing that such action would cause a breach of a representation or warranty herein.

(k) It and its subsidiaries will conduct cash management operations (including the collection of accounts receivable and realization of cash from other assets and the payment of trade payables and other liabilities) only in the ordinary and usual course of business, consistent with past practices, and, except as contemplated by the Transaction Agreements, all transactions between the Packco Group or the Packaging Business, on the one hand, and the New Grace Group or the New Grace Business, on the other, shall only be in the ordinary and usual course of business, consistent with the past practices.

(l) Neither it nor any of its subsidiaries will authorize or enter into an agreement to take any of the actions referred to in paragraphs (a) through (k) above.

6.2.  Certain Transactions.

(a) It is understood and agreed by the parties hereto that, pursuant to the Distribution Agreement, at the time of the Reorganization and subject to Section 2.02 of the Distribution Agreement, neither Grace nor any member of the Packco Group shall have cash or marketable securities, it being contemplated that, in connection with the Reorganization, such cash and marketable securities shall be provided to Grace-Conn.

(b) Prior to the Distribution, Grace shall cause each of the parties to the Distribution Agreement, the Tax Sharing Agreement and the Benefits Agreement to duly enter into such agreements, which agreements shall not be amended without the consent of Sealed Air, which will not be unreasonably withheld.

6.3. Acquisition Proposals. Each party hereto agrees that neither it nor any of its subsidiaries nor any of its respective officers and directors or the officers and directors of its subsidiaries shall, and it shall each direct and use its best efforts to cause its employees, agents and representatives (including, without limitation, any investment banker, attorney or accountant retained by it or any of its subsidiaries) not to, initiate, solicit or encourage, directly or indirectly, any inquiries or the making or implementation of any proposal or offer with respect to a merger, acquisition, consolidation, business combination, recapitalization or similar transaction involving, or any purchase of all or any significant portion of the assets or any equity securities of, it or any of its subsidiaries (any such proposal or offer being hereinafter referred to as an "Acquisition Proposal") or provide any

XXX-002428