confidential information or data to, or have any discussions or engage in any negotiations with, any person relating to an Acquisition Proposal; provided, however, that the Grace Board or the Sealed Air Board may furnish or cause to be furnished information (pursuant to confidentiality arrangements) and may participate in such discussions and negotiations directly or through its representatives if (i) the failure to provide such information or participate in such negotiations and discussions would, in the opinion of its outside counsel, cause the members of the Grace Board or the Sealed Air Board, as the case may be, to breach their fiduciary duties under applicable law or (ii) another person makes a written offer or written proposal that was not solicited and did not otherwise result from a breach of this Section 6.3 and which, based upon the identity of the person making such offer or proposal, the terms thereof and the availability of adequate financing therefor, the Grace Board or the Sealed Air Board, as the case may be, believes, in the good faith exercise of its business judgment and based upon advice of its outside legal and financial advisors, could reasonably be expected to be consummated and represents a transaction more favorable to its shareholders than the Reorganization (a "Higher Offer"); provided further, however, that the term "Acquisition Proposal" shall not include a proposal exclusively involving all or part of the stock or assets of New Grace and the New Grace Business (so long as any such proposal (and the consummation thereof) will not adversely affect the transactions contemplated hereby. Grace or Sealed Air, as the case may be, shall notify the other party hereto as soon as practicable if any such inquiries or proposals are received by, any such information is requested from, or any such negotiations or discussions are sought to be initiated or continued with it, which notice shall include the identity of the interested person and the material terms and conditions of any inquiry, request for information, offer or proposal. Thereafter, the party giving the notice shall keep the other reasonably informed of the status and details of any such inquiry, request for information, offer or proposal, discussion or negotiations.

6.4. Information Supplied. Each of the parties hereto agrees that none of the information supplied or to be supplied by it for inclusion or incorporation by reference in any Registration Statement, the Joint Proxy Statement or Schedule 14A, or any amendment or supplement thereto, will, in the case of a Registration Statement, at the time such Registration Statement and each amendment and supplement thereto becomes effective under the Securities Act, or, in the case of a Joint Proxy Statement or Schedule 14A, at the time such Joint Proxy Statement or Schedule 14A and each amendment and supplement thereto is filed in definitive form with the SEC or mailed to shareholders and at the time of the applicable Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading. All documents that either party is responsible for filing with the SEC in connection with the Reorganization will comply as to form and substance in all material respects with the applicable requirements of the Exchange Act.

6.5. Shareholder Approvals. Each of Grace and Sealed Air agrees to take, in accordance with applicable law and its Certificate of Incorporation and By-laws, all action necessary to convene a meeting of holders of Grace Common Shares and Sealed Air Common Shares, respectively, as promptly as practicable after the Registration Statements are declared effective under the Securities Act, to consider and vote upon the approval of the transactions contemplated by the Transaction Agreements (including, without limitation, the Grace Amendment). Subject to the remainder of this Section 6.5, each of the Grace Board and the Sealed Air Board shall recommend such adoption and approval and shall take all lawful action to solicit such approval by shareholders. The Grace Board or the Sealed Air Board, as the case may be, may fail to make such a recommendation, or withdraw, modify, or change any such recommendation, or recommend another offer or proposal, if (i) the making of such recommendation or failing to withdraw, modify or change its recommendation or to recommend another offer or proposal would, in the opinion of its outside counsel, cause the members of the Grace Board or the Sealed Air Board, as the case may be, to breach their fiduciary duties under applicable law, or (ii) there is a Higher Offer. In such event, notwithstanding anything contained in this Agreement to the contrary, any such failure to recommend, withdrawal, modification or change of recommendation or recommendation of such other offer or proposal, or the entering by Grace or Sealed Air into an agreement with respect to a Higher Offer (provided that Grace or Sealed Air, as the case may be, shall have provided the other party with at least four days' prior notice of its intention to enter into such agreement and the identity of the other party thereto and the material terms and conditions of the agreement to be entered into with such person), shall not constitute a breach of this Agreement by Grace or Sealed Air, as the case may be.

6.6. Filings; Other Actions. (a) Subject to the obligations contained herein, Grace and Sealed Air shall promptly prepare for filing the Grace Registration Statement and the Joint Proxy Statement to be mailed to their shareholders, and Grace shall prepare the New Grace Registration Statement (and related prospectus forming a part thereof to be mailed to the Grace shareholders), in each case in connection with the Reorganization. In connection with the foregoing, Grace shall prepare audited annual and unaudited interim financial statements prepared in accordance with US GAAP and in compliance with Regulation S-K under the Securities Act for the Packaging Business (including Grace after giving effect to the Distribution) and for the New Grace Business, and such financial statements shall be included in the Registration Statements and the Joint Proxy Statement as may be appropriate. Each party hereto shall use its reasonable efforts, after consultation with the other parties hereto, to respond promptly to any comments made by the SEC with respect to such filings, to have such filings declared effective or cleared, as the case may be, and cause such filings to be mailed at the earliest reasonably practicable time. Each party hereto and its counsel shall be given a reasonable opportunity to review and comment on each amendment or such filings prior to the filing thereof with the SEC. Each party hereto also shall use its reasonable efforts to obtain all necessary state securities law or blue sky permits and

XXX-002429

approvals required to carry out the transactions contemplated hereby and shall furnish all information as may be reasonably requested in connection with any such action.

(b) Each party hereto shall cooperate with the other parties hereto, subject to the terms and conditions set forth herein, use its reasonable efforts promptly to prepare and file all necessary documentation, to effect all necessary applications, notices, petitions, filings and other documents, and to obtain as promptly as reasonably practicable all necessary permits, consents, orders, approvals and authorizations of, or any exemption by, all third parties and Governmental Entities necessary or advisable to consummate the transactions contemplated hereby. Each party hereto shall consult with the other parties hereto with respect to the obtaining of all permits, consents, approvals and authorizations of all third parties and Governmental Entities necessary or advisable to consummate the transactions contemplated hereby, and each party shall keep the other parties hereto apprised of the status of matters relating to completion of the transactions contemplated hereby.

(c) Each party hereto shall, upon reasonable request and except as otherwise may be required by applicable law, furnish the other parties hereto with all information concerning itself, its subsidiaries, directors, officers, shareholders and other Affiliates and such other matters as may be reasonably necessary or advisable in connection any statement, filing, notice or application made by or on behalf of such other party or any of its Affiliates to any Governmental Entity in connection with any transactions contemplated by this Agreement.

(d) Each party hereto shall, subject to applicable laws relating to the disclosure and exchange of information, promptly furnish the other parties hereto with copies of written communications received by each such party or any of its subsidiaries, from, or delivered by any of the foregoing to, any Governmental Entity in respect of the transactions contemplated hereby.

(e) Each party hereto shall cooperate with each other party hereto and shall use reasonable efforts to take or cause to be taken all actions and do or cause to be done all things reasonably necessary, proper or advisable to obtain favorable review of the proposed transaction under the HSR Act and any foreign antitrust or competition laws.

6.7. Audited Financial Statements; Comfort Letters. (a) Grace shall prepare, as promptly as practicable, audited annual and unaudited interim financial statements with respect to each of the New Grace Group and the Packco Group, as described in Section 6.6(a) hereto. Grace shall deliver to Sealed Air copies of any such financial statements relating to the Packaging Business, which shall be certified without qualification by Price Waterhouse LLP or other nationally recognized accounting firm reasonably acceptable to Sealed Air (the "Packaging Business Financial Statements").

(b) Each of Grace and Sealed Air shall use all reasonable efforts to cause to be delivered to the other party, as appropriate, and its directors letters of its independent accountants, dated (i) the date on which each Registration Statement shall become effective and (ii) a date shortly prior to the Effective Time, and addressed to such other party and its directors, in form and substance customary for "comfort" letters delivered by independent accountants in connection with registration statements.

6.8. Access. Upon reasonable notice, and except as may otherwise be required by applicable law, each party hereto shall afford each other party's Representatives access, during normal business hours throughout the period until the Effective Time, to its properties, books, Contracts and records and, during such period, shall (and shall cause each of its subsidiaries to) furnish promptly to the other party all information concerning its business, properties and personnel as may reasonably be requested; provided that no investigation pursuant to this Section 6.8 shall affect or be deemed to modify any representation or warranty made by the party furnishing such information; provided further that with respect to the work papers of independent accountants or any other contract, document, information or other material the provision of which is not permitted without the consent of a third party, the provision of access shall be subject to the permission of such independent accountants or such third party, and each party hereto shall use reasonable efforts to secure such permission for the other. Each party hereto shall not, and shall cause its respective Representatives not to, use any information obtained pursuant to this Section 6.8 for any purpose unrelated to the consummation of the transactions contemplated by the Transaction Agreements. All information obtained pursuant to this paragraph shall be subject to the provisions of the written confidentiality arrangements existing among the parties hereto.

6.9. Notification of Certain Matters. Each party shall give prompt notice to the other party of (i) any material inaccuracy in any representation or warranty made by it in this Agreement, (ii) any material failure by it to comply with any of its covenants or agreements under this Agreement and (iii) any change or event that is reasonably likely to result in any Material Adverse Effect or to delay, in any substantial respect, or prevent consummation of the Reorganization, in each case to the knowledge of the executive officers.

6.10. Publicity. The initial press release relating hereto shall be a joint press release and, thereafter, each party hereto shall consult with each other party hereto prior to issuing any press releases or otherwise making public statements with respect to the transactions contemplated hereby and prior to making any filings with any Governmental Entity or stock exchange with respect thereto; provided that, if a party shall be advised by counsel that any such press release, statement or filing is required by applicable law and it shall not be practicable to consult with the other parties prior to the time such press release, statement or filing is required, a party may make such press release, statement or filing and shall promptly notify the other parties

XXX-002430

thereof.

6.11. Employee Benefits; Headquarters Employees. (a) Grace and Sealed Air covenant and agree that from and after the Effective Time, Grace, Packco and the Surviving Corporation, as the case may be, shall maintain either employee benefits plans and programs that are, in the aggregate, at least substantially comparable to the plans and programs in effect with respect to Packco Employees at the Effective Time or other plans that are, in the aggregate, at least substantially comparable to the plans and programs in effect from time to time with respect to comparable Sealed Air employees.

(b) As a result of the Merger, Sealed Air acknowledges that it will need to add employees to its corporate staff and related support services, including in the areas of legal, tax, human resources, accounting, risk management, cash management, investor relations, information systems and internal audit. In seeking to fill these needs, Sealed Air shall work with Grace to identify, prior to the Effective Time, appropriate people located at Grace's Boca Raton headquarters and shall give such individuals preferential consideration.

6.12. Expenses. (a) Except as set forth in paragraphs (b) and (c) below, Section 8.04 of the Distribution Agreement and in the Other Agreements, all costs and expenses, including without limitation, legal, investment banking, financial, accounting and other professional fees and expenses, incurred by Grace or its subsidiaries in connection with the Transaction Agreements and the transactions contemplated thereby shall be paid by New Grace (or if the Reorganization is not consummated, Grace) and all such costs and expenses incurred by Sealed Air or its subsidiaries shall be paid by Newco (or if the Reorganization is not consummated, Sealed Air); provided, however, that the costs and expenses of printing and mailing the Joint Proxy Statement and the Grace Registration Statement, and all filing fees paid to the SEC in connection therewith, shall be evenly divided between New Grace (or if the Reorganization is not consummated, Grace) and Sealed Air. The payments under this Section 6.12 shall not be in limitation of the rights of the parties hereto under Sections 8.5 and 9.10 hereof.

(b)  In the event that:

(i)  this Agreement shall be terminated pursuant to:

(A) Section 8.2(iii) (due to a Higher Offer with respect to Grace);

(B) Section 8.2(ii) if, after an Acquisition Proposal with respect to Grace has been publicly disclosed or announced, the Grace shareholders do not approve the matters required by Section 7.1(a) and, within one year after termination of this Agreement, Grace consummates or enters into a written agreement to consummate an Acquisition Proposal (except that, for this purpose, the reference to "significant portion" in the definition thereof in Section 6.3 shall mean 20%) or any person (other than an employee stock or similar plan for the benefit of Grace employees) or group of affiliated persons shall acquire beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of at least 35% of the outstanding Grace Common Shares;

(C) Section 8.4(ii) and, within one year after termination of this Agreement, Grace consummates or enters into a written agreement to consummate an Acquisition Proposal (except that, for this purpose, the reference to "significant portion" in the definition thereof in Section 6.3 shall mean 20%) or any person (other than an employee stock or similar plan for the benefit of Grace employees) or group of affiliated persons shall acquire beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of at least 35% of the outstanding Grace Common Shares; or

(D) Section 8.2(ii) (due to a failure to obtain Grace shareholder approval at the Grace Meeting other than in the circumstances described in clause (B)); and

(ii) at the time of such termination, Sealed Air shall not be in material breach of its covenants or agreements contained in this Agreement;

then, Grace shall pay to Sealed Air, in exchange for a complete release of any liabilities of Grace hereunder, the amount of (1) $150 million plus actual out of pocket expenses incurred to third parties in connection with the transactions contemplated hereby after the date of this Agreement, in the case of an event described in clauses (i)(A) or (i)(C) above, (2) in the case of clause (i)(B), $25 million at the time of termination and $125 million plus the expenses described above upon the occurrence of the additional event described in clause (i)(B) or (3) $25 million, in the event of termination described in clause (i)(D) above. The amounts payable under this Section shall be paid by wire transfer of immediately available funds within 24 hours to the account specified by Sealed Air in writing.

(c)  In the event that:

(i)  this Agreement shall be terminated pursuant to:

(A) Section 8.2(iii) (due to a Higher Offer with respect to Sealed Air);

(B) Section 8.2(ii), if, after an Acquisition Proposal with respect to Sealed Air has been publicly disclosed or announced, the

XXX-002431

Sealed Air shareholders do not approve the matters required by Section 7.1(a), and, within one year after termination of this Agreement, Sealed Air consummates or enters into a written agreement to consummate an Acquisition Proposal (except that, for this purpose, the reference to "significant portion" in the definition thereof in Section 6.3 shall mean 20%) or any person (other than an employee stock or similar plan for the benefit of Sealed Air employees) or group of affiliated persons shall acquire beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of at least 35% of the outstanding Sealed Air Common Shares;

(C) Section 8.3(ii) and, within one year after termination of this Agreement, Sealed Air consummates or enters into a written agreement to consummate an Acquisition Proposal (except that, for this purpose, the reference to "significant portion" in the definition thereof in Section 6.3 shall mean 20%) or any person (other than an employee stock or similar plan for the benefit of Sealed Air employees) or group of affiliated persons shall acquire beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of at least 35% of the outstanding Sealed Air Common Shares; or

(D) Section 8.2(ii) (due to a failure to obtain Sealed Air shareholder approval at the Sealed Air Meeting other than in the circumstances described in clause (B)); and

(ii) at the time of such termination, Grace shall not be in material breach of its covenants or agreements contained in this Agreement;

then, Sealed Air shall pay to Grace, in exchange for a complete release of any liabilities of Sealed Air hereunder, the amount of (1) $75 million plus actual out of pocket expenses incurred to third parties in connection with the transactions contemplated hereby after the date of this Agreement, in the case of an event described in clauses (i)(A) or (i)(C) above, (2) in the case of clause (i)(B), $25 million at the time of termination and $50 million plus the expenses described above upon occurrence of the additional event described in clause (i)(B) or (3) $25 million, in the event of termination described in clause (i)(D) above. The amounts payable under this Section shall be paid by wire transfer of immediately available funds within 24 hours to the account specified by Grace in writing.

6.13. Antitakeover Statutes. If any Takeover Statute is or may become applicable to the transactions contemplated hereby, each of the parties hereto and the members of its Board of Directors shall grant such approvals and take such actions as are necessary so that the transactions contemplated by this Agreement may be consummated as promptly as practicable on the terms contemplated hereby and otherwise act to eliminate or minimize the effects of any Takeover Statute on any of the transactions contemplated by this Agreement.

6.14. Securities Act Compliance. As soon as practicable after the date of the Meetings, each party hereto shall identify all persons who were, at the time of the Meetings, possible Affiliates, shall use its reasonable efforts to obtain a written agreement in the usual and customary form from each person who is so identified as a possible Affiliate and shall deliver such written agreements to Grace or Newco as soon as practicable after the Meetings.

6.15. Transaction Agreements. (a) Prior to the Effective Time, the parties shall consummate any transactions to be consummated prior to the Effective Time pursuant to the Distribution Agreement or the Other Agreements.

(b) The parties shall not waive or amend any terms of the Distribution Agreement or the Other Agreements without the consent of the other parties hereto, which consent shall not be unreasonably withheld.

6.16. Tax Matters. Each party agrees to report the Distribution as a tax-free distribution under the Code and the Merger as a tax-free reorganization under the Code on all tax returns and other filings, and take no position inconsistent therewith, except where, in the opinion of nationally recognized tax counsel to such party, there is not "substantial authority," as defined in Section 6662 of the Code, to support such a position.

ARTICLE VII

CONDITIONS

7.1. Conditions to Each Party's Obligation. The respective obligation of each party hereto to consummate the Reorganization is subject to the fulfillment of each of the following conditions:

(a) Shareholder Approval. To the extent required by law or stock exchange regulations, the transactions contemplated by the Transaction Agreements shall have been duly approved by the shareholders of Sealed Air and Grace in accordance with applicable law.

(b) Governmental and Regulatory Consents. The waiting periods applicable to the consummation of the Merger under the HSR Act shall have expired or been terminated; and all filings required to be made prior to the Closing by any party hereto or any of its respective subsidiaries with, and all consents, approvals and authorizations required to be obtained prior to the Closing by any party hereto or any of its respective subsidiaries from, any Governmental Entity in connection with the execution, delivery and performance of this Agreement, the Distribution Agreement and the Other Agreements and the consummation of the transactions contemplated hereby and thereby (to the extent such transactions are required to be consummated prior to the Effective Time)

XXX-002432

shall have been made or obtained, except where the failure to obtain such consents, approvals and authorizations (i) is not reasonably likely to have a Material Adverse Effect on (A) the New Grace Group (with respect to the condition for Grace) or (B) the Packco Group or Sealed Air (with respect to the condition for Sealed Air), and (ii) could not reasonably be expected to subject the parties hereto or their Affiliates or any directors or officers of any of the foregoing to criminal liability.

(c) Third-Party Consents. All consents or approvals of all persons (other than Governmental Entities) required for or in connection with the execution, delivery and performance of this Agreement, the Distribution Agreement and the Other Agreements and the consummation of the transactions contemplated hereby and thereby shall have been obtained and shall be in full force and effect, except for those the failure of which to obtain would not have a Material Adverse Effect with respect to (i) the New Grace Group (with respect to the condition for Grace), or (ii) the Packco Group or Sealed Air (with respect to the condition for Sealed Air).

(d) Governmental Matters. No Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, judgment, decree, injunction or other order (whether temporary, preliminary or permanent) which is in effect and prohibits consummation of the transactions contemplated hereby or by the Distribution Agreement or the Other Agreements.

(e) Tax Opinions. Grace shall have received the opinion of Wachtell, Lipton, Rosen & Katz, dated the date of the Effective Time, substantially in the form of Exhibit C hereto. In rendering such opinion, such firm may receive and rely upon representations contained in certificates of Grace, Merger Sub and Sealed Air and others, including, without limitation, the Grace Tax Matters Certificate and the Sealed Air Tax Matters Certificate. Sealed Air shall have received the opinion of Davis Polk & Wardwell, dated the date of the Effective Time, substantially in the form of Exhibit D hereto. In rendering such opinion, such firm may receive and rely upon representations contained in certificates of Grace, Merger Sub and Sealed Air and others, including, without limitation, the Grace Tax Matters Certificate and the Sealed Air Tax Matters Certificate.

(f) Registration Statements. The Registration Statements shall have become effective under the Securities Act or Exchange Act (as applicable), and no stop order suspending the effectiveness of the Registration Statements shall have been issued and no proceedings for that purpose shall have been initiated or threatened by the SEC.

(g) The Contribution, the Distribution and the Recapitalization. The Contribution, the Distribution and the Recapitalization shall have been consummated as provided in the Distribution Agreement, and the conditions to consummation of such transactions set forth in Section 8.01 of the Distribution Agreement shall have been satisfied or, to the reasonable satisfaction of Sealed Air, shall have been waived.

(h) Stock Exchange Listing. The Newco Common Shares and Newco Convertible Preferred Shares to be issued in the Recapitalization and the Merger shall have been authorized for listing on the NYSE, subject to official notice of issuance.

7.2. Conditions to Obligation of Grace. The obligation of Grace to consummate the Reorganization is also subject to the fulfillment or waiver by Grace prior to the Closing of each of the following conditions:

(a) Representations and Warranties. The representations and warranties of Sealed Air set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement, and such representations and warranties shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except that representations and warranties that by their terms speak as of the date of this Agreement or some other date shall be true and correct in all material respects as of such date) disregarding with respect to the Closing Date all qualifications and exceptions contained therein relating to materiality or Material Adverse Effect, except for such matters as would not in the aggregate reasonably be expected to have a Material Adverse Effect with respect to Sealed Air, and Grace shall have received a certificate signed on behalf of Sealed Air by an officer to such effect.

(b) Performance of Obligations. Sealed Air shall have performed in all material respects all obligations required to be performed by it under this Agreement or the other Transaction Agreements at or prior to the Closing Date, and Grace shall have received a certificate signed on behalf of Sealed Air by an officer to such effect.

7.3. Conditions to Obligation of Sealed Air. The obligation of Sealed Air to consummate the Reorganization is also subject to the fulfillment or waiver by Sealed Air prior to the Closing of each of the following conditions:

(a) Representations and Warranties. The representations and warranties of Grace set forth in this Agreement shall be true and correct in all material respects as of the date of this Agreement, and the representations and warranties set forth in Section 5.1 shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date (except that representations and warranties that by their terms speak as of the date of this Agreement or some other date shall be true and correct in all material respects as of such date, and the representations and warranties set forth in Section 5.2 shall be true and correct as of the Closing Date as though made on and as of the

XXX-002433

Closing Date (or in the case of representations and warranties that speak of some other date, as of such date), disregarding all qualifications and exceptions contained therein relating to materiality or Material Adverse Effect, except for such matters as would not in the aggregate reasonably be expected to have a Material Adverse Effect with respect to the Packaging Business or the Packco Group, and Sealed Air shall have received a certificate signed on behalf of Grace by an officer to such effect.

(b) Performance of Obligations. Grace shall have performed in all material respects all obligations required to be performed by it under this Agreement or the other Transaction Agreements at or prior to the Closing Date, and Sealed Air shall have received a certificate signed on behalf of Grace by an officer to such effect.

(c) Letter of Credit. New Grace or another member of the New Grace Group shall have obtained the letter of credit contemplated by Section 2.06(b) of the Distribution Agreement (to the extent required thereby).

(d) Solvency Opinion. The Sealed Air Board shall have received the opinion referred to in Section 8.01(a)(ix)(A) of the Distribution Agreement regarding New Grace and Grace-Conn. and shall be entitled to rely on such opinion as if it were addressed to it.

ARTICLE VIII

TERMINATION

8.1. Termination by Mutual Consent. This Agreement may be terminated, and the Reorganization may be abandoned, at any time prior to the Effective Time, before or after the approval by the shareholders of Grace and/or Sealed Air, by the mutual consent of each party hereto, which consent shall be effected by action of its Board of Directors.

8.2. Termination by any Party Hereto. This Agreement may be terminated, and the Reorganization may be abandoned, by action of the Board of Directors of any party hereto, if (i) the Reorganization shall not have been consummated by April 30, 1998, provided that the right to terminate this Agreement pursuant to this clause (i) shall not be available to any party whose breach of any provision of this Agreement results in the failure of the Reorganization to be consummated by such date, (ii) at the Grace Meeting or at any adjournment thereof, the approval of Grace's shareholders required by Section 7.1(a), or, at the Sealed Air Meeting or any adjournment thereof, the approval of Sealed Air's shareholders required by Section 7.1(a) shall not have been obtained, or (iii) Grace or Sealed Air shall have entered into an agreement with respect to a Higher Offer in a manner permitted by Section 6.5.

8.3. Termination by Grace. This Agreement may be terminated and the Reorganization may be abandoned at any time prior to the Effective Time, before or after the adoption and approval by shareholders of Grace referred to in Section 7.1(a), by action of the Grace Board, if (i) Sealed Air shall have failed to comply in any material respect with any of the covenants or agreements contained herein to be performed by it at or prior to the time of termination, which failure (a) is not capable of being cured prior to April 30, 1998 and with respect to which Grace has provided 15 days' written notice; or (b) is capable of being cured prior to such date but with respect to such failure Sealed Air has not made, or has ceased to make, diligent efforts to cure within 15 days of written notice from Grace; (ii) the Sealed Air Board shall have failed to recommend to its shareholders the approval of the transactions contemplated hereby or shall have withdrawn, modified or changed in a manner materially adverse to Grace its approval or recommendation of this Agreement; or (iii) the average closing sales price of one Sealed Air Common Share for NYSE composite transactions, as reported in The Wall Street Journal, for the twenty trading days ending on the last trading day immediately preceding the day of the Effective Time (but for this clause) is less than $37.00 per share.

8.4. Termination by Sealed Air. This Agreement may be terminated and the Reorganization may be abandoned at any time prior to the Effective Time, before or after the adoption and approval by shareholders of Sealed Air referred to in Section 7.1(a), by action of the Sealed Air Board, if (i) Grace shall have failed to comply in any material respect with any of the covenants or agreements contained herein to be performed by it at or prior to the time of termination, which failure (a) is not capable of being cured prior to April 30, 1998 and with respect to which Sealed Air has provided 15 days' written notice; or (b) is capable of being cured prior to such date but with respect to such failure Grace has not made, or has ceased to make, diligent efforts to cure within 15 days of written notice from Sealed Air; (ii) the Grace Board shall have failed to recommend to its shareholders the approval of the transactions contemplated hereby or shall have withdrawn, modified or changed in a manner materially adverse to Sealed Air its approval or recommendation of this Agreement; or (iii) the average closing sales price of one Grace Common Share for NYSE composite transactions, as reported in The Wall Street Journal, for the twenty trading days ending on the last trading day immediately preceding the day of the Effective Time (but for this clause) is less than $45.375 per share.

8.5. Effect of Termination and Abandonment. In the event of termination of this Agreement and the abandonment of the Reorganization pursuant to this Article VIII, no party hereto (or any of its directors or officers) shall have any liability or further obligation to any other party, except as set forth in Section 6.12 and except that nothing herein will relieve any party from liability for any material and willful breach of any covenant contained herein.

ARTICLE IX

XXX-002434

MISCELLANEOUS AND GENERAL

9.1. Survival. Only those agreements and covenants of the parties which by their express terms apply in whole or in part after the Effective Time shall survive the Effective Time. All other representations, warranties, agreements and covenants shall be deemed only to be conditions of the Reorganization and shall not survive the Effective Time.

