# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - -

In Re:                  : Chapter 11
                        :
                        : Case No.
W.R. GRACE & CO., et al,: 01-01139 JKF
                        :
                        : (Jointly
        Debtors         : Administered)

- - -

Wednesday, August 25, 2009

- - -

Oral deposition of KAREN O. McKEE, taken pursuant to notice, was held at the offices of PEPPER HAMILTON, LLP, Two Logan Square, 30th Floor, 18th & Arch Streets, Philadelphia, Pennsylvania, commencing at 10:11 a.m., on the above date, before Lori A. Zabielski, a Registered Professional Reporter and Notary Public.

- - -

MAGNA LEGAL SERVICES
Seven Penn Center
1635 Market Street
8th Floor
Philadelphia, Pennsylvania 19103

fc77ba30-9d7a-4fcc-ad18-fb2be8b69fa4

### Page 6

```
 1            - - -
 2      DEPOSITION SUPPORT INDEX
 3            - - -
 4
 5   Direction to Witness Not to Answer:
 6   Page  Line      Page  Line
 7    43   10         44    01
 8
 9
10   Request for Production of Documents:
11   Page  Line      Page  Line
12   NONE
13
14
15   Stipulations:
16   Page  Line      Page  Line
17    07   04
18
19
20   Area(s) Marked Confidential:
21   Page  Line      Page  Line
22   NONE
23
24
```

### Page 7

```
 1            - - -
 2          PROCEEDINGS
 3            - - -
 4        (It is hereby stipulated and
 5   agreed by and among counsel for
 6   the respective parties that the
 7   reading, signing, filing, sealing
 8   and certification of the
 9   deposition are waived; and that
10   all objections, except as to the
11   form of the question, will be
12   reserved until the time of trial.)
13            - - -
14        KAREN O. McKEE, after having
15   been first duly sworn, was
16   examined and testified as follows:
17            - - -
18          EXAMINATION
19            - - -
20   BY MR. SCHIAVONI:
21        Q.  Ms. McKee, can you tell me
22   what your current position is with BNSF?
23        A.  Yes, sir.  My title is
24   manager of corporate policies,
```

### Page 8

```
 1   compliance, and records.
 2        Q.  And how long have you worked
 3   for BNSF?
 4        A.  I have worked for BNSF since
 5   June 5th, 2006.
 6        MS. DeCRISTOFARO:  I don't
 7   want to interrupt, but who do you
 8   mean by BNSF?  I thought maybe we
 9   could get that out of the way.  Do
10   you mean the railway?
11   BY MR. SCHIAVONI:
12        Q.  Actually, who technically is
13   your employer?  What's the full name of
14   the company?
15        A.  BNSF Railway Company.
16        Q.  Okay.  And where did you
17   work prior to June 5th, 2006?
18        A.  I joined the railroad -- I
19   am sorry.  I joined the railroad
20   June 5th, 2006.  I have been in my
21   current position since November of 2007.
22   Prior to that, I worked for Walco
23   International.
24        MR. PHILLIPS:  Can you spell
```

### Page 9

```
 1   that for us?
 2        THE WITNESS:  It's
 3   W-A-L-C-O.
 4   BY MR. SCHIAVONI:
 5        Q.  And what does Walco
 6   International do, generally?
 7        A.  It's a distributor of animal
 8   health products.
 9        Q.  And how long did you work
10   there?
11        A.  I worked there for
12   six years.
13        Q.  All right.  And so you
14   worked at Walco from sometime in 2000 to
15   June of 2006?
16        A.  That's correct.
17        Q.  Where did you work before
18   that?
19        A.  I worked For Nurse Finders.
20        Q.  And what does Nurse Finders
21   do?
22        A.  It places nurses in
23   hospitals and for home care.
24        Q.  Okay.  And what was the
```

Page 14

1  A. Manager, corporate policies,
2  compliance, and records.
3  Q. And you assumed that role in
4  November of '07?
5  A. That's correct.
6  Q. And what did you do for BNSF
7  before that? Did you have a different
8  position or title?
9  A. I was in a different
10 position. I was hired as a corporate
11 paralegal.
12 Q. And did you work in a
13 particular division or part of a company
14 as a corporate paralegal?
15 A. In the law department.
16 Q. Okay. And who did you work
17 for in the law department?
18 A. I reported directly to Doug
19 Warner, but I worked with the corporate
20 group.
21 Q. And as the manager of
22 corporate policies and records, who do
23 you report to?
24 Let me ask you another

