IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>W.R. GRACE & CO., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 01-01139 (JKF)<br>(Jointly Administered)<br><br>Hearing Date: September 8, 2009 at 11:00 a.m.<br>Objection Deadline: August 28, 2009<br><br>Ref. No. 22800 |

## LIBBY CLAIMANTS' BRIEF IN RESPONSE TO PLAN PROPONENTS' MOTION IN LIMINE TO PRECLUDE EXPERT TESTIMONY ON BEHALF OF THE LIBBY CLAIMANTS BASED UPON AN ALLEGED FAILURE TO PRODUCE RELIANCE MATERIALS

The claimants injured by exposure to asbestos from the Debtors' operations in Lincoln County, Montana (the "Libby Claimants"),[1] by and through their counsel, Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP, hereby file this brief in opposition to the Plan Proponents' Motion in Limine to Preclude Expert Testimony on Behalf of the Libby Claimants Where the Reliance Materials on Which the Testimony is Based Have Not Been Produced [D.I. 22800] (the "Motion in Limine").

### INTRODUCTION

1. This Court is by now certainly familiar with the Debtors' claim that Dr. Whitehouse relies upon, yet failed to produce, medical records regarding the 1,800 asbestos patients treated at the CARD Clinic in Libby, Montana, where Dr. Whitehouse practiced.[2]

---

[1] As identified in the Amended and Restated Verified Statement of Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP Pursuant to Fed. R. Bankr. P. 2019 [D.I. 22784], as it may be amended and restated from time to time.

[2] The Libby Claimants do not intend to reargue issues already addressed by the Court, but must respond to the Plan Proponents' filing – itself a repeat of past arguments - and in particular their whole reliance on an inaccurate factual record.

{393.001-W0002478.}

2.	The Plan Proponents' Motion in Limine depends upon an inaccurate factual portrayal of Dr. Whitehouse's "reliance" on 1,800 Libby patients' records in this case.[3] Debtors rely upon isolated and ultimately less than complete statements adduced from Dr. Whitehouse during one of his depositions as the basis for arguing that he relies upon 1,800 patients' records for his opinions in this case,[4] and for inappropriately trying to impose that false "reliance" on Drs. Frank and Molgaard.

3.	Omitted from the Plan Proponents' statements about 1,800 Libby patients are clear statements on the record that demonstrate Dr. Whitehouse <u>does not rely</u> upon all 1,800 patients of the Libby CARD Clinic for his opinions in this case. Rather, in appropriately discrete fashion, Dr. Whitehouse's various opinions in this case depend upon either his knowledge of and experience with the 950 Libby Claimants, or his analysis of much smaller, distinct Libby patient groups who were the subjects of particular studies.

4.	Just as Libby Claimants admit that medical records regarding all 1,800 Libby asbestos victims have not been produced, neither have Plan Proponents disputed the fact that medical records were produced for all 950 Libby Claimants and for all subjects of Dr. Whitehouse's studies. There can be no dispute that all records supporting Dr. Whitehouse's specific opinions regarding Libby Claimants' asbestos disease have been produced.

5.	In short, as Libby Claimants will demonstrate, the Motion in Limine is based upon an entirely false set of assumptions and mischaracterizations about what Dr. Whitehouse relies upon for his opinions in this case. Neither Dr. Whitehouse, nor Drs. Frank and Molgaard,

---

[3] References to 1,800 originated from one statement in the Report of Dr. Alan C. Whitehouse, 12/29/08, ¶ 2, "I currently practice chest medicine at the [CARD] in Libby, Montana, where we have over 1,800 active cases of asbestos disease from exposure to Libby asbestos."

[4] *See* March 19, 2009, Deposition of Alan C. Whitehouse, M.D., 68:19-21 ("Q. So, there are 1800 people whose patient care over the years is relevant to your opinions in this case? A. Yes.") (quoted portion attached hereto as Exhibit 1). The March 19, 2009, deposition was terminated due to Dr. Whitehouse's illness.

2

should be precluded from offering their opinions in this case, as all of the reliance materials forming the basis of the Libby Claimants' expert testimony have been produced.

