IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE


| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| W.R. GRACE & CO., | . | Case No. 01-01139(JKF) |
| *et al.,* | . | Jointly Administered |
| | . | |
| Debtors. | . | Aug. 24, 2009 (10:35 a.m.) |
| | . | (Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

<u>Appearances</u>:

| | |
|---|---|
| For the Debtors: | Janet S. Baer, Esq.<br>Law Office of Janet S. Baer<br>David M. Bernick, Esq.<br>Theodore Freedman, Esq.<br>Barbara Harding, Esq.<br>Kirkland & Ellis |
| For Morgan Stanley: | Jeffrey Friedman, Esq.<br>Katten Muchin |
| For the Creditors<br>Committee: | Kenneth Pasquale, Esq.<br>Stroock & Stroock & Lavan |
| For the Bank Lenders: | Richard Cobb, Esq.<br>Landis Rath & Cobb |
| For Asbestos PI<br>Claimants: | Roger Frankel, Esq.<br>Jonathan Guy, Esq.<br>Orrick, Herrington |
| For the Libby Claimants: | Tom L. Lewis, Esq.<br>Mark Kovacich, Esquire<br>Lewis, Slovak & Kovacich<br>Daniel Cohn, Esq.<br>Cohn, Whitesell & Goldberg LLP |
| For Travelers: | Elisa Alcabes, Esq.<br>Simpson Thacher & Bartlett |
| For Asbestos Property<br>Damage Claimants: | Daniel Speights, Esq.<br>Speights & Runyan |

2

For Fireman's Fund:        Mark Plevin, Esq.
                           Crowell & Moring, LLP


For Garlock Sealing        Carl N. Kunz, II, Esq.
Technologies:              Morris James LLP

For Arrowood:              Garvin McDaniel, Esq.
                           Bifferato, Gentilotti

For the ACC:               Peter Lockwood, Esq.
                           Nathan D. Finch, Esq.
                           Caplin & Drysdale

Audio Operator:            Lori Coster

Transcriber:               Elaine M. Ryan
                           (302) 683-0221

        Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.

1         THE CLERK: All rise.

2         THE COURT: Good morning, please be seated.  This is

3    the matter of W.R. Grace, Bankruptcy No. 01-1139.  I have a

4    list of participants by phone: Elisa Alcabes, Scott Baena,

5    Janet Baer, Ari Berman, David Bernick, Deanna Boll, Thomas

6    Brandi, Oliver Butt, Elizabeth Cabraser, Linda Casey, Tiffany

7    Cobb, Andrew Craig, Leslie Davis, Michael Davis, Elizabeth

8    DeCristofaro, Elizabeth Devine, Martin Dies, Melanie Dritz,

9    Terence Edwards, Lisa Esayian, Sander Esserman, Mary Beth

10   Forshaw, Roger Frankel, Theodore Freedman, Jeff Friedman,

11   Daniel Glosband, John Greene, Robert Guttmann, Barbara

12   Harding, John Harding, Robert Horkovich, Brian Kasprzak,

13   Stuart Kovensky, John Kozyak, Matthew Kramer, Arlene Krieger,

14   Michael Lastowski, Richard Levy, Jeffrey Liesemer, Michael

15   Linn, Peri Mahaley, Douglas Mannal, John Mattey, Robert

16   Millner, Marti Murray, Kate Orr, Merritt Pardini, David

17   Parsons, Steve Peirce, Carl Pernicone, Margaret Phillips,

18   John Phillips, Mark Plevin, Joseph Radecki, Andrew Rosenberg,

19   Alan Runyan, Jay Sakalo, Darrell Scott, Mark Shelnitz,

20   Michael Shiner, David Siegel, Marnie Simon, Walter Slocombe,

21   Susette Smith, Jason Solganick, Daniel Speights, Shayne

22   Spencer, Brian Stansbury, Theodore Tacconelli, Alexander

23   Thain, David Turetsky, Edward Westbrook, Jennifer Whitener,

24   Richard Wyron, and Rebecca Zubaty.  Okay, I'll take entries

25   in the Court, please, good morning.

1              THE COURT: Good morning.

2              MR. BERNICK: Good morning.  David Bernick for

3   Grace.

4              MS. BAER: Janet Baer for Grace.

5              MR. FINCH: Nathan Finch and Peter Lockwood for the

6   ACC.

7              THE COURT: Good morning.

8              MR. PASQUALE: Good morning, Your Honor.  Ken

9   Pasquale and Lewis Kruger from Stroock for the Unsecured

10  Creditors Committee.

11             THE COURT: Thank you, good morning.

12             MR. KRAMER: Good morning, Your Honor.  Matt Kramer

13  of Bilzin Sumberg on behalf of the Property Damage Committee.

14             MR. FRANKEL: Good morning, Your Honor.  Roger

15  Frankel and Jonathan Guy from Orrick, Herrington on behalf of

16  the Asbestos Personal Injury Claimants.  Thank you.

17             MR. HURFORD: Good morning, Your Honor.  Mark

18  Hurford, Campbell, Levine for the ACC.

19             MR. COBB: Good morning, Your Honor.  Richard Cobb

20  on behalf of the Bank Lender Group.

21             MS. PHILLIPS: Margaret Phillips on behalf of -

22             THE COURT: Sorry, I can't hear you.

23             MS. PHILLIPS: Margaret Phillips on behalf of the

24  Bank Lender Group.

25             MR. TACCONELLI: Good morning, Your Honor.  Theodore

1    Tacconelli for the Property Damage Committee.

2              MR. O'NEILL: Good morning, Your Honor.  James

3    O'Neill for Grace.

4              MR. McDANIEL: Good morning, Your Honor.  Garvin

5    McDaniel for Arrowood.

6              MR. COHN: Good morning, Your Honor.  Dan Cohn for

7    the Libby Claimants.

8              MR. KOVACICH: Good morning, Your Honor.  Mark

9    Kovacich on behalf of the Libby Claimants.

10             MR. LEWIS: Tom Lewis on behalf of the Libby

11   Claimants.

12             THE COURT: Thank you.

13             MR. DEMMY: Good morning, Your Honor.  John Demmy

14   for Fireman's Fund Insurance Company and the Allianz

15   Insurers.

16             MR. PLEVIN: Good morning, Your Honor.  Mark Plevin

17   on behalf of Fireman's Fund with respect to its surety claim.

18             MR. BLABEY: Good morning.  David Blabey on behalf

19   of the Equity Committee.

20             MR. KUNZ: Good morning, Your Honor.  Carl Kunz on

21   behalf of Garlock.

22             THE COURT: I'm sorry, I can't hear you.  I

23   apologize.  I don't know what's going on but that microphone

24   is like not working.  I'm sorry.

25             MR. KUNZ: No problem, Your Honor.  Carl Kunz on

1   behalf of Garlock.

2           THE COURT: Thank you.

3           MR. KATZENSTEIN: Good morning, Your Honor.  Robert

4   Katzenstein on behalf of Kaneb Pipe Line.

5           MR. MARTIN: Good morning, Judge Fitzgerald.  R.

6   Craig Martin from Edwards Angell Palmer & Dodge on behalf of

7   Morgan Stanley Senior Funding, and I also have Mr. Friedman

8   here.

9           MR. FRIEDMAN: Good morning, Your Honor.  Jeff

10  Friedman on behalf of Morgan Stanley.

11          MR. MONACO: Good morning, Your Honor.  Frank Monaco

12  of Womble Carlyle for the State of Montana.

13          THE COURT: I'm sorry, for -

14          MR. MONACO: The State of Montana.

15          THE COURT: Is there something we can do with that

16  microphone?  I absolutely cannot hear people coming from the

17  microphone.  If I don't hear their voices, I'm not getting

18  anything.

19          UNIDENTIFIED SPEAKER: (Microphone not recording.)

20          THE COURT: Okay, thank you.

21          MR. BROWN: Good morning, Your Honor.  Michael Brown

22  on behalf of OneBeacon, Seaton, GEICO, and Republic.

23          MS. DeCRISTOFARO: Good morning, Your Honor.

24  Elizabeth DeCristofaro for Continental Casualty Company.

25          THE COURT: Good morning.

1          MR. GIANNOTTO: Good morning, Your Honor.  Michael
2     Giannotto for Continental Casualty.
3          MR. GLOSBAND: Good morning, Your Honor.  Daniel
4     Glosband also for Continental Casualty.
5          MR. LONGOSZ: Good morning, Your Honor.  Edward
6     Longosz on behalf of Maryland Casualty and Zurich.
7          MR. WISLER: Good morning, Your Honor.  Jeffrey
8     Wisler on behalf of Maryland Casualty and Zurich.
9          MR. RICH: Good morning, Your Honor.  Alan Rich for
10    the PD FCR.
11         MR. HARVEY: Good morning, Your Honor.  Matthew
12    Harvey on behalf of Travelers Insurance.
13         THE COURT: Ms. Baer?
14         MS. BAER: Thank you, Your Honor, good morning.
15    Your Honor, on the agenda today items 1, 2, 3, 4, 5 are all
16    continued.  Items 1 and 2 and 4 and 5 to the September 29th
17    hearing and item 3 we've now agreed will be continued to the
18    October 26th hearing.  That's our objection to a Maryland
19    Casualty claim.
20         THE COURT: Alright.
21         MS. BAER: Your Honor, you entered orders on items
22    7, 8, and 9.
23         THE COURT: I thought I did 6 too.
24         MS. BAER: Six, too, sorry, I skipped it.
25         THE COURT: Okay.

1          MS. BAER: That takes us, Your Honor, to item number

2     10.  Your Honor, there are no objections to this.  It is

3     Grace's motion to sell its Davidson membranes business in

4     Littleton, Colorado.  The membranes business is a developer

5     and producer of membranes that are used in the natural gas

6     production operations.  Grace decided approximately six

7     months ago, Your Honor, that it was no longer complimentary

8     to the debtors' business.  It's a small portion of its

9     business, less than one percent but required tremendous

10    management oversight.  We have no other presence in the

11    market and therefore no leverage in the market, and it's a

12    situation where there is quite a lot of potential but it

13    needs significant capital to develop.  Your Honor, the

14    debtors in conjunction with Seal and Associates took upon the

15    idea of marketing this product.  They went out into the

16    industry, did a tremendous amount of due diligence, brought

17    in a number of parties to make bids, ultimately settled on a

18    private sale bid of $22 million to a buyer.  Notice and

19    motion was sent out in redacted form to all interested

20    parties, including several parties who had previously

21    exhibited an interest in the business.  In addition, notice

22    went out to all parties to transfer contracts that are being

23    part of this sale.  No objections were received.  The general

24    unsecured creditors did make inquiry.  We responded to all of

25    their inquiry.  We also did a presentation for them on the

1    business.  Full copies, unredacted copies were provided to

2    all of the office committees, and after all of that, Your

3    Honor, the only thing that we were asked to do was make a

4    couple minor changes in the order that were requested by the

5    general unsecured creditors.  A certificate of counsel was

6    filed last week with that revised order, and, Your Honor, we

7    would ask today that you enter the order permitting us to

8    sell the membranes business to the buyer.  I have both the

9    redacted and an unredacted form of the order and agreement,

10   Your Honor.  What we would ask is that the redacted form be

11   signed and put on the docket and the unredacted form be

12   signed and we then submit it under seal.  Your Honor, the

13   identity of the buyer and its guarantor are sensitive.  There

14   are a few sensitive business terms in the asset purchase

15   agreement which is why we've done it in this way.

16        THE COURT: Why do I need the unredacted version on

17   the record then at all?

18        MS. BAER: You don't necessarily, Your Honor.

19   That's certainly your option.  We need a signed copy

20   obviously for the closing.  In fact, I was going to ask if

21   you'd sign an extra two, one for the buyer and one for the

22   seller, but if there's no need for the Court, we're perfectly

23   happy, in fact even more comfortable not to put the

24   unredacted form anywhere on the record.

25        THE COURT: Is there some reason that anybody is

1  aware of that the unredacted form needs to be put on record

2  at all, if it's going to cause some potential problem for the

3  business?  This is a speak now or forever hold your peace.

4  If I don't hear an objection to that process, I'm going to

5  sign the orders but indicate that the unredacted version will

6  be kept in debtors' files and not submitted to the Court.

7  I'm hearing no objection.  If you want to make -

8          MS. BAER: Your Honor, buyer's counsel has informed

9  me that they need the unredacted order in the Court's record

10  under seal and they'll need to then get a copy showing that

11  it's under seal.

12          THE COURT: Okay, that's fine.

13          MS. BAER: Your Honor, at this time I'd like to hand

14  up one copy of the unredacted and one copy of the redacted,

15  and then perhaps after Court I can get extra copies signed.

16          THE COURT: Okay.

17          MS. BAER: Unless you want me to hand them all up

18  now.

19          THE COURT: Why don't you just give them all to me

20  now and then we won't lose track of them; or do you want

21  copies after they're docketed?

22          MS. BAER: No, I don't think that's necessary, Your

23  Honor.  We can just take the signed copies now.

24          THE COURT: Okay, that's fine.  Just hand them all

25  up then.

1          MS. BAER: Thank you, Your Honor.  Your Honor, that

2    takes us to agenda item number 11, which Mr. Bernick's going

3    to address.

4          THE COURT: Mr. Bernick?

5          MR. BERNICK: Good morning, Your Honor.

6          THE COURT: Good morning.

7          MR. BERNICK: We're actually going to go through

8    items 11, 13, 14, and 15 as a group, and I guess I would

9    propose that we cover all of them.  They're all somewhat

10   related.   They're motions to strike expert testimony.  I'll

11   be arguing two of them, which are 11 and 14, and Mr. Finch

12   will be arguing two of them, which are 13 and 15.  The first

13   of them is our motion -

14         THE COURT: May I interrupt for a minute?

15         MR. BERNICK: Sure.

16         THE COURT: Why don't we get through the other

17   either business or sort of uncontested matters first, because

18   I think these arguments will take more time.  I don't know if

19   everybody wants to be here for these arguments, and to the

20   extent - I know we have item 16 -

21         MR. BERNICK: Yeah, well maybe if I can go through

22   the rest of the agenda and I'd be happy to defer these.

23   Twelve is moot because 12 is - we already have an agreed

24   order that covers the supplemental report of Molgaard, so

25   that doesn't need to go forward, that's already been taken

1    care of.   There is -

2            THE COURT: I'm sorry, an order's been entered?

3            MR. BERNICK: No, there's no order - I'm sorry,

4    there is an order.  There's a discovery order that was

5    agreed, and it covers the same subject matter and it says Dr.

6    Molgaard will be allowed to have the supplemental report.

7            THE COURT: Right.

8            MR. BERNICK: So, I believe it's - what is now down

9    here as 12 is moot because there's already an existing order.

10   I don't know if Mr. Cohn disagrees.

11           MR. COHN: Well, I half agree.  I agree that the

12   matter of his being permitted to submit the report was dealt

13   with by the other order, but in addition, the motion has a

14   request for judicial notice.  No objection was filed by any

15   party, and I would respectfully submit that therefore the

16   order should be entered in the form submitted with the

17   motion.

18           MR. BERNICK: Refresh me, what's the judicial notice

19   of what?

20           MR. COHN: It's of the ATSDR - I'm sorry, it's the -

21           THE COURT: Can you please get somebody from systems

22   up here.  I really cannot hear from that microphone.  Thank

23   you.  Well, I'll wait because I don't know how their setup is

24   and sometimes it may make is worse.  Parties who are on the

25   phone, can you please put your mute buttons on while you're

1    not speaking.

2         MR. COHN: So, the issue of judicial notice was

3    requested.  As I say, it was not opposed.  There were three

4    exhibits essentially to Dr. Molgaard's report, and we would

5    ask that judicial notice of the reliability of those -

6    they're government documents that that ought to be resolved

7    by an order which could be entered today.

8         MR. BERNICK:  Your Honor, that slipped between the

9    cracks.  I've just indicated in a sidebar with Mr. Cohn, that

10   goes to the exhibits issues, and there are going to be all

11   kinds of issues associated with the exhibits.  We don't

12   believe that judicial notice is appropriate of those

13   documents.  We're going to have a further discussion of

14   judicial notice later on today, but we're not agreeable to

15   taking judicial notice of those matters, and that's an

16   admissibility - it's partly an admissibility issue.  We would

17   suggest that that aspect of their motion, if they want to

18   continue prosecuting that by way of a motion as opposed to

19   simply asking for judicial notice in connection with the

20   submission of the exhibits at trial, that we ask that that be

21   put over so that it can be taken up together with all of the

22   other exhibit issues that are going to exist in connection

23   with this case.

24        THE COURT: Okay, well, with respect to the judicial

25   notice issue, if they're government documents regularly kept

1    in the course of business, I can agree that they exist, but

2    that doesn't mean that they're going to be admissible as a

3    result.  It simply means that you don't have to authenticate

4    them further in this context.

5           MR. BERNICK: Correct.

6           THE COURT: So, if there's going to be some

7    disagreement that they're not authentic?

8           MR. BERNICK: No disagreement about that, but that's

9    precisely the distinction that we're going to get into.  I've

10   no problem with the authenticity of the documents since to

11   the extent they're asking that judicial notice be taken of

12   the documents so that they're authentic, I don't have a

13   problem with that.  I didn't understand that to be the

14   proffer though.

15          THE COURT: Okay, well, that will not govern

16   admissibility but with respect to authenticity, if there's no

17   objection to their authenticity, I don't have a problem

18   taking judicial notice for that purpose.

19          MR. COHN: And we're fine with that, Your Honor, and

20   we'll take up any remaining issues in the discussion of

21   exhibits with Mr. Bernick and the plan proponents??

22          THE COURT: Okay, I'm going to need some form of

23   order with respect to all of the exhibits, so I suggest - or

24   I need a ruling, I suppose, to the extent there are

25   objections not necessarily an order, so it seems to me that

1   at the time that you need to offer those exhibits, if you

2   make a request for judicial notice with respect to

3   authenticity, you've heard from the plan proponents, they're

4   not going to oppose it.  Is anybody at this point in time who

5   intends to appear at the trial going to oppose judicial

6   notice for purposes of authenticity of the three exhibits?

7   The government reports they're attached to Dr. Molgaard's

8   report.  Okay, so, I don't think it will be an issue.

9          MR. BERNICK: Do you need - just to wrap up the

10  docket number, do you need an order or -

11         THE COURT: I thought there was an order that

12  addressed this number 12, but let me - I'm not sure what the

13  agenda says with respect to that, but I thought there was an

14  order that had been entered.

15         MR. BERNICK: It had not been entered, Your Honor,

16  which is why it remained on the agenda.

17         THE COURT: Okay, so, I have not signed the order?

18  I just saw it - I'm sorry.

19         MR. COHN: Mr. Bernick and I can reach agreement on

20  a form of order that does just what we've stated on the

21  record.

22         THE COURT: Alright.  Alright, so, with respect to

23  item 12, you'll submit a proposed order.

24         MR. BERNICK: Yes, Your Honor.

25         THE COURT: Okay, thank you.

1           MR. BERNICK: Item 16, we can put at the end of the

2    docket.  I think it's going to be covered by - there's an

3    agreement on item 16.

4           THE COURT: I know, but I don't agree.

5           MR. BERNICK: Oh, you don't agree.

6           THE COURT: No.

7           MR. BERNICK: Okay, so I guess we're going to have

8    an discussion about item 16.

9           THE COURT: We're going to discuss item 16.

10          MR. BERNICK: Okay.  And then item 20, we don't

11   oppose the motion for leave to file a supplement to the Libby

12   objection, and so, we're prepared to agree to that.

13          THE COURT: So you'll submit a proposed order on

14   item 20?

15          MR. BERNICK: Yes.

16          THE COURT: Alright, one second.  Okay, thank you.

17          MR. BERNICK: Then I think in light of Your Honor's

18   suggestion, what probably makes sense is to take up 18, 19,

19   and 17, and then after that, probably in order of general

20   interest.  I'm not sure it is general interest.  We can then

21   deal with 16 and then finish up with these other motions.

22          THE COURT: Alright.

23          MR. BERNICK: So, on 18 and 19, they're very short.

24   Mr. Lockwood will be reporting on the status of Phase I

25   issues, which I believe is focused on insurance neutrality,

1   and then we have a very brief report with respect to 19,

2   which we have agreed, that is the plan proponents and the

3   Committee for the General Unsecured Creditors have agreed

4   that 19 is simply a status report.  We're not going to argue

5   impairment here this morning.

6           THE COURT: Alright.

7           MR. BERNICK: Which will save some time.  I don't

8   know if Your Honor was looking forward to hearing that.

9           THE COURT: I was.

10          MR. BERNICK: Oh, you were.  Well, maybe the status

11  will be a little bit more - it may be kind of a beefier

12  status of Your Honor wants to throw out issues, I know that

13  the plan proponents, I should say the debtors would be very

14  happy to talk about the impairment issues that are set forth

15  in the briefs, but maybe we can have Mr. Lockwood address

16  item 18 first, then we'll go to 19, and then we'll go through

17  what is really the most significant matter we have this

18  morning which is the status on Phase II confirmation issues

19  which is 17, if that's alright with the Court.

20          THE COURT: That's fine.

21          MR. BERNICK: Okay.

22          MR. LOCKWOOD: Your Honor, this will be very short.

23  The plan proponents and the Phase I insurer objectors had a

24  meeting after the last hearing and made substantial progress.

25  There's been another revised draft proposal circulated early

1    this week by the insurers.  We are in the process of

2    reviewing it and going to be getting back to them, so in

3    essence, we're still negotiating.

4          THE COURT: Okay.  Is there anything that you're

5    expecting from me with respect to the Phase I at this point?

6          MR. LOCKWOOD: No.

7          THE COURT: Okay.  Oh, Tim, do you need a break to

8    check this out?

9          UNIDENTIFIED SPEAKER: It may take me a minute or

10   so.

11         THE COURT: Okay.  If you folks want a quick break,

12   you can -

13         UNIDENTIFIED SPEAKER: (Microphone not recording.)

14         THE COURT: Okay.  That microphone, I just can't

15   hear from it.

16         UNIDENTIFIED SPEAKER: I'll come back -

17         THE COURT: Now I can hear you from it.

18         UNIDENTIFIED SPEAKER: Is this better?

19         THE COURT: Yeah, it must be the direction.

20         UNIDENTIFIED SPEAKER: They just need to speak into

21   it.

22         THE COURT: Just stick around for a minute so I make

23   sure I can hear.  People on the phone, please, can you put

24   your mute buttons on.  Can the Court Call operator find out

25   where the switch scratch is coming from please and mute that

1    line for me until whoever it is has to speak.

2            COURT CALL: Yes, Your Honor.

3            THE COURT: Thank you.  Okay, so, I don't need to do

4    anything with respect to item 18?   Alright, next.

5            MR. BERNICK: Item 18, that's correct.  Item 19 is

6    the impairment issue, and we have in the course of submitting

7    our Phase II brief, the trial brief, as Your Honor knows we

8    have a whole separate brief on the issue of default interest,

9    and in that brief we kind of set out - we cover our final

10   state-of-the-art thinking.  Maybe I shouldn't say final,

11   nothing is final - our state-of-the-art thinking in responds

12   to what I think is the last submission that was made by the

13   general unsecured creditors, and we just wanted to bring that

14   to the Court's attention.  Those briefs are, as you know,

15   quite extensive.  If Your Honor wants to take those up today,

16   we're more than happy to have some discussion with the Court,

17   and so I really leave it up to the Court as to what Your

18   Honor wants to do, but we just wanted to alert the Court to

19   the fact that while Phase II focuses on other issues, that

20   trial brief contains further arguments that deal with Phase I

21   in response to the arguments that have been made by the

22   General Unsecured Creditors Committee, and I think that Mr.

23   Pasquale and I agreed this morning - last week, that in light

24   of the fact that Your Honor is very careful and thorough in

25   reading the briefs, that we would be content to rest on the

1  papers.  Again, if Your Honor wants to ask us questions or

2  really talk about anything, we're more than happy to do that.

3       THE COURT: Alright.  Yes, sir.

4       MR. FRIEDMAN: Good morning, Your Honor.  Jeff

5  Friedman for Morgan Stanley.  I understood that Your Honor

6  wanted to hear argument and scheduled supplemental argument

7  for this morning.  I have less than 10 minutes, if I may,

8  Your Honor.

9       MR. BERNICK: Actually, it was scheduled at our

10  suggestion to the Court.  Nobody else suggested that we have

11  an argument on Phase I and apparently it was already argued.

12       THE COURT: Well, frankly, I don't really have a

13  strong preference about it one way or the other.  I've looked

14  at the briefs.  I haven't studied them with the level of care

15  yet in which I'm prepared to make any rulings, but I have

16  taken a look at the briefs.  If you want to do an argument,

17  that's fine.  If you want to defer it, that's okay.  It's

18  just up to you, but if one side is going to argue, in all

19  fairness, I think everybody needs to be aware of that so that

20  anybody who chooses to argue can.  It doesn't have to be

21  today, I suppose, or if you're prepared to go forward today

22  and the others want to defer it, we can do that too, but I'm

23  going to be taking a much closer look at the briefs than I

24  have so far, I can tell you.

25       MR. FRIEDMAN: Your Honor, we did at the time Your

1    Honor had suggested this or at the time the possibility was

2    raised, reserve Morgan Stanley's right to participate.

3    Morgan Stanley did file a supplemental brief on impairment,

4    and again, Your Honor, I am prepared to go forward this

5    morning.  It's brief.  As I said, it's less than 10 minutes.

6            THE COURT: Alright, go ahead, and then I'll hear

7    from the other sides.  If they want to defer it, they may,

8    and if they want to do it today, they can.  Go ahead.

9            MR. FRIEDMAN: Thank you, Your Honor.  Your Honor,

10   there are a number of undisputed points with respect to the

11   treatment of Class 9 claimants such as Morgan Stanley Senior

12   Funding.  It is undisputed that the plan proposes to cash out

13   the Class 9 claims.  It's also undisputed that a Class 9

14   claimant with an allowed claim who doesn't raise any dispute

15   about the post-petition interest rates proposed by the plan

16   proponents, is going to be paid everything the plan proposes

17   to pay the claimant in cash on the effective date of the

18   plan.  This is a classic cash out.  It's also undisputed,

19   Your Honor, that the plan will not pay any post-petition

20   interest whatsoever to holders of allowed claims who choose

21   to dispute the appropriate interest rate with the plan

22   proponents unless and until the holder prevails by a final

23   order in a litigation that will conclude sometime well after

24   the effective date of the plan, possibly years, if it goes to

25   the Third Circuit.

1       THE COURT: Well, how would they know what interest

2   level to pay until the - - if the objection is to the interest

3   level and there isn't an adjudication as to what's

4   appropriate, how can they pay it until there's a final

5   adjudication?

6       MR. FRIEDMAN: I'm coming to that, Your Honor,

7   because I do think at some point Your Honor will have to

8   determine what an appropriate interest rate is in connection

9   with determining the un-impairment issues that have been

10  raised, and if that's something other than the contract rate,

11  whatever that contract rate may be, then we submit that

12  whatever generic rate Your Honor determines should apply

13  because we're certainly not asking Your Honor to determine on

14  a case-by-case basis in connection with the confirmation

15  hearing, everybody's disputed interest rate.  That would be

16  days and days of Your Honor's time.

17      THE COURT: Well, how can I determine if you're

18  saying any contract rates in any claim should apply

19  regardless of the fact that that may then lead to a disparate

20  treatment argument as opposed to picking a rate somehow from

21  whatever, whatever standards you choose to use.

22      MR. FRIEDMAN: Your Honor, it's Morgan Stanley's

23  position that under 1124(1) unaltered contractual rights

24  means unaltered contractual rights.  Ultimately we believe

25  that that should be the standard, and whatever a contract

1    says, whether it's a default rate - in our case there's only

2    one rate of interest stated in our contract, whatever it is,

3    we believe that happens to be the right answer.  I don't know

4    if Your Honor is going to come out that way, but we do

5    believe, and as I'm prepared to argue, that post-petition

6    interest on the facts of this case is required.  What Your

7    Honor ultimately decides the appropriate rate of post-

8    petition interest should be is something that Your Honor is

9    going to have to decide as part of the confirmation process.

10              THE COURT: Okay.

11              MR. FRIEDMAN: So, again, it's undisputed, Your

12   Honor, that the plan does provide that anyone who disputes

13   the interest rate is not going to be paid until after - at

14   least the plan provides until after a litigation is had and

15   determined by final order, and it's also undisputed that the

16   plan proponents assert that they will have the right to

17   contend that they shouldn't have to pay any post-petition

18   interest at all to anyone who disputes it.  They have the

19   right to argue that the post-petition interest rate should in

20   essence be a zero.  It is also undisputed, Your Honor, that

21   there are six different treatments regarding post-petition

22   interest with respect to Class 9.  There's an interest regime

23   for the banks, which is undisputedly more than their non-

24   default contract interest but less than their default rate

25   interest and which compounds in a manner different than the

1   other interest rate regimes in Class 9.  There's an interest

2   rate regime for certain environmental claims based on a 4.19

3   percent interest rate.  There's a non-default interest rate

4   regime for contracts with a non-default rate in their

5   contract.  There's an interest rate regime of 4.19 percent

6   for those without non-default contract rates of interest.

7   There's a 4.19 percent interest rate regime for those who

8   file a notice of non-default contract rate of interest.  And

9   then finally, Your Honor, there's a 6 post-petition interest

10  rate regime for creditors like Morgan Stanley that dispute

11  the interest treatment proposed by the debtor and filed a

12  post-petition interest determination notice.  And the plan

13  provides for this 6 group to get zero post-petition interest

14  on the effective date on their otherwise allowed claim, and

15  Morgan Stanley has an allowed claim here, and that they'll

16  receive no post-petition interest unless and until they

17  prevail by a final order no longer subject to appeal or

18  review following the outcome of interest rate litigation.

19  It's also undisputed that despite all of these differences

20  with regard to the treatment of post-petition interest for

21  Class 9 creditors, that the debtors and the plan proponents

22  contend that under § 1124(1) every Class 9 creditor is

23  unimpaired, and Morgan Stanley disagrees with that

24  conclusion.  I don't believe, Your Honor, that anyone has

25  taken issue with the fact that Congress struck § 1124(3) from

1    the Bankruptcy Code which provided, when it was in the Code,

2    for un-impairment by cash-out in response to the <u>New Valley</u>

3    case that was decided by the Bankruptcy Court in New Jersey

4    where creditors were cashed out without payment of post-

5    petition interest despite the equity holders having retained

6    substantial value on account of their equity interests.  So,

7    accordingly, Congress set up a plan proponent and wants to

8    cash-out a class of creditors, the class is entitled to vote

9    on that treatment, and if it votes to reject that treatment,

10   the cram-down standards at § 1129(b) have to be satisfied as

11   to that rejecting class.  Notwithstanding the repeal of

12   1124(3), Your Honor, since then, plans in this Circuit have

13   been permitted to cash out claims relying on § 1124(1) of the

14   Bankruptcy Code.  Bankruptcy Judge Walsh in the <u>PPI</u>

15   <u>Enterprises</u> case concluded that all Congress really wanted to

16   do in repealing 1124(3) was to make sure that post-petition

17   interest was paid in order to render un-impaired, which Judge

18   Walsh characterized as purely money claims, and while it

19   seems to Morgan Stanley, Your Honor, that Judge Walsh and the

20   Third Circuit's acceptance of an 1124(1) cash-out would have

21   rendered § 1124(3) mere surplusage when they were both part

22   of the Bankruptcy Code.  We do believe that it's nevertheless

23   possible to reconcile the holding in <u>PPI</u> with the repeal of

24   § 1124(3).  But again to be clear, Your Honor, Morgan

25   Stanley does submit and believes the correct answer is that

1   "unaltered" in § 1124(1) has a very plain meaning and that if

2   contractual rights are to be left unaltered, that includes

3   whatever rights to interest are set forth in that contract.

4   The debtors' argument that it's the Bankruptcy Code that

5   strips unsecured creditors of their right to post-petition

6   interest in a case like this one is simply wrong and runs

7   counter to well-established case law that mandates post-

8   petition interest when equity holders are retaining or

9   receiving property on account of their equity interest, as is

10  the case here.  Nevertheless, to reconcile the use of

11  § 1124(1) -

12          THE COURT: The bankruptcy - I could not find a

13  case, as I recall, that actually said that because an equity

14  interest is retaining property some default rate of interest

15  had to be applied, but your contention is different.  You're

16  saying that a contractual rate has to apply but you're not

17  defining what the contractual rate is because for your client

18  you only have one.

19          MR. FRIEDMAN: That's true, although, Your Honor,

20  for what it's worth, I think whatever the contract says to me

21  leaving unaltered someone's contractual rights is just an

22  interpretation of what the contract provides, but yes, in our

23  case, Your Honor, there's only one contractual rate of

24  interest set forth in our contract.

25          THE COURT: Okay, and this plan, and what is that

1   contract rate?

2           MR. FRIEDMAN: It's prime plus 3, Your Honor.  It is

3   the only rate in the contract.  The debtors contend that -

4           THE COURT: Well, I haven't looked at the contracts,

5   so I need - whatever the contract language is, I think in

6   this instance, I'm going to need to see.  If it only applies

7   on default, it's a default rate.

8           MR. FRIEDMAN: Well, Your Honor, this was a letter

9   of credit reimbursement agreement.

10          THE COURT: Okay.

11          MR. FRIEDMAN: So, when the bank honored the letter

12  of credit, paid the recipient beneficiary of the letter of

13  credit at that point, the debtor had an obligation to repay

14  the bank.

15          THE COURT: Okay.

16          MR. FRIEDMAN: Interest runs from the date of that

17  obligation.

18          THE COURT: Alright.

19          MR. FRIEDMAN: And the debtor has contended that

20  that's a default rate of interest.  I understand the

21  argument.  We contend that whatever our rate of interest to

22  leave our contractual rights unaltered, that's the rate that

23  needs to be paid.

24          THE COURT: Okay.

25          MR. FRIEDMAN: Nevertheless, Your Honor, there could

1   be a reconciliation of the concept of using § 1124(1) as a

2   cash-out mechanism in place of § 1124(3) in a manner that's

3   consistent with Congress's clear intent when it repealed

4   § 1124(3).  At the very least the post-petition interest that

5   Judge Walsh says is mandated under § 1124(1) should be

6   measured against and not be less than the post-petition

7   interest that would be required by § 1129(b) when equity is

8   retaining and receiving property on account of its equity

9   interests as is the case here.  Your Honor, in about two

10  weeks when Phase II of the confirmation hearing begins, the

11  Court's going to embark on a somewhat lengthy evidentiary

12  hearing on the debtors' solvency for purposes of § 1124, and

13  Morgan Stanley submits that the Court is incorrect to do so.

14  When the cases that are legion speak of solvency in the post-

15  petition interest context, we submit that they do so loosely

16  in the sense that for purposes of § 1129(b) courts assume,

17  and correctly so, that where equity is retaining and

18  receiving property on account of its equity interests, that

19  is considered solvency per se for these purposes.

20       THE COURT: Where are you coming up with that.  I

21  have never seen a case that defines solvency per se.  If

22  you've got one, I'd like to read it.

23       MR. FRIEDMAN: Your Honor, what we are arguing is

24  that since 1129(b) was supposed to be the option for

25  creditors who were cashed out and rejected it, nowhere in

1    § 1129(b) does the word "solvency" or "insolvency" appear.

2    Creditors, unsecured creditors have to be paid in full under

3    § 1129(b) when equity retains or receives property on account

4    of their equity interests.  That's what 1129(b) says.  We are

5    suggesting, Your Honor, that that is the minimum standard if

6    you're going to rely on 1124(1) for un-impairment that has to

7    be met.  Congress intended -

8         THE COURT: I think the only disagreement is what

9    constitutes payment in full.

10        MR. FRIEDMAN: Well, Your Honor, we'll be happy to

11   supply you cases under 1129(b) because again the cases are

12   legion and I don't think the debtor disputes that under

13   1129(b) where equity is retaining an interest, post-petition

14   interest is required to be paid to unsecured creditors.

15   Putting aside the rate, which I know the debtor has an issue

16   with, I don't think there's any doubt that the case law is

17   well-established that post petition interest must be paid to

18   unsecured creditors where equity is receiving or retaining an

19   interest.

20        THE COURT: Okay.  If you want to show me some cases

21   that say that that is required, I would be happy to see them,

22   but for purposes of this discussion, I'm not going to take

23   issue with that statement simply because the plan does

24   propose to pay unsecured creditors interest.  I think the

25   issue is, what rate has to apply.  So this plan complies with

1    1129(b).  It has an interest rate for unsecured creditors

2    with equity retaining the interest.  So I don't think it's an

3    1129(b) issue.  I think it's an issue to request to decide

4    whether or not your client's impaired, not whether or not

5    your client is getting interest such that the plan satisfies

6    that requirement when equity is retaining an interest.

7         MR. FRIEDMAN: Well, Your Honor, but all we're

8    suggesting, while we understand this is presented in the

9    context of impairment, Morgan Stanley is arguing that in

10   order for impairment/un-impairment to exist under 1124(1) it

11   can't be a lesser standard and would have existed under

12   1124(3) if you're going to cash out.

13        THE COURT: 1124(3) doesn't exist anymore.

14        MR. FRIEDMAN: Agreed, Your Honor, but as Judge

15   Walsh recognized, what Congress intended to do was to make

16   sure that -

17        THE COURT: That you got paid interest.

18        MR. FRIEDMAN: That you got paid interest in a

19   situation where there was a solvent debtor.  My only point,

20   Your Honor, is that for purposes of this, we believe that

21   solvency shouldn't be measured against an elaborate expert-

22   laden hearing as to whether or not the assets exceed the

23   liabilities.  The debtor should be estopped from even arguing

24   that they're insolvent for these purposes.

25        THE COURT: Just because equity retains an interest

1  doesn't mean that the debtor's solvent.

2           MR. FRIEDMAN: I disagree with that, Your Honor.

3           THE COURT: Well, you have to give me a case that

4  says so, because I couldn't find one.

5           MR. FRIEDMAN: I disagree with that, Your Honor.  I

6  think once equity is retaining an interest -

7           THE COURT: Give me a case.  I'm happy to take a

8  look at it.  I just couldn't find one.

9           MR. FRIEDMAN: Okay.

10          THE COURT: If it's out there, I would love to read

11 it.

12          MR. FRIEDMAN: But again, Your Honor, § 1129(b),

13 which is the standard that we think should apply at a minimum

14 to be measured against the interest rate paid under 1124(1)

15 if you're going to declare and disenfranchise Class 9 -

16          THE COURT: That argument I understand.

17          MR. FRIEDMAN: Right.  And all I'm saying is, Your

18 Honor, 1129(b) case law is quite elaborate that post-petition

19 interest has to be paid.  Now Your Honor says, Well, post-

20 petition interest is being paid -

21          THE COURT: Right.

22          MR. FRIEDMAN:  - so that satisfies 1129(b).  That's

23 a different debate, Your Honor, and we'll have that debate as

24 to the appropriate rate of interest I thought in connection

25 Phase II or in connection with post-effective date litigation

1    on a case-by-case basis.  But we do agree that post-petition

2    interest has to be paid.  I think maybe the debtor agrees

3    that post-petition interest has to be paid and we just have a

4    debate about rate.

5          MR. BERNICK: If I can make a suggestion, Your

6    Honor.  All of this is really completely non-germane.  Morgan

7    Stanley elected pursuant to a procedure that was approved by

8    the Court that their rate of interest be permanent post-

9    confirmation.  These are not like the other lenders.  We're

10   not asking to have the matter of their interest rate

11   determined in connection with Phase II.  They elected to

12   participate in the process.  That process will determine what

13   rate, if any applies to their claim.

14         THE COURT: Oh.

15         MR. BERNICK: So, all of these arguments that are

16   being made are post-confirmation arguments.  I conferred with

17   counsel for the General Unsecured Creditors Committee and the

18   bank lenders - and we're happy to defer all of those issues

19   which are actually germane to them in Phase II as opposed to

20   post-confirmation, we're happy to defer all these argument

21   until later because there are so many other things that are

22   taking place today, but Morgan Stanley is in a position where

23   they're being treated differently.  They've got a different

24   kind of process, and we only have to resolve 502 and post-

25   petition interest today because for them it's going to be

1  determined after the fact.  So, if counsel can finish the

2  remarks, and he's got a long outline here, we'd just like to

3  get on with the other matters that are before the Court.

4         THE COURT: Well, it's taken more than 10 minutes,

5  but okay.

6         MR. FRIEDMAN: Your Honor, I am almost done.  I

7  mean, Your Honor asked some questions and I tried to reply to

8  those questions.

9         THE COURT: But if you've elected a post-

10  confirmation determination, why are we even having this

11  discussion, I don't have a confirmed plan and I don't even

12  know if I will have a confirmed plan.

13        MR. FRIEDMAN: Understood.  Two things on that.

14  One, we have no choice.  This was the debtors' procedure

15  mandated on us.  It's not necessarily how we would choose to

16  proceed, but I can understand if there are interest rate

17  disputes -

18        THE COURT: It was an election.

19        MR. FRIEDMAN: Well, but it was either take the

20  debtors' interest rate or do this process, there was no other

21  choice.

22        MR. BERNICK: No, they could object, they could do

23  what everybody else is doing.  They can object.  They have it

24  litigated now, and they didn't do that.

25        MR. FRIEDMAN: Your Honor, I didn't think that the

1  Court was going to sit through a one-by-one interest rate

2  determination for every creditor who wanted to dispute.

3          THE COURT: I'm going to have to anybody who elects

4  that process.

5          MR. FRIEDMAN: Well, the question is, Your Honor,

6  did you want to do it in the middle of the confirmation

7  hearing.

8          THE COURT: No, I want to do it post-confirmation

9  because I don't know if the plan's going to be confirmed.

10  There's no point taking on an issue that hasn't become ripe.

11          MR. FRIEDMAN: And we don't fundamentally disagree

12  with that.  I just want to make one more point, however, Your

13  Honor, because I think we're now in agreement that in order

14  to leave the Class 9 unimpaired, some post-petition interest

15  needs to be paid.  I think the debtor agrees with that -

16          THE COURT: I don't know who agrees - I don't know

17  whether there's an agreement.  I think I said for purposes of

18  this argument I'd accept that proposition so I could get to

19  the meat and potatoes of what Morgan Stanley's concern is.

20          MR. FRIEDMAN: Okay.  That's fine.  My final point,

21  Your Honor, is that because, as Morgan Stanley contends that

22  all Class 9 creditors are entitled to post-petition interest

23  in the context of this plan or equity holders are walking

24  away with hundreds of millions of dollars, the 6 interest

25  regime in which a creditor with an undisputed allowed Class 9

1    claim, like Morgan Stanley, gets zero interest on the

2    effected date because it has chosen to dispute the

3    appropriateness of the interest rate.  We think that renders

4    the plan un-confirmable as a matter of law.  Zero is not a

5    possible post-petition interest rate when equity holders are

6    receiving value as they are here.  Zero is not a defense-able

7    interpretation of unimpairment in the context of this case.

8    It's up to this Court to determine what post-petition

9    interest rate is necessary for the unimpairment standards to

10   be satisfied, and while we believe, as do the banks, the

11   Committee, and many of the cases cited starting on page 11 of

12   our supplemental brief that § 1124(1) means unaltered with

13   respect to whatever interest rate is in the contract,

14   nevertheless, whatever the Court decides is the appropriate

15   rate of post-petition interest, if it's other than what's

16   provided in our contract, that rate is the minimum rate the

17   plan proponents have to pay us on the effective date of the

18   plan.

19        THE COURT: You're saying 4.19 percent has to be

20   paid even if there's a dispute because that's the minimum

21   rate in this class.

22        MR. FRIEDMAN: I'm saying 4.19 percent or whatever

23   Your Honor decides has to be the minimum rare.  If Your Honor

24   decides, for example, that a non-default rate has to be paid

25   and for people without a non-default rate 4.19 percent is a

1    good rate, then that's the rate, but they have to pay that to

2    us on the effective date of the plan even if we're disputing

3    the ultimate interest rate determination because that's what

4    Your Honor has determined is necessary to leave us

5    unimpaired.  We have an allowed claim, and if Your Honor says

6    on an allowed claim, and that's undisputed here, you've got

7    to pay 4.19 percent interest unless some court determines

8    it's more or less, that's Your Honor's condition as it were

9    to your agreement to confirm the plan.

10           THE COURT: Alright.

11           MR. FRIEDMAN: They're not free to ignore that, and

12    that's my final point, Your Honor.

13           THE COURT: Okay.  That I understand.  I'm not quite

14    sure, frankly, if that's the issue for two creditors why this

15    one can't be worked out.

16           MR. BERNICK: Well, in fact, this is exactly what

17    the status is.  It has been worked out.  We had an election

18    procedure.  Your Honor approved the election procedure.  They

19    made the election and the election contemplated that they be

20    paid in full whatever interest Your Honor ultimately

21    determined they were entitled to receive.

22           THE COURT: Oh, I see, so this is -

23           MR. BERNICK: They don't get paid interest on the

24    effective date not because they will never get paid interest

25    but because it's a post-confirmation litigation procedure,

1    and there's no way to make out the proposition.  It's the

2    whole basis of the distinction in PPIE.  You can't make out

3    the proposition that where a matter is - where a process or

4    procedure is a function of the Code as objection litigation

5    to post-petition interest would be, that where that

6    procedure's a function of the Code rather than the plan,

7    there is no impairment.  These people are not impaired in a

8    zillion years.  They made an election to do the litigation

9    process that others have done during the bankruptcy.  They

10   made the election to do it post-bankruptcy.  The procedure's

11   a function of the Code.  It's not a function of the plan, and

12   so now we hear from counsel for 25 minutes of all kinds of

13   arguments that basically indicate that they don't like the

14   election that they made.  They made the election.  That's

15   just the end of it.  That is all that I really have to say,

16   and I think I already said it to a certain extent in my

17   suggestion to the Court, but I certainly don't think that we

18   really need to spend anymore time on this this morning.  It's

19   been interesting to hear counsel's remarks about matters that

20   are of general interest to other folks in the courtroom, but

21   really in so far as Morgan Stanley is concerned, these

22   arguments are completely premature arguments because their

23   litigation will take place post-confirmation.  Unless Your

24   Honor has any further questions to pose to us, I don't know

25   if counsel for the bank lenders or for the Unsecured

1    Creditors Committee want to speak to the issue.

2            MR. PASQUALE: Your Honor, we have nothing to add.

3    As Mr. Bernick said earlier we'll rest on the papers.  Your

4    Honor, I'm sure understands that our silence doesn't mean

5    that we're agreeing, but the papers are more than adequate to

6    deal with the issues.  Thank you.

7            THE COURT: Alright.

8            MR. COBB: Your Honor, Richard Cobb for the bank

9    lenders.  Ditto.

10            THE COURT: Okay.  My, agreement over something, I'm

11    impressed.

12            MR. FRIEDMAN: Your Honor, just one quick point in

13    rebuttal and that is our election doesn't change my point

14    that to the extent Your Honor determines a minimum rate of

15    interest has to be paid to leave us unimpaired, they have to

16    pay that on the confirmation date.  Our election, which was

17    effectively forced, wasn't a waiver of our right to be paid

18    what Your Honor says we need to be paid in order to be

19    unimpaired.

20            THE COURT: But your election to determine the

21    interest rate may not mean that you're entitled to be paid

22    whatever the rest of the Class 9 creditors, assuming that

23    Class 9 is appropriately stated.  I'm not making a

24    determination.  I'm just saying "assuming".  Assuming that

25    you can have multiple interest rates paid to creditors within

1    a class -

2              MR. FRIEDMAN: Yes.

3              THE COURT: - the fact that you've elected to have

4    your client's rate determined post-confirmation means that it

5    may not be the same rate as everybody else's.

6              MR. FRIEDMAN: Your Honor, again, I think that Your

7    Honor needs to determine a generic rate.  If Your Honor

8    decides that it's the contract rate that should apply, but if

9    it's a default rate, it shouldn't apply and someone doesn't

10   have a default rate, Your Honor's going to have to come up

11   with another rate or decide if the debtor's rate is

12   appropriate.

13             THE COURT: Well, if I do that, then there's isn't

14   any need for post-confirmation litigation, because once I

15   determine that it has to be a uniform rate, Morgan Stanley's

16   going to get that uniform rate too.

17             MR. FRIEDMAN: Well, if that's what Your Honor

18   decides ultimately, that's right, then the appeal would be in

19   essence to an appellate court at that point.

20             THE COURT: But I can't make that determination

21   because you've elected that I can't do it until post-

22   confirmation.

23             MR. FRIEDMAN: No, Your Honor.

24             THE COURT: You've a Hobson's choice, Mr. Friedman.

25             MR. FRIEDMAN: No, Your Honor, I think that we're in

1    a category.  If you take us - to say that we've completely

2    opted out of Class 9 and we're somehow unimpaired because we

3    make this election, I think is incorrect.

4         THE COURT: No, you haven't opted out of Class 9.  I

5    don't think that's the - that's not what the process said.

6         MR. FRIEDMAN: Well, but there are only five

7    possible treatments in Class 9 and there's only two that we

8    can conceivably fit in.  We can either fit into the one that

9    deals with people with a non-default contract rate of

10   interest, where there's a debate between the debtor and

11   Morgan Stanley over what its contract rate of interest is, or

12   we fit into the 4.19 percent for people that don't have a

13   non-default rate of interest.  Those are the only two places

14   we can fit in.  To say that because we've elected to litigate

15   over that issue, we get zero interest when at worst we'd be

16   paid 4.19 percent, it doesn't make any sense to me, and I

17   don't think that's what the election meant, and I don't think

18   that's a fair result for the election because that doesn't

19   leave us unimpaired.

20        THE COURT: Alright.

21        MR. BERNICK: I think that probably what makes sense

22   is, now that we're dealing with the default interest rate

23   issue, maybe we really ought to take up what we felt was

24   going to be an agreement on item 16, which was the

25   stipulation regarding the impact of whatever findings Your

1    Honor makes with respect to solvency, and because I know also

2    that there are folks that -

3          THE COURT: Well, before you get to 16, I need to

4    wrap up this one.

5          MR. BERNICK: Sure.

6          THE COURT: Everyone is agreeing that this issue can

7    be determined on the briefs in addition to Morgan Stanley's

8    argument today; is that correct?  So it's now under

9    advisement for me.  No one else is asking for additional

10   argument.

11         MR. BERNICK: I think that that is correct, and with

12   respect to Morgan Stanley and Mr. Freedman will - I know if

13   Mr. Freedman's on the telephone?

14         THE COURT: Mr. Freedman -

15         MR. FRIEDMAN: I'm right here.

16         MR. FREEDMAN (TELEPHONIC): Yes, I am, and it can be

17   determined on the briefs.

18         MR. BERNICK: Yeah, my Mr. Freedman.

19         THE COURT: Okay, thank you.

20         MR. BERNICK: Yes, two e's instead of, I'm assuming

21   an ie or ei.

22         THE COURT: Alright so I just need to make a note to

23   myself to let me know that in fact this is something that I

24   can now get working on.  Okay.  Now you wanted to turn to 16?

25         MR. BERNICK: Yeah, just because we may as well get

1   - we find out what Your Honor's concern is with the proposed

2   agreed order that we had worked out, and that's with respect

3   to the findings on solvency, and let me stress for the Court

4   that this agreement doesn't really address whatever Your

5   Honor's determination is and doesn't address what Your Honor

6   will be asked to determine.

7        THE COURT: Well, that's the problem.

8        MR. BERNICK: That's right.

9        THE COURT: Once I make this determination, I think

10  I'm the only Court that has jurisdiction over this issue of

11  solvency, and if it's going to be litigated, folks, it's

12  going to be litigated by everybody and binding on everyone

13  for all purposes.  I don't see any way that I can make a

14  determination of solvency for plan confirmation purposes and

15  then say, but it doesn't have any effect after this.  You're

16  either solvent or you're not, and that's what the findings

17  will be.

18       MR. BERNICK: Well, I think that - let me just peel

19  off a couple of layers for that because that will have some

20  significant - it may have some significant ramifications.

21  Your Honor, as Your Honor knows, the agreement that is before

22  the Court in the context of the plan, the plan is an

23  agreement, and the agreement as between the debtors and the

24  personal injury constituency be that the current claimants

25  the ACC or the FCR says that there won't be a determination

1    that is binding with respect to the claimants on the issue of

2    what the claims are worth or what impact that determination

3    may have on their ability to be paid.

4            THE COURT: Then I think this not going to be a

5    confirmable plan if we have to get into a solvency

6    circumstance.

7            MR. BERNICK: Well, I guess the -

8            THE COURT: There's no way that I can see that this

9    Court can make a determination after a full evidentiary

10   hearing as to whether or not this debtor is solvent, and then

11   say, but I didn't really mean it.  It's not binding by

12   anyone.

13           MR. BERNICK: No, I think it really is just like

14   many, many other things, it is the question of what's the

15   purpose. You can have estimations, for example, which is what

16   this essentially would be.  It's an estimation.  This would

17   be -

18           THE COURT: No.  I mean, yes, solvency to a certain

19   extent as of a certain date may in some senses be an

20   estimation because I'm relying on expert testimony, probably,

21   to make this determination, but no, this is going to be a

22   finding of fact.  If it's going to be contested, I've got to

23   make findings, and once I have to make those findings, I am

24   not able to say that they are limited in scope because they

25   will have collateral consequences and *res judicata*

1   consequences, and this Court can't limit those consequences.

2            MR. BERNICK: We're not seeking to limit the

3   consequences.  We're seeking to explore and press Your Honor

4   on the question of whether in fact you will be making a

5   determination of fact in the way in which Your Honor suggests

6   that you will be.  The issue of solvency, just like many

7   other issues in the Bankruptcy Code can be made for different

8   purposes.  Estimation of person injury liability, that's what

9   we're talking about here, is what is the extent of the

10  liability.  That's what the governing consideration is, which

11  is the extent of liability.  The extent of liability can be

12  made for a variety of different purposes.  Estimation,

13  including estimation of extent of liability, as we know, can

14  be made for a wide variety of purposes, can be made for

15  purposes of determining how to count the votes, it can be

16  made for a whole bunch of different reasons.  So when Your

17  Honor talks about *res judicata* or collateral estoppel, that's

18  a function of a) the underlying evidence or facts, and b) the

19  applicable law, and in this case - and it also depends upon

20  who it is that is bound.

21           THE COURT: Everybody's bound by a finding of

22  solvency.

23           MR. BERNICK: Well, with due respect to the Court, I

24  don't know that somebody who has no stake in the outcome -

25  This is a dispute that does not involve, does not involve

1    personal injury claimants.  It is purely a question of what

2    treatment is accorded to the general unsecured creditors, the

3    lenders in particular.  The lenders are saying they are

4    entitled to receive default interest on their claim.  That is

5    an issue as between those lenders and the debtors who are the

6    debtors on that claim.  The personal injury claimants are not

7    even parties to the underlying obligation.  They're not

8    parties to the dispute, and so, when Your Honor talks about

9    the fact that, Well, this will be binding on everybody, this

10   is a bankruptcy case, and in the context of a bankruptcy

11   case, there are all kinds of people who are parties to the

12   case who aren't necessarily parties to a particular dispute.

13   If Your Honor resolves a dispute between two parties, it

14   doesn't affect strangers to that dispute just because they

15   are in the Bankruptcy Court.

16        THE COURT: The asbestos creditors are not strangers

17   to this dispute.

18        MR. BERNICK: They are absolutely strangers.  They

19   are absolutely strangers with respect to the question of

20   whether there is default interest that is due and owing to

21   these particular creditors.  They are complete strangers to

22   this.  In fact, in connection with this plan, this is an

23   issue that is the debtors' issue.  It is not the issue of

24   other creditors.

25        THE COURT: But to get there -

1            MR. BERNICK: Yes.

2            THE COURT:  - I need to make a finding as to

3    whether or not the debtor is solvent.  The major component of

4    the liability side for the debtors is what their asbestos

5    liabilities will be.  Now, do I need to articulate

6    specifically the amount of that liability?  No.  But do I

7    need to find out whether it is more or less than the debtors'

8    assets?  Yes, and that finding is going to be binding because

9    it will be a finding of solvency.  It will not be a finding

10   as to what the debtor specifically owes to asbestos

11   creditors.

12           MR. BERNICK: Well, but, Your Honor, again, if it is

13   not that, it cannot be binding on them.  They are not parties

14   to the dispute.

15           THE COURT: Well, what else could it be?

16           MR. BERNICK: It is purely binding with respect to

17   the parties to the dispute over default interest.  You can

18   litigate all kinds of issues.  You could have - if such and

19   such product is defective, that can be resolved by 19

20   different courts around the country, not in the context of

21   bankruptcy, and it's not binding on a party who's not a party

22   to that dispute.

23           THE COURT: But solvency is different.  You can't

24   make that analogy in this circumstance.

25           MR. BERNICK: To the contrary, solvency only is

1  germane - in the context of which it is being raised, it is

2  only germane to these litigants, that is, to the lenders and

3  to the -

4       THE COURT: No, it's the whole plan confirmation.

5  If in fact these debtors are insolvent and cannot satisfy the

6  other creditors above equity as to whatever their treatment

7  under this plan will be, this plan can't be confirmed because

8  equity can't retain an interest.  Now, that's the risk.

9       MR. BERNICK: Your Honor has framed the issue as

10 being an issue that maybe we would have had back at the

11 beginning of the case, if we had resolved this issue up front

12 and it turned out the debtor wasn't solvent, then maybe a lot

13 of different consequences would have flowed from that,

14 including consequences with respect to other claimants.  That

15 is not the context in which this is taking place.  It is not.

16 This is purely - we have resolved our differences with

17 respect to the personal injury claimants.  They are not

18 taking the position that their claims are worth more than X.

19 It is a done deal with respect to them.

20       THE COURT: I understand that.

21       MR. BERNICK: And therefore, this issue is not an

22 issue of, is there solvency in the Grace case for all

23 purposes because almost everybody in this courtroom has

24 recognized and has agreed to step down from the issue of what

25 the amount of the liabilities is because they basically

1    agreed that for plan purposes a certain amount of this money

2    is going to be paid.

3            THE COURT: But some of them haven't, and as to

4    those creditors who are unsecured and ahead of equity, you

5    still have to determine whether or not you're solvent.

6            MR. BERNICK: But that again is the issue of whether

7    they should be treated ahead of equity is not governed by the

8    question in this instance.  This is a question about whether

9    they are entitled to the default interest.

10           THE COURT: I've already said they're not.

11           MR. BERNICK: Well, I understand that.  So the only

12   way they can become - they can get default interest is if

13   under the Code our treatment of them violates the fair and

14   equitable standard.

15           THE COURT: Right.

16           MR. BERNICK: Assuming that there's impairment.

17   That is an issue that doesn't require - We don't have to sit

18   here and say, The whole rest of the case, the future of the

19   entire case is going to turn upon the fact that they have an

20   objection based upon solvency.  If that were the case that

21   anytime Your Honor determines an issue in this case as

22   between two parties, even if everybody else has agreed to the

23   outcome and has said, We don't need to do it, the entire case

24   gets turned on its head and we litigate this issue.

25           THE COURT: No, this is a plan confirmation

1   standard.  I mean this is raised in the context of plan

2   confirmation, and the debtor - I'll just say the debtor.  The

3   plan proponents, if I say the debtor, I mean the plan

4   proponents, the plan proponents in the case have the burden

5   to substantiate that they've met all of the standards for

6   confirmation.

7          MR. BERNICK: Right.

8          THE COURT: If they're going to take the position

9   that equity can retain an interest in the case, then they

10  have to meet the standards that show how equity can retain in

11  interest in the case.  You can do it by consent of all

12  parties.  I mean, lots of plans get confirmed that way where

13  debtors are insolvent, but here, you've got a group of

14  creditors who are saying, Equity is not entitled to an

15  interest unless you pay us a certain rate of interest.  Now,

16  your resolution, and I'm not making findings, your resolution

17  to avoid it is to figure out a negotiated solution.

18  Otherwise, if I'm making findings of solvency they will be

19  binding.

20         MR. BERNICK: Well, but, Your Honor, that negotiated

21  solution that basically - if they come in at this point, they

22  can take the entire case and make it . . . (microphone not

23  recording) to whatever . . . that's the effect of what you're

24  saying, but I don't -

25         THE COURT: No, what I'm saying is, they can make

1    whatever demand they want.  They have to prove that the plan

2    is not fair and equitable.  I mean, it's a burden of proof.

3              MR. BERNICK: I understand that.

4              THE COURT: Okay.

5              MR. BERNICK: But that is -

6              THE COURT: Once I make those findings, they are

7    binding.

8              MR. BERNICK: That is exactly - Again, you can't

9    have collateral estoppel or *res judicata* unless you have an

10   identity of parties, a subject matter that includes both fact

11   and law.  That's the basic case -

12             THE COURT: I actually don't need the history

13   lesson.

14             MR. BERNICK: I understand that, but this is really

15   - it seems odd that it's exactly what it is that's really at

16   issue here.

17             THE COURT: Alright.

18             MR. BERNICK: Is whether the issue really is between

19   the same parties and involves the same subject matters.  The

20   issue of whether the plan is fair and equitable can be

21   decided on a global basis with respect to all creditors and

22   in the right case if that really is true, that is if

23   everybody has got the same issue, then the determination

24   about fairness and equity affects everybody the same way.

25   That is not true in this case.

1          THE COURT: It affects the Class 9 and the equity

2    and the plan proponents.

3          MR. BERNICK: No, Class 9 is not coextensive with

4    the general unsecured creditors - with the bank lenders who

5    we're affecting here.  We've got an issue that pertains -

6          THE COURT: I thought the unsecured creditors were

7    objecting too.

8          MR. BERNICK: No, no, no.  It's the bank lenders who

9    have objected.  Morgan Stanley, for example, is in a

10   different position.  They're post-confirmation, but you have

11   the bank lenders who have posed this objection and the

12   Committee on behalf of the general unsecured creditors.

13         THE COURT: Right.  They both objected.

14         MR. BERNICK: Yes, but - that's fine, so it's Class

15   9.

16         THE COURT: Right, that's what I said.

17         MR. BERNICK: Well, it's not all of the Class 9,

18   because again we've got Morgan Stanley who has agreed to

19   litigate the issue post-confirmation.

20         MR. FRIEDMAN: Your Honor, that's not correct.  Just

21   so we're clear -

22         MR. BERNICK: You know -

23         MR. FRIEDMAN: Just stop, just stop a second, Mr.

24   Bernick.

25         THE COURT: Gentlemen.

1           MR. BERNICK: Yes, I did not interrupt.

2           THE COURT: You did interrupt.

3           MR. FRIEDMAN:  Your Honor, Your Honor, your

4    determination of solvency, if you determine we're solvent, it

5    is preposterous to think that Morgan Stanley then needs to

6    relitigate that issue with the debtor.

7           THE COURT: That's true.

8           MR. FRIEDMAN: You're absolutely right.  I mean, the

9    bankruptcy affects -

10          MR. BERNICK: That actually illustrates why it is so

11   problematic because the answer is . . . (microphone not

12   recording) -

13          THE COURT: Look, it's the plan proponents' plan -

14          MR. BERNICK: I don't want to get -

15          THE COURT: Mr. Bernick, you could have classified

16   creditors in different classes to avoid this.  It's not done

17   that way.  This is Class 9 -

18          MR. BERNICK: My argument doesn't turn on it, Your

19   Honor.  My argument doesn't turn on it.

20          THE COURT: Alright.

21          MR. BERNICK: Okay, so counsel can sit down, relax.

22   We can talk about what our argument actually is as opposed to

23   what he believes it is.  We have a dispute, call it with

24   respect to all Class 9s, notwithstanding the election that .

25   . . (microphone not recording).

1           THE COURT: You're not being picked up on the

2    recording.

3           MR. BERNICK: It says it's green.  It says it's on.

4    What?

5           UNIDENTIFIED SPEAKER: (Microphone not recording.)

6           MR. BERNICK: Okay.  The issue of fairness and

7    equity with respect to the Class 9, they say is going to turn

8    on solvency.  They would like to have Your Honor say that so

9    long as Your Honor determines that there is not solvency,

10   that that's the end of the issue, and that's actually not

11   true.

12          THE COURT: I agree.

13          MR. BERNICK: The issue really is, what amount of

14   interest should be paid, and in the context of fairness and

15   equity, fairness and equity takes you to what amount - It's

16   not a light switch, such that you say, Well, gee, if there is

17   any money going to equity, then the debtor is solvent and

18   they must be entitled to default interest.

19          THE COURT: I agree.

20          MR. BERNICK: Okay.

21          THE COURT: The issue is solvency because the case

22   law says that for a solvent debtor the default rate of

23   interest is the presumptive standard.  So it switches the

24   burdens of proof -

25          MR. BERNICK: It does not say that.  That is the <u>Dow</u>

1    <u>Corning</u> case and Your Honor's opinion already recognized that

2    the presumption is only a function of Sixth Circuit law, it's

3    not the law elsewhere.  I think that perhaps what we would

4    say is the more accurate characterization of law outside of

5    <u>Dow Corning</u> is that determination of fair and equitable,

6    equitable consideration and it focuses on should any interest

7    be paid and if so, what amount.  That's the ultimate fact

8    that has to be determined.  The ultimate fact that has to be

9    determined is not solvency.  The ultimate fact that has to be

10   determined with respect to Class 9 is, What amount?  It's

11   this right here, fairness and equity, what amount.  An issue

12   that has to be taken up in the context - and that issue, what

13   amount to pay these folks to make it fair and equitable, that

14   issue relates to them alone.  The final determination that

15   Your Honor makes on fairness and equity with respect to Class

16   9 is not a determination with respect to Class 6.  It is

17   solely with respect to Class 9.  So, if Your Honor reaches

18   fairness and equity with respect to the default rate of

19   interest in Class 9, that is an issue that doesn't make the

20   plan unfair and inequitable with respect to Class 6, it makes

21   it unfair and inequitable with respect to Class 9 if we're

22   not providing for it in the plan.   So the actual issue that

23   is being resolved, at the end of the day is an issue that is

24   binding in a collateral estoppel or *res judicata* sense only

25   with respect to the debtors in Class 9.  It is not binding

1   with respect to Class 6.  They are strangers to that dispute.

2   It may be that they have an economic interest in it because

3   they're co-proponents to the plan, but they are not parties

4   to that adjudication under traditional collateral estoppel

5   and *res judicata*.  I want to make one other point which

6   really bears on this very heavily.  In the context of

7   reaching fairness and equity with respect to Class 9, that is

8   a) are they entitled - they didn't get into the zone, and b)

9   what is the amount.  All Your Honor has to determine with

10  respect to the issue that's before the Court on default

11  interest is one matter, is the rate of interest called out in

12  the plan, is it fair and equitable.

13          THE COURT: And that may be well affected by whether

14  or not the debtor is solvent.

15          MR. BERNICK: I understand that.  It may be

16  affected, may be affected.  There's no formula.  There's no

17  one thing that says, Well, depending upon this outcome, this

18  is the amount of money that get provided for.  This is an

19  equitable determination.  That is all that it is.  There is

20  no formula, there's no magic.  There's no case law that says

21  you are automatically entitled to default interest if there's

22  solvency.  This is an equitable determination.  If equity has

23  money - let me go back.  If equity gets money, gets value,

24  Your Honor has recognized there is not a single case -

25          THE COURT: That's right.

1          MR. BERNICK:  - not one case that says that means

2     any given amount of default interest or any default interest.

3     So this is a classic equitable determination by the Court as

4     fairness and equity as the standard indicates.  So all that

5     Your Honor actually is determining at the end of the day is,

6     is the rate of interest that's proposed fair and equitable.

7     You're not determining there's another rate of interest.

8     You're just saying, with this plan, is that rate of interest

9     fair and equitable.  Now, in making that determination, Your

10    Honor can consider a whole bunch of different factors, all

11    kinds of different factors, and we'd urge Your Honor to

12    consider not only the question of well, solvency, and I'm

13    going to tell you in a minute, solvency when, as of what

14    time, under what circumstances.  Solvency itself is a very

15    complicated issue as a legal matter as well as a factual

16    matter, but solvency is one factor, maybe even an important

17    factor.  Your Honor's going to exercise your discretion in

18    determining equity based upon a series of facts, including

19    the history of the case and the nature of dealings between

20    the debtor and other constituencies, but most particularly

21    the general unsecureds and the agreement that they reached at

22    one time, the fact that they themselves said, We believe that

23    equity can get money and we still don't get the full default

24    rate.  Remember that's what the deal was before this plan.

25    So you have a whole history of conduct that bears upon the

1    question of what rate to pick.  So, we now go back and say,

2    Can you get collateral estoppel as to an evidentiary fact

3    holding, that's all it is, it's an evidentiary factor and you

4    get collateral estoppel with respect to people who are not

5    parties to the dispute based upon the fact that there is one

6    equitable factor as to which there is a subject matter

7    overlap, that is, they're the personal injury constituency,

8    and that is not even close to the world of collateral

9    estoppel.  It's one thing if you are determining the scope of

10   their liability with them at the table litigating, and the

11   only issue - and you actually must determine what the amount

12   of the liability is in order to dispose of their issue.

13   Here, you don't need to do any such thing because solvency,

14   which really comes down to what is the scope of the asbestos

15   liability in value, what is the scope of that as only a

16   factor and indeed you may decide that you can't determine on

17   the basis of this record that there is one number.  Maybe

18   it's a range of numbers.  Maybe it's so uncertain you can't

19   really decide what the range is.  In fact, I just took the

20   deposition of their expert the other day.  Their expert the

21   other day had this to say, Mr. Frezza (phonetical) said, and

22   I took him back through this whole situation.  Their own

23   expert, and I said - because all their expert did is he took

24   the issue of solvency -

25            MR. PASQUALE: Are we having a confirmation hearing

1    today?

2            MR. BERNICK: No, no, look -

3            THE COURT: I don't know.  My determination, I

4    believe, is that if I have to determine solvency, it's going

5    to be binding.  All parties are here at the table.  If they

6    choose to participate in the debate, they may.

7            MR. LOCKWOOD: Your Honor -

8            THE COURT:  If they choose not to, they need not,

9    but they're here.  They have notice -

10           MR. LOCKWOOD: Your Honor, this is a motion -

11           THE COURT: Mr. Lockwood, they have notice, they can

12    participate, to the extent they choose not to, they act at

13    their peril, I need to determine at least whether or not the

14    asbestos liabilities do or do not exceed the capability of

15    the debtor to pay those liabilities, and that fact is going

16    to be binding.  It's a fact I have to determine after

17    litigation.

18           MR. LOCKWOOD: Your Honor, please.  This motion was

19    made by the Asbestos Claimants Committee and the Futures

20    Representative.

21           THE COURT: Okay.

22           MR. LOCKWOOD: We have yet to be heard on a single -

23           THE COURT: I'm happy to hear you.

24           MR. LOCKWOOD: And we've got some serious

25    considerations, and with all due respect to Mr. Bernick, I

1  would like for us to have our shot at this before Your Honor

2  rules.

3          THE COURT: You may.

4          MR. BERNICK: That's fine.  I'll sit down, go ahead.

5          MR. LOCKWOOD: Your Honor, what we're talking about

6  here is what people could do by stipulations and agreements.

7  We're not talking here about the law of *res judicata,* with

8  all due respect to Mr. Bernick.  I don't disagree with his

9  analysis, but what we've got here is the following scenario:

10 As Your Honor will remember a couple of years ago, we had an

11 estimation hearing.  That estimation hearing stopped in the

12 middle.  The debtors put on their case and the asbestos

13 constituency didn't put on its case because we made a deal.

14 Now, the Unsecured Creditors Committee are proposing to

15 litigate solvency with the debtors by incorporating by

16 reference, in effect, half of the estimation case.  Now,

17 we've got, at that point, putting aside Mr. Bernick's points

18 about the uncertainty and the various ways in which and the

19 fact that solvency when and for what purpose and all that,

20 but just looking at it from the perspective of this is

21 supposed to be a bankruptcy proceeding where the creditors

22 and the debtors work things out and you try to have

23 stipulations and you try to have agreements and stuff.  We

24 agreed that we weren't going to put on our case, which was

25 going to take a lot of time and involve a lot more witnesses.

1          THE COURT: Yes.

2          MR. LOCKWOOD: Now, in effect, are we now supposed

3    to say, Okay, because the Unsecured Creditors Committee and

4    the debtor want to litigate this issue of interest, Your

5    Honor might in that fight make a determination the asbestos

6    liability is X.  If that asbestos liability is very low, then

7    we have sat by and essentially forfeited our right to

8    participate in the estimation hearing because we tried to

9    reach a consensual plan with the debtor.  Now, Your Honor, in

10   the Owens Corning case, Your Honor approved a stipulation

11   with a bunch of insurance companies that specifically said

12   that the estimation proceedings in that case were not going

13   to be binding on the insurers.

14         THE COURT: And I don't have any problem doing that.

15         MR. LOCKWOOD: And in this case, we're negotiating

16   stipulations with insurers about insurance neutrality, and

17   among those stipulations is for the purpose of making sure

18   that findings by this Bankruptcy Court in a case where

19   they're parties, they've entered appearances, they've showed

20   up and objected, those findings will not have collateral

21   estoppel or res judicata effect.  The principle behind both

22   of those approaches, is the notion that parties can in fact

23   agree -

24         THE COURT: No, the principle behind those notions

25   is that you can estimate liabilities for a variety of

1    purposes, one of which is for plan confirmation that need not

2    be binding and therefore the Court doesn't have to make it

3    binding.  This Court wouldn't have jurisdiction to try those

4    cases to final verdict in any event.  That is different from

5    solvency.

6          MR. LOCKWOOD: Whether something is *res judicata*, as

7    Your Honor has noted upon numerous occasions, depends on some

8    other court in some other context deciding.

9          THE COURT: Yes.

10         MR. LOCKWOOD: And the other court could decide that

11   a finding in a proceeding which it didn't have jurisdiction

12   over, is nevertheless binding on the parties in the other

13   court.  There's nothing about *res judicata* or collateral

14   estoppel that says that findings of fact by court number 1

15   are only binding in court number 2 if court number 2 had

16   jurisdiction over the controversy in which the findings were

17   rendered.

18         THE COURT: So what?  I mean, I'm missing the point.

19         MR. LOCKWOOD: The point, Your Honor, is that we in

20   effect - Let's assume Your Honor doesn't confirm this plan.

21   Let me see if I can approach it a different way.  The purpose

22   of this stipulation was to allow the debtors and the asbestos

23   constituencies to in effect reserve their respective rights

24   to litigate against each other if this plan doesn't get

25   confirmed and we go back to the drawing board, what the size

1    of the asbestos liability is.  That was the purpose of it.

2    The debtor doesn't want the liability to be real high.  The

3    asbestos constituencies don't want it to be real low, but

4    there's this other controversy over post-petition interest.

5    So the notion was, we were going to make a deal in effect

6    that said, We agree we won't be bound by this even though

7    it's in a confirmation hearing because we're co-proponents of

8    the plan and we don't want to have co-proponents of a plan be

9    forced by an objector into getting into a fight with each

10   other over something that we've resolved by agreement.  And

11   that's basically all this stipulation is intended to deal

12   with.  It's to say that however Your Honor comes out on this

13   fight, and even if it results in Your Honor deciding that

14   this plan is not confirmable, if we then have to have a new

15   plan and we have to seek confirmation and the debtors and the

16   asbestos constituencies can't make a deal, remember, under

17   the terms of this plan, if Your Honor rules against the

18   debtors in favor of the lenders, as Your Honor noted, this

19   plan is not confirmable by its terms.  Now the parties can

20   waive that, that's true, but nevertheless on the face of it,

21   it's not confirmable.  As a result, the co-proponents have no

22   idea where they're going to be headed if Your Honor makes

23   that determination.  So, we want, with the Court's

24   permission, to be able to reserve our respective rights on

25   this so that we won't be bound.  In this Court in a

1    subsequent proceeding, I don't know of any rule of law nor

2    has anybody - and remember, the people that objected to this

3    order, the unsecured creditors of BNSF have after we made a

4    variety of language changes, agreed to accept it.  So they're

5    not objecting.  So at the moment the only person who's

6    objecting, Your Honor, is you, and I'm -

7              THE COURT: It's my order.

8              MR. LOCKWOOD: I understand, but the point is, what

9    is intrinsically illegal or improper about the notion of a

10   court in a consensual plan reorganization scheme environment

11   allowing one set of disputants, namely the debtors and the

12   asbestos constituencies, to say by agreement, in effect,

13   accepted by the Court, we agree that this other fight going

14   on over here won't for all time and all purposes decide the

15   fight that we had earlier that we've agreed to stop fighting

16   and make a deal on.  If we have to go back to square one,

17   which is the plan isn't confirmable, so we don't have - we're

18   no longer co-proponents of a plan, then everybody's reserving

19   their rights to go back in there and we fight that fight

20   because otherwise you're telling us, I have to put on - Let

21   me rephrase that.  Are you telling me that in order to

22   protect myself down the road, I have to say, Stop everything,

23   Judge, if you're going to rule this, we've got to postpone

24   the confirmation hearing.  We're going to put on the rest of

25   our estimation case.  We're going to treat this plan as

1    though there was no deal -

2           THE COURT: Well, let me ask you the question, Mr.

3    Lockwood.  How do I determine solvency without estimating the

4    asbestos liabilities?

5           MR. BERNICK: I can.

6           MR. LOCKWOOD: He can say that, but my point is,

7    even if you do, if we and the debtors agree that we're not

8    bound by that, then we can relitigate it at some other point.

9           THE COURT: Why am I making a determination if

10   nobody's going to be bound by the very issue -

11          MR. LOCKWOOD: Because this is a much more limited

12   fight.  As Mr. Bernick will tell you, we're agreeing not to

13   put on all our witnesses.  We're agreeing not to reopen the

14   estimation hearing and start back where we left off.

15          THE COURT: So what are you going to do?  How am I

16   going to know what this estimated liability is?  Are you

17   stipulating to a number that everybody agrees to?

18          MR. LOCKWOOD: I'll let Mr. Bernick talk about that.

19          MR. BERNICK: I want to take up on Peter's point for

20   just a minute, and I know that the gentlemen on this side of

21   the courtroom of course will want to be heard although this

22   is a total showstopper.  I mean, this is - the whole plan, a

23   precondition of the plan is the determination of the rate of

24   interest as set forth in the plan being confirmable.  So,

25   it's not - it's significant money, and when Your Honor talks

1    about the negotiation dynamics, this is a situation where two

2    parties that have a dispute with respect to one issue in the

3    case, the whole rest of the case, and I don't mean to do any

4    disservice to my insurance colleagues and my Libby

5    colleagues, but the whole rest of the case is resolved, and

6    the whole idea of that resolution was to avoid an enormous

7    host of issues on a) how to do the estimation; b) what use to

8    make of the estimation.  So, effectively what happens is,

9    that if people who are now - don't have a dog in the fight on

10   the legal issue that's being posed here, are nonetheless

11   bound notwithstanding the agreement that they've reached,

12   then these folks have the case by the tail.  They have the

13   entire case by the tail, and you want to talk about how

14   they're going to negotiate, it's quite clear how they would

15   negotiate, because they have the ability to hold up the whole

16   confirmation of the plan.  I believe that that concept, that

17   is that parties to a different dispute can reach agreement

18   and then be subject to an adjudication that does not involve

19   them, does not involve them as a matter of law, does not

20   involve them is, I mean, a) it's the opposite of bankruptcy

21   and b) it is the opposite of the adjudicative process.

22             THE COURT: I think I see the difference.  The plan

23   proponents seem to think that this is a very narrow issue,

24   and I don't.  I think it is a plan confirmation determinative

25   issue, and as a result, if I cannot determine whether the

1    plan is confirmable without making a determination of

2    solvency, I don't see how parties can stipulate away the

3    ability to be bound by that determination.  If it were

4    limited to the concept of whether or not the treatment of one

5    class is fair and equitable and despite that determination

6    the plan would still be confirmable, then I think there is a

7    way to say that the asbestos creditors have no dog in the

8    fight, but without that determination, this plan - now I said

9    that badly.  Whether or not the plan is confirmable is driven

10   by a determination as to whether this class if fairly and

11   equitably treated because of equity retaining something in

12   the case because otherwise you can't get into cram-down.  So,

13   you folks either need to go back to the table and resolve

14   this issue because I'm not at this point - I have already

15   ruled that the bank lenders are not entitled to default

16   interest as a matter of law.  I've ruled that.

17          MR. BERNICK: Right.

18          THE COURT: So the issue is very simple with respect

19   to fair and equitable, and parties can negotiate on the fair

20   and equitable side.

21          MR. BERNICK: I'll spend two more minutes addressing

22   that because I think Your Honor actually with your

23   articulation was very, very close to the problem.  If you

24   have a dispute, fairness and equity is not disputed by a

25   significant creditor constituency, the personal injury folks.

1    They don't dispute that the plan is fair and equitable, they

2    support it.

3            THE COURT: Right.

4            MR. BERNICK: Fairness and equity, yes, if the plan

5    as a whole has one part, one single little part that violates

6    the fair and equitable test, the plan can't be confirmed, but

7    we all know that that is a function not of there having been

8    an adjudication that is binding on all of the other creditor

9    constituencies, but rather because the plan is one whole, and

10   we also know that if that's the case, that part of the plan

11   can be fixed.  The process of adjudicating whether the plan

12   is fair and equitable with respect to one constituency,

13   whether that adjudication is legally binding on a basis of

14   *res judicata* or collateral estoppel with respect to other

15   parties, that is a completely different kettle of fish.  The

16   plan as a whole is non-confirmable because the plan as a

17   whole is one document by agreement.  It is not one document

18   in the sense that it is an adjudication.  It's not one

19   document by adjudication.  If Your Honor decides you don't

20   have fairness and equity with respect to one class, yes, the

21   debtor can't re-litigate that issue because the debtor is the

22   one that is actually party to the dispute with respect to

23   that class.

24           THE COURT: The plan proponents are the parties.

25           MR. BERNICK: No, no, the plan proponents are not

1  the parties with respect to whether the debtor owes default

2  interest to the lenders.  They are not parties to that.

3         THE COURT: I agree.  The contract does not involve

4  the unsecured creditors.

5         MR. BERNICK: Exactly.  So if that is true, if they

6  are not parties, that a determination of whether these folks

7  are entitled to default interest included any and all - *res*

8  *judicata* and collateral estoppel require an identity of

9  issues and an identity of parties.  You can have a situation

10  where I've got a product that I sell in Minnesota.  It is

11  found to be defective with respect to Ramona here in

12  Minnesota.  I can't re-litigate the issue of product defect,

13  but I may win that case, and if I win the case, that doesn't

14  stop Ms. Baer from suing me in New York.  The issues may be

15  the same as subordinate issues, but there's no *res judicata*

16  and no collateral estoppel with respect to the other

17  litigants.  Why?  Because ultimately the adjudication is not

18  one that's designed to be binding on them because it's not

19  their dispute.  So, yes, you can decide solvency 18 times

20  around the country in different contexts.  It doesn't make it

21  collateral estoppel or *res judicata* with respect to people

22  who aren't parties to it.  This is absolutely no different,

23  and if the results, Your Honor, would be that you can't have

24  a stipulation of settlement with respect to 9 out of 10

25  constituencies that can't be opened because a similar issue

1   is now raised in the context of adjudicating fairness and

2   equity with respect to the 10th constituency then that

3   effectively puts that 10th constituency in the position of

4   running the case, and that is not required by *res judicata*

5   and it's not required by collateral estoppel.  Your Honor may

6   find it to be more efficient, but it actually undercuts the

7   entire fabric of the process of reaching a consensual plan.

8   Now, let me make one other observation, and I know that Mr.

9   Frankel definitely wants to speak to the Court, and the other

10  observation is this: Your Honor has, I think, bought in a

11  little bit to the idea that sovereigncy for purposes of

12  determining fairness and equity that you must determine what

13  the scope of the liability is, because otherwise you can't

14  determine solvency, and, Your Honor, I don't believe that

15  that is correct.  In fact, I would say it is incorrect, and

16  the reason that it's incorrect is that that means that in

17  order to decide fairness and equity, you must in fact go

18  forward, and fairness and equity is with respect to a number

19  in the plan.  You must go forward and determine solvency to a

20  specific number or a range of numbers that enables you to -

21          THE COURT: Well, it's to a class.

22          MR. BERNICK: What?

23          THE COURT:  It's to a class, a determined fairness

24  and equity with respect to the class.

25          MR. BERNICK: Yes, to a class.  It will also have

1   essentially the same issue which is default interest.

2           THE COURT: Okay.

3           MR. BERNICK: Okay.

4           THE COURT: Well, no, it's - I don't think it's

5   default interest.  The bank lenders - well, maybe it is, I'm

6   not sure about the unsecured creditors.

7           MR. BERNICK: Yes, that's what the issue is because

8   our plan clears the best interest test and federal judgment

9   rate, so - and it's more than that.  So the only way that

10  they can get more is by saying they're entitled to above what

11  we're saying -

12          THE COURT: Okay, that's right.

13          MR. BERNICK:  - which is default interest, and

14  effectively, Your Honor seems to be operating on the

15  presumption that the only way to determine fairness and

16  equity for purposes of saying is there default interest or

17  not is to determine an actual number for the liability.

18          THE COURT: No, I think I just said I have to

19  determine that it's either more than or less than the

20  debtors' ability to pay, i.e., its assets.

21          MR. BERNICK: With due respect, Your Honor, I don't

22  think you need to do that at all.

23          THE COURT: Okay.

24          MR. BERNICK: And I don't even think that it's

25  appropriate in this context that you do that and for the

1    following reason.  The solvency determination - remember the

2    personal injury constituency takes the position not only that

3    the estimate should be high rather than below one that we

4    proposed.  They also said, whatever you determine in

5    estimation is not binding with respect to determining the

6    actual liability to our constituency.  They took issue with

7    the whole idea that any determination with respect - that

8    came out of the estimation process would be binding on any of

9    the individual claimants for purposes of a 524(g) plan.  Why?

10   Because the individual claimants are not parties to the

11   litigation about what the overall scope of the liability is,

12   and that underscores a fundamental problem that again gets

13   back to the question of how these folks can be bound by the

14   outcome of the result.  The estimation is not binding in the

15   view of the asbestos claimant constituency with respect to

16   any individual.  Now, therefore, Your Honor is not really

17   going to determine the actual amount of the actual liability

18   to claimants.

19          THE COURT: I said that half an hour ago.

20          MR. BERNICK: Right, and because that's true, you're

21   not really determining solvency in the sense of saying,

22   Here's the liquidated amount of the asbestos liability.

23   You're determining solvency even under their theory by

24   saying, Here is what I in the context of an estimation in

25   this case under these circumstances might be able to find.

1   That is not a determination of solvency in the precise sense

2   of balance sheet solvency.  We don't have liquidated claims.

3   We don't know what they're actually going to be worth, and at

4   the time this deal was struck nobody even knew what the

5   estimate was going to be.  Instead, we had widely competing

6   estimates, in fact, what their expert has admitted and it can

7   really be controverted, is that the whole question of whether

8   the debtor is or is not solvent was completely indeterminate.

9   Nobody really knew.  It was all up to Your Honor to decide at

10  the end of the day.  So when this plan got put together and

11  talk about why are we here in bankruptcy, we're here in

12  bankruptcy to determine what is fair and equitable in the

13  context of a consensual resolution, this consensual

14  resolution was reached where liabilities were indeterminate

15  and uncertain, and so, if Your Honor now says, Well, I can't

16  determine fairness and equity until I come up with the truth

17  of the matter at the end of the day, that is completely

18  different from what happens in the actual negotiation process

19  during the bankruptcy itself, which is that you have wide

20  uncertainty.

21        THE COURT: Well, litigation and negotiation aren't

22  the same.   That's the reason why you normally go to

23  negotiate and don't litigate these issues.

24        MR. BERNICK: But fairness and equity ultimately, in

25  the context of bankruptcy, is different from the legal

1   entitlement.  We already know that.

2          THE COURT: Yes.

3          MR. BERNICK: So fairness and equity in a bankruptcy

4   has everything to do with the negotiation process, everything

5   to do with it, and I think what, again, what I would suggest

6   to Your Honor is that whether a given number is fair and

7   equitable requires consideration of all of the different

8   circumstances that surround the awarding of default interest,

9   all of the different circumstances.  There's no case that

10  says that it's a formula.  There's no case that says it's

11  solely solvency.  There's one case that says there's a

12  presumption of full default interest in the event of

13  solvency.  So what else is Your Honor supposed to determine?

14  Your Honor is supposed to determine all of the other factors

15  that bear upon the question of whether our number in the plan

16  is fair and equitable.  If Your Honor is only determining

17  whether there's default interest based upon is there a dollar

18  extra in the balance sheet, well that's pretty simple.  If

19  you find that - It could be pretty simple.  It's not simple

20  in this case, then all Your Honor needs to determine is

21  whether there's a dollar or not, but the whole idea of this

22  being a fair and equitable determination, is it doesn't just

23  depend upon that.  It depends upon an awful lot of other

24  things, and in this case, Your Honor, the proofs ultimately

25  will be there is so much uncertainty even in the ranges of

1  the estimates that have been put out there.  There's no

2  statistically significant different between Dr. Peterson's

3  number and Dr. Florence's number.

4        THE COURT: Alright.  You'll tell me that by way of

5  some evidence.

6        MR. BERNICK: I understand that, but what I'm

7  suggesting to Your Honor is that this all stands to

8  illustrate that the issue of what is fair and equitable that

9  we're actually adjudicating here is not the same issue that

10  would be determined in some subsequent proceeding if this

11  plan is not determined.  So, for example, if Your Honor were

12  to determine that there is insolvency here, these folks lose,

13  but then if we're now all bound by that as we go forward,

14  it's a totally different case.  It's a totally different

15  plan.

16        THE COURT: Yes, and in that totally different plan,

17  all the stops are pulled and you start the whole process all

18  over again.

19        MR. BERNICK: Well, that turns the entire case

20  around, and what I'm suggesting to Your Honor is that that

21  shouldn't be so because the issue that we're addressing in

22  the context of default interest, is a unique issue under the

23  law and under the facts.

24        THE COURT: I understand what you're saying.

25        MR. BERNICK: Yeah, and because it's unique, it is

1    not binding and should not be binding in the formal sense of

2    which I think Your Honor was saying when you said that the

3    outcome of this process will be binding on all the other

4    people in the courtroom.

5            THE COURT: Yes.

6            MR. BERNICK: I think that that presumes that

7    there's a level of identity that I don't think that the law

8    on *res judicata* or collateral estoppel says at all.  It may

9    be important for Your Honor from an efficiency point of view,

10   but it's not, I don't think, correct and what I would suggest

11   and the reason I'm going to close now, Mr. Frankel is going

12   to address the Court, is that if Your Honor believes that the

13   adjudication of this issue requires that there be a full

14   solvency determination that includes all the different

15   constituencies to this case, then I think that we should

16   brief this because if that's so, I'm not sure we should go

17   forward with this confirmation hearing at this time.

18           THE COURT: Alright.  Mr. Frankel?

19           MR. FRANKEL: Good morning, Your Honor.

20           THE COURT: Good morning.

21           MR. FRANKEL: I probably wouldn't have stood behind

22   Mr. Bernick if I hadn't thought he was winding up when I

23   started standing behind him.

24           MR. BERNICK: It's always difficult to get me to

25   wind up.

1          MR. FRANKEL:  Your Honor, I want to go back to what

2    we were trying to accomplish by this motion that was a motion

3    of the ACC and the FCR.  We were trying to avoid being

4    interested in the default interest issue.  That was what was

5    driving this.  Even though it's a condition to confirmation

6    that's waivable, it's not an issue that we are a party to and

7    it's really not an issue that we need to litigate.

8          THE COURT: Well, can I explore that just for a

9    second.  Mr. Bernick tells me that this issue is monetarily

10   significant such that a condition to the plan confirmation is

11   that I have to determine that the interest rates that are in

12   the plan are all that the debtor has to pay because if the

13   debtor has to pay more, in essence, it can't comply with the

14   other provisions of the plan, one of which is the

15   contributions into the trust.  How are your clients not

16   interested?

17         MR. FRANKEL: Your Honor, perhaps the testimony at

18   the confirmation hearing will bear out that Grace is prepared

19   to fund the confirmation of the trust if this plan is

20   confirmed.

21         THE COURT: Well, yes.

22         MR. FRANKEL: Okay?  The interest issue is roughly a

23   $100 million issue.  Grace, if it loses that issue, has to

24   make a decision whether or not it will go forward or not.

25   That's the issue.  If they go forward, they'll fund the

1    trust.  We're not concerned about that.  What this is about

2    is if they don't go forward and we are back to square one

3    with a whole new plan, and if we're back to square one with a

4    whole new plan, then we would have put on our estimation.

5    The agreement that came out of the estimation proceeding is

6    an agreement that resulted in this plan right now.

7          THE COURT: Yes.

8          MR. FRANKEL: We don't want to have to put on the

9    rest of our estimation hearing in this confirmation.

10         THE COURT: Yes, I understand.

11         MR. FRANKEL: Okay?  All that we have requested in

12   here is that the debtors be allowed to put on however they

13   want to put on their case with regard to default interest.

14   The lenders, obviously, will do the same, and the parties

15   have agreed that the use of that will be limited, and that

16   will be used in this confirmation.  It will be used under

17   this plan, but if for whatever reason we don't go forward and

18   this plan is not confirmed and we are back to square one, we

19   don't have a plan before you, God knows when it will be, we

20   are saying at that point we should not be precluded from

21   having to go back to estimation and put on an estimation

22   case.  That's all we're saying and the parties have agreed to

23   that with some exceptions and these were exceptions that were

24   negotiated with the lenders.  They can use evidence that they

25   think is relevant, that came out of the confirmation hearing.

1    That's fine.  All we're saying is, we shouldn't be precluded

2    from going back and putting on an estimation case under some

3    different plan at some later date.  And that's really all

4    this does.

5        THE COURT: I don't think any party would be

6    precluded from doing that in a different plan, in a different

7    case.

8        MR. FRANKEL: Well, what Your Honor - I don't think

9    this order should not bother the Court if that's the case.

10   This order does not say anything other than what the parties

11   may do, and -

12       THE COURT: It says that, "The findings or

13   conclusions reached by the Court with respect to debtors'

14   solvency for purposes of determining whether to confirm this

15   plan may not be used by any party for any purpose other than

16   in connection with objections to confirmation and does not

17   preclude any party from offering any evidence on the issue of

18   debtors' solvency in the event a plan of reorganization other

19   than this plan is proposed for confirmation."

20       MR. FRANKEL: So, Your Honor, both of those a) and

21   b) are restrictive of parties to this case.  They are not

22   restrictive of the Court.  They are restrictive of what any

23   party may use from this confirmation hearing in another

24   confirmation hearing, and what we're saying is, if Your Honor

25   decides that Grace is solvent, we don't know what you're

1   going to do to decide that.  We don't know whether you're

2   going to have a full-blown estimation of some sort, but we

3   don't want to have to worry about it, and that's really what

4   Mr. Bernick is saying.  If we have to worry about it, we have

5   a different kind of confirmation hearing, and there's no

6   reason as long as the debtors are onboard and the lenders are

7   onboard that we don't have to worry about it.  The only issue

8   is, we don't want somebody later to say, Well, the Court said

9   they were solvent even though the Court really didn't go into

10  a full-blown estimation hearing.  The Court said you're

11  solvent and therefore, in that next plan, a year and a half

12  from now, that solvency determination is binding on the

13  asbestos claimants and therefore we can't put on an

14  estimation hearing that goes above X.

15        THE COURT: Regardless of what the findings are,

16  they can only be based on the evidence that I get.  I've

17  already asked the question, How am I going to determine

18  solvency without knowing what the liabilities of the debtor

19  are?  I don't know that.  I mean, if you folks have a way

20  that I can determine what the asset side is and not be

21  concerned about the liability side and know whether the

22  debtors are solvent, then, in this instance, you need to give

23  me an expert who says I can do that because that's not my

24  understanding of how I can determine solvency.  If I can just

25  look at assets, I would imagine it's probably going to be

1    stipulated case.  If I have to look at liabilities, unless

2    you folks can come up with a number that you agree on or a

3    range of numbers you agree on, I need a hearing.  Once I have

4    that hearing, you're all here.  You were all either plan

5    proponents or plan objectors, and you're bound by the

6    determinations I make.  I don't know how else -

7              MR. FRANKEL: Your Honor, let me -

8              THE COURT: Otherwise, I don't know why we have a

9    Court.

10             MR. FRANKEL: Let me give an example, because I

11   don't think you can avoid the issue of liabilities.  So,

12   there's different ways of estimating the liability.

13             THE COURT: Sure.

14             MR. FRANKEL: One way would be each side puts on an

15   expert, and Your Honor makes a decision.  Okay?  That's not

16   what our full-blown estimation case would be.  Your Honor

17   knows we had weeks left in our case when this matter was

18   settled.

19             THE COURT: Well, if I'm not given the evidence, I'm

20   obviously not going to base findings on evidence I don't

21   have.

22             MR. FRANKEL: And all we're saying is, we don't want

23   to be precluded from later in a different plan putting on

24   that evidence.

25             THE COURT: I don't think any party - if this plan

1    is not confirmed and it's essentially off the table somehow.

2    Let's just say it's withdrawn, and the parties go back to

3    square one, I don't think any party can be precluded from

4    presenting evidence with respect to the new plan.  As to a

5    determination as to when solvency has to be required, it has

6    to be made as of the effective date.  That's when the plan

7    says that the interest has to be paid.  So that's no magic.

8    We all know what the date is as to which solvency has to be

9    determined.  If that date comes and goes and the plan isn't

10   effective and there's a new plan on the table, it will be a

11   different issue.  Now, I'm totally lost as to what you folks

12   are asking.

13        MR. FRANKEL: I believe that's all we're asking for

14   is that when - if and when there's a new plan on the table,

15   we're not precluded from putting on our estimation case.

16        THE COURT: I don't think you're precluded from

17   producing evidence that isn't produced.  Whether somebody

18   else is going to argue that you could have produced it and it

19   you didn't and you waived it, and you were here, those are

20   big issues.  I don't have a conclusion to those issues.  All

21   I know is, if I make findings, you folks are going to be

22   bound by them.

23        MR. BERNICK: Just a footnote, Your Honor, and I

24   know that Mr. Pasquale and others, and I think we're going to

25   need to confer at some point to figure out where to go, but

1    it's also incorrect from our point of view that you must

2    actually determine a number.  You may decide you can't

3    determine because it's sufficiently uncertain.

4              THE COURT: You're right, I may.

5              MR. BERNICK: And that is going to be the essence of

6    our position, is that this has so much uncertainty that when

7    you determine what's fair and equitable, the number we have

8    in the plan is fair by reference to all those factors

9    including uncertainty.

10             THE COURT: I understand that.

11             MR. BERNICK: That is the essence of our case.

12             THE COURT: I understand that that's what the

13   debtors are going to say, but you're only a piece of the

14   case.

15             MR. BERNICK: I understand.

16             THE COURT:  Mr. Pasquale?

17             MR. PASQUALE: Thank you, Your Honor.  Ken Pasquale

18   for the Unsecured Creditors Committee, very patiently waiting

19   my turn.  Let me first say, we agree with virtually

20   everything Your Honor has said about solvency and what it

21   will mean to litigate solvency in a confirmation hearing.

22   But the Future Claims Representative, the Personal Injury

23   Committee, they're plan proponents, they are parties to this

24   proceeding.  Your Honor said it better than I can.  It's a

25   confirmation proceeding.  This is objections to confirmation,

1    and the brief that was submitted opposing the objection on

2    the lender issues were filed not by Grace, by the plan

3    proponents, Your Honor, everyone, as you would expect.  No

4    surprise there.  The issue of solvency is one that we would

5    just as well not take up as well.  I mean the issue is

6    interest and to some extent, a limited extent, I agree with

7    some of what Mr. Bernick said this morning.  The settlement

8    with the Personal Injury Group, that's fine, but we were put

9    to our burden proceedings for over a year now, and the very

10    brief that I just referenced says on page 42, that the

11    objections that we've raised under 1129 require proof of

12    solvency.  What are we supposed to do?  So we are prepared to

13    prove solvency.  We said in our papers, Your Honor, that

14    we're happy to stipulate to that issue and then none of this

15    matters.  And then Mr. Bernick - the rest of what Mr. Bernick

16    said, I do agree with, the matter of equities is what this

17    objection rests on.  We can avoid this solvency issue

18    entirely for purposes of this plan, and we're a little

19    surprised we being forced to litigate it, but if we are, we

20    will have to litigate it and we will put on proof to show

21    that the debtors are solvent as of the effective date.  I

22    don't really think there should be much of a dispute about

23    that, but have, as you know, been getting a lot of push-back

24    on that issue.  That said, Your Honor, you know, the

25    settlement with the Personal Injury Group is part of the

1   plan.  It's not approved yet.  It would only be approved upon

2   confirmation, and so, whatever happens in this courtroom with

3   all of the various objecting parties, will be part of the

4   confirmation record.  And when we put in a response to the PI

5   and the FCR's motion, frankly I think we misunderstood what

6   they were trying to obtain by the motion, and so we did think

7   that they were looking to limit the findings with respect to

8   this plan, with respect to this confirmation hearing.

9   Subsequent to filing our objection, we had some discussions

10  and just so it's clear, Your Honor, we agree with you as

11  well.  It wasn't our view that anything that happens with

12  respect to this plan would in fact be binding on a subsequent

13  plan.  So when we were presented with the idea of stipulating

14  to that, that was an easy give.  We thought that made sense.

15  So we are in favor of the stipulation.  Nothing has changed

16  in that regard, but with respect to proving solvency at this

17  confirmation hearing with respect to this plan, again, Your

18  Honor, we agree with you.  It's binding on everybody with

19  respect to this plan.  It's part of the single record with

20  respect to this plan, and whatever it means at the end of the

21  day is what it means.  Thank you, Your Honor.

22          THE COURT: Mr. Cobb?

23          MR. COBB: Your Honor, Your Honor, Richard Cobb on

24  behalf of the Bank Lenders Group.  Your Honor, it's an

25  unfortunate circumstance to have to sit back and listen to

1    Mr. Bernick begin his confirmation hearing with argument with

2    regard to how easy it will be to prove that the debtors are -

3    that you can't make a decision on finding a number.  I want

4    to make it clear to the Court that there's a very direct way

5    out of this conundrum.  The debtors know what their liability

6    is for asbestos personal injury liability.  It's the amount

7    they have to fund for the settlement.  They know it because

8    by virtue of the plan injunction and because of the bar

9    dates, et cetera, there will be no additional personal injury

10   liabilities.  It's all capped.  It's in the settlement.  So

11   we know what it is.  It's what they're paying.  It's very

12   simple.  But, Your Honor, if you're going to put us to our

13   burden of proof and as the plan proponents have suggested, we

14   are prepared to go forward on our piece of the case, that is,

15   here's what the debtors, we believe, have admitted asbestos

16   personal injury liability is.  But as I just said, Your

17   Honor, you don't have to get there.  Your Honor, I didn't

18   want to burden the Court with this very brief statement but

19   there have been introductory comments made that clearly are

20   part of their confirmation case and so I felt compelled to

21   speak.  Your Honor, you had also commented that you have

22   determined as a matter of law that the bank lenders are not

23   entitled to default interest.

24          THE COURT: As part of the claim.

25          MR. COBB: That's correct, Your Honor, so I needed

1    to clarify.

2          THE COURT: Okay, I didn't want to expand it beyond

3    that.  It's part of their allowed claim, yes.

4          MR. COBB: Thank you, Your Honor.

5          THE COURT:  Mr. Friedman?

6          MR. FRIEDMAN: Thank you, Your Honor.  Your Honor,

7    just to clarify, we've reserved our right at the end of Phase

8    I for Mr. Martin here to deal with the solvency issue and to

9    object to solvency.  We did not think that it was wise to

10   burden the Court given that the Unsecured Creditors Committee

11   representing all of Class 9, including Morgan Stanley, was

12   going to litigate the issue of insolvency or solvency if

13   Morgan Stanley needed to duplicate that workload.  The notion

14   that Mr. Bernick suggested when we litigate post-petition

15   over our interest rate, he's free to re-litigate solvency as

16   if it never occurred in this Court is absurd and completely

17   at odds with the notion of a confirmation finding -

18         THE COURT: Well, this stipulation doesn't bind the

19   debtor.  It is an effort to say that the Asbestos Creditors

20   Committee and the Future Claims Rep would not be precluded

21   from producing additional evidence.

22         MR. FRIEDMAN: Your Honor, as between Class 6

23   representatives and the debtor, I don't have an issue, but

24   that's not what Mr. Bernick said when I said a few minutes

25   ago that we think that they're bound by a solvency

1    determination by this Court as to us, that we don't have to

2    in a context of litigating over our interest rate in a post-

3    effective rate environment have to reprove solvency or have

4    them reprove insolvency.  We think that's done once you

5    confirm this plan.  If you reject the plan, then solvency

6    might be determined at some different date with a different

7    set of evidence.  Obviously that's going to change the

8    circumstances.

9            THE COURT: Okay.

10           MR. FRIEDMAN: But you're correct, Your Honor,

11   confirmation is much broader than a one-off litigation

12   between two parties.

13           MR. LOCKWOOD: Your Honor, I'd just like to follow

14   up on something Mr. Pasquale said because I think he really

15   put his finger on exactly a) what the problem is, and b) what

16   the answer ought to be.  We agree that Your Honor's findings

17   are going to bind this confirmation of this plan; okay?  I

18   mean, Mr. Bernick has his approach, which he's described.

19   The unsecured creditors have their approach, which they've

20   described in somewhat less detail.  It's clear there's

21   dueling approaches.  Your Honor is going to at the end of the

22   day resolve it, and as Your Honor said, you would not

23   normally, if it was a different plan and a different

24   confirmation hearing, say to people, You can't put on any

25   evidence that you didn't put on the last time around on a

1   different plan.  The problem that Your Honor identified that

2   I think Mr. Pasquale averted to and as far as we're

3   concerned, I believe we're accepting of, is this notion that

4   while you would agree with us that we wouldn't be precluded

5   from putting on evidence, you couldn't prevent somebody else

6   from getting up at the time we tried to do that and argue

7   that there was waiver or some kind of preclusion because we

8   should have put on the evidence the first time around and now

9   because it's another confirmation that's similar enough that

10  we were somehow or another prevented from putting it on the

11  next time.  Obviously, there's a potential for a lot of

12  dispute about that kind of argument as to about whether we

13  could or couldn't put on the rest of the estimation case if

14  we no longer had the same plan and everybody was back to, as

15  you put it, square zero.  And as Mr. Pasquale said, what this

16  stipulation was only intended to do is simply say agreement

17  among the parties and particularly between the plan

18  proponents who while they're allied on this plan, might not

19  be allied on the next plan, you remember we had two competing

20  plans once before, an agreement in essence that would say,

21  with the Court's approval, that the parties won't make those

22  kind of arguments if there's a new confirmation hearing.

23          THE COURT: Alright -

24          MR. LOCKWOOD: And I would suggest that that's

25  similar to what we're doing in insurance neutrality when the

1    insurers and the plan proponents stipulate that they won't

2    use this Court's finding in some other case.

3          THE COURT: Alright, Mr. Lockwood, you folks have

4    beaten me down.  In looking at this order, it seems to me

5    that after having had this rather fulsome discussion that

6    you're not trying to do anything other than what I think

7    you're permitted to do anyway.  So, I don't have a problem

8    signing the stipulation.

9          MR. LOCKWOOD: Thank you, Your Honor.

10          THE COURT: We'll take a 10-minute recess.

11          MR. BERNICK: Thank you, Your Honor.

12          (Whereupon at 12:34 p.m., a recess was taken in the

13    hearing in this matter.)

14          (Whereupon at 12:48 p.m., the hearing in this

15    matter reconvened and the following proceedings were had:)

16          THE CLERK: All rise.

17          THE COURT: Please be seated.  Alright, the court

18    reporters are just going to come in and switch after 1 as

19    backup lunch, so you'll notice a change in court reporters,

20    but we'll just continue.

21          MR. BERNICK: Okay.  I feel like all of the rest of

22    the day should be downhill.  To let everybody else know, that

23    in light of a bunch of different things, including the

24    flexibility of Mr. Kruger who is gracious enough to agree to

25    have his deposition deferred, we will not be proceeding with

1    his deposition this afternoon.  We tentatively scheduled it

2    for and I'm speaking to the Court, but I'm kind of letting

3    everybody else know, we've tentatively scheduled that for

4    September the 2nd, which will be in our office in New York or

5    Mr. Pasquale's office in New York beginning at 10 o'clock,

6    but I don't know if the courtroom was going to empty out in

7    all good to Mr. Cobb's office for the deposition.  I suspect

8    not, but in any event to let everybody know, which also means

9    that we may have a little more flexibility, not that we want

10   to use that flexibility this afternoon.

11          THE COURT: Where's Mr. Kruger, I need his

12   deposition back.

13          MR. BERNICK: So, I think where we're headed next is

14   to the discussion of the order of proof in the confirmation

15   hearing.

16          THE COURT: Alright.

17          MR. BERNICK: And there really are quite a number of

18   issues that arise in connection with this.  Some of them are

19   specific.  A lot of them are specific to individual

20   constituencies, but I think probably the first order of

21   business is to go through what we at least proposed as an

22   order of proof so the Court can see what we have in mind and

23   I know that I circulated the - yes, if you could hand that up

24   to the Court, that would be great.  We've had some

25   significant discussions and this is a set of graphics that we

1   circulated to people last night and we distributed further

2   copies this morning so everybody should have them, and I want

3   to stress two things: First, I want to talk a little bit

4   about the basic concept and then second I want to stress that

5   where we say there's substantial agreement, we use the word

6   "substantial" advisedly or, you know, importantly, because we

7   don't purport to represent that everybody's agreed to all

8   aspects of this at all, and so, I think probably when we go

9   through it and maybe the best idea is for me to give an

10   overview and then we can go through it page by page, people

11   will have the opportunity to express objections if they have

12   objections.  The basic concept is this, and we've spent a lot

13   of time thinking this through, our concern is that if we went

14   through the plan proponents' case in its entirety, a) the

15   cross-examinations would last for a long time, they may still

16   ast for a long time; b) it would be very for the Court then

17   to line up the various objections with what the objections

18   were objections to because so much time had elapsed; and c)

19   that there might be people who would have to stick around

20   through parts of the confirmation hearing that really weren't

21   interested in those parts, not that they're really interested

22   in many aspects of it at this point, but it would be an

23   unnecessary encumbrance on the time of a lot of people who

24   may have a more limited area of interest in the hearing.  So,

25   what we did conceptually is to say, what if we peeled off

1    layers of the confirmation issues sequentially that are more

2    or less subject matter specific and constituency specific and

3    deal with them one at a time so that the plan proponents

4    would speak to them and then whoever the interested

5    constituency was could make objections and speak to them, and

6    then save to the end issues that are of more general

7    interest, which isn't to say that we finish up with each

8    constituency in their entirety.  It's really, as we go

9    forward, it is more that we take up constituency specific

10   issues.  So it really is a sequencing of issues rather than

11   being necessarily a sequencing of parties.   So, Your Honor

12   can foresee that this would enable us to basically segregate

13   out as three distinct phases of the hearing, first of all,

14   the Libby claimants, who have issues that are specific to

15   them.  They have issues that are more generic, but they have

16   issues that are specific.  Deal first with those Libby

17   specific issues then go to the insurance companies and other

18   third-party claimants, then to the lenders, and that's the

19   default interest issue, fair and equitable default, and then

20   finally, the last category would be kind of everything else,

21   and those would be the issues that are of more general

22   interest, and we floated this idea.  We've discussed it a lot

23   and that is the approach that underpins this basic proposal.

24   Within each segment then, we - plan proponents would go first

25   and then objectors would go second, and Your Honor would have

1   the whole thing in a package.  Having had the advantage of

2   wanting to do down this road at the outset, we also wrote our

3   briefs in the same way, that is to say, we have a separate

4   insurance brief, lender brief, Libby claimants' brief and

5   then we have kind of an omnibus brief, and our hope is that

6   would provide some additional structure for the proceedings.

7   We do want to talk after we get through the order of proof

8   also about the briefing process and how that might work, but

9   that really is a separate issue.  So with all that prefatory

10  statement having been made, we tried to get this down

11  basically also with estimates of the time for examination by

12  witness.  So -

13          THE COURT: Mr. Bernick, let me interrupt for one

14  minute.

15          MR. BERNICK: Sure.

16          THE COURT: I think when I was giving you the dates,

17  I neglected to tell you that on Thursdays we're going to have

18  to terminate at 4 so that I can teach Thursday afternoons.

19  So, to the extent that - I see the first one is only 6 hours,

20  but to the extent that there are planning issues that you

21  need to address, on Thursdays, I'll have to stop at 4.

22          MR. BERNICK: Yes, and let me say, generally, we

23  have odd days that are lasting too long and so the idea that

24  this is day one, day two, day three is only the most general

25  kind of deal.  It's certainly more of an order than anything

1   else, and so, inevitably the times are going to prove to be

2   inaccurate.  These are, again, very rough estimates.  So, but

3   we would begin first of all not by having arguments on

4   Daubert -

5       THE COURT: I'm sorry, it just occurred to me that I

6   wondered whether the estimation of time would be binding on

7   all parties.

8       MR. BERNICK: No, this one is binding.  This one is

9   binding, but only for purposes of this plan, only for

10  purposes of this plan.

11      THE COURT: Okay.

12      MR. BERNICK: Nobody else incidentally, rose to

13  endorse that statement.  So, the first issue is the

14  discrimination issue, the equal treatment issue, which is

15  probably the principal issue that the Libby claimants have

16  raised.  We would go first, and we would call Mr. Insulbuck

17  to testify about the matters that are listed there, and

18  that's largely historical.  Dr. Welch, talk about the TDP.

19  Dr. Welch, there are two aspects of the TDP that are at

20  issue, there are others as well, but they wouldn't taken up

21  here.  One is the medical criteria for qualification and the

22  other is the scheduled values, and so, Dr. Welch would talk

23  about medical criteria.  Dr. Peterson would talk about the

24  scheduled values, and then Mr. Hughes would talk about Libby

25  litigation history, and then essentially we have some matters

1    to be submitted on paper, and then in terms of summarizes,

2    depositions, we thought that it might be useful to do

3    something that we did in the estimation trial, which is

4    instead of simply having - We'll have the designations

5    submitted to the Court, but in order to present the

6    designations in a cohesive fashion, we'll have kind of a 1006

7    summary of those, and we would present those, but because the

8    only time that we're indicating here, because we're not going

9    to have the readings of depositions, the only time that's

10   indicated here is for live testimony and we've tried to

11   provide estimates of this and I'll say that the Libby

12   claimants have been very responsive to the idea of trying to

13   get our time focused, and while I know that they would like

14   to have more extensive cross-examinations, they've indicated

15   that there's probably some sense to the idea, and they

16   probably indicated also that Your Honor will see sense of the

17   idea that if we're short on direct, they should be short on

18   cross.  So, I don't want to suggest here that everybody's

19   happy with these periods of time, and maybe they'll say today

20   they want more, but I think we, in the meet-and-confers, came

21   out with the basic idea that we're going to be very short on

22   direct and they expect to have crosses that are pretty much

23   commensurate with that.  Let me go through the other two

24   slides and then maybe we can hear from the Libby claimants

25   about how they feel about this and then proceed in that

1   fashion, Your Honor.  The next segment would be the Libby

2   claimants' response, and that - they have the five claimants,

3   Your Honor will recall, that there was a discussion about

4   whether any claimants should be able to offer testimony at

5   all, and Your Honor reserved on whether it would be

6   admissible but said go forward and you'll hear from five.

7   So, we have got the five and we've got an estimate for that.

8   Now, one issue that we're going to need to take up is a very

9   significant issue that's now arisen is what we now have

10   beyond this in the way of records and exhibits, and I'm going

11   to just hold off on that until we get through the whole order

12   of proof.  So, I'm not going to address the question of the

13   other medical records and the deposition designations.  They

14   had a lot of deposition designations.  I would suggest that

15   we hold that off as an issue that we'll take up a little bit

16   later after we get through the order of proof.

17          MR. LEWIS: That's fine.

18          MR. BERNICK: Okay, good, thanks, Tom.  So, we have

19   the five claimants, an issue about whether it should come in,

20   but we've got time reserved for it.  We have Dr. Whitehouse,

21   Dr. Molgaard and Dr. Spear.  We have a motion with respect to

22   Dr. Spear that Your Honor will hear today, and obviously, I

23   think I've lost track of something that I said before.  There

24   are Daubert motions pending with respect to certain of these

25   witnesses.  We've suggested that there not be a separate

1  argument time for the Daubert motions, and that we start

2  first day with the testimony rather than doing Daubert

3  motions and that really was driven by at least our sense that

4  Your Honor will read the Daubert papers and that your

5  practice in the past has been pretty much to let people

6  testify and then reserve on the issue.  We feel very strongly

7  about the Daubert arguments that we have, but we don't think

8  it's appropriate to take up the confirmation hearing time in

9  order to deal with it.  Maybe there's another time that we

10 can do it.  So, we have Whitehouse, Molgaard, and Spear, then

11 there are some declarations and documents, but the next live

12 witness is Dr. Frank.  I know that they want to have Dr.

13 Frank testify on Thursday the 10th, so that's going to be

14 something we'll try to do, although it depends really on

15 where we are in the process.  I know they feel that's very

16 important and we're not - We'll certainly see what we can do

17 about that but this is aspirational that we're going to get

18 there.  We do have a disagreement here that they want to have

19 four hours of direct with Dr. Frank, and I suspect that

20 that's probably due, and this is based upon conversations

21 that we had at the meet-and-confers, with the prospect that

22 it may be that Dr. Whitehouse will not be able to testify

23 because of the issue that's outstanding with respect to him.

24 If he does not testify, then we can understand how Dr.

25 Frank's examination should be a longer examination, but we do

1    not agree it should be necessary to have Dr. Frank on for

2    four hours if Dr. Whitehouse also is testifying.  We then

3    have a response which is Dr. Wyle, that's our rebuttal, and

4    Dr. Mulgafcar (phonetical), if necessary, and that time is

5    indicated.  And so, I think that that really is essentially

6    the Libby case subject to the other issues that we said we're

7    doing but in terms of live testimony, that's pretty much how

8    we see the Libby case going in, and with that, I'll ask Mr.

9    Lewis if he's going to address the Court to address -

10            THE COURT: May I ask a question first -

11            MR. BERNICK: Certainly.

12            THE COURT:  - because it may affect both.  How are

13   the evidentiary binders going to be submitted?  Are you going

14   to submit a binder that will deal specifically with Libby,

15   specifically with the bank lenders, just in accord with what

16   you said, and then -

17            MR. BERNICK: Yes.

18            THE COURT:  - a separate series to address the

19   general issues?

20            MR. BERNICK: Yes.  That would be our expectation,

21   certainly, yes.  Yes, that's our plan.

22            THE COURT: Alright.

23            MR. BERNICK: Yeah.

24            MR. LEWIS: Could you put that back up again,

25   please, up on the screen?  Alright, thank you.  Your Honor,

1   there is one element of uncertainty about how this is going

2   to work as proposed by the plan proponents.  While much of

3   what's put here is agreed to except for those portions that

4   are highlighted, one of the things we asked of the plan

5   proponents is that we, rather than bring adverse witnesses

6   such as Mr. Hughes, Mr. Peterson in our case in chief, would

7   it be more efficient to do our adverse examination of those

8   witnesses during their case in chief so that the witness

9   would only have to come to court once.  We thought that was a

10  good idea and although I didn't participate in this

11  particular meet-and confer, it's my understanding that they

12  had no objection to that.

13          THE COURT: That's fine with me.

14          MR. LEWIS: Yes.

15          THE COURT: I think you can designate at which point

16  you're done on cross and starting your case in chief.

17          MR. LEWIS: Right.  So, for example, the one thing

18  this doesn't cover then is like, for example, let's say Mr.

19  Insulbuck is called to testify and they put him on and we

20  cross for an hour, and we have 10 or 15 minutes of testimony

21  that ordinarily go in our case in chief, that's not accounted

22  for here and that's the only little problem I see here.  I

23  think that's a little problem because I don't think, except

24  as to Mr. Hughes there will be considerable adverse

25  examination as part of our case in chief.  The others will be

1   fairly short.  So I don't know how to handle that, but other

2   than that, I'll go through this one by one; would that be

3   okay?

4          THE COURT: Yes, the issue may be, I guess - are you

5   suggesting that you need additional time that hasn't been

6   worked out with the debtor?

7          MR. LEWIS: Yes.

8          THE COURT: Okay.

9          MR. LEWIS: Yes, I think there might have been a

10  misunderstanding or - I know that we - Well, I for example,

11  when we get to Hughes down here, I might need a half hour for

12  cross, but I might need as much as 45 minutes to an hour for

13  testimony I want to elicit from him as an adverse witness.

14         THE COURT: Oh, I see, so no adverse witnesses are

15  included in this three days -

16         MR. LEWIS: Right, and I did submit a sheet - I

17  personally submitted a sheet which had those adverse witness

18  times on there.

19         THE COURT: Okay.

20         MR. LEWIS: I guess that wasn't considered.  But in

21  any event, with respect to just pure cross, everything's good

22  here, I think.  I don't know about these declarations on the

23  first page.  I'm not sure what they mean by that.  The

24  summaries, excuse me, I haven't seen any of those.  I'll

25  prefer to put the deposition testimony in as deposition

1    testimony.  Five claimants, 2.5 hours is fine.   With respect

2    to Dr. Whitehouse, we offer a bit of a compromise.  We've got

3    3 hours we wanted for direct, Mr. Heberling (phonetical) will

4    be handling this portion of the case.  He thinks he needs 2.5

5    hours.  With regard to Mr. Molgaard, we've told them 2 hours.

6    That can be reduced to 1.5 hours.  With respect to Dr. Spear,

7    we've decided after further review that we can do the direct

8    in 1.5 hours rather than 3 hours.  And with respect to Dr.

9    Frank, Mr. Heberling advises that he can do that in 3 hours.

10         THE COURT: Okay, with respect to Dr. Frank, Mr.

11   Bernick was asking whether that is assuming that Dr.

12   Whitehouse is testifying or assuming that he is not testify?

13         MR. LEWIS: We are assuming Dr. Whitehouse will

14   testify.  He'll certainly testify as a treating physician, as

15   we've advised the Court in the past.

16         THE COURT: So, you're assuming you need a

17   combination of 2 1/2 for Dr. Whitehouse and 3 for Dr. Frank.

18         MR. LEWIS: That's what Mr. Heberling advises.

19         THE COURT: Alright.  As to Dr. Wyle, Mr. Heberling

20   would like, he thinks he needs 1.25 hours to cross Dr. Wyle.

21   As to Mulgafcar, the time they propose is acceptable, Your

22   Honor.  The other thing I should bring up - I'm sorry, I

23   should have moved this, but, the other thing is on day 4 and

24   on day 7, there are witnesses where we're - there's no - On

25   day 4 for example, do you have that one?

1          THE COURT: Where there's no identification of the

2     witness's name?

3          MR. LEWIS: Yes, there's no identification as to

4     who's examining.  That's confusing to us because we see under

5     Mr. Posner you have no time set aside for our crossing him

6     should he touch on something that's important to our case,

7     and I don't know what the substantial agreement is as to the

8     other - Was that agreed - Fink and Insulbuck for these

9     purposes, are you saying we get one hour of cross?  Are is

10    that cross for everybody?

11         MR. BERNICK: That's for everybody.

12         MR. LEWIS: That's what I thought.

13         MR. BERNICK: Everybody who voiced an interest,

14    that's what the whole purpose of the meet-and-confer.

15         MR. LEWIS: Alright.

16         MR. BERNICK: But remember, this is for insurance

17    and third party, that is, indemnification and contribution

18    issues.  That's all that's here.

19         MR. LEWIS: Agreed, and for the most part, we'll sit

20    that one out, but let's look at what Mr. Hughes is going to

21    testify to.  TDP v. Tort System Standards.  We'll be

22    intensely interest in that and we cross-examine on that.

23         MR. BERNICK: Well, I suspect that given what he'll

24    say on that score, you will not be interested in it because

25    he's not going to be talking about - he's talking about

1    whether the new TDP is substantially different from the way

2    the cases were resolved before then, and I don't think it's

3    Libby specific.  Libby specific testimony will be offered as

4    part of your cite.

5            MR. LEWIS: Well, I want to reserve on that, Your

6    Honor.  I'd like to see his testimony.  Your Honor, on page

7    7, we'll have cross-examination on this of Mr. Insulbuck and

8    Mr. Peterson for certain, and Mr. Cohn advises that he'd want

9    perhaps a half hour on Mr. Insulbuck and a half hour on Mr.

10   Peterson.  The others we'd have to just take as it goes.

11   That's what we propose, Your Honor.

12           MR. BERNICK: I appreciate that, and I think we're

13   pretty close and we'll follow through.  I don't know that

14   there's much fine-tuning that Your Honor wants to have take

15   place today, but I think today's an opportunity for people to

16   say where they are.  With respect to the issues that have

17   been raised on Peterson and Hughes, all I'll say is that it's

18   fine if the cross-examination that takes place of Peterson

19   and Hughes as adverse witnesses takes place while they're on

20   the stand, but with respect to those matters that are

21   specific to the issue of discrimination on the TDP, and with

22   that said, then we don't have a problem in doing them all at

23   once.

24           THE COURT: You mean on day 4 and whatever the other

25   day -

1          MR. BERNICK: Well, that's on day one.  I mean, the

2     first time around is supposed to be everything that relates

3     to the equal treatment issue on the TDPs.

4          THE COURT: Right.

5          MR. BERNICK: And therefore, if they want to call

6     Peterson and Hughes adversely on that, that's fine, that's

7     exactly when it should be.  So they say call adversely, I'm

8     talking about call adversely on the issue of equal treatment

9     as opposed to on the issue that may come up later on.  We

10    want to keep the first segment focused on discrimination with

11    respect to the Libby claimants.  Day 4 is really an insurance

12    - is the issues that have been raised by the insurers and

13    other folks who are acting - I believe there's a prospect of

14    third-party claims, and that's not third - I don't believe

15    that that would include the Libby claimants.  They have

16    direct claims.  It's not a question of third-party claims,

17    but no one's stopping people from doing an examination here.

18    What people have to tell us though is exactly - I mean say

19    they want an hour or something like - they've got to tell us

20    what it's for because otherwise we have no idea.  Everybody's

21    going to want to stand up and say, Well, I reserve my right

22    to have a half an hour or 45 minutes, and then we will not

23    know really where the schedule is.  The whole point of this

24    is to kind of have people saying now exactly what they want

25    to ask questions about and why it's going to take so long

1    because otherwise we'll have this huge problem where we'll

2    reserve all kinds of time, and then people will take much

3    less time, and if you're on a trial that only involves two

4    parties, that's doable, but when you've got 30/40 different

5    parties, that's not doable.  So, I'd say, first with respect

6    to Mr. Lewis' concern about page 1, day 1, no problem on

7    Peterson, no problem on Hughes provided the cross is relevant

8    to the TDP on Libby and with respect to the declarations, all

9    we're really saying here is that there's no live time in

10   court with respect to declarations.  We're not saying that

11   they're admissible, that depends on whether you all agree but

12   we're saying we're not going to take a lot of time.  Same

13   thing with respect to the summaries.  We don't have the

14   summaries yet, and when you see the summaries we can take

15   that up as an evidentiary matter.

16         MR. LEWIS: Well, the only thing there is I think 45

17   minutes -

18         MR. BERNICK: No, that's just to review the summary.

19   You have to cross-examine the summary.  Now maybe Cobb would,

20   but this, you know - With respect to page 2, Whitehouse,

21   Molgaard, Spear, we got the indication of how long that's

22   going to take.  We understand that, and you know, if that's

23   how long the direct takes, that's how long the direct takes,

24   but that then is going to start to significantly extend the

25   schedule.

1          THE COURT: Well, if I can interject.  Based on the

2     fact that you've got 3 whole days reserved for Libby, I

3     question whether you're going to want to get into the

4     insurance things on a Friday anyway, and it may make more

5     sense just to keep that Friday in the event that time does

6     spill over for whatever may be left on - I don't know.

7          MR. BERNICK: That's the -

8          THE COURT: I realize it's pushing back, but -

9          MR. BERNICK: Yeah, but the problem is not so much

10    that, as it is that if we go to a more kind of take it as we

11    go type of approach, this whole schedule will open up big

12    holes because people will say, I need X-period of time and I

13    need Y-period of time, and then they'll take it.  So, the

14    whole idea here was that we interpreted Your Honor's request

15    for actual examination times that will be used in light of

16    the tight schedule that we're on to really say to people, you

17    know, what is it you actually need to do and let's articulate

18    it now, and people have been - including the people in Libby,

19    and I don't exclude them, they've been pretty good about

20    committing.  So, I would really like to keep this thing

21    rolling and we'll see how much time is necessary for these

22    people but what I would urge and Mr. Heberling is the source

23    of some of these estimates, what I would urge is for folks to

24    consider that this is a trial before the Judge.  It's not a

25    jury trial, and at least in our experience in these contested

1    matters, the direct examinations are really quite quick

2    because the Court already knows what's happening and that

3    maybe we don't need, if Dr. Whitehouse is going to testify as

4    a treating physician, I don't know how in the world that's

5    going to take 3 hours of direct examination because all he's

6    going to be doing is reviewing individual cases, and so, you

7    know, Spear, we've got issues on Spear.  For today, we'll

8    take these matters under consideration and we'll be back to

9    the Libby folks about it, but it would be good to get Your

10   Honor's endorsement for the proposition that when people give

11   these estimates they're prepared to articulate exactly what

12   they're going to be covering so that we can really come back

13   to the Court if it looks like there's just a major

14   disconnect.

15          THE COURT: Yeah, that's fine, and I support the

16   fact that there should be a schedule and that people should

17   be bound to that schedule.  I think my concern about starting

18   this thing on the Friday is that if it turns out that you

19   actually do need to add some time into the schedule for the

20   witnesses who are not included now, for example, then I don't

21   think you're going to get much done on a Friday afternoon

22   with the insurers starting a case on Friday afternoon.

23          MR. BERNICK: That's true.  The people who aren't in

24   there though, is that they weren't in there - they are there.

25   It's Peterson and Hughes, is that they're not in there as

1   part of that Libby's response, that is there will be -

2   Peterson will be longer, not much according to Mr. Lewis,

3   which we appreciate.  Mr. Hughes will be a little longer.  So

4   not that the schedule doesn't include people.  It's that

5   we're adding on some time for Peterson, some time for Hughes.

6          THE COURT: Okay, well, for example, I think what

7   Mr. Lewis used as an example was Mr. Insulbuck where he may

8   need a few minutes on his case in chief, and this includes

9   cross but doesn't include his own direct.

10         MR. BERNICK: No, but, Insulbuck - the two people

11  that were mentioned were Peterson and Hughes.  Insulbuck

12  appears - again, he's coming back.

13         THE COURT: Yes.

14         MR. BERNICK: And then at that point - and that's

15  much later on, that's day 4.  Yes, if there's a reason to

16  have cross of Insulbuck by the Libby people that is not

17  Libby-specific -

18         THE COURT: No, I don't think that's the issue.

19  Maybe I misunderstood.  I thought that the Libby claimants

20  had reserved the ability to call in their case in chief some

21  of the witnesses who are listed on the plan proponents list,

22  and, for example, if they have a couple of questions that

23  they want to ask in their case in chief of Mr. Insulbuck,

24  they wanted to do it while he's on the stand on day 1 rather

25  than having to bring him back at the end of day 3, for

1  example, to finish their case.

2        MR. BERNICK: No, well, we can get clarification on

3  this.  I think it's a little - Our case in chief we call

4  Insulbuck.

5        THE COURT: Right.

6        MR. BERNICK: At that point they get to ask

7  questions of Insulbuck if they want to at that time rather

8  than calling him back as really on page 2, planned for

9  Libby's response.

10        THE COURT: Right, but what they were suggesting, I

11  thought, was that this hour that's listed for cross is what

12  they need for cross and they still need a few minutes if they

13  have additional questions in their case.

14        MR. BERNICK: Yes, and that's why if they wanted to

15  call Insulbuck adversely -

16        THE COURT: Yes.

17        MR. BERNICK: - apart from cross, there would be

18  more time for Insulbuck on this first page.

19        THE COURT: Right.

20        MR. BERNICK: Same thing, but I think the ones they

21  actually talked about were Peterson and Hughes.  But whatever

22  it is, those numbers could go up a little bit, I agree.

23        THE COURT: Right, and that's why I'm worried about

24  - well, not worried but concerned about having a new issue

25  start on a Friday because it seems to me that by the time you

1    add, you know, even it's only 2 hours, you're not going to

2    get much done.

3            MR. BERNICK: I cannot - Your Honor, having been

4    there before, I really think we have got to have the

5    anticipation of zero dead time, that is, if it's necessary to

6    push the insurers back at the end of the day - not the

7    insurance but the insurers, the insurance segment, we should

8    make that judgment at the time, but I really think that if we

9    start to create kind of provisional space in the schedule, a)

10   it will be used, and b) the entire schedule will slip in a

11   very, very major way.

12           THE COURT: Okay.  I'll be there.  Just so you

13   understand that on Friday, we're stopping at 4 o'clock on the

14   dot.

15           MR. BERNICK: Yes, no, we got that.

16           THE COURT: On that Thursday, I'm sorry, on

17   Thursday, thank you.

18           MR. BERNICK: No, no, we understand that.

19           THE COURT: Okay.

20           MR. BERNICK: That's something that we're going to

21   have to live with, but I think that the whole idea is to have

22   this locked in as much as possible so that it really happens

23   that way.

24           THE COURT: Alright, that's fine.

25           MR. BERNICK: Because otherwise, I'm concerned about

1    the overall schedule.  I don't know, Tom is there anything

2    else you want -

3         MR. LEWIS: Yes, just quickly.  Your Honor, I think

4    this is probably my fault because Mr. Posner, we identified

5    him as a witness in our case in chief and we simply -

6         MR. BERNICK: (Microphone not recording.)

7         MR. LEWIS: Yes, yes for discrimination.  We did.

8    We can do it when Mr. Posner's here.  We have brief

9    examination of him on that issue, but the problem is it's

10   late in the case.  I don't want you to bring him in - Let me

11   finish; okay?  What I'm proposing is we will reserve proof

12   for our case in chief if that's acceptable to the Court, and

13   just not rest our case until we get Posner when he comes.

14   That's how I've done it in every trial I've ever had.

15        THE COURT: I don't think anybody's cases are

16   actually going to rest until the end of the trial anyway.

17        MR. BERNICK: That's right.

18        MR. LEWIS: Okay.

19        MR. BERNICK: I understand where you're going with

20   that.   Because we're doing it issue by issue, all you're

21   doing is resting on the issue as opposed to resting generally

22   in you case in chief.

23        MR. LEWIS: And there's one other thing.  There's

24   one thing that is objectionable to the Libby claimants and

25   that's the way they form the issues here, and so, what they

1    would like to do is say, you know, they're going to testify

2    on a certain issue and limit us to that.  To the extent that

3    we're taking them and their case in chief as part of our

4    case, we don't want to be limited; okay?

5         THE COURT: Then if that's the case, I think rather

6    than doing it this way you should just recall the witnesses.

7    It will be inconvenient for them, but -

8         MR. BERNICK: That's the whole idea, Thomas.  We are

9    not - days 1 through 3 is not all of Libby, and it's not all

10   of Libby's examination of witnesses just with respect to the

11   issue of equal treatment, and we are bringing people back and

12   if you've listed a witness that you want to call on some

13   later issue, they should be in this.

14        MR. LEWIS: That's fine with us.

15        MR. BERNICK: Because -

16        MR. LEWIS: We can work with that.

17        MR. BERNICK: That's the concept.

18        MR. LEWIS: Thank you.

19        MR. BERNICK: I don't know - Mr. Brown rose to his

20   feet to -

21        MR. LEWIS: It seems to be a bit inefficient.

22        MR. BERNICK: Well -

23        MR. BROWN: Your Honor, I just wanted to follow up

24   on one of your comments.  The insurers do have a problem with

25   the schedule which we've shared with the plan proponents, in

1    particular the availability of our experts the following

2    week.

3            UNIDENTIFIED SPEAKER: (Microphone not recording.)

4            MR. BROWN: Understood, but the Court was talking

5    about the possibility of moving the insurer issues into the

6    following week, and that would weigh in favor of doing that.

7            MR. BERNICK: Yeah, well - This is -

8            THE COURT: Wait, I'm sorry.  I thought you just

9    said your experts are not available the following week.

10           MR. BERNICK: That's what he's saying is that he'd

11   like to have the insurers people the next week.  I don't

12   understand that.  So, why don't you wait until we go through

13   the sequence.

14           MR. BROWN: Your Honor, our experts are not

15   available till the latter part of the following week.

16           THE COURT: Oh, until the next week.  Okay.

17           MR. BERNICK: But we're not even talking about that

18   week.  And this is again, our experts are not available is

19   something that all experts would like to be able to say, and

20   we have - this is again something where we're going to try to

21   work around it, but you know, to have 50 people stand in the

22   service of the convenience of an expert is something that

23   we're going to have something at least to say about, and

24   we're trying to accommodate it, but at the end of the day, we

25   can't have the schedule depend on what's happening with each

1    expert.  So, on the insurers' segment, which is days 4 and 5,

2    we have as indicated here Fink, Insulbuck again, Posner,

3    who's an insurance guy, and I now - I understand Mr. Lewis

4    may have examination of Mr. Posner.  We need to know

5    specifically what's about and how long it's going to take.

6    We have Hughes, and we obviously have a difference of view

7    here but we're prepared to try to work this thing through.

8    When we have multiple insurers who are asking questions,

9    we're assuming that Your Honor's going to follow the rule

10   that says if one examiner covers an issue, then it shouldn't

11   be recovered by other examiners, and -

12         THE COURT: Unless there is some relevance to a

13   particular policy, for example, and it has to come up in a

14   different context, otherwise, yes, I don't expect, for

15   example, everybody to challenge a specific portion of a

16   curriculum vitae.  Once it's done, I'll understand that the

17   insurers can say we join in that, and that will be that.

18         MS. ALCABES (TELEPHONIC): Your Honor.

19         THE COURT: Yes.

20         MS. ALCABES (TELEPHONIC): This is Elisa Alcabes for

21   Travelers.

22         THE COURT: Yes.

23         MS. ALCABES (TELEPHONIC): You know, on this issue,

24   I think particularly with Posner who is the risk manager,

25   Travelers has identified Posner as a witness, and this is a

1    similar issue to the one that the Libby claimants raised.

2    We've clearly identified Posner and Hughes as witnesses as

3    part of our direct case.  We have issues that we need to

4    address separate and apart from other insurers, and according

5    to the chart that they've put in front of you today, there is

6    no accommodation to that at all, and we provided them this

7    information a long time ago.  I'm just not clear on how

8    they're factoring in the issue that Travelers has separate

9    issues that they've known about, that we've indicated we need

10   some time with Posner and Hughes on, and it's not going to

11   satisfy Travelers just to be able to cross-examine these

12   witnesses.  We have issues that we - you know, fact issues

13   that we need to bring out from these witnesses.

14        MR. BERNICK: Yeah, we understand that, and Ms.

15   Alcabes, I think you probably have the version that has the

16   yellow - the right column.  We understand that that's why we

17   reflected 2 hours for Travelers.   So that is - we have put

18   that down, and we're not saying, No.  We're saying that

19   that's not our proposal and as other people have made other

20   proposals, that's fine, and we need to pursue it.  What we're

21   saying is, two things.  One is that there needs to be some

22   kind of articulation when a party says they want - especially

23   2 hours, exactly why it's going to take 2 hours, and second,

24   we ought not to have then people who notwithstanding the

25   brilliance of your cross-examination, which we're all looking

1  forward to, want to cover the same ground.  That's all that

2  we're saying.  So, we're not closing the door on anything.

3  We're not asking the Court to endorse the shorter period of

4  time as opposed to the longer period of time.  What we're

5  saying is that going forward we ought to have a process that

6  tries to pin down, you know, what kind of time is really

7  going to be taken.  Same thing with respect to Hughes.

8         THE COURT: Well, they - the list I have suggests

9  for Posner, 2 hours for Travelers, half for Seaton, half for

10  GEICO, and half for AXA, and a quarter of an hour for

11  Maryland, and then for Hughes, an hour for Travelers, a half

12  an hour for GEICO, a half an hour for Seaton, and a quarter

13  of an hour for AXA.

14         MR. BERNICK: Right.

15         THE COURT: So, I mean if that's the time estimate

16  that you think you need then that's fine.

17         MS. ALCABES (TELEPHONIC): And, Your Honor, I'm not

18  suggesting that in addition to an hour of cross, Travelers

19  necessarily needs 2 full hours with Posner, but it just

20  wasn't clear to me the way that this chart appears where it

21  is that Travelers gets to put Posner and Hughes in its direct

22  case, in addition to doing any cross-examination that's

23  necessary.

24         MR. BERNICK: Right there.  We're saying that

25  whatever you're doing with Posner and Hughes, we have put the

1   time that you've asked for there, and if you want to use it

2   for your cross or direct case, that's where we're putting it

3   down.  We're not trying to foreclose anybody from the

4   estimates that they have given.  The whole point of this

5   chart is to incorporate people's estimates that they've

6   provided us.

7        THE COURT: Okay, so are those - is that time

8   sufficient, 2 hours for Posner for cross and your direct

9   case, and an hour for Hughes?

10        MS. ALCABES (TELEPHONIC): For Travelers, yes.  The

11   estimates that we provided, the 2 hours for Posner and 1 hour

12   for Hughes as part of our direct case and any cross-

13   examination would be sufficient.

14        THE COURT: Okay, so that's fine.

15        MR. BERNICK: Yeah.  I think that that works.  On

16   Sealed Air that is an error.  There will not be a live Sealed

17   Air witness.  Do you see then the indication for Mr. Shelnitz

18   and then for Arrowood.  The next day would also be insurance,

19   and I know now we're going to get to Mr. Brown's issue, but

20   we have - the auto focus is off.  Now, the auto focus is on.

21   I guess that makes sense.  We had Priest and Shine who are

22   two of the experts and apparently there's a scheduling issue.

23   This would be - on even our schedule, it would be the

24   following week.  So we're not talking about calling these

25   people on Friday, obviously.  If they've got a problem in

1   scheduling Priest and Shine to take place early the following

2   week, we're going to have to talk about that, but as we get

3   pressed in the case of Dr. Frank as well, we really need to

4   know exactly what the conflict is and to get some

5   communication that the deals with the substance of the

6   conflict - from the witness, the substance of the conflict

7   and exactly what the circumstances are about trying to

8   rearrange schedules because if we postpone Priest and Shine,

9   they'll be very much out of order, and we just need to know -

10          THE COURT: Well, let me find out from Mr. Brown.

11   Mr. Brown?

12          MR. BROWN: Your Honor, I will address Professor

13   Priest.  I'm familiar with his schedule and Mr. Giannotto

14   will address Mr. Shine.  Let me start by saying that we may

15   be able to solve this problem.  You've got a report, albeit a

16   brief one from Mr. Lockwood about the status of insurance

17   neutrality negotiations.  If in fact we can get that nailed

18   down and the plan proponents, in the light of what we've

19   heard earlier seem to be great proponents of insurance

20   neutrality these days, I think that we can probably dispense

21   with the need to have Professor Priest at all.  Having said

22   that, his conflict is he's indicated as testifying on the

23   14th, Monday the 14th, day 5.  He has a class that begins that

24   day.  He's a professor at Yale and he has a class that begins

25   that day.  He is available on the 9th, the 10th, and the 16th,

1  and he tells me with great trouble he could be available on,

2  I believe it's the 11th.  So that's the issue, Your Honor.

3  It's simply his availability and as I said, if we can resolve

4  the issue of insurance neutrality, I have a feeling we won't

5  be calling Professor Priest at all.

6       THE COURT: Okay.  Well to the extent that you need

7  to take a specific witness here and there out of turn, I

8  don't have a problem with that, but you all have to agree

9  that it can be done.  I don't want every witness taken out of

10 turn, then the case will make no sense, but because this is a

11 pretty logical sequence of events, but to the extent that

12 Professor Priest is available on a specific day and not

13 another, I'm really not sure why you can't work out that

14 issue especially if it's going to take an hour and a half

15 total for his testimony.

16       MR. BROWN: Actually, Your Honor, in terms of the

17 direct, I would expect the direct to be less than an hour.

18       THE COURT: Okay.

19       MR. BROWN: And while I'm up here, I think I can say

20 with respect to Professor Shine, it's an hour and a half

21 tops.  I have other issues on other topics that Mr. Bernick

22 was raising.  I don't know whether you want me to take those

23 out of turn or -

24       THE COURT: No, I want to hear the rest of your plan

25 first.  I just wanted to know about the unavailability of the

1    experts.  Mr. Giannotto.

2          MR. GIANNOTTO: Your Honor, Michael Giannotto for

3    Continental.  We'll be the ones putting on Professor Shine.

4    He has classes all day Monday and Monday night as well.  He

5    said he can fly in first thing Tuesday morning.  He can be

6    here by Tuesday afternoon, the 15th.  He can testify on the

7    16th.  He can testify on the 17th.  I've really tried to twist

8    his arm to try to get him to call off his classes, and he

9    can't, and I appreciate Mr. Bernick's concerns.  I mean, he's

10   got to put together this whole schedule, and we don't want to

11   throw a monkeywrench, but -

12         THE COURT: It's very difficult at the beginning of

13   the term to call off classes.  It's hard enough in the middle

14   of the term, but it's really tough at the beginning.  So, I'm

15   sympathetic to that.

16         MR. GIANNOTTO: But I submit to you, Your Honor, I

17   will work with Mr. Bernick, with Mr. Lockwood, because I

18   assume he's going to be doing the cross-examination to figure

19   out a way to get Professor Shine in someplace on this

20   schedule, and he can make it, and we'll just - you know,

21   we'll do the best we can and if we have a problem, we'll have

22   to come back to you, but I submit we'll do whatever we can to

23   try to work that out.

24         THE COURT: Alright.  As I said, you know, if it's

25   two witnesses, you can probably work out taking something out

1    of turn that will not necessarily jeopardize the whole

2    process, but I don't expect to hear this for everybody.  I

3    understand at the beginning of classes why it's tough, but

4    this - at the moment, this is only a projected schedule

5    anyway, and I hope you can stick to it but, experience

6    teaches me that it may not necessarily follow exactly the way

7    this does.  So, it may be that he won't be called till

8    Tuesday anyhow.

9         MR. GIANNOTTO: Thank you, Your Honor.

10        MR. BERNICK: I heard though that the idea was

11   Wednesday.  You know, having professors testify, that's

12   terrific, but it's their choice and when we call them out of

13   order, particular these are two major witnesses -

14        THE COURT: Yes, they are.

15        MR. BERNICK: It's going to have a real impact.  My

16   hope is that we don't have to - we can reach agreement on

17   neutrality and we don't have to cross-examine or hear from

18   Dr. Priest and I'm assuming Dr. Shine, but if they are to be

19   called, then this works both ways.  They're going to have to

20   give up something too to make this schedule work and it may

21   be that we'll call them on the prior Friday.  To have them

22   called subsequently in the case in the middle of the lenders'

23   case or the middle of the last category, that's just not

24   going to work.

25        THE COURT: Well, out of order, means you can do it

1    sooner.

2              MR. BERNICK: Yeah.

3              THE COURT: As opposed to later.  So, if they're

4    available Friday and you know, the - My guess is that on

5    Friday, based on the Libby schedule, Friday morning is

6    probably still going to be Libby.  I may be wrong, but that's

7    what this is looking like to me.  So, if they can testify

8    Friday afternoon, fine.

9              MR. BERNICK: Right, and this is something that

10   we'll work on.  With respect to the balance of the schedule,

11   I think we've talked about our case in terms of the response

12   to it.  We've just basically got the time here, and you can

13   see on the right side what other folks have suggested.

14   We've heard some revisions to those numbers today, and that's

15   appreciated.  Rebuttal's a question mark, and so maybe it's

16   appropriate that Mr. Brown and others want to talk about the

17   comments they have, now's the time to do it.

18              THE COURT: Mr. Brown?

19              MR. BROWN: Your Honor, just a few brief comments.

20   On page 4, for Mr. Posner and Mr. Hughes, the 3.5 hours and

21   2.25, that's indicated as being cross.  The actual filings we

22   made were indications of direct.  I'm not disputing the time

23   frames.  I think they're fine except that that was supposed

24   to be for direct and cross.  That is direct as part of our

25   case in chief and relevant cross.

1          THE COURT: That's fine.

2          MR. BROWN: And I just don't want there to be any

3    confusion with respect to the other witnesses, Mr. Fink and

4    Mr. Insulbuck.  There's nothing indicated by way of cross for

5    them.  That doesn't mean that we don't have cross for them.

6    There's time allotted but he hasn't - Mr. Bernick hasn't

7    indicated who's interested in doing cross.  That obviously

8    will depend on what the direct examination looks like.

9          MR. BERNICK: We have an hour down, and the reason

10   it's not indicated is because nobody told us there was a

11   problem.

12         MR. BROWN: Your Honor, we were - what we submitted

13   on Friday was an estimate of our direct time not our cross-

14   examination, and I think that's pretty much what everyone

15   else did as well.

16         THE COURT: Well, some of them -

17         MR. BROWN: Bottom line, I think this is their case

18   against the insurers.  The suggestion that we wouldn't have

19   cross-examination for the witnesses that they're putting down

20   is really, I think, a little silly.

21         MR. BERNICK: To the contrary.  We had it down for

22   an hour of cross -

23         MR. BROWN: Right.

24         MR. BERNICK:  - an hour of cross for Insulbuck for

25   -

1          MR. BROWN: Your Honor, I'm not -

2          MR. BERNICK: If there's more time that you need for

3     those witnesses, we didn't hear it, so, if there is, let us

4     know.  We're not seeking today to say, Oh, well, this is just

5     absolutely the way it's going to be.  So, if there's more

6     time for some purpose, people can let us know, you just have

7     to be very specific about what's going to be covered.

8          MR. BROWN: Your Honor, I think -

9          THE COURT: Yeah, I think it's -

10         MR. BROWN:  - he's misconstruing my comments.

11         THE COURT: Well, I'm not.  To the extent that any

12    party wants cross-examination of any witness, I think it

13    would be a good idea to send to the debtor an estimate of

14    that time.  I understand that it's somewhat bound by what the

15    direct is going to be, but you know as to almost all these

16    witnesses, you've got either depositions out the kazoo or

17    expert reports multiples in many cases.  So, I don't think

18    the direct testimony is going to be a surprise.  What the

19    limited areas are, maybe you don't quite yet know.  So, I

20    appreciate the fact that cross will be somewhat governed by

21    what the direct is, but I think you need to let the debtor

22    know for a number of reasons, one of which is, everybody's

23    going to have to notify witnesses as to what the order is and

24    when they're going to have to be called, and unless we have a

25    pretty accurate estimate then we're going to have witnesses

1    sitting all over the place waiting for things and that's not

2    appropriate.

3          MR. BROWN: Your Honor, I'm not disputing that.  I

4    simply - if you look at the two cells below that in yellow,

5    you'll see that those are indicated as being cross, and when

6    Mr. Bernick was up here he said those are the people that

7    indicated an interest in cross, and when I got up here the

8    first thing I said was actually that was the direct time.

9          THE COURT: Yes.

10          MR. BROWN: I didn't want the fact that there's no

11    one listed as having an interest in cross for Mr. Fink and

12    Mr. Insulbuck to be a suggestion that my clients, for

13    example, are not interested.  I understand if he needs a time

14    estimate, we're happy to provide that, and I don't think it's

15    going to be any lengthy period of time.

16          MR. BERNICK: (Microphone not recording.)

17          THE COURT: Okay.  I think we can actually move onto

18    something.  To extent that the plan objectors have asked for

19    time, the debtors understand that the time they've asked for

20    is to include both cross and direct of your case in chief.

21    To the extent that there is no party listed as having sought

22    a specific time for cross-examination, obviously, anybody is

23    permitted to cross-examine.  Whether you're going to want to

24    is, I guess, debatable depending on what the direct testimony

25    is going to be about, but the debtor has allowed for cross in

1    this schedule just so that there will be the availability for

2    any party to cross with respect to that witness.  So, I think

3    that should clarify that for all the entries on all the

4    charts.

5         MR. BROWN: Agreed, Your Honor.

6         MR. SPEIGHTS (TELEPHONIC): Your Honor, this is Dan

7    Speights representing Anderson -

8         THE COURT: Just a minute, Mr. Speights.  You're not

9    coming across here.  I need to turn up the volume.  Just a

10   minute.  Okay, try it again.

11        MR. SPEIGHTS (TELEPHONIC): Your Honor, this is Dan

12   Speights representing Anderson.  I just have one question as

13   a matter of clarification.  I'm confused as to whether the

14   first 3 days are to be Libby only or whether, for example, if

15   Anderson has a few questions for Mr. Insulbuck on the area of

16   equality of treatment we are supposed to do our cross-

17   examination when he's called during the first 3 days of

18   trial.

19        THE COURT: Alright, Mr. Bernick?

20        MR. BERNICK: Yeah, I believe that - it's an

21   important point, so I'll repeat it.  The whole idea is to

22   segment this by issue and to the maximum extent possible

23   constituency.  So, Mr. Speights, the first 3 days are Libby

24   equal treatment issues.  That's it.  Then if you have issues

25   with respect to equal treatment with respect to your client,

1   that would be taken up beginning with day 7, which is kind of

2   anything else, and we have Mr. Insulbuck in day 7.  So, if

3   you have cross with respect to Mr. Insulbuck on equal

4   treatment, that would be the time to do it.

5           THE COURT: Mr. Speights?

6           MR. SPEIGHTS (TELEPHONIC): Thank you, Your Honor.

7   I understood, I just wanted the clarification.

8           THE COURT: Okay.

9           MR. PHILLIPS (TELEPHONIC): And, Your Honor, this is

10  Bob Phillips representing BNSF, and I just had one question,

11  a clarification.  I'm not at all - I have no problem with the

12  general structure that Mr. Bernick has put together, and I

13  think it's a good approach.  He has allowed, I think, one

14  hour for my client's presentation of its case in chief.  We

15  will do everything we can to present our material as

16  carefully as possible and through documents rather than

17  testimony, but I'm worried that one hour will not be

18  sufficient.  I do think we can get it done within 2 hours.

19          MR. BERNICK: We'll mark that down.

20          THE COURT: Alright, it's marked.

21          MR. PHILLIPS (TELEPHONIC): Thank you.

22          THE COURT: Anybody else on the phone before I

23  return to Mr. Brown?  Okay, Mr. Brown, go ahead.

24          MR. BROWN: Your Honor, we did have an issue with

25  the Sealed Air witness, but I understand that person is not

1  going to testify, so that's resolved.  I'm a little bit

2  unclear on what's proposed for Mr. Shelnitz, so I don't know

3  whether I have any issues with that or not.  Perhaps the plan

4  proponents could tell us what Mr. Shelnitz' declaration will

5  say.

6           THE COURT: Mr. Bernick?

7           MR. BERNICK: Yeah, there's nothing down there

8  because we're not sure that there is going to be a

9  declaration.  It falls under the same category with respect

10  to any other declaration or paper submission.  If there is

11  not agreement on the paper submission or declaration that it

12  can come in as a declaration, then he may be called live, and

13  if we decide to call him live, all we're saying is there's a

14  spot but we don't believe that he necessarily will be.  So

15  all this is - it's not there because we don't have a specific

16  proposal to make at this time.  There's no more elucidation

17  that I can provide to counsel.

18           MR. BROWN: That's fine, Your Honor.

19           THE COURT: Any other insurers?  Mr. Plevin?

20           MR. PLEVIN: Thank you, Your Honor.  I have a couple

21  of points.  One on - The schedule to me, as a person who's

22  got a very narrow role in this case, looks difficult.  I

23  mean, we've got a lot of days that would be ending 6-7 at

24  night, and for those of us who would be coming to Pittsburgh

25  for just a day or two out of the trial, I'm wondering if we

1   can put in place a protocol where the plan proponents would

2   at some point during the day give us a status report on the

3   schedule so that those of us who are listening in on the

4   phone can know whether to rush to the airport or put it off a

5   day.  We just went through something like this in the Asarco

6   trial down in Corpus Christi, and that sort of reporting by

7   the debtors' counsel actually, I think, worked out pretty

8   well and it was informative and helpful.

9        THE COURT: Yeah, I mean, every case I've done where

10  they've had this many witnesses, the plaintiff and then later

11  the defendants have indicated how many witnesses they intend

12  to call that day, and there's been some form of indication,

13  let's say, why don't we say at the - after the lunch recess

14  and at the close of the case each day, we'll ask that that

15  report, regardless of who it is who's got the witness at that

16  time, so we can find out how many witnesses will be called

17  the next day and in what order.

18       MR. PLEVIN: I think that would be helpful and -

19       THE COURT: Or two days, you may it need it two days

20  in advance for flight time, I don't know.  You folks can

21  discuss that, I don't know the arrangements.  It's going to

22  be tough two days in advance.

23       MR. PLEVIN: Well, from my perspective with the

24  insurance issues being split under this schedule between a

25  Friday and a Monday, it makes it - it's very important to

1    know whether we're actually going to get to any insurance

2    issues on Friday to avoid having to make two trips.

3         THE COURT: Well, I think if the two experts or

4    perhaps one expert, however many experts are available Friday

5    and not available when they're normally scheduled, that may

6    be a good thing to start with.

7         MR. BERNICK: I think it's an excellent proposal.

8    We have no problems with it.  It's getting to Pittsburgh

9    though that's little bit different than getting to Corpus

10   Christi, I think Mr. Plevin will agree, and therefore, I

11   think probably the most probative thing is going to be more

12   or less like where we are towards the end of the day, but the

13   other thing is that people should feel absolutely free to

14   just email us if there's something in particular that they're

15   concerned about.  I don't want to get swamped with emails,

16   but we have no problem with - We're the ones that want to

17   keep this process rolling and not take up people's time. So

18   we have no problem with communicating along those lines.

19        THE COURT: Alright.

20        MR. PLEVIN: Alright.  Point two, Your Honor, you

21   haven't seen them yet, but the deposition designations and

22   objections and counter designations are being exchanged

23   between the parties, and I think they're due to be submitted

24   to the Court tomorrow.  In terms of, for instances, whether

25   or not I might want to cross-examine a witness, to the extent

1   that the testimony that I've designated from that witness's

2   deposition is not getting in by deposition, I may need to do

3   some questioning live at the trial in order to try to elicit

4   the same testimony, depending on what the objection is and

5   what the Court's ruling is.  So, this is sort of an inquiry

6   as to what the Court's process is going to be in terms of

7   ruling on the deposition designations and the objections and

8   telling us so that we know whether we need to cross witnesses

9   or not.

10          THE COURT: Well, I guess the issue is, for me is,

11   what are the nature of the objections.  Because if they're

12   relevance, I can't determine that now.  If there's something

13   else, then I guess I need to know what the objection is, and

14   so I can put it into a context, but relevance is obviously

15   something until I hear the context, I just don't know.

16          MR. PLEVIN: Well, I'll tell you and Mr. Bernick can

17   correct me if he disagrees with what I've said, but the way

18   that the plan proponents have so far done their objections,

19   is they've used one or two letter codes to identify what the

20   basis of the objection is.  So what Your Honor will get

21   tomorrow is are hard copies of the depositions with in the

22   left-hand column what the objecting parties have designated

23   and in the right-hand column, the plan proponents' objections

24   and this one or two letter code for the basis of the

25   objection.

1           THE COURT: Give me an sample as to the nature of

2     the objection.  Just, I mean -

3           MR. PLEVIN: It ranges from relevance to best

4     evidence to legal opinion to foundation.

5           THE COURT: I think I'm going to have to make

6     rulings as I hear the witnesses offered in some context

7     unless we set up a separate day for it, but relevance, I

8     absolutely cannot give you a relevance ruling until I know

9     the context.  Now, what I could do with relevance objections,

10    if you all agree, is simply admit the testimony and then when

11    I get to the findings of fact and conclusions of law, if I

12    deem that it's not relevant, I'll not consider it and make a

13    relevance ruling, but if you want a ruling as it goes on, on

14    relevance, I can't do that until I hear the evidence in

15    context.

16          MR. BERNICK: My proposal with respect to Mr.

17    Plevin's concern is that, you know, it's a good - I

18    understand why he has this issue.  I'm not sure that - I

19    mean, it basically revisits everything that we've done in

20    connection with the CMO.  The CMO people had to identify the

21    people that they're going to call to trial, and that was done

22    without knowing how Your Honor would rule on deposition

23    designations.  I'm also not sure what kind of testimony

24    really could be elicited from the people who are being called

25    anyhow.  Be that as it may, I'm just not sure how to solve

1    this problem unless Your Honor is going to go through the

2    deposition designations on a parallel track with taking live

3    testimony, and I just don't see that as being feasible.

4         THE COURT: It's not very efficient, that's for

5    sure.

6         MR. BERNICK: Yeah, well I mean, well we'd either

7    have to do it live and in court or Your Honor has to do

8    outside.  You don't have the time anyhow because

9    realistically, I just don't know how to solve Mr. Plevin's

10   problem.  I suspect that he has a concern with some

11   particular testimony, and maybe we can have a communication

12   offline and figure out what that testimony is, and then have

13   a more meaningful discussion about this.  I don't want to try

14   to articulate a general principle that applies to all

15   deposition designations.

16        MR. PLEVIN: And I appreciate that suggestion.  I'll

17   be glad to have that conversation with Mr. Bernick or whoever

18   else on that side of the table he designates.  Just to put it

19   in context, I only designated testimony from three witnesses,

20   and two of them are scheduled to appear live, and so, the

21   question for me would be, do I need to spend no more than

22   five minutes actually asking the questions, because I think

23   my portion of the depositions of these witnesses was only

24   about 10 minutes total, and some of what I designated, some

25   of what I questioned no one designated and some of what I

1    designated was not objected to.  So, it's really a subset of

2    that.

3         MR. BERNICK: For 5 minutes, this is not worth

4    taking up.

5         THE COURT: Yeah, I think to the extent that there's

6    going to be a specific issue, I actually do trust that as

7    litigators you folks are probably going to work that issue

8    out because it will probably hit on both sides, and you need

9    some resolution that will accommodate everyone.  I don't know

10   that I have a solution for you.  I think the only thing that

11   I can do is at the time the deposition is offered, if there

12   is an objection that I have to rule on then, we'll have to

13   read the deposition, and that will take additional time.  I

14   don't know how else to do it except to reserve rulings until

15   after the live testimony is over and I read the depositions

16   and then determine based on the objection that's been raised

17   whether it's proper.

18        MR. PLEVIN: Okay.  Point three, and the last point

19   that I have, Your Honor, is -

20        MR. LEWIS: Your Honor, may I be heard on the

21   previous points.

22        THE COURT: Alright, Mr. Lewis.

23        MR. LEWIS: Excuse me, sir.  I don't understand

24   this.  If a witness is called to testify, then the deposition

25   is out the window unless there's admissions or something in

1    the deposition that can go into evidence.

2          THE COURT: No, I think Mr. Plevin was saying that

3    he won't know whether he has to call the witness because he's

4    planning to proceed by deposition, but if I sustain an

5    objection to the deposition, he may have to bring the witness

6    in live in order to try to articulate the same point.

7          MR. LEWIS: I thought what he said was that two of

8    the witnesses were going to testify live.  And he'd only have

9    5 minutes if his deposition designations went 10.  They can't

10    come in if the witness comes live.

11          THE COURT: No, he's talking about the third one,

12    the deponent; correct?

13          MR. LEWIS: Okay, I misunderstood that.

14          THE COURT: No, maybe not.

15          MR. BERNICK: It doesn't -

16          MR. PLEVIN: No, Your Honor, if Grace's 30(b)(6)

17    witness made an admission during his deposition, I would put

18    in the deposition designation, but if you're not going to

19    admit the testimony because of an objection that was made and

20    he's going to be here anyway because the plan proponents are

21    calling him, I would try to elicit the equivalent testimony

22    through his -

23          THE COURT: That's probably the way to do it, but

24    whether it will go in or not I don't know when or how I'm

25    going to get those objections before me to make rulings.

1          MR. PLEVIN: Alright.  Okay.  And my point is if

2    even though he's taking the stand once or twice, since I had

3    what I wanted in the deposition, if it was admitted, I

4    wouldn't take any of the Court's time questioning him.

5          THE COURT: Yes.  Mr. Brown.

6          MR. BROWN: Your Honor, this actually raises two

7    issues.  You may recall that in Phase I there was objections

8    to deposition designations on the grounds that the witness

9    was available.  That objection was dropped by the plan

10   proponents so I think that's a legitimate question for right

11   now as to whether they intend to drop that as to third-party

12   witnesses for example, like Mr. Insulbuck and Mr. Posner,

13   because otherwise we run the risk of facing the argument that

14   the witness is available and we have to cross-examine him,

15   which defeats the purpose of going through the deposition

16   designations.  So that's my first point.  My second point,

17   Your Honor, is that the counter-designations and objections

18   to -

19         THE COURT: Mr. Brown, I'm sorry.  Please, whoever

20   doesn't have your mute button on, please put it on.  There's

21   a lot of clicking that's happening and it's distracting.  I'm

22   sorry, Mr. Brown.

23         MR. BROWN: Your Honor, Mr. Bernick has just told me

24   he's going to take up the topic of the designations later so

25   I'll raise my second point later, but I think we do need

1    clarity on whether that objection is going to be raised by

2    the plan proponents or for that matter anyone else.

3            THE COURT: Alright.

4            MR. BERNICK: The answer to that is yes.  I mean the

5    Rules of Evidence say that if somebody is available to

6    testify live in court then the deposition testimony is

7    hearsay.  If the witness is - particularly if we're calling

8    them live, the answer is, they should do it on cross-

9    examination.  If it falls within the scope of the direct

10   examination, it should be done on cross.  So, I think that

11   that's a relatively straightforward proposition, and all of

12   these things should have been determined in connection with

13   the case management process and not now.  The Rules of

14   Evidence govern, if someone is available to testify as a

15   third-party witness, you're obliged to secure their testimony

16   live.

17           MR. BROWN: Your Honor, we were asked as part of the

18   case management process to indicate whether we intended to

19   call someone live or by deposition.  If what Mr. Bernick is

20   now suggesting is that there's going to be an objection to

21   designations, for example, from Mr. Posner's deposition, or

22   Mr. Insulbuck's, then I think the answer is there's going to

23   be a lot more questions asked of those witnesses.

24           THE COURT: Look, I don't understand if the witness

25   is going to testify live and has already testified in a

1    deposition to the same matters that are going to be brought

2    up in court anyway, then if the parties agree that those

3    portions of the testimony in the deposition are admissible as

4    though the witness was there live, I think you can make that

5    agreement.  I don't see a problem with it.  In most cases

6    we've done the case in chief by way of declaration and

7    subjected the witness to cross-examination.  So, I don't

8    understand what the issue would be provided that the parties

9    agree.  So, I'm just going to make something up.  Let's say,

10   Mr. Insulbuck is asked his name, and he's testified to his

11   name in the deposition.  Well, that may be a bad example,

12   because he's going to have to state his name for purposes of

13   the record, but nonetheless, you know, he doesn't need to

14   repeat that testimony live.  It's already in the deposition

15   transcript and I don't - if there's no objection to it, I

16   don't know why it can't come in by way of deposition.

17          MR. BROWN: I agree with Your Honor.  I think what

18   we heard Mr. Bernick say is that there will be an objection

19   to it because the witness is available, and that's what we

20   need clarification on.

21          THE COURT: That's where I'm headed.  So, Mr.

22   Bernick, if there is no objection to the nature of the

23   testimony as opposed to a hearsay objection, why isn't -

24          MR. BERNICK: It's really pretty simple.  I don't

25   know what all the designations are, but the whole idea of a

1    trial is to have a clear understanding of what the witness's

2    testimony is, and there may be designations that were fine in

3    the context of a deposition that was taken for discovery

4    purposes, but the trial now is an opportunity if the witness

5    is there on the stand, to have him be able to explain what

6    his testimony is.  So, what I don't want to have happen is

7    people are now relying on deposition designations that are

8    partial or they take place in a different context and then

9    instead of confronting the witness with that testimony when

10   they're there and they're being examined on exactly the same

11   subject.  Instead people stand back and they say, Well, I'll

12   offer the testimony, and here it is, it's X and Y and Z, and

13   it's very incomplete or is really addressing a different

14   issue but it got into something that's arguably of relevance.

15          THE COURT: Alright, Mr. Brown, it's just going to

16   be longer.  You'll have to do it live.

17          MR. BERNICK: It may be.  Again, it would be much

18   easier if we addressed this question in the context of

19   specific testimony rather than as a general abstract

20   proposition.

21          THE COURT: Look, what's going to be good for the

22   goose is good for the gander.

23          MR. BERNICK: I understand that.

24          THE COURT: It's a rule that will apply to

25   everybody.  So, be careful what you ask for.

1          MR. BERNICK: I understand that.

2          THE COURT:  Okay.

3          MR. BROWN: Your Honor, I don't want to belabor the

4   point, but the counter designations and objections to the

5   designations were due on Friday, and we were served with

6   those.  I don't think this was raised as an objection by the

7   plan proponents.  There were lots of objections.  There was

8   best evidence.  There was relevance.

9          THE COURT: Well then why are we talking about it.

10         MR. BERNICK: It's hearsay.  That includes -

11         MR. BROWN: There were some hearsay objections, Your

12   Honor, but there were a lot more best evidence, most of it

13   was relevance.

14         MR. BERNICK: If we didn't make it, we didn't make

15   it.

16         THE COURT: If the objection's not raised, it's not

17   raised.

18         MR. BROWN: My only point, Your Honor, is that if

19   that objection is going to be raised and the availability of

20   Mr. Posner or Mr. Insulbuck or other third parties is going

21   to be a basis for excluding the deposition designations then

22   there may be additional direct examination of those

23   witnesses.

24         THE COURT: It won't be a basis unless the objection

25   was raised.  I'm not going to create issues that you folks

1    haven't already created.

2          MR. BROWN: Well, Your Honor, we haven't actually

3    gotten through all the deposition - the objections so far,

4    but - so I don't know the extent to which it's been raised.

5          THE COURT: Alright.  I think Mr. Bernick's

6    suggestion that when you all take a look at all of the

7    objections, you confer as to whether or not any of them can

8    be resolved so that the depositions can or can't be used,

9    whatever the outcome is, you get a resolution among

10   yourselves.  Mr. Plevin.

11         MR. PLEVIN: Your Honor, my last point is simply,

12   this is the last page of Mr. Bernick's proposal, and it shows

13   closing argument on the 13th and 14th if needed.  And I'm not

14   sure exactly what that means, whether that means we would

15   only start on the 13th if we didn't finish in September with

16   closing arguments or whether we're starting closing arguments

17   for sure on October 13th.

18         THE COURT: Would the Court Call operator please

19   disconnect or put on mute whoever it is who has not muted

20   their line.

21         MR. BERNICK: The answer is that I think that

22   there's a common theme for Mr. Plevin's question which I

23   fully appreciate which is scheduling and the availability of

24   counsel to address their very discreet issues.  So, what I'll

25   say about this is that we simply are indicating the Court has

1    previously said we could have these days, and I don't know if

2    they're going to be needed for testimony or what.  We simply

3    put down closing argument.  I don't know that we need closing

4    argument.  So this is a very much - we'll see what we need

5    for the end of the schedule, and I think in terms of

6    availability of counsel, everybody is on notice and at risk

7    for those days because they've been set aside.  Whether we

8    need them and what they need them for is something that I

9    don't think we can say right now.

10            THE COURT: I think that's the solution, Mr. Plevin.

11   I actually wanted some additional days built in because to

12   the extent there's any lapse in this schedule, I don't even

13   know if I'll be able to have to court reporter for days at 9

14   and 10 hours at a time.  I'm assuming that I may, but I don't

15   know.  So to the extent that some of these days like have

16   9.75 hours, that doesn't build in a lunch.  It doesn't build

17   in a recess.  It doesn't build in a closing time, and so, I

18   think there's going to be slippage in this schedule just

19   because it's pretty ambitious.

20            MR. PLEVIN: My suggestion, to be precise, Your

21   Honor, was that to the extent we're going to have closing

22   argument and you may not have decided that one way or the

23   other yet, but if we're going to have closing argument that

24   we not start the closing argument before October 13th.

25            THE COURT: Oh, it won't start, I'm sure it won't

1   start before then because we haven't discussed this issue and

2   I don't want to take things too much out of order, but I'll

3   raise it.  I probably will want some form of closing argument

4   at some point.  What I've done in -

5          MR. BERNICK: Your Honor, I think you've already

6   told us that generally you would like to schedule the closing

7   argument after the post-trial submissions.

8          THE COURT: Yes, that's exactly right.

9          MR. BERNICK: And we were going to talk about that

10  when we talked about the briefing -

11         THE COURT: Okay.

12         MR. BERNICK: But I think that, while again Mr.

13  Plevin is always a pleasure to deal with, it might be better

14  if we got back to the order of proof and got to the lenders

15  who are next and then came back at the end and any and all

16  comments that people have -

17         THE COURT: In any event it won't start before

18  October 13th.

19         MR. PLEVIN: That's fine, okay, thank you, Your

20  Honor.

21         MR. BERNICK: So, with respect to the lenders, this

22  is the next day and we've had a fairly extensive discussion

23  of this.  There's a major issue relating to the lenders which

24  has to do with the use, the role of the prior estimation

25  transcripts, but that's not live testimony, and therefore,

1    it's really not reflected here, so I think this is fairly

2    self-explanatory.  We've got a few witnesses who are going to

3    appear.  We've agreed, notwithstanding my prior position, Mr.

4    Cobb prevailed upon me the wisdom not to burden Mr. Freegood

5    with a live appearance, so we've agreed that his declaration

6    being presented, and beyond that I think it's fairly self-

7    explanatory, and I would just leave it up to Mr. Pasquale and

8    Mr. Kruger and Mr. Cobb to offer any comments if they want.

9         MR. PASQUALE: Thanks, Your Honor.  Ken Pasquale for

10   the Creditors Committee.  A couple of points here.  Mr.

11   Kruger is not listed as a witness for us.  He should be.  In

12   fact the debtors' submission to the Court, I think it was

13   Friday, that had this type of thing, had Mr. Kruger listed

14   for us and -

15        MR. BERNICK: We don't have a problem with that.

16        MR. PASQUALE: Okay, so that we don't have a problem

17   with.  I suspect including cross, and I just for

18   clarification the numbers here I assume are direct and cross?

19        MR. BERNICK: Yes.

20        MR. PASQUALE: Okay.  So I think Mr. Kruger would be

21   similar to Mr. Shelnitz, an hour, hour and a half, in that

22   range.

23        THE COURT: Alright.

24        MR. PASQUALE: Just a couple of things.  On the

25   experts, Ms. Zilly and Mr. Frezza, I think this is probably

1    light, in light of some of the changes in structure that we

2    were anticipating.  They may be 2 hours each, all in, but I

3    do think Dr. Peterson will be less on cross than the hour and

4    a half.  So we can make up some time there.  I see there's

5    only a half hour for the designation of the summaries, but I

6    assume again in light of Mr. Bernick's comments to Mr. Ordway

7    (phonetical), yes, he will not be live, but Mr. Frezza will

8    be.  So, I assume there's no designation for him.  I

9    certainly haven't seen one yet in any event.  And one other

10   suggestion, Your Honor, and this is what you said a moment

11   ago, I think for some of these witnesses we can have directs

12   - It would be our suggestion we have directs by the

13   declarations, and that would be Mr. Shelnitz, Mr. Tarolla,

14   and Mr. Kruger, and due cross is live, and that would save

15   some time.  Thank you.

16        MR. BERNICK: We're not - I understand that and I

17   understand the sentiment behind it.  My experience that just

18   means that you're saving essentially the same time for

19   redirect examination.  I just think that if the witnesses are

20   there, it won't take long to put in the direct testimony.

21   You can see that in all these cases.  They can do the cross

22   and then we'll do the redirect.  Declarations are usable for

23   cross-examination.  We'll still consider that proposal and we

24   appreciate that, but right now our anticipation would be to

25   call Mr. Shelnitz live and to put in his testimony orally and

1    then just have it done the usual way.

2         THE COURT: Alright.

3         MR. BERNICK: So, I understand that Your Honor

4    customarily sees a lot done by declaration, and I understand

5    that's fine.  I've had whole trials that are direct

6    examinations put in through summaries, and my experience is

7    that at end of the day, you spend more time arguing about the

8    summaries then you do about actually taking the testimony.

9    So, we'll consider that.  I appreciate the suggestion.  Right

10   now that's not our preferred course, but we'll certainly be

11   happy to revisit that.  As to the suggestion that was made on

12   Frezza, I think that Mr. Pasquale is correct.  Mr. Frezza is

13   going to be appearing live as part of their case.  We still

14   may want to present summaries, but if Mr. Frezza's appearing

15   live, he can't - hard for it to be a summary of deposition

16   testimony because he was there.  So, I think that he's

17   correct about Frezza.  Ordway's a different proposition.

18        THE COURT: Alright, so, I take it you folks are

19   going to be able to work out the time frames with respect to

20   this one.  It sounds like you're already in substantial

21   agreement, and there isn't much difference really.

22        MR. PASQUALE: I think at the end of the day, with

23   less for some witnesses but more for others.  I think that

24   the total is roughly there.  I think maybe at the end it's a

25   little longer than that, but I think we're in general

1   agreement on the total time.

2          THE COURT: Alright.

3          MR. COBB: Your Honor, Richard Cobb for the Bank

4   Group.  I just want to make sure we're clear.  I join with

5   Mr. Pasquale's comments and I do agree, I think that it

6   works.

7          MR. BERNICK: We'll be able to work this out -

8          MR. COBB: It's an hour here or there.

9          THE COURT: Okay.

10         MR. BERNICK: Which then brings us to the end, the

11  last segment, and there really are a variety of different

12  subjects that are encompassed by this.  Your Honor can see

13  all the different matters.  This is where we'll now pick up

14  the property damage claimants, also feasibility, the Canadian

15  settlement, 524(g), best interest tests.  This will be all

16  part of this segment, and Mr. Lessern (phonetical) will be

17  appearing, and then on the objectors we have the Libby folks

18  if they've got other more generic issues, that's where they

19  are.  Spear for non-products coverage to the extent that that

20  is still an issue.  He'll be able to appear then.  And then

21  we have our rebuttal as basically being a question mark.  I

22  know that Mr. Speights is on the phone.  We've recorded Mr.

23  Speights' estimates as being - that's the stuff that's in

24  yellow, and I don't know if Mr. Speights has anything else

25  that he wants to cover, but that would be the end of the

1    process, and we have, as I said, a series of discreet issues

2    to take up after we get through this, so we're not done with

3    it, but that certainly covers the basic flow of the evidence

4    that we expect.

5         THE COURT: Okay, Mr. Speights the chart that I've

6    been handed with respect to Anderson Memorial shows an hour

7    on direct for Ewing and a hour and a half direct for Freeman,

8    quarter of an hour direct for Hilton, and half an hour direct

9    for Solomons.  Is that your estimate of what you need and is

10   anything missing?

11        MR. SPEIGHTS (TELEPHONIC): I don't think anything's

12   missing and I think that's our best estimate at the moment.

13   We're still involved in some discovery issues, which may

14   clarify but I don't anticipate any longer and I do anticipate

15   cross.  Are we on day 7 the 524(g) issues or day 8 everything

16   else issues?

17        THE COURT: I think we moved to day 8 everything

18   else, but we can go back to day 5 if we need to.

19        MR. SPEIGHTS (TELEPHONIC): No, I'm perfectly happy

20   to advise the plan proponents of our anticipated cross time

21   on day 7.  I'll do it now, but I'll be happy to just send

22   them an email and tell them that, and I'm not sure who

23   they're calling on day 8.

24        MR. BERNICK: On day 8, we're not sure either,

25   that's why we put question marks.

1          MR. SPEIGHTS (TELEPHONIC): So that goes back about

2     4 or 5 hours, I think that's probably accurate, but it

3     somewhat depends on who the plan proponents are calling as

4     well.

5          MR. BERNICK: Yeah, let me be clear.  With respect

6     to the estimated times, we have received declarations from

7     Freeman and Solomon.  We're not agreeable to those

8     declarations coming in.  They relate to matters we don't

9     think are relevant, but they're also plainly hearsay.

10    They're not depositions, they're simply declarations.  So,

11    when I said time, I'm not indicating that we're agreeable

12    that those matters can be presented to the Court.  We simply

13    faithfully recorded what Mr. Speights had said.  With respect

14    to Mr. Hilton, it's the same thing.  Mr. Hilton's an expert.

15    There's no expert report for him.  I don't remember what the

16    situation is with respect to Ewing, but we don't intend to

17    indicate by our putting down the hours that we have any

18    agreement as to the admissibility of the tendered evidence.

19    We're simply saying, Okay, that's what he said, we're putting

20    it in the schedule.

21         THE COURT: I don't think anybody has agreed by

22    agreeing to a schedule as to the admissibility of any

23    evidence.

24         MR. BERNICK: Right.

25         THE COURT: It's just figuring out how much time

1    it's going to take to get the testimony in to the extent that

2    it's proffered.  Mr. Speights, anything more you want to add?

3           MR. SPEIGHTS (TELEPHONIC): No, Your Honor.

4           MR. BERNICK: So I think that that brings us to the

5    end of our basic review of the order of proof.  With respect

6    to, I guess there's one issue, all the rest is now fairly

7    discreet stuff beginning with briefing, and so, if it's

8    appropriate maybe I can -

9           THE COURT: Let me find out from any other parties

10   if they want to be heard first. Mr. Friedman.

11          MR. FRIEDMAN: Jeffrey Friedman, Your Honor, for

12   Morgan Stanley.  Your Honor, there's nothing specifically in

13   the schedule and we were in meet-and-confers with the plan

14   proponents, but there's nothing specifically in the schedule

15   for dealing with pure legal arguments that we have under

16   1129, § 1123(a)(4) issues, classification issues.  If Your

17   Honor wants to make those part of closing argument, that's

18   fine.  That's sort of what the debtor was suggesting, but we

19   do think it's very important to be able to argue those issues

20   whether as part of closing argument or at the end of some

21   other day, but we do want the opportunity to present those to

22   the Court.

23          THE COURT: I think you may want to do them in

24   connection with the evidence that's been elicited, perhaps.

25   So, it may make sense just to put them as part of the closing

1    arguments.  I'm amenable to that or another schedule if you

2    find it more convenient, but it seems to be that this is a

3    pretty ambitious schedule for evidence and it may be better

4    to put the legal arguments off till the end.

5          MR. BERNICK: That's what - that's the whole - I

6    mean, that was what I'm going to take up with briefing and

7    the like.  This is purely in every call that we've ever had,

8    all the meet-and-confers have been crystal clear that what

9    we're talking about is a schedule for live testimony because

10   those are trial days, and if we had legal argument

11   interspersed throughout that process, not speaking as one who

12   is most guilty on these things, we'd have a hard time getting

13   out of here, so, and we'll take up the idea though of

14   argument here in a minute.

15         THE COURT: Alright.  Mr. Demmy?

16         MR. DEMMY: Your Honor, I just had one very brief

17   point and it relates to the order of proof.  We did file a

18   draft on Friday. It included, I believe, a 30-minute slot for

19   corporate representatives to testify with respect to

20   authenticity of documents and so forth.  It didn't make it

21   in.  I don't think that's a big deal because I think we're

22   going to ultimately have a stipulation like you've seen

23   previously in this case and in other cases but I did want to

24   just note that for the record that it was not in there, but I

25   don't think it's a showstopper to -

1           THE COURT: Okay.

2           MR. DEMMY:  - borrow that phrase.

3           THE COURT: Mr. Brown.

4           MR. BROWN: Your Honor, I just to re-raise the point

5    two that I deferred because I thought Mr. Bernick was going

6    to talk about deposition designations.

7           MR. BERNICK: (Microphone not recording.)

8           MR. BROWN: Oh, I thought we were moving on to

9    briefing at this point, Your Honor.

10          THE COURT: Not yet.  I'm still trying to get the

11   schedule -

12          MR. BERNICK: We have briefing, designations,

13   medical records, new people, judicial notice, lots of things.

14          THE COURT: Okay.  Mr. Monaco.

15          MR. MONACO: Good afternoon, Your Honor.  I'll be

16   brief.  For the record, Frank Monaco for the State of

17   Montana.  Your Honor, we're generally fine with the order of

18   proof.  We view our issues as primarily legal in nature,

19   however there may be some questions we'll want to ask on

20   cross-examination.  I think most if not all of them can be

21   covered in days 7 and 8, but it is conceivable we may have a

22   question to, like for instance, because our issues are

23   related to the Libby claimants' issues that may crop up, but

24   I can't imagine it being more than a couple of questions.  I

25   think our total time for cross-examination will be under 15

1    minutes.

2         THE COURT: Alright.

3         MR. MONACO: I just wanted to let the Court be aware

4    of that.

5         THE COURT: Okay.

6         MR. MONACO: Thank you.

7         MR. KUNZ: Good afternoon, Your Honor.  Carl Kunz

8    for Garlock Sealing Technologies.  Your Honor, we proposed to

9    the debtor that we would have two witnesses.  In the meantime

10   we've tried to enter into a stipulation with the debtor.  I

11   believe the stipulation is actually in the debtor's hands

12   now, with stipulated facts, and I think we've reached an

13   agreement in principal on that would avoid the necessity of

14   carrying two live witnesses or adding two live witnesses to

15   the schedule.  Primarily I think Garlock has issues with

16   respect to TDP and fair and equitable matters, but I think

17   the - hopefully the resolution is that Your Honor will simply

18   have stipulated facts but to the extent that we need to

19   insert two witnesses into the schedule, we'll work with the

20   debtors to put them in in an appropriate time with an

21   appropriate allotment of time.

22        THE COURT: Alright, okay.

23        MR. KUNZ: Thank you.

24        THE COURT: Anyone on the phone have any issues

25   about just the schedule and not the issues that we haven't

1    gotten into yet.  Okay, Mr. Bernick.

2         MR. BERNICK: Boy.  Okay, so, briefing and argument.

3    Our proposal in order to move this process forward and as

4    we're going through this year, it is fair to say that there

5    are resolutions that are being reached as the debtor has done

6    and as the plan proponents have done throughout this case

7    issues get litigation but the litigation generally serves to

8    frame, at some point in time or another, resolution, and

9    that's why the case is so extensively consensual at this

10   point.  It continues.  We're having settlements and

11   continuing settlement discussions and we would really urge

12   that the Court keep this on a schedule that maintains the

13   momentum that we now have, which is of course no premature

14   prediction of success, but it says that as we're - we really

15   have a good pace now in terms of getting through things that

16   we maintain it, and this is very important for all the plan

17   proponents and I'm sure also for other constituencies in the

18   case.  To that end, we would propose that first of all we not

19   have closing arguments at the end of the trial because

20   inevitably, I think that the briefing will be an opportunity

21   for the Court to come up to speed on it and I don't know that

22   the closings would be efficient at that point.

23        THE COURT: They won't be as effective if I can't at

24   least get some draft proposed findings and conclusions of law

25   from the parties in.  So, I agree.  I want them scheduled but

1  they don't need to be at the end of the testimony, they can

2  be after some - either you're calling them briefs.  I would

3  at least like to see proposed findings and conclusions.

4        MR. BERNICK: Well, I had really two/three things.

5  One was kind of the back-end, the timing of the argument

6  because we would like not - We'd like to get that scheduled

7  and then move back and - schedule the briefs and the

8  arguments to be pretty tight and pretty close together so we

9  don't wait for an argument and lose the time really that

10  elapses between the briefing and the argument.  Secondly, the

11  form of the briefs and third the timing of the briefs.  With

12  respect to the form of the briefs, we'll do whatever it is

13  that Your Honor believes is appropriate, but at least my

14  sense is, that having looked at Your Honor's prior opinions

15  in the case, I think that while there are some proposed

16  findings that get borrowed, by and large the parties'

17  submissions and proposed findings of fact and conclusions of

18  law are in order of magnitude, almost more extensive than

19  what Your Honor ultimately writes, and that's because the

20  Court synthesizes the evidence of the law in a way that makes

21  sense to the Court, and so I really ask the question about

22  whether it makes sense to have proposed findings, which tend

23  to be very, very voluminous, and then you have to get into

24  cross-referencing them and all the rest of that stuff as

25  opposed to having post-trial briefing subject to some real

1    limitations on length that may follow a structure that the

2    Court finds to be, you know, easiest.  So, for example, we

3    would think that in the same fashion that we have the Libby

4    claimants TDP issues or Libby claimants' issues, just take

5    the Libby claimants' issues, be a brief, and, you know, one

6    brief on either side.  Lenders, same kind of thing.

7    Insurers, same kind of thing, and then again, segmented all

8    the rest of the issues kind of thing.  We have briefs and we

9    further propose that those briefs be sequenced so that we

10   don't wait until all the evidence is in before people start

11   to work on them.  So, for example, we would say, 21 days

12   after the evidence is done on equal treatment and the Libby

13   claimants, both sides would exchange simultaneous briefs on

14   that subject.  21 days after the default interest issue has

15   been put before the Court in terms of the evidence, we'd have

16   briefs exchanged on that subject, and in that way, you get

17   briefs that are kind of more issue-driven and they're prompt.

18   So, that would be our proposal -

19             THE COURT: Well, that's fine.

20             MR. BERNICK:  - but I just put it up to Your Honor

21   about what you'd like to do.

22             THE COURT: I want at some point something that tees

23   up the facts that you think have been proven with the legal

24   standards that are applicable.

25             MR. BERNICK: Right.

1          THE COURT: Now, if you can do that through a brief

2     but actually with citations to the record that show me where

3     the fact is, that's fine.  The reason I have usually ordered

4     post-findings and conclusions is because I want them sentence

5     by sentence with a true-up in the record where I can find the

6     fact.  I don't use them in that sense, because they don't

7     usually make a whole lot of sense, just to read proposed

8     findings, but they are very helpful in analyzing what a

9     party's position is and where in the record I can go to see

10    whether that party's view of the record really is or isn't

11    sustainable.

12          MR. BERNICK: What we could do, and we've done this

13    in other cases is first of all, if everybody understands that

14    that's what Your Honor wants, I'm a thousand percent

15    confident that the briefs that will be submitted will at

16    least attempt to meet that standard.

17          THE COURT: Well, no, unfortunately they usually

18    don't unless I order that it has to be done that way because

19    people still use briefs for argument purposes, and I'm happy

20    to get the argument but I want to know where in the record

21    the argument is based.

22          MR. BERNICK: Yes.  That's what I'm saying, and we

23    can actually - everybody can really do this.  It's available

24    technology.  We can actually provide hyperlinks so that you

25    can click on the citation and you get the exhibit to the

1    extent that it's - you get the exhibit or you get the piece

2    of the transcript.

3         THE COURT: Yeah and that's actually helpful too.

4         MR. BERNICK: But that's what our proposal would be,

5    and in terms of timing we feel very strongly that while the

6    evidence is as fresh as it's going to be in people's minds

7    and in order to keep this process rolling that we would

8    sequence the briefing in the way that I've indicated.  Now it

9    doesn't have to be resolved today, and maybe Your Honor could

10   set a date for people to submit proposals on post-trial

11   briefing and on post-trial argument, but our proposal would

12   be that we have sequential briefing simultaneous instead of,

13   you know, the usual, and that it be triggered by the basic

14   phases of the trial, and that way Your Honor gets the briefs

15   in a way that is most responsive to or, you know, kind of

16   tied to the evidence in the best way.  That would be our

17   proposal, and then at some point at the back end, we would

18   then have the argument on all of the issues, and Your Honor

19   would have the benefit of having the briefs.

20        THE COURT: Alright.  Mr. Pasquale?

21        MR. PASQUALE: Thank you, Your Honor.  I'm not

22   necessarily opposed to that, but I'm confused and perhaps

23   concerned.  Yes, we're going to try to phase this by issues,

24   but we heard Mr. Bernick when you were presenting how this

25   was going to occur during the trial itself that - you know,

1  evidence is not in until the last day, and so, a witness may

2  appear on some other issue and we of course can still ask

3  questions that may be relevant at a time when the briefing is

4  already ongoing.  I'm a little confused by how we do that

5  other than at the end of the case.

6        THE COURT: Well, I think you'd have to do some

7  supplemental to the extent that the witness was recalled and

8  changed testimony or whatever it is that you think would

9  further articulate your client's position.  So, but I think

10  the idea of getting the briefs done as the issues are

11  finished is probably a good one because it is fresh in

12  everyone's mind and I think it will make the job at the end

13  of the case easier for everyone.

14        MR. PASQUALE: I'm sorry, Your Honor, and I assume

15  with the 21 days nothing is due until the trial is over

16  anyway, so it should be able to work out, but I did want to

17  raise the issue.

18        MR. BERNICK: Yeah, I think - let me be clear, this

19  is a concept that we're putting out on the table.  Like to

20  get Your Honor's reaction to it.  If Your Honor's reaction is

21  consistent with it or isn't consistent with it, what we'll

22  then do is circulate - like we have with the case management

23  orders, we'll circulate a proposal, we'll consult with Your

24  Honor's staff to figure out what the available dates might be

25  for a hearing, and then we will circulate that and then

1   convene a meet-and-confer to do a case management order just

2   like we have on other matters.  So, we're not asking for a

3   definitive commitment today.  We're just putting the concept

4   out there.

5          THE COURT: Alright.  Mr. Lewis?

6          MR. LEWIS: Thank you, Your Honor.  I don't care

7   what form we put the post-trial filings in.  They can be

8   conclusions of law, they can be briefs, whatever, but there's

9   a little difficulty for us.  We're going to be out here.  We

10  don't have the same resources here, and we're going to be

11  here probably for the whole trial.  We won't be able to start

12  our briefing on the 4th day, and I think we're all capable of

13  remembering what went on at trial for 30 days.  I would

14  propose that we do it 30 days from the end of the trial and

15  everybody operate under the same rules.  This phasing affects

16  us.  It doesn't affect most everybody else, and it's

17  difficult for us.  We can access the Madison Avenue

18  technology and that they propose and everything, I guess, but

19  we think 30 days from the end of the trial would be perfectly

20  adequate.  Everybody file their briefs, everybody operate

21  under the same rules.  Thank you.

22         THE COURT: Okay.

23         MR. BERNICK: We'd be happy to take up that subject

24  with Mr. Lewis and his co-counsel on a call.  I would observe

25  that while it is true that each one of them comes from a

1  small firm, they've been responsible for hundreds and

2  hundreds of pages of briefing in this case, probably more

3  pages than everybody else except the plan proponents on just

4  their issues.  I haven't seen any technology problems.

5  They've also been accommodated.  Counsel have flown from all

6  over the country to accommodate them where they are on a

7  variety of occasions, and you know, if they're rasing these

8  matters and they're going to have these extensive briefs,

9  they have the resources.  It's just a question of working it

10  out.

11        THE COURT: Well, wait.  Let me talk one minute

12  about the briefs.  I don't expect that I'm going to need

13  hundred-page briefs that simply restate what the pretrial

14  briefs said.  What I'm looking for at the conclusion of the

15  case, to the extent an issue hasn't been briefed and needs to

16  be briefed, fine.  To the extent that the findings of fact

17  are now going to support the briefs that I got, that's what I

18  need.  I need the citations to the record that show where the

19  elements of proof have been satisfied so that I can then make

20  determinations as to whether the plan's confirmable or not.

21  I mean, as a bottom line, that's what I'm trying to get to.

22  So, to the extent that I already have a 200-page brief, I

23  don't expect it to be restated.  I don't need that.  I'll

24  have the pretrial brief.  Brief limitations in terms of the

25  arguments on the law, I do expect to be somewhat limited.

1   What I want to see is where in the record the findings of

2   fact will be that support the analysis that the parties have

3   given me, the respective burdens of proof, and the

4   conclusions of law that I have to draw.  That's what I'm

5   looking for.  I don't know if that's helpful, but -

6         MR. BERNICK: But we will talk with Mr. Lewis and

7   his co-counsel to see what we can work out and if that's - I

8   don't know if Your Honor has any other reaction or people on

9   the phone want to talk.  We then have a series of discreet

10  issues to take up including we want to put at the top of the

11  list Mr. Brown's designation issue.

12        THE COURT: Well, let me find out from folks on the

13  phone.  Does anybody have anything you want to say about the

14  concept of briefs either at the conclusion of the trial or in

15  sequences, the case issue-by-issue process finishes.  Okay.

16        MR. BERNICK: Okay.  Well, we'll make a proposal and

17  that's the best way to find out where people ultimately end

18  up being.

19        THE COURT: Alright.

20        MR. SPEIGHTS (TELEPHONIC): Your Honor, this is Dan

21  Speights.  I vote with Mr. Lewis.

22        THE COURT: Alright.

23        MR. BERNICK: Okay.  Well, you've got a constituency

24  now.  Two against one, that's right.  Okay.  We'll see what

25  we can do about that.  On the designations, I know that Mr.

1    Brown wants to address that.  We have a significant issue

2    with respect to the designations at least in the case of some

3    of the people who have submitted designations.  I believe

4    that the rule on designations contemplates that we're going

5    to have page and line designations and we're not going to

6    have whole transcripts.  And that was made clear, I believe,

7    in connection with Phase I of this case where initially there

8    were designations of entire transcripts, and Your Honor

9    clarified that that wasn't appropriate and really at the end

10   of the day not only is a burden for all the parties then to

11   deal with all the transcripts, but it's a burden for the

12   Court to have to deal with the entire transcript.  The State

13   of Montana at least as of August the 21st -

14          MS. BAER: David -

15          MR. BERNICK: What?

16          MS. BAER: They gave us something today as we speak.

17   That apparently addresses some of that.

18          MR. BERNICK: Okay.  Have you guys now done page and

19   lines?  I just -

20          MR. MONACO: Yes, Your Honor - Frank Monaco again

21   for the State of Montana.  We did file an amended designation

22   that designates specific portions of the transcript.

23          THE COURT: Alright.

24          MR. BERNICK: Okay, thank you.

25          THE COURT: Has everyone filed the designations with

1    these color codes already?

2            MR. BERNICK: That's in process.

3            THE COURT: Is there any way to change that red.  I

4    cannot read the black words behind the red.  I thought when

5    you were talking red, I was going to get red ink, but it's so

6    dark that I had a very bright day and I had a lot of trouble

7    reading those designations.

8            MS. BAER: Your Honor, we -

9            MR. BERNICK: We'll get a new set of markers -

10           THE COURT: Something that's not so dark against the

11   black text would be helpful.  The green was fine.

12           MR. BERNICK: I was in trial, and I was using three

13   markers on the boards, and one of the jurors complained 30

14   feet away about the fumes, so we had to get special markers

15   to accommodate the fumes.  This is a little bit more

16   reasonable, I think, but whatever it is, we'll certainly -

17           THE COURT: You don't need to redo what has already

18   been filed of record, but if it's possible to change that

19   color to mute it a little bit, that would be very helpful.

20           MS. BAER: Your Honor, tomorrow the debtor is

21   responsible for providing you full copies with all the

22   different colors for the different parties, so we'll take a

23   look and see what we can do to make it better.

24           THE COURT: Yeah, if you can change the ink or just,

25   you know, put a bracket in colors or something around it so I

1   don't need to look through that really dark stuff, because

2   that's the only one I've seen that I wasn't able to read, but

3   if there's anything else that's really dark I'm going to have

4   trouble distinguishing the letters, and it gets very tiring

5   reading a lot of pages when you're straining that much.

6   Okay.

7           MS. BAER: Understood, Your Honor.

8           MR. BERNICK: We think we have the Libby claimants.

9   We have the entire deposition of a 287-page deposition of

10  Earl Lovick, and 197 consecutive pages from a second

11  deposition from the same witness which would mean a total of

12  roughly 500 pages of testimony that all comes in in bulk, and

13  then we have 4 days of the estimation proceedings designated

14  one day from the criminal trial, and it includes excerpts

15  from opening arguments from the PI estimation, opening

16  arguments, criminal trial.  It's just not a designation, so

17  we would really - we would suggest that anybody who has

18  submitted a deposition designation that involves all or

19  substantially all of a transcript, go back and give us

20  specific designations.  We are not going to suggest that

21  they're too late, but we believe that that's the appropriate

22  way to go.  With respect to the lenders and the general

23  unsecured creditors, we have a different issue in their case,

24  and I don't mean to include them in this statement, and we'll

25  take that up separately if that's alright.

1          MR. PASQUALE: It's alright to the extent - I don't

2     know what Mr. Bernick is going to say, but we've not received

3     written response to our request.  I'm not sure that's up for

4     today.

5          MR. BERNICK: Well, if it's not up for today, it's

6     not, but what I'm saying is that my comments with respect to

7     deposition designations does not include the general

8     unsecureds. I will attempt to address them in a moment with a

9     different issue.

10         THE COURT: Alright, we'll all find out what the

11    issues are and see whether it's appropriate for today or not.

12    Okay, with respect to Libby, I guess that's the first one to

13    take up.  Mr. Lewis?

14         MR. LEWIS: Yes, that's our area, Your Honor, and

15    the way it came about, we started seeing other people

16    designating entire depositions, and I'm late in the case and

17    I was not aware that you had to make specific designations.

18    We will make designations forthwith.

19         THE COURT: Okay.  Yeah, designating an entire

20    deposition transcript is really not helpful because it's not

21    - a discovery deposition can't totally be relevant to trial.

22    So, I want the portions that you expect me to read not the

23    whole designation.

24         MR. LEWIS: Yes, we'll take care of that, Your

25    Honor.

1          THE COURT: Alright.

2          MR. LEWIS: And I apologize to the Court.

3          THE COURT: Okay.

4          MR. PLEVIN: Your Honor, I understand now we're on

5    designations, so, I just have a process issue.  The plan

6    objectors provided their designations.  The plan proponents

7    provided their counter designations and objections on Friday,

8    and the plan objectors' counter-countered designations and

9    objections to the counter-designations are due today.  The ne

10   thing that is not covered is our responses to the plan

11   proponents' objections.  It's not covered in the CMO and I

12   just thought I ought to raise that issue so that we could

13   come up with some timing for that.

14          THE COURT: Okay.

15          MR. PLEVIN: And Mr. Bernick seems to be making

16   faces.  In Phase I, Your Honor, I believe we provided Your

17   Honor with charts.

18          THE COURT: You did.

19          MR. PLEVIN: And that's what I'm talking about,

20   whether we're going to go through that process in Phase II as

21   well.

22          THE COURT: That would be helpful.

23          MR. PLEVIN: That's what I thought, that's why I

24   raised it.

25          MR. BERNICK: I'm still making a face.  If it was

1   done in Phase I, God bless, we'll do it again.  So I thought

2   the discussion was responses to objections.  We'll now get

3   responses to objections on both sides.  I don't know whatever

4   Your Honor finds most useful, we'll do.  I just think that

5   it's going to be pretty - the relevance objections are going

6   to be pretty -

7        THE COURT: The relevance objections, there's no

8   point in responding to because I can't rule on relevance

9   objections until I hear the context.

10        MR. BERNICK: Right.

11        THE COURT: So, there's just no point.

12        MR. BERNICK: Right.

13        THE COURT: If there is a way to satisfy a hearsay

14   objection, I'm not sure how, but -

15        MR. BERNICK: So I don't know - yeah, these are

16   hearsay or it's not.  If they want to prepare a chart, I

17   don't know, do we have a problem with the charts in the Phase

18   I?

19        MS. BAER: The objections to exhibits isn't due

20   until September 1.  That's my recollection, the chart was as

21   to exhibits for deposition -

22        THE COURT: No, there was a chart as to witnesses, I

23   think, in the objections by party, but I don't remember

24   responses to that on the chart.

25        MR. PLEVIN: We made a proffer, Your Honor. There

1   were objections that were raised at one stage and we made a

2   proffer for what the testimony was relevant to.  That's what

3   I'm referring to.  We provided a chart and the question is

4   are we going to go through that process again.  They've

5   raised objections.  The only thing you're going to have is an

6   (h) in the column that says hearsay or best evidence or

7   something.  You won't have our response to that unless we

8   come up with a protocol for dealing with that.

9          MR. BERNICK: But if it's relevance, Your Honor's

10  already said -

11         MR. PLEVIN: Understood, but there are a lot of

12  objections, relevance is only one of them.

13         THE COURT: I think if it's possible to build that

14  into the schedule it would be helpful. It might expedite some

15  ruling that I'll be able to give.  If I've got to figure it

16  out on my own, it's probably not coming until the end of

17  trial.

18         MR. PLEVIN: Okay.

19         THE COURT: So if there's a way to get the responses

20  in, at least I'd have some clue as to why you're proffering.

21         MR. BERNICK: Well, what might make sense then is

22  instead of having - I hate to say this, in the same fashion

23  that we have the transcript that's kind of everything, it was

24  the designations, the objections, et cetera.  It probably

25  makes sense to try to develop something that as to each

1  transcript tells the Court that if there are responses to any

2  of the objections, what the responses are, and instead of

3  coming in from one for each party, it probably ought to be on

4  one sheet for Your Honor.  So, what I -

5       THE COURT: How big is the sheet, Mr. Bernick?

6       MR. PLEVIN: Your Honor, I think it would be easier

7  on a party-by-party basis, otherwise you're asking all the

8  plan objectors to try to coordinate their responses.

9       MR. BERNICK: I wouldn't dream of suggesting that.

10  That's beyond the pale.  What I'm thinking is that if we were

11  to circulate a format for it, then people could at least

12  follow the format electronically, and that we might be able

13  to synthesize it for the Court so that instead of getting 19

14  different pages of responses, we would give you for each

15  deposition what the responses to the objections are, and that

16  way it's easier on the Court.

17       MR. PLEVIN: I'm all in favor of a simple format,

18  Your Honor, that's fine.

19       MR. BERNICK: We'll try and do that, and we'll make

20  a proposal for the schedule for it.

21       THE COURT: Alright.

22       MR. BERNICK: A couple of other things.  One, we

23  still have not received declarations.  The agreement that the

24  parties reached as reflected in one of the agreed orders with

25  regard to the Libby claimants, was that when it came to

1   making a record for the Libby claimants' argument they had

2   vested rights and policies; remember that one?  That they

3   were going to submit instead of having live testimony there

4   would be something by way of a declaration, a limited number

5   of declarations and this is - an agreement is called out in

6   one of the agreed orders.  We were supposed to get those

7   declarations so that particularly the Future Claims

8   Representative can figure out whether this is a satisfactory

9   way to proceed.  We haven't gotten them yet.  I'm assuming

10  this because of the press of other things, but I wanted to

11  let the Court know and to then urge the Libby claimants -

12          MR. LEWIS: We're working on them.  I think we'll

13  have them by Wednesday, but the problem there is I've got

14  depositions with Libby this week, so - We'll get you some

15  samples.  I think that's what you wanted.  Is that correct?

16          MR. BERNICK: Yes.  Well, he's nodding.

17          MR. LEWIS: I think we're going to have them right

18  away, Your Honor, we're working on them.

19          MR. BERNICK: Okay, well, it's out there.

20          MR. LEWIS: They're going to be very simple.

21  They're not going to be very - We're going to stick to the

22  agreement.

23          THE COURT: Alright.  To the extent that they could

24  be done even on a rolling basis, that may help.

25          MR. LEWIS: We can try that, we'll see.

1          THE COURT: Alright.

2          MR. BERNICK: Libby medical records.  There's an

3   issue about confidentiality.  Your Honor issued an order that

4   says that medical records should be maintained as

5   confidential.  We had a discussion about whether that was

6   going to feasible to redact them.  I think if all we're

7   talking about are medical records with respect to the

8   individuals that now have been identified, we can proceed by

9   way of redaction, so I'll defer that issue for today.

10          THE COURT: You mean as to the five?

11          MR. BERNICK: Well, that's a big issue.  We're going

12   to get to that.  So, whatever it is, if what we're talking

13   about are a limited number of medical files, redaction ought

14   to work which would obviate the need to seal the courtroom,

15   but I'll return to this when we talk about where we are in

16   the five.  I guess the next major issue, one of the last

17   major issues is judicial notice, and this is now with respect

18   to the lenders and the General Unsecured Creditors Committee.

19   Your Honor's aware of the fact that the General Unsecured

20   Creditors Committee and the lenders have said that they want

21   to submit the proceedings, the transcript from the estimation

22   trial as it had taken place as part of their proof of

23   solvency.  In service of that, they have asked for the Court

24   - or they made a request for the Court to take judicial

25   notice of a very substantial portion of material.  It really

1    is essentially the entirety of the estimation proceeding.  We

2    believe that that's an incorrect reading of the rules and an

3    incorrect use of the rules, which is not to say that the same

4    materials can't come before the Court but that they have to

5    come before the Court in a different fashion.  The

6    appropriate way in which to do that would be to -

7             MR. PASQUALE: Your Honor, excuse me.  This is what

8    I was referencing earlier.  We have not received any written

9    responses.  If we're going to have argument, I think we're

10   entitled to a written response and we set this for a hearing

11   at the appropriate time.  I was not on notice this was going

12   to be discussed and argued today, and I don't even know what

13   the debtors' position is.

14            MR. BERNICK: They're directly on the trial

15   schedule, and I think if we can have a discussion of this, it

16   would certainly help, because I think Your Honor already has

17   suggested how the rules reached a very, very straightforward

18   matter.  Judicial notice is a way of having basically issues

19   about authenticity or the fact of a document being in

20   existence come before the Court.

21            THE COURT: Yes.

22            MR. BERNICK: We don't have any issue that if they

23   want to have the authenticity of the transcripts and exhibits

24   established maybe this is the right way to do it, but the

25   judicial notice is not a doctrine that says you then pass go

1    and collect 200 -

2        THE COURT: I can't take judicial notice of

3    adjudicated facts anyway.

4        MR. BERNICK: Right.  So, that's the basic point,

5    and our proposal really was, and this is why I raised it

6    today, is that we should get transcript designations from the

7    estimation proceeding, and if we get those transcript pages,

8    we'll then figure out what the appropriate counter-

9    designations are and if there are any evidentiary objections

10   that to relate to them.  But I'll be handling them in exactly

11   the same fashion as to the use of prior testimony, and it is

12   not a question, unless they seek to establish judicial

13   notice, a different fact.  That it's a fact other than the

14   truths of the content of the transcript.  If they seek to use

15   the transcript to establish some other fact that really is

16   not disputed, well, that's a different proposition, but we

17   can't tell.  All we know is that they designated thousands of

18   pages of testimony.  If it is designated for the truth of the

19   matter, it's a contested matter and it ought to take place by

20   way of designation.  If it is designated to establish some

21   fact that is not disputed, we need to know what the fact is.

22   Maybe there's a much easier way of getting that fact before

23   the Court than having thousands of pages of transcript and

24   all kinds of exhibits being traditionally noticed.  So, we're

25   seeking to resolve this issue and that's why we're raising it

1    now.

2            THE COURT: Okay.

3            MR. PASQUALE: Like I said, Your Honor, it's being

4    raised now in court for the first time.  No one's discussed

5    this with me before.  We are - I think that's a process that

6    need not take place.  Our position is that this is the

7    debtors' direct case on the estimation.  Of course it wasn't

8    adjudicated.  No one's arguing that.  We cited case law in

9    our request for judicial notice.  This has been done before.

10   We are asking the Court not to recreate the wheel, instead of

11   what we would otherwise perhaps consider doing, bringing all

12   these witnesses in, the Court's done this already, and the

13   Court can take judicial notice of the facts that were

14   submitted under oath during that proceeding.

15           THE COURT: No, I can't.

16           MR. PASQUALE: For whatever weight it's worth, Your

17   Honor, and we did cite case law in the brief, in our notice

18   for Your Honor where this has been done many times before.

19           THE COURT: Well, I can take prior testimony as

20   prior testimony but it has to be adjudged - I have never made

21   a fact determination based on that testimony.

22           MR. PASQUALE: Of course.

23           THE COURT: I don't know if it's true or not.  I've

24   never assessed the credibility.

25           MR. PASQUALE:  Nor are we asking you to do that.

1          THE COURT: I thought you were just asking.

2          MR. PASQUALE: No, it's the fact, the evidence was

3   presented, it certainly was not rebutted.  We understand

4   that.

5          THE COURT: It wasn't rebutted because the trial

6   stopped.

7          MR. PASQUALE: Correct, correct, Your Honor, and

8   we've given a Ninth Circuit case in our materials where

9   that's exactly what happened on a motion for a trustee, and

10  the Court accepted - said it's really not judicial notice,

11  but it's the same point.  We can take this in - as the Ninth

12  Circuit said, it's appropriate for the trial judge, the

13  bankruptcy judge to consider the evidence for whatever it's

14  worth with respect to confirmation, that it made no sense to

15  do it all over again.  That's all we're asking.

16         THE COURT: Alright, so you just don't want to

17  recall the same witnesses who have already testified is the

18  point.

19         MR. PASQUALE: Excuse me, Your Honor?

20         THE COURT:  You're asking me to essentially permit

21  the transcripts to come in as though it were a part of your

22  case in chief here.

23         MR. PASQUALE: Exactly, exactly, for whatever it's

24  worth.  That's it.  Again, we don't have a written response.

25  I mean we've cited case law, Your Honor.  I think we have

1    authority for this.  We're not starting something that hasn't

2    been done.

3         THE COURT: Okay.  I haven't seen this so I'm not

4    familiar with it.  I do know one thing and that is I cannot

5    take judicial notice of a fact that is an adjudicated fact.

6    I can only take judicial notice of facts that are easily

7    capable of resolution without contests such as the fact that

8    a particular newspaper is dated on a certain day, for

9    example.  So, to the extent that what you're saying is that

10   you want to prove that the debtor offered this evidence, I

11   can take judicial notice of the fact that the debtor

12   proffered the evidence, but I cannot take judicial notice of

13   the truth of the evidence that the debtor proffered.

14        MR. PASQUALE: Your Honor, again, we've gone through

15   this.  I would suggest that the appropriate time to take this

16   up is either when we argue about exhibits generally.  I

17   assume we're going to do that at some point before the trial,

18   or when we present the evidence, and we actually are putting

19   on our witnesses and go to present the evidence.  Between now

20   and then things inevitably are going to change anyway.  I

21   don't think today is the day for us to argue this.

22        THE COURT: Well, you are entitled to a response,

23   and you folks should meet and confer to see whether this can

24   -

25        MR. BERNICK: Yeah.  Well, the reason we're raising

1    it today is that time is very, very short, and well, and

2    they've got, again, thousands of pages that we believe, if

3    they're really being proffered for the truth of what's

4    asserted in those pages, need to be designated and need to

5    come in by way of evidence.  If the proffer, and this is why

6    I think it's productive to talk about this, if the proffer -

7    if the judicial notice is being requested for purposes of

8    establishing the fact that the debtor offered the following

9    transcript as evidence in support of its estimation, we don't

10   need to deal with thousands of pages.  Yes, the debtor

11   offered this evidence in support of its estimation, but that

12   fact then can't go to the adjudication of the truth -

13            THE COURT: That's right.

14            MR. BERNICK:  - of what's asserted there.

15            THE COURT: I agree with that.

16            MR. BERNICK: So the fork in the road is for what

17   purpose is the judicial notice being sought.  If it's being

18   sought solely for purposes of establishing what the debtor

19   did, that's fine, we can do it in a much simpler fashion than

20   having this huge transcript.  If it's proffered though in

21   support of the truth of what's asserted for purposes of

22   determining solvency, that's a very, very different

23   proposition, and that most certainly will be a contested

24   issue, and it's not appropriate for judicial notice, and the

25   rule could not be clearer as to how to handle these things.

1    There's Third Circuit authority.  The rules themselves and

2    the advisory notes say exactly this.  So, if we can get

3    clarification from the General Unsecured Creditors Committee

4    of what is the fact, is it the content and truth of the

5    evidence?  Or is it the fact that it was proffered that is

6    sought to be judicially noticed.

7            THE COURT: Alright, Mr. Pasquale.

8            MR. PASQUALE: Your Honor, we filed our request for

9    judicial notice on August 7th.  Today's the 24th, and I'm

10   hearing this today for the first time.  I just don't think

11   it's fair to address this today.

12           THE COURT: I agree.  You're entitled -

13           MR. PASQUALE: That said -

14           THE COURT:  - to a response.

15           MR. PASQUALE: That said, Your Honor, our proof will

16   be at trial that the debtors have presented lengthy evidence

17   as to what the estimated value of the personal injury

18   liabilities is.  We have adopted that.  Our expert has

19   adopted that number for purposes of solvency.  We think it

20   appropriate, and I'll read from the case I cited, but we

21   think it appropriate that the Court consider that evidence

22   again without recreating the wheel.  This is a Ninth Circuit

23   case, I'm going to mispronounce it, I think it's Asequia, in

24   which the Court on page 1358 to 59 said, "In the typical

25   reorganization case, the Bankruptcy Judge will preside over

1   many hearings in which the Court is asked to draw legal

2   conclusions from facts developed at prior proceedings.  To

3   require the Bankruptcy Court to ignore prior evidence would

4   impose a harsh and unnecessary administrative burden.  We

5   find nothing in either the language or logic of the Code

6   requiring the Court or parties to grind the same corn a

7   second time."  That's all we're asking, Your Honor, is that

8   we would not have to parade the same witnesses in and say,

9   Here's what we would do, frankly when we were standing by the

10  debtors during the estimation trial, as to what the estimated

11  liability would be.  It's been done before.  That's what

12  we're asking, Your Honor.  I don't want to use Mr. Bernick's

13  words.  He's very good with words.   That's our purpose,

14  nothing more.  Of course, Your Honor, we're not saying that's

15  the number, of course not.  The case I cited was a case where

16  a motion for a trustee was raised early in the case, was

17  settled, no determination on the motion.  The Court

18  considered the evidence at confirmation.  That's all we're

19  asking Your Honor to do here.

20        THE COURT: So, your expert essentially - I'll just

21  use the word "read" I don't know if that's what happened or

22  not, but your expert read the prior trial transcript, the

23  estimation trial transcript and incorporated that evidence

24  into his opinion.

25        MR. PASQUALE: He didn't even go that far, Your

1    Honor.  The expert didn't even read the transcripts.  We want

2    Your Honor to have that in the record of the confirmation

3    hearing.  Our expert used the debtors' experts' median value

4    of the asbestos liabilities in doing his solvency analysis.

5           THE COURT: Okay, so if that's the case, I would

6    think that the expert's entitled to rely on a statement under

7    oath as, you know, experts do, then why do I even need to get

8    into the whole transcript?

9           MR. PASQUALE: Your Honor, and frankly, that's one

10   of the reasons I suggested we wait and not do this today. I

11   said things developed over time.  We're considering our case

12   as we go on.  I wanted to get on notice early that this is

13   what we were considering so that there was no argument later,

14   and that's why we filed this in early August.

15          THE COURT: Okay.  I think you two need to talk.  It

16   doesn't sound like you're not going to be able to work this

17   one out.

18          MR. PASQUALE: I agree, Your Honor.

19          MR. BERNICK: Yeah, I'm happy.  I've not heard the

20   description.  I don't believe that what they're doing with

21   judicial notice is correct and the rule says it's wrong and

22   the rules says it wrong on the face of it, but if they want

23   to go forward on the basis of judicial notice, we will in

24   fact file a response to the judicial notice and then Your

25   Honor can determine the matter.  It's really a question of

1   what they - the only reason I raised it today is that it

2   bears upon the content and substance of this trial.  That's

3   the only reason I raised it today.  If they want to have this

4   deferred and taken up at a later date, that's fine.  Their

5   expert that they rely upon, actually all he says is, he took

6   that number, he just took it because the lawyers said you

7   should take it.  They directed him to take it.  He says - I

8   asked him, "Well, you're not offering any expert opinion that

9   the substitution, that is of Dr. Florence's number in our *pro*

10  *forma* is appropriate are you?  Answer: No, because I'm not an

11  expert at estimating asbestos claims so, no."  So, if that -

12           MR. PASQUALE: I don't think I said otherwise.

13           MR. BERNICK: Well, but that's my point.  So if what

14  they intend to do is to have judicial notice of this

15  transcript, under the rule on judicial notice for the fact of

16  what happened in that transcript and have their expert rely

17  upon, it, that's fine, we'll respond to it.  That's fine.  So

18  we'll file a piece of paper and we'll say we don't think it's

19  correct, and Your Honor will resolve it in due course.

20           THE COURT: Alright.  I have not read this case.  I

21  am surprised that you can do this by way of judicial notice,

22  but I'm not surprised that you can do it in a different

23  fashion.  So, maybe the issue is whether or not you need to

24  use judicial notice.  I think you folks should talk.  I don't

25  think this is one that shouldn't get resolved.

1          MR. BERNICK: Yeah, okay.  Then that brings us -

2     we'll certainly file our paper and we'll talk with Mr. Cobb

3     and Mr. Kruger and Mr. Pasquale to see if this can't be

4     resolved.  The last issue that we had on the content of the

5     trial relates to - I invoked friends across the aisle who

6     represent the Libby claimants and we have a pretty

7     significant problem that we believe should be raised now and

8     should be resolved now.  Your Honor will recall that there

9     was a significant issue that was raised concerning the

10    relevance of testimony by individual Libby claimants, and

11    whether any evidence really should come in on that score.  I

12    believe Your Honor observed that this is not a personal

13    injury trial, and in order to resolve this matter, you

14    indicated, well, why don't we have discovery with respect to

15    - pick a number, 5, 10 Libby claimants, and reserved on the

16    issue of whether it would be admissible, but you said 5.  And

17    so, we then had some extended discussion with counsel for the

18    Libby claimants in order to try to resolve our differences

19    because you told us to go back and have that conference, and

20    in fact we did.  We had two different orders.  One order

21    related to the expert discovery.  Another order related to

22    individual claimant testimony.  With respect to the expert

23    discovery, the only thing that I'll feature is that all

24    expert opinions to be proffered at trial and all reliance

25    materials be limited to those exchanged prior to July 31,

1   2009, and there then is some exceptions that are listed, and

2   you'll see what the exceptions are, and none of them are

3   germane to this.  So, expert reliance material was fixed as

4   of July 31 which is almost 30 days ago.  With respect to the

5   individual claimant testimony, we reached agreement with

6   respect to - this is a separate order that individual

7   claimants who will testify regarding already settled claims,

8   the claimants identified the following 6 witnesses.  We had 6

9   witnesses, and they're all listed here, and it then said,

10  importantly that the scope of the testimony shall be exposure

11  history and/or working conditions of the settled claimant,

12  settlement of claims and a short description of medical

13  diagnoses, and notably, what that would mean in combination

14  with the list is that we're only talking about settled claims

15  and we're only talking about a limited number of settled

16  claims.  There was then a dispute about whether other

17  individual settlements would come before the Court and we

18  didn't agree that they should but we said if you intend to do

19  that, you've got to submit the evidence by a certain date and

20  again, these are all settled claims, and Your Honor

21  determined that on the paper and entered the order that

22  included our version that is paragraph (9) that says, "Any

23  additional individual settlements, you've to let us know."

24  So, basically the state of play was that we had agreement on

25  5 that was consistent with what Your Honor indicated and if

1    they wanted to submit any others, we weren't agreeing that

2    they would come in, but they had to do so by a certain time.

3    We now have learned that essentially there are medical

4    records regarding - I'm sorry, there are deposition

5    designations for an additional 18 settled claims, 18.  So

6    contrary to 5, we've now popped it up to 18, and we've

7    received records regarding 3 medical records and settlement

8    records regarding an additional 3.  So we have now, not 5, we

9    have evidence that they intend to proffer with regard to 18

10   plus 3, 21 additional settled claims.  It's completely

11   contrary to the Court's instruction.  It's completely

12   contrary to the agreed order, and we just can't deal with it.

13   It's out of time.  It's contrary to order.  This should not

14   be permitted.  There are then an additional 5 cases, as we

15   understand it, where the designations relate to pending

16   claims or claims that may be pending, an additional 2 medical

17   record or other files relating to pending claims, so, beyond

18   the settled claims we have 5 pending claims.  That's

19   completely contrary to the Court's instructions.  Completely

20   contrary to the order that was issued.  If the purpose of

21   these various proffers is to support expert testimony, it's

22   too late.  It's contrary to the agreement that was reached

23   that said July 31 is the cutoff.  Nor could it support expert

24   testimony because they have no expert.  They do not have an

25   expert who is going to opine on the relationship, if any,

1   between these various settlements and the scheduled values

2   that are there.  There is no expert that the Libby claimants

3   will call who will offer an opinion about what drove the

4   settlement values, not one.  So originally there was some

5   talk of there maybe being witnesses.  There will be no such

6   witnesses.  So, all of these different individual settlement

7   files can't supply reliance materials both because they're

8   not timely and because there's no expert who is going to be

9   relying upon them for purposes of expert testimony.  If the

10  purpose of this testimony is not the settlement values but it

11  goes to TDP issues, that is how the TDPs read out for

12  diagnostic purposes, again, it's not timely because it's past

13  the July 31 cutoff.  So, none of this material can be used by

14  any expert even if they had an expert.  So the only purpose

15  of this proffer is again to go back to a presentation to the

16  Court of individual claims, either individual claims that

17  were settled for purposes of God knows what, that they were

18  settled, because there can't be any opinions offered

19  regarding them, or for purposes of establishing that so-and-

20  so has a medical condition, which doesn't go to any issue in

21  the case either because nobody can rely upon those medical

22  conditions in order to argue about the medical criteria

23  because they're too late.  So for all of these reasons, it is

24  a) specifically contrary to the orders that were agreed, and

25  b) it doesn't serve any purpose in the case other than to try

1    to put before the Court individuals or their individual cases

2    so that counsel can argue for opinions and conclusions that

3    counsel seeks to derive from them.  Counsel had the

4    opportunity to designate themselves as expert witnesses.

5    They never did, and indeed, in this order, they specifically

6    agreed that they wouldn't be offering any testimony.  So why

7    does the evidence now come in when the evidence of the

8    individual cases come in when it can't be tied up by anybody.

9    So, Your Honor, we have a major, major problem here.  Your

10   Honor could not have been clearer, that this material was

11   likely not relevant, and it ought to be very limited.

12   They've now said, Oh, we're going to put in an additional 26

13   cases.  They can't be reliance as materials because they're

14   too late.  They can support expert opinions from counsel

15   because counsel aren't experts.

16          THE COURT: Alright.  Mr. Lewis?

17          MR. LEWIS: Yes, Your Honor.  I hate to see Mr.

18   Bernick so worked up over a very simple issue.  This order

19   was issued by the Court.  There were competing orders.  The

20   Court issued the order and it included a paragraph (9) that

21   was drafted by the plan proponents, and the Court modified it

22   slightly and entered an order that required us to identify

23   any additional individual settlements where they intend to

24   offer case specific evidence.  If the Libby claimants wish to

25   proffer any case specific evidence beyond the amount of the

1  settlement and the identity of the parties to the settlement

2  relating to any individual claimant in addition to those

3  identified above in (1), they must identify the individual

4  claimant and produce all case specific documents relating to

5  each such claimant no later than August 20, 2009.  Grace must

6  produce any responsive evidence no later than August 27.  I

7  don't know how we can get into trouble with the Court by

8  complying with that order completely and providing more than

9  maybe the order intended.  When we read the second sentence

10  of that, it said, "If the Libby claimants which to proffer

11  any case specific evidence beyond the amount of the

12  settlement relating to any individual claimant in addition to

13  those", et cetera, they had to give this evidence.  And we

14  did.  So, I don't know what we've done wrong here.  We've

15  complied with the order.  The order was issued on the 17th.

16  We had three days to go through thousands and thousands of

17  pages of documents.  That's all we did for three days, and we

18  complied with the order.  So, I don't know what we've done

19  wrong here.

20        THE COURT: I'm not sure.  The issue with respect to

21  whether or not these witnesses can testify and what that

22  testimony will be relevant to is something that I preserved,

23  but I thought this order was by the debtor simply saying that

24  if we don't have everything then give it to us, and it seems

25  to me that if the Libby counsel intend to offer or proffer

1    additional evidence it was necessary to provide the backup

2    documentation.  That's all I was doing.  I wasn't making any

3    determination as to whether it's proper or not proper, just

4    that if you want to try to do it, you have to produce the

5    evidence so if they need a deposition or whatever, they can

6    schedule it.

7           MR. LEWIS: And that just doesn't say that these

8    witnesses are going to testify.

9           THE COURT: No.

10          MR. LEWIS: We're sticking - just a second, Mr.

11   Bernick?

12          MR. BERNICK: (Microphone not recording.)

13          MR. LEWIS:  We've listed the people who are going

14   to testify or if they're allowed to testify.  We respect the

15   Court's reservation of ruling on that issue, but we've just

16   complied with an order here, and we haven't done anything

17   wrong.

18          MR. BERNICK: It's really pretty simple.  Two

19   pieces, one is testimony and the other is the files.  On the

20   testimony we're supposed to have 5 - 6, they're listed.  We

21   now have an additional 21 pieces of testimony by claimants

22   through designations.  So, the 5 or 6 is now 5 or 6 plus 21

23   people who are testifying through depositions.

24          THE COURT: Well, were the depositions taken?  I

25   mean, were the -

1          MR. BERNICK: The depositions were taken in

2    connection with personal injury cases at some point in time

3    in the past.

4          THE COURT: Well, then, you'll raise your

5    objections.

6          MR. BERNICK: Well, I understand that, but, Your

7    Honor, we now have to deal with THE fact that they're going

8    to be providing deposition testimony with respect to people

9    who by order aren't supposed to be testifying in this trial.

10   I mean, sure, we'll go back -

11         THE COURT: Mr. Bernick, the debtors asked for this.

12   You know it seems to me that the debtors had a logical reason

13   for asking for it.  To the extent that there was going to be

14   some additional witness that somebody wanted to designate for

15   any purpose, the debtors said, we're entitled to see what the

16   basis for the designation is, and I agree.  I thought it the

17   other way around and I think it on behalf of the debtor.  The

18   other parties are entitled to have that information from the

19   debtor and the debtor's entitled to have it from the other

20   parties.

21         MR. BERNICK: Maybe I'm not making myself clear.

22         MR. LEWIS: Mr. Bernick, perhaps I can help.

23         MR. BERNICK: No, what I really would like, and I'm

24   sure he's respond anyhow and help me, but just let me finish

25   my point which is that this says the Libby claimants

1    identified the following 6 witnesses.  Completion of

2    discovery in individual claims will have testified regarding

3    already settled claims and they identified 6 witnesses.

4         THE COURT: Yes.

5         MR. BERNICK: And that was the deal.  It was a hard

6    fought for deal consistent with the Court's direction.

7         THE COURT: Alright.

8         MR. BERNICK: Okay.  We now get designations from an

9    additional 21 witnesses.  Now, we can object to those things.

10        THE COURT: Yes.

11        MR. BERNICK: And say that we think it's outside of

12   the order, and if Your Honor wants to put us to that task we

13   will, but, Your Honor, in our shoes, to track down these 21

14   witnesses, go back through the files, designate any

15   responsive material is so contrary to the essence of this

16   order that we don't believe we should be put to the burden of

17   doing it.  What the issue was and the reason that we wanted

18   paragraph (9) was we didn't want to be facing this argument

19   down the road when they came out with a whole bunch of new

20   people.  We want to say, we want to deal with it now.  Yes,

21   they made the submission, but now that they've made the

22   submission, we're asking the Court to give us relief from the

23   burden of having to respond to all of these different people

24   when it's completely contrary to the Court's order.  This

25   paragraph (9) was not a statement of, please violate the

1   agreement that's reflected in paragraph (1) and give us a

2   whole bunch of new people.  It was only because they said

3   that they were going to do it, and they weren't even going to

4   tell us who they were.

5       THE COURT: Well, now you know.

6       MR. BERNICK: Well, now I know.  So, now that I know

7   I'm saying, guess what?  It's more than the 5 and that's not

8   right.

9       THE COURT: Okay.  Mr. Lewis -

10      MR. BERNICK: You say we just make the objections,

11  we'll make the objections.

12      THE COURT: Well, the issue that I was addressing

13  when the 5 or 6 came up was duplicative testimony.  Number

14  one, I don't know that any individual claimant testimony is

15  relevant at all to any of the issues that I have to try, and

16  I specifically reserve that, but the point was that to the

17  extent that a party thinks that that testimony is going to be

18  relevant then I thought that all parties have the right to

19  explore that issue and do the discovery.

20      MR. BERNICK: Right.

21      THE COURT: So, I was doing a discovery order.

22      MR. BERNICK: Right.

23      THE COURT: Then I get presented with the order that

24  memorialized my ruling and it had this additional paragraph

25  that basically says just in case there's anybody else out

1    there, tell us who it is and give us the records.  I think

2    that's appropriate.  Just in case there's anybody else out

3    there, you should have the right to that information.  I

4    don't know whether they're going to proffer those witnesses.

5    I'm not sure how if they're not listed.  Mr. Lewis, what's

6    the purpose for the additional designations?

7         MR. LEWIS: They're not going to testify, and their

8    depositions are not going to be read to the Court.

9         THE COURT: Okay.

10        MR. LEWIS: Okay?  There going to be the subject of

11   Dr. Whitehouse's testimony reporting their numbers.  We have

12   to have that in evidence.  That's all it is.

13        MR. BERNICK: I appreciate that, and if Dr.

14   Whitehouse is going to testify as a treating physician, he

15   can.  There's only two problems, a) he can't testify about

16   numbers because that's not within the area of his expertise.

17   He's a doctor.  He's not a settlement expert.  Never was

18   tendered as a settlement expert -

19        MR. LEWIS: No, no, no.  I'm sorry, I meant PFT

20   numbers.

21        MR. BERNICK: Well, PFT numbers.  Then there's the

22   second problem which is that the order with regard to

23   discovery says that you can only testify to matters that are

24   based upon the reliance materials that were tendered,

25   exchanged prior to July 31, 2009.  This post-dates that.  He

1    can't testify about them.

2         MR. LEWIS: Your Honor, they've had the medical

3    records forever.

4         THE COURT: You need to use a microphone, Mr. Lewis.

5         MR. LEWIS: I'm sorry, Your Honor.  They've had

6    these medical records forever.  The problem is it said - that

7    order was very broad.  It required us to produce everything

8    that had anything to do with this specific case, and so,

9    we've been beat up once because we didn't make disclosures,

10   but this medical they've had for months and months.  There's

11   nothing new here.  They didn't ask for this stuff in

12   discovery, but we complied with the order, and they're not

13   going to testify and their depositions were not designated

14   because they're not going to be used.

15        THE COURT: Okay.  If that's the case, I think I

16   agree, you're in compliance with the order.  To the extent

17   that you've got some objection to Dr. Whitehouse using this

18   evidence because it hasn't been disclosed, I think that's

19   probably part of your objection to Dr. Whitehouse.

20        MR. BERNICK: Well, that's fine, Your Honor, but

21   this is specifically this was designed so that we wouldn't

22   have supplementation after the date and this calls up Dr. -

23        THE COURT: Well you got what you asked for, Mr.

24   Bernick.  I mean you're complaining about getting what you

25   asked for.

1              MR. BERNICK: No, I'm not.  We asked to have them

2    with respect to individual discovery, we asked if you're

3    going to make an additional tender, tell us what it is.  It

4    wasn't that it was proper.  In a totally separate order for

5    experts, it specifically dealt with experts, we all agreed

6    that there wouldn't be anything after July of 2009, and in

7    the expert report that Dr. Whitehouse then submitted, he

8    doesn't talk about these individuals.

9              THE COURT: Well, then you'll probably have an

10   objection you can raise.

11             MR. BERNICK: Okay, well, that's fine.  Your Honor,

12   we'll raise the objection, but this deals with the scope of

13   the trial and what Dr. Whitehouse is going to talk about.  If

14   it comes in, there's all kinds of responsive stuff that we've

15   to do with it.  Basically, we've now got 26 new people who

16   are completely contrary to the agreement that was reached,

17   and they're going to try to put them in through Dr.

18   Whitehouse.  We think it's wrong and will affect the scope of

19   the trial.

20             THE COURT: No.  I hope that's not the purpose.

21   What I heard Mr. Lewis say is that Dr. Whitehouse apparently

22   has had these medical records and he's relied on them as part

23   of his treating physician role to talk about what their PFT

24   numbers are.  Now, what that's relevant to at the moment, I

25   suppose it's going to be to the discriminatory treatment

1    issue, but I'm not sure, I'll have to wait and find out what

2    it's proffered for.  To the extent that Dr. Whitehouse is

3    testifying as a treating physician, he can certainly testify

4    as to what particular PFT numbers are, but I don't know what

5    the relevance is.  So, I'm not sure why I'm arguing about

6    this now.  It seems to me that you've got an expert objection

7    issue, but the Libby counsel complied with the order, you

8    asked for it, you got it.  You now know that Dr. Whitehouse

9    is apparently going to make use of these 21, however many,

10   people.

11          MR. BERNICK: Well, we'll make the argument later.

12   The fact is, a treating physician doesn't mean that they're

13   anything other than reliance materials.

14          THE COURT: Well, then, I think you've got that

15   argument that you can make and I'll hear from them when you

16   make it and see where it comes out.

17          MR. BERNICK: We will make our objection and then I

18   believe that we have nothing further relating to the trial

19   process.  We have, I think, remaining the 4 discreet motions

20   - was there something else, Janet?

21          MS. BAER: The timing.  Your Honor, clearly under

22   your order, we are supposed to file a final order of proof

23   today.  That doesn't make any sense since we need to talk to

24   all of the other parties.

25          THE COURT: No, it doesn't.

1          MS. BAER: So I think we need a little additional

2     time to file the final order.

3          THE COURT: How much time?

4          MR. BERNICK: I think we'll have a meet-and-confer

5     sometime, I hope, a little bit later on this week, and maybe

6     a week from today.  Does that sound like it's sensible?

7          THE COURT: That's fine.

8          MR. BERNICK: So, with that, I think we would -

9     unless others want to address some other aspect of item 17.

10    We would go back to items 11, 13, 14, and 15, which are the

11    four motions.

12         THE COURT: Let me find out.  Anybody else have

13    anything to address with respect to the trial process and

14    item 17?  Okay, we'll take a 10-minute recess.   Anybody

15    who's not interested in the rest of the agenda is free to

16    leave and we'll reconvene with the arguments.

17         (Whereupon at 3:17 p.m., a recess was taken in the

18    hearing in this matter.)

19         (Whereupon at 3:30 p.m., the hearing in this matter

20    reconvened and the following proceedings were had:)

21         THE CLERK: All rise.

22         THE COURT: Thank you.  Please be seated.  Is

23    anybody still here from the Unsecured Creditors Committee?

24         MR. PASQUALE: Yes, Your Honor.

25         THE COURT:  Oh, Mr. Pasquale.  The reason I haven't

1   seen your motion is because it was filed as a COC not as a

2   motion so you need to get that fixed.

3          MR. PASQUALE: I will speak to my local counsel.

4   Thank you, Your Honor.

5          MS. BAER: Your Honor, we didn't see it either until

6   two days ago, and it also was filed the same day as all the

7   trial briefs, so it was quite a day.

8          THE COURT: Okay.  Alright, Mr. Bernick.

9          MR. BERNICK: Yes, we have a motivated group of

10  lawyers here, at least on our side of the fence because

11  there's a 4:15 train to New York.

12         THE COURT: Good luck.

13         MR. BERNICK: Well, but I committed to Brother Lewis

14  over here that I would actually be short and so I will.  I'm

15  going to argue the Spear motion because that is our motion to

16  exclude the testimony of Dr. Spear and then there are three

17  motions as to which the Libby claimants have made, and I

18  think we're going to basically take them as a group.  So, Mr.

19  Cohn, I believe, is going to - well, one of Mr. Cohn's able

20  colleague, who joins us here today, they're going to argue

21  those and then we'll respond to them as a group, Mr. Finch

22  and I.  Dr. Spear is an industrial hygienist.  He has been

23  active in connection with the litigation, the personal injury

24  litigation arising out of the operation of the mine in Libby,

25  Montana, and he basically has gone through and his report is

1    a very extensive review of the history of Libby operations,

2    mine operations, from the point of view of whether the

3    standards at the time in terms of industrial hygiene were

4    being complied with.  What we'll say here is that it's very

5    obvious that Grace's conduct at Libby mine spans decades.

6    The question of what that evidence showed with respect to

7    culpability is the culpability of Grace comprised a better

8    part of two of the three months of the criminal trial, and

9    even that was not complete in the sense that the issues in

10   the criminal trial were not coextensive with the entire

11   history of those operations.  So Spear has very extensive

12   views about his version of why Grace's conduct violated

13   standards and is culpable.  It is disputed.  We're prepared

14   to respond to it, but it will be a very labor-intensive

15   exercise and really an unnecessary one given the current

16   posture of the case.  And why is that true?  The ultimate

17   issues with respect to Libby are discrimination issues a)

18   with respect to medical criteria, they're in the TDP, and b)

19   with respect to scheduled values.  He says nothing that

20   relates to medical criteria, that's not his area of

21   expertise.   He addresses the question of the nature of

22   Grace's conduct in order, as they say, to put into context

23   the nature of the claims against Grace at Libby, which really

24   means Grace's culpability at Libby.  There's not a single

25   expert in this case who will tie Grace's culpability to the

1   amounts that Grace paid in settlement, and therefore, in any

2   sense to the propriety of the scheduled values in the TDP.

3   That is to say, if they had an expert who said, We believe

4   that the evidence of Grace's culpability is in fact what is

5   responsible for the settlement values and that it's different

6   from how culpability drives settlement values outside of

7   Grace, there might be a point of reference that would say

8   that Dr. Spear's testimony regarding culpability has some

9   relevance.  There is no such witness.  There's not a single

10  witness, expert witness, and that's what you'd require, an

11  expert witness who could tie the two things together, and

12  there's certainly not an expert witness who could say equal

13  treatment, that the culpability of Grace at Libby was

14  different in kind and therefore drove different values from

15  the culpability of Grace outside of Libby.  So, this is a

16  classic case where Dr. Spear's testimony just does not fit

17  with the proofs of this case and is irrelevant.  Moreover, he

18  can't even get it to the point where his testimony ties into

19  any of the individuals who currently have claims.  There are

20  people who had claims at Libby for many years, but he was

21  asked point blank in his deposition, Can you speak to how any

22  of your history actually bears upon individual claims who are

23  current claimants?  And the answer is he could not, nor is

24  there any other expert who's going to be able to offer the

25  testimony of how Grace's alleged culpability per Dr. Spear

1    actually relates to people who are claimants in this case.

2    There's not going to be a single point of expert and nexus

3    between the two, which again you would have, because only an

4    expert can talk about what drives values in Grey and Libby

5    versus other places.  That is a subject for expert testimony.

6    There is no such expert testimony.  So, we object to and move

7    to exclude the testimony of Dr. Spear because there is no

8    expert in this case who can tie it up to the issue in this

9    case which is discriminatory treatment.

10         MR. KOVACICH: Your Honor, Mark Kovacich on behalf

11    of the Libby claimants.  I'm going to address the motion to

12    exclude Dr. Spear as a witness.  The fundamental problem that

13    the Libby claimants have with the bankruptcy plan here is

14    that the TDP undervalues their claims, and it undervalues

15    their claims by throwing them in with dramatically dissimilar

16    claims.  There are reasons why Grace paid on average more

17    than $250,000 per claim to settle cases in Libby while the

18    national average was about 100 times less than that, at

19    $2,500 per claim.

20         THE COURT: Well, per claim, what type of claim?

21         MR. KOVACICH: The average for all disease

22    categories in Libby pre-bankruptcy by Grace's own numbers

23    exceeded $250,000.

24         THE COURT: Well, okay, but in a vacuum, that

25    doesn't tell me anything, because I need to know what types

1    of claims.  If it's all mesothelioma claims in Libby and not

2    mesothelioma claims anywhere else then that alone is a

3    substantial reason why the values differ.  So, just as a bald

4    number that doesn't tell me anything.

5         MR. KOVACICH: Well, there were claims of various

6    disease kinds in Libby that were settled on average at that

7    level, just as there were elsewhere in the country and this

8    is the point I'm trying to make and why Dr. Spear's testimony

9    is relevant to the issues here.  We don't need an expert to

10   say what issues drove these settlement values up as high as

11   they were because Grace's own in-house counsel said it.  J.

12   Hughes, when he was recently deposed testified and I've

13   written a quote here from his testimony when talking about

14   why they paid so much more in Libby.  "The combination of the

15   fact that we were the only defendant and the exposure issues

16   were much different caused the cases to have higher values."

17   Dr. Spear is going to testify as to the exposure issues.

18   Now, in his deposition what he conceded is that he hadn't

19   done basically a dose reconstruction for any particular

20   claimant, but what his testimony does establish is the nature

21   of the exposures at the mine and mill and the manner in which

22   asbestos from that operation was distributed throughout the

23   town of Libby creating exposures to people in the community.

24        THE COURT: But that's only relevant as a standard

25   of comparison to someplace else, if what you're saying is

1    that it's discriminatory treatment.  So you still need to tie

2    up with what was different elsewhere.

3            MR. KOVACICH: Well, it's tied up with what was

4    different elsewhere, first through Mr. Hughes' testimony,

5    that the products cases were very different because the

6    exposures were very different.

7            THE COURT: No.  I don't think that's what he said.

8    He said he was the only - Grace was the only defendant in the

9    case and the exposure issues were different, but that doesn't

10   mean that Grace is - or that the specific exposure for any

11   particular plan is different there than elsewhere.  You have

12   to tie that up.  It has to be a standard of comparison if

13   you're arguing discrimination.

14           MR. KOVACICH: The point is also made, Your Honor,

15   by the testimony that we've designated from the estimation

16   hearing where Grace's expert witnesses put on extensive

17   testimony that something like 80 percent of the claimants in

18   this bankruptcy were not exposed to enough asbestos - enough

19   Grace asbestos to cause any disease, both industrial hygiene

20   testimony and medical testimony.  And that's really the

21   problem here.  Prior to the bankruptcy, Grace had won a

22   majority of the cases that actually went to a verdict.  I

23   think there's a statement by either Mr. Lockwood or Mr. Finch

24   in the estimation that there was something like 80 cases

25   tried to verdict and Grace won two-thirds of them, but while

1    they were winning those cases, because they were putting on

2    evidence that the claimants had minimal exposure to Grace

3    asbestos, they put on a doctor to say there's a certain

4    benchmark exposure that's necessary before Grace's asbestos

5    could be found to be a cause of the disease.  While these

6    claimants had asbestos disease, they were also exposed to

7    asbestos from multiple other sources, and so, juries were

8    finding that Grace didn't cause disease in a majority of

9    these claimants.  That's why these settlement values are so

10   low.  These TDP values are based on settlements, not a

11   determination of what these people's damages were, and the

12   settlements for the most part, particularly under the non-

13   malignant disease categories were nuisance value settlements

14   because Grace was winning those cases.  That is not the

15   situation in Libby.  They lost every case that went to

16   verdict and they lost them to the tune of hundreds of

17   thousands of dollars.  There was a case tried for about a

18   week by my partner, Tom Lewis, that for a gentleman who had

19   pleural disease it would be characterized under this TDP as

20   mild and scheduled value somewhere shy of $10,000.  That case

21   settled for $1.1 million while the trial was ongoing.  They

22   had no exposure defense in these cases.  There was nobody

23   else to blame, and that's why they paid so much more.  We're

24   not treating similar claims similarly simply by saying,

25   everybody who has the same level of disease should get the

1   same level of payment because there are a lot of other

2   factors that drive claim value, and Mr. Bernick is correct

3   that we don't have an expert disclosed on our side to testify

4   as to what those factors are, but we don't need it because J.

5   Hughes testified as to what those factors are, and he did

6   testify extensively that one of the major factors was the

7   extent of exposure and whether they had this exposure defense

8   to be able to say that our contribution to this person's

9   exposure wasn't enough to cause their disease.  Dr. Spear

10  will testify that there were excessive exposures in the mine

11  and mill, and it seems to me that people in this bankruptcy

12  case have been ignoring this fact, but we still represent

13  several hundred people who worked up there and family members

14  of people who worked up there.  These are the same types of

15  cases that were settled pre-bankruptcy for an average of

16  $250,000 and more, both the malignant cases and the non-

17  malignant cases.  And I would also point out that the plan

18  proponents have recognized that exposure is a relevant issue

19  in this case.  They've designated Dr. William Longo to

20  testify as to exposures which were involved with some of the

21  products cases.  We have a stipulation recently that we've

22  entered into to put Dr. Longo's report in evidence, and then

23  our cross-examination of Dr. Longo will consist of deposition

24  questions that were asked.  His testimony doesn't address

25  anything except exposure outside of Libby.  Of course

1    exposure is important because exposure is one of the major

2    factors that drove the value of these cases prior to the

3    bankruptcy.  The last comment I would like to make, Your

4    Honor, is that as I sat in the courtroom here today, I heard

5    you advise the parties a number of times that this really

6    isn't the best time to address a relevance objection to

7    evidence, and that's exactly what we have here, is a

8    relevance objection.  Perhaps it would be better to put Dr.

9    Spear on the stand, hear what he actually has to say, and see

10   how it ties into the arguments that are being made before we

11   jump to the conclusion that his testimony is not appropriate

12   in any respect.  Finally, I want to note that on the agenda

13   there's a reference to a joinder in this motion that was

14   filed by Arrowood.  I haven't heard any argument based on

15   that joinder that actually argued a separate basis to exclude

16   Dr. Spear.  Arrowood, as the Court is aware, has settled with

17   the plan proponents and has agreed to cease prosecuting its

18   objection to the plan.  The Court's order approving that

19   settlement reserved the issue of whether 524(g) protection

20   would be appropriate.  Dr. Spear is obviously not going to

21   testify about that, so I don't know if Arrowood planned on

22   participating in this argument, but it's our position it

23   would be inappropriate for them to do so given their status

24   as a settled party.

25           THE COURT: Okay.  Is there anyone for Arrowood even

1    present?  Mr. McDaniel?

2            MR. KOVACICH: Thank you, Your Honor.

3            THE COURT: Are you planning to take a position on

4    this?

5            MR. BERNICK: I think he's going to speak.  He's

6    going to join in our motion, so we should probably - in our

7    position so we should probably - I'm sorry, I'm totally

8    confused -

9            THE COURT: Mr. McDaniel?

10           MR. McDANIEL: I was just going to actually just

11   wait until Mr. Bernick did his rebuttal and then join in the

12   end, so, but I am here.

13           MR. BERNICK: Feel free -

14           THE COURT: All right.

15           MR. BERNICK: I think we heard just now exactly an

16   illustration of the problem which is that the ultimate issue,

17   as Your Honor has identified is the question of disparate

18   treatment.  Disparate treatment can't be demonstrated on the

19   basis of simply talking about Libby.  It's always going to be

20   comparative, and it's not a matter on which you can take or

21   on which fact testimony alone is going to carry the day.  It

22   is an issue that is inherently one that requires the

23   testimony of an expert witness, and indeed a complex expert

24   witness, somebody who basically knows estimation and tort

25   system values, people like Dr. Peterson, Dr. Florence, and

1   others who have spent years and years and developed very

2   complicated models to use in order to address the question of

3   equal treatment.  The whole idea of the TDPs, the whole idea

4   of estimation is what is equal treatment and on what kind of

5   basis.  There is no such witness who's going to testify for

6   the Libby people at all, and instead of having that we're

7   going to hear arguments of counsel that stand in place of

8   expert testimony that are based upon fact here, facts there,

9   facts everywhere.  Whether that's appropriate or not, I guess

10  is for the Court to consider, but it doesn't establish that

11  there's any kind of basis for accepting the expert testimony

12  of Dr. Spear.  Dr. Spear is not that expert.  Indeed, he

13  can't address any part of it, and the reason he can't is that

14  he doesn't have the comparitor.  So, he can talk all he wants

15  about how much exposure there was.  He can't quantify the

16  dose, but even if he could quantify the dose, he doesn't have

17  the comparison on the other side.  Nobody else has the

18  comparison on the other side.  So he says, I believe that

19  there was a lot of exposure to Libby but he can't say, he

20  can't even begin to say that it demonstrates unequal

21  treatment nor is there anyone else who will say, Yes, what

22  Dr. Spear demonstrates now tells me that the people at Libby

23  are not being treated in the same way as the people outside

24  of Libby.  There's no witness who's going to proffer that

25  kind of testimony.  Number two, the force of our motion is

1   culpability.  This is not a question of an expert coming in

2   and saying, The exposures are actually X or actually

3   different.  What Dr. Spear wants to say is that Grace engaged

4   in culpable conduct, violated standards and the like.  That

5   has no bearing on anything.  Nobody says - Mr. Hughes says

6   nothing about culpability or the degree of exposure and the

7   excessive nature of the exposure.  So Dr. Spear can't

8   quantify dose either at Libby or elsewhere.  Can't do

9   anything that is comparative, Libby versus elsewhere.  Can't

10  talk about culpability because there's no predicate that says

11  culpability is even relevant.  So from the get-go, and we

12  wouldn't raise this.  We know Your Honor's predisposition to

13  let these things ride, but we're talking bout 3 hours worth

14  of testimony from Dr. Spear.  We're talking about matters

15  that we presumably will have to respond to until Your Honor

16  determines whether it's relevant or not, and we know from day

17  one, right at the outset, it doesn't match with anything.

18  Now the other statements that were made by counsel are

19  basically anecdotes.  Well, there's a lot of money paid to

20  settle cases that went to trial.  Well, there's a lot of

21  money paid to settle cases that went to trial or didn't go to

22  trial outside of Libby.  So, the fact that there was money to

23  pay cases that went to trial in Libby or high verdicts in

24  Libby doesn't go to any fact that's at issue and Dr. Spear

25  can't supply the predicate for it.  He says, Well, Grace won

1    most of its cases outside of Libby and lost the cases inside

2    Libby.  Well, let's assume that that is true.  That's totally

3    a function of what's being tried, and yes, in Libby, it may

4    be that the cases were different.  That doesn't mean that the

5    cases that were like Libby outside of Libby are being treated

6    differently.  It says that on average, maybe the mix of

7    disease and the mix of exposure outside of Libby was

8    different from the mix inside of Libby.  That doesn't

9    establish that the TDP is discriminatory.  So we have a bunch

10   of little snippets that are being put out on the table here

11   but there is no basis for expert testimony from Dr. Spear

12   that addresses the issue that the Libby claimants purport to

13   address, which is equal or unequal treatment.  He can't do it

14   and his opinions regarding culpability violation of standards

15   are entirely irrelevant on any theory of the case.

16          THE COURT: Mr. Finch?

17          MR. FINCH: Three quick points, Your Honor.  With

18   respect to his argument that we believe that industrial

19   hygiene testimony is relevant because we designated the

20   testimony of William Longo.  Mr. Longo is not an industrial

21   hygienist.  He's a material scientist who was put forward

22   solely for the proposition that the exact same type of fiber

23   that was in the vermiculite, in and around Libby, also ended

24   up in Grace's commercial construction products, to rebut

25   their argument that there's something special and unique

1   about Libby asbestos.  Libby asbestos went everywhere, to

2   expansion plants and exposed construction workers on job

3   sites.  To the extent that they have put in the testimony

4   from the estimation hearing of Grace's experts, it was

5   Anderson & Lees, first of all the Asbestos Claimants

6   Committee's objected to that testimony.  Second of all, there

7   was no rebuttal ever to that testimony because the case was

8   settled, as Your Honor well knows, and third, under the

9   standards that Grace's experts put forward in that estimation

10  hearing, 95 percent of the Libby claimants wouldn't have

11  valid claims either.  So it has nothing to do with the

12  exposure testimony that Dr. Spear is going to proffer, and

13  third, as Mr. Bernick pointed out, there's no testimony that

14  Grace's culpability had anything to do in any particular case

15  with the claim values that were paid or collectively.  Dr.

16  Spear can't provide that testimony.  All you can have is Mr.

17  Kovacich who's basically making it up.  He doesn't know what

18  evidence Grace put on in 80 cases at a trial.  He takes one

19  little snippet of J. Hughes' testimony out of context.  I

20  believe when you hear Mr. Hughes' direct testimony, he will

21  tell you that the primary reason why the Libby cases got more

22  value is that Grace was the only guy to sue there, not

23  because the exposures or the culpability was higher there or

24  lower there or anything in terms of fault, and what they want

25  to put this guy on for 3 hours is basically to try to prove

1    that Grace did bad things in Libby, Montana.  Well the TDP,

2    Your Honor, basically says if you can prove some evidence of

3    exposure and meet the medical criteria and meet the exposure

4    criteria, the trust will say that that is a case that has

5    sufficient evidentiary value, that's it's worth making a

6    settlement offer whether you're in Libby our outside Libby.

7    It's equal treatment as to conduct.  The trust isn't going to

8    make every claimant re-litigate the question of whether Grace

9    adequately warned of the hazards of his products or whether

10   Grace was negligent in Libby, Montana.  So, in terms of

11   supporting a disparate treatment argument the testimony of

12   Spear about how bad Grace did in Libby or what his conduct

13   was in Libby is completely irrelevant to the issues that you

14   have before you for plan confirmation.

15           THE COURT: Mr. McDaniel?

16           MR. McDANIEL: Your Honor, Garvin McDaniel for

17   Arrowood.  Your Honor, I simply join in the debtors', Mr.

18   Finch's comments.  The only comment I want to make is I

19   believe counsel for Libby said that Arrowood had settled

20   their matter and therefore is barred or not allowed to be

21   involved in this process.  We'll continue to be involved in

22   this case, Your Honor.  Our settlement's contingent on plan

23   confirmation and while we're definitely not objecting to

24   anything to the plan proponents, we have objected and we'll

25   object to the Libby motions or BNSF motions as we see fit,

1    Your Honor.

2             THE COURT: Alright.  Mr. Guy?

3             MR. GUY: Thank you, Your Honor.  I agree with

4    Arrowood's counsel.  That was the settlement that we had with

5    them.  The deal was not to take positions against the plan,

6    but they could still protect their interests in the

7    confirmation process.  Your Honor, the confirmation hearing

8    isn't going to decide whether Grace was at fault in

9    connection with asbestos.  That was a separate issue.  It's

10   got nothing to do with confirmation.  The purpose of the

11   confirmation for Libby is to determine whether or not they're

12   getting fair and equitable treatment, and the testimony being

13   offered by this expert would not help that issue at all, and

14   I think what was telling in Libby's counsel's comments was to

15   say, Well, Mr. Hughes said this and Mr. Hughes said that.

16   Everything that they were saying about Mr. Hughes, and I'm

17   not adopting whether it was accurate or not, everything

18   they're saying about Mr. Hughes is to support their argument

19   that they didn't get fair treatment because they got

20   different treatment pre-petition.  To the extent they want to

21   make that argument, they have the testimony to make it.  They

22   don't need an expert to talk about industrial hygiene.  It

23   doesn't help them and there's no prejudice to it being

24   excluded.  Thank you.

25             THE COURT: Anyone on the phone taking a position?

1    No, okay.

2         MR. KOVACICH: Your Honor, may I respond to a couple

3    of arguments that were made there?

4         THE COURT: Yes.

5         MR. KOVACICH: Mr. Bernick commented in his rebuttal

6    that what the evidence shows about the disparate settlement

7    values and I don't hear anyone disputing the fact that they

8    were very disparate, that maybe what that shows is that there

9    was a different mix of disease and exposure issues inside

10   Libby versus outside and that that doesn't constitute unequal

11   treatment under the plan.  Well, it certainly does because

12   those differences are not accounted for in the plan.  The

13   Libby claimants who were getting a hundred times more than

14   everybody else pre-bankruptcy are assigned to the same

15   scheduled values which are based on nuisance value

16   settlements.

17        THE COURT: But plans always are required to treat

18   claimants with similar circumstances similarly.  How the

19   Libby claimants got their disease is probably not material at

20   all to whether or not they have the disease.  The issue is,

21   do they have it, and if they do, and they're treated the same

22   way as every other claimant with the same disease in the

23   plan, I don't see how you have a discriminatory treatment

24   issue.  The fact that the debtor was - I'll even say

25   criminally culpable may have caused circumstances under our

1    criminal laws, and of course the debtor wasn't convicted,

2    but, you know, may have caused a different set of issues, but

3    that doesn't give any individual claimant a different right

4    for bankruptcy purposes than other individual claimant would

5    have.  So, if you've got two people, hypothetically, with

6    identical diseases, one from Libby and one not, the fact that

7    they have identical diseases means for plan confirmation

8    purposes, they should be paid the same amount.  The fact that

9    one got exposure from Libby and the other didn't isn't

10   relevant.

11        MR. KOVACICH: The interest of these creditors, Your

12   Honor, all of these claimants is that they had causes of

13   action against Grace prior to the bankruptcy, and those

14   claims had value.

15        THE COURT: Well, all of them did.

16        MR. KOVACICH: And there are issues that impact the

17   claim value besides just what is your disease.

18        THE COURT: No, I don't think that's the case.  The

19   things that impact the claim value are whatever it is that

20   the claim is comprised of.  The claims here are comprised of

21   personal injuries.  So you have to substantiate that you have

22   a personal injury.   How you got it at this point in time

23   makes absolutely no difference.  The question is, Do you have

24   it?  If you have it, you're entitled to be paid X, everybody

25   with that disease is entitled to be paid X.  So we don't have

1    discriminatory treatment.  Now, if you have a different

2    disease, then you don't fit within X, you fit within Y, and

3    everybody who fits within Y has the same or similar claim and

4    is to be treated equally.  I just don't see where, you know,

5    the fact that - and I'm not accepting anything as fact, but

6    assuming that the facts showed that there was - I'll call it

7    more intense exposure at Libby because maybe the fact that

8    the folks had to work in the mine and then go home, and they

9    can't get away from the exposure meant that they were more

10   likely to get a disease, but the reality is, they have the

11   disease.  So, it doesn't matter how it came up.  What matters

12   is that they have it, and if they have it, and they can

13   substantiate it, they're entitled to be paid.  I simply don't

14   think that the - I don't think there's a valid point aside

15   from that to be made.  Now, there may be other ways in which

16   discrimination could be shown, but not based on the fact that

17   the same people have the same diseases.

18         MR. KOVACICH: The problem, Your Honor, is that the

19   - what these claimants start with is their claim against

20   Grace and what has to be treated equally is the value of

21   those claims, and -

22         THE COURT: No, that's not correct.  That's just a

23   misread of the Bankruptcy Code.

24         MR. KOVACICH: Nobody would argue here with the

25   proposition that a mesothelioma claim should be valued higher

1    than some of these other non-malignant claims.  That's a

2    critical part of the TDP.  The mesothelioma claims get paid

3    drastically more.

4            THE COURT: That's a different claim.

5            MR. KOVACICH: And the reason, the basis for that is

6    that prior to the bankruptcy on average meso cases were

7    valued higher than those other cases.

8            THE COURT: Well, that's a function of the fact that

9    the people are more seriously ill and are going to die or

10   have died, and so their damages in the tort system are

11   substantially higher than somebody who has an exposure is and

12   is - I'll use the word "asymptomatic".  I realize there may

13   be a pleural thickening but doesn't have a disability that is

14   serious for purposes of getting on with your normal life.

15   That's the distinction.  The tort system recognized those

16   differences in values because the worth of the disease was

17   worse and therefore valued higher in our society.  So, the

18   plan recognizes that distinction among the claimants.

19           MR. KOVACICH: But the tort system also recognized

20   differences in the nature of exposure because many of those

21   mesothelioma claimants would not prevail in a case against

22   Grace because they might have worked around some monacote

23   (phonetical) while they had Johns Manville asbestos falling

24   on their heads.

25           THE COURT: Exactly, so, as a result there is a

1    different source for the revenue.  So debtors' settlement

2    history would be less because there are two entities who

3    would pay the claim and be responsible for it not just one.

4    That's exactly right, but that doesn't change the fact that

5    the claim has a value and if you add together all of the

6    exposures outside Libby by any one plaintiff - Let's say a

7    person is exposed to five different sources of asbestos and

8    makes claims against five different estates and recovers

9    against all five of those estates, that collective total

10   should be worth the same value that the Libby claimant had

11   who was exposed to only the one defendant and the one

12   defendant's going to pay.  That's the nature of our tort

13   system.

14           MR. KOVACICH: Well, the TDP doesn't compensate the

15   claimants in that manner, Your Honor.

16           THE COURT: It does compensate the claimants that

17   way because it recognizes that you have to produce evidence

18   of exposure to Grace's products.  So everybody who's got the

19   exposure to Grace's products are going to be settling their

20   claims for a particular value.

21           MR. KOVACICH: But the claimants who had exposure to

22   Grace's products along with a hundred others are going to get

23   the same value as the claimants in Libby -

24           THE COURT: That shouldn't be the case.  The trust

25   will be objecting based on the fact that they can't possibly

1    substantiate that level of damage against Grace because

2    they've made those claims against other entities.  I mean,

3    that may be a problem with the trust and how the trust

4    operates if it were ever to do something in a discriminatory

5    fashion.  I'm not going there, but the way the trust is set

6    up is not itself discriminatory.  Whether there's a

7    discriminatory impact is a different issue for a different

8    day, but whether or not the trust discriminates with respect

9    to the claimants who are to be treated in that trust is the

10   issue I'm addressing or will have to address.  I'm only

11   looking at Dr. Spear right now to see where this is relevant.

12   I want to make that clear.  I'm not making findings with

13   respect to anything except Dr. Spear, but his testimony can't

14   inform that analysis.

15         MR. KOVACICH: Your Honor, I won't continue arguing.

16   I guess our point with Dr. Spear is that the exposure issues

17   are extremely critical to tort value prior to the bankruptcy.

18   That's the primary purpose for which he was designated as a

19   witness.  His testimony is relevant for that purpose.

20         THE COURT: Well, I guess the question I have is, is

21   anybody disputing what the settlement values are between the

22   debtor and any group of claimants including Libby claimants?

23   I don't even know if it's an issue.

24         MR. BERNICK: The settlement values are pretty much

25   - and there's no dispute about what was paid to settle cases.

1            THE COURT: Okay.

2            MR. BERNICK: There's no question about that.

3            THE COURT: Alright.

4            MR. BERNICK: And there's no question actually but

5    that in the TDP consideration is given to whether there's one

6    exposure - what exposure source or multiple exposure sources,

7    so -

8            THE COURT: Well, I know there's an add on factor -

9            MR. BERNICK: There's a multiplier.

10           THE COURT:  - a multiplier factor, yes.

11           MR. BERNICK: And so but the - I'm interrupting

12    counsel's presentation, but the answer is, there's no dispute

13    about what the historical settlements at Libby are.

14           THE COURT: Okay.

15           MR. BERNICK: And so, that's not an issue.

16           THE COURT: Alright, so then, if that's the case,

17    you can tell me what the historical settlements are.  That's

18    the relevant factor, I think that you need, not how they got

19    there.

20           MR. KOVACICH: Well, one point I would make on that

21    though, Your Honor, is there seems to be a disagreement with

22    the plan proponents and Libby about the similarity between

23    the cases that were settled pre-bankruptcy and the claims

24    that are pending now, and Dr. Spear's testimony establishing

25    the nature of the exposures in Libby would be relevant to

1    show that in fact the people who still have claims now have

2    claims of the exact same nature as those that were settled

3    for an average to 268,000 prior to the bankruptcy.

4            MR. BERNICK: Well, he can't testify -

5            THE COURT: He's not a doctor.

6            MR. BERNICK: He specifically said he didn't think

7    that compares them.  He can only give his perspective

8    generally on historic claims. There's no opinion in this case

9    from Dr. Spear or from anybody else that makes the comparison

10   that counsel just made reference to.  They don't have an

11   expert on that.

12           THE COURT: But, even if the current claims track

13   the historic claims that a person with a severe pleural

14   disease today has the same sever pleural disease that someone

15   had 30 years ago.  So we're looking at the same disease.  The

16   relevance is whether or not those folks are going to be

17   filing claims against the trust and how they're going to be

18   paid against the trust.  How they got that disease is not

19   material.  It's like telling me that the debtor could, I

20   guess, discriminate between two creditors with unsecured

21   claims put in the same class because one's a trade creditor

22   and one is a different type of - a bond creditor - when

23   they're classified together.  That can't be.  They have to be

24   treated similarly, that's what the law requires, and 524(g)

25   is even more intense in terms of what it requires for similar

1   treatment than the 1129 standards are.  So, I just don't see

2   the basis for Dr. Spear to support the discriminatory

3   treatment issue because what he's going to tell me is based

4   on general exposure facts and not on the dose response, which

5   sets the disease in part and therefore sets the disease level

6   and how a claimant would apply to the trust funds, because

7   the overall generic exposure is not material.  The fact

8   that's material is that a claimant has a particular disease,

9   and is going to be treated a particular way in the trust, and

10  as long as that's the same for all creditors with that same

11  disease, that's not discriminatory.

12          MR. KOVACICH: Your Honor, I think that the

13  disagreement and I'll make this brief and we can - I think

14  we've caused trouble with people catching their train at

15  4:15. I apologize.  The real disagreement here is that the

16  values of these claims were impacted by things aside from

17  what nature of disease these people had.  And J. Hughes will

18  acknowledge that in his testimony.  And the TDP, regardless

19  of the fact that it allows for individual review and some

20  increase in what people get paid, it caps these claims at a

21  very small fraction of what Grace was paying people with the

22  same types of claims before it went into bankruptcy.

23          THE COURT: Well, now that may be a different issue.

24  Whether Grace is inappropriately capping the claim despite

25  the add-on factor for different types of exposure.  That may

1    be a different issue from whether or not how the claimant got

2    the disease comes up.  There may be elements of

3    discriminatory treatment, but they're not based on exposure.

4    They're based on the fact that the plan may not appropriately

5    accord for the settlement history that the debtor had pre-

6    petition, but Dr. Spear can't talk about that.  He can only

7    talk about the exposure.

8              MR. KOVACICH: Thank you, Your Honor.

9              MR. BERNICK: Just to be clear on Mr. Hughes'

10    testimony, it would be very consistent with Your Honor's

11    observation when he says, "The combination of the fact that

12    we were the only defendant and the exposure issues were much

13    different and caused the cases to have higher values.  A

14    typical non-Libby case, we talked about the credibility of

15    the witnesses, we talked about exposure . . . (indiscernible)

16    information in the files that were either inconsistent with

17    the presence of exposure and in particular building our

18    technical information we had about the products was

19    inconsistent with the use that they were talking about.  But

20    in Libby we had a known commodity in terms of the process,

21    the employment here, people's role or function at the mine or

22    mill so we had a better idea.  It wouldn't typically have

23    been an issue whether or not they were exposed to asbestos."

24    So, it's the same criteria.  Do you have exposure or do you

25    not have exposure.  For many people outside of Libby,

1    exposure was a genuine issue.  For people inside Libby,

2    particularly people who lived at the mine, exposure was not

3    an issue.  They had the exposure and the source of the

4    exposure was not an issue, it was overwhelmingly going to be

5    exposure at the mine.  So the issue is not your typical

6    person outside of Libby and the Libby people, it is if you

7    take the people outside of Libby who have sole source

8    exposures, like people who used to work at a Manville

9    distributor or something like that and you say, Well, how is

10   it they're treated and how are the Libby people with sole

11   exposure treated, that's the point of comparison.  So the

12   averages are misleading.  The mixes are misleading.  If you

13   have the same disease and they are both people who have clear

14   exposure, no complications, no other sources of exposure,

15   they ought to be treated in like fashion, and like fashion

16   doesn't mean mathematical precision.  And what Dr. Spear

17   doesn't address and what nobody addresses, other than for

18   example, people who are going to testify for the plan

19   proponents, is the right comparison which is the apples and

20   apples comparison.  Known, clear exposure predominantly one

21   source, how are they treated under the TDP inside and outside

22   of Libby and the answer is that they're treated in a

23   comparable fashion, and that's not something that Mr. Spear

24   can address.

25             THE COURT: If Dr. Spear can - I mean if it's even

1    disputed, I'm not sure it is, if Dr. Spear addresses the fact

2    that Libby claimants were essentially sole source exposure

3    claimants and that's a contested fact, I think he can address

4    that issue, but I don't think that's -

5        MR. BERNICK: That's not contested.  That's not the

6    force of his testimony.  Everybody knows that people who

7    settled cases in the past who were workers at the mine, they

8    got pretty clear exposure cases.  That's not how those cases

9    were litigated.  They were litigated on the basis of because

10   they were workers they get to prove intentional tort under

11   Montana law.  And so, by and large, these were intentional

12   tort cases under Montana law and that's what the active

13   litigation was.  It was rarely as a result of exposure.  Now,

14   it's not to say that the same thing wouldn't be true of

15   current Libby claimants because the current population has a

16   much - some of them may have a mine history, but very, very

17   few of them have a - much fewer have a mine history.  We're

18   mostly talking now about people who were present in the

19   community.  Now, again, their source exposure is going to

20   probably be if they have exposure, if they have exposure it's

21   going to be Libby, but the current population is a) not the

22   past population as a whole.  I mean there would certainly be

23   people who are like that, but as a whole, people who lived

24   20, 30, 40 years later are different from people who had the

25   historical exposures.  We know that that's true.  So, the

1    comparison is if you had people at Libby who go back a long

2    time and worked at the mine, are they being treated

3    differently from people outside of Libby who also go back and

4    have a sole source exposure, and the answer to that Dr. Spear

5    cannot address.  We then have current Libby claimants who

6    didn't work at the mine, and they had much lesser exposures.

7    They're going to be more like the people outside of Libby who

8    had much lesser exposures and they have had alternative

9    exposures.  Both types of people are treated exactly the same

10   way under the TDP because they have to be treated, and that's

11   why it's so misleading to try to address this, you know, the

12   trial results here and this history here, it has to hang

13   together as a discrimination issue.  And Dr. Spear, frankly,

14   he's a guy that testified and maybe very ably for the mine

15   worker claimants, but he's not a person who is suited to

16   testify about this issue which is very much a creature of the

17   bankruptcy process.  I don't know if Your Honor wants to hear

18   any more on this.

19            THE COURT:  No, I do not believe on this issue that

20   the information that Dr. Spear can provide regarding

21   conditions at the Libby mine, hygienic conditions at the

22   Libby mine is relevant to the determination I have to make as

23   to whether or not the TDP is discriminatory because I don't

24   think it gets us there.  I don't believe that the claim

25   status is based on exposure.  It's based on what is your

1   claim, and if you are diseased in a certain way you have a

2   particular claim.  The source of that claim other than the

3   fact that it came from Grace is not material.  I mean, how it

4   came from Grace, I should say is not material.  Mr. Lewis?

5        MR. LEWIS: Yes.  Thank you for your prompt ruling.

6   I'm concerned about how we make our offer of proof on this

7   issue.  Do we need to bring this witness to trial -

8        THE COURT: No.

9        MR. LEWIS: - to make an offer of proof, can we file

10  an affidavit or -

11       THE COURT: Yes.

12       MR. LEWIS: Alright.  And I have one other thing to

13  say.  This is not as simple as it looks.  The average

14  settlement in Libby was $268,000, including people who were

15  not represented.  The average mesothelioma case settled all

16  around the country resulting in many thousand dollars.

17  That's in Mr. Hughes' testimony.  So I mean there is a huge

18  disparity here and we believe that more factors - and I

19  respectfully, I'm not arguing with the Court, but we know in

20  the tort value system liability is always critical.   The

21  more serious a liability the more likely for you to get an

22  adequate verdict or an adequate settlement.  Causation of all

23  these issues play into the tort value.  So to the extent

24  they're going to bring in evidence as to the tort value, we

25  want to be able to bring Dr. -

1          THE COURT: Spear?

2          MR. LEWIS: - Spear - senior moment.  I'm 64 today.

3     Your Honor, I'm getting old.

4          THE COURT: Oh, Happy Birthday.

5          MR. LEWIS:  And I spent it all day in this hot

6     courtroom.  I've got to make a plane because I've go to go to

7     Libya and take depositions, or be there for depositions.

8     Anyway, to the extent that they're going to bring in

9     evidence, to which we can rebut or -

10         THE COURT: This is not a ruling that you can't use

11    Dr. Spear in rebuttal.

12         MR. LEWIS: Alright.

13         THE COURT: It's for your case in chief on the point

14    that I made.

15         MR. LEWIS: We understand, and thank you for your

16    prompt ruling.

17         THE COURT: He may be appropriate on rebuttal.  I'm

18    not making any rulings about that.

19         MR. BERNICK: Alright.  Average meso claimant from

20    Grace, $90,000, whatever, that's a piece of the total.  Mr.

21    Lewis didn't tell you how much on average a mesothelioma

22    claimant outside of Libby gets in the aggregate for their

23    claim from all claimants, and I venture that we're talking in

24    the multiple millions of dollars.

25         THE COURT: Okay.  I think the evidence, if it comes

1    in the way it does typically is that the settlement values in

2    the plan will be based on certain factors.  I'm going to hear

3    a lot about those factors, I'm sure.  To the extent Dr. Spear

4    has some rebuttal evidence with regard to those factors, I'm

5    not ruling that he's not an appropriate witness.  He may very

6    well be.  I don't know that.  I'm only looking at the

7    exposure issue for discrimination.  That's it.  Okay, I'll

8    take an order from the debtor when you can run it by counsel.

9          MR. BERNICK: Thank you.  Right, we would then

10   propose that Mr. Cohn if he is ready, willing, and able, as

11   I'm confident that he is, take up the three - Can you take

12   them up all three together, the three motions with regard to

13   our experts and then Mr. Finch and I will respond.

14         THE COURT: Alright.  Mr. Cohn.

15         MR. COHN: Yes, Your Honor, these are your items 13,

16   14, and 15 on the agenda which we've agreed to take together.

17   Now, what these three motions have in common, Your Honor, is

18   that they are an outgrowth of this Court's ruling about Dr.

19   Whitehouse imposing essentially a very strict standard for

20   providing reliance materials by medical experts who examine

21   patients and in the case of all three of these witnesses, who

22   are experts, who are being proffered by the plan proponents,

23   they each testified at their depositions that they examine

24   patients and that the examination of patients plays a role in

25   their expert opinions, and so, for that reason alone, Your

1  Honor, we would submit that not having provide those patient

2  records, these expert reports ought to be stricken.  But in

3  each case, Your Honor, and I'm not going to belabor that

4  point, Your Honor, because in each case these experts have

5  more specific information on reliance materials which they

6  failed to provide concerning the examination of patients.  I

7  start off, Your Honor, with Dr. Gail Stockman.  Would it be

8  convenient for the Court for me to hand up a copy for your

9  review?

10         THE COURT: Sure.

11         MR. COHN: Thank you.

12         THE COURT: Thank you.

13         MR. COHN: And, Your Honor, with your permission,

14  may Mr. Lewis and Mr. Kovacich be excused, they have a plane

15  to catch.

16         THE COURT: Yes, certainly.

17         MR. COHN: Thank you.  And now if you look at page

18  2, paragraph (14) of that report, Your Honor.  Dr. Stockman

19  makes it clear that the examination of patients plays a role

20  in terms of her opinion.

21         THE COURT: Okay.  Well, she says she's provided

22  second opinion reviews based on certain medical records and

23  she's seen and examined so many patients and then followed so

24  many more from Libby who were either self-referred or

25  referred by their primary physician.

1          MR. COHN: Yes, Your Honor, and I'm sorry, and then

2     to tie it together, Your Honor, you would need to look at her

3     deposition as quoted on page 8 of our motion where she's

4     asked, "And were these patients important", referring to

5     those patients in paragraph (14) of her report, "And were

6     these patient important to the formulations of your opinions

7     on asbestos disease from Libby exposures?  Witness: They were

8     certainly important in that they served as a sample of

9     patients who were alleged to have asbestos-related disease

10     from Libby."  So, you have she examined patients in Libby.

11     She says they are important to her opinion.  We've never been

12     provided with those patient records, and Grace conceded in

13     its reply that we were not provided with those records, and

14     Grace instead argues the fact that in describing her

15     qualifications, Dr. Stockman mentions her clinical experience

16     in examining and treating patients, does not mean she relied

17     on all materials related to that experience for the purpose

18     of making her report.  Nor is her deposition testimony that

19     her clinical experience with such patients was important,

20     proved the contrary.  Well, her entire report, Your Honor, if

21     you look at it is a criticism of Dr. Whitehouse' methodology

22     and conclusions.  In her report she cites the examination of

23     specific Libby patients.  If you look at page 19 through 23

24     of the report, it consists entirely of her description of

25     certain of those patients, and her conclusions about those

1    patients and about Dr. Whitehouse's conclusions about those

2    patients.  Now Grace claims to have produced the records for

3    those patients.  We don't think they were properly produced

4    because they were so far redacted as to be unuseable, but

5    let's forget about that point, Your Honor, because the point

6    is that she testified that she looked at a larger sample of

7    patients and she never provided the records for the larger

8    sample. She is in the exact same position that - we've been

9    put in the exact same position with respect to her testimony

10   as the plan proponents complained about with respect to Dr.

11   Whitehouse, namely that there was a whole group of patients

12   that were examined and not all of the records were produced

13   and so we have no way to cross-examine this expert on the

14   basis of well, Was it fair to take those three people?  Were

15   they a representative sample of the Libby patients?  And so,

16   Your Honor, we respectfully submit that Dr. Stockman's report

17   must be stricken because she may not testify about her

18   conclusions about Libby asbestos disease given that they're

19   based on examination of Libby patients whose medical records

20   have not been produced to the Libby claimants.

21            THE COURT: Alright.

22            MR. COHN: That is Dr. Stockman.  Now as for Dr.

23   Parker, we stated on page 8 of our motion that his opinions

24   on medical records - that his opinions were based on records

25   of specific Libby claimants, including his -

1          THE COURT: I'm sorry, that his opinion was based on

2    what?  I didn't hear you.

3          MR. COHN: I'm sorry.  We alleged in our motion that

4    his opinions are based on medical records of specific Libby

5    patients including x-ray films.

6          THE COURT: Alright.

7          MR. COHN: Grace in its reply said, No, Dr. Parker

8    did not consider the films in forming his opinion, and this

9    is now quoting Grace's reply, "Indeed, all of his work for

10   the ATSDR", that's a government agency, "in connection with

11   his 2001 and 2002 screening activities in Libby occurred

12   prior to his retention by Grace in this case."  Close quote.

13   When  we look at page 117 of his deposition transcript, and

14   this is attached to our motion, Your Honor, he says the

15   following, under oath: "Pleural plaques far exceed the

16   presence of diffuse pleural thickening in x-rays that I've

17   seen from Libby, including an enriched film set that I saw in

18   February and April of this year."  That's 2009.  So, Your

19   Honor, those are in his report, by the way, the first of his

20   reports that was submitted in April of 2009.  So, Your Honor,

21   it's clear that he -

22         MR. BERNICK: (Microphone not recording.)

23         MR. COHN: Yes, page 117, lines 2 through 6 of the

24   deposition transcript.  In sum, Your Honor, these x-rays,

25   including the original - I'm sorry, including the enriched

1    films that he specifically referred to as having been read in

2    2009 were not produced to the Libby claimants and for that

3    reason again being consistent with the order that was entered

4    against Dr. Whitehouse, the testimony of Dr. Parker should be

5    barred.  Dr. Friedman.  In his report, Your Honor, at pages

6    10 through 12, and by the way, his report, I should say is

7    actually attached to Grace's reply, Grace's opposition to our

8    motion, but in that report at pages 10 through 12 he says I

9    have relied - strike that. "I have based my opinion on my

10   review of" and then he lists a bunch of items.  On page 12,

11   item (h) is, "Review of certain patient records from Dr

12   Whitehouse, Dr. Black, and the Card Clinic Practice including

13   but not necessarily limited to the 123 patients in the"

14   quote, unquote, "in the progression study."  That's what he

15   says in his report.  We look at his deposition, at page 89 he

16   says, "And then I looked at PFT results that were performed

17   on the 123 after the study cutoff date."  It was after the

18   cutoff date, in other words, of the progressivity study.

19   Those PFT results that he looked at that were performed after

20   the date of the study, and of course, since it's after the

21   date of the study, Dr. Whitehouse doesn't have access to

22   those independently, have never been produced to us.  And

23   referring to those post-study PFT results, he testified, and

24   this is at page 93, line 3 of his deposition, "I have a

25   database, yes, sir", he says.  That database has never been

1    produced to us, Your Honor, and so for these reasons, Dr.

2    Friedman's report should be stricken and he should be barred

3    from testifying at the confirmation hearing.  Thank you, Your

4    Honor.

5            THE COURT: Mr. Bernick?

6            MR. BERNICK: Yes, I'm going to address Dr. Parker,

7    and it's really a fairly simple distinction that's being

8    missed and although I can certainly understand why the Libby

9    claimants would want to make sure that sauce for the goose is

10   sauce for the gander, and that whatever standard applies to

11   Dr. Whitehouse applies also to our experts.  The ganders are

12   different here because the nature of the expert opinions that

13   are being offered and are at issue from the experts that

14   we're talking about on this motion are different from Dr.

15   Whitehouse.  Dr. Whitehouse specifically relied upon his

16   experience with the 1,800 patients, specifically said so in

17   his expert report.  Indeed, that was the way in which he

18   captured in a data set or purported data set his views about

19   his experience at Libby.  So, that was a discreet set of

20   patients where in his expert report and in his deposition he

21   specifically said, "I relied", and those are magical words

22   and important words.  The situation with respect to Dr.

23   Parker is entirely different.  Remember, Your Honor, that the

24   expert discovery in these cases has always recognized the

25   distinction between reliance materials and other material on

1    one hand and other material that the expert may have seen or

2    reviewed during the course of his work.  There's always been

3    that distinction, as the language, such as the language we

4    see, this is the CMO from Phase I simultaneously with the

5    service of expert reports, the parties shall also serve other

6    interested parties with all documents on which the expert

7    relies.  "Relies" is the magical word in forming his or her

8    opinions which are not publicly available.  Draft reports

9    prepared in connection with this case are not discoverable,

10   but nothing shall be precluded - basically cross-examination.

11   That word "rely" is very important and it's actually more

12   limited than the kind of discovery that would otherwise be

13   afforded under Rule 26, but the core of Rule 26 is reliance

14   material, and the standing orders of this case pick out

15   reliance materials for specific treatment in connection with

16   the discovery process.  So, what happened with respect to Dr.

17   Parker?  Dr. Parker specifically called out in his expert

18   report what he was relying on, and never once mentioned his

19   experience with the ATSDR study, never even talked about it

20   as being a reliance material.  Instead the motion that's

21   being made by the claimants, the Libby claimants here, is

22   based upon his deposition, and if you actually take a look at

23   the parts of the deposition that they quote, they basically

24   quote a portion of the deposition where essentially counsel

25   for the Libby claimants is exploring Dr. Parker's experience

1    with the people at Libby, and in the process of doing that,

2    they asked and he truthfully responds as concerns his

3    experience with the ATSDR study.  They can't create his

4    reliance on something that he does not rely upon for his

5    expert opinions.  That's essentially what's happened in the

6    deposition and what's happened in their motion, is they try

7    to make him into a guy who's relying on evidence that hasn't

8    been furnished whereas in fact his expert report is not

9    consistent with that, and indeed, his deposition is not

10   consistent with that.  There's a distinction between having

11   some kind of experience in general terms and specifically

12   relying on the other hand with particular data or a

13   particular experience.  So, they're playing around with this

14   idea of reliance.  They're using depositions in which they

15   invite the witness to refer to other material and then say,

16   Oh, because he hasn't furnished that material we now should

17   be striking his expert opinions.  It's particularly

18   inappropriate though in the case of the ATSDR study and Dr.

19   Parker's contact with the study.  Dr. Parker is not an author

20   of the ATSDR study.  He never assembled a study of the ATSDR

21   survey.  That was done by others and published by others.

22   Dr. Parker's role of the ATSDR survey was much more limited.

23   His role - I'm sorry, that's probably my problem - His role

24   was that he was the tie-breaking B-reader.  So you have two

25   different B-readers who disagreed, he was the tiebreaker.

1    And that's his only role.  He never was a blind in the study.

2    He didn't know anything else about the patients.  Didn't know

3    who they were, never got a copy of the B-read, never got a

4    copy of the x-ray, never did a study.  It's never been

5    furnished to him.  So, because he served in this role of

6    being a third set of eyes with respect to - I mean, I guess

7    he could be cross-examined on how he performed that duty, but

8    he's not proffering any opinion based upon that data set.

9    He's addressing what Dr. Whitehouse has to say but he's not

10   bringing to bear his own experience with that group, and

11   saying, Oh, I'm relying upon this for purposes of my study.

12   That's very different from Dr. Whitehouse who specifically

13   picked out a data set and said, Yeah, I'm relying on that

14   data set, and I'm relying on my experience with that data

15   set.  So they're literally going back into Dr. Parker's

16   history to take his role as a referee and change it into

17   being a data set that's the basis of his opinion.  Remember

18   all these opinions are opinions about groups.  Are the Libby

19   people different in someway with respect to their disease

20   than people elsewhere?  He says, I don't see the unique

21   disease.  In so doing he doesn't rely upon a data set from

22   the ATSDR survey representing his own observations because he

23   didn't even know what it was.  He was blind and he doesn't

24   know whose particular x-rays he saw and in the aggregate what

25   it is that he found.  That's nowhere recorded.  It's nowhere

1    that he can use it as a reliance material.  All he did was to

2    say - he called it yes or no as the tiebreaker.  He has no

3    data set of his reads and therefore can never rely upon a

4    data set of his reads in support of his expert opinions.  So,

5    I think that all of the quotes they have from the deposition

6    really deal with their bringing out some of his experience,

7    but in terms of his opinion with respect to a group it is not

8    based upon a discreet data set comprising in whole or in part

9    what he actually observed as the x-rays because he never

10   recorded it, and he doesn't have it, and it wasn't consistent

11   with his role.

12        MR. FINCH: Nathan Finch for the ACC.  Your Honor, I

13   think it's important to keep in mind the very different

14   nature of what Dr. Whitehouse has done and what he relied

15   upon and what Dr. Parker and Dr. Friedman, and Dr. Stockman

16   all did.  They are rebuttal experts.  Dr. Whitehouse said, I

17   have this population of 1,800 people, and he specifically

18   said that he was relying on that population to give his

19   opinions about how people in that population will progress.

20   That 76 percent of them will have a decline in lung function,

21   that there's a probability of dying of an asbestos-related

22   disease.  Those are by their very nature epidemiological

23   assertions by a doctor who is relying on the patient

24   histories of those 1,800 people, and Mr. Bernick's partner

25   asked him not once but twice in his deposition questions to

1    the effect of, Let me get this straight.  You're relying on

2    the medical histories, the patient histories of these 1,800

3    people as the fundamental bases of your opinions; correct?

4    And he answered, Yes, which is what he did.  That's very

5    different than what Dr. Stockman did or what Dr. Friedman

6    did.  Dr. Stockman is a medical doctor in Libby, Montana who

7    has seen - who came from Texas originally, who has seen

8    hundreds and hundreds of people who have been exposed to

9    asbestos or silica or other non-malignant diseases and she

10   also has seen somewhere around 20 to 30 people in Libby who

11   have been exposed to Grace asbestos, and her testimony and

12   her report, if you look at here report, she talks about her

13   general experience, and in part, in way of passing she says,

14   I saw these people in Texas, and I saw some people in Libby,

15   but then when she goes to her specific opinions, her specific

16   opinions are relying on the medical literature to say that

17   what Dr. Whitehouse is saying about the special or different

18   or - they don't like to use the word "unique", but

19   substantially different nature of pleural disease in Libby.

20   She says, a) that's not borne out by the medical literature,

21   and in b) she picks out three cases, and those are the only

22   three cases that she's relying on, as examples were, in her

23   opinion in these three cases, and we clearly gave the medical

24   records for those three cases to the Libby claimants'

25   lawyers, not once but twice, and those three cases she said,

1    I looked at the medical records for claimant X and Dr.

2    Whitehouse had diagnosed that person with an asbestos-related

3    disease, and in my opinion this person doesn't have an

4    asbestos-related disease.  They're perfectly capable of

5    cross-examining her for what she did with those three cases,

6    but she's not relying on any cases outside of Libby or any

7    cases of the other people she's seen in Libby to make her

8    specific criticisms about these three cases.  She's relying

9    on three people's cases, a discreet set of medical records

10   that the Libby claimants have, and it's very different for a

11   doctor who's a rebuttal doctor to be coming in and saying,

12   I'm relying on these three things to criticize your

13   diagnostic practices than it is to say, I'm relying on this

14   data set of 1,800 people and giving epidemiological

15   projections of those people.  With respect to Dr. Friedman,

16   again, the motion, he describes how his clinical practice was

17   important for him in forming his views about asbestos, but

18   that's not really the issue.  Any professional, whether they

19   be a doctor or an accountant or anything else, is going to

20   learn from practicing their trade, but that doesn't convert

21   the clinical practice or the practice that Dr. Friedman had

22   in seeing lots of patients even in sort of reviewing it for

23   purposes of legal testimony in cases, that doesn't convert

24   the files of every patient he's ever saw into something he's

25   relying on.  He's relying on his general experience and

1    knowledge the way any doctor is.  The difference between him

2    and Dr. Whitehouse is that Dr. Whitehouse says, I'm relying

3    specifically on the medical histories of these 1,800 people

4    for my opinions.  Dr. Friedman is saying, What I'm relying on

5    is medical literature and the patient records of the Libby

6    patients, and the only patient records that he has access to

7    are what Libby either gave to Grace and then Grace turned

8    around and gave it to Dr. Friedman or was produced in the

9    course of the discovery in the criminal case, which again,

10   came from the Libby claimants and the Card Clinic file which

11   went to Dr. Friedman but also was produced by Grace to Libby.

12   So, maybe he didn't delineate in his expert report exactly

13   which files he was looking at, but all of the patients that

14   he was talking about were Dr. Whitehouse's patients, and all

15   of the pulmonary function tests they were complaining about

16   were available to them when Grace produced the records it got

17   from the Card Clinic files by a subpoena in a criminal case

18   to the Libby claimants in the context of the estimation.  So,

19   anything Dr. Friedman had it wasn't like he had this database

20   of information that he went out and created.  This is their

21   claimants' medical records and/or Card Clinic medical records

22   that they received in discovery from Grace in the context of

23   the estimation case.  So I don't think it's fair or proper to

24   convert reliance materials that they clearly have or reliance

25   materials that are just an expert's background and expertise

1    from training into the same type of records that Dr.

2    Whitehouse relied upon.  There's no basis for striking Dr.

3    Stockman's report or Dr. Friedman's report any more than in a

4    tax case if you have an accountant come in and testify that I

5    used to work for H&R Block for 20 years, and I relied on

6    these five tax returns to give an opinion that the

7    defendant's tax returns are fraudulent.  To say, Oh, that

8    makes you have to produce all the tax returns you've ever

9    reviewed in your career.  That's what they're basically

10    truing to convert this to, and I don't think that the rules

11    require that and I don't think your order with respect to Dr.

12    Whitehouse requires that, and certainly with respect to Dr.

13    Stockman, the patient record that she relied on for her

14    opinions here are the three people whose records they got and

15    there's no basis to strike her report.

16            THE COURT: Mr. Guy?

17            MR. GUY: Your Honor, your ruling on Dr. Whitehouse

18    was correct.  The Libby claimants apparently didn't have an

19    issue with these rebuttal experts until after you ruling, but

20    the distinction is obviously very different.  Here we have

21    experts who have information that helped them form their

22    expertise, that happens all the time.  Or they have

23    information that they used that was Libby's information.  So

24    they're entirely different from Whitehouse who is an expert

25    who expressly said he relied upon opinions, relied in forming

1    his opinions upon information we didn't have.   That's not

2    the situation here with the rebuttal experts who are, by the

3    way, rebutting Dr. Whitehouse.  So, their motion should be

4    denied.  Thank you.

5         THE COURT: Anybody else before I turn back to Mr.

6    Cohn?  Alright, Mr. Cohn.

7         MR. COHN: Thank you, Your Honor.  First of all, Mr.

8    Bernick said as to Dr. Parker that for us to say that he

9    relied on these supplementary x-rays that he looked at was

10   inconsistent with his report, so, may I hand you his report,

11   please?

12        THE COURT: Alright.  Thank you.

13        MR. COHN: Recall, Your Honor, that his testimony at

14   the deposition was, Pleural plaques far exceed the presence

15   of diffuse pleural thickening in x-rays I've seen from Libby

16   including that set that he just reviewed in February and

17   April.  So, if you look at page 7 of the report, starting at

18   the first full paragraph, but really it goes on in the second

19   and third, that's exactly what he's talking about.  He's

20   talking about pleural plaques, diffuse pleural thickening.

21   That is the subject of his report.

22        MR. BERNICK: Can I see the report?

23        MR. COHN: Sure.

24        THE COURT: Okay, well, page 7 of this report,

25   starting in the first full paragraph essentially talks about

1   the fact that it is generally accepted as to what pleural

2   inflammation from asbestos can result in.  The second

3   paragraph describes pleural plaques in some detail, and the

4   third paragraph talks about the diffuse pleural thickening

5   and what that means and where it can be associated.

6          MR. COHN: Right, and so - and, Your Honor, that was

7   the topic then that he was - that he said in his deposition,

8   the x-rays bore upon.  So the x-rays bear upon the subject

9   of these pleural plaques and diffuse pleural thickening, and

10  when you look at his report, there it is in his report.  This

11  was not just a topic that as Mr. Bernick said, counsel, you

12  know, Libby claimants' counsel wanted to ask him about at

13  this deposition and so of course he answered the questions.

14  This is something that actually appeared in his report.  He

15  addresses that very topic.

16         THE COURT: Okay.  I think the issue is whether or

17  not he relied specifically on information that wasn't

18  produced.  That's the issue.

19         MR. COHN: Well, and as to that, Your Honor, recall

20  we had this - what Mr. Bernick said, of course, he was doing

21  this B-reads for the ATSDR study back in 2000-2001.  The

22  problem is, Your Honor, that he was not doing reads for the

23  2000-2001 ATSDR study in February and April of 2009 when he

24  is reviewing these enhanced x-rays.  What's really happening

25  is, these enhanced x-rays are being reviewed at the time

1    frame of and on the topic of the very report that he was

2    preparing for Grace at the time.  And it appears then on page

3    7 of his report, a discussion of pleural plaques and diffuse

4    pleural thickening.  Now maybe he, you know, he does not say

5    expressly that he relied on those x-rays, but clearly he was

6    considering those x-rays on a topic that was present in his

7    report at the time he was preparing his report.  We asked for

8    this material, and I probably should have said that to Your

9    Honor about all three of the experts, that we did send to the

10   plan proponents a request for them to provide these records,

11   and they failed to provide them.  Your Honor, this places us

12   in a position where it constrains our ability to cross-

13   examine these witnesses on the very topic of their reports.

14   That is as to Parker.  Are we going to - I can talk about the

15   other ones, or Mr. Bernick can interrupt on Parker.

16         THE COURT: Can we finish - I would actually prefer

17   to finish on one and then go to the next and finish so that I

18   get the issue, because the issues aren't exactly the same.

19         MR. COHN: Sure.  That's fine, Your Honor.

20         THE COURT: Okay.

21         MR. BERNICK: The issue is, as Your Honor indicates,

22   that he says he's relying on and the expert report was cited

23   here which is the governing document of what he relies upon,

24   makes no mention of his participation in the ATSDR study in

25   2000-2001.  None.  There's no question but that his - the

1    topic that's addressed in his report is his testimony

2    regarding diffuse pleural thickening and pleural plaques and

3    the like.  That's not the issue.  The issue is the underlying

4    data and he nowhere relies upon it here.  In the deposition,

5    he's been asked some general questions about his views, and

6    when he talks about his views he talks about the people at

7    Libby.  It is here that the follow-up he says, What am I

8    talking about?  The Amanus and McDonald studies and the

9    committee cohorts that have been studied by the ATSDR, that's

10   typical of dah-dah-dah in what way?  They have more pleural

11   disease, et cetera, et cetera.  He does talk about the Peking

12   study but not his particular reads that drive the Peking

13   study because he doesn't know what those reads are.  It's

14   then, in response to this, he gets a more general question.

15   Is it also typical in the sense that there's a predominantly

16   visceral pleural thickening with significant extent and

17   thickness to it?  Answer: The presence of pleural disease in

18   excess of the . . . (indiscernible) disease is different with

19   . . . in most chrysotile exposed populations and that seems

20   to be the case in Libby.  And did you see a predominance and

21   pleural thickening of visceral pleural thickening over

22   pleural plaques?  That is a general question.  It doesn't ask

23   for what he's relying upon as the basis for his opinion.

24   It's now a pretty open-ended question.  And he says, No, the

25   pleural plaques far exceed the presence of what I've seen in

1    Libby including an enriched film set that I saw in February

2    and April of this year.  What does enriched mean?  So, in

3    response to the general question, he says, the pleural

4    plaques far exceed the presence in x-rays that I've seen in

5    Libby, and he goes on to say including this new film set that

6    he has.  Incidentally, he doesn't have the film set.  He

7    doesn't have the data from the film set.  He simply

8    participated as a reader, and he's not saying, I'm relying

9    upon that, he's simply answering a question that's more

10   general in scope and saying, I've seen this at Libby

11   including.  So, yes, it's something he's reviewed, like many,

12   many other things that are reviewed, and Mr. Cohn was careful

13   to say, Well, this is certainly something he was considering

14   at the time of his expert report.  There a gagillion things

15   people consider at the time of their expert reports.  The

16   whole difference between these people and Whitehouse and the

17   whole difference between the way that the standing orders in

18   this case work, is that reliance is what's key, and he's not

19   saying either in his expert report or even in his deposition

20   that he's relying on his acting as a referee.  He doesn't

21   have the data from when he acts as a referee.  He doesn't

22   have a group study from when he acts as a referee -

23            THE COURT: Okay, where do I find out what he is

24   relying on?

25            MR. BERNICK: It's in the expert report.

1          THE COURT: Okay, where?  Do you want this?  Mona,

2    can you give this to Mr. Bernick.  Thank you.

3          MR. BERNICK:   I thought that there was a list that

4    was attached to the end - Okay.  Welch's report - gives his

5    opinions.  Dr. Whitehouse's report, rebuttal.  Describes

6    what's in the medical literature.  ILO guidelines.  The ILO

7    classification.  The American Thoracic Society Publications.

8    That's a big one.  2000 version of the ILO classification.

9    It's basically review of the medical literature.  There's

10   nothing else other than the medical literature different at

11   Libby.  There's not a single mention of any of the ATSDR

12   data, not one.  These are all based upon the literature.

13          THE COURT: Okay, Mr. Cohn.

14          MR. COHN: Well, yes, Your Honor.  Unlike Dr.

15   Friedman who was so kind as to actually set forth expressly

16   what he was relying upon, this report you can't tell, and so

17   - and I think that that's really the conclusion.  I can hand

18   it back up to you if you'd like, but there is no place where

19   he just says, Here's what I relied upon, and so in order to

20   find out what he relied upon, of course, we had to inquire at

21   the deposition.

22          THE COURT: But the question that was asked of him

23   in the deposition doesn't substantiate that he relied on that

24   document for forming this opinion.  I think that is a

25   distinction.  He does mention that he had some access to it

1    and those x-rays were consistent with whatever his statement

2    was, which I apologize, I can't quote.

3         MR. COHN: It is true, Your Honor.  I was very

4    careful to state exactly what we know, which is that he

5    looked in the February and April time frame of this year when

6    concededly he was no longer doing work for the ATSDR study.

7    What he's looking at are enriched x-rays on the topic of

8    pleural plaques versus diffuse pleural thickening and that

9    topic is right here on page 7 of his report.

10        THE COURT: It is.  The topic is clearly there.  It

11   seems to me that the appropriate result for Dr. Parker is

12   that this is a subject for cross-examination.  I don't know

13   what he's going to say on cross.  If he says that he relied

14   on this and it wasn't produced, I'll have to not permit him

15   to testify, but I don't see anything in his report and I

16   don't see in the sections of the deposition transcript that

17   you showed me that he indicates a reliance on documents that

18   were not produced.  So, I'm going to permit him to testify

19   but you can clearly ask him specifically that question on

20   cross-examination and if he says that he relied on it, and

21   the information isn't produced, then at that point, I agree,

22   he won't be permitted to testify.  As to rebuttal witnesses,

23   I don't know whether they're going to be called anyway.  So,

24   it's -

25        MR. COHN: Okay.

1           THE COURT: Okay.

2           MR. COHN: Shall we move onto -

3           MR. BERNICK: Please do.  Your Honor, I really

4    apologize for leaving, particularly in the middle of an

5    argument, but Mr. Finch is going to be handling the rest of

6    the items.  May I be excused to catch my train?

7           THE COURT: That's fine, yes.

8           MR. BERNICK: Thank you very much, I appreciate . .

9    . (microphone not recording).

10          THE COURT: Alright, so as to item 14, the order

11   that I would like from - I don't know if the debtors are

12   preparing them and showing them to you, Mr. Cohn, is that the

13   motion to strike is denied, but it is a subject that may be

14   brought up at cross-examination, and I'll reconsider it at

15   that time.

16          MR. COHN: Thank you, Your Honor.  Alright, now, the

17   next doctor was Dr. Stockman addressed by Mr. Finch, and in

18   his defense of Dr. Stockman, he said her specific opinions

19   relied on medical literature.  And then she picks out - but

20   also that she picked out those three cases.  She is in the

21   exact analogous position to Dr. Whitehouse.  Dr. Whitehouse,

22   the reason why - let me step back for a second.  You'll

23   recall that we said in response to the complaint about Dr.

24   Whitehouse that he is fully able to express all of the

25   opinions that he could express based on the 1,800 patients,

1    based on the 950 patients whose records had been produced.

2    The response to that was, Well, but unless we see the whole

3    data set of the 1,800 it's not fair because how would anybody

4    cross-examine on the basis of whether the set was

5    representative or not.  We faced the exact same difficulty

6    here, Your Honor.  She chose three out of the approximately

7    30 patients whose records she had.  She chose three patients

8    to illustrate a point, a point that of course she's writing

9    as  a paid expert on behalf of W.R. Grace and we're

10   permitted, I think, to have some degree of skepticism as to

11   whether those three patients were representative of the

12   group.

13            THE COURT: Oh, you may, but that also is the

14   subject for cross-examination.  I think there are two things

15   going on with respect to Dr. Stockman.  One is that she is

16   giving a general opinion within a field of expertise, and the

17   second is, that she is criticizing Dr. Whitehouse's

18   methodology.  And for the methodology objection, she picks

19   out three patients that Dr. Whitehouse also examined and

20   says, This is what - in essence, This is what I'm talking

21   about.  Dr. Whitehouse found X, Y, Z.  I've reviewed the same

22   documents.  I don't see X, Y, Z.  That's different from

23   expressing a general opinion based on the medical literature

24   not related specifically to the second point which is what

25   Dr. Whitehouse found and that she disagree with as a matter

1    of reviewing the same patient histories that he reviewed.

2            MR. COHN: Well, no, no, wait a second.  What she

3    said was she reviewed a particular set of 27 or 30 patient

4    records.

5            THE COURT: Right.

6            MR. COHN: We don't have those records, Your Honor.

7    We can't have them.  We can't know which ones she reviewed

8    without having those records from her.  Correct, Your Honor,

9    we could cross-examine her on the topic.  We could only

10   cross-examine her or we could only have a fair opportunity to

11   cross-examine if we have those records, and those records

12   have never been produced.  So, we don't know who the 30 are.

13   We don't know what the records showed, and we don't know

14   whether the selection of a particular three out of the 30 to

15   be a topic of criticism of Dr. Whitehouse was fair or unfair

16   because we don't know whether the three are representative or

17   unrepresentative, and we aren't able to inquire other than by

18   having all of the records.  They obviously thought it was

19   important enough to supply us the three records of the

20   patients that she cited in her report.  They claim to have

21   done so.  Again, I'm not in a position, not having been

22   personally involved to tell you one way or the other whether

23   those records were produced, Your Honor, but they conceded

24   that it was important for us to have those records, otherwise

25   how could she produce a report like this that specifically

1    delves into those three patients.  But she says, and the

2    testimony that I quoted was that this was part of a group of,

3    again, 27 or 30 patients that she looked at, and we didn't

4    get the records for all of those patients, and I would

5    respectfully suggest that without those, sure we could cross-

6    examine, you know, you can always cross-examine without

7    documents, Your Honor, but it would be an unfair type of

8    cross-examination unless we have received those records.

9        THE COURT: So, her review of the 27 or 30, whatever

10   that number is, was related to her criticism of Dr.

11   Whitehouse's methodology, but you only got three, the three

12   that she chose to illustrate, you didn't get all 27 or

13   whatever the number was.

14       MR. COHN: Yes, that's right.  That's exactly right,

15   Your Honor.

16       THE COURT: So, it's not related to her opinion

17   based on medical literature.  It's based on her criticism of

18   Dr. Whitehouse because she didn't find the same - come up

19   with the same analysis or disease that he did.

20       MR. COHN: Yes, that would appear to be so.

21       THE COURT: Alright.

22       MR. COHN: Exactly, and so, if the result is, Your

23   Honor, let's just hypothesize, that in these three there are

24   grounds for some difference of medical opinion as to Dr.

25   Whitehouse, and that maybe Dr. Whitehouse over-diagnosed

1  asbestos disease in those three, but let's say in the other

2  27, it turns out, he was if any thing overly conservative.

3  Or maybe just on target.  No fault to be found.  That's

4  certainly a relevant topic for cross-examination but we can't

5  cross-examine them unless we have those records with which to

6  do it.

7          THE COURT: Alright.

8          MR. COHN: Now, as to - Oh, I'm sorry, we were going

9  to do it one doctor at a time.  That's fine.

10          MR. FINCH: Your Honor, I think the Libby claimants

11 and counsel for the Libby claimants misunderstand the

12 difference between something being offered because it's

13 representative of something else and something being offered

14 for illustrative purposes.  They are putting forward Dr.

15 Whitehouse to say - Can I go over to the easel?

16          THE COURT: Yes.

17          MR. FINCH: They're putting forward Dr. Whitehouse

18 to say, I've looked at this group of my patients, whether

19 it's the 123 patients in the progression study or the 79

20 people in the Card mortality study or the 1,800 patients -

21          THE COURT: You're not being picked up.

22          MR. FINCH: Oh, okay.  It wasn't that good a

23 drawing.  I don't have the talent with on the minute drawing

24 maybe that Mr. Bernick does, but the whole point is, they're

25 - Dr. Whitehouse is trying to say that whether you're talking

1    about the smaller bubble and the bigger bubble or the 1,800

2    being a proxy for anybody with Libby asbestos disease.  He's

3    saying, I've looked at these records, whether it's 950 or

4    1,800, and in my opinion they're sufficiently representative

5    of anybody who has Libby asbestos disease that I can give you

6    the opinion that there's a probability of dying or a 76

7    percent chance that the person will suffer a lung function

8    decline.  I don't think he can offer those opinions.  I think

9    their own epidemiologist as we've argued in our Daubert

10   paper, made it quite clear that what he was doing was

11   descriptive in nature and not analytical and he doesn't have

12   the ability or the foundation, nobody's done the work to make

13   those kind of broad statements.  What Dr. Stockman did was

14   she said, I've looked at the medical literature.  In the

15   course of my background and training and experience with

16   asbestos patients, generally, and 30 asbestos patients in

17   Libby give me the expertise to evaluate the medical

18   literature.  So her report, if you look at it, at the end it

19   has a list of references, and the references - maybe we

20   didn't articulate it well enough, but the references are the

21   materials in the medical literature that she relied upon in

22   forming her opinions, and the only other things that she

23   relied upon in forming her opinions are the three

24   illustrative cases that she is using to demonstrate, if you

25   look at these three cases, I'm disagreeing with Dr.

1    Whitehouse's views generally, but I'm disagreeing with his

2    diagnostic practices with respect to these three cases.  I'm

3    not disagreeing with his diagnostic practices with respect to

4    cases I haven't told you about or 1,800 cases or 950 cases,

5    but let me show you these three cases.  It would be as if in

6    my example of the accountant on the tax returns, if an

7    accountant came and said, Let me show you three returns and

8    there are math errors, there are fundamental flawed math

9    errors on these three returns.  What she is saying is, these

10   three people, you know, one of them had 88 pack years of

11   smoking history and Dr. Whitehouse attributed their lung

12   problems to an asbestos-related disease.  I mean she was 62

13   years old and she had 88 pack years of history.  That's like

14   two packs a day for 40-some odd years.   What do you expect

15   to have after that kind of smoking history.  She's saying

16   that these three people in my opinion as a medical doctor,

17   these three people don't have asbestos-related diseases, they

18   have diseased caused by smoking or other factors, and you can

19   give that testimony the weight you think it deserves.  She's

20   not saying, I'm saying that this is representative of

21   everything that Dr. Whitehouse has done, but in evaluating

22   what he's saying as a treating physician, you should take

23   into account that he's made some serious errors here, and

24   that is the sole purpose of the testimony as to individual

25   claimants, of individual medical people that - I don't know

1    if they're claimants or not claimants, but the three people

2    whose records that we indisputably gave to Libby claimants,

3    and that's what she's relying on in addition to her

4    references which are the bulk of what she's relying on.

5    That's very different from saying, I am trying to say that

6    this population of 950 is representative of anybody with

7    asbestos disease that gets it from being exposed to

8    vermiculite in Libber, Montana.  It's very different than

9    saying, I'm going to give epidemiological type conclusory

10   testimony by saying X is representative of Y.  What she is

11   saying is, this in my view, these are three examples that I

12   have chosen to illustrate to you where he has made serious

13   flaws, and they can cross-examine her all they want by

14   saying, Well, isn't it true that you had access to 30 and you

15   picked these three.  That doesn't change the fact that they

16   have the information to cross-examine her on the three, and

17   she's not saying anything and I'll stipulate that she's not

18   saying anything about the representativeness necessarily of

19   the three to the 120 or the 1,800.  All I'm saying is this is

20   a guy - we're putting her on to show the doctor - if we put

21   her on at all, to show that Dr. Whitehouse can get things

22   seriously wrong even as a treating or diagnosing doctor.

23        MR. COHN: What this - and I'll be very brief, Your

24   Honor.  What this amounts to is, saying that if an expert

25   looks at 30 patients and 27 of them don't bear out the thesis

1   that the expert wants to advance and the other three do, that

2   the expert is only relying on the three that do.

3           THE COURT: Were all 30 also patients of Dr.

4   Whitehouse?  Because that's what I'm missing.  I don't think

5   that there's a statement that she analyzed 30 patients that

6   Dr. Whitehouse also analyzed and only came up with three,

7   that she thinks are seriously flawed.  What she's saying, I

8   think is, my general experience is that I've looked at

9   records or I've looked at 30 patients from Libby, but three

10   of those patients I totally disagree with Dr. Whitehouse's

11   examination on, and here they are.  I think that's different

12   from forming a general opinion that says there is

13   epidemiological evidence that Libby claimants have a

14   different disease or don't have it because I've reviewed 30

15   patients' records and from that I conclude that everyone in

16   Libby could follow the same pattern.  I don't think the

17   issues are the same.

18           MR. COHN: Well, I agree that they're not the same,

19   but I would respectfully suggest that it's the same

20   principle, which is that if you look at 30 - and in her case

21   it's only 30, it's 30 Libby claimants.  I'm sorry - 30 Libby

22   residents.

23           THE COURT: But are they Whitehouse's though,

24   because the point of this portion of her report is to say

25   that as a treating physician, as a diagnostician, I disagree

1    with what Whitehouse found.  I've looked at these same three

2    records that he looked at and he came up with X and I came up

3    with Y.  That's what she's saying.  She's not saying - I

4    don't think she's saying that I looked at 30 Dr. Whitehouse

5    records and I'm only going to talk about three.  I thought

6    she said, I examined 30 patients from Libby, but I didn't

7    understand that they're all Dr. Whitehouse patients.

8            MR. FINCH: She doesn't have any statement that

9    they're all Dr. Whitehouse.  She says that there are 25 to 30

10   patients of the Card Clinic and not all the Card Clinic are

11   Dr. Whitehouse's and she says that she's evaluated and

12   followed 15 to 20 patients from Libby who were either self-

13   referred or referred by their primary physician, and she's

14   not saying anything about the three being representative of

15   Dr. Whitehouse.  She's just saying look at these three.  He's

16   made some serious errors.  These are people who smoked,

17   another one of them smoked, you know, three packs a day from

18   the time he was 22 to 66 and Dr. Whitehouse says it's an

19   asbestos-related lung function decline, and Dr. Stockman

20   says, I don't think so.   That's the only purpose of that

21   portion of her testimony, Your Honor.

22           MR. COHN: Your Honor, the chance of looking at

23   getting a set of records from the Card Clinic and having it -

24   having none of the others besides the three being Dr.

25   Whitehouse patients are pretty small because Dr. Whitehouse

1   is a big part of the Card practice, and if the response had

2   come back to us from the plan proponents when we requested

3   these records, if the response had come back to say, Well,

4   you know, the ones that are patients who are of other doctors

5   aren't relevant, but here are the 8 or 10 or 15 or whatever

6   they are of the patients that she examined who were Dr.

7   Whitehouse patients, okay, then maybe there wouldn't have

8   been a basis for this motion, but we didn't get any of those

9   records, and we didn't get a response.  There's been no

10   attempt to provide us with those patient records who are

11   patients of Dr. Whitehouse.

12          THE COURT: Okay, well, it seems to me that this

13   issue is limited only to the portion of what may be rebuttal

14   testimony regarding Dr. Whitehouse's diagnostic practices.

15   To the extent that she reviewed other records - pardon me,

16   she reviewed records of other patients of Dr. Whitehouse, she

17   doesn't appear to in any way be relying on those records to

18   attack Dr. Whitehouse's methodologies.  She's only relying on

19   these three, and so, I think that the discovery that has been

20   produced is appropriate.  Nonetheless, I'm going to have the

21   plan proponents go back to Dr. Stockman and find out whether

22   she knows if any of the others were patients of Dr.

23   Whitehouse, and if they were, I'll order disclosure of those

24   patient records for whatever use you can make of cross-

25   examination of her in the event that she's called to testify.

1    It seems to me that because she's only complaining about his

2    findings that that is what is relevant for cross-examination,

3    that she had a subset and she only picked these three

4    perhaps.  I don't know if it's relevant, but I can see how

5    that could lead to relevant or discoverable evidence.  So,

6    how much time do you need to do that?

7          MR. FINCH: Well, it depends on whether - she may

8    not even know if they're Dr. Whitehouse's patients.

9          THE COURT: She may not.

10         MR. FINCH: And we can certainly put a call into

11   here, you know, late today or tomorrow and find our whether

12   a) she has these records, and b) whether she knows if they're

13   Dr. Whitehouse's patients, and we'll - if we have them, we'll

14   make them available assuming there aren't the same sort of

15   HIPA issues that are with respect to the non-Libby claimants

16   for the Dr. Whitehouse materials.  We didn't produce this

17   stuff because she didn't rely on it.  That's our -

18         THE COURT: I understand, but it seems to me that it

19   may be relevant for cross-examination, if she's called on,

20   this limited point concerning what Dr. Whitehouse found as

21   opposed to what she may have found.  It may be.  So, to the

22   extent that there are other records of Dr. Whitehouse that

23   she reviewed and has, they're to be produced.  If she

24   reviewed them and doesn't have them, you're going to make

25   that fact known and make appropriate efforts to get them, to

1   produce them.   Now, time's getting short, so you need to do

2   this quickly.  How soon?

3           MR. FINCH: Seven days.  We'll try to do within

4   seven days.

5           THE COURT: Alright.  So all I'm granting is this

6   issue concerning any other records of Dr. Whitehouse to the

7   extent Dr. Stockman is aware that they were Dr. Whitehouse

8   patients, reviewed them and has the documents and hasn't

9   produced them or else requiring some effort to get them to

10  the extent that she knows that they were Dr. Whitehouse

11  patients and they haven't been produced, and I understand

12  this isn't a reliance issue, it's a cross-examination issue,

13  and that's what I'm ordering it for.  So, if they're not

14  produced, then I'll find out about inferences if I'm asked to

15  draw them at the time of trial.

16          MR. FINCH: Okay, and just to be clear, Your Honor,

17  you're not - this only relates to her criticism of his

18  diagnostic practices with respect to either his three

19  patients or his three plus X patients and not to the rest of

20  her report which was based on the medical literature.

21          THE COURT: That's right.  So, that - let me make

22  one note, please.  So they're to be produced in a week -

23          MR. FINCH: Can we make a week from tomorrow since

24  I'm going to be not back to my office until tomorrow?

25          THE COURT: Yes.  Yeah, I don't know whether you'll

1  be able to get her today anyway.  It's getting a little late.

2  So a week from tomorrow is fine.  Okay, Mr. Cohn.

3          MR. COHN: Aright, thank you, Your Honor, and I'll

4  prepare an order to that effect and circulate it to Mr.

5  Finch.

6          THE COURT: Alright.

7          MR. COHN: And finally that brings us to Dr. Gary

8  Friedman, and he, remember, was the one who actually did very

9  helpfully list at the end of this report that which he relied

10  upon, and that which he relied upon included, quote, "Review

11  of certain patient records from Dr. Whitehouse, Dr. Black,

12  and the Card Clinic practice, including but not necessarily

13  limited to the 123 patients in the progression study."  And

14  who then said that he looked at PFT results that were

15  performed on the 123 after the study cutoff date.  Had a

16  database of those results, and failed to produce either the

17  records or the database.

18          THE COURT: Go ahead.

19          MR. COHN: Well, Your Honor, I think those facts

20  speak for themselves.  In this case, this was directly the

21  subject of his reliance.  He was relying on - the very topic

22  of his opinion is the 123 patients in the progression study.

23  He actually acquired additional data over and above what Dr.

24  Whitehouse had used in connection with the study, and yet the

25  results of those additional tests have not been supplied to

1   us.  He should not be allowed to opine on Dr. Whitehouse's

2   progression study.  Thank you.

3        MR. FINCH: Your Honor, I think there is some

4   confusion about the records, the PFT results that Mr. Cohen

5   is talking about here, and luckily for me, I guess, the

6   little circle up there has a number 123 in it.  That's the

7   progression study.  That was a study that Dr. Whitehouse

8   initiated sometime in 2000 or 2001 where he collected

9   pulmonary function tests results and using some kind of basis

10  to exclude some of his patients and keep some others, he

11  whittled down his patient population to 123 people, but he

12  had pulmonary function test scores for those people.  Those

13  records were produced to Grace, as I understand it, both in

14  the criminal case and in the estimation case as part of the

15  backup for Dr. Whitehouse's expert testimony and/or as part

16  of the government's obligations to turn over material to a

17  criminal defendant in the criminal case.  Dr. Friedman didn't

18  get anything that the Libby claimants didn't already have.

19  Now, they may have gotten it two years ago in the context of

20  when it - As I understand what happened is, Grace got these

21  records by putting a subpoena on the Card Clinic and then

22  produced them to Libby in the course of the estimation case.

23  Leaving aside the fact that the vast majority of these

24  records were already in Dr Whitehouse's database.  Remember

25  the databases that no longer exist.  The ones that - thanks,

1  he's not in the courtroom, but the ones he was going crazy

2  about, I want these databases, I want these databases.  Those

3  databases were the collection of all the pulmonary function

4  test scores for these 123 people going over a series of time

5  plus the addresses of the people in his patient population.

6  There aren't any pulmonary function test scores that Dr.

7  Whitehouse doesn't have access to and the Libby claimants

8  don't have access to both because they were in sort of the

9  reliance material for his article and the basis of his

10  testimony in the criminal case and because they got them from

11  the government and they got them from Grace.  If it the fact

12  that there is some pulmonary function test score that Dr.

13  Friedman has that the Libby claimants don't have, I guess

14  that he shouldn't be allowed to talk about the result his

15  comparison of 123 pulmonary function test scores results, but

16  I don't think that's the case.  I think that everything that

17  either Grace got in the criminal case or Dr. Whitehouse

18  initially had was produced to the Libby claimants as part of

19  either the estimation discovery or as part of the discovery

20  in this case.  It wasn't like Dr. Friedman invented these

21  records or had access to records that Libby didn't have.  So,

22  I think that, you know, the proper place to get to the bottom

23  of this would be to list the - for the Libby claimants to

24  list for each of the 123 people all the pulmonary function

25  test scores that those people have had and I can show it to

1   Dr. Friedman and say, Do you have any that aren't on this

2   list?  And I submit to you the answer will be no, because he

3   didn't get them anywhere other than Libby originally or from

4   Grace's discovery in the criminal case which he turned around

5   and gave to Libby in the estimation case.  I recognize this

6   is confusing.  It's confusing even to me, but I don't -

7          THE COURT: If I understand what you're saying, one

8   way or another, both the debtor and Libby had access to these

9   records either the source of the records was Dr. Whitehouse

10  himself or the source was that Grace got them as a result of

11  the criminal case and produced them to Libby in that case.

12         MR. FINCH: Not in that case, in - all through Dr.

13  Whitehouse and they produced them to Libby in the estimation

14  case because they got them through a subpoena in the criminal

15  case.  If there's some pulmonary function test scores that

16  the Libby claimants' lawyers don't have that Dr. Friedman

17  does, first of all, I'd be very, very surprised how that

18  could possibly happen, but if that turns out to be the case,

19  then, you know, either he - if he has in his possession some

20  pulmonary function test results that they don't have, I can't

21  imagine how that would be the case, then I guess he shouldn't

22  be allowed to testify about pulmonary function tests.  His

23  report covers a lot of things beyond that, but I guess the

24  way I would start is to say, Give me a list for each of the

25  123 people, every date they have a pulmonary function test

1    score result that you, Libby claimants, have access to, and

2    if - and give us that list because to this date I still don't

3    think I've gotten a complete list of every single pulmonary

4    function test score for these 123 people from them, at least,

5    in a way that I can match it up, and then I can give it to

6    Dr. Friedman and say, you know, Dr. Friedman, is there any of

7    these test scores that you have - Do you have any test scores

8    other than the ones that are on this list?

9        THE COURT: Well, why doesn't he just produce the

10   list of the PFT scores that he has?

11       MR. FINCH: Produce the - but he didn't do it

12   because I thought they had it.  I mean, I guess I can go back

13   to him and say, Can you produce the - all the patient records

14   that you got originally from Libby.  I mean, the reason we

15   didn't produce stuff to Libby is because -

16       THE COURT: They had it.

17       MR. FINCH: They had it.  I mean I did not believe

18   that they didn't have it.  So if what you're ordering me is

19   go back to Dr. Friedman and say, Take a look at these

20   pulmonary function test scores and give them all to Libby,

21   I'll go do that, but the reason I didn't produce them is

22   because I thought they had them, because they have all of

23   this data from one source or another.  So, if what Your Honor

24   is saying, on pain of not letting Dr. Friedman testify to

25   that part of his report, I've got to go back and say, Gary -

1   Excuse me, Dr. Friedman, give me this material, I think we

2   can get that to them in seven days or less.

3          THE COURT: Okay. I am not clear that you're talking

4   about the same data set.  I think that's where I'm losing

5   this.  To the extent that Libby produced the records to the

6   debtor that Dr. Friedman is using, and that's all he's using,

7   you don't have to reproduce them, but I think what Mr. Cohn

8   is saying is that there's something that's beyond this 123

9   that came in after that study was closed; aren't you, Mr.

10  Cohen?

11         MR. COHN: Yeah, it's the same - What the testimony

12  is, is it is the same 123 patients, but the data I think he

13  assembled were from after the close of the study.  So,

14  clearly we produced - we have it in our possession, all the

15  data from the study.  It's the post-study data that's at

16  issue here, and we don't even know what he's talking about.

17  He says he has the data and he says he has a database.  And

18  neither the data nor the database, which is really what might

19  put the matter to rest, have been produced to us.

20         MR. FINCH: Your Honor, that's - Now I understand

21  exactly what he's talking about, and they do have it.  The

22  123 patient study had a cutoff date for purposes of - they

23  decided to cut off at X-date.  I can't remember if it was in

24  2002 or 2003.  Dr. Whitehouse had pulmonary function tests

25  score results after the cutoff date of the study.  The 123

1    people's pulmonary function test score results, you know,

2    they might have started in 1990 and Whitehouse had them all

3    the way up until Grace laid a subpoena on him in the criminal

4    case, and he gave them to Grace and then Grace turned around

5    and spun it back to the Libby claimants' lawyers in the

6    estimation discovery.  So they had - they got everything that

7    Gary Friedman got came out of Whitehouse's files, and to the

8    extent there's a database, all Friedman did was type up the

9    123 people's pulmonary function test score results into his

10   own database, which is the underlying date they already have.

11   So if what they're really talking about is the same 123

12   people, now I understand he's talking about the same 123

13   people, they've got ever pulmonary function test score result

14   for all 123 people regardless of when it was taken because it

15   came to Dr. Friedman based on Grace's subpoena and discovery

16   in the criminal case.  I don't think there's anything else.

17   I will go back to Dr. Friedman.  I will say, Dr. Friedman,

18   these 123 people, their pulmonary function tests from the

19   beginning the world till the end of time, put the on a disk

20   if you get it and give it to the Libby claimants.  I don't

21   think there's going to be a single pulmonary function test

22   score they don't already have, but if that is the discovery

23   that they say that they need, that post-whatever the closing

24   date of the study, those pulmonary function test scores.  I

25   think they've got them, but I'll go back and I'll Friedman

1    and assuming I can get ahold of him and he can get them to

2    me, I'll get them to him in seven days.

3            THE COURT: Okay.

4            MR. COHN: If it turns out that we already have

5    them, I'm not sure that we need them so much at that database

6    which shows which readings he's talking about, because that's

7    what's important to understand what he actually did as an

8    expert.  So, yes, we need his database and we need any of the

9    readings that we don't already have.

10           THE COURT: Okay, well, to the extent you don't

11   already have them, then I agree, as I said before what's good

12   for the goose is good for the gander and on this issue, he

13   won't be permitted to testify if the documents haven't been

14   produced, but to the extent that they came from Dr.

15   Whitehouse to the debtor and then went back in the estimation

16   hearing, it sounds as though you should already have it.

17           MR. COHN: Well, we might.  But again, that's where

18   his database comes in because what his database should show

19   is what were the dates and the results of the test and then

20   we can cross-check that against our records to see, Oh, okay,

21   yeah, we do have one or we don't.

22           THE COURT: Okay, so why isn't the database being

23   produced?

24           MR. FINCH: The database, as I understand it, is

25   just him typing up the records that he got from Libby, and

1    he's not trying to make a - he's going to use examples from

2    that which is we gave them before the deposition, some

3    examples that he would use at trial, but not - the database

4    is just nothing more than typing the pulmonary function test

5    scores into an Excel spreadsheet as I understand it.

6            THE COURT: Okay.  Then why can't that be produced

7    then?

8            MR. FINCH: I'll ask him to produce it.

9            THE COURT: Fine.

10           MR. FINCH: He can either produce it or he can't. I

11   mean, there's only -

12           THE COURT: Yes, Ms. Harding.

13           MS. HARDING: Your Honor, I do want to - We've got

14   to do between now and trial, and I don't think that we should

15   have to go back to Dr. - These records, Dr. Whitehouse is a

16   123-patient group.  He relying on that study in this case.

17   He's the person relying upon it.  It was his duty to turn

18   over all of the records related to that study, and the ones

19   he didn't use, the ones he decided to exclude as well.  The

20   only reason that they weren't - we didn't ask them to

21   reproduce them here because we already had them, and so, the

22   idea that they somehow don't have them is ridiculous.

23   There's absolutely no way that we have a single PFT test that

24   was not produced by the Card Clinic, Dr. Whitehouse.  Nobody

25   in our side did PFT tests.  They didn't - with the exception

1    of, you know, ATSDR things which may be separate, but Dr.

2    Whitehouse's patients with the PFT tests, they produced them

3    to us, so -

4         THE COURT: Okay, that's fine, but nonetheless,

5    you've got an expert who says he's relying on them, and it's

6    apparently for tests that were after the study was closed,

7    even though it may have come from Dr. Whitehouse, he's

8    entitled to know what the challenge to his expertise is.  So,

9    to the extent that there's an issue then - of non-production

10   then produce it, and with respect to the database, if it's

11   available produce that too.  If all it is a typed up list,

12   then, you know, it will be worth what it is.  I'm not sure

13   that actually constitutes a database in the fashion I

14   understood people meant it, but if it's a typed list and he

15   typed it he can produce that too.

16        MR. COHN: And the list will be helpful to us to

17   identify the very PFT test that we're trying to identify. So,

18   thank you very much, Your Honor.

19        THE COURT: Alright, so, within a week?

20        MR. FINCH: Yes, Your Honor.

21        THE COURT: And Mr. Cohn, are you going to prepare

22   that order?

23        MR. COHN: Yes, Your Honor, and also showing it to

24   Mr. Finch.

25        THE COURT: Alright, and that's 15, I think.  I

1  think something on the agenda got mixed up, 13 and 15.  I

2  believe that's 15.  Ms. Baer?

3         MS. BAER: Your Honor, just a couple of things on

4  due dates.  Tomorrow the debtors are responsible for

5  delivering to you the binders of all of the pleadings for

6  confirmation as well as you had requested we put all the

7  exhibits on CDs.

8         THE COURT: Yes.

9         MS. BAER: With respect to the binders, Your Honor,

10 could we have one more day because we need to get them to

11 Pittsburgh and we're all here.

12        THE COURT: Oh, yes, that's fine.

13        MS. BAER: Will assemble them tomorrow and get them

14 out to you.

15        THE COURT: Yes.

16        MS. BAER: And then with respect to the CDs, Your

17 Honor, we're very close but there were a couple of parties

18 who did not pre-label their exhibits for trial exhibits, so

19 we've gone back to them and said please fix these, so we will

20 get those exhibits to you within a couple of days, but again,

21 it probably won't be tomorrow because we're fixing them.

22        THE COURT: That's fine.

23        MS. BAER: Okay, thank you, Your Honor.

24        MR. FINCH: Your Honor, I have one last mechanical

25 question and maybe Mr. Hurford took this up with Ramona, but

1   it's really Your Honor's preference.  As in the estimation

2   case and every other case I've tried in the past 15 years, in

3   addition to all the exhibits that come in electronically -

4   well these didn't come in electronically, they came in a big

5   truck, but there's exhibits that you've put into evidence

6   because you want them in evidence, and then there's exhibits

7   that you'll actually use with the witnesses, and that's a

8   much smaller set.  And my practice has always been and I

9   think the debtors' practice has been that when the witness

10  takes the stand, you hand a copy of the exhibits you might

11  offer into evidence through that witness to the witness to

12  the Court to opposing counsel.  My only question is, we would

13  tend to do that here because I think it helps Your Honor

14  follow the testimony.  Would you have any objection to us

15  doing the exhibits but having them on double-sided paper to

16  save -

17          THE COURT: No.

18          MR. FINCH: You don't have a problem with that?

19          THE COURT: I don't have a problem.

20          MR. FINCH: Okay, alright.  That's very - saves the

21  trees, I guess.

22          THE COURT: All I'm expecting in paper copy are the

23  documents that you're actually going to be showing to a

24  witness or me if it's some offer that you're making and I

25  need to look at a specific document.  Otherwise, I'm

1    expecting that you're going to mark on this - you're going to

2    put on the CD all of the exhibits that are relevant, but

3    you're going to limit in paper copy those that you're

4    actually trying to offer into evidence, because, you're

5    right, people sometimes mark a whole lot of things, and don't

6    offer them, and I don't really need all of that.

7          MR. FINCH: People mark thousands of things and put

8    20 into evidence.

9          THE COURT: Well, plus, with respect to the

10   insurance policies, I really don't need hard copies of all of

11   the policies either.  To the extent that you're going to

12   refer - if you're going to refer to a specific provision of a

13   policy, then I'd like the first page so I know what policy it

14   refers to and the pages that you're referring to in the

15   policy, and that's it.  I don't need the whole policy, you

16   know, that may be a hundred pages when you're referring to

17   two paragraphs.  I don't know what else I can do to limit

18   documents.  I'm not really sure what else will be coming in

19   in big volume, but anything else?  No.  Anybody else, any

20         (The remainder of this page is intentionally left

21   blank.)

22

23

24

25

1    other issues?  Well, have a nice evening, folks.  We're

2    adjourned.

3              ALL: Thank you, Your Honor.

4              (Whereupon at 5:29 p.m., the hearing in this matter

5    was concluded for this date.)

6

7

8

9

10

11

12

13

14

15

16

17

18              I, Elaine M. Ryan, approved transcriber for the

19    United States Courts, certify that the foregoing is a correct

20    transcript from the electronic sound recording of the

21    proceedings in the above-entitled matter.

22

23    /s/ Elaine M. Ryan_____August 28, 2009
      Elaine M. Ryan
      2801 Faulkland Road
      Wilmington, DE 19808
      (302) 683-0221