# EXHIBIT 2

8/8/09
#22733

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | **Hearing Date: September 8, 2009 at 9:00 a.m.** |

## PLAN PROPONENTS' MAIN BRIEF IN SUPPORT OF PLAN CONFIRMATION

---

[1]    The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.),
W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon,
Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc.,
Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC
(f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a
Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC
Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities
Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary
Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe,
Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc.
(f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace
Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W.
R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe
Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai
Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH,
Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings
Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA
Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental
Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin &
Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country
Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

Debtors benefit from numerous settlements under the Joint Plan, including the $1.1 billion

contribution from Sealed Air and Fresenius and global settlements of significant asbestos

liabilities with the Asbestos PI Claimants, the Asbestos PD Claimants, and the ZAI Claimants,

respectively.

### C.   THE LIQUIDATION ANALYSIS DEMONSTRATES THAT THE DEBTORS HAVE SATISFIED THE BEST INTERESTS TEST

The Debtors provided a detailed liquidation analysis as Exhibit 8 in the Exhibit Book for

the Joint Plan and Disclosure Statement that demonstrates that the Joint Plan satisfies the "best

interests" test.[83]  The liquidation analysis provided a comparison of the recoveries under a

hypothetical chapter 7 liquidation and under the Joint Plan, adjusting for the various costs and

requirements in each scenario.

### 1.   The Value of the Debtors' Assets Is Significantly Higher in Chapter 11 Than in Chapter 7.

In a chapter 11, the value of Grace is significantly higher than its value under a

hypothetical chapter 7 liquidation.  As shown in Exhibit 8, the value of Grace is reduced from

$2.1 billion to $2.5 billion in chapter 11 to $1.05 billion to $1.25 billion in chapter 7.  The value

of Grace in chapter 7 is reduced by a discount factor of 50% for two main reasons.  First, a

forced chapter 7 liquidation would significantly erode the value of Grace because it would need

to be sold under time pressures to satisfy the expedited sales process in a chapter 7 liquidation.

Second, the discount factor also quantifies the probability that the Debtors' businesses cannot be

sold for fair value or at all out of the fear and risk of asbestos liability that would follow the sold

---

[83]   *See* Liquidation Analysis at Exhibit 8 in the Exhibit Book to the Disclosure Statement to the Joint Plan.

assets because of the lack of section 524(g) protection.[84]  The Joint Plan, by contrast, allows the

Debtors to continue as a going concern with the protection of section 524(g).  In short, Grace's

value in a chapter 11 is more than a billion dollars higher than in a chapter 7.

2.    **The Debtors Have a Higher Asset Value in Chapter 11 Than in Chapter 7 Because of Sealed Air and Fresenius Contributing Over $1 Billion in Value.**

In addition to the increased value of Grace itself in chapter 11, under the Joint Plan and as

described in more detail herein, Sealed Air and Fresenius are providing a combined payment of

approximately $1.1 billion to "sponsor" the Joint Plan that would likely not be available in a

chapter 7 liquidation.  The $1.1 billion payment was reached for one primary reason that is

available only in chapter 11 and not chapter 7 -- the protection from future successor liability

offered by section 524(g) of the Bankruptcy Code.

Before the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement

(together, the "Settlement Agreements,") both Cryovac, as predecessor to Sealed Air, and

Fresenius, faced enormous potential future liabilities estimated to be as high as $4.2 billion for

successor liability claims relating to exposure to asbestos.[85]  Because of the section 524(g)

injunctions, both Sealed Air and Fresenius were able to cap all potential future liability for

asbestos claims, and, thus were willing to contribute the $1.1 billion under the Sealed Air

Settlement Agreement and Fresenius Settlement Agreement to fund the Asbestos PI Trust and

the Asbestos PD Trust.

---

[84]   See In re Chrysler LLC, Case No. 09-2311 (2d Cir. Aug. 5, 2009) (declining to determine a bankruptcy court's authority to extinguish future asbestos claims without section 524(g) protection in a section 363 sale scenario).

[85]   Report of Dr. Mark A. Peterson, Summary of Forecasts of Grace Liability and Defense Costs for Asbestos Bodily Injury Claims, dated September 14, 2002, at 3; see also Sealed Air Proof of Claim No. 14361 (which showed a claimed amount in excess of $4.8 billion).

Sealed Air and Fresenius, however, would likely not have contributed the same amount of money to the Debtors' estates in a chapter 7 liquidation as they are contributing under the Joint Plan, since section 524(g) would not have protected them from successor liability claims in a liquidation. While the Debtors' liquidation analysis notes that under a chapter 7 liquidation the potential recovery from Sealed Air and Fresenius could reach approximately $978 million, in fact, the likelihood is that the amount that they would have contributed is closer to zero. Because of the lack of section 524(g) protection to avoid successor liability claims, the only value for creditors that would be available in a chapter 7 liquidation are the proceeds that Sealed Air and Fresenius would be willing to pay to avoid a fraudulent conveyance action.

It is unlikely, however, that they would be willing to pay much to settle a fraudulent conveyance action. At the time of the transaction, Houlihan Lokey Howard & Zukin determined that the Debtors were solvent even taking into account all asbestos liability through 2039.[86] In the view of Sealed Air and Fresenius, Judge Wolin in his solvency opinion limited the claims to be taken into account for purposes of solvency to those claims that were filed or could have been filed, *i.e.*, the diseases that were diagnosable, as of the date of the transaction in 1997.[87] As Dr.

---

[86]  Houlihan Lokey Howard & Zukin Solvency Opinion, dated August 14, 1997, at Bates No. H00203-06.

[87]  *See* Opinion of Judge Wolin, *In re W.R. Grace & Co., et al.*, Case No. 01-1139, Adv. Pro. 02-2210 (Bankr. D. Del. July 29, 2002) at 20-21:

> It is reasonable to conclude that of the tens of thousands of persons making claims for asbestos personal injury against W.R. Grace after the 1998 transfer date, substantial numbers of them had viable claims against the company prior to that time. Asbestos had not been manufactured or employed in industry for many years prior to 1998 and any person with a post-1998 claim must have been exposed long before the transfer date. That such exposure would lead to long-term, serious, health effects with long latency periods has been common knowledge for twenty to perhaps thirty years. It may be, under some states; law, that this exposure is enough. *See, e.g., Avers*, 106 N.J. 557. However, it must also follow that many, and no doubt a substantial majority, of these persons had some physical manifestation of their exposure, whether they knew it at that time

(Continued...)

Peterson, the expert for the Asbestos PI and PD Claimants who were the plaintiffs in the fraudulent conveyance action, admitted, claims are asserted within one year for malignant claims and within five years for non-malignant claims, significantly earlier and fewer than claims filed through 2039.[88] Thus, as they understood Judge Wolin's opinion, it is reasonable to believe that the Debtors would have been found to be solvent at the time of the transaction and, thus, in the opinion of Sealed Air and Fresenius, the fraudulent conveyance action alone was of little value for Sealed Air and Fresenius to settle.

Moreover, it is unlikely that Sealed Air or Fresenius would be willing to pay much to resolve a fraudulent transfer claim without also receiving successor liability protection from future claims, which would be impossible in the context of a chapter 7 liquidation. This is so because even if Sealed Air had paid to resolve a fraudulent transfer claim brought by the chapter 7 trustee, as soon as the liquidation was over and the stay lifted, all future asbestos claimants would immediately have the right to sue Sealed Air under successor liability theories, and thus any payment to resolve the fraudulent transfer case would do nothing to resolve the liability for future claims, which is the bulk of the liability in any event. As such, it is unlikely that Sealed Air would pay any significant money to resolve the fraudulent transfer claim when it would still be subject to suit from future claimants.

---

or not. Exposure and physical manifestation doubtless gave the affected person a claim under the laws of most states. *See Schweitzer*, 758 F.3d at 942 (quoting W. Prosser & P. Keeton, *Prosser & Keeton on Torts* 165 (5th ed. 1984)). Therefore, and for the reasons stated thus far, these persons had a "right to payment" and thus a claim for purposes of the solvency analysis of the UFTA on the transfer date.

[Dkt. No. 121].

[88]   Expert Report of Dr. Mark A. Peterson in Connection with the Asbestos Personal Injury Estimation Hr'g, dated June 20, 2007 [Dkt. No. 16113, Ex. A].

Therefore, any recovery in a liquidation from the fraudulent conveyance action, if any, is far more likely to be on the lower end of the estimated recovery range, producing far less value for the Debtors' estates than the combined Sealed Air and Fresenius settlement payments under the Joint Plan. Thus, in addition to the increased value of the Debtors' assets of over $1 billion in chapter 11 compared to chapter 7, chapter 11 also provides the estates with an additional $1.1 billion in capital from Sealed Air and Fresenius that likely would not have been available in chapter 7.

### 3.    Assets Available for Unsecured Creditors.

In addition, the liquidation value available for the unsecured creditors would be reduced by, among other things:

- the claims of secured creditors to the extent of the value of their collateral;

- the costs of the liquidation, as well as other administrative expenses of the Debtors' chapter 7 cases;

- costs of the reorganization as well as other unpaid administrative expenses of the chapter 11 cases; and

- priority claims and priority tax claims.

According to the liquidation analysis, the costs associated with a chapter 7 liquidation would reduce the assets available in a liquidation by $126-144 million. In chapter 11, the costs associated with the Joint Plan would reduce the Debtors' assets by $176 million. Accounting for the costs of a liquidation and a reorganization, and the value of the Insurance Recovery proceeds and Cash, which is the same in both chapter 7 and chapter 11, the Plan yields greater value to unsecured creditors with an estimated high-end value of $4.680 billion to a low-end value of $4.280 billion. This is compared to an estimated high-end value of $3.371 billion (which

43

includes an unlikely $1 billion payment by Sealed Air and Fresenius in a chapter 7 liquidation) to a low-end value of $2.211 billion for unsecured claims in a liquidation.

In short, the Joint Plan likely provides for more than $2 billion in assets for unsecured creditors, after all costs and recoveries are calculated, than would be available in a chapter 7 liquidation.

### 4.   The Liabilities of the Debtors in Chapter 7 Are Uncertain and There Is a Wide Range of Potential Liabilities in a Chapter 7.

One of the primary benefits of the Joint Plan is the certainty that it provides the Debtors with respect to their liabilities.  Under the Joint Plan, the Debtors are able to provide approximately $1.4 billion to satisfy general unsecured claims, which include postpetition interest as set forth in their treatment under the Joint Plan.  Likewise, under the Joint Plan, the Debtors provide approximately $2.773 billion to $2.424 billion to settle Asbestos PI and PD Claims.  Under the low-end scenario under the Joint Plan, Asbestos PI payments consist of $2.214 billion and Asbestos PD payments consist of $209.1 million.[89]  Under the high-end scenario under the Joint Plan, Asbestos PI payments consist of $2.562 billion and Asbestos PD Claims consist of $212.3 million.

Under the most likely high chapter 7 scenario, the Debtors can most likely, at best, provide only $2.4 billion to General Unsecured Creditors, Asbestos PI and PD Claims (*i.e.*, the high value of the Debtors under chapter 7, which is $1.250 billion, plus Cash and Insurance Recovery Proceeds, for a total asset value of $2.537 billion, minus liquidation costs of $126 million.

---

[89]   Includes non-ZAI PD Settlement of $112 million and US ZAI Settlement of $54.5 million.

A chapter 7 trustee would be forced to resolve all those unsecured claims with only the limited assets of $2.4 billion while winding down the estate. There is no reason to doubt that Asbestos PI and PD claims would have been hotly contested and vigorously disputed with wide-ranging potential values for the claims, as they were in chapter 11. Under these circumstances, it is unlikely that in the process of liquidating the estate that the chapter 7 trustee would be willing to litigate the claims. Instead, the chapter 7 trustee would almost certainly settle the claims.

While the outcome cannot be known, it is equally almost certainly true that the chapter 7 trustee would neither have the incentive nor the leverage to settle at low values. As such, the unsecured claims would face the prospect of not receiving anywhere near the value of claims given the limited amount of assets and the potential billions of dollars of claims.

