# Exhibit 3

Page 1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

------------------------------X

IN RE:                                Chapter 11

W. R. GRACE & CO., et al.,            01-1139(JFK)

                                      Jointly

                Debtors.           Administered

------------------------------X


HIGHLY CONFIDENTIAL

DEPOSITION OF PAMELA D. ZILLY

New York, New York

August 20, 2009




Reported by:

Bonnie Pruszynski, RMR

JOB NO. 24345

Page 146

1  Zilly - Highly Confidential
2  there would be from the cash that comes into the
3  Chapter 7 trustee to get to the amount that is
4  left over for distribution to general unsecured
5  creditors?
6      A    The cost associated with the
7  Chapter 7 liquidation and any costs that are
8  allowed and any expenses that are allowed that
9  were incurred under the Chapter 11 reorganization,
10 and priority tax claims and priority claims. I
11 don't recall if you mentioned those.
12     Q    Preparing the best interests analysis
13 requires making assumptions about how the
14 Chapter 7 case will play out; is that correct?
15     A    Yes.
16     Q    And the quality of the best interests
17 analysis depends on the reasonableness of those
18 assumptions, does it not?
19         MR. LEIBENSTEIN: Objection.
20     A    I don't know what you mean by the
21 quality.
22     Q    Let me ask it again. I'm sorry, let
23 me withdraw the question and ask another one.
24         The accuracy of the best interests
25 analysis depends on the reasonableness of the

Page 147

1  Zilly - Highly Confidential
2  assumptions; is that correct?
3          MR. LEIBENSTEIN: Objection.
4      A    Again, I am having trouble with the
5  word "accuracy." This is a hypothetical analysis
6  of a Chapter 7 liquidation using the most
7  reasonable assumptions and/or facts that were in
8  evidence at the time.
9      Q    And would you say that in preparing
10 the best interests analysis for Grace, you have
11 used the most reasonable assumptions that are
12 available at this time?
13     A    Yes.
14     Q    There is always uncertainty about how
15 a Chapter 7 case will turn out, is there not?
16     A    Uncertainty as to what?
17         MR. LEIBENSTEIN: You know it's going
18 to be liquidated.
19     Q    Well, there is always uncertainty as
20 to the percentage distribution to general
21 unsecured creditors that will be the bottom line
22 result, is there not?
23         MR. LEIBENSTEIN: Objection.
24     A    I'm sorry, I'm having trouble with
25 your question. There is -- I believe the first

Page 148

1  Zilly - Highly Confidential
2  question was, there is always uncertainty as to
3  how a Chapter 7 would turn out. And then the
4  second question was, there is always uncertainty
5  with respect to the percentage distribution to
6  unsecured creditors.
7      Q    You can answer either one.
8      A    Well, I guess my question is or my
9  problem with the question is, is the concept of
10 uncertainty. If there is uncertainty with respect
11 to the fact that actual results may differ than my
12 assumptions, yes.
13     Q    And that's because it is inherently
14 unforeseeable how, how the Chapter 7 case will
15 turn out?
16         MR. LEIBENSTEIN: Objection.
17     Q    Is that correct?
18     A    Are you asking specifically with
19 respect to this analysis or in general?
20     Q    Well, why don't I withdraw the
21 question, and we'll really just move on.
22         This best interests analysis provides
23 a range of projected outcomes; is that correct?
24     A    Yes.
25     Q    And in the best interests analysis

Page 149

1  Zilly - Highly Confidential
2  you prepared for Grace, the chance of generating
3  cash at the top end of the range is pretty small,
4  is it not?
5      A    I'm sorry. Are you referring to
6  Chapter 7 or Chapter 11?
7      Q    Chapter 7.
8          MR. LEIBENSTEIN: I'm going to
9  object. I don't understand the question.
10         MR. COHN: Well, what's more
11 important is whether the witness understands
12 the question.
13         MR. LEIBENSTEIN: I agree with that.
14         MR. COHN: And judging from the fact
15 that she sat there for 30 seconds without
16 answering, I'm beginning to have my doubts.
17     A    Could you repeat the question?
18     Q    Yes. Let me -- well, why don't I do
19 this. Let me ask it in more concrete terms.
20         Let me direct your attention to page
21 three of Exhibit 14.
22     A    Yes.
23     Q    And ask you to look at the line that
24 is about three-quarters of the way down the page
25 called "Estimated value before provision for

Case 01-01139-AMC    Doc 23041-3    Filed 08/31/09    Page 4 of 15

**Page 150**

Zilly - Highly Confidential

1 general unsecured claims, asbestos PI and PD
2 claims and equity interests."
3     A    Yes.
4     Q    And is it fair to say that that line
5 forecasts a range from a low of 2.211 billion to a
6 high of $3.371 billion as being the range of
7 potential outcomes on that line?
8     A    Under these assumptions, yes.
9     Q    Now, the chance of generating the
10 full 3.371 billion at the top of that range is
11 pretty small, is it not?
12     A    I mean, it assumes a range of
13 possible outcomes. On the Chapter 7 liquidation
14 high, the primary differences -- in fact, the only
15 differences between these two columns -- no, I'm
16 sorry, there is one other difference.
17     But the significant difference in the
18 numbers refers to the assumption in the high
19 scenario that the Fresenius payment and the Sealed
20 Air payment would come in as a discounted value,
21 whereas in the low scenario it assumes that the
22 recovery under those two line items is zero.
23     Q    So, so you are saying that is the
24 most significant of the differences between the

**Page 151**

Zilly - Highly Confidential

1 high end and the low end; is that correct?
2         MR. LEIBENSTEIN: Objection.
3     A    That is the most significant in
4 dollar amount.
5     Q    So, in percentage terms, what would
6 you say are the chances of achieving the high end
7 outcome of approximately 3.371 billion?
8     A    I didn't assess this in terms of
9 percentage terms. There is an assumption made
10 that in the high end, that Chapter 7 trustee would
11 be, would be successful in achieving the same
12 settlements as Sealed Air and Fresenius paid under
13 the plan.
14     The reason it's in the high column is
15 because -- and not in the low column -- is because
16 that represents a best outcome, which one cannot
17 assume, and therefore is zero in the low column.
18     Q    You have no opinion about whether it
19 is more likely that the Chapter 7 trustee will
20 achieve the high-end figure, 3.371 billion, than
21 the low-end figure of 2.211 billion; is that
22 right?
23         MR. LEIBENSTEIN: Objection,
24 mischaracterizes the testimony.

