## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., *et al.*, | Case No. 01-01139 (JFK) |
| Debtors. | (Jointly Administered) |

## LIBBY CLAIMANTS' OPPOSITION TO
## PLAN PROPONENTS' MOTION IN LIMINE TO EXCLUDE
## LIBBY EXPERTS' TESTIMONY

Claimants injured by exposure to asbestos from the Debtors' operations in Lincoln County, Montana (the "Libby Claimants"), by and through their counsel, Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP, submit this opposition to the Plan Proponents' Motion In Limine to Exclude Expert Testimony of Alan Whitehouse, M.D., Arthur Frank, M.D., Craig Molgaard, PH.D., and Terry Spear, PH.D. dated August 13, 2009 [Docket No. 22766].

# TABLE OF CONTENTS

I.     BACKGROUND ..................................................................................................1

II.    COMBUSTION ENGINEERING AND THE LAW OF DISCRIMINATION .................2

    A.  The Legal Context ...............................................................................................2

    B.  Particular discriminations against Libby Claimants.............................................3

        1.  Severes are not fairly classified as severes at level 4B ........................3

        2.  Categorical discrimination against severe pleurals in 4B ....................4

    C.  Grace's view – only the "clear cases" and the "very severe" meet level 4B ..............5

    D.  The issue is not whether the TDP will treat non-Libby Claimants differently than Libby Claimants....................................................................................................5

    E.  Libby winchite exposure claimants are not "substantially similar" to other claimants.....................................................................................................7

III.   EPIDEMIOLOGY TERMS SHOULD NOT BE MISUSED .........................................8

IV.    RESPONSE TO ARGUMENTS AS TO PARTICULAR WITNESSES .......................13

    A.  Dr. Whitehouse and Dr. Frank...........................................................................14

        1.  Dr. Whitehouse and Dr. Frank have addressed the issue of discrimination. Their testimony is relevant...............................................14

        2.  Dr. Whitehouse, who has published two epidemiology studies, is qualified to testify to the associations and opinions derived in studies he has conducted.  Like any other pulmonologist he may testify to epidemiology studies in the pulmonary medical literature ......................15

        3.  Dr. Whitehouse may testify to descriptive epidemiology studies he has conducted.  Grace misrepresents epidemiology ................................18

    B.  The CARD Mortality Study is a descriptive epidemiology study .........................19

    C.  Whitehouse (2004) is a descriptive epidemiology study ......................................21

    D.  The Dr. Whitehouse/Dr. Frank criticisms of the TDP medical criteria are based upon extensive patient data and the medical literature................................23

        1.  Blunting of the costophrenic angle .............................................................24

        2.  The 3mm thickness requirement..................................................................24

        3.  The FEV1/FVC ratio ....................................................................................25

        4.  Diffusion capacity (DLCO) .........................................................................25

    E.  The studies and opinions of Dr. Frank and Dr. Whitehouse are not "mere hypotheses" unsupported by data ......................................................................26

V.     DR. MOLGAARD (EPIDEMIOLOGY) ......................................................................27

    A.  Dr. Molgaard's testimony is relevant .................................................................27

VI.    DR. SPEAR .............................................................................................................27

    A.  The Plan Proponents' Motion in Limine With Respect to Dr. Terry Spear is Moot...........................................................................................27

VII.   CONCLUSION ........................................................................................................28

## I.    BACKGROUND.

Libby Claimants[1] are certainly "resource challenged." Libby does not have huge law firms with teams of lawyers to file motion after motion. But, Libby has facts to bring to court. Lincoln County, Montana, is #1 in the nation for the asbestosis death rate. CDC/NIOSH (2009).[2] Lincoln County, Montana, is #3 in the nation for the mesothelioma death rate. CDC/NIOSH (2009).[3] There is something different about Libby which merits these unfortunate rankings.

Grace[4] pays Libby a compliment. Despite the opportunity for over eight years in this bankruptcy, and despite having spent over $150 million on Libby issues, Grace has not had a single doctor perform a single examination on a Libby patient. No Grace study is offered to suggest that these people are dying of something other than asbestos disease. Instead, Grace presents a maze of sophistry, in attacking Libby's expert witnesses in an attempt to prevent them from testifying.

The central issues are "discrimination" and "epidemiology." Once these two issues are straightened out, Grace's arguments fall away like flies. Grace repeats two quotes over and over. One from the Dr. Frank (occupational medicine) deposition focuses on the lack of a study showing "disproportionate effect" upon Libby compared to claimants outside Libby. Once it is clear that we may demonstrate discrimination against Libby Claimants without doing a

---

[1] As identified in the Amended and Restated Verified Statement of Cohn Whitesell & Goldberg LLP and Landis Rath & Cobb LLP Pursuant to Fed. R. Bankr. P. 2019 [D.I. 22784], as it may be amended and restated from time to time.

[2] CDC/NIOSH, "Work Related Lung Disease Surveillance System, Table 1-10 Asbestosis: Counties With Highest Age-Adjusted Death Rates (per million population), U.S. Residents Age 15 and Over, 1995-2004." Exh. 1.

[3] CDC/NIOSH, "Work Related Lung Disease Surveillance System, Table 7-10 Malignant Mesothelioma: Counties With Highest Age-Adjusted Death Rates (per million population), U.S. Residents Age 15 and Over, 2000-2004. Exh. 2.

[4] We refer to "Grace" with regard to the Plan Proponents' Motion In Limine to Exclude Expert Testimony of Alan Whitehouse, M.D., Arthur Frank, M.D., Craig Molgaard, PH.D., and Terry Spear, PH.D. (the "Motion In Limine"), as the issues here are ones which Grace has pursued for years.

nationwide study, this argument falls away. The other quote repeated over and over is from the

Dr. Molgaard (epidemiology) deposition, and involves use of the terms "hypothesis," "cause,"

"analytic," and "proven." Grace argues that the epidemiology studies by Dr. Whitehouse and Dr.

Frank produce mere hypotheses, and should be dismissed. Once the epidemiology meaning of

the quoted terms is made clear, this argument falls away as well.

## II.    COMBUSTION ENGINEERING AND THE LAW OF DISCRIMINATION.

### A.    The Legal Context.

Grace argues that the Dr. Whitehouse/Dr. Frank opinions are irrelevant under FRE 702,

because they do not address the narrow issue framed by Grace. Grace states that the legal

standard for the "fundamental issue" in these proceedings is that "'equal' treatment requires that

all personal injury claims be resolved through the same process."[5] For this proposition, Grace

cites a case from the Eastern District of Missouri. Grace omits ever to cite, in its entire brief, the

case of *In re Combustion Engineering, Inc.,* 391 F.3d 190 (3d Cir 2005). *Combustion*

*Engineering* is the definitive Third Circuit case on asbestos bankruptcy plan requirements. It

provides essential guidance in this case.

