# EXHIBIT "B"

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

————————————————————X

In Re:                              Chapter 11

                                    Case No.

                                    01-01139 JKF

W.R. Grace & Co., et al.,

                                    (Jointly

        Debtors.        Administered)

————————————————————X

— — —

May 6, 2009

— — —

DEPOSITION of JEFFREY POSNER, held

at the offices of Kirkland & Ellis, 655

Fifteenth Street, N.W., Washington, DC,

commencing at 9:08 A.M., on the above

date, before Lisa Lynch, a Registered

Merit Reporter, New Jersey Certified Court

Reporter, License No. XI00825, and

Certified Realtime Reporter

— — —

MAGNA LEGAL SERVICES, LLP

7 Penn Center, 8th Floor

1635 Market Street

Philadelphia, PA  19103

1.866.MAGNA.21

Page 166

1    Q.   What you're talking about,
2    Part B of a workers' compensation policy
3    is employers' liability coverage?
4        A.   Yes.
5        Q.   Who provided the workers'
6    compensation coverage to Grace in
7    Montana?
8        A.   Well, it -- during the
9    Maryland Casualty years it was Maryland
10   Casualty.  During the CNA years it was
11   CNA.  Prior to Maryland Casualty, I don't
12   know if we ever found workers' comp
13   policies.
14       Q.   Were you able to make any
15   determination as to who was providing the
16   workers' compensation coverage prior to
17   that time regardless of whether you found
18   those policies?
19       A.   Well, it would have been
20   workers' comp coverage for -- it would
21   have been workers' comp for Zonolite, not
22   for W.R. Grace, and I don't think we ever
23   knew or we never found out.
24       Q.   Did you locate workers'

Page 167

1    compensation policies issued by Maryland
2    Casualty that applied in the State of
3    Montana to W.R. Grace employees?
4        A.   Yes, we did.
5        Q.   Did those policies include
6    Part B employers' liability coverage?
7        A.   Yes, they did.
8        Q.   Did you make demand upon
9    Maryland Casualty at any time that it
10   indemnify Grace for the claims brought by
11   the employees in Libby under its
12   employers' liability coverage?
13       A.   Yes, we did.
14       Q.   What was Maryland
15   Casualty's response?
16       A.   Their response basically
17   was that there's a provision in the
18   policy -- and I can't remember precisely
19   what it states but it has something to do
20   with filing the claim within 36 months
21   either after the policy expires or after a
22   person's last exposed.  I can't remember
23   the precise language.  I haven't looked at
24   it in a while.  But basically we were

Page 168

1    outside the 36-month period and they
2    denied coverage for it as did CNA, the
3    subsequent carrier, on the same basis for
4    most of the claims.
5        Q.   Those policies, the
6    workers' compensation policies with Part B
7    employers' liability coverage, that was
8    issued on a form separate from the CGL
9    policies, right?
10       A.   They were workers' comp
11   policies.  Yes, they were separate
12   policies.
13       Q.   What were the coverage
14   limits for employers' liability coverage
15   under the Maryland Casualty employers'
16   liability policies?
17       A.   I don't remember, sitting
18   here.
19       Q.   Do you remember what the
20   coverage limits were under any of the
21   employers' liability policies issued by
22   CNA for workers' compensation or
23   employers' liability coverage in the State
24   of Montana?

Page 169

1        A.   Well, it would have been
2    the limit on the policy.  And I don't
3    remember.  I mean, it could have been a
4    million dollars or it could have been
5    500,000.  I can't remember, sitting here.
6    Probably somewhere in that range.  That
7    would have been typical.  Maybe it was a
8    little more; I don't know.
9        Q.   Were the demands that Grace
10   made for coverage under the employers'
11   liability coverages submitted to CNA and
12   Maryland Casualty in writing?
13       A.   To my recollection, yes.
14       Q.   And were the responses by
15   those carriers likewise provided to Grace
16   in writing?
17       A.   To my recollection, yes.
18           MR. KOVACICH:  Counsel, I
19       don't believe that any of those
20       policies or that correspondence has
21       been produced and once again, for
22       the record, we've been prejudiced
23       by that lack of production and all
24       of those materials are within the

Page 170

1    scope of discovery propounded in
2    this proceeding.
3        MS. ESAYIAN:  For the
4    record, I'll take your request
5    under advisement but each time that
6    you make these requests, for the
7    record, we dispute that all of
8    these materials are within the
9    scope of the discovery request.
10   That remains to be seen.
11   BY MR. KOVACICH:
12       Q.   Do you know where copies of
13   the workers' compensation policies and
14   employers' liability policies issued by
15   Maryland Casualty and CNA are physically
16   maintained by Grace?
17       A.   I think they are either in
18   the Boca Raton office of Grace, actually
19   sitting, residing in one of the cabinets
20   right now, or possibly they sent them off
21   to storage.  I don't -- I don't know.  But
22   they were at one time -- I know we had
23   copies in the Boca Raton office.
24       Q.   If they were sent off to

