# <u>EXHIBIT C - PART 2</u>

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

--------------------------------------------

CHAPTER 11

IN RE: W.R. GRACE & CO., et al.

    Debtor,

Case No. 01-1139 (JFK)

Jointly Administered

--------------------------------------------

VIDEOTAPED DEPOSITION OF

William E. Longo, Ph.D.

October 23, 2007

Duluth, Georgia

Lead:  Douglas E. Cameron, Esquire

Firm:  Reed Smith

FINAL COPY

JANE ROSE REPORTING  1-800-825-3341

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 7

1    MR. KRAMER:  Matthew Kramer representing

2    the Property Damage Committee.

3    MR. BIANCA:  Salvatore Bianca from

4    Kirkland Ellis representing W.R. Grace.

5    MR. CUTLER:  Josh Cutler from Orrick,

6    Herrington & Sutcliffe representing The Future

7    Claimants Representative.

8    MS. FARBER:  Peggy Farber from Kramer,

9    Levin, Naftalis & Frankel representing The

10   Official Equity Committee.

11   MS. CUTLER:  Ilana Cutler, Stroock,

12   Stroock & Lavan representing The Unsecured

13   Creditor's Committee.

14   THE VIDEOGRAPHER:  Will the court reporter

15   now please swear in the witness.

16   WILLIAM E. LONGO, PH.D.,

17   having been first duly sworn, was examined and

18   testified as follows:

19   EXAMINATION

20   BY MR. CAMERON:

21   Q.   Would you state your name for the record,

22   please.

23   A.   William Edward Longo.

24   Q.   And where do you reside, Dr. Longo?

25   A.   My office address is 3945 Lakefield Court,

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 12

1    these, if not all of them, are personal injury. I
2    haven't really had that many property damage cases
3    since about 2001 or so.
4        Q.   Okay. Can you tell me today what
5    percentage of your work is related to asbestos
6    consulting?
7        A.   My personal time is about 50 percent.
8        Q.   How about the company time?
9        A.   I would estimate now it's about
10   50 percent.
11       Q.   How much of that 50 percent time, both
12   personally -- first personally as related to
13   litigation consulting?
14       A.   I would say, for the company,
15   approximately -- for litigation -- 25 to 30. My own
16   personal time, probably about 40 percent.
17       Q.   And you say over the last couple -- over
18   the last couple of years that has been primarily in
19   the personal injury litigation?
20       A.   Yes.
21       Q.   And has that been providing consulting
22   services for the plaintiffs or the defendants in that
23   litigation?
24       A.   Primarily plaintiffs. From time to time I
25   do testify for defendants in litigation.

US District Court - Delaware                FINAL - Oct. 23, 2007
Chapter 11 - W.R. Grace                     William Longo, Ph.D.

Page 13

1        Q.   What defendants have you testified for in
2    the personal injury litigation recently?
3        A.   Let's see, I think I had a deposition two
4    or three weeks ago for a safety apparel company
5    called Guard-Line.
6             Mostly safety apparel companies.
7    Occasionally for Carborundum grinding wheels.  Have
8    done studies on behalf of others, but have not been
9    called to testify.  Been listed, but not called.
10       Q.   Is that consultation for defendants, is
11   that in connection with -- that is in connection with
12   litigation?
13       A.   Yes.
14       Q.   And it's asbestos personal injury
15   litigation?
16       A.   Yes.
17       Q.   Tell me roughly how much you have been
18   paid over the last five years for testifying on
19   behalf of plaintiffs in the personal injury
20   litigation?
21       A.   For deposition, trial testimony,
22   consulting, travel, MAS has probably billed on my
23   behalf somewhere around 250,000 a year.
24       Q.   You don't have any consultation where you
25   bill it out yourself; is that correct?

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

US District Court - Delaware          FINAL - Oct. 23, 2007
Chapter 11 - W.R. Grace               William Longo, Ph.D.

Page 17

1     Q.   Okay.  Not reports or data from the

2     in-place materials or disturbances thereof?

3         A.   I did bring one reference on that.  It's

4     not necessarily Monokote-3, it's -- somehow I

5     overlooked it when I was doing my rebuttal, but I

6     have it in case somebody wants to talk about it.

7         Q.   And what reference is that?

8         A.   I will have to pull it.  As I have gotten

9     older, my memory has gotten worse.

10        Q.   You referred to a Selikoff study.  What

11     Selikoff study was that?

12        A.   It's a study they did in New York where

13     they made measurements during the spraying, mixing

14     and spraying of various types of fireproofing

15     materials in the city.

16        Q.   Is that the one that you reference in your

17     rebuttal report?

18        A.   Yes.

19        Q.   Other than preparing for your deposition,

20     pulling together some references, have you done any

21     other work since the -- on the personal injury side

22     of this matter since preparing your July 24, 2007

23     report?

24        A.   No.

25        Q.   Dr. Longo, you're not a certified

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 18

1    industrial hygienist, correct?
2        A.   Correct.
3        Q.   And you're not an epidemiologist?
4        A.   Correct.
5        Q.   You don't have a degree in epidemiology or
6    masters of public health, correct?
7        A.   I do not.
8        Q.   You're not a toxicologist?
9        A.   That is correct.
10       Q.   And you're not a physician?
11       A.   That is correct.
12       Q.   Not a pathologist?
13       A.   Correct --
14       Q.   Or --
15       A.   -- I am not.
16       Q.   -- medical doctor of any kind?
17       A.   That is correct, I am not.
18       Q.   You're not an expert in risk assessment?
19       A.   That is correct, I am not.
20       Q.   You're not an expert in aerodynamics?
21       A.   No, I guess I would say I might know a
22   little bit more about it than the average layperson,
23   but it's not an area that I routinely testify about.
24       Q.   You publish in that area?
25       A.   No.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 19

1    Q.   And you're not a physicist?
2    A.   That is correct.
3    Q.   And you're not an expert in aerosol
4    behavior?
5    A.   I don't know if I would classify myself as
6    not an expert in aerosol behavior.  Certainly I
7    didn't get a Ph.D. or take aerosol behavior-type
8    classes, other than in materials science on aerosols
9    are solid, especially during processing.  But as for
10   how asbestos behaves as an aerosol, I would consider
11   myself an expert in that area.
12   Q.   Okay.  And have you published in that
13   area?
14   A.   I have published in the release of
15   asbestos-containing fibers from in-place products,
16   which is a form of aerosol, the study of aerosols.
17   Q.   And your publishing in that area, is that
18   limited to the microscopy and the analytical results
19   of samples that were taken during those activities?
20   A.   Certainly samples were taken and results
21   were published, but essentially publish the entire
22   study.
23   Q.   Have you studied the toxicity of short
24   fibers?
25   A.   I have not.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 20

1       **Q.**    **Have you done any studies on the**
2   **toxicities of different fiber types?**
3       A.   I have not.
4       **Q.**    **Have you studied lung fiber clearing**
5   **mechanisms or rates?**
6       A.   I have looked at that in the past, because
7   we do do a lot of tissue digestion analysis for fiber
8   burdens, and certainly I have looked at the
9   bioresistance of chrysotile and the ability of the
10   lungs to clear chrysotile fibers to help understand
11   some of the results we get from when we analyze lung
12   tissue. But it's not a major area of focus, it's
13   just reading other people's papers.
14       **Q.**    **You haven't published in that area?**
15       A.   Have not.
16       **Q.**    **Okay. Would you consider yourself an**
17   **expert in that area?**
18       A.   No. I don't know if I would consider
19   myself an expert. And again, probably have a little
20   bit more knowledge than the layperson having to do
21   with chrysotile clearance in lungs, but it's not
22   something I have spent a lot of time studying, other
23   than our own analysis of folks who have been
24   occupationally exposed to asbestos and what we find
25   in their lungs.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 21

1    Q.   And have you studied a dose/response
2    relationship between asbestos exposure and disease?
3    A.   That's not an area I testify about.
4    Q.   And have you performed a risk assessment?
5    A.   Again, not an area I testify about.
6    Q.   You didn't perform a risk assessment in
7    this case, have you?
8    A.   I have not.
9    Q.   Have you studied aerodynamics of asbestos
10   fibers?
11   A.   I have in the past, yes.
12   Q.   And what did your study entail there?
13   A.   Two areas.  Primarily some of the early
14   work in the Environmental Protection Agency, or
15   Sawyer's work looking at the fall or drop rate of a
16   single chrysotile fiber, because of its ability -- I
17   mean to say it's aerodynamic maybe is a misnomer.
18   Because of the size and mass it tends to behave by
19   Brownian motion in the air pushed around by air
20   molecules.
21         And I also looked at the aspect of it that
22   in a real world this probably doesn't happen that
23   much because of the way that when fibers are released
24   from a product, how they can cascade and hit each
25   other.

US District Court - Delaware                    FINAL - Oct. 23, 2007
Chapter 11 - W.R. Grace                         William Longo, Ph.D.

Page 25

1      correct?
2          A.   Correct.
3          Q.   In preparing your reports, have you
4      reviewed any of the individual exposure information
5      provided by the claimants in this case?
6          A.   No.
7          Q.   Are you aware that the claimants in this
8      case were asked to complete a questionnaire regarding
9      their claim?
10         A.   I was not.
11         Q.   So I take it you haven't reviewed any of
12     those questionnaires?
13         A.   That's correct, I have not.
14         Q.   Have you reviewed any data submitted by
15     the claimants in this bankruptcy?
16         A.   Have not.
17         Q.   Are you aware of a database that's
18     maintained by Russ Consulting in this case?
19         A.   No.
20         Q.   So I take it you haven't reviewed any
21     materials from that database?
22         A.   That is correct.
23         Q.   So your opinions are not dependent upon
24     the exposure information provided by any particular
25     claimant, correct?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 26

1      A.    That's correct.

2      Q.    So when you say in your report that an

3    exposure is significant or elevated, you're not

4    providing an opinion as to whether that exposure may

5    cause disease; is that correct?

