IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | Chapter 11 |
| | ) | |
| **W. R. GRACE & CO., *et al.,*[1]** | ) | Case No.: 01-01139 (JKF) |
| | ) | Jointly Administered |
| **Debtors.** | ) | |
| | ) | Related Docket No. 22965 |

PLAN PROPONENTS' RESPONSE TO
SUPPLEMENTAL TRIAL BRIEF OF LIBBY
CLAIMANTS IN OPPOSITION TO CONFIRMATION OF FIRST
AMENDED JOINT PLAN OF REORGANIZATION, ADDRESSING
BEST INTERESTS OF CREDITORS TEST UNDER 11 U.S.C. § 1129(A)(7)

## INTRODUCTION

The best interests test requires a careful comparison between a chapter 11 reorganization

and a hypothetical chapter 7 liquidation.  In so doing, it is necessary to take account of the fact

that chapter 11 affords a debtor a number of tools to restructure its business and maximize the

recovery of all creditors.  This is especially true in an asbestos bankruptcy, where section 524(g)

---

[1]  The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food 'N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

provides additional tools to maximize recovery for current and future claimants. The *uncontested* record makes clear that Grace has fully utilized the orderly process of chapter 11 to maximize recovery for its creditors.

A hypothetical chapter 7 liquidation, by contrast, has none of these valuable tools. As such, all the evidence demonstrates that a chapter 7 liquidation would lead to reduced assets, with all creditors racing to seek a sliver of that smaller pie. The Libby Claimants offer no evidence — only argument and speculation — to show otherwise. Moreover, the Libby Claimants' argument that the Joint Plan fails the best interests test is based on a fundamental misconception of the environment and rules that would operate in a chapter 7 liquidation. The Libby Claimants assume that the same orderly rules of chapter 11 would apply in a chapter 7 liquidation. In fact, in a chapter 7 liquidation, it would be inevitable that extensive litigation for limited assets would ensue. Under this realistic view of a chapter 7 environment, it is clear that impaired creditors would fare worse in a chapter 7 than under the Joint Plan. As such the undisputed evidence -- as opposed to argument -- plainly shows that the Joint Plan is in the best interests of all creditors.

I.    **THE CHAPTER 11 PROCESS IN THIS CASE HAS REALIZED THE FULL POTENTIAL OF CHAPTER 11 GENERALLY AND SECTION 524(g) IN PARTICULAR — ALL FOR THE BENEFIT OF CREDITORS.**

Satisfaction of the best interests test always requires a comparison of the benefits of a chapter 11 case against the benefits of a hypothetical chapter 7 case from the perspective of an impaired creditor. Chapter 11 is premised on a belief that value can be maximized by allowing a debtor to continue to operate its business as a going concern while bringing claimants competing for limited assets into one forum. Accordingly, chapter 11 of the Bankruptcy Code affords a debtor a number of tools to restructure its business and maximize the recovery of all creditors.

Moreover, this premise is highlighted in a chapter 11 case that seeks to confirm a plan of reorganization with a supplemental channeling injunction pursuant to section 524(g) of the Bankruptcy Code because such a case seeks to settle not just conventional economic interests against the debtor but also the current and future mass tort claims associated with asbestos. Section 524(g) provides additional tools to a debtor to maximize its assets for the benefit of not only current, but also, future claimants, and to allow a debtor to enter into a global resolution of its asbestos liabilities in light of the reality that the debtor will have limited assets to pay present and future claims.[2]

Grace's chapter 11 process and the resulting Joint Plan is a poster child for how the policies and purposes of chapter 11, as filtered through section 524(g), should function.  Grace has remained a strong and independent company with a bright outlook for the future.    In addition, the parties negotiated for a contribution of over a billion dollars from Sealed Air and Fresenius in exchange for a section 524(g) global resolution of significant asbestos liability that provides for both present and future asbestos claims.  Further, the chapter 11 process allowed Grace latitude to defend itself on multiple fronts, including the criminal case.  Moreover, Grace was able to define the relative scope of its liabilities with a methodical process that has been utilized to great effect.  Finally, the Joint Plan achieved a negotiated settlement among a variety of competing interests to deal fairly with all interests in a highly structured and nuanced fashion.

A.    **The Chapter 11 Process Has Strengthened the Debtors' Business.**

The Debtors commenced these chapter 11 cases on April 2, 2001.   Throughout the chapter 11 process, in the eight years that the Debtors have operated their business as debtors in possession, Grace has not sold off or liquidated any substantial assets.  In fact, not only has the

---

[2]    *See* II U.S.C. § 524(g)(4)(A)(ii).

