IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| W.R. GRACE & CO., *ET AL.*, ) | |
| DEBTORS ) | Chapter 11 |
| W.R. GRACE & CO., *et al.*; ) | |
| OFFICIAL COMMITTEE OF ) | Case No. 01-1139 (JKF) |
| ASBESTOS PERSONAL INJURY ) | Jointly Administered |
| CLAIMANTS; ASBESTOS PI FUTURE ) | |
| CLAIMANTS' REPRESENTATIVE; ) | Objection Deadline: Sept. 4, 2009 |
| OFFICIAL COMMITTEE OF EQUITY ) | Hearing Date & Time: Sept. 8, 2009 |
| SECURITY HOLDERS; ) | Pittsburgh, Pennsylvania |
| | **Related to Docket No. 22766** |

**PLAN PROPONENTS' REPLY IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY OF ALAN WHITEHOUSE, M.D., ARTHUR FRANK, M.D., CRAIG MOLGAARD, PH.D., AND TERRY SPEAR, PH.D.**

[remainder of page left blank]

There is certainly no question that there are people who have developed very serious and even fatal diseases because of exposure to asbestos in Libby. The historical working conditions at the Zonolite/Grace mining and milling operation have been known for over forty years and were the subject of epidemiological studies dating back to the 1980's. These historical working conditions caused a high rate of disease among workers and their family members. The picture in the broader Libby community, which is now coming forward to make claims, however, is quite different. The ATSDR's mortality study--a controlled epidemiological study--revealed in 2002 that the greater community of Libby, outside of the working population, did not experience an elevated level of disease.

The question before this Court, however, is not whether there is a high prevalence of disease in Libby. Rather the question is whether the various personal injury claimants <u>from</u> Libby will receive the same treatment as other personal injury claimants <u>outside</u> of Libby. Simply put, it is an issue of whether the Libby Claimants face discrimination--not "discrimination" in an employment or other similar context--but rather discrimination in a bankruptcy sense.

Two points will be addressed in this reply. *First*, Plan Proponents will focus again on what discrimination is in the context of a bankruptcy--as that is the touchstone of what type of expert testimony is and is not relevant. Discrimination in the context of a 524(g) trust means that claims resolution procedures for one group (Libby) are less favorable than procedures spelled out for another group (non-Libby). No such discrimination is present here. The Grace TDP is crafted in the tradition of dozens of other TDPs and treats claimants inside and outside of Libby the same. The Libby Claimants' own experts concede this, and they have not even attempted to show that people inside of Libby are treated differently than others. The Libby Claimants'

insistence, though, that they would like more Libby Claimants to be included in the expedited review does not go to proving discrimination.

*Second*, this brief addresses the question of whether the assertion of Libby's experts that Libby Claimants have the same disease but with unique features meets the reliability standard of *Daubert*. That assertion is on its face a comparative statement about the characteristics of groups of people. It can only be reliably addressed through controlled epidemiological studies. None of the Libby Claimants' expert opinions are based on such analyses and therefore cannot reliably speak to whether the claimants in Libby are different from those outside of Libby.

## I. THE LIBBY CLAIMANTS MISCONSTRUE BANKRUPTCY "DISCRIMINATION" AND THUS FAIL TO EVEN ADDRESS THE PROPER LEGAL QUESTION.

The Libby Claimants' fundamentally misapprehend what kind of discrimination is at issue in this case. The relevant framework for assessing discrimination in this bankruptcy case is clear:

- The Bankruptcy Code requires equal treatment for similarly situated creditors under the plan of reorganization.[1]

- Under the Bankruptcy Code, similar treatment means giving creditors the same process.[2]

- In the context of a 524(g) trust, the "process" refers to the processing of claims by the trust.[3] In this case, this process is governed by the Grace TDP.

- The processing of claims under the proposed Grace TDP are not novel or somehow designed to discriminate against anyone and particularly not designed to discriminate against the Libby Claimants. These processes have been used in scores of trusts for years. These processes apply uniformly throughout the entire country.

---

[1] *See* 11 U.S.C. §§ 524(g), 1123(a)(4); *Begier v. IRS*, 496 U.S. 53, 58 (1990).

[2] 11 U.S.C. § 524(g)(2)(B)(ii)(V); *In re Central Med. Ctr., Inc.*, 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990).

[3] 11 U.S.C. § 524(g)(2)(B)(ii)(V).

- These process for paying claims under the Grace TDP includes differentiation by disease, with the more serious diseases getting more money. The TDP permits expedited payment of claims for a particular disease category if the claimant meets specific, objective criteria.[4]

- The disease category challenged as "discriminatory" by the Libby Claimants is the "Severe Pleural Disease" category. This TDP category was developed in response to concerns expressed by the Libby Claimants and relates to a disease that occurs both inside Libby and outside Libby.

