# <u>Exhibit A</u>

*Execution*

## ASSET PURCHASE AGREEMENT

by and between

### W. R. GRACE & CO.-CONN,

as Seller

and

### THE RECTORSEAL CORPORATION,

as Buyer

August 18, 2009

*Execution*

## TABLE OF CONTENTS

Page No.

**Article 1.  Definitions** ...................................................................................................6
    1.01.  General. .............................................................................................6
    1.02.  Defined Terms ..................................................................................7
**Article 2.  Sale of Business, Purchase Price** .........................................................17
    2.01.  Purchase and Sale of Transferred Assets ...................................17
    2.02.  Excluded Assets ...............................................................................19
    2.03.  Transferred Liabilities ....................................................................20
    2.04.  Excluded Liabilities .........................................................................21
    2.05.  Amount and Payment of Consideration .......................................22
    2.06.  IRS Form 8594 ................................................................................22
    2.07.  Assumption and Assignment of Transferred Contracts .............23
**Article 3.  Closing** ..........................................................................................................22
    3.01.  Closing Date. ....................................................................................23
    3.02.  Time and Place of Closing, Simultaneity .....................................23
    3.03.  Transfers at the Closing; Payments ..............................................23
    3.04.  Further Assurances of Buyer .........................................................24
    3.05.  Further Assurances of Seller .........................................................24
**Article 4.  Purchase Price Adjustments** ...................................................................25
    4.01.  Definitions. .......................................................................................25
    4.02.  Initial Payment - Working Capital Adjustment. ..........................26
    4.03.  Deferred Payment - Deferred Payment Adjustment ...................25
**Article 5.  Seller's Representations and Warranties** ..............................................26
    5.01.  Corporate Organization and Existence .........................................26
    5.02.  Corporate Power .............................................................................26
    5.03.  Authorization ...................................................................................27
    5.04.  Execution and Delivery ..................................................................27
    5.05.  No Conflict. ......................................................................................27
    5.06.  Consents and Approvals .................................................................27
    5.07.  Binding Effect. .................................................................................28
    5.08.  Financial Information. .....................................................................28
    5.09.  Sufficiency of Assets ......................................................................28
    5.10.  Real Property Title to Transferred Assets; Liens; Permits. ........29
    5.11.  Inventory ..........................................................................................29
    5.12.  Litigation; Investigations ...............................................................29
    5.13.  Contracts. .........................................................................................30
    5.14.  Employment .....................................................................................30
    5.15.  Intellectual Property .......................................................................30
    5.16.  Conduct of Business .......................................................................33
    5.17.  Compliance with Laws ...................................................................33
    5.18.  Brokers .............................................................................................33
    5.19.  Taxes ................................................................................................33
    5.20.  Product Recalls; Warranties ..........................................................34
    5.21.  Material Adverse Effect ..................................................................34
**Article 6.  Buyer Representations and Warranties** ................................................35

*Execution*

# TABLE OF CONTENTS

Page No.

6.01. Corporate Status.................................................................................35
6.02. Authorization..................................................................................35
6.03. No Conflict....................................................................................35
6.04. Consent and Approvals........................................................................36
6.05. Binding Effect................................................................................36
6.06. Sufficient Funds..............................................................................36
6.07. Brokers.......................................................................................36
6.08. Litigation....................................................................................36
**Article 7. Buyer's Investigation ................................................................37**
7.01. Investigation.................................................................................37
7.02. Financial Information.........................................................................36
7.03. No Additional Representations.................................................................36
**Article 8. Covenants of Seller and Buyer ........................................................38**
8.01. Bankruptcy Court Actions......................................................................38
8.02. Notices to Third Parties .....................................................................38
8.03. Commercially Reasonable Efforts ..............................................................38
8.04. Waiver of Bulk Sales Law Compliance ..........................................................39
8.05. Mail or Other Communications Received After Closing ..........................................39
8.06. Taxes.........................................................................................39
8.07. Listing, Testing and Code Agency Agreements ..................................................39
**Article 9. Conduct of Business Prior to the Closing ............................................40**
**Article 10. Conditions Precedent to Buyer's Obligations.........................................40**
10.01. Accuracy of Representations and Warranties ..................................................40
10.02. Performance of Covenants and Agreements.....................................................41
10.03. Consents, etc...............................................................................41
10.04. Litigation..................................................................................41
10.05. Certificates of Seller......................................................................41
10.06. Bankruptcy Court Approval...................................................................42
**Article 11. Conditions Precedent to Seller's Obligations .......................................42**
11.01. Accuracy of Representations and Warranties .................................................42
11.02. Performance of Covenants and Agreements.....................................................42
11.03. Consents, etc...............................................................................43
11.04. Litigation..................................................................................43
11.05. Certificates of Buyer.......................................................................43
11.06. Bankruptcy Court Approval...................................................................44
**Article 12. Termination .......................................................................44**
12.01. Rights to Terminate.........................................................................42
12.02. Consequences of Termination.................................................................42
**Article 13. Indemnification ...................................................................45**
13.01. Definitions.................................................................................45
13.02. Seller's Indemnification....................................................................46
13.03. Buyer's Indemnification.....................................................................46
13.04. Limitations.................................................................................47
13.05. Defense of Third-Party Claims...............................................................48

*Execution*

## TABLE OF CONTENTS

Page No.

13.06. Unsuccessful Indemnification Claims; Damages ......................................48
13.07. No Consequential or Lost Profit Damages; Exclusive Remedy .........................49
13.08. Characterization of Indemnity Payment for Tax Purposes ...........................50
**Article 14.  Post-Closing Matters**...................................................**50**
14.01. Mutual Cooperation. ..........................................................50
14.02. Preservation of Files and Records.............................................51
14.03. Reports ......................................................................51
14.04. Renewal of Guaranteed Items .................................................51
14.05. "Grace" and "Grace Construction Products" Names ..............................51
14.06. Intercompany Agreements .....................................................52
14.07. Covenant Not to Compete......................................................53
14.08. Nonsolicitation..............................................................52
14.09. Confidentiality..............................................................53
14.10. Obligations for Accounts Receivable and Inventory After Closing.....................54
14.11. Removal/Disposal of Transferred Assets.......................................55
**Article 15.  Expenses** ...........................................................**57**
15.01. Expenses ....................................................................57
15.02. Transfer Taxes ..............................................................58
15.03. Property Prorations..........................................................56
**Article 16.  Notices** ............................................................**57**
16.01. Notices .....................................................................58
**Article 17.  General** ...........................................................**59**
17.01. Entire Agreement ............................................................59
17.02. Governing Law ...............................................................59
17.03. Submission to Jurisdiction ..................................................59
17.04. Third-Party Beneficiaries....................................................60
17.05. Assignment; Successors.......................................................60
17.06. Amendments and Waivers.......................................................60
17.07. Counterparts ................................................................60
17.08. Time is of the Essence ......................................................59
17.09. Attorney's Fees .............................................................59

*Execution*

**Exhibits and Schedules**

**<u>Exhibits</u>**

| | |
|---|---|
| A. | Closing Assumption Agreement |
| B. | Form of Sale Order |

**<u>Schedules</u>**

| | |
|---|---|
| 1.02 | Products |
| 2.01(a) | Certain Tangible Personal Property |
| 2.01(e) | Code Testing Approvals |
| 2.02(k) | Certain Excluded Assets |
| 2.05 | Seller Wire Transfer Instructions |
| 4.01(a) | Seller Accounting Policies |
| 4.01(c) | Deemed Salable Inventory |
| 5.05 | No Conflict |
| 5.06 | Consents and Approvals |
| 5.08(a) | Seller Financial Schedules |
| 5.08(b) | Seller P&L Statement |
| 5.08(c) | Seller Accounts Receivable |
| 5.09 | Sufficiency of Assets |
| 5.10(a) | Manufacturing Sites |
| 5.10(c) | Permits of Seller |
| 5.11 | Off-site Inventory |
| 5.13 | Transferred Contracts |
| 5.15(a) | Scheduled Intellectual Property |
| 5.15(b) | Intellectual Property Infringements or Conflicts |
| 5.15(c) | Transferred Patent and Application Listings |
| 5.15(d) | Transferred Trademark Registrations |
| 5.15(e) | Transferred Copyrights |
| 5.15(f) | Third Party Rights to Transferred Intellectual Property |
| 5.15(g) | Transferred Intellectual Property |
| 5.15(i) | Licensed Intellectual Property |
| 5.20 | Product Recalls |
| 14.07(b) | Buyer Scheduled Products |

*Execution*

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made as of August 18, 2009, by and between W. R. Grace & Co.-Conn., a Connecticut corporation ("Seller") and The RectorSeal Corporation, a Delaware corporation ("Buyer, and collectively with Seller, the "Parties" and each, a "Party"). Capitalized terms used herein have the meanings specified in Section 1.02 or elsewhere in this Agreement.

