*Execution*

and documents relating to Taxes concerning the Transferred Assets or the Business; (iv) provide timely notice to the other Party in writing of any pending or threatened Tax audits or assessments relating to Taxes concerning the Transferred Assets or the Business for taxable periods for which the other Party may have a liability under this Agreement; and (v) furnish the other Party with copies of all correspondence received from any taxing authority in connection with any Tax audit or information request with respect to any such taxable period.

8.07.   Listing, Testing and Code Agency Approvals.   Seller shall use commercially reasonable efforts (at the sole cost of Buyer), and Buyer shall cooperate with such efforts, to transfer to Buyer, or otherwise qualify Buyer under, all Code Testing Approvals effective on the Closing Date or as soon as practicable thereafter.   If this Agreement is terminated prior to Closing, Buyer shall use commercially reasonable efforts (at the sole cost of Buyer), to terminate the transfer or qualification of Buyer under all Code Testing Approvals and, if necessary, to transfer to Seller, or otherwise qualify Seller under, all Code Testing Approvals as soon as practicable after the termination of this Agreement.   The obligations of Buyer in the preceding sentence shall survive the termination of this Agreement.

## Article 9.

## Conduct of Business Prior to the Closing

Seller agrees that except as otherwise consented to by Buyer, from the date of this Agreement until the Closing, Seller shall conduct the Business only in the ordinary course of business and consistent with prior practice.

## Article 10.

## Conditions Precedent to Buyer's Obligations

All obligations of Buyer under this Agreement are subject, at Buyer's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

10.01.   Accuracy of Representations and Warranties.   Each and every representation and warranty of Seller contained herein that is qualified as to materiality shall be true and correct in all respects at and as of the Closing Date, and each of the representations and warranties of Seller contained herein that is not so qualified shall be true and correct in all material respects with the

*Execution*

same force as if made on and as of the Closing Date, except for: (i) changes that have not had and could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and (ii) those representations and warranties that address matters only as of a particular date.

10.02. <u>Performance of Covenants and Agreements</u>.    Seller shall have performed, or complied with, in all material respects all of the covenants and agreements required to be performed, or complied with, by Seller at or prior to the Closing Date pursuant to this Agreement.

10.03. <u>Permits, Consents, etc.</u>

(a)    There shall be no material consent, approval or authorization of, or declaration to or filing with, any Governmental Authority required in connection with the Transactions that has not been accomplished or obtained and which may not be accomplished or obtained after the Closing Date without penalty or other adverse consequences to the Buyer Entities.

(b)    No Law shall have been enacted by a Governmental Authority that prohibits the consummation of the Transactions contemplated by this Agreement, and no judgment, order, decree or injunction enjoining or preventing the consummation of the Transactions contemplated by this Agreement shall be in effect.

10.04. <u>Litigation</u>.    No Proceeding, including any proceeding before the Bankruptcy Court, shall have been instituted (and remain pending on the Closing Date) against any Seller Entity or Buyer Entity that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of this Agreement, the Transaction Documents or the Transactions which, if successful, would materially adversely affect the right of the Buying Companies to consummate the Transactions or to continue the Business substantially as currently operated or that might involve material liability on the part of any Buyer Entity.

10.05. <u>Certificates of Seller</u>.

*Execution*

(a)    Seller shall have delivered to Buyer a certificate of Seller, dated the Closing Date, signed by the President or any Vice President of Seller certifying that the conditions set forth in Sections 10.01 and 10.02 have been satisfied.

(b)    Seller shall have delivered to Buyer a certificate of Seller, dated the Closing Date, signed by the Secretary or an Assistant Secretary of Seller, certifying:  (i) that the Transaction Documents to which Seller is a party have been duly authorized, executed and delivered by Seller; and (ii) the incumbency of the officers executing and delivering the Transaction Documents on behalf of Seller.

(c)    Buyer shall have received a certificate of good standing of the Seller in its jurisdiction of organization.

10.06. Bankruptcy Court Approval.  The Sale Order shall have been entered.

## Article 11.

## Conditions Precedent to Seller's Obligations

All obligations of Seller under this Agreement are subject, at Seller's option, to the fulfillment prior to or at the Closing, of each of the following conditions:

11.01. Accuracy of Representations and Warranties.  Each and every representation and warranty of Buyer contained herein that is qualified as to materiality shall be true and correct in all respects at and as of the Closing Date, and each of the representations and warranties of Buyer contained herein that is not so qualified shall be true and correct in all material respects with the same force as if made on and as of the Closing Date, except for:  (i) changes which have not had and could not reasonably be expected to have, individually or in the aggregate, a material adverse effect upon the ability of the Buyer to consummate the Transactions; and (ii) those representations and warranties that address matters only as a particular date.

11.02. Performance of Covenants and Agreements.  Buyer shall have performed, or complied with, in all material respects, all of the covenants and agreements required to be performed, or complied with, by Buyer at or prior to the Closing Date pursuant to this Agreement.

*Execution*

11.03. Permits, Consents, etc.

(a)    There shall be no material consent, approval or authorization of, or declaration to or filing with, any Governmental Authority required in connection with the Transactions which has not been accomplished or obtained and which may not be accomplished or obtained after the Closing Date without penalty or other material adverse consequences to the Seller Group.

(b)    No Law shall have been enacted by a Governmental Authority that prohibits the consummation of the Transactions contemplated by this Agreement, and no judgment, order, decree or injunction enjoining or preventing the consummation of the Transactions contemplated by this Agreement shall be in effect.

