**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In Re: | § | **Chapter 11** |
| | § | |
| **W.R. GRACE & CO., et al.,** | § | **Jointly Administered** |
| | § | **Case No. 01-01139 (JKF)** |
| **Debtors.** | § | |
| | § | |

**FEE AUDITOR'S FINAL REPORT REGARDING
FEE APPLICATION OF KIRKLAND & ELLIS LLP
FOR THE THIRTY-SECOND INTERIM PERIOD**

This is the final report of Warren H. Smith & Associates, P.C., acting in its capacity as fee auditor in the above-captioned bankruptcy proceedings, regarding the <u>Fee Application of Kirkland & Ellis LLP for the Thirty-Second Interim Period</u> (the "Application").

**BACKGROUND**

1.      Kirkland & Ellis LLP ("K&E") was retained as counsel to the Debtors.  In the Application, K&E seeks approval of fees totaling $11,105,186.50 and expenses totaling $2,965,262.20 for its services from January 1, 2009 through March 31, 2009 (the "Application Period").

2.      In conducting this audit and reaching the conclusions and recommendations contained herein, we reviewed in detail the Application in its entirety, including each of the time and expense entries included in the exhibits to the Application, for compliance with 11 U.S.C. § 330, Local Rule 2016-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Amended Effective February 1, 2009, and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330, Issued January 30, 1996 (the "U.S. Trustee Guidelines"), as well as for consistency with precedent established in the United States Bankruptcy Court for

the District of Delaware, the United States District Court for the District of Delaware, and the Third Circuit Court of Appeals.  We served an initial report on K&E based upon our review, and we received a response from K&E, portions of which response are quoted herein.

### DISCUSSION

3.    We note that subsequent to the filing of K&E's Application, K&E agreed with the debtors to voluntarily reduce the amount of its fees for the Application Period by $906,426.30.  This voluntary fee reduction is reflected in our fee recommendation in Paragraph 18, below.

4.    In our initial report, we noted that during the months of January, February, and March 2009, 40 K&E personnel went to Montana to work on the criminal case.  A list of the individuals traveling to Montana is attached as Exhibit "A."  We understand that this was a large undertaking, however, 40 people is an extraordinary number of people to be working on-site on the trial and trial preparation.  The total fees billed for the Montana criminal case during the Application Period were $8,356,699.50.  The travel expenses alone totaled $403,185.05.  Thus, we asked K&E to explain why it was necessary for each person listed to be present in Montana during the trial and trial preparation, as well as the role each person played in the trial and trial preparation.  K&E provided a response which we have included as Response Exhibits "1" and "1-a."  We accept K&E's response, and, in light of the reduction set forth in paragraph 3, above, have no objection to these fees.

5.    In our initial report, we noted that during the Application Period, K&E Technical Services personnel Marvin Gibbons ($235), Aaron Rutell ($190), Derek Bremer ($240), Carmelo Soto ($240), and Alun Harris-John ($220) billed 2,277.30 hours for total fees of $505,866.50

for technical support for the Montana criminal matter.[1]  The pertinent time entries are listed on Exhibit "B."  We asked K&E to explain why it was necessary to have five technical support personnel present and working on the trial site.  In addition, we noted that there were numerous occasions when the technical support personnel billed anywhere from 8 to 20 hours on the case in one day.  Thus, we also asked K&E  whether the technical support personnel were performing tasks directly related to the case for all the time they billed, or whether they were billing for all the time that they were "on call" or "on hand" to assist with technical support.  Finally, we asked K&E if any comparison had been performed in the cost of performing this work in-house versus the cost of hiring a third-party vendor to perform these technical services.  K&E's response is included as Response Exhibit "2."  We accept K&E's response,  and, in light of the reduction set forth in paragraph 3, above, have no objection to these fees.

6.    In our initial report, we noted certain instances in which several K&E professionals and paraprofessionals attended the same hearing.  We have noted the time entries for these hearings on Exhibit "C."  Paragraph II.D.5. of the U.S. Trustee Guidelines provides: "If more than one professional from the applicant firm attends a hearing or conference, the applicant should explain the need for multiple attendees."  Thus, for each hearing listed, we asked K&E to explain why it was necessary for each attorney and legal assistant to be present.  K&E's response is included as Response Exhibit "3."  We accept K&E's response with respect to the hearings on January 21-22, 2009.  With respect to the January 14, 2009 hearing, we appreciate K&E's willingness to deduct the fees of associate, Rashad Evans, for

---

[1]These fees were included in the fees of $8,356,699.50 billed for the Montana criminal matter.

a reduction of $1,927.00.  With respect to the March 9, 2009 hearing, it does not appear to

us that the response establishes the necessity of attendance at the hearing by both Craig

Bruens and Christopher Greco.  The fact that Mr. Greco worked with Mr. Bruens on the

solicitation materials and on the disclosure statement order does not, in and of itself,

demonstrate the necessity of his attendance at the hearing.  Ordinarily, we would recommend

disallowance of Mr. Greco's time in attending and traveling to and from the hearing, for a

reduction of $4,772.50 in fees.  This reduction, combined with K&E's voluntary deduction

of Mr. Evans' time would result in a reduction of $6,699.50 in fees.  However, because K&E

has already agreed with the debtor to voluntarily reduce its fees by $906,426.30 overall, we

recommend no additional fee reductions on this issue.

7.      In our initial report, we noted that on January 8, 2009, 13 K&E professionals and

paraprofessionals attended a joint defense conference.  The total time spent was 119.50

hours, for total fees of $60,576.50.   As with the hearings, it was not always apparent from

the time entries why attendance of each attorney and paralegal was required.  The pertinent

time entries are listed on Exhibit "D."  In light of the Guideline cited above, we asked K&E

to explain why it was necessary for each attendee to be present at this conference.  K&E's

response is included as Response Exhibit "4."  We accept K&E's response and have no

objection to these fees.

8.      In our initial report, we noted that on March 19, 2009, attorneys Brian Stansbury ($550) and

Karen Lee ($320), as well as legal assistants Timothy Fitzsimmons ($240) and Morgan

Rohrhofer ($150), attended the deposition of A. Whitehouse.  The total time spent, including

non-working travel time, was 56.30 hours for total fees of $17,700.00.  The time entries are

as follows:

| 3/19/2009 | Morgan Rohrhofer | 9.00 | 1,350.00 | Assist B. Stansbury prior to, during and following A. Whitehouse deposition. |
|-----------|------------------|------|----------|------|
| 3/19/2009 | Brian T Stansbury | 5.80 | 3,190.00 | Prepare for deposition of A. Whitehouse (1.4); conduct deposition of A. Whitehouse (4.4). |
| 3/19/2009 | Timothy J Fitzsimmons | 7.50 | 1,800.00 | Attend deposition of expert witness, assist with impeachment documents and perform follow-up tasks following deposition. |
| 3/19/2009 | Karen F Lee | 10.00 | 3,200.00 | Prepare for deposition and assist in deposition. |
| 3/18/2009 | Morgan Rohrhofer | 4.00 | 600.00 | Travel from Washington, DC to Spokane, WA for deposition (billed at half time). |
| 3/18/2009 | Brian T Stansbury | 4.00 | 2,200.00 | Travel from Washington, DC to Spokane, WA for deposition (billed at half time). |
| 3/18/2009 | Karen F Lee | 4.00 | 1,280.00 | Travel from Washington, DC to Spokane, WA for deposition (billed at half time). |
| 3/19/2009 | Morgan Rohrhofer | 4.00 | 600.00 | Return travel from Spokane, WA to Washington, DC after deposition (billed at half time). |
| 3/19/2009 | Brian T Stansbury | 4.00 | 2,200.00 | Return travel to Washington, DC from deposition in Spokane, WA (billed at half time). |
| 3/20/2009 | Karen F Lee | 4.00 | 1,280.00 | Return travel from Spokane, WA to Washington, DC after deposition (billed at half time). |
| | | 56.30 | $17,700.00 | |

Thus, we asked K&E to explain why it was necessary for each attendee to be present at the deposition. K&E responded as follows:

      This deposition took place in Spokane, where Dr. Whitehouse maintains his medical practice. He is a pulmonologist whose testimony was at the crux of the

Government's criminal case against Grace, and who, in the bankruptcy case context, is the Libby claimants' primary expert. His deposition took very high priority for Grace. Thanks in large part to the amount of preparation done by K&E prior to the deposition, K&E was able to obtain numerous damaging admissions from Dr. Whitehouse, greatly lessening his effectiveness as a witness for the Libby claimants.

Each of the four deposition attendee's responsibilities is described below.

Brian Stansbury conducted the deposition, and supervised the deposition preparation. Karen Lee second-chaired the deposition, and Morgan Rohrhofer organized and indexed the deposition files -- a huge set of materials, including more than 25 boxes of exhibits. Between 70 and 80 exhibits were used during the course of the deposition, and the total would have been higher had Dr. Whitehouse and his counsel not terminated the deposition prematurely. As further described on Response Exhibit 1 and in prior fee responses, Tim Fitzsimmons is a legal assistant/analyst with a doctorate in biomedical sciences. He attended Dr. Whitehouse's deposition as a scientific advisor. Over the course of Grace's bankruptcy and criminal cases, Tim has conducted line-by-line analyses of much of Dr. Whitehouse's published work, and as a result, was able to advise Brian and Karen of any inaccuracies between a published report or prior testimony and an answer given by Dr. Whitehouse during the deposition. All four K&E team members worked in Spokane before the deposition to get the exhibits organized and marked in order to allow Brian and Karen to cover a large amount of material in an efficient manner.

In response to our follow-up inquiry, K&E provided the following additional information:

. . . Karen Lee assisted Brian with formulating follow up questions (she did not actually conduct the deposition questioning) and assisted in choosing exhibits at various times during the deposition. There were apparently numerous exhibits at issue, many of which contained medical records, among other things, and which required on site analysis and attorney discretion as the deposition evolved.

We accept K&E's response and have no objection to these fees.

9.     In our initial report, we noted a total of $245,331.25 in charges for amounts paid to Etrial

Communications for professional services rendered. In response to our inquiry, K&E

provided the following information concerning these charges:

The Initial Report identifies $245,331.25 in charges for amounts paid to Etrial Communications, and requests that K&E explain the services provided by Etrial and

how those services were used at trial.[2]

K&E hired Etrial Communications, on behalf of the entire joint defense, to assist in the creation and management of the exhibits and demonstrative evidence used during the criminal trial. Etrial provided graphic design consultation to each of the joint defense firms, and was utilized during many trial preparation sessions. The reason for this level of participation was that Etrial, based on the content of these sessions, made recommendations for graphics and technology support and concepts (actual depictions of a particular idea in demonstrative form) to be used at trial. Often, defense attorneys would give an Etrial employee a general idea of the point that the attorney wanted conveyed in a particular exhibit or demonstrative, together with the key related factual information. Etrial personnel would then come up with the demonstrative approach to conveying the point, whether that approach took the form of detailed timelines, pictures, icons, or some other demonstrative. Etrial personnel would receive materials from an attorney, convert them to a tag image file (TIF) image, and upload the image to PowerPoint or similar software. Once uploaded, Etrial then numbered and organized the exhibits in the proper order for trial use. Etrial personnel did this each day, working with thousands of exhibits, many of which were being constantly updated and changed. In addition, Etrial archived and catalogued all trial exhibits for future use. During trial, an Etrial employee was responsible for running the computer connected to the courtroom's audio/visual systems, ensuring that the correct demonstratives and exhibits appeared on the screen at the correct time, making needed changes during trial, and preparing new exhibits on the spot. The tight coordination between Etrial and the joint defense was evident in the courtroom when compared to the antiquated and limited systems employed by the Government. It was obvious to the judge and the jury that the defense team had a command of logistics in the courtroom, which added credibility to the substantive arguments made by the defense. Furthermore, K&E's and Etrial's use of large 4 foot by 6 foot boards (typically containing timelines and other icon-based concepts) vastly improved the defense's ability to educate the jury on a case that extended back at least thirty years.

The defense team prepared hundreds of exhibits every day during the trial; by trial's end, the defense had approximately 22,000 potential exhibits in the defense database. Neither K&E nor any other law firm has the graphic design talent or capacity to staff a major trial from a trial graphics standpoint, and so hiring a vendor such as Etrial was a necessity. Because the Etrial expenses are properly chargeable to the Debtors' estate, K&E respectfully requests reimbursement in full.

---

[2]All of the expenses questioned in (¶¶ 9-14) of the Initial Report relate to the defense of the criminal trial, and when we refer to use "at trial" with regard to a particular product or service, we are referring to the Montana criminal trial.

We accept K&E's response and have no objection to these expenses.

10.    In our initial report, we noted the following charges for Iris Data Services LLC:

| 2/4/2009 | 3,935.00 | IRIS DATA SERVICES LLC - Outside Computer Services, Unify Export and Image Build, Hard Drive, 2/04/09 |
|---|---|---|
| 11/25/2008 | 164,970.00 | IRIS DATA SERVICES LLC - Outside Computer Services, Links to Tifs and OCR, 11/2008 |
| 11/30/2008 | 11,925.00 | IRIS DATA SERVICES LLC - Outside Computer Services, Monthly Unifying Hosting Fee, 11/2008 |
| 12/10/2008 | 28,577.12 | IRIS DATA SERVICES LLC - Outside Computer Services, Links to Tifs and OCR, 12/2008 |
| 12/31/2008 | 12,459.00 | IRIS DATA SERVICES LLC - Outside Computer Services, Monthly Unifying Hosting Fee, 12/2008 |
| 1/31/2009 | 13,320.00 | IRIS DATA SERVICES LLC - Outside Computer Services, Monthly Unifying Hosting Fee, 1/2009 |
| 2/12/2009 | 9,690.00 | IRIS DATA SERVICES LLC - Outside Computer Services, Links to Tifs and OCR, 2/12/2009 |
| 2/28/2009 | 13,899.00 | IRIS DATA SERVICES LLC - Outside Computer Services, Monthly Unifying Hosting Fee, 2/2009 |
| 3/3/2009 | 11,788.10 | IRIS DATA SERVICES LLC - Outside Computer Services, Links to Tifs and OCR, 2/2009 |
|  | $270,563.22 |  |

In response to our request, K&E provided the itemized invoices comprising the $164,970.00 charge,

which we reviewed, and advised as follows:

K&E hired IRIS Data Services to provide an online review tool to assist

defense team attorneys with the review of the millions of Government documents produced in the criminal case. The IRIS expenses listed in the Initial Report relate to the design, creation, maintenance and technical support of an online review database designed so that all information loaded onto it would be accessible by all K&E defense team attorneys and paraprofessionals from its Chicago, D.C. and Los Angeles offices. All of the documents produced by the Government needed to be reviewed by K&E attorneys ahead of trial in order to prepare witnesses, create exhibits, prepare attorney work-product, conduct direct, cross and rebuttal examination preparations, and so on. From these governmental document productions, K&E received hard copy documents and documents on discs and hard drives. IRIS uploaded the documents to the online review database, created TIF images of each document, created links to the original native files, created a coding template for use by the attorneys, performed optical character recognition, which allowed for searching capabilities, and performed de-duplication, which removed all duplicate documents from the database. IRIS charged K&E a monthly hosting fee for the maintenance and support of the database. The sheer number of documents produced and necessity to review them as quickly as possible made it more cost effective for an outside vendor to create and maintain an online review database than for K&E personnel to have done it.

The $164,970.00 amount questioned in the Initial Report was properly billed to the Debtors. This charge represents three separate invoices that were combined into one charge on the Fee Application . . . .

As can be seen from the descriptions above of the services provided by Etrial and IRIS, the two vendors performed quite different functions -- as to Etrial, trial exhibits, demonstratives and related support and, as to IRIS, setup and maintenance of the online document review database. Because the IRIS Data Services charges are properly chargeable to Grace, K&E respectfully requests reimbursement in full.

We accept K&E's response and have no objection to these expenses.

11.     In our initial report, we noted a total of $16,395.41 paid to Semperon Corporation. In

response to our inquiry, K&E provided the following information concerning this charge:

Semperon is a technology company that specializes in providing connectivity for businesses opening new, remote or temporary offices. K&E chose Semperon as the vendor to provide network connectivity for the three Missoula locations (the Downtown Office, the Reserve Street Office, and the courthouse). The company developed the network, infrastructure and application strategies that allowed the entire joint defense team to work successfully from all three locations. First

Semperon developed the network to deliver the required level of bandwidth and quality to support the various applications needed for the trial team to operate. Once the network was developed, Semperon technicians installed it; once the network was up, Semperon worked remotely to provide ongoing support. The company provided connectivity for internet, telephone, voicemail, facsimile, printers and all software applications. In addition, it provided all the necessary switches, firewalls,[3] routers and telephones. Semperon's services were critical to keeping the trial team connected and functioning while working from these satellite offices.

