UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                    .    Case No.  01-1139 (JKF)
                          .
W.R. GRACE & CO.,         .
et al.,                   .    USX Tower - 54th Floor
                          .    600 Grant Street
                          .    Pittsburgh, PA 15219
            Debtors.   .
                          .    September 10, 2009
. . . . . . . . . . . . . ..    9:02 a.m.



TRANSCRIPT OF PLAN CONFIRMATION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For the Asbestos
Creditors Committee:      Caplin & Drysdale, Chartered
                          By:  PETER LOCKWOOD, ESQ.
                               NATHAN FINCH, ESQ.
                          One Thomas Circle, NW
                          Washington, D.C.  20005

For the Future           Orrick, Herrington & Sutcliffe, LLP
Claimants                 By:  ROGER FRANKEL, ESQ.
Representatives:               JONATHAN GUY, ESQ.
                          Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007


Audio Operator:          Janet Heller

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Libby Claimants:    Lewis, Slovak & Kovacich, P.C.
                           By:  TOM L. LEWIS, ESQ.
                               MARK KOVACICH, ESQ.
                           725 Third Avenue North
                           Great Falls, MT 59401

                           McGarvey, Heberling, Sullivan and
                            McGarvey, P.C.
                           By:  JON HEBERLING, ESQ.
                               JOHN LACEY, ESQ.
                           725 Third Avenue North
                           Great Falls, MT  59401

                           Cohn Whitesell & Goldberg, LLP
                           By:  DANIEL C. COHN, ESQ.
                           101 Arch Street
                           Boston, MA  02110

For the                    Stroock & Stroock & Lavan
Unsecured Creditors'       By:  KENNETH PASQUALE, ESQ.
Committee:                     ARLENE KRIEGER, ESQ.
                           180 Maiden Lane
                           New York, NY  10038-4982

For the Property           Bilzin Sumberg Baena Price &
Damage Committee:           Axelrod LLP
                           By:  MATTHEW KRAMER, ESQ.
                           200 South Biscayne Boulevard
                           Suite 2500
                           Miami, FL  33131

For the Ad Hoc             Dewey & LeBoeuf, LLP
Committee of Equity        By:  JENNIFER WHITENER, ESQ.
Sec. Holders:              125 West 55th Street
                           New York, NY  10019

For Committee of           Campbell & Levine
Asbestos Personal          By:  MARK T. HURFORD, ESQ.
Injury Claimants:          800 North King Street
                           Suite 300
                           Wilmington, DE  19701

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D)

| | |
|---|---|
| For Maryland Casualty: | Eckert Seamans Cherin & Mellott, LLC<br>By:  EDWARD LONGOSZ, II, ESQ.<br>1747 Pennsylvania Avenue, N.W.<br>Suite 1200<br>Washington, D.C.  20006 |
| For Sealed Air: | Skadden, Arps, Slate, Meagher & Flom,<br>  LLP<br>By: DAVID TURETSKY, ESQ.<br>One Rodney Square<br>Wilmington, DE  19801 |
| For Garlock Sealing<br>Technologies: | Robinson, Bradshaw & Hinson, P.A.<br>By:  GARLAND CASSADA, ESQ.<br>     RICHARD WORF, ESQ.<br>101 North Tryon Street<br>Suite 1900<br>Charlotte, NC  28246 |
| For State of Montana: | Womble, Carlyle, Sandridge & Rice<br>By:  KEVIN MANGAN, ESQ.<br>222 Delaware Avenue<br>Suite 1501<br>Wilmington, DE  19801 |
| For Edwards' Judgment<br>Claimants: | Reaud, Morgan & Quinn<br>By:  DAVID J. PARSONS, ESQ.<br>801 Laurel<br>Beaumont, TX  77701 |
| For BNSF Railway: | Pepper Hamilton, LLP<br>By:  LINDA CASEY, ESQ.<br>3000 Two Logan Square<br>Philadelphia, PA  19103 |
| For Fresenius: | McDermott Will & Emery<br>By:  NATHAN F. COCO, ESQ.<br>227 West Monroe Street<br>Chicago, IL  60606 |
| For Travelers: | Simpson Thacher<br>By:  MARY BETH FORSHAW, ESQ.<br>     ELISA ALCABES, ESQ.<br>425 Lexington Avenue<br>New York, NY  10017 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D)

For GEICO, Seaton          Drinker Biddle & Reath LLP
Ins. Co., Republic         By:  MICHAEL F. BROWN, ESQ.
Ins. Co.:                       JEFFREY M. BOERGER, ESQ.
                           One Logan Square
                           18th and Cherry Streets
                           Philadelphia, PA  19103

For Royal Indemnity        O'Melveny & Myers, LLP
& Arrowood:                By:  TANCRED SCHIAVONI, ESQ.
                           Times Square Tower
                           Seven Times Square
                           New  York, NY  10036

For CNA:                   Goodwin Procter, LLP
                           By:  DANIEL GLOSBAND, ESQ.
                           Exchange Place
                           Boston, MA  02109-2881

For Fireman's Fund:        Stevens & Lee, P.C.
                           By:  JOHN DEMMY, ESQ.
                           1105 North Market Street, 7th Fl.
                           Wilmington, DE  19801

For Maryland Casualty:     Connelly Bove Lodge & Hutz, LLP
                           By:  JEFFREY WISLER, ESQ.
                           The Nemours Building
                           1007 North Orange Street
                           Wilmington, DE  19899

For MCC & Zurich:          Eckert Seamans
                           By:  EDWARD D. LONGOSZ, ESQ.
                           1747 Pennsylvania Avenue, NW
                           Suite 1200
                           Washington, DC 20006

                           By:  RICHARD F. DOLLSON, ESQ.

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                           By:  JANET BAER, ESQ.
                                LISA ESAYIAN, ESQ.
                                ELLI LEIBENSTEIN, ESQ.
                           200 East Randolph Drive
                           Chicago, IL  60601

For the Debtors:            Kirkland & Ellis, LLP
                           By:  THEODORE FREEDMAN, ESQ.
                                CHRISTOPHER GRECO, ESQ.
                                CLEMENT YEE, ESQ.
                           Citigroup Center, 153 East 53rd St.
                           New York, NY  10022

For the Debtors:            Pachulski, Stang, Ziehl &Jones
                           By:  JAMES O'NEILL, ESQ.
                           919 North Market Street
                           17th Floor
                           Wilmington, DE  19899-8705

For AXA Belgium:            Tucker Arensberg, P.C.
                           By:  MICHAEL A. SHINER, ESQ.
                           1500 One PPG Place
                           Pittsburgh, PA  15222

For Kneb Pipe Line          Fulbright & Jaworski
Operating Partnership,      By:  STEVE PIERCE, ESQ.
LP:                        300 Convent Street, Suite 2200
                           San Antonio, TX 78205-3792

For Various Claimant        Stutzman, Bromberg, Esserman & Plifka
Firms:                     By:  DAVID J. PARSONS, ESQ.
                           2323 Bryan Street
                           Suite 2200
                           Dallas, TX  75201

For State of Montana        Womble Carlyle Sandridge & Rice
Dept. of Environmental      By:  FRANCIS MONACO, ESQ.
Quality:                   222 Delaware Avenue, Suite 1501
                           Wilmington, DE 19801

For The Hartford:           Wilmer Cutler Pickering Hale & Dorr,
                            LLP
                           By:  NANCY MANZER, ESQ.
                           1875 Pennsylvania Avenue, NW
                           Washington, D.C. 20006


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D)

```
For Morgan Stanley       Katten Muchin Roseenman, LLP
Senior Funding, Inc.:    By:  JEFF FRIEDMAN, ESQ.
                               MERRITT PARDINI, ESQ.
                         575 Madison Avenue
                         New York, NY  10022-2585


                         Edwards Angell Palmer Dodge, LLP
                         By:  ROBERT CRAIG MARTIN, ESQ.
                         919 N Market St.
                         Wilmington, DE 19801-3023

For Travelers Casualty   Morris Nichols Arsht & Tunnell, LLP
& Surety Company:        By:  ERIN FAYE, ESQ.
                         1201 North Market Street
                         PO Box 1347
                         Wilmington, DE 19801

For Ford, Marrin,        Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer          Gleser, LLP
& Gleser, LLP:           By:  ELIZABETH M. DeCRISTOFARO, ESQ.
                         Wall Street Plaza, 23rd Floor
                         New York, NY  10005-1875

For Allstate Insurance:  Cuyler Burke, LLP
                         By:  ANDREW CRAIG, ESQ.
                         Parsippany Corporate Center
                         Four Century Drive
                         Parsippany, NJ  07054

For Federal Insurance    Cozen O'Connor
Company:                 By:  JACOB C. COHN, ESQ.
                         1900 Market Street
                         Philadelphia, PA  19103

For Serengeti:           Vinson & Elkins, LLP
                         By:  ARI BERMAN, ESQ.
                         Trammell Crow Center
                         2001 Ross Avenue, Suite 3700
                         Dallas, TX  75201

For the Equity           Kramer Levin Naftalis & Frankel
Committee:               By:  DAVID E. BLABEY, JR., ESQ.
                         919 Third Avenue
                         New York, NY  10022
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D)

For Scott Company:          Vorys, Sater, Seymour & Pease, LLP
                            By:  TIFFANY COBB, ESQ.
                            52 East Gay Street
                            Columbus, OH  43216

For Official Committee      Dies & Hile, LLP
of Asbestos Property        By:  MARTIN DIES, ESQ.
Damage Claimants:           1601 Rio Grande, Suite 330
                            Austin, TX  78701

                            LECG
                            By:  ELIZABETH DEVINE, ESQ.
                            1725 Eye Street NW, Ste 800
                            Washington, DC,  20006

For the Property            Bilzin Sumberg Baena Price &
Damage Committee:             Axelrod LLP
                            By:  MATTHEW KRAMER, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

For the Property            Bilzin Sumberg Baena Price &
Damage Committee:             Axelrod LLP
                            By:  SCOTT BAENA, ESQ.
                                 JAY SAKALO, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

For the Bank Lenders:       Paul Weiss Rifkind Wharton &
                              Garrison, LLP
                            By:  MARGARET PHILLIPS, ESQ.
                                 REBECCA ZUBATY, ESQ.
                                 ANDREW N. ROSENBERG, ESQ.
                            1285 Avenue of the Americas
                            New York, NY  10019

For the Bank Lenders:       Crowell & Moring LLP
                            By:  TACIE YOON, ESQ.
                            1001 Pennsylvania Avenue, N.W.
                            Washington, DC  20004

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D)

| For Asbestos Property | Scott Law Group |
| Damage Claimants: | By:  DARRELL SCOTT, ESQ. |
| | 1001 East Main Street, Suite 500 |
| | Sevierville, TN  37864 |

For Asbestos Property          Scott Law Group
Damage Claimants:              By:  DARRELL SCOTT, ESQ.
                               1001 East Main Street, Suite 500
                               Sevierville, TN  37864

For National Union Fire        Zeichner Ellman & Krause, LLP
Insurance Co.:                 By:  ROBERT GUTTMANN, ESQ.
                                    MICHAEL DAVIS, ESQ.
                               575 Lexington Avenue
                               New York, NY  10022

For the Future                 Orrick, Herrington & Sutcliffe,
Claimants                        LLP
Representatives:               By:  DEBRA FELDER, ESQ.
                                    JOSHUA CUTLER, ESQ.
                               Washington Harbour
                               3050 K Street, N.W.
                               Washington, D.C.  20007

For Federal Insurance          Cozen O'Connor
Company:                       By:  ILAN ROSENBERG, ESQ.
                               1900 Market Street
                               Philadelphia, PA  19103

For Allstate Insurance:        Cuyler Burk, LLP
                               By:  STEFANO CALOGERO, ESQ.
                               Parsippany Corporate Center
                               Four Century Drive
                               Parsippany, NJ  07054

For Official Committee         Anderson Kill & Olick
of Asbestos Personal           By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:              1251 Avenue of the Americas
                               New York, NY  10020-1186

For Grace Certain              Montgomery, McCracken, Walker &
Cancer Claimants:                Rhoads, LLP
                               By:  NATALIE D. RAMSEY, ESQ.
                               300 Delaware Avenue, Ste. 750
                               Wilmington, DE  19801

For Pentwater Capital          Pentwater Capital Management
Management:                    By:  JORDAN FISHER

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D)

```
For David T. Austern,      Phillips, Goldman & Spence, P.A.
the Future Claimants'      By:  JOHN C. PHILLIPS, ESQ.
Representative:            1200 North Broom Street
                           Wilmington, DE  19806

For the Asbestos           Ferry Joseph & Pearce, P.A.
Creditors Committee:       By:  THEODORE TACCONELLI, ESQ.
                           824 Market Street, Suite 19899
                           Wilmington, DE  19899

For Ford, Marrin,          Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer           Gleser
& Gleser:                  By:  SHAYNE SPENCER, ESQ.
                           Wall Street Plaza
                           New York, NY  10005

For Official Committee     Duane Morris, LLP
of Unsecured Creditors:    By:  MICHAEL LASTOWSKI, ESQ.
                           1100 North Market Street, Suite 1200
                           Wilmington, DE  19801-1246

For Official Committee     Brandi Law Firm
of Asbestos Property       By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:               TERENCE D. EDWARDS, ESQ.
                           44 Montgomery St., Suite 1050
                           San Francisco, CA  94104

                           Lieff, Cabraser, Heimann & Bernstein
                           By:  ELIZABETH J. CABRASER, ESQ.
                           Embarcadero Center West
                           275 Battery Street, Suite 3000
                           San Francisco, CA  94111

                           Riker, Danzig, Scherer, Hyland &
                            Perretti, LLP
                           By:  TARA MONDELLI, ESQ.
                                CURTIS PLAZA, ESQ.
                           Headquarters Plaza
                           One Speedwell Avenue
                           Morristown, NJ  07962

For the Libby Claimants:   Cohn, Whitesell & Goldberg, LLP
                           By:  CHRISTOPHER M. CANDON, ESQ.
                           101 Arch Street
                           Boston, MA  02110
```

TELEPHONIC APPEARANCES (CONT'D)

For the Libby Claimants:  Landis, Rath & Cobb, LLP
                      By:  KERRI K. MUMFORD, ESQ.
                            JAMES S. GREEN, JR., ESQ.
                      919 Market Street, Suite 1800
                      Wilmington, DE  19899

For Bloomberg, LLP:     Bloomberg, LLP
                      By:  STEVEN H. CHURCH

For the Bank Lenders:   Landis, Rath & Cobb, LLP
                      By:  RICHARD COBB, ESQ.
                      919 Market Street, Suite 1800
                      Wilmington, DE  19899

For Everest
Reinsurance Co.:       Crowell & Moring LLP
                      By:  LESLIE A. DAVIS, ESQ.
                            MARK PLEVIN, ESQ.
                      1001 Pennsylvania Avenue, N.W.
                      Washington, DC  20004

For the PD Committee:   Speights & Runyan
                      By:  DANIEL SPEIGHTS, ESQ.
                            MARION FAIREY, ESQ.
                            ALAN RUNYAN, ESQ.
                      200 Jackson Avenue, East
                      Hampton, SC  29924

For Garlock Sealing
Technologies:         Morris James, LLP
                      By:  BRETT FALLON, ESQ.
                      500 Delaware Avenue
                      Suite 1500
                      Wilmington, DE  19801

For Hound Partners:     BRIAN M. GOOTZEIT

For Everest Reinsurance Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:      By:  BRIAN L. KASPRZAK, ESQ.
                            JOHN D. MATTEY, ESQ.
                      913 North Market Street
                      Suite 800
                      Wilmington, DE  19801

For Murray Capital     Murray Capital Management, Inc.
Management            By:  MARTI MURRAY

For Normandy Hill      Normandy Hill Capital, LLP
Capital, LLP:        By:  MATTHEW CANTOR

TELEPHONIC APPEARANCES (CONT'D)

For Anderson Memorial          Kozyak, Tropin & Throckmorton, PA
Hospital:                      By:  JOHN W. KOZYAK, ESQ.
                                    DAVID L. ROSENDORF, ESQ.
                               2525 Ponce de Leon, 9th Floor
                               Miami, Florida 33134

For ZAI Claimants              Hogan Firm Attorneys at Law
& various law firms:           By:  DANIEL K. HOGAN, ESQ.
                               1311 Delaware Avenue
                               Wilmington, DE  19801

For the U.S. Trustee:          Office of the U.S. Trustee
                               By:  DAVID KLAUDER, ESQ.
                               844 King Street, Suite 2313
                               Wilmington, DE  19801

For Arrowwood                  Bifferato Gentilotti LLC
Indemnity Co.:                 By:  GARVAN McDANIEL, ESQ.
                               800 North King Street
                               Wilmington, DE  19801

For the PD Committee:          Speights & Runyan
                               By:  DANIEL SPEIGHTS, ESQ.
                                    ALAN RUNYAN, ESQ.
                               200 Jackson Avenue, East
                               Hampton, SC  29924

For AXA Belgium:               Mendes & Mount
                               By:  ANNA NEWSOM, ESQ.
                               750 Seventh Avenue
                               New York, NY  10019

For Royal Insurance:           Wilson Elser Moskowitz Edelman
                                 & Dicker, LLP
                               By:  CARL PERNICONE, ESQ.
                                    150 East 42nd Street
                                    New York, NY  10017

For Official Committee         Richardson Patrick Westbrook &
of Asbestos Property             Brickman, P.C.
Claimants:                     By:  EDWARD J. WESTBROOK, ESQ.
                               174 East Bay Street
                               Charleston, SC  29401

For Dow Jones                  Dow Jones News Wires
News Wires:                    By:  PEG BRICKLEY


                    **J&J COURT TRANSCRIBERS, INC.**

# I N D E X

**WITNESSES:**                                              **PAGE**
DR. CRAIG MOLGAARD
  Direct Examination by Mr. Heberling                         18
  Cross Examination by Mr. Finch                              62
  Cross Examination by Mr. Bernick                            79
  Redirect Examination by Mr. Heberling                      116

DR. ARTHUR FRANK
  Direct Examination by Mr. Heberling                        127
  Voir Dire by Mr. Bernick                                   154
  Continued Direct Examination by Mr. Heberling              157
  Cross Examination by Mr. Finch                             224
  Cross Examination by Mr. Bernick                           246
  Redirect Examination by Mr. Heberling                      288

DR. ALLAN WHITEHOUSE
  Voir Dire by Mr. Heberling                                 293

**EXHIBITS**                                  **I.D.**    **EVD.**
LC-53 NIOSH Table 1-10 Asbestosis               –           20
LC-51A Section head from LC-53                   –           21
LC-54A NIOSH Table 7-10                          –           24
LC-48 U.S. EPA Determination & Findings
        Lincoln County, Montana*                 –           30
LC-49 EPA memorandum amendment 6/17/09*          –           34
LC-50 Companion document to LC-48*               –           34
LC-209 ATSDR 2002 mortality study on Libby       –           36
Plan Proponents 237 Deposition                   –           87
LC-8 Rule 1006 Summary                         146          150
LC-15A List                                    173          175
Plan Proponents' 600                           230          230

*Admitted subject to relevance ruling

1          THE COURT:  This is the continuation of the Phase II

2   confirmation hearing in W.R. Grace.  The participants listed by

3   phone are Scott Baena, Janet Baer, Ari Berman, David Bernick,

4   David Blabey, Thomas Brandi, Peg Brickley, Elizabeth Cabraser,

5   Stefano Calogero, Christopher Candon, Matthew Cantor, Stephen

6   Church, Richard Cobb, Tiffany Cobb, Jacob Cohn, Andrew Craig,

7   Joshua Cutler, Leslie Davis, Michael Davis, Elizabeth

8   DeCristofaro, Elizabeth Devine, Martin Dies, Terrence Edwards,

9   Lisa Esayian, Marion Fairey, Brett Fallon, Erin Fay, Debra

10  Felder, Theodore Freedman, Jeff Freedman, Brian Gootzeit,

11  Christopher Greco, James Green, Robert Guttmann, Daniel Hogan,

12  Robert Horkovich, Brian Kasprzak, David Klauder, John Kozyak,

13  Matthew Kramer, Michael Lastowski, Ellie Leibenstein, Nancy

14  Manzer, Robert Martin, John Mattey, Garvan McDaniel, Francis

15  Monaco, Tara Mondelli, Kerri Mumford, Marti Murray, Anna

16  Newsom, James O'Neill, Merritt Pardini, David Parsons, Steve

17  Pierce, Carl Pernicone -- does somebody have a phone on?  Would

18  you please turn it off?  There's music playing or some noise.

19                          (Pause)

20          THE COURT:  Steve Pierce, Carl Pernicone, Margaret

21  Phillips, John Phillips, Curtis Plaza, Mark Plevin, Natalie

22  Ramsey, Andrew Rosenberg, Ilan Rosenberg, David Rosendorf, Alan

23  Runyon, Jay Sakalo, Darrell Scott, Michael Shiner, Daniel

24  Speights, Shayne Spencer, Theodore Tacconelli, Edward

25  Westbrook, Clement Yee, Tacie Yoon, Rebecca Zubaty, Jordan

1  Fisher, and I think Brian Gootzeit was already mentioned.  Jan,

2  do you need entries in Court again or if people -- you're okay

3  if people identify themselves?  All right, folks, it looks as

4  though basically I've got the same list of counsel.  Is there

5  anyone new who wishes to enter an appearance who's here today

6  for the first time who hasn't entered an appearance yet?

7                     (No verbal response)

8           THE COURT:  All right.  If you would, for the benefit

9  of the court reporter, please, would you just identify yourself

10  the first time you speak and the party you're representing,

11  since we have a different court reporter today from yesterday?

12  Mr. Heberling --

13           MR. HEBERLING:  Yes, Your Honor.

14           THE COURT:  --  are you still examining, Dr.

15  Molgaard?

16           MR. HEBERLING:  First I have a couple matters.

17           THE COURT:  Yes, sir.

18           MR. HEBERLING:  I have not had the opportunity to

19  talk to Mr. Bernick about this, but we would like to call Dr.

20  Frank first to insure that he's off the stand today.  I

21  understand there's an objection from the ACC on that.

22           MR. FINCH:  There --

23           THE COURT:  Mr. Finch.

24           MR. FINCH:  There certainly is, Your Honor.  It's

25  completely contrary to accepted trial practice to start the

1  direct examination of a witness and have several hours of it,

2  and I think it's prejudicial to the plan proponents' case not

3  to be -- for us to be able to establish, to use a

4  colloquialism, what a lot of hooey Dr. Molgaard is attempting

5  to persuade this Court about before we hear from Dr. Frank.  So

6  I would object.

7          MR. BERNICK:  Your Honor, I have a slightly different

8  concern.

9          THE COURT:  Is your microphone on, Mr. Bernick?

10          MR. BERNICK:  No, it's not.  Thank you.  I have a

11  slightly different concern, which is that Mr. Herberling

12  represented that he was I can't say seeing the light at the end

13  of the tunnel, but he thought that maybe he'd be another half

14  hour, and I don't think that our cross examination -- Mr. Finch

15  has cross.  I have very limited cross -- is going to last all

16  that long, so this is not a situation where Dr. Frank, whose

17  schedule I completely appreciate and we have tried to

18  accommodate here, as Your Honor well knows, is not going to get

19  out of here today.  If it's a problem, then we've got a very

20  profound problem with how the trial's going.

21          So I think that if Mr. Heberling's estimate holds,

22  we'll probably be done with Dr. Molgaard by say 10:15/10:25,

23  and at that point Dr. Frank can testify.  They've estimated

24  that they'll spend three hours with him on direct examination.

25  I don't know whether that estimate is real, but I'm doing the

1 principal cross for Dr. Frank, and I will be take nothing even

2 remotely close to that period of time, because by that time

3 Your Honor will have heard most of the matters now twice.

4          So I don't think there's any risk that Dr. Frank is

5 not going to be able to get out of here today.  Indeed I think

6 that he'll be able to scoot off to the airport and catch a very

7 early flight.

8          THE COURT:  Mr. Guy.

9          MR. GUY:  Your Honor, we join -- Mr. Herberling did

10 say it would only take half an hour, so I think we should just

11 proceed.

12          MR. BERNICK:  I would also add that in conversation

13 with Mr. Lewis yesterday, I raised the specific problem that I

14 thought he indicated that we were going to be able to cross Dr.

15 Molgaard this morning.

16          THE COURT:  I think, Mr. Heberling, under these

17 circumstances, we probably should just continue with Dr.

18 Molgaard and see at least whether the direct can't be finished

19 and then determine what to do from thereon.  So let's at least

20 get the direct finished, and then we'll see.

21          MR. HEBERLING:  Thank you, Your Honor.  And another

22 matter is at the end of the day in Mr. Bernick's remarks he

23 mentioned that the -- he recognized that he'd opened the door

24 to his witness on the issue of the Whitehouse progression study

25 and the position that it was largely irrelevant.  We think we

1  could save a lot of time.  All of the witnesses that will

2  follow will be talking about it in -- either as a critique or a

3  rebuttal to a critique, and we would propose, just as we agreed

4  not to address the issue of fiber potency, we could simply not

5  address the issue of the Whitehouse 2004 study or the Weill

6  followup to the Whitehouse 2004 study.  I haven't had a chance

7  to discuss this with Mr. Bernick.  Again, the ACC has an

8  objection to that.

9       MR. BERNICK:  The only issue that I -- and it's a

10  significant issue -- is that there were -- as I indicated to

11  the Court yesterday, we didn't think the progression was

12  relevant to the TDP, but we then went on to say progression is

13  relevant to the extent that Mr. Hughes testified, that Dr.

14  Whitehouse's progression theory is largely what drove the very

15  high values that we saw in tort settlements.  It would be in

16  the mid to late 1990s.  And that the world has changed, because

17  we now finally have access to the underlying data.

18       Dr. Weill's analysis will establish the flaws of that

19  study, and I think, in fact, we're going to get very

20  significant concessions, both from Dr. Molgaard, who,

21  incidently, I would also like to cross examine, because I want

22  to use his cross with Dr. Frank, but concessions from Dr.

23  Molgaard regarding the limitations on that progression study,

24  none of which were recognized, none of which were built into

25  testimony about progression in the nineties that drove the

1 values.

2          So we're talking about values of future cases.

3 They've said that they're not being properly valued.  We

4 believe that the world has changed in a lot of ways.  So I

5 don't think that we can agree that progression is not in the

6 case.  We certainly believe it's not in the case in terms of

7 the TDP, but for the history it's in.

8          THE COURT:  All right.

9          MR. HEBERLING:  Well, that was an attempt to save

10 time, Your Honor.

11          THE COURT:  It was, but not one that's going to be

12 successful I think, Mr. Heberling.

13                    (Pause)

14          THE COURT:  Yes, Dr. Molgaard, I would just remind

15 you you're still under oath, sir.  Thank you.

16     DR. CRAIG MOLGAARD, LIBBY CLAIMANTS' WITNESS, SWORN

17          MR. HEBERLING:  Good morning.

18                    DIRECT EXAMINATION

19 BY MR. HEBERLING:

20 Q    Let's refer to LC-53.

21          THE COURT:  I'm sorry.  What's the exhibit?

22          MR. HEBERLING:  LC-53, Your Honor.

23          THE COURT:  Okay.

24 Q    Dr. Molgaard, you now have in front of you Exhibit LC-53,

25 a NIOSH publication, Table 1-10 Asbestosis, Counties With

1 Highest Age Adjusted Death Rate Per Million Population, U.S.

2 Residents Age 15 and Over, 2000 to 2004.  Are you familiar with

3 this document and the tables that follow?

4 A    Yes, I am.

5 Q    Are you familiar with NIOSH's work-related lung disease

6 program?

7 A    Somewhat, yes.

8 Q    And can you describe, in general, what it does?

9 A    It's a surveillance system of different diseases that are

10 related to work exposures.  They use National Center for Health

11 Statistics data and U.S. Census Bureau data to come up with the

12 age-adjusted rates for different diseases.

13 Q    Have you been to the NIOSH website?

14 A    Yes, I have.

15 Q    Have you examined all the related documents at the

16 website?

17 A    I have looked at some documents.

18 Q    Is this an official government publication?

19 A    Yes, it is.

20 Q    Who is it issued by?

21 A    It's issued by the Centers for Disease Control and

22 National Institute of Occupational Safety and Health.

23 Q    And does NIOSH have a duty to gather and report this

24 information?

25 A    That's my understanding.

1  Q    Where would that duty be found?

2  A    In their mission statement, I believe.

3  Q    And does NIOSH have a program to do this?

4  A    Yeah, that's what this world program is, I believe.

5  Q    Does this document contain information on mortality rates

6  for Lincoln County, Montana?

7  A    Yes, it does.

8         MR. HEBERLING:  We offer LC-53.

9         THE COURT:  It's admitted.

10  Q    Let's put up LC-51A, and is this a document from the same

11  section on the same website?

12  A    I believe it's Document LC-53.

13  Q    53A.  Excuse me.  51A.

14  A    51A is a section head.

15  Q    And is it from the same publication as LC-53 was?

16  A    I think that the LC-51A is a different document than what

17  you're talking about, John.  I think you're referring to LC-53.

18  No?

19  Q    LC-53 is the one that we just looked at --

20  A    The asbestosis.

21  Q    -- and which went into evidence.  Do you have it on the

22  screen in front of you?

23  A    Yeah, the header.  Just a second.  Oh, all right.

24  Q    Okay.  Are you familiar with that one?

25  A    Yes.

Molgaard - Direct/Heberling                    21

1  Q    Does it come from the same publication?

2  A    Yes, it does.

3          MR. HEBERLING:  We offer LC-51A.

4          THE COURT:  It's admitted.

5  Q    Okay.  Let's refer to Table 1-10, which is LC-53, second

6  or third page.

7          THE COURT:  Wait.  I'm sorry.  Where are you now?

8          MR. HEBERLING:  LC-53.

9          THE COURT:  Okay.  Where?

10          MR. HEBERLING:  I believe it's the second page in the

11  document.

12          THE COURT:  Okay.

13  Q    First, what is the significance of -- well, let me ask a

14  few related questions first.  There's an age-adjusted rate for

15  Lincoln County, Montana.  Do you see that?

16  A    Yes, I do.

17  Q    At the top of the list, do you see Lincoln County,

18  Montana?

19  A    Yes, I do.

20  Q    And what does age-adjusted rate 262.5 mean?

21  A    That means that the -- when you adjust for the population

22  structure to make comparisons equal, that Lincoln County has

23  the highest age-adjusted rate for asbestosis in the United

24  States, and it's roughly 40 times the overall United States

25  rate, which is 6.1.

1  Q    And that's shown at the bottom of the table?

2  A    Yes.

3  Q    And is there a rate for females as well?

4  A    Yes, there is.

5  Q    What is that?

6  A    It's 18.2 percent.

7  Q    What's the significance of that?

8  A    It's extremely high.  I think it's the third highest in

9  the country, according to these numbers.

10 Q    And does that have any significance in terms of non-

11 occupational exposure?

12 A    Given that the percentage of female minors in the Libby

13 area was much lower than that, it would indicate that there was

14 some community disease patterns also in Libby.

15 Q    What is the quality of the epidemiologic evidence on this

16 exhibit?

17 A    It's fairly good.

18         THE COURT:  Excuse me.  Are you making a distinction

19 between household family and community when you say it

20 indicates that there is some community disease involvement?

21         THE WITNESS:  No, I'm not.  That table wouldn't let

22 me make that distinction.

23         THE COURT:  Okay.  Thank you.

24 Q    You say it's good evidence?  Why is that?  What about --

25 can you address the issue of the power and statistical

Molgaard - Direct/Heberling                    23

1  significance of these numbers?

2  A    It's a -- it's very good evidence.  It's very powerful

3  evidence.  A 40-some fold difference from the national overall

4  rate is kind of amazing.  That's just a lot of increase.  And

5  even the difference between Lincoln County and the next county,

6  George County, I believe is something like 12 percent, so that

7  even against another very high county, which is George County,

8  Mississippi, Lincoln County still is -- has a 12 percent

9  elevation or approximately.

10 Q    And compared to the other epidemiological evidence

11 regarding death rates in Lincoln County, Montana that's

12 available, how does this compare?

13 A    I think very favorably.

14 Q    In the field of public health, is a death rate such as

15 Lincoln County being Number one for asbestos is important?

16 A    It's impressive.  It's persuasive evidence that there is

17 something going on there in terms of disease and exposure.

18 Q    What kinds of decisions or death rate data used for?

19 A    They can lead to making decisions about public policy in

20 regard to different exposures and to lead to the proclamation

21 of a public health emergency for Libby that we've seen recently

22 happen.

23 Q    Okay.  Let's refer to Exhibit LC-54A.  It should be a

24 title page.

25                          (Pause)


                    **J&J COURT TRANSCRIBERS, INC.**

1  Q    I'm now showing you LC-54A, Page 2.

2  A    Yes.

3  Q    Are you familiar with this exhibit?

4  A    Yes.

5  Q    Does this appear to be a Table 7-10 Malignancy,

6  Mesothelioma, Counties With Highest Age-Adjusted Death Rates

7  Per Million Population, U.S. Residents Age 15 and Over, 2000

8  dash 2004?

9  A    Correct.

10  Q    And is this an official government publication?

11  A    Yes, it is.

12  Q    Issued by CDC NIOSH?

13  A    Yes.

14  Q    And did NIOSH have a duty to gather and report this

15  information as well?

16  A    I believe so.

17          MR. HEBERLING:  We offer LC-54A.

18          THE COURT:  It's admitted.

19  Q    And on this -- on this Table 7-10 where does Lincoln

20  County fall in terms of rank for counties in the United States?

21  A    It falls Number 3.

22  Q    What is the significance of that from an epidemiological

23  point of view?

24  A    It's also an elevated age-adjusted rate.  It's

25  approximately five times the overall United States rate, so

Molgaard - Direct/Heberling                    25

1  it's behind Sagadahoc County, Maine and Koochicching County,

2  Minnesota, but it's certainly in the top tier of counties.

3  Q    What is the quality of the epidemiological evidence here?

4  A    It's very good.

5  Q    What is the best evidence of link between exposure and

6  disease epidemiologically?

7  A    Mortality.

8  Q    Does this meet that?

9  A    Yes.

10 Q    And let's refer to Exhibit LC-48.  Have you got that in

11 front of you?

12 A    Yes.

13 Q    Does that appear to be a U.S. Environmental Protection

14 Agency Determination and Findings of Public Health Emergency

15 for the Libby asbestos sites in Lincoln County, Montana?

16 A    Yes.

17 Q    Are you familiar with this in related documents?

18 A    Yes, I am.

19 Q    Who issued these documents?

20 A    The Environmental Protection Agency.

21 Q    Did the EPA have a duty to gather and report this

22 information?

23 A    Yes, I believe so.

24 Q    Do these documents contain information relating to Libby?

25 A    Yes, they do.

1          MR. HEBERLING:  We offer LC-48.

2          MR. FINCH:  Objection.  Relevance.

3          THE COURT:  What is the relevance?

4          MR. HEBERLING:  The relevance is that the -- the

5   document contains information on Libby and determinations of

6   adverse health effects and exposure roots and so forth.  And

7   importantly, it shows that -- it goes to the Libby is different

8   argument.  That Libby is not substantially similar.  Libby is

9   different because of the intensity, the incidence, and the

10  severity of disease in Libby, and, therefore, we believe it is

11  not substantially similar to other claims under the statute and

12  the Combustion Engineering case.

13         MR. FINCH:  We object, Your Honor.  First of all,

14  whether claim are substantially similar or not, the case law is

15  clear that you can put in the same -- a debtor can put in the

16  same class contract claims with tort claims as in unsecured

17  creditors, and we've litigated that issue with settled asbestos

18  claimants versus unsettled asbestos claimants in other cases.

19  It cannot possibly be a basis for a classification under 1122

20  of the Bankruptcy Code that the strength of one claimant's case

21  versus another claimant's case, because every single case turns

22  on its own facts.

23         The incidence of disease in Lincoln County, Montana

24  is irrelevant to both the classification issue and to the TDP

25  issue.  If people get sick and they fall into the various

Molgaard - Direct/Heberling                    27

1  disease categories in the TDP, they can -- if they meet the

2  expedited review criteria, they can have their claims

3  compensated that way.  If they don't, as Mr. Inselbuch

4  testified at length on Tuesday, they can proceed through

5  individual review and put on the exact same sort of evidence

6  that they're putting on before this Court to persuade either

7  the trust or a jury in Montana that they -- that the disease

8  they suffer from should be treated at the higher category.

9         So I fail to see the relevance of an EPA document

10  that basically says that -- it makes no quantitative assessment

11  of causation in the document.  It doesn't tell you anything

12  about whether this TDP complies with the Bankruptcy Code or

13  not, and it doesn't establish that any particular group of

14  individuals is different from any other group of individuals in

15  any way that matters for classification purposes under the

16  Bankruptcy Code.  So for all those reasons, I find that -- I

17  would argue that it's irrelevant.

18         MR. HEBERLING:  Your Honor, this goes to the severity

19  of disease in Libby.  There's a probability of death which does

20  not present elsewhere.  A high incidence of community disease

21  is very important.  The EPA has recognized this, and this

22  document -- it's certainly within the scope of relevance for

23  the contentions that we're presenting.

24         THE COURT:  This document says that there is a higher

25  risk of death from mesothelioma by Libby people who contracted

1  in Libby than who -- than those who contracted elsewhere?

2          MR. HEBERLING:  Oh, no, the document doesn't

3  specifically state that, but I'm reciting the basis for our

4  belief that Libby is different, and that should be -- and our

5  contention under the statute that the claims are not

6  substantially similar to others and that, therefore, should

7  have different treatment.  So this goes -- this is relevant to

8  our contention.

9          MR. FINCH:  Your Honor, I think we'll establish in

10 cross examination there's nothing in this document that says

11 that you're more likely to die from mesothelioma in Libby than

12 you are from mesothelioma if you get it somewhere else.

13 There's nothing in this document that says if you get

14 asbestosis in Libby, you're more likely to die of the

15 asbestosis than if you get the asbestosis in Pittsburgh.

16 There's just -- that doesn't -- it doesn't go to the -- either

17 the severity or the prognosis of asbestosis or mesothelioma if

18 you have the disease, and it doesn't go to the severity or

19 prognosis of pleural disease.  It doesn't even really talk

20 about pleural disease.

21         MR. HEBERLING:  In connection with the Libby is

22 different argument, this document says that, "The Libby

23 asbestos site is unique with respect to multiplicity of

24 exposure roots, unique with respect to the cumulative exposures

25 experienced by community members, and unique with respect to

1  the adverse health effects from asbestosis exposure already

2  present and documented in the residents."

3          THE COURT:  Yes, I don't think that's -- but I think

4  the problem is that that's actually not a fact that anybody is

5  contesting.  I don't think it's relevant to the issue.  The

6  issue is whether or not each individual claimant who will have

7  the right to be treated through the trust is -- has a similar

8  right to be treated by the trust in the same way that everyone

9  else holding the same disease has the right to be treated.

10         I don't -- I've just taken a look at this document.

11 It does not in any way say that there is some different disease

12 in Libby than is elsewhere.  It talks about exposures and the

13 fact that there are multiple exposures in Libby, but that's not

14 -- I don't think that's contested.  Is someone contesting that

15 issue?  I haven't heard a contest by anyone.

16         MR. FINCH:  The ACC is not contesting that issue, and

17 I think, Your Honor, you'll recall that both Dr. Welch and Mr.

18 Inselbuch testified about the exposure requirements in the TDP.

19 The exposure requirements for people in and around Lincoln,

20 Montana -- Lincoln County, Montana are relaxed as compared to

21 the rest of the claimants.  So if the TDP is in any way

22 discriminatory as to exposure, it's discriminating its people

23 outside of Libby versus in Libby.  Not that I concede that.

24 There's nothing in the TDP that doesn't recognize that there is

25 -- there could be exposure to Grace asbestos in the community

1 of Lincoln County, Montana, and, therefore, they have much more

2 relaxed exposure requirements than what we have in what I would

3 call the sort of state of the art or standard TDPs that have

4 been approved by this Court and other courts in numerous

5 asbestos bankruptcy cases over the years.

6       THE COURT:  All right.  I honestly don't know whether

7 this is relevant or not.  I don't think it is.  I'm going to

8 admit it subject to a relevancy ruling later, so that it can be

9 explored further on cross examination as well.  I find -- I

10 don't think it's going to turn out to be relevant to the issue,

11 because the issue is not whether Libby as a city is different

12 from any other city.  The issue is whether the TDP

13 discriminates against claimants with substantially similar

14 diseases, and this document does nothing to substantiate that

15 Libby's claims are different from any other claims.  So I don't

16 -- I really don't see the relevance, but I will admit it

17 subject to a relevancy ruling later.

18                    (Pause)

19       MR. HEBERLING:  One of the bases for relevance is

20 that the plan proponents in their case have put on evidence

21 that there is no significant communities of disease in Libby,

22 and this document certainly controverts that.

23       THE COURT:  No, I don't think that's what the

24 evidence has been so far.  The evidence is that pre-petition

25 there were no community-only claims that were settled by Grace

1 for Libby residents.  That's what the issue is.  That's what

2 the evidence is.  Pardon me.

3             MR. BERNICK:  And our contention is that the

4 population's a different population.  It's not -- our case

5 doesn't turn on whether, in fact, science has established a

6 relationship or not with respect to the community.  It's a

7 different issue.  That's the point.

8             THE COURT:  But all this document would do, I think,

9 is show that the debtor ought to expect that claims -- if the

10 debtor were in the tort system, the debtor could expect that

11 there may be claims coming against it from Libby residents.  To

12 the extent that the debtor's interest is being transferred to

13 the trust, the trust can expect that there will be claims

14 coming against it from Libby residents.  But they already

15 expect that.  So I don't see how this document tends to prove

16 any fact in dispute in this case, but again, I've admitted it

17 subject to a relevance determination later.

18             MR. HEBERLING:  We will proceed, Your Honor.

19             THE COURT:  All right.

20 BY MR. HEBERLING:

21 Q    The document states that, "The Libby asbestos site is

22 unique with respect to the multiplicity of exposure roots.

23 What is a basis for that?

24 A    The basis is that there were multiple sources of exposure

25 from inhalation, indoor air, outdoor air, possibly water, et

1  cetera.   There was just a very great amount of exposure in the

2  environment, so that people were separate multiple hits, if you

3  will, from the exposure from existing in Libby and Lincoln

4  County.

5  Q    And the document states that, "The Libby asbestos site is

6  unique with respect to the cumulative exposures experienced by

7  community members."  Do you agree with that?

8  A    Yeah, I do.

9  Q    What is the basis for your opinion?

10  A    As I mentioned, there was a lot of vermiculite waste and

11  materials spread throughout the community, and it was widely

12  distributed through the southern Lincoln County.  A lot of it

13  was used in the soil and the yards to line football fields et

14  cetera.   It was commonly played with by children as a item that

15  was a lot of fun to mold into forms and put on a stove, et

16  cetera.   So there were multiple community exposures in the

17  Libby area.

18  Q    The document also states that, "The Libby asbestos data is

19  unique with respect to the adverse health effects from asbestos

20  exposure already present and documented in the residents."  Do

21  you agree with that?

22  A    I -- yeah, I do.

23  Q    What is the basis for your opinion?

24  A    The NIOSH CDC documents are part of it.  Where there is

25  extremely high rates of mortality for two of the asbestosis

1  related-disease states.

2  Q    And what number of studies are cited in support of the

3  public health emergency determination?

4  A    I believe there are --

5            MR. FINCH:  Objection.  Relevance.

6            THE COURT:  What's the relevance?

7            MR. HEBERLING:  Well, it's going to the -- we're

8  going to the Whitehouse '04, Peipens '03, and others which --

9            THE COURT:  Is there -- I'm sorry.

10            MR. HEBERLING:  -- are important in this case --

11            THE COURT:  Is there a document that's cites them as

12  part of an exhibit?

13            MR. HEBERLING:  Oh, actually, let's -- there are two

14  more exhibits which I need to refer to.

15            THE COURT:  All right.

16            MR. HEBERLING:  Okay.  Let's put up LC-49.

17  Q    And does this appear to be an EPA action memorandum

18  agreement -- amendment dated June 17, 2009?

19  A    Yes.  Yes, it is.

20  Q    Are you familiar with it?

21  A    Yes, I am.

22  Q    Is it referred to in the EPA Determination and Findings of

23  a Public Health Emergency?

24  A    I believe it is.

25  Q    Was this issued by the EPA?

1  A    Yes.

2  Q    And did it have a duty to gather and report this

3  information?

4  A    Yes, it did.

5           MR. HEBERLING:  We offer LC-49.

6           MR. FINCH:  Objection.  Same relevance objection as

7  to the order itself.

8           THE COURT:  Okay.  Same ruling with respect to a

9  determination later as to whether there is relevance to this

10  document.  I'll admit it subject to that determination.

11  Q    Let's refer to LC-50.  And are you familiar with this

12  document?

13  A    Yes, I am.

14  Q    Is this appear a companion document to the EPA Findings

15  and Determination of Public Health Emergency?

16  A    Yes, it is.

17  Q    And did the EPA have a duty to gather and report this

18  information?

19  A    Yes, I believe so.

20           MR. HEBERLING:  We offer LC-50.

21           MR. FINCH:  Objection.  Same relevance objection as

22  before.

23           THE COURT:  All right, and the same ruling.  LC-50 --

24  excuse me -- is admitted subject to a determination as to

25  relevance later.

Molgaard - Direct/Heberling                    35

1  Q    Now, I was asking with regard to the number of studies

2  cited for the public health determination, do you happen to

3  know the number of studies?

4           THE COURT:  I'm sorry.  I didn't hear your question.

5  Would you repeat it, please?

6           MR. HEBERLING:  Yes.

7  Q    What number of studies are cited in support of the public

8  health emergency determination?

9  A    I actually haven't counted them.  It looks like there

10 would be close to 20 here.

11 Q    Okay, and what are the -- some of the important ones?

12          MR. FINCH:  Objection.  Foundation.

13          THE COURT:  Sustained.

14          MR. FINCH:  And relevance.

15          MR. HEBERLING:  Well, the document can speak for

16 itself.

17 Q    Let's refer to the ATSDR 2002 mortality study on Libby.

18 That's LC-209.

19                         (Pause)

20 Q    Does this appear to be a study titled Mortality in Libby,

21 Montana, 1979-1998, issued by the EPA August 6, 2002?

22 A    Yes, it is.

23 Q    Are you familiar with this study?

24 A    Yes, I am.

25 Q    Have you done work with the ATSDR?

1  A    I'm currently involved in an epilepsy study where the

2  project officer from the Centers for Disease Control is a ATSDR

3  officer.

4  Q    And is this an official government publication?

5  A    Yes, it is.

6  Q    Did the ATSDR have a duty to gather and report this

7  information?

8  A    I believe so.

9  Q    Does this document contain information regarding Libby?

10 A    Yes.

11 Q    And in your review do you find it to be reliable?

12 A    Yes.

13         MR. HEBERLING:  We offer LC-209.

14         MR. FINCH:  No objection.

15         THE COURT:  It's admitted.

16 Q    Is this an epidemiology study?

17 A    It's a descriptive mortality study, yes.

18 Q    Can you briefly describe the study designed?

19 A    They basically had death certificate data which they

20 linked to employment information from a facility in Libby that

21 mined and milled vermiculite, and then it showed that the

22 majority of the asbestosis deaths and some lung cancer deaths

23 were prior employees at the facility.

24 Q    And --

25 A    Most mesothelioma also occurred in former workers.  So,

1  basically, what they were doing was they were linking death

2  certificates to employment history.

3  Q    And were the results significant in terms of confidence

4  intervals?

5  A    They were very powerful in terms of confidence intervals.

6  Q    What was the study's finding regarding asbestosis rates?

7  A    It was also elevated.

8  Q    Okay.  Dr. Moolgavkar has stated at Table 8 of the ATSDR

9  report notes "Only one of these asbestos deaths occurs in an

10 individual who was not occupationally exposed with 11 occurring

11 in non-occupationally exposed individuals.  When these 11

12 deaths are removed, deaths from pneumoconiosis were not

13 elevated among those not occupationally exposed."  Are you

14 aware of this statement?

15 A    Yes, I am.

16 Q    And Dr. Moolgavkar states, "There is no evidence that

17 environmental exposures contributed to the deaths from

18 pneumoconiosis."  Do you agree with that statement?

19 A    No, I don't.

20 Q    Why?

21 A    Because there were additional cases that were found after

22 the study closed in 2002, I believe, it is.

23 Q    Is there an obligation in epidemiology to use current

24 evidence?

25 A    Yes, there is.

Molgaard - Direct/Heberling                    38

1  Q    What was the ATS --

2          THE COURT:  Pardon me.  I'm confused about that.

3  Could I ask --

4          MR. HEBERLING:  Sure.

5          THE COURT:  -- a question, please?  I understand that

6  the use of current evidence is appropriate, but in doing an

7  epidemiology study don't you have to have a beginning period

8  and an end period, or else does your study never close?

9          THE WITNESS:  Well, it didn't ask me a beginning and

10 end, but some of these studies do go on.  They do never close.

11 Like Framingham or most, where most of what we learned about

12 heart disease in the United States is still ongoing, and it

13 started in 1947.  The Selikoff cohort has been followed

14 repeatedly.  So normally when you do a re-analysis, you go in

15 and look at the current -- the most up-to-date information data

16 that you can get a hold of, because you will learn something

17 more with the newer information usually.

18         THE COURT:  So this is a reexamination of the data

19 that was previously published concerning death rates from 1979

20 to 1998 that should've taken into account new information

21 gathered in a study after that date?

22         THE WITNESS:  No, I think the point is, is that if

23 you want to make statements about what's happening in terms of

24 mortality in Libby for specific diseases that you would want to

25 be using current data at the time that you're making your

Molgaard - Direct/Heberling                    39

1  statement.

2  Q    Did Dr. Moolgavkar --

3          MR. BERNICK:  I can you, Your Honor --

4  Q    -- make his own statement regarding whether or not there

5  was evidence that environmental exposures contributed to deaths

6  from asbestosis?

7          MR. BERNICK:  Objection, Your Honor.  I promise that

8  I -- myself I would stay quiet this morning, but I think it

9  really is ambiguous.  Is the witness offering an opinion that

10 the study omitted data, that Dr. Moolgavkar omitted data

11 somehow?  It's now ambiguous what he is saying.  Is he critical

12 of the study?

13         MR. HEBERLING:  Yes --

14         THE COURT:  I think that's what I'm confused about.

15         MR. HEBERLING:  -- that's what I -- I was about to

16 clarify.  We're addressing a statement by Dr. Moolgavkar about

17 whether there is any such evidence in --

18         THE COURT:  In this study?

19         MR. HEBERLING:  No.  No.

20         THE COURT:  Doesn't he refer to Table 8 of this study

21 or did you say it's --

22         MR. HEBERLING:  He refers to Table 8 in the statement

23 I read first.  He also makes a separate statement that there is

24 no evidence of environmentally caused asbestosis, yes.

25         MR. BERNICK:  That --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. HEBERLING:  And he makes that statement in 2009.

2          MR. BERNICK:  Your Honor, that --

3          MR. HEBERLING:  So that's the statement we're

4 addressing.

5          MR. BERNSTEIN:  Dr. Moolgavkar's statement in 2009 is

6 something I'm sure he'll be very anxious to address, but Dr.

7 Moolgavkar's statement is not relevant in this case.  What's

8 relevant in the case is, and particularly through this witness

9 with this document, is does he have any criticism of this

10 study?  It's the study that counts.

11          MR. HEBERLING:  Dr. Moolgavkar made his own

12 statement, and we're rebutting that, Your Honor.

13          THE COURT:  Okay.  I don't have his statement before

14 me.  I think what I'm going to need to know, so I understand

15 this in context is what paragraph or what portion his statement

16 that you're referring to, simply because if what he's talking

17 about is the fact that this study doesn't have that evidence,

18 and that's what you're exploring, this study being Exhibit LC-

19 209, then I understand it in that context.

20          If it's something else that you're doing, then I

21 don't understand the use of this document concerning a

22 criticism of Dr. Moolgavkar's 2009 statement.  So if you could

23 just clarify what it is you're doing, so that I understand the

24 record, that would be helpful.

25 Q    Okay.  Do you understand that Dr. Moolgavkar's made a

1 separate statement that there is no evidence of environmentally

2 caused asbestosis deaths in community exposures?

3 A    Yes.

4         THE COURT:  Okay.  Pardon me.  Before you said

5 pneumoconiosis.  Now you're saying asbestosis.

6 Q    Is asbestosis a form of pneumoconiosis?

7 A    Yes.

8         THE COURT:  But -- okay, it's a form, but are you --

9 which is it that you're asking about?  I'm -- I just want to be

10 clear.

11        MR. HEBERLING:  Okay.  We're asking asbestosis.

12        THE COURT:  All right.

13        MR. BERNICK:  If the witness is going to -- could we

14 just put the statement in front of the witness and the Court,

15 so we can see what it is that he's criticizing?

16        THE COURT:  Okay.  Well, first he was just asked if

17 Dr. Moolgavkar issued this statement, and the answer was yes,

18 he did.  So that's as far as -- along as we are, I think.

19 Okay.

20 Q    Do you agree with that statement?

21 A    No.

22 Q    And for what reason?

23 A    I don't agree with the statement, because there have been

24 subsequent additional cases identified in Libby from 2002.

25 Q    And can you state how many there -- such cases there are?

1  A    I can't remember off the top of my head.  I think four or

2  five.

3          THE COURT:  I'm sorry, Doctor, four or five

4  additional mesothelioma deaths?

5          THE WITNESS:  That's my understanding.  No, not --

6  not mesothelioma.  I don't know.  Asbestosis is what we're

7  talking about.

8          THE COURT:  I'm sorry?  I --

9          THE WITNESS:  I think we're talking about asbestosis.

10          THE COURT:  Asbestosis deaths?

11  Q    And here was one before 19 --

12          THE COURT:  Wait.  Wait.  I'm --

13  A    I think we're talking about different things.

14          THE COURT:  I'm trying to understand.  I'm sorry.  I

15  don't have Dr. Moolgavkar's statement, so as a result, I'm not

16  clear what your testimony is, and I'm just trying to understand

17  your testimony.  So is it -- so there are three or four

18  additional what kinds of cases since 2002?

19          THE WITNESS:  I believe Moolgavkar's statement was

20  about mesothelioma.

21          MR. BERNICK:  Objection.  We now hear that the

22  witness is I believe.  If he doesn't know, he shouldn't be

23  testifying about it.  Can we establish whether the witness

24  actually knows what Dr. Moolgavkar said before he is prompted

25  by the statement -- seeing the statement itself?

1          THE COURT:  I think it would be helpful if we all had

2     a copy of the statement so everybody -- especially me if I'm

3     going to have to make findings of fact later.  I don't want to

4     be confused about the evidence that you're presenting, and

5     right now I am.  Plus, I understood this witness' testimony

6     yesterday to say that there were three or four additional

7     mesothelioma deaths.  That's what prompted me to ask today

8     whether this is related to mesothelioma deaths.  So I'm just

9     not clear what it is that the evidence is.

10                         (Pause)

11          MR. HEBERLING:  Counsel, do you have the exhibit

12     number for the Moolgavkar report of April 6th, 2009?

13          MR. BERNICK:  April 6, 2009?

14          MR. HEBERLING:  Uh-huh.

15                         (Pause)

16          MR. HEBERLING:  Your Honor, I have the report, but I

17     don't have the exhibit number.

18          THE COURT:  Okay.  That's fine.  I'm sure we can get

19     the exhibit number at a later date.

20          MR. HEBERLING:  Okay.  I'm reading from the

21     Moolgavkar report of April 6, 2009 at Page 11.  "In conclusion,

22     there is no evidence that environmental exposure --"

23          MR. BERNICK:  I'm sorry.  Could we just have it put

24     on the screen?  That's not -- that's Mr. --

25          MR. HEBERLING:  That's what things look like when

1 I --

2          THE COURT:  All right.  I'm --

3          MR. HEBERLING:  -- take a deposition.

4          THE COURT:  I'm ignoring all of the -- I'm not

5 looking at any of the blue writing.  I couldn't read it if I

6 tried, so if we could just amplify the --

7          MR. HEBERLING:  Okay.

8          THE COURT:  All right.  Thank you.

9          MR. HEBERLING:  I'm pointing at this right here.  He

10 states at Page --

11          MR. BERNICK:  Could you just blow it up, so we can

12 all see it?

13          MR. HEBERLING:  -- 11 that, "There is no evidence

14 that environmental exposure to asbestos contributed to the

15 deaths from lung cancer, mesothelioma, and NMRD, including

16 asbestosis in the Libby area."

17          MR. BERNICK:  That's not a statement regarding the

18 ATSDR report.  That's a general statement about -- it's a

19 conclusion.  It's a conclusion of an expert regarding

20 causation.

21          THE COURT:  Okay.  That's --

22          MR. HEBERLING:  Exactly.  That's what we're --

23          THE COURT:  That's what he's getting to.

24          MR. HEBERLING:  -- addressing.

25          MR. BERNICK:  Well, it does not --

Molgaard - Direct/Heberling                    45

1       THE COURT:  That's why I'm confused about the use of
2  this exhibit, so --
3       MR. BERNICK:  Yes.
4       THE COURT:  All right.
5  Q    Okay.  I believe you've stated that you disagree with this
6  statement, and your basis?
7  A    The basis is that there were additional cases that were
8  community cases that were asbestosis cases and I believe
9  mesothelioma cases also after this study was done.
10      MR. BERNICK:  Could we --
11 A    So there have been additional cases which I believe Dr.
12 Moolgavkar's is not acknowledging.
13      MR. BERNICK:  I move to strike, Your Honor.  I
14 believe it doesn't cut it.  There's no foundation of where this
15 witness got the information and what disease it actually was.
16      THE COURT:  Right now that's sustained.  You need to
17 lay the foundation.  Could you put that back up on the screen,
18 so I can finish my note, please?
19      MR. HEBERLING:  Sorry.
20                  (Pause)
21 Q    Okay, Dr. Moolgav -- Dr. Molgaard, did you --
22      THE COURT:  Thank you.  If you need it again, you can
23 use it, Mr. Heberling.  Thank you.
24      MR. HEBERLING:  No, I don't.  I can leave it there.
25 Q    Dr. Molgaard, did you undertake a procedure to determine

1 the number of deaths from asbestosis since the close of data in

2 1998?

3 A    I relied on the -- Dr. Whitehouse's documents, which has

4 data on additional cases that have been identified in Libby

5 from 1998.

6 Q    What did you do to make the determination of how many such

7 deaths there were?

8 A    Counted them.

9          MR. BERNICK:  Well, what -- objection.  Which

10 document?

11 Q    Okay.  What particular documents did you look at?

12 A    The -- I believe it's the May, 2009 Whitehouse report.

13 Q    And was there a certain exhibit?  Can you describe what

14 lists you look at or --

15 A    There were --

16 Q    -- what exhibits?

17 A    Yeah, there was the CARD mortality data was part of that.

18 Q    And was there a list of death certificates?

19 A    Yes, there were.

20 Q    Which -- and did you go through that list to find

21 asbestosis deaths?

22 A    Yes.

23 Q    Did you narrow them down to excluding workers, for

24 example?  Did you exclude workers?

25 A    Yes.

1          MR. BERNICK:  Objection.  Lack of foundation.

2  Q    And --

3          THE COURT:  How does he know who the workers are?

4  Q    Did you have a listing?

5  A    There was a spreadsheet which broke out the new cases by

6  occupation, by residence, by age of diagnosis, et cetera.

7          MR. BERNICK:  Your Honor, I move to strike all of

8  this testimony on this.  It's based on an expert report.  That

9  doesn't cut it under Rule 702.  He hasn't indicated that he

10  actually reviewed the death certificates, whether they were

11  ones that were filled out by Dr. Whitehouse himself.  And in

12  certain terms of causation, there's no causation evidence that

13  the witness actually looked at.  He's just taking it from Dr.

14  Whitehouse's report.

15          MR. FINCH:  And also, Your Honor, your -- I

16  understood your ruling on what this witness is qualified to

17  testify to would be epidemiology not medical causation or

18  whether or not -- well, medical causation as it relates to

19  asbestos.  He's not qualified to do that, and so since he's

20  talking about a review of something that he didn't do, I'd

21  object.

22          THE COURT:  Well, I'm not quite sure at this point

23  what the point is.  I think the doctor testified that he

24  disagrees with Dr. Moolgavkar's conclusion that there is no

25  evidence of environmental exposure to asbestos --

1          MR. BERNICK:  Causing.

2          THE COURT:  -- causing -- that's right -- causing.

3   That's the word here that --

4          MR. BERNICK:  Contribute I think it is.

5          THE COURT:  -- that environmental exposure to

6   asbestos contributed to the deaths from Libby -- in Libby from

7   lung cancer, mesothelioma, and asbestosis-related diseases.

8   And I believe what the testimony so far is, is this witness is

9   criticizing Dr. Moolgavkar's report based on the fact that

10  there was some additional evidence of additional diseases that

11  from his review of Dr. Whitehouse's study he concluded were

12  environmentally based.

13         MR. BERNICK:  Whitehouse's expert report.

14         THE COURT:  Dr. Whitehouse's expert report, yes.  So

15  you need to lay the foundation that that type of analysis is

16  something that an expert in Dr. Molgaard's position would

17  normally use in rendering whatever opinion it is that he's now

18  going to render, because I think we're getting into medical

19  issues as to which this witness is not qualified to offer

20  opinions.  He clearly is competent to offer opinions concerning

21  the epidemiological studies, but I think we're beyond that.

22  BY MR. HEBERLING:

23  Q    In epidemiological work do you often use death

24  certificates?

25  A    Very often.

1 Q    Do you simply take what is stated on the death

2 certificates?

3 A    You take it and tally out the data, yes.

4 Q    Do you make any determination as to cause of death

5 yourself?

6 A    No.

7 Q    And you stated you tally out the information.  Is that

8 what you did in this case?

9 A    Yes, I did.

10 Q    And then did you further narrow the data to those who died

11 in Lincoln County?

12 A    Yes.

13 Q    How did you figure that out?

14 A    Because there was -- it was on the data spreadsheets where

15 they died.

16 Q    And then when you finally tallied it, did it come down to

17 15 since 19 -- since two thousand -- excuse me -- 1998?

18        MR. BERNICK:  Objection, Your Honor.  This doesn't

19 address the foundation issue under Rule 702 and 703.

20        THE COURT:  Well, so far all he's doing is testifying

21 about tallying and looking at a document.  I still -- and I

22 think that's okay.  I don't know what conclusion we're getting

23 to, but so far this process is fine.  Overruled.  And but what

24 turned out to be 15?  I don't understand the question.

25 Q    What was the 15?

Molgaard - Direct/Heberling                    50

1  A     When you subtract out mine workers, and you subtract out

2  those who were not residents, you end up with 15 data points,

3  deaths in the community.  So that they are community --

4  Q     What kind of deaths?

5  A     They were asbestosis.

6  Q     Okay.  So you had earlier stated that one should use

7  current data when making statements about death rates?

8  A     Yes.

9  Q     And how does the 15 relate to that?

10  A     They should have been considered.  I think that

11  Moolgavkar's statement is in error, because he ignored those 15

12  deaths.

13         THE COURT:  But what period of time are we -- when

14  were the deaths?

15  Q     What was the close of data in the ATSDR 2002 study?

16  A     Two thousand -- I -- it goes from -- I think these are

17  from 2002 to 2008, if I remember correctly.

18         THE COURT:  I'm sorry.  The 15 are from 2002 to 2008?

19         THE WITNESS:  Yes.

20  Q     Okay.  You -- the -- those are the ones you found?

21  A     On the data sheets, yes.

22  Q     And what were -- what was the close of data in the ATSDR

23  2002 study?  What year?

24  A     2002.  No.  No.  '99.  I'm sorry.

25  Q     And in the title --

**J&J COURT TRANSCRIBERS, INC.**

1  A    Or '98.

2  Q    -- it says, "Mortality in Libby, Montana, 1979 to 1998?"

3  A    Yes, it was '98.

4  Q    Does that give you an --

5  A    It's '98, yeah.

6  Q    And were the 15 that you found subsequent to 1998?

7  A    Yes.

8         MR. HEBERLING:  Okay.

9                    (Pause)

10        MR. BERNICK:  Your Honor, I -- it says they should've

11 been considered, I believe was his answer to the prior

12 question.  That is an opinion by this witness as an expert.  It

13 does not have proper foundation under 702, 703, because he

14 hasn't established that his scientists in his field would

15 ordinarily find reliable a litigation expert report under 702,

16 703.

17        THE COURT:  I'm still looking for the foundation.

18        MR. HEBERLING:  Okay.

19 Q    Did you have the actual death certificates as well in a

20 volume?

21 A    Yes, I did.

22 Q    Did you compare some of the actual death certificates to

23 the list?

24 A    I did a few, yes.

25        MR. BERNICK:  I'm sorry?

**J&J COURT TRANSCRIBERS, INC.**

1          THE WITNESS:  I did a few, yes.

2          MR. BERNICK:  A few?

3          THE WITNESS:  Yes.

4  Q    Were you satisfied that the list faithfully recounted the

5  information on the death certificates?

6          MR. FINCH:  Objection.  Lack of foundation.

7          THE COURT:  I don't know what information is on the

8  list compared to what's on the death certificate other than the

9  witness has testified that the place of death was listed.

10         MR. HEBERLING:  Okay.

11         MR. BERNICK:  Your Honor, at this point I --

12         MR. HEBERLING:  Let's --

13         MR. BERNICK:  I would -- we've made our objection.

14 It's so painful, and it's taking up so much time.  Maybe if

15 Your Honor just could reserve on this and just --

16         MR. HEBERLING:  We're -- we're prepared --

17         MR. BERNICK:  -- try to complete the --

18         MR. HEBERLING:  -- to get out the lists and compare

19 them.

20         MR. BERNICK:  Oh, I'm sure, but few isn't going to

21 turn into all, so our objection stands.  But maybe if we could

22 continue the cross and get on to something else, it would help

23 us get through the examination -- or the direct, excuse me.  It

24 would help us get through the examination.

25         THE COURT:  All right.  I will permit this then

Molgaard - Direct/Heberling                    53

1 subject to a determination later whether -- as to whether or

2 not there is a foundation.  So I believe the question, Doctor,

3 is whether those death certificates that you compared were

4 faithfully recorded on the list that you also reviewed.

5          THE WITNESS:  They appear to be.  There was also one

6 that I noticed was filled out by Dr. Whitehouse.

7          MR. BERNICK:  Move to strike as not responsive.

8          THE COURT:  It's not responsive, but it's also I

9 think not -- at this point not material.

10                      (Pause)

11          MR. HEBERLING:  I'm sorry, Your Honor, we're hunting

12 for a couple of exhibits.

13                      (Pause)

14          MR. HEBERLING:  I'll ask some foundational questions.

15 We're moving on to the rebuttal to the Weill report.

16          THE COURT:  All right.

17 BY MR. HEBERLING:

18 Q    Are you familiar with the -- Dr. Weill's surrebuttal

19 report of July 24, 2009?

20 A    Yes, I am.

21 Q    Did you prepare a rebuttal report to that?

22 A    I contributed to one that was done jointly with Dr.

23 Whitehouse.

24 Q    The first section of the Weill July 24, 2009 report is

25 titled The ATSDR Analysis.  Can you briefly -- I'm now putting

1  up LC-116 this is the July 24, 2009 Dr. Weill report.  Is this

2  the report that you reviewed?

3  A    Yes.

4  Q    Can you briefly describe Dr. Weill's study on the -- which

5  he calls the ATSDR analysis?  Very briefly.

6  A    He just briefly re-analyzed some of the data that was used

7  in the ATSDR study, and he looked at different aspects of x-

8  rays that were in that study.

9  Q    Did you do an evaluation of the methods in the Weill

10  study?

11  A    Yes, I did.

12  Q    How many chest x-rays did he use?

13  A    I believe he used 26.

14  Q    In the total in the first section --

15                         (Pause)

16  Q    Now we're now showing you LC-117, Libby claimants' expert

17  rebuttal to responses raised in Dr. Weill report.  Do you see

18  that?

19  A    Yes.

20  Q    Is that the report you mentioned you contributed to?

21  A    Yes.

22  Q    And I'm now showing you Page 2.  Does that refresh your

23  recollection as to the number of chest x-rays used in the Weill

24  report and the Peipens report?

25  A    Yes, it does.

1  Q    How many were there used by Weill?

2  A    Weill looked at 6,000 I believe it was -- 6,160, according

3  to this --

4  Q    And --

5  A    -- out of --

6  Q    -- how many had the Peipens study looked at?

7  A    6,668.

8  Q    Did you do any reconciliation to the number used in

9  Peipens?

10         MR. BERNICK:  Your Honor, at this point I object.

11  All he's doing is reading from a report.  He's now mistaken the

12  number of x-rays by two and a half orders of magnitude.  I

13  don't think it's proper to simply have the witness read his own

14  expert report while he's sitting there on the stand and just

15  read off his opinions.

16         THE COURT:  Well, I -- that's true.  It was used to

17  refresh recollection.  That's appropriate.  But at this point

18  you need to ask him questions.

19  Q    Okay.  Did -- in the Weill report did you find any

20  reconciliation to the Peipens study?

21  A    I'm not sure what that means, reconciliation.

22  Q    In terms of the number of x-rays.

23  A    I didn't see an explanation for why there were -- 500 some

24  dropped out.

25  Q    And is that --

**J&J COURT TRANSCRIBERS, INC.**

1      MR. BERNICK:  The witness again is still looking at

2 the expert report, which is still on the screen.

3      THE COURT:  Could you take the x-ray report -- or the

4 expert report off.  Thank you.  I don't know that the witness

5 is using it for this purpose, but fine.

6 Q    Okay.  You mentioned that 500 had been left out.  Do you

7 have an opinion whether that would affect the reliability of

8 the Weill study?

9      MR. BERNICK:  Objection.  Lack of foundation

10 regarding why they weren't there.  He can't express an opinion

11 about its propriety, unless he has knowledge about why they

12 were taken out.

13 Q    Did you come to a conclusion as to whether or not there

14 should've been a statement as to why the 500 weren't there?

15 A    I thought there should've been a statement, yes.

16 Q    Did you find one?

17 A    I did not.

18 Q    Do you think that's significant?

19 A    I think it is significant.

20 Q    And --

21      THE COURT:  The lack of a statement is significant?

22      MR. HEBERLING:  The lack of a statement as to why the

23 500 x-rays were left out.

24      THE COURT:  All right.

25 Q    And --

1          MR. BERNICK:  Well --

2  Q     -- do you have an opinion as to whether that would --

3  leaving out 500 would affect the reliability of the numbers in

4  Dr. Weill's study?

5          MR. BERNICK:  Same objection.  Lack of foundation for

6  that opinion.

7          THE COURT:  How can he know whether it affects

8  reliability if he doesn't know why they were dropped out?

9          MR. HEBERLING:  The reliability is an issue of how

10 the numbers fit together, and five -- leaving out 500 in just

11 in terms of the numbers is a very significant problem.

12         THE COURT:  The witness has testified that a sample

13 size of 30 to 35 is statistically significant, and this is over

14 6,000.  You can ask the question.  Overruled.

15 Q     Can you tell -- can you inform the Court as to why 500 out

16 of 6,000 would be a significant number affecting the

17 reliability of Dr. Weill's numbers?

18         THE COURT:  Wait.  That's a different question.  Your

19 first question was does he have an opinion as to whether

20 leaving out those 500 would affect reliability.  That's a yes

21 or no answer.  I've overruled the objection.  He may answer

22 that question.

23 Q     Okay.  Do you have an opinion as to whether leaving out

24 the 500 would affect the reliability of Dr. Weill's numbers?

25 A     If you're leaving out approximately --

1          MR. BERNICK:  Your Honor, I'm sorry.  It's a yes or

2 no.

3          THE COURT:  It's a -- if you can answer yes or no

4 whether you do or don't have an opinion, sir?

5          THE WITNESS:  Yes, I have an opinion.

6 Q    What is that opinion?

7          MR. BERNICK:  Your Honor, at this point we again --

8 in order to gt this done, can we just have a standing objection

9 on --

10          THE COURT:  No.

11          MR. BERNICK:   -- on <u>Daubert</u> grounds to this

12 testimony?

13          THE COURT:  Oh, on <u>Daubert</u> grounds, that -- I've

14 preserved all <u>Daubert</u> ground objections to a later date, yes.

15          MR. BERNICK:  Okay, and then you won't give it to me

16 for foundation under 702, 703?

17          THE COURT:  I'll reserve on that.

18          MR. BERNICK:  Okay.

19          MR. HEBERLING:  Okay.

20          THE COURT:  You can state your opinion, sir.

21 Q    What is your opinion?

22 A    My opinion is that usually methodologically when you are

23 analyzing data, if you exclude any data at all from your

24 analysis, it's on the basis of specific exclusion criteria.

25 You explain why they were excluded in a great deal of detail

1  and that this was not evident was disconcerting.  If you're

2  taking out approximately eight percent of your sample, it could

3  result in different kinds of bias being introduced into the

4  study results.

5  Q    Then did Dr. Weill also exclude subjects with a 1.0 high

6  or low reading or more?

7  A    Yes, he did.

8  Q    And was that explained?

9  A    No, it was not.

10 Q    And does that constitute a significant exclusion which may

11 affect the numbers in the study?

12        MR. BERNICK:  Same objections.  If they can just be

13 reserved?

14        THE COURT:  It's reserved.

15        THE WITNESS:  I thought so.

16 Q    Did you go through the numbers regarding Dr. Weill's

17 findings on width and extent requirements and whether those

18 numbers supported the use of width and extent as an important

19 first criteria in determining who is or is not likely to be

20 impaired?

21 A    Yes, I did.

22 Q    And briefly, can you explain -- well, do you have an

23 opinion as to whether Weill's data supported his observations?

24 A    I felt it did not.

25 Q    And why?

1  A    Because the numbers were almost identical.

2  Q    Numbers were almost identical.  Which of the screens were

3  you referring to when you said the numbers are almost

4  identical?

5  A    I believe the width was at 54 and then the angle at 56.

6  Q    Okay, so are you referring to the lung function test

7  screen?

8  A    Yes.

9  Q    Okay, and why is it that the numbers being so similar had

10  any effect on your opinion as to whether the width and extent

11  should be used as a first criterion?

12  A    Because the lung function numbers were not different for

13  the two different concepts.

14  Q    So which concept was actually the screen?  Which

15  criterion?  Which actually functioned as a screen?

16  A    It was the pulmonary lung function test.

17  Q    And which criterion did not function as a screen?

18         MR. FINCH:  Objection, lack of foundation.  Same 702,

19  703 objection.

20         THE COURT:  I'm going to overrule the objection at

21  this point.

22  Q    Okay, so did the --

23         THE COURT:  The question, I think, is what did not

24  function as a screen?

25         MR. HEBERLING:  I'll rephrase it.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Did the width and extent screen have any function at all

2  in terms of screening people in Dr. Weill's numbers?

3  A    I don't believe so.

4  Q    Then did Dr. Weill also do an evaluation of the Whitehouse

5  2004 population?  Was that the Section 2 in Weill's report?

6  A    Yes, that's correct.

7  Q    And do you have the Dr. Weill study in front of you --

8  A    No.

9  Q    -- in your black book?

10  A    I don't believe I do.

11  Q    Okay, let me ask you this.  Does the Weill study account

12  for subjects in the Whitehouse 2004 study who had died since

13  the close of data in the Whitehouse 2004 study?

14  A    I believe it looked at them.

15  Q    And then when the subjects in the Whitehouse 2004 study

16  died, was there any mathematical accounting for the

17  disappearance of those individuals from the followup?

18          MR. BERNICK:  Objection, lack of foundation.

19          THE COURT:  What's the foundation?

20  Q    Did you review the Weill study regarding the followup of

21  the Whitehouse 123 subjects population?

22  A    Yes.

23  Q    And did Dr. Weill attempt to present lung function numbers

24  for those 123 subjects after 2001 when the Whitehouse data

25  closed?

1 A    Yes.

2 Q    And then was there a certain number who had died

3 subsequent to 2001?

4 A    Yes.

5 Q    Did Weill account for -- did he use zeros for lung

6 function for people who are dead?

7 A    Yes.

8           MR. HEBERLING:  There's a third section to the Weill

9 report which is the comparison to the CARD mortality study.  I

10 think we'll cover that through other witnesses.  And I don't

11 want to take any more time because we want to get Dr. Frank on.

12 So with that, I'll close the direct examination.

13           THE COURT:  All right.  Mr. Finch?

14           MR. FINCH:  Just give me about 30 seconds to get

15 organized, Your Honor?

16           THE COURT:  Sure.

17                        (Pause)

18           MR. FINCH:  Are you ready, Your Honor?

19           THE COURT:  Yes, sir, thank you.

20           MR. FINCH:  Nathan Finch for the Asbestos Claimants

21 Committee.

22                   CROSS EXAMINATION

23 BY MR. FINCH:

24 Q    Good morning, Dr. Molgaard.

25 A    Good morning, sir.

Molgaard - Cross/Finch                          63

1  Q    You and I had met before, correct?

2  A    That's correct.

3  Q    I have put before you --

4            MR. FINCH:  May I approach the witness, Your Honor?

5            THE COURT:  Yes.

6  Q    I have put before you several documents.  I have, in case

7  you need to refer to them, both of your deposition transcripts,

8  Dr. Whitehouse's June deposition transcript and a notebook that

9  has got some tabs in it that I believe has many of the exhibits

10 that he referred to on direct examination.

11           THE COURT:  All right.

12 Q    I'm going to see if I can do this fast and that will

13 depend entirely on you, Dr. Molgaard.  Okay, would you agree

14 with me that no one has -- none of the material you've looked

15 at, be it the EPA documents, the work done by you or Dr.

16 Whitehouse or Dr. Frank, none of that establishes that if you

17 get mesothelioma in the State of Montana, you're more likely to

18 die from mesothelioma than if you get mesothelioma outside of

19 the State of Montana?

20 A    I agree.

21 Q    Would you also agree with me that if you get mesothelioma

22 from asbestos exposure in the State of Montana you're not any

23 more likely to die than if you get -- excuse me, let's back up,

24 you get lung cancer from asbestos exposure in the State of

25 Montana, you're not any more or any less likely to die from

1  lung cancer than outside of the State of Montana?

2  A    I agree.

3  Q    Would you agree with me that if you -- would you agree

4  with me there is some literature in the medical literature that

5  suggests that certain gastrointestinal tract cancers are

6  associated with exposure to asbestos?

7  A    Yes.

8  Q    And there's been no work done by anybody in this case or

9  by the United States government that you reviewed at least that

10  says that if you get a GI tract cancer in the State of Montana,

11  you're more likely to die from it than if you get a GI tract

12  cancer elsewhere?

13  A    I agree.

14  Q    And would you agree with me that if you contract the

15  disease asbestosis in the State of Montana, there's been

16  nothing that, if you have the disease, there's been nothing

17  that has been done either by your or by Dr. Whitehouse that

18  shows that you're more likely to die from the disease

19  asbestosis in the State of Montana than if you get asbestosis

20  in Texas or Mississippi or Boston and die from it there?

21          MR. HEBERLING:  Objection, irrelevant.  It's not part

22  of our burden to show what the probability of death is

23  elsewhere in the United States.

24          THE COURT:  Oh, but it is because you're contending

25  that there is a discriminatory impact on the citizens of Libby

1 because of the severity and incidents of death there.  So it is

2 -- I'm not necessarily sure where the burden is, but this is

3 clearly relevant to your contention.  Overruled.

4          MR. HEBERLING:  Your Honor, we believe -- we've got

5 proof that there's a probability of death in Libby exposures,

6 but we do not have a burden to prove what the exposures are --

7 the probability of death is elsewhere.  All we can show is that

8 there is no such study elsewhere which --

9          THE COURT:  That's what the question is, has he done

10 a study --

11          MR. HEBERLING:  -- shows the probability of death.

12          THE COURT:  That's the question.

13          MR. HEBERLING:  Okay, that's a medical question.

14          THE COURT:  Well, the question is, has he or Dr.

15 Whitehouse -- I'm sorry, I think it was Dr. Whitehouse --

16     Q    The question is has anybody in the world done a study

17 that you have looked at for as part of your work in this case

18 that shows that if you get asbestosis in the State of Montana,

19 you're more likely to die from asbestosis than if you get

20 asbestosis outside of the State of Montana?

21          MR. HEBERLING:  Objection, relevance.

22          THE COURT:  Overruled.

23 A    To my knowledge there are no comparative survival analysis

24 studies in existence.

25 Q    Okay, and the Libby claimants' lawyers have talked about

1  add-ons to the TDP relating to the severe disabling pleural

2  disease category.  Were you in court when there was some

3  discussion of that?

4  A    I believe so, yes.

5  Q    Okay, and whatever the proof is about that, it's not

6  coming to the Court through you?  You have no opinions about

7  the TDP medical and exposure criteria, correct?

8  A    No.

9  Q    Let's talk a little bit about epidemiology.  You would

10  agree that descriptive epidemiology cannot be used to prove a

11  causal hypothesis, is that right?

12  A    Normally, that is correct.

13  Q    Would you agree that analytic epidemiology can be used to

14  prove causal hypotheses?

15  A    Yes.

16  Q    All right, Dr. Whitehouse has a population of patients,

17  correct?

18  A    Yes.

19  Q    And I believe you testified on direct that when you're

20  doing work in epidemiology that involves clinical medicine, you

21  rely heavily on the experience and judgment of the medical

22  doctor with the clinical expertise, do you recall that

23  testimony?

24  A    Yes.

25  Q    And so in the work that you have done related to Libby and

1  Libby asbestos in this case you relied very heavily on Dr.

2  Whitehouse's medical opinions and judgments, correct?

3  A    Yes, I have.

4  Q    With respect to the CARD mortality study, for example, you

5  didn't go and review the underlying medical data for any of

6  those 186 people, correct?

7  A    Correct.

8  Q    You didn't decide at the outset how that study should be

9  set up, that was decided by Dr. Whitehouse, correct?

10 A    It was before I was involved, yes.

11 Q    And you didn't look at the death certificates or the

12 pulmonary function test scores or any of the medical data to

13 determine what, if anything -- well, they all died, what caused

14 their death, right?

15 A    Right.

16 Q    Okay, would you agree with me that 100 percent of Dr.

17 Whitehouse's patients are going to die of something?

18 A    Yes.

19 Q    And the question, if once you go beyond say 100 percent of

20 -- would you agree with me also that 100 percent of the Libby

21 claimants are going to die?

22 A    Yes.

23 Q    One hundred percent of the people in this room are going

24 to die?

25 A    Yes.

1  Q    All right.

2              THE COURT:  All but one.

3                        (Laughter)

4              MR. FINCH:  I always thought that I would be exempt

5  as well, Your Honor.  Possibly two.

6  Q    Once you go beyond saying they're all going to die and

7  start asking the question because of what, that becomes a

8  causal hypothesis, correct?

9  A    Yes.

10  Q    Okay.  Would you agree with me that the opinion that

11  someone who has asbestos disease caused by -- excuse me.

12  Someone who has pleural disease caused by asbestos exposure in

13  and around Libby, Montana, is likely to die from an

14  asbestos-related disease, that is a causal hypothesis?

15  A    It's a question that could be a hypothesis, yes.

16  Q    And it's a question that is a hypothesis about the cause

17  of death, correct?

18  A    Yes.

19  Q    Okay, would you agree with me that everybody in the world

20  eventually suffers a decline in lung function just by factor of

21  aging?

22  A    Yes, I would agree.

23  Q    Okay, and so all of Dr. Whitehouse's patients are going to

24  suffer a lung function decline at some point eventually, right?

25  A    As they age, yes.

1  Q    I mean unless they got hit by a bus at 25, you're

2  eventually going to suffer lung function decline, right?

3  A    Yes.

4  Q    So would you agree with me that an opinion that someone's

5  lung function decline is caused by their asbestos disease as

6  opposed to something else is again a causal hypothesis?

7  A    Yes.

8  Q    Would you agree with me that an association between two

9  different things does not prove causation?

10  A    It does not prove causation with a caveat that

11  associations are very much what we tend to work with in

12  epidemiology and if we have multiple replications where there

13  are associations, then we think very seriously about whether or

14  not there is causation going on.

15  Q    But in and of itself, an association doesn't prove

16  causation, right?

17  A    Only in the study that the association came from it's

18  showing for that study, for that sample, it would be an

19  association that would be valid for that study.  It's not

20  something that necessarily generalizes outside of that study.

21  Q    Okay, and would you also agree that just because you --

22  let me back up.  You can get sunburn from being outside in the

23  sun, right?

24  A    Yes.

25  Q    And generally speaking, people are outside more in the

1 summer than they are in the winter, right?

2 A    Yes.

3 Q    And generally speaking, people eat more ice cream in the

4 summer than they do in the winter, right?

5 A    Yes.

6 Q    And so if you tracked the association between eating ice

7 cream and sunburns, you would see a correlation between the

8 more ice cream consumption, the more sunburn, right?

9 A    Yes.

10 Q    And you could repeat that study every single year.  You

11 could do a new study with a new group of people every year, you

12 could do it with a million people year after year afer year,

13 right?  You could repeat that study year after year after year,

14 correct?

15 A    Yes.

16 Q    That -- if you did that study 100 times, it would never

17 prove that eating ice cream causes sunburns, right?

18 A    Right.

19 Q    Notwithstanding the repetitiveness of the association,

20 that doesn't prove causation, correct?

21 A    You could be endlessly wrong, correct.

22 Q    All right, would you agree with me that a properly

23 designed epidemiological study must precisely define the

24 hypothesis to be tested and the background rate of the disease

25 at issue?

1  A    There should be a specification of the research question

2  involved, though for descriptive studies, there will probably

3  not be a, usually a hypothesis, per se, specified.  And the

4  background rate is usually something that comes up in the

5  discussion section of a paper.

6  Q    But generally speaking, you have to precisely define the

7  hypothesis you're looking at, right?

8  A    Or precisely state your question, yeah.

9  Q    And I believe you testified to this on direct but would

10  you also believe that epidemiology generally is the best

11  evidence available to scientists interested in determining

12  whether a disease is causally related to use of or exposure to

13  a substance?

14  A    I think it's the best evidence at the population level.  I

15  think there are other kinds of evidence that are often used in

16  medicine that are specific to an individual which are also very

17  good.  And there are other fields that do things differently

18  with individuals such as toxicology that are not

19  population-based.  The thrust in epidemiology is to the

20  population.

21  Q    Okay, do you understand that -- would you agree with me

22  that if someone who is attempting to make predictions about the

23  future course of disease in a group of people, they're

24  attempting to do epidemiology?

25  A    Yes.

1 Q    And if they're attempting to do epidemiology, they should

2 be held to epidemiological standards?

3 A    It would be good.

4 Q    Okay.  Would you agree with me that if you're going to

5 talk about the risk of death from a disease, it's important to

6 distinguish between the different types of disease?

7 A    Yes.

8 Q    So if, for example, you were trying to analyze the risk of

9 dying from a smoking-related disease -- well, let's back up.

10 You understand that smoking cigarettes has been conclusively

11 established to cause lung cancer, right?

12 A    Yes.

13 Q    Okay, another disease caused by smoking cigarettes is

14 emphysema, right?

15 A    Yes.

16 Q    Another disease caused by smoking cigarettes is chronic

17 obstructive pulmonary disease, right?

18 A    Yes.

19 Q    COPD, right?

20 A    Correct.

21 Q    Okay, would you agree with me if you were going to attempt

22 to prove a hypothesis through epidemiology as to the

23 probability of death from emphysema, it's important to

24 distinguish between people with emphysema as opposed to people

25 with lung cancer?

1  A    Yes.

2  Q    And similarly, if you're going to test the hypothesis of

3  whether or not pleural disease caused by exposure to Libby

4  asbestos is more severe than pleural disease caused by exposure

5  elsewhere, it's important to define and distinguish between

6  pleural disease as compared to asbestosis?

7  A    I tend to think of pleural disease as being a type of

8  asbestosis.

9  Q    Okay, but if you're wrong about that, if pleural disease

10 is a separate disease than asbestosis, like lung cancer is a

11 separate disease from emphysema, if you're going to test the

12 hypothesis about whether or not there is a probability of death

13 from pleural disease, it's important to distinguish between, in

14 your analysis, between people with pleural disease and

15 asbestosis?

16 A    In the analysis, that would be important, yes.

17 Q    Okay, you haven't -- well, let me back up.  You talked

18 about -- there's been testimony in this case about Dr.

19 Whitehouse's lung function progression study, do you recall

20 that testimony?

21 A    Yes.

22 Q    Okay, and it's in your notebook but I won't ask you to

23 refer to it unless you need to.

24        MR. FINCH:  Your Honor, the 123-patient study has

25 been marked as Libby claimants' Exhibit 1.  I don't think it's

1  been offered in evidence yet.

2  Q     But can we just talk about that as the 123-patient

3  progression study, Dr. Molgaard?

4  A     Sure.

5  Q     Okay, would you agree with me -- first of all, you didn't

6  have anything to do with that paper, right?

7  A     That's correct.

8  Q     And would you agree with me that of those 123 patients, 45

9  percent of them had at least some evidence on chest x-ray or

10 CAT scan that they had interstitial changes consistent with

11 asbestosis?

12         MR. HEBERLING:  Objection, beyond the scope.  We only

13 asked questions regarding the epidemiological methods in the

14 study, not the analysis in terms of numbers, smokers and so

15 forth or numbers of pleural disease.

16         MR. FINCH:  May I rephrase, Your Honor?

17         THE COURT:  Yes.

18 Q     Did you do anything to determine whether or not of the 123

19 patients in the progression study how many of them had

20 asbestosis?

21 A     I just read the paper in terms of that.

22 Q     Okay, and so I believe you agreed before that if you're

23 trying to make a causal prediction as to the effects of pleural

24 disease, you would want to focus on pleural disease and not

25 include people with asbestosis in your analysis, right?

1          MR. HEBERLING:  Objection.  That's a medical

2    question, not epidemiology.

3          MR. FINCH:  No, it's an epidemiological question,

4    Your Honor.

5          THE COURT:  How?

6          MR. FINCH:  He -- I asked him whether or not if

7    you're trying to distinguish epidemiologically to make a causal

8    statement about the progression of disease or severity of

9    disease, it's important to distinguish between the types of

10   disease.

11         THE COURT:  All right, overruled.

12   Q    Do you recall my question?

13   A    Could you rephrase it or say it again, sir?

14   Q    I kind of liked it the last time.  If you're trying to

15   make a causal prediction as to the effects of pleural disease,

16   you would want to focus on the pleural disease and not include

17   people in your study who have asbestosis, right?

18   A    If you're assuming that they are indeed distinct entities

19   and not a subtype of one or the other.

20   Q    Another piece of information that's been talked about in

21   this case by you and eventually as we'll hear from Dr. Frank

22   and Dr. Whitehouse about it, is Dr. Whitehouse's CARD mortality

23   study.

24   A    Yes.

25   Q    And it's been stipulated by counsel for the Libby

**J&J COURT TRANSCRIBERS, INC.**

1 claimants that when we're talking about that study, we're

2 talking about the study as is reflected in Dr. Whitehouse's

3 expert report in May of 2009 in this case, right?

4 A    Right.

5 Q    And in that CARD mortality study he is attempting to --

6 would you agree with me that he is attempting to use the

7 results of that study to predict the likelihood of disease in

8 the patient population that he sees?

9 A    Yes.

10 Q    Okay, and in the CARD mortality study did you understand

11 that of the 76 non-malignant deaths Dr. Whitehouse included

12 people who had both people who had pleural disease as well as

13 people who had asbestosis?

14 A    Yes.

15 Q    You didn't set any of the protocols for how Dr. Whitehouse

16 gathered his data to do the CARD mortality study, correct?

17         MR. HEBERLING:  I'm sorry, I didn't hear the

18 question.

19 Q    You didn't set any of the protocols for how --

20         MR. HEBERLING:  Is it study?

21 Q    -- any of the data that Dr. Whitehouse gathered in either

22 his mortality study or his progression study?

23 A    No.

24 Q    And you don't have any basis to know whether or not Dr.

25 Whitehouse gathered his data appropriately from an

1  epidemiological perspective because you weren't involved in the

2  data gathering, correct?

3  A    That's correct.

4  Q    You've written in publications regarding the importance of

5  having pathological evidence of disease if you're doing an

6  epidemiological study?

7  A    I have, yes.

8  Q    And if autopsy pathology is available, someone doing an

9  epidemiological study should rely on the pathology in the

10  autopsies?

11  A    In most situations, yes.  I think in -- for asbestosis it

12  may be a little bit of a unique situation in terms of the need

13  for that for diagnostic purposes.  But in general, I do believe

14  that.

15  Q    Well, you're not a pulmonologist.  You don't know whether

16  the best evidence of whether or not you have asbestosis is what

17  you see on an x-ray or pathology, right?

18  A    I'm not a pulmonologist.

19  Q    And the reason pathology is important is that it can help

20  establish what was the underlying cause of death, correct?

21  A    That's true.

22  Q    And you would agree with me that the EPA order that you

23  talked about on direct, the -- it's Libby claimants' 48, 49 and

24  50.  There's nothing in this document that says that if you

25  have pleural disease caused by exposure to asbestos in and

1  around Lincoln County, Montana, that you have a probability of

2  dying from the pleural disease, correct?

3  A    Correct.

4  Q    There's nothing in the EPA order or any of the literature

5  it cites that says if you have pleural disease caused by

6  exposure to asbestos in or around Lincoln County, Montana, you

7  have a probability of dying of pleural disease?

8  A    I believe that's true.

9  Q    And the only thing that the EPA cites to, and all of the

10  references attached that has any information at all about lung

11  function test scores, is Whitehouse -- Dr. Whitehouse's

12  123-patient progression study, correct?

13  A    Yes.

14          MR. FINCH:  No further questions for me, Your Honor.

15          MR. BERNICK:  Could we put up a board?

16          MR. HEBERLING:  Your Honor, we'll enter an objection

17  that the plan proponents are a single entity in this case and

18  there should not be two lawyers cross examining.

19          MR. FINCH:  Your Honor, I think it's well established

20  under Third Circuit precedent that parties in interest in

21  bankruptcy cases have an independent right to be heard on

22  issues and the idea that Grace and the Asbestos Claimants'

23  Committee are a single entity is -- let's just say we would

24  strongly disagree with that.

25          MR. HEBERLING:  Plan proponents are a single entity

1  in this case.

2           THE COURT:  The plan proponents are jointly

3  supporting the proposition of this plan but their interests are

4  not totally aligned in the confirmation process.  The debtor is

5  clearly a party-in-interest with standing regarding the

6  confirmation standards of its own plan.  So the objection is

7  overruled.

8           MR. BERNICK:  This Court -- we're very sensitive to

9  time.

10          THE COURT:  I can't hear you.

11          MR. BERNICK:  We're very sensitive to time and we --

12 Mr. Finch and I agreed about how to divide this up so that

13 there won't be duplication and he has been very prompt and I

14 will try to do the same.  There we go, okay.

15                        CROSS EXAMINATION

16 BY MR. BERNICK:

17 Q    Good morning, Dr. Moolgavkar (sic).  Can you hear me?

18 A    Molgaard.

19 Q    That's the second time.  And remember what I said the

20 first time which is that you got the better hair?  We'll see

21 about whose side we're on here.

22 A    Okay.

23 Q    I apologize.  And I certainly apologize to Dr. Molgavkar.

24 I take it by virtue of what you've said here and yesterday that

25 standards are important in your field of epidemiology, is that

1  correct?

2  A     That is true.

3  Q     Indeed, standards in epidemiology are the thrust and focus

4  of the testimony that you've offered to this Court, is that

5  right?

6  A     By and large, yes.

7  Q     And is it true that in the field of epidemiology, in

8  particular, epidemiologists feel that it's very important that

9  their standards be applied rigorously?

10 A     By and large that's true.

11 Q     Well, and you indeed yourself believe that part of the

12 important function of epidemiologists is to be reflective about

13 their own work and indeed to be hypercritical of how their work

14 is performed and whether it meets standards, correct?

15 A     That's true.

16 Q     Hypercritical.  So, and is it also true that during the

17 course of your work as a -- you've acted as a litigation expert

18 in other cases, have you not?

19 A     Yes, I have.

20 Q     And is it true that when you've been called to offer

21 opinions to in service of defending a product that's being said

22 to have a bad effect so as to cause harm, you actually have

23 recited epidemiological standards and insisted upon absolute

24 compliance with those standards in criticizing the efforts of

25 people on the other side to advance epidemiology that doesn't

1  meet those standards, correct?

2  A    I've argued that way, yes.

3  Q    I'm sorry?

4  A    Yes, I have argued in that direction.

5  Q    Well, argued, you've offered expert opinions as a

6  scientist where you have set out the rubric for reliable

7  scientific information and insisted that because the other side

8  -- the other side's scientists and the science didn't meet

9  those standards that their opinions should be disregarded as a

10 scientific matter, is that accurate?

11 A    I have done it, yes.

12 Q    Okay.  Now, you made a fundamental distinction in the

13 course of your examination here that I want to go back to for

14 just a moment.  You made a fundamental distinction between

15 descriptive -- this happens every time -- epidemiology and

16 analytic, correct?

17 A    As type -- two different categories of observational

18 studies, yes.

19 Q    That's right, you made that distinction as an important

20 distinction when you took the stand.  Is the answer to that

21 correct?

22 A    Yes.

23 Q    Okay, and is it true that really, in the field of

24 epidemiology the descriptive work is generally done before the

25 analytic work?

Molgaard - Cross/Bernick                    82

1  A    In general.

2  Q    And the reason that that's so is that the descriptive work

3  cannot accomplish, can't go as far as the analytic work, is

4  that correct?

5  A    That's part of the answer.  Part of it is also is that

6  there's -- often there is a certain amount of population

7  surveillance data which is used to go into the design of

8  analytic studies.

9  Q    Okay, so this is a one and a two, correct?

10  A    If there was a 1.5 in there for population surveillance,

11  that would be good.

12  Q    But analytic takes you further down the road towards

13  causation than descriptive does, correct?

14  A    That's true in general.

15  Q    Okay, so we want to be very careful to preserve this order

16  of priority between descriptive and analytic, correct?

17  A    Yes.

18  Q    Want to adhere to that rigorously, right?

19  A    If you can, yes.

20  Q    Well, if you can.  Not if you can.  If you can't adhere to

21  that, you're not complying with standards, correct?

22  A    Adhering to standards is a matter of degree.

23  Q    Oh, okay.

24  A    Okay.

25  Q    Well, I want to talk about the --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. HEBERLING:  Objection.  I don't believe the

2  witness --

3          MR. BERNICK:  I'll withdraw it.  I want to talk --

4          MR. HEBERLING:  -- was done with his answer.

5          THE COURT:  I think the witness wasn't finished, Mr.

6  Bernick.

7          MR. BERNICK:  Okay, I'm sorry.  I apologize.

8  A    All I was just going to say is that there are studies

9  which are clearly an attempt to do epidemiology which were not

10 necessarily good studies and there are other studies which are

11 good because they've managed to adhere to standards pretty

12 well.

13 Q    Okay, and your testimony here today and in the testimony

14 that's being offered in connection with this case, we should be

15 hypercritical and make sure that descriptive epidemiology

16 doesn't take precedence over analytic epidemiology, correct?

17 A    I don't really think of it that way especially, but the

18 deal is, is that when one's thinking about causation, the model

19 I've moved to in the last few years before I got involved in

20 this litigation, is one where you use an eco-epidemiologic

21 perspective on causation where different studies are factored

22 in in sort of a systems theory approach.  So descriptive

23 studies and analytic studies and these studies and molecular

24 studies and surveillance studies and all this stuff comes

25 together into a model and then you think about what does it all

Molgaard - Cross/Bernick                84

1  mean together.

2  Q    Okay, so --

3  A    So what you're doing is historically correct.  My own

4  theoretical position has changed in the last few years.

5  Q    So this is historically correct, the priority that I have

6  here.  Descriptive comes first, analytic second, right?

7  A    Mm-mm.

8  Q    I mean analytic takes priority at the end of the day over

9  descriptive, that is the historically correct approach, right?

10  A    Right.

11  Q    That is the approach that is established and recognized in

12  the basic textbooks of epidemiology today, correct?

13  A    In many of them, yes.

14  Q    Well, and indeed in the very ones that you cited before

15  this Court, textbooks like Rothman, textbooks like Last.

16  A    Mm-mm.

17  Q    That -- those textbooks adopt the approach, the historical

18  approach where analytical epidemiology at the end of the day

19  trumps descriptive epidemiology when it comes to causation,

20  correct?

21  A    If you're thinking about causation, yes.

22  Q    I'm sorry?

23  A    If you're thinking about causation.

24  Q    That's what we're here to talk about, causation, causal

25  relationships.  That's what Dr. Whitehouse is addressing,

Molgaard - Cross/Bernick                    85

1  right?

2          MR. HEBERLING:  Objection to the speech.  It's not a

3  question.

4          MR. BERNICK:  I'll withdraw it.

5  Q    What Dr. Whitehouse is addressing are causal

6  relationships.

7          MR. HEBERLING:  Objection to the -- this is not a

8  question.

9  Q    True --

10         THE COURT:  It is a question if you'd let him finish.

11 Please continue.

12 Q    What Dr. Whitehouse and Dr. Frank and what we are

13 addressing here in this courtroom are causal relationships,

14 true or not?

15 A    That may be what you're addressing but as an

16 epidemiologist, I think in terms of associations and

17 replicational studies.

18 Q    Dr. Whitehouse doesn't simply talk about associations.  He

19 talks about causal relationships, right?

20 A    As a clinician, he might, yes.

21 Q    Well, in his reports he does, correct?

22 A    Mm-mm.

23 Q    I'm sorry?

24 A    Yes.

25 Q    Dr. Frank in his report talks about causation, correct?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    You heard counsel for the Libby claimants talk about

3  causation, correct?

4  A    Yes.

5  Q    An established science, the established science, the

6  reliable science today says that when it comes to causation,

7  analytic epidemiology trumps descriptive epidemiology, true or

8  not?

9  A    I don't know what you mean by trumps.

10 Q    Takes precedence over, controls, that's what I mean.  You

11 look to analytical epidemiology to tell you about causation,

12 correct?

13 A    Not always.

14 Q    Not always.  Not always, when?  In your work, is that

15 fair?

16 A    In many people's work.

17 Q    Okay, when it comes to Rothman, when it comes to Last, all

18 those textbooks say exactly what I said, correct?

19 A    I don't believe it's exactly that way.

20 Q    Well, let's take a look.  First of all, let's take a look

21 at your own testimony.  I know you've got a chart.  We'll get

22 to the chart, but I just want to make clear, we'll just show

23 you your testimony and see if you agree with it.

24       MR. HEBERLING:  Objection.  Improper examination.  He

25 should be asked a question first.

1          MR. BERNICK:  No.  I'm asking -- I'm simply going to

2   show --

3          MR. HEBERLING:  There's nothing to impeach.

4          MR. BERNICK:  I'm not seeking to impeach him.  I'm

5   showing him a statement that he made and I'm asking him whether

6   he agrees or not.  We are marking this, incidentally, as Plan

7   Proponents' 237.

8          THE COURT:  All right.

9   Q    This is your deposition.  It says I believe I wrote it

10  down here that you described or defined descriptive

11  epidemiology as, "a study concerned with and designed only,

12  designed only, to describe existing -- the existing

13  distribution of variables without regard to causal or other

14  hypotheses."  Is that correct?

15  A    That's what is in Last's dictionary and I do agree with

16  that.

17  Q    Is it also true that part of the purpose of descriptive

18  epidemiology is to generate or create hypotheses?

19  A    Yes.

20  Q    And then it's up to analytical epidemiology under

21  established science today and you agree it's up to the

22  analytical epidemiology to test the hypotheses, right?  Your

23  word?

24  A    It is a process that works like that often.

25  Q    No, it is your chart that says that the purpose of

1  analytic epidemiology is to test the hypothesis, right?

2  A    Yes.

3  Q    And that's something that can't be done with descriptive

4  epidemiology, correct?

5  A    Correct.

6  Q    Now, analytic epidemiology -- I want to show you the

7  second page of 237 and this is again a quote and I think you

8  agree with this from Last, the textbook, "Analytic study.

9  Analytic study is designed to examine associations commonly

10  putative or hypothesized causal relationships usually concerned

11  with identifying or measuring the effects of risk factors or

12  with the health effects of specific exposures, contrast

13  descriptive study which does not test hypotheses."  Do you

14  agree with that?

15  A    Yes.

16  Q    So we get causal when we're talking analytic.  When we're

17  talking descriptive, we're not talking causal, correct, in the

18  study?

19  A    In those designs per se.

20  Q    Okay, and, in fact, and I'm showing you an expert report

21  that you've issued.  When it comes to doing those kinds of

22  studies, when it comes to grading the standards, applying the

23  standards of epidemiology, you have actually ranked standards.

24  You've ranked these kinds of tests and you say as follows.

25  First of all, a case series, is a case series descriptive?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    Okay, are case series anecdotal?

3  A    No.

4  Q    They're not anecdotal?

5  A    I don't think of them at this point as anecdotal, no.

6  Q    Well, but sure they are.  What it is is a -- a case report

7  is anecdotal, isn't it?

8  A    A single case report I think of as being anecdotal, yes.

9  Q    Yeah, and it's anecdotal in a sense that a doctor writes a

10 letter, writes an article and he tells the story of an

11 individual patient, right?

12 A    Correct.

13 Q    And all in this case series is is that the doctor, when he

14 writes the article, tells the story of not just one patient,

15 but a whole bunch of patients, right?

16 A    Right.

17 Q    And in that respect, case series articles are anecdotal,

18 correct?

19 A    I don't think that way today.

20 Q    I'm sorry?

21 A    I don't believe that today.

22 Q    You don't believe that today.  Isn't that what the

23 literature generally says is that both case reports and case

24 series are anecdotal?

25 A    I think that in general they are considered to be a

1  magnitude indifference in terms of what they can tell you.  A

2  single case report, I have always argued, is not persuasive of

3  anything, but you can learn something from a case series.

4  Q    You agree, do you know, that epidemiologists and other

5  scientists value the importance of properly-designed and

6  conducted studies?

7  A    Yes.

8  Q    You agree that a proper study design must precisely define

9  the hypothesis to be tested in the background rate of disease

10 at issue, right?

11 A    The research question needs to be specified and it's good

12 to know what the background rate is, yeah.

13 Q    I'm just reading your own words.  Do you agree?

14 A    I agree with it.

15 Q    Okay, only through a properly-designed study can

16 scientists answer the question of whether the rate of

17 occurrence in an exposed population is greater than the rate of

18 occurrence in the unexposed population, right?

19 A    Yes.

20 Q    Once it is determined that the rate of occurrence of a

21 disease is greater in exposed population, we say that there is

22 an association between the exposure and the disease, correct?

23 A    Yes.

24 Q    Now, in all of what we've talked about here, you're

25 talking about controlled studies, right?

Molgaard - Cross/Bernick                    91

1  A    Yes.

2  Q    And, in fact, controlled studies can give you an

3  association, right?

4  A    Yes.

5  Q    And descriptive studies generally are not controlled

6  studies, correct?

7  A    They use comparison populations usually, yes.

8  Q    But they're not randomized controlled studies, correct?

9  They're not matched controlled studies, descriptive studies?

10  A    Well, many analytic studies are not randomized either.

11  Some of --

12  Q    I ask you with respect to descriptive studies, descriptive

13  studies are not properly and statistically-controlled studies,

14  correct?

15  A    That's not what they're for.

16  Q    I'm sorry?

17  A    They're not for --

18  Q    I didn't ask you that.  They are not controlled studies,

19  true or not?

20  A    No, you asked whether they were properly.  They are proper

21  for what they are as a research design.

22  Q    I asked you statistically.  They're not

23  statistically-controlled studies, correct?

24  A    You said properly and statistically.

25  Q    Okay, I apologize.  I just want to be clear.

1  A    Yeah.

2  Q    Descriptive studies are not statistically-controlled

3  studies, right?

4  A    Right.

5  Q    Okay.  Proper analytic studies are, correct?

6  A    Yes.

7  Q    Okay now, even with you having a controlled-statistical

8  study showing the association and analytic study, you don't get

9  the causation until you have replication and consistency,

10  correct?

11  A    Correct.

12  Q    Now, in the case of Libby, there are mortality studies

13  that have shown the increased rate of disease or risk of

14  disease with respect to people who worked in the mines,

15  correct?

16  A    Correct.

17  Q    And not only were they analytical studies that were

18  properly controlled, there were -- there is more than one.  You

19  had Amandus and you also had McDonald, correct?

20  A    Correct.

21  Q    And then later on they were re-reviewed and bolstered in

22  the process of re-review, correct?

23  A    Yes.

24  Q    So at Libby, folks know through established analytical

25  studies, that the Libby mine caused the kinds of rates of

1 disease that you testified to in connection with your direct

2 examination, right?

3 A    Yes.

4 Q    That is all very rigorous and demanding to do, correct?

5 A    Correct.

6 Q    Now, in connection with your work on this case you did a

7 report initially, correct, the first report that you did?

8 A    Yes.

9 Q    And it said that certain studies, which were descriptive

10 studies, including the 2004 Whitehouse paper and the 2008

11 Whitehouse paper and the CARD mortality study, you said that

12 those are all fine studies.  They were descriptive, do you

13 recall that?

14 A    Yes.

15 Q    You talked all about how they met descriptive standards,

16 correct?

17 A    Yes.

18 Q    And you didn't -- you were very clear that they were not

19 analytical studies, correct?

20 A    Correct.

21 Q    And, in fact, Dr. Whitehouse doesn't have in any of his

22 work a controlled epidemiological study, correct?

23 A    Correct.

24 Q    But what you didn't address in your first report, which

25 you didn't address is that, in fact, the CARD study is

Molgaard - Cross/Bernick                    94

1  masquerading in this case as a study that addresses causal

2  relationships.  You didn't address that in your report, did

3  you?

4          MR. HEBERLING:  Objection.  Improper cross

5  examination.  Masquerading is --

6          MR. BERNICK:  I'll change it.

7  Q    You didn't address -- and I withdraw the question.  You

8  didn't address in your report the fact that the CARD mortality

9  study is being used and, indeed, recites that it has actually

10 addressed causal relationships, correct?

11 A    It actually recites -- are you saying there's a quote in

12 there?

13 Q    Yeah, the CARD mortality data, indeed, data that you've

14 talked about here addresses causal relationships, right?

15 A    Yes.

16 Q    Okay.  And, in fact, Dr. Whitehouse, when he's offered

17 opinions in his report, doesn't stay away from causal

18 relationships.  He addresses causal relationships, right?

19 A    Yes.

20 Q    Even though all of his studies are descriptive, right?

21 A    Yes.

22 Q    So we took a look at LC-8 which you showed to the Court

23 yesterday.  You didn't talk about this.  You just talked about

24 proportionality.  But at the very top of the page, Significant

25 Contributing Factor Analysis, do you see that?

1  A    Yes.

2  Q    That's right on the summary of the CARD mortality study

3  that you showed the Court, right?

4  A    Yes.

5  Q    And you know from being involved in litigation,

6  Significant Contributing Factor is a phrase of art that is used

7  to say that something contributes to in the sense of helping to

8  cause something else, right?

9  A    Right.

10  Q    That is a causal statement, Significant Contributing

11  Factor, as it appears on the CARD mortality summary LC-8,

12  correct?

13  A    I would probably maybe -- I don't know if I would

14  interpret it that way or not, but I'm fine with you

15  interpreting it that way.

16  Q    That's certainly what a reader would think.  It's not oh,

17  maybe it's hypothesized.  It's not hypothesizing like a

18  descriptive study.  It is causally-relating like an analytical

19  study, right?

20  A    I don't read that into that.  I have a different issue

21  with that line there than what you're bringing up.

22  Q    Whatever the issue was, you never brought it out on direct

23  examination, did you?  Never told the Court what your issue

24  was, did you?

25  A    No.

1 Q    In your reports you never told the Court what the issue

2 was.  In your direct examination you never told the Court what

3 the issue was, right?

4         MR. HEBERLING:  Objection, vague as to what the issue

5 may be.

6         MR. BERNICK:  Well, it'll be -- I'm sure we can bring

7 it out.

8 Q    So let me just talk about Dr. Whitehouse's reports.  Dr.

9 Whitehouse's own opinions which you reviewed in the context of

10 his reports, those opinions get into causation.  It says

11 pleural disease from exposure to Libby asbestos.  Is that a

12 causal statement in Dr. Whitehouse's report?

13 A    It would seem to be.

14 Q    Well, it not only would it seem to be, it is, is it not?

15 A    I guess.

16 Q    And in all of your reports that you did before you were

17 deposed, you never took on the fact that Dr. Whitehouse was

18 taking descriptive studies and descriptive data in drawing

19 causal conclusions, did you?

20 A    No.

21 Q    You never said that that doesn't comply with standards,

22 did you?

23 A    No.

24 Q    You still haven't -- when you came and talked here today

25 and yesterday for hours you haven't been candid with the Court

1 and said that Dr. Whitehouse is expressing causal opinions and

2 he shouldn't do that based upon historically-correct

3 methodology in the field of epidemiology, correct?

4 A    In my first deposition I made it perfectly clear that part

5 of descriptive epidemiology is population surveillance and that

6 population surveillance, even though it is descriptive, which

7 is what I think of Whitehouse's work as being examples of is

8 descriptive population surveillance, that can be used to make

9 policy decisions and is done all the time.

10 Q    I didn't ask you about --

11             MR. HEBERLING:  Objection.

12             MR. BERNICK:  I'm sorry.

13             MR. HEBERLING:  Let him finish.

14 Q    Go ahead, finish.

15 A    I just -- it's done frequently all the time in public

16 health that policy decisions are made on the basis of

17 descriptive population surveillance, so --

18 Q    I didn't ask --

19 A    But you're not letting me put the middle box in which I

20 did do in my first deposition.  I was allowed to put a box in

21 between descriptive and analytic studies that said population

22 surveillance.

23 Q    All right, when it comes to actually -- your diagram in

24 this case, your diagram in this case doesn't put population

25 studies in between descriptive and analytic, does it?

1  A    I did at deposition.

2  Q    I didn't ask you that.  The chart that you showed the

3  Court yesterday, we're going to get to it.  It has two columns,

4  not three, right?

5  A    That's true.

6  Q    You never talk about population surveys in the chart you

7  showed the Court, did you?

8  A    Not on that chart.

9  Q    Okay, and you didn't tell this Court and you didn't say at

10 any point in time that what Dr. Whitehouse is doing when he

11 uses his work to express causal conclusions does not comply

12 with the historically-established standards and methods for

13 expressing views about causation within the field of

14 epidemiology, correct?

15 A    I did not say that, no.

16 Q    Well, you gave your deposition in June.  In your

17 deposition in June you make some very significant statements on

18 the record and under oath about the state of science today, did

19 you not?

20 A    Yes.

21 Q    In fact, you admitted that you can't -- and this is not --

22 isn't it true that as a fact when you testified, as a fact when

23 you testified, you acknowledged that you could not offer an

24 opinion to a reasonable degree of certainty as an

25 epidemiologist that the pleural disease caused by exposure to

1 Libby asbestos is more severe in terms of loss of lung function

2 than pleural disease caused by other forms of asbestos outside

3 of Libby, you acknowledge that, correct?

4 A    Yes.

5         MR. HEBERLING:  Objection, irrelevant.

6         THE COURT:  I'm going to admit it subject to the same

7 relevancy determinations that I've been making on the other --

8 in your case, Mr. Heberling, because at this point I need to

9 connect the dots and I don't know how to do that at this stage.

10 So I'll admit it but subject to relevancy.  Let me make

11 objection -- let me make a note please for a minute.  Okay,

12 thank you.

13 Q    And you also admitted, did you not as a fact in June, that

14 somebody who has pleural disease, you couldn't say as a matter

15 of epidemiological science, you couldn't say that someone who

16 has pleural disease caused by exposure to Libby asbestos is

17 more likely to die than someone who has pleural disease caused

18 by some other asbestos, didn't you make that statement?

19 A    Yes.

20         MR. HEBERLING:  Objection, irrelevant.

21         THE COURT:  No, this was clearly covered on direct.

22 That's overruled.

23 Q    Now, after you got done with that deposition, you decided

24 to issue another report, right?

25 A    Yes.

Molgaard - Cross/Bernick                    100

1   Q    And that other report, you also decided to do a new chart,

2   right?

3   A    Yes.

4   Q    Okay, and you showed the chart to the Court yesterday.

5   And I just want to spend a moment on this chart.  First of all,

6   in this chart for some reason you switched the order of

7   analytic and descriptive, right?

8   A    Yeah.

9   Q    I'm sorry?

10  A    Yes.

11  Q    And you also kind of put them on exactly the same footing.

12  They're equal studies on two sides of the page, right?

13  A    Yes.

14  Q    And they all both come down in marching fashion to

15  ultimately -- both of them contribute to what you wanted to get

16  to which is public health decisions, right?

17  A    Right.

18  Q    And in that chart even though descriptive studies are done

19  without regard to causal hypotheses in relationships, you

20  decided to equate descriptive and analytic epidemiology both as

21  providing evidence for causation, right?

22  A    They both provide evidence.  It's just different types.

23  Q    Yeah, but you don't even say -- well, in fairness, you do

24  say different types but you basically put them on a par with

25  one another when it comes to providing evidence of causation,

1  correct?  That's what your chart does, right?

2  A    The chart makes it look that way, yes.

3  Q    Yeah, okay.  And certainly you want to deform the

4  predicate for then saying, you know what, these types of

5  evidence, they pretty much carry the same weight when it comes

6  to what you wanted to get to which is forming a basis for

7  public health decisions, right?  That's what your chart

8  basically says, right?  Same weight?

9  A    No, I'm not trying to say that with that chart.  I'm just

10  saying that they both are used to make public health decisions.

11  Q    Right, so you got -- may establish -- there's no

12  difference between the two when it comes to establishing an

13  association, right?

14  A    Mm-mm.

15  Q    What?

16  A    They both establish associations.  It's just --

17  Q    You make no distinction.  They look like they're equal,

18  right?

19  A    I guess.

20  Q    Statistical prediction for analytic, statistical inference

21  for descriptive.  You don't even explain what the difference is

22  between a prediction and an inference.  You never explained in

23  your direct examination, did you?

24  A    I don't believe I was ever asked.

25  Q    Well, but this is your chart, is it not?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    Did you put this chart together yourself?

3  A    Yes.

4  Q    Now, I want to get to the last point because that brings

5  us back to this all end model that you talked about --

6  A    Mm-mm.

7  Q    I want to -- that's really what I wanted to get to and

8  then I'll be done.  It turns out that after you were examined

9  in June, this public health emergency came out that you

10  featured in your direct examination, do you recall that?

11  A    Yes.

12  Q    Now, let's just be clear on the public health emergency

13  here that you have focused on.  That public health emergency

14  was an administrative determination, correct?

15  A    I'm not sure what that means exactly.

16  Q    Well, just what it says at the end.  This is the last --

17  third page of LC-48 which your counsel put -- I'm sorry, which

18  Libby's counsel put into evidence.  It recites CERCLA.  That's

19  a statutory cleanup piece of legislation, right?

20  A    If you say so.  I'll agree.

21  Q    Well, that's what it says.  Did you read this?

22  A    Yeah.

23  Q    And do you see that the president is given authority and

24  it's broad and it's discretionary, right?

25  A    Yes.

Molgaard - Cross/Bernick                    103

1  Q    It doesn't say anything about science, right?

2  A    It invokes public health science by saying public health

3  or environmental emergency.

4  Q    I'm sorry, I don't see the word science anywhere in that

5  statement.

6  A    It does not.  It says emergency.

7  Q    And it turns out that the president's power then is

8  delegated to the EPA, to the administrator of the EPA, right?

9  A    Right.

10  Q    Which means that it is administrative.  The public health

11  emergency is administrative, right?

12  A    That's what it would mean I guess.

13  Q    Okay, and it's administrative in service of policy, right?

14  A    Yes.

15  Q    The purpose of the public health emergency is not to make

16  a scientific statement.  It's to express a regulatory policy

17  and serve a policy which is protection of public health,

18  correct?

19  A    Correct.

20  Q    A public health emergency declaration is not a statement

21  of consensus science by scientists.  It is an administrative

22  pronouncement and the administrators may, within their

23  discretion, decide to rely upon science, right?

24  A    That would seem reasonable.

25  Q    Okay, that's true, right?

**J&J COURT TRANSCRIBERS, INC.**

Molgaard - Cross/Bernick                    104

1  A    It seems reasonably true.

2  Q    Okay, and so, in fact, when it comes to that public health

3  emergency, the state of science wasn't all of a sudden changed

4  by virtue of the public health emergency, was it?

5  A    No.

6  Q    The state of science wasn't clarified scientifically by

7  scientists when it comes to Libby in the public health

8  emergency, was it?

9  A    Could I hear that question again?

10 Q    Yes.  We didn't have a panel of scientists issuing the

11 public health emergency and saying here's where we think the

12 science is?

13 A    Correct.

14 Q    In fact, isn't it true that when it came to the public

15 health emergency at Libby it was all of nine years after the

16 Seattle Post Intelligencer came out with its articles, correct?

17 A    Correct.

18 Q    It was actually 20 years after Libby was shut down and 25

19 years after the Amandus and McDonald studies came out, right?

20 A    Correct.

21 Q    And during that whole period of time the EPA was there and

22 never declared a public health emergency, right?

23 A    That's correct.

24 Q    And, in fact, the reason why the public health emergency

25 was declared in 2009 is that it was a political decision,

**J&J COURT TRANSCRIBERS, INC.**

1  wasn't it?

2  A    That, I don't know.

3  Q    Well, are you familiar with the fact that people at Libby

4  lobbied Senator Baucus to conduct an investigation in 2008 into

5  why a public health emergency hadn't been declared before then?

6  A    I didn't know that.

7  Q    You know that Senator Baucus and people in Congress issued

8  a whole report basically in 2008 saying there should have been

9  a public health emergency, did you know that?

10 A    I didn't not know that.

11 Q    And did you know that the public health emergency on its

12 face says that the whole purpose of this thing is not to

13 clarify the state of science, but to provide money for medical

14 care in Libby, Montana, $6 million, did you read that?

15 A    I still don't see it.  Is that the highlighted part?

16 Q    Right here.  Medical care in Libby has been historically

17 limited, thus reducing the chance.  And all the publicity that

18 came out in the EPA's announcement said Senator Baucus deserves

19 credit for bringing money to Libby, Montana.  And I don't

20 criticize that but that's the truth of what happened, correct?

21 A    I didn't know the background of this so if that is the

22 case, then that is true.

23 Q    Okay, so now we get to what you decided to do.  Public

24 health emergency comes out and you issue a new report, right?

25 A    Right.

Molgaard - Cross/Bernick                106

1  Q    And in that new report you decide to make public health

2  decision making the centerpiece of how it is that the

3  descriptive epidemiology could actually drive a judgment about

4  the science, right?

5  A    What I'm trying to do with the second report is to make a

6  link between the epidemiology and policy decisions.

7  Q    Policy decisions.

8  A    Yes.

9  Q    And, in fact, your chart that you have submitted to this

10 Court and shown is all about how science serves policy

11 decisions, right?

12 A    Yes.

13 Q    And those are judgments, are they not?

14 A    They are.

15 Q    They're not scientific statements, correct?

16 A    They are often based on scientific statements --

17 Q    Did somebody tell --

18 A    -- but they are --

19 Q    Did somebody tell you that in this case somehow we're

20 going to determine what the appropriate public policy is with

21 respect to claimants of Libby?

22 A    No.

23 Q    In fact, you know from your experience that in a court of

24 law there are rules that say that the evidence on science

25 should be scientifically reliable, you know that, right?

1  A    Yes.

2  Q    In fact, you have used that rubric, the fact that we're

3  supposed to have good science for science sake in this court.

4  You know that and you've used that rubric, correct?

5  A    That's correct.

6  Q    And yet you deliberately decided that in this case, no

7  matter what that -- no what you had done in the past, you were

8  going to bring public policy, public health policy in as the

9  trump card for being able to establish that there was some

10 basis for saying causation, correct?

11         MR. HEBERLING:  Objection.  It's contrary to the

12 structure of what we're talking about here.  The purpose of

13 epidemiology is to get to public health decisions.

14 Q    Oh, okay.  In fact, what you did in your report is that

15 you put public health policy -- you used public health policy

16 to get to causation where doing it the real way, the

17 historically correct way, just hadn't taken place, correct?

18 You used descriptive epidemiology and public health policy to

19 get you to statements about causation to this Court, right?

20 A    No, that's not what I did.  I did in my first deposition

21 clearly explained that there is such a thing as population

22 surveillance and that population surveillance is used to make

23 policy decisions.  And that is what this figure is

24 illustrating, basically.  I should have probably put in

25 population surveillance in between those two, but I did say it

1 | very explicitly, actually drew a box on a figure provided me by
2 | counsel, one of your colleagues, saying that that needs to be
3 | in there as part of what we do in epidemiology.  A lot of what
4 | we do is descriptive population surveillance which leads to
5 | policy decisions.  And so what this was was simply returning to
6 | what was in the first deposition.
7 | Q    I'm talking about your first deposition.  I talk about
8 | what you came out with at the end of the day.  You actually say
9 | in your final report the etiological impact of asbestos
10 | exposure in Lincoln County is without epidemiological doubt.
11 | Now, etiological impact, that's causation, right?  I'm sorry?
12 | A    Yes.
13 | Q    So the bottom line of your final report is that causation
14 | is without doubt, right?
15 | A    Yes.
16 | Q    And the only way you can't get to that statement -- you
17 | can't get there on the basis of established science, correct?
18 | A    Yes, you can because it's done all of the time in public
19 | health and epidemiology.  That's --
20 | Q    Well, I'm going to get --
21 |         MR. HEBERLING:  Objection, I don't believe he --
22 |         MR. BERNICK:  I'll withdraw the question.
23 | Q    The only way --
24 |         MR. HEBERLING:  I don't believe the witness had
25 | finished the answer.

1          MR. BERNICK:  Okay.  Finish the answer.  I apologize.

2    Go ahead.

3    A    There are multiple examples of using population

4    surveillance where policy decisions are made.  The classic

5    example is the SEER system, surveillance epidemiology and end

6    results of the National Cancer Institute where descriptive

7    population surveillance is used nationally to make decisions

8    and recommendations about what to do to prevent different types

9    of cancers.  It's part of what we do and I have been repeating

10   this over and over again as we've gone forward that this is

11   part of what we do in epidemiology.  There's also population

12   surveillance.

13   Q    The --

14          THE COURT:  May I ask a question?

15          MR. BERNICK:  Sure.

16          THE COURT:  Doctor, you don't seem to be using the

17   term population surveillance as a euphemism for descriptive

18   epidemiology.  They seem to be different in your mind.  Are

19   they, and if so, could you describe the difference?  I

20   understand that you think that there is something between these

21   two, but the problem I'm having is when I look at the reports

22   that are here, you clearly define them as descriptive.

23          THE WITNESS:  Yes.

24          THE COURT:  So I don't understand what anything has

25   to do with the population surveillance and public health policy

1 in this case.

2         THE WITNESS:  Because you have different populations

3 that you are watching and the watching involves descriptive

4 studies and you're trying to say, well, I have more multiple

5 sclerosis here than I should have in this population.  Perhaps

6 we should do something in terms of policy.  Perhaps there's

7 something wrong with the heavy metal system in this -- in the

8 water system here in this county.  Or you're looking at the

9 amount of cancer that you have in the State of Iowa and you're

10 looking at those descriptively in terms of descriptive rates

11 and then you make decisions about should we have a

12 recommendation about what kind of pesticide exposure is

13 acceptable because we believe the pesticide exposure is

14 involved with the higher rate of cancer in Iowa for certain

15 cancer sites.  So that there are populations that are followed

16 and because of cost and because of time they are usually

17 followed descriptively with descriptive studies and

18 recommendations about policy come from those.  That is a

19 reality.  Those exist.

20         THE COURT:  Okay.  I --

21         THE WITNESS:  And to say that you -- the pure

22 descriptive study does not make causative statements, but if

23 it's used within surveilling a population or as a surveillance

24 system, policy decisions come from those whether or not they're

25 a measure of association as a relative risk or an odds ratio or

Molgaard - Cross/Bernick                111

1  a logistic progression.  Policy decisions do come from

2  descriptive studies in surveillance systems.

3          THE COURT:  Yes, sir.  But you do understand that I

4  am not in a position of making policy decisions.  That's not my

5  function here, correct?

6          THE WITNESS:  I understand that.

7  Q    That really is -- first of all, the CARD study is not a

8  population-based study, is it?

9  A    No, it's not.

10 Q    The 2004 and 2008 studies are not population-based

11 studies, are they?

12 A    No, they're not.

13 Q    There is no population-based study for Libby, Montana

14 that's been cited by Dr. Whitehouse or you in this case,

15 correct?

16 A    Correct.

17 Q    And, therefore, the only way that you feel that you can

18 get to a statement like without a doubt causation has been

19 shown, in this case the only way that you can get there is

20 based upon public health policy, correct?

21 A    Fine.

22 Q    Thank you.  Now, knowing that, you actually, in your

23 deposition, tried to put some other labels on that policy

24 approach that are wrong, right?  Let me be concrete.  In your

25 deposition, you actually said that this policy-based judgment

**J&J COURT TRANSCRIBERS, INC.**

1  that you made was a meta-analysis, did you not?

2  A    I used that expression.

3  Q    And that was false, wasn't it?

4  A    I used the expression to mean a literature, a focused

5  literature review.

6  Q    Oh, no.  A meta-analysis is not simply a literature

7  review.  A meta-analysis is a defined term in the textbooks,

8  correct?  We can go to Rothman's (phonetic) right now in my

9  folder and find a definition for meta-analysis, can we not?

10  A    I defined in the deposition how I was using a term.  I

11  stated it was not a formal statistical meta-analysis, but was a

12  lit review and that's how I was using the term.

13  Q    Actually, when you answered the question, what you said is

14  what I have done is basically a meta-analysis, right?

15  A    And then I clarified it.

16  Q    No, you didn't clarify.  The question was where in your

17  two expert reports is there a meta-analysis, Dr. Molgaard --

18  A    If you read --

19  Q    -- and then you got into, oh, well, because you're being

20  confronted by your report, you got into starting talking about

21  a literature review, right?

22  A    I clarified what I meant.

23  Q    Okay.  You clarified what you meant when you were pressed

24  on that fact that it wasn't in your reports, right?

25  A    I clarified myself.

1  Q    Okay.  And, in fact, in none of your reports do you even

2  use the word meta-analysis, right?

3  A    No.

4  Q    Is -- that's -- I'm right, am I not?

5  A    I believe you are.

6  Q    And there's not even the word meta-analysis in the public

7  health emergency document, is there?

8  A    That's true.

9  Q    Because a meta-analysis requires that you have not one,

10 but several analytic epidemiological studies and then you have

11 to extract from those studies statistically and perform yet

12 another statistical analysis, correct?

13 A    And I clarified it in exactly that fashion.

14 Q    Well, am I correct?

15 A    Your correction agrees with my clarification.

16 Q    Okay.  And, therefore, your statement what I've done

17 basically is a meta-analysis, that's an incorrect statement, is

18 it not?

19 A    And then I clarified it.

20 Q    Might have clarified.  You basically had to walk away from

21 it, right?

22 A    In my mind, there are two types of meta-analysis.

23 Q    I see.

24 A    As an epidemiologist, I think of it as two different ways

25 of doing it.

1 Q    Well, you know, doctor, let me be just be blunt about

2 it -- clear.  Is it correct, Dr. Molgaard, that you are in here

3 talking about a theory, a policy-based theory that you have

4 developed in the last few years, is that fair?  Just used the

5 word theory when we began, and now we know it's policy.  You

6 have a policy-based theory that you have applied to this case,

7 true or not?

8 A    I don't understand you.

9 Q    Another thing you said, and I'll close on this, is that

10 this was eco-epidemiology, do you remember that?

11 A    Yes.

12 Q    It's misspelled by the court reporter for a good reason.

13 It's called eco-epidemiology which was interesting.  I read

14 that and I said what in the world is that.  Is it going to --

15 and, but then I said, oh, eco-epidemiology and that -- it's not

16 -- it turns out, though, that's not kind of spa type

17 epidemiology.  There's actually a term called eco-epidemiology

18 -- ecological epidemiology?  Is there a term?  I think it's a

19 yes or no.

20 A    There is a term in last, yes.

21 Q    Okay.  And isn't it true that eco-epidemiology appears no

22 where in any of your prior reports?  First time it occurred was

23 in your last one?

24 A    It's in that report, yes.

25 Q    Okay.  And isn't it true that eco-epidemiology appears no

1  where as even a word in the public health emergency document or

2  in the NIOSH public -- the report that you talked about?

3  A    I don't believe it is.

4  Q    Okay.  And then you went on to say eco-epidemiology is

5  analytic epidemiology.  You said that, right?

6  A    Yes, it is.

7  Q    And yet you didn't do eco-epidemiology here either because

8  you didn't do any analytic epidemiology, correct?

9  A    There was analytic epidemiology done in Libby.

10  Q    Isn't it true that there is no statement of the precise

11  methodology that you have deployed here which uses public

12  health policy to make definitive statements about causation?

13  A    Could I have that question, again, please?

14  Q    Yes.  There is no written statement anywhere that we can

15  find that spells out the precise steps that you have followed,

16  that you have adhered to in this case.  There's no place

17  outside of this case, let me put it this way -- withdraw.

18  Strike the question.  We can't go to any textbook, we can't go

19  to any authoritative pronouncement in the field of science and

20  find spelled out the precise methodology that you have applied

21  in this case to be able to use public health policy in order to

22  make statements, definitive without a doubt statements

23  regarding causation.  We can't find that, correct?

24  A    Well, I think that the conceptual framework of

25  eco-epidemiology does allow you to talk about policy in terms

Molgaard - Cross/Bernick/Redirect/Heberling        116

1  of multiple replicated studies in a population --

2  Q    I didn't ask you --

3  A    -- some of which are analytic, some of which are

4  descriptive.

5  Q    I didn't ask you that, with due respect.  I can go to any

6  one of these descriptive studies, I can go to any one of these

7  analytic studies, and I can find a statement of a protocol that

8  the study author or researcher followed in conducting the

9  study, can I not?

10 A    Right.

11 Q    I can't find anywhere in the authoritative literature a

12 statement that is the protocol of what you followed here in

13 coming to the public health policy conclusion that causation

14 has been established without a doubt.  Can't find your protocol

15 in the public literature, can I, as a protocol?

16 A    I don't know there is such a protocol in existence.

17        MR. BERNICK:  Thank you.  That's all I have, Your

18 Honor.

19        THE COURT:  Why don't we take a ten-minute -- oh,

20 well, no, let's finish and then we'll just take a lunch break.

21                    REDIRECT EXAMINATION

22 BY MR. HEBERLING:

23 Q    First of all, Dr. Molgaard, with regard to the term

24 eco-epidemiology and ecological epidemiology, are there two

25 different terms there?

Molgaard - Redirect/Heberling                117

1  A    Yes, they are two different things.

2  Q    And which was the proper term to describe your

3  considerations?

4  A    The eco-epidemiology is.

5  Q    And what is ecological epidemiology?

6  A    Ecological epidemiology is an example of an earlier

7  research design that was used historically in the earlier

8  periods of epidemiology where there was no information on the

9  joint distribution of the risk factor and the disease status

10  for individuals in the sample, and so it was considered to be

11  an ecological or group study.  But it was not considered a

12  strong design and it's not the same thing as eco-epidemiology

13  at all.

14  Q    Okay.  And so it would be -- there -- it would be

15  misleading to use one term where the other term was

16  appropriate, correct?

17  A    I believe so.

18  Q    And Mr. Bernick wrote population-based study in the middle

19  section here.  Is there a difference --

20         THE CLERK:  Please stay by a microphone --

21         MR. HEBERLING:  Sorry.

22  Q    Is there a difference between population-based study and

23  population surveillance?

24  A    Yes.

25  Q    You mentioned that the Whitehouse 2004 and CARD mortality

1  study were population surveillance, correct?

2          MR. BERNICK:  Objection.  A, that's leading, B, I

3  don't believe it's correct.

4          THE COURT:  Well, it is leading, sustained.

5  Q    Okay.  Did you refer to any studies as population

6  surveillance?

7  A    Yes.

8  Q    Which studies?

9  A    I referred to the Whitehouse studies and the CARD

10  mortality study as examples where there is population

11  surveillance going on.  That's how I think of them.

12  Q    Did you ever refer to them as population based?

13  A    No.

14  Q    What is the difference?

15  A    Population based is you have a -- usually a geo-political

16  unit of some kind, a county or a state or city, and where you

17  do case ascertainment for a specific disease with a specific

18  denominator.  And so it is population based.  It's a study

19  based within an entire geo-political population.

20  Q    And so a population-based study is, say, a whole county?

21  A    Yeah.

22  Q    And population surveillance, how does that apply to the

23  CARD mortality study?

24  A    There is a subset or group within the population of

25  Lincoln County that in those studies, in the CARD study or the

1  other studies has been looked at.  There is some attempt to see

2  what's happening with this population.  It's not a study of an

3  individual, it's a study of a group of a population.

4  Q    Okay.

5  A    But it's not geo-politically defined.  It's just a

6  different definition of what the group is.

7  Q    So the population in surveillance is the group of

8  diagnosed patients, correct?

9  A    Yes, right.

10 Q    Okay.  And as to Mr. Bernick's questions to you, were

11 those all related to population-based studies?

12            MR. BERNICK:  Objection to the form of the question.

13 The record will reflect what the questions related to.

14            THE COURT:  That's an awfully broad statement.

15 Q    Okay.  Did Mr. Bernick ask you any questions in a -- did

16 Mr. Bernick ask you a series of questions on population

17 surveillance studies?

18            MR. BERNICK:  Objection, leading.

19            THE COURT:  Overruled.

20 A    He asked some questions about those, yes.

21 Q    And would it be misleading to confuse the two?

22 A    It would be misleading, yes.

23 Q    Then regarding the political reasons behind the public

24 health emergency, are you aware that back in 2001 and 2002

25 there was a lobbying effort for a public health emergency?

Molgaard - Redirect/Heberling                    120

1  A    No, I did not know that.

2  Q    Are you aware that it's been reported that Christine

3  Whitman, Director of the EPA, resigned and that was a factor in

4  the sense that she was pressured not to declare a public health

5  emergency?

6  A    No, I did not know that.

7         UNIDENTIFIED ATTORNEY:  I guess that means it's

8  political.

9  Q    Okay.  Let's go to the epidemiological studies chart.

10  Okay.  Do descriptive studies establish association?

11  A    They can.

12  Q    And do the -- does the CARD mortality study, in

13  particular, establish association?

14        MR. BERNICK:  Your Honor, if he wants to go over

15  this, I guess that's fine.  It's gone on for -- but he

16  shouldn't lead and it shouldn't simply be repetitive of the

17  direct examination.

18        UNIDENTIFIED ATTORNEY:  I think this is very

19  repetitive, Your Honor.

20        THE COURT:  I think it's repetitive.  It's definitely

21  leading, so ask non-leading questions.

22        MR. HEBERLING:  It's just foundational.

23        THE COURT:  Well, it's not foundational.  He's

24  testified about this before, so --

25  Q    Okay.  So why is it you have evidence for causation on the

**J&J COURT TRANSCRIBERS, INC.**

1 descriptive side?

2 A    Because you can have some evidence for causation in

3 population surveillance studies which often can be and are

4 descriptive studies.

5 Q    And does a -- on the analytic side, does a single study

6 prove causation generally?

7              MR. BERNICK:  Objection, leading.

8              UNIDENTIFIED ATTORNEY:  Objection.

9              THE COURT:  Sustained.

10 Q    On the analytic side, when -- do studies address

11 causation?

12             THE COURT:  I'm sorry, I didn't understand.  Would

13 you repeat the question, please?

14 Q    Do analytic studies address causation?

15 A    Yes.

16 Q    And what can a single study do in the sense of causation?

17 A    Usually it takes much, much more than a single study to

18 establish causation.

19 Q    And when you speak of causation, are you speaking in

20 epidemiologic terms?

21 A    Yes, I am speaking in terms of epidemiology.

22 Q    And in a series of associations, the evidence of

23 causation?

24 A    If the associations are moving in the same direction and

25 if there are enough of them, it can.

Molgaard - Redirect/Heberling                    122

1  Q    And you talked about case series.  Can a case series

2  present evidence of causation?

3          MR. BERNICK:  Objection, all this has been gone over.

4  It's not new.

5          MR. FINCH:  Objection, asked and answered.

6          THE COURT:  Overruled.  Go ahead.

7  A    The question was --

8  Q    Can a case series present evidence of causation?

9  A    In and of itself, I think it's usually unlikely.  It

10 can -- you can see associations.  It can be -- statistical

11 inference can be done in a case series.

12 Q    So how does a set of inferences relate to forming evidence

13 for causation on the descriptive side?

14 A    If the inferences can generalize to a larger population,

15 it could be used to make a statement about causation.  That's

16 different from the analytic situation where there is the

17 ability to do predictions through the use of regression

18 techniques.

19 Q    And do descriptive studies need to be statistically

20 controlled?

21 A    No.

22 Q    Are controls necessary to establish an association?

23 A    No.

24 Q    What is the alternative to strict controls on the

25 descriptive side?

1  A    Usually it's comparison of one descriptive study and one

2  vocation to another descriptive study in a different location

3  and you compare your rates or your associations between the two

4  and that -- so you have a comparison group rather than a

5  control group.

6  Q    And when you made your statement that without a doubt

7  asbestos exposure was causing asbestos disease in Lincoln

8  County, how did you arrive at that?

9  A    I arrived at it by looking at the various studies, both

10 descriptive epidemiology, as well as other kinds of studies

11 that were coming out of the historical mix of research in

12 Lincoln County and I felt it was compelling.

13 Q    Then do you recall discussion of one of your earlier

14 reports in another case --

15 A    Yes.

16 Q    -- during the cross examination?  Well, do you recall the

17 ranking of evidence there?

18 A    Yeah, it was case series was ranked as being able to make

19 -- I forget how that works, but I think it was mixed statements

20 about causation.  It was considered one of the five designs

21 that you could use to do that, but it was considered the

22 weakest of them.  That was a --

23 Q    So what do you mean -- what do you refer to by statements

24 of causation?

25 A    Well, I can't remember exactly what this -- it was an

1 American Heart Association document and I believe what -- they

2 were ranking them.  Ah, there you go.

3 Q    Okay.  Do you see Level 5 data from anecdotal case series?

4 A    Yeah.

5 Q    So a case series --

6 A    That's a case series, yeah.

7 Q    How does that function in terms of statements of

8 causation?

9 A    It's -- following that, it means that it can be used to

10 make statements about causation.  That is not exactly what Last

11 says.

12 Q    Does Last foreclose in any way the use of descriptive

13 studies to provide evidence of causation?

14 A    No.

15         MR. BERNICK:  Objection, it's leading.  It's also the

16 quote from Last --

17         THE COURT:  Your microphone's not on.

18         MR. BERNICK:  It's leading and the quote from Last

19 was actually displayed to the Court, so the witness's

20 recollection of it doesn't really matter at this point.

21         THE COURT:  Okay.  It's overruled.

22 Q    And why is it that Last's statement does not foreclose

23 descriptive studies from providing evidence of causation?

24 A    Well, because there are some situations where they are,

25 indeed, used that way and the American Heart Association

**J&J COURT TRANSCRIBERS, INC.**

1 clearly believes that.  And I think there are different experts

2 out there.  I'm a believer in Last, so one has to think about

3 where is the Last definition not a precise as it should be.

4 And I think that there is some room to think about it as the

5 way the American Heart Association does because there are some

6 examples where you get descriptive studies being used that way.

7 Q    And as to the CARD mortality study and the Whitehouse

8 2004, what kind of descriptive study were they?

9 A    Those are mortality studies.

10 Q    Okay.  And is there anything inappropriate in terms of

11 epidemiology studies from using the CARD mortality study to

12 provide evidence for causation?

13 A    You can use descriptive mortality studies to make some

14 statements about causation.

15        THE COURT:  I don't think that's the question.  I

16 think he's specifically talking about the CARD study.

17 A    Can I hear the question, again?

18 Q    Is there anything inappropriate about using the CARD

19 mortality study as a piece of evidence for causation?

20 A    As long as it's understood that it is a descriptive study

21 and that from my way of thinking it is an example of an

22 investigator doing population surveillance with a descriptive

23 design and the design is a mortality study.

24 Q    And then the use in public health decisions, if a decision

25 is made, does that mean that a form of causation has been

1  established by the decision maker?

2  A    No, not necessarily.  There is a famous dictum in

3  epidemiology called Lilienfeld's dictum which says that if you

4  have a --

5  Q    I want to go to the pubic health decision.  As to the

6  public health decision, is there any -- is there -- when

7  decisions are reached, are evidence for causation considered?

8         THE COURT:  I'm sorry, that's a pretty broad

9  statement and there are all sorts of different types of public

10 health policy decisions.  Could you tie it to something that's

11 related to this case?

12 Q    Okay.  In the Libby public health emergency, was evidence

13 of causation considered?

14        MR. BERNICK:  Objection, lack of foundation.

15        THE COURT:  Foundation.

16 Q    In the Libby public health emergency, was -- public health

17 emergency decision, was there any evidence for causation

18 supplied in the list of references?

19 A    I believe there was.

20        MR. HEBERLING:  Okay.  That's all I have.

21        UNIDENTIFIED ATTORNEY:  I wouldn't do it.

22        THE COURT:  Mr. Finch?

23        MR. FINCH:  No recross, Your Honor.

24        THE COURT:  Mr. Bernick, no?

25        MR. BERNICK:  No, I'm sorry, no recross.

1          THE COURT:  You're excused, doctor.  Thank you.

2  We'll take a lunch recess now until 12:35 and we'll reconvene

3  at 12:35.

4                         (Recess)

5          THE COURT:  I guess we need the recorder first.

6          UNIDENTIFIED SPEAKER:  What?

7          THE COURT:  All right, sir, thank you.

8                         (Pause)

9          MR. HEBERLING:  We'll call Dr. Arthur Frank.

10         THE COURT:  All right.  Thank you.

11       ARTHUR L. FRANK, LIBBY CLAIMANTS' WITNESS, SWORN

12         THE CLERK:  You may be seated.

13         THE WITNESS:  Thank you.

14                    DIRECT EXAMINATION

15  BY MR. HEBERLING:

16  Q    State your name for the record, please.

17  A    Arthur Leonard Frank.

18  Q    Your business address?

19  A    Drexel University School of Public Health, 1505 Race

20  Street, Philadelphia, PA 19102.

21  Q    Are you a medical doctor?

22  A    I am.

23  Q    What fields are you board certified in?

24  A    Internal medicine and occupational medicine.

25  Q    What is your current position?

**J&J COURT TRANSCRIBERS, INC.**

1  A    I am professor and chair of the Department of

2  Environmental and Occupational Health at the School of Public

3  Health at Drexel.  I'm also a professor of medicine in the

4  Pulmonary Division.

5  Q    Could you summarize your education?

6  A    After graduating from college, I attended medical school

7  at the Mount Sinai School of Medicine, entering in 1968 in the

8  first class when the school opened and graduating with my

9  medical degree in 1972.  I stayed on at the Mount Sinai

10  Hospital to do a year of internal medicine training, that's

11  general adult medicine.  I left at that point to serve in the

12  United States Public Health Service on active duty at the Lung

13  Cancer branch of the National Cancer Institute at the NIH,

14  working on the effects of asbestos on respiratory tissue.  That

15  was '73 to '75.  '75 to '77 I returned to Mount Sinai where I

16  completed my two residencies in internal medicine and

17  occupational medicine and also finished a second doctoral

18  degree, my Ph.D in Biomedical Sciences which I had started as

19  a medical student and was awarded that in 1977.

20  Q    When did you first become interested in asbestos?

21  A    I met Dr. Irving Selikoff who was head of the

22  Environmental Sciences Laboratory and doing asbestos research

23  in December of 1968 and immediately became interested and

24  started working with him.

25  Q    What work did you do with the Selikoff group?

Frank - Direct/Heberling                    129

1  A     Depended on where I was in my level of training.  As a

2  first and second year medical student without much clinical

3  skill I would do mostly paperwork, interviewing of research

4  subjects and such.  By the time I was more clinically trained,

5  I would do some of the examinations and over time sort of

6  progressed to the point where I would be put in charge of the

7  field team that might be up to fifty people as we went out and

8  did our research around the United States.

9  Q     This was after you had your medical degree and the Ph.D?

10  A     Yes.

11  Q     Then would you continue to summarize your professional

12  experience?

13  A     After finishing my basic education, though, I guess as a

14  physician we like to think we are life-long learners, I stayed

15  at the Mount Sinai School of Medicine on the faculty from 1977

16  to 1983, starting as an instructor and leaving as an associate

17  professor.  From 1983 to 1994, I chaired the Department of

18  Preventive Medicine and Environmental Health at the University

19  of Kentucky College of Medicine.  I left there in 1994 to

20  become Vice President for Medical Education and Professor of

21  Occupational and Environmental Medicine and Professor of Cell

22  Biology and Environmental Sciences at the University of Texas

23  Health Science Center in Tyler, and in 2002 took my current

24  position.

25  Q     In Tyler, Texas, was there an asbestos problem there?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, there was.  There had been an asbestos plant

2  operating roughly about a mile or so from the University

3  Hospital.  It was the successor plant to one that I had studied

4  with Dr. Selikoff in Patterson, New Jersey, so I had seen

5  workers in Patterson and now was engaged in research on workers

6  in Tyler.

7  Q    Did you participate in any publications while you were

8  with the Selikoff group?

9  A    I did, a few.

10  Q    And with regard to the Tyler, Texas population, did you

11  publish?

12  A    I did.

13  Q    What was that?

14  A    That was a mortality study of the workers who had worked

15  at the plant in Tyler.

16  Q    And, over the years, have you reviewed a number of chest

17  x-rays in asbestos-related work?

18  A    Thousands of them.

19  Q    Do you know of anyone with more extensive experience than

20  you have with chest x-rays in asbestos work?

21  A    I've never kept track of who's got as much or more.

22  There's certainly probably a handful of people like myself,

23  including many that were trained at Sinai that have continued

24  over the life of their career to do work.  But, I mean, one

25  study alone in China I read 1,600 sets of x-rays of asbestos

1  factory workers.  That's just one study.  And then all the

2  other x-rays over the years.

3  Q     Are you a B-reader?

4  A     I am not.  I took the B-reader exam once in 1983.  About

5  half the physicians like myself didn't pass.  I didn't pass.  I

6  decided it wasn't necessary for me to be a B-reader to do work

7  and all of the research I've done that required the reading of

8  x-rays has all been published in the peer review literature.

9  Q     Have you continued to use the ILO system over the decades?

10 A     I use it.  I teach it.  I've taught it over the years to

11 residents.  I teach it pretty much on a yearly basis when I do

12 some teaching in India, so I'm familiar with it, yes.

13 Q     Have you evaluated lung function tests in your asbestos

14 work?

15 A     Yes.

16 Q     Can you estimate the number?

17 A     Again, from research studies, we did, you know, thousands

18 of exams on asbestos-exposed workers.  All of them had PFTs.

19 Q     And have you examined or treated patients for

20 asbestos-related disease?

21 A     I have.

22 Q     And over what years did you do that?

23 A     From 1968 to the present time.

24 Q     How long have you been doing medical legal work?

25 A     About 30 years now.

1  Q    And are you being paid for the work, your work in this

2  case?

3  A    A bill will be rendered in this case as it is in every

4  case I've done over 30 years, but all the money will be paid to

5  my university and over the years every penny has always gone to

6  whichever university I've worked at.

7  Q    And have you served on various governmental boards and

8  studies?

9  A    I have.

10 Q    Could you name a few?

11 A    Probably among the more prominent ones, I've done a fair

12 amount of work with NIOSH.  I served on their grants review

13 panel for four years, the last year of which I chaired it.  I

14 was then appointed to the Board of Scientific Counselors of

15 NIOSH and more recently, about a year ago, was appointed to the

16 Board of Scientific Counselors which is the highest level

17 advisory body to the director of the National Center for

18 Environmental Health/ATSDR, an agency that has been discussed

19 in this courtroom already.

20 Q    And when did your work on Libby begin?

21 A    My work on Libby began -- I don't know the exact year,

22 probably about four or five years ago.  I was approached by the

23 Department of Justice to be asked to possibly work with them

24 which I agreed to do on their case that they had in Montana

25 recently.

Frank - Direct/Heberling                          133

1  Q    And when were you first hired by our firm in the civil

2  cases?

3  A    Probably about three years ago.  It would have been a year

4  after I started working with the Department of Justice, I

5  believe.

6  Q    How many trips to Libby have you made?

7  A    I've been there three times, I think, and I've been to

8  Missoula once, in addition, on Libby business.  I think three

9  times to Libby.

10  Q    Generally, what have you done on the trips to Libby?

11  A    I've done a number of things.  When I was there with the

12  Department of Justice folks, they took me up to the mine site

13  and gave me a tour of the facilities.  On all of the other

14  occasions, including that one, I would be at the CARD clinic

15  learning about the clinical aspects of the patients that were

16  being seen there.

17  Q    Have you reviewed chest x-rays and CT films with Dr.

18  Whitehouse and Dr. Black?

19  A    I have.

20  Q    Can you estimate the numbers?

21  A    Hundred and fifty, maybe.

22  Q    And have you also reviewed lung function tests?

23  A    Yes.

24  Q    And have you reviewed diagnostic practices with the CARD

25  doctors?

1  A    Yes, we discussed the way they would approach the care of

2  their patients which was basically standard medical practice.

3  Q    And how long have you had an interest in the asbestos

4  medicine literature?

5  A    Since December of 1968.

6  Q    Can you estimate the number of articles that you've read

7  on asbestos medicine?

8  A    Thousands.  That doesn't mean I remember everything about

9  them, but I've read thousands of them.

10  Q    And have you taken a special interest in pleural disease

11  asbestos literature?

12  A    I have.

13  Q    And in epidemiology, have you had any special training in

14  that?

15  A    I have.  As a board certified physician in occupational

16  medicine which is a branch of preventative medicine, we are

17  required to have more training than the average physician would

18  get in the field of epidemiology.  I've certainly had that

19  training.  I have taught epidemiology.  I think the first time

20  I taught it I was still a resident at Mount Sinai doing some of

21  my occupational medicine work and taught epidemiology to the

22  medical students there and have done epidemiological research

23  over much of my career.

24  Q    Have you been qualified in court as an epidemiology

25  expert?

Frank - Direct/Heberling                    135

1  A    Oh, I believe so.  I've been qualified a fair number of

2  times in court and there are various designations.  Certainty,

3  about the epidemiology of asbestos disease.

4         MR. HEBERLING:  We tender the witness as an expert in

5  occupational medicine and particularly asbestos medicine and

6  epidemiology.

7         MR. BERNICK:  I don't believe there's been any

8  foundation established to offer him as an expert

9  epidemiologist.  He may have expertise in epidemiology

10 ancillary to the first proffer, occupational medicine,

11 pulmonary medicine with regard to asbestos, but I don't think

12 that makes him into an epidemiologist.

13        THE COURT:  I think that's fair.

14        MR. HEBERLING:  Yes.  We would argue that his

15 qualifications are certainly parallel to those of Dr. Welch and

16 she was offered as an expert in epidemiology, as well.

17        MR. FINCH:  Your Honor, I did not offer Dr. Welch as

18 an expert in epidemiology.  I offered -- I proffered her and I

19 believe she was recognized by the Court as an expert in the

20 epidemiology of asbestos-related diseases which is a subset,

21 but certainly doesn't -- I did not proffer her as an

22 epidemiologist for all purposes.

23        MR. HEBERLING:  Okay.  I similarly, then, will offer

24 Dr. Frank as an expert in the epidemiology of asbestos-related

25 disease.

1          THE COURT:  Any objection?

2          MR. GUY:  Your Honor, the only objection is that we

3 do have a pending motion in limine as with the prior expert.

4          THE COURT:  Oh, yes, the motions in limine and the

5 Daubert motions I have reserved, so thank you for pointing that

6 out, but we're going to get to those after the evidence is

7 finished.

8          MR. GUY:  Understood.  Thank you, Your Honor.

9          THE COURT:  All right.  With that caveat, Dr. Frank

10 is qualified to testify as an expert in the field of the

11 epidemiology of asbestos disease and in occupational medicine.

12 Q    When you first began your work on Libby, were you

13 skeptical?

14 A    I was skeptical that Libby was different from any of the

15 many other asbestos populations I had become familiar with over

16 the years.

17 Q    And what is your position now?

18 A    Having been to Libby, having looked at the data, there is

19 clearly a different experience in some ways in Libby compared

20 to the experience literally on a world-wide basis with other

21 populations exposed to asbestos.

22 Q    How is this experience different?

23 A    Particularly in the area of the clinical severity of

24 pleural disease.  Obviously, a mesothelioma is a mesothelioma,

25 lung cancer is a lung cancer, parenchymal disease is

1  parenchymal disease, but we have a situation here where there

2  is far more pleural disease in the absence of parenchymal

3  disease and a severity of that disease that I've not seen

4  anywhere else in the world, nor in the literature regarding

5  anywhere else in the world.

6  Q    Do you believe interstitial fibrosis, plaques and pleural

7  thickening have any relationship to one another?

8  A    Absolutely, they're, first of all, all caused by asbestos

9  and they are all fibrotic changes caused by the laying down of

10 collagen which would make them all a similar disease.

11 Basically, I consider either interstitial fibrosis or pleural

12 plaques, which is a fibrotic change, as the same disease,

13 though others, obviously, use other terminology and I believe

14 they are all the disease asbestosis which can then be

15 differentiated into parenchymal asbestosis and pleural

16 asbestosis.

17 Q    Is there a historical basis in the literature for this

18 view?

19 A    Absolutely.  In the year 1867, Dr. Zenker, a German

20 pathologist, described the term pneumoconiosis or dust diseases

21 of the lung and he described in that first patient for whom he

22 described -- coined the term that there was evidence of both

23 pleural and parenchymal disease.  If you look at the literature

24 through let us say about 1960, prior to that, the clear

25 understanding in reading the literature, the textbooks, for

1  example Dr. Lanza's textbook on silicosis and asbestosis from

2  1938 clearly describes asbestosis as a disease that affects the

3  pleura and the parenchyma.  So that is the historic basis for

4  that.

5          My own training and my experience with Dr. Selikoff

6  was such that he used the term pleural asbestosis and I

7  certainly agreed with that.  I agreed with a lot of things that

8  Dr. Selikoff said and did, though not necessarily absolutely

9  everything, but certainly agreed that that was appropriate.

10 And even the ILO classification speaks to that as one disease.

11 If one looks at the ILO form, there's Part 2A and 2B, Part 2A

12 says are there any parenchymal changes due to pneumoconiosis.

13 You can mark yes or no, and then you go to the second part, 2B,

14 and it says are there any pleural diseases related to

15 pneumoconiosis.  You can mark yes or no, so you can have no

16 evidence of interstitial disease.  You have evidence of pleural

17 disease.  It's called a pneumoconiosis and once you have

18 established that that particular patient's pneumoconiosis was

19 caused by asbestos, I think it is entirely appropriate to call

20 it asbestosis of the pleura.

21 Q    What is the CARD mortality study?

22 A    The CARD mortality study is an assessment of a number of

23 people who had been cared for through the physicians at the

24 CARD clinic that examine a variety of factors that look at

25 where they were exposed to asbestos, what their x-ray findings

Frank - Direct/Heberling                    139

1  were, and then what they died from.

2  Q    Okay.  Who designed the CARD mortality study?

3  A    The study was put together I should say jointly with the

4  input of Dr. Whitehouse, Dr. Molgaard and myself.

5  Q    And when -- let's see -- what is the cohort in the CARD

6  mortality study?

7  A    The cohort is a subset of patients seen at the CARD clinic

8  for whom there is evidence that they have died.

9  Q    And how did you identify the deceased in the cohort?

10 A    Death certificates.  That's the primary way.

11        MR. BERNICK:  Your Honor, we'd like to restate and

12 make sure it's preserved our objection to testimony regarding

13 the CARD mortality study for all the reasons that are set forth

14 in our motions and we'd like to get the Court's concurrence

15 that that is a standing objection that we don't have to renew.

16        MR. HEBERLING:  No objection to that.

17        THE COURT:  All right.  That's fine.  I will accept

18 that proposition for this witness.

19 Q    Okay.  Dr. Frank, we went through this exhibit with Dr.

20 Molgaard, but with regard to the process used --

21        THE COURT:  What's the exhibit label, I'm sorry?

22        MR. HEBERLING:  Well, I don't have the one with the

23 number.  It'd be 271 or 272, something like that.

24        THE COURT:  All right.

25 Q    For this study, did you obtain death certificates?

1  A    Yes.

2  Q    How?

3  A    Mostly from the records either of the CARD clinic, from

4  the state, or the hospital, wherever they were available from.

5  Q    And on the death certificates, how -- was there an initial

6  review for cause of death?

7  A    Yes, every death --

8          MR. FINCH:  Objection, lack of foundation.  Who was

9  the you, who did this?

10         THE WITNESS:  There wasn't a you in there.

11         MR. FINCH:  I -- there hasn't been a foundation

12 established that this witness ever reviewed a single death

13 certificate.

14         THE COURT:  That's sustained.  You need to lay the

15 foundation.

16 Q    Are you familiar with how the study was done?

17 A    Yes.

18 Q    Did you individually review the death certificates?

19 A    I have at a point in time reviewed them all.  I have

20 copies of all of them.  The initial review was not done by me.

21 Q    Do you know how the initial review was done?

22 A    Yes, they were assembled and looked at for what the death

23 certificate listed as the cause of death.

24         MR. BERNICK:  Objection, move to strike.  That called

25 for a yes or no answer and then we need the foundation in order

**J&J COURT TRANSCRIBERS, INC.**

1  to proceed to determine how it is that he knows what he just

2  said.

3          THE COURT:  All right.  I'll strike the testimony.

4  Will you lay the foundation, Mr. Heberling?

5  Q    In medical studies, generally, have you worked with teams

6  of doctors?

7  A    Yes.

8  Q    And in each study did you do all the work yourself?

9  A    No, sir.

10 Q    Were you, nevertheless, familiar with the work done by the

11 other doctors?

12 A    Yes.

13 Q    Is this one any different?

14 A    No.

15 Q    Are you familiar with how the death certificate and cause

16 of death process was done?

17 A    Yes.

18         MR. BERNICK:  Could we find out how as foundation?

19         MR. HEBERLING:  I'm sorry --

20         MR. BERNICK:  Objection, lack of foundation.  The

21 fact -- he now asserts that he's familiar.  I don't doubt that

22 he's familiar, but I think it's important to establish what

23 this witness actually knows about what occurred versus what he

24 simply learned from Dr. Whitehouse.

25         THE COURT:  If we could let Mr. Heberling ask another

1  question, we might get there.  So far all he said is yes, he's

2  familiar.

3  Q    How is it that you're familiar with the death

4  certificate and --

5  A    I spoke to Dr. -- oh, I'm sorry.

6  Q    Okay.  The death certificate evaluation process first.

7  A    It was originally done by Dr. Whitehouse.

8  Q    And likewise as to the best -- what is a best available

9  information process on cause of death?

10 A    Having studied with Dr. Selikoff, I learned during the

11 course of my time with him and also having done some work on

12 the quality of death certificates that they are not always

13 entirely accurate as to the actual cause of death.  There have

14 been studies, you can -- one could look at the literature.  So

15 one goes beyond what is simply written on the piece of paper if

16 one has such an interest and wants to undertake a more accurate

17 assessment to look at the best available information which is

18 to go beyond the death certificate to look at whatever other

19 information is available, biopsy results, tissue samples,

20 autopsy reports, medical records, et cetera.

21       There are many cases where the death certificate is

22 mis-filled out because the person who may be filling it out is

23 not as familiar with the case as, let's say, the treating

24 physician.  If someone dies, it's in the middle of the night at

25 a hospital, a resident may get it wrong.  Some studies, if they

1  use a large enough population of individuals, do use death

2  certificates and find it difficult to go back and assess each

3  one and you just accept the fact that there's some error in

4  there and you know that and you go on.  But in a relatively

5  modestly sized study, you can actually do an individual

6  assessment of each case, which is what Dr. Selikoff would do

7  with the mortality experiences of insulators as the death

8  records came in and that's what was done in this case.

9  Q    You mentioned under reporting of asbestosis on death

10 certificates?

11 A    I didn't mention it yet, but it's certainly something that

12 is in the literature, not only from the work of Dr. Selikoff

13 with insulators, but others, Markowitz and others speak to the

14 under reporting of asbestosis as a cause of death on death

15 certificates.  And other literature speaks to the under

16 reporting of that as a disease process in people.

17 Q    Is it important to get the treating physician's records to

18 do a best available information analysis?

19 A    That is certainly an additional important piece of

20 information along with whatever else may be available.  But,

21 certainly, the treating physician would be in as good a

22 position as anyone to have an understanding of what was going

23 on with that patient.

24 Q    And were you able to get the treating physician records in

25 the CARD mortality study?

1  A    Yes.

2  Q    How so?

3  A    Because Dr. Whitehouse was the treating physician for if

4  not everyone of these, almost every one of these patients.

5  Q    And as to the others, were there other doctors at the CARD

6  clinic?

7  A    There were other doctors at the CARD clinic or maybe in

8  the community with which Dr. Whitehouse was quite familiar

9  with.

10 Q    And for the CARD mortality, what percentage of the cases

11 did you have treating physician records on?

12 A    I don't -- oh, treating -- I believe all of them,

13 virtually all of them.

14 Q    They were CARD patients, were they not?

15 A    They were CARD patients.

16 Q    You mentioned the Selikoff studies.  Can you compare the

17 best available information review done for the CARD mortality

18 study with the Selikoff studies, particularly the 1991 death

19 certificate study?

20 A    They are very similar, but they have some differences.

21 They're similar in that they attempt to get the best

22 information available.  What Dr. Selikoff would do would be to

23 write to the hospitals where the insulators had died and obtain

24 autopsy reports, went so far as to get pathology tissue when

25 available so that an in-house pathologist who was knowledgeable

1 about asbestos disease could look at them.  But they were in

2 almost no cases, with probably one or two exceptions of local

3 people from the New York/New Jersey area that Dr. Selikoff may

4 have taken care of as a patient known to Dr. Selikoff or

5 anybody on the team.  In this case, all of the patients seen at

6 the CARD clinic were known to the doctors at the CARD clinic,

7 including Dr. Whitehouse.

8 Q    And have you done a comparison of the CARD mortality study

9 in terms of the records obtaining process with the Selikoff

10 study?

11 A    Yes.  In one case it was the medical records of the

12 treating doctors.  In the other case, it was a variety of these

13 other things.  So if you will, cold records versus hot records,

14 records that were well known to the doctors who were making the

15 judgments about these patients.

16 Q    And who had the hot records and who had the cold records?

17 A    Oh, Dr. Whitehouse had the hot records.  Dr. Selikoff sort

18 of had the cold records.  They were records he obtained after

19 the patients had died and he, with probably a few exceptions,

20 knew nothing specific about any of those patients or their

21 clinical course or anything else.

22 Q    And do you have an opinion as to whether the studies are

23 comparable on the basis of how records were obtained --

24 A    They are --

25 Q    -- and the completeness of the best evidence or best

1  information review?

2  A    They're certainly comparable.  I wouldn't say that they

3  are exactly the same, but they are comparable and as close as

4  you can get to mimic the earlier study of Dr. Selikoff in

5  trying to obtain the best evidence and the best judgment about

6  a case.  So while not identical, they attempted to do the same

7  thing which was to get the best information about the cause of

8  death in that case.

9  Q    Do you have an opinion whether the two studies are

10  sufficiently comparable that the results can be compared?

11  A    I think so, yes.

12  Q    What is that opinion?

13  A    My opinion is yes, they can be compared.

14         MR. HEBERLING:  Let's put LC-8.  Your Honor, if I may

15  approach the witness (indiscernible).

16         THE COURT:  All right.

17                    (Pause)

18         THE COURT:  Thank you.

19         UNIDENTIFIED ATTORNEY:  We're not getting into that

20  right away.

21  Q    I am now showing you Exhibit LC-8.  Are you familiar with

22  that?

23  A    I am.

24  Q    Could you briefly identify what it is?

25  A    Yes.  It is, as it says, a summary of the mortality study

1  disease percentages among the three different groups

2  represented, workers at the facility, the miners, their direct

3  family members and those with only community exposure and then

4  looks at the percentage with particular diagnoses depending on

5  what level of information one is looking at.

6  Q    Then the three sections, top, middle and bottom, could you

7  briefly explain what those are?

8  A    Yes.  The first section is the totality of the 110 cases

9  that were present on the previous chart for which there was

10 enough information that were not -- that fell into the box that

11 one could start looking at.  That was 110 patients and there

12 was 76 that were not felt to have asbestos disease.  Then if

13 actually one goes to the bottom, it's what the death

14 certificate said is the cause of death and then spread out over

15 those three groups from both -- not both, but from

16 mesothelioma, lung cancer, asbestosis and other

17 asbestos-related cancers and it gives the various numbers and

18 then percentages there.

19          And then the middle piece is that comparative group

20 with the best available information and you see that it doesn't

21 change for mesothelioma.  It doesn't change for lung cancer.

22 Those diagnoses were pretty well made, but that the deaths from

23 asbestosis as per the death certificate which we've already

24 discussed is often under reported, went from 26 percent to 41

25 percent.  And the other asbestos-related cancer is -- again,

1  cancers are much better diagnosed and reported -- stayed the

2  same.

3  Q    Do you determine the status of the disease as to whether

4  they were miners?

5  A    Yes.  The three categories are miners, family members of

6  miners or community only exposure.

7  Q    And did you do some verification of the numbers in these

8  categories?

9  A    Yes, I mean, that's -- this is the process that was done

10 looking at this and, you know, looking at the death

11 certificates.  I've seen the death certificates and compared

12 them.  So, yes, there was verification done.

13 Q    Are you comfortable in relying on this data?

14 A    Yes.

15 Q    Regarding determinations of death and use of related data

16 for all these procedures, how do these procedures compare to

17 what you're doing if publishing a paper?

18 A    What one would do, just as Selikoff did when he published

19 his paper regarding his processes, you would explain the

20 process you went through to get to these numbers and why they

21 changed.

22 Q    And can you compare the rigorousness with which the data

23 was examined and presented for the CARD mortality study with a

24 paper that you would be intending to publish?

25 A    Yes.

1  Q    And, in fact -- oh, and how do you compare that?

2  A    Well, I feel this a reliable set of data and when

3  published would rely upon it as representing what it says it

4  represents.

5  Q    Is there work toward publication?

6  A    Yes.

7  Q    Are you participating in that?

8  A    Yes.

9  Q    You intend to be an author?

10 A    Yes.

11 Q    Does this Exhibit LC-8 summarize voluminous data?

12 A    Yes, it does.

13           MR. HEBERLING:  We offer LC-8.

14           MR. BERNICK:  I have no -- it's a 1006 summary?

15           MR. HEBERLING:  Yes.

16           MR. BERNICK:  Yeah.  We don't have a problem with the

17 summary itself, but to the extent that the summary appears as

18 part of a document that states a conclusion, it's just a part

19 of an expert report.  So if the data could be segregated out

20 and just re-labeled as 1006 summary without the argumentation

21 of the opinion, we wouldn't have an objection.  There's an

22 opinion at the top that talks about causation.

23           THE COURT:  Yes, it does.

24           MR. HEBERLING:  Yes, we went through the

25 determination as a basis for cause of death and so forth and

1 the -- we're only presenting ones that are asbestos related in

2 the cause of death.  That's the point of the chart.

3          MR. BERNICK:  Well, then, that's not a summary

4 anymore, Your Honor.  I would also add that this was not timely

5 disclosed under the pretrial order in this case.

6          MR. HEBERLING:  It certainly was.  It was disclosed

7 in December of 2008.

8          MR. BERNICK:  But not as a 1006 summary which it's

9 not.

10          THE COURT:  Well, the witness has just testified that

11 it summarizes numerous -- a variety of data.  It appears to be

12 a summary chart in the fashion in which it's written.  The

13 significance of the causation factor listed at the top which

14 states, "significant contributing factor analysis as of July 9,

15 2008" I will disregard.  I will treat it as the main caption

16 says, as a summary of mortality study disease percentages and

17 nothing more.

18          MR. BERNICK:  Thank you.

19          THE COURT:  So it's admitted as a Rule 1006 summary.

20 Q    Okay.  What does significant contributing factor mean to

21 you in medicine?

22 A    Well, significant contributing factor would mean that it

23 was an underlying cause of death, not just something that was

24 present in the party at the time of their death.  For example,

25 you could have a mesothelioma and get hit by a bus.  Your cause

1 of death would be trauma from the bus accident.  Other

2 significant condition would be listed as mesothelioma.  But

3 where we ended up with this table is that these were not just

4 present, but were contributory cause to death.

5 Q    And how many of the 186 subjects in the study were

6 diagnosed with asbestos disease?

7 A    Of the ones -- I mean, all of the ones here had asbestos

8 disease.  I believe they'd all been diagnosed with some

9 asbestos disease, but didn't meet the criteria to end up in the

10 study.

11 Q    What is --

12 A    They were not all diagnosed as asbestos disease as their

13 cause of death which is also why there's fewer here than we

14 started out with, with the 186.

15 Q    What does representative mean in epidemiology?

16 A    Representative is that it is a subset of the whole group

17 from which it comes and with certain caveats can be said to

18 reflect what the experience of the group may be in the future.

19 Q    Is there any way that the 186 subjects in the study

20 resemble all other CARD patients being followed for

21 asbestos-related disease?

22 A    Well, they all --

23        MR. BERNICK:  I'm sorry.  At this point, there is a

24 foundation problem which is who all the other people are in the

25 study.  I suspect where Mr. Herberling is going is --

1          MR. HEBERLING:  Yeah, I'll withdraw that question.

2          MR. BERNICK:  Okay.

3  Q    Is there any way -- have you heard discussion of 950 Libby

4  claimants in this proceeding?

5  A    I've heard that figure at some point during our

6  discussions, yes.

7  Q    And what's your understanding as to whether the 950 Libby

8  claimants have been diagnosed with asbestos disease?

9  A    They've all been diagnosed with an asbestos-related

10 disease.

11 Q    So is there any way that the 186 subjects in the study

12 resemble the 950 Libby claimants?

13 A    Certainly --

14         MR. BERNICK: Objection.  I'm sorry.  Objection, lack

15 of foundation as to what the source of the 950 was and the

16 methodology applied in order to be able to express an opinion

17 under 702, 703.

18         THE COURT:  That has to be sustained.

19 Q    How is it you know that the 950 are diagnosed?

20 A    From discussions that lawsuits were filed, that that's why

21 they are claimants and that my experience tells me that to file

22 a lawsuit, there has to be some evidence of an asbestos-related

23 disease.  And so all of these people have been diagnosed with a

24 disease, just as the 186 have been.

25 Q    And do you have any information as to the 950 as to

                    **J&J COURT TRANSCRIBERS, INC.**

Frank - Direct/Heberling                          153

1 whether they were exposed to Libby winchite asbestos?

2 A    Yes, they --

3         MR. BERNICK:  Objection, lack of --

4               (Attorney conversation)

5 Q    I asked him if he has any information.

6         THE COURT:  So it's a yes or no answer.

7 A    Yes.

8 Q    And how did you obtain that information?

9 A    In my various understandings of the patients that were

10 seen at the CARD clinic and my discussions over who filed

11 lawsuits.  Not everybody who was exposed has filed a lawsuit,

12 but all those people who filed a lawsuit have been exposed to

13 Libby asbestos.

14 Q    Do you have an opinion whether the 186 subjects in the

15 study are representative of the Libby claimants who are CARD

16 patients?

17        MR. BERNICK:  Your Honor, could I have a little bit

18 of voir dire on that, just very short?

19        THE COURT:  All right.  Well, I think I need an

20 answer first just to make sure he does have that opinion.

21        MR. BERNICK:  Yes or no, yeah.

22 A    The question, again.  I'm sorry.

23 Q    Do you have an opinion whether the 186 subjects in the

24 CARD mortality study are representative of Libby claimants who

25 are CARD patients?

Frank - Direct/Heberling/Voir Dire/Bernick          154

1              THE COURT:  It's yes or no, sir.

2  A    Yes.

3              THE COURT:  All right.  Now, Mr. Bernick.

4              MR. BERNICK:  Thank you, Your Honor.

5                    VOIR DIRE EXAMINATION

6  BY MR. BERNICK:

7  Q    Good afternoon, Dr. Frank.

8  A    Mr. Bernick, good afternoon.

9  Q    Okay.  The 950 claimants, did you actually review those

10 claimants --

11 A    No.

12 Q    -- as who they are?

13 A    Not all of them, no.

14 Q    Okay.  Did you -- do you have a list of who they are?

15 A    I'm not sure if I have such a list.  I don't recall seeing

16 one.

17 Q    How do you know that they're all claimants?

18 A    That's how they've been described.  That's the definition

19 of this group.

20 Q    Okay.  So --

21 A    I mean, it was -- the question was put to me that there

22 are --

23 Q    I just --

24 A    -- 950 claimants.

25 Q    Right.  I just --

                    **J&J COURT TRANSCRIBERS, INC.**

1  A    That's how -- I take the term to be self-evident.

2  Q    What -- no.  You had to hear -- did you hear from somebody

3  that they're all claimants?

4  A    Yes.

5  Q    Okay.  From whom?

6  A    Mr. Heberling.

7  Q    And any other source that you have?

8  A    No.

9  Q    Okay.  And do you know that they all have, in fact, filed

10 complaints in a lawsuit?

11 A    I would think the term claimant means that there is a --

12 Q    I didn't ask you that.  Do you know that they --

13 A    I don't know what the legal status of those 950

14 individuals are.

15 Q    Okay.  Is there any other source of information that you

16 have that there are 950 claimants other than what you described

17 that is from Mr. Heberling who have filed complaints or

18 lawsuits?

19 A    No.

20       MR. BERNICK:  Okay.  Your Honor, I don't believe that

21 a foundation has been established under Rule 702, 703 that the

22 witness has evidence or facts that are sufficiently reliable

23 within his discipline to express an expert opinion.  All that

24 we have is that he talked to Mr. Heberling.  Mr. Heberling told

25 him that there were 950 claimants.  He is taking that to be

1  true and he's further taking that to mean that they have filed

2  complaints.  And he's further taking that to mean that they

3  have diagnoses and exposure and fact.  That is far too

4  attenuated to establish a proper foundation under 702.

5          THE COURT:  Mr. Heberling?

6          MR. HEBERLING:  In the expert report of Dr.

7  Whitehouse, is there a discussion of --

8          THE COURT:  No, I'm sorry.  Do you have a response to

9  the objection?

10          MR. HEBERLING:  Oh.  I thought I was --

11          THE COURT:  I'm sorry.

12          MR. HEBERLING:  Well, Dr. Frank has testified that

13  all these people are diagnosed.  And so one -- the real

14  question is whether a person diagnosed is sufficiently related

15  to the 186 subjects in the study.  And we will show that the

16  basis for the one group being representative to the other is

17  that they're diagnosed.  It's --

18          THE COURT:  All right.

19          MR. HEBERLING:  -- really quite simple.

20          THE COURT:  The objection is sustained.  The witness

21  testified he did not review all the records.  He doesn't even

22  know if he's had a list.  He doesn't know who the claimants

23  are.  He's only been told that there are 950 of them and as we

24  know being a claimant doesn't mean you filed a lawsuit or that

25  you've been diagnosed.  So the objection is sustained.

1  Q    Have you been informed -- in reviewing the Dr. Whitehouse

2  expert report for May 2009, is there any discussion in there of

3  950 claimants?

4  A    Nine hundred and 50 claimants?

5  Q    Nine hundred and 50 Libby Claimants.

6  A    I believe that figure does appear in there.

7  Q    And do you have any information as to whether or not these

8  are people being followed for asbestos-related disease?

9  A    My understanding is these are all people that have been

10  followed at the CARD clinic and there should be accurate

11  diagnoses of them.

12  Q    And did Dr. Whitehouse also sign the expert report?

13  A    Yes.

14  Q    And as to other -- the other patients at the CARD Clinic

15  who were diagnosed with asbestos-related disease, do you have

16  an opinion whether the 186 subjects in the study are

17  representative of them in any way?

18         THE COURT:  You mean, in addition to the 950?  I

19  don't know who the other patients are that you're referring to.

20         MR. HEBERLING:  That would be in addition.  It's

21  perhaps a larger number, yes.

22         THE COURT:  So, the question is, is the 186

23  representative of all patients at the CARD Clinic?

24         MR. HEBERLING:  I'll withdraw that and stick with the

25  950 for a moment.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    With this information through Dr. Whitehouse, through the

2  Dr. Whitehouse reports, have you made a decision as to whether

3  or not to accept the 950 patients as diagnosed with asbestos

4  disease at the CARD Clinic?

5  A    Yes.

6  Q    What is that decision?

7  A    The decision is that I believe the physicians at the CARD

8  Clinic have the experience, and knowledge and track record to

9  show that people do or do not have asbestos-related disease.

10 Q    Have you examined a number of their diagnoses?

11 A    I have examined a number of their diagnoses.  I have

12 looked at the X-rays, CT scans, PFTs and even on one or another

13 occasion a patient or two.

14        MR. FINCH:  Your Honor, may I have some voir dire on

15 this?

16        THE COURT:  Well --

17        MR. HEBERLING:  I'm not quite done yet.

18        THE COURT:  Go ahead.

19 Q    And do you have an opinion whether you concur in the

20 diagnostic methods used by Dr. Whitehouse and the CARD Clinic

21 doctors?

22 A    I certainly concur there is standard medical practice that

23 one would use to make any kind of diagnosis.  In this case,

24 there's a focus, of course, on exposure to Libby asbestos.

25 But, the diagnoses and the diagnostic procedures they went

1 through are standard medical practice.  So, I do concur with

2 them.  There was nothing unusual or outside the bounds of the

3 clinical practice of medicine that gave me any pause about the

4 diagnostic procedures used to both collect the information and

5 make an ultimate diagnosis.

6 Q    Have you, in fact, relied on those diagnoses in some way?

7 A    Yes.

8 Q    How?

9 A    I've relied upon them for an understanding of the patients

10 seen at the CARD Clinic who have and have not been diagnosed

11 with asbestosis or some asbestos-related disease.

12 Q    And do you have any opinion whether the 186 subjects in

13 the CARD mortality study are representative of the Libby

14 Claimants diagnosed with asbestos disease by the CARD Clinic?

15          MR. GUY:  Same objection that was raised before, Your

16 Honor.

17          THE COURT:  Wait, I'm sorry.  I missed the question,

18 Mr. Heberling.  Would you restate it for me, please?

19 Q    Do you have an opinion whether the 186 subjects in the

20 study are representative of the Libby Claimants who are CARD

21 patients?

22          MR. BERNICK:  It's a yes or no?

23          THE COURT:  Is it a -- well --

24 A    Yes, I do have an opinion.

25          THE COURT:  Could you define who the Libby patients

1 are, or Libby Claimants are for me?

2          MR. HEBERLING:  We have submitted lists.  They're in

3 the record.

4          THE COURT:  The 950?

5          MR. HEBERLING:  The 950.

6          THE COURT:  Okay, I'm sorry.  He answered yes, he has

7 an opinion.  Your next question?

8 Q    And what is that opinion?

9          MR. BERNICK:  At this point, Your Honor, two

10 objections.  Number one, he still hasn't provided the

11 foundation.  At this point, we don't know whether the list

12 that's been provided by counsel of the 950 claimants is or is

13 not the same list of people as to whom the CARD Clinic actually

14 has diagnoses.  This witness doesn't know that.  To say that

15 they're claimants, he has no clue about whether the two things

16 match up.  That's number one.  Number two, there is not one

17 expert report in this case where Dr. Frank expresses the view

18 that the 186 are representative of people -- of 950 claimants

19 who have filed claims in this case, not one.

20          MR. GUY:  I have a third objection, Your Honor.

21 You've already ruled on this.  You've already sustained the

22 objection, Your Honor.  It's the exact same question.

23          THE COURT:  With this witness?

24          MR. GUY:  Yes, Your Honor.  The objection that you

25 sustained before was the same.

1          THE COURT:  Oh.

2          MR. GUY:  He didn't know who those claimants were.

3          THE COURT:  He doesn't have the underlying -- yes,

4   and then I thought there was being a foundation laid, but it

5   appears that the foundation still is not laid because the

6   witness has testified he doesn't know who the 950 are.  He

7   hasn't reviewed them all and he doesn't recall having seen a

8   list.

9          MR. HEBERLING:  Okay.

10  Q    As to the patients diagnosed with asbestos disease at the

11  CARD Clinic, do you have an opinion as to whether the 186

12  subjects in the study are representative of them in some way?

13  A    Yes, I do have an opinion.

14  Q    What is that --

15  A    And, yes, they are representative in some way.

16         MR. BERNICK:  No, Your Honor.

17         THE COURT:  No, it's stricken.

18         THE WITNESS:  Oh.

19         THE COURT:  It's stricken.  He can only state his

20  opinion.

21         THE WITNESS:  Oh.

22         THE COURT:  Then ask the next -- that he has an

23  opinion or doesn't have an opinion, then ask a question,

24  please.

25  Q    What is your opinion?

1        MR. FINCH:  Objection, lack of foundation.

2        THE COURT:  Sustained.

3        MR. HEBERLING:  Your Honor, we've shown that the --

4   it's his understanding that the patients being followed are

5   diagnosed with asbestos disease at the CARD Clinic.

6        THE COURT:  The 186.

7        MR. HEBERLING:  All of them.

8        THE COURT:  Okay.  He has said that there are

9   patients at the clinic who are being followed for asbestos

10  diseases, yes.

11       MR. HEBERLING:  Okay.  So --

12       THE COURT:  As his understanding.

13       MR. HEBERLING:  Yes.

14       THE COURT:  Yes.

15       MR. HEBERLING:  And I'm asking whether the 186 in the

16  study are representative of patients at the CARD Clinic who are

17  diagnosed.

18       THE COURT:  I know, but you haven't substantiated

19  that he knows who those patients are that he's allegedly saying

20  the 186 may or may not be representative of.  You need to lay a

21  foundation.  There is no foundation.

22  Q    How is it that you know that the CARD -- that the -- let's

23  back up a bit.  Does the CARD Clinic treat any other diseases,

24  other than asbestos disease?

25  A    They assess people to see if they have asbestos disease.

**J&J COURT TRANSCRIBERS, INC.**

Frank - Direct/Heberling                          163

1  Some are found to have it.  Some are found not to have it.  For

2  those that have the disease, they continue to be seen and

3  followed at the clinic or elsewhere, but at least they are

4  known to the clinic as having asbestos disease.

5  Q    Okay.  So, do you have an opinion as to whether the 186

6  subjects who were diagnosed with asbestos disease at the CARD

7  Clinic are representative of other claimants being followed and

8  treated at the CARD Clinic for asbestos disease?

9  A    Yes, I have an opinion.

10 Q    What is that opinion?

11         MR. BERNICK:  Objection.

12         UNIDENTIFIED ATTORNEY:  Objection.

13         MR. BERNICK:  Lack of foundation.

14         THE COURT:  It's still sustained.  I have to sustain

15 this objection.  There is nothing on the record that indicates

16 who these people are, what information this doctor has,

17 personally, to be able to make that representation.  There is

18 no foundation on this record.

19         MR. HEBERLING:  I'll try again.

20 Q    How is it that you know that the patients at the CARD

21 Clinic are being followed for asbestos disease?

22 A    By having been at the CARD Clinic, by having seen their

23 procedures, by discussing with them how they follow patients,

24 and am aware that the patients that are seen on an ongoing

25 basis have all been diagnosed with an asbestos-related disease.

Frank - Direct/Heberling                        164

1  Q    Specifically, how did you come to that awareness?

2  A    By going to the clinic, by reading charts, by talking with

3  the physicians there, by looking at the records and seeing the

4  data that was being developed over time, and even talking to,

5  as I said, one or two individuals followed there.

6  Q    And are you comfortable in relying on that information?

7  A    Yes.

8  Q    So, what is your opinion as to whether the CARD mortality

9  study, 186 subjects, are representative of the patients being

10 followed for a diagnosis of asbestos-related disease at the

11 CARD Clinic?

12           MR. BERNICK:  We object, Your Honor, on the same

13 grounds.

14           THE COURT:  I don't believe the foundation has been

15 properly established.

16           MR. HEBERLING:  Your Honor, I'll make a quick offer

17 of proof.

18           THE COURT:  All right.

19           MR. HEBERLING:  As asked, the witness has stated that

20 he has an opinion.  He will state that the opinion is that the

21 186 subjects in the study are representative of the 950 Libby

22 Claimants, and separately if asked would express an opinion

23 that the 186 subjects in the study are representative of

24 patients being followed and/or treated for asbestos disease at

25 the CARD Clinic.

1        THE COURT:  All right, the proffer is on record.

2 Q    And do you have an opinion whether a Libby claimant was a

3 CARD Clinic patient and diagnosed with asbestos disease from

4 Libby winchite exposure has a probability of death from

5 asbestos-related disease?

6 A    Yes, I do.

7 Q    What is that opinion?

8        MR. BERNICK:  Your Honor, at this point not only is

9 there a lack of foundation, but there is no relevance that's

10 apparent to this question.  There is nothing in this trial that

11 turns on probability of death and it doesn't affect the TDP,

12 the operation of the TDP, discrimination under the TDP or

13 anything.

14        THE COURT:  I don't see the relevance.  Mr.

15 Heberling?

16        MR. HEBERLING:  Briefly, the relevance is to the

17 issue of Libby being different, the substantially similar

18 language in the statute as restated in Combustion Engineering.

19 We feel that is a separate issue from the reasonableness of the

20 TDPs and the discrimination issue.  A substantially similar

21 issue is the issue to which the probability of death goes to.

22 That occurs nowhere else.

23        THE COURT:  There is no probability of death from

24 something like exposure to asbestos when somebody contracts

25 mesothelioma elsewhere?  You can't possibly establish that

1  fact.

2        MR. HEBERLING:  Maybe I didn't state it sufficiently

3  clearly.  A probability of death from asbestosis,

4  asbestos-related disease nonmalignant, has not been established

5  anywhere else but Libby.

6        MR. BERNICK:  If the issue --

7        MR. HEBERLING:  So, that is --

8        MR. BERNICK:  If the issue --

9        MR. HEBERLING:  -- a point for the not substantially

10  similar argument that we make.

11        MR. BERNICK:  Your Honor, if the separate issue is

12  not discrimination under the plan but rather is classification,

13  I believe as a matter of law that there's no basis for that

14  argument.  Otherwise, we would have separate classifications

15  for all kinds of different diseases which are not separately

16  classified.  That's just not a plausible legal argument and,

17  therefore, for that reason, as well, the question of

18  probability of death is irrelevant.

19        THE COURT:  The probability of death at some point

20  may affect the damage question.  It has nothing to do with this

21  case.  Anybody who has an asbestos disease of any type from

22  Grace exposure is entitled to file a claim against the trust

23  and to have it adjudicated by that body.  So, the probability

24  that somebody is going to die from it in Libby doesn't make a

25  difference in the operation of the trust because there will be

1  other people who will die from diseases who also have the

2  ability to make that claim against the trust.

3        MR. HEBERLING:  I understand the Court's ruling.

4  Thank you.

5        THE COURT:  Okay.  I'll sustain the objection.

6                (Pause)

7        MR. HEBERLING:  I'd like to make an additional point

8  in support of the not substantially similar argument that we're

9  making.

10       THE COURT:  All right.

11       MR. HEBERLING:  We will show, through Dr. Frank, that

12  not only is there a probability of death for those diagnosed

13  with asbestos disease from Libby exposures, but also that there

14  is no reported cohort in the United States that anywhere else

15  that has that probability of death.  And we believe the

16  probability of death makes the Libby asbestos disease claimants

17  in a category similar to mesothelioma or lung cancer where

18  there is a clear probability of death.  For other nonmalignant

19  asbestos disease claimants, there is no probability of death

20  and, therefore, we believe that Libby should have a separate

21  category based upon the probability of death and other measures

22  of severity.

23       MR. BERNICK:  Your Honor, classification is a voting

24  issue.  There's no reason under the bankruptcy law if votes are

25  separately tallied for people with variations of diseases if

1   such there are.  The lung cancer -- the testimony is, that lung

2   cancer almost inevitably results in death.  So, pick a number

3   80, 90 percent.  Mesothelioma always results in death.  And at

4   that point below that, you're into a gradation.  If we had to

5   determine votes for separate classes based upon gradations of

6   risk for what is admittedly a different disease, then I think

7   you would be overturning all of the asbestos bankruptcies that

8   have gone forward to confirmation.  So, I don't believe that

9   that proffer is any different as a matter of law from the prior

10  proffers.

11          MR. FINCH:  Your Honor, I make one additional point,

12  that the probability of death as a distinguishing factor

13  basically goes to the strength of the person's claim against

14  W.R. Grace or the W.R. Grace Trust and a factor of damages.  It

15  is clearly not a basis for separate classification how strong

16  or how weak your unsecured claim is against a debtor.  A

17  contract claim that is in a settled asbestos personal injury

18  claim, there is absolutely no dispute as to the validity of

19  that claim or the amount and the damages maybe -- amount owed

20  under the contract may be substantial.

21          There is clear case law, I think maybe even by this

22  Court -- I can't recall where we litigated the issue -- but

23  it's clear case law that says that you can classify contract

24  claims for asbestos personal injury victims in the same class

25  as unsettled asbestos personal injury claims.  And that there's

1  no basis under 1122 or in the <u>Combustion Engineering</u> case for

2  having separate classes based on how strong your case is

3  against Grace as a personal injury case or how much money you

4  might recover in damages.  Every single individual asbestos

5  claim that comes to this trust or that is filed against the

6  trust is going to turn on its own set of facts.  And there's

7  going to be claims raising from very strong mesothelioma claims

8  of lay down exposure to cases where it is very, very doubtful

9  as to both disease and exposure, and that is not a basis for

10 separately classifying each one of those cases.

11        THE COURT:  I think the issue that you're trying to

12 get to is whether or not the classification within the trust,

13 the subclass within the trust of the severe disease category is

14 somehow or other too restrictive for the Libby plaintiffs.

15 That seems to be where this is going.  Do I understand the

16 nature of your objection?

17        MR. HEBERLING:  That's correct.  And in the

18 discrimination claims that's also a basis in the sense that

19 it's too restrictive.  We have the stronger claims, as they

20 just referred to, based on the probability of death.  So, I

21 want to make sure the record reflects that we're arguing both

22 bases.

23        THE COURT:  Okay.  It's overruled for the reasons

24 that I've overruled it before, part of which include -- with

25 other witnesses this line of questioning -- part of which

Frank - Direct/Heberling                    170

1 include the fact that to the extent that a person has a higher

2 probability of contracting a more severe disease after they

3 substantiate to the trust that they have a lesser severe form

4 of disease, less severe form of disease, they have the

5 opportunity under this TDP to go back to the trust and produce

6 the evidence of the greater disease.  So, they are still taken

7 care of within this trust distribution procedure.  Everyone who

8 substantiates that they have a particular level of disease is

9 classified with respect to the TDP.

10        So, the fact that there is a stronger probability

11 that a person from Libby may die than there is that a person

12 from Boston may die of a particular disease does not affect the

13 ability of that person to go to the trust or to seek the

14 appropriate level of damages from that trust.  So, I don't see

15 the relevance of this line of questioning.  To the extent that

16 you're arguing for separate classification, I don't see a basis

17 for it in any of the literature or any of the law.  And in, I

18 don't know, 18, 20, 25, however many asbestos cases that I've

19 personally handled, I've never seen it or awarded it for any

20 group of particular personal injury claimants.  So, the

21 objection is sustained.

22 BY MR. HEBERLING:

23 Q    Do you have Exhibit 15 in your CARD mortality study book

24 in front of you?

25 A    The LC-15?

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Yes, LC-15.

2  A    Yes, the death certificates of 110 people.

3         THE COURT:  Okay.  That is not in this book, but I'm

4  sure I need them.  Is it on the CD?

5         MR. HEBERLING:  Yes, it is on a CD.

6         THE COURT:  Okay.

7         MR. HEBERLING:  We can supply it to you on a CD.

8         THE COURT:  No, I don't think I need them.  I just

9  wanted you to know that it's not specifically in the binder

10 that you handed up to me, this binder.

11        MR. HEBERLING:  There should be a green binder.

12 That's the one I couldn't find.

13        THE COURT:  Oh, the mortality study itself?

14        MR. HEBERLING:  Yes.

15        THE COURT:  Oh, okay.

16        MR. HEBERLING:  I think I may have given that to you

17 earlier, Your Honor.

18        THE COURT:  Okay, it's here.  Thank you.

19 Q    Okay.  Referring to Exhibit 15, you mentioned that they

20 are a series of death certificates?

21 A    Yes, sir.

22 Q    And have you had a copy of this series of death

23 certificates for some time?

24 A    Yes, sir.

25        MR. HEBERLING:  And I will represent to the Court

1  that I have the original death certificates here and that all

2  but two have seals.  The two that do not have original seals

3  from a district court or other agency are here presented in

4  formal copies.

5           THE COURT:  All right.

6  Q    For the CARD mortality study did you maintain lists of the

7  deceased?

8  A    Yes.

9  Q    And have you done work to verify that the death

10 certificates that you've reviewed are fairly reflected on the

11 lists?

12 A    Yes.

13 Q    Okay.

14           MR. HEBERLING:  Under Federal Rule of Evidence 9021,

15 we believe the death certificates are self-authenticating and

16 we offer the 110 death certificates.

17           MR. BERNICK:  Objection, relevance.

18           THE COURT:  I note that most -- at least the ones

19 I've looked at have had the identifying information deleted.

20 Are you satisfied that this set, the copy set, in fact, has all

21 the personal identifying information deleted?

22           MR. HEBERLING:  Yes, my staff did that I -- yes.

23           THE COURT:  Okay.  I will admit them subject to a

24 determination of relevance later.

25           MR. HEBERLING:  Okay.  Then, also as part of Exhibit

1  15, which I think we should remark since it is a separate list

2  as -- make it 15(a).

3  Q    Dr. Frank, do you have before you a list entitled, Death

4  Certificate Causes of Death 110?

5  A    I do.

6  Q    Are you familiar with that list?

7  A    I am.

8  Q    And is it one that you've had for some time?

9  A    Yes.

10  Q    Can you identify what it is, what it presents?

11  A    It presents the information on the death certificates for

12  these 110 individuals in the manner of the presentation on the

13  death certificates.  The first, second, third and fourth lines

14  is found on death certificates in terms of cause of death and

15  other significant conditions.

16  Q    And is this list a summary of a voluminous record?

17  A    Yes.

18        MR. HEBERLING:  We offer the list of the 110 death

19  certificates as a Rule 1006, summary of voluminous records.

20        MR. BERNICK:  Your Honor, I want to go back on the

21  prior one and incorporate it in this objection, which is that

22  the number of people who were part of this study may or may not

23  serve as a basis for an expert opinion under 702 and 703.

24  However, those rules say that although the opinion could be

25  expressed as an expert opinion, the underlying materials do not

1 come into evidence unless there is a specific showing that says

2 that, you know, there's importance to it.  So, the fact of the

3 110 may be relevant to this witness' testimony about the

4 mortality study, but there's no need for us to go through all

5 of the underlying data in the mortality study, including these

6 certificates, and offer it into evidence because it doesn't

7 come in under the rules.

8          MR. FINCH:  I also object on relevance grounds.

9          MR. GUY:  Your Honor, may I add one thing?  Just with

10 some concern about the confidentiality of this information, I

11 don't know where we are with this, but it does have all the

12 names there.  It also shows multiple causes of death.  So, I

13 don't know how dispositive any of this is going to be.

14          THE COURT:  I'm sorry.  What is it that you're

15 looking at that has the names?

16          MR. GUY:  Your Honor, I'm looking at the document

17 that's showing upon the ELMO, and it has the last names and

18 first names and then cause of death.

19          MR. HEBERLING:  Your Honor, we have a copy for the

20 Court which is redacted.  But, more importantly, we --

21          THE COURT:  The copy that I'm looking at, I don't

22 think I'm missing the names of the individuals.  It has the

23 cause of death and a description of the cause of death and the

24 underlying disease.  It has a pin number that's been assigned

25 as a last name.  That's Exhibit -- what has been marked as

1  Exhibit 15(a).  Exhibits 15, which are the death certificates

2  themselves, have all, from a quick look at this, been modified

3  to take out the names of the deceased and any other identifying

4  information.

5          MR. GUY:  Your Honor, I just wanted to be sure

6  because what's on the screen has the names.  As long as what

7  they put into the record doesn't --

8          THE COURT:  I do not have a list that has the names.

9  I have Pin 1, Pin 3, Pin 16, Pin 35, and so forth.  I do not

10 have a list of names.  Okay.  Having addressed the names, with

11 respect to the relevance, I will admit 15(a) subject to a

12 relevance determination, but only as a summary.  And with

13 respect to Mr. Bernick's contention -- objection, pardon me,

14 that the underlying documents to the study are not themselves

15 admissible, that is a correct proposition of law.

16         So, I am not sure, as a result, what the relevance of

17 the underlying documents will be, but I've admitted them

18 subject to a relevance determination so we can get through this

19 witness' testimony.  In the event that I determine it's

20 appropriate to strike that information later, I will do so.

21 That will include Exhibits 15 and 15(a).

22         MR. HEBERLING:  Let's refer to LC-13.  And, Your

23 Honor, as I understand it at this point, we may show or use

24 documents which have individuals' names on them without

25 clearing the court, but there will be no use of the names in

1 findings or official -- or decisions of the Court, and that we

2 have taken care of it that way so that we can have the

3 individual names in the record, but not in the findings.

4        THE COURT:  Provided that you give me some other

5 designation.

6        MR. HEBERLING:  Yes.

7        THE COURT:  If you don't give me a different

8 designation, I won't know -- I won't have another way to refer

9 to anything if I need to make that reference.

10        MR. HEBERLING:  We came prepared to do that.  We have

11 all our exhibits with names on and pin numbers, and also with

12 just pin numbers and names redacted.

13        THE COURT:  All right.

14        MR. HEBERLING:  So, we could go either way, but the

15 other side has preferred to use the names and we're satisfied

16 with that as long as there's no findings or reference to

17 individual's personal injury cases.  We don't want to try

18 individual cases here.  That's the point.

19        THE COURT:  Right.  So, that the especially treating

20 physicians know who it is you're referring to, I think they

21 need to know the names.  For my purposes I don't.  I just need

22 a pin number.  So, if perhaps the record can say the

23 individual's name and the pin number, at some point I think we

24 could redact from the trial transcript the names and have only

25 the pin number because we should have a chart then that will

1   indicate what pin number is affiliated with what person.  Is

2   that what you're saying?

3           MR. HEBERLING:  Yes, we have that for the Court.

4           THE COURT:  Okay, that's fine.  And that part of the

5   record I think should be made and sealed as an exhibit that's

6   under seal.

7           MR. HEBERLING:  Okay.

8   BY MR. HEBERLING:

9   Q    Dr. Frank, do you have LC-13 in front of you?

10  A    I do.

11  Q    And is the title, Card Mortality Study 76 Nonmalignant

12  Deaths, Just X-Ray Readings by Dr. Frank?

13  A    Yes.

14          THE COURT:  Pardon me, Mr. Heberling.  Somewhere in

15  that discussion I missed what exhibit you're looking at.

16          MR. HEBERLING:  Sorry, LC-13.

17          THE COURT:  One three.

18          MR. HEBERLING:  LC-13.

19          THE COURT:  Okay.  I apologize.  I'm with you.  Thank

20  you.

21  Q    Can you identify this exhibit?

22  A    Yes, this is the listing of the 76 patients who make up

23  the CARD mortality study for whom I read X-rays and generated

24  my assessment of what their X-rays and CT findings showed.

25  Q    And, generally, how was this spreadsheet compiled, from

1 what sources?

2          MR. BERNICK:  Objection.  If you note -- can we

3 establish whether he did it or somebody else did it, you know,

4 how it knows?

5          THE COURT:  Yes, that's fair.

6 Q    Did you, yourself, create the spreadsheet?

7 A    I did not create the spreadsheet, but I created the data

8 upon which the spreadsheet is made and verified that the

9 information on the spreadsheet reflected the data that I

10 created.

11 Q    And how did you create the data, what did you put it on?

12 A    I put it on individual sheets for each patient when I read

13 their X-rays and/or CTs.

14 Q    Okay.  Then, did you take the spreadsheet and go

15 one-by-one and verify that your chest X-ray readings were

16 faithfully entered upon the spreadsheet?

17 A    I did.

18 Q    Did you have a graduate student help you with that?

19 A    No, I did that myself.  The original sheets were generated

20 by me with the assistance of a scribe who happened to be a

21 graduate student.  And I verified the sheets and then I

22 verified the accuracy of the sheets and what made it to this

23 document.

24 Q    Okay.

25          MR. HEBERLING:  Dr. Frank is prepared to go through

1  every column on the long spreadsheet and state the source of

2  the information and describe it.  That would take time, but if

3  --

4         THE COURT:  I don't know -- why is it that you want

5  this information on the record?

6         MR. HEBERLING:  Because the percentages of people

7  excluded are generated from this spreadsheet.  And so, we need

8  to go from the spreadsheet to the percentages excluded for

9  various purposes and also for other purposes of counting.  We

10  count from the spreadsheet.

11         MR. BERNICK:  Your Honor, I think there again is just

12  a fundamental misapprehension of what the rules of evidence do

13  with respect to expert testimony.  This spreadsheet covers a

14  wide variety of topics involving all kinds of information that

15  this witness may or may not have personal involvement with.  We

16  know that he did do his own readings of X-rays, and we have no

17  reason to doubt that they're accurately recorded on this piece

18  of paper.  That's one column out of like 20.

19         But, the problem here is that apparently Mr.

20  Heberling believes that he has to offer into evidence all of

21  the different pieces of data that went into the compilation of

22  materials for an unpublished study.  If this study actually had

23  been published, it would be an article and we would have the

24  article -- maybe we would have the underlying data, maybe we

25  wouldn't.  But, we wouldn't be spending hours trying get into

1 evidence information that doesn't come into evidence under the

2 rules.  So, we object to any proffer of this document into

3 evidence.  If the witness can establish a foundation, he can

4 rely upon it.  None of that has been done.

5          And I hasten to add, we are now an hour and a half

6 into this afternoon's proceeding.  We have four -- three

7 different experts, one of theirs, two of ours, all waiting to

8 get on the stand and get off the stand by tomorrow afternoon.

9 We have four other witnesses who are in town --

10          THE COURT:  Do you have an objection, Mr. Bernick?

11          MR. BERNICK:  Yes.

12          THE COURT:  -- if you have it, make it.

13          MR. BERNICK:  This is a complete derogation of the

14 federal rules.  And if Mr. Heberling would read the rules, we

15 wouldn't be spending hours here.  It doesn't come in under 702,

16 703.  There's not an adequate foundation for this witness to

17 testify personally to anything but the X-rays.  So, we object

18 to any use of this document as being put into evidence.

19          MR. FINCH:  Also a relevance objection.

20          MR. HEBERLING:  Your Honor, we could lay all that

21 foundation, but the spreadsheets are very important.  And I

22 would suggest that we mark them as an exhibit that the witness

23 has considered and not for the truth of the specific item.

24          MR. BERNICK:  That is an improper proffer under the

25 federal rules.  There is no such provision in the federal

1  rules.

2          THE COURT:  There is a host of data summarized on

3  this document that goes well beyond just X-rays, CT scans, and

4  I'm not even sure I found cause of death.  The cause of death

5  doesn't appear to be listed.  It has notes.  It has significant

6  information concerning pulmonary functions.  It does list a

7  date of death.  It lists, for example, a law firm.  I am not at

8  all sure what the witnesses -- how the witness would take

9  cognizance of this document and all these columns in offering

10  any sort of expert opinion, in any event.

11          MR. HEBERLING:  Your Honor, as we pointed out, we can

12  go through every single one of these bits of information and

13  show that he's familiar and he knows the procedures and so

14  forth.  We've had other exhibits in this trial which were

15  marked as exhibits that the witness has considered.  I would

16  suggest that it be marked for that purpose.

17          THE COURT:  Well, I took them subject to relevance.

18  I said at the outset I have some difficulty understanding the

19  relevance.  I was doing it because I thought you were going to

20  have this witness looking at the death certificates and that's

21  why they were offered.  But, if you're not, frankly I don't

22  understand the need for the death certificates, in any event.

23  If they substantiate the fact that on this chart there is, for

24  example, a date of death, and this is a summary of that

25  information, you don't need the death certificate.  So, I'm

                    **J&J COURT TRANSCRIBERS, INC.**

1  really confused.

2           MR. HEBERLING:  Well, the death certificates will be

3  connected to other information that we supply later.  I'd

4  prefer to just move on.

5           THE COURT:  All right.  I don't understand the

6  proffer.  Can you tell me, please, what the witness' testimony

7  about LC-13 is supposed to be about?  Can you make a proffer as

8  to what the use of this exhibit is for?

9           MR. HEBERLING:  From this exhibit we have developed

10  various percentages of people who do not -- who through the

11  chest X-ray measurements, through the lung function test

12  measurements do not qualify under the TDPs and --

13           THE COURT:  For expedited review.

14           MR. HEBERLING:  Right.  Do not qualify under the

15  specific medical criteria in the TDPs.  Okay, so --

16           MR. BERNICK:  As to that --

17           MR. HEBERLING:  Excuse me.  Let me finish.  So, we

18  can put the percentages into evidence through Dr. Frank, I

19  suppose, with or without having the spreadsheets in evidence.

20  I felt that in an abundance of caution we should have the

21  spreadsheets in evidence so it's very clear how this data was

22  derived.  But, I am getting the signal from the Court that she

23  would prefer not to have that.

24           THE COURT:  No, it's not that I have a preference one

25  way or the other.  I'm trying to make sure that I have

1  admissible evidence admitted and non-admissible evidence not

2  admitted, that's all.  I'm just trying to honor what the rules

3  of evidence tell me I have to honor.  I have no preference one

4  way or the other as to whether it does or doesn't come in, but

5  for that.

6         It seems to me that to the extent that what you want

7  to do is substantiate that these people who are dead and

8  therefore who wouldn't have qualified under the TDP for a

9  distribution as I understand it because this is it, this is the

10 evidence that they will have, is that what you're -- let me

11 start again.

12        MR. HEBERLING:  Yes, it is --

13        THE COURT:  Let me ask a question as opposed to

14 making a statement.  Is your contention that these 76 people

15 will have claims against the trust?

16        MR. HEBERLING:  Yes.

17        THE COURT:  And that they won't qualify for expedited

18 review because of some function that they will not -- some

19 standard in the trust distribution procedure that they will not

20 meet?

21        MR. HEBERLING:  Yes.  Most of the 86 percent will not

22 qualify.  There are nine of out 64, I believe, who do qualify,

23 and we have another exhibit that sorts them out.

24        THE COURT:  All right.

25        MR. BERNICK:  Your Honor, with that proffer, again,

1  we dispute the relevance because of the group, but we have no

2  problem with this witness, if it's in his report, offering

3  testimony about the effect of the TDP on these claims.  We have

4  not objected on that basis.  And if we would just get to the

5  chart, which we all know is here, that's not a problem.  We've

6  had access to the material.  We can cross examine with respect

7  to it.  That's what the rules provide.  I don't believe it's

8  necessary to have any of it be in evidence.  That is our sole

9  position here.

10          THE COURT:  All right.  What I will do is accept this

11  chart for one purpose and one purpose only, and that is so that

12  in reviewing the evidence later I have a summary of whatever

13  evidence it is that you're going to present related to these 76

14  individuals and how they will or will not qualify for expedited

15  review under the TDP.

16          MR. HEBERLING:  Thank you, Your Honor.

17          THE COURT:  All of the rest of the information I will

18  not consider and is not admitted.  So, I think you're going to

19  have to tell me which columns.  Get to that point.

20          MR. HEBERLING:  And there are some other purposes for

21  which we use this.  There are some other counts that we make.

22  So, it is a bit broader than just the TDP medical criteria.

23          THE COURT:  Well, when you get there you can

24  substantiate a foundation and then I'll take it one step at a

25  time.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. HEBERLING:  Okay.

2          THE COURT:  So, this is Exhibit 13 is right now

3  admitted for that limited purpose only.

4          MR. HEBERLING:  Okay.

5  BY MR. HEBERLING:

6  Q    Dr. Frank, in the chest X-ray readings for the CARD

7  mortality study did you read for pleural disease?

8  A    Yes.

9  Q    Did you read for interstitial disease?

10  A    Yes.

11  Q    What did most of the deceased have?

12  A    More had pleural disease than interstitial disease.  A

13  very small number had -- a relatively small number had

14  interstitial disease.

15  Q    What is pure pleural disease?  Excuse me -- I mean, strike

16  that.  What is a pleural death?

17  A    A pleural death as I -- for the purposes of this

18  discussion is someone who has no evidence of interstitial

19  disease, but has died of an asbestos-related disease which was

20  felt to be pleural in nature and pleural only.

21  Q    And did you count up the pleural deaths?

22  A    Yes.

23  Q    And how -- if you define pleural death using the

24  information on the spreadsheet, what column do you look for?

25  A    You would look at those who have evidence of pleural

1  disease and no evidence of parenchymal disease, so either a

2  zero zero, or a zero one.

3  Q    And do you have a counting sheet with you -- or do you

4  know how many died of -- as pleural deaths?

5  A    I don't recall the number at the moment.

6  Q    Okay.

7  A    I mean, one could --

8  Q    Please refer in your --

9  A    -- sit here and figure it out, but I don't recall that

10 number.

11 Q    Please refer in your book to LC-109.

12 A    Yes, sir.  Okay.  I do have that data here.  Yes, LC-109

13 --

14                     (Attorney conversation)

15 A    -- if you look at Page 3 of 6, 20 of 37 had no evidence of

16 interstitial fibrosis.

17             UNIDENTIFIED SPEAKER:  109.

18             MR. BERNICK:  109.  I'm sorry, Mr. Frank, you said --

19 Dr. Frank, it was how many?

20             THE WITNESS:  Excuse me?

21             MR. BERNICK:  How many?

22             UNIDENTIFIED SPEAKER:  Twenty out of 37.

23             THE WITNESS:  Twenty of 37 had minimal or no

24 interstitial fibrosis.

25 Q    And did you consider those pleural deaths?

**J&J COURT TRANSCRIBERS, INC.**

Frank - Direct/Heberling                          187

1  A    Yes.

2  Q    And is this information on pleural deaths significant?

3  A    Yes.  We have 20 individuals here with no evidence of

4  interstitial disease who died of -- as a result of their

5  exposure to asbestos that caused only pleural disease.  If you

6  look -- first of all, in my own experience I had never seen

7  such a case before I had gone to Libby.  If one looks at the

8  scientific literature, there are probably less than a handful

9  of cases reported literally in the world scientific literature

10 of pleural disease only causing death.  It has never been

11 thought of in the world of asbestos medicine prior to Libby as

12 leading to the death of individuals with only that disease.

13        It has been called everything from a beauty mark to a

14 marker of exposure.  It has been dismissed as insignificant.

15 It is clearly a disease.  You should not be having pleural

16 plaques, but it has never been thought of by itself as a cause

17 of death.  It's certainly been predictive of the greater

18 development of asbestos-related cancers.  But, as a cause of

19 death, pleural disease only is an extremely rare entity, I

20 mean, less than a handful of cases reported.

21        MR. BERNICK:  For the record, to clarify the numbers

22 that just came in because the witness referred to LC-109 and I

23 believe had a figure of 20 of 37, and just so the record is

24 clear I believe that that's taken from the bottom of Page 3 of

25 6 of LC-109 that --

**J&J COURT TRANSCRIBERS, INC.**

1          THE WITNESS:  That's what I said --

2          MR. BERNICK:  Well, I didn't know where it --

3          THE WITNESS:  Yes.

4          MR. BERNICK:  Oh, you did?

5          THE WITNESS:  I did say Page 3 of 6.

6          MR. BERNICK:  Oh, okay, I'm sorry.  I was shuffling

7   around.  I apologize.  And that would be had minimal or no

8   interstitial fibrosis?

9          THE WITNESS:  That's what it says, but --

10          MR. BERNICK:  Yes.

11          THE WITNESS:  It's not even minimal or it's not

12   considered as fibrosis because it's a zero one.

13          MR. BERNICK:  I understand.

14          THE WITNESS:  Zero zero and zero one are not evidence

15   of interstitial disease.

16          MR. BERNICK:  Right.  But, out of the 37 and the 37

17   are those where --

18          MR. HEBERLING:  Objection.

19          THE COURT:  Mr. Bernick, I don't think you're on

20   cross yet.

21          MR. BERNICK:  I understand, but, you know, Your

22   Honor, this is why now that he's got the information, 20 out of

23   37 came out of nowhere.  There are a thousand numbers here.  We

24   ought to know on the record what 20 out of 37 refers to,

25   specifically.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. HEBERLING:  Well, we can --

2          MR. BERNICK:  And he hasn't told us about the 37.

3          MR. HEBERLING:  We can repeat the foundation, but it

4   --

5          THE COURT:  No, I think he's just asking what the 37

6   is.  Twenty of the 37 allegedly have no interstitial fibrosis,

7   but what's the population of 37?

8          MR. HEBERLING:  It's above that.

9          THE WITNESS:  Thirty-seven -- if you look at just

10  above that, 37 with moderate or extensive pleural disease.

11         MR. BERNICK:  Thank you.

12  BY MR. HEBERLING:

13  Q    Okay.  As to the lung functions presented on the

14  spreadsheet that we spoke of, do you have a book of the

15  pulmonary function tests?

16  A    Yes.

17  Q    And is that something that you've had for some time?

18  A    Yes.

19  Q    Okay.  Briefly, what are the most important indicators of

20  severity in asbestos-related disease?

21  A    If you're dead from it or not, that would be the most

22  severe indicator.

23  Q    And how about --

24  A    If you're dead, then that's pretty severe.

25  Q    Short of death, what does one use?

1  A    Severity can be defined in many ways.  Basically, as a

2  clinician, one would define the severity as to the pulmonary

3  limitation someone has.  One can have a grossly abnormal X-ray

4  but feel fine and, you know, play full court basketball, and I

5  wouldn't say that those people have severe disease, though

6  their X-ray may look severe.  It is really the clinical

7  functioning of that individual which is best gotten to by

8  measurements of pulmonary function testing.

9  Q    And what are the three indicators of severity, generally,

10  in pulmonary function testing?

11  A    It would be -- for asbestos-related disease, it would be

12  forced vital capacity, the ratio of FEV1 to forced vital

13  capacity and the DLCO, diffusing capacity.

14  Q    What is the level for severe lung function loss under the

15  TDPs?

16  A    It's either 65, or 60 or less.  I don't have that chart in

17  front of me.

18  Q    Whatever the level is, is that level reasonable for DLCO?

19  A    No, DLCO may not be reflective in what the FEV or FEV1

20  says.  And you can have actually unremarkable FEV1 and FVC and

21  still have a markedly abnormal DLCO, but that's not considered.

22  Q    What would be a level for severe DLCO insufficiency?

23  A    It would be --

24        MR. FINCH:  Objection, lack of foundation.  I don't

25  know what he's -- what opinion he's offering -- asking him to

1  give.

2          THE COURT:  I'm sorry.  What was the question, Mr.

3  Heberling?

4          MR. HEBERLING:  What would be a severe diffusion

5  capacity decrement?

6  A    Well, anything below -- I mean, it will vary depending on

7  whose numbers you might wish to look at.  There's no probably

8  one number.  Down to 80 percent would be considered normal,

9  below 80 percent is abnormal.  And where you want to say it's

10  mild, moderate or severe depends.  But, certainly you will have

11  people tell you that when they're at 65 or 60, for example,

12  it's pretty likely that they're going to report significant

13  symptomatology; limitations of activity, normal function, not

14  being able to carry, you know, more than a bag of groceries

15  where they used to be able to carry two, and so forth.

16  Q    And what is isolated DLCO?

17  A    Isolated DLCO means you have a decrement in the DLCO with

18  a maintenance of FEV and FEC -- FEV1 and FEC.

19  Q    Is there isolated DLCO in the CARD mortality study?

20  A    Yes, there are patients who have a decrement in DLCO who

21  maintain their FEV1 and FEC.

22  Q    And can you please refer to the counting sheet, the

23  LC-109, Page 1?

24  A    Yes, sir.

25  Q    And --

1  A    And we have a number there, 29 have only decrements in

2  DLCO, less than 65 out of the three measures that we talked

3  about.

4  Q    Is this level of isolated DLCO related to the issue of

5  Libby being different?

6  A    I believe it is.  There is a significant decrement in DLCO

7  in people with very minimal changes on X-ray or CT.

8  Q    Have you reviewed the Selikoff and Seidman 1991 study

9  entitled, Asbestos Associated Deaths Among Insulation Workers

10 in the United States and Canada, 1967 to 1987?

11 A    Yes.

12 Q    And are you familiar with this study?

13 A    I am.

14 Q    Did you do any work on it?

15 A    By 1991 I had been gone from Mount Sinai for six years.

16 Some of the data would have come from the time that I would

17 have been there, but I did do -- I'm not an author.  I didn't

18 do work directly on that study, but I'm familiar with it.

19 Q    Is this the kind of literature relied upon in the field of

20 occupational medicine?

21 A    Yes.

22 Q    Have you done an analysis of whether this study is

23 comparable to the CARD mortality study?

24 A    Yes.  What exhibit numbers so I can turn to it?

25 Q    Overhead Number 6 in your books.

1  A    No.  I'll look at it here.

2  Q    And can we mark that with the next sticker?

3  A    Briefly, what does this overhead show?

4  A    This shows, per the discussion we had earlier, of best

5  evidence versus death certificate that when they looked at the

6  4951 deaths among 17,800 insulators that were being followed, a

7  representative group of the whole group, the total

8  asbestos-related deaths were 2242, by best evidence, and only

9  1578 by the death certificate.  And cancers were 1815 compared

10 to 1377, and asbestosis deaths more than doubled to 427 as

11 listed on the death certificate as 201.

12        MR. BERNICK:  Your Honor, I object to the use of this

13 document for comparative purposes because it doesn't go to any

14 issue in the case.  It's irrelevant how this population

15 compares to Selikoff.

16        THE COURT:  I don't know what the relevance of that

17 is.

18        MR. HEBERLING:  The relevance is that the insulator's

19 cohort is a well-studied cohort of heavily exposed asbestos

20 disease patients.  And Dr. Frank has made a comparison between

21 -- finally between the death rate or death -- the death rate

22 among the insulators versus the CARD mortality study death

23 rate.  That's where we're going.

24        MR. BERNICK:  Your Honor, that doesn't go to any

25 issue in the case, at all.  That doesn't affect anything.  If

1  it's comparable, then there's nothing unique and that's --

2  there's nothing different.  But, there's nothing different

3  insofar as the TDP is concerned or classification is concerned.

4        THE COURT:  I think we're still going to death rates

5  which I've determined are not relevant for the reasons I've

6  already expressed earlier.

7        MR. HEBERLING:  Okay.  I'll make a brief offer of

8  proof.  May I do so, Your Honor?

9        THE COURT:  Yes, sir.

10        MR. HEBERLING:  Okay.  Dr. Frank will testify that he

11  has evaluated both studies for their proportionate mortality

12  ratio, meaning the percentage of diseased individuals who died

13  in both studies.  The number is greater in the Libby study than

14  the CARD -- than the insulator studies.  And Dr. Frank will

15  further testify that the insulators had very heavy exposures

16  whereas most of the people in the CARD mortality study were

17  community exposures or family exposures, not miners who have

18  heavy exposures but the community people who had relatively

19  light exposures and that, therefore, again Libby is different.

20  It's a much more severe presentation of disease going to our

21  discrimination arguments and our not substantially similar

22  arguments.

23        THE COURT:  There has been a measurement of levels of

24  exposure in Libby?

25        MR. BERNICK:  Not in this study.

1          MR. HEBERLING:  Dr. Frank will testify that he can

2 characterize the insulators' exposures as heavy based upon his

3 own experience having worked on insulator studies.  And

4 community exposures in Libby are characterized as relatively

5 light.

6          THE COURT:  By whom?

7          MR. HEBERLING:  By Dr. Frank, by other authors.

8          THE COURT:  Apparently not by the EPA.  It just

9 introduced a national health emergency study that says that

10 because of the five different exposures to people in Libby,

11 including most of which are -- or all of which now are

12 community related -- there's a national health emergency.

13          MR. HEBERLING:  Yes.  And the thing is in Libby, the

14 exposures are relatively light compared to occupational

15 exposures, but the --

16          THE COURT:  Well, I don't know that.  Somebody is

17 going to have to give me --

18          MR. HEBERLING:  -- winchite asbestos is nevertheless

19 causing --

20          THE COURT:  Mr. Heberling, unless there has been a

21 study that tells me what those exposure levels are, that is

22 clearly the subject of expertise by not an epidemiologist and

23 not a doctor, maybe by an occupational health person, I don't

24 know.  But, if that has been done, I need to hear it.  I'm just

25 not aware that there has been that type of evidence that has

1   been introduced in the expert reports here.

2            MR. BERNICK:  Your --

3            MR. HEBERLING:  Just briefly, Dr. Frank will testify

4   that community exposures are universally characterized as

5   light.

6            THE COURT:  They may be, but what you told me is that

7   this comparison is to show that there was heavy exposure versus

8   different exposure in Libby.  I need to know what that exposure

9   is, and I'm not aware of the measures.  And if they're here,

10  fine.  I'm just not aware of them.

11           MR. BERNICK:  Your Honor, further, with respect to

12  the witness' testimony, this document is now in and he's

13  testified to the 20 out of 37.  We don't have those actually

14  identified which is going to be a problem on the record.  But,

15  be that as it may, he's now being asked to give a global

16  opinion with respect to a comparative mortality with this group

17  on the assumption of light versus heavy exposure.  And there is

18  -- he's already said that this group is a mix of people who are

19  community and people who are not pure community.

20           So, what we need to know before he expresses an

21  opinion about their probability of -- whether their probability

22  of death is comparable to the heavy exposure cohort in Selikoff

23  is, who are the people on this list who are community only?  I

24  believe he can tell that.  We just need to know which ones they

25  are so we can keep track of his testimony because right now we

1 don't know.

2         MR. HEBERLING:  Well, we don't get to that because as

3 I understand it the Court has ruled that the probability of

4 death opinions and percentages are not relevant.

5         MR. BERNICK:  Well, but that's what this comparison

6 is.

7         THE COURT:  But, he's making a proffer as to this

8 exhibit over your objection.  And I was asking an additional

9 question because I understood the proffer to be that I'm -- if

10 I admitted it, I would have some comparison of exposure rates,

11 and I'm not aware of a comparison of exposure rates.

12         MR. BERNICK:  But, that's exactly what my point --

13 question went to, is that there is exposure rate information in

14 this very document here.

15         THE COURT:  In the Selikoff study.

16         MR. BERNICK:  No, no, I'm looking -- this is the CARD

17 study.

18         THE COURT:  Oh, all right.

19         MR. BERNICK:  So, the CARD study tells you who is a

20 community and who is not a community.  And so, if he's going to

21 offer an opinion that says this is -- this CARD is community

22 and that's heavy, we know what part of CARD is community so we

23 know on what basis he's offering a comparison.  I further note,

24 however, that Your Honor is absolutely correct, ultimately,

25 this comparison goes to rates of mortality, and rates of

1  mortality are irrelevant.  So, what I'm saying is, (a)

2  foundational problem, (b) relevance problem.  And maybe the

3  witness can provide the foundation.  It's not going to solve

4  relevance.

5          MR. HEBERLING:  I don't understand the argument

6  because the Court has ruled.

7          THE COURT:  I have.  I was trying to understand the

8  proffer, Mr. Heberling.  So, I apologize.  Somehow I must have

9  gotten things mixed up.  I was trying to understand the proffer

10 --

11         MR. HEBERLING:  Yes.

12         THE COURT:  -- and where the proffer was coming from

13 with respect to evidence of exposure rates, because I

14 understood that that's what the proffer was, that there would

15 be testimony concerning exposure rates in the Selikoff study

16 versus exposure rates in Libby.  And I was asking what the

17 underlying information about the exposure rates in Libby was

18 because I haven't read all of the expert reports, but so far I

19 haven't seen anything that identifies a rate of exposure in the

20 community in Libby.

21         MR. HEBERLING:  I understand that, and there is none.

22         THE COURT:  Okay.  Then, if that's the case, the

23 testimony can't make a comparison of exposure rates to

24 something that hasn't been done with respect to an exposure

25 rate.  So, it's not competent in that sense.  And, otherwise,

1  I've already sustained the objection for the other reasons.

2  BY MR. HEBERLING:

3  Q    Okay.  Let's move on to the TDP medical criteria.  What is

4  blunting of the costophrenic angle?

5  A    Blunting of the costophrenic angle is fibrotic change in

6  the anatomical position where the sidewall of the chest meets

7  the diaphragm.

8  Q    And do you understand that the TDP medical criteria

9  restrict diffused pleural thickening to cases where there is

10 blunting?

11 A    Yes.

12         MR. FINCH:  Objection, misstates the document.

13         THE COURT:  Mr. Finch, I sorry, I can't hear you.

14         MR. FINCH:  Objection.  It misstates the document.

15 The expedited review criteria do that, but the TDP, as a whole,

16 don't.

17         MR. HEBERLING:  I said TDP medical criteria.

18         MR. FINCH:  He did not limit it to expedited review

19 criteria.  As we heard testimony on Tuesday, in the individual

20 review process, you can prove up severe pleural disease without

21 the blunting.

22         THE COURT:  Mr. Finch, I can't hear you.

23         MR. FINCH:  He did not specify whether he's --

24         THE COURT:  No, don't get so close.  Just speak --

25         MR. FINCH:  He did not specify whether it's expedited

Frank - Direct/Heberling                    200

1  review or individual review.  His question wasn't so limited.

2  We heard extensive testimony a couple of days ago.

3           THE COURT:  All right.  That's sustained.  Can you

4  limit the question -- or restate the question, please?

5           MR. HEBERLING:  I referred to TDP medical criteria --

6           THE COURT:  Yes.

7           MR. HEBERLING:  -- because it's only an expedited

8  review that there are criteria.  So, that's -- it's the same

9  thing.

10           THE COURT:  All right.  So, you're asking only about

11  the expedited review.

12           MR. HEBERLING:  Yes.  And when I refer to TDP medical

13  criteria, that's what I mean.

14           THE COURT:  All right.

15           MR. HEBERLING:  Okay.

16  Q    So, when you answered, did you understand that the

17  reference was to the TDP medical criteria?

18  A    Yes.

19  Q    Clinically, is blunting of the costophrenic angle always

20  found in a diagnosis of diffused pleural thickening?

21  A    No, there are various definitions of diffused pleural

22  thickening to be found in the literature.  Some include it,

23  some do not include it.  And some say that there are three

24  types of diffused pleural thickening, only one of which

25  includes the -- well, there are varying definitions of diffused

**J&J COURT TRANSCRIBERS, INC.**

Frank - Direct/Heberling                              201

1  pleural thickening, some of which do include and some of which

2  do not include that definition.

3  Q    Okay.  Is blunting of the costophrenic angle a measure of

4  severity of asbestos-related disease?

5  A    It is not.  X-ray changes do not correlate very well with

6  severity of disease as measured in the patient.

7          THE COURT:  Doctor, so I understand your testimony,

8  you're saying they don't correlate to severity as measured in

9  the patient.  This is functional.

10         THE WITNESS:  Functional impairment to a pulmonary

11 function.

12         THE COURT:  All right, thank you.

13         THE WITNESS:  Either what the patient tells you they

14 can do, which is one measure of functionality, or what the

15 numbers actually tell you.

16         THE COURT:  All right, thank you.

17         THE WITNESS:  They do not correlate well.

18         THE COURT:  Thank you.

19                        (Pause)

20         MR. HEBERLING:  Is the overhead -- we need to mark

21 this.  We'll mark this Overhead as 277.

22 Q    Does that appear to be a simple drawing of the lung?

23 A    Yes.

24 Q    And where is the costophrenic angle?

25 A    At the bottom in that triangular part that is blackened

**J&J COURT TRANSCRIBERS, INC.**

1 in, the bottom left.

2 Q    Where is the chest wall?

3 A    As listed, it's the area on the outer wall of the lung or

4 the inner wall of the chest where it says "wall".

5 Q    Okay.  And can diffused pleural thickening be anywhere

6 along the chest wall?

7 A    It depends on what you use as a -- I mean, you can -- the

8 wall can be thickened anywhere.  If you want to use the term

9 "diffused pleural thickening" to include blunting, it may or

10 may not be there.

11 Q    And can you have pleural thickening on the wall without

12 blunting?

13 A    Absolutely.

14 Q    Is that common?

15 A    Yes.

16 Q    Can there be pleural thickening in the angle, in the

17 costophrenic angle, without any on the wall?

18 A    Much less likely.

19 Q    Is it common?

20 A    No.

21 Q    In the CARD mortality study when reading chest X-rays, did

22 you note blunting?

23 A    Yes.

24 Q    How did you present the information?

25 A    It's all on that table.

Frank - Direct/Heberling                    203

1  Q    Simply by presence or absence of blunting?

2  A    Presence or absence.

3  Q    And of the 76 deceased in the CARD -- I'll say, of the

4  deceased in the CARD mortality study, what percentage had no

5  blunting?

6  A    Of the 76 that -- no, I'd have to find the numbers.

7  Q    Okay.  You want to look at LC-109?

8  A    Yes, I have to go back to that.  Again, the distinction

9  is, these are all patients who have died of a nonmalignant

10  disease.  That's what the 76 represents.  And of these 76, 38

11  had unilateral or bilateral blunting.

12  Q    What percentage had no blunting?

13  A    Forty-three.

14  Q    What happened to those patients without blunting?

15  A    In terms of the TDP?

16  Q    No, what happened to them physically?

17  A    They died.

18  Q    And by your understanding of the TDP medical criteria are

19  they excluded?

20  A    Yes.

21          MR. FINCH:  Objection, lack of foundation.  He

22  doesn't have the foundation to give an opinion about what will

23  happen to claims under the TDP.

24          MR. HEBERLING:  We can do that.

25          THE COURT:  That's sustained.

Frank - Direct/Heberling                    204

1  Q    Are you familiar with the TDP medical criteria?

2  A    I am.

3  Q    And by those do you mean the medical criteria for

4  expedited review?

5  A    Yes.

6  Q    And with regard to the 43 percent in the CARD mortality

7  study who did not have blunting, are those excluded under the

8  medical criteria --

9  A    They're excluded --

10 Q    -- for 4B?

11 A    They're excluded as having diffused pleural thickening.

12 Q    Is this medically reasonable?

13 A    No.

14 Q    Why?

15 A    Because again as -- the definition of diffused pleural

16 thickening varies in the literature, this is one variant of how

17 it is measured in the literature.  And it ultimately does not

18 go to the issue of functionality.  You shouldn't decide if

19 someone is severe or not simply on an X-ray finding.

20        MR. BERNICK:  I'm sorry, Your Honor, I move to strike

21 that.  That is an opinion that again expresses a view about how

22 people who are applying these criteria should or should not do

23 their business.  This witness is not an expert in compensation

24 schemes. So, that last statement should be stricken.

25        MR. FINCH:  Well, I join in that, Your Honor.  He

1  doesn't  -- plus, he doesn't have the basis to --

2        THE COURT:  Mr. Finch, I can't hear you.

3        MR. FINCH:  I join in the objection.

4        MR. HEBERLING:  Your Honor, this is a completely

5  mechanical determination as to whether or not there is

6  blunting, and if there is no blunting, then the people don't

7  make a 4(b).  This is not a medical judgment.

8        MR. BERNICK:  The witness -- that's not the issue.

9  The witness went on to offer his own view about whether they

10  should or should not be treated in a certain way.  That should

11  be stricken.

12        MR. HEBERLING:  Well, that was the question is

13  whether it's medically reasonable.

14        MR. BERNICK:  But that's not a question of medical

15  reasonableness.  The TDP is not an issue about purely what is

16  medically reasonable.  It is a compensation scheme.  He can be

17  asked for whether it's supported, or supportable, but he can't

18  express a view on whether it's appropriate to treat people in

19  any given way.

20        MR. HEBERLING:  The Plan Proponents' case was that

21  the medical criteria are medically reasonable.  That's what Dr.

22  Welch testified to.  We are responding to that.

23        THE COURT:  Dr. Welch did --

24        MR. FINCH:  Your Honor, Dr. Welch's testimony -- may

25  I be heard?  Dr. Welch's testimony was that there is -- her --

1 that by medically reasonable, she meant that there was support

2 in the medical literature for the criterion and that it would

3 pick up the clear-cut cases of asbestos-related disease for

4 purposes of the expedited review automatic settlement payment.

5 Mr. Inselbuch testified that even if someone doesn't meet those

6 criteria, they can nonetheless be offered a settlement amount

7 by the trust up to the exact same amount of money as if they

8 did qualify.  They just had to provide additional information

9 and so, the purpose of, or the evidence put on by the Plan

10 Proponents in our view as to the reasonableness goes to the

11 reasonableness of the TDP process as a whole.

12        THE COURT:  I think when you're talking about the

13 expedited review process, I just want to make sure I understand

14 that what you're talking about is that if a person doesn't have

15 the blunting, that they will not qualify for the expedited

16 review process without having to submit some additional

17 documentation.  Correct?

18        MR. FINCH:  Correct.

19        THE COURT:  You're not suggesting that they're simply

20 thrown out of the trust altogether.

21        MR. HEBERLING:  Level 4(b), the question was whether

22 it was medically reasonable for the TDP medical criteria to

23 exclude people from 4(b) for no -- for lack of blunting.

24        THE COURT:  All right.  This is a medical doctor.

25 He's also an occupational -- he's qualified in occupational

1  diseases.  It seems to me for this purpose, he's qualified to

2  express an opinion as to whether or not this is medically

3  reasonable.  Whether that is a relevant standard, I will

4  consider later.  I will permit the testimony right now.  I

5  agree that the TDP is a compensation scheme, but I also agree

6  that classifying people within certain classes is based on

7  medical criteria.  So, I'll permit the testimony.  The

8  objection is overruled.

9  BY MR. HEBERLING:

10      Q    Can you discuss various studies in support of your

11 opinion that the exclusion for lack of blunting is not medical

12 reasonable?

13 A    Yes, there are a number of studies that define it with or

14 without blunting.  Even the ATS criteria talks about diffuse

15 pleural thickening and doesn't state that it requires blunting

16 to cause something to diffuse pleural thickening.

17 Q    Okay.  Are you familiar with the McLoud study?

18 A    Yes.  I have that here.

19      Q    Briefly, was the McLoud study on individuals with

20 diffuse pleural thickening identified by histologically by

21 tissue analysis?

22 A    Yes.

23 Q    And can you use the overhead to discuss the findings in

24 the McLoud study?

25          THE COURT:  Can you tell me what exhibit you're

Frank - Direct/Heberling                          208

1  using, please?

2          MR. HEBERLING:  We're at LC-278, Your Honor.  Sorry.

3          THE COURT:  All right.  Thank you.

4  A    What McLoud's paper speaks to is that there are three

5  causes of what they call diffuse pleural thickening.  The vast

6  majority appeared to come about as a result of another process

7  called benign at -- well, they've got it -- it says your

8  asbestosis effusion.  It's benign asbestotic pleural effusion.

9  That is excess fluid put out in to the chest cavity as a result

10 of irritation from asbestos that leaves as its mark, a blunted

11 costophrenic angle in many cases.

12      They also defined it as confluent plaques without

13 necessarily requiring that and also asbestosis related to

14 pleural change when there is both pulmonary or parenchymal and

15 pleural fibrosis.

16 Q    And as to the -- these three kinds by origin of pleural

17 thickening, did you see all three in the CARD Mortality study?

18 A    Yes.  There were people that had evidence of an effusion,

19 there were some that had confluent plaques, and there were some

20 small number because we saw less parenchymal disease and in

21 fact, McLoud says that it's uncommon where the parenchymal

22 disease goes out into the pleura.  But we did see them all.

23 Q    And can you say what portion of the total cases in McLoud

24 had -- what portion of the total cases of pleural thickening in

25 McLoud had blunting?

1  A    It says 47 percent.  Oh, well -- yeah, it would be 47

2  percent -- well, I have -- let me get -- let me go back to the

3  paper, I'm sorry.

4  Q    Oh, I'm sorry.  This is -- we have the wrong one.  There

5  should be a better one.

6       Do you have a recollection from McLoud?  What portions,

7  what percentage roughly, had blunting?

8  A    I'm looking at the paper.

9  Q    Let's get out McLoud.

10       THE COURT:  Mr. Heberling, while you're looking, I

11  just want to make sure, yesterday and today you used a number

12  of overhead exhibits that have been marked, but I don't have

13  copies of them.  I want to make sure that before -- at least by

14  the time you leave tomorrow that I do have copies of everything

15  that's been marked.  Okay.  Thank you.

16                        (Pause)

17  A    It looks to be on the order of about a third that had

18  blunting as a result of effusions.  The others were for

19  multiple confluent plaques and don't speak to having blunting,

20  and another percent were only an extension of pulmonary

21  fibrosis.

22       Q    So, would it be fair to say that less than half had

23  blunting in the McLoud study?

24  A    Yes.  In what they call diffuse pleural thickening, less

25  than half had blunting.

1    Q        And you also mentioned the ATS 2004 diagnostic

2  criteria --

3  A    Yes.

4    Q        -- publication?

5  A    Yes.

6    Q        Did ATS 2004 also recognize the three kinds of

7  pleural thickening?

8  A    Yes, they did.  You'll find that on Page 707 of the

9  document.  Diffuse pleural thickening is in the first -- the

10 left-hand column.

11 Q    And as to -- under the TDP medical criteria for a level

12 4(b) what happens to the two kinds of pleural thickening due to

13 confluent plaques and due to extension of asbestosis?

14          MR. FINCH:  Your Honor, can I just have the witness

15 tell me what page of ATS he was reading from?

16          THE WITNESS:  I just said 707.

17          MR. FINCH:  Okay.  Under the Rule of Completeness,

18 could you read the entire statement about the -- on Page 707

19 about blunting, Dr. Frank?

20          THE WITNESS:  Well, is it --

21          MR. FINCH:  Your Honor, the 2004 ATS, Page 707.

22          THE COURT:  What's the exhibit number, please?

23          MR. FINCH:  In evidence is plan preponderance exhibit

24 147.

25          THE COURT:  All right.

1          THE WITNESS:  It's almost the equivalent of a column

2  you want me to read.

3          MR. FINCH:  Sure.  I'd like -- under the Rule of

4  Completeness, I would request that Dr. Frank be required to

5  read the first sentence that begins on the top right column of

6  Page 707.

7          MR. HEBERLING:  We object to the intrusion upon the

8  direct examination.

9          THE COURT:  You can do it on cross examination.  Go

10 ahead, Mr. Heberling.  You started to ask a question.

11 Something about the medical criteria, but I lost the question.

12 I'm sorry.

13 A    You asked me --

14 Q    On the overhead there are three --

15 A    Yeah.

16 Q    -- kinds of pleural thickening.

17 A    The latter two would not be included under 4(b).  If they

18 didn't have blunting.

19 Q    And were there cases like that in the CARD Mortality study

20 in the Libby population?

21 A    Yes.  With that criteria, 42 percent of the individuals

22 would have been moved out of category 4(b), because they didn't

23 have blunting.

24         MR. FINCH:  Objection.  Move to strike.

25         THE COURT:  That's sustained.  That's absolutely a

1  misreading of the TDP.

2           MR. HEBERLING:  Okay.

3  Q    By saying moved out of the TDP, did you mean level 4(b)?

4  A    Yes.  That's what I said.

5           MR. BERNICK:  Objection.  Move to strike.

6           THE COURT:  That is a misreading of level 4(b) of the

7  TDP.  The objection is sustained and the testimony is stricken.

8           MR. HEBERLING:  Well, I'm not quite sure what the

9  problem is, but I'll lay some --

10          THE COURT:  The problem is, they wouldn't qualify for

11 expedited review, but with additional evidence that indicates,

12 for example, that they suffer from confluent plaques without

13 blunting, and are impaired, they would still qualify for the

14 add-on factor by virtue of individual review.  They are not

15 simply ignored by the TDP because they don't need the expedited

16 review process.  It is a misreading of the TDP.

17          MR. HEBERLING:  I'm sorry.  I probably didn't include

18 in the question the medical criteria or expedited review and I

19 apologize for that, Your Honor.  I'll restate the question.

20 Q    Under the TDP medical criteria for expedited review, what

21 would happen to the second and third categories of pleural

22 thickening as presented by McLoud?

23 A    It would not meet the criteria of blunting and would be

24 moved out to some other status at that point.

25 Q    And are you familiar with the Lilis 1991 article?

1  A    I am.

2  Q    And briefly, were there -- was there a study on groups of

3  patients with pleural thickening with and without blunting?

4  A    Yes.  And there was a greater decrement in lung function

5  in those people without blunting compared to the people with

6  blunting.

7  Q    Let's address the three millimeters thickness requirement

8  in the medical criteria for 4(b).

9  A    Yes.

10 Q    Is a first -- is there any thickness requirement in the

11 diagnostic criteria for diagnosis of asbestos-related pleural

12 disease?

13 A    No.

14 Q    Is thickness of pleural thickening any measure of severity

15 of disease?

16 A    No.

17 Q    Did you make a determination as to how many in the CARD

18 mortality study did not meet the three millimeter requirement?

19 A    Yes.

20 Q    Do you know the percentage?

21 A    I don't recall the number offhand, but it would exclude

22 more people --

23 Q    Let's refer to LC-109.

24 A    Okay.  I'm sorry.

25 Q    I direct your -- into --

1              THE COURT:  Is the information on the chart?

2    A    Page 3 of 6, if you look in the middle of the page --

3    Q    Can I direct your attention to Page 3?

4    A    Yes.

5    Q    Your chest x-ray reading?

6    A    Yes.

7    Q    Do you have it?

8    A    I have it.

9    Q    Okay, and so --

10   A    One side there were 37 percent that had evidence of

11   pleural thickening less than three millimeters and 22 percent

12   on the other side.

13   Q    And --

14   A    And together it was 16 percent.

15            MR. BERNICK:  Your Honor, I object to the use of this

16   exhibit.  As I have told Mr. Heberling before, which already

17   fills in the numbers at the end because it assumes testimony

18   that as to which there has been no foundation and this witness

19   has not provided it.  We have a very extensive spread sheet and

20   the witness has now testified twice about calculations based

21   upon that spread sheet where we're now struggling to figure out

22   what in the world he did.  Each one of those numbers comes from

23   a calculation that he did -- those numbers on the graphic now

24   being shown, came from the calculation that he did from the

25   spread sheet, and we should know who is it that falls into

Frank - Direct/Heberling                    215

1  these -- which numbers -- which numbered people fall into these

2  people so that we can figure it out.

3       THE COURT:  Yes.  Yes, you're entitled to know that,

4  and if it's not brought out on direct, you can ask it on cross,

5  and it will certainly go to the weight if not the admissibility

6  of the evidence if you don't have that information somewhere.

7  Q    Okay.  Dr. Frank, on the spreadsheet, do you list by exact

8  number of millimeters the thickness of pleural thickening?

9  A    Yes.

10 Q    And how would you determine who meets the three millimeter

11 requirement?

12 A    You would go down the list and see how many individuals

13 and which specific individuals did or did not meet the three

14 millimeter requirement.  One can do that from the sheet.  The

15 information is all here.

16      MR. BERNICK:  Your Honor, again, just to make things

17 very direct and easy, you don't get to that sort until you go

18 through the prior source to figure out who's in the buckets

19 going down the middle of the page.  So we can try -- we're

20 trying now to reconstruct it in the light of this witness's

21 testimony about this sheet.  But it's very, very difficult to

22 do.  And then on cross examination, what do I have to do?  I've

23 got to sit there and say, well, isn't it a fact that this

24 bucket picks up the -- it's going to take hours.

25      THE COURT:  Then it will take hours.  Go ahead, Mr.

1 Heberling.

2          MR. HEBERLING:  Your Honor, we disclosed the counting

3 sheet and the spread sheets long, long ago, and they could have

4 done this.

5          THE COURT:  It's not a matter of disclosure --

6          MR. BERNICK:  Can't do it.

7          THE COURT:  -- it's a matter of foundational

8 evidence.  So, this is the trial.  This isn't discovery.  You

9 need to lay the foundation.

10 Q    Dr. Frank --

11 A    We can go line-by-line and look at each individual to see

12 if they meet it or not.

13 Q    And is that how the counting sheet was done?

14 A    Yes.

15          MR. BERNICK:  But the counting sheet we have, and he

16 can't figure it out.  So, we're trying to reconstruct it.

17          MR. HEBERLING:  So we're in Court.

18          THE COURT:  If you have an objection, make it,

19 otherwise --

20          MR. BERNICK:  I'm sorry.

21          THE COURT:  -- reserve your questions for cross exam,

22 and if it takes all day, it will take all day. Except we only

23 have until 4:00.  So, it will have to resume tonight.  Go

24 ahead.

25 Q    Then for extent of chest wall, is that an element of the

Frank - Direct/Heberling                          217

1  diagnosis of asbestos-related pleural disease?  Extent of the

2  chest wall covered by pleural thickening, is that a --

3  A    You mean -- so that I understand the question, do you mean

4  is that one of the criteria for entering the TDP medical

5  criteria?

6  Q    Well, let me rephrase the question.  For the diagnosis of

7  asbestos-related pleural disease, is the extent of the chest

8  wall, which may be covered by pleural thickening a necessary

9  element in the diagnosis?

10  A    No, it is not.

11  Q    Is extent of the chest wall a measure of severity?

12  A    No, it is not.

13  Q    And please refer again to the counting sheet on Page 3.

14  A    Yes.

15  Q    And did you make a determination as to how -- what

16  percentage of the CARD mortality study deceased met the

17  requirement for 25 percent of the chest wall?

18  A    Yes.  And the number would be on one side 40 percent, and

19  on the other side 20 percent and collectively, 20 percent would

20  not meet the criteria.

21  Q    And in the TDPs, is there also a ratio requirement?

22  A    Yes, there is.

23  Q    Is that the FEV1/FVC ratio?

24  A    Yes.

25  Q    And what is the ratio an indicator of?

**J&J COURT TRANSCRIBERS, INC.**

1  A    One of the measures of lung function, relationship, the

2  ratio between the ability to blow out air divided by how much

3  air your lung held.

4  Q    And is -- in the TDP medical criteria, is that used as a

5  limitation on the FVC requirement?

6  A    Yes.

7  Q    And in the CARD mortality study did you make a

8  determination of how many met the ratio requirement that the

9  ratio exceed 65?

10  A    Yes, 60 percent would and 40 percent would not.

11  Q    As to the three millimeters thickness requirement in the

12  TDP medical criteria for expedited review, do you have an

13  opinion on whether that requirement is medically reasonable?

14  A    No, it is not.

15  Q    Why?

16  A    Because it is not a reflection of someone's functionality.

17  I mean, here we have people that would not meet the criteria,

18  but are dead of an asbestos-related disease.

19         MR. BERNICK:  Objection.  Move to strike.  Nobody in

20  the CARD mortality study is ever going to be presenting a claim

21  to the trust.

22         THE COURT:  Well, that's apparently not the case.

23  Mr. Heberling said they would be presenting claims to the

24  trust, all 76 of these.

25         MR. FINCH:  I never heard --

**J&J COURT TRANSCRIBERS, INC.**

Frank - Direct/Heberling                              219

1          THE COURT:  So, the objection is overruled.

2  Q    And with regard to the TDP medical criteria requirement

3  for level 4B, that there be an extent of coverage of the chest

4  wall with pleural thickening greater than 25 percent, do you

5  have an opinion of whether that is medically reasonable?

6  A    I do not believe it is medically reasonable.

7  Q    And why?

8  A    Because again, it does not go to the issue of severity.

9  Either you have disease, or you don't have disease and in this

10  case, if you have the disease and you're dead from it, that's

11  about as severe as you can get.

12  Q    And with regard to the DLCO requirement -- the omission of

13  use of DLCO as a measure of severity of lung function loss, do

14  you have an opinion as to whether that is medically reasonable?

15  A    If one was taking care of patients, one would certainly

16  use the DLCO as a measure of how they are functioning.  To not

17  include it is to throw out a useful and valuable piece of

18  information and serves to exclude people rather than take a

19  good measure of functionality and make use of it.

20  Q    On the use of the FEV1/FVC ratio requirement to restrict

21  FVC qualification under level 4B of the medical criteria, do

22  you have an opinion whether that is medically reasonable?

23  A    I do have an opinion, and I do not believe it is medically

24  reasonable.

25          Q    What is your understanding as to whether CT scans

**J&J COURT TRANSCRIBERS, INC.**

1  can be used under the TDP medical criteria?

2  A    My understanding is that whatever the CT scans shows, it

3  is not to be used or utilized as part of the determination.

4  Q    Is it possible to measure thickness of this diffused

5  pleural thickening on CT scans?

6  A    Yes, it is.

7  Q    Is it possible to measure extent of the chest wall on CT

8  scans?

9  A    Yes, it is.

10  Q    And is it --

11  A    Much better than the use of a -- just a chest x-ray.

12  Q    And is it possible to identify the presence or absence of

13  blunting of the costophrenic angle on a CT scan?

14  A    Yes, it is.

15  Q    ATS 2004, Page 696 states only 50 to 80 percent of cases

16  of documented pleural thickening demonstrated by autopsy,

17  conventional CT or HRCT are detected by chest radiographs.  Do

18  you agree with that statement?

19  A    Yes.

20  Q    Is there a consensus on that point?

21  A    Yes.

22  Q    What is that?

23  A    That's accurate.  This is, after all, a consensus document

24  and I think in general people who do the kind of work that I do

25  say that chest x-rays are bad for detecting pleural disease

1  compared to CTs or autopsies.

2  Q    And the -- regarding unilateral disease, are you aware

3  that the TDPs medical criteria, level 4B require bilateral

4  nonmalignant asbestos-related disease?

5  A    Yes.

6  Q    Do you have an opinion as to whether that requirement is

7  medically reasonable?

8  A    If one -- I don't believe it is medically reasonable,

9  because if one goes through a proper differential diagnosis,

10 there's a certain percentage of individuals who will only have

11 unilateral disease, especially on a chest x-ray which is much

12 less sensitive than the CT findings which are not being

13 utilized under the current scheme, and therefore, people will

14 be excluded.  If you find another obvious reason, previous

15 chest trauma, surgery, prior history of tuberculosis and

16 pyemia, et cetera, an explanation of a unilateral thickening,

17 then that should not by itself be utilized, but ruling out all

18 the other reasonable causes, and having had someone who was

19 exposed to asbestos, it would be reasonable to include them.

20 Q    Okay.  Let's show LC-18.

21      THE COURT:  I'm sorry.  What's the exhibit?

22      MR. HEBERLING:  LC-18.

23      THE COURT:  Eighteen, thank you.  I don't see that in

24 these books.  I'm sorry if I'm missing it.

25      THE WITNESS:  I don't have it -- I don't have it

1  either.

2           THE COURT:  Do you need a break, Doctor?  I know you

3  -- okay.

4           THE WITNESS:  I'm fine, thank you, Your Honor.

5           MR. BERNICK:  I've proposed that we have a geriatric

6  metric measurable by who leaves first, and because I was

7  teasing Mr. Frankel over here as having won the other day, and

8  Mr. Lewis as having come in second, I notice that they're still

9  in their seats while the young guys are going.

10          That wasn't on the record, right?

11          THE COURT:  We'll have it taken off record.

12          MR. FRANKEL:  I'd complain, Your Honor, but I

13 resemble everyone.

14 Q    Okay, Dr. Frank, do you have LC-18 in front of you?

15 A    I do now, thank you.

16 Q    Are you familiar with this document?

17 A    It's a summary of -- it's the background material that

18 goes to OH 4B.

19 Q    Okay.  And in column five --

20 A    Yes.

21 Q    Does that appear to be an application of all the

22 requirements in the TDP level 4B medical criteria to the 76 in

23 the CARD mortality study based upon your chest x-ray readings?

24          MR. FINCH:  Objection.  Lack of foundation to the

25 extent that the title of the document says Analysis of the

Frank - Direct/Heberling                            223

1  Effect of TDP Medical Criteria.  This witness has no foundation

2  to offer an opinion about how the TDP as a whole would deal

3  with these cases.  If the title of the document were changed to

4  expedited review criteria and his opinion were so limited, I

5  would withdraw the -- I would not have an objection.

6           MR. HEBERLING:  Your Honor, all through this case,

7  it's been my belief that there are no medical criteria in

8  individual review, and so I've always referred to the medical

9  criteria as being the criteria in expedited review and I

10  realize that caused problems with that, so --

11          THE COURT:  All right.  Do you have a problem if we

12  change it to say analysis of the effect of the expedited level

13  4B TDP medical criteria?

14          MR. HEBERLING:  That sounds just fine to me, Your

15  Honor.

16          THE COURT:  Mr. Finch?

17          MR. FINCH:  That would be fine.

18          THE COURT:  All right.  The title is so changed.

19  Q    And here, have you sorted through all the individuals and

20  run them through the criteria and determine how many pass?

21  A    Yes.

22  Q    And did 9 of 64 pass?

23  A    Yes.

24  Q    And was that 14 percent of those that you had sufficient

25  data for all the columns?

**J&J COURT TRANSCRIBERS, INC.**

Frank - Cross/Finch                                         224

1   A    Yes.

2           MR. HEBERLING:  That's all I have, Your Honor.

3           THE COURT:  Mr. Bernick?

4           MR. BERNICK:  I can start.  We're still busy trying

5   to reconstruct all this back at the -- at the -- back in.

6   Actually, if you give us maybe five minutes, or ten minutes, I

7   can --

8           THE COURT:  All right.  We'll take a five-minute

9   recess.  Keep in mind, please, we do have to terminate at 4:00.

10          MR. BERNICK:  I understand if it was -- represents --

11  yeah.

12          THE COURT:  We'll be in recess for five minutes.

13                          (Recess)

14          THE COURT:  Before we're back on the record, the

15  doctor was not able to get a later flight, so if we can get

16  done in time to get him to a 5:30 flight, that would be great.

17  Okay, Mr. Finch.

18                     CROSS EXAMINATION

19  BY MR. FINCH:

20  Q    Could somebody hand -- do you have a copy of your

21  deposition up there, Doctor?

22  A    I do not.

23  Q    Okay.

24  A    I'm sure you'll share one with me.

25  Q    This is a copy of the exhibits I might use with you.

                    **J&J COURT TRANSCRIBERS, INC.**

1      MR. FINCH:  Your Honor, do you still have the same

2  notebook that I used with Dr. Molgaard?

3          THE COURT:  I can get it, yes.

4          MR. FINCH:  Carol, I need the -- I need Frank's

5  deposition.  Where is Frank's deposition, guys?  Okay, we'll

6  start without it.  May I have the ELMO, please?

7      Q      Dr. Frank, were you sitting in the courtroom when I

8  was cross examining Professor Molgaard.

9  A      I was.

10  Q      Okay.  And you would agree that there's nothing -- would

11  you agree that the first four lines of this chart, that there's

12  nothing that proves that mesothelioma from Libby is more severe

13  and the prognosis is different than outside of Libby?

14  A      I would agree with that.

15  Q      You would agree with that for a lung cancer and the

16  gastrointestinal cancers?

17  A      Yes.

18  Q      You agreed for that with asbestosis?

19  A      Well, it depends on what your definition of asbestosis is.

20  Q      Parenchymal fibrosis, interstitial fibrosis of the

21  parenchyma of the lung.

22  A      I don't think we have any -- we actually have a deficit of

23  such changes in people from Libby, and to the extent that we

24  do, radiologically, it is less severe, but prognostically or in

25  terms of pulmonary function, which don't correlate well, I

1  can't speak to that, so -- the first three I'll give you that

2  you're going to likely die in once place as much as another

3  with some minor variation.

4  Q   And the fourth place, the asbestosis, if you got

5  asbestosis in Libby, there's -- you can't say that you're going

6  to die any faster or any slower than asbestosis defined as

7  interstitial fibrosis in the parenchyma of the lung somewhere

8  else?

9  A   I have no basis to say that.

10 Q   Okay.

11 A   It may be different, but I have no basis.  The other three

12 I pretty much have a basis.

13 Q   Okay.  So, you've got no basis to say it, right?

14 A   Right.  One way or the other.

15 Q   So, if I were to write instead of nothing, if I were to

16 write no basis, that would be it.

17 A   Correct.

18 Q   Okay, now you do say that pleural disease from Libby, the

19 severity and the prognosis of pleural disease caused by

20 exposure to Libby asbestos is different than what you've seen

21 elsewhere, is that right?

22 A   And what the world's literature tells us is elsewhere.

23 Q   Okay.  And that is based upon a probability of death

24 analysis, is that right?

25 A   In part, yes.

1  Q    The CARD -- based on the CARD mortality study?

2  A    Yes.

3  Q    So, for probability of death, you've got to put CARD

4  mortality study?

5  A    Well, that's one piece of information.  The other is the

6  world's literature that says three or four people have died of

7  pleural only disease.

8  Q    Okay, but stuff specific to Libby, the world's literature

9  is stuff outside of Libby, right?  It's talking about pleural

10 disease outside of Libby.

11 A    But that's the comparison you need to make when you don't

12 have a definitive analytic epidemiological study.  I mean,

13 again, you want -- collectively, you went through that with Dr.

14 Molgarrd this morning, but you rely on other information to

15 reach determinations.

16 Q    Okay.  But what your -- the other information you're

17 relying on about Libby, is that what you call the CARD

18 mortality study?

19 A    Well, that's the data we have for Libby and then you do

20 something with it.  You compare it to the rest of the world.

21 Q    Okay, but this is the only data that you have from Libby

22 that relates to probability of death, the CARD mortality study?

23 A    No.  In fact, the CARD mortality study is not a

24 probability of death study, it's -- these are people that died

25 and what did they have when they died?  The probability of

1 death comes from other data that we haven't discussed.

2 Q    Okay.  All right, you have one piece of information you

3 consider is a CARD mortality study, right?

4 A    The CARD mortality study gives us some insight into the

5 issues that we've been discussing this afternoon for the last

6 several hours.

7 Q    Okay.  And in terms of lung function decline, for people

8 -- well, let me back up.  Of the 1,800 CARD patients with

9 asbestos-related disease, you have looked at the chest x-rays

10 or the CT scans of about 125 of them, is that right?

11 A    Something like that.  I certainly have not looked at all

12 1,800.

13 Q    And you have not -- and you've looked at the pulmonary

14 function test scores -- test records -- of about 25 of them,

15 right?

16 A    No.  We looked at all of them for the people in the CARD

17 mortality study, but some in addition to that.

18 Q    So, 76 of them.

19 A    Seventy -- maybe a hundred.

20 Q    You certainly didn't review all the medical records

21 available for all 76 people in the CARD mortality study that

22 died, right?

23 A    That's correct.

24 Q    And you didn't make a determination as to their cause of

25 death.  Dr. Whitehouse did that, right?

1  A    Correct.  We had some discussion with him as to what

2  criteria to be used, but he made the ultimate determination.

3  Q    He looked at the medical records, you didn't, right?

4  A    Correct.

5  Q    And you certainly didn't look at the medical records of

6  all 1,800 people in the -- that have asbestos-related diseases,

7  correct?

8  A    Correct.

9  Q    You didn't.  You haven't looked at the x-rays of anymore

10 than 125 people, correct?

11 A    Something like that, correct.

12 Q    With respect to the lung function decline, are you

13 familiar with Dr. Whitehouse's progression paper, 2004 paper?

14 A    I am.

15 Q    You had nothing to do with that, right?

16 A    Correct.

17 Q    You --

18        MR. FINCH:  In this next set of questions, Your

19 Honor, is admittedly beyond the scope of direct, but it goes to

20 the Libby claimants evidence and assertions that their cases

21 are in some way medically better than cases outside of Libby

22 that -- with which they have elicited through the cross

23 examination of Mr. Hughes, so this is our -- we would have

24 called Dr. Frank in our case.  This is our response to that

25 case.  It's a piece of cross examination.

1          THE COURT:  All right.

2          MR. FINCH:  And Your Honor, at this time I'd also

3   like to offer for demonstrative purposes only, this chart.

4   I'll maybe come back to the bottom of the chart, but what's the

5   next Plan Proponent's exhibit?  Why don't we make it 600.  I

6   know we haven't gotten up to 600.  And we offer 600 for

7   demonstrative purposes only.

8          MR. HEBERLING:  May I see the exhibit?

9          MR. FINCH:  It's on the ELMO here.

10         MR. HEBERLING:  I couldn't read it that well.

11         I will object that this is contrary to the record,

12  particularly as to the Libby pleural disease lung function

13  decline.  I think he and others have testified to other bases

14  for that.  So, if you put a plus there, I wouldn't object.

15         MR. FINCH:  Okay.  We'll put a plus beside the 2004

16  progression paper?

17         MR. HEBERLING:  Yes.

18         MR. FINCH:  Okay.  With that amendment to the planned

19  proponents' exhibit 600.  May it come in for demonstrative

20  purposes, Your Honor?

21         THE COURT:  All right.  It's admitted for that

22  purpose only.

23  Q    Dr. Frank, you testified from time-to-time in asbestos

24  personal injury cases, correct?

25  A    Yes, sir.

1  Q    I'm showing you a -- you have it on the ELMO.  I'm showing

2  you a document from a slide from Dr. Welch's Power Point

3  presentation.  Would you agree that there's no say for

4  threshold dose of exposure to asbestos that won't cause

5  mesothelioma?

6  A    Yes.

7  Q    Would you agree that low dose asbestos exposures could

8  cause mesothelioma?

9  A    Yes.

10 Q    Would you agree that asbestos exposures below a cumulative

11 dose of one fiber milliliter can cause mesothelioma?

12 A    One fiber milliliter year.

13 Q    A year.

14 A    Yes.

15 Q    Would you agree that all fiber types --

16 A    Yes.

17 Q    -- including chrysotile-caused mesothelioma?

18 A    Yes.

19 Q    Would you agree that any non-trivial asbestos exposure

20 contributing to the cumulative dose can cause or contributing

21 to cause the -- or cause mesothelioma?

22 A    Yes.

23 Q    So, if somebody worked around a Grace asbestos-containing

24 construction product for a couple of days and then worked

25 around asbestos-containing products from 50 other companies for

**J&J COURT TRANSCRIBERS, INC.**

1 10 years, your opinion would be to a reasonable agree of

2 medical certainty that their exposure to the Grace products

3 caused or contributed to causing their mesothelioma?

4 A    Yes.

5 Q    Would you have that same view with respect to asbestos-

6 related lung cancer if you determine --

7 A    Yes.  Yes.

8 Q    -- the lung cancer was asbestos-related?

9 A    Yes.  Yes.

10 Q    Just so the record is clear, let me make it clear, if

11 somebody works around Grace asbestos-containing products and

12 even if those products are just chrysotile products in Boston

13 for two weeks, and they work around amphibole products for

14 years, your opinion would be to a reasonable degree of medical

15 certainty that if they got lung cancer, that the lung cancer

16 was caused at least in part by exposure to the Grace asbestos

17 product?

18 A    Yes.

19      Q    And does that same opinion hold for the

20 nonmalignant diseases?

21 A    Yes.  No, it doesn't hold in entirety.  There is a

22 threshold for non --

23      Q    There is a threshold dose for nonmalignants, which

24 is --

25 A    Yes, but if someone is diagnosed with the disease and they

1  had a few days exposure, all of the exposures would have

2  contributed.  To that extent I'll agree.

3       Q      Okay.  Let's go back and talk about these add-ons

4  to the TDPs.  It's your testimony -- I think you testified to

5  this on direct -- that basically, the -- we're talking about

6  the severe disabling pleural disease category for in the

7  expedited review criteria of the TDP.  Do you understand that,

8  Dr. Frank?

9  A    Yes.

10 Q    And you went through on your direct examination six

11 different things that you've said on direct examination were

12 medically unreasonable, is that right?

13 A    Yes.  From a medical standpoint, they're unreasonable.

14 Q    Okay, and the six things -- does plan proponents exhibit

15 600 correctly list the six things that you testified on direct

16 were medically unreasonable?

17 A    Yes.

18 Q    Okay.  That would be blunting, extent and width, HRCT,

19 DLCO FEV1/FVC, and unilateral?

20 A    Well, you're doing this in shorthand.  I'll let the

21 testimony speak for itself, but there are specific issues about

22 each one of them.  It's the absence or the lack of use, or

23 whatever, but the testimony -- I'll stand behind what I

24 testified to a short while ago.

25 Q    Okay.  And you're not giving any opinion as to the -- what

1  would happen -- you're not giving an opinion as to what would

2  happen in an individual review process with respect to any

3  given case, correct?

4  A    I have no way of knowing, but the individual review as I

5  understand it, is not medically driven, nor does a medical

6  person become involved, so given the obvious complexity of

7  these issues and the difficulty that even doctors have on

8  agreeing of what should be what, turn over what is essentially

9  a medical decision to someone without medical training makes

10  little sense to me, but you know, I don't create these

11  criteria, but medically, it doesn't make sense.

12  Q    You don't know whether the trust would or would not hire a

13  doctor to give it advice about individual review cases?

14           MR. HEBERLING:  Objection.  Calls for speculation.

15           MR. FINCH:  That's the point.

16           THE COURT:  Yes, it does.  The question is does he or

17  does he not know.  Would you rephrase the question?

18  Q    Do you know one way or another whether or not the trust

19  would hire medical doctors to give it advice on individually-

20  reviewed cases?

21  A    It is not required as I understand it, but I do not know

22  if they would go beyond the minimum requirements.

23  Q    Okay.  The blunting requirement, you would agree with me

24  that the 2000 ILO guidelines require blunting before one can

25  call pleural disease diffused pleural thickening?

1  A    That's what they said.  That's one group's opinion.

2  Q    And that wasn't just one group of, you know, 15 people in

3  this room; that was a group of people who are experts in

4  reading x-rays for pneumoconiosis, correct?  That's what the

5  ILO people are?

6  A    Yes.  Just as the ATS criteria from 2004 did not require

7  that.  It just cited that, but didn't say that that's what they

8  adopted.  So, a different group of people well-known to read x-

9  rays came to a different conclusion.

10 Q    Okay.

11        MR. FINCH:  Could I have planned proponents' exhibit

12 147, please.  It's in your book.

13        Your Honor, what we've done is a little index.

14 There's tabs.  Tab Number 3 in the black book -- do you have a

15 black book in front of you, Dr. Frank?

16 A    I do.

17 Q    Tab Number 3 --

18 A    Is that document.

19 Q    Is the 2004 ATS document?

20 A    Right.  And we were on Page 707 discussing that earlier,

21 you and -- well, I was discussing it; you were making some

22 comments about it.

23 Q    Okay.  Isn't it true that at the top of Page 707 -- could

24 I have it on the ELMO, too?  Not on the ELMO, on the --

25 whatever the magic box is that you press the buttons.

1          THE COURT:  If you could just continue, I --

2          MR. FINCH:  Sure.

3   Q    Okay.  The top of Page 707, Dr. Frank, isn't it true that

4   what the ATS 2004 statement says is diffuse pleural fibrosis

5   extends continuously over a portion of the visceral pleura,

6   often causing adhesions to the parietal pleural, involving the

7   fissures and obliterating the costophrenic angle.  Did I read

8   that correctly?

9   A    You did.  Often, but not always.

10  Q    And in your view in order to classify pleural disease as

11  diffuse pleural thickening, isn't it true that the ATS

12  statement requires blunting of the costophrenic angle?

13  A    I don't read it as such.

14  Q    Oh, someone could interpret that it says that, correct?

15  A    I suspect someone, you know, people can interpret things

16  all different kinds of ways.

17  Q    And in the next sentence down, they discuss the newly-

18  revised ILO classification recognizes pleural thickening as

19  diffuse, only in the presence of and in continuity with an

20  obliterated costophrenic angle.

21  A    That's a simple statement of fact which you elicited from

22  me that in 2000 the ILO stated that.  They didn't say they were

23  adopting this.

24  Q    All right.  Would you agree with me, at least, there is at

25  least some support in the medical literature that in order to

1  define something as diffuse pleural thickening, there has to be

2  blunting of the costophrenic angle?

3  A    Some scientists have decided to define it as such, and

4  some have decided not to, just as some have decided that

5  pleural disease is not asbestosis.  It's a semantic issue.

6  Q    But you would agree that there's some medical literature

7  that supports Dr. Welch's view that blunting is a requirement

8  for defining diffuse pleural thickening as requiring blunting

9  of the costophrenic angle.

10 A    It's not a -- it's --

11          MR. HEBERLING:  Objection.  Asked and answered.

12          THE COURT:  No, this is a different question, I

13 think.

14 A    It's not a question of support, it's a question of how you

15 choose to define it.  Some people do define it that way, and

16 you can make the case for the use of that definition, but you

17 can also make a case for it not requiring that.

18 Q    Okay, so --

19          MR. GUY:  That questioned called for --

20          THE COURT:  I can't hear you, Mr. Guy.

21          MR. GUY:  Your Honor, Jonathan Guy.  That question

22 and all the other FCR questions calls for a yes or no answer.

23          THE COURT:  I'm sorry.  This is the FCR, not the ACC.

24 I'm sorry, Mr. Guy.  I couldn't hear you.

25          MR. GUY:  Your Honor, my only point is the witness is

Frank - Cross/Finch                              238

1  answering questions with a lot of speech when he could answer

2  with a yes or no.  The questions call for a yes or no answer.

3          THE COURT:  If -- the witness is entitled to explain

4  his answers and I'm going to give him leave to explain.  Go

5  ahead.

6  Q    You talked about the Lilis paper, right?

7  A    Yes.

8  Q    All right.  That is in your --

9  A    Which exhibit number?

10 Q    It's in your book.  It's number 14 in the black notebook.

11 A    Yes, sir.  That's Lilis 91.

12         MR. FINCH:  For Your Honor, that's been identified as

13 plan proponents exhibit 41.

14         THE COURT:  All right.

15 Q    And the Lilis paper defines diffuse pleural fibrosis as

16 requiring a blunting of the costophrenic angle, correct?

17 A    Could you point out to me where it says that?  I think

18 it's -- they said that there's diffuse pleural fibrosis.  You

19 can have it with or without the angle.

20 Q    For purposes of the definitions that they're using in the

21 paper, isn't it true, Dr. Frank, that Ms. Lilis --

22 A    Dr. Lilis.

23 Q    Excuse me, Dr. Lilis, defined diffuse pleura fibrosis as

24 that which includes blunting of the costophrenic angle?

25 A    Could you point me to where it says that?

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Page 149 of the document.  Second paragraph.  It's under

2 the --

3 A    For the purposes of this paper, that's how she defined it,

4 and she said you can also have diffuse pleural fibrosis -- or

5 your circumscribed plaque, which she dealt with separately.

6 Q    Right.  And she dealt with diffuse pleural fibrosis, which

7 she defined as having blunting, separately from circumscribed

8 pleural fibrosis or pleural plaque, right?  She defined  --

9 A    Well, for certain analyses, that's what she did, yes.

10 Q    Okay, and one analysis appears on Page 156.

11 A    The pulmonary function relationship.

12 Q    Of the document, right?

13 A    Yes.

14 Q    Okay.  And doesn't that show that there is a substantially

15 across all of the indexes there's a substantially greater

16 decline in lung function for the people who have diffuse

17 pleural fibrosis, which she defined as blunting of the

18 costophrenic angle -- is requiring that -- as compared to

19 people who have circumscribed pleural fibrosis, which is

20 pleural plaque.

21          MR. HEBERLING:  Objection.  Unclear as to the word

22 declined.

23          THE COURT:  I can't hear you, Mr. Heberling.

24          MR. FINCH:  Can I have the ELMO back, please?

25          MR. HEBERLING:  The objection was unclear as to the

1  meaning of the term decline.

2           MR. FINCH:  Let me rephrase the question.

3  Q    Would you agree with me that on Page 156, she analyzed the

4  forced -- by the relationship between forced vital capacity and

5  whether someone had circumscribed pleural fibrosis, or diffuse

6  pleural fibrosis?

7  A    And as a group, the people with diffuse pleural fibrosis

8  as she defined it, started with lower levels of FVC.

9           Q      Okay.  They had substantially lower levels of FVC.

10  Correct?  F -- forced vital capacity.

11  A    I know that substantially they had lower levels.  Can we

12  agree on that?

13  Q    And what she meant by -- you know Dr. Lilis?  You've

14  worked with her, correct?

15  A    Yes.

16  Q    And this is probably the largest study of the impact of

17  pleural disease in terms of the number of patients in the

18  study, correct?

19  A    Probably so.

20  Q    And it's a well-designed epidemiological study?

21  A    It's -- yes.  Well, to make it simple, yes.

22  Q    And in that study, she defined diffuse pleural fibrosis as

23  requiring blunting of the costophrenic angle.

24  A    For the purposes of this study, that's what she did.

25  Q    All right.  The extent and width requirements of the 2000

1  -- excuse me.  The extent and width criteria of the TDP -- the

2  medical criteria in the TDP, you criticized those as well as

3  not being medically reasonable, correct?

4  A    Yes.

5  Q    Okay.

6  A    I mean, I took medically reasonable to be something you

7  don't need to make a diagnosis.  That's what medically

8  reasonable is.  What's reasonable under these circumstances

9  depends on how you want to make these definitions.

10  Q    Okay, so --

11  A    If you want to include people or exclude them.

12  Q    So, what you meant by medically reasonable is not required

13  to make a diagnosis, right?  Isn't it true that nothing -- the

14  2004 ATS doesn't require any kind of level of functional

15  impairment to make a diagnosis, correct?

16  A    That's probably true.

17  Q    And the 2004 ATs doesn't require -- all it requires is

18  either pathology or imaging that shows a structural change

19  that's consistent with asbestosis or some kind of pleural

20  disease, right?

21  A    And that's what medical criteria have been essentially

22  forever.

23  Q    Okay.  But if you're trying to isolate that population of

24  people who have severe pleural disease that you could be very

25  certain that the lung function decline were caused by the

1  pleural disease and not something else, blunting is a

2  reasonable way to do it, right?

3          MR. HEBERLING:  Objection.  Irrelevant.  There's no

4  very certain language in the TDP medical criteria.

5          THE COURT:  There is no certain language?

6          MR. HEBERLING:  No very certain language.

7          THE COURT:  All right.  Restate the question.

8          MR. FINCH:  I'll withdraw the question.

9  Q    Would you agree with me that the 2000 ILO speaks to the

10 blunting issue and it provides support for that.

11 A    That's the third time now.  Yes.  I'll agree with that for

12 the third time.

13 Q    Okay.  And also the 2000 ILO supports the extent and width

14 requirement.

15 A    They changed it in 2000.  Prior to that there was no

16 requirement of three millimeters.

17 Q    Okay.  Would you agree with me that for CAT scans at

18 least, there is -- do you use the ILO system when you grade x-

19 rays?

20 A    Yes.

21 Q    Would you agree with me that that's sort of a standard

22 system that people use so that doctors around the world can

23 talk to each other about what an x-ray shows in terms of

24 pneumoconiosis?

25         MR. HEBERLING:  Objection.  Vague as to the term

1 "people."

2 Q    Could you agree with me that the ILO system, the scoring

3 system is something that medical practitioners use on a regular

4 basis to describe and talk about what they see on x-rays?

5 A    The ILO system was designed to be used for epidemiological

6 purposes to look at patients that were thought to have

7 pneumoconiosis.  They have been utilized for all kinds of

8 things that they were never intended for, so I will say that

9 doctors do use it for that, but it's not just a -- it was

10 mainly done for epidemiological purposes, not to describe a

11 single x-ray.  It was to be able to compare groups of people

12 and develop information about how much exposure it took to get

13 to what kind of x-ray change.

14 Q    Okay.  Would you agree with me that there is -- that ILO

15 system is sort of a consensus system for how you should

16 describe an x-ray for epidemiological purposes?

17 A    Yes.

18 Q    Okay.  Would you agree with me that there is no similar

19 consensus with respect to CAT scans as to how you should

20 describe the changes you see on the CAT scans for purposes of

21 grading the -- what you see for asbestos-related diseases?

22        MR. HEBERLING:  Objection.  Irrelevant.

23        THE COURT:  What's the relevance?

24        MR. FINCH:  The relevance, Your Honor, is that he

25 criticized the requirement of using x-rays as not medically

1  reasonable --

2           THE COURT:  CT scans?

3           MR. FINCH:  No, he required -- he criticized the fact

4  that the expedited review criteria didn't allow -- or did not

5  have CT scans --

6           THE COURT:  Right.

7           MR. FINCH:  -- as part of the basis for it.

8           THE COURT:  Okay.  I see.  The objection is

9  overruled.  It's relevant.

10 A    There's work being done on establishing a similar kind of

11 criteria which has not come to full fruition, but from a

12 medical standpoint, there is still valuable information on a CT

13 scan that can be used, and if we were standing here prior to

14 2000, looking at the older system, they wouldn't have a

15 requirement for three millimeters.  The fact that some group

16 now decided to make use of it, probably has to do with

17 epidemiological purposes, and again, is not medically justified

18 to make the diagnosis.

19 Q    Would you agree with me that a lot of things can cause a

20 reduction in DLCO besides asbestos disease?

21 A    Certainly.

22 Q    Would you agree with me that Forced Excretory Volume, the

23 FEV1/FVC ratio is a good way to determine whether something is

24 a restrictive disease rather than an obstructive disease?

25 A    You can use it to do that.

1  Q    And isn't it the case that in -- when you're looking at

2  groups of people who have asbestos-related nonmalignant

3  diseases, the majority by far are -- show restrictive lung

4  function diseases as opposed to obstructive.

5  A    No, the majority probably show no abnormal pulmonary

6  function.  If they have abnormal pulmonary function, it may be

7  restrictive if it's caused by the dust that they're exposed to.

8  If they're smokers, they may also have obstructive disease.

9  Q    Okay.  But would you agree with me that for the people who

10  do suffer lung function declines as a result of asbestos

11  exposure, generally speaking, it's more often a restrictive

12  defect than an obstructive defect?

13  A    It has classically been thought of that way, but there's

14  certainly a body of literature that says early on you get

15  obstructive changes.  I refer you to the work of Dr. Kilburn,

16  K-i-l-b-u-r-n, and there's some other literature that says you

17  get obstructive changes as well.  But it's classically thought

18  of as a restrictive change.

19  Q    Finally, the unilateral issue, isn't it true that for

20  people with asbestos-related nonmalignant disease, in about 93

21  percent of the cases, it's bilateral and not unilateral?

22  A    Right.  But there's seven percent that would be missed,

23  especially if you do a history and review the records to rule

24  out any other cause.  You can then allow in a unilateral change

25  if you have no other explanation for it.

1          MR. FINCH:  Your Honor, move to strike everything

2   after the word "right" as non-responsive.

3          THE COURT:  That's overruled.

4          MR. FINCH:  Pass the witness.

5                      CROSS EXAMINATION

6   BY MR. BERNICK:

7      Q      I'm trying to reconstruct things here, Dr. Frank.

8   Okay.  Thank you very much.  I'll try not to cover the same

9   ground as Mr. Finch and get you out of here in time for your

10  flight, which is I'm sure, something that many attorneys have

11  promised you over the years, right?

12         UNIDENTIFIED ATTORNEY:  Sorry, I can't hear anything

13  that being said.

14         MR. BERNICK:  Sometimes that actually happens.  I

15  said that we'll try to get him out in time for his flight,

16  which is something that he's probably had been promised for

17  many years.

18         UNIDENTIFIED ATTORNEY:  As long as you keep to your

19  promise.

20  Q   Dr. Frank, you've been promised -- let me just say -- let

21  me -- well, we'll see if we can do.  So, in fact, let's just

22  get this on the table.  You're a very articulate, smart,

23  knowledgeable, accomplished witness in the area of asbestos,

24  right?

25  A    I will take that as a compliment.  I'll leave that to

1  others to judge.  That's certainly not something I would judge

2  about myself.

3  Q    I see.  Then that -- not only that you're modest, but the

4  fact of the matter is that you're so accomplished --

5  A    I'm not good-looking, so I don't have everything.

6  Q    You're so accomplished that you've literally testified in

7  thousands of depositions, correct?

8  A    Not thousands.

9  Q    Oh, I --

10 A    About 1,100.

11 Q    Eleven hundred.  Who's to quibble.  Okay.

12 A    I just want to be accurate.  I'm here under oath and I

13 want to be honest.

14 Q    I know, I know, and I also know that you know the

15 importance of being responsive to a question and that you've

16 tried to do that, so let's start this process with some simple

17 questions and then kind of get to the meat of it.  First of

18 all, I want to get our focus back on what I think is an issue

19 in this case, which is a TDP and the TDP 4B is focused on a

20 relationship between pleural disease and severe or serious

21 impairment, right?  That's the focal point of 4B, correct?

22 A    It's however you want to define it.  That's what it says,

23 I mean --

24 Q    No, I -- well, that's what it says.

25 A    It says severe disease and it focuses on pleural disease.

Frank - Cross/Bernick                    248

1  Q    So, therefore the answer to my question is yes, that's the

2  focal point of 4B, correct?

3  A    Yes.

4  Q    Now, I want to talk a little bit about the science that

5  relates to pleural disease, okay.  And I want to make the same

6  distinction that you did, I think, between definitions and

7  functionality.  You made that distinction, did you not?

8  A    I did.

9  Q    Okay, so we're all agreeable that when it comes to diffuse

10  plural thickening, that is an entity that a distinct diagnostic

11  entity is, it not?

12  A    I don't agree with that, but the literature clearly says

13  well, it is a distinct entity, but it -- the distinction varies

14  from person to person and author to author.  Some use one

15  definition; some use another.

16  Q    We asked this question and you give this answer at Page

17  147 of the deposition I took of you on June 5, 2009.  We'll get

18  to that definition in a minute.  Would you agree with me that

19  today diffuse pleural thickening is recognized as a distinct

20  diagnostic entity in the scientific literature?  Question --

21  answer --

22  A    It is, but --

23  Q    Answer --

24          MR. HEBERLING:  Objection.  Cross -- there's no

25  relationship between the item read and the question read

Frank - Cross/Bernick                                    249

1  earlier.

2          THE COURT:  Oh, yes, there clearly is, but okay, the

3  witness has said yes.  Go ahead.

4  Q    Okay, so it is distinct, is it not?  That's what you went

5  on to say, distinct from other forms of pleural disease.

6  Answer, yes.  That's what your answer was at the time.

7  A    But it depends on how you define it.  Sure, it's --

8  Q    You didn't say that at the time, did you?

9  A    I don't know what the rest of it says.  You'd have to --

10 Q    It just says what it says right in front of you.  You know

11 how to read the deposition.  We'll get to --

12 A    Well, that's the whole thing.  I have the four lines or so

13 you showed me.

14 Q    Sure.  In the four lines I showed you, you said yes.  You

15 didn't say, oh, well, it depends on the definition, correct?

16 You didn't say that, right?

17 A    Let's see what it says afterwards.  Did I make a

18 distinction?

19 Q    How many pages do you want?

20 A    I don't know.  It's -- whatever -- whatever accurately

21 reflects what I said.

22 Q    It does -- exactly, it's a transcript, and you give that

23 answer to that question.  Can you answer that question?

24 A    I answered that answer to that question, but I don't know

25 what the context was.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Fine, but if we believe, your counsel believes you've got

2 a deposition and I misled you and I took it out of context, I'm

3 sure he'll bring it out on redirect examination.

4          MR. HEBERLING:  It's an improper comment.

5          THE COURT:  It is.  It's stricken.

6 Q    That's the first question.  Is there a question mark in

7 your mind now, whether --

8 A    It is a distinct disease which can vary by whose

9 definition you're using.

10        Q      Okay.

11 A    Do we agree on that?

12        Q      Okay.  Great.  Next step, would you agree with me

13 that it's been defined at certain points -- defined -- to

14 include situations where there's not blunting of the

15 costophrenic angle?

16 A    Yes.

17 Q    So, in definition, sometimes the definitions have included

18 blunting, sometimes they've not included blunting, correct?

19 A    I'll agree with that.

20 Q    Okay, and in fact the ILO in 1980, the ILO in 1980, said

21 it's not confined.  Not confined to blunting, right?

22 A    Yes.  They changed -- I --

23 Q    Yes?

24 A    Yes.

25 Q    Okay.

**J&J COURT TRANSCRIBERS, INC.**

1  A    I don't recall the criteria from 1980 to that specificity,

2  but I know they changed in 2000, so it must have been different

3  earlier.

4  Q    You read the McLoud paper, did you not?

5  A    Yes.

6  Q    You actually singled out the McLoud paper on direct

7  examination, didn't you?

8  A    It was singled out.

9  Q    Okay.  And did you read it carefully before you came to

10 court to talk about it?

11 A    It's a -- you know, I'm not sure I remember --

12 Q    Did you read it carefully?

13 A    I did.

14 Q    Okay.  Isn't it true --

15 A    Maybe not carefully enough to answer very specific

16 questions.

17 Q    Okay.

18 A    But I don't have it in front of me right now.

19 Q    And in fact, isn't it true -- you just tell me if you

20 don't remember, that in the McLoud study they recite that

21 they're using the definition of the ILO in 1980, and they go

22 onto include in diffuse plural thickening both cases involving

23 blunting and cases not involving blunting?

24 A    I have that recollection.

25 Q    Okay.  Good.  So, we've got McLoud in 1985, who was

1  saying, yeah, I'll go ahead and use that.  Now, McLoud in 1985

2  included both blunting and not blunting and he looked to see

3  about impairment, right?

4  A    Yes.

5  Q    Lilis, in 1991 did the same thing, right?

6  A    Yes.

7  Q    And it's fair to say that both of these papers comment on

8  a need and desire to become a little bit more specific in the

9  definition, fair?

10 A    That's probably a fair statement.

11 Q    And we know that ultimately, in 2000, the ILO had a new

12 definition that included blunting, correct?

13 A    So it says.

14 Q    Okay.  And we also know, you said the American Thoracic

15 Society was -- it's publication in 1994, you said well, it

16 might be --

17 A    2004.  2004.

18 Q    I'm sorry 2004, right.  You candidly said it might be read

19 to say blunting should be included, right?

20 A    They don't say that that's what they adopt.  They say that

21 the ILO adopts it, nor do they say we agree with this, or we're

22 adopting the same thing.

23 Q    I understand.  I just want to be clear.  They actually

24 talk about they have a whole section on how to deal with and

25 define diffuse plural thickening and they recite the ILO, but I

1 agree with you.  They don't adopt the ILO definition.  I agree

2 with that.  Okay?  So, all of this discussion of his, a

3 discussion about definitions, right?  How do you define it?

4          MR. HEBERLING:  Objection.  Unclear as to this

5 discussion.

6 Q    ILO 1980, the definition considered by McLoud and Lilis in

7 '85 and '91 and ILO 2000.  Those are all -- they talk about how

8 to define it, fair?

9 A    They all talk about how to define it.

10 Q    So, now I want to shift.  Instead of talking about how to

11 define it, I want to go back to functionality.  Functionality.

12 If we want to get functional in figuring out a relationship of

13 pleural disease and impairment, that functional relationship,

14 maybe it's picked up by the deposition -- definition -- maybe

15 not.  Right?

16 A    I see nowhere where it's picked up by the definition.

17 Q    Okay.

18 A    In any of these papers.

19 Q    In any of these papers.  So, let's talk about --

20 A    They don't discuss functionality.  In fact, that's what

21 they're studying is the functionality vis-a-vis the definition.

22 Q    Right.  So, if we want to figure out functionally what's

23 the -- how do you determine the relation -- what kind of

24 pleural disease has serious impairment -- one way to do that is

25 to do some scientific investigation and see is there a

1  relationship.  When is there a relationship between pleural

2  disease and serious impairment?  There would be one way to do

3  it, right?

4  A    Yes.

5  Q    And in fact, a significant body of science that looks into

6  that very question is, that is, what kind of pleural disease is

7  related to, or associated with serious impairment, right?

8  A    And both types are, with and without blunting.

9  Q    I didn't ask you that.  I just asked you whether there's a

10 body of science, right?

11 A    There is a body of science which speaks to both sides of

12 the issue.

13 Q    Okay.  Now, in point of fact, isn't it true that you

14 actually have not read the literature to study the different

15 kinds of studies and articles that have been published,

16 published, on the relationship between diffuse pleural

17 thickening and impairment?  You've not specifically reviewed

18 that literature?  True or not?

19 A    That's what I testified to at the deposition and I've read

20 --

21 Q    And did you testify truthfully?

22       MR. HEBERLING:  Objection.  The witness is not

23 permitted to finish his answer, even close.

24 A    I did --

25 Q    Go ahead.  You finish.

**J&J COURT TRANSCRIBERS, INC.**

1 A    Thank you.  I did testify to that and, as the statement

2 said, specifically for that purpose.  I've now gone back and

3 read the literature looking at that issue.

4 Q    Oh.  Oh, okay.  So, you gave us all of your opinions at

5 your deposition in June and, as of June, you had not

6 specifically done a review to see what science said about this

7 relationship, right?

8 A    But I also -- that's what I testified to, but all the

9 other statements I made about functionality and definitions --

10         MR. BERNICK:  I move to strike as not responsive.

11 That calls for a very simple answer.

12         THE COURT:  Sustained.

13 Q    You testified and you testified truthfully that you had

14 not done a specific review of the literature to see what

15 science said about the relationship of pleural disease and

16 serious impairment?  True or not?

17         MR. HEBERLING:  Your Honor, I have some concerns

18 regarding relevance here.  Mr. Bernick is talking about this

19 relationship between pleural disease and severe impairment but

20 it's not -- I have a concern whether this is established as

21 having any relevance to Libby.  There's no foundation extending

22 these studies to Libby which is an amphibole.  It's winchite

23 that hasn't been studied.  And we have the CARD mortality study

24 which indicates other things.  So, I'm not sure about the

25 connection between what Mr. Bernick is talking about and Libby.

1          THE COURT:  Mr. Bernick?

2          MR. BERNICK:  Yeah.  Pretty simple.  The witness has

3  expressed the opinion that the TDP's definition of when that

4  relationship exists is not medically reasonable.  That opens

5  the door to the question about what medical science says about

6  that issue and this goes to the question of whether, as of the

7  time that he was called upon to testify and long after he had

8  rendered his expert reports, he had even done a thorough review

9  of the literature on that issue.  That's what it goes to, Your

10 Honor.

11         THE COURT:  All right.  It's relevant.  Overruled.

12 Q    You hadn't done that review of the literature as of that

13 time, correct?

14 A    For that specific purpose.

15 Q    And, in fact --

16 A    I had read those papers but not with the construct, as you

17 put it to me, in mind as I read them.

18 Q    Okay.  And, in fact, no matter how you had read those

19 papers, with that construct or some other kind of construct,

20 you couldn't even tell me what science has to say about when

21 diffuse pleural thickening is associated with the loss of lung

22 function?  You couldn't even tell me that, correct?

23 A    I don't recall what the question was at the time.  There

24 were articles that I had read that did relate to that and some

25 that I could not relate to that.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Were you asked this question, Dr. Frank, at Page 168 in

2 the same fashion?  "Can you tell me what science has to say

3 when diffuse pleural thickening is associated with loss of lung

4 function?  Answer:  I cannot.  I have not studied that."  Was

5 that your answer to my question at that time?

6 A    It was.

7 Q    Isn't it true that, at that time, you couldn't even tell

8 me the where in the pleura the problem was, the condition

9 existed, that gave rise to diffuse pleural thickening?

10 Correct?  You couldn't distinguish the two parts of the pleura

11 and which one was responsible, correct?

12 A    And I still can't because, in some cases, it's one, and in

13 some cases it's the other, and they say you can't make a

14 distinction in looking at x-rays.

15 Q    At that time, you hadn't even looked at the literature to

16 see what it said on that subject, correct?

17 A    I had read the literature but had not focused on that

18 specific question.

19 Q    Okay.  Well, now, it turns out that there is literature

20 that deals with the subject.  Now you've had the opportunity to

21 take a look at it.  Is it true that the literature that

22 examines the relationship between pleural disease and serious

23 impairment looks to see whether blunting of the costophrenic

24 angle is associated with serious impairment?

25 A    Well, in some cases, it's associated; in some cases, it's

1  not associated.

2  Q    I see.  All I simply asked you is, is there literature on

3  that subject?

4  A    Yes.

5  Q    And isn't it true that studies, including the McLoud study

6  that you specifically cited, says that yes, there is a strong

7  association between blunting of the costophrenic angle and the

8  diminution of lung function?

9  A    (No verbal response).

10  Q    Statistically significant, strong relationship between

11  blunting of the costophrenic angle and serious impairment of

12  lung function?

13  A    Yes, it does say that.

14  Q    Okay.  Isn't it true that Lilis finds the same thing?

15  McLoud and Lilis both make the same finding?

16  A    They both find that, at the time that they started

17  studying the people or had data that there was that

18  relationship.  What Lilis also says was without blunting you

19  get a greater diminution over time, but you start at a higher

20  level.

21  Q    Isn't it true that McLoud specifically looked at the

22  question of when there's thickening not from blunting but from

23  confluent plaques, there's no indication of there being a

24  significant diminution of lung function?

25  A    I'd have to go back and look at the -- I can't agree to

1  something I don't recall the specificity of.  They looked at

2  three different kinds of changes and I don't recall what the

3  specific lung function change was in relation to each of those.

4  Q    I'll tell you what.  We've got the study.  The Court's got

5  the study.

6  A    Right.

7  Q    We got the paragraph.  And, in the interest of getting you

8  out of here --

9  A    Right.

10 Q    -- I can move onto something else because the world won't

11 turn on your answer to that question.

12 A    Okay.

13 Q    Isn't it true that the impairment that's associated with

14 diffuse pleural thickening is an obstructive impairment?

15 A    (No verbal response).

16 Q    That's what they report?

17 A    I don't recall that that was what was reported.

18 Q    Wait.  You haven't looked -- in looking at the literature

19 now with the benefit of these weeks, you can't tell us whether

20 the impairment that is associated with diffuse pleural

21 thickening is restrictive or obstructive or both?

22 A    In some people, it will be one, the other, or the other.

23 Q    I'm sure that that's true.  But what do the studies

24 actually say when it's examined scientifically about whether

25 this condition --

Frank - Cross/Bernick                    260

1  A    Well, let's take a look at see what the studies say.

2  Q    Well, I'm asking you what you're saying, what you believe

3  right now.  Can you answer the question right now?

4  A    Without looking at the -- look.  There's a lot of

5  literature.  I don't recall the details of each study with

6  regard to every question.  The studies will speak for

7  themselves, as you said, and either it says it or it doesn't.

8  And the fact that I don't remember it, I'm not sure should

9  necessarily be held against me.

10  Q    Is it true that in the TDP, there is a measurement of lung

11  function that is required?  The medical criteria for expedited

12  review --

13  A    There is.

14  Q    There is a criteria that specifically designed to single

15  out cases of obstruction versus -- I'm sorry -- cases of

16  restriction -- I got it the wrong way, I apologize --

17  restriction versus obstruction?

18         THE COURT:  Restate the question, please.

19         MR. BERNICK:  Yes.  I'll restate it.

20  Q    Isn't it true that in the TDP, there's a test that's

21  designed to ascertain whether the claimant has evidence of

22  restriction?

23  A    Yes.

24  Q    And I'll go back and I'll re-ask my question.  Isn't it

25  true that, in the scientific literature, diffuse pleural

Frank - Cross/Bernick                                261

1 thickening is associated with a restrictive condition?

2 A    It can be.  Yes.  But what you said before was obstructed,

3 which is --

4 Q    Yeah, I know.  I made a mistake.  But you couldn't it

5 answer it either way, right?

6 A    I said I couldn't remember.  I said -- if you read --

7 re-read my comment, it's usually thought of as restrictive

8 which is what I said but I didn't recall what the specific

9 study said and I can't find in here that it says one way or the

10 other what the pulmonary function changes are.

11 Q    Well, we're not going to -- you're not going to find it in

12 the next three minutes so let's go on to talk about something

13 else, Dr. Frank.  Okay?

14     So, now, I want to focus on the question that I think you

15 --

16 A    It doesn't even talk about obstructive changes.  It talks

17 about restrictive change.

18 Q    It talks about restrictive change?

19 A    Right.  So, I would --

20 Q    Okay.  That was -- which one were you reading there?

21 Cloud (sic)?

22 A    McLoud.

23 Q    Cloud.

24 A    McLoud.

25 Q    McLoud.  Okay.  Now, you suggest in your testimony that

Frank - Cross/Bernick                    262

1  the way that the TDP medical criteria for the expedited review

2  are put together; that they have the effect of basically not

3  including certain cases that you think are important cases,

4  correct?

5  A    I think the data shows that it more than suggests that, in

6  fact, it does keep people out who die of an asbestos disease,

7  who are dead from their asbestos disease.

8  Q    Die, dead.  We know that.  Saying it again and again

9  doesn't answer --

10  A    And they wouldn't qualify under the expedited medical

11  criteria.

12  Q    That's right and you're bringing home the fact that people

13  who have suffered a loss are not being included.  We get that.

14  Okay.  We're going to talk about the basis that you have for

15  saying it in a minute.

16        MR. HEBERLING:  Objection to the speech.  It's not a

17  question.

18        THE COURT:  Sustained.

19  Q    I want to talk about how many of those people are excluded

20  at Libby, okay.  How many people that you believe have serious,

21  and pleural disease with serious impairment?  That's the

22  target, right?  How many of those people at Libby, based upon

23  your study, and have died, are excluded?  Okay?

24  A    Eighty-six percent.

25  Q    I know that that's what you testified to.  I want to

1  unpack that a little bit.  Now, that was a mortality study,

2  right?

3  A    Which is a very clear measurement of outcome.

4  Q    Yeah.  The answer to my question is yes.  It would make

5  things go a little bit faster.  Right, Dr. Frank? It's a

6  mortality study, correct?

7  A    Yes.

8  Q    Okay.  And in the mortality study, you have already given

9  us two figures when you started to talk about the effect of the

10  TDP, correct?

11  A    I think we've given you more than two figures.  I don't

12  know --

13  Q    Well, you started out giving two.

14  A    I don't know which two figures you want.

15  Q    Okay.  You gave us a 37.  Remember the 37?

16  A    That was one of the figures we talked about.

17  Q    Then you said there was a 20 out of 37, right?

18  A    Right.

19  Q    Okay.  In the 37, if I recall correctly, these were people

20  who had moderate or extensive -- you can go back from the

21  accounting memo -- moderate or extensive pleural disease,

22  right?

23  A    Let's take a look.

24  Q    I think it's on Page 3 of 6.

25  A    Do you remember the exhibit number?

1          THE COURT:  109, I think.

2          MR. BERNICK:  LC-109.

3  A    Okay.  Okay.  Yes.

4  Q    Okay.  And then, of those --

5  A    No, I didn't -- no, no, no, no.

6  Q    Thirty-seven.

7  A    Twenty of 37 had minimal or no interstitial fibrosis.  We

8  weren't talking about pleural disease.

9  Q    What's 37?

10  A    People that had Category 0, ILO Category 0 interstitial

11  disease.  That's what the 37 is.

12  Q    If you look, what does the language say right after 37?

13  A    I'll read this sentence again.  20 of 37 had minimal or no

14  interstitial fibrosis, ILO 0/1 or less.  That's what it says.

15  Q    That's not -- I know what the 20 is.  I'm talking about

16  the 37.

17  A    So 17 would have had some evidence of interstitial

18  disease.

19  Q    I want to get the 37.  The 37 are people --

20  A    That's a -- well, that's a different 37.  I was looking

21  just below that.

22  Q    Well, no, no.

23  A    Okay.  Let's go to that.

24  Q    No, no.  Thirty-seven is what you begin with.  Those are

25  people with moderate or extensive pleural disease, right?

1  A    Yes.

2  Q    And then, if you want to look to see which ones of them

3  had minimal or no interstitial fibrosis --

4  A    Okay.

5  Q    -- that's the 20, right?

6  A    Yes.

7  Q    So, these are people -- you start with the 37.  That's

8  moderate or extensive pleural disease.  You want to get to the

9  pure pleural disease, right?

10  A    Right.

11  Q    So, you eliminate people who have evidence of an ILO of

12  1/0 or greater, correct?

13  A    Yes.

14  Q    And you end up, for the pure pleurals of approximately 20

15  people, correct?

16  A    Yes.

17  Q    Okay.  So, now we've got pure pleural disease.  And I want

18  to go back to what the target of the TDP is which is serious

19  impairment.  How many of those 20 people with pure pleural

20  disease had serious impairment?

21  A    All of them.  They were dead from an asbestos-related

22  disease that wasn't cancer.

23  Q    Oh, okay.  Correct.  I understand that they ultimately

24  died.  The question --

25  A    They did of an asbestos -- it's not just that they died

Frank - Cross/Bernick                          266

1  but they died of a non-malignant asbestos disease.  That's as

2  serious as you can get.  It doesn't meet the 4B definition of

3  serious but medically it is serious.  You're dead.  That's

4  pretty serious.

5  Q    Okay.  Again, we get the point.  We're going to get to the

6  mortality in just a moment.  The question is, they had measures

7  of whether they had serious impairment of lung function at the

8  time that they died, did they not?

9  A    That's a different question.

10 Q    Oh, that's a different question?  So that's the question

11 that I want, is serious lung function impairment.  That's what

12 the TDP looks for, is lung function impairment, right?

13 A    Yes.

14 Q    Okay.  So, tell me, of the 20 people, how many people had

15 serious lung function impairment at the time that they were

16 being diagnosed?

17 A    I'd have to go through the chart and figure that out.  I

18 can't tell you what that number of that 20 is without doing

19 some calculations on the record.

20 Q    Oh.  So, well, how is it that you -- is that in your

21 accounting memo?  Can you tell me?

22 A    I don't see that, the answer to your question, in this

23 memo.

24 Q    I have that there are nine.

25        MR. HEBERLING:  Objection.  No foundation.

Frank - Cross/Bernick                    267

1          MR. BERNICK:  Well, I did what I was --

2   Q    Apparently, that what you did is -- I went back through

3   the sheet and I tried to pick them out and we picked out nine.

4          MR. HEBERLING:  Objection.  He can't testify.

5          THE COURT:  There's no questions.

6          MR. HEBERLING:  He can't supply his own foundation.

7          THE COURT:  That's sustained.

8   Q    So, you can't tell us now, of the people who are pure

9   pleural disease, how many of them actually had what the TDP is

10  looking for, which is a loss, a serious loss, of lung function?

11         MR. HEBERLING:  Objection.  Asked and answered.

12         THE COURT:  That's sustained.

13  Q    Can you tell us who the 20 people are?

14  A    I'd have to go through the 76 and pick them out, just like

15  you did.

16  Q    So, when you came in to testify about the 37 and the 20 I

17  order to make your point, you didn't bring along your work so

18  that we could figure out whether it was right?

19  A    It's here.  Here's the work.

20  Q    I understand that but you gave us the figures and now

21  you're telling me we can't ask you about the figures because

22  you don't --

23  A    You can ask me about it but, if you notice, I didn't

24  generate that memo.

25  Q    Oh.  So, is the memo right or wrong, or do you not know?

Frank - Cross/Bernick                          268

1  A    I take it to be right.

2  Q    I didn't ask you whether you took it to be right.  Do you

3  know whether it's right or wrong or not?

4  A    I did not go back and do the exact recounts to see that

5  those numbers were correct.

6  Q    When you testified that 37 was the number for moderate or

7  extensive plural disease, did you know that that testimony was

8  accurate?

9  A    I believed it to be accurate on the basis --

10 Q    Oh, I didn't ask you whether you --

11 A    -- of this memo.

12        MR. HEBERLING:  Objection.  He's not letting him --

13        MR. BERNICK:  I'm sorry.

14        MR. HEBERLING:  -- complete the answer.

15        MR. BERNICK:  Go ahead.

16        THE COURT:  Go ahead, Doctor.

17 A    I believed it was accurate based on this memo.

18 Q    Did you know as an expert that it was accurate?

19 A    I had no reason to think it wasn't.

20        MR. BERNICK:  Move to strike as not responsive.

21 Q    Did you know?

22 A    Having not done the exact picking out of the cases to come

23 up with those numbers, I know what the numbers tell me.  I

24 didn't do it myself.

25 Q    When you testified in all those thousand depositions, did

1  you learn what it means to answer a question?

2          MR. HEBERLING:  Objection.  Argumentative.

3          THE COURT:  Sustained.

4          MR. BERNICK:  I'll withdraw the question.

5  Q    Did you know that the 20 figure that you provided to us

6  under oath, did you know, based upon your own assessment of the

7  data from your own data sheet, that that number was accurate?

8  A    I took the underlying data to be accurate.  I'm not the

9  one that did the spreadsheet.

10 Q    It's true, is it not, that you can't even tell us, as an

11 expert sitting here, based upon your own work, you can't tell

12 us how many people in the CARD mortality study, even had the

13 pure pleural disease that is the target and subject of Section

14 4B, correct?

15         MR. HEBERLING:  Objection.  Argumentative.

16         THE COURT:  No.  That's -- this is fair cross

17 examination.

18 A    I'm not sure what the -- pure pleural disease --

19 Q    You can't tell us how many cases --

20         MR. HEBERLING:  Objection.

21 Q    -- of pure pleural disease -- has no interstitial

22 involvement are even present in the CARD mortality study of

23 your own knowledge, correct?

24 A    I can go down the list and count up for you.  I have not

25 done that calculation.  It is all -- the data is all here.

Frank - Cross/Bernick                    270

1  Q    How many --

2  A    Of those 76, some have pure pleural disease, some have

3  both disease.  I can't recall if there was any that had just

4  parenchymal disease.  There may be one or two of those.

5  Q    How many people who had the pure pleural disease had

6  diffuse pleural thickening?

7  A    By whose definition?

8  Q    Anybody's definition.  Your definition.

9  A    My definition would not include the necessity for blunting

10 and so I can't tell you that.

11 Q    Well, even if we included the blunting.  How many people

12 either blunting --

13 A    I can't tell you the exact number.

14 Q    I'm sorry.  How many people, either blunting or not

15 blunting, had diffuse pleural thickening within your group of

16 20?

17 A    It would again depend on your definition of diffuse

18 pleural thickening.

19 Q    Either one.  The 1980 definition, the 2000 definition, the

20 ATS definition, your definition?

21 A    I don't know exactly what that number is.

22 Q    How many people within the 20 people who had pure pleural

23 disease of moderate or extensive nature failed -- would have

24 failed to pass on your view -- would have failed to pass the

25 medical criteria for Section 4B of the TDP?  How many would

1 have failed to pass?

2 A    Eighty-six percent of the group and I --

3 Q    No.  I'm talking about the 20.  I'm not talking about the

4 entire group.

5 A    I don't know.

6 Q    Now, I want to get finally to the question that actually

7 brings us here today.  We've talked a little bit about Libby.

8 Now, I want to talk about outside of Libby, people who have

9 pleural disease outside of Libby and whether there is a

10 difference in the capture; that is, how many people are

11 captured by TDP inside and outside of Libby.  Have you made any

12 determination of the capture rate -- that is, the rate at which

13 people would be picked up or would fail -- the --

14          MR. HEBERLING:  Objection.  Outside the scope of

15 direct.

16          THE COURT:  I think it goes to the issues that you

17 are attempting to raise and I think it's a yes or no question

18 so, since it's cross, I'm going to let that question go.

19 A    No.  No.

20 Q    You haven't analyzed the impact of the TDP outside of

21 Libby?

22 A    I'm not aware that there's enough data in any of the

23 literature to be able to do that.  I can give you studies of

24 mostly x-ray findings but they don't come with descriptions in

25 all cases of blunting nor do they come with descriptions of the

1  PFTs.  So the data to do that analysis outside Libby doesn't

2  exist.

3  Q    Well, the fact of the matter is that you simply haven't

4  done the analysis?  You haven't even tried?

5           MR. HEBERLING:  Objection.  The --

6           THE COURT:  Sustained.

7  Q    Isn't it a fact that you haven't even tried to perform an

8  analysis with respect to people outside of Libby?

9           MR. HEBERLING:  Same objection and the question

10 assumes that other people's medical records outside Libby would

11 be available to him somehow.

12          THE COURT:  Well --

13          MR. BERNICK:  There are all kinds -- okay.  I'll

14 rephrase that question.

15 Q    All kinds of medical records outside of Libby have got

16 information about exposure, lung function, the diagnosis

17 including the data regarding diffuse plural thickening.

18 There's all kinds of medical data out there in databases and

19 literature, correct?

20 A    Not in a way that would allow you to do that same kind of

21 analysis.  There's a --

22 Q    What about the -- okay.

23          MR. HEBERLING:  Objection.

24 A    They're studies that look at x-rays.

25          MR. HEBERLING:  He's not letting the witness finish

Frank - Cross/Bernick                    273

1 the question.

2 A    There's studies that look at PFTs.  There are studies that

3 report some data and not other data.  Even among the

4 insulators, you know, which is clearly an occupational group,

5 the data exists but it doesn't exist in the literature in a way

6 where you could put the same analysis together with some

7 exceptions.

8 Q    McLoud and Lilis study people outside of Libby, right?

9 A    Yes.  Lilis looked at the insulators in a very limited

10 number of those.

11 Q    Okay.

12 A    But the paper dealt with pulmonary function.  It didn't

13 have in the same paper the x-rays.

14 Q    Oh, but --

15 A    You can go to other -- if I could finish?

16 Q    Sure.  Go ahead and finish.

17 A    You can go to other data and find out the x-ray

18 experience.  But nowhere would you be able to take a paper that

19 talks about the x-ray experience of insulators and say that the

20 data that Dr. Lilis has in her paper about PFTs is the same

21 data.  You have to go back to the raw data.

22 Q    Right.

23 A    Which has never been done in the literature.  I don't have

24 access to that data so --

25 Q    You don't have access to the data that Lilis had access

Frank - Cross/Bernick                           274

1  to?

2  A    Of course not.  It's not my research.

3  Q    Oh, but there's no reason you couldn't have -- that is the

4  same insulator data that you folks work with at Mt. Sinai,

5  right?

6  A    I haven't been at Mt. Sinai since 1984 --

7  Q    Oh.

8  A    -- and that data sits there at Mt. Sinai and someone

9  theoretically could do it but I have no access to that data at

10 the moment.

11 Q    My point is that you never undertook to conduct an

12 investigation to try to get access to the data that was there,

13 correct?

14 A    It's not my data.  I would have no basis --

15         MR. BERNICK:  Can I please have an instruction for

16 the witness, yes or no?

17         THE COURT:  You can answer yes or no, Doctor, and

18 then you can explain your answer.

19 A    No, I did not do so, because it would be an improper

20 request to go and say, I want to look at this data for this

21 purpose.

22 Q    Isn't it true that one of the reasons that you didn't go

23 look was that your expectation was that, because there is

24 nothing different about the people outside and inside Libby,

25 there wasn't any point in looking to see what the answer to the

1 question was?  Isn't that a fact?

2 A    No.  In fact, I do think the people in Libby are different

3 than the people outside Libby.

4 Q    Weren't you asked this question and didn't you give this

5 answer at Page 36 of the same deposition?

6 A    Well, the diseases are the same but the --

7          MR. BERNICK:  Your Honor.  Your Honor, we're not

8 going to get --

9          THE WITNESS:  Okay.  All right.

10          MR. BERNICK:  -- Dr. Frank out of here unless he

11 answers the question.

12          THE WITNESS:  I'm not getting out of here anyway so

13 that's not an issue because --

14          THE COURT:  All right, gentlemen.  You ask the

15 questions.  You answer.  And that's enough of the comments from

16 everybody.  Go ahead, Mr. Bernick.

17 Q    Dr. Frank, did you give this answer in response to this

18 question?  "Well, the diseases that people in Libby suffered

19 are no different than the diseases people outside of Libby

20 suffered, is that correct?" and your was, "It's the same set of

21 asbestos-related diseases."  Was that your answer?

22          MR. HEBERLING:  Objection.  Improper impeachment.

23 The depositions about diseases and Dr. Frank, his statement was

24 that Libby is different in some way.

25          MR. BERNICK:  I'm leading up to the point.  I'm

1 laying a foundation about what he believes concerning the

2 diseases.

3          THE COURT:  All right.  But it's nonetheless not

4 proper impeachment.  He hasn't denied that statement.

5 Q    Isn't it true that the people of Libby suffered diseases

6 that are no different from the people outside of Libby?

7 A    They suffered the same diseases, mesothelioma, lung

8 cancer, parenchymal asbestosis, pleural disease, however you

9 want to define it, but how they get it and the extent of what

10 it does to them is different, but the scent of diseases is the

11 same.  There's no disease that has occurred in Libby that's

12 different from the diseases elsewhere but the manifestation is

13 different.

14 Q    Okay.  Are you done?  Are you done?

15 A    Yes.

16 Q    Okay.  Isn't it true that when it comes to whether people

17 at Libby will meet the diffuse pleural thickening requirement

18 in Libby differently from outside of Libby?  You believe that

19 there's nothing different about the people outside than inside?

20          MR. HEBERLING:  Objection.  Vague as to the diffuse

21 pleural thickening requirement.

22          THE COURT:  No.  I think the diffuse pleural

23 thickening requirement this witness has explained.  I think he

24 can answer that question.

25 A    Well, could I see -- you're reading it and I don't know

Frank - Cross/Bernick                    277

1  the context again of what came before and what came after.

2  Q    Well, your counsel has insisted that I can't use it unless

3  I ask you first whether you agree or not.  So, I said, isn't it

4  true that when it comes to whether people inside and outside of

5  Libby will have a different success rate --

6  A    Well, read the question, not how you're interpreting it.

7  Q    Okay.  I'll -- fine.

8  A    Just let me see it.

9          THE COURT:  Gentlemen.  Do you need a recess, Doctor?

10          THE WITNESS:  Well, you know, I'd really rather see

11  it than have Mr. Bernick give me his --

12          THE COURT:  Your counsel has objected so he has to do

13  it this way because your counsel is objecting.

14  Q    Isn't it true that when it comes to meeting the thickness

15  and extent requirements for diffuse pleural thickening in the

16  TDP, there will be people outside of Libby who won't meet those

17  requirements?

18  A    And I probably said yes.

19  Q    No.  Your answer was, "There will be people inside who

20  won't meet it."

21  A    And there will be people outside who won't meet it as

22  well.

23  Q    And, that there's -- in that respect, there is nothing

24  different about the people outside than inside?  True or not?

25  A    It is true that there is nothing different that some

**J&J COURT TRANSCRIBERS, INC.**

1 people will meet it and some people will not meet it.  That

2 doesn't mean that, as a group, the people in Libby are not

3 different.

4 Q    I'm not asking you whether they're different now.  I'm

5 asking you this question.  Were you asked these questions and

6 did you give these answers at Page 192?  "Question:  We know

7 from the literature that there are people with diffuse pleural

8 thickening outside of Libby who wouldn't meet the thickness and

9 extent requirements, right?" and your answer was, "There will

10 be people inside Libby who won't meet it."  And I said, "I

11 understand that but I'm focusing first on outside and then

12 we'll get to Libby," and your answer was, "There is nothing

13 different about the people outside than inside."  Was --

14 A    With regard to the --

15 Q    Was --

16 A    I did say that and it's with regard to the prior question

17 over will some of them meet the thickness and extent

18 requirement and there's no difference that some will meet it

19 inside Libby, some will not; outside some would meet it and

20 some would not.  But the --

21 Q    And that there is nothing different about the people

22 outside than inside, correct?

23 A    But there is something different about the --

24 Q    Was that your answer, Dr. Frank?

25 A    The answer is what it says there but in the context it

Frank - Cross/Bernick                    279

1  doesn't refer to the totality of the experience of the people

2  of Libby.  It has to do specifically with the question of

3  diffuse pleural thickening outside Libby wouldn't meet the

4  requirement issue.

5  Q    Isn't it true that anything we're going to talk about with

6  regard to criteria probably are not going to be different for

7  who it is?  I mean, if you're talking about the science, it's

8  the same science, isn't that true?

9  A    Where is that?  Oh, is that --

10 Q    Just tell me.  Is that true.  I'll say it again.

11 A    Say it again.

12 Q    Isn't it true that anything that we're going to talk about

13 with regard to criteria probably are not going to be different

14 for who it is?  I mean, if you're talking about the science,

15 it's the same science?  Would you agree with that?

16 A    Yes.

17          MR. HEBERLING:  Objection.  Context.

18          THE COURT:  Overruled.  The witness has answered.

19 Q    Now, Dr. Whitehouse -- you've talked extensively with Dr.

20 Whitehouse on all these subjects, correct?

21          MR. HEBERLING:  Objection.  Vague as to all these

22 subjects.

23          MR. BERNICK:  Well, let's be very specific.

24 Q    You've talked specifically with Dr. Whitehouse about the

25 question of whether the blunting criteria in Level 4B has the

1  same proportion and effect inside as outside of Libby?  Have

2  you discussed that with him?

3  A    Not in that phraseology.  No.

4  Q    I'm going to put before you a statement that Dr.

5  Whitehouse has made under oath --

6          MR. BERNICK:  -- and that, Your Honor, we will

7  confront him with it and ask him to confirm tomorrow.  And I

8  just want to ask whether this witness agrees or disagrees and

9  --

10          MR. HEBERLING:  Objection to impeaching the witness

11  --

12          MR. BERNICK:  I'm not impeaching.

13          MR. HEBERLING:  -- with another witness's testimony.

14          THE COURT:  I don't think it's impeachment but you

15  can ask the question without the document.

16  Q    Would you agree that, when it comes to the blunting

17  criteria in Level 4, that that it has a very close, very

18  similar proportion and effect inside Libby as outside Libby?

19  A    I don't understand the question.  I mean --

20  Q    I'll repeat -- because I'm trying --

21  A    You can read it again.  It's not one that -- the criteria

22  are the same but the experience inside Libby and outside Libby

23  may or may not be different and it's not something I've ever

24  discussed with Dr. Whitehouse.

25  Q    I'm just asking you whether you agree that, when it comes

Frank - Cross/Bernick                    281

1  to the blunting criteria in Level 4, that that has a very close

2  or very similar proportionate effect inside and outside of

3  Libby?

4  A    I don't understand it so I can't agree or disagree with

5  it.

6  Q    Fine.

7           MR. HEBERLING:  And I object to unclear as to similar

8  or not similar, proportionate --

9           THE COURT:  It doesn't matter.  The witness has said

10 he can't answer the question; he doesn't understand it.  So,

11 you don't need an objection for that score.

12 Q    Finally, I want to come back to your statements with some

13 frequency this afternoon that, after all, all of the people in

14 the mortality study died from asbestos.  That's been your

15 testimony, right?

16 A    Yes, sir.

17 Q    All the people in the mortality study died from asbestos,

18 right?

19 A    Yes.

20 Q    And, in fact, that's the predicate for being able to

21 conduct this whole mortality study, is that there was an effort

22 made to isolate within the population, the people at the CARD

23 clinic, those people who had been diagnosed with an

24 asbestos-related disease, had died, and had died from that

25 disease, correct?

Frank - Cross/Bernick                    282

1  A    Yes, and even more so that they died from a non-malignant

2  type of asbestos disease.

3  Q    Okay.  With that addition, would you agree with me that

4  that was the predicate for the conduct of the CARD mortality

5  study?

6  A    Yes.

7  Q    Okay.  Now, this point that you have made repeatedly, that

8  all the people that we're talking about here died from pleural

9  disease -- that's the point that you've made, correct?

10 A    I didn't say that.

11 Q    Oh.

12 A    I didn't say that all of them died of pleural disease.

13 Some also had parenchymal disease.

14 Q    Oh, okay.  So now are you saying that it's the 20 people?

15 Would it be the 20 people who died from pure pleural disease?

16 A    Well, there are 20 people who had pure pleural disease who

17 died --

18 Q    Yes.

19 A    -- and were judged to have died of an asbestos-related

20 disease.

21 Q    Okay, or judged to.

22 A    Yes.

23 Q    I want to know whether you, as an expert, are saying as an

24 expert, subject to cross examination, that the 20 people in the

25 CARD mortality study who had pure pleural disease actually died

1 from it?  Is that your testimony?

2 A    Yes.  That is based on my discussions with Dr. Whitehouse

3 who did the actual assessment of each of those patients using

4 criteria that we discussed jointly.

5 Q    So, this is the first time -- but it's your expert

6 testimony -- and, if it's not, if it's Dr. Whitehouse, we'll

7 ask him but, if it's yours, I want to ask you about it.  Is it

8 your opinion as an expert that these 20 people -- you don't

9 even know who the 20 people are, right?

10 A    We could figure them out.

11 Q    Can figure them out.  But these 20 people who had pure

12 pleural disease died from it, is that your opinion?

13 A    Yes.

14 Q    Okay.  Now, in support of that opinion, isn't it true, Dr.

15 Frank, that you haven't reviewed any of the medical records for

16 those people?

17 A    I can't -- not knowing exactly who those people are, I may

18 or may not have seen those medical records but I did not review

19 them for that purpose.  This is a team exercise, as Mr.

20 Heberling pointed out, and the person who did the assessment

21 based upon the criteria that we discussed was Dr. Whitehouse.

22 Q    There's a long --

23 A    And you can ask him about each of those 20, I'm sure.

24 Q    Well, I may or may not have the opportunity.  I'm not sure

25 that he knows the 20 that you testified to.  But, be that as it

1  may, you, yourself, have not examined the medical files, right?

2  A    For that purpose, no.

3  Q    Isn't it true that you, yourself, haven't done any

4  analysis of the cause of death for anybody at the CARD clinic?

5  A    Correct.

6  Q    Isn't it true that the sole source of your opinion as to

7  these 20 people, these 20 people, that they died from their

8  pleural disease is your visiting with Dr. Whitehouse?

9  A    Yes, and what information might be on the death

10  certificate.

11  Q    And isn't it true that, when it comes to Dr. Whitehouse's

12  opinion, when it comes to his opinion that these 20 people died

13  from their pleural disease, that there is not even a written

14  record that exists today as to how he drew his conclusion?

15  A    I don't know if there is or there is not.  I'm sure

16  there's a record of his judgment but what the written record

17  that it was based upon was the medical records as they existed

18  in his own experience.

19  Q    You don't know that.  Do you know that a documentary

20  record actually even exists which --

21          MR. HEBERLING:  Objection.  Argumentative.

22  Q    Do you know that a documentary record even exists?

23          THE COURT:  Restate --

24          MR. BERNICK:  Okay.  I'm sorry.

25          THE COURT:  You're going too fast.  I can't rule on

Frank - Cross/Bernick                              285

1  objections.  The objection is sustained.  He was restating the

2  question.  Go ahead and restate the question.

3  Q    Isn't it true there is no written record today that will

4  even help us understand how it is that Dr. Whitehouse reached

5  his opinion with respect to those 20 people?

6  A    I don't know one way or the other.  You'll have to ask

7  him.  And there is a written record in that they have medical

8  records at the CARD clinic.

9                              (Pause)

10 Q    I want to finish up with a couple more questions; I'm

11 done.  Going back to our fundamental question about capturing

12 cases where pleural disease has led to serious impairment, I

13 want you to assume for my question that the purpose of the TDP

14 is not to capture all of those cases but to capture clear

15 cases; not even necessarily all clear cases but to capture

16 clear cases of people who have pleural disease that has

17 resulted in serious impairment?  The goal is to capture clear

18 cases; not all cases but clear cases?

19 A    Some clear cases.

20 Q    Some clear cases.  Would you agree with that?  I haven't

21 heard you testify that people who qualify under the medical

22 criteria of the TDP will include people who really don't have

23 pleural disease that's resulted in serious impairment?  I

24 haven't heard you say that.

25 A    I haven't been asked about that.

1          MR. HEBERLING:  Objection.  It's irrelevant because

2    there's nothing in the TDP that says anything about capturing

3    clear cases.

4          THE COURT:  That's true but TDPs don't usually say

5    that they're out there to capture clear cases, so I'm not sure

6    what the objection is.  It's a functional question that's being

7    asked.

8          MR. BERNICK:  That's right.

9          MR. HEBERLING:  Well, the question goes to clear

10   cases and it's unclear that that has anything to do with the

11   TDP.

12         MR. FINCH:  Your Honor, to respond to that, Mr.

13   Inselbuch testified on direct examination, which was

14   essentially unchallenged, that the purpose of the expedited

15   review criteria in the TDP are to identify the clear-cut cases

16   of the disease.

17         THE COURT:  Dr. Welch testified to the same thing so

18   the objection is overruled.

19         MR. HEBERLING:  Okay.  We think the TDP as a document

20   speaks for itself.

21         THE COURT:  Well, okay.  The document does speak for

22   itself.

23   Q    Could -- have you talked with Dr. Whitehouse as to his

24   views?  I mean, you collaborated with Dr. Whitehouse on his --

25   on the expert report, correct?

**J&J COURT TRANSCRIBERS, INC.**

1  A    (No verbal response).

2  Q    You collaborated with Dr. Whitehouse on the expert --

3  A    I've collaborated with Dr. Whitehouse and have had

4  discussions with him and some of our discussions have probably

5  ended up in the expert report.

6  Q    Okay.  Have you talked with him to what, or whether or not

7  the TDP Section 4B will, in fact, pick up clear cases of people

8  with pleural disease who have serious impairment?  Have you

9  talked with him on that?

10 A    No, I have not.

11 Q    If I were to tell you that his testimony is that, yes,

12 based upon the science, the TDP will pick up clear cases of

13 pleural disease resulting in serious impairment?  Would you

14 agree with that?

15 A    I would agree that they are restrictive enough that the

16 cases are unlikely to be anything but clear and it's a question

17 of where you set the bar.

18 Q    That's fine.  Thank you, Dr. Frank.

19             MR. BERNICK:  I am done.

20             THE WITNESS:  You're welcome.

21             THE COURT:  Redirect, Mr. Heberling?

22             MR. HEBERLING:  First, may I have an indication of

23 when the Court needs to leave?  The Court's available till

24 five, is it?

25             THE COURT:  Yes.

1           MR. HEBERLING:  Okay.

2           THE COURT:  Well, I think we'll try to finish this

3   witness.

4           MR. HEBERLING:  Well, I certainly won't go past five.

5           THE COURT:  Go ahead.

6                    REDIRECT EXAMINATION

7   BY MR. HEBERLING:

8   Q    First of all, on the 20 cases of pleural deaths, did you

9   do your own evaluation of each and every chest x-ray?

10  A    I did.

11  Q    And did you also examine the pulmonary function test

12  records that you had in a volume?

13  A    Yes.

14  Q    So, to that extent, did you review medical records on

15  those people?

16  A    Yes, to that extent.

17  Q    And, to your knowledge, has anyone undertaken to study the

18  effect of each of the medical criteria in the TDP upon people

19  with pleural disease outside Libby?

20  A    I've never seen anything in the literature to that effect

21  nor have I seen any medical justification of similar plans in

22  other settings.  They are out there but there's no written

23  documentation in the peer-reviewed scientific literature that

24  justifies them, to my knowledge.

25  Q    When you say they're out there, are you referring to plans

                    **J&J COURT TRANSCRIBERS, INC.**

1 or studies on how --

2 A    Plans, not studies.  I've not seen any studies.  I've seen

3 it -- I know that there are other plans and there has never

4 been, to my knowledge and my reading, scientific underpinnings

5 in the peer-reviewed literature as to the justification for

6 those plans.

7 Q    The Category 4B is called Severe and Disabling Pleural

8 Disease, correct?

9 A    Yes.

10 Q    What is the best method medically to determine who is

11 severe?

12        MR. BERNICK:  Your Honor, this goes over direct

13 examination.

14        THE COURT:  It is going over direct examination.  You

15 can ask it if it's foundational but let's go.

16 A    It depends what you mean by severe.  It's where you define

17 severe.

18 Q    Okay.  And how -- when you have a patient and you want to

19 describe the patient as severe, what data do you look to first?

20 A    As much data as you have.  You interview the patient, you

21 ask them about their functional status.  You look at their

22 chest x-ray.  You look at their pulmonary function test.  You

23 look at their CT results and you look at their DLCO, whatever

24 you have and then you reach a medical conclusion about the

25 severity of their disease.

1  Q    Is there any correlation with regard to pleural disease

2  between radiographic severity and functional severity?

3  A    No.

4  Q    Is the ILO used clinically by doctors in treating real

5  patients on any significant scale?

6  A    No.

7  Q    Why is that?

8  A    Because it was not designed for clinical care of patients.

9  It was designed to describe x-rays and it is well understood

10 that the radiologic appearance doesn't go along with clinical

11 findings that you only get by examining a patient.

12 Q    And, on cross examination, you stated that DLCO decreases

13 may be caused by many things?

14 A    Yes.

15          MR. BERNICK:  I didn't ask a single question about

16 that.

17          MR. HEBERLING:  But there was another examiner.

18          MR. BERNICK:  Oh, I'm sorry.  I apologize.

19          THE COURT:  Overruled.  Go ahead.

20          MR. BERNICK:  What did she say?

21          UNIDENTIFIED SPEAKER:  You've got to listen to him

22 too.

23 Q    As to the other PDP medical criteria on lung functions,

24 let's take TLC, total lung capacity.

25 A    Yes.

1  Q    Are there other things that cause total lung capacity to

2  be reduced?

3  A    Of course.

4  Q    Other than asbestos?

5  A    Of course.

6  Q    And as to forced vital capacity, are there other things

7  that cause forced vital capacity to be reduced other than

8  asbestos disease?

9  A    Certainly.

10 Q    Does it make any sense to toss out DLCO when you're

11 retaining forced vital capacity and total capacity as measures

12 of severity?

13          MR. BERNICK:  Objection to the form of the question.

14          THE COURT:  Sustained.

15 Q    Medically, is it reasonable to exclude DLCO from

16 consideration on the basis that it may be related to other

17 diseases --

18 A    No.

19 Q    -- but not TLC or FVC?

20 A    No.

21 Q    How about smoking?  Does DLCO drop with smoking disease?

22 A    Yes.

23 Q    Does forced vital capacity drop with smoking disease?

24 A    Not very commonly but it can.

25 Q    Okay.  And does it make sense medically to exclude DLCO on

1 a basis that it may drop with smoking disease while not doing

2 the same with forced vital capacity?

3 A    No.

4            MR. HEBERLING:  That's all I have.

5            THE COURT:  Mr. Finch?

6            MR. FINCH:  No recross, Your Honor.

7            THE COURT:  Mr. Bernick?

8            MR. BERNICK:  Nothing further.

9            THE COURT:  You're excused, Doctor.

10           THE WITNESS:  Thank you, Your Honor.

11           THE COURT:  Thank you.  All right.  I suppose at this

12 point, is there any benefit to trying another witness today,

13 starting someone today?

14           MR. BERNICK:  The next witness will be Dr. Whitehouse

15 but I think that, you know, we're at the Court's disposal.  We

16 appreciate the extra time but I also -- my understanding is

17 that Dr. Whitehouse is only going to be about an hour on direct

18 examination.

19           MR. HEBERLING:  Well, maybe an hour and a half.  I

20 don't like to pin myself down.

21           MR. BERNICK:  Well, then, maybe we ought to start

22 him.

23           THE COURT:  Why don't we get Dr. Whitehouse's

24 qualifications on record at least.  That will take 15 minutes

25 and then we'll see about adjourning at that point then.

1                              (Pause)

2          DR. ALLAN WHITEHOUSE, LIBBY CLAIMANT'S WITNESS, SWORN

3                        VOIR DIRE EXAMINATION

4    BY MR. HEBERLING:

5    Q     State your name, please, for the record.

6    A     Allan Whitehouse.

7    Q     And your address?

8    A     28810 North Milan Road, Chattaroy, Washington 99003.

9    Q     Are you a medical doctor?

10   A     I am.

11   Q     In what areas are you board certified?

12   A     Board certified in internal medicine and pulmonary

13   diseases.

14   Q     Since what date have you been so?

15   A     I'm sorry.  I didn't hear that.

16   Q     Since what date have you been board certified in those

17   areas?

18   A     Since 1971 and '72.

19   Q     Can you summarize your education?

20   A     Yes.  I have a bachelors degree from Cornell University.

21   I went to medical school at the University of Cincinnati and

22   graduated in 1963.  I had my training in internal medicine

23   partly at Duke Hospital and then completed my pulmonary

24   training at University of Colorado at Denver.  I had several

25   years in the U.S. Air Force.  In the interim, I've been in

1 practice in Spokane starting in 1969.

2 Q    And how long did you continue your practice in Spokane,

3 Washington as a pulmonologist?

4 A    Well, I practiced office-based and hospital pulmonology

5 until 2004 and at that point my partner and I closed our office

6 and I had worked until just basically about a week ago in Libby

7 on a regular basis as much as eight days a month and then I'm

8 still available for consultation but I'm otherwise going to

9 retire at this point.

10 Q    So, are you virtually retired?  Is that fair to say?

11 A    I guess it's a virtual retirement of a sense, like

12 something on the computer, but that sounds good enough.

13 Q    When did you start working at the Center for Asbestos

14 Related Disease in Libby?

15 A    Well, I've been on and off going up to Libby since

16 probably about 1998 or '99 on a fairly regular basis since 1999

17 when the original description of the problems in Libby surfaced

18 and then, from '04 until just the end of '08, I was up there

19 twice a month for four-day stretches.  I was living up there

20 for a while.

21 Q    What kind of patient load did you carry in your

22 pulmonology practice in Spokane?

23 A    Well, it was quite variable.  I did intensive care

24 practice in large part for maybe the first ten or 15 years, a

25 large number hospital-based and intensive care as well as an

1  office practice and then gradually, from mostly 1998 on, gave

2  up the hospital intensive care practice and did mostly office

3  pulmonary disease.   My practice has always been virtually all

4  pulmonary disease.

5  Q    Then, in the 1990's, what kind of patient load did you

6  have in your office practice?

7  A    Well, I tried to keep it to about less than 22.  It's very

8  difficult to do quality pulmonary disease unless you take a

9  fair amount of time with people.  And so generally it was a

10 patient load of 18 to 20 a day.

11 Q    And how may total patient charts were you following?

12 A    I think my partner and I ended up -- we've been partners

13 since 1974 -- added it up and we had something close to 5,000

14 charts that were active when we quit work in the office.

15 Q    And you mentioned work in the intensive care units.

16 During what decades did you do that?

17 A    Oh, I did it all the time, all the way up until 2004.

18 It's just that I've been cutting down on it.  We continued to

19 do the intensive care work on our own patients but we weren't

20 doing outside consulting work in the ICU at that point.  So,

21 you know, I was the only pulmonologist for the first five years

22 in practice and I had as many as ten or 15 people in the

23 hospital ICU on ventilators for a long period of time.

24 Q    And in the 1970s and '80s, how many times a week did you

25 rush to the hospital in the middle of the night to treat a

1 patient in crisis?

2 A    It's a little hard to answer.  We had varying call

3 schedules so it would -- you know, sometimes I'd be on every

4 other night, sometimes as little as every fifth night.  Up

5 practically every night.

6 Q    What do you mean by up practically every night?

7 A    I would usually be back in the hospital at least in the

8 early to mid-evening.  You know, like eight or ten at night and

9 may times up in the middle of the night having to go in and

10 deal with a problem.

11 Q    And then, when you were at the hospital in the middle of

12 the night, did you maintain a full schedule the next day as

13 well?

14 A    Yes.

15          MR. BERNICK:  Objection.  Relevance.

16          THE COURT:  What's the relevance?

17          MR. HEBERLING:  The intensity of the practice, Your

18 Honor.  The description of his practice.

19          THE COURT:  All right.  Overruled.

20 A    Would you repeat what you wanted me to ask?  I didn't hear

21 what the Judge said.

22          THE COURT:  Oh, you can answer, sir.  I'm sorry.

23          THE WITNESS:  Your Honor, I was the one that made the

24 noise when you -- I had a hearing aid break this morning.

25          THE COURT:  We have an infrared system, sir.  Would

1  that help?  I'm not sure.

2        THE WITNESS:  No, I can hear as long as everybody

3  talks up a little bit.

4        THE COURT:  All right.  Thank you.

5        THE WITNESS:  I'll be okay.

6        THE COURT:  I was just saying that you could answer

7  the question.

8        THE WITNESS:  Okay.

9  Q    Okay.  So, the question was, after having been at the

10 hospital for an hour or two in the middle of the night, did you

11 maintain a full schedule the next day?

12 A    Yes.

13 Q    And then over what period of time did you keep this kind

14 of schedule?

15 A    Oh, I think I probably kept that schedule up until about

16 1990 or '95.  I don't know for sure.  I just sort of, you know,

17 gradually modified it as I got older and my partner, who is a

18 little bit younger than I am but not much, pretty much did the

19 same.

20 Q    And what is your experience in running pulmonary labs?

21 A    Well, I -- when I was in the Air Force, I had to set up

22 and run a rather complete pulmonary laboratory.  I was assigned

23 to the chimp lab basically at Halloman Air Force Base in New

24 Mexico and had to set up a pulmonary lab which included lung

25 volumes and diffusion and for actually human research that was

**J&J COURT TRANSCRIBERS, INC.**

1  done on deceleration and things related to high-G forces.

2  Q    And for what period of time were you responsible for

3  pulmonary labs?

4  A    Well, after than, when I went into practice, I was medical

5  director of respiratory therapy at Sacred Heart Hospital and

6  ran the pulmonary lab and, in fact, at one time, I ran the

7  pulmonary labs at all five hospitals because I was the only

8  pulmonologist in town.  And so I would visit all and try to set

9  the standards and things like that.

10 Q    And have you been responsible for running pulmonary labs

11 all the way through your practice, up to 2008?

12 A    Oh, yes, I have, including Libby.

13 Q    And are you familiar with computerized pulmonary function

14 test equipment?

15 A    Yes.

16 Q    How long have you used that?

17 A    I knew you were going to ask me that question.  I was

18 trying to remember when we got our first set of equipment.  It

19 was some time in, I think, probably about 1986 or '87.  We've

20 had computerized equipment since that time and probably three

21 or four different sets.

22 Q    How long have you been seeing patients with asbestos

23 disease from Libby exposures?

24 A    Well, the first patients that I saw from Libby that I

25 could really recall and have charts on was in the very early

1  '80s and I started seeing the affects of their asbestos

2  exposure some time shortly thereafter.

3  Q    And can you estimate what total number of patients you

4  have evaluated for asbestos disease due to Libby exposures?

5  A    Due to Libby exposure?

6  Q    Yeah.

7  A    Well, probably -- I actually do not know the exact number.

8  I know that I had in my office charts, probably about 600

9  patients, and then I'd seen almost all the patients at the

10 clinic in Libby at one time or another, if only for one visit.

11 And that was the people that had asbestos disease and a fair

12 number of people that did not, that were people that we were

13 following in the clinic on a regular basis that had significant

14 exposures and the total number, I don't really know.  It's

15 probably somewhere between 1,500, 1,800, somewhere in there.

16 Q    And in doing evaluations on patients with suspected

17 asbestos disease, did you come to other conclusions at times?

18 A    Most of those were people that were in the screening

19 program that the ATSDR had in 2000, 2001.  And some of them had

20 very minimal disease or some that I really could not identify

21 any disease on, and we had people that were just worried and

22 came into the clinic and we'd look them over and we continued

23 to follow those people but on about a three-year basis.

24 Q    And as to people with asbestos exposures from other than

25 Libby, have you seen patients like that over the years?

1 A    Yes, in my private practice but not actually in Libby

2 anymore.   But, in my private practice in Spokane, we had a fair

3 number of asbestos cases, both my partner and I did.   They came

4 from, many of them, from the shipyards in Western Washington.

5 There was a beet factory in Moses Lake that -- which is a town

6 out in the basin that had a lot asbestos cases.   There was a

7 paper mill in Walula, and one in Lewiston.   I did some

8 contractual work for the State in Eastern Washington Hospital

9 checking people that worked there because there was an

10 extensive asbestos exposure there; a similar thing for Pacific

11 Gas Transmission and for Washington Water Power at one time,

12 screening their employees, and actually not finding much from

13 most of them.   I don't know the exact number, probably over 500

14 cases all together.

15 Q    Were those cases -- is that 500 positive for asbestos

16 disease?

17 A    Yeah, ones that I identified as asbestos-related changes

18 and made a diagnosis on.

19 Q    And you mentioned screenings.   What did you do in

20 connection with designing and conducting screenings for

21 companies for asbestos disease?

22 A    Basically, I had a history questionnaire and we did

23 pulmonary functions on them and reviewed a chest x-ray and sent

24 a report back to the company.   They were looking for asbestos

25 changes and employees who had been exposed, as well as some of

1  their asbestos workers that were doing abatement.

2  Q    Have you published papers on asbestos disease?

3  A    There's two of them.  One is a paper, 2004, on progression

4  of lung function loss and then a paper detailing or bringing up

5  to date the number of mesothelioma cases in Libby that was

6  published last November.

7  Q    Is the first paper you mentioned entitled, "Asbestos

8  Related Pleural Disease Due to Tremolite Associated with

9  Progressive Loss of Lung Function, Serial Observations in 124

10  Miners, Family Members, and Residents of Libby, Montana,"

11  American Journal of Industrial Medicine?

12  A    Yes, it is.  I would take note that the paper was

13  submitted, I guess probably about the end of 2001, really

14  before we appreciated and got all the information concerning

15  winchite richterites.  But it was sort of too late to change

16  the title at that point in time when it went in.

17  Q    And was the second paper entitled, "Environmental Exposure

18  to Libby Asbestos and Mesotheliomas"?

19  A    Yes.

20            MR. HEBERLING:  We tender the witness on -- shall I

21  make my tender tomorrow?

22            THE COURT:  No.  We'll see if we can do the cross.

23  I'm not sure how much there will be if there is any voir dire

24  so, no, do it now, please.

25            MR. HEBERLING:  Okay.  I'll tender the witness as an

1  expert in pulmonary disease, including asbestos disease.

2            THE COURT:  Any objection?

3            MR. BERNICK:  No objection.

4            MR. FINCH:  No, Your Honor.

5            THE COURT:  All right.  He's qualified to offer

6  expert opinion testimony in the areas of pulmonary disease,

7  including asbestos disease.  Is this a good place to stop for

8  the night?

9            MR. HEBERLING:  Yes, Your Honor.

10           THE COURT:  Mr. Demmy?

11           MR. FINCH:  Your Honor.  Excuse me, sir.  Before --

12  we still have our Daubert motion with respect to this witness

13  with respect to any opinions he may offer that are in the

14  nature of opinions about asbestos-related epidemiology or

15  attempts to use the work that he has done to project or predict

16  outcomes in other people.  So I just want to maintain our

17  Daubert objections, Rule 702, 703.

18           THE COURT:  Yes.  Everybody's Daubert objections are

19  maintained until we get to an argument and I can make a ruling

20  on the Daubert objections.  I have been accepting witnesses'

21  testimony.  I am going to continue to do it because we -- while

22  you have your witnesses here, I prefer to use the time for that

23  purpose.  So, everyone's Daubert objections to any expert

24  report or any expert testimony that have been made and filed to

25  date are preserved.

**J&J COURT TRANSCRIBERS, INC.**

1           Mr. Demmy?

2           MR. DEMMY:  Thank you, Your Honor.  I hope this is

3  going to be very quick.  Tomorrow is supposed to be the start

4  of the day the phase of the trial regarding insurance issues

5  and it appears very doubtful that that is going be the case.

6           THE COURT:  Yes, it does.

7           MR. DEMMY:  And we were also promised status reports.

8  I was hoping, because I have co-counsel and witnesses

9  potentially that would be coming in, and I think other folks do

10 as well --

11          THE COURT:  Stop them.  Just stop them, Mr. Demmy.

12 There's no point.

13          MR. DEMMY:  Well, I was hoping for something official

14 from the plan proponents to that effect.

15          MR. BERNICK:  I'm happy to tell the Court what our

16 schedule is, I think, tomorrow, which is that now that we've

17 got the qualifications down, I'm cautiously optimistic, history

18 to the contrary notwithstanding, that we'll be done with Dr.

19 Whitehouse, say, in a couple of hours tomorrow morning.  And

20 then it goes back to the plan proponents for their rebuttal.

21 We have very short rebuttal from two expert witnesses.  It's

22 just become shorter as we've gone through the evidence.  And

23 then we'll be done with Libby-specific issues and we'll be able

24 to start the insurance part of the case.  Our witnesses then

25 will be Mr. Fink, Mr. Posner, maybe Mr. Hughes.  And I suspect

**J&J COURT TRANSCRIBERS, INC.**

1 that that will take up the balance of the day, although it's

2 conceivable that it won't.  And the people who then would

3 follow Mr. Inselbuch -- I don't think he's around though.

4          UNIDENTIFIED SPEAKER:  He's available Monday.

5          MR. BERNICK:  Yeah.  He's available Monday.  We may

6 get to Mr. Shelnitz who's got testimony.  So I think that, with

7 respect to Fireman's Fund, I don't think we have any issue

8 about putting over Fireman's Fund until next week.  But we

9 definitely intend to get significantly into the insurance phase

10 tomorrow.

11          THE COURT:  That's fine.  It's just that in terms of

12 having more witnesses come, there's no point in having

13 additional witnesses come from the insurers tomorrow.  So, all

14 insurers, cancel your witnesses but be aware of the fact that

15 if you have someone that you want to be in the courtroom during

16 any portion of the insurance testimony phase, they will need to

17 be here tomorrow.

18          MR. LOCKWOOD:  Your Honor, Peter Lockwood.

19          THE COURT:  Just a minute, Mr. Lockwood, until I hear

20 from Mr. Demmy.

21          MR. DEMMY:  Just one question to clarify.  Is it

22 contemplated that Mr. Fink would be the first witness and that

23 you would go in order from there, based on the order of proof?

24          UNIDENTIFIED SPEAKER:  Fink, Posner --

25          MR. DEMMY:  I apologize if I didn't hear it

1 correctly.

2          THE COURT:  Fink, Posner, Hughes, possibly Shelnitz.

3 Yes, Mr. Lockwood.

4          MR. DEMMY:  Thank you, Your Honor.

5          MR. LOCKWOOD:  Just for the benefit of the insurers

6 and others, as a matter of scheduling, Mr. Inselbuch will be

7 present on Monday to testify and you'll recall, Your Honor,

8 that there had been discussions about people who had named

9 witnesses as their case-in-chief, insurers, other objectors,

10 and being able to examine the witness.  We anticipate, just so

11 that everybody's, you know, can make plans, that Mr.

12 Inselbuch's direct examination will be relatively brief and we

13 also anticipate that he will be tendered for both cross and

14 direct examination of objector case-in-chief at that time.  For

15 a variety of reasons having to do both with the nature of his

16 anticipated testimony and scheduling issues with respect to

17 him, we do not intend to call Mr. Inselbuch back on day seven

18 to testify about sort of generally described 524(g) issues as

19 was set out in the order of proof.  And so basically what we

20 are saying is that we would expect and anticipate that

21 everybody that had questions for Mr. Inselbuch other than the

22 Libby claimants who conducted their examination on day one,

23 should be prepared to go forward and have at him.

24          THE COURT:  Anybody have a problem with having at Mr.

25 Inselbuch next Monday?

1                          (Laughter)

2              THE COURT:  All right.  No one's raising any

3    objection so that's fine.  We'll proceed in that fashion with

4    respect to Mr. Inselbuch.  Any other housekeeping matters?  Dr.

5    Whitehouse, you're excused until tomorrow morning, sir, at nine

6    o'clock.  Please don't discuss your testimony with anyone this

7    evening.

8              DR. WHITEHOUSE:  Okay.

9              THE COURT:  All right.  We're adjourned until nine

10   o'clock.

11             MR. BERNICK:  Thank you, Your Honor, for --

12             MR. WISLER:  Your Honor, you have motions on for

13   eight-thirty.

14             THE COURT:  Motions?  I have motions at eight-thirty?

15   I'm sorry?

16             MR. WISLER:  Your Honor, you entered orders

17   scheduling two motions for a hearing tomorrow at eight-thirty

18   so I just wanted to make sure we're going forward with that.

19             THE COURT:  Yes.  I'm sorry.  Yes, Mr. Wisler.  We'll

20   start motions at eight-thirty.  I was trying to adjourn the

21   trial until nine o'clock.  Thank you for the clarification.

22             MR. WISLER:  Understood, Your Honor.

23             THE COURT:  All right.

24                      *    *    *    *    *

25

1          **C E R T I F I C A T I O N**

2              We, PATRICIA REPKO, MARY POLITO, KELLI PHILBURN,

3   CARLA OAKLEY, ANNETTE PAPP and CECILIA ASHBOCK, court approved

4   transcribers, certify that the foregoing is a correct

5   transcript from the official electronic sound recording of the

6   proceedings in the above-entitled matter, and to the best of

7   our ability.

8

9   /s/ Patricia Repko             /s/ Mary Polito

10  PATRICIA REPKO                 MARY POLITO

11

12

13  /s/ Kelli Philburn             /s/ Carla Oakley

14  KELLI PHILBURN                 CARLA OAKLEY

15

16

17  /s/ Annette Papp               /s/ Cecilia Ashbock

18  ANNETTE PAPP                   CECILIA ASHBOCK

19  J&J COURT TRANSCRIBERS, INC.

20                                 DATE:  September 14, 2009

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**