UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                    .    Case No.  01-1139 (JKF)
                          .
W.R. GRACE & CO.,         .
et al.,                   .    USX Tower - 54th Floor
                          .    600 Grant Street
                          .    Pittsburgh, PA 15219
            Debtors.  .
                          .    September 8, 2009
. . . . . . . . . . . . ..    9:05 a.m.


TRANSCRIPT OF PLAN CONFIRMATION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:         Kirkland & Ellis, LLP
                         By:  DAVID BERNICK, ESQ.
                              BARBARA HARDING, ESQ.
                              JANET BAER, ESQ.
                              LISA ESAYIAN, ESQ.
                         200 East Randolph Drive
                         Chicago, IL  60601


For the Debtors:         Kirkland & Ellis, LLP
                         By:  THEODORE FREEDMAN, ESQ.
                         Citigroup Center, 153 East 53rd St.
                         New York, NY  10022




Audio Operator:          Janet Heller

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Asbestos
Creditors Committee:        Caplin & Drysdale, Chartered
                            By:  PETER LOCKWOOD, ESQ.
                                 NATHAN FINCH, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005

For the Future             Orrick, Herrington & Sutcliffe, LLP
Claimants                  By:  ROGER FRANKEL, ESQ.
Representatives:                JONATHAN GUY, ESQ.
                           Washington Harbour
                           3050 K Street, N.W.
                           Washington, D.C.  20007

For the Equity             Kramer Levin Naftalis & Frankel
Committee:                 By:  DAVID E. BLABEY, JR., ESQ.
                           919 Third Avenue
                           New York, NY  10022

For the Libby Claimants:   Lewis, Slovak & Kovacich, P.C.
                           By:  TOM L. LEWIS, ESQ.
                                MARK KOVACICH, ESQ.
                           725 Third Avenue North
                           Great Falls, MT 59401

                           McGarvey, Heberling, Sullivan and
                            McGarvey, P.C.
                           By:  JON HEBERLING, ESQ.
                                JOHN LACEY, ESQ.
                           725 Third Avenue North
                           Great Falls, MT  59401

                           Cohn Whitesell & Goldberg, LLP
                           By:  DANIEL C. COHN, ESQ.
                           101 Arch Street
                           Boston, MA  02110

For the                    Stroock & Stroock & Lavan
Unsecured Creditors'       By:  KENNETH PASQUALE, ESQ.
Committee:                      ARLENE KRIEGER, ESQ.
                           180 Maiden Lane
                           New York, NY  10038-4982

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D)

| | |
|---|---|
| For the Property Damage Committee: | Bilzin Sumberg Baena Price & Axelrod LLP<br>By:  MATTHEW KRAMER, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For the Ad Hoc Committee of Equity Sec. Holders: | Dewey & LeBoeuf, LLP<br>By:  JENNIFER WHITENER, ESQ.<br>125 West 55th Street<br>New York, NY  10019 |
| For Committee of Asbestos Personal Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701 |
| For Maryland Casualty: | Eckert Seamans Cherin & Mellott, LLC<br>By:  EDWARD LONGOSZ, II, ESQ.<br>1747 Pennsylvania Avenue, N.W.<br>Suite 1200<br>Washington, D.C.  20006 |
| For Sealed Air: | Skadden, Arps, Slate, Meagher & Flom, LLP<br>By: DAVID TURETSKY, ESQ.<br>One Rodney Square<br>Wilmington, DE  19801 |
| For Garlock Sealing Technologies: | Robinson, Bradshaw & Hinson, P.A.<br>By:  GARLAND CASSADA, ESQ.<br>RICHARD WORF, ESQ.<br>101 North Tryon Street<br>Suite 1900<br>Charlotte, NC  28246 |
| For AXA Belgium: | Tucker Arensberg, P.C.<br>By:  MICHAEL A. SHINER, ESQ.<br>1500 One PPG Place<br>Pittsburgh, PA  15222 |
| For State of Montana: | Womble, Carlyle, Sandridge & Rice<br>By:  KEVIN MANGAN, ESQ.<br>222 Delaware Avenue<br>Suite 1501<br>Wilmington, DE  19801 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D)

| | |
|---|---|
| For Serengeti: | Vinson & Elkins, LLP<br>By:  ARI BERMAN, ESQ.<br>Trammell Crow Center<br>2001 Ross Avenue, Suite 3700<br>Dallas, TX  75201 |
| For the Debtors: | Pachulski, Stang, Ziehl &Jones<br>By:  JAMES O'NEILL, ESQ.<br>919 North Market Street<br>17th Floor<br>Wilmington, DE  19899-8705 |
| For Federal Insurance<br>Company: | Cozen O'Connor<br>By:  JACOB C. COHN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Various Claimant<br>Firms: | Stutzman, Bromberg, Esserman & Plifka<br>By:  DAVID J. PARSONS, ESQ.<br>2323 Bryan Street<br>Suite 2200<br>Dallas, TX  75201 |
| For Edwards' Judgment<br>Claimants: | Reaud, Morgan & Quinn<br>By:  DAVID J. PARSONS, ESQ.<br>801 Laurel<br>Beaumont, TX  77701 |
| For BNSF Railway: | Pepper Hamilton, LLP<br>By:  LINDA CASEY, ESQ.<br>3000 Two Logan Square<br>Philadelphia, PA  19103 |
| For Scott Company: | Vorys, Sater, Seymour & Pease, LLP<br>By:  TIFFANY COBB, ESQ.<br>52 East Gay Street<br>Columbus, OH  43216 |
| For Fresenius: | McDermott Will & Emery<br>By:  NATHAN F. COCO, ESQ.<br>227 West Monroe Street<br>Chicago, IL  60606 |
| For Travelers: | Simpson Thacher<br>By:  MARY BETH FORSHAW, ESQ.<br>    ELISA ALCABES, ESQ.<br>425 Lexington Avenue<br>New York, NY  10017 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D)

For GEICO, Seaton          Drinker Biddle & Reath LLP
Ins. Co., Republic         By:  MICHAEL F. BROWN, ESQ.
Ins. Co.:                       JEFFREY M. BOERGER, ESQ.
                           One Logan Square
                           18th and Cherry Streets
                           Philadelphia, PA  19103

For Allstate Insurance:    Cuyler Burke, LLP
                           By:  ANDREW CRAIG, ESQ.
                           Parsippany Corporate Center
                           Four Century Drive
                           Parsippany, NJ  07054

For Ford, Marrin,          Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer           Gleser, LLP
& Gleser, LLP:             By:  ELIZABETH M. DeCRISTOFARO, ESQ.
                           Wall Street Plaza, 23rd Floor
                           New York, NY  10005-1875

                           By:  MIKE GIANOTO, ESQ.

For Royal Indemnity        O'Melveny & Myers, LLP
& Arrowood:                By:  TANCRED SCHIAVONI, ESQ.
                           Times Square Tower
                           Seven Times Square
                           New  York, NY  10036

For CNA:                   Goodwin Procter, LLP
                           By:  DANIEL GLOSBAND, ESQ.
                           Exchange Place
                           Boston, MA  02109-2881

For Fireman's Fund:        Stevens & Lee, P.C.
                           By:  JOHN DEMMY, ESQ.
                           1105 North Market Street, 7th Fl.
                           Wilmington, DE  19801

For Maryland Casualty:     Connelly Bove Lodge & Hutz, LLP
                           By:  JEFFREY WISLER, ESQ.
                           The Nemours Building
                           1007 North Orange Street
                           Wilmington, DE  19899

APPEARANCES (CONT'D)

For MCC & Zurich:          Eckert Seamans
                           By:  EDWARD D. LONGOSZ, ESQ.
                           1747 Pennsylvania Avenue, NW
                           Suite 1200
                           Washington, DC 20006

                           By:  RICHARD F. DOLLSON, ESQ.

TELEPHONIC APPEARANCES:

For the Unsecured          Strook & Strook & Lavan
Creditors' Committee:      By:  LEWIS KRUGER, ESQ.
                           180 Maiden Lane
                           New York, NY 10038

For Ad Hoc Committee:      Weil, Gotshal & Manges
                           By:  M. JARRAD WRIGHT, ESQ.
                           1300 Eye Street NW, Suite 900
                           Washington, D.C.  20005

For Official Committee     Kramer Levin Naftalis & Frankel
of Equity Holders:          LLP
                           By:  PHILLIP BENTLEY, ESQ.
                           919 Third Avenue
                           New York, NY  10022

For Official Committee     Dies & Hile, LLP
of Asbestos Property       By:  MARTIN DIES, ESQ.
Damage Claimants:          1601 Rio Grande, Suite 330
                           Austin, TX  78701

                           LECG
                           By:  ELIZABETH DEVINE, ESQ.
                           1725 Eye Street NW, Ste 800
                           Washington, DC,  20006

For the Property           Bilzin Sumberg Baena Price &
Damage Committee:           Axelrod LLP
                           By:  SCOTT BAENA, ESQ.
                                JAY SAKALO, ESQ.
                           200 South Biscayne Boulevard
                           Suite 2500
                           Miami, FL  33131

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D)

```
For Hartford Financial      Wilmer Cutler Pickering Hale & Dorr,
Service Group, Inc.:          LLP
                            By:  MELANIE DRITZ, ESQ.
                            399 Park Avenue
                            New York, NY  10022


For the Bank Lenders:       Paul Weiss Rifkind Wharton &
                              Garrison, LLP
                            By:  ANDREW N. ROSENBERG, ESQ.
                                 MARGARET PHILLIPS, ESQ.
                                 REBECCA ZUBATY, ESQ.
                            1285 Avenue of the Americas
                            New York, NY  10019


For Fireman's Fund:         Stevens & Lee, P.C.
                            By:  MARNIE SIMON, ESQ.
                            1105 North Market Street, 7th Fl.
                            Wilmington, DE  19801

                            Crowell & Moring LLP
                            By:  TACIE YOON, ESQ.
                            1001 Pennsylvania Avenue, N.W.
                            Washington, DC  20004


For Asbestos Property       Scott Law Group
Damage Claimants:           By:  DARRELL SCOTT, ESQ.
                            1001 East Main Street, Suite 500
                            Sevierville, TN  37864


For National Union Fire     Zeichner Ellman & Krause, LLP
Insurance Co.:              By:  ROBERT GUTTMANN, ESQ.
                                 MICHAEL DAVIS, ESQ.
                            575 Lexington Avenue
                            New York, NY  10022


For PD FCR:                 Law Office of Alan B. Rich
                            By:  ALAN RICH, ESQ.
                            1201 Main Street, Suite 1910,
                            Dallas, TX  75202


For the Future             Orrick, Herrington & Sutcliffe,
Claimants                     LLP
Representatives:            By:  DEBRA FELDER, ESQ.
                                 JOSHUA CUTLER, ESQ.
                            Washington Harbour
                            3050 K Street, N.W.
                            Washington, D.C.  20007
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Federal Insurance Company: | Cozen O'Connor<br>By:  ILAN ROSENBERG, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Allstate Insurance: | Cuyler Burk, LLP<br>By:  STEFANO CALOGERO, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054 |
| For Official Committee of Asbestos Personal Injury Claimants: | Anderson Kill & Olick<br>By:  ROBERT M. HORKOVICH, ESQ.<br>1251 Avenue of the Americas<br>New York, NY  10020-1186 |
| For Grace Certain Cancer Claimants: | Montgomery, McCracken, Walker &<br>   Rhoads, LLP<br>By:  NATALIE D. RAMSEY, ESQ.<br>300 Delaware Avenue, Ste. 750<br>Wilmington, DE  19801 |
| For David T. Austern, the Future Claimants' Representative: | Phillips, Goldman & Spence, P.A.<br>By:  JOHN C. PHILLIPS, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For the Asbestos Creditors Committee: | Ferry Joseph & Pearce, P.A.<br>By:  THEODORE TACCONELLI, ESQ.<br>824 Market Street, Suite 19899<br>Wilmington, DE  19899 |
| For Ford, Marrin, Esposito, Witmeyer & Gleser: | Ford, Marrin, Esposito, Witmeyer &<br>   Gleser<br>By:  SHAYNE SPENCER, ESQ.<br>Wall Street Plaza<br>New York, NY  10005 |
| For Official Committee of Unsecured Creditors: | Duane Morris, LLP<br>By:  MICHAEL LASTOWSKI, ESQ.<br>1100 North Market Street, Suite 1200<br>Wilmington, DE  19801-1246 |

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

```
For Official Committee    Brandi Law Firm
of Asbestos Property      By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:              TERENCE D. EDWARDS, ESQ.
                          44 Montgomery St., Suite 1050
                          San Francisco, CA  94104

                          Lieff, Cabraser, Heimann & Bernstein
                          By:  ELIZABETH J. CABRASER, ESQ.
                          Embarcadero Center West
                          275 Battery Street, Suite 3000
                          San Francisco, CA  94111

                          Riker, Danzig, Scherer, Hyland &
                           Perretti, LLP
                          By:  TARA MONDELLI, ESQ.
                               CURTIS PLAZA, ESQ.
                          Headquarters Plaza
                          One Speedwell Avenue
                          Morristown, NJ  07962

For the Libby Claimants:  Cohn, Whitesell & Goldberg, LLP
                          By:  CHRISTOPHER M. CANDON, ESQ.
                          101 Arch Street
                          Boston, MA  02110

                          Landis, Rath & Cobb, LLP
                          By:  KERRI K. MUMFORD, ESQ.
                          919 Market Street, Suite 1800
                          Wilmington, DE  19899

For Longacre Masterfund:  Pepper Hamilton, LLP
                          By:  JAMES C. CARIGNAN, ESQ.
                          Hercules Plaza
                          Suite 5100
                          1313 Market Street
                          Wilmington, DE  19899

For Bloomberg, LLP:       Bloomberg, LLP
                          By:  STEVEN H. CHURCH

For the Bank Lenders:     Landis, Rath & Cobb, LLP
                          By:  RICHARD COBB, ESQ.
                          919 Market Street, Suite 1800
                          Wilmington, DE  19899
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Travelers Casualty       Morris, Nicholas, Arsht & Tunnell, LLP
Surety Company:              By:  ANN C. CORDO, ESQ.
                             1201 North Market Street, 18th Floor
                             Wilmington, DE  19899

For Everest                  Crowell & Moring LLP
Reinsurance Co.:             By:  LESLIE A. DAVIS, ESQ.
                                  MARK PLEVIN, ESQ.
                             1001 Pennsylvania Avenue, N.W.
                             Washington, DC  20004

For the PD Committee:        Speights & Runyan
                             By:  DANIEL SPEIGHTS, ESQ.
                                  MARION FAIREY, ESQ.
                                  ALAN RUNYAN, ESQ.
                             200 Jackson Avenue, East
                             Hampton, SC  29924

For Garlock Sealing          Morris James, LLP
Technologies:                By:  BRETT FALLON, ESQ.
                             500 Delaware Avenue
                             Suite 1500
                             Wilmington, DE  19801

For Hound Partners:          BRIAN M. GOOTZEIT

For Everest Reinsurance      Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:             By:  BRIAN L. KASPRZAK, ESQ.
                                  JOHN D. MATTEY, ESQ.
                             913 North Market Street
                             Suite 800
                             Wilmington, DE  19801

For Anderson Memorial        Kozyak, Tropin & Throckmorton, PA
Hospital:                    By:  JOHN W. KOZYAK, ESQ.
                                  DAVID L. ROSENDORF, ESQ.
                             2525 Ponce de Leon, 9th Floor
                             Miami, Florida 33134

For ZAI Claimants            Hogan Firm Attorneys at Law
& various law firms:         By:  DANIEL K. HOGAN, ESQ.
                             1311 Delaware Avenue
                             Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For the U.S. Trustee:        Office of the U.S. Trustee
                             By:  DAVID KLAUDER, ESQ.
                             844 King Street, Suite 2313
                             Wilmington, DE  19801

For Arrowwood                Bifferato Gentilotti LLC
Indemnity Co.:               By:  GARVAN McDANIEL, ESQ.
                             800 North King Street
                             Wilmington, DE  19801

For the PD Committee:        Speights & Runyan
                             By:  DANIEL SPEIGHTS, ESQ.
                                  ALAN RUNYAN, ESQ.
                             200 Jackson Avenue, East
                             Hampton, SC  29924

For AXA Belgium:             Mendes & Mount
                             By:  ANNA NEWSOM, ESQ.
                             750 Seventh Avenue
                             New York, NY  10019

For Royal Insurance:         Wilson Elser Moskowitz Edelman
                               & Dicker, LLP
                             By:  CARL PERNICONE, ESQ.
                                  150 East 42nd Street
                                  New York, NY  10017

For Official Committee       Richardson Patrick Westbrook &
of Asbestos Property           Brickman, P.C.
Claimants:                   By:  EDWARD J. WESTBROOK, ESQ.
                             174 East Bay Street
                             Charleston, SC  29401

For Dow Jones                Dow Jones News Wires
News Wires:                  By:  PEG BRICKLEY

For Murray Capital           Murray Capital Management, Inc.
Management                   By:  MARTI MURRAY

**J&J COURT TRANSCRIBERS, INC.**

**I N D E X**

| WITNESSES | PAGE |
|---|---|
| ELIHU INSELBUCH | |
| Direct Examination by Mr. Finch | 24 |
| Cross Examination by Mr. Lewis | 74 |
| Redirect Examination by Mr. Finch | 100 |
| | |
| LAURA STEWART WELCH | |
| Direct Examination by Mr. Finch | 106 |
| Cross Examination by Mr. Heberling | 157 |
| Redirect Examination by Mr. Finch | 197 |
| Recross Examination by Mr. Heberling | 204 |
| | |
| MARK ALAN PETERSON | |
| Direct Examination by Mr. Finch | 206 |

**EXHIBITS**

| | | I.D. | EVD. |
|---|---|---|---|
| PP-277 | Plan and exhibits | 37 | 37 |
| PP-276 | Disclosure statement | 37 | 37 |
| PP-147 | Document from the American Thoracic Society | | 125 |
| PP-115 | Document | | 141 |
| PP-174 | Document | | 206 |

1         THE COURT:  Please be seated.  This is the matter of

2  W.R. Grace, Bankruptcy Number 01-1139.  Today is the beginning

3  of the Phase II confirmation hearing.  I have a list of

4  participants by phone.  Scott Baena, Janet Baer, Ari Berman,

5  David Bernick, David Blabey, Thomas Brandi, Peg Brickley,

6  Elizabeth Cabraser, Stefano Calogero, Christopher Candon, James

7  Carignan, Steven Church, Richard Cobb, Tiffany Cobb, Jacob

8  Cohn, Ann Cordo, Andrew Craig, Joshua Cutler, Leslie Davis,

9  Michael Davis, Elizabeth DeCristofaro, Elizabeth Devine, Martin

10 Dies, Melanie Dritz, Terence Edwards, Lisa Esayian, Marion

11 Fairey, Brett Fallon, Debra Felder, Jordan Fisher, Theodore

12 Freedman, Brian Gootzelt -- I'm sorry, Gootzeit I think it is

13 -- James Green, Robert Guttmann, Daniel Hogan, Robert

14 Horkovich, Brian Kasprzak, David Klauder, John Kozyak, Matthew

15 Kramer, Michael Lastowski, John Mattey, Garvan McDaniel, Tara

16 Mondelli, Kerri Mumford, Marti Murray, Anna Newsom, James

17 O'Neill, David Parsons, Carl Pernicone, Margaret Phillips, John

18 Phillips, Curtis Plaza, Mark Plevin, Andrew Rosenberg, Ian

19 Rosenberg, David Rosendorf, Alan Runyan, Jay Sakalo, Darrell

20 Scott, Mark Shelnitz, Michael Shiner, Marnie Simon, Daniel

21 Speights, Shayne Spencer, Theodore Tacconelli, Edward

22 Westbrook, Tacie Yoon and Rebecca Zubaty.  I'll take entries in

23 court please.  Good morning.

24         MR. BERNICK:  Good morning, Your Honor.  David

25 Bernick for Grace.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. FINCH:  Good morning, Your Honor.  Nathan Finch

2 for the Official Committee for Asbestos Personal Injury

3 Claimants.

4           MR. LOCKWOOD:  Good morning, Your  Honor, Peter

5 Lockwood also for the Asbestos Committee.

6           THE COURT:  Mr. Lockwood, I don't think whatever

7 microphone you were using was on if you were using one.

8           MR. LOCKWOOD:  Peter Lockwood for the Asbestos

9 Claimants' Committee, Your Honor.

10          THE COURT:  Thank you.

11          MR. GUY:  Jonathan Guy for the Asbestos PI Future

12 Claimants' Representative, I'm here with Roger Frankel.

13          THE COURT:  Thank you.  Good morning.

14          MR. LEWIS:  Good morning, Your Honor.  Tom Lewis for

15 Libby claimants.

16          MR. KOVACICH:  Mark Kovacich for the Libby claimants.

17          MR. HEBERLING:  Jon Heberling for the Libby

18 claimants.

19          THE COURT:  Can't hear you sir.  I can't hear you.

20 I'm sorry, your microphone's not on.

21          MR. LACY:  John Lacy for the Libby claimants.

22          MR. COHN:  Good morning.  Dan Cohn for the Libby

23 claimants.

24          THE COURT:  Yours isn't on either, Mr. Cohn.  No,

25 press the button.  That's on now.

1          MR. COHN:  Okay.  Terrific, thank you.

2          THE COURT:  Thank you.

3          MR. HURFORD:  Good morning, Your Honor.  Mark

4  Hurford, Campbell Levine for the ACC.

5          MR. O'NEILL:  Good morning, Your Honor.  James

6  O'Neill for Grace.

7          MR. KRAMER:  Good morning, Your Honor.  Matt Kramer

8  for the Property Damage Committee.

9          MR. MANGAN:  Good morning, Your Honor.  Kevin Mangan

10  for the State of Montana.

11          MR. CASSADA:  Good morning, Your Honor.  I'm Garland

12  Cassada.  I'm here with my partner, Rich Worf.  We're here for

13  Garlock Sealing Technologies.

14          THE COURT:  I'm sorry, sir, would you spell your last

15  name please?

16          MR. CASSADA:  Yes, it's C-a-s-s-a-d-a.

17          THE COURT:  And who are you with, sir?

18          MR. CASSADA:  I'm with the law firm Robinson,

19  Bradshaw and Hinson, I represent Garlock --

20          THE COURT:  Yes, who was your co-counsel?  I'm sorry.

21          MR. CASSADA:  My co-counsel, Richard Worf.

22          THE COURT:  Thank you.

23          MR. CASSADA:  And also our local counsel, Brett

24  Fallon, is on the telephone.

25          THE COURT:  All right.  Thank you.

1          MR. CASSADA:  Thank you.

2          MR. RICH:  Good morning, Your Honor.  Alan Rich for

3   the Property Damage FCR.

4          THE COURT:  Good morning.

5          MR. COHN:  Good morning, Your Honor.  Jacob Cohn for

6   Federal Insurance Company.

7          MR. PASQUALE:  Good morning, Your Honor.  Ken

8   Pasquale and Arlene Krieger from Strook for the Unsecured

9   Creditors' Committee.

10          MR. SHINER:  Good morning, Your Honor.  Michael

11   Shiner for AXA Belgium, its successor to Royal --

12          THE COURT:  Pardon me.  Folks, pardon me.  Excuse me.

13   Counsel, if you want to talk, use the attorney conference rooms

14   please.  I'm not going to be able to deal all day long with

15   people talking in the background.  I'm sorry.  Mr. Shiner,

16   would you start again?

17          MR. SHINER:  Good morning, Your Honor.  Michael

18   Shiner, counsel for AXA Belgium, a successor to Royal Beige and

19   certain London Market companies.

20          THE COURT:  Thank you.

21          MR. PARSONS:  Good morning, Your Honor.  David

22   Parsons from the Reaud, Morgan and Quinn firm on behalf of the

23   Edwards' judgment claimants.

24          THE COURT:  Good morning.

25          MS. CASEY:  Good morning, Your Honor.  Linda Casey on

1 | behalf of BNSF Railway Company.

2 |      MS. COBB:  Good morning, Your Honor.  Tiffany Cobb on

3 | behalf of the Scott's Company, LLC.

4 |      MR. TURETSKY:  Good morning, Your Honor.  David

5 | Turetsky of Skadden Arps on behalf of Sealed Air Corporation.

6 |      MR. COCO:  Good morning, Your Honor.  Nathan Coco on

7 | behalf of Fresenius Medical Care Holdings Inc.

8 |      MS. FORSHAW:  Good morning, Your Honor.  Mary Beth

9 | Forshaw on behalf of Traveler's Casualty.

10 |      MS. ALCABES:  Good morning, Your Honor.  Elisa

11 | Alcabes on behalf of Traveler's Casualty.

12 |      THE COURT:  One second please.  Thank you.

13 |      MR. BROWN:  Good morning, Your Honor.  Michael Brown

14 | and Jeff Burger and we're here for One Beacon American

15 | Insurance Company, Seaton Insurance Company, GEICO and Republic

16 | Insurance Company.

17 |      MR. CRAIG:  Good morning, Your Honor.  Andrew Craig

18 | for Allstate Insurance Company.

19 |      MS. DeCRISTOFARO:  Good morning, Your Honor.

20 | Elizabeth DeCristofaro for Continental Casualty Company and

21 | Continental Insurance Company and related affiliates.

22 |      MR. GLOSBAND:  Good morning, Your Honor.  Dan

23 | Glosband also for Continental Casualty et al.

24 |      MR. GIONATO:  Good morning, Your Honor.  Mike Gionato

25 | on behalf of Continental Casualty.

1          MR. SCHIAVONI:  Your Honor, Tancred Schiavoni and

2    Carl Pernicone for Arrowood.

3          MR. DEMMY:  Your Honor, John Demmy of Stevens and Lee

4    for Fireman's Fund Insurance Company and the Allianz insurers.

5          MR. WISLER:  Good morning, Your Honor.  Jeffrey

6    Wisler on behalf of Maryland Casualty and Zurich.

7          MR. DOLLSON:  Good morning, Your Honor.  Richard F.

8    Dollson on behalf of Maryland Casualty and Zurich.

9          MR. LONGOSZ:  Good morning, Your Honor.  Edward

10   Longosz, also on behalf of Maryland Casualty and Zurich.

11         MS. BAER:  Good morning, Your Honor.  Janet Baer on

12   behalf of W.R. Grace.  Your Honor, also with me is Ted Freedman

13   and Barbara Harding.  And, Your Honor, Ms. Harding is going to

14   be needing to step out in a little while, so just wanted to let

15   you know there will be a little activity there.

16         THE COURT:  All right.

17         MS. BAER:  Your Honor, before we start the

18   confirmation hearing, there are a number of settlements on the

19   agenda where there have been no objections and we'd ask Your

20   Honor if we could get those entered.

21         THE COURT:  I haven't seen them yet.

22         MS. BAER:  I have them all, Your Honor, in front of

23   me.

24         THE COURT:  I have not read the motions yet, so no,

25   I'm not prepared at all to do the settlements.  I'll try to get

1  to them after court.  They were in binders that were locked in

2  boxes and I haven't seen them, so no, I cannot do the

3  settlements yet.

4         MS. BAER:  We understand, Your Honor.  There are four

5  settlements, Your Honor, there are no objections on any of

6  them.  They are Scotts, London Market Companies, St. Paul

7  Companies and Allstate Insurance, Your Honor.

8         THE COURT:  Do you know what agenda numbers they are

9  in the binders?

10        MS. BAER:  Yes, Your Honor.  They're Agenda Numbers

11  2, 3, 4 and 5.  Agenda Item Number one takes up almost all the

12  binders, which is the confirmation.

13        THE COURT:  All right.  I will get to them as soon as

14  I can, but I can't address them now.

15        MS. BAER:  Thank you, Your Honor.  There are also,

16  Your Honor, three orders that were filed also with certificates

17  of counsel related to the August 24th omnibus hearing.  Those

18  three orders related to certain witnesses and things like that

19  that affect the confirmation.  Again, submitted with CLC's --

20        THE COURT:  Those should have been ordered this

21  morning.

22        MS. BAER:  Okay.  Then we will proceed, Your Honor,

23  at this point with the confirmation matters.

24        THE COURT:  All right.

25        MR. BERNICK:  In half a heartbeat we're going to

1 start the evidence, Your Honor, here, with Mr. Inselbuch, but I

2 did want, if you could show please to the Court PP-500 to --

3 got it on the screen?

4       THE COURT:  No, Mr. Bernick, I'm sorry.  I just lost

5 -- I don't know what I just lost.  Give me a second please to

6 get back to where I was here.

7                   (Pause)

8       THE COURT:  I'm sorry, Mr. Bernick.  What is it that

9 you're showing me?

10       MR. BERNICK:  Yes, I just want to remind the Court,

11 just kind of a little checklist, because there are a number of

12 motions that have been filed with regard to the Libby related

13 evidence and we've just got a chart here and we'll furnish a

14 copy to the Court.  This is PP-500.  And we'll also furnish

15 copies to opposing counsel.  It simply lists the various

16 motions that relate to the Libby evidence that are still

17 pending.  And we've also broken it down by the witness who's

18 affected by the motion.  So that's all this is.  As to which

19 witnesses do we have Daubert motions, which witnesses are

20 affected by the 1800 claimants' issue and the like.  It's just

21 for the Court's information as to kind of a checklist and

22 that's all that it is.  And I'm assuming that now that we have

23 made those motions in limine, that as the evidence is

24 introduced by the Libby claimants that implicate these various

25 matters, that our record is preserved as having made objections

1 on this basis or on the basis that are set forth in those

2 motions, and that we don't have to stand up and reiterate those

3 objections on an ongoing basis during the course of the trial.

4 If that's satisfactory with the Court, obviously we would like

5 to have the matters also ruled on. Some of them actually do

6 relate, not simply to issues of relevance, there are a couple

7 that relate to relevance, but most of these relate to

8 procedural matters. That is, the failure to disclose the 1800

9 patient files, there's no expert report regarding treating

10 physicians. Those are the objections and if Your Honor would

11 prefer, the first time they come up, we're happy to raise them

12 also orally. But we want to make sure this is, it's kind of a

13 somewhat complicated rubric, we want to make sure that the

14 Court is alerted to the fact that these objections are out

15 there and that they will be coming up in connection with the

16 testimony that's about to begin.

17        THE COURT: I think it would be advisable to raise

18 them the first time and then tell me what it is that you want.

19 Because I thought I'd ruled on some of these issues that came

20 up prepetition. I just this morning got two motions that I

21 haven't seen before that were apparently filed yesterday. One

22 by Fireman's -- or one by the debtor on behalf of the motion

23 filed by Fireman's Fund. I've never seen the motion filed by

24 Fireman's Fund, it was never transmitted to me in accord with

25 the case management order, so I have no clue what that's all

1  about.  And the other concerning a confidentiality issue with

2  respect to the --

3       MR. BERNICK:  Yes.  I appreciate that, Your Honor.

4  The confidentiality issue, we've had further conversations.

5  There's a whole series of conversations, we've had further

6  conversations, and Your Honor does not need to be concerned

7  with that right now because those conversations may result in

8  an agreement.  But essentially that relates to the presentation

9  of evidence relating to individual settlements in medical

10 records where there are confidentiality concerns.  And the

11 question is whether we had to clear the courtroom, whether

12 we're going to go through and redact, you know, hundreds of

13 records.  So that issue is out there.  I think we'll -- I hope

14 we'll be able to resolve it.

15      With respect to Fireman's Fund, that is something

16 that the Court doesn't need to worry about in connection with

17 the Libby issues.  It relates to a motion to shorten time by

18 Fireman's Fund in connection with their specific issue.  We can

19 take that up at some other point.  We don't have to worry about

20 it this morning.

21      These are all Libby specific, and I don't believe

22 that they've actually been ruled on.  Some of them relate to

23 matters where Your Honor has already ruled, but these are the

24 motions that say we now want to preclude the evidence.  For

25 example, Your Honor has said with regard to Dr. Whitehouse that

1  he can't offer opinions or -- Your Honor has ruled with respect

2  to the opinions that he has offered as to the 1800, but that

3  hasn't translated into a ruling that says he can't offer the

4  following opinions.

5          THE COURT:  All right.

6          MR. BERNICK:  So there is history on some of these,

7  but I believe that they're all still pending, and we'd be happy

8  to explain that as the issues come up.

9          THE COURT:  I think that would be helpful.

10          MR. BERNICK:  And with that, the Plan Proponents will

11  call as their first witness, Mr. Inselbuch, and Mr. Finch will

12  be handling that examination.

13          THE COURT:  Okay.  Just a minute, gentlemen.  I'm

14  sorry, I'm having some computer issue and I'm going to have to

15  call staff, because I don't want to lose things in the middle

16  of typing and it just happened again.

17          MR. BERNICK:  Okay.

18          THE COURT:  So although I apologize, just hold on for

19  a minute please.

20                  (Pause)

21          THE COURT:  I don't know, Mr. Finch.  We'll try it

22  and see.  They've given me a suggestion so I'll see what I can

23  do here now.

24          MR. FINCH:  Okay.

25          THE COURT:  I apologize.  Would you call the witness

1  again please?

2           MR. FINCH:  Yes.   Your Honor, Nathan Finch on behalf

3  of the Asbestos Claimants' Committee.   The Plan Proponents call

4  Mr. Elihu Inselbuch as the first witness.

5           THE COURT:  All right, thank you.  Mr. Inselbuch --

6           MR. FINCH:  And just for Your Honor's information and

7  for other people in the courtroom, we have -- everyone's gotten

8  copies of the exhibits ad nauseam.  We have a courtesy copy of

9  the exhibits that we'll use in the direct examination of each

10  of our witnesses.  Mr. Inselbuch has a book, you have a book,

11  we gave a copy to Libby claimants.

12           THE CLERK:  Please raise your right hand.

13              ELIHU INSELBUCH, WITNESS, SWORN

14           THE CLERK:  You may be seated.

15           THE WITNESS:  Thank you.

16           THE CLERK:  Please use the microphone.

17                DIRECT EXAMINATION

18  BY MR. FINCH:

19  Q    Good morning.

20  A    Good morning, Mr. Finch.

21  Q    Could you state your name for the record please, sir?

22  A    Elihu Inselbuch.

23  Q    Could you describe your educational background, beginning

24  with high school and continuing through any professional

25  degrees you may have received?

1 A    I graduated from public high school in New York City in

2 1955.  I have a bachelor of arts from Princeton University,

3 which I received in 1959, a bachelor of laws from the Columbia

4 University School of Law in 1962, a master of laws in taxation

5 from New York University School of Law in 1965.

6 Q    Are you licensed to practice law in any states?

7 A    Licensed to practice in New York and in the District of

8 Columbia.

9 Q    Are you a member of any federal bars around the country?

10 A    I'm a member of the bars, Circuit Courts and a number of

11 the District Courts, of course including the Southern Division

12 of New York and the District of Columbia.

13 Q    And you're a member of the Bar of the Supreme Court of the

14 United States?

15 A    I am.

16 Q    Could you give the Court a brief rundown of your full time

17 employment history beginning with the first job that you had

18 after college and continuing to the present?

19 A    After six months serving in the United States Army, I went

20 to work in the legal department of the American Society of

21 Composers, Authors and Publishers.  I worked there from 1963

22 until sometime in 1966 doing primarily copyright infringement

23 litigation and any trust litigation that related to the consent

24 decree under which ASCAP functioned.

25         I went to work at first as an associate and later as

1  a partner at Gilbert, Siegel and Young, a law firm, smaller law

2  firm in New York, from 1966, I was there until 1986.  I was

3  doing entirely litigation.  The litigation was for the most

4  part related to the clients of the firm and it varied across

5  the board.  Some of the work was defending Rolls Royce Motor

6  Cars that were involved in accidents.  Some of it Rolls Royce

7  Aero Engines that were involved in accidents.  I prosecuted

8  people who infringed Rolls Royce's trademarks.  I represented

9  the A.C. Nielsen Company in litigation that involved complaints

10 about the way they did they television ratings.

11        I also had one particular client that the firm did

12 not generally service, the Firestone Tire and Rubber Company

13 for which I did their New York products liability defense for a

14 number of years.

15        I was involved in one of the largest securities fraud

16 class actions, the Homestead Production Company class action

17 that ran from sometime in the middle '70s until the late '80s.

18 Represented a plaintiff's class.

19        I left Gilbert -- and at the very end of my time at

20 Gilbert, Siegel and Young, in the fall of 1985, I was retained

21 to represent what was called the Asbestos Health Committee in

22 the Johns Manville bankruptcy.  It's the committee that you

23 think of here as the Asbestos Creditors' Committee.  I left

24 Gilbert, Siegel and Young in 1986 and came to Caplin and

25 Drysdale where I'm currently a member.

1        At Caplin and Drysdale I have over the years done a

2    multiplicity of litigation in various fields, but more and more

3    as I became involved with the Asbestos Plaintiffs'

4    constituency, that began to take up a great deal of my time.

5    Particularly, in the Manville case which ran from 1985 until

6    the Manville plan became effective in 1988, I represented that

7    constituency in class action litigation, the case that became

8    Ortiz in the Supreme Court, an attempt to resolve the

9    fibreboard insurance litigation.  And beginning in around 2000,

10   as a number of companies began to file in Chapter 11 as a

11   result of their asbestos liabilities, I became -- is that

12   better?

13        THE COURT:  Yes, thank you.

14   A    I became largely involved in representing asbestos

15   creditors' committees in those bankruptcies.  And here I am

16   today.

17   Q    Mr. Inselbuch, you mentioned in your prior answer the

18   Manville bankruptcy.  Can you give the Judge just a brief

19   description of what the Manville bankruptcy was about?

20        MR. LEWIS:  Objection.  Relevancy?

21        THE COURT:  What's the relevance?

22        MR. FINCH:  Your Honor, the relevance is that the

23   Libby claimants have made a series of objections to the plan of

24   reorganization in this case, and we believe Mr. Inselbuch's

25   testimony about the Manville case and how the Manville plan was

1  originally structured and how it had to be restructured as a

2  result of the failure of the original Manville Trust to

3  adequately deal with the asbestos claims is directly relevant

4  to the questions this Court has to decide, which is, does the

5  plan of reorganization and particularly -- generally and

6  particularly, the trust distribution process provide a

7  mechanism by which similarly situated claimants are treated

8  equally across the board both as between different disease

9  types and presents and futures, many of the objections raised

10 by the Libby claimants are issues that have been considered and

11 dealt with in the Manville case and other asbestos bankruptcies

12 that this Court and other courts around the country have

13 confirmed and approved the plans of reorganization in those

14 cases.  And I think therefore the testimony is relevant as a

15 background, not only background, but also some of the

16 explanation directly on point to the objections raised by the

17 Libby claimants.

18         THE COURT:  Mr. Lewis?

19         MR. LEWIS:  Excuse me.  This testimony's entirely

20 irrelevant.  The Libby claimants weren't party to any of these

21 proceedings they're going to talk about today.  And I think

22 this is just a lecture for the Court from a capable counsel, no

23 doubt, but really it invades the providence of the Court, it

24 wastes the Court's time.

25         THE COURT:  I don't know if it will waste the Court's

1  time, but I don't see the relevance.  I think I need to judge

2  this plan on whether this plan meets the standards of the

3  Bankruptcy Code and the 524 injunction.  So the objection's

4  sustained.

5           MR. FINCH:  Your Honor, the provisions of this plan

6  are modeled in part on the history in other cases.  And I

7  believe it is directly relevant to show, to demonstrate why

8  this plan complies with both 1123(a)(4) and 524(g) to hear

9  testimony of Mr. Inselbuch about the issues and concerns raised

10 by the Libby claimants and how that has been addressed in this

11 plan as compared to other plans, and the reasons for that.

12          THE COURT:  No.  How it's bee addressed in this plan

13 is relevant.   What relevance it would have to some other plan

14 I don't see.  So yes, the testimony concerning this plan is

15 clearly relevant, you may proceed on that basis.

16          MR. FINCH:  Well, let's lay the foundation with this

17 plan and maybe we will get into, Your Honor, we could see the

18 relevancy of plans in other cases.

19 BY MR. FINCH:

20 Q    Mr. Inselbuch, did there come a time in the late 1990s

21 when you were involved with a company called Fibreboard?

22 A    It was the early 1990s, yes.

23 Q    Could you describe what the Fibreboard case was about and

24 how -- whether it was a bankruptcy or a class action?

25          MR. LEWIS:  Your Honor, I won't object that this is

1 foundational, but it appears to be irrelevant for the same

2 reasons.

3           THE COURT:  What's the relevance, Mr. Finch?

4           MR. FINCH:  This goes to the issue of the Grace plan

5 and its use of the bankruptcy process to resolve asbestos

6 liabilities as opposed to something outside of bankruptcy.  So

7 if I may have a leeway with a couple of questions, Your Honor?

8           THE COURT:  All right.

9 BY MR. FINCH:

10 Q    Could you describe briefly the Fibreboard litigation and

11 what that was about?

12 A    Fibreboard was a company located in California that made

13 products that subjected it to a substantial amount of exposure

14 for asbestos claims.  It had very little by way of assets, but

15 it had two insurance policies that either provided unlimited

16 coverage or no coverage depending on how the Courts construed

17 those policies.  The question -- the construction of those

18 policies was being litigated by Fibreboard and its insurers in

19 the State Courts in California.  We got involved there on

20 behalf of what became a class of asbestos claimants because we

21 were trying to prevent the all or nothing result that would

22 come from the Supreme Court of California and see whether there

23 could be a settlement achieved.

24           We negotiated a settlement and the objectors to that

25 settlement litigated the matter to the Supreme Court of the

1 United States.  That became the Ortiz case.  It followed, soon

2 after the Georgine case was decided by the Supreme Court.  And

3 the net effect of those two pieces of litigation satisfied us

4 in the late 1990s that we were unaware of any procedural route

5 outside of bankruptcy that would make it possible to resolve

6 the long tail of asbestos liabilities as between either a

7 defendant, its insurers and claims.

8          THE COURT:  Mr. Finch, we've lost the Court Call

9 line.  We need to reconnect.  So just a second please.

10          MR. COHN:  And, Your Honor, while we're dealing with

11 logistics, would it be possible to so arrange things that the

12 witness sounds louder in the courtroom?  We're having

13 difficulty hearing up here at the counsel table.

14          THE COURT:  As soon as we reconnect the Court Call

15 I'll try to take care of that problem, Mr. Cohn.

16          THE COURT:  All right, Mr. Cohn, is that better?

17          THE WITNESS:  Is that better?

18          THE COURT:  No.

19          THE WITNESS:  Is that better?  I'll just talk louder,

20 Judge.

21          THE COURT:  All right.

22          MR. FINCH:  Are we ready to proceed, Your Honor?

23          THE COURT:  Yes, thank you.

24 BY MR. FINCH:

25 Q    Mr. Inselbuch, following the Supreme Court's decision in

1  the Fibreboard case, did there come a time in early 2000 when a

2  series of companies started going into bankruptcy to resolve

3  their asbestos liabilities?

4  A    Yes.

5  Q    And what if any role did you and your law firm play in

6  those cases?

7  A    In a number of those bankruptcies where asbestos

8  creditors' committees were appointed, we were engaged as

9  counsel to that committee.

10 Q    And did that include the W.R. Grace Bankruptcy Committee?

11 A    It did and it does.

12 Q    Could you turn in your exhibit book to what has been

13 pre-marked as Exhibit 277.4?

14 A    Yes, sir.

15 Q    Do you recognize that as the Asbestos PI Trust

16 Distribution Procedures for the W.R. Grace case?

17 A    I do.

18      MR. FINCH:  Your Honor, the Bankruptcy Plan and all

19 of its exhibits have been pre-marked as Plan Proponents Exhibit

20 277.  At this time we would offer the entire plan and the

21 exhibits thereto into evidence.

22      THE COURT:  They're admitted.

23      MR. FINCH:  We'd also at this time offer Exhibit 276,

24 which is the disclosure statement.

25      THE COURT:  It's also admitted.

1  BY MR. FINCH:

2  Q    Mr. Inselbuch, the Libby claimants had an objection based

3  on equal treatment, saying that the way the cases are resolved

4  inside of Libby or for Libby is different or unfair as compared

5  to the way cases are resolved outside of Libby.  I'd like you

6  to -- I'd like to focus first on the way that cases outside of

7  Libby are dealt with in this TDP, in this plan, and what that

8  is based on.  So could you describe for me, for the Court, the

9  process by which this TDP addresses asbestos personal injury

10 claims?

11 A    This document is the latest in a long iteration of trust

12 distribution processes that have developed in these

13 bankruptcies over a number of years.  The purpose that it is

14 trying to accomplish is to resolve all present and all future

15 claims as efficiently and inexpensively as possible so that the

16 bulk of the corpus that comes into the trust can actually go to

17 the claimants and not be lost in transaction costs.  And to

18 resolve the claims over time more or less as similarly as can

19 be reasonably expected so that we would, in effect, obey the

20 mandate of Section 524(g) which is to pay presents and futures

21 in the same or as similar possible manner.

22        The way this thing works, it provides for two forms,

23 basically, of claims processing.  In order to observe the

24 attempt at efficiency, it provides a system called expedited

25 review where if a claimant can satisfy specific criteria for a

1 number of categories, the claimant can get an automatic offer

2 of an award in an amount provided in a matrix that is provided

3 in the document.

4          For those claimants who cannot satisfy the specific

5 criteria of the categories or for those claimants who for one

6 reason or another would like an opportunity to seek a greater

7 amount of compensation, we provide in here what's called an

8 individual review process, under which the trust personnel

9 applied particular criteria that are provided in the document

10 in an effort to reach agreement with a claimant on an amount of

11 compensation.

12          All of these awards of compensation are subject to a

13 sharing, a payment percentage that is determined by experts

14 working for the trust and its constituents in an effort to

15 provide for equal treatment over time among all claimants so

16 that from time to time the trust is required to estimate its

17 potential liabilities, the present value of its potential

18 liabilities, estimate the value of its assets, and thus

19 calculate the amount of basically the percentage that can be

20 paid on claims both present and future.  This process is also

21 mandated by Section 524(g) in an effort to ensure that over

22 time, present and future claimants will be treated

23 substantially similar.

24          In an effort further to both make the process more

25 efficient and to make the estimation process possible, there

1  are constraints placed upon the amounts that any claimant can

2  recover from the trust.  If they recover through individual

3  review, we know exactly what they will recover -- I'm sorry, in

4  expedited review, we know exactly what they will recover.  If

5  they recover in individual review, there's a maximum provided

6  for that category of claims, beyond which they cannot recover.

7  And there is an average provided for the trusts to seek to

8  obtain an average between what the claims that will be resolved

9  in expedited review and the claims that will be resolved in

10 individual review, so that from time to time the trust will be

11 able to best predict what its ability to pay on a payment

12 percentage basis would be.

13         Now, because we anticipate in individual review that

14 not all claims, not all claimants will be satisfied with what

15 the trust says, they think the fair offer would be, the process

16 permits for an ADR, mediation, arbitration, either binding or

17 non binding arbitration.  If the claimant elects non binding

18 arbitration, they can exit to the tort system to further

19 determine how much the amount would be in terms of the

20 liquidated value of their claim.

21         Nonetheless, no matter how that's done, the maximums

22 still control so that the great bulk of claimants will not be

23 subject to what might be the result of some odd outliers

24 throughout the United States which would have an effect on the

25 ability to pay everybody.

1          The concept is to pay rough justice through these two

2   processes.  Hopefully the expectation would be that the

3   overwhelming percentage of claimants would opt for the

4   expedited review process.  That has been our experience, and

5   that for those claimants who either cannot satisfy the

6   expedited review process or would seek additional compensation,

7   they can exit to the individual process.  That's generally how

8   it works.

9   Q    Okay.  You mentioned a lot of things in your answer.  I'm

10  going to take you through them one by one.  The expedited

11  review criteria, could you tell the Judge where in the Grace

12  TDP those provisions are found?  And I direct your attention to

13  Page 23 and 24 of Exhibit 277.4.

14  A    At Section 5.3, and the criteria, Your Honor, and the

15  categories begin at the top -- it's Section 5.3(a)(3) which is

16  at Page 23, and the disease level categories begin at Page 24

17  and continue through Page 27.  In addition, on Page 32 -- 31

18  and 32, there's a table which lists the scheduled values and

19  the average values and the maximum values that I made mention

20  about.

21  Q    The expedited review criteria, those are generally medical

22  in exposure criteria?

23  A    Yes.

24  Q    What is the -- first of all, is expedited review process

25  something that is new to the Grace TDP?

1  A    No.  It goes back to the Manville, the 1995 Manville TDP.

2  Q    What is the rationale for the expedited review criteria

3  and category?  What are they designed to capture?

4  A    Well, they're meant to provide bright line criteria for

5  the various disease processes and for exposure requirements.

6  So that they would basically require no debate.  They could be

7  administered by a processing department someplace and you could

8  check off these things and it would make the process very

9  simple and inexpensive.

10       What the criteria tried to do is replicate what

11 really is going on out in the world.  The diseases are not

12 mysteries.  Mesothelioma, we all know what mesothelioma is, we

13 know what lung cancer is, and we have a number of other cancers

14 that medical science says can be in part at least caused by

15 exposure to asbestos.

16       Then we have a series of non-malignant asbestos

17 diseases.  And here we've done a certain amount of artificial

18 separation or definitions to try and provide categories for

19 more severely disabled asbestotics or sufferers with pleural

20 disease would be compensated at a higher level.  There is no

21 such thing out in the tort system, there are no criteria like

22 that in the tort system, but at the  same time, we all

23 recognize that in fact settlements and jury awards reflect how

24 badly injured the particular claimant is.

25       Now that's on the medical side.  On the exposure

1  side, we tried to provide, again, bright line demonstrations of

2  exposure that would be beyond question, so that if a person has

3  the criteria for the disease and has the exposure that is

4  called for underneath the plan, they can automatically be given

5  an award.

6  Q    And that concept of expedited review, have you ever had a

7  situation where there was a bankruptcy trust set up where there

8  wasn't expedited review criteria?

9  A    Oh yes.  The original bankruptcy plan in Manville

10  basically said, come to 30 days or so of an ADR and then exit

11  to the tort system and catch as catch can.

12  Q    And how did that work in terms of mechanisms for resolving

13  asbestos claims and seeing that injured people are compensated

14  fairly?

15  A    Well, the earliest people in the queue got a substantial

16  amount of the money that was on hand, and after something less

17  than a year and a half, the Manville Trust was out of cash.

18  Q    What happened then?

19  A    Well, then Judge Weinstein took control of the Manville --

20          MR. LEWIS:  Your Honor, this testimony's irrelevant.

21          THE COURT:  It's irrelevant, Mr. Finch.

22  Q    Mr. Inselbuch, you mentioned the expedited review criteria

23  in the W.R. Grace plan, there's also the process of individual

24  review that you described.  Is that something that is new to

25  the Grace TDP as compared to other places?

1  A    No, that's been -- the two processes, expedited review and

2  individual review, began in the 1995  Manville plan and have

3  been in every plan I have worked on since then.

4  Q    You said the 1995 Manville plan, are you talking about the

5  class action litigation and restructure of the Manville trust?

6  A    Yes.

7  Q    And that was the litigation that resulted from --

8          MR. LEWIS:  Objection, leading and irrelevant.

9          THE COURT:  Mr. Finch, please.

10 Q    Mr. Inselbuch, can you describe for us what the individual

11 review process is intended to accomplish in the Grace TDP?

12 A    It is to serve two purposes.  There will be claims, and

13 there will be some substantial number of claimants perhaps who

14 cannot for one reason or another satisfy the specific criteria

15 that are provided for in expedited review.  Yet clearly they

16 are sick and they have been exposed to Grace asbestos products.

17 The channeling injunction in the plan will channel to the trust

18 all claims that have validity -- all asbestos personal injury

19 claims that have validity against Grace.  So the trust has to

20 respond to all of those claims irrespective of whether or not

21 they satisfied criteria that we provide for expedited review.

22         So people who for one reason or another can't satisfy

23 the specific criteria or some of the specific criteria can come

24 to individual review and have their particular situations

25 evaluated on a one by one basis.

**J&J COURT TRANSCRIBERS, INC.**

1    The other area of individual review is for those

2 cases where for one reason or another, the claimants believe

3 that the amount provided for in the expedited review schedule

4 is insufficient and for one reason or another, they believe

5 their cases merits additional, substantial compensation, and

6 those cases can go through individual review.  And criteria

7 provided in the TDP in Section 5.3(b)(2) at Page 30, valuation

8 factors to be considered in individual review that the trust is

9 charged to apply in considering those claims as well.

10 Q    If an individual claimant, let's just say hypothetically

11 an individual claimant doesn't meet the expedited review

12 medical and exposure criteria for severe asbestosis, could they

13 not -- what's the scheduled value for severe asbestosis in the

14 Grace plan, Mr. Inselbuch?

15 A    Level 4-A, $50,000 scheduled value.

16 Q    And that's also the scheduled value for the severe

17 disabling pleural disease?

18 A    Yes, sir.

19 Q    Okay, if a claimant doesn't meet the medical and exposure

20 criteria, one or more of them, in the expedited review process

21 for severe asbestosis and it's a non malignant claimant, is

22 there anything in the TDP that would prevent the claimant from

23 being offered a settlement that is equal to the $50,000 value

24 for severe asbestos through either the individual review

25 process or otherwise?

1  A    No.

2              THE COURT:  I think you lost me.  There were too many

3  ifs in there.

4              MR. FINCH:  Sure.

5  Q    If a claimant doesn't meet the expedited review criteria

6  for severe -- let's just say severe asbestosis, is there

7  anything in the TDP that precludes that payment from

8  nonetheless being offered a settlement by the trust that's

9  equal to the $50,000?

10 A    No, quite the contrary.  The TDP provides that in those

11 circumstances, the trust can offer a claimant an amount up to

12 that scheduled value if the trust is satisfied that

13 notwithstanding, the failure to meet the particulars of the

14 categories in the classifications, the claimant is indeed

15 suffering from that disease.

16 Q    Okay.

17             THE COURT:  I'm sorry.  I lost it.  If they don't

18 meet the criteria for the disease, the trust can still settle

19 for the maximum amount that says that they've met the criteria

20 for the disease?

21             THE WITNESS:  Up to that.

22 Q    Through what process, Mr. Inselbuch?

23 A    Well, this would, again, be through individual review.

24 The idea here is, some claimants might -- take a look, Your

25 Honor, at Page 26 and lets look at severe asbestosis.  There

1  are lots of medical criteria here.  And let's assume that

2  instead of measuring a TLC of less than 65 percent, they meet

3  all the other criteria, but the measurement is 70 percent.  The

4  trustees might still consider that that person has satisfied

5  this criteria for disease, because they recognize that the

6  scores that are reflected here are variables that depend upon

7  people and how young they are, how old they are and what

8  averages are using in calculating these numbers.  That's just

9  an example.

10         On the other hand, they might, if the claimant missed

11  more than one of these characteristics, the trustees might say,

12  well, you're a lot sicker than somebody down in level three,

13  but you're not really up to this level 4-A, we will offer you

14  an amount that is less than $50,000, but substantially more

15  than 7500.

16         MR. LEWIS:  Your Honor, I move to strike the

17  testimony on the grounds that it is nonresponsive to the

18  question.  I think the question was, through what process would

19  they arrive at this $50,000 amount without satisfying the

20  particulars of the TDP.

21         THE COURT:  I think the answer to that question was

22  through the individual review process, which is --

23         MR. LEWIS:  I didn't hear that, but if that, if the

24  witness can confirm that, I'll withdraw my objection.

25         THE WITNESS:  Yes.

1 Q   Okay.  Just to be clear, the expedited review process is

2 if in the pieces of paper that the claimant submits to the

3 trust, you can say, yes -- let's take severe disabling pleural

4 disease -- yes, you have a diagnosis of pleural thickening that

5 meets the ILO requirements, yes you have TLC less than 65

6 percent, that would get the scheduled value offered, is that

7 right?

8 A   Yes, sir.

9 Q   And if on the other hand you had someone come into the

10 trust that says I've got severe pleural disease, I'm really

11 sick, but they don't meet the ILO requirements let's say, is it

12 possible for that claimant in the individual review process to

13 persuade the trust and the trust nonetheless offer them a

14 scheduled value amount up to the $50,000?

15 A   Yes.

16 Q   Okay.  And is that concept of individual review, the

17 individual review process, is that something that is created

18 for the first time in this case?

19 A   No, it's been this way since the 1995 Manville TDP and in

20 every case where I've been involved.

21 Q   Okay.  You talked about the individual review process and

22 the expedited review process.  Can you describe the -- and

23 focusing on for claims outside of Libby for right now and for

24 things that are not Libby specific, can you focus on, can you

25 describe for the Court where the medical and exposure criteria

1 for the expedited review process came from?

2 A    The medical criteria came from a combination of the

3 knowledge that the personal injury bar has of the medical

4 criteria for these diseases, plus consultations with medical

5 advisors.  The exposure criteria came from discussions among,

6 originally among the personal injury bar in order to provide

7 these various categories and with ultimately representatives of

8 the other constituencies in each of these Chapter 11s.

9 Q    Okay.  Are the exposure and medical criteria in expedited

10 review procedures in the W.R. Grace plan, any of them new and

11 different for this case?

12 A    Yes.  Based on discussions that we had with the Libby, the

13 lawyers who represent the Libby constituency, they took the

14 position with the rest of the asbestos creditors committee that

15 there was a disease process that was common in Libby that they

16 call or is described as severe disabling pleural disease, and

17 that the TDP, as written previously, did not provide for that

18 disease.  We consulted, the committee consulted with its

19 medical experts who confirmed the existence in the literature

20 of this disease, although it was apparently unusual to observe

21 in practice.  But because it existed in the medical literature

22 and because the Libby claimants took the position that people

23 from Lincoln County, Montana suffered from this process, we

24 added a new disease level to the TDP to provide for severe

25 disabling pleural disease, which is now Level B.

1  Q     That's Category -- Level 4-B and it's found on Page 26 of

2  the TDP, is that right, Mr. Inselbuch?

3  A     Yes.

4  Q     Okay.  Well, we'll come back to the severe disabling

5  pleural disease in a little bit more detail in a moment.  I

6  want to ask you about some other things you mentioned that the

7  TDP does and have you describe the rationale for them.  You had

8  mentioned in your answer that there are limits or caps on the

9  maximum amount of money that a claimant can recover from the

10 trust, do you recall that testimony?

11 A     Yes.

12 Q     Can you describe to the Court what those caps are and what

13 they're intended to accomplish?

14 A     First, you have to understand that when we set the

15 schedule of values what we are trying to capture based upon our

16 experts' analysis of, in this case, the Grace litigation

17 history, is the Grace several share of the liability for each

18 disease process.  In the tort system there is joint and several

19 liability, but what we tried to provide here is what Grace's

20 share of that liability is as reflected by its settlement

21 history.

22        The maximums, again, as related to the particular

23 disease process  were recommended to the Committee by its

24 experts to reflect an order of magnitude higher than the

25 scheduled values that would probably include something like 70

1  to 80 percent of the claimants throughout the country.  We were

2  setting a maximum to cut off the what we regarded as the

3  outlier cases.  Cases that most folks would say received

4  compensation well beyond what the norm should be for that

5  disease process as a result of the vagaries of the tort system.

6          So we have the schedule value providing the several

7  share of liability for Grace, historically set at a number just

8  above the midpoint of the historical history in an effort to

9  encourage people to opt for the expedited review process.  And

10  we have the maximums to permit for recovery up to fairly

11  substantially higher numbers, but still cutting off the upper

12  end of what we would call the outliers.

13  Q    And who was the expert that gave advice to the Committee

14  on the values that appear in the TDP?

15  A    Dr. Mark Peterson.

16  Q    And could you describe just briefly what Dr. Peterson's

17  background is and the role he has played for the Grace Asbestos

18  Claimants' Committee?

19          MR. FINCH:  You'll hear from Dr. Peterson later

20  today, Your Honor, but Mr. Inselbuch can describe briefly who

21  he is and what he does.

22  A    Well, Dr. Peterson has been involved in these particular

23  issues, the resolution of asbestos related bankruptcies back to

24  the Manville restructuring litigation in 2000 -- in 1990 when

25  he was appointed by Judge Weinstein as a special advisor to the

1 Court.  Since then, he has been engaged by numerous of the

2 Asbestos Creditors' Committees for the purpose of doing

3 estimates of the Grace liabilities -- the debtors' liabilities

4 -- to  provide the input that would become the scheduled values

5 here, to participate in the negotiations that lead to the

6 initial payment percentage with the futures representative and

7 other constituencies, and generally to give advice on the

8 claims' history and its significance to the Committee.

9 Q    You mentioned that the caps, the maximum amount the

10 plaintiffs can receive under this TDP, is that something that

11 is new to this TDP?

12 A    No.

13 Q    And has it been modeled on other things?

14 A    It's been around since the first iteration in 1990.

15 Q    The first iteration of what?

16 A    Of the attempt to restructure the Manville plan.

17 Q    Is there an opportunity for claimants, if they disagree

18 with the Trust's settlement offer or its categorization of

19 which disease their claim falls into to have that dispute heard

20 by a jury?

21 A    Yes.  I think I said that they can opt for -- they first

22 go through an ADR process of mediation and arbitration.  The

23 arbitration can be binding or non-binding.  If they elect

24 non-binding and they're still dissatisfied, they can exit to

25 the tort system and have a jury decide either whether or not

1  they satisfied the categorization provisions in the TDP or the

2  amount of entitlement in individual review, up again to the

3  maximum numbers.

4  Q    So if, for example, a claimant who says they have severe

5  pleural disease goes through, doesn't meet the expedited

6  review process and goes through the individual review process

7  and the trust doesn't agree with them, what, if anything can

8  that claimant do in a jury trial?

9  A    Can put on whatever proofs that they would have that

10  within the criteria that are provided for individual review

11  that I mentioned before.

12  Q    What are you referring to when you say -- you're focusing

13  on Section 5.3(b) of the TDP?

14  A    Yes.

15  Q    5.3(b)(2), the factors are laid out, they can put on proof

16  that are within the factors provided for in the TDP and a jury

17  -- and so will the Trust, presumably -- and the jury will

18  decide then applying those factors, what the value would be.

19  Q    Subject to the caps and the maximum you can get?

20  A    Yes, sir.

21          MR. FINCH:  Could you put Exhibit 277.04 on the

22  screen?

23  Q    Focusing your attention on Page 58 and 59 of the TDP, Mr.

24  Inselbuch.

25  A    Yes?

1    MR. LEWIS:  Counsel, could you provide the Plan

2  Proponents Bates stamp number?  I don't have that marked.

3    MR. FINCH:  It's Plan Proponents Bates Stamp Number

4  14571 and 14572.

5    MR. LEWIS:  Thank you, sir.

6    MR. FINCH:  It will be Sections 7.6 and 7.7.

7  Q    Are those, Mr. Inselbuch, are those the provisions of the

8  TDP that describe and govern the rights to a jury trial and the

9  cap on the amount of judgments?

10 A    Yes.

11 Q    Does the cap on the judgments only apply to the Libby

12 claimants or does it apply across the board?

13 A    It applies to all claimants.

14 Q    As part of your work in this case and other asbestos

15 bankruptcies, have you become familiar with the size of

16 verdicts in the tort system from time to time?

17 A    I'm sorry, I didn't hear the question.

18    MR. LEWIS:  Excuse me.

19 Q    Sure.  Have you become familiar -- well, let me rephrase

20 the question.  Does the cap, in your view, impact the claimants

21 from Libby unfairly as compared to other claims?

22    MR. LEWIS:  Objection.  That calls for an opinion

23 evidence.  This is witness is not identified as an expert and

24 in his deposition testified he would not testify as an expert

25 and his counsel also made that clear in his deposition.

1 Furthermore, that invades the providence of the finder of fact.

2          MR. FINCH:  We'll get to it with Dr. Peterson, then,

3 Your Honor.

4          THE COURT:  All right.

5 Q    The -- does the Grace TDP allow for the payment of

6 punitive damages?

7 A    No.

8 Q    What is -- is that something that's new to this case?

9 A    No.

10 Q    What's the rationale for that?

11 A    Well, the goal in all of these programs since at least the

12 Manville restructuring was to develop a process where the

13 presents and the futures would be paid as substantially the

14 same as possible.  If you permitted for some early entrance in

15 the cue to receive punitive damages, you would deplete the

16 resources early on and to the detriment of the people at the

17 end of the cue.  Moreover, the claims now are channeled to a

18 trust.  There would seem to be no purpose in the law to award

19 punitive damages against the trust which engaged in no conduct

20 itself that had anything to do with the damage that the

21 claimants have suffered, so there would be no deterrent effect

22 that would be the utility of punitive damages.  So either to

23 protect the pro rata share concept or because there's no

24 particular purpose in having punitive damages, we have not

25 permitted for punitive damages to be awarded --

1  Q    Did they --

2  A    -- to be included in the compensation.

3  Q    Does the elimination of punitive damages apply only to the

4  Libby claimants?

5  A    No, it applies to everybody.

6  Q    Do other -- had other claimants alleged punitive damages,

7  the right to punitive damages against Grace?

8  A    Oh, sure, throughout the country claimants had alleged and

9  some had been awarded punitive damages.

10  Q    The --

11  A    I'm not sure if I could recite on whether or not there

12  actually had been an award of punitive damages against Grace in

13  particular.

14        THE COURT:  All right.

15        MR. LEWIS:  I could not hear that, Your Honor.  I

16  apologize.

17        THE COURT:  Could you restate what you just said, Mr.

18  Inselbuch?

19        THE WITNESS:  Sure.  Mr. Lewis, I just wanted to

20  correct my last answer.  I couldn't recite, as I sit here

21  today, a specific case where punitive damages were awarded

22  against Grace.  I believe there were, but I couldn't, if asked

23  about it, I couldn't tell you today.

24        MR. LEWIS:  Thank you.

25  Q    The -- another thing you mentioned as part of the

1  individual review process is to account for situations where

2  the amount of money in the schedule of value may not be enough

3  for whatever reason.  Are you familiar with something in the

4  Grace TDP called the concept of extraordinary claims?

5  A    I am.

6  Q    Could you describe to the Court what the goal behind the

7  extraordinary claims provision is in the Grace TDP?

8  A    The extraordinary claims provision has been in these TDPs,

9  again, since at least the 1995 Manville plan.  It's to take

10 account for the -- what are relatively unusual situations where

11 a claimant really is only able to collect from, in this

12 particular situation, Grace.  As I said before, the categories

13 in the schedule of value provide Grace's several share on the

14 assumption that the claimant would have claims for liability

15 against a number of other defendants in the tort system.  But

16 there are situations and originally it was brought to mind in

17 Manville that there were people who worked at the Manville

18 plant in Manville, New Jersey, as it happened, and they would

19 have claims against no one other than Manville.  So we had to

20 provide a category, a treatment for those folks to provide a

21 multiple, up to a multiple of recovery where that would be the

22 case.

23      So the extraordinary claims provision typically

24 provided, and does here as well, that if the exposure to the

25 product is at least 75 percent for this particular debtor, then

1  the recovery, the maximum that could be recovered in individual

2  review is multiplied by five to provide more room for a higher

3  payment to that claimant.  We changed -- we added to the

4  extraordinary claims provisions.  You asked me before what's

5  different in this TDP.  The extraordinary claims provision was

6  changed to take account for arguments that the Libby

7  constituency was making.  They said, well, our exposure is

8  almost entirely to Libby, to Grace product.  We're well beyond

9  the 75 percentage.  We think -- and we think our recoveries are

10 substantially higher than other people get around the country.

11            So after a certain amount of give and take on that,

12 the committee included a provision that says if the exposure is

13 at least 95 percent Grace, then the multiple can be as much as

14 eight times.  In either case, whether it's five times or eight

15 times, the document says that cannot be the likelihood -- there

16 has to be little likelihood of recovery somewhere else from

17 some other tortfeasor in order to qualify for extraordinary

18 treatment.

19 Q    Can you show Exhibit 277.4 on the screen and Page 32?

20 Directing your attention, Mr. Inselbuch, to Pages 32 and 33 of

21 the Grace trust distribution procedures, is that where the

22 extraordinary claims --

23 A    Yes, sir.

24 Q    -- provisions are found?

25 A    Yes, sir.

1 Q    In the individual review process, is it possible -- is

2 there anything in the TDP that would prevent a claimant who

3 doesn't meet the medical criteria for severe disabling pleural

4 disease to, nonetheless, receive a $400,000 settlement offer

5 from the trust if they can prove extraordinary exposure?

6 A    No.

7 Q    And that would be just the same as the other individual

8 review process we talked about before?

9 A    Correct.

10 Q    And is it correct that Section 5.3(b)(1) is the place in

11 the TDP that's on Page 29, is the place in the TDP, (b)(1) and

12 (b)(2) that describes the individual review process?

13 A    It begins on Page 27 and it runs through some place on

14 Page 31.

15 Q    Okay.  Now, you mentioned --

16 A    You had asked me what are the changes we made and I never

17 finished that answer.

18 Q    That's what I was getting to next.

19 A    All right.

20 Q    So, Mr. Inselbuch, what changes were made to the Grace TDP

21 in an attempt to accommodate the concerns of the Libby

22 claimants?

23 A    Well, first, as I testified, we created this new category,

24 4(b), for severe disabling pleural disease.  Second, we

25 provided, as I've testified, this additional category of

1  extraordinary claims treatment.  Third --

2  Q    You mean you increased the multiple from five to eight?

3  A    Yes, we provided this additional extraordinary claims

4  treatment provision.  The five is still there.  The eight is an

5  additional tester.  We also modified the exposure requirements

6  in some of these categories to take account for the fact that,

7  as described to us, the Libby exposure was not in many

8  situations industrial exposure.  And the exposure criteria in

9  these categories in a number of places require something called

10 significant occupational exposure which is on the job working

11 with asbestos fibers or in the close proximity to someone else

12 working with asbestos fibers that will get you exposed.

13 Because a lot of the Libby exposure, as it was described to us,

14 was not of that nature, we modified the exposure requirements

15 to accommodate claimants whose claims arose in Lincoln County,

16 Montana in that respect.

17        We also, because they -- it was explained to us by

18 the Libby folks that their pleural disease was progressive, we

19 provided a second opportunity to come back and claim for Level

20 4B which is severe disabling pleural disease even after first

21 recovering in Level 3, which had not been the case in other

22 TDPs.

23 Q    Could you explain how that works?  Well, first of all,

24 where in the TDP is that comeback right found?

25 A    Second diseases.

1  Q     All right.  Attention -- direct your attention to --

2  A     5.9, Page 44.  Many jurisdictions take the view that

3  cancer is a second disease, a different disease from

4  non-malignant asbestos disease.  So these TDPs recognize that

5  someone could have a claim for non-malignant asbestos disease

6  and sometime later succumb to a malignant asbestos disease, and

7  the TDPs have historically and this TDP provides for what we

8  call comeback rights.  You can then file another claim for the

9  second disease.  We have added here in order to accommodate the

10 Libby claims a comeback right from Level 3 to Level 4 even

11 though it's not perhaps a new disease.  We thought that they

12 should have an opportunity since they say that these diseases

13 are progressive and over a period of time to first seek

14 whatever the lower level of compensation might be and then come

15 back again if they then succumb to more severe problems.

16 Q     So, in other words, someone from Libby could settle their

17 case at Category 2 or Category 3 and then if they get sicker,

18 they would be entitled to come back and to present a claim for

19 the severe pleural disease.

20 A     Yes, sir.

21 Q     You mentioned in your earlier testimony that the severe

22 disabling pleural disease category was something new that was

23 added at the request of the Libby claimants and that you had

24 consulted with the ACC's medical expert about that.  Could you

25 describe for the Court who the ACC's medical expert is and how

1 that process worked?

2 A    The expert is Dr. Laura Welch who's in the courtroom and

3 basically we asked her to provide to the committee a --

4         MR. LEWIS:  Your Honor, excuse me, I must object.  In

5 his deposition, this witness testified that he had no personal

6 knowledge of the consultation with the doctor.  So I'd like

7 some foundational testimony to show that he himself has

8 personal knowledge of what these consultations were, please.

9         THE COURT:  All right.

10         MR. FINCH:  I'll lay a foundation.

11 Q    Mr. Inselbuch, were you the person from Caplin & Drysdale

12 who was principally responsible for the TDP in this case?

13 A    Yes.

14 Q    Did you have a conference call with Dr. Welch and members

15 of the Grace committee to discuss Libby medical issues?

16 A    Yes.

17 Q    Did -- in that conference call, did the -- did you provide

18 any directions to Dr. Welch?

19 A    Dr. Welch was asked to recommend to the committee if we

20 adopted this concept of severe disabling pleural disease what

21 the touchstone criteria would be like the other criteria that

22 would be ready markers for awarding this compensation.  She

23 provided that and that's what's in the TDP.

24 Q    Okay.  You've mentioned four ways in which the TDP has

25 been changed from what I'll call the state of the art TDP to

1  accommodate the Libby claimants, the creation of the new severe

2  disabling pleural disease category, the relax of the definition

3  of Grace exposure to account for their community exposures, the

4  creation of a new eight times extraordinary claims multiplier,

5  and the creation of comeback rights or second disease rights as

6  between the non-malignant disease categories so if they did

7  progress to the severe pleural disease they would be entitled

8  to come back for another claim.  Were there things that the

9  Libby claimants are objecting to in the plan of reorganization

10 now that were not changed in the Grace TDP?

11 A    Yes.

12 Q    Can you describe those things to the Court?

13 A    Well, first in the criteria that are provided for severe

14 disabling asbestos pleural disease, the Libby claimants

15 objected to a number of the requirements that Dr. Welch had

16 recommended that the committee provide for in the document.

17 Those included definitional provisions that Dr. Welch

18 recommended that had to do with the thickness of materials,

19 that had to do with tests that measured lung capacity that had

20 to do with something that had -- that was observable on x-ray

21 and a number of medical issues that are not my area of

22 expertise.  We took whatever the Libby folks wanted to do, took

23 it to the medical consultant.  And when the -- if the medical

24 consultant said it was inappropriate to do it that way, at

25 least in providing criteria that would provide for automatic

1 compensation, we acted on the advice of the medical consultant.

2          The Libby folks also had difficulty with what we had

3 done with extraordinary claims provisions.  It was their view

4 that the multiplier should not be a maximum, an expansion of

5 the available amount that could be awarded to a particular

6 claimant based upon the criteria in the TDP, but rather for at

7 least the claimants from Lincoln County, Montana, it should be

8 an automatic award of that multiple for their clients

9 irrespective of how they would satisfy the particular factors

10 that are considered in individual review.  The committee did

11 not view that as appropriate because we thought that the Libby

12 folks, Libby claimants, as best possible, should be treated in

13 the same manner as claimants throughout the country and the

14 world for that matter.

15          They also took the view that they should be excused

16 from the provision in the extraordinary claims provisions that

17 require that there be little likelihood of recovery elsewhere.

18 We -- the committee declined to adopt that, as well, because

19 the theory of the extraordinary claims provision is, in fact,

20 that the claimant should be entitled to a greater award because

21 they have little likelihood of success in collecting money

22 elsewhere.

23 Q    Does the -- did the Libby claimants have complaints about

24 the values in the TDP that were not accepted?

25          THE COURT:  I'm sorry, I didn't understand the

1  question.

2  Q     Sure.  Were there -- let me back up.  The settlement

3  averages in the TDP, are they jurisdiction specific or are they

4  intended to capture sort of something else?

5  A     You mean the category values --

6  Q     The category values, the schedule values and the --

7  A     -- in expedited review?

8  Q     -- and the schedule values and the average values.

9  A     They are not jurisdiction specific.  They are designed to

10  capture a number that is a bit above the 50 percent mark for

11  settlements historically that Grace entered into throughout the

12  country.

13  Q     Does the Grace trust distribution procedures provide

14  different amounts of payment based on -- let me back up.  How

15  does the Grace plan deal with the treatment of insurance

16  proceeds?

17  A     Well, under the plan, if there is unsettled insurance at

18  the end of the confirmation process, that -- the rights to that

19  unsettled insurance are conveyed to the trust.  To the extent

20  that there is settled insurance that may be in the form of

21  insurance in place or something akin to that, that is similarly

22  conveyed to the trust.  If there are settlement proceeds that

23  arose after a certain date which I don't recall offhand, those

24  proceeds also come to the trust.

25              Then the trust merges those assets with all the other

1  assets that it has under the plan in order to calculate the

2  total value of its assets so that a payment percentage can be

3  determined, and then it applies that payment percentage across

4  the board to all claimants, irrespective of the particular

5  pattern of exposure that any individual plaintiff might have

6  had, historically claimant might have had, which would have --

7  might have triggered one or another or some policies, but not

8  other policies.  But, basically, we take the assets as a whole

9  and apply then evenly to all claimants.

10 Q    How does the Grace TDP deal with the fact that there might

11 be different amounts of insurance available depending on what

12 the claimants' individual facts are?

13 A    I just thought I answered that.

14 Q    Well, you answered how it was put in the pot.  I guess is

15 there anything in the TDP that would provide a different amount

16 of money --

17 A    Oh.

18 Q    -- to a claimant depending on how much insurance the trust

19 could access?

20 A    No.  As I said, we don't look at each claimant's footprint

21 in the tort system to see what policies might or might not have

22 been triggered.  This is another objection that the Libby

23 constituents have made to the plan that we considered at the

24 committee.  They take the view that at least with respect to

25 certain unsettled insurance that their claimants can trigger --

1  could trigger greater recovery from those policy or policies

2  and, thus, they should be entitled to a greater distribution on

3  account of that from the trust.

4  Q    Could you describe to the Court how the Grace TDP deals

5  with loss of consortium or wrongful death claims?

6  A    The concept of the TDP is that there is one claim, one

7  injury.  Various state laws will carve up rights to collect

8  because of that injury among various entities.  We have, of

9  course, the injured party himself or herself.  We have

10 potentially loss of consortium claims.  If the person dies,

11 there are wrongful death claims.  There are -- and sometimes

12 the estate under state law has the wrongful death claim,

13 sometimes some heirs do, sometimes there are rights in

14 survivors.  But from the standpoint of the TDP, there is only

15 one injury and we -- the trust pays once to cover all of those

16 claims.

17 Q    Is there anything in the individual review process

18 provisions that discuss concepts that would be applicable in a

19 wrongful death or consortium claim, directing your attention to

20 Page 30 of the TDP?

21 A    Well, the fact of a victim's family existence will affect

22 the value of the claim if they have more dependants, if they

23 have a widow or a widower, if -- all of those things can affect

24 the value of the claim and the criteria include that, the

25 valuation factors in individual review.  But what I was saying

1  before is after you have determined what the value of that

2  claim is, it's one claim for one injury and the trust pays

3  once.

4  Q    And how does the trust deal with situations where, first

5  of all, the way that the trust deals with the consortium

6  claims, the Grace trust and the Grace TDP, is that something

7  new and different in this case or is that something that

8  existed before?

9  A    No, it's the same as it's been since 1995.

10 Q    And is the way that the trust deals with wrongful death

11 and consortium claims something that is unique or specific to

12 Libby?

13 A    No.

14 Q    It affects consortium claims around the country the same

15 way as it would in Montana?

16        MR. LEWIS:  Objection, leading.  There's lots of

17 leading questions here, but he's getting -- going too far now,

18 Your Honor.

19 Q    Okay.  Could you describe how the trust would deal with

20 the situation if there were either a consortium claim or claims

21 by dependants that it was unable to get a release from at the

22 time it settled the case?

23 A    Well, first of all, this trust is not a --

24        MR. LEWIS:  Objection, that's a compound question, I

25 think, Your Honor.  I didn't understand it.

1 Q     Would you describe the process how the trust would deal

2 with a situation if it had a consortium claim where it couldn't

3 get a release?

4 A     First of all, the trust is not in existence yet, so I can

5 only testify to the way other trusts operating under similar

6 provisions have handled this.  It's no different from --

7           MR. LEWIS:  Objection.  He's just established that he

8 can't lay foundation for -- to answer the question.

9           THE COURT:  Sustained.

10 Q    Mr. Inselbuch, do you have experience with how other

11 trusts deal with that situation?

12 A     Yes.

13 Q     And how is it that you came to have that understanding?

14 A     Under the terms of this TDP and all the other TDPs, an

15 entity is created called the trust --

16           MR. LEWIS:  Objection.  The answer is not responsive

17 to the question, Your Honor.

18           THE COURT:  Sustained.

19           MR. FINCH:  Your Honor, I was asking him how is it

20 that he came to know how other trusts deal with consortium

21 claims and he was answering that --

22           THE COURT:  It's irrelevant, Mr. Finch.  Let's get to

23 this one.

24 Q     Is there anything in the TDP or the trust document that

25 would preclude the payment of a consortium claim by the trust?

1 A    No.   The documents provide for the generation of releases.

2 This document does so that when they pay a claim they get the

3 necessary releases to resolve whatever claims exist or they're

4 empowered to.

5         MR. FINCH:  Your Honor, I'd like to confer with my

6 colleagues just for a minute.   I think I might be done, but I

7 just want to --

8         THE COURT:  Yes, I have one question, too, so if I

9 may ask it before you go.  Mr. Inselbuch, you indicated that

10 the average settlement values include something that's slightly

11 above the 50 percent value basically for what debtor has -- the

12 debtor has settled its tort liabilities for.  Does that include

13 the Libby settlements --

14        THE WITNESS:  Yes, they're all --

15        THE COURT:  -- in that 50 percent number?

16        THE WITNESS:  Yes, it would, but in fairness, Your

17 Honor, the Libby numbers, because they're a relatively small

18 number of folks, will have a very small effect on the national

19 values that are involved there.

20        THE COURT:  All right.  Thank you.

21        MR. FINCH:  May I confer with my colleagues?

22        THE COURT:  Yes.

23                     (Pause)

24        THE COURT:  All right.  Folks, I'm being advised that

25 some people who have entered appearances did not sign in, so my

1  court recorder does not know who you are.  Please provide her

2  with a card and sign in the list when you have -- when we have

3  a break.  And, also, while they're conferring, I should make

4  this announcement.  We have a staff person who will be sitting

5  outside the door every morning from eight until nine so that if

6  anyone wants to order CDs of the transcript for that day,

7  please do it in the morning.  Otherwise, we will not be able to

8  make copies by the time staff has to leave that night.  So you

9  won't be able to get them that night when court is done unless

10  you order them that morning before court starts.  So there will

11  be a staff person outside the door every morning for anyone who

12  wants to order a CD.

13          MR. BERNICK:  Your Honor, while Mr. Finch is

14  conferring with Mr. Lockwood, Your Honor addressed relevance

15  objections that were posed as to testimony that would have been

16  offered regarding the experience with the Manville trust and

17  the experience with the Owens Corning or Fibreboard settlement

18  program.  And just to be clear, the Libby claimants have made

19  their equal treatment objection.  There are also objections

20  that have been made regarding the need for a channeling

21  injunction, including objections by them.  I am taking Your

22  Honor's rulings with regard to relevance to be focused on the

23  relevance of Manville and Fibreboard to the issue of equal

24  treatment that the Libby claimants have raised.  Obviously, our

25  burden is to establish the need for five -- you know, whether

1  this plan serves the goals for 524(g) and whether those goals

2  could be accomplished in some other fashion.  And you're not

3  ruling on the relevance of Manville and Fibreboard to the issue

4  of the importance of the channeling injunction.

5          THE COURT:  No, I'm ruling that whether or not

6  Manville and Fibreboard resolve their own individual asbestos

7  liabilities in a particular way is not relevant to how Grace

8  resolves its asbestos liabilities.

9          MR. BERNICK:  Well --

10         THE COURT:  We're in a bankruptcy.  We have a plan.

11 The question is whether this plan equally treats, if that's the

12 appropriate standard, that's the objection, equally treats the

13 Libby plaintiffs.  It doesn't matter whether Manville did it,

14 it matters whether this plan does it.

15         MR. BERNICK:  I understand.  And that's why I say

16 equal treatment.  I understand the Court's ruling would relate

17 to equal treatment.  We also have a burden, though, with

18 respect to this plan to establish that the channeling

19 injunction, in fact, serves the purpose of achieving the goals

20 of 524(g) and whether they can be achieved in some other way --

21         THE COURT:  Why do you have to show whether they can

22 or can't be achieved in some other way?

23         MR. BERNICK:  -- well, it's the importance of the

24 channeling injunction.

25         THE COURT:  I don't -- all right.  Perhaps --

1          MR. BERNICK:  Well, we'll just --

2          THE COURT:  -- I'm missing the significance of the

3   importance of the channeling injunction.  Somebody's going to

4   have to give me a very detailed brief about why the channeling

5   injunction would not be important in the context of this case.

6          MR. BERNICK:  I understand that --

7          THE COURT:  Eight years down the road I think the

8   channeling injunction is important as a matter of law --

9          MR. BERNICK:  Oh, okay.

10          THE COURT:  -- if not a matter of fact.  So somebody

11   raising an issue --

12          MR. BERNICK:  Fine.

13          THE COURT:  -- give me a very detailed brief --

14          MR. BERNICK:  I understand.

15          THE COURT:  -- because otherwise I'm not going there.

16          MR. BERNICK:  Okay.  Got it.

17          THE COURT:  Mr. Finch, are -- I'm sorry, Mr. Lewis,

18   did you have a comment on --

19          MR. LEWIS:  No, I thought he was done.  I was going

20   to ask for a break.  I need a break.

21          THE COURT:  We -- as soon as Mr. Finch is finished

22   we'll take a break.

23          MR. FINCH:  I'll be done in less than two minutes,

24   Tom.  I promise.

25          MR. LEWIS:  That's perfect.  I can survive that long.

1 BY MR. FINCH:

2 Q    Mr. Inselbuch, can you tell us whether or not the same

3 process for resolving asbestos personal injury claims applies

4 to both Libby claimants and people outside of Libby in the

5 Grace TDP?

6 A    Yes, sir, it does.

7 Q    And is -- are the expedited review medical criteria

8 designed to capture everyone who might possibly have an

9 asbestos related disease?

10           MR. LEWIS:  Objection, leading.

11           THE COURT:  Well, it's been asked and answered.

12           MR. FINCH:  With that, Your Honor, I would just make

13 an offer of proof of some additional documents which I think

14 Mr. Lewis will all object to on relevance, but let me just

15 offer them so I can have a record.  The plan proponents would

16 offer Plan Proponents Exhibit 31 which were the claims

17 resolution procedures in place at the time the Manville trust

18 first began resolving asbestos claims at the conclusion of the

19 Manville bankruptcy in 1988.  Is the only basis of the

20 objection relevance, Mr. Lewis?

21           MR. LEWIS:  Yes, sir.

22           THE COURT:  All right.

23           MR. FINCH:  We offer that.

24           THE COURT:  The relevance objection is sustained.

25 If, in fact, it turns out later that something is relevant, you

1  certainly may re-offer, but as I understand the record right

2  now, I see no relevance.

3          MR. FINCH:  Okay.

4          THE COURT:  The objection is sustained.

5          MR. FINCH:  Thank you.  Plan Proponents Exhibit

6  Number 66, Your Honor, is the 1995 Manville TDP that was

7  created at the end process of the class action litigation to

8  restructure the Manville trust.  We offer Exhibit 66.

9          MR. LEWIS:  Objection, relevance.  It is offered for

10 the truth of the matter stated therein?

11         MR. FINCH:  Your Honor, we don't think the hearsay

12 objection applies.  We're not offering -- the document is part

13 of a contract.  It's part -- it's a verbal act.  It's not

14 offered for the truth.  It is what it is.  It creates a legal

15 relationship between the beneficiaries of the Manville trust

16 and the Manville trust.  It's not -- it doesn't fit the --

17         THE COURT:  What's the relevance here?  This isn't

18 Manville.  This is Grace.

19         MR. FINCH:  Your Honor, this is --

20         THE COURT:  Why do I need to get into Manville?

21         MR. FINCH:  Your Honor --

22         THE COURT:  Other courts have litigated Manville.

23         MR. FINCH:  -- I'm not rearguing the relevance

24 objection, I'm just addressing Mr. Lewis's hearsay objection.

25 It's --

1          MR. LEWIS:  I understand you're making an offer of

2   proof and I didn't mean to interrupt that.  My objection is

3   relevance and hearsay.

4          MR. FINCH:  Okay.  As to the relevance, I understand

5   Your Honor has ruled.  Would you like to hear the argument on

6   the hearsay objection?

7          THE COURT:  Not at this time.

8          MR. FINCH:  Okay.

9          THE COURT:  If it ever becomes relevant, I'll hear it

10  then.

11         MR. FINCH:  Okay.  Thank --

12         THE COURT:  The objection is sustained on the grounds

13  of relevance.

14         MR. FINCH:  Thank you.  Exhibit -- the plan

15  proponents would also offer Plan Proponents Exhibit 137 which

16  is the 2002 Manville TDP.

17         MR. LEWIS:  Objection, relevance and hearsay.

18         THE COURT:  All right.  I'm not ruling on hearsay.

19  That's not before me.  I'm ruling on relevance at this point

20  and only on relevance.  It's not admitted because at this point

21  I see no relevance.

22         MR. FINCH:  Okay.  The plan proponents would offer

23  Plan Proponents Exhibit 141 which is the trust distribution

24  procedures filed with a proposed plan of reorganization in the

25  summer of 2002 in the Babcock & Wilcox bankruptcy proceedings.

1          MR. LEWIS:  Same objection, relevance.

2          THE COURT:  Mr. Finch, what --

3          MR. FINCH:  Your --

4          THE COURT:  -- is the purpose?

5          MR. FINCH:  Your Honor, I'm making an offer of proof.

6  My last document is --

7          THE COURT:  You haven't even mentioned Babcock &

8  Wilcox, so what is the proffer for?

9  BY MR. FINCH:

10 Q    Mr. Inselbuch, were you counsel to the Babcock & Wilcox

11 committee?

12 A    Yes, sir.

13 Q    Was the TDP in the Babcock & Wilcox case in 2002 the first

14 one that was filed with a court somewhere to address the new

15 wave of asbestos bankruptcies of which the Grace case was a

16 part?

17 A    Yes, sir.

18          MR. LEWIS:  Objection, leading, also, Your Honor.

19          THE COURT:  That's sustained.

20 Q    What was the Babcock 2002 TDP?

21 A    It was the first generation of TDPs that were crafted

22 after the wave of bankruptcies that came in 2000 that modified

23 what had been the Manville criteria, both with respect to

24 medical issues and with respect to exposure issues, to tighten

25 up all of those criteria so that the expedited review process

1 would be more constrained.

2          MR. LEWIS:  Are you offering that now?

3          MR. FINCH:  I'm offering Exhibit 141, which is the --

4          MR. LEWIS:  Okay.  I understood that question to be

5 foundational.  I did not object to the extent it's substantive.

6 I do object and move that the answer be stricken.  I also

7 object to the exhibit on the grounds of relevance.

8          THE COURT:  All right.  The exhibit would speak for

9 itself, but I see no relevance.  The objection to relevance is

10 sustained.

11          MR. FINCH:  And, finally, Your Honor, the plan

12 proponents would offer a Plan Proponent Exhibit 287 which is

13 the United States Gypsum trust distribution procedures that was

14 approved by this Court in 2006.

15          MR. LEWIS:  Objection, relevance.

16          THE COURT:  Sustained.

17          MR. FINCH:  With that, Your Honor, the plan

18 proponents pass the witness.

19          THE COURT:  All right.  We'll take a ten-minute

20 recess.

21          MR. LEWIS:  Thank you, Your Honor.

22          MR. FINCH:  Thank you, Your Honor.

23          THE COURT:  You're excused, Mr. Inselbuch.

24          THE WITNESS:  Thank you.

25          THE COURT:  I just want to make my -- finish my note.

1 Thank you.

2                      (Recess)

3             THE COURT:  Please be seated.  Mr. Inselbuch?  Mr.

4 Lewis?

5             MR. LEWIS:  Thank you, Your Honor.

6                   CROSS EXAMINATION

7 BY MR. LEWIS:

8 Q    Good morning, Mr. Inselbuch.

9 A    Good morning, Mr. Lewis.

10 Q    How long have you been lead counsel for the ACC in these

11 proceedings?

12 A    From its beginning.

13 Q    And you, I believe, testified that you were the person on

14 behalf of the ACC primarily responsible for the trust agreement

15 and the TDP, is that true?

16 A    Certainly for the TDP.

17 Q    But perhaps not to the trust agreement?

18 A    Well, I don't know what you mean by responsible.

19 Q    Okay.  What I mean, you as lead counsel, were you

20 primarily responsible for the drafting of the trust agreement?

21 A    I was responsible for the product.  I didn't do the

22 drafting.

23 Q    And with respect to the TDP, did you have more direct

24 involvement with drafting the TDP --

25 A    Certainly in so far as it involved changes to accommodate

                **J&J COURT TRANSCRIBERS, INC.**

1  Libby's issues.

2  Q    Very well.  Thank you.  Now, are the TDP disease values

3  based on tort system values?

4  A    You're asking me about the expedited review category

5  values?

6  Q    I'm talking about the TDP disease values.  Are they based

7  on tort system value?

8  A    If you're asking me about the values that are in the

9  expedited review criteria, they are based upon values that were

10 achieved in the tort system.

11 Q    For example, then, if you had a Level 2 claim which

12 expedited review provides for $2,500 per claim, correct?

13 A    I'd have to look and see.

14 Q    Well, assume that to be true.

15 A    Sure.

16 Q    Okay.  Is that intended to approximate the average value

17 in the tort system for that kind of disease?

18 A    It was intended to reflect something a little higher than

19 the average for diseases of -- in that -- of that order of

20 seriousness.

21 Q    And that wasn't to entice or to -- maybe that's too strong

22 a word -- to encourage claimants to proceed with expedited

23 processing under the TDP and the plan, correct?

24 A    Among other things, yes.

25 Q    Okay.  And so the $2,500 for Level 2 is, indeed, above the

1  average value for that kind of claim around the country as paid

2  by W.R. Grace, is that true?

3  A    It's meant to be, yes.

4  Q    Okay.  Was the process of arriving at disease values based

5  on Dr. Peterson's proposed values in consultation with the ACC?

6  A    Yes.

7  Q    And were Dr. Peterson's values based on the Grace

8  historical settlement values and how those values might have

9  evolved absent a Chapter 11 filing by Grace?

10 A    Yes.

11 Q    So then did Dr. Peterson share his views with the

12 committee --

13 A    Yes.

14 Q    -- on what should be done in this particular case?

15 A    Yes.

16 Q    And that's based on Grace's historical settlement history,

17 true?

18 A    Yes.

19 Q    Did it also reflect Dr. Peterson's advice as to whether,

20 if at all, these claims would have evolved over the years had

21 there not been a filing by Grace?

22 A    Yes.

23 Q    Did this evolution include growing the value of the claims

24 to present worth, if you know?

25 A    As I understood it from Dr. Peterson, he was trying to

1  provide the committee with an estimate of what the settlement

2  values would have been as of the time he was doing the work had

3  there not been a Grace Chapter 11.  But there had been other

4  Chapters 11 -- Chapters 11s -- taking other major defendants

5  out of the tort system and, thus, leading potentially to higher

6  amounts of liability for Grace if it had remained in the tort

7  system.

8  Q    Does that explain why the average value for a mesothelioma

9  case -- well, let me first ask a foundational question.  Do you

10 understand that the average value for a meso case against Grace

11 immediately prior to the filing was approximately $90,000?

12 A    I don't recall.

13 Q    So you don't know?

14 A    I don't recall.

15 Q    You can't recall today?

16 A    Correct.

17 Q    But we do know that the value set for a mesothelioma under

18 the TDP and the plan is $180,000, correct?

19 A    That's what it says.

20 Q    But you don't know that?

21 A    I don't carry the numbers in my head, Mr. Lewis.

22 Q    Okay.  Fair enough.  Do you know if the values for Libby

23 that were used to arrive at what you call the special treatment

24 or the extraordinary treatment for Libby claims were also grown

25 to present worth?

1  A    What you mean by grown is to take account for the fact

2  that had Grace not been in Chapter 11, others would have been?

3  Q    Yeah.

4  A    I don't believe they were.

5  Q    So they were not grown or raised to account for, what,

6  inflation and settlements and verdicts?

7  A    That would have resulted from other companies going into

8  Chapter 11 since that was irrelevant with regard to the Libby

9  claims.

10  Q    Yes, but we do know that in the tort system the verdicts

11  have gone up with time, correct, if you know?

12  A    As a general proposition, they've gone up with time.

13  Q    All right.  Now, when Mr. or Dr. Peterson -- is he

14  referred to Dr. Peterson or Mr. Peterson, sir?

15  A    I call him Mark.

16  Q    Okay.  I'll call him Mr. Peterson --

17  A    Fine.

18  Q    -- if that's all right because I don't know him very well.

19  In arriving at these values that he provided for the ACC, did

20  Mr. Peterson have access to the Grace historical settlement

21  values?

22  A    I understood that he did.

23  Q    He had access to that database, correct?

24  A    I understood that he did.

25  Q    And he had access to the historical database as it related

1  to Libby, true?

2  A    I understood that he did.

3  Q    And he had access to Grace's database as it related to

4  non-Libby cases, true?

5  A    I understood that he did.

6  Q    Okay.  And directly or indirectly through Mr. Peterson,

7  the ACC and presumably you had access to the historical

8  database for both Libby exposure cases and non-Libby exposure

9  cases, is that also true?

10  A    I'm not sure.

11  Q    So you don't know?

12  A    I know that no member of the committee that I'm aware of

13  actually did access the historical database, but I'm not sure

14  whether or not they were empowered to.

15  Q    So your testimony is that no member of the committee ever

16  accessed the historical -- the database or Grace's historical

17  settlement values, is that true?

18  A    I believe that's true, other than the information they got

19  from Dr. Peterson.

20  Q    You testified that Level 4B severe disabling pleural

21  disease was developed specifically in response to the Libby

22  claimants, is that correct?

23  A    Yes, sir.

24  Q    And do you know what Level 4B pays?

25  A    I think $50,000.

1  Q    That's what you testified on direct, correct?

2  A    Well, if I had it in front of me.

3  Q    Okay.  And then the plan authorizes an 8X multiplier

4  extraordinary treatment if all criteria are met under the plan,

5  correct?

6  A    It authorizes it whether or not the criteria are met.

7  Q    Okay.  So does that mean --

8  A    I'm sure -- I don't know which criteria you're talking

9  about.

10  Q    Well, let's take the TDP criteria first.

11  A    For what?

12  Q    If the TDP criteria are met and it is demonstrated that

13  the claimant has 95 percent or more Grace exposure --

14  A    Yes.

15  Q    -- then the claimant qualifies for an 8X multiplier,

16  correct?

17  A    If the claimant also satisfies the trust that he has

18  little likelihood of collecting any money elsewhere.

19  Q    Thank you.  With that --

20  A    And he qualifies for up to an 8X multiplier.

21  Q    All right.  Well, in your direct testimony, I thought you

22  said he qualifies for the 8X multiplier.  You didn't say up to.

23  Is that a modification of your earlier testimony?

24  A    I don't believe so.

25          MR. FINCH:  Object to form.

1  Q    Okay.  All right.  I understand, you know.  In any event,

2  just to be clear --

3  A    In fact, I testified at length that you didn't like that.

4  Q    I'm sorry.  I didn't hear what you said to me.

5  A    I think I testified at length that this was an objection

6  that Libby had that you wanted an automatic eight times

7  multiplier and the committee would not agree.

8         MR. LEWIS:  I want to be polite to you, sir, but you

9  should let me ask the questions and I move to strike that

10  volunteer testimony, Your Honor.

11         THE COURT:  Sustained.

12  Q    Sir, that 8X multiplier applies not just to Libby, but to

13  everybody in the United States if they can meet the criteria

14  and show that they had at least 95 percent Grace exposure and

15  had no substantial likelihood of recovery elsewhere, correct?

16  A    Yes, sir.

17  Q    Okay.  So it does -- even though it was developed for

18  Libby, it's applied across the board, correct?

19  A    Yes, sir.

20  Q    All right.  Now, when you arrived at that 8X multiplier,

21  you had a method in doing that, correct?

22  A    By you, you mean the committee?

23  Q    You and the committee.

24  A    There was a method, yes.

25  Q    And the method was that eight times $50,000 was $400,000

1  which fairly well approximated the average recovery in Libby or

2  represented Libby claimants exposed to Grace asbestos, correct?

3  A    I don't remember it quite that way.

4  Q    Is that what you testified to in your deposition, or do

5  you know?

6  A    I don't know.  I can't recite what I testified to in my

7  deposition.

8  Q    Okay.  In any event, the ACC recognized that the 400,000

9  historic settlement value only for -- with respect to severe

10  disabling pleural disease under Level 4B, correct?

11  A    I don't understand the question.

12  Q    All right.  What historic value did the ACC use for

13  purposes of assigning value for impaired but not severe cases?

14  A    You mean Level 3?

15  Q    Yes.

16  A    The unimpaired cases or the lower less impaired cases were

17  not specifically reviewed in this context.  We were trying to

18  put a value on the severely disabled pleural disease and couple

19  that with a multiple which made available in the extreme cases

20  would come up to values which we were told the Libby claimants

21  were achieving against Grace before the bankruptcy.

22  Q    So let me understand that correctly.  So you applied the

23  8X multiplier and the other criteria to achieve approximation

24  of what this historical Libby recovery was for just the

25  impaired and severely disabled claims, is that true?

1  A    That's not what I said.

2  Q    Well, is it true?

3  A    I'm not sure.

4  Q    Okay.  Did you say that you did not use the historical

5  values for Libby's settlements in reaching the recovery that

6  would be used for impaired but not disabled claimants under

7  Level 3?

8  A    That's correct.

9  Q    And may I assume that you did not use Libby historical

10  values for Level 2 either?

11  A    That's correct.

12  Q    Okay.  Did you use Libby historical values with respect to

13  the mesothelioma claims, if you know?

14  A    We looked at that and didn't believe that any change

15  needed to be made.

16  Q    Do you know that there are a number of cases in Libby

17  where impaired but not disabled claimants under the TDP

18  achieved settlements in excess of 400,000?

19  A    Yes, there are cases like that all over the country.

20  Q    Did you know that in Libby all of the cases resulted in

21  some recovery?

22  A    I don't know that one way or the other.

23  Q    Did you know in Libby that none of the cases were

24  dismissed prior to trial or settlement?

25  A    I don't know that one way or the other.

1  Q    I'm going to jump around here just a little bit.  Near the

2  end of your testimony, you talked about wrongful death and loss

3  of consortium, do you recall that?

4  A    Yes.

5  Q    And you said that under this plan wrongful death or

6  consortium claims are treated as one claim, one recovery, is

7  that true?

8  A    One injury, yes.

9  Q    One injury, fair enough.  And, therefore, one recovery?

10 A    Yes, sir.

11 Q    Okay.  Did the ACC look at average values, average

12 historical values for Grace claims in Libby in arriving at its

13 conclusion that wrongful death claims or consortium claims

14 would be treated as one claim under the plan?

15 A    I'm not sure I understand the question, but I think the

16 answer is no because it would have not been relevant to our

17 thinking.

18 Q    Do you remember that -- at English common law there was no

19 such thing as a wrongful death claim?

20 A    Do I remember that?  I'm not that old.

21 Q    Well, do you understand that all wrongful death claims are

22 creatures of statute?

23 A    I believe I learned that in law school.

24 Q    All right.  And that started with Lord Campbell's Act, do

25 you recall that now?

1  A    No.

2  Q    Okay.  Well, let me talk to you about that a little bit.

3  So you treat under the plan all claimants equal with respect to

4  wrongful death claims, correct?

5  A    We try to, yes.

6  Q    Do you know if there are states where wrong -- damages for

7  wrongful death are not recoverable?

8  A    Yes.

9  Q    Do you know how wrongful death and survivorship claims are

10  handled in Montana?

11  A    I don't recall.  It was explained to me some months ago,

12  but I don't recall specifically.

13  Q    Do you understand that in -- when someone dies of

14  asbestosis in Montana that there can be both a survival and a

15  wrongful death claim?

16  A    Yes, and it's true in other jurisdictions, also.

17  Q    So there was no attempt --

18          THE COURT:  Wait.  Excuse me, just a minute.  Just

19  tell him to do what she asks.  Thank you.  I'm sorry.  Go

20  ahead.

21          MR. LEWIS:  Thank you, Your Honor.

22  Q    So was this an example of the rough justice that you were

23  attempting to achieve by the TDP and the plan?

24  A    No.  It was a codification of what we understand goes on

25  in the tort system throughout the country that when defendants

1 settle cases where there's a death involved, they like to pay

2 one amount of money and they like to resolve the claim with

3 everybody that might have a piece of the statutory rights.  And

4 that's what the trust is trying to do.

5 Q    Is settlement of wrongful death claims mentioned in the

6 plan?

7 A    I think if you look at the definition of personal injury

8 or whatever that word of art is it will include claims for

9 death and survivorship and whatever else in the plan glossary.

10 Q    Is there anything --

11 A    I think they're called PI trust claims, sorry.

12 Q    I'm sorry.  I didn't mean to interrupt you.

13 A    No, I'm sorry.

14 Q    Is there any place in the plan that prescribes who has to

15 sign a release or if a release has to be signed to get any

16 recovery under the plan?

17 A    I think the TDP and the trust agreement somewhere provide

18 for the requirement that proper releases be obtained and the

19 trustees will determine what that means.

20 Q    But that would be up to the trustee?

21 A    And it will vary from state to state.

22 Q    Okay.  But even though the releases might vary, the amount

23 recoverable for wrongful death would be the same, correct?

24 A    No.  It depends what disease.  It would depend upon

25 whether the case went through individual review or not.  It

1 would depend upon whether it was an extraordinary claim.  The

2 amounts could be very different.

3 Q     But the claim would be resolved as one injury?

4 A     That would be the intention.

5 Q     So even if under Montana law a plaintiff's survived for an

6 appreciable period of time, say many years before he died, and

7 then his beneficiaries brought a wrongful death claim, there

8 couldn't be two recoveries under that situation with respect to

9 the TDP, correct?

10 A     That's correct.  But all of those factors should be

11 considered in the amount that's considered in individual

12 review.

13 Q     Okay.  Let's talk about individual review for a minute.

14 You said that individual review could be done in more than one

15 way, correct?

16 A     No, the process is always the same.

17 Q     What is the process?  Just refresh my recollection on

18 that.

19 A     All right.  Claimant asks to be -- have the claim

20 considered in -- well, one way is if the claim is rejected

21 under expedited review and the claimant believes it was

22 wrongfully rejected.  The claimant can take up through the ADR

23 process the question of whether that rejection was correct.

24 Holding that aside, a claimant can elect individual review

25 either to deal with that question or to deal with valuation

1  questions.  And when the claimant does that, the trust will

2  have developed some process for considering what the trust

3  might or might not offer by way of compensation.

4  Q    What plan -- what process is identified in the plan?

5  A    The plan provides the criteria and the factors that the

6  trust is required to implement, who the people are that the

7  trust decides to hire, whether they would be out -- an outside

8  office or whether they would be internal personnel or whether

9  they would be some other functionary who would do it in the

10  first instance, that's left for the trustees to decide.  They

11  also can decide what piece of paper the claimant might have to

12  file to elect individual review.  Things like that are left to

13  the discretion of a trustee.

14  Q    Let me be more specific, sir.  Does the plan provide for

15  arbitration in some circumstances?

16  A    Yes.

17  Q    Okay.  Does it provide for binding arbitration?

18  A    It does.

19  Q    Does it provide for mediation?

20  A    Yes.

21  Q    Who picks those people that do the mediation and the

22  arbitration?

23  A    The mediators and the arbitrators are selected by the

24  trustees with the concurrence of the TAC members and the

25  futures rep.

1  Q    Does the ACC have any say in who picks those people?

2  A    No.

3  Q    How about with respect to the extraordinary claims, who

4  picks the extraordinary claims panel?

5  A    The trustees would --

6         MR. BERNICK:  Your Honor, I'm going to object.  I

7  don't think this goes to the question of equal treatment.

8  There's -- this issue comes up later on in the course of the

9  trial.  It doesn't go to equal treatment.  It's not Libby

10 specific.

11        MR. LEWIS:  Well, I don't think he can object.

12        THE COURT:  Why is the --

13        MR. LEWIS:  I mean, he's not handling this witness.

14 I don't understand this.

15        MR. BERNICK:  I represent W.R. Grace.  I don't

16 represent, Your Honor, the ACC.

17        THE COURT:  He clearly has standing on behalf of the

18 debtor to object.  But, regardless, well, how does this affect

19 the Libby specific issues.

20        MR. LEWIS:  Well, it's cross examination of matters

21 covered in direct examination.

22        THE COURT:  It is.  And the issues will come up at a

23 later time.  We've narrowed this trial so that the Libby

24 specific issues are what are to be tried first.  That was my

25 understanding of the case procedure.

1          MR. LEWIS:  Well, I think with a couple more

2   questions we may or may not establish as it relates to Libby.

3   I don't know what his answer is going to be, Your Honor.

4          THE COURT:  Well, okay.  You've got a little leeway,

5   but move it to something that's relevant.

6          MR. LEWIS:  Yeah, I will move it along.

7          THE WITNESS:  Could I have the question back?

8   Q    Yeah.  Who picks -- we have an -- we can have

9   extraordinary claims under the plan, correct?

10  A    Yes.

11  Q    Okay.  And how does the extraordinary claims process work?

12  A    Well, a claimant -- presumably pieces of paper will be

13  generated by the trust that will govern what claimants have to

14  do to say I want to be treated as an extraordinary claim.  When

15  they do that, the trust will respond.  If the trust agrees with

16  the claimant, that will be -- then they would proceed as an

17  extraordinary claim.  If they do not agree with the claimant,

18  then there is access to what's called the extraordinary claims

19  panel which will ultimately decide the question.

20  Q    And who sits on that panel?  Who decides who sits on that

21  panel?

22  A    The trustees with the consent of the TAC members and the

23  futures representative.

24  Q    All right.  Is there -- can a claimant who's denied

25  extraordinary claims treatment after he has a hearing or

1  consideration by the panel, and after the panel makes decision,

2  is it an exit to have a jury trial?

3  A    No.

4  Q    Why not?

5  A    The plan does not so provide.

6  Q    The only way that a claimant can get a jury trial is to

7  first go through the mediation non-binding arbitration process

8  and if he's not happy ask for a jury trial, is that correct?

9  A    That does not have to do with extraordinary claims, but

10 that's correct.

11 Q    I understand that.  What I'm saying is if a person wants

12 to access the extraordinary claims process does he effectively

13 waive his right to a jury trial under the plan?

14 A    No.  No, there is no right to a jury trial on a question

15 of extraordinary claims, but on all the issues of valuation

16 they're not trumped by seeking extraordinary claims treatment.

17 Q    Okay.  The point I'm making though is if a claimant

18 decides to seek extraordinary claims treatment which would

19 include the eight times multiplier, is that correct?

20 A    It could.

21 Q    Okay.  If he's dissatisfied he's stuck with what the

22 extraordinary claims panel says, right?

23 A    On the question of whether it's an extraordinary claim,

24 that's correct.

25 Q    Now, what about the jury trial?  What kind -- if a

1 claimant goes through the process and qualifies for a jury

2 trial, does he get a jury trial as to the tort value of his or

3 her case?

4          MR. BERNICK:  Your Honor, again, this is all -- not a

5 word is Libby specific or goes to discrimination or unequal

6 treatment.  Everybody gets the same process.

7          THE COURT:  So far that's what the witness has been

8 saying.  If you want to show some difference I think we could

9 get to those questions.

10          MR. LEWIS:  I do have another question that will

11 establish.

12 Q    Did the ACC assume that virtually all of the Libby claims

13 would go through the extraordinary claims process?

14 A    We didn't know, because Libby has been asserting for a

15 long -- the Libby claimants have been asserting for a long time

16 that they have entitlements to recovery -- to substantial

17 recoveries elsewhere.  So we didn't know exactly what they

18 would be doing, or what they would be claiming, and we don't

19 know today what they might or might not be claiming at the

20 trust.

21 Q    Well, let me ask it this way, did the ACC anticipate that

22 Libby claimants almost all have to seek extraordinary review to

23 obtain a just result?

24 A    No.

25 Q    Was the 8X multiplier -- well, let me withdraw the

1  question.  The 8X multiplier which is part of the extraordinary

2  claims process was in fact developed in response to the Libby

3  claims.  You testified to that, true?

4  A    The claims that were being made on behalf of the Libby

5  claimants.  Yes.

6  Q    Let's talk about punitive damages.  You testified on

7  direct that punitive damages could not be considered or would

8  not be considered in this plan, is that correct?

9  A    That's correct.

10  Q    Is there anything in the Bankruptcy Code that prevented

11  the plan proponents from including something for claimants who

12  could show punitive conduct on the part of Grace?

13          MR. FINCH:  Objection.  Calls for a legal conclusion.

14          THE COURT:  Doesn't it call for a legal conclusion?

15          MR. LEWIS:  No.  I asked if there's anything in the

16  plan, Your Honor, that provides --

17          THE COURT:  No, you asked him the Bankruptcy Code.

18          MR. FINCH:  He asked him the Bankruptcy Code.

19          MR. LEWIS:  Well, I'll just -- I'll rephrase the

20  question.

21  A    I don't know.  It's all right.

22  Q    You don't know?

23  A    I don't know.

24  Q    All right.

25  A    I don't purport to be an expert on the Bankruptcy Code.

1           THE COURT:  Okay.

2   Q    So you don't know whether there's any law that would

3   require inclusion of punitive damages in -- let me finish -- in

4   a plan --

5           MR. FINCH:  Objection.

6   Q    -- or exclude punitive damages in a plan?

7           MR. FINCH:  Objection.  Calls for legal conclusion.

8           MR. BERNICK:  It also doesn't go to discrimination.

9   Same rule applies to all jurisdictions.

10          THE COURT:  Both sustained.

11  Q    Have you ever been to Libby?

12  A    No, sir.

13  Q    Ever reviewed any Libby specific claims?

14  A    I don't believe I reviewed any specific claims, Libby or

15  otherwise.

16  Q    Now you said the medical criteria came from the PI

17  Committee upon consultation with medical advisors, is that

18  correct?

19  A    Well, apart from the Libby pieces those criteria had

20  existed for a long time and were brought forward here.  The

21  Libby pieces --

22  Q    Okay, so you --

23  A    -- yes.

24  Q    Okay.  So as to the non-Libby claimants you didn't consult

25  any medical experts to decide what the medical criteria would

1  be for them, correct?

2  A    Not in connection with the Grace TDP.

3  Q    But only as to Libby did you consult to medical.

4  A    Because we were going to make a modification.

5  Q    Fair enough.  Now, you indicated as to caps, that the

6  first reason for caps was you were trying to establish Grace's

7  several share.  Do you recall that testimony?

8  A    We were trying to establish Grace's several share, but

9  that wasn't the reason for the cap.

10 Q    But in response to that you said you were trying to --

11 when you were asked about the caps that's one of the things you

12 testified to, do you recall that?

13 A    Not that way.

14 Q    Well, in any event, were you trying to establish Grace's

15 several share for some purpose?

16 A    Yes.  For the dollar values for the categories in the

17 plan.

18 Q    All right.  Now in evaluating Grace's several share does

19 that depend greatly on state law?

20 A    Not in our view.  We took the historical settlements, the

21 hundreds of thousands of resolved cases throughout the country,

22 and we did not, as I recall, investigate the vagaries of the

23 different state laws.

24 Q    Okay, but -- so then by several share you didn't mean

25 joint and several liability.  You meant what Grace's share

1 would be of a recovery when there were multiple defendants or

2 no defendants, is that what you're talking about?

3 A    No.   Something north of 95 percent of cases -- asbestos

4 cases in the tort system settled.   Very, very few actually go

5 to verdict.   The history of those settlements was what we took

6 to -- what we understood to be Grace's view of what its several

7 share of the liability was.

8 Q    Okay.   So if Grace paid $20,000 in a Monokote claim --

9 A    Yes.

10 Q    -- that your -- as to that particular claim that would be

11 Grace's view as to their several share in that claim, is that

12 what you're saying?

13 A    Yes, in a general sense.

14 Q    And if Grace paid 500,000 for a Libby exposure at the mine

15 or mill that would be Grace's view as to its several share in

16 that case.

17 A    No.   Because the concept of a several share as we

18 understood it did not apply in Libby.

19 Q    And why not?

20 A    Because as we understood it, the Libby claimants did not

21 have claims against other asbestos manufacturers.

22 Q    For the most part -- well, let me rephrase that.   I think

23 we're agreeing here.   So as to a Monokote claim or some other

24 products claim there might be 20 or 30 or 40 defendants,

25 correct?

1  A    There might be.

2  Q    And in that case if all defendants contributed, Grace's

3  several share would be reduced substantially, correct?

4  A    Several share would be what it is.

5  Q    But in Grace cases in Libby where the exposure was almost

6  all Grace asbestos --

7  A    Yes.

8  Q    -- then generally in many cases there were no other

9  defendants, correct?

10  A    Apart from the argument that the Libby folks have been

11  making that they have these claims against other entities,

12  that's correct.

13  Q    All right.

14  A    As far as we knew there were no other asbestos products to

15  which the Libby claimants were exposed.

16  Q    Right.  So if the claim against the railroad was an

17  asbestos claim was based on exposure to --

18  A    Grace product.

19  Q    -- Grace product.

20  A    Yes, sir.  That's our understanding.

21  Q    And same with the state of Montana, right?

22  A    That's our understanding.

23  Q    All right.  So the Grace share would be the dominant --

24  they'd be the dominant reliable party, do you agree with that

25  in that situation?

1  A    No.

2  Q    Okay.

3  A    As I understood these claims they were independent tort

4  claims to which Grace might not even be a joint tort feasor.

5  Q    All right.  But the Grace settlement value that they paid

6  that's the best indicator of what their share of liability is.

7  We can agree with that, correct?

8  A    I guess so.  I'm not sure I understand.  I'm not sure

9  we're saying different things.

10  Q    Okay.  Well, did Dr. Peterson's numbers come -- were those

11  based upon Grace data as to the historical value of

12  settlements?

13  A    That was our understanding.

14  Q    All right.

15          MR. LEWIS:  I'll try to speed it up, Your Honor.

16  Just let me review my notes.  I'm about done.

17          THE COURT:  Sure.

18                    (Pause)

19  Q    One last line of questions.  Do you know what the average

20  settlement value according to Grace records was for settlements

21  in Libby, or arising from Libby exposure would be a more

22  correct way to ask the question.

23  A    Not as I sit here today.

24  Q    And do you know --

25  A    I was exposed to all those numbers at one point.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  Fair enough.  And you don't know what the average

2  settlement of value -- amount was for non-Libby exposure cases

3  according to Grace's data, is that true?

4  A    As I sit here today, no.  I don't -- I can't recite on

5  those numbers.

6  Q    Okay.  So if I have this correct, just summarizing your

7  testimony as to your role with respect to the TDP -- don't take

8  this as an offense, but were you the big picture guy here?

9  A    Whatever its warts, I'm responsible for it.

10  Q    Fair enough.  But the devil's always in the details in

11  these kinds of things, correct?

12  A    There are devils in the details and there are devils

13  elsewhere.

14  Q    In any event you weren't the guy that provided the

15  details.  The details were provided -- the number details were

16  provided by Mr. Peterson, true?

17  A    He made recommendations to the committee members with

18  respect to the numbers.  The committee members themselves were

19  very experienced in this area, and had -- each of them had

20  their own views about numbers as well.  What you see in the TDP

21  is what the committee ultimately, after consulting with the

22  futures representative, agreed those numbers should be.

23  Q    But you personally were not involved in those numbers,

24  correct?

25  A    I was, as you say, the big picture fellow.  I was --

1  Q    There you go.

2  A    I was running the conversation.

3  Q    All right.  Thanks a lot.

4          MR. LEWIS:  Pass the witness, Your Honor.

5          MR. FINCH:  Redirect, Your Honor?

6          THE COURT:  All right.  Mr. Finch.

7                    REDIRECT EXAMINATION

8  BY MR. FINCH:

9  Q    Can you describe how the several share concept relates to

10 the multiplier in the extraordinary claims provision?

11 A    Yeah.  The expedited review provisions are based on the

12 assumption that in the overwhelming number of cases the

13 claimant will have claims not only against Grace, but against a

14 multiplicity of other defendants, because of the nature of the

15 work usually done.  But in some small minority of cases that is

16 not the fact.  And in those situations where the liability that

17 the particular claimant could assert is primarily against

18 Grace, it would be unfair to limit the recovery that that

19 person would have in the same way we limit the recovery for

20 someone who has a multiplicity of other sources of recovery.

21 That is what the extraordinary claims provision is designed to

22 fix in a kind of rough justice way.  Multiply the available

23 maximum recovery so that you can accommodate the fact that the

24 particular claimant has little likelihood of recovery

25 elsewhere.

1  Q    In response to one of Mr. Lewis' questions you said that

2  the extraordinary claims panel's decision was final as to

3  whether or not the claim was extraordinary.  Do you recall that

4  testimony?

5  A    Yes, sir.

6  Q    What do you mean by whether or not the claim is

7  extraordinary?

8  A    The only question that goes to the extraordinary claims

9  panel is whether or not the claim satisfies the requirements

10  for extraordinary claims treatment.

11  Q    You mean the 95 percent or 75 percent, is that what you

12  mean by that?

13  A    Yes, sir.

14  Q    And what about the question of what disease the claimant

15  has?  Is that decided by the extraordinary claims panel?

16  A    No.

17  Q    And that's something that can be decided by either an

18  arbitrator or the juror.

19  A    Yes.

20        MR. LEWIS:  Objection, leading, Your Honor.

21  Q    How is that question decided?

22  A    Other than whether or not the claimant's claim is

23  extraordinary or not all other issues in individual review can

24  go up the ADR channel and ultimately exit to the tort system if

25  the claimant wishes to.

1 Q    You were asked some questions about the wrongful death and

2 consortium claims.  Why wasn't the TDP changed at the request

3 of the Libby claimants to have separate categories and separate

4 values for wrongful death and consortium only claims?

5 A    Apart from it being seen as unnecessary it would create a

6 multiplicity of differing calculations depending upon what the

7 operative state law would be.  And in our judgment if you

8 permitted for a multiplicity of claims by various people around

9 the same tort or the same damage, you would -- you could -- the

10 process costs would be imponderable.  We do, under this

11 document, what defendants do in the tort system.  They seek to

12 resolve the claim for the injury and put to rest whatever the

13 various pieces of that claim might be at the same time;

14 whether it's wrongful death, whether it's a survivorship claim,

15 whether it's a loss of consortium claim, and whether it's the

16 underlying claim itself.  There's a package of injury there

17 that the TDP designs to pay once and provides the trust with

18 the right to seek releases from whomever it might think might

19 have such a claim.

20 Q    Why wasn't the little likelihood of substantial recovery

21 elsewhere provision eliminated at the request of the Libby

22 claimants?

23 A    It's at the heart of the extraordinary claims provision.

24 The idea of the extraordinary claims provision is that the

25 claimant can't recover somewhere else.  If they can recover

1   somewhere else --

2        MR. LEWIS:  Your Honor, that's beyond the scope of my

3   cross.  I did not touch that subject.

4        THE COURT:  And it's been asked and answered, Mr.

5   Finch.  Let's get to something new if you have something new.

6   Q    You testified that about how the $50,000 average value for

7   severe disabling pleural disease related to the 8X multiplier

8   in Libby claimants' history.  Do you recall that testimony?

9   A    Yes.

10  Q    Why didn't the committee do a similar analysis for the

11  unimpaired non-malignants from Libby?

12  A    The committee was generally unsympathetic to the idea that

13  there would be the ability to collect substantially larger sums

14  above what the national averages were for what were regarded as

15  relatively minor injuries.  The committee was most concerned

16  with providing appropriate compensation for people who are

17  seriously damaged by exposure to Grace asbestos.

18  Q    Did the fact that there was comeback rights as between the

19  non-malignant disease categories play a role in that

20  consideration?

21  A    Sure.  If they ultimately got sick -- got sicker they

22  could come back again and collect again.

23  Q    When it came to dealing with the Libby claimants and their

24  concerns that they expressed to the TDP, who was the person

25  that primarily was most involved in dealing with those concerns

1 from counsel to committee?

2 A    From counsel to committee myself and to some degree

3 yourself.

4 Q    And when it came to the details of what they were

5 complaining about did you have extensive communications and

6 correspondence with counsel for Libby claimants?

7              MR. LEWIS:  Objection, leading, Your Honor.

8              THE COURT:  Sustained.

9 Q    Could you describe the process that you dealt with the

10 counsel for the Libby claimants?

11 A    Well, first of all, the committee appointed a subcommittee

12 or actually designated its negotiating subcommittee to address

13 these issues with counsel and with the Libby constituency.  In

14 the course of that, I, as counsel, engaged in a number of

15 conversations with counsel for the Libby claimants.  We

16 exchanged a great deal of correspondence on the subject, and I

17 would report back.  Sometimes the members of the committee

18 would be present in those discussions, sometimes not.

19              MR. FINCH:  Your Honor, I don't have anything

20 further.

21              THE COURT:  Mr. Lewis, any recross?

22              MR. LEWIS:  No, Your Honor, no more questions.

23              THE COURT:  You're excused, Mr. Inselbuch.  Thank

24 you.

25              MR. INSELBUCH:  Thank you, Your Honor.

1          THE COURT:  Mr. Finch.

2          MR. FINCH:  Your Honor, the next plan proponents'

3 witness would be Dr. Laura Welch.  I don't know what Your

4 Honor's plans are for the lunch break, but before we put on Dr.

5 Welch could I have a five minute break?

6          THE COURT:  Well, maybe this is a time to recess for

7 lunch.  How long do you folks need?  We are going to stop trial

8 everyday at six except, I think you got the word, the final

9 Thursday.  I have to stop at noon.  I had an emergency.

10          MR. FINCH:  Is there also a stoppage at four on

11 Thursday or is that --

12          THE COURT:  This Thursday.  Yes.

13          MR. FINCH:  This Thursday it'll stop at four.  I

14 think Dr. Welch's direct will take an hour, an hour and 15

15 minutes max.

16          THE COURT:  So you folks tell me.

17          MR. FINCH:  Is the question how long do we want for

18 lunch?

19          THE COURT:  Yes.

20          MR. BERNICK:  I think during the estimation trial it

21 ended up being kind of, if you say 45 minutes we get started in

22 an hour.

23          THE COURT:  It's hard to get up and down the

24 elevators.

25          MR. BERNICK:  Yes.  But I think that the more that we

**J&J COURT TRANSCRIBERS, INC.**

1  adhere to the schedule which -- and I commend counsel for the

2  Libby claimants for either being deliberately succinct or in

3  any event being naturally succinct, but we're on schedule and I

4  think that if we keep it 45 minutes and therefore make sure

5  that we're back in an hour we're going to move through this.

6          THE COURT:  All right.  Then you want to do -- we'll

7  take a lunch recess now then so that you can start your witness

8  and then we'll continue with her through the afternoon.  So

9  we'll be in recess until one o'clock.  We will start at one

10 o'clock on time.

11         MR. FINCH:  Thank you, Your Honor.

12         THE COURT:  All right.

13                       (Recess)

14         THE COURT:  Please be seated.  Mr. Finch.

15         MR. FINCH:  Nathan Finch for the asbestos claimants

16 committee.  Your Honor, the plan proponents' next witness is

17 Dr. Laurie Welch.  And as with the other witness we have a set

18 of exhibits and we also have a demonstrative -- set of

19 demonstrative exhibits.  May I approach the bench and hand Your

20 Honor her copy?

21         THE COURT:  Yes.  Thank you.  I think Dr. Welch needs

22 to be sworn in.

23

24 L A U R A   W E L C H, WITNESS, SWORN

25                    DIRECT EXAMINATION


**J&J COURT TRANSCRIBERS, INC.**

1 BY MR. FINCH:

2 Q    Could you state your name for the record, Dr. Welch.

3 A    Laura Stewart Welch.

4 Q    Did you prepare some slides for your testimony today?

5 A    Yes, I did.

6 Q    Did you review them all?

7 A    I did.

8 Q    Do these slides accurately describe your qualifications

9 and the opinions and subject matters of your testimony?

10 A    Yes, I think they do.

11 Q    Do you believe that they will help the Court to understand

12 the testimony you're about to give?

13          MR. FINCH:  Your Honor, these slides are in the slide

14 show book.  They have been marked plan proponents Exhibit 174.

15 If I could have the slides up on the screen.  A copy of them

16 has been provided to counsel for the Libby claimants this

17 morning.

18 Q    Dr. Welch, could you describe your educational background,

19 please?

20 A    Yes.  I graduated with a Bachelors in biology from

21 Swarthmore College in 1974, and I graduated from the State

22 University of New York at Stony Brook Medical School in 1978.

23 I then did a residency program in internal medicine at

24 Montefiore Hospital which is in the Bronx.  It's part of the

25 Albert Einstein School of Medicine.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Are you licensed to practice medicine?

2  A    Yes.  In the state of Maryland.

3  Q    What are your areas of specialty?

4  A    I'm board certified both in occupational environmental

5  medicine and in internal medicine.

6           MR. FINCH:  Can I have the next slide, please.

7  Q    What is internal medicine?

8  A    It's medicine for adults.  It's really general practice,

9  but restricted to adults.  No kids and no ObGyn.

10  Q    And what is occupational medicine?

11  A    It's a specialty that focuses on the relationship between

12  individual and work or their environment.  So it can range from

13  setting up medical programs for groups of workers to prevent

14  illness to treating individuals with work related conditions.

15  It's very broad, but it's really that intersection between work

16  and disease.

17  Q    Could you tell the Court what formal training -- advanced

18  training you've had in epidemiology?

19  A    Yes.  As part of my residency in internal medicine I took

20  about three-quarters of a Masters in public health at the

21  Columbia School of Public Health.  We had a joint relationship

22  with Columbia School Public Health.  So I took advanced

23  training in epidemiology and statistics and in public health.

24  Q    Have you held any faculty positions at a medical school?

25  A    Yes.  I was on the faculty at Yale University School of

1 Medicine in the 1980s.  Actually I was at Einstein for a year

2 prior to going to Yale.  And then in 1985 moved to Washington

3 and took a full-time position at the George Washington

4 University School of Medicine.  I'm currently adjunct there,

5 but I've been on the faculty there since 1985.

6 Q    Were you a chair of any departments while you were at

7 George Washington?

8 A    Yeah.  I was chair of the Department of Environmental and

9 Occupational Health.

10         MR. FINCH:  Next slide, please.

11 Q    Could you describe other professional positions you've

12 held since 1985?

13 A    Yes.  As I mentioned I was full-time at GW, at George

14 Washington, and that was for about 12 years.  And then I kept a

15 faculty appointment there, but I went to work for the

16 Washington Hospital Center which is the largest hospital in

17 Washington, D.C.  And I ran the occupational environmental

18 programs for the hospital which included workers compensation,

19 employee health, short and long-term disability, as well as a

20 practice seeing people with work related conditions.  Then in

21 2003 I took my current job, I'm medical director for an

22 organization called The Center for Construction Research and

23 Training that focuses on improving health and safety in the

24 construction industry in the U.S.

25 Q    Is that the CPWR entity that's up there?

1  A    Correct.

2  Q    Could you describe why you decided to leave George

3  Washington and take a position at the CPWR?

4  A    Well, both at GW and at the hospital center my work kept

5  expanding to fill the time I didn't have and I had two

6  teenagers.  So although CPWR is a great job it was a way for me

7  to kind of step back from being so busy and widespread and be

8  able to get my kids through highschool.

9            MR. FINCH:  Next slide, please.

10 Q    Have you been a consultant to any agencies of the United

11 States Government on medical issues or epidemiological issues?

12 A    On the slides we have consultant to NIH.  I've also been a

13 consultant to EPA, OSHA and NIOSH which are the three agencies

14 that deal with health and safety.

15 Q    On what types of issues?

16 A    EPA, it was regarding Love Canal.  On OSHA it was help to

17 set up medical standards particularly for ergonomics, but also

18 from other chemical exposures.  And for NIOSH for just multiple

19 things, peer review, grants review, documents review, a range

20 of different consultations.

21 Q    Have you served as a peer reviewer for -- in the medical

22 journals?

23 A    Yes.

24 Q    Could you describe what those are?

25 A    Yeah.  I'm currently a peer reviewer for American journal

1  Industrial Medicine, the Scandinavian Journal Work

2  Environmental Health, and the Journal of Occupational

3  Environmental Medicine.  I probably do three or four papers for

4  each of those journals every year.  And then occasionally for

5  environmental research and environmental health prospectives,

6  The Journal The American Medical Women's Association, a range

7  of others that send me an occasional paper.

8  Q    Over the course of your medical career did you have

9  occasion to see and treat patients with asbestos related

10 diseases on a regular basis?

11 A    Yes.

12 Q    Where and when?

13 A    Well, starting actually from just when I finished my

14 residency at Albert Einstein in New York we set up an

15 occupational medicine clinic at Montefiore.  And then through

16 my whole career at Yale, at GW and at the Washington Hospital

17 Center.  When I went to work for CPWR I stopped having a

18 clinical practice.  So for about 20 years I had a regular

19 practice and a good proportion of the patients I saw had

20 asbestos exposure and asbestos related diseases.

21          MR. FINCH:  Next slide, please.

22 Q    Over the course of your career approximately how many

23 people have you diagnosed and treated with asbestos related

24 illnesses?

25 A    Well, as a ballpark I'd say around a thousand.  It could

Welch - Direct/Finch                              112

1  be more than that.

2  Q    And what diseases did these individuals suffer from?

3  A    Well, generally the majority was non-malignant asbestos

4  related disease like asbestosis or pleural thickening from

5  asbestos, some lung cancers, one or two people with

6  mesothelioma where I was the diagnosing physician.

7  Q    In the course of your medical career have you had the

8  occasion to review x-rays on a regular basis for purposes of

9  diagnoses and treatment of people with asbestos related

10 disease?

11 A    Yes, I have.

12 Q    Do you review pulmonary function tests on a regular basis

13 as part of your medical practice?

14 A    Yes, I do.

15 Q    Are you a B-reader?

16 A    No, I'm not.

17 Q    In addition to seeing patients for purposes of diagnosis

18 and treatment have you also had occasion to review the files of

19 people who have been deceased as a result of asbestos related

20 diseases for the purposes of giving opinions about what caused

21 their demise?

22 A    Yes, I have, on a pretty regular basis.

23 Q    You've served as an expert witness or expert consultant in

24 asbestos personal injury cases?

25 A    Yes, I have.

1  Q    Have you ever designed an epidemiological study to study

2  disease in asbestos exposed populations?

3  A    Yes, I have.

4         MR. FINCH:  Next slide, please.

5  Q    Could you describe the various studies that you have

6  designed and been the principal investigator for?

7  A    The two large population-based surveys that I've been

8  involved with, one, the longer one is for sheet-metal workers.

9  Sheet-metal workers are a construction craft that install duct

10 systems.  And they had exposure to asbestos due to other crafts

11 using asbestos around them.  The International Union had hired

12 Dr. Selikoff in the early '80s to do a pilot study for them to

13 figure out whether sheet-metal workers had asbestos related

14 disease and he found a significant prevalence of disease so

15 they -- the union contracted with me to set up a national

16 program for them, which we started -- the first examinations

17 were in 1988 and it's still ongoing.  We've had -- we've

18 examined just a little over 20,000 people with a number of

19 people having come back for recurrent exams, repeat exams.

20 Q    And from time to time have you published the findings of

21 this study in peer review medical literature?

22 A    Yes.

23 Q    Have you published articles about asbestos related

24 epidemiology in peer review medical journals?

25 A    Yes.

1 Q    Can you give us examples of the type of topics that you

2 have published articles about relating to asbestos related

3 epidemiology?

4 A    I think I published four papers about the sheet-metal

5 survey, initial prevalence of disease and then more recently

6 looking at changes over time, how people examined at different

7 periods of time have different prevalence of disease.  We just

8 published an analysis of causes of death among the people who

9 participated in our screening program.  And then in addition I

10 didn't mention the other large program is a similar program for

11 construction workers who worked for the Department of Energy on

12 building nuclear facilities.  We have a similar program around

13 the country that's examined about -- I think about 12,000

14 people.  And along with Dr. Dement who's at Duke we published

15 similar papers looking at asbestos related findings, abnormal

16 pulmonary function, and then some other issues like beryllium

17 and noise out of that population based study as well.

18 Q    Do you use epidemiology on a regular basis in your career

19 in occupational medicine?

20 A    Yes.

21 Q    How long have you been doing and using epidemiology as a

22 regular part of your work?

23 A    Really probably since 1981, 1982.

24 Q    In addition to writing articles and serving as the lead

25 investigator on the sheet-metal worker study and the other

1 study you mentioned what other things do you do to keep

2 yourself current on asbestos related epidemiology or asbestos

3 related medical issues?

4 A     Well, I read -- subscribe to and read maybe ten

5 occupational medicine journals every month, and I have a

6 regular computer search that identifies articles of interest in

7 the literature including anything related to asbestos.  And

8 then in addition in -- for preparing any of these publications

9 I'll go back and review all of the relevant literature, because

10 sometimes you -- asking a specific question I might look at a

11 particular study in a different light or it may be helpful in

12 terms of something I'm trying to explain in a paper.  So I'm

13 regularly looking at what's new coming out and then also going

14 back and looking at things that I've looked at before, but

15 reading them again.

16 Q     Do you also serve as a -- you also serve as a consulting

17 or testifying expert on asbestos medical cases?

18 A     Yes, I do.

19 Q     Does that help keep you current on what the state of the

20 literature is?

21 A     Yes, that's true.

22 Q     Approximately what percentage of your time do you spend

23 either as a consulting or a testifying expert in asbestos

24 personal injury litigation?

25 A     Oh, I probably do one or two cases a year.  It's not a big

1 proportion of my time.

2 Q    Have you received any grants from the United States

3 Government to study asbestos related illnesses?

4 A    Yes.

5 Q    And what was that?

6 A    Well, there were two grants.  One of which was to look at

7 -- it's kind of a narrow issue within occupational epidemiology

8 to look at the ability of workers to report exposures and their

9 distribution among different tasks which included asbestos.

10 But the larger one was to look at causes of death among the

11 sheet-metal workers.  It was a grant from NIOSH that we had in

12 the 1990s.

13 Q    Did there ever come a time when you were asked to consult

14 with the United States Senate Judiciary Committee and its

15 staffers on asbestos medical and asbestos epidemiological

16 issues?

17 A    Yes.  At the end of --

18          MR. FINCH:  Next slide.

19 A    -- 2002, and then continuing on through, I think 2005 I

20 worked with the judiciary committee on -- I guess the name

21 people know the most is the FAIR Act.  It was an idea to set up

22 a national trust or a national compensation system for asbestos

23 related disease.

24 Q    Did you give advice to the Senate of Judiciary Committee

25 and their staffers on the epidemiology of asbestos related

1 disease as part of that work?

2 A    Yes, I did.

3 Q    Did you give advice on the medical criteria that were in

4 the proposed trust fund bill?

5 A    Yes, I did.

6 Q    Did you give advice on the risk of disease and the

7 likelihood of death from asbestos disease as part of that work?

8 A    Yes, I did.

9 Q    Were you ever invited to testify under oath before

10 congress about your work and your -- on the topics of asbestos

11 related disease?

12 A    Yes, I did.  I testified before the judiciary committee

13 two or three times.

14 Q    Have you ever been recognized by a federal court as an

15 expert in asbestos related medical issues?

16 A    Yes, I have.

17 Q    On what topics?

18 A    Internal medicine, occupational medicine, epidemiology of

19 asbestos related disease, diagnosis, treatment.  I think that

20 probably covers it.

21 Q    Have you also been recognized by state courts on those

22 subject matters?

23 A    Yes, I have.

24         MR. FINCH:  Your Honor, at this time the plan

25 proponents would proffer Dr. Welch as an expert in internal

1 medicine, occupational medicine, the epidemiology of asbestos

2 related diseases, and the diagnosis of asbestos related

3 diseases.

4          UNIDENTIFIED SPEAKER:  (Indiscernible)

5          THE COURT:  All right, she is accepted as an expert

6 on those topics.

7          MR. FINCH:  Thank you, Your Honor.

8 Q    Dr. Welch, have you ever served as an expert both

9 consulting and testifying for an asbestos claimants committee?

10 A    Yes.

11 Q    In addition to your work in -- are you an expert for the

12 Grace asbestos claimants committee?

13 A    Yes.

14 Q    And in addition to your work here have you worked with

15 asbestos claimants committees in other bankruptcy cases?

16 A    Yes, I have.

17 Q    What are the two main topics of opinions that you've been

18 asked to provide information to the Court about today?

19          MR. FINCH:  Next slide, please.

20 A    The large picture was -- I was asked, and I can explain

21 today, I evaluated the medical and exposure criteria in the TDP

22 overall.  But I specifically worked on a new category that was

23 added for this TDP on the severe disabling pleural disease

24 which is the level 4B.  And Mr. Inselbuch was talking about

25 that earlier this morning, and for both of them to give an

1  opinion whether they're medically reasonable.

2  Q    Okay.  What preparation did you do with respect to those

3  two areas of work?

4  A    I looked at what existed in previous TDPs, some of which I

5  was familiar with because I had worked on previous bankruptcies

6  as we just talked about.  And looked at the medical literature

7  about asbestos related disease that's relevant to those

8  categories which is really defining exposure and defining

9  disease.  And then for the level 4B in particular I looked at

10 all the literature I could find relating to severe disabling

11 pleural disease, what's the best way to define it, level

12 impairment.  In addition, I looked at all the Libby specific

13 information, government reports, published papers that related

14 to Libby, and testimony and reports from Dr. Whitehouse and Dr.

15 Frank that talk about the impact of pleural disease in that

16 population so I could kind of understand what the questions

17 were and design a TDP that I thought was medically reasonable

18 in that context.

19 Q    Did you read any government reports about the asbestos

20 containing vermiculite being shipped to other places outside of

21 Montana?

22 A    Yes.

23 Q    Would you turn in your exhibit binder to Exhibit -- Plan

24 Proponents' Exhibit 163.

25 A    I have that.  Yes.

1 Q    What is that document, Dr. Welch?

2 A    It's a October, 2008 report from ATSDR.  It's entitled,

3 "Summary Report Exposure to Asbestos Containing Vermiculite

4 from Libby Montana at 28 Processing Sites in the United

5 States."

6 Q    And what did you learn from your consultation of this

7 report?

8 A    Well, that asbestos containing vermiculite from Libby was

9 shipped to more than these 28 sites.  I think it's 200 sites

10 across the country.  And they did an evaluation at these --

11 specifically at these 28 sites that had received asbestos

12 containing vermiculite from the mine.  And the report documents

13 the potential for exposure to vermiculite at these sites.

14          MR. FINCH:  Okay.  Your Honor, at this time we would

15 offer Plan Proponents 163.

16          MR. HEBERLING:  Objection.  It's a hearsay report.

17 It's medical literature --

18          COURT CLERK:  You have to use the microphone.

19          THE COURT:  Leave it down, but turn it on.

20          MR. HEBERLING:  It is green.

21          THE COURT:  Oh.  It's working now.  Go ahead.

22          MR. HEBERLING:  Yes.  This is medical literature and

23 under 80318 it's not accepted into evidence.  So our objection

24 goes to that.

25          MR. FINCH:  Your Honor, I think this is not medical

1  literature.  This is a governmental report that comes into

2  evidence pursuant to Federal Rule of evidence 8038, the records

3  of an administrative agency reporting findings required by an

4  administrative agency.

5           THE COURT:  Then have the witness please identify

6  that fact on the record, because it's not --

7           MR. FINCH:  Your Honor, I will not offer the exhibit

8  at this time.

9           MR. HEBERLING:  If it's offered as a government

10  report I would not object.

11           MR. FINCH:  I withdraw the offer of the exhibit, Your

12  Honor.

13           THE COURT:  All right.

14  Q    Did you, in addition to reading the published literature

15  that's publicly available and published in the medical journals

16  about asbestos disease in and around Libby, Montana, did you

17  also read nonpublic information about Libby disease?  By that I

18  mean either the expert witness reports or the testimony of the

19  Libby doctors?

20  A    Yes, I did.

21  Q    And did you talk with any of your colleagues in the

22  asbestos medical field about Libby specific issues as part of

23  your work in preparation for the work you did for the Grace

24  asbestos claimants committee in this case?

25  A    Well, I actually specifically about Libby I had talked a

1  while ago to Steve Levine at Mt. Sinai.  And he's one of the

2  people who had worked a little bit with Dr. Whitehouse and Dr.

3  Frank on analysis of the data -- of the screen medical results

4  from Libby.  And I don't recall other people I specifically

5  talked about Libby issues to.

6  Q    Did you have occasion to meet with either Dr. Whitehouse

7  or Dr. Frank as part of your work in this case?

8  A    Yes, I did.  We met in Philadelphia for a day.

9  Q    Okay.  I'm going to ask you a lot of questions about

10 whether the various medical and exposure criteria that are set

11 forth in the expedited review section of the Grace TDP are

12 reasonable or medically reasonable.  Can you explain to the

13 Court what you mean by medically reasonable in the context of

14 the opinions about the Grace's TDP criteria that you are going

15 to be discussing here today?

16 A    Yes.

17 Q    Could you tell the Court, please.

18 A    Yes.  When I say it's medically reasonable, I'm saying

19 that it's grounded in the medical literature and that

20 specifically if someone meets a criteria that set forth the

21 expedited review that the trust can be confident that that

22 individual has an asbestos related disease that's caused in

23 whole or in part by exposure to Grace products.

24 Q    If someone doesn't meet that expedited review criteria

25 does that mean that they don't have an asbestos related

1  disease?

2  A    No.

3  Q    What does that mean to you in the context of a medical

4  expert?

5  A    Well, the criteria is set so that it's in a way those are

6  very clear-cut cases.  So that's why I said, you know, if you

7  meet these criteria that trust can be confident that that

8  person has an asbestos related disease.  There are going to be

9  other people definitely who don't meet those criteria, but have

10 an asbestos related disease that's caused by Grace.  But

11 there's something about their case that requires a little more

12 review.  And that's what the individual review is for.

13 Q    You mean you would want more individualized review of that

14 situation.

15 A    Correct.  There might be more information you'd want than

16 what's required by the expedited review which only has a few

17 requirements.  So someone doesn't meet one of them they might

18 meet it by having some other test available.  But because of

19 the nature of other testing or something about the individual

20 it really requires looking at the sum total of the information

21 on that individual if they don't meet those specified expedited

22 review criteria.

23 Q    Okay.  With that preface let's talk about non-malignant

24 diseases in general and the TDPs criteria for severe disabling

25 pleural disease in specifics.  First of all, is there some kind

1  of authoritative document put out by the American Thoracic

2  Society that describes how you should go about diagnosing non-

3  malignant asbestos diseases?

4  A    Yes.

5  Q    Go ahead.  Sorry.

6  A    In 2004 the American Thoracic Society published a guidance

7  document that I probably wouldn't get the title right, but

8  it's, you know, diagnosis of non-malignant asbestos related

9  diseases.

10  Q    Is it -- could you turn in your exhibit book to Exhibit

11  147.  What is Exhibit 147, Dr. Welch?

12  A    It's the document I was referring to from the American

13  Thoracic Society, Diagnosis and Initial Management of Non-

14  malignant Diseases Related to Asbestos.  It was published in

15  the American Journal of Respiratory and Critical Care Medicine

16  in 2004.

17  Q    And do you regard this as authoritative as to the

18  diagnosis and management of non-malignant diseases?

19  A    Yes.

20  Q    Could you describe just briefly what the American Thoracic

21  Society process is to create this document?

22  A    Yeah.  The American Thoracic Society is a professional

23  organization of pulmonary specialists.  And they have a process

24  for creating their own -- the ATS guidance documents that is --

25  put together a committee and the committee is established to

1  not have any substantial conflicts of interest of the committee

2  members.   They produce the report which then goes to the peer

3  review and goes to the board of the ATS before it's approved

4  and finalized.

5  Q    Okay.

6          MR. FINCH:  Could you put the slide show back up, and

7  specifically slide 9.   Okay.   Your Honor, at this time we would

8  offer the 2004 American Thoracic Society document, Plan

9  Proponent's Exhibit 147.

10          MR. HEBERLING:  No objection, Your Honor.

11          THE COURT:  It's admitted.

12  Q    Dr. Welch, what does the American Thoracic Society

13  statement tell you about what criteria are required to diagnose

14  a non-malignant asbestos related disease?

15  A    It requires evidence of disease, and that can be

16  radiologic or pathologic primarily.   And then it requires

17  exposure to asbestos, and appropriate latencies.   So the time

18  between first exposure and disease needs to be consistent with

19  what we know to be the appropriate lag time.   It varies -- the

20  criteria on the x-ray or pathology obviously vary depending on

21  whether you are talking about asbestosis or asbestos related

22  pleural black.   But primarily pathologic findings, evidence of

23  exposure.

24  Q    Are there different asbestos related non-malignant

25  diseases or are they all the same disease?

1  A    They're not all the same.  No.

2  Q    Can you describe the difference -- the different diseases?

3  A    There are sort of two categories, and then subcategories.

4  Q    Okay.  Why don't you describe the two broad categories

5  first.

6  A    Two broad categories are asbestosis which is interstitial

7  fibrosis.  It's scarring in the lung parenchyma, right in the

8  lung itself, and asbestos related pleural scarring.  The pleura

9  is a lining around the lung so when the scarring occurs in the

10 pleura it's actually outside the lung in the pleura.  And that

11 occurs because when asbestos is breathed in it's transported

12 through the lung out into that pleural space as part of its --

13 the body's attempt to get it out of the body.  So it can reside

14 in there and cause a scar to form.

15 Q    Okay, we'll get into a little bit more detail about

16 pleural diseases in just a minute.  But does the 2004 American

17 Thoracic Society document give you any guidance as to how to

18 grade the severity of asbestos related non-malignant diseases

19 with respect to lung function tests?

20 A    No, it doesn't.

21 Q    And is functional impairment required to make a diagnosis

22 of a non-malignant asbestos disease?

23 A    No.

24      THE COURT:  I'm sorry, I didn't hear the question.

25 Q    Is functional impairment required by the American Thoracic

1  Society to make a diagnosis of a non-malignant asbestos

2  disease?

3  A    No.  You can make the diagnosis based on either an x-ray,

4  a CAT scan or a pathology and appropriate exposure.  Because

5  you can have the disease without it having to reduce your lung

6  function.  The document does talk about the patterns of lung

7  function impairment that you would get, but it doesn't require

8  that lung function abnormalities be present to make the

9  diagnosis.

10 Q    Okay.

11            MR. FINCH:  Next slide, please.

12 Q    Dr. Welch, what is a pleural plaque?

13 A    Pleural plaque is a scar on the pleural surface.  The

14 simple way.

15 Q    A scar on the pleural surface caused by what?  Are there

16 asbestos related pleural plaques?

17 A    Asbestos related pleural plaques come -- other things that

18 cause inflammation in the pleural space can also heal with a

19 scar.  But the most typical -- particularly in the picture that

20 we're showing here.  And where that's located it's most

21 typically caused by asbestos.

22 Q    Do pleural plaques generally impair lung function?

23 A    It's always easier to talk about things that we have an

24 agreed upon terminology.

25 Q    Okay.

**J&J COURT TRANSCRIBERS, INC.**

1  A    Now, I and a lot of people, I think, now are beginning to

2  make the distinction between pleural plaque and diffused

3  pleural thickening.  But there's been, if you look at the

4  medical literature from the '50s onward the people aren't

5  always using the same terms.  But when I'm talking about

6  pleural plaque I'm talking about really what we're seeing in

7  this picture here which is a circumscribed area of scarring on

8  the pleural surface that does not include the angle at the

9  bottom of the lung there that would cause costophrenic angle.

10 Q    And does that type of disease of the lung which, for

11 purposes here we'll call pleural plaque and the TDP we'll call

12 pleural plaque, does that cause -- generally speaking does that

13 cause any kind of lung function decline?

14 A    In population studies there's a little bit of lung

15 function decline, three percent, five percent, but generally it

16 doesn't cause a significant impairment or what we would call a

17 clinically significant impairment of lung function.

18 Q    And just define for the Court what you mean by a

19 clinically significant impairment of lung function.

20 A    Something that someone would notice.  It would cause them

21 shortness of breath.  Often it's, you know, lung function is

22 considered normal until people drop below about 80 percent of

23 their predicted normal value.  So something of -- as long as

24 you're in the 90 percent range that's not clinically

25 significant.

1          MR. FINCH:  Next slide, please.

2  Q    You mentioned in your prior answer something called the

3  diffused pleural thickening as distinguishing it between that

4  and pleural plaque.  What is diffused pleural thickening?

5  Could you tell the Court what is diffused pleural thickening?

6  A    Sure.  There's two pleural surfaces and sort of two

7  minutes on lung anatomy.  If you take a deep breath you're

8  using your muscles of the chest to expand your chest wall and

9  the lung has to follow.  And the reason it does is because

10 there's a pleural surface on the lung and one against the chest

11 and there's a vacuum in between.  So you breathe in, your lungs

12 go out.  And those two pleural surfaces have a little bit of

13 fluid in between them and they slide so that your lung can move

14 independently.  It's really floating inside your chest and it's

15 in and out like out a bellows.  So that the one on the chest

16 wall side is called the parietal pleura and the one on the lung

17 side is called the visceral like viscera in innards.

18         So what we know clinically is that scarring that

19 involves the visceral pleura tends to have a much more

20 significant impact on lung function than what causes the

21 parietal pleura.  And the reason is because it's scarring

22 around the lung, and when you get that scarring around the lung

23 it's essentially anchoring the lung to the chest wall.  When

24 you breathe in the lung can't move independently, it can't

25 expand appropriately.

1      Using the definition that's now been codified by the

2  International Labor Organization when you read a chest x-ray

3  diffused pleura thickening involves blunting of the

4  costophrenic angle.  And that's the angle at the base of the

5  lung where the lung meets the diaphragm at the base of the

6  lung.  And there have been a number of really good studies that

7  show that if what we wanted measured looking at the x-ray is we

8  want to find a finding on the x-ray that predicts that visceral

9  scarring and therefore is related to significant impairment of

10  lung function.  Blunting of the angle is the best predictor on

11  the x-ray of scarring, that significant clinical scarring.

12  Q    Okay.  Just for a minute, definitionally, what's the

13  parenchyma of the lung?

14  A    That's the body of the lung.  That's the part of the lung

15  where the gas is exchanged.  Oxygen goes in --

16  Q    The meat part of the lung?

17  A    Yeah.

18  Q    And the pleura is the stuff around it.

19  A    The pleura is the stuff around it.

20  Q    And you mentioned blunting of the costophrenic angle.

21      MR. FINCH:  Can I have the next slide, please.  Slide

22  12.

23  A    Yeah, this is a --

24  Q    What does slide 12 show?

25  A    This is one of these, a picture is worth a thousand words.

1  The one on my left -- I guess --

2  Q    The one with the red -- how about the one without the red?

3  A    The other one's the normal lung.  The one without the red

4  on it is the normal lung.  And you can see that normally on

5  both sides there's a fairly deep angle on the side where the --

6  as you come down along the ribs and go along the diaphragm.

7  And then the one with the red shows blunting of the

8  costophrenic angle.  So on the -- that person's other side, the

9  one that's not marked with red you can still see the angle, but

10  on this side essentially scarring has reduced the -- encased

11  the lung and reduced that angle.  So that's pretty significant

12  blunting of the angle shown by where the lung used to be before

13  the scarring and then the yellow arrow showing us the lung is

14  shrunk and encased.  So that's what we call blunting of the

15  costophrenic angle.  Now that's a very dramatic example, but

16  it's good to have a dramatic example when trying to explain

17  what's happening.

18  Q    Now with that as background, let's turn to the severe

19  disabling pleural disease which is category 4B of the Grace

20  TDP.  First of all, Dr. Welch, who designed the medical and

21  exposure criteria for severe disabling pleural disease in the

22  expedited review section of the Grace TDP?

23  A    Well, I designed the medical, and the exposure criteria is

24  brought in really from the other parallel exposure criteria,

25  it's from the 4A, the severe asbestosis category.

Welch - Direct/Finch                          132

1  Q    Okay.  In your opinion as a doctor that specializes in

2  asbestos disease would you hold the opinion to a reasonable

3  degree of medical certainty across all the disease categories

4  if someone meets the exposure criteria and the medical criteria

5  that their asbestos related disease was caused --

6              MR. HEBERLING:  Objection.

7  Q    -- at least in whole or in part by exposure to Grace

8  asbestos?

9  A    Yes.

10             MR. HEBERLING:  Objection, leading.

11             THE COURT:  It is leading, but I think in this

12 instance it's irrelevant.  So the objection's overruled.  Wait

13 until I make a note, please.  All right.  Thank you.

14 Q    Okay.  How did you go about -- what did you do to allow

15 you to design the medical criteria for the severe disabling

16 pleural disease category in the Grace TDP?

17 A    Well, there's two parts of it.  There's defining what on

18 x-ray is medically reasonable so the trust can be confident

19 this is an asbestos related disease that causes impairment.

20 And then there's the pulmonary function criteria that define

21 the severe disability.  Now the --

22 Q    Did -- sorry.  Go ahead.

23 A    The pulmonary function criteria matched the criteria that

24 are set for asbestosis which is severe disabling asbestosis

25 which is 4A.  So really what we did -- what I did in creating

1 4B was to say we've already decided in 4A that a severe

2 impairment is these PFTs and those of that -- those PFT

3 criteria have been used in previous trusts.  And I think

4 they're medically reasonable.  They do define a severe

5 impairment from an asbestos related disease.  And we can walk

6 through details of that if you want to.

7         But the other part of setting up the criteria was to

8 say okay, what on x-ray, we're going to use x-rays for people

9 to send in a claim to the trust.  What criteria should we use?

10 So I turned to the International Labor Organization's standards

11 for classifications of x-rays for dust diseases of the lung,

12 and they have a definition for diffused pleural thickening.

13 And it's -- the criteria are based around that definition.

14         Now undermining the setting up the criteria I also

15 reviewed the literature to be confident that I could say that

16 of people with pleural scarring from asbestos of any kind, it's

17 the people with diffused pleural thickening who will have the

18 significant impairment.  So this criteria, the 4B, says you

19 have to have diffused pleural thickening to get into 4B.  So if

20 somebody has pleural thickening that doesn't meet that

21 definition that we've set, they would need an individualized

22 review.

23 Q    Okay.  You mentioned that you had reviewed medical

24 literature --

25         MR. FINCH:  Next slide, please.

1  Q    -- and other things.  Could you describe just briefly what

2  you -- the main points of what you learned about severe

3  disabling pleural disease from your review of the medical

4  literature and the 2000 ILO guidelines?

5  A    Yes.  Generally when you look at populations of

6  individuals exposed to asbestos, about ten, 15 percent of all

7  the pleural disease falls into this diffused pleural thickening

8  category.  So it's a small proportion of people with asbestos

9  disease, but it's present in almost every population study.

10 And that if you -- on studies there have been a couple of

11 really nice studies that have taken people who have a diffused

12 pleural thickening including blunting of the costophrenic angle

13 and compared their pulmonary function tests to people with

14 other kinds of pleural changes, pleural scarring from asbestos,

15 and those studies demonstrate that if you have blunting of the

16 angle you're likely to have decreased pulmonary function

17 testing.  And if you don't you're unlikely.

18        There was a paper by Lilis that does that very well.

19 There's a recent paper by Omaly, and then there's some others.

20 And I think that the American Thoracic Society consensus

21 document they talked about reflects this growing consensus that

22 diffused pleural thickening should be defined as having

23 blunting of the angle.  And my review of the literature

24 confirmed that for me that that is the finding that identifies

25 the people who have significant lung function impairment.

1  Q    Okay.  You mentioned an article by a Lilis.

2             MR. FINCH:  Can I have the next slide, please.

3  Q    What was the Lilis article?  Can you describe that study

4  to the Court and what it demonstrates?

5  A    Yes.  Ruth Lilis was a professor at Mt. Sinai and part of

6  the Irving Selikoff sort of asbestos study group.  And you may

7  or may not be familiar with the insulator study, but its basis

8  from -- a lot of what we know about asbestos disease, they

9  followed 17,000 members of the Insulator's local across the

10 United States.  This paper was based on detailed pulmonary

11 function tests on about 1500 of those insulators.  And what Dr.

12 Lilis did here was she created an index based on how much

13 pleural scarring was present on the chest x-ray.  Basically the

14 length and the width and calcifications and a bunch of

15 different points.  And you can see on the slide, you can have a

16 score as small as one and a score greater than 22 is the

17 category on this score.

18            But what this slide illustrates is people on the left

19 are people with pleural scarring but without blunting of the

20 angle, and on the right it's people who do have blunting of the

21 angle.  And it's a pretty dramatic difference in that the

22 people on the right side who have diffused pleural fibrosis,

23 their pulmonary function tests are uniformly under that 80

24 percent when on the left side the people who have pleural

25 scarring absent blunting of the costophrenic angle they're

1  generally as a group in numbers they're close to 80 percent.

2  You need quite a bit scarring to drop it even down to 75

3  percent in the category that had an index as high as 22.  So I

4  think just visually it gives you a very good picture that it is

5  blunting of the angle that drops the lung function so

6  substantially.

7  Q    And of these two charts these aren't something -- where do

8  these come from?  Do these come right from the paper?

9  A    Yeah.  These come from the paper, published in 1991.  It

10 was in American Journal of Industrial Medicine.

11 Q    Could you turn to Exhibit 41 in your exhibit book, Dr.

12 Welch, Plan Proponents 41.

13 A    And that's the paper that I was referring to.

14 Q    That's the Lilis paper?

15 A    Correct.

16 Q    And on Page 154 -- excuse me 156 of that document it's

17 PP002232, is the Bates number.

18 A    Correct.  That's where that slide comes from.

19 Q    That's where the two graphs come from.

20 A    Correct.

21      MR. FINCH:  Your Honor, at this point we would offer

22 Plan Proponents' Exhibit 41, not for it's truth, just for the

23 fact that Dr. Welch considered it, and it was something that

24 was available to her in the medical literature.

25      MR. HEBERLING:  Counsel, this is not something we've

1 discussed, but I would propose that we allow the medical

2 literature in generally on this basis.  Obviously if I'm not

3 going to object to yours, I would expect that you not object to

4 ours.  So if we can make that kind of agreement I'm happy to

5 have it go in.

6        MR. BERNICK:  I don't believe that the literature

7 should come in generally.  It can -- if the article itself has

8 historical significance as a fact that prompted something.  I

9 don't know that this is being proffered for that purpose.  But

10 at least -- I don't think that Grace is prepared to stipulate

11 to the actual admission of scientific literature, nor do I see

12 the point for it.  It comes in to inform the Court's assessment

13 of the expert and this reliance material and certainly the

14 Court can have copies.  But I don't think that they're properly

15 admissible unless the historical fact of their having been

16 written is of consequence such as a standard or something of

17 that kind.

18        THE COURT:  I don't think --

19        MR. FINCH:  The only historical fact in which it's

20 being offered, Your Honor, is if this is -- this distinction

21 between the lung function decline in diffused pleural

22 thickening versus pleural plaque.  It has been noted and

23 described in the medical literature for almost 20 years.  I'm

24 not sure where I am with Mr. Bernick on this, but I will --

25 it's been marked for purposes of identification, and we will

1  either work out a stipulation with the Libby claimants as to

2  the purpose for which this is admitted or not.

3          THE COURT:  One second, Mr. Finch.  Did we lose them

4  again?

5          THE CLERK:  Yes, but I don't know why.

6          UNIDENTIFIED ATTORNEY:  Do we need to --

7          THE COURT:  We'll just wait a second.  I think for

8  purposes (indiscernible - phone disconnection) this is clearly

9  a (indiscernible).  I don't think it has independent

10 significance and relevance as admissible evidence, but it is

11 clearly something that the witness is able to take cognizance

12 of and has --

13         COURT CALL:  Thank you for standing by.  May I have

14 the name of the Court please?

15         THE CLERK:  Yes, this is for Judge Fitzgerald again.

16 We keep getting disconnects.

17         COURT CALL:  I'm placing you back online.

18         THE COURT:  As I was saying, I believe it's her

19 testimony that is the relevant evidence, and this document

20 itself has -- I don't believe has particular independent

21 evidential value.  If you can work out a stipulation with the

22 Libby claimants to that effect, it's fine.  I don't have any

23 problem taking it as something that the witness has testified

24 she used in her examination.  I think that's proper.  It's not

25 hearsay provided that it's not being used for the truth of the

1 matter and your offer excludes it from that purpose.  So, if

2 you two want to work out a stipulation about medical documents

3 I'm happy to hear it.  Otherwise, I don't think it is -- I will

4 take it as an exhibit that she has used, but only for that

5 purpose and no other.

6          MR. HEBERLING:  For the record, Your Honor, we'll

7 maintain our hearsay objection under (indiscernible), but I do

8 propose that this sort of literature be received, but not

9 admitted as documents the witnesses considered.

10          THE COURT:  I agree that it's proper in that

11 capacity.  The witnesses identified it in that capacity.  And

12 as long as it's not offered for the truth there is no hearsay

13 objection that needs to be stated because I'm not accepting it

14 for the truth, only for the fact that the witness considered

15 it, and it is part of a medical literature document.  So, I'll

16 take it on that limited basis.

17          MR. HEBERLING:  Okay.

18          THE COURT:  Let me make a note.

19          MR. BERNICK:  I just -- I don't mean to be

20 persnickety about this, but from our point of view we don't

21 want a sauce rule that's going to come out of this that says

22 that medical articles actually come into evidence.

23          THE COURT:  I'm not accepting it for purposes other

24 than for what it was offered which is that this witness was

25 aware of it and considered it in rendering her opinion.  That's

1  all.

2  BY MR. FINCH:

3  Q    That was the only purpose for offering it to Your Honor.

4  Okay.  I believe you mentioned before that diffuse pleural

5  thickening has been a diagnostic entity that's been defined in

6  the medical literature.  For how long has it been recognized as

7  a separate disease from, say, the asbestosis?

8  A    Oh.  I mean, I don't know how far back to date it, but

9  I've seen papers that date back to the '60s talking about

10 diffuse pleural thickening.

11 Q    Did you examine the question of whether pleural disease

12 that was being suffered by people in Libby, Montana was a new

13 and different disease than pleural disease described in the

14 medical literature outside of Libby?

15 A    Yes.

16 Q    And what did you conclude about that?

17 A    As far as I could tell the pleural disease in Libby is the

18 same pleural disease that we see in other people exposed to

19 asbestos.

20       MR. FINCH:  The severe disabling pleural disease,

21 Your Honor, categories, is found in the Grace TDP at Page 26.

22 And if we could have Exhibit 277.04, Page 26?

23 Q    Dr. Welch, did you have an opinion whether the severe

24 disabling pleural disease category is medically reasonable?

25 A    Yes, I do think it's medically reasonable.

1 Q    You referred to consulting the 2000 ILO for the

2 radiographic criteria for this disease.

3 A    Yes.

4 Q    Could you turn in your exhibit book to Exhibit Plan

5 Proponents 115?

6 A    Yes.  That's the guidelines for the use of the ILO

7 classification, the 2000 revised edition.

8 Q    And could you turn to Page 7 of that document?

9 A    Yes.

10 Q    And what is found on Page 7 of the 2000 ILO?

11 A    It's part of the definition section, and that's where the

12 definition of diffuse pleural thickening is found in this book.

13 Q    Could you read the -- does the 2000 ILO require blunting

14 of the costophrenic angle in order to define something as

15 diffuse pleural thickening?

16 A    Yes, it does.

17         MR. FINCH:  Your Honor, we offer at this time Plan

18 Proponent's 115 for the same purposes that I offered the other

19 document, not for its truth, but to show that the literature

20 exists and it was something considered by Dr. Welch as part of

21 her work for the Grace Asbestos Claims Committee in this case.

22         UNIDENTIFIED ATTORNEY:  No objection.

23         THE COURT:  All right.  Submitted for that purpose.

24 One minute, please.  All right.  Thank you.

25         MR. FINCH:  Could you go to Slide 19 in the slide

1  show, please?

2  Q    The Libby claimants had made a series of criticisms about

3  the severe pleural disease category in the TDP.  One of those,

4  Dr. Welch, is the blunting of the costophrenic angle

5  requirement.  In your view, is it -- is that a well-founded

6  criticism?  Is it unreasonable to require blunting of the

7  costophrenic angle?

8  A    No, I think it's reasonable.  It's -- blunting of the

9  angle is now part of the standard definition of diffuse pleural

10  thickening by the international agency that tells us how to

11  read these chest x-rays.

12  Q    That's what, the ILO?

13  A    That's the ILO.  The -- you know, the --

14  Q    Is the American Thoracic Society document also --

15  A    The American Thoracic Society has adopted that definition.

16  The ILO system is used by B-readers in this country.  A

17  B-reader is someone trained and certified to read chest x-rays

18  for dust diseases, and under some regulations under the mine

19  regulations and under some OSHA regulations, people who read

20  chest x-rays have to be B-readers, and this is the system they

21  use.  So, it is the standard notation now from the ILO and the

22  NIOSH B-reading system is to include blunting of the angle.

23  Q    What about the extent and width requirement?  In your view

24  is that medically reasonable to have those requirements in the

25  Grace TDP for severe disabling pleural disease?

1  A    Yes.

2  Q    And where do those requirements come from in the medical

3  literature?

4  A    Well, they're in the ILO requirement in the ILO -- the ILO

5  defines the numbers that we -- however we refer to it in the

6  TDP.  The purpose of defining extent and width is a lot to

7  be -- so the trust can be sure that pleural thickening is

8  really there which is the purpose of using the ILO system.

9  It's standardizes it rather than it being debated in the eye of

10  the beholder in some sense.  And I think it's -- we pointed out

11  if someone doesn't meet the extent and width requirements but

12  has severe impairment, they can come back for an individual

13  review and certainly be awarded if that thickening is there.

14  Q    In the expedited review criteria for severe disabling

15  pleural disease, there's no way to qualify for that category on

16  expedited review by using a CT scan -- HRTC scan which is

17  something that the Libby claimants have criticized the TDP for.

18  Could you explain to us your views about whether or not that's

19  reasonable not to allow CT scans as a way to qualify in the

20  expedited review process?

21  A    Yes.  You know, a CT scan certainly can show pleural

22  scarring, but we don't yet have a standard system for

23  classifying CT scans for any kind of asbestos-related disease

24  or for asbestos-related pleural scarring, so -- which we do on

25  the x-ray.

1          So, if some -- so, the CT scan, since we don't have a

2   system where we could say to a claims examiner or someone

3   processing the trust, if they checked this box on this form

4   then they qualify for expedited review.  We can do that on the

5   x-ray.  We can't do it for a CT scan.  So, a CT scan could come

6   in as part of an individual review -- individualized review.

7   Q    So, it's your understanding that CT scans could be used in

8   an individual review.  They're just not one of the expedited

9   review criteria?

10          MR. HEBERLING:  Objection.  Leading.

11          THE COURT:  Sustained.

12  Q    Do you have any understanding as to whether CT scans can

13  be used in individual due process?

14  A    Yes.  CT scans could and certainly should be used in that

15  process.  And as I guess what I was saying in my answer, maybe

16  I went too far, I think they need to be used in individualized

17  review rather than expedited review because we don't have a

18  standard classification for the CT scan that could be put into

19  a simple expedited review.  So, they're going to default to the

20  individualized review category, and that's where they need to

21  be looked at and evaluated.

22  Q    And by standardized process, is that something like the

23  ILO grading system for x-rays?

24  A    Right.  That's right.  Now, we don't have an ILO system

25  for CT scans.  I mean, you know, we may in another decade, but

1  at the present time we don't.

2  Q    Okay.  And the Court has in other context heard lots about

3  the ILO standards, but is that the 1/1, 1/0?  Is that the ILO

4  grading system?

5  A    That's correct.

6          MR. FINCH:  Your Honor, I don't think we need to go

7  into the details of that here.  That may be beating a horse

8  that is long since dead.

9  Q    Can you describe briefly what DLCO is?

10 A    Yes.

11         THE COURT:  I'm sorry.  I couldn't hear you.

12         MR. FINCH:  Sorry.

13 Q    Could you describe briefly what DLCO is?

14 A    DLCO --

15 Q    In the context of lung function tests.

16 A    Right.  DLCO is diffusion capacity, and it's one standard

17 measurement of lung function.  What we use in the TDP is vital

18 capacity and total lung capacity.  They're a measure of lung

19 volume.  And diffusion capacity measures gas exchange, so it's

20 measuring a different part of lung function.

21 Q    Do you think it is medically reasonable not to have a

22 reduction in DLCO standing alone as a way to qualify for

23 expedited review for any of the non-malignant disease

24 categories?

25 A    Yes, I do.  I think that the lung -- reduction in total

1 lung capacity or reduction in force vital capacity is a measure

2 of lung restriction, and that's the characteristic finding of

3 asbestos-related disease.  A reduction in diffusion capacity

4 can occur with restrictive lung disease, but can also occur,

5 and significantly does occur with smoking-related lung

6 injuries.  And you can't differentiate it based on the

7 diffusion capacity.  So, someone who has an isolated reduction

8 in diffusion capacity without anything else that tells you it's

9 restricted lung disease, it could be caused by many other

10 medical conditions.

11 Q    Another thing the Libby claimants criticize is that for

12 the non-malignant disease categories that pay more money for

13 lung function impairment, there has to be certain scores on an

14 FEV1/FVC ratio.  First of all, could you turn to Slide 22 in

15 your exhibit book and tell the Court what an FEV1/FVC ratio is?

16 A    In spirometry, which is the simple lung function test that

17 you can do in a physician's office, the individual takes a

18 really deep breath and blows out as hard and fast as they can.

19 And the total amount of air they get out is called the force

20 vital capacity.  They usually have to blow out for six seconds

21 and then in six seconds you can get all the air out.

22        And if you look at the curve you can see that over

23 that six seconds a great big part of it comes out in the

24 beginning.  If you've ever done this test you know that those

25 last three seconds are painful because you feel like you've

1 completely emptied your lung, and somebody keeps telling you

2 go, go, go, go, go.

3          What comes out in the first second is called the

4 FEV1.  And in a normal person about 80 percent of your lung

5 function comes out in the first second and the other 20 percent

6 comes out over the next five seconds.  So, the FEV1/FVC ratio

7 is a measure of air flow.  Does that make sense?  I mean, I

8 explained this to a lot of people and it often takes like six

9 iterations because most doctors don't understand it either.

10 Q    Ten for me maybe, but --

11 A    Ten for you, okay.  Well -- so, you weren't paying

12 attention the first four maybe.  So, that the FEV1/FVC ratio,

13 as the lung -- if there's obstruction, a smaller proportion of

14 the air comes out in the first second because the person's

15 having to push against obstruction to get it out.  So, that

16 ratio starts to go down, and that's what you see in the second

17 graph.  We see that on the one that -- it's not quite as sharp

18 at the top corner.  It gets to almost the same lung volume at

19 six seconds, but at the first second it's down -- it's at two

20 and a half versus almost three and a half.

21          So, FEV1 will go down when lung volume goes down, but

22 the ratio of FEV1 to FVC is the best measure on spirometry of

23 obstruction.  The reason that matters here is that asbestosis

24 and diffuse pleural thickening make the lungs smaller, so they

25 cause restriction.  So, in a case of pure severe diffuse

1  pleural thickening you'll see a reduction in lung volume,

2  reduction in that FVC, but the amount that comes out in the

3  first second will be proportionally the same.  So, that ratio

4  will stay around -- 80, as you get older, your ratio goes down,

5  so 70, something like that.

6      If the ratio goes down more than that there's a

7  component of obstructive lung disease which is often caused by

8  smoking.  So that in the sense that the expedited criteria are

9  set to pick out the really clear cut cases.  The criteria are

10 set to have people with significant obstructive disease have to

11 go through individual review.  It's only a small amount of

12 obstructive disease that can come through on the expedited

13 criteria.  But, when that ratio starts to drop down to 60

14 percent, someone needs to look at the case and determine

15 whether asbestosis is still a significant contributing factor

16 to the impairment because they clearly have obstructive disease

17 as well.

18 Q    And is the FEV1/FVC requirement something that's required

19 in all of the non-malignant disease categories that requires

20 some kind of decline in lung function to get additional

21 compensation?

22 A    Yes.

23 Q    And do you believe that having that is medically

24 reasonable?

25 A    Yes, I do.

1 Q    Okay.  Let's discuss very briefly a few other aspects of

2 your testimony.

3         MR. FINCH:  Could you turn to Slide 23?

4 Q    Dr. Welch, what part of the lung does mesothelioma attack?

5 A    Mesothelioma arises in the pleural surfaces of the lung.

6 It's not in the parenchyma lung itself.  It comes out -- the

7 mesothelial cells make up the pleural surfaces.  So, it can be

8 the pleural space, it could be the diaphragm, the pleural space

9 on the diaphragm.  Any place where there's a pleural surface.

10 Q    And what is the medical literature showing us to be the

11 prognosis of someone who's diagnosed with mesothelioma?

12 A    Someone who's diagnosed with it will die of it in 95

13 percent of the cases.

14 Q    Do you have an opinion about whether the medical and

15 exposure criteria for mesothelioma are medically reasonable?

16 A    Yes, I do think they are medically reasonable.

17         MR. FINCH:  And could I have Slide 26, please?

18 Q    And why is that?

19 A    Why medically reasonable?

20 Q    Why is the mesothelioma exposure and medical criteria

21 reasonable?

22 A    Well, the diagnosis of mesothelioma is based on pathologic

23 examination of the tissue, and that's standard practice, so

24 that's required by the TDP.  And then the -- there's not a lot

25 of exposure requirements -- I mean not a long exposure required

1  because we know from many -- a lot of medical literature that

2  mesothelioma can occur after quite limited exposure to

3  asbestos.  There are cases from, you know, people who worked

4  for a couple of months in a factory.  There's just many, many

5  case series of low dose exposures, household contacts, people

6  who never had occupational exposure to asbestos causes

7  mesothelioma.

8          And all of the international agencies that have

9  looked at it say there is no level below which risk doesn't

10 exist.  So, the International Agency for Research on Cancer,

11 the World Health Organization, National Cancer Institute, they

12 all say there's no safe level of exposure to asbestos as far as

13 mesothelioma's concerned.

14 Q    Is there epidemiological literature that demonstrates, in

15 your view at least, that asbestos exposures below one fiber

16 year can cause mesothelioma?

17 A    Yes.  Absolutely.

18 Q    Is it correct that Slides 27 and 28 list some of the

19 literature that support your opinion that low doses asbestos

20 exposure causes mesothelioma?

21 A    That's correct.

22 Q    Does exposure to chrysotile asbestos cause mesothelioma?

23 A    Absolutely.  Yes.

24 Q    What is the official position of the United States

25 Government about how likely chrysotile is to cause mesothelioma

1 as compared to other asbestos fiber types?

2 A    Well, the EPA, OSHA, NIOSH, all say that all fiber types

3 cause asbestos.  And EPA tried to figure out whether they could

4 assign even a different potency or risk to the different fiber

5 types and decided that they would not do that, and they'll

6 continue to treat them as if they all have the same potency.

7 Q    Did that EPA review happen recently?

8 A    Yes.

9 Q    When?

10 A    Last year.

11 Q    And were you involved in providing testimony to the EPA

12 about that process?

13 A    Yes, I was.

14 Q    We talked about the exposure requirements under the TDP.

15 Do you have a view one way or the other as to whether the TDP

16 criteria for lung cancer are medically reasonable?

17 A    Yes, I think they are.

18 Q    The Libby claimants have said in their briefs that 100

19 percent of the people with lung cancer will qualify under the

20 TDP, is that correct?

21 A    A hundred percent of the people in Libby would qualify?

22 Q    No, 100 percent of the people with lung cancer diagnoses

23 would qualify for compensation under the TDP?

24 A    No.  I --

25 Q    Let me rephrase that.  Can you describe for me what the

1 TDP requires in order to have -- to qualify an expedited review

2 for lung cancer?

3 A    Well, it requires a diagnosis of primary lung cancer.  And

4 then the exposure criteria include -- they have to have a

5 bilateral asbestos-related non-malignant disease as defined in

6 the TDP.

7           MR. FINCH:  Could we have Slide 34, please?

8 A    So, they have to have evidence on chest x-ray of some

9 non-malignant asbestos-related disease.  And then in addition,

10 there are exposure criteria that are different depending on

11 whether someone from Libby or outside of Libby.  The -- there's

12 a requirement of significant occupational exposure to asbestos

13 for -- and I think it's -- I won't talk about the Libby-

14 specific ones because I'm not sure I would get them all right,

15 but the significant occupational exposure to asbestos is a

16 fairly high bar.  It requires a lot of exposure to asbestos.

17 Q    And is that based on medical literature?

18 A    Yes.  It's based on the -- there was a conference in

19 1997 -- or it was published in 1997 in Helsinki that brought

20 people from all over the world to make a determination about

21 what level of asbestos exposure is required that you could

22 attribute a lung cancer to the exposure even in the absence of

23 a non-malignant disease.

24           And this significant occupational exposure is kind of

25 benchmarked around that.  It's not -- it doesn't define it

1 exactly the same way, but it's medically reasonable.  It relies

2 on that information.  So, if you apply the significant

3 occupational exposure criteria and the presence of the non-

4 malignant asbestos-related disease, it's very few of the

5 165,000 lung cancers in the U.S. every year that would qualify

6 for this.

7 Q    Do the Libby claimants have to meet the significant

8 occupational exposure requirement like the rest of the

9 plaintiffs do?

10 A    No, I don't think they do.

11 Q    Did you review the rest of the TDP's medical and exposure

12 criteria for the non-malignant diseases?

13 A    Yes, I did.

14 Q    Did you find those to be medically reasonable?

15 A    Yes, I did.

16        THE COURT:  Mr. Finch, I need a clarification.  It

17 went by me too fast.  I'm sorry, doctor.  You said that the

18 Libby claimants do not have to meet the same exposure standards

19 or medical criteria standards?  I'm sorry.

20        THE WITNESS:  Well, the exposure criteria, but the

21 exposure are part of the TDP criteria, so it's the -- like for

22 lung cancer, they have to have lung cancer, but the exposure

23 criteria don't require that significant occupational exposure.

24        THE COURT:  Okay.  Thank you.

25 BY MR. FINCH:

**J&J COURT TRANSCRIBERS, INC.**

Welch - Direct/Finch                          154

1  Q    In your view does the reasonableness of the TDP medical

2  criteria turn on the question of whether there is something

3  different or not about Libby asbestos disease?  Would they be

4  reasonable even if it is different?

5  A    Right.

6            UNIDENTIFIED ATTORNEY:  Sorry.  I didn't hear the

7  question.

8            MR. FINCH:  Sure.

9  Q    Does the reasonableness of the TDP medical criteria turn

10 on the question of whether or not there is a different disease

11 in Libby?  I know you've concluded that there isn't.  Some

12 people have said there is.  In your view is it still medically

13 reasonable one way or the other on that question?

14 A    Yes, I think it is medically reasonable on that question,

15 and I do think it would take into account the characteristics

16 that Dr. Whitehouse describes for the Libby pleural disease.

17 If it's progressive --

18           MR. HEBERLING:  Objection.  The answer is beyond the

19 scope of the question.

20           THE WITNESS:  Okay.

21           UNIDENTIFIED ATTORNEY:  You don't have to pay

22 attention --

23           MR. FINCH:  -- beyond the scope of the question?

24           MR. BERNICK:  What?  I don't know what he said --

25           MR. FINCH:  I don't understand --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  -- interrupted the answer.

2          MR. FINCH:  I don't understand the objection.

3          THE COURT:  The objection was that her answer is

4    going beyond the scope of the question which was whether

5    they're medically reasonable and she was explaining, I think,

6    why she thought they were.  But, then she started to go into

7    characteristics about Dr. Whitehouse's reports and diagnoses of

8    his own patients.

9          MR. FINCH:  And I didn't hear the rule -- the Court's

10   ruling on the objection.

11         THE COURT:  It seems to me that it went a little bit

12   beyond the scope of the question.

13         MR. FINCH:  Okay.

14   BY MR. FINCH:

15   Q    Where did you stop the permissive part of the answer, and

16   why don't you just --

17         THE COURT:  The objection came in the middle.  Why

18   don't you just ask another question.

19         MR. FINCH:  Okay.

20   Q    Could you explain why it is that the reasonableness of the

21   TDP medical criteria for severe disabling pleural disease don't

22   turn on the answer of the question of whether something is

23   different about Libby pleural disease?

24         MR. HEBERLING:  Objection, and may I voir dire the

25   witness on this issue?

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  What's the nature of the objection?

2          MR. HEBERLING:  The question has gone to whether the

3 medical criteria are reasonable for Libby, and I don't see

4 foundation for that.

5          MR. FINCH:  That's not what I asked.  That's not what

6 I asked.

7          MR. HEBERLING:  It's two questions ago, and I think

8 it links in here.

9          MR. FINCH:  No, that's not the question.

10          THE COURT:  That is not the question that's before me

11 now, I think.  Restate the question.

12 BY MR. FINCH:

13 Q    Regardless of the debate about whether or not pleural

14 disease in Libby is different or not different, in your view,

15 is the TDP medically reasonable?

16 A    Yes.

17          MR. FINCH:  Your Honor, with that I'm going to pass

18 the witness.

19          THE COURT:  Good afternoon.

20          MR. HEBERLING:  Good afternoon, Your Honor.  Your

21 Honor, we did not have an opportunity this morning to

22 thoroughly confer with the information technology people.  We

23 have overheads.  We hope that they come up on the screen.  If

24 not I have hard copies, as well.

25          THE COURT:  All right.

1      MR. BERNICK:  Or you can -- you know, John, just use

2  the ELMO.  You can put them right on the plate and they'll work

3  up on the screen.

4      THE COURT:  Paper copies would be helpful for me in

5  any event.

6      MR. HEBERLING:  May I approach, Your Honor?

7      THE COURT:  Yes, please.  And maybe for the witness,

8  too.  I don't know.  Thank you.

9      THE WITNESS:  If they're going to show behind me it

10  might be easier to --

11      THE COURT:  Well, it will be on your screen, but it

12  still --

13      THE WITNESS:  Oh, they're here.  Okay.

14      THE COURT:  It depends on whether you'd like paper.

15      THE WITNESS:  It depends on whether I have to take

16  off my bifocals.

17                    CROSS EXAMINATION

18  BY MR. HEBERLING:

19  Q    Good afternoon, Dr. Welch.

20  A    How are you?

21  Q    Good.  This Category 4B, severe and disabling pleural

22  disease, has not appeared in other bankruptcies before this

23  one, correct?

24  A    That's my understanding, yes.

25  Q    And you were consulted by the ACC in the process of

1  creating 4B for Libby, correct?

2  A    For the TDP, correct.

3  Q    And it was with Libby in mind, correct?

4  A    Correct.  Although, you know, there are cases of severe

5  disabling pleural disease from Grace exposure among other

6  workers, too.  They just haven't been compensated in the

7  previous TDP.  It's not a new disease of Libby.  It just was

8  not previously compensated.

9  Q    And there was a concern from Libby that there is a lot of

10 severe pleural disease that would not be covered and you agreed

11 with that, correct?

12            MR. BERNICK:  Objection to the form of the question.

13 Concerned where?

14            THE COURT:  All right.  Sustained.

15 Q    There was a concern from Libby that there was a lot of

16 severe pleural disease and that would not be covered, and you

17 agreed with that, correct?

18 A    Not be covered without 4B.

19 Q    Right.

20 A    Is that what you meant?  Because I do think it is covered

21 with 4B, so I just want to make that distinction.

22 Q    And in your deposition you said not be covered under the

23 fund, meaning under the funds -- under various funds, prior

24 forms of TDPs, correct?

25

Welch - Cross/Heberling                    159

1  A    Right.  Without a -- let me say what I think I said then.

2  Without a specific criteria that covers disabling pleural

3  disease, those people couldn't necessarily have claimed under

4  something that required a 21 as the measure of severity on

5  their x-ray previously.  So, yes, I agree with that.

6  Q    And you agreed that there was a subgroup with significant

7  impairment from pleural disease, correct?

8           MR. BERNICK:  Objection to form.  Subgroup where?

9           THE COURT:  And that's sustained.

10          MR. HEBERLING:  Okay.

11 Q    Did you testify at your deposition that you agreed that

12 there was a subgroup?

13          MR. BERNICK:  Your Honor, it's not a proper use of

14 the deposition.  She's said nothing to be impeached.  Could you

15 just reformulate the question so it's clear.

16          THE COURT:  And that's sustained.

17 Q    Do you believe that there's a subgroup of patients who

18 have significant impairment from pleural disease?

19 A    Yes.  In asbestos-exposed populations everywhere there is

20 a subgroup of people with pleural disease who have significant

21 impairment, yes.

22 Q    And in this process of designing 4B, did you obtain any

23 data from the CARD Clinic center for asbestos-related disease

24 clinic in Libby on how a blunting requirement might affect the

25 Libby exposure patients?

1  A    Well, I understand -- I'm fairly sure that Dr. Whitehouse

2  testified on that.  I know his opinion is that it would

3  exclude --

4            MR. BERNICK:  Let the witness be cautioned.

5            THE WITNESS:  Sorry.  I don't know that I --

6            MR. HEBERLING:  Objection to counsel's interruption.

7            MR. BERNICK:  Well, no, I --

8            THE WITNESS:  Let me go back and answer the question.

9            MR. BERNICK:  The witness was going beyond the scope

10 of what was being asked.

11            THE COURT:  The witness, I think, was attempting to

12 explain the answer to the question.  I think the question is

13 whether you got information from the CARD Clinic as to how the

14 blunting requirement would affect the population in Libby who

15 would qualify otherwise for 4B treatment, is that what you're

16 asking?

17            MR. HEBERLING:  That's exactly it, yes.

18 A    I didn't review individual files for that specific

19 purpose, but I have seen something either in something to that

20 affect in Dr. Whitehouse's testimony.  But, I haven't -- I

21 didn't look at the individual files and analyze them to answer

22 that specific question.

23 Q    And did you see that in Dr. Whitehouse's testimony before

24 or after you began the process of designing 4B?

25 A    Well, since I think your question was would they be

Welch - Cross/Heberling                    161

1  excluded by 4B, I think it was after.  Didn't you ask me that

2  there would be individuals excluded by 4B?

3  Q    Yes, and in the process of designing 4B did you obtain

4  data from the CARD Clinic?

5  A    I didn't analyze data from the CARD Clinic specifically in

6  designing 4B.

7  Q    And in the process of designing 4B did you obtain any data

8  from the CARD Clinic on how the three millimeter requirements

9  for thickness of pleural thickening and the 25 percent extent

10 of chest wall requirement would affect Libby exposure patients?

11 A    I did not do that analysis.  And I'm aware that Dr. Wild

12 did a very nice analysis of the --

13         MR. HEBERLING:  Objection.  Beyond the scope of the

14 question.  Motion to strike the answer.

15         THE COURT:  No.  I think she said she didn't do it.

16 She said who did.  To the extent that she's expressing her

17 evaluation of someone else's work, that's stricken.

18 Q    So, this process of designing 4B set requirements without

19 specific information on how they would affect Libby --

20         MR. BERNICK:  Objection to the form of the question.

21 It's ambiguous.

22         THE COURT:  Sustained.

23 Q    In designing the Category 4B, did you have specific

24 information, numbers or any kind of -- did you do any kind of

25 study on how these requirements in 4B, namely -- okay, and

**J&J COURT TRANSCRIBERS, INC.**

1  we're talking about the blunting, the three millimeters and the

2  25 percent extent of the chest wall, how they would affect

3  Libby patients?

4  A    Really, I think what you're asking is, which Libby

5  patients would get an expedited review and which would get

6  individual review.  Your question seems to imply that they

7  would be excluded, but they wouldn't -- they're not excluded

8  from individual review if they don't meet the expedited

9  criteria.

10 Q    The question is directed at the expedited review, so would

11 you kindly answer it in that vein?

12           MR. BERNICK:  What's the question?

13           MR. HEBERLING:  I object to counsel interjecting

14 questions into --

15           THE COURT:  That's sustained.

16 A    But, could you ask me the question again?

17 Q    Yes, I will.  In this process of setting the 4B

18 requirements, did you obtain specific information on how the

19 expedited review requirements for blunting, three

20 millimeters, 25 percent extent would affect Libby patients?

21 A    I didn't do that analysis.  I didn't see what proportion

22 would meet expedited review or have to do individual review.

23 No, I did not do that analysis.

24 Q    Did you consult with doctors at the CARD Clinic regarding

25 these criteria for 4B severe pleural disease expedited review?

Welch - Cross/Heberling                         163

1  A     No, I did not.

2  Q     And you accepted the fact of severe pleural disease in

3  Libby, correct?

4  A     I do know that there are cases that I would -- that meet

5  the criteria for diffuse pleural thickening.  I've seen records

6  on individuals.  And I would presume based on what I know about

7  asbestos, most populations, there would be some.  Is that

8  responsive?

9  Q     Now, the TDPs allow Libby claims based on a six-month

10 residency in Lincoln County, correct?

11 A     I don't want to quote that specific exposure requirements.

12 I know six months, it's -- my understanding is that six months

13 of exposure to Grace products and Libby.  And whether that's

14 defined in Lincoln County, I don't know specifically.

15 Q     Okay.  Close enough.  And you mentioned a Helsinki report,

16 and there they used 25 fiber years as a minimum for development

17 of asbestosis, correct?

18 A     Used it for what purpose?

19 Q     As a threshold or a benchmark for asbestosis cases?

20 A     No, they don't.

21 Q     Could you explain what the 25 fiber years and asbestosis

22 cases in terms of the Helsinki criteria may be?

23 A     You want me to explain how in that Helsinki document they

24 used the term 25 fiber years?

25 Q     Yes.

Welch - Cross/Heberling                    164

1  A    I'd rather look at the document rather than try to state

2  it from memory.

3           MR. HEBERLING:  Okay.  Can we have PP-165 up?

4  Q    Now, that would be Exhibit 1 your deposition.

5  A    Oh, okay.  Great.  Because I was kind of hoping I had a

6  copy.  Exhibit 1 is my report.

7  Q    And that should be your report for December '08?

8  A    March 2009.

9  Q    Okay.  Then please look at Exhibit 2.

10 A    Okay.  Exhibit 2 is December 2008.

11 Q    Okay.  Then six lines up from the bottom.  Do you see

12 where your report says, "This report, referring back to the

13 Helsinki report, concluded that the exposures described were

14 estimated to represent accumulative exposure" --

15 A    Can I stop you a second.  I don't know what page you're

16 on.

17 Q    Six.  Sorry.

18 A    Page 6, Exhibit 2.  Okay.

19 Q    Okay.  Six lines up from the bottom.  I'll start again.

20 A    Okay.  I see where you are now.  Mm-mm.

21 Q    Your report says, "This report, referring back to the

22 Helsinki report, concluded that the exposures described were

23 estimated to represent accumulative exposure of 25 fiber years

24 and that clinical cases of asbestosis occur at similar

25 accumulative exposure levels," right?

1 A    Okay.

2 Q    Okay.  So, that -- do you see -- do you consider that a

3 benchmark of 25 fiber years for development of asbestosis?  Or

4 what would you call that?

5 A    The discussion there of 25 fiber years is part of the

6 discussion of attribution of lung cancer to asbestos exposure.

7 It's -- they're not -- the Helsinki group didn't make a fiber

8 year requirement for diagnosis of asbestosis at all.  They're

9 using that as a benchmark if you were to look -- compensate

10 lung cancer in the absence of a non-malignant disease on x-ray.

11 Q    Then in the last phrase you say, "Clinical cases of

12 asbestosis occur at similar accumulative exposure levels."  Do

13 you see that?

14 A    Correct.

15 Q    Is that your statement or Helsinki's report?

16 A    I'm paraphrasing the Helsinki report.

17 Q    Okay.  So, would you agree it would be hard to achieve 25

18 fiber years total exposure in just six months?

19       MR. BERNICK:  Objection to the form of the question

20 and foundation.

21 A    No.  It's not hard to achieve 25 fiber years in six

22 months.

23 Q    You'd have to have 50 fiber years of exposure, correct?

24 Excuse me.  A 50 fiber year rate of exposure for six months,

25 right?

Welch - Cross/Heberling                    166

1  A    Right.  Fifty fibers per cc would be the appropriate

2  measurement for six months.  And there are many occupations

3  where people get that kind of exposure historically, so it's

4  not -- you can achieve 25 fiber years in six months.

5  Q    And six months is the residency requirement for Libby

6  exposure, is it not?

7  A    Yes.  I wasn't answering your question in six months in

8  Libby.  You didn't say six months in Libby, so maybe I

9  misunderstood.  Do you want to -- are we getting confused?

10 Q    So, let's say at an illegal work site, if we're -- with a

11 one fiber per cc exposure for workers, it would take 25 years

12 exposure to have 25 years -- total fiber years, correct?

13        MR. FINCH:  Objection.  Relevance, Your Honor.  The

14 TDP doesn't have anywhere in it, for Libby or outside of Libby,

15 a fiber year requirement.  It has a -- for Libby it's six

16 months living in Lincoln County, and outside of Libby it has

17 the significant occupational exposure which is not defined in

18 terms of fiber years a for certain of the non-malignant

19 categories and the asbestos-related lung cancer.  So, I don't

20 see the relevance at all of the hypothetical questions about

21 fiber year exposure.

22        MR. HEBERLING:  Your Honor, this goes to the issue of

23 Libby being different.  The exposure at this illegal work site

24 that I had posed would be ten times the OSHA standard.  And

25 yet, it would take 25 years under those conditions to get to

**J&J COURT TRANSCRIBERS, INC.**

Welch - Cross/Heberling                    167

1  the threshold for asbestosis, and yet the category for Libby

2  allows just six months residency, breathing the air in Libby.

3  That's an indication through the witness' testimony that the

4  exposures in Libby are to a very toxic form of asbestos.

5           THE WITNESS:  May I raise my hand?

6           MR. BERNICK:  Your Honor, that is an opinion -- hold

7  on.  No, no.  I have an objection.

8           THE WITNESS:  Was that a question you posed to me?

9           MR. BERNICK:  I have an objection.

10           THE COURT:  I'm sorry.  It's a response to an

11  objection.  I don't think there is anything in the witness'

12  testimony so far that can assume toxicity based on exposure

13  over that particular time frame.  And you're going to have to

14  link it up a lot more clearly than this for me to make that

15  kind of a leap.  I think what the TDP does is explain that

16  Libby residents will qualify for that category of treatment if

17  they have resided in Lincoln County for six months.  It doesn't

18  have anything to do with toxicity, it gives them a break.  They

19  only have to --

20           UNIDENTIFIED ATTORNEY:  That's exactly right.

21           THE COURT:  -- say I've lived here for six months,

22  and therefore I now am going to qualify for treatment under

23  this category.  I can't -- I've lost the relevance.  I think

24  there's a misunderstanding as to what the TDP does.

25           MR. LOCKWOOD:  Your Honor, if Mr. Heberling is

Welch - Cross/Heberling                    168

1  suggesting that we should make Libby exposure requirements more

2  stringent like a year or five years, I suppose we could --

3           THE COURT:  Mr. Lockwood.  All right.  That's enough.

4  Okay.  The objection is sustained.  I think that's a

5  misunderstanding of the TDP.  If you want to get from the

6  witness the understandings of TDP to make sure that there isn't

7  something relevant, you know, please pursue that.

8  BY MR. HEBERLING:

9  Q    Six month exposure requirement applies to Libby, Lincoln

10 County, and nowhere else, correct?

11 A    That's my understanding, yes.

12 Q    Are you aware that there are individuals in Libby with

13 only six months residency who have asbestos disease?

14 A    I haven't looked at the individual cases to know whether

15 they're -- no, I don't know that for a fact.

16 Q    Are you aware that Libby has a different form of asbestos

17 than elsewhere in the United States?

18 A    No, that's not true.

19 Q    And are you aware that Libby asbestos is winchite largely?

20 A    Some of the Libby asbestos is winchite.  Some is

21 Tremolite.  Tremolite's through the United States --

22 Q    Isn't it about 84 percent winchite?

23 A    I don't know the numbers.  Winchite -- richtrite

24 (phonetic) --

25 Q    Those are all rare forms of asbestos, are they not?

**J&J COURT TRANSCRIBERS, INC.**

1 A    They're actually not defined as forms of asbestos.

2 They're asbestos-like materials, but when you look at the OSHA

3 definition of asbestos I think they're not included.

4 Q    And they're asbestos formed materials nevertheless,

5 correct?

6 A    Correct.

7 Q    And are you familiar with Meeker 2003 which reviews this?

8         MR. BERNICK:  Your Honor, this goes beyond scope.

9 She's not a geologist.  Mr. -- Dr. Meeker was -- is.

10        THE COURT:  It's proper.  The witness can answer it.

11 If she knows, she knows.

12 Q    You may answer.

13 A    I know I've seen Dr. Meeker's paper, but I don't remember

14 the details.  It wasn't part of my opinions in this TDP.

15 Q    Can you tell us of any other community cohort in the

16 United States exposed to winchite asbestos in a significant way

17 which has received the attention in the medical literature?

18        THE COURT:  I need to interrupt.  I'm sorry.  I

19 thought the witness said that winchite is not included in the

20 definitions -- standard definitions of asbestos.  That it's

21 asbestos form.

22        MR. HEBERLING:  She is agreed that it is asbestos

23 form.

24        THE COURT:  Right.

25        MR. HEBERLING:  And as --

1          THE COURT:  I think you need to restate your question

2 then.

3 BY MR. HEBERLING:

4 Q    Are you aware of any other communities which have

5 widespread exposure to winchite asbestos in the United States?

6 A    Well, the -- I think as we mentioned before, the Libby

7 vermiculite was shipped all across the country to expansion

8 plants.  And the same materials that were present in the Libby

9 mines and the Libby community were sent to those 200 plants,

10 and there's community exposure at those plants.  And some of

11 which has been studied in the ATSDR documents, and the workers

12 have been studied through ATSDR study.  So, there are

13 communities impacted by the same material.  It's not restricted

14 to Libby, Montana.

15 Q    And you would expect the same patterns of pleural disease

16 in the people thus exposed as in the people in Libby as well,

17 correct?

18 A    In the one published study looking at expansion plant

19 populations, it was a similar proportion of people with pleural

20 disease as in the Libby ATSDR study.

21 Q    Okay.  Let's --

22          UNIDENTIFIED ATTORNEY:  (Indiscernible).

23          THE COURT:  Do you have the portable?  I don't think

24 it's turned on.  I'm sorry.  You probably -- that's better.

25 Thank you.

1                          (Pause)

2                UNIDENTIFIED ATTORNEY:  Just use the ELMO.  It might

3  be a lot easier.

4                UNIDENTIFIED ATTORNEY:  There you go.  It's right

5  up --

6                THE COURT:  Just a minute.  It's not on yet.

7  She's -- okay.  Thank you.

8                MR. BERNICK:  I do have an objection because I

9  specifically had a conference with counsel about the numbers

10 that appear in the right column.  It was represented to me that

11 they would not be displayed and not be used with this witness

12 on this stand.  And that's exactly what was said to me by

13 counsel for Libby.

14               MR. HEBERLING:  (Indiscernible).

15               MR. BERNICK:  Oh.  Oh, I see, so -- I guess I got --

16 I wasn't careful enough in my words.

17               THE COURT:  All right.  For now -- counsel's agreed

18 he's only using the middle section, so that's all we'll talk

19 about.  Go ahead.

20               UNIDENTIFIED SPEAKER:  (Indiscernible).

21               THE COURT:  Unfortunately, you're going to have to

22 speak directly into that I'm afraid.  It's on.  He just had it

23 down (indiscernible).

24               THE CLERK:  Sir, it's not picking up.  I don't know

25 why it's not picking up.

                    **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Jan, do you have a lavalier mic?

2          THE CLERK:  He has it right here.

3          THE COURT:  For tomorrow, could you get a couple in

4    here, please?

5          UNIDENTIFIED ATTORNEY:  You have to turn it on, too.

6    The little green thing or the little flip.

7          MR. HEBERLING:  Got it.  Okay.  Perhaps this'll work.

8          THE COURT:  Okay.

9    BY MR. HEBERLING:

10   Q    Okay.  So, we have the initial diagnosis at the top.  And

11   then do you see blunting here?

12   A    Can I stop to ask you questions as you go down or do you

13   want me to just --

14   Q    I'll ask the questions.

15   A    Okay.  Go ahead.

16   Q    Okay.  Do you see the initial diagnosis of diffuse pleural

17   thickening up at the top?

18   A    Okay.

19   Q    And then the -- one of the chest x-ray criteria that you

20   discussed was blunting, correct?

21   A    Correct.  Blunting the costophrenic angle, correct.

22   Q    Okay.  And if the person has no blunting of the

23   costophrenic angle, he's out of 4B, correct?

24   A    He would have to go to individual review.

25   Q    Then there's a three millimeter thickness requirement for

1  the pleural thickening or --

2  A    Correct.

3  Q    -- expedited review, correct?

4  A    Correct.

5  Q    And if they don't have that they're out of 4B, correct?

6  A    Again, individual review.  If they -- you know, if they

7  otherwise meet their criteria.

8  Q    Then the next item is over 25 percent of extent of chest

9  wall?  That's another chest x-ray reading --

10 A    Correct.  Another criteria in the TDP.  That's correct.

11 Q    And if they don't have that they go out, right?  Out of

12 4B?

13 A    To individual review.

14 Q    Okay.  Then in the lower section we have lung function

15 test levels that need to be met, correct?

16 A    Correct.

17 Q    So, if a person has total lung capacity under 65 and all

18 the other criterias, that person would go to 4B compensation,

19 correct?

20 A    Correct.

21 Q    And if they have a forced vital capacity under 65, they

22 don't go straight to compensation.  They have to meet another

23 criteria which is the having the ratio, the obstructive disease

24 issue, or FEV1/FEC over 65, correct?

25 A    Correct.

1  Q    And if not they go out?

2  A    For individual review.

3  Q    Okay.  Thank you.

4           THE COURT:  I just want the record to be clear.  Dr.,

5  when you're saying -- the question is, they go out.  And your

6  answer is, they go to individual review.  I think what you're

7  saying is they stay in Category -- they can stay in Category

8  4B, but it's an individual review as opposed to an automatic

9  payment because you've met the criteria.

10          THE WITNESS:  Correct.

11          THE COURT:  Okay.  Thank you.

12          THE WITNESS:  Correct.  If they have impairment and

13 they have -- and they want to make a claim that they have this

14 diffuse pleural thickening but they don't meet those specific

15 points, then they can apply under individual review.

16          THE COURT:  All right.  Thank you.

17 Q    And, Dr. Welch, you discussed the ATS 2004 diagnostic

18 criteria during your direct examination.  Do you recall that?

19 A    Yes.

20 Q    That's American Thoracic Society standards?

21 A    Correct.

22 Q    Now, the definition for diffuse pleural thickening in the

23 American Thoracic Society diagnostic criteria does not include

24 the three millimeter thickness requirement, does it?

25 A    I don't specifically recall if it does or not.  I

Welch - Cross/Heberling                    175

1  don't -- yes, actually, let me look at it because I have it in

2  one of these books.

3                              (Pause)

4  A    I mean the basic criteria that the ATS uses is evidence of

5  structural pathology consistent with asbestos-related disease.

6  And that could be on chest x-ray or a CT scan.  Evidence of

7  causation by asbestos is documented by exposure, other

8  characteristics, then excludes other plausible findings.  So,

9  for diagnosis of any non-malignant asbestos-related disease

10  they do -- they don't require using the ILO classification,

11  specifically the way we do in the TDP.

12  Q    And so, the three millimeter thickness requirement is not

13  a requirement for a diagnosis of asbestos-related disease under

14  the ATS 2004 publication, correct?

15  A    That's correct.  And as I said before, the expedited

16  review  won't include everybody.

17  Q    Likewise, the ATS 2004 diagnostic criteria standard

18  definition for the diagnosis of asbestos disease does not

19  include the 25 percent or more coverage of the chest wall,

20  correct?

21  A    I just want to look at the plaque section and see.

22                              (Pause)

23  A    It doesn't refer specifically to 25 percent.

24  Q    So, the three millimeter and the 25 percent extent of the

25  chest wall requirements are apart from the standard diagnosis,

Welch - Cross/Heberling                    176

1  correct?

2          MR. BERNICK:  Objection to the form of the question.

3          THE COURT:  What's wrong --

4          MR. BERNICK:  The questions were about the ATS

5  guidelines.  Now the more general question is -- and there

6  hasn't even been foundation to establish what those

7  standards -- where those standards are derived from.

8          MR. HEBERLING:  I'll rephrase the question.

9  BY MR. HEBERLING:

10 Q    The -- so the three millimeter thickness requirement and

11 the 25 percent extent of chest wall requirements are not a part

12 of the standard diagnosis stated in the ATS 2004 publication,

13 correct?

14 A    That's correct.

15 Q    And nor are the three millimeter thickness and 25 percent

16 extent requirements measures of severity of asbestos lung

17 disease?

18 A    No.  Yes, they're not intended as measures of severity.

19 Q    So, given these additional requirements of three

20 millimeters thickness and 25 percent extent, you know that

21 there are going to be a certain percentage of people who do

22 have severe disease who are not going to qualify under the

23 successive presumptions they have to meet under the medical

24 criteria, correct?

25 A    No.

1          MR. BERNICK:  Objection.  Lack of foundation.

2  Assumes a fact that's not been established.

3          THE COURT:  That's sustained.

4  Q    Given that the criteria of three millimeters thickness and

5  25 percent extent are added on to the normal diagnostic

6  requirements for asbestos disease, isn't it true that there's a

7  certain -- do you then know that there's going to be a certain

8  number of people who do have severe disease who are not going

9  to qualify under Level 4B?

10         MR. BERNICK:  Your Honor, I would not object to the

11 question if the prefatory statement is eliminated.  It just

12 asks question.  I don't know what he means by normal.  It's not

13 been established through this witness.  Just ask the question

14 and it'll be fine.

15         THE COURT:  Sustained.

16 Q    Is it correct that when you set your assumptions as high

17 as they are you get a high degree of certainty, but you also

18 know there is going to be a certain percentage of people who do

19 have severe pleural disease who are not going to qualify under

20 the excessive presumptions they have to meet?

21 A    I do agree with the general statement that I do think

22 there will be people who have severe pleural disease who can't

23 meet the expedited review, and they would go to individual

24 review.  I'm not so sure I would say that the criteria are a

25 high bar that we've set.  I mean, three millimeters is what the

1  ILO requires if you say there's pleural thickening present.

2  That's their minimum requirement for pleural thickening.  But,

3  I think your question went to the fact, well, will there be

4  people who can't meet expedited review and they have to go to

5  individual review with severe pleural disease.  That's likely.

6  Q    And the ILO system is a system of classifications, is it

7  not?

8  A    Yes.  That's what it's for.  It's for standard

9  classification of chest x-rays.

10  Q    And it's not designed for clinical diagnosis of asbestos

11  disease, correct?

12  A    Not specifically, no, it's not.

13  Q    And so, there may be individuals who have significant

14  diffuse pleural thickening, but who do not meet the criteria

15  set by the ILO classification, correct?

16          MR. BERNICK:  Objection to the form of the question.

17          THE COURT:  Overruled.  She can answer.

18  A    Can you tell me what you mean by significant pleural

19  thickening?

20  A    Well, I just read you a sentence from your report.  What

21  did you mean by significant pleural thickening?

22          THE COURT:  I'm sorry.  You asked her a question.  I

23  don't know that you read her statement that she would recognize

24  in that form.

25  A    Thanks.  Yes.  I knew you were reading from something when

1  you asked me that question.  And I kind of paraphrased your

2  question, but I didn't know where you were reading it from.

3  Q    Please refer to your report of March '09.  This is PP-200,

4  Page 19.

5  A    Okay.

6  Q    Do you see at the top where you're saying, "There may be

7  individuals who have significant diffuse pleural thickening,

8  but do not meet the criteria set by the ILO classification"?

9  A    Correct.

10  Q    What did you mean by significant diffuse pleural

11  thickening at that -- in that statement?

12  A    Well, I'm really talking about the context of the TDP, and

13  there could be people who otherwise would meet the criteria for

14  4B, but might not meet those specific ILO criteria.  And those

15  were the people who would go to expedited review.

16  Q    And under individual review were a --

17  A    Individual review.  Sorry.  I said expedite.  I meant

18  individual.  Thanks.

19  Q    I understood that.  Where a claimant, for example, has

20  only two millimeters thickness, but the lung is encased and he

21  has severe lung function loss, and yet is out of Category 4B,

22  he can go to individual review, right?

23  A    Correct.

24  Q    Okay.  And for the individual review process, have you

25  stated that you believe a physician review is not necessary?

1  A    The trust will establish their individual review process.

2  I'm not setting that up for the trust.

3  Q    And in your opinion physician review is not necessary,

4  correct?

5         MR. BERNICK:  Objection.  Goes beyond the scope of

6  the examination.  And it's irrelevant.

7         THE COURT:  It does seem to go beyond the scope of

8  the examination.  What is the relevance?

9         MR. HEBERLING:  Well, Your Honor, they discussed

10  individual review in some detail --

11         THE COURT:  Yes.

12         MR. HEBERLING:  -- and I'm asking the witness whether

13  she thinks physician review should be --

14         MR. BERNICK:  It is irrelevant because the witness

15  has just testified, and I think it is undisputed, that these

16  matters will be set up by the trustees.  So, she's kind of

17  being asked to give an advisory opinion about how the trustees

18  should do their work.

19         THE COURT:  If you're asking whether the TDP requires

20  it, I think the witness may be in the capacity to the answer.

21  But, the trust hasn't been established yet.  I don't know that

22  the witness could opine as to what the requirements will be in

23  that capacity.

24         MR. HEBERLING:  Well, I'll ask a couple questions and

25  we'll see where we go.

1          THE COURT:  All right.

2   BY MR. HEBERLING:

3   Q    So, is it your understanding that the TDP requires a

4   physician review in connection with the individual review?

5   A    I don't think that that's specified in the TDP.

6   Q    In your opinion, should there be?

7          MR. BERNICK:  That's the same problem.

8          UNIDENTIFIED ATTORNEY:  Objection.  It's the same

9   problem.

10         THE COURT:  She's been qualified as an expert to

11  opine as to what is medically reasonable.  I'm missing why this

12  isn't appropriate for cross examination.

13         MR. BERNICK:  Because it's not a question of scope,

14  it's a question of relevance, and not a question for

15  qualifications.  It's relevance.  What the trust does when the

16  trust is set up is whatever it is.  She is not offering

17  opinions as to what standard -- never has on direct or in the

18  reports -- what standard should be applied by the trust when it

19  comes to individual review.

20         THE COURT:  Yes, you're correct.  The objection's

21  sustained.

22  Q    Do you know if there are any medical guidelines provided

23  in the TDPs for this individual review on questions of two

24  millimeters or obstructive disease or any such medical issue?

25  A    As I said before, it's my understanding that the process

1 for individual review has not been established yet.  So, such

2 guidance -- to my knowledge it doesn't exist yet.

3 Q    And you've never performed or participated in individual

4 review for an asbestos trust, correct?

5 A    That's correct.

6 Q    And you have never seen an individual review report?

7 A    Not to my knowledge.  Not to my recollection.

8 Q    And as to CT scans, is it correct that you did not

9 consider that the TDP allows for use of CT scans to measure the

10 three millimeters thickness or the 25 percent extent of chest

11 wall?

12          MR. FINCH:  Object to form.

13          THE COURT:  Is it her understanding what the TDP

14 states?

15          MR. LOCKWOOD:  He's not distinguishing between an

16 expedited review and the individual review in the TDP, Your

17 Honor.

18          THE COURT:  All right.  Sustained.

19          MR. HEBERLING:  Well, there's nothing in the

20 individual review, so -- I will include the words expedited

21 review --

22          THE COURT:  All right.

23          MR. HEBERLING:  -- but -- okay.

24 Q    So, as to CT scans, is it correct that -- strike that.  As

25 to CT scans, is it your understanding that under expedited

                    **J&J COURT TRANSCRIBERS, INC.**

1 review you do not consider that the TDP allows for use of CT

2 scans to measure the three millimeter sickness or the 25

3 percent extent of chest wall?

4 A    The expedited TDP is based on a chest x-ray not on a CT

5 scan.

6 Q    And do you consider that CT scans may be used in the

7 diagnosis of diffuse pleural thickening for Level 4B expedited?

8 A    Not for expedited, but individual, because the expedited

9 is based on a chest x-ray, and so if a CT is being used for

10 part of the demonstration to meet the criteria, it would be on

11 individual review.  That's my understanding.

12 Q    Then, the ATS 2004 document, Page 696, you may want to

13 look at this, but I'll read the quote, and see where we go.  It

14 says only 50 to 80 percent of cases of documented pleural

15 thickening demonstrated by autopsy, CT, or HRCT are detected by

16 chest radiograph.  Do you agree with that?

17 A    I don't know about the exact number, but there are plenty

18 of studies that show you find more pleural scarring when you do

19 a CT scan than on a plain chest film.  That is correct.

20 Q    And HRCT, one sees 40 to 50 percent more pleural

21 thickening, correct?

22 A    That's a reasonable estimate.  I mean, I think you can get

23 -- I've seen that number.  You find about twice as much pleural

24 thickening of any kind, small pleural plaques.  Not necessarily

25 -- people haven't done that study to look at costophrenic angle

Welch - Cross/Heberling                    184

1  obliteration, for example.  Do you find that on HRCT versus

2  chest x-ray more?  That's certainly not in that twice as much

3  category, but I can't give you a number.

4  Q    And back to the poster here.  CT scans are not used for

5  any of the criteria for 4B, correct?

6  A    For expedited review it's based on classification of a

7  chest x-ray, not on CT scans, so they're not used for expedited

8  review, but I think as I said, if that's the basis for

9  diagnosing severe pleural disease, that can go on individual

10 review.

11            MR. HEBERLING:  Objection to the -- the answer is

12 exceeding the scope of the question.

13            THE COURT:  No.  Actually it's not.

14            MR. HEBERLING:  We're into individual review again.

15            THE COURT:  She was explaining the answer.  She said

16 that it was not there for expedited, but can be used for

17 individual.

18            MR. HEBERLING:  Okay.

19            THE COURT:  I think that's within the scope.  But it

20 has been gone over at least ten times now.  We could move to a

21 new area.

22 BY MR. HEBERLING:

23 Q    Let's move on to DLCO, and on the poster we have DLCO has

24 -- with a dotted line around it, and you've testified that

25 that's not used as a basis for severity of lung function loss,

1  correct?

2  A    In the expedited review it's not.  It could be used in the

3  individual review.

4  Q    Okay.  And the ATS 2004 diagnostic criteria document, Page

5  697, states evaluation of subjects with suspected asbestos-

6  related disease should include spirometry, all lung volumes,

7  and carbon monoxide diffusing capacity.  Do you agree with

8  that?

9  A    Sure.

10  Q    So, ATS 2004 recommends DLCO for evaluation of asbestos

11  disease?

12  A    Sure.  That's appropriate.

13  Q    And are you familiar with the AMA guides to permanent

14  impairment?

15  A    Yes.

16  Q    And those are used all across the nation in workers'

17  compensation cases for evaluation of impairment?

18  A    Yes.

19  Q    And they also use DLCO as a measure or an indicator of

20  severity, correct?

21  A    Yes.  Sure.  If you're not trying to differentiate one

22  kind of lung disease from another it's a good measure of

23  impairment.

24  Q    And you, yourself, do not operate equipment, or know how

25  regarding the equipment to do lung volume tests, for example?

1  A    You probably have to be more specific --

2           MR. FINCH:  Objection.  Relevance.  Usually a lab

3  tech does that, Your Honor.

4           THE COURT:  She can answer whether she does it or

5  not.  Overruled.

6  A    I mean -- I'll make you ask me another question, because

7  spirometry measures lung volumes.  I routinely do spirometry.

8  I'm trained to do spriometry.  Did you want to exclude

9  spirometry from your question?

10 Q    I'm asking you about measurement of lung volumes.

11 A    Spirometry measures lung volumes.

12 Q    Can you operate the equipment to do the lung function

13 tests to measure total lung capacity?

14 A    I don't do that.

15 Q    Do you do the tests to measure diffusing capacity?

16 A    No.

17 Q    And is it fair to say you defer to a pulmonologist on

18 those?

19 A    Usually the -- a laboratory that does it, it's either a

20 pulmonary physician's office or a hospital based lab under the

21 supervision of a pulmonary doctor.  But I can interpret them

22 myself even if I don't do the tests.

23 Q    And are you familiar with the Lee, et al. 2003 article

24 which we discussed at your deposition briefly?

25 A    It would help if you tell me the title, or what the

1 subject is.

2 Q    Okay.  Let's bring up PP -- or, let's see, LC 232.

3 A    Is that an exhibit that I have in front of me, too, or --

4 Q    I can get -- I need the box.

5                        (Pause)

6 A    You may not need to give me it.  It depends on how much

7 you're going to ask me about it.

8 Q    Well, you wanted to know the title.

9 A    Okay.

10 Q    LC 232.  Can I have a -- Volume 2?

11                       (Pause)

12 A    I remember which article you're talking about.

13 Q    What is the title of that article?

14 A    It is entitled "Radiographic ILO Readings Predict Arterial

15 Oxygen Desaturation During Exercise in Subjects With

16 Asbestosis."

17 Q    And at Page 2005 -- or, 205, toward the bottom left hand

18 column, I believe, it says, "In our study pleural thickening

19 was --"

20            THE COURT:  I'm sorry.  I can't hear you.

21 Q    It says, "In our study pleural thickening was associated

22 with reduced lung volumes and DLCO as has been shown by

23 others."  Do you have that?

24 A    Yes, I do.

25 Q    And I take it you disagree with that?

1 A    Well, I don't disagree with their statement, but I think

2 in my deposition I did point out that this was a group of

3 patients with asbestosis, so those who had pleural thickening

4 also had asbestosis, so you can't conclude that the impact on

5 diffusion capacity is related to the pleural thickening because

6 to do that analysis appropriately you would want to exclude

7 people who have asbestosis.  Asbestosis is well recognized to

8 impact diffusion capacity among other lung volume tests.  So, I

9 don't think it really goes to the question about the impact of

10 pleural thickening on DLCO.

11 Q    And would you look at Page 202?

12 A    Okay.

13 Q    Table 1.  Do you see that the first 13 of the 38 subjects

14 did not have asbestosis?

15 A    The -- they state in the methods that they were subjects

16 with asbestosis.  So, you pointing out 13 people had a

17 profusion less than 1/0, but that doesn't mean they don't have

18 asbestosis.

19 Q    And isn't the standard diagnostic level for asbestosis

20 1/0?

21 A    "Asbestosis was diagnosed --" I'm quoting from the paper

22 -- "Asbestosis was diagnosed on the basis of the history of

23 significant asbestos exposure over at least six months,

24 presence of crackles on auscultation, and evidence of

25 interstitial fibrosis on high resolution CT scan of the chest."

Welch - Cross/Heberling                    189

1  So, there were some people included who had asbestosis on CT

2  scan who did not have asbestosis on chest x-ray, which is not

3  surprising that that happens, because you just pointed out that

4  the CT scan is more sensitive in finding asbestos-related lung

5  disease.  Everyone in this study had asbestosis.

6  Q    And nevertheless the authors concluded that reduced DLCO

7  was associated with pleural thickening, correct?

8  A    You read that statement.  Let's see if I -- it's at the

9  very end of their discussion.  And it says --

10                        (Pause)

11 A    You read the statement from the article.

12 Q    All right.  And so, you -- and I believe you continue to

13 disagree with that, correct?

14 A    I don't know what it is that I'm disagreeing with.

15 Q    The association of pleural thickening --

16 A    That they report an association -- okay.

17 Q    -- and decline in diffusion capacity.

18 A    Okay.  That -- there's a statement to that effect in this

19 paper.  I'm not disagreeing with that.

20 Q    Okay.  And likewise, in Cookson, 1983, are you familiar

21 with that one?

22 A    Do you have it in here?

23 Q    No.  That's going to be LC 214.  In the abstract.  Do you

24 see where it says the ratio of transfer factor to effective

25 alveolar volume correlates directly with the degree of pleural

**J&J COURT TRANSCRIBERS, INC.**

Welch - Cross/Heberling                    190

1  thickening as alveolar volume fell with the increasing severity

2  of pleural disease.

3  A    I see what you're -- you read it correctly.

4  Q    Okay.  And again, that's a long way of saying that

5  diffusing capacity drop was associated with pleural thickening,

6  correct?

7  A    You have to let me read it because if the -- they show a

8  transfer factor to volume changes, it could be the diffusion

9  goes up rather than down because the volume went down.  But

10 give me a minute and I'll see if I can --

11 Q    Okay.

12 A    -- interpret this for you.

13                        (Pause)

14           MR. BERNICK:  Your Honor, with due respect to the

15 scientific inquiry here, this really doesn't have much

16 relevance at all because the witness, there's no foundation for

17 establishing that the witness believes that DLCO was not

18 included amongst the criteria because it didn't associate with

19 diffuse pleural thickening.  That's not the witness's testimony

20 at all.  And I would note that we're now over an hour into the

21 cross examination.  Can we get an estimate about how much

22 longer the cross is going to go?

23           THE COURT:  Do you have an estimate of how long

24 you're going to be?

25           MR. HEBERLING:  Say another ten, 15 minutes.

1          THE COURT:  All right.  To the extent that that was

2    an objection, it's overruled.  This is cross examination.

3          MR. HEBERLING:  Okay.  Let's move on --

4          THE WITNESS:  I don't want to spend time to

5    understand that particular paper.

6    BY MR. HEBERLING:

7    Q    So, is it your position generally that DLCO decrease is

8    not associated with diffuse pleural thickening?

9          THE COURT:  I'm sorry.  Decrease or increase?  I --

10         MR. HEBERLING:  Decrease.

11         THE COURT:  Decrease?

12         MR. HEBERLING:  Drop.

13         MR. FINCH:  Objection.  Mis-characterizes the

14   testimony.

15         THE COURT:  It's a direct question.

16         MR. HEBERLING:  It's a question.

17         THE COURT:  Overruled.

18   A    It's my opinion that decrease in -- the severe -- sorry,

19   let me start again.  Diffuse pleural thickening, defined the

20   way we defined it in the TDP, generally doesn't cause a

21   reduction in DLCO, but it generally does, and it generally

22   causes restrictive lung disease, primarily, and not an isolated

23   reduction in DLCO.

24   Q    As to blunting, I'm showing you Slide 11 from the book you

25   prepared.  And you're saying diffuse pleural thickening usually

1 involved blunting of the costophrenic angle, correct?

2 A    Right.  And the way we've defined it, the way the ILO now

3 defines it, it does involve blunting the costophrenic angle.

4 Q    And what did you mean when you said DPT usually involves

5 blunting of the costophrenic angle?  Are you speaking

6 physically, or in terms of a definition?

7 A    Well, the definition is that it involves blunting the

8 costophrenic angle based on the current ILO and the current

9 ATS.  You can find papers that predate that, papers from the

10 1980s, where they include cases of diffuse pleural thickening

11 that don't include blunting the costophrenic angle.  I would

12 say the science and the research has evolved to the point

13 where, as I think as I said before, that blunting the

14 costophrenic angle is the best predictor of significant lung

15 function impairment.  That's why it's included in the ILO

16 classification.

17 Q    Is it your statement that DPT usually involves blunting of

18 the costophrenic angle?  Did you make that statement?

19 A    Yes, I did, and I don't think it's precise enough, because

20 the way I define DPT it has to have blunting of the

21 costophrenic angle.  You can have a lot of pleural scarring,

22 but it's not DPT without blunting of the angle.

23 Q    And are you familiar with the McLoud study, 1985?

24 A    Right.  And that's one of the ones that predates this

25 concensus to define DPT with blunting of the angle.

1  Q    And in McLoud isn't it true that about half of the people

2  with diffuse pleural thickening, as determined by tissue

3  samples, did not have blunting of the costophrenic angle?

4  A    I sort of feel like your question is a little bit apples

5  and oranges.  I mean, the TDP is trying to define the people

6  who have significant impairment from pleural thickening, not

7  just define the people who have pleural thickening.  So, when

8  you want to -- there's a lot of people who can have a lot of

9  pleural thickening but no lung function impairment from it, or

10 not dropping down to the level that we've defined as severe for

11 the purpose of the TDP.  And the McLoud paper is not looking at

12 that.  It's describing cases of a lot of pleural thickening,

13 but it's not looking at the comparison or predictor of lung

14 function impairment.

15 Q    Would it be fair to say that in the McLoud study only

16 about half of the 120 that had asbestos-related disease had

17 blunting of the costophrenic angle?

18 A    You're probably reading out of my deposition.  I don't

19 have the paper in front of me.  I don't have the numbers.

20 Q    Okay.

21 A    I --

22 Q    Would you look at your deposition --

23 A    All I'm saying it's -- I don't think it's a -- it's not

24 relevant to the TDP because she's not talking about lung

25 function impairment, and it's a 1985 paper.  So, she describes

1 a series of cases that she called diffuse pleural thickening.

2 She's using a different definition than what we're using if we

3 use the ILO definition, so it's not apples and oranges -- it is

4 apples and oranges in that way.

5 Q    Did you agree with the statement I just read at the time

6 of your deposition?

7 A    If you're reading it out of my deposition, I take your

8 word for it that you're reading it correctly.  And to agree

9 with it I'd have to look at the paper again because I don't

10 remember off the top of my head the numbers.

11 Q    Well, I'm trying not to take too much time with that.

12 A    That's okay, because I don't think it -- I'll agree with

13 you.

14 Q    Okay.  And are you aware that in the Libby CARD Mortality

15 Study about half of the people died without having blunting of

16 the costophrenic angle?

17        MR. BERNICK:  Objection.  Lack of foundation to ask

18 that question.

19        THE COURT:  What's the foundation?

20 Q    Have you read Dr. Whitehouse's report on the description

21 of the CARD Mortality Study?

22 A    I have.

23 Q    And did you see in there that 43 percent or so had no

24 blunting of the costophrenic angle?

25        MR. BERNICK:  Objection.  That report is not in

Welch - Cross/Heberling                          195

1  Evidence.  It's not found -- not established that it's a basis

2  for this witness's testimony, and there is a motion that

3  relates to the CARD Mortality Study for reasons that counsel is

4  very well aware of.

5          THE COURT:  It's not in Evidence?

6          MR. HEBERLING:  Not yet.

7          THE COURT:  Have you substantiated that she has used

8  it as part of her study?  Because otherwise I'm not sure where

9  we're going with this.

10 BY MR. HEBERLING:

11 Q    And you showed -- or, you discussed the Lilis 1991

12 article, and you showed a diagram with people with blunting on

13 one side and people without blunting on the other.  Do you

14 recall that, the step diagram?

15 A    Yes.

16 Q    And is it correct that also for the people who did not

17 have blunting there was a significant decrease in FVC loss over

18 time?

19 A    It's not over time.

20 Q    Okay.  But there was a significant decrease in FVC loss

21 with increasing pleural index, meaning increasing thickness and

22 extent of pleural thickening?

23 A    That's correct.  The people who had a lot of pleural

24 disease, even in the absence of costophrenic angle

25 obliteration, had lower lung function than people with a lower

1  value of the index.  That's correct.

2  Q    And those people would be like the ones who were excluded

3  from Level 4B for lack of blunting, correct?

4  A    Right.  They would go to expedited review.  That group,

5  even the highest group in the Lilis paper, didn't fall into the

6  lung function impairment that's set by 4B.  So, even though --

7  as your index goes up your lung function goes down, it's still

8  generally, if I'm remembering the paper they were generally

9  above 70 percent of predicted.  But there could be people with

10  very -- a lot of pleural disease absent blunting who do have

11  decreased lung function, and they would do individual review

12  because without the blunting of the angle you have to look at

13  all the other characteristics to determine whether it's the

14  plaque that's causing the decreased lung function or some other

15  condition.

16  Q    And you mentioned people with 70 percent of normal lung

17  function, correct --

18  A    Correct.

19  Q    -- in the group without blunting?  So, that would imply

20  that half were above 70 and half were below 70, more or less?

21       MR. BERNICK:  Objection.  Lack of foundation.

22  A    I don't know the number.  No, I don't know.  It could be

23  that there was one person below and 99 of them were above.

24  Q    And still the average is 70?

25  A    It could -- that certainly --

1  Q    If the average is 70, isn't it fair to say that there will

2  probably be a bell curve distribution?

3  A    No.

4  Q    No?

5  A    You can't assume there's a bell shape curve distribution

6  around a number like that.

7  Q    Okay.  So, you wouldn't imagine that there would be a

8  significant number of people with -- in the group average of 70

9  who had lung functions down at Level 50 or so, which was the --

10          MR. BERNICK:  Objection.  Objection.  Her imagination

11  is not of relevance.

12          THE COURT:  That's sustained.

13          THE WITNESS:  Though I'm happy to answer his

14  question, if you want to ask it again.

15          MR. HEBERLING:  I think I'll end there, Your Honor.

16  Thank you.

17          THE COURT:  How long will you be, Mr. Finch?

18          MR. FINCH:  Ten minutes, maybe --

19          UNIDENTIFIED ATTORNEY:  Five.

20          MR. FINCH:  Five to ten minutes.

21          THE COURT:  Okay.

22          MR. FINCH:  Can I do the redirect now rather --

23          THE COURT:  Yes.

24          MR. FINCH:  And then the afternoon recess?

25                    REDIRECT EXAMINATION

1 BY MR. FINCH:

2 Q    Dr. Welch, do you still have the McLoud paper in your book

3 in front of you?  I think it's Libby Claimants' Exhibit 214.

4 A    214 was Cooks, and I actually never even opened up to

5 McLoud.

6         MR. FINCH:  Why don't you just show it.  She knows

7 the --

8         UNIDENTIFIED ATTORNEY:  Can I have the ELMO?

9         MR. FINCH:  I do have the ELMO.

10 Q    Okay.  This is from the McLoud paper.

11         THE COURT:  What's the exhibit?

12         MR. FINCH:  85.  Sorry, Your Honor.

13         THE WITNESS:  Oh.  It's 242 in this book, looking at

14 his index.  Yes.  And then I can find it.

15 Q    Thank you.  Do you have the McLoud?  Just so we're clear,

16 they're talking about diffuse pleural thickening in asbestos

17 exposed populations?

18 A    Right.  From McLoud, Woods, Carrington, Epler and Gaensler

19 --

20 Q    1985?

21 A    Correct.

22 Q    Okay.  On Page 11 --

23         UNIDENTIFIED ATTORNEY:  Zoom.  There we go.  More,

24 more, more, more, more.  There you go.

25 Q    Okay.  This refers to the 1980 high/low classification?

Welch - Redirect/Finch                               199

1  A    Yes, it does.

2  Q    How does the 1980 classification differ from the 2000

3  classification for purposes of diffuse pleural thickening?

4  A    The 1981 does not require blunting of the costophrenic

5  angle.

6  Q    And why did the 2000 ILO require -- make that a

7  requirement?

8  A    There's a lot of variation between readers in the use of

9  the classification for diffuse pleural disease.  The ILO hadn't

10 provided very much guidance in what was diffuse versus what was

11 circumscribed, so they looked at all the information to see

12 what was important -- one -- is it important to make a

13 distinction between circumscribed and diffuse?  If not, they

14 can just give up asking people to do that classification.  But

15 it is important to make a distinction, and they added that

16 blunting of the angle to increase the reliability of the

17 classification.  So, when people are calling it diffuse,

18 they're identifying the diffuse as the category that we know is

19 clinically significant, and increase reader agreement by adding

20 that criteria.

21 Q    In your view has the science and the literature advanced

22 between 1980 and 2000?

23        MR. HEBERLING:  Objection.  Leading.

24 Q    Could you describe the advancement of the science you were

25 talking about in your response to Mr. Heberling's questions

**J&J COURT TRANSCRIBERS, INC.**

1  between the 1980 ILO and the 2000 ILO as it relates to the

2  diffuse pleural thickening definition?

3  A    Yes.  There have been a number of studies that look at the

4  impact of findings on the chest x-ray on pulmonary function.

5  Lilis was one.  I think I mentioned this other one, 2004, by

6  Amley (phonetic).  And there are some others that are smaller

7  but consistent that show that it's -- the presence of blunting

8  of the costophrenic angle is the best predictor on x-ray of

9  significant loss of lung function.

10  Q    There was some discussion about the ILO guidelines not

11  being in the 2004 ATS document.  Do you use the ILO guidelines

12  in clinical practice to describe what is shown on x-rays?

13  A    Yes.

14  Q    And so, is it fair to say that the ILO is used as one of

15  the tools in making a diagnosis?

16  A    Yes.

17  Q    Did you design the severe disabling pleural disease

18  category for the purpose of excluding Libby claimants?

19  A    No.

20          MR. HEBERLING:  Objection.  Leading.

21          THE COURT:  It's leading.

22  Q    What were your goals in designing the severe disabling

23  pleural disease category?

24  A    Was to add to the TDP a category for those individuals

25  from Libby, but also from everywhere in the United States, who

1  have this specific kind of pleural disease that causes

2  significant lung function impairment.  I think as I said before

3  it's a group that was not included in previous TDPs, and I

4  think it should have been.  So, we -- I got the chance to add

5  it here.

6  Q    Mr. Heberling asked you some questions about reviewing

7  CARD clinic data and data from Libby patients.  Do you recall

8  those questions?

9  A    Yes.

10 Q    Did you review medical records from any claimants anywhere

11 for the purposes of determining what percentage of them would

12 qualify under the expedited review criteria for any disease

13 category?

14 A    No.

15 Q    Did you, as part of your work in this case, at some point

16 review data from the CARD clinic and x-rays of Libby patients?

17 A    Yes.

18         MR. HEBERLING:  Objection.  Beyond the scope.

19         THE COURT:  I'm sorry.  It went by so fast I didn't

20 even hear the question.  I was still thinking about the last

21 answer.  Mr. Finch, you're going in such a rapid fire.  The

22 witness can keep up with you, but I can't.  So --

23         MR. FINCH:  Okay.  I'm sorry, Your Honor.  I'll slow

24 down.

25 Q    Mr. Heberling asked you some questions about did you

1 review data from the CARD clinic or x-rays of Libby patients?

2 A     Right.  I remember that.

3 Q     Okay.  He didn't ask you at any point in time did you ever

4 review that material?

5 A     I did look at x-rays and medical records of patients from

6 the CARD clinic.

7 Q     Okay.  And you reviewed Dr. Whitehouse's reports, too; is

8 that correct?

9 A     That's correct.

10 Q     Notwithstanding that, do you still believe that the

11 medical and exposure criteria for severe disabling pleural

12 disease are reasonable?

13 A     Yes, I do.

14 Q     Does the reasonableness of the TDP depend, in your view,

15 on the type of fiber that people are exposed to?

16 A     No, it doesn't.

17 Q     Did -- Mr. Heberling showed you this chart.

18 A     Do you want to make it --

19 Q     Yes.  He'll get around to it.

20 A     -- bigger -- smaller.

21 Q     There you go.

22                              (Pause)

23 Q     I'm going to write asbestosis 2/1.  Why, in your view, is

24 it reasonable to have additional requirements for severe

25 asbestosis and severe pleural disease beyond just a diagnosis

1 of asbestosis or a diagnosis of some kind of pleural disease,

2 whereas there is nothing beyond a diagnosis of mesothelioma in

3 the TDP?

4 A    Mesothelioma, one, it's always caused by asbestos, and

5 two, it kills you.  Asbestosis and asbestos-related pleural

6 disease, once you know it's asbestosis or asbestos-related

7 disease it's caused by asbestos, but it can be caused by

8 something else.  Interstitial fibrosis can be caused by

9 something else.  Pleural scarring can be caused by something

10 else.  So, you don't necessarily have the certainty you have

11 with mesothelioma that is asbestos-related, on one hand.  And

12 then, most people with non-malignant asbestos-related disease

13 die of something else.  There's a whole range of severities.

14 So, this category, Category 4, both asbestosis and disabling

15 pleural disease, is designed for the relatively small subset of

16 people with non-malignant disease who have a significant impact

17 from it.  They're not necessarily going to die from it, but

18 it's a significant impact on their life.  Did that answer your

19 question?

20 Q    Yes, ma'am.

21         MR. FINCH:  With that, Your Honor, I have no further

22 redirect.

23         THE COURT:  Recross?

24         MR. HEBERLING:  Just briefly, Your Honor.  Can I use

25 that?

1          MR. FINCH:  Sure.

2          MR. HEBERLING:  Thank you.

3          MR. FINCH:  Do you need this?

4          MR. HEBERLING:  No.

5          MR. FINCH:  Take it away.

6                    (Pause)

7              RECROSS EXAMINATION

8  BY MR. HEBERLING:

9  Q    Okay.  I believe you just testified that in the case of

10 mesothelioma there's a diagnosis, and no further hurdles, no

11 further requirements, they can go straight to compensation

12 because it's -- the level of certainty is fairly high, right?

13 A    Right.  I mean, it does require Grace exposure to get

14 compensated --

15 Q    Yes.  These are the medical criteria --

16 A    -- in this TDP.

17 Q    -- you understand?  Not the exposure criteria?

18 A    Okay.

19 Q    And for 4B, severe and disabling pleural disease, in order

20 to determine that it's severe we have the lung function

21 requirements down in the lower section?

22 A    Right.

23 Q    So, in order to make a decision on whether it's severe you

24 would need some kind of lung function level that would have to

25 be met, correct?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Right.

2  Q    But the other requirements, particularly this 25 percent

3  and the three millimeter sickness are not part of the

4  diagnosis, are they?

5  A    Well, they --

6         MR. BERNICK:  Objection.

7  A    -- yes, they are.

8         MR. BERNICK:  Not part of the diagnosis of what?

9  Q    They're not part of the ATS 2004 diagnostic criteria --

10        MR. BERNICK:  That's --

11 Q    -- for the diagnosis of asbestos disease, correct?

12        MR. BERNICK:  That's repetitive of his cross

13 examination almost verbatim.

14        THE COURT:  It is repetitive.  If you're going to

15 make another point, go ahead, but she's already testified to

16 this.

17        MR. HEBERLING:  That's my point.  Thank you.

18        THE COURT:  Mr. Finch, anything more?

19        MR. FINCH:  No re-redirect, or whatever it is.

20        THE COURT:  All right.  You're excused, Dr. Welch.

21 Thank you.  We'll take a ten minute recess.

22        MR. FINCH:  Thank you, Your Honor.

23        MR. BERNICK:  As a process point, Your Honor, if we

24 come back in ten minutes I think that we'll have a shot at

25 getting through Dr. Peterson and maybe getting Mr. Hughes on

1  the stand.  So it would be very good --

2         THE COURT:  All right.

3         MR. BERNICK:  -- because we'll be on schedule.

4         THE COURT:  Okay.  Thank you.

5                    (Recess)

6         THE COURT:  Please be seated.  Mr. Finch?

7         MR. FINCH:  Nathan Finch for the Asbestos Claimants'

8  Committee.  Your Honor, the next witness called by the plan

9  proponents is Dr. Mark Peterson.  Before we call him, I

10  neglected to offer for demonstrative purposes only Plan

11  Proponents' Exhibit 174, which is Dr. Welch's slide show.

12         THE COURT:  Any objection to that for demonstrative

13  purposes?

14         MR. HEBERLING:  It's for demonstrative purposes?

15         THE COURT:  Yes.

16         MR. FINCH:  Yes.

17         MR. HEBERLING:  (Indiscernible).

18         THE COURT:  All right.  It's admitted for

19  demonstrative purposes.  Can you swear Dr. Peterson so he can

20  sit down, Jan, please?

21       MARK ALAN PETERSON, PLAN PROPONENTS' WITNESS, SWORN

22                    DIRECT EXAMINATION

23  BY MR. FINCH:

24  Q    Good afternoon, Dr. Peterson.  Could you state your full

25  name for the record?

1  A    Mark Alan Peterson.

2  Q    Did you prepare some slides to help describe and

3  illustrate your testimony today?

4  A    Yes.

5  Q    Could I -- you should have in front of you Exhibit 178A.

6           MR. FINCH:  And, Your Honor, may I approach the bench

7  and hand the Court a copy?

8           THE COURT:  Thank you.

9  Q    Is the document you're holding that's on the screen the

10  slides you prepared, Dr. Peterson?

11  A    Yes.

12  Q    Could you describe briefly your educational background?

13  A    I have an undergraduate degree from the University of

14  Minnesota, a law degree from Harvard, and a Master's and Ph.D.

15  in Experimental Social Psychology from the University of

16  California, Los Angeles.

17  Q    Have you held any teaching positions at law school or

18  other places?

19  A    Yes.

20  Q    Describe those, please?

21  A    I taught -- I was a visiting professor at UCLA.  I taught

22  courses on law, and social science, and mass torts.  I taught

23  at the RAND Graduate School, its Ph.D. program, on law and

24  social science, and while I was in graduate school I taught in

25  both the law school and the psychology department.

1 Q    Next slide, please?  You mentioned something called RAND.

2 Could you describe the work you have done at the RAND

3 Corporation and what that entailed?

4 A    RAND, of course, is a public policy research corporation,

5 non-profit, independent, and I worked there for 25 years doing

6 empirical and quantitative research -- objective quantitative

7 research on the legal system, how it operates, both -- first in

8 the criminal justice area, and then in 1980 I was one of a

9 number of founding members of RAND's Institute for Civil

10 Justice, that really has come to be known as a preeminent

11 organization conducting policy research, empirical work on how

12 the civil justice system operates in this country.  And for 25

13 years I conducted research in both areas, primarily civil

14 justice focusing in the area of mass torts.

15 Q    Could you scoot forward a little bit and speak more

16 directly into the microphone?  In mass torts did that include

17 asbestos claims?

18 A    Yes.  That's a primary area of asbestos, particularly how

19 asbestos claims are valued, how lawyers -- plaintiffs' lawyers

20 and defense lawyers value and settle asbestos claims.  It was a

21 primary area of research.

22 Q    Could you describe what you did to gain an understanding

23 and expertise as to the factors that go into valuing and

24 resolving asbestos personal injury claims while at the RAND

25 Corporation and since then?

1  A     A number of sources.  Primarily it's both large scale data

2  analyses for many databases of resolved asbestos claims.

3  Primarily in my consulting work it applied research that I

4  carry out, but some of that at RAND, as well.  But I

5  supplemented that with extensive interviews, systematic

6  interviews using basically a Socratic method with plaintiffs'

7  lawyers and defense lawyers first for Judge Tom Lambros, who is

8  a U.S. District Court Judge in Cleveland, who ran the Ohio

9  asbestos litigation project, and he asked me to -- this was a

10 RAND project -- to spend a considerable amount of time in

11 Cleveland talking with the plaintiff and defense lawyers there,

12 asking them how they settle claims, changing one factor at a

13 time to see how it affected the values.

14      From that we developed what's called an expert system.

15 It's a computer system that took the rules that we generated

16 from those interviews and put them in a bunch of if/then

17 statements so that we could run a computer to try and think

18 like a lawyer.  The primary problem with that is at the time

19 RAND was on a mainframe and it took so much power for the

20 computer to run we shut down the whole system at RAND once.  We

21 ended up -- that work terminated.  But I have done a similar

22 project like that for the Manville Trust.

23      So, throughout all of it this -- data analysis is central

24 to the work I do, but I believe in all of my work that you

25 can't make meaningful and intelligent analyses of data unless

1  you really understand the phenomenon that you're looking at.

2  And here I get that by reading documents, by talking to

3  participants, by examining what's happened with regard to how

4  claims are resolved, and filed, and so on, which, for over 25

5  years that's been the center of my career.

6  Q    Have you authored any publications in journals, peer

7  review journals about mass torts and asbestos -- mass torts

8  generally, and asbestos in particular?

9  A    Yes.  I've offered -- I've authored or co-authored 34

10 documents, and a substantial portion of them are in the area of

11 mass torts.  These are both journal articles and also RAND has

12 a report system where it publishes monographs that are peer

13 reviewed similar to, and usually has a more extensive, I've

14 found, review process than even many periodicals.

15 Q    Have you served as a Court-appointed expert to any Judges

16 on the valuation, and settlement, and resolution of asbestos or

17 other mass tort claims?  Next slide, please?

18 A    Yes, I have.

19 Q    Can you describe that, please?

20 A    Well, there are five instances.  One of them was for Judge

21 Robert Merhige in the Dalkon Shield case is where we collected

22 data and reviewed that, provided the Court with -- and the

23 parties with information that they -- helped -- I was an expert

24 for the Court in designing that research project.  I worked for

25 --

1  Q    Dalkon Shield was what?

2  A    An inter-uterine device manufactured by A.H. Robbins.  It

3  was the A.H. Robbins bankruptcy.  And that bankruptcy case was

4  in the mid-1980s.

5  Q    Okay.  Could you describe the work you've done for Judges

6  in asbestos-related litigation in valuing asbestos tort cases?

7  A    Yes.  I worked for four Federal and Bankruptcy Court

8  Judges as the expert for the Court, as a neutral expert, first

9  for Judge Lambros, as I've described.  In addition to the

10 process I've described for Judge Lambros we also collected data

11 on resolved claims in order that we could then value new claims

12 as they came in based upon what was the historic settlements

13 for those claims.

14     I did a similar larger project for Judge Robert Parker in

15 the Eastern District of Texas involving a class action where we

16 collected data on 600 asbestos claims in Texas.

17     The largest project I've done was to work with Judge Jack

18 Weinstein and Burt Lifland on the Manville Trust restructuring

19 that Mr. Inselbuch referred to earlier.  I was the special

20 advisor to the Court, where I provided both technical

21 assistance to the Court and to the parties of interest with the

22 Manville Trust, and also worked as the -- basically a special

23 -- as a mediator in helping to resolve the litigation.  There

24 was a class action litigation filed in order to correct the

25 failures of the Manville Trust, which, as Mr. Inselbuch said,

1  failed about a year after it was founded.  It ran out of money.

2  It was dragged into so many trials it was spending $50 million

3  a year in --

4        MR. KOVACICH:  Your Honor, I object.  The witness has

5  gone beyond the question that he was asked, and he's now giving

6  history on matters that are irrelevant to the issues at hand.

7        THE COURT:  He's explaining his role, but I

8  understand that you were appointed as a special expert, and I

9  -- I believe there was one more.

10        THE WITNESS:  Well, Lifland and Weinstein were two

11  Judges --

12        THE COURT:  Oh.

13        THE WITNESS:  -- one engagement.

14        THE COURT:  Okay.

15        THE WITNESS:  I worked on that engagement really --

16  when the class action was settled the settlement created an

17  office called the Special Advisor to the Trust, so I carried on

18  that work -- continued to work with the Courts until 2007, so

19  that was a 17-year engagement.  In 2007 I was named a Trustee

20  of the Manville Trust, so I gave up that engagement.

21  Q    Are you a Trustee of any other 524(g) or other asbestos

22  settlement trusts in addition to Manville?

23  A    Yes, the Fuller-Austin Settlement Trust.  It's a small

24  trust in Texas.

25  Q    In your role as an advisor to the Courts on asbestos

1 matters did you provide those Courts with quantitative analyses

2 of values of asbestos personal injury claims and the factors

3 that affect those values?

4 A    Yes.

5 Q    Have you ever provided expert testimony on asbestos

6 liabilities and the value of asbestos claims in connection with

7 either asbestos-related bankruptcies or asbestos class actions?

8 A    Yes, I have.  Also insurance litigation.  I've testified

9 over 20 times -- I think by now it's close to 25 times, mostly

10 providing estimations of asbestos liabilities, but on other

11 matters, as well, in bankruptcies, class actions, and insurance

12 litigation.

13 Q    Have you been recognized by Courts in the District Court

14 of Delaware relating to valuing asbestos claims and estimating

15 asbestos liabilities within the past five years?

16 A    Yes.  In Delaware, and I believe their trials were in

17 other jurisdictions.  Yes.

18 Q    Would that be -- could you list some of those cases?

19 A    Armstrong, twice there, Owens Corning.

20 Q    Turner & Newell?

21 A    Turner & Newell.

22 Q    Did -- next slide.  Are you currently a consulting expert

23 to any asbestos trusts on their claims resolution procedures?

24 A    Yes.  I'm an expert for and a consultant for about 20

25 asbestos trusts on both matters of estimations of liability as

1  well as their trust distribution procedures and the

2  implementation and technical issues with regard to the trust

3  distribution procedures.  I should state that in my engagement

4  in the bankruptcy cases I've also helped design and provided

5  data, and statistical analyses for the construction of trust

6  distribution procedures in virtually every case.

7  Q    Have you been a testifying expert in litigation involving

8  insurance coverage issues?

9  A    Yes.  I've worked on -- for both sides.  I've worked for

10  insurers.  I was a testifying expert for Continental and Chubb

11  in the <u>Ahern</u> class action.

12  Q    What's sometimes called the <u>Fibreboard</u> case?

13  A    Yes.  The <u>Fibreboard</u> case.  Again, Mr. Inselbuch cross

14  examined me in that case.

15  Q    Have you ever been asked to appear and testify before the

16  United States Congress on projections of asbestos claims and

17  projections of asbestos liabilities and the value of asbestos

18  claims?

19  A    Yes.  Three times on -- with regard to the issue of the

20  FAIR Act.  Also, it involved looking at the ability to pay the

21  cost of the FAIR Act, so it was both sides of that.

22  Q    Have you served as a consulting expert on the value of

23  asbestos claims and the factors that drive the value of

24  asbestos claims and estimations of asbestos liability to

25  parties over the past decade or more?

1 A    Well, other than these engagements I've worked with

2 insurance companies, with businesses, defendants.

3 Q    Have you also done consulting work for asbestos claimants'

4 committees in bankruptcies in addition to this --

5 A    Oh, certainly.  Certainly.  Yes.  Asbestos claimants'

6 committees, I've worked for several representatives of future

7 claimants.  I've really kind of had a gamut of interested

8 parties in my engagements.

9         MR. FINCH:  Your Honor, at this time we would proffer

10 Dr. Mark Peterson as an expert in asbestos claims valuation,

11 which would include estimating the value of asbestos personal

12 injury claims, the factors that drive those values, the

13 projection of future asbestos personal injury claims, and the

14 cost to resolve pending and future asbestos personal injury

15 claims.

16         MR. KOVACICH:  No objection.

17         THE COURT:  All right.  Dr. Peterson is permitted to

18 offer an expert opinion in those areas.

19 BY MR. FINCH:

20 Q    Dr. Peterson, have you been retained by an expert in this

21 case?

22 A    I've been retained as an expert --

23 Q    Have you been retained as an expert in this case?

24 A    Yes.

25 Q    By what party?

1  A    The Asbestos Claimants' Committee.

2  Q    For what purposes?

3  A    To both -- to provide analyses of asbestos claims,

4  estimates of liability, and how the plan or any proposed plan

5  or alternative proposed plans treat and deal with asbestos

6  claims, and particularly the development of trust distribution

7  procedures.

8  Q    Did you provide reports both to the Asbestos Claimants'

9  Committee and to its members, and to the Court in which you

10 attempted to estimate what Grace's liability would be, or the

11 cost to resolve asbestos claims would be as of April 2001?

12 A    Yes, I did.

13 Q    Could you turn to Exhibit 199 in your exhibit book?

14 A    Yes, I have that.

15 Q    What's 199?

16 A    That's my expert report on the issues that you just

17 inquired about, the estimation of asbestos liabilities.

18 Q    That's the estimation of Grace's liabilities in the tort

19 system as of April 2001?

20 A    Yes.  These are in the tort system.  There's a -- it was

21 originally done in June 2007.  We had a couple of small

22 technical and typographical changes which we made in January

23 2009.  This is the corrected edition.

24 Q    Okay.  So, the document 199 is the -- substantively the

25 same report you delivered to the Asbestos Claimants' Committee

1  and the Court in June 2007 in connection with the estimation

2  proceedings?

3  A    Yes.  There were no substantive -- significant changes.

4  Q    Okay.

5        MR. FINCH:  Your Honor, we offer Exhibit 199 not for

6  its truth but just to show that this document was made

7  available to the members of the Asbestos Claimants' Committee

8  and the Court in 2007.

9        MR. KOVACICH:  Objection.  The document is hearsay,

10 and presuming the doctor is going to provide testimony on the

11 opinions set forth in the document, it would be cumulative of

12 his testimony.

13       MR. FINCH:  Your Honor, I'm not offering the document

14 for its truth.  I'm offering the document for the fact that Dr.

15 Peterson created a document, it was given to, among other

16 people, counsel for the Libby claimants back in 2007.

17       MR BERNICK:  Your Honor, from the debtor's point of

18 view -- you know how sensitive I am to the issue of what comes

19 in through experts -- there's an allegation that the ACC did

20 not deal with the Libby claimants' counsel and the Libby

21 claimants in good faith, and there's already been testimony

22 about this, but we want to bring out through Dr. Peterson that

23 his analysis was made available to them directly in connection

24 with the case.

25       MR. KOVACICH:  If I may respond, Your Honor?  Mr.

1  Inselbuch already testified that the plan proponents considered

2  Dr. Peterson's evaluations.  Dr. Peterson has and will continue

3  to testify that he advised those parties that the fact that

4  that occurred doesn't make his very lengthy substantive hearsay

5  report admissible in evidence.

6          UNIDENTIFIED ATTORNEY:  It's not offered for its

7  truth, Your Honor.

8          THE COURT:  The report is not being offered for the

9  truth.  It's being offered only to show that it was of record

10 in these proceedings as of June of 2007 and available to the

11 parties.  Here's the problem I have, Mr. Finch.  I don't know

12 where it's made available to the parties or of record in these

13 proceedings.  The witness has obviously prepared this report,

14 but I need some connecting up to show that it was, in fact,

15 provided.  If it was, I'll accept it for that very limited

16 purpose, clearly not for the truth.  But so far I don't have

17 that evidence on record.

18         MR. FINCH:  Okay.  I will have to prove up exactly

19 how it came, either through a stipulation or through another

20 witness.  Dr. Peterson knows he created the report, but he

21 obviously can't say that he pushed the button and filed it with

22 the Court.

23         THE COURT:  All right.  Well, I'll accept it subject

24 to that trueing up at a later date.

25 BY MR. FINCH:


**J&J COURT TRANSCRIBERS, INC.**

1  Q    Dr. Peterson, as part of your work in estimating Grace's

2  liability and costs to resolve pending and future asbestos

3  claims and in giving the recommendations to the ACC about TDP

4  values, did you have to become familiar with Grace's litigation

5  history and historical claim values?

6  A    Yes.  That's essential.

7  Q    Can you describe how you went about doing that?

8  A    Well, in a number of steps.  One is that I, of course,

9  obtained the data about the -- the claims data that W.R. Grace

10 maintained, and did an enormous amount of analyses of that.

11 Two, I read documents, statements by W.R. Grace. such as

12 financial statements.  Three, I looked at and read the

13 depositions and statements by persons who handled claims and

14 negotiated settlements on behalf of W.R. Grace.

15 Q    Who specifically were those people?

16 A    Mr. Hughes, among others.  I know that there were several,

17 but his comes to mind.  I looked at the -- in order to

18 understand the context in which these cases were settling,

19 because there were many references by W.R. Grace to the

20 changing litigation environment as of 2001 and how it would

21 affect their future settlements and expected claim filings.  I

22 looked at what happened to the claim filings and settlements by

23 other defendants who remained in litigation beyond the point in

24 time W.R. Grace did.  It provided basically a view as to how

25 the litigation continued and presumably would have affected

1 W.R. Grace.  Those are among the sources I looked at.

2           MR. FINCH:  Could you put the slide show back up and

3 go to -- it's marked 23, but I think it's, like, the second

4 slide back from the one we were just at?  That one.  Yes.

5 Q    Dr. Peterson, what did you learn about Grace's settlement

6 averages historically when you investigated its claims

7 litigation history?

8 A    Well, this is the trend for mesothelioma claims.  The

9 levels of settlements, the size of settlements differ by

10 disease.  Mesotheliomas have the largest, lung cancer next, and

11 then other cancers next, and non-malignant.  So, there's an

12 enormous variability in range with regard to each of those

13 diseases.  The trends for all of them -- for all the cancers

14 were up, in particular, and mesothelioma is both the most

15 significant case because it involves the most money, and also

16 demonstrated a very strong upward trend, which is shown on this

17 Exhibit 23.

18      Grace's experience and the average settlement in constant

19 dollars, 2001 dollars, is the red line.  It isn't always up.

20 It isn't steadily up.  Statisticians say it's non-monotonic,

21 but it goes up and down with an upward trend.  You can fit an

22 upward trend line to that.  And the year to year variations, we

23 have some understanding about why those occurred.

24 Q    Grace is the red line.  What are these other companies

25 shown on here?

1  A     These are other --

2  Q     Are these other companies?   Is this their historical

3  mesothelioma values?

4  A     Yes.

5  Q     And what are these other companies, and why do they appear

6  on this chart?

7  A     Well, there are other major companies that have

8  similarities to Grace, and also companies that I have data for.

9  I cannot get private data from companies that are still in

10 litigation.   It's highly proprietary, and so that's not

11 available.   I only -- I don't work for a lot of defendants.   If

12 I did, I couldn't use it anyway.   But we get the data when a

13 company goes into bankruptcy, and this shows information from

14 -- for other companies that went into bankruptcy, major

15 companies, of which three continued in litigation after W.R.

16 Grace entered bankruptcy in April 2001, and those three

17 companies are USG, Turner & Newell, and Quigley.   And Turner &

18 Newell and USG both are companies that made -- that all made

19 construction -- products that were used in the construction

20 trades, and Turner & Newell also had mining operations,

21 different -- they weren't mining the same kind of mineral, but

22 they were mining asbestos fibers.

23 Q     Are these averages nationwide settlement averages for all

24 these companies and Grace?

25 A     Yes.   My analyses are -- the questions I am asked and deal

1 with are at a nationwide level, although we do look at some

2 information at state levels, too, but these reflect national

3 trends.

4 Q    Generally speaking, when you do estimates of a company's

5 liability for purposes of estimating its tort liability or

6 giving advice to an Asbestos Claimants' Committee on TDP

7 values, do you use nationwide settlement data?

8 A    Yes.

9 Q    Nationwide averages?

10 A    Yes.  That's the pertinent level of analysis.

11        MR. FINCH:  The next slide, please?

12 Q    Did you come to have a view as to what factors were

13 causing Grace's costs to resolve asbestos personal injury

14 claims to go up at or around the time when it's going into --

15 went into bankruptcy?

16 A    Yes.  There are factors that were -- explained the most

17 recent increase, the 2001, for example, 2000/2001 levels, and

18 also represent trends that continued after the bankruptcy, so

19 they --

20 Q    Let's talk first just about the things that happened up

21 until the time Grace went into bankruptcy.  What were those

22 factors?

23 A    Well, there are several, I think the most important of

24 which are on this demonstrative, Number 25, is the fact that

25 many other co-defendants, major co-defendants, went into

1  bankruptcy in 2000 and 2001.  Grace has commented on that those

2  bankruptcies would cause its settlements to increase and would

3  also cause it to receive more claims.  They've made that

4  observation.  Other companies have made that observation.

5  Q    Grace made that observation where?  In its --

6  A    In its -- well, it's made again and again, but it appears

7  in its financial statements that are two pages earlier in this

8  book, and it also made -- and that was a 2007 financial

9  statement, the 10K.  They also made it contemporaneous

10 statements in their financial statements of 2000 and 2001, and

11 also, I believe, the statements were made by representatives of

12 Grace during their depositions.

13 Q    Okay.  What -- in addition to the co-defendant

14 bankruptcies, what other factors increased, in your view,

15 Grace's costs to resolve asbestos claims?

16 A    Well, the bankruptcies of the eight co-defendants affected

17 Grace and other defendants who remain in litigation, and for

18 this -- for forecasting we need to assume that Grace would have

19 remained in litigation, because we're estimating their tort

20 liabilities.  There are other matters that affected Grace

21 specifically, and an important one was that it had become a

22 target defendant.  Grace, in the 1990s, was a less significant,

23 more peripheral defendant that got increasing visibility in

24 part because plaintiff's lawyers were looking for additional

25 defendants that they could -- from whom they could get

1  compensation.  So, that was a trend that was going on.

2        But that was accelerated by a number of forms of publicity

3  that were unfavorable to Grace describing its business

4  operations in Libby, Montana, and its exposure of persons in

5  Libby.  There were newspaper articles nationally and

6  regionally, there were television documentaries, there were

7  books, a number of publications that had rather wide

8  circulation and visibility came to give a high profile to W.R.

9  Grace, really the highest profile of any defendant in the

10  country, exceeded perhaps only by Manville 20 years ago.

11  Q    Since Grace went into bankruptcy have there been things

12  that have occurred in asbestos litigation that in your view

13  would have continued this trend you were observing in Grace's

14  claims history and settlement value history?

15  A    Yes.  I mean, these --

16        MR. FINCH:  Could you turn two slides forward?

17  A    Both of these matters, the bankruptcies of the other

18  defendants, the unfavorable publicity, the targeting of the

19  W.R. Grace, have continuing effects.  I mean, they just didn't

20  stop in 2001.  They continued to reverberate through the system

21  and affect people, other people, and would have affected Grace

22  today had it continued in litigation.  But there are other

23  matters that have kind of happened since then.  There are

24  bankruptcies of additional defendants that continue to occur,

25  not such a huge spike in significant defendants at one time,

**J&J COURT TRANSCRIBERS, INC.**

Peterson - Direct/Finch                           225

1  but there are some major defendants who have continued to go

2  into bankruptcy, further diluting the amount of money available

3  to play claimants by solvent defendants, and therefore

4  increasing the obligations and demands on other defendants,

5  like Grace, assuming that it continued -- it had still been in

6  the tort litigation.  That's an important matter.

7  Q    Were there other things that happened in the litigation,

8  generally, that had the effect of increasing claim values for

9  some types of claims and decreasing claim values for other

10 types of claims?

11 A    Yes.  There were a series of events, all having the effect

12 of sharply reducing the number of non-malignant filings in

13 asbestos claims.  One of them is the criticism -- increasing

14 criticism of the medical practices in documenting non-malignant

15 claims.  The defendants' insurance companies, even some Courts

16 (indiscernible) it, that kind of reached its height with Judge

17 Jack in Texas, who studied the practice for documenting

18 silicosis claims.  It's a different disease, but the practices

19 used to screen claims, (indiscernible) claims, was very

20 similar, done by many of the same law firms.  That, plus tort

21 reform that came in in a few of the major cases states, Texas,

22 Ohio, Mississippi, also struck a blow at non-malignant claims.

23 And then the plaintiffs' bar reoriented itself.  It changed

24 from many law firms that previously had concentrated heavily on

25 these non-malignant claims, shifted their practices, greatly

1  dropping their non-malignant claims and beginning to advertise

2  for mesothelioma and lung cancers.  That advertising -- I don't

3  know what it's like here, but in California it's just constant

4  and ubiquitous.  And so, that all of that had the effect of

5  increasing the number of mesothelioma claims, sharply dropping

6  the number of non-malignant claims, and it had an important

7  effect on the values of claims because the biggest impediment

8  to a plaintiff in getting a large settlement is the ability to

9  get to trial.

10      As Grace noted, that it -- it tried to settle claims early

11  on in order to avoid getting near trial date because claims

12  values go up as trials approach.  That's the time when the

13  plaintiff can finally hold the defendant accountable.  And so,

14  the problem is that there were so many non-malignant claims in

15  litigation that it glutted the system and prevented many non --

16  many meso creditors to get a new trial.  Now those claims are

17  gone, and they're gone because of the efforts of the

18  defendants, to a great extent.

19  Q   The non-malignant claims are gone, basically?

20  A   The non-malignants are gone.  But ironically, in getting

21  rid of the claims they were trying to get rid of, they

22  increased the values of mesos because they've given them an

23  easier opportunity to get to trial.  That was demonstrated

24  strongly by some changes in New York which basically really

25  greatly restricted unimpaired non-malignant claims.  The

Peterson - Direct/Finch                    227

1  consequence is that even more people got to try meso claims in

2  New York, the values went up.

3  Q    The factors you've been describing, are these factors that

4  would apply in every single jurisdiction in the United States,

5  or are they factors that apply to Grace nationwide?

6  A    Well, these -- all of these factors function differently

7  in different jurisdictions, and there, interestingly Libby is a

8  good example of that, because the factors that I mentioned that

9  were important here, the most important ones for Grace, the

10  bankruptcies of other co-defendants, the bad publicity, and --

11  about the activities in Libby, the inability to get to trial,

12  none of those -- they had a different -- they were -- it was a

13  different situation in Montana.  Montana -- the knowledge of

14  Libby was there already.  They didn't need to be informed.

15  People already hated Grace.  And so, you know, they came to --

16  I don't mean to be disrespectful to your client, Mr. Bernick,

17  but I'm describing objectively what --

18             MR. BERNICK:  It won't be the first time.

19                        (Laughter)

20  A    And so, that event, although it changed the litigation

21  nationally, didn't have much of an impact, because they were

22  already there.  It's the same thing with regard to the

23  opportunities, or the loss of solvent co-defendants who paid

24  part of the liabilities.  That didn't exist before, for the

25  most part, in Montana, and Libby, so the loss of those co-

Peterson - Direct/Finch                    228

1  defendants didn't really affect Grace very much.  It was

2  already paying most of the liability.  And similarly, the great

3  glut of claims that made it difficult -- extremely difficult to

4  get to trial in New York, or California, or Texas, wasn't as

5  big an issue in Montana because it has a much smaller case

6  load.  So, none of those factors had nearly the same kind of

7  impact in Montana, but they did affect nationally, and they

8  drove up the averages, because the Libby claims and the Montana

9  claims are such a small part of the overall number of claims.

10 The lesser trends there, my expectation of the lesser trends

11 there wouldn't have affected the national trends.  They were

12 just overwhelmed by the big changes that were occurring

13 elsewhere.

14 Q    Could you turn to Slide 56?  It's this one, the one that

15 has a table.

16 A    Yes.

17 Q    I'll just put it on the ELMO.  What does that show, Dr.

18 Peterson?

19 A    Well, we knew that values were going up for Grace, but

20 because they're in bankruptcy they weren't settling, so we had

21 to estimate what would have been the amount, would quantify the

22 change.  And so, I used five different methods to quantify what

23 the amount of the change is.  Two of them were based

24 exclusively on W.R. Grace data.  We looked at what's the -- the

25 historic trends over time, and the reach of the diseases using

Peterson - Direct/Finch                    229

1  multiple regression, a technique that lets you look at what's

2  the annual effect, the trend, time trend, taking into account

3  -- in this case we took into account state, because values

4  differ from state to state and we wanted to reduce the

5  possibility that in some years there may be more Texas claims

6  than other years, for example.

7          The second was just a short term increase, we just

8  looked at how much the W.R. Grace settlements had increased

9  over the last five years and just extended that trend up into

10 the future.

11         The other three was to look at these defendants, who

12 I already mentioned, comparable defendants, to see what

13 happened to them after Grace went into bankruptcy with regard

14 to those settlements, so we looked at the averages for Quigley,

15 Turner, Newell and U.S.G. and basically said that W.R. Grace

16 would experience similar levels of increase that we saw for all

17 three of those defendants although we spread that increase for

18 Grace out over six years, rather than -- for each of those

19 companies, that change occurred in a year. but we spread that

20 out in order to be conservative.  And that's what this table

21 reflects.

22 Q    Okay.  And this shows the various diseases, asbestos

23 related diseases as shown in the Grace database and your

24 projections of what the claim values for those diseases would

25 be under the different approaches, had Grace stayed in the tort

1  system and not gone into bankruptcy?

2          MR. KOVACICH:  Objection, leading.

3  Q    Could you --

4  A    Yes, this table shows the results of each of those five

5  analyses, by disease, by the method and it shows, for example,

6  for mesothelioma, they were paying on average, in the $90,000

7  for mesothelioma in 2001 when they went into bankruptcy.  And

8  these analyses are actually remarkably consistent, even though

9  they're different methods and different data, and they show

10  that by 2006, the average mesothelioma -- or value of a

11  mesothelioma claim, by each of these five methods, ranges from

12  188,000 to $225,000.

13  Q    I don't see anything on here about consortium claims or

14  wrongful death claims.  How does the Grace database deal with

15  consortium or wrongful death claims?

16  A    Well, it identifies consortium claims and wrongful death

17  claims in the database.  It's a --

18  Q    But is there any value shown for those claims?

19  A    No.  Well, what they do is, they consolidate the claim

20  with the underlying injury claim.  And so, you link them

21  together.  I mean, they're linked together by Grace in the

22  database and we link them in our analysis.  We sum the values

23  across all of them.  So, if there's a consortium or wrongful

24  death and an injury claim, we add them all up, but invariably,

25  the consortium -- I don't think the consortium claim ever had

1  independent value placed on it, in the database.  That didn't

2  mean that it didn't have value and influence how much Grace

3  paid on settling their claim, but it's just -- whatever it is,

4  it's the consolidated number.  These analyses that we've done

5  for the use of the W.R. Grace data is for all of the ancillary

6  as well as original injury claims tied together for the same

7  person.

8  Q    So, let's just play that out with a hypothetical.  Would

9  the settlement averages you use in your analyses and forecast,

10  include, for example, for the mesothelioma claims, would that

11  also include a component in there that would pick up the piece

12  of a mesothelioma claim that was a consortium claim that goes

13  into the average value used nationwide?

14         MR. KOVACICH:  Objection.  This is leading and it's

15  also repetitive of his prior answer.

16         THE COURT:  Well, it is leading but I think it's

17  trying to get a clarification and if it's repetitive I think I

18  need to hear it so that I understand how it does and doesn't

19  work.  So, Dr. Peterson, if you --

20  Q    To cure the leading, Dr. Peterson, could you explain how

21  the consortium claim affects the value of the mesothelioma

22  average used in the TDP and in your estimates of liability?

23  A    It increases the values that we place on mesothelioma

24  claims -- that Grace placed on meosthelioma claims and that we

25  place on mesothelioma claims, to the degree that it influenced

1  how much Grace settled by.  It has precisely the same impact

2  that Grace gave it.

3        If a consortium claim increased the value of a claim

4  so that W.R. Grace settled it for $20,000 more, the database

5  reflects that, we used the data as it's reflected by adding in

6  that additional value of consortium claim.  If it wasn't taken

7  or counted, it had no value, it doesn't have an affect, but

8  however Grace addressed it, it's reflected in the database.

9  Q    Okay.  Is that true for both consortium and wrongful

10 death?

11 A    That's true for consortium, and wrongful death and also as

12 part of the work I've done, I didn't mention it earlier, but I

13 reviewed hundreds of case files for W.R. Grace.

14        MR. KOVACICH:  I object, Your Honor.  The witness is

15 giving a speech beyond the scope of the question he was asked.

16        THE COURT:  All right, that's sustained. I'm still

17 not clear, then, Mr. Finch.  If I may.  Dr. Peterson, I'm not

18 clear about whether in the database is there a separate value

19 reflected for a wrongful death settlement, for example?

20        THE WITNESS:  There is a place for a value, if there

21 is a value.  But it is always a zero value for consortium claim

22 in W.R. Grace's database.  So, they never give it an explicit

23 value.  What I'm saying is that it may have had an implicit

24 value and be taken into account in considering the underlying

25 claim.  We put -- we add these together, but we're adding zero

Peterson - Direct/Finch                          233

1  in.

2              THE COURT:  All right.  Thank you.

3              THE WITNESS:  But it's never explicitly given a

4  value.

5              THE COURT:  Okay, thank you.

6  Q    So, just to keep it on the level of an individual case,

7  assume a hypothetical where you had a Mr. and Mrs. John Smith,

8  and Mr. Smith had mesothelioma, and Grace settled Mr. Smith's

9  mesothelioma claim and Mrs. Smith's consortium claim and Mr.

10 Smith got $100,000 and Mrs. Smith got $20,000, how would the

11 database record that phenomena?

12 A    It's $120,000 stated with regard to the claim by Mr. Smith

13 and zero with regard to Mrs. Smith.

14 Q    Next slide.  What does this slide show, Dr. Peterson?

15 A    This slide shows the TDP values that Mr. Inselbuch

16 discussed on the right side for each of the categories, disease

17 categories in the W.R. Grace trust proposed TDP.  In the column

18 to the left of it is the average values for each of the

19 diseases we estimate they are at the current time for W.R.

20 Grace.

21 Q    Did you, in fact, provide advice to the committee, the

22 Grace Asbestos Claimants Committee, as to what the scheduled

23 and average and maximum values could be for the Grace TDP?

24 A    I made a suggestion of what would be, I believed,

25 appropriate TDP values, yes.

Peterson - Direct/Finch                    234

1  Q    Based on Grace's history as you expected it to continue?

2  A    Well, it's based on its history as we've kind of advanced

3  it by these analyses and also based on looking at what are the

4  levels of TDP values, the relative levels of TDP values in

5  other cases.

6  Q    Did -- and what does the next slide show?

7  A    The next slide is identical, except here it shows the

8  amount that Grace was paying in 2001 to resolve the claim. This

9  is the actual settlement amounts at the point in time just

10 before Grace went into bankruptcy.

11         MR. FINCH:  Can I have the ELMO please?

12 Q    I note on here that the non-malignant value is the same

13 across all the categories in the non-malignants on the left

14 hand column, Grace 2001 settlement average.  Can you explain to

15 the Court why that is?

16 A    Yes.  The W.R. Grace database, and no defendants database,

17 provide the data necessary to dis-aggregate the non-malignant

18 claims, they differ by severity, that's been talked about a lot

19 today, but the database doesn't say this is a severe asbestosis

20 case as opposed to this is an unimpaired asbestosis case.

21 There is no reliable data -- there are no reliable data about

22 that.

23         And, so, we can't look and character it -- what was

24 the average among the severest asbestosis cases, for example,

25 because we don't know which of the asbestosis cases are severe.

Peterson - Direct/Finch                                    235

1  So the $3,472 reflects the average across all non-malignant

2  claims and you can see that the actual -- the TDP values are,

3  in some instances, less.  They're the cases that would have

4  been at the lower end of whatever generated that $3400 average

5  and the severe asbestosis are higher.

6          But we can't -- that's the part we can't quantify and

7  that's why in doing a TDP it's helpful and instructive to look

8  at what have been the TDPs that other parties have agreed to,

9  and what courts approved, to get some sense of what's the

10 relative value that people generally put on different kinds of

11 non-malignant claims.

12 Q    Did you have discussions about the claim values and the

13 TDP values across the disease categories with counsel for the

14 Libby claimants?

15 A    Yes.

16 Q    Did you ever tell them that the factors which affected

17 Grace's nationwide settlement averages would also increase the

18 value of their claims in the same way?

19 A    I said the contrary to that.

20 Q    Cam you describe for the Court what you told the Libby

21 claimants counsel about that?

22 A    Well, there was a discussion about analyses that counsel

23 had done with regard to his attempt to estimate, kind of

24 updated current values for Grace in Libby.

25 Q    Counsel for who had done that?  Counsel for --

**J&J COURT TRANSCRIBERS, INC.**

1  A    Mr. Cohn, counsel for the Libby claimants.

2  Q    Mr. Dan Cohn?

3  A    Yes.  And part of that was, they used an earlier analysis

4  that we had done we don't use now, it doesn't figure into any

5  of our estimates in this case and it doesn't figure into the

6  TDP construction, but where we did have some markup in value,

7  we were trying to figure out how can we estimate

8  (indiscernible) -- but I told them that I did not believe that

9  was appropriate to do for the Grace cases for the reasons --

10  for the Grace cases in Libby, for the reasons that I discussed

11  earlier.  That one would not --

12          UNIDENTIFIED MALE SPEAKER:  Your Honor, we're have a

13  difficult time hearing over here, I'm sorry.

14          MS. HELLER:  Is it lighting?

15          THE WITNESS:  It's lit now, I apologize.  I'm sorry.

16  Q    Go back, what did you tell the Libby claimants about their

17  -- what you believe would happen to their values?

18  A    I believe that -- I told them that the reasons that the

19  values increased nationally and the reasons that I justified

20  the -- whatever amount of adjustment quantitatively one puts in

21  for the national average, is not an appropriate adjustment for

22  Libby because the events that explain why values increase were

23  not events, were not affects that actually happened in Libby,

24  as I've already explained.

25  Q    Such as what?

1  A     The fact that people already despised Libby when they were

2  settling before the bankruptcy.

3  Q     Despised Grace.

4  A     Excuse me, I beg your pardon, I apologize.  People

5  despised -- people in Libby despised Grace already and they

6  were holding it against them and it affected settlement values

7  there.  That occurred before the bankruptcy, the increase in

8  publicity didn't really affect that like it did nationally,

9  where people learned about the Libby situation for the first

10 time.  Similarly, since Grace was already paying virtually all

11 of the liability when it was -- before its bankruptcy, there

12 was no way to go up because it wasn't assuming a larger part of

13 that share, it was already paying it.

14 Q     What about the co-defendant bankruptcies?

15 A     That's the explanation for the co-defendant bankruptcy.

16 The co-defendant bankruptcies did not have an impact in Libby

17 because Grace was already paying almost all the liability.

18 Q     I'm going to put the four on the ELMO, a chart that the

19 Libby claimants have put in their trial brief in this case.

20 The left hand column shows that they say is their -- what they

21 --

22        MR. BERNICK:  Zoom.  It can't be read.  Excuse me.

23 Q     Dr. Peterson, this is a Page 18 of the Libby claimants'

24 trial brief, Your Honor.  The left hand column shows what Libby

25 says is its historical settlement and verdict amounts and then

1  it has various adjustment factors.  First of all, Dr. Peterson,

2  did you investigate Libby's historical judgments and verdict

3  amounts?

4  A    Yes.

5  Q    Do you believe this chart is a fair depiction of your

6  views and your work as to what the impact would be on Libby's

7  historical settlement averages going forward?

8           MR. KOVACICH:  I object, Your Honor.  This goes

9  beyond any opinion disclosed in Dr. Peterson's report.

10          MR. FINCH:  Your Honor, this --

11          MR. KOVACICH:  He does not set forth a projected

12  growth rate for Libby claims and he provides no opinion

13  commenting on the numbers that Mr. Finch is asking him about.

14          MR. FINCH:  This is fact witness testimony, Your

15  Honor, this is Dr. Peterson, what he told the Libby claimants

16  about -- I believe an expert is entitled to respond to a

17  misleading characterization of his work.  They have put before

18  this Court a document which they purport to say is Dr.

19  Peterson's opinions about what would happen to the Libby

20  values, and as he just testified a moment ago, he did not say

21  that the Libby values would be inflated in the same way or

22  increased in the same way that Grace's nationwide averages had

23  been increased, and I think it's fair and proper to ask him,

24  did he ever tell the Libby claimants that this chart was

25  accurate.  They have represented to this Court that he had

1 something to do with this chart and, therefore, I think it's a

2 proper question to him, to ask, Dr. Peterson do you believe

3 this chart is an accurate representation of your work and the

4 opinions you gave to the Libby claimants about claims values?

5 　　　　MR. KOVACICH:  To the extent we're talking about Dr.

6 Peterson's discussion with the Libby claimants' lawyers, he's

7 already testified that he advised them he did not think the

8 claims should be growing in the same manner.  To the extent he

9 has an opinion about the numbers utilized in the Libby

10 claimants' brief, that opinion was not disclosed and it should

11 not be admitted in this hearing.

12 　　　　THE COURT:  Is there a representation that this work,

13 that the chart, is derived from analyses provided by Dr.

14 Paterson?

15 　　　　MR. FINCH:  The footnote says the Libby claim figures

16 have been brought current using the same adjustment developed

17 by Asbestos PI Committee's estimation expert, Dr. Mark

18 Peterson, to bring Grace's pre-bankruptcy verdict settlement

19 figures into line with current values for purposes of the TDP.

20 　　　　I think that's an implicit, if not explicit,

21 representation to the Court that Dr. Peterson had something to

22 do with the information on this chart, that they used his work

23 in constructing this chart.  And he did not ever provide them

24 with the opinions that their values would be anything close to

25 what is shown in the third -- or excuse me, the fourth column

1  on this chart.  I think that's proper both fact witness

2  testimony and to avoid their misleading use of a document to

3  the Court.

4         MR. KOVACICH:  The manner in which these values are

5  reflected in the brief is explained in the brief with reference

6  to work that Dr. Peterson previously did.  To the extent the

7  plan proponents disagree with the way in which it was used,

8  they can certainly make those arguments.  They cannot bring

9  forth an expert witness to comment on something when the expert

10 witness was not disclosed to do so.

11        MR. BERNICK:  Nate, when was the brief filed?

12        MR. FINCH:  The brief was filed July 20th 2007, Your

13 Honor.

14        THE COURT:  Dr. Peterson may be an appropriate

15 rebuttal witness if, in fact, there is some evidence brought

16 forth about this, otherwise, I understand that what has been

17 done is that someone took what they view Dr. Peterson's work to

18 have been and applied it to their own figures in a fashion they

19 think Dr. Peterson would have used.  I'm not sure that there is

20 an assertion anywhere that Dr. Peterson was responsible for

21 this chart.  Is there that assertion?

22        MR. KOVACICH:  No, Your Honor, there is not.

23        THE COURT:  Okay.

24        MR. FINCH:  Okay.  If the Libby claimants do put on,

25 attempt to put on evidence that that's what their values would

Peterson - Direct/Finch                    241

1  be, then we will bring Dr. Peterson back to rebut that.

2              THE COURT:  All right.  That may be appropriate

3  rebuttal.

4  Q    Dr. Peterson, did you do anything as part of your work in

5  this case to analyze the magnitude of successful plaintiffs'

6  verdicts against Grace in non-malignant cases in Libby, as

7  compared to outside of Libby?

8  A    Yes.

9  Q    Could you turn to the last slide in your book?

10 A    Yes, Page 62 is the number.

11 Q    First of all, how did you go about doing that?

12 A    We had data on the database about the Libby settlements

13 and we had both data and we had --

14 Q    You're talking verdicts?

15 A    Verdicts, these are verdicts.  These are for non-malignant

16 claims.  All these are non-malignants.

17 Q    And what did you learn about the size of successful

18 plaintiff verdicts for non-malignant claims in Libby as

19 compared to the size of successful plaintiff verdicts for

20 non-malignant claims outside of Libby?

21 A    Well, the non-malignant verdicts in Libby were actually

22 less than non-malignant verdicts that were entered in other

23 case, in other states.  The three top numbers, 585, 250 and

24 413,000 were the Libby.  I think we got that data, those

25 rounded numbers, from the Libby counsel.

**J&J COURT TRANSCRIBERS, INC.**

Peterson - Direct/Finch                         242

1       The other three were provided by data and

2  supplemental information from W.R. Grace.  There were eight

3  verdicts involving a non-malignant claim outside of Libby, of

4  which five are under appeal, and if you include the ones under

5  appeal, obviously, the non-malignant average is far higher,

6  when the verdict is reached outside of Libby than there, and

7  even if you exclude the under appeal, they're still

8  substantially higher in the verdicts reached in jurisdictions

9  other than Libby, than they are in Libby.

10 Q    And did you, in one of your expert reports do the math to

11 show what the averages were for the Libby verdicts, the

12 successful plaintiffs verdicts in Libby, Montana, as compared

13 to the successful plaintiffs' verdicts outside of Libby?

14 A    Yes.

15 Q    And, do you recall what those averages were?

16 A    Offhand, I don't.

17 Q    Would it refresh your recollection to look at your trust

18 report, Exhibit 201, Page 9?  Bottom of the page.

19 A    Yes.  I see it.

20 Q    And, what is the average for successful plaintiffs'

21 verdicts in Libby?

22 A    $416,000.

23 Q    And, what's the average for successful plaintiff verdicts

24 outside of Libby, not including cases under appeal?

25 A    It's a little over a million, 1,027,995.


**J&J COURT TRANSCRIBERS, INC.**

1 Q    And, if you include the plaintiffs verdicts where there is

2 an appeal pending, what's the average for outside of Libby, in

3 non-malignant cases?

4 A    $5,188,950.

5       MR. FINCH:  Your Honor, at this time we offer Exhibit

6 178A for demonstrative purposes only.

7       THE COURT:  All right, it's accepted for that purpose

8 only.

9       MR. FINCH:  Pass the witness.

10                     CROSS EXAMINATION

11 BY MR. KOVACICH:

12 Q    Good afternoon, Dr. Peterson.

13 A    Good afternoon.

14 Q    I'm Mark Kovacich on behalf of the Libby claimants.  Dr.

15 Peterson, one of the goals of the TDP that you helped develop

16 is to pay claimants as equivalent a share as possible of the

17 value of their claim in the tort system, right?

18 A    It's to -- that is a goal.  It is -- it's to pay them

19 values that are not necessarily precisely what they got in the

20 tort system, but what they would have gotten, you don't know

21 that, but to pay them what -- values that are appropriate,

22 given the values in the tort system.  I'm probably more

23 comfortable with that.

24 Q    One your goals in establishing claim values in the TDP was

25 to set those values consistent with tort system values for

1  similar claims, right?

2           MR. BERNICK:  Objection.  Are we talking about the

3  scheduled values?  Objection to ambiguous.

4           THE WITNESS:  The --

5           THE COURT:  Pardon me just a second.  Can you restate

6  the question, please?

7  Q    My question is, Dr. Peterson, isn't it true that one of

8  your goals in establishing claim values in the TDP was to set

9  values consistent with tort system values for similar claims?

10          THE COURT:  That's the same question you just asked.

11 Can you rephrase the question, please?

12 Q    Dr. Peterson, what values did you provide assistance to

13 the plan proponents in developing for use in the TDP?

14 A    We proposed to them the schedule values, the average

15 values and the maximum values for each of the disease

16 categories, that represented our conclusion about what would be

17 the current levels of those values now, against Grace, in the

18 tort system, at a national level.

19 Q    And you also assisted with the provisions in the TDP

20 addressing extraordinary claims and providing a multiplier for

21 that purpose, right?

22 A    We did analyses of that issue.  I don't think that I

23 proposed the eight fold value.  I don't think that was

24 something I had proposed.

25 Q    I'm sorry, I didn't ask if you proposed that, I asked if

1  you assisted in the process whereby those multipliers were

2  incorporated into the TDP.

3  A    We -- I'm not sure that that's correct.  We did what I

4  said I did, by looking at how that corresponds to values in

5  Libby, for example, but that's kind of what we did.  You can

6  characterize that however you want.

7  Q    To the extent that you assisted in developing values for

8  the TDP as you've described, one of the goals in doing so was

9  to set those values consistent with tort system values for

10 similar claims, right?

11           MR. BERNICK:  That's the same question --

12           MR. FINCH:  Objection.

13           UNIDENTIFIED ATTORNEY:  Asked and answered.

14           MR. KOVACICH:  Your Honor, it wasn't answered because

15 it was objected to, and I was instructed to change the

16 question.

17           THE COURT:  Yes, but it is still the same question.  I

18 think the witness has said he -- as I understand it, he did not

19 set that formulation of the multiplier, so I'm a little unclear

20 what you're asking.  I'm sorry.  Could you rephrase it for my

21 benefit?  Even if the witness understands it, I didn't.

22 Q    My question, Dr. Peterson, was simply whether one of your

23 goals in assisting with the development of the TDP values was

24 to set those values consistent with the tort system values for

25 similar claim.

**J&J COURT TRANSCRIBERS, INC.**

1  A    One of a number of goals is to create TDP values that are

2  not inconsistent with the tort values but that's a national

3  goal, it's not on case by case basis.  I can't do that, the TDP

4  isn't constructed that way because many of the claims get their

5  values through individual review, there isn't a set value.  But

6  the values that need to be put into the TDPs should be

7  consistent generally with the relative values of diseases as I

8  think they would be paid now by Grace, at a national level.

9  But it's a national goal, it's not case by case.

10 Q    Well, one of the reasons that you provide for the

11 individual review is so that there's enough flexibility to

12 allow the trust to pay claims which have different

13 circumstances, according to what the values were for similar

14 claims in the tort system prior to the bankruptcy.

15        MR. BERNICK:  Objection. (A) lack of foundation; (B)

16 it's beyond the scope of his testimony, it deals with trust

17 practice and (C) it's ambiguous according to, or in accordance

18 with is not a precise term.

19        THE COURT:  Want to rephrase the question, please.

20 Q    Dr. Peterson, do you agree that the scheduled values in

21 the TDP do provide a fair estimate of tort system value?

22 A    I believe they do, an average national value, yes.  Again,

23 they're highly variable, case to case.

24 Q    When you performed your work to assist with the

25 development of the scheduled values under the TDP, one of the

1 things you did is, as you've described, is review historical

2 settlement and verdict amounts in cases against Grace, right?

3 A     Yes.

4 Q     And, the reason that you did that was in order to

5 establish values which were consistent with the tort system

6 values as determined by settlements and verdicts in cases

7 against Grace, correct?

8           MR. BERNICK:  Your Honor, this is now the fourth

9 time.  He's asked -- I mean the witness has testified as to

10 this, but this is argumentative at this point.  Four different

11 times he's asked this question, Your Honor sustained the

12 objection three times, we then let him ask it the last, without

13 objecting and apparently, he's still not happy.

14           THE COURT:  I think the witness has answered the

15 question as to what he did.  If you're asking a different

16 question, then it sounded the same to me, too.

17           MR. KOVACICH:  I apologize if it was the same

18 question, I think that was the first time I asked him why he

19 utilized the historical settlement and verdict amounts in

20 developing the TDP values.

21           THE COURT:  You're asking why he used those as

22 opposed to the fact that he was trying to emulate those values?

23           MR. KOVACICH:  My question was, whether Dr. Peterson

24 agrees that he used those values, so that the scheduled values

25 in the TDP would, in fact, be consistent with the values of

1  similar claims in the tort system.

2          THE COURT:  Okay.  That question he has answered, but

3  Dr. Peterson, you can try it one more time.

4          THE WITNESS:  I have a different problem with your

5  question.  When you inserted the historical -- consistent with

6  historical values.  As I described in my direct testimony, the

7  historical values for Grace are actually lower and I don't

8  believe are an appropriate guide as to what the current values

9  are, or what the TDP values should be.  So, I tried to set it

10 based upon my best expert judgment about what is the current

11 values of those claims against Grace but those were my

12 analyses, they're numbers that I provided, they weren't taken

13 out of a database.  They were guided by the database, we used

14 the database in multiple ways that I previously testified to,

15 in order for me to arrive at my opinions, but we didn't use the

16 historical data directly in this analysis.  And so, that was

17 the predicate of your question.

18 Q    Do you agree that past settlements provide a useful data

19 because they present the best evidence of how the actual

20 participants in the litigation valued their claims?

21         MR. BERNICK:  I'm sorry.  Objection to form.  Useful

22 data for what purpose?  We're here to talk about the TDP.

23         MR. KOVACICH:  I am talking about the TDP.

24         MR. BERNICK:  Well, then if we have -- I'm sorry, if

25 we have a question that specifies the TDP, it would be better.

1          THE COURT:  Can you rephrase the question and then

2  we'll assume it's about the TDP until you change that analysis.

3  Q    Do you agree, Dr. Peterson, that past settlements provide

4  useful data to your efforts in developing values under the TDP

5  because they present the best evidence about how the actual

6  participants in the litigation valued their claims?

7  A    Yes, they're useful, but they're not sufficient in this

8  case.

9  Q    When Grace settled cases prior to entering bankruptcy it

10 did so because it recognized risk that it might be found liable

11 for more than it paid to settle those cases, do you agree with

12 that?

13 A    I'm sorry, I didn't track the question, could you repeat

14 it?

15 Q    When Grace settled asbestos injury cases prior to its

16 petition for bankruptcy, it did so because it recognized risk

17 that it might be found liable for more than it paid to settle

18 those cases, right?

19 A    Yes.

20 Q    And, that was true with respect to the settlement amounts

21 that Grace voluntarily paid in Libby as well as elsewhere

22 around the county, right?

23 A    Yes.

24 Q    You agree there are a number of factors that influence

25 claim value in the tort system?

Peterson - Cross/Kovacich                    250

1  A    Certainly.

2  Q    Nature of disease is one of those factors, you've talked

3  about that quite a bit here today?

4  A    Yes.

5  Q    Another factor that influences claim value in the tort

6  system is evidence regarding the extent of exposure?

7  A    It has -- it's an important element for affecting relative

8  values, particularly if cases are individually reviewed or go

9  to trial, or prepare to go to trial.  It's probably less

10 important for cases that are settled in mass.

11 Q    Another important factor is the strength of the

12 plaintiffs' liability case?

13 A    That's pretty much the same issue as the one we discussed

14 and I'd give the same answer.

15 Q    You're aware that Grace paid high settlements and verdicts

16 to plaintiffs in Libby, Montana, compared to most other

17 jurisdictions?

18 A    To most other, yes, not all.

19 Q    And, you believe that those higher values were due in part

20 to the fact that all or almost all of the Libby plaintiffs'

21 exposures were to Grace asbestos?

22 A    That's a major part of it, yes.  It's not the sole reason.

23 Q    Most other claimants in the Grace bankruptcy were exposed

24 by and have claims against multiple defendants?

25 A    Yes.

1 Q    Another reason that you've identified for higher values in

2 Libby is that the Libby plaintiffs claim more serious

3 non-malignant injuries than what you typically see elsewhere?

4 A    I don't know that I -- they claim that, I think that Grace

5 would not acknowledge that the claim is correct.  So, I'm not

6 sure that that was a -- hard to know how significant that was.

7 Q    Dr. Peterson, you have a copy of the report that you

8 prepared in the estimation case?  I thought that was one of the

9 exhibits that counsel handed up.

10 A    Yes, yes.

11          MR. FINCH:  199.

12          THE WITNESS:  I have 199, yes.

13 Q    I apologize.  Actually, I want to ask you about the report

14 that you prepared in March of 2009, titled <u>Preliminary Expert</u>

15 <u>Report on W.R. Grace</u> --

16 A    I've got -- yeah, I have that as well.  Thank you.

17          THE COURT:  Is it an exhibit?

18          MR. KOVACICH:  It would be --

19          THE WITNESS:  201, Your Honor.

20          THE COURT:  Thank you.

21 Q    At Page 9 of that report, Dr. Peterson --

22 A    I have that.

23 Q    -- the third full paragraph.

24 A    That begins the relatively high --

25 Q    The first sentence in that paragraph states, the

1 relatively high historic values paid by Grace to Libby

2 claimants seem to reflect matters that are addressed in the

3 TDP.  Did I read that correctly?

4 A    Yes.

5 Q    And, then you go on to discuss some of those factors, one

6 of which, in the third sentence states, "Libby plaintiffs often

7 claim much more serious non-malignant injuries than we have

8 seen for the nation as a whole", right?

9 A    Yes.  It's extended and explained in the next sentence.

10 Q    Dr. Peterson, to account for the higher settlement and

11 verdict values that you observed in Libby, you assisted the

12 plan proponents in developing an extraordinary claims

13 multiplier that was intended to address that situation, right?

14 A    In the manner that I previously described to you, yes.

15 Q    The eight times multiplier for extraordinary claims?

16 A    Well, I looked at how it compared with values, the values

17 of -- I did a number of quantitative analyses, where an eight

18 times multiplier was an assumption in the analysis.  That's

19 what I did.

20 Q    You understood that the purpose of the eight times

21 multiplier was to address the unique circumstances that existed

22 with respect to claims in Libby.

23         MR. BERNICK:  Objection to the form of the question,

24 what circumstances?

25         THE COURT:  That's sustained.

Peterson - Cross/Kovacich                253

1  Q    Dr. Peterson, what was your understanding as to why the

2  extraordinary claims provisions in the TDP provided for an

3  eight times multiplier in cases involving 95 percent exposure

4  to Grace asbestos?

5  A    It was to address the issue that the Libby claimants

6  raised about the fact that they had claimants who were exposed

7  exclusively, or almost exclusively, by W.R. Grace. I think

8  that's a generally understood event and it was a concession on

9  the part of the ACC to have a more generous treatment of

10 extraordinary claims in order to give greater compensation to

11 the Libby claimants.

12 Q    The same eight times multiplier applies with respect to

13 extraordinary claims regardless of the disease category for the

14 claim, right?

15 A    Yes, it does and it applies to claims not just -- I don't

16 want to imply that that's just for Libby, it applies to claims

17 from any location.

18 Q    How did you come up with eight as the number for the

19 multiplier?

20 A    I testified and told you that I didn't.

21 Q    Do you have any personal knowledge as to who did come up

22 with eight times as the appropriate multiplier to address the

23 extraordinary claims involving 95 percent exposure to Grace

24 asbestos?

25 A    Specifically, no.

1  Q    As you sit here today, you have no idea, whatsoever, as to

2  how that eight time multiplier was derived, is that accurate?

3  A    That's correct.  Well, I understood why it was done, so

4  how that part -- I just don't know who came up with it or why

5  they settled on eight.  It wasn't a decision that I

6  participated in.

7  Q    And, you're not able to offer any opinion, therefore, as

8  to whether that eight times multiplier is an appropriate figure

9  to address the circumstances of those cases?

10 A    Oh, no, that's a different question.  I think it's an

11 appropriate number.  I just didn't originate it and I don't

12 know who did.

13 Q    On what would you base your conclusion that it's an

14 appropriate number?

15 A    It provides compensation to Libby claimants and people

16 with -- well, in Libby specifically, it would apply a level of

17 compensation that is quite close to what people got

18 historically, consistently with the multiple objectives of the

19 trust distribution procedures.

20 Q    And how are you able to determine that the eight times

21 multiplier provides compensation consistent with what people

22 got historically?

23 A    I have data on what people got historically, by what the

24 Libby claimants received.  I was provided that data by your

25 counsel.

1  Q    And, you reviewed that data and determined that a

2  multiplier of eight times across all disease categories would

3  provide compensation consistent with what those claimants

4  received pre-bankruptcy in the tort system?

5  A    Well, I have a continuing problem with your word

6  consistent, because you're setting a general rule that applies

7  to specific cases and like any of the rules of the TDP, it fits

8  some cases more closely than others.  It's an attempt, again,

9  it's a rough justice notion, as Mr. Inselbuch said, that all of

10 the TDPs strive to achieve rough justice and on average, if you

11 assume that claimants will get -- will, for example, be

12 eligible for the 4B category and they get an eight fold

13 increase, the values that that would imply to the more serious

14 non-malignant claimants in Libby, are consistent with the

15 values they got historically,  I can't say that it's precisely

16 the same, it won't be in every case.

17 Q    And I apologize, I didn't think I asked you if they were

18 precisely the same, I believe I asked if they would be

19 consistent.  You --

20 A    I would say generally consistent.  And also -- but I added

21 -- I interrupted you, I'm sorry.  Generally consistent but also

22 the TDP has to reflect multiple objectives.  I mean it doesn't

23 serve just one objective.  One, it is -- is to conserve the

24 assets; two is to treat people relatively equivalent, from

25 state to state, case to case, and to distribute money across

1  all people, and also to prevent a run on the store.  It has all

2  those objectives and they all have to be taken into account.

3  There's multiple things one has to do in order to deal fairly

4  with the claimants.

5           MR. KOVACICH:  Your Honor, I move to strike the

6  witnesses speech that was not responsive to my question.

7           MR. FINCH:  That's directly --

8           THE COURT:  He -- that's overruled.  He asked whether

9  he should, essentially continue and you didn't tell him not to.

10 So, I think that's responsive to the question.

11 Q    What data did you consider when you determined that the

12 eight times multiplier, as compared to the Libby claim values,

13 would be generally consistent -- would provide compensation

14 generally consistent with what they got in the tort system?

15 A    Let me be hypothetical, but specific.  We would look at a

16 -- the maximum amount that a claimant might get and the

17 scheduled amount, I mean kind of a range, and multiply the

18 number -- actually it's a scheduled value, it's multiplied by

19 eight.  You would take the scheduled value and multiply it by

20 eight for mesothelioma.  So, it's -- whatever the scheduled

21 value for mesothelioma -- 180,000, I guess, multiply that times

22 eight and look -- does that seem to be an adequate amount of

23 compensation when you look at what the Libby claimants got

24 historically and our conclusion was, yes, that appears to be a

25 number that's consistent with what people got historically.

1  Q    Did you do that analysis taking the scheduled values and

2  multiplying those times eight with respect to any of the other

3  disease categories for comparison to the pre-bankruptcy

4  settlement values in Libby?

5  A    Yes, we did for each disease.  And I wanted to be specific

6  with regard to what the calculation was.  It just seemed to me

7  more useful, but yes we did it for each disease.  But for

8  non-malignants there's a problem because, you know, again, we

9  don't know the severity of the non-malignant claim.  What the

10 settlements.

11 Q    With respect to the non-malignants, you looked at the

12 pre-bankruptcy settlement values in Libby and determined that

13 on average if claimants got the 50,000 scheduled value under

14 Category 4B and that was multiplied times eight, that would

15 approximate the average settlement value for non-malignant

16 claims in Libby, right?

17 A    If it --

18         MR. BERNICK:  I'm sorry, non-malignant, severe

19 pleural disease?

20         MR. KOVACICH:  Is that an objection?

21         MR. BERNICK:  Yes.  It's ambiguous.

22         THE COURT:  It's sustained.

23 Q    Dr. Peterson, the process that you were describing in your

24 comparison of values under the TDP and, in particular, the

25 extraordinary claims values, with the multipliers, your

1 comparison of that with the pre-bankruptcy claims in Libby, you

2 described reviewing data on the non-malignant settlements in

3 Libby, right?

4 A    We had a list of -- we had Grace data on the one hand,

5 which identified Libby claims, and then we had a list of claims

6 that Mr. Cohn provided us with of Libby claims.  They were for

7 the most part, the same, although there are four more claims in

8 the Grace data, that are identified as Libby claimants, so

9 there is some difference, but we looked at those claims on both

10 lists and did the analysis as I've described.

11 Q    And the analysis that you've described involved looking at

12 the $50,000 scheduled value for severe asbestosis or severe

13 pleural disease, multiplying it times eight and that figure was

14 approximately the same as the average settlement for all

15 non-malignant claims in Libby, right?

16 Q    I can't say that --

17          MR. BERNICK:  Objection to the form of the question.

18 It shouldn't be a trick here.  I mean the 50,000 relates to a

19 certain category, but his question goes --

20          THE COURT:  He's said it this time, severe asbestosis

21 and severe pleural disease.  It's overruled.

22          MR. BERNICK:  It's all non-malignant claims in Libby,

23 is the question.

24          THE WITNESS:  I --

25          MR. LOCKWOOD:   Excuse me, Your Honor.  There are two

1 different averages that Mr. Bernick is referring to.  There's

2 all non-malignant claims in Libby, that's one average, there's

3 all severe impaired, non-malignant claims in Libby, that's a

4 different average.  And it's ambiguous in the question, which

5 set of averages he's asking about.

6        THE COURT:  All right, I'm sorry.  I understood the

7 question to be the $50,000 severe asbestosis and severe pleural

8 disease. If there's something other than that, can you please

9 restate the question and, perhaps, just limit it to one of the

10 categories at a time and then we won't have this objection.

11 Q    Dr. Peterson, did you rely on the settlement values that

12 Mr. Cohn provided to you, that you've described in your

13 testimony, with respect to your conclusion that the eight times

14 multiplier was appropriate for the non-malignant claims under

15 the TDP?

16        MR. BERNICK:  Objection.

17        MR. LOCKWOOD:  Objection.  It's still ambiguous to

18 which non-malignant claims under the TDP he's talking about and

19 which settlement numbers he got from Mr. Cohn, which include

20 different kinds of settlement values.

21        MR. KOVACICH:  I'm attempting to lay a foundation as

22 to which settlement values he considered, Your Honor, and I'm

23 talking about all of the non-malignant claims.

24        MR. LOCKWOOD:  If this is foundational, I'll withdraw

25 the objection.

1        THE COURT:  Okay.  So, the question is, whether this

2   witness relied on all the data provided as to all non-malignant

3   claims by Mr. Cohn, in establishing the TDP values.

4        MR. KOVACICH:  I'll withdraw the question and start

5   over.

6   Q    Dr. Peterson, you've testified that you reviewed

7   settlement data provided by Mr. Cohn, right?

8   A    We used Mr. Cohn's list of settlements in some of the work

9   we did, yes.  But, I need to add that we also used the Grace

10  database, which was, for the most part, the same as Mr. Cohn's

11  list, but there were a couple of additional claims in the Grace

12  database.

13       MR. FINCH:  Mr. Kovacich, are you --

14       MS. HELLER:  You have to use a microphone, Mr.

15  Lockwood.

16       MR. FINCH:  Mr. Kovacich, the document in your hand

17  is in Dr. Peterson's book, it's under Exhibit 152.

18       MR. KOVACICH:  Thank you.

19  Q    Dr. Peterson, apparently the document I'm attempting to

20  find is in your book under Exhibit 152.

21  A    Oh, I'm sorry, I apologize, I had the wrong source.  This

22  is the document and it was from Mr. Heberling, I apologize.  I

23  had the wrong --

24  Q    Do you recognize Exhibit 152?

25  A    Yes, I do.

1  Q    And this is the information that was provided to you by

2  the Libby claimants counsel regarding their historic

3  settlements in Libby, right?

4  A    Yes.

5  Q    You did review this information to verify that it was

6  accurate in comparison to the Grace claims database, right?

7  A    Yes.  We were able to validate, we were able to compare

8  the numbers to what's in the Grace database.  There were two

9  more mesothelioma claims in the Grace database.  And there were

10  two more non-malignant claims.  Actually, I'm a bit concerned

11  here.  This -- I believe there are more settlements than these,

12  there's more than just a difference of four in the Grace

13  database.  They have a larger number of mesotheliomas, they had

14  seven for example, not three.

15  Q    Okay.  We have two different categories of non-malignant

16  claims listed on this document, right?

17  A    Yes.

18  Q    There's three settlements that were classified on here as

19  unimpaired, right?

20  A    That's how they were classified.

21        MR. BERNICK:  I'm sorry, classified by Mr. Heberling?

22        THE WITNESS:  That's how I understood the question.

23        MR. BERNICK:  Yes, okay.

24  Q    And 28 for which the document here states impaired, right?

25  A    That's what Mr. Heberling said, yes.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    And the process that you described earlier where you

2 compared the $50,000 severe pleural scheduled value with an

3 eight times multiplier to non-malignant settlement values in

4 Libby, you took the $50,000 times eight, came up with 400,000

5 and that approximated the average as set forth for the

6 impaired, non-malignant claims on this document, right?

7 A    Yes.  But I think we also looked at it on a case by case

8 basis.

9 Q    When did you look at it on a case by case basis?

10 A    At the same -- well all you have to do is compare $400,000

11 to these listed numbers.

12 Q    Did you compare any of the settlements set forth on this

13 document, or any other settlements from Libby, for that matter,

14 with scheduled values for any disease category other than

15 severe pleural?

16 A    I think we did it for each of the categories, is my

17 recollection.  The unimpaireds, I'm not sure we knew how to

18 deal with it, we didn't know which category it would fit in.

19 Q    Dr. Peterson, you don't know what any of these people

20 would -- which disease category any of these people would

21 qualify for under the Grace TDP, isn't that true?

22        MR. FINCH:  Objection.  None of these people are

23 going to qualify for anything under the Grace TDP because

24 they've already gotten paid by Grace.

25        THE COURT:  That's sustained.

1  Q    Dr. Peterson, when you did your analysis comparing the

2  values that would be paid under the TDP for current and future

3  claims, when you compared that with the historic settlements in

4  Libby, did you give any consideration to the nature of the

5  non-malignant disease of those people who had settled?

6  A    Other than the representation made by Mr. Heberling, in

7  this letter and list, we had no data on the severity of

8  disease, non-malignant diseases or what categories they might

9  have fit in if they were to be reviewed under the TDP.

10 Q    And, Mr. Heberling didn't attempt to give you the kind of

11 data that could be used to classify these people under the

12 different categories in the TDP, did he?

13 A    There was no offer to do so.

14 Q    And so, for example, if you look at the entry for J.

15 Swennes (phonetic), fourth from the top under 28 impaired, that

16 reflects he received a settlement of $580,000, right?

17 A    Yes.

18 Q    But you don't know whether Mr. Swennes was, in fact, a

19 severe pleural as characterized by the TDP or whether he was --

20 would have fallen under some lower category with a scheduled

21 value of 2500 bucks.

22       MR. FINCH:  Objection.  Mr. Swennes wouldn't fall

23 under any category in the TDP, he's already gotten money from

24 Grace.

25       MR. KOVACICH:  Your Honor, the testimony here is that

1  this eight times multiplier is reasonable because it would

2  allow claimants qualifying for the $50,000 severe pleural

3  category to achieve values consistent with the pre-bankruptcy

4  settlement average of $400,000 and the problem with that is,

5  almost none of these people would have had claims that would

6  have fallen under the severe pleural category, their scheduled

7  values would be 2500, 7500 and the like.  Multiplied times

8  eight, it doesn't come anywhere close to the settlements that

9  they achieved with Grace prior to the bankruptcy.

10          MR. BERNICK:  Your Honor, I really think this may be

11 another miscommunication point.  I don't believe anybody has

12 made the representation that anybody valued those 28 cases and

13 said, gee, they are -- fall into some category and, therefore,

14 we're going to achieve parity with them.  It's not the witness'

15 testimony, that's not the testimony of anybody.  It is a

16 question of what benchmark was represented to apply to people

17 who had a severe problem and that was taken at face value.

18          I don't think there's been any testimony that these

19 people were somehow assessed on the facts and were used as

20 individuals as opposed to an experience that was being

21 represented by counsel.

22          MR. KOVACICH:  If I may respond, Your Honor.  I

23 disagree.  The witness testified that he believes the eight

24 times multiplier is reasonable because he compared the 50,000

25 scheduled value times eight with the settlement average for

1  non-malignant claims in Libby prior to the bankruptcy.

2          MR. FINCH:  Yes, yes.

3          MR. LOCKWOOD:  He also testified that you had

4  individual values on a case by case --

5          MS. HELLER:  Mr. Lockwood, you have to use the

6  microphone.

7          MR. LOCKWOOD:  Your Honor, he also testified that you

8  had to value -- that each case was valued individually and

9  separately and that these were averages, and counsel is now

10  testifying up there, that every case on this list that his

11  co-counsel gave to Mr. Peterson, had certain characteristics.

12  No such representation was made in the letter to Mr. Peterson.

13  No request to Mr. Peterson was made that he go individually and

14  look at the files, he's just testifying and he's asking you on

15  the basis of his testimony to instruct Mr. Peterson to answer

16  differently.

17          THE COURT:  I'm not instructing Dr. Peterson to

18  answer differently.  He's answering the questions as he

19  understands them in the fashion that he used the data and my

20  understanding and Dr. Peterson, if I'm incorrect please correct

21  me is, that you did with respect to this list, which is the

22  second page of Exhibit 152, the settlement data provided to you

23  by Mr. Heberling, in the 28 impaired category, you looked at

24  what the average is that's calculated here, it's slightly over

25  $419,000, did the math when you timesed the $50,000 in the TDP

1  for that particular category that you were looking at at the

2  time, multiplied it by eight, came up with $400,000 and decided

3  that that was roughly equivalent, using a rough justice

4  standard in that capacity.  That was step one.

5           THE WITNESS:  I think that was a great summary.

6           THE COURT:  All right. And step two was, you looked

7  at the numbers that are stated and, again, just looking at this

8  28 impaireds, for F. Alsbury (phonetic) the first one, $440,000

9  and made your own determination that 400,000 was roughly

10 equivalent to 440,000.  And for the next one, J -- I think

11 that's Sallin that is listed at 375,000, that 400,000 was

12 roughly equivalent to 375,000.  And so on down the list, with

13 some exceptions that are obvious outliers to that $400,000.

14          THE WITNESS:  I would accept that, too.

15          THE COURT:  Okay.  I understand the witness'

16 testimony.  I don't think that what you're asking, what you are

17 suggesting, is what the witness did.  If you want to try it

18 again with this witness to see if there was more to it, go

19 ahead.

20 Q    Just a simple point.  You can't compare these settlement

21 values with the extraordinary claims treatment under the TDP

22 because you don't have any idea what category these people

23 would have fallen under, isn't that true?

24 A    Of course, not. I don't know what the details of these

25 claims are and we don't know how the trust is going to

1 implement the individual review for this category.  There's a

2 lot of things we can't say for sure.  That's why you use

3 averages in these kinds of things, because it's inherent

4 imprecision and that's why you also have to look at the

5 multiple objectives of the trust.  There are other

6 considerations that have to be made in constructing a document

7 and a process as complex as this, not simply whether you can

8 nail every number exactly.

9 Q    Did you do any empirical analysis to compare how the

10 extraordinary claims treatment would apply to categories such

11 as Level 3 under the non-malignant categories?  For example,

12 did you -- the Level 3 scheduled value, I believe is $7500, is

13 that right?

14 A    That's correct, yes.

15 Q    With an eight times multiplier, that would allow for

16 extraordinary claims treatment of --

17 A    Sixty.

18 Q    60,000.  You didn't do any empirical analysis to determine

19 whether 60,000 was anywhere close to what claimants in Libby,

20 with that type of disease, were settling the claims for with

21 Grace prior to the bankruptcy, did you?

22 A    There really isn't an empirical analysis to be done.  I

23 mean, I think I did the multiplication and I compared these

24 with what eight times the values for any of the non-malignant

25 categories were and it's pretty obvious, there's no -- it's not

1  as much empirical, it's just a calculation.  Yeah, I looked at

2  that.

3  Q    I guess I'm confused.  How did you look at that when you

4  didn't have information about which category these claimants

5  would have fallen in?

6  A    Because this whole analysis is a what if.  We would call

7  it a sensitivity analysis.  If all of these claims were in

8  Category 4A or 4B, then they would get -- and they are

9  extraordinary claims, they would get $400,000.  If all of these

10 claims were in Category 3 and an extraordinary claim, then

11 they'd get $60,000.  So, it's a what if, okay?  If this is what

12 the facts are it has a certain comparative.  If -- all 4A and B

13 has certain comparisons.  If it's a different category, it has

14 a different comparison.  That's just -- that's a way of looking

15 at kind of what -- when you're uncertain about something that's

16 the way to look at something.

17 Q    And if almost all of them are disqualified for one reason

18 or another, from Level 4B, then what the values provided by the

19 TDP will approximate as -- will not be similar to what these

20 claims were settled for prior to the bankruptcy.

21           MR. BERNICK:  Objection.

22           MR. FINCH:  Objection.

23           MR. BERNICK:  Objection to the form of the question.

24           THE COURT:  This is an expert, he can answer the

25 question.  Go ahead, Dr. Peterson.

1          THE WITNESS:  If the -- these were sent to me as

2    impaired claims, the representation here and elsewhere is that

3    these are very seriously sick individuals.  If they are that

4    sick, my assumption is that they will probably -- it's a

5    different assumption than you're making, but my assumption is,

6    they would probably qualify under 4A or 4B, and I hope they do.

7    And, if so, they'll get $400,000.  If they're not that sick,

8    then I don't think they should get $400,000.  They may have

9    gotten more historically, but you've got to have some sense of

10   what's the -- if you overpay some claimants, you're underpaying

11   everyone else.  You have to have some balance with regard to --

12   in constructing a document as complex with this, that has to

13   deal with so many individual cases.  You have to do rough

14   justice.

15   Q    And as part of that rough justice, if that means that you

16   pay substantially less to claimants in this bankruptcy than

17   what they would have achieved in the tort system, then that's

18   acceptable to you?

19          MR. FINCH:  Objection, Your Honor.  Objection to

20   form.  What they would have achieved in the tort system is --

21   we're here on this TDP and these values and this is a bunch of

22   historically settled cases that aren't ever going to go through

23   the TDP process.

24          THE COURT:  This witness has already explained that

25   the vagaries of the tort system did not afford a precise

1  analysis of what any claimant would have received when, in

2  fact, they're not in the tort system.  So, I think the question

3  presumes a fact that's not in evidence.  The objection is

4  sustained.

5  Q    Dr. Peterson, did you do any comparison of the overall

6  settlement averages for Libby claims versus non-Libby claims,

7  as part of your evaluation?

8  A    You mean the -- across all diseases?  No, I didn't, that's

9  a meaningless analysis.

10 Q    I have here a document that's marked Exhibit, Plaintiffs'

11 Exhibit 63.

12          MR. FINCH:  Can I get a copy, counsel?

13          THE COURT:  Is this in the binders somewhere?  Is it

14 in the binders somewhere?

15          MR. KOVACICH:  It should be, Pages 1 through -- it

16 should be 26, I included Page 27.

17          THE COURT:  Okay.  Thank you.

18 Q    Have you ever seen this document, Dr. Peterson?

19 A    I have seen some of the monthly asbestos litigation

20 summaries.  I may have seen them all, I don't know.  I can't

21 tell you that I've seen this particular one.

22 Q    Did you see any of the monthly litigation summaries that

23 provided a breakdown of settlement values for different types

24 of claims including claims by Libby employees?

25 A    I don't recall.  It's been a long time since I looked at

1  anything like this.

2  Q    If you could look at Page 12 of Exhibit 63.

3  A    Bates number?

4          MR. FINCH:  91-1625.

5          THE WITNESS:  91-1625 with a 12 in the lower right,

6  okay.  I see that page.

7  Q    At the bottom of the page, there's a table that sets forth

8  settlements for Libby employees and various other types of

9  claimants, do you see that?

10 A    I do.

11 Q    Have you ever seen --

12 A    I'm sorry, which part of the page, the bottom, okay.

13 Q    Last table on the page.

14 A    Yes.

15 Q    Have you ever seen those figures before?

16 A    I have pretty good eyes for reading small material, but

17 this taxes me.

18          THE COURT:  Likewise.  I can't make out a thing, it

19 looks like chicken scratch, sorry.

20          THE WITNESS:  I can't tell you what these numbers

21 are.

22          THE COURT:  Much better.

23          MR. FINCH:  There you go.

24          THE WITNESS:  Thank you.

25 Q    Dr. Peterson, have you ever seen the data that's reflected

1 on the last table on that page?

2 A    I don't know.

3 Q    Do you see the last column represents the cumulative

4 settlement averages for all of those categories of claimants?

5 A    The last column?

6        MR. FINCH:  Objection, lack of foundation.  Dr.

7 Peterson has testified he doesn't recall if he's seen this

8 document.  There's been no foundation laid that he either

9 created the document, knows what the document reflects or had

10 anything to do with it, or that it played any role in his

11 analysis of any of the work that he did in this case.  He

12 testified that he reviewed summaries like this as part of his

13 work but I don't think they've laid the foundation yet, that

14 they can start asking him about what this table means.

15        THE COURT:  That's sustained.

16 Q    Dr. Peterson, did anyone from Grace ever or the ACC

17 provide data to you showing what the average settlement amounts

18 were for Libby claimants, Libby employees versus other Grace

19 employees, non-Grace employees, construction workers and the

20 like?

21 A    Well, as I've testified, I've seen some of the monthly

22 settlements and I believe they're in there, but I thought it

23 was meaningless information.  As I testified before, I don't

24 think it tells me anything.

25 Q    Do you have any recollection of what the comparison was

1 between the average settlement for a Libby employee and the

2 average settlement for other claimants?

3 A    Well, since I thought it was a meaningless number, I

4 didn't retain it.

5 Q    And you have no idea whether it is even on the same order

6 of magnitude as an eight times multiplier?

7 A    It has -- it means nothing.  I don't know what it is.  I

8 don't recall them.  I'll be happy to explain why it means

9 nothing if you want.

10         MR. BERNICK:  Bob, how much more time do you need?

11         MR. KOVACICH:  We'll wrap it up here pretty quick.

12         MR. BERNICK:  Pretty quick.

13 Q    Dr. Peterson, do you recall that Jennifer Biggs did an

14 estimation of Grace's liability on behalf of the future

15 claimants' representative in this case?

16 A    Yes.

17 Q    Did you review her work?

18 A    Some of it.

19 Q    Do you recall that she -- did you consider her work for

20 purposes of the work that you did, either in the estimation or

21 for purposes of the confirmation?

22 A    I don't think so.

23 Q    Do you recall that she did an estimation of future

24 liability that was specific to Libby?

25         MR. GUY:  Objection, Your Honor, it's beyond the

**J&J COURT TRANSCRIBERS, INC.**

Peterson - Cross/Kovacich                    274

1  scope and he just said he didn't consider it, so I don't see

2  what relevance it has.

3         AUDIO OPERATOR:  Mr. Guy, I cannot hear you.

4         MR. GUY:  I'm sorry.  Jonathan Guy for the FCL.  It's

5  beyond the scope and the witness just testified that he didn't

6  consider it so I don't see what relevance it has.

7         THE COURT:  Well, he testified that he doesn't think

8  so, so I'll permit a little bit of this to see whether, in

9  fact, he did or does recall anything.

10        THE WITNESS:  I'm sorry, what's your question?

11  Q    Do you recall that Jennifer Biggs did an estimation with

12  specific reference to future claims to be expected in Libby,

13  Montana?

14  A    I believe I recall that she did it but I didn't -- I can't

15  recall anything about it.  I didn't rely upon it in any way.

16  Q    And you didn't give it any consideration when you were

17  attempting to determine how Libby claims should be treated

18  versus the claims of others in this bankruptcy?

19  A    I didn't rely on it in any way.

20  Q    And you personally didn't do any estimation with specific

21  reference to Libby as opposed to other claimants, is that true?

22  A    Estimation of what, the average value?  No.

23  Q    Or the extent of future liability.

24        MR. BERNICK:  We're talking about a formal estimate?

25  Objection to form.

Peterson - Cross/Kovacich                        275

1  A    We made calculations based on hypotheticals as to what the

2  total liability might be involving the Libby claims under the

3  TDP, yes.

4           UNIDENTIFIED MALE SPEAKER:  Your Honor, we're having

5  difficulty hearing over here again.

6           THE COURT:  Oh, I'm sorry.  Dr. Peterson, if you

7  could stay closer to the microphone.  Would you repeat your

8  answer for them please?

9           THE WITNESS:  We didn't do a formal analysis.  We did

10 some calculations based on varying assumptions as to what the

11 range of payments might be, obligations and payments under the

12 TDP for the Libby claimants, yes.

13 Q    Was that part of the report that you prepared for the

14 estimation case?

15 A    No.

16 Q    In what context did you do that work?

17 A    We just wanted to know what the order of magnitude of

18 liability might be.  Part, I think, was the question is how

19 significantly would it impact the payment percentage if it all.

20 I think that was one of the -- but it was exploratory.  It

21 wasn't done for any formal objective.

22 Q    And you didn't do -- you didn't use any of that work for

23 purposes of developing the extraordinary claims values under

24 the TDP or otherwise determining how to treat Libby claims

25 under the TDP, is that accurate?

1  A    No, because it's not relevant to that.

2  Q    The projected future value of claims in Libby is not

3  relevant to the treatment of those claims under the TDP?

4  A    No, if they're -- you know, if -- no, it's not relevant.

5  Q    Just briefly I want to ask about your testimony about the

6  factors that you expected to cause an increase in Grace's

7  liability since 2001.  Do you recall that testimony?

8  A    Yes.

9  Q    One of the factors that you identified was bad publicity

10 about Libby, Montana?

11 A    Yes.

12 Q    Did I understand your testimony that it's your opinion

13 that bad publicity in Libby, Montana, would cause an increase

14 in claim values everywhere but Libby, Montana?

15 A    I think it had already raised the values.  That's what my

16 testimony was.  Bad publicity did raise the values in Libby and

17 I think it raised it enormously.

18 Q    On what do you base that testimony?

19 A    Just knowledge of when that information was distributed,

20 knowledge about how juries and people react to stories of

21 extremely bad behavior on the part of corporations, being

22 victimized, having studied asbestos and other litigations for

23 25 years.  I get some -- I have some sense of what really makes

24 people angry and what the implications are of that for how much

25 a defendant has to pay.  It's not a surprising phenomenon.

1  Q    Do you have any knowledge about -- as to where the Libby

2  cases were actually tried or venued before they were settled?

3  A    I recall -- well, they're in Montana.  The publicity in

4  Montana was widespread.  I don't think they were -- I know they

5  were in Libby.  They may have been in Butte, I'm not sure.  I

6  knew of it.  I don't recall.

7  Q    Do you have any specific information that you can provide

8  to support that opinion as to what publicity was distributed in

9  any part of Montana prior to the widely-disseminated publicity

10 that you're talking about everywhere else?

11 A    I know that there were articles in the Seattle newspaper.

12 There were statements by people who were doing some of the

13 medical review studies.  I don't know who entirely they were

14 disseminated to.

15 Q    The articles that you're talking about in the Seattle

16 newspaper, that's the national media that you indicated would

17 cause claims to rise everywhere else, right?

18 A    The Seattle paper is a regional newspaper.  It's not

19 really a national newspaper.  It has a national impact, perhaps

20 because other people pick it up.  I can't tell you specifically

21 where the circulation of Post Intelligencer was.

22 Q    And you can't tell us anything about how publicity prior

23 to the wave of national publicity about Libby had already

24 informed everyone in Montana about Grace's activities there?

25        MR. BERNICK:  Object.  The question now is -- counsel

1  is testifying.  And candidly, having studied the matter and

2  having been in Libby for all these years, there can't possibly

3  be a representation that the Seattle Post Intelligencer in 1999

4  was the first time that people in Libby knew about what was

5  going on in Libby.  That is not a fair representation to the

6  Court.

7           THE COURT:  Now you're testifying.  Could we just --

8           MR. KOVACICH:  The cases weren't even venued in Libby

9  for the most part.

10          THE COURT:  Gentlemen, that doesn't mean that people

11 in Montana won't know about them.  But I understand the point

12 you're making.  I think the witness has tried to answer the

13 questions that you have asked him but I lost the last question

14 if it was a question.  It sounded like a statement.  I'm sorry,

15 could you re-ask it?

16 Q   Dr. Peterson, you don't know anything about specific media

17 attention in Montana prior to the time frame where the national

18 media started distributing information about Grace's activities

19 in Libby, isn't that true?

20 A   I think that's correct.  By media you mean newspapers and

21 television and radio, and people like that?

22 Q   By media I mean whatever media types you were referring to

23 in your report when you indicated that the negative publicity

24 about Libby would cause an increase in claim values everywhere

25 but Libby.

**J&J COURT TRANSCRIBERS, INC.**

1 A    Those media -- types of media I can't say specifically

2 what was included or not included or what other forms of

3 communications there were in Montana.

4 Q    Dr. Peterson, you've also testified here today that the

5 average verdicts for non-Libby, non-malignant cases were higher

6 than the average verdicts for non-malignant cases in Libby, do

7 you recall that testimony?

8 A    Yes.

9 Q    When you prepared those numbers you didn't take into

10 account any of the defense verdicts that Grace had achieved in

11 non-malignant cases, did you?

12 A    It wasn't relevant to the issue I was looking at.

13 Q    You did an analysis of the average verdicts in Grace cases

14 which included the defense verdicts for purposes of your

15 estimation work, right?

16 A    Not for purposes of attempting to understand the values of

17 claims when they're paid.  All of this -- everything we've been

18 talking about is what's the value of a claim that has value,

19 not what's the value of the claims that don't have value.

20 Q    I'm sorry, I didn't ask you what the purpose of that

21 analysis was, just whether you agree with me that for the work

22 that you did in the estimation you prepared an average of the

23 verdicts including the defense verdicts.

24 A    We did present that.

25 Q    And you would agree that Grace actually won the majority

1  of the asbestos injury cases that were tried to verdict against

2  it, right?

3  A    I don't recall that.  Actually, I think they lost the

4  majority of the verdicts against them.

5  Q    I'm sorry, did I misspeak and say they --

6  A    You said that Grace won.  I think they lost 57 percent of

7  them.  No, I'm not sure.  It's in my report.  I just -- I can't

8  recall it.

9  Q    If you could look at Page 96 of your estimation report.  I

10 think you have it.

11          THE COURT:  What's the exhibit number please?

12          MR. FINCH:  199, Your Honor.

13 A    I have that.  Page -- I'm sorry, which -- this is --

14 Q    The average --

15          MR. FINCH:  What page are you looking at, Mr.

16 Kovacich?

17          MR. KOVACICH:  I'm looking at Page 96 right now.

18 Q    The average verdict for non-malignant claims taken into

19 account, Grace's defense verdict was actually $222,000, right?

20 A    There's nothing on my Page 96 that says that.

21          MR. FINCH:  I think it's Page 97 in the official

22 exhibit marked.

23          THE WITNESS:  Thank you.

24 Q    Perhaps I have a prior version of the report.  You see the

25 discussion in your report about the average verdicts?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, I do, in the second paragraph on Page 97.

2  Q    And you would agree with me that the average verdict for a

3  non-malignant claim was $222,000 when you take into account all

4  of the defense verdicts that Grace achieved?

5  A    Yes.

6  Q    And you're aware that Grace didn't achieve any defense

7  verdicts in Libby cases, right?

8  A    I am not aware of that I don't think.

9  Q    Where did you get the information that you considered to

10  evaluate these verdict amounts?

11  A    There were data in the database.  There was a list of

12  settlement -- of verdicts, rather, prepared by W.R. Grace.

13  There was attached to a document involving Steve Snyder, who's

14  -- and I don't recall the document or the context of it, but

15  there were --

16          MR. BERNICK:  Your Honor, there are -- I'm sorry.

17  A    -- a couple sources.

18          MR. BERNICK:  We're now 12 minutes before six.  We

19  are now one witness behind, but I'm more concerned about Dr.

20  Peterson being able to leave this evening.  I know that Mr.

21  Finch probably has a very terse redirect.  But could we inquire

22  about when this examination is going to be done so that we can

23  finish with Dr. Peterson?

24          THE COURT:  How long will you be, Mr. Kovacich?

25          MR. KOVACICH:  As soon as we're done talking about

1 this.  It should be just a few moments, Your Honor.

2          THE COURT:  All right.

3          MR. KOVACICH:  As soon as we're done talking about

4 this, it should be (indiscernible) everybody's eyes, worse than

5 the last time.

6 Q    Do you recognize this, Dr. Peterson?

7          THE COURT:  Can you identify what you've handed him?

8          MR. KOVACICH:  It is a -- it was Exhibit 2 to Mr. J.

9 Hughes' deposition during the estimation case and it's a table

10 summarizing verdicts in asbestos bodily injury cases against

11 W.R. Grace.

12 A    I don't recall if this was the document that we used or

13 not.

14 Q    If you could look at the overhead sheet that had your

15 comparison of the Libby verdicts and non-Libby verdicts?

16 A    I'm sorry, you want me to look at what?  I don't

17 understand what you're referring to.

18 Q    The table from your report that provided a comparison of

19 Libby verdicts and non-Libby verdicts.

20          MR. BERNICK:  Last one.

21          THE WITNESS:  Oh, the demonstrative, you're talking

22 about?

23          MR. BERNICK:  Yeah, demonstrative.

24          THE WITNESS:  Thank you.  I have that.

25          MR. BERNICK:  Page 62.

1     Q    See that the rather large non-malignant verdict

2  amounts that you set forth on the table as being under appeal

3  are reported on this document Exhibit 2 to the Hughes

4  deposition?

5  A    It looks like that, yes.

6  Q    Those cases appear to all have been tried as part of the

7  same matter in Texas with a verdict on the same date?

8  A    I'd have to look more clearly at this document.

9  Q    Your own document has the same cause number for those

10  handful of cases, right?

11         MR. BERNICK:  We'll stipulate that that is true as to

12  those last five cases, not as to the ones before it.

13         THE WITNESS:  I will accept both of your

14  representations of that fact.

15         THE COURT:  All right.

16  Q    Did you compare -- as you've indicated in your materials,

17  those verdicts are under appeal, right?

18  A    Yeah, it's my understanding, yes.

19  Q    Did you compare those verdicts to the mesothelioma

20  verdicts against Grace in order to evaluate whether -- how they

21  compared to the historic meso verdicts?

22  A    I don't recall making any other comparisons.

23         UNIDENTIFIED MALE SPEAKER:  I'm sorry, Your Honor,

24  once again we can't hear over here.  Could we hear that last

25  answer?

1           THE COURT:  He said he doesn't recall doing that

2    comparison.

3           UNIDENTIFIED MALE SPEAKER:  Thank you.

4    Q    And you don't recall doing any comparison where you would

5    have counted the number of cases at any disease level -- strike

6    that.  You didn't do any analysis where you looked at the

7    number of non-malignant cases where Grace achieved a defense

8    verdict for purposes of your comparison of verdicts inside and

9    outside Libby, right?

10   A    I didn't since my objective was to see what was the

11   average amount of compensation paid in verdicts or what was the

12   amount of compensation paid in verdicts when plaintiffs were

13   successful.  The idea is to what's -- it goes to what's the

14   value of a claim.  The value of a claim is what a jury gives

15   it, what a settlement amount is.  That isn't an issue and it

16   gets zero value.  That's not an interesting question or it

17   wasn't related to anything that I was trying to do or look at.

18   It's irrelevant.

19   Q    Did Grace give any consideration to its prospects for

20   achieving a defense verdict in cases when it evaluated those

21   cases for settlement?

22   A    Did Grace take into account its chances of winning?  Of

23   course it did.  That's -- I'm not Grace and I wasn't doing an

24   analysis for that reason.

25   Q    And you didn't do any analysis to consider Grace's

1  prospects for defense verdicts inside and outside Libby for

2  purposes of your work in this case, right?

3          MR. LOCKWOOD:  Objection, Your Honor.  He would have

4  to speculate the merits of cases that the Heberling firm and

5  the Lewis firm would file in the future and whether they would

6  be dismissed.  I mean --

7          THE COURT:  That's sustained.

8          MR. KOVACICH:  Your Honor, I'm finished.

9          THE COURT:  Okay.

10          MR. FINCH:  Brief redirect, Your Honor?

11          THE COURT:  Yes, sir.

12                    REDIRECT EXAMINATION

13  BY MR. FINCH:

14  Q    Dr. Peterson, why do you use national values in the

15  estimates you provided for purposes of the TDP instead of local

16  values?

17  A    Because the structure of the trust distribution procedures

18  are an attempt to have -- develop a plan that's applicable in

19  every state across the country and to treat people in a uniform

20  manner as well as they can and indeed that's an edict of

21  524(g).  So you do that rather than creating a favorite son

22  analysis state-by-state.  Moreover, you can't construct a TDP

23  that would have scheduled values and so on differently from

24  state-to-state.  It would be unmanageable and it would promote

25  potentially abusive practices by some claimants.

Peterson - Redirect/Finch                    286

1  Q    You were shown this document, which is plan proponents 152

2  in your cross examination.  Did the Libby -- first of all, does

3  the Grace database provide any information about the lung

4  function test scores or the level of impairment for any of the

5  non-malignant claims shown on this list?

6  A    No.

7  Q    Did the Libby claimants ever provide you with information

8  and ask you to analyze what level of lung function impairment

9  any of these people might have had on this list?

10 A    No.

11 Q    Did they ever describe to you what they meant by impaired

12 versus unimpaired?

13 A    No.

14 Q    You were asked some questions about Libby settlements

15 versus settlements outside of Libby and said it was a

16 meaningless comparison and I offered to tell Mr. Kovacich why

17 he didn't take you up on that.  Why is that a meaningless

18 comparison?

19 A    Well, it's a mere mixing of apples and oranges in doing

20 the calculation.  The average payment settlement involves meso

21 and lung cancer and non-malignants and all these mixed together

22 and the distribution of those may -- they differ state-by-

23 state, location by location and when you try and sum -- by

24 being an employee or not.  And when you compare -- if you want

25 to compare what's the relative amount of payments to people,

1 you have to do it at the level of the disease because now

2 you're dealing with like kinds of claims.  But if you do it

3 across, you don't know what you're comparing.

4 Q    The -- you were asked some questions about the future

5 value of Libby claims.  Why is that not relevant to the work

6 you did for purposes of the TDP values?

7 A    It's just not relevant.  I mean the values that they get

8 or might get, get what they get.  The idea is to be fair to

9 them.  And if they get as much money as altogether that people

10 get in all other states and that's the right and fair thing to

11 do, then so be it.

12 Q    Could you turn in your exhibit book to Exhibit 201,

13 specifically Page 9 of 201?

14 A    Page 9?

15 Q    Page 9 of Exhibit 201.

16 A    Yes, I have that.

17 Q    You were asked a question by Mr. Kovacich about the third

18 full paragraph, the sentence, "Libby plaintiffs often claim

19 much more serious non-malignant injuries than we have seen for

20 the nation as a whole."  Do you recall that?

21 A    Yes.

22 Q    And your response was -- the next sentence answers that.

23 "We don't have the document in evidence."  Can you just read

24 the next sentence?

25 A    Can I read the two together?

1 Q    Yes.

2 A    "Libby plaintiffs often claim much more serious

3 non-malignant injuries than we have seen for the nation as a

4 whole.  The higher values for exclusive exposures or more

5 serious non-malignant injuries will get greater compensation

6 under the TDP."  The next sentence, "A claimant can get even

7 greater compensation if both applied to his or her claim."

8           MR. FINCH:  Back to the ELMO.

9 Q    These are some of the factors that you identified which

10 had driven up Grace's cost to resolve asbestos claims

11 historically before it went into bankruptcy?

12 A    Yes.

13 Q    As between these factors, which were more important in

14 your view?

15 A    I think the first -- well, nationally I'd say the first is

16 the most important of them.

17 Q    The co-defendant bankruptcies?

18 A    The co-defendant bankruptcies, yes.

19 Q    Can things happen in asbestos litigation that cause claim

20 values for particular types of claims to go down as well as go

21 up?

22 A    Sure.

23 Q    Has that happened in asbestos litigation to non-malignant

24 claims?

25 A    I think so, non-malignant claims, for example.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    What kind of things would that include that could cause

2  claim values to go down as well as up?  Excuse me, what kind of

3  things can cause claim values to go down?

4  A    Within the same -- nationally you're talking about or in

5  --

6  Q    Nationally.

7  A    Well, if high jurisdiction cases are no longer able to --

8  if cases get removed from high jurisdiction cases and sent to

9  lower jurisdiction cases, that could affect the national

10 average.  I think all of this increased skepticism and scrutiny

11 of non-malignant claims has driven down the values of

12 non-malignant claims.  Those are two that come to mind.

13 Q    Does docket congestion play a role in the value of claims?

14 A    Oh, absolutely.

15        MR. KOVACICH:  Objection.  Leading.

16 A    Yes, the ability --

17        THE COURT:  It's sustained.  Can you rephrase the --

18 Q    Okay, is there anything else that plays a role in the --

19 that would cause a decline in the value of claims?

20 A    Anything that would make it more difficult for claimants

21 to be able to get to trial would change it.

22 Q    Such as?

23 A    Docket.

24 Q    Finally, Dr. Peterson, does the TDP provide a different

25 process for the Libby claimants for resolving their claims and

**J&J COURT TRANSCRIBERS, INC.**

1  having values apply to their claims and -- than for non-Libby

2  claimants?

3          THE COURT:  I'm sorry, would you rephrase that?  I

4  lost something.

5          MR. FINCH:  Sure.

6  Q    Does the TDP provide a different process for the Libby

7  claimants to resolve their claims than other claimants, or is

8  it the same process?

9  A    It's the same process.  There's the one issue with regard

10 to what kind -- how it shows the exposure, rather significant

11 occupational exposure.  But the process itself is the same.

12 The values and benefits of the TDP are the same across the

13 country and in each state.  The burdens and the limits, the

14 burdens and limits that I was asked about with Libby apply to

15 many more claims outside of Libby.  It has a bind in limit to

16 the amount of money people get much more in places other than

17 Libby than at Libby.

18 Q    This list of more than eight cases has a total of -- it

19 looks like there was a total of less than 40 historical Libby

20 settlements.

21         THE COURT:  I'm sorry, what document number?

22         MR. FINCH:  Document 152.

23 Q    Twenty-eight plus three plus --

24 A    That's why I'm concerned that this is a limited document

25 because our data shows that there were about 58 non-malignant

1  settlements and seven mesos and that's more than are on here.

2  Those are data -- those are Libby claims identified in the W.R.

3  Grace database.

4  Q    The Libby claimants assert that what makes them unique or

5  different is that they have fatal non-malignant diseases and

6  almost exclusive exposure to Grace asbestos.  Were there

7  claimants outside of Libby that would have those kind of

8  characteristics as well based on your view of Grace's asbestos

9  litigation history?

10  A    Oh yes, there are claimants outside of Libby that would

11  have fatal non-malignant diseases, extraordinarily serious

12  ones.  There are claimants outside of Libby whose exposure was

13  solely to Grace or almost solely, and there are people that

14  have combinations of both.  Again, those characteristics are

15  not unique to Libby.

16          MR. FINCH:  Your Honor, with that, I have no further

17  redirect.

18          MR. BERNICK:  If I could just spare the trouble of

19  communicating with Mr. Finch and ask a question of Dr.

20  Peterson?  Dr. Peterson, in an answer you gave to Mr. Finch

21  regarding whether it was the same process at Libby -- the TDP

22  process would be the same at Libby as elsewhere, you made

23  mention of there being an issue with respect to exposure.

24          THE WITNESS:  Yes.

25          MR. BERNICK:  You remember that?  Was that area of

1 the TDP more generous to Libby, less generous to Libby, the

2 same or what?

3          THE WITNESS:  It makes it easier for the Libby cases

4 to qualify and in that sense, it's more generous.

5          MR. BERNICK:  Thank you.

6          THE WITNESS:  It's an attempt to recognize the

7 realities there but it gives the Libby claimants a benefit

8 that's similarly situated but I don't want to go there.  It

9 gives them a benefit.

10          MR. BERNICK:  Okay, thank you.

11          MR. FINCH:  Your Honor, that's it.

12          THE COURT:  All right.

13          MR. FINCH:  Recross?

14          MR. KOVACICH:  No recross.

15          THE COURT:  You're excused, Dr. Peterson, thank you.

16          THE WITNESS:  Thank you very much.

17          THE COURT:  Mr. Bernick?

18          MR. BERNICK:  I know that we're at six o'clock and

19 we're -- it's 6:05 so we're past our stay here.  With respect

20 to tomorrow -- I'll just stay here.  With respect to tomorrow,

21 the next witness is Mr. Hughes.  We were supposed to try to get

22 to Mr. Hughes today.  It didn't work out so we'll start with

23 Mr. Hughes tomorrow morning.  After that, the -- I believe that

24 the next up are the Libby claimants' witnesses and there are a

25 couple of claimants that will implicate one of the motions that

1 we have.  There's then Dr. Molgaard who implicates <u>Daubert</u>.

2          And then most critically for time planning purposes,

3 we have Dr. Whitehouse.  Dr. Whitehouse, I think given where we

4 are today, is highly likely to testify tomorrow and maybe we'll

5 get through his direct examination, I don't know.  I've been

6 told that Dr. Frank then needs to testify first thing on

7 Thursday morning no matter what else is going on and we're

8 prepared to certainly accommodate that.

9          The reason I flagged Dr. Whitehouse is that he is

10 probably of all those people the one, the scope of whose

11 testimony is most impacted by the motions that are pending.  I

12 know that Your Honor will recall specifically the motion that

13 deals with the fact that his opinions formulated and expressed,

14 at least originally, were based upon the 1,800 and we don't

15 have the 1,800 and the whole question about whether he should

16 be permitted to testify to epidemiological matters.  That would

17 have a very significant impact on the scope of his direct

18 examination as opposed to whether he testifies as a treating

19 physician although we have a motion on that as well.

20          I guess what I'm getting at is, I'm assuming that

21 Your Honor hasn't had a chance to go through those Whitehouse

22 motions.

23          THE COURT:  I haven't seen any of the motions.  Were

24 they --

25          MR. BERNICK:  These are motions that were filed --

1  they are motions in limine.

2          THE COURT:  Oh, the motions in limine.

3          MR. BERNICK:  Yes, and --

4          THE COURT:  Yes, I've seen -- I've seen -- I think

5  I've seen all the motions in limine unless something has been

6  filed in the last three days.

7          MR. BERNICK:  Okay, so --

8          THE COURT:  If it's been filed since Thursday night,

9  I'm not sure I would have seen them Friday.  If anything was

10 filed since Thursday night, I haven't seen it.

11         MR. BERNICK:  Okay.  It might be helpful if we had

12 some indication when we start -- maybe when we start tomorrow

13 about what we're going to really be dealing with when it comes

14 to Dr. Whitehouse.  It's kind of -- there's a very significant

15 difference between his offering general opinions and his

16 testifying as a treating physician.  We also have not received,

17 at least so far to my knowledge, an identification of which

18 individuals -- we've asked repeatedly which individuals is Dr.

19 Whitehouse going to address.  Out of all the different people,

20 I think he's been treating physician for, you know, 950 people

21 plus.

22         But we -- and we have, of course, all kinds of

23 motions that relate to whether they should have any.  But we

24 still don't even know who he's going to testify to as a

25 treating physician and we're now less than -- I guess we're 18

1  hours away from his appearance.  So right now I don't know what

2  Dr. Whitehouse is going to say as a treating physician.  We

3  don't have an expert report.  We don't have an identification

4  of individuals.  I don't know if he's going to be permitted to

5  testify regarding epidemiological matters.  So he is something

6  of a major cipher here.

7         THE COURT:  Well, we can start with arguments in the

8  morning if that's what you want to do or you can wait until

9  he's called and make your objections and give me the documents.

10  I think what would be helpful is if someone can give me a list

11  of where on the docket these exhibit numbers are unless, Mona,

12  have you pulled them while we've been in here, the motions in

13  limine?

14         MR. BERNICK:  Yeah, and they're also in that little

15  chart --

16         THE COURT:  Oh, were those --

17         MR. BERNICK:  -- the dockets lists, that little chart

18  that we gave you this morning I think should list the docket

19  numbers for the different motions.

20         THE COURT:  Well, that chart has disappeared.

21         MR. BERNICK:  Well, we'll give you another one.

22         MR. FINCH:  Your Honor, in addition to the --

23         THE COURT:  Just a second.  Thank you.  All right,

24  they have the exhibit numbers on, so I'll take a look at these

25  things this evening.

1          MR. LEWIS:  Your Honor, the Libby claimants have

2    something we should advise counsel about.  We are unable to get

3    --

4          AUDIO OPERATOR:  Please turn on your microphone.

5          MR. LEWIS:  I'm sorry.  It says it's on.

6          THE COURT:  Yes, they always are green but that

7    doesn't necessarily mean they're on.

8          MR. LEWIS:  Oh, I got it.  That's better.  I

9    apologize.  My voice is a little rough so I'll speak very

10   slowly.  We have been unable to get --

11         THE COURT:  Can you back up?  You're too close to the

12   microphone.  Sorry.  Ten inches it says.  There's a sign there.

13         MR. LEWIS:  You just can't -- you can't teach old

14   dogs new tricks.

15         MR. BERNICK:  He says this with a smile.  I mean you

16   know.

17         MR. LEWIS:  Anyway, Your Honor, we are unable to get

18   all of the Libby witnesses that we anticipated bringing to

19   trial here.  One of them, Norita Skramstad's son died last week

20   and she's not able to appear.  One of them was Mr. Schnetter

21   (phonetic).  He had an emergency, very serious emergency health

22   problem in his family.  He could not be deposed so we are not

23   going to proffer him.  We only have two witnesses.  One of them

24   is Mr. Tom who will not be testifying about his own disease.

25   He will be testifying about -- he'll be providing foundation

1  for photographs if the Court allows them.  Excuse me, you're

2  smiling.  Is there a problem over there, sir?

3          MR. BERNICK:  No, I'm just charmed as always.  I

4  mean, really, it's --

5          MR. LEWIS:  I mean I'm just -- I've told some of the

6  other counsel but I haven't told everybody.  So we're going to

7  have -- Mr. Tom is just going to testify to lay a foundation

8  for some photographs we'd like to get in which actually shows

9  the Libby premises.  And I don't know if the Court's going to

10  allow that or not.  The Court has made no indication of that.

11  Is there a pending motion?

12          MR. BERNICK:  There's a pending motion regarding the

13  relevance of working conditions.

14          MR. LEWIS:  Right.

15          MR. BERNICK:  And Your Honor ruled with regard to Dr.

16  Spear's testimony on that subject and we would think that that

17  same ruling would be applicable to Mr. Tom, that is, that

18  working conditions really are not at issue here.  They don't go

19  to an issue here.

20          MR. LEWIS:  That may be true but there's been a lot

21  of testimony about exposure and probably Mr. Tom knows more

22  about exposure in Libby than any witness that's testified.

23          MR. BERNICK:  I doubt that.  That's really an area

24  for expert testimony.

25          MR. LEWIS:  Well, anyway --

1          MR. LOCKWOOD:  Well, wait a minute.  The TDP provides

2    that the Libby claimants don't have to prove exposure so why on

3    earth would we --

4          THE COURT:  I think that's the point.  Anyone who is

5    living --

6          MR. LEWIS:  And I am asking in the nature of an

7    advisory on that issue.  I'd like to get that resolved.  If

8    these people are not going to be allowed to testify, let's send

9    them home.  The other man is Mr. Swennes who would testify as

10   to what his settlement value -- settlement was.  That's in

11   evidence.  That came in today.  Perhaps we don't even need to

12   call him.  And we don't want to take up the Court's time

13   unnecessarily.  And even if we do call these two witnesses and

14   they're allowed, it's not going to be two and a half hours.

15   It's going to be about 20 minutes of testimony.  And I just

16   want to alert the Court to that.

17          MR. BERNICK:  What -- could we then get the same --

18   well, that then leaves Mr. -- Dr. Molgaard would be next and

19   then we have -- then we do have the issue with respect to

20   Whitehouse and the question that I posed with respect to Dr.

21   Whitehouse is a treating versus epi.  On the treating physician

22   -- as a treating physician, who's he going to talk about?  We

23   have no idea.  He's seen 950 people.  Who is he going to talk

24   about?

25          THE COURT:  Well, I don't think a treating physician

**J&J COURT TRANSCRIBERS, INC.**

1 in that sense has to provide an expert report.  Obviously,

2 they're doctors and they're are experts in that sense.  But

3 nonetheless, I think the issue of an expert report is not

4 really relevant.  They're testifying, I think in this sense,

5 more like either a lay witness or a fact witness who has dealt

6 with the plaintiff.

7        But I'm still not certain that I understand what the

8 relevance will be as to any specific claimants' medical history

9 or condition.  So that's what I am still at a loss for.  I

10 provided some discovery to see whether there was something that

11 would come out with respect to relevance but I still don't know

12 what that is.

13        MR. HEBERLING:  Your Honor, we have provided the plan

14 proponents with an exhibit called, "Settled and Non-Settled

15 Cases."  These are -- the non-settled cases are individuals we

16 listed for deposition last May.  The Court preferred that we

17 not depose them but rather have the doctor talk about the

18 conditions and what categories of the TDP these people fall in.

19 That is the extent of the testimony.  We gave them the chart

20 two, three weeks ago and so we wanted -- he will be talking

21 about those people and the settled claims, what category they

22 fall in and this is mechanical through the TDPs, following the

23 lung function test numbers.  We have an exhibit which covers it

24 all.  Hopefully that won't take too long unless he has to go

25 through each one.

1          And then also we will probably show a couple of rapid

2    progression cases.  And I won't -- we have an issue also as to

3    whether we use numbers rather than names.  But the rapid

4    progression cases that were disclosed in December of '08, they

5    know who those people are.  He's been deposed on them.

6          THE COURT:  Well, with respect to the use of the

7    numbers as opposed to names, if the claimants are actually

8    putting their own medical history at issue -- because to the

9    extent that Dr. Whitehouse is going to, or they, whoever it is

10   who's called, are going to opine that they belong in a

11   particular settlement category, number one, I don't know that

12   the documentation issues as to the trust are done so I think

13   it's -- I'm just not sure how anyone at this stage without

14   filing the claim that the trust is going to require be filed,

15   will be able to say we belong in category X.

16         But to the extent that you feel somebody has to

17   explain that, from my point of view, I'm not sure that the

18   individual witness can make that determination because it's the

19   treating physician who says you've got a disease that is this

20   disease.  The plaintiff may know how they feel but they're not

21   the experts to classify the disease.

22         MR. HEBERLING:  Right.  I was referring to the

23   treating physician testimony and we just go pass/fail on these

24   lung function test numbers and blunting and so forth and that's

25   it.  We're not going into the medical history.

1          MR. BERNICK:  That's the whole problem.  First of

2    all, we put on the screen --

3          THE COURT:  I can't read it.  I'm sorry.

4          MR. BERNICK:  Okay well, that's fine.  I'll pull it

5    up a little bit.  It is small.  This effectively will give it

6    -- it is 19 people -- chart of settled/non-settled malignant,

7    asbestos-related disease cases.  There are 19 of them.  Now, if

8    he testifies as a treating physician, that's one thing.  I

9    don't know that his testimony as a treating physician is really

10   why they're calling him.  It sounds like they're not.  What

11   they're saying is they want to have him go through this chart

12   and then tell the Court whether or not these people will, in

13   fact, qualify under the TDP or not.  In order to cross examine

14   him on that subject, we need to get into those files.

15         THE COURT:  Yes, I think you do.

16         MR. BERNICK:  And so we need to have the files for

17   those people.  We also don't know what his statement regarding

18   that is.  The testimony about how the TDP will apply to them is

19   not testimony as a treating physician.  It's not fact

20   testimony.  It's essentially his contention about how he

21   believes the TDP should apply to these people.  We have no

22   expert report on that, none.  So as I sit here right now I

23   don't have a clue about what Dr. Whitehouse is going to say,

24   will happen insofar as the application of the TDP people -- TDP

25   to these people will work, and I certainly don't have the

1  ability to somehow muster 19 files and be in a position to

2  cross examine Dr. Whitehouse.

3          I'll further note that we have settled claims -- with

4  respect to settled claims, there are issues about whether we

5  can even discuss the settlements because the settlements have

6  confidentiality provisions that are binding on Grace.  We can't

7  discuss those settlements and those are provisions that are

8  binding with respect to the claimant.  They can't be waived by

9  counsel.  They can't waived by anybody in this court.  I don't

10 know how we even talk about them.

11         With respect to the non-settled, non-malignant ARD

12 cases, we're now being told for the first time that this

13 exercise will take place.  If, in fact, it takes place, we are

14 in a position where how do I bring out on cross examination the

15 limitations of these 18 people?  These 18 people were picked

16 how?

17         And then with respect to progression, there was a

18 statement about progression.  The progression cases.  The

19 progression cases are the subject of an article, 123 people.

20 That's published.  We know about that.  There's then a separate

21 list of progression cases that's not the subject of any

22 article.  It's just 22 cases that are out there.  So we have

23 this profusion of individual cases that are coming in.  We had

24 an agreement.

25         THE COURT:  But I'm still concerned about the

**J&J COURT TRANSCRIBERS, INC.**

1  relevance.  This is all fine and dandy except that I don't know

2  the relevance.  As I understand the TDP, to the extent that

3  there is a progression case, the claimant who has earlier

4  satisfied a non-malignant disease at a lower category, who now

5  -- who later has a progressive disease will be able to apply to

6  the trust under the new category with a new criteria being

7  satisfied.  So I don't understand what the difference makes

8  with respect to the progression.

9       MR. BERNICK:  That is right on.  And then with

10  respect to how the TDP applies.  Let's assume he goes through

11  all 18 and says ten of them don't work and here's why, the only

12  possible relevance -- it's a discrimination issue.  We know

13  that they're not all going to be picked up.  It's not designed

14  to pick everybody up.  So the only issue for discrimination

15  purposes is the fact that they're not picked up -- out of these

16  18 people, whatever number is not picked up, does that go to

17  establish the proposition of different treatment?  And he can't

18  testify to that because: (a) he can't say that these are

19  representative; (b) he has no comparator.  There's no analysis

20  that takes place outside of Libby.

21       There's not one expert on their side who will say

22  Libby doesn't do as well under the TDP by reason of process

23  than people outside of Libby.  There's no comparison to be

24  found.  Our expert is the only one who has even gone through

25  and systematically applied the TDP and we haven't even called

1 him.  So this is why --

2        MR. HEBERLING:  Your Honor, may we be heard on some

3 of these issues?  We're collecting quite a few issues here and

4 we would like to respond.

5        MR. BERNICK:  Well, I'll shut up, but the problem

6 here is that we're now learning, you know, it's 6:20 on the

7 night before, what this guy is actually going to do and what he

8 is actually going to do -- his opinion has changed 19 times.

9 He's done all kinds of work.  This is brand new.

10        THE COURT:  Then, Mr. Bernick, then you'll point it

11 out on cross examination if that's the case.  If his opinion

12 has changed 19 times and it changes the 20th time on the

13 examination, and I'm not making findings -- I'm using Mr.

14 Bernick's analogy -- then in all probability it's not going to

15 be a very credible opinion.  So you'll bring that out on cross

16 examination if, in fact, your view of the world is correct.

17 Mr. Lewis?

18        MR. FINCH:  Your Honor, just let the record reflect

19 that the ACC would have a foundational objection to Dr.

20 Whitehouse offering any testimony about what people will or

21 won't get under the TDP.  He doesn't have the expertise to do

22 that.

23        THE COURT:  Well, that is a problem -- that's the

24 problem.  And that's --

25        MR. LOCKWOOD:  And more importantly, to follow up on

1  that, what Mr. Bernick omitted was that at best what he could

2  testify about is that they didn't meet expedited review

3  criteria.  He can't possibly testify whether they meet -- what

4  their treatment under individual review will be.  And so I'm at

5  a loss to know --

6              THE COURT:  Mr. Lockwood, I don't even know --

7              MR. LOCKWOOD:  This is the question you were raising,

8  Your Honor.

9              THE COURT:  Mr. Lockwood, I don't even know how he

10  can say that they won't qualify for expedited review treatment.

11  They haven't submitted claims yet and --

12              MR. LOCKWOOD:  Well, I agree with that.

13              THE COURT:  -- it's quite possible by the time the

14  trust is set up and they have to submit documentations that

15  they will qualify for expedited review treatment and there just

16  simply isn't a way at this point to know.  Mr. Lewis?

17              MR. LEWIS:  Your Honor, there's a couple of things

18  that were said here that I find a little bit disturbing.

19  Number one, the Court ordered us to give more documentation,

20  more medical records, extensive background on any settled

21  person that we might talk about in this case.  We did that.

22  When Mr. Bernick says he doesn't have the data on these people

23  in our list that we've provided him --

24              THE COURT:  No, I don't think that's what he said.

25              MR. LEWIS:  That's what he said.

1           THE COURT:  I think he said that he can't cull

2    through 1,800 patients to pick out the 18 or however many Dr.

3    Whitehouse will testify about because you haven't identified

4    for him who those will be.

5           MR. LEWIS:  We have identified them.

6           MR. BERNICK:  Now you're saying that this is what

7    he's going do.  This is the first notice we've had that he's

8    going to do this when he testifies.

9           THE COURT:  And that's the problem.

10          MR. LEWIS:  Your Honor, we're just doing what the

11   Court told us to do.

12          THE COURT:  No, no, Mr. Lewis.

13          MR. LEWIS:  Yes, you -- I can --

14          THE COURT:  I opened discovery and I required that

15   discovery documents be provided.  I don't have anything and I

16   haven't given an opinion and I haven't made any order that says

17   that when you're going to call a witness, how you have to make

18   the particular discovery about what that witness's substance --

19   substance of that witness's testimony will be.  If Dr.

20   Whitehouse is permitted to testify, then you will have to have

21   copies of the records here that he relies on and I will defer

22   cross examination for an appropriate time to permit the plan

23   proponents to be able to look at those documents and prepare

24   for cross examination.

25          They can't possibly prepare for cross examination,

**J&J COURT TRANSCRIBERS, INC.**

1 for example, for Dr. Whitehouse saying that person A has

2 disease B and qualifies on level 4B because they haven't been

3 able to see the documents that would back it up and to cross

4 examine Dr. Whitehouse on his opinion as to why all of those

5 facts are there.  They need the medical records.

6           MR. LEWIS:  They have the medical records.

7           THE COURT:  Then you'll have to point them out, bring

8 copies and I'll give them an opportunity if need be to look at

9 them so that they can prepare an appropriate cross examination.

10          MR. HEBERLING:  Your Honor, we delivered those

11 records in March.

12          MR. BERNICK:  Yeah, all 950.

13          MR. LEWIS:  And we also delivered them again in

14 response to the judge's order for these specific claims.

15          THE COURT:  Okay well, if they've been delivered for

16 the specific claims --

17          MR. LEWIS:  Pursuant to your order.

18          THE COURT:  Okay, when was that, Mr. Lewis?

19          MR. LEWIS:  Immediately after you ordered them.

20          THE COURT:  Okay, so --

21          MR. LEWIS:  That would have been a couple, three

22 weeks ago.

23          THE COURT:  So these are non-settled malignant claim.

24          MR. LEWIS:  Some of them are settled non-malignant.

25          THE COURT:  I'm sorry, non -- yes, non-settled,

1 non-malignant.

2      MR. LEWIS:  They're non-settled, non-malignant claims

3 and settled non-malignant claims, I'm sorry, in which we were

4 required to go back and give him all kinds of documents

5 relating to how we arrived at the settlement, correspondence

6 between -- we did that, all right.

7      MR. BERNICK:  Again, the problem is, Your Honor, that

8 we had a very specific arrangement -- very specific -- about

9 the number of people that they'd be able to get into is four or

10 five.  They then indicated through Dr. -- that Dr. Whitehouse

11 was going to cover more.  Actually, it wasn't even that.  They

12 were going to -- all kinds of designations and I raised the

13 issue saying I don't even know that we got all the information.

14 Your Honor said give him the information and then they made the

15 same argument after that that they're making today that now

16 that they've given us the information, that that somehow

17 relieves them of the limitation that Your Honor imposed which

18 was only four or five.

19      And you said specifically what you reiterated today

20 which is that you weren't ruling on that, that all you had done

21 is to say produce the information, that you were going to

22 decide in the context of this trial how much testimony

23 regarding individuals we are going to have.  That's where we

24 were.  And we didn't know that Dr. Whitehouse was going to come

25 in as a "treating physician" and actually opine as to how the

1 TDP works which he: a) isn't --

2          MR. LEWIS:  Your Honor --

3          MR. BERNICK:  -- necessarily qualified to do; but, b)

4 how does it relate to discrimination?

5          THE COURT:  Okay, Mr. Bernick, you've had your say.

6 Let me hear from Mr. Lewis.

7          MR. LEWIS:  Your Honor, I challenge the record on

8 that.  I've got the record of what you said from the bench,

9 okay?  First of all, you said from the bench, "I mean as a

10 treating physician, fine.  To the extent that's relevant and

11 I'm not ruling on relevance, I think Dr. Whitehouse can testify

12 as a treating physician.  But that doesn't permit him to get

13 into epidemiological issues and that's the problem.  And all I

14 thought I was addressing in the prior order was his ability to

15 testify from what documents as an expert --

16          THE COURT:  Right.

17          MR. LEWIS:  -- in epidemiology area and not in the

18 treating physician area.  And no one had ever -- had even

19 raised that issue with me."

20          THE COURT:  Yes.

21          MR. LEWIS:  And then subsequently the Court ruled.

22 Well, the clarification that you may need is that I wasn't

23 asked to address, wasn't addressing any testimony that Dr.

24 Whitehouse may be offering as a fact witness, as a treating

25 physician.  That wasn't the intent of the order.  The objection

1  I had was to strike his expert reports based on the -- and not

2  permit any testimony based on them because he hadn't produced

3  all the underlying documentation.

4          So if you need clarification on that score, I'm happy

5  to provide it.  And then we have the order of the Court which

6  required us to give him this extra information and we complied.

7  And you made your motion and the Court denied your motion.

8          MR. BERNICK:  Your Honor, that's a totally separate

9  issue.

10         MR. LEWIS:  It's not a separate issue.

11         THE COURT:  It is a separate issue.

12         MR. BERNICK:  That was the issue -- that's why we

13 supplied the chart and I respect Mr. Lewis tremendously and I

14 know he is earnest in trying to muster the record but I think

15 that that is -- there are a couple of issues: 1) --

16         THE COURT:  All right, I'm not addressing them today.

17 I will take a look at these documents.  Where are the responses

18 to these documents in the docket?  This tells me where the main

19 docket number is.  I want to know what responses have been

20 filed so that I can review them.  And we'll get to as many of

21 them as I can address tomorrow.  If I can't read them all

22 because you folks are inundating me with paper, then I won't

23 address them all tomorrow.  I'll do what I can.

24         MR. BERNICK:  Can I ask Mr. Lewis whether in

25 connection with Dr. Whitehouse he intends or Mr. Heberling,

**J&J COURT TRANSCRIBERS, INC.**

1  whether Mr. Heberling intends to elicit opinions from Dr.

2  Whitehouse regarding what we've called the epidemiological

3  issues, that is, the nature of disease at Libby, the mortality

4  study or is he only going to do what you've now described which

5  is to go through these 18 or 19 cases and talk about the TDP?

6          MR. HEBERLING:  Okay, so first I'll respond and I'll

7  stay seated because that's where the microphone is.  I'm sorry,

8  Your Honor.

9          THE COURT:  That's fine.

10          MR. HEBERLING:  As to the 18 or 19 cases, what Dr.

11  Whitehouse is going to do is testify to the last pulmonary

12  function test numbers mechanically and how those go through the

13  TDP.  All we really have to do is supply the numbers and

14  anybody could decide how this TDP applies.  Okay, so that's

15  very mechanical.  It's not going to be opinion testimony.  It

16  doesn't go into each patient's history.

17          And then with regard to the CARD Mortality Study, we

18  are intending to go through that with Dr. Frank because he was

19  a co-author of it.  Now, there may be some opinions that Dr.

20  Whitehouse offers which they will be objecting to.  You can

21  almost guarantee it.  So we'll have to encounter those and

22  address those at the time.

23          THE COURT:  Okay, as to epidemiological issues, I

24  think my ruling was that to the extent that Dr. Whitehouse was

25  opining in the reports, that he was basing his studies on 1,800

1  people, but that those records were not produced, that he could

2  not opine about the epidemiological issues with respect to

3  those 1,800 people because he can't possibly be cross examined

4  when he can't produce the information.  So I don't see how he's

5  going to offer an epidemiological opinion.

6          As to fact witness -- I'll call it fact witness.  I

7  understand he's a physician.  As a treating physician, if there

8  is something relevant, he is permitted to testify.  Whether

9  there will be something relevant, I don't know until I hear the

10 testimony.  I can't possibly make a relevance ruling in

11 advance.  I don't think Dr. Whitehouse can testify as to how

12 the TDP will apply to any specific person, because that does

13 require, I think, some either level of expert analysis or it at

14 least requires the TDP to be up and functioning and some

15 process in place to see that.

16         He can say that his tests have revealed that, you

17 know, the most recent PFT shows x,y,z or whatever.  He's the

18 treating physician.  I don't even know if you need him for that

19 purpose if you have that information in chart form and it's

20 backed up by the documents that you've submitted.  I think you

21 could probably get a stipulation to that effect.  I don't know

22 the relevance.  But if it's relevant, then he could testify to

23 it.

24         MR. BERNICK:  What might be worthwhile, if I can try

25 to make a suggestion in order to keep this process rolling

1 because I think today an awful lot got done, I think people

2 tried very hard and we appreciate Your Honor's patience and

3 allotting so much time, maybe if we started out with Mr. Hughes

4 who's next, and then went to Dr. Molgaard?

5         MR. HEBERLING:  Yes.

6         MR. BERNICK:  Okay, and then --

7         MR. HEBERLING:  That's what we intend.

8         MR. BERNICK:  And then -- I'm sorry?

9         MR. HEBERLING:  That's what we intend, yes.

10         MR. BERNICK:  Okay, and then -- and so we don't do

11 the claimants first and then you'll let us know if you could by

12 email tonight if you're really going to call these claimants or

13 the two people.

14         MR. LEWIS:  The Court has sort of advised us I think

15 today again that --

16         MR. BERNICK:  I understand that.  I don't know what

17 --

18         THE COURT:  Until they're called and you tell me for

19 what purpose, I'm not willing to say they can't testify.  I

20 haven't heard anything yet that tells me what their testimony

21 -- what relevance their own testimony has.  Dr. Whitehouse, I

22 understand.  I don't see how the particular person can

23 necessarily advance the ball.  If you want photographs of the

24 facility at Libby, from my point of view, I don't care whether

25 there are photographs of Libby.  But it's not going to be

**J&J COURT TRANSCRIBERS, INC.**

1  relevant to the determination of how the TDP works because I

2  won't have a comparison of the photographs of Libby and it

3  doesn't matter because the Libby folks, as long as they have

4  lived in Libby for six months, qualify under the other reviews

5  anyway.  They don't have to have worked in the facility and I

6  understand they've had serious exposure issues.  No one's even

7  contesting that they haven't had serious exposure to Grace

8  asbestos.

9        MR. LEWIS:  In fact, I think we probably will call

10  those witnesses but we'll advise the Court first thing in the

11  morning.

12        MR. BERNICK:  Well, if you could advise us tonight so

13  that we don't spend time, you know, going --

14        MR. LEWIS:  We'll caucus and we'll call you.

15        MR. BERNICK:  Okay, and then with respect to Dr.

16  Whitehouse, if you can tell us tonight what your intent is just

17  regarding the scope of his testimony in light of what the Court

18  has said, that'll certainly make it easier for us to determine

19  what we have to do.

20        MR. LEWIS:  Well, we want Dr. Whitehouse here.  In

21  lieu of the 100 witnesses that --

22        THE COURT:  Yes.

23        MR. LEWIS:  -- she suggested to us, Dr. Whitehouse

24  can do exactly what we're trying to do here.

25        THE COURT:  I think Dr. Whitehouse can testify to

1 those facts to the extent that they're relevant.  I don't see

2 why he can't.  He's the treating physician.  If he's diagnosed

3 it or seen the records.  He's clearly competent to testify

4 about the medical condition and the PFT scores.  So if that's

5 relevant, I'm just not sure that you need him for that purpose

6 because the stipulation may do it.  If you want him on the

7 stand for credibility purposes, that's fine.

8          MR. BERNICK:  Yeah. I'm more focused really on the

9 CARD Mortality Study and the other things where I think the

10 Court has given us an indication of what's going to happen.

11          MR. HEBERLING:  Perhaps I should --

12          MR. LEWIS:  We're not going to violate an order of

13 the Court.  The Court says we can't use him for epidemiological

14 purposes, you know.  Good point.

15          MR. HEBERLING:  Perhaps we -- we may try to clarify

16 that in the CARD Mortality Study there's 76 people,

17 non-malignant deaths and we delivered all the medical records

18 long ago on those people and we believe that's a freestanding

19 study.  It doesn't relate to the 950 or the 1,800.  But if the

20 Court is of the opinion that he is prevented from testifying on

21 epidemiology matters because of the failure to deliver all

22 1,800 sets of records, we understand that.

23          THE COURT:  I have ruled on the 1,800.  I don't even

24 think I've had an issue with respect to a separate 76 study.

25          MR. BERNICK:  No, the 76 are part of the 1,800 and

**J&J COURT TRANSCRIBERS, INC.**

1  they're the core of the CARD Mortality Study.

2          THE COURT:  That's an issue that you folks are going

3  to have to either let me read if you've briefed because I

4  haven't seen it or you're going to have to describe to me in

5  more detail.  They're telling me it's a separate study.  You're

6  telling me it isn't.  I don't have a clue.

7          MR. BERNICK:  That's fine, and this is not a question

8  that I think we need to negotiate before the Court but I --

9  right now, it's not just our inconvenience in preparing to

10  cross examine Dr. Whitehouse on the 76 which is the core of the

11  CARD Mortality Study.  That's why everything is being done on

12  CARD is the 76 people.  It's not separate.  It's the core of

13  the thing and I don't think that Mr. Lewis or Mr. Heberling are

14  going to say that somehow it's now a different study.

15          So I would urge counsel to reach out to us and talk

16  through what's going to happen tomorrow.  We'll see if we can

17  resolve this among ourselves.  But this is not just a question

18  of convenience to us.  This is a question of how tomorrow is

19  going to be taken, because we're now going to lose a very

20  significant period of time, dead time in court --

21          THE COURT:  Mr. Bernick --

22          MR. BERNICK:  -- because Dr. Frank isn't going to be

23  here until Thursday.

24          THE COURT:  Well, then if that's the case, I don't

25  know if you have any other witnesses that can be called in this

1  respect.

2        MR. BERNICK:  That is exactly the problem now is that

3  we really wanted to be sure that we would have -- we'll caucus

4  and see if there's somebody we can call now.  But this is the

5  whole reason, and this could have been avoided, by simply

6  letting us -- having the discussion that we're having now like

7  three days ago so we could fill the schedule or having Dr.

8  Frank here.

9        THE COURT:  Okay, there's nothing I can do to fix

10 that problem now.

11       MR. BERNICK:  There's nothing you can do.

12       THE COURT:  So we are going to recess until nine

13 o'clock tomorrow.  Mr. Demmy --

14       MR. DEMMY: Your Honor, one more item.  I'm sorry.

15 This will take 30 seconds of your time and I appreciate the

16 Court letting me speak.  John Demmy for Fireman's Fund.  You

17 mentioned earlier this morning, maybe one of the first things

18 you did mention was a Fireman's Fund motion that you had not

19 seen.  My understanding is that we have -- my office has

20 communicated with chambers and that you have that motion.  You

21 probably haven't seen it.

22       THE COURT:  I have seen it.  I read it at lunchtime.

23 I scheduled it for the September 29th conference with a

24 response date of September the 16th at five o'clock.

25       MR. DEMMY:  Thank you, Your Honor.

1          THE COURT:  It's not on the docket yet but that's

2    what I did.

3          MR. DEMMY:  Thank you, Your Honor.

4          MR. LEWIS:  Are we in recess, Your Honor?

5          THE COURT:  Ms. Baer?

6          MS. BAER:  Your Honor, I just wanted to point out

7    that if you were going to look at the Libby motions, they have

8    corresponding agenda items where the responses are.  The very

9    first one on that chart is agenda item Number 6.  The very

10   second one is agenda item Number 8.  The third one is agenda

11   item Number 7.  And then, Your Honor, the next three are

12   related to prior orders but they are a motion that was just

13   filed yesterday but they relate to prior orders.

14         MR. LACY:  Does this reference the motion?

15         MS. BAER:  No, this has nothing to do with the

16   reliance materials.  On the reliance materials and the issue of

17   confidentiality, we worked that out with the Libby folks.  We

18   have draft language on an order that we will submit to the

19   Court in the morning, Your Honor.

20         MR. LACY:  I'm referring to a different -- there was

21   a separate motion in limine filed.  It raised reliance

22   materials that reference Dr. Frank, Dr. Molgaard and Dr.

23   Whitehouse.

24         THE COURT:  I have no clue.  When was this filed?

25         MR. LACY:  Yeah, and that's why I'm asking if it was

1  on this -- I don't have the docket number.

2          THE COURT:  Why am I getting everything the day

3  before trial starts?  You know, it's not as though this has --

4  this case hasn't been pending long enough.  Ms. Baer, I haven't

5  seen the motion I don't think that you're referring to with

6  respect to these last three.  The one that I saw that was filed

7  yesterday related to the confidentiality issue.  I haven't seen

8  another one.

9          MS. BAER:  It was filed late yesterday, Your Honor.

10 There were two motions filed.  One was early and that's the one

11 you're talking about.  There was one filed late and that's the

12 docket number that's on --

13          THE COURT:  So I don't have responses in from anybody

14 about these things yet?

15          MS. BAER:  No, Your Honor.

16          THE COURT:  Well, then how am I going to hear about

17 them?

18          MS. BAER:  Your Honor --

19          MR. BERNICK:  Objections re individual evidence, no

20 lead to current or future claims.  Yet it is only the last one

21 that was filed yesterday.  There was a deadline for motions in

22 limine, right?  But there's a deadline for Daubert.  All of

23 these things ended up getting pushed back though because of the

24 continued discovery relating to experts who are going to be

25 addressing Libby.  That's what the source of the problem was.

1  So some of these things relate to -- are old issues.  Preclude

2  expert testimony regarding 1,800, that is an old issue.  All

3  we've done is file the motion that essentially seeks

4  enforcement of your prior determination on that.

5          THE COURT:  I'm concerned about the 23184 which

6  apparently --

7          MR. BERNICK:  23184 --

8          THE COURT:  -- was filed last night and as to which I

9  haven't seen it.  I don't know if anybody's seen it yet.

10          MR. BERNICK:  The 23184 is the one that is triggered

11  by -- it is new and it's the one that is triggered by all of

12  these individual -- the indication that all these individual

13  cases are going to come up.  And that one we did file.  We've

14  argued this before but we did file that just now and the

15  principal reason that we're flagging it is that the agreed

16  order regarding experts not only specifies the number of

17  individuals who can be at issue but also says, and this is why

18  it's germane to Whitehouse, you can't -- there's no additional

19  reliance materials that the experts can use beyond those that

20  were already identified as of July.

21          THE COURT:  -- July, yes.

22          MR. BERNICK:  And to the extent that all these

23  additional things have now come in as being -- new individuals

24  whose cases are going to be presented and Dr. Whitehouse is

25  going to talk about them, then they would be -- run afoul of

1  that order and that's why we filed this.

2          Now, if I can reach agreement with Mr. Heberling and

3  Mr. Lewis about who it is that they're actually going to have

4  Dr. Whitehouse talk about as now essentially a fact witness and

5  it's a limited number, we've gone back and it turns out that

6  they didn't give us all those files, they gave us some, not

7  all, I can have a conversation with him and we can get down to

8  a small number of people, we don't care.  We can have Mr.

9  Whitehouse -- Dr. Whitehouse testify and get this thing done.

10          THE COURT:  Okay, folks, we really do have to leave.

11          MR. BERNICK:  Yes.

12          THE COURT:  I promised staff we'd be out of here by

13  6:30.  We're going to miss buses and that's a problem.  So I'm

14  not doing this any longer.  If you've got these issues, you

15  bring them up at lunchtime and those of you who care enough,

16  will not eat lunch and we'll deal with these at lunch from here

17  on in.

18          Okay, with respect to 23184, I haven't seen it.

19  Gentlemen, be prepared to argue it tomorrow morning because

20  that's what we're going to do.

21          MR. LOCKWOOD:  Your Honor, I have a copy of it.

22          THE COURT:  I'll take it.

23          MR. LOCKWOOD:  It doesn't have the docket number on

24  it.

25          THE COURT:  That's fine.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. LEWIS:  Is that the one served on us at nine

2   o'clock last night?

3          THE COURT:  Thank you.

4          MR. LOCKWOOD:  Yes.

5          MR. LEWIS:  Okay.

6          THE COURT:  Okay, we'll address this tomorrow

7   morning.  Okay, these issues, the <u>Daubert</u> motion, the motion

8   preclude the expert testimony concerning the 1,800 although

9   unless there's something different about the 76, I think I've

10  already ruled on the 1,800, the individual testimony I think

11  I've addressed and counsel is apparently prepared to do this

12  through Dr. Whitehouse if I understand it as opposed to the

13  individuals.  So I don't think there's too much with respect to

14  what are currently agenda numbers 7 and 8.  But I'll take a

15  look at them again.  Be prepared to address them tomorrow and

16  this new 23184.

17         MR. BERNICK:  Thank you very much.

18         THE COURT:  All right, we're adjourned to nine

19  o'clock.

20                    *  *  *  *  *

21

22

23

24

25

# C E R T I F I C A T I O N

We, RITA BERGEN, KELLI PHILBURN, KIMBERLY UPSHUR, KATHLEEN BETZ, TAMMY DeRISI, ELAINE HOWELL and MARY POLITO, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above entitled matter, and to the best of our ability.


/s/ Rita Bergen

RITA BERGEN

/s/ Kelli R. Philburn

KELLI PHILBURN

/s/ Kimberly Upshur

KIMBERLY UPSHUR

/s/ Kathleen Betz

KATHLEEN BETZ

/s/ Tammy DeRisi

TAMMY DeRISI

/s/ Elaine Howell

ELAINE HOWELL

/s/ Mary Polito

MARY POLITO

J&J COURT TRANSCRIBERS, INC.        DATE: September 10, 2009



**J&J COURT TRANSCRIBERS, INC.**