UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                        .    Case No.  01-1139 (JKF)
                              .
W.R. GRACE & CO.,             .
et al.,                       .    USX Tower – 54th Floor
                              .    600 Grant Street
                              .    Pittsburgh, PA 15219
                 Debtors.     .
                              .    September 14, 2009
. . . . . . . . . . . . ..         8:42 a.m.


TRANSCRIPT OF PLAN CONFIRMATION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                            By:  DAVID BERNICK, ESQ.
                                 LISA G. ESAYIAN, ESQ.
                            200 East Randolph Drive
                            Chicago, IL  60601


For the Asbestos            Caplin & Drysdale, Chartered
Creditors Committee:        By:  NATHAN FINCH, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C. 20005


For the Future              Orrick, Herrington & Sutcliffe, LLP
Claimants                   By:  ROGER FRANKEL, ESQ.
Representatives:                 JONATHAN GUY, ESQ.
                            Washington Harbour
                            3050 K Street, N.W.
                            Washington, D.C.  20007


Audio Operator:             Janet Heller

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Libby Claimants:  Lewis, Slovak & Kovacich, P.C.
                          By:  TOM L. LEWIS, ESQ.
                          725 Third Avenue North
                          Great Falls, MT 59401

                          McGarvey, Heberling, Sullivan and
                           McGarvey, P.C.
                          By:  JON HEBERLING, ESQ.
                               JOHN LACEY, ESQ.
                          725 Third Avenue North
                          Great Falls, MT  59401

                          Cohn Whitesell & Goldberg, LLP
                          By:  DANIEL C. COHN, ESQ.
                          101 Arch Street
                          Boston, MA  02110

For Arrowwood:            Wilson, Elser, Moskowitz, Edelman,
                           & Dicker, LLP
                          By:  CARL J. PERNICONE, ESQ.
                          150 East 42nd Street
                          New York, NY 10017

                          O'Melveny & Myers, LLP
                          By:  TANCRED SCHIAVONI, ESQ.
                          Times Square Tower
                          Seven Times Square
                          New York, NY 10036

For BNSF Railway:         Pepper Hamilton, LLP
                          By:  LINDA CASEY, ESQ.
                               BOB PHILLIPS, ESQ.
                               JAMES CARIGNAN, ESQ.
                          3000 Two Logan Square
                          Philadelphia, PA  19103

For CNA:                  Goodwin Procter, LLP
                          By:  MICHAEL GIANNOTTO, ESQ.
                          Exchange Place
                          Boston, MA  02109-2881

For Fireman's Fund:       Stevens & Lee
                          By:  MARNIE SIMON, ESQ.
                          600 College Road East, Suite 4400
                          Princeton, NJ 08540

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Maryland Casualty:          Connelly Bove Lodge & Hutz, LLP
                                By:  JEFFREY WISLER, ESQ.
                                The Nemours Building
                                1007 North Orange Street
                                Wilmington, DE  19899

For MCC & Zurich:               Eckert Seamans
                                By:  EDWARD D. LONGOSZ, ESQ.
                                1747 Pennsylvania Avenue, NW
                                Suite 1200
                                Washington, DC 20006

                                Wiley Rein, LLP
                                By:  RICHARD A. IFFT, ESQ.
                                1776 K Street NW
                                Washington, DC 20006

For Ford, Marrin,               Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer                 Gleser, LLP
& Gleser, LLP:                  By:  ELIZABETH M. DeCRISTOFARO, ESQ.
                                Wall Street Plaza, 23rd Floor
                                New York, NY  10005-1875

For Kneb Pipe Line              Fulbright & Jaworski
Operating Partnership,          By:  STEVE PIERCE, ESQ.
LP:                             300 Convent Street, Suite 2200
                                San Antonio, TX 78205-3792

For Travelers:                  Simpson Thacher
                                By:  ELISA ALCABES, ESQ.
                                425 Lexington Avenue
                                New York, NY  10017

For State of Montana            Womble Carlyle Sandridge & Rice
Dept. of Environmental          By:  FRANCIS MONACO, ESQ.
Quality:                        222 Delaware Avenue, Suite 1501
                                Wilmington, DE 19801

For AXA Belgium:                Tucker Arensberg, P.C.
                                By:  MICHAEL A. SHINER, ESQ.
                                1500 One PPG Place
                                Pittsburgh, PA  15222

                                Mendes & Mount
                                By:  EILEEN McCABE, ESQ.
                                750 Seventh Avenue
                                New York, NY  10019

**J&J COURT TRANSCRIBERS, INC.**

4

APPEARANCES (CONT'D):

For Committee of            Campbell & Levine
Asbestos Personal           By:  MARK T. HURFORD, ESQ.
Injury Claimants:           800 North King Street
                            Suite 300
                            Wilmington, DE  19701

For Kneb Pipe Line          Gilbert & Renton, LLC
Operating Partnership,      By:  ROBERT GILBERT, ESQ.
LP:                         344 North Main Street
                            Andover, MA 01810

For Garlock Sealing         Robinson, Bradshaw & Hinson, P.A.
Technologies:               By:  GARLAND CASSADA, ESQ.
                                 RICHARD WORF, ESQ.
                            101 North Tryon Street
                            Suite 1900
                            Charlotte, NC  28246

For Federal Insurance       Cozen O'Connor
Company:                    By:  JACOB C. COHN, ESQ.
                            1900 Market Street
                            Philadelphia, PA  19103

For Sealed Air:             Skadden, Arps, Slate, Meagher & Flom,
                              LLP
                            By:  DAVID TURETSKY, ESQ.
                                 J. GREGORY ST. CLAIR, ESQ.
                            One Rodney Square
                            Wilmington, DE  19801

For National Union Fire     Zeichner Ellman & Krause, LLP
Insurance Co.:              By:  MICHAEL DAVIS, ESQ.
                            575 Lexington Avenue
                            New York, NY  10022

For the Unsecured           Strook & Strook & Lavan
Creditors' Committee:       By:  ARLENE KRIEGER, ESQ.
                                 KENNETH PASQUALE, ESQ.
                            180 Maiden Lane
                            New York, NY 10038

For Continental             Goodwin Procter, LLP
Casualty Co.:               By:  DANIEL GLOSBAND, ESQ.
                            Exchange Place
                            Boston, MA  02109-2881

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

```
For Fireman's Fund      Crowell & Moring LLP
Insurance Co.:          By:  LESLIE A. DAVIS, ESQ.
                             MARK PLEVIN, ESQ.
                        1001 Pennsylvania Avenue, N.W.
                        Washington, DC  20004


For One Beacon          Drinker Biddle & Reath LLP
Ins. Co., Geico,        By:  MICHAEL F. BROWN, ESQ.
Seaton Ins. Co.              JEFFREY M. BOERGER, ESQ.
& Republic Ins. Co:     One Logan Square
                        18th and Cherry Streets
                        Philadelphia, PA  19103


                        Drinker Biddle
                        By:  WARREN PRATT, ESQ.
                        1100 N. Market Street
                        Wilmington, DE 19801-1254

TELEPHONIC APPEARANCES:

For the Debtors:        Kirkland & Ellis, LLP
                        By:  JANET BAER, ESQ.
                             ELLI LEIBENSTEIN, ESQ.
                        200 East Randolph Drive
                        Chicago, IL  60601


For the Debtors:        Kirkland & Ellis, LLP
                        By:  THEODORE FREEDMAN, ESQ.
                             CHRISTOPHER GRECO, ESQ.
                             CLEMENT YEE, ESQ.
                        Citigroup Center, 153 East 53rd St.
                        New York, NY  10022


For the Debtors:        Pachulski, Stang, Ziehl &Jones
                        By:  JAMES O'NEILL, ESQ.
                        919 North Market Street, 17th Floor
                        Wilmington, DE  19899-8705

For Various Claimant    Stutzman, Bromberg, Esserman & Plifka
Firms:                  By:  DAVID J. PARSONS, ESQ.
                        2323 Bryan Street,  Suite 2200
                        Dallas, TX  75201


For Morgan Stanley      Katten Muchin Roseenman, LLP
Senior Funding, Inc.:   By:  JEFF FRIEDMAN, ESQ.
                             MERRITT PARDINI, ESQ.
                        575 Madison Avenue
                        New York, NY  10022-2585
```

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Morgan Stanley<br>Senior Funding, Inc.: | Edwards Angell Palmer Dodge, LLP<br>By:  ROBERT CRAIG MARTIN, ESQ.<br>919 N Market St.<br>Wilmington, DE 19801-3023 |
| For Serengeti: | Vinson & Elkins, LLP<br>By:  ARI BERMAN, ESQ.<br>Trammell Crow Center<br>2001 Ross Avenue, Suite 3700<br>Dallas, TX  75201 |
| For Scott Company: | Vorys, Sater, Seymour & Pease, LLP<br>By:  TIFFANY COBB, ESQ.<br>52 East Gay Street<br>Columbus, OH  43216 |
| For Official Committee<br>of Asbestos Property<br>Damage Claimants: | Dies & Hile, LLP<br>By:  MARTIN DIES, ESQ.<br>1601 Rio Grande, Suite 330<br>Austin, TX  78701<br><br>LECG<br>By:  ELIZABETH DEVINE, ESQ.<br>1725 Eye Street NW, Ste 800<br>Washington, DC,  20006 |
| For the Property<br>Damage Committee: | Bilzin Sumberg Baena Price &<br>  Axelrod LLP<br>By:  MATTHEW KRAMER, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For the Property<br>Damage Committee: | Bilzin Sumberg Baena Price &<br>  Axelrod LLP<br>By:  SCOTT BAENA, ESQ.<br>     JAY SAKALO, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For the Bank Lenders:         Paul Weiss Rifkind Wharton &
                                 Garrison, LLP
                              By:  MARGARET PHILLIPS, ESQ.
                                   REBECCA ZUBATY, ESQ.
                                   ANDREW N. ROSENBERG, ESQ.
                              1285 Avenue of the Americas
                              New York, NY  10019

For the Bank Lenders:         Crowell & Moring LLP
                              By:  TACIE YOON, ESQ.
                              1001 Pennsylvania Avenue, N.W.
                              Washington, DC  20004

For Asbestos Property         Scott Law Group
Damage Claimants:             By:  DARRELL SCOTT, ESQ.
                              1001 East Main Street, Suite 500
                              Sevierville, TN  37864

For National Union Fire       Zeichner Ellman & Krause, LLP
Insurance Co.:                By:  ROBERT GUTTMANN, ESQ.
                              575 Lexington Avenue
                              New York, NY  10022

For the Future               Orrick, Herrington & Sutcliffe,
Claimants                        LLP
Representatives:             By:  DEBRA FELDER, ESQ.
                                   JOSHUA CUTLER, ESQ.
                              Washington Harbour
                              3050 K Street, N.W.
                              Washington, D.C.  20007

For Federal Insurance        Cozen O'Connor
Company:                     By:  ILAN ROSENBERG, ESQ.
                              1900 Market Street
                              Philadelphia, PA  19103

For Official Committee       Anderson Kill & Olick
of Asbestos Personal         By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:            1251 Avenue of the Americas
                              New York, NY  10020-1186

For Grace Certain            Montgomery, McCracken, Walker &
Cancer Claimants:                Rhoads, LLP
                             By:  NATALIE D. RAMSEY, ESQ.
                              300 Delaware Avenue, Ste. 750
                              Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For David T. Austern,        Phillips, Goldman & Spence, P.A.
the Future Claimants'        By:  JOHN C. PHILLIPS, ESQ.
Representative:              1200 North Broom Street
                             Wilmington, DE  19806

                             By:  DAVID T. AUSTERN

For Allstate Insurance:      Cuyler Burk, LLP
                             By:  STEFANO CALOGERO, ESQ.
                                  ANDREW K. CRAIG, ESQ.
                             Parsippany Corporate Center
                             Four Century Drive
                             Parsippany, NJ  07054

For the Asbestos             Ferry Joseph & Pearce, P.A.
Creditors Committee:         By:  THEODORE TACCONELLI, ESQ.
                             824 Market Street, Suite 19899
                             Wilmington, DE  19899

For Ford, Marrin,            Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer             Gleser
& Gleser:                    By:  SHAYNE SPENCER, ESQ.
                                  ELIZABETH DeCRISTAFANO, ESQ.
                             Wall Street Plaza
                             New York, NY  10005

For Official Committee       Duane Morris, LLP
of Unsecured Creditors:      By:  MICHAEL LASTOWSKI, ESQ.
                             1100 North Market Street, Suite 1200
                             Wilmington, DE  19801-1246

For Official Committee       Brandi Law Firm
of Asbestos Property         By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:                 TERENCE D. EDWARDS, ESQ.
                             44 Montgomery St., Suite 1050
                             San Francisco, CA  94104

                             Lieff, Cabraser, Heimann & Bernstein
                             By:  ELIZABETH J. CABRASER, ESQ.
                             Embarcadero Center West
                             275 Battery Street, Suite 3000
                             San Francisco, CA  94111

TELEPHONIC APPEARANCES (CONT'D):

For Official Committee:   Riker, Danzig, Scherer, Hyland &
of Asbestos Property       Perretti, LLP
Damage Claimants:         By:  TARA MONDELLI, ESQ.
                               CURTIS PLAZA, ESQ.
                          Headquarters Plaza
                          One Speedwell Avenue
                          Morristown, NJ  07962

For the Libby Claimants: Cohn, Whitesell & Goldberg, LLP
                         By:  CHRISTOPHER M. CANDON, ESQ.
                         101 Arch Street
                         Boston, MA  02110

For the Libby Claimants: Landis, Rath & Cobb, LLP
                         By:  KERRI K. MUMFORD, ESQ.
                              JAMES S. GREEN, JR., ESQ.
                         919 Market Street, Suite 1800
                         Wilmington, DE  19899

For the Bank Lenders:    Landis, Rath & Cobb, LLP
                         By:  RICHARD COBB, ESQ.
                         919 Market Street, Suite 1800
                         Wilmington, DE  19899

For the PD Committee:    Speights & Runyan
                         By:  DANIEL SPEIGHTS, ESQ.
                              MARION FAIREY, ESQ.
                              ALAN RUNYAN, ESQ.
                         200 Jackson Avenue, East
                         Hampton, SC  29924

For Everest Reinsurance  Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:         By:  BRIAN L. KASPRZAK, ESQ.
                              JOHN D. MATTEY, ESQ.
                         913 North Market Street
                         Suite 800
                         Wilmington, DE  19801

For Murray Capital       Murray Capital Management, Inc.
Management               By:  MARTI MURRAY

For Normandy Hill        Normandy Hill Capital, LLP
Capital, LLP:            By:  MATTHEW CANTOR

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Anderson Memorial          Kozyak, Tropin & Throckmorton, PA
Hospital:                      By:  JOHN W. KOZYAK, ESQ.
                               2525 Ponce de Leon, 9th Floor
                               Miami, Florida 33134

For ZAI Claimants              Hogan Firm Attorneys at Law
& various law firms:           By:  DANIEL K. HOGAN, ESQ.
                               1311 Delaware Avenue
                               Wilmington, DE  19801

For the U.S. Trustee:          Office of the U.S. Trustee
                               By:  DAVID KLAUDER, ESQ.
                               844 King Street, Suite 2313
                               Wilmington, DE  19801

For Arrowwood                  Bifferato Gentilotti LLC
Indemnity Co.:                 By:  GARVAN McDANIEL, ESQ.
                               800 North King Street
                               Wilmington, DE  19801

For AXA Belgium:               Mendes & Mount
                               By:  ANNA NEWSOM, ESQ.
                               750 Seventh Avenue
                               New York, NY  10019

For Royal Insurance:           Wilson Elser Moskowitz Edelman
                                 & Dicker, LLP
                               By:  CARL PERNICONE, ESQ.
                               150 East 42nd Street
                               New York, NY  10017

For Official Committee         Richardson Patrick Westbrook &
of Asbestos Property             Brickman, P.C.
Claimants:                     By:  EDWARD J. WESTBROOK, ESQ.
                               174 East Bay Street
                               Charleston, SC  29401

For Dow Jones                  Dow Jones News Wires
News Wires:                    By:  PEG BRICKLEY

For the Equity                 Kramer Levin Naftalis & Frankel
Committee:                     By:  DAVID E. BLABEY, JR., ESQ.
                               919 Third Avenue
                               New York, NY  10022

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Hartford Financial        Wilmer Wilmer Cutler Pickering Hale &
Service Group:                 Dorr, LLP
                              By:  MELANIE R. DRITZ, ESQ.
                              399 Park Avenue
                              New York, NY  10022

For Travelers Casualty        Morris Nichols Arsht & Tunnell, LLP
Surety Company:               By:  MATTHEW B. HARVEY
                              1201 N. Market Street
                              PO Box 1347
                              Wilmington, DE 19899-1347

For Asbestos Property         Pryor Cashman, LLP
Damage Claimants:             By:  RICHARD LEVY, ESQ.
                              410 Park Avenue
                              New York, NY  10022

For David T. Austern,         Lincoln International, LLC
Future Claimants'             By:  JOSEPH RADECKI
Representative:

**J&J COURT TRANSCRIBERS, INC.**

**I N D E X**

**WITNESSES:**                                              **PAGE**
ELIHU INSELBUCH
  Direct Examination by Mr. Lockwood              31
  Cross Examination by Mr. Giannotto             46
  Cross Examination by Mr. Cassada               78
  Cross Examination by Mr. Monaco                107
  Cross Examination by Ms. Casey                 112
  Cross Examination by Mr. Davis                 132
  Cross Examination by Mr. Speights              139
  Redirect Examination by Mr. Lockwood           164
  Recross Examination by Mr. Giannotto           167

RICHARD C. FINKE
  Direct Examination by Ms. Esayian              169
  Cross Examination by Mr. Plevin                185
  Cross Examination by Mr. Brown                 186
  Cross Examination by Mr. Cohn                  229
  Redirect Examination by Ms. Esayian            235

JAY HUGHES
  Direct Examination by Mr. Bernick              237
  Direct Examination by Mr. Finch                268
  Cross Examination by Mr. Lewis                 281
  Cross Examination by Mr. Phillips              290
  Cross Examination by Mr. Monaco                295


**EXHIBITS**                            **I.D.**   **EVD.**
CNA-13 Order/Armstrong World Industries   --        55
CNA-26 annual report                      62        64
CNA-10 annual report                      64        65
PP-505-1, 505-2, 505-3 505-4              --        183
PP-1 Settlement agreement                 --        239
FCR-1 to 13 Documents                     --        290
State of Montana 149 Proof of claim       --        304

1              THE CLERK:  Court come to order.

2              THE COURT:  Please be seated.  This is the

3    continuation of the Phase II confirmation hearing in the W.R.

4    Grace 01-1139.  I have a list of participants by phone are

5    David Austern, Scott Baena, Janet Baer, Ari Berman, David

6    Bernick, David Blabey, Thomas Brandi, Peg Brickley, Elizabeth

7    Cabraser, Stefano Calogero, Christopher Candon, Matthew Cantor,

8    Richard Cobb, Tiffany Cobb, Jacob Cohn, Andrew Craig, Joshua

9    Cutler, Leslie Davis, Michael Davis, Elizabeth DeCristofaro,

10   Elizabeth Devine, Martin Dies, Melanie Dritz, Terrence Edwards,

11   Marion Fairey, Debra Felder, Theodore Freedman, Jeff Friedman,

12   Robert Gilbert, Christopher Greco, James Green, Robert

13   Guttmann, Matthew Harvey, Daniel Hogan, Robert Horkovich, Brian

14   Kasprzak, David Klauder, John Kozyak, Matthew Kramer, Michael

15   Lastowski, Ellie Leibenstein, Richard Levy, Robert Craig

16   Martin, John Mattey, Garvan McDaniel, Tara Mondelli, Kerri

17   Mumford, Marti Murray, Anna Newsom, James O'Neill, Merritt

18   Pardini, David Parsons, Carl Pernicone, Margaret Phillips, John

19   Phillips, Curtis Plaza, Mark Plevin, Joseph Radecki, Natalie

20   Ramsey, Andrew Rosenberg, Ilan Rosenberg, David Rosendorf, Alan

21   Runyan, Jay Sakalo, Darrell Scott, Michael Shiner, Daniel

22   Speights, Shayne Spencer, Theodore Tacconelli, Edward

23   Westbrook, Clement Yee, Tacie Yoon, Rebecca Zubaty.

24              Folks, before we begin I'm having a problem.  I don't

25   know if any of the parties are present.  There was as a

**J&J COURT TRANSCRIBERS, INC.**

1  stipulation of fact filed some time over the weekend or this

2  morning by Longacre and others.  We cannot print it.  For

3  whatever reason, it has jammed up our system, and it's 90-some

4  pages long.  We simply cannot print it.  I need a hard -- a

5  paper copy from whoever filed the stipulation, because I don't

6  know what it is.  Do I need it for today?  Good morning.

7        MR. CARIGNAN:  Good morning, Your Honor.  James

8  Carignan of Pepper Hamilton for Longacre.  I walked in at the

9  tail end of that.  I'm sorry.  I do have several hard copies.

10 If I may approach?

11       THE COURT:  Yes, please.  Is it something I need for

12 today?

13       MR. CARIGNAN:  Oh, well, I'd say that depends on

14 whether -- on the schedule if we're given an opportunity to

15 present our case today.

16       THE COURT:  Okay.  That's fine.  Yes, I'll take a

17 copy, please, if you don't mind, because, otherwise, at the

18 moment I don't have any access to it.  We can't read it, and we

19 can't print it.

20       MR. CARIGNAN:  Certainly.  Let me just grab it.

21       THE COURT:  While he's doing that, can I get entries

22 of appearances for people who will be presenting information

23 today, please?  Good morning.

24       MR. BERNICK:  Good morning.  David Bernick for Grace.

25       MR. LOCKWOOD:  Peter Lockwood for the ACC, Your

1  Honor.

2          MR. FINCH:  Nathan Finch for the ACC, Your Honor.

3          MR. GUY:  Jonathan Guy and Roger Frankel for the

4  Asbestos PI FCR, Your Honor.

5          MR. MONACO:  Frank Monaco from Womble Carlyle on

6  behalf of the State of Montana.

7          THE COURT:  One second, please, folks.

8                          (Pause)

9          MR. HURFORD:  Mark Hurford for the ACC.

10          THE COURT:  And I missed Mr. Monaco.  Just a second.

11  Okay.  I'm back.  Thank you.

12          MR. PIERCE:  Good morning, Your Honor.  Steve Pierce

13  for Kaneb Pipe Line.

14          MR. GILBERT:  Good morning.  Robert Gilbert for

15  Kaneb.

16          MR. CASSADA:  Good morning, Your Honor.  I'm Garland

17  Cassada, Robinson, Bradshaw & Hinson.  I'm here with Rich Worf

18  of our firm today.  We represent Garlock Sealing Technologies,

19  a co-defendant in the tort system.

20          MR. COHN:  Good morning, Your Honor.  Jacob Cohn for

21  Cozen O'Connor for Federal Insurance Company.

22          MR. TURETSKY:  Good morning, Your Honor.  David

23  Turetsky of Skadden Arps with J. Gregory St. Clair also of

24  Skadden for Sealed Air Corporation.

25          THE COURT:  Good morning.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. SIMON:  Good morning, Your Honor.  Marnie Simon

2     from Stevens & Lee for FFIC Alliance.  John Demmy cannot be in

3     court today.  He had a Third Circuit argument.  And I filed a

4     pro hac vice motion on September 3rd.  It has not yet been

5     granted.

6          THE COURT:  All right.  I haven't seen it, but I'll

7     have someone look for it for me.  Thank you.

8          MS. SIMON:  Thank you.

9          THE CLERK:  Can I have your name, please?

10         MS. SIMON:  Marnie, M-a-r-n-I-e, Simon, S-i-m-o-n,

11    Docket Number 23136.

12         THE COURT:  Good morning.

13         MS. CASEY:  Good morning, Your Honor.  Linda Casey at

14    Pepper Hamilton on behalf of BNSF Railway Company.  With me in

15    Court today is Jim Carignan, also at Pepper Hamilton, and

16    Robert Phillips of the Phillips Law Firm.

17         THE COURT:  Thank you.  Good morning.

18         MR. PERNICONE:  Good morning, Your Honor.  Carl

19    Pernicone and Tancred Schiavoni for Arrowwood.

20         MR. DAVIS:  Good morning, Your Honor.

21         THE COURT:  Good morning.

22         MR. DAVIS:  Michael Davis for National Union Fire

23    Insurance Company and the other Chartis companies.

24         MR. LEWIS:  Good morning, Your Honor.  Tom Lewis for

25    the Libby claimants.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Good morning.

2          MR. COHN:  Good morning, Your Honor.  Dan Cohn for

3   the Libby Claimants.

4          THE COURT:  Good morning.

5          MR. SHINER:  Good morning, Your Honor.  Michael

6   Shiner and with me is Eileen McCabe, counsel for AXA Belgium,

7   as successor to Royal Belge.

8          THE COURT:  Excuse me one second here.

9                    (Pause)

10         THE COURT:  Thank you.  Good morning.

11         MS. KRIEGER:  Good morning.  Good morning, Your

12  Honor.  Arlene Krieger from Stroock and Stroock and Lavan on

13  behalf of the Unsecured Creditors' Committee, and my colleague

14  Ken Pasquale will be here a little bit later.

15         THE COURT:  All right.  Thank you.

16         MS. ALCABES:  Good morning, Your Honor.  Elisa

17  Alcabes for Travelers Casualty and Surety Company.

18         MR. GLOSBAND:  Good morning, Your Honor.  Daniel

19  Glosband for Continental Casualty Company.

20         THE COURT:  Good morning.

21         MR. HEBERLING:  Good morning, Your Honor.  John

22  Heberling for Libby claimants.

23         THE COURT:  Good morning.

24         MR. LACEY:  Good morning.  And John Lacey, Libby

25  claimants.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Good morning.

2          MR. WISLER:  Good morning, Your Honor.  Jeffrey

3  Wisler on behalf of Maryland Casualty and Zurich.

4          MR. IFFT:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MR. IFFT:  Richard Ifft on behalf of Maryland

7  Casualty and Zurich as well.

8          THE COURT:  Good morning.

9          MR. LONGOSZ:  Good morning, Your Honor.  Edward

10  Longosz also on behalf of Maryland Casualty and Zurich.

11          MR. GIANNOTTO:  Good morning, Your Honor.  Michael

12  Giannotto on behalf --

13          THE COURT:  Your microphone's not on, Mr. Giannotto.

14          MR. GIANNOTTO:  Michael Giannotto on behalf of

15  Continental Casualty and the other CNA companies.

16          MS. DeCRISTOFARO:  Good morning, Your Honor.

17  Elizabeth DeCristofaro for Continental Casualty and the other

18  CNA companies as well.

19          MR. PLEVIN:  Good morning, Your Honor.  Mark Plevin

20  and Leslie Davis for Fireman's Fund Insurance Company with

21  respect to its surety claim.

22          MR. BROWN:  Good morning, Your Honor.  Michael Brown

23  on behalf of One Beacon American Insurance Company --

24          THE CLERK:  We can't hear you, Mr. Brown.

25          THE COURT:  I don't think your microphone's on.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BROWN:  One Beacon American Insurance.

2          THE COURT:  The microphone's not on.

3          MR. BROWN:  On behalf of One Beacon --

4          THE COURT:  The microphone's not on.

5          MR. BROWN:  Michael Brown on behalf of --

6          THE COURT:  It's -- can you press it just once?  I

7  think it's being pressed -- is it bright green or dull green?

8          MR. BROWN:  Michael Brown on behalf of One Beacon --

9          THE COURT:  It's not on.

10          MR. BROWN:  -- Insurance Company --

11          UNIDENTIFIED SPEAKER:  Try that.

12          MR. BROWN:  Michael Brown on behalf of One Beacon

13  American Insurance Company, Seaton Insurance Company, Geico,

14  and Republic Insurance Company.  Thank you.

15          MR. PRATT:  Warren Pratt --

16          THE COURT:  That microphone's not on.  Is it not

17  plugged in?  Try it again.  Press the button once.

18          MR. PRATT:  Warren Pratt --

19          THE COURT:  No.  Try again.  They may have

20  disconnected it to put in the -- okay -- to put in the Lavalier

21  mike in that side.

22          MR. GUY:  We were hoping it would expedite things,

23  Your Honor.

24          THE COURT:  Mr. Pratt, can you enter your appearance

25  for me?  I don't think it's picked up the record.

**J&J COURT TRANSCRIBERS, INC.**

1              MR. PRATT:  Warren Pratt, Your Honor, for One Beacon

2    American Insurance Company, Seaton Insurance Company, Geico,

3    and Republic Insurance Company.

4              THE COURT:  Okay.  Thank you.  Jan, can --

5              MR. GUY:  Your Honor, may I be --

6              THE COURT:  -- can you send --

7              MR. GUY:  -- may I quickly --

8              THE COURT:  Can you send a note down to systems,

9    please, to come to check that microphone?  If it's un -- if

10   there is a plan to use the Lavalier side over there, which may

11   be the case, then -- it is the Lavalier?

12             THE CLERK:  It's the Lavalier.

13             THE COURT:  Okay.  And you have one?

14             THE CLERK:  I have two.

15             THE COURT:  Okay.  Fine.  Thank you.  Mr. Guy.

16             MR. GUY:  Your Honor, on the Longacre stipulation, I

17   think we received that on Sunday.  We also haven't had a chance

18   to review it.  I believe it has a signature line for the

19   Asbestos PI FCR.  We are not of a position to say now whether

20   we are on board or not, but I suspect we will be, but we just

21   need an opportunity to review it.  So before the Court enters

22   the stipulation anyway, we would just like to take a -- some

23   time this morning to take a look at it.

24             THE COURT:  Oh, I'm not going to entering a

25   stipulation until somebody at least proffers it to tell me what

**J&J COURT TRANSCRIBERS, INC.**

1 it is, especially a 90-page one that I haven't read yet.  But

2 okay.

3            MR. GUY:  We have the same sentiment, Your Honor.

4            THE COURT:  All right.

5            MR. GUY:  Thank you.

6            THE COURT:  Thank you.  All right.  Who's up?

7            MR. BERNICK:  Your Honor, I'm sorry.  We were

8 conferring to determine what the issue was.  We have a couple

9 housekeeping matters.  One, there are some plan modifications

10 that were made in response to concerns that were raised by BNSF

11 and Ms. Esayian will be distributing those to the parties and

12 to the Court.  We want to make sure that happened before any

13 further evidence was taken.  I guess it's really kind of later

14 on today.

15            The second is that we have a logistical problem that

16 we'd like to resolve.  Todd Maynes is a partner of mine.  He's

17 a tax partner.  He's issued a declaration that says that the

18 Trust would constitute a qualified settlement fund.  We're not

19 aware of any issue concerning the accuracy of that opinion.

20 The declaration's been distributed.  There's nothing that's

21 been raised in any of the trial briefs or any of the papers

22 saying that it's wrong, and we don't want to have to bring in

23 Mr. Maynes.

24            There are hearsay objections that have been made.

25 Hearsay objections obviously would be resolved if he showed up.

1 Some of the declarations said yes, it's mine.  So the issue is

2 whether we have to bring Todd Maynes here to show up and say

3 yes, it's mine and to permit cross examination, which cross

4 examination there's no indication will actually go to the

5 substance of the document.

6 　　　　So why is it that we have to bring him?  Well,

7 apparently, Seaton, One Beacon has issues, because they want

8 slides relating to Mr. Shelnitz's testimony later on today,

9 which slides are in process.  They're not done.  They'll be

10 done this morning.  I personally have been working on them.

11 And they want agreements as to certain documents.  I hate to

12 raise this, but we have no other recourse.  It is completely

13 improper to hold these different elements hostage to one

14 another.  It impairs our process of trying to get

15 predictability in the witnesses who are going to testify at

16 trial, which is an extremely difficult logistical task.  We're

17 trying to keep this trial moving.

18 　　　　THE COURT:  Wait.  I'm sorry.  There's a hearsay

19 objection to Mr. Maynes' declaration, because somebody wants

20 documents on another witness?

21 　　　　MR. BERNICK:  There's a hearsay objection to Mr.

22 Maynes' declaration, which then means that we have to bring him

23 to say yes, the declaration is mine.

24 　　　　THE COURT:  Yes.

25 　　　　MR. BERNICK:  And my understanding is that the

1  problem -- the reason we can't get the agreement not to call

2  him -- I know that this is true -- is that we haven't (a)

3  provided the slides to Mr. Shelnitz's testimony this afternoon

4  and (b) --

5          THE COURT:  That have nothing to do with Mr. Maynes'

6  declaration.

7          MR. BERNICK:  Nothing.  Absolutely nothing --

8          THE COURT:  All right.

9          MR. BERNICK:  -- to do with it.  And we need to get

10 this process continuing without these kinds of problems.  I

11 raised it with counsel for Seaton, One Beacon this morning, who

12 wanted to talk with me about all kinds of other things but

13 didn't want to reach the agreement.  And then in the words of

14 the gentleman to Mr. Brown's left -- right, I forget what his

15 name is, said, "Just bring him."  Now, that's not the way we're

16 trying to do business here.

17         THE COURT:  Gentlemen, is there an objection to what

18 Mr. Maynes has to say?

19         MR. BROWN:  Your Honor, may I?

20         THE COURT:  Yes.

21         MR. BROWN:  Your Honor, we have been trying to work

22 out some relatively straightforward evidentiary issues.

23         THE COURT:  Okay, but my question is, is there going

24 to be some dispute about the fact that the Trust will be a

25 qualified settlement fund?  Because if not, I don't know what

1  the issue is, and we'll get to the other things later.  But I

2  don't see the need to call -- to have the expense or the time

3  taken for a witness to come if there is no issue.  If there is

4  an issue, fine.  Tell me what the issue is.

5          MR. BROWN:  Your Honor, I don't -- Mr. Maynes isn't

6  going to testify, if at all, until later this week, and the

7  problem -- the evidentiary issues we raised about Mr. Maynes'

8  declaration, he signs hearsay, which is what Mr. Bernick

9  referred to, is it is a legal opinion.  From start to finish it

10  is a legal opinion.  He wants to get up on the stand or he

11  wants to provide a declaration that's purely a legal opinion.

12  It's improper.  It wasn't disclosed early, and we've lodged an

13  objection to it simply for the purpose of trying to get the

14  plan proponents to react to some very straightforward documents

15  that we're trying to get into the record.

16          THE COURT:  I'm sorry.  You don't hold one witness

17  hostage, because there are other issues.  The issue is does

18  someone dispute that this Trust will be a qualified settlement

19  fund?  If so, we'll have Mr. Maynes come.  If not, I don't see

20  the need for this.

21          MR. BROWN:  I don't -- Your Honor, I don't see the

22  need for Mr. Maynes to come either, but the fact of the matter

23  is, is that the testimony that he would present, whether it's

24  by declaration or in person is still a legal opinion.

25          MR. LOCKWOOD:  Your Honor, he won't answer your

1  question.

2          THE COURT:  You're --

3          MR. LOCKWOOD:  There --

4          MR. BROWN:  I will answer --

5          MR. LOCKWOOD:  There is no issue.  No party to this

6  case, including but not limited to Mr. Brown's clients, has

7  asserted that this Trust will not be a QSF.  No party.  We've

8  got a room full of people here.  If somebody disagrees with

9  that, including Mr. Brown, they should say so, but he is not

10 answering your question.

11         MR. BROWN:  I'm happy to answer that.  Mr. Lockwood

12 is correct, Your Honor.  We have not raised an objection to

13 that.  We have raised an objection to the declaration, and, you

14 know, I thought one of the ways that you solved problems with

15 evidentiary issues, so they don't have to be taken up by the

16 Court, is you do a little bit of a horse trading, and that's

17 what we're doing.

18         THE COURT:  Okay.  I don't see horse trading over an

19 issue for this.  I'm not going to require a tax partner from

20 Kirkland & Ellis to come here if there is no issue as to what

21 the gentleman would have to say.  If there is no dispute by

22 anybody that the Trust will qualify as a qualified settlement

23 fund, then I don't even need the declaration.  Why can't I get

24 a stipulation to that effect?  That will solve your problem

25 with the declaration, and that will get us past the issue.  So

**J&J COURT TRANSCRIBERS, INC.**

1 is there anybody who objects to this Court finding as a fact

2 that the Trust will qualify as a qualified settlement fund?

3                    (No verbal response)

4          THE COURT:  Anyone on the phone?  I understand you're

5 on mute.  As a result, I -- but I want your microphones opened,

6 so that if someone has an objection, I can hear it.  Does

7 anyone on the phone have an objection?

8                    (No verbal response)

9          THE COURT:  All right.  There is no objection from

10 anyone.  I will accept as a fact, without the need for witness

11 testimony, that the Trust will qualify as a qualified

12 settlement fund for Internal Revenue Service purposes.

13          MR. BROWN:  Thank you, Your Honor.

14          THE COURT:  Mr. Speights, you came in late.  I want

15 to make sure that you don't have a problem with what I just

16 said.

17                       (Laughter)

18          THE COURT:  No one has to date raised an objection to

19 the fact that if this plan is confirmed and the Trust is set

20 up, that it will qualify as a qualified settlement fund for

21 Internal Revenue Service purposes, and I am prepared to accept

22 that as a fact without the need for any testimony.  Do you have

23 any objection to my doing so?

24          MR. SPEIGHTS:  Good morning, Your Honor.

25          THE COURT:  Good morning.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. SPEIGHTS:  Dan Speights making a special

2   appearance for Anderson Memorial Hospital with respect to Mr.

3   Inselbuch's testimony, which Your Honor stated last Thursday

4   would be my only opportunity to examine Mr. Inselbuch, and

5   that's why I'm here.  I'm not avoiding your question, by the

6   way, but I want to say that for the record.

7          THE COURT:  All right.

8          MR. SPEIGHTS:  You have now exceeded my pay grade,

9   however.  I hope that Mr. Rosendorf might be on the phone,

10  although this is not our phase of the hearing, and that he

11  would address that.  And if not, I will certainly check with

12  him.  I have no reason to believe that we -- that we are going

13  to disagree with Your Honor's ruling on that point.  I just --

14  I'm not a bankruptcy lawyer, and I'm certainly not a tax

15  lawyer.

16          THE COURT:  All right.  Mr. Rosen -- is Mr. Rosendorf

17  on the phone?  If so, can you un-mute his microphone, please?

18  Mr. Rosendorf?

19              (No verbal response)

20          THE COURT:  Do I have a Court Call operator?

21          OPERATOR:  Yes, you do, Your Honor.

22          THE COURT:  Is Mr. Rosen --

23          OPERATOR:  He's not on the line.

24          THE COURT:  Is Mr. Rosendorf on the line?

25          OPERATOR:  No, Your Honor, he is not.

**J&J COURT TRANSCRIBERS, INC.**

1         THE COURT:  Okay, then I -- Mr. Speights, I will wait

2  until you have an opportunity to contact him later today to let

3  me know, because I don't see the need to bring a witness if

4  that fact is not going to be disagreed with by any entity.

5         MR. LOCKWOOD:  Your Honor, just for the record, the

6  Anderson Memorial Hospital objection papers did not contain an

7  objection that the plan was -- the asbestos PI Trust --

8         THE COURT:  I understand.

9         MR. LOCKWOOD:  -- did not qualify as a QSF.

10        THE COURT:  Yes, I understand that no one has raised

11  this issue, but before I release a witness, I want to make sure

12  that no one disagrees.  That's all I'm doing.  So I'm dotting

13  that I.  End of story.  So, Mr. Speights, if you could please

14  let me know.

15        MR. SPEIGHTS:  I will be happy to, and just, Your

16  Honor, to -- I don't think I need to do this for Mr. Rosendorf,

17  but because this was not our phase, we are not covering every

18  minute on the phone claims that have been going on, but I know

19  that he has been monitoring it to some extent, and I will check

20  with him at the first break.

21        THE COURT:  Okay.  Thank you.

22        MS. ESAYIAN:  Good morning, Your Honor.  Lisa Esayian

23  for the debtors.  I wanted to just follow up briefly regarding

24  Mr. Bernick's mention of the plan modifications that we worked

25  out with BNSF.  Briefly what I wanted to say is that I'm going

1  to hand out copies, but we recognize that other parties may

2  have some comments on them.  We would ask that parties let us

3  know -- let BNSF and us know during the course of today,

4  because if there's some -- I'll say if there's some substantial

5  disagreement with the modifications, it would affect what

6  testimony BNSF puts on this afternoon.  Whereas, if there's

7  substantial agreement with the modifications, it would

8  eliminate a substantial portion of the testimony that BNSF

9  would put on this afternoon, which is why we're handing out the

10 modifications this morning.

11       It is also -- there's also one provision in them that

12 we and BNSF may tweak further.  We think it's a minor tweak,

13 but my point is that it's subject -- it's not quite a done

14 deal, but we wanted to hand it out to everyone for comments.

15       THE COURT:  All right.  Mr. Bernick, any other

16 housekeeping?

17       MR. BERNICK:  No, I think that we're ready to

18 proceed.  Thank you, Your Honor.

19       THE COURT:  Anybody else?  Any housekeeping matters?

20              (No verbal response)

21       THE COURT:  Okay.

22       MR. SCHIAVONI:  Oh, Your Honor, I'm sorry.  One very

23 quick housekeeping matter.  On Friday because of the haste --

24       THE COURT:  Mr. Schiavoni, she needs your appearance

25 entered.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. SCHIAVONI:  I'm sorry.  It's Mr. Schiavoni for

2    Arrowwood.  We handed up unobjected to deposition designations

3    for Mr. Posner, and if I could just put in the record just what

4    the pages were?  I physically handed those up.  They were pre-

5    designated and shared with all the parties as part of the

6    scheduling of exchanges on those.

7           THE COURT:  All right.

8           MR. SCHIAVONI:  But it's from the May 6th, 2009

9    deposition.  There are only three designations.  One was Page

10   144, Line -- starting at Line 22 through Page 149 to Line 23.

11   The other was starting on Page 308 -- starting on Line 8 of

12   Page 308 through Page 314, Line 7.  And then the third and last

13   one was Page 334 starting at Line 11 through Page 337 of Line

14   21.  Thank you, Your Honor.

15          THE COURT:  Okay.  Thank you.  Anyone else?

16                    (No verbal response)

17          THE COURT:  Okay, Mr. Lockwood.

18          MR. LOCKWOOD:  Your Honor, the plan proponents recall

19   Mr. Elihu Inselbuch to the stand.

20          THE COURT:  You'll need to swear him, Jan.  I've

21   released him earlier.

22        ELIHU INSELBUCH, PLAN PROPONENTS' WITNESS, SWORN

23          THE COURT:  Good morning.

24          THE WITNESS:  Good morning.

25          MR. LOCKWOOD:  Your Honor, for the record, I've

**J&J COURT TRANSCRIBERS, INC.**

1  handed Mr. Inselbuch the Phase II confirmation hearing witness

2  notebook for Elihu Inselbuch.  It's --

3            THE WITNESS:  There's other material here.

4            MR. LOCKWOOD:  Excuse me?

5            THE WITNESS:  I don't know what this is.  That says

6  Posner Slide 1.

7            THE COURT:  Okay.

8            THE WITNESS:  I have this.

9            THE COURT:  This is the same notebook that was used

10 before?

11           MR. LOCKWOOD:  This was the same notebook that was

12 used --

13           THE COURT:  All right.  I have it.

14           MR. LOCKWOOD:  -- on day one, Your Honor, and we've

15 handed out copies to folks in the audience.  Just for the

16 record, I don't anticipate utilizing with Mr. Inselbuch any of

17 the exhibits in the book other than two, and those two are plan

18 proponent Exhibit 277.02, which is the Asbestos PI Trust

19 agreement, and plan proponent Exhibit 277.04, which is the

20 Asbestos Trust PI distribution procedures.

21           THE COURT:  All right.

22           MR. LOCKWOOD:  Good morning, Mr. Inselbuch.

23           THE WITNESS:  Good morning, Mr. Lockwood.

24                     DIRECT EXAMINATION

25 BY MR. LOCKWOOD:

**J&J COURT TRANSCRIBERS, INC.**

1  Q    You've testified at some length earlier in the trial about

2  the Trust distribution procedures, and I don't intend to go

3  back into that testimony, but today I want to ask you some

4  questions about some different aspects of the Trust documents

5  and their contents.  First, could you identify formally for the

6  record Exhibit 2.77 -- excuse me -- 277.02 in your exhibit book

7  that's before you?

8  A    That's the Asbestos Personal Injury Trust agreement, which

9  is a document part of the plan.

10  Q    And I want to discuss with you some aspects of that

11  agreement here today and, specifically, could you describe for

12  the Court in a general sense the governance structure of the

13  Trust as reflected in that agreement?

14  A    The Trust is governed by three trustees.  For certain

15  purposes under the documents, as specified in the documents,

16  the trustees need to either consult with or reach -- or obtain

17  the consent of two entities, one being the Future Claimants'

18  Representative, the other being an entity called the Trustees'

19  Advisory Committee or the TAC.

20  Q    Do you recall who the proposed Trustees of the Grace

21  Asbestos PI Trust are?

22  A    Yes.

23  Q    Could you name them?

24  A    Harry Huge, Lewis Sifford, and Dean Trafelet.

25  Q    Could you briefly describe for the Court -- and I mean

1  briefly -- a short bio of each of those gentlemen?

2  A    Harry Huge is a well-known lawyer originally working out

3  of the Arnold & Porter firm in Washington, very active in civil

4  rights work.  In fact, I believe he represented the Indians --

5  the Native American community at some length.  Lewis Sifford is

6  one of the foremost trial lawyers in Dallas, Texas.  Dean

7  Trafelet is a retired judge in Chicago, who, among other

8  things, administered the asbestos tort docket in Cook County.

9  Q    Administers or administered?

10 A    Administered.  He's retired.

11 Q    And who is the Asbestos PI Trust Future Claimants'

12 Representative?

13 A    David Austern.

14 Q    And do you recall the names of the members of the Asbestos

15 PI Trust Advisory Committee, which I shall refer to hereinafter

16 as the TAC?

17 A    I believe so.  Joseph Rice, John Cooney, Russell Budd, and

18 Perry Weitz.

19 Q    And do those four gentlemen have any other involvement in

20 the Grace bankruptcy case?

21 A    They're all members of the Grace Asbestos Creditors'

22 Committee.

23 Q    And do you know how they came to be members of the

24 Asbestos Claimants' -- Creditors' Committee?

25 A    Well, I mis-spoke.  They have clients who are members of

1 the Asbestos Creditors' Committee.  Their clients became

2 members of the Committee, because they were appointed by the

3 United States Trustee.

4 Q    Now, turning to the TAC for a moment, could you tell us

5 again in a general way what the responsibilities of the Grace

6 -- the proposed responsibilities of the Grace Asbestos PI TAC

7 are under the Trust agreement?

8 A    You're asking me as attorney for the TAC?  I haven't been

9 retained.

10 Q    No.  No.  No.  I didn't -- if I said that, I mis-spoke.

11 Is -- before I -- before I re-ask the question, let me ask

12 another question.  You -- with respect to Mr. Sifford, you said

13 he was a trial attorney from Dallas, Texas?

14 A    Yes, sir.

15 Q    Does he represent asbestos personal injury claimants?

16 A    He does not and has never.

17 Q    Returning to my aborted question about the TAC, could you

18 tell us in a general sense what the proposed function under the

19 Trust agreement of the TAC is with respect to the Grace Trust?

20 A    I can't describe it just in relationship to the Trust

21 agreement.  I can describe it in relationship to both the Trust

22 agreement and the TDP.

23 Q    Please do so.

24 A    -- or Trust distribution procedures.  The TAC serves three

25 functions, and the design here is to emulate the design we've

1  had in a number of other trusts where the trusts or the TAC has

2  served those functions as well.

3          First, to facilitate the administration of the trust

4  by helping the trustees, providing them with knowledge and

5  understanding of how claims are administered, what will be the

6  most efficient way for the trustees to deal with the thousand

7  or so law firms around the country that will be presenting

8  claims to the trust, what will be the most efficient way for

9  those law firms to be dealing with the trusts in processing

10 their claims.  That involves meetings with the trustees,

11 meetings with the constituency, trying to identify what are --

12 what will inevitable, which is in the document, that need to be

13 resolved to facilitate easy administration of the process.

14         The second role of the TAC -- and here the role is

15 shared with the Futures Representative -- is to provide a

16 spokesperson for the present asbestos community in the event

17 that it is felt necessary by the trustees or by any other,

18 either the TAC or the Futures Rep, to make certain kinds of

19 changes in the basic outline of the trust or to create certain

20 procedures that are called for by the trust documents and the

21 TDP, so that the intent of the craftsmen of the document will

22 be carried forward as best as possible.

23         The third general area is to keep the constituency at

24 large, the thousand law firms or so, around the country who

25 will be filing claims on behalf of their clients with the trust

1 informed of the progress of the trust and in an effort to make

2 the entire process as efficient as possible.

3 Q    Now, are the members of the trust -- as you've described

4 them, they're asbestos plaintiff's lawyers.  Correct?

5              THE COURT:  The members of the TAC?

6              MR. LOCKWOOD:  Excuse me.  Members of the TAC.  Thank

7 you, Your Honor.

8 A    They are indeed.

9 Q    And why is that?

10 A    Well, they carry with them the requisite knowledge to

11 accomplish these goals that I've just described.  They are

12 familiar with the way asbestos personal injury claims are

13 gathered and prepared in plaintiff's firms throughout the

14 country, they being -- they being lawyers whose clients were

15 members of the asbestos committee understand what the goals

16 were in drafting this document in the first place, and they

17 being very well respected members of the plaintiff's community

18 are in a unique position to be able to discuss with the

19 constituency at large what is going on, what needs to be

20 improved, and how that can happen.

21 Q    Now, what role, if any, do TAC members have in the

22 processing and resolution by the trust of claims filed with the

23 Trust?

24 A    In terms of the individual claims themselves, none.

25 Q    Do the TAC members have the right to represent individual

1  claimants in tendering claims to the Trust?

2  A    Yes.

3  Q    And is it expected that they will do so?

4  A    Yes, sir.

5  Q    And -- strike that.  You've indicated that there are

6  provisions in the Trust agreement concerning the obtained --

7  the obtaining of concurrence by the TAC to certain actions by

8  the trustees.  Did the -- does the Trust agreement specifically

9  spell out the types of activities for which such concurrence is

10 required?

11 A    Yes, there's a long menu of those situations that is

12 provided in the Trust agreement, and there are additional

13 provisions along that line in the TDP itself.

14 Q    With respect to the Trust agreement, just for the record,

15 could you take a look at the exhibit and identify for the Court

16 the specific provisions in that agreement that you've just

17 referred to?

18 A    Yes, it's found in Section 2.2F, which is at Pages 11

19 through 13 of the exhibit.

20 Q    And you're familiar with this document.  Is that fair to

21 say?

22 A    I am.

23 Q    Did you have a role, either level of responsibility or as

24 a draftsman, in actually creating this document?

25 A    I did.

1 Q    What was that role?

2 A    I was the one ultimately responsible as counsel to the

3 Committee to see to it that the document was satisfactory to

4 the Committee.

5 Q    With respect to this particular Grace Trust agreement, is

6 this a novel form of document in your experience?

7 A    No.

8 Q    Could you tell us to what extent this document is similar

9 or different from trust agreements that have been utilized in

10 plans confirmed previously by bankruptcy courts including this

11 one?

12          MR. PRATT:  Objection, Your Honor.  Relevance.

13          THE COURT:  What are the -- what's the relevance?

14          MR. LOCKWOOD:  Just history and background of -- I'm

15 going to get into things that have been changed in this, and

16 I'm just providing a foundation for the proposition about the

17 way things have been created in this case.

18          THE COURT:  Well --

19          MR. LOCKWOOD:  I'm not going into any details.  One

20 question, Your Honor.

21          THE COURT:  Okay.  To the extent that it's relevant

22 to this case, fine.  If it's relevant to the other hundred and

23 so cases, I really don't need to hear it.

24          MR. LOCKWOOD:  All I'm asking about is with respect

25 to this document in this case.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.

2          MR. LOCKWOOD:  It doesn't have progenitors.

3          THE COURT:  Okay.

4  A    For the most part, this document is a markup of trust

5  agreements that have been crafted over the past seven years in

6  asbestos bankruptcies.

7  Q    Turning to the -- returning, rather, to the provisions

8  dealing with the concurrence of the TAC in proposed actions by

9  the trustees, does that -- is that concurrence provide the TAC

10 with an absolute veto over proposed actions by the trustees

11 that are set forth in that section you referred to?

12 A    No, neither absolute veto by the TAC or by the Futures

13 Representative.  There are provisions that describe how the

14 trustees, if they wish to, can go forward to get a ruling that

15 the TAC or the FCR's refusal to give consent was unreasonably

16 withheld, and, ultimately, there is exit to the Bankruptcy

17 Court to review that.

18 Q    And the Bankruptcy Court is which court?

19 A    This court here.

20 Q    And you mentioned the Futures Rep.  What, if any, consent

21 rights does the Futures Rep have under the Trust agreement?

22 A    They are identical to the TAC's consent rights.

23 Q    Are there other provisions of the Trust dealing with

24 obligations on the part of the trustees to consult with the TAC

25 on certain matters?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    And could you tell the Court what those provisions are or

3  where they may be found in that document?

4  A    In Section 2.2E at Page 10.

5  Q    And separate from the consent rights that you testified

6  about earlier, is there anything in the provisions dealing with

7  consultation that gives the TAC members some form of veto or

8  control over trustee actions?

9  A    No.

10         MR. PRATT:  Objection, Your Honor, with respect to

11 the word control.  I think that calls for a conclusion that's

12 not warranted.

13         THE COURT:  Mr. Lockwood.

14         MR. LOCKWOOD:  Your Honor, I think the term control

15 -- it's -- I'm referring to is there a provision in the

16 document which purports to do that.  I don't think that's a

17 terribly complicated matter.  I don't see what's objectionable

18 about it.

19         THE COURT:  All right, so the question is does the

20 document provide some -- a provision that gives the TAC members

21 control over the trustees?

22         MR. LOCKWOOD:  Relating to the consultation rights

23 that he's talking about as opposed to the consent rights which

24 he talked about earlier.

25         THE COURT:  All right.  Overruled.

1  A     No.

2         THE COURT:  I'll note for the record the document

3  will speak for itself.

4                        (Pause)

5  Q     I want to turn now, Mr. Inselbuch, very briefly to the

6  subject of indirect PI trust claims and focusing for the moment

7  on the Asbestos Trust PI Trust distribution procedures, which

8  is Exhibit 277.04, I believe in your exhibit book.

9  A     Yes, sir.

10 Q     Are there -- first, do you understand what the term

11 indirect PI trust claims refers to generally?

12 A     I believe I do.

13 Q     Are there provisions in the Trust distribution procedures

14 for dealing with such claims?

15 A     There are several.  The principal provision is Section 5.6

16 of the TDP which runs from Page 35 to Page 37, and there are

17 some specialized provisions in Section 5.12 and 5.13 that run

18 from Pages 47 through Pages 51.

19 Q     Are -- to your knowledge, are Sections 5.12 and 5.13

20 provisions that were created specifically in the W.R. Grace

21 bankruptcy case?

22 A     They were.

23 Q     And just as a very high level overview, why were they

24 created, if you know?

25 A     Well, as it was explained to the Committee, there were

1  certain objectors who took the view that in the event their

2  claims actually did arise, there was no provision in the TDP

3  that properly provided for the administration of those claims.

4  So these provisions were put in the TDP with the agreement of

5  the TAC to provide those procedures in what was regarded as the

6  possible event that claims such as those described in either of

7  these two sections might arise.

8  Q    You said in your last answer with the agreement of the

9  TAC.

10 A    I said -- I meant the Committee.

11 Q    Again, at the level of considerable generality, what sorts

12 of claims was Section 5.6 of the TDP intended to deal with?

13 A    5.6, which is the general indirect claims provision, which

14 is similar to provisions in a number of other documents, was

15 especially drafted to this case.  It deals with the garden

16 variety claim over that a co-defendant might have for

17 contribution arising from the co-defendant suffering a jury

18 verdict, paying the entire jury verdict under circumstances

19 where that verdict included the liability or the potential

20 liability of Grace, and that -- and, thus, the co-defendant

21 became entitled to a claim back against Grace or any of the

22 other joint tortfeasors for contribution.  That's the basic

23 concept of the indirect PI trust claim.

24 Q    Are there essentially -- is there essentially one set of

25 provisions for all indirect trust claims covered by Section 5.6

1  or is there more than one such set of provisions?

2  A    Well, there are two basically in 5.6.  What -- the over --

3  overriding concept here is that in the event that a co-

4  defendant in the court system pays money to a claimant which,

5  in fact, extinguishes that claimants' claim against the Trust,

6  then the co-defendant steps into the claimants' shoes and then

7  can pursue the claim against the Trust in the same way that the

8  claimant could have and can recover back from the Trust the

9  same amounts that the claimant might have recovered from the

10 Trust.

11        In a -- there can be situations where the co-

12 defendant's indirect claim is, shall we say, presumptively

13 valid where, in fact, as part of the process of resolving the

14 claim against the co-defendant, the co-defendant resolves the

15 claim against the trust and obtains a release from the claimant

16 of the claim against the Trust.  In that kind of circumstance

17 there would be little dispute as to whether or not the co-

18 defendant had the right to stand in the claimants' shoes and

19 recover the claimants' entitlement from the Trust.

20        But it was recognized, and I think to that degree

21 this section is different from other TDPs.  It was recognized

22 that the co-defendants may not necessarily accomplish -- be

23 able to accomplish the result of obtaining a release for the

24 Trust, because the claimant may just be unwilling to provide

25 such a document.  So the document here, the TDP, provides a

**J&J COURT TRANSCRIBERS, INC.**

1  process by which the co-defendant can demonstrate to the Trust

2  that, in fact, the co-defendant has extinguished the claim

3  against the claimants' claim against the Trust in whole or in

4  part and, thus, is entitled in whole or in part to step into

5  the claimants' shoes and recover from the Trust.

6  Q    With respect to the first category that you just

7  described, are those -- are those claims described in the

8  Section 5.6 as some form of --

9  A    Yeah, they're called presumptively valid indirect PI trust

10 claims.

11 Q    And with respect to the second category of claims, again,

12 as a general matter, what is the process by which an indirect

13 claimant would go about proving up such a claim to the Trust?

14 A    Well, the mechanics have not been spelled out by the

15 trustees, but presumably, there would be some form of claim

16 form that would be crafted for the indirect claimant and the

17 same way the trustees will ultimately craft a claim form for

18 the claimants.

19      They will submit their claim to the trustees, and the

20 trustees will either agree with them or they won't agree with

21 them.  If they agree with them, so be it.  The indirect

22 claimant will then liquidate the claim in the same manner that

23 the claimant could've liquidated the claim.  And then the --

24 and be paid at the payment percentage just in the same way the

25 claimant would've been paid.

1           If the trustees do not agree that their claim is an

2    indirect PI trust claim, the indirect claimant, the joint

3    tortfeasor, has the same appellate right, so to speak, as would

4    a claimant can go to ADR and exit to the tort system to resolve

5    the question of whether or not they would be entitled to enjoy

6    the status of an indirect PI trust claim.

7    Q    With respect to the description that you just gave, what,

8    if any, differences between that process and the individual

9    review process for direct claims are there?

10   A    None.

11   Q    You mentioned earlier in describing the type of claims

12   that were covered by Section 5.6 I believe as contribution

13   claims.  Is it only contribution claims or do they also include

14   indemnity or subrogation or a similar type?

15   A    They would include all of those claims, but predominantly

16   the concept is best described by thinking about contribution

17   claims.  Other kinds of claims that would arise at law based

18   upon the joint tortfeasor paying the liability of the claimant

19   -- of the Trust to the claimant, which might be styled whatever

20   it might be styled under local law, would be included in the

21   same category.

22           MR. LOCKWOOD:  Thank you, Mr. Inselbuch.  Your Honor,

23   that completes my examination.

24           THE COURT:  Good morning.

25           MR. GIANNOTTO:  Good morning, Your Honor.  Good

**J&J COURT TRANSCRIBERS, INC.**

1  morning, Mr. Inselbuch.  I'm Michael Giannotto.  I represent

2  the CNA companies in this case.  I believe we've met the other

3  day.

4              THE WITNESS:  Indeed.  Good morning, sir.

5              MR. GIANNOTTO:  Good morning.

6                    CROSS EXAMINATION

7  BY MR. GIANNOTTO:

8  Q    Now, in this case, as I understand it, you law firm, as

9  counsel for the ACC, drafted the Trust distribution procedures.

10 Is that correct?

11 A    Yes, sir.

12 Q    Okay, and I think you testified earlier this morning that

13 your firm was responsible at least for the initial draft of the

14 Trust agreement as well.  Is that correct?

15 A    Yes, sir.

16 Q    Okay, and I -- in your deposition I think you told us that

17 after those drafts were made, they were distributed to the FCR

18 for their concurrence -- for his concurrence as well?

19 A    After they were completed by the Committee and the

20 Committee was satisfied with the documents, they were then

21 distributed for review by the Future Claimants' Representative.

22 Q    Okay.  Now, the ACC and the FCR selected the trustees for

23 this -- the proposed trustees for this Trust.  Is that correct?

24 A    That's correct, subject to the approval of the Court.

25 They also discussed who -- the identify of these trustees with

                    **J&J COURT TRANSCRIBERS, INC.**

1  the other plan proponents.

2  Q    Okay, but the initial let's say nomination of them was

3  done by the ACC in conjunction with the FCR?

4  A    That's fair.

5  Q    Okay.  Now, under the plan, as I understand it, and tell

6  me if I'm wrong, the initial members -- the proposed members of

7  the TAC, the Trust Advisory Committee, were selected by the

8  ACC.  Is that correct?

9  A    That's correct, subject again to comment by the other plan

10 proponents or any objection that the Court might have.

11 Q    Okay, but the plan itself states that the TAC will be

12 selected by the ACC.

13 A    Yes, sir.

14 Q    Okay.  Now, you mentioned that the initial -- the proposed

15 members of the TAC that were initially nominated by the ACC,

16 and let's just call it that, are Mr. Rice, Mr. Cooney, Mr.

17 Budd, and Mr. Weitz.  Is that correct?

18 A    Yes, sir.

19 Q    And they're all prominent asbestos personal injury

20 attorneys?

21 A    Yes, sir --

22 Q    Okay.

23 A    -- and they do other things, too.

24 Q    I'm sure they do.  And they were all members -- they were

25 all representing their clients on the ACC.  Is that correct?

1  A    That's correct, and they also were the four lawyers who

2  constituted the subcommittee -- negotiating subcommittee of the

3  ACC for the purpose of negotiating the plan.

4  Q    Okay, so since the -- since the TAC -- I'm sorry.  Since

5  the ACC nominated the TAC, in effect, these four individuals

6  who have been nominated for the TAC helped nominate themselves.

7  Is that correct?

8  A    Yes.

9  Q    Okay, so they voted in favor of themselves on the ACC to

10 be on the TAC?

11 A    I believe that's correct.

12 Q    Okay, and also since the ACC under the plan has the

13 responsibility to select the trustees, these members of the

14 TAC, or the proposed members of the TAC, were involved in

15 selecting the trustees in this case.  Is that correct?

16 A    They were.

17 Q    Okay.  Now, when the ACC was con -- and you're counsel for

18 the ACC.  Is that correct?

19 A    That's correct.

20 Q    Were you --

21 A    My firm is.

22 Q    Your firm is, and your firm was involved in the

23 deliberations over the selection of the TAC and the trustees.

24 Is that correct?

25 A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  In determining what TAC members to select for this

2  Trust, did the ACC look to consider anyone other than asbestos

3  personal injury attorneys who had clients who were creditors --

4  asbestos PI clients who were creditors of Grace?

5  A    The Committee selected its negotiating subcommittee as the

6  four people most knowledgeable of what the purpose of these

7  documents is and how they should be administered in the future.

8  Q    Okay, so the answer is no, you did not look beyond

9  asbestos PI attorneys who were representing clients --

10  A    Did not look beyond the Committee.

11  Q    You did not --

12  A    Lawyers on the Committee.  Lawyers for the members of the

13  Committee.

14  Q    And those lawyers were lawyers representing asbestos PI

15  claimants?

16  A    Representing the members of the Committee, yes.

17  Q    Okay.  Asbestos PI claimants with claims against Grace.

18  A    That's why they were on the Committee.

19  Q    Okay.  Thank you.  Now, I think you mentioned this on

20  direct, but if I'm wrong, please correct me, because I don't

21  want to misstate what you stated.  But I think you said you

22  expect -- I think that's the word you used -- but I don't want

23  to misquote you.  I think you said you expect that these

24  proposed members of the TAC, once the Trust is up and running,

25  will be submitting claims to the Trust on behalf of their

1  individual clients whom they are now representing on the ACC.

2  A    Well, they only represent one client on the ACC.  Yes,

3  they will be -- it is of my expectation that they -- that their

4  law firms will be submitting claims for clients to the Trust.

5  Q    And I take it from answers to written discovery that I've

6  seen that you would expect that they would -- each of these

7  four individuals who are nominated for the TAC or their law

8  firms would be submitting at least a thousand claims to the

9  Trust.  Is that correct?

10 A    I would think so.

11 Q    No?

12 A    I would think so.

13 Q    Oh, you think so.

14 A    Yes.

15 Q    Okay.  Thank you.  I'm sorry.  And again I believe from

16 answers to written discovery served by ACC, I believe you would

17 expect that these members of the TAC will be receiving

18 compensation from their clients in return for making these

19 claims to the Trust once the Trust is up and running.

20 A    I would assume so.

21 Q    Okay.  I believe in your -- in the answers to

22 interrogatories served by the ACC the answer given was that --

23 wait I want to quote it.  I want to make sure.  "It is likely

24 that that would occur."  Would you agree that it is likely?

25 A    Yes, sir.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  Thank you.  And do you believe it is likely they

2  will be -- they will be getting compensated through contingency

3  fee arrangements?

4  A    I think it's likely.

5  Q    Okay.  Now, I believe that the Trust agreement provides in

6  Section 5.2 -- and please correct me if I'm wrong.  Tell me if

7  I'm correct -- that the TAC members have a fiduciary duty to

8  all present PI claims to the Trust.  Is that correct?

9  A    Yes, sir.

10 Q    And --

11 A    I don't -- I could check the section number, but it's

12 something --

13 Q    You --

14 A    -- in there.

15 Q    Okay.  If you --

16         THE COURT:  I'm sorry.  The -- was that about the TAC

17 or the trustees that --

18         MR. GIANNOTTO:  It's about the TAC.

19         THE COURT:  Okay.

20         MR. GIANNOTTO:  That Section 5.2 of the Trust

21 agreement -- well, let me get --

22 A    Yes, sir, that's correct.

23 Q    Okay.  So as members of the TAC, if this Trust is approved

24 and goes into operation, they will have fiduciary duties to

25 persons in addition to the clients -- their own clients that

**J&J COURT TRANSCRIBERS, INC.**

1 they will be representing in submitting claims to this Trust.

2 Is that correct?

3 A    Yes, sir.

4 Q    Okay, and to the extent that insurance companies are

5 present PI claimants in the form of indirect PI claimants,

6 these members of the TAC will have fiduciary duties to those

7 insurance companies.  Is that correct?

8 A    To the extent that they have valid indirect claims, that's

9 correct.

10 Q    Well, to the extent that they make indirect PI claims, the

11 TAC has to treat them with the same fairness and the same

12 fiduciary duties they would treat anyone, present claim and who

13 makes a claim.

14 A    That's not the TAC's job.

15 Q    Pardon?

16 A    That's not the TAC's job.  That's the Trust's job.

17 Q    Okay, but they would have a fiduciary duty to the same

18 extent to insurance companies who have indirect PI trust claims

19 as they would have to personal injury disease individuals who

20 submit claims.

21 A    Only if they have valid --

22 Q    Well --

23 A    -- indirect --

24 Q    Well, to that --

25 A    -- insurance claims.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    -- to that extent they would -- you're saying they would

2 only have fiduciary duties to asbestos PI claimants who submit

3 valid claims.

4 A    Correct.

5 Q    Okay.  I think you mentioned a few minutes ago that the

6 proposed members of the TAC do things other than asbestos PI

7 work.  Is that correct?

8 A    I believe they do.

9 Q    Do you know if any of the -- and you've been involved in a

10 number of these bankruptcies over the past several years.

11 Correct?

12 A    Yes, but I've been told that's irrelevant.

13 Q    All right.  It's -- it won't be for this question.

14                    (Laughter)

15 A    The proposed members of the TAC, you've known them for

16 quite a few years.  Is that correct?

17 A    I've known them for various periods of time.

18 Q    Okay, and are you generally familiar with their law

19 practices?

20 A    Not -- I wouldn't say so.

21 Q    Okay.

22 A    I know what their asbestos plaintiffs practice is in

23 general.  I know a bit about what the rest they do, but I don't

24 -- I'm not familiar enough with each of their practices to be

25 able to recite about them.

1  Q    Well, let me ask you this, and if you're not aware of it,

2  please, just tell me you're not.  Are you aware whether any of

3  these proposed members of the TAC or their law firms represent

4  insurance companies who have issued liability insurance to

5  manufacturers, distributors, whatever, of asbestos products?

6  A    I don't know.

7  Q    Okay.  That's fair enough.  Okay.  Now, the Future

8  Claimants' Representative, under the Trust he is a fiduciary to

9  future Trust claimants.  Is that correct?

10 A    Correct.

11 Q    Okay.  Now, how was the Futures Representative chosen?  I

12 don't mean how was he selected in this bankruptcy as a whole.

13 I know the Court had to approve that.  But how was -- how was

14 he selected to represent the future claimants once the -- in

15 connection with the Trust?

16 A    He is the existing Futures Claimants' Representative in

17 this bankruptcy.

18 Q    And so for that reason he was selected to represent --

19 A    Yes.

20 Q    Is that the way it's worked in all the other bankruptcies?

21 I'll strike that.  That is irrelevant.

22 A    I don't remember.

23 Q    Okay.  Is the Futures Representative an asbestos personal

24 injury attorney?

25 A    He is not.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Okay.  To your knowledge, do you expect that he will be

2 representing claimants who submit claims to the Trust?

3 A    No.

4 Q    To your knowledge, will he have any contingency fee

5 arrangements with any claimants who submit claims to the Trust

6 whether present or future?

7 A    No.

8 Q    Okay.  Now, I am going to now turn to some of your other

9 bankruptcies, but I'm going to explain why it's relevant when

10 -- once they object.  I think you testified on Tuesday before

11 you were cut off that you have served as counsel for the

12 asbestos Creditors' Committee in a number of bankruptcies over

13 the last 15 years.  Is that correct?

14 A    Actually, in the last 26 years, yes.

15 Q    Okay.  Now, I'm focusing on the asbestos bankruptcies with

16 which you've been involved.  It's true, isn't it, that the

17 proposed members of the TAC here, as well as the trustees that

18 have been initially nominated by the ACC, have been trustees

19 and TAC members in several other asbestos bankruptcy trusts.

20 Is that correct?

21        MR. LOCKWOOD:  Objection, Your Honor.  That's so

22 broad and so compound that I don't how he could give a yes or

23 no answer to that.

24        THE COURT:  That's pretty tough.  You'll need to

25 break it down a little more if you want a yes or no.

**J&J COURT TRANSCRIBERS, INC.**

Inselbuch - Cross/Giannotto                    56

1 Q    Okay.  Let's focus on specific bankruptcies then.  As I

2 understand it, you were the counsel for the Asbestos Creditors'

3 Committee in connection with the Armstrong World Industries

4 bankruptcy.  Is that correct?

5 A    My firm was.

6 Q    Okay, and were you involved in it at all?

7 A    Yes, sir.

8 Q    Okay.  Now, isn't it -- now, the three trustees of this

9 Trust I think you mentioned were Mr. Huge, Mr. Trafelet, and

10 Mr. Sifford.  Is that correct?

11 A    Correct.

12 Q    Okay.  Isn't it true that Mr. Sifford was the Trustee or

13 is the Trustee of the Armstrong World Industries Trust?

14 A    I think he was.  I'm not sure he is any longer.

15 Q    Okay, but he was at some point?

16 A    I believe that's correct.

17 Q    How about Mr. Huge?  Isn't that also true?

18 A    Yes.

19 Q    And Mr. Trafelet, he was the Futures Representative for

20 the Armstrong World Industries Trust.  Is that correct?

21 A    He still is.

22 Q    Okay, and the TAC for the Armstrong World Industries TAC,

23 it had a lot of -- it had a number of members, but four of

24 those members are the same four individuals that have been

25 proposed for the TAC here.  Is that correct?

**J&J COURT TRANSCRIBERS, INC.**

Inselbuch - Cross/Giannotto                57

1  A    I can't recite on that.

2  Q    Okay.  You know what?  I --

3  A    I don't dispute it, but I can't recite on it.

4  Q    No, I'm going to -- I'm going to try to refresh your

5  recollection.  I forgot to pass out my notebooks.  I'll pass

6  them out now.

7                        (Pause)

8           MR. GIANNOTTO:  Sorry.  Your Honor, may I approach?

9           THE COURT:  Yes.

10          MR. GIANNOTTO:  Your Honor, would you like a copy?

11  These are exhibits that are designated in exhibits by CNA.

12                        (Pause)

13  Q    Okay.  Mr. Inselbuch, could you turn to Tab 13 in that

14  binder?

15  A    Yes, sir.

16  Q    Okay, and it's a document with a heading from <u>Armstrong</u>

17  <u>World Industries</u>, and it's entitled "Order Confirming the

18  Fourth Amended Plan of Reorganization."  Do you see that?

19  A    That's what it says.

20  Q    Okay.  If you will turn to Page 3 of that document?

21  A    Yes, sir.

22  Q    And starting at the bottom of the page, Paragraph 4,

23  there's a list of people whom the document indicates have been

24  appointed to be the initial members of the TAC in that Trust.

25  Would you look at that and tell me --

                **J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, sir.

2  Q    -- does that refresh your recollection as to whether Mr.

3  Cooney, Mr. Budd, Mr. Rice, and Mr. Weitz were initial members

4  of the TAC in the <u>Armstrong World Industries</u>?

5  A    No.

6          MR. GIANNOTTO:  Your Honor, I would move CNA Exhibit

7  13 into evidence and there -- and this list of objections to

8  our exhibits.  The plan proponents listed as the only objection

9  to this relevance, and I believe it is relevant, and I'm going

10 to go through a few other trusts, not a whole lot, three or

11 four, to show that these same players are trustees and TACs in

12 similar trusts.  And we believe it is relevant to show that

13 there's a close relationship between these individuals which

14 will lead them to have influence over how the trustees exercise

15 their discretion, and that that is relevant to our concern that

16 these TAC members whom we've argued in legal papers have

17 conflicts of interest, will lead to a trust that will not treat

18 everybody equally and fairly.  So that's why we believe it's

19 relevant.

20         MR. LOCKWOOD:  Your Honor, we have no objection to

21 the admission of this evidence for the limited purpose of

22 establishing that the individuals denominated in that paragraph

23 were, in fact, nominated as the original TAC members given that

24 Mr. Inselbuch does not recall that fact.

25         THE COURT:  Okay.  I am willing to accept it for that

Inselbuch - Cross/Giannotto                    59

1  purpose, but I need some designation better than Tab 13,

2  because lots of binders have Tab 13.  No, it's CNA Exhibit 13,

3  Your Honor.

4          THE COURT:  Oh, it's not -- oh, it's marked -- it's

5  not marked CNA.  Oh, I see up at the top as opposed to the

6  bottom.  All right.  It's admitted for the limited purpose of

7  establishing the initial TAC members in the <u>Armstrong World</u>

8  <u>Industries'</u> case.  This is CNA Exhibit 13.

9          MR. GIANNOTTO:  Your Honor, I'd also like to admit it

10 for the purpose of it also specifies the trustees of the Trust

11 as well, and I'd like to admit it for that purpose as well.

12         THE COURT:  Well, I don't know that the witness has

13 yet said that he can't identify who the initial trustees were.

14 You only asked him about the TAC.

15         MR. GIANNOTTO:  I think he actually said that Mr. --

16 I think he actually testified -- please correct me if I'm wrong

17 -- that he was aware that both Mr. Huge and Mr. Sifford had

18 been at least the trustees of this trust.

19 Q    Is that correct, Mr. Inselbuch?

20 A    Mr. Huge still is.  Mr. Sifford was.

21         MR. GIANNOTTO:  And so I'd like to admit this for the

22 purpose of showing that they were initial members of the

23 trustees?

24         THE COURT:  But his -- why do I need the document?

25 It's not admissible as I understand it in and of its own when

**J&J COURT TRANSCRIBERS, INC.**

1 the witness has already stated who the members are?  The other

2 document's admissible, because he -- it didn't refresh his

3 recollection, but there is no dispute as to the statement of

4 fact.  I don't think there's a dispute as to this statement

5 either.

6         MR. GIANNOTTO:  I don't think there's a dispute as to

7 it, but this is documentary evidence and additional to his

8 testimonial evidence that this is the case.

9         MR. LOCKWOOD:  Is there some question about the

10 reliability of his testimonial evidence, Your Honor, that this

11 needs to bolster it?

12         MR. GIANNOTTO:  Not from me.  I trust Mr. Inselbuch.

13 I'd leave it alone.

14         THE COURT:  All right.  It is cumulative, but to the

15 extent that it is what it is, it's obviously an order of the

16 Court, and the Court can take judicial notice of the fact that

17 this order has been entered and has made a finding of the fact

18 by the District Court.  So I suppose it's no harm.

19         MR. GIANNOTTO:  Thank you, Your Honor.

20         THE WITNESS:  I should point out that neither Mr.

21 Knutti nor Mr. Tully is currently a trustee of this Trust, just

22 McClarity (phonetic) of the Armstrong Trust, although they were

23 initial trustees.

24         MR. GIANNOTTO:  Ready to go?

25         THE COURT:  Yes, thank you.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  I want to focus on the Owens Corning bankruptcy.

2  That's one where your firm was counsel for the ACC as well?

3  A    Yes, sir.

4  Q    Okay, and it's true, isn't it, that both Mr. Huge and Mr.

5  Trafelet, who are nominated as Trustees here, were initial

6  trustees of that bankruptcy trust?

7  A    Yes.

8  Q    Okay, and it's true also, is it not, that the four members

9  of the TAC nominated in this case, the Grace case, were members

10 of the TAC for the Owens Corning bankruptcy trust?

11 A    I don't recall.

12 Q    Okay.  Could you turn to Tab 23 in the book I gave you?

13 And this is CNA Exhibit 23.

14                        (Pause)

15 Q    Are you there, Mr. Inselbuch?

16 A    I'm there, Page 30, Section 7.

17 Q    Right.  Does that refresh your recollection as to whether

18 Mr. Budd, Mr. Cooney, Mr. Rice, and Mr. Weitz were initial

19 members of the TAC in the Owens Corning bankruptcy?

20 A    They were four of the nine.

21 Q    But does it refresh your recollection that they were four

22 of the nine?

23 A    No.

24        MR. GIANNOTTO:  Okay.  Your Honor, I'd move to admit

25 this exhibit, which is CNA Exhibit 23, for the same purposes

**J&J COURT TRANSCRIBERS, INC.**

1 described earlier.

2          THE COURT:  It's admitted for the same limited

3 purpose.

4 Q    Okay.  Your firm was also counsel for the ACC in the U.S.

5 Gypsum bankruptcy, is that correct?

6 A    Yes, sir.

7 Q    Okay.  Is it true that Mr. Sifford was one of the initial

8 trustees of the U.S. Gypsum Bankruptcy Trust?

9 A    I don't recall.

10 Q    Okay.  Could you turn to Exhibit 26 in your binder?  And

11 this is CNA Exhibit 26?

12 A    Yes, sir.

13 Q    And what this is, is an annual report from the settlement

14 trust for the U.S. Gypsum Trust.  Could you look at the first

15 line there and read it to yourself and tell me whether that

16 refreshes your recollection as to whether Mr. Sifford was a

17 trustee of the U.S. Gypsum Trust?

18 A    No.

19 Q    Okay.  Let me ask you this, were the -- do you know

20 whether the -- well, strike that.  The TAC in the U.S. Gypsum

21 case, did that include all four individuals who were nominated

22 for the TAC here?

23 A    I don't recall.

24 Q    Okay.  Sticking with CNA Exhibit 26, could you turn to

25 Page 4 of that exhibit and look under Heading C and read that

**J&J COURT TRANSCRIBERS, INC.**

Inselbuch - Cross/Giannotto                    63

1  to yourself, please?

2  A    Yes, I have.

3  Q    Okay.  Does that refresh your recollection as to whether

4  the members of the TAC that have been proposed in Grace are

5  individuals who are all among the members of the TAC that is

6  involved in the U.S. Gypsum bankruptcy?

7  A    It doesn't refresh my recollection.

8           MR. GIANNOTTO:  Your Honor, I would move to admit

9  Exhibit 23 for the same purposes as the prior two exhibits I

10 mentioned.

11          MR. LOCKWOOD:  Your Honor --

12          THE COURT:  I thought it was 26.

13          MR. GIANNOTTO:  I'm sorry.  It is 26.

14          THE COURT:  All right.  I'm sorry.  Mr. Lockwood?

15          MR. LOCKWOOD:  Your Honor, I have a limited objection

16 to this which is that this document refers to a reporting

17 period.  It does not, like the previous two documents, relate

18 to the initial membership of either the trustees or the TAC.

19 So, it cannot be for the same limited purpose as before.

20          I would not object to its admission for the

21 proposition of showing that these -- the folks identified were

22 trustees and TAC members as of the reporting period that this

23 document reflects, but I'm not sure that that was the purpose

24 for which it was proffered.

25          MR. GIANNOTTO:  No, that's acceptable, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

Inselbuch - Cross/Giannotto                    64

1          THE COURT:  All right.  It's admitted for that same

2   limited purpose of showing who the trustees and the TAC members

3   were as of the reporting period.  This states for the fiscal

4   year ending December 31, 2008.

5          MR. GIAQNNOTTO:  And, Your Honor, and I promise this

6   will be the last one.

7   Q    Was your firm counsel for the ACC in the AB Lummus

8   bankruptcy?  I don't know if I'm pronouncing that correctly

9   A    No.

10         MR. GIANNOTTO:  Okay.  Your Honor, I don't know

11   whether you want me to use now to try to admit documents

12   dealing with Lummus because Mr. Inselbuch does not have

13   knowledge of them, or you want us to try to put them in at the

14   end of the whole insurance case in chief?

15         THE COURT:  What -- is the purpose going to be the

16   same thing --

17         MR. GIANNOTTO:  The same purpose.  If you look at

18   Tabs 10 and 11 -- I'm sorry, Tab 10.  I'm sorry.  Tab 10

19   indicates that Mr. Trafelet was an initial trustee of the

20   Lummus trust and that the TAC member was Mr. Weitz and I'd like

21   to admit this document just for the purpose of showing that.

22         THE COURT:  Is there any objection?

23                (No audible response)

24         THE COURT:  All right.  Give it -- tell me again who

25   the members were, please?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. GIANNOTTO:  That Mr. Trafelet was an initial

2    trustee of the Lummus PI trust and that Mr. Weitz was an

3    initial member of the TAC for that trust.

4          MR. LOCKWOOD:  I'm sorry, Your Honor.  What --

5          THE COURT:  Exhibit 10.

6          MR. LOCKWOOD:  Exhibit 10?

7          MR. GIANNOTTO:  Ten, yes.

8          THE COURT:  He's asking whether or not you will agree

9    to admit Exhibit 10 for the limited purpose of showing that Mr.

10   Trafelet was an initial trustee and Mr. Weitz was an initial

11   member of the TAC of AB Lummus Global, even though this witness

12   cannot substantiate this document because the firm did not

13   represent the ACC.

14         MR. LOCKWOOD:  Could I consult with Mr. Bernick --

15         THE COURT:  Yes.

16         MR. LOCKWOOD:  -- for a moment?

17              (Attorney discussion)

18         MR. LOCKWOOD:  No objection, for the same limited

19   purpose as the previous exhibits, Your Honor.

20         THE COURT:  All right.  It will be admitted for that

21   purpose.

22   BY MR. GIANNOTTO:

23   Q   Mr. Inselbuch, you testified on direct that there are

24   various consent or concurrence, I believe was the work you used

25   powers --

1  A    If I did, I should have said consent because that's the

2  language in the document.

3  Q    I think you said concurrence, but I think we all knew what

4  you meant.  That there are certain instances where the TAC has

5  consent for things that are going to be done under the trust or

6  the TDP, is that correct?

7  A    Yes, sir.

8      Q    Okay.  And we'll go through them in a second, but I

9  believe you also said in response to Mr. Lockwood's questions

10 that the TAC serves three functions.  I want to make sure I

11 have these right.  I think you said that the first function is

12 to facilitate the administration of the trust because the TAC

13 members have knowledge and understanding of how to deal with

14 these claims and they have experience, and so they can assist

15 the trustee in dealing with matters that come before the Trust,

16 is that correct?

17         MR. LOCKWOOD:  Objection, Your Honor, if he's

18 purporting to quote Mr. Inselbuch's answer, if he's simply

19 trying to ask a general question about whether he gave

20 testimony, you know, substantially to that effect or something

21 like that.

22 Q    Did you give testimony substantially to that effect?

23 A    With certain differences.

24 Q    What were the differences?

25 A    I think I included in my description that the TAC members

Inselbuch - Cross/Giannotto                    67

1 would be knowledgeable about how the claims were processed and

2 developed inside the 1,000 law firms around the country who

3 would be presenting them to the trust.

4 Q    Okay.  And, you know, the TAC -- TAC stands for Trust

5 Advisory Committee, correct?

6 A    I think so.

7 Q    Okay.  Now, in order to serve that function to provide

8 this kind of help and advice that you just testified to, is

9 there any reason that the TAC has to have, in effect, consent

10 authority under this trust, why can't they just advise the

11 trustee and give the trustee the benefit of their knowledge?

12 A    They don't have consent rights, generally speaking, with

13 respect to the administration of the trust.  They only have

14 consent rights where the consent rights are specified.

15 Q    Right.  But, they have to consent to changes in the TDP,

16 is that correct?

17 A    That's different.

18 Q    But, they do have to consent to that, correct?

19 A    Yes, sir.

20 Q    Okay.

21 A    Unless their consent is overridden -- their failure to

22 consent is overridden.

23 Q    Yes, we'll get to that.  In its initial matter the trustee

24 has to seek their consent to change the TDP?

25 A    And that of the future representative.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Right.  And to change the medical or exposure criteria, is

2  that correct?

3  A    Yes, sir.

4  Q    And even to higher a claims handling facility to process

5  the claims, they need the TAC's consent for that, don't they?

6  A    If it's something outside of the trust, itself.

7  Q    Right.  They have to -- they have to get that permission

8  and they have to get the TAC's -- the trustee has to get the

9  TAC's consent with the FCR's consent if the trustees want to

10 require the claimant to provide additional kinds of medical or

11 exposure data when they submit their claims, is that correct?

12 A    Yes.

13 Q    Okay.  Now, turning back to the question that I asked you

14 before, and I'll elaborate on it a little bit, I think you said

15 there were three functions of the trustee.  You mentioned one

16 just now -- of the TAC, I'm sorry -- you mentioned one just

17 now.  A second one I think you said was to provide a

18 spokesperson for present asbestos claimants, is that correct?

19 A    No.  I said a spokesperson for the purpose of

20 participating in any proposed changes in the methodology of the

21 TDP or the trust agreement.

22 Q    Okay.  And I guess what I'm getting at is, to be a

23 spokesperson they would have -- they could give their views to

24 the trustee, but there's no need to give them the power to have

25 to consent to what the trustee does if their roll is just as a

1  spokesperson to make the views of their constituencies known?

2  A    I disagree.

3  Q    Why do you disagree?

4  A    Well, if you're going to change what is the fundamental

5  deal, and you look at the trust agreement and the TDP as the

6  deal or as the plan, because unlike other situations where plan

7  documents are not generally amended over time because the plan

8  has a very short life -- well, assets are distributed, this

9  document is going to live for decades.  And it was recognized

10 that even people as clever as the lawyers in my firm would not

11 be able to anticipate all the different things that might occur

12 in the administration of the document, in the tort system

13 itself, in medicine, and we were humble enough to suggest that

14 there has to be a way to amend this document.

15       But, if the document is going to be amended to

16 account for those kinds of issues, then the people who

17 represent the constituencies involved need to be at the table

18 and need to agree about it.  And that's the purpose of the

19 consent provisions where you're going to affect changes in the

20 structure of the document in the ways -- in the particular

21 cases that are specified in either the trust agreement or the

22 TDP.

23 Q    But, the ability to have to consent to these things, that

24 gives these TAC members, does it not, the ability to veto, as

25 it were -- and we'll get back to the Court review -- but as an

**J&J COURT TRANSCRIBERS, INC.**

1  initial matter before you get to Court review, veto changes

2  that might be detrimental to their individual clients even

3  though they might be in the interest of the present PI trust

4  claimants as a whole?

5  A    No.

6  Q    Why not?

7  A    First of all, they don't have a veto, as you well know,

8  because their denial of consent can always be overridden,

9  either by the ADR process or by the Court.

10        Second of all, there is no reason to assume why any

11  individual client's interest would be different from the

12  constituencies, at large, if they have valid PI trust claims.

13  Q    Well --

14        MR. PRATT:  Objection, Your Honor.  I'm going to move

15  to strike the latter part of that.

16        MR. LOCKWOOD:  Your Honor, I don't believe that

17  somebody other than the questioner can move to strike part of

18  an answer.

19        THE COURT:  I think that's probably correct, but what

20  is your objection?

21        MR. PRATT:  Your Honor, Mr. Inselbuch is testifying

22  as a fact witness.  He's an attorney, but he has not filed an

23  expert report.  Now, a fact witness can express opinions and

24  those are admissible under some circumstances.  When you look

25  at Rule 701 that spells out what those circumstances are, but

1 to be admissible the opinion is, it's limited to those that are

2 rationally based on the perceptions of the witness.  There's

3 been no foundation for Mr. Inselbuch to talk about that because

4 he's already testified on direct that he doesn't know about the

5 law practices of the TAC members.  He disclaimed knowledge of

6 that.  He doesn't know, for example, whether they represent

7 insurances companies.

8        What he's trying to do now is express a conclusion or

9 an opinion about that, and I don't think there's a foundation

10 for him to do it.  It was not responsive to the question that

11 was asked and that's why I move to strike it.

12        THE COURT:  Well, I think it is responsive because

13 the question was, I think, something to the effect of why not

14 when he said no, there was no veto and any action can be

15 overridden, and then he went on to explain why in his view

16 there would be no conflict.  So, I think it is responsive, but

17 whether it constitutes lay opinion and testimony as opposed to

18 expert testimony, without a report, is a different issue.  Mr.

19 Giannotto, response to Mr. Pratt?

20        MR. GIANNOTTO:  I will move to strike the answer for

21 the sake --

22        MR. LOCKWOOD:  Your Honor, first this is a way of

23 getting around the opening the door kind of problem.  If one

24 attorney asks a question that says why not and some other

25 attorney gets to jump up and say, gee, you know, I really wish

1  he hadn't opened that door.

2          THE COURT:  Well, they have different clients.

3          MR. LOCKWOOD:  Well, I understand that, but, again,

4  the normal rule is that you can't object to -- he could have

5  objected to the why not question, but you don't get to object

6  to the answer to a question that wasn't objected to.

7          THE COURT:  That is correct as a principle of law,

8  and I will stick to it from here on in, but for now the

9  testimony is stricken at the request of Mr. Giannotto.  You can

10 --

11         MR. LOCKWOOD:  Could I --

12         THE COURT:  -- start the question again.

13         MR. LOCKWOOD:  Could I, Your Honor, make a second

14 point?  It's not -- are you striking as unresponsive or are you

15 striking on the ground that it's not proper lay testimony?

16         THE COURT:  It's not proper lay testimony, the latter

17 part is not based rationally on his perception.  It's a legal

18 conclusion as to whether or not someone would or wouldn't have

19 a conflict of interest in representing two different entities.

20 I think that's a matter of conclusion of law, not a matter of

21 fact.

22         MR. LOCKWOOD:  Your Honor, they're proposing to put

23 up an expert witness as a -- who is a business school professor

24 who's going to --

25         THE COURT:  We'll get to that when they do it, Mr.

**J&J COURT TRANSCRIBERS, INC.**

1  Lockwood.  Please, let's keep the trial going the way it's

2  supposed to go.  The testimony is stricken as outside the

3  perception of a lay witness.  If you need to call Mr. Inselbuch

4  later because of something that happens, you're obviously free

5  to do that.

6          MR. LOCKWOOD:  Your Honor, the rule says that you can

7  -- the lay witness who is a professional --

8          THE COURT:  Yes.

9          MR. LOCKWOOD:  -- can testify about matters that are

10  expert matters without a report, if the matters are within his

11  scope of expertise and his responsibilities.

12          THE COURT:  And if they are based rationally on his

13  perception.

14          MR. LOCKWOOD:  Right.  And Mr. Inselbuch has been

15  presenting TACs and trusts for years.

16          THE COURT:  There is no evidence --

17          MR. LOCKWOOD:  If there's anybody who has any --

18          THE COURT:  There is no evidence on this record that

19  Mr. Inselbuch has represented a TAC or a trust, only about

20  asbestos creditors committee.  The objection is sustained.

21  Let's move on.

22  BY MR. GIANNOTTO:

23  Q    Okay.  In addition to consent powers, I think you

24  mentioned that the TAC has certain consultation rights with the

25  trustee, is that correct?

1  A     Yes.

2  Q     Okay.  And -- strike that.  You talked a little bit, I

3  think, on direct, and you mentioned it earlier in a response to

4  a question that even given these consent powers the Court can

5  always override the refusal to give consent if the consent is

6  withheld unreasonably, or something to that effect, is that

7  correct?

8  A     Yes.

9  Q     Okay.  Let me ask you a foundation question.  Have you

10 been involved at all -- the trusts that we've mentioned and

11 other where you've been counsel for the ACC -- have you been

12 involved in the decision-making that goes on after the trust is

13 established as to changing trust procedures and whatnot where

14 the consent of the TAC is required?

15 A     Yes.  In all of those cases that you mentioned I was

16 counsel to -- and am counsel to the TAC.

17 Q     Okay.  And could you tell us how often have the trustees

18 gone to the courts in those cases to override refusals to

19 consent by the TAC?

20 A     I know of no occasion where that was necessary.

21 Q     So, you know of no occasion where it was done, is that

22 correct?

23 A     I have no -- I know of no occasion where the consent was

24 refused.

25 Q     Okay.  I want to turn to something different now, if I

**J&J COURT TRANSCRIBERS, INC.**

1  might, and this is in response to -- Mr. Lockwood had mentioned

2  in Court on Thursday or Friday that this was going to be the

3  only time Mr. Inselbuch would -- the second time he'd come back

4  and so if -- something to the effect that if we had any other

5  questions about 524(g) we should ask them now, is that correct?

6          MR. LOCKWOOD:  Your Honor, we've stipulated that a

7  number of these insurers and including, I believe, CNA has

8  designated Mr. Inselbuch as an adverse witness in their own

9  cases in chief and we've also agreed that he could be examined

10 as such now.

11         THE COURT:  All right.

12         MR. GIANNOTTO:  Could I just have a second, Your

13 Honor, to consult with --

14              (Off the record conversation)

15         MR. GIANNOTTO:  Okay.  Thank you, Your Honor.

16 Q    My understanding, Mr. Inselbuch, is that you were involved

17 in the enactment of Section 524(g) of the bankruptcy code, is

18 that correct?

19 A    I was involved in the drafting and proposal of various

20 forms of 524(g) in the late 1980s and early 1990s.

21 Q    Okay.  And my understanding, and correct me if I'm wrong,

22 is that 524(g) was modeled on the channeling injunction and the

23 provisions of the Manville bankruptcy plan?

24 A    People say that.  If you read 524(h) what you will see is

25 that if the Manville plan, which was then being restructured in

1 the district court in a class action satisfied the provision of

2 524(g), then it would be covered by 524(g).  But, the general

3 concept of the channeling injunction, yes, it was modeled on

4 that as it came out of the Manville bankruptcy.

5 Q    And you were counsel for -- I believe you said in your

6 deposition, I don't want to get this wrong, but what the

7 equivalent of the ACC was in that bankruptcy, but it was called

8 something else?

9 A    That was called the Asbestos Health Committee.

10 Q    Okay.  And you were counsel to the Asbestos Health

11 Committee?

12 A    From 1985 until the bankruptcy was confirmed --

13 consummated.

14 Q    Okay.  And the trust that was set up in connection with

15 the Manville bankruptcy, it's true, isn't it, that that

16 received equity stock in the reorganized debtor?

17 A    It did.

18 Q    Okay.  And it also had a right to share and reorganize

19 Manville's profits in the future?

20 A    It did.

21 Q    Mr. Inselbuch, in connection with other bankruptcies that

22 you have been involved in, have you been involved in

23 negotiating settlements with insurance companies as part of

24 those bankruptcies?

25 A    Not directly, I don't believe.

Inselbuch - Cross/Giannotto                    77

1  Q    By that you mean, what, that you didn't have any

2  face-to-face talks with insurers?

3  A    I think that's correct.  I don't remember any such

4  discussions off-hand, but --

5  Q    Okay.  When you say not directly, how did you indirectly

6  -- how were you indirectly involved?

7  A    Well --

8         MR. GUY:  Objection, Your Honor.  I'm not sure how

9  discussions with insurers and other bankruptcies is relevant to

10 this case.

11        THE COURT:  Mr. Giannotto, what's the relevance?

12        MR. GIANNOTTO:  The relevance is, we've lodged an

13 objection to the plan on the ground that the failure to extend

14 524(g) injunction farther than the plan does will lead to

15 lesser recoveries by the trust.  And we want to establish that,

16 if he has the basis for saying it, that the insurance companies

17 will be more willing to put -- to settle and to put larger

18 amounts of money in the trust if they can get 524(g)

19 protection.

20        THE COURT:  How would this witness know what's in the

21 mind of an insurance company and whether it would or wouldn't

22 settle under any circumstances?

23        MR. GIANNOTTO:  If he's involved in negotiations with

24 them, he'd know what they said to him.

25        THE COURT:  What happened in a prior case I've

1 already determined is not relevant.  If you want to open these

2 doors, I'm going to open them for all purposes for everyone.  I

3 don't understand the relevance of what happened in any other

4 specific case unless it's some historical background which we

5 have plenty of.

6         MR. GIANNOTTO:  All right.  I'll back down on that

7 then, Your Honor.  Can I just consult with counsel?

8                  (Attorney discussion)

9         MR. GIANNOTTO:  Your Honor, that's all I have.  Thank

10 you, very much, Mr. Inselbuch.

11         THE WITNESS:  Thank you, sir.

12         THE COURT:  Why don't we take a ten minute recess and

13 then we'll reconvene with the next examiner.

14                     (Recess)

15         THE COURT:  Who's next?  Good morning.

16         MR. CASSADA:  Good morning, Your Honor.  I'm Garland

17 Cassada.  As earlier stated, I represent Garlock Sealing

18 Technologies.  Garlock is a co-defendant in the tort system and

19 therefore has an interest in the indirect claim provisions of

20 the TDP.

21         THE COURT:  All right.

22                  CROSS EXAMINATION

23 BY MR. CASSADA:

24 Q    Mr. Inselbuch, you have a copy of the TDP before you,

25 don't you?

1  A     The what?

2  Q     You have a copy of the Trust Distribution Proceeding

3  before you?

4  A     I do.

5  Q     A few preliminary questions.  It's true, isn't it, that

6  asbestos PI claims include claims of co-defendants who might

7  have contribution claims based on joint several liability, is

8  that correct?

9  A     I believe that's the plan definition of PI trust claims,

10 yes.

11 Q     Yes.  Okay.  And those claims are enjoined by the

12 channeling injunction and sent to the trust for an exclusive

13 remedy, is that correct?

14 A     Yes, sir.

15 Q     Okay.  Good.  It would be true that those -- the persons

16 who hold those claims are beneficiaries of the trust?

17 A     To the extent they hold those claims, yes, correct.

18 Q     Right.  And as beneficiaries, they're entitled to the same

19 fair and equitable treatment that bodily injury claimants are

20 entitled to under the trust agreement, isn't that correct?

21 A     In that capacity, for sure.

22 Q     Yes.  And would it also be true that the co-defendants who

23 might hold contribution claims also should have equal standing

24 in the eyes of the trustees as claimants who hold bodily injury

25 claims?

1  A    To the extent that they would become indirect trust claims

2  under the documents, yes.  Just because co-defendants have

3  contribution claims in the air doesn't mean that they have an

4  indirect trust claims.

5  Q    Okay.  But, if there are allegations they have

6  contribution claims, they're barred from making those

7  allegations in the tort system, is that correct?

8  A    I don't mean to be picky with you, but if you --

9  they're -- you're saying about contribution claims against

10  Grace, is that what you're saying?

11  Q    That's correct.  Yes.

12  A    Yes.  Then the answer is yes.

13  Q    Okay.  You testified some last Tuesday about the effect

14  that bankruptcies have on the liabilities of co-defendants who

15  remain in the tort system after some companies leave the tort

16  system for bankruptcy, do you recall that?

17  A    No.

18  Q    You don't recall any testimony to that effect?

19  A    I don't.

20  Q    You were explaining the basis of the Libby settlement and

21  the extraordinary claims?

22  A    I can't say I remember.

23  Q    Okay.  Is it true that the trust distribution procedures

24  are designed to permit bodily injury claimants to delay

25  asserting their claims against the trust until they've been

1 able to solve their claims against co-defendants in the tort

2 system?

3 A    No.

4 Q    And that's not a goal of the TDP?

5 A    No.

6 Q    Absent the channeling injunction, is it true that a

7 claimant like Garlock would be free to join Grace in a -- in an

8 asbestos claim where Garlock has been sued to have Grace's

9 potential liability determined side-by-side with Garlock's?

10          MR. LOCKWOOD:  Objection to form, Your Honor.

11          THE COURT:  There's no microphone.

12          MR. LOCKWOOD:  Objection to form.  He's -- Grace is

13 getting a discharge in bankruptcy.  This appears to be some

14 hypothetical question and it's asking both a hypothetical and a

15 legal opinion and it's -- he's not even telling you what kind

16 of claims, what the effect of --

17          THE COURT:  That's sustained.

18          MR. LOCKWOOD:  -- whether --

19 Q    Well, asbestos PI claims include contingent claims for

20 contribution, do they not?

21          THE COURT:  Was that contention?

22          MR. CASSADA:  Contingent.

23          THE COURT:  Contingent, oh, thank you.

24          MR. CASSADA:  Yes.

25 A    I don't know that they include any contingent claims.

**J&J COURT TRANSCRIBERS, INC.**

1 They include claims for contribution that would lie against

2 Grace, had Grace not gone into Chapter 11.

3 Q    Well, the definition is very broad of asbestos PI claims,

4 it includes contingent claims, does it not?

5         MR. LOCKWOOD:  What definition?  Objection, Your

6 Honor.

7 Q    Of asbestos PI claims?

8 A    I don't know.  You'd have to show me the definition.

9         MR. CASSADA:  Okay.  Your Honor, may I approach the

10 witness?

11         THE COURT:  Yes.

12 Q    Yes.  Mr. Inselbuch --

13         MR. LOCKWOOD:  For the record, could --

14 Q    -- I've handed you a --

15         MR. LOCKWOOD:  Oh, I'm sorry.  Go ahead.

16 Q    I've handed you a copy of the TDP.  I don't believe it's

17 the current copy because I believe under the current copy the

18 definition of indirect asbestos PI claims have been removed,

19 but the prior TDP included that definition in the footnotes

20 which carried over the definition from the reorganization plan,

21 as I understand it?

22         MR. LOCKWOOD:  Objection to the representation, Your

23 Honor.  The footnote was removed from the TDP because of

24 objections that it did not accurately reflect the plan

25 definition and therefore it now picks up the plan definition by

**J&J COURT TRANSCRIBERS, INC.**

1  using the defined term in lieu of the footnote.

2          THE COURT:  Okay.  I think we need to use the current

3  one, so that everybody's on the same page.  Does someone have a

4  copy of the current one, if that's a relevant inquiry?

5          MR. LOCKWOOD:  It would be in the plan.  That's --

6  there's an -- the plan has been admitted as an exhibit.  I

7  think it's PP-277, maybe .01, I'm not sure.

8          MR. CASSADA:  Yes.  Your Honor, I apologize.  When I

9  saw the motion by the debtors to amend the plan I read that to

10 mean that they were removing that definition because it was

11 included in the plan and it was redundant.

12                        (Pause)

13         MR. CASSADA:  Your Honor, rather than working through

14 the long definition with Mr. Inselbuch, let me see if I can

15 establish whether he has this knowledge.

16 Q    Are you knowledgeable that under state law, under civil

17 procedure, that a defendant who's sued in a tort claim can join

18 in the law suit other defendants who might be liable for the

19 same claim?

20 A    I know that that's the case in many jurisdictions.  I

21 don't know it's the case in all.

22 Q    Okay.  To the extent that a co-defendant such as Garlock

23 believes that it has that right in a case, in a state that

24 permits joinder, that claim would be enjoined by the channeling

25 injunction, would it not?

**J&J COURT TRANSCRIBERS, INC.**

1  A    That's correct.

2  Q    Okay.

3  A    All claims against the trust in the tort system are

4  enjoined.  The trust doesn't go into the tort system whether at

5  the behest of the claimant or the co-defendant.

6  Q    Okay.  So, to the extent that Garlock has a right in any

7  particular action to join Grace and have Grace's liability

8  adjudicated side-by-side with Garlock's, then under the plan

9  Garlock loses that right, correct?

10  A    And in place of it, just as the claimants do, it gets the

11  right to pursue the indirect claim through the TDP process.

12  Q    Okay.  But, there's nothing in the TDP process that

13  permits Garlock to file a claim before Garlock has actually

14  paid all or a portion of Grace's share, correct?

15  A    That's correct.

16  Q    Okay.  Let me ask you to look at Section 5.1 of the trust

17  distribution procedure, in particular 5.1(a)(2)?

18  A    Yes.

19  Q    Are you there?

20  A    Yes, sir.

21  Q    This provision addresses the effect of the statutes of

22  limitation that are imposed on asbestos PI claims, correct?

23  A    Yes, sir.

24  Q    Yes.  And if we -- I'm going to ask you to skip to the

25  last couple of sentences of this section, but essentially this

1  provision adopts a three-year statute of limitations for

2  asbestos PI claims?

3  A    Roughly speaking, yes.

4  Q    All right.  And that's triggered either by the later of

5  diagnosis or the initial claims payment date?

6  A    Yes, so long as the claim was still viable at the time of

7  the petition.

8  Q    Right.  Okay.  So, for any claim that -- where a disease

9  was diagnosed after the petition date, there's a three-year

10  statute of limitations period?

11  A    Yes, sir.

12  Q    But, this section's qualified by the rights that a

13  claimant may have to defer his claim under Section 6.3,

14  correct?

15  A    Not qualified, at all.

16  Q    Well, it doesn't affect -- it's subject to the right to

17  defer under 6.3?

18  A    The claimant has the right to defer his or her claim.

19  Q    Okay.  And let's look at Section 6.3, that's on Page 52?

20  A    Yes, sir.

21  Q    Okay.  And under that provision it begins by saying that a

22  claimant can withdraw a PI trust claim at any time without

23  written notice -- or, excuse me -- upon written notice to the

24  PI trust and file another claim subsequently, do you see that?

25  A    Yes, sir.

1  Q    Okay.  So, under this provision if a plaintiff sued

2  Garlock in the tort system it could wait three years before it

3  asserted a claim against the trust, correct?

4  A    Yes.

5  Q    And it could file a claim against the trust one day before

6  the three-year limitations period without evidence of Grace

7  exposure and then withdraw that claim and have an indefinite

8  period of time to file a claim in the future, is that correct?

9  A    Not an indefinite time.

10 Q    Well, is there anything in this provision that places a

11 time limit for the claimant to file a claim?

12 A    Are you talking about withdrawal or are you talking about

13 deferral?

14 Q    I'm talking about withdrawal?

15 A    No, there's no limit.

16 Q    Okay.  So, he could -- so, the claimant could file it ten

17 or 20 years down the road?

18 A    In theory.

19 Q    Okay.

20 A    That's regarded as a good thing for the trust.

21 Q    And, in fact, that provision permits claimants in the tort

22 system to delay processing their claims against the trust until

23 they resolve their claim in the tort system, correct?

24 A    It would permit that, if that's what they wanted to do.

25 In the same way, they don't have to resolve their claims

**J&J COURT TRANSCRIBERS, INC.**

1  against Grace in the tort system until they resolve their

2  claims against Garlock in the tort system.

3  Q    But, they are, in fact, good reasons for a plaintiff to

4  want to delay their trust claims until they resolve their

5  claims in the tort system, are there not?

6           MR. LOCKWOOD:  Objection, lack of foundation.

7           THE COURT:  Sustained.

8  Q    Well, these trust provisions, in fact, are designed to

9  permit a claimant to avoid having to give credit to defendants

10 in the tort system for payments they're going to get from the

11 trust?

12 A    Not so.  They were not designed with that in mind, at all.

13 Q    Well, that Section 6.3 certainly facilitates that, doesn't

14 it?

15 A    I don't know.

16 Q    Okay.

17 A    Well, I had understood that credits in the tort system or

18 -- only arose if a plaintiff decided to settle, to resolve the

19 liability with one of several joint tortfeasors, not just

20 because the plaintiff chooses to sue or not sue one or another

21 and not just because a co-defendant likes to bring in other

22 parties.

23 Q    Well, then you're familiar, I take it, that in some states

24 co-defendants are entitled to automatic credit for any

25 settlement with other defendants, are you familiar with that?

1  A    Sure.  But, the plaintiff has to decide to settle with the

2  other defendants.  They don't have to do that.

3  Q    They don't have to settle with Grace either?

4  A    That's right.

5  Q    Okay.  Let me ask you to look at Section 5.7 of the TDP,

6  the last paragraph?

7  A    5.7, what?

8  Q    It's 5.7, last paragraph of the provision.  It's on -- it

9  appears right before Section 5.8, claims (indiscernible)?

10 A    This is in 5.7(b)(3), Grace exposure?

11 Q    Yes, sir.

12 A    Okay.  Got it.

13 Q    Okay.  You see the last paragraph, first sentence?

14 A    Starts with the word "evidence"?

15 Q    Yes.

16 A    Yes.

17 Q    Could you read that sentence for me, please?

18 A    Aloud?

19 Q    Yes, sir.

20 A    "Evidence submitted to establish proof of Grace exposure

21 is for the sole benefit of the PI trust, not third parties or

22 defendants in the tort system."

23 Q    Correct.  Okay.  Mr. Inselbuch, are you familiar with the

24 adage that the public is entitled to every man's evidence?

25 A    No.

**J&J COURT TRANSCRIBERS, INC.**

1  Q     You're not familiar with that?

2  A     No.

3  Q     So, in the tort system would evidence of Grace exposure be

4  for the sole benefit of Grace, or could other defendants use

5  it, as well?

6  A     Whose evidence?

7  Q     Evidence of Grace exposure?

8  A     Put in by whom?

9  Q     By the plaintiff?

10 A     If it's put in, in open court it would be available to

11 everybody.

12 Q     But, the trust isn't an open process, is it?

13 A     It's a settlement process and whatever they submitted to

14 Grace by way of settlement wouldn't be available to the public,

15 under any adage.

16 Q     Okay.  If it's a settlement process, it's not a voluntary

17 settlement, is it?  The only way a claimant gets to the tort

18 system is through the trust, is that correct?

19 A     The only way anybody gets to the tort system is through

20 the trust, yes.

21 Q     Okay.  So, to get to the tort system you have to enter

22 into your so-called settlement process, correct?

23          MR. LOCKWOOD:  Objection to form.

24 A     The whole document is a settlement document.  The whole

25 goal here is to resolve by settlement and as efficiently as

**J&J COURT TRANSCRIBERS, INC.**

1  possible where claims that would have lied -- lain against

2  Grace.  That's what this is.  This is all a settlement process.

3  It's a settlement process even when an -- when a co-defendant

4  brings an indirect claim.

5  Q    So, under the TDP any claim filed against the trust is

6  confidential?

7  A    Subject to certain provisions in the document that might

8  require disclosure, that's correct.  And those provisions

9  include advising when people -- whether or not the trust has

10 resolved the claim when that becomes relevant to set off issues

11 that may exist in the tort system.

12 Q    All right.  Okay.  So, at least as it relates to

13 co-defendants like Garlock, as far as the trust is concerned a

14 claim filed by a claimant is confidential, the fact of the

15 claim filing?

16 A    That's not what I said.

17 Q    Well, answer my question.

18 A    I did, I thought.  I'll say the same thing.  It's

19 confidential, except to the extent that the document provides

20 otherwise.

21 Q    Okay.  And evidence submitted by the plaintiff of Grace

22 exposure in the world of this trust is for the sole benefit of

23 the trust?

24            MR. LOCKWOOD:  Objection, evidence submitted where?

25            MR. CASSADA:  Evidence submitted to the trust of

1 Grace exposure by a plaintiff.

2 A    The document contemplates the applicability of the tort

3 law in each of the jurisdictions of the United States, and the

4 trust will respond to subpoenas that are lawfully issued under

5 the jurisdictions of the United States.  So, to me, I don't

6 understand the issue because if Garlock or any other

7 co-defendant is being sued by a plaintiff and Garlock believes

8 the plaintiff has submitted evidence to the trust, why don't

9 they just subpoena that evidence and the proof of claim and

10 whatever else from that claimant who's a litigant with them the

11 tort system?  If they're entitled to that, under whatever adage

12 of evidence you want to use, the Court there will give it to

13 them.

14 Q    Well, that would work where the plaintiff hasn't

15 indefinitely deferred the claim under Section 6.3, correct?

16 A    It depends on what they filed.  They had to file

17 something, if they filed a claim.

18 Q    But, they don't need to file evidence of Grace exposure in

19 order to benefit from --

20 A    Well, you can take their deposition.

21 Q    -- withdraw the claim -- excuse me, let me finish my

22 question.

23 A    Sorry.

24 Q    A claimant does not have to file evidence of Grace

25 exposure in order to benefit from the indefinite deferral of

1 the claim?

2 A    That's correct.

3 Q    Okay.

4 A    But, there's nothing to prevent you, Garlock, from taking

5 discovery of that plaintiff about what the plaintiff's

6 exposures were.

7 Q    Okay.

8 A    Just as you do in the tort system, just as you do before

9 there's a bankruptcy when you want to lay off liability on some

10 other co-defendant.

11 Q    Well, since you brought up that point, let me ask you to

12 look at another provision?

13 A    Okay.

14 Q    Look at the last provision in that paragraph, and I'll

15 read this one for you, "Similarly, failure to identify Grace

16 products in claimant's underlying tort action or to any other

17 bankruptcy trust does not preclude the claimant from recovering

18 from the PI trust, provided the claimant otherwise satisfies

19 the medical and exposure requirements of this TDP," do you see

20 that?

21 A    Yes.

22 Q    Okay.  Did I read it correctly, more or less?

23 A    Yes.

24 Q    Okay.  So, under 6.3 in this provision then, a plaintiff

25 could assert a claim in the tort system and sue Garlock and a

1  handful of other defendants, take the position that they are

2  the sole cause of the claimant's disease, resolve their claim

3  and then turn around and file a claim against the trust

4  submitting evidence of Grace exposure and comply with the

5  medical evidence, and under those circumstances the trustees

6  could not preclude that claimant from recovering, is that

7  correct?

8  A    No.

9  Q    No?

10  A    No.

11  Q    Okay.  So, this provision does not allow a claimant who

12  failed to identify Grace in the tort system and then present a

13  claim to the trust?

14  A    There's a difference between failing to identify under

15  circumstances where there would be no need to do so and

16  asserting that there was no exposure to Grace products which

17  was part of your question.

18  Q    Okay.  Well, let me --

19  A    If they do that, then I would suspect -- and that came to

20  the attention of the trustees, I would suspect the trustees

21  would have questions about the viability of their evidence --

22  Q    Well, let me ask you --

23  A    -- and the believability of their evidence which the

24  trustees are allowed to question.

25  Q    Let me change me question then.  Suppose in the tort

1  system the plaintiff was asked in interrogatories and in

2  depositions to identify all sources of asbestos exposure that

3  caused an injury?

4  A     You could do that now.

5  Q     Sure you can.

6  A     You could do that after this plan is in place.

7  Q     And the claimant does not identify Grace under those

8  circumstances.

9  A     Right.

10  Q     Is the claimant thereafter precluded from proceeding

11  against the trust?

12  A     You would have to -- if I were a trustee and that were

13  brought to my attention, I would look at the form of the

14  question and the form of the answer, and if I believe that the

15  form of the answer created credibility issues I would act on

16  that.

17  Q     Yes, but you're not the trustee and the trustee is bound

18  by this document, right?

19  A     Yes, and that's what I think this document would call for.

20  Q     And this --

21  A     This document including this paragraph and the other

22  paragraphs in here that deal with the credibility of evidence.

23  Q     This document says that failure to identify Grace products

24  does not preclude the claimant.

25  A     That's different from saying, I was not exposed to Grace.

1          THE COURT:  Pardon me.  That is not what this

2    document says.  So, I think you need to restate the question as

3    to what the document really says.  The last sentence says -- if

4    I can find where to begin -- "Similarly, the failure to

5    identify Grace products in the claimant's underlying tort

6    action or to other bankruptcy trusts does not preclude the

7    claimant from recovering from the PI trust, provided the

8    claimant otherwise satisfies the medical and exposure

9    requirements for this TDP."  That's what the document says.

10         MR. CASSADA:  That's what we quoted earlier, and I've

11   asked him --

12         THE COURT:  You did quote it earlier, but --

13         MR. CASSADA:  -- questions about how that provision

14   works.

15         THE COURT:  But, your newest question did not state

16   that correctly.

17         MR. CASSADA:  Well, okay, my question was probing at

18   how the provision works in certain circumstances.

19   Q    I want to get you to help us understand how judgments are

20   treated under the TDP.  Now, if Garlock -- and I'd refer you to

21   this, to Section 7.8 of the TDP.

22   A    This is a judgment against the trust.

23   Q    Exactly.  So, in a circumstance where a co-defendant like

24   Garlock asserted a claim against the trust and eventually

25   advanced to the tort system and a jury and obtained a judgment

1  against the trust for contribution of $1 million, then the

2  co-defendant would not get paid $1 million, correct?

3  A    I'd have to go through the arithmetic, but --

4  Q    Okay.  Well, let me ask you a question and you can -- let

5  me ask it a different way.  Any judgment that a co-defendant

6  obtains against the trust is limited by this -- by the TDP in

7  two respects, one, it can't exceed the maximum amount, so if

8  it's a mesothelioma claim it can't exceed $450,000 --

9  A    Well, if it's a --

10  Q    -- unless it's an extraordinary claim?

11  A    Right.

12  Q    Okay.  And it also can't exceed the applicable percentage,

13  correct?

14  A    The applicable --

15  Q    The applicable payment percentage?

16  A    Whatever it is, it gets paid at the payment percentage.

17  Q    Okay.  So, in my example, if Garlock obtained a $1 million

18  judgment and was not entitled to extraordinary claim treatment,

19  then Garlock would receive the applicable payment percentage of

20  $450,000, is that correct?

21          MR. LOCKWOOD:  Objection, Your Honor.  I think that

22  question is very confusing.  He said the applicable payment

23  percentage of $450,000.

24  Q    The applicable payment percentage times $450,000?

25          THE COURT:  You -- if this is a meso claim for which

**J&J COURT TRANSCRIBERS, INC.**

1  Garlock recovered its judgments?

2            MR. CASSADA:  Yes, Your Honor.

3            THE COURT:  Okay.  Do you want to restate the

4  question?  I think there a lot of ifs, and it might help to

5  have it all.

6            MR. CASSADA:  Okay.  Let me see if I can clarify

7  that.

8  Q    Under my question, Garlock has obtained a judgment against

9  the trust for contribution for a claim based on mesothelioma --

10 a judgment in Garlock paid on a mesothelioma claim, and Garlock

11 does not qualify for the extraordinary claims treatment --

12 A    The claim doesn't.

13 Q    I'm sorry?

14 A    The claim doesn't qualify for --

15 Q    The claim doesn't qualify, exactly, for extraordinary

16 claims treatment.

17 A    Right.

18 Q    And under those circumstances is it true that Garlock's

19 recovery, total recovery, would be the applicable payment

20 percentage times $450,000?

21 A    Yes, but only in the -- under the methodology of Section

22 7.78.

23 Q    Well, there would be -- there would also be provisions

24 about how that judgment would be paid?

25 A    Correct.

1  Q    Okay.  And, I mean, let's just talk about that for a

2  moment.  There would be two payments, I take it, the first

3  would be an initial payment?

4  A    Yeah.

5  Q    And the initial payment would be the applicable payment

6  percentage times the greater of whatever the trust offered

7  Garlock to settle the claim and the award Garlock obtained in

8  non-binding (indiscernible)?

9  A    Correct.

10 Q    Okay.  And then the balance of that judgment would be paid

11 -- the balance of the amount owed to Garlock would be paid over

12 five years beginning in year six?

13 A    Over five years -- yeah, just as it provides for

14 claimants.

15 Q    Right.  And without interest, correct?

16 A    Without interest.

17 Q    Okay.  And that would be true also in my hypothetical with

18 a million dollar judgment, if the payment percentage were 100

19 percent, Garlock still would not get paid that judgment in

20 full, would it?

21 A    It would only get paid up to the maximum amount -- a

22 maximum value for the particular category.

23 Q    That's 450,000.  Okay.

24 A    Just as with the claimants.

25 Q    And the applicable payment percentage is now estimated to

1  be in the range of 25 percent to 35 percent?

2  A    That's what the document says.

3  Q    Co-defendants did not have a representative on the

4  Asbestos Claimants Committee, did they?

5  A    No.

6  Q    And co-defendants don't have -- will not have a

7  representative under the TAC if the plan is confirmed, will it?

8  A    On the TAC.

9  Q    I'm sorry?

10  A    You mean on the TAC?

11  Q    Yes, on the TAC?

12  A    That's correct.

13  Q    And I'm speaking of co-defendants who --

14  A    Like Garlock.

15  Q    -- a representative like Garlock who might have claims for

16  contribution?

17  A    Correct.

18  Q    Okay.  The indirect -- or excuse me -- the individualized

19  review process for processing of asbestos claims, that process,

20  if you don't go through the expedited review and you go to

21  individualized review, a claimant is entitled to additional or

22  a premium in compensation if the plaintiff's represented by

23  certain law firms, is that correct?

24          MR. LOCKWOOD:  Objection.

25  A    No.

**J&J COURT TRANSCRIBERS, INC.**

Inselbuch - Cross/Cassada                    100

1  Q    Okay.  Well, one of the factors that a trust can consider

2  in valuing a claim is the quality of the plaintiff's law firm?

3  A    Yes.

4  Q    Is that correct?  Okay.  And, that is, some law firms

5  historically have been more effective than others in

6  representing their clients and getting higher judgments?

7  A    Yes, and the jurisdictional values where those law firms

8  exist are different, also.

9  Q    Okay.  But, all other things being equal, if you got one

10 of the law firms that's deemed to be very affective, you're

11 going to get a higher settlement than if you don't?

12 A    Only if you qualify to select that jurisdiction.  The

13 claimant's -- the results of in the claimant's jurisdiction --

14 the claimant jurisdiction is a defined term.

15 Q    I understand that.

16 A    Claimants can't opt to pick any law firm in any

17 jurisdiction around the country.

18 Q    Yes, but my question is all other factors being equal.

19 A    But, they're never all equal.

20 Q    Well, my question assumes they are?

21 A    Well, you didn't tell me which law firms you're talking

22 about and what jurisdictions you're talking about.

23 Q    I asked you under certain law firms would qualify the

24 claimant for a higher settlement offer than other law firms?

25 A    If the claimant could hire that firm just as that claimant

**J&J COURT TRANSCRIBERS, INC.**

1 will -- that law firm historically gets much higher verdicts

2 against Garlock than other claimant's law firms do.  That's the

3 nature of the tort system and they're -- and depending on the

4 jurisdiction, claims against Garlock and everybody else will be

5 either higher or lower, depending upon where the jurisdiction

6 is and what the makeup of juries are.  We tried to mirror the

7 tort system as best we could.

8 Q    Except when it came to claims for contingent contribution,

9 those do not mirror the tort system, the provisions of the TDP

10 --

11 A    They do, indeed, mirror the tort system.

12 Q    Well, Garlock is not permitted to file a claim with the

13 trust, is it, based on a contingent claim for contribution?

14 A    But, filing a claim is an irrelevance.  What you're

15 worried about, and you know what you're worried about, is

16 set-offs.  Set-offs only arise where there's a settlement.

17 That's a function of state law.  We didn't effect that in any

18 way.

19 Q    All right.  If Garlock is concerned about obtaining a

20 determination of trust liability then Garlock has no way of

21 triggering that determination under the TDP unless Garlock has

22 paid the trust liability, is that correct?

23 A    That's correct.

24 Q    Okay.  And that provision does not mirror the tort system?

25 A    In this -- in order to extricate the trust from the tort

Inselbuch - Cross/Cassada                102

1  system whether the claim is coming from a claimant or a

2  co-defendant we have -- what the channeling injunction does is

3  say neither the plaintiff nor the co-defendant can sue the

4  trust.  What they must do is follow the procedures in the TDP

5  which are identical for the claimants and the co-defendants.

6  Q    But, the TDP do not allow Garlock or a co-defendant to

7  initiate the trust's determination of liability of a particular

8  bodily injury claim?

9        MR. LOCKWOOD:  Objection in any state, in every

10 state?  Object to form.

11 Q    You misunderstand my question.  My question is whether

12 there's a process -- whether the TDP permit Garlock to initiate

13 the resolution of a bodily injury claim?

14 A    How could it?

15 Q    Simply by allowing Garlock to initiate the resolution of a

16 particular claim.

17 A    To do what?

18 Q    To file the claim, to file the evidence of exposure and to

19 determine whether the claim warrants a settlement offer.

20       THE COURT:  Wait.  I'm sorry.  Garlock, having

21 already paid the claim and subrogated its rights?

22       MR. CASSADA:  No, this is where Garlock -- no, no

23 this is where Garlock has not paid the claim.

24       THE COURT:  Well, how would Garlock be able to

25 substantiate that it's a personal injury claimant?  I've lost

**J&J COURT TRANSCRIBERS, INC.**

1  the line of questioning.  I'm sorry.

2              MR. CASSADA:  Well, maybe it's not worth pursuing.

3  The point is that in the tort system Garlock can file the claim

4  against Grace, even when Garlock hasn't paid a portion of

5  Grace's share, so --

6              THE COURT:  You can join Grace as a --

7              MR. CASSADA:  Can join Grace.

8              THE COURT:  -- co-defendant.

9              MR. CASSADA:  That's right, and --

10             THE COURT:  But, you can't file a claim against Grace

11  for a personal injury that your client doesn't have.

12             MR. CASSADA:  That's exactly what joining does, Your

13  Honor.  It permits co-defendants in the tort system to

14  adjudicate Grace's liability.

15             THE COURT:  Interliability.

16             MR. CASSADA:  Yes.

17             THE COURT:  Yes, interliability among the defendants.

18             MR. CASSADA:  No, it -- no --

19             THE COURT:  You -- it doesn't give the defendant the

20  ability to prosecute the claim on behalf of the plaintiff.

21             MR. CASSADA:  It gives the defendant the opportunity

22  to prosecute Grace's liability for a particular claim that has

23  been brought against the defendant.  It certainly gives a

24  defendant that right.

25             THE COURT:  The co-defendants have certain rights

1  against themselves.  That's correct.  To defend the liability

2  and to say I didn't do it, the other co-defendant did.

3             MR. CASSADA:  Right.

4             THE COURT:  That's what you're saying?

5             MR. CASSADA:  Yes.

6             THE COURT:  Yes.  Okay.  I'm back with you.

7             MR. CASSADA:  Okay.

8             THE COURT:  I thought you were saying that you could

9  somehow or other file the complaint as though you were the --

10 your client was the plaintiff in an asbestos bodily injury

11 suit, which is what I think you were -- I thought you were

12 asking this witness, could Garlock assume that it's a personal

13 injury plaintiff and file the claim?  I thought that was the

14 question.

15            MR. CASSADA:  Well, my question was similar to that,

16 Your Honor.  It was just -- it was the point that the TDP do

17 not allow Garlock to initiate the trust's determination of the

18 allowance of a particular asbestos claim.

19            THE COURT:  In the tort system?

20            MR. CASSADA:  No, in the -- under the trust process.

21 The TDP do not permit that.  They do not have --

22            THE COURT:  Until the co-defendant pays?

23            MR. CASSADA:  That's correct, Your Honor.

24            THE COURT:  Yes.  Okay.

25 BY MR. CASSADA:

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Now, my final question, at least I hope, Mr. Inselbuch,

2  the members of the Asbestos Claimants' Committee who you've

3  identified as the new members of the TAC, that's Mr. Rice,

4  Budd, Cooney and Weitz?

5  A    They're not members of the committee.  They're counsel to

6  members of the committee.

7  Q    They're counsel to members of the committee?

8  A    Yes.

9  Q    But, they're the ones who meet when the committee has

10 meetings and make decisions about the TDP and other things in

11 the case, correct?

12 A    Yes.

13 Q    Okay.

14 A    With the other lawyers for the other claimants.

15 Q    Okay.  And these lawyers are among those who would be

16 considered effective lawyers who would get a premium for their

17 clients over --

18         MR. LOCKWOOD:  Object to form, Your Honor.

19 Q    -- claimants -- plaintiffs represented by other lawyers?

20         THE COURT:  Overruled.

21         MR. LOCKWOOD:  Object to form.

22         THE COURT:  Overruled.

23 A    My experience has been that some of them do in some

24 jurisdictions, and some of them don't.

25 Q    But, by and large these four lawyers -- when you say some

**J&J COURT TRANSCRIBERS, INC.**

1  of them do and some of them don't, you're talking about these

2  particular lawyers?

3  A    I am.

4  Q    Okay.  These particular lawyers though have claims and

5  will have claims in the future that would be entitled to

6  premium consideration on the basis of the lawyers representing

7  the claimants, is that correct?

8  A    Some may, and some may not.

9  Q    Okay.  Does the -- isn't it true that the trust agreement

10 permits -- provides that the trustees cannot receive an

11 increase in compensation above the -- an increase indicated by

12 the consumer price index without the consent of these very TAC

13 members?

14 A    And the futures representative.

15 Q    And the future representative.

16 A    Subject, of course, to ADR and exits of the tort system --

17 to the bankruptcy court.

18        MR. CASSADA:  Excuse me, Your Honor.  I want to

19 confer with my --

20        THE COURT:  Yes.

21            (Attorney discussion)

22 Q    Retouching, Mr. Inselbuch, on one thing you said earlier,

23 you said that the trust would have to respond to any subpoena

24 by a co-defendant issued out of any court?

25 A    Whatever the courts that are specified in the document.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  And -- okay, but it wouldn't be any court?

2  A    No, it's a federal district court, I think.  It's the

3  state courts of Delaware, and it's the bankruptcy court.

4  Q    Okay.  So, if a co-defendant wanted evidence from the

5  trust they'd have to come to Delaware in a bankruptcy --

6  A    Yeah, but they can get the very same evidence from the

7  plaintiff in their case in the court where they're pending.

8  Q    Of course, if the claim hasn't been filed yet there's no

9  evidence to be obtained?

10  A    Then there won't be any at the trust either.

11          MR. CASSADA:  Okay.  Thank you, Your Honor.  That's

12  all I have.

13          THE COURT:  Mr. Monaco?

14          MR. MONACO:  Good morning, Your Honor.

15          THE COURT:  Good morning.

16                    CROSS EXAMINATION

17  BY MR. MONACO:

18  Q    Good morning, Mr. Inselbuch.

19  A    Good morning.

20  Q    Mr. Inselbuch, my name is Frank Monaco.  I represent the

21  State of Montana and I just have a couple of questions for you.

22  Garlock's attorney covered a lot of the ground that I was going

23  to.  Well, first of all, Mr. Inselbuch, I assume you're aware

24  that my client has contribution indemnification claims against

25  Grace as a result of law suits filed by the Libby claimants in

1  the State of Montana?

2  A    So, you say.

3  Q    And I think you testified earlier on direct that there

4  were no differences in the review process in terms of reviewing

5  indirect and direct asbestos personal injury claims, correct?

6  A    That's generally correct.

7  Q    Okay.  Now, the plan does define the two types of claims

8  differently.  There's a definition for indirect asbestos

9  personal injury claims and there's a definition for direct

10  asbestos personal injury claims, correct?

11  A    No, they're all -- I believe the last time I looked at

12  this that they're all within the definition of PI trust claim.

13  Q    That's --

14  A    It's separated out so that these provision can make sense.

15  Q    Okay.  But, they are defined differently under the claim,

16  correct?

17  A    Yes.

18  Q    Okay.  And there are obviously provisions within the TDP

19  that are specifically designed to deal with indirect asbestos

20  personal injury claims?

21  A    5.6.

22  Q    5.6, and there are some other provisions in there that

23  touch upon those kinds of claims, as well.  Now, would you

24  agree, based on the different definition of those types of

25  claims and the fact that there are specific provisions designed

1  to address and direct asbestos personal injury claims, there

2  are some differences between indirect and direct, correct?

3  A    I don't know what you're asking.

4  Q    Well --

5  A    At the end of the day whether it's a direct claim or an

6  indirect claim, it goes through the same process and it's

7  subject to the same rules and can receive the same awards.

8  Q    Okay.  That's not responsive.  My question was --

9  A    Sorry, I didn't understand the question.

10 Q    -- the process was the same, but the types and nature of

11 the claims are somewhat different?

12 A    I don't think so.

13 Q    Okay.

14 A    I think the structure of this document says that if the

15 co-defendant frees the trust of its responsibility to the

16 claimant, in general, then the co-defendant steps into the

17 shoes of the claimant and can pursue this claimant's claim

18 under the same set of rules.  So, I see them as the same claim.

19 Q    Okay.  But, there are different ways of dealing with those

20 claims, is there not, I mean why else would you have 5.6?

21 A    To say what I just said.

22 Q    Now, turning to 5.6, the TDP does limit the allowable

23 amount of an indirect personal injury trust claim to the amount

24 paid to the underlying asbestos plaintiff, correct?

25 A    Yes.

1  Q    Okay.  Would you also agree that there is no specific

2  provision within the TDP that provides for payment of

3  attorneys' fees or other defense costs for indirect claims?

4  A    Neither for direct claims or indirect claims.  However, if

5  you look at -- it's a little different when you get to 5.12 and

6  5.13.  We're revealing about indemnification responsibilities,

7  but generally speaking under 5.6, that's correct.

8  Q    Okay.  Now, the attorney for Garlock asked you a series of

9  questions regarding the maximum allowable amount in a

10 hypothetical if a co-defendant obtains a judgment in excess of

11 that maximum allowable amount, and would you agree that because

12 of the assignment of a maximum value for asbestos -- direct

13 asbestos personal injury claims, that that could negatively

14 impact a holder of a indirect trust claim if they receive a

15 judgment in an amount excess of the maximum value?

16 A    Sorry, I couldn't follow that.

17 Q    Going through the line of questioning that Garlock's

18 attorney went through with you obtaining a judgment in excess

19 of a maximum value -- there's a maximum value assigned to --

20 A    The four fifty he was talking about.

21 Q    Right.  Right.  So, if a co-defendant obtains a judgment

22 for a million dollars against Grace or --

23 A    Against the trust.

24 Q    Right.  Trust, or there is a judgment rendered against it

25 for a million dollars, against the co-defendant, would that

1 impact negatively their ability to -- the maximum amount affect

2 their ability to obtain monies in excess of the maximum

3 allowable amount?

4 A    Well, I think you've mixed up some apples and oranges.  I

5 think I testified to Garlock's counsel that if you -- in a

6 litigation against the trust after you've exited through the

7 ADR process in which the co-defendant or the indirect claimant

8 gets a recovery in excess of the maximum value, the recovery is

9 limited to the maximum value.  Just because the co-defendant

10 suffers a verdict in the tort system against it, that's in

11 excess of the maximum value, is not relevant to this question

12 because what this -- what the TDP is trying to evaluate is the

13 contribution claim which will not be as much as whatever the

14 verdict might be against the co-defendant in the tort system

15 in the litigation with the plaintiff.

16 Q    Okay.  But, under my scenario that I've put to you where a

17 judgment is rendered against a co-defendant and now has a

18 contribution indemnification claim that exceeds the maximum

19 allowed amount, could it have a negative impact based on how

20 the TDP is set up currently?

21 A    It can only recover up to the maximum value at the payment

22 percentage.

23 Q    Okay.

24 A    If that is a negative impact, it is a negative impact.

25         MR. MONACO:  Thank you.  No further questions, Your

**J&J COURT TRANSCRIBERS, INC.**

1  Honor.

2                    CROSS EXAMINATION

3  BY MS. CASEY:

4  Q    Linda Casey on behalf of BNSF Railway Company.  Good

5  morning, Mr. Inselbuch.

6  A    Good morning.

7  Q    The TDP treats indirect PI trust claimants as standing in

8  the shoes of the direct claimant and restricts the indirect PI

9  trust claimant to an amount no greater than what the direct

10 claimant could have received under the TDP, correct?

11 A    Under 5.6, yes.

12 Q    And this restriction on the right of the indirect PI trust

13 claimant to receive more than what the direct claimant would

14 have been able to receive under the TDP would prevent an award

15 to an indirect PI trust claimant who can establish a

16 contractual indemnification agreement that obligates one or

17 more of the debtors to indemnify the indirect PI trust claimant

18 for attorneys' fees and defense costs, correct?

19 A    I don't think so.

20 Q    Where in the TDP would the indirect PI trust claimant be

21 entitled to an award for their contractual right to get

22 indemnified for attorneys' fees and defense costs?

23 A    Your hypothetical is, a co-defendant with a contractual

24 indemnity right?

25 Q    Either a co-defendant or an entity who is sued on their

                **J&J COURT TRANSCRIBERS, INC.**

1  own and has a right back to a contractual indemnity to one or

2  more of the debtors?

3  A    Where would that come from?

4  Q    You are aware that BNSF has asserted that it has a

5  contractual agreement between BNSF Railway and W.R. Grace and

6  its predecessors concerning the operations of the side

7  agreement and the conveyor belt at the Zonolite mine, correct?

8  A    Yeah.

9  Q    And you are aware that W -- that BNSF has asserted that it

10  has a contractual right for full indemnification for any claims

11  related to that, including claims that arise out of BNSF's own

12  negligence?

13  A    I'm sorry?

14  Q    That the -- that BNSF asserts that the contractual

15  indemnity protects BNSF or obligates Grace to indemnify BNSF

16  for claims asserting that BNSF itself were negligent, and

17  therefore BNSF could be the sole named party in the lawsuit?

18  A    That would not necessarily give rise to an indirect trust

19  claim.

20  Q    That would not be channeled to the trust?

21  A    It may not give rise to an indirect trust claim.

22  Q    So, is it your testimony that if BNSF has a claim under a

23  contractual indemnity that's based upon an underlying asbestos

24  PI claim --

25  A    Oh, that's different.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    -- that it would not be enjoined and transferred to the

2  trust?

3  A    I didn't understand your question that way.

4  Q    Okay.  Let me ask the question again.  If BNSF asserts a

5  right and is able to establish a contractual right to

6  indemnification of attorneys' fees relating to an underlying

7  asbestos PI claim, is that claim enjoined and channeled to the

8  trust?

9  A    I would guess it would be.

10 Q    Does the TDP's restriction on the right of the indirect PI

11 trust claimant to only receive the amount the direct claimant

12 receives, restrict BNSF's right to an award if it is able to

13 establish a contractual right to indemnification of its

14 attorneys' fees?

15 A    I don't know.

16 Q    Do you know whether if the direct claimant would have been

17 able to assert a claim under the TDP for BNSF's defense costs?

18 A    Why would he?

19 Q    Would he have a right to assert under the TDP?

20 A    Why would a direct claimant assert anything on behalf of

21 BNSF?

22 Q    And BNSF is restricted to whatever the direct claimant

23 could assert against the TDP -- against the trust?

24 A    I think that's right.

25 Q    So, we would, in fact, be limited and would not be able to

1  get an award for attorneys' fees, assuming we can establish a

2  contractual indemnification right to attorneys' fees under the

3  TDP?

4  A    I have to say, I hadn't thought about that.

5  Q    Do you agree that the direct claimant couldn't?  BNSF is

6  restricted to what the direct claimant could and therefore the

7  TDP does not allow us to get an award for our contractual

8  rights that are enjoined and channeled to the TDP?

9         THE WITNESS:  May I have a minute, Your Honor, to

10  look at the document?

11         THE COURT:  Yes.

12               (Pause)

13  A    It's an interesting question.  I think the principle in

14  5.6 is that the indirect claimant cannot collect more than the

15  direct claimant could recover, where it says, "However, in no

16  event shall reimbursement to the indirect claimant be greater

17  than the amount to which the direct claimant would have

18  otherwise been entitled."  I think you're right, that it

19  doesn't say specifically on your set of facts that the claim

20  could include the amount of attorneys' fees.  But I think the

21  sense of the argument is that it should, at least up to the

22  amount that the direct claimant could have recovered from the

23  Trust.

24  Q    But the direct claimant's claim that the direct claimant

25  can cover to this trust is the rough justice several liability

1 of the underlying medical claim includes no portion for

2 attorneys' fees?

3 A    Yes.   That's true.  But the claim over may not be that

4 large.

5 Q    But if the claim over for the medical is even larger than

6 the standard value, there could be no award for the attorneys'

7 fees in excess of that?

8 A    If the argument is that -- I must be missing something

9 here.  The claimant has a claim against BNSF that you say is

10 channeled.

11 Q    Correct.  No.  The claimant's claim is channeled.  BNSF's

12 claim for indemnification --

13 A    Is not channeled.

14 Q    -- is also channeled?

15 A    Right.

16 Q    Okay.

17 A    So, the claim --

18 Q    BNSF then defends the claim --

19 A    Yeah.

20 Q    -- gets either a judgment or a settlement that has to pay

21 the medical expenses to the PI claimant, also incurs defense

22 costs.  They come to the Trust and they assert a claim against

23 the Trust and they attempt to assert their indemnification

24 rights to be indemnified not just for the underlying judgment

25 or settlement but also for their defense costs?

**J&J COURT TRANSCRIBERS, INC.**

1  A    I think they can assert that but they can only recover up

2  to the amount that the direct claimant could recover.

3  Q    And the direct claimant, the purpose of the TDP, the

4  maximum value that the direct claimant could recover, is

5  designed to be the several liability that Grace has for the

6  actual medical damage?

7  A    It may or may not be as large or larger than what the

8  judgment against BNSF.

9  Q    So, let me see if I can understand.  If the underlying

10 settlement and judgment was for less than what the standard

11 value is, and the standard value is the applicable maximum

12 value for that particular claimant, then BNSF could get the

13 full amount of the claim, of the underlying liability in the

14 direct claimant's action, and could also get the attorneys'

15 fees up to the maximum value for the standard value, up to the

16 standard value?

17 A    I think that's right.

18 Q    Now, if the claim that BNSF had, the amount of the

19 settlement or the judgment entered against it for the direct

20 indemnification of the liability, was in excess of the standard

21 value, BNSF would not be entitled to an award for its

22 contractual rights to attorneys' fees and defense costs because

23 it would exceed --

24        MR. LOCKWOOD:  Your Honor, I'm going to have to

25 object to the term standard value.  I don't believe it's a

**J&J COURT TRANSCRIBERS, INC.**

Inselbuch - Cross/Casey                    118

1  defined term.  I mean, I think the witness and the questioner

2  may understand what she's talking about but I'm not sure.

3          THE COURT:  I think we all understand what she's

4  talking about.  But if you want to use the terms that are

5  provided in the document, that may be helpful.

6          MS. CASEY:  I will, Your Honor.

7          THE WITNESS:  Is there a question?

8          THE COURT:  She's going to restate the question.

9          THE WITNESS:  Thank you.

10 Q    I believe the term is scheduled value.

11 A    Okay.

12 Q    If the -- if BNSF pays either a settlement or a judgment

13 that, in and of itself is in excess of the scheduled value

14 applicable to the direct claimant's claim, then when it asserts

15 its contractual right for indemnity, because the direct

16 liability exceeds the scheduled value, it will not be entitled

17 to an award for the attorneys' fees, even if it can establish a

18 contractual right to be indemnified for the attorneys' fees?

19 A    Well --

20 Q    How is it that incorrect?

21 A    You can take the claimant to individual review and, if it

22 merits it, there could be a larger award.

23 Q    Is it your testimony that the individual review process

24 permits an award in excess of the maximum values provided by

25 the plan for any particular -- by the TDP for any particular --

1 A    Not greater than the maximum but greater than the

2 scheduled value.  That's what you asked me about.

3 Q    In what circumstances can someone -- can an underlying

4 direct claimant get more than the scheduled value?

5 A    If the criteria that are provided for in individual review

6 yield a larger number.

7 Q    And the criteria for individual review are all related to

8 medical and exposure criteria, not related to whether they are

9 entitled to defense costs?

10 A    That's true but we were talking about a window of

11 opportunity for you.  We're not talking about an allocation.

12 Q    So --

13 A    You could well get a recovery that would be large enough

14 although you couldn't recover more than you paid and you can't

15 get more than the verdict would be but there might be room in

16 there for you to collect attorneys' fees.

17 Q    So your interpretation of the TDP provides that BNSF may

18 be entitled to an award for its attorneys' fees if it was

19 successful in having the underlying claimant recover less than

20 what the underlying claimant would have been able to receive in

21 the TDP?

22 A    Yes, if you do a good job at trial.

23 Q    And, if we end up having to pay what the underlying

24 claimant is entitled to under the TDP, it cuts off our rights

25 to attorneys' fees?

**J&J COURT TRANSCRIBERS, INC.**

1  A    It depends on the numbers.

2  Q    Take my assumption.  My assumption is we pay to the direct

3  claimant exactly what the direct claimant would have been

4  entitled as a scheduled value through individual review,

5  through arbitration, through trust.

6  A    Yes.

7  Q    We pay them exactly what the direct claimant would have

8  been entitled.  We would not be entitled to an award of

9  attorneys' fees?

10          MR. LOCKWOOD:  Objection.  She used the term

11  scheduled value --

12          MS. CASEY:  I'm sorry.

13          MR. LOCKWOOD:  -- and I think she means maximum

14  value.

15          THE COURT:  I'm not sure.  Are you talking about the

16  settled or the maximum because I'm not sure either.

17          MS. CASEY:  I'm actually talking -- I'll take a step

18  back.

19  Q    Whatever is the particular maximum that a particular

20  direct claimant is entitled to under the TDP, whether the

21  direct claimant is not entitled to anything more than the

22  scheduled value because it has no extraordinary circumstances

23  or whether they are entitled to the maximum value, if BNSF pays

24  the amount equal to what the direct claimant would have been

25  entitled to completely, BNSF would not be entitled to an award

1  of attorneys' fees under the TDP?

2  A    It would not be --

3        MR. GUY:  Objection, Your Honor.  It's not clear when

4  the counsel for BNSF is asking.  Is it the amount that was due

5  to the claimant for BNSF liability or is it the amount that was

6  due to the claimant for Grace's liability?  If it's the latter,

7  I'm not clear why they would be paying that.

8  Q    Is it not true that in the tort system there are

9  occasions, such as contributory negligence, comparative fault,

10 all those situations, where a defendant will be, in fact, held

11 liable to pay under joint and several liability theories

12 Grace's liability to the underlying claimant?

13 A    No.  It pays its own liability which may be joint and

14 several.

15 Q    Okay.  And if it pays joint and several liability which is

16 its own liability, then there would, in fact, be claims that

17 Grace would have had to have paid and therefore, under the TDP,

18 we would have paid amounts that, under the TDP process, the

19 direct claimant could have asserted against Grace?

20 A    Right.    And you -- in those -- in that set of facts, you

21 step into the direct claimant's shoes.

22 Q    Right.  And can only get the attorneys' fees that we are

23 contractually entitled to if we paid less than what the direct

24 claimant could have gotten under the Trust, out of the Trust?

25 A    I guess that's right.

1  Q    And to go to the second --

2  A    And then, again, only at the payment percentage.

3  Q    Correct.

4  A    Now, let's go to the second scenario.  BNSF is sued for

5  its own negligence and this is not a liability of Grace.  The

6  TDP provides that we are restricted to what the direct claimant

7  could assert and, since the direct claimant would not be

8  asserting the negligence claim against BNSF against the Trust,

9  even if BNSF can establish a binding contractual obligation --

10            THE COURT:  I'm sorry.  You really lost me.

11            MS. CASEY:  Okay.

12            THE COURT:  I have no clue what you're asking.

13            MS. CASEY:  I'll take a step back.

14            THE WITNESS:  Good because I didn't either.

15  Q    You are aware that BNSF has asserted that is has a

16  contractual arrangement with the debtors that requires the

17  debtors to indemnify BNSF for claims asserted against BNSF,

18  including asbestos-related claims, even if BNSF was negligent

19  in its own right?  Correct?

20  A    So you say.

21  Q    Okay.  I understand that that's just our assertion and I'm

22  not asking the Judge to rule on that right now.  If an asbestos

23  claimant asserts a claim against BNSF for BNSF's own negligence

24  that is subsequently determined does, in fact, fall within this

25  contractual indemnity arrangement, is it not true that the TDP

1 that restricts the indirect PI trust claimant from recovering

2 an award against the Trust, the amount that the direct claimant

3 would have been able to assert against the Trust, would prevent

4 BNSF from getting an award for the contractual obligation of

5 the debtors to indemnify BNSF for its own negligence?

6          MR. LOCKWOOD:  Objection to form.  (a) I don't

7 understand the question but, (b), I think it misstates -- are

8 you saying that BNSF was held liable for an asbestos personal

9 injury claim as defined in the Trust, i.e., one that's based on

10 exposure to Grace vermiculite?  Or are you saying that BNSF was

11 held liable because some Grace person at the loading dock

12 dropped a wrench on the head of somebody and, under your view

13 of the indemnity, Grace has to indemnify BNSF for that

14 liability --

15          MS. CASEY:  The question assumes --

16          MR. LOCKWOOD:  -- because I suggest to you that

17 there's a substantial difference in how the plan would treat

18 those two scenarios.  So I object to the form as confusing.

19          THE COURT:  Sustained.

20 Q    If you would please assume for me that the claim asserted

21 against BNSF for BNSF's negligence, falls within the definition

22 of an indirect PI trust claim --

23 A    Then we're back to the same scenario we started with.

24 Q    And, therefore, because the direct claimant would not be

25 able to assert against the Trust a claim based on BNSF's

1  negligence, BNSF would not be able to get an award against the

2  Trust for the contractual indemnification obligation to

3  indemnify BNSF for BNSF's negligence?

4  A    No, that's not right.  If it's a PI trust claim, it's a PI

5  trust claim.

6  Q    Can you show me where in the TDP BNSF would be entitled to

7  receive an award for BNSF's negligence?

8  A    If it's -- if it is indemnified for a PI trust claim, it's

9  indemnified.

10 Q    Is it --

11 A    But it's only if it's a PI trust claim.  That means it has

12 to be based upon exposure to Grace asbestos.

13 Q    And I asked you to assume that.  We have asserted in this

14 case, and we will subsequently move into evidence the

15 complaints that have been asserted against us, that BNSF is

16 liable as a result of Grace's vermiculite concentrate, exposure

17 to Grace's vermiculite concentrate.  Therefore, the claims

18 against BNSF for BNSF's own negligence in the handling of the

19 vermiculite concentrate, falls within the definition -- well,

20 let me ask you a question.  Do you believe that a claim by BNSF

21 for indemnity under the contractual indemnification that BNSF

22 asserts the debtors owe to it for a claim by a creditor who has

23 been injured by exposure to asbestos, based upon BNSF's hauling

24 of Grace's vermiculite concentrate, is enjoined and channeled

25 to the Trust?

1  A    I think so.  To me, it's not any different from the

2  Garlock claim.

3  Q    Okay.

4  A    I mean, you have -- may I explain?

5  Q    Absolutely.

6  A    If you -- a plaintiff may have a claim against a number of

7  defendants that arises out of a particular stream of conduct,

8  here we're talking about exposure to Grace product.  If your

9  client, the railroad, is a co-defendant in effect in that

10 process, even if the legal theory against your client is

11 different from the legal theory against Grace, then I don't see

12 why 5.6 wouldn't apply.

13 Q    I'm not saying it doesn't apply and I don't think that was

14 my question.  My question is, does the restriction in 5.6 --

15 A    On what?

16 Q    -- that the award can only be limited to what the direct

17 claimant could have asserted against the Trust, prevent BNSF

18 from getting an award when the judgment entered in the lower

19 court or the settlement was based upon BNSF's own negligence,

20 even if BNSF can establish a contractual arrangement in which

21 the debtors agree to indemnify BNSF's for its own negligence?

22        MR. LOCKWOOD:  Objection, Your Honor.  I believe the

23 witness just answered that exact question.

24        THE COURT:  Well, let him try it one more time.

25 A    Okay.  The hypothesis is that somebody sues BNSF and gets

1  a judgment and the judgment, in effect, covers the entire

2  injury, the tort liability damages, and BNSF has the good

3  fortune to pay all of that, now BNSF has a claim over against

4  Grace under the TDP under 5.6.  That claim over is -- because

5  they have freed Grace of any liability to this claimant,

6  irrespective of what the legal theory may have been, they've

7  paid the entire tort damages.  That's the concept.  Then they

8  can come under 5.6 and they can recover what Grace -- what the

9  Grace trust would have paid this claimant.

10  Q    The direct claimant?

11  A    Yes.

12  Q    But that's not my question.

13  A    I thought it was.

14  Q    My question is, if BNSF pays the whole liability --

15  A    Yes.

16  Q    -- not just Grace's rough justice several share but the

17  full liability --

18  A    Correct.

19  Q    -- and that full liability includes a portion attributable

20  just to BNSF's negligence, is that portion that's attributable

21  just to BNSF's negligence allowable as a claim against the

22  Trust when the Trust says that it is restricted to the direct

23  claimant's claims against the Trust?

24  A    I don't know any tort system that works this way.  If BNSF

25  pays a judgment, it has rights of contribution.  If the rights

Inselbuch - Cross/Casey                    127

1  of contribution are against Grace, those get decided if Grace

2  weren't in Chapter 11 in a courthouse.  It doesn't depend upon

3  what BNSF's sole liability would be.  It would depend upon what

4  Grace's contribution would be and here, under 5.6, BNSF can

5  pursue Grace's share of that.

6  Q    Once again, you changed my question.

7           MR. LOCKWOOD:  Your Honor --

8  Q    I'm not asking you about --

9           MR. LOCKWOOD:  -- I object.  He is not changing it.

10          MS. CASEY:  Can I --

11          MR. LOCKWOOD:  The questioner appears to be assuming

12 that if a co-defendant becomes jointly and severally liable for

13 exposure to Grace vermiculite because of its independent

14 negligence that somehow or another the fact that the

15 co-defendant's liability was predicated on its own negligence

16 means that it doesn't have a contribution claim against Grace.

17 The witness has now answered three separate times that, in his

18 opinion, it does constitute --

19          THE COURT:  No.  I think the issue is, if BNSF were

20 to suffer a judgment against BNSF and only against BNSF for its

21 sole negligence, how this would happen, I don't know, but

22 assume that it does.  Then, does its theory that it has a

23 contractual claim against Grace, based on indemnification, come

24 into the Trust for payment, and if so, at what level?  That's

25 what she's trying to ask.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. CASEY:  And the fact that the witness was

2     answering based on state contribution law and not based on

3     contract law.

4     Q    If we have a contract that permits us to assert against

5     Grace the judgment that was for BNSF's negligence, can it get

6     an award under these TDPs under its contract?

7     A    Yes.  It's the same answer.

8     Q    And what is -- the answer is that the TDP does permit a

9     claim --

10    A    Yes, if it is indeed a PI trust claim.  If it's -- as my

11    counsel said, if it's because somebody dropped a wrench on

12    somebody's head, it wouldn't be a PI trust claim.  They could

13    not recover from the Trust.  But if it is in fact based upon

14    exposure to Grace product, then it becomes a PI trust claim.

15    Here, it would be irrespective of the independent right to

16    indemnification.  You would still have a right to contribution

17    against Grace for the same tort.  The little question from

18    before was one about attorneys' fees which you don't get in

19    contribution.  That question is still there.

20    Q    Is it your testimony that the TDP only allows contribution

21    claims, and as long as my right -- as long as BNSF's right is

22    based on contribution, we can come in and we don't have to

23    worry about the contract because, as long as it's contribution,

24    you can come in?

25          MR. LOCKWOOD:  Your Honor, objection.  The witness --

                **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Sustained.

2          MR. LOCKWOOD:  -- previously testified --

3          THE COURT:  No.  Mr. Lockwood.

4          MR. LOCKWOOD:  -- that indemnity -

5          THE COURT:  Mr. Lockwood, sustained.  You need to ask

6  a question that doesn't have 15 parts to it, please.

7  Q    Can you please point out to me, in the TDP, where BNSF is

8  entitled to an award for its full contractual rights of

9  indemnity not restricted by what the direct claimant would have

10 been able to assert against Grace?

11 A    As we discussed before, the only issue that you've raised

12 that's interesting is the question of attorneys' fees.

13 Otherwise, we're just going around in a big circle.  It's the

14 same under 5.6.  Whatever the rubric is in the courthouse, for

15 whatever reason, you suffer the judgment.

16 Q    Do you understand that contractual indemnification

17 agreements often modify contribution and a party can, in fact,

18 agree to pay one hundred percent of the liability even if that

19 one hundred percent is greater than its several share?

20         MR. LOCKWOOD:  Your Honor, I object.  The witness

21 testified on direct that the scope of indirect claims included

22 contribution, indemnity, subrogation, et cetera.  This

23 questioner seems to be assuming that the PI trust claim,

24 indirect trust claim, definitions do not include indemnity

25 claims for asbestos PI trust claims.  The witness has now

1  testified, I think four times, maybe five, that they do.

2          MS. CASEY:  Your Honor, that's a complete

3  mischaracterization of what I'm saying.  What I'm saying is

4  that it is, in fact, an indirect PI trust claim and enjoined

5  and channeled to the Trust.  But then the TDP does not permit

6  the allowance of an award equal to what the contractual

7  indemnity agreement provides.

8          THE COURT:  And the witness has said that, to the

9  extent that it's an asbestos indirect PI trust claim, it's

10  going to be treated under Section 5.6.  Period.  End of story.

11  So, whatever the maximums are under 5.6 -- if your client

12  sustains this horrible judgment that exceeds all those maximums

13  and, in addition to that, has attorneys' fees, it's going to be

14  capped at the maximums.  Do I understand that correctly?

15          THE WITNESS:  Yes, ma'am.

16  G    And that that maximum is designed to be Grace's several

17  share of the liability, the rough justice several share of the

18  liability?

19  A    No.  No.  The scheduled value is designed to be Grace's

20  rough justice share of several liability.  The maximum is

21  something beyond that.

22  Q    Well, let's explore whether BNSF will be able to get the

23  maximum value.  The maximum value is only available to direct

24  claimants who establish a right to an extraordinary claim,

25  correct?

**J&J COURT TRANSCRIBERS, INC.**

1  A     Wrong.

2  Q     Where else is a claimant entitled to go up to the maximum

3  value?

4  A     An individual review.

5  Q     But in the individual review, they have to establish a

6  right to an extraordinary claim?

7  A     Wrong.  If they establish the right to be treated as an

8  extraordinary claimant, the maximum value is multiplied by

9  either five or eight percent times.

10 Q     I apologize.  I'm wrong.  The eight times multiplier which

11 was designed to deal with the situation where a claimant can

12 establish that 95 percent of its exposure was to Grace asbestos

13 --

14 A     And they can't collect from you.

15 Q     And they can't collect from me.

16 A     Right.

17 Q     So, as soon as they collect from me and I come in and I'm

18 restricted to what the direct claimant could have recovered,

19 I'm never entitled to that eight times multiplier, am I?

20 A     That's correct.  I would assume not.

21 Q     So, I would, in fact, be limited to the scheduled value?

22 A     Wrong.  You would be limited by the maximum values.

23 Q     The maximum value which does not include the eight times

24 multiplier?

25 A     Correct.

**J&J COURT TRANSCRIBERS, INC.**

Case 01-01139-AMC    Doc 23286    Filed 09/18/09    Page 132 of 313

Inselbuch - Cross/Casey                    132

Q     And the maximum value is still intended to be the rough

justice several share under certain circumstances?

A     Wrong.

Q     What is it intended to be?

A     It's -- the rough justice several share is what the

schedule value provides. The maximum value provides room when

cases are different for one reason or another and can prove

under the indirect -- under the provisions here for individual

review, the various criteria can prove up a greater value,

which would be more than the rough justice several liability of

Grace.

Q     But it would be potentially less than the actual liability

in the tort system?

A     Everything is potentially less than something.

Q     And when a party has entered into a contractual indemnity

in which Grace has agreed to the full indemnification of all

claims, BNSF is nevertheless not entitled to assert -- to an

award equal to what it's contractual rights are?  It is limited

by the TDP?

A     There's no way to know that.  If you do a good job at

trial, you might come in well below the maximum.  I don't know.

Q     The question is, though, since the TDP limits BNSF to the

amount that the direct claimant is entitled  --

A     Yes.

Q     -- and the amount that's the direct claimant is entitled

**J&J COURT TRANSCRIBERS, INC.**

Inselbuch - Cross/Davis                       133

1  is intended to be Grace's several share whether it be the

2  scheduled value or the maximum value because there's some

3  extraordinary circumstances that require that several share to

4  be a greater amount, BNSF is limited to that determination of

5  the several share even if its contractual indemnity obligation

6  entitles it to full indemnification?

7          MR. GUY:  Objection, Your Honor.

8          MR. LOCKWOOD:  Objection to form.

9          THE COURT:  Sustained.

10          MS. CASEY:  I have no further questions.

11          THE COURT:  Anyone have a short period of time, maybe

12  20 or 30 minutes' worth?  If so, we'll -- no?  Are all of the

13  insurers and other parties, third parties, who are intending to

14  question Mr. Inselbuch, asked your questions so we're going on

15  to redirect?  Mr. Speights, you still have some?  Mr. Davis?

16          MR. DAVIS:  One line of question.

17                  CROSS EXAMINATION

18  BY MR. DAVIS:

19  Q    Mr. Inselbuch, I represent National Union Fire Insurance

20  Company of Pittsburgh, PA, which has as proof of claim which

21  includes within it an element of attorneys' fees in its

22  capacity as a surety.  As I understand it, the plan as written

23  is intended to put surety claims into the capacity of indirect

24  claims in Class 6.  Is that your understanding?

25  A    I don't know.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    You don't know.  From what I just heard of the BNSF cross

2  examination, if a claimant, for instance, ultimately could not

3  establish any claim at all because perhaps there was no

4  illness, and therefore the claimant had no entitlement to

5  recovery whatsoever, then someone in BNSF's position would have

6  no ability to get its legal fees at all, would it?

7  A    BNSF's claim over is predicated on the claim being a PI

8  trust claim.

9  Q    Right.  But the PI --

10 A    If it doesn't have any rights as a PI trust claim --

11 Q    Right.

12 A    -- then there's no claim over.

13 Q    Right.  So, BNSF would not get its legal fees dealt with

14 at all?

15 A    It would get nothing.

16 Q    Exactly.  Similarly --

17 A    This is the wrench dropped on somebody case.

18 Q    Well, not -- bear with me a moment.  Maybe that's exactly

19 the point because the issue isn't what's a fair recovery.  The

20 issue isn't what's the recovery going to be.  The issue is

21 going to be -- the issue is classification.  Should that wrench

22 -- should that legal fee claim be in Class 9 instead of Class 6

23 --

24 A    Now you're going beyond me.

25 Q    -- because there is no provision for it?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Now you've gone beyond me.  I don't --

2  Q    Yeah.  And let me go to my claim, my client's claim.

3  Well, really, let me go to the point.  Did your committee

4  represent my client?

5  A    Pardon?

6  Q    Did your committee represent my client?

7  A    In the event that your client currently has an asbestos

8  personal injury claim against the Trust, it represents those

9  interests.

10 Q    Right.

11 A    I'm sorry.  Against Grace.

12 Q    Suppose the BNSF claim that we talked about, for legal

13 fees only, legal fees only arising from indemnity where there's

14 no personal injury claim establishable after the fact, did your

15 committee represent BNSF's interest?

16 A    Do you represent BNSF?

17 Q    Did you -- No, I don't.

18 A    I don't think we represent any -- the committee acts for

19 anything other than the asbestos personal injury claims.

20 Q    Right.

21 A    That's why you're here --

22 Q    So is it fair to classify --

23 A    -- and BNSF has their own lawyers.

24 Q    -- is it fair to classify a party that your committee

25 didn't represent in the class that your committee created?

1          MR. LOCKWOOD:  Objection, Your Honor.  He's asking

2     for a legal conclusion on a bankruptcy law matter from a

3     witness that certainly hasn't been tendered for that purpose.

4          THE COURT:  That's sustained.

5     Q    Did your client -- did your committee, in fact, exercise

6     its efforts to maximize the recovery for claims for attorneys'

7     fees where there was no underlying injury where that -- even if

8     that claim is relegated to your class?

9          MR. GUY:  Objection, Your Honor.

10          MR. LOCKWOOD:  Objection.

11          MR. GUY:  The issue of whether the committee did or

12     what it didn't do isn't before the Court.  The question is what

13     the plan does or doesn't do.

14          THE COURT:  That's sustained, but I think this

15     witness has already said that, to the extent there is not an

16     asbestos personal injury claim that the Trust is going to take

17     cognizance of, then somebody having an indirect claim based on

18     a claim that doesn't exist against the Trust, isn't going to be

19     paid.  I don't know how it could be paid.

20     Q    Well, let's go to my claim.  My claim consists of a small

21     piece of legal fees, because the remainder of it has been

22     transferred, but the claim that remains with my client is for a

23     small amount of legal fees --

24     A    The claim against Grace?

25     Q    Against Grace, arising from a general agreement of

                    **J&J COURT TRANSCRIBERS, INC.**

Inselbuch - Cross/Davis                    137

1  indemnity to a surety who provided assurance of a settlement of

2  asbestos PI claims.  Regardless of whether that claim belongs

3  in Class 9 or Class 6, my question to you is when you

4  negotiated Class 9, were you cognizant of the interests of that

5  claim and did you seek to maximize it?

6          MR. LOCKWOOD:  Your Honor, I object.  This -- what

7  he's doing, he acknowledges that the claim arose out of a

8  settlement of asbestos personal injury claims.  He also

9  acknowledged that the claim then got split between his client

10 and some other -- and somebody else, I believe Long Acre

11 actually holds the rest of the claim.  He's now asking this

12 witness whether the committee anticipated the splitting of a

13 claim such that all that remains --

14         MR. DAVIS:  Not at all.

15         MR. LOCKWOOD:  -- of one piece of it is some

16 attorneys' fees, whether the committee wanted to maximize the

17 recovery on that little split of the claim that -- I mean, this

18 is just -- I object to the form.  I object to lack of

19 foundation.  I object to the competence of the witness to

20 answer the question.  And I'm sure there are other valid

21 objections as well that I haven't thought of.

22                     (Laughter)

23         THE COURT:  I haven't heard that this witness did

24 anything to negotiate Class 9 claims and that was the question.

25         MR. DAVIS:  Correct.  That was the question.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  So, could we substantiate the foundation

2  first?  The objection to the foundation and whatever else there

3  was is sustained.

4  Q    Mr. Inselbuch, did you negotiate Class 9 claims?

5  A    With whom?

6  Q    With the other plan proponents?

7  A    In terms of the documents, the plan documents?

8  Q    In terms of the recovery.

9          MR. LOCKWOOD:  Objection, Your Honor.  Does Mr.

10  Inselbuch know what he's referring to --

11          THE WITNESS:  No.

12          MR. LOCKWOOD:  -- by Class 9 claims?

13          THE WITNESS:  I do not.

14          MR. LOCKWOOD:  Could you please lay a foundation?

15          MR. DAVIS:  I'm sorry.

16  Q    The plan provides for Class 6 which is the asbestos

17  claimants and Class 9 which is general unsecured claimants.

18  Are you aware of that?

19  A    No, but I'll accept it.

20  Q    Okay.  Your committee negotiated for the benefit of Class

21  6 claimants, did it not?

22  A    Negotiated for its constituency.  Smarter lawyers than I

23  call them Class 6.

24  Q    Did you negotiate for the benefit of everybody who is

25  relegated to Class 6?

1  A     Since I don't know what Class 6 says, I can't answer you.

2  I don't know.

3          MR. DAVIS:  Nothing further, Your Honor.

4          THE COURT:  All right.  We'll take a lunch recess

5  until one o'clock.

6                    (Recess)

7          COURT CLERK:  Be seated.

8          THE COURT:  Mr. Inselbuch.  Are you ready for

9  whoever's next?

10         THE WITNESS:  Yes, ma'am.

11         THE COURT:  Who's next?  Mr. Speights?

12         MR. SPEIGHTS:  Your Honor, I'm ready to cross examine

13 Mr. Inselbuch.  However, I am informed that Mr. Rosendorf is on

14 the phone.  I don't know if you'd like to ask him the question

15 that you asked me early this morning.

16         THE COURT:  Oh, all right.  Mr. Rosendorf, I was

17 asking the parties this morning whether they would agree that,

18 without the need for a witness being called to support this

19 fact, that I could find as a fact that the Trust would qualify

20 as a qualified settlement fund for Internal Revenue Service

21 purposes.  And Mr. Speights said that he wanted you to have the

22 ability to answer that question.

23         MR. ROSENDORF:  Thank you, Your Honor.  Can you hear

24 me?  I'm not sure if my line is on mute or not.

25         THE COURT:  Yes.  We can hear you.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. ROSENDORF:  Very good.  Your Honor, for tax

2   purposes, we do not have an objection to that being introduced

3   by a submission rather than testimony.  We do have other issues

4   with the 524G trust but they are not tax issues.

5          THE COURT:  All right.  Is there some purpose other

6   than for Internal Revenue purposes that I'd have to make this

7   finding?

8          MR. ROSENDORF:  No, I don't believe so.

9          THE COURT:  Okay.  That's fine.  I didn't see why

10  either.  All right.  Thank you, Mr. Rosendorf.  I appreciate

11  it.

12         MR. ROSENDORF:  Thank you.

13         THE COURT:  Okay, Mr. Speights.

14                    CROSS EXAMINATION

15  BY MR SPEIGHTS:

16  Q    Good afternoon, Mr. Inselbuch.

17  A    Good afternoon, Mr. Speights.

18  Q    Mr. Inselbuch, is it correct to say that you have not

19  represented the asbestos PI committee in every plan

20  confirmation involving a 524G trust?

21  A    I think that's correct.

22  Q    I believe one bankruptcy that was not mentioned today was

23  National Gypsum Company.  Now, you're aware that that was an

24  NGC bankruptcy, aren't you?

25  A    Yes, sir.

**J&J COURT TRANSCRIBERS, INC.**

Inselbuch - Cross/Speights                    141

1  Q    And that was a 524G trust?

2  A    I don't know.  I take your word for it.

3  Q    And, in addition, during the pre-confirmation phase, you

4  were not involved in the Celotex bankruptcy, were you?

5  A    Marginally.

6  Q    You did not represent the PI committee in the Celotex

7  bankruptcy prior to confirmation, correct?

8  A    That's correct.

9  Q    And since confirmation of the Celotex bankruptcy, you have

10 represented the PI TAC in that case?

11 A    Not directly after confirmation or consummation plan but

12 at some time thereafter and continuing until today.

13 Q    Now, you are certainly very aware and very knowledgeable

14 about 524G.  Is that a fair statement?

15 A    I'm aware of it and I think I have knowledge of it.

16 Q    And you've worked with it extensively?

17 A    It's not something that I've worked with.  No.  It's the

18 law.

19 Q    Well, Mr. Inselbuch, would you agree with me that 524G

20 speaks in terms of a trust in the singular and never speaks in

21 terms of trusts in the plural?

22         MR. LOCKWOOD:  Objection, Your Honor.  This is asking

23 the witness to testify about the law, about what the statute

24 says.

25         THE COURT:  Doesn't the statute speak for itself?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. SPEIGHTS:  Well, it lays a foundation for some

2     additional questions, Your Honor.

3          THE COURT:  All right.

4          MR. SPEIGHTS  If he doesn't recall what the statute

5     says, I have it here but I'd like to establish that 524G itself

6     refers to trust in the singular.

7          THE COURT:  All right.  He may answer if he -- Mr.

8     Inselbuch, you may answer if you know.

9     A    I think that's correct but I couldn't be sure.

10    Q    Let me --

11    A    It's a very complicated statute.

12    Q    That we agree upon.  Let me hand you a copy right out of

13    the U.S. Code of 524G.

14         MR. SPEIGHTS:  May I approach the witness?

15         THE COURT:  Yes, sir.

16    Q    And I believe it starts at the bottom of the first page,

17    and I have attempted to go through and underline everywhere the

18    word appears, and at least in those ten instances, would you

19    agree with me that everywhere the word trust appears, it's in

20    the singular, either a trust or the trust?

21         MR. GUY:  Your Honor, we don't have a copy of what's

22    been underlined by counsel but I would stipulate for my part

23    that the provision says what is says in the Code and I don't

24    know that it's helpful to go through line by line, saying when

25    it says trust and when it says trusts.

**J&J COURT TRANSCRIBERS, INC.**

Inselbuch - Cross/Speights                    143

1       THE COURT:  Anyone else agree that the Code says --

2  or that Section 524G says what it says?  All right.

3       MR. LOCKWOOD:  So stipulated, Your Honor.

4       MR. GUY:  Your Honor, I'll agree with it.

5       MR. SPEIGHTS:  I'll stipulate that the sun rises in

6  the east, Your Honor, but that's -- I think the only question

7  is does he agree, at least, in those ten instances which I've

8  underlined in the language, it's in the singular.

9  A    Yes, that's what it says.  Want it back?

10                    (Pause)

11 Q    Would you also agree with me, Mr. Inselbuch, that in the

12 Celotex bankruptcy, the plan of reorganization provides for one

13 trust which pays asbestos property damage and personal injury

14 claims?

15      MR. LOCKWOOD:  Objection.  Relevance.

16      THE COURT:  I'm sorry.  The question was whether this

17 trust says that?

18      MR. SPEIGHTS:  No, Your Honor.

19      THE COURT:  I'm sorry.

20      MR. SPEIGHTS:  I asked him would he agree with me

21 that, in the Celotex bankruptcy, there is one trust which pays

22 both PI and PD claims.

23      THE COURT:  The relevance objection is sustained.

24 Q    Would you agree with me that there has been litigation in

25 the Celotex bankruptcy post-confirmation between the Celotex

**J&J COURT TRANSCRIBERS, INC.**

Inselbuch - Cross/Speights                144

1  asbestos trust and the PI TAC which you represent on one side

2  and asbestos PD claimants on the other side?

3          MR. LOCKWOOD:  Objection.  Relevance.

4          THE COURT:  What's the relevance, Mr. Speights?

5          MR. SPEIGHTS:  Pardon me?

6          THE COURT:  What is the relevance?

7          MR. SPEIGHTS:  Your Honor, the relevance is I'm going

8  to try to get Mr. Inselbuch to identify Anderson's Exhibit 40

9  which I think is directly relevant for a number of matters.  I

10 hope he can identify it and we can avoid having to bring a

11 witness here, by the way, and it's foundation to introducing

12 Anderson Exhibit 40.

13         MR. LOCKWOOD:  Your Honor, what is Anderson Exhibit

14 40?

15         THE COURT:  If you would show it to Mr. Lockwood, Mr.

16 Speights?

17         MR. LOCKWOOD:  Maybe we have it here.  I think we've

18 got it.

19                  (Pause)

20         MR. LOCKWOOD:  I'm going to object on the relevance

21 of Anderson Exhibit 40 so, saying that this is laying a

22 foundation for it, doesn't cure anything, Your Honor.  I mean,

23 I'll read you the title of it.  It's an order from the Celotex

24 bankruptcy court captioned, "Order on Asbestos Settlement Trust

25 Motion Seeking Instructions Regarding Payment of 52 Asbestos

**J&J COURT TRANSCRIBERS, INC.**

Inselbuch - Cross/Speights                    145

1 Property Damage Claims Submitted by Anderson Memorial

2 Hospital."  I mean, I can't even begin to imagine what the

3 relevance to that has to this case.

4         THE COURT:  Well, I'm not sure either so maybe, if

5 you could tell me what that relevance is, maybe I can back into

6 objection that's before me now.

7         MR. SPEIGHTS:  If I might, Your Honor, let me try a

8 couple more questions and I have a feeling we'll end up back at

9 the same place and I will have to educate the Court and Mr.

10 Inselbuch about where I want to go with this.

11        THE COURT:  All right.

12        MR. SPEIGHTS:  But at least let me try to set a

13 little more foundation.

14        THE COURT:  Okay.

15 Q    Mr. Inselbuch, is it fair to say that the asbestos PI

16 committee's position in this case is that there should be only

17 -- there should be separate trusts for the asbestos PI

18 claimants on the one hand and asbestos PD claimants on the

19 other hand?

20 A    That subject may have come up at a committee meeting at

21 some point but I don't recall it.

22 Q    Do you recall that the PI committee advised Judge Roland

23 when he had the case that the PI committee wanted to have a

24 separate trust for PI claims?

25 A    I don't recall.

**J&J COURT TRANSCRIBERS, INC.**

Inselbuch - Cross/Speights                146

1  Q    Are you telling us, Mr. Inselbuch, that you don't care

2  whether there's one trust or two trusts?  That is, the PI

3  committee doesn't care whether there's one trust or two trusts

4  in this bankruptcy -- of Grace bankruptcy?

5  A    I'm not saying that.

6         MR. LOCKWOOD:  Objection.  I don't know how a PI

7  committee can care about something, Your Honor.

8         THE COURT:  Sustained.

9  Q    Do you have -- does the PI committee have a position as to

10 whether there should be one trust for PI and one trust for PD

11 or one trust for all asbestos claimants?

12 A    I think I tried to answer that.  I don't recall the

13 subject so I can't recall what the committee's view is of this

14 if I don't recall what, if any, discussion there was of it.  As

15 we sit here today, we have whatever the plan is that's on the

16 table.

17 Q    Do you recall the members -- I'm not asking you who they

18 are yet but do you recall any of the members of the PI TAC

19 in the Celotex case?

20        MR. GUY:  Objection.  Relevance, Your Honor.

21        THE COURT:  Well, I let this in before.  I'm not sure

22 what the relevance is going to be but I'll let it in again.

23 Overruled.

24 A    As of now?

25 Q    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1  A     I'm not sure.

2  Q     Well, do you -- would you agree that both Motley Rice and

3  Baron and Budd have been members of the PI TAC in Celotex?

4  A     Yes.

5  Q     And would you agree that those two law firms are members

6  of the TAC and members of the negotiating committee with

7  respect to the W.R. Grace bankruptcy?

8  A     Yes.

9  Q     I believe you said that you were involved in the

10 negotiation of the plan of reorganization with the debtors in

11 equity, is that correct?

12 A     No, I don't think I said that.

13 Q     Were you?

14 A     I don't know what you mean by involved.

15 Q     Mr. Wechler has stated that the chief negotiative PI was

16 Mr. Rice.  Would you agree with that?

17 A     If Mr. Rice is in the room, he's the chief.

18                          (Laughter)

19 Q     Would you also agree that Mr. Shelnitz was involved in

20 negotiations of the deal on behalf of the debtors?

21 A     I don't know what you mean by the deal.

22         MR. LOCKWOOD:  Objection.  What do you mean --

23 A     If you mean the discussions that led to the original term

24 sheet --

25 Q     Yes, sir.

1  A    Yes, Mr. Shelnitz was there.  So was I.

2  Q    Would you agree with me that from the PI committee's

3  perspective, as a plan proponent, that the PI committee as far

4  as treatment of traditional PD claims is concerned, had the

5  position that none of that money should come out of your hide?

6  That is, the PI constituency hide?

7           MR. BERNICK:  I'm going to object to that question,

8  Your Honor.  That calls for the course of the negotiations

9  leading up to the term sheet and that is a privileged area and

10 should not be the subject of inquiry in this court beyond the

11 general process that's involved.  The subject position should

12 not be subject to inquiry here.

13          THE COURT:  What's the relevance of what the

14 committee's position is anyway?

15          MR. SPEIGHTS:  Well, the committee is one of the plan

16 proponents.

17          THE COURT:  Yes.

18          MR. SPEIGHTS:  I might say that Mr. Inselbuch -- I

19 believe he answered it then but he answered the same question

20 at deposition.  But that's as far as --

21          MR. LOCKWOOD:  Your Honor, the fact that something is

22 answered at deposition doesn't mean it's admissible in a trial.

23          THE COURT:  That's so but let Mr. Speights make his

24 point, please.

25          MR. SPEIGHTS:  The answer -- the question is whether

Inselbuch - Cross/Speights                    149

1  a plan proponent -- what its position was on this plan, and I'm

2  trying to establish which I probably could do in two minutes,

3  that the PI committee's position -- that is, the plan proponent

4  -- is that it has no interest whatsoever in how traditional PD

5  claims are dealt with.  That comes out of the hide of equity

6  and the PI committee so that my dispute on behalf of Anderson

7  is not with Mr. Inselbuch or his committee or Mr. Frankel or

8  his future claimants representatives.  The issue in dispute

9  about the treatment of Anderson is with equity and Mr.

10 Bernick's client.

11         MR. BERNICK:  Your Honor, I think that as a proration

12 from Mr. Speights -- I know that he said this in his papers --

13 it's not proper here and it's entirely irrelevant.  The

14 question is the plan of reorganization that's before the Court.

15 We are not negotiating in this case in this courtroom

16 proceeding.  We're just dealing with the plan that's been

17 agreed and all the plan proponents support it.  So, whatever

18 Mr. Speights might think of its being the underlying

19 negotiation practice or what drove it or economics is entirely

20 irrelevant and it's privileged, privileged under Rule 408.

21         THE COURT:  Well, I think the problem is that you

22 need to substantiate at least at what point in time all of this

23 is happening because, as I understand it, the debtor's assets

24 is the debtor's assets and they're going to be divided up among

25 some group.  So, I don't quite understand the point.  To the

1 extent that there's an objection to the distribution of assets,

2 all parties are affected by the distribution of assets.

3 So, I think I need to sustain the objection but I'll give you a

4 chance to respond.

5          MR. SPEIGHTS:  Well, Your Honor, let me just --

6 earlier when I wanted to offer Exhibit 40, I said something to

7 the same effect, and I said I would come back to it.  Anderson

8 has a number of objections to the plan.  We're up here now

9 almost on a cameo basis because Mr. Inselbuch is here.  We

10 haven't seen the whole case presented by the debtors as to

11 Anderson and so my cross examination is a little bit

12 herky-jerky because we are just sitting over here to

13 accommodate Mr. Inselbuch which I'm more than happy to do.

14          But, among our many objections to the plan are, first

15 of all, we assert that the plan was or is presently being

16 asserted in bad faith or not being asserted in good faith in

17 accordance with the Bankruptcy Code.  We also challenge

18 feasibility.  We have a number of objections on that.  So, I'm

19 trying to get through Mr. Inselbuch, as one of the plan

20 proponents, to show that Mr. Inselbuch and his committee,

21 number one, have negotiated a plan in which they had left it

22 entirely to the debtors to decide how traditional PD claims are

23 treated under this plan.  It all goes back to W.R. Grace and

24 what it wants with respect to traditional PD claims in general

25 and with Mr. Speights and Anderson Memorial Hospital in

1 particular.

2          For that reason, I'm trying to show the circumstances

3 of how this deal is being proposed to Your Honor and that's a

4 big jigsaw puzzle and only two or three pieces am I trying to

5 get out of Mr. Inselbuch.

6          At the same time, Your Honor, I think it's relevant

7 through good faith objections to show that the origin of the

8 dispute in Celotex, number one, which is reflected in this

9 order that I will be able to show, I believe, the PI TAC was

10 intimately involved in -- in fact, they're named parties in

11 this order -- which resolved Anderson's claim down in Tampa,

12 Florida.  The bankruptcy which Mr. Bernick has frequently

13 referred to in this case as being where some war broke out.  To

14 place that in context and to show by this order which was

15 produced in a proceeding involving the PI TAC, shows that

16 Anderson's claims were allowed in a certain sum there, through

17 a process which goes directly to the issue of feasibility,

18 because if you take the 52 allowed claims in this order which

19 is a 12 percent plan but take the full amount, what we will be

20 able to show, I believe, is that the average amount per

21 building for Anderson claims is $5 million per building which

22 comes up to be a very large sum which has effect on feasibility

23 in this plan.

24          I'm not sure I've covered every ground.  I'm just

25 trying to lay the groundwork now with Mr. Inselbuch that this

1 is what happened in Celotex and their deal that they're

2 supporting in this plan leaves it to the debtor to decide and

3 the PI and future claimant's representatives have no interest,

4 I believe, in whether Anderson goes back to the tort system or

5 whether Anderson is decided by Your Honor, et cetera, et

6 cetera.  Now I've made my showing at your request.

7          MR. BERNICK:  Your Honor, if we're going to go

8 through that in connection with anybody who wants to make a

9 proffer of why something is relevant, we're really not going to

10 get out of here, and I think that now having heard the proffer

11 over, that really the common theme for everything Mr. Speights

12 wants to do is to talk about what happened in prior cases and

13 then why the negotiation, at least as he views it through his

14 perspective of this case, is different.  We feel very strongly

15 that the history of negotiations substantively leading to this

16 plan should be off limits, and Your Honor has ruled that that

17 was appropriate in connection with the depositions that have

18 been taken of the Grace witnesses.

19          It is improper in a court of law to talk about

20 privileged settlement matters and that's exactly what it is

21 that Mr. Speights is doing.  It is entirely irrelevant to the

22 standard of good faith, it's entirely irrelevant to this

23 proceeding, and is corrosive of the integrity of the

24 negotiation process.  And we strenuously take issue with the

25 idea that we should be dealing with these matters in this

1 proceeding.

2         THE COURT:  Okay.  Well, I don't see the relevance of

3 what happened in Celotex, because to the extent that there was

4 an allowance of a claim in Celotex, that should have been, I

5 would assume, Celotex's liability for whatever occurred in that

6 case not Grace's.  And to the extent that Grace has or doesn't

7 have some liability, that's going to have to be determined in a

8 different place, regardless of where.  It's not Celotex's

9 liability that's at issue, it's Grace's.

10         So, I don't see that the proffer establishes the fact

11 that this plan would be infeasible simply because the claims

12 that were allowed in Celotex were on average $5 million each,

13 even though there were 52 of them.  So, the objection is

14 sustained.

15 BY MR. SPEIGHTS:

16 Q    Mr. Inselbuch, let me ask you, unless I'm violating some

17 confidentiality order which I'm sure the plan proponents will

18 be alert to raise, let me show you Plan Proponent's Exhibit 344

19 which is a term sheet which was e-mailed to me, I think over

20 the weekend by Kirkland & Ellis.

21         MR. BERNICK:  Before you -- why is it being shown?

22 Could you take it off the -- he said it might be confidential.

23         MR. SPEIGHTS:  I don't know that it is but --

24         MR. BERNICK:  344.  We're looking at --

25         MR. SPEIGHTS:  It was at one time.

1                        (Pause)

2              MR. BERNICK:  No, this is not confidential.

3              THE COURT:  Mr. Speights, is it three three four or

4    three four four?

5              MR. SPEIGHTS:  Three four four.

6              THE COURT:  Thank you.

7              MR. BERNICK:  This is actually an attachment to an

8    exhibit that we have because the exhibit is an e-mail relating

9    to the litigation with the lenders.  It's an e-mail from Mr.

10   Shelnitz to Ms. Kreeger and Mr. Kruger and Mr. Pasquale.  We

11   don't have an objection to its use by Mr. Speights.

12             MR. SPEIGHTS:  Thank you.  I'm going to put it on the

13   ELMO.  Can you see the ELMO up there?

14             THE WITNESS:  I have my own ELMO.

15             MR. SPEIGHTS:  Oh, okay.

16             THE COURT:  As soon as we get them turned on, Mr.

17   Speights.

18   Q    Now, first of all, I guess in fairness to you, Mr.

19   Inselbuch, I show you the cover mail from Mr. Shelnitz early --

20             COURT CLERK:  You have to get closer to the

21   microphone?

22             MR. SPEIGHTS:  I'm sorry.

23   Q    I'm showing you first the cover e-mail from Mr. Shelnitz

24   forwarding the document in question.  I don't want to ask you

25   anything about it but, in fairness, I want you to know the

Inselbuch - Cross/Speights                155

1  source of it.  And then the next page, if you've seen that, I'm

2  going to turn, is a term sheet for resolution of asbestos

3  personal injury claims.  Now, is it correct that the asbestos

4  personal injury committee negotiated a term sheet with the

5  debtors and others to resolve this bankruptcy?

6  A    Yes.

7  Q    I want to turn your attention to a paragraph dealing with

8  traditional PD claims which is at the bottom of Page 3.

9  A    Well, before you do that, this cover note says that this

10  is draft of the term sheet.

11  Q    I understand.

12  A    I don't know whether this document is the same form as the

13  term sheet which was actually executed.

14  Q    I appreciate that and I'm going to Paragraph B9 on Page 3

15  and I'm going to ask you that exact question.  Paragraph --

16  A    I can't answer that question.

17  Q    Well, I hadn't asked it yet.

18  A    You said that was the exact question.  I thought I knew

19  what it was.

20  Q    Well, I withdraw my exact question.

21                        (Laughter)

22  Q    You see the portion there, Traditional Asbestos Property

23  Damage Claims?

24  A    I see that.

25  Q    And you see the Treatment of Traditional Property Damage

**J&J COURT TRANSCRIBERS, INC.**

1 Claims?

2 A    I see that.

3 Q    And, to your knowledge, has that provision of the term

4 sheet been changed?

5 A    I don't know.

6 Q    I'm asking you to assume that that is the same provision

7 in the plan of reorganization as it exists today.  Can we

8 assume that, Mr. Inselbuch?

9 A    Yes, you can assume anything you want.

10 Q    All right, sir.  Now, if that is the same plan provision

11 that exists today, would you agree with me that that provision

12 does not provide how the debtors or anyone else should decide

13 whether PD claims, traditional PD claims, are allowed or

14 disallowed?

15        MR. LOCKWOOD:  Your Honor, I object to the premise

16 that if that plan provision is the same today -- this is a term

17 sheet.  It's been superseded by the plan.  The plan, to my

18 knowledge, does not have that particular provision as such in

19 it.  But, in any event, if it does, the plan is the place to

20 refer the witness to, not the term sheet.

21 A    It's a draft term sheet.

22        MR. SPEIGHTS:  I'll rephrase the question.  I'll

23 rephrase the question.

24 Q    Under this term sheet, understanding that it's not the

25 final term sheet, under this term sheet, is it correct that

Inselbuch - Cross/Speights                157

1 there is no provision about how traditional PD claims should be

2 allowed or disallowed?

3          MR. GUY:  Objection, Your Honor.  I don't know

4 whether this is the final term sheet or not but, as Mr.

5 Lockwood just said, all that's relevant here is what the plan

6 says today, not what a prior term sheet said.

7          THE COURT:  It seems to me that what is relevant is

8 the plan, Mr. Speights.  I'm giving you some leeway because

9 you've got this objection that indicates that there is

10 something about the plan proposition before the Court that's

11 not in good faith.  So, I'm assuming that this is going to that

12 issue?

13          MR. SPEIGHTS:  It is.

14          THE COURT:  All right.

15          MR. SPEIGHTS:  Among others, Your Honor.

16          THE COURT:  All right.  Well, I'll give you some

17 relevance -- or some leeway, pardon me, but I will accept this

18 evidence subject to a relevance objection later.

19          MR. SPEIGHTS:  Thank you, Your Honor.

20          THE COURT:  Relevance, pardon me, determination

21 later.

22 A    What this Paragraph 9 says is, "The plan shall set forth

23 procedures for the allowance of all asbestos PD claims."  So,

24 yeah, it doesn't provide the procedures in the term sheet.  No

25 procedure is generally provided in the term sheet.

**J&J COURT TRANSCRIBERS, INC.**

Inselbuch - Cross/Speights                    158

1  Q    Would it be fair to -- strike that.  Has the PI committee

2  taken a position on how traditional PD claims should be allowed

3  or disallowed?

4          MR. LOCKWOOD:  Objection to form.  Taken a position

5  where, how?

6          THE COURT:  All right.  Do you want to limit the

7  question, Mr. Speights?

8  Q    I understand the plan now provides that traditional PD

9  claims, present traditional PD claims, will be decided by the

10 bankruptcy court.  Is that your understanding?

11 A    I really don't know, Mr. Speights.

12 Q    Well, has the PI committee taken a position as to whether

13 that is the appropriate way to deal with traditional PD claims,

14 present traditional PD claims?

15         MR. LOCKWOOD:  Same objection.

16         THE COURT:  I'm going to overrule it.  To the extent

17 the witness can answer it, he'll answer it.

18 A    The asbestos creditors committee supports the plan of

19 reorganization plus it supports the treatment that the plan

20 provides for PD claimants.  I am not sufficiently erudite to

21 recite on what that treatment is.

22 Q    Well, I go back to my other question, Mr. Inselbuch, and

23 don't answer it until your lawyer can object.  Haven't you

24 already --

25 A    I hardly need the instruction.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Aren't you already of the view that the PI committee does

2 not care how PD claims are treated, traditional PD claims,

3 other than not wanting the money to come out of the hide of the

4 PI claimants?

5            MR. LOCKWOOD:  Objection.

6            THE COURT:  I'm overruling it subject to deciding the

7 relevance later.  If you can answer, Mr. Inselbuch?

8 A    The interest of the PI -- what you call the PI committee,

9 the asbestos creditors committee, in the treatment by the plan

10 of the claims of other than personal injury claimants, is that

11 they be treated in the way that will satisfy the Court that the

12 plan can be confirmed.

13            MR. SPEIGHTS:  One moment, Your Honor.

14                         (Pause)

15 Q    Would it be fair to say that if the Court decided to

16 permit Anderson to return to the tort system, it would not

17 violate the term sheet that the PI committee negotiated with

18 the debtors in equity?

19            MR. BERNICK:  Objection.  Calls for a legal

20 conclusion and it's also entirely irrelevant to the plan of

21 reorganization.

22            THE COURT:  I'm not sure what the point is that

23 you're driving at.  It doesn't seem relevant, Mr. Speights, but

24 if you can substantiate what the relevance is?

25            MR. SPEIGHTS:  How about if I tell that's my last

**J&J COURT TRANSCRIBERS, INC.**

1  question, Judge?

2                        (Laughter)

3            THE COURT:  All right.  The objection is sustained.

4                        (Laughter)

5            MR. SPEIGHTS:  Your Honor, I go back to what I've

6  been trying to say and I think you granted me leeway to show

7  that.  The PI committee is a plan proponent which negotiated a

8  deal, was instrumental in negotiating that deal, especially

9  through Mr. Rice and Mr. Wechler and the plan proponents, and

10 that the deal they negotiated dealt with traditional PD claims

11 such as Anderson and that under the deal that they negotiated,

12 there is no requirement that Anderson be tried by the

13 bankruptcy court as opposed to being returned to the tort

14 system.  That's all I'm trying to establish, Your Honor, on

15 this question.

16           THE COURT:  So, you want to get behind the plan to

17 the negotiations to see whether the negotiations themselves

18 required the plan treatment?

19           MR. SPEIGHTS:  I'm trying to get to the deal itself

20 negotiated by Mr. Inselbuch's committee.  The deal does not

21 require Anderson to stay in the bankruptcy court.

22           MR. LOCKWOOD:  Objection, Your Honor.

23           MR. SPEIGHTS:  The plan procedures that were later

24 negotiated and which are being proposed here which I don't

25 think was being pushed by the PI committee requires that.  I'm

Inselbuch - Cross/Speights                161

1  trying to draw that distinction and I'm not trying to sabotage

2  the deal that was negotiated on this objection.  I'm trying to

3  show that this was not part of the deal that was negotiated.

4  This is something else that's come along later.

5          THE COURT:  All right.  So the point that you're

6  trying to make is that the plan is not the deal?

7          MR. SPEIGHTS:  The plan is not the deal that was

8  negotiated and announced as a part of the term sheet.

9          MR. BERNICK:  Your Honor, it is true that the term

10  sheet --

11          MR. SPEIGHTS:  If I could finish one thing?

12          MR. BERNICK:  I thought you were done.

13          MR. SPEIGHTS:  I was but then I remembered something

14  else.  It was not part of the term sheet that was negotiated

15  without question that, when it was turned over by the PI

16  committee and the future claimant's representative to the

17  debtor, it was turned over with the understanding that they

18  would deal with property damage claims which they have

19  proceeded to do and they have dealt with them this way.  Now

20  I'm through, Mr. Bernick.

21          MR. BERNICK:  Yeah.  That's a very interesting story

22  that Mr. Speights is speculating and inferring.  It is a story

23  that has nothing to do with matters that are, (a) either

24  discoverable or (b) admissible.  The objective fact and the

25  only relevant fact is that the procedures that he's focused on

**J&J COURT TRANSCRIBERS, INC.**

Inselbuch - Cross/Speights                    162

1  were, in fact, negotiated subsequently.  They were negotiated

2  at the time that we had a futures representative for the PD

3  committee.

4         And as Mr. Speights knows, because he was present

5  during some of the discussions that led finally to the plan as

6  it is today, both the future claimant's representative and the

7  PD committee were involved in those discussions.  They resulted

8  in a separate treatment with respect to the PD claimants and,

9  in that treatment, procedures through a CMO that would apply to

10 claims that had not yet been resolved.  And that's all in the

11 plan.

12        THE COURT:  All right.

13        MR. BERNICK:  So, all the stuff about what happened

14 at the time of the term sheet may be of interest as a

15 historical matter to Mr. Speights, but it's not germane to the

16 plan that's before the Court and it gets into matters that are

17 not properly admissible.

18        MR. SPEIGHTS:  Your Honor, before you rule, I want to

19 say that I strongly disagree with Mr. Bernick's revised

20 history.  However, we're just here today on one issue.  This is

21 not Anderson's day.  I understand that but I want the record to

22 reflect that I strongly disagree with his --

23        MR. BERNICK:  It is Anderson's day with Mr. Inselbuch

24 on this issue.

25        THE COURT:  All right.  I said that I would accept as

**J&J COURT TRANSCRIBERS, INC.**

Inselbuch - Cross/Speights                    163

1   evidence subject to some relevance and, in fact, if it gets

2   into confidential settlement discussions, I will strike it

3   immediately because I don't think that's proper under the Rules

4   of Evidence.  But, to the extent that Mr. Inselbuch can answer

5   the question, I'm going to permit him to answer the question

6   subject to a relevance objection.  So, Mr. Inselbuch --

7           MR. LOCKWOOD:  Your Honor, I just have one additional

8   objection to form which is that he's talking about the deal and

9   the implication is that the deal is embodied in the term sheet

10  and not in the plan and it seems to me that --

11          THE COURT:  Well, the term sheet says that the plan

12  is going to set up the procedures.  I mean, that's what the

13  term sheet says.

14          MR. LOCKWOOD:  Well, that's true.

15          THE COURT:  You may ask your question, if you would

16  restate it, because I've lost it, Mr. Speights.  For my

17  benefit, please?

18  BY MR. SPEIGHTS:

19  Q   Mr. Inselbuch, I think the question was, and I'll restate

20  it, that the deal -- that is, the term sheet as opposed to the

21  final plan of reorganization -- the term sheet does not require

22  as a part of that term sheet present PD claimants to be tried

23  by the bankruptcy court?  Isn't that correct?

24  A   The term sheet provides that the plan will provide a

25  procedure for liquidating the PD claims.  It does not, in the

1 term sheet, provide any procedure for doing that.

2 Q    And isn't it also correct, Mr. Inselbuch, that the PI

3 committee was not involved in negotiating those procedures

4 after the term sheet was executed?

5        MR. BERNICK:  I'm going to object and I would caution

6 -- I believe that that questions asks for particulars about how

7 the negotiations actually proceeded.  I also believe it's wrong

8 because in part because it's overly broad but this is precisely

9 the kind of thing that Rule 408 is designed to foreclose.

10        THE COURT:  All right.  Well, I think whether or not

11 the committee participated as a yes or no answer does not get

12 into settlement discussions and terms so I think the objection

13 is overruled on that basis.  But it's a yes or no answer.

14        MR. BERNICK:  Well, also, then, just to be clear, the

15 discussions that resulted finally in the plan were discussions

16 that included not only preliminary discussions but the actual

17 formulation of the plan itself and Mr. Speights's question as

18 it's framed now really asks whether the PI committee played no

19 role through counsel in the actual crafting of the plan,

20 including those provisions that related to PD.

21        THE COURT:  Then Mr. Inselbuch can answer that

22 question.

23 A    If I understand the question, the Committee, the Asbestos

24 Creditors Committee, through counsel, participated in some

25 detail in the negotiation and drafting of what is now the plan

1 of reorganization and most of its provisions.  Many of the

2 subsets of those term -- of those plan provisions, the

3 negotiating of those subsets were assigned to particular

4 members of the group of plan proponents.  And as far as I

5 recall, the Asbestos Creditors Committee did not play an active

6 role in negotiating with you or any other PD Claimant

7 representatives of the procedures that exist in the plan.

8          MR. SPEIGHTS:  That's all I have, Your Honor, other

9 than to say I believe the end of Mr. Inselbuch's answer

10 responded to my question which was about negotiations, the rest

11 was in response to Mr. Bernick's question, but he did answer

12 the question about negotiations.  Thank you, very much, Your

13 Honor.

14          THE COURT:  All right.  Anyone else on cross exam?

15                    (No verbal response)

16          THE COURT:  All right.  Redirect.  I should say also

17 in case in chief because I understand that some of this had to

18 do with the questioner's case in chief.  But in any event, Mr.

19 Lockwood, your turn.

20                    REDIRECT EXAMINATION

21 BY MR. LOCKWOOD:

22 Q    I have basically two topics and maybe even just two

23 questions that I'd like to address to you, Mr. Inselbuch.

24 First -- and I apologize if I didn't -- my notes didn't get

25 this accurately.  I believe you were asked by counsel for

1  Garlock whether or not the TAC had the right to consent to the

2  compensation of the trustees in the Grace Trust Agreement and I

3  think you said yes -- compensation increases.  I think you said

4  yes.  I may be wrong about that.  But what I'd like you to do

5  is to look at Section 4.5 of the trust Agreement and tell the

6  Court exactly what the respective role of the trustees and the

7  TAC are in dealing with annual compensation increases for

8  trustees.

9           THE COURT:  And this is 277.02, the Trust Agreement?

10          MR. LOCKWOOD:  Yes, Your Honor, it is.

11          THE COURT:  All right.

12  A    What section was that, Peter?

13  Q    4.5.

14  A    Well the relevant sentence, if I just read it out of the

15  document --

16  Q    However you feel like you can best answer it.

17  A    "Per annum retainer and hourly compensation payable to the

18  trustees hereunder shall be reviewed every year by the trustees

19  and after consultation with the members of the TAC and the

20  Futures Representative, appropriately adjusted by the trustees

21  for changes in the cost of living."

22  Q    So that's a consultation right on the part of the TAC and

23  not a consent right?

24  A    Yes, I misspoke.

25  Q    My second question is this, you had a lengthy exchange

**J&J COURT TRANSCRIBERS, INC.**

1  with counsel for Garlock about determining the liability of

2  Grace in the tort system and the procedures for that, and I

3  don't want to try and paraphrase it, but you remember generally

4  that exchange of questions and answers?

5  A    That was this morning so I do remember it.

6  Q    Are there jurisdictions to your knowledge where a

7  co-defendant such as Garlock can obtain a determination of the

8  liability of Grace or the Grace Trust in a tort suit without

9  having to implead the Trust as a defendant?

10 A    Yes.  There are some jurisdictions at least that will

11 permit the identification of bankrupts or bankrupt joint

12 tort-feasors on the jury verdict form so that the jury can

13 allocate fault.  That may be the operative tort law concept to

14 the bankrupts.

15 Q    And could you give us an example or examples of such

16 jurisdictions?

17 A    At last look I think New York does that.

18 Q    So it's then a matter of state tort law as to whether or

19 not setoff or credit rights can be litigated against absent

20 defendants by co-defendants?

21 A    Well that's true, but what I'm talking about had not to do

22 with setoffs.  What I'm talking about is the opportunity that

23 the Garlock lawyers seem to be so worried about, about

24 determining the respective fault of the various co-defendants

25 in the same proceeding.  That's different from the question of

1 whether there would be a setoff permitted to one or another of

2 the co-defendants as a result of that.

3          There are also jurisdictions where joint and several

4 liability doesn't lie against the defendant unless it is

5 allocated some threshold amount of the relative fault of the

6 case.  So there it would also be important.  And in New York to

7 that extent, having them on the verdict form, permits for that

8 to happen in the same proceeding.  Setoffs are different.

9 Setoffs only occur when somebody settles, whether with a trust

10 or with another co-defendant.

11          MR. LOCKWOOD:  No further questions, Your Honor.

12          THE COURT:  Recross.

13          MR. GIANNOTTO:  I just have a very quick question

14 just to clear up the record.  This is Michael Giannotto.

15                    RECROSS EXAMINATION

16 BY MR. GIANNOTTO:

17 Q    Mr. Lockwood referred you to a provision in the Trust

18 Agreement about whether it was a concurrence or a consent role

19 by the TAC in terms of the trustee's compensation, do you

20 recall that?

21          MR. LOCKWOOD:  Objection.  He says concurrence or

22 consent.  The question was consultation or consent.

23 Q    Consultation or consent.

24 A    You mean the question he just asked me?

25 Q    Yeah.

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, I remember that, too.

2  Q    Okay.  Could you turn to the Trust Agreement at Section

3  2.2(f) Romanette (ix) which is on Page 11.

4  A    Yes, sir.

5  Q    And if you could just read that to yourself, please,

6  subsection 9.

7  A    Which subdivision?

8  Q    Subdivision 9, Roman Numeral IX.

9  A    Right.

10  Q    Okay.

11  A    I was right.

12  Q    Right, you were right the first time that's what I wanted

13  to make clear, that to change the compensation other than to

14  reflect cost of living increases of the trustees you need the

15  tax consent --

16          MR. LOCKWOOD:  Objection.

17  Q    -- unless the Bankruptcy Court approves it?

18          MR. LOCKWOOD:  Objection, he didn't --

19  A    Future claimants representative.

20          THE COURT:  Wait.  I'm sorry, I got left out of that

21  loop, Mr. Lockwood.

22          MR. LOCKWOOD:  Well, he left out part of what he was

23  reading from the section.  It says --

24  A    Why don't I just read the sentence.

25  Q    Why don't you do that.

**J&J COURT TRANSCRIBERS, INC.**

1  A    "To change the compensation and/or per diem of the members

2  of the TAC the Futures Representative, the Delaware Trustee or

3  the Trustees, other than to reflect cost of living increases or

4  changes approved by the Bankruptcy Court as otherwise provided

5  herein.  That's a listing of something that would require the

6  consent of the TAC and the Futures Representative."

7  Q    Thank you, very much, Mr. Inselbuch.

8  A    "Subject to appeals and ultimately a decision by the

9  Bankruptcy Court."

10           MR. GIANNOTTO:  Thank you, very much.

11           THE COURT:  Anyone else on recross?

12                   (No verbal response)

13           THE COURT:  Mr. Lockwood, anything further from you?

14           MR. LOCKWOOD:  No, Your Honor.

15           THE COURT:  You're excused, Mr. Inselbuch.  Thank

16 you.

17           THE WITNESS:  Thank you, Your Honor.

18           THE COURT:  Mr. Lockwood, any further witnesses?

19           MR. LOCKWOOD:  I believe the debtors are putting on

20 the next witness, Your Honor.

21           THE COURT:  Ms. Esayian.

22           MS. ESAYIAN:  Your Honor, Lisa Esayian for the

23 debtors.  Our next witness is Richard Finke from W.R. Grace.

24 And, Your Honor, we do not have a binder for Mr. Finke because

25 it's a relatively brief examination.  We just have a few

Finke - Direct/Esayian                    171

1 demonstrative exhibits.  I don't know if Your Honor has a copy.

2 If not I will hand you -- if I may approach I'll hand you an

3 extra copy.

4          THE COURT:  Yes.  Thank you.  Wait one second, Jan.

5 Thank you.  All right, if you'd swear Mr. Finke, please.

6          RICHARD C. FINKE, DEBTOR'S WITNESS, SWORN

7                    DIRECT EXAMINATION

8 BY MS. ESAYIAN:

9 Q    Good afternoon, Mr. Finke.

10 A    Good afternoon.

11 Q    Could you state your full name for the Court and the

12 record, please?

13 A    Yes.  Richard C. Finke.

14 Q    By whom are you employed?

15 A    W.R. Grace and Company.

16 Q    For how long have you worked for W.R. Grace?

17 A    For a little over 20 years.

18 Q    Could you give the Court a very brief overview of your

19 educational background and employment with Grace?

20 A    Yes.  I received a B.A. from Case Western Reserve

21 University in 1976, a J.D. from Duke University School of Law

22 in 1979 and I worked for ten years for a New York law firm

23 Cadwalader, Wickersham & Taft doing general litigation and then

24 I joined W.R. Grace in February of 1989.

25 Q    In general terms what have been your duties with W.R.

**J&J COURT TRANSCRIBERS, INC.**

1 Grace since February of 1989?

2 A    Pre-petition, my duties principally involved case

3 management and oversight of asbestos property damage

4 litigation.  That included support of outside counsel,

5 development and preparation of expert witnesses and you know,

6 similar tasks.

7 Q    And how about post-petition, has that changed in some way?

8 A    Initially it was limited to property damage aspects of the

9 Chapter 11 cases including review of the approximately 4,000

10 property damages claims that were filed by the bar date.  That

11 changed in -- during the summer of 2004.  At that time I was

12 asked by their CEO Paul Norris and our then General Counsel

13 David Siegel to take on responsibility for the general in-house

14 management and oversight of the development of a plan of

15 reorganization.  And those responsibilities have continued till

16 today and they include review and commenting and editing of the

17 plan sections, disclosure statement sections and related plan

18 exhibits, coordinating in-house counsel and other personnel in

19 terms of seeing to it that the appropriate in-house people

20 reviewed and commented on pertinent sections of the plan and

21 the disclosure statement and plan exhibits.  The

22 responsibilities also include communicating with management

23 concerning plan developments and issues and attending numerous

24 strategy sessions and discussions.

25 Q    So would it be fair to say that you have been closely

Finke - Direct/Esayian                    173

1  involved in your in-house general oversight roles with the

2  development of the proposed plan that is before the Court

3  today?

4  A    Yes.

5  Q    Now, Mr. Finke, in your role with respect to assisting

6  with the development of the proposed plan, I'm going to ask you

7  some questions about certain specific provisions of the plan

8  and the first provision I'm going to ask about is Section 8.8.7

9  which includes certain releases.  And I believe you have in

10  front of you a copy of this demonstrative exhibit which shows

11  the best -- a large portion of Section 8.8.7.

12        First of all, Mr. Finke, have you reviewed this

13  provision previously?

14  A    Yes, I have.

15  Q    And are you familiar with it?

16  A    Yes, I am.

17  Q    What is the purpose of Section 8.8.7?

18  A    The purpose is without, you know, reading, you know,

19  through this verbiage is essentially to release the enumerated

20  parties in this section and their representatives to the extent

21  they served during the Chapter 11 cases from any claim held by

22  a holder of a claim in the Chapter 11 cases or the holder of an

23  equity interest from any claims pertaining to the debtors or

24  the reorganized debtors or their businesses or these Chapter 11

25  cases.

**J&J COURT TRANSCRIBERS, INC.**

Finke - Direct/Esayian                                    174

1  Q    Has this section 8.8.7 recently been modified?

2  A    Yes, it was.

3  Q    And how did those modifications come about?

4  A    This was -- the recent modification was in response to an

5  objection by the U.S. Trustee.  He objected to the scope of the

6  releases to the extent that they -- that the section could be

7  read to release claims of representatives who have not been at

8  all involved in the Chapter 11 cases.  And so the additional

9  language which is highlighted in yellow I believe was added to

10 narrow the scope.

11 Q    And would that be the -- could you just read the

12 additional language that was added in response to the U.S.

13 Trustee objection?

14 A    Yes.  "To the extent such representatives served during

15 the Chapter 11 cases."

16 Q    And why -- as a general matter why did Grace -- why has

17 Grace and the plan proponents included this Section 8.8.7 in

18 the proposed plan?

19 A    There are several reasons.  One reason is to protect the

20 debtors' and reorganized debtors' assets.  Some of the parties

21 listed and released pursuant to this section have

22 indemnification rights over against Grace for claims that might

23 otherwise be discharged or enjoined as against the debtors and

24 reorganized debtors.  So we felt it was important to include

25 this release provision to prevent a sort of backdoor liability

Finke - Direct/Esayian                    175

1  situation from arising.

2          We were also advised by outside counsel that such

3  provisions are -- I believe the word was ubiquitous in plan

4  reorganizations -- plans of reorganization and that therefore

5  parties participating in these Chapter 11 cases would expect

6  that such a release provision would be included

7          And finally, we also came to believe that this

8  provision should be included to encourage those who are

9  participating in the Chapter 11 cases and their

10 representatives, to encourage a unfettered and vigorous

11 participation, not only just from Grace's standpoint, which

12 would involve Grace's own representatives operating our

13 businesses and representing the company, but also to encourage

14 other participants and creditors to negotiate settlements of

15 claims and to, you know, participate in the formulation of the

16 plan.

17 Q   Now, Mr. Finke, Section 8.8.7 covers only certain

18 specifically listed parties, committees and their

19 representatives.  Why are those particular entities and parties

20 covered by this release provision?

21 A   Well, some have -- as I indicated, some have an identity

22 of interest with the debtors which are reflected in

23 indemnification rights over against the debtors, others have

24 made a substantial contribution to the plan both financial and

25 otherwise.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    In the course of mailing out the plan and disclosure

2 statement for the voting process, do you know if creditors were

3 informed of this release?

4 A    Yes, they were.  In the voting instructions that

5 accompanied ballots that were sent to creditors eligible to

6 vote on the plan, the voting instructions clearly stated that

7 this Section 8.8.7 would be included in the plan and that a

8 vote in favor of the plan would be deemed to release claims as

9 explained in this provision against the enumerated parties.

10 And that language was set out in boldface type in a separate

11 box in the voting instructions.

12         THE COURT:  Ms. Esayian, I don't think we got the

13 exhibit number for the demonstrative for 8.8.7 on record.

14         MS. ESAYIAN:  You're correct, Your Honor.  I

15 apologize.  That was Plan Proponent's 505-1.

16         THE COURT:  All right.

17 Q    And, Mr. Finke, I have now -- could you now take a look at

18 Plan Proponent's 505-4, and is that the page from the cover

19 letter that was included with the ballot, the cover letter that

20 had the voting instructions and that includes in a box in bold

21 the notification to the creditors of this release provision,

22 Section 8.8.7?

23 A    Yes, it is, although I don't believe in the -- at least I

24 don't recall that the voting instructions had the title of the

25 box highlighted in gold or yellow.

**J&J COURT TRANSCRIBERS, INC.**

Finke - Direct/Esayian                    177

1  A    So for demonstrative purposes we put the title in yellow,

2  but the actual version that was sent out was in bold, but not

3  in yellow, is that fair?

4  A    Yes.

5  Q    Now, is there any exception to what we've just described,

6  that creditors were informed of this release in the voting

7  instructions?  Any exception in terms of a party that's covered

8  by the release provision?

9  A    Yeah, there is an exception, parenthetical exception, in

10 Section 8.8.7.  The exception relates to the fact that

11 representatives of the Sealed Air indemnified parties and the

12 Fresenius indemnified parties are released from these claims,

13 which notwithstanding the extent of I think their activity in

14 the cases I think that arises out of -- at least my

15 understanding is that that arises out of the Sealed Air and

16 Fresenius agreements.

17 Q    All right.  Now, Mr. Finke, I'd like to turn to another

18 release provision in the plan and that is Section 8.8.8.  And I

19 believe you have in front of you Plan Proponent's Exhibit

20 505-2.  Have you seen this Provision 8.8.8 previously?

21 A    Yes, I have.

22 Q    And are you generally familiar with it?

23 A    Yes, I am.

24 Q    After the plan was mailed out for voting this past spring

25 were there any objections to this provision 8.8.8?

1  A    I'm aware of one, again, by the U.S. Trustee similar to

2  the previous provision that we discussed.  The U.S. Trustee

3  thought the terms of Section 8.8.8 were over broad and that

4  only the representatives of the debtors and nondebtor

5  affiliates that should be released are those that served during

6  the Chapter 11 cases and so that modification was made to this

7  section.

8  Q    All right.  And so that modification was made recently to

9  this section as reflected in Plan Proponent's 505-2?

10 A    Yes, in the highlighted language.

11 Q    Mr. Finke, in Grace's business judgment is this -- why is

12 this release appropriate and necessary for the proposed plan of

13 reorganization?

14 A    Grace made the determination as an exercise of its

15 business judgment that the benefits arising from releasing its

16 own representatives from their actions and conduct during the

17 course of the Chapter 11 as it relates to, you know, the

18 debtors and these cases, greatly outweighed the potential

19 costs, distractions, delays and potential negative impact on

20 employee morale that might arise from the company's pursuing

21 claims against its representatives.

22 Q    Were these -- the employees you're referring to, were

23 these employees who were actively involved in running Grace

24 businesses and operations?

25 A    Certainly they are included, yes.

**J&J COURT TRANSCRIBERS, INC.**

1 Q     And did Grace actually do some evaluation of the costs and

2 benefits and make a decision as to whether it was appropriate

3 to release these claims?

4 A     Yes, in terms of considering the pros and cons of

5 including a provision like this is the plan, it was felt that

6 it was more important to include this Section 8.8.8 both as a

7 reward for individuals who stayed with the company through the

8 quite protracted and uncertain Chapter 11 cases that the

9 debtors are in and also it was -- there was a concern that even

10 assuming it had a substantial claim against a representative

11 that pursuing such claims would be contrary to one of the

12 principal objectives that Grace had in entering Chapter 11 in

13 the first place, which was to try to put behind it to the

14 fullest extent possible and feasible, all claims, disputes and

15 litigation and come out of Chapter 11 with a fresh start.  And

16 by pursuing any claims against its own representatives, that

17 would just send the wrong message to the rest of the workforce

18 and perhaps entangle it in matters that it really wanted to put

19 behind it.

20 Q     In addition to the releases in 8.8.8 being appropriate in

21 Grace's judgment for those reasons, does Grace have a view as

22 to whether the releases are also necessary in the context of

23 the overall settlements that are achieved by the plan?

24 A     Yes.  I mean that's kind of what I was trying to say, you

25 know, as part of this fresh start that the company is looking

**J&J COURT TRANSCRIBERS, INC.**

1 for, that its releases of this nature are viewed as sort of an

2 integral piece of a bigger puzzle which is represented by the

3 plan.

4 Q     All right.  Now I'd like to ask you about just one more

5 plan provision and that is Section 11.9.  And I believe you

6 have in front of you Plan Proponent's Exhibit 505-3.  Mr.

7 Finke, have you seen and are you generally familiar with

8 Section 11.9?

9 A     Yes, I am.

10 Q     A similar question as to the other two provisions we've

11 looked at.  Did the plan proponents recently modify Section

12 11.9?

13 A     Yes, we did.  Again, the U.S. Trustee asserted an

14 objection to the inclusion of certain entities and -- well

15 entities in the list of parties that would benefit from Section

16 11.9.

17 Q     And is that modification and the deletion of those

18 entities reflected in the red strikeouts on 505-3?

19 A     Yes, it is.  The -- again, the Trustee raised its concern

20 and belief that only parties who had been active during the

21 Chapter 11 cases should be eligible for releases from claims.

22 And since the entities in question, the two trusts, the

23 trustees and trust advisory committees, do not come into

24 existence until the effective date, he felt it was

25 inappropriate to have them included in this section so we have

1  deleted them.

2  Q    And did that deletion fully resolve the U.S. Trustee's

3  objection with respect to Section 11.9?

4  A    Yes, to my understanding he was satisfied and has

5  withdrawn his objection.

6  Q    How about for the other two provisions we looked at, 8.8.7

7  and 8.8.8, did the modifications that you've described there

8  for those provisions fully resolve the U.S. Trustee's

9  objections to those provisions?

10 A    It is my understanding that they did, yes.

11 Q    Mr. Finke, in general what is the purpose of Section 11.9?

12 A    Section 11.9 seeks to provide, in essence, immunity from

13 liability with -- to the enumerated parties for any and all

14 acts and omissions in connection with or arising out of the

15 Chapter 11 cases as is set forth in the section.  The purpose

16 of the provision, you know, we felt strongly that anyone, any

17 party who participated in the process of seeking negotiated

18 settlements of claims and of trying to pull a consensual plan

19 together and of making substantial contributions to integral

20 components of that plan should not -- or should be allowed to

21 do so without concern that subsequent to the Chapter 11 they

22 would be subjected to claims of misconduct or errors of

23 judgment or a similar type of claims.  So we included this

24 provision which again, we were advised by outside counsel is a

25 typical part of plans of reorganization and are consistent with

Finke - Direct/Esayian                          182

1 Third Circuit Law.

2 Q    Thank you.  Now I'd just like to turn to one final topic

3 away from these plan provisions for a moment, Mr. Finke, and

4 ask you a few questions about contributions that Grace is

5 making to the Trust and in context with the proposed plan on

6 behalf of certain other parties.  First of all, I want to ask

7 you, as a general matter, are you aware that Grace settled with

8 certain insurance companies prior to its Chapter 11 filing and

9 provided indemnity provisions to those insurance companies in

10 those settlement agreements?

11 A    Yes, I am.

12 Q    And again, as a general matter, are you aware of how the

13 plan deals with those indemnity provisions?

14 A    I'm not sure I understand the question.

15 Q    Maybe I can just simplify it a little bit.  As a general

16 matter are you aware that the plan would give protection under

17 the channeling injunction, protection under Section 524(g) to

18 those settled insurers who have indemnities in their

19 pre-petition settlement agreements?

20 A    Yes.  I mean, certainly the plan includes within the

21 definition of asbestos protected parties settled asbestos

22 insurance companies which, as I understand, include the

23 companies you are referring to that had pre-petition settlement

24 agreements with Grace and which included the indemnity

25 obligations.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    All right.  So then with respect to those insurance

2 companies that have those pre-petition settlement agreements

3 with Grace that include indemnities from Grace to the insurers,

4 are any contributions being made in the proposed plan to the

5 Trust on behalf of those settled pre-petition insurers?

6 A    Yes.  I mean Grace is making -- when Grace makes its

7 contribution to the 524(g) Trusts, it will do so at least in

8 part, on behalf of those settled asbestos insurance companies

9 which had pre-petition settlement agreements with Grace.  We

10 believe that such contributions are consistent or we have been

11 advised that such contributions are consistent with Third

12 Circuit Law and we believe that they are essential to prevent

13 the type of backdoor liability I was referring to earlier by

14 which claims could be brought against settled insurance

15 companies and which, if not protected, could seek to be

16 satisfied through the debtors' or reorganized debtors' assets.

17 Q    And in addition to the contributions that Grace is making

18 -- strike that.  Is Grace also making contributions on behalf

19 of any other entities that are defined in the plan as asbestos

20 protected parties?

21 A    Yes.  I mean, Grace is making contributions on behalf, of

22 course, itself, the debtors, the nondebtor affiliates, the

23 reorganized debtors, Montana vermiculite and the settled

24 asbestos insurance companies that I mentioned.  Those

25 contributions do not include or are not being made on behalf of

Finke - Direct/Esayian                            184

1  either the Sealed Air indemnified parties or the Fresenius

2  indemnified parties or the insurance companies which have

3  reached settlements with Grace recently within the -- during

4  the pendency of the Chapter 11 cases.

5  Q    And those insurance companies that have reached

6  settlements recently, is it your understanding that they are

7  putting in their own contributions?

8  A    Yes, pursuant to the settlement agreements.

9            MS. ESAYIAN:  Your Honor, I'd just like to move the

10  admission for demonstrative purposes of the four exhibits,

11  505-1, -2, -3 and -4.

12            THE COURT:  Any objection?

13            MR. BROWN:  Your Honor -- no objection, Your Honor,

14  but just note for the record that they are not complete.

15            THE COURT:  They are not complete?

16            MR. BROWN:  Right.

17            MS. ESAYIAN:  That is correct, Your Honor.  They are

18  in -- there are ellipses in some places indicating some text

19  that is not critical for today's arguments that have been

20  removed, and the page that shows the page from the letter that

21  was included with the voting instructions is just one page from

22  that letter.  One moment, Your Honor.

23            THE COURT:  All right.  Plan Exhibits 505-1, 2, 3 and

24  4 are admitted.

25            MR. COHN:  Your Honor, I'm sorry, may we -- this is

**J&J COURT TRANSCRIBERS, INC.**

Finke - Direct/Esayian                    185

1  Dan Cohn for the Libby claimants.  May we have a moment to look

2  at those exhibits, please?

3           THE COURT:  Oh, yes.

4           MS. ESAYIAN:  Oh, I'm sorry.  While he's looking at

5  them, Your Honor, may I amend the offer so that the exhibit

6  that is actually the page from the voting instructions, which

7  is 505-4, would be actually admitted into evidence not for

8  demonstrative purposes, but for evidentiary purposes and the

9  other ones would be admitted for demonstrative purposes.

10          MR. COHN:  Your Honor, I've looked at the exhibits.

11 No objection from the Libby claimants.

12          THE COURT:  Mr. Brown.

13          MR. BROWN:  No objection, Your Honor.

14          THE COURT:  All right, one second until I change my

15 note, please.

16                    (Pause)

17          THE COURT:  Okay, thank you.

18 Q   Mr. Finke, just one final question regarding Plan

19 Provision 8.8.7.  You talked a little bit about how Fresenius

20 and Sealed Air were exceptions in that provision as noted in

21 the -- roughly in the middle of the provision.  Is there also

22 -- are you aware that there's also a -- let me just read to you

23 a sentence from the end of the provision.  It says, "In

24 addition to the foregoing, each holder of a claim or equity

25 interest who receives or retains any property under this plan

**J&J COURT TRANSCRIBERS, INC.**

1  shall also be deemed to unconditionally release the Fresenius

2  indemnified parties to the same extent as the release in the

3  preceding sentence."  Are you aware that that sentence is also

4  in Section 8.8.7?

5  A    Yes, I am familiar with that.

6  Q    And is that also an exception to the general outline of

7  Section 8.8.7?

8  A    Yes, or it's in addition to the other provisions of 8.8.7.

9  That sentence was essentially mandated to be included in the

10 plan by both the Fresenius settlement agreement and the order

11 of the court approving that agreement.

12         MS. ESAYIAN:  Thank you, very much.

13         THE COURT:  Mr. Plevin.

14         MR. PLEVIN:  Your Honor, I've reached an agreement

15 with Ms. Esayian over the weekend whereby most of my cross

16 examination of Mr. Finke is coming in by way of deposition

17 designations.  We did a little horse trading in which I

18 withdrew some designations, she withdrew some objections to

19 other designations, I withdrew objections to some of her

20 counter designations and we agreed that I would ask a limited

21 number of questions on a specific topic.  Ms. Esayian and I

22 will figure out how to get the revised designations to the

23 Court in a way that makes sense.  We haven't figured that out

24 yet, but we will.

25         THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. PLEVIN:  So I just have a few questions without

2     prejudice to that coming in.

3                          CROSS EXAMINATION

4     BY MR. PLEVIN:

5     Q     Good afternoon, Mr. Finke.

6     A     Good afternoon.

7     Q     Do you remember that we met at your deposition on May 13

8     of this year in Washington?

9     A     Yes, I do.

10    Q     As of that time whether Fireman's Funds Surety based

11    claims should be in Class 6 under the plan was still under

12    consideration and discussion at Grace, wasn't it?

13    A     Yes, that's right.

14          MR. PLEVIN:  No further questions, Your Honor.  Thank

15    you.

16          THE COURT:  Just one second, please.

17          MR. BERNICK:  I'm not sure who was the best horse

18    trader on that one.

19                              (Pause)

20          THE COURT:  Go ahead, Mr. Brown.

21          MR. BROWN:  Good afternoon, Your Honor.  Just a minor

22    point.  The questions I have for Mr. Finke this afternoon are

23    in my capacity as counsel for One Beacon America Insurance

24    Company and Seton Insurance Company only.

25          THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

1                    CROSS EXAMINATION

2    BY MR. BROWN:

3    Q    Good afternoon, Mr. Finke.

4    A    Good afternoon, sir.

5    Q    Do you have a screen in front of you with the language in

6    Plan Proponent's 505-1 in front of you?

7    A    Yes, I do.

8    Q    Okay.  The first question I have is whether the language

9    that is highlighted in yellow is intended to modify only that

10   which comes after the comma, asbestos PD FCR, in other words,

11   is it only modifying the party's representatives or everything

12   that precedes that?

13   A    I believe it just -- the way I read it, it just refers to

14   each such party's representatives.

15   Q    Okay.  So it's limited to just the representatives?

16   A    Yes.

17   Q    Now, Mr. Finke, you indicated that you had begun your

18   career in 1989 at Grace?

19   A    Yes.

20   Q    And at that time you were senior litigation counsel, is

21   that correct?

22   A    Yes.

23   Q    And you held that position as I understand it until March

24   of 2006?

25   A    Actually it was September 2005.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    September 2005.

2  A    Yeah.  I got the date wrong in my deposition, but I did

3  correct it.

4  Q    Okay.  And your title now is assistant general counsel for

5  litigation at Grace, correct?

6  A    Yes.

7  Q    When you first began back in 1989 you reported to Mr.

8  Beber, is that correct?

9  A    Yes.

10  Q    And he was the general counsel at the time?

11  A    I'm sorry, in 1989?

12  Q    When you started, yes.

13  A    No, he was not.

14  Q    When did he become general counsel?

15  A    About a year or so thereafter.

16  Q    Okay.  And at that point you reported to him?

17  A    Yes.

18  Q    All right.  Now he retired at some point, did he not?

19  A    Yes.

20  Q    And when was that?

21        MR. GUY:  Objection, relevance, Your Honor.

22        THE COURT:  Relevance, Mr. Brown?

23        MR. BROWN:  Just a little bit of background, Your

24  Honor.

25        THE COURT:  Well, help him out then if you know.

**J&J COURT TRANSCRIBERS, INC.**

1       MR. BROWN:  I don't know.

2       THE COURT:  Oh.

3  A    I believe in the late 1990s.  I don't recall exactly when.

4  Q    He was replaced then by Mr. Siegel, is that correct?

5  A    Yes.

6  Q    David Siegel?

7  A    Yes.

8  Q    And Mr. Siegel was the general counsel at the time,

9  correct?

10 A    Yes.

11 Q    And you reported to him?

12 A    Yes.

13 Q    Were you reporting to Mr. Siegel when Grace filed for

14 bankruptcy?

15 A    Yes.

16      MR. BROWN:  Your Honor, just -- I don't know whether

17 Mr. Finke has the plan proponent's exhibits in front of him or

18 available to him in a binder.  I have the number.  Perhaps it

19 could be brought up in the screen.

20      THE COURT:  That's fine.  I don't think he does.  I

21 don't see any other binders.

22      MS. ESAYIAN:  No, he doesn't have the complete set of

23 plan proponent's exhibits.

24      MR. BROWN:  Okay.

25 Q    Mr. Finke, I'd like you to take a look at what's been

**J&J COURT TRANSCRIBERS, INC.**

1  marked as Plan Proponent's 243.

2          MR. BROWN:  And actually I have a copy, Your Honor,

3  if I may approach the witness.

4          THE COURT:  All right.  We're still going to need it

5  on the screen or something for everyone else to follow.

6          MR. BROWN:  I've got a marked up version of it, Your

7  Honor.  Can you put it on the screen for us?

8                          (Pause)

9  Q    Mr. Finke, you've seen this document before, have you not?

10 A    I believe I did quite some time ago.

11 Q    Okay.  Can you turn to the very last page of it.  It's

12 Bates label PP9948.

13 A    Okay.

14 Q    Do you recognize the signature on that page as being Mr.

15 Siegel's signature?

16 A    Yes.

17 Q    Okay.

18         MR. BROWN:  Your Honor, I would move for the

19 admission of PP-243 into evidence.

20         THE COURT:  Okay.

21         MR. GUY:  Your Honor, I'm not sure what relevance

22 this is to anything.

23         MR. BROWN:  Your Honor, I'll be happy to address

24 that.  You may recall, Your Honor, from Friday's testimony that

25 Mr. Posner was somewhat equivocal on identifying Fresenius

**J&J COURT TRANSCRIBERS, INC.**

1  Medical Care Holdings, Inc. and Sealed Air Corporation.  This

2  document, which is a verified complaint for declaratory relief

3  which was filed in this case, sets forth a description of the

4  transactions pursuant to which W.R. Grace and Company, the New

5  York corporation, became Fresenius Medical Care Holdings, Inc.

6  It also sets forth the -- that's the Fresenius transaction.

7  It sets forth the details for the Sealed Air transaction, which

8  is the transaction pursuant to which W.R. Grace and Company,

9  Delaware, became Sealed Air Corporation.  And it's accompanied

10 by a declaration by Mr. Siegel regarding those facts and it's

11 an admission of a party opponent.

12         MR. BERNICK:  So what's the relevance?

13         THE COURT:  I still don't know what the relevance is.

14         MR. BROWN:  The relevance, Your Honor, is that the

15 plan is enjoining claims that my client, Seton, has under one

16 of its pre-petition settlement agreements, claims against

17 Fresenius and Sealed Air.  Those injunctions and releases are a

18 subject of our plan objections.

19         MR. BERNICK:  I'm going to be putting on our witness

20 concerning those transactions and I still don't understand what

21 the relationship is (a)between this witness' testimony on

22 direct and this whole subject matter, and (b)what the corporate

23 history has to do with the injunctions issue that apparently

24 Seton and One Beacon want to raise, and (c)what that has to do

25 with this witness.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BROWN:  Your Honor, I'm happy to address that.

2     This witness has testified about Section 8.8.7.  I'm going to

3     ask him how the claim that my client has against Sealed Air

4     Corporation and Fresenius, is dealt with under that provision

5     and other provisions in the plan.

6          THE COURT:  Okay.

7          MR. BERNICK:  That would call for this witness'

8     interpretation and conclusion as a legal matter regarding the

9     application of the plan to this particular client and I still

10    don't see how that implicates anything about the verified

11    complaint.  The verified complaint has got no nexus to any of

12    this.

13         THE COURT:  Exhibit 213 will be admitted for the

14    limited purpose of --

15         MR. BROWN:  I'm sorry, Your Honor,  it's PP-243.

16         THE COURT:  Oh, I'm sorry.  Let me make a change

17    first.  Exhibit 243 is admitted for the limited purpose of

18    substantiating the transactions by which one entity of Grace

19    became Fresenius Medical Holdings and another became Sealed Air

20    as an admission of a party.

21         MR. BERNICK:  Your Honor, that's just the concern.

22    That's the part that has no bearing on this witness' testimony.

23    He's got no foundation that's been established for getting that

24    document in through this witness and it doesn't relate to his

25    direct examination and this is --

**J&J COURT TRANSCRIBERS, INC.**

Finke - Cross/Brown                    194

1        THE COURT:  He just identified the signatory on a

2   sworn and subscribed document that's part of the Court's

3   record.

4        MR. BERNICK:  But the issue is not whether this

5   document may come in through some means.  The issue is whether

6   there's any foundation to ask this witness any questions

7   regarding it and what --

8        THE COURT:  Well, I don't know about that.

9        MR. BERNICK:  Well, that's the whole point, is that

10  --

11       THE COURT:  There aren't any questions yet.

12       MR. BROWN:  Your Honor, there are no questions about

13  the document.

14       MR. BERNICK:  Well then why does the document come in

15  at this point in time through this witness?  Mr. Shelnitz will

16  be testifying two witnesses down.  He's the person who was

17  involved.  It seems to me that if a document is to come in

18  there has to be a foundation through a witness.  It's not

19  simply a question of its admissibility as falling within an

20  exception to the hearsay rule as an admission, it's a question

21  of 602 foundation.  And there is no foundation through this

22  witness.

23       THE COURT:  There is a foundation.  He just

24  identified the signatory as the person he reports to on a

25  document that's a verified complaint.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  That's not the -- that's not foundation

2   for the substance of what the document has to say.

3          THE COURT:  Okay.  I see.  You're challenging my

4   ruling as to the purpose for its admission.

5          MR. BERNICK:  That's correct.

6          THE COURT:  All right, that's fine.  I'll withdraw

7   the purpose for its admission and simply say that it's

8   admitted.

9          MR. BROWN:  Thank you, Your Honor.  While we're on

10  this subject, Your Honor, I have three other documents that

11  pertain to the same issue.

12         MR. BERNICK:  Then why don't we have them tendered

13  through a witness so we don't have to go through the same

14  exercise.

15         MR. BROWN:  Your Honor, if I may.  The document that

16  Your Honor has just admitted gives a relatively simplified

17  version of these transactions.  There are two other documents

18  which are on our exhibit list.  I believe they're also on the

19  plan proponent's exhibit list.  They were the subject of a

20  request for judicial notice.  There was no objection.  And

21  indeed there's been no objection to the documents.  Those

22  documents, Your Honor, are OS-50 and OS-51.  They are

23  respectively the S-4 registration statements in connection with

24  the Fresenius transaction and the Sealed Air transaction and

25  they provide greater detail concerning the actual transactions.

**J&J COURT TRANSCRIBERS, INC.**

1 They are indeed cited in the plan of reorganization and they

2 are SEC filings.  We would ask that those be admitted, as well,

3 Your Honor.

4      MR. BERNICK:  That again is improper for exactly the

5 same reason.  You don't have a witness on the stand to now say

6 this is now the opportunity for us to put into evidence

7 whatever document we think is germane.  The documents, all of

8 them, need a foundation.  And there is no foundation through

9 this witness.  They don't provide their own foundation.  These

10 are pleadings.  Pleadings simply go to the fact that they are

11 allegations.  Those allegations may or may not be true.  these

12 are --

13      MR. BROWN:  Your Honor, these are SEC filings, they

14 are not pleadings.

15      MR. BERNICK:  I'm talking about the first one first.

16 As to the SEC --

17      MR. BROWN:  There's already been a ruling on the

18 first one.

19      MR. BERNICK:  Well, no, there was only -- there was a

20 ruling that was very, very limited.  This ought to be done in a

21 proper way through a live witness.  This is not proper trial

22 procedure.  It's not admissible under the Rules of Evidence.

23 This is Evidence 101.  And this should be done through Mr.

24 Shelnitz who will be testifying shortly.  All we're doing is

25 wasting the time of this witness as to whom there has been no

Finke - Cross/Brown                        197

1  proper foundation established to deal with any of these

2  documents.

3          THE COURT:  If there are no questions of the witness

4  about the substance, the document has been authenticated.  It

5  is a document that is of record before the Court.  I can take

6  judicial notice, let alone having it admitted as substantive

7  evidence of the fact that the document is part of the record

8  and is a verified complaint, and that is all.  That's the only

9  purpose.  There is nothing about the truth or not truth because

10 I struck that.  I think you are correct in that respect.

11         With respect to SEC filings I haven't seen them.  If

12 you want to show the parties to see whether or not they'll

13 agree that somehow or other this is -- they are admissible as

14 some recorded compilation of a government agency fine,

15 otherwise you need to do it through a witness.

16         MR. BROWN:  Okay.  Your Honor, a clarification if I

17 can.  I had understood that PP-243 was admitted and the basis

18 for that was that was that it was an admission of a party

19 opponent.

20         THE COURT:  I struck that because Mr. Bernick is

21 correct that a complaint is not an admission, it's an

22 allegation.

23         MR. BROWN:  No, Your Honor, it is accompanied by a

24 declaration.  The declaration --

25         MR. BERNICK:  This is all a bunch of --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  If it's of this witness then you can't

2   authenticate it through this witness.  If that's the case then

3   he is quite correct and the objection has to be sustained.  The

4   exhibit is not admitted.  You need to authenticate it if it's

5   the declaration you're looking for.

6          MR. BROWN:  All right.  Your Honor, if I may.  It is

7   -- PP-243 was the subject of a request for judicial notice to

8   which there was no objection.

9          THE COURT:  Fine, I can take judicial notice --

10          MR. BROWN:  Okay.

11          THE COURT:  -- of the fact that it is filed of

12   record, but that does not adjudicate the truth or content of

13   the document.

14          MR. BROWN:  Mr. Finke authenticated the signature of

15   Mr. Siegel.

16          THE COURT:  He did.

17          MR. BROWN:  Mr. Siegel's declaration is attached to

18   the complaint.  I'm happy to have just the declaration come

19   into evidence, Your Honor.

20          THE COURT:  He cannot authenticate the truth or

21   falsity of the declaration, all he can do is authenticate that

22   it is the signature of a witness, that's all.  You need to move

23   on, Mr. Brown.  Mr. Bernick is correct.  I retract the

24   admission of 243.  It needs to come in through the proper

25   witness if what you are doing is attempting to use the

1  declaration as substantive evidence.  So 243 is not admitted

2  although it has been authenticated.

3  BY MR. BROWN:

4  Q    Mr. Finke, you've been practicing law a long time, have

5  you not?

6  A    Yes, I have.

7  Q    Do you understand the difference between a release and an

8  injunction?

9  A    I believe so.

10  Q    If Judge Fitzgerald has a claim against me for breach of

11  contract, without Her Honor's consent are you able to release

12  that claim?

13          MR. GUY:  Objection, Your Honor.  Speculation,

14  hypothetical, calls for a legal conclusion.

15          MR. BROWN:  This is expert testimony.

16          MR. GUY:  Irrelevant.

17          THE COURT:  Sustained.

18  Q    Mr. Finke, you said that one of your pre-petition duties

19  was to deal with the asbestos property damage claims that were

20  brought against Grace, correct?

21  A    Yes.

22  Q    In the context of doing that, did you have occasion to

23  settle property damage claims?

24  A    I was involved in the settlement of them.  I did not

25  settle them myself.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    What was your involvement?

2  A    Reporting to Mr. Beber at the time all relevant facts,

3  issues, et cetera, and sometimes participating in settlement

4  negotiations with him and opposing counsel.

5  Q    Okay.  In the context of doing that did you have occasion

6  to obtain releases from claimants?

7  A    Yes.

8  Q    Okay.  Did you ever accept a release from someone that was

9  not the claimant?

10  A    Not that I recall.

11  Q    Is it your general understanding that a release is

12  something given by one party to another?

13        MR. BERNICK:  Your Honor, this again is the

14  continuation of the same line of questioning.  Mr. Brown hasn't

15  turned the page to a new section of his outline.  This is all

16  using Mr. Finke in order to establish what is essentially a

17  legal argument.  It doesn't call for factual testimony.  It's

18  not proper.  It goes beyond the scope of direct and it

19  shouldn't be permitted.

20        MR. BROWN:  Your Honor, two things.  The first is

21  that I'm trying to make certain that Mr. Finke and I are on the

22  same page when we use the same terms.  And the concept of

23  releases in the plan and the concept of injunctions in the plan

24  is conflated.  So I'm simply trying to establish as a

25  foundation for my following questions that we're on the same

**J&J COURT TRANSCRIBERS, INC.**

1  page as to what the distinction is between the two.

2          MR. BERNICK:  Well, that's a very different question.

3  He can ask for what his understanding of the terms as used in

4  the plan are.  Apparently he believes the plan is not properly

5  drafted.  The place to sort that out is in his trial brief or

6  whatever.  If he wants to direct Mr. Finke to a portion of the

7  plan, say what does this mean and then -- based upon this

8  definition and ask him some factual question, there won't be an

9  objection.

10          MR. BROWN:  Your Honor --

11          THE COURT:  Okay.  The objection has to be sustained

12  as asked that asks for a legal conclusion, not a factual

13  statement.

14          MR. BROWN:  Okay.  Can I just get a clarification,

15  Your Honor, on who was the attorney that handled the direct

16  examination of Mr. Finke and whether it's appropriate for Mr.

17  Bernick to be lodging objections.

18          THE COURT:  Ah.

19          MR. BERNICK:  Well that's very simple, Your Honor.

20  The direct examination was extremely straightforward.  Mr.

21  Finke was examined concerning why it was that Grace agreed to

22  this particular provision and how it was modified and then some

23  other related questions.  Mr. Brown obviously has a very

24  different agenda that gets into many, many other issues and we

25  think frankly they're outside the proper scope of cross

1  examination.  We'll raise them one by one.  But these are

2  matters that go beyond what was anticipated from Mr. Finke.

3            THE COURT:  They may, but nonetheless I think the

4  rule is that the person who asks the questions makes the

5  objections so we're going to use that rule.  Go ahead, Mr.

6  Brown.

7            MR. BERNICK:  Thank you, Your Honor.

8  Q    Mr. Finke, you've read the plan, correct?

9  A    Yes.

10 Q    Several times?

11 A    Some parts many times, other parts just once.

12 Q    Okay.  You understand it?

13 A    Not everything, no.

14 Q    Is it safe to say that you understand Article 8 of the

15 plan which is entitled injunctions, releases and discharge?

16 A    I have an understanding of Article 8, yes.

17 Q    You just testified about portions of Article 8, did you

18 not?

19 A    Yes, I did.

20 Q    Would you take a look, Mr. Finke, at Section 8.8.7.

21            MR. BROWN:  And, Your Honor, 8.8.7 was the subject of

22 a technical amendment.  I'm not sure what's going -- is that

23 the technical amendment that's going up?

24            THE COURT:  Are you talking about Exhibit PP505-1?

25            MR. BROWN:  Yes, Your Honor, but as I noted earlier,

**J&J COURT TRANSCRIBERS, INC.**

1  that's not complete.

2           THE COURT:  Okay.  So what are you referring to then?

3           MR. BROWN:  I'm -- I don't know whether it's been

4  marked as an exhibit actually, Your Honor.

5           THE COURT:  The plan itself?

6           MR. BROWN:  he plan was marked as an exhibit, Your

7  Honor.  I don't know whether the technical amendments to the

8  plan were marked as an exhibit.

9           THE COURT:  I don't know.

10          MR. ESAYIAN:  What technical amendments are you

11  referring to, the ones that were just filed on Friday?

12          MR. BROWN:  September 4th.

13          MS. ESAYIAN:  Okay.

14          MR. BROWN:  Have they been marked as an exhibit?

15          MS. ESAYIAN:  I don't believe so.

16          THE COURT:  I don't think I've even seen them.

17          MR. BROWN:  Your Honor, I have marked this OS-52.

18  May I approach the witness?

19          THE COURT:  Yes.  If you're going to be using them

20  you're either going to have to put them up on the overhead and

21  give me a copy later or else hand me a copy.

22                          (Pause)

23          MR. BROWN:  We apologize, Your Honor.  We thought the

24  plan proponents would have the technical amendments.

25          THE COURT:  You want someone on my staff to make some

**J&J COURT TRANSCRIBERS, INC.**

1  copies?  Do you have something else you can do for a few

2  minutes until we make a copy?

3          MR. BROWN:  Your Honor, the provisions that Mr. Finke

4  just testified to on direct have been technically amended so I

5  wanted to use the set that had been amended.

6          THE COURT:  Okay.

7  Q    Okay, Mr. Finke, this is going to be a little bit of a

8  challenge because the technical amendment --

9          THE COURT:  You're going to have to magnify it so

10 that it's legible.

11         MR. BROWN:  All right, Your Honor?

12         THE COURT:  It's fine.

13         MR. BROWN:  Okay.

14 Q    Mr. Finke, this is a little bit of a challenge.  I don't

15 know whether you have 8.8.7 in front of you.  There are no page

16 numbers on the technical amendment so I don't have one to refer

17 you to.

18 A    Yeah, I have it in front of me.

19 Q    Okay.  The release that's granted in the first sentence of

20 8.8.7 only applies to holders of claims in equity interest to

21 vote in favor of the plan, correct?

22 A    Yes.

23 Q    So if my client, One Beacon, did not vote in favor of the

24 plan it's not deemed to have provided the release in that first

25 sentence, is that correct?

1       MS. ESAYIAN:  Your Honor, I object.  This calls for a

2  legal opinion and interpretation of this plan provision.

3       MR. BROWN:  Your Honor, that's what we've been doing

4  all day.

5       THE COURT:  It is what we've been doing all day.

6       MS. ESAYIAN:  It's not something that he did in his

7  direct examination.  He did not interpret plan provisions.  He

8  provided the company's rationale for entering into certain plan

9  provisions.

10       THE COURT:  Well, that's true, that is what he did,

11  nonetheless I think this is a fair question for the person who

12  indicated that he is familiar with these.  So I'm going to

13  overrule it.  If it turns out not to be relevant, I'll strike

14  it all later, but we need to get through this evidence.  So

15  I'll accept this subject to a relevance and the fact that the

16  document speaks for itself.  Objection.

17  Q    Mr. Finke, if my client, One Beacon, did not vote in favor

18  of the plan, it's not deemed to have provided the release in

19  the first sentence of 8.8.7, correct?

20  A    Yes, that's my understanding.

21  Q    And that would be true for my client, Seton, as well?

22  A    If it did not vote in favor of the plan, correct.

23  Q    Okay.  Now the second sentence which Ms. Esayian referred

24  you to says, "In addition to the foregoing, each holder of a

25  claim or equity interest who receives or retains any property

1  under this plan, shall also be deemed to unconditionally

2  release the Fresenius indemnified parties to the same extent as

3  the release in the preceding sentence." Did I read that

4  correctly?

5  A    Yes.

6  Q    Okay.  Now this provision is intended to bind all holders

7  of claims that receive or retain money, correct?

8  A    Who receive or retain any property.

9  Q    Okay.  And that's true whether they voted for the plan or

10 not, correct?

11 A    That is my understanding, yes.

12 Q    What if they receive property and send it back?

13        MS. ESAYIAN:  Objection, calls for speculation and a

14 legal conclusion.

15        THE COURT:  Sustained.

16 Q    All right.  Mr. Finke, I want to refer you to another

17 provision in the plan.  It's also in the technical amendments.

18 It was subject to technical amendments.  It's Section 7.13.

19 Are you familiar with that provision of the plan, Mr. Finke?

20 A    Yes, I am familiar with it.

21 Q    Okay.  I'm correct, am I not, that it is intended

22 primarily to protect nondebtors Fresenius and Sealed Air?

23        MS. ESAYIAN:  Your Honor, I would lodge an objection

24 that this goes beyond the scope of the direct examination.

25        THE COURT:  It does.  That's sustained.

**J&J COURT TRANSCRIBERS, INC.**

1         MR. BROWN:  Your Honor, may I address it?  It does

2    not go beyond the scope of the direct examination.  The direct

3    examination dealt with the releases in the plan.  This is a

4    release in the plan.  It just doesn't happen to be in Article

5    8.

6         MS. ESAYIAN:  But the direct exam didn't purport to

7    cover ever release or every injunction in the plan, it only

8    covered three specific provisions.

9         THE COURT:  Do you have this witness listed in your

10   own case, Mr. Brown?

11        MR. BROWN:  Your Honor, we do have him listed in our

12   own case.  We had him listed by deposition designation and that

13   has not been waived and at this point we're prepared to move

14   forward with him on direct if that's --

15        THE COURT:  I think that's what's going to happen.

16   This is outside the scope of the direct that the debtors

17   produced.  So while he's here you can ask him questions in your

18   own case.

19   Q    Mr. Finke, I'm correct, am I not, that Section 7.13 of the

20   plan is primarily designed to protect nondebtors Fresenius and

21   Sealed Air?

22        MS. ESAYIAN:  Same objection.

23        THE COURT:  Sustained.

24   Q    Mr. Finke, is it your understanding that Section 7.13 of

25   the plan protects Fresenius and Sealed Air?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. GUY:  Objection, Your Honor.

2          THE COURT:  Mr. Guy, your microphone is not on.

3          MR. GUY:  Objection, Your Honor.  The Court has

4   already ruled that this is beyond the scope of the --

5          THE COURT:  He's on his case in chief and that

6   question is not objectionable.  Overruled.

7   A    I'm sorry, could you repeat the question.

8   Q    Yes.  Am I correct that Section 7.13 of the plan protects

9   nondebtors Fresenius and Sealed Air from certain claims?

10  A    Yes, I believe it does.

11         MS. ESAYIAN:  Your Honor, that's the objectionable

12  question that calls for a legal conclusion. The question that

13  wasn't objectionable was what his understanding was.

14         THE COURT:  That's what he just repeated.

15         UNIDENTIFIED SPEAKER:  No.

16         MS. ESAYIAN:  He didn't use the word understanding

17  the last time around.

18         THE COURT:  Oh, I'm sorry, I thought he did.  Okay.

19  Would you restate the question, Mr. Brown?

20  Q    Mr. Finke, do you understand Section 7.13 to protect for

21  Fresenius and Sealed Air from the claims set forth therein?

22  A    Yes, that is my understanding.

23  Q    The heading it comes under is no successor liability,

24  correct?

25  A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    I want to focus your attention on the second paragraph.

2 Unfortunately, it begins at the bottom of one page and

3 continues onto the next.  Do you see where it says accept as

4 otherwise expressly provided?

5 A    Yes, I do.

6 Q    Okay.  I want to carry it over to the next page.  It says,

7 "Except as otherwise expressly provided in this plan effective

8 automatically on the effective date the asbestos protected

9 parties shall be unconditionally irrevocably and fully released

10 from," and then it continues.  Do you see that?

11 A    Yes.

12 Q    Okay.  Would you agree with me that that's in the passive

13 voice?

14 A    I have to ask you to define passive voice.

15 Q    We don't know who is doing the releasing.

16 A    I don't know that I can agree with you on that.

17 Q    Can you tell me then who was doing the releasing?

18 A    I would read it such that regardless of who was doing the

19 releasing, except as otherwise expressly provided in this plan,

20 the asbestos protected parties are released from the enumerated

21 claims.

22 Q    Okay.  Does it mean the world is releasing those claims?

23         MS. ESAYIAN:  Objection, calls for a legal

24 conclusion.

25         THE COURT:  Sustained.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Do you have an understanding as to the scope of the

2  parties that are releasing the claims set forth in 7.13?

3  A    Yes, based on my reading of this provision.

4  Q    Does it include my client One Beacon?

5  A    It would appear to be binding on any entity --

6  Q    And it would include --

7  A    -- except as might be otherwise provided in the plan.

8  Q    And it would include my client Seaton as well, would it

9  not?

10 A    Yes.

11 Q    I'm correct, am I not, that 7.13 is intended to release

12 both asbestos-related claims and non-asbestos-related claims?

13         MS. ESAYIAN:  Objection, calls for a legal

14 conclusion.

15         THE COURT:  Sustained.

16 Q    Do you know, Mr. Finke, whether Section 7.13 releases

17 asbestos-related claims?

18         MS. ESAYIAN:  Same objection.

19         THE COURT:  Now, that's a do you know.  It's a yes or

20 no, overruled.

21 A    Yes.

22 Q    It does?

23 A    Yes.

24         THE COURT:  The answer is yes he knows, I think.

25         MR. BROWN:  He knows.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Does it?

2  A    Yes, I believe it does.

3  Q    Does it also release non-asbestos claims?

4           MS. ESAYIAN:  I have an objection for the record that

5  this section speaks for itself, particularly on that kind of a

6  question.

7           THE COURT:  Sustained.

8  Q    Mr. Finke, do you know whether 7.13 releases

9  non-asbestos-related claims?

10          MS. ESAYIAN:  Same objection.

11          MR. LOCKWOOD:  Well, initial objection as to form.

12 All non-asbestos-related claims without regard to the

13 definitions used in the section?

14          THE COURT:  Sustained.

15 Q    Mr. Finke, do you know whether Section 7.13 releases any

16 non-asbestos-related claims?

17          MS. ESAYIAN:  Same objection, speaks for itself.

18          THE COURT:  No, this is a do you know, overruled.

19 A    I have an understanding, yes.

20 Q    What is your understanding?

21 A    It appears to release some non-asbestos claims.

22          MR. BERNICK:  Your Honor, I don't know if this might

23 be -- we would have a motion -- and I suspect that the other

24 plan proponents would join in it -- regarding the examination

25 of this witness generally.  We'd like to make that motion and I

**J&J COURT TRANSCRIBERS, INC.**

1  don't know if -- you know, this is the -- coming on the

2  afternoon break, but -- well, we would have a motion to make

3  with regard to the conduct of this examination.  And it will

4  probably give application to other witnesses who are going to

5  testify on matters that relate to the plan in order to deal

6  with very specific requirements of the code by the factual

7  predicate, not an interpretation of the plan.  And so, at some

8  point we'll continue to -- Ms. Esayian will continue to make

9  the objections as will other counsel, but we would like to

10 present a motion to the Court with regard to this issue.

11          THE COURT:  All right, go ahead.

12          MR. BERNICK:  I think that the federal rules do in

13 fact provide very clear guidance on this.  Mr. Finke is a fact

14 witness.  He can testify to the facts.  The only fact that he

15 can testify to regarding this agreement, the plan, are facts

16 that relate to how it was put together if he know them, and we

17 would have a foundation for them, and if that testimony would

18 otherwise be relevant and permissible.  To the extent that any

19 question calls for any kind of inference or conclusion to be

20 drawn, it is plainly a question that he can only answer because

21 he's a lawyer.  And under 7.01 and 7.02, that means it's expert

22 opinion.

23          To the extent that Mr. Finke is being called as a

24 witness on direct by the carriers here as part of their case,

25 they are essentially seeking to turn him into something that he

**J&J COURT TRANSCRIBERS, INC.**

1  was never presented in our case to be, which is an expert

2  witness, nor have they disclosed him as an expert witness in

3  their case.  So, we can continue to make all of these

4  objections, but it's very plain that any question that calls

5  for him to interpret the plan goes beyond the scope of his

6  designation by either side and turns him into an expert, and

7  that is just impermissible.

8          I know Your Honor wants to get on with the

9  examination to take evidence, but, you know, I think it's very

10 apparent that the whole thrust of this examination is, as I've

11 indicated, to turn him into an expert for the other side.  And

12 under those circumstances by permitting the examination to

13 continue, it doesn't help expedite the trial.  It will in fact

14 have the effect of prolonging the trial.  So, I think it's very

15 important.  We would make a motion to limit the examination of

16 Mr. Finke as part of either the cross examination of Mr. Finke

17 during our case or in service of presenting the case of

18 objectors to limit that examination to matters as to which Mr.

19 Finke has actual personal knowledge, and to preclude questions

20 that call on his skills as a lawyer.

21         UNIDENTIFIED SPEAKER:  Your Honor?

22         MR. GUY:  We would join in that --

23         UNIDENTIFIED SPEAKER:  Your Honor?

24         MR. GUY:  For the SCO we would join in that

25 objection.  These questions go to what the plan says.  No one

1  is saying it's unclear.  There's no need to try to elicit

2  testimony from individual witnesses taking isolated portions of

3  the plan and asking for the witness' understanding of what the

4  plan does when the plan has it in there in black and white.

5  And in argument they can certainly refer to it in their briefs

6  and at oral argument, and in closing they can refer to it in

7  their briefs.

8          MR. BROWN:  Your Honor, if I may address that.  Mr.

9  Finke on direct testified to the intent behind 8.8.7 and other

10 provisions.  I'm asking him about the intent behind this

11 provision, and I'm going to tie it to 8.8.7 in just a moment.

12 Indeed, if there were not so many interruptions in my

13 examination, we would have been there already.

14         THE COURT:  All right, just a minute.  Actually, I

15 don't have a reference in my notes to the word intent in his

16 examination.  So, let me search it again just to make sure I

17 didn't miss it.

18         MR. BROWN:  I might have used the word understanding,

19 Your Honor.

20         THE COURT:  Well, his understanding and the intent

21 are two different things.

22         MR. BERNICK:  Mr. Finke has to provide, as indeed the

23 debtor has to provide, certain factual predicates in order to

24 satisfy the requirements of the code.  And that again is

25 factual testimony.

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  Right.

2           MR. BERNICK:  There's almost not a single question

3 that Mr. Brown has asked that doesn't require that Mr. Finke

4 not only talk about what the intent or goal was of a certain

5 provision, but also asks him to interpret the language of that

6 --

7           THE COURT:  I heard the objection, Mr. Bernick.

8           MR. BERNICK:  Yes, I'm sorry, Your Honor.

9           THE COURT:  Okay.  With respect to the issue of the

10 fact that Mr. Finke testified about intent, my notes at this

11 point do not reflect that word in his examination.

12           MR. BROWN:  All right.

13           THE COURT:  That's not to say I take perfect notes,

14 but, nonetheless, I don't find it.  So, I don't see how at this

15 point that ties into a statement regarding intent.  With

16 respect to the issue that this is now approaching expertise, it

17 is.  I thought I said it earlier that I would --

18           MR. BROWN:  Your Honor -- okay.

19           THE COURT:  -- take this subject to a Rule 7.01 and

20 7.02 objection.  But, it is not getting to interpretative

21 issues, and this witness has been called as a fact witness.

22           MR. BROWN:  All right, Your Honor, I think I can

23 solve the problem.  On direct Mr. Finke was asked a number of

24 questions about the purpose of 8.8.7 and 8.8.8.  So, I'll make

25 the questions about what the purpose is and maybe we can cut

1  through this.

2           THE COURT:  All right.

3  BY MR. BROWN:

4  Q    Mr. Finke, am I correct that the purpose of 11.13 is to

5  release certain types of asbestos-related claims.

6           UNIDENTIFIED SPEAKER:  11.13 or 7.13?

7           MR. BROWN:  I'm sorry, 7.13.

8           THE COURT:  Have you substantiated that the witness

9  knows?  I mean, he said he read the plan, but now we're into

10 fact testimony.  So, you need to lay a foundation first.

11          MR. BROWN:  Your Honor, I asked him if he was

12 familiar with the plan.

13          THE COURT:  You did.

14          MR. BERNICK:  That's not the same thing.

15 Q    Mr. Finke, are you familiar with Section 7.13?

16 A    I'm familiar with it in that I have, you know, previously

17 read it, yes.

18 Q    You have an understanding as to its purpose -- as to what

19 its purpose was historically?

20 A    Yes, I do have a general understanding as to its purpose.

21 Q    What is its purpose?

22 A    My understanding is that it is intended to make clear that

23 no other entity or at least none of the entities specified in

24 Section 7.13 is to be deemed to be or considered to be a

25 successor to the debtor or any of the debtor's affiliates.  I

1 believe it is also intended to protect asbestos protected

2 parties from certain types of claims based on historical

3 relationship and/or transactions between and among the asbestos

4 protected parties.

5 Q    And would that include Fresenius Medical Care Holdings?

6 A    Yes, I believe it would.

7 Q    Would it also include Sealed Air Corporation?

8 A    Yes, I believe it does.

9 Q    And is the purpose of this provision among other things to

10 enjoin -- excuse me -- to release claims that my client, One

11 Beacon, might have against Fresenius or Sealed Air?

12         MS. ESAYIAN:  Objection to the extent it calls for an

13 expert opinion as opposed to this witness' understanding.

14         THE COURT:  That's sustained.

15         MR. BROWN:  Your Honor, I'm using the same word

16 they're using, purpose.

17         UNIDENTIFIED SPEAKER:  That's not the point.

18         THE COURT:  Regardless, you have to substantiate that

19 this witness knows specifically as to your client what the

20 claims are, what the releases are supposed to do and that this

21 provision covers all of that, Mr. Brown.  It's a much broader

22 question than just what does the plan say.

23 Q    Mr. Finke, do you have an understanding or are you aware

24 that my client Seaton has asserted a misrepresentation claim

25 against Fresenius and Sealed Air?

Finke - Cross/Brown                    218

1  A    Yes, I believe I saw a letter that set forth that

2  allegation.

3  Q    Okay.  And that letter was from me, is that correct?

4  A    I believe it was.

5  Q    Do you have an understanding as to what the nature of that

6  claim is?

7        MS. ESAYIAN:  Your Honor, we object to this line of

8  questioning without the letter in front of us, without the

9  letter in front of Mr. Finke so he can have some concrete

10 testimony about this and some understanding as to whether

11 really he knows what these claims are about or not.

12       THE COURT:  Isn't this outside the scope of -- I

13 haven't understood that this witness right now is general

14 litigation, counsel, and I don't know the nature of the

15 allegations, Mr. Brown.  I can't tell whether this is within

16 his actual knowledge or not.  You need to lay a foundation.

17       MR. BROWN:  I'll show him the letter.

18       THE COURT:  Well, your sending a letter to them

19 doesn't mean that they agree with your allegations.

20       MR. BROWN:  I'm not --

21       THE COURT:  The question was that he was aware, he

22 said, yes, he knew.  He was aware of it.  So, where are you

23 going next?

24 Q    Mr. Finke, do you have an understanding as to the nature

25 of that claim?

**J&J COURT TRANSCRIBERS, INC.**

Finke - Cross/Brown                                        219

1  A    Very, very superficial understanding.

2  Q    Okay.  Do you have enough of an understanding to know

3  whether that claim is released under 7.13?

4            MS. ESAYIAN:  Objection to form and calls for a legal

5  conclusion.

6            THE COURT:  Sustained.

7                       (Pause)

8            MR. BROWN:  Your Honor, may I approach the witness?

9            THE COURT:  Mr. Brown, I hope you're making copies of

10 all of these exhibits because otherwise, the Court is not going

11 to have a record of everything you're using.  And the order

12 said if you're going to use something in court to make a paper

13 copy.  So far, you haven't handed up a single exhibit.  So, I'm

14 concerned about what the record is going to be like.

15           MR. BROWN:  Your Honor, it was my understanding that

16 the Court had copies of all of these exhibits.

17           THE COURT:  Well, if I do in all of what you see

18 here, then tell me where --

19           MR. BROWN:  Okay, well --

20           THE COURT:  -- so I can look at them.

21           MR. BROWN:  This is an exhibit on the plan

22 proponent's list, Your Honor, so.

23           THE COURT:  What is it, please?

24           MR. BROWN:  It is PP-239.

25           THE COURT:  And where is it located in these binders?

                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  We'll try to pull you a copy, Your

2   Honor.

3          THE COURT:  Please --

4          MR. BROWN:  Your Honor, we were not privy to the

5   process by which these were provided to the Court.  So, I'm at

6   a little bit of a disadvantage knowing what you have.

7          THE COURT:  These are exhibits you are using.  Why

8   don't you have your copies of your exhibits ready?  That's I

9   guess the issue.  But, okay, fine, we'll find it.

10  Q    Mr. Finke, do you recognize PP-239?

11  A    Yes.

12  Q    Is this the letter that you just testified about?

13  A    Yes, this is a copy of the letter that I saw and was

14  referring to.

15  Q    Okay.  And do you have an understanding as to the nature

16  of the claim asserted in this letter against Fresenius?

17  A    In general, yes.

18  Q    Do you know whether Section 7.13 of the plan -- whether

19  the purpose behind 7.13 of the plan was to release the sort of

20  claim or the type of claim that's described in PP-239?

21         MS. ESAYIAN:  Objection to form, also calls for a

22  legal conclusion, and also invades the privilege as he was

23  litigation counsel and was involved in discussions regarding

24  how to deal with this letter.

25         MR. BROWN:  Your Honor, I'm simply trying to lay a

Finke - Cross/Brown                        221

1  foundation about the nature of the claims that my client has

2  and the impact of the releases on that claim.

3          THE COURT:  Well, I understand but that's -- this

4  witness can't testify to what your client thinks the impact of

5  the plan is on its claim.  That's wholly not -- that's wholly

6  outside the scope of this witness' capabilities.  To the extent

7  that you have something that is a fact question, you may ask

8  it.  But, you're asking for legal conclusion.  and to the

9  extent that he was counsel, there's an objection, a privilege

10  issue which at this point I have to sustain.  But, folks, at

11  some point, the debtor is going to have to tell me what it

12  thinks these things mean.

13          MR. BERNICK:  Well, Your Honor, that is fine.  We're

14  trying to see right now whether Seaton One Beacon even had an

15  objection to this particular provision.  But, most certainly we

16  do.  And we supplied trial briefs.  And after this process is

17  done, there will be more trial brief where people who are

18  totally versed in the plan will respond to these issues.  Mr.

19  Finke is stepping forward to provide limited factual testimony.

20  They can't in-house counsel for Grace and seek to elicit from

21  him support for their legal arguments and legal interpretation.

22  That's all --

23          THE COURT:  I've already --

24          MR. BERNICK:  Yes.

25          THE COURT:  -- sustained the objection.  So, okay,

Finke - Cross/Brown                                    222

1  Mr. Brown.

2  Q    Mr. Finke, are you familiar with the filings that have

3  been made by Kaneb in this bankruptcy case?

4  A    Yes, I am.

5  Q    Have you reviewed them?

6  A    Yes, I have.

7  Q    You understand the allegations that are set forth in them?

8  A    I have an understanding of them, yes, I think so.

9  Q    Are you familiar with the two lift stay motions that Kaneb

10 filed?

11 A    Yes.

12 Q    You understanding, don't you, that one of them related to

13 the Otis Pipeline environmental site in Massachusetts?

14 A    Yes.

15 Q    And you understand that the other related to the Macon,

16 Georgia environmental site?

17 A    Yes.

18 Q    Okay.  What do you understand to be Kaneb's allegations,

19 vis-a-vis settled asbestos insurance companies?

20 A    My understanding is that Kaneb believes it has rights to

21 certain insurance coverage that had been purposed by Grace and

22 which Kaneb has a right to by virtue of its acquisition of a

23 former Grace subsidiary.

24 Q    Okay.  Can you take a look at OS-40, which is in one of

25 your binders there?

**J&J COURT TRANSCRIBERS, INC.**

Finke - Cross/Brown                                      223

1          UNIDENTIFIED SPEAKER:  OS what?

2          MR. BROWN:  Forty.

3          UNIDENTIFIED SPEAKER:  Forty.

4          MR. BROWN:  Four, zero.

5          THE COURT:  Do I have this somewhere?

6          MR. BROWN:  You have this on disk, Your Honor, and

7    hard copies.

8          THE COURT:  I have hard copies?  Unless they're in a

9    binder, the hard copies that I was provided Friday and the

10   OS-7 and that includes some GR exhibits.

11         MR. BROWN:  All right.  I'm informed by my colleague,

12   Your Honor, that we provided these in hard copy form to the

13   plan proponents and that the plan proponents provided them to

14   the Court.

15         THE COURT:  Okay.  I have all of these binders.  I

16   need to know where in these binders these documents are.

17         MS. BAER:  Your Honor, if I could just clarify, we

18   provided as you requested a disk of all plan proponents and all

19   plan objectors' exhibits.  We informed each plan objector that

20   if they were going to use an exhibit at the hearing, they

21   needed to bring a hard copy, that you did not want hard copy

22   exhibits in those binders and you do not have hard copy

23   exhibits in those binders.  What you do have in the binders are

24   the plan documents, the plan, the disclosure statement, those

25   exhibits, and we can point those to you.  But, to the extent

**J&J COURT TRANSCRIBERS, INC.**

1  that they're using exhibits other than that, they were to bring

2  hard copies and that's what we're all doing.

3          UNIDENTIFIED SPEAKER:  Your Honor?

4          THE COURT:  All right.  Everybody who is going to use

5  an exhibit in court has to bring a hard copy for the witness

6  and for me starting tomorrow.  And, Mr. Brown, you can submit

7  yours after the facts since you don't have them here today.

8          MR. BROWN:  We'll do that, Your Honor.

9          THE COURT:  All right.

10         MR. BROWN:  Your Honor, I did not understand that to

11 be the protocol.  We were specifically told that Your Honor

12 didn't want hard copies.

13         THE COURT:  No, I think the -- at least a discussion

14 if not an order, I can't remember which, Mr. Brown, said I did

15 not want hard copies except to the extent they were going to be

16 shown to a witness at trial.  I wanted hard copies only of the

17 portions that would be presented to the witness at trial.  I'm

18 certain that's what I said because I said it more than once.

19 But, in any event, it's fine.  If you can just substitute them

20 later, I'll catch up with you.

21 BY MR. BROWN:

22 Q    Mr. Finke, do you have a copy of OS-40 in front of you?

23 A    Yes, I do.

24 Q    Could you identify it, please?

25 A    It is motion of Kaneb Pipeline Operating Partnership, LP

**J&J COURT TRANSCRIBERS, INC.**

1  and Support Terminal Services, Inc. for an order modifying the

2  automatic stay.

3  Q    Okay.  And I'm correct, am I not, that in that filing

4  Kaneb wanted the lifting of the stay in part so that Kaneb

5  could pursue certain Grace insurers?  If you look at -- if you

6  look at Page XXX1115 --

7           MR. GUY:  Your Honor, for the SCO I'm willing to

8  stipulate whatever that motion says it says.  We're not

9  offering it for the truth of the matter asserted, but it says

10 what it says.  To ask the witness to go through it and talk

11 about what another third party intended in its motion is

12 improper.

13          MR. BROWN:  Your Honor, if -- part of what I am

14 trying to do is to establish that claims have been asserted

15 against my clients in the context of this bankruptcy case that

16 trigger claims by my clients against the debtors and certain

17 non-debtor third parties, namely Fresenius and Sealed Air.  I

18 am trying to lay a foundation with these documents that the

19 claim has been asserted against us, that it is covered by

20 either the indemnity provisions or that it triggers a

21 misrepresentation claim, and then how that claim is being

22 impacted, released or enjoined under the plan.

23          MR. GUY:  Objection, Your Honor.  Those are all legal

24 arguments.

25          THE COURT:  Well, they're -- it's not just legal

1 argument.  The fact is that whether a claim has been asserted

2 against your client coming from a pleading is not an admission

3 against the debtor or the plan proponents.  So, you can't do

4 that through this process.

5         MR. BROWN:  Your Honor, I am not asking that this

6 document be admitted for the truth of the matter asserted,

7 quite the contrary.  I'm simply asking when I move for its

8 admission that it be admitted for purpose of demonstrating that

9 a claim has in fact been asserted against my clients.

10        MR. BERNICK:  Your Honor, there really is a simpler

11 -- much simpler solution.  There's no question in fact, the

12 next witness until this direct examination began -- and I'm now

13 reconsidering whether it's prudent to call the next witness.

14 The next witness was going to go through each of the objectors'

15 claims, that is to say how claims have arisen against each of

16 these objectors, including claims against Beacon One Seaton in

17 order to explain the relationship between those claims and the

18 underlying liability.  There's not any issue in this case but

19 that people have asserted claims against Mr. Brown's clients.

20 And there's no question in this case that Mr. Brown is taking

21 steps through his client in light of those claims.  That's not

22 really at issue at all.

23        What is at issue is using this witness to say, well,

24 okay, (a) are you aware of it, he may or may not be, (b) how

25 does it get treated under the plan?  That's the problem.  We

1  don't need to take up this witness' time with establishing the

2  predicate facts about what kinds of claims are arising against

3  the various objectors here.  We agree that that's happening.

4  The real issue is what is the consequence of that with respect

5  to the plan issues before the Court.  Mr. Finke can't address

6  that.  He's not a bankruptcy lawyer and he can't address the

7  plan because -- well, as I -- there I'm repeating myself.

8  That's the source of the problem, not the predicate facts that

9  Mr. Brown wants to get in, which we would probably be prepared

10  to stipulate to.

11      MR. BROWN:  Your Honor, there maybe a way to cut

12  through some of this.  We have a number of documents that we

13  would like admitted into evidence that I don't think really

14  need to be proffered through a witness.  The plan proponents

15  have insisted that that process be left until the close of the

16  confirmation hearing, at which point if there is an issue about

17  getting some of those documents into evidence, it will be too

18  late to really solve the problem.  So, if we could have a

19  recess and address some of these issues, I can get these

20  documents into evidence and let this witness go.

21      THE COURT:  You will have a recess from 5:30 on

22  tonight at which you may have this conversation to your heart's

23  content.  And if you want to defer your cross examination until

24  tomorrow so that you can undertake that effort, that's fine.

25      MR. BERNICK:  Your Honor, I would agree.  There's

**J&J COURT TRANSCRIBERS, INC.**

1  only one issue with that which is that we now understand the

2  reality of what's happening here, which is that Mr. Brown's

3  client doesn't like the procedures that have been set up in

4  this case.  We set up -- because what he's doing here, if he

5  gets to defer his cross pending an in-trial conference

6  regarding the admissibility of exhibits including relevance and

7  other things so that he can then conduct a cross examination,

8  we will have everybody on this side of the room engaging in the

9  same negotiation.

10      We took the position that the documents because Your

11  Honor is not going to decide on deposition designations and is

12  not going to decide on documents until after the fact, the

13  issues of relevance should be deferred.  And that's just the

14  way that it's going to be.  If we do it any other way, we will

15  be sitting here watching the clock run while people try to get

16  their documents in.

17      THE COURT:  Mr. Bernick, we are watching the clock

18  run as people are trying to get the documents in.

19      MR. BERNICK:  I know.  I'm trying to solve that

20  problem.

21      THE COURT:  So, to the extent that a conference with

22  respect to a -- for example, if in fact it's not disputed that

23  there are claims asserted against certain the insurers, then a

24  stipulation to that effect would certainly eliminate what's now

25  been going on for over an hour.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. BERNICK:  Right, but I really think the solution

2   there is the stipulation as opposed to holding back on cross

3   examination such that if the document -- if you can't reach

4   agreement on the document, then we --

5        THE COURT:  I can't get a stipulation in until I have

6   you talk, and I don't want to waste the next two hours of trial

7   testimony with witnesses while you do it.  You've got all night

8   from 5:30 on to get those stipulations worked out.  So, you're

9   hereby ordered to confer to see whether or not you can arrive

10  at some stipulations that will eliminate the need for witnesses

11  on anybody's behalf.

12       MR. BROWN:  Your Honor, that is fine.  And I just

13  want to point out, we started this morning when I indicated

14  that we were trying to do some horse trading.  The horse

15  trading that I was referring to was to get these types of

16  exhibits in, and I couldn't get a stipulation from the other

17  side.  So, they forced us to do this.  I mean, Mr. Bernick sits

18  here and tells -- you know, is --

19       THE COURT:  Okay.  I understand.  I do understand

20  that it has been somewhat of a frustrating process for

21  everyone.  The issue is this.  If in fact there is no dispute

22  of the nature of the claims that are being asserted against, in

23  your case One Beacon Seaton, then I don't understand why we

24  need to burden this witness or anybody else with the facts that

25  he may or may not know.  Talk to each other and get a

**J&J COURT TRANSCRIBERS, INC.**

1  stipulation done.

2           MR. BROWN:  Your Honor, I will defer my cross

3  examination pending that stipulation.

4           THE COURT:  All right.  If it's not stipulated, Mr.

5  Brown, as soon as whoever is on the stand finishes tomorrow,

6  you're up next.

7           MR. BROWN:  Thank you.

8           THE COURT:  All right.  Let's take a ten-minute

9  recess.  Maybe you can get it down in ten minutes.

10           MR. BROWN:  I think we can.  I thought we were close.

11           MR. BERNICK:  Yes, but just -- Your Honor, that was

12  really --

13           THE COURT:  We're in recess.

14                           (Recess)

15           THE COURT:  Please be seated.  Are you ready, Mr.

16  Finke?

17           MR. BERNICK:  I don't know that anybody -- well, I

18  know Mr. Cohn I know wanted to do some cross.

19           THE COURT:  Mr. Finke, are you ready?

20           MR. FINKE:  Yes, I am.

21           THE COURT:  Yes, sir, all right.

22           MR. BERNICK:  Can we find out if anybody else intends

23  to cross examine Mr. Finke?  Has anyone heard that anybody else

24  intends to cross examine?  Okay.  Well, let's start with Mr.

25  Cohn.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.  Mr. Cohn?

2          MR. COHN:  Thank you, Your Honor.

3   BY MR. COHN:

4   Q    Good afternoon, Mr. Finke.  I'm Dan Cohn.  I represent --

5   A    Good afternoon.

6   Q    Thank you.  I represent the Libby Claimants.  Do you

7   recall -- it must seem like some time ago, but do you recall

8   testifying on direct examination about the contributions that

9   Grace would make on behalf of various pre-petition settled

10  insurers?

11  A    Yes.

12  Q    All right.  And just for clarity, those pre-petition

13  settled insurers are insurers who settled with Grace prior to

14  the Chapter 11 case and paid whatever consideration they were

15  going to pay such that it was received by the debtors prior to

16  the Chapter 11.  Is that your understanding?

17  A    Yes.

18  Q    Now, what are the contributions that are being made on

19  behalf of these insurers?

20  A    The contributions that the debtors are making to the

21  524(g) trusts, which is a combination of cash and the warrants,

22  asbestos insurance rights, et cetera.

23  Q    And what portion of those assets represents a contribution

24  by the debtors on behalf of themselves versus a contribution

25  made on behalf of the insurance?

**J&J COURT TRANSCRIBERS, INC.**

1 A    No specific portion of the debtors' total contribution has

2 been set aside or allocated or denoted to remain on behalf of

3 the settled asbestos insurance companies.

4 Q    Is there a provision of the plan that specifies that an

5 undetermined portion of the assets that are being contributed

6 to the trust are being contributed on behalf of the insurers?

7 A    I don't recall a plan provision that sets that out, no.

8 Q    And if a particular insurer were to be removed from the

9 list of asbestos protected parties being protected by the

10 Section 524G injunction, would that entitle Grace to a decrease

11 in the amount of assets contributed to the asbestos PI trust?

12         MS. ESAYIAN:  Objection, calls for speculation.

13         UNIDENTIFIED SPEAKER:  And a legal conclusion.

14         MS. ESAYIAN:  And a legal conclusion.

15         THE COURT:  No, I don't think so.  I think this is a

16 factual statement based on the fact that the witness said

17 there's not an allocation that's been made, overruled.

18 A    I don't believe so.

19 Q    So, even if all the pre-petition settled insurers were to

20 be removed from the protection of a Section 524G injunction and

21 thus no contributions would be made on their behalf, Grace

22 would contribute the same amount to the trust, correct?

23         MS. ESAYIAN:  Objection, that clearly calls for a

24 legal conclusion.

25         THE COURT:  It does, sustained.

**J&J COURT TRANSCRIBERS, INC.**

Finke - Cross/Cohn                                                  233

1  Q    How much -- strike that.  What is the value if any of the

2  assets that are being contributed to the asbestos PI trust on

3  behalf of Maryland Casualty Company?

4  A    As I said, no specific allocation or amount has been

5  denoted to apply to any particular settled asbestos insurance

6  company.

7  Q    And when you say that assets are being contributed on

8  behalf of the insurers, how do you know that?

9  A    That was a determination that Grace made in furtherance of

10 the, you know, objectives -- Grace's objectives in the Chapter

11 11 such as to preserve its assets such as to, you know, support

12 and prevent the undermining of the releases, discharges and

13 injunctions in the plan.

14 Q    And is that determination set forth in writing?

15 A    I believe it was in our trial brief.  I'm not entirely --

16 I think it has been in writing, but in sitting here right now I

17 can't recall.  I couldn't point you exactly to where it is.

18 Q    Were you involved in making that determination?

19 A    No, I was not.

20 Q    How was that determination -- strike that.  Was that

21 determination communicated to you?

22        MS. ESAYIAN:  Objection to the extent that it calls

23 for privilege.

24        THE COURT:  To the extent what?

25        MS. ESAYIAN:  To the extent that it invades the

**J&J COURT TRANSCRIBERS, INC.**

Finke - Cross/Cohn                                    234

1  privilege.

2          THE COURT:  Now, all right, can you clarify by whom,

3  please?

4          MR. COHN:  Well, I can, Your Honor, however, this

5  witness testified on direct that he was advised by counsel that

6  this was legally sufficient in the Third Circuit or words to

7  that effect.  And, therefore, there is a waiver, at least to

8  this issue, of any attorney-client privilege.  So, what I would

9  like to ask is was this communicated to the witness by anyone

10  including by counsel.

11          MS. ESAYIAN:  But, the question wasn't about the law

12  in the Third Circuit and how that was communicated to the

13  witness.  The question was about how the determination as to

14  whether the substantial contributions that Grace was making to

15  the plan on -- were on behalf of all those insurance parties,

16  whether that was communicated to the witness and by whom.

17          THE COURT:  Yes, but I think on direct the witness

18  said that he was advised by counsel that this was an

19  appropriate provision to include in the plan.  So, if he's

20  already said that he was advised by counsel, then I'm not sure

21  that that's not a waiver.  Did you miss something?

22          MR. GUY:  Your Honor, I don't think he talked about

23  substantial contributions.  I think he was talking about the

24  appropriateness of the releases.

25          THE COURT:  Oh, I'm sorry.  I think that's correct.

**J&J COURT TRANSCRIBERS, INC.**

1 I think, Mr. Cohn, I don't think you did talk about the

2 substantial contribution.  You did talk about the scope of the

3 releases.

4         MR. COHN:  Well, I --

5         THE COURT:  So, I don't think the question has been

6 -- the privilege has been waived as to this.  So, if you can

7 narrow your questions?

8         MR. COHN:  Well, Your Honor, I think we should go

9 back.  And I realize that presents illogistical difficulty, but

10 we need to go back and look at the transcript in this regard

11 because my notes do reflect that the statement was made in

12 regard to the matter of the contributions on behalf of

13 insurers.

14         THE COURT:  Okay.  Well, the only way we're going to

15 do that from the official record is to wait until somebody can

16 point us out to where, and frankly that's going to be

17 difficult.  I don't know whether the folks who have the

18 instantaneous transcripts can do this or not as some unofficial

19 purpose.  Otherwise, we can take a recess until tomorrow until

20 we find it.

21         MR. COHN:  Well, if Mr. Finke is coming back tomorrow

22 anyway because of Mr. Brown, then --

23         THE COURT:  He will be back tomorrow.

24         MR. COHN:  Then, we can do that.  And so, in the

25 meantime, why don't I proceed without asking for privilege

1 communications.

2           THE COURT:  All right.

3 BY MR. COHN:

4 Q    So, Mr. Finke, was the determination to attribute

5 (indiscernible) contributions to the asbestos PI trust in part

6 contributions on behalf of the insurers communicated to you by

7 someone other than an attorney for Grace?

8 A    No.

9           MR. COHN:  No further questions, Your Honor.

10           THE COURT:  Anyone else have questions for this

11 witness?

12                     (No verbal response)

13           THE COURT:  I think it may make sense to not do any

14 further redirect until after the cross examination is finished.

15 Is that what you're expectation is?

16           MR. BERNICK:  Well, I think that -- do you have the

17 -- if you just give us half a second?

18                     (Pause)

19           MR. BERNICK:  I think we'll just close out the

20 witness' testimony so far.  Then, if he is recalled tomorrow to

21 testify to further matters, which we hope to be able to work

22 out, I think we just ought to regard that separately.

23           THE COURT:  All right, that's fine.

24                     REDIRECT EXAMINATION

25 BY MS. ESAYIAN:

**J&J COURT TRANSCRIBERS, INC.**

1  Q    You were asked by Mr. Brown a number of questions about

2  Section 7.13 in the plan, the provision titled, no successor

3  liability.  I'm sure you recall those questions.  Can you tell

4  us what connection, what relationship is there between that

5  provision, Section 7.13, and the requirements of the order

6  approving the Fresenius settlement agreement?

7           MR. BROWN:  Objection, Your Honor, lack of

8  foundation.

9           THE COURT:  Sustained.

10          UNIDENTIFIED SPEAKER:  If he knows it.  Do you know?

11          MS. ESAYIAN:  Well, let me -- I mean, I can -- we can

12  lay some foundation.

13  Q    I mean, Mr. Finke, are you familiar with the -- are you

14  generally familiar with the Fresenius settlement agreement and

15  the order approving it?

16  A    Very generally familiar with the settlement agreement.

17  Q    Based on your general familiarity with the settlement

18  agreement, are you able to tell us what the relationship is

19  between 7.13 and that settlement agreement?

20          MR. BROWN:  Objection, Your Honor, calls for a legal

21  conclusion.

22          THE COURT:  This only calls for a yes or no,

23  overruled.

24  A    I would be guessing, so no.

25  Q    Okay, thank you.

**J&J COURT TRANSCRIBERS, INC.**

1        MS. ESAYIAN:  We'll cover it with another witness.

2        THE COURT:  Is that all?

3        MR. BERNICK:  I think that's all, yes.

4        THE COURT:  Mr. Finke, you're excused until tomorrow,

5   sir, but I'll need you back tomorrow.

6        MR. BERNICK:  And as I understand the rules of the

7   road tomorrow, he's being recalled tomorrow in the event that

8   we're not able to reach agreement with Mr. Brown regarding the

9   documents that he wants to get in and with respect to Mr.

10  Cohn's --

11       MR. COHN:  I can make that easier, Your Honor.  We'll

12  waive the right to any further examination of Mr. Finke.

13       MR. BERNICK:  Thank you.

14       THE COURT:  Oh, all right.

15       MR. BERNICK:  So, the purpose of his being recalled

16  tomorrow then is for Mr. Brown's benefit, is that right?

17       THE COURT:  Yes.

18       MR. BERNICK:  All right.  Our next witness will be

19  Jay Hughes.

20            JAY HUGHES, DEBTOR'S WITNESS, SWORN

21                      (Pause)

22       MR. BERNICK:  Could you please swear the witness?

23       THE COURT:  He is --

24       MR. BERNICK:  Oh, I'm sorry.

25                   DIRECT EXAMINATION

**J&J COURT TRANSCRIBERS, INC.**

1  BY MR. BERNICK:

2  Q    Good afternoon, Mr. Hughes.  Are you the same Mr. Hughes

3  that made that brilliant cameo appearance here the other day?

4  A    Yes, I am.

5  Q    Okay.  We have just a series of really kind of three

6  particular pieces to put in place here.  I want to begin with

7  the settlement criteria.  Prior to the time that Grace filed a

8  Chapter 11 petition, I take it much testimony that we have

9  heard here throughout this proceeding, obviously there were a

10  number of personal injury settlements, is that correct?

11  A    Yes, there was.

12  Q    Okay.  Tell me whether or not -- in the course of agreeing

13  to these settlements tell me whether or not Grace adopted as it

14  went along certain settlement criteria.

15  A    Yes.

16  Q    Could you just tell us in general terms what the

17  settlement criteria were where you had rather large settlement,

18  the bulk of the settlement?

19  A    Generally, we required some evidence of exposure to a

20  various product and a diagnosis of an asbestos-related disease

21  from a qualified physician.

22  Q    I want to show you what we marked as Plan Proponents

23  Exhibit Number 1, and specifically Pages 1 through 16 of that.

24       MR. BERNICK:  Have we handed up a notebook to the

25  Court yet?  And which tab do you know that it is?  Okay, so,

**J&J COURT TRANSCRIBERS, INC.**

1  yes, it's at the very end of your binder, Your Honor.  It's

2  called, Confidential Settlement Agreement, and do you have that

3  in front of you, Mr. Hughes?

4          THE COURT:  I'm sorry, what is the tab number?

5          MR. BERNICK:  It's at the very end.  It's probably

6  added on at the end, handwritten, PP-1.

7          MR. FINCH:  It's a portion of Plan Proponents'

8  Exhibit 1, Your Honor.

9          THE COURT:  I'm sorry, I don't see one in this

10 binder.  Maybe I'm missing it.  The last one I have in the

11 binder is 277.04.

12         MR. BERNICK:  Yes, it's --

13         THE COURT:  Oh, PP-1, I see it.  I apologize.  I've

14 got it.

15         MR. BERNICK:  Okay.  Yes, she's got it.

16 Q    Could you identify that document?

17 A    Sure.  It's a settlement agreement between Grace and

18 settling plaintiffs represented by the law firm of Baron and

19 Budd.  That was from I believe 1998.

20 Q    Okay.

21         MR. COHN:  And I want to offer into evidence Plan

22 Proponents Exhibit 1, but only Pages 1 through 16.  The rest of

23 it is very bulky and not material.

24         THE COURT:  It's admitted.

25 Q    Directing your attention, this is a settlement agreement

**J&J COURT TRANSCRIBERS, INC.**

1  with the Baron and Budd firm.

2  A    Yes.

3  Q    Did this cover a number of different claims?

4  A    Yes, it did, approximately 9,800.

5  Q    Okay.  And directing your attention to Pages 6 and 7,

6  Paragraph 8, will you tell the Court whether or not the

7  criteria for accepting the settlement of this number of claims,

8  whether those criteria were spelled out in Paragraph 8?

9  A    Yes, they are.

10 Q    Directing your attention to the bottom of Page 6, does the

11 bottom of Page 6 in Paragraph 8 actually spell out what's

12 necessary for exposure evidence?

13 A    Yes, it does.

14 Q    Okay.  Beyond saying -- beyond where you have a worker to

15 work site beyond demonstrating that there has been other

16 evidence that the Grace products were at that site and (b) that

17 the settlement plaintiff during a time when it's reasonable to

18 expect that the settling plaintiff would have been exposed to

19 Grace work product, other than being able to show there was

20 product at the site and the claimant was working there during a

21 time when they could have been exposed at the site, was there

22 any other exposure requirement?

23 A    No, there wasn't.

24 Q    And when it comes to medical evidence -- and I want to

25 direct your attention specifically to medical evidence relating

1  to non-malignant asbestos-related disease.  What did it take --

2  what was sufficient to get a settlement of a non-malignant

3  asbestos-related disease in connection with this settlement?

4  What did you have to have?

5  A    Diagnosis by a competent physician.

6  Q    But, if you didn't have that but you had a B-read

7  confirming the condition was that also enough?

8  A    Yes.

9  Q    There has been a lot of discussion about, you know, other

10  requirements that we have in particular in the TDPs.  I don't

11  want to get into the substance of that.  That's for other

12  people to talk about and I don't want to ask you to draw

13  inferences or conclusions.  But, was there any other real

14  requirement in order to get qualification of the medical

15  criteria other than simply having the diagnosis or having the

16  B-read?

17  A    No, there generally wasn't.

18  Q    Is this the only settlement that spelled out and adopted

19  those kinds of criteria?

20  A    No, there were several inventory type settlements that we

21  reached with plaintiffs' law firms that had large number of

22  cases that had similar criteria.

23  Q    Let me ask you some questions about the -- another

24  pre-petition fact which is, what took place with regard to the

25  consent of insurers to settlements?  Prior to the filing of the

Hughes - Direct/Bernick                              243

1  Chapter 11 were there certain insurers that had a -- by

2  contract a right to offer -- to either give or withhold consent

3  with regard to settlements that were taking place?

4  A    Yes, there were.

5  Q    And were you involved, were you knowledgeable concerning

6  what happened with respect to whether those consents were

7  withhold or not provided?

8  A    Yes, I was involved in providing the information to the

9  insurers.

10 Q    Okay.  And what was your experience as to whether insurers

11 insisted upon their --

12         MR. BROWN:  Objection, Your Honor, form of the

13 question, use of the term insurers in the context of this case

14 is vague.  There are --

15         THE COURT:  All right, that's sustained.

16         MR. BROWN:  -- unsettled insurers.  There are

17 reimbursements insurers.

18         THE COURT:  That's sustained.

19         MR. BERNICK:  That's fine.

20 Q    With respect to reimbursement insurers, did the

21 reimbursement insurers withhold their consent?

22 A    Not to settlements as I recall.  There were -- no.

23 Q    What about unsettled insurers?

24 A    No.

25         MS. DeCRISTOFARO:  Objection, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  You folks need to use a microphone.  Ms.

2   DeCristofaro, you've got one so we'll start with you.

3          MS. DeCRISTOFARO:  Okay.  Your Honor, the relevance

4   of this testimony to unsettled insurers who weren't having

5   these agreements tendered to them for approval, I would move to

6   strike all of this.  The only offer that they've made that

7   there is a consent requirement that I've seen is by parties who

8   aren't participating anymore.  If so, it's not admissible as to

9   unsettled insurers.

10          MR. BERNICK:  Well, I'll respond to the earnest

11   suggestion that we limit this to the settled insurers, because

12   I'm told by my counsel that it only relates to the settled

13   insurers.

14          UNIDENTIFIED SPEAKER:  Coverage in place insurers.

15          UNIDENTIFIED SPEAKER:  Reimbursement insurers.

16          MR. BERNICK:  But, as defined that is coverage in

17   place insurers.  Did I get that right?  No?  Okay.  Well,

18   that's going to be the focus of my question with respect to the

19   coverage in place insurers, and I believe that that's defined

20   under the plan as reimbursement insurers.

21   Q    Was your -- what was your experience as to whether consent

22   was withheld?

23   A    I don't recall a specific incident where consent was

24   withheld for a settlement.

25   Q    Okay.  I want to show you --

**J&J COURT TRANSCRIBERS, INC.**

1          MS. DeCRISTOFARO:  Again, Your Honor, may we have a

2  clarification about which insurers they're talking about?

3          MR. FINCH:  We're talking about reimbursement

4  insurers.

5          MR. BERNICK:  I already got that.  So, with respect

6  to --

7          MS. DeCRISTOFARO:  All reimbursement insurers?  Most

8  of them aren't participating.

9          MR. BERNICK:  Your Honor, that goes to -- the

10 question is the witness' practice and experience.  If they want

11 to bring out on cross examination what it is that he knows

12 about a particular carrier, they can.

13         THE COURT:  His testimony is he doesn't recall a

14 single instance where a reimbursement insurer as defined

15 refused to consent to a settlement.  So, his testimony is on

16 record, the rest of it subject to cross examination.  Go ahead,

17 Mr. Bernick.

18         MR. BERNICK:  Thank you.

19 Q   I want to direct your attention to Plan Proponents'

20 Exhibit 95.

21         MR. BERNICK:  Where is that in the book?  Is that at

22 the back end, too?

23         UNIDENTIFIED SPEAKER:  Number 12.

24         MR. BERNICK:  Number 12.

25 Q   Do you have that, Mr. Hughes?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2            MR. BERNICK:  Your Honor, do you --

3            THE COURT:  I have it.

4            MR. BERNICK:  Okay.

5  Q    Is that a December 2, 1997 letter from you at W.R. Grace

6  to an Eileen McCabe at Mendes and Mount?

7            MS. DeCRISTOFARO:  Objection, Your Honor, relevance.

8            THE COURT:  That's not what Exhibit 95 is.

9            MR. HUGHES:  That's not what I have either.

10            THE COURT:  So, let's start with that.

11                         (Pause)

12            THE COURT:  Is this a substitute 95?

13            MR. BERNICK:  It is I think 95, PP-95.

14            THE COURT:  All right.

15            MR. BERNICK:  It was not actually in the binder.

16            THE COURT:  One second, please.  I want to take the

17  other one out I don't --

18            MS. DeCRISTOFARO:  Your Honor, may we have a copy?

19            THE COURT:  Yes.

20            MR. BERNICK:  Exhibit 95.  You have all the Plan

21  Proponent exhibits.

22  Q    Mr. Hughes, is this a December 2, 1997 letter from

23  yourself to an Eileen McCabe and Mendes and Mount?

24  A    Yes, it is.

25  Q    And did you write that in connection with consent to

**J&J COURT TRANSCRIBERS, INC.**

Hughes - Direct/Bernick                    247

1  settlement rights that their client had?

2          MS. DeCRISTOFARO:  Objection, Your Honor.

3          MS. McCABE:  Your Honor, may I -- if I could just

4  note an objection and maybe clarify what client --

5          THE COURT:  Please state your name.

6          MS. McCABE:  I'm sorry, Eileen McCabe from Mendes and

7  Mount, clarify what client.

8          THE COURT:  You want to take a look at the exhibit?

9  You can take a look at the exhibit if you need to.

10         MS. McCABE:  I just think it was because I represent

11 a different client here, Your Honor.

12         THE CLERK:  You have to use the microphone.

13         MS. McCABE:  I represent a different client here,

14 Your Honor, and I believe that was for London Market Insurers.

15         MR. BERNICK:  I believe that it is for the London

16 Market Insurers.

17         THE COURT:  Okay.

18         MS. McCABE:  So, I want to make sure we're not --

19 there's no misunderstanding on the record that it was to AXA

20 Belgium as successor to Royal Belgium.

21         THE COURT:  All right.

22         MR. BERNICK:  They would know best what Eileen McCabe

23 was doing in connection with this issue.  All I'm really going

24 to ask the witness is for his knowledge about the document.

25 Q    First of all, is this a letter that you wrote on or about

**J&J COURT TRANSCRIBERS, INC.**

1  the date appears to Mendes and Mount in connection with consent

2  to settlement right?

3  A    Yes, it was.

4         MR. BERNICK:  Okay.  So, we would offer it, Your

5  Honor.

6         MS. DeCRISTOFARO:  Your Honor, objection to relevance

7  and to the question.  London Market Insurers has a settlement

8  on file.  They're not a participant and that letter can't be

9  offered against anybody else.

10        MR. BERNICK:  Your Honor, it absolutely can be

11 offered for purposes of establishing that the carriers that had

12 consent to settlement rights did not assert them.  It doesn't

13 make any difference if they've settled or not.  The question

14 is, what was the practice?  And this goes to the proposition of

15 whether the plan has an adverse effect, as they have claimed

16 that it does, to the extent that the right to the consent to

17 settlement right is affected, or demonstrating that they never

18 exercised their right to refuse the consent prior to the

19 Chapter 11 being filed.  This goes to that and they can't by --

20 because another party has settled keep the evidence out from

21 the Court's consideration.

22        MS. DeCRISTOFARO:  Your Honor, it would be relevant

23 to the issue of whether London consented prior to -- under

24 their settlement agreement and the terms of their settlement

25 agreement and communications between them and Grace.  I don't

Hughes - Direct/Bernick                    249

1  see how that's at all admissible vis-a-vis any other party.

2  London is not before the Court.  It's directed to London.  It's

3  regarding their contract and their consent and whether they

4  exercised them.

5          MR. BERNICK:  The question is whether the plan -- how

6  the plan compares with the pre-petition practice for

7  settlements in the tort system and for the consent of the

8  carriers.  And it doesn't have to be demonstrated carrier by

9  carrier, case by case.  This was the way that things were

10 handled, and it is a fact of how the system was operating.  And

11 through some special circumstance that relates to their

12 clients' situation, they can bring it out on cross.  The

13 evidence is still admissible.

14         MR. BROWN:  Your Honor, Mr. Bernick continues to use

15 the imprecise term carriers and insurers.  It's muddying the

16 waters in terms of who is talking about.  And in the context of

17 this case where the plan proponents are seeking to bind the

18 reimbursement insurers to the TDPs but not the other insurers,

19 it's important that he be clear in his language.

20         THE COURT:  All right.  The objection with respect to

21 being clear in the language is sustained, because otherwise I

22 think the record will not be clear.  The objection to relevance

23 is overruled.  I think <u>Combustion Engineering</u> sets forth the

24 principle that pre-petition practice is relevant to post-plan

25 practice and, therefore, the objection is overruled.

1          MR. BROWN:  Your Honor, it's relevant as to whom?

2          THE COURT:  Well, I'm going to require the phrasing

3     to be restated.  I sustained that objection.  But, the

4     relevance objection, once this is -- well, I guess you're

5     right.  I guess I need to know to whom first.  Can you restate

6     the question for me, Mr. Bernick.

7          MR. BERNICK:  Yes.

8     Q    Does this document relate to a dialogue that you had with

9     the Mendes and Mount people to -- it was in relationship to the

10    London Market Carriers?

11    A    Yes, it is.

12         MS. McCABE:  Objection, Your Honor.  I feel like the

13    record is going to be unclear, Your Honor.  That's pursuant to

14    a settlement agreement.  I mean, I can bring it out con cross

15    but it's pursuant to a settlement agreement that was entered in

16    1996 between Grace and London Market Insurers.  And just to

17    address one point -- I have to address this point -- Mr.

18    Bernick raised, he said there was a waiver or lack of consent,

19    there is no foundation there was a lack of consent or waiver of

20    consent or something on that part, but --

21         UNIDENTIFIED SPEAKER:  They can exercise their --

22    they didn't withhold the consent.  It's so simple.

23         MS. McCABE:  Well, there is a difference there as to

24    whether we withheld consent or didn't exercise any rights.

25    But, putting that aside, putting that issue aside, Your Honor,

**J&J COURT TRANSCRIBERS, INC.**

Hughes - Direct/Bernick                    251

1  I think the bigger issue is that these letters were written in

2  the context of the settlement agreement with the London Market

3  Insurers that was executed in 1996.  And just following up on

4  my co-counsel's objections, I think it would be improper or I

5  would object on grounds of relevance as to AXA Belgium, Your

6  Honor, that this was a course of conduct with all of the

7  insurers.

8            THE COURT:  I don't --

9            MR. BERNICK:  I'm sorry, Your Honor.

10            THE COURT:  -- think it shows a course of conduct

11  with all insurers.  But, the witness has already testified that

12  he is not -- he doesn't recall a single reimbursement insurer

13  who objected.  So, it's follow-up in that sense to the extent

14  that this is a reimbursement insurer.  That's what I'm waiting

15  to hear, whether this is a reimbursement insurer.

16  BY MR. BERNICK:

17  Q    Is this a reimbursement insurer?

18  A    Yes, it is.

19            THE COURT:  Okay.  Then, the objection to relevance

20  is overruled.  It seems to me that at this point, it is

21  relevant.

22            MR. BERNICK:  Okay.

23  Q    So, do you recall -- let me just direct your --

24            MR. BERNICK:  First of all, I offer the document,

25  Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1           MS. McCABE:  And again, we maintain our objection,

2    Your Honor.

3           THE COURT:  What's the relevance of the document as

4    opposed to the testimony?

5           MR. BERNICK:  Well, the document bears out his

6    testimony.  It confirms his testimony from recollection.  We're

7    talking about something that took place ten years ago.

8           THE COURT:  He hasn't denied that he had any

9    recollection error or problem.

10          MR. BERNICK:  But, that's -- it goes to --

11          MR. BROWN:  Your Honor, the document also goes to

12   notice.

13          THE COURT:  Of what?

14          UNIDENTIFIED SPEAKER:  Notice of a settlement that

15   Grace informed its reimbursement insurers, namely Lloyds of

16   London, London Market Insurers, about a settlement.  And the

17   testimony I believe will establish (a) that that notice was

18   provided to the London Market Insurers and to the other

19   reimbursement insurer listed on the CC line, and (b) that

20   notwithstanding Mr. Hughes' notification that, I'm going to

21   settle these cases for $50 million, there was no objection by

22   the reimbursement insurers to that settlement.

23          THE COURT:  He's already testified to that effect.  I

24   don't see the relevance of the document itself.

25          MR. BERNICK:  The relevance is not at all an issue.

1  The witness has testified to what the practice was and he is

2  going to -- and he testified I believe and he will testify

3  further that as true with respect to this particular carrier

4  who is a reimbursement carrier.  If Your Honor is indicating

5  that to offer a document that confirms his oral testimony is

6  cumulative, I can understand that.  But, it seems to me that --

7          MR. COHN:  Your Honor, then we object that it's

8  cumulative.

9          MR. BERNICK:  That's about the mileage here.

10          UNIDENTIFIED SPEAKER:  Your Honor, we --

11          THE COURT:  It is cumulative, but that's not -- that

12  is not the problem.

13          MR. BERNICK:  Your Honor, somebody has got to take

14  control of --

15          THE COURT:  And I am, so all of you stop.

16          MR. BERNICK:  Okay.  So, if Your Honor's

17  determination is that this is cumulative --

18          THE COURT:  Is that stopping?

19          MR. BERNICK:  Oh, I'm sorry.  I thought I was talking

20  when I was interrupted.

21          THE COURT:  This document talks about a settlement

22  which, Mr. Bernick, you have been continually objecting to as

23  not leading to relevant or admissible evidence.  So, what makes

24  this document any different than any other settlement agreement

25  that the debtor entered into, the document itself?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  The document itself is relevant.  It's

2 the reason that the witness' testimony just now is relevant,

3 which is it goes to the proposition that people were notified

4 that -- in particular the London markets were notified by their

5 counsel and they did not exercise their rights to refuse due --

6 did not exercise their rights to refuse to consent to a

7 settlement.  So, the document is just as relevant as the

8 witness' testimony on the same subject.

9          Your Honor, we are offering it precisely because of

10 the fact that pre-petition settlement practices in fact are

11 relevant.  Our position is not that settlements generally don't

12 come in.  Our position is that they can come in depending upon

13 the purpose for which they are offered.  This is offered to

14 establish a fact.  The fact is that this particular insurer

15 like others did not refuse to consent to settlements.

16          MR. BROWN:  Your Honor, again --

17          THE COURT:  Okay, but this document does not

18 establish that fact.  It is a document by Grace asking the

19 London Market Insurers --

20          MR. BERNICK:  Yes.

21          THE COURT:  -- if they wish to participate in the

22 settlement.  It does not substantiate that they did not or did

23 participate.

24          MR. BERNICK:  That's my next question, is that after

25 he sent the letter out did Mendes and Mount get back to him and

1 say, oh, no, we don't want you to proceed with the settlement?

2 That --

3         THE COURT:  That's a relevant question.

4         MR. BERNICK:  Yes --

5         MS. DeCRISTOFARO:  Your Honor, if we may, the idea is

6 it provides notice or it provides behavior, conduct.  This

7 letter only goes to the behavior and conduct of London under

8 their settlement.

9         THE COURT:  Well, there are copies.  I don't know who

10 the copies are to, Ms. DeCristofaro.  But, assuming for now

11 that it's addressed to counsel for London, then I can accept

12 that that's who at least the intent is for.

13         MS. DeCRISTOFARO:  And then -- but London --

14         THE COURT:  And it goes to the conduct of London.

15 But, I don't think the Combustion Engineering limits itself to

16 the fact that the pre-petition practice is -- has to be varied

17 on an insurer by insurer basis.  If in fact there is some

18 variation, then that can be brought out in cross examination.

19 I think Combustion stands for the proposition that one of the

20 things that the debtor can do in support of it's plan is

21 establish that the pre-petition practice is carried out in the

22 plan, and it is relevant to that issue.

23         MS. DeCRISTOFARO:  Your Honor, I think the Combustion

24 Engineering issue really goes to a practice of handling the

25 claims and this is not about that.  This is about the terms of

**J&J COURT TRANSCRIBERS, INC.**

1  a settlement agreement.  Now, whether someone decides to object

2  to a settlement agreement under their contractual rights is

3  different than what <u>Combustion</u> was getting at, which is you set

4  up a claims facility and --

5          THE COURT:  The issues were different in <u>Combustion</u>,

6  but the premise -- the precept that the Court announces which

7  is that the debtor can substantiate its pre-petition practice

8  to show that the plan comports with it I don't think is limited

9  to claims history.  To the extent that this document is going

10  to substantiate that there was a pattern -- and I don't know

11  that it is, but I'm -- for example, it's relevant to the issue

12  of whether or not there was a pattern by insurers generally not

13  to object to debtor settlements.  And if that is the case, then

14  the insurers have a different issue in terms of showing that

15  the plan violates their rights than perhaps otherwise.  So, I

16  think <u>Combustion</u> is relevant in that sense.  I think this

17  document goes to that point.  It is cumulative.  I will admit

18  it only for the purpose of the fact that it is cumulative and I

19  will give it such weight as I deem it appropriate, and I don't

20  deem it appropriate to weigh it much.  It's the witness'

21  testimony that is substantial here.

22          MS. DeCRISTOFARO:  Your Honor, just again to

23  follow-up on this.

24          THE COURT:  Please, how many times do I have to rule,

25  really?

**J&J COURT TRANSCRIBERS, INC.**

1        MS. DeCRISTOFARO:  Your Honor, I just wanted to

2 clarify the same distinction Mr. Brown was ruling.  That

3 discussion relates to reimbursement insurers and not generally

4 to unsettled --

5        THE COURT:  That was the question, yes.

6        MS. DeCRISTOFARO:  -- yes.

7        UNIDENTIFIED SPEAKER:  Your Honor?

8        THE COURT:  Can everybody agree that the question

9 right now related to reimbursement insurers?  That was the

10 question.  I asked Mr. Bernick to restate it and he did.

11        MR. BERNICK:  Yes, that is the question.

12        MR. BROWN:  Your Honor, could we agree that this

13 entire line of questioning is directed at the reimbursement

14 insurers --

15        THE COURT:  Well, you have to ask the question or

16 that --

17        MR. BROWN:  -- because it's not relevant to anyone

18 else?

19        THE COURT:  You have to ask Mr. Bernick that.  I

20 don't know what the intent is.  Mr. Bernick?

21        MR. BERNICK:  I don't think that -- the question is

22 exactly as it is on the face.  We don't have any obligation.

23 If it's not part of proper court practice every time a question

24 is asked saying, well, is his whole line of questioning limited

25 to this or that?  I don't know what the whole line of

1 questioning is.  I suspect --

2          THE COURT:  The answer is no.  He'll just have to --

3          MR. BROWN:  Could I ask for a proffer of its

4 relevance?

5          MS. DeCRISTOFARO:  We'll object, Your Honor.

6          THE COURT:  Folks, he will state each question with

7 respect to what group of insurers he is asking the question

8 about and then we will know.  Let's go, Mr. Bernick.

9          MR. BERNICK:  Thank you very much.

10 BY MR. BERNICK:

11 Q    After you --

12          MR. BERNICK:  Is the document admitted?  I think Your

13 Honor accepted it for the limited purpose.

14          THE COURT:  I did.

15          MR. BERNICK:  Okay.

16          THE COURT:  Well, I accepted it.

17          MR. BERNICK:  Yes.

18          THE COURT:  And I said I'd give it such weight as I

19 think it deserves.

20          MR. BERNICK:  Right.

21 Q    Mr. Hughes, after you sent this letter did you ever

22 receive a response back saying that there was not an agreement

23 that the settlement could go forward from the representatives

24 of the London Market Insurers -- reimbursement insurers?

25 A    I may have had a confirmation with the representative from

1 London Market, but it definitely was not to the effect that

2 they were withholding their consent.  The settlement went

3 through and it was reimbursed pursuant to our agreement.

4 Q    Okay.  Next subject.  I want to talk a little bit about

5 non-product cases, that is lawsuits that were filed that were

6 non-product lawsuits.  Were there, in fact, non-products

7 lawsuits that were filed and settled by Grace pre-petition?

8          MS. DeCRISTOFARO:  Objection, Your Honor.  The

9 question calls for a legal conclusion.

10          THE COURT:  Sustained.

11 Q    Were there -- did Grace -- did you within the context of

12 your work distinguish between lawsuits that came in that pled a

13 claim for product liability and lawsuits that came in that pled

14 conduct or underlying facts that spoke in negligence or

15 intentional tort?

16          MS. DeCRISTOFARO:  Objection to the form.

17          THE COURT:  Overruled.

18 Q    You look confused.  Did I ask a --

19 A    No, no.  I mean, I guess I distinguished between them but

20 --

21 Q    Well, what distinction did you make, if any?

22 A    Well, products liability claims were, you know, involved

23 claims that -- finished products, manufactured and sold by

24 Grace, asbestos containing products, somehow defective and that

25 as a result, people were exposed to asbestos and that these

1  exposures resulted in asbestos-related disease.

2  Q    Okay.    I'll move onto something else.    Mr. Finch has got

3  an urgent desire to cover this and I'm happy to defer to him.

4  Last subject, and that is the claims that have been made by

5  some of the objectors here.    Are you familiar with the claims

6  that have been made by some of the objectors here, and I'm

7  going to go through a list here, I'm going to ask you about

8  Maryland Casualty, State of Montana, BNSF, Fireman's Fund and

9  Seaton, One Beacon.    Are you familiar with the claims that

10 have been made by those listed objectors in this case?    That is

11 the claims that they want to press against Grace or against

12 other?

13 A    Yes, I am.

14 Q    I want to begin by, first of all, covering the underlying

15 claims that prompt their claims and this time when I draw them

16 out in deference to Mr. Lewis, who is still there, we're going

17 to flatten the mountain and then we're going to come down -- I

18 didn't get that one.    Okay.    And we have Rainy Creek Road that

19 stands around Zonolite Mountain, and comes down to the

20 screening plant and there's a little conveyor that goes across

21 the river and the famous BNSF railroad platform and we have a

22 little train that goes off on its way; goes to places like

23 Scotts; goes to places like Grace, where the product is

24 expanded and then used and buildings such as the building on

25 which Mr. Edwards worked and on which the other claimants

1  represented by the Reaud, Morgan & Quinn firm, worked.   Okay.

2  So, BNSF and Zonolite Mountain, okay.

3          Are you familiar with the claims that have been

4  asserted against Maryland Casualty that according to them, give

5  rise to claims that they are pressing in this case?

6  A    Yes, I am.

7  Q    What is the -- from what underlying facts do the Maryland

8  Casualty claims emanate, historically?

9  A    Well, Maryland Casualty was Grace's general liability

10  insurance carrier from, I think 1963 to 1973.   It was actually

11  it's carrier before then, but with respect to the Zonolite

12  business, it started when Grace acquired the Zonolite business

13  in 1963.   In connection with its insurance coverage for Grace,

14  Maryland Casualty, as many insurance carriers, it provided

15  consulting services, industrial hygiene services, and some of

16  those types of services were provided with respect to the

17  Zonolite employees up at Libby and in the lawsuits that were

18  filed against Maryland Casualty, I believe there may have been

19  one or two before we filed bankruptcy, but primarily, I think

20  post Grace filing, the people who were exposed to asbestos,

21  former employees of Grace and I think to some degree, family

22  members who, again, the same types of exposures, same claims,

23  that would underlie the Libby claims against Grace, on the

24  theory that Maryland Casualty, by providing these kinds of

25  services, had created a duty between them and the Libby

1 employees and the family members and that by not taking certain

2 steps to reduce the exposure after conducting this work, had

3 breached the duty and that breach resulted in their developing

4 asbestos-related diseases.

5 Q    So, these are, essentially, the same kind of bodily

6 injuries, that they are alleging against Grace?

7 A    In many cases, the same claimants, but certainly, the same

8 types of claims.

9 Q    Being now alleged against Maryland Casualty because of its

10 historical involvement at the site, fair?

11 A    Yes.

12 Q    And, then what now, claim, as you understand it, has

13 arisen in the mind of Maryland Casualty out of its exposure,

14 that is, what is the follow-on claim that Maryland Casualty is

15 making, as you understand it?

16 A    Well, in the 1990s, as a result of their providing

17 comprehensive, general liability coverage that was available

18 for asbestos claims to Grace, they entered into settlement

19 agreements with Grace, settling that insurance and in those

20 agreements, there was indemnification language which said that

21 to the extent claims arising out of the insurance coverage, for

22 asbestos anyway, that Grace would indemnify them for these

23 types of claims and there's an argument that they have and it's

24 alleged that these claims followed in the scope of that

25 indemnification and, therefore, Maryland Casualty has a claim

1  back against Grace.

2  Q     Arising out of the original bodily --

3  A     Again, going back to the original bodily injury claims

4  involving the Libby employees and family members and community.

5  Q     State of Montana.  Are you familiar with claims that the

6  State of Montana has made or is making in this case, or wishes

7  to make in this case?

8  A     Yes, I am.

9  Q     Tell us what the historical backdrop of those claims is.

10 A     Well, the State of Montana, particularly the State of

11 Montana, Department of Public Health, starting as early as the

12 operation of the mine, but I think the first specific reference

13 to asbestos came in the 50s, provided -- did inspections

14 pursuant to their authority as the state agency regulating

15 these kinds of activities, at the Libby, Montana site and,

16 again, the allegations and the complaints that have been made

17 against the state, it's my understanding, allege that the state

18 by undertaking this work, created a duty between they, the

19 state, and the Libby employees and family members, that by not

20 taking certain steps to communicate what they learned about the

21 conditions up at the mine and mill, breached this duty and,

22 therefore, they were liable to the Libby claimants for damages

23 for their asbestos related diseases.

24 Q     So, another bodily injury underlying tort?

25 A     Again, the same basic tort, same exposures, same work

1  sites.

2  Q    But what now is the State of Montana's claim?  We've got

3  an indemnity with respect to -- is there written indemnity that

4  was being invoked by Maryland Casualty?  What's the basis,

5  what's the asserted basis for the action over by the State of

6  Montana?

7  A    Well, the State of Montana, I don't believe it's a

8  contractual indemnification, I think it's a common law

9  contribution and indemnification claim that they've asserted in

10  these complaints, essentially arguing, or the proofs of claim

11  against Grace, that these were really Grace's liability and

12  they're standing in Grace's place and, therefore, they should

13  be entitled to reimbursement from Grace under common law

14  contribution and indemnity.

15  Q    Okay.  Now, what about BNSF?  Has BNSF faced also bodily

16  injury claims arising out of the operations of, or associated

17  with the Libby mine?

18  A    Yes, it has.

19  Q    And, so, we've got, again, they're arising out of bodily

20  injury claims against BNSF?

21  A    That same basic tort, personal injury related to asbestos

22  exposure, in many cases the same claimants.  BNSF, as I think I

23  testified earlier, or last week, was the -- operated the

24  railway and a right-of-way on the other side of the Kootenai

25  River, from the screening plant and there was a loading and

1  then in connection with that operation and the agreement under

2  which Grace operated the loading station, and the conveyor

3  across the right-of-way, there was indemnification language in

4  that agreement, which essentially said that Grace would

5  indemnify them for, BNSF for any damages incurred as a result

6  -- arising out of the operation of the loading dock or station,

7  or whatever it's called.

8  Q    And, that's now a written indemnity that's being invoked?

9  A    Yes.

10 Q    Let's talk about Scotts.  Scotts was here in the case.

11 Has Scotts asserted claims against -- has Scotts, itself,

12 experienced claims that have been brought against it?

13 A    Yes, it has.

14 Q    And tell me the nature of those claims.

15 A    Well, Scotts --

16      MR. BROWN:  Objection, Your Honor.  Could we have

17 some foundation here, that this witness actually has some

18 familiarity with it?

19      THE COURT:  Yes.

20 Q    Do you have familiarity with it?

21 A    With claims against Scotts?

22 Q    Yes.

23 A    Yes, I do.

24 Q    Okay.  And is that part of your job?

25 A    Yes.  I learned that in my capacity as an attorney for

1  Grace.

2  Q    Okay. So, Scotts, as we know, well, let me just ask.  You

3  know a lot of things that we now have to introduce here.   Is

4  there insurance that is being -- that Scotts was seeking to get

5  access to in connection with the bodily injury claims that were

6  being brought against it?

7  A    Yes. Scotts was a large customer, vermiculite customer of

8  Grace and at some point in the context of these bankruptcy

9  proceedings, or outside the bankruptcy proceedings, they

10 received some personal injury lawsuits from people who alleged

11 exposure to their products that contained vermiculite and

12 attempted to access Grace insurance coverage on the theory that

13 they were a named insured or, that may not be the appropriate

14 term of art, under I think the vendors endorsement, because

15 they sold our products.

16 Q    Okay.

17 A    Or they sold products that incorporated our vermiculite in

18 them.

19 Q    Which insurance was implicated by the exposures that had

20 taken place at Scotts?

21 A    The products -- I mean -- the CGL policies, you know. were

22 our primary carriers and other insurance carriers.

23 Q    Okay.  Seaton, One Beacon is obviously present and active

24 in this proceeding.  What relation, if any, is there between

25 the issues that Seaton One -- the claims that Seaton, One Beach

1 is concerned about and has expressed its concern and Scotts?

2 A    I think they were one of the insurance carriers that

3 Scotts was arguing that the coverage applied to Scotts claims.

4 Q    Okay.  So, the claims that Seaton, One Beacon wishes to

5 assert, in part, emanate from the underlying bodily injury

6 claims of Scotts?

7 A    Yes.

8 Q    Now, we've also heard from Kaneb.  Are you familiar with

9 the situation involving Kaneb?

10 A    No, I'm not.

11 Q    Okay.  So, we'll put that in the data box.  What about the

12 Edwards case, are you familiar with the Edwards case?

13 A    Yes, I ma.

14 Q    And, what was the Edwards case?  What was and is the

15 Edwards case?

16 A    The Edwards case was a group of five cases that Grace and

17 Pittsburgh Corning tried to verdict in Beaumont, Texas, in, I

18 think, early 2000, that resulted in a compensatory and punitive

19 damage award, a substantial compensatory and punitive damage

20 award against both companies.

21 Q    So, that's a bodily injury award?

22 A    Yes, it was.

23 Q    Now, we've heard about Fireman's Fund.  What, if any,

24 relationship is there between this personal injury award and

25 the issues that relate to Fireman's Fund?

1 A    Well, when we lost the case, and decided to appeal, under

2 the Texas law, we had to obtain a bond in order to bond the

3 judgment, and we went out and obtained an appeal bond, in the

4 amount, I think, I believe it was $43 million, which was the

5 amount of the full compensatory damages, joint and several

6 compensatory damages, the Grace specific punitive damage award

7 and a year of interest which is what was required under Texas

8 law.

9 Q    Okay.    And that bond came from whom?

10 A    It came from Fireman's Fund.

11 Q    Now, there's also been discussion of Long Acre.  Does Long

12 Acre also have a relationship to an underlying bodily injury

13 claim?

14 A    Yes, it does.

15 Q    And just explain what that is, what that relationship is.

16 A    Well, Long Acre purchased the claims of National Union and

17 National Union had issued bonds, surety bond, which was to

18 guarantee Grace's performance under a settlement agreement with

19 the law firm Reaud, Morgan and Quinn, that we entered into in,

20 again, I think it was -- this was September or October of 2001.

21 Under the terms of -- in the negotiations, the plaintiff's

22 lawyer insisted that we guaranteed payment through some third

23 party and we used the surety bond as the vehicle to meet our

24 obligation for a guarantee under the agreement.  The agreement

25 called for four specific payments.  October, I think, of 2000,

Hughes - Direct/Bernick                              269

1  January of 2001, January of 2002 and January 2003.  After we,

2  you know, filed bankruptcy, we didn't make the last two

3  payments.

4  Q    So, here you have also a bodily injury underlying claim.

5  A    Right.

6  Q    Out of that arises out a settlement.

7  A    Yes.

8  Q    And out of the settlement arises the need for the bond?

9  A    Yes.

10  Q    And the bond is now held by Long Acre.

11  A    Correct, the claim.

12         MR. BERNICK:  Yes, okay.  I think that's it, Your

13  Honor, I'd pass the witness  Oh, Mr. Finch had something he

14  wanted to cover.

15         MR. FINCH:  Nathan Finch for the Asbestos Claimants

16  Committee, Your Honor.

17         THE COURT:  Yes.

18                    CROSS EXAMINATION

19  BY MR. FINCH:

20  Q    Mr. Hughes, do you still have Exhibit 95 in front of you?

21  A    Yes, I do.

22  Q    On the second page of Exhibit 95, there are a couple of

23  cc's, do you see that?

24  A    Yes.

25  Q    One of them is a gentleman named Jeffrey Genereux.

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    Do you know who that is?

3  A    Yes, I do.

4  Q    Could you tell the Court who Mr. Genereux is?

5  A    Mr. Genereux was a employee of Alan Gray & Associates,

6  which is an insurance consulting and auditing firm that handled

7  the auditing and administration of the reimbursement agreement

8  between AIG and Grace.

9  Q    Was Exhibit 95 the only piece of correspondence you ever

10  sent to Ms. McCabe or Mr. Genereux announcing Grace's intent to

11  settle asbestos personal injury claims?

12  A    No, I sent them routinely.

13  Q    How frequently would you send them letters announcing

14  Grace's intent to settle asbestos personal injury claims?

15  A    Frequently.

16  Q    Would the correspondence fill up boxes?

17  A    Yes.

18        MS. DeCRISTOFARO:  Objection, Your Honor, relevance.

19  Q    Would it be at least on a daily basis, or a weekly basis?

20  A    Yeah.

21        MS. DeCRISTOFARO:  Objection.

22        THE WITNESS:  I mean -- the

23        MS. DeCRISTOFARO:  Your Honor, if I may, I don't want

24  to -- but we do object to the whole idea of --

25        THE COURT:  I can't hear you Ms. DeCristofaro.

**J&J COURT TRANSCRIBERS, INC.**

1    MS. DeCRISTOFARO:  I'm sorry.  We do -- the course of

2  conduct between Grace and London we object to as not admissible

3  as to the other insurers.

4

5    THE COURT:  Yes.  You need to state the same --

6  Q    Okay.  With the same limitations, talking about

7  reimbursement insurers, was AIG a party to a reimbursement

8  insurance agreement?

9  A    Yes, it was.

10 Q    Okay.  How frequently did you correspond with

11 representatives of reimbursement agreement insurers, announcing

12 Grace's intent to settle asbestos personal injury claims?

13    MR. COHN:  Objection, Your Honor, relevance and

14 especially with respect to AIG.  As I understand, they had a

15 reimbursement agreement that was fundamentally different from

16 those of many others and I would ask that a foundation be laid

17 as to what AIG's settlement agreements relevance is to this.

18    THE COURT:  What's the relevance?

19    MR. FINCH:  Your Honor, it's another reimbursement.

20 There were ten reimbursement agreements as I understand it.

21 Two of them, only two of them had any kind of consent to

22 settlement rights at all.  One was London and AIG had an

23 agreement that was not a consent to settlement but it had a

24 right to associate, or at least to participate in Grace's

25 strategy for resolving claims.  I think the fact that the

**J&J COURT TRANSCRIBERS, INC.**

1 London Market insurers, Lloyds of London and AIG, never

2 objected to Grace's course of dealing with asbestos claimants,

3 is relevant to the historical practices of what Grace did and

4 the reimbursement insurers not being harmed by the practices in

5 this plan.

6         MS. DeCRISTOFARO:  Your Honor, if it's offered

7 against AIG or London, that would be correct, but they're --

8         MR. FINCH:  I believe Your Honor has already ruled on

9 this with respect to the --

10        THE COURT:  Well, okay.  Two out of ten doesn't

11 necessarily substantiate a practice.  So, I'm willing to accept

12 the evidence.  It seems to me that it's relevant as to what

13 Grace's historical practice was, but if I just understood it,

14 two out of ten having this consent to settlements in the first

15 place, doesn't necessarily substantiate that there is a

16 practice, especially when there are a total of ten and eight

17 don't have them.

18        MR. FINCH:  The point, Your Honor, is that the

19 findings that we're seeking in the plan do not impinge upon the

20 rights of the reimbursement agreement insurers and this is the

21 course of dealing with Grace and the claimants and the TDP and

22 the settlement criteria in the TDP don't --

23        THE COURT:  Okay.  So the TDP is going to essentially

24 say that there is no consent, but you're going to say that the

25 reimbursers, eight of the ten, had no right to consent in the

1  first place and the other two who had it didn't exercise it.

2           MR. FINCH:  Correct, that's the point.

3           THE COURT:  And, that's what this is relevant to.

4           MR. FINCH:  That's the point of this evidence.

5           THE COURT:  All right.  It's relevant to that point.

6  Q    Okay.  My question, I believe, Mr. Hughes, is how

7  frequently did you inform the representatives of Lloyds of

8  London and AIG, who had reimbursement agreements as to Grace's

9  intent to settle asbestos personal injury claims?

10  A    Frequently.

11  Q    As part of your role as inside counsel for Grace, did you

12  have to become familiar with the general facts in evidence in

13  cases that Grace would actually take to verdict in the tort

14  system?

15  A    Yes.

16  Q    Are you familiar with a case involving a man named Braxton

17  Kiley (phonetic)?

18  A    Yes, I am.

19  Q    Describe, just very briefly, what that case was about and

20  what the result of it was.

21  A    It was a, again, asbestos personal injury case, I believe,

22  in the Circuit Court of the City of St. Louis.  Mr. Kiley

23  worked at a McDonnell-Douglas facility.  He alleged he was

24  exposed in the course of his work to Monokote MK3 and there was

25  a substantial verdict.  I don't recall the amount of the

1  verdict.  It was settled for a different amount, but it was in

2  the 3 to $4 million range, I believe.

3  Q    And, the verdict was in excess of a couple million

4  dollars?

5  A    Yes, it was.

6  Q    Did you regard that as a strong asbestos personal injury

7  claim or a weak asbestos personal injury claim before Grace

8  took it to trial?

9  A    I think we considered it a strong case for a variety of

10  factors, but --

11  Q    Are you familiar with a Norsworthy case?

12  A    Yes, I am.

13  Q    Was that a non-malignant case that was tried in Texas?

14  A    Yes, it was.

15  Q    Did that also result in a verdict in the multimillion

16  dollar range against W.R. Grace?

17  A    Yes, it did.

18  Q    What, if any, ability, did W.R. Grace have when it was in

19  the tort system, to limit or cap the amount of judgments

20  against it in cases that went to verdict?

21  A    We didn't have that -- except to the extent it was limited

22  by law, but I guess the answer to your question is, we didn't

23  have any ability to limit it.

24  Q    Did you become personally familiar with -- as part of your

25  job duties as defending Grace in asbestos litigation, did you

1 keep track of verdicts entered against not only Grace, but

2 other defendants?

3 A    Yes.

4 Q    Did you become familiar with the fact that there were

5 judgments in asbestos personal injury cases that exceeded $10

6 million?

7 A    Yes.

8         MR. COHN:  Objection, foundation.

9         THE COURT:  He said that he kept track of the

10 verdicts in other cases, so I think that is the foundation,

11 although I don't have any specifics.

12        MR. COHN:  But, he has no firsthand knowledge, Your

13 Honor.

14        THE COURT:  That's true.

15 Q    How did you become familiar with verdicts entered in other

16 cases?

17 A    Well, I was -- there were publications, legal and specific

18 publications geared towards the asbestos litigation, which

19 reports on verdicts in the asbestos litigation and as an

20 attorney working and evaluating claims, I kept up with those

21 kinds of publications.  I also was personally familiar with a

22 lot of lawyers who were involved, both defense and plaintiffs

23 lawyers in cases around the country.

24        MR. FINCH:  Your Honor, at the -- well, let me back

25 up.

**J&J COURT TRANSCRIBERS, INC.**

1  Q   Mr. Hughes, did Grace ever, prior to the time it went into

2  bankruptcy, resolve cases with people who were either employees

3  or invites onto Grace owned premises?

4  A   Yes, we did.

5  Q   And did you do that with respect to people who were

6  outside the State of Montana?

7  A   Yes, we did.

8  Q   Are you familiar with the case of a man named Dayton

9  Prouty?

10  A   Yes, I am.

11  Q   What generally was that case about?

12  A   Dayton Prouty, Jr., the plaintiff, was a veterinarian in

13  Corpus Christi, Texas, whose father, Dayton Prouty was an

14  executive in the 40s, 50s and 60s for the Zonolite Company.

15  And, Dr. Prouty came down with mesothelioma in the late 90s.

16  Q   And, was he someone who was -- asserted a claim against

17  Grace based on -- first of all, where was he -- where did he

18  allege that he was exposed to Grace asbestos?

19  A   Well, he claimed that during the years that when he was

20  young man and a boy and he lived with his parents, he would on,

21  you know, Saturday afternoons, or whatever, go into the office

22  with his father, in the office.  His father worked at an office

23  that was in the Dearborne, Michigan Zonolite expanding plaint.

24  Q   And so, Zonolite was Grace's predecessor, that was a Grace

25  owned place?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2          MR. LEWIS:  Hold on just a second.  I don't have

3  access to a mike back there, but these questions, he's asking a

4  lot of leading questions, he's getting close to the mark now.

5  I'd like him to stop asking leading questions.  Should I stand

6  here and object when he does it?

7          THE COURT:   No.  Please stop asking leading

8  questions.

9          MR. FINCH:  I'll stop the leading, Your Honor.  I was

10 trying to get through this quickly.  Mr. Hughes, do you have

11 Plan Proponent's Exhibit 5062 and 5063?  I think it's in front

12 of you.  May I have the ELMO, please.

13         THE COURT:  What tab is it?

14         MR. FINCH:  It's a slide.  Front pocket, Your Honor.

15         THE COURT:  Thank you.

16 Q    Mr. Hughes, can you identify 5062 and 5063?

17 A    Yes.

18 Q    Leaving aside the title, did you help prepare these two

19 exhibits?

20 A    Yes.

21 Q    Can you describe for the Court how you went about

22 preparing these exhibits?

23 A    Well, I -- based on my experience and some information

24 that we maintain in the case management system, Grace's in-

25 house database for personal injury claims, I identified cases

1  that had been -- asbestos personal injury cases that had been

2  brought by claimants outside of Libby who had either worked at

3  a Grace facility or, you know, were exposed in connection with

4  a Grace operation, an expanding plant, and these lists compile

5  those cases.

6          Again, it's limited and there are probably others,

7  but these are a representative sample of those kinds of cases.

8  Q    Now, these basically -- all this information comes out of

9  Grace's claims management database which is in evidence as Plan

10  Proponents' Exhibit 7?

11  A    Yes.

12          MR. LEWIS:  Your Honor, I think that contradicts the

13  witness' testimony.  He also said he got some information

14  elsewhere, as I recall.

15          THE COURT:  He said, based on his experience and

16  information from the in-house, personal injury database.

17          THE WITNESS:  Yeah, I meant from my -- well --

18  Q    What did you mean, Mr. Hughes by --

19  A    I meant from my memory.  That I, you know, I was familiar

20  with cases.  If somebody had asked me the question, to put

21  together the thing, some of the information in the case

22  management system, a lot of it, there were a few of the cases

23  because they were, you know, serious cases like Dr, Prouty's

24  case, I knew from memory.

25  Q    Your Honor -- and is it correct the information on here

1  was based on information either that was in your memory or in

2  the Grace historical claims database that's already in

3  evidence?

4  A    Well, some of them came from --

5  Q    Well, let me back up.

6  A    Some of the information came from PIQs that were filed in

7  the bankruptcy, as I recall.

8  Q    These are resolved cases.  I'm just looking at Slides 2

9  and 3.  5062 and 5063.

10 A    Oh, two and three, yes.  These are resolves cases, these

11 came from the case management system.

12      MR. FINCH:  Okay.  We would offer Plan Proponents

13 Exhibit 5062 and 5063 as Rule 1006 summaries derived from

14 information in the Grace historical claims database.

15      MS. DeCRISTOFARO:  I bet Your Honor could predict

16 what I'm going to say.  Your Honor, we object to the extent

17 that they're offered to establish that these are non-products

18 personal injury.  I noticed that they added the title

19 potential.  In our view, there's certainly not a determination

20 to be made here, that they are non-products claims.  There's

21 certainly not any information the Court could determine that.

22 We -- and it certainly can't be offered against any of the

23 insurers.

24      To the extent it's meant just simply to establish

25 that Grace alleges that there are potential claimed,

1  non-products claims elsewhere in the country, as not offered

2  against the insurers to prove it, to that extent I would not

3  object.  As long as it's clear on the record.

4           MR. FINCH:  It's only being offered for the latter

5  purpose, Your Honor.  That's clear enough from the record.

6  It's only being offered to show that Grace and the plan

7  proponents have received claims from people who allege -- or

8  arising from Grace owned premises which could be non-products

9  cases.  We are not offering this as against any insurance

10 companies and it certainly doesn't -- we're not asking the

11 Court to adjudicate as a matter of law or findings of fact or

12 anything else, whether these are or are not non-products cases.

13          THE COURT:  Well, the whole chart is listed as Grace

14 non-product personal injury claims and something.  Now, it's

15 not in evidence.  Maybe the witness can substantiate what that

16 column means, but I don't understand the proffer if that's not

17 what it's for.

18          MR. FINCH:  No, Your Honor -- Your Honor, resolved

19 Grace asbestos claims with potential non-product exposure --

20          THE COURT:  Yes, and then the account name says Grace

21 non=products personal injury claims.

22          MR. SCHIAVONI:  Your Honor, for Arrowood, I

23 understand Mr. Finch's proffer to be one that, he's offering

24 this for a specific fact pattern, with regard to whether or not

25 that triggers or constitutes a type of coverage, he's not

**J&J COURT TRANSCRIBERS, INC.**

1 offering it for that, he's offering it for the fact pattern, as

2 I understand it, and I don't have an objection to that.

3             MR. FINCH:  That's correct, Your Honor.  And I would

4 be perfectly happy to strike the column, account name from the

5 exhibit.

6             THE COURT:  Mr. Lewis.

7             MR. LEWIS:  Your Honor, I have a more fundamental

8 objection.  This is not a proper 1006 summary.  I don't know

9 any law that would support a 1006 summary, based partly on a

10 witness' memory.

11            THE COURT:  No, he's testified that these two pages,

12 5062 and 5063 were drawn from the information in the database,

13 not from his memory.

14            MR. LEWIS:  No, he did not say that all the

15 information on these pages were in the database, and I don't

16 think they could be here.

17            THE COURT:  Well, let me find out.  Mr. Finch, can

18 you lay the foundation for these two documents?

19 Q    Mr. Hughes, other than account name, is all the

20 information shown on 5062 and 5063 come straight out of the

21 Grace asbestos claims database?

22 A    Yes, it does.

23            THE COURT:  So, submit a revised exhibit that

24 eliminates the account name and the offensive title, and then I

25 will take the revised exhibit.  For now, I'll offer this one,

1  but understanding that the column called account name, on

2  Exhibits 5062 and 5063 is not admitted and that the caption is

3  only descriptive so we know what the exhibit is.  And it has no

4  weight in terms of the evidence.

5          MR. FINCH:  The caption is not being offered for any

6  probative value.  The witness' testimony is what it is.

7          THE COURT:  All right, okay.  Let me make a note

8  please.  All right, thank you.

9          MR. FINCH:  I have one final set of questions, Your

10 Honor.

11 Q    Mr. Hughes, in response to Mr. Bernick's questions, you

12 discussed the Edwards judgment, which is drawn quite nicely on

13 the chart over there.  Do you recall that?

14 A    Yes.

15 Q    And, I believe you said that that was a case that involved

16 both punitive damages and compensatory damages?

17 A    Yes.

18 Q    What, if any, ability did Grace have when it was in the

19 tort system to completely eliminate the risk of punitive

20 damages in all cases?

21 A    We didn't.

22         MR. FINCH:  Pass the witness, Your Honor.

23         THE COURT:  Anyone going to cross examine?  Mr.

24 Lewis?

25         MR. LEWIS:  Yes, Your Honor, thank you.

**J&J COURT TRANSCRIBERS, INC.**

1                        CROSS EXAMINATION

2    BY MR. LEWIS:

3    Q    You have Dayton Prouty, do you recall that?

4    A    Yes.

5    Q    And you said he got his exposure sitting in his father's

6    office, who was a -- his father was a Grace executive?

7    A    Yes, that was part of the exposure.

8    Q    Where was that office located?

9    A    That was in Dearborn, Michigan, in connection with the

10   expanding plant.  It was actually in -- the office was right in

11   the plant, as I recall.

12   Q    Are there other cases where family members, or even

13   workers were exposed to asbestos that resulted in asbestos

14   disease while sitting in any office, in a non-industrial

15   location?

16            MR. BERNICK:    Objection.  I think that's directly

17   contrary to what the witness just said, so it's not other.  I

18   object to the form of the question.

19            MR. FINCH:  And, again, there's an objection --

20            THE COURT:  The objection is sustained to the word

21   other.

22            MR. LEWIS:  Fair enough.

23            THE WITNESS:  Could you repeat the question, please?

24            MR. LEWIS:  Sure.

25            MS. DeCRISTOFARO:  Your Honor, objection.  That he

1  can't testify from personal knowledge what happened to people.

2  He can say what was alleged in a different case.

3          THE COURT:  That's sustained, too, but --

4          MR. LEWIS:  That's the difficulty with these

5  exhibits, Your Honor.  They talk about the nature of exposure

6  right on them.

7          MR. BERNICK:  We'll stipulate that they all come from

8  a CMS database which is based up allegations that are made in

9  various complaints, in other pleadings, in materials submitted

10 in connection with cases.  They don't represent the witness'

11 personal knowledge.

12         THE COURT:  I don't see an exposure issue on these

13 two pages.  I've stricken the account name and the rest of the

14 information is a case ID, a short name, a party ID number, a

15 full name, a disposition date, a disposition type, an account

16 ID, a case status and a case served.

17         MR. LEWIS:  But the witness testified -- excuse me.

18 The witness testified at least as to one person who had an

19 exposure in a non-industrial setting, as I understood his

20 testimony.

21         THE COURT:  He said it was from the expanding plant,

22 the office was in the expanding plant.

23         MR. LEWIS:  All right.  I go onto another question.

24         THE COURT:  All right.

25         MR. FINCH:  You want the board back?

Hughes - Cross/Lewis                                            285

1          MR. LEWIS:  I can see the board.

2   Q    Can you see the board with respect to Burlington Northern

3   Sante Fe Railroad's loading location there?

4   A    Thank you.  Yes, I can.

5   Q    Okay.  You said that there was an agreement between the

6   Burlington Northern Sante Fe Railroad or it's predecessors and

7   Grace concerning indemnification, contractual indemnification

8   for injuries or disease that occurred in that location, at the

9   loading dock, was that your testimony?

10         MR. BERNICK:  Objection to the form of the question.

11         THE COURT:  I think he's trying to get a

12  clarification.  The witness can clarify his testimony.

13         THE WITNESS:  Well, there was an agreement between

14  Burlington Northern or its predecessor, the Zonolite Company

15  and then later Grace, concerning the -- governing Grace's

16  operation of the loading dock on the railroad's property or the

17  railroad's right-of-way.  Part of that agreement and it

18  included an agreement that -- whereby Grace or Zonolite, before

19  it, would indemnify and hold harmless the railroad for injuries

20  or personal injury or damages that -- resulting from the

21  operation of the loading facility at the rail site.

22  Q    Do you recognize that agreement as referred to, as a

23  siting agreement?

24  A    That's one way I've heard them referred to as, yeah.

25  Q    Generally, what is a siting agreement?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Again, it's the relationship --

2          MR. PHILLIPS:  Objection, no foundation.

3          THE COURT:  I'm sorry, I can't hear you.

4          MR. PHILLIPS:  Objection, no foundation.

5  Q    Do you know what a siting --

6          THE CLERK:  Please state your name.

7          MR. PHILLIPS:  Robert Phillips.

8          MR. LEWIS:  Oh, sorry.  Go ahead.  Stand up here

9  right by me so you can object, because I know you're going to.

10         MR. PHILLIPS:  No foundation.

11         MR. LEWIS:  Your Honor, we go a long way back.  He's

12 another Montana lawyer.

13         THE COURT:  All right.  That objection is sustained.

14 Q    Do you know what a siting agreement is?

15 A    It's an agreement between a company and a railroad

16 concerning the right-of-way, you know, railroad siting onto the

17 -- either onto their property or on the railroad's

18 right-of-way.

19 Q    In this particular siting agreement, or indemnity

20 agreement, was the indemnity limited only to this one siting

21 near the loading facility?

22         MR. LOCKWOOD:  Objection.  Calls for a legal

23 conclusion, Your Honor.  It's asking him to interpret the

24 contract.

25         THE COURT:   Does the contract specify, I think the

1  document would speak for itself.

2          MR. LEWIS:  Well, I'd like -- may I ask him his

3  understanding of it?

4          THE COURT:  Yes.

5          MR. BERNICK:  Your Honor, the purpose of and the

6  scope of this witness' testimony on direct examination was

7  simply to characterize the nature and source of the claims,

8  because it bears upon classification.  The witness was not

9  tendered to and didn't testify to what the actual scope of the

10 indemnity was, but rather, that the written indemnity was the

11 basis of the claim over by Burlington Northern.

12         MR. LOCKWOOD:  And more specifically, Your Honor, the

13 witness was not put up to testify as to whether or not -- what

14 the rights of Grace and BNSF, respectively, were under this

15 agreement.  That is not an issue being tendered to the Court.

16         MR. LEWIS:  May it please the Court, the difficulty

17 here is that the chart implies that the agreement that was

18 discussed was limited to that location, it would be -- I would

19 simply want to ask the witness if the siting agreement, or

20 indemnification agreement applied to sitings in the Town of

21 Libby, where there were other Grace facilities and I think it's

22 certainly relevant cross examination.

23         MR. BERNICK:  It's no relevance to the classification

24 issue and the source of the relationship between the claim over

25 and the underlying claim, he did not elicit any aspect of that

**J&J COURT TRANSCRIBERS, INC.**

1 on my examination.  I don't know if the witness has even ever

2 seen the documents.

3           THE COURT:  Well, why don't we substantiate whether

4 he's seen the documents and see if we get any further than

5 that.

6 Q    Well, you've seen siting agreements that existed between

7 Grace and BNSF concerning their impact on personal injury

8 liability cases in Libby, is that true?

9 A    I don't know if I've seen the actual agreements.  I've

10 seen the letters concerning the indemnification and the

11 insurance in connection with my work.  There was correspondence

12 that was -- I've seen that.  I'm not sure I've seen the actual

13 agreement.

14 Q    This is the question I'm going to ask.  Based on your

15 knowledge of the siting agreement, do you know if the siting

16 agreement between Grace and the railroad also applied to other

17 sitings at other locations, in the Libby or Lincoln County

18 area?

19           MR. LOCKWOOD:  Objection.  Lack of foundation.

20           MR. LEWIS:  It's a foundational question.

21           MR. LOCKWOOD:  A legal opinion.

22           THE COURT:  It's a foundational question, overruled.

23           THE WITNESS:  I don't know.

24           MR. LEWIS:  No further questions, Your Honor.

25           THE COURT:  Mr. Phillips.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. PHILLIPS:  Thank you, Your Honor.  May I approach

2  the witness?

3          THE COURT:  Yes, sir.

4          MR. PHILLIPS:  And may I approach the bench?

5          THE COURT:  Please.  Thank you.

6          MR. PHILLIPS:  Your Honor, and counsel, what you have

7  here is a selection of exhibits that I think would be relevant

8  to all of the testimony that we may have to solicit.  The

9  purpose of it, and the list on the front by the way, for

10 everyone, doesn't include everything because I took out a

11 number of the exhibits, that I don't think I need.

12         Your Honor, I believe that I already have agreement

13 from everyone to admit Exhibits 1 through 13 and I move their

14 admission.

15         MR. BERNICK:  Your Honor, this, again, I think is

16 going to turn into a document exercise, and a document issue.

17 None of these documents, I believe, are implicated by the

18 substance of this witness' testimony.  He didn't opine as to

19 the interpretation of the documents, the application of the

20 documents.  He simply characterized the claim.

21         Now, if they, again, want to use this witness as part

22 of their case, to introduce the documents, that then goes --you

23 know, moots the scope issue, but it does then pose a question

24 about whether this is an efficient way to put documents into

25 evidence and I don't know if he has the foundation to be able

1  to do it.

2          THE COURT:  Well, I have --

3          MR. BERNICK:  We've undertaken to look at all these

4  documents and to deal with these issues and to go through two

5  notebooks worth of documents and go through one-by-one through

6  the witness on the stand, I don't think is an efficient use of

7  the Court's time.

8          THE COURT:  Okay.  I only have one notebook and mine

9  starts with Number 7.  So, to the extent -- and it doesn't have

10  13 in it, or 13.  In fact, it's got seven and eight and the

11  jumps to 14.

12          MR. PHILLIPS:  Right.  I only need seven and eight

13  right now, but I'd be happy to bring the other ones in, in the

14  morning, Your Honor.  I just didn't make copies of all of

15  those, sorry.

16          THE COURT:  All right.  I thought, though, counsel

17  say that there was a stipulation that Exhibits 1 through 13

18  were admissible.  So, if that's the case and he wants to move

19  their admission now, what's the objection?

20          MR. LOCKWOOD:  Can we consult, Your Honor, about

21  this?

22          THE COURT:  Yes.

23          MR. BERNICK:  This is the same --

24          THE COURT:  Well, if they're coming in without

25  evidence, it doesn't matter if it comes in now.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  That's --

2          MS. ESAYIAN:  Your Honor, when we -- Lisa Esayian on

3  behalf of the debtors.  When we received and reviewed the

4  exhibits, the first 13 were these contracts that have been

5  referred to between BNSF's predecessors and Grace's

6  predecessors Zonolite, and for the debtors, we said that we

7  would not object because they are contracts, we would not

8  object to their authenticity.  We may have reserved a relevance

9  objection, but we said we would not object to their

10  authenticity or hearsay, or anything else, except for relevance

11  objection, depending on what they were offered for.

12          THE COURT:  Okay.  So, why are they --

13          MR. PHILLIPS:  My -- if I may be heard?

14          THE COURT:  Yes.

15          MR. PHILLIPS:  My recollection of the agreement was

16  that these could be admitted without objection for the purpose

17  of the confirmation hearing only.

18          MS. ESAYIAN:  The debtors don't have a problem with

19  that but I don't know about the other parties.

20          MR. GUY:  We have no objection, Your Honor.

21          THE COURT:  Mr. Guy, you have no objection?

22          MR. GUY:  We're behind the board, we have no

23  objection.

24          THE COURT:  All right.

25          MR. LOCKWOOD:  The ACC is okay with that, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.  Then Exhibits 1 through 13

2   will be admitted, without the need for any further testimony.

3          MR. PHILLIPS:  Thank you, Your Honor.

4          THE COURT:  But I need copies.

5          MR. PHILLIPS:  I got your message earlier.

6          THE COURT:  All right.  Let me make a note, please.

7   All right.

8                      CROSS EXAMINATION

9   BY MR. PHILLIPS:

10  Q    And if I could just draw your attention, Mr. Hughes, to

11  Exhibit Number 7.  Have you ever seen that before?

12  A    7A?

13  Q    7, yes 7A.  And just to speed it along, I think you'll

14  find that the indemnity clause was actually amended by Exhibit

15  8A.

16         MR. FINCH:  Objection.  Lack of foundation, to the

17  extent he's asking him what the document says.

18         THE COURT:  I don't think there's a question yet,

19  except is he familiar with it.

20         THE WITNESS:  Well, I've seen, again, in connection

21  with this case, I have seen correspondence and some documents

22  related to the agreement between Burlington Northern and its

23  predecessors, and Grace and Zonolite.

24         I don't specifically recall having seen these

25  particular documents and, quite frankly, can't read them.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. PHILLIPS:  They are difficult to read.

2          MR. BERNICK:  Apart from that.

3          MR. PHILLIPS:  I'll agree to that.

4                          (Pause)

5  Q    Those copies are the best copies that we have and those

6  are, of course, old historical documents, but those were the

7  best that we can find.

8          Mr. Hughes, in spite of the fact that you've not seen

9  these specific documents, you are aware that historically, the

10 relationship between Great Northern Railway and Zonolite was

11 one whereby Zonolite had some duty to indemnify Great Northern

12 Railway arising out of the operations of the Libby mine,

13 correct?

14 A    Yes.

15 Q    And, you were also aware that there was an additional

16 requirement that Zonolite acquire insurance for Great Northern

17 Railway for that same operation?

18         MR. FINCH:  Objection.  No foundation.

19         MR. BERNICK:  Yeah, I would join in that objection

20 because it's a question that -- it's not a background question.

21         THE COURT:  It's sustained.  It's sustained.

22         MR. BERNICK:  Yes.

23         MR. PHILLIPS:  I'm sorry, did you sustain the

24 objection?

25         THE COURT:  Yes, because the issue is whether it was

1 required to get.  This witness testified earlier that he wasn't

2 employed at the time that the insurance would have been

3 obtained, so I don't see that there's a foundation for this.

4 Q    Mr. Hughes, do you remember testifying at your deposition

5 that you were aware of the requirement about the acquisition of

6 insurance?

7          MR. BERNICK:  That still doesn't give a foundation

8 for it.  He has to be competent and there has to be a

9 foundation under 602, to be able to testify.  The fact that he

10 may have heard something does not establish that he has

11 sufficient personal knowledge to attest to the fact.

12          THE COURT:  Yes.  You have to lay the foundation, Mr.

13 Phillips.

14 Q    I'll just ask Mr. Hughes -- were you aware that there was

15 a requirement, historically, between Zonolite and W.R. Grace,

16 that Zonolite had the obligation to acquire -- I'm sorry,

17 Zonolite and Great Northern Railway, that there was a

18 requirement that Zonolite acquire insurance for the railway?

19          MR. BERNICK:  That's the same question.  Maybe there

20 are documents, if there's a contract, then we can see it, but

21 not through this witness.

22          MR. PHILLIPS:  Well, we could go bac and read seven

23 and eight, but I just asked him if he knows.

24          THE COURT:  I think this is a yes or no. Is he aware,

25 so the objection is overruled.

1           THE WITNESS:  Yes.

2  Q    And that had been in place for a number of years, that

3  requirement?

4           MR. BERNICK:  No.  The answer is, he's aware.

5           MR. PHILLIPS:  Okay.

6  Q    And, what is your awareness?  What do you know about that?

7           MR. BERNICK:  That, again, doesn't pass 602.

8  Q    Well, how are you aware?

9  A    I'm aware in connection with issues I was involved in, in

10 the last four or five years, concerning insurance and claims by

11 BNSF.

12 Q    And, so, was there a requirement then, Mr. Hughes, that

13 Zonolite acquire insurance for the Great Northern Railway?

14          MR. BERNICK:  That question asks for this witness' --

15 the conclusion as a lawyer.  He's just testified that the basis

16 for his knowledge is information that he obtained during the

17 course of this case and, therefore, you're asking in-house

18 counsel for his mental impressions and attorney work product

19 concerning an ultimate issue with regard to BNSF.

20          THE COURT:  That's sustained.

21          MR. PHILLIPS:  May I ask him one more question on

22 foundation?

23          THE COURT:  Yes.

24 Q    Was it your job to know that kind of stuff, Mr. Hughes?

25 A    It was part of my job, yes.

                    **J&J COURT TRANSCRIBERS, INC.**

1        MR. PHILLIPS:  I'll ask the same question, Your

2   Honor, I believe a foundation has been laid.

3        MR. SCHIAVONI:  Objection.  Your Honor, this happened

4   at a different company, 30 years before this gentleman even

5   joined.  There's no foundation for this.

6        THE COURT:  There is no foundation for this witness'

7   personal knowledge.  He testified that he became aware of this

8   because of the ongoing litigation, and he's also in-house

9   counsel.  So to that extent, it is a work product issue.

10  Q    You did testify, did you not, Mr. Hughes, that W.R. Grace

11  had assumed the obligations of Zonolite, the liabilities of

12  Zonolite?  You're aware of that?

13  A    Yes.

14        MR. PHILLIPS:  No further questions.  Thank you.

15        THE COURT:  All right.

16        MR. BERNICK:  Where is everybody at that --

17        THE COURT:  Mr. Monaco.

18                    CROSS EXAMINATION

19  BY MR. MONACO:

20  Q    Good afternoon, Mr. Hughes.

21  A    Good afternoon.

22  Q    My name is Frank Monaco, I represent the State of Montana.

23  I have a couple of questions for you.  You testified on direct

24  about your understanding of the basis of Montana's claims for

25  contribution and indemnification.

**J&J COURT TRANSCRIBERS, INC.**

1 A    Yes.

2 Q    And I'd like to ask you a few follow up questions on that.

3 You're aware that those claims are based on 148 lawsuits

4 brought by the Libby claimants in the State of Montana against

5 the State of Montana?

6 A    I didn't know the specific number, but I knew there were

7 several, yes.

8 Q    And, are you aware that the State of Montana has filed a

9 proof of claim based on those contribution indemnification

10 claims with the bankruptcy court?

11         MR. BERNICK:  Ob -- well -- no objection to that

12 question.

13 Q    Okay.

14 A    Yes.

15 Q    Do you have any reason to dispute the fact that the State

16 of Montana has filed a proof of claim?

17         MR. BERNICK:  Actually, the prior question, Your

18 Honor, in fairness, was ambiguous.  There are 148 claims and

19 the question suggested that the proof of claim covered all of

20 them.

21         THE COURT:  No, it doesn't.  All he said is he aware

22 that Montana filed a proof of claim.  He hasn't asked any

23 specifics, and the answer was yes.

24         MR. BERNICK:  Okay.

25         THE COURT:  Go ahead, Mr. Monaco.

**J&J COURT TRANSCRIBERS, INC.**

Hughes - Cross/Monaco                                    298

1  Q    Okay.  Now, Mr. Hughes are you familiar with the

2  provisions of the plan, as a general matter?

3  A    As a general matter.

4  Q    Okay.  Are you also familiar with the provisions of the

5  TDP?

6  A    Again, as a general matter, yes.

7  Q    Isn't it correct that Montana's claims for contribution

8  indemnification are being treated as indirect, asbestos

9  personal injury claims under Section 5.6 of the TDP?

10  A    Yes.

11  Q    And, are you aware that the State of Montana has not paid

12  anything in connection with the 148 lawsuits that were brought

13  against it, either by way of judgment or settlement?

14  A    It has not?

15  Q    Has not.

16          MR. BERNICK:  Just not attorneys fees or anything?

17          MR. MONACO:  Pardon?

18          MR. BERNICK:  Not attorneys fees or anything?

19  Q    I'm talking about to the claimants themselves.

20  A    I wasn't aware of that.

21  Q    Is it your understanding that the State of Montana cannot

22  assert a claim for contribution indemnification against the TDP

23  unless and until it pays the claims against the Libby

24  claimants?

25          MR. BERNICK:  Objection, that calls for, once again,

**J&J COURT TRANSCRIBERS, INC.**

1   for the witness, now a different witness, to interpret the

2   plan.  We did not open that door, I didn't ask him a single

3   question about the plan, as part of an examination of Mr.

4   Hughes as their witness.  He is not -- he's not been -- he's

5   not permitted to ask a question about matters that call for the

6   interpretation of the plan, the exercise of legal expertise.

7   So, it calls for an expert opinion outside the scope and I

8   believe Your Honor already addressed this in connection with

9   Phase 1.   Interpretation of the plan is not for testimony by a

10  fact witness.

11          THE COURT:  Mr. Monaco?

12          MR. MONACO:  Well, first of all, Your Honor, I would

13  like to have his understanding of that.  Second of all, he was

14  held out as being a witness who was going to testify as to the

15  TDP versus tort standards.  And, I think that's a fair

16  questions to ask him.

17          MR. BERNICK:  And I didn't have -- that is true, and

18  then because of the concern about opening the door to having

19  him be testifying as an expert, because he'd be comparing it to

20  the TDP, I specifically did not ask him to make a single

21  comparison.  I simply asked him what the prepetition practice

22  was.  So, we have not elicited any expert testimony, we have

23  not opened the door to aby expert testimony.

24          MR. FINCH:  And my questions were similarly just

25  based on Grace's prepetition practices, Your Honor.

1          THE COURT:  I think this call for a legal conclusion,

2    as to how the claim is going to be treated.  At some point, I

3    have to have some testimony as to how these claims are going to

4    be treated, Mr. Monaco.  So, I'm not sure when it's coming, but

5    I haven't heard it yet.

6          MR. MONACO:  Okay.

7          MR. LOCKWOOD:  Your Honor, Mr. Inselbuch testified at

8    length about Section 5.6 --

9          THE COURT:  He did.

10          MR. LOCKWOOD:  -- and what claims went into it and

11    Mr. Monaco, among others, examined him about that and there's

12    no -- I'm really at a -- and he was involved in the drafting of

13    it.  Now you're taking Grace's in-house litigation counsel and

14    asking him to testify on a subject that he said he had a

15    nominal familiarity with.

16          THE COURT:  Actually, I'm not taking any witness and

17    asking any witness to testify about anything, Mr. Lockwood.

18          MR. LOCKWOOD:  I'm sorry, Your Honor.

19          THE COURT:  Go ahead, and ask your next question.

20          MR. LOCKWOOD:  I didn't mean to suggest that you

21    were.

22          MR. MONACO:  Your Honor, at Mr. Hughes deposition, my

23    partner Mr. Mangan questioned Mr. Hughes about these very

24    topics, you know, at length.

25          MR. LOCKWOOD:  Your Honor, we in the deposition did

1 not limit answering questions to questions that would be

2 admissible at trial.  It was a discovery deposition.

3          THE COURT:  Yes.  I mean discovery isn't necessarily

4 admissible evidence, Mr. Monaco.  The concern I have is, this

5 questions seems to go to a legal conclusion, which is what the

6 effect is on Montana and that is outside the scope of what this

7 witness has testified to.

8          MR. MONACO:  Fair enough.

9 Q    Okay.  Mr. Hughes, is it your understanding that the TDP

10 operates on a first in, first out basis?

11          MR. BERNICK:  Same objection, Your Honor.  Beyond

12 scope.  Now he's interpreting the TDP.  I'm not sure why it is

13 that Your Honor can rule on something, and then the pages don't

14 get turned and we just go further down the same page.

15          MR. MONACO:  Your Honor, I only have a few more

16 questions.

17          MR. BERNICK:  Well, it doesn't --

18          THE COURT:  Okay.  I think it is still asking for a

19 legal conclusion because I don't think, Mr. Monaco, that this

20 witness has testified to anything about the operation of the

21 TDP on that basis.  If I'm wrong, somebody should tell me now,

22 because I don't want to foreclose the testimony if there is

23 something in the record about it.  But I don't recall it.

24          MR. MONACO:  Again, Your Honor, he was held out as

25 someone who is going to testify to these types of issues, we

1 questioned him at his deposition about it, we designated

2 deposition portions of the transcript, and I think it's a

3 little bit unfair now to say that we can't question him about

4 these very topics.

5          MR. BERNICK:  But we held out -- we never promised

6 that Mr. Hughes was going to come in to suit the purposes of

7 objectors and testify about anything.  We said if he appears,

8 he may testify about these things.  And we made the decision

9 precisely because it would open the door, witness what we just

10 saw here today, to a lot of examination of a witness as an

11 expert regarding matters that he hasn't studied in as much

12 detail as Mr. Inselbuch.  We didn't do it.  We're not required

13 to.

14          THE COURT:  Have you identified this witness in your

15 own pretrial statements?

16          MR. MONACO:  Your Honor, we basically relied on cross

17 examination of witnesses.  I think I'd have to go back and

18 check.

19          THE COURT:  And is there an objection to the

20 designations in the transcript that you filed?

21          MR. MONACO:  There have been, Your Honor, but they

22 have not been resolved.

23          THE COURT:  All right.  Tonight, you folks go see if

24 you can resolve it, because otherwise, if this witness as been

25 designated as a person who can address these questions and

1 people rely on that fact and he's here, and we'll get into it,

2 but we'll do it tomorrow, Mr. Monaco, after you go see if you

3 can resolve the objections to the deposition designations.

4        MR. MONACO:  Okay.  Your Honor, I don't think I have

5 anything further.  I guess as housekeeping matter while I'm up

6 here and we were addressing the issues of the 148 complaints,

7 and the proof of claim, I do have a stipulation with the plan

8 proponents to admit them into evidence.  There were some

9 objections filed.  They've either been resolved or withdrawn.

10 I don't know if this the appropriate time to admit them.

11        THE COURT:  To admit what, I'm sorry?

12        MR. MONACO:  The 148 complaints that were filed in

13 the State of Montana, plus the proof of claim that was filed by

14 the State of Montana.  I would point out with respect to the

15 proof of claim, I think that the debtors designated in the list

16 of exhibits as an amended complaint, that isn't quite accurate.

17 I do have a copy here of the proof of claim, if Your Honor

18 needs it.  I think it's the last one.  It's 149.  But it's not

19 a complaint, it's the proof of claim.

20        THE COURT:  Okay.  You folks are agreeing that

21 complaints and the proof of claim are admissible?

22        MR. BERNICK:  Well, again, this exactly the same

23 thing happening all over again.

24        THE COURT:  Your co-counsel is saying yes, Mr.

25 Bernick.  Maybe you'd better consult with them, first.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  It may well be, but again the practice

2    that's being established here is that we're now being,

3    essentially, held hostage to resolving these different matters

4    that counsel knows we all said were to be resolved separately.

5    There's a procedure, a written procedure that deals with this.

6    Is the proof of claim something that we would stipulate to, as

7    the fact of the proof of claim, yes.  If Mr. Monaco wants to

8    put in all 148 complaints, the answer is, for the purpose of

9    establishing that they've been made, yes, of course.

10          MR. MONACO:  Your Honor, I'm not trying to establish

11    the truth of the matter, we don't agree with the allegations in

12    the complaint.

13          THE COURT:  Obviously.

14          MR. MONACO:  I mean, that's obvious.  So --

15          MR. BERNICK:  Then what's the purpose --

16          MR. MONACO:  -- it's just to show the basis of our

17    contribution indemnification claims.

18          THE COURT:  But -- okay.  I don't think anybody is --

19          MR. BERNICK:  Well, but the basis for the

20    contribution --

21          THE COURT:  -- no one is contending that the State of

22    Montana hasn't got -- hasn't alleged that it has an

23    indemnification or contribution claim based on these 148

24    complaints.  It seems to me that the proof claim, to the extent

25    you want that in, is fine, I'm not sure what the complaints are

1  going to do for this Court in terms of what the indemnification

2  issue is, I'm not going to be addressing it anyway.

3              MR. BERNICK:  Right.

4              THE COURT:  So, it's --

5              MR. MONACO:  Your Honor, it's just to show that we

6  have claims based on those complaints.

7              THE COURT:  Okay.  I don't think that's a fact in

8  dispute.

9              MR. MONACO:  Okay.

10             THE COURT:  Is it a fact in dispute?

11             MR. BERNICK:  It's not.  I elicited it through Mr.

12 Hughes.

13             THE COURT:  Is it a fact in dispute?  Yes or no?

14             MR. BERNICK:  No, it's not.

15             THE COURT:  All right.

16             MR. MONACO:  Okay.

17             THE COURT:  Then I'll take the proof of claim, I

18 don't need the 148 complaints because it's not disputed.

19             MR. MONACO:  Okay, that's fine, Your Honor.  As long

20 as that's the stipulation.

21             THE COURT:  Do you have the proof of claim marked?

22             MR. MONACO:  Your Honor, it was marked as Montana 149

23 and if we're not going to admit the 148 because we're

24 stipulating --

25             MR. BERNICK:  I have it right here.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. MONACO:  I have it one right here I can get.

2          MR. BERNICK:  I have --

3          THE COURT:  All right, 149 is fine.  I'll take

4  Montana 149 and have it admitted for the purpose of showing

5  that the proof of claim was filed.

6          MR. MONACO: If I could approach, Your Honor.

7          THE COURT:  Yes.  Okay, thank you.

8          MR. MONACO:  I apologize, Your Honor, I didn't know

9  if this was the appropriate time since we were up here talking

10  about it, or at the end of the evidence.

11          THE COURT:  It's a little confusing, Mr. Monaco, so

12  it's fine.  All right.  We are going to recess until nine

13  o'clock tomorrow morning.  You're finished, correct, Mr.

14  Monaco?

15          MR. MONACO:  Yes, Your Honor.

16          THE COURT:  All right.  We're going to recess until

17  nine o'clock tomorrow morning.   You folks have some work cut

18  out for you tonight, so talk to each other.  You're excused

19  until morning.

20          MS. DeCRISTOFARO:  Excuse me, Your Honor, one

21  housekeeping -- we all have a number of exhibits which have

22  already been submitted to the Court that we don't plan to

23  question about, that are unobjected to, do you want us to bring

24  four copies of those?

25          THE COURT:  No.  I'm not sure where you're telling me

*J&J COURT TRANSCRIBERS, INC.*

1  they're submitted, on the disks?

2          MS. DeCRISTOFARO:  On the disks.

3          THE COURT:  Okay.

4          MS. DeCRISTOFARO:  Do you need one hard copy, is that

5  what you need then?

6          THE COURT:  If you're not going to -- if you're not

7  using them with the witness, I don't need any hard copies.

8  Folks, please.

9          If you're not using them with a witness, I don't need

10 any hard copies.  I just need the copies to the extent that

11 you're showing them to the witness so that I have a record of

12 what it is because some of these exhibit numbers bear different

13 exhibit stickers, sometimes the parties use duplicate numbers

14 and I want to make sure that if something is shown to the

15 witness, that I have what you show the witness.

16         MS. DeCRISTOFARO:  Okay.  And so for a proof that's

17 unobjected, you don't need any hard copies.

18         THE COURT:  If the proof is unobjected to, as long as

19 you can designate for me where those exhibits are, that is, if

20 they're on the CD and how they're marked, that's all I need.

21         MS. DeCRISTOFARO:  That's fine, Your Honor.  We just

22 wanted -- we were running around thinking we now needed four

23 copies of all our exhibits.

24         THE COURT:  No.

25         MS. DeCRISTOFARO:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. BERNICK:  In terms of tomorrow, Your Honor, we

2    had Mr. Hughes and I know the lady here has been waiting very

3    patiently and Mr. Plevin is always very, very patient.

4           THE COURT:  Gentlemen, I need to leave, please can we

5    --

6           MR. BERNICK:  Yes, oh, I'm sorry.  Okay.  That's

7    fine.  We can just talk here about who is going to be next.  I

8    don't want to hold Your Honor up.

9           THE COURT:  That's fine.  If you could put it on the

10   record, go ahead.  That's fine.

11          MR. BERNICK:  Yes.  So, we have Mr. Hughes, and I'm

12   assuming, is there anybody else that needs to cross examine Mr.

13   Hughes?

14          UNIDENTIFIED ATTORNEY:  I need five minutes.

15          MR. BERNICK:  Okay.  So, it sounds like --

16          MS. DeCRISTOFARO:  I might have a few questions.

17          MR. BERNICK:  Okay. So, it sounds like it's going to

18   be relatively short.  After that will be Mr. Shelnitz, who will

19   go through the corporate history with Fresenius and Sealed Air

20   transactions.  That's the purpose of his appearance.  He'll

21   come back later on lender issues.

22          At that point I don't believe that we have anyone

23   else to call live with respect to insurance, and with respect

24   to indirect claims.  Am I wrong about that?  So, that, I think

25   is all that we'll be doing on insurance and indirect claims.

**J&J COURT TRANSCRIBERS, INC.**

1          Dr. Peterson had a situation at home, he'll be here

2   tomorrow and he's to testify on any and all matters that he'll

3   be called upon to testify.  They'll be lenders best interests

4   and there may be a couple miscellaneous things. So, we

5   definitely want to get to him.  So, after Mr. Shelnitz, I would

6   ask that the Court permit us to put on Dr. Peterson, to

7   complete his examination tomorrow and then we can determine

8   whether there's anybody else who -- well, basically we're then

9   into the insurers and indirect claimants case, because all that

10  we've had is ours.  But we don't have any other live witnesses

11  save Mr. Shelnitz, and then Dr. Peterson, whose testimony may

12  bear in part upon that, in connection with this phase of the

13  trial.

14          THE COURT:  All right.  I don't have any objection

15  calling Dr. Peterson out of turn if that's fine with the

16  parties.  We've been doing it to accommodate everyone else, you

17  know.  This trial will have to come in in some fashion when

18  everybody puts the pieces together anyway.  So, there's no

19  problem with that.

20          So, it's Hughes, Shelnitz, Finke, to the extent that

21  he is recalled, and Peterson tomorrow.

22          MR. BERNICK:  That's correct.  Well, then there will

23  be other people after that, but that's correct.  So, depending

24  upon, though, and we still don't really know, to what extent

25  the objectors are going to call live witnesses as part of their

1  insurance and indirect claims case.  That's what would be next.

2          THE COURT:  All right.  Is that going to happen

3  tomorrow?

4          MR. BERNICK:  Yes. There's no reason for it not to.

5          THE COURT:  Okay.  Mr. Plevin?

6          MR. PLEVIN:  Your Honor, I have a witness who arrived

7  here earlier today because we were told we might get through

8  the plan proponents case today.  I'd like to have him --

9          THE COURT:  Who is it?

10          MR. PLEVIN:  Richard Kowalcik (phonetic), from

11  Fireman's Fund.

12          THE COURT:  All right.

13          MR. PLEVIN:  I'd like to have him testify tomorrow so

14  he can be released and go home.

15          MR. BERNICK:  Is there anybody else who's going to

16  call somebody live?

17          MR. GIANNOTTI:  Your Honor, Dr. Shine, he's an expert

18  for the insurer --

19          THE COURT:  I can't hear you.

20          MR. GIANNOTTI:  I'm sorry.  Professor Shine is an

21  expert that the insurers are calling and he's going to try to

22  get here by tomorrow afternoon.  I thin he'll be able to, but

23  in an e-mail we got from Ms. Baer last night, she seemed to

24  indicate that it would be okay if he went on on Wednesday if he

25  couldn't get here, but I'm going to try to get him here.  He

1 has to fly in the morning.

2          THE COURT:  I think it's likely that by the time you

3 get through the four debtor witnesses and one from Mr. Plevin,

4 it'll be unlikely to have too much more going on.  Does anybody

5 have a witness who is already here or who you expect?  Mr.

6 Phillips?

7          MR. PHILLIPS:  Your Honor, thank you.  And, counsel,

8 I've got two witnesses here that we are trying to work an

9 agreement out with the debtors for a modification that will

10 eliminate their need.  But I'm --

11          THE COURT:  Who are they?

12          MR. PHILLIPS:  I'm sorry, we have Mr. Buren

13 (phonetic) and Ms. McKee (phonetic), both from BNSF.

14          THE COURT:  All right.

15          MR. PHILLIPS:  Thank you.

16          MR. LOCKWOOD:  Your Honor, on the subject of

17 Professor Shine, I think it would be well advised for him to

18 come on Wednesday and what I would like to urge in the interest

19 of, perhaps, saving him the trip, is tomorrow we could argue

20 the motion in limine on him and Professor Priest and then they

21 wouldn't have to come out here and argue the motion and if it

22 were granted, turn around and fly home without testifying.

23          THE COURT:  All right.  That's fine with me, if you

24 want to do that after the witnesses conclude tomorrow, to see

25 whether that will happen, but folks, I really do have to leave,

**J&J COURT TRANSCRIBERS, INC.**

1 I'm sorry.  I told you yesterday, I told you Friday I needed to

2 be out the door at 5:30.  Mr. Brown, you're it.  You're the

3 end.

4         MR. BROWN:  Your Honor, I just wanted to announce

5 that we are not going to be calling Professor Priest.

6         THE COURT:  Okay.  Is anyone calling Professor

7 Priest?

8                         (No audible response)

9         THE COURT:  All right.  Then I don't need an argument

10 with respect to Professor Priest.

11         MR. BERNICK:  That's very -- we appreciate that,

12 that's very useful to know.  So, you should go, I mean, we've

13 got --

14         THE COURT:  Yes.

15         MR. BERNICK:  -- we may actually get through and get

16 to some other people.

17         THE COURT:  Okay, that's fine.  All right.  We're

18 adjourned, then, until nine o'clock.

19                         * * * * *

20

21

22

23

24

25

# **C E R T I F I C A T I O N**

We, PATRICIA REPKO, AMY RENTNER, CECILIA ASHBOCK, LORI AULETTA, CARLA OAKLEY & ELAINE HOWELL, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of our ability.


/s/ Patricia Repko

PATRICIA REPKO

/s/ Amy Rentner

AMY RENTNER

/s/ Cecilia Ashbock

CECILIA ASHBOCK

/s/ Lori Auletta

LORI AULETTA

/s/ Carla Oakley

CARLA OAKLEY

/s/ Elaine Howell              Date:   September 17, 2009

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.


**J&J COURT TRANSCRIBERS, INC.**