IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| W. R. GRACE & CO., et al.[1] | ) Case No. 01-01139 (JKF) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) Hearing Date: October 26, 2009, at 10:30 a.m. ET |
| | Objection Deadline: October 9, 2009 |

## MOTION FOR AN ORDER AUTHORIZING THE SALE OF 5% OF THE LIMITED LIABILITY COMPANY INTERESTS OF ADVANCED REFINING TECHNOLOGIES LLC AND CERTAIN RELATED AGREEMENTS AND TRANSACTIONS

W. R. Grace & Co.-Conn. (variously, the "Seller" or "Grace") and the remaining Debtors file this motion (the "Motion") requesting entry of an order, in substantially the form attached hereto as **Exhibit A** (the "Order"), authorizing the following transactions (collectively, the "Transactions"):[2]

---

[1] The Debtors consist of the following 62 entities: W. R. Grace & Co. (f/k/a Grace Specialty Chemicals, Inc.), W. R. Grace & Co.-Conn., A-1 Bit & Tool Co., Inc., Alewife Boston Ltd., Alewife Land Corporation, Amicon, Inc., CB Biomedical, Inc. (f/k/a Circe Biomedical, Inc.), CCHP, Inc., Coalgrace, Inc., Coalgrace II, Inc., Creative Food >N Fun Company, Darex Puerto Rico, Inc., Del Taco Restaurants, Inc., Dewey and Almy, LLC (f/k/a Dewey and Almy Company), Ecarg, Inc., Five Alewife Boston Ltd., G C Limited Partners I, Inc. (f/k/a Grace Cocoa Limited Partners I, Inc.), G C Management, Inc. (f/k/a Grace Cocoa Management, Inc.), GEC Management Corporation, GN Holdings, Inc., GPC Thomasville Corp., Gloucester New Communities Company, Inc., Grace A-B Inc., Grace A-B II Inc., Grace Chemical Company of Cuba, Grace Culinary Systems, Inc., Grace Drilling Company, Grace Energy Corporation, Grace Environmental, Inc., Grace Europe, Inc., Grace H-G Inc., Grace H-G II Inc., Grace Hotel Services Corporation, Grace International Holdings, Inc. (f/k/a Dearborn International Holdings, Inc.), Grace Offshore Company, Grace PAR Corporation, Grace Petroleum Libya Incorporated, Grace Tarpon Investors, Inc., Grace Ventures Corp., Grace Washington, Inc., W. R. Grace Capital Corporation, W. R. Grace Land Corporation, Gracoal, Inc., Gracoal II, Inc., Guanica-Caribe Land Development Corporation, Hanover Square Corporation, Homco International, Inc., Kootenai Development Company, L B Realty, Inc., Litigation Management, Inc. (f/k/a GHSC Holding, Inc., Grace JVH, Inc., Asbestos Management, Inc.), Monolith Enterprises, Incorporated, Monroe Street, Inc., MRA Holdings Corp. (f/k/a Nestor-BNA Holdings Corporation), MRA Intermedco, Inc. (f/k/a Nestor-BNA, Inc.), MRA Staffing Systems, Inc. (f/k/a British Nursing Association, Inc.), Remedium Group, Inc. (f/k/a Environmental Liability Management, Inc., E&C Liquidating Corp., Emerson & Cuming, Inc.), Southern Oil, Resin & Fiberglass, Inc., Water Street Corporation, Axial Basin Ranch Company, CC Partners (f/k/a Cross Country Staffing), Hayden-Gulch West Coal Company, H-G Coal Company.

[2] Capitalized terms not defined in this Motion shall have the meaning ascribed to them in, as the case may be, the Agreements (as that term is defined in this Motion) or the *First Amended Joint Plan of Reorganization* (the "Plan") in these Chapter 11 Cases, as amended, Docket nos. 19579, 20666, 20872, 20873 and 21594.To the

- *Sale.* Pursuant to section 363(b), the sale (the "Sale") of 5% (the "Sale Asset") of the limited liability company interests (the "LLC Interests") of Advanced Refining Technologies LLC ("ART") by Seller to Chevron U.S.A. Inc. (variously, "Buyer" or "Chevron"), for a sale price of $4.0 million (the "Sale Price"), pursuant to an agreement in the form attached hereto as **Exhibit B** (the "Sale Agreement");

