UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                      .    Case No.  01-1139 (JKF)
                            .
W.R. GRACE & CO.,           .
et al.,                     .    USX Tower – 54th Floor
                            .    600 Grant Street
                            .    Pittsburgh, PA 15219
              Debtors.      .
                            .    September 9, 2009
. . . . . . . . . . . . ..       9:11 a.m.


TRANSCRIPT OF PLAN CONFIRMATION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:        Kirkland & Ellis, LLP
                        By:  DAVID BERNICK, ESQ.
                             BARBARA HARDING, ESQ.
                             JANET BAER, ESQ.
                        200 East Randolph Drive
                        Chicago, IL  60601


For the Debtors:        Kirkland & Ellis, LLP
                        By:  THEODORE FREEDMAN, ESQ.
                        Citigroup Center, 153 East 53rd St.
                        New York, NY  10022


Audio Operator:         Cathy Younker

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

```
For the Asbestos
Creditors Committee:        Caplin & Drysdale, Chartered
                            By:  PETER LOCKWOOD, ESQ.
                                 NATHAN FINCH, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C.  20005

For the Future             Orrick, Herrington & Sutcliffe, LLP
Claimants                  By:  ROGER FRANKEL, ESQ.
Representatives:                JONATHAN GUY, ESQ.
                           Washington Harbour
                           3050 K Street, N.W.
                           Washington, D.C.  20007

For the Equity             Kramer Levin Naftalis & Frankel
Committee:                 By:  DAVID E. BLABEY, JR., ESQ.
                           919 Third Avenue
                           New York, NY  10022

For the Libby Claimants:   Lewis, Slovak & Kovacich, P.C.
                           By:  TOM L. LEWIS, ESQ.
                                MARK KOVACICH, ESQ.
                           725 Third Avenue North
                           Great Falls, MT 59401

                           McGarvey, Heberling, Sullivan and
                            McGarvey, P.C.
                           By:  JON HEBERLING, ESQ.
                                JOHN LACEY, ESQ.
                           725 Third Avenue North
                           Great Falls, MT  59401

                           Cohn Whitesell & Goldberg, LLP
                           By:  DANIEL C. COHN, ESQ.
                           101 Arch Street
                           Boston, MA  02110

For the                    Stroock & Stroock & Lavan
Unsecured Creditors'       By:  KENNETH PASQUALE, ESQ.
Committee:                      ARLENE KRIEGER, ESQ.
                           180 Maiden Lane
                           New York, NY  10038-4982
```

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D)

For the Property          Bilzin Sumberg Baena Price &
Damage Committee:            Axelrod LLP
                          By:  MATTHEW KRAMER, ESQ.
                          200 South Biscayne Boulevard
                          Suite 2500
                          Miami, FL  33131

For Committee of          Campbell & Levine
Asbestos Personal         By:  MARK T. KRAMER, ESQ.
Injury Claimants:         800 North King Street
                          Suite 300
                          Wilmington, DE  19701

For Maryland Casualty:    Eckert Seamans Cherin & Mellott, LLC
                          By:  EDWARD LONGOSZ, II, ESQ.
                          1747 Pennsylvania Avenue, N.W.
                          Suite 1200
                          Washington, D.C.  20006

For Sealed Air:           Skadden, Arps, Slate, Meagher & Flom,
                            LLP
                          By:  DAVID TURETSKY, ESQ.
                               J. GREGORY ST. CLAIR, ESQ.
                          One Rodney Square
                          Wilmington, DE  19801

For Garlock Sealing       Robinson, Bradshaw & Hinson, P.A.
Technologies:             By:  GARLAND CASSADA, ESQ.
                               RICHARD WORF, ESQ.
                          101 North Tryon Street
                          Suite 1900
                          Charlotte, NC  28246

For State of Montana:     Womble, Carlyle, Sandridge & Rice
                          By:  KEVIN MANGAN, ESQ.
                          222 Delaware Avenue
                          Suite 1501
                          Wilmington, DE  19801

For Federal Insurance     Cozen O'Connor
Company:                  By:  JACOB C. COHN, ESQ.
                          1900 Market Street
                          Philadelphia, PA  19103

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D)

For Edwards' Judgment          Reaud, Morgan & Quinn
Claimants:                     By:  DAVID J. PARSONS, ESQ.
                               801 Laurel
                               Beaumont, TX  77701


For BNSF Railway:              Pepper Hamilton, LLP
                               By:  LINDA CASEY, ESQ.
                               3000 Two Logan Square
                               Philadelphia, PA  19103


For Travelers:                 Simpson Thacher
                               By:  MINDY LOK, ESQ.
                               425 Lexington Avenue
                               New York, NY  10017


For GEICO, Seaton              Drinker Biddle & Reath LLP
Ins. Co., Republic             By:  JEFFREY M. BOERGER, ESQ.
Ins. Co.:                      One Logan Square
                               18th and Cherry Streets
                               Philadelphia, PA  19103


For Allstate Insurance:        Cuyler Burke, LLP
                               By:  ANDREW CRAIG, ESQ.
                               Parsippany Corporate Center
                               Four Century Drive
                               Parsippany, NJ  07054


For Ford, Marrin,              Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer               Gleser, LLP
& Gleser, LLP:                 By:  ELIZABETH M. DeCRISTOFARO, ESQ.
                               Wall Street Plaza, 23rd Floor
                               New York, NY  10005-1875


For Royal Indemnity            O'Melveny & Myers, LLP
& Arrowood:                    By:  TANCRED SCHIAVONI, ESQ.
                               Times Square Tower
                               Seven Times Square
                               New  York, NY  10036


For CNA:                       Goodwin Procter, LLP
                               By:  DANIEL GLOSBAND, ESQ.
                                    MIKE GIANNOTTO, ESQ.
                               Exchange Place
                               Boston, MA  02109-2881

APPEARANCES (CONT'D)

For Fireman's Fund:            Stevens & Lee, P.C.
                               By:  JOHN DEMMY, ESQ.
                               1105 North Market Street, 7th Fl.
                               Wilmington, DE  19801

For Maryland Casualty:         Connelly Bove Lodge & Hutz, LLP
                               By:  JEFFREY WISLER, ESQ.
                               The Nemours Building
                               1007 North Orange Street
                               Wilmington, DE  19899

                               Wiley Rein
                               By:  RICHARD IFFT, ESQ.
                               1776 k Street, NW
                               Washington, D.C. 20006

TELEPHONIC APPEARANCES:

For the Unsecured             Strook & Strook & Lavan
Creditors' Committee:         By:  LEWIS KRUGER, ESQ.
                              180 Maiden Lane
                              New York, NY 10038

For Ad Hoc Committee:         Weil, Gotshal & Manges
                              By:  M. JARRAD WRIGHT, ESQ.
                              1300 Eye Street NW, Suite 900
                              Washington, D.C.  20005

For Official Committee        Kramer Levin Naftalis & Frankel
of Equity Holders:             LLP
                              By:  PHILLIP BENTLEY, ESQ.
                              919 Third Avenue
                              New York, NY  10022

For Official Committee        Dies & Hile, LLP
of Asbestos Property          By:  MARTIN DIES, ESQ.
Damage Claimants:             1601 Rio Grande, Suite 330
                              Austin, TX  78701

                              LECG
                              By:  ELIZABETH DEVINE, ESQ.
                              1725 Eye Street NW, Ste 800
                              Washington, DC,  20006

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D)

For the Property                Bilzin Sumberg Baena Price &
Damage Committee:                  Axelrod LLP
                                By:  SCOTT BAENA, ESQ.
                                     JAY SAKALO, ESQ.
                                200 South Biscayne Boulevard
                                Suite 2500
                                Miami, FL  33131

For Hartford Financial          Wilmer Cutler Pickering Hale & Dorr,
Service Group, Inc.:               LLP
                                By:  MELANIE DRITZ, ESQ.
                                399 Park Avenue
                                New York, NY  10022

For the Bank Lenders:           Paul Weiss Rifkind Wharton &
                                   Garrison, LLP
                                By:  ANDREW N. ROSENBERG, ESQ.
                                     MARGARET PHILLIPS, ESQ.
                                     REBECCA ZUBATY, ESQ.
                                1285 Avenue of the Americas
                                New York, NY  10019

For Fireman's Fund:             Stevens & Lee, P.C.
                                By:  MARNIE SIMON, ESQ.
                                1105 North Market Street, 7th Fl.
                                Wilmington, DE  19801

                                Crowell & Moring LLP
                                By:  TACIE YOON, ESQ.
                                1001 Pennsylvania Avenue, N.W.
                                Washington, DC  20004

For Asbestos Property           Scott Law Group
Damage Claimants:               By:  DARRELL SCOTT, ESQ.
                                1001 East Main Street, Suite 500
                                Sevierville, TN  37864

For National Union Fire         Zeichner Ellman & Krause, LLP
Insurance Co.:                  By:  ROBERT GUTTMANN, ESQ.
                                     MICHAEL DAVIS, ESQ.
                                575 Lexington Avenue
                                New York, NY  10022

For PD FCR:                     Law Office of Alan B. Rich
                                By:  ALAN RICH, ESQ.
                                1201 Main Street, Suite 1910,
                                Dallas, TX  75202

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

```
For the Future           Orrick, Herrington & Sutcliffe,
Claimants                   LLP
Representatives:         By:  DEBRA FELDER, ESQ.
                              JOSHUA CUTLER, ESQ.
                         Washington Harbour
                         3050 K Street, N.W.
                         Washington, D.C.  20007


For Federal Insurance    Cozen O'Connor
Company:                 By:  ILAN ROSENBERG, ESQ.
                         1900 Market Street
                         Philadelphia, PA  19103


For Allstate Insurance:  Cuyler Burk, LLP
                         By:  STEFANO CALOGERO, ESQ.
                         Parsippany Corporate Center
                         Four Century Drive
                         Parsippany, NJ  07054


For Official Committee   Anderson Kill & Olick
of Asbestos Personal     By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:        1251 Avenue of the Americas
                         New York, NY  10020-1186


For Grace Certain        Montgomery, McCracken, Walker &
Cancer Claimants:           Rhoads, LLP
                         By:  NATALIE D. RAMSEY, ESQ.
                         300 Delaware Avenue, Ste. 750
                         Wilmington, DE  19801


For David T. Austern,    Phillips, Goldman & Spence, P.A.
the Future Claimants'    By:  JOHN C. PHILLIPS, JR., ESQ.
Representative:          1200 North Broom Street
                         Wilmington, DE  19806


For the Asbestos         Ferry Joseph & Pearce, P.A.
Creditors Committee:     By:  THEODORE TACCONELLI, ESQ.
                         824 Market Street, Suite 19899
                         Wilmington, DE  19899


For Ford, Marrin,        Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer          Gleser
& Gleser:                By:  SHAYNE SPENCER, ESQ.
                         Wall Street Plaza
                         New York, NY  10005
```

TELEPHONIC APPEARANCES (CONT'D):

```
For Official Committee      Duane Morris, LLP
of Unsecured Creditors:     By:  MICHAEL LASTOWSKI, ESQ.
                            1100 North Market Street, Suite 1200
                            Wilmington, DE  19801-1246

For Official Committee      Brandi Law Firm
of Asbestos Property        By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:                TERENCE D. EDWARDS, ESQ.
                            44 Montgomery St., Suite 1050
                            San Francisco, CA  94104

                            Lieff, Cabraser, Heimann & Bernstein
                            By:  ELIZABETH J. CABRASER, ESQ.
                            Embarcadero Center West
                            275 Battery Street, Suite 3000
                            San Francisco, CA  94111

                            Riker, Danzig, Scherer, Hyland &
                             Perretti, LLP
                            By:  TARA MONDELLI, ESQ.
                                 CURTIS PLAZA, ESQ.
                            Headquarters Plaza
                            One Speedwell Avenue
                            Morristown, NJ  07962

For the Libby Claimants:    Cohn, Whitesell & Goldberg, LLP
                            By:  CHRISTOPHER M. CANDON, ESQ.
                            101 Arch Street
                            Boston, MA  02110

                            Landis, Rath & Cobb, LLP
                            By:  KERRI K. MUMFORD, ESQ.
                            919 Market Street, Suite 1800
                            Wilmington, DE  19899

For Longacre Masterfund:    Pepper Hamilton, LLP
                            By:  JAMES C. CARIGNAN, ESQ.
                            Hercules Plaza
                            Suite 5100
                            1313 Market Street
                            Wilmington, DE  19899

For Bloomberg, LLP:         Bloomberg, LLP
                            By:  STEVEN H. CHURCH
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For the Bank Lenders:        Landis, Rath & Cobb, LLP
                             By:  RICHARD COBB, ESQ.
                                  JAMES S. GREEN, JR., ESQ.
                             919 Market Street, Suite 1800
                             Wilmington, DE  19899

For Travelers Casualty       Morris, Nicholas, Arsht & Tunnell, LLP
Surety Company:              By:  ANN C. CORDO, ESQ.
                             1201 North Market Street, 18th Floor
                             Wilmington, DE  19899

For Everest                  Crowell & Moring LLP
Reinsurance Co.:             By:  LESLIE A. DAVIS, ESQ.
                                  MARK PLEVIN, ESQ.
                             1001 Pennsylvania Avenue, N.W.
                             Washington, DC  20004

For the PD Committee:        Speights & Runyan
                             By:  DANIEL SPEIGHTS, ESQ.
                                  MARION FAIREY, ESQ.
                                  ALAN RUNYAN, ESQ.
                             200 Jackson Avenue, East
                             Hampton, SC  29924

For Garlock Sealing          Morris James, LLP
Technologies:                By:  BRETT FALLON, ESQ.
                             500 Delaware Avenue
                             Suite 1500
                             Wilmington, DE  19801

For Hound Partners:          Hound Partners
                             By:  BRIAN M. GOOTZEIT

For Everest Reinsurance      Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:             By:  BRIAN L. KASPRZAK, ESQ.
                                  JOHN D. MATTEY, ESQ.
                             913 North Market Street
                             Suite 800
                             Wilmington, DE  19801

For Anderson Memorial        Kozyak, Tropin & Throckmorton, PA
Hospital:                    By:  JOHN W. KOZYAK, ESQ.
                                  DAVID L. ROSENDORF, ESQ.
                             2525 Ponce de Leon, 9th Floor
                             Miami, Florida 33134

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

```
For ZAI Claimants          Hogan Firm Attorneys at Law
& various law firms:       By:  DANIEL K. HOGAN, ESQ.
                           1311 Delaware Avenue
                           Wilmington, DE  19801


For the U.S. Trustee:      Office of the U.S. Trustee
                           By:  DAVID KLAUDER, ESQ.
                           844 King Street, Suite 2313
                           Wilmington, DE  19801

For Arrowwood              Bifferato Gentilotti LLC
Indemnity Co.:             By:  GARVAN McDANIEL, ESQ.
                           800 North King Street
                           Wilmington, DE  19801

For the PD Committee:      Speights & Runyan
                           By:  DANIEL SPEIGHTS, ESQ.
                                ALAN RUNYAN, ESQ.
                           200 Jackson Avenue, East
                           Hampton, SC  29924

For AXA Belgium:           Mendes & Mount
                           By:  ANNA NEWSOM, ESQ.
                           750 Seventh Avenue
                           New York, NY  10019

For Royal Insurance:       Wilson Elser Moskowitz Edelman
                             & Dicker, LLP
                           By:  CARL PERNICONE, ESQ.
                           150 East 42nd Street
                           New York, NY  10017

For AXA Belgium:           Tucker Arensberg, P.C.
                           By:  MICHAEL A. SHINER, ESQ.
                           1500 One PPG Place
                           Pittsburgh, PA  15222

For Official Committee     Richardson Patrick Westbrook &
of Asbestos Property         Brickman, P.C.
Claimants:                 By:  EDWARD J. WESTBROOK, ESQ.
                           174 East Bay Street
                           Charleston, SC  29401

For Dow Jones              Dow Jones News Wires
News Wires:                By:  PEG BRICKLEY
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

```
For Murray Capital        Murray Capital Management, Inc.
Management                By:  MARTI MURRAY

For Serengeti:            Vinson & Elkins, LLP
                          By:  ARI BERMAN, ESQ.
                          Trammell Crow Center
                          2001 Ross Avenue, Suite 3700
                          Dallas, TX  75201

For the Debtors:          Pachulski, Stang, Ziehl &Jones
                          By:  JAMES O'NEILL, ESQ.
                          919 North Market Street
                          17th Floor
                          Wilmington, DE  19899-8705

                          Kirkland & Ellis, LLP
                          By:  CHRISTOPHER GRECO, ESQ.
                               CLEMENT YEE, ESQ.
                          601 Lexington Avenue
                          New York, NY  10022

                          W.R. Grace & Co.
                          By:  MARK A. SHELNITZ, ESQ.
                          7500 Grace Drive
                          Columbia, ND 21044

For Various Claimant      Stutzman, Bromberg, Esserman & Plifka
Firms:                    By:  DAVID J. PARSONS, ESQ.
                          2323 Bryan Street
                          Suite 2200
                          Dallas, TX  75201

For Scott Company:        Vorys, Sater, Seymour & Pease, LLP
                          By:  TIFFANY COBB, ESQ.
                          52 East Gay Street
                          Columbus, OH  43216

For Pentwater Capital     Pentwater Capital Management
Management:               By:  JORDAN FISHER

For Morgan Stanley        Edwards, Angell, Palmer, Dodge, LLP
Senior Funding:           By:  ROBERT CRAIG MARTIN, ESQ.
                          919 North Market Street
                          Wilmington, DE 19801
```

TELEPHONIC APPEARANCES (CONT'D):

For State of Montana:        Womble, Carlyle, Sandridge & Rice
                             By:  FRANCIS MONACO, ESQ.
                             222 Delaware Avenue
                             Suite 1501
                             Wilmington, DE  19801

For Kaneb Pipe Line          Fulbright & Jaworski
Operating Partnership:        By:  STEVE A. PEIRCE, ESQ.
                             300 Convent Street
                             San Antonio, TX 78205

For PD FCR:                  ALEX SANDERS, ESQ.


                             - - -


**J&J COURT TRANSCRIBERS, INC.**

## I N D E X

**WITNESSES**                                                    **PAGE**

JAY HUGHES
   Direct Examination by Mr. Bernick               34
   Direct Examination by Mr. Finch                 86
   Cross Examination by Mr. Lewis                  89
   Redirect Examination by Mr. Bernick            191
   Recross Examination by Mr. Lewis               196

CRAIG MOLGAARD
   Direct Examination by Mr. Heberling            209
   Voir Dire Examination by Mr. Finch             214
   Continued Direct Examination by Mr. Heberling  218


**EXHIBITS**                                       **ID**      **EVD**

501-2       Document                                            50
293         Transcript of Dr. Whitehouse re
               Schnetter case                                   57
290         Letter                                              64
289         Document                               66          66
501-8       Document                               67          67
PP-7        Document                               72          72
501-4       Document                               73          73
501.6       Document                               76          76
501.7       Document                               79          80
501.8(a)    Document                               86          86
LC-270      Settlement Summary                    172         172
LC-271      Verdict document                      184
214         Expert report                                     207
214-A       Expert report                         206         207
214-B       Curriculum Vitae                      206         207
LC-272      Study                                 223
LC-273      Study                                 230

1          THE COURT:  Be seated.  I'm sorry.  This is a

2   continuation of the Phase II confirmation trial on W.R. Grace.

3   I have a list of participants by phone.  Scott Baena, Janet

4   Baer, Ari Berman. David Bernick, David Blabey, Thomas Brandi,

5   Peg Brickley, Elizabeth Cabraser, Stefano Calogero, Christopher

6   Candon, Steven Church, Richard Cobb, Tiffany Cobb, Jacob Cohn,

7   Ann Cordo, Andrew Craig, Joshua Cutler, Leslie Davis, Michael

8   Davis, Elizabeth DeCristofaro. Elizabeth Devine, Martin Dies,

9   Melanie Dritz, Terence Edwards, Lisa Esayian, Marion Fairey,

10  Brett Fallon, Debra Felder, Jordan Fisher, Theodore Freedman,

11  Robert Gilbert, Brian Gootzeit, Christopher Greco. James Green,

12  Robert Guttmann, Daniel Hogan, Robert Horkovich, Brian

13  Kasprzak, David Klauder, John Kozyak, Matthew Kramer, Michael

14  Lastowski, Robert Martin, John Mattey, Garvan McDaniel, Francis

15  Monaco, Tara Mondelli, Kerri Mumford, Marti Murray, Anna

16  Newsom, James O'Neill, David Parsons, Steve Peirce, Carl

17  Pernicone, Margaret Phillips, John Phillips, Curtis Plaza, Mark

18  Plevin, Andrew Rosenberg, Ilan Rosenberg, David Rosendorf, Alan

19  Runyan Jay Sakalo, Darrell Scott, Mark Shelnitz, Michael

20  Shiner, Daniel Speights, Shayne Spencer, Theodore Tacconelli,

21  Edward Westbrook, Clement Yee, Tacie Yoon and Rebecca Zubaty.

22          Are there any changes from yesterday's entries of

23  appearance in court?  If so, I'll take additions or

24  corrections.  Otherwise we'll keep the record -- oh, Cathy, do

25  you need a list since you were not here yesterday?  You do.

1            AUDIO OPERATOR:  (Inaudible).

2            THE COURT:  Okay.  It might be easier if I just have

3  the list.  Okay.  I'm sorry, we have a different court reporter

4  so I am going to take entries this morning, please.  I need

5  entries of appearances, because we have a different court

6  reporter.

7            MR. BERNICK:  Okay.  David Bernick for Grace.

8            MR. FINCH:  Nathan Finch for the ACC.

9            MR. LOCKWOOD:  Peter Lockwood for the ACC.

10           MR. GUY:  Jonathan Guy and Roger Frankel for the

11 Asbestos PI FCR.

12           MR. LEWIS:  Tom Lewis for the Libby claimants.

13           MR. KOVACICH:  Mark Kovacich for the Libby claimants.

14           MR. HEBERLING:  Jon Heberling for the Libby

15 claimants.

16           MR. LACY:  John Lacy for the Libby claimants.

17           THE COURT:  Your microphone's not on, Mr. Lacy.

18           MR. LACY:  John Lacy for the Libby claimants.

19           MR. COHN:  Daniel Cohn for the Libby claimants.

20           MR. HURFORD:  Mark Hurford, Campbell & Levine, for

21 the ACC.

22           MR. KRAMER:  Good morning, Your Honor, Matt Kramer,

23 Bilzin Sumberg, for the Property Damage Committee.

24           THE COURT:  Good morning.

25           MR. CASSADA:  Good morning, Your Honor, I'm Garland

1 Cassada here with Rich Worf and we represent Garlock Sealing

2 Technologies.

3          MR. SANDERS:  Good morning, I'm Alex Sanders, PD FCR.

4          MR. PASQUALE:  Good morning, Your Honor, Ken Pasquale

5 and Arlene Krieger from Stroock for the Unsecured Creditors

6 Committee.

7          THE COURT:  Good morning.

8          MR. TURETSKY:  Good morning, Your Honor, David

9 Turetsky and J. Gregory St. Clair, Skadden, Arps for Sealed Air

10 Corporation.

11          MS. CASEY:  Good morning, Your Honor, Linda Casey on

12 behalf of BNSF Railway.

13          MR. PARSONS:  Good morning, Your Honor, David Parsons

14 for the Reaud, Morgan Firm on behalf of the Edwards' Judgment

15 Claimants.

16          MR. MANGAN:  Your Honor, Kevin Mangan on behalf of

17 the state of Montana.

18          MR. BOERGER:  Good morning, Your Honor, Jeff Boerger

19 for GEICO, Republic, Seaton and One Beacon.

20          THE COURT:  Good morning.

21          MR. GIANNOTTO:  Good morning, Your Honor, Michael

22 Giannotto for Continental Casualty.

23          MS. DeCRISTOFARO:  Good morning, Your Honor,

24 Elizabeth DeCristofaro for Continental Casualty.

25          MR. GLOSBAND:  Good morning, Your Honor, Daniel

1  Glosband also for Continental Casualty.

2          MR. DEMMY:  John Demmy of Stevens & Lee for Fireman's
3  Fund Insurance Company and the Allianz Insurers.

4          MR. COHN:  Jacob Cohn of Cozen, O'Connor for Federal
5  Insurance Company.

6          MS. LOK:  Mindy Lok for Travelers.

7          MR. CRAIG:  Good morning, Andrew Craig for Allstate,
8  Your Honor.

9          MR. BLABEY:  Good morning, David Blabey from Kramer
10  Levin for the Equity Committee.

11          MR. RICH:  Good morning, Your Honor, Alan Rich
12  representing Jeff Sanders of PD FCR.

13          MR. SCHIAVONI:  Your Honor, Tancred Schiavoni and
14  Carl Pernicone for Arrowood.

15          THE COURT:  One second.  Thanks.

16          MR. WISLER:  Good morning, Your Honor, Jeffrey Wisler
17  on behalf of Maryland Casualty and Zurich.

18          MR. IFFT:  Good morning, Richard Ifft on behalf of
19  Maryland Casualty and Zurich.

20          MR. LONGOSZ:  Good morning, Your Honor, Ed Longosz on
21  behalf of Maryland Casualty and Zurich.

22          THE COURT:  Good morning.

23          MS. BAER:  Good Morning, Your Honor, Janet Baer on
24  behalf of W.R. Grace.  Also here on behalf of Grace are Ted
25  Freedman and Barbara Harding.

1              Your Honor, before we start the confirmation hearing

2    we do have an agreed order that we would like to present to the

3    Court.  This resolves, Your Honor, the matter that we filed on

4    yesterday morning, agenda item -- I'm sorry, Docket Number

5    23182.  It was our emergency motion to resolve a procedure with

6    respect to the introduction and discussion of confidential

7    privileged medical records and the like.  We've worked out an

8    order with the Libby claimants essentially along the lines of

9    what the debtor had proposed which is when confidential

10   information is in fact discussed we would clear the courtroom.

11             Most of the people here are actually subject to the

12   protective orders, but there are probably a few that are not.

13   We'll have to shut off the phone and then ask the court

14   reporter to keep that part under seal and marked confidential.

15   Hopefully, Your Honor, it won't happen too often, and we will

16   try to make it run as smoothly as possible.  We're not sure

17   there's any other alternative.

18             THE COURT:  I'm not sure either so for the moment

19   we'll see if it works.

20             MS. BAER:  Your Honor, we'll try as much as we can to

21   make it work and see how we go.

22             THE COURT:  Okay.  You recognize that in sealing this

23   courtroom and the record your court reporters are going to have

24   to leave as well.  You will not have access to that portion of

25   the transcripts because I don't know how else I can keep it

1  private.

2           MR. BERNICK:   There are two issues that are going to

3  come up that impact on confidentiality.   One is patient

4  information.   And the second is settlement information.

5  Protecting the patient information is, I think, something that

6  can be accomplished pretty readily.   If counsel does not refer

7  to the name of the patient and instead we're working with

8  documents, everybody will essentially know what the name is in

9  this courtroom, but I think that that at least will mean that

10 the transcript does not need to be sealed.   I'm not sure what

11 else can be done at this point in time.   Maybe we can figure

12 something else out.   I kind of doubt it.

13          Frankly, all of this is the responsibility of the

14 people representing these people.   We've been very careful

15 about this, but we are not in control.   We don't -- we can't

16 deal with these people individually, they're not our clients,

17 we can't really do anything.   With respect to the settlement

18 information, once again, it is the Libby claimants who are

19 putting all of this at issue.   And the settlement information

20 is subject to agreements that have been reached between Grace

21 and these individual claimants.   But the claimants again are

22 not our clients.

23          So I'm going to assume that for the plan proponents

24 that there is no issue with the disclosure of the settlement

25 information, because their former counsel is sitting here --

1  current counsel for all I know is sitting here right at the

2  table watching this information be displayed.  And if they

3  believe that there's a problem in sharing the settlement

4  information that relates to their clients I think it's

5  incumbent upon them to take suitable measures to protect

6  against this disclosure.  Having seen no such measures being

7  taken that's not our problem.

8        We're going to assume that they are authorized by

9  their client to release the information for whatever purpose it

10  might be used in this courtroom because they in fact are the

11  people who are putting it at issue in this case.  That is the

12  individual information at issue in this case.  Nothing that the

13  plan proponents have done so far has identified any single

14  individual claimant, whatsoever.  It is they who are putting

15  them at issue with the recent exhibits that have been

16  proffered.

17        So we're going to assume that by virtue of their

18  having proffered those exhibits with the names of the

19  individuals, that not only do they have the approval of those

20  individuals with respect to medical information, but also with

21  respect to settlement information.  We're prepared to do

22  anything and everything that's necessary to facilitate their

23  protection of their clients, but if they're prepared to have

24  the names come out, the settlement amounts come up, so be it.

25        MR. COHN:  Your Honor, may I ask to just have a

1  moment with Mr. Bernick?

2          THE COURT:  Yes.

3          MR. COHN:  Thank you.

4          MR. LEWIS:  Your Honor, while he's doing that I have

5  a --

6          MR. BERNICK:  Well, I can't do both things at once.

7  I'm happy to talk to Mr. Cohn.

8          MR. LEWIS:  Well, this will just take a second.

9          THE COURT:  All right.

10          MR. LEWIS:  With respect to the settlement

11  information, the confidentiality agreements are between the

12  claimants and W.R. Grace.

13          MR. BERNICK:  Well, your client's --

14          MR. LEWIS:  Mr. Bernick, Grace is your client.

15          MR. BERNICK:  I know.

16          MR. LEWIS:  And you have a confidentiality right.

17  And if you're waiving that we have no problem with that.

18          MR. BERNICK:  We have no concern about waiving our

19  confidentiality right.  We waived our confidentiality right

20  eons ago.  So that's not an issue at all.  We're talking about

21  -- I'm sorry, I don't mean to address Mr. Lewis as much as we'd

22  like to talk with one another.  That is our position, Your

23  Honor.

24          MR. LEWIS:  Well, then we don't have a problem here,

25  Your Honor.  That's the first time I heard that they'd waived

1  their rights under confidentiality under these settlements.

2  And we take those seriously because if we do breach a

3  confidentiality without their permission we can have difficulty

4  later.  So there's no issue there.

5          THE COURT:  All right.  So your clients have waived

6  their confidentiality right --

7          MR. LEWIS:  Absolutely.

8          THE COURT:  -- and debtor has as well with respect to

9  the settlements.

10          MR. LEWIS:  As to the settlement.

11          MR. BERNICK:  And with respect to the medical

12  information which again, they are putting at issue through --

13          THE COURT:  Well, let's talk about the settlements

14  first, one piece at a time.  With respect to the settlements,

15  correct?

16          MR. LEWIS:  Yes.  We have waived.

17          MR. BERNICK:  Can I hear the same representation from

18  Mr. Heberling who has his own clients?

19          MR. HEBERLING:  I can't hear.

20          MR. LEWIS:  He wants you to waive for your clients --

21          MR. BERNICK:  Can I hear the same thing from Mr.

22  Heberling with respect to his clients?

23          MR. HEBERLING:  We're co-counsel.  We waive it.

24          MR. BERNICK:  Thank you.

25          THE COURT:  All right.  Yes.  Go ahead.  Do you need

1  me to take a recess or will you only be a minute?

2          MR. COHN:  It should really just be a moment, Your

3  Honor.

4          THE COURT:  All right.

5                      (Pause)

6          MR. BERNICK:  Your Honor, I'd like to hear the same

7  representation from Mr. Heberling and Mr. Lewis then with

8  respect to the medical information that relates to the same

9  people.  I think it'll be very limited, but right now they've

10 already marked as an exhibit a document, actually probably many

11 exhibits that already contain the medical information of these

12 people down to individuals.  Lung function tests, the nature of

13 their disease, what their prospects are.  It's all in exhibits

14 that have been furnished to the Court already.

15         And, again, our assumption would be that they

16 wouldn't do that unless they have the authority of their

17 current or former clients to do so.  So in the same fashion

18 that we ask for the acknowledgment of waiver with respect to

19 settlement, or I think Your Honor did, we ask the same thing

20 with respect to the medical information that's set forth in

21 their files.

22         THE COURT:  Mr. Cohn.

23         MR. COHN:  Your Honor, Mr. Bernick is proceeding in

24 completely contrary to the spirit of the agreed order in which

25 we reached an agreement with Grace to grant its motion.  And

1  perhaps there's been some miscommunication within the Grace

2  team.  So maybe a short recess would be helpful to get this

3  straightened out.

4          MR. BERNICK:  Mr. Cohn approached me and said what

5  about, you know, some kind of measure that says the court

6  reporters can see it, but -- we don't have to seal this

7  courtroom.  We don't have to take the trouble to go through all

8  of this, because they have already put it on the public record.

9  I don't know what the difference is between this -- because

10 they submitted the exhibits.  The exhibits contain -- like the

11 little list that you saw yesterday that brought all this about.

12 The little list that was --

13         THE COURT:  Yes.

14         MR. BERNICK:  -- you know, the settled/unsettled.  It

15 contains medical information for every single one of those

16 individuals.  The Peterson -- the Heberling letter from

17 Heberling to Peterson is already in evidence in this case.  It

18 contains medical information with all the names in black and

19 white.  And there are numerous other exhibits that have been

20 marked, that have been furnished to the Court, are all over the

21 place without any concern.

22         THE COURT:  All right.

23         MR. COHN:  Your Honor, as I said, there was a

24 discussion of what we would do.  I thought I reached a

25 agreement with Mr. Bernick's co-counsel.  I think we just need

1  a moment to straighten out what exactly has been agreed to.

2          THE COURT:  Okay.  I think the issue, Mr. Cohn, and

3  I'm happy to give you time to talk if that's what you need, but

4  I think the issue was raised because I'm concerned that in

5  order to keep what you've presented as the agreed order I'm not

6  sure that I can do what you expect to have done, and have the

7  information sealed.  So if we're going to seal it that means

8  everybody is going to leave the courtroom who is not directly

9  involved in the trial including your individual court

10  reporters.  We will shut down the phone, because otherwise I

11  have no ability to keep this information under seal.  So it has

12  to be that way.  Or else we need some other resolution.

13          MR. COHN:  Right.  I think we could provide for the

14  court reporters in the order.  But -- and that was perhaps a --

15          THE COURT:  I will not provide for the court

16  reporters in the order, I cannot keep the information sealed if

17  there are numerous transcripts floating around other than the

18  official record.  So I will not permit that, because if the

19  room is going to be sealed then the court's record will be the

20  court's record, and there will be no other record, but the

21  sealed record.  That's the problem.

22          MR. COHN:  Okay, that's fine.  Okay.  I'm sorry.  I

23  thought you mean -- I somehow got the idea that you were going

24  to exclude the court's audio.

25          THE COURT:  Oh, no, no, no.

1              MR. BERNICK:  What do we do with everybody --

2              THE COURT:  No, I won't exclude the court's reporter.

3 No.

4              MR. BERNICK:  What about everybody on the phone?

5              THE COURT:  They'll have to be shut off.  There will

6 be no participation by phone.  I can't do that.  We'll shut the

7 attorney conference room mics off and the courtroom will be

8 sealed.  You know, it seems a little -- I'm not sure that we

9 need to do this that's why I had suggested earlier that perhaps

10 the witness could be shown the -- I'll call them unredacted

11 documents, but for purposes of the identification on the record

12 some form of list that simply deletes the name of the patient,

13 if that's the issue, is the information kept confidential

14 enough if the medical information is disclosed, but not

15 associated with the name of a person.

16              MR. COHN:  We were -- that was the original road we

17 were going down, Your Honor, and Grace proposed something else

18 and we wanted to accommodate them.  And that's why we -- that's

19 why this order is so --

20              MR. BERNICK:  If I could --

21              THE COURT:  Well, Grace's concern though with respect

22 to making sure that the witness knows specifically the person

23 involved especially if it's going to be a treating physician is

24 a legitimate concern.  That witness can't be given a number and

25 told it has -- that person has to know the name of the entity.

1          MR. COHN:  That's why we -- Your Honor, that's why we

2     worked this out so as to try to accommodate just those

3     concerns.  But if there appears to be some disconnect here --

4          MR. BERNICK:  There is no disconnect.

5          THE COURT:  All right.

6          MR. BERNICK:  There is zero disconnect.

7          THE COURT:  We will take a five minute recess to see

8     if you can work this out.  Thank you.

9          MR. COHN:  Thank you, Your Honor.

10                         (Recess)

11          THE COURT:  Oh, I'm sorry.

12          MR. COHN:  Yes, Your Honor, we have worked something

13     out that should be less cumbersome.

14          THE COURT:  All right.

15          MR. COHN:  And will be workable.  First of all, Your

16     Honor, the agreement is that there will be no findings of the

17     Court in respect of any individual patient which I think was

18     the way it was going to be anyway.  But we will clarify that in

19     the form of an agreement approved that we hope by the Court.

20     And then the second element of our agreement is that after the

21     fact --

22          UNIDENTIFIED ATTORNEY:  Your Honor, we can't hear a

23     word.

24          MR. COHN:  Is that me or is this the microphone?

25          THE COURT:  No, it's on.  I don't know what's

1  happening.  Maybe there's a speaker problem.  If you could just

2  speak a little louder, Mr. Cohn.

3          MR. COHN:  Okay.  All right.  The first element of

4  what we agreed to -- I'm sorry, Your Honor, I don't like to

5  shout at you.

6          THE COURT:  Can you hear now?  That's all right.  Can

7  you hear?

8          UNIDENTIFIED ATTORNEY:  That's better.

9          THE COURT:  Okay.

10          MR. COHN:  All right.  The first element of what was

11  agreed to is that there shall be no findings of the Court in

12  conjunction with the confirmation proceedings that relate to or

13  identify individual claimants.  And then the second element is

14  that we will, after the fact, go back and redact exhibits that

15  contain any information that is individual claimant medical

16  information so as to remove patient identifying information.

17  But for purposes of going forward with the testimony we will go

18  forward on the basis that people can be examined based on

19  unredacted materials.  Is that correct, Mr. Bernick?

20          MR. BERNICK:  Give me a moment.

21          THE COURT:  Mr. Cohn, I just want an understanding.

22  When you're talking about no findings of the Court as to any

23  individual patient, I'm not exactly sure.  I'm not making

24  medical findings or talking about what level of disease they

25  may or may not have, and if there is some agreement to identify

1  -- I'll just use an analogy -- Joe Smith as, you know, Patient

2  A, then certainly I can use whatever designation the parties

3  use if that's relevant at all.  I don't know that it will be.

4  But I'm not sure what other types of findings you're precluding

5  me from making.  Because to the extent that there's some

6  relevant information, if I need to make findings I'm going to

7  make those findings.

8         MR. COHN:  No, no, of course, Your Honor.  First of

9  all, we were addressing concerning medical issues, but also,

10 Your Honor, to the extent that you needed to or felt that you

11 should refer to in some way to medical information, if you did

12 so by number, that's within the terms of the protective order

13 that you've already entered.

14        THE COURT:  All right.  That's fine.  Whatever

15 identification the parties use I can certainly agree to use.

16        MR. BERNICK:  And insofar as the formal records --

17        THE COURT:  Mr. Bernick, I don't think your

18 microphone's on.

19        MR. BERNICK:  It's a good thing.  Otherwise there

20 would have been all kinds of unpleasantness that would have

21 gone all over the place.  So we're totally flexible when it

22 comes to the transcript.  We're totally flexible when it comes

23 to the findings, transcript after the fact.  We're totally

24 flexible when it comes to the exhibits, after the fact.  All

25 that I am concerned is that we have a free and open proceeding

1 this morning or during the day or whenever these issues come up

2 so that we don't have to take extraordinary steps to shut this

3 courtroom down so that we can deal with this issue.

4          And I had a representation from Mr. Heberling that

5 that is what our arrangement is.  And I just want confirmation

6 that during the course of this trial we're not going to have

7 any issues about protecting confidential information relating

8 to individual claimants when the trial takes place in open

9 court.

10          MR. HEBERLING:  That's correct.  And Mr. Cohn stated

11 it correctly.

12          THE COURT:  All right.  Then I guess I don't need

13 this protective order.  So I will take a different order from

14 you folks, not this one which I'm throwing away, when you have

15 a chance to draft it.

16          MR. COHN:  Thank you, Your Honor.

17          THE COURT:  All right.  Ms. Baer, are there any other

18 preliminary issues you want to address this morning?

19          MS. BAER:  No, Your Honor.

20          THE COURT:  Okay.  I did this morning have the orders

21 entered on the four COCs that I hadn't had a chance to take a

22 look at until last night.  So I've read those motions, I'm fine

23 with them, and those orders are entered.

24          MS. BAER:  Thank you, Your Honor.

25          THE COURT:  Okay.  Mr. Bernick.

1          MR. BERNICK:  Yes.  We'll call as our next witness

2  Mr. Jay Hughes.  And I want to apologize to the Court.  We have

3  a notebook of materials that Mr. Hughes will be referring to.

4  I think probably until that notebook has been -- until that

5  notebook is available if I could furnish the Court --

6          COURT CLERK:  Mr. Bernick, your microphone is not on.

7          MR. BERNICK:  Thank you.

8          THE COURT:  We need to get the witness sworn, first,

9  please.

10  J A Y   H U G H E S, WITNESS, SWORN

11          COURT CLERK:  Please be seated.

12          MR. LEWIS:  May it please the Court.  I have an

13  objection.  I object to the use of these documents.  If the

14  Court would look at them briefly and just peruse them there's

15  two things about them that are objectionable.  The first thing

16  is they're in the nature of leading questions.  They imply

17  answers for the witness.  The witness needs to answer open-

18  ended questions, and not be prompted by such a document.  I've

19  never seen this before.  My understanding is you're going to

20  lay foundation for demonstrative exhibit which has been going

21  in, the witness testifies to the facts with open non-leading

22  questions, without prompting, and then the exhibit is offered.

23          And the second thing about this there's a lot of

24  expert opinion here on this document alone that we haven't seen

25  and this man has not been -- excuse me, sir, -- Mr. Hughes has

1  not been identified as an expert witness, no report has been

2  provided, nothing by way of reliance material has been

3  provided.  And this is the first time we saw this document

4  about 30 minutes ago, maybe five minutes before the court

5  convened this morning.  Maybe 45 minutes ago.

6        MR. BERNICK:  Those are all false representations.

7  Mr. Lewis was furnished or his counsel was furnished copies of

8  these documents mid-day yesterday.  That's when these

9  demonstratives were completed and furnished to the people

10 sitting at this table.  There was not a word spoken from mid-

11 day yesterday, we thought we were going to call Mr. Hughes

12 yesterday.  There was not a word spoken that indicated there

13 was any kind of issue whatsoever.  There's an arrangement with

14 this Court pursuant to which demonstratives used on direct

15 examination are to be furnished in advance.  They were

16 furnished almost 24 hours in advance, and we've never heard

17 from Mr. Lewis.  That's number one.

18        Number two, I haven't asked a single question.  If

19 Mr. Lewis wants to go through the process whereby in contrast

20 to what happened yesterday through three different witnesses

21 all of whom used demonstratives in exactly this fashion and

22 there was not a word from the other side of the courtroom, if

23 he wants me to go through and make sure that before the

24 demonstrative is displayed we elicit the testimony from Mr.

25 Hughes, we're more than happy to do it, and to lay the

1 foundation.

2        With respect to expert opinions this is truly ironic.

3 Because as Your Honor will see, and it'll be very interesting

4 to listen to the cross examination of Mr. Hughes, all that Mr.

5 Hughes is going to address are the matters set forth in his

6 settlement documents.  And those settlement documents have been

7 the bulwark of the Libby claimants' efforts to show that the

8 settlement history in connection with W.R. Grace shows that

9 there is some discrimination problem with respect to this plan.

10 They used his documents for that purpose.  They quote his

11 deposition for that purpose.

12        Mr. Hughes was a litigation manager for W.R. Grace.

13 All he's going to talk about is the fact, the facts of what he

14 did and how cases were settled.  The historical facts.  That's

15 not expert opinion.  If Mr. Lewis wants to maintain the

16 position that somehow it is, then I'm sure he'll stipulate that

17 none of Mr. Hughes' files, historical files that are the basis

18 for their expert's work and are the basis for their position in

19 this case can come into evidence because they're all expert

20 opinions.

21        MR. FINCH:  Your Honor, I would add that this is --

22 Nathan Finch for the Asbestos Claimants Committee.  Mr. Hughes

23 is not giving opinions about what factors drive the settlement

24 process the way Dr. Peterson did who was qualified as an expert

25 in that.  Mr. Hughes is testifying about what factors he

1  considered as in-house counsel to W.R. Grace who oversee and

2  ran their entire litigation process.  He's not saying I am

3  giving you opinions about what would happen or what the process

4  was.  He's saying this is what I considered at the time, back

5  in the day when I did deals with asbestos personal injury

6  claimants and their lawyers.  That's a big difference in terms

7  of whether he is required to do an expert report or not.

8           THE COURT:  All right.  Lay the foundation for the

9  witness before you use any demonstrative exhibit.  If it's

10  truly demonstrative then it will be accepted for that purpose

11  and no other as the other demonstratives are not a substantive

12  evidence.  But you can proceed, Mr. Bernick.

13           MR. BERNICK:  Thank you very much, Your Honor.

14                    DIRECT EXAMINATION

15  BY MR. BERNICK:

16  Q    Good morning, Mr. Hughes.

17  A    Good morning, Mr. Bernick.

18  Q    Could you tell us whether you have a position at W.R.

19  Grace.

20  A    Yes.  I'm employed as senior litigation counsel with W.R.

21  Grace.

22  Q    For how long have you worked at W.R. Grace?

23  A    I've been employed by Grace since February of 1985.

24  Q    Prior to that time could you give the Court a very brief

25  overview of your educational background and your employment

1 history?

2 A    I have a Bachelor's degree from Boston University, a Law

3 Degree from Suffolk University, I'm a member of the

4 Massachusetts Bar since 1981.  I worked in -- for a company

5 that's now part of Tyco called Simplex for four years as an in-

6 house lawyer prior to my employment with Grace, after I passed

7 the bar.

8 Q    Could you tell us in general terms the nature of your

9 duties at W.R. Grace since you joined the company?

10 A    Well, from 1985 through 1988, approximately, I worked as

11 -- my title was assistant counsel for what was then the

12 industrial chemicals group of Grace.  And I worked primarily on

13 asbestos-related matters, personal injury and property damage

14 in the related discovery.  I worked with the outside lawyers in

15 putting together the case.  I worked with the outside lawyers

16 and insurance companies in organizing our network of defense

17 counsel.  And in addition to that probably approximately

18 another third of my time I handled matters unrelated to

19 asbestos.

20         In 1988 I was -- then left the Cambridge,

21 Massachusetts office where I worked at that point and went to

22 New York and worked in what was then called the Office of

23 Environmental Policy in again a purely litigation management

24 position and was asked to manage the day-to-day litigation and

25 settlement of asbestos personal injury claims that were pending

1  against the company.  And I -- essentially my job

2  responsibilities stayed limited to asbestos personal injury

3  cases with some involvement in property damage and other toxic

4  torts from then to about 2001 when Grace filed bankruptcy.

5  Q    Thank you very much.  Could you tell us, Mr. Hughes,

6  there's -- the Libby claimants are the subject of our

7  proceedings during this phase of the confirmation.  Could you

8  tell us what, if any, involvement you had in connection with

9  litigation involving Libby claimants prior to the time that

10  Grace filed this Chapter 11?

11  A    Well, in 1985 when I joined the company I think there were

12  a handful at most of individual lawsuits that had been filed

13  against the company.  And in connection with my work as a more

14  junior lawyer in the legal department at that point I was aware

15  of the cases.  In 1988, '89 when I moved to New York in

16  connection with taking over responsibility for the day-to-day

17  management of the personal injury litigation I became the in-

18  house lawyer responsible for the litigation and the settlement

19  of the Libby cases working with our outside counsel from

20  Mazula, Montana, Gary Graham.

21  Q    And in that regard did you have occasion to make the

22  acquaintance of our esteemed counsel here Mr. Lewis and Mr.

23  Heberling?

24  A    Yes.

25  Q    Okay.  I want to begin just with some basic facts about

Hughes - Direct/Bernick                         37

1  Libby.  And we won't have any fancy demonstratives.  This is

2  all hand drawings.  There's no representation here --

3            MR. LEWIS:  Your Honor, I object.

4  Q    -- physical accuracy.

5            MR. LEWIS:  That kind of comment is inappropriate.

6            THE COURT:  All right.  Sustained.

7  Q    We're going to be very dry then.  I want to draw a picture

8  of, you know, Libby's Zonolite Mountain.  Was there a mountain

9  near Libby called Zonolite Mountain?

10 A    Yes, there was.

11 Q    Okay.  And could you tell us what was mined at that

12 mountain?

13 A    There was a Vermiculite mine and Vermiculite is a

14 naturally occurring mineral of mica-like material.  And they

15 had an open mining operation at the top of the mountain and it

16 was five to ten miles outside the actual town of Libby.

17 Q    When the Vermiculite came out of the ground what was it?

18 A    Well, like any material that's mined the Vermiculite that

19 came out of the ground, the ore, the raw vermiculite.

20 Q    Okay.  And after the ore came out of the ground what

21 happened -- was that further up on Zonolite Mountain?

22 A    Yes, it was.

23 Q    What happened to the Vermiculite ore after it came out of

24 the mountain?

25 A    Well, right in association with the mine site there was a

1  mill, a milling operation, a couple of different ones, it went

2  through some technological changes over time, but the process

3  -- there was a process there where they would take the ore and

4  they would concentrate it or mill it so that the final product

5  that would be shipped out to outside of Libby would have, you

6  know, be higher percentage of Vermiculite material that they

7  were really interested in.

8  Q    So we have ore.  What was it that came out of the mill?

9  A    It was commonly referred to as the Vermiculite

10 concentrate.

11 Q    Concentrate.  Okay.  So the concentrate comes out of the

12 mill and where does it go next?

13 A    The concentrate is then shipped by rail car to expanding

14 plants throughout the country.

15 Q    Concentrates in the middle of the mountain here on this

16 drawing, Mr. Hughes, doesn't have to get down the mountain

17 first?

18 A    Well, there's a conveyor system at the mine site that took

19 the material from the milling operation down to the rail siding

20 and at the rail siding where it was loaded into the railroad

21 cars and shipped off to the expanding plants.

22 Q    BNFS is in this case.  Does that have some relationship to

23 BNSF?

24 A    It's my understanding that BNSF were the owners and the

25 operators of the rail line where the siding was locating.

Hughes - Direct/Bernick                         39

1  Q    Okay.  Now, we got the concentrate going down that's put

2  in these rail cards.  The concentrate itself the Judge is

3  familiar -- the Court's familiar with ZAI as an expanded

4  product.  Is the concentrate the same thing as expanded product

5  or not?

6  A    No.

7  Q    What's the difference between -- just in your own -- based

8  upon your experience with the litigation -- we don't want to

9  get technical here -- what's the difference between the

10 concentrate and the expanded product?

11 A    Well, because it's a mica-like material there's moisture

12 trapped in the different layers of material in the concentrate.

13 And when it's put out at the plants it's put in the expansion

14 process which essentially is a 2000 degree furnace.  It's

15 heated, it expands like popcorn.

16 Q    Okay.  Was there an expansion operation at the mine back

17 in the olden days?

18 A    No.

19 Q    Okay.  How far back -- do you know whether at any point in

20 time there was an expansion operation in the Libby area?

21 A    In the early days there was an expansion operation in the

22 town of Libby.

23 Q    Okay.  Do you know when that shut down?

24 A    1960s, I believe.

25 Q    Okay.  So during the period after that time concentrate

1  comes off the mountain, gets put in the rail cars and off they

2  go.

3  A    Yes.

4  Q    Where do the rail cars go?

5  A    Throughout the country.

6  Q    All throughout the country?

7  A    There were expanding plants in -- 30 expanding plants

8  owned by Grace.  There were a group of expanding plants in

9  other cities that were operated by independent licensees who

10 manufactured the same kinds of products as Grace, but under

11 license from Grace.  And then there were totally independent

12 third parties who expanded their own Vermiculite and for

13 inclusion in their own products.

14 Q    Okay.  So we got all these expansion plants.  We don't

15 want to do too many of them.  But I think you said some of them

16 were Grace.

17 A    Um-huh.

18 Q    And some of them were other.

19 A    Yes.

20 Q    Okay.  When the expansion -- when the material ended up in

21 somebody else's expansion plant I take it that they popped the

22 popcorn and it became expanded product.

23 A    Yes.

24 Q    When Grace popped the popcorn it became expanded product,

25 too, right?

Hughes - Direct/Bernick                    41

1  A    Yes.

2  Q    The expanded product that Grace used what was done with

3  the expanded product that Grace used?

4  A    It was sold in a variety of insulation, construction and

5  in agricultural and horticultural products.  Both pure expanded

6  Vermiculite and in some cases mixed with other material.

7  Q    Okay.  Tell us what was the principal product that

8  occasioned the asbestos litigation that Grace faced over the

9  years, both personal injury and property?

10  A    The principal product would have been Monokote MK-3

11  structural steel fireproofing.

12  Q    How broadly was that used throughout the United States?

13  A    It was used throughout the country and wherever there was

14  high-rise construction.

15  Q    Okay.  Now, MK-3 is different from MK-4, MK-5?

16  A    Yes.

17  Q    What was the difference between MK-3 and MK-4?

18  A    MK-3 contained, as one of its components chrysotile

19  asbestos commercially added.  It was mixed with the products

20  and the expanded Vermiculite and plaster at the expanding

21  plants, bagged and shipped to the job sites.  In 1973 or

22  thereabouts the government banned the spray application of

23  asbestos containing materials and so the Monokote product was

24  reformulated and the chrysotile asbestos was removed from the

25  mix and MK-4 and MK-5 were those products.

1 Q    The ore that contained Vermiculite, did it also contain

2 asbestos?

3 A    Yes, it did.

4 Q    And that was called what?

5 A    Well, it was commonly referred to throughout the history I

6 was involved in the litigation and by regulatory agencies as

7 Tremolite asbestos.

8 Q    Okay.  The concentrate, did that contain any asbestos?

9 A    Yes, it did, but a substantially reduced amount.

10 Q    The expanded product -- well, first of all, the expansion

11 process itself, did that release asbestos?

12 A    Yes, it did.

13 Q    The expanded product, did that still contain -- albeit

14 very small -- did that contain asbestos?

15 A    Yes.  There was the potential for asbestos in very small

16 amounts in the expanded products.

17 Q    Tell us, after or during the course of the Libby

18 operations and thereafter, what was the geographical scope of

19 the part of the country where Tremolite asbestos from the Libby

20 mine was in place or being used?

21 A    Well, Libby material would have been used because some of

22 its properties would have been used throughout the country.  We

23 did operate another expanding plant in South Carolina, but it

24 was much smaller.

25 Q    And that also had -- didn't have the Libby Tremolite.

Hughes - Direct/Bernick                                43

1  A    No, it didn't.

2  Q    We've talked about Tremolite being all over the country,

3  what about the product -- first let me ask, this concentrate

4  was it sold by Grace?

5  A    Yes.

6  Q    Did we sell the concentrate?  So it was a product?  A

7  commercial product.

8  A    Yes.

9  Q    That commercial product, tell us to what extent that

10  commercial product was disseminated throughout the country?

11  A    Well, when I was explaining the three primary users of the

12  concentrate, the Grace owned plants, the independent licensees

13  and the third party expanders, both the independent licensees

14  and the third party expanders would have been buying

15  concentrate as a product.  Grace would have shipped them

16  concentrate and paid for it.

17  Q    Did Grace ever believe that the Tremolite asbestos from

18  the Libby mine was somehow asbestos where the only exposures

19  were to people in Libby?

20        MR. LEWIS:  Objection, Your Honor.  He's asking this

21  witness to testify as to the state of mind of his corporation.

22  He may ask the witness --

23        MR. BERNICK:  I'll withdraw the question.

24  Q    Did you ever have the assessment that the only exposures

25  to Tremolite were within the Libby community?

1  A    No.

2  Q    Now, to the extent -- let's talk a little bit about Libby.

3  Obviously people who work on the ore, they're exposed to

4  something that's not -- so Grace didn't sell the ore, did it?

5  A    No.

6  Q    To the extent that workers at the mine were only exposed

7  to the concentrate, because that's where they worked downstream

8  of the mill, at the time did you have the understanding that

9  they were being exposed to a commercial product that was going

10 to be shipped?

11          MR. LEWIS:  Objection.  Leading.

12 Q    Well, what was your understanding?

13 A    It was going to be shipped after it left the milling

14 operation and proceeded down the mountain on the conveyor

15 system.

16 Q    Let's talk about the people in the Libby community.  Did

17 you have any familiarity with whether concentrate was taken

18 off-site and was available in different parts of the community?

19          MR. LEWIS:  I did not hear the question, I apologize,

20 Your Honor.

21          MR. BERNICK:  I'll repeat the question.

22 Q    Was there any transportation of the concentrate, this

23 commercial product, was there any transportation of that

24 concentrate off-site and into the community?

25 A    Within the Libby community, yes.

1  Q    Was there -- and again, that's the same material that's

2  the commercial product?

3  A    Yes.

4  Q    Was there any use of expanded Vermiculite, the product,

5  the commercial product expanded Vermiculite, was there any use

6  of that product within the community?

7  A    Yes.

8  Q    What about the ore?  Did you become familiar that mill

9  tailings made their way into certain specific parts of Libby?

10 A    Yes.

11         MR. LEWIS:  Objection.

12 Q    Where --

13         MR. LEWIS:  Leading.

14         MR. BERNICK:  That's foundation.

15         THE COURT:  The question was did you become aware as,

16 as a foundation.  I think that is appropriate so the

17 objection's overruled.

18 Q    Where specifically did the mill tailings end up?

19 A    Well, there's a couple of instances historically that I'm

20 aware of at some point in time in the 1970s mill tailings were

21 used on the Libby highschool track, at the junior highschool

22 track, and at an ice-skating -- outdoor ice-skating rink near

23 one of the elementary schools in town.

24 Q    Okay.  Apart from those particular locations tell us

25 whether or not you became aware of the mill tailings or ore

1  being anywhere else in the Libby community.

2  A    I'm not aware of any other location.

3  Q    With the exception of those particular locations tell us

4  whether or not -- tell us whether to your knowledge there was

5  any exposure of the community based upon the litigation, any

6  exposure to the community to anything other than commercial

7  product?

8  A    None that I'm aware of.

9        MR. BERNICK:  Next exhibit.

10  Q    Give us, Mr. Hughes, just a very brief overview of when

11  litigation concerning asbestos products began against Grace and

12  essentially how it unfolded over the years.  Just a very brief

13  overview.  We want to get a time fame.

14  A    In approximately, I think, 1977, '78 thereabouts it

15  probably was the first asbestos personal injury claim tort suit

16  filed against W.R. Grace.  Prior to 1980, 1981 it was probably

17  literally a handful of cases.  In '81, '82 cases began to be

18  filed more regularly.  The point of reference I use is that

19  when I joined Grace in February of 1985 I think shortly

20  thereafter Grace was named in its 1000th asbestos personal

21  injury case.  At the same time in the early '80s there were

22  many asbestos in buildings cases being filed against the

23  company as well.  And those are what we refer to as property

24  damage cases where building owners sought to recover the cost

25  of the removal of the asbestos containing products or otherwise

1  deal with the presence of asbestos containing products in

2  buildings.

3  Q    Okay.  I want to talk about diseases.  What kinds of

4  diseases were alleged in connection with the personal injury

5  cases?

6  A    Well, I would generally categorize the cases or organize

7  the cases in three basic groups, mesothelioma cases, lung

8  cancer cases, and nonmalignant cases.

9  Q    Could you tell us whether or not the different types of

10  diseases that were being alleged had any effect on the

11  litigation.  That is, what relationship, if any, did they play

12  to the litigation process?

13  A    Well, I think they had an effect on the fundamental issues

14  that were typically litigated.  In a meso case because of the

15  strong association between meso and asbestos exposure and in

16  most cases where the diagnosis of mesothelioma was confirmed

17  the issue really that was litigated would have been product

18  exposure or product ID.  The question of whether or not the

19  individual plaintiff had been exposed to Grace products or

20  operations.

21          In a lung cancer case because there is an alternative

22  environmental agent associated with lung cancer that's well

23  known and well established, cigarette smoking, and we were

24  talking about a population where cigarette smoking was fairly

25  popular the issue was often product exposure.  But also we

1  dealt with whether or not the particular lung cancer was

2  related to asbestos causation.

3  Q    Causation.  Okay.

4  A    In a nonmalignant case you have the question of product

5  exposure and whether or not they were exposed to a Grace

6  product or operation.  You have a question of whether or not

7  the particular disease and the impairment is related to

8  asbestos exposure generally.

9        And then finally, which isn't the case in a meso or

10  lung cancer case because both meso and lung cancer are serious

11  cancers with a very poor prognosis in most cases, in a

12  nonmalignant case the question is whether or not the person

13  really has any kind of legitimate asbestos-related disease or

14  condition that is an impairment or a disease in the kind of

15  conventional way we think about it even if there are some kind

16  of arguably asbestos-related lung changes visible on x-ray.

17  Q    Let's talk about --

18  A    So the severity of the disease would be a question or

19  whether or not a disease existed.

20  Q    Let's talk about settlement.  What relationship, if any,

21  to the settlement process did the categorization of the

22  diseases have?

23  A    Well, I think that the values for the cases in most

24  jurisdictions reflected that.  I mean, in a meso case, because

25  it was a clear association between asbestos and mesothelioma

1  and the seriousness of the disease, all things being equal, the

2  cases had higher settlement values than the typical lung cancer

3  case.

4  Q    Okay.

5  A    The lung cancer case, again, because there was this

6  significant alternative theory of exposure and many of the

7  plaintiffs were cigarette smokers the typical value for a lung

8  cancer case, even though they were both essentially, you know,

9  serious cancers with a poor prognosis, lung cancer cases

10 settled for, in general, significantly less than a mesothelioma

11 case.

12 Q    Okay.  What about the nonmalignant?

13 A    Nonmalignant cases settled for less, but there were other

14 factors.  Typically product exposure and the severity of the

15 disease would influence that, but they were less than lung

16 cancer and meso cases on average.

17 Q    I want to zero in a little bit more on the settlement

18 process and ask you generally, what fact or how many factors

19 are there, roughly, that could conceivably or in your

20 experience that did in fact affect the settlement process and

21 the settlement amount?

22 A    Well, I think that you could name depending on how much

23 you sliced it.  And you could name several factors, ten, 20

24 factors.  But I generally like to look at the cases from a

25 standpoint of four basic factors; the number of defendants, how

1  many other parties were involved in the case and were likely to

2  contribute to the settlement, product exposure, what was the

3  quality and quantity of the product exposure that was going to

4  be presented against Grace in the case, the disease, the

5  quality of the medical condition, whether or not the person had

6  mesothelioma or lung cancer, they had a nonmalignant, the

7  radiographic rating that it might have been given, the level of

8  impairment, the extent to which we thought that the impairment

9  was related to asbestos exposure as opposed to some other kind

10 of issues, cigarette smoking and the like.

11         And finally the jurisdiction of the case was pending

12 was also important.  There were a lot of issues, you know,

13 different lawyers in different parts of the country had

14 different history of results in asbestos personal injury

15 litigation.  And in many parts of the country the jury pool was

16 such that there was a history of larger verdicts in places like

17 Madison County, Illinois or Beaumont, Texas.

18 Q    I want to show you defendants' exhibit -- Proponents'

19 Exhibit EXPP501-2 and ask you whether that demonstrative now

20 reflects the factors that you just now identified as the most

21 important factors influencing settlement?

22 A    Yes, it does.

23         MR. BERNICK:  Your Honor, we offer for demonstrative

24 purposes 501-2.  It's in the Court's notebook.

25         MR. LEWIS:  No objection subject to cross

1  examination, Your Honor.

2          THE COURT:  All right.  It's admitted.  Give me a

3  second, Mr. Bernick.

4  Q    Some of the other factors, I don't think we really need to

5  get into a lot of the details on it.  I want to come back to

6  this one in just a moment.  But some of the other factors, what

7  were some of the other factors that could affect the value of

8  the case depending upon the facts of the case?

9  A    Well, things like the age of the plaintiff, whether there

10 were surviving children in a meso case, economic damages, the

11 level of earnings, the particular plaintiff.  The types of

12 things I would say that would be common in any personal injury

13 case in evaluating what its economic value was before the jury.

14 Q    I want to come back to jurisdiction for a moment and ask

15 you, when you say jurisdiction mattered what more specifically

16 -- what factors more specifically about jurisdiction were you

17 referring to?

18 A    Well, as I alluded to first in -- there are jurisdictions

19 throughout the country where the jury pool, and it's been

20 proven both by in experience and all kinds of tort matters and

21 other kinds of litigation, have shown to be both -- have

22 pronounced anti-corporate biases and a propensity to award

23 large amounts of money, and with the right case, the juries.

24 And when you were dealing with a case like that, for example,

25 and again, using the classic example of Beaumont, Texas or

1 Madison County, Illinois the jury pool in a court where the

2 case would be tried, would influence the settlement value.  And

3 conversely, there were jurisdictions in other parts of the

4 country where jurors were known to be fairly frugal in awarding

5 damages even in an appropriate case where liability had been

6 established.

7 Q    Okay.  Hang on for just a second.  Okay.  When it comes to

8 jurisdiction -- well, let's get more specific and now go

9 through Libby.  And I guess what I'll do is just ask you and

10 then we'll see whether the demonstrative will come in.  You

11 can't look at it yet. okay?  With respect to Libby, the Libby

12 situation, were you involved in the settlement of the cases at

13 Libby?

14 A    Yes, I was.

15 Q    And for how long?

16 A    For approximately 12, 13 years.

17 Q    Okay.  Are you familiar, do you recall, were you involved

18 in it to the point you can identify the factors that from your

19 point of view affected the settlement values that Grace

20 ultimately agreed to pay to resolve those claims?

21 A    Yes.

22 Q    Okay.  Let's first of all talk about the factors that in

23 your view were important.  And you've talked about these four

24 factors.  What about the number of defendants, was that or was

25 that not a factor that it had an impact on Grace's settlements

1  of the Libby cases in your experience?

2  A    Yes, it was.

3  Q    And could you tell us how?

4  A    Well, in the cases, the asbestos personal injury cases

5  throughout the country in the typical case, again there are

6  exceptions to this throughout the country, there would normally

7  be a handful or more of other defendants who had been named in

8  the lawsuit who the plaintiff was alleging exposure to their

9  products and therefore Grace wasn't the only party who would be

10 making a settlement offer or eventually settling the case.  In

11 Libby, Grace was typically -- and in fact in virtually all the

12 cases prior to our bankruptcy, the only defendant or certainly

13 the only defendant who was contributing to a settlement.

14 Q    Okay.  What about product ID?  What affect or why did that

15 factor work at Libby versus elsewhere in your experience prior

16 to 2001?

17 A    Product exposure was -- had a fundamental difference in

18 Libby.  In the -- in a Libby case, because, particularly in the

19 earlier years where -- by earlier I mean prior to our

20 bankruptcy -- the allegations were related to employees and

21 former employees and their family members.  And so while in a

22 typical personal injury case, the question of whether or not

23 they were exposed, the plaintiffs were exposed to an asbestos-

24 containing product or an operation by Grace, was perhaps the

25 most litigated issue.  In a Libby case the question of a worker

1  who would work during the '50s and '60s say, for example, it

2  really wasn't litigated whether or not they had actually been

3  exposed to asbestos and whether or not Grace would ultimately

4  be responsible to that were they found to be liable.

5  Q    Okay.  What about the question of severity of disease?

6  And I really want to focus your attention on nonmalignant

7  disease.  How did severity of disease in terms of nonmalignant

8  disease affect settlements at Libby -- well, first of all

9  elsewhere and Libby?  Comparatively.

10 A    Well, elsewhere the severity of the disease was an

11 important factor as I went through here in terms of when you

12 make the first categorization of the cases from meso, lung

13 cancer and nonmalignants.  Nonmalignant cases generally

14 throughout the country settled for less money than the typicals

15 or the related cancer cases.  In Libby, particularly in the

16 earlier years say prior to 1995, it was my experience that the

17 cases involved -- the nonmalignant cases there tended to be

18 people who had a substantial exposure in employment at the mine

19 and mill operation, and were again, compared to the cases

20 outside generally involved a higher level impairment than the

21 many, many cases we saw outside which in many cases only

22 involved a chest x-ray and an opinion that the lung changes

23 were related to asbestos exposure.

24 Q    Okay.  Now, outside of Libby you've told us that the

25 dollar amounts for nonmalignant disease were relatively low.

1  Outside of Libby was there -- tell us whether or not there was

2  a -- there was litigation over whether the nonmalignant disease

3  could evolve to being more serious.  That is outside of Libby

4  was there a focal point on whether somebody would stay

5  nonmalignant and therefore would remain not that severe, or --

6  and whether they would progress?

7  A    Yes.  Generally though the cases outside of Libby were --

8  it was my experience -- were settled on the basis of their

9  current medical condition.  Obviously there was evidence in a

10 litigated case of the possibility of some kind of progression.

11 But typically they were settled based on their current medical

12 condition.  In Libby starting at about 1996 we saw a

13 fundamental change in the evidence that was being presented on

14 progression and as a result we were confronted with cases that

15 were involved what we thought -- believed to be relatively -- I

16 hesitate to use the word minor, but relatively low level

17 impairment or no impairment where associated pleural changes

18 which were being presented to us based on -- with an opinion

19 that progression to more serious condition was almost

20 inevitable.  And we were being asked to consider that in

21 valuing the cases.

22 Q    Okay.  I want to show you if you --

23         MR. BERNICK:  I'm looking for a notebook for -- we

24 don't have a notebook for the witness.  You're going to have to

25 deal with what I give you, okay.

1 Q    So we're going to show you Plan Proponents' Exhibit 293

2 which is in the Court's notebook, and I'm going to give you --

3          MR. BERNICK:  Is this for me that I can use these

4 two?  They're going to match up and everything's going to be

5 hunky dory?

6          UNIDENTIFIED ATTORNEY:  That's what I'm told.

7 Q    Okay.  So I'm going to hand you my notebook which contains

8 a transcript of proceedings involving the Schnetter case.  Are

9 you familiar with the Schnetter case?

10 A    Yes, I am.

11 Q    Okay.  And was that one of the cases where --

12          MR. LEWIS:  I'm sorry, what number is it?

13          MR. BERNICK:  It's the last one in your notebook.

14 Q    What was the date of the Schnetter case?

15 A    It was tried, but not to verdict, in May of 1997.

16 Q    1997.  And could you tell us whether Dr. Whitehouse

17 testified in that case?

18 A    Yes, he did.

19 Q    And were you familiar with the transcript of the -- were

20 you present when he testified?

21 A    No, I wasn't.

22 Q    Okay.  Did you become familiar from the transcript with

23 what he testified regarding the progression of Mr. Schnetter?

24 A    Yes.

25 Q    Okay.  Turning to Exhibit 293 and the tabs that are marked

1  there I want to direct your attention to -- is this in fact a

2  transcript of the testimony that was offered?

3  A    Yes, it is.

4           MR. BERNICK:  Okay.  Your Honor, we would offer it

5  for purposes not for the truth of the matter asserted, but for

6  the fact that Dr. Whitehouse was testifying and testifying to

7  this progression theory beginning at some point in the mid-

8  1990s.

9  A    Yes.

10          MR. BERNICK:  I know you'll agree.  The question is

11 whether the Court will.

12                         (Laughter)

13          THE COURT:  Is there an objection?

14          MR. LEWIS:  There's no objection, Your Honor.

15          THE COURT:  All right.  It's admitted for that

16 purpose.  Let me make a note though, Mr. Bernick, please.

17          MR. LEWIS:  What portion of the transcript?  The

18 entire transcript's being offered?

19          MR. BERNICK:  Well, we're going to talk about 165 and

20 166 and then 55 subject to your cross examination.

21          THE COURT:  All right, it's admitted.  Thank you.

22 Q    I want to direct your attention to Pages 165 and 166.  Do

23 you see where it says,

24 "Q    Dr. Whitehouse, do you have an opinion as to whether or

25 not Dan Schnetter will need oxygen in the future to a

1  reasonable degree of medical probability?

2  "A    Almost for a certain at some point in time.  Yes.

3  "Q    When will he need oxygen?

4  "A    Well, I don't know for sure.  He appears his x-ray has

5  progressed rather rapidly all of a sudden, and his diffusion

6  has decreased in the last 15 months."

7          You see then later on he goes on to predict that Dan

8  Schnetter will need oxygen within five to ten years.  Do you

9  see that?

10  A    Yes, I do.

11          THE COURT:  I'm sorry.  I'm not following.  What page

12  are you on?

13          MR. BERNICK:  This is 165 and 166.  And I tried to

14  put it up on the screen for Your Honor and blow it up.

15          THE COURT:  It's not on the screen.

16          MR. BERNICK:  That's a limitation.  There we go.  And

17  I'll blow it up even more.

18  Q    Do you see where that testimony is given about rapid

19  progression?

20  A    Yes.

21  Q    And then on Pages 55 and 56 of the transcript do you see

22  where Mr. Schnetter himself said, --

23  "Q    After you saw Dr. Whitehouse in 1995 what was your

24  understanding as to your lung condition?

25  "A    That it was severe.  That it was going to be progressive.

1  He didn't sugarcoat it.  He told me he was going to -- it was

2  going to slow me down a lot."

3            Is that what you had reference to when you talked

4  about the progression theory or assertion or evidence that was

5  being provided beginning in the mid-1990s?

6  A    Yes, it was.

7  Q    I want to direct your attention to jurisdiction, the

8  impact of jurisdiction in Libby versus elsewhere.  How did

9  jurisdiction affect values in Libby?  Settlement values in

10 Libby.

11 A    Well, I think after these cases we had a series -- we

12 litigated some cases.  And one of the reasons we did that was

13 because we had paid substantial money in the Schnetter case and

14 we were looking to confirm what we had been told by our Montana

15 counsel which was that relatively speaking, though Lincoln

16 County juries were going to be fairly frugal in awarding

17 damages in a personal injury case --

18            MR. LEWIS:  Your Honor, this is hearsay.

19            THE COURT:  It is.

20            MR. BERNICK:  I'll rephrase the question so that the

21 purpose of asking the question is clearer.

22 Q    When you decided to go forward and settle cases that

23 involved Libby during the 1990s, what impact did the local

24 environment or local jurisdiction have, just generally with

25 respect to the settlement amounts?

1  A    First we were under the belief that Lincoln County was a

2  -- juries would be relatively conservative in the award of

3  damages.

4         MR. LEWIS:  I can't hear, Your Honor.

5  A    Were relatively conservative in terms of the award of

6  damages.  The other issue was that we had some concern that

7  because in Libby, the facts of Grace's program in terms of

8  cleaning the plant up, and there was a lot of documentation

9  concerning conditions at the mine, Grace's response, corporate

10 response and the division's response to cleaning up the mine,

11 advising the employees and so on, we were concerned if those

12 kinds of evidence would be introduced would have a direct

13 impact on a Lincoln County jury because many of the individuals

14 in the jury pool would have had, you know, personal

15 relationships with former employees and family members.

16 Q    Okay.  Let's talk about that factor a little bit.  And

17 then I want to talk about how Lincoln County in your experience

18 compared bottom line as a jurisdiction to other places.  But

19 there was testimony yesterday from Dr. Peterson about the

20 effect of local publicity or publicity on jury values.  And let

21 me just ask, tell us whether or not the publicity surrounding

22 the mine bore upon the value of the cases at Libby?

23 A    Well, I think to the extent of the point I just made that

24 the fact that the awareness of disease among the employees in

25 the lawsuits bore upon the issue that was an issue of concern

1  in terms of that the jurors knew the people and were familiar

2  with the condition, familiar with the people.  There were news

3  reports early on in.  In the mid-1980s, for example, there was

4  a study done by epidemioligists of Yale University reporting on

5  the incident of the disease at Libby.  And these news reports

6  were --

7          THE COURT:  Mr. Hughes, you need to keep your voice

8  up.  I'm sorry.

9          THE WITNESS:  I'm sorry.

10 A   Would have been disseminated in newspapers that were read

11 by people in Libby.  And then again --

12         MR. LEWIS:  Your Honor, I want to have some

13 foundation.  There needs to be more foundation on this.

14         MR. BERNICK:  Okay.  I'll be happy to give

15 foundation.

16 Q   A representation was made to the Court yesterday by

17 counsel for the Libby claimants that somehow the publicity

18 surrounding Libby all of a sudden arose in the late -- with the

19 Seattle Post Intelligencer in 1999.

20         MR. LEWIS:  Your Honor, that's an improper question.

21 He's not entitled to inform this witness as to what other

22 testimony was offered in this court yesterday, particularly as

23 to -- under these circumstances.

24         MR. BERNICK:  Your Honor, that is not a proper basis

25 for -- this witness can respond directly to what's in the

1  transcript and moreover there was no request to sequester

2  witnesses whatsoever.  And further, this was a -- I'm going to

3  show the witness a document --

4            THE COURT:  Ask a question.

5            MR. BERNICK:  Okay.

6  Q    So let's go to --

7            MR. LEWIS:  Your Honor, I get tired of this man

8  accusing me of misrepresentations.

9            MR. BERNICK:  It wasn't you, it was your partner.

10            MR. LEWIS:  We don't need -- no, you've done it

11  twice, okay.

12            THE COURT:  Gentlemen, you will both --

13            MR. LEWIS:  We need to not have this in this court.

14            THE COURT:  We do need to not have it, but you will

15  both please address me and not each other in the future.  Mr.

16  Bernick instead of making a speech ask a question.

17  Q    Okay.  So let's take a look at Exhibit 288 in your

18  notebook.  Do you recognize the Missoulian?

19  A    Yes, I do.

20  Q    The Missoulian is a what?

21  A    It's a newspaper in Mazula, Montana.

22  Q    Okay.  And what's the date of this particular article?

23  A    October 2nd, 1985.

24  Q    Does this article deal with the miners at Libby?

25  A    Yes, it does.,

1  Q    Now, I want to tie this back to a specific event and to

2  Dr. Whitehouse.  I want you to take a look at Exhibit 290.  Do

3  you see that?

4  A    Yes.

5  Q    Could you tell us whether or not this is a letter on Grace

6  letterhead?

7  A    Yes, it is.

8  Q    And do you see down at the bottom that there is a Bates

9  production number?

10 A    Yes.

11 Q    Was this a document that was produced during the course of

12 the litigation of the criminal case.

13 A    Yes, it was.

14 Q    It was a document that was generated and maintained in the

15 ordinary course of Grace's business.

16 A    Yes, it was.

17             MR. BERNICK:  We offer it.  It's Exhibit 290.

18             THE COURT:  It's admitted.

19             MR. LEWIS:  Your Honor, may I read the letter before

20 I -- just briefly?

21             THE COURT:  Oh, I'm sorry.  I didn't hear from you so

22 I thought you were --

23             MR. LEWIS:  I did just get this seconds ago, right?

24 You agree with that, counsel?

25             MR. BERNICK:  Yes.  It's cross --

1          THE COURT:  Gentlemen.  You may have a minute to look

2    at it.  Please stop the conversations.  Mr. Lewis, take a look

3    at it.

4          MR. LEWIS:  Yes.  I apologize to the Court, Your

5    Honor.

6                        (Pause)

7          MR. LEWIS:  I don't see any relevance to this

8    document, Your Honor.

9          MR. BERNICK:  Well, we'll be happy to lay the

10   foundation.  First of all -- well, I'll lay further foundation.

11   Q    Tell us whether or not, Mr. Hughes, this relates to a

12   series or presentations that were made not in late 1999, but

13   back in the mid-1980s about mortality data, presentations that

14   were made publicly to people at Libby?

15   A    Yes, it does.

16         MR. BERNICK:  We offer it.

17         THE COURT:  All right, it's admitted.

18         MR. BERNICK:  And we don't need to beat this horse,

19   Your Honor, but --

20   Q    Taking a look at this letter, is this a letter that was

21   written by Mr. McCague of W.R. Grace?

22   A    Yes, it was.

23   Q    And was Mr. McCague at the time an employee who actually

24   was the mine manager at Libby, Montana?

25   A    Yes, he was.

1 Q    And the subject is the McGill University Study Report.

2 What was that?

3 A    That was the epidemiological study on the incidents of

4 asbestos-related disease among the miners who worked at Libby

5 that was published in 1986, '85 or thereabouts.

6 Q    Did that study, I'm just going to ask you, what did that

7 study conclude about whether people at Libby were getting sick

8 as a result of having worked at the mine?

9          MR. LEWIS:  Objection, Your Honor.  That's hearsay.

10          THE COURT:  Sustained.

11          MR. BERNICK:  We're offering for the fact.

12 Q    Did you become aware of the assertion -- strike that.  In

13 connection with the work that you did on settlements, were you

14 aware of the McGill study?

15 A    Yes.

16 Q    Okay.  And to the extent that you were aware of the McGill

17 study, what was your understanding in connection with your

18 settlement work about what the McGill study found?

19 A    My understanding --

20          MR. LEWIS:  Objection, Your Honor.  That doesn't cure

21 the hearsay defect.

22          THE COURT:  It does not.  Sustained.

23 Q    Well, was the McGill study a factor, or not, in your

24 settlement of cases?

25 A    Yes, it was.

1  Q    And why was it a factor in your settlement of cases?

2  A    Because it was an epidemiological study directly related

3  to the individuals who were filing the lawsuits against Grace

4  that found an increased incidence of asbestos-related disease

5  among the population.  So, it would be relevant to causation,

6  among other things.

7  Q    This letter from Mr. McCague regarding the McGill

8  University study says, "Dear Dr. Whitehouse..." and it goes on

9  to talk about the study, do you see that?

10 A    Yes.

11 Q    And it goes on to say, "Dr. McDonald will be in Libby on

12 July 9, 1985.  I would like to invite you to join us for lunch

13 at noon at the Venture Inn.  I'm sure you'll find the results

14 of the study interesting and informative."  And do you see

15 there's also handwriting that says -- apparently Dr. Whitehouse

16 wasn't going to attend -- "I hope you can possibly reconsider,"

17 do you see that?

18 A    Yes.

19 Q    I want to show you Exhibit 289 in your book.  Do you see

20 that?

21 A    Yes.

22 Q    Is that another document on Grace letterhead?

23 A    Yes, it is.

24 Q    Was it generated in the ordinary course of business?

25 A    Yes, it was.

1        MR. BERNICK:  We offer it.

2        MR. LEWIS:  What exhibit was it?  I apologize.

3        THE COURT:  289.

4        MR. BERNICK:  289.

5        MR. LEWIS:  Thank you.

6        MR. BERNICK:  It's that one.

7        THE COURT:  Any objection?

8        MR. LEWIS:  No, I don't have any objection to this.

9        THE COURT:  It's admitted.

10   Q    This document reflects, again, Mr. McCague, same period of

11   time, same study, right?

12   A    Yes.

13   Q    It says, "To all employees, as you know a study of the

14   health effects of our work environment has been underway by a

15   McGill University group of scientists.  Dr. J. Corbett McDonald

16   who heads up this group will be in Libby July 9 to discuss the

17   results of the study with us.  There will be a meeting of all

18   employees to hear this presentation."  When you were settling

19   cases, did you have any impression that somehow the fact of the

20   mine hurting people at Libby was new news in 1999?

21   A    No.

22   Q    I want to show you, in order to get you turned over to the

23   tender mercies of Mr. Lewis here, Demonstrative Exhibit 501-8.

24   It should also probably be in your book.  Does 501-8 reflect

25   how the four basic factors that you identified as being

1 important generally, tell us whether or not that now summarizes

2 or lists your understanding of how those four factors worked at

3 Libby, to your experience, and outside of Libby, to your

4 experience?

5 A    Yes, it does.

6         MR. BERNICK:  We offer it as a demonstrative.

7         MR. LEWIS:  No objection, Your Honor.

8         THE COURT:  It's admitted as a demonstrative.

9 Q    I want to focus on one thing that we didn't talk about.

10 We talked about how at Libby the number of defendants was

11 important, because there's Grace only.  How product ID was

12 important, because there generally was no issue, and how

13 Whitehouse progression was important.  Let me just focus on

14 Whitehouse progression.  Outside of Libby, you said the cases

15 were settled on the basis of what people essentially had, and

16 they were for nonmalignant cases and they were settled for low

17 money.

18 A    Yes.

19 Q    What impact, if any, did the progression theory, or the

20 progression evidence that Dr. Whitehouse was beginning to

21 present in the middle 1990s, what impact, if any, did that have

22 on Grace's settlement calculus with respect to Libby, and tell

23 us also whether that was the same or different for other

24 jurisdictions.

25 Q    It had an effect on the calculus, because cases, you know,

1  the cases involving, as I said, from an objective medical

2  criteria, relatively minor impairment or no impairment were

3  being presented as cases in which a relatively young individual

4  might have an almost inevitable progression to serious lung

5  impairment.

6  Q    Okay.  So, when you talk again about severity of disease

7  on the screen here, the Whitehouse progression case versus

8  progression not established outside of Libby, how did that

9  affect the relative value of cases in Libby and outside of

10  Libby; nonmalignant cases?

11  A    It was significant.

12  Q    Jurisdiction.  You've talked about how -- we've talked

13  about how in Libby there were local mine conduct issues that

14  were important.  Outside of Libby, was Libby somehow unique in

15  being a jurisdiction that had factors that increased settlement

16  amounts?

17        MR. LEWIS:  Your Honor, that is patently leading.

18  It's pretty off --

19        THE COURT:  Sustained.

20        MR. BERNICK:  I'll try something a little less

21  offensive.

22  Q    Tell us whether or not -- just tell us the experience that

23  you had in Libby as a jurisdiction, tell us to what extent it

24  was the same or to what extent it was different in terms of

25  having jurisdictional factors that drove settlement.

1  A    I think every jurisdiction throughout the country where we

2  settled cases had unique factors.  Unique factors that were

3  relevant and influenced the settlement decisions.  Libby had

4  the issues that kind of were cited on the demonstrative that,

5  you know, local conduct and the conduct that specifically would

6  have been introduced in terms of evidence related to people,

7  and, you know, people tend to identify more with things that

8  happen in their local community, and that kind of issue.  But,

9  there were, again, jurisdictions throughout the country where

10 cultural issues in terms of attitudes towards corporations,

11 experience with other kinds of cases, also influenced how we

12 settle cases.

13 Q    Could you just give us a couple examples of jurisdictions

14 where there tended to be upward pressure on values because of

15 jurisdictional factors?

16 A    Well, again, the classic two examples that people

17 generally cite are Madison County, Illinois, directly across

18 from St. Louis in southern Illinois where there's been a

19 history of extremely large, often aberrant verdicts in

20 asbestos and other kinds of cases.  And then in Beaumont, Texas

21 and Jefferson County, Texas, the Rio Grande Valley in Texas,

22 places in West Virginia, Mississippi, Jefferson County,

23 Mississippi, again, where there's been, just again for reasons

24 that a social scientist could probably explain better than I,

25 but there's been high verdicts in asbestos and other kinds of

1  cases.

2  Q    Okay.  I want to return now to talking about the trend.

3  You were talking about how things have changed a bit.  I want

4  to direct your attention to Exhibit 501-4, which is in the

5  book.  That one you've got.  And I want to ask you, have you

6  had the opportunity to look at this demonstrative before you

7  came here to testify here today?

8  A    Yes, I have.

9  Q    Okay.  There's a yellow trend line.  Tell us what that

10  yellow trend line represents.

11  A    The settlement activity in Libby.

12  Q    Okay.  Activity, does that reflect numbers of cases, or

13  values for settlements or what?

14  A    The -- I'm not sure what it represents based on this

15  version of the --

16  Q    Okay.  Well, let me give you something that might refresh

17  your recollection.

18          MR. LEWIS:  Can I see what you're handing him,

19  counsel?  Your Honor, I apologize.  May I see what he's handing

20  him?

21          MR. BERNICK:  Sure.  I haven't even shown it to him

22  yet.

23          THE COURT:  Yes.

24  Q    Let me just ask you --

25  A    It's the settlement values.

1  Q    Settlement values, and why do you say that?

2         MR. BERNICK:  I didn't let the record reflect, he did

3  not see it when he answered that question.

4  Q    What -- because you remember now going over the trend,

5  specifically?

6  A    Yes.

7  Q    Okay.

8  A    The reason for my confusion is that the filing activity

9  had a similar curve, actually, if you look at it.

10 Q    Is there a database that reflects the settlement

11 activities of Grace?

12 A    Yes.

13 Q    What's it called?

14 A    It's commonly referred to as the Case Management System,

15 or CMS.

16 Q    Is that the database that Grace maintained in the ordinary

17 course of its business that reflected settlement activity?

18 A    Yes.

19         MR. BERNICK:  It is an exhibit, it's part of a CD

20 called Plan Proponents-7, Your Honor, and we offer it.

21         MR. LEWIS:  No objection, Your Honor.  We're talking

22 about --

23         MR. BERNICK:  The CMS database.

24         MR. LEWIS:  501-4?

25         MR. BERNICK:  No.  We're talking about the CMS

Hughes - Direct/Bernick                    73

1  database, the big database that's got all the settlements on

2  it.  We're offering that.

3        THE COURT:  All right.  You're saying it's on the CD?

4        MR. BERNICK:  It's on a CD as Plan Proponent-7.

5  There's a particular file within Plan Proponent-7 which we can

6  assist the Court in locating.  But, we're offering the CMS

7  database.

8        MR. LEWIS:  No objection, Your Honor.

9        THE COURT:  It's admitted.

10       MR. BERNICK:  Okay.

11 Q   Does Plan Proponent Exhibit 501, does that reflect

12 generally the trend of settlement values over time from '87 to

13 the bankruptcy in '01 at Libby for nonmalignant claims?

14       THE COURT:  Wait, I'm sorry.  Exhibit 501-4, the

15 question is what?  I'm sorry.

16 Q   Yes.  Does this reflect the settlement value trend for

17 nonmalignant cases at Libby from '87 to April of '01?

18 A   Yes.

19       MR. BERNICK:  We offer it as --

20       MR. LEWIS:  Did you say 501-4?

21       MR. BERNICK:  501-4.  See, 501-4.

22       MR. LEWIS:  I know.  But, the question was, does it

23 reflect the settlement values?

24       MR. BERNICK:  The settlement values by year from '87

25 to '01.  That's the question.  He said, yes.  So, we're now --

1      MR. LEWIS:  Previously, he said it did not, and

2 that's what confused me.

3      MR. BERNICK:  Well, that's because when I went up to

4 --

5      MR. LEWIS:  I now understand.  No objection.

6      MR. BERNICK:  Thank you.

7      THE COURT:  It's admitted.

8 Q    Showing it on the screen now --

9      MR. LEWIS:  As a demonstrative exhibit, Your Honor?

10      MR. BERNICK:  As a demonstrative.

11      THE COURT:  Yes, it's a demonstrative.

12      MR. BERNICK:  Reflecting the witness' recollection.

13 If you want to check it against the CMS database, I think it

14 also matches.

15 BY MR. BERNICK:

16 Q    So, this shows that with respect to nonmalignant claims

17 beginning in '87 first settlement in Libby beyond the workmen's

18 comp cases, first litigation settlement, kind of rises a little

19 bit, falls pretty far, and then takes this rise in the

20 mid-1990s.  What happened during the mid-1990s?  I know you've

21 already touched on this, but to be clear, what happened in the

22 mid 1990s that drove settlement values that Grace was agreeing

23 to, to your knowledge, based upon your own direct involvement,

24 what was it that drove those settlement values so high?

25 A    It was the first time we encountered cases where Dr.

1 Whitehouse's theory on progression was being aggressively

2 presented by the Libby claimants.

3 Q    Okay.  Now, I see that the values then came down to a

4 still high, but less extreme level.  In your experience, why

5 was that so?

6 A    That was because as a result of the settlements in the

7 1997/1998, the decision was made to try cases to verdict.  And

8 we tried three cases to verdict, and the cases that we tried to

9 verdict resulted in juries awarding damages that were

10 substantially lower than those '97/'98 settlements.  I believe

11 they were, you know -- well, they were substantially lower.

12 Q    Okay.  Now, during this period of time, I want to show you

13 501.6.  It should be in your book.  It's the one that looks

14 like this.  Have you assisted in preparing a tabulation of the

15 number of cases that were settled at Libby by disease and by

16 nature of exposure.  Have you helped prepare this compilation?

17 A    Yes, I have.

18       MR. BERNICK:  Your Honor, we would offer this as a

19 demonstrative, 501.6.

20       THE COURT:  Any objection?

21       MR. LEWIS:  No.

22       THE COURT:  It's admitted as a demonstrative.

23 Q    We're now still in the period of time, are we not, before

24 the bankruptcy?

25 A    Yes, we are.

1  Q    And roughly, how many meso cases were settled between --

2  prior to the bankruptcy based upon your experience and your

3  review?

4  A    Eight -- excuse me -- nine.

5  Q    Okay.  And when you say household, what does that refer

6  to?

7  A    That refers to someone who lived with or had a close

8  family relationship with someone who was employed at the mine.

9  Q    What about people who had only exposure through the

10 community, were there any meso cases that were settled that

11 were pure community exposure; that is, no mine exposure and no

12 household exposure?

13 A    No.

14 Q    What about lung cancer, how many lung cancer cases were

15 settled before the bankruptcy, in total?

16 A    Fourteen.

17 Q    Any of those cases involve purely community exposures?

18 A    No.

19 Q    What about nonmalignant disease?

20 A    There were 62 cases settled.

21 Q    Any of them involve community only exposures?

22 A    No.

23 Q    Now, in terms of rough ranges of the values that were paid

24 in settlement for these different categories, have you, prior

25 to appearing here, done a review of roughly the average

1  settlements -- and I'm only interested in the range based upon

2  your experience and your review -- just a rough number, the

3  average settlements for mesothelioma at Libby?

4  A    I think we're in the $350,000 plus or minus range.

5  Q    What about lung cancer?

6  A    Two hundred and forty thousand, plus or minus.

7  Q    And nonmalignant?

8  A    I believe 240, plus or minus.  Very similar.

9  Q    If we go outside of Libby, I want to talk about not just

10 averages, but averages for law firms that tended to have a

11 higher settlement jurisdiction.  I'm not talking about, you

12 know, the national average.  I'm talking about places like

13 Libby where you have a higher settlement pressure.  What kind

14 of ranges did you have for mesothelioma with those law firms?

15 A    It varied, obviously, over time.  But, I think there were

16 probably firms where the range of their typical mesothelioma

17 was at or around 300,000.

18 Q    Okay.

19 A    Particularly in later years.

20 Q    Okay.  And that's where there are more than one defendant,

21 or just one defendant?

22 A    There was more than one defendant, many cases like that.

23 Q    What about lung cancer?

24 A    Lung cancer cases probably there were firms that were in

25 the range of 50 or 60,000 in terms of averages.  Again, these

1 are discreet firms that had high values based on the

2 jurisdiction they were in.

3 Q    And nonmalignant?

4 A    Nonmalignant, there were probably people who had

5 settlement values at or about 50,000, plus or minus.  Again, I

6 have the data.

7 Q    Okay.  I now want to direct your attention to the period

8 of time since the bankruptcy.  Everything we've talked about so

9 far is prior to the bankruptcy, right?

10 A    Yes.

11 Q    Okay.  I want to talk about the period of time now after

12 the bankruptcy and go back to some of these same factors that

13 you talked about.  And I now want to say, well, okay, have you

14 kept track of the litigation outside the Libby since the

15 bankruptcy?

16 A    Yes, I have.

17 Q    As part of your job?

18 A    Yes, I have.

19 Q    Okay.  And has that work -- strike that.  The same thing

20 with respect to Libby, have you kept track of the litigation in

21 this case concerning Libby?

22 A    Yes, I have.

23 Q    Okay.  If we go to these same factors, now, since the --

24 first let me ask you, are you familiar with the ATSDR

25 screening?

1  A    Yes, I am.

2  Q    And the ATSDR screening was conducted at Libby during

3  what period of time?

4  A    I believe from 1999 or 2000, through 2001.

5  Q    Okay.  And did you sit through the trial of the criminal

6  case when Dr. Whitehouse testified about the impact that that

7  screening had on the kinds of patients and numbers of patients

8  who were coming to him?

9  A    Yes, I did.

10 Q    And again, offered solely for the fact of its having been

11 said we're going to get Dr. Whitehouse in here, but solely for

12 the fact of having it been said, you've got to have a

13 screening, there's all kinds of publicity, what happened to the

14 patient population at Libby as a result of that screening?

15       MR. LEWIS:  Your Honor, that's leading.  He's

16 testifying and then asking the witness to testify about his

17 testimony.

18       THE COURT:  Sustained.

19 Q    I want to show you Plan Proponents Exhibit 501.  Do you

20 have that in your notebook there?

21 A    501 dash?

22 Q    Seven.

23 A    Seven.  Yes, I do.

24 Q    Do you see that that is -- those are figures that were

25 taken from the Libby trial -- the trial brief of the Libby

1 claimants in this case at Page 10?

2 A    Yes.

3 Q    Okay.  The numbers that we see here for settled cases, it

4 says, 100 percent worker or family, zero percent community

5 exposure, but then with respect to the unsettled claims it says

6 about half and half, do you see that?

7 A    Yes, I do.

8        MR. BERNICK:  Your Honor, for demonstrative purposes

9 based upon the representation made by the Libby Claimants in

10 their brief, we would offer 501.7, and it's solely for purposes

11 of eliciting further testimony from the witness about his own

12 understanding.

13        MR. LEWIS:  No objection.

14        THE COURT:  It's admitted.

15 Q    Do we see that prior to -- the settled cases, and those of

16 course would be cases that were settled before the bankruptcy

17 was filed, we don't have community exposure, is that consistent

18 with your own experience?

19 A    Yes, community only exposure.  There were no cases that

20 involved community only exposure.

21 Q    Whereas the claimants are representing that now the mix is

22 equally community exposure as non-community exposure?

23 A    Yes, I see that.

24 Q    Is that consistent with your understanding of the effect

25 of the ATSDR?

1  A    Yes.  It's my understanding based on the data and the

2  information presented by Dr. Whitehouse in the criminal case,

3  by submissions by Libby claimants and information from Dr.

4  Whitehouse in this case, that there's a substantial increase in

5  the number of cases involved that are alleging community only

6  exposures.

7  Q    Okay.  Now, so we go back to demonstrative 501.4 in the

8  post-bankruptcy period of time, one change that you've

9  identified is that we now have a community population, right?

10 A    Yes.

11 Q    Okay.  Let's talk about something else.  Number of

12 defendants.  Prior to the bankruptcy, tell us whether there are

13 any other defendants, to your knowledge, other than Grace.

14 A    They named other defendants, you know, the estate of prior

15 mine manager for reasons of diversity to maintain state court

16 jurisdiction, but no viable, you know, entities were named in

17 the lawsuits --

18 Q    Are you familiar that in this case --

19 A    -- or certainly that settled the cases.

20 Q    Are you familiar that while this case has been pending,

21 the Libby claimants have sought to involve BNSF in

22 Libby-related litigation?

23 A    Yes.

24 Q    Maryland Casualty in Libby-related litigation?

25 A    Yes.

1  Q    Is this any longer a situation like it was before the

2  bankruptcy where there's only one defendant that the Libby

3  claimants are going after?

4           MR. LEWIS:  Objection, leading, Your Honor.

5           THE COURT:  Sustained.

6  Q    Tell us whether or not it's the same or different.

7  A    There are additional.  In fact, as BNSF, I think there's

8  been claims alleged against Maryland Casualty, the State of

9  Montana.

10 Q    Okay.  What about outside of Libby, what's happened to the

11 -- you said before the bankruptcy when Grace was sued there

12 were a number of defendants outside the bankruptcy, what's

13 happened to the defendant pool?

14 A    In and -- in the time that Grace filed bankruptcy there

15 was, as the Court's aware of, there were several other

16 asbestos-related bankruptcies that were filed, so that the pool

17 of solvent defendants in the asbestos litigation shrank

18 considerably from 1999 to 2002.

19 Q    So, the Graces of the world that didn't file bankruptcy,

20 what effect, in your experience, would that have?

21 A    Well, as the pool of defendants shrinks, the remaining

22 solvent defendants are generally going to be required to pay

23 more money, certainly in a transition period when the claimants

24 are looking for potential sources.  And then these higher

25 levels of settlement tend to perpetuate themselves.  So, yes,

1  they tend to have an upward pressure on the settlement of the

2  solvent -- remaining solvent defendants.

3  Q    With respect to product ID, you told us that at Libby,

4  before the bankruptcy, there wasn't much issue about product

5  ID?

6  A    No.

7  Q    Okay.  What about when you have people who didn't work at

8  the mine, but who are just simply members of the community, is

9  that the same set of circumstances?

10  A    Not in my opinion.

11  Q    Why not?

12  A    I think that's a fundamental difference.  When you look --

13  first, when you look at the employees, you have established

14  both data concerning the exposures at the mine and mill and you

15  have a confirmed epidemiological study and morbidity and

16  mortality among the workers showing that there was an increased

17  incidence and there was a follow up study after the '85 study.

18  Among the family members, again, we have confirmed, not

19  specific to Libby, but there are confirmed studies showing an

20  increased incidence of asbestos-related disease among family

21  members and spouses of asbestos-exposed workers.

22        In the community exposure, first I -- you know, based

23  on my experience and my gain through involvement in this

24  bankruptcy and in the Libby criminal case, there's some

25  legitimate issue, factual issue, of whether or not there were

1  any exposures or any, you know, appreciable exposures to Libby

2  community members --

3          THE COURT:  Objection, this is getting into expert

4  testimony, Your Honor.

5          THE COURT:  Sustained.

6  Q    Okay.  Let's just go to -- the circumstance that was

7  present before the bankruptcy, which was no issue of product

8  ID, is that circumstance present when you're dealing with

9  community people?  Not an opinion, just a fact.

10 A    No, it is not.  There's an issue of exposure when you're

11 dealing with a community only case.

12 Q    Just to keep track, Grace only --

13         MR. LEWIS:  Excuse me, Your Honor, is counsel writing

14 on --

15         MR. BERNICK:  Yes, I am.  I said, at issue, just like

16 the witness said.  I'm going to offer this as a demonstrative.

17         MR. LEWIS:  I thought it was already offered, wasn't

18 it?

19         MR. BERNICK:  It is.  But, I'm going to re-offer it.

20         MR. LEWIS:  All right.  You're going to substitute

21 your hand -- excuse me, let me talk to the Court.  I didn't

22 know counsel could write all over exhibits.  We've got a new

23 exhibit, Your Honor.

24         THE COURT:  Well, he can write all over the exhibit,

25 but what I'll require is that I get an unwritten on copy that

1  will be whatever page this is, 507, I'm sorry, I can't see the

2  bottom of the page, 501 dash, whatever page this is, and then

3  we'll get a 501, whatever page it is, (a), with the writing on

4  it.

5           MR. LEWIS:  No objection, Your Honor.

6           THE COURT:  All right.

7           MR. LEWIS:  As long as they're both there.

8           THE COURT:  They'll both be there.

9  BY MR. BERNICK:

10 Q    In Grace only, before the bankruptcy, since the bankruptcy

11 we have more?

12 A    Yeah, other defendants have emerged.

13 Q    Now, let's talk about the Whitehouse progression case.

14 Has Grace since been able to obtain the data underlying Dr.

15 Whitehouse's work on progression?

16 A    Yes, we have.

17 Q    Has Grace been able to analyze that data through its own

18 experts to determine whether or not Dr. Whitehouse's

19 progression theory holds water?

20 A    Yes, it has.

21           MR. BERNICK:  We're going to hear from Dr. Weill in a

22 moment in this case.

23 Q    Finally, with respect to conduct issues, the conduct

24 issues that existed with respect to Grace before the Chapter

25 11, before the Chapter 11, did those relate to the mine or the

1  community?

2  A    Generally, to the mine itself.

3  Q    If we now have community cases, is the relationship

4  between the conduct at the mine and the plaintiff the same or

5  different?

6  A    It's different.  The conduct at the mine would be directly

7  applicable in terms of, you know, the allegations that were

8  made about that there wasn't a sufficient education program

9  among the workers about the asbestos risk and so on.  It would

10  be much more remote when you're dealing with a community

11  exposure case.

12  Q    Tell us whether or not 501-8(a) now reflects the facts as

13  you understand them that exist with regard to Libby

14  post-bankruptcy.

15  A    It does.

16  Q    Outside of Libby, the multiple defendants -- I think you

17  said that the pool, the defendants' number had shrunk?

18  A    Yes.

19  Q    Has anything else changed outside of Libby since the

20  filing of 11?

21  A    Well, based on the data I've seen in connection with the

22  estimation trial there were some increases in the average

23  settlement values, particularly in serious cases, and there has

24  been a substantial reduction in a number of

25  nonmalignant cases that are filed against solvent defendants.

1  Q    With that change that I have now made, does 501.8(a)

2  reflect the post-bankruptcy status quo, as you understand it?

3  A    Yes.

4        MR. BERNICK:  Pass the witness.  We offer 501.8(a)

5  for demonstrative purposes.

6        THE COURT:  Any objection?  It's admitted for

7  demonstrative purposes.

8                    DIRECT EXAMINATION

9  BY MR. FINCH:

10    Q    Nathan Finch for the Asbestos Claimants' Committee.

11 Mr. Hughes, Mr. Bernick offered in evidence,through you,the

12 Grace Historical Claims' Database of Plan Proponents Exhibit 7,

13 do you recall that?

14 A    Yes.

15 Q    How does that database deal with consortium claims?

16 A    The consortium claims are sub-plaintiffs to individual

17 case number, so they're considered one claim.

18 Q    And what is the dollar value shown for any consortium

19 settlement in that database?

20 A    It's always incorporated in the value that we show for the

21 particular -- for the injured party.

22 Q    Were consortium claims, claims brought by people outside

23 of Montana?

24 A    Absolutely.  Virtually every case involving certainly a

25 married plaintiff would have had an associated consortium claim

1 under the laws of, I think every state, but certainly the vast

2 majority of states.

3 Q    As part of your work in defending Grace in asbestos

4 personal injury litigation, did you have occasion to review the

5 complaints filed against it from jurisdictions around the

6 country?

7 A    Yes, I did.

8 Q    Did the people in jurisdictions outside of Montana allege

9 that Grace engaged in conduct that would warrant punitive

10 damages?

11 A    Yes.  In fact, in virtually every case, barring exceptions

12 based on state law, both inside Libby, outside Libby, there

13 were claims for punitive damages asserted against the company.

14        MR. FINCH:  Okay.  With that, Your Honor, the only

15 other thing, we re-offer Exhibit 288, which Mr. Bernick

16 offered, we never got a ruling on.  I think he established the

17 relevance of the document with the witness.  It's Plan

18 Proponents' Exhibit -- it was the first letter, there was an

19 objection based on relevance.

20        THE COURT:  No, I don't have an offer for 288.

21        MR. BERNICK:  Which one?  Anybody need it?

22        THE COURT:  288 is the newspaper article.

23        MR. BERNICK:  Yes, I didn't offer the newspaper

24 article.

25        UNIDENTIFIED SPEAKER:  No, but which is the McCague

1  letter, this one?

2          MR. BERNICK:  I offered that.

3          UNIDENTIFIED SPEAKER:  It's 290.

4          THE COURT:  290 is admitted.

5          MR. BERNICK:  And the memo was in.

6          THE COURT:  But, I do not have an offer for 288.

7          MR. BERNICK:  And 288 is the articles, and I didn't

8  offer them, and I don't want to offer them.  If they want to

9  offer them, they can.  Do you want to offer them?

10         I think the Plan -- is there anyone else who wants --

11 the Plan Proponents pass the witness.

12         THE COURT:  All right.  Why don't we take a

13 ten-minute recess and we'll start with cross examination.

14                        (Recess)

15         THE COURT:  ...that I have a conference call that's

16 not going to last long, but I'm not exactly sure what time it's

17 going to take place.  As soon as it comes in, I'm going to take

18 a probably either lunch or a 15-minute recess, whichever I

19 need.  I expect it sometime around noon.  Are you cross

20 examining, Mr. Lewis?

21         MR. LEWIS:  Yes, Your Honor.  If that's okay.

22         THE COURT:  Yes, sir.  Are you ready, Mr. Hughes?

23         THE WITNESS:  Yes, I am.

24         THE COURT:  All right.  Go ahead.

25         MR. LEWIS:  May I approach this chart over here, Your

1  Honor?

2          THE COURT:  Sure.

3                  CROSS EXAMINATION

4  BY MR. LEWIS:

5  Q    Good morning, Mr. Hughes.

6  A    Good morning, Mr. Lewis.

7  Q    You have been in charge of --

8          THE COURT:  Do you have a microphone on?

9          MR. LEWIS:  Sorry.  I'd best stay over here then,

10 because I don't have one of those fancy things.

11         THE COURT:  We can -- we may have to steal it from

12 Mr. Bernick, but we can have you use that if you need it.

13         MR. LEWIS:  I could move the chart over here.

14         MR. BERNICK:  I won't be able to see it then.  Would

15 you like the microphone?  It's running out of batteries at this

16 point, but you're free to have.

17         THE COURT:  Kathy, at lunch, can you get new

18 batteries, and also see if we can get a second Lavalier mic?

19         MR. LEWIS:  Thank you, sir.

20         THE COURT:  Okay, thank you.

21         MR. LEWIS:  I forgot about that, Your Honor.

22 BY MR. LEWIS:

23 Q    You've been senior litigation counsel in charge of Libby

24 -- excuse me -- Grace Asbestos Settlements since 1985, is that

25 true?

1  A    No.   I believe I said 1989, and it's personal injury

2  asbestos litigation.

3  Q    All right.  Since 1989.

4  A    Yes, through the date of the bankruptcy.

5  Q    Is there anybody at Grace that's more familiar with

6  settlement data and settlement evaluation of Grace personal

7  injury asbestos cases than you?

8  A    Probably not.

9  Q    You have a data collection system at Grace concerning

10 asbestos personal injury cases, correct?

11 A    Yes.

12 Q    And that was prepared in the ordinary -- that data that's

13 accumulated was accumulated in the ordinary and usual course of

14 business, correct?

15 A    Yes, it was.

16 Q    And it's carefully maintained by W.R. Grace, is that true?

17 A    It's maintained by W.R. Grace.

18 Q    By Grace employees, correct?

19 A    Yes, it is.

20       MR. LEWIS:  I don't think this exhibit is in.  Your

21 Honor, I'll try to adjust this.

22       For purposes of identification, Your Honor, this is

23 Libby Claimants' Exhibit 63-1.

24       THE COURT:  All right.

25 Q    Can you see that document on the screen, sir?

1  A    Yes, I can.

2  Q    Are you familiar with that document?

3         MR. BERNICK:  I'm sorry, what's the number again?

4         MR. LEWIS:  6300, LC-63-001.

5  Q    You can see that document -- the first page of the

6  document on the screen?

7  A    Yes, I can.

8  Q    And would you look through the pages of the document and

9  satisfy yourself as to what it is?

10  A    Do you have a copy of the document I can look at?

11         UNIDENTIFIED ATTORNEY:  It's 63.

12         MR. BERNICK:  So 63?

13         MR. LEWIS:  63-001 through 63-026.

14         MR. BERNICK:  I'm sorry.  Mr. Lewis, just so we're

15  clear, it's 63 and you're just looking at the first page, which

16  is Page 1, but the exhibit, I think, is 063, LC-063.  You're

17  just looking at the first page, so they're marked Page 1, 2, 3

18  --

19         MR. LEWIS:  I am looking at the first page.  That's

20  what I put on the screen.

21         UNIDENTIFIED ATTORNEY:  It's 1 to 26.

22         MR. LEWIS:  What?

23         UNIDENTIFIED ATTORNEY:  Page 1 to 26.

24  Q    Do you agree that this is marked LC Exhibit 63-001?

25         MR. BERNICK:  Your Honor, for the record, it is just

1  63.  Each page is then marked sequentially thereafter.  They're

2  not separate exhibits.

3          THE COURT:  Yes, I understand.  It's been used -- it

4  was used with Dr. Peterson, shown to Dr. Peterson --

5          MR. BERNICK:  Right.

6          MR. LEWIS:  But, it's not in evidence.

7          THE COURT:  Although, as far as I know, it's not in

8  evidence, correct.  Go ahead.

9  Q    And the last page is 026, correct?

10 A    Yes.

11 Q    Could you review that briefly to make sure that --

12         MR. BERNICK:  Your Honor, that is not --

13 Q    -- and then advise if you're familiar with that document?

14         MR. BERNICK:  I'm sorry, Your Honor.  That is not

15 Exhibit 63 that we've been furnished has 187 pages.  So, if

16 they want to make a separate -- if they want to offer the whole

17 document and then just use the first 26 pages, that's fine.

18 But, if we're going to establish a foundation for the admission

19 of the document, it should be the complete document.

20         MR. LEWIS:  I don't see why, Your Honor.  We're only

21 offering this as what's relevant from this exhibit.

22         THE COURT:  Let me find out from the witness what it

23 is and if he knows what it is and there is -- I don't know what

24 the rest of the pages are.  I've only been given the first 26

25 pages, as well.  So, if the witness thinks it's not complete,

1 then he'll make that known.  If it's fine the way it is, he'll

2 let me know.

3 BY MR. LEWIS:

4 Q    Sir, do you recognize that document?

5 A    Yes, I do.

6 Q    Is that a Grace document?

7 A    Yes, it is.

8 Q    And was that document produced in the ordinary and usual

9 course of the business of W.R. Grace?

10 A    Yes, it was.

11 Q    And is it the document that you relied on in your business

12 as a principal person involving asbestos settlements by Grace?

13 A    It was one of the tools that I used in terms of tracking

14 the settlement activity.  Although this particular version of

15 it is the final summary, and therefore I wouldn't have used it

16 in the same way as its prior predecessor versions.

17 Q    That was my next question.  In fact, this is the final

18 summary of Grace settlements immediately prior to the filing of

19 this bankruptcy action, is that true?

20 A    Yes.

21        MR. LEWIS:  I'll come back to that later, Your Honor.

22        THE COURT:  You need to either take off or turn off

23 the Lavalier if we're going to use that microphone, because

24 we're getting feedback with both microphones.

25        MR. LEWIS:  All right, I apologize.  First I want to

1  offer Exhibit 63, Pages 001 through 026.

2         MR. BERNICK:  I don't have an objection to its coming

3  in for the fact that it's a summary, but it's a huge document

4  with many layers of hearsay within hearsay, I don't believe

5  should come in for the truth of the matter asserted.  If

6  there's some part of it that Mr. Lewis wants to offer for the

7  truth of the matter asserted, that may not be a problem, but

8  the whole document shouldn't come in.

9         MR. LEWIS:  Well, Your Honor, the business records'

10  exception has laid forth admissibility.

11         MR. BERNICK:  But, that only cures the first layer.

12  It doesn't cure all the other layers of hearsay that are within

13  this document.

14         THE COURT:  Well, I don't know what all the other

15  layers may be, because so far I don't even have a document -- I

16  don't have a description of what this document is on the

17  record.

18         MR. BERNICK:  Okay.

19         THE COURT:  So, I don't know what it is or purports

20  to be yet.

21  BY MR. LEWIS:

22  Q    What is this document?

23  A    It's the monthly asbestos litigation summary.

24  Q    And it's the last monthly asbestos litigation summary

25  before the bankruptcy, correct?

1  A    It's dated April 11th, 2001 and it reports as of the end

2  of March.

3  Q    And so it would be the only asbestos litigation summary

4  Grace has that reports the latest information on settlement

5  data prior to the bankruptcy, is that true?

6  A    It reports information on settlement activity and filing

7  activity just prior to the filing of the bankruptcy, yes.

8         MR. LEWIS:  Offer the exhibit, Your Honor.

9         MR. BERNICK:  The same problem.  There's no -- the

10 document contains all kinds of statistics, all kinds of

11 descriptions.  It's a very complicated document.  It can come

12 in under, it's a business record, but that only cures, that

13 only cures the first layer of hearsay.  If there's hearsay

14 within hearsay, there has to be an independent exception under

15 the Business Records' Rule, or some other exception to the

16 Hearsay Rule.

17        THE COURT:  Well, again, I don't know what it -- I

18 don't know what hearsay within hearsay this document contains

19 at this point.  The witness has said that it's a document that

20 he used in the course of his business and it says, one of the

21 tools to track settlements.  So, if that's what he used it for,

22 it seems to me that the information in it is something that

23 this witness has relied on and it's admissible for showing what

24 he relied on.

25        MR. BERNICK:  Well, that is a different -- I've

1  already said I have no quarrel with the admission of the

2  document as being the monthly report, as being what the witness

3  relies upon.  To say that it comes in to establish the truth of

4  every statement in here, is impermissible under the rules.

5  Just take -- each one of these things talk about, you know,

6  hearsay statements contained in complaints.  Those complaints

7  aren't true.  It contains all kinds of information that comes

8  to Grace from a variety of different sources.  And all these

9  things, it just depends on what part of this really is being

10  offered.  I don't know why that should be so difficult for Mr.

11  Lewis to specify what he needs out of the document.

12          THE COURT:  The first 26 pages, I'm up to Page 9, do

13  not seem to have any hearsay within hearsay statements.  This

14  appears to be a chart, a compilation of information.  It

15  doesn't have -- there are pages that I can't read.  As Dr.

16  Peterson pointed out, there are things on here -- it's simply

17  not legible.  So, I don't know whether the non-legible parts

18  are hearsay within hearsay so somebody, I suppose, is going to

19  have to tell me what they say in order for me to make that

20  evaluation.  But, the parts that I can read don't appear to be

21  hearsay within hearsay.  They are simply charts of information

22  that have numbers associated with a variety of different things

23  like the number of cases within a particular state, or the

24  asbestos bodily injury claims served in a particular year.

25  They do not appear to be hearsay within hearsay.  So, you can

1 raise that objection if there is particular information that is

2 a hearsay statement not cured by the business records

3 exception.

4           MR. BERNICK:  Fine, Your Honor.

5           THE COURT:  But, at the moment I think it's

6 admissible.  So, Exhibit 63 is admitted.

7 BY MR. LEWIS:

8 Q    All right, Mr. Hughes, I'll come back to that exhibit in

9 awhile.  I direct your attention to the drawing of --

10          UNIDENTIFIED SPEAKER:  You're coming through very

11 faint.

12          MR. LEWIS:  Is that better?

13          THE COURT:  Yes.

14          MR. LEWIS:  All right.  Technologically challenged.

15 I apologize.

16 Q    All right, here we go.  Now that everybody can finally

17 hear me and you can hear me, too, Mr. Hughes.  Do you see the

18 chart Mr. Bernick drew?

19 A    Yes.

20 Q    Based on some of your testimony?

21 A    Yes.

22 Q    Have you ever been to the mine in Libby?

23 A    I've been out there on the property.  I haven't been to

24 the mine while it was in operation.

25 Q    Did you tell me in your deposition that you'd never been

1  to the mine, you'd been to Libby twice, but not gone to the

2  --

3  A    When it was in operation I thought.

4  Q    Okay.  All right.  Did you go up and look at this mine to

5  verify all these facts that you testified to?

6         MR. BERNICK:  Objection.

7  A    Again, it wasn't in operation when I was there.

8         MR. BERNICK:  Objection to the form of the question.

9  What fact?

10        MR. LEWIS:  I wasn't finished with my question.

11 Okay?.

12        MR. BERNICK:  Oh, I thought you were.  Sorry.

13 Q    Did you go up and actually look at the mine to determine

14 what the facilities looked like up there?

15 A    Again, it wasn't in operation when I was there.

16 Q    But, did you go up and look at what the mountain looked

17 like when you went up there?

18 A    I went up Rainy Creek Road, but I, you know, generally in

19 the area, it was blocked off at the time.

20 Q    Did you --

21 A    I was up there in connection with settlement conference, I

22 think, with either Mr. Heberling or you, I can't recall.

23 Q    But, you went up to the mine.  Did you actually go onto

24 the mine premises or just to the top of Rainy Creek Road?

25 A    Again, the mine premises weren't in operation at the time

1  I was there.  So, I'm not sure I understand your question.

2  Q    Well, does the mountain look anything like this now,

3  doesn't it really look about like this?

4  A    Oh, yes.

5  Q    The bottom portion of that?

6  A    Well, I've seen photographs.

7          MR. BERNICK:  I'll stipulate.  I didn't bring a

8  photograph, and I could re-draw it.  I was trying to be a

9  little -- Mr. Lewis, if you could remove yourself briefly so I

10 can address the Court -- we'll stipulate that the mountain

11 doesn't look that way.  That wasn't the purpose of the drawing

12 is to give an accurate rendition of Zonolite Mountain with its

13 truncated top and all the roads going all over the place.

14         MR. LEWIS:  Then why was it drawn, Your Honor?  I

15 don't --

16         MR. BERNICK:  Your Honor, I didn't offer it.  I used

17 it to illustrate the operations.  I didn't offer it.  I didn't

18 even make it a demonstrative.  I did nothing other than to

19 create a schematic drawing that dealt with ore concentrated and

20 where it went.  And we're happy, if Mr. Lewis is that concerned

21 about the record, and there is no record that reflects what

22 that drawing looks like, and there won't be one, if he wants to

23 put a photograph in, God bless.

24         MR. LEWIS:  Is that an objection?

25         THE COURT:  I don't know if there's an objection or

1  not, but to the extent that this was -- Mr. Bernick never

2  represented that this was an accurate to scale type of drawing,

3  and I didn't understand it for that purpose.  So --

4          MR. LEWIS:  May I point out some things that we

5  believe are missing on this drawing?

6          THE COURT:  Sure.

7          MR. LEWIS:  Thank you, Your Honor.

8  BY MR. LEWIS:

9  Q    Now, where's Rainey Creek Road on that drawing?

10 A    Again, it's -- with all due respect to Mr. Bernick, it's a

11 very rough draft of what a mountain looks like.

12                    (Laughter)

13 A    And I don't think I can specifically identify the location

14 of Rainey Creek Road.

15 Q    But, you were on Rainey Creek Road once?

16 A    I know that Rainey Creek Road runs down from the site down

17 to the highway there that runs along the Kootenai River.

18 Q    Does this drawing show the screening plant?  Do you know

19 what the screening plant is?

20 A    Yes, I do.

21 Q    And what is the screening plant?

22 A    The screening plant is a Grace facility down at the bottom

23 of the mountain.

24 Q    Right on the river banks of the Kootenai River, correct?

25 A    Yes.

1          UNIDENTIFIED SPEAKER:  The beautiful Kootenai River.

2 Q    And does it show the conveyer that goes across the river

3 to the loading facility on the other side of the river?

4          MR. BERNICK:  Your Honor, I'll stipulate that again,

5 it doesn't.  What is the objection?  Relevance.  What is the

6 relevance?

7          MR. LEWIS:  Well, it's cross examination.  He brought

8 it up, Your Honor.

9          THE COURT:  Mr. Lewis, he wasn't trying to draw the

10 mountain.  He was pointing out that the ore came from the

11 mountain, was turned into concentrate, was then moved down the

12 mountain in a particular facility.  That was the purpose of the

13 drawing.

14          MR. LEWIS:  I'm getting there, Your Honor.

15          THE COURT:  Okay.

16          MR. LEWIS:  All right?

17 Q    Did you actually see the concentrate being transported

18 down the mountain to the screening plant?

19 A    Again, the mine was not in operation when I was there.

20 Q    So, the answer is no?

21 A    No.

22 Q    Okay.  Did you see any of the settling ponds?

23 A    No.

24 Q    Did you see where they discarded asbestos tailings after

25 they removed as much as they could from the vermiculite

1  concentrate?

2          MR. BERNICK:  Objection.  Does this refer to his

3  visit, or what he's seen in photographs or what?

4          THE COURT:  Sustained.

5          MR. LEWIS:  I can't ask the witness what he knows?

6          THE COURT:  Yes, you can.  But, you have to limit the

7  questionS so the witness knows whether you're talking about

8  during his visit, at some other time, for some other reason,

9  from photographs.  The question is too broad.

10 Q    Did you see where they discarded asbestos tailings over

11 the side of the mountain?

12 A    I'm familiar, generally familiar with the practices up

13 there.  I don't think I saw that.

14 Q    In fact, everything that you testified about here was just

15 based upon hearsay, is that true?

16 A    It's based on photographs.  It's based on my experience

17 having been involved in the settlement and the evaluation of

18 the cases for many years and participating in trials.

19 Q    Did you ever review the testimony of Mr. Lovick from the

20 Schnetter case?

21 A    I'm sure I have.

22 Q    Did you review the testimony of Mr. Lovick when he talked

23 about how they discarded asbestos waste material over the side

24 of the mountain?

25          MR. BERNICK:  Objection.  That is irrelevant, and if

1  it's offered for the truth of the matter, it's hearsay.

2            THE COURT:  What's the relevance?

3            MR. LEWIS:  The relevance is, Mr. Lovick was an agent

4  of Grace.  He was the trial representative at these trials.

5  Everything he said is an admission.  Okay?

6            THE COURT:  Yes, so?

7            MR. LEWIS:  I'm asking -- Mr. Bernick was allowed to

8  ask him what information he relied on and I'm asking whether he

9  knows about Mr. Lovick's testimony.

10           THE COURT:  Yes, but it has to be relevant to a

11  point.  And I'm not understanding what the relevance is.

12           MR. LEWIS:  The relevance --

13  Q    Did you review any documents to tell you how Grace

14  disposed of asbestos waste material at Zonolite Mountain?

15  A    As I said, I have been involved in the cases for many,

16  many years.

17  Q    Do you understand that there's approximately a one-mile

18  drift of asbestos waste material that Grace has dumped over the

19  side of the mountain?

20  A    I understand there's waste on the mountain.

21  Q    Do you understand that there's been testimony and

22  documentation that Rainey Creek runs right through there and

23  asbestos waste gets in the Kootenai River by that means?

24           MR. BERNICK:  Objection, relevance and time frame and

25  foundation.

1          THE COURT:  Sustained.  I'm still missing -- there

2    isn't a dispute about exposure to Grace's products, unless I'm

3    missing the point.

4          MR. LEWIS:  The problem here, Your Honor, is Mr.

5    Bernick's -- all this testimony was about exposure.

6          MR. BERNICK:  Let me just be clear what the proffer

7    of that testimony was for, maybe this will help narrow this

8    thing.  The proffer of this testimony was to establish only a

9    couple of things.  That our issue in this confirmation as

10   opposed to working conditions, that number one, Tremolite is

11   not confined to the Libby site or the Town of Libby, and that

12   relates to the question of whether there's exposures to

13   Tremolite outside of Libby, Tremolite-based claims outside of

14   Libby.  That goes to discrimination.

15         THE COURT:  Mr. Bernick, you can make your arguments

16   later.  I understood what the purpose of the admission was.

17         MR. BERNICK:  Right.

18         THE COURT:  But, this is cross examination and the

19   issue is open.  So, to the extent that the witness has some

20   knowledge about disposal of asbestos tailings, because it has

21   now become a relevant issue with respect to some other matters

22   that have been raised, he can answer that question.  But, the

23   question that was asked is a very complex question.  Does he

24   know that there is something, Rainey Creek that runs through

25   the tailings that then dumps into the Kootenai River.  He

1  hasn't even substantiated that he agrees that there is this

2  mountain of waste that you describe.  So you need to lay the

3  foundation.  The objection is sustained.

4  Q    You know there's a huge amount of asbestos waste on the

5  side of that mountain, true?

6  A    I know that there's asbestos waste.

7  Q    And that it was dumped over the side of the mountain

8  before they put it in the tailing ponds, right?

9  A    Yes.

10 Q    So, for many years there were no tailing ponds there to

11 settle out any particulate matter that was in the waste, true?

12 A    Yes.  Again, I'm not sure I understand how it relates to

13 Mr. Bernick's drawing and what we discussed in my earlier

14 testimony.

15 Q    It relates to other matters.  Just answer my question.

16 Okay?

17         THE COURT:  You can ask me to direct the witness,

18 please, gentlemen.  I really would like trial procedures to be

19 followed.  You do have to answer the witness' questions he's

20 asking, Mr. Hughes.

21         MR. LEWIS:  Could the court reporter read back the

22 question?  Is it on there?

23         THE COURT:  It will take awhile.

24         MR. LEWIS:  Oh, will it?  Okay.

25 Q    Well, the question was --

1          THE COURT:  Wait.  You can't ask and have her look at

2  the same time.  You need to do one or the other.

3          MR. LEWIS:  I was going to withdraw the request and

4  restate the question.

5          THE COURT:  All right.

6          MR. LEWIS:  If that's easier for staff.

7          THE COURT:  Can you get back up to the beginning

8  where you left off then, Kathy?

9          COURT REPORTER:  I'll go back.

10          THE COURT:  All right, go ahead.

11          MR. LEWIS:  Thank you, Your Honor.

12  Q    Now, you postulated or opinioned that there was not very

13  much exposure in the community of Libby as part of your direct

14  testimony, do you recall that?

15          MR. BERNICK:  Objection.  Objection, lack of

16  foundation, misstatement of the record.

17          THE COURT:  That misstates the witness' testimony.

18  That objection is sustained.

19  Q    Do you claim that there is not very much exposure to Grace

20  asbestos in the community of Libby?

21          MR. BERNICK:  Objection to form and it goes beyond

22  scope.

23          THE COURT:  Overruled.

24  A    Could you repeat the question?

25  Q    Do you claim that there's not very much asbestos exposure

1  as compared to the mine in the town of Libby?

2  A    As compared to the mine when it was in operation?

3  Q    Yes.

4  A    I would think that would be true, yes.

5  Q    Okay.  Do you claim that there's not enough asbestos

6  exposure in the town of Libby to create a risk of

7  asbestos-related disease for community exposure cases?

8            MR. BERNICK:  Objection; (a) relevance, (b) it asks

9  for an expert opinion, (c) it goes beyond scope.

10           THE COURT:  That's sustained.

11 Q    You claim that there were no settled community exposure

12 cases, is that true?

13 A    Community only exposure cases.  There were some cases

14 where people in the course of their deposition testimony

15 alleged community exposures, but they were people who either

16 lived with former employees or were former employees.  And

17 those were settled cases.

18 Q    But, there were settled cases that also involved people

19 who only had community exposure, correct?

20 A    Settled cases involving only community exposure?

21 Q    Yes, sir.

22 A    You'll have to point me to a particular case.

23 Q    Well, do you know the answer or not?

24 A    I said you'd have to point me to a particular case.  I'm

25 not familiar with any case that fits that description.

1 Q    All right, we'll get back to that.  All right.  So, in any

2 event, did you get up to the top of the mountain to see what

3 the pit looks like, what the mining activity is?

4 A    I said again that --

5            MR. BERNICK:  Objection, relevance.

6            THE COURT:  Sustained.  Sustained.  This has been

7 asked and answered.  The mine wasn't in operation.  He's made

8 the point, I got the point.  Move on to something relevant.

9            MR. LEWIS:  Your Honor, the question was awkward.

10 Q    What I meant to say, did you get to the top of the

11 mountain and see what was left of the mining operation?

12 A    Only through photographs.

13 Q    So, you've seen photographs of the mine?

14 A    Yes.

15 Q    Okay.  I want to direct your attention to the factors that

16 influence what you paid for nonmalignant settlements

17 pre-bankruptcy.  Now, you testified, I believe, that -- let's

18 take these in reverse.  Let's take jurisdiction, for example.

19 Do you agree that there were significant principles of law that

20 changed the liability picture in Libby?

21            MR. BERNICK:  Objection.  That calls for an expert

22 opinion.

23 A    Principles of law?

24            THE COURT:  Pardon me.

25            MR. LEWIS:  I'll rephrase the question.  I'll

1  withdraw and rephrase the question.

2  Q    You were senior litigation counsel responsible for these

3  personal injury settlements.  In that position, did you have to

4  have some knowledge, some passing knowledge, of the laws of the

5  jurisdictions in which settlements were made?

6  A    Yes.

7  Q    And in Montana, do you agree that the <u>Gidley v. W.R. Grace</u>

8  case and the <u>Lockwood v. W.R. Grace</u> case substantially changed

9  the liability picture with respect to Grace workers' claims

10  against Grace for exposure at the mill?

11 A    Well, both cases provided for different reasons, permitted

12 Grace employees to sue Grace in tort contrary to the general

13 principle that workers' compensation statutes barred direct

14 common law claims against an employer.

15 Q    So, in many states -- or would you say in most states, a

16 claim like this would be barred by workers' compensation --

17         MR. BERNICK:  Objection, calls for a legal

18 conclusion.

19         THE COURT:  I don't know what claim.  A claim like

20 what?

21         MR. BERNICK:  I have a different objection, but I'll

22 just go ahead.

23 Q    Do you agree that in most jurisdictions, claims by workers

24 employed by Grace against Grace for exposure in the workplace

25 were barred by workers' compensation exclusivity?

1  A    But, the non-Libby cases we've been talking about are

2  cases that aren't subject to workers' compensation or the

3  exclusivity provisions of the Workers' Compensation statute.

4  That's the problem I'm having with your question.  The Libby

5  cases wouldn't be in court granted, but for the <u>Gidley</u> and the

6  <u>Lockwood</u> cases, because generally barring exceptions -- and

7  there are exceptions in many other states besides Montana -- to

8  the Workers' Compensation statute, employees cannot sue

9  employers in tort.  But, the problem I have in the context of

10 this case is that the other cases, the vast majority of them,

11 the tens of hundreds of thousands of cases you're comparing to,

12 didn't involve Grace employees, so the Workers' Compensation

13 statute you're talking about and the issue of exclusivity and

14 bar are irrelevant to those cases.

15 Q    But, do you agree that there's substantial exposures in

16 the workplace at Libby for Grace employees to asbestos?

17 A    As an industrial hygiene matter?

18 Q    Yes.

19 A    Well, I'm not an industrial hygienist, but I'm familiar

20 with the data based on my work in the litigation.  And there

21 was certainly exposures, asbestos exposures associated with the

22 mine and mill during a period of operation and they were --

23 there's epidemiological studies showing an increased incidence

24 of asbestos-related disease among the workers.

25 Q    Okay.  And then you testified that the same kind of

1 exposures were found at expansion plants around the country,

2 words to that effect, is that true?

3           MR. BERNICK:  Objection.  That was not the question

4 that I asked.  I don't believe that was what the witness

5 testified to.

6           THE COURT:  Frankly, I don't know whether it was or

7 not.  But, he can answer this question.  If it's not correct,

8 he'll let us know.  You can answer, Mr. Hughes.

9 A    Well, I don't think I testified to that effect, but there

10 were certainly asbestos exposures associated with working at an

11 expanding plant.

12 Q    And for Grace employees working at those expansion plants,

13 most of them were barred by workers' compensation exclusivity,

14 is that true?

15 A    Well, again, some were barred by workers' compensation

16 exclusivity.  There were exceptions to the exclusivity

17 provisions in the workers' comp in a lot of states, either

18 statutory exceptions or common law exceptions.  I'm not

19 familiar enough with the specifics, the laws under the various

20 states.  But, again, we did have -- there are common law

21 lawsuits filed by the former Grace expanding plant employees

22 and Grace owned expanding plants, that were filed against the

23 company.

24 Q    And your data shows that you settled ten of those

25 elsewhere in the United States, is that true?

1 A     There were -- may have been -- I don't know the precise

2 number.  As I testified to earlier in my deposition though, the

3 categories besides Libby employees in turn that appear, I think

4 you're relying on the monthly asbestos litigation summary for

5 that comment.  There's some questions about the accuracy in

6 terms of the ability of us to get that information and capture

7 it.  But, certainly there was at least ten.

8 Q     Well, in your deposition, did you say there were ten

9 settlements involving --

10 A     I said there were at least ten.

11 Q     But, there weren't very many compared to the large number

12 of asbestos claims that were settled around the country, do you

13 agree with that?

14 A     Yes.

15 Q     And do you agree that the probable reason for that is that

16 most of those claims around the country were barred by workers'

17 compensation exclusivity?

18 A     Most of the claims were subject to workers' compensation

19 exclusivity, yes.

20 Q     There's another -- I want to go to the discussion, the

21 area of your direct examination relating to vermiculite

22 concentrate.  Okay?  Now, vermiculite concentrate was, I

23 believe, according to your testimony, what came out of the mill

24 and it was transported down Rainey Creek Road by truck or down

25 some other mechanism to the screening facility or into the town

1 of Libby, true?

2 A    Well, except I'm not sure I understand when you say the

3 town of Libby.  It was distributed throughout the country.

4 Q    But, first if it was going to go by rail it went across

5 the conveyer belt to the loading facility on the other side of

6 the river, true?

7 A    Yes.

8 Q    Okay.  And that was vermiculite concentrate, not expanded

9 product, correct?

10 A    Yes.

11 Q    The only place they expanded vermiculite in Libby -- that

12 Grace expanded Vermiculite in Libby was at the downtown

13 facility along the railroad, is that true?

14 A    Yeah, commercially, I think there was a capability for

15 research purposes to do it up at the mine site, but, yes.

16 Q    And the person who was studying that was a man named -- an

17 engineer named David Robinson, do you recall that?

18 A    I know David Robinson more as the -- in another capacity,

19 but I do not he worked in engineering at Libby.  I don't know

20 the specifics of what you're referring to.  It doesn't ring a

21 bell with me.

22 Q    Well, David Robinson was a brother to the CEO of Robinson

23 Insulation in Great Falls, is that correct?

24 A    That's how I know Dave Robinson, yes.

25 Q    And, in fact, he became a principal in that firm after he

1  left W.R. Grace's employment, true?

2  A    I know he later worked and was involved in Robinson

3  Insulation with his brother, yes.

4  Q    And they operated an expansion plant in Great Falls under

5  license with W.R. Grace, true?

6  A    Yes.

7  Q    And after 1975 or '76, they were the only expansion plant

8  in the United States, according to their license, who could

9  expand W.R. Grace concentrate for distribution in Montana, is

10 that true?

11 A    The only hesitation is whether or not one of the other

12 independent licensees in that region might have had some

13 territory or some counties in Montana.  But, my recollection is

14 the entire state of Montana was included in their license

15 territory.

16 Q    And they had multiple cases against Grace for exposure to

17 expanded vermiculite at their facility, correct?

18         MR. LOCKWOOD:  Objection; (a) who is they?

19         MR. LEWIS:  Robinson Insulation's employees.

20         THE COURT:  Multiple cases of what?

21 Q    All right.  You settled multiple cases with claimants who

22 worked at Robinson Insulation in Great Falls, Montana, correct?

23 A    I'm not sure of the characterization of multiple cases.

24 There was certainly more than one case involving former

25 employees at the Robinson Insulation Expanding plant.  The only

1  thing I disagree with your original question is that you said

2  exposure to expanded products.  The exposures at an expanding

3  plant are to concentrate, not to the expanded product

4  necessarily.  I mean, I suppose both, because the expanded

5  product is the final product.

6  Q    Okay.  Have you been to an expansion plant?

7  A    Yes, I have.

8  Q    Do you know what they do there?

9  A    They expand the material.

10 Q    Under heat.  As you described, correct?

11 A    Right.

12 Q    And the people have to handle both concentrate and

13 expanded vermiculite --

14 A    But, you didn't say concentrate and expanded.  You said

15 just expanded in your question and I was just clarifying that.

16 Q    Well, okay.  But, they are exposed to expanded vermiculite

17 at this expansion plant in Great Falls, correct?

18 A    Yes, but they're also exposed to concentrate.

19 Q    Fair enough.  But, we know that expanded vermiculite is

20 more dangerous than concentrate, is that correct or not?

21       MR. BERNICK:  Objection; (a) that calls for a legal

22 conclusion and an expert opinion (b) it is completely

23 irrelevant to the issues in this case, to say nothing of this

24 witness' testimony.

25       THE COURT:  Sustained.

1          MR. LEWIS:  Your Honor, may I be heard on this,

2  briefly?

3          THE COURT:  This witness isn't an expert in the

4  dangers of vermiculite products.

5          MR. LEWIS:  This witness testified as to all sorts of

6  matters, that he said he couldn't testify to in his deposition,

7  relating to asbestos byproducts, asbestos --

8          THE COURT:  There was no objection to what the

9  witness testified to.  He was not being called to give an

10  expert opinion.  He is now.  He has not been called as an

11  expert, the objection is sustained.

12          MR. LEWIS:  Thank you, Your Honor.

13  Q    In any event, the point of my cross examination on this

14  point is, based on your data, would the Robinson Insulation

15  cases be included in the ten or so cases that you have on your

16  data?

17  A    No, they wouldn't.

18  Q    And why not?

19  A    Because they weren't employees of Grace.

20  Q    Well, they were -- the facility was operated under a

21  license given to them by Grace, correct?

22  A    Right.

23  Q    In any event, when they talk about exposure to expansion

24  plants around the country, do you know whether, in fact, those

25  exposures approximate the exposures at the Libby Mill, one way

1 or the other?

2          MR. BERNICK:  And this calls for an expert opinion,

3 but just to let this thing go forward to conclusion.

4          THE COURT:  It's a do you know.  It's a yes or no

5 question.  You can answer, Mr. Hughes.

6 A    Could you repeat the question?

7 Q    Do you know whether the -- do you know how the exposures

8 at expansion plants compare to exposures at the Libby mine and

9 mill?

10 A    Exposures to workers?

11 Q    Yes.

12 A    Again, based on the data, it would depend on the time and

13 period, but certainly there were measurable exposures to

14 asbestos both at the expanding plants and at the mine and mill.

15 Q    So, the answer is, you don't know?

16 A    I don't know the specifics, and I think that's more of a

17 question for if I had the data available.  But, the bottom line

18 is --

19 Q    All right.  Let's go --

20 A    Go ahead.

21 Q    I'm sorry.  I didn't meant to interrupt you.  Go ahead and

22 finish your answer.

23 A    I'm finished.

24 Q    All right.  Thank you.  Let's go to the severity of

25 disease.  And we've got Whitehouse Progression case listed

1  there, correct?

2  A    Yes.

3  Q    And did you folks hire a prestigious lawyer in Montana to

4  defend the Grace cases there?

5  A    We hired an attorney to represent us, yes.

6  Q    Well, Gary Graham, correct?

7  A    Yes.

8  Q    And he's the person who you said informed you about these

9  cases, correct?  He informed you that this was a conservative

10  jurisdiction, true?

11         MR. BERNICK:  I'm sorry, Your Honor.  There was an

12  objection on grounds that that called for hearsay, and as a

13  result I was prevailed upon to change my question just to talk

14  about the witness' understanding.  If we're now going to open

15  the door to what his counsel told him, I think that that's

16  really beyond the scope of my examination.

17         MR. LEWIS:  The problem is, Your Honor, he went on to

18  say when he was told without saying who told him after that

19  fact.

20         THE COURT:  You raised a hearsay objection that I

21  sustained.  The witness then was asked what he did, and he

22  described what he did.  So, the objection -- I mean, if you

23  want to ask, and it's something that the witness can answer

24  without violating an attorney/client privilege you may pursue

25  the line.

Hughes - Cross/Lewis                    120

1  Q    Anyway, someone told you that Lincoln County was a

2  conservative jurisdiction for juries, correct?

3  A    That was the impression.  Conservative in terms of the

4  amount of money that would be awarded.

5  Q    And that turned out to be accurate, correct?

6  A    Relatively speaking, yes.

7  Q    The Libby juries didn't -- there weren't any runaway

8  verdicts in Libby, true?

9  A    Not in the cases we tried.

10 Q    All right.  And did Mr. -- well, let me say it this way.

11 Did Grace retain its own experts to testify as to the nature

12 and extent of the disease for each of these people who went to

13 trial?

14 A    Yes.

15 Q    And was one of those witnesses Dorsett Smith -- Dr.

16 Dorsett Smith?

17 A    Yes.

18 Q    Do you know that all of the -- that those doctors that

19 testified admitted to the same Progression potential as Dr.

20 Whitehouse?

21       MR. BERNICK:  Objection.  Lack of foundation.

22 Assumes facts not in evidence.

23       THE COURT:  Sustained.

24 Q    Did you review your doctor's opinions and testimony in

25 addition to Dr. Whitehouse's testimony?

1          THE COURT:  When you say your, you mean the company's

2 correct?

3          MR. LEWIS:  I mean the company's, yes, Your Honor.

4          THE COURT:  All right.

5 A    You mean -- what do you mean by review?  I mean --

6 Q    Well, you said you -- for giving your testimony today you

7 reviewed what Dr. Whitehouse was saying about Progression, is

8 that true?

9 A    I was just -- reviewed it.  It was just shown to me, yes.

10 Q    Okay.  Was it shown to you by Mr. Bernick?

11 A    Yes.

12 Q    Did he show you the actual reports and data?

13 A    Not this afternoon.

14          MR. BERNICK:  I'm sorry, for whom?  For Dr.

15 Whitehouse?

16          MR. LEWIS:  The witness answered before I finished

17 and so did the objection.  I'll restate my question if that's

18 satisfactory.

19          THE COURT:  Yes.

20          MR. LEWIS:  Okay.

21 Q    Were you shown the actual data from Dr. Whitehouse's

22 files?

23 A    I'm sure I reviewed it at the time of the trial and at the

24 time of the settlement of the case.

25 Q    You haven't reviewed it for many years, correct?

1  A    No, I don't think I've seen it recently.

2  Q    All right.  And, in fact, in your deposition when I asked

3  you laboriously what the factors were that influenced your

4  settlement values in Libby, you never mentioned Dr. Whitehouse

5  or Progression, is that true?

6  A    I'd have to review my testimony.  I certainly mentioned

7  the severity of the disease in questions around the

8  uniqueness --

9  Q    We don't have any arguments with severity of the disease.

10         MR. BERNICK:  I'm sorry.  The witness -- I don't know

11  if the witness was done.  I know Mr. Lewis didn't intend to

12  interrupt him, but --

13  Q    Go ahead.  Finish your --

14  A    Again, I said I may -- I don't recall specifically the

15  details, but my recollection was, was that the issue of the

16  severity of the disease and the issue of what the disease was

17  being relevant to settlement was the subject of deposition

18  testimony, and if it was, then it was because I wasn't asked.

19  Q    Well, I carefully asked you every factor and you

20  identified four.  One of them was severity.  Do you recall

21  that?  Severity of disease?

22  A    Yes.

23  Q    The other one wasn't product ID.  It was the nature of the

24  exposure, do you recall that?

25  A    Well, that's the same thing.

1  Q    Okay.  Well, is it the same thing?

2  A    It's exposure.

3  Q    When dealing with a product in Libby --

4           MR. BERNICK:  Again, I --

5           THE COURT:  You have to let the witness answer, Mr.

6  Lewis.

7           MR. BERNICK:  Yes.

8  A    I think it's the same thing.

9  Q    Okay.

10  A    It's the question of relating the asbestos exposure to the

11  medical condition.  And so, I think it's the same issue in a

12  different context.

13  Q    Let me ask you some questions on that then.  Exposure was

14  never a major issue in the defense of the Libby cases, do you

15  agree with that?

16  A    Not involving the employees, and certainly not involving

17  employees employed pre -- you know, in the earlier days for

18  sure, but generally not with employees, no.

19  Q    And you were concerned about liability for something other

20  than products liability, correct, in Libby?

21  A    I was concerned about liability, true.

22  Q    And that's why Grace bought insurance that provided

23  general liability or premises coverage in addition to products

24  liability coverage, is that true?

25           MR. BERNICK:  Objection.  Lack of foundation, also

1 ambiguous as to time.

2          THE COURT:  That's sustained.

3 Q    Throughout the time that Grace operated at Libby, did you

4 at Grace, the people at Grace, insure for non-products

5 liability?

6          UNIDENTIFIED ATTORNEY:  Objection to form.

7          THE COURT:  Sustained.

8 Q    Did Grace buy non-products coverage or not throughout the

9 period of time that it operated the mine in Libby?

10          MR. BERNICK:  Your Honor, I still don't have a

11 foundation if this witness is familiar with this.

12          THE COURT:  No, we don't.  You have to lay a

13 foundation.

14          MR. LEWIS:  This witness was identified in a 30(b)(6)

15 deposition as a person knowledgeable in insurance.

16          THE COURT:  He may be, but on this record I have no

17 foundation.

18 Q    Are you a person knowledgeable in the insurance that was

19 purchased by Grace?

20 A    Based on my role as senior litigation counsel involved in

21 asbestos personal injury cases, I was -- I'm generally familiar

22 with Grace's insurance.

23 Q    And you know the kinds of insurance they purchased for

24 coverage in Libby, is that true?

25 A    I'm generally aware of what the kinds of insurance they

Hughes - Cross/Lewis                                        125

1  purchased company-wide.

2  Q    And one of the reasons they had -- did they have

3  non-products coverage in place for Libby?

4  A    They had comprehensive general liability policies that

5  included non-products that covered all of their operations,

6  yes.

7  Q    And in your deposition do you recall testifying that the

8  kinds of cases that were brought in Libby were not products

9  liability cases?

10 A    Yes.

11 Q    So, there was no claim of products liability in any of the

12 cases filed by the Heberling firm or by my firm, true?

13 A    That's not true.  I think in --

14 Q    As to Grace.

15        MR. BERNICK:  I'm sorry.  Could you not interrupt the

16 witness?

17 A    That's not true.  I think there were products liability

18 allegations in some of the later cases and maybe even in the

19 earlier cases.  And what I mean by that is that there were

20 non-products cases in the sense that they involved exposures to

21 Grace operations and associated with the Grace mine and mill.

22 But, in some of the cases later on there was also allegations

23 of exposure to, you know, attic insulation in Grace products.

24 Q    But, essentially in Libby, what we're dealing with were

25 non-products cases, do you agree with that?

1          MR. BERNICK:  Objection.

2          MR. TACCONELLI:  Objection to form, Your Honor.  It

3   calls for a legal conclusion.

4          THE CLERK:  You have to use the mics.

5          MR. BERNICK:  Whoa.  Whoa.  Your Honor, I object to

6   the question on two grounds.  First of all, now you're into a

7   question of asking for the witness' expertise with respect to

8   coverage matter.  Second, Mr. Lewis is assuming a certain

9   definition of what constitutes a product in his question.  He's

10  not explained to the witness what that definition is, and

11  therefore the question is ambiguous.  And third, it goes beyond

12  the scope of my examination.

13         THE COURT:  That's sustained.

14         MR. LEWIS:  Your Honor, this witness was called as

15  part of our case in chief, so I understood that I could go

16  beyond the scope of the cross examination.  That's what the

17  ruling of the Court was I thought.  That's why I'm extending my

18  cross examination, is that right?

19         THE COURT:  Are you asking me or counsel?

20         MR. LEWIS:  I'm asking you.  That's what I understood

21  the Court's ruling to be.

22         THE COURT:  I thought the way it finally came down,

23  and I'm subject to being corrected because this was discussed a

24  long time and I'm not sure I know the answer, was that we were

25  going to close the direct case and then have -- while the

1  witness was here, the case opened for either Libby or the

2  insurers or whoever.  If I'm incorrect just let me know and --

3  I don't care which way it's done.  I just thought that was the

4  result.

5       MR. BERNICK:  Okay.  Your Honor, from our point of

6  view, I did make the objection based on scope, but I would

7  accede that -- I would acknowledge Mr. Lewis' point, and I

8  don't -- I would prefer that if he's going to be permitted to

9  ask these questions that they would be asked now.  My

10 objection, though, really is the more fundamental one, and that

11 is that he's now essentially asking the witness insurance

12 coverage issues.  We did pursue on my examination predicate

13 facts that would bear upon the coverage issue, but they're

14 predicate facts.  They don't call for the witness to express

15 any kind of conclusion whatsoever.

16      And so, our objection remains that he's basically

17 asking the witness to offer views or opinions on whether

18 products coverage or non-products coverage would apply.  I

19 don't think that that's appropriate.  I think that that calls

20 for expert -- an expert opinion and a legal conclusion.

21      THE COURT:  Okay.  I don't -- I haven't heard that

22 this witness has testified to his own qualifications to answer

23 products coverage or non-products coverage questions.  I have

24 heard about settlement values and about litigation strategies,

25 but nothing related to insurance.  So, if you're going to

1  pursue this line you need to establish his expertise and his

2  familiarity.

3          MR. WISLER:  Your Honor, Jeff Wisler on behalf of

4  Maryland Casualty.

5          THE COURT:  You need to use the microphone.

6          MR. WISLER:  Your Honor, Jeff Wisler on behalf of

7  Maryland Casualty.  I do understand that Mr. Lewis had reserved

8  the right to examine Mr. Hughes on direct, but specifically in

9  terms of insurance issues, and very specifically in terms of

10 non-products coverage, this was scheduled to be brought up on

11 day eight, and that's what the order approved that was filed

12 with the Court and everybody participated in says.  So, I think

13 that it's inappropriate at this time because it's certainly

14 beyond the scope of what Mr. Bernick asked, and it's not really

15 that part of the case and it's not the way we had intended the

16 case to go forward.

17         MR. BERNICK:  I'm going to speak actually against

18 that to the extent that I specifically elicited from this

19 witness facts relating to exposure to commercial products,

20 including concentrate and expansion products.  And I did so for

21 purposes of eliciting testimony that might be relevant

22 ultimately to the Libby claimants' contention regarding

23 non-products coverage.  So, from our point of view, we're

24 prepared to have Mr. Hughes testify to the facts.  That's

25 different from testifying to a conclusion about whether

1 coverage exists or not and under what policy.

2          THE COURT:  Okay.  To the extent that there are

3 insurance-related questions, my understanding was that we would

4 be taking those issues up when the insurers are all here and

5 available to present whatever testimony and cross examination

6 they want to do.  So, I am concerned about the bifurcation of

7 this process to make sure that anybody who may have an interest

8 in cross examining in your case in chief would not be here to

9 do it.  So, I thought the conclusion was that the debtors would

10 stop their case and then Libby would present its case and

11 that's the rule that I am invoking.

12          So, you may recall this witness in your own case for

13 that purpose, but you must now just cross examine because

14 otherwise I can't control this process without everyone here

15 who may have some interest in cross examining during your case.

16          MR. LEWIS:  The purpose of my cross examination was

17 to show that they wouldn't have insured against non-products

18 coverage if they weren't dealing with non-products.  That's

19 really the purpose of my cross examination.

20          MR. BERNICK:  That -- well, that's not a question,

21 so --

22          MR. LEWIS:  Well, I mean, I'm trying to explain the

23 relevancy.  I'm not going into insurance issues --

24          MR. LOCKWOOD:  Your Honor --

25          MR. LEWIS:  -- even if Mr. Bernick was.

1          MR. LOCKWOOD:  Your Honor, Mr. Lewis hasn't

2    established that you could purchase a comprehensive general

3    liability policy that didn't have both kinds of coverage in it.

4          THE COURT:  No one has substantiated that this

5    witness --

6          MR. LOCKWOOD:  There's no -- so he's making that up.

7          THE COURT:  No one has yet substantiated on this

8    record that this witness has anything other than general

9    familiarity with the debtor's insurance.  If you want to lay

10   the foundation questions please do, but let's start it so that

11   the record is complete.  At the moment what I have this witness

12   here for is factual testimony about settlements and litigation

13   and nothing more.  If you're getting into insurance, and maybe

14   he has that expertise, I am not aware of it yet.

15         MR. LEWIS:  I think I've established what I can

16   establish, so I'll move onto another subject, Your Honor.

17   BY MR. LEWIS:

18   Q    I want to go back to the Whitehouse Progression.  Once

19   again, you folks and every one of the Libby -- Grace and every

20   one of the Libby cases retain experts to it -- medical experts

21   to it, conduct medical examinations of these individuals that

22   were going to trial, correct?

23         MR. BERNICK:  It's -- all has been just -- already

24   pursued in examination by counsel.

25         THE COURT:  He's answered that question, yes, so go

1  ahead.

2         MR. LEWIS:  This is foundation.

3         THE COURT:  All right.  Go ahead.

4  BY MR. LEWIS:

5  Q    Is that true?

6  A    Yes.

7  Q    Okay.  And did Mr. Bernick provide you with copies of your

8  independent medical examinations prior to your testimony here

9  in court?

10 A    I have not seen those since the time of the trial.

11 Q    So, you wouldn't know whether Dorsett Smith or anybody

12 else agreed or disagreed with Dr. Whitehouse on Progression, is

13 that true?

14        MR. BERNICK:  Objection.  Relevance.

15        THE COURT:  What's the relevance?

16        MR. LEWIS:  Well, they brought -- Your Honor, they

17 brought up -- they're trying to discredit the value of these

18 cases based upon some claim that Dr. Whitehouse's testimony was

19 not accurate when their own witness has admitted it at these

20 trials or in depositions prior to the trial.

21        THE COURT:  I haven't heard anything about

22 discrediting the value of the settlements.  I have heard an

23 explanation for what factors went into the settlements, but

24 it's fine.  I understand the relevancy.  The objection's

25 overruled.

1  A    Could you repeat the question?

2  Q    Do you know whether or not any of your medical doctors

3  that you retained for independent evaluation purposes in the

4  Libby cases refuted Dr. Whitehouse's testimony on Progression?

5  A    Again, I haven't looked at the report, so I haven't seen

6  them.

7  Q    Do you know if there is even objection to that testimony

8  by your counsel in those cases that were tried?

9  A    Objection by my -- our counsel?

10 Q    Yes.

11 A    I'm not sure I understand what you're asking.

12 Q    All right.  If you don't understand the question I'll move

13 to another one.  Now, there's an -- going back to jurisdiction,

14 okay, we talked -- there's a factor on the non-Libby cases,

15 plaintiff's counsel in high verdict jury pool.  You talked

16 about the high verdict jury pool, correct?

17 A    Yes.

18 Q    But, you didn't talk about plaintiff's counsel.  Do you

19 recall me asking you questions about that subject in your

20 deposition?

21 A    Yes.

22      MR. BERNICK:  I'm sorry.  That's not proper use of a

23 deposition.

24      MR. LEWIS:  Oh, I -- I'm just establishing that he

25 knows something about this subject.

1          MR. BERNICK:  Well, I think we already established

2    that.  Object to the question.

3          THE COURT:  It's sustained.  It's sustained.  Ask a

4    proper question.

5          MR. LEWIS:  All right.

6    Q    You had a certain familiarity with many of the major

7    asbestos firms around the country, correct?

8    A    Yes.

9    Q    You had a good relationship with what firms?

10   A    Well, I don't know.  Again, good relationship -- I'm not

11   sure I understand what you're talking about.

12   Q    Well, you had a relationship with what firms that would be

13   considered major firms around the country?

14   A    Well, to the extent I settle cases I had relationships

15   with many of the firms.

16   Q    Well, you were settling thousands of cases with some of

17   these firms, correct?

18   A    Yes.

19   Q    Now, when you talk about plaintiffs' counsel, if you've

20   got very excellent plaintiffs' counsel, is that a factor that

21   you assume will drive up the settlement value of the case?

22   A    That would certainly increase the potential settlement

23   value.

24   Q    And when you get a settlement -- an opinion from your

25   lawyers as to what the value of the case is, is one of the

1  things you ask them the capabilities of the plaintiffs'

2  counsel?

3  A    Yes.

4  Q    Okay.  Now, we know that Mr. Cooney in Chicago is a great

5  plaintiffs' attorney.  You knew that, right?

6  A    Yes.

7  Q    And you knew that Mr. Weitz or Weitz (pronouncing) in New

8  York was a great plaintiffs' counsel, right?

9  A    Certainly he -- the firm had excellent trial lawyers and

10 an established record.

11 Q    Baron & Budd the same way, right?

12 A    Yes.

13 Q    Okay.  Now, all that the Libby people had was a couple of

14 country lawyers who --

15                          (Laughter)

16 Q    -- weren't big players in the asbestos field, is that

17 true?

18        THE COURT:  If you want to object, Mr. Cohn, you may

19 object on this basis.

20                          (Laughter)

21 Q    As to the settlements.  As to the recoveries in Montana.

22 These were basically two country law firms with no high profile

23 in the asbestos settlement field, correct?

24 A    I don't think that's true.  I think that both you and Mr.

25 Heberling had established reputations as trial lawyers in

Hughes - Cross/Lewis                          135

1  Montana.

2  Q    But, compared to these other folks, and we are small

3  potatoes, and you certainly didn't increase the settlement of

4  value of Libby cases because who was representing these

5  plaintiffs, is that true?

6         MR. BERNICK:  Objection to the form of the question

7  and foundation.

8         THE COURT:  Sustained.

9  Q    Well, you said one of the factors was plaintiffs' counsel,

10 correct?

11 A    Yes.

12 Q    Can we assume that better plaintiffs' counsel you

13 gentlemen were willing to pay more value for the cases?

14        MR. BERNICK:  I'm sorry.  Objection.  Can we have

15 clarification when he says one of the factors was plaintiffs'

16 counsel at Libby or outside of Libby?

17        MR. LEWIS:  Well, for every case.

18        MR. BERNICK:  No, no, I'm -- well, that's --

19        MR. LEWIS:  I did not --

20        MR. BERNICK:  Okay.

21        MR. LEWIS:  There's nothing wrong with that question.

22        THE COURT:  You can answer, Mr. Hughes.  For every

23 case.

24 A    Yes.  The plaintiffs' lawyer was something we considered.

25 Is information that I would ask for.

1  Q    So, what I'm saying is, the Libby counsel had better

2  counsel than Baron & Budd, correct?

3  A    Well, now you're making distinctions that, you know, seem

4  vague to me.  I mean, I think Gary -- I think that you and Mr.

5  Heberling were considered established trial lawyers with a

6  track record in Montana.

7  Q    Well, here's my point, sir.  With respect to Baron & Budd,

8  on one occasion you did an inventory settlement where you

9  settled 10,000 cases for $50 million, is that true?

10 A    Ten thousand plus or minus, yes.

11 Q    Roughly 10,000, correct?

12 A    Yes.

13 Q    And that was an arm's length transaction, correct?

14 A    Yes, it was.

15 Q    And that was a reasonable settlement based upon fair and

16 reasonable negotiations, is that true?

17 A    It made sense at the time.

18 Q    And the average recovery was about $5,000 per claim in

19 that settlement, correct?

20 A    Yes.

21 Q    And those -- that settlement included mesothelioma cases

22 and cancers, is that true?

23 A    Yes.

24 Q    And then you settled 130 cases with Mr. Cooney just before

25 the bankruptcy, and those were all mesothelioma cases, true?

Hughes - Cross/Lewis                    137

1  A    Yes.

2  Q    And was that an inventory settlement?

3  A    Again, I -- you know, inventory settlement is not a

4  precisely defined term of art, but it was an agreement we

5  reached on a group of cases.  I tend to think of an inventory

6  settlement as all the cases being represented by a particular

7  law firm.  I'm not sure Mr. Cooney's settlement fits that

8  description.

9  Q    All right.  But, it was all the mesothelioma cases that

10  Mr. Cooney had in his office with claims against Grace,

11  correct?

12  A    Again, generally speaking, I think that's an accurate

13  description of what was settled.

14  Q    And the average settlement for those 130 meso cases was

15  $90,000, is that true?

16  A    Again, I don't have the information in front of me, but

17  that sounds about right.

18  Q    Okay.  And that was just before Grace entered bankruptcy,

19  true?

20  A    It was in 2001 as I recall.

21  Q    And I'm sure the judge knows what an inventory settlement

22  is, but I need to establish a record of that, you Honor.  Would

23  you tell the Court what an inventory settlement is?

24  A    Well, I think I just testified.  My definition of an

25  inventory settlement would be where Grace reached an agreement

1  with a law firm to settle all of the asbestos-related injury

2  claims involving the firm's current clients.

3  Q    Okay.  So, in the case of Baron & Budd, roughly 10,000

4  cases were settled, and those were all the existing cases in

5  that firm's asbestos inventory, correct?

6  A    Yes.

7  Q    And as a part of that inventory settlement, does the firm

8  have to agree to a moratorium?

9  A    It varied, but the Baron & Budd settlement agreement had a

10  moratorium, yes.

11  Q    And when was that settlement entered into, if you know?

12  A    Late 1990s.

13         MR. BERNICK:  Your Honor, at this point I don't know

14  what the relevance is, so I'm going to object to the

15  continuation of this line of questioning.  Now, got three other

16  different -- two other different settlement packages.  I'm sure

17  there are many -- they are very complicated.  What is the

18  relevance?

19         MR. LEWIS:  The relevance is, we're comparing what

20  was obtained outside of Libby in the hands of very able counsel

21  which -- to the kinds of values that were achieved in Libby.

22         MR. BERNICK:  I'm sorry.  Then I object, Your Honor,

23  because we don't have -- if that's the purpose, we don't have

24  foundation apples and apples.  If there's no inventory deal in

25  Libby, then you can't compare it to an inventory deal outside

1  of Libby.

2          THE COURT:  That seems to be a correct proposition.

3          MR. LEWIS:  So, is the objection sustained?  I can't

4  go into this?

5          THE COURT:  Yes.  Well, no.  That objection's

6  sustained.  I didn't say you can't explore the area, but I am

7  concerned about what the relevance is if there are no inventory

8  deals in Libby.

9  BY MR. LEWIS:

10  Q    Were there group settlements that did not require a

11  moratorium.

12  A    Yes.

13  Q    And was Cooney's settlement -- excuse me -- was the

14  settlement with Mr. Cooney one of those settlements?

15          MR. BERNICK:  Objection.  That one occurred on the

16  eve of bankruptcy.

17          THE COURT:  It doesn't matter.  Overruled.

18  A    I don't recall whether there was a moratorium.

19  Q    Well, it didn't include settlement of all of his existing

20  cases.  It only include settlement of his meso cases, correct?

21  A    Correct.  Yes.

22  Q    So, it did not -- it was not, by your definition, an

23  inventory settlement, correct?

24  A    Yes.

25  Q    And was that settlement fair and reasonable and based upon

Hughes - Cross/Lewis                    140

1  arm-length negotiations between you and Mr. Cooney's firm?

2  A    Certainly --

3         THE COURT:  Overruled.  You may answer.

4  A    It made sense at the time.

5  Q    Was it a reasonable settlement in your view?

6  A    I think given, you know, the risks in trying cases in

7  Madison County, Illinois, I think it's reasonable.

8  Q    But, this was a high jurisdiction -- one of the highest

9  jurisdictions in the country, correct?  You testified to that.

10 A    Yes.

11 Q    And you were able to settle these cases -- these

12 mesothelioma cases for $90,000 apiece, true?

13 A    The settlement -- you have the data as well as I do.

14 Q    Well, is that a true statement?

15 A    Yes.  As I recall, the settlement was approximately

16 $90,000 a mesothelioma case.

17 Q    Okay.  I want to go back to products.  I want to go to

18 products.  Let's examine what we had at Libby.  You said you

19 had first vermiculite concentrate that was then transported for

20 expansion for use by -- to be sold to end users, is that

21 correct?

22 A    Concentrate?

23 Q    Yes.

24 A    Yes.

25 Q    You didn't sell any concentrate in Libby, Montana, true?

1           MR. BERNICK:  In the town of Libby?  Objection to

2 form.

3           MR. LEWIS:  Libby, Montana.

4           THE COURT:  I don't understand.  Are you asking the

5 witness whether he personally sold product and where?

6           MR. LEWIS:  I constantly do that.  By you I'm talking

7 about Grace.  I'll try to make a better question, and I

8 withdraw that question.

9 Q    Did Grace sell any vermiculite concentrate to end users in

10 Libby?

11 A    I don't know the answer to that question.

12 Q    Well, was it true or not that Grace sent its concentrate

13 except for the little bit of amount that they expanded

14 experimentally in downtown Libby outside of Libby for

15 expansion?

16 A    Based on the available records, the vast majority of the

17 Libby concentrate was shipped by rail car to locations

18 throughout the country other than Libby, Montana.

19 Q    And there at the expansion plants, then the concentrate

20 was expanded and then packaged for sale to end users, is that

21 true?

22 A    Generally that's true.

23 Q    Did Libby expand any vermiculite in Libby for sale to

24 end users, if you know?

25           THE COURT:  Did Libby?

1        MR. LOCKWOOD:  The question said did Libby expand.

2        MR. LEWIS:  I misspoke.

3   Q    Did Grace expand any vermiculite concentrate in Libby for

4   a sale in common to end users?

5   A    I don't believe so.

6   Q    Do you know -- do you agree with me --

7   A    And again -- let me put a caveat on that.  I don't believe

8   so, but the question of the operations and, you know,

9   limitations of time I have a problem with.  You know, I mean,

10  there were earlier zonolite and zonolite predecessors

11  operations in the '30s, '40s and '50s, and I don't -- I

12  wouldn't have any -- have not seen any records or had any

13  knowledge of what might have happened in those days.

14  Q    So, the point is, you don't know as you sit here whether

15  or not any expanded vermiculite or vermiculite concentrate was

16  actually sold by Grace in Libby, is that true?

17  A    Well, first it was sold by -- you know, Libby vermiculite

18  was incorporated into products that were sold throughout the

19  United States and Libby is a market for the product, so I don't

20  know how to answer that question.  I hesitate to say one way or

21  another, but I don't know.  The other thing is that, you know,

22  obviously in litigation involving your clients and elsewhere,

23  there have certainly been allegations that there were finished

24  vermiculite products available for sale in Libby.

25  Q    There were some at the retail store at the lumber mill in

1  Libby, is that what you're referring to?

2  A    No.  I mean, again, I don't know.  I mean, I've seen --

3  Q    You just don't know if it was sold or not?

4  A    I'm sure -- well --

5  Q    Well, you're guessing when you say that?

6  A    Well, there were -- it's sometimes hard for me to say --

7  you know, again, there may have been.  I don't know.

8  Q    You never went to Libby and checked to see if it was

9  available for sale to end users in Libby, correct?

10      MR. BERNICK:  I'm sorry.

11 Q    Grace expanded asbestos was for sale to end users in

12 Libby, is that true?

13      MR. BERNICK:  When Mr. Hughes himself was present

14 there?

15      MR. LEWIS:  Yes.  You.

16      MR. BERNICK:  Well, I --

17      MR. LEWIS:  Yes.  Okay.

18      MR. BERNICK:  The question doesn't --

19 Q    Did you personally go to Libby and check to see if there

20 was any expanded asbestos that came from the Grace mine that

21 was for sale to end users in Libby?

22 A    Again, I've only seen expanded products in Libby in

23 photographs.

24 Q    Let me try to shorten this.  If you can't agree with this

25 I'll get onto another subject.  Do you agree that the gravamen

Hughes - Cross/Lewis                            144

1  of the complaints against Grace for Libby asbestos exposure was

2  non-products liability?

3           UNIDENTIFIED ATTORNEY:  Objection to form.

4           MR. BERNICK:  Like objection to form, that calls for

5  a legal conclusion and the conclusion of an expert regarding

6  coverage.

7           THE COURT:  And that's sustained.

8  BY MR. LEWIS:

9  Q    Did you settle one case in Libby based upon allegations of

10 products liability, if you know?

11          MR. BERNICK:  I'm sorry.  That now refers to a

12 doctrine of law.  The doctrine of law is irrelevant to the

13 issue of coverage, and this is a back door question about

14 coverage expertise and coverage --

15          THE COURT:  No, I don't think -- this said did he

16 settle a case that referred to.  I think that was the question.

17 That referred to non-products.  And that's a question -- this

18 is the settlement person for Grace.  That's overruled.

19          MR. BERNICK:  That's fine, Your Honor.

20          THE COURT:  You may answer.

21 A    Could you repeat the question?

22 Q    Yes.  Did you settle any cases in Libby that were based on

23 an allegation of products liability?

24 A    Again, as I testified to earlier, the cases that we

25 settled were generally workers and family members of worker.

1 Q    And they (inaudible) include products liability

2 allegations, true?

3 A    Again, I don't recall specifically, but there were later

4 cases involving workers where one or both of the firms through

5 in allegations of exposure to finish products in the

6 allegations in the complaint or in the course of discovery.

7 So, I hesitate to give you a definitive answer, but generally,

8 they were workers and family members of workers whose exposure

9 was the result of their employment at the mine and mill.

10 Q    And not products cases, correct?

11          MR. BERNICK:  Objection.  That now calls for --

12          THE COURT:  Sustained.  Mr. Lewis, he's answered your

13 question twice.

14                      (Pause)

15 Q    In any event you've testified there was no product issue

16 at Libby, is that true?

17          MR. LEWIS:  May I approach the witness, Your Honor?

18          THE COURT:  Yes.

19          MR. BERNICK:  So, you're showing him the

20 demonstrative?

21          MR. LEWIS:  Yes.

22          MR. BERNICK:  Well, then, let's get -- could we have

23 the demonstrative identified so that we know how you're

24 prompting him to answer?

25          MR. LEWIS:  Your Honor, I think it's an old adage in

1  the law a lawyer can refresh the recollection of a witness with

2  a bowl of spaghetti and that's what I'm trying to --

3          THE COURT:  Yes, except the witness hasn't testified

4  that he had a failure of recollection.  And first you have to

5  get that on the record.

6          MR. LEWIS:  Okay.

7  BY MR. LEWIS:

8  Q    Do you recall that you testified there was no issue of

9  product ID in Libby?

10  A    I said there was no issue of product exposure at Libby

11  because the vast majority if not all of the pre-petition

12  settled cases involved exposures of employees and for family

13  members of employees and that it was established both by the

14  information available to Grace at the time of the litigation

15  and to an epidemiological study that there were asbestos

16  exposures associated with the mine and mill.

17  Q    That's what I wanted to establish.  Thank you, sir.  I

18  want to direct your attention to LC Exhibit 63, and I would

19  like you to go to Page 25.

20          MR. LEWIS:  And, Your Honor, I'm going to try to

21  adjust this so we can see this.

22          MR. BERNICK:  Are you -- do you know how to do it,

23  Tom?

24          MR. LEWIS:  I do know how to do it I think.  Thank

25  you.  I'm going to sort of cut this page in half so we can get

1  this as big as possible if I could do this.  Whoops.  Too big.

2          MR. BERNICK:  Twenty-three?

3          MR. LEWIS:  Twenty-five.

4          MR. BERNICK:  Twenty-five.

5          THE COURT:  Cathy, I think the screens just went off.

6          MR. BERNICK:  Yes, I got it.  Do you want to just ask

7  him -- do you have that copy in front of you, Jay?

8          THE WITNESS:  Yes.

9          MR. LEWIS:  Mine went off, too.

10          MR. BERNICK:  Well, do you want to just -- he's got a

11  copy in front of him.

12          THE COURT:  Mr. Bernick, it's not legible.

13          MR. BERNICK:  Oh.  There you go.

14  BY MR. LEWIS:

15  Q    All right.  Would you --

16          MR. LEWIS:  Can you hear me?

17          THE COURT:  Yes.

18  Q    Please describe what is shown on LC Exhibit 63, Page 20?

19          THE COURT:  Can you put it into focus?  I

20  literally -- this page is not legible and I can't understand

21  what that is either on the screen because I can't see it

22  either.

23          MR. LEWIS:  Is this how to focus?

24          MR. BERNICK:  No, here.

25          THE COURT:  Okay.

1         MR. LEWIS:  She's concerned about focus.

2         THE COURT:  I can see.

3         MR. BERNICK:  She can't see it unless it's blown up.

4         THE COURT:  I can see it now.  Thank you.

5         MR. LEWIS:  Okay.

6         THE COURT:  Can you see it, Mr. Hughes?

7         THE WITNESS:  Yes, I can.

8         THE COURT:  All right.

9  BY MR. LEWIS:

10  Q    Now, what is it?

11  A    It's an analysis of the money that Grace spent on

12  asbestos-related litigation and the payments.

13  Q    And this -- you're confident it's accurate as to what the

14  amount was actually paid because there are checks that verify

15  that, is that true?

16  A    Again, I didn't prepare this report, but it's -- and this

17  wouldn't have been something I'd need to rely on on a day to

18  day basis in my role as, you know, settling and litigant --

19  managing the settlement and litigations in the asbestos

20  personal injury claims.  But, generally, it was created in

21  Grace's business, and I know John Port (phonetic) was relying

22  on, you know, information concerning what payments had been

23  made.

24  Q    Do you agree that the amounts paid at least on -- shown to

25  be paid on this page are, in fact, accurate?

1          MR. BERNICK:  Well, unless he wants to establish --

2    it sounds like this was tendered as a business record and now

3    he wants the -- Mr. Hughes' personal verification of accuracy

4    beyond the fact that it's a business record.  And if that's

5    true then he needs to establish a foundation for this witness

6    to address this in terms of his personal knowledge of its

7    accuracy.

8          THE COURT:  It sounds as though You're asking for his

9    personal verification.

10          MR. LEWIS:  I am.

11          THE COURT:  All right.  Then you do need to lay the

12    foundation.

13    BY MR. LEWIS:

14    Q    You're familiar with this particular page of the last

15    report issued on this subject prior to the bankruptcy, is that

16    true?

17          THE COURT:  Pardon me.  I just can't see.  Is the top

18    number -- can you tell me what the year of the top number is,

19    please, on the page?  Is it 1992?

20    Q    It says, "As of March 31, 2001," is that correct, Mr.

21    Hughes?

22    A    Yes.

23          THE COURT:  Going down the left-hand column, can you

24    just tell me what year it starts in, please?  Is that 1992?

25          MR. LEWIS:  I think I should give that to the -- ask

1 the witness perhaps if that's all right.

2          THE COURT:  All right.

3 Q    Does it start at the top in 1992?

4 A    Yes, but there's no data across from 1992.  The actual

5 information starts in 1993.

6          MR. BERNICK:  Your Honor, I -- there are -- there

7 must be 200, 300 entries, and we've got four, five or six

8 different tables.  I think we just ought to be fair with the

9 witness, and frankly fair with everybody.  What particular

10 numbers is Mr. Lewis focused on so that we can get some

11 testimony?

12          MR. LEWIS:  I'm just trying to comply with the order

13 of a court, Your Honor, with respect to the dates.  That's all

14 I'm trying to do here.  I will get to --

15          THE COURT:  I was asking the dates, but yes, I think

16 you were asking foundation questions.  It's just that I can't

17 make out the date, so I was asking to make sure I have the

18 right page.

19          MR. LEWIS:  You know what, Your Honor?  I have the

20 wrong page, because in my -- I want to go to -- yes, there's

21 inconsistent numbering here.  I apologize.  We'll get this

22 straight.  Okay.

23 Q    I'm directing your attention to what was Bate stamped at

24 one time, 911625, marked as LC Exhibit 63012.

25          MR. LEWIS:  No wonder the witness had difficulty with

1  that particular page, Your Honor, because I was on the wrong

2  page.

3  Q    All right.  Now, would you tell the Court what this

4  document is?

5  A    This is the -- a summary document that Mr. Port prepared

6  and incorporated into the monthly asbestos summary which showed

7  the filing and settlement activity with respect to asbestos

8  personal injury claims that have been filed against the

9  company.

10 Q    Now, as to this document, do you agree that the amounts

11 paid as reported by this document are, in fact, accurate?

12 A    They were generally accurate.  There may be, you know,

13 minor issues, but I was -- I didn't -- the other page that I

14 was less familiar -- this page I did rely on in my day to day

15 activity and I found it to be, you know, some -- as we've

16 discussed before, some points of data I would be less likely to

17 verify the accuracy, but generally the money and the amounts of

18 money that were spent by the company were tracked accurately.

19 And this report was -- I found it to be a fairly accurate and

20 worthwhile tool.

21 Q    If I understand what you're saying -- well, let me ask

22 this directly.  You have no difficulty with the numbers, but

23 you may have some difficulty with what category some of the

24 numbers are assigned to, is that true, generally?

25 A    Yes.

1  Q    Okay.  Let's go to the top, and we have -- the first line

2  is Libby employees, do you see that?

3  A    Yes.

4  Q    And does that include not only Libby employees, but also

5  all other direct Libby claims against Grace?

6  A    That would include all claims involving exposures

7  associated with the Libby operation, yes.

8  Q    So, is the explanation for it being Libby employees that

9  initially the claims were almost exclusively Libby employees?

10  A    Yes.

11  Q    And then later, family member claims started appearing

12  and --

13          MR. BERNICK:  I'm sorry.  What?

14  Q    Family member claims started appearing, and the community

15  exposure started appearing later?

16          MR. BERNICK:  Objection.  That's three different

17  things, and we're talking about settlements.  Objection to

18  form.

19          MR. LEWIS:  Okay.

20  Q    Is that -- later did you include family member exposure

21  claims for family members of Grace workers?

22  A    It would've been included in the Libby employees section.

23  Q    And then later yet, non-family member community claims

24  would've been included under Libby employees, is that true?

25  A    Again, there were only a handful of those prior to the

1  filing of the bankruptcy or less.  But, yes, I think they

2  would've been treated that way.

3  Q    Fair enough.  Now, we've got what it says, "Other Grace

4  employees," do you see that?

5  A    Yes.

6  Q    And who does that include?

7  A    That would be people employed by Grace outside of Libby.

8  Q    So, that would be Grace employees who were employed at --

9  primarily at expansion plants, correct?

10 A    Yes.  That was the intent when the document was created.

11 Q    And how many total did you have under that category?

12 A    According to this document ten, as I said, though, because

13 in the asbestos personal injury litigation, you know, it was

14 very difficult to track a person's actual work history based on

15 complaints and so on.  I'd be more accurate saying that at

16 least ten.

17 Q    But, in any event -- I accept your testimony on that.  I'm

18 not challenging it.  But, you understand where I got the number

19 ten now, right?

20 A    Yes.

21 Q    Okay.  All right.  Then it says non-Grace employees.  Who

22 are those people?

23 A    Well, it's footnoted.  It says, "Employees of Grace

24 customer who used or processed Grace vermiculite."

25 Q    And, for example, that would be like Scott to whom Grace

1  sold vermiculite and they expanded themselves, true?

2  A    Yes.

3  Q    Okay.  And just to complete the record, what does Scott

4  do?  What is the business of Scott with respect to vermiculite?

5  A    They're in the, you know, agriculture, horticulture and

6  lawn care business, and they incorporate vermiculite as a

7  component in many of their products.

8  Q    All right, then, the next one is building occupants.  Who

9  does that include?

10  A    That was intended to include people who are alleging

11  exposure just to Grace products by having worked in a building

12  where Grace products were present.

13  Q    Would that include exposure to attic insulation?

14          MR. BERNICK:  Settled -- I'm sorry.  Settled attic

15  insulation cases?

16          MR. LEWIS:  I'm just asking --

17  A    These are claims filed we're talking about here.

18          MR. BERNICK:  Oh, okay.  I thought the -- oh, I'm

19  sorry.  I thought these were -- are we reading off the same

20  thing?  They're all --

21  Q    Not all of these cases are settled, right?

22  A    No, those are the claims served.

23          MR. BERNICK:  Which part are you now referring to?

24          MR. LEWIS:  Building occupants.

25          MR. BERNICK:  To be fair, there are five different --

1  four different places on the page where this rubric is used.

2  Some of them relate only to settlements.  I, frankly, was

3  following along the settlement one.

4          MR. LEWIS:  I'm talking about the top.

5          MR. BERNICK:  Okay.

6          MR. LEWIS:  I'm trying to lay foundation as to which

7  each of -- who were included?  What kind of claims were

8  included in each of these definitions?

9          MR. BERNICK:  Okay.  So --

10          MR. LEWIS:  And I'm talking about Number 4, building

11  occupants.

12  Q    You understood that, is that true, sir?

13          MR. BERNICK:  Well, no, I'm sorry, but it's Number 4,

14  but it's now -- you're at Column 8 then.

15          THE COURT:  Mr. Bernick, he's starting at the top of

16  the page --

17          MR. BERNICK:  Yes.

18          THE COURT:  -- and he's down to building occupants.

19  He's covered the other three.  He's down to building occupants.

20  Go on, Mr. Lewis.

21          MR. BERNICK:  I don't mean to be laborious.  I'm --

22  Q    Did you understand that to be my question that I was

23  asking about whether building occupants include -- mechanical

24  and building occupants included zonolite attic insulation

25  claims related to personal injury?

1  A     It may have.  Again, I really want to emphasize that the

2  Libby employee claims with the exception of the Libby employee

3  claims, and perhaps the construction in others, these other

4  categories were very difficult to monitor based on the

5  information that will be provided to us in a typical asbestos

6  personal injury complaint.  So, it would have to be obvious to

7  the data entry clerk who would enter in the complaint that they

8  fit into this category.

9  Q    Okay.  I --

10       MR. BERNICK:  I'm sorry.  Your Honor, I -- really,

11  we're at Column 8.  As opposed to Column 9, makes a big

12  difference whether you have a claim filing number or a

13  settlement number because --

14       THE COURT:  He's talking about claims, Mr. Bernick.

15  He started that off.  His first question was about claims.

16  He's at the top of the page working his way down regarding

17  claims, is that correct?

18       MR. LEWIS:  That's correct, Your Honor.  I'm not

19  talking about amounts right now.

20       THE COURT:  Mr. Hughes, did you understand that to be

21  the case when you were answering the questions so far?

22       THE WITNESS:  He did cite ten when he talked about

23  the other (indiscernible) claims, and that is in the

24  accumulative case filed column.  So, I understood that's where

25  we were looking at.

1          MR. LEWIS:  And that's where we're at, right?

2          THE COURT:  I thought you were on building occupants

3 now.

4          MR. LEWIS:  I am on building occupants.

5          THE COURT:  All right.

6 Q    But, the number ten relates to Section Number 2.  It

7 doesn't relate to building occupants, correct?

8 A    Right.  But, I was trying to identify the column.

9 Q    I was trying -- I was just trying to explore as to what

10 kind of claims might be included under the heading, or this

11 category building occupants.

12 A    Right.  And I said -- I described the type of claims that

13 it was intended to cover, but expressed my belief and my

14 opinion after using this form for many years that I -- you

15 know, that there's a lot of claims that would logically fit

16 into that, that based on the information we were provided

17 wouldn't necessarily be -- I wouldn't be confident or captured

18 by that number.

19 Q    So, the -- okay.  Let's go on to the next one, building

20 maintenance personnel.  Now, what was that intended to collect?

21 What kinds of claims?

22 A    People whose exposures were -- arose from their

23 post-installation work activity which disturbed in-place

24 asbestos products.

25 Q    So, if somebody does a remodel and disturbs the zonolite

1 insulation in the wall and somehow made or claims to have been

2 exposed to asbestos in that matter, would that be fair?

3 A    Well, I think --

4         MR. BERNICK:  I'm sorry.  A relevance.  That is the

5 relevance claim -- relevance issue on this whole line of

6 examination.  There hasn't been a word of zonolite on direct

7 examination.  It's not implicated -- there's no settlements.

8 What's the relevance?

9         MR. LEWIS:  I'm just trying to explain the form, and

10 I'll get to the relevance.  I think the witness is entitled to

11 explain the form, and they're not?

12         THE COURT:  Only if it's relevant.  So, tell me what

13 the relevance is and then we'll see --

14         MR. LEWIS:  The relevancy is, I am going to get down

15 to the bottom and I am going to ask the witness as to the

16 amount of the settlements, the average settlements as to each

17 of these categories, and I'm going to allow him to explain as

18 he's just done that some of these, besides Libby, may not be

19 categorized quite right.  But, I'm going to give as much

20 information as we can to the finder of fact from this form.

21         MR. BERNICK:  But, Your Honor, why don't we just get

22 down to the bottom of the page instead of dealing with the top

23 of the page which is not even settlements?

24         MR. LEWIS:  That's where I'm going if I can just get

25 the categories defined.

1      THE COURT:  Okay.  Somebody's going to have to give

2  the finder of fact a legible copy of this page because it's

3  not.  So, if you're going to have me make any sense out of it

4  from the testimony and the chart, I need a copy I can read.

5  This I can't.  Go ahead, Mr. Lewis.

6      MR. LEWIS:  We will assure that that's done, Your

7  Honor.

8      THE COURT:  All right.  MR. Lewis, how long are you

9  going to be with this witness?  It's one o'clock.  If you're

10  going to be a long time --

11      MR. LEWIS:  I'm going to be another half hour, 45

12  minutes.

13      THE COURT:  All right.  I think what we'll do is

14  recess here and take a lunch hour.  We'll reconvene at one

15  forty-five.

16      MR. LEWIS:  Thank you, Your Honor.

17      THE COURT:  You're excused until one forty-five, Mr.

18  Hughes.

19                    (Recess)

20      THE CLERK:  All rise.

21      THE COURT:  Please be seated.  Mr. Hughes, are you

22  ready?  Yes, sir?  Mr. Lewis?

23      MR. LEWIS:  Thank you, Your Honor.  Your Honor, we

24  are --

25      THE COURT:  Cathy, you're going to need to turn the

1  screen.

2           MR. LEWIS:  In an effort to assist the Court, we've

3  got a great big one of these that might help, but it's still

4  not the clearest.  It's the best we could do --

5           THE COURT:  All right.

6           MR. LEWIS:  -- on short -- may I approach the bench?

7           THE COURT:  Thank you.  Yes, please.  I was trying

8  that myself.  I'll see if we can get a better copy later.

9  Thank you very much.  That's much better.  Thanks.

10 BY MR. LEWIS:

11 Q    Okay.  One more definitional category is construction and

12 other.  Do you see that?

13 A    Yes.

14 Q    And construction and other is the vast majority of other

15 cases -- vast majority of asbestos claims against Grace that

16 were filed and settled, correct?

17 A    Well, in the column we were talking about before the

18 break, we were actually talking about the cases that were

19 settled, but -- excuse me -- that were filed.  But, yes, that's

20 generally true.

21 Q    All right.  Let's go down to the bottom here.  And about

22 halfway down the page do you see a title, "Grace's share of

23 settlement judgment cost in thousands"?

24 A    Yes.

25 Q    Okay.  Now, the first section below that is settlements in

Hughes - Cross/Lewis                    161

1  dollars paid, correct?  Total settlements and dollars paid not

2  averaged, is that true?

3  A    Yes.

4  Q    Okay.  Let's go to the bottom where it says, "Average

5  settlement judgment cost per claimant thousands," okay?  Do you

6  have me?

7  A    Yes.

8  Q    Okay.  Thirty-three Libby employees.  What is the average

9  settlement for all Libby claims?

10          MR. BERNICK:  All Libby claims regardless of disease.

11  Object to the form of the question.

12          THE COURT:  Are you just reading from the chart?

13          MR. LEWIS:  Yes.

14          THE COURT:  Okay.  It says, "Libby employees".

15          MR. LEWIS:  The witness earlier defined that as

16  including Libby employees, family members, and a few community

17  exposure cases.  I believe he's defined that term.

18          MR. FINCH:  That was for claims, not for settlements.

19          MR. LEWIS:  Huh?

20          THE COURT:  For claims.

21          MR. FINCH:  That was for claims filed.

22          MR. LEWIS:  Indeed.  Indeed it was.  I'll clarify

23  that, Your Honor.  Thank you, counsel.

24  Q    Mr. Hughes, when you use Libby employees here were you

25  including the same groups -- people in those groups as Libby

1  claims, sir?

2  A    Yes, I was, although at the time of our bankruptcy there

3  were no pure community exposure cases settled.

4  Q    But, there were community exposure cases that were settled

5  that alleged a substantial factor in bringing about their claim

6  was community exposure, is that true?

7  A    I'd have to -- you'd have to point me to a particular

8  case.  I don't recall.

9  Q    Well, I think you testified that there were claims at

10 least that included both community exposure and familial

11 exposure together.  Did you testify to that, sir?

12 A    Again, there were claims that involved work exposure.

13 There may have been allegations of community exposure or --

14 and/or family exposure.  The point I was making was, though,

15 you asked me to define -- to say that Libby employees that

16 appears on 33 -- Line 33 where we -- the data is reporting on

17 the average settlement, whether that includes family member

18 exposures, community, and workers, and I just made the point

19 that at the time of the report and at the time of the Grace

20 filing, I don't recall and don't believe there was any pure

21 community exposure cases.  They were all family member cases --

22 excuse me -- worker and family member cases.

23 Q    All right.  But, in any event, these numbers include

24 mesotheliomas?

25 A    Yes.

1  Q    They include malignant cases that are not mesotheliomas,

2  correct?

3  A    Yes.

4  Q    And they include non-malignant cases in this number,

5  correct?

6  A    Yes.

7  Q    And can we assume that all of the other numbers for the

8  other categories reported here also include mesotheliomas,

9  other malignancies, and non-malignant cases?

10  A    I don't know.

11        MR. BERNICK:  I'm sorry.  Yes, I don't think the

12  witness -- I think he's answered.  He shouldn't be required to

13  make assumptions.

14        MR. LEWIS:  I didn't understand that.  Was that an

15  objection?

16        THE COURT:  Well, it may have been, but the witness

17  already said he doesn't know.

18        MR. LEWIS:  Okay.

19  Q    Well, I thought in your original testimony about this

20  exhibit, and maybe I'm wrong.  Please correct me if I am.  You

21  said that this exhibit showed all of the settled cases as of

22  March 31, 2001, is that true?

23  A    Yes.

24  Q    Okay.  So, by definition, it would include mesos, not

25  other malignancies, and non-malignancies, is that correct?

1  A    It would had such cases been settled involving people who
2  fit into each of those categories.
3  Q    Okay.  So, there might be a category where there wasn't a
4  meso, for example?
5  A    That's my point.
6  Q    All right.  Now, under other Grace employees, how many
7  claims does it show that were settled?
8           THE COURT:  Are you looking at Line 34?
9           MR. LEWIS:  Yes, Your Honor.
10 A    I can't -- you can't determine that -- the answer to that
11 question on Line 34.
12 Q    Okay.  What you can determine is that the total amount
13 paid for other Grace employees, which you defined as including
14 expansion plant exposures of Grace employees, and the average
15 was 15,000 per claim, is that correct?
16 A    That's what's reported on Line 34, Column 8.
17 Q    And this is the portion of your report that you have the
18 greatest confidence in because you have Grace documents,
19 checks, and so forth that actually support the data in the
20 bottom as to settlements, is that true?
21 A    Supports the dollars paid.
22 Q    Right.
23 A    There's some concern because of what I said earlier, that
24 there may be settlements included in construction and other
25 category, which is the catchall category, that may, if you look

1  at the file, might actually have been more appropriately

2  categorized in the others.

3  Q    Fair enough.  In any event, we can read here as to

4  non-Grace employees the average was $92,000, correct?

5  A    That's what's reported in -- on Line 35, Column 8.

6  Q    And the building occupants was $32,000, correct?  That was

7  the average?

8  A    That's what the report here says at Column -- Line 36,

9  Column 8.

10 Q    And the average for construction -- of building

11 maintenance personnel was 2,000, correct?

12 A    In Column 8 --

13 Q    Yes.

14 A    -- Line 37, yes.

15 Q    And the average for all others was approximately 4,000,

16 correct?

17 A    Again, on Line 38, Column 8, yes, 4,000.

18 Q    All right.  Did you -- were you able to -- you say that --

19 if I understand your testimony correctly, you're saying that

20 you believe the Libby employees' numbers are accurate, but that

21 you cannot differentiate between perhaps a building maintenance

22 personnel and a building occupant?  There might be some

23 misassignment as to what kind of claim that is, is that your

24 testimony?

25 A    I wouldn't limit it to those two categories.

1  Q    No, I'm not --

2  A    But, I'm saying the categories between -- you know, the

3  categories other than the Libby and then the construction and

4  other catchall, there may be others in the construction and

5  other catchall that would more appropriately have been

6  categorized in the other -- you know, other Grace employees, et

7  cetera.

8  Q    Do you agree with me that -- or do you agree that the

9  construction and other is the -- by a great amount the largest

10 number of claims reported on this document?

11 A    The report speaks for itself, but yes.  That's certainly

12 true.

13 Q    Did you ever attempt to take all those non-Libby groups

14 and combine the number of claims and take the amount paid to

15 determine what was the average for all non-Libby claimants

16 collectively?

17 A    Yes, we've done that.

18 Q    And what is the average amount of recovery?

19         MR. BERNICK:  And I, again, this is without

20 distinction.  Any distinction is just -- on a per claimant --

21         MR. LEWIS:  The only distinction is it's got -- that

22 it's non-Libby.

23         MR. BERNICK:  Per claim.

24         MR. LEWIS:  Per claim.

25 Q    And what is that amount?

1  A    I don't have it at the top of my head, quite frankly, but

2  it's certainly --

3  Q    Is it less than 5,000?

4  A    I'd have to calculate it very quickly.  You can probably

5  do that from this information right here.

6  Q    I won't require you to do that, sir.  I think we can all

7  calculate that.  And it'll save the Court time if we don't do

8  that.  All right.  Now, I just -- one -- this is the data that

9  you -- one source of data that you would use to evaluate claims

10  for settlement.

11  A    That's a report telling me or summarizing activity for the

12  prior month or the prior year.  The data itself is coming from

13  the case management system, and directly into it.  And so, it

14  would be let me know where, how much money was being spent,

15  those kinds of things.  I mean, it -- but I guess to some

16  degree it was used in evaluating a case, although I'm not sure

17  it would really be generally applicable to the four conditions

18  or the four CARD criteria I referred to earlier.  But, yes, I

19  mean it was something I had to use to track how much we were

20  spending on the cases.

21  Q    But, this is the best evidence as to the historical value

22  of Libby settlements, is that true?

23  A    No.

24        MR. BERNICK:  Objection to the form of the question.

25  Ambiguous.  Based on this calculation or -- the witness has

1 testified to historical values with a lot of other metrics.

2 So, it's what the best evidence for what?

3          MR. LEWIS:  I'll withdraw the question.  I think

4 that's a good objection.

5          MR. BERNICK:  Every once in awhile I get it right.

6 Q    This is the --

7          MR. BERNICK:  I said every once in a while I get it

8 right.

9 Q    This is the best evidence as to what was actually paid by

10 Grace to settle asbestos cases against it around the country,

11 is that true?

12 A    That's what it's reporting on.

13          THE COURT:  Is that a yes or a no?

14          THE WITNESS:  Well, I'm grappling with the term best

15 evidence, but --

16 A    Why don't you repeat the question.

17 Q    Well, is this the best evidence as to what amounts Grace

18 paid the settled asbestos cases against it?

19          MR. BERNICK:  Object to form.

20          THE COURT:  That just asked the witness in the same

21 words what the best evidence is.  I think that's what he's not

22 understanding.

23          MR. LOCKWOOD:  Your Honor, the problem is that -- the

24 question is whether he's asking for best evidence or whether

25 he's asking for the best summary.

1           THE COURT:  You need the microphone, Mr. Lockwood.

2           MR. LOCKWOOD:  Whether he's asking for the best

3    evidence or is he asking for some sort of summary.  This

4    doesn't purport to be the agreements themselves or the checks.

5    I mean, the best evidence by -- would be the checks.  He

6    doesn't really mean best evidence, I don't think.

7           THE COURT:  That's --

8           MR. LOCKWOOD:  If he does, the question is

9    objectionable.

10          MR. BERNICK:  I -- I --

11          THE COURT:  I think the witness indicated that he is

12   grappling with that term and didn't understand it either, so I

13   ask that perhaps the question could be restated.

14          MR. BERNICK:  Just so I -- yes, I'm sorry.  Just so I

15   don't -- maybe Mr. Lewis can accommodate this concern as well

16   as he did before.  My concern is this is snippet quote and it

17   doesn't specify what kind of a -- what kind of settlement it

18   is, that is, aggregate not distinguishing by disease.  It's

19   just per claim.

20          MR. LEWIS:  I can clarify, Your Honor.

21          THE COURT:  All right.

22   Q    Is this the best evidence that Grace has to show the

23   average amounts of settlements paid by Grace to settle asbestos

24   cases in this country?

25          MR. BERNICK:  Objection to form, per claim without

1  regard to disease or what, what's the calculus?

2         MR. LEWIS:  I said the average.  I think that I said

3  that means average per claim.

4         THE COURT:  All right.  Average per claim, all

5  claims.

6         MR. LEWIS:  Yes, Your Honor.

7  A    I mean, that's -- again, that's what it's reporting.

8  Whether it's the best, I mean, the data itself is maintained in

9  the case management system and this is just a summary report

10 prepared by a Grace employee.  I mean, it's certainly something

11 we relied on in -- internally in Grace in assessing what the

12 averages were.

13        MR. LEWIS:  That's good enough, Your Honor.  Let me

14 change subjects here a little bit.

15                      (Pause)

16 Q    I'm showing you a document entitled the Libby

17 Nonmalignant Settlements, 1987 to 2001, have you seen that

18 document before?

19 A    Yes, I have.

20 Q    And was it prepared by counsel for Grace, Mr. Bernick, or

21 his staff?

22 A    Yes.

23 Q    Does that document accurately reflect amounts paid for

24 nonmalignant settlements in Libby from 1987 to 2001?

25 A    I believe it's generally accurate.  Again, I was involved

Hughes - Cross/Lewis                    171

1  in the preparation and then maybe, you know, there's always the

2  potential for human error, but I think it's generally accurate.

3          MR. LEWIS:  I'd like to mark this for admission and

4  move it's admission, Your Honor.  What is the next exhibit?

5          AUDIO OPERATOR:  Which number is that, PP what?

6          MR. LEWIS:  No, it's not.  It's just got the Page 13

7  on it.  That's why I can't do it.

8          UNIDENTIFIED ATTORNEY:  Yes.  Let's mark it Libby --

9          MR. LOCKWOOD:  Is this being moved as a

10  demonstrative, Your Honor, or it this being moved for

11  admission?

12          THE COURT:  I don't know, but I could I get it marked

13  first and then I'll --

14          MR. LEWIS:  Yes.

15          THE COURT:  -- hear what it is?

16          MR. LEWIS:  You know what the next number is that we

17  have?

18          UNIDENTIFIED SPEAKER:  In our --

19          MR. LEWIS:  Libby claimant number?

20          UNIDENTIFIED SPEAKER:  No, (inaudible).

21          MR. LEWIS:  Oh, I gave her one, too.  He's got

22  another one.  Oh, this is the bottom, yeah.

23          THE COURT:  Okay.  Thank you.

24          UNIDENTIFIED SPEAKER:  Mr. Lewis, 270, LC-270.

25          MR. LEWIS:  What?

1            UNIDENTIFIED SPEAKER:  LC-270.

2            MR. LEWIS:  LC-270, that would be the next one?

3 Just so I complete the record, Your Honor, I'll show it to the

4 witness as marked.

5            THE COURT:  All right.

6 BY MR. LEWIS:

7 Q    I'm handing you what had been marked as Exhibit LC-270 and

8 is that a fair summary detailing -- actually, is that a

9 statement as to the nonmalignant case settlements in Libby that

10 were settled between 1987 and 2001 providing the exact amount

11 of their settlement -- of each settlement?

12 A    Yes, subject to my earlier comment that it was prepared

13 from a case management system and barring human error,

14 that's -- I believe it to be an accurate description of the

15 settlements for nonmalignant cases during that time period.

16 Q    And you participated in the preparation of that document?

17 A    I certainly provided the data and had seen it before.

18 Q    And you believe it was prepared by your counsel?

19 A    Yes, it was.  Yes.

20            MR. LEWIS:  Okay.  I offer this Exhibit LC-270, Your

21 Honor.

22            MR. BERNICK:  We have no objection to that.

23            THE COURT:  All right.  It's admitted.

24 Q    You talked about malignancies and mesotheliomas in your

25 testimony, how many mesos were there in Libby?

1          MR. BERNICK:  Meso cases that were filed?  Objection

2 to form.

3 Q    How many mesothelioma cases were filed in Libby against

4 W.R. Grace if you know?

5 A    I believe there were eight.

6 Q    And how many of those cases were settled?

7 A    I can't recall if any were pending at the time we filed.

8 Q    Do you know the average value of the mesothelioma cases --

9 average settlement value of the mesothelioma cases in Libby?

10 A    I think it was --

11          MR. BERNICK:  Asked and answered.

12 A    -- asked, yeah.

13          MR. LEWIS:  It was answered in response to Mr.

14 Bernick's question.  I'm cross examining the witness on that.

15 It's just foundational.

16          THE COURT:  All right.  You can answer.

17 A    I believe it was 350,000, plus or minus.

18 Q    And were some of the people who settled their mesothelioma

19 cases unrepresented?

20 A    Yes -- no, that's -- I don't believe that's true.  No.

21 There were some that were settled that didn't file lawsuits.

22 I'm sorry, but they were represented.

23 Q    Okay.  And who were they -- do you remember who they were

24 represented by?

25 A    You'd have to identify the particular claimant.

1 Q    Okay.  How many were settled with firms other than Mr.

2 Heberling's firm and my firm?

3 A    I don't recall.

4 Q    Were there other claims settled in Libby with

5 unrepresented claimants?

6         MR. BERNICK:  Asked and answered.

7         THE COURT:  Other asbestos claims?

8         MR. LEWIS:  Yes, other asbestos claims settled by

9 Grace with unrepresented claimants.

10         THE COURT:  I think he said no, that everyone had

11 counsel, but hadn't filed lawsuits.

12         MR. LEWIS:  No, I -- that was relating to

13 mesothelioma, Your Honor.

14         THE COURT:  Oh.

15 Q    Is that how you understood the question, sir?

16 A    Yes.

17 Q    Okay.  No, I'm talking about non-mesothelioma cases?

18 A    There were a handful.

19 Q    And were those mostly management people of Grace?

20 A    No.  There were some management people, I believe.  But, I

21 -- but, again, I'm -- it depends on how you define management,

22 I think, supervisory personnel.  I don't really recall

23 specifically who they were, but I do know that a couple people

24 approached the company directly for settlements and we

25 accommodated them.

1  Q    I think you indicated in your testimony that the peak were

2  settlement values that occurred in about 1997 to 1999 for Libby

3  nonmalignant cases, is that true?

4  A    The peak for what?

5  Q    The peak settlement value for Grace with Libby

6  nonmalignant cases was from 1997 to 1999, is that true?

7  A    There were -- I believe it was '97, '98.  But, again, the

8  data, it speaks for itself.  I mean, it's reported here.  It's

9  -- but, the -- this is the list you just provided provides that

10  information.

11  Q    When you talked about the three cases that were tried to

12  judgment in Libby?

13  A    Yes.

14  Q    Do you know when those cases were tried?

15  A    '98 and '99.

16  Q    So, that was during the peak?

17       MR. BERNICK:  Why don't you show him the --

18  objection, Mr. Lewis has just --

19  Q    Oh, okay, I'll be glad to show him.  I'm sorry.  It might

20  speed things up.  I'm showing you Exhibit EXPP501-4, do you see

21  that exhibit?

22  A    Yes.

23  Q    I would like you to compare that to Exhibit LC-270?

24       MR. BERNICK:  Do you have another copy of that?  The

25  only copy we have here in the courtroom and I've provided it to

1  counsel for your convenience.  Could I ask for a copy --

2          MR. LEWIS:  I have other questions.  I'll have my --

3  I will have my assistant go make some copies and come back with

4  that if that's what you'd like to do.  Is that satisfactory,

5  Your Honor?

6          THE COURT:  Yes, if you want to give it to my clerk

7  we can make some copies.  They're not going to be color coded.

8  A    I haven't finished looking.

9          MR. LEWIS:  The witness wants to look at it.

10         THE COURT:  Oh.

11         THE WITNESS:  Okay.

12         THE COURT:  I think I need a copy anyway because I

13 think it's been separately marked and I don't have one.  So,

14 Mona, could you make the -- make a dozen or -- yes, please.

15 BY MR. LEWIS:

16 Q    Thank you.  Okay.  I'll come back to that.  I think I'm

17 getting pretty close, Your Honor.  I really am.

18         Well, one factor I haven't touched on was the number

19 of defendants and you testified that -- about that briefly in

20 direct, correct?

21 A    Yes.

22 Q    Okay.  In Libby as to the cases settled pre-bankruptcy,

23 almost all of those were Grace-only defendant cases, correct?

24 A    Yes.

25 Q    Okay.  And elsewhere in the country, usually there were

1 multiple defendants in addition to Grace, is that correct?

2 A    Usually, yes.

3 Q    And pre-bankruptcy at least sometimes there might be as

4 many as 20 other defendants named, true?

5 A    Yes, named.

6 Q    And maybe even 50, true?

7 A    Named, yes.

8        MR. BERNICK:  I'm not -- I'm sorry.  I'm -- I was

9 coughing.  I object to form.  The witness previously testified

10 at time of settlement, did they come by the time they were

11 filed or by the time they were settled because the chart

12 related to settlements?

13        MR. LEWIS:  Well, counselor, I'm having a chart made

14 and I'm trying to go to another subject while the chart is

15 being copied and this is not about the chart.

16        MR. BERNICK:  No, it's about the chart that the

17 witness testified to on direct examination.

18        THE COURT:  Thank you.

19        MR. BERNICK:  Factors relating to settlements

20 included numbers of defendants the witness testified at the

21 time of settlement, so I objected to form.  Are you asking

22 about numbers of defendants at the time of settlement or at the

23 time the case is filed?

24        MR. LEWIS:  At the time the case was settled by

25 Grace.

1          THE COURT:  Is the question could there have been as

2  many as 50 defendants that were co-defendants with Grace at the

3  time Grace settled the cases?

4          MR. LEWIS:  Yes.

5  A    I don't think there was ever 50, quite frankly.

6  Q    Okay.  Could there be as many as 50 defendants at the time

7  the case was filed against Grace?

8  A    Yes.

9  Q    Okay.  Now, the number of the co-defendants as a general

10 proposition drove Grace's share of the liability to the

11 claimant down, is that true?

12 A    It certainly was a factor in reducing the claim -- Grace's

13 share of the settlement.

14 Q    Well, is --

15 A    The availability of settlement monies from other

16 defendants, yeah.

17 Q    No, not a hard question, is that a yes or a no?

18 A    Yes, it had an influence on the settlements paid by Grace.

19 Q    All right.  And at times you were able to minimize Grace's

20 liability by arguing that Grace was a peripheral defendant in

21 these multiple defendant cases, is that true?

22 A    I don't think I probably ever argued Grace was a

23 peripheral defendant.  I think we may have argued that Grace's

24 roll in the particular case as far as exposure that the

25 evidence was either non-existent or very slim and as a result

1 when you look at the entire profile, the entire history of the

2 individuals' occupational history, Grace's share in the case

3 should be very little.  Yeah, I definitely would have argued

4 that -- taken that position.

5 Q    But, with respect to Libby, Grace was never a peripheral

6 defendant, it was generally the only defendant in Libby,

7 correct?

8 A    Grace was the --

9            MR. BERNICK:  Objection, at this point this is just

10 reiterating what he's already testified to on direct

11 examination.  It's cumulative.

12            THE COURT:  It is getting cumulative.

13            MR. LEWIS:  All right.  Okay.  Let's go back to this

14 exhibit, may I approach the bench and the witness, Your Honor?

15            THE COURT:  Yes, I actually have a copy.

16            MR. LEWIS:  Oh, you do.

17            THE COURT:  Yes, thank you.

18 Q    I'm handing the witness Exhibit LC-270 and before we had

19 this copied you had the opportunity to look at this document,

20 correct?

21 A    Yes.

22 Q    And your testimony was that in Libby, the peak of

23 settlements was in 1997 and 1998, is that your testimony?

24 A    Well, the two highest settlements both occurred in '97 as

25 I recall.

Hughes - Cross/Lewis                    180

1  Q    Yeah, but that's the two highest single settlements, is

2  that your testimony?

3  A    Yes.

4  Q    Okay.  But, in terms of the average amount of settlements

5  or the total amount of settlements, 1999 and 2000 involved

6  payment of much greater funds, correct?

7  A    The total amount, yes.

8  Q    And there were substantial settlements made after the jury

9  trials, correct?

10  A    Yes.

11  Q    Robert Wilkins (phonetic), $800,000, correct?

12  A    Again, the document is accurate to the best of my

13  knowledge.

14  Q    All right.  Okay.

15         MR. LEWIS:  I think I'm done, Your Honor.  May I

16  confer with my co-counsel?

17  Q    Sir, do you know how many Grace asbestos came -- went to

18  verdict before the bankruptcy, roughly -- an estimate?

19  A    Went to verdict?  There were -- there was one earlier case

20  that we tried the first phase of which is the only hesitancy,

21  then there were three cases that went to verdict.

22  Q    How many?

23  A    Three.

24  Q    Three, okay.  And nationwide, do you know how many

25  asbestos cases went to verdict against Grace?

Hughes - Cross/Lewis                    181

1  A    Substantially more than three, but I don't have the -- I'd

2  have to look into the records and come up with a precise

3  number.  But, it's been -- it's certainly available.

4             MR. LEWIS:  Okay.

5                        (Pause)

6             MR. LEWIS:  Your Honor, we're going to mark this 271.

7  Q    Sir, do you -- when you were settling cases around the

8  country was a primary factor to be considered the exposure to

9  the individual claimant seeking settlement?

10  A    You mean the -- in what sense are using the term exposure?

11  Q    Well, in deciding to settle the case, was one of -- one of

12  the primary factors for evaluating the amount of the -- that

13  would be paid by Grace the issue of what the exposure was to

14  the claimant seeking settlement?

15  A    Of the asbestos exposure?

16  Q    Yes.

17  A    Yes, that was certainly a primary factual issue.  In any

18  asbestos case is the nature of the exposure of your product.

19  Q    And particularly in the products cases around the country,

20  those cases that were tried to verdict and won by Grace, the

21  claimant got zero, many of those verdicts turned on the

22  inadequacy of proof as to exposure for that particular client,

23  is that true?

24  A    Certainly that was a reason you would get a defense

25  verdict, yes.

Hughes - Cross/Lewis                    182

1  Q    Okay.  And you were suspicious of some of the quality of

2  the exposure evidence offered in cases around the country,

3  true?

4  A    Yes.

5  Q    You felt that many of the cases around the country were

6  essentially bogus because the -- there was inadequate proof of

7  any exposure to Grace products at the facility where the

8  claimant seeking settlement was working, correct?

9  A    Yes, I had questions about the credibility of the product

10 exposure evidence in a lot of cases.

11 Q    And the reason for that is that you believed that either

12 plaintiffs or their lawyers were let's say maybe defrauding the

13 system is too strong a word, but they were playing with the

14 system by coming up with affidavits of exposure at places where

15 you, yourself, knew there were no Grace products, correct?

16         MR. BERNICK:  Objection, there's lack of foundation

17 that this has any relevance to his settlement approach which is

18 the entire sum and substance of his testimony here.

19         THE COURT:  I'm not sure what the relevance is.

20         MR. LEWIS:  I think I can demonstrate the relevance,

21 Your Honor.

22         THE COURT:  All right.  I'll give you some leeway.

23         MR. LEWIS:  All right.

24 Q    Is that true?

25 A    Could you repeat the question?

1          MR. BERNICK:  Well, I'm sorry.  If -- there ought to

2 be a foundation, so he can demonstrate that there's relevance.

3          THE COURT:  The question --

4          MR. BERNICK:  You just don't ask whether it's true.

5          THE COURT:  The question is, is -- was that his

6 belief that plaintiffs and their lawyers were essentially

7 playing with the system by coming up with affidavits of

8 exposure in places where this witness knew that there were no

9 Grace products?

10 Q    That's -- that was a concern of yours and that's true,

11 correct?

12 A    It was a concern of mine.

13 Q    And you felt it was true, correct?

14 A    Well, I felt that the process that -- which they created

15 some of the product exposure affidavits and the products

16 exposure evidence seemed inconsistent with what I knew about

17 Grace products and inconsistent with how people remembered

18 things many years after the events.

19 Q    But, there was no such issue in Libby, is that true?

20 A    No, I think we talked about that in my direct testimony

21 and that the -- there -- the issue of exposure was different in

22 Libby because it was employees in -- at a particular --

23 Q    And the -- I'm sorry.

24 A    -- site where there was a epidemiological study done and

25 there was a lot of data about asbestos exposure at the site.

1  Q    And the problem for you as a claims settlement manager for

2  Grace was that even though you won most of the cases, you got a

3  defense verdict, when a verdict was obtained against Grace it

4  tended to be very large, true?

5  A    Yes, there was some very high verdicts against Grace

6  including as high as eight, $9 million dollars on individual

7  cases.

8  Q    But, Grace won most of the cases, correct?

9  A    I don't know if we won most of them.  You'd have to show

10 me the record, but certainly there were a substantial number.

11 I wouldn't want to misspeak.

12          MR. LEWIS:  We'll mark that 271.  May I approach the

13 witness, Your Honor?

14          THE COURT:  Yes.

15          MR. LEWIS:  May I approach the bench?

16          THE COURT:  Thank you.

17 Q    Would you take a moment just to look at this document?

18 Mr. Hughes, is this a copy of a Grace document?

19 A    It appears to be generated from our case management

20 system.

21 Q    Does it appear to summarize what happened in the cases

22 that went to verdict or judgment against Grace?

23 A    Yes.

24 Q    Do you agree with me that substantially more than half of

25 these cases that were tried against Grace were lost by the

1 plaintiff and Grace prevailed with zero liability?

2 A    It appears to be that from this document.

3 Q    Now, there's a group of very large recoveries near the

4 bottom and they were tried in Beaumont, Texas in the district

5 court of Jefferson County, Texas.  It looks like there's five

6 large verdicts, do you see that?

7 A    Yes.

8 Q    Were those verdicts all obtained in the trial of one case?

9 A    Yes, they were.

10 Q    Do you consider those -- that -- those recoveries an

11 outlier?

12 A    Well, I mean, how do you define an outlier.  I mean, I

13 don't think they're an outlier in the sense of that's one of

14 the outcomes that you would -- might be expected in trying

15 personal injury cases at Beaumont.  I mean, there have been

16 certainly -- other -- there was another defendant in that case.

17 There were other cases like that.

18        It's -- there's certainly, I mean, the numbers speak

19 for themselves here.

20 Q    Okay.  Well, in any event --

21 A    But, there were other high verdicts, as well, in Dallas

22 and the Norsworthy (phonetic), Cheney (phonetic), Williams

23 cases.  They were all high verdicts.

24 Q    Did you -- was this document prepared in the ordinary and

25 usual course of the business of W. R. Grace?

1 A    It appears, again, to be something that would generate

2 from our case management system, but it's not something -- it

3 doesn't look like the kind of document I would use in my, you

4 know, in my regular day-to-day activities when I was managing

5 the cases.  I'm not sure when and how this was generated.

6 Q    Do you know if this document was made -- was maintained in

7 the records of the Grace company?

8 A    Again, it appears to be something that was generated from

9 our case management system, but not knowing where it came from

10 or more information about where it was located, I can't say

11 that unequivocally that it was something that came from Grace's

12 files and came out of the case management system.

13 Q    Well, you would have consulted on every one of these cases

14 that were tried, is that true?

15 A    Again, it's been several years for some of them, but

16 generally, yes.

17 Q    Do you agree that this chart prepared by Grace accurately

18 reflects the result of the cases that went to jury against

19 Grace --

20           MR. BERNICK:  Objection --

21 Q    -- in this country?

22           MR. BERNICK:  That sounds like then -- like an -- a

23 request for personal verification, is that what the counsel --

24           MR. LEWIS:  It is --

25           MR. BERNICK:  Okay.

1          MR. LEWIS:   -- because the witness -- I'm asking the

2   witness.

3   A     Again, I'm concerned about this document, per say.   I

4   mean, I think the information is available in the case

5   management system and to the extent this is a -- has been

6   generated from the information contained in the case management

7   system, yes.   But, I have some reservations because this isn't

8   the type of, you know, document that I would -- would have been

9   a routine report I would have looked at and seen.   You can

10  create reports like this, but this doesn't really ring a bell

11  with me.

12  Q     Okay.  Well, that's not the question.   The question is do

13  the amounts listed on this document based upon your involvement

14  in each one of these cases appear to be accurate?

15         MR. BERNICK:   Objection to the form of the question.

16  Is this now no longer a request for personal verification?

17         THE COURT:   I think the witness did answer the first

18  question saying he can't say whether this information's

19  accurate because he doesn't know the source, so I'm not sure

20  how you've amended the question.

21         MR. LEWIS:   No, Your Honor, I asked -- that's -- the

22  witness did not answer the question that I asked.   The witness

23  talked about his system.   I'm asking as to his personal

24  knowledge.   If he doesn't know that these are accurate, I get

25  on to another subject, Your Honor.

1           THE COURT:  All right.  Then ask him if he has

2 personal knowledge --

3           MR. LEWIS:  I did.

4           THE COURT:  -- and let's start with that.

5           MR. LEWIS:  I did ask him that.

6           THE COURT:  The --

7 A    Again, most of the cases that there are settlement

8 amounts, you know, seem to be in a ball park.  The cases would

9 be reported in our -- and the reason why I -- there's some

10 difference is that first of all verdicts are subject to

11 settlement credits and so on and often they're reported here in

12 the amount we ultimately paid rather than the amount of the

13 jury's verdict.

14           But, from the cases I recall it does appear to

15 certainly be consistent with my recollections of what we paid

16 and/or what the jury awarded in the cases.

17           MR. LEWIS:  Okay.  Move the admission of Exhibit

18 LC-271.

19           MR. BERNICK:  At this point I don't believe that

20 there's a foundation for the admission of this document.  It's

21 not a business record.  It doesn't generate or maintain the

22 ordinary course of business.  There may be another witness who

23 can get it in, but I don't think it's come in through this

24 witness.

25           THE COURT:  I don't see how this document's

1  admissible though this witness either, Mr. Lewis.  He's denied

2  having any personal knowledge of how it was generated and said

3  that, you know, the information seems somewhat consistent with

4  his recollection, but that's all he can say.  I don't think

5  this document has been established to be a document that came

6  from Grace.

7         MR. LEWIS:  Well, Your Honor, the problem with the

8  objection is the fact that this witness has admitted that this

9  was prepared by Grace.  It is therefore an admission and not

10 subject to any hearsay objection.

11         THE COURT:  I think what he said is it appears to be

12 something that may have been generated from a case management

13 system, but it's not a document that he would generally have

14 used in his operations and he is not certain of the source.

15 That's -- Mr. Hughes, am I misunderstanding your testimony?

16         THE WITNESS:  That is my testimony as I intended it

17 to be and I think that's what I said.

18 BY MR. LEWIS:

19 Q    Well, didn't you say this document was prepared by Grace,

20 you couldn't state that that was done during the ordinary and

21 usual course of the business, but did you not say this document

22 was prepared by Grace?

23 A    I thought I said it -- it's appearance and the information

24 and the formatting and so on looked like something that was

25 generated from our case management system, but I didn't

1  typically use this form.  And, so it would have been something

2  that I -- and I don't specifically recall that -- the context

3  of when this particular report was generated.

4           MR. BERNICK:  May I make a suggestion?

5  A    In other words certain reports you would create in the

6  normal course, monthly asbestos litigation summary.  This is

7  not something like that and I just don't recall anything else

8  about it.

9           MR. BERNICK:  May I make a suggestion to Mr. Lewis

10  and the Court in order to expedite this matter at this late

11  hour?  This document may well be able to come in.  I don't

12  think it can come in through Mr. Hughes, but we will determine

13  whether there's any objection to its admission and we'll let

14  Mr. Lewis and his colleagues know.  And if there's any issue

15  about providing some foundation it may be that we can provide

16  that foundation later on.  We just need to go back and check

17  the document and where it came from in order to verify that

18  really can be used for that purpose.

19           MR. LEWIS:  So --

20           THE COURT:  All right.  I do not see a foundation

21  through this witness, so I don't think this document is

22  admissible through this witness based on his testimony.  So,

23  I'm not admitting Exhibit 271 at this time.

24           MR. LEWIS:  I'm -- then I ask the Court to ask --

25  relay to counsel for Grace and the ACC a request that they

1  admit that this is a Grace document and admit the foundation

2  because it certainly is.

3          THE COURT:  Well,

4          MR. BERNICK:  I just respond -- I actually

5  anticipated and responded to Mr. Lewis's concern about getting

6  the document in and we will make the inquiries that I undertook

7  to do and I'm not prepared to make any such admission here

8  right now.

9          THE COURT:  Okay.  I -- at the moment I'm not going

10 to compel anybody to make that admission.  I don't know what

11 the document is or where it came from, so Mr. Bernick has

12 committed to make that effort and, so I guess by tomorrow

13 morning we'll know whether or not, in fact, there is a

14 stipulation with respect to this issue.

15         MR. LEWIS:  With that, Your Honor, I pass the

16 witness.  Thank you, Your Honor.

17         THE COURT:  All right.  Mr. Bernick?

18                     REDIRECT EXAMINATION

19         MR. BERNICK:  Yes, I just have a couple of questions.

20 You disappeared with one of the microphones.

21         MR. LEWIS:  I did disappear with the portable mic and

22 you have my most sincere apologies.

23 BY MR. BERNICK:

24 Q    To make apples to apples comparisons --

25         THE COURT:  You have to wait, Mr. Bernick, until the

1  microphone's on.  I can't hear you.

2  Q    To make apples to apples comparison --

3           UNIDENTIFIED SPEAKER:  It's not on.

4           MR. BERNICK:  My microphone's not on.  It's not on

5  the switch.  Is that better?

6           THE COURT:  Yes.

7           MR. BERNICK:  Thank you.

8  Q    It looks like from another hearing we just kind of -- the

9  Grace easel here.  Okay.  So, apples and apples, you were asked

10  in Libby and outside Libby, do you remember being asked some

11  questions about the workman's comp law and how it may change

12  from jurisdiction to jurisdiction?

13  A    Yes.

14           MR. LEWIS:  Your Honor?

15           MR. BERNICK:  Okay.

16           MR. LEWIS:  When counsel gets to the -- and starts

17  writing things down and then asking the witness, that's an

18  inherently leading inquiry and it's improper.

19           MR. BERNICK:  I haven't written anything yet.

20           THE COURT:  I think the -- counsel is permitted to

21  make an illustrative chart, but it might be helpful to ask the

22  witness a question first and, yes, there is nothing on it yet.

23  So --

24  Q    Right.  Do you remember offering test -- being asked

25  questions by Mr. Lewis regarding workman's comp law?

1  A    Yes.

2  Q    Okay.  To the extent that you made comparisons, do you

3  recall on your direct examination between values of cases in

4  Libby and values of cases outside of Libby, and I don't mean to

5  draw those to precision like I did the mountain, they're just

6  values inside and outside of Libby, remember that we made some

7  comparisons?

8  A    Yes.

9  Q    Okay.  Now, when cases were settled in Libby, tell us

10  whether when the cases were settled was there, in fact, a

11  workman's comp bar?

12  A    No.

13  Q    When cases were settled outside of Libby, tell us whether

14  or not there was a workman's comp bar?

15  A    There wouldn't have been a worker's comp bar because they

16  were generally not our employees and worker's compensation law

17  wouldn't have been applicable.

18  Q    There are cases, therefore they couldn't have been a bar,

19  right?

20  A    Right.

21  Q    Okay.  So, when it came to the comparisons, apples and

22  apples between the Libby settlements and outside Libby

23  settlements as you testified on direct examination, did the

24  workman's comp law that was unique to Libby, did it have any

25  bearing one way or the other on settlement values?

1  A    No.

2  Q    Can we talk now, again, about Libby -- non-Libby?

3  A    Yes.

4  Q    I want to deal with mesotheliomas.  Do you recall on

5  direct examination talking about the relative values or

6  settlements of mesos in Libby and settlements of mesos outside

7  of Libby?

8  A    Yes.

9  Q    Okay.  And I think you gave us a figure of 340 to $350,000

10 per case averaged meso settlement prior to the bankruptcy?

11 A    Yes.

12 Q    Okay.  Now, there were some questions that were asked of

13 you and I want to get again to apples and apples, there are

14 some questions that were asked of you regarding an inventory

15 settlement, do you recall that?

16 A    Yes.

17 Q    I don't want to talk about the inventory settlement

18 because you've already I think handled that on cross

19 examination.  I want to talk about the other settlement, the

20 Cooney settlement and I think that you testified that there

21 were 130 cases that were settled for $90,000 -- oh, that's not

22 it.  It's 90 million.  It's $90,000 a case?

23 A    Yes.

24 Q    Okay.  Now, Mr. Cooney's cases I think you testified were

25 settled shortly before the bankruptcy?

1  A    Yeah, my recollection was late '99, earlier 2000.

2  Q    During that period of time, early -- late '99, early 2000?

3  A    Excuse me, late 2000, early 2001.

4  Q    During that period of time, tell us whether there was any

5  speculation in the newspapers that Grace was about to file?

6  A    There -- my recollection that it -- these settlements

7  occurred when there had been some published reports that we

8  were at least exploring Chapter 11.

9  Q    When you settled a group of cases like the group of cases

10 that you settled with Mr. Cooney, when you settled those cases

11 is there any way that Mr. Cooney down in Madison County could

12 take 130 cases to verdict right away?

13 A    No.

14 Q    Tell us whether or not a group settlement of that nature

15 that is no inventory by group, tell us what affect, if any, the

16 fact that it's being a group would have on the price that you

17 had to pay per claim?

18 A    You would tend to pay less in a group.

19 Q    You got a discount?

20 A    Yes, a discount.

21 Q    Tell us then also with respect to a settlement like that

22 where there's a prospect that Grace is shortly going to go into

23 Chapter 11, tell us whether or not a settlement under those

24 circumstances whether that would have any affect either up or

25 down or no affect, on the price that you had to pay?

Hughes - Redirect/Bernick                         196

1  A    It would have a downward affect on the price that you had

2  to pay.

3  Q    Now, when you paid per claim $90,000 to Mr. Cooney for the

4  benefit of his clients, were you the only one - was Grace the

5  only one that was paying money to Mr. Cooney for each one of

6  those claims?

7  A    No, they were -- there were other defendants in the cases.

8  Q    Five, ten, do you have any idea?

9  A    I don't have any idea --

10 Q    If it were --

11 A    -- but there were certainly others.

12 Q    I'm sorry?

13 A    There were certainly others.

14 Q    Let's assume it was just five, how would the aggregate

15 value of the meso case in the hands of Mr. Cooney compare to

16 the aggregate value of the meso case settled with the Libby

17 people?

18 A    It would be higher.

19 Q    Is this situation where in the aggregate more is being

20 paid per claim for meso, is that just confined to -- in Libby,

21 is that just confined to Mr. Cooney?

22 A    No.

23           MR. BERNICK:  That's all I have.

24           THE COURT:  Mr. Lewis, anything further?

25           MR. LEWIS:  Certainly.

1                    RECROSS EXAMINATION

2  BY MR. LEWIS:

3  Q    This sort of proves the point that Grace's liability --

4  this analysis that you went through with Mr. Bernick, this sort

5  of proves the point though, right, your only liability in these

6  Madison County cases was 90,000 as compared to 340 or 350,000

7  on Libby, true?

8  A    Well, subject to the issues that -- well, Mr. Bernick

9  raised as far as the context of the settlement, the group and

10 the discount that we would typically get and the fact that it

11 occurred prior to bankruptcy.

12 Q    And you wouldn't be qualified to any discount in Libby

13 because those were single settlements, true?

14 A    Right, they were single case settlements involving Grace

15 as an individual defendant --

16 Q    And there weren't five other --

17 A    -- and we were paying substantially less or at least the

18 claimants were receiving substantially less in Libby than in

19 cases pending in Madison County and other Illinois

20 jurisdictions.

21 Q    Yeah, but --

22 A    That's what it tells me.

23 Q    But, you didn't pay substantially more in Madison County

24 than you did in Libby, true, you, Grace?

25 A    I mean the numbers speak for themselves.

1          MR. LEWIS:  Well, I -- Your Honor, I'd like the

2  witness to answer my questions without arguing with me.  This

3  is cross examination.  I'm entitled to a direct response.

4          THE COURT:  It is.  Ask your question again.

5  Q    Okay.  So, at -- with respect to Grace's liability in

6  these Madison County cases it was 90,000, you paid --

7  A    We paid on average 90,000.

8  Q    What?

9  A    Pardon me.  Go ahead.  I'm sorry.

10 Q    You said the average was 90 in response to Mr. Bernick?

11 A    Yes.

12 Q    Okay.  And you paid almost, what, four times that amount

13 in Libby for the same meso?

14 A    Between three and four times that amount -- excuse me.

15 Between what did you say -- what is your question?

16 Q    Grace paid 90,000 in Madison County --

17 A    Right.

18 Q    -- in the Cooney cases, right?

19 A    Um-hum.

20 Q    You paid 340 or 350,000 for meso cases on average in

21 Libby, true?

22 A    Right.

23 Q    Okay.  Do you agree that your liability in Libby was a

24 little less than four times what your liability was in Madison

25 County for a meso case?

1          MR. BERNICK:  Object to the form of the question,

2  liability in what way?

3  Q    You're -- I'm talking about the amount of their liability,

4  you understood that, correct?

5  A    The amount of money we paid on the Cooney cases averaged

6  90,000 in the 130 case settlement that was reached in that

7  in -- shortly before bankruptcy in the -- and it was a group of

8  130.  Our average historically in the meso cases in Libby was

9  340,000 to 350,000 or somewhere about around there.

10 Q    Understood.  And Libby couldn't qualify for anything from

11 five other tort feasors, correct?

12         MR. BERNICK:  I'm sorry.  Object to form.

13 A    Again, we were the only defendant in the pre-petition

14 Libby mesothelioma cases, correct.

15 Q    Okay.  And the 90,000 you paid in the Cooney cases is

16 almost exactly the same as your average mesothelioma value for

17 settlements in the rest of the country, is that true?

18         MR. BERNICK:  Objection to the form of the question.

19         THE COURT:  I'm sorry.  I lost the question, Mr.

20 Lewis.  If you could restate it, please.

21 Q    Yes.  Do you -- you paid 90,000 in the Cooney cases in

22 Madison County, Illinois, correct?

23 A    Yes.

24 Q    And how does that compare with your national average

25 outside of Libby for mesothelioma cases?

1  A    Well, it depends on which average you're looking at, quite

2  frankly.  And I don't -- meaning our historical average for the

3  entire history of Grace, again, I'd have to -- you'd have to

4  provide me with data that reports it's reliable in terms of

5  what we were paying.

6  Q    Okay.  So, you don't know the average?

7  A    I don't know the answer off the top of my head.

8  Q    All right.  Now, this worker's compensation issue, you

9  understood when I was talking about the bar I was talking at

10  the bar -- about the bar as it applied to workplace cases, did

11  you not?

12  A    I, again, the bar would only apply to workplace cases, but

13  only cases -- would have only applicability to cases involving

14  Grace employees.

15  Q    Exactly.  But, those were some of the -- you already

16  agreed that those were some of the highest exposure cases in

17  the Country, correct?

18           MR. BERNICK:  Object to the form of the question.

19  Q    Were those some of the highest exposure cases in the

20  Country?

21           MR. BERNICK:  Objection, which cases?

22           MR. LEWIS: If you'd let me finish, I'll say it.

23  Q    And I'm referring to occupational exposures to Grace

24  employees?

25           MR. BERNICK:  Where?

1 Q     Everywhere in the Country?

2          THE COURT:  I'm sorry.  I don't understand.  I

3 apologize, but I don't understand the question.

4 Q     The exposures in the workplace to Grace employees, how did

5 those compare to exposures elsewhere in the country?

6          MR. BERNICK:  Objection, lack of foundation and

7 relevance.  Your Honor, this is now recross and we're replowing

8 the same old ground.  It's very simple arithmetic and now we're

9 going all the way back into the nature of the liability and the

10 depths of the liability and the exposures.

11          THE COURT:  I think it's fair recross based on the

12 limited redirect, but I think the question needs to be restated

13 because it's -- has too many open ends.  It's not limited as to

14 time and place.  It's pretty much not answerable.

15 Q     Just before Grace entered bankruptcy, do you agree that

16 there were large exposures to Grace workers in the workplace

17 with W. R. Grace?

18          MR. BERNICK:  Objection: (a) lack of foundation; (b)

19 it calls for an expert conclusion regarding exposure; (c) it's

20 irrelevant.

21          MR. LEWIS:  I think you asked him about the same

22 kinds of stuff in your direct when you start talking about

23 exposures.

24          THE COURT:  No.

25          MR. BERNICK:  My re -- I'm sorry.

Hughes - Recross/Lewis                    202

1          MR. LEWIS:  You disguised -- you just disguised it as

2     product.

3          MR. BERNICK:  I'm sorry.  Excuse me, my -- well, I'll

4     wait for the question, Your Honor.

5          THE COURT:  That objection is sustained.  I -- Mr.

6     Bernick's questions talked about the distinction between

7     worker's comp cases inside and outside Libby and had to do with

8     the fact that any settled case obviously wasn't barred by

9     worker's compensation claim because if it had been barred by a

10    worker's compensation claim there wouldn't be a case to settle.

11         Your questions are going well beyond that limited

12    focus.  So, I'm trying to give you some leeway, but I think you

13    have to ask a question that's going to get within this witness'

14    knowledge and I think you're going outside that.

15    Q    Do you know the nature of the exposure for Grace workers

16    who worked in Libby?

17    A    Again, there's historical data about the exposures and

18    that there was occupational exposure to asbestos at the Libby

19    Mine and Milling Facility.  And particularly is the data that

20    shows in the earlier years it was higher and it, you know,

21    there were a lot of improvements and so on and so forth.  But,

22    again, I'm not sure.

23    Q    Exposure was not an issue in Libby, correct?

24    A    Because that was their -- the claim against Grace was

25    based on the employment there and we were processing

1  asbestos -- Tremolite asbestos, vermiculite -- Tremolite

2  asbestos associated with vermiculite there and as a result -- I

3  mean, again, I said this.  There was not a product exposure

4  issue.  It was beyond argument that there were asbestos

5  exposures at the Libby Mine and Mill.

6  Q    Does the same thing apply to the expansion plants?

7  A    Yes.

8  Q    And there were 30 of those, correct?

9  A    Oh, I don't know how many, but --

10 Q    There were a number of Grace --

11 A    -- there were a number of them throughout the country.

12 Q    -- expansion plants?

13         MR. BERNICK:  I'm sorry.  Object, this is --

14         THE COURT:  This is way outside the scope of

15 redirect.

16         MR. LEWIS:  I don't think it is, Your Honor, because

17 it explains why it's important concerning the bar.  There was

18 no bar in Libby.  As to these other high exposure cases at

19 other expansion plants around the Country, most of those were

20 barred by exclusivity and that was the point of my original

21 cross, but I'll --

22         MR. BERNICK:  Yes, well the point of my redirect has

23 nothing to do with it.  The point of my redirect is the apples

24 to apples comparisons of settlement values.

25         MR. LEWIS:  The Court has ruled and I'm finished with

1  this witness, Your Honor.

2          THE COURT:  All right.  Anything further, Mr.

3  Bernick?  You're excused.  Mr. Hughes.  Thank you.

4          THE WITNESS:  Thank you.

5          MR. LEWIS:  Will this witness be subject to recall by

6  the Court, Your Honor?

7          THE COURT:  If you need him subject to recall, yes.

8          MR. LEWIS:  No, I think -- is he going to testify on

9  other issues in this case?

10          THE COURT:  Oh.

11          MR. LEWIS:  Because I think he was just excused.

12          THE COURT:  No --

13          MR. BERNICK:  No, no --

14          THE COURT:  I've only excused him from the stand now.

15  I -- my understanding is that you're calling him back in your

16  case in chief.  That's what you indicated earlier.

17          MR. BERNICK:  We --

18          MR. LEWIS:  No, I think I've covered most everything

19  I need to cover --

20          THE COURT:  Oh.

21          MR. LEWIS:  -- in this cross examination, Your Honor.

22          THE COURT:  All right.  Then I don't know.

23          MR. BERNICK:  I'm happy to hear that.  We will be

24  calling him back in any event as the order of proof indicates,

25  to testify with regard to those issues that the other parties

1  to the case have.  I know that they're eagerly awaiting their

2  chance too, so he'll be called back for that.

3         THE COURT:  Okay.  Next witness.

4         MR. BERNICK:  I think that Mr. Finch will handle the

5  next part here.

6         MR. FINCH:  Your Honor, the next witness is actually

7  a witness whose testimony will be proffered through

8  stipulation.  This is -- the witness is Dr. Samuel Hammar who

9  is a pathologist as an expert for the asbestos claimants'

10 committee.  There is a stipulation entered into between the

11 Libby claimants and the plan proponents which permits the

12 admissibility of Dr. Hammar's two expert witness reports.  One

13 done in connection with the confirmation hearing, one done in

14 connection with the estimation hearing as substantive evidence

15 in this case.

16        In addition, there's two other paragraphs from the

17 stipulation I'd like to read into evidence and then I'll submit

18 the reports.

19        THE COURT:  I'm sorry.  I'm just have -- there's a

20 lot of feedback.  I think it's because the portable mic is on.

21 Would you just check to see if it's off and I lose it in the

22 static?  Okay.  Thank you.

23        All right.  There's a stipulation between the plan

24 proponents and Libby that's going to admit what?

25        MR. FINCH:  It's going to admit the Curriculum Vitae

1  and two expert witness reports of Samuel Hammar.  Dr. Hammar is

2  a pathologist from the State of Washington who is an expert for

3  the asbestos claimants' committee in the estimation proceeding

4  and an expert for the asbestos claimants' committee in the

5  confirmation hearing.  He has done two expert witness reports,

6  the second of which has been marked as a plan proponents

7  exhibit already.  I believe it's Exhibit 214.

8          The other one has not been marked as an exhibit.

9  That was an oversight.  We can give it an exhibit number as

10 soon as we know what the next exhibit number is, but the

11 stipulation is this -- an agreement that the reports come into

12 evidence as if he had testified to the matters in the reports

13 live.  There's also two other paragraphs in the stipulation

14 that I'd like to read into the record now which is as follows.

15         "Through his clinical practice, Dr. Hammar has

16 evaluated lung tissue from individuals who have been exposed to

17 tremolite, winchite and richterite from Libby.  In some

18 instances it was Dr. Whitehouse who requested that the lung

19 tissue be sent to Dr. Hammar.

20         It is further stipulated and agreed between the

21 debtor, the official committee of asbestos claimants and the

22 Libby claimants that from the standpoint of pathology there is

23 no difference in the asbestos related disease observed in

24 patients exposed to tremolite, winchite and richterite from

25 Libby, Montana, as opposed to the disease observed in patients

1  exposed to other forms of asbestos.  There is no pathological

2  evidence to support a contention that asbestos disease caused

3  by exposures to Libby tremolite, winchite and richterite is

4  distinct from disease cause by other forms of asbestos."

5        And with that, Your Honor, what I'd like to do is

6  just hand up to the Court a copy of the stipulation and we will

7  supply an exhibit number for the other report later in the

8  proceedings.

9        THE COURT:  Why don't you just make it 214A?  If

10  you've got them then I'll have them both together.

11        MR. FINCH:  Okay.

12        THE COURT:  All right.  So, I take it there is no

13  objection to Exhibit 214 or Exhibit 214A?

14        MR. LEWIS:  Correct, Your Honor.

15        MR. FINCH:  Then I guess we should make his CD 214B.

16        THE COURT:  All right.  So, 214A -- I'm sorry, 214,

17  214A and 214B are admitted.

18        MR. FINCH:  Your Honor, I'll just hand up a copy

19  of -- we'll submit a copy of the exhibits.

20        THE COURT:  Thank you.  One minute, please.

21        MR. BERNICK:  I'm sorry.

22        THE COURT:  So, the second report is what's marked as

23  Exhibit C?

24        MR. FINCH:  No, Your Honor, the first report is

25  Exhibit 214.  The earlier report from the estimation case is

1   Exhibit 214A and his Curriculum Vitae is 214B as in baseball.

2           THE COURT:  Yes, where does 214 start because you've

3   got two -- oh, I see.  I apologize.  I see it here.  Okay.

4   Thank you.  All right.  Mr. Bernick?

5           MR. BERNICK:  Yes, I think with that, the plan

6   proponents -- I don't know if the -- if this is appropriate in

7   light of the sequence nature of this trial, but to the extent

8   that it is and perhaps I think the Court indicated that it is

9   your expectation we will rest with respect to our case in

10  support of the plan, vis-a-vis, the Libby claimants

11  specifically.

12          Obviously, we are going to continue our evidence in

13  further support of the plan with respect to other parties as we

14  proceed and we also have rebuttal evidence depending upon the

15  scope of the objections made by the Libby claimants.  But,

16  subject to that we rest in this phase of the trial.

17          THE COURT:  Mr. Finch?

18          MR. FINCH:  Yes.  Just to clarify, it's the -- that

19  we're resting with respect to the Libby claimants' objections

20  based on --

21          MR. BERNICK:  We're not resting with respect to their

22  objections.

23          MR. FINCH:  No, not -- only the ones related to the

24  TDP.

25                      (Pause)

1          THE COURT:  What -- I think the point is that the

2  debtor has no more evidence to offer in support of the plan

3  based on specifically the Libby issues that have been subject

4  to this trial and it's time for the Libby folks to put on any

5  case they choose in support of their objections.

6          MR. BERNICK:  That's right, Your Honor.

7          THE COURT:  Okay.  Would you like a recess or do you

8  want to start?

9          MR. HEBERLING:  I think we can start, Your Honor.

10          THE COURT:  All right.

11          MR. HEBERLING:  If the Court would prefer a recess at

12  this point, that --

13          THE COURT:  No, that's fine.  We'll wait a little

14  while yet.

15          MR. HEBERLING:  Okay.  We'll call Dr. Craig Molgaard.

16  And, Your Honor, our side is not hooked into the exhibit

17  system, and so I think we'll put certain exhibits up through

18  the ELMO and I would like to have an -- or my assistant sit

19  here, if that's possible.

20          THE COURT:  Sure.  That's fine.

21          MR. HEBERLING:  Okay.

22          THE COURT:  Can you swear in Dr. Molgaard, please?

23      DOCTOR CRAIG MOLGAARD, LIBBY CLAIMANTS' WITNESS, SWORN

24          THE CLERK:  Your name, again, sir?  Your name?

25          THE WITNESS:  Dr. Craig Molgaard.

1         THE COURT:  When you're ready, Mr. Heberling?

2                   DIRECT EXAMINATION

3  BY MR. HEBERLING:

4  Q    State your name for the record, please?

5  A    It's Craig Alan Molgaard.

6  Q    And what's your address?

7  A    4590 Nicole Court, Missoula, Montana, 59803.

8  Q    What's your current position?

9  A    I'm a professor and chair of a school of public and

10 community health sciences at the University of Montana.

11 Q    Can you give a summary of your education?

12 A    I have a PhD in social science and an MPH in epidemiology.

13 Q    And did the PhD in social science involve medical --

14 health and medical sciences, as well?

15 A    Yeah, I was enrolled in a health and medical sciences dual

16 degree program at the same time that I was getting the PhD in

17 anthropology.  The health and medical sciences program was a

18 program set up jointly between UCSF and UC Berkeley where

19 students from the Berkeley campus took courses with medical

20 students brought over from UCSF.

21 Q    And was the -- what university was the PhD from?

22 A    University of California at Berkeley.

23 Q    How about the MPH in epidemiology?

24 A    University of California at Berkeley.

25 Q    What year?

Molgaard - Direct/Heberling                    211

1  A    PhD was in '79 and the MPH was in '82.

2  Q    Can you summarize your experience in epidemiology --

3         THE COURT:  Sir, you can't use both the microphones

4  at the same time.  It causes a feedback.  You either have to

5  turn the one off or else walk away from the podium.

6  Q    Well, can you summarize your experience in epidemiology

7  since 1982?

8  A    I initially was a faculty member in a Division of

9  Epidemiology and Bio-statistics at a new school of public

10  health at San Diego State University.  I worked in that

11  position until '89.  Then I became division head of that

12  division of epidemiology and bio-statistics until '96.  In '96

13  I took a position at the University of Kansas School of

14  Medicine to build a new MPH program for Kansas.  And eventually

15  became chair of the Department of Preventative Medicine and

16  Public Health at the School of Medicine at the University of

17  Kansas in Wichita.

18         Then I came here to -- or to Montana three years ago.

19  They wanted to build an MPH program and a certificate program

20  of public health and they contacted me and asked if I'd be

21  willing to help build them such a program.  My experience in

22  the epidemiology per se was largely influenced by the time I

23  spent as an NIH trainee at the Mayo Clinic where I worked with

24  a man named Leonard Kurland who was a neuroepidemiologist, the

25  epidemiology of neurologic diseases.  And I worked with him and

1 got interested in neurology and eventually worked in

2 neuroepidemiology for some time with different data bases and

3 different study sections.  And then went back to Berkeley and

4 got an MPH degree in behavioral risk factors in cardiovascular

5 disease which was an NIH postdoctoral fellowship.

6        Since then I've worked on a number of different

7 epidemiology projects including looking at ALS, which is Lou

8 Gehrig's disease, MS, multiple sclerosis.  I'm currently

9 involved in an -- a Center for Disease Control epilepsy

10 prevalence project in Kansas looking at epilepsy in rural

11 communities.  And I'm also involved in some work around

12 infectious disease outbreak control in Montana for the Health

13 Resource Services Administration where I am work -- actually,

14 that's a Robert Wood Johnson one, and that is where I am in

15 charge of the evaluation of the project and the -- and I'm

16 doing a HRSA project in another county where I'm involved in

17 the evaluation.

18        So, most of my -- most of my work has been in either

19 neuroepidemiology or social epidemiology.  I worked with

20 Leonard Syme, S-y-m-e, at the University of California when I

21 was getting my MPH and had worked in other environments.  I

22 worked in Japan doing descriptive epidemiology of HTLV1

23 seroprevalence among the third marine division on Okinawa.

24 I've also worked in tobacco projects in Mexico and various

25 other international projects throughout the world.

1    I have done some work also when I was on sabbatical

2 at the University of Oxford in England looking at mad cow

3 disease and was one of the first American investigators to

4 predict that epidemic.  So, basically my research in

5 epidemiology has covered a lot of different areas.  So,

6 basically I am involved in neuroepidemiology and social

7 epidemiology and environmental health.

8 Q    What number of publications do you have in epidemiology?

9 A    I have something like 165, 170.

10 Q    And have you served on various governmental boards?

11 A    Yes, I have.

12 Q    Could you just name a few?

13 A    I just came back from a review panel in Atlanta at the

14 Centers for Disease Control where I was part of a panel of

15 reviewing projects for funding for translational research.

16 Q    And have you served on various editorial boards for

17 publications?

18 A    Yeah, I've served on -- I served on a couple of those.

19 I've served on a journal called Neuroepidemiology and I served

20 on a journal called Cephalagia.

21 Q    And could you briefly explain your experience in the field

22 of public health?

23 A    My -- the -- most of my work in public health has been --

24 in recent years has been in terms of trying to build public

25 health infrastructure and create new training programs for MPH

1  students.  This is the third new program I'm involved with now

2  and the issue really is, is the public health program in the

3  United States has been largely in disarray for a number of

4  years.  And with 9/11, there is an increasing emphasis on

5  strengthening the public health system and improving its

6  capacity as well as creating more and better training programs.

7  Q    Has your testimony been accepted in Court as an expert

8  witness on epidemiology?

9  A    Yes.

10 Q    Can you state whether these are federal or state courts?

11 A    They were both.

12 Q    Okay.  And what number of times, approximately?

13 A    I've been involved in probably 55 or 60 cases one way or

14 another.  Most of those were --

15 Q    How many times have you testified at a trial?

16 A    Three.

17 Q    And over the past 30 years, can you estimate the number of

18 medical literature publications that you have reviewed?

19 A    Over the past how many years?

20 Q    Thirty?

21 A    Thirty, I don't know, thousands.

22       MR. HERBERLING:  We tender the witness as an expert

23 in epidemiology.

24       MR. FINCH:  Your Honor, brief voir dire?

25       THE COURT:  All right.

1                     VOIR DIRE EXAMINATION

2  BY MR. FINCH:

3  Q    Good afternoon, Dr. Molgaard.  Nathan Finch for the

4  asbestos claimant's committee.  You mentioned that your work

5  has primarily been in neuroepidemiology and social

6  epidemiology, correct, sir?

7  A    And I also said environmental epidemiology.

8  Q    You talked about Lou Gehrig's disease and multiple

9  sclerosis and CDC.  You haven't designed any kind of

10 epidemiological study like Dr. Welch has that relates to the

11 subject of asbestos related disease, correct?

12 A    Right.

13 Q    And you haven't -- you've got over 165 articles on your

14 resume.  The only one that even mentions the word asbestos in

15 it is a comparison of how the government responded to the Libby

16 situation versus how the government responded to the marine

17 outbreak you were talking about in Japan, right?

18 A    Well, it was actually the -- there is that one paper and

19 that paper is one comparing the community response during a

20 mercury poisoning outbreak in Japan to the community response

21 to the environmental problems in Libby.

22 Q    You would agree with me that there are literally thousands

23 of articles in the medical literature that relate to

24 asbestos-related diseases, correct?

25 A    Correct.

1  Q    And, that there are hundreds of articles that are

2  epidemiological studies that relate to asbestos-related

3  diseases, correct?

4  A    I would imagine.

5  Q    And you have not done anything like a systematic review of

6  the literature as it relates to asbestos, correct?

7  A    No, I have not.

8  Q    In fact, your only review of literature as it relates to

9  asbestos are the items that are listed in your references to

10 your first expert witness report, correct?

11 A    Um -- I've looked at other material.

12 Q    But you certainly haven't attempted to do a worldwide

13 literature search on the epidemiology of asbestos-related

14 disease, correct?

15 A    I don't have the resources or time to do that, so no, I

16 have not.

17 Q    And, you haven't spent your career, like Dr. Welch has,

18 studying asbestos-related diseases, correct?

19 A    That's correct.

20 Q    You do know -- you're not a medical doctor, correct?

21 A    That's correct.

22 Q    You're not a pulmonologist?

23 A    That's correct.

24 Q    You're not certified in internal or occupational medicine?

25 A    That's correct.

1  Q    You do know enough about the lung to know that there's a

2  difference between the parenchyma of the lung, which is the

3  inside, and the pleura of the lung, which is the lining around

4  the lung, correct?

5  A    Right.

6  Q    And, isn't it true that you told me, not once, not twice,

7  but three times last week that you believe that mesothelioma

8  was a cancer of the parenchyma of the lung and not the pleura

9  of the lung?

10 A    It's a cancer of the supporting structure around the lung.

11 Q    You told me it was a cancer of the parenchyma, right?

12 A    I misstated myself.

13 Q    Not once, but three times you misstated yourself.

14 A    Probably.

15 Q    And you still don't know, to this day, whether or not

16 pleural plaques are a different disease than asbestosis, right?

17 A    My understanding and belief is that they are a type of

18 asbestosis.

19        MR. FINCH:  Your Honor, with that voir dire, I think

20 -- at least Asbestos Claimants' Committee, I'll let Mr. Bernick

21 speak for himself, I have no objection to Dr. Molgaard

22 testifying to basic epidemiological principles.  I do object to

23 any testimony about the epidemiology of asbestos-related

24 disease or epidemiology as it relates and specifically to Libby

25 asbestos or any other type of asbestos because (a) I don't

Molgaard - Direct/Heberling                  218

1  think he has either done the work necessary to have the

2  expertise in that, hasn't studied the literature necessary to

3  have an expertise with that; and based on everything he has

4  said about his qualifications and training, he doesn't have --

5  hasn't created for himself the experience and the background to

6  give any kind of opinions about asbestos-related epidemiology.

7          So, I have no objection to him testifying to general

8  epidemiological principles, I do object to any testimony that

9  talks specifically about asbestos or asbestos literature or

10  asbestos medical issues, as it relates to fiber type or disease

11  progression or anything else asbestos-related.

12          THE COURT:  Mr. Heberling.

13          MR. HEBERLING:  May I ask further questions, Your

14  Honor?

15          THE COURT:  Yes.  On qualifications?

16          MR. HEBERLING:  On qualifications, yes.

17          THE COURT:  Yes, sir, go ahead.

18  Q    Dr. Molgaard, as to the various fields of epidemiology

19  you've worked in, you've mentioned neuro and cardio and

20  environmental, do the principles of epidemiology that apply to

21  all those fields and others, remain the same across the board?

22  A    I believe they do, by and large.

23  Q    And, in connection with this case, have you reviewed a

24  substantial number of pieces of medical literature on asbestos

25  disease?

1  A    Yes, I have.

2  Q    Do you find any difference in the application of

3  epidemiological principles in the area of asbestos medicine to

4  the other areas in medicine you have worked with regarding

5  epidemiology?

6  A    No, not really.

7  Q    And, with regard to Libby, have you done work on the CARD

8  mortality study?

9  A    I have spent some time looking at the CARD mortality

10 study.

11 Q    And when did you begin consulting on that?

12 A    It would have been in January, December/January.

13 Q    And, is that something that may be published?

14 A    I'm hoping that we can get a manuscript pulled together on

15 that one, yes.

16 Q    And who is working on that?

17 A    I am, Dr. Whitehouse is.  There'll be others, I imagine.

18 Q    And, how long -- okay, strike that.

19        MR. HEBERLING:  That's the extent of the further

20 qualifications questions, Your Honor.

21        MR. FINCH:  Your Honor, I think I have the same

22 objections.  I don't think he has qualified this expert as

23 someone to talk about asbestos-related epidemiology.

24        THE COURT:  I think the point I'm getting is that the

25 principles of epidemiology are well within this witness'

1  qualifications as applied specifically to the medical criteria

2  for asbestos diseases.  The witness, I think, is saying that he

3  does not have that qualification.  So, to the extent that he is

4  prepared to testify about the epidemiological principles and

5  studies overall, he is certainly qualified.  To the extent that

6  he is attempting to offer opinions about the medical science of

7  various asbestos diseases, he does not have that qualification

8  and I will not permit that testimony.

9          MR. HEBERLING:  Right.  He is not a medical witness,

10 Your Honor.

11         THE COURT:  That's what I understood.

12         MR. BERNICK:  Your Honor, maybe this is the

13 appropriate time so I don't interrupt Mr. Heberling's

14 examination.  We do have motions in limine and _Daubert_ motions

15 relating to this witness and I want to make sure that the

16 positions and the objections that we make there are now

17 preserved and are not being waived by allowing the witness to

18 testify as an expert.  And then when we have an objection, I

19 understand Your Honor wants us to make the objection and we

20 will do those -- we will make those objections to substantive

21 testimony.

22         THE COURT:  Yes.  The _Daubert_ issues, I think we have

23 to preserve until we get to a time where they can be argued,

24 witness by witness.  Obviously, I cannot make those

25 determinations in a vacuum.  So, I will preserve the _Daubert_

1  exceptions and objections, I'll permit the witness to testify,

2  subject to the fact that I may, at some point, strike the

3  testimony if the Daubert objections turn out to have merit, but

4  I'm not there at this point.

5          MR. BERNICK:  Thank you, Your Honor.

6          MR. FINCH:  Thank you, Your Honor.

7  Q    Dr. Molgaard, I'm showing you a red book, Dictionary of

8  Epidemiology, edited by John M. Last, are you familiar with

9  this?

10 A    Yes, I am.

11 Q    Can you describe its function in the field of

12 epidemiology?

13 A    Its function has been, really, to provide clarity in terms

14 of terminology and definitions in epidemiology.  It was

15 constructed by the International Epidemiology Association a

16 number of years ago, edited by John Last, and an editorial

17 board.  There have been something like 130 epidemiologists who

18 have contributed to it.  It's published by Oxford University

19 Press.

20 Q    Is it widely used or relied upon?

21 A    I believe it's used quite a bit, yeah.

22 Q    And, I'll read for you the definition of epidemiology at

23 Page 62, "The study of the distribution and determinants of

24 health related states or events in specified populations and

25 the application of this study to control of health problems."

1  Do you agree with that?

2  A    Yes.

3  Q    Generally, what is an epidemiology study?

4  A    It's an attempt to answer a question, really.  You have a

5  specific question about something you want to learn more about

6  pertaining to disease and exposure and that question allows you

7  to formulate a hypothesis and then you go forward and design --

8  set your study design together, you pick your sample population

9  or target population you're going to collect data from, you

10 collect the data in some rigorous methological fashion, then do

11 an analysis of the data and depending on the design you've

12 chosen, you'll do one or another kind of a design and then you

13 interpret the results and usually that leads to a modification

14 of your initial hypothesis.

15 Q    And would it be fair to say an epidemiology study puts

16 numbers on phenomena and events?

17          MR. FINCH:  Objection, leading.

18          THE WITNESS:  It's --

19          THE COURT:  It's background information.

20          THE WITNESS:  I would say that's fair to say.  The

21 general idea is to try to provide numerical substance to

22 questions we have about events in our environment.

23 Q    How much of the -- can you say how much of the medical

24 literature epidemiology includes?

25 A    I think it's a very large percentage because much of what

1  goes on in the medical literature is addressed to trying to

2  figure out what the relationships are between one medical event

3  and another medical event.  So, I would say, you know, 70, 75

4  percent, 80 percent.

5  Q    And, does an author have to be an epidemiologist to

6  publish in the medical literature?

7  A    No.

8  Q    Let's show the first overhead.

9         MR. BERNICK:  Your Honor, I'll note at this point,

10  contrary to the practice that was established with respect to

11  Mr. Hughes ths morning, we're now back to showing

12  demonstratives in advance of questioning and I suppose these

13  are all leading.  Notwithstanding that precedent this morning,

14  we're prepared and we hope that the sauce will now be

15  recognized by my friends on the other side of the courtroom,

16  we're prepared to proceed by allowing the demonstratives to be

17  shown, in advance of questions being posed.  And, I'm assuming

18  that we're not going to hear the objections any more when we

19  seek to do the same thing with respect to our witnesses.

20         THE COURT:  I don't know what you'll hear.  Go ahead,

21  Mr. Heberling.

22                    (Laughter)

23         MR. BERNICK:  I probably would concur in that.

24  Q    Did you prepare this overhead?

25  A    Yes.

Molgaard - Direct/Heberling                224

1          THE COURT:  Is this marked, please?

2          MR. HEBERLING:  Well, we call it Overhead 1.  Do you

3   -- would the clerk prefer to have an exhibit number?

4          THE COURT:  I would because -- well, yes, because I'm

5   going to want hard copies, paper copies because otherwise when

6   I'm back reviewing my notes, I'm not going to have a clue what

7   this is all about.

8          MR. HEBERLING:  Okay.  Sorry, Your Honor.

9          THE COURT:  But it's fine.  If you want to call it

10  Libby Overhead 1, that's fine.

11         MR. HEBERLING:  Let's just start with 272 and

12  continue from there.

13         THE COURT:  All right.

14         MR. HEBERLING:  LC-272.

15         THE COURT:  All right.

16  Q    Could you use this overhead to briefly explain study

17  designs in epidemiology?

18  A    Yeah.  The approach here is to try to make a distinction

19  between observational, experimental designs.  Historically,

20  much of what epidemiology was, was observational work and

21  observational designs are broken down into usually descriptive

22  versus analytic studies.

23         Descriptive studies are usually those of incidents

24  and prevalence and mortality and other correlations between

25  risk factors and disease states or injury states.  Analytic

1  studies are usually thought of in terms of case control or

2  cohort or historical cohort studies.  And then the analytic

3  studies you're looking at measures of association such as odds,

4  ratios, or relative risks and in descriptive studies, you're

5  looking at, really you're looking at correlations and rates of

6  events.

7          The experimental side is more recent and involves

8  randomization.  Here, you have different types of trials that

9  you can do.  Classic standard, gold standard as a clinical

10 trial, but you also have behavioral trials, such as the Mr. Fit

11 Project, which is a multiple risk factor intervention trial in

12 cardiovascular epidemiology, or community trials of different

13 types.

14         The real question is whether you're doing descriptive

15 or analytic work is compared to what.  You're trying to get

16 some idea about disease events and risk events in a population

17 and then make a statement compared to other populations what is

18 happening.  So, you can have two kinds of -- compared to what

19 answers, you can have one called a comparison group which is

20 often used when you're doing descriptive work, you'll have some

21 other population, where there's descriptive information and

22 that will be your comparison group, or you can have formal

23 controls.  Formal controls are often used in analytic work and

24 the controls can either be neighborhood or hospital or disease

25 registries of some kind.

1      This is somewhat arbitrary, but it's one way of

2  lining up what the different kinds of designs are and their

3  relationships and I often use this sort of approach when I'm

4  teaching research methods to epidemiology students.

5      There is -- some designs cross over very -- it's

6  untidy, there are things called cross-sectional designs.  Some

7  epidemiologists consider those to be analytic, they are a basic

8  design where you can also do measures of association.  Others

9  think of cross-sectional designs as being descriptive ones

10  where you're doing incidents and prevalence and mortality

11  studies.  So, you get some sort of slop over, if you will,

12  between the designs.

13  Q    And the experimental side of the chart, could experimental

14  studies be done regarding Libby asbestos disease?

15  A    I don't see how because it would be --

16      MR. BERNICK:  I'm sorry, Your Honor, this goes beyond

17  the scope of any expert report that he's issued.

18      MR. FINCH:  Join in that objection.

19      MR. HEBERLING:  We're explaining basics.

20      MR. BERNICK:  Well, no, he's actually -- that's a

21  specific opinion now with regard to Libby and I don't believe,

22  I can be corrected, but I don't believe it appears anywhere, in

23  any of his expert reports.

24      MR. HEBERLING:  Well, is there a problem with doing

25  experimental studies on people?

1        THE WITNESS:  Yes.

2        MR. BERNICK:  Well, I'm sorry.  That is also

3  something that is not addressed in any of his expert reports.

4        THE COURT:  It may or may not be, but Mr. Bernick,

5  I've been down this road in so many cases, it's really nothing

6  new.  I don't think it's going to affect this record to have

7  this type of testimony come in, so the objection is overruled.

8  Let's get to something that's relevant to Libby.

9  Q    Okay.  Just briefly, is there a problem doing experimental

10  studies on people with -- or people in Libby regarding Libby

11  asbestos disease?

12  A    It would seem to be unethical.

13  Q    Okay.  And why would it be unethical?  What would be

14  involved?

15  A    Well, because you're --

16        MR. BERNICK:  Objection, Your Honor.  Having now --

17  we heard Your Honor say this is not something that you really

18  want to hear --

19        MR. HEBERLING:  Okay.

20        THE COURT:  It's not something I probably have to get

21  into.  If you need to make a record, fine, but I really don't

22  think that there will be many judges who will not understand

23  that it might not be appropriate to assist in somebody's early

24  demise in order to do the type of experimental research that

25  may otherwise be required.

1 Q    So, do most medical studies fall on the observational

2 side?

3 A    I believe they do, yes.

4         MR. BERNICK:  I object to relevance.  This is not a

5 medical situation at all.

6         THE COURT:  I'm not sure whether it's a medical

7 situation, but I think the witness is qualified to at least

8 express an opinion on that score, so the objection is

9 overruled.

10 Q    Okay.  Then Last, Page 50, defines a descriptive study as

11 a study concerned with and designed only to describe the

12 existing distribution of variables without regard to causal or

13 other hypotheses, do you agree with that?

14 A    Yes, I do.

15 Q    Can you describe the kinds of descriptive epidemiology

16 studies and give examples, briefly?

17 A    Well, once again they are studies of the incidence of

18 disease, the prevalence of disease, incidence being new cases

19 of disease in a population, often a defined population,

20 prevalence being the amount of disease in a time period or at a

21 point period.  Mortality studies which are often followup

22 studies of some kind or other, or can be cross-sectional.

23 Q    Can you give some examples of descriptive studies in this

24 case?

25 A    I believe that the Whitehouse papers were descriptive.

1 The Peipens paper, I believe, is one of those where it's kind

2 of difficult to decide whether it's descriptive or whether it's

3 cross-sectional.  Those would be some of the examples.

4 Q    Okay.  And did you look at longitudinal lung function

5 studies also in this case?

6 A    Yes, I did.

7 Q    Were those descriptive or analytic?

8 A    They were descriptive.

9 Q    And as to analytic studies, Last, Page 5, it defines that

10 as a study designed to examine associations commonly putative

11 or hypothesized casual relationships an analytic study is

12 usually concerned with identifying or measuring the effects of

13 risk factors or is concerned with health effects of specific

14 exposures.  Do you agree with that?

15 A    I do, with a caveat that sometimes sufficient statistical

16 inference is done in a descriptive study base that you can say

17 that it is shading over into being analytic.

18 Q    And in medical literature, which is more prevalent,

19 descriptive or analytic studies?

20          MR. FINCH:  Objection, relevance.

21          THE COURT:  What is the relevance?

22          MR. HEBERLING:  The relevance is that there have been

23 allegations through experts in this case that the Whitehouse

24 '04, the Whitehouse 2008, Peipens 2003 and the CARD mortality

25 study are not proper epidemiological studies.  In fact, they

Molgaard - Direct/Heberling                    230

1  are descriptive epidemiology and so we're defining descriptive

2  epidemiology, and we will later show that they fit that

3  definition.

4       THE COURT:  Well, okay, specifically related to

5  Whitehouse, I understand and the other papers you've mentioned,

6  but the question was generally speaking, which types of medical

7  studies are more prevalent, either descriptive or analytic and

8  I'm not sure I understand the relevance.

9       MR. HEBERLING:  There's the notion from the plan

10  proponents that the only kind of epidemiology studies are the

11  analytic studies and we're showing that, in fact, most of the

12  medical literature is descriptive studies.

13       MR. BERNICK:  Your Honor, to be clear, our position

14  and the position of our experts, has nothing to do with

15  prevalence, like the numbers that are performed.  It has to do

16  with which ones go to an issue in the case which has to do with

17  causal relationships versus -- that are proven, versus causal

18  hypotheses.  So, if he wants to ask about prevalence, that's

19  fine, but we're not saying we count noses, it's a question of

20  what kind of method fits.

21       THE COURT:  All right.  In any event, the objection

22  is overruled.  I'm not sure that there is relevance, but I'll

23  consider that later.  You may answer the question, please, Dr.

24  Molgaard.

25  Q    Where a doctor publishes a medical study following

1  patients over time and describes a disease process, what kind

2  of study is that?

3  A    Usually that would be descriptive.

4  Q    Okay.  Then I'm showing you the next overhead which would

5  be LC-273.  Did you prepare that?

6  A    Yes.

7  Q    And would you use the overhead to briefly compare

8  descriptive and analytic studies?

9  A    Basically what you're trying to do in epidemiology is,

10 you're trying to establish, in either case, some kind of a

11 statistical association between event X and event Y.  Analytic

12 studies are -- may be random, descriptive studies are not.

13 Analytic studies usually have controls.

14 Q    Do both kinds of studies establish an association?

15 A    They can.  I mean, it's kind of what you're trying to do.

16 Ultimately with descriptive studies, you're looking at either

17 correlations or rates, but you're trying to establish that

18 there's some kind of an association between a risk factor and a

19 disease, whether that risk fact be membership in a group and

20 exposure to something in that group has a lot of, perhaps, here

21 a -- you belong to a group where there is a great deal of

22 tobacco use, so that leads to a higher percentage of tobacco

23 use associated with mortality from lung disease, so you have an

24 association of that kind in the structure of the rate.

25 Q    And, then as to hypothesis, when is a hypothesis no longer

1 a hypothesis?

2 A    Usually -- well, it depends on how many times it's been

3 replicated.  I think a lot of what we have in this field is a

4 tendency to believe we need to replicate our studies, to carry

5 them out more than one time and that if we have -- generally if

6 you get replication, if the association shows up over and over

7 again, then people, investigators, and the research community

8 will come to the conclusion that overall, the hypothesis is

9 true.  That the association is true and it is confirmed.

10 Q    And in epidemiology, when it is accepted that the

11 hypothesis is true, is that causation?

12          MR. BERNICK:  Objection   Are we assuming --

13          MR. FINCH:  Objection.

14          MR. BERNICK:  -- are we assuming that the hypothesis

15 is one relating to causation?

16          THE COURT:  I think you need to reform the question.

17 Q    A hypothesis is about the relation of two events or

18 phenomena, correct?

19 A    Right.

20 Q    And when there's been enough replication, at what point do

21 you reach an acceptance that there's causation between event A

22 and event B?

23 A    It's hard to answer that because we are generally very

24 wary of the use of the term causation.  I think that it's often

25 a question of social definition and social policy, where a

Molgaard - Direct/Heberling                        233

1  hypothesis is accepted as being true, and you have a causative

2  event.  But most epidemiologists are reluctant to say that

3  something is proven to be caused by one thing or another,

4  because we're sort of trained to be cautious that way.

5  Q    What's an association?

6  A    That's a formal term, it refers to a relationship between

7  two events, that is usually statistically shown to be true.

8  Q    And, can an association be expressed in a form of a

9  percentage?

10  A    I believe it can.

11  Q    And take, for example, from this case the CARD mortality

12  study, are you familiar with that?

13  A    Yes, I am.

14  Q    Let's assume that in the CARD mortality study that 43

15  percent of the deceased did not have blunting of the

16  costrophrenic angle, would that be an association?

17  A    It would be --

18         MR. BERNICK:  Objection, lack of foundation.

19         THE COURT:  Sustained.

20         MR. HEBERLING:  This is an assumed question.  I'm not

21  -- this is not for proving of fact.

22         MR. BERNICK:  But still, lack --

23         MR. HEBERLING:  I'm exploring what's an association.

24         MR. BERNICK:  It's still lack of foundation.  43

25  percent is a test of -- of what, on what basis.  And Your

Molgaard - Direct/Heberling                   234

1  Honor, we do have an objection regarding the CARD mortality

2  study in particular, by reason of it's being based upon the

3  famous 1800 patients.  We believe that that study should not be

4  admissible for the reasons set forth in our motions.  We want

5  to preserve that objection, but we don't want to interrupt the

6  flow of the examination, we want to get it done and get to

7  cross.

8           THE COURT:  All right.  Well, as I -- the objection

9  with respect to the CARD study is also preserved, we'll deal

10 with that at another time, but with respect to this, I don't

11 believe there has been a foundation established with this

12 witness' knowledge concerning whether or not there is a

13 blunting or not a blunting, or what that means and an

14 association with what.  So, the objection is sustained.

15          MR. HEBERLING:  It was a hypothetical question, Your

16 Honor.  Okay.

17 Q   So if, for example, a certain amount of deceased, in the

18 CARD mortality study, had a certain percentage of pleural

19 thickening of the chest wall, would the relationship between

20 the deceased from asbestos disease and pleural thickening, a

21 certain percentage on the chest wall, would that be a kind of

22 association?

23          MR. FINCH:  Objection, objection to form and

24 foundation.

25          THE COURT:  I don't think there has been a foundation

Molgaard - Direct/Heberling                    235

1  laid with respect to those types of hypotheticals.  This

2  expert, obviously, is an expert in epidemiological practice,

3  but I thought we just went into the fact that he is not a

4  medical doctor and as far as I know, there hasn't been an

5  association established with respect to his answering any kinds

6  of questions related to the physiology of a person.  If there

7  is that foundation, then you need to lay it.

8            MR. HEBERLING:  Your Honor, we're exploring the

9  relationship of -- the percentages of one event to another.

10  He's not commenting on the medical significance.  This is

11  simply one phenomena and another and I'll ask some more

12  questions of the witness.

13            THE COURT:  All right.

14  Q    Do you regularly review epidemiologic studies that are in

15  progress?

16  A    Yes, I do.

17  Q    Is that part of your job at the university?

18  A    Yes.

19  Q    And, how many epidemiologic studies have you reviewed for

20  researchers before publication?

21  A    I suppose it's in the hundreds.

22  Q    And when you do that, do you necessarily enter any kind of

23  conclusion as to the biology that's involved?

24  A    What I do usually is, I try to find a clinician or work

25  with a clinician, who takes care of the biological processes

1  and issues, as part of the research team and then rely on that

2  person's expertise.

3        (Counsel discussing exhibits amongst each other)

4            MR. BERNICK:  Your Honor, for the record, just so

5  that we're clear, that Mr. Heberling has approached us for the

6  first time with a notebook called mortality study or mortality

7  data.  Apparently, it's a bunch of exhibits and it's the first

8  time we've ever seen them as a collection and I don't even know

9  how many there are now.  So, we're not prepared to -- and we

10 don't have a copy.  So, I think we just have to call them out

11 one at a time if they're going to be used.

12           THE COURT:  All right.

13           MR. HEBERLING:  Yes, that's exactly what I intend to

14 do, one at a time, these are exhibits that were disclosed long,

15 long ago in the Whitehouse 2008 report, which includes the CARD

16 medical study or CARD mortality study exhibits.  I had put them

17 together for the convenience of the witness.

18 Q    Okay.  First of all, let me ask, just foundationally, are

19 you familiar with the CARD mortality study?

20 A    Yes, I am.

21 Q    And, you mentioned that you're working on an effort toward

22 publishing it?

23 A    Yes, I am.

24 Q    As between analytic and descriptive, what kind of

25 epidemiological study is it?

Molgaard - Direct/Heberling                    237

1  A    The one I'm working on, is that what you mean?

2  Q    Yes.

3  A    This one, I think, will be a hybrid.  There will be

4  elements of both descriptive and analytic work in it before I'm

5  finished with it.

6           MR. FINCH:  Objection, Your Honor.

7           MR. BERNICK:  Objection.

8           MR. FINCH:  There was nothing about this in either of

9  his reports.

10           MR. BERNICK:  Well, it's not even done.  I move to

11  strike the statement about what the future might bring.

12           MR. HEBERLING:  I'll ask about the current version of

13  it.

14           THE COURT:  All right.

15  Q    With regard to the CARD mortality in its current state,

16  meaning as disclosed in the Whitehouse expert report, and

17  you've reviewed the -- Dr. Whitehouse expert report, have you?

18  A    Yes.

19  Q    As to the CARD mortality in its state -- study in its

20  current state, what kind of study is it?

21  A    It's a descriptive study.

22  Q    And how so?  What has it got in it that makes it

23  descriptive?

24  A    It's descriptive because it's essentially a mortality

25  study.  A group of people have been followed in terms of their

1 mortality experience after exposure to the Libby environment

2 and other environments in the nearby surrounding area.

3 Q    And, first, could you describe the study design?

4 A    These are people who have been -- come to the CARD Center

5 and who have died.  There are 227 deceased.  Forty-one of these

6 were taken out of the study because the data was incomplete.

7 There was no chart or no film or no death certificate.

8          THE COURT:  Dr. Molgaard, I'm sorry, I can't I can't

9 hear you.  I apologize.

10          THE WITNESS:  Oh, I'm sorry.  It begins as

11 individuals who have come the CARD Center and have passed away,

12 there are 227 of them.  Of the 227, 41 were thrown out of the

13 study because the data was incomplete.  There was no chart,

14 there was no film, no death certificate or no diagnosis and

15 that leaves you with 186 subjects.

16          Of these 76 died, their deaths were not

17 asbestos-related, and there were 110 asbestos deaths, both

18 malignant and non-malignant.  There were 34 cancers,

19 mesothelioma, lung cancer, other cancers and there were 76

20 non-malignant asbestos-related disease deaths.

21 Q    As to the selection of subjects, these were all CARD

22 patients?

23 A    Yes.

24          MR. FINCH:  Objection.  Lack of foundation.  Your

25 Honor, can I have a continuing lack of foundation objection to

Molgaard - Direct/Heberling                    239

1 his testimony about how this study was designed or what it did

2 or what it was --

3          THE COURT:  Yes.  You haven't substantiated that this

4 witness did the design, so I'm not quite sure what firsthand

5 knowledge or what the use is that he's made.  If you could lay

6 some foundation please.

7 Q    When did you begin work on the CARD mortality study?

8 A    I initially began thinking about it seriously in spring of

9 this year.

10 Q    And, before that, did you consult?

11 A    I consulted --

12 Q    When did you begin consulting?

13 A    In this discussion, I began in December or January of this

14 year.

15 Q    Okay.  And who did you consult with?

16 A    With you by and large.

17 Q    And did you also consult with any doctors?

18 A    I talked with Whitehouse, yes.

19 Q    And, did you also, in conference, talk to Dr. Frank?

20 A    Yes.

21 Q    And did you consult with Dr. Whitehouse more than once?

22 A    Several times, I believe.

23 Q    What did you do?

24 A    I tried to understand what had happened in this study, in

25 terms of -- up to that point.  What had been done in terms of

1 the design of it and what kind of a study it was and whether it

2 had relevance to thinking about the Libby environmental

3 problems.

4 Q     And did you do an evaluation of the design before the Dr.

5 Whitehouse report was issued?

6           THE COURT:  Which report?

7           MR. HEBERLING:  Before the Dr. Whitehouse report of

8 December 28th, 2008 was done.

9           THE WITNESS:  By evaluation, I did not do a formal

10 evaluation of it, I simply looked at it and examined it and

11 considered whether it had merit as a type of descriptive

12 epidemiology that would have some meaning.

13 Q     And, did you come to a determination as to whether the

14 design was adequate?

15           MR. BERNICK:  Your Honor, at this point, we're now

16 going from foundation to opinions and I don't know -- I haven't

17 heard any undertaking, we were supposed to hear from Dr.

18 Whitehouse this afternoon, and that Dr. Whitehouse was going to

19 testify about this study.  I'm prepared to standby and -- we

20 have objections to the testimony but not to raise a foundation

21 objection if, in fact, they're going to put the author of the

22 study on the stand to talk about it.  Of course, we have

23 objections to all of that, but I know Your Honor is reserving

24 on those.

25           But I think that if Dr. Whitehouse is not going to

Molgaard - Direct/Heberling                241

1 testify about the study, it's not appropriate for this witness

2 to come in and put his imprimatur on the study as to which he

3 doesn't have real familiarity.  He's just started to work on

4 this, this year.  That study has been the subject of expert

5 reports in this case by Dr. Whitehouse for years.

6          MR. HEBERLING:  Well, I'll object to the extensive

7 argument.  The witness has testified that he is familiar with

8 the study, there are two authors, Dr. Whitehouse and Dr. Frank

9 and to some extent, both will discuss the CARD mortality study.

10          MR. BERNICK:  There are not two authors to the CARD

11 --

12          MR. HEBERLING:  And we've called the epidemiologist

13 first.  We had to call somebody first.

14          MR. BERNICK:  Well, that's fine as long as Dr.

15 Whitehouse will be available for cross examination and there

16 are not two authors for the CARD mortality study.  It was done

17 by Dr. Whitehouse.

18          MR. HEBERLING:  That's --

19          MR. FINCH:  Your Honor, I join in the --

20          MR. HEBERLING:  --  I object to that.  That's not

21 true, that's absolutely contrary to the record.

22          THE COURT:  Well, we can ask the witness that

23 question folks.  You know, neither of you can testify, we'll

24 put these questions to the witness who can testify.  He can

25 tell me who the authors were, he's apparently read it and

1 familiar with it, so he can answer that question, if you don't

2 mind, gentlemen.  Mr. Finch.

3        MR. FINCH:  Your Honor, I still have the same

4 foundation objection.  He still hasn't established, with this

5 witness, that he has the foundation that he -- Dr. Whitehouse's

6 CARD mortality study appears in only two places, in Dr.

7 Whitehouse's December -- in this case, in Dr. Whitehouse's 2008

8 report and in his May 2009 report.  And Dr. Molgaard has not

9 established that he either reviewed the data collection for the

10 CARD mortality study or that he set the protocols for the study

11 or that he designed the study, for the study that is the basis

12 of Dr. Whitehouse's testimony in this case, is an unpublished

13 CARD mortality study that he's been working on for years and it

14 keeps changing and he keep describing it differently in his

15 reports.  But the two -- the CARD mortality study that Dr.

16 Whitehouse has done and has relied upon, this witness had

17 nothing to do with either selecting the protocols or reviewing

18 the data or determining from a perspective of epidemiology, how

19 that data collections should be done.  I believe I can

20 establish that with --

21        MR. HEBERLING:  Well, Your Honor, the argument is

22 contrary to the record, we've established.

23        THE COURT:  Well, no, I don't think it is.  I think

24 the witness said he just got started on reviewing this study as

25 of about December of last year when he consulted and seriously

Molgaard - Direct/Heberling                    243

1  this spring, but the study, as I understand it, was finished

2  before that period of time.  Maybe you'd better lay the

3  foundation for me, maybe I'm in error.

4          MR. HEBERLING:  Your Honor, the record will show that

5  the study was not delivered or finished until December 28th,

6  2008.

7          THE COURT:  Right.  Which is about the time the

8  witness got involved.

9          MR. HEBERLING:  Yes.  The witness has testified that

10 he consulted --

11         THE COURT:  Sir, can you turn one of those -- can you

12 please turn off that microphone if you're going to stand at the

13 podium.  It's really --

14         MR. HEBERLING:  I thought I did.

15         THE COURT:  The sound just travels, unless it's just

16 something that's a problem there.

17         MR. HEBERLING:  It went back on.

18         THE COURT:  Okay.  Thank you.

19         MR. HEBERLING:  That's strange.

20         THE COURT:  If you -- it's in a pocket, it happens.

21         MR. HEBERLING:  Something happened in my pocket, Your

22 Honor.

23         THE COURT:  Okay.  If you could just lay, for me

24 please, this witness -- so I understand what this witness'

25 familiarity is with this study, because I'm losing that point.

Molgaard - Direct/Heberling                    244

1  I don't understand that point.

2  Q    In December, 2008, you've testified that you consulted

3  with Dr. Whitehouse and Dr. Frank, correct?

4  A    That's correct.

5  Q    And what -- did you have a draft of the study at the time?

6  A    What I had was the spreadsheets of the actual data, and

7  then the preliminary analysis of the type that's up on the

8  screen.

9  Q    And was there also a descriptive paragraph or two in the

10  Whitehouse report, draft, describing the study?

11  A    Yes, there was.

12        MR. BERNICK:  Your Honor, (a) that's leading and (b)

13  if we just have a short voir dire, I think that we'll establish

14  very quickly what he knows and what he doesn't know, if that

15  might be appropriate on this one.

16        THE COURT:  Well --

17        MR. HEBERLING:  I'm not quite done.

18        THE COURT:  I think what we're going to do is take a

19  ten minute recess.  You folks go work out the basic fundamental

20  issues because I need some information as to what the doctor

21  knows with respect to this study, to see whether we're going to

22  get beyond that level, and right now I don't have it.  So,

23  we'll take a ten minute recess.

24                    (Recess)

25        THE COURT:  Please be seated.  Are you ready, Mr.

 1  Molgaard?

 2              THE WITNESS:  Yes.

 3              THE COURT:  All right, Mr. Heberling.

 4              MR. HEBERLING:  We'll clarify the witness' testimony

 5  on several points.

 6              THE COURT:  All right.

 7  Q    In December of 2008, before the Whitehouse report was

 8  issued at the end of December, December 28th -- well, strike

 9  that.  Okay.  Are you familiar with the December 2008

10  Whitehouse report?

11  A    Yes.

12  Q    And did that include certain materials relating to the

13  CARD mortality study?

14  A    Yes.

15  Q    And, can you compare the materials in the Whitehouse 2008

16  report with the materials that you reviewed earlier in

17  December?

18  A    They were very similar.

19  Q    And, when you made your review earlier in December, did

20  you review the study for its basic design?

21  A    Yes, I did.

22  Q    And, did you issue any kind of opinion or -- any kind of

23  opinion to us on whether the design was adequate?

24  A    I --

25              MR. BERNICK:  Your Honor, I'm sorry, it's a yes or

1  no.  Your Honor, I'm sorry -- go ahead.

2              THE WITNESS:  Yes.

3              MR. HEBERLING:  This is foundational.  I'm not asking

4  him whether the study as it exists now is adequate, that's a

5  separate question.

6              THE COURT:  All right.

7              MR. HEBERLING:  We're trying to do more foundation.

8  Q    And, in the process -- and in December, when you did this

9  review, had you been contacted by me?

10 A    By you?

11 Q    Yes.

12 A    Yes.

13 Q    And, were you being paid by me to do the review?

14 A    I believe I was.

15 Q    And, did you discuss with Dr. Whitehouse and Dr. Frank

16 your review of the study?

17 A    Yes.

18 Q    And at what time did you do that, what month?  Was that in

19 December?

20 A    It was either December or January.  I can't remember

21 exactly.

22 Q    Was it before the Whitehouse report was issued and made

23 public?

24 A    Yeah, it would have been, so it would have been in

25 December, I guess.

1  Q    And, did you go back through all the data and verify the

2  data against the original sources for the data?

3  A    I reviewed the data in some detail.  I'm not sure about

4  what your question is.

5  Q    Well, for example, with regard to the chest x-ray

6  measurements on the 76 deceased, did you go back to the

7  original information sheets which were the source for the

8  spreadsheet data?

9  A    Yes, I've looked at those extensively.

10 Q    Did you supervise the study -- CARD mortality study?

11 A    No.

12 Q    Did you consult?

13 A    I would say I became a consultant in January.  From

14 December on, really.

15 Q    Okay.  And have there been changes in the data between

16 December and say, June?

17 A    There have been changes in the spreadsheets, yes.

18 Q    Can you describe examples of some of the changes?

19 A    I think at one point there was --

20        MR. BERNICK:  Your Honor, at this point we did have a

21 -- I have an objection.  We had an extensive discussion on the

22 break.  Thus far all the examination has walked away from where

23 we were, but I want to say to the Court, we have three

24 different witnesses who are coming up and apparently they

25 intend to have all three different witnesses describe what went

1  into this study.  That's not right, that is completely

2  cumulative and we do not agree to have this witness testify

3  about this study in terms of the details of how it got put

4  together, because we'll end up cross examining three different

5  witnesses on all the same basic problems, and that's not an

6  appropriate process.  We object because we believe that this

7  testimony is going to be cumulative.

8         MR. HEBERLING:  Your Honor, again, this is -- what

9  Mr. Bernick is saying is not true.  This is the epidemiologist,

10  he's doing the procedural review on the study in terms of

11  epidemiology.  Dr. Frank will testify most extensively, Dr.

12  Whitehouse will testify in part, but Dr. Frank and Dr.

13  Whitehouse are not going to cover the same ground.  They will

14  discuss the medical conclusions and significance.

15         THE COURT:  All right.

16  Q    So, I asked you for examples of changes that were made in

17  the data as between how it stood in December and up to June.

18  A    At one point, I believe there were 79 deaths in the study

19  and then it was adjusted down to 76, that were thrown out for

20  various reasons.

21  Q    So, and are you familiar with the CARD mortality study in

22  its current form, as is shown on exhibits in this case?

23  A    Yes.

24  Q    And, in it's --

25         MR. FINCH:  Objection, Your Honor.  Is he talking

Molgaard - Direct/Heberling                    249

1   about -- by current form, the mortality study as it appears in

2   Dr. Whitehouse's May 2009 expert report?

3           MR. HEBERLING:  Yes.  And I think there was an errata

4   sheet, but beyond that, I don't think there -- any way, it's

5   reflected in the exhibits in this case, it's with Dr.

6   Whitehouse's May 2009 report.

7           THE COURT:  Okay.  I do think it would be helpful for

8   me, if you'll refer which report is the current report because

9   I don't know which report you're referring to, but okay, I

10  understand the May 2009 report, Doctor, is that what you

11  understand, too?

12          THE WITNESS:  That's what I understood, yes.

13          MR. FINCH:  If we could just get a stipulation from

14  counsel for Libby that when they talk about the CARD mortality

15  study, they are talking about the information and statements

16  that are contained in Dr. Whitehouse's May 2009 expert witness

17  report in this case.

18          MR. HEBERLING:  So stipulated, that's correct, with

19  the errata sheet.

20          THE COURT:  All right.  With the errata sheet?

21          MR. HEBERLING:  Yes, there's an errata sheet.

22  Q    Okay.  So, as to the CARD mortality study, meaning what's

23  in the May 2009 Dr. Whitehouse report, have you reviewed the

24  methods for the study?

25  A    As explained by Dr. Whitehouse, yes.

1  Q    And, do you have an opinion whether the methods conform to

2  epidemiological principles?

3  A    My belief is that it is an example of descriptive

4  epidemiology, a descriptive mortality study.

5  Q    Did you find -- do you have an opinion whether it

6  adequately follows epidemiology principles in presenting the

7  study?

8  A    I believe it did.

9  Q    Have you reviewed the design of the study?

10  A    Yes, I have.

11  Q    Do you have an opinion on whether the design of the study

12  is adequate in terms of epidemiology principles?

13  A    I thought it was fairly typical of this type of mortality

14  study.

15  Q    Okay.  Are you familiar with the criticisms of the study

16  from the Grace experts?

17  A    Yes.

18       MR. HEBERLING:  Your Honor, this is our rebuttal to

19  Grace experts, through this witness, even though they haven't

20  given the criticisms yet, but this witness is here today as,

21  just as we are proving things through cross examination, we're

22  doing this out of order as well.

23       THE COURT:  All right.

24  Q    So, Dr. Moolgavkar states that age must be accounted for

25  in any comparison of the mortality experience of two

Molgaard - Direct/Heberling                    251

1  populations.  Are you aware of that criticism?

2  A    Yeah.  I've read that.  My belief was that this was by and

3  large, a proportionate mortality study and if you follow Last,

4  it's not necessary to have age of the study population.  Really

5  what you're looking at is the proportions of individuals in a

6  population who have mortality as a result of a certain

7  experience.

8           MR. HEBERLING:  Okay.  Let's put up LC-8.

9                     (Pause)

10 Q    Do you now have LC-8 before you?

11 A    Yes.

12 Q    Are you familiar with this exhibit?

13 A    Yes.

14 Q    Can you explain the format?

15 A    Basically the --

16           MR. BERNICK:  I'm sorry this is LC-8?

17           THE COURT:  Yes.

18           MR. HEBERLING:  Yes.

19           MR. BERNICK:  It's not in evidence, I don't think.

20           MR. HEBERLING:  Correct.

21           MR. BERNICK:  Okay.  So, if it's not in evidence, the

22 witness shouldn't be talking about it.

23           MR. FINCH:  I join in that objection.

24           MR. HEBERLING:  I just asked him if he can identify

25 the exhibit, if he's familiar with it.  This is foundation.

1          MR. BERNICK:  Okay.

2          THE COURT:  He said he's familiar with it and then he

3  asked him to explain the format.  So, I guess explaining the

4  format is fine, if it's foundational.  I'll have to hear it.

5          MR. BERNICK:  Well, I mean, I don't --

6          MR. HEBERLING:  I'll supply further foundation, Your

7  Honor.

8  Q    Is this page that you're looking at from the CARD

9  mortality study?

10 A    Yes.

11 Q    And have you reviewed it?

12 A    Yes.

13 Q    Okay.  Now we were just talking about a proportionate

14 mortality ratio, correct?

15 A    Right.

16 Q    Which number -- well, please explain the format of LC-8

17 first.

18 A    Well, the top death due to asbestos disease is sort of the

19 overall breakdown of the data.

20         MR. BERNICK:  Your Honor, this is not -- we're not

21 doing -- we'd very much like to get through this witness and

22 get done, but this is no record.  We haven't identified what

23 LC-8 is, we haven't identified what portion of LC-8 is being

24 displayed to the Court and is being subjected to these

25 questions.  Why can't we just get the document?

1          THE COURT:  That's fair.  The objection is sustained.

2  Q    Okay.  Can you identify LC-8?

3  A    It's on the screen, yes.

4  Q    And, does it have any relationship to the CARD mortality

5  study?

6  A    It's part of the CARD mortality study.

7  Q    What does it do?

8  A    What it does is, it gives you a summary of the mortality

9  events that are described in the CARD study and it breaks them

10  out by two different ways.

11  Q    Can you explain the two different ways?

12          MR. FINCH:  Objection.  Now he's going beyond what

13  the document is and is asking him to explain the significance

14  of the document.

15          THE COURT:  That's right.  The description is now on

16  the record, the witness has identified what it is.

17          MR. HEBERLING:  All right.

18          MR. FINCH:  And I don't think they've laid a

19  foundation for admissibility, or for him to talk about it,

20  beyond that.

21  Q    Is there a proportionate mortality ratio number on the

22  exhibit?

23  A    It's not written per se.  I believe the 110 over 186 is an

24  example of that, which is 59 percent.

25  Q    Okay.  Now, Dr. Moolgavkar in his report states that Dr.

Molgaard - Direct/Heberling                    254

1 Whitehouse has --

2          THE COURT:  I'm sorry, can you please just take that

3 off if you're going to stay by the podium?  You don't need both

4 microphones and it's --

5          MR. HEBERLING:  Hum.  This time it's not on, but I

6 certainly will take it off.

7          THE COURT:  Okay.  Thank you.  If you're going to

8 move around, then that's fine, but it's just causing some

9 terrible feedback.

10          MR. HEBERLING:  Thank you.  Usually I move around,

11 but today, perhaps, I'll stay right here.

12          THE COURT:  All right.

13 Q    Dr. Moolgavkar, in his report, has criticized the CARD

14 mortality study, stating that Dr. Whitehouse has absolutely no

15 information on the level of exposure to Libby fiber in his

16 patient population.  Do you have a response to that?

17 A    I don't think you need to have dose data to do this kind

18 of a calculation, which is just a simple mortality comparison

19 where you look at the proportion of mortality that is

20 attributed to death by a specific disease.

21 Q    Why don't you need that?

22 A    Well, because what you're trying to do is a certain kind

23 of measure here, which is very commonly used in occupational

24 epidemiology, or it's the proportion of death in one population

25 caused by disease and then you compare that overall proportion

1 to other proportions in other populations.  You often see these

2 comparisons where they'll go across 10 or 12 or 15 different

3 occupational cohorts, exposed to the same kind of exposure.

4 Q    And, can you say how often you have dose response

5 information in such a study?

6 A    Not very often.

7 Q    And these studies are published anyway?

8 A    Yes.

9         MR. BERNICK:  I'm sorry, this study was published?

10         MR. HEBERLING:  No.

11         MR. BERNICK:  Oh, these studies, I'm sorry.  Sorry.

12 Q    Then Dr. Moolgavkar states "A proper quantitative analysis

13 of other exposures including, if possible, the estimation of

14 etiologic fraction is imperative before any conclusions can be

15 drawn regarding the contribution of Libby fibers to disease

16 causation."   Are you familiar with that statement?

17 A    Yes, I am.

18 Q    First of all, what is the etiologic fraction?

19 A    It's a proportion, basically, of a certain disease that

20 you can attribute, or is a fraction of all disease, or all

21 mortality in a population.

22 Q    Okay.  So, what is your response to Dr. Moolgavkar's

23 statement?

24 A    I didn't think it was appropriate.  I thought that since

25 we have a proportionate mortality in this situation already,

Molgaard - Direct/Heberling                256

1 that worrying about the etiologic fraction was overkill a bit.

2 Q    Okay.  Does etiologic fraction go to disease causation?

3 A    It goes, really, to exposure.

4 Q    Okay.  And was exposure and causation by asbestos analyzed

5 in anyway as to these people?

6 A    Yes, it was.

7 Q    How?.

8         MR. FINCH:  Objection, lack of foundation.  He didn't

9 do it.

10         THE COURT:  Pardon me one second.  Oh, pardon me, I

11 need a very brief recess.  We'll take a five minute recess.

12                     (Recess)

13         THE COURT:  Please be seated.  Folks, I apologize for

14 the interrupt.  Cathy -- either Mr. Heberling, I need you

15 either to repeat your last question because I lost it, or else

16 I need the court reporter to read it back.  Do you remember

17 what it was, sir?

18         MR. HEBERLING:  I have a vague recollection.

19         THE COURT:  Okay.

20         MR. HEBERLING:  I will repeat it.  Mr. Finch, said

21 he'd be about two minutes.

22         THE COURT:  Okay.  Could I just hear the last

23 question?

24         MR. HEBERLING:  It was something like --

25         MR. GUY:  We have it here, Your Honor.

1          THE COURT:  Oh, would you read it for me?

2          MR. GUY:  Was exposure and causation by asbestos

3   analyzed in any way as to these people?  Yes, it was.  How.

4          THE COURT:  Okay.

5          MR. GUY:  Mr. Finch:  Objection.

6          THE COURT:  Okay.

7          THE WITNESS:  By these cases being within the

8   Center's study volume, they were cases that had been studied

9   and diagnosed and researched by Dr. Whitehouse.  So, there was

10  knowledge of asbestos exposure within the case load.

11  Q    Then Dr. Welch's report, March 2009 states, "Standard

12  mortality analyses use the underlying cause of death,

13  determined by a nosologist, someone specifically trained in

14  determining the cause of death."  Are you aware of that

15  criticism?

16  A    Yes.

17  Q    Is it correct?

18  A    Not to my belief.  Nosologists are rarely used, although

19  they are sometimes used.

20  Q    And what about using the underlying cause of death from

21  the death certificate, is that the only way to do a study?

22  A    No.  You can do it with a contributing also.

23  Q    And which is more common?

24  A    I think probably the contributing is probably more common.

25  Q    Okay.  Then Dr. Moolgavkar states "That the 186 subjects

Molgaard - Direct/Heberling                    258

1  in the CARD mortality study are not representative of the Libby

2  population in general." Do you agree with that?

3  A    I agree they're not. I think that was never the intent.

4         MR. BERNICK: I'm sorry, what?

5         THE WITNESS: It was not the intent of the 186 to be

6  thought of as being representative of the Libby population in

7  general.

8         MR. BERNICK: Move to strike as not responsive. The

9  question asks whether it was representative, not whether it was

10  intended to be representative.

11         THE COURT: That's true. He said he agreed with the

12  statement and that portion of his testimony I'll accept. With

13  respect to the intent, that's stricken.

14  Q    And why do you agree?

15  A    Because the people who come to the CARD Center or CARD

16  Clinic, are basically self-selecting, for one reason or

17  another, to come in for medical care or treatment or diagnosis

18  or referral, or whatever, so that they are different than the

19  rest of the population of Libby.

20  Q    The rest of the population of Libby, are they diagnosed

21  with asbestos disease?

22  A    No.

23  Q    And, what about the people in the study?

24  A    They are.

25  Q    Is that a significant difference?

1  A    Yes.

2  Q    What does representative mean in epidemiology?

3  A    It can mean a lot of different things.  It's a question of

4  what is -- what part of a population are you trying to be

5  representative of, what dimension of the population is your

6  sample supposedly going to be similar to the whole population

7  of.

8  Q    Last Page 157, defines representative as meaning simply

9  that the sample resembles the population in some way.  Do you

10 agree with that?

11 A    Yes, I do.

12 Q    And, in -- who are the subjects in the CARD mortality

13 study representative of?

14         MR. BERNICK:  Objection.  That assumes that they're

15 representative of anybody.

16         MR. FINCH:  It's also not in his report.

17         THE COURT:  That's sustained.  You can lay a

18 foundation.

19 Q    Have you considered the dimensions of who the subjects in

20 the CARD mortality study may be representative of, if anyone?

21 A    I think they're representative --

22         MR. BERNICK:  I'm sorry, that calls for a yes or no

23 answer and then there's a foundation issue.

24         THE COURT:  Yes, sir, you need to answer that yes or

25 no.

1  Q    Have you -- the question was, have you considered it.  So,

2  that's yes or no, and then I'll ask --

3  A    Yes.

4  Q    -- have you considered that?

5  A    Yes, I have.

6  Q    And, what was the result of your consideration?

7            MR. BERNICK:  Your Honor, at this point, he's now

8  apparently going to testify that they're representative of some

9  body, some group or some population, and that is something if,

10  because he's an expert, he has to provide a foundation

11  sufficient under <u>Daubert</u>, to be able to express an opinion.  He

12  has not provided that foundation and it's no where in his

13  report.

14            MR. FINCH:  I join in both bases for that objection.

15            MR. HEBERLING:  Your Honor, we're responding to

16  criticisms of the study and we have certainly, throughly

17  foundationed (sic) him, as being fully familiar with the study,

18  and -- well, I can think of a couple more questions I can ask

19  him, I will do so.

20            THE COURT:  All right.

21  Q    When you're working on a study, that's a medical study, do

22  you consult with the doctor doing the study?

23  A    Yes, I do.

24  Q    And, who handles the medical issues?

25  A    The clinician.

1 Q    And, sometimes do you have to inquire into the medical

2 issues?

3 A    Sometimes, yes.

4 Q    Is it important for you to understand the medical issues

5 in order to do an epidemiological review?

6 A    It's helpful.

7 Q    Have you done that in this case?

8 A    Yes.

9 Q    And have you inquired sufficiently to have an opinion on

10 who the subjects of the CARD mortality study may be

11 representative of?

12        MR. BERNICK:  Objection.  At this point, what he's

13 now established is that he talked to Dr. Whitehouse.  If he's

14 relying upon something that Dr. Whitehouse told him to say and

15 he's accepting it, simply saying it's representative, we can

16 cross examine Dr. Whitehouse, that's fine, but if he is the one

17 who is making the determination about whether it's

18 representative or not, talking to Dr. Whitehouse is not a

19 methodology, it is sufficient under <u>Daubert</u> to support an

20 opinion.

21        MR. FINCH:  And he also, nowhere in any of his

22 reports, expressed the opinion --

23        THE COURT:  Mr. Finch, you need to use the

24 microphone.

25        MR. FINCH:  Yes.  He also, nowhere in any of his

Molgaard - Direct/Heberling                    262

1  reports, expressed the opinion that the CARD mortality study

2  subjects are representative of anyone else.  I think this is

3  unfair to elicit expert opinion testimony that's not set forth

4  in either of his reports.

5          THE COURT:  Is this the subject he's inquired of in

6  his report?

7                          (Pause)

8          MR. HEBERLING:  It's hard to find on a quick review,

9  but at Page 9, in his first report, Dr. Molgaard states: "The

10 study does not determine loss of function due to asbestos --

11 excuse me -- does determine loss of lung function due to

12 asbestos exposure in 123 subjects, with two lung function

13 tests.  Their common thread is a diagnosis of asbestos

14 disease."

15         MR. BERNICK:  That's a different study.

16         MR. FINCH:  That's a different study.

17         MR. HEBERLING:  Well, it's the same principle.  We're

18 applying --

19         MR. FINCH:  Your Honor, the purpose of an expert

20 witness report is to inform counsel for the opposing party as

21 to what subjects they have to inquire about in a deposition and

22 what they don't.  If it's not in the report and he doesn't have

23 any opinion or basis for it, it's not admissible.  I don't

24 think -- it's not admissible pursuant to Daubert because he

25 hasn't laid a foundation that he has the basis for a reliable

1    opinion on it, and second, it's nowhere in his report.

2           The section Mr. Heberling just quoted from was about

3    the 123 patient lung function study, which is a completely

4    different study.

5           MR. HEBERLING:  Well, at Page 3, under CARD mortality

6    study, in his report, Dr. Molgaard states: "I have reviewed the

7    materials and methods for the CARD mortality study and the

8    Whitehouse report generally and they meet epidemiologic

9    requirements."  At Paragraph 32 in the Whitehouse report, it is

10   stated that, "Once diagnosed, a Libby CARD patient has a

11   probability of death by asbestos disease."  So that's an

12   extension of the CARD mortality study to all those diagnosed.

13   Dr. Molgaard has approved the CARD mortality study as being --

14   meeting epidemiologic standards and so he has approved that

15   statement.

16          MR. FINCH:  May I respond, Your Honor?

17          THE COURT:  Yes.

18          MR. FINCH:  Saying that the CARD mortality study

19   meets epidemiologic requirements, as he's defined epidemiology

20   to include both descriptive studies, which cannot prove causal

21   hypothesis and other types of studies, in no way sets forth an

22   opinion that it is my opinion that the 176 people in the CARD

23   mortality study are representative of some other group of

24   people, whether they are the 950 Libby claimants, the 950 Libby

25   claimants who are represented by Mr. Heberling and Mr. Lewis,

Molgaard - Direct/Heberling                    264

1 or the 1800 people in the CARD patient population, or the whole

2 world, he has no opinion anywhere -- this man has no opinion

3 anywhere in his expert witness report, that the 176 people in

4 the CARD mortality study, are representative of anything.

5          THE COURT:  This is clearly the subject for expert

6 opinion.  If it's in the report you can inquire about it when

7 you can show me, if it is not in the report, it's beyond the

8 scope of this witness' report and that is not fair at this

9 point in time.  It should have been discoverable so that it

10 could be inquired into during the deposition and other

11 discovery in the case.

12          MR. HEBERLING:  In fact, I believe it was discussed

13 at depositions, so it was established there and that was back

14 in June.

15          MR. FINCH:  There was no testimony from this --

16          MR. HEBERLING:  Oh, yes.

17          THE COURT:  What's established where in June?

18          MR. HEBERLING:  In his deposition they asked him

19 questions about how far these opinions could be extended, to

20 what group of patients and so forth.

21          THE COURT:  Okay.

22          MR. BERNICK:  Your Honor, I think that really the

23 only reason that I think that this is such a focus of objection

24 is the question of what this group is representative of --

25          THE COURT:  That's right.

1          MR. BERNICK:  -- is a very, very important question

2   in terms of the application of any of this to the group that

3   we're talking about, which is current Libby claimants.  It is

4   the -- the question of whether something is representative

5   usually involves testing, statistical testing, and

6   methodologies.  There's been no explanation in the reports or

7   from this witness that any of those methodologies were actually

8   applied.  If he did it he ought to have it in a report and he

9   can say it.  He hasn't said it here.  He didn't say it in the

10  report.

11         MR. GUY:  Your Honor, I have a --

12         MR. HEBERLING:  (Indiscernible) statement of

13  epidemiology --

14         MR. GUY:  -- separate objection.  Your Honor, may I

15  be heard?

16         THE COURT:  Just a minute.  Mr. Heberling, go ahead.

17         MR. HEBERLING:  Okay.  I can establish through the

18  witness that the CARD mortality study and many other

19  descriptive studies form associations, and associations may be

20  used to make public health decisions and decisions about

21  causation.  It doesn't have to be an analytic study to do that.

22  I can establish that through it.  And the --

23         MR. BERNICK:  But that's not --

24         MR. FINCH:  That's not the same thing.

25         MR. GUY:  Your Honor, my objection is very different.

1             THE COURT:  Yes, sir?

2             MR. GUY:  Mr. Heberling is saying that Dr. Molgaard

3 has approved the statement that once diagnosed a Libby CARD

4 patient has a probability of death by asbestos disease.  Your

5 Honor has already ruled that he is not qualified to offer

6 opinions about the medical science of various asbestos

7 diseases.  This expert cannot testify to that at all.

8             THE COURT:  Well, I agree that he can't offer that

9 opinion if that's what he's prepared to offer because it's

10 outside what he has been permitted to testify here as an expert

11 about.  But in addition, I thought I understood the witness to

12 say that the people who come to the CARD clinic are self

13 selected, that they are different from the rest of the

14 population of Libby, that they have been in one sense diagnosed

15 with an asbestos disease and the rest of the population hasn't.

16 So, to the extent that the comparison is to try to get into the

17 population of Libby, this witness has already said that this

18 CARD sample is not representative.

19             MR. HEBERLING:  Correct.  And we do not -- there is

20 no extension of any of our studies to the people in Libby who

21 are not diagnosed.

22             THE COURT:  Okay.

23             MR. HEBERLING:  That's a false issue.  We are

24 extending our studies to the group that are diagnosed, which

25 would include the 950 Libby claimants.

1        THE COURT:  But the problem with that is that that

2   study included, apparently, 1,800 people, not 950.  The medical

3   records haven't been produced and nobody is permitted to use

4   that as a base for any expert opinion in this case because it's

5   not possible to cross examine someone on the basis of records

6   that haven't been produced, particularly when you're now

7   trying, I guess, to make an association between people who may

8   have been diagnosed without producing the underlying documents.

9   The objection is sustained.

10       MR. HEBERLING:  Okay.  One small clarification.

11  There is no study on the 1,800.  The 76 deaths in the CARD

12  mortality study from non-malignant disease are from the CARD

13  patient population, so they're from the 1,800, but we -- as to

14  the CARD mortality study we exchanged all medical records, so

15  those have been delivered, both Libby claimants and the ones

16  who are not Libby claimants.  So, that has all been done.

17       MR. BERNICK:  Your Honor?  Your Honor, we're now

18  getting into kind of a major, major can of worms, and we could

19  have a very long dialogue about how this relates to the 1,800.

20  I think that what we propose to the Court was that we go

21  forward and have the examination conducted notwithstanding the

22  issues that we've raised concerning the 1,800 to get it done.

23  But it should still be subject to the limitations of whether

24  the witness is really testifying on the basis of some expert

25  methodology and whether it's been disclosed.  And on the narrow

1 question that's before the Court, which is is this group, the

2 mortality group, representative of some group?  That is a

3 technical expert issue, and if he had done that kind of

4 analysis it should have been set out in the report and he

5 should be laying it out today.  That really is the issue.  And

6 if he hasn't done it, we should just go on to another subject.

7          THE COURT:  I agree that it is the subject of an

8 expert report.  If it has not been produced then it is beyond

9 the scope of what he can testify about.

10          MR. HEBERLING:  We'll address that issue through Dr.

11 Frank, Your Honor.

12          THE COURT:  All right.

13 BY MR. HEBERLING:

14 Q    Then, one last question about the CARD mortality study.

15 Do you have an opinion whether the CARD mortality study as a

16 whole meets epidemiological study standards?

17 A    As a whole I believe it does.

18          THE COURT:  Well, I don't know what as a whole means.

19 I'm sorry.  Are you talking about the 1,800, the 186, the 76?

20 I don't know what that -- I just don't understand the question.

21          MR. HEBERLING:  I'm sorry.  Can we put the study

22 subjects up on the -- remember the flow diagram?  No?

23          THE COURT:  Is it limited to the May 2009 report?

24          MR. HEBERLING:  It's limited to the study as

25 described in the May 2000 report, which had 185 subjects who

Molgaard - Direct/Heberling                          269

1  had died and we had sufficient records on, and out of that 110

2  died of asbestos disease.

3           THE COURT:  Okay.

4           MR. HEBERLING:  So, it's just those people, not the

5  whole 950, or the whole 1,800.

6           THE COURT:  Okay.  That's what I didn't understand.

7  That's fine.  Thank you.

8           MR. BERNICK:  Well, I -- again, we would object to

9  that because that takes us into the heart of the study,

10  including that flow diagram which Mr. Heberling agreed not to

11  use over the break.  If he wants to ask the general question,

12  you know, from our point of view we kind of expect what the

13  witness is going to say, and we object to all of his testimony

14  for the reasons stated.  Maybe we just ought to take his answer

15  and push on.

16          THE COURT:  I believe he answered that, yes, it --

17          MR. BERNICK:  Oh.  Okay.

18          THE COURT:  -- it did meet those studies.  I was

19  asking -- I didn't understand what as a whole meant.

20          MR. BERNICK:  Yes, I understand that.

21          THE COURT:  Okay.

22  BY MR. HEBERLING:

23  Q    Moving on to the Whitehouse 2004 study -- could you put

24  LC-1 up?  Are you familiar with the Whitehouse 2004 study?

25  A    Yes.

1 Q    And is that an article titled, "Asbestos Related Pleural

2 Disease Due to Tremolite Associated with Progressive Loss of

3 Lung Function, Serial Observations in 123 Miners, Family

4 Members, and Residents of Libby, Montana"?

5 A    Yes.

6 Q    And is that epidemiology?

7 A    In my mind it is.

8 Q    What kind?

9 A    It's descriptive epidemiology.

10 Q    Does it develop associations?

11 A    It can, yes.

12 Q    I mean, does this particular study develop --

13 A    I believe it does.  Yes.

14 Q    And are you familiar with the <u>American Journal of</u>

15 <u>Industrial Medicine</u>?

16 A    Yes.

17 Q    Is that a peer reviewed journal?

18 A    Yes.

19 Q    And does the peer review process have any epidemiology

20 aspects?

21 A    Usually it does.

22 Q    What are those?

23 A    Usually there will be somebody -- depending on the paper

24 that you're looking at, but usually there will be someone who

25 is a reviewer who will have epidemiology training one way or

1 another.  Usually there are three reviewers, and between the

2 three reviewers and the editor usually there is someone there

3 who has a background of some kind in epidemiology, some

4 training.

5 Q    Okay.  And can you briefly describe the design of the

6 Whitehouse 2004 article?

7            MR. BERNICK:  Your Honor, we preserve our prior

8 objections, and we understand that at some point Your Honor

9 will rule with respect to whether this study passes Daubert

10 standards and fits to the issues in this case.

11            THE COURT:  Yes.  Can you just tell me what exhibit

12 the witness is referring to, please?

13            MR. HEBERLING:  LC-1.

14            THE COURT:  All right.  Thank you.

15            MR. FINCH:  Your Honor, I also have a lack of

16 foundation objection.  This -- whatever his role with respect

17 to the mortality study since December of 2008, this witness had

18 absolutely nothing to do with the creation, or design, or data

19 review, or anything else with a paper that was published in

20 2004 by Dr. Whitehouse on lung function.  So, I think there's

21 no foundation that he can describe what was done in this study.

22            THE COURT:  Well, I haven't heard a foundation yet,

23 so let's lay one.

24 BY MR. HEBERLING:

25 Q    Are you familiar with the study?

Molgaard - Direct/Heberling                    272

1  A    Yes.

2  Q    Have you reviewed it in terms of epidemiology standards?

3  A    Yes.

4  Q    Are you familiar with the design of the study?

5  A    Yes.

6  Q    Could you describe it?

7  A    I would describe it as descriptive epidemiology of a case

8  series that came into Dr. Whitehouse's clinic.

9  Q    And what kind of epidemiology is a case series?

10 A    It's a -- where a -- you often see clinicians do this.

11 They will have a large group of patients who they have worked

12 with over a period of time, and then they will take the

13 clinical data that they have on these patients, do an analysis,

14 and write it up and send it into a journal.  And sometimes you

15 see very small series, like five or ten.  This is a large

16 series, like 123.

17 Q    And do you have an opinion whether this Whitehouse study

18 of 2004 meets the case theory -- series epidemiology standards?

19 A    I believe it does.

20        MR. BERNICK:  Objection.  Lack of foundation as to

21 whether there are any standards.

22        THE COURT:  Are there standards?

23 Q    Are there epidemiology standards that would apply to a

24 study like this?

25 A    I believe that the definition of what a case series, or

Molgaard - Direct/Heberling                    273

1  case referral study is in Last is our standard in the field.

2  Q    Does the Whitehouse 2004 study meet that standard?

3  A    I believe so.

4         MR. BERNICK:  But when the witness referred to Last,

5  is that the proper name, Last, as in the book?

6         THE WITNESS:  It's the <u>Dictionary of Epidemiology</u>.

7  It's by John Last.

8  Q    And could you describe the design in terms of what kinds

9  of analysis was done in the Whitehouse 2004 study?

10 A    In a very typical descriptive epidemiology study he was by

11 and large looking at clinical correlates among these patients

12 who had come to his attention in his practice, and so he was

13 looking at their lung function.  He was looking at their, you

14 know, age, and stuff like this.

15 Q    And was some kind of statistical analysis done?

16 A    Yes, there was.

17 Q    Can you describe that?

18 A    The analysis was looking, I believe, at the three main

19 lung function parameters in terms of whether they were

20 statistically significant in terms of their differences or

21 change through time.

22 Q    Okay.  Do you have an opinion whether the design of the

23 study was adequate?

24 A    I felt it was.

25 Q    And do you have an opinion whether the methods used in the

1 study were adequate in terms of epidemiology analysis?

2 A    For that type of descriptive epidemiology, yes, I felt it

3 was.

4 Q    Okay.  Dr. Moolgavkar criticizes Whitehouse 2004 for using

5 just two data points, first lung function and last lung

6 function.  What is your response to that?

7 A    Well, Rom did a summary table, looking at that issue, and

8 I think something like 75 percent of the studies of this type

9 used just two measures.  It's very common to do that.

10          MR. BERNICK:  I'm sorry.  That was a reference to

11 what?

12          THE WITNESS:  An article written by R-o-m, Rom.

13 Q    Did you review a number of longitudinal lung function

14 studies similar to Whitehouse '04?

15 A    I looked at some of them, yes.

16          MR. BERNICK:  I'm sorry.  Is this -- I'm sorry.

17 Could we have -- we're looking to see if this is in the expert

18 report either, Your Honor.  Go ahead.  I'm sorry.

19          MR. HEBERLING:  Actually, it is.  This is --

20          MR. BERNICK:  Yes.  We have -- it is.

21          MR. HEBERLING:  You found it?

22          MR. BERNICK:  Yes.

23          MR. FINCH:  We did.

24 BY MR. HEBERLING:

25 Q    Then Dr. Moolgavkar states Dr. Whitehouse does not say how

1 the effective age can be adjusted using these normative values.

2 Did you understand that criticism?

3 A    Not very well, because they are -- age is already built

4 into the norm values for lung function.

5 Q    So, what is your response to Dr. Moolgavkar?

6 A    I don't know why he made that criticism.

7 Q    Then, Moolgavkar states the Whitehouse 2004 study should

8 have performed a regression in which pulmonary capacity is

9 modeled as a function of covariates such as age, gender,

10 smoking, history of obesity, radiologic changes, pleural

11 thickening, and most importantly, history of exposure to

12 asbestos.  Do you agree with that criticism?

13 A    I don't really because I think there are times that

14 regression is appropriate, and there are other times when you

15 don't need to do it.  I'm not a great fan of regression

16 techniques in general, and I know a lot of people who are not,

17 so --

18        MR. BERNICK:  Objection.  Move to strike that last

19 statement.  There's no basis that would comply with 702 and 703

20 for having opinions offered on whether Dr. Molgaard is a fan,

21 or other people are a fan of anything.  It's not a scientific

22 opinion.

23        THE COURT:  That's sustained.

24 BY MR. HEBERLING:

25 Q    Well, what did you mean by being a fan of a certain

1  opinion?  Or -- can you give a professional statement that

2  doesn't use the word fan?

3  A    I can probably avoid the word fan.

4        MR. BERNICK:  Well, just to be clear, we're just

5  interested in scientific methodology.  That's the foundation

6  that we're interested in.

7  A    There are several ways to control for confounding

8  variables in an analysis.  You can either control for them in a

9  regression, or you can control for them by stratification.  You

10  can also control for them by simple use of controls.  There are

11  many people who are less than enthusiastic about the use of

12  regression techniques in all situations.  We believe that

13  stratification is still -- which is the older technique -- is

14  still a reasonable approach to trying to control the impact of

15  confounding variables when you're looking at a disease and

16  exposure situation.

17  Q    Do you recognize a fellow by the name of Rothman as an

18  authority in epidemiology?

19  A    He is an authority.  Yes.

20  Q    Are you familiar with the text, <u>Teaching Epidemiology, 2nd</u>

21  <u>Edition</u>?

22  A    Yes.

23  Q    At Page 73 Rothman states, "Multi-varied analysis is

24  helpful to achieve various analytic ends, but its problems are

25  often underestimated.  My teaching emphasizes caution in

1 respect to multi-variate models which have more pitfalls than

2 stratified analysis, but it's become fashionable presumably

3 because the technology allows such analyses to conducted more

4 readily." Do you agree with that?

5 A    Yes, I do.

6 Q    Is that what you were referring to in your answer?

7 A    Yes, it was.

8 Q    Okay.  As to the correlations that Dr. Moolgavkar listed

9 that he felt should have been done, what about age and gender?

10 Are they controlled in the analysis in any way?

11 A    Through the norming -- use of the norms they are.

12 Q    And what norms are you referring to?

13 A    For lung function.

14 Q    Okay.  Was a smoking correlation done?

15 A    It was my understanding it was looked at during the review

16 process.

17 Q    Is a --

18         MR. BERNICK:  Objection.  What's the -- could we have

19 the -- move to strike.  Lack of foundation.

20         THE COURT:  If it's not part of the report that he's

21 reviewing?  I'm confused.

22 Q    What's the basis for your understanding that a smoking

23 correlation was done?

24 A    Because I read it in the documentation I believe provided

25 by Whitehouse for the process of getting his paper submitted

Molgaard - Direct/Heberling                    278

1  and accepted for publication.  And as part of that review the

2  reviewers asked for them to look at smoking history, do an

3  analysis of that, and they did not find that it was

4  contributing any information or had any impact to what was

5  going on in the paper, so it was never put in the paper but was

6  done as part of the review process.

7  Q    Was there --

8          MR. BERNICK:  I'm not sure -- I don't believe that

9  that document has been furnished, and if it is, if it exists,

10 we would like to see it.

11         MR. HEBERLING:  Yes.  It's described in Dr.

12 Whitehouse's '07 deposition.

13         MR. BERNICK:  That doesn't mean that we've got it.

14         MR. HEBERLING:  Oh.  Excuse me.  It's not a document.

15 It was described in the deposition as an analysis done during

16 the peer review process, and --

17         MR. BERNICK:  Do we have the analysis?  If all the

18 witness does is --

19         MR. HEBERLING:  I don't think Dr. Whitehouse still

20 had a copy of it or -- the -- there's a record --

21         THE COURT:  I don't understand how we're looking at

22 part of a review process that's not part of the report when

23 what you're getting to is the design of the study and you're

24 trying to make correlations.  I've lost -- I've totally lost

25 the relevance to what this witness is doing with respect to the

Molgaard - Direct/Heberling                    279

1 design of this study.  I understand that the smoking

2 correlation was apparently not considered as part of the study

3 because it's not in the published portion of the study.  Is

4 that correct?

5            MR. HEBERLING:  Correct.

6            MR. FINCH:  Your Honor, there's also --

7 BY MR. HEBERLING:

8 Q    And in the smoking correlation was there a significant

9 enough number of smokers to get numbers that had statistical

10 solidity?

11           MR. BERNICK:  Objection.  Lack of foundation and lack

12 of discovery.

13           THE COURT:  That's sustained.

14 Q    Do you have information on the number of smokers in the

15 study?

16 A    I could be very wrong here, but I thought -- I thought

17 there were 46 who had smoking history out of the 123.

18           MR. BERNICK:  Is that -- that's fine.  Is that in the

19 study?

20                       (Pause)

21           MR. BERNICK:  Oh.  Yes.  We found the reference in

22 the paper, Your Honor.

23                       (Pause)

24           THE COURT:  This --

25           MR. FINCH:  What have you put in front of the

Molgaard - Direct/Heberling                    280

1  document?

2          THE COURT:  -- is Page 221 from Exhibit what?  I'm

3  sorry.  LC-1?

4          MR. HEBERLING:  From LC-1, Your Honor.

5          THE COURT:  All right.

6  BY MR. HEBERLING:

7  Q    And does Page 221 refresh your recollection as to the

8  number of smokers in the study?

9  A    Right.

10  Q    What was the number?

11  A    Seven percent.  Eight of the 123 were current smokers.

12  Q    And was the --

13          MR. BERNICK:  Your Honor, that's really misleading.

14  You have included the ex-smokers, too.

15          MR. FINCH:  Under the rule of completeness I ask that

16  it be included.

17          THE COURT:  I'm sorry.  I couldn't hear you.

18          MR. FINCH:  Under the rule of completeness, Federal

19  Rule of Evidence 106, I request that he read the entire

20  sentence into the record.

21          THE COURT:  All right.  Please have him read the

22  whole sentence.

23  BY MR. HEBERLING:

24  Q    Please read the whole sentence including current smokers

25  and ex-smokers.

1  A    All right.  It says, "The majority of the 123 patients

2  were ex-smokers, with eight of the 123, seven percent being

3  current smokers.  Also, 27, or 21 percent, never smoked."

4  Q    And does that refresh your recollection as to how many

5  were current smokers?

6  A    Yeah.

7  Q    And is eight a sufficient number to do a statistically

8  sound analysis?

9        MR. BERNICK:  Objection.  Lack of foundation.  And

10  that particular analysis I'm highly confident is not in this

11  expert report.

12        THE COURT:  I think the problem is, if I understand

13  this correctly, that this study did not look at smoking as to

14  whether or not there was or wasn't a causative factor for any

15  association between smoking and the diseases, the lung function

16  problems that the people who were in this study had.  And yet,

17  the study itself is saying that the majority were either ex-

18  smokers or current smokers, and only 27 of them never smoked at

19  all, and this witness has testified, as I understand it, that

20  smoking was not addressed in the study.  So, I'm not sure where

21  else we're going.

22        MR. FINCH:  Your Honor, I think that should be better

23  explained by Dr. Whitehouse, who did the analysis.

24        THE COURT:  All right.

25  BY MR. HEBERLING:

1  Q    Then, another of the list of items that Dr. Moolgavkar

2  thought should have been considered included an obesity

3  correlation.  Was that done?

4  A    He looked -- they looked at BMI, body mass index.

5  Q    So, was the correlation done in the study?

6  A    It reports it here.  It's --

7  Q    And also, was a correlation with pleural changes done?

8  A    Yes, it reports one here.

9  Q    Was there any correlation done regarding history of

10  asbestos exposure?

11  A    Yes, I believe there was.

12  Q    So, did the correlations done meet -- in the 2004

13  Whitehouse article meet epidemiology studies?

14  A    Yes.

15  Q    Standards?  Excuse me.

16  A    Yes.

17  Q    And Dr. Moolgavkar states that Whitehouse 2004 does not

18  provide information that would be required to determine what

19  extent of loss of lung function among residents of Libby is

20  attributable to the asbestos exposure.  Is this necessary?

21  A    I believe it does provide that information.

22  Q    As to all residents of Libby?

23  A    Oh, not all residents of Libby, no.  As far as the study

24  sample goes.

25  Q    And was the study on all residents of Libby in any way?

1  A    No, not in any way.

2  Q    Dr. Welch criticizes Whitehouse 2004 for using cross

3  sectional data.  What's your response to that?

4  A    That's commonly done.

5  Q    And what is cross sectional data, briefly?

6  A    Basically you define what period you're going to look at a

7  sample, and you look at both the exposure and the disease

8  status during this time period.  So, it can be, like, for one

9  week, all cases that come into your clinic for one week, or all

10 cases that come into a clinic for one month, and you look at

11 both exposure and disease status among those cases who come in.

12 That's one example.

13 Q    You said it was common.  How common is it?

14 A    Very common.  If you will, think of it as a snapshot of

15 the sample where you're looking across the sample in time.

16 Q    Dr. Welch criticizes the changes found in lung function,

17 stating that they could be solely due to chance.  Are you

18 familiar with that criticism?

19 A    Yes.

20 Q    And what is your response to it?

21 A    It's a pretty good sample size.  I think that that would

22 stabilize the estimates to some extent.  I don't see chance as

23 being an issue in this situation.

24      MR. BERNICK:  Objection.  Move to strike.  The

25 statement of what the witness just gave purported to address

Molgaard - Direct/Heberling                284

1  the question of whether there was a sufficient statistical

2  strength in the sample size to be able to make a statement that

3  eliminated chance, or the considered chance.  That is a

4  statement that under <u>Daubert</u> requires a methodology.  It's not

5  a question of the witness eyeballing the thing and kind of

6  providing a judgment.  There's no analysis in his report,

7  there's no analysis that's been provided here that demonstrates

8  a study by this witness of statistical strength in the paper.

9          MR. HEBERLING:  I'll lay further foundation, Your

10 Honor.

11         THE COURT:  All right.  Until then the testimony is

12 stricken, so we'll get back to it if the foundation is laid.

13 BY MR. HEBERLING:

14 Q    Okay.  What is the central limits theorem in epidemiology?

15 A    It refers to, in statistics, when you have achieved a

16 large enough sample so that basically the test, the analytic

17 inferential test that you're going to use, or any test that

18 you're going to use, are -- the sample, once it gets above 30,

19 35, is going to have -- is affected by this rule, the central

20 limits theorem, which says at that point the distribution

21 approximates a normal distribution, and so you can do

22 statistical testing at that point.  It will work out.

23         MR. BERNICK:  Objection.  Move to strike.  I don't

24 believe he's done that.  I don't believe it's in his report.

25         THE COURT:  Has that test been done?

1          MR. HEBERLING:  Well, I think it involves -- he's

2    stated that if the number of subjects is above 30, then the

3    numbers stabilize sufficiently, so I can ask him --

4          THE COURT:  Well, I thought he said in the analytic

5    inferential test, not in the descriptive test.  Isn't there a

6    distinction?

7          MR. HEBERLING:  I'll ask.  Thank you.

8    BY MR. HEBERLING:

9    Q    Is there a distinction between analytic and descriptive

10   epidemiology as to the central limits theorem?

11   A    No, there's not.  And if I may add, the -- what I'm

12   referring to really is Figure 1 in this paper, where there was

13   formal inferential statistics done which were highly

14   significant, and the reason that they worked is because the

15   sample size obviously was big enough.

16         MR. BERNICK:  We stand by the objection because this

17   is not in his report.

18         THE COURT:  All right.  I'm going to reserve ruling

19   on this simply because frankly I think we need to get through

20   it so I can understand what the testimony is.  I don't know

21   what the relevance is at this point and I'm not sure I'm

22   following where this relevance is coming into the nature of

23   this report, but he's not through it yet so I'm going to

24   reserve ruling.

25         MR. HEBERLING:  Yes.  I'm sure Your Honor can

Molgaard - Direct/Heberling                          286

1  appreciate the difficulty of trying to go as quickly as

2  possible but then getting into something like the central

3  limits theorem, and it's not easy to go quickly through that,

4  so --

5          THE COURT:  Well, if the witness had done the tests

6  and provided a report it would have been easier.

7          MR. HEBERLING:  Well, this is a response to the

8  criticism, so it's in his report.  He said that the numbers

9  will stabilize.

10          MR. FINCH:  Where in his report, Mr. Heberling, does

11  the witness describe the central limits theorem?

12          MR. HEBERLING:  He said the numbers will stabilize,

13  and that's why.  So, this is covered.

14          MR. FINCH:  Where?  On what page, sir?

15                    (Pause)

16          MR. BERNICK:  Maybe we can search for this later --

17          MR. HEBERLING:  It's Page 21, at the bottom.  It

18  says, "The sample size is sufficiently large to stabilize the

19  average estimate."  It's specifically responding to the

20  criticism that we're discussing here.

21          MR. BERNICK:  Yes.  There's not a single mention of

22  the analysis that the witness just talked about.  Again, we

23  object.  We'd like to go on, subject to that objection, and

24  complete the --

25          THE COURT:  Yes.

1            MR. BERNICK:  -- examination.

2            THE COURT:  Yes.  Go ahead.

3   BY MR. HEBERLING:

4   Q    Well, how large a sample do you need to stabilize the

5   estimate?

6   A    It is usually the rule -- the principle is approximately

7   30.  It's not a test --

8   Q    Does the --

9   A    -- it's a principle that's used in decision making in

10  statistics.  It's not a test process.

11  Q    Does the stability of the number go up with the increasing

12  number of subjects?

13  A    That's the general idea.  Yes.

14  Q    And is the number of subjects being 123 significant?

15  A    I believe it is because otherwise you would not have

16  gotten a statistically significant result on Figure 1.  And

17  there are error bars on Figure 1.  You can see that the

18  comparisons are significant.

19           MR. BERNICK:  And that, again, I don't believe, is in

20  the report.

21           THE COURT:  I think -- I believe what Mr. Heberling

22  is doing is having the witness respond to the criticisms of Dr.

23  Whitehouse's and the other studies in this case, the 123 lung

24  function study that were raised by the debtor and the plan

25  proponents' experts.

1          MR. BERNICK:  Yes --

2          THE COURT:  And so, I -- was there no rebuttal

3   report?

4          MR. BERNICK:  There was -- that's the whole problem

5   is that they were given the opportunity to supplement their

6   reports to respond to the criticism, so when we say it's not in

7   the report, it's not even in the report that purports to be

8   responsive to what Dr. Moolgavkar and Dr. Welch said.

9          THE COURT:  All right.

10                         (Pause)

11  BY MR. HEBERLING:

12  Q    Okay.  Dr. Molgaard, you referred to -- did you refer to

13  Figure 4 or Figure 1 in the Whitehouse '04 publication?

14  A    I was referring to Figure 1.

15  Q    Do you have before you now the overhead, Whitehouse 2004

16  Figure 1 from the study?

17  A    Yes.

18         THE COURT:  I'm sorry.  Can you tell me again?  I've

19  lost the exhibit number.

20         MR. HEBERLING:  These are overheads, and we're

21  placing exhibit numbers on as we go, so -- the next number,

22  please?

23         THE COURT:  So, the 2004 study doesn't have an

24  exhibit number?

25         MR. HEBERLING:  It was LC-1.

1          THE COURT:  Okay.

2          MR. HEBERLING:  Oh, yes.  It can be found there.

3          THE COURT:  All right.  Thank you.

4          MR. FINCH:  Just for clarification, this -- these

5   charts are part -- they're an exhibit in the 2004 lung function

6   study?  Is that right?

7          MR. HEBERLING:  Yes.  Okay.  Put a sticker on it.

8   Q    We're now looking at overhead LC-275, and you mentioned

9   something about the statistical stability of the study.  Would

10  you -- could you use the overhead to explain that?

11         MR. BERNICK:  Again, Your Honor, that I don't believe

12  is in his rebuttal report.  What we're going to hear right now

13  is what the witness is eyeballing here on the stand.

14         MR. HEBERLING:  He reviewed the Whitehouse '04 report

15  extensively in his expert witness report.

16         MR. BERNICK:  That's the whole problem is that he's

17  responding now to what Dr. Moolgavkar said concerning the

18  progression study, and he should have provided in his rebuttal

19  reports a description of the analysis that he is now going to

20  give, and I don't believe, although again I could be corrected,

21  that it's in his rebuttal report.

22         MR. HEBERLING:  This -- the stability of the estimate

23  related to that -- that was a piece from the report that we

24  just quoted directly, and he made -- the witness made reference

25  in support of his testimony to Whitehouse Figure 1.  So --

1          THE COURT:  He did make that.

2          MR. HEBERLING:  -- I went -- so, I went to that.

3          THE COURT:  All right.

4          MR. HEBERLING:  I think it's connected.

5          THE COURT:  Again, I'm going to accept the testimony

6  because I need to figure out how this is all connecting up, and

7  I'm not sure yet, so I will permit the testimony subject to

8  ruling on this objection at a later time, because I have not

9  seen the rebuttal report.  I'm sure it's here.  It's just one

10 that I haven't had a chance to get to read yet, and so, I don't

11 -- that's part of the problem, there are just a lot of reports,

12 and I just simply haven't gotten to this one yet, so I don't

13 know what it says, and as a result I'm not prepared to make

14 rulings right now.  So, I'll accept the testimony subject to

15 ruling on that objection at a later date.

16 BY MR. HEBERLING:

17 Q    So, Dr. Molgaard, can you explain what you were referring

18 to?

19 A    I was referring to the three measures of lung function

20 here in the table and Figure 1, and basically on the tops of

21 each of these bars --

22 Q    Okay.  What are the three lung functions?  And explain

23 what is shown there for the --

24 A    Yes.  It's force, vital capacity, total lung capacity, and

25 diffusion capacity, DLCO.  Okay.

1  Q    And then, what was the average lung function loss --

2  A    The loss was --

3  Q    -- per year?

4  A    The loss was, like, 2.2, 2.3, and three percent per year

5  --

6  Q    Okay.

7  A    -- over 35 months.

8  Q    And then, what about statistical stability?

9  A    Well, the stability, given that it's well over 30, should

10 be okay, and I think the proof is in the pudding when you

11 compare the error bars on each of these bar graphs for each of

12 the three lung functions the error bars are indicating that

13 there is a statistically significant difference there.  Okay?

14 So there --

15           MR. BERNICK:  I'm --

16 A    -- what you're looking at is you do have enough samples to

17 detect a difference if it exists.

18 Q    So --

19           MR. BERNICK:  Your Honor, again, I believe that

20 actually that is not even in the progression study itself, that

21 analysis, so what the witness has now supplied is free form, on

22 the stand, no prior disclosure.

23           THE COURT:  All right.  As I said, I'm going to

24 accept this until I can have a chance to go look at the reports

25 at a later date.

1 BY MR. HEBERLING:

2 Q    You mentioned error bars.  What do they look like on the

3 overhead?

4 A    They are the little bars right on top of each of the -- of

5 the bars.  Those are saying -- if those lines, those little

6 bars, overlap, that means that there is no significant

7 difference on that lung function test through time, over 35

8 months.  Because those little lines on top of each of the bars

9 don't overlap, that means that it's statistically significantly

10 different.

11 Q    Okay.  And that's something known to epidemiologists?

12 A    Yes.

13 Q    Then, P less than .001, what does that mean?

14 A    I think what the statistician involved did is he's come up

15 with some kind of a test, or he can put all three of these

16 comparisons in, but what it means is that the probability of

17 this happening is highly -- it's point -- it's a way

18 significant probability.  This is highly statistically

19 significant.  Usually what we use is .05.  This is .001.  This

20 is really statistically significant.

21 Q    Okay.  And in the public health arena has Whitehouse 2004

22 been relied upon in any public health decisions?

23              MR. BERNICK:  Objection.

24              MR. FINCH:  Objection.

25              MR. BERNICK:  Objection.  Relevance.

1          MR. FINCH:  And lack of foundation.

2          MR. HEBERLING:  Well, Your Honor, it's very relevant.

3  This is a basis for the public health emergency declaration in

4  Libby which shows the extent that Libby has differed in terms

5  of disease severity than elsewhere.

6          THE COURT:  Then you'll -- well, I don't know that

7  the public health declaration said that Libby was different in

8  disease severity.  I don't think the study actually had that

9  conclusion.  If it did, I can be corrected, you can show me,

10 but I don't think it said that.

11         MR. BERNICK:  Your Honor --

12         MR. HEBERLING:  We'll get there.

13         MR. BERNICK:  I'm sorry.  The public health --

14         MR. HEBERLING:  There is a quote --

15         MR. BERNICK:  -- the public health emergency is an

16 administrative decision that we all know, and the people in

17 Libby know, and it's been well documented, has been

18 tremendously political.  It is not a scientific document.

19         MR. HEBERLING:  Objection.  There is no basis in the

20 record for that.

21         THE COURT:  There isn't -- gentlemen, there is no

22 basis in the record for either of your statements.  I don't

23 have any basis for any public health emergency statement yet,

24 and I certainly don't know that a statement issued in 2009 was

25 based on a study that was done in 2004.  So, all of it is

1 stricken, your comments and Mr. Bernick's comments.  Now I've

2 lost what the objection was.

3          MR. FINCH:  The objection was lack of foundation.

4 How can he testify what was a basis for the emergency order

5 issued by the EPA when, A, he wasn't at the EPA; and B, when

6 you look at the list of references in the document it doesn't

7 mention the Whitehouse 2004 paper.

8          MR. HEBERLING:  Yes, it does.

9          MR. FINCH:  No, it doesn't.  It says the index of

10 documents in the administrative record.  That's not the same

11 thing as a reference.  Anybody can put anything in the

12 administrative record.  There's all kinds of stuff in the

13 administrative record criticizing a variety of things --

14          THE COURT:  Gentlemen, you're going well beyond the

15 question.

16          MR. FINCH:  The basic objection is lack of

17 foundation.  He wasn't involved in making this determination,

18 so he can't testify why the government did what it did.

19          THE COURT:  Okay.  You folks have the instantaneous

20 reader.  Can somebody read the question back to me, because

21 frankly that's not what I understood the question to be,

22 anyway.

23          MR. BERNICK:  Some techno-genius here is going to do

24 this.  I thought Mr. Guy was the master.

25          MR. GUY:  Yes.

1        THE COURT:  I thought it was has the study been used

2   by the government, but not specifically related to any public

3   health emergency?  I didn't hear those words.

4        MR. BERNICK:  The question was has the document been

5   relied upon by the public health authorities?  I think that's

6   what it was.

7        THE COURT:  Okay.  That's --

8        MR. BERNICK:  That's -- is that the essence --

9        MR. HEBERLING:  No, that isn't exactly right --

10       MR. BERNICK:  Okay.  Well, then, you --

11       MR. HEBERLING:  -- but it's close enough.  Has it

12  been relied upon in the public health decisions?

13       MR. FINCH:  Objection.  Lack of foundation.

14       MR. HEBERLING:  Your Honor, I think we'll --

15       THE COURT:  I don't understand that this witness has

16  a relationship with the public health authorities to know.  If

17  you can lay a foundation, then you can ask the question, but I

18  don't know the foundation.

19       MR. HEBERLING:  Okay.  I think we'll cover this a bit

20  later in the examination.

21       THE COURT:  All right.

22  BY MR. HEBERLING:

23  Q    Okay.  Let's refer to LC-2.

24                      (Pause)

25  Q    Is this an article titled "Environmental Exposure to Libby

1  Asbestos and Mesotheliomas"?

2  A    Yes.

3  Q    Is it published in the <u>American Journal of Industrial</u>

4  <u>Medicine</u>?

5  A    Yes.

6  Q    Are you familiar with the article?

7  A    I'm sorry.  What?

8  Q    Are you familiar with the article?

9  A    Yes.

10 Q    And could you read who the authors are?

11            MR. BERNICK:  Objection.  Your Honor, this article

12 has absolutely no relevance to anything.  It relates to -- it's

13 a case series, or actually case reports relating to

14 mesothelioma among people in Libby.  It has no relationship to

15 any issue that's before the Court for decision.

16            MR. HEBERLING:  It goes to the severity of the

17 asbestos disease situation, and we will be showing that Lincoln

18 County is now number three in the United States for

19 mesothelioma death rate.

20            THE COURT:  What difference does it make?  They're

21 all going to have claims that can be processed by the trust.

22            MR. BERNICK:  Right.

23            THE COURT:  The severity of the disease is something

24 they're going to have to prove to the trust.

25            MR. HEBERLING:  Well, Your Honor, this goes to the

Molgaard - Direct/Heberling                    297

1  Libby is different issue, and that these claims are not

2  substantially similar to claims elsewhere, and therefore they

3  should be treated differently.

4        THE COURT:  Someone's mesothelioma claim is different

5  from somebody else's mesothelioma claim?

6        MR. HEBERLING:  The rate of mesothelioma indicates a

7  disease severity that is higher than elsewhere.  That's our --

8        THE COURT:  You mean the disease incidence?

9        MR. HEBERLING:  -- our contention.

10        MR. BERNICK:  All of these people will be compensated

11  under the TDP.  They will all qualify, to the extent that they

12  lived in Libby for the right period of time.  There is no issue

13  that's been raised by any of their experts regarding the

14  adequacy of the TDP itself to reach all of these mesothelioma

15  cases.  So, how ever many there are, a small number, a large

16  number, is completely irrelevant to the discrimination issue.

17  It is the sole focus of the issue that brings us here.

18        MR. FINCH:  And as to the classification issue, Your

19  Honor, if I may respond to that?  All of their experts have

20  testified that there is no difference in terms of likelihood of

21  death or severity for mesothelioma caused by exposure to Libby

22  asbestos as compared to mesothelioma caused by anything else,

23  and so, it's irrelevant to their plan objections.

24        MR. HEBERLING:  Under Combustion Engineering, where a

25  class of claims is not substantially similar to others, it

1 should be treated differently, and not doing so is a

2 discrimination.  We contend --

3         THE COURT:  So, your argument is that all meso cases

4 ought to be taken out and put into a separate class?

5         MR. HEBERLING:  No.  We contend that this is evidence

6 of a disease severity and intensity seen nowhere else.

7         MR. BERNICK:  But it doesn't -- that's the whole

8 problem is that --

9         THE COURT:  That's the problem.  It doesn't matter

10 because as long the TDP treats all meso claims the same, or

11 substantially similarly, then there is no discrimination.  The

12 fact that a person obtained, unfortunately contracted a

13 mesothelioma because of exposure in Libby is no different from

14 somebody contracting it by living in Boston.  It's still

15 mesothelioma, it's still going to kill you, and it's still

16 going to be compensable provided that you can meet the exposure

17 and other criteria.

18         MR. FINCH:  And, Your Honor, one other basis for the

19 objection.  When Mr. Heberling is talking about severity, he's

20 talking about incidence of disease in Libby for mesothelioma.

21 There is -- it doesn't matter whether there is ten cases from

22 Libby, or 100 cases from Libby, versus 50,000 mesothelioma and

23 lung cancer cases from the rest of the country, which is what

24 Dr. Peterson will testify to next week in his estimate of the

25 total liability.  It has nothing to do with the TDP issues.

Molgaard - Direct/Heberling                    299

1              THE COURT:  Mr. Finch, you use so many words that I

2  lose track of what your objection is.  What's your objection?

3              MR. FINCH:  The objection is lack of relevance, Your

4  Honor.

5              THE COURT:  Okay.

6              MR. GUY:  Your Honor, may I be heard?

7              THE COURT:  Yes.

8              MR. GUY:  I have a small suggestion from my part for

9  the FCR.  I just want to have a standing objection on

10  relevance, foundation, Daubert, whatever it may be, because I

11  think we just need to get this witness off the stand.  The

12  Libby claimants had a day for their case, and we're only -- not

13  even finished with their expert, and it's ten to six.  So,

14  whatever they can do -- they have -- the Court has allocated

15  them a lot of time.  Whatever they -- if they want to take up

16  all their time with this witness, which I'm very confident the

17  Court is going to strike --

18              THE COURT:  All right.  With respect to standing

19  objections, because I am not able at this point to rule on the

20  issues that I have already preserved, the objections to the

21  Daubert standards and the objections to admissibility based on

22  relevance are preserved.  Anything else, folks, you need to

23  raise, because I don't know a standing objection in any other

24  capacity.  So, those two things I will preserve.  The rest you

25  need to raise, they are not preserved.  You need to do them on

1  a question-by-question basis.  With respect to the relevance

2  issue, I did not understand anywhere in the papers that Libby

3  was contending that mesothelioma in Libby was different from

4  mesothelioma elsewhere.  And if you are making that contention,

5  this witness is not a medical expert and is obviously not the

6  person who can offer that opinion.  So, the objection on that

7  score is sustained.

8         MR. HEBERLING:  Okay.  We'll move on to fiber

9  potency.

10 BY MR. HEBERLING:

11 Q    Have you reviewed the section of the Moolgavkar report

12 where he calculates fiber potency for the Libby fiber?

13 A    Yes.

14 Q    Are you familiar with his method?

15 A    Yes.

16        MR. BERNICK:  We're not going to be putting in any

17 evidence regarding fiber potency unless and until the Libby

18 claimants do, and I don't believe that they are going to.  So,

19 to the extent that this is now opening up a whole new issue,

20 which is fiber potency, in rebuttal, we don't plan to present

21 that evidence unless the Libby folks do, and he is the wrong

22 person to address that issue.

23        MR. HEBERLING:  Well, he may be the right person, but

24 --

25        THE COURT:  Well, I guess the question is if this --

1   is this --

2           MR. HEBERLING:  The question is if they're not going

3   to put -- see, we're --

4           THE COURT:  Yes.

5           MR. HEBERLING:  -- responding to their expert

6   reports.

7           THE COURT:  Yes.

8           MR. HEBERLING:  So, if they're not putting on fiber

9   potency testimony, we designated some testimony from Dr.

10  Moolgavkar where he gives fiber potencies for amphiboles versus

11  chrysotile.  Beyond that we're not -- and there's already some

12  in from Dr. Hammar, so beyond that we're not offering anything

13  --

14          MR. BERNICK:  No, that's not -- that's -- to say that

15  there's -- well, there's just a little bit doesn't mean that

16  it's no longer being placed at issue.  If it is the intent of

17  the Libby claimants to put fiber potency at issue, then we will

18  most definitely respond.  We haven't heard it yet.  It hasn't

19  been presented yet.  The deposition designations haven't been

20  accepted yet.  Dr. Hammar's designations, to the extent there

21  are any, haven't been even proffered yet.  So, if they do

22  become an issue we will, in fact, respond to it.  Fiber

23  potency, again, has got zero relevance to the discrimination

24  issue, which is why we don't intend to address it.

25          MR. HEBERLING:  We won't address it at this time,

1 Your Honor.

2          THE COURT:  All right.  If it comes up, then

3 obviously you can reopen this case for that purpose.

4 BY MR. HEBERLING:

5 Q    Then in Dr. Moolgavkar's report he did an analysis of --

6 based upon Sullivan 2007 relating to worker deaths from

7 mesothelioma.  Are you familiar with that?

8 A    Yes.

9 Q    And --

10          MR. BERNICK:  That is the same issue, Your Honor.

11          THE COURT:  Ask your question, Mr. Heberling.

12 Q    Okay.  Are you familiar with Sullivan 2007?

13 A    Yes.

14 Q    Who are the subjects in that study?

15 A    They were -- if I remember correctly they were a follow up

16 of the -- I could be wrong here -- the ATSDR group.

17 Q    Was it the Amandus group?

18 A    Yes.

19 Q    And what number of mesotheliomas did Sullivan come up

20 with?

21          MR. FINCH:  Objection.  Relevance.

22          MR. HEBERLING:  I -- it's my impression that this

23 relates to the ATSDR report, which had just, I think, one

24 environmental meso, and five or six worker mesos.  And it's in

25 the same section as the analysis that Moolgavkar puts forth on

1  numbers of mesotheliomas.  And the point here is that they --

2  ATSDR closed their data in 1998.  Sullivan closed their data in

3  2001.  And there have been several mesotheliomas since then

4  which Mr. Moolgavkar should have considered.

5          MR. BERNICK:  That's not --

6          MR. HEBERLING:  So --

7          MR. BERNICK:  It's not -- that's -- they're

8  completely different studies, two completely different data

9  sets.  The ATSDR mortality study was one data set.  The data

10  set that is follow on to the Amandus study that was analyzed by

11  Sullivan is an entirely different data set.  So -- and to the

12  extent that they now want to aggregate those data sets and say,

13  well, gee, there are more mesotheliomas than Dr. Moolgavkar

14  found, again, it goes to the same issue, which is the number of

15  mesotheliomas in Libby, and it's completely and utterly

16  irrelevant.

17          THE COURT:  I'm losing the track of why the number of

18  mesos, or really any -- as a raw number why the number of

19  mesothelioma cases in Libby is relevant.  The issue, I think,

20  is whether those claimants are somehow or other discriminated

21  against by virtue of the fact that the plan and the TDP won't

22  treat them substantially equally with the other claims of their

23  character.  And I'm not finding a connection.

24          MR. HEBERLING:  I think this can be clarified.

25          THE COURT:  All right.

1      MR. HEBERLING:  Mr. Bernick, are you willing to

2 represent to the Court that you're not going to present any

3 evidence through Dr. Moolgavkar on worker mesos?

4      MR. BERNICK:  Well, the worker -- what we're going to

5 do is present evidence through Dr. -- that's too broad.  To the

6 extent that their worker mesos are overall part of a mortality

7 study as it is in the ATSDR mortality study, and Amandus, and

8 McDonald, we're going to talk about those studies.  We are not

9 going to address the issue of the number of mesotheliomas or

10 the incidence of mesothelioma in Libby, because it's not at

11 issue.

12      MR. HEBERLING:  I think he said he is, and I think he

13 said he isn't.

14      MR. BERNICK:  No.  I said what I said.  I'm not going

15 to address the question of the number of mesotheliomas in

16 Libby.

17      THE COURT:  But he is going to address the studies,

18 and if you're addressing the studies on rebuttal, it's a little

19 difficult to do rebuttal before the direct.  I'm sorry.  Maybe

20 that's why I'm having so much trouble piecing this together.

21 But nonetheless, if they're going to address the studies you

22 may address the studies.

23      MR. HEBERLING:  Okay.

24 BY MR. HEBERLING:

25 Q    So, since 2001 have there been additional mesotheliomas in

1 the Grace workers?

2          MR. BERNICK:  Your Honor, I now have consulted with

3 Ms. Harding.  This is -- Dr. Moolgavkar addressed the number of

4 mesotheliomas as part of a re-analysis of the Sullivan study in

5 order to respond to the issue of toxicity.  So, this again goes

6 back to Moolgavkar on toxicity.  We will not be pursuing it --

7          MR. HEBERLING:  Does that mean --

8          MR. FINCH:  Unless the Libby claimants put on

9 evidence related to fiber toxicity issues.

10          THE COURT:  So, you're not going to look at the

11 studies, either?

12          MR. BERNICK:  The only reason I made reference to the

13 studies, Your Honor, is Dr. Moolgavkar is going to talk about

14 how to do a good epidemiological study.  That's the only reason

15 he's going to be talking about those studies.  He is not going

16 to be addressing the question about relative toxicity in the

17 analysis of mesos from that point of view --

18          THE COURT:  All right.

19          MR. BERNICK:  -- which is what gave rise to this

20 whole thing.

21          THE COURT:  Okay.

22          MR. HEBERLING:  Okay.  So, is it correct, then, that

23 you will not be putting on any evidence relating to worker

24 mesos, just community mesos?

25          MR. BERNICK:  No.  I'll say it again, the third time.

1  He's going to talk about the studies.  He's going to talk about

2  worker mortality and community mortality through those studies.

3  He is not going to address the relative toxicity of the

4  materials, and therefore is not going to get into the analysis

5  of the number of mesos and how those mesos have surfaced in the

6  Sullivan study and the ATSDR study.

7           MR. HEBERLING:  So, it looks like we do need to put

8  on our evidence that there are several mesotheliomas since the

9  closing date of those studies which Dr. Molgaard will testify

10 Dr. Moolgavkar should have considered.  So, that's our point.

11 He should have considered current data.

12           THE COURT:  All right.  Okay.  You can ask this

13 question of the witness.

14 BY MR. HEBERLING:

15 Q    Okay.  So, since 2001 are there additional mesotheliomas

16 among Grace workers?

17 A    I believe there are.  Yes.

18 Q    How many?

19 A    I believe there are four or five.

20 Q    And where did you get that information?

21 A    From the documents provided by Whitehouse, I believe.

22 Q    Okay.  And how does -- does Dr. Moolgavkar use any of this

23 information on additional worker mesotheliomas in his reports?

24 A    I don't believe he did.

25 Q    Does the failure to use current data meet epidemiological

1 standards?

2          MR. BERNICK:  Objection to form.

3          THE COURT:  Overruled.

4 A    I believe it is unusual that if you have data that you

5 would not use it.

6 Q    And is that, in fact, an ethical requirement in

7 epidemiology?

8          MR. BERNICK:  Objection.  Relevance and foundation.

9          THE COURT:  Overruled.

10 A    It is either -- I hesitate to say ethical, but I think

11 it's inappropriate and improper analytically.

12          MR. HEBERLING:  Your Honor, it's six o'clock.  I am

13 at a stopping point if the Court would like to stop at this

14 point.

15          THE COURT:  All right.  I suppose that we probably --

16          MR. BERNICK:  Can we get an estimate of how much

17 longer we expect that the direct examination of Dr. Molgaard

18 will go?

19          MR. HEBERLING:  I regret that this has been slow.  I

20 would say at least another half hour.

21          THE COURT:  All right.

22          MR. BERNICK:  Well, then, I -- then we want this --

23 we want to finish this witness before Dr. Frank testifies.  We

24 want to get this done, so --

25          MR. HEBERLING:  We can do that.  Yes.

1            THE COURT:  All right.  Okay.  We will recess until

2    nine o'clock tomorrow morning.  You're excused until nine, sir,

3    but I'll have to remind you that you'll be under oath in the

4    morning, so please don't discuss your testimony with anyone

5    tonight.  Thank you.

6            THE WITNESS:   All right.

7                      (Off the record)

8            THE COURT:  All right.  We're back on the record.

9    Just -- you're free to leave, sir.  You don't have to stay up

10   here, and --

11           MR. BERNICK:  He's having so much fun he wants to

12   stay.

13           THE COURT:  Yes.  Mr. Bernick, go ahead.

14           MR. BERNICK:  Yes.  I think it might be appropriate

15   to kind of do --

16           THE COURT:  Anyone who wants to leave except counsel

17   who are going to be involved in the rest of the trial for this

18   week are free to go, but do it as quietly as you can, please.

19   Okay, Mr. Bernick.  Sorry.

20           MR. BERNICK:  So, it would be kind of good to get a

21   sense of where we're going tomorrow.  Obviously today it went

22   about -- well, much more slowly than I think at least the plan

23   proponents anticipated.  We are very concerned about this

24   testimony becoming cumulative.  We already see that it's going

25   to become cumulative.  We object to that, all these different

1 people talking about the same study, talking about the same

2 issues.  I know Your Honor will take that up as we go, and I

3 know that Your Honor is going to be very flexible, as you have

4 been in the past.  But there really is a fundamental problem

5 about what all this really goes to at the end of the day, and

6 just from the plan proponent's point of view, and the reason

7 that we made the undertakings that we did with respect to Dr.

8 Moolgavkar and others.

9         We believe that the progression study is irrelevant

10 to the TDP issues because if people progress under the TDP they

11 get compensated.  If they progress more frequently, more

12 dramatically, they get compensated more frequently and they get

13 compensated at higher levels under the TDP.  The only reason we

14 believe that progression is of relevance is that progression is

15 something that we placed at issue, the progression study, in

16 the context of talking about why it is that the Libby claim

17 values spiked in the mid 1990s and still maintained at a high

18 level later on in the 1990s, and the story is different today.

19 So, we know that we've opened that door.  We think that

20 progression is relevant solely for that purpose, and that's the

21 only reason that we have delved into it.

22         With respect to all of these other issues that are

23 now coming in through the CARD mortality study and through

24 other vehicles about whether the disease in Libby was, quote,

25 different, that's a red herring.  Different can mean all kinds

1 of different things.  The question is whether the difference is

2 material to the TDP, and so there can be all kinds of

3 differences, if they don't affect whether people get

4 compensation under the TDP they're of no consequence and we

5 don't have to delve into them here.  That's why we elicited

6 testimony to the effect that the TDP works, in the view of our

7 experts, regardless of whether there's, quote, a different

8 disease.

9          THE COURT:  It's not time for an argument, Mr.

10 Bernick.

11          MR. BERNICK:  I understand that, Judge.

12          THE COURT:  Where are you going?

13          MR. BERNICK:  Okay.  Where I'm going is that I think

14 that there is very low relevance to a long excursus about

15 whether Libby is different and that the evidence that's being

16 presented, therefore, has low probative value and it's

17 cumulative, and that we believe that Your Honor should exert

18 control over the latitude that I know Your Honor ordinarily

19 would exert -- would produce flexibility and allow people to

20 testify at length.  We think that Your Honor ought to insist

21 that we have succinct examinations of the remaining witnesses

22 so we can get past this issue and get on with the rest of the

23 case, and we are going to be objecting tomorrow on the grounds

24 of cumulative evidence from these witnesses.

25          MR. HEBERLING:  Your Honor --

1          THE COURT:  Well, when you object I'll make rulings.

2          MR. BERNICK:  I understand that.

3          THE COURT:  Mr. Heberling?

4          MR. HEBERLING:  I'll respond in one tenth of the time

5     that Mr. Bernick took.

6          THE COURT:  Could you use a microphone?

7          MR. HEBERLING:  Sorry.  Okay.  The CARD mortality

8     study is important because in Libby we have people with severe

9     pleural disease who are not compensated.  The CARD mortality

10    study developed these percentages.  42 percent go out because

11    they don't have blunting.  Another three -- 16 percent go out

12    because they don't have the thickness.  Another 18 percent go

13    out because they don't have the extent of the chest wall, and

14    so forth.

15         THE COURT:  But that's only going out from the

16    expedited review process.  That's been the whole point of the

17    TDP, that there is individual review if you don't meet that the

18    standards that the TDP sets up for the expedited review

19    process.  It's not that they drop off the face of the earth.

20    Grace still has to figure out a way to compensate them.  The

21    only issue is what category will they fit in because they will

22    have certain medical criteria that they have to meet in order

23    to be in a category?  And if they develop a more severe disease

24    later, they can come back to the TDP for additional

25    compensation under the new category.  And if they don't have

1 all of the requirements that the expedited review process

2 requires, then they can seek the -- or will have to go through

3 individual review.  It's not that they fall out.

4        MR. HEBERLING:  Well, I understand the Court's

5 concern, and our position is that these discriminations against

6 severe -- people with severe pleural disease, not only Libby,

7 but elsewhere, are not cured by an individual review process,

8 which is entirely discretionary, and has no standards, and is

9 entirely private.  We don't believe that the Court can transfer

10 important rights to a private entity with total discretion over

11 how to deal with them.  We think as a matter of law that's not

12 proper.

13        THE COURT:  But my understanding is, though, that

14 what's transferred to, as you call it, a private entity, I

15 mean, I think you're not talking about the trust because surely

16 payment through the trust, assuming that it's proper payment,

17 isn't the focus of the objections.  I think what you're talking

18 about is the panel that may have the first and only shot at

19 determining whether somebody fits within that category.  Is

20 that the issue?

21        MR. HEBERLING:  That's correct.

22        THE COURT:  Okay.  So, Libby's real objection to this

23 TDP is the fact that that panel has the sole and exclusive

24 ability to determine whether or not somebody meets the severe

25 pleural disease category and then once that determination is

1 made you go elsewhere for the values.

2          MR. LOCKWOOD:  Your Honor.  That's a mistake.

3          UNIDENTIFIED ATTORNEY:  That mis-describes -- that's

4 a mistake.

5          MR. LOCKWOOD:  Excuse me.  The testimony was that the

6 panel deals only with the question of whether a claim --

7          THE CLERK:  We're not picking you up.

8          MR. LOCKWOOD:  The panel -- the testimony from Mr.

9 Inselbuch was quite clear that the extraordinary claims panel,

10 which is the only panel referred to in the TDP --

11          THE COURT:  Yes.

12          MR. LOCKWOOD:  -- decides only one issue --

13          THE COURT:  Yes.

14          MR. LOCKWOOD:  -- whether or not a claim is entitled

15 to extraordinary claims treatment, i.e., a multiplier.  It does

16 not determine --

17          THE COURT:  Oh, I'm sorry.

18          MR. LOCKWOOD:  -- whether somebody meets severe

19 pleural disease --

20          THE COURT:  Yes.

21          MR. LOCKWOOD:  -- or any of the other issues

22 presented by the TDP.

23          THE COURT:  Yes.  Thank you for the correction.  I

24 apologize.  I knew that, but I mis-stated it in the context of

25 this, so I appreciate the correction.  But the reality -- I

1    think the objection remains, by Libby, nonetheless, because

2    getting into that category and qualifying for the multiplier is

3    the objection that Libby claimants are raising, that somehow or

4    other this panel may have some -- well, I'll use an extreme --

5    some animus against Libby claimants for some reason, and

6    therefore Libby claimants will be precluded from the multiplier

7    simply because of the construction of the panel.  That seems to

8    be the big issue.  If that is the big issue why don't you folks

9    go talk about that?  That's not rocket science to resolve.

10          MR. BERNICK:  Not only that, but that doesn't require

11   that we delve into --

12          THE CLERK:  Speak into the mike, please.

13          MR. BERNICK:  It's on.  That doesn't require that we

14   get into all of these other different things.  That is an issue

15   about process.  We acknowledge that process is the test.  We

16   disagree, obviously.  We think the panel is fine, but we

17   understand your -- but that does not require that we go down

18   the path of all these esoteric inquiries.

19          THE COURT:  Well --

20          MR. BERNICK:  That's the fundamental issue here is

21   that there is this residual that somehow the Libby claimants

22   believe that they must establish that they're different.  And

23   what we said at the outset is we're indifferent about that

24   unless it's something that effects the viability of the

25   process.

1        And so, that's -- and as to this comment here, Your

2    Honor has already given them the latitude to talk about what

3    effect these criteria have on given cases.  You've already

4    given them that latitude.  We don't have a problem if they want

5    to talk about how these criteria effect people who are included

6    in the mortality study.  They can to do that.  It's that they

7    can't hold that group out as being representative of anybody.

8    It is just those people.  And so, this issue of representation

9    is what gets us back into all these gyrations.

10        THE COURT:  Well, the problem with the CARD study, as

11    I understand it right now, is that those folks are not ever

12    going to be subject to payments through the asbestos trust.

13        UNIDENTIFIED ATTORNEY:  Right.  That's true.

14        THE COURT:  And so, they're simply not there to claim

15    against the trust.  To the extent that --

16        MR. HEBERLING:  Excuse me, but there are -- they have

17    wrongful death cases, or survival cases, so they'll be

18    claimants.  But --

19        THE COURT:  They're not going to get compensated --

20        MR. HEBERLING:  -- they're dead, and they can't --

21    they can't get worse in terms of the measurements of their x-

22    rays, so they're out.  And the trust is a private entity, and

23    we don't believe that the individual review process in the

24    trust can cure this and other discriminations.

25        THE COURT:  Okay.  Well, I think the case law will

1 not support that view because every case I've seen so far has

2 set these things up through a trust.  One, generally, not

3 always, usually one trust, sometimes with sub-funds depending

4 on the type of issues that are being addressed through the

5 trust.  But for purposes of where the claimants go, they are

6 all classified together.  There hasn't been a case -- and there

7 are at least, I don't know, 35 or 40 different cases with

8 reported opinions, some not reported opinions, that deal with

9 these kinds of issues.  524(g) is not a new statute.  We are

10 still testing the parameters of 524(g) in certain instances,

11 but I don't think this is one of them.

12        MR. HEBERLING:  Your Honor, we believe this is a case

13 of first impression that the individual review process has

14 never been litigated, so here we are.

15        THE COURT:  The individual review process, if that is

16 the issue -- if the issue is whether this panel is -- has too

17 much control, then you folks should go talk about that issue.

18 If that's the only thing that is driving this trial, we're

19 going down a road that you folks could probably solve in the

20 matter of, you know, a day's worth of negotiations.

21        MR. LOCKWOOD:  Your Honor, the problem is, as Mr.

22 Heberling at one point admitted, is that they don't trust the

23 individual review process for determining the seriousness of

24 the disease.  The panel, as I said before, they don't -- they

25 don't like it, but it's not the only thing they don't like.

1 And I might add that this panel approach has been used in every

2 single case that has been -- come down the pike so far, and

3 that it applies equally to Libby and non-Libby claimants who

4 want to get extraordinary claims treatment.

5        THE COURT:  Okay.  We are far away from whatever the

6 housekeeping issue was that you wanted to address.

7                    (Laughter)

8        THE COURT:  If the housekeeping issue is that you're

9 going to object to cumulative evidence, Mr. Bernick, I don't

10 need a speech about it, just object, and I'll make a ruling.

11        MR. BERNICK:  Thank you, Your Honor.

12        MR. HEBERLING:  Thank you, Your Honor.

13        MR. BERNICK:  With that, could we have an estimate

14 for how long?

15        THE COURT:  Yes.  How long will you be with your

16 witnesses -- this witness first, and then is Dr. Frank next?

17        MR. HEBERLING:  Dr. Frank is a long witness because

18 we go through the whole CARD mortality study with him.  Perhaps

19 -- having heard some of the representations here there may be

20 areas that we don't need to go into, but then we have Dr.

21 Whitehouse, so we would be lucky to finish at four o'clock

22 tomorrow, which I believe is the close of Court.

23        THE COURT:  Yes.

24        MR. HEBERLING:  So, I believe we'll go into Friday

25 morning, but not probably very far.

1          THE COURT:  All right.

2          MR. BERNICK:  Your Honor, that then means -- that is

3 a -- that's a dramatic effect, because then we have, now, with

4 all that's been done, we have Dr. Moolgavkar, and we have Dr.

5 Weill.  So, we're now talking about midday Friday, early Friday

6 afternoon, and --

7          THE COURT:  It's the way life is in litigation, Mr.

8 Bernick.

9          MR. BERNICK:  I understand that.

10          THE COURT:  You've been in a courtroom a long time.

11          MR. BERNICK:  Yes.

12          THE COURT:  You know how those things work.  Okay.

13          MR. BERNICK:  It doesn't get any easier watching the

14 paint dry.

15          THE COURT:  It doesn't get any easier from this side

16 of the bench either, I can tell you.

17          MR. BERNICK:  I'm sure.

18                    (Laughter)

19          THE COURT:  All right.  We're adjourned until nine

20 o'clock tomorrow.

21          MR. HEBERLING:  Thank you, Your Honor.

22          MR. BERNICK:  Thank you, Your Honor.

23                    * * * * *

24

25

319

# **C E R T I F I C A T I O N**

We, KIMBERLY UPSHUR, RITA BERGEN, KATHLEEN BETZ, AMY RENTNER, ELAINE HOWELL and TAMMY DeRISI, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter to the best of our abilities.


/s/ Kimberly Upshur
KIMBERLY UPSHUR

/s/ Rita Bergen
RITA BERGEN

/s/ Kathleen Betz
KATHLEEN BETZ

/s/ Amy Rentner
AMY RENTNER

/s/ Elaine Howell
ELAINE HOWELL


/s/ Tammy DeRisi                    Date: September 14, 2009
TAMMY DeRISI
J&J COURT TRANSCRIBERS, INC.