9.2. Modification or Amendment. Subject to the applicable provisions of the DGCL, at any time prior to the Effective Time, the parties hereto may modify or amend this Agreement, by written agreement executed and delivered by duly authorized officers of the respective parties.

9.3. Waiver of Conditions. The conditions to each party's obligation to consummate the Reorganization and the Merger are for the sole benefit of such party and may be waived by such party in whole or in part to the extent permitted by applicable law.

9.4. Counterparts. For the convenience of the parties hereto, this Agreement may be executed in any number of separate counterparts signed by one or more of the parties hereto, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

9.5. Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

9.6. Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by cable, telegram, telex or other standard form of telecommunications, or by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

(a)   If to Grace or Merger Sub:

W. R. Grace & Co.
One Town Center Road
Boca Raton, Florida  33486-1010
Attention:  Secretary
Fax: (561) 362-1970

with a copy to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY  10019
Attention:  Andrew R. Brownstein, Esq.
Fax: (212) 403-2000

(b)   If to Sealed Air:

Sealed Air
Park 80 East
Saddle Brook, New Jersey  07663
Attention:  President
Fax:  (201) 703-4152

with a copy to:

Davis Polk & Wardwell
450 Lexington Ave.
New York, NY  10017
Attention:  Christopher Mayer, Esq.
Fax:  (212) 450-4800

or to such other address as any party hereto may have furnished to the other parties by a notice in writing in accordance with this Section.

9.7. Entire Agreement; Assignment. This Agreement (and the Exhibits and Disclosure Letters hereto) (a) constitute the entire agreement, and supersede all other prior agreements, understandings, representations and warranties, both written and oral, among the parties, with respect to the subject matter hereof other than the written confidentiality arrangements existing among the parties hereto, which shall survive, and (b) shall not be assignable by operation of law or otherwise.

9.8. Definition of "Subsidiary." When a reference is made in this Agreement to a subsidiary of a party, the term "subsidiary" means any corporation or other organization whether incorporated or unincorporated of which at least a majority of the securities or interests having by the terms thereof ordinary voting power to elect at least a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such party or by any one or more of its subsidiaries, or by such party and one or more of its subsidiaries.

9.9. Captions. The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement, and shall not be deemed to limit or otherwise affect any of the provisions hereof.

9.10. Specific Performance. In the event of any actual or threatened default in, or breach of, any of the terms, conditions and provisions of this Agreement, the party or parties who are or are to be thereby aggrieved shall

XXX-002435

have the right of specific performance and injunctive relief giving effect to its or their rights under this Agreement, in addition to any and all other rights and remedies at law or in equity, and all such rights and remedies shall be cumulative. The parties agree that the remedies at law for any breach or threatened breach, including monetary damages, are inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is waived.

9.11. Severability. If any provision of this Agreement or the application thereof to any person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.

9.12. Third-Party Beneficiaries. Nothing contained in this Agreement, expressed or implied, is intended to confer upon any person or entity, other than the parties hereto, any benefit, right or remedies.

9.13. Further Assurances. In addition to the actions specifically provided for elsewhere in this Agreement, but subject to Section 9.1 hereof, each of the parties hereto shall use reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable laws, regulations and agreements to consummate and make effective the transactions contemplated by this Agreement.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto on the date first hereinabove written.

W. R. GRACE & CO.


By: /s/ Albert J. Costello
    --------------------------------
    Name:  Albert J. Costello
    Title: Chairman, President and
           Chief Executive Officer


SEALED AIR CORPORATION


By: /s/ T.J. Dermot Dunphy
    --------------------------------
    Name:  T.J. Dermot Dunphy
    Title: Chairman of the Board
           and Chief Executive Officer


PACKCO ACQUISITION CORP.


By: /s/ Larry Ellberger
    --------------------------------
    Name:  Larry Ellberger
    Title: President


                                              Annex A

                DEFINED TERMS


        Acquisition Proposal:  as defined in Section 6.3 hereof.

        Affiliate:  as defined in Rule 12b-2 under the Exchange Act.

        Agreement:  as defined in the Preamble hereof.

        Benefits Agreement:  the executed agreement in the form of Exhibit A to the Distribution Agreement.

        CERCLA:  the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

        Closing:  as defined in Section 1.4 hereof.

        Closing Date:  as defined in Section 1.4 hereof.

        Code:  the Internal Revenue Code of 1986, as amended.

        Contracts:  as defined in Section 5.1(d)(ii).

        Contribution:  as defined in Recital B hereof.

XXX-002436

DGCL:  as defined in Section 1.3 hereof.

Disclosure Letters:  the Sealed Air Disclosure Letter and the Grace Disclosure Letter.

Distribution:  as defined in Recital C hereof.

Distribution Agreement:  as defined in Recital B hereof.

Effective Time:  as defined in Section 1.3 hereof.

Environmental Law: any federal, state, foreign or local law, statute, ordinance, rule, regulation, code, license, permit, authorization, approval, consent, common law, legal doctrine, order, judgment, decree, injunction, requirement or agreement with any government entity or other third party, (a) relating to the pollution, protection, preservation, investigation or restoration of the environment (including, without limitation, air, water vapor, surface water, groundwater, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or to human health or safety, or (b) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of Hazardous Substances.

ERISA:  the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

ERISA Affiliate: with respect to any entity, trade or business, any other entity, trade or business that is a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes the first entity, trade or business, or that is a member of the same "controlled group" as the first entity, trade or business pursuant to Section 4001(a)(14) of ERISA.

Exchange Act:  the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

Exchange Agent:  as defined in Section 4.2(a) hereof.

Governmental Entity:  as defined in Section 5.1(d)(i) hereof.

Grace:  as defined in the Preamble hereof.

Grace Board:  the Board of Directors of Grace.

Grace Certificate of Incorporation:  as defined in Section 2.1 hereof.

Grace Common Shares:  shares of common stock, par value $.01 per share, of Grace (including the associated Grace Rights).

Grace-Conn.:  as defined in Recital C hereof.

Grace Credit Agreement:  as defined in the Distribution Agreement.

Grace Disclosure Letter:  as defined in Section 5.1 hereof.

Grace Meeting:  a duly convened meeting of holders of Grace Common Shares called to vote on and approve the transactions contemplated hereby (including the transactions contemplated by the Distribution Agreement).

Grace Options:  as defined in Section 5.1(a)(i) hereof.

Grace Preferred Shares:  shares of preferred stock, par value $.01 per share, of Grace.

Grace Registration Statement: the registration statement to be filed by Grace with the SEC in connection with the issuance of Newco Common Shares and Newco Convertible Preferred Shares in the Merger and the Recapitalization, which shall include therein the Joint Proxy Statement.

Grace Rights:  the preferred share purchase rights of Grace issued pursuant to the Grace Rights Agreement.

Grace Rights Agreement:  the Rights Agreement, dated as of September 25, 1996, by and between Grace and The Chase Manhattan Bank, as Rights Agent.

Grace Savings Plan:  the W.R. Grace & Co. Salaried Employees Savings and Investment Plan.

Grace Stock Plans:  as defined in Section 5.1(a)(i) hereof.

Grace Tax Matters Certificate:  as defined in Section 5.1(j) hereof.

Hazardous Substance: any substance, waste or material listed, defined, designated or classified as a pollutant or contaminant, or as ignitable, corrosive, reactive or hazardous, toxic, radioactive or dangerous, or otherwise regulated under any Environmental Law, whether by type or by quantity, including any substance containing any such substance as a component.

Higher Offer:  as defined in Section 6.3 hereof.

HSR Act:  the Hart-Scott-Rodino Antitrust Improvements Act of

XXX-002437

1976, as amended.

IRS:  the United States Internal Revenue Service.

Joint Proxy Statement: the joint proxy statement (including all proxy solicitation materials constituting a part thereof) to be prepared by the parties hereto and mailed to the Grace shareholders or Sealed Air shareholders, as the case may be, in connection with the Reorganization.

knowledge of executive officers: shall mean, in the case of Grace or Sealed Air, as the case may be, the knowledge of each officer of such party subject to Section 16 of the Exchange Act pursuant to Rule 16a-2 under the Exchange Act.

Lien:  as defined in Section 5.2(g) hereof.

material:  with respect to any party, material to such party and its subsidiaries, taken as a whole.

Material Adverse Effect:  with respect to any party, an effect which would be materially adverse to the properties, business, financial condition, results of operations or prospects of such party and its subsidiaries taken as a whole.

Meetings:  the Grace Meeting and the Sealed Air Meeting.

Merger:  as defined in Recital E hereof.

Merger Certificate:  as defined in Section 1.3 hereof.

Merger Sub:  as defined in the Preamble hereof.

Merger Sub Common Stock:  as defined in Section 5.1(a)(ii) hereof.

Multiemployer Plan:  as defined in Section 5.2(l)(v) hereof.

Multiple Employer Plan:  as defined in Section 5.2(l)(v) hereof.

Newco:  as defined in Recital E hereto.

Newco Amendment:  as defined in Recital E hereof, the terms of which are attached hereto as Exhibit F.

Newco Certificate:  a certificate evidencing Newco Common Shares.

Newco Common Shares:  the shares of common stock of Newco, par value $.10 per share.

Newco Convertible Preferred Shares:  the shares of Series A Convertible Preferred Stock of Newco, par value $.10 per share, the terms of which are set forth in Exhibit E hereto.

New Grace:  as defined in the Distribution Agreement.

New Grace Business:  as defined in the Distribution Agreement.

New Grace Group:  as defined in the Distribution Agreement.

New Grace Registration Statement:  the registration statement to be filed with the SEC by New Grace in connection with the Distribution.

NYSE:  the New York Stock Exchange, Inc.

Old Sealed Air Certificate:  a certificate evidencing Sealed Air Common Shares.

Other Agreements:  as defined in the Distribution Agreement.

Packaging Business:  as defined in the Distribution Agreement.

Packaging Business Disclosure Letter:  as defined in Section 5.2 hereof.

Packaging Business Disclosure Letter Balance Sheet:  as disclosed in Section 5.2(d)(i) hereof.

Packaging Business Disclosure Letter Financial Statements:  as defined in Section 5.2(d)(i) hereof.

Packaging Business Financial Statements:  as defined in Section 6.7(a) hereof.

Packaging Business Intellectual Property:  as defined in Section 5.2(m) hereof.

Packaging Business Plans:  as defined in Section 5.2(l)(i) hereof.

Packaging Business-Only Plans:  as defined in Section 5.2(l)(i) hereof.

Packco:  as defined in Recital B hereof.

Packco Assets:  as defined in the Distribution Agreement.

Packco Employees:  as defined in the Benefits Agreement.

XXX-002438

Packco Group:  as defined in the Distribution Agreement.

Packco Qualified Plans:  as defined in Section 5.2(1)(iii) hereof.

Packco Subsidiary:  as defined in the Distribution Agreement.

Recapitalization:  as defined in the Distribution Agreement.

Registration Statements:  the Grace Registration Statement and the New Grace Registration Statement.

Reorganization:  the Contribution, the Recapitalization, the Distribution and the Merger and other transactions contemplated by the Transaction Agreements.

Representatives:  with respect to any party, such party's officers, employees, counsel, accountants and other authorized representatives.

S.C. Certificate of Incorporation:  as defined in Section 2.1 hereof.

Schedules 14A: the Schedule 14A to be filed by Grace or Sealed Air, as the case may be, in connection with the Reorganization, including the related Joint Proxy Statement.

Sealed Air:  as defined in the Preamble hereof.

Sealed Air Board:  the Board of Directors of Sealed Air.

Sealed Air Common Shares:  shares of common stock, par value $.01 per share, of Sealed Air.

Sealed Air Disclosure Letter:  as defined in Section 5.3 hereof.

Sealed Air Employees:  as defined in Section 5.3(1)(i) hereof.

Sealed Air Intellectual Property:  as defined in Section 5.3(p) hereof.

Sealed Air Meeting:  a duly convened meeting of holders of Sealed Air Common Shares called to vote on and approve the transactions contemplated hereby.

Sealed Air Plans:  as defined in Section 5.3(1)(i) hereof.

Sealed Air Qualified Plans:  as defined in Section 5.3(1)(iii).

Sealed Air Stock Plans:  as defined in Section 5.3(a) hereof.

Sealed Air Tax Matters Certificate:  as defined in Section 5.3(q) hereof.

SEC:  the Securities and Exchange Commission.

SEC Documents: with respect to any party, all filings made by such party or its subsidiaries with the SEC since December 31, 1994, including notes, schedules, amendments and exhibits thereto.

Securities Act: the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

subsidiary:  as defined in Section 9.8 hereof.

Surviving Corporation:  as defined in Section 1.2 hereof.

Takeover Statute:  as defined in Section 5.1(g) hereof.

Tax Sharing Agreement:  the executed agreement in the form of Exhibit B to the Distribution Agreement.

Transaction Agreements:  this Agreement, the Distribution Agreement and the Other Agreements.

US GAAP:  United States generally accepted accounting principles consistently applied.

ANNEX B

FORM OF

DISTRIBUTION AGREEMENT

by and among

W. R. GRACE & CO.

W. R. GRACE & CO.-CONN,

XXX-002439

and

GRACE SPECIALTY CHEMICALS, INC.

(to be renamed "W. R. Grace & Co.")

Dated as of [          ], 1997

## TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| I. | Definitions | | 2 |
| | 1.01 | General | 2 |
| | 1.02 | References to Time | 17 |
| II. | Certain Transactions Prior to the Distribution Date | | 18 |
| | 2.01 | Transfer of Packco Assets; Assumption of Packco Liabilities | 18 |
| | 2.02 | Certain Foreign Transfers | 20 |
| | 2.03 | Certificate of Incorporation; By-laws; Rights Plan | 23 |
| | 2.04 | Issuance of Stock | 23 |
| | 2.05 | Other Agreements; Shared Facilities | 23 |
| | 2.06 | Financing | 24 |
| | 2.07 | Grace Recapitalization | 26 |
| | 2.08 | Registration and Listing | 27 |
| | 2.09 | Grace and New Grace Boards | 28 |
| | 2.10 | Transfers Not Effected Prior to the Distribution; Transfers Deemed Effective as of the Distribution Date | 28 |
| | 2.11 | Intercompany Accounts and Distribution Payments | 29 |
| III. | The Distribution | | 29 |
| | 3.01 | Record Date and Distribution Date | 29 |
| | 3.02 | The Agent | 29 |
| | 3.03 | Delivery of Share Certificates to the Agent | 29 |
| | 3.04 | The Distribution | 30 |
| IV. | Survival and Indemnification | | 30 |
| | 4.01 | Survival of Agreements | 30 |
| | 4.02 | Indemnification | 30 |
| | 4.03 | Procedures for Indemnification for Third-Party Claims | 31 |
| | 4.04 | Remedies Cumulative | 33 |
| V. | Certain Additional Covenants | | 34 |
| | 5.01 | Notices to Third Parties | 34 |
| | 5.02 | Licenses and Permits | 34 |
| | 5.03 | Intercompany Agreements | 34 |
| | 5.04 | Guarantee Obligations | 35 |
| | 5.05 | Further Assurances | 36 |
| | 5.06 | Environmental Claims Cooperation | 36 |
| VI. | Access to Information | | 36 |
| | 6.01 | Provision of Corporate Records | 36 |
| | 6.02 | Access to Information | 37 |
| | 6.03 | Production of Witnesses | 39 |
| | 6.04 | Retention of Records | 39 |
| | 6.05 | Confidentiality | 40 |
| | 6.06 | Cooperation with Respect to Government Reports and Filings | 40 |
| VII. | No Representations or Warranties | | 41 |
| | 7.01 | No Representations or Warranties | 41 |
| VIII. | Miscellaneous | | 42 |
| | 8.01 | Conditions to Obligations | 42 |
| | 8.02 | Use of Grace Name and Mark | 43 |
| | 8.03 | Complete Agreement | 44 |
| | 8.04 | Expenses | 44 |
| | 8.05 | Governing Law | 45 |
| | 8.06 | Notices | 45 |
| | 8.07 | Amendment and Modification | 46 |
| | 8.08 | Successors and Assigns; No Third-Party Beneficiaries | 46 |
| | 8.09 | Counterparts | 46 |
| | 8.10 | Interpretation | 46 |
| | 8.11 | Severability | 47 |

XXX-002440

```
        8.12    References: Construction......................    47
        8.13    Termination.................................    47
        8.14    SAC Reasonable Consent......................    47

SIGNATURES                                                       48

Schedules to Distribution Agreement


Exhibit A       Form of Employee Benefits Allocation Agreement

Exhibit B       Form of Tax Sharing Agreement

Exhibit C       Form of New Grace Certificate of Incorporation [to be
                provided prior to signing of this Agreement]

Exhibit D       Form of New Grace Bylaws [to be provided prior to signing of
                this Agreement]

Exhibit         E Form of New Grace Preferred Share Purchase Rights Plan [to
                be provided prior to signing of this Agreement]
```

                    DISTRIBUTION AGREEMENT


        THIS DISTRIBUTION AGREEMENT (this "Agreement"), dated as of [
], 1997, by and among W. R. Grace & Co., a Delaware corporation ("Grace"),
W. R. Grace & Co.-Conn., a Connecticut corporation and a wholly owned subsidiary
of Grace ("Grace-Conn.") and Grace Specialty Chemicals, Inc., a Delaware
corporation and a wholly owned subsidiary of Grace ("New Grace").

                            RECITALS
                            --------

        A. The Merger Agreement. Grace and Sealed Air Corporation, a
Delaware corporation ("SAC"), have entered into an Agreement and Plan of Merger,
dated as of August 14, 1997 (the "Merger Agreement"), pursuant to which, at the
Effective Time (as defined therein), a wholly owned subsidiary of Grace will
merge with and into SAC, with SAC being the surviving corporation (the
"Merger"), and Grace being renamed "Sealed Air Corporation".

        B. The Distribution Agreement. This Agreement and the Other
Agreements (as defined herein) set forth certain transactions that SAC has
required as a condition to its willingness to consummate the Merger, and the
purpose of this Agreement is to make possible the Merger by divesting Grace of
the businesses and operations to be conducted by New Grace and its subsidiaries,
including Grace-Conn.

        C. The Contribution. Prior to the Effective Time, and subject to the
terms and conditions set forth in this Agreement, Grace intends to cause the
transfer to a wholly owned subsidiary of Grace-Conn. ("Packco") of certain
assets and liabilities of Grace and its subsidiaries predominantly related to
the Packaging Business (the "Contribution"), as contemplated by this Agreement
and the Other Agreements.

        D. Financing. It is the intention of the parties hereto that, prior
to the Distribution: (i) Grace and/or Packco shall enter into new financing
arrangements and shall make, or cause to be made, the New Grace Capital
Contribution (as defined herein); and (ii) the parties shall cooperate with one
another with respect to the foregoing.

        E. The Distribution. Following the Contribution and immediately
prior to the Effective Time, subject to the conditions set forth in this Agreement, (i) the
capital stock of Packco will be distributed to Grace (the "Intragroup Spinoff"),
(ii) the capital stock of Grace-Conn. will be contributed to New Grace and (ii)
all of the issued and outstanding shares of the common stock of New Grace
(together with the New Grace Rights, "New Grace Common Stock") will be
distributed on a pro rata basis (the "Distribution") to the holders as of the
Record Date of the common stock of Grace, par value $.01 per share ("Grace
Common Stock"), other than shares held in the treasury of Grace.

        F. The Recapitalization. Following the Distribution and immediately
prior to the Effective Time, Grace intends to consummate the Recapitalization in
which each holder of a share of Grace Common Stock shall hold, immediately
thereafter, the Per Share Common Consideration and the Per Share Preferred
Consideration.

        G. Intention of the Parties. It is the intention of the parties (i)
to this Agreement that, for United States federal income tax purposes, the
Contribution and associated transactions shall qualify as a tax-free transaction
under Section 351 of the Internal Revenue Code of 1986, as amended (the "Code"),
the Contribution and the Intragroup Spinoff (and associated transactions) shall
qualify as a tax-free transaction under Sections 355 and 368 of the Code, the
Distribution and associated transactions shall qualify as a tax-free transaction
under Sections 355 and 368 of the Code, and the Recapitalization shall be
tax-free to Grace and its shareholders under the Code, and (ii) to this
Agreement and the Merger Agreement that the Merger shall qualify as a
"reorganization" within the meaning of Section 368 of the Code and the Merger
will be tax free under the Code to Grace, SAC and their respective shareholders.

        NOW, THEREFORE, in consideration of the premises, and of the
representations, warranties, covenants and agreements set forth herein, the

XXX-002441

parties hereto hereby agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01 General. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

Adjusted Foreign Transfer Taxes:  as defined in Section 2.02(c) hereof.

Affiliate: with respect to any specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person; provided, however, that, for purposes of this Agreement, no member of either Group shall be deemed to be an Affiliate of any member of the other Group.

Agent:  the distribution agent to be appointed by Grace to distribute the shares of New Grace Common Stock pursuant to the Distribution.

Agreement:  as defined in the preamble to this Agreement.

Asset: any and all assets and properties, tangible or intangible, including, without limitation, the following: (i) cash, notes and accounts and notes receivable (whether current or non-current); (ii) certificates of deposit, banker's acceptances, stock, debentures, evidences of indebtedness, certificates of interest or participation in profit-sharing agreements, collateral-trust certificates, preorganization certificates or subscriptions, transferable shares, investment contracts, voting-trust certificates, fractional undivided interests in oil, gas or other mineral rights, puts, calls, straddles, options and other securities of any kind; (iii) intangible property rights, inventions, discoveries, know-how, United States and foreign patents and patent applications, trade secrets, confidential information, registered and unregistered trademarks, service marks, service names, trade styles and trade names and associated goodwill; statutory, common law and registered copyrights; applications for any of the foregoing, rights to use the foregoing and other rights in, to and under the foregoing; (iv) rights under leases, contracts, licenses, permits, distribution arrangements, sales and purchase agreements, other agreements and business arrangements; (v) real estate and buildings and other improvements thereon; (vi) leasehold improvements, fixtures, trade fixtures, machinery, equipment (including transportation and office equipment), tools, dies and furniture; (vii) office supplies, production supplies, spare parts, other miscellaneous supplies and other tangible property of any kind; (viii) computer equipment and software; (ix) raw materials, work-in-process, finished goods, consigned goods and other inventories; (x) prepayments or prepaid expenses; (xi) claims, causes of action, choses in action, rights under express or implied warranties, rights of recovery and rights of setoff of any kind; (xii) the right to receive mail, payments on accounts receivable and other communications; (xiii) lists of customers, records pertaining to customers and accounts, personnel records, lists and records pertaining to customers, suppliers and agents, and books, ledgers, files and business records of every kind; (xiv) advertising materials and other printed or written materials; (xv) goodwill as a going concern and other intangible properties; (xvi) employee contracts, including any rights thereunder to restrict an employee from competing in certain respects; and (xvii) licenses and authorizations issued by any governmental authority.

Benefits Agreement:  the Employee Benefits Allocation Agreement to be entered into prior to the Distribution between Grace and New Grace, substantially in the form of Exhibit A hereto, with such changes as are acceptable to Grace, New Grace, Grace-Conn. and SAC.

Business:  the New Grace Business or the Packaging Business.

Code:  as defined in the Recitals to this Agreement.

Contribution:  as defined in the Recitals to this Agreement.

Debt Costs:  as defined in Section 2.06(b) hereof.

Deemed Foreign Tax Credits:  as defined in Section 2.02(c) hereof.

Deemed Repatriations:  as defined in Section 2.02(c) hereof.

Distribution:  as defined in the Recitals to this Agreement.

Distribution Date:  the date as of which the Distribution shall be effected, to be determined by, or under the authority of, the Board of Directors of Grace consistent with this Agreement and the Merger Agreement.

Effective Time:  as defined in the Merger Agreement.

Environmental Law:  as defined in the Merger Agreement.

Excess Short-Term Payables:  as defined in Section 2.02(c) hereof.

Excess Shares:  as defined in Section 2.07(b) hereof.

Exchange Act:  the Securities Exchange Act of 1934, as amended, together with the rules and regulations promulgated thereunder.

Exchange Agent:  the exchange agent to be retained in connection

XXX-002442

with effecting the Recapitalization (which may also be the Exchange Agent with respect to the Merger and/or the Agent).

Foreign Exchange Rate: with respect to any currency other than United States dollars as of any date, the rate on such date at which such currency may be exchanged for United States dollars as quoted in The Wall Street Journal.

Foreign New Grace Subsidiaries: as defined in the Tax Sharing Agreement.

Foreign NOLs: as defined in Section 2.02(c) hereof.

Foreign Packco Subsidiaries: as defined in the Tax Sharing Agreement.

Foreign Tax Credits: as defined in Section 2.02(c) hereof.

Foreign Transfer Taxes: as defined in Section 2.02(c) hereof.

Foreign Transfers: as defined in Section 2.02(a) hereof.

Grace: as defined in the preamble to this Agreement.

Grace Certificate of Incorporation: as defined in the Merger Agreement.

Grace Common Stock: as defined in the Recitals to this Agreement.

Grace-Conn.: as defined in the preamble to this Agreement.

Grace-Conn. Assets: all of the Assets owned by Grace or its Subsidiaries immediately prior to the Distribution, other than any Packco Assets.

Grace-Conn. Liabilities: all of the Liabilities of Grace or its Subsidiaries immediately prior to the Distribution, other than Packco Liabilities.

Grace-Conn. Public Debt: (i) the outstanding indebtedness of Grace-Conn. under its 8.0% Notes Due 2004, 7.4% Notes Due 2000 and 7.75% Notes Due 2002 (other than any such indebtedness owned by Grace-Conn. or another member of the New Grace Group) and (ii) with respect to any indebtedness described in clause (i), any amendments, modifications, refinancings, extensions, renewals, refundings or replacements of, or indebtedness exchanged for, such indebtedness which in each case is guaranteed by Grace (other than any such indebtedness owned by Grace-Conn. or another member of the New Grace Group).

Grace Credit Agreement: the credit agreement or other financing agreements or arrangements to be entered into by Grace and/or Packco prior to the Distribution Date to fund the New Grace Capital Contribution and fees and expenses of Packco (or Grace) in connection with the transactions contemplated hereby and to provide Packco with working capital.

Group: the Packco Group or the New Grace Group.

Indemnifiable Losses: all losses, Liabilities, damages, claims, demands, judgments or settlements of any nature or kind, including all reasonable costs and expenses (legal, accounting or otherwise as such costs are incurred) relating thereto, suffered (and not actually reimbursed by insurance proceeds) by an Indemnitee, including any reasonable costs or expenses of enforcing any indemnity hereunder.

Indemnifying Party: a Person who or which is obligated under this Agreement to provide indemnification.

Indemnitee: a Person who or which may seek indemnification under this Agreement.

Indemnity Payment: an amount that an Indemnifying Party is required to pay to or in respect of an Indemnitee pursuant to Article IV.

Information: all records, books, contracts, instruments, computer data and other data and information.