Page 15

1  question. Do you work in a particular
2  division or group of the company?
3  A. Yes, sir. I am still in the
4  law department.
5  Q. And do you report to anyone
6  specifically in the law department?
7  A. I report directly to James
8  Obermiller. It's O-B-E-R-M-I-L-L-E-R.
9  Q. And can you describe for us
10 what your responsibilities are as manager
11 of corporate policies and records of
12 BNSF?
13 A. I manage the corporate
14 policies. If there is a new policy, we
15 have certain procedures for ensuring that
16 those policies are appropriately
17 approved and that existing policies are
18 reviewed on a timely basis. I do a lot
19 of work on the code of conduct and other
20 compliance issues. I work closely with
21 the person who manages our hold orders
22 and with corporate support who manages
23 our records.
24 Q. Let me just see if I can go

Page 16

1  through those one by one.
2  The existing policies that
3  you manage, those are insurance policies,
4  I take it, right?
5  A. I am sorry. Corporate
6  policies.
7  Q. Okay. In general terms, can
8  you tell us what is the nature of the
9  corporate policies that you manage?
10 First of all, they are not insurance
11 policies, right?
12 A. No, sir, they are not
13 insurance policies.
14 Q. What are they then?
15 A. They would be, like, our
16 gift policy, travel policy, our code of
17 conduct, general policies that apply to
18 our corporate population.
19 Q. And is it fair to say that
20 you maintain those policies in some form
21 or nature? Is that your role?
22 A. That is a portion of my
23 role, yes.
24 Q. Okay. Does your role also

Page 17

1  include formulating corporate policies?
2  A. Occasionally, I will draft
3  policies that would then be vetted
4  through many other people before they
5  became policies.
6  Q. Okay. And is one of your
7  roles to circulate the corporate policies
8  and make sure that people are familiar
9  with them?
10 A. Yes, it is.
11 Q. Okay. And another thing you
12 mentioned was the code of conduct. Is
13 that sort of a policy in and of itself an
14 ethics policy for employees and officers
15 of the company?
16 A. Yes, sir, it is.
17 Q. Okay. And then the third
18 thing you mentioned were hold orders. I
19 just don't know what you had in mind
20 there. Can you expand a little bit on
21 that?
22 A. One of the policies that I
23 manage is the records and information
24 retention policy, and a part of that

### Page 18

**BNSF** [margin annotation, bracketing lines 1-8]

1  policy has to do with hold orders, when
2  documents are placed on hold, which
3  suspends them from their normal retention
4  period. And we have a person who manages
5  that process, who sends out the notices
6  and tracks the responses so that we know
7  where those various records are located.
8  I work very closely with him.
9      Q.  And there was a fourth
10 category of things. I thought you said
11 requests which I have in my notes here.
12 Are there any requests that you issue as
13 part of your role?
14     A.  Requests for various things
15 to carry out my responsibilities.
16     Q.  Okay. Maybe we will come
17 back to that in a bit. I may have it
18 wrong in my notes.
19         With respect to your
20 position, with respect to your
21 responsibilities for record retention
22 policies and practices, do you report to
23 anyone specifically?
24     A.  I report to James

### Page 19

1  Obermiller.
2      Q.  Okay. And who is it in the
3  company that is responsible for
4  formulating record retention policies and
5  practices?
6      A.  The law department is the
7  owner of the record retention and
8  information policy. We have schedules
9  that apply to various types of records.
10 We work with the business owner of those
11 records, and we work with attorneys who
12 are knowledgeable in that area to ensure
13 that our policy in terms of retention
14 periods complies with law.
15     Q.  Okay. And I take it one
16 thing you have is you actually have a
17 policy and a practice with regard to how
18 long particular documents are to be
19 retained; is that right?
20     A.  Yes, sir.
21     Q.  And one of your jobs is to
22 sort of maintain those policies and
23 practices in some sort of written form?
24     A.  Yes, sir.

### Page 20

1      Q.  Who is it in the company
2  that is actually responsible for
3  formulating those policies and practices?
4      A.  It's managed by my
5  department, but it is formulated by
6  meeting with the businesspeople and with
7  attorneys in the law department.
8      Q.  Okay. Is it Mr. Obermayer
9  or --
10         MR. PHILLIPS: Obermiller.
11        THE WITNESS: Obermiller.
12 BY MR. SCHIAVONI:
13     Q.  Obermiller, is he one the
14 who is in charge of formulating record
15 retention policies and practices?
16     A.  It's a unified effort.
17 There is not one person that is
18 responsible that says this is what our
19 retention period is going to be. We have
20 to work with the departments and with the
21 attorneys. I think that's what you are
22 asking me --
23     Q.  Yes.
24     A.  -- is who decides how long