## ARGUMENT

**I.    Dr. Whitehouse has complied with FRCP 26(a)(2)(B) by producing all medical records that he actually analyzed and relied upon for his opinions in this case. No basis for excluding him, or the other Libby Claimants' Experts exists.**

6.     Plan Proponents erroneously and without any factual basis assert that "Dr. Whitehouse's opinions on Libby asbestos-related disease are predicated on his <u>analysis of</u> the medical records of 1,800 patients at the CARD Clinic whom he asserts were exposed to tremolite in Libby, Montana." (Motion in Limine, Br. at 2) (emphasis added). Their misrepresentations induced this Court into such a false belief, which they cite now in their Motion in Limine: "the reason he's gotten to [his] opinion is because he's <u>looked at</u> this population of 1,800 patients." *Id.*, at 4 (citing the May 14, 2009, Hearing Transcript (D.I. 21882), 105:12-13) (emphasis added).

7.     Dr. Whitehouse has never "analyzed" 1,800 Libby patients' medical records. The only time Dr. Whitehouse has ever "looked at this population of 1,800 patients" is on a case-by-case basis as their treating physician. He testified at his most recent deposition:[5]

> Q.    I haven't seen anywhere in your reports or in the medical literature an analysis of if you took all of those 1,800 people and tracked their lung function over time what, if any, decline you would see; is that correct?
> A.    No, I haven't, and several reasons for that. (Exh. 2, 44:2-7).
> . . . .
>
> Q.    Would you also agree with me that there are no studies with respect— published studies with respect to the 1,800 patients diagnosed in the CARD Clinic?
> A.    There are not. (Exh. 2, 198:9-13).

---

[5] *See* June 16, 2009, Deposition of Alan C. Whitehouse, M.D. Relevant portions are attached hereto as Exhibit 2.

3

{393.001-W0002478.}

Factually, there can be no controversy. He analyzed and performed well-defined, in some cases peer-reviewed studies on smaller groups of Libby patients.[6] Dr. Whitehouse did not ever specifically "analyze" the 1,800 Libby patients.

8.  Indeed, while Dr. Whitehouse recognizes his role in having treated all 1,800 CARD patients, he specifically distinguishes therein between the 950 Libby Claimants and the other 850 Libby asbestos patients:

> Q.  But there's—there's 1,800 people that are part of the clinic and there's 950 of them that are Libby claimants and you have more familiarity with that group than the 850 diseased patients that you see, but aren't the Libby claimants, correct?
> A.  That's true and particularly since there's been a lot added in the last year or so and I've been working less up there.
> Q.  And I believe I asked you this morning, but you haven't done anything to compare and contrast either the type of disease or the severity of the disease between the 850 other patients and the 950 who are Libby claimants, correct?
> A.  No. (Exh. 2, 84:17—85:5).

That distinction applies especially with regard to any work that Dr. Whitehouse performed beyond the scope of his case by case duties as a treating physician of asbestos patients. Referencing specifically his role as an expert witness for the represented Libby Claimants, he stated:

> Q.  Okay. Have you done anything to analyze the differences in either the type of disease that people have or how severe it is as compared between Mr. Heberling's and Mr. Lewis' clients and the 850 people who aren't— who have Libby asbestos disease who aren't their clients to see if there are any differences between those two groups?
> A.  No, we haven't done a formal study of that. (Exh. 2, 46:4-11).
>     . . . .

---

[6] These studies include: (a) Whitehouse (2004) "Asbestos Related Pleural Disease Due to Tremolite Associated With Progressive Loss of Lung Function: Serial Observations in 123 Miners, Family Members, and Residents of Libby, Montana," Am J Ind Med 46:219-225 [123 Libby patients]; (b) Whitehouse et al (2008) "Environmental Exposure to Libby Asbestos and Mesotheliomas," Am J Ind Med., 51(11):877-880 [11 Libby patients]; and (c) CARD mortality study [110 Libby patients].

4

> Q. And all that's been made available in this case is the 950 or thereabouts, correct?
> A. And that's basically all I've been talking about is those 950. (Exh. 2, 197:7-10).

Dr. Whitehouse is clear about having done nothing to put the other 850 Libby asbestos patients at issue in this case, and therefore he cannot be found to have relied upon their records when offering specific opinions regarding the 950 Libby Claimants.