While the Debtors' estimates for Asbestos PI liability ranged from $200 million and $989 million, with a median value of $468 million, according to the Asbestos PI Claimants, estimates of the Debtors' total PI liability ranged from "between $4.7 and $6.2 billion and most likely between $5.4 and $6.2 billion"[90] (and the claims through 2009 alone, without taking account of the acceleration of claims in a chapter 7 liquidation, total over $2.828 billion).[91]

Likewise, while the Joint Plan provides for at least $149.3 million for non-ZAI PD Claims, the potential liability for non-ZAI claims was highly uncertain and potentially significantly higher. While the Joint Plan provides for between $54.5 million and $58 million to ZAI Claimants (and potential additional contingent payments), outside of the Joint Plan, the potential liability of ZAI Claims was also highly uncertain and potentially significantly higher.

---

[90]  *See* Expert Report of Dr. Mark Peterson in Connection with the Asbestos Personal Injury Estimation Hr'g, dated June 20, 2007 [Dkt. No. 16113, Ex. A]

[91]  *See* Email from Nathan Finch to Dan Cohn (June 7, 2009 at 8:50 PM).

At one point, ZAI Claimants argued that ZAI could potentially be in 11 million homes[92] with a value of $5,000 to $7,500 per home.[93] Even using the ZAI Claimants' later estimate of ZAI damage of one million homes at $3,000 to $5,000 per home, the total liability would be from $3 billion to $5 billion.[94] Liability for Non-ZAI PD Claims combined with ZAI PD Claims reaches between $4 billion and $6 billion.

In sum, the potential liability of the Asbestos PI and PD Claims in a chapter 7 liquidation exceeded $10 billion and the General Unsecured Creditors would have a claim for $999 million and any postpetition interest to the extent any value remained. Given the nature of a chapter 7 liquidation and the disputed and uncertain nature of Asbestos PI and PD liability, as well as the limited pool of $2.4 billion of assets, all the creditors would likely receive far less than 100 cents on the dollar for any settlements they made. On the other hand, under the Joint Plan, the Debtors' liability for asbestos claims were settled to a finite number with their respective representatives.[95]

Accordingly, the Debtors have proven by a preponderance of the evidence that impaired creditors would recover an amount under the Joint Plan equal to or greater than the amount that they would recover in a liquidation. Thus, the Debtors have satisfied the best interests test under section 1129(a)(7) of the Bankruptcy Code.

---

[92] Zonolite Attic Insulation Class Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment, Appendix E (Legend to Production Information from Bureau of Mines Minerals Yearbooks), dated July 9, 2003 [Dkt. No. 4028].

[93] ZAI Claimants' Opposition to Grace's Motion for an Immediate Bar Date, dated April 10, 2008, at 9 [Dkt. No. 18493].

[94] 6/2/08 Hrg. Tr. at 137 [Dkt. No. 18913].

[95] Traveler's Tr. Br., dated July 13, 2009, based on the best interests test, is similarly without merit for they fail to take into account any recoveries reserved for Asbestos PI and PD claimants. [Dkt. No. 22420].

# EXHIBIT 3

Page 1

1

2            UNITED STATES BANKRUPTCY COURT

3                 DISTRICT OF DELAWARE

4    ------------------------------X

5    IN RE:                         Chapter 11

6    W. R. GRACE & CO., et al.,     01-1139(JFK)

7                                   Jointly

8                  Debtors.        Administered

9    ------------------------------X

10

11              HIGHLY CONFIDENTIAL

12         DEPOSITION OF PAMELA D. ZILLY

13               New York, New York

14                August 20, 2009

15

16

17   Reported by:

     Bonnie Pruszynski, RMR

18   JOB NO. 24345

19

20

21

22

23

24

25

Page 146

1     Zilly - Highly Confidential
2   there would be from the cash that comes into the
3   Chapter 7 trustee to get to the amount that is
4   left over for distribution to general unsecured
5   creditors?
6     A     The cost associated with the
7   Chapter 7 liquidation and any costs that are
8   allowed and any expenses that are allowed that
9   were incurred under the Chapter 11 reorganization,
10  and priority tax claims and priority claims. I
11  don't recall if you mentioned those.
12    Q     Preparing the best interests analysis
13  requires making assumptions about how the
14  Chapter 7 case will play out; is that correct?
15    A     Yes.
16    Q     And the quality of the best interests
17  analysis depends on the reasonableness of those
18  assumptions, does it not?
19        MR. LEIBENSTEIN: Objection.
20    A     I don't know what you mean by the
21  quality.
22    Q     Let me ask it again. I'm sorry, let
23  me withdraw the question and ask another one.
24        The accuracy of the best interests
25  analysis depends on the reasonableness of the

Page 147

1     Zilly - Highly Confidential
2   assumptions; is that correct?
3         MR. LEIBENSTEIN: Objection.
4     A     Again, I am having trouble with the
5   word "accuracy." This is a hypothetical analysis
6   of a Chapter 7 liquidation using the most
7   reasonable assumptions and/or facts that were in
8   evidence at the time.
9     Q     And would you say that in preparing
10  the best interests analysis for Grace, you have
11  used the most reasonable assumptions that are
12  available at this time?
13    A     Yes.
14    Q     There is always uncertainty about how
15  a Chapter 7 case will turn out, is there not?
16    A     Uncertainty as to what?
17        MR. LEIBENSTEIN: You know it's going
18  to be liquidated.
19    Q     Well, there is always uncertainty as
20  to the percentage distribution to general
21  unsecured creditors that will be the bottom line
22  result, is there not?
23        MR. LEIBENSTEIN: Objection.
24    A     I'm sorry, I'm having trouble with
25  your question. There is -- I believe the first

Page 148

1     Zilly - Highly Confidential
2   question was, there is always uncertainty as to
3   how a Chapter 7 would turn out. And then the
4   second question was, there is always uncertainty
5   with respect to the percentage distribution to
6   unsecured creditors.
7     Q     You can answer either one.
8     A     Well, I guess my question is or my
9   problem with the question is, is the concept of
10  uncertainty. If there is uncertainty with respect
11  to the fact that actual results may differ than my
12  assumptions, yes.
13    Q     And that's because it is inherently
14  unforeseeable how, how the Chapter 7 case will
15  turn out?
16        MR. LEIBENSTEIN: Objection.
17    Q     Is that correct?
18    A     Are you asking specifically with
19  respect to this analysis or in general?
20    Q     Well, why don't I withdraw the
21  question, and we'll really just move on.
22        This best interests analysis provides
23  a range of projected outcomes; is that correct?
24    A     Yes.
25    Q     And in the best interests analysis

Page 149

1     Zilly - Highly Confidential
2   you prepared for Grace, the chance of generating
3   cash at the top end of the range is pretty small,
4   is it not?
5     A     I'm sorry. Are you referring to
6   Chapter 7 or Chapter 11?
7     Q     Chapter 7.
8         MR. LEIBENSTEIN: I'm going to
9   object. I don't understand the question.
10        MR. COHN: Well, what's more
11  important is whether the witness understands
12  the question.
13        MR. LEIBENSTEIN: I agree with that.
14        MR. COHN: And judging from the fact
15  that she sat there for 30 seconds without
16  answering, I'm beginning to have my doubts.
17    A     Could you repeat the question?
18    Q     Yes. Let me -- well, why don't I do
19  this. Let me ask it in more concrete terms.
20        Let me direct your attention to page
21  three of Exhibit 14.
22    A     Yes.
23    Q     And ask you to look at the line that
24  is about three-quarters of the way down the page
25  called "Estimated value before provision for

Page 150

```
1          Zilly - Highly Confidential
2    general unsecured claims, asbestos PI and PD
3    claims and equity interests."
4       A    Yes.
5       Q    And is it fair to say that that line
6    forecasts a range from a low of 2.211 billion to a
7    high of $3.371 billion as being the range of
8    potential outcomes on that line?
9       A    Under these assumptions, yes.
10      Q    Now, the chance of generating the
11   full 3.371 billion at the top of that range is
12   pretty small, is it not?
13      A    I mean, it assumes a range of
14   possible outcomes. On the Chapter 7 liquidation
15   high, the primary differences -- in fact, the only
16   differences between these two columns -- no, I'm
17   sorry, there is one other difference.
18           But the significant difference in the
19   numbers refers to the assumption in the high
20   scenario that the Fresenius payment and the Sealed
21   Air payment would come in as a discounted value,
22   whereas in the low scenario it assumes that the
23   recovery under those two line items is zero.
24      Q    So, so you are saying that is the
25   most significant of the differences between the
```

Page 151

```
1          Zilly - Highly Confidential
2    high end and the low end; is that correct?
3           MR. LEIBENSTEIN: Objection.
4       A    That is the most significant in
5    dollar amount.
6       Q    So, in percentage terms, what would
7    you say are the chances of achieving the high end
8    outcome of approximately 3.371 billion?
9       A    I didn't assess this in terms of
10   percentage terms. There is an assumption made
11   that in the high end, that Chapter 7 trustee would
12   be, would be successful in achieving the same
13   settlements as Sealed Air and Fresenius paid under
14   the plan.
15           The reason it's in the high column is
16   because -- and not in the low column -- is because
17   that represents a best outcome, which one cannot
18   assume, and therefore is zero in the low column.
19      Q    You have no opinion about whether it
20   is more likely that the Chapter 7 trustee will
21   achieve the high-end figure, 3.371 billion, than
22   the low-end figure of 2.211 billion; is that
23   right?
24           MR. LEIBENSTEIN: Objection,
25   mischaracterizes the testimony.
```

Page 152

```
1         Zilly - Highly Confidential
2           MR. COHN: I wasn't trying to
3    characterize it.
4           MR. LEIBENSTEIN: You started off by
5    "so." When you say "so," it sounds like
6    based on what you previously said. That is
7    what "so" implies.
8       A    What this analysis says is there was
9    a range of values ranging from zero to the high
10   column. The zero column assumes that -- that the
11   trustee would not be able to achieve the same
12   settlements with Sealed Air and Fresenius, and the
13   reason for that assumption is primarily because of
14   a lack of 524G protection under a Chapter 7, in
15   which case it would -- it would -- it would be
16   optimistic to assume that Sealed Air would make
17   the same payments as it did under the Chapter 11
18   case, when in fact in the Chapter 7 case, the
19   reason for making -- I'm assuming the reason for
20   making that settlement was in fact getting the
21   benefit of the 524G injunction as well as
22   fraudulent conveyance issue would not be available
23   to them in the Chapter 7.
24      Q    I would like to come back to the
25   specific issue of that line item and others a
```

Page 153

```
1         Zilly - Highly Confidential
2    little later on.
3           (Interruption in proceedings.)
4       Q    So, right now I would like you to
5    try, if you can, to answer the question of what
6    level of comfort you have that the particular
7    bottom-line outcomes will be achieved, so, let me
8    again ask it, see whether I can ask it in a way
9    that permits you to answer.
10           How likely is it, in your view, that
11   the Chapter 7 trustee will achieve at least the
12   low figure of 2.211 billion that you have
13   forecasted?
14      A    Well, that is what my analysis
15   assumes on the low end.
16      Q    So, therefore, would you say it is
17   your view that it is very likely that the trustee
18   will achieve at least the 2.211 billion result at
19   the low end?
20           MR. LEIBENSTEIN: Objection.
21      A    I don't have a view, nor do I
22   express a view, as to whether it's likely or not.
23   This is my range of values under the assumptions
24   that are set forth in the analysis. I don't have
25   a separate view with respect to these numbers.
```

Page 154

1    Zilly - Highly Confidential
2       Q    So, is it your testimony that you
3    prepared a best interests analysis yielding a
4    result --
5            (Interruption in proceedings.)
6            (Discussion held off the record.)
7       Q    Let's strike the question I was
8    starting to ask.
9            Does Exhibit 14 represent your
10   forecast of the outcome likely to be achieved in a
11   Chapter 7 case of Grace?
12           MR. LEIBENSTEIN:  Objection, asked
13       and answered, mischaracterizes the
14       testimony.
15       A    Exhibit 14 makes certain assumptions
16   with respect to how a Chapter 7 liquidation would
17   evolve, and page three sets forth what those
18   assumptions are -- what these assumptions are and
19   what the, what the estimated values would be under
20   those assumptions.
21       Q    And am I correct to recall that you
22   testified that the assumptions that you made were
23   reasonable assumptions?
24           MR. LEIBENSTEIN:  Objection, asked
25       and answered.