**Page 152**

Zilly - Highly Confidential

1     MR. COHN: I wasn't trying to
2 characterize it.
3     MR. LEIBENSTEIN: You started off by
4 "so." When you say "so," it sounds like
5 based on what you previously said. That is
6 what "so" implies.
7     A    What this analysis says is there was
8 a range of values ranging from zero to the high
9 column. The zero column assumes that -- that the
10 trustee would not be able to achieve the same
11 settlements with Sealed Air and Fresenius, and the
12 reason for that assumption is primarily because of
13 a lack of 524G protection under a Chapter 7, in
14 which case it would -- it would -- it would be
15 optimistic to assume that Sealed Air would make
16 the same payments as it did under the Chapter 11
17 case, when in fact in the Chapter 7 case, the
18 reason for making -- I'm assuming the reason for
19 making that settlement was in fact getting the
20 benefit of the 524G injunction as well as
21 fraudulent conveyance issue would not be available
22 to them in the Chapter 7.
23     Q    I would like to come back to the
24 specific issue of that line item and others a

**Page 153**

Zilly - Highly Confidential

1 little later on.
2     (Interruption in proceedings.)
3     Q    So, right now I would like you to
4 try, if you can, to answer the question of what
5 level of comfort you have that the particular
6 bottom-line outcomes will be achieved, so, let me
7 again ask it, see whether I can ask it in a way
8 that permits you to answer.
9     How likely is it, in your view, that
10 the Chapter 7 trustee will achieve at least the
11 low figure of 2.211 billion that you have
12 forecasted?
13     A    Well, that is what my analysis
14 assumes on the low end.
15     Q    So, therefore, would you say it is
16 your view that it is very likely that the trustee
17 will achieve at least the 2.211 billion result at
18 the low end?
19         MR. LEIBENSTEIN: Objection.
20     A    I don't have a view, nor do I
21 express a view, as to whether it's likely or not.
22 This is my range of values under the assumptions
23 that are set forth in the analysis. I don't have
24 a separate view with respect to these numbers.

39 (Pages 150 to 153)

Page 154

1  Zilly - Highly Confidential
2  Q   So, is it your testimony that you
3  prepared a best interests analysis yielding a
4  result --
5       (Interruption in proceedings.)
6       (Discussion held off the record.)
7  Q   Let's strike the question I was
8  starting to ask.
9       Does Exhibit 14 represent your
10 forecast of the outcome likely to be achieved in a
11 Chapter 7 case of Grace?
12      MR. LEIBENSTEIN: Objection, asked
13 and answered, mischaracterizes the
14 testimony.
15 A   Exhibit 14 makes certain assumptions
16 with respect to how a Chapter 7 liquidation would
17 evolve, and page three sets forth what those
18 assumptions are -- what these assumptions are and
19 what the, what the estimated values would be under
20 those assumptions.
21 Q   And am I correct to recall that you
22 testified that the assumptions that you made were
23 reasonable assumptions?
24      MR. LEIBENSTEIN: Objection, asked
25 and answered.

Page 155

1  Zilly - Highly Confidential
2  A   What I testified to is that I -- is
3  that the assumptions that I used I believed were
4  reasonable and -- the assumptions that I used were
5  reasonable and that the analysis also included
6  other facts that were in evidence at the time this
7  analysis was prepared.
8       (Record read.)
9  Q   Does the best interests analysis,
10 which is Exhibit 14, represent a reasonable
11 forecast of the results of a Chapter 7 case of
12 Grace?
13      MR. LEIBENSTEIN: Objection.
14      You can answer.
15 A   It represents a reasonable result of
16 an analysis that is based on assumptions that I
17 believe were reasonable.
18 Q   But now please -- it was posed as a
19 yes or no question, so would you please answer the
20 question yes or no.
21      Would you like it read back to you?
22      MR. LEIBENSTEIN: I don't think it's
23 only a yes or no question. I think she is
24 entitled to say she can't answer it yes or
25 no also.

Page 156

1  Zilly - Highly Confidential
2       THE WITNESS: What was the question?
3       (Record read.)
4       MR. LEIBENSTEIN: Objection, asked
5  and answered.
6  A   I can't answer that, or I have
7  answered it to the best of my ability.
8  Q   In order to make reasonable
9  assumptions about how a Chapter 7 case will play
10 out, you need to be familiar with how Chapter 7
11 works; is that correct?
12 A   Generally, yes.
13 Q   Are you familiar with how Chapter 7
14 works?
15 A   Generally, yes.
16 Q   How did you acquire that familiarity?
17 A   From experience in working with
18 Chapter 11 cases, experience discussing
19 Chapter 7 -- the potential of Chapter 11 cases
20 being liquidated under Chapter 7, the experience
21 of having done best interests analysis for
22 15 years, and from discussing certain legal
23 aspects of a Chapter 7 liquidation with counsel.
24 Q   Have you ever been engaged in any
25 capacity in a Chapter 7 case?

Page 157

1  Zilly - Highly Confidential
2  A   No.
3  Q   Has any of the companies for which
4  you performed a best interests analysis ever had
5  its Chapter 11 case converted to Chapter 7?
6  A   No.
7  Q   Now, you said you have done best
8  interests analysis for 15 years. Would you tell
9  me over that time approximately how many of these
10 analyses you prepared?
11      MR. LEIBENSTEIN: Objection, vague.
12 A   I don't recall.
13 Q   Well, let's do it this way: Would
14 you just recite the names of the debtors for which
15 you can now recall having done a best interests
16 analysis?
17      MR. LEIBENSTEIN: Objection.
18 A   Dow Corning, Babcock & Wilcox, ABB
19 Lummas, Combustion Engineering. Those are the
20 ones that I recall.
21 Q   When a Chapter 7 trustee sells a
22 business as a going concern, does he or she
23 typically emphasize a relatively speedy
24 disposition of the business?
25 A   Yes, consistent with still trying to

Page 158

Zilly - Highly Confidential

achieve the highest value for the assets.