If, as Grace suggests, all that is required that "all personal injury claims be resolved

through the same process," then within that process it matters little that certain classes or groups

be discriminated against. Grace, p.2, actually argues that "because the process established by the

Plan is the same for all Claimants, by definition there can be no discriminatory treatment." If

Grace's argument were correct, the TDP could provide that unimpaired pleural claims would be

liquidated for $180,000 and mesotheolioma claims for $2,500 (instead of the converse, as the

TDP now provides), and mesothelioma claimants would have no grounds for complaint. This is

---

[5] Motion In Limine, p.2.

certainly not the message of *Combustion Engineering*. In *Combustion Engineering*, Plan confirmation was vacated because "the *Combustion Engineering* bankruptcy Plan may not impermissibly discriminate against certain asbestos personal injury claimants." 391 F.3d at 239. "[T]he Certain Cancer Claimants . . . appeared to receive a demonstratively unequal share of the limited Combustion Engineering funds." *Id.,* at 242. An important issue was the plan's "treatment of malignant asbestos claims relative to non-malignant asbestos claims." *Id.* The court observed that "section 1123(a)(4) requires that a Plan of reorganization 'provide the same treatment for each claim or interest of a particular class.'" *Id.,* at 239. In sum, as the Plan Proponents acknowledge, the Plan may not "discriminate." In *Combustion Engineering* the key words are "relative to;" claims must be treated fairly *relative to* each other.

There is another issue. As required by Section 1122(a) of the Bankruptcy Code and as *Combustion Engineering* instructs: "only substantially similar claims may be classified together under a plan of reorganization." *Id.*, at 239. Libby Claimants demonstrate that Libby winchite exposures are different, and not "substantially similar" to other claims.

**B.     Particular discriminations against Libby Claimants.**

**1.     Severes are not fairly classified as severes at level 4B.**

In recognition of the severity of pleural disease from Libby exposures, the Grace Plan is the first asbestos plan to create a "severe pleural disease" category (4B). In this case, Libby exposures may be called "Libby winchite exposures." Winchite[6] asbestos is a rare form of asbestos. Libby winchite exposures also occurred in Grace expansion plants at various locations across the United States.

_____

[6] Libby asbestos is 84% winchite, 11% richterite, and 6% tremolite, Meeker (2003), "The Composition and Morphology of Amphiboles from the Rainy Creek Complex, Near Libby, Montana," Am Mineralogist, 2003; 88:1955-1969.

3

Unfortunately, only about 14% of Libby patients who have died of non-malignant asbestos-related disease (ARD) are classified under the Plan as 4B "severe pleural disease." CARD Mortality Study, Expert Report of Dr. Alan C. Whitehouse May 2009, ¶ 80. The study was done on the theory that "these patients were all severe and are now dead." *Id.*, ¶ 79. 110 CARD patients died of asbestos-related disease, 76 of which died of non-malignant ARD and would be considered "severe."

Severes are not fairly classified as severes at level 4B, because the TDPs place several "add-ons" onto the standard diagnosis and evaluation of severity. These "add-ons" have the following effects, per the CARD mortality study.[7]

    The blunting requirement excludes 42%
    The 3mm thickness requirement excludes 16%
    The over 25% extent requirement excludes 18%
    The FEV1/FVC ratio requirement excludes 40%
    Omitting use of DLCO excludes 52%
    Omitting use of CT scans excludes a significant number

The above exclusions overlap. The net result is that 86% of severes (who are dead) are excluded from level 4B. The exclusions are arbitrary. They amount to discriminations. The discriminations operate upon any claimant with severe pleural disease, who is excluded by them.

### 2.    Categorical discrimination against severe pleurals in 4B.

In the TDPs, cancer claimants qualify on a standard diagnosis. This operates at level 8 (mesothelioma), level 7 (lung cancer), and level 5 (other cancers). At level 4B (severe pleural disease), the TDPs place several "add-ons" onto the standard diagnosis and evaluation of severity. The result is as follows:

---

[7] See Expert Report of Dr. Alan C. Whitehouse, May 2009, ¶¶ 75-80.

| Level | | % Qualify |
|---|---|---|
| 8 | Mesothelioma | 100% |
| 7 | Lung cancer | 100% |
| 5 | Other cancer | 100% |
| 4B | Severe pleural disease | 14% |

This is a categorical discrimination against Libby exposures in particular and severe pleurals in general.

### C.    Grace's view – only the "clear cases" and the "very severe" meet level 4B.

Grace, p.29, disagrees "that the TDP's criteria for expedited review should compensate all of the truly sick people in Libby.  That is not the purpose of the TDP; rather the TDP aims to provide immediate compensation to clear cases of disease with objective findings that demonstrate that an individual truly has disease."  (Emphasis added).  Grace, p.24, also refers to these as the "very severe."

This is a fundamental error.  Level 4B, "severe and disabling pleural disease" cannot be limited to the "very severe" and "clear cases" as severe pleural disease.  Yet the "add-ons" in level 4B accomplish exactly that.  This is a discrimination against "severes" who meet the standard diagnosis and evaluation procedures, but do not meet the "add-ons."  The Plan will "impermissibly discriminate" under *Combustion Engineering*, 391 F.3d at 239.  Clearly the Plan does not "provide the same treatment for each claim or interest of a particular class."  *Id.*  Clearly "relevance" in this case extends to the issues the Libby Claimants raise.

### D.    The issue is not whether the TDP will treat non-Libby Claimants differently than Libby Claimants.

Forgetting the actual issues raised by Libby, Grace attempts to narrow the issue further, at p.13, "to the extent an issue of discrimination exists, involves whether the TDP will treat non-

5

Libby Claimants differently than Libby Claimants." Then Grace cites a number of deposition questions on whether Libby's experts had conducted nationwide studies on non-Libby Claimants. Nationwide studies are not necessary to prove discrimination. As demonstrated above, all Libby need do is prove discrimination against Libby Claimants or that they are a part of a group discriminated against.

Let us consider an example of a large insurance company charged with discrimination against women in granting managerial promotions. A plaintiff need only prove that she is a member of a class (females) discriminated against on promotions. It is not a defense to contend that there is no more discrimination in Pennsylvania than there is in other states. The plaintiff does not have to prove discrimination rates in other states, or demonstrate that the Pennsylvania rate is disproportionate to other states.

In the instant case, the Libby Claimants can demonstrate that Libby exposure "severes" are discriminated against because many who are truly severe (i.e., dead) are not classified as "severe" due to the add-ons in level 4B. Claimants with severe pleural disease from other parts of the U.S. could do the same. Similarly, since level 4B "severes" are discriminated against in comparison to how levels 8, 7, and 5 are treated, this too may be "impermissible discrimination" upon severes from other states as well.