Page 171

1    storage, where would that be, if you
2    know?
3        A.   I mean, I don't know where
4    the storage facility's physically
5    located.
6        Q.   Do you recall whether
7    Maryland Casualty provided any other basis
8    to deny coverage for the employee claims
9    in Montana aside from the reporting period
10   that you referenced?
11       A.   I mean, I don't have a
12   recollection of what they said.  I mean, I
13   remember thinking that that was the key
14   issue.  They may have cited other things
15   in the letter; I don't have a specific
16   recollection.  But to the best of my
17   recollection, the key issue for Grace was
18   this 36-month issue.
19       Q.   Did Grace demand a defense
20   under those policies?
21       MR. LONGOSZ:  Under what
22   policies?
23       MR. KOVACICH:  Maryland
24   Casualty employers' liability

Page 172

1    policies.
2        A.   I think we did, yes.
3        Q.   And that request was also
4    denied by Maryland Casualty?
5        A.   I can't remember
6    specifically, but I think yes.  I think
7    CNA may have defended one or two claims
8    because CNA was an ongoing carrier for
9    Grace and the claim may not have fallen
10   within that 36-month period.  I can't
11   remember precisely what had -- I don't
12   think Maryland ever paid anything, but
13   again I'm speaking from recollection.
14   We're talking about many years ago.
15       Q.   Do you remember when Grace
16   made the demand on Maryland Casualty for
17   coverage under the employers' liability
18   policy?
19       A.   I can't remember
20   specifically.
21       Q.   Do you remember whether it
22   was before or after any of the settlements
23   that Grace entered into with Maryland
24   Casualty relating to coverage for asbestos

Page 173

1    claims?
2        A.   I don't remember, but the
3    settlements -- the settlements with
4    Maryland Casualty don't cover the
5    workers' comp policies.
6        Q.   It was Grace's position
7    that the coverage it demanded under the
8    employers' liability coverage was not
9    subject to any settlement with Maryland
10   Casualty Company, right?
11       A.   My recollection of the
12   Maryland settlement agreements is that it
13   specifically excludes the workers' comp
14   policies or they're certainly not listed
15   there.
16       Q.   Did either Grace or
17   Maryland Casualty file a declaratory
18   judgment action or any other form of
19   litigation in relation to that -- the
20   employers' liability coverage in
21   Montana?
22       A.   No.
23       Q.   Do you remember when those
24   communications took place in relation to

Page 186

1    A.   Yes, but subject to a cap.
2  So, for example -- I don't remember the
3  amount of cap, but if it was $200,000 and
4  say there was a cap of -- I'll throw out a
5  number.  Say that cap was seven million
6  dollars or eight million dollars.  Well,
7  they could charge back until they reached
8  this cap and then, once they reached the
9  cap, there were no chargebacks at all.
10    Q.   Did they reach the cap as
11  to all of the policies in effect between
12  1973 and 1978?
13    A.   Well, they reached the cap
14  in all the policies between 1973 and 1985
15  because of the asbestos claims.
16    Q.   So additional claims under
17  those policies relating to coverage
18  between 1973 and 1978 would not be subject
19  to a $200,000 stop loss, right?
20    MS. DeCRISTOFARO:
21  Objection to form.
22    A.   Well, basically --
23    THE WITNESS:  I need to ask
24  a question here about

Page 187

1  confidentiality.
2    MR. GUY:  Do you want to
3  take this off the record?
4    THE WITNESS:  I'm sorry, I
5  meant it to be off the record.
6    (Off the record.)
7    A.   With CNA, the CNA policies
8  between 1973 and 1985 were the subject of
9  settlement agreement.  In that settlement
10  agreement CNA had paid Grace a sum of
11  money and we had all agreed that the
12  maximum amounts under those
13  retrospectively rated plans from 1973 to
14  1985 had been exhausted.  So basically to
15  the extent any additional claims were paid
16  under those policies between '73 and '85,
17  they could not charge amounts back to
18  Grace.
19    Now, they weren't
20  responsible for product liability
21  asbestos claims because those were
22  released in the CNA settlement
23  agreement but, you know, what
24  wasn't released were the workers'