6      A.    That's correct.

7      Q.    Have you ever examined Grace's market

8    share for any of the asbestos-containing products it

9    sold?

10      A.    Yes and no.  No, I haven't sat down and

11    took a look at what W.R. Grace has provided on how

12    much of the market they own, but I have been working

13    on -- not so much lately -- but for approximately ten

14    years our laboratory was one of the primary

15    laboratories in all the property damage litigation

16    for buildings from around the country, and over those

17    years I got a, what I think is a very intuitive

18    feeling for what W.R. Grace had out in the market.

19         If you were to ask me what percentage of

20    products did we see that came from buildings from

21    Hawaii to New York City, my response would be that

22    almost 65 to 70 percent of all the buildings we ever

23    looked at had a W.R. Grace product in it.

24         USG was next, National G a little bit

25    after that, and then the mineral wool companies had a

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 39

1    A.    I mean, I can't point to any specific

2    piece of information that I would rely on.  But it's

3    hard to point to things that I have knowledge of

4    after almost 20 years of working in this area and

5    doing research and all the years that I spent

6    involved in the property damage cases and analysis

7    and information.

8        I mean, I can't physically bring that, but

9    there is a wealth of information that I can't say I

10   really rely on, but it is there.

11   Q.    But are there any -- I'm focusing off are

12   there any specific references that we haven't

13   received?

14       We received all the references in your

15   report, I just want to make sure there aren't any

16   specific references that we haven't received that

17   you're going to be relying upon to support your

18   opinion?

19   A.    No, I brought additional ones that weren't

20   listed, so I would have to say no.

21   Q.    Okay.  If you could look at Exhibit 1,

22   your September 15, 2006 report on Page 8, you state

23   that the -- under Roman Numeral III -- "three

24   principal suppliers of chrysotile used in Grace's

25   asbestos-containing construction products were

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 40

LC

1      Johns-Manville, Carey-Canada and National Gypsum."
2           Do you see that?
3      A.   Yes.
4      Q.   Did I read that correctly?
5      A.   Yes.
6      Q.   Can you tell me what percentages of
7   chrysotile used by Grace came from each of those
8   companies?
9      A.   No.
10     Q.   Do you know during what time periods they
11  purchased from those companies, specific companies?
12     A.   Well, National Gypsum in their
13  interrogatories said they sold to Grace from '58 to
14  '74. Carey-Canada -- well, they mined chrysotile
15  from '58 to '72. So I don't know if I have the
16  specific information from the others. And a lot of
17  these recalled from just looking through W.R. Grace
18  formulations where they mention where they got the
19  asbestos.
20          But I didn't write down the particular
21  years.
22     Q.   Do you know what percentage of the
23  chrysotile from these companies may have been
24  contaminated with tremolite?
25     A.   It would be my opinion that all the

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 41

1  chrysotile that came out of Canada from these regions
2  would have been contaminated with tremolite.  The
3  tremolite cannot be fully removed, and if you perform
4  Addison and Davies analysis on Canadian chrysotile,
5  you will find tremolite.
6      Q.   Have you done any independent analysis?
7      A.   We have done a lot.
8      Q.   Is it reported in your report?
9      A.   No.  It's not.
10      Q.   Not part of your reports?
11      A.   No.
12      Q.   Have you examined whether any of these
13  companies use selected monitoring procedures to avoid
14  or reduce tremolite contamination?
15      A.   I researched that whole area using density
16  floats, water wash, and there's no technique that can
17  remove it fully.
18      Q.   You're not an expert on mining operations,
19  are you?
20      A.   I'm not.
21          (Longo Exhibit 3 was marked for
22      identification.)
23      Q.   (By Mr. Cameron)  One of the references in
24  your report is the Williams-Jones article that I just
25  handed you marked as Exhibit 3; is that correct?

US District Court - Delaware          FINAL - Oct. 23, 2007
Chapter 11 - W.R. Grace               William Longo, Ph.D.

Page 42

1      A.   That's correct.

2      Q.   And in the abstract, the writers about --

3   in the second paragraph include the "Appreciable

4   quantities of amphibole also are present in

5   pyroxenite (tremolite) and slate (actinolite) in

6   contact with serpen" -- how do you pronounce that?

7      A.   Serpentine.

8      Q.   No.

9      A.   Oh, serpentinite.

10     Q.   -- "serpentinite distal to the ore zones.

11  Significantly, the chrysotile ores are essentially

12  amphibole-free."

13     A.   Correct.

14     Q.   Do you see that?  And you agree with that

15  statement?

16     A.   I do.

17     Q.   If you go over on to Page 93, the authors

18  state under Distribution of Amphibole-Group Minerals,

19  "Significantly, however, amphibole-group minerals are

20  effectively absent from the chrysotile-bearing

21  serpentinite ores; only one of 175 chrysotile-bearing

22  samples that were analyzed using x-ray diffraction

23  contained detectable tremolite (greater than 0.1

24  weight percentage, less than 2.5 weight percentage)."

26         Did I read that correctly?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 43

1    A.  Right; and I agree with that.

2    Q.  And you agree with that statement?

3    A.  I do.

4    Q.  Earlier on Page 93 they also state, do

5    they not, that, "Nevertheless, on the basis of the

6    criteria of the U.S. Occupational Safety and Health

7    Administration, only a small proportion of the

8    fibrous amphibole is asbestiform," citing to Langer,

9    et al., 1991.

10        So you see that? Did I read that

11   correctly?

12   A.  Yes.

13   Q.  And do you agree with that statement?

14   A.  No.

15   Q.  Okay.

16   A.  And again, our analysis doesn't really

17   look at the issue of asbestiform and not asbestiform.

18   Our analysis of these materials in the past has been

19   to look at it as what is deemed measurable by both

20   the Environmental Protection Agency and OSHA.

21        So, we don't get into the argument

22   asbestiform or nonasbestiform, what we look at is

23   the -- is it fibrous, does it meet the definition of

24   the Environmental Protection Agency of 1-to-5, and at

25   least greater than .5; and then with OSHA, does it

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 48

1    that meets, it's asbestos?

2        A.    And counted as the criteria states.

3        Q.    And you do agree that tremolite/actinolite

4    can exist in both an asbestiform and nonasbestiform

5    habit, correct?

6        A.    I agree.

7        Q.    Now the Williams-Jones paper dealt with,

8    what, the Jeffrey Mine; is that correct?

9        A.    Yes.

10       Q.    Are you aware of a recent paper by Gunter,

11    et al., that was written for the Carey Mine?

12       A.    No.

13           (Longo Exhibit 4 was marked for

14       identification.)

15       Q.    (By Mr. Cameron)   Show you what's been

16    marked as deposition Exhibit Number 4, which is the

17    article Characterization of Chrysotile Samples for

18    the Presence of Amphiboles:  The Carey Canadian

19    Deposit, Southeastern Quebec, Canada, by Mickey E.

20    Gunter, et al.

21           Have you seen this before?

22       A.    No.

23       Q.    In the abstract, last sentence of the

24    abstract, states that "Scanning electron microscopy

25    (SEM) and PLM analyses of amphiboles in the one

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 49

1    amphibole-containing sample revealed nonasbestiform
2    amphiboles with approximately 50 percent
3    anthophyllite and the remainder actinolite, plotting
4    close to the tremolite/actinolite boundary as
5    determined by SEM-EDS (energy dispersive spect --
6        A.    Spectroscopy.
7        Q.    -- spectroscopy.)" Can't read that.
8            Did I read that correctly?
9        A.    You did.
10       Q.    Okay. Does that suggest that there was
11   one sample that was amphibole containing and it was
12   nonasbestiform?
13       A.    It suggests that the one sample that they
14   analyzed by this method.
15       Q.    If you look back on Page 278, Table VI,
16   Raw EDS Chemical Data. Do you see that?
17       A.    I do.
18       Q.    None of those samples, other than the
19   standard sample, or the reference standard, contained
20   tremolite; is that correct?
21       A.    I don't know, I mean it's -- I haven't
22   seen this paper. So in order for me to opine about
23   it with any clarity, I would have to review it. My
24   first reaction of looking over the abstract, and
25   certainly at first reaction, based on the method they

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 50

1    used, I'm not surprised at their findings.
2        Q.    Why's that?
3        A.    Because there was some work done in 1990,
4    when you look at chrysotile samples or ore samples,
5    you have to remove because of the very, very low
6    concentration of tremolite, you have to remove the
7    interfering features.
8            Using XRD and PLM, even this new fancy XRD
9    method, is not the way to do this. So, I mean, I
10   certainly would like to have an opportunity to read
11   through it and digest it a little bit more, but my
12   first reaction is not surprising.
13       Q.    If you look at Page 9 of your report,
14   Exhibit Number 1. At the bottom of the last
15   sentence, last paragraph says that, "However, our
16   analytical studies with pre-1990 asbestos-containing
17   products that contain Canadian chrysotile have shown
18   the presence of small amounts of tremolite/actinolite
19   contaminants on numerous occasions."
20           Did I read that correctly?
21       A.    You did.
22       Q.    Can you tell me how many occasions that
23   was from?
24       A.    Let's see. The ones I can talk about,
25   let's say we performed this analysis somewhere

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 53

1    tremolite, statistically it's impossible to run

2    across one.

3        Q.    And were those studies peer reviewed?

4        A.    No.

5        Q.    These were done for litigation?

6        A.    No.  They have been used in litigation,

7    but we did it because -- we essentially started it

8    because my data, I thought, was being misrepresented

9    in litigation.

10        Q.    And these are the studies involving the

11    sheet gaskets and brake linings?

12        A.    Yes.

13        Q.    Those aren't Grace products, correct?

14        A.    No.

15        Q.    Okay.

16        A.    But it's using Canadian chrysotile.  So

17    it's not so much that it's in a gasket, it's so much

18    as it's a high chrysotile content material from

19    Canada.

20        Q.    Okay.  Are you aware in Canada where those

21    are from, do you know?