3

Debtors' business been stabilized, Debtors' management has demonstrated the ability to "improve productivity, improve working capital, grow its businesses, and sustain a healthy core EBITDA level."[3]  As a result, the Debtors' business operations today are strong.[4]

### B. The Tools Afforded to Grace by Chapter 11 Have Brought Tremendous Value to the Debtors' Estates.

The unique chapter 11 landscape has allowed the Debtors to achieve a consensual plan that has maximized the assets available for creditors.  The tools afforded by chapter 11 gave the debtors two principal advantages:  (i) breathing room for the Debtors to formulate a largely consensual plan due to the fact that the debtors were allowed to continue to manage their assets without distraction and formulate a plan of reorganization through a structured settlement without interference from outside parties, and (ii) through section 524(g), the means to implement such a plan.

Using these tools to their advantage, the Debtors have been able to bring tremendous value to their estates for the benefit of all of their creditors.  Thus, third parties, including Sealed Air, Fresenius and various insurers, have been induced to participate in the Joint Plan by contributing significant sums of money in return for the permanent global release from Grace's asbestos exposure that is available only in chapter 11 because of section 524(g).  In addition, through the protections of section 524(g), the value of the Debtors' estates has been preserved for the benefit of all constituencies through the removal of the asbestos overhang.

---

[3]  *See* Feasibility Report of Pamela D. Zilly at 8 [Dkt. No. 21671]; Feasibility Br. at 5 [Dkt. No. 22959].

[4]  *Id.*

C.    **Grace Has Defined the Scope of its Liabilities Methodically Using Both Litigation and Settlement.**

The chapter 11 process has also allowed Grace to define, in the Joint Plan, the scope of its liabilities methodically using both litigation and settlement. Individual creditors and classes of creditors have had the opportunity to reach arm's-length settlements or litigate with Debtors, based on precise knowledge of their legal options and merits of litigation and settlements. Through litigation and settlement, Grace was able to resolve, as part of the Joint Plan, the overwhelming majority of property damage claims on an individual basis. Likewise, Grace was also able to resolve, through the mechanics of the Joint Plan, classes of claims, including the Asbestos PI Claimants and the ZAI Claimants.

II.    **THE LIBBY CLAIMANTS HAVE FAILED TO COME TO TERMS WITH THE DIFFERENCES BETWEEN CHAPTER 11 AND CHAPTER 7.**

The Libby Claimants fundamentally misconceive the operation of a chapter 7 litigation. The Libby Claimants assume that all of the benefits of a chapter 11 case would be implemented in a chapter 7 liquidation. Thus, the Libby Claimants' liquidation analysis keeps the high values achieved only because of chapter 11 and section 524(g) and retains the lower liabilities for all claims, other than their own, that were also obtained only through the chapter 11 process. The Libby Claimants then use all these *chapter 11* benefits, and argue that these benefits would be deployed solely to benefit the Libby Claimants in a *chapter 7* liquidation. This approach is fundamentally flawed.

A chapter 7 liquidation of the Debtors' estates would be designed to distribute the depreciating assets to current claimants -- without any of the tools or processes of chapter 11. Accordingly, the chapter 7 process would be vastly different than the Libby Claimants describe. Rather, chapter 7 would likely involve thousands of creditors competing for depreciating assets.

5

There are several reasons that in such an environment the Libby Claimants would fare far worse than they will under the Joint Plan.

First, it is a virtual certainty that Sealed Air and Fresenius would have no incentive to contribute to a chapter 7 liquidation. The Libby Claimants assert the argument that Sealed Air and Fresenius settled for $1.068 billion, not because of the protections afforded by the section 524(g) injunction, but rather because they "suffered adverse rulings in the litigation" and therefore they would be willing to settle for the same amount with a chapter 7 trustee.[5] Such an assertion is entirely without evidentiary support and is a misrepresentation of the reasons Sealed Air and Fresenius settled. The main impetus behind Sealed Air and Fresenius settling with the Debtors was for protection against successor liabilities under section 524(g) of the Bankruptcy Code, which is available only in a chapter 11 case.[6] In particular, in a chapter 7 liquidation of Grace's estate, the only claim for Sealed Air and Fresenius to settle would be the fraudulent conveyance action, which they viewed as being weak and which would not protect Sealed Air and Fresenius from successor liability claims. Thus, the amount that the Libby Claimants argue would have been obtained from the fraudulent conveyance action in a chapter 7 liquidation is not based on evidence – rather, it is based on exaggeration and speculation. Indeed, it is highly unlikely that Sealed Air and Fresenius would have contributed much, if anything, in a chapter 7 liquidation, where any such contributions would not protect them from future claims.