- The expedited payment criteria to be applied to this disease--whether inside or outside of Libby--are the same.

- The Plan Proponents recognize that these criteria will not capture every case of severe pleural disease; rather, they will only capture the clearest, most self-evident cases of severe pleural disease. This will have the effect of denying expedited payment to people _inside_ and _outside_ of Libby who cannot meet the objective criteria, and who will then have to establish that they have severe pleural disease through an individual review process.

Accordingly, the Plan Proponents have (and will at the Confirmation Hearing) clearly met their burden of demonstrating that the TDP provides for similar treatment to claimants both inside and outside of Libby.

To the extent that the Libby Claimants want to come forward to show that the Plan Proponents are wrong and that the TDP criteria are somehow discriminatory, it will be their burden to demonstrate that, to begin with, the TDP will be disproportionately exclusive with respect to people who have a severe form of pleural disease in Libby as compared to people who have a severe form of pleural disease outside of Libby. The Libby Claimants' experts, however, have not performed this analysis, and they admit this.[5] Rather, they intend to offer extensive testimony about people who will not receive expedited treatment for their pleural disease under

---

[4] TDP §§ 2.2 & 5.3(a).

[5] 6/5/09 Frank Dep. at 195; *see also* 6/16/09 Whitehouse Dep. at 266-69.

the TDP and that those people in fact do have a severe form of pleural disease.[6] But the issue of discrimination does not turn on whether the TDP criteria should be broadened or narrowed to include or exclude more people. Rather, the issue is whether the TDP criteria will exclude people with severe pleural disease in Libby but include people who have the same disease outside of Libby. None of the Libby Claimants' expert testimony addresses this singular, fundamental question to the issue of bankruptcy discrimination.

## II. THE LIBBY CLAIMANTS CANNOT EVEN PROVE BY RELIABLE SCIENCE THAT PLEURAL DISEASE IN LIBBY IS DIFFERENT FROM PLEURAL DISEASE ELSEWHERE AND ESSENTIALLY CONCEDE THAT IT IS NOT.

Unable to show discrimination, the Libby Claimants retreat to a broader proposition that need not even be decided by the Court: specifically, that pleural disease in Libby has unique characteristics not found outside of Libby. Such an opinion, under the Federal Rules of Evidence, must be based on comparative epidemiology that studies the characteristics of pleural disease in Libby and pleural disease outside of Libby and supports a scientifically derived causal conclusion of such a difference. None of the Libby Claimants' experts' have generated, identified, or relied on a comparative epidemiological analysis that supports such a conclusion, and thus they cannot offer reliable expert opinions relevant to whether pleural disease in Libby is different.

While Dr. Whitehouse has previously repudiated any suggestion that pleural disease in Libby is "unique,"[7] the Libby Claimants now unequivocally assert that "Libby is different"[8] and

---

[6] 9/1/09 Libby Claimants' Opp'n to Plan Proponents' Mot. in Limine to Exclude Libby Experts' Testimony ("Libby Claimants' Response") [Dkt. # 23072] at 5-6.

[7] 6/16/09 Whitehouse Dep. at 203.

[8] Libby Claimants' Response at 7.

that there is a "distinct pattern for Libby asbestos disease."[9] Opinions such as these, which characterize the nature and course of diseases in one population compared to another, are classic epidemiological opinions that must be based on proper epidemiology. As a threshold matter, Dr. Whitehouse was previously ruled unqualified by a U.S. District Court to render such opinions.[10] This finding is particularly relevant given that the three studies that Dr. Whitehouse relies upon to support the proposition that pleural disease in Libby is different or distinct from pleural disease elsewhere--Whitehouse (2004), Whitehouse (2008), and the CARD Mortality Study-- were all authored by *Dr. Whitehouse* and describe phenomenon that *Dr. Whitehouse* observed in *Dr. Whitehouse's* patient practice. While the deficiencies in these studies were detailed with particularity in Plan Proponents' August 12, 2009 *Daubert* motion[11] and the expert reports attached to that motion, none of these studies even speak to the issue as to whether pleural disease in Libby is actually different than pleural disease outside of Libby.

- **Whitehouse (2008)** - This is a case series of people who spent time in Libby who were diagnosed with mesothelioma. Dr. Whitehouse himself acknowledged that this paper is not relevant to nonmalignant pleural disease in Libby.

- **Whitehouse (2004)** - In this paper, Dr. Whitehouse averaged annual loss of lung function for 123 of his patients. Among the study's numerous flaws, these 123 individuals included people with interstitial lung disease,[12] which, as Dr. Whitehouse acknowledges, also causes a loss of lung function and confounds any effort to attribute the observed loss of lung function to pleural disease only.[13] This study merely demonstrates a simple proposition: 123 people in Dr. Whitehouse's patient population who were diagnosed with various asbestos-

---

[9] *Id.* (quoting Expert Report of Dr. Alan C. Whitehouse, May 2009, ¶ 34).