### RECITALS:

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to acquire from Seller, certain assets associated with the manufacture and sale of the Products;

WHEREAS, upon the terms and subject to the conditions hereinafter set forth and in order to consummate the desired transfer of the Transferred Assets (as hereinafter defined), the Parties desire that Seller sell, assign and transfer to Buyer, and that Buyer purchase and acquire from Seller, the Transferred Assets, and that Buyer assume the Transferred Liabilities; and

WHEREAS, Seller intends that the transactions contemplated by this Agreement shall be implemented through the filing of the Sale Motion pursuant to Sections 105, 363 and 365 of the Bankruptcy Code seeking approval of the transactions contemplated by this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the Parties hereby agree as follows:

### Article 1.

### Definitions

1.01. General.

(a)    This Agreement and the Transaction Documents are the result of the joint efforts of Buyer and Seller, and there is to be no construction against either Party based on any presumption of that Party's involvement in the drafting thereof.

(b)    All Article and Section numbers, and Exhibit and Schedule references, used in this Agreement refer to Articles and Sections of this Agreement, and Exhibits and Schedules

*Execution*

attached hereto or delivered simultaneously herewith, unless otherwise specifically stated. The captions used in this Agreement are for convenience of reference only and shall not be considered in the interpretation of the provisions hereof.

(c)     Any of the terms defined in this Agreement and the Transaction Documents may be used in the singular or the plural. In this Agreement and the Transaction Documents, unless otherwise specifically stated, "hereof," "herein," "hereto," "hereunder" and the like refer to this Agreement or a Transaction Document, as the case may be, as a whole and not merely to the specific Section, Article, paragraph or clause in which the word appears. Except as otherwise expressly provided, any noun or pronoun used in this Agreement or the Transaction Documents shall be deemed to include the plural as well as the singular and to cover all genders, and the terms "include" and "including" shall be deemed to be followed by the following phrase "without limitation."

(d)     The terms "dollars" and "$" in this Agreement or the Transaction Documents shall mean United States dollars.

1.02.   <u>Defined Terms</u>.  For purposes of this Agreement, including the Exhibits and Schedules, the following defined terms have the meanings set forth in this Section.

"<u>Affiliate</u>" of any Person shall mean any other Person, which, directly or indirectly, controls or is controlled by or is under common control with such Person. Solely for purposes of this definition of Affiliate, a Person shall be deemed to "control," be "controlled by" or be "under common control with" another Person if such other Person possesses, directly or indirectly, power to direct or cause the direction of the management or policies of such Person whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

"<u>Agreement</u>" has the meaning given to such term in the preamble.

"<u>Bankruptcy Code</u>" means 11 U.S.C. § 101 *et seq.*

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware or any other court of competent jurisdiction having jurisdiction over the Chapter 11

*Execution*

Case or over any appeal of an order entered in the Chapter 11 Case that relates to the Transactions.

"Book Value" has the meaning given to such term in Section 4.02.

"Bulk Sales Law" has the meaning given to such term in Section 8.04.

"Business" means the manufacture and sale of the Products as conducted by Seller immediately prior to the date of this Agreement.

"Business Day" means a day that is not a Saturday or Sunday, nor a day on which banks are generally closed in New York City.

"Business Executive" means John Goga.

"Buyer" has the meaning given to such term in the preamble.

"Buyer Entity" means Buyer, any of its Subsidiaries, its ultimate parent, and any of its ultimate parent's direct or indirect Subsidiaries.

"Buyer Group" means all the Buyer Entities.

"Buyer Indemnitees" has the meaning given to such term in Section 13.02.

"Buyer's Claim" has the meaning given to such term in Section 13.04.

"Buying Companies" means, collectively, Buyer and any and all designees of Buyer to whom Transferred Assets are transferred pursuant to this Agreement.

"Chapter 11 Cases" means *In re: W. R. Grace & Co. et al., Debtors*, Chapter 11, Cases Nos. 01-1139 et al. (JKF) (Jointly Administered) in the Bankruptcy Court.

"Claim" has the meaning given to such term in Section 13.01.

"Closing" has the meaning given to such term in Section 3.01.

"Closing Assumption Agreement" means the assumption agreement to be executed and delivered by Buyer at the Closing in substantially the form attached hereto as Exhibit A.

*Execution*

"Closing Current Assets" has the meaning given to such term in Section 4.01.

"Closing Date" has the meaning given to such term in Section 3.02.

"Closing Transfer Documents" means such bills of sale, assignments and other instruments of sale, transfer and assignment in order to effectively transfer to Buyer or its designees all right, title and interest of Seller in the Transferred Assets as Buyer shall reasonably request.

"Code" means the Internal Revenue Code of 1986, as amended.

"Code Testing Approvals" has the meaning given to such term in Section 2.01.

"Confidential Information" has the meaning given to such term in Section 14.09.

"Confidentiality Agreement" means the Confidentiality Agreement dated March 10, 2009, between Seller and Capital Southwest Corporation as amended on June 23, 2009 to include Buyer as a party thereto.

"Contamination" means the emission, discharge, placement, presence or release of any Hazardous Substance to, on, onto or into the Environment and the effects of such emission, discharge, placement, presence or release, including the presence or existence of any such Hazardous Substance.

"Control" in respect to Seller's or another Seller Entity's interest in Intellectual Property, shall mean that Seller or another Seller Entity (1) has the right to transfer ownership, make available, and/or grant licenses under such Intellectual Property without accounting to others, or (2) has the right to transfer ownership of, make available, and/or license such Intellectual Property, subject to royalty or other obligations or restrictions on which the exercise of Seller's or another Seller Entity's right is contingent, which Seller or another Seller Entity shall satisfy without any commitment by Buyer.

*Execution*

"Copyrights" has the meaning given to such term in the "Intellectual Property" definition in Section 1.02.

"Damages" has the meaning given to such term in Section 13.01.

"Deemed Salable Inventory" has the meaning give to such term in Section 4.01.

"Deferred Payment" has the meaning give to such term in Section 2.05.

"Deferred Payment Adjustment" has the meaning given to such term in Section 4.03.

"Deferred Payment Date" has the meaning give to such term in Section 2.05.

"Direct Claims" has the meaning given to such term in Section 13.01.

"Disposal" has the meaning given to such term in Section 14.11.

"Due Diligence Information" has the meaning given to such term in Section 7.02.

"Environment" means navigable waters, waters of the contiguous zone, ocean waters, surface waters, groundwater, surface and subsurface land, outdoor and indoor air and any other environmental medium or natural resource.

"Environmental Laws" means, collectively, any and all applicable Laws, directives, authorizations, notices, Permits, or other requirements of a Governmental Authority, relating in any way to Contamination, protection of the Environment, protection of natural resources or protection of human health and safety, including those relating to emissions, discharges, releases or threatened emissions, discharges or releases to, on, onto or into the Environment of, or exposures or threatened exposures to, any Hazardous Substance.

"Environmental Matters" means any matter arising out of or relating to (a) Contamination; (b) Environmental Laws and compliance with Environmental Laws; or (c) protection of the Environment (indoor or outdoor).

"Estimate" has the meaning given to such term in Section 4.02.

*Execution*

"Excluded Assets" has the meaning given to such term in Section 2.02.

"Excluded Liabilities" has the meaning given to such term in Section 2.04.

"Final Order" means any order of the Bankruptcy Court after all opportunities for rehearing, reargument, petition for certiorari and appeal are exhausted or expired and any requests for rehearing have been denied, and that has not been revised, stayed, enjoined, set aside, annulled, reversed, remanded, modified or suspended, with respect to which any required waiting period has expired, and to which all conditions to effectiveness prescribed therein or otherwise by law or order have been satisfied.