11.04. Litigation.    No Proceeding, including any proceeding before the Bankruptcy Court, shall have been instituted (and remain pending on the Closing Date) against any Seller Entity or Buyer Entity that questions, or reasonably could be expected to lead to subsequent questioning of, the validity or legality of this Agreement, the Transaction Documents or the Transactions which, if successful, would materially adversely affect the right of any of the Selling Companies to consummate the Transactions or might involve material liability on the part of any Seller Entity.

11.05. Certificates of Buyer.

(a)    Buyer shall have delivered to Seller a certificate of Buyer, dated the Closing Date, signed by the President or a Vice President of Buyer, certifying that the conditions set forth in Sections 11.01 and 11.02 have been satisfied.

(b)    Buyer shall have delivered to Seller a certificate of Buyer, dated the Closing Date, signed by the Secretary or an Assistant Secretary of Buyer, certifying:  (i) that resolutions of the Board of Directors of Buyer authorizing the Transactions and the execution, delivery and performance of the Transaction Documents to which Buyer is a party have been duly adopted and have not been amended but remain in full force and effect as of the Closing Date; (ii) that the Transaction Documents to which Buyer is a party have been duly authorized, executed and delivered by Buyer; (iii) the incumbency of the officers executing and delivering the Transaction

*Execution*

Documents on behalf of Buyer; and (iv) the adoption of authorizing resolutions with respect to the Transactions.

(c)    Seller shall have received a certificate of good standing of the Buyer in its jurisdiction of organization.

11.06. <u>Bankruptcy Court Approval</u>.  The Sale Order shall have been entered.

### Article 12.

### Termination

12.01. <u>Rights to Terminate</u>.

(a)    This Agreement may be terminated at any time prior to the Closing by mutual written agreement of Seller and Buyer.

(b)    This Agreement may be terminated by Buyer or Seller if the Sale Order has not been entered by September 30, 2009.

(c)    This Agreement may be terminated by Buyer or Seller if the Bankruptcy Court enters an order approving competitive bidding procedures for the Transferred Assets.

(d)    This Agreement may be terminated by Buyer if any of the conditions in <u>Article 10</u> are not capable of being satisfied by September 30, 2009.

(e)    This Agreement may be terminated by Seller if any of the conditions in <u>Article 11</u> are not capable of being satisfied by September 30, 2009.

(f)    This Agreement may be terminated by either Party if the Closing does not occur by September 30, 2009 (provided that no Party may terminate if the failure to close is the result of a breach of the Sale Agreement by that Party).

(g)    Subject to <u>Section 8.01(c)</u>, this Agreement may be terminated by either Party if the Bankruptcy Court approves an order authorizing the sale of the Transferred Assets to another Person.

*Execution*

12.02. <u>Consequences of Termination</u>.  Each Party's right of termination under Section 12.01 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of such right of termination will not be an election of remedies.  The provisions of, and obligations of the Parties, under this <u>Section 12.02</u>, <u>Section 13.07</u> and <u>Section 15.01</u> and <u>Article 16</u> and <u>Article 17</u> and the obligations of Buyer under <u>Section 8.07</u> shall survive any termination of this Agreement.  In addition, if this Agreement is terminated because of a breach of this Agreement by the non-terminating Party or because one or more of the conditions to the terminating Party's obligations under this Agreement is not satisfied as a result of the non-terminating Party's failure to comply with its obligations under this Agreement, the terminating Party's right to pursue all legal remedies will survive such termination unimpaired.

## Article 13.

### Indemnification

13.01. <u>Definitions</u>.  As used in this Agreement:

(a)    "<u>Claim</u>" means any claim, demand or Proceeding, including any proceeding before the Bankruptcy Court.

(b)    "<u>Damages</u>" means, subject to <u>Section 13.07</u>, any and all penalties, fines, damages, liabilities, losses or costs, including, in each case, Litigation Expenses (except as otherwise provided in this Article 13), less the amount of any proceeds actually received by any Indemnified Party under any insurance policy.  "<u>Damages</u>" shall include Damages actually incurred by a Seller Entity or Buyer Entity on whose behalf a Party makes an Indemnification Claim, pursuant to any valid legal obligation (existing as of the date of this Agreement) of such Seller Entity or Buyer Entity to indemnify a director, officer or employee of such Seller Entity or Buyer Entity (each a "<u>Related Person</u>") in respect of a Third-Party Claim only if such Seller Entity or Buyer Entity has valid legal rights (existing as of the date of this Agreement) in respect of its obligations in respect of a Third-Party Claim against such Related Person no less favorable to such Seller Entity or Buyer Entity than Indemnifying Party's rights set forth in this Article 13 and such rights are assigned to Indemnifying Party.

(c)    "<u>Direct Claims</u>" means Claims other than Third-Party Claims.

*Execution*

(d)    "Indemnification Claim" means a Claim for indemnification under this Agreement, including without limitation, a Claim for indemnification for a Third-Party Claim.

(e)    "Indemnified Party" means a Party seeking indemnification under this Agreement.

(f)    "Indemnifying Party" means a Party against whom indemnification under this Agreement is sought.

(g)    "Litigation Expenses" means reasonable attorneys' fees and other costs and expenses incident to Proceedings, demands or investigations respecting, or the prosecution or defense of, a Claim.

(h)    "Third-Party Claim" means a Claim by any Person, other than Seller Entities or Buyer Entities, which could give rise to a right of indemnification under this Article 13.