All of the questioned invoices relate to the development, implementation and support of the network described above. Because the Semperon charges were properly charged to the Debtors' estate, we respectfully request reimbursement in full.

We accept K&E's response and have no objection to these expenses.

12.    In our initial report, we noted a total of $129,242.70 paid to Aquipt, Inc., for equipment rental. Included in this amount were $3,453.00 in overnight delivery charges and $17,024.00 for the services of an on-site technician. In response to our inquiry, K&E provided a list of equipment rented from Aquipt, which list we have included as Response Exhibit "5," and, in addition, provided the following information:

Aquipt is a litigation technology service provider, providing law firms with computer and audio visual technology and services for war rooms and courtrooms. K&E does not maintain a stock of excess equipment for remote trials, particularly a trial the size of the Grace criminal trial. Aquipt rented to K&E, for the use of the entire joint defense, all the technological equipment needed for all three satellite locations . . . . K&E has a long-standing and high rental-volume relationship with Aquipt and passes on to the client the most competitive prices available.[4]

With regard to overnight delivery charges, the majority of computer equipment was delivered via ground transportation in January. K&E incurred

---

[3]Firewalls ensuring client confidentiality were a particularly important component of Semperon's services in the criminal trial, given that there were six separate law firms with six distinct clients functioning out of the satellite offices.

[4]K&E's discount on Aquipt's standard rental fee ranges from 15% to 40%, depending on the item rented.

overnight delivery charges only when equipment broke down and a replacement was needed the next day. If equipment and/or supplies were not needed on an emergency basis, K&E used ground transportation to get replacements.  As to the on-site technician, Aquipt technicians did assist with the set-up and breakdown of all of its equipment.  The Aquipt technicians are specifically trained to install and set up Aquipt's particular equipment.  Once installation and configuration was complete, K&E technical services team members Derek Bremer and Alun Harris-John could, and did, troubleshoot the Aquipt equipment (along with the many other technical services functions they performed, described above).  An Aquipt technician returned only to take down the equipment once trial ended.[5]

We accept K&E's response and have no objection to these expenses.

13.     In our initial report, we noted charges totaling $358,058.99 paid to Allegra Print & Imaging

for outside copying and binding services.  In addition, we noted that included in the above

amount was a charge for $142,018.40, dated February 16, 2009, for binders and tabs.[6]  In

response to our inquiry, K&E provided the itemized invoices for the $142,018.40 charge,

which invoices we reviewed, and in addition, responded as follows:

Allegra handled all of the overflow copying and scanning work for the entire joint defense for the trial.  Once the trial began, there was so much heavy-duty copying and scanning to be done so quickly that it could not have been completed in-house even if K&E had the equipment to do so at the remote trial offices. Allegra's pre-trial projects included, for example, the preparation of multiple tabbed, indexed hard copy binders and electronic scanned copies of several Government experts' prior testimony.  Numerous attorneys not only needed copies of this testimony, but also needed to be able to search across all of the transcripts.  In order to accomplish this, Allegra also had the transcripts scanned and loaded into the Concordance database.  In addition, during trial, the Government continued to produce documents to the defense; some of these productions were hard copy and some electronic.  K&E would receive the materials and had an agreement with the Department of Justice to make copies available to the other defense firms.  The making of the necessary copy sets often made for huge copying/binding projects.  In addition, as K&E and the rest of the joint defense firms prepared for cross

---

[5]For security reasons, Aquipt technicians are not allowed access to data.  They were there strictly to install and configure hardware.

[6]This was in addition to $14,461.22 in custom tabs purchased by K&E from another vendor.

examination of a given Government witness, K&E would create a "vault" set of the work product generated for that witness.  This was so that numerous attorneys could utilize the work product for their particular cross-examination needs while keeping one "mint" set of materials.  These materials were often full of color highlighting, the copying of which is much more expensive than non-color copying, and often required hand time for the vendors (for such tasks as matching colored tape flags on the originals and copy set, etc.).  After the trial, K&E did return a number of tabs and binders to Allegra, and is expecting to receive a credit from Allegra, which will show up in a future fee application as soon as the amount is credited to K&E.

With regard to the $142,018.40 charge, this charge was actually a combined charge for 33 separate invoices.  K&E's Billing Department consolidated them and described them on the Fee Application as "Allegra Print & Imaging - Outside Copy/Binding Services, Binders and Tabs, 2/16/09") because they all had the same date and description . . . .   These invoices are for copy jobs which happened to include binders and tabs, not just for binders and tabs.  We recognize that the description we provided in the Fee Application did not make this completely clear, and we will try to make expenses such as this more transparent on future fee applications.

We accept K&E's response and have no objection to these expenses.

14.    In our initial report, we noted charges totaling $21,857.50 for magnetic court boards.  In

response to our inquiry on this issue, K&E provided the following information:

. . . [R]egarding the magnetic boards, defense team trial attorneys, in particular David Bernick, used them as visual tools in order to explain and simplify for the jury such complex concepts as particular epidemiological evidence and the progression of relevant federal regulation.  While the defense made use of a good number of electronic presentation materials, they also found more traditional trial boards to be very useful in terms of helping jurors be able to form a picture in their minds of the timeline of the case.  The boards served to provide more permanent (as compared to electronic exhibits), highly visible demonstratives and served   as visual reinforcement of key defense themes.  During David's courtroom presentations, he presented the factual defense case in a story fashion that progressed along the case timeline; as he would reach a pre-determined part of the story, he would peel off a blank white magnet attached to the storyboard to reveal the next part of the visual story.  He would continue this process until the complete story had been told.  David has found these magnetic boards, used in this manner, to have a great impact on juries and used them throughout the defense's court presentations.  Because of the custom nature of the boards, in that they are all specifically related to the factual and scientific issues related to the Libby mine, they are not useable by other K&E clients.

We accept K&E's response and have no objection to these expenses.

15.    In our initial report, we noted the following air fare charges for which more information was

needed:

| 1/15/2009 | 1,800.00 | Barbara Harding, Airfare, Missoula, MT, 01/19/09 to 01/23/09 |
| 3/18/2009 | 1,562.46 | Morgan Rohrhofer, Airfare, Spokane, WA / Washington, DC, 03/18/09 to 03/19/09 (Deposition Preparation) |
| 3/18/2009 | 1,712.46 | Brian Stansbury, Airfare, Spokane, WA / Washington, DC, 03/18/09 to 03/19/09 (Deposition Preparation) |
| 3/18/2009 | 1,298.40 | Timothy Fitzsimmons, Airfare, Spokane, WA / Washington, DC, 03/18/09 to 03/20/09 (Deposition Preparation) |
| 3/18/2009 | 1,782.91 | Karen Lee, Airfare, Spokane, WA / Washington, DC, 03/18/09 to 03/20/09 (Attend Deposition) |
| 3/21/2009 | 1,585.70 | Brian Stansbury, Airfare, Houston, TX / Washington, DC, 03/21/09 to 03/25/09 (Expert Witness Conference) |
| 2/4/2009 | 1,493.20 | Tyler Mace, Airfare, Boston, MA 02/04/09 to 02/04/09 (Conference) |
| 2/15/2009 | 1,885.88 | Barbara Harding, Airfare, Missoula, MT, 02/15/09 to 02/27/09 (Trial) |
| 2/28/2009 | 1,893.96 | Barbara Harding, Airfare, Missoula, MT, 02/28/09 to 03/04/09 (Trial) |
| 3/4/2009 | 2,017.90 | Walter Lancaster, Airfare, Missoula, MT, 03/04/09 to 03/07/09 (Trial) |
| 3/5/2009 | 1,622.40 | Karen Lee, Airfare, Missoula, MT, 03/05/09 to 03/08/09 (Trial) |
| 3/11/2009 | 1,774.87 | Scott McMillin, Airfare, Missoula, MT, 03/07/09 to 03/12/09 (Trial) |
| 3/11/2009 | 1,653.37 | Scott McMillin, Airfare, Missoula, MT 03/22/09 to 03/26/09 (Trial) |

| | | |
|---|---|---|
| 3/12/2009 | 1,713.10 | Peter Farrell, Airfare, Missoula, MT 03/12/09 to 03/14/09 (Trial) |

In response to our inquiry, K&E provided additional information concerning these charges, which information we have included as Response Exhibit "6." In addition, K&E responded that "each of these airfares was booked at the lowest available coach rate . . ." Thus, we accept K&E's response and have no objection to these expenses.

16.     In our initial report, we noted an unusually large cab fare charge for which more information was needed:

| | | |
|---|---|---|
| 2/20/2009 | 464.25 | David Bernick, Cabfare, Missoula, MT, 02/20/09 (Trial) |

In response to our inquiry, K&E provided the following information: "A review of the expense receipt shows that this charge resulted from excess wait time, with Mr. Bernick ultimately not using the car that day, and K&E agrees to reduce the charge to the Debtors' estate to zero." We appreciate K&E's response and recommend a reduction of $464.25 in expenses.

17.     In our initial report, we noted the following meal charge which appeared slightly excessive:

| | | |
|---|---|---|
| 3/30/2009 | 140.45 | Brian Stansbury, Travel Meal with Others, San Francisco, CA, 03/30/09 (Expert Witness Conference), Dinner for 2 people |

It appears to us that one can dine satisfactorily in San Francisco for $55 per person. In response to our inquiry, K&E provided the following information:

> The Initial Report identifies one travel meal charge, for $140.45, incurred by Brian Stansbury for a March 30, 2009 dinner for two people on a trip to an expert conference in San Francisco. Since the per-person meal cost for this charge exceeds the $55 recommended allowance, K&E agrees that reimbursement for this charge should be reduced by $30.45 to bring the expense down to the $110.00 allowable amount.

We appreciate K&E's response and recommend a reduction of $30.45 in expenses.

### CONCLUSION

18.     In summary, we recommend approval of $10,198,760.20 in fees ($11,105,186.50 minus

$906,426.30[7]) and $2,964,767.50 in expenses ($2,965,262.20 minus $494.70) for K&E's

services for the Application Period.

Respectfully submitted,

**WARREN H. SMITH & ASSOCIATES, P.C.**

By: _____

Warren H. Smith
Texas State Bar No. 18757050

Republic Center
325 N. St. Paul Street, Suite 1250
Dallas, Texas  75201
214-698-3868
214-722-0081 (fax)
whsmith@whsmithlaw.com

**FEE AUDITOR**

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served by First Class United States mail to the attached service list on this 15th day of September, 2009.

_____

Warren H. Smith

---

[7] See paragraph 3, above.

**FEE AUDITOR'S FINAL REPORT** - Page 15
wrg FR KE 32Q 1-3.09.wpd

# SERVICE LIST
## Notice Parties

**The Applicant**
Deanna Boll
David M. Bernick, P.C.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

dboll@kirkland.com
dbernick@kirkland.com

**The Debtor**
William Sparks
W.R. Grace & Co.
7500 Grace Drive
Columbia, MD 21044
william.sparks@grace.com

**Counsel for the Debtors**
James H.M. Sprayregen, Esq.
Kirkland & Ellis
200 East Randolph Drive
Chicago, IL 60601

Laura Davis Jones, Esq.
James R. O'Neill
Pachulski, Stang, Ziehl & Jones LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705

**Counsel for the Official Committee of Unsecured Creditors**
Lewis Kruger, Esq
Stroock & Stroock & Lavan
180 Maiden Lane
New York, NY 10038-4982

Michael R. Lastowski, Esq.
Duane Morris LLP
1100 N. Market Street, Suite 1200
Wilmington, De 19801-1246

**Counsel to the Official Committee of Property Damage Claimants**
Scott L. Baena, Esq
Bilzin, Sumberg, Dunn, Baena, Price & Axelrod
First Union Financial Center
200 South Biscayne Boulevard, Suite 2500
Miami, FL 33131

Michael B. Joseph, Esq.
Ferry & Joseph, P.A.
824 Market Street, Suite 904
P.O. Box 1351
Wilmington, DE 19899

**Counsel to the Official Committee of Personal Injury Claimants**
Elihu Inselbuch, Esq.
Caplin & Drysdale
375 Park Avenue, 35th Floor
New York, NY 10152-3500

Marla R. Eskin
Campbell & Levine, LLC
Suite 300
800 N. King Street
Wilmington, DE  19801

**Official Committee of Equity Holders**
Gary M. Becker
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10036

**United States Trustee**
David Klauder
Office of the United States Trustee
844 King Street, Suite 2311
Wilmington, DE 19801

## EXHIBIT "A"

### K&E Personnel in Montana for the Criminal Trial

**Partners**
Ellen Ahern
David Bernick, P.C.
Barbara Harding
Walter Lancaster
Scott McMillin
Brian Stansbury
Laurence Urgenson

**Associates**
Heather Bloom
Peter Farrell
James Golden
Patrick King
Rebecca Koch
Lauren Kozak
Karen Lee
Tyler Mace
Derek Muller

**Legal Assistants**
Megan Brown
Timothy Fitzsimmons
Khalid Osman
Carlos Padilla
Natalya Palma
Daniel Rooney
Terrell Stansbury

**Project Assistants**
Mike Kilgariff
Jared Voskuhl
Sarah Whitney
Ian Young

**Case Assistants**
Shawn Olender
Morgan Rohrhofer

**Technical Services**
Derek Bremer
Marvin Gibbons
Alun Harris-John
Aaron Rutell
Carmelo Soto

**Non-Billing**
Christine Baker
Jan Blair
Sandra Fiore
Vanessa Higareda
Joan Moore
Sharon Morris

## EXHIBIT "B"

### Technical Services

| | | | | |
|---|---|---|---|---|
| 1/5/2009 | Marvin R Gibbons, Jr. | 2.50 | 575.00 | Address issues re remote trial office logistics. |
| 1/5/2009 | Daniel T Rooney | 2.00 | 500.00 | ...............; make logistical arrangements for joint defense team trial site (2.0). |
| 1/6/2009 | Marvin R Gibbons, Jr. | 3.50 | 805.00 | Coordinate set up of trial office for six law firms involving 80-person joint defense team at remote location. |
| 1/7/2009 | Marvin R Gibbons, Jr. | 2.00 | 460.00 | Perform data management functions for server for use at remote trial office. |
| 1/9/2009 | Marvin R Gibbons, Jr. | 8.00 | 1,840.00 | Coordinate set up of trial office for six law firms involving 80-person joint defense team at remote location. |
| 1/10/2009 | Marvin R Gibbons, Jr. | 4.00 | 920.00 | Coordinate set up of trial office for six law firms involving 80-person joint defense team at remote location. |
| 1/11/2009 | Marvin R Gibbons, Jr. | 3.00 | 690.00 | Coordinate set up of trial office for six law firms involving 80-person joint defense team at remote location. |
| 1/11/2009 | Aaron Rutell | 6.50 | 1,235.00 | Set up technology for trial site. |
| 1/12/2009 | Marvin R Gibbons, Jr. | 11.00 | 2,530.00 | Coordinate set up of trial office for six law firms involving 80-person joint defense team at remote location. |
| 1/12/2009 | Carmelo A Soto | 6.50 | 1,560.00 | Support servers and create networks for six firm trial site. |
| 1/12/2009 | Aaron Rutell | 11.00 | 2,090.00 | Wire and organize trial site for computers, phone support and other data processes. |
| 1/12/2009 | Alun Harris-John | 3.50 | 770.00 | Wire and organize trial site for computers, phone support and other data processes. |