- *LLC Amendment.* The amendment of the LLC Agreement (as defined below) to reflect the Sale and to effectuate certain other amendments, on the terms and conditions set forth in Amendment No. 4 to the LLC Agreement, the form of which is attached hereto as **Exhibit C** (the "LLC Amendment");

- *Credit Agreement Amendment.* Pursuant to section 363(b), amendment, the form of which is attached hereto as (**Exhibit D**) of the Grace-ART Credit Agreement (as defined below), under which Grace makes loans on an unsecured basis to ART, to reduce the available credit line from $24.75 million to $20.25 million (the "Credit Agreement Amendment" and together with the Sale Agreement and the LLC Amendment, the "Agreements"); and

- *Capital Loans.* Pursuant to section 364, Grace's borrowing certain amounts from ART on an unsecured basis (the "Capital Loans") and repaying on a cash-neutral basis, as contemplated by the Catalyst Supply Agreement (as defined below), the proceeds of which will be used for maintenance capital expenditures in connection with Grace's performance of the Catalyst Supply Agreement, in the amounts of $8.7 million (pertaining to expenditures made in 2007-08) and up to $3.5 million (pertaining to expenditures being made in 2009), as evidenced by demand notes in the form of **Exhibit E-1** and **Exhibit E-2**, respectively (the "Notes"), and additional borrowings in 2010 and thereafter through and including 2014 in amounts not to exceed $6.0 million in any one year, on substantially the same terms and conditions as set forth in the Notes.[3]

In support of this Motion, the Debtors state as follows:

---

extent of any inconsistency between the summary of the Transactions set forth herein and the Agreements and the Notes (as defined below), the terms and conditions of the Agreements and Notes shall govern.

[3] The LLC Agreement and the Catalyst Supply Agreement (as defined below) contain confidential business terms, and have therefore not been attached to this Motion. The relevant parts of the Catalyst Supply Agreement are attached as **Exhibit F** to this Motion. The LLC Agreement and the Catalyst Supply Agreement will be provided upon request to the Court, the Official Committees and the United States Trustee. Other parties-in-interest may obtain, upon written request and execution of a confidentiality agreement satisfactory to the Debtors and Buyer.

2

## JURISDICTION

1.  This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue of this proceeding and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.  The predicates for the relief requested herein are sections 105(a), 363(b), (f), (m) and (n), and 364(b) of the Bankruptcy Code, Fed. R. Bankr. P. 2002(a)(2), 4001(a) and (c), 6004(a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9006 and 9014, and Rules 2002-1(b) and 9006-1 of the District of Delaware Local Rules.

## BACKGROUND

3.  On April 2, 2001 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). These Chapter 11 Cases have been consolidated for administrative purposes only, and, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their properties as debtors-in-possession.

### I. ART's Business

4.  ART is a limited liability company organized under the laws of Delaware, 55% of whose LLC Interests are owned by the Seller ("Grace's LLC Interest") and 45% by Buyer, and has been operating since March 2001 in the ordinary course of business. Its business and affairs are governed by the Limited Liability Company Agreement dated March 1, 2001, between Grace and Buyer (as amended, the "LLC Agreement"). The LLC Agreement provides, in relevant part, that Grace and Buyer jointly manage ART, with all actions by the ART Executive Committee requiring the approval of both Grace and Buyer. ART is not a Debtor in these Chapter 11 Cases.

5.  ART develops, markets and sells hydroprocessing catalysts, which are used to upgrade heavy oils into lighter, more useful products by removing impurities such as nitrogen,

sulfur and heavy metals, allowing less expensive feedstocks to be used in the petroleum refining process. Grace is the primary manufacturer of ART's products, although ART also obtains products from non-U.S. manufacturers pursuant to agreements that are not the subject of this Motion. In 2008, ART's revenues were approximately $355 million.

6. In connection with their business relationship, Grace and ART are parties among other things to:

- Hydroprocessing Catalyst Supply Agreement dated March 1, 2001 (as amended, the "Catalyst Supply Agreement"), under which Grace sells hydroprocessing catalysts to ART; and

- Credit Agreement dated March 1, 2001 (as amended, the "Grace-ART Credit Agreement"), under which Grace has committed to provide ART with up to $24.75 million of revolving credit loans on an unsecured basis.

During the pendency of these Chapter 11 Cases, Grace has made loans to ART under the Grace-ART Credit Agreement in the ordinary course of business.