Intragroup Spinoff: as defined in Recital E to this Agreement.

Joint Proxy Statement: as defined in the Merger Agreement.

Liabilities: all debts, liabilities and obligations, whether absolute or contingent, matured or unmatured, liquidated or unliquidated, accrued or unaccrued, known or unknown, whenever arising, and whether or not the same would properly be reflected on a balance sheet.

Litigation Matters: actual, threatened or future litigations, investigations, claims or other legal matters that have been or may be asserted against, or otherwise adversely affect, Grace and/or New Grace (or members of either Group).

Merger: as defined in the Recitals to this Agreement.

Merger Agreement: as defined in the Recitals to this Agreement.

Net Benefit Amount: the amount (whether positive or negative)

XXX-002443

equal to (i) minus (ii), where (i) is the sum of the U.S. Plan Assets and the Foreign Plan Assets (each as defined below) and (ii) is the sum of the U.S. Benefit Plan Liabilities and the Foreign Benefit Plan Liabilities (each as defined below).

"U.S. Plan Assets" means the aggregate fair market value, as of the Distribution Date, of the assets of the Union Retirement Plan (as defined in the Benefits Agreement) and the assets that will be transferred to the Packco Hourly Non-Union Retirement Plan (as defined in the Benefits Agreement) pursuant to Section 4.01(d) of the Benefits Agreement, in each case as reasonably determined by Actuarial Sciences Associates ("ASA"). "Foreign Plan Assets" means the aggregate fair market value, as of the Distribution Date, of the assets that will be, pursuant to the Foreign Plans Agreement (as defined in the Benefits Agreement), transferred from a Noninsured Foreign Pension Plan (as defined in the Benefits Agreement) that is a New Grace Benefit Plan (as defined in the Benefits Agreement) (a "Transferring New Grace Foreign Plan") to a Packco Benefit Plan or retained by a Noninsured Foreign Pension Plan that is a Packco Benefit Plan (a "Retained Grace Foreign Plan"), in each case as reasonably determined by the Local Actuary (as defined in the Benefits Agreement) for the relevant Transferring New Grace Foreign Plan or Retained Grace Foreign Plan.

"U.S. Benefit Plan Liabilities" means the sum of the Accrued Benefit Obligation, calculated in accordance with FAS 87 ("ABO"), for (i) benefits of Packco Participants (as defined in the Benefits Agreement) under the Union Retirement Plan and (ii) benefits of Packco Participants under the Hourly Non-Union Retirement Plan (as defined in the Benefits Agreement) that are assumed by the Packco Hourly Non-Union Retirement Plan pursuant to Section 4.01(d) of the Benefits Agreement. "Foreign Benefit Plan Liabilities" means the greater of (i) the sum of the ABOs for the Assumed Foreign Benefits (as defined below) plus $10 million or (ii) the sum of the Projected Benefit Obligations, calculated in accordance with FAS 87 ("PBO"), for the Assumed Foreign Benefits. The "Assumed Foreign Benefits" means the aggregate amount of the retirement benefits of Packco Participants under each Noninsured Foreign Pension Plan that are, pursuant to the Foreign Benefits Agreement, either assumed by a Packco Benefit Plan from a Transferring New Grace Foreign Plan or retained by a Retained Grace Foreign Plan.

The determination of U.S. Benefit Plan Liabilities shall be made by ASA in accordance with the actuarial and other assumptions set forth on Schedule 1.01(f). The determination of the ABOs and PBOs for the Assumed Foreign Benefits shall in each case be made by AON Consulting ("AON") as of the Distribution Date based upon the actuarial and other assumptions used by AON to determine the ABO or PBO (as applicable) of the relevant Transferring New Grace Foreign Plan or Retained Grace Foreign Plan for purposes of Grace's fiscal 1996 year-end financial disclosures, if such ABO or PBO is reported thereon, which actuarial and other assumptions are set forth on Schedule 1.01(f), provided, in the case of the assumptions relating to each Noninsured Foreign Pension Plan, that such assumptions are reasonable. To the extent that the ABO or PBO for a particular Transferring New Grace Foreign Plan or Retained Grace Foreign Plan was not so reported, such assumptions shall be reasonable assumptions developed by AON in the manner most typically used by AON to develop assumptions for determining ABO or PBO for FAS 87 purposes for substantially similar plans in the applicable jurisdiction.

ASA, the Local Actuaries and AON (collectively, the "Actuaries") shall initially make the determinations called for by this definition on a good-faith estimated basis not later than December 31, 1997 or such other date as the parties hereto shall request. In making such initial determinations, the local Actuaries shall be entitled to rely upon the advice of Grace and New Grace with respect to the anticipated terms and conditions of the Foreign Plans Agreement (if it has not yet been signed) and the manner in which its terms and conditions will be implemented. Final determinations shall be made by the Actuaries as and when the asset transfers and assumptions of liabilities contemplated by the Foreign Plans Agreement and Section 4.01(d) of the Benefits Agreement are completed, and the New Grace Capital Contribution shall be adjusted as necessary to reflect the Net Benefit Amount as so finally determined. Grace and New Grace agree to cooperate in supplying the Actuaries with all information reasonably requested by them in connection with making such determinations, including, without limitation, information concerning plan participants, assets and benefits. Grace, New Grace and SAC shall be entitled to review and comment on the Actuaries' analyses as the Actuaries are in the process of making their determinations.

New Grace:  as defined in the preamble to this Agreement.

New Grace Business:  all of the businesses and operations conducted by Grace and its Subsidiaries at any time, whether prior to, on or after the Distribution Date, other than the Packaging Business.

New Grace Capital Contribution:  the capital contribution, distribution or other transfer to be received by Grace-Conn. at or shortly prior to the Distribution, in the aggregate amount of:

|         |     |                                                                                              |
|---------|-----|----------------------------------------------------------------------------------------------|
|         | (a) | $1,200,000,000;                                                                              |
| plus    | (b) | the aggregate amount of cash held by Packco or any Packco Subsidiaries immediately prior to the Distribution; |
| minus   | (c) | the amount by which                                                                          |
|         |     | (i)  the aggregate amount of (x) withholding Taxes that would be imposed by foreign jurisdictions |

XXX-002444

on a deemed distribution to Packco by each Foreign Packco Subsidiary immediately following the Distribution, of an amount of cash equal to the excess of (I) the amount of cash held by such Foreign Packco Subsidiary immediately prior to the Distribution over (II) the sum of (A) the amount of debt that may be repaid without penalty plus current accrued but unpaid Taxes of such Subsidiary as of the Distribution Date and (B) Excess Short-Term Payables of such Subsidiary; provided, however, that such amount of cash shall be determined taking into account the principles, as applied to Packco, set forth in the proviso in Section 2.02(c)(v), and (y) Taxes that would be imposed by the United States or any political subdivision thereof in excess of the Foreign Tax Credits of Packco in respect of Taxes paid by Packco or deemed paid by Packco as a result of such deemed distributions of such cash;

exceeds   (ii)   the aggregate amount of Packco Repatriation Tax Costs;

plus   (d)   the Net Benefit Amount; and

plus       (e) the aggregate amount of Transaction Costs, if any, payable by Grace to New Grace pursuant to Section 8.04 of this Agreement, as of the Distribution Date.

New Grace Common Stock:  as defined in the Recitals to this Agreement.

New Grace Group:  New Grace, Grace-Conn. and the other New Grace Subsidiaries.

New Grace Group Excess Cash:  as defined in Section 2.02(c) hereof.

New Grace Indemnitees:  New Grace, each Affiliate of Grace-Conn. (other than members of the Packco Group) and each of their respective Representatives and each of the heirs, executors, successors and assigns of any of the foregoing.

New Grace Repatriation Tax Costs:  as defined in Section 2.02(c) hereof.

New Grace Rights:  the preferred share purchase rights of New Grace.

New Grace Subsidiaries:  all direct and indirect Subsidiaries of Grace, including foreign subsidiaries of Grace-Conn. to be formed pursuant to the Tax Sharing Agreement or Section 2.02 hereof, other than Packco and any Packco Subsidiary.

Newco Common Stock:  the shares of common stock, par value $.10 per share, of Grace.

Newco Convertible Preferred Stock:  the Series A Convertible Preferred Stock of Grace, par value $.10 per share, the terms of which are described in Exhibit E to the Merger Agreement.

NYSE:  New York Stock Exchange, Inc.

Other Agreements: the Benefits Agreement, the Tax Sharing Agreement, an insurance procedures agreement, an intellectual property license agreement, an interim services agreement, the shared facilities agreements and the other agreements entered into or to be entered into in connection with the Distribution as contemplated by Article II of this Agreement.

Packaging Business: all of the worldwide packaging businesses, operations and investments conducted or owned by Grace and its Subsidiaries at any time, whether prior to, on or after the Distribution Date, including Cryovac([Registered])flexible plastic packaging systems, Cryovac([Registered]) rigid plastic cups and tubs for dairy foods and Formpac([Registered]) foam trays for supermarket and institutional food service, provided that the Packaging Business shall not include the worldwide businesses, operations and investments at or prior to the Distribution Date conducted or owned by Grace and its Subsidiaries of its container business group (which was, until 1996, operated as a separate business unit known as Grace Container Products and any extensions of such former business unit since such time and through the Distribution Date), including, without limitation, Darex([Registered]) container sealants and coatings.

Packco:  as defined in the Recitals to this Agreement.

Packco Assets: collectively and except as otherwise provided in any of the Other Agreements, (i) all of the right, title and interest immediately prior to the time of the Distribution of Grace and its Subsidiaries in all Assets that are predominantly used or held for use in or predominantly relating to or to the extent arising from the Packaging Business; (ii) the rights to use shared Assets as provided in Article II; (iii) all other Assets of Grace and its Subsidiaries to the extent specifically assigned to or retained by any member of the Packco Group pursuant to this Agreement or any Other Agreement; (iv) the capital stock of Packco and all Packco Subsidiaries; and (v) the Assets set forth on Schedule 1.01(a) hereto; provided that

XXX-002445

(a)  all cash and marketable securities held by any member of the Packco Group immediately prior to the Distribution shall be Grace-Conn. Assets;

(b)  intellectual property rights shall be Packco Assets in the form and to the extent provided in Section 2.01(d);

(c)  with respect to leased or owned real property included in the Packco Assets that is not used exclusively by the Packaging Business, Packco Assets shall include only real property used or held for use in the Packaging Business as of the Distribution Date and shall not include any vacant or unoccupied property otherwise owned or leased by Grace or any of its Subsidiaries (except in the case of vacant or unoccupied property (I) on a site that is engaged predominantly in the Packaging Business, to provide a reasonable buffer area for such operations, to the extent practicable or (II) that is used or held for use in the Packaging Business);

(d)  other than as provided herein or in the Other Agreements, Packco Assets shall not include any general corporate or corporate service operations of Grace conducted in its Boca Raton, Florida headquarters and the other locations set forth on Schedule 1.01(b) hereto;

(e)  all right, title and interest of Grace and its Subsidiaries in the real property identified on Schedule 1.01(a) shall be Packco Assets; and

(f)  Packco Assets shall not include (I) the Woburn, MA Grace facility or the Scuffletown Rd., South Carolina facility previously used by the Packaging Business (or any Assets located at or relating to such facilities); (II) Assets relating to any divested business or product line of Grace or any of its Subsidiaries (including rights to payment and indemnification thereunder, but Packco Assets shall include rights to indemnification relating to amounts paid by the Packco Group pursuant to clause (a)(II) of the definition of Packco Liabilities); (III) any interim service or tolling agreements entered into in connection with any divestiture by Grace or any of its Subsidiaries prior to the Distribution Date; and (IV) the Assets set forth on Schedule 1.01(c).

Packco Group:  Grace, Packco and the Packco Subsidiaries.

Packco Group Excess Cash:  as defined in Section 2.02(c) hereof.

Packco Indemnitees:  Grace, Packco, each Affiliate of Packco and each of their respective Representatives and each of the heirs, executors, successors and assigns of any of the foregoing.

Packco Liabilities: collectively, and in each case except to the extent otherwise provided in any Other Agreement, (i) all Liabilities of Grace and its Subsidiaries to the extent relating to or arising from the Packaging Business or the Packco Assets; (ii) all Liabilities of Grace and its Subsidiaries to the extent assigned to or assumed by Grace and Packco under this Agreement or any Other Agreement; (iii) all Liabilities of Grace and/or Packco under the Grace Credit Agreement; and (iv) all Liabilities set forth on Schedule 1.01(d) hereto, provided that Packco Liabilities shall not, in any event, include:

(a)  Liabilities of Grace and its Subsidiaries (I) arising under any Environmental Law relating to any facility or Asset that was used or held for use in the Packaging Business prior to but not on or after the Distribution Date (including formerly owned or leased facilities and former offsite disposal facilities) or (II) relating to any business or product line that was part of, or any facility or Asset that was used or held for use in, the Packaging Business that, in each case, has been divested prior to the Distribution Date; provided that, except as otherwise provided below, 25% of such Liabilities described in this clause not to exceed $10 million in the aggregate shall be Packco Liabilities;

(b)  Liabilities arising under any Environmental Law relating to or arising from the Woburn, MA Grace facility or the Scuffletown Road, SC facility;

(c)  Liabilities for any indebtedness, other than indebtedness under the Grace Credit Agreement and indebtedness to unaffiliated persons outstanding on the date hereof;

(d)  Liabilities of Grace or any of its Subsidiaries relating to or arising from any interim service or tolling agreements entered into in connection with any divestiture by Grace or any of its Subsidiaries;

(e)  Liabilities, whether such Liabilities relate to events, occurrences or circumstances occurring or existing, or whether such Liabilities arise, before, on or after the Distribution Date, relating to asbestos or asbestos-containing materials manufactured and/or sold (collectively, "Asbestos Activities") by Grace, Grace-Conn. or any of their respective Subsidiaries, affiliates or predecessors (but this clause shall not include such Liabilities to the extent relating to Asbestos Activities, if any, conducted after the Distribution Date of any member of the Packco Group or any of their Affiliates after the Distribution Date);

XXX-002446

(f) Liabilities relating to or arising from any violation or alleged violation on or prior to the Distribution Date by Grace, Grace-Conn. or any of their respective Subsidiaries, affiliates or predecessors of any federal, state or foreign securities laws; and

(g) Liabilities relating to or arising from any breach or alleged breach of fiduciary duties by any director or executive officer of Grace, Grace-Conn. or any of their respective Subsidiaries, affiliates or predecessors prior to the Distribution Date.

Packco Repatriation Tax Costs:  as defined in Section 2.02(c) hereof.

Packco Subsidiaries: all direct and indirect Subsidiaries of Grace to be transferred to or formed by Packco in connection with the Contribution or the Foreign Transfers (including any such Subsidiary to be formed pursuant to the Tax Sharing Agreement or Section 2.02).

Per Share Common Consideration:  the shares (or fraction of a share) of Newco Common Stock issuable in the Recapitalization per share of Grace Common Stock outstanding as of the Record Date, such amount to be determined by dividing (a) the amount equal to (I) 40,895,000, increased by the product, if any, of (x) 1.7027 and (y) the net increase in outstanding Sealed Air Common Shares between August 14, 1997 and the Distribution Date, minus (II) the Net Option Number, by (b) the aggregate number of shares of Grace Common Stock outstanding as of the Record Date, the result being rounded to the nearest one-thousandth (or, in the event there is no nearest number, rounded up to the next one-thousandth).  "Net Option Number" means

(i)     the aggregate number of shares of Newco Common Stock into which all outstanding options to purchase shares of Grace Common Stock outstanding as of the Distribution Date and held by Packco Employees are or may be exercisable (whether or not then exercisable) immediately after the Effective Time (such number calculated as provided in the Benefits Agreement, the "Newco Options"), multiplied by the amount by which:

(I)     the average of the arithmetic mean between the highest and lowest sales prices of a share of Newco Common Stock on the New York Stock Exchange Composite Tape on each of the five trading days beginning on the ex-dividend date for the Distribution (the "SAC Stock Price")

exceeds (II)    the weighted average per-share exercise price for the Newco Options, calculated as provided in the Benefits Agreement;

divided by    (ii)    the SAC Stock Price.

Fractional shares otherwise issuable to a Grace shareholder shall be treated as provided in Section 2.07(b). In the event that shares of Grace Common Stock are issued between the Record Date and the Effective Time, including pursuant to the exercise of stock options granted by Grace (but not including issuances in the Recapitalization), such Consideration shall be appropriately adjusted.

Per Share Preferred Consideration: the shares (or fraction of a share) of Newco Convertible Preferred Stock issuable in the Recapitalization per share of Grace Common Stock outstanding as of the Record Date, such amount to be calculated by dividing 36,000,000 by the aggregate number of shares of Grace Common Stock outstanding as of the Record Date, the result being rounded to the nearest one-thousandth (or, in the event there is no nearest number, rounded up to the next one-thousandth). Fractional shares otherwise issuable to a Grace shareholder shall be treated as provided in Section 2.07(b). In the event that shares of Grace Common Stock are issued between the Record Date and the Effective Time, including pursuant to the exercise of stock options granted by Grace (but not including issuances in the Recapitalization), such Consideration shall be appropriately adjusted.

Person:  an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated organization or a government or any department or agency thereof.

Pre-Distribution Period:  as defined in the Tax Sharing Agreement.

Privileged Information: with respect to either Group, Information regarding a member of such Group, or any of its operations, Assets or Liabilities (whether in documents or stored in any other form or known to its employees or agents) that is or may be protected from disclosure pursuant to the attorney-client privilege, the work product doctrine or other applicable privileges, that a member of the other Group may come into possession of or obtain access to pursuant to this Agreement or otherwise.

Recapitalization:  as defined in Section 2.07 hereof.

Record Date: the close of business on the date to be determined by the Board of Directors of Grace as the record date for determining shareholders of Grace entitled to receive the Distribution and the Recapitalization, which date shall be the day of, or the business day immediately preceding the day of, the Effective Time.

Registration Statements: a registration statement on Form 10 (or, if such form is not appropriate, the appropriate form pursuant to the Securities

XXX-002447

Act) to be filed by New Grace with the SEC to effect the registration of the New Grace Common Stock and the New Grace Rights pursuant to the Exchange Act (or, if applicable, pursuant to the Securities Act) and the registration statement to be filed by Grace with the SEC in connection with the Recapitalization and the Merger pursuant to the Securities Act.

Representative:  with respect to any Person, any of such Person's directors, officers, employees, agents, consultants, advisors, accountants, attorneys and representatives.

SAC:  as defined in the Recitals to this Agreement.

SEC:  the Securities and Exchange Commission.

Securities Act:  the Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder.

Severance Costs:  as defined in Section 8.04 hereof.

Shared Facilities: other than Shared Regional Headquarters, any production, manufacturing, sales office or other facility (whether owned or leased) of Grace or any of its subsidiaries in which operations of both the Packaging Business and the New Grace Business are conducted as of the Distribution Date, including the facilities listed on Schedule 1.01(e) hereto.

Shared Regional Headquarters:  regional headquarters of Grace in which services are provided, as of the Distribution Date, to both the Packaging Business and the New Grace Business.

Subsidiary: with respect to any specified Person, any corporation or other legal entity of which such Person or any of its subsidiaries controls or owns, directly or indirectly, more than 50% of the stock or other equity interest entitled to vote on the election of members to the board of directors or similar governing body.

Subsidiary Excess Cash:  as defined in Section 2.02(c) hereof.

Tax:  as defined in the Tax Sharing Agreement.

Tax Benefit:  as defined in the Tax Sharing Agreement.

Tax Sharing Agreement:  the Tax Sharing Agreement to be entered into prior to the Distribution between Grace and New Grace, substantially in the form of Exhibit B hereto, with such changes as are acceptable to Grace, New Grace, Grace-Conn. and SAC.

Third-Party Claim: any claim, suit, derivative suit, arbitration, inquiry, proceeding or investigation by or before any court, any governmental or other regulatory or administrative agency or commission or any arbitration tribunal asserted by a Person who or which is neither a party hereto nor an Affiliate of a party hereto.

Transaction Agreements:  as defined in the Merger Agreement.

Transaction Costs:  as defined in Section 8.04 hereof.

Withholding Taxes:  as defined in Section 2.02(c) hereof.

SECTION 1.02 References to Time. All references in this Agreement to times of the day shall be to New York City time.

ARTICLE II

CERTAIN TRANSACTIONS PRIOR TO THE DISTRIBUTION DATE

SECTION 2.01 Transfer of Packco Assets; Assumption of Packco Liabilities. (a) Prior to the Distribution Date but subject to Section 2.02, Grace shall transfer, or cause to be transferred to Packco or, at Packco's option, to a Packco Subsidiary effective as of the Distribution Date all of the Packco Assets. Immediately prior to the Distribution, the capital stock of Packco shall be distributed to Grace. Grace shall also transfer, or cause to be transferred, the capital stock of any Subsidiary such that, as of the Distribution Date, the Packco Subsidiaries shall be wholly owned (except for shares held by directors or officers to comply with applicable law) by a member of the Packco Group and the New Grace Subsidiaries shall be wholly owned (except for shares held by directors or officers to comply with applicable law) by a member of the New Grace Group. Effective as of the Distribution Date, the transfers described in this Section will result in Packco or another member of the Packco Group obtaining all of the rights, title and interests of Grace and its Subsidiaries in the Packco Assets, subject to Sections 2.05 and 2.10.

(b) Effective as of the Distribution Date and subject to Section 2.02, Packco shall, or shall cause a Packco Subsidiary to, assume, pay, perform, and discharge in due course all of the Packco Liabilities.

(c) Separation of Assets. The Packco Assets and Grace-Conn. Assets (including Assets that are, or are contained in, the Shared Facilities) shall, to the extent reasonably practicable (including taking into account the costs of any actions taken), be severed, divided or otherwise separated from each other so that a member of the respective Group will own and control their respective Assets as of the Distribution Date, provided that neither Grace nor New Grace shall be obligated to make significant expenditures to effect such separation prior to the Distribution Date. Actions taken and expenditures incurred to separate the Shared Facilities shall be subject to the agreement of Grace, New

XXX-002448

Grace and SAC. Such separation may include subdivision of real property, subleasing or other division of shared buildings or premises and allocation of shared working capital, equipment and other Assets. Such separation shall be effected in a manner that does not unreasonably disrupt either the Packaging Business or the New Grace Business and minimizes, to the extent practicable, current and future costs (and losses of tax or other economic benefits) of the respective Businesses. With respect to any Asset that cannot reasonably be separated or otherwise allocated as provided above, (i) all right, title and interest of Grace and its Subsidiaries shall be allocated to the Group as to which such Asset is predominantly used or held for use or predominantly relates and (ii) the other Group shall have a right to use such Assets in its Business in a manner consistent with past practice for a period which is coterminous with the life of the Asset described in (i) (and the coextensive obligation to pay its allocable share of any costs or expenses related to such Asset pursuant to the last sentence of this Section 2.01(c)). To the extent the separation of Assets cannot be achieved in a reasonably practicable manner, the parties will enter into appropriate arrangements regarding the shared Asset. Any costs related to the use of a shared Asset that is not separated as of the Distribution Date shall be allocated, with respect to the two-year period beginning immediately after the Distribution Date, based on the methodology historically used by Grace, and, for any period thereafter, using such reasonable manner as agreed by New Grace and Grace.

(d) Intellectual Property. Notwithstanding the foregoing or anything else contained herein, any intellectual property rights of Grace or any of its Subsidiaries that are Packco Assets shall be licensed to or transferred to Packco, as the case may be, as follows. With respect to intellectual property rights used or held for use solely in connection with the Packaging Business, Packco shall have full ownership (to the extent of Grace's rights therein) of such rights. Except as otherwise provided in Schedule 2.01(d), with respect to intellectual property rights that are used or held for use in both the Packaging Business and the New Grace Business, title to such rights shall be owned by the New Grace Group and the Packco Group shall have an exclusive, worldwide, fully paid, perpetual, royalty-free license to use the intellectual property rights for the field of use described in the next sentence hereof. The field of use shall be (i) the businesses engaged in by Packco and the Packco Group as of the Distribution Date and the businesses of SAC as of the Distribution Date, including, in each case, reasonable extensions thereof, provided, however, that such field of use shall not include the field described in the proviso to the definition of "Packaging Business" as well as (to the extent not described in such proviso) the business of (A) closures, closure sealant compositions and multifunctional can ends which are used on or with rigid containers and (B) coatings, sealants, compositions and equipment used or held for use in the manufacture of cans and other rigid containers, in each case including reasonable extensions thereof; and (ii) notwithstanding (i), with respect to reasonable extensions referred to in the first part of clause (i) that overlap with the reasonable extensions described in the proviso in clause (i), the field of use shall include such overlap but the license therefor shall be non-exclusive and the New Grace Group shall also have title to use such intellectual property in the area of overlap. Such licenses shall not unduly restrict the subsequent transfer or license (within the applicable field of use) of the intellectual property. Such arrangements shall not restrict or limit in any way the rights of SAC to use any intellectual property that is not a Packco Asset.

(e) The costs (and other out-of-pocket losses) attributable to the separation of the Assets, including, without limitation, the Shared Facilities, shall be allocated pursuant to Section 8.04.

SECTION 2.02 Certain Foreign Transfers. (a) Prior to the Distribution Date, Grace shall use its reasonable best efforts to effect the legal separation of the Packco Assets and Packco Liabilities, on the one hand, from the Grace-Conn. Assets and Grace-Conn. Liabilities, on the other hand, that are located in jurisdictions outside the United States. Such separation may include asset transfers, stock transfers, spin-offs, mergers, reorganizations, consolidations or other transfers which may be effected before, simultaneously with or after the Distribution (collectively, the "Foreign Transfers"). Any Foreign Transfer that occurs after the Distribution shall be effected pursuant to a binding commitment in existence prior to the Distribution Date.

(b) The Adjusted Foreign Transfer Taxes shall be allocated between the New Grace Group and the Packco Group as provided in Section 8.04. Each party shall reimburse the other to the extent that such other party pays Foreign Transfer Taxes in excess of the amount of Adjusted Foreign Transfer Taxes allocable to such other party pursuant to Section 8.04. Such payment shall, for Tax purposes, be characterized as an adjustment of the New Grace Capital Contribution.

(c) (i) "Adjusted Foreign Transfer Taxes" shall mean the excess, if any, of (I) the sum of the Foreign Transfer Taxes, Packco Repatriation Tax Costs and New Grace Repatriation Tax Costs over (II) the present value using a discount rate of 5% (or, in the case of value added taxes, the gross value) of any Tax Benefits (including foreign tax credits for United States federal income tax purposes ("Foreign Tax Credits") other than Foreign Tax Credits attributable to Foreign Transfer Taxes or Withholding Taxes that in the aggregate do not exceed the Tax imposed by the United States and any political subdivision thereof on the Deemed Repatriation) that may or would arise as a result of the Foreign Transfers, the payment of the Foreign Transfer Taxes or the Deemed Repatriations. Such Tax Benefits shall be presumed to be utilized in the first year in which they arise (or are deemed to arise). All amounts relating to the calculation of Adjusted Foreign Transfer Taxes and the amount calculated pursuant to clause (c) of the definition of "New Grace Capital Contribution" shall be calculated in local currency and translated into U.S. Dollars at the Foreign Exchange Rate for such currency as of the Distribution Date.