### Page 21

1  you are going to retain this record and
2  how long you are going to retain this
3  record.
4      Q.  Right.
5      A.  It depends on the record.
6  And, as I said, we work with the
7  businesspeople, how long do you need it,
8  what do you use it for, how long do you
9  need it for a business purpose; and then
10 we work with the appropriate attorney
11 within the law department. I manage that
12 process. And we say, what are the legal
13 requirements for these type of documents,
14 and that's how it's determined what
15 retention period was put on the document.
16     Q.  Are there different lawyers
17 in the BNSF law department who are
18 responsible for participating in the
19 formulation of document retention
20 policies for different types of
21 documents?
22     A.  That would be true, yes.
23     Q.  And who is it in the law
24 department who is responsible for

Page 38

1  fair to say you don't know who he is or
2  who he was employed by?
3      A.  T.J.?
4      Q.  T.J. Slattery, yes.
5      A.  He was employed by the Great
6  Northern.
7      Q.  Are you looking at the
8  exhibit list in front of you?
9      A.  I am.
10     Q.  Okay. Mr. Slattery, other
11 than the fact that he is on the list, do
12 you have any independent basis to know
13 that he was employed by the Great
14 Northern Railroad Company?
15     A.  Yes, sir, I do.
16     Q.  And what is that?
17     A.  I have seen documents with
18 his name on it that are Great Northern
19 documents, and my understanding is he was
20 in-house counsel.
21     Q.  And what is that
22 understanding based on?
23     A.  Based on correspondence and
24 documents that I have seen over the

[Handwritten annotation: "BNSF" with bracket marking lines 10-20]

Page 39

1  course of my employment.
2      Q.  So it's things that you read
3  in papers that were in your files?
4      A.  Yes, sir.
5      Q.  Okay. Do you know, the
6  documents that were found in your files,
7  based on the search done before you were
8  manager of corporate policies and
9  records, do you know where they came
10 from, the individual documents?
11     A.  The contracts, the deeds,
12 those types of records were kept in the
13 normal course of business of Great
14 Northern Railway which was located in
15 Saint Paul. It came from their offices.
16     Q.  And how do you know that?
17     A.  I know that through my
18 corporate knowledge from working with the
19 company, from knowing some of the
20 history.
21     Q.  Well, specifically, what is
22 it that informs you that a particular
23 document came from Great Northern as
24 opposed to it was obtained from Marsh &

Page 40

1  McLennan or from some other source? Is
2  there some notation or some memo or note
3  in the files that tells you where the
4  document came from?
5      A.  The documents that are in
6  our files are corporate records, and
7  that's why they are in our possession.
8      Q.  Well, you are not claiming,
9  are you, that the copies of the insurance
10 policies that are listed here as exhibits
11 that were issued to Zonolite have been in
12 your files, that they came from your
13 files, are you? You got these from a
14 lawyer outside the company, didn't you?
15     A.  I would assume that's true,
16 yes, sir.
17     Q.  Let's sort of step back and
18 talk about this search for a second.
19          The search that was done
20 before you were manager of corporate
21 policies and records that was a search
22 that was done not just of BNSF's records
23 but also you had outside counsel
24 undertake a search of other people's

Page 41

1  records, right?
2      A.  My understanding from the
3  people I talked to was we searched the
4  Great Northern records, they reached out
5  to people in the field, they reached out
6  to people in various departments, risk
7  management departments, wherever our
8  corporate records might have been.
9      Q.  But did they also reach out
10 to sources outside of the BNSF company?
11     A.  I don't know.
12     Q.  Okay. And your
13 understanding as to where these documents
14 came from is based on what other people
15 told you, right?
16     A.  Yes, sir.
17     Q.  And the other people that
18 told you where these records came from,
19 are they lawyers?
20     A.  Some were lawyers; some were
21 not.
22     Q.  Okay. Tell us who the
23 lawyers were that told you where the
24 records came from.

11 (Pages 38 to 41)

Page 42

1  MR. PHILLIPS: I think you
2  are going to have to specify which
3  records you are talking about,
4  Counsel.
5  MR. SCHIAVONI: Okay.
6  BY MR. SCHIAVONI:
7  Q. Part of your knowledge about
8  where the records came from is based upon
9  speaking to lawyers; is that right?
10  A. Yes, sir.
11  Q. Tell us who those lawyers
12  were.
13  A. As it relates to this case
14  specifically?
15  Q. Yes, yes.
16  A. I spoke with Jim Roberts in
17  our offices; I have worked with
18  Mr. Phillips.
19  Q. Okay. And what did
20  Mr. Roberts tell you about where the
21  source was of the documents that are in
22  your files and that concern this case?
23  MR. PHILLIPS: And I will
24  object to it on attorney-client