9. Dr. Whitehouse testified that the opinions he will offer in this case are <u>based upon</u> no more than the 950 Libby Claimants (or particular study groups),[7] and not upon either the 850 non-Libby Claimants or upon all 1,800 Libby asbestos patients:

> Q. Okay. Would you agree with me that your opinions about someone who has been diagnosed with an asbestos-related non-malignant disease as a result of being exposed to Libby asbestos, that that person would have a probability of death are based on the CARD mortality study?
> A. <u>I'm only going to base that on the ones that I know about which is the Libby claimants, the 950 there</u>. (Exh. 2, 84:1-7) (emphasis added).
> . . . .
>
> Q. And so, basically, is it correct that what you're saying now is that you believe you can offer the opinions that you have to offer in this case without having to rely upon the full 1,800, rather you can express your views simply confined to the 950 people?
> A. Yeah, I think so for a number of reasons. (Exh. 2, 310:22—311:3).

10. Likewise, the opinions regarding Libby asbestos disease that Dr. Whitehouse intends to offer in this case <u>apply only to</u> the 950 Libby Claimants. He testified specifically and consistently that he did not intend to apply any of his opinions regarding Libby asbestos disease to the other 850 Libby asbestos patients or to all 1,800 patients as a whole:

> Q. Okay. And is it correct that you hold the opinion that someone who is diagnosed with a non-malignant asbestos disease caused by exposure to Libby asbestos is more likely than not going to die from an asbestos-related disease?
> A. Out of that 950?

---

[7] Indeed, the opinions that Dr. Whitehouse intends to offer in this case derive primarily from the 76 deaths in the CARD mortality study. *See* ¶¶ 31-32, Expert Report of Dr. Alan C. Whitehouse, May 2009.

5

> Q. Out of the 950 or the 1,800?
> A. Will you read - - repeat the question again.
> Q. Sure.
> A. I want to make sure I get it right.
> Q. Do you have an opinion—do you have an opinion to a reasonable degree of medical certainty that for the 950 Libby claimants who have been diagnosed with a non-malignant asbestos-related disease, that each one of them is more likely than not going to die from an asbestos-related disease?
> A. The death rate, when we've gone through the death certificates in all of these people, it's something like 57 percent - - or I think it was 52 percent on best information, 57 percent was significant association with asbestos disease - - I think that group of people has the same breakdown in percentages as the 950 - - approximately a third miners, and the balance are community members and family members. Community members are the majority - - I think you can make the extrapolation having looked at those people myself, that most of the people that died are my patients, looking at those, then <u>we're going to see the same thing in the 950</u> and so that there is a high probability or not a high probability, there's probability that they're going to die more than 50 percent from asbestos disease.
> Q. Okay. What about related - -
> A. And then add to that the cancers on top of it.
> Q. What about the 850? The 850 on this that aren't - -
> A. The 850?
> Q. Yeah.
> A. I'm not going to draw any conclusions. I don't know anything about them. (Exh. 2, 85:9-86:25) (emphasis added).
> . . . .
>
> Q. Okay. Now, you offered the view that you could use the information that you have about the 79 people from the CARD mortality study and extrapolate to the 950 or, thereabouts, people who have made claims in this case, right?
> A. Correct.
> Q. Okay. And I take it then that you're not going to be relying upon the remaining 850 people for any of your opinions in this case; is that right?
> A. No, there's no way I would be able to in - - (Exh. 2, 309:5-14).

11. Again, there is no ambiguity and can be no dispute. Dr. Whitehouse has based his opinions in this case upon, and intends to apply them strictly to, the 950 Libby Claimants or some other much smaller study group, all of whose records have been produced. The record

6

{393.001-W0002478.}

speaks for itself. Dr. Whitehouse should not be precluded from testifying on the grounds asserted in the Motion in Limine.