Page 155

1    Zilly - Highly Confidential
2       A    What I testified to is that I -- is
3    that the assumptions that I used I believed were
4    reasonable and -- the assumptions that I used were
5    reasonable and that the analysis also included
6    other facts that were in evidence at the time this
7    analysis was prepared.
8            (Record read.)
9       Q    **Does the best interests analysis,**
10   **which is Exhibit 14, represent a reasonable**
11   **forecast of the results of a Chapter 7 case of**
12   **Grace?**
13           MR. LEIBENSTEIN:  Objection.
14           You can answer.
15       A    It represents a reasonable result of
16   an analysis that is based on assumptions that I
17   believe were reasonable.
18       Q    **But now please -- it was posed as a**
19   **yes or no question, so would you please answer the**
20   **question yes or no.**
21           **Would you like it read back to you?**
22           MR. LEIBENSTEIN:  I don't think it's
23       only a yes or no question.  I think she is
24       entitled to say she can't answer it yes or
25       no also.

Page 156

1    Zilly - Highly Confidential
2            THE WITNESS:  What was the question?
3            (Record read.)
4            MR. LEIBENSTEIN:  Objection, asked
5        and answered.
6        A    I can't answer that, or I have
7    answered it to the best of my ability.
8        Q    **In order to make reasonable**
9    **assumptions about how a Chapter 7 case will play**
10   **out, you need to be familiar with how Chapter 7**
11   **works; is that correct?**
12       A    Generally, yes.
13       Q    **Are you familiar with how Chapter 7**
14   **works?**
15       A    Generally, yes.
16       Q    **How did you acquire that familiarity?**
17       A    From experience in working with
18   Chapter 11 cases, experience discussing
19   Chapter 7 -- the potential of Chapter 11 cases
20   being liquidated under Chapter 7, the experience
21   of having done best interests analysis for
22   15 years, and from discussing certain legal
23   aspects of a Chapter 7 liquidation with counsel.
24       Q    **Have you ever been engaged in any**
25   **capacity in a Chapter 7 case?**

Page 157

1    **Zilly - Highly Confidential**
2        A    No.
3        Q    **Has any of the companies for which**
4    **you performed a best interests analysis ever had**
5    **its Chapter 11 case converted to Chapter 7?**
6        A    No.
7        Q    **Now, you said you have done best**
8    **interests analysis for 15 years.  Would you tell**
9    **me over that time approximately how many of these**
10   **analyses you prepared?**
11           MR. LEIBENSTEIN:  Objection, vague.
12       A    I don't recall.
13       Q    **Well, let's do it this way:  Would**
14   **you just recite the names of the debtors for which**
15   **you can now recall having done a best interests**
16   **analysis?**
17           MR. LEIBENSTEIN:  Objection.
18       A    Dow Corning, Babcock & Wilcox, ABB
19   Lummas, Combustion Engineering.  Those are the
20   ones that I recall.
21       Q    **When a Chapter 7 trustee sells a**
22   **business as a going concern, does he or she**
23   **typically emphasize a relatively speedy**
24   **disposition of the business?**
25       A    Yes, consistent with still trying to

Page 158

Zilly - Highly Confidential

1 achieve the highest value for the assets.
2     Q     When a Chapter 7 trustee pursues
3 litigation, is it typical that he or she would try
4 to settle the litigation in a relatively short
5 time frame?
6     A     I think the trustee would have to
7 balance settling the litigation with the cost, the
8 time, and the potential outcome of that
9 litigation.
10     Q     So the trustee would attempt to
11 maximize the value of the litigation, having all
12 of those factors in mind; is that correct?
13         MR. LEIBENSTEIN: Objection,
14 mischaracterizes the testimony. You said
15 "so the trustee." That is not what she
16 said.
17     Q     Then let me, let me ask the question
18 this way: Would the trustee try to maximize the
19 value of the litigation, having in mind the
20 factors that you just enumerated?
21     A     I'm sorry, I don't understand the
22 question. The litigation regarding what?
23     Q     I'm talking about how a Chapter 7
24 trustee in general would be motivated to act. So

Page 159

Zilly - Highly Confidential

1 I am saying when a trustee has litigation as one
2 of the assets of the estate.
3     A     I think there would be a time
4 constraint and a money constraint with respect to
5 a Chapter 7 trustee pursuing litigation to the end
6 with respect to assets of the estate. And balance
7 that against the view as to what the probable
8 outcome of that litigation would be.
9     Q     In general in a Chapter 7 case,
10 litigation gets settled rather than pursued to the
11 end; is that correct?
12     A     Or not pursued at all.
13     Q     But the answer is yes, with the "or
14 not pursued at all"?
15     A     Yes.
16     Q     How did you come to prepare the best
17 interests analysis for Grace?
18     A     I think as I testified before, the
19 best interests test is a requirement under the
20 plan of reorganization, and in my capacity as a
21 financial advisor to the company, it was my
22 responsibility working with the company to prepare
23 the best interests analysis.
24     Q     So were you asked at some point by

Page 160

Zilly - Highly Confidential

1 someone to undertake that project?
2     A     No. I mean I --
3         (Interruption in proceedings.)
4     A     I was not specifically -- I'm
5 assuming he's not objecting.
6         I was not specifically asked. I
7 simply knew that it was going to be part of my
8 responsibility.
9     Q     So, when did you start preparing
10 Exhibit 14?
11         MR. LEIBENSTEIN: Objection, vague.
12 There were other plans where there were best
13 interests analysis. I mean there was
14 another iteration of this best interests
15 analysis. I'm not sure what you are
16 referring to when you say the Exhibit 14,
17 because there's specifically this
18 Exhibit 14, but remember there was a plan
19 last year that had something very similar.
20         MR. COHN: That is helpful.
21     Q     When did you first start to prepare
22 any --
23         MR. LEIBENSTEIN: I like always to be
24 helpful.

Page 161

Zilly - Highly Confidential

1     Q     When did you first start to prepare
2 any best interests analysis for Grace?
3     A     Probably several months prior to the
4 time the first plan and disclosure statement, or
5 the first time that a plan and disclosure
6 statement was filed.
7     Q     And how did you go about preparing
8 that best interests analysis?
9     A     The best interests analysis requires
10 that certain conditions are met, identifying what
11 those conditions are and the analysis that needs
12 to go into preparing the analysis, to see whether
13 or not those conditions are met, and then
14 determining the actual dollar amounts that would
15 feed into the analysis to be able to determine
16 whether or not the best interests test is met.
17     Q     I guess I was trying to get at
18 something less abstract, which is what did you
19 actually do as a human being to get the project
20 started.
21         MR. LEIBENSTEIN: I'm going to
22 object.
23     A     I am glad everyone finds this
24 humorous.

Page 162

1    Zilly - Highly Confidential
2         I estimated the value of the
3    reorganized debtors. I determined a discount
4    factor. I determined what other assets would be
5    available. And all of this, by the way, refers to
6    both Chapter 7 liquidation and the Chapter 11
7    cases reorganization.
8         I determined the amount of possible
9    insurance recovery. I analyzed the costs that
10   would be in a Chapter 11 reorganization. I
11   calculated the costs that would be in a Chapter 7
12   liquidation based on the assumptions set forth on
13   this page.
14        I looked at the claims analysis that
15   we had prepared based on claim filings to
16   determine how much would be in the way of
17   administrative expenses, priority tax claims and
18   priority claims and secured claims.
19        Did a mathematical calculation to
20   determine what the estimated value would be before
21   general unsecured claims, asbestos PI and PD
22   claims and equity interests.
23   Q    All right. So let's go through that
24   item by item.
25        MR. LEIBENSTEIN: Is it now

Page 163

1    Zilly - Highly Confidential
2    convenient if I take a two-minute break?
3         MR. COHN: Of course.
4         (Recess taken.)
5    BY MR. COHN:
6    Q    All right. Directing your attention
7    to page three of Exhibit 14, would you first tell
8    me what is the assumed date of conversion of the
9    Grace bankruptcy case from Chapter 11 to Chapter 7
10   under this analysis?
11   A    12/31/09.
12   Q    Let's -- starting off with the line
13   entitled "Estimated Value of Reorganized Debtors
14   and Non-Debtor Affiliates," would you first tell
15   me how you reached the figure itself, and then we
16   will talk about the discount factor.
17   A    The value of the organized debtors is
18   the same value that was set forth in the
19   disclosure statement as the value of the
20   reorganized enterprise value of the debtors based
21   on the valuation analysis we did for the
22   disclosure statement.
23        And it's based on an analysis of --
24   typical valuation analysis based on looking at
25   comparable companies -- excuse me. It was an

Page 164

1    Zilly - Highly Confidential
2    enterprise, total enterprise value to EBITDA
3    analysis, looking at comparable companies to
4    Grace, as well as the average multiple of Grace's
5    peer set of companies over the last ten years, as
6    well as looking at precedent transactions.
7    Q    And was that valuation analysis the
8    subject of an expert report?
9         MR. LEIBENSTEIN: Objection, vague.
10   A    I don't believe so. I think it was
11   simply set forth in the disclosure statement.
12   Q    Now, the next line is a discount
13   factor. Would you please explain how that was
14   derived.
15   A    The discount factor in the Chapter 7
16   liquidation is presumed to be 50 percent off of
17   the estimated value of the reorganized debtor and
18   the non-debtor affiliates. That 50% is intended
19   to capture the discount off of the estimated value
20   because of the time pressures that the trustee
21   would be under in terms of selling this business,
22   as well as quantifying the probability that the
23   asset could not be sold at fair market value or
24   potentially at all.
25   Q    How soon after conversion to

Page 165

1    Zilly - Highly Confidential
2    Chapter 7 would this sale likely take place?
3    A    The analysis doesn't assume a certain
4    set number of months, but what it does is simply
5    assume that the trustee would be attempting to
6    sell this asset as quickly as possible, and
7    probably I think our estimate was within -- our
8    overall estimate was that it would take, you know,
9    12 months or so to actually achieve the entire
10   Chapter 7 liquidation and the sale would probably
11   take place sometime during that time.
12        The reason we didn't feel it was
13   important to specify a number of months is because
14   although there would be costs associated with
15   running the business during that period of time,
16   those costs it was assumed would be offset by any
17   cash that came into the business during that
18   period of time.
19   Q    So, if I understand you correctly,
20   you would expect the sale to be completed within
21   12 months after the date of conversion?
22   A    That is correct.
23   Q    But it could be sooner.
24   A    It could be sooner. The analysis,
25   the analysis -- the date is not as important for

Page 166

1       Zilly - Highly Confidential
2   purposes of the estimated value as it is important
3   for the assumption of cash, and the cash number
4   assumes that all of this is wound down by
5   12/31/09.
6       Q    I'm sorry, do you mean 12/31/10?
7       A    I'm sorry. 12/31/10, yes.
8       Q    Okay. So in answer to the question I
9   asked, which is, "Or it might be sooner," it
10  sounds as though you are saying, but don't let me
11  put words in your mouth, that most likely it would
12  take the full 12 months or something very close to
13  it.
14      MR. LEIBENSTEIN: Objection.
15      Q    To sell the business.
16      MR. LEIBENSTEIN: Objection.
17      A    The actual sale could take less --
18  the actual sale of the business could take less
19  than 12 months. Documenting that sale, closing
20  out the Chapter 7, we assumed would take
21  12 months.
22      Q    Let's talk about cash.
23           Grace is projected to have
24  $787 million of cash on hand as of 12/31/09; is
25  that correct?