Q   When a Chapter 7 trustee pursues litigation, is it typical that he or she would try to settle the litigation in a relatively short time frame?

A   I think the trustee would have to balance settling the litigation with the cost, the time, and the potential outcome of that litigation.

Q   So the trustee would attempt to maximize the value of the litigation, having all of those factors in mind; is that correct?

MR. LEIBENSTEIN: Objection, mischaracterizes the testimony. You said "so the trustee." That is not what she said.

Q   Then let me, let me ask the question this way: Would the trustee try to maximize the value of the litigation, having in mind the factors that you just enumerated?

A   I'm sorry, I don't understand the question. The litigation regarding what?

Q   I'm talking about how a Chapter 7 trustee in general would be motivated to act. So

Page 159

Zilly - Highly Confidential

I am saying when a trustee has litigation as one of the assets of the estate.

A   I think there would be a time constraint and a money constraint with respect to a Chapter 7 trustee pursuing litigation to the end with respect to assets of the estate. And balance that against the view as to what the probable outcome of that litigation would be.

Q   In general in a Chapter 7 case, litigation gets settled rather than pursued to the end; is that correct?

A   Or not pursued at all.

Q   But the answer is yes, with the "or not pursued at all"?

A   Yes.

Q   How did you come to prepare the best interests analysis for Grace?

A   I think as I testified before, the best interests test is a requirement under the plan of reorganization, and in my capacity as a financial advisor to the company, it was my responsibility working with the company to prepare the best interests analysis.

Q   So were you asked at some point by

Page 160

Zilly - Highly Confidential

someone to undertake that project?

A   No. I mean I --

(Interruption in proceedings.)

A   I was not specifically -- I'm assuming he's not objecting.

I was not specifically asked. I simply knew that it was going to be part of my responsibility.

Q   So, when did you start preparing Exhibit 14?

MR. LEIBENSTEIN: Objection, vague. There were other plans where there were best interests analysis. I mean there was another iteration of this best interests analysis. I'm not sure what you are referring to when you say the Exhibit 14, because there's specifically this Exhibit 14, but remember there was a plan last year that had something very similar.

MR. COHN: That is helpful.

Q   When did you first start to prepare any --

MR. LEIBENSTEIN: I like always to be helpful.

Page 161

Zilly - Highly Confidential

Q   When did you first start to prepare any best interests analysis for Grace?

A   Probably several months prior to the time the first plan and disclosure statement, or the first time that a plan and disclosure statement was filed.

Q   And how did you go about preparing that best interests analysis?

A   The best interests analysis requires that certain conditions are met, identifying what those conditions are and the analysis that needs to go into preparing the analysis, to see whether or not those conditions are met, and then determining the actual dollar amounts that would feed into the analysis to be able to determine whether or not the best interests test is met.

Q   I guess I was trying to get at something less abstract, which is what did you actually do as a human being to get the project started.

MR. LEIBENSTEIN: I'm going to object.

A   I am glad everyone finds this humorous.

Page 162

1  Zilly - Highly Confidential
2  I estimated the value of the
3  reorganized debtors. I determined a discount
4  factor. I determined what other assets would be
5  available. And all of this, by the way, refers to
6  both Chapter 7 liquidation and the Chapter 11
7  cases reorganization.
8      I determined the amount of possible
9  insurance recovery. I analyzed the costs that
10 would be in a Chapter 11 reorganization. I
11 calculated the costs that would be in a Chapter 7
12 liquidation based on the assumptions set forth on
13 this page.
14      I looked at the claims analysis that
15 we had prepared based on claim filings to
16 determine how much would be in the way of
17 administrative expenses, priority tax claims and
18 priority claims and secured claims.
19      Did a mathematical calculation to
20 determine what the estimated value would be before
21 general unsecured claims, asbestos PI and PD
22 claims and equity interests.
23  Q    All right. So let's go through that
24 item by item.
25      MR. LEIBENSTEIN: Is it now

Page 163

1  Zilly - Highly Confidential
2  convenient if I take a two-minute break?
3      MR. COHN: Of course.
4      (Recess taken.)
5  BY MR. COHN:
6  Q    All right. Directing your attention
7  to page three of Exhibit 14, would you first tell
8  me what is the assumed date of conversion of the
9  Grace bankruptcy case from Chapter 11 to Chapter 7
10 under this analysis?
11 A    12/31/09.
12 Q    Let's -- starting off with the line
13 entitled "Estimated Value of Reorganized Debtors
14 and Non-Debtor Affiliates," would you first tell
15 me how you reached the figure itself, and then we
16 will talk about the discount factor.
17 A    The value of the organized debtors is
18 the same value that was set forth in the
19 disclosure statement as the value of the
20 reorganized enterprise value of the debtors based
21 on the valuation analysis we did for the
22 disclosure statement.
23      And it's based on an analysis of --
24 typical valuation analysis based on looking at
25 comparable companies -- excuse me. It was an

Page 164

1  Zilly - Highly Confidential
2  enterprise, total enterprise value to EBITDA
3  analysis, looking at comparable companies to
4  Grace, as well as the average multiple of Grace's
5  peer set of companies over the last ten years, as
6  well as looking at precedent transactions.
7  Q    And was that valuation analysis the
8  subject of an expert report?
9      MR. LEIBENSTEIN: Objection, vague.
10 A    I don't believe so. I think it was
11 simply set forth in the disclosure statement.
12 Q    Now, the next line is a discount
13 factor. Would you please explain how that was
14 derived.
15 A    The discount factor in the Chapter 7
16 liquidation is presumed to be 50 percent off of
17 the estimated value of the reorganized debtor and
18 the non-debtor affiliates. That 50% is intended
19 to capture the discount off of the estimated value
20 because of the time pressures that the trustee
21 would be under in terms of selling this business,
22 as well as quantifying the probability that the
23 asset could not be sold at fair market value or
24 potentially at all.
25 Q    How soon after conversion to

Page 165

1  Zilly - Highly Confidential
2  Chapter 7 would this sale likely take place?
3  A    The analysis doesn't assume a certain
4  set number of months, but what it does is simply
5  assume that the trustee would be attempting to
6  sell this asset as quickly as possible, and
7  probably I think our estimate was within -- our
8  overall estimate was that it would take, you know,
9  12 months or so to actually achieve the entire
10 Chapter 7 liquidation and the sale would probably
11 take place sometime during that time.
12      The reason we didn't feel it was
13 important to specify a number of months is because
14 although there would be costs associated with
15 running the business during that period of time,
16 those costs it was assumed would be offset by any
17 cash that came into the business during that
18 period of time.
19 Q    So, if I understand you correctly,
20 you would expect the sale to be completed within
21 12 months after the date of conversion?
22 A    That is correct.
23 Q    But it could be sooner.
24 A    It could be sooner. The analysis,
25 the analysis -- the date is not as important for

Page 166

Zilly - Highly Confidential

purposes of the estimated value as it is important for the assumption of cash, and the cash number assumes that all of this is wound down by 12/31/09.