Thus the repeatedly quoted question to Dr. Frank is truly irrelevant:

Q:    And have you done the analysis about whether the TDP category IV B would have any kind of <u>disproportionate effect</u> on people with diffuse pleural disease at Libby?

A.    I've not done that kind of analysis (emphasis added).

Libby need not prove "disproportionate effect" as compared to claimants in other states. Libby need only prove discrimination against Libby exposure claimants.

**E.    Libby winchite exposure claimants are not "substantially similar" to other claimants.**

Libby is different. "There generally appears to be a distinct pattern for Libby asbestos disease."[8] Libby has the same list of malignant and non-malignant asbestos-related diseases as elsewhere. The pathology is the same. The differences are in type of asbestos (winchite) and in disease presentation and severity. The differences are that Libby asbestos disease is predominantly pleural.[9] The pleural disease is highly progressive.[10] Once diagnosed, the patient has a probability of death by asbestos-related disease.[11] Death by pure pleural disease is common.[12] Many have diffusion capacity as the leading indicator of severity.[13] The above observations are documented in the epidemiology study called the CARD Mortality Study.[14] None of the foregoing phenomena is reported in the literature elsewhere in the United States. Libby exposures are not "substantially similar" to other claims. The probability of death leads to a probability of future medical expenses. This is a reason that Libby settlement amounts are much greater than elsewhere.

The EPA Public Health Emergency Determination[15] speaks to the "Libby is different" issue.

The Libby Asbestos Site is unique with respect to the multiplicity of exposure routes, the cumulative exposures as experienced by community members, and the adverse health effects from asbestos exposure already present and documented in the residents.

---

[8] Expert Report of Dr. Alan C. Whitehouse, May 2009, ¶ 34.
[9] *Id.*, ¶ 31(4) and (5).
[10] *Id.*, ¶ 34.
[11] *Id.*, ¶ 32.
[12] *Id.*, ¶ 31(3).
[13] *Id.*, ¶ 31(7).
[14] See Footnote references above. The highly progressive nature of Libby asbestos disease is also documented at Whitehouse (2004).
[15] Determination and Findings of Public Health Emergency for the Libby Asbestos Site in Lincoln County, Montana United States Environmental Protection Agency, June 17, 2009, p.1 (Exhibit 3(a)).

{393.001-W0002594.}

The "Libby is different" issue and testimony relating relative thereto are within the scope of "relevance" in this case under FRE 702.

## III.    EPIDEMIOLOGY TERMS SHOULD NOT BE MISUSED.

Grace, p.26, asserts that "Dr. Whitehouse's opinions constitute nothing more than a series of untested 'hypotheses,'" and therefore, at p.27, "must be excluded as unreliable." In epidemiology everything remains a "hypothesis" until proven by replicated controlled experiment.

Scientific terminology is very important in epidemiology. The generally accepted terminology for epidemiology is set forth in Last, J.M. Ed., A Dictionary of Epidemiology (2001).[16] Epidemiology is divided into "observational" epidemiology and "experimental" epidemiology. Medical studies are "observational," because generally an experimental study cannot be done on human beings.[17] It would be unethical to experiment with human beings by giving groups of people a controlled dose of asbestos, then observing the development of disease. Accordingly, medical studies remain in the field of observational epidemiology.[18]

Observational epidemiology is divided into "analytic" epidemiology and "descriptive" epidemiology. The characteristics of each may be summarized as follows: [19]

---

[16] Molgaard Affidavit (8/31/09) ¶2, Exh. 4.
[17] *Id.*, ¶ 3, also see *Reference Manual on Scientific Evidence* (Fed. Judicial Ctr. 2d ed. 2000) *Reference Guide on Epidemiology,* 338 – 339.
[18] *Id.*, ¶ 3.
[19] See *Id.*, generally.

| **Analytic** | **Descriptive** |
|---|---|

| | **Analytic** | **Descriptive** |
|---|---|---|
| 1. | Establish An Association | Establish An Association |
| 2. | May Be Random | Not |
| 3. | Usually Has Controls | May Have A Comparison Group |
| 4. | May Be Dose/Response | Not |
| 5. | May Test A Hypothesis | Not |
| 6. | Evidence for Causation | Evidence for Causation |
| 7. | Statistical Prediction | Statistical Inference |
| | | (A Generalization) |

**Whitehouse (2004)**
**Whitehouse *et al.* (2008)**
**Card Mortality Study**

The key here is that associations developed through descriptive epidemiology may be used as generalizations and may form the basis for public health decisions.[20]  In Libby, where clinical trial of asbestos dosing would be unethical, descriptive studies become more important.

Most medical studies are descriptive epidemiology.  A cohort is observed over time. Data is analyzed, and percentage or number associations are developed.  This is true of the longitudinal lung function studies like Whitehouse (2004), Jones *et al.* (1989), Olsen *et al.* (1985), Siracusa *et al.* (1984), Murphy *et al.* (1971, 1978), and Rom *et al.* (1992).[21]

The Surveillance, Epidemiology and End Results (SEER) program of the National Cancer Institute is an example of a cancer surveillance system that is largely descriptive epidemiology.  SEER collects cancer incidence and survival data from population-based registries covering about 26% of the U.S. population.  Data is collected on patient demographics, primary tumor site, tumor morphology, stage at diagnosis, first course of treatment, and follow-up for vital status (SEER Website). "Surveillance of cancer patterns is the foundation of the

---

[20] *Id.*, ¶ 13.
[21] *Id.*, ¶ 10 and Sur-Rebuttal Report of Dr. Craig Molgaard (Epidemiology) ¶ 5 and 13(c).

9

SEER network. It has been the primary means of measuring the national burden of cancer

through incidence, morbidity, mortality and survival statistics, as well as evaluation of the impact

of cancer related risk factors.  Surveillance includes descriptive studies, geospatial and GIS

clusters/outbreaks data, sentinel/signal early warnings, health disparities, models and methods

and policy data." (SEER Web Site and Molgaard Affidavit, ¶ 9)

A classic example of descriptive epidemiology being used to determine health policy is a

descriptive study carried out at the Mayo Clinic, examining rates of Guillaume Barre Syndrome.

Kurland and Molgaard, "The Patient Record in Epidemiology," Scientific American 1981 (245)

54-63.[22]

In epidemiology, everything is a hypothesis until proven by replication.[23]  In the asbestos

insulators studies, observations on death rates, though documented by data, remain as

hypotheses.  Not all individuals in the insulators cohort have died as yet.  The observed rates

could change if updated in a new study.  The death rates remain unproven, because the studies

have not been replicated.[24]

The following series of questions and answers is quoted three times in the Grace Motion

in Limine.  The following is from p.26.