Page 188

1  compensation claims for which they
2  were, you know, continuing to pay.
3  And to the extent there were, you
4  know, non-products claims, those
5  were still open as well.
6    Q.   And as to those
7  non-products claims, because the -- those
8  threshold levels for applicability of the
9  stop loss had been met, there would be no
10  stop loss applicable to the non-products
11  claims, right?
12    A.   Correct.  The bottom line
13  is that because of the settlement
14  agreement and the amounts paid by Grace
15  under the retrospective plans and the
16  amount that CNA paid to Grace, at the end
17  of the day basically we all agreed that
18  the retros between 1973 and 1985 were
19  effectively closed and no more chargebacks
20  could be made to Grace.
21    Q.   What was the date of the
22  settlement agreement with CNA that you're
23  referencing?
24    A.   I want to say it was 1990,

Page 189

1  maybe July 31st or sometime around then.
2  I can't remember the precise date but I
3  think it was the 1990 settlement
4  agreement.
5    Q.   And how much did CNA pay?
6    A.   Well, CNA, as I recall,
7  wrote Grace a check for somewhere around
8  21 million dollars but they had paid
9  significant amounts of money in addition
10  to that over the course of time and I
11  think they agreed they wouldn't seek
12  reimbursement from Grace for those
13  amounts.  So the payment was for 21
14  million in connection with that agreement
15  but prior amounts had been paid under the
16  CNA policies over a period of time.
17    Q.   At some point subsequent to
18  that settlement agreement you demanded
19  coverage on behalf of Grace for the
20  claims -- asbestos injury claims arising
21  in Libby, Montana, right?
22    A.   Correct, for the
23  non-employee claims arising out of Libby,
24  Montana.

Page 190

1    Q.   And you had also claimed
2 coverage for the employee claims under the
3 other coverage that we talked about
4 earlier, right?
5    A.   At a point in time we had
6 done that, yes.
7    Q.   Was that likewise after the
8 settlement agreement?
9    A.   I can't remember precisely.
10 I mean, it may have been before and after
11 the settlement agreement.
12    Q.   And your position in
13 demanding coverage on behalf of Grace for
14 the non-employee claims in Libby was that
15 those were premises claims not subject to
16 the aggregate limits for products
17 claims --
18    A.   That is --
19    Q.   -- and also not subject to
20 the settlement agreement?
21    MS. ESAYIAN: Objection to
22 form but you can answer if you
23 can.
24    A.   That is correct.

Page 191

1    Q.   Let me just break that down
2 so that the record is clear.
3    It was your position and Grace's
4 position that the non-employee Libby
5 claims were covered by the CNA policies as
6 premises claims, not subject to the
7 aggregate limits applicable to products
8 claims, right?
9    A.   That is correct.
10    Q.   And it was also your
11 position that the non-employee Libby
12 claims were not subject to the settlement
13 agreement? That was Grace's position,
14 right?
15    A.   That is correct.
16    Q.   Did you demand premises
17 coverage from CNA for any other claims
18 apart from those arising in Libby,
19 Montana?
20    A.   Well, I mean, CNA paid over
21 the years many kinds of premises claims
22 for Grace, just general claims in the
23 ongoing business. I mean, Grace owned
24 retail stores, restaurants, I mean, so

Page 192

1 there were premises claims under those
2 policies for many years which CNA had
3 paid.
4    Q.   CNA disputed coverage for
5 the premises claims that you put them on
6 notice of arising out of Libby, right?
7    MS. DeCRISTOFARO:
8 Objection to form.
9    A.   I think it's fair to say
10 that they disputed that since they sued
11 us.
12    Q.   You indicated there were
13 lots of other premises claims. Do you
14 recall ever demanding coverage for other
15 premises claims for personal injury as a
16 result of asbestos exposure aside from the
17 claims arising in Libby, Montana?
18    MS. ESAYIAN: Demanding
19 from CNA?
20    MS. DeCRISTOFARO:
21 Objection to form.
22    MR. KOVACICH: From CNA.
23    A.   There may have been one or
24 two isolated incidents over the years of

Page 193

1 premises claims other than Libby. I can't
2 remember now. The bulk of the claims -- I
3 mean 99.999 percent were products claims.
4 There may have been an isolated case here
5 and there that I recall that was a
6 premises claim.
7    Q.   By an isolated case here
8 and there, you mean one or two individuals
9 that had exposure under --
10    A.   Yeah.
11    Q.   -- some --
12    A.   I can't remember. There
13 were a couple of unusual circumstances
14 over the years and I can't even tell you
15 where or how, but I just have a
16 recollection that we had a couple of
17 instances where they may have paid
18 premises claims.
19    Q.   The overwhelming majority
20 of the asbestos injury claims against
21 Grace were products claims?
22    A.   That is correct.
23    Q.   And to your knowledge, the
24 majority of premises claims for asbestos