22        A.    I think these manufacturers use

23    Johns-Manville, the Jeffrey Mine facility.

24        Q.    Can the Addison & Davies method

25    distinguish between tremolite and actinolite?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 54

1      A.    The method itself doesn't distinguish, but

2    both tremolite and actinolite are unaffected by the

3    Addison and Davies.  The Addison and Davies method is

4    just a sample preparation procedure.  It leaves

5    amphiboles behind, such as tremolite/actinolite,

6    crocidolite.  I mean, we haven't tested it with

7    amosite, but I don't think that would be dissolved

8    either.  And, of course, removes all the chrysotile.

9      Q.    Are there difficulties if there's more

10    than one amphibole present in doing the analysis?

11      A.    No.

12      Q.    Does Addison and Davies recognize that

13    there difficulties would arise if more than one

14    amphibole were present?

15      A.    It may be difficult for Addison and Davies

16    using their analytical technique, but using

17    analytical TEM is not a difficulty.  We have analyzed

18    samples that have both tremolite, actinolite, as well

19    as crocidolite in it, it doesn't have any problems

20    distinguishing between the two -- or three, excuse

21    me.

22      Q.    Is it tough to quantify in that situation

23    because of the multiple amphiboles?

24      A.    No.  I mean, it's a rigorous analysis by

25    itself, but the identity or the identification of a

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 55

1    particular type of amphibole in a sample, we don't
2    see any effect from the Addison Davies method.
3         (Longo Exhibit 5 was marked for
4         identification.)
5         Q.  (By Mr. Cameron)  Show you what's been
6    marked as Deposition Exhibit Number 5, which is -- is
7    that the Addison and Davies reference that you have
8    in your --
9         A.   It is.
10        Q.   -- report?  If you look at Page 173, and
11   maybe I'm just misunderstanding this.  Page 173 at
12   the bottom of the page, it says, "Further
13   difficulties would arise with XRD and IR if more than
14   one amphibole were present.  For example, tremolite
15   and actinolite both occur commonly in vermiculates,
16   and quantitative instrumental analysis would then be
17   very difficult."
18        Do you agree with that statement?
19        A.   I do.
20        Q.   Can you tell me how I'm misreading that
21   statement?
22        A.   You're not reading that misstatement.  And
23   as I mentioned in my answer to your question, I said
24   there could be some difficulty in the analytical
25   techniques that Addison and Davies was using.

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 56

1        Both XRD and IR are methods that -- let's

2   start with IR.  Infrared analysis is a method that

3   has been looked at and rejected by every organization

4   that I'm aware of for quantifying or detecting or

5   determining the type of asbestos present in a sample.

6   XRD has its own issues.

7        I would never use XRD and IR to make that

8   determination.  We would use analytical transmission

9   electron microscopy.  So, I fully agree with that

10  statement, especially in 1990.

11       Now, if Addison and Davies had used

12  electron microscopy, transmission electron microscopy

13  and not scanning electron microscopy, they would have

14  those difficulties.

15       Q.   And when you have done this analysis,

16  again, you don't try to determine whether or not it's

17  asbestiform or nonasbestiform, is that correct?

18       A.   When we do this analysis and quantitate it

19  by transmission electron microscopy, we only

20  determine tremolite or actinolite or crocidolite

21  fibers that meet the definition by either the EPA or

22  OSHA.  So these would be the type of fibers that we

23  identify that in an air sample would be counted.

24       Q.   But you also indicated some of this work

26  was bulk sample analysis, correct?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 58

1    A.    Again.  Those were not optical bulk

2    samples.  When we looked at those samples by optical

3    microscopy, the tremolite concentration is too low to

4    be resolved, so you cannot do the classic

5    mineralogical definition.

6        Those samples had to be processed in order

7    to extract or concentrate the tremolite.  And the

8    only way you can identify it to that point, in our

9    opinion, is by analytical transmission electron

10    microscopy, then those fibers don't look any

11    different than if you were taking an air sample.

12        MR. CAMERON:  Let's take a couple minute

13    break.

14        THE VIDEOGRAPHER:  The time is 10:27 a.m.

15    going off the video record.

16        (Recess from 10:29 a.m. to 10:38 a.m.)

17        THE VIDEOGRAPHER:  We are now on the

18    record with videotape Number 2, Volume I, in the

19    continuing deposition of Dr. William Longo.  The

20    time is 10:36 a.m.

21    Q.    (By Mr. Cameron)  Dr. Longo, if you would

22    look at Page 10 of your -- probably keep your two

23    reports out because I'm probably going to go back and

24    forth with those.

26        But staying on Exhibit Number 1, Page 10,

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 59

1    last paragraph where you state that "The small
2    amounts of tremolite/actinolite found in chrysotile
3    is normally not detected using the EPA recommended
4    standard analytical techniques for asbestos analysis.
5    The EPA method uses polarized light microscopy (PLM)
6    and would typically have a detection limit for
7    asbestos of about 0.5 percent when contained in a
8    construction product like fireproofing or acoustical
9    plasters. A tremolite concentration of less than
10   0.5 percent would not be detected using PLM."
11        Did I read that correctly?
12   A.   You did.
13   Q.   And what's the support for this statement,
14   is it the method that you cite at the --
15   A.   Yes.
16   Q.   -- in Number 20?
17   A.   Yes, and plus all the years of experience
18   of analyzing samples and what is detectable and not
19   detectable by polarized light microscopy.
20   Q.   Doesn't that PLM method permit counting
21   using the -- point counting using 400 points or more
22   for quantification?
23   A.   It does.
24   Q.   And if you do that and one asbestos point
25   is counted, what would the detection limit be, one

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 60

1    out of the 400?  What would the detection limit be?

2        A.    I don't know, you're asking a math

3    question.

4        Q.    It would be 0.25 percent?

5        A.    It would.

6        Q.    And doesn't that method also require that

7    the detection of asbestos be reported trace if

8    asbestos is seen but not counted during the point

9    count procedure?

10        A.    It does.

11        Q.    Would you agree based on that that the

12    detection limit is lower than .5 percent?

13        A.    No.  Not my experience.  Theoretically

14    that would sound correct, but you just don't find it

15    when it gets below that just because of how small it

16    is.  So we don't see it at the lower than a half a

17    percent.  Typically lower than 1 percent, half a

18    percent, we just don't see it.

19        Q.    Even though if you did point counting,

20    your detection limit would be lower; is that correct?

21        A.    I would agree.

22        Q.    Did you do point counting when you did

23    these analyses?

24        A.    No.

25        Q.    Why not?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 61

1    A.    At least our experience has been point

2    counting is not very accurate. The volume estimates

3    are better. And they allow you to do that, but that

4    turns the analysis into a very long, drawn-out

5    affair, and we just don't believe that the

6    quantification is any better than regular volume

7    estimates, and when we have these trace to ultra

8    trace levels of tremolite, you're not going to see

9    it. And that's just been our experience.

10    Q.    But in your experience, you don't do the

11    point count?

12    A.    We have, but we don't. We have not found

13    it very accurate as compared to volume estimates.

14    Q.    And so your opinion is that the PLM level

15    of detection or sensitivity is .5 percent for this?

16    A.    Yes. Depending on what the material is.

17    It could be a little higher, it could be a little

18    lower. I would say that's a good average of where we

19    have trouble seeing the materials.

20    Q.    Okay. Are you aware of, is it

21    Dr. McCrone?

22    A.    Yes.

23    Q.    Dr. McCrone's book The Asbestos Particle

24    Atlas?

25    A.    I'm aware of it.

Page 62

1      Q.   Are you familiar with his inclusion that

2   on the other hand, talking about PLM, it's very

3   sensitive down to the points per million range?

4      A.   And if we had Dr. McCrone working in our

5   laboratory, three or four of those, I wouldn't have

6   any doubt that they could do that.

7      Q.   So you're saying it has sensitivity for

8   folks as experienced as Dr. McCrone, but not --

9      A.   You know, I haven't verified that you can

10  do that, but if Dr. McCrone says he can do it, I'm

11  not here to dispute that.

12     Q.   So you don't disagree with his statement

13  that the sensitivity is such?

14     A.   I don't agree or disagree.  But very

15  rarely in a lab would you have a caliber of optical

16  microscopist as Dr. McCrone.

17     Q.   So in terms of your opinion with respect

18  to the detection limit under the PLM method, it could

19  vary based on the microscopist?

20     A.   It could.  I don't think it would be much

21  better than that.  And again, these are based on

22  analysis of samples where we have found absolutely no

23  tremolite by PLM, and I think our optical

24  microscopists are some of the best.  And then we

25  circle back around and do the Addison and Davies

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 63

1    technique and do find tremolite.  Not at .5 percent,

2    but usually the tremolite that we run into is at the

3    .1 or less percent.  .5 percent with Addison and

4    Davies would be pretty high.  To us, on routine

5    analysis, .5 percent is about where we draw the line.

6        Q.    If you look at your September 15 report,

7    Page 5, in your Executive Summary of Opinions,

8    Number 8, you state that "The W.R. Grace Libby,

9    Montana, vermiculite mine was also known to have

10    significant amounts of tremolite/actinolite

11    contamination."

12        A.    Yes.

13        Q.    Did I read that correctly?

14        A.    Yes.

15        Q.    Can you tell me what you mean by

16    significant in that opinion?

17        A.    Significant is typically used in our --

18    anything over essentially 10 times over what the

19    analytical detection limit would be, so --

20        Q.    I'm sorry?

21        A.    -- analytical detection limit of most

22    techniques.  So the analytical detection limit of

23    about .5 percent.  The Libby vermiculite essentially

24    was a tremolite mine initially that then started

25    processing vermiculite.  There's been an analysis of

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 64

1    the ore as high as 25 to 30 percent.

2         So when we say significant, it would be 10

3    to 20 times over background, or our detection limit,

4    starting at the ore. Obviously as the vermiculite is

5    processed, that material gets reduced, the amount of

6    tremolite present.