Second, in a chapter 7 liquidation of Grace's estate there would be no orderly process to litigate and settle individual claims and classes of claims. Thus, the settlements that Debtors

---

[5] *See* Libby Br. at 4.

[6] *See, e.g.,* Sealed Air Settlement Agreement § II(c)(6) (requiring the section 524(g) supplemental channeling injunction as a pre-condition to the Sealed Air Settlement Agreement).

have negotiated with classes of claims, including the Asbestos PI claims and ZAI claims, would be negated. In addition, the numerous individual settlements of property damage claims, environmental claims and other individual claims that the Debtors have negotiated, all of which are contingent on confirmation of the Joint Plan, would be negated. A chapter 7 trustee would be left without the time, resources or incentive to liquidate these claims with the same leverage that was available to the Debtors in these chapter 11 cases.

Third, a chapter 7 liquidation would likely result in an enormous acceleration of claims, including claims that would otherwise be "future" claims, in connection with the liquidation process. Those individual asbestos personal injury and property damage claims would be thrown into a common pool for the chapter 7 trustee, who would not have the incentive, funds or time to deal with them appropriately.

In short, the Libby Claimants fundamentally miscomprehend what would inevitably occur in a chapter 7 liquidation. As a result of this misconception of the chapter 7 liquidation process, the Libby Claimants substantially underestimate the value of asbestos claims in a chapter 7 liquidation. For example, the Libby Claimants estimate that the total amount of Asbestos PD claims, including ZAI claims, in a chapter 7 liquidation would be only $214 million.[7] The Libby Claimants do not take into account, however, that notwithstanding the ZAI science trial or any other arguments that the Debtors could assert, in a chapter 7 case the ZAI class action would still be pending where the class is seeking damages of $5,000 per home with

---

[7]    Libby Br. at 6.

claims for over a million homes.[8]  There is vast potential liability in a chapter 7 liquidation which

the Libby Claimants simply ignore in their calculations.

## III.    ALL CLAIMANTS WILL FARE DEMONSTRABLY BETTER UNDER THE PLAN THAN IN A CHAPTER 7 LIQUIDATION.

In light of the reality of the Joint Plan resulting from a chapter 11 reorganization and the

reality of a chapter 7 liquidation, the Joint Plan is plainly in the best interests of all creditors.

Not only would creditors receive more under the Joint Plan than in chapter 7, all other factors

also point to the Joint Plan being in the best interests of creditors.  This is especially true in light

of section 524(g)'s purpose to provide fairly for future claimants as well as current claimants.

The Libby Claimants' assertions about the values of assets and liabilities in a chapter 7

liquidation are based only on argument -- not evidence or facts.  Using assets and liabilities that

are calculated based on record facts and evidence, it is clear that the Libby Claimants would fare

worse in a chapter 7 liquidation than under the Joint Plan.

The numbers speak for themselves.  As discussed, the facts demonstrate that it is highly

unlikely that Sealed Air and Fresenius would have paid much, if anything, in a chapter 7

liquidation.  Moreover, the Libby Claimants do not dispute[9] that the value of Grace in a chapter 7

liquidation would be reduced from $2.1 billion and $2.5 billion by 50% to $1.05 billion to $1.25

billion in a chapter 7 liquidation because of the need to sell under time pressure and because of

the risk of asbestos liability given the lack of section 524(g) protection.  Thus, the total value of

Grace's assets in a chapter 7 case available to creditors, after all recoveries and costs are

calculated, would be between $2.21 billion to $2.411 billion compared to between $4.280 billion

---

[8]    *See, e.g., ZAI Claimants Memorandum in Support of Motion for Order Recognizing and Permitting Filing of a Washington Class Proof of Claim* [Docket No. 18324].

to $4.680 billion under chapter 11. In short, the Joint Plan provides for more than $2 billion in assets for creditors than would be available in a chapter 7 liquidation.

In a chapter 7 case, the $2.2 billion to $2.4 billion in available assets would have to be shared by General Unsecured Claims, which are approximately $1 billion, and Asbestos PD claims and Asbestos PI Claims. If the aggregate value of Asbestos PD claims were to end up at $5 billion, and the aggregate value Asbestos of PI claims were to be only 25% greater than the Libby Claimants' low end estimate for that class,[10] or approximately $5 billion, then the available recovery for any individual Asbestos PI Claimant in a chapter 7 case would be, at the most, 20% - 22%, as opposed to the, at least, 25% - 35% recovery anticipated for Asbestos PI Claimants under the Joint Plan.[11] Thus, Libby Claimants would fare worse in a chapter 7 case than they would in a chapter 11 case.