[10] *United States v. W.R. Grace*, Doc. No. 1103, Apr. 21, 2009 Order at 4 (finding that "Dr. Whitehouse does not possess specialized knowledge in the field of epidemiology[]" and "strik[ing] the inadmissible opinion"); *United States v. W.R. Grace*, Mar. 4, 2009, Tr. vol. 7 at 1692-95 (D. Mont.).

[11] 8/13/09 Plan Proponents' Mot. in Limine to Exclude Expert Testimony of Alan Whitehouse, M.D., Arthur Frank, M.D., Craig Molgaard, Ph.D., and Terry Spear, Ph.D [Dkt. # 22766] at 19-22.

[12] Whitehouse (2004) at 221.

[13] 9/2/09 Whitehouse Dep. at 18.

related diseases, on average, lost lung function over time. This study makes no comparison between people with pleural disease in Libby and those elsewhere, nor does it demonstrate that pleural disease in Libby manifests itself differently than elsewhere.

- **CARD Mortality Study** - This study describes the medical condition of patients from the CARD Clinic who have died. Drs. Frank and Whitehouse provide x-ray and PFT data for these individuals and take issue with the fact that not enough of the people who, according to Dr. Whitehouse, died because of their pleural disease would be entitled to expedited recovery under the TDP. Once again, Dr. Whitehouse does not isolate those cases with pleural disease only and instead opines about "pleural death" for people who had severe asbestosis, which confound any analysis of the effects of pleural disease.[14] Moreover, this analysis is limited to CARD patients in Libby and does not make any meaningful comparison between the manifestation of pleural disease inside and outside of Libby.

These studies merely <u>describe</u> what Dr. Whitehouse has observed within his patient practice of people exposed to asbestos in Libby. Dr. Whitehouse admitted that he has conducted no analysis of pleural disease "in any patient population <u>outside</u> of Libby."[15] None of these studies, nor any opinions based on these studies, establish through epidemiology that pleural disease in Libby is different than pleural disease outside of Libby.

## CONCLUSION

For the foregoing reasons, the Plan Proponents respectfully request that the Court preclude the Libby Claimants' experts from testifying at the Confirmation Hearing.

---

[14] *Id.* at 18, 92.

[15] 6/16/09 Whitehouse Dep. at 115 (emphasis added).

Dated: September 4, 2009            Respectfully submitted,

KIRKLAND & ELLIS LLP

David M. Bernick, P.C.
Theodore Freedman
Citigroup Center
601 Lexington Ave.
New York, New York  10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

and

Barbara M. Harding
Brian T. Stansbury
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 879-5200

and

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
70 W. Madison St.
Suite 2100
Chicago, IL 60602
Telephone:  (312) 641-2162
Facsimile:  (312) 641-2165

and

PACHULSKI, STANG, ZIEHL & JONES LLP

/s/ James E. O'Neill
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
joneill@pszjlaw.com
kmakowski@pszjlaw.com

*Co-Counsel for the Debtors and Debtors in Possession*

CAPMPBELL & LEVINE, LLC

/s/ Mark T. Hurford
Mark T. Hurford (Bar No. 3299)
Marla R. Eskin (Bar No. 2989)
800 King Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 426-1900
mhurford@camlev.com

CAPLIN & DRYSDALE, CHARTERED
Elihu Inselbuch
375 Park Avenue, 35th Floor
New York, NY 10152-3500
Telephone: (212) 319-7125
Facsimile: (212) 644-6755

Peter Van N. Lockwood
Nathan D. Finch
Kevin Maclay
One Thomas Circle, N.W.
Washington, D.C. 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301

*Counsel for the Official Committee of
Asbestos Personal Injury Claimants*

PHILIPS, GOLDMAN & SPENCE, P.A.

/s/ John C. Philips
John C. Philips (Bar No.110)
1200 North Broom Street
Wilmington, DE 19806
Telephone: (302) 655-4200
Facsimile: (302) 655-4210
jcp@pgslaw.com

and

ORRICK, HERRINGTON & SUTCLIFFE LLP
Roger Frankel
Richard H. Wyron
Jonathan P. Guy
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500

*Counsel for David T Austern, Asbestos PI Future Claimants' Representative*

SAUL EWING LLP

/s/s Teresa K.D. Currier
Teresa K.D. Currier (Bar No. (3080)
222 Delaware Avenue, 12th Floor
Wilmington, DE 19801
Telephone: (302) 421-6800
Facsimile: (302) 421-6813
tcurrier@saul.com

and

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Philip Bentley
Gregory Horowitz
David Blabey
1177 Avenue Of The Americas
New York, NY 10036
Telephone: (212) 715-9100
*Counsel for the Official Committee of Equity Security Holders*