"Financial Schedules" has the meaning given to such term in Section 5.08.

"Governmental Authority" means an entity, including contractors and agents acting on behalf of an entity, exercising executive, legislative, judicial, regulatory or administrative functions of government, including, but not limited to, agencies, departments, boards, commissions, and other instrumentalities thereof, whether national, federal, state, local or foreign.

"Hazardous Substance" means any element, substance, compound or mixture whether solid, liquid or gaseous, that is subject to regulation or control under any Environmental Law.

"Inclusion Notice" has the meaning given to such term in Section 2.03.

"Indemnification Claim" has the meaning given to such term in Section 13.01.

"Indemnified Party" has the meaning given to such term in Section 13.01.

"Indemnifying Party" has the meaning given to such term in Section 13.01.

"Information" has the meaning given to such term in the "Intellectual Property" definition in Section 1.02.

"Initial Payment" has the meaning given to such term in Section 2.05.

*Execution*

"Intellectual Property" or "IP" means any and all of the following:

(a)    United States and foreign patents, patent disclosures and patent applications, including all reissues, divisions, continuations, continuations-in part, divisionals, revisions, utility models, representations, substitutions, or extensions of any of the foregoing (collectively, "Patent Rights");

(b)    (1) internet domain names, (2) W. R. Grace website content regarding the Business, (3) trademarks, service marks, trade names, brand names, trade dress, logos, and designs, assumed names and other indications of origin, whether registered or unregistered, and any applications or renewals therefor, and (4) all goodwill symbolized thereby or associated with subsection (3) (collectively, "Trademark Rights");

(c)    United States and foreign copyrightable works and all copyrights, whether registered or unregistered, and any applications and registrations therefor or renewals or derivatives thereof (collectively, "Copyrights"); and

(d)    all inventions, invention disclosures, trade secrets and confidential Business information, discoveries, work papers in the possession of Seller, lab manuals, lab notes, technical information, formulae, processes, designs, drawings, know-how, show-how, technical data, specifications, manufacturing know-how, trade secrets, computer software and sales data, technical manuals and documentation which are not embodied within subparagraphs (a), (b) and (c) (collectively, "Information").

"Inventory" means inventories and supplies of raw materials, works-in-process, finished goods, spare parts, packaging inventories and other inventory items owned by Seller, wherever located.

"Laws" means all federal, state, provincial, local and foreign laws, statutes, ordinances, rules, regulations, orders, judgments, decrees, writs, arbitral orders, settlement agreements, conciliation agreements, injunctions or other requirements of all applicable governmental, judicial, legislative, executive, administrative and regulatory authorities.

*Execution*

"Lien" means any pledge, security interest, deed of trust, charge, option, claim, covenant, condition, right of first refusal, transfer restriction or other lien or encumbrance other than a Permitted Lien.

"Litigation Expenses" has the meaning given to such term in Section 13.01.

"Material Adverse Effect" means any circumstance, change or effect that is materially adverse to the Transferred Assets or the business, financial condition or results of operations of the Business, in each case taken as a whole; provided however, a Material Adverse Effect shall not include any failure on the part of any Party or its Affiliates: (i) to transfer any Code Testing Approval to Buyer; or (ii) to transfer any rights and incidents in, to and under the Transferred Contracts to Buyer.

"Movers" has the meaning given to such term in Section 14.11.

"Noncompetition Term" has the meaning given to such term in Section 14.07.

"Nonsolicitation Term" has the meaning given to such term in Section 14.08.

"P&L Statements" has the meaning given such term in Section 5.08.

"Patent Rights" has the meaning given to such term in the "Intellectual Property" definition in Section 1.02.

"Party" and "Parties" have the meanings given to such terms in the preamble.

"Permits" means licenses, permits, registrations, orders and approvals required by applicable Laws or Governmental Authorities (including those relating to Environmental Laws).

"Permitted Liens" means (i) any Liens securing Taxes, or (ii) any claims of materialmen, carriers, landlords and like Persons, in each case, which are not yet due and payable.

*Execution*

"Person" means any individual, partnership, firm, trust, association, company, limited liability company, corporation, joint venture, unincorporated organization, other business entity or Governmental Authority.

"Plant" means the real property owned by Seller and located at 1330 Industry Road, Hatfield, Pennsylvania 19440.

"Post-Petition Loan Agreement" means the Post-Petition Loan and Security Agreement dated as of April 1, 2001, as amended, among the financial institutions named therein as the Lenders, Bank of America, N.A., as the Agent and W. R. Grace & Co. and the Subsidiaries of W. R. Grace & Co. named therein, as Debtors and Debtors in Possession, as the Borrowers.

"Proceeding" means any action, suit, investigation or proceeding, including, but not limited to, any workers compensation claim, litigation commenced by or on behalf of employees, environmental, condemnation, expropriation, eminent domain or similar proceeding, or any proceeding seeking to revoke, cancel, suspend or modify any provision of a permit, by or before a Governmental Authority other than the Bankruptcy Court.

"Products" means the products listed on Schedule 1.02.

"Purchase Price" has the meaning given to such term in Section 2.05.

"Related Person" has the meaning given to such term in Section 13.01.

"Removal" has the meaning given to such term in Section 14.11.

"Removal Date" has the meaning given to such term in Section 14.11.

"Removal Plan" has the meaning given to such term in Section 14.11.

"Sale Motion" means a motion that shall include a form of sale order in substantially the form attached hereto as Exhibit B, which Seller shall file with the Bankruptcy Court seeking approval for the Transactions.

*Execution*

"Sale Order" means the order of the Bankruptcy Court approving the consummation of the Transactions.

"Scheduled Closing Date" has the meaning given to such term in Section 3.01.

"Seller" has the meaning given to such term in the preamble.

"Seller Accounting Policies" has the meaning given to such term in Section 4.01.

"Seller Entity" means Seller, any of its Subsidiaries, its ultimate parent and any of its ultimate parent's direct or indirect Subsidiaries.

"Seller Executives" means D. Andrew Bonham, William T. Seeley, Philip Zanghi and Paul Hanlon.

"Seller Group" means all the Seller Entities.

"Seller Indemnitees" has the meaning given to such term in Section 13.03.

"Seller Marks" means any company names, product names, logos or trademarks of Seller that are not included in the Transferred Intellectual Property.

"Seller's Claim" has the meaning given to such term in Section 13.04.

"Seller's Knowledge" means the actual knowledge of any of the Seller Executives after reasonable inquiry.

"Specified Rate" means a fixed rate of interest per annum equal to the U.S. prime rate, as reported by *The Wall Street Journal,* plus ten percent (10%), compounded monthly.

"Storage Fee" has the meaning given to such term in Section 14.11.

"Subsidiary" of a Person means any other Person in which the first Person directly or through one or more intermediaries owns securities or other equity interests representing more than 50% of the voting power of all such securities or other equity interests.

*Execution*

"Tangible Personal Property" means machinery and associated switch gear, equipment, quality control lab equipment, tools, dies, molds, formulations, trade show equipment, test equipment, tooling and other tangible personal property.

"Target Assets" has the meaning given to such term in Section 4.02.

"Tax" means (i) any federal, state, provincial, local or foreign net income, gross income, gross receipts, windfall profits, severance, production, property, sales, use, license, excise, franchise, employment, payroll, withholding, alternative or add-on minimum, *ad valorem*, value added, transfer, stamp, environmental, registration or inventory tax, or any other tax, custom, duty, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or penalty, imposed by any Governmental Authority, and (ii) any liability for the payment of amounts with respect to any tax, duty, fee, assessment and charge described in clause (i) as a result of being a member of an affiliated, consolidated, combined or unitary group, or as a result of any obligation under any tax sharing arrangement or tax indemnity agreement or as a result of transferee or successor liability.

"Tax Return" means any return, statement, report or form required to be filed or submitted to any Governmental Authority in connection with the determination, assessment, collection or payment of any Tax or in connection with the administration, implementation or enforcement or compliance with any law relating to any Tax.

"Third-Party" means any Person other than the Seller Group and the Buyer Group.