13.02. Seller's Indemnification.

(a)    Subject to the terms and limitations of this Article 13, Seller shall indemnify Buyer against any Damages actually incurred by the Buyer Entities (collectively, the "Buyer Indemnitees") that are caused by or arise out of: (i) the failure of Seller to perform and fulfill any covenant or agreement to be performed by it under this Agreement; (ii) any breach of any representation or warranty of Seller set forth in Article 5; and (iii) any of the Excluded Liabilities, including without limitation, Excluded Liabilities related to Environmental Matters and Tax.

(b)    The representations and warranties of Seller set forth in Article 5 shall survive the Closing and, except for Section 5.03 (Authorization) and Section 5.18 (Brokers), shall expire and be of no further force and effect at 5:00 p.m. U. S. Eastern Time on the eighteen (18) month anniversary of the Closing Date.   The representations and warranties of Seller set forth in Sections 5.03 and 5.18 shall survive until the expiration of the relevant statute of limitations as it may be tolled or extended.

13.03. Buyer's Indemnification.

-46-
*Asset Purchase Agreement*

*Execution*

(a)     Subject to the terms and limitations of this Article, Buyer shall indemnify Seller against any Damages actually incurred by the Seller Entities (collectively, the "Seller Indemnitees") which are caused by or arise out of: (i) the failure of any Buying Company to perform or fulfill any provision or agreement to be performed or fulfilled by it under this Agreement; (ii) any inaccuracy in any representation or breach of any warranty of Buyer set forth in Article 6; (iii) the failure of any Buyer Entity subsequent to the Closing to perform or fulfill its or any Seller Entity's obligations under any contract, agreement or obligation included in the Transferred Liabilities; (iv) any of the Transferred Liabilities, including without limitation, Transferred Liabilities related to Environmental Matters and Tax; and (v) subject in addition to the terms and conditions set forth in Section 14.11, the Removal and/or the Disposal.

(b)     The representations and warranties of Buyer set forth in Article 6 shall survive the Closing and, except for Section 6.02 (Authorization) and Section 6.07 (Brokers), shall expire and be of no further force and effect at 5:00 p.m. U. S. Eastern Time on the eighteen (18) month anniversary of the Closing Date. The representations and warranties of Buyer set forth in Sections 6.02 and 6.07 shall survive until the expiration of the relevant statute of limitations as it may be tolled or extended.

13.04. Limitations.

(a)     Buyer shall not assert any Indemnification Claim on behalf of any Buyer Indemnitee (a "Buyer's Claim"), and Seller shall not be liable, with respect to the breach of any representation or warranty in Article 5 unless: (i) Buyer has notified Seller in writing in accordance with Section 16.01 within the applicable survival period, if any, set forth in Section 13.02(b); (ii) such Buyer's Claim gives rise to Damages (excluding Litigation Expenses for purposes of the threshold set forth in this clause (ii) only) in excess of $5,000; and (iii) the aggregate amount of all Buyer's Claims asserted under clause (ii) shall exceed $20,000, and then only with respect to the excess of such aggregate Buyer's Claims over said $20,000. The limits specified in clauses (ii) and (iii) of the preceding sentence shall not apply to Buyer's Claims with respect to the breach by Seller of any representation or warranty in Sections 5.03 and 5.18. In no event shall the aggregate amount of Buyer's rights to indemnification with respect to all Buyer's Claims under Section 13.02(a)(ii) exceed ten percent (10%) of the Purchase Price.

*Execution*

(b)     Seller shall not assert any Claim for indemnification on behalf of any Seller Indemnitee (a "Seller's Claim"), and Buyer shall not be liable, with respect to the breach of any representation or warranty in Article 6, unless:  (i) Seller has notified Buyer in writing in accordance with Section 16.01 within the applicable survival period, if any, set forth in Section 13.03(b); (ii) such Seller's Claim gives rise to Damages (excluding Litigation Expenses for purposes of the threshold set forth in this clause (ii) only) in excess of $5,000; and (iii) the aggregate amount of all Seller's Claims asserted under clause (ii) shall exceed $20,000, and then only with respect to the excess of such aggregate Seller's Claims over said $20,000. The limits specified in clauses (ii) and (iii) of the preceding sentence shall not apply to Seller's Claims with respect to the breach by Buyer of any representation or warranty in Sections 6.02 and 6.07. In no event shall the aggregate amount of Seller's rights to indemnification with respect to all Seller's Claims under Section 13.03(a)(ii) exceed ten percent (10%) of the Purchase Price.

(c)     The dollar thresholds set forth in this Section 13.04 relating to breaches of representations and warranties have been negotiated for the special purpose of the provisions to which they relate, and are not to be taken as evidence of the level of "materiality" for purposes of any statutory or common law which may be applicable to the Transactions under which a level of materiality might be an issue.

13.05. Defense of Third-Party Claims.

(a)     Buyer shall notify Seller in writing promptly after learning of any Third-Party Claim for which Buyer intends to seek indemnification on behalf of any Buyer Indemnitee from Seller under this Agreement, or to have taken into account for purposes of the dollar thresholds in Section 13.04. Seller shall notify Buyer in writing promptly after learning of any Third-Party Claim for which Seller intends to seek indemnification on behalf of any Seller Indemnitee from Buyer under this Agreement, or to have taken into account for purposes of the dollar thresholds in Section 13.04. It shall be a necessary condition of any rights to indemnification or payment with respect to any Third-Party Claim, or for such Third-Party Claim to be taken into account for purposes of the dollar thresholds under Section 13.04, that the Indemnified Party notify the Indemnifying Party prior to the time when Indemnifying Party's ability to contest the Third-Party Claim would be materially impaired by lack of notice but in no event more than ten (10)

*Execution*

days after any Seller Indemnitee, if Seller is the Indemnified Party, or any Buyer Indemnitee, if Buyer is the Indemnified Party, has notice of the Third-Party Claim. If Buyer does not give such notice of a Third-Party Claim, it shall be deemed to have waived as to itself and all Buyer Indemnitees all rights to indemnification or payment with respect to such Third-Party Claim. If Seller does not give such notice of a Third-Party Claim, it shall be deemed to have waived as to itself and all Seller Indemnitees all rights to indemnification or payment with respect to such Third-Party Claim.