| 1/13/2009 | Marvin R Gibbons, Jr. | 8.00 | 1,840.00 | Coordinate set up of trial office for six law firms involving 80-person joint defense team at remote location. |
| 1/13/2009 | Carmelo A Soto | 7.50 | 1,800.00 | Support servers and create networks for six firm trial site. |
| 1/13/2009 | Aaron Rutell | 12.50 | 2,375.00 | Wire and organize trial site for computers, phone support and other data processes. |
| 1/13/2009 | Alun Harris-John | 7.00 | 1,540.00 | Wire and organize trial site for computers, phone support and other data processes. |
| 1/14/2009 | Marvin R Gibbons, Jr. | 10.00 | 2,300.00 | Coordinate set up of trial office for six law firms involving 80-person joint defense team at remote location. |
| 1/14/2009 | Carmelo A Soto | 9.00 | 2,160.00 | Support servers and create networks for six firm trial site. |
| 1/14/2009 | Aaron Rutell | 9.50 | 1,805.00 | Wire and organize trial site for computers, phone support and other data processes. |
| 1/14/2009 | Alun Harris-John | 10.00 | 2,200.00 | Wire and organize trial site for computers, phone support and other data processes. |
| 1/15/2009 | Marvin R Gibbons, Jr. | 9.00 | 2,070.00 | Coordinate set up of trial office for six law firms involving 80-person joint defense team at remote location. |
| 1/15/2009 | Carmelo A Soto | 8.50 | 2,040.00 | Support servers and create networks for six firm trial site. |
| 1/15/2009 | Aaron Rutell | 9.00 | 1,710.00 | Support servers and assist with individual computer network operations. |
| 1/15/2009 | Alun Harris-John | 10.00 | 2,200.00 | Support servers and assist with individual computer network operations. |
| 1/16/2009 | Marvin R Gibbons, Jr. | 8.50 | 1,955.00 | Coordinate set up of trial office for six law firms at remote location. |
| 1/16/2009 | Carmelo A Soto | 8.00 | 1,920.00 | Support servers and create networks for six firm trial site. |

| 1/16/2009 | Aaron Rutell | 8.50 | 1,615.00 | Support servers and assist with individual computer network operations. |
| 1/16/2009 | Alun Harris-John | 10.50 | 2,310.00 | Support servers and assist with individual computer network operations. |
| 1/17/2009 | Marvin R Gibbons, Jr. | 9.00 | 2,070.00 | Coordinate set up of trial office for six law firms at remote location. |
| 1/17/2009 | Carmelo A Soto | 9.00 | 2,160.00 | Support servers and create networks for six firm trial site. |
| 1/17/2009 | Aaron Rutell | 8.50 | 1,520.00 | Support servers and assist with individual computer network operations. |
| 1/17/2009 | Alun Harris-John | 9.30 | 2,046.00 | Support servers and assist with individual computer network operations. |
| 1/18/2009 | Marvin R Gibbons, Jr. | 14.00 | 3,220.00 | Coordinate set up of trial office for six law firms at remote location. |
| 1/18/2009 | Carmelo A Soto | 12.00 | 2,880.00 | Support servers and create networks for six firm trial site. |
| 1/18/2009 | Aaron Rutell | 14.00 | 2,660.00 | Support servers and assist with individual computer network operations. |
| 1/18/2009 | Alun Harris-John | 11.00 | 2,420.00 | Support servers and assist with individual computer network operations. |
| 1/19/2009 | Marvin R Gibbons, Jr. | 10.00 | 2,300.00 | Coordinate set up of trial office for six law firms at remote location, and support servers, networks, and individuals on-site. |
| 1/19/2009 | Carmelo A Soto | 10.00 | 2,400.00 | Support servers and create networks for six firm trial site. |
| 1/19/2009 | Aaron Rutell | 10.50 | 1,995.00 | Support servers and assist with individual computer network operations. |
| 1/19/2009 | Derek J Bremer | 15.80 | 3,792.00 | Support servers and assist with individual computer network operations. |

| 1/19/2009 | Alun Harris-John | 16.80 | 3,696.00 | Support servers and assist with individual computer network operations. |
| 1/20/2009 | Marvin R Gibbons, Jr. | 13.00 | 2,990.00 | Coordinate set up of trial office for six law firms at remote location, and support servers, networks, and individuals on-site. |
| 1/20/2009 | Carmelo A Soto | 12.00 | 2,880.00 | Support servers and assist with individual computer network operations. |
| 1/20/2009 | Aaron Rutell | 12.50 | 2,375.00 | Support six-firm servers and individual networks. |
| 1/20/2009 | Derek J Bremer | 13.50 | 3,240.00 | Support servers and assist with individual computer network operations. |
| 1/20/2009 | Alun Harris-John | 13.50 | 2,970.00 | Support servers and assist with individual computer network operations. |
| 1/21/2009 | Marvin R Gibbons, Jr. | 11.50 | 2,645.00 | Coordinate set up of trial office for six law firms at remote location, and support servers, networks, and individuals on-site. |
| 1/21/2009 | Carmelo A Soto | 10.00 | 2,400.00 | Support servers and assist with individual computer network operations. |
| 1/21/2009 | Aaron Rutell | 10.00 | 1,900.00 | Support six-firm servers and individual networks. |
| 1/21/2009 | Derek J Bremer | 14.00 | 3,360.00 | Create firewall system for joint defense team. |
| 1/21/2009 | Alun Harris-John | 14.00 | 3,080.00 | Create firewall system for joint defense team. |
| 1/22/2009 | Marvin R Gibbons, Jr. | 10.50 | 2,415.00 | Coordinate set up of trial office for six law firms at remote location, and support servers, networks, and individuals on-site. |
| 1/22/2009 | Carmelo A Soto | 9.00 | 2,160.00 | Support servers and assist with individual computer network operations. |
| 1/22/2009 | Aaron Rutell | 9.00 | 1,710.00 | Support six-firm servers and individual networks. |
| 1/22/2009 | Derek J Bremer | 12.50 | 3,000.00 | Create firewall system for joint defense team. |

| 1/22/2009 | Alun Harris-John | 12.50 | 2,750.00 | Work on firewall system and troubleshoot server issues. |
| 1/23/2009 | Marvin R Gibbons, Jr. | 8.50 | 1,955.00 | Work on six separate firewalls so firms can operate independently. |
| 1/23/2009 | Carmelo A Soto | 3.00 | 720.00 | Support servers and assist with individual computer network operations. |
| 1/23/2009 | Aaron Rutell | 8.50 | 1,615.00 | Set up and maintain technology at trial site. |
| 1/23/2009 | Derek J Bremer | 9.50 | 2,280.00 | Troubleshoot networking problems and individual access issues. |
| 1/23/2009 | Alun Harris-John | 9.50 | 2,090.00 | Support six-firm servers and individual networks. |
| 1/24/2009 | Marvin R Gibbons, Jr. | 2.20 | 506.00 | Perform data management for server going to remote trial office. |
| 1/24/2009 | Aaron Rutell | 9.80 | 1,862.00 | Support six-firm servers and individual networks. |
| 1/24/2009 | Derek J Bremer | 7.00 | 1,680.00 | Support six-firm servers and individual networks. |
| 1/24/2009 | Alun Harris-John | 7.00 | 1,540.00 | Support six-firm servers and individual networks. |
| 1/25/2009 | Derek J Bremer | 7.00 | 1,680.00 | Support six-firm servers and individual networks. |
| 1/25/2009 | Alun Harris-John | 7.00 | 1,540.00 | Support six-firm servers and individual networks. |
| 1/26/2009 | Derek J Bremer | 8.00 | 1,920.00 | Support six-firm servers and individual networks. |
| 1/26/2009 | Alun Harris-John | 9.00 | 1,980.00 | Support six-firm servers and individual networks. |
| 1/27/2009 | Alun Harris-John | 9.50 | 2,090.00 | Support six-firm servers and individual networks. |

| 1/28/2009 | Derek J Bremer | 10.50 | 2,520.00 | Support six-firm servers and individual networks. |
| 1/28/2009 | Alun Harris-John | 9.50 | 2,090.00 | Support six-firm servers and individual networks. |
| 1/29/2009 | Aaron Rutell | 9.30 | 1,767.00 | Support six-firm servers and individual networks. |
| 1/29/2009 | Derek J Bremer | 10.30 | 2,472.00 | Support six-firm servers and individual networks. |
| 1/29/2009 | Alun Harris-John | 8.00 | 1,760.00 | Support six-firm servers and individual networks. |
| 1/30/2009 | Aaron Rutell | 9.00 | 1,710.00 | Support six-firm servers and individual networks. |
| 1/30/2009 | Derek J Bremer | 9.00 | 2,160.00 | Support six-firm servers and individual networks. |
| 1/30/2009 | Alun Harris-John | 3.50 | 770.00 | Support six-firm servers and individual networks. |
| 1/31/2009 | Marvin R Gibbons, Jr. | 0.50 | 115.00 | Perform remote data management for server going to trial office. |
| 1/31/2009 | Aaron Rutell | 7.00 | 1,330.00 | Support six-firm servers and individual networks. |
| 1/31/2009 | Derek J Bremer | 7.00 | 1,680.00 | Support six-firm servers and individual networks. |
| 2/1/2009 | Marvin R Gibbons, Jr. | 3.00 | 705.00 | Coordinate setup and support for trial office for all joint defense law firms involving 80-person joint defense team in Missoula, MT. |
| 2/1/2009 | Aaron Rutell | 3.00 | 570.00 | Support servers and networks for all six legal defense firms. |
| 2/1/2009 | Derek J Bremer | 7.00 | 1,680.00 | Support six-firm servers and individual networks. |

| | | | | |
|---|---|---|---|---|
| 2/2/2009 | Aaron Rutell | 9.50 | 1,805.00 | Provide technical support to all users across six-firm joint defense (6.5); perform maintenance on networks (3.0). |
| 2/2/2009 | Derek J Bremer | 10.00 | 2,400.00 | Support six-firm servers and individual networks. |
| 2/2/2009 | Alun Harris-John | 10.00 | 2,200.00 | Support six firm servers and individual computer networks and provide assistance to users with technical issues. |
| 2/3/2009 | Marvin R Gibbons, Jr. | 9.00 | 2,115.00 | Provide support to all defense team networks and individual servers. |
| 2/3/2009 | Aaron Rutell | 9.50 | 1,805.00 | Support six firm servers and individual networks. |
| 2/3/2009 | Derek J Bremer | 10.50 | 2,520.00 | Support six firm servers and individual networks. |
| 2/3/2009 | Alun Harris-John | 10.50 | 2,310.00 | Support six firm servers and individual computer networks and provide technical assistance to users. |
| 2/4/2009 | Marvin R Gibbons, Jr. | 8.00 | 1,880.00 | Perform data management for servers for all joint defense firms at trial. |
| 2/4/2009 | Aaron Rutell | 8.50 | 1,615.00 | Support six firm servers and individual networks. |
| 2/4/2009 | Alun Harris-John | 9.50 | 2,090.00 | Support all joint defense firm servers and networks and assist users with issues re same. |
| 2/5/2009 | Marvin R Gibbons, Jr. | 9.50 | 2,232.50 | Assist technicians from all joint defense teams with network connections (6.5); troubleshoot connectivity issues (3.0). |
| 2/5/2009 | Aaron Rutell | 9.00 | 1,710.00 | Perform maintenance checks and conduct routine maintenance on six-firm network and individual servers (6.1); support servers and networks (2.9). |
| 2/5/2009 | Derek J Bremer | 9.50 | 2,280.00 | Support all joint defense firm servers and individual networks. |

| | | | | |
|---|---|---|---|---|
| 2/5/2009 | Alun Harris-John | 9.50 | 2,090.00 | Support all joint defense firm servers and networks. |
| 2/6/2009 | Marvin R Gibbons, Jr. | 8.00 | 1,880.00 | Complete distribution of computer equipment and hardware at trial site (1.5); assist with network connectivity issues (3.0); provide support to all defense team networks and servers (3.5). |
| 2/6/2009 | Aaron Rutell | 8.50 | 1,615.00 | Support six firm servers and individual computer networks. |
| 2/6/2009 | Alun Harris-John | 9.50 | 2,090.00 | Support six firm servers and individual networks and troubleshoot issues with same. |
| 2/7/2009 | Marvin R Gibbons, Jr. | 5.50 | 1,292.50 | Assist technicians from all defense teams with network and server connectivity issues. |
| 2/7/2009 | Aaron Rutell | 5.50 | 1,045.00 | Support all defense team servers and networks and assist users with technical issues. |
| 2/7/2009 | Derek J Bremer | 7.00 | 1,680.00 | Support six defense team servers and individual networks. |
| 2/7/2009 | Alun Harris-John | 5.00 | 1,100.00 | Support six firm servers and individual networks. |
| 2/9/2009 | Marvin R Gibbons, Jr. | 9.00 | 2,115.00 | Provide support to all defense firms with network, server connectivity and other technical issues. |
| 2/9/2009 | Aaron Rutell | 9.50 | 1,805.00 | Support users from all joint defense firms re server and network issues. |
| 2/9/2009 | Derek J Bremer | 10.00 | 2,400.00 | Support users from all joint defense firms re server and network issues. |
| 2/9/2009 | Alun Harris-John | 10.50 | 2,310.00 | Support six firm servers and individual computer networks and provide assistance to users with technical issues. |
| 2/10/2009 | Marvin R Gibbons, Jr. | 11.00 | 2,585.00 | Provide support to all defense firms with network, server connectivity and other technical issues. |

| 2/10/2009 | Aaron Rutell | 11.50 | 2,185.00 | Support users from all joint defense firms re server and network issues. |
| 2/10/2009 | Derek J Bremer | 11.50 | 2,760.00 | Support users from all joint defense firms re server and network issues. |
| 2/10/2009 | Alun Harris-John | 12.00 | 2,640.00 | Support six firm servers and individual computer networks and provide assistance to users with technical issues. |
| 2/11/2009 | Marvin R Gibbons, Jr. | 10.00 | 2,350.00 | Assist technicians from all joint defense teams with various technical issues (2.1); address issues re connectivity of all defense teams to network (4.6); assist with technical issues as they arise (3.3). |
| 2/11/2009 | Aaron Rutell | 12.00 | 2,280.00 | Support servers and individual networks for all defense firms. |
| 2/11/2009 | Derek J Bremer | 13.00 | 3,120.00 | Support six firm servers and individual networks and troubleshoot issues re same. |
| 2/11/2009 | Alun Harris-John | 12.00 | 2,640.00 | Support six firm servers and individual computer networks. |
| 2/12/2009 | Aaron Rutell | 13.00 | 2,470.00 | Provide support to all defense team networks and servers. |
| 2/12/2009 | Derek J Bremer | 13.00 | 3,120.00 | Support six firm networks and individual servers and assist users with issues re same. |
| 2/12/2009 | Alun Harris-John | 13.00 | 2,860.00 | Support six firm servers and individual computer networks and assist individual users with technical issues re same. |
| 2/13/2009 | Marvin R Gibbons, Jr. | 9.50 | 2,232.50 | Assist all defense teams with network server and connectivity issues. |
| 2/13/2009 | Aaron Rutell | 10.50 | 1,995.00 | Provide support to all defense team networks and servers. |
| 2/13/2009 | Alun Harris-John | 10.50 | 2,310.00 | Support all joint defense firm servers and individual networks. |

| 2/14/2009 | Marvin R Gibbons, Jr. | 1.00 | 235.00 | Provide support to all defense team networks and servers. |
| 2/14/2009 | Aaron Rutell | 12.00 | 2,280.00 | Provide support to all defense team networks and servers. |
| 2/14/2009 | Derek J Bremer | 9.00 | 2,160.00 | Provide support to all defense team networks and servers. |
| 2/14/2009 | Alun Harris-John | 9.50 | 2,090.00 | Support six firm servers and individual computer networks. |
| 2/15/2009 | Aaron Rutell | 10.50 | 1,995.00 | Provide support to all defense team networks and servers. |
| 2/15/2009 | Derek J Bremer | 11.50 | 2,760.00 | Provide support to all defense team firms re networks, servers and other technology issues. |
| 2/16/2009 | Marvin R Gibbons, Jr. | 2.00 | 470.00 | Provide support to all defense team networks and servers. |
| 2/16/2009 | Aaron Rutell | 12.00 | 2,280.00 | Provide support to all defense team networks and servers. |
| 2/16/2009 | Derek J Bremer | 12.50 | 3,000.00 | Provide support to all defense team networks and servers. |
| 2/17/2009 | Aaron Rutell | 12.50 | 2,375.00 | Support six firm servers and individual networks. |
| 2/17/2009 | Derek J Bremer | 14.00 | 3,360.00 | Support six firm servers and individual networks. |
| 2/17/2009 | Alun Harris-John | 13.30 | 2,926.00 | Provide support for six firm servers and individual computer networks. |
| 2/18/2009 | Aaron Rutell | 12.50 | 2,375.00 | Provide technical support to individual uses from all joint defense firms (8.0); perform network and server maintenance (4.5). |
| 2/18/2009 | Derek J Bremer | 18.50 | 4,440.00 | Support six-firm servers and individual networks, assisting K&E and defense attorneys with technology issues. |