7. ART is also party to a credit agreement (the "Chevron Credit Agreement") with Chevron Capital Corporation, an affiliate of Buyer ("Chevron Capital"), under which Chevron Capital has committed to provide ART with up to $20.25 million of revolving credit loans on an unsecured basis. The terms of the Grace-ART Credit Agreement and the Chevron Credit Agreement are substantially identical in all other respects.

8. Grace's $24.75 million loan commitment is 55% of the total loan commitments, and Chevron Capital's $20.25 million loan commitment is 45% of the total loan commitments. The reduction in loan commitment under the Grace-ART Credit Agreement from $24.75 million to $20.25 million will make the commitments of Grace and Chevron Capital each 50% of the total commitment.

## II. Consummating the Sale Is the Optimal Method of Deconsolidating ART from Grace Parent's Consolidated Group

9. Under applicable accounting rules, ART's revenues and results of operations are included in the consolidated revenues and results of operations of W. R. Grace & Co. ("Grace Parent"), which is one of the Debtors, and its consolidated subsidiaries, which include Grace and all of the other Debtors, and Grace Parent reports Buyer's interest in ART as a non-controlling interest in consolidated results.

10. When ART began business prior to the petition date, the ART structure reflected Grace's judgment that consolidating ART's sales into the Grace Parent Group's financial reporting would be advantageous for the business and was also appropriate for accounting purposes. ART subsequently grew from an $80 million to a $350 million business with greater financing requirements. Because of the differences in scale resulting from this substantial growth, and after substantial analysis by Grace and its financial advisors and auditors, Grace has concluded that ART should be restructured and that consolidation is no longer advantageous for the following reasons:

- Under the current arrangements, Grace disproportionately funds ART by funding maintenance capital and providing the majority of the revolving credit commitments to ART. Grace management has concluded that the restructuring steps embodied in the Transactions would reduce the cash burden on Grace. After restructuring, ART management will have greater responsibility for ART's cash management; and Grace believes that this will lead to a proportionately distributed and effective management of ART's business;

- As long as ART remains consolidated with the Grace Parent group, any borrowing by ART under the Chevron-ART Credit Agreement may trigger a cap on interest tax deductions by a non-Debtor Grace subsidiary that could eliminate a substantial portion of such deductions and resulting tax savings. The deductions carry over into subsequent years, but remain subject to the deduction cap in those years.

- ART's sales are volatile because they generally involve large purchases by petroleum refiners as the result of competitive bidding arrangements, at intervals that generally are both several years in length and difficult to predict. Further volatility is the result of ART's revenues including a catalytic metals component (molybdenum, cobalt,

5

nickel) whose cost is just a pass-through of the cost of the metals to ART, but whose price is often highly volatile. The inclusion of ART's volatile performance in the Grace Parent consolidated group results have a distorting effect on the publicly reported financial performance of the consolidated group.

11. Therefore, the Debtors have concluded that it is in their best interests, and those of their estates, creditors and equity holders, to restructure ART and to deconsolidate ART's financial operating results from Grace Parent's consolidated group. After extensive analysis and consultation with its financial auditors, Grace has concluded that the Sale is a "reconsideration event" that, under applicable accounting rules, would allow Grace to deconsolidate ART.

12. Under the LLC Agreement, Grace cannot sell the Sale Asset without Buyer's consent, and Buyer is not willing to consent to a sale to a third party. Grace therefore undertook discussions with Buyer for a potential sale of the Sale Asset to Buyer. The parties agreed upon a Sale Price of $4.0 million in cash.

13. In connection with the Sale, the parties also agreed to the terms of the LLC Amendment, which makes the LLC Agreement reflect the Sale related to the modification of the LLC Interests and contains certain additional amendments related to the operation of ART. In addition, the Credit Agreement Amendment, as documented in Amendment No. 4 to the Grace-ART Credit Agreement, will reduce Grace's commitment thereunder to $20.25 million, or 50% of the aggregate commitments of Grace and Chevron Capital to ART.

14. Buyer will not be an insider as the Bankruptcy Code defines that term as a result of the Sale or any of the actions contemplated in relation thereto.

### III. Capital Loans

15. The Catalyst Supply Agreement contains provisions under which Grace, with ART's consent, can obtain the Capital Loans, which take the form of demand loans from ART

for the purpose of financing maintenance capital expenditures in connection with Grace's performance of the agreement.