XXX-002449

(ii) "Foreign Transfer Taxes" shall mean net Taxes that may be imposed by any jurisdiction other than the United States or any political subdivision thereof in connection with the Foreign Transfers (and any Tax net of associated foreign tax credits imposed by the United States or a political subdivision thereof on the Foreign Transfer in Venezuela) on any member of the New Grace Group or the Packco Group; provided, however, that the Foreign NOLs shall be taken into account in calculating the amount of Foreign Transfer Taxes.

(iii) "Packco Repatriation Tax Costs" and "New Grace Repatriation Tax Costs", respectively, shall mean the sum of the (I) withholding Taxes that would be imposed by a foreign jurisdiction on a deemed distribution of Packco Group Excess Cash to Packco or of New Grace Group Excess Cash to New Grace, respectively (the "Deemed Repatriations"), on the day immediately following the Distribution ("Withholding Taxes") and (II) Taxes that would be imposed by the United States or any political subdivision thereof on a Deemed Repatriation (without taking into account any net operating loss or other deduction) in excess of the Foreign Tax Credits of Packco or Grace-Conn., respectively, in respect of Taxes paid or deemed paid by Packco or Grace-Conn., respectively, as a result of such Deemed Repatriation ("Deemed Foreign Tax Credits").

(iv) "Packco Group Excess Cash" and "New Grace Group Excess Cash", respectively, shall mean the sum of the amount of Subsidiary Excess Cash for all Foreign Packco Subsidiaries or Foreign New Grace Subsidiaries.

(v) "Subsidiary Excess Cash" shall mean the cash transferred to a Foreign Packco Subsidiary or Foreign New Grace Subsidiary pursuant to a Foreign Transfer in excess of the sum of (I) the amount of debt that may be repaid without penalty plus current accrued unpaid Taxes of such Subsidiary as of the Distribution Date and (II) the excess of trade and other short-term payables over trade and other short-term receivables of such Subsidiary ("Excess Short-Term Payables"); provided, however, that each party shall take steps (including causing the Subsidiary to loan cash to an Affiliate organized in a foreign jurisdiction to the extent that such Affiliate can use such cash to repay its debt or to pay current accrued unpaid Taxes and Excess Short-Term Payables) and cooperate in good faith to minimize the amount of Subsidiary Excess Cash, taking into account Tax and financial considerations as if each party were bearing the full amount of its respective Repatriation Tax Cost.

(vi) The "Foreign NOLs" shall mean net operating losses for German income tax purposes of Grace GmbH and Grace Multiflex GmbH, and net operating losses for other foreign income tax purposes of any other Foreign Packco Subsidiary, attributable to the Pre-Distribution Period to the extent, in either case, that such net operating losses would be an Overall Tax Benefit (or Hypothetical Pre-Distribution Overall Tax Benefit), calculated without regard to any Tax Item arising on the Foreign Transfer involving such Subsidiary, that does not exceed the amount of income or gain arising, for purposes of the applicable foreign income tax, on the Foreign Transfer involving such Subsidiary.

(d) In connection with the Foreign Transfers, certain Assets (including cash) or Liabilities that, without the agreement of the parties as required by this Section 2.02(d), would be Grace-Conn. Assets or Grace-Conn. Liabilities, as the case may be, may be retained by Packco or a Packco Subsidiary (or Assets or Liabilities that, without the agreement of the parties as required by this Section 2.02(d), would be Packco Assets or Packco Liabilities, may be retained by New Grace or a New Grace Subsidiary) if agreed between Grace and New Grace and reasonably satisfactory to SAC.

(e) Neither SAC nor any member of the Packco Group or the New Grace Group shall take any action, or fail or omit to take any action where the taking of such action or the failure or omission to take such action would disturb the tax treatment assumed by the parties in calculating the Foreign Transfer Taxes and cause any Indemnifiable Loss to a member of the other Group, including an increase in the amount of Adjusted Foreign Transfer Taxes borne by the other Group. Grace agrees to indemnify and hold the Grace-Conn. Indemnitees harmless, and Grace-Conn. agrees to indemnify and hold the Packco Indemnitees harmless, from and against any such Indemnifiable Loss without regard to any limitation contained in Section 8.04.

(f) Adjusted Foreign Transfer Taxes shall be recalculated upon any audit adjustment, Final Determination or any other change (i) of a Foreign Transfer Tax or another foreign Tax or Tax Item that would change the amount of Deemed Foreign Tax Credit or otherwise alter Packco Repatriation Tax Costs or New Grace Repatriation Tax Costs or (ii) that changes the amount of a Foreign NOL. Appropriate payment shall be made between the parties such that Foreign Transfer Taxes, as so redetermined, and Adjusted Foreign Transfer Taxes, as so recalculated, are shared according to the principles of Section 2.02(b).

SECTION 2.03  Certificate of Incorporation; By-laws; Rights Plan. (a)  Prior to the Distribution Date, Grace shall contribute the capital stock of Grace-Conn. to New Grace, as well as the capital stock of any other Subsidiary of Grace formed in connection with the Foreign Transfers that is not a Packco Subsidiary.  In addition, prior to the Distribution Date, the parties hereto shall take all action necessary so that, at the Distribution Date, New Grace's name shall be "W. R. Grace & Co."

(b) Prior to the Distribution Date, Grace and New Grace shall take all action necessary so that the certificate of incorporation and by-laws of New Grace and the preferred share purchase rights plan of New Grace shall be in effect as specified by New Grace, each in the form of Exhibits C, D and E hereto, respectively (with such changes as Grace and New Grace may find appropriate).

(c) Prior to the Distribution Date, Grace and Packco shall take all action necessary so that the certificate of incorporation and by-laws of Packco

XXX-002450

shall be substantially similar to the customary form of certificate of incorporation and by-laws for a wholly owned Delaware subsidiary and reasonably acceptable to SAC.

SECTION 2.04 Issuance of Stock. Prior to the Distribution Date, the parties hereto shall take all steps necessary so that the number of shares of New Grace Common Stock outstanding and held by Grace shall equal the number of shares of Grace Common Stock outstanding on the Record Date.

SECTION 2.05 Other Agreements; Shared Facilities. (a) Each of Grace and New Grace shall, prior to the Distribution Date, enter into, or cause the appropriate members of the Group of which it is a member to enter into, the Other Agreements in connection with the Distribution, including, without limitation, agreements with respect to (i) insurance procedures, (ii) interim services (including, without limitation, services to be provided by the Shared Regional Headquarters consistent with current operations of the respective Businesses, and services to be provided by country organizations to operations of the other Business consistent with past practice), which shall be charged at allocated cost based on Grace's historical methodology, subject to applicable tax laws in any jurisdiction, (iii) intellectual property licenses as contemplated by Section 2.01, (iv) and other matters as may be advisable. The Other Agreements (or, in the case of the forms of agreement attached hereto, any amendments thereto) shall be on terms reasonably acceptable to Grace, New Grace and SAC. Agreements regarding interim services (including country services) shall generally have a term not to exceed 24 months (subject to earlier termination on six months' notice (or such shorter period as does not impose additional costs on the providing party) by the party receiving the services) and will provide, in the case of agreements pursuant to which Packco is to provide services to New Grace, for services at least as extensive as any obligations contained in interim service and tolling agreements entered into prior to the Distribution Date between Grace and a third party. Such Agreements regarding interim services (including country services) will also provide that any value added taxes imposed on such services shall be paid and borne, as between the parties, by the party receiving such services. The parties shall use reasonable efforts to conclude the Other Agreements prior to the time the other conditions to the Distribution have been satisfied.

(b) The parties acknowledge and agree that operation by members of the Packco Group or New Grace Group of the Shared Facilities after the Distribution Date may continue to require the joint occupation or use by the parties of certain related premises or facilities (such as waste disposal, utilities, security and other matters). The parties shall enter into appropriate arrangements regarding cost allocation and service provision with respect to these matters, which allocation shall be as described in Section 2.01(c) and 2.05(a), as applicable. The agreements described in this paragraph (b) shall be included in the Other Agreements.

SECTION 2.06 Financing. (a) Prior to the Distribution Date, Grace and/or Packco shall enter into the Grace Credit Agreement, which shall be on terms reasonably acceptable to Grace and SAC, and Grace and/or Packco shall contribute, or cause to be contributed, the New Grace Capital Contribution to Grace-Conn., all as described in this Section. No member of the New Grace Group shall have any Liability or obligation with respect to the Grace Credit Agreement. At the election of New Grace and subject to the consent of Grace and SAC, which will not be unreasonably withheld, a portion of the New Grace Capital Contribution may be contributed to foreign Subsidiaries of New Grace. It is contemplated that the New Grace Capital Contribution shall be effected as follows; provided, however, that Packco shall not borrow an amount in excess of the tax basis, for U.S. federal income tax purposes, of Grace-Conn. in the stock of Packco: (i) each of Grace and Packco shall borrow agreed-upon amounts; (ii) Packco distributes a portion of the New Grace Capital Contribution to Grace-Conn. which uses such funds to pay creditors; (iii) the Intragroup Spinoff occurs; (iv) Grace contributes the remaining amount of the New Grace Capital Contribution to New Grace as well as the capital stock of Grace-Conn.; and (v) New Grace loans the amount described in clause (iv) to Grace-Conn. in the form of a security.

(b) Prior to the Distribution, Grace-Conn. may consummate a cash tender offer in accordance with applicable securities laws for any and all Grace-Conn. Public Debt. Grace-Conn. may also elect, in its discretion, to defease or otherwise acquire any portion of the Grace-Conn. Public Debt. To the extent that upon consummation of the Distribution, there remains outstanding (other than to the extent owned by Grace-Conn. or New Grace) in excess of $50 million in principal amount of the Grace-Conn. Public Debt, New Grace or Grace-Conn. shall obtain an "evergreen" letter of credit, with an initial expiration date no sooner than 364 days after the Effective Time, from a financial institution or group of financial institutions reasonably acceptable to Grace and SAC for the benefit of Grace with respect to such outstanding amount from time to time in excess of $50 million.

The letter of credit shall be in form and substance reasonably acceptable to SAC and shall entitle Grace to draw thereunder if Grace shall be required to make (and makes) any payment pursuant to the terms of its guarantee of any Grace-Conn. Public Debt. The expiration date of such letter of credit shall be automatically extended for successive 364-day periods, with an absolute expiration date on the date that is the 91st day after the date on which the outstanding principal amount of the Grace-Conn. Public Debt shall have been reduced to no more than $50 million, unless, prior to such 91st day, any payments shall have been made that are subject to avoidance pursuant to a bankruptcy or similar proceeding, in which case such letter of credit shall be extended (with respect to the applicable payments) until such payments are no longer subject to such avoidance, unless notice of termination is given by the issuing bank or banks, in which case Grace shall be entitled to draw thereunder (whether or not any demand for payment in respect of its guarantee shall have been made), provided that, to the extent such funds are not used to make

XXX-002451

payments on the Grace-Conn. Public Debt, Grace shall hold such proceeds separate in an interest-bearing escrow account with a financial institution and pursuant to escrow arrangements reasonably acceptable to Grace-Conn. To the extent that the amount held in such escrow account is greater than (i) the outstanding Grace-Conn. Public Debt minus (ii) $50 million, Grace shall remit such excess amount to Grace-Conn. The amount of the letter of credit may be reduced from time to time, but shall not at any time be less than the amount by which the outstanding principal amount of the Grace-Conn. Public Debt (other than such debt owned by a member of the New Grace Group) exceeds $50 million.

"Debt Costs" shall mean the costs incurred by Grace or Grace-Conn. in connection with a tender offer, defeasance, retirement or other acquisition of Grace-Conn. Public Debt, which costs shall consist of (i) any incremental costs, fees, expenses and payments incurred in connection with such action, and in the case of a tender offer shall include all costs, fees, expenses and payments incurred in connection with a tender offer that are, in the aggregate, in excess of the outstanding principal amount and accrued interest of the Grace-Conn. Public Debt so acquired; plus (ii) any costs associated with terminating or re-negotiating any related interest rate swap agreements with respect to the amount of Grace-Conn. Public Debt acquired, defeased or retired; and plus (iii) the costs of the letter of credit described above.

SECTION 2.07 Grace Recapitalization. (a) Immediately prior to the Effective Time, Grace shall consummate a recapitalization of the Grace Common Stock, such that each share of Grace Common Stock outstanding as of the Record Date shall be exchanged for the Per Share Common Consideration and the Per Share Preferred Consideration (the "Recapitalization"). Options to purchase shares of Grace Common Stock previously granted by Grace or a predecessor and outstanding as of the time of the Recapitalization shall be treated as provided in the Benefits Agreement. In connection with the Recapitalization and the Merger, the Grace Certificate of Incorporation shall be amended so that the par value of the Newco Common Stock will be $.10 per share, as well as otherwise provided in the Merger Agreement. Grace shall retain an Exchange Agent or transfer agent as appropriate and take other appropriate actions to effect the Recapitalization, including customary procedures with respect to the exchange of share certificates.

(b) No fractional shares of Newco Common Stock or Newco Convertible Preferred Stock shall be issued in the Recapitalization. In lieu of any such fractional shares, each person who would otherwise have been entitled to a fraction of a share of Newco Common Stock or Newco Convertible Preferred Stock upon surrender of former shares of Grace Common Stock for exchange pursuant to the Recapitalization shall be paid an amount in cash (without interest) equal to such holder's proportionate interest in the net proceeds from the sale or sales in the open market by the Exchange Agent, on behalf of all such holders, of the aggregate fractional shares of Newco Common Stock or Newco Convertible Preferred Stock issued pursuant to this paragraph. As soon as practicable following the Distribution Date, the Exchange Agent shall determine the excess of (i) the number of full shares of Newco Common Stock or Newco Convertible Preferred Stock, as the case may be, delivered to the Exchange Agent over (ii) the aggregate number of full shares of Newco Common Stock or Newco Convertible Preferred Stock to be distributed in respect of Grace Common Shares (such excess, the "Excess Shares"), and the Exchange Agent, as agent for the former holders of such Grace Common Shares, shall sell the Excess Shares at the prevailing prices on the open market. The sale of the Excess Shares by the Exchange Agent shall be executed on a public exchange through one or more firms and shall be executed in round lots to the extent practicable. Grace shall pay all commissions, transfer taxes and other out-of-pocket transaction costs, including the expenses and compensation of the Exchange Agent, incurred in connection with such sale of Excess Shares. Until the net proceeds of such sale or sales have been distributed, the Exchange Agent shall hold such proceeds in trust for such former stockholders. As soon as practicable after the determination of the amount of cash to be paid in lieu of any fractional interests, the Exchange Agent shall make available in accordance with this Agreement such amounts to such former stockholders.

SECTION 2.08 Registration and Listing. Prior to the Distribution Date:

(a) The parties shall take such efforts regarding the Registration Statements and the Joint Proxy Statement as is provided in the Merger Agreement. After such Registration Statements become effective, Grace shall cause the Joint Proxy Statement and the information statement (or prospectus, as the case may be) for the New Grace Common Stock forming a part of the Registration Statement for New Grace to be delivered to all holders of record of Grace Common Stock as of the record date for the meeting of Grace shareholders to which the Joint Proxy Statement relates.

(b) The parties hereto shall use reasonable efforts to take all such action as may be necessary or appropriate under state securities and blue sky laws in connection with the transactions contemplated by this Agreement.

(c) New Grace and Grace shall prepare, and New Grace and Grace shall file and seek to make effective, an application for the listing of the New Grace Common Stock on the NYSE, and an application for the listing on the NYSE of the Newco Common Stock and the Newco Convertible Preferred Stock to be issued in connection with the Recapitalization and the Merger, in each case subject to official notice of issuance.

(d) The parties hereto shall cooperate in preparing, filing with the SEC and causing to become effective any registration statements or amendments thereto which are necessary or appropriate in order to effect the transactions contemplated hereby or to reflect the establishment of, or amendments to, any employee benefit plans contemplated hereby or by the Employee Benefits Agreement requiring registration under the Securities Act.

XXX-002452

SECTION 2.09 Grace and New Grace Boards. The parties hereto shall take all steps necessary so that, effective immediately after the Distribution, the Board of Directors of each of Grace and New Grace, so long as the common stock of such company is registered under Section 12 of the Exchange Act, shall at all times be comprised of a majority of independent directors (other than due to temporary vacancies).

SECTION 2.10 Transfers Not Effected Prior to the Distribution; Transfers Deemed Effective as of the Distribution Date. To the extent that any transfers contemplated by this Article II shall not have been consummated on the Distribution Date, including, without limitation, any Foreign Transfers, the parties shall cooperate to effect such transfers as promptly following the Distribution Date as shall be practicable. Nothing herein shall be deemed to require the transfer of any Assets or the assumption of any Liabilities which by their terms or operation of law cannot be transferred or assumed; provided, however, that Grace and New Grace and their respective Subsidiaries shall cooperate to obtain any necessary consents or approvals for the transfer of all Assets and Liabilities contemplated to be transferred pursuant to this Article II. In the event that any such transfer of Assets or Liabilities has not been consummated, effective as of and after the Distribution Date, the party retaining such Asset or Liability shall thereafter hold such Asset in trust for the use and benefit of the party entitled thereto (at the expense of the party entitled thereto) and retain such Liability for the account of the party by whom such Liability is to be assumed pursuant hereto, and take such other action as may be reasonably requested by the party to whom such Asset is to be transferred, or by whom such Liability is to be assumed, as the case may be, in order to place such party, insofar as reasonably possible, in the same position as would have existed had such Asset or Liability been transferred as contemplated hereby. As and when any such Asset or Liability becomes transferable, such transfer shall be effected forthwith. The parties agree that, as of the Distribution Date, each party hereto shall be deemed to have acquired complete and sole beneficial ownership over all of the Assets, together with all rights, powers and privileges incident thereto, and shall be deemed to have assumed in accordance with the terms of this Agreement all of the Liabilities, and all duties, obligations and responsibilities incident thereto, which such party is entitled to acquire or required to assume pursuant to the terms of this Agreement.

SECTION 2.11 Intercompany Accounts and Distribution Payments. After the Distribution Date, the parties shall be obligated to pay only those intercompany accounts between members of the New Grace Group and members of the Packco Group that arose in connection with transfers of goods and services in the ordinary course of business, consistent with past practices (which the parties shall use reasonable efforts to settle prior to the Distribution Date), and all other intercompany accounts shall be settled without transfer of non-financial assets as of the Distribution Date.

ARTICLE III

THE DISTRIBUTION

SECTION 3.01 Record Date and Distribution Date. Subject to the satisfaction of the conditions set forth in Section 8.01(a), the Board of Directors of Grace, in its sole discretion and consistent with the Merger Agreement, shall establish the Record Date and the Distribution Date and any appropriate procedures in connection with the Distribution.

SECTION 3.02 The Agent. Prior to the Distribution Date, New Grace shall enter into an agreement with the Agent providing for, among other things, the payment of the Distribution to the holders of Grace Common Stock in accordance with this Article III.

SECTION 3.03 Delivery of Share Certificates to the Agent. Prior to the Distribution Date, Grace shall deliver to the Agent a share certificate representing (or authorize the related book-entry transfer of) all of the outstanding shares of New Grace Common Stock to be distributed in connection with the payment of the Distribution. After the Distribution Date, upon the request of the Agent, New Grace shall provide all certificates for shares (or book-entry transfer authorizations) of New Grace Common Stock that the Agent shall require in order to effect the Distribution.

SECTION 3.04 The Distribution. Subject to the terms and conditions of this Agreement, New Grace shall instruct the Agent to distribute, as of the Distribution Date, one share of New Grace Common Stock in respect of each share of Grace Common Stock held by holders of record of Grace Common Stock on the Record Date.

ARTICLE IV

SURVIVAL AND INDEMNIFICATION

SECTION 4.01 Survival of Agreements. All covenants and agreements of the parties hereto contained in this Agreement shall survive the Distribution Date.

SECTION 4.02 Indemnification. (a) Except as specifically otherwise provided in the Other Agreements, the New Grace Group shall indemnify, defend and hold harmless the Packco Indemnitees from and against (i) all Indemnifiable Losses arising out of or due to the failure or alleged failure of any member of the New Grace Group (x) to pay any Grace-Conn. Liabilities (including, without limitation, all Liabilities specifically excluded from the definition of Packco Liabilities herein), whether such Indemnifiable Losses relate to events,

XXX-002453

occurrences or circumstances occurring or existing, or whether such Indemnifiable Losses are asserted, before or after the Distribution Date, or (y) to perform any of its obligations under this Agreement (including the obligation to effect the transfers as provided in the last sentence of Section 2.01(a)); (ii) all Indemnifiable Losses arising out of or based upon any untrue statement or alleged untrue statement of a material fact, or omission or alleged omission to state a material fact required to be stated, in the Registration Statements or the Joint Proxy Statement or any preliminary or final form thereof or any amendment thereto, or necessary to make the statements therein not misleading, except that such indemnifications shall not apply to any Indemnifiable Losses that arise out of or are based upon any statement or omission, or alleged statement or omission, in any of the portions of the Registration Statements or the Joint Proxy Statement, or any preliminary or final form thereof or any amendment thereto, solely with respect to information relating to SAC supplied by SAC specifically for use in the preparation thereof or relating to Newco after the Merger; and (iii) all Indemnifiable Losses arising from or relating to all existing litigation brought by pre-Merger shareholders of Grace acting in such capacity and all litigation to be brought by pre-Merger shareholders of Grace acting in such capacity and relating to any events or transactions occurring prior to the Effective Time or to the transactions contemplated by the Transaction Agreements.

(b) Except as specifically otherwise provided in the Other Agreements, the Packco Group shall indemnify, defend and hold harmless the New Grace Indemnitees from and against (i) all Indemnifiable Losses arising out of or due to the failure or alleged failure of any member of the Packco Group to pay any Packco Liabilities or to perform any of its obligations under this Agreement after the Distribution Date; and (ii) all Indemnifiable Losses arising out of or based upon any untrue statement or alleged untrue statement of a material fact, or omission or alleged omission to state a material fact required to be stated, in any portion of the Registration Statements or the Joint Proxy Statement (or any preliminary or final form thereof or any amendment thereto) solely with respect to information relating to SAC supplied by SAC specifically for use in the preparation thereof or relating to Newco after the Merger (including the pro forma financial information relating to Newco contained in the Registration Statements (other than the historical information relating to Grace and the Packaging Business)), or necessary to make the statements therein not misleading.

(c) If any Indemnity Payment required to be made hereunder or under any Other Agreement is denominated in a currency other than United States dollars, such payment shall be made in United States dollars and the amount thereof shall be computed using the Foreign Exchange Rate for such currency determined as of the date on which such Indemnity Payment is made.

(d) Notwithstanding anything to the contrary set forth herein, indemnification relating to any arrangements between any member of the Packco Group and any member of the New Grace Group for the provision after the Distribution of goods and services in the ordinary course shall be governed by the terms of such arrangements and not by this Section or as otherwise set forth in this Agreement and the Other Agreements.

SECTION 4.03 Procedures for Indemnification for Third-Party Claims. (a) Grace shall, and shall cause the other Packco Indemnitees to, notify New Grace in writing promptly after learning of any Third-Party Claim for which any Packco Indemnitee intends to seek indemnification from New Grace under this Agreement. New Grace shall, and shall cause the other New Grace Indemnitees to, notify Grace in writing promptly after learning of any Third-Party Claim for which any New Grace Indemnitee intends to seek indemnification from Grace under this Agreement. The failure of any Indemnitee to give such notice shall not relieve any Indemnifying Party of its obligations under this Article except to the extent that such Indemnifying Party or its Affiliate is actually prejudiced by such failure to give notice. Such notice shall describe such Third-Party Claim in reasonable detail considering the Information provided to the Indemnitee.

(b) Except as otherwise provided in paragraph (c) of this Section, an Indemnifying Party may, by notice to the Indemnitee and to Grace, if New Grace is the Indemnifying Party, or to the Indemnitee and New Grace, if Grace is the Indemnifying Party, at any time after receipt by such Indemnifying Party of such Indemnitee's notice of a Third-Party Claim, undertake (itself or through another member of the Group of which the Indemnifying Party is a member) the defense or settlement of such Third-Party Claim. If an Indemnifying Party undertakes the defense of any Third-Party Claim, such Indemnifying Party shall thereby admit its obligation to indemnify the Indemnitee against such Third-Party Claim, and such Indemnifying Party shall control the investigation and defense or settlement thereof, and the Indemnitee may not settle or compromise such Third-Party Claim, except that such Indemnifying Party shall not (i) require any Indemnitee, without its prior written consent, to take or refrain from taking any action in connection with such Third-Party Claim, or make any public statement, which such Indemnitee reasonably considers to be against its interests, nor (ii) without the prior written consent of the Indemnitee and of Grace, if the Indemnitee is a Packco Indemnitee, or the Indemnitee and of New Grace, if the Indemnitee is a New Grace Indemnitee, consent to any settlement that does not include as a part thereof an unconditional release of the Indemnitees from liability with respect to such Third-Party Claim or that requires the Indemnitee or any of its Representatives or Affiliates to make any payment that is not fully indemnified under this Agreement or to be subject to any non-monetary remedy; and subject to the Indemnifying Party's control rights, as specified herein, the Indemnitees may participate in such investigation and defense, at their own expense. Following the provision of notices to the Indemnifying Party, until such time as an Indemnifying Party has undertaken the defense of any Third-Party Claim as provided herein, such Indemnitee shall control the investigation and defense or settlement thereof, without prejudice to its right to seek indemnification

XXX-002454

hereunder.

(c) If an Indemnitee reasonably determines that there may be legal defenses available to it that are different from or in addition to those available to its Indemnifying Party which make it inappropriate for the Indemnifying Party to undertake the defense or settlement thereof, then such Indemnifying Party shall not be entitled to undertake the defense or settlement of such Third-Party Claim; and counsel for the Indemnifying Party shall be entitled to conduct the defense of such Indemnifying Party and counsel for the Indemnitee (selected by the Indemnitee) shall be entitled to conduct the defense of such Indemnitee, it being understood that both such counsel shall cooperate with each other to conduct the defense or settlement of such action as efficiently as possible. The above provisions of this paragraph (c) shall not apply to Third-Party Claims relating to asbestos claims described in the proviso to the definition of Grace Liabilities. Rather, with respect to such asbestos claims, with the consent of Grace-Conn., which shall not be unreasonably withheld, counsel for the Indemnifying Party shall be entitled to conduct the defense of such Third-Party Claim to the extent the legal defenses available to the Indemnifying Party and the Indemnitee are substantially similar, but counsel for the Indemnitee shall be entitled to assert and conduct its own defense to the extent, but only to the extent, of any additional legal defenses available to it.