Page 43

1  privilege, but I will allow the
2  witness to answer as long as we
3  have an agreement that it doesn't
4  constitute a waiver of other
5  attorney-client privilege issues.
6  MR. SCHIAVONI: I can't
7  agree to that if this witness is
8  going to be called to testify. So
9  I will just press the question.
10  MR. PHILLIPS: Then I
11  instruct the witness not to
12  answer.
13  BY MR. SCHIAVONI:
14  Q. All right. Ms. McKee, can
15  you tell us what Mr. Phillips told you
16  about the source of the documents that
17  form the basis for your knowledge about
18  the records in your file?
19  MR. PHILLIPS: Same offer of
20  allowing this question to be
21  answered is made.
22  MR. SCHIAVONI: I think I
23  need the freedom to inquire, Bob,
24  so I can't agree to that.

Page 44

1  MR. PHILLIPS: Then I will
2  instruct the witness not to
3  answer.
4  BY MR. SCHIAVONI:
5  Q. Ms. McKee, you can't testify
6  that all of the documents that are -- why
7  don't we mark as Exhibit-1 the list
8  that's in front of you. Okay. That
9  might be help.
10  MR. PHILLIPS: Could we give
11  it a different number because we
12  are going to have Exhibit-1 here.
13  MR. SCHIAVONI: Sure. What
14  number would you propose?
15  MR. PHILLIPS: This witness
16  is going to discuss numbers 1
17  through 82. The protocol you have
18  been using is to use the witness's
19  name and then 1, right? Let's do
20  that, McKee-1.
21  MR. SCHIAVONI: We can do a
22  letter. We can do it a letter,
23  and you can leave the other ones.
24  MR. PHILLIPS: Fair enough.

Page 45

1  MR. SCHIAVONI: We will make
2  this McKee-A.
3  (McKee-A marked for
4  identification at this time.)
5  BY MR. SCHIAVONI:
6  Q. Ms. McKee, we have marked as
7  Exhibit-A, McKee-A, this list that's in
8  front of you.
9  Can you tell us what you
10  understand the list to be?
11  A. I understand this to be a
12  list of the exhibits which I have
13  reviewed.
14  Q. Okay. And am I correct that
15  as of today, you have a file in your
16  office that includes these documents that
17  are listed under Exhibit-A?
18  A. We have files that include
19  these documents.
20  Q. Okay. And, Ms. McKee, am I
21  correct that the documents that are
22  listed on Exhibit-A are in your files as
23  a result of a search that took place
24  before you were manager of corporate

**BNSF**

Page 46

1  policies and records?
2     A.  Yes, sir.
3     Q.  And am I correct that you
4  can't identify with specificity which of
5  the documents on Exhibit-A were obtained
6  through that search from BNSF files as
7  opposed to files maintained by third
8  parties other than BNSF, because you
9  didn't participate in that search?
10    A.  I did not participate in the
11 search, no, sir.
12        MR. PHILLIPS:  When you say
13    other third parties, are you
14    including in that predecessors of
15    BNSF?
16        MR. SCHIAVONI:  No.  Let me
17    ask it again.
18 BY MR. SCHIAVONI:
19    Q.  Ms. McKee, is it fair to say
20 that you can't identify with specificity
21 which of the documents on Exhibit-A were
22 obtained from this search that was done
23 before you were manager of corporate
24 records from BNSF files as opposed to

Page 47

1  companies other than BNSF?
2        And I am not including the
3  predecessors here.  You know, companies
4  like Marsh Mac, companies that don't have
5  an affiliation with BNSF.
6     A.  My understanding is that
7  these files came from BNSF and its
8  predecessor company records.
9     Q.  Well, some did but not all
10 of them; isn't that right?
11    A.  My understanding is that
12 they all did.
13        Now, I understand where you
14 are going in saying this was a document,
15 but it was transmitted to our company as
16 a record and retained as a part of a
17 contract.
18    Q.  By the way, when you say
19 it's your understanding that they all
20 came from your files, that's something
21 that is based entirely on what other
22 people told you, right?
23    A.  Yes, sir.
24    Q.  And just to point out an

Page 48

1  example here is that you can't testify
2  with any personal knowledge that these
3  Royal insurance policies that are listed
4  here under item 14 came from BNSF's
5  files, can you?
6     A.  My understanding is that
7  they did.
8     Q.  Well, tell us, who told you
9  that?  Who represented that to you?
10    A.  I spoke with people in
11 corporate support that were involved in
12 the initial search, and the initial
13 search to my understanding was of our
14 corporate records.
15    Q.  Okay.  I want to know the
16 name of the person at BNSF who told you,
17 Ms. McKee, that the Royal insurance
18 policies listed under item 14 were in
19 your files at BNSF, that that's where
20 they were found.
21    A.  I can't specifically tell
22 you the name.
23        MR. PHILLIPS:  And you will
24    note that we are aren't