12. The Plan Proponents have stretched their mischaracterizations about Dr. Whitehouse's "reliance materials" throughout this case. Many of the arguments made here are found in and serve as the basis of the Plan Proponents' *Daubert* attack on the Libby Claimants' Experts. *See* D.I. XXX. The Motion in Limine wrongfully seeks to implicate Drs. Frank and Molgaard in FRCP 26(a)(2) obligations that might apply to Dr. Whitehouse. The Plan Proponents cite no authority that one expert's duty to produce materials as part of discovery extends to and could possibly infect all other experts. The Plan Proponents have never challenged, and there is no question now, that Drs. Frank and Molgaard have produced all of their own reliance materials. Nor is there any question that in addition to their review of Dr. Whitehouse's opinions, they have personal experience and opinions to offer based on their own involvement as experts in this case. Their fitness to testify should be determined exclusively in the context of *Daubert*, which is intended to focus on the substantive merits of an expert's particular testimony and his basis for such opinions. Relying instead on the Motion in Limine, which constitutes a second-hand procedural attack on Dr. Whitehouse, not the qualifications or methodology of Drs. Frank and Molgaard specifically, is unnecessary and ultimately the same kind of "end-run" around *Daubert* of which Libby Claimants have been accused. (Motion in Limine, Br. at 6). At the very least, the Motion in Limine is premature and the Court should wait for the time of trial, when <u>specific</u> questions or opinions involving Drs. Frank and Molgaard can be evaluated on the basis of whether they rely upon allegedly not produced in spite of a FRCP obligation to do so.

{393.001-W0002478.}

## II. Dr. Whitehouse's treating physician testimony is not appropriately the subject of this Motion in Limine.

13. First, the Motion in Limine claims that the Plan Proponents will not have an opportunity to respond to treating physician testimony that Dr. Whitehouse might give at trial because it could involve "patients whose records have not been produced." (Motion in Limine, Br. at 8). As stated above, Dr. Whitehouse's testimony in this case, no matter what his capacity, will only involve those patients whose records have been produced, either as part of the Libby Claimants whose claims are at issue or as a part of a particular study performed by Dr Whitehouse. The Plan Proponents have never refuted their receipt of all such records, but cite only the 850 other Libby asbestos patients whom Dr. Whitehouse is <u>not</u> relying upon as having not been produced to them. The Plan Proponents' claim cannot be a basis for any decision about the scope of Dr. Whitehouse's ability to testify as a treating physician.

14. The Court has postponed numerous times the issue of what testimony is relevant until the time of trial. Here, too, there are no grounds to determine pre-trial, without any specific line of questioning or proffer of testimony before the Court, that Dr. Whitehouse's testimony will not be relevant or for that matter duplicative, as also claimed in the Motion in Limine. Indeed, the Court has determined that Dr. Whitehouse may testify as a treating physician. The Court and all parties are more than capable of evaluating the Plan Proponents' concerns regarding relevance or duplication of testimony at trial, rather than here in the empty void about what such treating physician testimony might involve.

15. More generally, while Dr. Whitehouse's role as a treating physician of Libby asbestos patients is indeed far-reaching, it cannot be made the fault of Libby Claimants that Grace ultimately caused disease in a broad population of hundreds rather than just a handful of individuals. All the records on which he might rely have been produced and in the Plan

8

{393.001-W0002478.}

Proponents' possession for many months; in Grace's case, they have had many patients' records for years. There is no basis to limit Dr. Whitehouse's potential testimony to the Libby witnesses who have given depositions. Libby Claimants sought months ago to permit more than just the six Libby Claimants now allowed by the Court. Again, Libby Claimants understand the Court's prior rulings and have no intention of rearguing them here. But by the same token, the Plan Proponents cannot continue to overreach and erode, even before the start of trial, the evidence that would be available for Libby Claimants to rely upon in attempting to prove their many and diverse objections. This issue should be deferred to the time of trial.

## CONCLUSION

Based upon the above, Libby Claimants respectfully request that this Court deny the Motion in Limine, and grant any further relief that is just and proper.

Dated: August 28, 2009  
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

_/s/ Kerri Mumford_
Adam G. Landis (No. 3407)  
Kerri K. Mumford (No. 4186)  
919 Market Street, Suite 1800  
Wilmington, DE 19801  
Telephone: (302) 467-4400  
Facsimile: (302) 467-4450

- and -

Daniel C. Cohn  
Christopher M. Candon  
**COHN WHITESELL & GOLDBERG LLP**  
101 Arch Street  
Boston, MA 02110  
Telephone: (617) 951-2505  
Facsimile: (617) 951-0679

*Counsel for Libby Claimants*