Page 167

1       Zilly - Highly Confidential
2       A    That is not quite what this number
3   relates to. Basically, it's -- under the, under
4   the plan assumptions, there is an assumption of
5   cash at a starting day, there is an assumption of
6   the use of cash for purposes of implementing the
7   plan, and paying all of its obligations under the
8   plan on the effective date, ending up with a cash
9   amount at the end of a year.
10           We basically worked backwards and
11  said if you simply added back all of those
12  amounts, what would be the pro forma cash that
13  would be available under the Chapter 7
14  liquidation. It's very close. There just might
15  be some things that are off slightly.
16      Q    All right. So basically the
17  787 million would be the cash that was on hand at
18  that moment right before the projected
19  consummation of the Chapter 11 plan on 12/31/09;
20  is that correct? Or very close?
21      A    Yes, that's correct.
22      Q    Now, there would be additional cash
23  generated by the business during 2010, as I
24  believe you just testified; is that correct?
25      A    Yes, that's correct.

Page 168

1       Zilly - Highly Confidential
2       Q    Assuming that the business continued
3   to make the normal investments in capital
4   expenditure, and other items that were necessary
5   to maintain the value of the business -- well,
6   strike that. Let me not assume that.
7            Would it be your expectation that the
8   business would continue to make the -- to invest
9   in capital expenditures, or would that stuff
10  likely get put on hold during the period when the
11  company was being marketed?
12      A    I think that -- I think that any
13  significant expenditures on capital expenditures
14  would probably -- would probably not happen. I
15  believe the company would continue to spend
16  whatever it needed to spend to maintain its
17  properties.
18           And also that cash would be used to
19  pay liabilities that are also occurring in the
20  normal cycle of any business, i.e., cash coming in
21  from accounts receivable, but then you also have
22  cash that has to go out to pay its payables.
23      Q    Assuming that the sale took place on
24  12/31/2010, how much excess cash, if any, over and
25  above the cash needed to pay the obligations

Page 169

1       Zilly - Highly Confidential
2   incurred in running the business, would be
3   generated by the business?
4       MR. LEIBENSTEIN: Objection, asked
5   and answered.
6       A    I have not done that analysis, and as
7   I believe I have testified, that any, quote, cash
8   that is generated by the business would also be
9   used by the business during the period of time
10  when it was for sale to pay its ongoing
11  liabilities from operating as a going concern, so
12  that to the extent the sale did not take place for
13  six months to a year, the company would be cash
14  neutral.
15      Q    May I direct your attention, please,
16  to page eight of Exhibit 1, which is your report
17  on feasibility.
18      A    Yes.
19      Q    Now, is it correct that you have
20  forecast that the business will generate core
21  EBITDA in the year 2010 of $416 million?
22      A    That is the company's estimate.
23      Q    Do you believe that it is correct?
24      A    I believe it's reasonable.
25      Q    Okay. So in the context of

1      Zilly - Highly Confidential
2  Chapter 7, I believe you said a moment ago that
3  capital expenditures will likely be put on hold.
4  Does that mean that the figure two lines down on
5  the chart on page eight, Exhibit 1, would no
6  longer be required to be spent?
7      MR. LEIBENSTEIN: Objection.
8      A    The company's forecast of 416 million
9  of EBITDA in 2010 assumes several things that
10  would not be the case with respect to liquidation
11  analysis.
12          Number one, it assumes that the plan
13  is confirmed, and confers all the benefits that
14  the company coming out of Chapter 11 could
15  theoretically realize in its business.
16          And number two, what I believe I
17  testified to was the company will continue to make
18  its maintenance capital expenditures.
19      Q    And where do I find -- I'm sorry.
20  Was there anything else besides one and two?
21      A    Um-um.
22      Q    Okay. Where would I find on page
23  eight of your report a number representing what
24  you have called maintenance expenses that are
25  going to continue to be spent?

1      Zilly - Highly Confidential
2      MR. LEIBENSTEIN: Objection,
3  mischaracterizes what she just said.
4      A    You would not find the number. The
5  cap-ex number on this page represents both
6  maintenance capital expenditures as well as
7  investments in facilities.
8      Q    And do you know approximately the
9  division between the two?
10      A    I recall that probably close to
11  anywhere from 80, 75 to 100 million dollars would
12  be maintenance cap ex.
13      Q    So the balance of 60 million to
14  85 million dollars would represent non-maintenance
15  cap ex which would be postponed in the context of
16  Chapter 7; is that correct?
17      MR. LEIBENSTEIN: Objection.
18      A    Which may be postponed in the context
19  of Chapter 7.
20      Q    Now, would you please explain to me
21  how confirmation of the Chapter 11 case affects
22  EBITDA -- strike that -- Chapter 11 plan affects
23  EBITDA.
24      A    There are a number of ways that
25  exiting Chapter 11 would affect EBITDA. While the

1      Zilly - Highly Confidential
2  company is in bankruptcy, its focus among other
3  things has been on cash flow generation to have
4  sufficient cash to make payments under the plan.
5  To the extent that they were out of Chapter 11,
6  they presumably would spend more, as you can see,
7  on capital expenditures, to invest further in the
8  business, to invest further in expanding its
9  facilities, to invest further in building new
10  facility such that they generate more sales, which
11  would have the effect of generating more EBITDA.
12          They would be in a position to take
13  advantage of more, for example, joint venture
14  opportunities, to make acquisitions, to invest
15  more heavily in research and development and
16  bringing along certain new products that it
17  currently has in the pipeline.
18          They would have the ability to
19  potentially have more, more flexibility with
20  respect to the pricing of its products, in terms
21  of implementing price increases, and they would
22  probably have the opportunity to do business with,
23  more business with certain institutions, with
24  certain companies who may have felt that working
25  with a Chapter 11 company was not something they

1      Zilly - Highly Confidential
2  desired to do.
3          All of those would go to either
4  improve sales, gross profit and EBITDA, once out
5  of bankruptcy.
6      Q    So, is it your testimony that if the
7  Grace bankruptcy were to last another year -- we
8  are now talking about Chapter 11 bankruptcy --
9  were to last another year, that the forecasted
10  company EBITDA of $416 million would not be
11  achieved?
12      MR. LEIBENSTEIN: Objection.
13      A    My testimony is that the $416 million
14  assumes that the company is out of bankruptcy as
15  of December 31st, and therefore, you cannot rely
16  on the 416, assuming the company is in either
17  Chapter 11 or, worse, Chapter 7.
18      Q    Has the company prepared a forecast
19  for the year 2010 that assumes that the company
20  remains in Chapter 11 during that year?
21      A    Not to my knowledge, no.
22      Q    What is your understanding of --
23  well, strike that.
24          Is it your understanding that Grace
25  will emerge from Chapter 11 on the so-called

Page 174

Zilly - Highly Confidential

1
2  effective date of its Chapter 11 plan?
3          MR. LEIBENSTEIN:  Objection.
4      A   I'm sorry, could you --
5          MR. LEIBENSTEIN:  Calls for
6  speculation.
7      A   Could you repeat the question.
8          (Record read.)
9      A   I don't -- I have no understanding.
10  I mean, the 12/31 -- in order to be able to
11  prepare analyses with respect to these types of
12  issues, there has to be an assumed effective date.
13  We assume the effective date is 12/31/09.  I have
14  no evidence to suggest that is not the date, but
15  that is simply the date that was picked.
16      Q   What do you understand is meant by
17  "Grace's emergence from Chapter 11"?
18      A   That the company consummates its plan
19  of reorganization.
20      Q   Okay.  Thank you.
21          Now, can you direct your attention
22  back to Exhibit 14.
23      A   Yes.
24      Q   And I would now like to ask you about
25  the line item called "Fresenius payment."

Page 175

Zilly - Highly Confidential

1
2          Would you please first explain to me
3  what the figures of 115 million as the low and the
4  high in Chapter 11 are meant to signify.
5      A   They are meant to signify the amount
6  of, the dollar amount of the settlement pursuant
7  to the Fresenius agreement.
8      Q   That is the Fresenius settlement
9  agreement?
10      A   Correct.
11      Q   And that settlement agreement settled
12  what?
13          Would you like me to ask it another
14  way?
15          MR. LEIBENSTEIN:  I'm going to object
16      to the extent it calls for a legal
17      conclusion.
18          But you can answer to the best of
19      your knowledge.
20      A   Some -- my understanding was the
21  settlement agreement was reached in the context of
22  the -- what's become known as the fraudulent
23  conveyance lawsuit.  The actual dollar amount I
24  believe was more complicated than that and related
25  to specific tax issues between Fresenius and

Page 176

Zilly - Highly Confidential

1
2  Grace, the details of which I am not aware.
3      Q   Okay.  But when we talk about a
4  settlement agreement, what it settled was a
5  fraudulent transfer lawsuit?
6          MR. LEIBENSTEIN:  Objection.
7      A   That is my understanding.  I am not
8  sure that is the correct legal term, but that is
9  my understanding.
10      Q   And would your answer be the same, by
11  the way, if we were talking about the Cryovac
12  payment on the next line?
13      A   If you are referring to the answer to
14  settle a certain fraudulent conveyance action, the
15  answer is yes.
16      Q   Now, would you explain to me -- now I
17  am just back to Fresenius.
18          Would you explain to me the
19  $105 million figure at the high end of the range
20  in Chapter 7?
21      A   the 105 million assumes that the
22  trustee would actually, Chapter 7 trustee would
23  actually litigate and achieve a settlement in the
24  same dollar amount as under the Chapter 11
25  reorganization, but discounted for, I believe it

Page 177

Zilly - Highly Confidential

1
2  was three years, for the time that it would take
3  to achieve that result.
4      Q   And now please explain to me the --
5  it looks like a dash --
6      A   Correct.
7      Q   -- in the low end of the range of the
8  Fresenius payment.
9      A   The low end of the range assumes that
10  zero, no dollars are forthcoming in the Chapter 7
11  liquidation for any number of reasons.  Either
12  because the trustee chooses not to pursue the
13  litigation, a likely scenario, I guess, given the
14  time and the money that it would take to pursue
15  that litigation, and the fact that even if that
16  litigation were pursued, that the likelihood of
17  getting the same settlement dollars out of
18  Fresenius would be small, based on the fact that
19  in a Chapter 7 liquidation, there is no 524G
20  protection for Fresenius, and which would
21  basically cover its successor liability issues,
22  and also the fact that my understanding is that
23  the risks of -- to Fresenius on just a fraudulent
24  conveyance lawsuit from a legal perspective was
25  deemed small.