Q   I'm sorry, do you mean 12/31/10?

A   I'm sorry. 12/31/10, yes.

Q   Okay. So in answer to the question I asked, which is, "Or it might be sooner," it sounds as though you are saying, but don't let me put words in your mouth, that most likely it would take the full 12 months or something very close to it.

MR. LEIBENSTEIN: Objection.

Q   To sell the business.

MR. LEIBENSTEIN: Objection.

A   The actual sale could take less -- the actual sale of the business could take less than 12 months. Documenting that sale, closing out the Chapter 7, we assumed would take 12 months.

Q   Let's talk about cash. Grace is projected to have $787 million of cash on hand as of 12/31/09; is that correct?

Page 167

Zilly - Highly Confidential

A   That is not quite what this number relates to. Basically, it's -- under the, under the plan assumptions, there is an assumption of cash at a starting day, there is an assumption of the use of cash for purposes of implementing the plan, and paying all of its obligations under the plan on the effective date, ending up with a cash amount at the end of a year.

We basically worked backwards and said if you simply added back all of those amounts, what would be the pro forma cash that would be available under the Chapter 7 liquidation. It's very close. There just might be some things that are off slightly.

Q   All right. So basically the 787 million would be the cash that was on hand at that moment right before the projected consummation of the Chapter 11 plan on 12/31/09; is that correct? Or very close?

A   Yes, that's correct.

Q   Now, there would be additional cash generated by the business during 2010, as I believe you just testified; is that correct?

A   Yes, that's correct.

Page 168

Zilly - Highly Confidential

Q   Assuming that the business continued to make the normal investments in capital expenditure, and other items that were necessary to maintain the value of the business -- well, strike that. Let me not assume that.

Would it be your expectation that the business would continue to make the -- to invest in capital expenditures, or would that stuff likely get put on hold during the period when the company was being marketed?

A   I think that -- I think that any significant expenditures on capital expenditures would probably -- would probably not happen. I believe the company would continue to spend whatever it needed to spend to maintain its properties.

And also that cash would be used to pay liabilities that are also occurring in the normal cycle of any business, i.e., cash coming in from accounts receivable, but then you also have cash that has to go out to pay its payables.

Q   Assuming that the sale took place on 12/31/2010, how much excess cash, if any, over and above the cash needed to pay the obligations

Page 169

Zilly - Highly Confidential

incurred in running the business, would be generated by the business?

MR. LEIBENSTEIN: Objection, asked and answered.

A   I have not done that analysis, and as I believe I have testified, that any, quote, cash that is generated by the business would also be used by the business during the period of time when it was for sale to pay its ongoing liabilities from operating as a going concern, so that to the extent the sale did not take place for six months to a year, the company would be cash neutral.

Q   May I direct your attention, please, to page eight of Exhibit 1, which is your report on feasibility.

A   Yes.

Q   Now, is it correct that you have forecast that the business will generate core EBITDA in the year 2010 of $416 million?

A   That is the company's estimate.

Q   Do you believe that it is correct?

A   I believe it's reasonable.

Q   Okay. So in the context of

Page 170

1  Zilly - Highly Confidential
2  Chapter 7, I believe you said a moment ago that
3  capital expenditures will likely be put on hold.
4  Does that mean that the figure two lines down on
5  the chart on page eight, Exhibit 1, would no
6  longer be required to be spent?
7      MR. LEIBENSTEIN: Objection.
8  A   The company's forecast of 416 million
9  of EBITDA in 2010 assumes several things that
10 would not be the case with respect to liquidation
11 analysis.
12     Number one, it assumes that the plan
13 is confirmed, and confers all the benefits that
14 the company coming out of Chapter 11 could
15 theoretically realize in its business.
16     And number two, what I believe I
17 testified to was the company will continue to make
18 its maintenance capital expenditures.
19 Q   And where do I find -- I'm sorry.
20 Was there anything else besides one and two?
21 A   Um-um.
22 Q   Okay. Where would I find on page
23 eight of your report a number representing what
24 you have called maintenance expenses that are
25 going to continue to be spent?

Page 171

1  Zilly - Highly Confidential
2      MR. LEIBENSTEIN: Objection,
3  mischaracterizes what she just said.
4  A   You would not find the number. The
5  cap-ex number on this page represents both
6  maintenance capital expenditures as well as
7  investments in facilities.
8  Q   And do you know approximately the
9  division between the two?
10 A   I recall that probably close to
11 anywhere from 80, 75 to 100 million dollars would
12 be maintenance cap ex.
13 Q   So the balance of 60 million to
14 85 million dollars would represent non-maintenance
15 cap ex which would be postponed in the context of
16 Chapter 7; is that correct?
17     MR. LEIBENSTEIN: Objection.
18 A   Which may be postponed in the context
19 of Chapter 7.
20 Q   Now, would you please explain to me
21 how confirmation of the Chapter 11 case affects
22 EBITDA -- strike that -- Chapter 11 plan affects
23 EBITDA.
24 A   There are a number of ways that
25 exiting Chapter 11 would affect EBITDA. While the