> Q.    One **hypothesis** that Dr. Whitehouse has raised is that pleural disease **caused** by
> exposure to Libby asbestos is different, in terms of severity of lung function loss,
> than pleural disease **caused** by other forms of asbestos.  That's a hypothesis that
> he has, correct?

> A.    Correct.

> Q.    And neither he nor you have done the **analytical** epidemiological work to
> determine whether that hypothesis is true?

> A.    Correct.

---

[22] *Id.*, ¶ 14.
[23] *Id.*, ¶ 12.
[24] *Id.*, ¶ 12.

Q.    The – you certainly haven't – you certainly are not prepared to give an opinion, to a reasonable degree of certainty as a epidemiology – as an **epidemiologist**, that the pleural disease **caused** by exposure to Libby asbestos is more severe, in terms of loss of lung function, than pleural disease **caused** by other forms of asbestos outside of Libby?

A.    Correct.

Q.    And in your view as an expert epidemiologist, none of the work done by Dr. Whitehouse or Dr. Frank, or any other expert in this case, would allow you to **prove** that **hypothesis**?

A.    Not that I'm aware of.

Q.    One **hypothesis** that one could test is whether or not pleural disease caused by exposure to Libby asbestos is more likely to lead to death than pleural disease **caused** by exposure to other types of asbestos, correct?

A.    Correct.

Q.    And neither you nor Dr. Whitehouse nor anybody else have done the **analytical** epidemiological work to **prove** where or not that hypothesis is true, correct?

A.    Correct.

Motion In Limine, p.26 (emphasis added) (internal citation omitted). Note the underscored bold terms. In epidemiology, "proof" of "causation" is very different than in the law. In the law, causation may be established by an opinion that X was more probably than not a substantial factor in causing Y. In epidemiology, proof requires formal testing and replication. Even then, several strong associations are necessary for causation.[25] This far exceeds the legal standard of "more likely than not" probability based on opinion. "Cause" and "proven" do not have the same meanings in epidemiology as in the law.

Epidemiologic studies, while considered to be "powerful evidence of causation," are not required to prove causation in a pharmaceutical personal injury case. See, e.g., Rider [v. Sandoz Pharm. Corp.] 295 F.3d [1194] at 1198-99 (citing Eighth, Tenth, and Eleventh Circuit decisions holding that epidemiology is not required to prove causation in a toxic tort

---

[25] Id., ¶ 12.

case); *In re Meridia Prods. Liab. Litig.,* 328 F.Supp.2d 791, 800-01 (N.D. Ohio 2004) (surveying the pre- and post- *Daubert* landscape and concluding that 'no court has held that epidemiological evidence is necessary to establish general causation when other methods of proof are available", *aff'd* 447 F.3d 861 (6th Cir. 2006).

Quote from In re Neurontin Marketing, Sales Practices, and Products Liability Litigation, 612 F.Supp.2d 116, (expanded *Rider* citation added)

The associations developed in the CARD mortality study and stated as percentage associations are developed from strong enough number data to be considered epidemiological evidence, from which public health decisions may be made.

Peipins *et al.* (2003) is a summary of the ATSDR screenings in Libby in 2000 and 2001. Of the population of the Libby area, 61% was screened. 18% had pleural abnormalities. This is a very high number. Whitehouse (2004) found that 76% of patients with two or more lung function tests had progressive loss of lung function. Like most medical studies, both these studies are descriptive epidemiology studies. The percentages are a form of statistical association. The associations thus developed remain "unproven" in epidemiology. Nevertheless, these two descriptive epidemiology studies were relied upon by the EPA in its "Determination and Findings of a Public Health Emergency for the Libby Asbestos Site in Lincoln County, Montana."[26]

The data driven, epidemiologically sound CARD mortality study, Whitehouse (2004), and Whitehouse *et al.* (2008), and percentage associations derived therefrom may not be rejected as mere "hypotheses" as that term is used in the law. A "mere hypothesis" in the law is one

---

[26] Exh. 3(b), US EPA Action Memorandum Amendment, p.11, 12, 13, 14, and 23; Exh. 3(c), US EPA Certification of Documents in the Administrative Record, pp. 2-3.

without validation by data or careful observation.[27]  This is very different from a "hypothesis" in epidemiology which may be a statistical inference solidly supported by data, but which nevertheless remains "unproven" by clinical trial and replication.  The 9th Circuit Court of Appeal in U.S. vs. W. R. Grace *et al.*, 504 F. 3d 745 at 766, reversing the lower court's exclusion of the ATSDR screening study in the Grace criminal trial as a basis underlying expert opinion or testimony, noted that:

> Further, **the fact that a study is associational-rather than an epidemiological study intended to show causation does not bar it from being used to inform an expert's opinion** . . . .
> . . .
> Moreover, the study, which was published in a peer-reviewed journal and relevant to association, is adequate under 702.  **The study's failure to establish causation goes to the weight it should be accorded,** but does not mean that an expert could not rely on it in forming an opinion.

(emphasis added)

## IV.    RESPONSE TO ARGUMENTS AS TO PARTICULAR WITNESSES.

Having clarified the issues of discrimination and epidemiology, using the clarifications as a basis, we will address the Grace Motion In Limine's issues as to the testimony of various witnesses.

---

[27] In *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517 (6th Cir. 2007), (*reh. & reh. en banc den.* 6th Cir. 2008) the district Court struggled with an expert opinion about which there was "substantial room for debate" about a data set and "substantial bases upon which to criticize" certain assumptions of the expert.  The district Court finally realized that the Daubert motion criticisms, though pointed, went to the weight and not the admissibility of the expert opinions (527-528).  The 6th Circuit in upholding the district Court's decision to allow the testimony noted the task for the Court in ". . . deciding whether an expert's opinion is reliable is not to determine if it is correct, but rather to determine it rests upon a reliable foundation, as opposed to, say, unsupported speculation." (530 -531) The 6th Circuit cited *Jahn v Equine Services*, 233 F.3d 382 (6th Cir. 2000) where ". . . opinions of the proferred testimony "may very well be shaky," "because the opinions were based upon facts in the record, and were not "assumptions" or "guesses,", challenges merely went to the accuracy of the conclusions, not to the reliability of the testimony." (531)  The District Court also quoted McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 801 (6th Cir. 2000)  "An expert's opinion, where based on assumed facts, must find some support for these assumptions in the record. However, mere "weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather on its admissibility." (internal quotations omitted).

13

### A.      Dr. Whitehouse and Dr. Frank.

Dr. Frank has concurred in the Expert Reports of Dr. Whitehouse of December 2008, March 2009, and May 2009.[28]  In the Dr. Frank section of the Motion In Limine, p.31, Dr. Frank is incorporated into the arguments concerning Dr. Whitehouse's opinions.  Accordingly, we will address both.