7    **Q.   And your opinion on Page 5, that relates**

8    **to the ore at the mine site, correct?**

9    A.   That's correct.

10   **Q.   That's the raw ore?**

11   A.   The raw ore.

12   **Q.   And when you refer to significant, it's**

13   **anywhere from -- if you find it 10 or 25 times over**

14   **the .5 percent detection limit?**

15   A.   Correct.

16   **Q.   You also said or 10 or 25 times over**

17   **background, what do you mean by background?**

18   A.   Well, that was a misnomer. Background,

19   that sort of slipped into what is normally found in

20   the air.

21   **Q.   Here you're talking about bulk sample**

22   **analysis, correct?**

23   A.   Correct.

24   **Q.   And what's your basis for that conclusion**

25   **that there were significant amounts of**

US District Court – Delaware
Chapter 11 – W.R. Grace

FINAL – Oct. 23, 2007
William Longo, Ph.D.

Page 65

1    tremolite/actinolite in the raw ore?

2        A.    I guess based on W.R. Grace's own

3    documents over the years, based on some of the

4    geological surveys done by the State of Montana.

5            You know, I didn't reference them all

6    because I didn't think that that would be disputed

7    that the vermiculite has tremolite/actinolite in it.

8    But there's quite a substantial amount of

9    documentation, both when the mine was first started,

10    as well as through when the Zonolite Company owned

11    it, as well as W.R. Grace.

12        Q.    My question is that your basis for that is

13    historical documents, you haven't done any

14    independent analysis yourself, correct?

15        A.    Well, I didn't understand that question.

16        Q.    Okay.

17        A.    Certainly we have looked at Libby,

18    Montana, vermiculite on many occasions, both

19    examining it in W.R. Grace products, as well as the

20    vermiculite material itself, as well as the ZAF

21    insulation, as well as the continuing work being done

22    by the EPA at the Libby Superfund site in which we

23    receive samples every day with this now called the

24    Libby amphibole.

25        Q.    Any raw ore that you've analyzed?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 66

1      A.   We have in the past, but most of what we
2  have analyzed is the processed ore.
3      Q.   And by processed ore, what do you mean?
4      A.   The stuff that's eventually put in the
5  bags and sold by W.R. Grace as exfoliated
6  vermiculite, depending on the grade.
7      Q.   Get to that in a minute.  You then
8  conclude in, I think it's opinion Number 9, that the
9  Grace asbestos-containing products, therefore,
10  contain tremolite/actinolite from both the
11  vermiculite and Canadian chrysotile.
12         Do you see that?
13      A.   Correct.
14      Q.   With respect to the tremolite/actinolite
15  from the vermiculite, you do not attempt to quantify
16  the amount that's in the finished product, do you?
17      A.   No, we have not.
18      Q.   And you agree it's a small amount?
19      A.   I would agree it's trace amounts.
20      Q.   And by trace amounts, what do you mean?
21      A.   Depending on the grade of the vermiculite,
22  we have seen it as high as a half a percent to less
23  than one, especially in the vermiculite that was used
24  in Hawaii, which seems to, at least across the
25  country, seems to be some of the highest tremolite,

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 67

1    but more likely in the trace amounts, around the .1

2    to .01 percent.

3        Q.    And that's through bulk sample analysis?

4        A.    Bulk sample analysis, TEM analysis, yes.

5        Q.    TEM air sample analysis?

6        A.    And TEM bulk sample analysis.

7        Q.    And when you do the bulk sample analysis

8    of the vermiculite to determine whether or not there

9    was tremolite, do you make a determination as to

10   whether that's asbestiform or nonasbestiform?

11       A.    When bulk analysis is done by PLM, only

12   asbestiform tremolite is reported.

13       Q.    How do you make that determination?

14       A.    That the aspect ratio is at least 20-to-1

15   to 100-to-1, that there is splayed ends on the

16   bundles or fibers, and that the percentage of

17   tremolite -- the percentage or the distribution of

18   asbestiform to nonasbestiform is greater than

19   50 percent.

20       Q.    What do you mean by the distribution?

21       A.    Well, all samples will have both

22   asbestiform and nonasbestiform when analyzing it by

23   polarized light microscopy or optical microscopy.

24   And when we try to determine the amount present, I

25   think one of the guidelines is is that the population

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 68

1   of asbestiform to nonasbestiform has to be greater

2   than 50 percent.

3       Q.   So you do it by population, not by

4   individual particle?

5       A.   Well, individual particle to develop the

6   population, and then it's reported by population.

7       Q.   Now, are you familiar with the mining and

8   milling operations at Libby?

9       A.   I have in the past, I have looked at it

10  enough times.

11      Q.   And you have already said you're not an

12  expert on mining operations, correct?

13      A.   I'm not.

14      Q.   At Page 13 of your report, if you look at

15  the, I guess it's the first sentence in the second

16  paragraph, states that "The unexpanded raw

17  vermiculite ore was shipped by rail to the various

18  expanding plants around North America."

19          Did I read that correctly?

20      A.   Yes.

21      Q.   Are you aware that it was vermiculite

22  concentrate and not the raw ore that was shipped to

23  the expanding plants?

24      A.   I'm just trying to remember where I

26  gleaned that information.  I guess I would have to

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 69

1    look at the difference between concentrate and raw

2    vermiculite ore and see if -- I'm not here, I can't

3    think of where I picked that reference out at the

4    moment.

5        Q.   Are you aware that the raw ore after

6    mining was first sent to a mill in Libby for

7    processing?

8        A.   Yes, I am.

9        Q.   And then after that milling process, the

10   end result was vermiculite concentrate, are you aware

11   of that?

12       A.   I think I do.

13       Q.   And that vermiculite -- in that process,

14   in that milling process of the raw ore, the amphibole

15   content in the raw ore was reduced during the

16   process, are you aware of that?

17       A.   That's correct.

18       Q.   And are you aware that the amphibole

19   content in the vermiculite concentrate -- I'm sorry,

20   strike that.

21           And then are you aware that the

22   vermiculite concentrate was shipped to expanding

23   plants and then went through the expansion process?

24       A.   That could be correct.

25       Q.   So, when you refer to the exposure and the

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 70

1    tremolite content, you're talking about the material
2    that comes out of the expansion process, correct?
3        A.    Correct.
4        Q.    Okay.  And are you aware that the
5    amphibole content in the vermiculite concentrate was
6    reduced during that expansion process?
7        A.    I am aware.  And again, I'm not suggesting
8    that the amount of tremolite/actinolite in the
9    expanded ore in the final product is anything -- is
10   at the same concentration as the raw vermiculite or
11   the concentrated vermiculite for exfoliation.  I
12   guess my main point here is that no matter what
13   W.R. Grace or the Zonolite Company did to the
14   vermiculite, they were never able to remove all the
15   tremolite/actinolite, there's always some present.
16       Now, if that small amount or trace amounts
17   is a health hazard or not, I will let others argue
18   that.  But certainly I'm not here to argue that the
19   concentration in the final product is anything than
20   what it is.  It is at typically at trace levels, less
21   than 1 percent.
22       Q.    When you talk about that
23   tremolite/actinolite contamination in the finished
24   products, are you making a distinction between
25   asbestiform and nonasbestiform tremolite?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 73

1    the type of general work or general groups of
2    individuals?
3         MR. BAILOR:  Wait a minute.  I'm going to
4    have to object to form on that question, I lost
5    what it is.
6    Q.    (By Mr. Cameron)  Okay.
7    A.    I'm not here to testify nor am I an expert
8    in every type of work done in a building or work
9    around these products, et cetera.  I'm here more of
10   the measurement guy.  What they do or what this
11   material has, I leave that up to the other experts in
12   this litigation.
13   Q.    Have you attempted to quantify the
14   tremolite exposure from working around the finished
15   products?
16   A.    No.
17   Q.    So you don't know what that exposure would
18   be for mixers?
19   A.    No, we haven't.  The only way to do that,
20   of course, is to have air samples from the mixers so
21   that we could then go and do Addison and Davies
22   technique or Addison and Davies analysis.  But no, we
23   haven't had the opportunity to get samples of that
24   aspect to actually get empirical data point.
25   Q.    When you did your mixing study, did you do



US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 74

1    that analysis?

2       A.   We did not.

3       Q.   Did you look for tremolite?

4       A.   We always look for tremolite.  Not

5    necessarily look for tremolite, we look for any type

6    of amphibole present.  But we did not detect it using

7    the normal techniques.  One would have to go back and

8    do an Addison and Davies on the Monokote mixing or

9    the Monokote pulverization or the Monokote dust and

10   debris study and determine how much is present.

11      Q.   Okay.  You didn't do that?

12      A.   We have not.

13      Q.   And you haven't attempted to quantify the

14   tremolite exposure from working around the finish

15   product by applicators; is that right?

16      A.   I have not.

17      Q.   Or for bystanders?

18      A.   I have not.

19      Q.   Or for any persons who work around the

20   in-place materials as either part of their job as a

21   maintenance worker or other contractor?

22      A.   That's correct, we have not.

23      Q.   Now, one of the sources that you identify

24   at Page 8 is a 1977 internal memorandum from Grace;

25   is that correct?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 77

1   the finished product, because the finished product
2   does have the vermiculite from these mines that have
3   tremolite in it.
4        So, you can't divorce one from the other.
5   Just because they are talking about ore doesn't mean
6   that downstream in the finished product there is not
7   an issue with that.
8        **Q.   So you equate the exposures to the raw ore**
9   **to the exposures to the tremolite and the vermiculite**
10  **in the finished products?**
11       A.   Didn't say that --
12       MR. BAILOR:  Objection.
13       THE WITNESS:  -- what I said was that
14  because the raw ore starts with tremolite, that
15  the finish product is going to have tremolite in
16  it.
17       As a materials scientist and a
18  microscopist and not a mining expert -- but not
19  a mining expert -- there's nothing that anybody
20  can show me or convince me I've ever seen that
21  you can separate out all the microscopic fibers
22  of one type from microscopic fibers of the other
23  type.
24       If this memo had said, gee, there's no
25  tremolite or actinolite in our ore, certainly

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 78

1    that would have a big impact also on the finish

2    product because if you are not starting with

3    tremolite and actinolite contamination ore,

4    you're certainly not going to have it in the end

5    product.