Moreover, when other factors, such as equality of distribution and section 524(g), are considered, it is even more clear that the Joint Plan is in the best interests of all creditors. Under section 524(g), the funds available for a debtor's estate are distributed among current and future claimants with the goal that they be treated in a substantially similar manner. In enacting section 524(g), Congress intended to protect future asbestos claimants as well as current asbestos claimants. It would turn Congress's intention on its head if a small group of current asbestos claimants could blow up a plan by arguing that the Bankruptcy Court should ignore future claimants on the liability side of a best interests analysis. Thus, for all these reasons, the Court

---

[9]    *See generally* Libby Br.

[10]   *See* Libby Br. at 4.

[11]   *See* Exhibit 4 to the Disclosure Statement, § 4.2.

DOCS_DE:152822.1

should overrule the Libby Claimants' objection and find that the Joint Plan is in the best interests of all creditors.

## IV.    THE LIBBY CLAIMANTS' COMPARISON OF THE ALLEGED "TORT SYSTEM VALUES" OF THEIR CLAIMS WITH THEIR CLAIMS' ALLEGED VALUES UNDER THE TDP IS FACTUALLY INCORRECT AND MISLEADING.

The Libby Claimants contend that in a hypothetical chapter 7 liquidation, they would be "entitled" to have their claims allowed "at their full tort system value[s]," which are allegedly greater than the TDP's scheduled values.[12]  The Libby Claimants, however, throw around the term "tort system value" as if it were a set of numbers etched in stone somewhere that juries must apply and a chapter 7 trustee must settle for.  It is not.  There is no defined "tort system value" that must be assigned to a particular type of claim.  "Tort system value" is simply a made-up term of the Libby Claimants with contrived numbers attached to it.  It is a mere rhetorical device that should have no bearing on the best interests analysis.

In addition, the Libby Claimants' assertions of what their claims will receive through the Individual Review process under the TDP as a basis for comparison to their "tort system history" are wholly speculative and disingenuous.  As the Plan Proponents will demonstrate at the confirmation hearing, there is nothing in the TDP that precludes, in the Individual Review process, any particular Libby Claimant with non-malignant disease from obtaining in that process (or from a jury, should it come to that) a settlement value up to $400,000 for a non-malignant disease claim.

Finally, the Libby Claimants assume that if their predecessors from Libby won sizeable verdicts and settlement awards prepetition, the Libby Claimants would win the same or comparable verdicts and settlement amounts in a chapter 7 case.  That assumption, however, has

---

[12]    *See* Libby Br. at 8.

DOCS_DE:152822.1

no basis.  At the very least, the Libby Claimants would be dealing with a chapter 7 trustee as their adversary, not Grace, and there is no evidence to suggest the amount at which a trustee, in a chapter 7 liquidation scenario, would settle the Libby claims.  One therefore cannot *assume*, as the Libby Claimants are asking this Court to do, that whatever settlement amounts or settlement averages the Libby Claimants received from Grace prepetition would be the same amounts or averages at which a chapter 7 trustee would settle post-confirmation.  The "past is prologue" approach urged by the Libby Claimants is purely speculative, and should not be used as a basis for weighing the best interests of creditors.

In sum, the comparison of the alleged "tort system values" of the Libby claims with their alleged values under the TDP is misleading and factually incorrect, and thus cannot furnish the proper basis for applying the best interests test under Bankruptcy Code § 1129(a)(7).

## V. THE LIBBY CLAIMANTS HAVE NO "DIRECT ACTION RIGHTS" AGAINST GRACE'S INSURANCE COVERAGE, AND WHATEVER THEY MIGHT RECOVER FROM A PARTY OUTSIDE A CHAPTER 7 CASE HAS NO RELEVANCE TO THE BEST INTERESTS TEST.

The Libby Claimants argue that the Joint Plan violates the best interests test because it does not allow them to "retain" their "direct action rights" against Grace's insurance carriers, which would be available to them in a chapter 7 case.  They are wrong.  As demonstrated in the Plan Proponents' initial trial brief, the Libby Claimants have *no* "direct action rights" against the insurance carriers to begin with.[13]  Thus, their objection relies on an utterly false premise.

Moreover, even assuming arguendo, without conceding, that the Libby Claimants could recover directly from the insurance carriers in a chapter 7 setting, such recoveries are irrelevant to the best interests analysis and should not be taken into account.  The only hypothetical

---

[13]   *See* PP Tr. Br. at 52-56.

recovery that can be taken into account is what the Libby Claimants would receive directly from a chapter 7 trustee.[14]  Thus, any hypothetical recovery by the Libby Claimants from Grace's insurance carriers outside the Joint Plan is irrelevant for determining the best interests analysis.