"Third-Party Bid" has the meaning given to such term in Section 8.01.

"Third-Party Claim" has the meaning given to such term in Section 13.01.

"Trademark Rights" has the meaning given to such term in the "Intellectual Property" definition in Section 1.02.

*Execution*

"Transaction Documents" means this Agreement and the documents to be executed pursuant to Section 3.03, including the Closing Assumption Agreement and the Closing Transfer Documents.

"Transactions" shall mean the transactions contemplated by the Transaction Documents.

"Transferred Assets" has the meaning given to such term in Section 2.01.

"Transferred Accounts Receivable" has the meaning given to such term in Section 4.02.

"Transferred Contracts" means the contracts listed on Schedule 5.13, and all purchase orders for any of the Products accepted by Seller between the date of this Agreement and the Closing Date, in the ordinary course of the business, where the related finished goods have not been shipped by the Closing Date.

"Transferred Intellectual Property" means Intellectual Property Controlled by Seller or another Seller Entity that is used exclusively in the Business or has been developed or is under development exclusively for use in the Business.

"Transferred Inventory" has the meaning given to such term in Section 4.01.

"Transferred Liabilities" has the meaning given to such term in Section 2.03.

"Uncollectable Accounts Receivable" has the meaning given to such term in Section 4.01.

"Unsalable Inventory" has the meaning given to such term in Section 4.02.

"Working Capital Adjustment" has the meaning given to such term in Section 4.01.

### Article 2.

### Sale of Business, Purchase Price

2.01.  Purchase and Sale of Transferred Assets.  On the terms and subject to the conditions hereof, and subject to the exclusions set forth in Section 2.02, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer free and clear of all Liens to the

*Execution*

maximum extent permissible under Section 363 of the Bankruptcy Code, and Buyer shall purchase, acquire and accept from Seller, all of the right, title and interest of Seller in, to and under any and all of the following assets, properties, rights, contracts and claims of Seller whether tangible or intangible, real, personal or mixed (collectively, the "Transferred Assets"):

(a)    all Tangible Personal Property:  (i) that is owned by any Seller Entity, used in the Business and located at the Plant; or (ii) listed on Schedule 2.01(a);

(b)    the Transferred Inventory;

(c)    the Transferred Accounts Receivable;

(d)    the Transferred Intellectual Property;

(e)    books and records (other than Tax Returns and related work papers), third-party non-governmental code testing certifications and approvals held by any Seller Entity to the extent related to the Products and set forth on Schedule 2.01(e) ("Code Testing Approvals") solely to the extent transferrable, files (including without limitation, all files related to the Code Testing Approvals), call reports, customer lists, prospect lists, quality control records, external and internal product test reports, product and packaging designs, mailing lists, distributor and manufacturer's representative lists, accounting records, tapes, disks, manuals, keys (other than for real property) reports, plans, catalogs, sales, marketing and promotional materials, and all other printed and written materials and general intangibles, in each case, to the extent pertaining exclusively to the Business, other than any of the foregoing that relate to any Excluded Asset or Excluded Liability;

(f)    rights under or pursuant to all warranties, representations and guarantees, whether express or implied, made by suppliers, manufacturers, contractors and other Third Parties with respect to any of the Transferred Assets, other than any of the foregoing that relate to any Excluded Asset or Excluded Liability;

(g)    rights and incidents in, to and under the Transferred Contracts;

*Execution*

(h)    all proceeds received by Seller from claims under insurance policies of Seller resulting from losses incurred by Seller between the date of this Agreement and the Closing Date related exclusively to any Transferred Asset; and

(i)    all other assets, properties, rights, contracts and claims of Seller, wherever located, whether tangible or intangible, real, personal or mixed, other than the Excluded Assets, as and to the extent such are used exclusively in the Business;

but, in any event, in clauses (a) through (i) above, excluding the Excluded Assets.

2.02.    <u>Excluded Assets</u>.  Notwithstanding anything to the contrary contained in <u>Section 2.01</u>, the Parties expressly understand and agree that the Transferred Assets shall not include, and Seller is not selling, assigning, transferring or conveying to Buyer, any right or title to or interest in, any of the following assets, properties, rights, contracts and claims, whether tangible or intangible, real, personal or mixed (collectively, the "<u>Excluded Assets</u>"):

(a)    cash and cash items;

(b)    refunds of Taxes related to taxable periods ending before the Closing Date;

(c)    amounts receivable from any unit of Seller other than the Business, or from any other Seller Entity;

(d)    all insurance policies of Seller, claims with respect to insurance policies of Seller and proceeds therefrom (except proceeds received by Seller from claims under insurance policies of Seller resulting from losses incurred by Seller between the date of this Agreement and the Closing Date related exclusively to any Transferred Asset) and refunds of amounts previously paid or prepaid on account of insurance policies of Seller;

(e)    all information received from or relating to a Third-Party that is subject to a confidentiality agreement that prohibits the transfer of such information unless consent of the counterparty to transfer of such information is obtained prior to the Closing;

(f)    records relating to any of the Excluded Assets or Excluded Liabilities;

*Execution*

(g)    the names "Grace" and "Grace Construction Products," whether alone or in combination with each other or with other words, including in any tradename, trademark or service mark;

(h)    all items that would otherwise be included in the Transferred Assets pursuant to Section 2.01 that if included in the Transferred Assets would reasonably be expected to result in a breach by a Seller Entity of an agreement or obligation of a Seller Entity to a customer or supplier of the Business;

(i)    all Tangible Personal Property located at any Seller facility other than the Plant except as listed on Schedule 2.01(a);

(j)    the Seller's real property and the Seller's rights to real property (i.e. leases to real property), including without limitation the Plant and all fixtures; and

(k)    all items that would otherwise be included in the Transferred Assets pursuant to Section 2.01 that are set forth on Schedule 2.02(k).

2.03.   Transferred Liabilities.  At the Closing, Buyer shall assume and be liable for, and shall pay, perform and discharge, only the following obligations and liabilities (collectively, the "Transferred Liabilities"):

(a)    all liabilities of any Seller Entity in, to and under the Transferred Contracts that relate to events arising exclusively on or after the Closing Date;

(b)    all liabilities and obligations of any Seller Entity arising out of the operation or ownership of the Transferred Assets on and after the Closing Date;

(c)    all liabilities and obligations arising from Environmental Matters arising from the Transferred Assets on and after the earlier to occur of (i) the Removal Date, or (ii) with respect to all or any portion of the Transferred Assets, the commencement of the Removal of the Transferred Assets or the commencement of the Removal of such portion thereof, *provided however,* that solely with respect to any Environmental Matters affecting the Plant, Seller informs Buyer (an "Inclusion Notice") of the occurrence or existence of facts or circumstances that may give rise to such potential liabilities or obligations on or before the date that is thirty

*Execution*

(30) days after the latest to occur of (A) the Removal Date, (B), with respect to all or any portion of the Transferred Assets, the completion of the Removal of the Transferred Assets or the completion of the Removal of such portion thereof, or (C) with respect to all or any portion of the Transferred Assets, the completion of the Disposal of the Transferred Assets or the completion of the Disposal of such portion thereof, and *provided further,* that if Seller fails to provide Buyer with an Inclusion Notice, all liabilities and obligations arising from Environmental Matters affecting the Plant shall be excluded from this Section 2.03(c);

(d)      Taxes related to the ownership or operation of the Transferred Assets for any tax period or portion thereof beginning on or after the Closing Date; and

(e)      any fee or commission or like payment owed to any Person for direct or indirect services as a broker, finder or financial advisor for Buyer in connection with the negotiations relating to the transactions contemplated by this Agreement pursuant to any agreement, arrangement or understanding made by or on behalf of Buyer.

but, in any event, in clauses (a) through (f) above, excluding the Excluded Liabilities.