(b)    Indemnifying Party shall have the right to undertake the defense of a Third-Party Claim of which Indemnified Party has notified Indemnifying Party, by providing written notice to Indemnified Party not later than sixty (60) days after receipt by Indemnifying Party of Indemnified Party's notice of the Claim, or such shorter period required to take any action or make any reply or answer timely, that it desires to undertake the defense of such Claim. Failure on the part of Indemnifying Party to so notify Indemnified Party that it will undertake such defense shall be deemed to be a waiver of Indemnifying Party's right to undertake such defense. If Indemnifying Party undertakes the defense of any Third-Party Claim, it shall control the investigation and defense thereof and Indemnified Party shall fully cooperate with Indemnifying Party with respect to such investigation and defense and, subject to Indemnifying Party's control rights, Indemnified Party may participate in such investigation and defense, solely at its own expense. If Indemnifying Party does not undertake the defense of a Third-Party Claim, then Indemnified Party shall control such investigation and defense and, subject to Indemnified Party's control rights, Indemnifying Party may participate in such investigation and defense, solely at its own expense.

(c)    The Parties shall make available to each other, their counsel and other representatives, all information, documents, employees, representatives and agents reasonably available to them which relate to any Third-Party Claim, and otherwise cooperate as may reasonably be required in connection with the investigation and defense thereof.

13.06. <u>Unsuccessful Indemnification Claims; Damages</u>.  If an Indemnified Party makes an Indemnification Claim against an Indemnifying Party, to the extent it is determined that such Indemnifying Party is not liable pursuant to this Agreement to indemnify such Indemnified Party

*Execution*

for such Indemnification Claim, Indemnified Party shall indemnify such Indemnifying Party for Damages incurred by such Indemnifying Party arising from such Indemnification Claim, including without limitation, Litigation Expenses incurred by such Indemnifying Party in defending against such Indemnification Claim or incurred by such Indemnifying Party in connection with any related Third-Party Claim pursuant to Section 13.05.

13.07. No Consequential or Lost Profit Damages; Exclusive Remedy.  Seller shall not seek or be entitled to on behalf of any Seller Indemnitee, and Buyer shall not seek or be entitled to on behalf of any Buyer Indemnitee, any incidental, indirect or consequential damages or damages for lost profits in any Indemnification Claims that are Direct Claims under this Article, except as shall be paid to a Person, other than Seller Indemnitees or Buyer Indemnitees, pursuant to a Third-Party Claim, nor shall Seller, on behalf of any Seller Indemnitee or Buyer, on behalf of any Buyer Indemnitee accept payment of any award or judgment against any Party for such indemnification to the extent that such award or judgment includes such Seller Indemnitee's or Buyer Indemnitee's incidental, indirect or consequential damages or damages for lost profits. Each of Seller, on behalf of itself and each Seller Indemnitee, and Buyer, on behalf of itself and each Buyer Indemnitee, acknowledges and agrees that its sole and exclusive remedy following the Closing Date with respect to any and all Claims relating to this Agreement, the Transactions, the Transferred Assets and the Business (other than Claims for fraud or requesting equitable relief), shall be pursuant to the indemnification provisions set forth in this Agreement.

13.08. Characterization of Indemnity Payment for Tax Purposes.  All amounts payable under Sections 13.02 or 13.03 shall be treated for all Tax purposes as adjustments to the Purchase Price, except as otherwise required by Law.

### Article 14.

### Post-Closing Matters

14.01. Mutual Cooperation.

(a)    After the Closing, each Party shall, and shall cause its Subsidiaries to, cooperate with the other Party and its Subsidiaries as reasonably requested by such other Party in connection with the prosecution or defense of any claims or other matters relating to the

*Execution*

Business. Such cooperation shall include the furnishing of testimony and other evidence, permitting access to employees and providing information regarding the whereabouts of former employees.

(b)    Seller and Buyer shall use commercially reasonable efforts to obtain any certificate or other document from any Governmental Authority or other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including, any Tax with respect to the Transactions).

14.02. Preservation of Files and Records.    For a period of three (3) years after the Closing, Buyer shall preserve all files and records in its possession relating to the Business and the Transferred Assets prior to the Closing, allow Seller access to such files and records and the right to make copies and extracts therefrom upon three (3) Business Days notice, at any time during normal business hours, and not dispose of any thereof.

14.03. Reports.    Buyer shall provide such assistance as Seller may reasonably request at Seller's expense for Seller's preparation of financial, Tax and other reports and statements relating to the Business for periods prior to the Closing Date.    Seller shall provide such assistance as Buyer may reasonably request at Buyer's expense for Buyer's preparation of financial, Tax and other reports and statements relating to the Business for periods after the Closing Date.

14.04. Renewal of Guaranteed Items.    Without the prior written consent of Seller, Buyer shall not, and shall not permit any other Buyer Entity to, renew or extend the term of, increase its obligations under, or transfer to a Third-Party, any lease, loan, contract or other obligation for which Seller or any other Seller Entity is liable as guarantor, original tenant, primary obligor or otherwise, unless all obligations of any member of the Seller Group with respect thereto are thereupon terminated by documentation satisfactory in form and substance to Seller.