| 2/18/2009 | Alun Harris-John | 18.50 | 4,070.00 | Provide support for six firm servers and individual computer networks. |
| 2/21/2009 | Derek J Bremer | 11.50 | 2,760.00 | Support six-firm servers and individual networks, assisting all defense attorneys with technical issues during court and non-court hours. |
| 2/22/2009 | Alun Harris-John | 17.00 | 3,740.00 | Provide support for six firm servers and individual computer networks. |
| 2/23/2009 | Derek J Bremer | 18.50 | 4,440.00 | Support six-firm servers and individual networks, assisting all defense attorneys with technical issues during court and non-court hours. |
| 2/23/2009 | Alun Harris-John | 18.80 | 4,136.00 | Provide support for six firm servers and individual computer networks. |
| 2/24/2009 | Marvin R Gibbons, Jr. | 1.00 | 235.00 | Supervise support of trial networks and servers. |
| 2/24/2009 | Aaron Rutell | 9.00 | 1,710.00 | Provide technical support to all joint defense firm and individual users. |
| 2/24/2009 | Derek J Bremer | 18.30 | 4,392.00 | Support six-firm servers and individual networks, assisting all defense attorneys with technical issues during court and non-court hours. |
| 2/25/2009 | Aaron Rutell | 11.80 | 2,242.00 | Support all defense team users re technical/network/server issues and perform maintenance on data and servers for trial. |
| 2/25/2009 | Derek J Bremer | 16.30 | 3,912.00 | Support six-firm servers and individual networks, assisting all defense attorneys with technical issues during court and non-court hours. |
| 2/25/2009 | Alun Harris-John | 20.80 | 4,576.00 | Provide support for six firm servers and individual computer networks. |

| | | | | |
|---|---|---|---|---|
| 2/26/2009 | Aaron Rutell | 10.50 | 1,995.00 | Support all defense team users re technical/network/server issues and perform maintenance on data and servers for trial. |
| 2/26/2009 | Derek J Bremer | 12.00 | 2,880.00 | Support six-firm servers and individual networks, assisting all defense attorneys with technical issues during court and non-court hours. |
| 2/26/2009 | Alun Harris-John | 12.00 | 2,640.00 | Provide support for six firm servers and individual computer networks. |
| 2/27/2009 | Aaron Rutell | 11.00 | 2,090.00 | Provide on-site support for six firm servers and individual networks and assist users with various issues re same. |
| 2/27/2009 | Alun Harris-John | 10.50 | 2,310.00 | Provide on-site support for six firm servers and individual networks. |
| 2/28/2009 | Aaron Rutell | 11.50 | 2,185.00 | Support all joint defense firm servers and individual networks and assist users with issues re same. |
| 2/28/2009 | Derek J Bremer | 15.50 | 3,720.00 | Support all joint defense firm services and individual networks and assist users with issues re same. |
| 2/28/2009 | Alun Harris-John | 9.50 | 2,090.00 | Support all defense team servers and individual networks. |
| 3/1/2009 | Aaron Rutell | 11.50 | 2,185.00 | Address daily issues re technology matters at trial offices (provide user support), monitor condition of network and ensure optimal utilization of servers. |
| 3/1/2009 | Derek J Bremer | 13.30 | 3,192.00 | Support six-firm servers and individual networks and assist K&E and joint defense attorneys with technology issues (assist attorneys with exhibits, databases and other technology needs during court and non-court hours). |
| 3/1/2009 | Alun Harris-John | 14.50 | 3,190.00 | Support six-firm servers and individual networks and assist K&E and joint defense |

| | | | | |
|---|---|---|---|---|
| | | | | attorneys with technology issues (assist attorneys with exhibits, databases and other technology needs during court and non-court hours). |
| 3/2/2009 | Aaron Rutell | 15.50 | 2,945.00 | Address daily issues re technology matters at trial offices, monitor condition of network, verify servers are running optimally, address wireless network issues, initiate wireless on attorneys' laptops and configure data map drives for incoming users. |
| 3/2/2009 | Derek J Bremer | 20.00 | 4,800.00 | Support six-firm servers and individual networks and assist defense teams with technology issues during court and non-court hours. |
| 3/2/2009 | Alun Harris-John | 16.30 | 3,586.00 | Support six-firm servers and individual networks and assist K&E and joint defense attorneys with technology issues during and after trial. |
| 3/3/2009 | Aaron Rutell | 13.00 | 2,470.00 | Provide support to defense team computer users, monitor condition of network, address wireless network issues, initiate wireless on laptops and configure data map drives for incoming users. |
| 3/3/2009 | Derek J Bremer | 12.00 | 2,880.00 | Support six-firm servers and individual networks and assist K&E and joint defense attorneys with technology issues during and after trial hours. |
| 3/3/2009 | Alun Harris-John | 18.50 | 4,070.00 | Support six-firm servers and individual networks and assist K&E and joint defense attorneys with technology issues during and after trial hours. |
| 3/4/2009 | Derek J Bremer | 13.80 | 3,312.00 | Support six-firm servers and individual networks and assist K&E and joint defense attorneys with technology issues during and after trial hours. |

| 3/4/2009 | Alun Harris-John | 11.50 | 2,530.00 | Support six-firm servers and individual networks and assist K&E and joint defense attorneys with technology issues during and after trial hours. |
| 3/5/2009 | Derek J Bremer | 7.00 | 1,680.00 | Support six-firm servers and individual networks and assist defense attorneys with exhibits, databases and other technology needs during court and non-court hours. |
| 3/5/2009 | Alun Harris-John | 8.00 | 1,760.00 | Support six-firm servers and individual networks and assist K&E and joint defense attorneys with exhibits, databases and other technology needs during court and non-court hours. |
| 3/6/2009 | Derek J Bremer | 8.00 | 1,920.00 | Support six-firm servers and individual networks and assist K&E and joint defense attorneys with exhibits, databases and other technology needs during court and non-court hours. |
| 3/6/2009 | Alun Harris-John | 9.00 | 1,980.00 | Support six-firm servers and individual networks and assist K&E and joint defense attorneys with technology issues during and after trial hours. |
| 3/7/2009 | Derek J Bremer | 8.80 | 2,112.00 | Support six-firm servers and individual networks and assist K&E and joint defense attorneys with technology issues during trial. |
| 3/7/2009 | Alun Harris-John | 7.00 | 1,540.00 | Support six-firm servers and individual networks and assist defense attorneys with exhibits, databases and other technology needs during court and non-court hours. |
| 3/8/2009 | Derek J Bremer | 13.00 | 3,120.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during and after trial hours. |
| 3/8/2009 | Alun Harris-John | 12.00 | 2,640.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during and after trial hours. |

| 3/9/2009 | Aaron Rutell | 13.00 | 2,470.00 | Address technology issues as they arise at trial offices, monitor condition of network, travel between court trial site and main trial site and configure data map drives for incoming users. |
|---|---|---|---|---|
| 3/9/2009 | Derek J Bremer | 18.00 | 4,320.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during and after trial (assist trial team with exhibits, databases and other technology needs during court and non-court hours). |
| 3/9/2009 | Alun Harris-John | 16.50 | 3,630.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during and after trial hours. |
| 3/10/2009 | Derek J Bremer | 16.80 | 4,032.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during and after trial hours. |
| 3/10/2009 | Alun Harris-John | 19.50 | 4,290.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during trial and non-trial hours. |
| 3/11/2009 | Aaron Rutell | 12.00 | 2,280.00 | Address technology issues as they arise at trial offices, monitor condition of network and address wireless network issues. |
| 3/11/2009 | Derek J Bremer | 13.00 | 3,120.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during trial. |
| 3/12/2009 | Aaron Rutell | 9.50 | 1,805.00 | Address daily issues re technology matters at trial offices, monitor condition of network, verify that servers run optimally and address wireless network issues. |
| 3/12/2009 | Alun Harris-John | 11.50 | 2,530.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during and after trial hours. |

| | | | | |
|---|---|---|---|---|
| 3/13/2009 | Derek J Bremer | 9.30 | 2,232.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during trial. |
| 3/13/2009 | Alun Harris-John | 10.00 | 2,200.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during and after trial hours. |
| 3/14/2009 | Derek J Bremer | 11.00 | 2,640.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/14/2009 | Alun Harris-John | 10.00 | 2,200.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during trial. |
| 3/15/2009 | Derek J Bremer | 14.50 | 3,480.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues before, during and after trial. |
| 3/15/2009 | Alun Harris-John | 15.50 | 3,410.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/16/2009 | Derek J Bremer | 16.30 | 3,912.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues, before, during and after trial hours. |
| 3/17/2009 | Derek J Bremer | 15.00 | 3,600.00 | Support six-firm servers and individual networks and assist K&E and joint defense attorneys with technology issues during trial and non-trial hours. |
| 3/17/2009 | Alun Harris-John | 17.50 | 3,850.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during trial and non-trial hours. |
| 3/18/2009 | Derek J Bremer | 15.00 | 3,600.00 | Support six-firm servers and individual networks and assist defense attorneys with |

| Date | Name | Hours | Amount | Description |
|------|------|-------|--------|-------------|
| | | | | technology issues during trial and non-trial hours. |
| 3/18/2009 | Alun Harris-John | 18.00 | 3,960.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/19/2009 | Derek J Bremer | 11.30 | 2,712.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/19/2009 | Alun Harris-John | 12.00 | 2,640.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/20/2009 | Derek J Bremer | 11.50 | 2,760.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/20/2009 | Alun Harris-John | 12.00 | 2,640.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/21/2009 | Derek J Bremer | 4.50 | 1,080.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/21/2009 | Alun Harris-John | 7.00 | 1,540.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/22/2009 | Derek J Bremer | 11.30 | 2,712.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |

| | | | | |
|---|---|---|---|---|
| 3/22/2009 | Alun Harris-John | 13.00 | 2,860.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/23/2009 | Derek J Bremer | 16.50 | 3,960.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/23/2009 | Alun Harris-John | 17.00 | 3,740.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/24/2009 | Derek J Bremer | 16.50 | 3,960.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/24/2009 | Alun Harris-John | 17.50 | 3,850.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/25/2009 | Derek J Bremer | 7.00 | 1,680.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/25/2009 | Alun Harris-John | 16.00 | 3,520.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/26/2009 | Derek J Bremer | 11.80 | 2,832.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/26/2009 | Alun Harris-John | 11.50 | 2,530.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |

| 3/27/2009 | Derek J Bremer | 7.00 | 1,680.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/27/2009 | Alun Harris-John | 8.00 | 1,760.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues during court and non-court hours. |
| 3/28/2009 | Alun Harris-John | 7.00 | 1,540.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues. |
| 3/29/2009 | Alun Harris-John | 7.00 | 1,540.00 | Support six-firm servers and individual networks and assist defense attorneys with technology issues. |
| 3/30/2009 | Alun Harris-John | 11.00 | 2,420.00 | Support six-firm servers and individual networks and assist K&E and joint defense attorneys with technology issues, exhibits, databases and other technology needs during court and non-court hours. |

|  |  | 2,277.30 | $505,866.50 |  |

## EXHIBIT "C"

### Hearings Attended by Multiple Professionals

a.      We note that on January 14, 2009, K&E attorneys Rashad Evans ($470), Craig Bruens ($645), Christopher Greco ($415), Deanna Boll ($675), Janet Baer ($835), Lisa Esayian ($735), and Theodore Freedman ($915) attended a hearing on the ZAI matter.  The total time spent, including non-working travel time, was 41.40 hours, for total fees of $31,133.50.

| | | | | |
|---|---|---|---|---|
| 1/13/2009 | Janet S Baer | 1.80 | 1,503.00 | Review and assemble materials in preparation for 1/14 hearing. |
| 1/13/2009 | Theodore L Freedman | 3.50 | 3,202.50 | Prepare for January 14 hearing. |
| 1/14/2009 | Rashad W Evans | 4.10 | 1,927.00 | Attend hearing via telephone. |
| 1/14/2009 | Craig A Bruens | 4.30 | 2,773.50 | Review ZAI motion and notices for hearing preparation (.8); attend via telephone hearing re ZAI and confirmation case management order (3.5). |
| 1/14/2009 | Christopher T Greco | 4.50 | 1,867.50 | Attend hearing via telephone. |
| 1/14/2009 | Deanna D Boll | 0.70 | 472.50 | Participate in telephonic hearing with Court re ZAI class action and coordinate service and preparation of such documents with Rust Consulting. |
| 1/14/2009 | Janet S Baer | 6.50 | 5,427.50 | Confer with R. Finke and T. Freedman re CMO and Libby issues in preparation for hearing on same (1.5); participate in 1/14 hearing re all matters (5.0). |
| 1/14/2009 | Lisa G Esayian | 2.00 | 1,470.00 | Participate  telephonically in portions of hearing re disclosure statement and case management order. |
| 1/14/2009 | Theodore L Freedman | 6.50 | 5,947.50 | Prepare for and participate in hearing re ZAI, CMO and Libby (6.5);............. |

| 1/13/2009 | Janet S Baer | 1.50 | 1,252.50 | Travel from Chicago, IL to Pittsburgh, PA for hearing on ZAI, Libby discovery and plan CMO (billed at half time). |
|---|---|---|---|---|
| 1/13/2009 | Theodore L Freedman | 1.80 | 1,647.00 | Travel from New York, NY to Pittsburgh, PA for hearing (billed at half time). |
| 1/14/2009 | Janet S Baer | 2.50 | 2,087.50 | Return travel from Pittsburgh, PA to Chicago, IL after hearing (travel delays) (billed at half time). |
| 1/14/2009 | Theodore L Freedman | 1.70 | 1,555.50 | Return travel from Pittsburgh, PA to New York, NY after hearing (billed at half time). |
| | | 41.40 | $31,133.50 | |

b.    We note that on January 21-22, 2009, timekeepers Laurence Urgenson ($925), Scott McMillin ($645), Barbara Harding ($635), Ellen Ahern ($615), Tyler Mace ($535), James Golden ($465), and Khalid Osman ($240) attended a Daubert hearing in the Montana case.  The total time spent, including non-working travel time, was 130.90 hours for total fees of $78,101.00.

| 1/21/2009 | Khalid M Osman | 8.00 | 1,920.00 | .............; attend hearing and assist attorneys during hearing (8.0). |
|---|---|---|---|---|
| 1/21/2009 | Tyler D Mace | 16.70 | 8,934.50 | Prepare for and attend Daubert hearing in Missoula. |
| 1/21/2009 | James Golden | 4.20 | 1,953.00 | .............; attend hearing (4.2). |
| 1/21/2009 | Ellen T Ahern | 8.00 | 4,920.00 | .............; attend hearing, including witness examination (6.9); attend direct examination of witness (1.1);.......... |
| 1/21/2009 | Barbara M Harding | 7.00 | 4,445.00 | .........; attend hearing and confer with client and joint defense re same (7.0);............. |
| 1/21/2009 | Scott A McMillin | 8.00 | 5,160.00 | Participate in evidentiary hearing (8.0);............... |

| 1/21/2009 | Laurence A Urgenson | 8.20 | 7,585.00 | .......; attend pretrial conference before Judge Molloy (8.2). |
|---|---|---|---|---|
| 1/22/2009 | Khalid M Osman | 7.50 | 1,800.00 | .......; attend hearing and assist attorneys as needed (7.5);... |
| 1/22/2009 | Tyler D Mace | 5.30 | 2,835.50 | Attend Daubert hearing (5.3);............. |
| 1/22/2009 | James Golden | 3.50 | 1,627.50 | ............; attend hearing (3.5). |
| 1/22/2009 | Ellen T Ahern | 8.50 | 5,227.50 | Prepare for and participate in hearing (8.5);........ |
| 1/22/2009 | Barbara M Harding | 5.00 | 3,175.00 | .........; attend hearing, examine witness, argue motions and confer with counsel (5.0);............... |
| 1/22/2009 | Scott A McMillin | 5.50 | 3,547.50 | Participate in evidentiary hearing (5.5);....... |
| 1/22/2009 | Laurence A Urgenson | 5.00 | 4,625.00 | ..........; attend pretrial conference before Judge Molloy (5.0). |
| 1/19/2009 | Tyler D Mace | 3.50 | 1,872.50 | Travel to Missoula, MT from Washington, DC for hearing (billed at half time). |
| 1/19/2009 | James Golden | 2.00 | 930.00 | Travel to Missoula, MT for hearing (billed at half time). |
| 1/19/2009 | Ellen T Ahern | 4.00 | 2,460.00 | Travel to Missoula, MT for hearing (billed at half time). |
| 1/19/2009 | Scott A McMillin | 3.20 | 2,064.00 | Travel to Missoula, MT for hearings (billed at half time). |
| 1/19/2009 | Laurence A Urgenson | 3.50 | 3,237.50 | Travel from Washington, DC to Missoula, MT for pretrial hearing (billed at half time). |
| 1/22/2009 | Ellen T Ahern | 4.50 | 2,767.50 | Return travel from Missoula, MT to Chicago, IL following hearing (billed at half time). |
| 1/22/2009 | Barbara M Harding | 3.50 | 2,222.50 | Return travel from Missoula, MT to Washington, DC after hearing (billed at half time). |

| | | | | |
|---|---|---|---|---|
| 1/22/2009 | Scott A McMillin | 3.70 | 2,386.50 | Return travel from Missoula, MT to Chicago, IL (billed at half time). |
| 1/22/2009 | Laurence A Urgenson | 2.60 | 2,405.00 | Return travel from Missoula, MT to Washington, DC (billed at half time). |
| | | 130.90 | $78,101.00 | |

       c.      We note that on March 9, 2009, Theodore Freedman ($915), Lisa Esayian ($735), Deanna Boll ($675), Craig Bruens ($645), Marc Lewinstein ($470), Christopher Greco ($415), and Daniel Kelleher ($225) attended the disclosure statement hearing.  The total time spent, including non-working travel time, was 44.50 hours for $25,220.00 in fees.