16. The Catalyst Supply Agreement further provides that ART will pay a manufacturing surcharge to Grace on the price of purchased catalysts equal to the amount of (a) depreciation on the items purchased with the Capital Loans plus (b) interest payments on the Capital Loans. The surcharge also applies with respect to maintenance capital expenditures made by Grace with its own funds. The Catalyst Supply Agreement provisions relating to the Capital Loans are attached as **Exhibit F**.

17. Grace has not previously obtained Capital Loans. It has made maintenance capital expenditures from its own funds, with repayment coming only through the depreciation surcharge over the life of the maintenance capital items. Such expenditures in recent years have averaged about $5.5 million per year. In 2009, Grace and Buyer have agreed to Capital Loans retrospectively for 2007-08 in the amount of $8.7 million, and for 2009 in an amount of up to $3.5 million (collectively, the "Initial Capital Loans"). Grace also expects that with ART's consent, it will obtain additional Capital Loans in 2010 and succeeding years. Grace therefore also seeks approval of the Court for any Capital Loan in any subsequent fiscal year (from 2010 through 2014, inclusive) in amounts not to exceed $6.0 million in any single year.

### IV. Summary of Terms and Conditions of the Proposed Transactions

18. The following is a summary of the chief terms and conditions of the Transactions:

| TERM | DESCRIPTION |
|---|---|
| | **The Sale** |
| SELLER | • W. R. Grace & Co.-Conn. |
| BUYER | • Chevron U.S.A. Inc. |
| SALE ASSET | • Part of Grace's LLC Interest equal to 5% of the total LLC Interests, which shall be free and clear of all liens and encumbrances pursuant to section 363(f). |
| SALE PRICE | • $4.0 million |

| TERM | DESCRIPTION |
|---|---|
| CONSUMMATION | • As soon as practicable after the Order shall have been entered and become final. |
| AMENDMENT NO. 4 TO LLC AGREEMENT | **LLC Amendment**<br>• Documentation of 50%-50% ownership<br>• Modification of allocations of taxes and distributions as between Grace and Buyer<br>• Deputy Managing Director, a newly created position, added to the Officers |
| AMENDMENT NO. 4 TO GRACE CREDIT AGREEMENT | **Credit Agreement Amendment**<br>• Decrease of Grace's revolving credit commitment to ART from $24.75 million to $20.25 million, thereby making it equal to Chevron Capital's commitment<br>• Terms otherwise remain unchanged; expires March 1, 2010 |
| $8,700,000 GRACE DEMAND NOTE | **Capital Loans**<br>• Principal: payable in 80 monthly installments beginning January 15, 2010, and upon demand by ART<br>• Interest: three-month LIBOR plus 1.25 percentage points (125 basis points), payable monthly, reset quarterly; increases by one percentage point (100 basis points) after default in any payment of principal or interest<br>• Prepayable at any time without premium or penalty<br>• Payment demand may be made by Buyer 180 days after any payment default, or upon subsequent bankruptcy of Grace or dissolution of ART<br>• Grace principal and interest payments effectively recovered from ART through Catalyst Supply Agreement surcharge |
| UP TO $3,500,000 GRACE DEMAND NOTE | • Principal: amount of 2009 maintenance capital loans by ART; payable in 96 monthly installments beginning February 15, 2010, and upon demand by ART<br>• Interest: three-month LIBOR plus 1.25 percentage points (125 basis points), payable monthly, reset quarterly; increases by one percentage point (100 basis points) after default in any payment of principal or interest<br>• Prepayable at any time without premium or penalty<br>• Grace principal and interest payments effectively recovered from ART through Catalyst Supply Agreement surcharge |

## RELIEF REQUESTED

19. By this Motion, pursuant to sections 105(a), 363(b), (f) and (m), and 364(a) and (b), of the Bankruptcy Code, the Debtors seek entry of an Order, substantially in the form attached hereto as **Exhibit A**:

- Approving the terms of the Sale pursuant to the terms and conditions of the Sale Agreement, substantially in the form attached hereto as **Exhibit B**, and the sale of the Sale Asset free and clear of liens and other encumbrances, and authorizing the Debtors to consummate the Sale;

- Approving the LLC Amendment, substantially in the form attached hereto as **Exhibit C**, and authorizing the Debtors to enter into the LLC Amendment;

- Approving the terms of the Credit Agreement Amendment, substantially in the form attached hereto as **Exhibit D**, and authorizing the Debtors to enter into the Credit Agreement Amendment;

- Authorizing the Debtors to enter into the Capital Loans on the terms and conditions set forth in the Notes in the form attached hereto as **Exhibits E-1 and E-2**;

- Authorizing the Debtors to undertake all actions necessary to consummate the Transactions;

- That takes effect immediately by virtue of this Court's waiving the 10-day stay under Bankruptcy Rules 6004(h) and 6006(d); and

- Granting such other and further relief as is just and proper.