(d) In no event shall an Indemnifying Party be liable for the fees and expenses of more than one counsel for all Indemnitees (in addition to its own counsel, if any) in connection with any one action, or separate but similar or related actions, in the same jurisdiction arising out of the same general allegations or circumstances.

(e) New Grace shall, and shall cause the other New Grace Indemnitees to, and Grace shall, and shall cause the other Packco Indemnitees to, make available to each other, their counsel and other Representatives, all information and documents reasonably available to them which relate to any Third-Party Claim, and otherwise cooperate as may reasonably be required in connection with the investigation, defense and settlement thereof, subject to the terms and conditions of a mutually acceptable joint defense agreement. Any joint defense agreement entered into by New Grace or Grace with any third party relating to any Third-Party Claim shall provide that New Grace or Grace may, if requested, provide information obtained through any such agreement to the New Grace Indemnitees and/or the Packco Indemnitees.

SECTION 4.04 Remedies Cumulative. The remedies provided in this Article IV shall be cumulative and shall not preclude assertion by any Indemnitee of any other rights or the seeking of any other remedies against any Indemnifying Party. However, the procedures set forth in Section 4.03 shall be the exclusive procedures governing any indemnity action brought under this Agreement, except as otherwise specifically provided in any of the Other Agreements.

ARTICLE V

CERTAIN ADDITIONAL COVENANTS

SECTION 5.01 Notices to Third Parties. In addition to the actions described in Section 5.02, the members of the Packco Group and the members of the New Grace Group shall cooperate to make all other filings and give notice to and obtain consents from all third parties that may reasonably be required to consummate the transactions contemplated by this Agreement, the Merger Agreement and the Other Agreements.

SECTION 5.02 Licenses and Permits. Each party hereto shall cause the appropriate members of its Group to prepare and file with the appropriate licensing and permitting authorities applications for the transfer or issuance, as may be necessary or advisable in connection with the transactions contemplated by this Agreement, the Other Agreements and the Merger Agreement, to its Group of all material governmental licenses and permits required for the members of its Group to operate its Business after the Distribution Date. The members of the New Grace Group and the members of the Packco Group shall cooperate and use all reasonable efforts to secure the transfer or issuance of the licenses and permits.

SECTION 5.03 Intercompany Agreements. All contracts, licenses, agreements, commitments or other arrangements, formal or informal, between any member of the Packco Group, on the one hand, and any member of the New Grace Group, on the other hand, in existence as of the Distribution Date, pursuant to which any member of either Group makes payments in respect of Taxes to any member of the other Group or provides to any member of the other Group goods or services (including, without limitation, management, administrative, legal, financial, accounting, data processing, insurance or technical support), or the use of any Assets of any member of the other Group, or the secondment of any employee, or pursuant to which rights, privileges or benefits are afforded to members of either Group as Affiliates of the other Group, shall terminate as of the close of business on the day prior to the Distribution Date, except as specifically provided herein or in the Other Agreements. From and after the Distribution Date, no member of either Group shall have any rights under any such contract, license, agreement, commitment or arrangement with any member of the other Group, except as specifically provided herein or in the Other Agreements.

SECTION 5.04 Guarantee Obligations. (a) Grace and New Grace shall cooperate, and shall cause their respective Groups to cooperate, to terminate, or to cause a member of the Packco Group to be substituted in all respects for any member of the New Grace Group in respect of, all obligations of any member of the New Grace Group under any Packco Liabilities for which such member of the

XXX-002455

New Grace Group may be liable, as guarantor, original tenant, primary obligor or otherwise. If such a termination or substitution is not effected by the Distribution Date, (i) Grace shall indemnify and hold harmless the New Grace Indemnitees for any Indemnifiable Loss arising from or relating thereto, and (ii) without the prior written consent of the Chief Financial Officer, Treasurer or any Assistant Treasurer of New Grace, from and after the Distribution Date, Grace shall not, and shall not permit any member of the Packco Group or any of its Affiliates to, renew or extend the term of, increase its obligations under, or transfer to a third party, any loan, lease, contract or other obligation for which any member of the New Grace Group is or may be liable unless all obligations of the New Grace Group with respect thereto are thereupon terminated by documentation reasonably satisfactory in form and substance to the Chief Financial Officer, Treasurer or any Assistant Treasurer of New Grace, provided that the limitations in clause (ii) shall not apply in the event that a member of the Packco Group obtains a letter of credit from a financial institution reasonably acceptable to New Grace and for the benefit of New Grace with respect to such obligation of the New Grace Group.

(b) Grace and New Grace shall cooperate, and shall cause their respective Groups to cooperate, to terminate, or to cause a member of the New Grace Group to be substituted in all respects for any member of the Packco Group in respect of, all obligations of any member of the Packco Group under any Grace-Conn. Liabilities for which such member of the Packco Group may be liable, as guarantor, original tenant, primary obligor or otherwise. The foregoing sentence does not apply to the Grace-Conn. Public Debt, which is governed by Section 2.06. If such a termination or substitution is not effected by the Distribution Date, (i) New Grace shall indemnify and hold harmless the Packco Indemnitees for any Indemnifiable Loss arising from or relating thereto, and (ii) without the prior written consent of the Chief Financial Officer, Treasurer or any Assistant Treasurer of Grace, from and after the Distribution Date, New Grace shall not, and shall not permit any member of the New Grace Group to, renew or extend the term of, increase its obligations under, or transfer to a third party, any loan, lease, contract or other obligation for which any member of the Packco Group is or may be liable unless all obligations of the Packco Group with respect thereto are thereupon terminated by documentation reasonably satisfactory in form and substance to the Chief Financial Officer, Treasurer or any Assistant Treasurer of Grace, provided that the limitations contained in clause (ii) shall not apply in the event that a member of the New Grace Group obtains a letter of credit from a financial institution reasonably acceptable to Grace and for the benefit of Grace with respect to such obligation of the Packco Group.

SECTION 5.05 Further Assurances. In addition to the actions specifically provided for elsewhere in this Agreement, each of the parties hereto shall use reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable laws, regulations and agreements to consummate and make effective the transactions contemplated by this Agreement. Without limiting the foregoing, each party hereto shall cooperate with the other party, and execute and deliver, or use reasonable efforts to cause to be executed and delivered, all instruments, and to make all filings with, and to obtain all consents, approvals or authorizations of, any governmental or regulatory authority or any other Person under any permit, license, agreement, indenture or other instrument, and take all such other actions as such party may reasonably be requested to take by any other party hereto from time to time, consistent with the terms of this Agreement, the Merger Agreement and the Other Agreements, in order to effectuate the provisions and purposes of this Agreement.

SECTION 5.06 Environmental Claims Cooperation. With respect to claims relating to Environmental Laws described in clause (a) of the definition of Packco Liabilities, the New Grace Group and the Packco Group shall cooperate to minimize the costs incurred in connection with such claims and shall generally cooperate and provide appropriate information to the other party with respect to such claims. Notwithstanding any other provision of this Agreement, including Article IV, Grace shall be entitled to participate in the defense of any such claims but New Grace shall control the resolution of any such claims; provided that New Grace shall not consent to entry of any judgment or enter into any settlement without the approval of Grace, which approval shall not be unreasonably withheld.

ARTICLE VI

ACCESS TO INFORMATION

SECTION 6.01 Provision of Corporate Records. Prior to or as promptly as practicable after the Distribution Date, Grace shall retain complete and accurate copies but shall deliver to New Grace all corporate books and records of the New Grace Group in its possession and copies of the relevant portions of all corporate books and records of the Packco Group relating directly and predominantly to the Grace-Conn. Assets, the New Grace Business, or the Liabilities of the New Grace Group, including, in each case, all active agreements, active litigation files and government filings. Grace shall also retain complete and accurate copies but deliver to New Grace all corporate board and committee minute books of Grace. From and after the Distribution Date, all such books, records and copies shall be the property of New Grace. Prior to or as promptly as practicable after the Distribution Date, New Grace shall deliver to Grace all corporate books and records of the Packco Group in its possession and copies of the relevant portions of all corporate books and records of the New Grace Group relating directly and predominantly to the Packco Assets, the Packaging Business, or the Liabilities of the Packco Group, including, in each case, all active agreements, active litigation files and government filings. From and after the Distribution Date, all such books, records and copies shall be the property of Grace. The costs and expenses incurred in the provision of records or other information to a party shall be paid for (including

XXX-002456

reimbursement of costs incurred by the providing party) by the requesting party.

SECTION 6.02 Access to Information. From and after the Distribution Date, each of Grace and New Grace shall afford to the other and to the other's Representatives reasonable access and duplicating rights during normal business hours to all Information within the possession or control of such party's Group relating to the other party's Group's pre-Distribution business, Assets or Liabilities or relating to or arising in connection with the relationship between the Groups on or prior to the Distribution Date, insofar as such access is reasonably required for a reasonable purpose, subject to the provisions below regarding Privileged Information. Without limiting the foregoing, Information may be requested under this Section 6.02 for audit, accounting, claims, litigation and Tax purposes, as well as for purposes of fulfilling disclosure and reporting obligations.

In furtherance of the foregoing:

(a) Each party hereto acknowledges that: (i) Each of Grace and New Grace (and the members of the Packco Group and the New Grace Group, respectively) has or may obtain Privileged Information; (ii) there are a number of Litigation Matters affecting each or both of Grace and New Grace; (iii) both Grace and New Grace have a common legal interest in Litigation Matters, in the Privileged Information and in the preservation of the confidential status of the Privileged Information, in each case relating to the pre-Distribution business of the Packco Group or the New Grace Group or relating to or arising in connection with the relationship between the Groups on or prior to the Distribution Date; and (iv) both Grace and New Grace intend that the transactions contemplated hereby and by the Merger Agreement and the Other Agreements and any transfer of Privileged Information in connection therewith shall not operate as a waiver of any potentially applicable privilege.

(b) Each of Grace and New Grace agrees, on behalf of itself and each member of the Group of which it is a member, not to disclose or otherwise waive any privilege attaching to any Privileged Information relating to the pre-Distribution business of the New Grace Group or the Packco Group, respectively, or relating to or arising in connection with the relationship between the Groups on or prior to the Distribution Date, without providing prompt written notice to and obtaining the prior written consent of the other, which consent shall not be unreasonably withheld and shall not be withheld if the other party certifies that such disclosure is to be made in response to a likely threat of suspension or debarment or similar action; provided, however, that Grace and New Grace may make such disclosure or waiver with respect to Privileged Information if such Privileged Information relates solely to the pre-Distribution business of the Packco Group in the case of Grace or the New Grace Group in the case of New Grace. In the event of a disagreement between any member of the Packco Group and any member of the New Grace Group concerning the reasonableness of withholding such consent, no disclosure shall be made prior to a resolution of such disagreement by a court of competent jurisdiction, provided that the limitations in this sentence shall not apply in the case of disclosure required by law and so certified as provided in the first sentence of this paragraph.

(c) Upon any member of the Packco Group or any member of the New Grace Group receiving any subpoena or other compulsory disclosure notice from a court, other governmental agency or otherwise which requests disclosure of Privileged Information, in each case relating to pre-Distribution business of the New Grace Group or the Packco Group, respectively, or relating to or arising in connection with the relationship between the Groups on or prior to the Distribution Date, the recipient of the notice shall promptly provide to the other Group (following the notice provisions set forth herein) a copy of such notice, the intended response, and all materials or information relating to the other Group that might be disclosed. In the event of a disagreement as to the intended response or the disclosure, unless and until the disagreement is resolved as provided in paragraph (b) of this Section, the parties shall cooperate to assert all defenses to disclosure claimed by either party's Group, and shall not disclose any disputed documents or information until all legal defenses and claims of privilege have been finally determined.

SECTION 6.03 Production of Witnesses. Subject to Section 6.02, after the Distribution Date, each of Grace and New Grace shall, and shall cause each member of the Packco Group and the New Grace Group, respectively, to make available to New Grace or Grace or any member of the New Grace Group or of the Packco Group, as the case may be, upon written request, such Group's directors, officers, employees and agents as witnesses to the extent that any such Person may reasonably be required in connection with any Litigation Matters, administrative or other proceedings in which the requesting party may from time to time be involved and relating to the pre-Distribution business of the Packco Group or the New Grace Group or relating to or in connection with the relationship between the Groups on or prior to the Distribution Date.

SECTION 6.04 Retention of Records. Except as otherwise agreed in writing, or as otherwise provided in the Other Agreements, each of Grace and New Grace shall, and shall cause the members of the Group of which it is a member to, retain all Information in such party's Group's possession or under its control relating directly and predominantly to the pre-Distribution business, Assets or Liabilities of the other party's Group until such Information is at least ten years old or until such later date as may be required by law, except that if, prior to the expiration of such period, any member of either party's Group wishes to destroy or dispose of any such Information that is at least three years old, prior to destroying or disposing of any of such Information, (a) the party whose Group is proposing to dispose of or destroy any such Information shall provide no less than 30 days' prior written notice to the

XXX-002457

other party, specifying the Information proposed to be destroyed or disposed of, and (b) if, prior to the scheduled date for such destruction or disposal, the other party requests in writing that any of the Information proposed to be destroyed or disposed of be delivered to such other party, the party whose Group is proposing to dispose of or destroy such Information promptly shall arrange for the delivery of the requested Information to a location specified by, and at the expense of, the requesting party.

        SECTION 6.05 Confidentiality. Subject to Section 6.02, which shall govern Privileged Information, from and after the Distribution Date, each of Grace and New Grace shall hold, and shall use reasonable efforts to cause its Affiliates and Representatives to hold, in strict confidence all Information concerning the other party's Group obtained by it prior to the Distribution Date or furnished to it by such other party's Group pursuant to this Agreement or the Other Agreements and shall not release or disclose such Information to any other Person, except its Affiliates and Representatives, who shall be bound by the provisions of this Section 6.05, and each party shall be responsible for a breach by any of its Affiliates or Representatives; provided, however, that any member of the Packco Group or the New Grace Group may disclose such Information to the extent that (a) disclosure is compelled by judicial or administrative process or, in the opinion of such Person's counsel, other requirements of law, or (b) such party can show that such Information was (i) available to such Person on a nonconfidential basis (other than from a member of the other party's Group) prior to its disclosure by the other party's Group, (ii) in the public domain through no fault of such Person or (iii) lawfully acquired by such Person from another source after the time that it was furnished to such Person by the other party's Group, and not acquired from such source subject to any confidentiality obligation on the part of such source known to the acquiror. Notwithstanding the foregoing, each of Grace and New Grace shall be deemed to have satisfied its obligations under this Section 6.05 with respect to any Information (other than Privileged Information) if it exercises the same care with regard to such Information as it takes to preserve confidentiality for its own similar Information.

        SECTION 6.06 Cooperation with Respect to Government Reports and Filings. Grace, on behalf of itself and each member of the Packco Group, agrees to provide any member of the New Grace Group, and New Grace, on behalf of itself and each member of the New Grace Group, agrees to provide any member of the Packco Group, with such cooperation and Information as may be reasonably requested by the other in connection with the preparation or filing of any government report or other government filing contemplated by this Agreement or in conducting any other government proceeding relating to the pre-Distribution business of the Packco Group or the New Grace Group, Assets or Liabilities of either Group or relating to or in connection with the relationship between the Groups on or prior to the Distribution Date. Such cooperation and Information shall include, without limitation, promptly forwarding copies of appropriate notices and forms or other communications received from or sent to any government authority which relate to the Packco Group, in the case of the New Grace Group, or the New Grace Group, in the case of the Packco Group. Each party shall make its employees and facilities available during normal business hours and on reasonable prior notice to provide explanation of any documents or Information provided hereunder.

ARTICLE VII

NO REPRESENTATIONS OR WARRANTIES

        SECTION 7.01 No Representations or Warranties. Except as expressly set forth herein or in any other Transaction Agreement (including Article II and Sections 4.01, 4.02 and 5.05), New Grace and Grace-Conn. understand and agree that no member of the Packco Group is, in this Agreement or in any other agreement or document, representing or warranting to New Grace or any member of the New Grace Group in any way as to the Grace-Conn. Assets, the New Grace Business or the Grace-Conn. Liabilities, it being agreed and understood that New Grace and each member of the New Grace Group shall take all of the Grace-Conn. Assets "as is, where is." Except as expressly set forth herein or in any other Transaction Agreement and subject to Sections 4.01, 4.02 and 5.05, New Grace and each member of the New Grace Group shall bear the economic and legal risk that the Grace-Conn. Assets shall prove to be insufficient or that the title of any member of the New Grace Group to any Grace-Conn. Assets shall be other than good and marketable and free from encumbrances. Except as expressly set forth herein or in any other Transaction Agreement (including Article II and Sections 4.01, 4.02 and 5.05), Grace understands and agrees that no member of the New Grace Group is, in this Agreement or in any other agreement or document, representing or warranting to Grace or any member of the Packco Group in any way as to the Packco Assets, the Packaging Business or the Packco Liabilities, it being agreed and understood that Grace, Packco and each other member of the Packco Group shall take all of the Packco Assets "as is, where is." Except as expressly set forth herein or in any other Transaction Agreement and subject to Sections 4.01, 4.02 and 5.05, Grace and each member of the Packco Group shall bear the economic and legal risk that the Packco Assets shall prove to be insufficient or that the title of any member of the Packco Group to any Packco Assets shall be other than good and marketable and free from encumbrances. The foregoing shall be without prejudice to any rights under Article II, Section 4.01, Section 4.02 or Section 5.05 or to the covenants otherwise contained in this Agreement or any other Transaction Agreement.

ARTICLE VIII

MISCELLANEOUS

        SECTION 8.01 Conditions to Obligations. (a) The obligations of the parties hereto to consummate the payment of the Distribution are subject to the

XXX-002458

satisfaction of each of the following conditions:

(i) the transactions contemplated hereby (including the Distribution, the Recapitalization, the Merger, the amendment to the Grace Certificate of Incorporation and otherwise as required by applicable law and stock exchange regulations) shall have been duly approved by Grace shareholders;

(ii) all conditions to the Merger set forth in the Merger Agreement (other than that the Distribution be consummated) shall have been satisfied or waived;

(iii) all third-party consents and governmental approvals required in connection with the transactions contemplated hereby shall have been received, except where the failure to obtain such consents or approvals would not have a material adverse effect on either (A) the ability of the parties to consummate the transactions contemplated by this Agreement, the Other Agreements or the Merger Agreement or (B) the business, assets, liabilities, financial condition or results of operations of Grace-Conn. or Packco and their respective subsidiaries, taken as a whole;

(iv) the transactions contemplated by Article II shall have been consummated in all material respects, to the extent required to be consummated prior to the Distribution;

(v) the shares of New Grace Common Stock to be issued in the Distribution, and the shares of Newco Common Stock and the Newco Convertible Preferred Stock to be issued in the Recapitalization and the Merger, as the case may be, shall have been authorized for listing on the NYSE, in each case subject to official notice of issuance;

(vi) the Board of Directors of New Grace, composed as contemplated by Section 2.09, shall have been duly elected;

(vii) the Registration Statements shall have been declared effective under the Exchange Act or the Securities Act, as the case may be, by the SEC and no stop order suspending the effectiveness of either of the Registration Statements shall have been issued by the SEC and, to the knowledge of Grace and New Grace, no proceeding for that purpose shall have been instituted by the SEC;

(viii) the applicable parties shall have entered into each of the Other Agreements;

(ix) (A) the Board of Directors of Grace shall have received customary opinions of a nationally recognized investment banking or appraisal firm in form and substance reasonably satisfactory to such Board to the effect that, after giving effect to the transactions set forth in Article II hereof, neither Grace nor New Grace and Grace-Conn. will be insolvent (such opinions to be dated as of the date of the Merger Agreement, the date the Board of Directors of Grace declares the Distribution and the Distribution Date) and (B) the financial condition of each of Grace and Grace-Conn. satisfies the requirements of Section 170 of the Delaware General Corporation Law and Section 33-687 of the Connecticut Business Corporation Act, respectively, such that the distribution of the common stock of Packco to Grace by Grace-Conn. and the Distribution may be effected without violating such Sections, and the Board of Directors of Grace and the Board of Directors of Grace-Conn. shall in good faith have determined that such requirements have been satisfied; and

(x) the transactions contemplated hereby shall be in compliance with all applicable federal and state securities laws.

(b) Any determination made by the Board of Directors of Grace or Grace-Conn. on behalf of such party hereto prior to the Distribution Date concerning the satisfaction or waiver of any or all of the conditions set forth in this Section shall be conclusive.

SECTION 8.02 Use of Grace Name and Mark. Grace acknowledges that Grace-Conn. shall own all rights in the "Grace" name and logo and related tradenames and marks. Effective at the Distribution Date, Grace shall change its name to a name that does not use the word "Grace" or any variation thereof and shall itself, and shall cause each member of the Packco Group to, cease all use of the "Grace" name as part of any corporate name. As promptly as practicable after the Distribution Date, Grace shall, and shall cause each member of the Packco Group to, cease all other use of the "Grace" name and logo and related tradenames and marks, provided that Grace may use inventory including any such name, logo, tradenames or marks in existence as of the Distribution Date. Grace shall cause the Packco Group to use such names, logos and marks during such transition period only to the extent consistent with past practice and as Grace reasonably believes is appropriate, and during the period of such usage Grace shall cause the Packco Group to maintain the same standards of quality with respect to such names, logos and marks as previously exercised. No such material shall be used by the Packco Group after the six-month anniversary of the Distribution Date.

SECTION 8.03 Complete Agreement. This Agreement, the Exhibits and Schedules hereto and the agreements and other documents referred to herein shall constitute the entire agreement between the parties hereto with respect to the subject matter hereof (other than the Merger Agreement and the schedules and exhibits thereto) and shall supersede all previous negotiations, commitments and writings with respect to such subject matter.

SECTION 8.04 Expenses. Except as otherwise specifically provided herein or in any other Transaction Agreement, New Grace shall bear all costs and expenses (including all Debt Costs, Adjusted Foreign Transfer Taxes, Severance

XXX-002459

Costs and losses of benefits) incurred by Grace, New Grace and/or any members of their respective Groups (collectively, the "Transaction Costs") in connection with the transactions contemplated by this Agreement and the Other Agreements (including the Contribution (and the related transfers, separations and/or allocations of Assets and Liabilities), the Intragroup Spinoff, the Distribution and the Recapitalization)); provided that Grace (for the account of Newco after the Merger) agrees to bear: (i) the lesser of $50 million and 37% of the aggregate amount of all Debt Costs, Adjusted Foreign Transfer Taxes and Severance Costs; (ii) the lesser of $10 million and 37% of all other Transaction Costs (excluding any Debt Costs, Adjusted Foreign Transfer Taxes, Severance Costs and costs and expenses payable by New Grace or Grace pursuant to Section 6.12 of the Merger Agreement) and (iii) the fees and costs incurred in connection with the Grace Credit Agreement. "Severance Costs" means the costs associated with the termination in connection with the transactions contemplated hereby (including the Merger) of employment of employees of Grace and Grace-Conn. located at the Grace corporate headquarters. To the extent Transaction Costs are not included in the New Grace Capital Contribution, Newco or New Grace shall promptly pay its share of any such costs upon receipt of reasonable documentation relating to such costs. Appropriate payment shall be made between the parties in respect of Adjusted Foreign Transfer Taxes on the Distribution Date so that Adjusted Foreign Transfer Taxes are borne in the proportions described above in this Section 8.04. Appropriate payment shall be made between the parties in respect of Adjusted Foreign Transfer Taxes and the amount calculated pursuant to clause (c) of the definition of "New Grace Capital Contribution" to the extent that such amounts estimated as of the Distribution Date may be recalculated in a more accurate manner. New Grace agrees that it shall pay, or cause Grace-Conn. to pay, all amounts payable by New Grace pursuant to Section 6.12(a) of the Merger Agreement. Any amount paid by one party to the other under this Agreement in respect of Transaction Costs shall be treated, for tax purposes, as an adjustment to the portion of the New Grace Capital Contribution contributed from Grace to New Grace.

SECTION 8.05 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (other than the laws regarding choice of laws and conflicts of laws that would apply the substantive laws of any other jurisdiction) as to all matters, including matters of validity, construction, effect, performance and remedies.

SECTION 8.06 Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by standard form of telecommunications, by courier, or by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to Grace or any member of the Packco Group:

Sealed Air Corporation
Park 80 East
Saddle Brook, New Jersey  07663
Attention:  President
Fax:  (201) 703-4152

and

Davis Polk & Wardwell
450 Lexington Avenue
New York, NY  10017
Attention:  Christopher Mayer, Esq.
Fax:  (212) 450-4800

If to New Grace or any member of the New Grace Group:

W. R. Grace & Co.
One Town Center Road
Boca Raton, Florida  33486
Attention:  Secretary
Fax:  (561) 362-1970

with a copy to:

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York  10019
Attention:  Andrew R. Brownstein, Esq.
Fax:  (212) 403-2000

or to such other address as any party hereto may have furnished to the other parties by a notice in writing in accordance with this Section.

SECTION 8.07 Amendment and Modification. This Agreement may be amended, modified or supplemented only by a written agreement signed by all of the parties hereto and subject to the reasonable consent of SAC.

SECTION 8.08 Successors and Assigns; No Third-Party Beneficiaries. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns, but neither this Agreement nor any of the rights, interests and obligations hereunder shall be assigned by any party hereto without the prior written consent of the other parties. Except for the provisions of Sections 4.02 and 4.03 relating to indemnities, which are also for the benefit of the Indemnitees, this Agreement is solely for the benefit of the parties hereto and their Subsidiaries and Affiliates and is not intended to confer upon any other Persons any rights or remedies hereunder.

XXX-002460

SECTION 8.09 Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

SECTION 8.10 Interpretation. (a) The Article and Section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties hereto and shall not in any way affect the meaning or interpretation of this Agreement.

(b) The parties hereto intend that the Distribution shall be a distribution pursuant to the provisions of Section 355 of the Code, so that no gain or loss shall be recognized for federal income tax purposes as a result of such transaction, and all provisions of this Agreement shall be so interpreted. The parties hereto do not intend to submit the Distribution to the Internal Revenue Service for a private letter ruling with respect to such nonrecognition, and any ultimate ruling or decision that any gain or loss should be recognized for federal income tax purposes shall not permit a rescission or reformation of this Agreement or transactions contemplated hereby.

SECTION 8.11 Severability. If any provision of this Agreement or the application thereof to any person or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.

SECTION 8.12 References; Construction. References to any "Article," "Exhibit," "Schedule" or "Section," without more, are to Articles, Exhibits, Schedules and Sections to or of this Agreement. Unless otherwise expressly stated, clauses beginning with the term "including" set forth examples only and in no way limit the generality of the matters thus exemplified.