Page 49

1     designating this witness as the
2     person founding Exhibit-14.
3         MR. SCHIAVONI:  I think it
4     just goes to general credibility.
5         MR. PHILLIPS:  You can ask.
6     I just was letting you know that's
7     not the purpose of this witness.
8  BY MR. SCHIAVONI:
9     Q.  And did someone tell you
10 that the Maryland Casualty policies that
11 are listed under 14 came from BNSF's
12 files?
13    A.  I didn't speak to them
14 specifically about the policies.  I spoke
15 to them in general about the documents
16 that were in our files.
17    Q.  But you are saying all these
18 documents on Exhibit-A were in your
19 files, right?
20    A.  Yes, sir.
21    Q.  Okay.  So they told you that
22 every document on this list, Exhibit-a,
23 was in your files?
24    A.  That's my understanding,

13 (Pages 46 to 49)

Page 74

1   Q.  I got you.  Okay.
2       Does BNSF have sort of an
3   index or a log of all of the agreements
4   it's entered it and its predecessors have
5   entered into?
6   A.  Yes, sir.
7   Q.  Okay.  Is that maintained in
8   some sort of database?
9   A.  Yes, sir.
10  Q.  So, I take it, that's
11  searchable in some way?
12  A.  Yes, sir.
13  Q.  Okay.  And the documents
14  themselves, the agreements themselves,
15  are they maintained in a form other than
16  in paper?  Like, for instance, are they
17  all microfilmed or on a CD or something
18  or in some other format?
19  A.  Today, we scan the documents
20  and have them in electronic format.  I
21  can't tell you, for sure, how far back
22  that goes.  I know there is an effort to
23  get to the point where they are all
24  scanned.

Page 75

1   Q.  Okay.  And these documents
2   that are listed generally under 1A to 13,
3   does BNSF maintain in its file the actual
4   signed copies of these, the original
5   signed copies?  Is that what one would
6   find if they traveled out to Fort Worth
7   and pulled the file?
8   A.  Generally speaking, yes.
9   Q.  And when you assumed --
10  well, let ask it differently.
11      Do you have a general log of
12  agreements that Great Northern entered
13  into when -- let me ask it differently.
14      What I am wondering is when
15  BNSF acquired Great Northern, did it get
16  a list of here are all our contracts, and
17  you have that list, a sort of Great
18  Northern contract list maintained
19  somewhere as its own separate stand-alone
20  document?
21  A.  I don't know.  I have never
22  seen anything like that.
23  Q.  Okay.  We talked earlier
24  about the search that was done before you

Page 76

1   were manager of corporate policies and
2   records, the documents that were found as
3   a result.
4       Where are those documents
5   physically maintained now?
6   A.  In Fort Worth, Texas.
7   Q.  Do you have a sub-collection
8   of these?  Do you have a collection of
9   these documents concerning Libby and
10  Grace?  I thought you were sort of
11  suggesting that you have a file somewhere
12  in your office.  Am I mistaken in that
13  respect?
14  A.  We have files in our office.
15  They are filed by contract number for the
16  contracts.  A lot of the correspondence
17  is in the file with the contracts.
18  That's how it was done in those days.
19  That's not how we do it now.
20      However, I actually pulled
21  some of the contract files.  I did a
22  sampling.  I did searches to confirm that
23  things were there.  I didn't pull every
24  single document to confirm it's there,

Page 77

1   but I pulled over 50 percent of these
2   documents.
3   Q.  Okay.  So, Ms. McKee, do you
4   maintain a file yourself, either you or
5   your group, of the documents that are
6   listed on Exhibit-A or some subset of the
7   documents listed on Exhibit-A?
8   A.  Yes.  We have these
9   documents.  If you are asking me if we
10  have these all together in a litigation
11  file, that's not how they are filed.
12  They are filed as Great Northern
13  documents with their file numbers in our
14  warehouse, which is searchable in the
15  database, which I can access and pull.
16  Q.  Okay.  Let me ask it a
17  little differently.  All right.
18      One thing you are saying is
19  that the documents listed on Exhibit-A,
20  either many or all of these documents,
21  are somewhere in the railroad's files.
22      But are you aware of any
23  single collection of the documents listed
24  on Exhibit-A or some subset of them being