Page 178

1  Zilly - Highly Confidential
2  **Q     Deemed small by whom?**
3  A     Those doing the legal analysis.
4  **Q     Who are you referring to?**
5  A     My understanding, in discussions with
6  both outside and inside counsel at -- for Grace,
7  is that the fraudulent conveyance lawsuit was
8  deemed to be a weaker case than the successor
9  liability lawsuit.
10 **Q     Now, did I understand correctly your**
11 **testimony of a moment ago to be that a Chapter 7**
12 **trustee would likely not pursue the litigation at**
13 **all?**
14      MR. LEIBENSTEIN: Objection.
15 Mischaracterizes the testimony.
16 A     I believe what I testified to is that
17 a Chapter 7 trustee would need to find the time
18 and the money to be able to pursue the fraudulent
19 conveyance litigation, and that the reason it is
20 zero in the low case is based on the assumption
21 that the trustee either would not pursue that
22 litigation because of the factors that I mentioned
23 before or would be -- even in pursuing the
24 litigation would be unsuccessful in achieving the
25 same results that were achieved in the Chapter 11

Page 179

1  Zilly - Highly Confidential
2  case because of the lack of the factors that I
3  just mentioned in a Chapter 7 case.
4  **Q     If the trustee chose to pursue the**
5  **litigation, is it likely in your view that he**
6  **would achieve a zero net recovery for the estate?**
7      MR. LEIBENSTEIN: Objection to the
8  use of the term "achieve."
9  A     I think it's more likely than not
10 that the Chapter 7 trustee would not -- would
11 achieve zero.
12 **Q     Let me direct your attention to the**
13 **next line item, which is the Cryovac payment.**
14 **Do I understand that the $953 million**
15 **figure on the Chapter 11 side of this chart**
16 **represents the value of the settlement between**
17 **Cryovac and Sealed Air on one hand and the**
18 **bankruptcy estate on the other, to the bankruptcy**
19 **estate?**
20 A     The 953 million, the Cryovac
21 settlement is comprised of two separate parts.
22 It's cash and the stock of Sealed Air. This
23 number assumes a value of the stock of Sealed Air
24 as of, I believe, February 20th, so based on
25 whatever the stock price was at that date plus

Page 180

1  Zilly - Highly Confidential
2  cash plus the interest that accrues on that cash,
3  that is the $953 million.
4  **Q     Have you updated this figure to**
5  **reflect any changes in the stock price since that**
6  **time?**
7  A     No, I have not.
8  **Q     What does the $873 million figure**
9  **represent at the high end of Chapter 7?**
10 A     It assumes that the Chapter 7 trustee
11 is successful in achieving the same results in
12 terms of the 953 million, but that it is
13 discounted to take into account the three-year
14 time period it would take to actually achieve that
15 result.
16 **Q     And the low-end figure?**
17 A     That assumes that the trustee does
18 not pursue the litigation because of the time
19 constraints of money, probability of success, or
20 time, or if he pursues the litigation, that it is
21 unsuccessful in achieving any recovery from Sealed
22 Air pursuant to that litigation.
23 **Q     Let's talk about the next line item,**
24 **which is insurance recovery.  Now, does this**
25 **figure -- this figure comes off the Grace balance**

Page 181

1  Zilly - Highly Confidential
2  **sheet, does it not?**
3  A     Yes. As of 12/31/08, I believe.
4  **Q     And does this represent in your view**
5  **the most accurate available figure to project the**
6  **value of Grace's insurance recoveries?**
7      MR. LEIBENSTEIN: Objection.
8  A     Yes, it does.
9  **Q     And that would be true in both**
10 **Chapter 7 and Chapter 11; correct?**
11 A     Yes. The insurance recovery
12 obviously is based on claims, when these claims
13 are paid, how much insurance the company has, and
14 so for lack of any other better information with
15 respect to claims, the 500 million was simply
16 assumed across all scenarios.
17 **Q     And that is a reasonable assumption**
18 **in your view?**
19 A     Yes.
20 **Q     Costs associated with Chapter 11**
21 **reorganization, would you please explain what that**
22 **line item signifies?**
23 A     The company identified $100 million
24 in its Chapter 11 plan to pay for the various
25 costs associated with exiting Chapter 11,

Page 182

1       Zilly - Highly Confidential
2   including exit financing costs, legal costs.
3       That is primarily it.
4       Q       And those costs would be avoided in
5   the event of a conversion to Chapter 7?
6       A       That is the assumption that is made
7   in this analysis.
8       Q       And that is a reasonable assumption;
9   correct?
10      A       Yes.
11      Q       Turning to the next line, which is
12  professional fees in a Chapter 7 liquidation, do I
13  understand that the projected professional fees
14  would be $24 million, apart from the fees of the
15  trustee and any additional brokerage fees?
16      A       That is correct.
17      Q       And that is based on an assumed
18  expenditure of $2 million per month for 12 months?
19      A       That's correct.
20      Q       If the case went on longer than
21  12 months, is it the assumption that would
22  probably have meant that less than $2 million a
23  month got spent in the first 12 months?
24          MR. LEIBENSTEIN: Objection.
25      A       No, that's not what I would have

Page 183

1       Zilly - Highly Confidential
2   assumed.
3       Q       So the cost could be a little more
4   than 24 million if the case went longer than a
5   year?
6       A       Based on this assumption, yes.
7       Q       The trustee fees in the next line, do
8   I understand the low case to be $27 million and
9   the high case to be $45 million.
10      A       Yes, that's correct.
11      Q       How did you get those figures?
12      A       It's 1.5 percent of the calculation
13  of estimated value available, the one million
14  fifty plus the cash amount less the fees paid.
15      Q       And why -- well, let me first ask:
16  Why did you estimate the trustee fees as a
17  percentage of what you just described rather than
18  as a number of hours that would be expended times
19  a reasonable hourly rate?
20      A       It's my understanding that, and I
21  don't recall where, but there is a general
22  standard that trustees' fees can range up to
23  3 percent of the amount of the proceeds realized
24  in the Chapter 7 liquidation, so we simply used
25  the percentage that was lower than that based on

Page 184

1       Zilly - Highly Confidential
2   the realizable proceeds in this hypothetical
3   Chapter 7 liquidation.
4       Q       And why did you use a percentage
5   lower than the statutory formula approximating
6   3 percent?
7           MR. LEIBENSTEIN: Objection.
8       A       That was simply an assumption.
9   3 percent of these numbers would be a significant
10  dollar amount, and we thought 1.5 percent was more
11  conservative in respect of the amount of dollars
12  that it would be applied against.
13      Q       If, if the trustee were to bill on an
14  hourly basis, what difference would it make in the
15  projected figure for trustee fees?
16      A       I haven't done that analysis.
17      Q       The next line, additional brokerage
18  fees, what is the basis for those figures?
19      A       The assumption there is the trustee
20  would hire a third party to actually market and
21  sell the Grace business, and that that third party
22  would require a fee that we have estimated to be
23  .5 percent of estimated proceeds.
24      Q       Now, as to both the trustee fees line
25  and the additional brokerage fee line, the reason

Page 185

1       Zilly - Highly Confidential
2   that the high case is a higher figure than the low
3   case is because there would be more cash coming in
4   the door; is that correct?
5       A       More total proceeds, yes.
6       Q       And so essentially the sum total of
7   those two lines says that 2 percent of the cash is
8   going out the door in trustee fees or additional
9   brokerage fees; is that correct?
10      A       I am sorry, I didn't follow that.
11      Q       You know, you actually -- your answer
12  to the previous question I think covers it, so why
13  don't we just move on.
14          The administrative expenses line,
15  would you first please explain to me where the
16  $31 million figure for Chapter 11 comes from.
17      A       That's an estimate based on the
18  company's books and records with respect to
19  administrative expenses that would be payable on
20  the effective date under the plan. The largest
21  amount of that is professional fee hold-backs for
22  all constituencies in the case, other professional
23  fees, and a small amount of an administrative
24  expense claim that is part of the environment EPA
25  settlement that the company entered into six or

Page 186

1    Zilly - Highly Confidential
2  eight months ago.
3    Q    And would you now explain to me where
4  the $26 million figure comes from for Chapter 7?
5    A    Yes. It's -- the reduction is based
6  on the assumption that certain of the professional
7  fees would not be paid in a Chapter 7 as opposed
8  to the Chapter 11.
9    Q    So that is the difference between the
10  31 million and the 26 million?
11    A    That is correct.
12    Q    Then priority tax claims and priority
13  claims, you have shown $39 million across the
14  board in either Chapter 7 or Chapter 11; is that
15  correct?
16    A    This again is an estimate based on
17  the company's books and records and an analysis of
18  claim filings, as well as an analysis by Grace's
19  tax team as to the amount of tax claims that would
20  be priority tax claims, primarily state claims,
21  that would be paid on the effective date, and a
22  very small amount of odds and ends priority
23  claims.
24    Q    So that brings us to what appears to
25  be the bottom line here, the line headed

Page 187

1    **Zilly - Highly Confidential**
2  **"Estimated Value Before Provision for General**
3  **Unsecured Claims, Asbestos PI and PD Claims and**
4  **Equity Interests."**
5    **Is it fair to say that the conclusion**
6  **of this Grace best interests analysis is that in a**
7  **Chapter 7 case for Grace, commencing on**
8  **December 31, 2009, the amount of money available**
9  **to pay general unsecured creditors would be in a**
10  **range of from $2.211 billion to $2.371 billion?**
11    MR. LEIBENSTEIN: Objection.
12    A    Yes, assuming that -- if you include
13  the Fresenius and the Cryovac in the 3.371,
14  correct.
15    Q    Now, is it your understanding that
16  under the proposed Chapter 11 plan, non-asbestos
17  general unsecured creditors will be paid 100 cents
18  on the dollar plus interest?
19    A    I'm sorry, could you just repeat the
20  question.
21    Q    Sure.
22    Is it your understanding that under
23  the proposed Chapter 11 plan, non-asbestos general
24  unsecured creditors will be paid 100 cents on the
25  dollar plus interest?

Page 188

1    **Zilly - Highly Confidential**
2    A    Yes, with one exception. The --
3  depending on how you define general unsecured
4  claims, if you're including the post-retirement
5  plan in the amount of general unsecured claims,
6  that is not getting interest. Those claimants --
7  those participants in that plan do not get
8  interest.
9    Q    Thank you.
10    Is your understanding that under the
11  Chapter -- let me start again.
12    Is it your understanding that under
13  the proposed Chapter 11 plan, asbestos personal
14  injury claims will be paid from a trust at a rate
15  projected to be from 25 to 35 cents on the dollar?
16    MR. LEIBENSTEIN: Objection.
17    A    I don't have personal knowledge of
18  that number, no.
19    Q    Is it your understanding that in a
20  Chapter 7 case for Grace, all general unsecured
21  claims would be paid at the same percentage rate?
22    MR. LEIBENSTEIN: Objection.
23    A    I don't understand that question.
24    Q    Is it your understanding that when a
25  Chapter 7 trustee distributes funds -- when he

Page 189

1    **Zilly - Highly Confidential**
2  **distributes funds to general unsecured creditors,**
3  **that he makes a pro rata distribution?**
4    MR. LEIBENSTEIN: Objection.
5    A    My understanding is that there would
6  be an amount of value cash available to distribute
7  to unsecured creditors and that amount would be
8  distributed to unsecured creditors. I guess if
9  that's --
10    Q    Well, yes. The rest of the question
11  was it would be distributed on a pro rata basis;
12  is that correct?
13    MR. LEIBENSTEIN: Objection.
14    A    I'm having trouble with your question
15  because I don't understand when you say pro rata.
16  Pro rata on what?
17    Q    Based on the amount of the claim as
18  allowed pursuant to Section 502 of the Bankruptcy
19  Code.
20    MR. LEIBENSTEIN: Objection, vague.
21    A    I think the Chapter 7 trustee would
22  distribute the proceeds based on claims, claim
23  amounts or settlement of claim amounts.
24    Q    So, what you are saying is that a
25  claim might be allowed based on either litigation

Page 190

1          Zilly - Highly Confidential
2     or settlement, and that most likely the allowance
3     would take place pursuant to settlement; is that
4     correct?
5          MR. LEIBENSTEIN: Objection.
6     A    I think what I just said was that the
7     pro rata -- that the distribution of the cash
8     would be to claimants, and those claimants would
9     either have allowed claims that were based on
10    either claims and/or settlements of those claims.
11    Q    Okay. And then once the allowed
12    amount of the claim had been determined, most
13    likely through settlement, the trustee would make
14    a pro rata distribution to all claimants based on
15    the allowed amount of their respective claims; is
16    that correct?
17         MR. LEIBENSTEIN: Objection, form.
18    A    I can't answer that question because
19    I don't know what you mean by the concept of an
20    allowed claim.
21    Q    If we define allowed as the amount
22    determined either by settlement or through the
23    outcome of litigation between the trustee and the
24    claimant, would that enable you to answer the
25    question?