Page 172

1  Zilly - Highly Confidential
2  company is in bankruptcy, its focus among other
3  things has been on cash flow generation to have
4  sufficient cash to make payments under the plan.
5  To the extent that they were out of Chapter 11,
6  they presumably would spend more, as you can see,
7  on capital expenditures, to invest further in the
8  business, to invest further in expanding its
9  facilities, to invest further in building new
10 facility such that they generate more sales, which
11 would have the effect of generating more EBITDA.
12     They would be in a position to take
13 advantage of more, for example, joint venture
14 opportunities, to make acquisitions, to invest
15 more heavily in research and development and
16 bringing along certain new products that it
17 currently has in the pipeline.
18     They would have the ability to
19 potentially have more, more flexibility with
20 respect to the pricing of its products, in terms
21 of implementing price increases, and they would
22 probably have the opportunity to do business with,
23 more business with certain institutions, with
24 certain companies who may have felt that working
25 with a Chapter 11 company was not something they

Page 173

1  Zilly - Highly Confidential
2  desired to do.
3      All of those would go to either
4  improve sales, gross profit and EBITDA, once out
5  of bankruptcy.
6  Q   So, is it your testimony that if the
7  Grace bankruptcy were to last another year -- we
8  are now talking about Chapter 11 bankruptcy --
9  were to last another year, that the forecasted
10 company EBITDA of $416 million would not be
11 achieved?
12     MR. LEIBENSTEIN: Objection.
13 A   My testimony is that the $416 million
14 assumes that the company is out of bankruptcy as
15 of December 31st, and therefore, you cannot rely
16 on the 416, assuming the company is in either
17 Chapter 11 or, worse, Chapter 7.
18 Q   Has the company prepared a forecast
19 for the year 2010 that assumes that the company
20 remains in Chapter 11 during that year?
21 A   Not to my knowledge, no.
22 Q   What is your understanding of --
23 well, strike that.
24     Is it your understanding that Grace
25 will emerge from Chapter 11 on the so-called

Page 174

Zilly - Highly Confidential

2 effective date of its Chapter 11 plan?
3     MR. LEIBENSTEIN: Objection.
4   A   I'm sorry, could you --
5     MR. LEIBENSTEIN: Calls for
6 speculation.
7   A   Could you repeat the question.
8     (Record read.)
9   A   I don't -- I have no understanding.
10 I mean, the 12/31 -- in order to be able to
11 prepare analyses with respect to these types of
12 issues, there has to be an assumed effective date.
13 We assume the effective date is 12/31/09. I have
14 no evidence to suggest that is not the date, but
15 that is simply the date that was picked.
16   Q   What do you understand is meant by
17 "Grace's emergence from Chapter 11"?
18   A   That the company consummates its plan
19 of reorganization.
20   Q   Okay. Thank you.
21     Now, can you direct your attention
22 back to Exhibit 14.
23   A   Yes.
24   Q   And I would now like to ask you about
25 the line item called "Fresenius payment."

Page 175

Zilly - Highly Confidential

2     Would you please first explain to me
3 what the figures of 115 million as the low and the
4 high in Chapter 11 are meant to signify.
5   A   They are meant to signify the amount
6 of, the dollar amount of the settlement pursuant
7 to the Fresenius agreement.
8   Q   That is the Fresenius settlement
9 agreement?
10   A   Correct.
11   Q   And that settlement agreement settled
12 what?
13     Would you like me to ask it another
14 way?
15     MR. LEIBENSTEIN: I'm going to object
16 to the extent it calls for a legal
17 conclusion.
18     But you can answer to the best of
19 your knowledge.
20   A   Some -- my understanding was the
21 settlement agreement was reached in the context of
22 the -- what's become known as the fraudulent
23 conveyance lawsuit. The actual dollar amount I
24 believe was more complicated than that and related
25 to specific tax issues between Fresenius and

Page 176

Zilly - Highly Confidential

2 Grace, the details of which I am not aware.
3   Q   Okay. But when we talk about a
4 settlement agreement, what it settled was a
5 fraudulent transfer lawsuit?
6     MR. LEIBENSTEIN: Objection.
7   A   That is my understanding. I am not
8 sure that is the correct legal term, but that is
9 my understanding.
10   Q   And would your answer be the same, by
11 the way, if we were talking about the Cryovac
12 payment on the next line?
13   A   If you are referring to the answer to
14 settle a certain fraudulent conveyance action, the
15 answer is yes.
16   Q   Now, would you explain to me -- now I
17 am just back to Fresenius.
18     Would you explain to me the
19 $105 million figure at the high end of the range
20 in Chapter 7?
21   A   the 105 million assumes that the
22 trustee would actually, Chapter 7 trustee would
23 actually litigate and achieve a settlement in the
24 same dollar amount as under the Chapter 11
25 reorganization, but discounted for, I believe it

Page 177

Zilly - Highly Confidential

2 was three years, for the time that it would take
3 to achieve that result.
4   Q   And now please explain to me the --
5 it looks like a dash --
6   A   Correct.
7   Q   -- in the low end of the range of the
8 Fresenius payment.
9   A   The low end of the range assumes that
10 zero, no dollars are forthcoming in the Chapter 7
11 liquidation for any number of reasons. Either
12 because the trustee chooses not to pursue the
13 litigation, a likely scenario, I guess, given the
14 time and the money that it would take to pursue
15 that litigation, and the fact that even if that
16 litigation were pursued, that the likelihood of
17 getting the same settlement dollars out of
18 Fresenius would be small, based on the fact that
19 in a Chapter 7 liquidation, there is no 524G
20 protection for Fresenius, and which would
21 basically cover its successor liability issues,
22 and also the fact that my understanding is that
23 the risks of -- to Fresenius on just a fraudulent
24 conveyance lawsuit from a legal perspective was
25 deemed small.