### 1.      Dr. Whitehouse and Dr. Frank have addressed the issue of discrimination.  Their testimony is relevant.

At p.13, Grace claims "Dr. Whitehouse has not addressed the only relevant issue here: alleged discrimination."  As explained above, Dr. Whitehouse and Dr. Frank have addressed the discrimination issues of (1) severes not classified as severes at level 4B, and (2) categorical discrimination against severe pleurals.  Their testimony is relevant.

Grace, p.13, asserts that the only issue of discrimination is "whether the TDP will treat non-Libby Claimants differently than Libby Claimants."  As discussed above, Libby Claimants' burden is to show discrimination against Libby and any group Libby Claimants are part of, and not to perform nationwide studies on how others are treated.  As noted at Grace's Motion In Limine, p.15, Dr. Whitehouse testified that people with severe pleural disease outside Libby would be excluded as well.  They are discriminated against too, because *the discrimination is against all severe pleurals who do not have the TDP's "add-on" requirements*.  Since Libby Claimants have no duty to perform nationwide studies on discrimination against others, Dr. Frank's statement that no "disproportionate effect" studies have been done does not render his opinions irrelevant or insufficient to address the issue before the court.  Disproportionate effect is not the issue.

---

[28] Sur-Rebuttal and Supplemental Expert Report of Dr. Arthur L. Frank, pp.1-2.

The following misrepresentation appears at Grace's Motion In Limine, p.14: "At his deposition, Dr. Whitehouse acknowledged that the criteria in the TDP reflect the criteria for evaluating disease established by the medical community." In the quotes that follow, what Dr. Whitehouse agrees with is that the <u>extremely narrow</u> TDP criteria with the "add-ons" may indeed capture clear, clear cases of severe pleural disease. A non-medical example would be: if you walk down the street and see someone dressed in black and gold, with a logo emblazoned "I love the Steelers," that's a clear, clear example of a Pittsburgh Steelers fan, but does not exclude the possibility that other people you passed in the street are also Pittsburgh Steelers fans. The issue is whether the TDP will <u>fairly</u> capture cases of severe pleural disease. The answer is no. The discrimination is blatant, as 86% of Libby Claimants who died of non-malignant asbestos-related disease are excluded from the severe pleural category 4B.

> **2.      Dr. Whitehouse, who has published two epidemiology studies, is qualified to testify to the associations and opinions derived in studies he has conducted. Like any other pulmonologist he may testify to epidemiology studies in the pulmonary medical literature.**

Dr. Whitehouse has published Whitehouse (2004) and Whitehouse *et al.* (2008). Grace's two epidemiologists agree that these are epidemiology studies.[29] Libby's epidemiologist Dr. Craig Molgaard agrees that these are epidemiology studies. After Dr. Whitehouse developed the associations and did the statistical work himself for Whitehouse (2004), a statistician reviewed it. The CARD Mortality Study, Whitehouse (2004), and Whitehouse *et al.* (2008), are all epidemiology studies.[30] Dr. Whitehouse may testify to them.

---

[29] Dr. Suresh Moolgavkar, May 26, 2009, deposition p.43 line 4 through p.44, line 8 and p.113, line 5 through 23. Exh. 5. Dr. Howard Ory, May 27, 2009, deposition p.6 line 9 through p.10, line 20 and p.112, line 18 through p.113, line 22. Exh. 6.
[30] Sur-Rebuttal Report of Dr. Craig Molgaard (epidemiology), at 2-3.

Medical literature is largely epidemiology studies. Groups of patients are followed over time, data is analyzed, and statistical inferences are drawn.[31] This is epidemiology. Medical doctors read epidemiology articles constantly and must be familiar with epidemiology concepts. In court, physicians inform the trier of fact as to the meaning of medical literature and how it bears upon issues in the case at hand. Dr. Whitehouse is eminently qualified to do this.

The Grace Motion In Limine, p.17, asserts that "Dr. Whitehouse is unqualified to render epidemiology opinions about populations of individuals." The 123 patients with a diagnosis of ARD in Whitehouse (2004) were Dr. Whitehouse's patients. This is a population. The 76 subjects in the CARD mortality study who died of non-malignant ARD were patients of the CARD Clinic. This is a population. Certainly Dr. Whitehouse can testify to subjects for whom he has gathered and analyzed data. Grace implies that Dr. Whitehouse and Dr. Frank extrapolate the studies on CARD patients to outside "populations" not diagnosed with ARD. They do not. This is a false issue.

Dr. Whitehouse, a pulmonologist, may testify to epidemiology studies, including those in the medical literature, just as any other expert pulmonologist may.

The Grace Motion In Limine, p.17, states: "Another federal court has already found that Dr. Whitehouse is unqualified to render epidemiology opinions about populations of individuals." This is not true. The Order of 4/21/09 in the criminal case is attached as Exh. 13 to the Grace Motion In Limine. The Order of 4/21/09 does not read as Grace represents. First, the Order states: "there is no basis upon which to strike Dr. Whitehouse's testimony in its entirety as Grace requested." Dr. Whitehouse testified to many generalizations about the population of

---

[31] Molgaard Affidavit ¶8. Last, JM Ed., a Dictionary of Epidemiology defines "epidemiology" as "the study of the distribution and determinants of health related states or events in specified population, and the application of this study to control health problems." p.62.

individuals with asbestos disease in Libby. This testimony was not stricken. The opinion that

was stricken is not one offered in this case. And the order in the criminal case, entered against

an overtaxed government lawyer on a different record than is before this Court, is not binding on

this Court and should not even be regarded as persuasive. In the criminal case, Judge Molloy

denied Grace's motion to strike Whitehouse (2004), "Asbestos-Related Pleural Disease Due to

Tremolite Associated with Progressive Loss of Lung Function: Serial Observations in 123

Miners, Family Members, and Residents of Libby, Montana," Am J Ind Med (2004) 46:219-

225, p.224, which states:

> It is apparent from these data that the majority of the 1,500 persons who have radiologic
> changes of asbestos exposure are at increased risk for progressive loss of lung function
> from pleural changes alone or from potential future development of interstitial fibrosis.
> Assuming a latency period of between 20 and 30 years to significant disease, it is not
> unreasonable to expect that the people of Libby, Montana, will have to be monitored over
> the next 30-40 years, because of the risk for loss of pulmonary function and other known
> diseases historically associated with asbestos exposure.

This is a carefully qualified conservative statement. All the U.S. Attorney had to do was read the

above quoted portion of the article to Dr. Whitehouse and ask him a question on its meaning.