6        On the same token, if you're starting with

7    it in the ore, you are going to have it in the

8    end product.

9    Q.    (By Mr. Cameron)  At different quantities?

10   A.    I agree.  It's still going to be there.

11   Q.    And you haven't attempted to quantify any

12   tremolite exposure from working around finished

13   products, is that correct?

14   A.    I have not, no.

15   Q.    At Page 9 of your rebuttal report at the

16   bottom you state that -- relating to Dr. Lee's

17   statement concerning the presence of nonasbestiform

18   amphiboles in the Libby vermiculite, do you see that

19   at the bottom of the page?

20   A.    Yes.

21   Q.    You state that the "statement by Dr. Lee

22   is not consistent with EPA's superfund work at Libby,

23   Montana, our own analysis of Libby, Montana, bulk

24   samples, or W.R. Grace's own analysis when they

25   operated the Libby vermiculite mine."

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 106

1        A.    Correct.  As we talked about earlier.

2        Q.    Can you tell me what group of workers who
3    are performing hands-on work with the products you
4    are referring to here?

5        A.    People mixing, people spraying, workers in
6    the building, renovation, sprinkler, installing
7    sprinklers, HVAC, plumbers, laborers cleaning up,
8    maintenance folks, and any dry removal.  But again,
9    others out there.

10            I know that Mr. Hays was deposed
11    yesterday, I'm sure he has a better understanding of
12    what workers are.

13        Q.    I just want to make clear that you're
14    referring to generally mixers, sprayers and then this
15    third group of people who are exposed to in-place
16    building materials, correct?

17        A.    Correct.

18        Q.    I'm not trying to pin you down on every
19    single type of person you're saying could be exposed
20    to in-place building material.

21            Can you tell me what you mean by
22    bystanders in the area?

23        A.    Well, whenever people are mixing and
24    spraying, there's usually other trades there.

25    Especially in high-rises where you have other trades

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 107

1    that may be working other ends of the building.  So,
2    you don't have just the guys with just hands on, you
3    have the bystanders who everybody from, you know,
4    plumbers, electricians, what have you.
5         Unless the facility -- unless during the
6    building operation when they are mixing and spraying
7    and everybody else is away from the facility during
8    that particular application, then you wouldn't have
9    so much as a bystander.
10        Q.   When you're talking about elevated levels
11   to bystanders, are you talking about that same
12   elevated level five feet away?
13        A.   Sure.
14        Q.   25 feet away?
15        A.   Yes.
16        Q.   A hundred feet away?
17        A.   Hundred feet away it's hard to say, I
18   don't have an opinion about a hundred feet away.
19        Q.   Have you done any analysis to determine
20   those levels five feet away?
21        A.   I have not.
22        Q.   25 feet away?
23        A.   I have not.
24        Q.   Hundred feet away?
25        A.   Have not.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 118

1    air measurements during mixing and spraying of

2    Monokote-3? What was the furthest?

3        A.    Well, we don't -- we have whatever general

4    area is.  We have data outside environment.  General

5    area of application.  General area of application.

6        Q.    You don't know how far away those samples

7    were taken?

8        A.    I don't.

9        Q.    Okay.

10       A.    But certainly they are not the operator's,

11   so they are bystanders of some sort, and whatever

12   general area means.

13           MR. CAMERON:  We need to change the tape.

14           THE VIDEOGRAPHER:  Going off the record.

15   The time is 11:58 a.m.  This ends tape Number 2

16   in the deposition of Dr. William Longo.

17           (Off the record.)

18           THE VIDEOGRAPHER:  Here begins videotape

19   Number 3 in the continuing deposition of

20   Dr. William Longo.  The time is 12:02 p.m.

21       Q.    (By Mr. Cameron)  Dr. Longo, did you

22   undertake any calculations or modeling to determine

23   what the exposures would be beyond the seven feet

24   where the samples were placed at the Monokote mixing

25   for gunning or the pulverization and dust and debris

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 119

1    **demonstrations?**

2        A.    We haven't done it for the Monokote or the

3    pulverization.  We have done it in the past by

4    looking at the point source of the asbestos

5    concentration. looking at the seven-foot

6    concentration, and then extending it out.

7            It's not what I would say quantitative

8    modeling because you're only dealing with two points.

9    A third point would be better.  But it gives you a

10   qualitative understanding on how far out until

11   theoretically you should hit zero or non-detectable

12   concentrations, because you do have at least

13   two points from zero to seven feet, and in other

14   studies we have shown that where it would

15   theoretically go down to zero is somewhere about 25

16   to 40 feet.

17       Q.    But you haven't done that for the work

18   **practice demonstrations you are relying upon here?**

19       A.    Well, no.  But certainly common sense

20   would tell you that if you're making a measurement at

21   the seven-foot mark and you have a wall six inches

22   behind you, if that wall wasn't there, certainly the

23   asbestos fibers measured at the seven-foot mark

24   wouldn't fall out of the air at the seven-and-a-half

25   foot mark.  You are going to get a dilution of sorts

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 120

1    as the fibers move out. And I think that's pretty
2    well understood in the scientific community.
3        Q.    You have not undertaken to quantify what
4    that exposure would be beyond seven feet; is that
5    correct?
6        A.    That's correct.
7        Q.    Did any of these studies, either the
8    mixing for gunning or the pulverization or dust and
9    debris measure exposures hours after the activity
10   took place?
11       A.    No.
12       Q.    I'm sorry, one hour after the activity
13   took place?
14       A.    No. I have to review, I think some of
15   them we may have 10 or 15 minutes after the activity.
16       Q.    Have you done any calculations for these
17   work practices demonstrations to estimate what the
18   exposure would be an hour after the activity? And
19   I'm referring now to the work practices simulations
20   that you did?
21       A.    No.
22       Q.    Did any of the testing in reference Number
23   31 that you are relying upon, did any of those test
24   take samples an hour after the activity took place?
25       A.    Sort of. We have one sample. The state

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 121

1  had an application for 15 minutes and then cleanup of

2  floor rest of time for 75 minutes. It's hard to

3  state what was left over from the application versus

4  what are they cleaning up off the floor, which is a

5  common practice when spray-applied materials are put

6  into a building. But I don't think anybody else in

7  any of these did. At least any of these studies.

8       Q.    The studies in reference Number 31?

9       A.    Correct. Where they talk about sampling

10  after the fact.

11       Q.    So you don't have any data that tells you

12  what the exposures would have been couple hours after

13  the activity; is that correct?

14       A.    That's correct.

15       Q.    Were any of the studies that we have gone

16  over here published in the peer-reviewed literature,

17  the two demonstrations that you've identified?

18       A.    No.

19       Q.    Did any of the data that you look at and

20  rely upon for this conclusion of exposure to

21  significant levels of airborne asbestos fibers, did

22  any of that involve actual maintenance workers

23  working around Grace asbestos construction products

24  in place?

25       A.    Besides our own published studies?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 122

1       Q.   Which published studies are you referring
2    to?
3           Let me back up.  The references that you
4    have made for your September 15, 2006 report, which
5    is 29, 30 and 31, your work practices demonstrations
6    and the W.R. Grace historical testing, did any of
7    those involve data from actual maintenance workers
8    working around Grace asbestos-containing construction
9    products in place?
10      A.   No.
11      Q.   Okay.  Now you were going to refer to
12   other data that does involve --
13      A.   I mean, we have a myriad of published
14   papers from work practices that we have done around
15   Grace products.  I didn't reference them in my
16   report, but obviously there is a few.  And we also
17   have -- we don't know if it's Grace, but we also have
18   Clayton's work around asbestos-containing
19   fireproofing materials that show very elevated
20   levels.  We also have our own studies.
21          I guess that's it.
22      Q.   But focusing upon your expert report
23   submitted here, the references that you've made, none
24   of those were published in peer-reviewed literature,
25   correct?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 123

1    A.   That's correct.
2    Q.   Take a break for lunch?
3    A.   Sure.
4         THE VIDEOGRAPHER:  Going off the record.
5    The time is 12:09 p.m.
6         (Lunch recess from 12:12 p.m. to 1:03 p.m.)
7         THE VIDEOGRAPHER:  Going on the record.
8    The time is 1:02 p.m.
9         MR. CAMERON:  For the record, during the
10   break I called back my office and I got the name
11   of the book that Exhibit 7 is the chapter from.
12   It's Chapter 2 Asbestos in the book entitled
13   Environmental Forensic:  Contaminant Specific
14   Guide, R.D. Morrison and B.L. Murphy, Academic
15   Press.
16        I thought I had the cover page from it but
17   I don't.
18        MR. BAILOR:  Thank you.
19   Q.   (By Mr. Cameron)  Okay.  Dr. Longo,
20   earlier in your testimony you had indicated that when
21   you used the term elevated or significant levels in
22   your opinions in your report, you're talking about
23   levels above background; is that correct?
24   A.   Correct.
25   Q.   And then you indicated you gave me -- that

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 160

1      Q.    15 feet away?

2      A.    Have not.

3      Q.    20 feet away?

4      A.    Have not.

5      Q.    You have never done any of that

6      calculation, right?

7      A.    No.

8      Q.    And the demonstration was not designed to

9      do that; is that correct?

10      A.    Well, the demonstration did not measure

11     that because we can't.  The data would allow you to

12     do that if one were to do the calculation.  So we

13     could do that.  I mean, it's simple arithmetic.  But

14     we haven't.  Just plot it on graph paper.