## CONCLUSION

This brief demonstrates that the best interests test needs to be approached with a careful and realistic view to the realities of chapter 11 versus chapter 7.  Under that view, facts and assumptions related to the values of both claims and assets are simply not interchangeable.  In chapter 11, an orderly reorganization driven process in which the court can estimate values, and the parties are inexorably driven to settlement, governs.  In chapter 7 the results would be purely speculative, driven by multitudinous litigation for a limited and diminishing pot of assets, and all of the drivers would be to reduce, not maximize, individual recoveries.

For these reasons and for all of the reasons stated herein, the Debtors submit that the Joint Plan complies with and satisfies section 1129(a)(7) of the Bankruptcy Code.

---

[14]  *See In re Dow Corning Corp*, 237 B.R. 380, 411 (Bankr. E.D. Mich. 1999) ("When employing the best-interest-of-creditors test, courts look at the [payment] the creditor would receive from the chapter 7 trustee – and only that amount – for comparison with the [payment] available under the plan .... Courts construing [the best interest test] ... uniformly hold that amounts obtainable from other sources, such as guarantors, are irrelevant ....") (citing *In re Rimgale*, 669 F.2d 426, 430 (7th Cir. 1982) (stating that the liquidation analysis "does not include additional amounts that a creditor may be able to collect after a liquidation"); *In re Syrus*, 12 B.R. 605, 608 (Bankr. D. Kan. 1981) (same); *In re Hurd*, 4 B.R. 551, 553 (Bankr. W.D. Mich. 1980) (same)); *see also* 7 Collier on Bankruptcy ¶ 1129.03[7][b], at 1129-46 (15th rev. ed. 2008) (stating that under the best interest of creditors test, "a creditor ... must receive property that has a present value equal to that [creditor's] hypothetical chapter 7 distribution if the debtor were liquidated instead of reorganized on the plan's effective date") (emphasis added).

DOCS_DE:152822.1

Dated: September 4, 2009                    Respectfully                    submitted,

Wilmington, Delaware

                              KIRKLAND & ELLIS LLP
                              David M. Bernick, P.C.
                              Theodore L. Freedman
                              Elli Leibenstein
                              Christopher T. Greco
                              601 Lexington Avenue
                              New York, NY 10022
                              Telephone: (212) 446-4800
                              Facsimile: (212) 446-4900

                              and

                              THE LAW OFFICES OF JANET S. BAER, P.C.
                              Janet S. Baer, P.C.
                              70 W. Madison Street
                              Suite 2100
                              Chicago, IL 60602
                              Telephone: (312) 641-2162

                              and


                                /s/ James E. O'Neill
                              PACHULSKI, STANG, ZIEHL & JONES LLP
                              James E. O'Neill (Bar No. 4042)
                              Timothy Cairns (Bar No. 4228)
                              919 North Market Street, 16th Floor
                              P.O. Box 8705
                              Wilmington, Delaware 19899-8705
                              (Courier 19801)
                              Telephone: (302) 652-4100
                              Facsimile: (302) 652-4400

                              *Counsel for the Debtors and Debtors in Possession*

CAMPBELL & LEVINE, LLC


 /s/ Mark T. Hurford
Mark T. Hurford (No. 3299)
800 N. King Street, Suite 300
Wilmington, DE 19801
Telephone:  (302) 426-1900
Facsimile:  (302) 426-9947
mhurford@camlev.com


and

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Jeffrey A. Liesemer
Kevin Maclay
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone:  (202) 862-5000
Facsimile:  (202) 429-3301

*Counsel for the Official Committee of Asbestos
Personal Injury Claimants*

PHILIPS, GOLDMAN & SPENCE, P.A.


  /s/ John C. Philips
John C. Philips (Bar No. 110)
1200 North Broom Street
Wilmington, DE 19806
Telephone: (302) 655-4200
Facsimile: (302) 655-4210

and

ORRICK, HERRINGTON & SUTCLIFFE LLP
Roger Frankel
Richard H. Wyron
Jonathan P. Guy
Debra L. Felder
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500

*Counsel for David T. Austern, Asbestos PI Future
Claimants' Representative*

SAUL EWING LLP

  /s/ Teresa K.D. Courrier
Teresa K.D. Currier (Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Facsimile: (302) 421-6813

and

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Philip Bentley
Gregory Horowitz
Douglas Mannal
1177 Avenue of the Americas
New York, NY 10022
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee of Equity Security Holders*