2.04.  Excluded Liabilities.  It is expressly understood and agreed that, except for the Transferred Liabilities, Buyer is not assuming and shall not be liable for any other liability or obligation of Seller, any Seller Entity or the Business, including the following liabilities and obligations of Seller (collectively, the "Excluded Liabilities"):

(a)      all accounts payable of Seller;

(b)      Taxes for any tax period or portion thereof ending before the Closing Date;

(c)      except as otherwise provided in the Transaction Documents, amounts payable to Seller or to any other Seller Entity;

(d)      premiums or any other charges under any insurance policy;

(e)      all liabilities and obligations, including any liability arising from claims for injury to persons or property, arising out of the Transferred Assets or the Business (other than Transferred Contracts) prior to the Closing Date;

*Execution*

(f)    all liabilities and obligations arising from Environmental Matters arising from the Transferred Assets prior to the earlier to occur of (i) the Removal Date, or (ii) with respect to all or any portion of the Transferred Assets, the commencement of the Removal of the Transferred Assets or the commencement of the Removal of such portion thereof;

(g)    all liabilities and obligations related to Seller's employees;

(h)    all liabilities of Seller in, to and under the Transferred Contracts that relate to events arising exclusively prior to the Closing Date; and

(i)    any fee or commission or like payment owed to any Person for direct or indirect services as a broker, finder or financial advisor for Seller in connection with the negotiations relating to the transactions contemplated by this Agreement pursuant to any agreement, arrangement or understanding made by or on behalf of Seller.

2.05.    <u>Amount and Payment of Consideration</u>.  The consideration payable by the Buyer for the purchase of the Transferred Assets (the "<u>Purchase Price</u>") consists of:  (a) an initial payment of $4,800,000 as adjusted by the Working Capital Adjustment (computed as set forth in <u>Article 4</u>) (the "<u>Initial Payment</u>"); and (b) a deferred payment of $300,000 less the amount of any Deferred Payment Adjustment (computed as set forth in <u>Article 4</u>) (the "<u>Deferred Payment</u>"). Buyer shall pay to Seller the Initial Payment and the Deferred Payment by wire transfer of immediately available funds to the Seller's account set forth on <u>Schedule 2.05</u>.  Buyer shall pay to Seller the Initial Payment at the Closing.  Buyer shall pay to Seller the Deferred Payment on the date that is one hundred eighty (180) days following the Closing Date (the "<u>Deferred Payment Date</u>").  In the event that the Deferred Payment is not received by Seller on or before the Deferred Payment Date, interest shall be paid on the unpaid amount of the Deferred Payment from the Deferred Payment Date to the date of payment, at the Specified Rate determined as of the Deferred Payment Date.

2.06.    <u>IRS Form 8594</u>.  Buyer shall retain Enterprise Appraisal, a certified appraisal firm that is independent of the Buyer, to appraise certain of the Transferred Assets in accordance with Section 1060 of the Code and FASB 141-R.  Buyer shall be responsible for all fees associated with such appraisal.  Each Party agrees to prepare and timely file U.S. Internal Revenue Service

*Execution*

Form 8594 (Asset Acquisition Statement) in accordance with Section 1060 of the Code with respect to the Transferred Assets and to cooperate in every reasonable way with the other Party in the preparation of such form. The Parties agree that the Purchase Price shall be allocated in accordance with Schedule 2.06, as such Schedule shall be updated post-Closing in accordance with the appraisal and the calculation of the Deferred Payment Adjustment.

2.07.  Assumption and Assignment of Transferred Contracts. At the Closing, Seller shall assume and assign to Buyer and Buyer will assume all of the Transferred Contracts subject to the requirement that Buyer will be liable only for any liabilities arising under such contracts exclusively on and after the Closing Date.

## Article 3.

## Closing.

3.01.  Closing Date. The Parties shall undertake the closing of the Transactions contemplated hereunder (the "Closing") on: (a) the first Business Day after the date on which the conditions to Closing set forth in Articles 10 and 11 (other than Sections 10.05 (Certificates of Seller) and 11.05 (Certificates of Buyer)) shall have been fulfilled or waived; provided however, that the Closing shall not occur prior to 12:01 AM on September 24, 2009; or (b) such other Business Day as the Parties may mutually agree to in writing in accordance with Section 17.06 (the "Scheduled Closing Date").

3.02.  Time and Place of Closing, Simultaneity. The Closing shall commence at 10:00 a.m. local time on the Scheduled Closing Date at the offices of Seller, 7500 Grace Drive, Columbia, Maryland, or remotely via the exchange of documents and signatures, or at such other time and place as the Parties may mutually agree to in writing. All of the actions to be taken and documents to be executed and delivered at the Closing shall be deemed to be taken, executed and delivered simultaneously, and no such action, execution or delivery shall be effective until all actions to be taken and executions and deliveries to be effected at the Closing are complete. The "Closing Date" is the date on which the Closing is effective. The Closing shall be deemed to have occurred at 12:01 AM on the Closing Date.

3.03.  Transfers at the Closing; Payments. At the Closing:

*Execution*

(a)     Seller shall execute, acknowledge and deliver to Buyer the Closing Transfer Documents.

(b)     Buyer shall pay to Seller's account the Initial Payment by wire transfer of immediately available funds.

(c)     Title and risk of loss with respect to the Transferred Assets shall transfer to Buyer and Buyer shall be deemed to have possession of the Transferred Assets whether or not Buyer removes the Transferred Assets, or any of them, from the Plant or other facilities where the Transferred Assets are located pursuant to Section 14.11 or otherwise.

(d)     Buyer shall execute, acknowledge and deliver to Seller the Closing Assumption Agreement in order to effectively assume the Transferred Liabilities in the form agreed upon by the Parties.

(e)     All consents obtained by Seller with respect to the Transferred Contracts shall be delivered to Buyer.

(f)     Seller will deliver the executed Sale Order to Buyer.

3.04.   Further Assurances of Seller.   At any time and from time to time after the Closing, at the request and expense of Buyer, each Seller Entity shall execute and deliver, or cause to be executed and delivered, all such deeds, assignments, and other documents, and take or cause to be taken all such other actions, as Buyer reasonably deems necessary or advisable in order to put Buyer or its designees in actual possession or operating control of the Transferred Assets, or to more fully and effectively vest in Buyer or its designees, or to confirm their title to and possession of, the Transferred Assets.

3.05.   Further Assurances of Buyer.   At any time and from time to time after the Closing, at the request and expense of Seller, Buyer shall execute and deliver, or cause to be executed and delivered, all such documents, and take or cause to be taken all such other actions, as Seller reasonably deems necessary or advisable in order to more fully and effectively divest Seller of responsibility for the Transferred Liabilities and incidents of ownership of the Transferred Assets.

*Execution*

## Article 4.

## Purchase Price Adjustments.

4.01.  Definitions.

(a)  "Closing Current Assets" means the aggregate amount, as of the Closing Date, of the Transferred Inventory and the Transferred Accounts Receivable computed on a going concern basis in accordance with the accounting policies and procedures (applied consistently) set forth in Schedule 4.01(a) (the "Seller Accounting Policies").

(b)  "Uncollectible Accounts Receivable" means the Transferred Accounts Receivable that are not collected by Buyer within one hundred eighty (180) days from the Closing Date.

(c)  "Deemed Salable Inventory" means all Transferred Inventory that is: (i) of the type and up to the quantity (to the extent a quantity is specified) included on Schedule 4.01(c); (ii) acquired or manufactured by Seller on or after the date of this Agreement at the request of Buyer; and (iii) used in the manufacture or packaging of the Transferred Inventory specified in clauses (i) and (ii) of this Section 4.01(c).

(d)  "Transferred Inventory" means Inventory wherever located that is owned by Seller as of the Closing Date and is exclusively used in the Business (other than Inventory consisting of raw materials packaging that contains Seller Marks that Seller, in its sole discretion, determines cannot be covered or removed).

(e)  "Unsalable Inventory" means Inventory included in the Transferred Inventory, other than Deemed Salable Inventory, that the Parties agree: (1) is or was obsolete, defective, damaged, aged beyond usable shelf life or otherwise outside specifications; and (2) cannot or could not be sold within one hundred eighty (180) days after the Closing Date.