14.05. "Grace" and "Grace Construction Products" Names.

(a)    The Buyer Entities shall have no right to use the "Grace" and/or "Grace Construction Products" names or other Seller Marks.    Buyer shall indicate whenever selling finished goods manufactured by Buyer that are packaged in packaging raw materials that contain

*Execution*

a Seller Mark that the Seller Mark is a company name, product name, logo or trademark of Seller.

(b)    After the Closing Date, Buyer may distribute or otherwise use catalogs and sales, marketing and promotional materials that contain Seller Marks solely in connection with the operation of the Transferred Assets; provided however, that Buyer shall:  (i) wherever practical, remove or cover any Seller Marks or Seller contact information on such materials; or (ii) to the extent that it is not practical to remove or cover a Seller Mark or Seller contact information on such materials, indicate in writing on such materials that any products or services included in such materials are offered for sale by Buyer with Buyer's contact information and that any Seller Mark on such materials is a company name, product name, logo or trademark of Seller.  After the date that is one hundred eighty (180) days after the Closing Date, Buyer shall cease to distribute or use catalogs and sales, marketing and promotional materials or other written materials that contain Seller Marks and shall destroy all such materials in its possession.

(c)    Seller owns and shall continue to own all Seller Marks, and Buyer shall have no claim or right in the Seller Marks.  Seller and its Affiliates shall retain all rights in the Seller Marks, and shall be entitled to all uses of the Seller Marks that existed prior to this Agreement, as well as to any and all future uses of the Seller Marks anywhere throughout the world.  Buyer and its Affiliates shall not register the Seller Marks or any other marks or names similar to the Seller Marks in its own name or have any other Person register the Seller Marks, or use the Seller Marks except under the circumstances provided in Section 14.05(a), above.

14.06. Intercompany Agreements.  Any contracts, licenses, agreements, commitments or other arrangements between any other Seller Entity and Seller related to the Business, whether written or oral, and whether express or implied, pursuant to which Seller or any other Seller Entity provides management, administrative, legal, financial, accounting, data processing, insurance, technical support or other services to the Business, or the use of any assets of any Seller Entity, or pursuant to which any rights, privileges or benefits are accorded to Seller related to the Business, shall terminate as of the Closing.  After the Closing, none of the Buyer Entities shall have any rights under any similar contract, license, agreement, commitment or arrangement with Seller or any other Seller Entity.

*Execution*

14.07. Covenant Not To Compete.

(a)    As a material inducement to Buyer to enter into this Agreement and to consummate the Transactions contemplated hereby, on behalf of the Seller Group, Seller agrees to the covenants and agreements set forth in this Section 14.07 for the benefit of Buyer Group.

(b)    No member of the Seller Group at any time from and after the Closing Date and through the fifth (5th) anniversary of the Closing Date (the "Noncompetition Term"), without the prior written consent of Buyer, shall directly or indirectly engage in the manufacture and sale of the Products and the products of Buyer set forth on Schedule 14.07(b) (collectively with the Products, the "Scheduled Products") in the Western Hemisphere, Europe, the Middle East, Australia, Asia and the Far East; or (ii) acquire control of more than one percent (1%) of the then-outstanding voting equity interests in a publicly-traded entity engaged in the manufacture and sale of the Scheduled Products in such region; provided however that the foregoing shall not apply to:  (A) the manufacture or sale of the Scheduled Products in such region in connection with Seller's efforts to liquidate Unsalable Inventory; (B) the manufacture or sale of the Scheduled Products in such region by a business acquired by Seller after the Closing Date if, in the year prior to such acquisition, its net sales of such products in such region were less than the lesser of:  (1) $0.5 million, or (2) ten percent (10%) of the net sales of the entire acquired business; or (C) the manufacture or sale of the Scheduled Products in such region by a unit of a business acquired by Seller after the Closing Date if Seller divests such unit within one (1) year after its acquisition.

(c)    The Parties agree and stipulate that the agreements and covenants contained in this Section 14.07 are fair and reasonable in light of all of the facts and circumstances of the relationship between Buyer and Seller; however, Buyer and Seller are aware that in certain circumstances courts have refused to enforce certain agreements not to compete.  Therefore, in furtherance of, and not in derogation of the provisions of this Section 14.07, Buyer and Seller agree that in the event a court should decline to enforce the provisions of Section 14.07, that Section 14.07 shall be deemed to be modified or reformed to restrict the Seller Group's competition with Buyer and its Affiliates to the maximum extent, as to time, geography and business scope, which the court shall find enforceable; provided, however, in no event shall the

*Execution*

provisions of <u>Section 14.07</u> be deemed to be more restrictive to the Seller Group than those contained herein. Notwithstanding the provisions of this Agreement or the other Transaction Documents, Seller is expressly permitted to take any actions deemed necessary or advisable by Seller in its sole discretion to liquidate any Unsalable Inventory.

14.08. <u>Nonsolicitation</u>.