| | | | | |
|---|---|---|---|---|
| 3/9/2009 | Craig A Bruens | 3.50 | 2,257.50 | Participate in disclosure statement hearing, including conferences with constituents before hearing (3.5);............ |
| 3/9/2009 | Christopher T Greco | 6.50 | 2,697.50 | Prepare for and attend disclosure statement hearing. |
| 3/9/2009 | Marc Lewinstein | 2.90 | 1,363.00 | Participate in disclosure statement hearing. |
| 3/9/2009 | Daniel Kelleher | 3.00 | 675.00 | .........; assist attorneys at hearing with in-court requests as needed (3.0);....... |
| 3/9/2009 | Deanna D Boll | 3.20 | 2,160.00 | Prepare for and attend disclosure statement hearing. |
| 3/9/2009 | Lisa G Esayian | 1.50 | 1,102.50 | Telephonically attend portions of Grace disclosure statement hearing re PD issues and insurance issues. |
| 3/9/2009 | Theodore L Freedman | 8.00 | 7,320.00 | Prepare for and participate in disclosure statement hearing. |
| 3/8/2009 | Craig A Bruens | 1.70 | 1,096.50 | Travel from New York, NY to Pittsburgh, PA for disclosure statement hearing (billed at half time). |

| | | | | |
|---|---|---|---|---|
| 3/8/2009 | Christopher T Greco | 2.30 | 954.50 | Travel from New York, NY to Pittsburgh, PA for disclosure statement hearing (billed at half time). |
| 3/8/2009 | Daniel Kelleher | 1.70 | 382.50 | Travel from New York, NY to Pittsburgh, PA for disclosure statement hearing (billed at half time). |
| 3/8/2009 | Deanna D Boll | 1.30 | 877.50 | Travel from Newark, NJ to Pittsburgh, PA for disclosure statement hearing (billed at half time). |
| 3/9/2009 | Craig A Bruens | 2.40 | 1,548.00 | Return travel to New York, NY from Pittsburgh, PA after disclosure statement hearing (flight delay) (billed at half time). |
| 3/9/2009 | Christopher T Greco | 2.70 | 1,120.50 | Return travel from Pittsburgh, PA to New York, NY after disclosure statement hearing (billed at half time). |
| 3/9/2009 | Daniel Kelleher | 2.00 | 450.00 | Return travel to New York, NY from Pittsburgh, PA after disclosure statement hearing (billed at half time). |
| 3/9/2009 | Deanna D Boll | 1.80 | 1,215.00 | Travel from Pittsburgh, PA to Newark, NJ after disclosure statement hearing (billed at half time). |
| | | 44.50 | $25,220.00 | |

## EXHIBIT "D"

## Joint Defense Conference

| 1/8/2009 | Terrell D Stansbury | 1.70 | 348.50 | .........; assist with joint defense conference (1.7);........ |
|---|---|---|---|---|
| 1/8/2009 | Khalid M Osman | 10.50 | 2,520.00 | Continue preparing joint defense materials (4.5); attend joint defense conference and oversee presentation slides (6.0);............. |
| 1/8/2009 | Tyler D Mace | 11.20 | 5,992.00 | Prepare for and attend joint defense conference re scientific defenses. |
| 1/8/2009 | Rebecca A Koch | 8.80 | 4,092.00 | Prepare for and attend joint defense conference (8.8);............. |
| 1/8/2009 | Brian T Stansbury | 5.50 | 3,025.00 | .....; participate in joint defense conference (5.5);.... |
| 1/8/2009 | Peter A Farrell | 8.40 | 3,612.00 | Participate in joint defense conference re strategy (6.3); confer with K&E team re preparation for same (2.1);............. |
| 1/8/2009 | Patrick J King | 9.50 | 3,562.50 | Confer with D. Bernick in preparation for joint defense presentation (.7); confer with K. Vanderport re graphics for same (1.5); confer with joint defense re case status and strategy (6.0); update and revise presentation re same for D. Bernick (1.3);................ |
| 1/8/2009 | David M Boutrous | 5.30 | 821.50 | ..............; prepare jury instruction materials for joint defense conference (1.0); assist attorneys as needed during joint defense conference (4.3). |
| 1/8/2009 | Karen F Lee | 10.50 | 3,360.00 | Prepare materials for joint defense team (3.1); confer with joint defense team (7.4). |
| 1/8/2009 | Ellen T Ahern | 12.00 | 7,380.00 | Prepare for and participate in joint defense science conference, including related follow up. |

| Date | Name | Hours | Amount | Description |
|---|---|---|---|---|
| 1/8/2009 | Walter R Lancaster | 6.90 | 5,175.00 | Attend science conference (6.9);........... |
| 1/8/2009 | Barbara M Harding | 12.50 | 7,937.50 | Prepare for conference (5.5); confer with joint defense (7.0);........... |
| 1/8/2009 | Laurence A Urgenson | 8.00 | 7,400.00 | Prepare for and participate in joint defense conference re science issues, document review, jury instructions, case status and strategy (8.0);........... |
| 1/6/2009 | Ellen T Ahern | 4.50 | 2,767.50 | Travel from Los Angeles, CA to Washington, DC for joint defense conference (numerous travel delays) (billed at half time). |
| 1/7/2009 | Ellen T Ahern | 2.20 | 1,353.00 | Travel from Chicago, IL to Washington, DC (continuation of Los Angeles flight) to participate in joint defense conference (travel delays) (billed at half time). |
| 1/8/2009 | Ellen T Ahern | 2.00 | 1,230.00 | Return travel from Washington, DC to Chicago, IL following joint defense conference (billed at half time). |
|  |  | 119.50 | $60,576.50 |  |

**RESPONSE EXHIBIT "1"**

**Criminal Trial Defense During First Quarter 2009 (¶ 3 and Exhibit "A")**

Paragraph 3 of the Initial Report requests more information regarding K&E's work on the defense involving the Montana criminal trial during the Fee Period, as well as a summary of the outcome of the criminal case.

On Exhibit 1- a, attached hereto, we provide a brief description of the respective roles and responsibilities of each member[8] of the K&E criminal defense team, as well as a summary of the "state of the defense" during the first quarter of 2009 -- a brief description of the manner in which the defense team organized the case, and a description of the major defense work being performed during the Fee Period.

Paragraph (b) below contains a summary of the outcome of the trial. In addition, while we have provided piecemeal summaries of the criminal matter's status in prior fee auditor responses, we thought it would be useful here to provide a broad overview of the matter, and we do so in Paragraph (a) below.

(a)    **Overview of the Criminal Matter**

In February 2005, the United States Department of Justice filed an eight-count indictment against Grace and seven of its former employees, charging that the defendants engaged in criminal conspiracy, obstruction of justice, and knowing endangerment, all in violation of federal law. The charges stemmed from Grace's operation of a vermiculite mine in Libby, Montana from 1963 to 1990. Specifically, the indictment charged that the defendants knowingly exposed the residents of the town of Libby to asbestos coming from the mine, causing the sickness or deaths of numerous Libby residents. Further, the indictment alleged that the defendants violated the Clean Air Act ("CAA") in a conspiracy to defraud the federal government (the "Government") by covering up their actions, and then obstructed the subsequent investigation.

In July 2006, after the District Court for the District of Montana dismissed several key counts of the indictment, the Government filed a superseding indictment that omitted the dismissed counts. Later that month, the District Court dismissed a portion of the conspiracy count of the superseding indictment, and, in August 2006, the District Court granted a motion by the defendants to exclude certain evidence. The Government appealed these and other rulings to the Ninth Circuit Court of Appeals. In September 2007, the Ninth Circuit overturned these District Court rulings. The defendants petitioned the Ninth Circuit for a rehearing, which was denied in December 2007, and,

---

[8]You ask about the roles of the 5 K&E defense team technical support personnel in both Exhibit "A" and in ¶ 4 of the Initial Report. To avoid confusion and duplication, we describe their roles only once here . . . (rather than on the attached Exhibit 1-a).

in April 2008, the defendants appealed to the U.S. Supreme Court.  On June 23, 2008, the Supreme Court denied *certiorari* in the appeal and remanded the case back to the District Court.  After that, despite a Court-approved mediation session, the two sides were unable to reach settlement, and jury selection was scheduled to begin on February 19, 2009, in the courtroom of Montana District Court Judge Donald Molloy.

The scope of the pretrial discovery and motion practice in this case was unprecedented in federal criminal litigation.  The Government produced over ten million pages of records held in the files of ten federal agencies.  Through motion practice in 2006, K&E was able to have much of the Government's scientific evidence excluded, which in turn forced the Government to take one of its three interlocutory appeals to the Ninth Circuit.  During pre-trial mediation, the Government, to settle the case, demanded that Grace pay a $1,000,000,000 fine, and that each of the individual defendants serve 24 months in prison.  Even if Grace could have paid a billion dollars to the Government, the proposed settlement would have both violated the agreed-upon terms of the plan of reorganization and severely jeopardized the Debtors' ability to emerge from bankruptcy at all.

After the completion of jury selection, the trial began with opening statements on February 23rd.[9]  The Government presented its case for eight weeks, after which the defense took three weeks to present its case.  Toward the end of the trial, the prosecution dropped charges against two of the remaining five individual defendants.  Of the remaining three, two faced up to fifteen years in prison and the other faced five years.

During the trial, the defense was able to highlight for the jury some of the evidentiary problems that the Government faced.  For example, because of the timing of the enactment of a particular CAA provision, the Government had to prove that the defendants knowingly endangered mine employees and residents of Libby after 1999, when the mine had already been closed (because earlier knowing endangerment was not relevant under the relevant CAA provision).  The defense was also able to explain to the jury that the statute of limitations required the Government to prove that laws were violated after 1999 (within five years of the 2005 indictment) even though Grace closed the mine years earlier.

What also became clear at trial was the fact that the defense team -- through exhaustive review of federal agency files -- had a greater command of the regulatory history of asbestos than did the Government's own prosecutorial team.  Several Government witnesses were confronted with

---

[9]The original indictment named 7 individual defendants.  During the pretrial period, 2 of those defendants succeeded in having their trials severed from the main trial.  One of those 2 passed away in 2007, with the other scheduled to have a separate trial after the main Grace trial ended.  When the Grace trial began in February, Grace was being tried along with 5 individual defendants.  Before trial ended, the Government dropped charges against 2 of the remaining 5, so that, ultimately, when the members of the jury received the case, the remaining defendants were Grace and 3 of the original individual defendants.  As discussed above, after the trial ended in acquittals, the Government dropped charges against the single remaining individual defendant.

thirty to forty-year-old agency records that were unknown to the prosecution.  The existence of these records was only discovered through the diligence of the defense team's pretrial preparation and review.  Such powerful impeachment material became a critical factor in negating the testimony of key Government witnesses.  In addition, the defense was able to discredit witness Robert Locke, a former Grace executive who testified that Grace executives knew that asbestos from the Libby mine was making people sick and that they actively worked to conceal that knowledge.  After his testimony, the defense was able to show that evidence turned over by the Government proved that Locke had grossly understated on the witness stand the frequency with which he had met with prosecutors.  K&E's cross examination of key Government expert Dr. Alan Whitehouse was another critical point in the trial, as certain of Dr. Whitehouse's admissions on cross caused the Court to strike major portions of his testimony.   In addition, because K&E was able to prevent the Government's asbestos sampling data from being entered into evidence, the Government failed to prove certain of its key factual allegations.

### b.    Outcome of the Trial

On May 8, 2009, in culmination of what the U.S. Attorney's Office in Montana described as one of the largest environmental criminal cases in U.S. history, the jury, after only two days of deliberation, returned a verdict of not guilty on all counts, acquitting Grace and all three of the remaining individual defendants of all charges.  In June, the Government dropped charges against the remaining individual defendant, closing the final chapter of the case.

**RESPONSE EXHIBIT "1-a"**

**CRIMINAL DEFENSE TEAM MEMBERS' ROLES AND RESPONSIBILITIES**[10]

*Formulation of the Defense*

K&E and the rest of the joint defense law firms organized Grace's defense by conceiving of it in three separate parts: the factual case, the expert case, and the defense of the substantive charges -- Clean Air Act (CAA)[11] charges, conspiracy charges, and obstruction of justice charges.

Developing the factual case required the creation of a detailed timeline of the facts of the case, including all relevant documents and anticipated witness testimony, for a time period beginning in the 1950s and continuing to the present time. The timeline was divided up into three main time periods: (a) from the 1950s (before Grace bought the Libby mine) through 1990 (when Grace shut down the mine); (b) from 1990 through 1999 (the mine dismantling and cleanup and sale of the mine properties); and (c) from 1999 to the present (Environmental Protection Agency ("EPA" involvement and cleanup). A different team of attorneys was responsible for each of these time periods, as well as for the development of the related portion of the factual case.

*Work Being Done During the Fee Period*

When the Fee Period began on January 1st, the trial was seven weeks away, and the K&E defense team was beginning its immediate pre-trial preparations. The team was working on two different major projects: (1) the master trial outline, and (2) cross examination outlines and key documents for all potential Government witnesses. The team was also working with David Bernick to prepare his opening statement.

The master trial outline was a massive project assigned to the whole team by David Bernick in the Fall of 2008, and represented K&E's theory of how to try the case. It was a representation of how the defense expected to try every aspect of the case -- the precise manner and order in which the defense prepared to conduct the trial. Each defense team attorney drafted, revised, and updated his or her individual portions of the outline, as determined by that attorney's functional defense responsibilities. Large portions of the outline were chronological and followed the division of the

---

[10]In order to facilitate understanding of the defense team and the team's reporting relationships, we have organized this Exhibit by team, first with the two lead defense attorneys (Bernick and Urgenson) at the top, and then followed by each of the four trial teams -- led by Mace, McMillin, Harding, and Lancaster.

[11]All defined terms used in this Exhibit have the meanings set forth for those terms in the Fee Response.

overall timeline into three key time periods. The cross examination project was another massive project being worked on by the whole team during the Fee Period. In November/December of 2008, the Government had provided the defense with a list of some 160 potential prosecution witnesses that could be called during trial. K&E had to make its best collective guess as to which witnesses the Government would actually call, and then put preparation for those witnesses at the top of the priority list. The defense could not ignore those witnesses it thought less likely to appear at trial, since there was no way to be certain in what direction the Government would go. So, leading up to the trial, the defense needed to prepare -- to varying degrees depending on how high a particular witness placed on the priority list -- for cross examinations of all of the potential Government witnesses.