## BASIS FOR RELIEF

**A. The Court Is Authorized to Approve Entry Into the Sale, the LLC Amendment and the Credit Agreement Amendment Pursuant to Sections 105(a) and 363(b)**

20. The Debtors bring this Motion under sections 105(a) and 363(b)(1) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code "permits the court to issue any order that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a). Section 363(b) of the Bankruptcy Code provides, in relevant part, that "the trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1).

21. This court has the statutory authority to authorize the Debtors to use or sell property of the estates pursuant to section 363(b)(1) of the Bankruptcy Code if such use or sale is an exercise of the Debtors' sound business judgment and when such use or sale is proposed in good faith. In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175 (D. Del. 1991); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Circ. 1986); In re Lionel Corp., 772 F. 2d 1063, 1071 (2d Cir. 1983); see also Fulton State Bank v. Schipper, 933 F.2d 513, 515 (7th Cir. 1991) (a

debtor's decision must be supported by "some articulated business justifications"); Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to section 363(b); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Ernst Home Center, Inc., 209 B.R. 974, 979 (Bankr. W. D. Wash. 1997).

22. Under Section 363(b) of the Bankruptcy Code, a debtor has the burden to establish that it has a valid business purpose for using estate property outside the ordinary course of business. See Lionel Corp., 722 F.2d at 1070-71. Once a debtor has articulated such a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the debtor's best interest. See In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). The business judgment rule has significance in Chapter 11 Cases as it shields a debtor's management from second guessing. See Committee of Asbestos Related Litigants and/or Creditors v. Johns Manville Corp. (In re Johns Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D. N.Y. 1986) ("The Code favors the continued operations of a business by a debtor and a presumption of reasonableness attaches to debtor's management decisions."). A party in interest seeking to challenge the debtor's valid business purpose must "produce some evidence supporting its objections." Montgomery Ward, 242 B.R. at 155.

23. Courts have applied four factors in determine whether a sound business justification exists: 1) whether a sound business reason exists for the proposed transactions; (ii) whether fair and reasonable consideration is provided; (iii) whether the transaction has been proposed and negotiated in good faith; (iv) whether adequate and reasonable notice is provided. See Lionel Corp., 722 F.2d at 1071 (setting forth the "sound business purpose" test); Abbotts

Dairies, 788 F.2d 145-47 (implicitly adopting the articulated business justification test of the Lionel standard and adding the "good faith" requirement); Delaware & Hudson, 124 B.R. at 176 (adopting Lionel in this district).

**B.  The Court Is Authorized to Approve the Capital Loans Pursuant to Section 364**

24.  Section 364(b) provides in relevant part:

> The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt ... allowable under section 503(b)(1) of this title as an administrative expense

Section 364(b) provides the Court with statutory authority to approve the Capital Loans because they are being made by ART to Grace on an unsecured basis, and any amounts owed thereunder would be administrative expenses for purposes of section 503(b)(1) of the Bankruptcy Code.

**C.  The Court Should Approve the Transactions**

25.  Consummating the Transactions will provide for more proportionate funding and management of ART, eliminate possible negative tax effects on Grace from the funding of ART, and remedy adverse effects of ART's volatile financial performance on the Debtors' consolidated financial statements. For these sound business reasons, the Debtors have determined that consummating these Transactions will be in their best interests, as well as those of their estates, their myriad creditor constituencies and their equity holders. In addition, each of the Transactions was proposed and negotiated in good faith and provides for fair and reasonable consideration.

- *The Sale*

26.  When the ART business was begun prior to the Petition Date, Grace believed that consolidating ART into the consolidated group's financial reporting would be advantageous. That is no longer the case, and Grace and the remaining Debtors have concluded, after extensive

11

analysis and for the reasons set forth above, that deconsolidating ART is now the best course of action.

27. The Sale will enable deconsolidation of ART for financial reporting purposes. Under the LLC Agreement, Grace cannot sell the Sale Asset without Buyer's consent, and Buyer is not willing to consent to a third party sale. Therefore, Grace negotiated the terms of the Sale with Buyer at arms' length and in good faith. As a result of these negotiations, Buyer and Seller both agreed, that the Sale Price of $4 million was fair and reasonable consideration for the Sale Asset.