SECTION 8.13 Termination. Notwithstanding any provision hereof, following termination of the Merger Agreement, this Agreement may be terminated and the Distribution abandoned at any time prior to the Distribution Date by and in the sole discretion of the Board of Directors of Grace without the approval of any other party hereto or of Grace's shareholders. In the event of such termination, no party hereto or to any Other Agreement shall have any Liability to any Person by reason of this Agreement or any Other Agreement.

SECTION 8.14 SAC Reasonable Consent. The parties hereto agree that any actions to be taken by Grace or New Grace under this Agreement that are not specifically required herein and that relate to Packco or the Packaging Business (including, without limitation, the transactions described in Article II) must be reasonably satisfactory to SAC.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

W. R. GRACE & CO.

By:
   ------------------------------
   Name:
   Title:

W. R. GRACE & CO.-CONN.

By:
   ------------------------------
   Name:
   Title:

GRACE SPECIALTY CHEMICALS, INC.
   (to be renamed W. R. Grace & Co.)

By:
   ------------------------------
   Name:
   Title:

ANNEX C

Donaldson Lufkin & Jenrettte Securities Corporation letterhead

August 14, 1997

Board of Directors
Sealed Air Corporation

XXX-002461

Park 80 East
Saddlebrook, New Jersey 07663-5291

Dear Madames and Sirs:

You have requested our opinion as to the fairness from a
financial point of view to holders of common stock, par value $.01 per share
(the "Company Common Stock") of Sealed Air Corporation (the "Company") of the
Exchange Ratio (as defined below). Pursuant to the draft of the Agreement and
Plan of Merger, dated as of August 14, 1997 (the "Merger Agreement") by and
among the Company, W.R. Grace & Co. ("Grace") and Packco Acquisition Corp., a
wholly owned subsidiary of Grace ("Merger Sub"), Merger Sub will be merged with
and into the Company (the "Merger").

We understand that pursuant to the draft of the Distribution
Agreement, dated as of August 14, 1997 (the "Distribution Agreement"), by and
among Grace, W.R. Grace & Co.-Conn., a wholly-owned subsidiary of Grace
("Grace-Conn."), and Grace Specialty Chemicals, Inc. ("New Grace") prior to the
Merger, certain transactions will be consummated including (i) the transfer (the
"Contribution") to a wholly-owned subsidiary of Grace-Conn. ("Packco") of
certain assets and liabilities of Grace and its subsidiaries predominantly
related to its Packaging Business (as defined in the Distribution Agreement),
(ii) the transfer of the issued and outstanding shares of Packco from
Grace-Conn. directly to Grace, (iii) the contribution of the issued and
outstanding shares of Grace-Conn. to New Grace, and (iv) the distribution
pro-rata of all the issued and outstanding shares of the common stock of New
Grace to the holders of common stock, par value $.01 per share (the "Grace
Common Stock"), of Grace (the "Distribution"). Immediately following the
Distribution and prior to the Merger, Grace would be recapitalized (as defined
in the Distribution Agreement, the "Recapitalization"), so that the holders of
Grace Common Stock would thereafter hold Newco Common Shares and Newco
Convertible Preferred Shares, all as defined and provided in the Distribution
Agreement.

Pursuant to the Merger Agreement each share of Company Common
Stock shall be converted, subject to certain exceptions, into the right to
receive one share of Newco Common Stock (the "Exchange Ratio"), all as set forth
more fully in the Merger Agreement. Upon consummation of the Merger, Grace shall
be renamed "Sealed Air Corporation."

In arriving at our opinion, we have reviewed the Merger Agreement
and the Distribution Agreement. We also have reviewed financial and other
information that was publicly available or furnished to us by the Company and
Grace including information provided during discussions with their respective
managements. Included in the information provided during discussions with the
respective managements were certain financial analyses and projections of Grace
and New Grace prepared by the management of Grace and certain financial analyses
and projections of the Company prepared by the management of the Company. In
addition, we have compared certain financial and securities data of the Company
and Grace with various other companies whose securities are traded in public
markets, reviewed the historical stock prices and trading volumes of the Grace
Common Stock and the Company Common Stock, reviewed prices and premiums paid in
certain other business combinations and conducted such other financial studies,
analyses and investigations as we deemed appropriate for purposes of this
opinion.

In rendering our opinion, we have relied upon and assumed the
accuracy and completeness of all of the financial and other information that was
available to us from public sources, that was provided to us by the Company,
Grace, their respective managements or other representatives, or that was
otherwise reviewed by us. In particular, we have relied upon the estimates of
the management of the Company of the operating synergies achievable as a result
of the Merger and upon our discussion of such synergies with the management of
Grace. With respect to the financial analysis and projections supplied to us, we
have assumed that they have been reasonably prepared on the basis reflecting the
best currently available estimates and judgments of the management of the
Company and Grace, respectively, as to the future operating and financial
performance of the Company and Grace, respectively. We have not assumed any
responsibility for making any independent evaluation of any assets or
liabilities or for making any independent verification of any of the information
reviewed by us. We have relied as to certain legal matters on advice of counsel
to the Company including that the transactions contemplated under the
Distribution Agreement will qualify as tax free transactions under the Internal
Revenue Code of 1986 (the "Code") and that the Merger will be tax free under the
Code to Grace, the Company and their respective stockholders.

Our opinion is necessarily based on economic, market, financial
and other conditions as they exist on, and on the information made available to
us as of, the date of this letter. It should be understood that, although
subsequent developments may affect this opinion, we do not have any obligation
to update, revise or reaffirm this opinion. We are expressing no opinion herein
as to the prices at which Grace's securities will actually trade at any time.
With respect to the contingent liabilities of Grace, we have not been requested
to and do not express any opinion regarding the financial impact of these
matters on Grace or the Company. Our opinion does not address the relative
merits of the Merger and the other business strategies being considered by the
Company's Board of Directors (the "Company's Board"), nor does it address the
Company's Board decision to proceed with the Merger. Our opinion does not
constitute a recommendation to any stockholder as to how such stockholder should
vote on the proposed transaction.

Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ"), as
part of its investment banking services, is regularly engaged in the valuation
of businesses and securities in connection with mergers, acquisitions,
underwritings, sales and distributions of listed and unlisted securities,

XXX-002462

private placements and valuations for corporate and other purposes. DLJ has
performed investment banking and other services for the Company and for Grace in
the past (including delivery of a fairness opinion for the Company in connection
with a $57 million acquisition of Trigon Industries in 1995 and acting as
underwriter in connection with a $360 million high yield offering for
Fresenius-National Medical Care, Inc., a former subsidiary of Grace) and has
been customarily compensated for such services.

       Based upon the foregoing and such other factors as we deem
relevant, we are of the opinion that the Exchange Ratio is fair to the holders
of Company Common Stock from a financial point of view.

     Very truly yours,


     DONALDSON, LUFKIN & JENRETTE
     SECURITIES CORPORATION



     By: /s/ Douglas V. Brown
        ---------------------
        Douglas V. Brown
        Managing Director


              ANNEX D


        Credit Suisse First Boston Corporation letterhead

August 14,1997


Board of Directors
W.R.Grace & Co.
One Town Center Rd.
Boca Raton, FL 33486-1010

Dear Sirs and Mesdames:

We understand that W. R. Grace & Co. ("Grace") and its wholly-owned subsidiary,
Packco Acquisition Corp. ("Merger Sub"), have entered into an Agreement and Plan
of Merger (the "Agreement") with Sealed Air Corporation ("Sealed Air"), and
Grace, Sealed Air and/or certain of their respective subsidiaries will enter
into certain related agreements, including a Distribution Agreement (the
"Distribution Agreement") by and among Grace, W.R. Grace & Co.-Conn., a
wholly-owned subsidiary of Grace-Conn."), and Grace Specialty Chemicals,
Inc., a wholly-owned subsidiary of Grace ("New Grace").

We understand that pursuant to these agreements, among other things: ( i) Grace
will contribute its worldwide packaging business (other than the container
business group) to a subsidiary of Grace ("Packco"); (ii) Grace and/or Packco
will enter into a credit agreement or other financing agreement or arrangement
(the "Grace Credit Agreement"); (iii) Grace and/or Packo will use the proceeds
of borrowings under the Grace Credit Agreement to make a capital contribution or
distribution in the aggregate amount of $1,200,000,000, subject to certain
adjustments, to Grace-Conn. (or certain of its subsidiaries); (iv) Grace-Conn.
intends to consummate a cash tender offer for all of its outstanding 8.0% Notes
due 2004, 7.4% Notes due 2000 and 7.75% Notes Due 2002 and, to the extent that
upon consummation of the Distribution (as defined below) there remains
outstanding (other than to the extent owned by Grace-Conn. or New Grace) in
excess of $50 million in principal amount of such notes, New Grace or
Grace-Conn. will obtain a letter of credit with respect to such outstanding
amount for the benefit of Grace; (v) the capital stock of Grace-Conn. will be
contributed to New Grace; (vi) Grace will distribute (the "Distribution") to the
holders of Common Stock, par value $.01 per share, of Grace ("Existing Grace
Common Stock") on a pro rata basis all the issued and outstanding shares of
Common Stock, par value $.01 per share, of New Grace ("New Grace Common Stock");
(vii) Grace will be recapitalized and in connection therewith (A) its
certificate of incorporation will be amended to, among other things, change the
par value of its Common Stock and (B) each share of Existing Grace Common Stock
will be exchanged for a number of shares of Common Stock, par value $.10 per
share, of Grace ("Newco Common Stock") and Convertible Preferred Stock, par
value $.10 per share, of Grace ("Newco Preferred Stock") determined in
accordance with the formulas set forth in the Distribution Agreement
(collectively, the "Recapitalization"); and (viii) Merger Sub will be merged
(the "Merger") with and into Sealed Air and in connection therewith Sealed Air
will become a wholly owned subsidiary of Grace and each share of Common Stock,
par value $.01 per share, of Sealed Air (other than shares owned by Grace or its
subsidiaries or any subsidiary of Grace or held in Sealed Air's treasury)
will be converted into one share of Newco Common Stock. The transactions
contemplated by the Agreement, the Distribution Agreement and the forms of
related agreements attached as exhibits thereto are collectively referred to
herein as the "Transactions."

You have asked us to advise you with the respect to the fairness to the holders
of Existing Grace Common Stock, from a financial point of view, of the terms of
the Distribution, the Recapitalization and the Merger, taken as a whole.

In arriving at our opinion, we have reviewed certain publicly available business

XXX-002463

and financial information relating to Grace and Sealed Air, as well as the Agreement, the Distribution Agreement and the forms of related agreements attached as exhibits thereto. We have also reviewed certain other information, including financial forecasts and certain information with respect to potential synergies which may result from the Merger provided to us by Grace and Sealed Air and have met with the managements of Grace and Sealed Air to discuss the business and prospects of Grace, Sealed Air and New Grace.

We have also considered certain financial and stock market data of Grace and Sealed Air, and we have compared that data with similar data for other publicly held companies in businesses similar to those of Grace and Sealed Air, and we have considered the financial terms of certain other business combinations and other transactions. We have also considered such other information, financial studies, analyses and investigations and financial, economic and market criteria which we deemed relevant.

In connection with our review, we have not assumed any responsibility for independent verification of any of the foregoing information and have relied on its being complete and accurate in all material respects. With respect to the financial forecasts, including the estimates of any potential future liabilities related to asbestos, we have assumed that they have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the managements of Grace and Sealed Air as to the future financial performance of Grace, Sealed Air and New Grace. We have also relied upon the views of the managements of Grace and Sealed Air concerning the business, operational and strategic benefits and implications of the Merger, including financial forecasts provided to us by Grace and Sealed Air relating to synergistic benefits to Grace and Sealed Air. We have not made an independent evaluation or appraisal of the assets or liabilities (contingent or otherwise) of Grace or Sealed Air. Our opinion is necessarily based upon financial, economic, market and other conditions as they exist and can be evaluated on the date hereof. We are not expressing any opinion as to what the value of the New Grace Common Stock or Newco Preferred Stock actually will be following the consummation of the Transactions or the prices at which the New Grace Common Stock, Newco Common Stock or Newco Preferred Stock will trade following the consummation of the Transactions. We also understand that the financial statements, pro forma financial statements and registration statement of New Grace have not yet been prepared. We were not requested to, and did not, solicit third-party indications of interest in acquiring all or any part of Grace. We have not been requested to opine, and our opinion does not in any manner address, Grace's underlying business decision to effect the Transactions.

We have assumed, with your consent, that the Transactions will comply with applicable United States, foreign, federal and state laws, including, without limitation, laws relating to the payment of dividends, bankruptcy, insolvency, reorganization, fraudulent conveyance, fraudulent transfer or other similar laws now or hereafter in effect affecting creditors' rights generally. We have assumed, with your consent, that receipt of the Newco Common Stock and Newco Preferred Stock in connection with the Recapitalization and New Grace Common Stock in connection with the Distribution will be tax-free for United States federal income tax purposes to the stockholders of Grace and that none of Grace, Sealed Air or New Grace will recognize material income, gain or loss for United States federal income tax purposes as a result of the Transactions. In addition, we have assumed, with your consent, that following the consummation of the Transactions, Grace and its subsidiaries and New Grace and its subsidiaries will perform their respective indemnification obligations which may arise under the Distribution Agreement (including the forms of related agreements attached as exhibits thereto) in accordance with their respective terms. We have further assumed, with your consent, that in the course of obtaining the necessary regulatory or other consents or approvals (contractual or otherwise) for the Transactions, no restrictions, including any divestiture requirements or amendments or modifications, will be imposed that will have a material adverse effect on the contemplated benefits of the Transactions. We have not been requested to opine, and our opinion does not in any matter address, any matters relating to the solvency of any entity and we have assumed that Grace and New Grace will be solvent following the consummation of the Transactions.

We have acted as financial advisor to Grace in connection with the Transactions and will receive a fee for our services, a significant portion of which is contingent upon the consummation of the Transactions. In the past, we have performed certain investment banking services for Grace and have received customary fees for such services.

In the ordinary course of our business, Credit Suisse First Boston Corporation and its affiliates may actively trade the debt and equity securities of Grace and Sealed Air for their own accounts and for the accounts of customers and, accordingly, may at any time hold a long or short position in such securities.

It is understood that this letter is for the information of the Board of Directors of Grace in connection with its consideration of the Transactions and does not constitute a recommendation to any stockholder as to how such stockholder should vote on any of the Transactions. We understand that our opinion and advice may be summarized in a registration statement relating to the Transactions, provided that no advice or opinion rendered by us, whether formal or informal, may be disclosed, in whole or in part, or summarized, excerpted from or otherwise referred to without our prior written consent, which will not be unreasonably withheld.

Based upon and subject to the foregoing, it is our opinion that, as of the date hereof, the terms of the Distribution, the Recapitalization and the Merger, taken as a whole, are fair, from a financial point of view, to the holders of Existing Grace Common Stock.

Very truly yours,

XXX-002464

CREDIT SUISSE FIRST BOSTON CORPORATION

                    Merrill Lynch & Co. letterhead

      August 14, 1997

Board of Directors
W.R. Grace & Co.
One Town Center Rd.
Boca Raton, FL 33486-1010

Members of the Board of Directors:

We understand that W.R. Grace & Co. ("Grace") and its wholly owned subsidiary,
Packo Acquisition Corp. ("Merger Sub"), have entered into an Agreement and Plan
of Merger (the "Agreement") with Sealed Air Corporation ("Sealed Air") and
Grace, Sealed Air and/or certain of their respective subsidiaries will enter
into certain related agreements, including a Distribution Agreement (the
"Distribution Agreement") by and among Grace, W.R. Grace & Co.-Conn., a wholly
owned subsidiary of Grace ("Grace-Conn."), and Grace Specialty Chemicals, Inc., a
wholly owned subsidiary of Grace ("New Grace").

We understand that pursuant to these agreements, among other things: (i) Grace
will contribute its worldwide packaging business (other than the container
business group) to a subsidiary of Grace ("Packo"); (ii) Grace and/or Packo will
enter into a credit agreement or other financing agreement or arrangement (the
"Grace Credit Agreement"); (iii) Grace and/or Packo will use the proceeds of
borrowings under the Grace Credit Agreement to make a capital contribution or
distribution in the aggregate amount of $1,200,000,000, subject to certain
adjustments, to Grace-Conn. (or certain of its subsidiaries); (iv) Grace-Conn.
intends to consummate a cash tender offer for all of its outstanding 8.0% Notes
due 2004, 7.4% Notes due 2000 and 7.75% Notes Due 2002 and, to the extent that
upon consummation of the Distribution (as defined below) there remains
outstanding (other than to the extent owned by Grace-Conn. or New Grace) in
excess of $50 million in principal amount of such notes, New Grace or
Grace-Conn. will obtain a letter of credit with respect to such outstanding
amount for the benefit of Grace; (v) the capital stock of Grace-Conn. will be
contributed to New Grace; (vi) Grace will distribute (the "Distribution") to the
holders of Common Stock, par value $.01 per share, of Grace ("Existing Grace
Common Stock") on a pro rata basis all the issued and outstanding shares of
Common Stock, par value $.01 per share, of New Grace ("New Grace Common Stock");
(vii) Grace will be recapitalized and in connection therewith (A) its
certificate of incorporation will be amended to, among other things, change the
par value of its Common Stock and (B) each share of Existing Grace Common Stock
will be exchanged for a number of shares of Common Stock, par value $.10 per
share, of Grace ("Newco Common Stock") and Convertible Preferred Stock, par
value $.10 per share, of Grace ("Newco Preferred Stock") determined in
accordance with the formulas set forth in the Distribution Agreement
(collectively, the "Recapitalization"); and (viii) Merger Sub will be merged
(the "Merger") with and into Sealed Air and in connection therewith Sealed Air
will become a wholly-owned subsidiary of Grace and each share of Sealed Air
Common Stock, par value $.01 per share, of Sealed Air ("Sealed Air Common Stock" (other than
shares owned by Grace or its subsidiaries or any subsidiary of Sealed Air or
held in Sealed Air's treasury) will be converted into one share of Newco Common
Stock. The transactions contemplated by the Agreement, the Distribution
Agreement and the forms of related agreements attached as exhibits thereto are
collectively referred to herein as the "Transactions".

You have asked us whether, in our opinion, the Distribution, the
Recapitalization and the Merger, taken as a whole, are fair from a financial
point of view to the holders of Existing Grace Common Stock.

In arriving at the opinion set forth below, we have, among other things:

      (1)     Reviewed certain publicly available business and financial
              information relating to Grace and Sealed Air that we deemed to be
              relevant;

      (2)     Reviewed certain information, including financial
              forecasts, relating to the business, earnings, cash flow,
              assets, liabilities and prospects of Grace, Sealed Air and New
              Grace, as well as the amount and timing of the cost savings and
              related expenses and synergies expected to result from the
              Merger (the "Expected Synergies") furnished to us by Grace and
              Sealed Air, respectively;

      (3)     Conducted discussions with members of senior management and
              representatives of Grace and Sealed Air concerning the matters
              described in clauses 1 and 2 above, as well as the respective
              businesses and prospects of Grace, Sealed Air and New Grace
              before and after giving effect to the Transactions and the
              Expected Synergies;

      (4)     Reviewed the market prices and valuation multiples for Existing
              Grace Common Stock and Sealed Air Common Stock and compared them
              with those of certain publicly traded companies that we deemed to
              be relevant;

      (5)     Reviewed the results of operations of Grace and Sealed Air and
              compared them with those of certain publicly traded companies

XXX-002465

that we deemed to be relevant;

(6)     Compared the proposed financial terms of the Transactions with
        the financial terms of certain other transactions that we deemed
        to be relevant;

(7)     Participated in certain discussions and negotiations among
        representatives of Grace and Sealed Air and their financial and
        legal advisors;

(8)     Reviewed the potential pro forma impact of the Transactions;

(9)     Reviewed the Agreement, the Distribution Agreement and the forms
        of related agreements attached as exhibits thereto; and

(10)    Reviewed such other financial studies and analyses and took into
        account such other matters as we deemed necessary, including our
        assessment of general economic, market and monetary conditions.

In preparing our opinion, we have assumed and relied on the accuracy and
completeness of all information supplied or otherwise made available to us,
discussed with or reviewed by or for us, or publicly available, and we have not
assumed any responsibility for independently verifying such information or
undertaken an independent evaluation or appraisal of any of the assets or
liabilities of Grace or Sealed Air or been furnished with any such evaluation or
appraisal. In addition, we have not assumed any obligation to conduct, nor have
we conducted, any physical inspection of the properties or facilities of Grace
or Sealed Air. With respect to the financial forecast information, including the
estimates of any potential future liabilities related to asbestos, and the
Expected Synergies, in each case furnished to or discussed with us by Grace or
Sealed Air, we have assumed that they have been reasonably prepared and reflect
the best currently available estimates and judgment of Grace's or Sealed Air's
management as to the expected future financial performance of Grace, Sealed Air
and New Grace, as the case may be, and the Expected Synergies.

Our opinion is necessarily based upon market, economic and other conditions as
they exist and can be evaluated on, and on the information made available to us
as of, the date hereof. We have assumed, with your consent, that in the course
of obtaining the necessary regulatory or other consents or approvals
(contractual or otherwise) for the Transactions, no restrictions, including any
divestiture requirements or amendments or modifications, will be imposed that
will have a material adverse effect on the contemplated benefits of the
Transactions. We have assumed, with your consent, that the Transactions will
comply with applicable United States, foreign, federal and state laws,
including, without limitation, laws relating to the payment of dividends,
bankruptcy, insolvency, reorganization, fraudulent conveyance, fraudulent
transfer or other similar laws now or hereafter in effect affecting creditors'
rights generally. We have assumed, with your consent, that receipt of the Newco
Common Stock and Newco Preferred Stock in connection with the Recapitalization
and New Grace Common Stock in connection with the Distribution will be tax-free
for United States federal income tax purposes to the stockholders of Grace and
that none of Grace, Sealed Air or New Grace will recognize material income, gain
or loss for United States federal income tax purposes as a result of the
Transactions. In addition, we have assumed, with your consent, that following
the consummation of the Transactions, Grace and its subsidiaries and New Grace
and its subsidiaries will perform their respective indemnification obligations
which may arise under the Distribution Agreement (including the forms of related
agreements attached as exhibits thereto) in accordance with their respective
terms. We have not been requested to opine, and our opinion does not in any
manner address, any matters relating to the solvency of any entity and we have
assumed that Grace and New Grace will be solvent following the consummation of
the Transactions.

In connection with the preparation of this opinion, we have not been authorized
by Grace or its Board of Directors to solicit, nor have we solicited,
third-party indications of interest for the acquisition of all or any part of
Grace.

We are acting as financial advisor to Grace in connection with the Transactions
and will receive a fee from Grace for our services, a significant portion of
which is contingent upon the consummation of the Transactions. In addition,
Grace has agreed to indemnify us for certain liabilities arising out of our
engagement. We have, in the past, provided financial advisory and financing
services to Grace and/or its affiliates and may continue to do so and have
received, and may receive, fees for the rendering of such services. In addition,
in the ordinary course of our business, we may actively trade Existing Grace
Common Stock and other securities of Grace, as well as Sealed Air Common Stock
and other securities of Sealed Air, for our own account and for the accounts of
customers and, accordingly, may at any time hold a long or short position in
such securities.

This opinion is for the use and benefit of the Board of Directors of Grace. Our
opinion does not address the merits of the underlying decision by Grace to
engage in the Transactions and does not constitute a recommendation to any
stockholder as to how such stockholder should vote on any of the Transactions.

We are not expressing any option herein as to the prices at which Newco Common
Stock, Newco Preferred Stock or New Grace Common Stock will trade following the
announcement or consummation of the Transactions.

On the basis of and subject to the foregoing, we are of the opinion that, as of
the date hereof, the terms of the Distribution, the Recapitalization and the
Merger, taken as a whole, are fair from a financial point of view to the holders
of Existing Grace Common Stock.
        Very truly yours,

XXX-002466

/s/ Merrill Lynch, Pierce, Fenner & Smith
Incorporated

MERRILL LYNCH, PIERCE, FENNER
& SMITH INCORPORATED

ANNEX E

AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

OF

SEALED AIR CORPORATION
(Formerly Named W.R. Grace & Co.)

Sealed Air Corporation, a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

1. The Corporation was originally incorporated under the name Grace Holding, Inc. on January 29, 1996, and its original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on the same date.

2. The Certificate of Incorporation of the Corporation was amended to change the name of the Corporation to W.R. Grace & Co. by the filing of an Amendment to Certificate of Incorporation of Grace Holding, Inc. with the Secretary of State of the State of Delaware on September 27, 1996.

3. The Certificate of Incorporation of the Corporation was further amended to change the name of the Corporation to Sealed Air Corporation by the filing of an Amendment to Certificate of Incorporation of W.R. Grace & Co. with the Secretary of State of the State of Delaware on _____ ___, 1998.

4. The text of the Certificate of Incorporation, as heretofore amended, is further amended and restated in its entirety by the Amended and Restated Certificate of Incorporation attached hereto.

5. The Amended and Restated Certificate of Incorporation attached hereto has been duly adopted by the Board of Directors and stockholders of the Corporation in accordance with the applicable provisions of Section 242 and 245 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, the Corporation has caused Certificate to be signed by its _____ and attested by its Secretary, for the purpose of amending and restating the Certificate of Incorporation of the Corporation pursuant to the General Corporation Law of the State of Delaware this _____ day of _____, 1998.

SEALED AIR CORPORATION

By: _____
    Name:
    Title:

ATTEST:

By:. _____
    Name:
    Title: Secretary

AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

OF

SEALED AIR CORPORATION(1)

- ----------
(1) If the Grace Special Charter Amendment Proposal is not approved, certain provisions of this Amended and Restated Certificate of Incorporation will be replaced by alternative provisions ("Alternative Provisions"). The Alternative Provisions are presented in footnotes following the provisions that they would replaced.

FIRST:  The name of the corporation is Sealed Air Corporation (the "Corporation").

SECOND: The registered office of the Corporation in the State of Delaware is to be located at The Prentiss-Hall Corporation Systems, Inc., 1013 Centre Road, Wilmington, New Castle County, Delaware 19805. Its registered agent

XXX-002467

at such address is The Prentiss-Hall Corporation Systems, Inc.

THIRD:  The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware.

FOURTH: The total number of shares of stock which the Corporation shall have authority to issue is 450,000,000, consisting of 400,000,000 shares of Common Stock, par value $0.10 per share (the "Common Stock"), and 50,000,000 shares of Preferred Stock, par value $0.10 per share (the "Preferred Stock").

The Preferred Stock may be issued from time to time in one or more series. The powers, designations, preferences and other rights and qualifications, limitations or restrictions of the Preferred Stock of each series shall be such as are stated and expressed in this Article Fourth and, to the extent not stated and expressed herein, shall be such as may be fixed by the Board of Directors (authority so to do being hereby expressly granted) and stated and expressed in a resolution or resolutions adopted by the Board of Directors providing for the initial issue of Preferred Stock of such series. Such resolution or resolutions shall (a) fix the dividend rights of holders of shares of such series, (b) fix the terms on which stock of such series may be redeemed if the shares of such series are to be redeemable, (c) fix the rights of the holders of stock of such series upon dissolution or any distribution of assets, (d) fix the terms or amount of the sinking fund, if any, to be provided for the purchase or redemption of stock of such series, (e) fix the terms upon which the stock of such series may be converted into or exchanged for stock of any other class or classes or of any one or more series of Preferred Stock if the shares of such series are to be convertible or exchangeable, (f) fix the voting rights, if any, of the shares of such series and (g) fix such other powers, designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof desired to be so fixed.