Page 191

1          Zilly - Highly Confidential
2     A    I'm sorry, say that again, please.
3     Q    Okay. If I told you that the -- that
4     the word "allowed" meant the amount of each claim
5     determined either by settlement or by court order
6     following litigation between the trustee and the
7     claimant, would that permit you to answer the
8     question?
9     A    I'm sorry. I'm not understanding the
10    question.
11    Q    Let's assume then that there are two
12    creditors and only two creditors in the Chapter 7
13    case. One of them has a claim for $100, which is
14    allowed by court order after a big fight, and the
15    other one has a claim which gets settled for $100.
16    It's your understanding that in each case, the
17    creditor would get the same percentage of its
18    claim paid by the trustee?
19         MR. LEIBENSTEIN: Objection.
20    A    It's my understanding the trustee
21    would pay whatever the court ordered be paid on
22    that claim.
23    Q    Do you have an understanding of
24    whether Chapter 7 requires that it be the same
25    percentage of each claim that gets paid once the

Page 192

1          Zilly - Highly Confidential
2     amount of that claim has been determined either by
3     settlement or court order?
4     A    I'm sorry, I don't understand your
5     question. The same percent of what?
6     Q    The same percentage of the allowed
7     amount of the claim as determined either by
8     settlement or court order.
9          MR. LEIBENSTEIN: Objection.
10    A    To me percentage involves a numerator
11    and a denominator, so I am -- so I guess I don't
12    understand your question.
13    Q    What is your understanding of how a
14    trustee decides how much to pay to each creditor?
15         MR. LEIBENSTEIN: Objection, vague.
16    Q    Once, once the amount of each claim
17    has been determined either by litigation or by
18    settlement.
19    A    That would depend on how much -- how
20    many assets were available.
21    Q    Right. So, let's say that after
22    obtaining -- to take an example, let's say that
23    the funds left over after the assets are sold and
24    the secured and priority claims are paid and all
25    the expenses of the Chapter 7 are paid, are $100,

Page 193

1          Zilly - Highly Confidential
2     and you have two claimants, one with a claim for
3     $100, and one with a claim for $300. So the total
4     claims are $400 as allowed either by settlement or
5     court order. And the assets, the cash that is
6     available to pay those claims is $100.
7          What is the percentage distribution
8     to those creditors?
9     A    Under that scenario, it's my
10    understanding that one would get 100 percent of
11    the claim, potentially not 100 percent of the
12    settlement, if the settlement wasn't the same as
13    the claim, and the other would get less than
14    one percent.
15    Q    So the trustee has $100 to distribute
16    to claims in the total allowed amount of $400.
17    Which claim is he going to pay in full?
18    A    I'm sorry, that is not the way I
19    understood the question.
20         MR. LEIBENSTEIN: You changed the
21    hypothetical. The first time it was that
22    there was $100 to pay each of the claims.
23    Pay one 100, and one 100 out of the 400.
24    Q    I'm sorry, $100 to pay all of the
25    claims. So you have two claims, one for $100 and

Page 194

1          Zilly - Highly Confidential
2    one for $300, and there is $100 available for
3    distribution.
4        A    Then each --
5        MR. LEIBENSTEIN: Wait. Objection,
6    vague.
7        Q    How much would be distributed to each
8    creditor?
9        MR. LEIBENSTEIN: Objection, vague.
10       A    It's my understanding that the
11   trustee would distribute the $100 to the claimant
12   of -- with the $100 claim, as well as the claimant
13   with the $300 claim.
14       Q    Right. So how much would go to each,
15   how much of the $300?
16       A    I'm sorry, I need a calculator. Less
17   than 100 percent of their allowed claim.
18       Q    Since there is $100 available to pay
19   $400 of claims in total, would that mean that each
20   creditor got 25 percent?
21       A    If you say so.
22       Q    In a Chapter 7 case for Grace,
23   commencing on December 31, 2009, what would the
24   percentage rate of payment be to general unsecured
25   creditors?

Page 195

1          Zilly - Highly Confidential
2        MR. LEIBENSTEIN: Objection.
3        A    I'm sorry, I'm sorry. Could you
4    repeat the question.
5        Q    Sure.
6        In a Chapter 7 case for Grace
7    commencing on December 31, 2009, as you have
8    assumed in the best interests analysis, what would
9    the percentage rate of payment be to general
10   unsecured creditors?
11       MR. LEIBENSTEIN: Objection, lack of
12   foundation.
13       A    Less than what they would get in a
14   Chapter 11 case.
15       Q    How much would they get in a
16   Chapter 11 case as a percentage rate of payment?
17       A    In a Chapter 11 case, you have an
18   estimated value, based on the value of Grace's
19   cash, certain settlements, and you have a general
20   unsecured claim which according to the plan is
21   fixed, and your provision for asbestos PI and PD
22   claims which have been settled in accordance with
23   the plan.
24       In the Chapter 7 liquidation, you
25   have less assets, no settlements, potential, and a

Page 196

1          Zilly - Highly Confidential
2    claim number put forth -- and an unknown claim
3    number, an unknown settlement for the asbestos PI
4    and the PD claims that, based on my understanding
5    of what the original claim amounts would be, would
6    be significantly higher than what was settled for
7    in the Chapter 11 case, which is why I state that
8    the percentage would be less in Chapter 7 than
9    under Chapter 11.
10       (Discussion held off the record.)
11   BY MR. COHN:
12       Q    Have you attempted to forecast the
13   percentage rate of payment to general unsecured
14   creditors in a Chapter 7 case with Grace
15   commencing on December 31, 2009?
16       MR. LEIBENSTEIN: Objection, vague.
17       A    I have not calculated the percentage.
18   I just, I just know that the total claims for
19   asbestos PI and PD would be higher in a Chapter 7
20   than in the Chapter 11. In the Chapter 11.
21   Sorry.
22       Q    Are you aware that in the Chapter 11
23   case, asbestos PI claims that will ultimately be
24   paid include not just present claims but also
25   future demands?

Page 197

1          Zilly - Highly Confidential
2        A    Yes.
3        Q    In a Chapter 7 case, would asbestos
4    PI claims that got paid include not only present
5    claims but also future demands?
6        A    I don't think the trustee in a
7    Chapter 7 would have the time, the inclination or
8    the money to differentiate between claimants that
9    showed up claiming they were future claims or
10   current claims.
11       MR. COHN: I have no further
12   questions.
13       MR. LEIBENSTEIN: Somebody on the
14   phone?
15       MS. LOK: Yes.
16       MR. LEIBENSTEIN: You said you only
17   have a few minutes.
18   EXAMINATION
19   BY MS. LOK:
20       Q    Ms. Zilly, I'm representing Travelers
21   Casualty. I'm with Simpson, Thacher & Bartlett.
22       In your best interests analysis, did
23   you perform any analysis to determine the value of
24   distribution that Travelers would receive for its
25   claims if the debtors liquidated under Chapter 7?

# **EXHIBIT 4**

THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| W. R. GRACE & CO., *et al.*, | : | Case No. 01-01139 (JKF) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |

## EXPERT REPORT OF PAMELA D. ZILLY REGARDING THE BEST INTERESTS TEST

1.      I am a Senior Managing Director of The Blackstone Group L.P. ("Blackstone"), a

financial advisory and investment firm that maintains offices at 345 Park Avenue, New York, New

York 10154. Blackstone provides financial advisory services to W. R. Grace & Co., et al.,

("Grace") pursuant to a Bankruptcy Retention Order dated May 2001. I am the senior member of

the Blackstone team providing these services to Grace.

### BLACKSTONE QUALIFICATIONS

2.      I have considerable experience with Chapter 11 reorganization and other distressed

company circumstances, advising both debtors and creditors. I have been actively involved in the

following advisory assignments, among others: ABB Lummus, Altos Hornos de Mexico, America

West Airlines, Inc., APS Holding Corporation, Best Products, The Babcock & Wilcox Company,

The Caldor Corporation, Combustion Engineering, Dow Corning Corporation, Harvard Industries,

The Kendall Company, Lone Star Industries, Phar-Mor Inc., Safety-Kleen Corp., Spreckels

Industries and Walter Industries. I have testified as an expert at trial or by deposition in the

following matters: ABB Lummus (2006; Pittsburgh PA), The Babcock & Wilcox Company (2005;

New Orleans, LA), Combustion Engineering, Inc. (2003; Chicago, IL and 2006; Pittsburgh, PA)

and Dow Corning Corporation (1999; New York, NY).

3.    I graduated *magna cum laude* and Phi Beta Kappa from Connecticut College and received an MSIA from Carnegie Mellon University.

4.    Prior to joining Blackstone in 1991, I worked at Chemical Bank in its Mergers & Acquisitions Group and its Restructuring & Reorganization Group.  Prior to joining Chemical Bank, I was a First Vice President in the Corporate Finance Department of E.F. Hutton & Company Inc.

5.    In connection with confirmation of the Debtors' First Amended Joint Plan of Reorganization (the "Plan"), I have previously prepared and filed Expert Reports (1) in Rebuttal to the Expert Report of H. Sean Mathis, (2) regarding Feasibility; and (3) in Rebuttal to the Expert Report of Robert J. Frezza.

## BEST INTERESTS TEST ANALYSIS

6.    Pursuant to section 1129(a)(7) of the Bankruptcy Code, each Holder of an impaired Claim or Equity Interest must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such non-accepting Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code (often referred to as the "Best Interests Test").  In my opinion, the Plan is in the best interests of all holders of claims in classes impaired by the Plan.

7.    I prepared the February 27, 2009 Best Interest Analysis, which is Exhibit 8 to the Disclosure Statement Exhibit Book.  It contains the analyses, basis, and reasons for my opinion that the Plan meets the Best Interests Test.  I have attached it as Exhibit 1.

8.    My opinions and the basis and reasons for my opinions were also expressed at pages 39-46 of the August 7, 2009 Plan Proponents' Main Brief In Support Of Plan Confirmation.  Attached as Exhibit 2 are the relevant pages from that Brief.

9.     On August 20, 2009 I was deposed extensively on my Best Interests Analysis by counsel for the Libby Claimants. At my deposition, I again explained the basis and reasons for my opinion. Attached as Exhibit 3 are the relevant pages from the deposition.

10.     In forming my opinion, I relied on: (1) the First Amended Joint Plan of Reorganization dated February 27, 2009; (2) the Disclosure Statement for the First Amended Joint Plan dated February 27, 2009, and (3) the Amended Exhibit 12 to the Disclosure Statement; (4) Transcript of Proceeding Before the Honorable Judith F. Fitzgerald United States Bankruptcy Court Judge at 137; June 2, 2009; (5) ZAI Claimants' Opposition to Grace's Motion for an Immediate Bar Date, April 10, 2008; (6) Estimation of the Number and Value of Pending and Future Asbestos-Related Personal Injury Claims; W.R. Grace Supplemental Report; Prepared for W.R. Grace by B. Thomas Florence, Ph.D., ARCP, September 25, 2007; and (7) Expert Report of Dr. Mark Peterson in Connection with the Asbestos Injury Estimates Hearing, July 20, 2007.


Pamela D. Zilly
THE BLACKSTONE GROUP
345 Park Avenue
New York, New York 10154
Telephone (212) 583-5388
Facsimile (212) 583-5707

# Exhibit 1

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., *et al.*[1] | ) | Case No. 01-01139 (JKF) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |
| | ) | |

## EXHIBIT 8 TO EXHIBIT BOOK
## BEST INTERESTS ANALYSIS

**EXHIBIT 8**

Attached.

---

[1]   The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

## BEST INTERESTS ANALYSIS

### INTRODUCTION

Pursuant to section 1129(a)(7) of the Bankruptcy Code,[1] each Holder of an impaired Claim or Equity Interest must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such non-accepting Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code (often referred to as the "Best Interests Test"). In connection with this requirement, the following hypothetical liquidation analysis (the "Liquidation Analysis") has been prepared so that the Bankruptcy Court may determine that the Plan is in the best interests of all classes impaired by the Plan.

THE LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE ASSETS OF THE DEBTORS AND NON-DEBTOR AFFILIATES. UNDERLYING THE LIQUIDATION ANALYSIS ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE, AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF MANAGEMENT AND ITS ADVISORS. ADDITIONALLY, VARIOUS LIQUIDATION DECISIONS UPON WHICH CERTAIN ASSUMPTIONS ARE BASED ARE SUBJECT TO CHANGE. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE ASSUMPTIONS AND ESTIMATES EMPLOYED IN DETERMINING THE LIQUIDATION VALUES OF THE DEBTORS' AND NON-DEBTOR AFFILIATES' ASSETS WILL RESULT IN THE PROCEEDS WHICH WOULD BE REALIZED WERE THE DEBTORS AND NON-DEBTOR AFFILIATES TO UNDERGO AN ACTUAL LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE. THIS ANALYSIS HAS NOT BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AICPA.