45 (Pages 174 to 177)

Page 178

1  Zilly - Highly Confidential
2  Q  Deemed small by whom?
3  A  Those doing the legal analysis.
4  Q  Who are you referring to?
5  A  My understanding, in discussions with
6  both outside and inside counsel at -- for Grace,
7  is that the fraudulent conveyance lawsuit was
8  deemed to be a weaker case than the successor
9  liability lawsuit.
10  Q  Now, did I understand correctly your
11  testimony of a moment ago to be that a Chapter 7
12  trustee would likely not pursue the litigation at
13  all?
14      MR. LEIBENSTEIN: Objection.
15  Mischaracterizes the testimony.
16  A  I believe what I testified to is that
17  a Chapter 7 trustee would need to find the time
18  and the money to be able to pursue the fraudulent
19  conveyance litigation, and that the reason it is
20  zero in the low case is based on the assumption
21  that the trustee either would not pursue that
22  litigation because of the factors that I mentioned
23  before or would be -- even in pursuing the
24  litigation would be unsuccessful in achieving the
25  same results that were achieved in the Chapter 11

Page 179

1  Zilly - Highly Confidential
2  case because of the lack of the factors that I
3  just mentioned in a Chapter 7 case.
4  Q  If the trustee chose to pursue the
5  litigation, is it likely in your view that he
6  would achieve a zero net recovery for the estate?
7      MR. LEIBENSTEIN: Objection to the
8  use of the term "achieve."
9  A  I think it's more likely than not
10  that the Chapter 7 trustee would not -- would
11  achieve zero.
12  Q  Let me direct your attention to the
13  next line item, which is the Cryovac payment.
14      Do I understand that the $953 million
15  figure on the Chapter 11 side of this chart
16  represents the value of the settlement between
17  Cryovac and Sealed Air on one hand and the
18  bankruptcy estate on the other, to the bankruptcy
19  estate?
20  A  The 953 million, the Cryovac
21  settlement is comprised of two separate parts.
22  It's cash and the stock of Sealed Air. This
23  number assumes a value of the stock of Sealed Air
24  as of, I believe, February 20th, so based on
25  whatever the stock price was at that date plus

Page 180

1  Zilly - Highly Confidential
2  cash plus the interest that accrues on that cash,
3  that is the $953 million.
4  Q  Have you updated this figure to
5  reflect any changes in the stock price since that
6  time?
7  A  No, I have not.
8  Q  What does the $873 million figure
9  represent at the high end of Chapter 7?
10  A  It assumes that the Chapter 7 trustee
11  is successful in achieving the same results in
12  terms of the 953 million, but that it is
13  discounted to take into account the three-year
14  time period it would take to actually achieve that
15  result.
16  Q  And the low-end figure?
17  A  That assumes that the trustee does
18  not pursue the litigation because of the time
19  constraints of money, probability of success, or
20  time, or if he pursues the litigation, that it is
21  unsuccessful in achieving any recovery from Sealed
22  Air pursuant to that litigation.
23  Q  Let's talk about the next line item,
24  which is insurance recovery. Now, does this
25  figure -- this figure comes off the Grace balance

Page 181

1  Zilly - Highly Confidential
2  sheet, does it not?
3  A  Yes. As of 12/31/08, I believe.
4  Q  And does this represent in your view
5  the most accurate available figure to project the
6  value of Grace's insurance recoveries?
7      MR. LEIBENSTEIN: Objection.
8  A  Yes, it does.
9  Q  And that would be true in both
10  Chapter 7 and Chapter 11; correct?
11  A  Yes. The insurance recovery
12  obviously is based on claims, when these claims
13  are paid, how much insurance the company has, and
14  so for lack of any other better information with
15  respect to claims, the 500 million was simply
16  assumed across all scenarios.
17  Q  And that is a reasonable assumption
18  in your view?
19  A  Yes.
20  Q  Costs associated with Chapter 11
21  reorganization, would you please explain what that
22  line item signifies?
23  A  The company identified $100 million
24  in its Chapter 11 plan to pay for the various
25  costs associated with exiting Chapter 11,

Page 182

Zilly - Highly Confidential

including exit financing costs, legal costs. That is primarily it.

Q And those costs would be avoided in the event of a conversion to Chapter 7?

A That is the assumption that is made in this analysis.

Q And that is a reasonable assumption; correct?

A Yes.

Q Turning to the next line, which is professional fees in a Chapter 7 liquidation, do I understand that the projected professional fees would be $24 million, apart from the fees of the trustee and any additional brokerage fees?

A That is correct.

Q And that is based on an assumed expenditure of $2 million per month for 12 months?

A That's correct.

Q If the case went on longer than 12 months, is it the assumption that would probably have meant that less than $2 million a month got spent in the first 12 months?

MR. LEIBENSTEIN: Objection.

A No, that's not what I would have

Page 183

Zilly - Highly Confidential

assumed.

Q So the cost could be a little more than 24 million if the case went longer than a year?

A Based on this assumption, yes.

Q The trustee fees in the next line, do I understand the low case to be $27 million and the high case to be $45 million.

A Yes, that's correct.

Q How did you get those figures?

A It's 1.5 percent of the calculation of estimated value available, the one million fifty plus the cash amount less the fees paid.

Q And why -- well, let me first ask: Why did you estimate the trustee fees as a percentage of what you just described rather than as a number of hours that would be expended times a reasonable hourly rate?

A It's my understanding that, and I don't recall where, but there is a general standard that trustees' fees can range up to 3 percent of the amount of the proceeds realized in the Chapter 7 liquidation, so we simply used the percentage that was lower than that based on

Page 184

Zilly - Highly Confidential

the realizable proceeds in this hypothetical Chapter 7 liquidation.

Q And why did you use a percentage lower than the statutory formula approximating 3 percent?

MR. LEIBENSTEIN: Objection.

A That was simply an assumption. 3 percent of these numbers would be a significant dollar amount, and we thought 1.5 percent was more conservative in respect of the amount of dollars that it would be applied against.

Q If, if the trustee were to bill on an hourly basis, what difference would it make in the projected figure for trustee fees?

A I haven't done that analysis.

Q The next line, additional brokerage fees, what is the basis for those figures?

A The assumption there is the trustee would hire a third party to actually market and sell the Grace business, and that that third party would require a fee that we have estimated to be .5 percent of the estimated proceeds.

Q Now, as to both the trustee fees line and the additional brokerage fee line, the reason

Page 185

Zilly - Highly Confidential

that the high case is a higher figure than the low case is because there would be more cash coming in the door; is that correct?

A More total proceeds, yes.

Q And so essentially the sum total of those two lines says that 2 percent of the cash is going out the door in trustee fees or additional brokerage fees; is that correct?

A I am sorry, I didn't follow that.

Q You know, you actually -- your answer to the previous question I think covers it, so why don't we just move on.