Instead, the U.S. Attorney asked the following question: "So how long into the future do you see

new cases of ARD presenting in Libby."[32] This appeared to the court to be a "prediction" and a

statement of "general causation," both of which have strict formal meanings in epidemiology,

and require exhaustive epidemiologic work to establish.[33] Dr. Whitehouse testified on cross-

examination that this is not a "scientific prediction" and that he was not putting "numbers" on

it.[34] However, the proper foundation was not laid for the opinion. That is not a problem in the

instant case. Judge Molloy did not strike Dr. Whitehouse's testimony on all epidemiology

---

[32] Tr. 1455 *U.S. v. W.R. Grace et al.,* CR 05-07-M-DWM, March 4, 2009, Trial Transcript p.1454, line 9 through p.1455, line 35. Exh. 7.
[33] Molgaard Affidavit ¶ 12.
[34] Tr. 1512 *U.S. v. W.R. Grace et al.,* CR 05-07-M-DWM, March 4, 2009, Trial Transcript pp.1511-1512. Exh. 7.

opinions. Judge Molloy struck just one, which was the perceived prediction to the year 2030.

Grace's claim at p.17 that Dr. Whitehouse is "not qualified to offer opinions regarding groups of

people" overreaches, and is contrary to the generally accepted practice of permitting a doctor to

testify about groups of patients he has studied.

> **3.    Dr. Whitehouse may testify to descriptive epidemiology studies he has conducted. Grace misrepresents epidemiology.**

The Grace Motion In Limine, p.18, starts off with a complaint on Dr. Whitehouse's

patients "many of whom were referred to Dr. Whitehouse by lawyers in this case." The "many"

turn out to be about five, out of 950 sets of medical records delivered to Grace.[35] Five of 950 is

not a significant percentage.

The Grace Motion In Limine, pp.18-19, discusses "populations" of 1,800 (all CARD

patients) and 950 (Libby Claimants), but no study was done on the 1,800 or the 950. The

associations and observations in Dr. Whitehouse's testimony to this court come largely from the

CARD Mortality Study, which was a study upon all deceased CARD patients[36] (186), of which

110 died of asbestos-related disease.[37] One of the conclusions is that "CARD patients once

diagnosed have a probability of death by asbestos-related disease."[38] Grace, p.19, wonders how

Dr. Frank and Dr. Whitehouse can extrapolate from the 110 deceased in the CARD mortality

study to a probability for all diagnosed patients. This is explained by Dr. Frank at his 6/5/09

deposition, pp.225-228. In epidemiology, "representative" means that "the sample resembles the

population in some way." The 110 deceased patients were all diagnosed with ARD. The Libby

---

[35] Attorney referrals to Dr. Whitehouse are discussed at pp.206-215, Dr. Whitehouse Depo 3/19/09, exhibits 57-65.
[36] All deceased who met certain data requirements. See Dr. Whitehouse Report May 2009, ¶ 31.
[37] Dr. Whitehouse Report May 2009, Exh. 7.
[38] *Id.*, ¶ 32.

Claimants are all diagnosed with ARD.  Accordingly, the extension is made.  110 is a large number, and has strong statistical strength.[39]

### B.    The CARD Mortality Study is a descriptive epidemiology study.

The CARD Mortality Study demonstrates that 59% of those diagnosed with ARD die of it.[40]  This is higher than reported elsewhere in the medical literature.[41]  The CARD mortality study data show that only 14% of the deceased qualify as "severe" under the TDPs.[42]

The Grace Motion In Limine, p.20, attacks the CARD mortality study that it "merely formulates a hypothesis."  In epidemiology terms the CARD mortality study formulates hypothesis (*e.g.*, that 59% died of ARD) in the same way that the asbestos insulators studies formed hypothesis.[43]  In epidemiology, an "association" is a "statistical dependence between two or more events, characteristics, or other variables.[44]  Each statistical inference, each percentage presented as based upon sufficient data is an association.[45]  The associations remain "hypotheses" until formally proven and replicated.[46]  The association is not a "mere hypothesis" but associations based on statistical inferences developed through epidemiological studies.

(1)    Grace, p.20, claims the CARD mortality study has no "protocol."  Assembly of subjects for the study is explained at Whitehouse Report December 2008, ¶ 31.  See Sur-Rebuttal Report of Dr. Craig Molgaard (epidemiology, p.3).

(2)    Grace, p.20, claims the CARD cohort of patients deceased from non-malignant asbestos-related disease is not medically comparable to the insulators' cohort of patients

---

[39] Molgaard Affidavit ¶ 12.
[40] Dr. Whitehouse Report May 2009, ¶31.
[41] Dr. Whitehouse Report May 2009, ¶32.
[42] *Id.*, ¶ 80 and Errata Sheet.
[43] Molgaard Affidavit ¶ 12.
[44] Last, Ed., p.7.
[45] Molgaard Affidavit ¶ 7.
[46] *Id.*, ¶ 12.

deceased from non-malignant asbestos-related disease.  Dr. Frank states reasons why the studies are medically comparable at Whitehouse Report December 2008, ¶ 32.  See also Sur-Rebuttal Report of Dr. Craig Molgaard (epidemiology, p.3).

(3)     Grace, p.20, asserts without support that the CARD mortality study was not representative of the CARD population.  As has been explained, the CARD population and the patients in the CARD mortality study are all diagnosed with ARD.  That is the link.

(4)     Grace, p.20, claims that a "level of exposure" is necessary to any medical study of asbestos patients.  "This is not necessary for an epidemiology study.  Most descriptive epidemiology studies, including those in the area of asbestos disease, do not inquire into dose/response relationships."  Sur-Rebuttal Report of Dr. Craig Molgaard (epidemiology, p.4).

(5)     Grace, p.20, states that "Dr. Molgaard testified that Dr. Whitehouse's approach (to cause of death) was inappropriate."  This is a misrepresentation of the record both as to Dr. Molgaard's deposition testimony and Dr Whitehouse's.  The hypothetical question to Dr. Molgaard assumed Dr. Whitehouse had rejected pathology evidence.  There is no evidence of that in Dr. Whitehouse's testimony.  In supposed support of their allegation, Grace identifies, without quoting it, a snippet of Dr. Molgaard's deposition testimony (6/25/09 Dr. Molgaard Dep. at 180-183) relating to some of his opinions about the value of considering pathology samples.  However, Grace fails to disclose to the Court, Dr. Molgaard's further testimony from the same deposition concerning his opinions regarding the usefulness of pathology in cases of lung disease:

> . . . in the general practice of internal medicine or chest disease, we don't
> even ask for autopsies because we know what they died of.  We know

{393.001-W0002594.}

> more than the pathologist can tell us for the most part.
> . . .
> In general, as I said earlier, I believe that autopsy confirmation is very
> useful.  Though, for lung diseases, I could see where it would be harder to
> do a good autopsy confirmation on that and maybe unnecessary.

6/25/09 Dr. Molgaard Dep. at 90-92.  Exh. 8.

The CARD mortality study meets epidemiology requirements.[47]  It is reliable evidence

within FRE 702.  Grace's claims are not only fully disposed by the record, they present to this

court a wrong view of epidemiology, which cannot be trusted.