15      Q.    Does the workplace simulation that you

16     refer to as the dust and debris sample indicate

17     anything about the length of exposure a worker would

18     experience in this type of situation?

19      A.    No.

20      Q.    Does it indicate anything about the

21     frequency of that exposure?

22      A.    No, that's up to the worker to say how

23     often this happened.  All it tells you is that -- I

24     don't know how often a worker this would have

25     happened to any particular worker, but every time it

LC

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 161

1  did happen, he would have exposures over the current

2  excursion limit, that's all I can tell you.

3    Q.   Does it tell you anything about what the

4  exposures would be in the area 30 minutes after the

5  simulated activity?

6    A.   No.

7    Q.   You only took it for the 12 minutes?

8    A.   That's correct.

9    Q.   And you used the Tyndall lighting effect

10  in this simulation, correct?

11    A.   I did.

12    Q.   What's the purpose for that?

13    A.   We use it in all our studies.  Two things,

14  one, we try to understand what the primary source of

15  the exposure is.  In here, in this particular one,

16  the primary source obviously is the dumping.

17      Also, the dumping of the dust happened in

18  the first minute or two.  The Tyndall lighting allows

19  you to see the levels of dust that remain in the

20  environment of the person who -- or in that area for

21  the other 13, 14 minutes.

22      Probably gives you some idea if you look

23  at the Tyndall lighting that if there's this much

24  after 15 minutes after it happened, obviously it's

25  going to -- after 15 minutes it's not going to fall

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 175

1     A.   Well, they're talking -- they way they set

2   the chart in Table I, they said it was decorative and

3   acoustical.  They say Table I is a composition of

4   sprayed mineral fiber products, and they cover

5   decorative, acoustical, thermal, and fireproofing.

6        So I saw on Table II they had the thermal

7   insulation powerhouse turbine and the spraying of

8   fireproofing underneath it.  They have got one

9   category here that says fireproofing on it, and

10   that's the cementitious.

11        So, nobody states looking through it --

12   nobody states with any certainty that's exactly where

13   it comes from.  But if I were to look at what

14   information I would have, I would say more likely

15   than not from cementitious.

16     Q.   Even though they have a description of the

17   other types of fireproofing in the body of the

18   article, they talk about the dry method, neither of

19   which are MK-3, correct?

20     A.   That's correct.

21     Q.   And they also refer in the title to the

22   application of sprayed inorganic fiber containing

23   asbestos?

24     A.   Correct.

25     Q.   I would like to turn, Dr. Longo, to the

US District Court - Delaware          FINAL - Oct. 23, 2007
Chapter 11 - W.R. Grace               William Longo, Ph.D.

Page 176

1     indirect preparation method. And I would like to go
2     through that with you for a little bit here this
3     afternoon.
4          A.   Sure.
5          Q.   And do I understand correctly that method
6     involves dissolving the filter and shaking the
7     resulting mixture and then sonicating it as part of
8     the preparation?
9          A.   That's one of the methods, yes.
10         Q.   And in contrast, the direct method
11    involves the direct transfer of the dust from the
12    original sampling filter to the TEM grids; is that
13    correct?
14         A.   That is correct.
15         Q.   And in fact, the ASTM D 5755, that's the
16    dust method protocol, correct?
17         A.   Correct.
18         Q.   That indicates, does it not, that the
19    indirect preparation method is intended to disperse
20    aggregated asbestos into fundamental fibrils, fiber
21    bundles, clusters or matricies that can be more
22    accurately quantified by transmission electron
23    microscopy; is that right?
24         A.   That's correct.
25         Q.   And would you agree with me that the

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 177

1    indirect preparation method results in a
2    disaggregation or breakup of particles during
3    sonication?
4        A.   No.
5        Q.   Okay.  So it's your opinion that the
6    indirect preparation does not affect or increase the
7    asbestos fiber counts?
8        A.   Yes and no.
9        Q.   Give me the yes and then give me the no.
10       A.   Yes, if there is loosely associated
11   asbestos fibers that normally would be counted by
12   direct as one structure but are not of the original
13   structure, meaning it is a false structure, so to
14   speak.  The indirect would give you a higher count
15   than the direct.
16           But no, if it's the position that the
17   indirect is causing a positive bias in the sample,
18   such that structures that were normally an intact
19   structure and then going through the indirect process
20   has become unattached and skewing the accounts, the
21   answer is no, it doesn't happen.
22       Q.   Are you aware of any peer-reviewed
23   publications that conclude sample preparation -- the
24   indirect sample preparation does affect asbestos
25   fiber size and fiber counts?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 178

1      A.   Yes.

2         Q.   Go through a couple of those here, if we

3   could.

4         (Longo Exhibit 10 was marked for

5         identification.)

6      Q.   (By Mr. Cameron)   Show you what's been

7   marked as Deposition Exhibit Number 10 and I will ask

8   you, are you familiar with or aware of the study by,

9   I will probably pronounce the names wrong, is it

10  Sahle and Laszlo?

11     A.   Yes.  I mean, I have reviewed these in the

12  past.  It's probably been ten years.

13     Q.   And these are scientists in Sweden; is

14  that correct?

15     A.   That's correct.

16     Q.   If you look at the abstract, the writers

17  found that "the indirect sample transfer technique

18  effects the fiber size distribution of different

19  materials differently." Do they not?

20     A.   That's what it states.

21     Q.   If you turn over to Page 30, they also

22  noted, didn't they, that there were authors who --

23  and I'm quoting -- "suggested that owing to the

24  breakup of the airborne fibers into smaller units and

25  drastic change of fiber size distribution, the use of

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 179

1    the indirect sample transfer method for asbestos
2    sampling should be discouraged and the more gentle
3    direct transfer method should be used."
4         Do you see that?  Did I read that
5    correctly?
6       A.   I'm sorry, where are you reading from?
7       Q.   I'm sorry.  The bottom of the third
8    paragraph.  Starting with contrary to this.  Stein,
9    Dement and others suggest that "owing to the breakup
10   of the airborne fibers into smaller units and drastic
11   change of fiber size distribution, the use of the
12   indirect sample transfer method for asbestos sampling
13   should be discouraged and the more gentle direct
14   transfer method should be used."
15        Did I read that correctly?
16      A.   You read that correctly.
17      Q.   And do you agree with that?
18      A.   No.
19      Q.   If you turn over to Page 35, top of the
20   page, end of the first paragraph, they also conclude,
21   do they not, "that their results also confirm the
22   generally held opinion that the direct and indirect
23   transfer methods provide different estimates of
24   airborne chrysotile concentration."
25      A.   Okay.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 180

1    **Q.   Did I read that correctly?**
2    A.   Yes.
3    **Q.   Do you agree with that?**
4    A.   In some cases it does.
5    **Q.   Turn over to Page 36, if you would.  And**
6    **one of the things they also found, and this is at the**
7    **top of the page, about middle of the first full**
8    **paragraph. "Under the indirect sample preparation**
9    **technique, the gypsum particles that were attached to**
10   **the chrysotile could be detached from the asbestos**
11   **fibers and thus the fibers were included in the**
12   **counting results."**
13            **Is that correct?**
14   A.   Yes, that's what they state.
15   **Q.   Do you agree with that?**
16   A.   It's hard for me to understand what they
17   are doing here.  So I don't know if I agree with it
18   or not.
19   **Q.   Okay.  Have I stated it correctly?**
20   A.   That's what it states.
21   **Q.   Is it clear that what they had concluded,**
22   **that under the direct preparation method, the sample**
23   **contained both the chrysotile and the gypsum so they**
24   **were not included in the count because the particles**
25   **were not respirable?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 181

1    A.   I mean, they stated they didn't include

2    it.

3        Q.   If you turn over to Page 41, first full

4    paragraph, partway down, the authors of the paper

5    also note that other reports or studies comparing

6    direct preparation to indirect preparation results,

7    do they not?

8        A.   That's correct.

9        Q.   Okay.  And they state that "Wang and Wang

10   found that mean of total fiber concentrations by the

11   indirect method to be 15.5 times the mean obtained by

12   the direct method."

13       Do you see that?

14       A.   Yes.

15       Q.   And do you agree with that?

16       A.   I agree that's what it states.

17       Q.   Do you agree that that's what they found

18   in the study they did in 1983?

19       A.   I don't recall that.

20       Q.   Don't recall?

21       A.   I mean, I haven't looked at this in some

22   time.

23       Q.   Okay.  They go on to state that "Chesson

24   and Hatfield presented an extensive comparison of

25   results in number of concentrations between the

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 182

1    direct and indirect sample transfer methods. It had

2    been shown that measurements made by the indirect

3    transfer method give 3.8 to 1700 times higher results

4    than measurements made by the direct transfer method

5    in number concentration.

6          "Concentrations measured by the indirect

7    transfer method were always greater than those

8    measured by the direct transfer method. The result

9    holds for total number of concentrations; i.e.,

10   fiber, bundles, clusters and matrices.

11         "Chrysotile fibers detected using the

12   indirect transfer method tended to be shorter and

13   thinner than those detected by the direct transfer

14   method. "They found no single factor that could be

15   applied to convert measurements made using indirect

16   transfer method to a value that is comparable with

17   measurements made using direct transfer method.

18         "The breakdown of large structures during

19   the" -- I guess that should be ashing. That is

20   ashing -- "sonification, and resuspension steps of

21   the indirect sample transfer method is assumed to be

22   the main explanation for such differences."

23         Did I read that correctly?

24   A.   You did.

25   Q.   Do you agree with that?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 183

1       A.   No, neither does Chesson.

2       Q.   Okay.

3       A.   Because the data doesn't support the

4   breakdown of the material, if you look at the size

5   distribution, and that's what primarily came -- that

6   I brought out of the Direct Versus Indirect EPA

7   protocol.

8       Q.   Okay.

9       A.   Excuse me, Direct Versus Indirect EPA

10  publication by Chesson.