4.02.  Initial Payment—Working Capital Adjustment.  On the Closing Date, the value of the Closing Current Assets will equal one million two hundred sixty-two thousand thirteen dollars and no cents ($1,262,013.00) (the "Target Assets"), with any variation being an adjustment of the Purchase Price as set forth in this Section 4.02 (the "Working Capital Adjustment").  As of the Closing Date, Buyer and Seller shall make a good faith estimate of the

*Execution*

value of the Closing Current Assets (the "Estimate"), including a list of all accounts receivable exclusive to the Business (the "Transferred Accounts Receivable"), and the Book Value of Transferred Inventory. If the amount of the Estimate is less than the Target Assets, the Initial Payment shall be reduced by an amount equal to the Target Assets less the amount of the Estimate. If the amount of the Estimate is greater than the Target Assets, the Initial Payment shall be increased by an amount equal to the amount of the Estimate less the Target Assets. If the amount of the Estimate equals the Target Assets, the Initial Payment shall not be adjusted. For purposes of this Agreement, the term "Book Value" in respect of Transferred Inventory or Unsalable Inventory shall mean the calculation of the book value of such Inventory pursuant to the Seller Accounting Policies.

4.03. Deferred Payment—Deferred Payment Adjustment. On the one hundred eightieth (180th) day following Closing, Buyer shall pay Seller the Deferred Payment, subject to adjustment as set forth in this Section 4.03 (the "Deferred Payment Adjustment"). If, as of the date that is one hundred eighty (180) days following the Closing Date, any Transferred Accounts Receivable is Uncollectible Accounts Receivable or if any Transferred Inventory is Unsalable Inventory, the Deferred Payment shall be reduced by the amount of such Uncollectible Accounts Receivable and the Book Value set forth in the Estimate of such Unsalable Inventory and Buyer shall assign to Seller such Unsalable Inventory, Uncollectible Accounts Receivable and all records included in the Transferred Assets related thereto.

## Article 5.

## Seller Representations and Warranties

Seller represents and warrants to Buyer as follows:

5.01. Corporate Organization and Existence. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Connecticut. Seller is duly licensed or qualified to conduct the Business as a foreign corporation in the State of Pennsylvania.

5.02. Corporate Power. Subject to entry of the Sale Order and it becoming a Final Order, Seller has full corporate power to enter into this Agreement and the other Transaction Documents to which it is or will be a party and perform its obligations hereunder and thereunder.

*Execution*

5.03.  <u>Authorization</u>.  Subject to entry of the Sale Order and it becoming a Final Order, the execution and delivery by Seller of this Agreement and the other Transaction Documents to which it is or will be a party and its performance of its obligations hereunder and thereunder have been duly authorized by all required corporate action.

5.04.  <u>Execution and Delivery</u>.  Subject to entry of the Sale Order and it becoming a Final Order, Seller has duly and validly executed and delivered this Agreement and the other Transaction Documents to which it is a party and which are being executed and delivered simultaneously with this Agreement.  The remaining Transaction Documents to which Seller will be a party, when executed and delivered at the Closing, will be duly and validly executed and delivered by Seller.

5.05.  <u>No Conflict</u>.  Except as set forth in <u>Schedule 5.05</u>, and subject to the entry of the Sale Order and it becoming a Final Order, the execution and delivery by Seller of this Agreement and the other Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, do not (a) conflict with its certificate of incorporation or by-laws; (b) result in any violation, breach or termination of, or constitute a default or give rise to any right of consent, cancellation, termination or acceleration or right to increase the obligations or otherwise modify the terms under any Material Contract; or (c) result in the creation or imposition of any Lien upon Seller or the Transferred Assets; (d) violate any Law applicable to any of Seller or the Transferred Assets; (e) result in any violation or breach of any of the provisions of, or constitute a default under, any law or regulation, judgment, order or decree, to which it is a party or by which it is bound, which violation, breach or default would materially adversely affect its ability to execute and deliver this Agreement or any other Transaction Document to which it is or will be a party or perform its obligations hereunder or thereunder.

5.06.  <u>Consents and Approvals</u>.  Except as set forth in <u>Schedule 5.06</u>, subject to entry of the Sale Order and it becoming a Final Order, no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Governmental Authority (other than the Bankruptcy Court) is required on the part of Seller in connection with the

*Execution*

execution and delivery of this Agreement or the Transaction Documents, the consummation of the Transactions or the compliance by Seller with any of the provisions hereof or thereof.

5.07.  Binding Effect.  Upon entry of the Sale Order and subject to it becoming a Final Order, this Agreement constitutes and, when executed and delivered at the Closing, each of the Transaction Documents to be executed by Seller will constitute, a valid and legally binding obligation of Seller, enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether in equity or at law).

5.08.  Financial Information.

(a)    Schedule 5.08(a) contains a schedule of the fixed assets exclusively used in the Business as of June 30, 2009 and schedule of Inventory exclusively used in the Business as of December 31, 2008 and June 30, 2009, each as prepared by Seller's management (the "Financial Schedules").  The Financial Schedules (i) were prepared in accordance with the Seller Accounting Policies from the books and records of Seller; and (ii) reflect accurately in all material respects in accordance with the Seller Accounting Policies the fixed assets and Inventory as of the dates set forth therein.

(b)    Schedule 5.08(b) contains the unaudited profit and loss statements of the Business for the year ended December 31, 2008 and the six (6) month period ended June 30, 2009 as prepared by Seller's management (the "P&L Statements").  The P&L Statements were prepared in accordance with the Seller Accounting Policies on the basis of the books and records of Seller.

(c)    Schedule 5.08(c) contains a list of certain accounts receivable exclusive to the Business as of June 30, 2009.  All of such accounts receivable represent sales actually made in the ordinary course of business of the Business, are not subject to any defense or offset and are collectible in the ordinary course of business of the Business.

5.09.  Sufficiency of Assets.  Except as set forth on Schedule 5.09, the Transferred Assets and the Transaction Documents provide Buyer with all the Tangible Personal Property and Intellectual Property necessary to operate the Business immediately following the Closing in

*Execution*

substantially the same manner as Seller conducted the Business in the twelve (12) months prior to the Closing.

5.10.   Real Property; Title to Transferred Assets; Liens; Permits.

(a)      Except as set forth on Schedule 5.10(a), the Plant comprises all of the real property used in the direct manufacturing operations of the Business.

(b)      Seller has good and marketable title to all of the personal property included in the Transferred Assets free and clear of all Liens except Liens under the Post-Petition Loan Agreement and Liens related to the Chapter 11 Cases. All of the Transferred Assets will be transferred to Buyer free and clear of all Liens except Permitted Liens.

(c)      Set forth on Schedule 5.10(c) is a list of all material Permits of Seller exclusively related to the Transferred Assets or the Business other than Permits issued by the Commonwealth of Pennsylvania or any Governmental Authority located therein or affiliated therewith.

5.11.   Inventory.  Seller is not in possession of any Inventory of the Business that is not owned by Seller.  Except as set forth on Schedule 5.11, no Third-Party is in possession of Inventory of the Business owned by Seller, other than transporters in the ordinary course of the Business.  Except as set forth on Schedule 5.11, all Inventory of the Business is located at the Plant.

5.12.   Litigation; Investigations.   Other than the Chapter 11 Cases, there are no (a) Proceedings pending or, to Seller's Knowledge, threatened against Seller or (b) orders of any Governmental Authority to which Seller is subject that, in each case, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, or seek to prevent or materially delay the consummation of the Transactions.  Other than the Chapter 11 Cases, there are no Proceedings pending or, to Seller's Knowledge, threatened against the Transferred Assets and no orders of any Governmental Authority to which the Business or the Transferred Assets are subject.

*Execution*

5.13. <u>Contracts</u>. <u>Schedule 5.13</u> lists certain contracts of Seller related exclusively to the Business.

5.14. <u>Employment</u>. Solely as of the date of this Agreement, to Seller's Knowledge, the Business Executive has made no threat or otherwise indicated any intent to cancel or otherwise terminate his relationship with Seller except as a result of employment with a Buyer Entity.

5.15. <u>Intellectual Property</u>.

(a)    Except as set forth on <u>Schedule 5.15(a)</u>, Seller owns all right, title and interest in, free and clear of all Liens, all Transferred Intellectual Property. Each item of Transferred Intellectual Property will be owned or available for use by Buyer on identical terms and conditions immediately subsequent to the Closing hereunder. Seller has taken all necessary action to maintain each item of Transferred Intellectual Property.