(a)   Seller, on behalf of the Seller Group, agrees that without the written consent of Buyer, at any time from and after the Closing Date and through the second anniversary of the Closing Date (the "<u>Nonsolicitation Term</u>") the Seller Group will not directly or indirectly through the actions of any other Person, whether for its own benefit or for that of another Person: (i) directly to solicit for employment any individual who came to the attention of Seller Group as a result of the Transactions and who as of the Closing Date was an employee of Buyer; or (ii) take any action, or advise or assist any Person in taking any action, that would interfere with or damage the relationships between Buyer and Persons that were customers, distributors, manufacturer's representatives and suppliers of the Business during the twelve (12) months prior to the Closing Date. As used in this <u>Section 14.08</u>, the term "solicit" shall not include, without limitation, general advertising for applicants for a position, engaging a recruiting firm to search for and screen prospects for a position (so long as no Seller Entity has instructed such recruiting firm to specifically seek employees of Buyer), or solicitation of an individual who contacts a Seller Entity or recruiting firm on his or her own initiative.

(b)   Buyer, on behalf of the Buyer Group, agrees that the Buyer Group will not (and will not permit any of its Affiliates to), at any time during the Nonsolicitation Term, directly or indirectly through the actions of any other Person, whether for its own benefit or for that of another Person solicit for employment any individual (other than, following the Closing, the Business Executive and Persons whose employment with Seller is terminated by Seller other than for cause) who came to the attention of Buyer Group as a result of the Transactions and who as of the Closing Date was an employee of Seller; provided however, that notwithstanding the foregoing, until the Closing Date, Seller may conduct negotiations with the Business Executive regarding possible employment of the Business Executive after the Closing but may not hire or otherwise retain the services of the Business Executive.

*Execution*

14.09. <u>Confidentiality</u>. Seller, on behalf of the Seller Group, acknowledges that during the course of their ownership of the Transferred Assets they have acquired highly specialized and technical knowledge with respect to the Business and the Transferred Assets, including, but not limited to, product designs, formulations, vendors, customers, distributors, product designs, manufacturing processes, manufacturer's representatives and distributors (the "<u>Confidential Information</u>"). Confidential Information excludes information that is or becomes available to the public other than as a result of a disclosure by the Seller Group in violation of this <u>Section 14.09</u>. Seller and the Seller Group recognize that the integrity and value of the Transferred Assets is dependent upon the confidentiality of the Confidential Information and that the protection of the Confidential Information against unauthorized disclosure or use is of critical importance to Buyer. Seller, on behalf of the Seller Group, agrees that, during the Noncompetition Term, Seller Group shall treat the Confidential Information in accordance with Seller Group's internal procedures relating to the protection of internal confidential information. If any member of the Seller Group is subpoenaed, or is otherwise required by Law to testify concerning any Confidential Information, Seller agrees (if and to the extent permitted by Law) to notify Buyer upon receipt of a subpoena so that Buyer may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. If such waiver or such protective order or other remedy is not obtained, the Seller Group shall furnish only that portion of the Confidential Information that it is advised by its legal advisers is legally required and shall exercise commercially reasonable efforts (at the sole cost of Buyer) to obtain reliable assurance that confidential treatment shall be accorded the Confidential Information. In any event, the Seller Group will not oppose action by Buyer or any of its Affiliates to obtain an appropriate protective order or other reliable assurance that confidential treatment shall be accorded the Confidential Information. Notwithstanding the foregoing, nothing in this Agreement shall prevent Seller Group from disclosing or otherwise using Confidential Information in defending against any Buyer Claim pursuant to <u>Article 13</u>.

14.10. <u>Obligations For Accounts Receivable And Inventory After Closing</u>.

(a)    In the event that Seller or any of its Affiliates receives any payment relating to any of the Transferred Accounts Receivable on or after the Closing Date, it shall be immediately (but in no event more than thirty (30) days after receipt) paid over to Buyer. In the event that

*Execution*

Buyer or any of its Affiliates receives any payment relating to any account receivable that either is not included in the Transferred Accounts Receivable or is included in Uncollectible Accounts Receivable, it shall be immediately (but in no event more than thirty (30) days after receipt) paid over to Seller.

(b)     From the Closing Date until the date which is one hundred eighty (180) days after the Closing Date, Buyer shall use commercially reasonable efforts to collect the Transferred Accounts Receivable and utilize the Transferred Inventory. For purposes of this Section 14.10, such "commercially reasonable efforts" shall prevent Buyer from selling any products of Buyer (other than Transferred Inventory) that meet the same end-use as the Products remaining in the Transferred Inventory to any Person that is set forth on the customer list included in the Transferred Assets pursuant to Section 2.01(e) unless such Person was a customer of Buyer during the twelve (12) months prior to the Closing Date.

14.11. Removal/Disposal of Transferred Assets.

(a)     Starting on the Closing Date, Buyer shall complete the removal of all Transferred Assets from the Plant and all Transferred Inventory that is not located at the Plant, from the Seller facility at which such Transferred Inventory is located (the "Removal") no later than thirty (30) days after the Closing Date (the "Removal Date"). Buyer shall conduct the Removal in a manner that does not disrupt Seller's operations and Buyer shall ensure that Buyer and any Persons retained by Buyer to conduct the Removal on Buyer's behalf (the "Movers") comply with all procedures and safety requirements of Seller (that have been provided to Buyer prior to the commencement of the Removal) and all applicable Laws, including without limitation, all Environmental Laws, in connection with the Removal. Buyer shall ensure that the Movers are covered by insurance that in coverage and amount is reasonable for the industry.