Once trial began, the Government's case unfolded each day in court, the defense had to react and alter its direction accordingly, and the work allocation among defense team members became more fluid by necessity. After the prosecution's opening statement, K&E rearranged the priority of a number of witnesses, and the defense team had to reprioritize its efforts accordingly. This reprioritizing and change of direction went on constantly throughout trial. Toward the end of each week in court, the Government would disclose its witness list for the following week, and at that point, the defense would focus on preparing for cross examinations of those next week's witnesses. With each new witness list, K&E also needed to coordinate with the joint defense on allocation of the resulting new work. In addition, the defense team would have to prepare motions seeking to limit portions of testimony or exhibits expected to be offered. These motions often had to be drafted on extremely short notice because the Government gave very little advance notice of documents and evidence it intended to present. Simultaneously, the defense team needed to revise and modify the master trial outline so that it included responses to each point made by the prosecution. With the disclosure of each new week's list of Government witnesses, K&E also needed to negotiate with the joint defense on work allocation. During the course of the trial, K&E attorneys often met with David Bernick very early in the morning to go over that day's coming cross examination(s). Usually David would request various revisions to the cross materials, and the team attorneys would literally run to the Main Street Office, have the changes made, and again run the revised materials to court.[12]


## ATTORNEY TEAM

### Lead Defense Attorneys -- Bernick and Urgenson

Chicago litigation partner **David Bernick**, as you know, was the lead trial lawyer on the criminal case. For the majority of the pre-trial period, he led the team from his Chicago and New York offices, but in the weeks immediately before the start of trial, he came to Montana to transition

---

[12]As discussed in the Fee Response, Judge Molloy required electronic copies of all demonstratives and exhibits. Defense team attorneys worked with Etrial to have all the materials prepared and ready for court.

into the trial leadership role and to get fully enmeshed in the day-to-day pre-trial activities of the defense team. David came to Missoula for the pre-trial hearings in January, and then returned to Missoula in mid-February. He functioned as both Grace's lead trial lawyer and head of the K&E defense team throughout the course of the trial. Once trial started, David was in the courtroom virtually every day. After trial each day, he convened a meeting of his top lieutenants, discussed the day's events and their significance, and handed out each team's assignments for the following day. David presented the opening and closing arguments, handled all of the major expert direct and cross examinations during trial, cross-examined the Government's key whistle-blower witness, and performed virtually all of the arguments on behalf of the joint defense.

D.C. litigation partner **Lawrence Urgenson** led K&E's defense team through the end of the pre-trial period. As we have described in prior fee responses, Larry had shepherded the case from before the indictment was handed down (from, in fact, the time Grace received the first subpoena, in 2004). A former Assistant U.S. Attorney with a vast knowledge of criminal law and extensive experience trying criminal cases, Larry's specialized criminal law knowledge was a necessary complement to David. As the trial date grew closer, Larry worked with David to fully integrate him into the day-to-day trial preparations and get David up to speed. After the first week of trial, Larry left Montana and worked on defense matters as needed from K&E's D.C. office.

Larry, followed by David, led four teams of attorneys, headed by, respectively, Tyler Mace, Scott McMillin, Barbara Harding, and Walter Lancaster.

### Tyler Mace's Team -- Factual Defense (1950s - 1990), Case Management, Brief-Writing

Then-litigation associate (now partner) **Tyler Mace**, based in Washington, D.C., headed up the team of associates Patrick King, Peter Farrell, and Rebecca Koch. Tyler went to Missoula on February 10th and remained for the duration of the trial. His team bore responsibility for the majority of the brief- and motion- writing, as well as factual development of the case for the 1950s to 1990 time period. In addition, Tyler managed discovery, case management activities, and communications with the joint defense on a day-to-day basis for both Larry and David. Tyler was charged with coordinating with the Government on discovery issues, ensuring that assigned tasks got performed in the time allotted, and making sure that the entire joint defense functioned in a coordinated manner.

D.C. litigation associate **Patrick King** reported to Tyler and was responsible for the 1970s through 1980s portion of the master timeline and related factual development. Patrick went to Missoula in mid-February and remained through the duration of the trial. Patrick spent a good deal of time researching and drafting factual modules and brief portions related to the defense of the conspiracy to defraud charge and, later, prosecutorial misconduct issues. He also assisted with pre-trial document review and analysis of the Government's productions, and worked to generate a post-1999 document chronology related to key EPA response events for the endangerment and obstruction portions of the case. He was charged with generating the factual defense regarding numerous issues, including the Government's knowledge of employee health conditions, the study of asbestos regulatory history, and Grace's industrial hygiene policies. At trial, Patrick was

primarily responsible for generating witness outlines and document packages in each of these areas, and helping the trial attorneys prepare for cross examinations. He also worked with Etrial to create hundreds of graphics and demonstratives for trial use.

D.C. litigation associate **Peter Farrell** also reported to Tyler, and was also at the trial site for essentially the entire Fee Period. Peter was the primary legal researcher and lead brief writer for the K&E trial team, and, in many instances, all of the joint defense firms. He spent considerable time in January researching, developing and drafting the trial brief as well as several discovery motions. Generally, David would give direction to Tyler and/or Peter about a brief or motion to be filed, and Peter would prepare the first draft, after which Tyler and Scott McMillin would each review and finalize the brief or motion for filing. Peter also spent a large amount of time drafting and revising the defense's proposed jury instructions and related documents. During trial, he researched and drafted several dozen motions and briefs, which were often filed on a daily basis.[13] He was also part of the team that developed, researched, and drafted motions related to the prosecutorial misconduct issues that arose during trial. Finally, he coordinated and drafted the defense's Rule 29 motion (seeking judgment in favor of the defense).

The third member of Tyler Mace's team was D.C. litigation associate **Rebecca Koch**, who also remained at the trial site for the duration of the Fee Period. Her area of responsibility was factual development for the 1950s through 1970s time period. Like all defense team associates, Rebecca was responsible for portions of the trial outline related to her assigned timeline period. In particular, Rebecca took the lead with respect to plant and mine improvements over time designed to improve health and safety at the mine. She dealt with all documents and witnesses relating to health and safety improvements.

### Scott McMillin's Team -- Science Defense (50% of Expert Work); Factual Defense (1990s - Forward) (Cleanup Defense)

Chicago litigation partner **Scott McMillin** led the team of Ellen Ahern, James Golden, and Derek Muller, with part-time assistance from Karen Lee (who was also on Barbara Harding's team). Scott and D.C. litigation partner Barbara Harding shared responsibility for the science/expert defense, with each taking half the expert-related work. Scott's responsibilities included development of the defense regarding epidemiology, risk assessment, sampling data and techniques, industrial hygiene, and geology. In addition, Scott and his team were responsible for developing the factual defense for the 1990s to the present. Scott was in Missoula for the January *Daubert* hearings, and then returned in mid-February. Once trial began, Scott was in court almost every day.

Chicago litigation partner **Ellen Ahern** reported to Scott, and worked with him on expert issues related to industrial hygiene and risk assessment. In the factual development arena, she

---

[13]These frequent motions and briefs were necessary because the judge would not allow any argument in front of the jury; thus, any argument in support of an objection had to be set out in a written brief.

focused on product labeling and compliance with state and federal product labeling regulations. She also worked directly with David preparing him to cross witnesses dealing with labeling and industrial hygiene. She, too, remained in Montana once trial began. Chicago litigation associate **Derek Muller** was at the trial site from mid-February until the end of March, and reported to Ellen and Scott. Derek was responsible for post-1999 factual development relating to the arrival of the EPA and the EPA's subsequent activities in Libby. He also worked with Scott on geological expert witnesses. As did all of the defense team associates, Derek reviewed thousands of documents produced by the Government over the months immediately preceding trial, flagging key documents and assigning categories to each. He also researched law for motions to dismiss, motions to exclude evidence, motions to strike witnesses, motions to limit testimony, motions concerning expert testimony, and motions relating to prosecutorial misconduct. Finally, he created slides and presentation materials for opening statement and witness testimony.

Chicago litigation associate **James Golden** was primarily responsible for mastery and development of the facts of the case for the 1990 to 1999 timeframe relating to the shutdown and cleanup of the mine, mill, export and screening facilities, as well as the subsequent marketing and sale of those properties. He drafted factual outlines relating to these issues, and prepared related materials for fact witnesses who worked on the closure and sale of the facilities. In addition, he helped David and Scott prepare for several of the most important EPA witnesses in the case, including Paul Peronard and Aubrey Miller. James also had primary responsibility for drafting portions of several briefs related to his area of responsibility. Like all the other defense team associates, James also assisted with the review of millions of pages of Government documents produced right before the trial began.

D.C. litigation associate **Karen Lee** worked on both Scott McMillin's and Barbara Harding's teams. Her responsibilities are described below under Barb's team description.

***Barbara Harding's Team -- Science Defense (50% of Expert Work: Physicians and Epidemiology), Victim Witnesses***

D.C. litigation partner **Barbara Harding** led the team responsible for the other half of the science/expert case -- physician and epidemiology expert work. Barb and her team were also responsible for victim-witness matters. Barb cross-examined the majority of the victim-witnesses called by the Government, as well as physician expert Dr. Teitelbaum. She worked closely with David to prepare to cross-examine Dr. Whitehouse and other Government physician experts. Barb was at the trial site from mid-February until mid-March, by which time most of the physician witnesses and victim-witnesses had testified. Upon completion of the portion of the case, she returned to D.C. to re-join the Grace bankruptcy team, focusing on preparation of response to objections to the plan of reorganization.[14]

---

[14]There was a significant reduction in the trial team once the trial got underway and opening statements were complete. The DC associate team (Tyler, Peter and Patrick) stayed throughout the end of the trial, while the "health effects" team of Barb, Brian and Karen left Missoula in

Reporting to Barb was D.C. litigation partner **Brian Stansbury**, who had primary responsibility for the development of Grace's medical defense -- primary responsibility for all physician experts. Brian, assisted by D.C. litigation associates Karen Lee and Heather Bloom, prepared direct and cross examinations of medical experts expected to be called by both the Government and the defense, including Dr. Whitehouse. Brian was at the trial site from mid-February through March 9th. Brian had primary responsibility for preparing the cross examination outlines for approximately forty victim-witnesses who would testify, in part, about their exposures to asbestos and the medical conditions that they allegedly developed as a result of these exposures. From March 9th until the end of trial, Brian assisted (from D.C.) as needed to prepare for the cross examinations of Drs. Lockey, Miller, Teitelbaum, and various victim-witnesses. Brian also traveled to Montana on a few occasions to prepare a Montana pulmonologist for a potential direct examination. In addition, Brian prepared a Stanford Medical School pulmonologist for potential direct examination.

D.C. litigation associate **Karen Lee** was a member of both Scott's and Barb's teams. She reported to Scott with respect to her work preparing direct and cross examinations on risk assessment issues, and to Brian on her work on physician expert issues. Karen spent less time at the trial site than she did in Libby, where most of the victim-witnesses lived and which is the location of the Center for Asbestos-Related Disease ("CARD") medical clinic. Under Brian's direction, Karen, assisted by case assistant Morgan Rohrhofer, went to the CARD clinic to collect medical records and x-rays on all of the people who participated in Dr. Whitehouse's asbestos exposure studies. She conducted the review while ensuring that it was done in accordance with the protective order relating to medical files. After conducting the review, Karen came to Missoula to help prepare trial exhibits and cross examination packages using the obtained medical records. (The records were mainly used in cross examinations of victim-witnesses.) From Missoula, Karen also supervised Morgan's continuing CARD clinic work (see below for further detail on Morgan's CARD clinic responsibilities).

D.C. litigation associate **Heather Bloom** also reported to Brian, and was in Missoula from mid-February until mid-March. She assisted Brian with his physician expert responsibilities by helping prepare for cross examinations of Dr. Whitehouse, Dr. Miller, and numerous victim-witnesses. She reviewed and gathered key documents for exhibits and assisted with developing cross outlines for these witnesses. Heather created trial modules for many of the patients Dr. Whitehouse was expected to discuss at trial. She also conducted document reviews of thousands of Government documents produced during the 4th quarter of 2008 - 1st quarter of 2009 period. In addition, Heather researched certain criminal procedure issues, and, later in the trial, issues relating to prosecutorial misconduct.

_____

mid-March, though Barb and Brian came back for a week during the defense's presentation of its case in chief.

*Walter Lancaster's Team --Obstruction of Justice  Defense/Factual Defense 1999 - Forward*

Los Angeles litigation partner **Walter Lancaster** was responsible for preparing the defense to the obstruction of justice charges.  In addition, he had primary responsibility for developing the cross examinations of two of the Government's chief expert/fact witnesses (witnesses whose testimony addressed all of the Government's charges).  He also worked on factual development of the case for the period from 1999-on with regard to the Government's obstruction of justice charges.  While Scott focused on the EPA's scientific investigation and the cleanup of Libby, Walter focused on Grace's conduct in response to the investigation (the response that the Government alleged amounted to obstruction of justice).  During trial, Walter was in the courtroom virtually 100% of the time, and he was the lead trial attorney on all of Grace's arguments related to the obstruction of justice charges.

Reporting to Walter was Los Angeles litigation associate **Lauren Kozak**.  Lauren did not travel to Missoula at all and instead supported Walter from the Los Angeles office.  She spent many hours conducting reviews of the many thousands of documents the Government produced between the latter part of 2008 and the early part of this year.  Under Walter's direction, Lauren also conducted legal research, which was used in Grace's trial brief and in its motion for acquittal, in support of dismissal of the obstruction of justice charges as a matter of law.  She also interviewed witnesses from the Montana Department of Environmental Quality and drafted witness interview outlines to help Walter prepare for key expert witness interviews.


## SUPPORT TEAM: LEGAL ASSISTANTS, PROJECT ASSISTANTS, AND CASE ASSISTANTS

As discussed in the Fee Response, preparing for and defending the Grace criminal case required 24-hour-a-day support, and the support team needed to work in twelve-hour shifts.[15]  To this end, K&E sent two support teams to Missoula -- a Chicago-based team led by Chicago legal assistant **Dan Rooney**, and a D.C.-based team led by D.C. legal assistant **Khalid Osman**.

Dan's team consisted of Chicago-based legal assistants **Megan Brown** and project assistants **Mike Kilgariff, Sarah Whitney, Jared Voskuhl, and Ian Young,** while Khalid's D.C. support team included legal assistants **Carlos Padilla, Terrell Stansbury**, and **Natalya Palma**; and case assistants **Morgan Rohrhofer** and **Shawn Olender**.  Legal assistant analyst **Tim Fitzsimmons** functioned in a distinct role described below.  Morgan, while on Khalid's team and functioning in a team role at the trial site, had a discrete role involving medical records review, which is further described below.

---

[15]The support needs of the defense team lessened somewhat by the third week of the trial or so, and the D.C. support team generally left Missoula by mid-March.

Dan and Khalid participated in attorney strategy meetings and worked in conjunction with the support teams of the other joint defense firms in the preparation of witness files and other materials to be used in court. They prepared and organized documents and information utilized by the ETrial team in the preparation of graphic evidence, and supervised and worked with their respective teams in doing the same. The support staff in Missoula worked as a team to support the defense attorneys; there is no way to distinguish what each particular legal, project, or case assistant did at the trial site since so many of their responsibilities were overlapping. The support team members were working as much as were the attorneys; hundred-hour weeks were common leading up to the trial, and at no time were there unused support staff sitting idle while waiting to be assigned tasks. Some of the many duties assigned the support team were: assisting with such tasks as preparing and organizing direct and cross examination packages; reviewing and marking physical documents as trial exhibits, converting physical files to electronic format for incorporation into the electronic trial presentation system; organizing witness-specific document packages for attorney review; and responding to requests for documents and information from the courtroom attorney team.

The volume of this type of work required during the Fee Period was enormous, and all of the project assistants pitched in to help with these enumerated tasks as well as any other requests that arose. It cannot be over-emphasized that during much of the Fee Period, especially during the weeks immediately before trial and the first several weeks of trial, the entire defense team was working at full capacity. Every time a new Government witness was disclosed or new Government documents were turned over to the defense, the team had to digest the information, divide up responsibilities with respect to that witness or that document, incorporate the relevant materials into the trial outline and witness examination packages, and adjust trial strategy as needed. Each member of the support team did whatever tasks were required to keep the trial team prepared and ready.

In addition to assisting with the support team work described above, Chicago legal assistant **Megan Brown**, once trial began, was in court every day tracking exhibits to distinguish between which were admitted as evidence and which were not. When the attorney team needed some information or documentation from the support team, Megan would generally be the person to liaison with the Main Street Office and coordinate getting the materials or information to the courthouse.