28. The Debtors believe that, for these reasons, the Sale is in their best interests as well as those of each other creditor and equity constituency. They therefore respectfully submit that the Court should approve the Sale on the terms described herein and set forth in the Sale Agreement attached hereto as **Exhibit B**.

- *The LLC Amendment*

29. The LLC Agreement requires that upon sale of any LLC Interests, Exhibit A to the LLC Agreement, which sets forth the LLC Interests of the members, be revised to reflect the change in ownership. The LLC Amendment is thus a required adjunct to the Sale. The Debtors therefore respectfully submit that the Court approve the LLC Amendment substantially in the form attached hereto as **Exhibit C**.

- *The Credit Agreement Amendment*

30. Since the formation of ART, Grace and Buyer have provided revolving credit facilities to ART in proportion to their respective LLC Interests. The Credit Agreement Amendment reduces Grace's loan commitments to ART from $24.75 million to $20.25 million, which is the same amount as Chevron's commitments. The Court therefore should approve the Credit Agreement Amendment in substantially the form attached hereto as **Exhibit D**.

- *The Capital Loans*

31. The Debtors believe that the Capital Loans, on the terms and conditions set forth in the forms of Notes attached hereto as **Exhibit E-1** and **E-2**, are in the Debtors' best interests, as well as those of their estates and creditors, for the reasons set forth in this Motion. The Debtors further believe that the claims arising from the Capital Loans are actual and necessary costs for the same reasons.

32. The Debtors therefore have concluded that each of the Transactions contemplated by this Motion are in their best interests, as well as those of their estates, creditors, equity holders and other constituencies. The Debtors respectfully submit that the Court should enter the Order, substantially in the form attached hereto as **Exhibit A**, approving the Transactions and each of the Agreements and Notes contemplated thereby, which are attached as **Exhibits B – E-2**.

### No Previous Motion

33. No previous motion for the relief sought herein has been made to this or any other court.

### No Briefing Schedule

34. The Debtors respectfully submit that this Motion does not present any novel issues of law requiring briefing. Therefore, pursuant to Rule 7.1.2 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (the "Local District Court Rules"), incorporated by reference in Rule 1001-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Debtors respectfully request that the Court set aside the briefing schedule set forth in Rule 7.1.2(a) of the Local District Rules.

## Waiver of Stay Pending Appeal

35. To successfully implement the foregoing Transactions, the Debtors seek a waiver of the notice requirements under Fed. R. Bankr. P. 6004(a) and the ten-day stay under Fed. R. Bankr. P. 6004(h).

## Notice

36. Notice of this Motion has been given to: (i) the office of the United States Trustee; (ii) counsel to the DIP Lender; (iii) counsel to JP Morgan Chase Bank N.A. as agent for the Debtors' prepetition lenders; (iv) counsel to each of the official committees appointed in these Chapter 11 Cases; (v) counsel to the Asbestos Personal Injury and Asbestos Property Damage Future Claimants' Representatives; (vi) those parties that requested service and notice of papers in accordance with Fed. R. Bankr. P. 2002; and (vii) counsel to the Buyer and Chevron Capital. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

91100-001\DOCS_DE:153329.1

WHEREFORE, the Debtors respectfully seek the entry of the Order substantially in the form attached hereto as <u>Exhibit A</u>, pursuant to section 105 of the Bankruptcy Code and Fed. R. Bankr. P. 9019: (i) approving the terms of the Transactions as being in the best interests of the Debtors, their estates and their creditors; (ii) authorizing the Debtors' performance of the Transactions; and (iii) granting such other relief as may be appropriate.

Dated: September 21, 2009

KIRKLAND & ELLIS LLP
Theodore L. Freedman
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

and

THE LAW OFFICES OF JANET S. BAER, P.C.
Janet S. Baer, P.C.
Roger J. Higgins
70 W. Madison St., Suite 2100
Chicago, IL 60602-4253
(312) 641-2162

and

PACHULSKI STANG ZIEHL & JONES LLP

_/s/ Laura Davis Jones_
Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Kathleen P. Makowski (Bar No. 3648)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(302) 652-4100
(302) 652-4400
Co-Counsel for the Debtors and Debtors-in-Possession