Except to the extent otherwise provided in the resolution or resolutions of the Board of Directors providing for the initial issue of shares of a particular series or expressly required by law, holders of shares of Preferred Stock of any series shall be entitled to one vote for each share thereof so held, shall vote share for share with the holders of the Common Stock without distinction as to class and shall not be entitled to vote separately as a class or series of a class. The number of shares of Preferred Stock authorized to be issued may be increased or decreased from time to time by the affirmative vote of the holders of a majority of the stock of the Corporation entitled to vote, and the holders of the Preferred Stock shall not be entitled to vote separately as a class or series of a class on any such increase or decrease.

All shares of any one series of Preferred Stock shall be identical with each other in all respects except that shares of any one series issued at different times may differ as to the dates from which dividends thereon shall accumulate, and all series of Preferred Stock shall rank equally and be identical in all respects except as specified in the respective resolutions of the Board of Directors providing for the initial issue thereof.

Subject to the prior and superior rights of the Preferred Stock as set forth in any resolution or resolutions of the Board of Directors providing for the initial issuance of any particular series of Preferred Stock, such dividends (payable in cash, stock or otherwise) as may be determined by the Board of Directors may be declared and paid on the Common Stock from time to time out of any funds legally available therefor and the Preferred Stock shall not be entitled to participate in any such dividend.

FIFTH:  The Corporation is to have perpetual existence.

SIXTH:  The private property of the stockholders shall not be subject to the payment of the corporate debts to any extent whatever except as otherwise provided by law.

SEVENTH:  In furtherance, and not in limitation of the powers

A. To make, alter or repeal the by-laws of the Corporation;(2)

_ _____
(2) Alternative Provision: Paragraph A of ARTICLE SEVENTH will state in the alternative:

A. To adopt, amend or repeal the by-laws of the Corporation; provided, however, that the by-laws adopted by the Board of Directors under the powers hereby conferred may be amended or repealed by the Board of Directors or by the stockholders having voting power with respect thereto, provided further that in the case of amendments by stockholders, the affirmative vote of the holders of at least 80 percent of the voting power of the then outstanding Voting Stock, voting together as a single class, shall be required to alter, amend or repeal any provision of the by-laws;

B. To authorize and cause to be executed mortgages and liens, with or without limit as to amount, upon the real and personal property of the Corporation;

C. To authorize the guaranty by the Corporation of securities, evidences of indebtedness and obligations of other persons, corporations and business entities;

D. By resolution adopted by a majority of the whole board, to

XXX-002468

designate one or more committees, each committee to consist of two or more of
the directors of the Corporation, which, to the extent provided in the
resolution, shall have and may exercise the powers of the Board of Directors in
the management of the business and affairs of the Corporation and may authorize
the seal of the Corporation to be affixed to all papers which may require it.
Such committee or committees shall have such name or names as may be determined
from time to time by resolution adopted by the Board of Directors. The Board of
Directors may designate one or more directors as alternate members of any
committee, who may replace any absent or disqualified member at any meeting of
the committee. The members of any such committee present at any meeting and not
disqualified from voting may, whether or not they constitute a quorum,
unanimously appoint another member of the Board of Directors to act at the
meeting in the place of any absent or disqualified member.

          All corporate powers of the Corporation shall be exercised by the
Board of Directors except as otherwise provided herein or by law.(3)

- -----------
(3) Alternative Provision: The final paragraph of ARTICLE SEVENTH will state in
the alternative:

          All corporate powers of the Corporation shall be exercised by the
          Board of Directors except as otherwise provided herein or by law.
          Notwithstanding anything contained in this Amended and Restated
          Certificate of Incorporation to the contrary, the affirmative vote of
          the holders of at least 80 percent of the voting power of the then
          outstanding Voting Stock, voting together as a single class, shall be
          required to amend, repeal or adopt any provision inconsistent with
          paragraph A of this ARTICLE SEVENTH. For the purposes of the Amended
          and Restated Certificate of Incorporation, "Voting Stock" shall mean
          the outstanding shares of capital stock of the Corporation entitled to
          vote generally in the election of directors.

          EIGHTH: Any property of the Corporation constituting less than
all of its assets including goodwill and its corporate franchise, deemed by the
Board of Directors to be not essential to the conduct of the business of the
Corporation, may be sold, leased, exchanged or otherwise disposed of by
authority of the Board of Directors. All of the property and assets of the
Corporation including its goodwill and its corporate franchises, may be sold,
leased or exchanged upon such terms and conditions and for such consideration
(which may be in whole or in part shares of stock and/or other securities of any
other corporation or corporations) as the Board of Directors shall deem
expedient and for the best interests of the Corporation, when and as authorized
by the affirmative vote of the holders of a majority of the stock issued and
outstanding having voting power given at a stockholders' meeting duly called for
that purpose upon at least 20 days notice containing notice of the proposed
sale, lease or exchange, or when authorized by the written consent of the
holders of a majority of the voting stock issued and outstanding.(4)

- ----------
(4) Alternative Provision: a portion of the last sentence of ARTICLE EIGHTH will
be struck, and the sentence will state in the alternative:

          All of the property and assets of the Corporation including its
          goodwill and its corporate franchises, may be sold, leased or exchanged
          upon such terms and conditions and for such consideration (which may be
          in whole or in part shares of stock and/or other securities of any
          other corporation or corporations) as the Board of Directors shall deem
          expedient and for the best interests of the Corporation, when and as
          authorized by the affirmative vote of the holders of a majority of the
          stock issued and outstanding having voting power given at a
          stockholders' meeting duly called for that purpose upon at least 20
          days notice containing notice of the proposed sale, lease or exchange.

          NINTH: A director or officer of the Corporation shall not be
disqualified by his office from dealing or contracting with the Corporation
either as a vendor, purchaser or otherwise, nor shall any transaction or
contract of the Corporation be void or voidable by reason of the fact that any
director or officer or any firm of which any director or officer is a member or
any corporation of which any director or officer is a stockholder, officer or
director, is in any way interested in such transaction or contract, provided
that such transaction or contract is or shall be authorized, ratified or
approved either (1) by a vote of a majority of a quorum of the Board of
Directors or of a committee thereof, without counting in such majority any
director so interested (although any director so interested may be included in
such quorum), or (2) by a majority of a quorum of the stockholders entitled to
vote at any meeting. No director or officer shall be liable to account to the
Corporation for any profits realized from any such transaction or contract
authorized, ratified or approved as aforesaid by reason of the fact that he, or
any firm of which he is a member or any corporation of which he is a
stockholder, officer or director, was interested in such transaction or
contract. Nothing herein contained shall create liability in the events above
described or prevent the authorization, ratification or approval of such
contracts in any other manner permitted by law.

          TENTH: Any contract, transaction or act of the Corporation or of
the Board of Directors which shall be approved or ratified by a majority of a
quorum of the stockholders entitled to vote at any meeting shall be as valid and
binding as though approved or ratified by every stockholder of such contract,
transaction or act; but any failure of the stockholders to approve or ratify such contract,
transaction or act, when and if submitted, shall not be deemed in any way to
invalidate the same or to deprive the Corporation, its directors or officers of

XXX-002469

their right to proceed with such contract, transaction or act.

ELEVENTH: Each person who is or was or has agreed to become a director or officer of the Corporation, and each such person who is or was serving or who has agreed to serve at the request of the Board of Directors or an officer of the Corporation as an employee or agent of the Corporation or as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans (including the heirs, executors, administrators or estate of such person), shall be indemnified by the Corporation, in accordance with the by-laws of the Corporation, to the fullest extent permitted from time to time by the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted prior to such amendment) or any other applicable laws as presently or hereafter in effect. Without limiting the generality or the effect of the foregoing, the Corporation may enter into one or more agreements with any person which provide for indemnification greater than or different from that provided in this ARTICLE ELEVENTH. Any amendment or repeal of this ARTICLE ELEVENTH shall not adversely affect any right or protection existing hereunder in respect of any act or omission occurring prior to such amendment or repeal.

TWELFTH: A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (1) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (2) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (3) under Section 174 of the General Corporation Law of the State of Delaware, or (4) for any transaction from which the director derived an improper personal benefit. Any amendment or repeal of this ARTICLE TWELFTH shall not adversely affect any right or protection of a director of the Corporation existing hereunder in respect of any act or omission occurring prior to such amendment or repeal.

THIRTEENTH: Whenever a compromise or arrangement is proposed between this corporation and its creditors or any class of them and/or between this corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of this corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for this corporation under Section 291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for this corporation under Section 279 of Title 8 of the Delaware Code, order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this corporation as consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this corporation, as the case may be, and also on this corporation.

FOURTEENTH: Meetings of stockholders and directors may be held within or without the State of Delaware, as the by-laws may provide. The books of account of the Corporation may be kept (subject to any provision contained in the statutes) outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the by-laws of the Corporation. Elections of directors need not be by written ballot unless the by-laws of the Corporation shall so provide.

FIFTEENTH: Whenever the vote of stockholders at a meeting thereof is required or permitted to be taken for or in connection with any corporate action, the meeting and vote of stockholders may be dispensed with if a written consent to such corporate action is signed by the holders of 51% of the stock who would have been entitled to vote upon such corporate action if a meeting were held; provided that in no case shall a written consent be by the holders of stock having less than the minimum percentage of the vote required herein or by statute for the proposed corporate action, and provided that prompt notice must be given to all stockholders of the taking of corporate action without a meeting and by less than unanimous written consent.(5)

- ----------
(5)Alternative Provision:, ARTICLE FIFTEENTH will be replaced in its entirety and state in the alternative:

Subject to the rights of the holders of any series of Preferred Stock or any other series or class of stock as set forth in this Amended and Restated Certificate of Incorporation to elect additional directors under specific circumstances, any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of stockholders of the Corporation and may not be effected by any consent in writing in lieu of a meeting of such stockholders. Notwithstanding anything contained in this Amended and Restated Certificate of Incorporation to the contrary, the affirmative vote of at least 80 percent of the voting power of the then outstanding Voting Stock, voting together as a single class, shall be required to amend, repeal or adopt any provision inconsistent with this ARTICLE FIFTEENTH.

SIXTEENTH:(6) The Corporation reserves the right to amend, alter,

XXX-002470

change or repeal any provision contained in this certificate of incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

---

(6) Alternative Provisions: in the alternative, ARTICLE SIXTEENTH will become "ARTICLE SEVENTEENTH" and the following article will be inserted immediately after ARTICLE FIFTEENTH:

> ARTICLE SIXTEENTH: Subject to the rights of the holders of any series of Preferred Stock or any other series or class of stock as set forth in this Amended and Restated Certificate of Incorporation to elect additional directors under specified circumstances, the number of directors of the Corporation shall be fixed, and may be increased or decreased from time to time in such manner as may be prescribed by the by-laws.
>
> The directors, other than those who may be elected by the holders of any series of Preferred Stock or any other series or class of stock as set forth in this Amended and Restated Certificate of Incorporation, shall be divided into three classes, as nearly equal in number as possible. One class of directors shall be initially elected for a term expiring at the annual meeting of stockholders to be held in 1998, another class shall be initially elected for a term expiring at the annual meeting of stockholders to be held in 1999, and another class shall be initially elected for a term expiring at the annual meeting of stockholders to be held in 2000. Members of each class shall hold office until their successors are elected and qualified. At each succeeding annual meeting of the stockholders of the Corporation, the successors of the class of directors whose term expires at that meeting shall be elected by a plurality vote of all votes cast at such meeting to hold office for a term expiring at the annual meeting of stockholders held in the third year following the year of their election.
>
> Subject to the rights of the holders of any series of Preferred Stock or any other series or class of stock as set forth in this Amended and Restated Certificate of Incorporation to elect additional directors under specified circumstances, any director may be removed from office at any time by the shareholders, but only for cause.
>
> Notwithstanding anything contained in this Amended and Restated Certificate of Incorporation to the contrary, the affirmative vote of the holders of at least 80 percent of the voting power of the then outstanding Voting Stock, voting together as a single class, shall be required to amend, repeal or adopt any provision inconsistent with this ARTICLE SEVENTEENTH.

PART II
INFORMATION NOT REQUIRED IN PROSPECTUS

Item 20. Indemnification of Directors and Officers.

Limitation of Liability of Directors

The Registrant's Amended and Restated Certificate of Incorporation (the "Registrant Charter") provides that a director will not be personally liable for monetary damages to the Registrant or its stockholders for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Registrant or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) for paying a dividend or approving a stock repurchase in violation of Section 174 of the Delaware General Corporate law ("DGCL"), or (iv) for any transaction from which the director derives an improper personal benefit.

Indemnification of Directors and Officers

The Registrant Charter provides that each individual who is or was or has agreed to become a director or officer of the Registrant or each such person who is or was serving or who has agreed to serve at the request of the Board of Directors of the Registrant as an employee or agent of the Registrant or as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans (also including the heirs, executors, administrators or estate of such person), will be indemnified by the Registrant, in accordance with the Registrant's By-laws, to the fullest extent permitted by the DGCL, as the same exists or may in the future be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Registrant to provide broader indemnification rights than the DGCL permitted prior to such amendment). The Registrant Charter also specifically authorizes the Registrant to enter into agreements with any person providing for indemnification greater than or different from that provided by the Registrant Charter.

The Registrant's By-laws provide that each person who was or is made a party or is threatened to be made a party to or is involved in any action, suit, or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), by reason of the fact that he or she or a person of whom he or she is the legal representative is or was a director, officer or

XXX-002471

employee of the Registrant or is or was serving at the request of the Registrant as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, whether the basis of such Proceeding is an alleged action in an official capacity as a director, officer, employee or agent or in any other capacity while serving as a director, officer, employee or agent, will be indemnified and held harmless by the Registrant to the fullest extent authorized by the DGCL as the same exists or may in the future be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Registrant to provide broader indemnification rights than the DGCL permitted prior to such amendment), against all expense, liability and loss (including, without limitation, attorneys' fees judgments, fines, excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith, and such indemnification will continue as to a person who has ceased to be a director, officer, employee or agent and will inure to the benefit of his or her heirs, executors and administrators; however, except as described in the next paragraph with respect to Proceedings seeking to enforce rights to indemnification, the Registrant will indemnify any such person seeking indemnification in connection with a Proceeding (or part thereof) initiated by such person only if such Proceeding (or part thereof) was authorized by the Registrant's Board.

Pursuant to the Registrant's By-laws, if a claim for indemnification as described in the preceding paragraph is not paid in full by the Registrant within 30 days after a written claim has been received by the Registrant, the claimant may, at any time thereafter, bring suit against the Registrant to recover the unpaid amount of the claim and, if successful, in whole or in part, the claimant will be entitled to be paid also the expense of prosecuting such claim. The Registrant's By-laws provide that it will be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any Proceeding in advance of its final disposition where the required undertaking, if any, has been tendered to the Registrant, as discussed below) that the claimant has not met the standards of conduct which make it permissible under the DGCL for the Registrant to indemnify the claimant for the amount claimed, but the burden of proving such defense will be on the Registrant. Neither the failure of the Registrant (including the Board of Directors of the Registrant, independent legal counsel or stockholders) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Registrant (including the Board of Directors of the Registrant, independent legal counsel or stockholders) that the claimant has not met such applicable standard of conduct, will be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

The Registrant's By-laws provide that the right conferred in the Registrant's By-laws to indemnification and the payment of expenses incurred in defending a Proceeding in advance of its final disposition will not be exclusive of any other right which any person may have or may in the future acquire under any statute, provision of the Registrant Charter or the Registrant's By-laws, agreement, vote of stockholders or disinterested directors or otherwise. The Registrant's By-laws permit the Registrant to maintain insurance, at its expense, to protect itself and any director, officer, employee or agent of the Registrant or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Registrant would have the power to indemnify such person against such expense, liability or loss under the DGCL. The Registrant maintains directors and officers liability insurance providing coverage to its directors and officers. In addition, the Registrant's By-laws authorize the Registrant, to the extent authorized from time to time by the Board of Directors of the Registrant, to grant rights to indemnification, and rights to be paid by the Registrant the expenses incurred in defending any Proceeding in advance of its final disposition, to any agent of the Registrant to the fullest extent of the provisions of the Registrant's By-laws with respect to the indemnification and advancement of expenses of directors, officers and employees of the Registrant.

The Registrant's By-laws provide that the right to indemnification conferred therein will be a contract right and will include the right to be paid by the Registrant the expenses incurred in defending any such Proceeding in advance of its final disposition, except that if the DGCL requires, the payment of such expenses incurred by a director or officer in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such person while a director or officer, including, without limitation, service to an employee benefit plan) in advance of the final disposition of a Proceeding will be made only upon delivery to the Registrant of an undertaking by or on behalf of such director or officer to repay all amounts so advanced if it is ultimately determined that such director or officer is not entitled to be indemnified under the Registrant's By-laws or otherwise.

Item 21.  Exhibits and Financial Statement Schedules.

(a) Exhibits.  See Exhibit Index.

(b) Financial Statement Schedules. Not Applicable

(c) Report, Opinion or Appraisal.  See Exhibits 5.1, 8.1 and 8.2

Item 22.  Undertakings.

The undersigned registrant hereby undertakes:

(a) That prior to any public reoffering of the securities

XXX-002472

registered hereunder through use of a prospectus which is a part of this registration statement, by any person or party who is deemed to be an underwriter within the meaning of Rule 145(c), such reoffering prospectus will contain the information called for by the applicable registration form with respect to reofferings by persons who may be deemed underwriters, in addition to the information called for by the other items of the applicable form.

(b) That every prospectus (i) that is filed pursuant to paragraph (b) immediately preceding, or (ii) that purports to meet the requirements of Section 10(a)(3) of the Securities Act of 1933 and is used in connection with an offering of securities subject to Rule 415, will be filed as a part of an amendment to this registration statement and will not be used until such amendment is effective, and that, for purposes of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(c) That, for purposes of determining any liability under the Securities Act of 1933, each filing of the registrant's annual report pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934 (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Securities Exchange Act of 1934) that is incorporated by reference in this registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(d) To respond to requests for information that is incorporated by reference into the Joint Proxy Statement/Prospectus pursuant to Item 4, 10(b), 11 or 13 of this Form, within one business day of receipt of such request, and to send the incorporated documents by first class mail or other equally prompt means. This includes information contained in documents filed subsequent to the effective date of this registration statement through the date of responding to the request.

(e) To supply by means of a post-effective amendment all information concerning a transaction, and the company being acquired involved therein, that was not the subject of and included in this registration statement when it became effective.

(f) Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Boca Raton, State of Florida, on February 13, 1998.

W. R. GRACE & CO.

Date: February 13, 1998        By: /s/ Larry Ellberger
                                   --------------------
                                   Larry Ellberger
                                   Senior Vice President and
                                   Chief Financial Officer


                    ---------------


Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed below by the following persons on behalf of the Registrant in the capacities and on the dates indicated.

<TABLE>
<CAPTION>

| Signature | Title | Date |
|---|---|---|
| <S> | <C> | <C> |
| /s/ Albert J. Costello<br>- ------------------------<br>(Albert J. Costello) | Chairman, President and<br>Chief Executive Officer<br>(Principal Executive Officer) | February 13, 1998 |
| /s/ Larry Ellberger<br>- ------------------------<br>(Larry Ellberger) | Senior Vice President and<br>Chief Financial Officer<br>(Principal Financial Officer) | February 13, 1998 |

XXX-002473

```
/s/ Kathleen A. Browne         Vice President and Controller    February 13, 1998
- ------------------------        (Principal Accounting Officer)
(Kathleen A. Browne)

        *
- ------------------------
(John F. Akers)                Director                         February 13, 1998


        *
- ------------------------
(Hank Brown)                   Director                         February 13, 1998

        *
- ------------------------
(Christopher Cheng)            Director                         February 13, 1998


        *
- ------------------------
(Harold A. Eckmann)            Director                         February 13, 1998

        *
- ------------------------
(James W. Frick)               Director                         February 13, 1998

        *
- ------------------------
(Marye Anne Fox)               Director                         February 13, 1998

        *
- ------------------------
(Thomas A. Holmes)             Director                         February 13, 1998


        *
- ------------------------
(Virginia A. Kamsky)           Director                         February 13, 1998

- ------------------------
(John J. Murphy)               Director                         February 13, 1998


- ------------------------
(John E. Phipps)               Director                         February 13, 1998

        *
- ------------------------
(Thomas A. Vanderslice)        Director                         February 13, 1998


     *By:   /s/ Robert B. Lamm
            ------------------------
            Robert B. Lamm
            Attorney-in-Fact
</TABLE>
```

EXHIBIT INDEX

```
Exhibit
Number                         Description

*2.1      Agreement and Plan of Merger dated as of August 14, 1997 among the
          Registrant, Sealed Air Corporation and Packco Acquisition Corp.
          (included as Annex A to the Joint Proxy Statement/Prospectus
          contained in this Registration Statement).

*2.2      Form of Distribution Agreement to be dated as of the Effective Time
          between the Registrant, W. R. Grace & Co.-Conn. and Grace
          Speciality Chemicals, Inc. (included as Annex B to the Joint Proxy
          Statement/Prospectus contained in this Registration Statement).

*3.1      Amended and Restated Certificate of Incorporation of W. R. Grace &
          Co. (incorporated herein by reference to Exhibit 4.1 to W. R. Grace
          & Co.'s Form 8-K filed on October 10, 1996 (the "October 1996 Form
          8-K")).

*3.2      Amended and Restated By-Laws of W. R. Grace & Co. (incorporated
          herein by reference to Exhibit 4.2 to the October 1996 Form 8-K).

*4.1      Certificate of Designations, Preferences and Rights of Series A
          Convertible Preferred Stock of New Sealed Air.

*4.2      Commitment Letters for the New Credit Agreements.

*5.1      Opinion of Wachtell, Lipton, Rosen & Katz regarding the validity of
          the securities being registered (including consent).
```

*8.1    Form of opinion of Davis Polk & Wardwell regarding certain federal income tax consequences relating to the Merger (including consent).

*8.2    Form of opinion of Wachtell, Lipton, Rosen & Katz regarding certain federal income tax consequences relating to the Reorganization and Merger (including consent).

*23.1    Consents of Price Waterhouse LLP.

*23.2    Consent of KPMG Peat Marwick LLP.

*23.3    Consent of Davis Polk & Wardwell (included in the opinion filed as Exhibit 8.1 to this Registration Statement).

*23.4    Consent of Wachtell, Lipton, Rosen & Katz (included in the opinions filed as Exhibit 5.1 and 8.2 to this Registration Statement).

*24.1    Form of Power of Attorney.

*99.1    Form of Sealed Air Corporation Proxy Card.

*99.2    Form of W. R. Grace & Co. Proxy Card.

*99.3    Consent of Donaldson, Lufkin & Jenrette Securities Corporation.

*99.4    Consent of Merrill Lynch & Co.

*99.5    Consent of Credit Suisse First Boston Corporation.

*99.6    Consents of persons named as future directors of the Registrant.

* Filed herewith.
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-4.1
<SEQUENCE>2
<TEXT>

EXHIBIT 4.1

CERTIFICATE OF DESIGNATIONS, PREFERENCES
AND RIGHTS OF SERIES A CONVERTIBLE PREFERRED STOCK
OF
W. R. GRACE & CO.

Pursuant to Section 151 of the
General Corporation Law of the State of Delaware

The undersigned, pursuant to the provisions of Sections 103 and 151 of the General Corporation Law of the State of Delaware, do hereby certify that, pursuant to the authority expressly vested in the Board of Directors of W. R. Grace & Co., a Delaware corporation (the "Corporation"), by the Corporation's Certificate of Incorporation, the Board of Directors has duly adopted the following resolutions:

RESOLVED that pursuant to the authority expressly granted to and vested in the Board of Directors of the Corporation by the Corporation's Certificate of Incorporation, the Board of Directors hereby provides for the issuance of and creates a series of Preferred Stock of the Corporation, par value $0.10 per share (the "Preferred Stock"), and hereby fixes the designation and amount and the voting powers, designations, preferences and relative, participating, optional and other special rights, and the qualifications, limitations and restrictions, of a series of Preferred Stock.

RESOLVED that each share of such series of Preferred Stock shall rank equally in all respects and shall be subject to the following provisions:

1. Number of Shares and Designation.  36,000,000 shares of Preferred Stock of the Corporation shall constitute a series of Preferred Stock designated as Series A Convertible Preferred Stock (the "Series A Preferred Stock").  The number of shares of Series A Preferred Stock may be increased (to the extent of the Corporation's authorized and unissued Preferred Stock) or decreased (but not below the number of shares of Series A Preferred Stock then outstanding) by further resolution duly adopted by the Board of Directors and the filing of a certificate of increase or decrease, as the case may be, with the Secretary of State of Delaware.

2. Rank.  The Series A Preferred Stock shall, with respect to payment of dividends, redemption payments and rights upon liquidation, dissolution or winding up of the affairs of the Corporation, (i) rank senior and prior to the Common Stock of the Corporation, par value $0.10 per share (the "Common Stock"), and each other class or series of equity securities of the Corporation, whether currently issued or issued in the future, that by its terms ranks junior to the Series A Preferred Stock (whether with respect to payment of dividends, redemption payments or rights upon liquidation, dissolution or winding up of the affairs of the Corporation) (all of such equity securities, including the Common Stock,

XXX-002475

are collectively referred to herein as the "Junior Securities"), (ii) rank
on a parity with each other class or series of equity securities of the
Corporation (other than the Common Stock), whether currently issued or
issued in the future, that does not by its terms expressly provide that it
ranks senior to or junior to the Series A Preferred Stock (whether with
respect to payment of dividends, redemption payments or rights upon
liquidation, dissolution or winding up of the affairs of the Corporation)
(all of such equity securities are collectively referred to herein as the
"Parity Securities"), and (iii) rank junior to each other class or series
of equity securities of the Corporation, whether currently issued or issued
in the future, that by its terms ranks senior to the Series A Preferred
Stock (whether with respect to payment of dividends, redemption payments or
rights upon liquidation, dissolution or winding up of the affairs of the
Corporation) (all of such equity securities are collectively referred to
herein as the "Senior Securities"). The respective definitions of Junior
Securities, Parity Securities and Senior Securities shall also include any
rights or options exercisable or exchangeable for or convertible into any
of the Junior Securities, Parity Securities or Senior Securities, as the
case may be.