### GENERAL ASSUMPTIONS

For purposes of this analysis, the Effective Date is assumed to be December 31, 2009. A summary of the assumptions used by management and its advisors in preparing the Liquidation Analysis follows.

#### Asset Sale Methodology

The Liquidation Analysis assumes that the hypothetical chapter 7 liquidation is effected via the orderly sale of the businesses of the Debtors and Non-Debtor Affiliates as going concerns. Because the Asbestos PI Channeling Injunction and Asbestos PD Channeling Injunction would not be available in a chapter 7 liquidation, the value realized from the orderly sale of the

---

[1]    All capitalized terms used in this Liquidation Analysis that are not otherwise defined herein shall have the meanings ascribed to them in the Plan.

businesses in all likelihood would be reduced as a result of a buyer's concern regarding the risk of asbestos liability in the acquisition of the assets. Further, the lack of the Asbestos PI Channeling Injunction and the Asbestos PD Channeling Injunction may preclude an orderly sale of the businesses as going concerns, in which case an actual liquidation of assets would be required. In that case, values realized would be further reduced.

**Estimates of Cost of Liquidation**

Conversion of the Chapter 11 Cases to chapter 7 would likely result in additional costs to the Debtors' estates. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee and other professionals retained by the trustee, including attorneys, financial advisors and consultants; asset disposition expenses; litigation costs related to possible fraudulent transfer actions and the resolution of asbestos and other Claims; all unpaid expenses incurred by the Debtors in the Chapter 11 Cases that are allowed in the chapter 7 cases; and Claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

In addition, liquidation costs could be higher, and the value of any distributions could be lower, if the chapter 7 cases were not completed within the 12-month period assumed in the Liquidation Analysis. In the event that litigation were necessary to resolve claims asserted in the chapter 7 cases, any delay could be further prolonged and administrative expenses further increased. The effects of this potential delay on the value of distributions under the hypothetical liquidation have not been considered.

## DETAILED LIQUIDATION ANALYSIS

The table below provides a comparison of the recoveries under a hypothetical chapter 7 liquidation and under the Chapter 11 Cases reorganization in accordance with the provisions of the Plan. The accompanying footnotes should be read in connection with the table.

*(unaudited, $ in millions)*

| | Note | Chapter 7 Liquidation | | Chapter 11 Cases Reorganization | |
| --- | :---: | :---: | :---: | :---: | :---: |
| | | Low | High | Low | High |
| **Calculation of Estimated Value Available:** | A | | | | |
| Estimated Value of Reorganized Debtors and Non-Debtor Affiliates | | $ 2,100 | $ 2,500 | $ 2,100 | $ 2,500 |
| Less: Discount Factor | | (1,050) | (1,250) | - | - |
| Estimated Value of Reorganized Debtors and Non-Debtor Affiliates | | 1,050 | 1,250 | 2,100 | 2,500 |
| Plus: | | | | | |
| Cash | B | 787 | 787 | 787 | 787 |
| Fresenius Payment | C | - | 105 | 115 | 115 |
| Cryovac Payment | C | - | 873 | 953 | 953 |
| Insurance Recovery | D | 500 | 500 | 500 | 500 |
| Estimated Value Before Provision for Chapter 7 Costs, Chapter 11 Costs, Administrative Expenses and Claims | | 2,337 | 3,515 | 4,456 | 4,856 |
| Less: | | | | | |
| Costs Associated with Chapter 11 Reorganization | | - | - | 100 | 100 |
| Costs Associated with Chapter 7 Liquidation | E | | | | |
| Professional Fees ($2.0 million / month for 12 months) | | 24 | 24 | - | - |
| Trustee Fees (1.5% of cash and estimated proceeds less other fees) | | 27 | 45 | - | - |
| Additional Brokerage Fees (0.5% of estimated proceeds) | | 5 | 6 | - | - |
| Administrative Expenses | | 26 | 26 | 31 | 31 |
| Priority Tax Claims and Priority Claims | | 39 | 39 | 39 | 39 |
| Secured Claims | | 5 | 5 | 5 | 5 |
| Estimated Value Before Provision for General Unsecured Claims, Asbestos PI and PD Claims and Equity Interests | | 2,211 | 3,371 | 4,280 | 4,680 |
| Provision for General Unsecured Claims | | 999 [1] | 999 [1] | 1,387 [2] | 1,387 [2] |
| Provision for Asbestos PI and PD Claims | | - [3] | - [3] | 2,773 [4] | 2,424 [4] |

[1] Plus post-petition interest, if any value available
[2] Includes post-petition interest for General Unsecured Claims as set forth in their treatment under the Plan
[3] Assumes Asbestos PI and PD Claims would be in dispute
[4] Represents value of the treatment of Asbestos PI Claims and Asbestos PD Claims under the Plan (obligations under the Deferred Payment Agreements discounted at approximately 5% in the low case and 10% in the high case)

## FOOTNOTES TO LIQUIDATION ANALYSIS

A summary of the assumptions used in the Liquidation Analysis is set forth below.

### NOTE A – PROCEEDS FROM ORDERLY SALE OF BUSINESSES

The Liquidation Analysis assumes the businesses of the Debtors and Non-Debtor Affiliates would be sold as going concerns for cash in one transaction.    The proceeds from this sale transaction are assumed to equal the range of the Reorganized Enterprise Value of the Reorganized Debtors and Non-Debtor Affiliates, as further described in Section 2.11 of the Disclosure Statement, less a discount factor of 50%.  Unlike a chapter 11 reorganization, chapter 7 does not provide for the issuance of the Asbestos PI Channeling Injunction or Asbestos PD Channeling Injunction.    Notwithstanding a presumed ability to sell assets in a sale under Bankruptcy Code §363 or the availability of an injunction under Bankruptcy Code §105, the discount factor quantifies the probability that the businesses could not be sold for fair value or at all because of the perceived risk that the asbestos liability would follow the assets sold.

U.S. taxes due on the gain from the orderly sale of the Debtors' and Non-Debtor Affiliates' businesses are assumed to be offset by existing tax attributes and deductions generated by payments made to Claimants in the chapter 7 cases. To the extent that the payment of claims did not occur within twelve months from the sale of the assets, the estate would incur cash tax obligations subject to future refunds.  The orderly sales of businesses in foreign countries are assumed to be structured as stock sales to minimize foreign taxes.

### NOTE B – CASH

Cash represents cash projected to be available at December 31, 2009.   Excess cash flow generated from operations during the liquidation sale process is assumed to be reinvested into the operations of the Debtors and Non-Debtor Affiliates.

### NOTE C – FRAUDULENT TRANSFER ACTIONS

Amounts from fraudulent transfer actions reflect the value, in the form of cash and securities, to be realized under litigation settlements with Fresenius and Cryovac, Inc., a subsidiary of Sealed Air (the "Fresenius Settlement Agreement" and the "Sealed Air Settlement Agreement," respectively, and collectively the "Agreements").     Pursuant to the Fresenius Settlement Agreement and the Sealed Air Settlement Agreement, respectively, and the provisions of the Plan, Fresenius shall make the Fresenius Payment and Cryovac shall make the Cryovac Payment. The Agreements specifically require the existence of the Asbestos PI Channeling Injunction and Asbestos PD Channeling Injunction.  Because the Asbestos PI and PD Channeling Injunctions are not available in a chapter 7 liquidation, the Liquidation Analysis assumes these settlement payments would not be made.  It is assumed, however, that a chapter 7 trustee would pursue similar litigation actions which resulted in the Agreements.   Because the outcome of this litigation cannot be known, a range is shown from zero (at the low end) to a level of Sealed Air proceeds equal to the Cryovac Payment and Fresenius proceeds equal to the Fresenius Payment on a present value basis assuming a discount rate of 3% and a three-year time period to collect

4

the proceeds (at the high end). The discount rate is used to capture the time element of the future payment but not the risk of collection.

NOTE D – INSURANCE

At December 31, 2008, taking into account existing settlement agreements with various insurance carriers, excess coverage with other insurers including certain insolvent carriers, and previous reimbursements, there remains approximately $916 million of excess insurance coverage. In a chapter 7 liquidation and the Chapter 11 Cases reorganization, the Insurance Recovery is based on the current book value of the insurance asset ($500 million). The ultimate amount of insurance received will depend on a number of factors that will only be determined at the time claims are paid including the nature of the claim, the relevant exposure years, the timing of the payment, the solvency of insurers and the legal status of policy rights. A more detailed description of these insurance policies can be found in Grace's Annual Report on Form 10-K for the year ended December 31, 2008.

NOTE E – COSTS ASSOCIATED WITH A CHAPTER 7 LIQUIDATION

The costs associated with a chapter 7 liquidation are assumed to include fees and costs for professionals retained by the chapter 7 trustee, including legal, financial and claims processing advisors, estimated at $2.0 million per month for twelve months. In addition, it is assumed the chapter 7 trustee would receive payments equal to 1.5% of the estimated total proceeds from sale of businesses and available cash less other chapter 7 expenses. Additional brokerage fees would be necessary for the orderly sale of the Debtors' businesses and other costs. Brokerage fees are calculated at 0.5% of estimated total proceeds from the sale of businesses.

# Exhibit 2

8|8|09
#22723

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| W. R. GRACE & CO., et al.[1] | ) | Case No. 01-01139 (JKF) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Hearing Date: September 8, 2009 at 9:00 a.m. |

## PLAN PROPONENTS' MAIN BRIEF IN SUPPORT OF PLAN CONFIRMATION

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co. Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., GC Limited Partners I, Inc., (f/k/a Grace Cocoa Limited Partners I, Inc.), GC Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc. GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation., W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (F/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

Debtors benefit from numerous settlements under the Joint Plan, including the $1.1 billion contribution from Sealed Air and Fresenius and global settlements of significant asbestos liabilities with the Asbestos PI Claimants, the Asbestos PD Claimants, and the ZAI Claimants, respectively.

## C.  THE LIQUIDATION ANALYSIS DEMONSTRATES THAT THE DEBTORS HAVE SATISFIED THE BEST INTERESTS TEST

The Debtors provided a detailed liquidation analysis as Exhibit 8 in the Exhibit Book for the Joint Plan and Disclosure Statement that demonstrates that the Joint Plan satisfies the "best interests" test.[83] The liquidation analysis provided a comparison of the recoveries under a hypothetical chapter 7 liquidation and under the Joint Plan, adjusting for the various costs and requirements in each scenario.

### 1.  The Value of the Debtors' Assets Is Significantly Higher in Chapter 11 Than in Chapter 7.

In a chapter 11, the value of Grace is significantly higher than its value under a hypothetical chapter 7 liquidation. As shown in Exhibit 8, the value of Grace is reduced from $2.1 billion to $2.5 billion in chapter 11 to $1.05 billion to $1.25 billion in chapter 7. The value of Grace in chapter 7 is reduced by a discount factor of 50% for two main reasons. First, a forced chapter 7 liquidation would significantly erode the value of Grace because it would need to be sold under time pressures to satisfy the expedited sales process in a chapter 7 liquidation. Second, the discount factor also quantifies the probability that the Debtors' businesses cannot be sold for fair value or at all out of the fear and risk of asbestos liability that would follow the sold

---

[83]  *See* Liquidation Analysis at Exhibit 8 in the Exhibit Book to the Disclosure Statement to the Joint Plan.

assets because of the lack of section 524(g) protection.[84]  The Joint Plan, by contrast, allows the

Debtors to continue as a going concern with the protection of section 524(g).  In short, Grace's

value in a chapter 11 is more than a billion dollars higher than in a chapter 7.

> 2.    **The Debtors Have a Higher Asset Value in Chapter 11 Than in Chapter 7 Because of Sealed Air and Fresenius Contributing Over $1 Billion in Value.**

In addition to the increased value of Grace itself in chapter 11, under the Joint Plan and as

described in more detail herein, Sealed Air and Fresenius are providing a combined payment of

approximately $1.1 billion to "sponsor" the Joint Plan that would likely not be available in a

chapter 7 liquidation.  The $1.1 billion payment was reached for one primary reason that is

available only in chapter 11 and not chapter 7 -- the protection from future successor liability

offered by section 524(g) of the Bankruptcy Code.