The administrative expenses line, would you first please explain to me where the $31 million figure for Chapter 11 comes from.

A That's an estimate based on the company's books and records with respect to administrative expenses that would be payable on the effective date under the plan. The largest amount of that is professional fee hold-backs for all constituencies in the case, other professional fees, and a small amount of an administrative expense claim that is part of the environment EPA settlement that the company entered into six or

Page 186

1  Zilly - Highly Confidential
2  eight months ago.
3  Q    And would you now explain to me where
4  the $26 million figure comes from for Chapter 7?
5  A    Yes. It's -- the reduction is based
6  on the assumption that certain of the professional
7  fees would not be paid in a Chapter 7 as opposed
8  to the Chapter 11.
9  Q    So that is the difference between the
10 31 million and the 26 million?
11 A    That is correct.
12 Q    Then priority tax claims and priority
13 claims, you have shown $39 million across the
14 board in either Chapter 7 or Chapter 11; is that
15 correct?
16 A    This again is an estimate based on
17 the company's books and records and an analysis of
18 claim filings, as well as an analysis by Grace's
19 tax team as to the amount of tax claims that would
20 be priority tax claims, primarily state claims,
21 that would be paid on the effective date, and a
22 very small amount of odds and ends priority
23 claims.
24 Q    So that brings us to what appears to
25 be the bottom line here, the line headed

Page 187

1  Zilly - Highly Confidential
2  "Estimated Value Before Provision for General
3  Unsecured Claims, Asbestos PI and PD Claims and
4  Equity Interests."
5  Is it fair to say that the conclusion
6  of this Grace best interests analysis is that in a
7  Chapter 7 case for Grace, commencing on
8  December 31, 2009, the amount of money available
9  to pay general unsecured creditors would be in a
10 range of from $2.211 billion to $2.371 billion?
11 MR. LEIBENSTEIN: Objection.
12 A    Yes, assuming that -- if you include
13 the Fresenius and the Cryovac in the 3.371,
14 correct.
15 Q    Now, is it your understanding that
16 under the proposed Chapter 11 plan, non-asbestos
17 general unsecured creditors will be paid 100 cents
18 on the dollar plus interest?
19 A    I'm sorry, could you just repeat the
20 question.
21 Q    Sure.
22 Is it your understanding that under
23 the proposed Chapter 11 plan, non-asbestos general
24 unsecured creditors will be paid 100 cents on the
25 dollar plus interest?

Page 188

1  Zilly - Highly Confidential
2  A    Yes, with one exception. The --
3  depending on how you define general unsecured
4  claims, if you're including the post-retirement
5  plan in the amount of general unsecured claims,
6  that is not getting interest. Those claimants --
7  those participants in that plan do not get
8  interest.
9  Q    Thank you.
10 Is your understanding that under the
11 Chapter -- let me start again.
12 Is it your understanding that under
13 the proposed Chapter 11 plan, asbestos personal
14 injury claims will be paid from a trust at a rate
15 projected to be from 25 to 35 cents on the dollar?
16 MR. LEIBENSTEIN: Objection.
17 A    I don't have personal knowledge of
18 that number, no.
19 Q    Is it your understanding that in a
20 Chapter 7 case for Grace, all general unsecured
21 claims would be paid at the same percentage rate?
22 MR. LEIBENSTEIN: Objection.
23 A    I don't understand that question.
24 Q    Is it your understanding that when a
25 Chapter 7 trustee distributes funds -- when he

Page 189

1  Zilly - Highly Confidential
2  distributes funds to general unsecured creditors,
3  that he makes a pro rata distribution?
4  MR. LEIBENSTEIN: Objection.
5  A    My understanding is that there would
6  be an amount of value cash available to distribute
7  to unsecured creditors and that amount would be
8  distributed to unsecured creditors. I guess if
9  that's --
10 Q    Well, yes. The rest of the question
11 was it would be distributed on a pro rata basis;
12 is that correct?
13 MR. LEIBENSTEIN: Objection.
14 A    I'm having trouble with your question
15 because I don't understand when you say pro rata.
16 Pro rata on what?
17 Q    Based on the amount of the claim as
18 allowed pursuant to Section 502 of the Bankruptcy
19 Code.
20 MR. LEIBENSTEIN: Objection, vague.
21 A    I think the Chapter 7 trustee would
22 distribute the proceeds based on claims, claim
23 amounts or settlement of claim amounts.
24 Q    So, what you are saying is that a
25 claim might be allowed based on either litigation

### Page 190

1  Zilly - Highly Confidential
2  or settlement, and that most likely the allowance
3  would take place pursuant to settlement; is that
4  correct?
5      MR. LEIBENSTEIN: Objection.
6    A  I think what I just said was that the
7  pro rata -- that the distribution of the cash
8  would be to claimants, and those claimants would
9  either have allowed claims that were based on
10 either claims and/or settlements of those claims.
11   Q  Okay. And then once the allowed
12 amount of the claim had been determined, most
13 likely through settlement, the trustee would make
14 a pro rata distribution to all claimants based on
15 the allowed amount of their respective claims; is
16 that correct?
17     MR. LEIBENSTEIN: Objection, form.
18   A  I can't answer that question because
19 I don't know what you mean by the concept of an
20 allowed claim.
21   Q  If we define allowed as the amount
22 determined either by settlement or through the
23 outcome of litigation between the trustee and the
24 claimant, would that enable you to answer the
25 question?