C.      **Whitehouse (2004) is a descriptive epidemiology study.**

The study in question is Whitehouse (2004) "Asbestos-Related Pleural Disease Due to

Tremolite Associated with Progressive Loss of Lung Function:  Serial Observations in 123

Miners, Family Members, and Residents of Libby, Montana," Am J Ind Med (2004)  46:219-

225.  It states at p.223:

> The progressive loss of lung function in 76% of the 123 patients with pleural changes
> followed in this group of patients with Libby tremolite exposure is excessive compared to
> other published reports.

Again, Grace, p.22, misrepresents epidemiology.  A descriptive epidemiologic study does not

test a hypothesis through a controlled experiment, but that does not mean a descriptive study

cannot develop statistical inferences and associations, which are important to the medical

literature.  Since most medical literature is descriptive (doctors following patients over time and

presenting data), Grace's extreme position invites the court to toss out most medical literature.

There are no missing links in this study as Grace suggests.  This is a peer reviewed

published study that Grace seeks to strike as "unreliable."  Grace has had the data underlying the

study since at least 2006, and has examined it many times.  Grace does not challenge the

---

[47] Sur-Rebuttal Report of Dr. Craig Molgaard, (epidemiology, p.3).

{393.001-W0002594.}

statistical conclusions in the study.  Instead, Grace tries to nibble around the edges.

(1)    Grace, p.21, complains that the subjects were "not randomly selected from the Libby population."  Whitehouse (2004) was not a study on the residents of Libby.  It was a study on patients diagnosed with ARD, including all patients with two lung function tests.  The selection was objective, not subjective.  Dr. Molgaard states:  "In a descriptive epidemiology study, subjects need not be randomly chosen.  Most epidemiology studies are descriptive, and most do not involve random selection."[48]

(3)    Grace, p.21 complains that there was no "control group," as to a "specific disease agent."  All in the study had exposure to Grace's asbestos in Libby, which has poisoned so many.  Dr. Molgaard explains that pulmonary function test norms set in large studies provide the control group for tracking lung function tests, as was done in Whitehouse (2004).[49]

(4)    Grace, p.22, complains that Whitehouse (2004) did not analyze community "exposure levels."  Dr. Molgaard explains that "few papers address dose/response.  Most asbestos studies do not examine exposure levels.[50]  There was Grace data from 1975, which showed an asbestos count of 1.1 f/cc at the hospital in Libby on the edge of downtown.[51]  This is over 30x the OSHA workplace asbestos permissible level.  Peipins et al. (2003) discusses this data, but there is not enough data for a dose/response analysis.

(5)    Grace, p.22, complains that Whitehouse (2004) used only two data points (first and last lung function test).  Dr. Molgaard states that "for longitudinal studies of lung

---

[48] Sur-Rebuttal Report of Dr. Craig Molgaard, (epidemiology, p.6).
[49] Sur-Rebuttal Report of Dr. Craig Molgaard, (epidemiology, p.6).
[50] Id.
[51] Dr.Whitehouse Report, December 2008, Exh. 20.

22

function loss due to asbestos exposure, use of two data points is common."[52]  Molgaard

cites four other published studies that do so.

Grace's points are not only wrong, they attempt to mislead the court.  Whitehouse (2004)

was one of the studies relied upon by the EPA in declaring the Libby Asbestos Site a Public

Health Emergency.[53]  Whitehouse (2004) is properly done and reliable.  Grace does not refute its

numeric conclusions of 76% progression and lung function losses of FVC 2.2% per year, TLC

2.3% per year, and DLCO 3.0% per year.

**D.     The Dr. Whitehouse/Dr. Frank criticisms of the TDP medical criteria are
based upon extensive patient data and the medical literature.**

Based on the CARD mortality study data, the TDP medical criteria for level 4B have the

following effect upon "severes," individuals who died of asbestos disease.

> The blunting requirement excludes 42%
> The 3mm thickness requirement excludes 16%
> The over 25% extent requirement excludes 18%
> The FEV1/FVC ration requirement excludes 40%
> Omitting use of DLCO excludes 52%
> Omitting use of CT scans excludes a significant number

Grace, p.23, asserts that "none of these objections are based on reliable methodologies."

It is a stretch to cite "reliable methodologies," since this section of the Grace Motion In Limine

does not discuss "methodologies."  The data and statistical inferences come from the CARD

mortality study, which Dr. Molgaard (epidemiologist) finds "meets epidemiology

requirements."[54]  Grace, p.23, again misleads the court stating:  "With each objection, Dr.

Whitehouse acknowledges the allegedly objectionable criterion is reasonably related to severity

of disease."  This is false, and Grace knows it to be false.  The only objection for which Grace

---

[52] Sur-Rebuttal Report of Dr. Craig Molgaard, (epidemiology, p.7).
[53] Exh. 3(c) US EPA Certification of Documents in the Administrative Record, p.3.
[54] Sur-Rebuttal Report of Dr. Craig Molgaard, (epidemiology, p.3).

actually makes an argument is blunting, and in the case of blunting the Dr. Whitehouse Report May 2009, ¶ 75 states: "Nor can blunting be a measure of severity of pleural disease. Lung function tests are the measure of asbestos disease." Grace points to a deposition statement that blunting may be associated with <u>very severe</u> impairment. This is the problem. If blunting is used as a rigid requirement then only a fraction of severe (deceased) cases qualify. This is a discrimination against many other severes.

### 1.      Blunting of the costophrenic angle.

Grace, p.23, alludes to extensive discussion in the medical literature. The literature is reviewed at Response of Dr. Frank and Dr. Whitehouse to Report of the ACC's Dr. L. Welch March 2009, pp.9-15. McLoud *et al.* (1985) identified three kinds of diffuse pleural thickening. American Thoracic Society (2004), p.707, recognizes the three kinds of diffuse pleural thickening. The Grace Plan medical criteria for level 4B recognize only one kind of diffuse pleural thickening (the kind with blunting). As a result, 43% of the Libby deceased are excluded. This is an argument over medical literature, not "methodologies."

### 2.      The 3mm thickness requirement.

The Dr. Whitehouse Report May 2009, ¶ 76, states: "No diagnostic definition of diffuse pleural thickening includes a requirement of a minimum thickness . . . nor is thickness of pleural thickening a measure of severity of impairment." The Expert Report of L. Welch December 2008 admits that "the dimensional criteria (3mm thickness and over 25% extent) . . . (are) not (used) as a measure of severity. Severity is defined by pulmonary function testing." Dr. Welch for the ACC[55] and Dr. Parker (for Grace)[56] admit that the 3mm thickness requirement is not a diagnostic requirement for diffuse pleural thickening. This is the point. These requirements are

---

[55] Laura Welch, M.D., June 3, 2009, deposition p.134, line 7 through 12. Exh. 9.
[56] John Parker, M.D., June 9, 2009, deposition p.65, line 11 through p.66, line 11. Exh. 10

{393.001-W0002594.}

"add-ons," which simply exclude people. The 3mm requirement for level 4B has no diagnostic basis.