11      Q.   So you disagree what they report in the

12  Exhibit Number 10?

13      A.   Well, not only disagree with it, they

14  misquoted what was said in that report.  Didn't say

15  anything -- anything like that.

16          It said that the size distribution -- the

17  size distribution didn't change to show the factor

18  that showed the increase because you get longer

19  structures and you get more bundles, more clusters,

20  more matrices.

21          And as they concluded and as we conclude,

22  if you have an indirect preparation and it's breaking

23  things up, it has got to severely shift the size

24  distribution.

25          So, what they state in there is not

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 184

1    actually what's in the EPA Direct Versus Indirect.

2         (Longo Exhibit 11 was marked for

3    identification.)

4         Q.   (By Mr. Cameron)  Show you what as been

5    marked as deposition Exhibit Number 11.  Overview:

6    Workshop on Fiber Toxicology Research Needs by John

7    Dement.  Have you ever seen this before?

8         A.   Yes.

9         Q.   Okay.  Over on Page 262, the man

10   concludes, does he not, that "the use of indirect

11   sample transfer for transmission electron microscopy

12   of asbestos has been shown to break up the airborne

13   fibers into smaller units.  Depending upon the

14   treatment, the observed concentration of fibers and

15   their size distribution change drastically."

16        He goes on to say, "therefore, the use of

17   indirect sample transfer method for asbestos sampling

18   should be discouraged and the more gentle direct

19   transfer method should be used."

20        Did I read that correctly?

21        A.   Yes.

22        Q.   And do you agree with that?

23        A.   I don't agree with it and either does John

24   Dement.

25        Q.   Okay.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 185

1          (Longo Exhibit 12 was marked for

2      Identification.)

3          Q.    (By Mr. Cameron)   Show you what's been

4      marked as Deposition Exhibit Number 12.  Paper the

5      Effect of Preparation Methods on the Assessment of

6      Airborne Concentrations of Asbestos Fibres by

7      Transmission Electron Microscopy by -- have you ever

8      seen this before?

9          A.    Give me a second.  I have seen all of

10     these at one time or another.

11         Q.    Okay.

12         A.    It looks familiar.  I know I have looked

13     at this in the past.

14         Q.    In the abstract the authors conclude, do

15     they not, that "It has been shown that ultrasonics,

16     often used in the indirect preparation method to

17     facilitate the recovery of dust, may significantly

18     increase the fiber number concentration.  This effect

19     is highly variable and dependent on the

20     characteristics of the workplace where the samples

21     were collected."

22             Did I read that correctly?

23         A.    Correct.

24         Q.    And --

25         A.    That's what it states.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 186

1      Q.   Okay.  Do you agree with that?

2      A.   No.

3      Q.   Okay.  And back in the conclusion,

4  Page 328, they also conclude that "the extensive work

5  of Chesson and Hatfield has shown that measurements

6  made by the indirect transfer method were 3.8 to 1700

7  times higher than measurements made by the direct

8  transfer method."

9          Did I read that correctly?

10     A.   You did.

11     Q.   And do you agree with that?

12     A.   No, I've always agreed that in the Chesson

13  study that the indirect sample analysis showed on the

14  range that they have.  What people tend to leave out

15  is that the Chesson study concluded that the increase

16  in numbers cannot be solely blamed on the

17  sonification and breakup because the data

18  demonstrates that the size distribution, there was

19  very little change.

20          In fact, there was more -- there was

21  larger structures found in the indirect than the

22  direct.

23          So, I think what's -- what goes on with

24  the direct and the indirect is that the direct

25  actually, especially in elevated sample levels,

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 187

1    produces a severe negative bias because of the

2    overlapping and interference, where the indirect

3    provides you with a more accurate estimation of

4    what's actually there.

5         If the sonification actually broke the

6    structures up, the size distributions wouldn't be so

7    close.

8         Q.    And you're familiar with Dr. Eric

9    Chatfield?

10        A.    I am.

11        Q.    Are you aware of any of his publications

12    that conclude that indirect preparation effects

13    asbestos fiber concentrations?

14        A.    He stated that.

15        Q.    And are you in agreement with his views on

16    that?

17        A.    Some of his views are -- have changed a

18    little bit over the years.  But the one thing I

19    always circle back with Eric on is then why did he

20    push so hard to have an International Standard

21    Organization, ISO method, for indirect air sample

22    analysis.

23        Q.    Do you agree with his view that the

24    indirect preparation affects asbestos fiber

25    concentrations?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 188

1       A.    Depends on what he means by affect.
2    Certainly if you have loaded -- If you have highly
3    loaded samples, the indirect prep typically will
4    produce -- give you a higher level than the indirect.
5    I don't think that's disputed by anybody and
6    certainly not by me.
7           It's where we get down to why is it
8    elevated. I believe it's because the direct produces
9    -- and especially in high-density, high-dust samples,
10   produces a negative bias on the analysis where the
11   indirect does not, based on EPA's Direct Versus
12   Indirect, and based on our own recent data from the
13   Tucson study.
14      Q.    In your view, should OSHA and EPA, under
15   the regulatory protocols, such as 7400, should they
16   be using indirect preparation?
17      A.    At a minimum, OSHA should be using TEM
18   analysis. And the TEM analysis for highly loaded
19   samples that normally now that OSHA says we might as
20   well throw away, you can't analyze them, should be
21   indirect.
22          But, would I be able to convince OSHA to
23   do that -- and certainly EPA uses indirect. Would I
24   be able to convince OSHA to do that? I would like to
25   think so, but probably not.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 189

1      Q.    You haven't been able to do so thus far?

2      A.    I haven't tried. If OSHA won't listen to

3    Archibald Cox, the chairman of the HEI-AR Committee

4    about why they should not use PCM and go to TEM, I'm

5    thinking that Bill Longo probably won't have much of

6    an effect on them either.

7      Q.    You're familiar with Dr. James Millette?

8      A.    I am.

9      Q.    Are you aware of any of his publications

10    that concluded indirect preparation affects fiber

11    concentrations in the World Trade Center dust?

12      A.    I have not seen that, but I will be happy

13    to take a look at it and tell you what I think.

14          (Longo Exhibit 13 was marked for

15    identification.)

16      Q.    (By Mr. Cameron)  Are you familiar with

17    Mr. Van Orden's publication that compares direct and

18    indirect preparation?

19      A.    No.

20      Q.    Show you what's been marked as deposition

21    Exhibit Number 13 and ask you have you seen this

22    before?

23      A.    Have not.

24      Q.    If you turn over to Page 187. Top of the

25    page under discussion where it says, "the above

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 190

1    calculations show that the volume distribution

2    resulting from indirect preparation of samples can be

3    explained as a fracture of the original particles.

4    The breakage parameters are similar to other

5    published values, suggesting that chrysotile, when

6    subjected to the indirect preparation procedures,

7    will fracture and behave in a similar manner to other

8    minerals.  These results are applicable to single

9    fibers which would not be subject to issues of

10    liberation from matrices and with little contribution

11    from bundles of fibers."

12            Do you see that?

13    A.    I see that.

14    Q.    Do you agree with that?

15    A.    No.

16    Q.    Okay.  Go over to Page 188, under

17    conclusion.  Says, "for single chrysotile fibers, the

18    data showed the fibers to be larger when comparing

19    directly prepared samples with those that undergo an

20    indirect preparation procedure.  The model suggests

21    that chrysotile behaves in a manner similar to other

22    minerals when fractured by external forces consistent

23    with existing fracture mechanic theory."

24            Did I read that correctly?

25    A.    Yes, you did.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 191

1    Q.    Do you agree with that?

2    A.    No.

3    Q.    Do you understand fracture mechanics?

4    A.    Used to.

5    Q.    When you were in school or --

6    A.    Getting a Ph.D. in engineering involves a

7    lot of that. And I understand he's done a modeling.

8    You know, the R. J. Lee Group, or Rich Lee and Drew

9    Van Orden have been individuals that have been

10   pushing this for a long time.

11        But the data -- and I haven't read their

12   model, but I'm sure it states what else they have

13   stated over the years. The data doesn't suggest it.

14        And again, I keep pointing back to where

15   you look at the size distribution of fibers found in

16   dust versus size distribution of the same type of

17   dust found in the air versus direct versus indirect

18   and you don't get a reduction in the size

19   distribution, so how are you breaking things up and

20   still maintaining relatively the same size

21   distribution.

22        In fact, you have some structures --

23   usually they are a little bit longer than the direct,

24   so you have length and width of direct and indirect

25   comparing to length and width of direct of the same

JANE ROSE REPORTING
1-800-825-3341   janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 192

1    type of samples, and you don't change the size

2    distribution.

3         You can't break a bunch of stuff up and

4    still get all the same size distribution.

5         Q.   Your view is you don't change the size

6    distribution so there's no breakup?

7         A.   Correct.

8         Q.   Do you know if any of the publications we

9    have just reviewed on indirect preparation were

10   published in peer-reviewed journals?

11        A.   As far as I can tell, they all were.

12        Q.   And you performed studies using both

13   indirect and direct analysis, correct?

14        A.   I have.

15        Q.   That was the pulverization study and the

16   dust and debris study; is that correct?

17        A.   That's correct.  But that's a different

18   argument.  The pulverization and dust and debris

19   study was the -- the opinion of Dr. Lee that no

20   respirable asbestos fibers can be released from

21   Monokote.  Forget about direct and indirect because

22   that's not really what that study was designed to do.

23        And if Dr. Lee's position is correct, then

24   there should be absolutely no asbestos fibers in the

25   Monokote when it's pulverized or when the dust and

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 193

1    debris or when it's resuspended.

2         And you then fast forward to the Tucson

3    Civic Center, disturbing the dust off the surfaces

4    under Monokote with Monokote dust, again, we should

5    see no respirable fibers, and what we have is a lot

6    of PCM fibers of the size that show an occupational

7    exposure.

8         Now, if you want to look at data that

9    demonstrates the direct versus indirect, then you

10   look at the size distribution of TEM air samples for

11   what was blown up in the air, versus what was found

12   on the surface, and those size distribution haven't

13   changed.