(b)    Except as set forth on <u>Schedule 5.15(b)</u>, to Seller's Knowledge, in the past eight years: in connection with the operation of the Transferred Assets and the Business, Seller has not interfered with, infringed upon, misappropriated or otherwise come into conflict with any Intellectual Property rights of any Third Person; and none of the directors and officers (and employees with responsibility for Intellectual Property matters) of Seller has received any charge, complaint, claim, demand or notice from any Governmental Authority or other Person alleging any such interference, infringement, misappropriation or conflict (including any claim that Seller must license or refrain from using any Intellectual Property rights of any other Person) arising from Seller's operation of the Transferred Assets or the Business. To Seller's Knowledge, in the past eight years, no Person has interfered with, infringed upon, misappropriated or otherwise come into conflict with any of the Transferred Intellectual Property.

(c)    <u>Schedule 5.15(c)</u> identifies (i) each patent or patent registration which has been issued to Seller in the United States and all jurisdictions worldwide with respect to any item of Transferred Intellectual Property, and (ii) each pending patent application or application for patent registration which Seller has filed with respect to any item of Transferred Intellectual Property anywhere in the world (together with any exceptions).

*Execution*

(d)    Schedule 5.15(d) identifies (i) each trademark or trademark registration which has been issued to Seller in the United States and all jurisdictions worldwide that is included Transferred Intellectual Property, and (ii) each pending trademark application or application for trademark registration which Seller has filed anywhere in the world (together with any exceptions) that is included Transferred Intellectual Property. Schedule 5.15(d) also identifies each trade name or unregistered trademark that is included Transferred Intellectual Property.

(e)    Schedule 5.15(e) identifies (i) each copyright or copyright registration which has been issued to Seller in the United States and all jurisdictions worldwide that is included Transferred Intellectual Property, and (ii) each pending copyright application or application for copyright registration which Seller has filed that is included Transferred Intellectual Property.

(f)    Schedule 5.15(f) identifies each license, agreement or other permission which Seller has granted to any other Person with respect to any item that is included Transferred Intellectual Property in the United States and any jurisdictions worldwide. Seller has delivered to Buyer correct and complete copies of all such licenses, agreements and other permissions (as amended to date) and has made available to Buyer correct and complete copies of all written documentation evidencing the legality, validity and enforceability of each such license, agreement and other permission (if applicable).

(g)    Schedule 5.15(g) identifies all Transferred Intellectual Property.

(h)    With respect to each item of Transferred Intellectual Property:

(i)    such item is not subject to any outstanding injunction, judgment, order, decree, ruling or charge;

(ii)    no action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand is pending or, to Seller's Knowledge, threatened which challenges the legality, validity, enforceability, use or ownership of such item;

(iii)    all licenses, agreements and other permissions pertaining to such item and all other rights to which Seller is entitled with respect thereto are in

-31-
*Asset Purchase Agreement*

*Execution*

compliance in all respects with all applicable Laws in all jurisdictions worldwide, including those pertaining to remittance of foreign exchange and Taxes; and

(iv)    Seller has not made a previous assignment, sale, transfer or agreement constituting a present or future assignment, sale or transfer of, or granted any Lien on, such item, other than licenses granted in the ordinary course of business consistent with past practice (and each such license has been identified on Schedule 5.15(f)); nor has Seller granted any release, covenant not to sue or other non-assertion assurance to any Person with respect to such item which could reasonably be expected to have a material adverse effect on the aggregate value of the Transferred Intellectual Property.

(i)    Schedule 5.15(i) identifies each item of Transferred Intellectual Property that any Person (other than Seller) owns and that Seller uses pursuant to any license, sublicense, agreement or permission. Seller has delivered to Buyer correct and complete copies of all such licenses, sublicenses, agreements and other permissions (as amended to date). With respect to each item of Intellectual Property required to be identified on Schedule 5.15(i):

(i)    to Seller's Knowledge, the license, sublicense, agreement or other permission covering such item is legal, valid, binding, enforceable and in full force and effect;

(ii)    to Seller's Knowledge, such license, sublicense, agreement or other permission will continue to be legal, valid, binding, enforceable and in full force and effect on identical terms following the consummation of the Transactions;

(iii)    subject to the Chapter 11 Cases, no party to such license, sublicense, agreement or other permission is in breach or default thereof, and no event has occurred which with the giving of notice or the lapse of time or both would constitute such a breach or default thereof or permit termination, modification or acceleration thereunder;

(iv)    Seller has not received any notice that any party to such license, sublicense, agreement or other permission has repudiated any provision thereof;

*Execution*

(v)    Seller has not granted any sublicense or similar right with respect to such license, sublicense, agreement or other permission;

(vi)    with respect to each such sublicense, to Seller's Knowledge, the representations and warranties set forth in clauses (i) through (iv) above are true and correct with respect to the underlying license;

(vii)    to Seller's Knowledge, the underlying item of Intellectual Property is not subject to any outstanding injunction, judgment, order, decree, ruling or charge; and

(viii)    to Seller's Knowledge, no action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand is pending or threatened which challenges the legality, validity or enforceability of the underlying item of Intellectual Property.

5.16.    Conduct of Business.    Since December 31, 2008, with the exception of activities related to the Transactions, the Business has been conducted in the ordinary course of business.

5.17.    Compliance with Laws.    For the past twelve (12) months:    (a) to Seller's Knowledge, Seller has complied in all material respects with all Laws that are applicable to the Business and the Transferred Assets and material to the operation thereof; and (b) no notice from any Governmental Authority has been served upon or, to Seller's Knowledge, threatened to be served upon, Seller with respect to the Business or the Transferred Assets claiming a material violation by Seller of any Law or order material to the operation thereof.

5.18.    Brokers.    No Person has acted directly or indirectly as a broker, finder or financial advisor for Seller in connection with the negotiations relating to the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment in respect thereof based in any way on any agreement, arrangement or understanding made by or on behalf of Seller.

5.19.    Taxes.

*Execution*

(a)     Seller has: (i) duly and timely filed with the appropriate taxing authority (or there has been filed on its behalf) all Tax Returns required to be filed by it (taking into account all applicable extensions) with respect to the Business and the Transferred Assets; and (ii) paid all Taxes due on such Tax Returns when payable.  All such Tax Returns are true and correct in all material respects.

(b)     There are no Liens for Taxes upon the Transferred Assets, except for Liens for Taxes not yet due and payable.

(c)     There is no audit, examination, deficiency, refund litigation, assessment, proposed adjustment pending or in progress or threatened with respect to any Taxes relating to the Business or the Transferred Assets.

(d)     Seller, with respect to the Business and the Transferred Assets, is in material compliance with all applicable information reporting and Tax withholding requirements under U.S. federal, state and local, and non-U.S. Tax Laws.

(e)     All monies required to be withheld by Seller (including from its employees for income Taxes, social security Taxes and other payroll Taxes) with respect to the Business and the Transferred Assets have been collected or withheld, and paid to the respective taxing authorities.

(f)     None of the Transferred Assets is properly treated as owned by any Person other than Seller for income Tax purposes.

(g)     None of the Transferred Assets is "tax-exempt use property" within the meaning of Section 168(h) of the Code.

5.20.   Product Recalls; Warranties.  Except as set forth on Schedule 5.20, to Seller's Knowledge, there are no facts, events or conditions (i) which could furnish a basis for the recall, withdrawal or suspension by any Governmental Authority of, or an injunction from or an award of Damages with respect to, any Product, or (ii) which would otherwise reasonably be expected to cause Seller to withdraw, recall or suspend or have enjoined any Product or to terminate or suspend testing of such Product.  Schedule 5.20 contains an accurate and complete list of (x) all

*Execution*

Products that have been recalled at any time since January 1, 2006, and (y) all Proceedings (whether completed or pending) at any time since January 1, 2006 seeking the recall, withdrawal, suspension or seizure of any Product.

5.21.  <u>Material Adverse Effect</u>  Solely as of the date of this Agreement, except as set forth in the Schedules, there are no facts pertaining exclusively to Seller or the Business that would reasonably be expected to have a Material Adverse Effect.