(b)     If Buyer fails to complete the Removal with respect to all or any portion of the Transferred Assets within fourteen (14) days after the Removal Date, at the sole option of Seller, exercisable at any time prior to the completion of the Removal by Buyer, Seller may convert to its own use, dispose of, or sell such Transferred Assets (the "Disposal"). Seller shall keep the proceeds or benefit from any use or sale of the Transferred Assets, without any offset or claim by Buyer for such proceeds or benefit, and Seller shall invoice Buyer and Buyer shall pay Seller for

*Execution*

any disposal, decommissioning or removal costs related thereto. All invoices under this <u>Section 14.11</u> shall be due and payable within ten (10) days of receipt. Seller shall charge and Buyer shall pay interest for any late payments at the Specified Rate determined as of the date the invoice is due. Charging such interest shall not constitute a waiver of Buyer's failure to pay on time or an election of remedies.

(c)    If Buyer fails to complete the Removal by the Removal Date, Seller shall invoice Buyer and Buyer shall pay Seller in advance a monthly storage fee of ten thousand dollars ($10,000.00) (the "<u>Storage Fee</u>"), and shall continue to pay such Storage Fee every month thereafter until the Removal or Disposal is completed.

(d)    In connection with the Removal of all or any portion of the Transferred Assets, Buyer may prepare a written plan setting forth in reasonable detail the manner in which Buyer and/or the Movers intend to conduct the Removal (a "<u>Removal Plan</u>") and submit that Removal Plan to Seller for approval. If, with respect to the Transferred Assets or any portion thereof, Seller has approved a Removal Plan, Buyer shall indemnify Seller from all Damages, including without limitation, Third-Party Claims, arising from or relating to: (i) Buyer's or the Movers' failure to conduct the Removal in accordance with the Removal Plan; (ii) otherwise caused by the negligence, gross negligence, recklessness or willful misconduct of Buyer or the Movers in conducting the Removal; and (iii) any Claim brought by any Buyer Indemnitee, any Related Person of any Buyer Indemnitee, the Movers or any director, officer or employee or Affiliate of the Movers. If, with respect to the Transferred Assets or any portion thereof, Seller has not approved a Removal Plan, Buyer shall indemnify Seller from all Damages arising from or relating to the Removal, including without limitation, Third-Party Claims. Buyer shall indemnify Seller from all Damages arising from or relating to the Disposal, including without limitation, Third-Party Claims. Seller shall invoice Buyer and Buyer shall pay Seller for any Damages for which it is liable under this <u>Section 14.11(d)</u>.

## Article 15.

### Expenses

15.01. <u>Expenses</u>. Except as otherwise expressly provided herein, Seller and Buyer shall each pay its own expenses in connection with this Agreement and the Transactions.

*Execution*

15.02. <u>Transfer Taxes</u>. Seller will pay any stamp duty, sales, transfer, value added, gross receipts, excise, recording, registration or similar Tax or closing costs applicable to this Agreement, the transfer to the Buying Companies of the Transferred Assets pursuant to this Agreement, any other Transaction Document or the Transactions.

15.03. <u>Property Prorations</u>. The following prorations relating to the Transferred Assets shall be made at Closing:

(a)    All personal property Taxes and assessments, whether general or special, and all *ad valorem* and other Taxes levied with respect to the Transferred Assets or any other tangible asset included in the Transferred Assets for any taxable period that includes any period before the Closing Date and ends after the Closing Date shall be prorated on a calendar-year basis, with Seller being liable for such Taxes attributable to the days in the calendar year prior to the Closing Date and Buyer being liable for such Taxes attributable to days in the calendar year on or after the Closing Date.

(b)    If any of the foregoing proration amounts cannot be determined as of the Closing Date due to final invoices not being issued as of the Closing Date, Seller and Buyer shall prorate such items as and when the actual invoices are issued to the appropriate Party. The Party owing amounts to the other by means of such prorations shall pay the same within thirty (30) days after delivery of a written request by the paying Party.

## Article 16.

### Notices

16.01. <u>Notices</u>. All notices, requests, demands and other communications required or permitted to be given under this Agreement or any of the other Transaction Documents shall be deemed to have been duly given if in writing and delivered personally or by private delivery service, delivered by facsimile transmission, or delivered by first-class, postage prepaid, registered or certified mail, addressed as follows:

*Execution*

If to Seller:

>   W. R. Grace & Co.-Conn.
>   7500 Grace Drive
>   Columbia, Maryland 21044
>   Attention: Corporate Secretary
>   Fax: (410) 531-4545
>   Confirmation: (410) 531-4362

If to any of the Buying Companies:

>   The RectorSeal Corporation
>   2601 Spenwick Drive,
>   Houston, Texas 77055
>   Attention: Corporate Secretary
>   Fax: (713) 263-7577
>   Confirmation: (713) 263-8001

Any Buying Company may change the address to which such communications are to be directed to it by giving written notice to Seller in the manner provided above. Seller may change the address to which such communications are to be directed to it by giving written notice to Buyer in the manner provided above.

## Article 17.

### General

17.01. Entire Agreement. This Agreement, together with the other Transaction Documents and the Confidentiality Agreement, sets forth the entire agreement and understanding of the Parties and related Persons with respect to the subject matter hereof and supersedes all prior agreements, arrangements and understandings relating thereto.

17.02. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to conflicts-of-laws principles that would require the application of any other law.

17.03. Submission to Jurisdiction. Each Party hereby irrevocably submits in any proceeding arising out of or relating to this Agreement or any of the Transaction Documents to which it is or will be a party, or any of its obligations hereunder or thereunder, to the jurisdiction of the Bankruptcy Court or, after the Chapter 11 Cases is closed, any federal or state court in the

*Execution*

State of Delaware, and waives any and all objections to such jurisdiction that it may have under the laws of the State of Delaware or any other jurisdiction.