D.C. legal assistant analyst **Dr. Timothy Fitzsimmons**, who holds a PhD in biomedical sciences, was a legal assistant analyst member of the defense team. His responsibilities in Missoula remained consistent with his responsibilities throughout the case: he served as scientific advisor to the defense attorneys, analyzing expert witness foundational documents, helping the attorneys and legal assistants with the scientific aspects of direct and cross examination preparations, and, as trial commenced, assisting the trial team with understanding and incorporating various complex scientific and medical testimony into the relevant cross and direction examination preparations.

Case assistant **Morgan Rohrhofer** spent relatively little time at the trial site; her significant Montana time was spent at the Libby CARD clinic assisting with the medical records review described under Karen Lee's description above. Under Karen's and ultimately Brian's supervision,

and both with Karen and after Karen had returned to the trial site, Morgan was charged with ensuring that all needed medical records were copied/scanned, organized and indexed for trial use and that full records were obtained for all of the victim-witnesses.

## TECHNICAL SERVICES

**Derek Bremer, Marvin Gibbons, Alun Harris-John, Aaron Rutell, and Carmelo Soto**

See (Response Exhibit "2") . . . for a description of the technical support team members' defense team roles and responsibilities.

## NON-BILLING

The Fee Report requests descriptions of the defense team responsibilities of six K&E secretaries:  D.C.-based **Christine Baker**, Chicago-based **Jan Blair**, New York-based **Sandra Fiore**, D.C.-based **Vanessa Higareda**, D.C.-based **Joan Moore**, and Chicago-based **Sharon Morris**.  These six came to Missoula on an as-needed basis, and their individual and joint responsibilities are described below, together with the amount of time each spent in Missoula during the Fee Period.

The secretaries who were asked to go to the trial for an extended period were chosen because they had prior experience on trials and understood that their lives during their time in Missoula would be dedicated essentially 100% to the trial.  All of the secretaries on the Missoula team were experienced "trial secretaries" except for Sandra Fiore, who is David Bernick's New York-based secretary and has the most experience with supporting David directly.  Jan Blair is both a veteran trial secretary and works directly with Scott McMillin.  She headed the Missoula secretarial team.  When a secretary assists during a trial, while there can be a generalized role for a particular secretary, each secretary is there to do whatever administrative tasks are needed at any given time. They work as a team, and their responsibilities are often more organizational and administrative than purely secretarial.

### Secretarial Team and Individual Secretarial Responsibilities

The secretarial team supported all of the joint defense firms; all-told, there were an average of eighty defense team personnel in Missoula at any given time as the trial was getting underway. During the trial and during the immediate pre-trial period, the Reserve Street Office was generally staffed with secretarial coverage from 7:00 a.m. until midnight, though coverage went longer if needed on a given day.  It was also staffed on the weekends whenever needed.  The Main Street Office had secretarial coverage from 7:00 a.m. until 5:30 p.m. on weekdays.

Jan Blair functioned as the office manager of both office sites.  She was also responsible for handling any issues relating to either of the two Missoula hotels at which defense team members

stayed.  She remained in Missoula for the entire Fee Period.  She was also charged with catering and beverage supply arrangements and coordinating mail and delivery service.  In addition, she dealt with the office cleaning staff, handled office building issues, made hotel and travel arrangements, and prepared expense reports for attorneys and paralegals.  She also ordered and stocked office supplies and groceries for the team.  In addition, in order to keep costs down, the team used a limited number of rental cars, and Jan as well as the other secretaries were typically asked periodically throughout the day to drive defense team members between the two offices, drive documents to court, and transport people to and from their hotels and to and from the airport.

Sharon Morris and Sandra Fiore were the secretaries supporting David Bernick directly.  Sharon was in Missoula from mid-February through the first week of March, when Sandra arrived and took over.  Each was there to work primarily for David, but also assisted everyone as the need arose.  Each helped Jan Blair daily with Jan's many tasks enumerated above.  Christine Baker and Vanessa Higareda both came to Missoula primarily to assist the D.C.-based K&E defense team members.  Vanessa was there for several weeks in February and came back in mid-March.  Christine arrived at the end of February and stayed through March.  Once the health effects attorney team went back to D.C., Christine and Vanessa traded off weeks in Missoula, again assisting Jan Blair with her many duties as well as helping everyone in the office as needed.  Joan Moore came to the Daubert hearings in January and then returned in mid-February and stayed through March.  Joan worked primarily in the Main Street Office, providing secretarial assistance to all staff using that office, keeping the copy/printing machines filled and working properly, running documents to and from court, keeping the break-out room at court organized, stocking the refrigerator, and coordinating breakfast and lunch catering for the Main Street office.  After 5:30 pm each day, she came to the main Reserve Street office to assist with the evening work.

### Billing

Per K&E's non-billable personnel policy, a secretary only billed Grace if she worked more than seven hours on a workday.  The average hourly overtime rate for the six secretaries who assisted the defense team was approximately $44.

**RESPONSE EXHIBIT "2"**

**K&E Technical Services Personnel Support at Criminal Trial**

Paragraph 4 of the Initial Report requests greater explanation concerning technical support provided by five K&E information technology (IT) services personnel during the criminal trial, and inquires whether K&E compared expected costs of providing "in-house" IT support against projected costs of hiring a third-party vendor.

The time entries for the five IT personnel listed on Exhibit "B" to the Initial Report represent two separate teams performing two separate functions: the trial setup team, and the trial technology services team.  We describe each of these teams below.

(a)    **Trial Setup Team**

With full approval from Grace, K&E shouldered the responsibility for all of the technology needs for all six defense firms in the case.  The trial setup team headed to Missoula in January 2009 in order to prepare the two remote trial offices ahead of the defense team's arrival.

There were two temporary satellite offices K&E set up in Missoula, Montana to prepare for the criminal trial.  Both of these offices were for use by K&E as well as the rest of the joint defense law firms.  The first office was an approximately 5,300 square foot site located a block from the courthouse, typically staffed by ten people at any given time during the Fee Period (the "Downtown Office").  The Downtown Office was used for preparation work and meetings immediately before and after Court, for preparation of materials that needed to be completed and brought to the courthouse during court hours, and for daily working lunches for joint defense and K&E trial team members.  There was also the main office location, located further away from the downtown Missoula area, which consisted of approximately 24,000 square feet of office space plus an additional approximate 16,000 square feet of useable storage space (the "Reserve Street Office"). The Reserve Street Office was used by as many as 80 individuals on the defense team, and was the building closest to the courthouse that contained enough functional space for the defense team's larger overall needs.

The trial setup team was headed by K&E trial setup coordinator Marvin Gibbons, assisted by Chicago trial technology assistant Aaron Rutell, New York senior trial support specialist Carmelo Soto, Chicago trial technology specialist Alun Harris-John, and, during the latter part of January, Chicago technology specialist Derek Bremer.  With six firms all on separate firewalled networks, the wiring and logistics requirements were immense, and, in fact, the Grace criminal trial was one of the most complex trial setups K&E has ever done.  Marvin was in Missoula for five weeks, from early January through mid-February.  He left once setup was complete and the trial was about to commence.  Carmelo was only in Missoula for ten days, during the "crunch" trial setup time in mid-January.  The setup included such tasks as wiring both sites for computers and telephones, setting up all servers, and ensuring that every work station in both offices could plug into the network.

Marvin Gibbons' role as trial setup coordinator can best be described as a "working project manager." He managed all technical matters relating to the trial. He, along with senior legal assistant Dan Rooney, traveled to Montana ahead of anyone else in order to find appropriate office locations. They looked at office space all over Missoula before choosing the Reserve Street Office and the Main Street Office to house the defense team offices. In order to choose appropriate sites, Marvin had to evaluate all the relevant features of potential office space, including such matters as a building's security, its technical capabilities, power sources, the internal network wiring, and the configuration of Internet circuits. Once Dan and Marvin found suitable space, Marvin recommended to the entire joint defense team how to utilize the space to accommodate the personnel, the furniture, the computer and other equipment, and the wiring needed. He made all arrangements with the rest of the joint defense firms concerning their own technical needs. Several days before the rest of the setup team's arrival, Marvin and Dan went back to Missoula to coordinate with local vendors and the village of Missoula about the defense team's arrival. They attended to logistical issues such as procuring permits necessary to allow delivery trucks in and out of the Main Street Office, arranging for garbage pickup, and the like.

Marvin's role as working project manager meant that he also performed the required labor (along with other members of this team). The Grace trial setup required many man hours and a working site manager to keep everyone on schedule so that no one was waiting for a phase of installation or configuration to be completed before the next set of tasks could be performed. One indication of the size and scope of the Grace defense trial team setup is the fact that when the Grace criminal defense team had set up in Missoula, it became the largest law firm in the State of Montana.

Once the equipment and furniture started being delivered, Marvin managed and coordinated the efforts of K&E's trial setup team, technicians from Semperon (see Paragraph 8), and technicians from Aquipt, Inc. (see Paragraph 9), as each group set up its respective equipment and furniture. Part of the K&E setup team began deploying all equipment (computers, printers, monitors, phones, etc.) and furniture, while others began the process of pulling, labeling, and testing of network cables to all office spaces that were not already configured for computer usage. Then Semperon technicians arrived and began installing network equipment -- network switches, routers, firewalls, etc. Once all of these items were cross-connected and turned on, the software configuration process began, and, upon completion of that process, hardware testing and configuration began. Because of the fact of the shared space (by all six defense firms), each work location had to be double-tested to ensure that it was correctly wired and configured for the appropriate law firm. K&E does not have the internal resources to develop a specialized network such as the one Semperon developed; however K&E's technical services personnel coordinated efforts with the Semperon technicians once certain processes were in place. After the trial commenced, K&E IT personnel took care of basic trouble-shooting and any other support issues that arose with respect to the Semperon network. Essentially, Semperon technicians did the "soft" configurations, and K&E's setup team did the hardware configurations and testing.

**(b)    Trial Technology Services Team**

As setup of the remote trial offices wound down in late January, Marvin Gibbons and Carmelo Soto left Missoula, and Alun Harris-John, Derek Bremer and Aaron Rutell stayed on as the trial technology services team. Alun and Derek supported the teams with software-related issues, while Aaron Rutell focused on network and hardware issues.

As to software issues, the defense team needed an IT professional on site throughout the entire trial. Alun or Derek would be in either the courtroom or at the Main Street Office (or back and forth, depending on the needs on a particular day) to support defense team members with any of the myriad of technical issues that arose, and the other person would be stationed at the Reserve Street Office to provide as-needed technological support to the people working there. In addition, the Reserve Street Office had a room full of servers for all six of the joint defense law firms. Either Derek or Alun was charged with maintenance and upkeep of these servers on a daily basis.

Aaron Rutell was there to monitor, modify, and support the network and hardware of both trial sites. He also supplied on-site support to all of the joint defense teams with regard to their own equipment, meaning that when technical issues arose, Aaron would work with the remote support personnel of the various joint defense law firms to address whatever technical issues those firms' trial site people were having. Hardware and software modifications were needed on a near daily basis in order to keep the extremely complicated network running without any down time.

You specifically ask whether, particularly with respect to days on which IT personnel billed a large number of hours, some of that time was spent "on call" waiting for defense team members to need technical assistance. IT personnel did not bill time waiting to be called. They billed a large number of hours (sometimes as many as 20) on days when technical emergencies arose and they had to stay until the emergencies got resolved, and where general technical services were being undertaken. When there was no technical assistance being given, the IT personnel did not bill time to Grace. Many K&E defense team members called Derek, Alun or Aaron at least once a day with issues ranging from a broken laptop to a network issue to assistance preparing a trial exhibit (sometimes all at once). IT personnel performed such diverse tasks as maintaining the enormous number of trial databases, assisting users when network problems arose, and maintaining and repairing the rented Aquipt computer equipment described in Paragraph 9 below.

### (c)    K&E Technology Services Compared to Third-Party Vendors

K&E does not believe it would have been possible for a third-party vendor to provide the IT services performed by K&E's IT personnel in Missoula, and so it did not compare expected costs of internal versus external IT services. Just the amount of startup time a vendor would have needed to get up to speed with respect to K&E's technology would have been prohibitive. This trial was unique: it was at least arguably the largest criminal environmental trial in national history; there was not one defense law firm, but six; it was expected to run long (and did run for 11 weeks); and, going in, the defense team knew that it would be a 24-hour-a-day proposition. As with the other defense team members who moved to Missoula for the duration, the IT team had to be willing to focus on nothing but the trial for as long as it took. An outside vendor likely would be juggling other clients.

In addition and as noted above, the K&E technicians did not bill Grace for time spent "on call," which would likely have been the case with an outside vendor.

**RESPONSE EXHIBIT "3"**

**<u>Multiple K&E Professionals' Attendance at Hearings</u>**

The Initial Report lists three hearings attended by K&E professionals and requests that we explain the necessity of each of the attending professionals. We address each hearing, and each such professional's respective responsibilities, in the lettered paragraphs below.

(a)    **January 14, 2009 ZAI Hearing**

*Evans, Bruens, Greco, Boll, Baer, Esayian, Freedman*

This was a large-scale bankruptcy hearing at which numerous items were presented. The hearing was intended to include status conferences on the U.S. ZAI claimants' motion for preliminary approval of class settlement and certification of a U.S. ZAI class, which was ultimately presented on certification of counsel with objections being withdrawn. Also scheduled was a status conference on the Debtors' motion to approve the disclosure statement (which got continued to the January omnibus hearing). Also up at the hearing were several motions by the Libby claimants, including their motion to compel Grace to respond to document requests as well as the confirmation case management order.

New York senior restructuring partner Ted Freedman, along with former Chicago restructuring partner Jan Baer, conducted the hearing on behalf of Grace. Ted heads up the team that has drafted the disclosure statement, plan, and related documents. Ted needed to remain current on all of the major issues up at the hearing, so that he could ensure that the plan documents were consistent with the state of the case and the Court's rulings that could affect the plan documents. This was particularly important in the Fee Period, as K&E filed the amended plan on February 27th. Working with Ted (and me) on the plan and disclosure statement documents were former Chicago restructuring partner Jan Baer, New York restructuring partner Craig Bruens, and New York restructuring associates Christopher Greco and Rashad Evans.

I have been primarily responsible for drafting and editing the joint plan, as well as working with Edward Westbrook, class counsel to the ZAI property damage class, to ensure that the ZAI class settlement was approved, since that settlement was an integral component of the joint plan. For that reason, I participated by telephone in the part of the hearing that could have affected plan-related documents. Jan Baer attended the hearing both in her plan documents drafting role and also to conduct the portions of the hearing related to presenting the agenda to the Court, providing the Court with an update on the status of the ZAI class settlement motion and the resolution thereof, and addressing issues related to Libby discovery.

With respect to the ZAI motion, New York restructuring partner Craig Bruens had conducted extensive research into class action settlements in previous chapter 11 cases, and he participated in the hearing in order to be able to respond on behalf of the Debtors to any questions the Court might

raise relating to the appropriateness of the class settlement.  Craig also worked extensively on the solicitation procedures, which were adjourned to March 9th.  He nonetheless was available in the event the Court raised any questions regarding the status of, or potential problems with, the solicitation procedures in advance of the March hearing.

Chicago litigation partner Lisa Esayian is responsible for a variety of ZAI-related issues, including ZAI class settlement issues, as well as more general discovery issues related to Libby.  She attended the relevant two hours of the January 14th hearing via telephone to assist, if needed, with those areas.  New York litigation associate Christopher Greco was working on amendments to the plan and plan documents necessitated by the proposed ZAI settlement.  He attended, via telephone, the ZAI-related portions of the hearing so that he could keep the plan documents current on ZAI issues.  Rashad Evans worked with Craig Bruens on researching class actions settlements.  K&E respectfully requests payment in full of the January 14th hearing-related fees of all of these professionals, except for those of Rashad Evans.  With respect to Rashad, K&E agrees to cut its $1,927.00 fee for Rashad's hearing-related time ($470 per hour for 4.1 hours).