       3. Dividends.

     (a)  The holders of shares of Series A Preferred Stock shall be
entitled to receive, when, as and if declared by the Board of Directors,
out of funds legally available for the payment of dividends, cash dividends
at the annual rate of $2.00 per share.  Such dividends shall be payable
quarterly in arrears, in equal amounts, on _____, _____, _____ and
_____ of each year (unless such day is not a Business Day (as defined
below), in which event such dividends shall be payable on the next
succeeding Business Day), commencing _____, 1998 (each such
payment date being a "Dividend Payment Date" and each such quarterly period
being a "Dividend Period").  Dividends on shares of Series A Preferred
Stock shall be cumulative from the date of issue, whether or not in any
Dividend Period there shall be funds of the Corporation legally available
for the payment of dividends.  The amount of dividends payable for each
full Dividend Period shall be computed by dividing the annual dividend rate
by four.  The amount of dividends payable on the Series A Preferred Stock
for the initial Dividend Period, or for any other period shorter or longer
than a full Dividend Period, shall be computed on the basis of a 360-day
year of twelve 30-day months.  As used herein, the term "Business Day"
means any day except a Saturday, Sunday or day on which banking
institutions are legally authorized to close in the City of New York.

     (b)  Each dividend shall be payable to the holders of record of
shares of Series A Preferred Stock as they appear on the stock records of
the Corporation at the close of business on such record dates (each, a
"Dividend Payment Record Date"), which shall be not more than 60 days nor
less than 10 days preceding the Dividend Payment Date thereof, as shall be
fixed by the Board of Directors.  Accrued and unpaid dividends for any past
Dividend Periods may be declared and paid at any time, without reference to
any Dividend Payment Date, to holders of record on such date, not more than
60 days nor less than 10 days preceding the payment date thereof, as may be
fixed by the Board of Directors.  No interest, or sum of money in lieu of
interest, shall be payable in respect of any dividend payment or payments
on the Series A Preferred Stock that may be in arrears.

     (c)  Except as described in the next succeeding sentence, so long as
any shares of Series A Preferred Stock are outstanding, (i) no dividends
shall be declared or paid or set apart for payment, or other distribution
declared or made, on any Parity Securities for any period unless the
Corporation has paid or contemporaneously pays or declares and sets apart
for payment on the Series A Preferred Stock all accrued and unpaid
dividends for all Dividend Periods terminating on or prior to the date of
payment of such dividends, and (ii) no dividends shall be declared or paid
or set apart for payment, or other distribution declared or made, on the
Series A Preferred Stock for any Dividend Period unless the Corporation has
paid or contemporaneously pays or declares and sets apart for payment on
any Parity Securities all accrued and unpaid dividends for all dividend
payment periods terminating on or prior to the Dividend Payment Date for
such dividends.  Unless and until dividends accrued but unpaid in respect
of all past Dividend Periods with respect to the Series A Preferred Stock
and all past dividend periods with respect to any Parity Securities at the
time outstanding shall have been paid in full or a sum sufficient for such
payment is set apart, all dividends declared by the Corporation upon shares
of Series A Preferred Stock and upon all Parity Securities shall be
declared ratably in proportion to the respective amounts of dividends
accrued and unpaid on the Series A Preferred Stock and Parity Securities.

     (d)  So long as any shares of Series A Preferred Stock are
outstanding, no dividends shall be declared or paid or set apart for
payment, or other distribution declared or made, upon any Junior Securities
(other than dividends or distributions paid in shares of, or options,
warrants or rights to subscribe for or purchase shares of Junior
Securities), nor shall any Junior Securities be redeemed, purchased or
otherwise acquired (other than a redemption, purchase or other acquisition
of shares of Common Stock made for purposes of any employee or director
incentive or benefit plans or arrangements of the Corporation or any
subsidiary of the Corporation) for any consideration (nor shall any moneys
be paid to or made available for a sinking fund for the redemption of any
shares of any such Junior Securities) by the Corporation, directly or
indirectly (except by conversion into or exchange for Junior Securities),
unless in each case (i) the full cumulative dividends on all outstanding
shares of Series A Preferred Stock and any other Parity Securities shall
have been paid or set apart for payment for all past Dividend Periods with

XXX-002476

respect to the Series A Preferred Stock and all past dividend periods with
respect to such Parity Securities and (ii) sufficient funds shall have been
paid or set apart for the payment of the dividend for the current Dividend
Period with respect to the Series A Preferred Stock and for the current
dividend period with respect to such Parity Securities.

(e)  The Corporation shall not, directly or indirectly, make any
payment on account of any purchase, redemption, retirement or other
acquisition of any Parity Securities (other than for consideration payable
solely in Junior Securities) unless all accrued and unpaid dividends on the
Series A Preferred Stock for all Dividend Payment Periods ending on or
before such payment for such Parity Securities shall have been paid or
declared and set apart for payment.

(f)  If at any time the Corporation issues any Senior Securities and
the Corporation shall have failed to declare and pay or set apart for
payment accrued and unpaid dividends on such Senior Securities, in whole or
in part, then (except to the extent allowed by the terms of the Senior
Securities) no dividends shall be declared or paid or set apart for payment
on the Series A Preferred Stock unless and until all accrued and unpaid
dividends with respect to the Senior Securities, including the full
dividends for the then-current dividend period, shall have been declared
and paid or set apart for payment.

    4.  Liquidation Preference.

(a)  The liquidation preference for the shares of Series A Preferred
Stock shall be $50.00 per share, plus an amount equal to the dividends
accrued and unpaid thereon, whether or not declared, to the payment date
(the "Liquidation Value").

(b)  In the event of any voluntary or involuntary liquidation,
dissolution or winding up of the Corporation, the holders of shares of
Series A Preferred Stock shall not be entitled to receive the Liquidation
Value of such shares until payment in full or provision has been made for
the payment in full of all claims of creditors of the Corporation and the
liquidation preferences for all Senior Securities, and shall be entitled to
receive the Liquidation Value of such shares before any payment or
distribution of any assets of the Corporation shall be made or set apart
for holders of any Junior Securities.  Subject to clause (i) above, if the
assets of the Corporation are not sufficient to pay in full the Liquidation
Value payable to the holders of shares of Series A Preferred Stock and the
liquidation preference payable to the holders of any Parity Securities,
then such assets, or the proceeds thereof, shall be distributed among the
holders of shares of Series A Preferred Stock and any such other Parity
Securities ratably in accordance with the Liquidation Value for the Series
A Preferred Stock and the liquidation preference for the Parity Securities,
respectively.  Upon payment in full of the Liquidation Value to which the
holders of shares of Series A Preferred Stock are entitled, the holders of
shares of Series A Preferred Stock will not be entitled to any further
participation in any distribution of assets of the Corporation.

(c)  Neither a consolidation or merger of the Corporation with or
into any other entity, nor a merger of any other entity with or into the
Corporation, nor a sale or transfer of all or any part of the Corporation's
assets for cash, securities or other property shall be considered a
liquidation, dissolution or winding up of the Corporation within the
meaning of this Section 4.

    5.  Redemption.

(a)  Optional Redemption.  The Series A Preferred Stock shall not be
redeemable prior to _____ __, 2001.  During the period from _____
__, 2001 until _____ __, 2003, the Corporation may redeem at its option
shares of Series A Preferred Stock in accordance with this Section 5 only if
the last reported sales price of a share of Common Stock in its principal
trading market for any 20 trading days within a period of 30 consecutive
trading days ending on the trading day prior to the date of mailing the notice
of redemption is at least $70.6563.  At any time on or after _____ __,
2001, to the extent the Corporation shall have funds legally available to
redeem shares of Series A Preferred Stock and if permitted by the immediately
preceding sentence, the Corporation may redeem shares of Series A Preferred
Stock, in whole or in part, at the option of the Corporation, at the
applicable cash redemption price per share set forth below for any redemption
during the 12-month period beginning on _____ ____ of the year indicated:

| Year | Redemption Price Per Share |
| --- | --- |
| 2001 | $51.40 |
| 2002 | $51.20 |
| 2003 | $51.00 |
| 2004 | $50.80 |
| 2005 | $50.60 |
| 2006 | $50.40 |
| 2007 | $50.20 |
| Thereafter | $50.00 |

plus, in each case, an amount equal to the dividends accrued and unpaid
thereon, whether or not declared, up to but not including the redemption date.
From and after _____ __, 2008, the Corporation may redeem shares of
Series A Preferred Stock, at any time in whole or in part, at the option of
the Corporation, at a cash redemption price per share of $50.00 plus an amount
equal to the dividends accrued and unpaid thereon, whether or not declared, up

XXX-002477

to but not including the redemption date.

(b)  Mandatory Redemption.  To the extent the Corporation shall have funds legally available for such payment, on _____, 2018 (the "Mandatory Redemption Date), the Corporation shall redeem all outstanding shares of Series A Preferred Stock at a redemption price of $50.00 per share in cash, together with accrued and unpaid dividends thereon, whether or not declared, up to but not including such redemption date, without interest.  If the Corporation is unable or shall fail to discharge its obligation to redeem all outstanding shares of Series A Preferred Stock on the Mandatory Redemption Date (the "Mandatory Redemption Obligation"): (i) dividends on the Series A Preferred Stock shall continue to accrue, without interest, in accordance with Section 3, and (ii) the Mandatory Redemption Obligation shall be discharged as soon thereafter as the Corporation is able to discharge such Mandatory Redemption Obligation.  If and for so long as any Mandatory Redemption Obligation with respect to the Series A Preferred Stock shall not be fully discharged on the Mandatory Redemption Date, the Corporation shall not (x) directly or indirectly, redeem, purchase, or otherwise acquire any Parity Securities or discharge any mandatory or optional redemption, sinking fund or other similar obligation in respect of any Parity Securities (except in connection with a redemption, sinking fund or other similar obligation to be satisfied pro rata with the Series A Preferred Stock) or (y) declare or pay or set apart for payment any dividends or other distributions upon any Junior Securities, or, directly or indirectly, discharge any mandatory or optional redemption, sinking fund or other similar obligation in respect of any Junior Securities.

6. Procedures for Redemption.

(a)  If fewer than all of the outstanding shares of Series A Preferred Stock are to be redeemed pursuant to Section 5, the shares shall be redeemed on a pro rata basis (according to the number of shares of Series A Preferred Stock held by each holder, with any fractional shares rounded to the nearest whole share) or in such other manner as the Board of Directors may determine, as may be prescribed by resolution of the Board of Directors.  Notwithstanding the provisions of Section 5 and this Section 6, unless full cumulative cash dividends (whether or not declared) on all outstanding shares of Series A Preferred Stock shall have been paid or contemporaneously are declared and paid or set apart for payment for all Dividend Periods terminating on or prior to the applicable redemption date, none of the shares of Series A Preferred Stock shall be redeemed, and no sum shall be set aside for such redemption, unless shares of Series A Preferred Stock are redeemed pro rata.

(b)  In the event of a redemption of shares of Series A Preferred Stock pursuant to Section 5, notice of such redemption shall be given by first class mail, postage prepaid, mailed not less than 15 days nor more than 60 days prior to the redemption date, to each holder of record of the shares to be redeemed at such holder's address as the same appears on the stock register of the Corporation; provided that neither the failure to give such notice nor any defect therein shall affect the validity of the giving of notice for the redemption of any share of Series A Preferred Stock to be redeemed, except as to the holder to whom the Corporation has failed to give said notice or except as to the holder whose notice was defective.  Each such notice shall state: (i) the redemption date; (ii) the number of shares of Series A Preferred Stock to be redeemed and, if fewer than all the shares held by such holder are to be redeemed, the number of shares to be redeemed from such holder; (iii) the redemption price; (iv) the place or places where certificates for such shares are to be surrendered for payment of the redemption price; and (v) that dividends on the shares to be redeemed will cease to accrue on such redemption date.  Any notice mailed in the manner herein provided shall be conclusively presumed to have been duly given whether or not the holder receives the notice.

(c)  If a notice of redemption has been given pursuant to Section 6(b) and if, on or before the redemption date, the funds necessary for such redemption (including all dividends on the shares of Series A Preferred Stock to be redeemed that will accrue to but not including the redemption date) shall have been set aside by the Corporation, separate and apart from its other funds, in trust for the pro rata benefit of the holders of the shares so called for redemption, then on the redemption date, notwithstanding that any certificates for such shares have not been surrendered for cancellation, (i) dividends shall cease to accrue on the shares of Series A Preferred Stock to be redeemed, (ii) the holders of such shares shall cease to be stockholders with respect to those shares, shall have no interest in or claims against the Corporation by virtue thereof and shall have no voting or other rights with respect thereto, except the conversion rights provided in Section 7 (in accordance with Section 6(e)) and the right to receive the monies payable upon such redemption, without interest thereon, upon surrender, if required by the Corporation) of their certificates, and (iii) the shares evidenced thereby shall no longer be outstanding.  Subject to applicable escheat laws, any monies so set aside by the Corporation and unclaimed at the end of two years from the redemption date shall revert to the general funds of the Corporation, after which reversion the holders of such shares so called for redemption shall look only to the general funds of the Corporation for the payment of the redemption price, without interest.  Any interest accrued on funds so deposited shall belong to the Corporation and be paid thereto from time to time.

(d)  Upon surrender in accordance with the Corporation's notice of redemption of the certificates for any shares so redeemed (properly endorsed or assigned for transfer, if the Board of Directors shall so require and the notice shall so state), such shares shall be redeemed by

XXX-002478

the Corporation at the redemption price aforesaid.  In case fewer than all
the shares represented by any such certificate are redeemed, a new
certificate shall be issued representing the unredeemed shares without cost
to the holder thereof.

(e)  If a notice of redemption has been given pursuant to Section
6(b) and any holder of shares of Series A Preferred Stock shall, prior to
the close of business on the Business Day preceding the redemption date,
give written notice to the Corporation pursuant to Section 7 of the
conversion of any or all of the shares to be redeemed held by the holder
(accompanied by a certificate or certificates for such shares, duly
endorsed or assigned to the Corporation, and any necessary transfer tax
payment, as required by Section 7), then such redemption shall not become
effective as to such shares to be converted and such conversion shall
become effective as provided in Section 7, whereupon any funds deposited by
the Corporation for the redemption of such shares shall (subject to any
right of the holder of such shares to receive the dividend payable thereon
as provided in Section 7) immediately upon such conversion be returned to
the Corporation or, if then held in trust by the Corporation, shall
automatically and without further corporate action or notice be discharged
from the trust.

7.  Conversion.

(a)  Right to Convert.

(i)  Subject to the provisions of this Section 7, each holder of
shares of Series A Preferred Stock shall have the right, at any time and
from time to time, at such holder's option, to convert any or all of such
holder's shares of Series A Preferred Stock, in whole or in part, into
fully paid and non-assessable shares of Common Stock at the conversion
price of $56.525 per share of Common Stock, subject to adjustment as
described in Section 7(c)  (as adjusted, the "Conversion Price").  The
number of shares of Common Stock into which a share of the Series A
Preferred Stock shall be convertible (calculated as to each conversion to
the nearest 1/1,000,000th of a share) shall be determined by dividing
$50.00 by the Conversion Price in effect at the time of conversion.

(ii)  If shares of Series A Preferred Stock are called for redemption
in accordance with Section 5(a), the right to convert shares so called for
redemption shall terminate at the close of business on the Business Day
immediately preceding the date fixed for redemption unless the Corporation shall
default in making payment of the amount payable upon such redemption, in which
case the conversion rights for such shares shall continue.

(b)  Mechanics of Conversion.

(i)  To exercise the conversion right, the holder of shares of Series A
Preferred Stock to be converted shall surrender the certificate or certificates
representing such shares at the office of the Corporation (or any transfer agent
of the Corporation previously designated by the Corporation to the holders of
Series A Preferred Stock for this purpose) with a written notice of election to
convert completed and signed, specifying the number of shares to be converted.
Unless the shares issuable upon conversion are to be issued in the same name as
the name in which such shares of Series A Preferred Stock are registered, each
share surrendered for conversion shall be accompanied by instruments of
transfer, in form satisfactory to the Corporation, duly executed by the holder
or the holder's duly authorized attorney and an amount sufficient to pay any
transfer or similar tax in accordance with Section 7(b)(vii). As promptly as
practicable after the surrender by the holder of the certificates for shares of
Series A Preferred Stock as aforesaid, the Corporation shall issue and shall
deliver to such holder, or on the holder's written order to the holder's
transferee, a certificate or certificates for the whole number of shares of
Common Stock issuable upon the conversion of such shares and a check payable in
an amount corresponding to any fractional interest in a share of Common Stock as
provided in Section 7(b)(viii).

(ii)  Each conversion shall be deemed to have been effected immediately
prior to the close of business on the first Business Day (the "Conversion Date")
on which the certificates for shares of Series A Preferred Stock shall have been
surrendered and such notice received by the Corporation as aforesaid. At such
time on the Conversion Date:

(w)  the person in whose name or names any certificate or certificates
for shares of Common Stock shall be issuable upon such
conversion shall be deemed to have become the holder of record
of the shares of Common Stock represented thereby at such time;

(x)  such shares of Series A Preferred Stock shall no longer be deemed to
be outstanding and all rights of a holder with respect to such
shares surrendered for conversion shall immediately terminate
except the right to receive the Common Stock and other amounts
payable pursuant to this Section 7;

(y)  in lieu of dividends on such Series A Preferred Stock pursuant to
Section 3, such shares of Series A Preferred Stock shall
participate equally and ratably with the holders of shares of
Common Stock in all dividends paid on the Common Stock; and

(z)  the right of the Corporation to redeem such shares of Series A
Preferred Stock shall terminate, regardless of whether a notice
of redemption has been mailed as aforesaid.

All shares of Common Stock delivered upon conversion of the Series A Preferred

XXX-002479

Stock will, upon delivery, be duly and validly issued and fully paid and non-assessable, free of all liens and charges and not subject to any preemptive rights.

(iii) Holders of shares of Series A Preferred Stock at the close of business on a Dividend Payment Record Date shall be entitled to receive the dividend payable on such shares on the corresponding Dividend Payment Date notwithstanding the conversion thereof following such Dividend Payment Record Date and prior to such Dividend Payment Date. However, shares of Series A Preferred Stock surrendered for conversion during the period between the close of business on any Dividend Payment Record Date and the opening of business on the corresponding Dividend Payment Date (except shares converted after the issuance of a notice of redemption during such period, which shall be entitled to such dividend on the Dividend Payment Date) must be accompanied by payment of an amount equal to the dividend payable on such shares on such Dividend Payment Date; provided that notwithstanding such surrender of shares for conversion after such Dividend Payment Record Date, the holders thereof at the close of business on such Dividend Payment Record Date shall be entitled to receive the dividend payable on such shares on the corresponding Dividend Payment Date. A holder of shares of Series A Preferred Stock on a Dividend Payment Record Date who (or whose transferee) tenders any such shares for conversion into shares of Common Stock on such Dividend Payment Date will receive the dividend payable by the Corporation on such shares of Series A Preferred Stock on such date, and the converting holder need not include payment of the amount of such dividend upon surrender of shares of Series A Preferred Stock for conversion.

(iv) Except as provided in clause (iii) above and in Section 7(c), the Corporation shall make no payment or adjustment for accrued and unpaid dividends on shares of Series A Preferred Stock, whether or not in arrears, on conversion of such shares or for dividends in cash on the shares of Common Stock issued upon such conversion.

(v) The Corporation covenants that it will at all times reserve and keep available, free from preemptive rights, such number of its authorized but unissued shares of Common Stock as shall be required for the purpose of effecting conversions of the Series A Preferred Stock. Prior to the delivery of any securities which the Corporation shall be obligated to deliver upon conversion of the Series A Preferred Stock, the Corporation shall comply with all applicable federal and state laws and regulations which require action to be taken by the Corporation.

(vi) The Corporation will pay any and all documentary stamp or similar issue or transfer taxes payable in respect of the issuance or delivery of shares of Common Stock on conversion of the Series A Preferred Stock pursuant hereto; provided that the Corporation shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance or delivery of shares of Common Stock in a name other than that of the holder of the Series A Preferred Stock to be converted, and no such issuance or delivery shall be made unless and until the person requesting such issuance or delivery has paid to the Corporation the amount of any such tax or has established, to the satisfaction of the Corporation, that such tax has been paid.

(vii) In connection with the conversion of any shares of Series A Preferred Stock, no fractions of shares of Common Stock shall be issued, but in lieu thereof the Corporation shall pay a cash adjustment in respect of such fractional interest in an amount equal to such fractional interest multiplied by the Daily Price (as defined below) per share of Common Stock on the Conversion Date. In the absence of a Daily Price, the Board of Directors shall in good faith determine the current market price on such basis as it considers appropriate, and such current market price shall be used to calculate the cash adjustment. As used herein, "Daily Price" means (w) if the shares of such class of Common Stock are then listed and traded on the New York Stock Exchange, Inc. ("NYSE"), the closing price on such day as reported on the NYSE Composite Transactions Tape; (x) if the shares of such class of Common Stock are not then listed and traded on the NYSE, the closing price on such day as reported by the principal national securities exchange on which the shares are listed and traded; (y) if the shares of such class of Common Stock are not then listed and traded on any such securities exchange, the last reported sale price on such day on the National Market of the National Association of Securities Dealers, Inc. Automated Quotation System ("NASDAQ"); or (z) if the shares of such class of Common Stock are not then traded on the NASDAQ National Market, the average of the highest reported bid and lowest reported asked price on such day, as reported by NASDAQ.

(c) Adjustments to Conversion Price. The Conversion Price shall be adjusted from time to time as follows:

(i) If, at any time after the date of issuance of the Series A Preferred Stock, the Corporation shall pay a dividend or make a distribution on any class of its capital stock in shares of its Common Stock, subdivide its outstanding shares of Common Stock into a greater number of shares or combine its outstanding shares of Common Stock into a smaller number of shares, the Conversion Price in effect immediately prior thereto shall be adjusted as provided below so that the Conversion Price thereafter shall be determined by multiplying the Conversion Price at which the shares of Series A Preferred Stock were theretofore convertible by a fraction, the numerator of which shall be the number of shares of Common Stock outstanding immediately prior to such action, and the denominator of which shall be the number of shares of Common Stock outstanding immediately following such action. Such adjustment shall be made whenever any event listed above shall occur and shall become effective retroactively immediately after the record date in the case of a dividend and immediately

XXX-002480

after the effective date in the case of a subdivision or combination.

(ii)  If, at any time after the date of issuance of the Series A Preferred Stock, the Corporation shall issue rights or warrants to all holders of its Common Stock entitling them (for a period expiring within 45 days after the record date for determining stockholders entitled to receive such rights or warrants) to subscribe for or purchase shares of Common Stock at a price per share less than the current market price per share of Common Stock at the record date therefor (as determined in accordance with the provisions of Section 7(c)(iv), the "Current Market Price"), or in case the Corporation shall issue to all holders of its Common Stock other securities convertible into or exchangeable for Common Stock for a consideration per share of Common Stock deliverable upon conversion or exchange thereof less than the Current Market Price, then the Conversion Price in effect immediately prior thereto shall be adjusted as provided below so that the Conversion Price therefor shall be equal to the price determined by multiplying the Conversion Price at which shares of Series A Preferred Stock were theretofore convertible by a fraction of which the numerator shall be the sum of (1) the number of shares of Common Stock outstanding on the date of issuance of the convertible or exchangeable securities, rights or warrants and (2) the number of additional shares of Common Stock that the aggregate offering price for the number of shares of Common Stock so offered would purchase at the Current Market Price per share of Common Stock, and of which the denominator shall be the sum of the number of shares of Common Stock outstanding on the date of issuance of such convertible or exchangeable securities, rights or warrants and the number of additional shares of Common Stock offered for subscription or purchase, or issuable upon such conversion or exchange.  Such adjustment shall be made whenever such convertible or exchangeable securities, rights or warrants are issued, and shall become effective immediately after the record date for the determination of stockholders entitled to receive such securities.  However, upon the expiration of any right or warrant to purchase Common Stock, the issuance of which resulted in an adjustment in the Conversion Price pursuant to this Section 7(c)(ii), if any such right or warrant shall expire and shall not have been exercised, the Conversion Price shall be recomputed immediately upon such expiration and effective immediately upon such expiration shall be increased to the price it would have been (but reflecting any other adjustments to the Conversion Price made pursuant to the provisions of this Section 7(c) after the issuance of such rights or warrants) had the adjustment of the Conversion Price made upon the issuance of such rights or warrants been made on the basis of offering for subscription or purchase only that number of shares of Common Stock actually purchased upon the exercise of such rights or warrants.  No further adjustment shall be made upon exercise of any right, warrant, convertible security or exchangeable security if any adjustment shall have been made upon issuance of such security.

(iii)  If, at any time after the date of issuance of the Series A Preferred Stock, the Corporation shall distribute to all holders of its Common Stock (including any dividend paid in connection with a consolidation or merger in which the Corporation is the continuing corporation) any shares of capital stock of the Corporation or its subsidiaries (other than Common Stock) or evidences of its indebtedness, cash or other assets (excluding dividends payable solely in cash that may from time to time be fixed by the Board of Directors, or dividends or distributions in connection with the liquidation, dissolution or winding up of the Corporation) or rights or warrants to subscribe for or purchase any of its securities or those of its subsidiaries or securities convertible or exchangeable for Common Stock (excluding those securities referred to in Section 7(c)(ii)), then in each such case the Conversion Price in effect immediately prior thereto shall be adjusted as provided below so that the Conversion Price thereafter shall be equal to the price determined by multiplying (A) the Conversion Price in effect on the record date mentioned below by (B) a fraction, the numerator of which shall be the Current Market Price per share of Common Stock on the record date mentioned below less the then fair market value (as determined by the Board of Directors, whose good faith determination shall be conclusive) as of such record date of the assets, evidences of indebtedness or securities so paid with respect to one share of Common Stock, and the denominator of which shall be the Current Market Price per share of Common Stock on such record date; provided, however, that in the event the then fair market value (as so determined) so paid with respect to one share of Common Stock is equal to or greater than the Current Market Price per share of Common Stock on the record date mentioned above, in lieu of the foregoing adjustment, adequate provision shall be made so that each holder of shares of Series A Preferred Stock shall have the right to receive the amount and kind of assets, evidences of indebtedness, or securities such holder would have received had such holder converted each such share of Series A Preferred Stock immediately prior to the record date for such dividend.  Such adjustment shall be made whenever any such payment is made, and shall become effective retroactively immediately after the record date for the determination of stockholders entitled to receive the payment.

(iv)  For the purpose of any computation under Sections 7(c)(ii) or 7(c)(iii), the Current Market Price per share of Common Stock at any date shall be deemed to be the average Daily Price for the 30 consecutive trading days commencing 35 trading days before the day in question.

(v)  No adjustment in the Conversion Price shall be required unless the adjustment would require an increase or decrease of at least 1% in the Conversion Price then in effect; provided, however, that any adjustments that by reason of this Section 7(c)(v) are not required to be made shall be carried forward and taken into account in any subsequent adjustment.  All calculations under this Section 7(c) shall be made to the nearest cent.

XXX-002481