Before the Sealed Air Settlement Agreement and the Fresenius Settlement Agreement

(together, the "Settlement Agreements,") both Cryovac, as predecessor to Sealed Air, and

Fresenius, faced enormous potential future liabilities estimated to be as high as $4.2 billion for

successor liability claims relating to exposure to asbestos.[85]  Because of the section 524(g)

injunctions, both Sealed Air and Fresenius were able to cap all potential future liability for

asbestos claims, and, thus were willing to contribute the $1.1 billion under the Sealed Air

Settlement Agreement and Fresenius Settlement Agreement to fund the Asbestos PI Trust and

the Asbestos PD Trust.

---

[84]  *See In re Chrysler LLC*, Case No. 09-2311 (2d Cir. Aug. 5, 2009) (declining to determine a bankruptcy court's authority to extinguish future asbestos claims without section 524(g) protection in a section 363 sale scenario).

[85]  Report of Dr. Mark. A. Peterson, *Summary of Forecasts of Grace Liability and Defense Costs for Asbestos Bodily Injury Claims*, dated September 14, 2002, at 3; *see also* Sealed Air Proof of Claim No. 14361 (which showed a claimed amount in excess of $4.8 billion).

Sealed Air and Fresenius, however, would likely not have contributed the same amount of money to the Debtors' estates in a chapter 7 liquidation as they are contributing under the Joint Plan, since section 524(g) would not have protected them from successor liability claims in a liquidation. While the Debtors' liquidation analysis notes that under a chapter 7 liquidation the potential recovery from Sealed Air and Fresenius could reach approximately $978 million, in fact, the likelihood is that the amount that they would have contributed is closer to zero. Because of the lack of section 524(g) protection to avoid successor liability claims, the only value for creditors that would be available in a chapter 7 liquidation are the proceeds that Sealed Air and Fresenius would be willing to pay to avoid a fraudulent conveyance action.

It is unlikely, however, that they would be willing to pay much to settle a fraudulent conveyance action. At the time of the transaction, Houlihan Lokey Howard & Zukin determined that the Debtors were solvent even taking into account all asbestos liability through 2039.[86] In the view of Sealed Air and Fresenius, Judge Wolin in his solvency opinion limited the claims to be taken into account for purposes of solvency to those claims that were filed or could have been filed, *i.e.*, the diseases that were diagnosable, as of the date of the transaction in 1997.[87] As Dr.

---

[86]  Houlihan Lokey Howard & Zukin Solvency Opinion, dated August 14, 1997, at Bates No. H00203-06.

[87]  *See* Opinion of Judge Wolin, *In re W.R. Grace & Co., et al.*, Case No. 01-1139, Adv. Pro. 02-2210 (Bankr. D. Del. July 29, 2002) at 20-21:

> It is reasonable to conclude that of the tens of thousands of persons making claims for asbestos personal injury against W.R. Grace after the 1998 transfer date, substantial numbers of them had viable claims against the company prior to that time. Asbestos had not been manufactured or employed in industry for many years prior to 1998 and any person with a post-1998 claim must have been exposed long before the transfer date. That such exposure would lead to long-term, serious, health effects with long latency periods has been common knowledge for twenty to perhaps thirty years. It may be, under some states; law, that this exposure is enough. *See, e.g., Avers*, 106 N.J. 557. However, it must also follow that many, and no doubt a substantial majority, of these persons had some physical manifestation of their exposure, whether they knew it at that time

(Continued...)

Peterson, the expert for the Asbestos PI and PD Claimants who were the plaintiffs in the fraudulent conveyance action, admitted, claims are asserted within one year for malignant claims and within five years for non-malignant claims, significantly earlier and fewer than claims filed through 2039.[88] Thus, as they understood Judge Wolin's opinion, it is reasonable to believe that the Debtors would have been found to be solvent at the time of the transaction and, thus, in the opinion of Sealed Air and Fresenius, the fraudulent conveyance action alone was of little value for Sealed Air and Fresenius to settle.

Moreover, it is unlikely that Sealed Air or Fresenius would be willing to pay much to resolve a fraudulent transfer claim without also receiving successor liability protection from future claims, which would be impossible in the context of a chapter 7 liquidation. This is so because even if Sealed Air had paid to resolve a fraudulent transfer claim brought by the chapter 7 trustee, as soon as the liquidation was over and the stay lifted, all future asbestos claimants would immediately have the right to sue Sealed Air under successor liability theories, and thus any payment to resolve the fraudulent transfer case would do nothing to resolve the liability for future claims, which is the bulk of the liability in any event. As such, it is unlikely that Sealed Air would pay any significant money to resolve the fraudulent transfer claim when it would still be subject to suit from future claimants.

---

or not. Exposure and physical manifestation doubtless gave the affected person a claim under the laws of most states. *See Schweitzer*, 758 F.3d at 942 (quoting W. Prosser & P. Keeton, *Prosser & Keeton on Torts* 165 (5th ed. 1984)). Therefore, and for the reasons stated thus far, these persons had a "right to payment" and thus a claim for purposes of the solvency analysis of the UFTA on the transfer date.

[Dkt. No. 121].

[88]  Expert Report of Dr. Mark A. Peterson in Connection with the Asbestos Personal Injury Estimation Hr'g, dated June 20, 2007 [Dkt. No. 16113, Ex. A].

Therefore, any recovery in a liquidation from the fraudulent conveyance action, if any, is far more likely to be on the lower end of the estimated recovery range, producing far less value for the Debtors' estates than the combined Sealed Air and Fresenius settlement payments under the Joint Plan. Thus, in addition to the increased value of the Debtors' assets of over $1 billion in chapter 11 compared to chapter 7, chapter 11 also provides the estates with an additional $1.1 billion in capital from Sealed Air and Fresenius that likely would not have been available in chapter 7.

### 3.    Assets Available for Unsecured Creditors.

In addition, the liquidation value available for the unsecured creditors would be reduced by, among other things:

- the claims of secured creditors to the extent of the value of their collateral;
- the costs of the liquidation, as well as other administrative expenses of the Debtors' chapter 7 cases;
- costs of the reorganization as well as other unpaid administrative expenses of the chapter 11 cases; and
- priority claims and priority tax claims.

According to the liquidation analysis, the costs associated with a chapter 7 liquidation would reduce the assets available in a liquidation by $126-144 million. In chapter 11, the costs associated with the Joint Plan would reduce the Debtors' assets by $176 million. Accounting for the costs of a liquidation and a reorganization, and the value of the Insurance Recovery proceeds and Cash, which is the same in both chapter 7 and chapter 11, the Plan yields greater value to unsecured creditors with an estimated high-end value of $4.680 billion to a low-end value of $4.280 billion. This is compared to an estimated high-end value of $3.371 billion (which

43

includes an unlikely $1 billion payment by Sealed Air and Fresenius in a chapter 7 liquidation) to a low-end value of $2.211 billion for unsecured claims in a liquidation.

In short, the Joint Plan likely provides for more than $2 billion in assets for unsecured creditors, after all costs and recoveries are calculated, than would be available in a chapter 7 liquidation.

4.    **The Liabilities of the Debtors in Chapter 7 Are Uncertain and There Is a Wide Range of Potential Liabilities in a Chapter 7.**

One of the primary benefits of the Joint Plan is the certainty that it provides the Debtors with respect to their liabilities. Under the Joint Plan, the Debtors are able to provide approximately $1.4 billion to satisfy general unsecured claims, which include postpetition interest as set forth in their treatment under the Joint Plan. Likewise, under the Joint Plan, the Debtors provide approximately $2.773 billion to $2.424 billion to settle Asbestos PI and PD Claims. Under the low-end scenario under the Joint Plan, Asbestos PI payments consist of $2.214 billion and Asbestos PD payments consist of $209.1 million.[89] Under the high-end scenario under the Joint Plan, Asbestos PI payments consist of $2.562 billion and Asbestos PD Claims consist of $212.3 million.

Under the most likely high chapter 7 scenario, the Debtors can most likely, at best, provide only $2.4 billion to General Unsecured Creditors, Asbestos PI and PD Claims (*i.e.*, the high value of the Debtors under chapter 7, which is $1.250 billion, plus Cash and Insurance Recovery Proceeds, for a total asset value of $2.537 billion, minus liquidation costs of $126 million.

---

[89]    Includes non-ZAI PD Settlement of $112 million and US ZAI Settlement of $54.5 million.

A chapter 7 trustee would be forced to resolve all those unsecured claims with only the limited assets of $2.4 billion while winding down the estate. There is no reason to doubt that Asbestos PI and PD claims would have been hotly contested and vigorously disputed with wide-ranging potential values for the claims, as they were in chapter 11. Under these circumstances, it is unlikely that in the process of liquidating the estate that the chapter 7 trustee would be willing to litigate the claims. Instead, the chapter 7 trustee would almost certainly settle the claims.

While the outcome cannot be known, it is equally almost certainly true that the chapter 7 trustee would neither have the incentive nor the leverage to settle at low values. As such, the unsecured claims would face the prospect of not receiving anywhere near the value of claims given the limited amount of assets and the potential billions of dollars of claims.

While the Debtors' estimates for Asbestos PI liability ranged from $200 million and $989 million, with a median value of $468 million, according to the Asbestos PI Claimants, estimates of the Debtors' total PI liability ranged from "between $4.7 and $6.2 billion and most likely between $5.4 and $6.2 billion" [90] (and the claims through 2009 alone, without taking account of the acceleration of claims in a chapter 7 liquidation, total over $2.828 billion).[91]

Likewise, while the Joint Plan provides for at least $149.3 million for non-ZAI PD Claims, the potential liability for non-ZAI claims was highly uncertain and potentially significantly higher. While the Joint Plan provides for between $54.5 million and $58 million to ZAI Claimants (and potential additional contingent payments), outside of the Joint Plan, the potential liability of ZAI Claims was also highly uncertain and potentially significantly higher.

---

[90]  *See* Expert Report of Dr. Mark Peterson in Connection with the Asbestos Personal Injury Estimation Hr'g, dated June 20, 2007 [Dkt. No. 16113, Ex. A]

[91]  *See* Email from Nathan Finch to Dan Cohn (June 7, 2009 at 8:50 PM).

At one point, ZAI Claimants argued that ZAI could potentially be in 11 million homes[92] with a value of $5,000 to $7,500 per home.[93]  Even using the ZAI Claimants' later estimate of ZAI damage of one million homes at $3,000 to $5,000 per home, the total liability would be from $3 billion to $5 billion.[94]  Liability for Non-ZAI PD Claims combined with ZAI PD Claims reaches between $4 billion and $6 billion.

In sum, the potential liability of the Asbestos PI and PD Claims in a chapter 7 liquidation exceeded $10 billion and the General Unsecured Creditors would have a claim for $999 million and any postpetition interest to the extent any value remained.  Given the nature of a chapter 7 liquidation and the disputed and uncertain nature of Asbestos PI and PD liability, as well as the limited pool of $2.4 billion of assets, all the creditors would likely receive far less than 100 cents on the dollar for any settlements they made.  On the other hand, under the Joint Plan, the Debtors' liability for asbestos claims were settled to a finite number with their respective representatives.[95]

Accordingly, the Debtors have proven by a preponderance of the evidence that impaired creditors would recover an amount under the Joint Plan equal to or greater than the amount that they would recover in a liquidation.  Thus, the Debtors have satisfied the best interests test under section 1129(a)(7) of the Bankruptcy Code.

---

[92]  Zonolite Attic Insulation Class Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment, Appendix E (Legend to Production Information from Bureau of Mines Minerals Yearbooks), dated July 9, 2003 [Dkt. No. 4028].

[93]  ZAI Claimants' Opposition to Grace's Motion for an Immediate Bar Date, dated April 10, 2008, at 9 [Dkt. No. 18493].

[94]  6/2/08 Hrg. Tr. at 137 [Dkt. No. 18913].

[95]  Traveler's Tr. Br., dated July 13, 2009, based on the best interests test, is similarly without merit for they fail to take into account any recoveries reserved for Asbestos PI and PD claimants.  [Dkt. No. 22420].