### Page 191

1  Zilly - Highly Confidential
2    A  I'm sorry, say that again, please.
3    Q  Okay. If I told you that the -- that
4  the word "allowed" meant the amount of each claim
5  determined either by settlement or by court order
6  following litigation between the trustee and the
7  claimant, would that permit you to answer the
8  question?
9    A  I'm sorry. I'm not understanding the
10 question.
11   Q  Let's assume then that there are two
12 creditors and only two creditors in the Chapter 7
13 case. One of them has a claim for $100, which is
14 allowed by court order after a big fight, and the
15 other one has a claim which gets settled for $100.
16 It's your understanding that in each case, the
17 creditor would get the same percentage of its
18 claim paid by the trustee?
19     MR. LEIBENSTEIN: Objection.
20   A  It's my understanding the trustee
21 would pay whatever the court ordered be paid on
22 that claim.
23   Q  Do you have an understanding of
24 whether Chapter 7 requires that it be the same
25 percentage of each claim that gets paid once the

### Page 192

1  Zilly - Highly Confidential
2  amount of that claim has been determined either by
3  settlement or court order?
4    A  I'm sorry, I don't understand your
5  question. The same percent of what?
6    Q  The same percentage of the allowed
7  amount of the claim as determined either by
8  settlement or court order.
9      MR. LEIBENSTEIN: Objection.
10   A  To me percentage involves a numerator
11 and a denominator, so I am -- so I guess I don't
12 understand your question.
13   Q  What is your understanding of how a
14 trustee decides how much to pay to each creditor?
15     MR. LEIBENSTEIN: Objection, vague.
16   Q  Once, once the amount of each claim
17 has been determined either by litigation or by
18 settlement.
19   A  That would depend on how much -- how
20 many assets were available.
21   Q  Right. So, let's say that after
22 obtaining -- to take an example, let's say that
23 the funds left over after the assets are sold and
24 the secured and priority claims are paid and all
25 the expenses of the Chapter 7 are paid, are $100,

### Page 193

1  Zilly - Highly Confidential
2  and you have two claimants, one with a claim for
3  $100, and one with a claim for $300. So the total
4  claims are $400 as allowed either by settlement or
5  court order. And the assets, the cash that is
6  available to pay those claims is $100.
7      What is the percentage distribution
8  to those creditors?
9    A  Under that scenario, it's my
10 understanding that one would get 100 percent of
11 the claim, potentially not 100 percent of the
12 settlement, if the settlement wasn't the same as
13 the claim, and the other would get less than
14 one percent.
15   Q  So the trustee has $100 to distribute
16 to claims in the total allowed amount of $400.
17 Which claim is he going to pay in full?
18   A  I'm sorry, that is not the way I
19 understood the question.
20     MR. LEIBENSTEIN: You changed the
21   hypothetical. The first time it was that
22   there was $100 to pay each of the claims.
23   Pay one 100, and one 100 out of the 400.
24   Q  I'm sorry, $100 to pay all of the
25 claims. So you have two claims, one for $100 and

Page 194

1  Zilly - Highly Confidential
2  one for $300, and there is $100 available for
3  distribution.
4  A    Then each --
5      MR. LEIBENSTEIN: Wait. Objection,
6  vague.
7  Q    How much would be distributed to each
8  creditor?
9      MR. LEIBENSTEIN: Objection, vague.
10 A    It's my understanding that the
11 trustee would distribute the $100 to the claimant
12 of -- with the $100 claim, as well as the claimant
13 with the $300 claim.
14 Q    Right. So how much would go to each,
15 how much of the $300?
16 A    I'm sorry, I need a calculator. Less
17 than 100 percent of their allowed claim.
18 Q    Since there is $100 available to pay
19 $400 of claims in total, would that mean that each
20 creditor got 25 percent?
21 A    If you say so.
22 Q    In a Chapter 7 case for Grace,
23 commencing on December 31, 2009, what would the
24 percentage rate of payment be to general unsecured
25 creditors?

Page 195

1  Zilly - Highly Confidential
2      MR. LEIBENSTEIN: Objection.
3  A    I'm sorry, I'm sorry. Could you
4  repeat the question.
5  Q    Sure.
6      In a Chapter 7 case for Grace
7  commencing on December 31, 2009, as you have
8  assumed in the best interests analysis, what would
9  the percentage rate of payment be to general
10 unsecured creditors?
11     MR. LEIBENSTEIN: Objection, lack of
12 foundation.
13 A    Less than what they would get in a
14 Chapter 11 case.
15 Q    How much would they get in a
16 Chapter 11 case as a percentage rate of payment?
17 A    In a Chapter 11 case, you have an
18 estimated value, based on the value of Grace's
19 cash, certain settlements, and you have a general
20 unsecured claim which according to the plan is
21 fixed, and your provision for asbestos PI and PD
22 claims which have been settled in accordance with
23 the plan.
24     In the Chapter 7 liquidation, you
25 have less assets, no settlements, potential, and a

Page 196

1  Zilly - Highly Confidential
2  claim number put forth -- and an unknown claim
3  number, an unknown settlement for the asbestos PI
4  and the PD claims that, based on my understanding
5  of what the original claim amounts would be, would
6  be significantly higher than what was settled for
7  in the Chapter 11 case, which is why I state that
8  the percentage would be less in Chapter 7 than
9  under Chapter 11.
10     (Discussion held off the record.)
11 BY MR. COHN:
12 Q    Have you attempted to forecast the
13 percentage rate of payment to general unsecured
14 creditors in a Chapter 7 case with Grace
15 commencing on December 31, 2009?
16     MR. LEIBENSTEIN: Objection, vague.
17 A    I have not calculated the percentage.
18 I just, I just know that the total claims for
19 asbestos PI and PD would be higher in a Chapter 7
20 than in the Chapter 11. In the Chapter 11.
21 Sorry.
22 Q    Are you aware that in the Chapter 11
23 case, asbestos PI claims that will ultimately be
24 paid include not just present claims but also
25 future demands?

Page 197

1  Zilly - Highly Confidential
2  A    Yes.
3  Q    In a Chapter 7 case, would asbestos
4  PI claims that got paid include not only present
5  claims but also future demands?
6  A    I don't think the trustee in a
7  Chapter 7 would have the time, the inclination or
8  the money to differentiate between claimants that
9  showed up claiming they were future claims or
10 current claims.
11     MR. COHN: I have no further
12 questions.
13     MR. LEIBENSTEIN: Somebody on the
14 phone?
15     MS. LOK: Yes.
16     MR. LEIBENSTEIN: You said you only
17 have a few minutes.
18 EXAMINATION
19 BY MS. LOK:
20 Q    Ms. Zilly, I'm representing Travelers
21 Casualty. I'm with Simpson, Thacher & Bartlett.
22     In your best interests analysis, did
23 you perform any analysis to determine the value of
24 distribution that Travelers would receive for its
25 claims if the debtors liquidated under Chapter 7?