### 3.    The FEV1/FVC ratio.

Again, Dr. Whitehouse and Dr. Frank's opinions, as set forth at Dr. Whitehouse Report May 2009, ¶¶ 60-67 and 80, are well grounded in the medical literature. Grace, p.25, makes the wild claim that for obstructive disease, "the medical community generally agrees is not" associated with non-malignant asbestos-related disease. This is way off the mark. American Thoracic Society (2004), p.708 states: "Asbestos exposure has long been known to be associated with an obstructive physiologic abnormality." Ohar *et al*. (2004)[57], p.751, states: "In this analysis 3,383 subjects we have shown that airways obstruction is more common than restriction in asbestos exposed individuals currently undergoing evaluation." Again Grace presents claims without reliable basis.

### 4.    Diffusion capacity (DLCO).

Here again Grace is on thin ice. The Grace Plan medical criteria for levels 3 and 4B omit a standard measure of severity, namely diffusion capacity. American Thoracic Society (2004) states that: "Evaluation of subjects with suspected asbestos-related disease should include . . . diffusing capacity." Dr. Welch and Dr. Parker admit that diffusing capacity is a standard measure of severity of asbestos disease.[58] Dr. Welch and Dr. Parker also admit that diffusing capacity is a standard measure of impairment in asbestos-related lung disease in the AMA Guides to Evaluation of Permanent Impairment 5th Ed.[59] This is used nationwide. Grace, p.25

---

[57] Changing Patterns in Asbestos-Induced Lung Disease, 2004; Chest 125;744-753.
[58] Parker deposition, p.97, line 8 through line 15 and Welch deposition, p.182, line 6 through line 20. Exhs. 10 and 9, respectively.
[59] Parker deposition, p.96, line 18 through p.97, line 2 and Welch deposition, p.184, line 21 through p.185, line 3. Exhs. 10 and 9, respectively.

{393.001-W0002594.}

asserts that the exclusion of use of diffusion capacity is "reasonable," despite its universal use as a standard measure of severity.  Grace's position is out of line with the medical literature.

### E.    The studies and opinions of Dr. Frank and Dr. Whitehouse are not "mere hypotheses" unsupported by data.

Grace, p.27, suggests that the court reject all medical literature which establishes associations, based on data and statistical inference, where the studies have not undergone formal experimental testing with controls and replication.  This is an extreme position, beyond the bounds of reasonable medical practice.

Grace suggests that the Whitehouse (2004) publication, the CARD mortality study and all the statistical inferences therefrom, which we use in this case, be stricken as "mere hypothesis," because they have not undergone formal epidemiologic testing with replication.  As discussed above, the problem here is with the word "hypothesis."  In the law, a "mere hypothesis" is one without proper validation through data or scientific observation.  In epidemiology, a "hypothesis" is a proposition not yet "proven" through an experimental or other testing.[60]  In epidemiology most of the conclusions in the medical literature remain as "hypothesis," because though based on data, they have not been tested or replicated.[61]  Grace attempts to seize upon this confusion and coax the court into declaring even published papers such as Peipins *et al.* (2003) and Whitehouse (2004) as "mere hypothesis."

Grace, p.26, again quotes Dr. Molgaard's answers using the terms "hypothesis," "cause," "proven," and "analytical," which have strict meanings in epidemiology.  Dr. Molgaard has carefully explained the meanings in an affidavit.  Grace cannot jump from its quotes on proof of causation in epidemiology to a rejection of all opinions from the Libby experts.  Grace misleads

---

[60] Molgaard Affidavit ¶ 12.
[61] *Id.*, ¶ 8.

the court.

## V.     DR. MOLGAARD (EPIDEMIOLOGY).

### A.     Dr. Molgaard's testimony is relevant.

Grace raises issues of epidemiology, then claims that the Libby Claimants'

epidemiologist's testimony in response is not relevant to any issues in the case.  Grace's claims

are empty.

Grace, p.34, argues that the epidemiologist Dr. Molgaard should have made "an

independent effort to validate or verify the reliability of diagnoses where best evidence

judgments used in the study."  What?  The epidemiologist redoes the doctor's work?  Grace cites

no standard in support of that assertion.  Also, at p.34, Grace again misuses the autopsy

hypothetical put to Dr. Molgaard.  Grace offers no believable basis for striking Dr. Molgaard's

testimony.

## VI.    DR. SPEAR

### A.     The Plan Proponents' Motion In Limine With Respect to
     Dr. Terry Spear is Moot.

The Plan Proponents also moved, for a second time, to exclude the testimony of Dr. Terry

Spear.  The Court heard the Plan Proponents' first motion to exclude Dr. Terry Spear's testimony

on August 24.  At the hearing, the Court granted the Plan Proponents' motion finding Dr. Spear's

testimony not relevant to the issues to be decided at the confirmation hearing.

The Plan Proponents' August 13 motion once again seeks to exclude Dr. Spear's

testimony.  The Libby Claimants maintain that Dr. Spear should be permitted to testify and will

submit an offer of proof describing the evidence they intended to elicit from him.  The Libby

Claimants contend his testimony is relevant to multiple issues, including the nature and extent of

their exposures which impact claim value, their punitive damage claims, and their entitlement to

non-aggregated premises insurance coverage.  Nonetheless, the Libby Claimants understand the

Court has already ruled on the admissibility of Dr. Spear's testimony and do not intend to

reargue the issue simply because the Plan Proponents filed multiple motions seeking the same

relief.

**VII**     **CONCLUSION**

For the foregoing reasons, the Libby Claimants submit that the Plan Proponents' Motion

In Limine to Exclude Expert Testimony of Alan Whitehouse, M.D., Arthur Frank, M.D., Craig

Molgaard, PH.D., and Terry Spear, PH.D. must be denied.

Dated: September 1, 2009     **LANDIS RATH & COBB LLP**
       Wilmington, Delaware

                                   Adam G. Landis (No. 3407)
                                   Kerri K. Mumford (No. 4186)
                                   919 Market Street, Suite 1800
                                   Wilmington, DE  19801
                                   Telephone: (302) 467-4400
                                   Facsimile: (302) 467-4450

                                        - and -

                                   Daniel C. Cohn
                                   Christopher M. Candon
                                  **COHN WHITESELL & GOLDBERG LLP**
                                   101 Arch Street
                                   Boston, MA  02110
                                   Telephone: (617) 951-2505
                                   Facsimile (617) 951-0679

                                   *Counsel for Libby Claimants*