14        As far as I can tell, that is probably the

15   most concise data we have yet on this.

16   Q.   And that data that you're referring to is

17   what?  What's the exact data set that you're relying

18   upon to make that conclusion?

19   A.   That's the Tucson Music Hall studies that

20   were done by Hatfield and Bennett at the Tucson Music

21   Hall where they did cleaning of surfaces and took

22   personal air sample while that cleaning was done to

23   measure what happens when that Monokote dust gets

24   reentrained into the air.  Those samples were

25   analyzed by PCM and then direct TEM.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 194

1       The direct TEM size distributions then

2   were compared back to the indirect TEM size

3   distributions from the dust samples taken from that

4   same facility under that Monokote.

5       **Q.   Any other data that you're relying upon**

6   **for this conclusion?**

7       A.   The Lancaster Library data. And I have

8   other data, but that's the only data that I supplied

9   for my opinion here.

10      **Q.   And your Lancaster Library data, that's**

11  **historical data; is that right?**

12      A.   Correct.

13      **Q.   Those were samples taken years ago?**

14      A.   '91. But just reanalyzed.

15      **Q.   So what you did is you reanalyzed the air**

16  **samples that were taken in '91?**

17      A.   Performed PCM and TEM and reanalyzed the

18  dust samples since the dust samples in '91, the

19  length and width of the structures weren't

20  characterized other than by AHERA.

21      **Q.   And the dust was in the Lancaster -- the**

22  **dust in the air were both taken in the same location?**

23      A.   Yes.

24      **Q.   Okay. And in Tucson, the dust and air**

25  **were both taken in the same location?**

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 195

1        A.    Well, the dust was taken up in the attic.
2    I don't know if it's the same location or not in the
3    attic, but --
4        Q.    **Same building?**
5        A.    Same building.
6        Q.    **And you say in the attic?**
7        A.    Well, that's what everybody calls it.
8    It's the space above the music hall.  They call it an
9    attic.  It's essentially almost a sealed area up
10   there.  HVAC systems, lighting, cables, what have
11   you.
12       Q.    **Any other data that you relied upon for**
13   **purposes of this opinion?**
14       A.    No other data that I've put into my expert
15   report, but over the years I have seen data out of
16   Rich Lee's lab.  One of his pieces of data for a
17   while to use until we looked at the size distribution
18   was his multiple sonifications of a single sample
19   where we looked at the size distribution, and he
20   sonicated this sample for ten minutes -- or five
21   minutes and then took an aliquot out and kept
22   sonicating it and kept saying the sample increased in
23   number in number in number, but you looked at the
24   size distribution and it all stayed the same.
25            His other data that he published, I think,

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 196

1    involved the Arizona road dirt and his round robin
2    data.  For indirect dust, again, if you look at the
3    size distribution, our own round robin data where we
4    sent, I think it was a hundred milligrams of Monokote
5    dust out to six or seven laboratories back in the
6    late '80s, early '90s and got good correlation
7    between the labs.
8           The data, round robin data that Jim
9    Millette sent out, samples again to other labs.
10          The coefficient of variation on this
11   indirect dust data was better than air sampling,
12   direct air sampling.
13          So the CV's are very good.  So you have to
14   think okay, if Dr. Lee is right, and a few of these
15   others, that the indirect preparation breaks things
16   up and increases the count, then all these different
17   laboratories who does this analysis would have to
18   break it up equal.  That this is a controlled breakup
19   of the fibers, but not just in one sample, but every
20   sample everybody does.  And that's just not
21   reasonable.
22          But again, that's stuff I didn't put in my
23   expert report.
24   Q.   For purposes of your expert report, it's
25   the Tucson data and the Lancaster Library data?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 197

1      A.   That's correct.

2      Q.   Nothing else?

3      A.   For my direct examination, that's correct.

4      Q.   And have you published anything in the

5  peer-reviewed literature that discusses the effect or

6  noneffect of indirect preparation?

7      A.   No. But I have published using indirect

8  TEM data in peer-reviewed publications -- in

9  peer-review publications. And just like the

10  peer-reviewed publications that you've shown me here

11  which say indirect breaks things up, I've published

12  in a peer-reviewed journal where we use indirect prep

13  and talk about the exposures and never received any

14  criticism about the indirect prep in a peer-review

15  publication.

16      Q.   Can you point me to the articles by your

17  peers in the microscopy community that claims

18  indirect preparation did not affect asbestos fiber

19  size or fiber count or apparent concentrations?

20      A.   No. I can just point you to the

21  peer-review publications where they say we used

22  indirect preparation -- indirect asbestos

23  preparation, here's our results.

24      Q.   And your view is nobody's commented on

26  those results that you've published?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 198

1      A.   Not that I'm aware of. If they did

2   comment, they didn't comment on it to the editor.

3      Q.   In your rebuttal report, I think it's

4   Page 3, you refer to the indirect sample preparation

5   method and say that the indirect sample preparation

6   method -- let me find where it is here -- first

7   paragraph. "The indirect sample preparation is

8   accepted in the industrial hygiene scientific

9   community and consequently has been used by both

10  NIOSH and the EPA to measure asbestos concentrations

11  for the determination of potential health hazards."

12         Did I read that correctly?

13     A.   Yes.

14     Q.   And you refer to the NIOSH Health Hazard

15  Evaluation Report --

16     A.   Correct.

17     Q.   -- of March of 1990, and the U.S.

18  Environmental Protection Agency report that's not

19  dated. In reference Number 6, correct?

20     A.   Correct.

21     Q.   The NIOSH Health Hazard Evaluation Report,

22  did that entail -- did they use the indirect

23  preparation method to quantify the asbestos levels in

24  the air?

25     A.   No.  Dust sample.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 199

1    Q.   That was dust sampling?

2    A.   Correct.

3    Q.   Same with the EPA report, correct?

4    A.   Correct.

5    Q.   Neither one of those used the indirect

6    preparation for the air sample analysis; is that

7    correct?

8    A.   That's correct. But I understand the

9    criticism is not just air samples, that the criticism

10   is that nobody uses indirect prep for anything.

11   Q.   But did they use it to try to quantify the

12   level of asbestos fibers in the air?

13   A.   No.  They used it for dust samples because

14   people understand that dust samples that contain

15   asbestos can easily become reentrained.  It's like --

16   so this was an indirect method to evaluate, in their

17   mind, a potential health hazard.

18   Q.   They evaluate to determine whether or not

19   there was asbestos in the dust, correct?

20   A.   Correct.

21   Q.   Not to try to quantify or determine what

22   the exposure, the airborne exposures may be?

23   A.   Well, no.  Nobody should be doing that

24   with dust samples.  Just like with the Environmental

25   Protection Agency, when somebody takes a bulk sample

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 200

1   off of Monokote-3 or thermal insulation and makes a
2   determination that there's 15 percent asbestos in
3   this thermal insulation, or there's 10 percent
4   asbestos in this fireproofing that's a cementitious
5   material, nobody tries to make a determination of
6   what that air level is based on that bulk sample, and
7   nobody should try to make a determination of what the
8   air level is based on an asbestos-containing dust.
9        It's just one of the tools they use to
10  help evaluate if there is a potential problem.
11  That's what dust is and that's what bulk samples are.
12      Q.   Is it your -- you're familiar with
13  NIOSH 7400, correct?
14      A.   I am.
15      Q.   And is it your opinion that NIOSH 7400
16  Method recognizes indirect preparation for PCM
17  analysis?
18      A.   The PCM analysis is a direct preparation.
19      Q.   Are you familiar with the AHERA
20  regulations?
21      A.   That is also a direct preparation.
22      Q.   Are you familiar with the Yamate method?
23      A.   I am.  That has both, direct and indirect,
24  as well as the ASTM dust method is indirect.  The ISO
25  international method has an indirect dust, the EPA

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 201

1   superfund method has an indirect dust, uses

2   sonification. And I guess one could argue that the

3   EPA water samples, which use sonification, may be an

4   indirect sample preparation.

5        Q.   Are you aware of the EPA's QAAP that they

6   developed for Libby, the quality -- don't know what

7   that stands for, quality something assurance program?

8        A.   I don't know.

9        Q.   That they developed for Libby?

10       A.   Don't know.

11       Q.   You're not -- you haven't seen that in

12   connection with the work you're doing for the EPA?

13       A.   I don't know what their documents states.

14   Obviously any analytical work we do for Libby through

15   the contractor has all quality assurance associated

16   with it and that may or may not be the same thing.

17       Q.   Have you done any work for the government,

18   other than the analysis work under the contract with

19   respect to Libby?

20       A.   We have worked for -- through contractors

21   with the EPA before developing soil sample analysis

22   technique.

23       Q.   In Libby?

24       A.   Not Libby, it was just a technique. And

25   I'm trying to think of who was doing that. That was

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - Oct. 23, 2007
William Longo, Ph.D.

Page 234

1    it's a get-out-of-jail-free card.

2        Q.    On Page 16 of your first report, last

3    paragraph on Page 16, you state: "Whether or not a

4    given worker has exposure to asbestos fibers from

5    W.R. Grace products, and the duration and extent of

6    such exposure, depends upon the specific individual

7    characteristics of each person's work history and

8    activities."

9        Did I read that correctly?

10    A.    Yes.

11        Q.    And you haven't analyzed or looked at any

12    such personal work history or activities, have you?

13    A.    I have not.

14        Q.    And all of these simulations that were the

15    work practices that you've done, those were all with

16    respect to MK-3; is that correct, not other Grace

17    containing products? Grace asbestos-containing

18    products, I'm sorry.

19    A.    It's all the ones that I have provided

20    here today. We do have one for Zonolite.

21        Q.    But I'm focusing upon what you've relied

22    upon for purposes of this opinion, they were all with

23    MK-3, right?

24    A.    Correct.

25        Q.    And in connection with those simulations,