### Article 6.

### Buyer Representations and Warranties

Buyer represents and warrants to Seller as follows:

6.01.  <u>Corporate Status</u>.  Buyer is a corporation duly organized and validly existing under the laws of the State of Delaware.  Buyer has full corporate power to enter into this Agreement and the other Transaction Documents to which it is or will be a party and perform its obligations hereunder and thereunder.  The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which it is or will be a party, and its performance of its obligations hereunder and thereunder, have been duly authorized by all required corporate action.

6.02.  <u>Authorization</u>.  Buyer has duly and validly executed and delivered this Agreement and the other Transaction Documents to which it is a party which are being executed and delivered simultaneously with this Agreement. The remaining Transaction Documents to which Buyer will be a party, when executed and delivered at the Closing, will be duly and validly executed and delivered by Buyer.

6.03.  <u>No Conflict</u>.  The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which it is or will be a party, and the performance by Buyer of its obligations hereunder and thereunder, do not (a) conflict with its certificate of incorporation or by-laws, or (b) result in any violation or breach of any of the provisions of, or constitute a default under, any law or regulation, judgment, order, decree or agreement to which it is a party or by which it is bound, which violation, breach or default would materially adversely affect its ability to execute and deliver this Agreement or any other Transaction Document to which it is or will be a party or perform its obligations hereunder or thereunder.

*Execution*

6.04.  <u>Consent and Approvals</u>.    No consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Buyer in connection with the execution and delivery of this Agreement or the Transaction Documents, the consummation of the Transactions or the compliance by Buyer with any of the provisions hereof or thereof.

6.05.  <u>Binding Effect</u>.  This Agreement constitutes and, when executed and delivered at the Closing, each of the Transaction Documents to be executed by Buyer will constitute, a valid and legally binding obligation of Buyer, enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether in equity or at law).

6.06.  <u>Sufficient Funds</u>.    Buyer has (or has access to through its wholly-owned Subsidiaries) on the date hereof and will have on the Closing Date and Deferred Payment Date, as the case may be, sufficient funds to consummate the Transactions and to meet its obligations under this Agreement.

6.07.  <u>Brokers</u>.  No Person has acted directly or indirectly as a broker, finder or financial advisor for Buyer in connection with the negotiations relating to the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment in respect thereof based in any way on any agreement, arrangement or understanding made by or on behalf of Buyer.

6.08.  <u>Litigation</u>.  There are no (a) Proceedings pending or, to Buyer's Knowledge, threatened against Buyer or (b) orders to which Buyer is subject that, in each case, individually or in the aggregate, could reasonably be expected to prevent Buyer from performing its obligations under this Agreement or the Transaction Documents or prevent or materially delay the consummation of the Transactions.

*Execution*

## Article 7.

### Buyer's Investigation

7.01. <u>Investigation</u>. Buyer has conducted its own investigation and has made its own evaluation of the Business, the Transferred Assets and the Transferred Liabilities.

7.02. <u>Financial Information</u>. As part of its investigation, Buyer has been given certain financial statements, forecasts, projections, opinions and other material prepared or furnished by the Seller Group or their representatives with respect to the Business and the Transferred Assets (the "<u>Due Diligence Information</u>"). There are uncertainties inherent in attempting to make projections and forecasts, formulate opinions and prepare other business information; Buyer is familiar with such uncertainties, and except to the extent set forth in <u>Article 5</u> of this Agreement, is not relying on any of the Due Diligence Information. Except for the specific representations and warranties in <u>Article 5</u>, neither Seller nor any other member of the Seller Group shall have any liability of any kind to Buyer or any other Buyer Entity with respect to any of the Due Diligence Information.

7.03. <u>No Additional Representations</u>. The representations and warranties made by Seller in <u>Article 5</u> are in lieu of and are exclusive of all other representations and warranties, including any implied warranties, regarding the Business, the Transferred Assets or the Transferred Liabilities. The Seller hereby disclaims any such other representations and warranties, including any implied warranties, notwithstanding the delivery or disclosure to Buyer of any documentation or other information (including without limitation any financial projections). Buyer acknowledges that it has not relied upon any representations and warranties, including any implied warranties, promises, inducements or statements of intention relating to the Transactions made by Seller or any Affiliate or related Person that is not set forth in this Agreement, notwithstanding the delivery or disclosure to Buyer of any documentation or other information (including any financial projections or other supplemental data). None of the representations or warranties made by Seller in this Agreement is or shall be construed or deemed to be made with respect to any Excluded Asset or Excluded Liability or any contract, note or other instrument or document constituting, evidencing or relating to any Excluded Asset or Excluded Liability.

*Execution*

## Article 8.

## Covenants of Seller and Buyer

8.01.  Bankruptcy Court Actions.

(a)    Unless Seller receives a Third-Party Bid (as hereinafter defined), Seller shall use commercially reasonable efforts to have the Bankruptcy Court approve the Sale Order and obtain any other approvals or consents from the Bankruptcy Court that may be reasonably necessary to consummate the Transactions.

(b)    Buyer shall use commercially reasonable efforts to assist Seller in obtaining approval of the Sale Order, including providing testimony as required at any hearing before the Bankruptcy Court.

(c)    Notwithstanding anything to the contrary set forth in this Agreement, Seller shall be free to take any action with respect to any offer that it may receive prior to the entry of the Sale Order for a sale of the Business and/or the Transferred Assets to a Third-Party (a "Third-Party Bid") including, providing information to, negotiating with and signing an agreement with a Third-Party regarding a Third-Party Bid, filing a motion with the Bankruptcy Court to approve the sale contemplated by a Third-Party Bid, recommending that such approval be granted and closing the sale contemplated by a Third-Party Bid.

8.02.  Notices to Third Parties.  Buyer and Seller shall cooperate to make all other filings and to give notice to all Third Parties that may reasonably be required to consummate the Transactions.

8.03.  Commercially Reasonable Efforts.  In making commercially reasonable efforts as required under any provision of this Agreement, no Party shall be required to undertake extraordinary or unreasonable measures, make any payment (other than for reasonable legal fees, unless otherwise provided) that it is not presently contractually required to make, divest any assets, make any change in the conduct of its business or that of the Business, accept any limitation on the future conduct of its business, enter into any other agreement or arrangement with any Person that it is not presently contractually required to enter into, accept any significant modification to its obligations under any existing agreement or arrangement that is to continue

-38-

*Asset Purchase Agreement*

*Execution*

after the Closing, except as contemplated by this Agreement or the Transaction Documents, or agree to any of the foregoing.

8.04.  <u>Waiver of Bulk Sales Law Compliance</u>.  Buyer hereby waives compliance by Seller with the requirements, if any, of <u>Article 6</u> of the Uniform Commercial Code as in force in any state in which Transferred Assets are located and all other laws applicable to bulk sales and transfers, to the extent applicable to the Transactions ("<u>Bulk Sale Laws</u>").  Seller agrees that any Sale Order submitted to the Bankruptcy Court hereunder shall contain a provision absolving Buyer from any liability under any Bulk Sale Laws.

8.05.  <u>Mail or Other Communications Received After Closing</u>.  On and after the Closing Date, each Party may receive and open all mail or other communications addressed to the other Party and deal with the contents thereof in its discretion to the extent that such mail or other communications and the contents thereof relate to the Business or the Transferred Assets.  Each Party agrees to keep and cause to be kept confidential the contents of, and to deliver or cause to be delivered promptly to the other Party, all other mail or communications received by such Party which are addressed to the other Party.

8.06.  <u>Taxes</u>.

(a)  Seller shall be responsible for the preparation and filing of all Tax Returns, applicable to the Business and the Transferred Assets, in each case attributable to taxable years or periods or portions thereof ending on the day preceding the Closing Date.

(b)  Buyer shall be responsible for the preparation and filing of all Tax Returns, applicable to the Transferred Assets that are attributable to taxable years, periods or portions thereof beginning on the Closing Date.

(c)  After the Closing Date, Seller and Buyer will, and will cause their respective Affiliates to: (i) assist in all reasonable respects the other Party in preparing any Tax Returns which such other Party is responsible for preparing and filing; (ii) cooperate in all reasonable respects in preparing for any audits of, or disputes with taxing authorities regarding, any Tax Returns concerning the Transferred Assets or the Business; (iii) make available to the other Party and to any taxing authority as reasonably requested by the other Party all information, Records,

-39-
*Asset Purchase Agreement*