17.04. <u>Third-Party Beneficiaries</u>.  This Agreement is for the sole benefit of the Parties and their permitted successors and assigns, and nothing herein expressed or implied will give or be construed to give to any Person, other than the Parties and such permitted successors and assigns, any legal or equitable rights hereunder.

17.05. <u>Assignment; Successors</u>.

(a)    This Agreement, and those Transaction Documents that do not have their own provisions governing assignment, may not be assigned in whole or part by either Party without the prior written consent of the other Party.

(b)    This Agreement shall be binding upon the Parties and their successors and permitted assigns.

17.06. <u>Amendments and Waivers</u>.  This Agreement may be amended, superseded or canceled, and any of the terms hereof may be waived, only by a written instrument specifically referring to this Agreement and specifically stating that it amends, supersedes or cancels this Agreement or waives any of its terms, executed by Seller and Buyer.  Failure of any Party to insist upon strict compliance with any of the terms of this Agreement in one or more instances shall not be deemed to be a waiver of its rights to insist upon such compliance in the future, or upon compliance with other terms hereof.

17.07. <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which counterparts may be signed by any one or all of the Parties.  Each such counterpart shall be an original, but all such counterparts shall constitute but one agreement.

17.08. <u>Time is of the Essence</u>.  With regard to all dates for payments and notices set forth or referred to in this Agreement, time is of the essence.

17.09. <u>Attorney's Fees</u>.    Should any litigation be commenced between the Parties concerning this Agreement, the Transactions, the Transferred Assets and the Business (other than litigation pursuant to <u>Article 13</u>), the Party prevailing in such litigation shall be entitled, in

*Execution*

addition to such other relief as may be granted, to a reasonable sum as and for attorney's fees, which sum shall be determined by the court in such litigation or in a separate action brought for that purpose.

[Signatures Next Page]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first above written.

**W. R. GRACE & CO.-CONN.**                    **THE RECTORSEAL CORPORATION**

By: _____        By: _____
    Name:  D. Andrew Bonham                      Name:  David M. Smith
    Title:  President, Grace                         Title:  President
          Construction Products

## BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

This Bill of Sale and Assignment and Assumption Agreement (this "Agreement") is made as of September [   ], 2009, by and between W. R. Grace & Co.-Conn., a Connecticut corporation ("Seller") and The RectorSeal Corporation, a Delaware corporation ("Buyer, and collectively with Seller, the "Parties" and each, a "Party")

This Agreement is being delivered pursuant to the Asset Purchase Agreement dated August 18, 2009 (the "Sale Agreement"), by and between Seller and Buyer, as approved by an order of the United States Bankruptcy Court for the District of Delaware dated September [   ], 2009. Capitalized terms used but not defined herein are used with the definitions given them in the Sale Agreement.

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

1.    (a)    Seller does hereby sell, assign, transfer, convey and deliver to Buyer free and clear of all Liens (other than Permitted Liens) to the maximum extent permissible under section 363 of the Bankruptcy Code, and Buyer does hereby purchase, acquire and accept from Seller, all of the right, title and interest of Seller in, to and under any and all of the Transferred Assets.

(b)    Buyer does hereby assume and shall be liable for, and shall pay, perform and discharge, the Transferred Liabilities.

2.    This Agreement is subject to the terms and conditions of the Sale Agreement. Neither the representations and warranties nor the rights and remedies of either Party under the Sale Agreement shall be deemed to be enlarged, modified or altered in any way by this Agreement.

### [Signatures Next Page]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

W. R. GRACE & CO.-CONN.

By: _____
    Name:  D. Andrew Bonham
    Title:  President, Grace Construction
         Products

THE  RECTORSEAL  CORPORATION

By: _____
    Name:  David M. Smith
    Title:  President

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date first above written.

**W. R. GRACE & CO.-CONN.**                    **THE RECTORSEAL CORPORATION**

By: _____          By: _____
    Name:  D. Andrew Bonham                       Name:  David M. Smith
    Title:  President, Grace                           Title:  President
           Construction Products

# EXHIBIT A

## BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

This Bill of Sale and Assignment and Assumption Agreement (this "Agreement") is made as of September [ ], 2009, by and between W. R. Grace & Co.-Conn., a Connecticut corporation ("Seller") and The RectorSeal Corporation, a Delaware corporation ("Buyer, and collectively with Seller, the "Parties" and each, a "Party")

This Agreement is being delivered pursuant to the Asset Purchase Agreement dated August 18, 2009 (the "Sale Agreement"), by and between Seller and Buyer, as approved by an order of the United States Bankruptcy Court for the District of Delaware dated September [ ], 2009. Capitalized terms used but not defined herein are used with the definitions given them in the Sale Agreement.

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

1.    (a)    Seller does hereby sell, assign, transfer, convey and deliver to Buyer free and clear of all Liens (other than Permitted Liens) to the maximum extent permissible under section 363 of the Bankruptcy Code, and Buyer does hereby purchase, acquire and accept from Seller, all of the right, title and interest of Seller in, to and under any and all of the Transferred Assets.

(b)    Buyer does hereby assume and shall be liable for, and shall pay, perform and discharge, the Transferred Liabilities.

2.    This Agreement is subject to the terms and conditions of the Sale Agreement. Neither the representations and warranties nor the rights and remedies of either Party under the Sale Agreement shall be deemed to be enlarged, modified or altered in any way by this Agreement.

**[Signatures Next Page]**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**W. R. GRACE & CO.-CONN.**                    **THE RECTORSEAL CORPORATION**

By: _____          By: _____
    Name:  D. Andrew Bonham                    Name:  David M. Smith
    Title:  President                                  Title:  President
    Grace Construction Products