### (b)    January 21-22, 2009 *Daubert* Hearing in the Criminal Case

### *Urgenson, McMillin, Harding, Ahern, Mace, Golden, Osman*

These criminal case hearings were held to address two sets of motions brought by the defense -- motions to limit or exclude certain types of Government evidence, including late-disclosed evidence; and *Daubert* motions to limit which Government experts would be permitted to testify at trial and the scope of the evidence on which of those testifying experts could rely.  The Court reserved three days for the hearing.  Prior to the hearings, the Government had disclosed five potential hearing witnesses, and, accordingly, K&E attorneys prepared to cross-examine all five. (The Government ended up calling only two witnesses during the hearings.)  David Bernick, Larry Urgenson, Barbara Harding and Scott McMillin[16] each conducted a portion of the hearing on behalf of Grace, with David and Barb each conducting a witness cross-examination and Larry and Scott each making a series of oral arguments.  These attorneys, as well as Ellen Ahern, Tyler Mace and James Golden were all working on their respective defense team responsibilities described in Response Exhibit 1, and attended the portions of the hearing relevant to their responsibilities. Khalid Osman provided legal assistant support to the hearing attorneys as they prepared ahead of the hearings as well as during the meeting with the joint defense (described in the next sentence) and during the actual hearings.  Since this was the last chance the combined joint defense would have to meet in person prior to trial, K&E attorneys also met with joint defense counsel on the day before the hearings, both to prepare for the hearings and to finalize trial strategy, witness assignments, and cross examination preparation.

K&E respectfully requests payment in full for the January 21st - 22nd *Daubert* hearing-related fees of these professionals and paraprofessionals.

---

[16]See Response Exhibit 1 for the title and home office of each criminal defense team member.

(c)      **March 9, 2009 Disclosure Statement Hearing**

*Freedman, Boll, Esayian, Bruens, Lewinstein, Greco, Kelleher*

In K&E's response to the Fee Auditor's Initial Report regarding the 31st Interim Period, we explained that in September 2008, the Debtors filed an amended plan and disclosure statement, and that, during the 4th quarter of 2008, the Debtors litigated numerous plan objections. Litigation over plan objections continued through January and February 2009, and the final hearing on the approval of the disclosure statement, the solicitation motion, and various notices related thereto was continued to March 9, 2009. At this hearing, the Court approved the disclosure statement and the plan voting procedures. The plan confirmation hearing commenced on September 8, 2009.

Ted Freedman, as described above and in prior responses, is responsible for developing much of Grace's chapter 11 plan and bankruptcy emergence strategy, and I am responsible for drafting the plan, coordinating with co-proponents regarding the plan, and negotiating with adverse parties regarding plan modifications.

Craig Bruens attended to fulfill his role, described in Paragraph 3(a) above, as drafter of Grace's plan solicitation procedures. Approval of the disclosure statement was accompanied by approval of the solicitation procedures at this same hearing. The solicitation procedures were complex because they involved the solicitation of asbestos PI claimants, ZAI claimants, asbestos PD claimants, as well as the provisional solicitation of general unsecured creditors. Further, the procedures included a mechanism for parties in interest to dispute classification of their claims. Lisa Esayian handles all insurance issues in connection with plan confirmation. This includes disclosure statement objections from insurers, primarily related to indirect asbestos PI claims and the scope of pre-petition insurance settlements, both of which were addressed at the March 9th hearing and were among the most significant issues with respect to disclosure statement approval. She attended the hearing in order to address these insurance-related issues and to be able to follow up on additional insurance-related issues that arose from this hearing.

New York restructuring associate Marc Lewinstein attended in his role as the lead associate working with Craig and Jan Baer on the drafting of the disclosure statement and the analysis of related issues. Christopher Greco worked with Craig Bruens on the solicitation materials, and also worked on the disclosure statement order. Chris also assisted Ted and me with hearing preparations. New York legal assistant Daniel Kelleher was responsible for setup and breakdown of the hearing team's materials in the courtroom, and he also assisted us with needed materials during the course of the hearing presentations.

K&E respectfully requests payment in full for the March 9th hearing-related fees of these professionals and paraprofessionals.

## RESPONSE EXHIBIT "4"

### January 8, 2009 Joint Defense Conference

### *T. Stansbury, Osman, Mace, Koch, B. Stansbury, Farrell, King, Boutrous, Lee, Ahern, Lancaster, Harding, Urgenson*

. . . I refer you to <u>(Response Exhibit 1 and 1-a)</u> for the overall defense team role of each of these individuals. In addition, below we describe each of their more specific responsibilities with respect to the January 8th conference.

The January 8th conference was a meeting held in K&E's Washington, D.C. offices. It was chaired by K&E and included lead counsel for each individual defendant. The timing of this meeting was important -- it occurred approximately one month before opening statements in the trial were scheduled and two weeks before the *Daubert* hearings described in Paragraph 3(b) above. The purpose of the meeting was two-fold: to both coordinate the trial defense strategy and to allow K&E to present certain scientific and state-of-the-art defenses to the joint defense firms.[17]

Laurence Urgenson attended and co-chaired (along with David Bernick) the meeting as the senior-most defense lawyer on the pre-trial team. Walter Lancaster made presentations related to his role in cross-examining Libby residents and former Libby employees at trial. Barbara Harding and Brian Stansbury, with associate help from Karen Lee, presented the defense related to health effects in the Libby community. These attorneys have focused extensively on the health expert work and the cross examination of the Government's medical experts. Ellen Ahern was responsible for managing a comprehensive review of late-produced agency records. She attended the meeting in order to present her progress to the entire team. Ellen was also part of the team preparing the graphics for David Bernick's presentation on the opening statement.

Tyler Mace, Patrick King, and Rebecca Koch also supported David's presentation. In their case, this meant that they were jointly responsible for the development of the state-of-the-art defense extending back to the 1950s (see <u>Response Exhibit 1 and 1-a</u> for their particular substantive areas of responsibility). Tyler also attended to fulfill his responsibility of managing the factual development and procedural motions practice of the case. Peter Farrell was responsible for drafting certain pre-trial motions directly related to the scientific defenses raised at trial, as well as the trial brief itself. In order to be able to carry out that responsibility, Peter attended the parts of the meeting during which legal strategy was discussed.

---

[17]In order to reduce costs and avoid duplication of effort, the joint defense assigned K&E the areas that were presented at the meeting. All other firms refrained from doing any work on these topics.

All of these attorneys attended those portions of the joint defense conference that were relevant to their respective ongoing trial work.

Khalid Osman, Terrell Stansbury, and David Boutrous were the paraprofessionals responsible for supporting the presentation requirements at the meeting, including preparing key document binders and work product for distribution to the joint defense.  Khalid, the lead paralegal on the D.C. team, was a full-time member of the trial team, and brought in Terrell and David to provide additional support because this meeting represented an assembly of all of the attorneys going to trial, with each of the K&E lawyers making a detailed presentation.  The amount of assistance required, from making Power Point presentations to reviewing and summarizing expert data in support of particular presentation slides, was enormous, and all three were needed to provide the needed paralegal support.

**RESPONSE EXHIBIT "5"**

**List of Equipment Rented from Equipt, Inc.**[18]

3 Ricoh desktop scanners (1 walk up color scanner in each remote office and 1 in the courthouse)

3 TeraStation high-power servers

3 Trialsafe high-power backup servers

8 APC Smart Uninterruptible Power Supply (power conditioner and battery backup; keeps power constant to servers and network equipment.  Connected to the servers via USB to start shutting them down properly if power goes out, to prevent data loss/data corruption)

7 Dell laptop computers (for specific K&E team member's use only) and Dell Latitude port replicators (docking stations)[19]

10 Dell Desktop personal computers (for K&E secretaries and for general public[20] walk-up use)

14 high-speed black and white network printers

---

[18]Not included in this list are the smaller ancillary rental items such as computer mice, mousepads, extra paper sheet trays, etc.

[19]K&E only rented laptop computers for K&E defense team members who did not already have laptops (generally, project and case assistants).  K&E attorneys and legal assistants brought their own K&E-issued laptop computers to Missoula.  K&E decided to rent the laptops for those who did not already have them because of the amount of movement required of all of the defense team members; people were shuttling back and forth between the 2 remote offices trial sites as well as to and from the courtroom once the trial started, and it was much easier and more efficient for people to bring their laptops than to require them to find an unused desktop computer while at a given office.  Joint defense professionals brought their own laptops, though K&E also rented desktop computers for professionals from the joint defense law firms.

[20]Public walkup use means for use by any of the defense team personnel in either of the two remote trial offices.  Joint defense provided their own computers to their people, though several of the desktop computers K&E rented were placed in the public areas of the offices, for all teams to use, for the scanning functions of the copiers.

15 high-speed color network printers

30 HP Laserjet desktop printers (one for each K&E team member's desk)

10 multi-function devices (copiers/scanners)

Multiple Netgear port gig switches (each conference room in both remote offices was equipped with multiple 8-port switches to allow conference attendees to access the network)

Verizon 3G Broadband service and wireless cart (to allow Internet access from courthouse)

TPAD laptop computers for Etrial professionals and TPAD port replicators (docking stations)[21]

**For Courtroom Use Only:**

1 Epson projector

1 DaLite Insta-Theater 80" screen

1 Wolfvision visualizer - Elmo  (electronic document camera; digital overhead projector)

1 speaker system

---

[21]K&E rented this equipment for use of Etrial personnel so that K&E could obtain its customary discount from Aquipt rather than having Etrial passing through a higher rental expense to Grace.

**RESPONSE EXHIBIT "6"**

**AIRFARE CHARGE INFORMATION**

| No. | Date | Amount | Professional and Requested Flight Information |
|---|---|---|---|
| 1. | 1/15/09 | $1,800.00 | Barbara Harding, Airfare, Missoula, MT, 01/19/09 to 01/23/09<br><br>*January 19, 2009 - Baltimore, MD to Denver, CO (Economy Class)/Denver CO to Missoula, MO (Economy Class)*<br><br>*January 22, 2009 - Missoula, MO to Denver, CO (Economy Class)/Denver, CO, to Baltimore, MD (Economy Class)*<br><br>*Four-Leg Airfare* |
| 2. | 3/18/09 | $1,562.46 | Morgan Rohrhofer, Airfare, Spokane, WA / Washington, DC, 03/18/09 to 03/19/09 (Deposition Preparation)<br><br>*March 18, 2009 - Washington, D.C. to Seattle, WA (Economy Class)/Seattle, WA to Spokane, WA (Economy Class)*<br><br>*March 19, 2009 - Spokane, WA to Seattle, WA (Economy Class)/Seattle, WA, Washington, D.C. (Economy Class*<br><br>*Four-Leg Airfare* |
| 3. | 3/18/09 | $1,712.46 | Brian Stansbury, Airfare, Spokane, WA / Washington, DC, 03/18/09 to 03/19/09 (Deposition Preparation)<br><br>*March 18, 2009 - Washington, D.C. to Seattle, WA (Economy Class)/Seattle, WA to Spokane, WA (Economy Class)*<br><br>*March 19, 2009 - Spokane, WA to Seattle, WA (Economy Class)/Seattle, WA, Washington, D.C. (Economy Class)*<br><br>*Four Leg Airfare* |

| No. | Date | Amount | Professional and Requested Flight Information |
|-----|------|--------|----------------------------------------------|
| 4. | 3/18/09 | $1,298.40 | Timothy Fitzsimmons, Airfare, Spokane, WA / Washington, DC, 03/18/09 to 03/20/09 (Deposition Preparation)<br><br>*March 18, 2009 - Washington, D.C. to Seattle, WA (Economy Class)/Seattle, WA to Spokane, WA (Economy Class)*<br><br>*March 20, 2009 - Spokane, WA to Seattle, WA (Economy Class)/Seattle, WA to Washington D.C. (Economy Class)*<br><br>*Four-Leg Trip* |
| 5. | 3/18/09 | $1,782.91 | Karen Lee, Airfare, Spokane, WA / Washington, DC, 03/18/09 to 03/20/09 (Attend Deposition)<br><br>*March 18, 2009 - Washington D.C. to Seattle, WA (Economy Class)/Seattle, WA to Spokane, WA (Economy Class)*<br><br>*March 19, 2009 - Spokane, WA to Seattle, WA (Economy Class)/Seattle, WA to Washington, D.C. (Economy Class)*<br><br>*Four-Leg Airfare* |
| 6. | 3/21/09 | $1,585.70 | Brian Stansbury, Airfare, Houston, TX / Washington, DC, 03/21/09 to 03/25/09 (Expert Witness Conference)<br><br>*March 21, 2009 - Washington, D.C. to Houston, TX (Economy Class)*<br><br>*March 25, 2009 - Houston, TX to Washington, D.C. (Economy Class)*<br><br>*Round Trip Airfare* |

| No. | Date | Amount | Professional and Requested Flight Information |
|---|---|---|---|
| 7. | 2/4/09 | $1,493.20 | Tyler Mace, Airfare, Boston, MA 02/04/09 to 02/04/09 (Conference) <br><br> *February 4, 2009 - Washington, D.C. to Boston MA (Economy Class)* <br><br> *February 4, 2009 - Boston, MA to Washington D.C. (Economy Class)* <br><br> *Round Trip Airfare* |
| 8. | 2/15/09 | $1,885.88 | Barbara Harding, Airfare, Missoula, MT, 02/15/09 to 02/27/09 (Trial) <br><br> *February 15, 2009 - Baltimore, MD to Minneapolis, MN (Economy Class)/Minneapolis, MN to Missoula, MO (Economy Class)* <br><br> *February 26, 2009 - Missoula, MO to Seattle, WA (Economy Class)/Seattle, WA to Washington D.C. (Economy Class)* <br><br> *Four Leg Airfare* |
| 9. | 2/28/09 | $1,893.96 | Barbara Harding, Airfare, Missoula, MT, 02/28/09 to 03/04/09 (Trial) <br><br> *February 28, 2009 - Baltimore, MD to Minneapolis, MN (Economy Class)/Minneapolis, MN to Missoula, MO (Economy Class)* <br><br> *March 4, 4009 - Missoula, MO to Seattle, WA (Economy Class)/Seattle, WA to Washington, D.C. (Economy Class)* <br><br> *Four-Leg Airfare* |

| No. | Date | Amount | Professional and Requested Flight Information |
|---|---|---|---|
| 10. | 3/4/09 | $2,017.90 | Walter Lancaster, Airfare, Missoula, MT, 03/04/09 to 03/07/09 (Trial)<br><br>*March 4, 2009 - Missoula, MO to Seattle, WA (Economy Class)/Seattle, WA to Atlanta, GA (Economy Class)*<br><br>*March 7, 2009 - Atlanta, GA to Salt Lake City, UT (Economy Class)/Salt Lake City, UT to Missoula, MO (Economy Class)*<br><br>*Round Trip Airfare* |
| 11. | 3/5/09 | $1,622.40 | Karen Lee, Airfare, Missoula, MT, 03/05/09 to 03/08/09 (Trial)<br><br>*March 5, 2009 - Missoula, MO to Minneapolis, MN (Economy Class)/Minneapolis, MN to Washington, D.C. (Economy Class)*<br><br>*March 8, 2009 - Washington, D.C. to Salt Lake City, UT (Economy Class)/Salt Lake City, UT to Missoula, MO (Economy Class)*<br><br>*Four Leg Airfare* |
| 12. | 3/11/09 | $1,774.87 | Scott McMillin, Airfare, Missoula, MT, 03/07/09 to 03/12/09 (Trial)<br><br>*March 7, 2009 - Chicago, IL to Denver, CO (Economy Class)/Denver, CO to Missoula, MO (Economy Class)*<br><br>*March 12, 2009 - Missoula, MO to Denver CO (Economy Class)/Denver, CO to Chicago, IL (Economy Class)*<br><br>*Four-Leg Airfare* |

| No. | Date | Amount | Professional and Requested Flight Information |
|---|---|---|---|
| 13. | 3/11/09 | $1,653.37 | Scott McMillin, Airfare, Missoula, MT 03/22/09 to 03/26/09 (Trial)<br><br>*March 22, 2009 - Chicago, IL to Denver, CO (Economy Class)/Denver, CO to Missoula, MO (Economy Class)*<br><br>*March 26, 2009 - Missoula, MO to Denver CO (Economy Class)/Denver, CO to Chicago, IL (Economy Class)*<br><br>*Four-Leg Airfare* |
| 14. | 3/12/09 | $1,713.10 | Peter Farrell, Airfare, Missoula, MT 03/12/09 to 03/14/09 (Trial)<br><br>*March 12, 2009 -Missoula, MO to Denver Co (Economy Class)/Denver, CO to Baltimore, MD (Economy Class)*<br><br>*March 14, 2009 - Baltimore, MD to Minneapolis, MN (Economy Class)/Minneapolis, MN to Missoula, MO (Economy Class)*<br><br>*Four-Leg Airfare* |