UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                      .    Case No.  01-1139 (JKF)
                            .
W.R. GRACE & CO.,           .
et al.,                     .    USX Tower - 54th Floor
                            .    600 Grant Street
                            .    Pittsburgh, PA 15219
            Debtors.   .
                            .    September 16, 2009
. . . . . . . . . . . . ..    9:09 a.m.


TRANSCRIPT OF PLAN CONFIRMATION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                            By:  DAVID BERNICK, ESQ.
                            200 East Randolph Drive
                            Chicago, IL  60601

For the Asbestos            Caplin & Drysdale, Chartered
Creditors Committee:        By:  NATHAN FINCH, ESQ.
                                 JAMES WEHNER, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C. 20005

For the Future              Orrick, Herrington & Sutcliffe, LLP
Claimants                   By:  ROGER FRANKEL, ESQ.
Representatives:                 JONATHAN GUY, ESQ.
                            Washington Harbour
                            3050 K Street, N.W.
                            Washington, D.C.  20007


Audio Operator:             Janet Heller

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Libby Claimants: Lewis, Slovak & Kovacich, P.C.
                         By:  TOM L. LEWIS, ESQ.
                         725 Third Avenue North
                         Great Falls, MT 59401

                         McGarvey, Heberling, Sullivan and
                          McGarvey, P.C.
                         By:  JON HEBERLING, ESQ.
                            JOHN LACEY, ESQ.
                         725 Third Avenue North
                         Great Falls, MT  59401

                         Cohn Whitesell & Goldberg, LLP
                         By:  DANIEL C. COHN, ESQ.
                         101 Arch Street
                         Boston, MA  02110

For Arrowood:            Wilson, Elser, Moskowitz, Edelman,
                          & Dicker, LLP
                         By:  CARL J. PERNICONE, ESQ.
                         150 East 42nd Street
                         New York, NY 10017

                         O'Melveny & Myers, LLP
                         By:  TANCRED SCHIAVONI, ESQ.
                         Times Square Tower
                         Seven Times Square
                         New York, NY 10036

For BNSF Railway:        Pepper Hamilton, LLP
                         By:  LINDA CASEY, ESQ.
                            BOB PHILLIPS, ESQ.
                         3000 Two Logan Square
                         Philadelphia, PA  19103

For CNA:                 Goodwin Procter, LLP
                         By:  MICHAEL GIANNOTTO, ESQ.
                         Exchange Place
                         Boston, MA  02109-2881

For Fireman's Fund:      Stevens & Lee
                         By:  MARNIE SIMON, ESQ.
                         600 College Road East, Suite 4400
                         Princeton, NJ 08540

APPEARANCES (CONT'D):

For Maryland Casualty:      Connelly Bove Lodge & Hutz, LLP
                            By:  JEFFREY WISLER, ESQ.
                            The Nemours Building
                            1007 North Orange Street
                            Wilmington, DE  19899

For MCC & Zurich:           Eckert Seamans
                            By:  EDWARD D. LONGOSZ, ESQ.
                            1747 Pennsylvania Avenue, NW
                            Suite 1200
                            Washington, DC 20006

                            Wiley Rein, LLP
                            By:  RICHARD A. IFFT, ESQ.
                            1776 K Street NW
                            Washington, DC 20006

For Ford, Marrin,           Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer            Gleser, LLP
& Gleser, LLP:              By:  ELIZABETH M. DeCRISTOFARO, ESQ.
                            Wall Street Plaza, 23rd Floor
                            New York, NY  10005-1875

For Kaneb Pipe Line         Fulbright & Jaworski
Operating Partnership,      By:  STEVE PIERCE, ESQ.
LP:                         300 Convent Street, Suite 2200
                            San Antonio, TX 78205-3792

For Travelers:              Simpson Thacher
                            By:  ELISA ALCABES, ESQ.
                            425 Lexington Avenue
                            New York, NY  10017

For State of Montana        Womble Carlyle Sandridge & Rice
Dept. of Environmental      By:  FRANCIS MONACO, ESQ.
Quality:                    222 Delaware Avenue, Suite 1501
                            Wilmington, DE 19801

For AXA Belgium:            Tucker Arensberg, P.C.
                            By:  MICHAEL A. SHINER, ESQ.
                            1500 One PPG Place
                            Pittsburgh, PA  15222

                            Mendes & Mount
                            By:  EILEEN McCABE, ESQ.
                            750 Seventh Avenue
                            New York, NY  10019

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

| | |
|---|---|
| For Committee of<br>Asbestos Personal<br>Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701 |
| For Kneb Pipe Line<br>Operating Partnership,<br>LP: | Gilbert & Renton, LLC<br>By:  ROBERT GILBERT, ESQ.<br>344 North Main Street<br>Andover, MA 01810 |
| For Garlock Sealing<br>Technologies: | Robinson, Bradshaw & Hinson, P.A.<br>By:  GARLAND CASSADA, ESQ.<br>     RICHARD WORF, ESQ.<br>101 North Tryon Street<br>Suite 1900<br>Charlotte, NC  28246 |
| For Federal Insurance<br>Company: | Cozen O'Connor<br>By:  JACOB C. COHN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Sealed Air: | Skadden, Arps, Slate, Meagher & Flom,<br> LLP<br>By:  DAVID TURETSKY, ESQ.<br>     J. GREGORY ST. CLAIR, ESQ.<br>One Rodney Square<br>Wilmington, DE  19801 |
| For National Union Fire<br>Insurance Co.: | Zeichner Ellman & Krause, LLP<br>By:  MICHAEL DAVIS, ESQ.<br>575 Lexington Avenue<br>New York, NY  10022 |
| For the Unsecured<br>Creditors' Committee: | Strook & Strook & Lavan<br>By:  ARLENE KRIEGER, ESQ.<br>     KENNETH PASQUALE, ESQ.<br>180 Maiden Lane<br>New York, NY 10038 |
| For Continental<br>Casualty Co.: | Goodwin Procter, LLP<br>By:  DANIEL GLOSBAND, ESQ.<br>Exchange Place<br>Boston, MA  02109-2881 |

APPEARANCES (CONT'D):

| | |
|---|---|
| For Fireman's Fund<br>Insurance Co.: | Crowell & Moring LLP<br>By:  LESLIE A. DAVIS, ESQ.<br>     MARK PLEVIN, ESQ.<br>1001 Pennsylvania Avenue, N.W.<br>Washington, DC  20004 |
| For OneBeacon<br>Ins. Co., Geico,<br>Ins. Co.<br>& Republic Ins. Co: | Drinker Biddle & Reath LLP<br>By:  MICHAEL F. BROWN, ESQ.<br>     JEFFREY M. BOERGER, ESQ.<br>One Logan Square<br>18th and Cherry Streets<br>Philadelphia, PA  19103<br><br>Drinker Biddle<br>By:  WARREN PRATT, ESQ.<br>1100 N. Market Street<br>Wilmington, DE 19801-1254 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Debtors: | Kirkland & Ellis, LLP<br>By:  JANET BAER, ESQ.<br>     ELLI LEIBENSTEIN, ESQ.<br>     RAFAEL VALDES, ESQ.<br>200 East Randolph Drive<br>Chicago, IL  60601 |
| For the Debtors: | Kirkland & Ellis, LLP<br>By:  THEODORE FREEDMAN, ESQ.<br>     CHRISTOPHER GRECO, ESQ.<br>     CLEMENT YEE, ESQ.<br>Citigroup Center, 153 East 53rd St.<br>New York, NY  10022 |
| For the Debtors: | Pachulski, Stang, Ziehl &Jones<br>By:  JAMES O'NEILL, ESQ.<br>919 North Market Street, 17th Floor<br>Wilmington, DE  19899-8705 |
| For Various Claimant<br>Firms: | Stutzman, Bromberg, Esserman & Plifka<br>By:  DAVID J. PARSONS, ESQ.<br>2323 Bryan Street,  Suite 2200<br>Dallas, TX  75201 |

TELEPHONIC APPEARANCES (CONT'D):

```
For Morgan Stanley        Katten Muchin Rosenman, LLP
Senior Funding, Inc.:     By:  JEFF FRIEDMAN, ESQ.
                               MERRITT PARDINI, ESQ.
                          575 Madison Avenue
                          New York, NY  10022-2585


For Morgan Stanley        Edwards Angell Palmer Dodge, LLP
Senior Funding, Inc.:     By:  ROBERT CRAIG MARTIN, ESQ.
                          919 N Market St.
                          Wilmington, DE 19801-3023


For Serengeti:            Vinson & Elkins, LLP
                          By:  ARI BERMAN, ESQ.
                          Trammell Crow Center
                          2001 Ross Avenue, Suite 3700
                          Dallas, TX  75201


For Scott Company:        Vorys, Sater, Seymour & Pease, LLP
                          By:  TIFFANY COBB, ESQ.
                          52 East Gay Street
                          Columbus, OH  43216


For Official Committee    Dies & Hile, LLP
of Asbestos Property      By:  MARTIN DIES, ESQ.
Damage Claimants:         1601 Rio Grande, Suite 330
                          Austin, TX  78701

                          LECG
                          By:  ELIZABETH DEVINE, ESQ.
                          1725 Eye Street NW, Ste 800
                          Washington, DC,  20006


For the Property          Bilzin Sumberg Baena Price &
Damage Committee:            Axelrod LLP
                          By:  MATTHEW KRAMER, ESQ.
                          200 South Biscayne Boulevard
                          Suite 2500
                          Miami, FL  33131


For the Property          Bilzin Sumberg Baena Price &
Damage Committee:            Axelrod LLP
                          By:  SCOTT BAENA, ESQ.
                               JAY SAKALO, ESQ.
                          200 South Biscayne Boulevard
                          Suite 2500
                          Miami, FL  33131
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For the Bank Lenders:      Paul Weiss Rifkind Wharton &
                             Garrison, LLP
                           By:  MARGARET PHILLIPS, ESQ.
                                REBECCA ZUBATY, ESQ.
                           1285 Avenue of the Americas
                           New York, NY  10019

For the Bank Lenders:      Crowell & Moring LLP
                           By:  TACIE YOON, ESQ.
                           1001 Pennsylvania Avenue, N.W.
                           Washington, DC  20004

For Asbestos Property      Scott Law Group
Damage Claimants:          By:  DARRELL SCOTT, ESQ.
                           1001 East Main Street, Suite 500
                           Sevierville, TN  37864

For National Union Fire    Zeichner Ellman & Krause, LLP
Insurance Co.:             By:  ROBERT GUTTMANN, ESQ.
                           575 Lexington Avenue
                           New York, NY  10022

For the Future            Orrick, Herrington & Sutcliffe,
Claimants                    LLP
Representatives:           By:  DEBRA FELDER, ESQ.
                                JOSHUA CUTLER, ESQ.
                           Washington Harbour
                           3050 K Street, N.W.
                           Washington, D.C.  20007

For Federal Insurance      Cozen O'Connor
Company:                   By:  ILAN ROSENBERG, ESQ.
                           1900 Market Street
                           Philadelphia, PA  19103

For Official Committee     Anderson Kill & Olick
of Asbestos Personal       By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:          1251 Avenue of the Americas
                           New York, NY  10020-1186

For Grace Certain          Montgomery, McCracken, Walker &
Cancer Claimants:            Rhoads, LLP
                           By:  NATALIE D. RAMSEY, ESQ.
                           300 Delaware Avenue, Ste. 750
                           Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For David T. Austern,          Phillips, Goldman & Spence, P.A.
the Future Claimants'          By:  JOHN C. PHILLIPS, ESQ.
Representative:                1200 North Broom Street
                               Wilmington, DE  19806

                               By:  DAVID T. AUSTERN

For Allstate Insurance:        Cuyler Burk, LLP
                               By:  STEFANO CALOGERO, ESQ.
                                    ANDREW K. CRAIG, ESQ.
                               Parsippany Corporate Center
                               Four Century Drive
                               Parsippany, NJ  07054

For the Asbestos               Ferry Joseph & Pearce, P.A.
Creditors Committee:           By:  THEODORE TACCONELLI, ESQ.
                               824 Market Street, Suite 19899
                               Wilmington, DE  19899

For Ford, Marrin,              Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer               Gleser
& Gleser:                      By:  SHAYNE SPENCER, ESQ.
                                    ELIZABETH DeCRISTAFANO, ESQ.
                               Wall Street Plaza
                               New York, NY  10005

For Official Committee         Duane Morris, LLP
of Unsecured Creditors:        By:  MICHAEL LASTOWSKI, ESQ.
                               1100 North Market Street, Suite 1200
                               Wilmington, DE  19801-1246

For Official Committee         Brandi Law Firm
of Asbestos Property           By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:                   TERENCE D. EDWARDS, ESQ.
                               44 Montgomery St., Suite 1050
                               San Francisco, CA  94104

                               Lieff, Cabraser, Heimann & Bernstein
                               By:  ELIZABETH J. CABRASER, ESQ.
                               Embarcadero Center West
                               275 Battery Street, Suite 3000
                               San Francisco, CA  94111

TELEPHONIC APPEARANCES (CONT'D):

For Official Committee:   Riker, Danzig, Scherer, Hyland &
of Asbestos Property       Perretti, LLP
Damage Claimants:         By:  TARA MONDELLI, ESQ.
                               CURTIS PLAZA, ESQ.
                          Headquarters Plaza
                          One Speedwell Avenue
                          Morristown, NJ  07962

For the Libby Claimants: Cohn, Whitesell & Goldberg, LLP
                          By:  CHRISTOPHER M. CANDON, ESQ.
                          101 Arch Street
                          Boston, MA  02110

For the Libby Claimants: Landis, Rath & Cobb, LLP
                          By:  KERRI K. MUMFORD, ESQ.
                               JAMES S. GREEN, JR., ESQ.
                          919 Market Street, Suite 1800
                          Wilmington, DE  19899

For the Bank Lenders:     Landis, Rath & Cobb, LLP
                          By:  RICHARD COBB, ESQ.
                          919 Market Street, Suite 1800
                          Wilmington, DE  19899

For the PD Committee:     Speights & Runyan
                          By:  DANIEL SPEIGHTS, ESQ.
                               MARION FAIREY, ESQ.
                               ALAN RUNYAN, ESQ.
                          200 Jackson Avenue, East
                          Hampton, SC  29924

For Everest Reinsurance   Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:          By:  BRIAN L. KASPRZAK, ESQ.
                               JOHN D. MATTEY, ESQ.
                          913 North Market Street
                          Suite 800
                          Wilmington, DE  19801

For Murray Capital        Murray Capital Management, Inc.
Management                By:  MARTI MURRAY

For Normandy Hill         Normandy Hill Capital, LLP
Capital, LLP:             By:  MATTHEW CANTOR

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Anderson Memorial        Kozyak, Tropin & Throckmorton, PA
Hospital:                    By:  JOHN W. KOZYAK, ESQ.
                             2525 Ponce de Leon, 9th Floor
                             Miami, Florida 33134

For ZAI Claimants            Hogan Firm Attorneys at Law
& various law firms:         By:  DANIEL K. HOGAN, ESQ.
                             1311 Delaware Avenue
                             Wilmington, DE  19801

For the U.S. Trustee:        Office of the U.S. Trustee
                             By:  DAVID KLAUDER, ESQ.
                             844 King Street, Suite 2313
                             Wilmington, DE  19801

For Arrowood                 Bifferato Gentilotti LLC
Indemnity Co.:               By:  GARVAN McDANIEL, ESQ.
                             800 North King Street
                             Wilmington, DE  19801

For AXA Belgium:             Mendes & Mount
                             By:  ANNA NEWSOM, ESQ.
                             750 Seventh Avenue
                             New York, NY  10019

For Royal Insurance:         Wilson Elser Moskowitz Edelman
                                & Dicker, LLP
                             By:  CARL PERNICONE, ESQ.
                             150 East 42nd Street
                             New York, NY  10017

For Official Committee       Richardson Patrick Westbrook &
of Asbestos Property            Brickman, P.C.
Claimants:                   By:  EDWARD J. WESTBROOK, ESQ.
                             174 East Bay Street
                             Charleston, SC  29401

For Dow Jones                Dow Jones News Wires
News Wires:                  By:  PEG BRICKLEY

For the Equity               Kramer Levin Naftalis & Frankel
Committee:                   By:  DAVID E. BLABEY, JR., ESQ.
                             919 Third Avenue
                             New York, NY  10022

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Hartford Financial        Wilmer Wilmer Cutler Pickering Hale &
Service Group:                 Dorr, LLP
                              By:  MELANIE R. DRITZ, ESQ.
                                   NANCY MANZER, ESQ.
                              399 Park Avenue
                              New York, NY  10022

For Travelers Casualty        Morris Nichols Arsht & Tunnell, LLP
Surety Company:               By:  MATTHEW B. HARVEY
                              1201 N. Market Street
                              PO Box 1347
                              Wilmington, DE 19899-1347

For Asbestos Property         Pryor Cashman, LLP
Damage Claimants:             By:  RICHARD LEVY, ESQ.
                              410 Park Avenue
                              New York, NY  10022

For David T. Austern,         Lincoln International, LLC
Future Claimants'             By:  JOSEPH RADECKI
Representative:

For Onex Credit               Onex Credit Partners
Partners:                     By:  STUART KOVENSKY

**I N D E X**

**WITNESSES**                                                    **PAGE**

ROBERT TAROLA
  Direct Examination by Mr. Bernick                    19
  Cross Examination by Mr. Pasquale                    36
  Redirect Examination by Mr. Bernick                  47
  Recross Examination by Mr. Pasquale                  51

MARK SHELNITZ
  Direct Examination by Mr. Bernick                    53
  Cross Examination by Mr. Pasquale                    73
  Redirect Examination by Mr. Bernick                  79
  Recross Examination by Mr. Pasquale                  80

PAM ZILLY
  Direct Examination by Mr. Bernick                   102
  Cross Examination by Mr. Cobb                        110

DENISE MARTIN
  Direct Examination by Mr. Bernick                   145
  Cross Examination by Mr. Pasquale                   153
  Redirect Examination by Bernick                     155

MICHAEL BROWN
  Direct Examination Mr. Pratt                        167
  Cross Examination by Mr. Bernick                    175
  Redirect Examination by Mr. Pratt                   177

LEWIS KRUGER
  Direct Examination by Mr. Pasquale                  195
  Cross Examination by Mr. Bernick                    205
  Redirect Examination by Mr. Pasquale                249
  Recross Examination by Mr. Bernick                  250

ROBERT FREZZA
  Direct Examination by Mr. Pasquale                  255
  Voir Dire Examination by Mr. Bernick                262
  Continued Direct Examination by Mr. Pasquale        267
  Cross Examination by Mr. Cobb                        294
  Cross Examination by Mr. Bernick                     296
  Redirect Examination by Mr. Pasquale                321
  Recross Examination by Mr. Bernick                  324
  Further Redirect By Mr. Pasquale                    328
  Recross Examination by Mr. Cobb                     329

**I N D E X(CONT'D)**

**EXHIBITS**

|  |  | **I.D.** | **EVD.** |
|---|---|---|---|
| PP-632 | Affidavit | 15 | 15 |
| PP-285 | Letter Agreement | 26 | 26 |
| PP-286 | Second Letter Agreement | 33 | 33 |
| BNSF-85 - 279 | Complaints |  | 85 |
| 507-10 | Graphic |  | 54 |
| PP-160 | Term Sheet |  | 65 |
| PP-344 | E-mail from Mr. Shelnitz |  | 67 |
| PP-284 | E-mail from Ms. Krieger |  | 70 |
| FF/Allianz 1 - 33 | Documents |  | 96 |
| FF/Allianz 34 - 36 | Documents |  | 96 |
| OS-1 | Documents (Revised through OS-7) |  | 97 |
| OS-14 - OS-20 | Documents |  | 97 |
| OS-27 | Document |  | 97 |
| OS-28 | Document |  | 97 |
| OS-40 | Document |  | 97 |
| OS-41 | Document |  | 97 |
| OS-44 | Document |  | 97 |
| OS-46 | Document |  | 97 |
| OS-48 - OS-51 | Documents |  | 97 |
| GR-14 - GR-20 | Revised Documents |  | 97 |
| PP-1 | Demonstrative |  | 110 |
| PP-2 & 3 | Demonstratives | 103 | 110 |
| PP-4 | Demonstrative |  | 110 |
| PP-5 | Demonstrative | 105 | 110 |
| PP-6 | Document |  | 110 |
| PP-7 | Demonstrative | 107 |  |
| S12-1,2,3,5,6 | Documents |  | 153 |
| Montana-1-148 | Documents |  | 163 |
| Garlock-3-10 | Documents |  | 165 |
| Garlock-13 | Document |  | 165 |
| Garlock-105 | Document |  | 165 |
| Garlock-106 | Document |  | 165 |
| Garlock-107 | Document |  | 165 |
| PP-239 - 240 | Documents |  | 178 |
| PP-271 & 271B | Documents |  | 181 |
| Libby-283 | Document |  | 184 |
| CCNLG 1 - 5 | Documents |  | 194 |
| CCBLG 41 | Chart | 283 |  |
| Arrowood A-58 | Declaration by Mr. Camphoover |  | 338 |

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  This is the continuation of the Phase II

2    confirmation hearing in the matter of W.R. Grace, 01-1139.  The

3    list of telephonic of participants today is Scott Baena, Janet

4    Baer, Ari Berman, David Bernick, David Blabey, Thomas Brandi,

5    Peg Brickley, Elizabeth Cabraser, Stefano Calogero, Christopher

6    Candon, Matthew Cantor, Richard Cobb, Tiffany Cobb, Jacob Cohn,

7    Ann Cordo, Andrew Craig, Joshua Cutler, Leslie Davis, Michael

8    Davis, Elizabeth DeCristofaro, Elizabeth Devine, Martin Dies,

9    Melanie Dritz, Terence Edwards, Marion Fairey, Brett Fallon,

10   Debra Felder, Jordan Fisher, Theodore Freedman, Jeff Friedman,

11   Christopher Greco, James Green, John Green, Robert Guttmann,

12   Daniel Hogan, Robert Horkovich, Brian Kasprzak, David Klauder,

13   Stuart Kovensky, John Kozyak, Matthew Kramer, Michael

14   Lastowski, Eli Leibenstein, Richard Levy, Nancy Manzer, Robert

15   Craig Martin, John Mattey, Garvan McDaniel, Tara Mondelli,

16   Kerri Mumford, Marti Murray, Anna Newsom, James O'Neill,

17   Merritt Pardini, David Parsons, Carl Pernicone, Margaret

18   Phillips, John Phillips, Curtis Plaza, Mark Plevin, Joseph

19   Radecki, Natalie Ramsey, Andrew Rosenberg, Ilan Rosenberg,

20   David Rosendorf, Alan Runyan, Jay Sakalo, Darrell Scott,

21   Michael Shiner, Marnie Simon, Daniel Speights, Shayne Spencer,

22   Theodore Tacconelli, Rafael Valdes, James Wehner,  Edward

23   Westbrook, Clement Yee, Tacie Yoon and Rebecca Zubaty.  Are

24   there any changes of appearances in Court?  All right, Ms.

25   Baer?

1          MS. BAER:  Good morning, Your Honor.  Janet Baer on

2    behalf of W.R. Grace.  Your Honor, last night I mentioned that

3    we had an affidavit from Canadian counsel that we were

4    circulating to everybody in the hopes that we could shorten

5    this up and not have to bring him down to testify with respect

6    to the ZAI settlement in Canada as well as the appointment of a

7    Canadian representative for ZAI claimants.  I did circulate

8    that document, Your Honor.  I asked if anybody had an objection

9    they would let me know.  I have not heard anything from anybody

10   about objections.  And, Your Honor, if there are no objections,

11   I would like to submit into evidence and ask to be admitted,

12   the affidavit from Canadian counsel with the Canadian orders

13   that was referenced.

14         THE COURT:  Does anyone have an objection to the

15   admission of the affidavit rather than having counsel appear

16   live as a witness?  There's no objection.  Is it marked as an

17   exhibit?

18         MS. BAER:  It is, Your Honor.  It's Plan Proponents'

19   Exhibit 632.  And if I may I'll approach.

20         THE COURT:  All right.  Okay, this is the affidavit

21   of Orestes Pasparakis dated September 15, 2009 with associated

22   documents and it is admitted.  Okay.

23         MS. BAER:  Thank you, Your Honor.

24         THE COURT:  Mr. Bernick.

25         MR. BERNICK:  Your Honor, we would propose this

1  morning that the following two witnesses have to testify

2  regarding the fund issues.  Mr. Tarola and Mr. Shelnitz.  And

3  then if there is anybody on the other side of the courtroom who

4  wishes to call a witness in connection with, a live witness in

5  connection with Phase II, we can go ahead and do that.  Mr.

6  Tarola has got a commitment that needs to get out of town as

7  soon as possible, and Mr. Shelnitz's, testimony, as you will

8  see, simply picks up on the same chronological sequence so we

9  think it makes sense to have both those witnesses heard first

10 thing.  Neither one of them should be long witnesses.  And then

11 maybe we can pick up with any remaining issues concerning the

12 insurers.

13       THE COURT:  I don't think your microphone's working,

14 Mr. Bernick, I'm sorry.  But I can hear you, but I'm not sure

15 that they can in the back.  They're saying no, they can't.  The

16 proposal is to begin, as we said yesterday, with Mr. Tarola,

17 then Mr. Shelnitz then back up to what we left off with

18 yesterday.

19       MR. BERNICK:  That's correct.  And then we should be

20 able to finish off, I think, Phase II, and then continue on to

21 Phase II -- Stage II, and then continue on with the examination

22 of witnesses relating to the insurers -- I'm sorry, the lender

23 issues, and we'll have Ms. Zilly, Dr. Martin and then -- those

24 are our live witnesses, and then I know that the -- good

25 morning -- I know that the unsecured creditors will then have a

1  couple of live witnesses.  We may have a very short buttal, but
2  we then expect that we'll be done with the lender's issue
3  probably sometime, I hope early this afternoon at the latest.
4  And then at that point we can go on with the rest of the case.
5  I don't know if Mr. Pasquale or Mr. Cobb have any different or
6  Mr. Kruger have any different views.

7          MR. PASQUALE:  Your Honor, no, that sounds fine with
8  us.  I think Mr. Bernick may be optimistic on timing, but we'll
9  see.  But the process is fine.

10         THE COURT:  It's Mr. Pasquale.  All right, that's
11 fine.

12         MR. BERNICK:  Okay.

13         THE COURT:  With respect to the issues that we left
14 reserved yesterday then, is everyone fine with starting with
15 Mr. Tarola and then backing up to those issues as we had talked
16 about yesterday?  Mr. Pratt?

17         MR. PRATT:  Good morning, Your Honor.  Warren Pratt
18 for creditor Seaton and One Group and that's fine with us.

19         THE COURT:  All right.

20         MR. PERNICONE:  Good morning, Your Honor.  Carl
21 Pernicone, cocounsel for Arrowood.  Just to remind you that Mr.
22 Schiavone had mentioned at the end of yesterday's proceeding
23 that he has an urgent matter, he's attending to it this
24 morning.

25         THE COURT:  Yes.

1          MR. PERNICONE:  He hopes to be here like around ten

2   o'clock, but certainly no later than midday, then we'll be able

3   to finish off whatever remains with respect to the Burlington

4   issues.

5          THE COURT:  All right.

6          MR. PERNICONE:  Okay, Mr. Bernick, I think we can

7   begin with Mr. Tarola then.

8          MR. BERNICK:  I just need to know, does he need to be

9   here for the --

10          UNIDENTIFIED SPEAKER:  Lender?

11          MR. BERNICK:  -- yes, that is to say, I think we're

12   going to be done before midday with the first two witnesses.

13   And then we are going to get back to the second stage.  So it's

14   going to be, you know, plus side of ten thirty or something

15   like that.  Would you prefer to simply have the whole thing --

16          MR. PERNICONE:  Mr. Schiavone was here principally to

17   deal with the Burlington issues, as he mentioned yesterday,

18   Your Honor, so he does need to be here for that.

19          THE COURT:  Okay, why don't we just start --

20          MR. BERNICK:  Yes, okay, that's fine.

21          THE COURT:  -- and we'll see when he comes.

22          MR. PERNICONE:  Great.  Thank you, Your Honor.

23          MR. BERNICK:  Okay.  We call Robert Tarola as the

24   next witness in connection with the, now the third stage on

25   Phase II.  Mr. Tarola can take the stand.

1              THE COURT:  Good morning.

2                  ROBERT TAROLA, DEBTOR'S WITNESS, SWORN

3              MR. BERNICK:  This covers both Mr. Tarola and Mr.

4    Shelnitz.

5              THE COURT:  all right, thank you.

6                        DIRECT EXAMINATION

7    BY MR. BERNICK:

8    Q    Good morning, Mr. Tarola.

9    A    Good morning.

10   Q    Good to see you again.  Could you tell the Court whether

11   you have in the last little while departed from Grace?  I know

12   you sometimes came to the hearings.  Have you now left Grace?

13   A    Yes.  I left Grace on October 31, 2008.

14   Q    Okay.  And what was your position at the time that you

15   left?

16   A    At the time I left I was senior vice president in charge

17   of corporate strategy.

18   Q    Okay.  And what relationship, if any, did that have to the

19   financial function of the company?

20   A    At that point in time, I was not involved directly with

21   overseeing or operating the financial function.

22   Q    Okay.  What have you done since you left Grace in 2008?

23   A    I set up a private consulting firm in Washington, D.C.,

24   called Right Advisory, LLC.

25   Q    Okay.  And just tell us briefly what it is that you're now

1 doing as part of that enterprise.

2 A    I'm doing three main things.  I'm working as a director of

3 one public company based in Denver called Tele Tech Holdings,

4 Inc.  I'm also working as a director of about 15 mutual funds

5 sponsored by Lake Mason Inc.  I serve as a financial expert to

6 the audit committees of each of those entities.  I'm also

7 engaged in consulting projects with generally large entities,

8 primarily consulting at the governance level in risk management

9 area and in corporate finance in the business improvement area.

10 Q    Okay.

11 A    I'm also teaching.

12 Q    Okay.  Where are you teaching at?

13 A    At corporate finance groups.  Most recently Marriott and

14 Northrop Grunman.  And I'm also pursuing teaching at MBA

15 programs.

16 Q    Terrific.  Okay, could you just tell us, give us a brief

17 overview of your educational background and then career path up

18 to Grace and then through Grace to kind of give the Court an

19 overview of your educational and professional background?

20 A    I graduated from Temple University with a bachelors of

21 business administration, concentrations in accounting and

22 marketing in 1973.  I spent the first two years after college

23 as a financial analyst with Chrysler Motors.  I was then hired

24 by Price Waterhouse, an international accounting and consulting

25 firm, roughly in the 1974 time frame in the Philadelphia office

1 of Price Waterhouse.  After roughly ten years, I was admitted

2 into the partnership of Price Waterhouse in 1984.  My first

3 assignment as a partner with Price Waterhouse was in their SEC,

4 Securities and Exchange Commission advisory group based in

5 Manhattan, New York City, where I consulted on capital markets

6 matters and financial reporting matters on behalf of clients of

7 that firm.

8           I then transferred to the Baltimore office of Price

9 Waterhouse where I took over as lead auditing partner for some

10 major clients of that office including T. Rowe Price mutual

11 fund and Lake Mason mutual funds.  And in 1991 roughly I was

12 promoted to a regional managing partner handling an industry

13 segment specializing in telecommunications media and

14 entertainment businesses based out of Washington, D.C. where I

15 became lead audit partner on MCI Communications and ran a

16 business base of about 500 people.

17           In 1996 -- let me back up.  At the same time I was a

18 partner with Price Waterhouse, I was serving on the board of

19 directors of a number of health and welfare organizations, one

20 of which was a hospital system that was based on Baltimore.  In

21 1996 I resigned from Price Waterhouse to become the CFO of that

22 hospital system.  It was eventually named Medstar Health, which

23 is a regional health system, hospitals, ambulatory care,

24 physician groups.

25           I was CFO for that health system from 1996 to 1999,

1  at which point I joined W.R. Grace as a senior vice president

2  and chief financial officer when Grace decided to move

3  headquarter from Florida to Maryland.

4  Q    Okay.  Are you appearing here at our request, at the

5  request of the debtors' W.R. Grace?

6  A    Yes, sir.

7  Q    And are you receiving any kind of compensation at all in

8  connection with your appearance?

9  A    Only -- my expectation is that my out of pocket costs will

10 be covered and some of my prep time, because I had to forego

11 some of my consulting assignments to be here.

12 Q    Okay.  Were you involved, while you were at W.R. Grace, in

13 the relationship of Grace in this case with the Unsecured

14 Creditors' Committee?

15 A    Yes, sir.

16 Q    Could you just describe -- well, let me just ask -- in

17 connection with that relationship, were you the lead person at

18 Grace who, on an ongoing basis, dealt with the members of the

19 Unsecured Creditors' Committee with regard to financial

20 matters?

21 A    I was the lead person dealing with financial matters

22 within Grace and I would deal with members of the Committee,

23 with members of the financial support group that they had

24 engaged, and from time to time with the law firm they had

25 engaged.

1  Q    Okay.  I'm going to focus my examination of you this

2  morning on the period of time up through February 19 -- excuse

3  me -- February 2006 and then Mr. Shelnitz is going to pick up

4  thereafter.  But during that period of time, that is up through

5  February of 2006, was there -- could you just describe for us

6  the nature of the relationship between W.R. Grace and the

7  Unsecured Creditors' Committee as concerns reporting of

8  information to the Unsecured Creditors' Committee?

9  A    Within a few months after filing for Chapter 11 protection

10 in April of 2001, we began reporting regularly to all of the

11 official committees in this bankruptcy case including the

12 Official Committee of General Unsecured Creditors.  The

13 reporting included regular public reporting as Grace continued

14 to be a public reporting entity as well as special reporting

15 which was designed under confidentiality arrangements with the

16 committees to give the committees and their financial advisors

17 a little more in depth information about how the company was

18 performing.  Those reports were quarterly.  The special

19 reporting was generally done by conference call with financial

20 advisors.  And then annually certain members of the management

21 team at W.R. Grace met in person with members of the Official

22 Committee of Unsecured Creditors together with their counsel

23 and financial advisors.

24 Q    Just describe in your own words the level of specificity

25 and detail that was provided to the Unsecured Creditors'

1  Committee during this period of time as part of the procedures

2  that you've just described.

3  Q    Well, we would share with them a normal report that we

4  would prepare for our board of directors.  A little more

5  condensed and focused than what is included in public reporting

6  to shareholders covering the same general information, but

7  basically would cover business performance, would cover

8  initiatives that we had ongoing, how we were doing toward

9  those, would cover peer comparisons, would cover market,

10 capital matters.  Would cover areas of productivity and asset

11 management, and a basic summary financial briefing for our

12 board, which was then shared with official committees.

13 Q    Did a time come in late 2004 when Grace submitted the

14 proposed plan or reorganization?

15 A    Yes, sir.

16 Q    What was the basis approach, just in very general terms,

17 as you recall it.  What was the basis approach that was taken

18 in that plan with respect to the treatment of personal injury

19 liabilities?

20 A    The basic approach was to enter into a process of

21 estimation to determine the amount that that liability might

22 require in the way of funding in order to satisfy that creditor

23 group.

24 Q    Was it a consensual plan as it was proposed?

25 A    No, sir, not to my knowledge.

1  Q    Okay.  Did that plan -- tell us in your own words your

2  understanding as to whether that original plan made provision

3  for value to go to old equity.

4  A    My understanding was that based on Grace's estimate of the

5  amount of value that would be eligible for settling claims that

6  were then uncertain, that there would be value leftover for old

7  equity.

8  Q    Did a time come in early 2005 when an amended plan was

9  proposed and filed by W.R. Grace?

10  A    Yes, sir.

11  Q    Let me just ask you, same basic approach as the first

12  plan?

13  A    Same basic approach, yes.

14  Q    Okay.  In connection with the amended plan, tell us

15  whether there was some discussion with the unsecured creditors

16  about post-petition interest.

17  Q    Well, after the original plan was filed, we began speaking

18  with both the chair of the Unsecured Creditors' Committee as

19  well as the chair of the Equity Committee about seeking their

20  support for our plan of reorganization.

21  Q    Ultimately did those discussions result in some agreement?

22  A    Yes, sir.

23  Q    I want to show you what we've marked as Plan Proponents

24  Exhibit 285.  It's in your notebook, which I'll give you.  I

25  knew there was a purpose for that last notebook.  Do you see

1  it there?  It's Plan Proponents' 285.

2  A    Yes, sir.

3  Q    Is that a copy, is Exhibit 285 a copy of the letter

4  agreement that reflects the agreement that was reached between

5  Grace and the Official Committee of Unsecured Creditors?

6  A    This was the letter that confirms the agreement of the

7  Official Committee of Unsecured Creditors to be a plan

8  proponent with respect to that January '06 amended plan.

9              MR. BERNICK:  Okay.  We offer Exhibit 285.

10             THE WITNESS:  Sorry, I meant January '05.

11             MR. BERNICK:  We offer Exhibit 285.

12             MR. PASQUALE:  No objection, Your Honor.

13             THE COURT:  It's admitted.

14  Q    Now, was this agreement, did this agreement, is this an

15  agreement to support this plan?

16             MR. BERNICK:  If we could just put it on ELMO please

17  for just a moment.  No, now you turned it off.  I appreciate

18  that.  You just turned it off again.  There, we've got it.

19  Q    While we're doing that, did this agreement relate, did

20  this agreement call for or reflect that there be support of the

21  plan?

22  A    Yes, sir.  By the Official Committee of Unsecured

23  Creditors.

24  Q    Right.  And this plan then is the amended plan, did the

25  amended plan that was filed in early '05 now specify a

1  particular rate of post-petition interest?

2  A    It did, and so did the original plan.  By virtue of this

3  agreement, that rate of interest changed.

4  Q    Yes.  It became more favorable?

5  A    It was higher than in the original plan, yes.

6  Q    Okay.  Now, I note that this letter is signed by the

7  esteemed head counsel for the Unsecured Creditors' Committee,

8  Mr. Kruger, and it says that this is in confirmation of an

9  agreement with the Official Committee of Unsecured Creditors.

10 Let me pursue that a little bit.  Prior to the time that this

11 letter was executed, could you describe how the negotiations

12 regarding the new rate of post-petition interest, how those

13 negotiations proceeded?  First of all, were you involved in

14 those negotiations?

15 A    Yes, sir.

16 Q    Okay.  And so just tell us in your own words how the

17 negotiations regarding the post-petition rate of interest

18 unfolded?

19 A    There were two other folks that participated in those

20 negotiations from W.R. Grace with me.  The CEO at the time, Mr.

21 Paul Norris, and the chief counsel at the time, Mr. David

22 Siegel.  We were speaking with Mr. Thomas Maher, who at that

23 time chaired the Official Committee of General Unsecured

24 Creditors, and with Mr. Ted Weschler who at the time chaired

25 the Equity Committee.

1  Q    Before you go on, Tom Maher, for whom did he work?

2  A    J.P. Morgan Chase.

3  Q    Had J.P. Morgan Chase played any role prepetition in

4  connection with the financing of W.R. Grace?

5  A    J.P. Morgan Chase through Chase Bank participated as lead

6  agent in the prepetition lending facility and had a

7  participation in that facility.

8  Q    Okay.  So now -- I've interrupted you.  Continue on.  How

9  did things unfold in the discussions with Mr. Maher?

10 A    Well, in trying to get the support of both the General

11 Unsecured Creditors' Committee as well as the Equity Committee,

12 we spoke with the chair people of both of those committees

13 looking for ways to achieve their dual support.  And with

14 respect to the General Unsecured Creditors' Committee, those

15 discussions were really centered around the amount of interest

16 Grace would pay on top of full value of prepetition claims for

17 anyone holding bank debt at the time as well as anyone holding

18 general unsecured creditor claims that were not of a lending

19 nature.

20 Q    And what was the outcome of those discussions?  First of

21 all, at any point during those discussions did Mr. Maher

22 indicate that he spoke only for the Committee, that the

23 Committee was separate from the lenders and he only spoke for

24 the Committee?

25 A    He never said anything to that effect.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    What ultimately was the outcome of the discussions with

2  Mr. Maher concerning the post-petition interest rate that would

3  be agreed?

4  A    Mr. Maher, the ultimate outcome was an agreement on the

5  part of W.R. Grace and the chair of the Equity Committee to

6  accept a rate of interest on bank debt equal to 6.09 percent

7  compounded quarterly from the beginning of the bankruptcy up

8  until a date forward.  An agreement to pay what was the federal

9  judgment rate going into bankruptcy on general unsecured claims

10 that did not have a contractual interest rate associated with

11 it, and to honor the general contractual rate of unsecured

12 claims that had a stated rate.

13 Q    The rate of 6.09 percent applied to lenders -- or I should

14 say the debt holders?

15 A    It applied to our bank debt and therefore anyone holding

16 it would have received that amount under that proposal.

17 Q    Was that amount, 6.09, greater than, less than or equal to

18 the federal judgment rate?

19 A    It was greater than the federal judgment rate.

20 Q    Was the 6.09 percent greater than, less than or equal to

21 the non-default contract rate set out in the debt?

22 A    At that point in time when we reached that agreement, it

23 was in excess of the non-default contract rate as measured from

24 the beginning of the bankruptcy to that point in time.

25 Q    Was it as much as the default rate under the contracts?

1  A    It all depended where the prime rate was at any point in

2  time.  It could have been in excess of the default rate

3  depending on where the prime rate was.

4  Q    At that point in time was it as much as the contract --

5  A    It was close.

6  Q    Close.  Okay.  So the letter agreement is then entered

7  into and with respect to -- well, let me ask you a question.

8  Who came up with 6.09?  Whose proposal was that?

9  A    Mr. Maher proposed that rate to W.R. Grace as a rate he

10 needed to get the support of his committee as a co-proponent of

11 our plan.

12 Q    Okay.  Now I noticed again that the official committee is

13 what's listed as being the counter party to this agreement.

14 Did you draw any distinction, did you read that when you saw

15 that in the letter as being any kind of indication somehow the

16 lenders were not in support of this agreement?

17       MR. PASQUALE:  Objection to form, leading, Your

18 Honor.

19 Q    What, if any, relationship did you draw between the fact

20 it was purported to this was a commitment by the official

21 committee and whether or not it was also a commitment for the

22 lenders?

23 A    Well, two things.  My understanding of Mr. Maher's role

24 was that he was representing all of the unsecured creditors in

25 his position as chairman of the official committee.  Secondly,

1  in the discussions around what interest rate would be

2  acceptable, he clearly indicated to us that he was in

3  consultation with certain lenders about what would be

4  acceptable.  And the 6.09 percent frankly was ascribed as an

5  amount that would provide an internal rate of return to the

6  lenders that would be acceptable.

7  Q    Okay.

8  A    I would say the holders of bank debt at the time, because

9  they may not have been the original lenders.

10 Q    Would there have been any point, as you understood at the

11 time, would there have been any point whatsoever in engaging in

12 this negotiating and entering into this agreement if it didn't

13 represent a commitment on behalf of the people who were

14 lenders?

15         MR. PASQUALE:  Objection, leading.

16         THE COURT:  Sustained.

17 Q    Well, did you think that you were engaged in an enterprise

18 that the lenders could simply walk away from?

19 A    I didn't even think about that.  I thought I was engaged

20 in an enterprise that we would honor and that would be honored

21 by the committee representing unsecured creditors.

22 Q    Was there anything that happened in connection with those

23 negotiations, either the discussions with Mr. Maher or the

24 discussions that involved counsel, was there anything that

25 happened in connection with those negotiations that was

1  inconsistent with the expectation that you've just now

2  described?

3        MR. PASQUALE:  Objection, Your Honor.  Lacks

4  foundation with respect to any discussions with counsel.

5        MR. BERNICK:  Any discussions that Mr. -- any

6  discussions that Mr. Tarola had with anybody who represented

7  the unsecured creditors.

8  Q    Was there anything about that happened in any of those

9  discussions that was in any way inconsistent with the

10 expectation that you have just described regarding the lenders?

11       MR. PASQUALE:  I'm sorry, Your Honor, I'm not trying

12 to impede, there's in fact no foundation that Mr. Tarola had

13 any discussions on this topic with counsel.

14       MR. BERNICK:  I didn't say, I said any

15 representative.

16       THE COURT:  He's not asking for counsel, he said any

17 representative, not limited to counsel.

18 A    I'm sorry.  Could you clarify that?

19 Q    Was there anything that you heard, learned of, experienced

20 in connection with the negotiations leading up to this letter,

21 anything that you heard, learned or experienced from any

22 representative of the unsecured creditors that was inconsistent

23 with your expectations regarding lender support?

24 A    My expectations through discussions was that the Creditors

25 Committee was representing all general unsecured creditors.  It

1   was the arrangement we reached was embodied in the amended plan

2   of reorganization.  We adjusted our books and records for that

3   arrangement and we continued to do accounting on the basis of

4   that arrangement.  So I presumed the arrangement would be

5   honored and was of sufficient validity to be relied upon.

6   Q    Thank you.  A year later, was there a second letter

7   agreement that was entered into?

8   A    In early 2006, yes.

9   Q    Yes.  Showing you Plan Proponents' Exhibit 286, is that a

10  copy of that letter?

11  A    Yes, sir.

12          MR. BERNICK:  We offer it.

13          MR. PASQUALE:  No objection.

14          THE COURT:  It's admitted.

15  Q    This letter, does this now reflect, Mr. Tarola, a further

16  agreement between the Official Committee of Unsecured Creditors

17  and the debtor?

18  A    Yes, sir.

19  Q    What's the difference between this agreement and the

20  agreement the year before, if any?

21  A    The only change reflected in this agreement from the

22  original agreement is the arrangement or agreement to replace

23  the 6.09 percent fixed rate of interest on our prepetition bank

24  debt, that is on W.R. Grace's prepetition bank debt with a

25  floating rate of interest that was tied to the prime rate

1  represented by major banks.

2  Q    Okay.  Were you involved in negotiations concerning this

3  change?

4  A    Yes, sir.

5  Q    And with whom did you engage in those negotiations?

6  A    Again, with Mr. Thomas Maher.

7  Q    Okay.  The particular approach that was then taken and

8  reflected in this letter regarding post-petition interest, who

9  came up with that idea?

10  A    Well, I can't recall exactly whether it was he or I.  But

11  at the time, the short term interest rates were trending upward

12  from where they had been a year earlier, and Mr. Maher wanted

13  to capture that upward trend for the holders of our prepetition

14  bank debt in an amended agreement.

15  Q    Okay.  When this agreement was amended as reflected in

16  Plan Proponents' 286, tell us whether your expectations

17  concerning lender support for this agreement were any different

18  from the expectations that you've already describe in

19  connection with the agreement of January 2005.  Any difference?

20  A    No, sir.  Again, these discussions occurred over several

21  weeks, perhaps more than a month I'm sure.  And it was my

22  understanding that Mr. Maher was in consultation with committee

23  members as well as anyone else he had to speak with in order to

24  sign this agreement.

25  Q    In the same fashion after the January 2005 letter, you've

1  described how the company relied upon the interest rate in

2  terms of its books and records and the statements that it made

3  to the public marketplace.  Tell us, how if at all, Grace

4  relied upon the amended agreement or the new agreement in

5  February 2006.

6  A    Well, again, we relied upon it in the same way.  The issue

7  we were trying to address at the time was that the committee by

8  virtue of the original agreement, in theory anyway, had the

9  ability to change its support for our plan as the end of

10 November.  The ultimate arrangement was that the committee

11 would accept the 6.09 percent through the end of December 2005

12 with an adjustment to a floating prime rate from January 1 of

13 2006 forward.  So we were dealing with a potential issue in

14 continued support.

15 Q    Okay.  There's a potential issue in continued support

16 leading up to the February '06 agreement?

17 A    Yes, sir.

18 Q    Was there any issue that you had about continuing support

19 after the new agreement was entered into?

20 A    No, sir.

21         MR. BERNICK:  Your Honor, we pass the witness.

22         THE COURT:  Mr. Pasquale.

23         MR. PASQUALE:  Your Honor, I know you don't have

24 enough paper, may I approach?

25         THE COURT:  Sure.  Thank you.

1                              CROSS EXAMINATION

2    BY MR. PASQUALE:

3    Q    Good morning, Mr. Tarola, how are you?

4    A    Good morning.

5    Q    Mr. Tarola, in answering Mr. Bernick's questions you said

6    more than once that Mr. Maher was negotiating with you on

7    behalf of not simply the bank debt holders, but all unsecured

8    creditors, is that right?

9    A    Yes, sir.

10   Q    And in fact leading up to the January 12th, '05 agreement,

11   you mentioned Mr. Maher specifically requested, and ultimately

12   it was agreed to, a specific rate for non-bank lender

13   creditors, right?

14   A    Yes, sir.

15   Q    And that wasn't surprising to you because you understood,

16   did you not, that Mr. Maher was negotiating as chair of the

17   Creditors' Committee.

18   A    That's correct.  Yes, sir.

19   Q    Now, the January 12th, '05 agreement -- I'm sorry, I lost

20   my reference -- Plan Proponents' Exhibit 285.

21   A    Yes, sir.

22   Q    That agreement is not signed by anyone but counsel for the

23   Creditors' Committee and counsel for W.R. Grace, correct?

24   A    That's correct.

25             THE COURT:  I'm sorry, was that by counsel for the

Tarola - Cross/Pasquale                    37

1  Committee or by Mr. Maher?

2        MR. PASQUALE:  Counsel for the Committee and counsel

3  for Grace, Your Honor.

4        THE COURT:  Okay, thank you.

5  Q    And that agreement, Mr. Tarola, pertains to the specific

6  joint plan before the Court in January of '05, isn't that

7  right?

8  A    The amended plan before the Court filed more or less

9  coincident with this agreement.

10 Q    And it's referred to in the agreement not as the amended

11 plan, but as the joint plan, correct?

12 A    Oh, yes, you're correct.  Yes, it's a joint plan.

13 Q    Now, the letter agreement provides for certain termination

14 events, doesn't it?

15 A    Well, it provides for the right to withdraw.

16 Q    Correct.

17 A    Yes, sir.

18 Q    That's right.

19 A    And you mentioned in fact towards the expiration period of

20 one of these dates, it became an issue as to whether or not the

21 Committee would renew the agreement, right?  Did you say that

22 in response to Mr. Bernick's question?

23 A    Well, specifically, the event, number one, was the failure

24 --

25        MR. BERNICK:  Judge, I'm sorry.  I'm sorry.  I object

**J&J COURT TRANSCRIBERS, INC.**

Tarola - Cross/Pasquale                    38

1  to the form of the question, renew.

2            MR. PASQUALE:  Okay, I'll rephrase, Your Honor.

3            THE COURT:  I'm sorry.  Okay.

4            MS. PASQUALE:  Not a problem, I'll rephrase, Your

5  Honor.

6  Q    Isn't it true, Mr. Tarola, that the disclosure statement

7  for the joint plan was not approved by the Court by November

8  30th, 2005?

9  A    That's correct.

10 Q    And the joint plan did not become effective by January

11 1st, 2007?

12 A    That's my understanding.

13 Q    In fact, the joint plan never became effective, because it

14 was never pursued by Grace subsequent to April 2008, right?

15 A    I don't know how to answer that.

16           MR. PASQUALE:  I'll withdraw, Your Honor.  Let me ask

17 a different question.

18 Q    Are you aware that the debtor's exclusive period under the

19 bankruptcy laws terminated in July of 2007?

20           MR. BERNICK:  Objection, it's beyond scope.

21           THE COURT:  It's a foundation question, it's a yes or

22 no.  You can answer, sir.

23 A    I don't recall being aware of that specifically.

24 Q    Now, at or about the time of this letter in January of

25 2005, did Grace obtain the signature of any bank debt holder on

1  any document obligating that holder to support the joint plan?

2  A    Not to my knowledge.

3  Q    Did W.R. Grace obtain the signature of J.P. Morgan on any

4  document obligating J.P. Morgan to support the joint plan?

5  A    Not to my knowledge.

6  Q    Did Grace obtain the signature of any bank debt holder on

7  any document obligating that holder to support the interest

8  rate that was negotiated by Mr. Maher of the Creditors'

9  Committee?

10        MR. BERNICK:  Objection, that calls for a legal

11  conclusion.

12        THE COURT:  No, the question -- all right, rephrase

13  the question.

14        MR. PASQUALE:  I will, Your Honor.

15  Q    Did Grace obtain the signature of any bank debt holder on

16  any document by which that bank debt holder agreed to the

17  post-petition interest rate negotiated between you and Mr.

18  Maher on behalf of the Committee?

19  A    Again, not to my knowledge.

20  Q    And did Grace get J.P. Morgan's signature on any document

21  by which J.P. Morgan agreed to the interest rate that you

22  negotiated with Mr. Maher on behalf of the Committee?

23  A    Not to my knowledge.

24  Q    Before I lose it, Mr. Tarola, you mentioned the joint

25  plan.  This letter itself doesn't set forth the interest rate

1 agreement that you reached with the Committee, right?

2 A    That's correct.  It refers to the details of the joint

3 plan.

4 Q    And the interest rates that you recited in response to Mr.

5 Bernick's questions, those interest rates are provided in the

6 joint plan, right?

7 A    That's correct.

8 Q    Do you recall the form of the consideration that the joint

9 plan provided for treatment of unsecured creditors?

10 A    I don't recall off the top of my head.

11 Q    Do you recall if it was all cash?

12 A    Now that you mention, I think it was part cash, part

13 equity value.

14 Q    Do you recall how much of cash and how much of stock?

15 A    My recollection is 85 percent cash, 15 percent other

16 consideration.

17 Q    Now turning to the February 27, 2006 letter, that's Plan

18 Proponents' Exhibit 286.

19 A    Yes, sir.

20 Q    That letter also refers specifically to the joint plan

21 that we've been discussing, doesn't it?

22 A    Yes, sir.

23 Q    And that letter agreement also provides for certain events

24 upon which the Committee could choose to terminate the

25 agreement, right?

1  A     Specifically it says the Committee has the right to

2  withdraw as a plan proponent if certain events occur.

3  Q     Thank you.  And I can take you down the same questions,

4  Mr. Tarola, but with respect to the disclosure statement

5  approval and confirmation of that plan, those events never

6  happened, right?

7  A     My understanding, that's correct.

8  Q     Now at or about the time of this letter, and in fact any

9  time thereafter during your tenure at Grace, did Grace ever

10 obtain the signature of any holder of bank debt providing for

11 that bank debt holder to support the joint claim.

12       MR. BERNICK:  Object to the question, the form of the

13 question in its scope.  The witness testified on direct only as

14 to matters that led up to and included the time of these two

15 letters.  We were the only ones who designated Mr. Tarola to

16 testify in this phase.  They're now attempting to use Mr.

17 Tarola as their own witness, and that's is not permissible

18 either under the rules of examination or under the orders of

19 this Court, which required that they identify him and they also

20 identify the matters as to which he would testify on their

21 behalf, and they failed to do so.

22       MR. PASQUALE:  Your Honor, this was the CFO of W.R.

23 Grace until -- sorry -- I think it was October 2008.  It's

24 directly relevant to the scope of the direct.

25       THE COURT:  It's clearly relevant, and to the extent

1 that he knows, he may answer this question.

2         THE WITNESS:  I'm sorry, could you repeat the

3 question?

4 Q    Sure.  At any time from this point, February of 2006 to

5 the time you left W.R. Grace, did W.R. Grace ever obtain the

6 signature on any document from any bank debt holder by which

7 that bank debt holder agreed to the terms of the joint plan?

8 A    Again, not to my knowledge, but I would like to say my

9 understanding of the bankruptcy process was that if individual

10 creditors objected to a proposed plan, that would come out at

11 the time the plan was voted upon, not in some interim period.

12         MR. PASQUALE:  Move to strike after his answer, Your

13 Honor, as nonresponsive.

14         THE COURT:  No, I think it is responsive.  He is the

15 CFO and to the extent that the debt company isn't asking for

16 that rate because of his understanding, that's relevant to your

17 question.

18         MR. PASQUALE:  That's fine, Your Honor.

19 Q    And as to J.P. Morgan, did Grace ever, during your tenure

20 at the company, obtain J.P. Morgan's signature on any piece of

21 paper by which J.P. Morgan agreed to be bound by the Creditors'

22 Committee's agreement set forth in Plan Proponent 286?

23 A    Again, not to my understanding.

24 Q    Now, during your negotiations with Mr. Maher in late 2005,

25 did Mr. Maher advise you that at least certain holders of the

1 bank debt were seeking default interest on their claim?

2 A    Not to my recollection.

3 Q    That wasn't a demand that Mr. Maher initially made in

4 negotiating with you?

5 A    No, sir.

6 Q    Now, between the time of -- strike that.  Between February

7 2006 and April 2008, isn't it true that you would periodically

8 check to determine at what prices the bank debt was trading?

9        MR. BERNICK:  Objection.  This is completely beyond

10 scope.

11        THE COURT:  It is beyond the scope.  His testimony

12 was limited by Mr. Bernick's statement at the outset to the

13 period up to February of 2006.  And I did permit the question

14 with respect to the signatures, I think that's relevant.  But

15 this, you've got to substantiate what the purpose is.

16        MR. PASQUALE:  Very clear, Your Honor.  I mean, the

17 purpose is the plan proponents have made allegations with

18 respect to the Committee and bank lenders objection and with

19 respect to the Creditors' Committee's actions, knowledge of the

20 bank holders and whether in essence it is equitable for the

21 bank debt holders and the Committee to be taking the positions

22 we're now taking in opposition to the plan.  The questions I'm

23 trying to elicit go to the fact, and I have other questions for

24 Mr. Shelnitz as to Grace's knowledge at the time they

25 negotiated the plan term sheet leading to the plan before the

1  Court, which we believe we can prove through this evidence show

2  that Grace knew or should have known of the bank lenders'

3  demands and taken that into account.

4           THE COURT:  All right, well --

5           MR. PASQUALE:  It goes to the equities, Your Honor.

6           MR. BERNICK:  I'm sorry, Your Honor.

7           THE COURT:  What the bank interest rates -- I

8  apologize -- I'm not sure if you were asking about what the

9  bank debt was trading at or the interest rates on the debt.

10          MR. PASQUALE:  I'm asking about the bank debt, in all

11 of these questions I'm about to ask go to the CFO, Mr. Tarola's

12 knowledge at the time and what he told others at Grace --

13          THE COURT:  But I missed the question.

14          MR. PASQUALE:  I'm sorry, Your Honor.

15          THE COURT:  Did you ask him about was he periodically

16 checking what the bank debt traded at?

17          MR. PASQUALE:  That's right.

18          THE COURT:  Is that the question?  Okay, I don't see

19 what relevance that has to Grace's knowledge of a demand by the

20 banks.

21          MR. PASQUALE:  It goes to Grace's knowledge -- and I

22 didn't get the answer yet, Your Honor -- but I will, as an

23 offer of proof, because we did depose Mr. Tarola, that Mr.

24 Tarola knew for a period of time that the price of the debt was

25 trading above the rate agreed to in the February 2006

Tarola - Cross/Pasquale                    45

1  agreement.

2          THE COURT:  But even if that's the case, that doesn't

3  substantiate that he has knowledge of a demand by the bank

4  lenders that's different from letter.

5          MR. PASQUALE:  Your Honor, I think it does and that's

6  my offer of proof.  I think it's evidence that is relevant to

7  the responses to our objections.

8          THE COURT:  Okay.  I don't see how.  If there's a

9  demand that's been made, then you can clearly pursue a demand,

10 but knowing what the bank debt's trading at when the letter

11 says that it's attached to the prime doesn't seem to me to be

12 significant.  I'm losing the relevance.  I don't see the

13 relevance.

14         MR. PASQUALE:  Well, the letter, Your Honor, as Mr.

15 Tarola has testified, is simply between the Creditors'

16 Committee and Grace.  We're talking now about the bank debt and

17 its trading itself, and again, W.R. Grace's knowledge of that.

18         MR. COBB:  Your Honor, may I be heard on this?

19         THE COURT:  Okay.

20         MR. COBB:  Your Honor, Richard Cobb on behalf of the

21 bank lenders.  Your Honor this goes to Grace's state of mind.

22 Mr. Bernick spent a great deal of time developing what he

23 believes is evidence that supports that Grace had a believe,

24 had an understanding, that certain representations were made by

25 Mr. Maher on behalf of certain bank lenders.  That there were

1  certain commitments that were made perhaps.  It goes to what

2  Grace's perception was, Grace's understanding was of where the

3  bank lenders were with regard to excepting or rejecting this

4  interest rate.   What Mr. Pasquale is attempting to

5  demonstrate, Your Honor, is simply that there was information

6  available to Grace that would have told Grace that there were

7  some bank holders, at least, that did not have, that did not

8  have a perception or an agreement that this was the interest

9  rate that they would accept or that would apply.  It's directly

10 relevant to what Grace knew or should have known.

11         THE COURT:  What the bank debt is trading at has

12 nothing to do with whether or not a lender has or has not made

13 a commitment to Grace.  If you're going to substantiate that

14 there was some demand made of Grace, you can pursue that.  But

15 the bank debt trade and this witness's knowledge of the bank

16 debt trade has nothing to do with whether or not a lender made

17 a demand -- or a bank debt holder made a demand.

18         MR. COBB:  I agree with, Your Honor, they're

19 different issues.

20         THE COURT:  Yes.

21         MR. COBB:  One is whether a demand was made, the

22 other is, what was Grace's state of mind, what was Grace's

23 understanding, what was Grace's knowledge with regard to what

24 the bank debt holders had agreed to accept.  And if the market

25 trading price is reflecting trading ranges above what the

Tarola - Redirect/Bernick                    47

1 purported agreed rate was, that's inconsistent with under a

2 different topic area, whether there was a demand made and

3 whether there was an acceptance, whether there was a counter to

4 that demand.

5          THE COURT:  Okay, this question was asked between

6 February 2006 and April 2008, the agreement was reached in, I

7 believe, January 2006.  Grace's understanding of what happened

8 after the agreement is reached clearly cannot be relevant to

9 Grace's intent to enter into an agreement that predated that

10 period.  The objection is sustained.

11          MR. PASQUALE:  With that, Your Honor, I have nothing

12 further for the witness.  Thank you.

13          THE COURT:  Mr. Cobb, do you have anything of this

14 witness?

15          MR. COBB:  I do not, Your Honor.  Thank you.

16          MR. BERNICK:  Mr. Plevin?

17          THE COURT:  Anyone?  All right, Mr. Bernick?

18                    REDIRECT EXAMINATION

19 BY MR. BERNICK:

20 Q    You're not a bankruptcy lawyer, are you, Mr. Tarola?

21 A    No, sir.

22 Q    When you negotiated this deal, did you negotiate, that is

23 the '05 and '06 letters, did you negotiate with a bankruptcy

24 lawyer?

25 A    No, sir.

1  Q    When you talked with Mr. Maher, did Mr. Maher make

2  distinctions about, I'm just the Committee and the lenders may

3  or may not sign on.  Did he ever make that distinction to you?

4  A    It never came up.

5  Q    Mr. Maher as a business man dealing with you as a business

6  man, when the letter came through, did you say, hey, you know,

7  you guys should note that Mr. Kruger, the lawyer signed it, not

8  a business person.  Did he ever point that out to you?

9  A    No, sir.

10 Q    At any point in time did the business people that you were

11 counting on in your negotiations ever give the slightest

12 indication that the kinds of questions that Mr. Pasquale is now

13 asking were questions that were in any way, shape or form

14 material to your deal with the Committee?

15 A    No, sir.  I thought we had a business arrangement.  We

16 intended to honor it.  I thought it would be honored by the

17 Committee.

18 Q    Now, it was pointed out that under the terms of the '05

19 letter, that the Creditors' Committee could, had the right to

20 withdraw if a bunch of different things didn't happen, and the

21 same right to withdraw under those circumstances or parallel

22 circumstances was also in the '06 letter.  Do you recall his

23 questions along those lines?

24 A    Yes, sir.

25 Q    Did they ever withdraw?

1  A    Not to my knowledge.

2  Q    You were also asked whether, you know, representations

3  were made et cetera, et cetera about support and the like

4  throughout the entire period of time between the execution of

5  this letter in February 2006 and the time that the term sheet

6  -- were you still at the company the time that the term sheet

7  for the plan was executed?

8  A    Do you mean the term sheet with the personal injury

9  creditors' group?

10  Q    Yes.

11  A    Yes, sir.

12  Q    At any point in time, pursuant to Mr. Pasquale's

13  questions, at any point in time between February of '06 and the

14  time of that term sheet did you ever hear any kind of

15  representation that the lenders would not vote in favor of a

16  plan that contained the interest rate that's set forth in the

17  plan that's referred to in the '06 letter.

18          MR. PASQUALE:  They're all leading questions, Your

19  Honor, I object.

20          THE COURT:  They are.  And I just sustained the

21  objections to questions beyond February 2006 because that was

22  your proffer.  If you're going beyond them, it's opening the

23  door.

24          MR. BERNICK:  In fact, with due respect to the Court,

25  I specifically objected to those questions.  And you permitted,

1 I believe the Court permitted the witness to answer regarding

2 the termination of the letter and whether in fact the, whether

3 anybody ever signed --

4          THE COURT:  Signed it, correct.

5          MR. BERNICK:  -- the documents.  And that obviously

6 raises the question of whether somebody is saying that the

7 letter is no longer any good as so far as the lenders are

8 concerned.

9          THE COURT:  All right.  Then the objection of the

10 leading nature of the question's sustained.  You can rephrase.

11 Q    What statements, if any, did you ever hear from Mr. Maher

12 or any other member of the Unsecured Creditors' Committee in

13 all these different meetings, what statements if any did you

14 hear?  That the lenders would not in fact support this plan?

15 A    I never heard any statements to that effect.

16 Q    Was there ever a demand?  Tell us whether or not there was

17 ever a demand made by the Unsecured Creditors in your dealings

18 with them at all theses different meetings if they ever made a

19 demand prior to the term sheet coming out for a rate of

20 pendency interest that was different from the plan that's

21 referred to in the 2006 letter.  Was such a demand made?

22          MR. PASQUALE:  Objection to form, Your Honor.  I'm

23 not clear from counsel's questions whether he's just referring

24 to this witness or Grace as an entity.

25          MR. BERNICK:  Well, I'm talking about, is, they asked

1 the questions of this witness and asked, I think the question

2 was, did he ever here in any of these meetings such a demand?

3 Is that -- okay.

4 Q    Did you ever hear in any of these meetings a demand by the

5 business people, the people that you were counting on, did you

6 ever hear a demand for a rate of interest that was different

7 from what was set forth in the plan that's referenced in the

8 February '06 letter?

9 A    Prior to what point in time?

10 Q    Prior to the term sheet coming out.

11 A    My recollection is that term sheet came out in early April

12 of 2008 and I never heard any demand for default interest until

13 after that date.

14 Q    Thank you.  Nothing further.

15         MR. PASQUALE:  Couple questions, Your Honor.

16         THE COURT:  Yes, sir.

17         MR. PASQUALE:  Thank you.

18                     RECROSS EXAMINATION

19 BY MR. PASQUALE:

20 Q    Mr. Tarola, with respect to the two letter agreements, and

21 please just answer this yes or no, did it ever -- did you ever

22 consider consulting with Grace's counsel as to whether or not

23 those agreement would be binding on bank debt holders directly.

24         MR. BERNICK:  Objection to the -- actually two

25 objections.  One is it goes beyond scope, and two is that

1  inevitably if he says yes then the fact that he says yes

2  invades the privilege.

3          MR. PASQUALE:  It has to be considered, Your Honor.

4  I mean, Mr. Bernick just asked him questions on redirect about

5  his expectations.

6          THE COURT:  All right.  So the question is, did he

7  consider consulting, not did he consult.

8          MR. BERNICK:  I'm sorry, Your Honor.  I asked no

9  questions about his expectations.  I asked questions about

10 whether representations were made, I asked questions about

11 whether demands were made.  I pursued nothing relating to his

12 state of mind.

13         THE COURT:  I think he was asked factual testimony.

14         MR. PASQUALE:  About his understanding of the meaning

15 of those letters, specifically to the point of what it meant to

16 him, to Mr. Tarola, that the Creditors' Committee was the party

17 to the agreement.

18         MR. BERNICK:  I didn't ask --

19         THE COURT:  Well, he asked, those questions were

20 asked on his original direct, not on redirect.  On redirect he

21 was asked, in essence, this is a quick summary, whether Mr.

22 Maher made a distinction between representing the Committee and

23 the lenders, it never came up.  He said the fact that Mr.

24 Kruger signed this letter, not the business people, did Mr.

25 Kruger ever mention that it wasn't a business person.  Did the

1  two letters contain essentially similar rights to withdraw if

2  certain events occurred.  As far as he knew, the Committee

3  never did withdraw.  Then there were factual questions about

4  whether he ever heard that lenders would not vote on the plan,

5  in essence, that form of question, objection was sustained, but

6  that was in essence the question.  And was there a demand by

7  the Unsecured Creditors' Committee for a default rate prior to

8  that agreement?  They're all factual questions, so the

9  objection is sustained in that form.

10 Q    Mr. Tarola, did you -- are you aware that the committee,

11 and Grace, and its legal counsel, would have regularly

12 scheduled calls to discuss the status of the case?

13 A    Yes, I am.

14 Q    Did you ever participate in any of those calls?

15 A    It's my recollection maybe -- maybe a few times, but not

16 on a regular basis.

17        MR. PASQUALE:  No other questions, Your Honor.

18        THE COURT:  Mr. Bernick?  You're excused, Mr. Tarola.

19 Thank you.

20        THE WITNESS:  Thank you.

21        MR. BERNICK:  Thank you, Mr. Tarola.  Our next

22 witness is Mark Shelnitz.

23        MARK SHELNITZ, PLAN PROPONENTS' WITNESS, SWORN

24                    DIRECT EXAMINATION

25 BY MR. BERNICK:

1  Q    Good morning, Mr. Shelnitz.

2  A    Good morning, Dave.

3  Q    Do you have the same notebook in front of you that Mr.

4  Tarola had?

5  A    I believe so.

6  Q    Okay.  If you could turn to Proponents' Exhibit 507-10,

7  which also is in the Court's notebook?

8  A    Okay.

9  Q    Do you see that that's a graphic?

10 A    Yes.

11 Q    Did you review that graphic in order to determine whether

12 it was accurate to the best of your knowledge?

13 A    I took a quick look, yes.

14 Q    Okay.  Would this graphic be helpful in going through the

15 sequence of events relating to the interest rate discussions

16 with the unsecured creditors?

17 A    Yes.

18          MR. BERNICK:  We offer 507-10 for demonstrative

19 purposes, Your Honor.

20          THE COURT:  It's admitted.

21 Q    I want to --

22          THE COURT:  I should explain.  For demonstrative

23 purposes only.

24          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

25 Q    You were present just now during the examination of Mr.

1 Tarola, were you not, sitting back in the back of the

2 courtroom?

3 A    Yes.

4 Q    And you heard him describe the first two letters, or the

5 two letters, the January '05 letter and the February '06

6 letter, which are Exhibits 285 -- Plan Proponents' Exhibits 285

7 and 286?  Did you hear that testimony?

8 A    Yes, I did.

9 Q    When did you first become involved in anything relating to

10 the on-going relationship between the Unsecured Creditors'

11 Committee and W.R. Grace?

12 A    I was involved from the beginning of the bankruptcy.  I

13 served under David Siegel, so I wasn't on the front line of the

14 negotiations for the 2005 letter agreement, but after Mr.

15 Siegel left I assisted Mr. Tarola in discussions with Mr. Maher

16 on the 2006 letter agreement.

17 Q    Okay.  I want to take us now beyond the two letter

18 agreements and talk about the period of time between the letter

19 agreement in February 2006 and entry into -- or, the submission

20 of the term sheet that had been agreed with the personal injury

21 representatives in April of 2008.  That's the period of time

22 that I want to cover first in my examination of you.  Did a

23 time come during this period of time when you had a telephone

24 conversation with Mr. Kruger regarding post-petition interest

25 rates that would be paid on the unsecured debt?

1  A    Generally, yes.

2  Q    Okay.  And roughly when in time did those -- did that

3  discussion with Mr. Kruger regarding the post-petition interest

4  rates, when did it occur?

5           MR. PASQUALE:  Objection to form, lacks foundation.

6  Your Honor, he said telephone conversation, singular.

7           THE COURT:  Oh.  All right.  It was a telephone

8  conversation, singular, and now it's discussions, plural, so

9  the foundation is that there's only been established one phone

10 call.

11          MR. BERNICK:  Oh.

12          THE COURT:  Restate the question.

13          MR. BERNICK:  Okay.  Just so we're on the same wave

14 length --

15 BY MR. BERNICK:

16 Q    Roughly when did the telephone conversation, first such

17 telephone conversation occur?

18 A    I believe it was in the spring of 2007.

19 Q    Okay.  What do you recall concerning your telephone

20 conversation with Mr. Kruger during that period of time, in the

21 spring of 2007?

22 A    I recall that the telephone conversation wasn't specific

23 to bank debt interest rates.  We had had -- I had been having

24 regular communications with committee counsel and Mr. Kruger,

25 periodic discussions on various issues relating to the

1 bankruptcy, and in one of those discussions, somewhere in the

2 spring of 2007 time frame, Mr. Kruger happened to mention to me

3 that he saw that the bank debt, or he had been advised that the

4 bank debt was trading at a level that indicated some

5 expectation of interest above the accrual rate in the 2006

6 letter agreement.

7 Q    Okay.  And was there anything else that you recall Mr.

8 Kruger saying during that conversation?

9 A    Well, we talked about that, and we talked about how thinly

10 traded the debt was, how it may not be indicative of anyone's

11 expectations, and that we really didn't know what to make of

12 it.

13 Q    Okay.  Did he tell you anything about whether there was a

14 majority -- whether the majority of lenders -- I'm just going

15 to ask you flat out -- did Mr. Kruger, during that call, make a

16 demand of any kind that -- on behalf of the committee or any of

17 the bank lenders, that Grace pay an interest rate different

18 from the interest rate in the plan that's referenced in the

19 February 2006 letter?

20 A    No.

21 Q    Did Mr. Kruger, during the course of that telephone call,

22 ever tell you that Stroock was going to advise, or had advised

23 the Unsecured Creditors' Committee to seek full default

24 interest?

25 A    No.

Shelnitz - Direct/Bernick                    58

1  Q    Did he ever tell you during that call that J.P. Morgan had

2  already expressed -- had expressed with you that a demand for

3  default interest should be made?

4  A    No.

5  Q    Did Mr. Kruger, during the course of that call, state in

6  words or in substance that the Unsecured Creditors' Committee

7  was withdrawing from the February '06 letter agreement?

8            MR. PASQUALE:  Your Honor, objection.  Mr. Bernick is

9  again just leading the witness.

10           THE COURT:  He is.  Sustained.

11           MR. BERNICK:  Okay.

12 Q    So, tell me whether there was any demand -- whether or not

13 any demand to withdraw -- strike that.  Could you tell me

14 whether or not any statement was made by Mr. Kruger regarding

15 withdrawal?

16 A    No.

17 Q    At any point in time -- let's -- instead of doing that

18 let's get a little bit closer to the actual term sheet.  Did a

19 time come when negotiations with the representatives in this

20 case of the personal injury claimants and personal injury

21 interest, did a time come when those negotiations toward an

22 agreement intensified?

23 A    Yes.

24 Q    Roughly when was that?

25 A    Late fall of 2007, into the first quarter of 2008.

1  Q    Okay.  Was that during the same period of time, going back

2  to our chart here, that the estimation proceedings were

3  intensifying as well, and we were facing a trial?

4  A    Very much so.

5  Q    Okay.  During that period of time was Grace negotiating --

6  during the period of time that Grace was negotiating with

7  representatives of the personal injury constituency, do you

8  know whether or not the Unsecured Creditors' Committee, through

9  their counsel, was made aware of the fact that Grace was

10 negotiating?

11 A    Yes.  I was the one that kept Mr. Kruger informed of the

12 status and nature of negotiations.

13 Q    During any of the discussions that you had with Mr. Kruger

14 prior to the time that the term sheet was entered into did Mr.

15 Kruger give any kind of warning to Grace that the unsecured

16 creditors would not vote in favor of a plan that contained the

17 same rate of interest in the plan that was referenced in the

18 February '06 letter?

19 A    No.

20 Q    At any point in time did Mr. Kruger make any statement

21 regarding withdrawal from the letter?

22 A    No.

23 Q    At any point in time did Mr. Kruger make a demand on

24 behalf of -- any kind of demand on behalf of the unsecured

25 creditors, or the Unsecured Creditors' Committee, regarding

1  default interest?

2  A    No.

3  Q    Now, are you aware of whether the Unsecured Creditors'

4  Committee, through any representative, actually participated

5  directly in negotiations with representatives of the personal

6  injury claimants in the negotiations leading up to the term

7  sheet?

8          MR. FRIEDMAN:  Your Honor, Jeff Friedman from Morgan

9  Stanley.  I object to the relevancy of this line of

10  questioning.  I've sat through Mr. Tarola's testimony, and I'm

11  now sitting through Mr. Shelnitz's testimony.  The plan

12  provides Class 9, and that's what this is all about, for the

13  unimpairment of each of the sub classes or each of the

14  treatments in Class 9.  That is a matter of law, and I don't

15  understand the relevancy of testimony as to what was agreed to

16  and what was not when it's ultimately up to this Court to

17  decide whether the interest rates provided are warranted,

18  should be higher, should be lower, and what's necessary to have

19  this plan confirmed based on the theory that Class 9 is

20  completely unimpaired.  I just don't understand the relevancy

21  of this.

22          MR. BERNICK:  Yes.  I think that's pretty simple.

23  The position that's been taken, at least by certain members of

24  -- certain creditors within Class 9, is that they are impaired.

25  Your Honor has yet to decide the issue of whether there's

1  impairment or not.  If Your Honor were to decide that there is

2  impairment, this is a dissenting class.  We would be required

3  to demonstrate fairness and equity, and as a consequence we

4  would be required to demonstrate that the interest rate that is

5  provided in the plan is fair and equitable, that it's an

6  equitable determination, and equitable determinations are fact

7  specific, made in context, and this is of vital relevance to

8  the issue of whether the interest rate in the plan is, in fact,

9  fair and equitable.

10        MR. FRIEDMAN:  Your Honor, fair and equitable is also

11  a legal determination.  The committee's agreement certainly

12  couldn't have bound all of the creditors in the universe that

13  are creditors in this plan.  At best it might have bound the

14  committee.  But I just, again, don't see the relevance of that

15  because Your Honor has to determine whether a particular

16  interest rate under the cram down standards of 1129(b) is fair

17  and equitable.

18        THE COURT:  I do have to determine that, but Mr.

19  Bernick is also correct, I need facts on which to base that

20  determination, so it is relevant toward that end if I determine

21  that there is an impairment.  I don't know at this point

22  whether I'm at that level, but we've got the witnesses here.

23  If I determine there's no impairment, then this is all

24  irrelevant.  If I determine there is an impairment, it is

25  relevant.  So, I need to hear it now because I'm not to the

1  point where I know the answer to the first legal question.

2          MR. FRIEDMAN:  Your Honor, I'm not -- for the record,

3  I'm just not sure why a particular entity's agreement or

4  disagreement as to a particular interest rate makes it fair and

5  equitable as to all of the creditors that are in Class 9.

6          THE COURT:  I don't think it's an issue as to all of

7  the creditors in Class 9 at this stage, but we'll see.  I mean,

8  I haven't heard that all of the creditors in Class 9 have voted

9  against the plan, but that's --

10         MR. BERNICK:  This --

11         THE COURT:  -- not the issue.

12         MR. BERNICK:  I'm sorry.

13         THE COURT:  Go ahead.

14         MR. BERNICK:  This particular creditor actually has

15 opted in favor of a completely different procedure, as the

16 Court is familiar, but that is, again, a subject for another

17 day.  It doesn't really bear upon, I think, Mr. Shelnitz's

18 examination.

19         MR. FRIEDMAN:  Just for the record, Morgan Stanley

20 voted against the plan.

21 BY MR. BERNICK:

22 Q    I think we left off, and I'll pose the question to you

23 again, in connection with the negotiations leading up to the

24 term sheet agreement with the personal injury constituency, are

25 you aware of whether any representative of the Unsecured

1 Creditors' Committee, or any representative of any lender

2 participated directly in those negotiations?

3 A    They did not.

4 Q    Okay.  At some point prior to these negotiations had there

5 been a period during which there were direct negotiations

6 between members -- representatives of the unsecured creditors

7 on the one hand and personal injury representatives on the

8 other?

9        THE COURT:  Mr. Bernick, I've lost the time frame.

10 I'm sorry.

11        MR. BERNICK:  I'll be clear and go back.

12 Q    Going back now, historically -- historically, was there a

13 point in time during which there were direct negotiations

14 between the unsecured creditor representatives and

15 representatives of the personal injury constituency?

16 A    Yes.

17 Q    And was Grace involved in those direct negotiations?

18 A    There were on and off negotiations throughout the course

19 of the bankruptcy, some of which Grace was -- were with

20 representatives of the unsecured creditors, and there were also

21 separate conversations between representatives of the unsecured

22 creditors and the representatives of the personal injury

23 claimants.

24 Q    In any of the discussions, now moving forward to the

25 negotiations that took place in '08, leading up to the term

**J&J COURT TRANSCRIBERS, INC.**

1  sheet, would you say you participated in, correct?

2  A    Yes.

3  Q    In any of those discussions and your communications -- I

4  should say in any of your communications with Mr. Kruger during

5  that particular period of time where Grace is talking directly

6  with the personal injury constituency and the unsecured

7  creditors are not, in any of your discussions with Mr. Kruger

8  did he say, demand that he wanted to participate directly in

9  the negotiations with the personal injury constituency?

10 A    No.  We had an understanding that -- in the negotiations,

11 any negotiations with the personal injury committee we were

12 going to fight for, negotiate for the rate agreed upon in the

13 2006 letter agreement, and the committee and committee counsel

14 were quite content to let the debtors negotiate on their

15 behalf.

16 Q    Did Mr. Kruger, at any point in time, during this period

17 leading up to the term sheet, say we are not going to sign onto

18 a plan unless it includes full default interest?

19 A    No.

20       MR. PASQUALE:  Your Honor, again, Mr. Bernick is

21 doing nothing but leading with all these questions.

22       THE COURT:  That's sustained.

23 Q    Well, tell me whether any such demand -- tell me whether

24 there was any conversation where any such demand was discussed?

25 A    There was no such conversation.  There was an

1 understanding between Mr. Kruger and I, the traditional

2 position of the Asbestos Creditors' Committee was that

3 everybody should take a haircut as part of a consensual plan.

4 And that would include the general unsecured class taking a

5 haircut not only as to interest, but as to principal.  And I

6 think that led to the alliance of the debtors with the general

7 unsecured class leading to the co-proponency in 2005 and 2006.

8 So, this is something that the committee was very well aware

9 of, the asbestos creditors' committee's position, and therefore

10 I think was part of their strategy in allying themselves with

11 the debtors to try to get them the rate negotiated for in 2006.

12 Q    Well, I want to be sure that that's not simply your

13 speculation.  Was that something -- was that or was that not

14 something that was discussed with Mr. Kruger?

15 A    It was.

16 Q    Showing you Plan Proponents' Exhibit 160, is this a copy

17 of the term sheet that was ultimately reached with the personal

18 injury constituency?

19 A    This copy isn't signed by the debtors, but it looks to be

20 the final term sheet, yes.

21          MR. BERNICK:  Okay.  We offer it.

22          MR. PASQUALE:  I'm not sure of the relevance, Your

23 Honor, but we don't have an objection.

24          THE COURT:  All right.  It's admitted.

25 BY MR. BERNICK:


**J&J COURT TRANSCRIBERS, INC.**

1  Q    I see, if we go to Page 3, there is a reference under B7

2  to the allowed general unsecured claims.  Do you see that?

3  A    Yes.

4  Q    It actually spells out a rate of post-petition interest?

5  A    Yes.

6  Q    Is that rate the same or different from the rate of post-

7  petition interest that was set out in the plan, referenced in

8  the February '06 letter?

9  A    Yes.

10  Q    Is it the same or different?

11  A    It's the same.

12  Q    Okay.  Now, why was this included, if this is a deal with

13  the personal injury constituency, why was it important, if it

14  was important, to recite the rate of interest, post-petition

15  interest, for the general unsecured claims?

16  A    This is the arrangement I had with the committee that any

17  consensual plan with the PI committee, the Asbestos Claimants'

18  Committee, would include interest at the negotiated rate, and

19  we would not negotiate for any other deal, so this basically

20  was included to confirm to the general unsecured committee and

21  class that we had delivered what we had bargained -- what they

22  had bargained for.

23  Q    Okay.  I want to show you exhibit -- Plan Proponents'

24  Exhibit 344.  Do you see that?

25  A    Yes.

1  Q    Could you identify that document for the record?

2  A    That is an e-mail that I sent to committee counsel, Arlene

3  Krieger, Lewis Kruger, and Ken Pasquale, attaching a draft of

4  the term sheet with the Personal Injury Committee.  Consistent

5  with what I said earlier, we were keeping the committee

6  apprized of the negotiations.  This term sheet was fairly

7  advanced, although not final, and I sent it to them for their

8  information as to where we were in negotiations.

9  Q    Okay.

10           MR. BERNICK:  We offer it, Your Honor.

11           MR. PASQUALE:  No objection, Your Honor.

12           THE COURT:  Exhibit 334 is admitted.

13  BY MR. BERNICK:

14  Q    This is dated April --

15           MR. LOCKWOOD:  334 or 344, Your Honor.

16           MR. BERNICK:  It's 344, Your Honor.

17           THE COURT:  Oh.  I'm sorry.  One second, please.

18  Okay.  344.

19  BY MR. BERNICK:

20  Q    Looking at Exhibit 344, is it dated April the 3rd?

21  A    Yes.

22  Q    And it goes from you to Ms. Krieger, who is counsel -- one

23  of the counsel for the Unsecured Creditors' Committee?

24  A    Correct.

25  Q    And it attaches the term sheet as it then was?

1  A    Yes.

2  Q    Now, this makes a reference to a clause.  It says, "As

3  discussed with Lewis, we are very close.  Please call me before

4  10:15 tomorrow if you need to discuss."  Did you have a

5  discussion with Mr. Kruger in about this period of time, that

6  is after the term sheet was advanced to the point that it was

7  close to being agreed?

8  A    I believe so, but I don't know exactly when.

9  Q    Okay.  Did you have a conversation regarding the term

10  sheet?

11  A    Yes.

12  Q    Okay.  Could you tell us how that conversation came about,

13  and what the substance of the conversation was?

14  A    The -- counsel for the committee had, I guess, a comment

15  on the term sheet, and they knew from my conversation with Mr.

16  Kruger, I guess, they knew that there were at least some

17  members of the class that might want to object to the interest

18  provided for in that Section B7 that you had pointed out to the

19  Court just earlier.  And they had suggested language to

20  effectively give any objectors to the interest rate the right

21  to advocate for a different rate.  So, they wanted to make sure

22  that objectors had any rights that they may have, or parties

23  that may have objections have those rights preserved to object.

24  Q    Did Mr. Kruger, during the course of the call, did he

25  discuss with you termination of the February '06 letter, or

Shelnitz - Direct/Bernick                                   69

1  withdrawal from it?

2  A    No.

3  Q    Did he discuss with you making a demand on behalf of the

4  Unsecured Creditors' Committee or the lenders a demand for full

5  default interest?

6         MR. PASQUALE:  Your Honor, again, I've been not

7  standing up every often, these are all leading questions.  Mr.

8  Bernick can just ask the witness what was discussed?

9         MR. BERNICK:  To the contrary.  I asked him what was

10  -- A, they're not leading; B, I asked him what was discussed

11  and he gave me an answer, and now I am eliciting whether

12  further items were discussed in the call.  And I've put

13  neutrally whether there was discussion.  Was there discussion

14  is about as non-leading as you can get.  Was there discussion

15  regarding termination?  Was there discussion regarding a

16  demand?

17         THE COURT:  You can answer, Mr. Shelnitz.

18  A    No, there were no -- no discussion regarding termination

19  or demand for default interest.

20  Q    Now, did you ultimately receive a response from Ms.

21  Krieger to Exhibit 344, that is the April 3 e-mail?

22  A    Yes.

23  Q    I want to show you Plan Proponents' Exhibit 284.  Is that

24  the e-mail response from Ms. Krieger?

25  A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. BERNICK:  We offer it.

2        THE COURT:  I'm sorry.  What's the exhibit number?

3        MR. BERNICK:  284.

4        MR. PASQUALE:  No objection, Your Honor.

5        THE COURT:  All right.  It's admitted.

6  BY MR. BERNICK:

7  Q    Now, this document is the next date, right?

8  A    Yes.

9  Q    From Ms. Krieger to you, with a copy to Mr. Kruger.  The

10 Re: is W.R. Grace term sheet.  It says, "Mark, set forth below

11 are our initial thoughts on changes to the allowed general

12 unsecured claims treatment description in the term sheet."  It

13 says, "Allowed general unsecured claims:  100 percent of

14 allowed amount plus post-petition interest as follows."  I'm

15 not sure why -- I must have bopped something here.  I'm getting

16 it displayed sideways even though I'm showing it -- well, I

17 guess maybe we can fool it.  There we go.  I'm now showing --

18 I'll read it on the screen.  "100 percent of allowed amount

19 plus post-petition interest as follows.  (i) for holders of

20 pre-petition bank credit facilities post-petition interest --"

21 I have to, again, make sure that I -- "interest at the rate of

22 6.09 percent from the filing date through December 31, 2005,

23 and thereafter at the floating rate, in each case compounded

24 quarterly in the matter provided for under such bank credit

25 facilities; and (ii) for all other unsecured claims, interest

1 at 4.9 percent compounded annually, or if pursuant to an

2 existing contract, interest at the non-default contract rate."

3       So far, tell us whether or not the language that Ms.

4 Krieger is suggesting is any different from what was set forth

5 in the February -- the plan referenced in the February '06

6 letter or what was set forth in the term sheet?  Any

7 difference?

8 A    No difference.

9 Q    It goes on to say, "Provided, however, any such holder may

10 seek to obtain a higher interest rate and shall be entitled to

11 such higher interest rate if the Court determines that such

12 interest is appropriate."  That was a proviso that was added by

13 Ms. Krieger?

14 A    Yes.

15 Q    How did you understand this e-mail?

16 A    I understood it as the committee and committee counsel

17 continued to be supportive of the letter agreement, but they

18 knew there were certain members of their class that might want

19 -- might object, and they sought to preserve their rights to

20 object, a right that, I guess, we believed that they had all

21 along anyway, but she sought to give express comfort to a

22 holder who may want to seek a higher rate, that they could do

23 so.

24 Q    Was there any communication -- tell us whether or not

25 there was any further communication with representatives of the

1 unsecured creditors regarding the issue of the post-petition

2 interest prior to the time that the term sheet was finalized

3 and filed?

4 A    I believe there was, to advise them that we didn't feel

5 that language was necessary.

6 Q    Any other communication?

7 A    Not that I recall.

8 Q    Any demand -- any discussion at any point prior to going

9 back to our graphic here, which probably also needs to be re-

10 oriented.  We'll figure this out, I think, on a break.  During

11 this period of time that the graphic shows, between April 3

12 when the term sheet is circulated and April 6th when it's

13 filed, any discussion of a demand for a default interest,

14 demand made by the creditors through their counsel?

15 A    No.

16          MR. BERNICK:  Pass the witness, Your Honor.

17          THE COURT:  Why don't we take a few minute recess,

18 and then we'll do cross examination?

19          MR. PASQUALE:  Thank you, Your Honor.  I appreciate

20 it.

21          THE COURT:  All right.  Ten minutes, please.  You're

22 excused, sir.  Go ahead.  I just want to finish a note.  Thank

23 you.

24                    (Recess)

25          THE COURT:  Please be seated.  Mr. Shelnitz, are you

1  ready?

2             THE WITNESS:  Yes.

3             THE COURT:  Mr. Pasquale?

4             MR. PASQUALE:  Thank you, Your Honor.

5                      CROSS EXAMINATION

6  BY MR. PASQUALE:

7  Q    Good morning, Mr. Shelnitz.

8  A    Good morning, Ken.

9  Q    Mr. Shelnitz, let me start pretty much where Mr. Bernick

10 left off, and that's with Exhibit 284.  Mr. Bernick asked you

11 some questions in particular about the last clause in Ms.

12 Krieger's e-mail; do you remember that?

13 A    Yes.

14 Q    You understood that that clause applied not only to the

15 claims of the bank debt holders, but also all other unsecured

16 claims, didn't you?

17 A    I don't recall, but I do recall in discussion with Stroock

18 that you had specifically raised the issue with me having it

19 applied to the others as well, yes.

20 Q    So, just so we're clear for the record, the issue being

21 that all unsecured creditors, bank debt holders and non-bank

22 debt holders, have the right to petition the Court for the rate

23 of interest they believe appropriate, correct?

24 A    Yes, I think that's right.

25 Q    Thank you.  Now, Mr. Shelnitz, were you in the courtroom

1  during the examination of Mr. Tarola?

2  A    Yes.

3  Q    And I asked Mr. Tarola a number of questions about whether

4  Grace had ever entered into agreements with bank debt holders,

5  so I'd now like to ask you, are you aware of whether Grace ever

6  requested a plan support or other agreement with any bank debt

7  holder with respect to any plan in these cases?

8  A    No, other than -- no.  Other than J.P. Morgan Chase was a

9  debt holder, and they -- they supported -- they chaired the

10  committee, so from that perspective we believe J.P. Morgan

11  Chase was certainly committed.

12  Q    Did J.P. Morgan Chase ever sign -- let me withdraw and try

13  again.  Did J.P. -- did you ever request -- I'll try one more

14  time.  Withdrawn.  Did Grace ever request from J.P. Morgan a

15  plan support or other agreement with respect to any plan in

16  these bankruptcy cases?

17  A    Well, J.P. Morgan negotiated the agreement with the 2005,

18  2006 letter agreement.  The fact that Mr. Kruger signed was

19  typical for the bankruptcy where counsel often signed

20  agreements on behalf of their clients, so -- whether Mr. Kruger

21  signed or J.P. Morgan signed it didn't really make a difference

22  from a documentation or memorialization standpoint.

23  Q    And Mr. Kruger's client is the Unsecured Creditors'

24  Committee, correct?

25  A    Correct.  Chaired by J.P. Morgan Chase.

1  Q    All right.  But I want to go back again, Mr. Shelnitz,

2  because I'm not sure you've answered my question.

3  A    Okay.

4  Q    Did Grace ever request a separate agreement with J.P.

5  Morgan Chase to support any plan of reorganization in these

6  cases?

7  A    No.

8  Q    Now, Mr. Bernick asked you a number of questions about

9  things that Mr. Kruger did not tell you.  Did Mr. Kruger, or

10 anyone at Stroock ever tell you that the committee would

11 support the term sheet or the plan currently before this Court?

12 A    No, but the question was never asked.

13 Q    Never asked by you in any of the discussions with Mr.

14 Kruger?

15 A    Well, we had discussions, and when he indicated to me that

16 the trading price of the debt indicated there may be some bank

17 debt holders that had an expectation of a higher rate of

18 interest, I recognized that that could be an issue, but that

19 the committee support would very powerful in getting the plan

20 confirmed.

21 Q    That was your expectation as to the effect of the

22 committee's support, correct?

23 A    Mr. Kruger never took issue with the statement.  Correct.

24 Q    Now, let's stay in the range of April 2008, you know, the

25 time of Exhibit 284, and -- which is April 4, 2008, and then

1   your e-mail was the day before that.  That's also in Evidence.

2   A    Right.

3   Q    You were told during the discussions with Stroock, during

4   that period of time, that certain bank debt holders were not

5   agreeable to the rate provided in the term sheet, weren't you?

6   A    I believe so.

7   Q    So, you knew that before the term sheet was signed?

8   A    Yes.

9   Q    Now, with respect to the negotiations that led to the term

10  sheet, Mr. Bernick asked you some questions about the

11  creditors' committee -- that the creditors' committee did not

12  participate in those negotiations.  Do you recall the

13  questions?

14  A    Correct.

15  Q    That was actually your decision, wasn't it?

16  A    Well, it was my position and suggestion to Mr. Kruger that

17  that would be the best way to get a deal done that -- a more

18  intimate discussion without the General Unsecured Committee

19  being there would be more productive and it would enable the

20  committee to avoid having to address the Asbestos Claimants'

21  Committee directly with an expectation that the ACC would be

22  requesting them to take a cut in their -- in recovery of the

23  amount of their principal.

24  Q    So, it was your strategic decision to which we agreed;

25  isn't that right?

Shelnitz - Cross/Pasquale                        77

1  A    Correct.

2  Q    Now, you mentioned also that you believed that there were,

3  at some point in time, direct negotiations between the

4  committee and the asbestos claimants.  What's the basis for

5  your -- for that statement?

6  A    Again, it's been a long case, but I was certainly aware of

7  communications between the committee or its counsel and members

8  of the ACC or their counsel on what the ACC might expect the

9  General Unsecured Committee to agree to.  Whether that took

10 place in connection with the Judge Pointer mediation, earlier

11 negotiations that preceded my being general counsel, I don't

12 recall specifically.

13 Q    So, you don't know when these negotiations that you

14 testified to would have taken place?

15 A    I think they took place on one or more occasions

16 throughout the course of the bankruptcy.

17 Q    And how did you --

18 A    They were communications --

19 Q    I'm sorry.

20 A    -- more than negotiations.

21 Q    Thank you.  You mentioned in response to Mr. Bernick's

22 questions at least a conversation with Mr. Kruger with respect

23 to the trading price of the debt.  In fact, there was more than

24 one conversation, wasn't there?

25 A    He did mention it in more than one conversation, yes.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And it was at least five conversations that you can

2  recall?

3  A    That would be a ballpark.

4  Q    Now, you mentioned also that you discussed that the debt

5  was thinly traded.  That was something you said to Mr. Kruger;

6  isn't that right?

7  A    Yes.  I mean, this was bank debt.  This wasn't publicly-

8  traded debt.  Mr. Tarola would receive notice any time that

9  bank debt traded hands.  He did not know what price it traded

10  hands at, but he was able to keep current with who the current

11  debt holders were and he would advise, since we consulted very

12  regularly, our offices were right down the hall, that the debt

13  was very thinly traded.

14  Q    Okay.  So, your comment to Mr. Kruger that the debt was

15  thinly traded, it is based on Mr. Tarola's checking the trading

16  of the bank debt?  Is that right?

17  A    I believe Blackstone may have also checked it, as well.

18  Q    And how often was that done?

19  A    Once a quarter.  It's just a -- I don't know specifically.

20  Q    And how did Mr. Tarola communicate the information that he

21  learned to Grace?

22  A    He, or someone in his treasury department, would keep a

23  list of the current bank debt holders based on the information

24  provided in the notices that were required to be given to the

25  company.

**J&J COURT TRANSCRIBERS, INC.**

Shelnitz - Redirect/Bernick                          79

1  Q    That was information that he shared with you?

2  A    Yes.

3  Q    And was it information that he shared with others at Grace

4  management?

5  A    Yes.

6  Q    Did he share that information with any members of the

7  board of directors, to your knowledge?

8  A    I don't recall.

9  Q    Did he share it with Mr. Festa?

10            THE COURT:  With whom?

11            MR. PASQUALE:  Mr. Festa, the CEO.

12 A    I believe so.

13            MR. PASQUALE:  Your Honor, may I just have one

14 minute, please?

15                         (Pause)

16            MR. PASQUALE:  That's all I have, Your Honor.  Thank

17 you.

18            THE COURT:  Anyone else?  Mr. Bernick?

19            MR. BERNICK:  Would it be all right if I just asked

20 the question from here, Your Honor?

21                    REDIRECT EXAMINATION

22 BY MR. BERNICK:

23 Q    Mr. Pasquale asked you whether you had ever requested an

24 agreement directly with the bank lenders themselves as opposed

25 to the committee.  Remember those questions?

**J&J COURT TRANSCRIBERS, INC.**

1 A    Yes.

2 Q    And you said no, you did not.  Why not?

3 A    It really wasn't top of mind.  The issue was trying to get

4 the committee to support the joint plan, and we believed that

5 the committee, in its fiduciary capacity on behalf of all

6 members of the class, were negotiating on behalf of the bank

7 debt holders.  As a matter of fact, the 2006 letter agreement

8 says it's on behalf of the bank debt holders, so we didn't

9 believe it was necessary to try to go track down individual

10 bank debt holders and sign them up to an agreement.  It really

11 just wasn't part of our thought process.

12          MR. BERNICK:  That's all I have.

13          MR. PASQUALE:  One question, Your Honor.

14                    RECROSS EXAMINATION

15 BY MR. PASQUALE:

16 Q    What belief did you have, Mr. Shelnitz, that Mr. Maher's

17 negotiating would be binding upon individual bank debt holders?

18          MR. BERNICK:  He just answered that.

19          THE COURT:  He can answer.

20 A    As I said, I didn't -- I wasn't really focusing on the

21 extent to which individual bank debt holders may or may not

22 have been bound.  Not being a bankruptcy law expert I really

23 wasn't quite sure to what extent they would or would not be

24 bound.

25          MR. PASQUALE:  Nothing further, Your Honor.  Thank

                    **J&J COURT TRANSCRIBERS, INC.**

1  you.

2          THE COURT:  Anyone else?  Mr. Bernick, anything

3  further?

4          MR. BERNICK:  No.

5          THE COURT:  You're excused, Mr. Shelnitz.

6          THE WITNESS:  Thank you.

7          THE COURT:  Thank you.

8          THE WITNESS:  This binder still up there?

9          THE COURT:  Yes.  They can stay.  I'm not sure if

10 anybody else is going to use them yet.

11         MR. BERNICK:  The plan proponents' next witness is

12 Pam Zilly.  Oh, I'm sorry --

13         MR. PASQUALE:  I thought we were switching --

14         MR. BERNICK:  Yes.  We -- now that Mr. Schiavoni is

15 here -- I'm sorry.  I guess -- you know, you just --

16         THE COURT:  What's the order -- I'm sorry.  I'm

17 confused.  Are we going back to yesterday, or finishing the --

18         MR. BERNICK:  I was going to call Ms. Zilly, but I

19 recalled that we undertook to take up to -- take up the

20 remaining matters from yesterday before Ms. Zilly is called,

21 so, my apologies to Ms. Zilly and the Court.  I think that

22 that's what our commitment was, so we may as well do that now.

23         THE COURT:  All right.  So, who is on first, then,

24 and what are we returning to?

25         MR. PASQUALE:  She switched, to get out of the way,

**J&J COURT TRANSCRIBERS, INC.**

1 Your Honor.

2          MR. LOCKWOOD:  Your Honor, as I recall we had two

3 matters left over, one involving BNSF and one involving

4 OneBeacon.  So, those are the folks we need to hear from, I

5 guess.

6                    (Pause)

7          THE COURT:  Well, if that's the case, I'm not sure if

8 you do want these binders left up here if you're going to be

9 using other exhibits.  I was thinking that they would be used

10 with the subsequent witnesses for the -- on the lender issues.

11          MR. BERNICK:  Is there going to be a witness for

12 BNSF?

13          UNIDENTIFIED ATTORNEY:  I don't think so.

14          MR. BERNICK:  Is there going to be a witness for

15 Seaton/OneBeacon?  I don't see them here.

16          MR. LOCKWOOD:  I think I saw Mr. Brown and Mr. Platt

17 in the conference room down the hallway.  Or maybe --

18          THE COURT:  And Mr. Phillips just left, so --

19          UNIDENTIFIED ATTORNEY:  I'll see if I can find them,

20 Your Honor.

21          THE COURT:  All right.  There's Mr. Phillips.  Is

22 BNSF going to be calling a witness?

23          MR. PHILLIPS:  No, Your Honor, unless the Court wants

24 to hear -- we're going to be making an offer of proof of the

25 certified copies of the complaints, our Exhibits 85 through

                    **J&J COURT TRANSCRIBERS, INC.**

1  279.  They're electronic in the exhibit room.  I've got a box

2  full of documents that are certified that I could -- that I'd

3  be happy to leave here in case we need them for authentication.

4  But I'd also be willing to take them back to -- not Montana,

5  but the offices of Pepper and shred them if we don't need that

6  much more paper.  So, we move the admission of Exhibits 85

7  through 279.

8              THE COURT:  And are they marked as BNSF exhibits?

9              MR. PHILLIPS:  Yes, ma'am.  They are offered -- they

10 are BNSF-85 through BNSF-279.  And again, I have certified

11 copies if --

12             THE COURT:  And what are they?

13             MR. PHILLIPS:  They are complaints that are now

14 pending in Montana State Courts, four different counties,

15 Lincoln County, Flathead County, Lewis and Clark County, and --

16 one more.  I don't remember.  Anyway -- and these are the

17 complaints that are currently pending involving BNSF and

18 others, representing roughly 500 claimants in that 195

19 lawsuits.

20             THE COURT:  All right.  And they're offered for the

21 purpose of establishing that BNSF has, in fact, been sued?

22             MR. PHILLIPS:  Yes, Your Honor.  And not for the

23 purpose of the contents, so they are not being offered to prove

24 the -- they aren't being offered to prove the truth of the

25 allegations, obviously, which we hotly contest.  They're really

1  to give Your Honor an idea of the nature of the claims that are

2  being made against BNSF, because you may be comparing that to

3  the indemnity agreements that we have already placed in the

4  record.  So, I so move.

5          THE COURT:  Okay.  Any objection?

6          MS. ESAYIAN:  Your Honor, Lisa Esayian for the

7  debtors.  The debtors do not object to the complaints with the

8  caveats as stated by Mr. Phillips that they're coming in just

9  for that limited purpose.

10          THE COURT:  I'll --

11          MR. SCHIAVONI:  No objection, Your Honor.

12          THE COURT:  I'm sorry?

13          MR. SCHIAVONI:  No objection.

14          THE COURT:  Okay.  I will take the -- since you've

15  got the certified copies I'll take them.  I don't know whether

16  we'll use them, but if we don't need them --

17          MR. PHILLIPS:  I'm sorry, Your Honor.

18          THE COURT:  I'll take the certified copies since

19  they're here.

20          MR. PHILLIPS:  Very good.

21          THE COURT:  And we'll just keep them.  If I don't

22  need them, for whatever reason, we'll make sure they're

23  shredded at the end --

24          MR. PHILLIPS:  Thank you, Your Honor.

25          THE COURT:   -- because the disks will also contain

1  them.  But, all right, let me make a note here.  BNSF Exhibits

2  85 through 279 are admitted for the purpose just stated.

3          MR. PHILLIPS:  Thank you, Your Honor.

4          MR. BERNICK:  Have you found Seaton/OneBeacon yet?

5          UNIDENTIFIED ATTORNEY:  Oh, there you --

6          MR. BERNICK:  You're up.

7          MS. ESAYIAN:  Your Honor, before Seaton/OneBeacon

8  speaks, may I get up and state something for the record related

9  to BNSF?

10          THE COURT:  Yes.

11          MS. ESAYIAN:  We have -- the plan proponents', Royal,

12  CNA and Maryland Casualty and BNSF have worked out some plan

13  modifications.  Your Honor might recall that I handed out some

14  proposed plan modifications.  I think it was yesterday or the

15  day before.  We've done some further tweaks on them.  We've

16  worked it out, and we will be filing those in due course.

17          MS. CASEY:  Your Honor, just for the record, part of

18  the --

19          THE CLERK:  Please state your name for the record.

20          MS. CASEY:  Oh.  Linda Casey for BNSF.  Part of the

21  understanding is that any settlement agreement that is going to

22  be deemed an insurance settlement agreement under the plan, the

23  debtors will be seeking a 9019 motion on that, and that's part

24  of the reliance that we have.

25          THE COURT:  All right.  Let me make a note, please.

1          MR. SCHIAVONI:  I --

2          THE COURT:  Wait until I make a note, please.

3                    (Pause)

4          THE COURT:  Yes, sir, Mr. Schiavoni?

5          MR. LOCKWOOD:  Excuse me.  Before Mr. Schiavoni, I

6   might offer one other comment about the plan modification Ms.

7   Casey just described.  That will also cure, in our view, an

8   objection to the plan modifications made by the Libby claimants

9   within the last relatively near term because they had objected

10  that the plan, as previously drafted, allowed us to make

11  settlements during the course of the bankruptcy without seeking

12  the Court's approval.  I'm not asking the Libby claimant's

13  counsel to agree to that.  I'm just noting it for the record.

14         MR. SCHIAVONI:  Tanc Schiavoni for Arrowood.  Thank

15  you, Your Honor and Mr. Bernick, for indulging me this morning.

16  I think there's something happy that comes from that short

17  delay, that it's also -- it's -- and I'll let BNSF confirm

18  this, but our overall understanding is that to the extent these

19  plan modifications are accepted by the Court, and the parties

20  have consented to it, that BNSF intends to withdraw the notice

21  of appeal that it's filed with respect to the Arrowood

22  settlement, so that would be a net positive.

23         It's also my understanding that BNSF intends to

24  withdraw certain of the objections it's asserted to the plan.

25  It's going to retain certain objections concerning -- and I'll

1  let them explain -- the contractual indemnity, and how they're

2  treated with respect to that, but objections with respect to

3  the injunction and how it deals with insurers they're going to

4  withdraw.  So, it narrows the objections, and that's a net

5  positive all the way around.

6        MS. CASEY:  Yes, Your Honor.  As -- with the proposed

7  revisions the settlement agreement will result in BNSF's

8  objections relating to the scope of the 524(g) injunction and

9  the permissibility of the Section 105(a) injunction, it would

10  resolve all of those objections.  BNSF has filed additional

11  objections relating to the plan's discrimination of its claims

12  for indemnity and contribution, and those claims that are based

13  on the discrimination both in how they are classified with the

14  direct claimants and the discriminatory treatment under the TDP

15  are not resolved and we will be continuing to press them.

16        THE COURT:  All right.

17        MR. SCHIAVONI:  Your Honor, lastly deals with just

18  the completion of Arrowood's proof, and that is yesterday we

19  put into Evidence two declarations of witnesses that were

20  proffered in connection with our settlement.  There's a third

21  that was proffered during the settlement hearing by the plan

22  proponents.  It's a declaration of Richard Finke in support of

23  the Arrowood settlement.  It went in unobjected to in

24  connection with the -- those proceedings, and we just would re-

25  tender it as part of these proceedings.  It's marked as

1 Arrowood Exhibit 35, and if there's no objections we would ask

2 that that be admitted.

3          MS. ESAYIAN:  There's no objection from the debtors,

4 Your Honor.  It's our declaration.

5          MR. SCHIAVONI:  And then, otherwise, Your Honor,

6 Arrowood had circulated its --

7          THE COURT:  Do I have that exhibit?

8          MR. SCHIAVONI:  No -- it's in the record, actually.

9          THE COURT:  No.

10          MR. SCHIAVONI:  But I --

11          THE COURT:  I need it here.  I'm not going to search

12 through 25,000 docket entries to find an exhibit.

13          MR. SCHIAVONI:  Understood.

14          THE COURT:  Okay.

15          MR. SCHIAVONI:  Your Honor, instead of -- what I'd

16 propose to do for Arrowood is give you a whole binder with all

17 of our exhibits in it --

18          THE COURT:  Yes.

19          MR. SCHIAVONI:  -- instead of piecemeal.  In fact,

20 I've sort of given you some things piecemeal already.  I'd like

21 to give you just one.

22          THE COURT:  That would be helpful.

23          MR. SCHIAVONI:  I don't have it physically right with

24 me, but I will pass it up as soon as we can.

25          THE COURT:  All right.

1          MR. SCHIAVONI:  The other -- we also had -- Arrowood

2  had, in accordance with the CMO, circulated our exhibit list

3  beforehand in accordance with the time deadlines, and in

4  accordance with those time lines we got --

5          THE COURT:  Wait.  Mr. Brown, could you turn your

6  microphone off?  Could you turn the microphone off?  For some

7  reason it's now working.

8                      (Laughter)

9          THE COURT:  I'm sorry, Mr. Schiavoni.  I didn't want

10  to listen in on their conversation.  Your --

11          MR. SCHIAVONI:  So, I'm going to proffer some

12  exhibits that -- we filed our exhibit list.  We did not get

13  objections to a number of our exhibits, and I think we can

14  proffer those without any objection.  They're out of -- and the

15  exhibits numbers for those are Arrowood Exhibit 1 through 6,

16  Arrowood Exhibit 8 --

17          THE COURT:  Wait.  I'm sorry.  1 through 6, 8?

18          MR. SCHIAVONI:  Eight.  Arrowood Exhibit 11 and 12,

19  Arrowood Exhibit 21, Arrowood Exhibit 35, 36, 37, Arrowood

20  Exhibit 43 and 44, Arrowood Exhibit 48, Arrowood Exhibit 76,

21  and then Arrowood Exhibit 77 through 79.  If there's no

22  objection, and I don't believe there are any, I'd ask that

23  those be admitted now.

24          THE COURT:  And what are they?

25          MR. SCHIAVONI:  I can read each one of them.

1          THE COURT:  Just in general terms.

2          MR. SCHIAVONI:  These are -- the first two are copies

3  of our excess policies that were settled.  But what these are,

4  as a general matter is the affidavits that went into Evidence.

5  The witnesses in those affidavits referred to policies,

6  letters, other documents all in support of our settlement in

7  their declarations themselves and they explained those exhibits

8  by and large in their declarations.  So, as a general matter

9  that's the type of --

10          THE COURT:  They're the affidavits, or they're the

11  documents referred to?

12          MR. SCHIAVONI:  They're the documents referred to by

13  the declarants in their declarations.

14          THE COURT:  All right.  Is there any objection to any

15  of the listed exhibits, Arrowood 1 to 6, 8, 11, 12, 21, 35, 36,

16  37, 43, 44, 48, 76 through 79?

17          MR. KOVACICH:  Your Honor, Mark Kovacich on behalf of

18  the Libby claimants.  I just don't know what these documents

19  are.  My recollection of the exhibit exchange with Arrowood was

20  that they filed some sort of document indicating they had a

21  settlement, and incorporating a prior exhibit list, and for the

22  record I guess I would just ask that we have the opportunity to

23  look at what is being offered here and make an objection if we

24  have one.

25          MR. SCHIAVONI:  Your Honor, I just -- I --

1          THE COURT:  Weren't these part of the documents that

2   were filed already, that were listed already?

3          MR. SCHIAVONI:  Yes, they were, and the list -- I've

4   circulated the list several times.  I understand -- I just

5   don't want you to think I didn't follow the rules and that I

6   haven't made an effort to meet and confer, but I'm also willing

7   to just go and meet, and we can come back after lunch and do

8   this again.  I know the Libby folks have been busy with a lot

9   of things, and I don't hold any fault that they haven't gotten

10  back to me.

11         THE COURT:  All right.  I'll accept the proffer,

12  then, after lunch.

13         MR. SCHIAVONI:  Okay.  Thank you, Your Honor.

14         THE COURT:  Anyone else have an objection to any of

15  these exhibits and need to meet to Mr. Schiavoni?

16         MR. SCHIAVONI:  Your Honor, we also have, on the same

17  list -- there are some exhibits that are in the nature of

18  pleadings, and SEC filings, that we would offer for a limited

19  purpose.  And Mr. Bernick kept sort of alluding that there

20  might be almost like an exhibit objection day, and I thought

21  that's when we'd deal with those.  I don't want to take up his

22  time here.  If we could agree with him over lunch I'd try to do

23  that, but we've -- or however he wants to do it.

24         MR. BERNICK:  You shouldn't hesitate.  There's a long

25  history of our time being taken up, and for good purpose.

**J&J COURT TRANSCRIBERS, INC.**

1                        (Laughter)

2              MS. ESAYIAN:  Your Honor --

3              MR. SCHIAVONI:  We'll come back after lunch, then,

4     and I'll read those into the record --

5              MS. ESAYIAN:  Your Honor --

6              THE COURT:  That is much a more uplifting way to

7     complain about trial delay, Mr. Bernick.  Thank you.

8                        (Laughter)

9              MS. ESAYIAN:  Your Honor, I'm not sure, I would like

10    to think we could solve this over lunch, but I'm not sure that

11    we can because as to those exhibits we don't object to the

12    limited purpose for which counsel would want them, but the

13    exhibits themselves are voluminous and have a lot of hearsay,

14    and we haven't figured out how to deal with that.

15             MR. SCHIAVONI:  Well, I could just specifically

16    identify them when I proffer the specific clauses we want.  I

17    was -- we've come up with different ways to suggest that we

18    could -- we'd sign a little stipulation specifically

19    identifying those, or I can just read them.  It would take 20

20    minutes or so to do it and we can do it that way after lunch.

21             THE COURT:  Talk about it at lunch.  Whichever way

22    you want to do it is fine.  If I need to make rulings, at some

23    point I have to make the rulings, and I'm going to need to

24    actually see the exhibits.  So, it would be helpful to have the

25    exhibits that you're proffering in some fashion.  I don't know

**J&J COURT TRANSCRIBERS, INC.**

93

1  if we actually need a day just to deal with exhibits, in

2  general.   There are some things we are going to have to deal

3  with, for example the motions in limine, I will want some

4  argument on some of those, but they generally deal with

5  witnesses' testimony as opposed to exhibits.   At least that's

6  what I recall now.   So, if you need some specific day, okay,

7  but it will be a very painful day, I know, because you're going

8  to have to put it all back in context, and that will probably

9  be tough.   I would think that if you can agree that the

10  exhibits can come in, and then argue them, as Mr. Bernick was

11  proposing yesterday in the briefs, and also explained that the

12  Court hasn't yet made a ruling, but here's what the proffer is

13  for, I think that might make the most sense.   But it's your

14  trial and I'll do it whatever way you folks want.

15          MR. SCHIAVONI:   We'll come back after lunch, Your

16  Honor.   Thank you.

17          THE COURT:   All right.

18          MS. DeCRISTOFARO:   Your Honor, just to finish up on

19  the BNSF issue, obviously the plan modifications will speak for

20  themselves, and no one here is trying to characterize them.

21  But just to be clear that the modifications or the agreement

22  doesn't obviate any claim by BNSF for indemnification under --

23  for the complaints that they had tendered, or any claim by

24  Continental Casualty arising out of what we have to pay BNSF

25  against the debtors, which I understand --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Wait.  I'm sorry.  I apologize.  I don't

2 think my head was following what you were saying.

3          MS. DeCRISTOFARO:  I'm sorry.

4          THE COURT:  Is this a -- is it a question or is it a

5 statement?

6          MS. DeCRISTOFARO:  Just further to everybody else's

7 statements about the BNSF --

8          THE COURT:  Okay.

9          MS. DeCRISTOFARO:  -- situation.

10          THE COURT:  All right.  And they don't what?

11          MS. DeCRISTOFARO:  They don't cover -- they don't

12 eliminate BNSF's claim for indemnification, and they don't

13 eliminate any claim that my client, Continental Casualty, might

14 have for what it may have to pay BNSF.

15          THE COURT:  All right.

16          MS. DeCRISTOFARO:  Thank you.

17          THE COURT:  Anything else on BNSF?

18          UNIDENTIFIED ATTORNEY:  No.

19          THE COURT:  All right.  Mr. Demmy?

20          MR. DEMMY:  Your Honor, John Demmy for Fireman's Fund

21 Insurance Company, Allianz S.p.A., formerly known as Allianz

22 Reunion De Secorta (phonetic), and Allianz SE, formerly known

23 as Allianz AG.  I have our exhibits, the Phase II exhibits that

24 I'd like to hand up to the Court, and I would just note in that

25 regard that there are 36 exhibits, 1 through 33 of which

1 there's no objection to them.  The exhibits, 34 through 36,

2 consist of discovery responses by the plan proponents.  There

3 is a relevance objection to those exhibits.  It's the same

4 objection that was lodged in connection with Phase I.  These

5 are the exact same exhibits that were submitted for Phase I,

6 and I would note that the debtors have -- or the plan

7 proponents, pursuant to the procedure that was put in place by

8 the Court in connection with Phase I, they've already filed a

9 motion to exclude those exhibits.  That motion appears at

10 Docket Number 22331.  We've filed an objection to that motion.

11            THE COURT:  Wait.  I'm sorry.  Docket Number what?

12            MR. DEMMY:  The motion is at Docket 22331, and the

13 objection that we filed in response is at Docket 22409.  The

14 point of that is, Your Honor, we're not looking to do anything

15 more than what's already been done.  We're submitting the same

16 exhibits.  We understand the same relevance objection was made

17 to Exhibits 34 through 36.  It's already been briefed.  If

18 there's a further procedure about dealing with exhibits to

19 which there's objections in connection with post-trial

20 briefing, we'll follow that, as well.  But I'd like to hand up

21 the binder which contains our exhibits 1 through 33, to which

22 there's no objection, 34 through 36, to which there's

23 objection, but there's already been proceedings on them, and

24 perhaps will be further proceedings with regard to those.

25            And I would also note, Your Honor, that I've given a

1  complete set of this binder to Mr. Horkovich, counsel for the

2  ACC.

3          THE COURT:  All right.  And these are marked as FF,

4  or as something else?

5          MR. DEMMY:  They are marked as FFIC/Allianz Phase II

6  Trial Exhibits.

7          THE COURT:  Mr. Horkovich?

8          MR. HORKOVICH:  Your Honor, no objection to

9  FFIC/Allianz Exhibits 1 through 33.  As Mr. Demmy said, we do

10 have an objection to 34 through 36, which has been briefed.

11         THE COURT:  All right.  One second.  Fireman's

12 Fund/Allianz Exhibits 1 through 33 are admitted, and Fireman's

13 Exhibits 34 through 36, the only objection is relevance?

14         MR. HORKOVICH:  It's a relevance objection, Your

15 Honor.  And as I've said, we've already briefed the issue.

16         THE COURT:  Admitted subject to a ruling on

17 relevance.

18         MR. HORKOVICH:  Thank you, Your Honor.

19         MR. BOERGER:  Your Honor --

20         THE COURT:  Good morning.

21         MR. BOERGER:  -- Jeff Boerger for OneBeacon/Seaton,

22 Geico and Republic, to complete our tender of our trial

23 exhibits.  Ms. Baer had an opportunity to look at these

24 yesterday evening, and as I understand it there are no

25 objections.

1          THE COURT:  All right.  I'll take them.  And can you

2  just restate for me the exhibit numbers, please?

3          MR. BOERGER:  Just a moment.

4                    (Pause)

5          MR. BOERGER:  The exhibit numbers are OS-1 Revised

6  through OS-7 Revised, OS-14, OS-15 -- I'm sorry, OS-14 through

7  OS-20, OS-27 and OS-28, OS-40 and 41, OS-44, OS-46, OS-48

8  through OS-51, and then, I believe, GR-14 through GR-20

9  Revised.

10          THE COURT:  All right.  All of those documents are

11 admitted.  You can give them to my clerk there.  I actually

12 have no more room.

13          MS. BAER:  Your Honor, it's just -- it's the

14 understanding that these are being admitted pursuant to the

15 terms of the stipulation that we've agreed to with

16 OneBeacon/Seaton.

17          THE COURT:  Yes.  I think that was stated on the

18 record yesterday, but let me make a note about that fact, too.

19                    (Pause)

20          THE COURT:  Yes, sir?

21          MR. WORF:  Good morning, Your Honor.  Richard Worf

22 for Garlock Sealing Technologies.  We have a few exhibits that

23 are not addressed in the stipulation that we had entered into

24 Evidence yesterday, and they are Garlock Exhibits 3, 4, 5, 6,

25 7, 8, 9, 10 and 13.  We move to have those admitted, and we are

**J&J COURT TRANSCRIBERS, INC.**

1  going to support the authenticity of those through declarations

2  that we circulated to the plan proponents last night.  We

3  haven't heard any objection from them as to authenticity.  We

4  imagine they may have some relevance objections.  These are

5  complaints that were filed against Garlock during the

6  bankruptcy in which the plaintiff identified Grace as somebody

7  they would have sued if Grace was not in bankruptcy.

8          We also have a Rule 1006 summary of 14,000 complaints

9  from Texas that were filed against both Grace and Garlock

10 before the petition date.  We also have one other exhibit that

11 is some discovery materials that were filed during the

12 bankruptcy in which the plaintiff identified Grace products and

13 exposure to Grace products in cases where they had sued

14 Garlock.  So, we would move to have those admitted.

15         MR. GUY:  Your Honor --

16         THE COURT:  Wait.  I'm not clear.  The exhibits --

17 I'm not clear what the exhibits are from that description.

18 Three through ten and 13 are just the complaints, but then you

19 have a separate 1006 summary that has to be identified and

20 another exhibit?

21         MR. WORF:  Thirteen is the 1006 summary.  Three

22 through nine are the complaints, and Number 10 is the discovery

23 materials.  They're from Louisiana.

24         THE COURT:  Yes, Mr. Guy?

25         MR. GUY:  Your Honor, if it's anybody's fault, it's

1 probably my fault.  I haven't had an opportunity to review

2 those individual documents and it's not Mr. Worf's fault.  I

3 would just like a chance to look at them over lunch.  I don't

4 think we'll have an issue with the complaints because they're

5 not being offered for the truth of the matter asserted.  I'm

6 sure the debtors would like to have a quick review of the

7 summary.  It's 14,000 complaints listed there.

8           In principle, we don't have an issue.  We just would

9 like an opportunity to look through the documents.

10          THE COURT:  All right.  I'll address these additional

11 documents after lunch.

12          MR. WORF:  Thank you.

13          THE COURT:  Okay.  Ms. DeCristofaro?

14          MS. DeCRISTOFARO:  Your Honor, just to quickly say

15 that we are working with the debtor to proffer exhibits as

16 expeditiously and to take as little time as possible and we

17 expect to do that.

18          MS. BAER:  Your Honor, I spoke with a couple of the

19 insurers in the hallway during the proceedings and a number of

20 them have a lot of exhibits we don't have an objection to, or

21 our objection is relevance which is preserved and it will be

22 argued in the briefs.  So the real question is sort of

23 procedurally, how does everybody get all this stuff in?  We --

24 from the plan proponents' perspective are going through our

25 list of exhibits now with the thought that there will be other

1  exhibits that are not objected to, we would move for the

2  admission of.  I would suggest we try to work through this and

3  come up with a procedure and tell you tomorrow morning what

4  that is.

5         THE COURT:  Well, yes, at some point it would be nice

6  to know.  So, okay.  That's fine.

7         What I do need from someone at some point, maybe

8  Friday is -- or Thursday -- I'll get the days straight some

9  time -- maybe Thursday morning is a good time to do it, is a --

10 an indication of when the parties who owe me exhibits are going

11 to produce them in binders so that I know that, in fact,

12 they're coming in because I still don't have from everyone all

13 of the exhibits that have been introduced and I need to make

14 sure that I do have them so that if we need them during the

15 course of this analysis that they're available.  So, while

16 you're talking about how you're going to do it, maybe you can

17 also discuss when you're going to do it.

18        And you're not going to be using, Mr. Pratt, any of

19 these binders that I have stacked in front of me that have just

20 been offered, are you?

21        MR. PRATT:  Not going to use them?

22        THE COURT:  Yes, right now.

23        MR. PRATT:  Well, Your Honor, all of those have been

24 used I believe, or they're coming in by agreement, but I'm not

25 going to use them right now.

1          THE COURT:  Then just give me a second to move them

2   out of my way.

3          MR. PRATT:  Sure thing.

4                    (Pause)

5          THE COURT:  Okay, sir.  Thank you.

6          MR. PRATT:  Warren Pratt, Your Honor, for creditors

7   Seaton and OneBeacon.  At Mr. Bernick's suggestion last night

8   we put together a proposed stipulation and worked on it quite

9   a while.  We didn't get it over to Mr. Freedman until about

10  8:30 this morning.  He just requested, a few minutes ago, that

11  he have an opportunity to consult with Mr. Bernick about that

12  over lunch, so Mr. Bernick's going to have a busy lunch.  But,

13  if the Court would indulge us on that we might preempt the need

14  for testimony here.

15         THE COURT:  All right.

16         MR. PRATT:  Thank you, Your Honor.

17         THE COURT:  Before you re-begin the cases, if you've

18  got this much you want to work out, do you want an early lunch

19  recess or do you want to start with another witness and then

20  recess at a normal time?

21         MR. BERNICK:  It's up to the Court.  We would prefer

22  to get on with the testimony, but we don't really care.

23  Whatever is most convenient for the Court.

24         THE COURT:  That's fine.  I think I'd rather keep

25  going for a little while, too, just so everyone is still going

1  to be here.  Is there anybody who was planning to leave?

2

3                    (No audible response)

4          THE COURT:  Okay.  Then why don't we start with

5  another witness and --

6          MR. BERNICK:  Can we --

7          THE COURT:  -- then we'll take a lunch recess.

8          MR. BERNICK:  Can we at least ask whether there's

9  anybody else who may call a live witness other than Seaton and

10 OneBeacon?

11         THE COURT:  Anyone?

12         MR. SCHIAVONI:  Judge, we had this one -- we had a

13 witness -- that we couldn't --

14         THE CLERK:  You have to use a microphone.

15         MR. SCHIAVONI:  We had a witness that Dan Cohn asked

16 to confer with us on and we're going to do that at lunch and

17 hopefully we'll resolve that.

18         THE COURT:  All right.  Possibly Arrowood.

19         MR. BERNICK:  We call Pam Zilly.

20                   PAM ZILLY, WITNESS, SWORN

21         MR. BERNICK:  Do we have notebooks?

22         THE COURT:  All right.  Someone is going to have to

23 take all of these notebooks away, so the witness has some room

24 to deal with whatever you're going to give her.  Thank you.

25                   (Pause)


                    **J&J COURT TRANSCRIBERS, INC.**

1        MR. BERNICK:  Has the witness been sworn?

2        THE COURT:  Yes, she has.

3        MR. BERNICK:  Thank you.

4                      DIRECT EXAMINATION

5   BY MR. BERNICK:

6   Q    Good morning, Ms. Zilly.  I want to take you through your

7   -- you've previously been qualified as an expert to testify

8   before this Court, is that right?

9   A    That's correct.

10  Q    Okay.  So, we'll go through this relatively quickly.

11  Could you please just describe your educational background

12  leading up to your first job?

13  A    I received a Bachelor of Arts in Economics and American

14  History from Connecticut College in 1975 and a Masters of

15  Science in Industrial Administration from Carnegie Mellon

16  University in 1977.

17  Q    Okay.  Does Exhibit 511-2, a demonstrative, reflect your

18  work experience up to the present time, does the different -- I

19  shouldn't say that -- does it reflect the different positions

20  that you've held at different companies up to the present time?

21  A    Yes, it does.

22  Q    Okay.  Have you had a variety of restructuring assignments

23  in connection with your professional career?

24  A    Yes, I have.

25  Q    Are some of the restructuring assignments reflected on

Zilly - Direct/Bernick                                    104

1  Demonstrative Exhibit 511-3?

2  A    Yes, they are.

3  Q    What about involvement in mass tort bankruptcies, what

4  mass tort bankruptcies, if any, have you been involved with?

5  A    It started with Dow Corning around 1996, Combustion

6  Engineering, ABB Lummus, The Babcock and Wilcox Company and

7  obviously W.R. Grace.

8          MR. BERNICK:  Okay.  Have -- we tender Ms. Zilly as

9  an expert in the field of being a financial advisor in

10  connection with restructuring matters.

11          UNIDENTIFIED ATTORNEY:  I have no objection, Your

12  Honor, for that purpose.

13          THE COURT:  She is so qualified.

14  Q    Have we asked you, Ms. Zilly, to address certain tasks and

15  issues regarding solvency in connection with this case?

16  A    Yes, you have.

17  Q    Okay.  But, as you understand it, what basically are some

18  of the tasks that you've been ask to perform?

19  A    With respect to specifically to solvency, I was asked to

20  review a report prepared by Mr. Robert Frezza on behalf of the

21  unsecured creditors committee and to write a rebuttal, prepare

22  a rebuttal report to his report.

23  Q    Have you been asked, specifically in connection with your

24  work, to focus on solvency of W.R. Grace as of the time the --

25  just before the terms sheet was signed up?

1  A    No, I was not.

2  Q    Okay.  If we wanted to capture what the state of play is

3  concerning solvency pre-plan, what definition can we work with

4  of solvency for purposes of understanding your work?

5  A    I think if you're asking me precisely in terms of a

6  definition or a test, various tests of solvency, there are

7  typically three tests that are put forth; a balance sheet test,

8  an adequate capital test and whether or not the debtor has the

9  ability to pay its debts as they come due.

10 Q    Okay.  If we wanted to take a look at what do all the --

11 do all of the different kinds of approaches that you've talked

12 about, do all of them require some examination of assets?

13 A    Yes.

14 Q    What about liabilities?

15 A    Yes.

16 Q    Okay.  As of the time that the -- as of the time that the

17 terms sheet was negotiated and, indeed, up through the present

18 time, have you looked at the question of whether it's possible

19 to quantify, with any degree of precision, the extent of the

20 personal injury asbestos liability of the company?

21 A    Yes, I have looked into that.

22 Q    And what have you done in order to look at that?

23 A    I have evaluated the various estimates put forth during

24 the estimation hearing, as well as rebuttal reports to those

25 estimates.  I have looked at the plan document, the amended

1  plan document, with respect to the assets that are going into

2  the PI trust, asbestos PI trust.  And, obviously, in connection

3  with looking at the estimation reports, also obviously read

4  those estimation -- the actual reports.

5  Q    I'm showing you the Plan Proponents' Demonstrative 511-6,

6  could you tell us what is reflected in that document?

7  A    This page shows the ranges, or certain of the ranges that

8  were set forth, I believe, in connection with the estimation

9  hearing either expert reports or rebuttal reports as to the

10 estimates of asbestos personal injury liabilities ranging from

11 a -- for purposes of this chart a low of $200 million to a high

12 of $6.2 billion.

13 Q    Okay.  At any point in time has the extent of Grace's

14 personal injury liabilities, absent a plan that is confirmed,

15 has the -- as an estimate -- strike that.  Has an estimate of

16 Grace's personal liability injuries actually been fixed?

17 A    No, it has not.

18 Q    As of this point in time, absent a plan of reorganization

19 that is confirmed, as a financial advisor and an expert in

20 restructuring, is there any methodology that you're aware of

21 that can be used to establish exactly or even approximately

22 what that personal injury ultimate -- liability ultimately

23 would be determined to be?

24 A    No, there is not.

25 Q    Based upon the current state of affairs with these

1 different estimates that are out there, is it possible to

2 render an opinion, a formal opinion, regarding Grace's

3 solvency?

4 A    No, I don't believe it is.

5 Q    Now, are you familiar with the fact that the plan of

6 reorganization that's been proposed in this case spells out a

7 rate of interest for -- post-petition interest to be paid to

8 the general and secured creditors?

9 A    Yes, I'm aware of that.

10 Q    And within that, are you aware of the rate that is

11 specified for the debt holders, in particular?

12 A    Yes, I'm aware of that.

13 Q    Okay.  And what is that rate?

14 A    The plan provides for a rate that beginning as of the

15 petition date was 6.09 percent, compounded annually, and then

16 beginning, I believe, January 1st, 2006, that rate now floats

17 with prime, also compounded annually.

18 Q    Okay.

19 A    Quarterly -- compounded quarterly, I'm sorry.

20 Q    Turning to Plan Proponents' Exhibit 511-7 for

21 demonstrative purposes.  And I'd say, Your Honor, this is a

22 chart that we've created for demonstrative purposes, not

23 representing that it was prepared by Ms. Zilly.

24         THE COURT:  It's not on yet.

25 Q    Now, let me ask you some questions, I've put on the

1  lefthand margin a range of 488 -- $468 million to $6.2 billion,

2  and in so doing I've used -- I've taken the median estimate

3  from Dr. Florence of 468 to the high estimate of Dr. Peterson

4  at 6.2, so it's pretty much the full range.  And I want to ask

5  you based upon your assessments of the assets and liabilities

6  of Grace, at $468 million, if the estimate were to turn out --

7  the binding estimate were to turn out to be $468 million, would

8  Grace be solvent or insolvent?

9  A    I'm assuming it was a binding termination.  At that level

10 of liability, I believe that Grace would be found solvent.

11 Q    By contrast, if we go to the high end at 6.2 billion,

12 could you tell us whether or not Grace would be solvent or

13 insolvent?

14 A    Grace would be insolvent at that level.

15 Q    Are you able to tell us where within that range of

16 potential outcomes the crossover point is; that is, where would

17 Grace be on the edge of insolvency or conversely on the edge of

18 solvency?

19 A    I haven't done a precise analysis, but it would in my --

20 based on my knowledge to date, it would fall closer to the $468

21 million number than the billion six for purposes of solvency.

22 Q    Okay.

23 A    Or six billion two for purposes of solvency.

24 Q    Now, you've told us that you recited the fact that the

25 amount of the estimated personal injury liability is disputed

1 at this time and you can't fix it, have you looked to see what,

2 if any, relationship there is between the rate that was put in

3 the plan of reorganization on the one hand and full default

4 interest versus zero post-petition interest on the other; that

5 is, if you determine where within that range the rate that's in

6 the plan falls?

7 A    Well, obviously, with insolvency there would be zero

8 post-petition interest and the compromised rate, in my view

9 falls somewhere in the middle between having zero interest and,

10 frankly, probably closer to the default interest line.

11 Q    Okay.  I want to ask you, in response to -- you said that

12 you took a look in connection with your work, at the work that

13 Mr. Frezza has done?

14 A    Yes.

15 Q    Okay.  Could you just describe, generally, what approach

16 Mr. Frezza has taken, and he's going to testify here in a bit,

17 but we thought that we would, consistent with the practice that

18 we've followed elsewhere, ask Ms. Zilly to take the stand once

19 in connection with this issue, could you tell us whether or not

20 -- what kind of approach Mr. Frezza has taken in terms of

21 whether he -- well, I'll just ask you flat out, what kind of

22 approaches has he taken?

23 A    Mr. Frezza's analysis primarily relies on a balance sheet

24 test where he inserts the number of 468 million for the

25 asbestos PI claims and assumes that given that number the

1 debtor has no liability whatsoever for asbestos PI claims

2 because the entire 468 million would be paid for out of the

3 Sealed Air and Fresenius settlements that are part of the plan

4 before this Court.

5 Q    Are you familiar with any convention or methodology within

6 your field -- established convention or methodology within your

7 field that would call for that kind of a support, that kind of

8 analysis?

9 A    No.  In my opinion it's simply picking one number without

10 giving any regard to what the effect on all other numbers would

11 have, nor does it give any effect to the fact that there is a

12 very wide range of numbers around "the asbestos PI number that

13 he uses".

14        MR. BERNICK:  Your Honor, we would offer for

15 demonstrative purposes Plan Proponents' Demonstratives 511-1,

16 511-2, 3, 4, 6 -- and 6 (sic).

17        THE COURT:  Any objection as to demonstratives?

18        MR. COBB:  No objection, Your Honor.

19        THE COURT:  All right.  One second please, 511-1, 2,

20 3, 4 ,5 and 6 are admitted as demonstratives.

21        MR. BERNICK:  Pass the witness, Your Honor.

22                    CROSS EXAMINATION

23 BY MR. COBB:

24 Q    Good morning, Ms. Zilly.

25 A    Good morning.

1 Q    My name is Richard Cobb and I represent the Bank Lender

2 Group in this bankruptcy along with the firm of Paul Weiss.

3 Now, let me start with some background and I apologize if some

4 of this is repetitive, but I think it's important for us to

5 appreciate your depth of knowledge about Grace in connection

6 with the opinions, observations and comments you've made today

7 and in your deposition.  Blackstone was retained by Grace in

8 2001, correct?

9 A    That's correct.

10 Q    And that, of course, is at or about the time when the

11 debtors filed for bankruptcy?

12 A    We retained slightly before.

13 Q    And you are the principal person at Blackstone responsible

14 for this engagement?

15 A    That is correct.

16 Q    And as principal in charge of this engagement at

17 Blackstone your activities have included reviewing the

18 companies projections, correct?

19 A    Yes.

20 Q    Preparing valuation analyses?

21 A    Yes.

22 Q    Advising the company with respect to acquisitions and

23 divestitures?

24 A    I believe what I testified to was advising them with

25 respect to acquisitions and divestitures in connection with

1  receiving bankruptcy court approval and the approval of various

2  committees in the case.

3  Q    And you've also provided advice to Grace with respect to

4  the settlement, some of the settlements that have been achieved

5  in this case, correct?

6  A    That's correct.

7  Q    And you are also working with the company to secure exit

8  financing for Grace, correct?

9  A    That's correct.

10 Q    And Blackstone's engagement here requires you to serve as

11 an expert testimony, as Grace may request, and is appropriate

12 in these cases, correct?

13 A    Yes, that is part of our engagement.

14 Q    And you have submitted various expert reports in this

15 bankruptcy.  I'll refer first to your expert report in rebuttal

16 to a Sean Mathis expert report?

17 A    That's correct.

18 Q    And describe for me, if you will, what that report

19 consists of, generally?

20 A    Mr. Mathis prepared an expert report which purported to

21 determine the value of the warrant that is being issued by

22 Grace to the asbestos PI trust as part of this plan.  My report

23 rebutted his purported value in his report.

24 Q    You also produced a feasibility report in connection with

25 this confirmation process, correct?

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Cross/Cobb                    113

1  A    That's correct.

2  Q    And can you generally describe what that report consists

3  of?

4        MR. BERNICK:  She's going to be brought back to

5  testify about feasibility --

6        MR. COBB:  That's fine.

7        MR. BERNICK:  -- tomorrow.

8  Q    I'll move to the next question.  You also recently

9  submitted an expert report regarding best interests, that is,

10  the best interest test under the bankruptcy code, is that

11  correct?

12  A    That's correct.

13  Q    And can you describe generally what that report relates

14  to?

15  A    It was an expert report setting forth the analysis and the

16  reasons why we, myself and the debtor, believes that the plan

17  meets the best interest test.

18        MR. KOVACICH:  I object to the --

19        THE COURT:  I don't think your microphone's on.

20        COURT CLERK:  That one doesn't work.

21        MR. BERNICK:  She's not going to offer any opinion

22  now.

23        MR. KOVACICH:  Well, that --

24        THE COURT:  You need to use the microphone.  I'm

25  sorry.  And please let him finish.

1          MR. KOVACICH:  I object to the --

2          THE COURT:  It's still not in, Mr. -- on Mr.

3    Kovacich.

4          MR. KOVACICH:  Okay.  Is that better?

5          THE COURT:  Yes.  Thank you.

6          MR. KOVACICH:  I object to the opinion -- she did

7    just offer an opinion in response to the question which is what

8    she did on the best interest analysis.  She started to explain

9    how she and the debtor felt that the best interest test was

10   met.  I object to that.  There's no foundation for it, and it's

11   also speculative.

12         MR. COBB:  Well, I guess I need to defend this one,

13   Judge, now that I'm on cross.  Your Honor, I am only

14   establishing background in the work that Ms. Zilly has

15   performed on behalf of Grace.  That's all.  I'm not attempting

16   to admit this report into evidence.  That is the report that

17   we're referring to on best interest.  I'm only trying to inform

18   the Court with regard to her depth of knowledge of Grace's

19   financial condition.  That's it.

20         THE COURT:  All right.  Well, I think the answer

21   fairly meets the question.  It was tell us what it was about

22   and she said what it was about.  That's what it was about, so I

23   don't see that there's an objection.  I don't believe at this

24   point she's expressing an opinion.  She's talking about what

25   the report did, so the objection's overruled.  I'm not

Zilly - Cross/Cobb                    115

1 accepting it as an opinion.  I'm just accepting it as what she

2 was doing in analyzing the best interest test in her report.

3 Okay.

4 Q    In addition, Ms. Zilly, you are the debtor's sole expert

5 witness with regard to solvency, that's correct?

6 A    That's correct.

7 Q    And you've submitted in that context your expert rebuttal

8 report to Mr. Frezza, the committee's expert and the lender's

9 expert, and you've also submitted an affidavit in connection

10 with the debtor's objection to the bank lender's proofs of

11 claim, correct?

12 A    That's correct.

13 Q    Now, in performing all of the analysis and preparing and

14 reviewing the financial reports, spread sheets, cash flows, all

15 of the items that we just discussed and referenced, you will

16 agree that you have never performed a solvency analysis of

17 Grace?

18 A    I have not performed a complete solvency analysis of

19 Grace, that's correct.

20 Q    I'm sorry, did you say a complete solvency analysis of

21 Grace or you --

22 A    Yes, in my view there are several tests for solvency.

23 Q    So, in your view there are simple tests for solvency?

24 A    Several.

25 Q    Several, okay.  Thank you.  And you would agree that

1 you're offering no opinion in this confirmation process with

2 regard to whether Grace is solvent?

3 A    That is correct.

4 Q    And you also are offering no opinion as to whether Grace

5 is insolvent?

6 A    That is correct.

7 Q    As of any date with respect to both of those questions?

8 A    I'm offering a rebuttal to Mr. Frezza's report.

9 Q    And you will agree with me that for purposes of the plan

10 that is before the Court -- I think it's be referred to as the

11 joint plan, I'll call it the plan for purposes of our

12 discussion -- that for purposes of the plan, the Court must

13 determine whether Grace will be solvent as of the effective

14 date of the plan, correct?

15        MR. BERNICK:  Objection, calls for the witness to

16 discuss procedures that the Court may or may not follow.

17 That's not an appropriate question for an expert in this case.

18        MR. COBB:  Your Honor, she's a -- she's been offered

19 as a financial restructuring expert.

20        THE COURT:  Yes, but --

21        MR. COBB:  She has extensive expertise apparently in

22 -- not only in testifying in bankruptcy processes, but also in

23 providing advice --

24        THE COURT:  Yes.

25        MR. COBB:   -- in connection with the bankruptcy.

1          THE COURT:  But, the issue is whether or not as a

2    legal matter I have to determine solvency as of the effective

3    date.  The objection's sustained.

4    Q    You would agree that one of the principal reasons, if not

5    the sole purpose of the debtors filing for Chapter 11, was

6    because of present and potential asbestos personal injury

7    claims and law suits against the company?

8          MR. BERNICK:  Your Honor, I object to this as being

9    irrelevant and beyond the scope.  Most of the questions so far

10   have been.

11         MR. COBB:  Your Honor, it's not beyond the scope.

12   Ms. Zilly has testified that in connection with her opinion she

13   believes that -- I mean, in the general context, Your Honor,

14   Ms. Zilly has actually said that she believes that Grace's

15   asbestos personal injury liabilities have not been resolved.

16         THE COURT:  Yes.

17         MR. COBB:  She just said that.  I am beginning the

18   process of getting to a -- several questions that she has -- I

19   mean, I want to hear from her whether she believes they have

20   been resolved and whether or not this plan resolves those

21   liabilities.

22         THE COURT:  Okay.  I'm not -- I'll give you a little

23   bit of leeway.  Overruled.  Do you want to restate the

24   question, Mr. Cobb?

25         MR. COBB:  You know what, I'm going to skip to the --

1 what I would consider to be the better stuff.

2          THE COURT:  All right.

3 BY MR. COBB:

4 Q    And you would also agree, Ms. Zilly -- would you agree,

5 Ms. Zilly, that under the plan through this bankruptcy process

6 that Grace's asbestos personal injury claims and lawsuits

7 against the company are resolved?

8          MR. BERNICK:  Objection, to form.  Are we assuming

9 the plan has now gone effective?

10          MR. COBB:  We are assuming that the plan, for

11 purposes of this question, is confirmed by the Court.

12          MR. BERNICK:  Well, then under -- strike that.

13 That's fine.  Is confirmed by the Court and goes effective?

14          MR. COBB:  And goes effective.

15 A    If the amended plan is confirmed by the Court and goes

16 effective, then I believe that pursuant to the settlement set

17 forth in the plan that relates to the amount of assets that

18 Grace and others will contribute to the PI trust, then the

19 asbestos claims will be resolved.

20 Q    And let's talk for a moment about the solvency test that I

21 think you had spoken briefly with, with Mr. Bernick.  You had

22 identified the ability to pay debts as when they -- as they

23 come due test, correct, that is one of the accepted methods --

24 expert methodologies for determining solvency of a company?

25 A    That is a test to determine solvency, correct.

Zilly - Cross/Cobb                          119

1  Q    And one of the tests?

2  A    And one of the tests.

3  Q    And it's also referred to as the cash flow test, is that

4  fair?

5  A    I don't, but perhaps others do.

6  Q    I'll stick with your definition then.  There's a second

7  test described as the adequate capital test, correct?

8  A    That's correct.

9  Q    And then the balance sheet test, correct?

10 A    Excuse me.  That's correct.

11 Q    And under the balance sheet test there are three generally

12 accepted methodologies for arriving at the value of a company's

13 assets, correct?

14 A    (No audible response).

15 Q    Well, let me walk you through them.  One of those

16 methodologies is determining the asset value by determining the

17 fair market value of the assets, correct?

18 A    That's correct.

19 Q    Second method would be determining the enterprise value of

20 the debtor?

21 A    That's another method.

22 Q    And then determining the debtor -- the value of the

23 debtor's assets by using the discounted cash flow method,

24 correct?

25 A    I would put three with two because I believe that the

                    **J&J COURT TRANSCRIBERS, INC.**

1 discounted cash flow method is a way -- one way of determining

2 the debtor's enterprise value.

3 Q    Okay.  Well, let's talk about total enterprise value then.

4 How would an expert, in a solvency context, calculate an

5 entity's total enterprise value?

6        MR. BERNICK:  Your Honor, this goes beyond the scope

7 of my examination.  They've got their own expert who's going to

8 go back and review all of this stuff, but she's not expressed

9 -- Ms. Zilly has not expressed as an expert an opinion

10 regarding how those would work.

11       MR. COBB:  Your Honor, I'm entitled to inquire of the

12 debtor's expert whether she has any issue, or any problems or

13 concerns or criticisms of Mr. Frezza's methodologies that he

14 employs in his report.

15       THE COURT:  Overruled.

16 Q    So, the question, I'll restate it.

17       MR. BERNICK:  I -- I'm sorry.  If that's the question

18 then I want you to ask that question.

19       MR. COBB:  I'm just trying to facilitate the witness

20 by simply restating the question, but you can read it back to

21 her if she'd like to hear it.

22       THE COURT:  No, I think that wasn't the objection.

23 He wanted to eliminate the preliminaries and get to the end

24 question was the point.  You may restate this question which

25 was how would an expert calculate an entity's enterprise value?

1  Q    That is the question, Ms. Zilly, that's pending.

2  A    Well, I'm a little bit confused because I don't think Mr.

3  Frezza did anything in that -- his report along those lines.

4  So, are you asking generally?

5  Q    I'm asking generally what would an expert do in order to

6  determine the total enterprise value of an entity's assets?

7  A    There are several tests of several ways, several analyses

8  that can be performed to determine a company's enterprise

9  value.  Number one is a discounted cash flow analysis, assuming

10  that you have projections for a sufficient period of time in

11  order to make that meaningful.  The second way is to do a

12  comparable company analysis which typically uses current

13  financial informations, as well as current financial

14  information and market information from companies that are

15  comparable to the company that you are evaluating.  And the

16  third way is to look at what is called comparable transactions

17  which attempts to look at transactions that would apply a

18  multiple that could be used to evaluate the fair market value

19  of the company that you're determining the enterprise value of.

20  Q    And let me ask you that same question with regard to

21  discounted cash flow, how would an expert employ that

22  methodology to determine the asset value of a company?

23  A    Well, I think as I testified several minutes ago, the

24  discounted cash flow analysis is one of the ways to determine

25  the enterprise value.  And typically if you're asking

1  specifically, discounted cash flow analysis is done by taking

2  the company's projections over a five or so longer period of

3  time, if they're available, and discounting those projections

4  back at an appropriate discount rate, as well as analyzing what

5  the terminal value is which is done by taking the company's

6  EBITDA and multiplying it times a multiple and discounting that

7  back at the same discount rate and arriving at a value of the

8  company.

9  Q    Now, you as Grace's solvency expert -- and actually in any

10 capacity, have you ever performed a discounted cash flow to

11 determine the value of Grace's assets?

12 A    No, I have not.

13 Q    And I think there's a third test under asset valuation and

14 that's fair market value, can you briefly explain what that

15 test involves?

16 A    Well, I'm -- in my view the fair -- in the solvency

17 analysis you're trying to determine what the value of the

18 assets is.  It is typically assumed that you're trying to

19 determine the fair market value, and the way I would have

20 phrased it was that all of the things we just discussed,

21 enterprise value is one way to determine the fair market value

22 of the assets.

23 Q    I'm sorry?

24 A    So, I'm -- I've lost the thread of your questions.

25 Q    Okay.  I had -- I think I had discussed earlier that -- I

1  had asked you whether there are three accepted methodologies

2  that an expert would employ to determine the asset value of a

3  company under a solvency test --

4  A    Right.

5         MR. BERNICK:  I'm sorry.  Actually what you asked

6  was, tests, at least that's what she testified to is tests.

7         MR. COBB:  Thank you, Mr. Bernick.

8  Q    And I'm not sure I understand your response with regard to

9  the fair market value test.  So, let me ask this.  Is the fair

10 market value test a distinct methodology for determining the

11 value of the debtor's assets under a solvency examination?

12 A    Solvency analysis requires you to value the assets and all

13 I'm saying is that the value of the assets is -- one of the

14 ways is the "fair market value" of those assets.

15 Q    Fair enough.  Are you -- and fair market value of assets,

16 does that require that there be appraisals of the company's

17 assets in order to complete that examination?

18 A    Not necessarily.

19 Q    Would it be helpful to an expert to have appraisals of a

20 company's assets in order to conduct that examination?

21 A    It would depend on how you plan to evaluate or determine

22 the fair market value.  If you wanted to do it via appraisals,

23 it would be helpful to have appraisals.  If you were doing it

24 another way, appraisals would not be as helpful.

25 Q    And how else could you determine a fair market value of a

Zilly - Cross/Cobb                    124

1 debtor's assets other than through market appraisals?

2 A    I think as I testified to doing an enterprise valuation.

3 Q    Okay.  I'll let this go.  I think you and I may be talking

4 past each other.  Now, let's talk for a moment about your

5 rebuttal expert report in connection with the expert report

6 issued by Sean Mathis, you do recall that you issued that

7 report, correct?

8 A    Yes.

9 Q    And you recall that you calculated Grace's total

10 enterprise value in connection with that report?

11 A    No, I don't believe I did do that.  I believe what I did

12 in my rebuttal report was to evaluate the way Mr. Mathis did it

13 and then I took the valuation I had prepared for the debtor's

14 disclosure statement and compared it to Mr. Mathis' way in my

15 report.

16 Q    Okay.  Now, what I'm going to do is I'm going to show you

17 a copy of that report.

18        MR. COBB:  For Mr. Bernick's purposes and for the

19 Court's purposes, I am not going to move this report or attempt

20 to move this report into evidence.  This is only to facilitate

21 our discussion about the work she performed in this context.

22        THE COURT:  All right.

23        MR. COBB:  May I approach the witness?

24        THE COURT:  Yes.  Is this Mr. Mathis' or hers?

25        MR. COBB:  This is her expert report in rebuttal of

**J&J COURT TRANSCRIBERS, INC.**

1  Mr. Mathis' report --

2           THE COURT:  All right.

3           MR. COBB:  -- I -- just to be clear.

4                      (Pause)

5           MR. COBB:  Your Honor, what I have shown the witness,

6  and for Ms. Zilly's benefit as well, this only includes the

7  supporting charts to your rebuttal report.

8           MR. BERNICK:  Yes --

9           MR. COBB:  For purposes of our discussion I'm only

10 going to be focusing on the charts.

11          MR. BERNICK:  Your Honor, I -- I'm not sure which --

12 is this the rebuttal report for Mathis or the rebuttal report

13 for Frezza?

14          MR. COBB:  This is the rebuttal report for Mr.

15 Mathis.

16          MR. BERNICK:  Well, I -- we shouldn't testify about

17 this at all.

18          MR. COBB:  I'm sorry, what's the objection, Your

19 Honor?

20          THE COURT:  That it's outside the scope --

21          MR. BERNICK:  The objection is that it goes beyond

22 the scope of her direct examination.  She testified about her

23 rebuttal to Frezza.  Mathis isn't going to testify and she's

24 not testifying about her rebuttal.

25          MR. COBB:  You're going to hear, Your Honor, in --

                    **J&J COURT TRANSCRIBERS, INC.**

1  probably in two or three hours from Mr. Frezza that Mr. Frezza

2  did rely on some of Ms. Zilly's calculations performed in the

3  context of this bankruptcy case.

4           MR. BERNICK:  Well, that's terrific.

5           MR. COBB:  May I?

6           MR. BERNICK:  But, -- I'm sorry.  Go ahead.

7           THE COURT:  Finish.

8           MR. COBB:  Thank you, Your Honor.  And, Your Honor,

9  part of that discussion is going to make a direct reference to

10 this total enterprise value that Ms. Zilly, as I questioned her

11 in her deposition, this total enterprise value calculation that

12 she performed.  Mr. Frezza will testify as he testifies.  And

13 what I am trying to provide the Court with is a foundational

14 basis as to where this number came from, that is, the total

15 enterprise value number, how Ms. Zilly calculated it and how --

16 and otherwise question her about this chart.  And I can explain

17 to you what Mr. Frezza's going to say, if you would prefer, but

18 I don't want to step out of line here.

19          THE COURT:  Mr. Bernick?

20          MR. BERNICK:  These are the documents that I believe

21 are relied upon by Mr. Frezza and there is no reference to

22 anything to do with her report regarding Mathis.

23          MR. COBB:  Let me clarify, Your Honor.  This same

24 analysis is employed in the debtor's disclosure statement.

25          THE COURT:  All right.

1    MR. COBB:  And I can refer to this chart which I

2 think Ms. Zilly is going to say she didn't perform a separate

3 calculation.  I can ask her this question -- separate

4 calculation of the debtor's total enterprise value that then

5 was used in the disclosure statement, or I can question her

6 from the disclosure statement.

7    MR. BERNICK:  I think there's a fundamental

8 misapprehension -- fundamental misapprehension about our

9 proffer of Ms. Zilly and what she's done.  She was proffered

10 this morning to testify about two things.  One is whether an

11 opinion regarding solvency can be expressed, given the broad

12 range of potential liabilities for the asbestos personal injury

13 claims, and the second was in rebuttal to the Frezza report.

14 We did not tender her to talk about enterprise value, to talk

15 about her response to Mr. Mathis' report, you know, or what

16 else Mr. Frezza might now want to do.

17    And, so it is improper examination.  It's not

18 impeachment.  It goes beyond the scope of direct examination.

19 Under the rules of evidence, Your Honor, I believe that he is

20 not entitled to turn our expert into his expert with respect to

21 matters not covered on direct examination, so I object to this

22 line of questioning.

23    MR. COBB:  Let me respond fully, Your Honor.  Your

24 Honor, Mr. Frezza has opined in his report that using Ms.

25 Zilly's calculations, including total enterprise value, that he

1  believes that Grace is solvent employing accepted expert

2  methodologies including the balance sheet test, including --

3          MR. BERNICK:  That's not what he says.  That's just

4  not -- that's not in there.  I mean, there's no state --

5          MR. COBB:  I'm sorry.  What's not in there?

6          MR. BERNICK:  Their reliance materials don't include

7  that.

8          MR. COBB:  Your Honor, this is not about reliance.

9  This is about Ms. Zilly's criticisms of his --

10         THE COURT:  No.  I think -- let me understand the

11 issue.  I think what the objection is, is that your expert has

12 not stated that he relied on Ms. Zilly's work in rebutting the

13 Mathis report as any part of his work product, and as a result

14 there's no disclosure of the fact that this witness may be

15 called for that purpose and she hasn't been proffered for that

16 purpose.

17         And in looking at what Mr. Bernick has put up, which

18 is just called Exhibit 2, documents relied on as part of Mr.

19 Frezza's report, I don't see the rebuttal report that this

20 witness prepared concerning Mr. Mathis listed.  So, unless

21 there's something else, I think it goes outside the scope of

22 the direct and it's not fair cross because it's not a subject

23 matter on which this witness could be prepared because it's not

24 identified in Mr. Frezza's report.

25         MR. COBB:  All right.  And, Your Honor, let me

1  address it this way.  This total enterprise value, meaning the

2  total enterprise value that appears in her rebuttal -- Ms.

3  Zilly's rebuttal report to Mr. Mathis, that enterprise value

4  appears in the disclosure statement.  I can continue my

5  questioning asking Ms. Zilly about the total enterprise value

6  calculations that appear in the disclosure statement.

7              THE COURT:  I guess you'll have to.

8              MR. COBB:  That's fine.

9              MR. BERNICK:  Your Honor, she wasn't tendered --

10             THE COURT:  I understand, but I'm sustaining the

11  objection --

12             MR. BERNICK:  Okay.

13             THE COURT:  -- to the use of this witness and that

14  document, her report.  That's all I have right now.

15             MR. COBB:  Thank you.

16  BY MR. COBB:

17  Q    Now, Ms. Zilly, in connection with the debtor's disclosure

18  statement, did you provide any information to the debtors

19  concerning total enterprise value?

20  A    For purposes of the debtor's disclosure statement,

21  Blackstone prepared a valuation analysis of the debtor assuming

22  that the plan was implemented and confirmed and went effective.

23  And if I may add it was based on the debtor's projections which

24  assumed the same.

25  Q    And that appears in the disclosure statement at Pages 47

1  through 50, I believe?

2  A    I wouldn't know.  I don't have the disclosure statement in

3  front of me.

4           MR. BERNICK:  Your Honor, object on two grounds.

5  One, is that he's now making Ms. Zilly into his expert with

6  regard to enterprise value.  That is not the subject of her

7  rebuttal report.  That's not the subject of Mr. Frezza's

8  rebuttal report that he ever relied upon that in connection

9  with his work.  Secondly -- and, so this continues to be

10 completely outside the scope of direct examination.

11          Secondly, what Ms. Zilly just said in response to the

12 question was that the enterprise value that was assessed in

13 connection with the disclosure statement made the assumption

14 that the plan went effective.  Ms. Zilly hasn't offered any

15 opinion with respect to what happens when the plan goes

16 effective.  What her opinions relate to in this regard is the

17 status before the plan goes effective.  So, for that reason, as

18 well, it is beyond the scope of my direct examination and

19 beyond the scope of what she did in her report.

20          MR. FINCH:  I also add, it's beyond -- there's been

21 no disclosure of this expert opinion in a report.

22          THE COURT:  I'm sorry.  There's been no disclosure --

23          MR. FINCH:  There's been no -- under the rule --

24 under the federal rules of evidence and the federal rules of

25 civil procedure if an expert witness is going to testify to an

1  opinion about a matter they're required to produce not only

2  what the opinion is, but also the backup information and data

3  on that matter.  Counsel for the bank debt group has

4  elicited -- or starting to elicit an expert opinion from the

5  witness that she has not provided an expert witness report for.

6  She has not provided the backup data for.  I don't have the

7  ability to cross examine or redirect that because it's never

8  been disclosed pursuant to either the federal rules of civil

9  procedure or federal rules of evidence.

10            MR. COBB:  Where shall I start, Your Honor?

11            THE COURT:  Responding.

12            MR. COBB:  Let me start with the fact that Mr. Frezza

13  clearly relied on the disclosure statement in forming his

14  opinion.

15            THE COURT:  But, reliance on the disclosure statement

16  in not necessarily the same thing as having this witness

17  testify to an opinion that she hasn't issued in an expert

18  report.  You cannot make her your expert.  She's the expert for

19  the debtor.  She hasn't been proffered for this purpose, so it

20  goes well beyond the scope of the direct.

21            MR. COBB:  Your Honor, all I was asking her -- we'll

22  jump to the end then.  All I was asking her was, what is the

23  accepted -- describe for the Court, essentially how you

24  calculate total enterprise value.  And then I was going to ask

25  her directly, is there any difference between the manner and

1  method that you employed in determining total enterprise value

2  and the manner and method in which an expert would employ in

3  determining total enterprise value in the context of a solvency

4  test?  That's it.  I'm not asking her opinion as to whether

5  they're solvent or not.  I'm just asking her is there any

6  difference in that methodology because Mr. Frezza's going to

7  testify -- because now they're begging this discussion, he's

8  going to testify that Ms. Zilly's done this work.  He's

9  examined the work that she's done.  He's relied on the figures

10 and the projections in the disclosure statement that she's

11 done.  He's relied on the conclusions that she's reached and he

12 is going to say there would be no different work done, at all,

13 if another expert was to issue an opinion with regard to

14 solvency of Grace as of the effective date, assuming the plan

15 does go effective.  It's before the Court.

16        THE COURT:  Okay.  You were going so fast I can't

17 even follow your words.

18        MR. COBB:  I'm fighting two people, Judge.  I feel

19 like I've got to --

20        THE COURT:  Well, you'll have help.

21        MR. COBB:  I'll slow down.

22        THE COURT:  There's help coming from the other side.

23        The objection is sustained.  If you want to get this

24 witness to describe, in her capacity, what the various

25 methodologies are, she is clearly an expert, she may do that.

Zilly - Cross/Cobb                                   133

1 So, let's start with that.

2          MR. COBB:  Your Honor, and, in fact, in fairness to

3 Grace and to Ms. Zilly she has already walked us through that

4 by providing a description of how she would calculate total

5 enterprise value.

6          MR. BERNICK:  Thank you.

7          MR. COBB:  You're welcome.

8 BY MR. COBB:

9 Q    Now, Ms. Zilly, you have no opinion as to what is the best

10 methodology in performing a solvency analysis to use in this

11 case to value Grace's assets, do you?

12 A    I'm sorry.  Could you repeat the question?

13 Q    You have no opinion, isn't it true, as to what is the best

14 expert methodology to employ in performing a solvency analysis

15 of Grace --

16          MR. BERNICK:  -- pre-effective date?

17 Q    -- pre-effective date?

18 A    I have not done a solvency analysis, so as of this date I

19 have no opinion as to what the best methodology is.

20 Q    Now, under this plan, assuming it is confirmed and goes

21 effective, it is your opinion that Grace will have the ability

22 to pay its debts, when due, as of the effective date, correct?

23          MR. BERNICK:  I'm sorry.  Those are -- the question

24 is defective as a matter of form.  Say assuming the plan goes

25 effective and then it's now the effective date, I don't know if

Zilly - Cross/Cobb                    134

1  there's a distinction.  I would think there's one, but beyond

2  the objection to form, the witness has testified repeatedly

3  that she has not performed the post-effective date analysis of

4  solvency.  And on my examination which is -- ought to define

5  the proper scope of cross, she was asked solely about the state

6  of affairs before the effective date.  So, this again goes

7  beyond the scope of my examination.

8           MR. COBB:  Your Honor, Ms. Zilly has provided a

9  report in rebuttal of Mr. Frezza's report and Mr. Frezza's

10  report issues an opinion with regard to Grace's solvency as of

11  12/31/09.  So, I think this is clearly within the ambit of what

12  I should be permitted to examine Ms. Zilly on.

13          MR. BERNICK:  I'm sorry, Your Honor.  She testified

14  again as to pre-effective date and the only comment that she

15  made regarding the post effective date period of time is that

16  there's no methodology that would simply permit the

17  substitution of one estimate in the pro forma plan or the pro

18  forma balance sheet.

19          THE COURT:  I don't know what the rebuttal report

20  rebutts.  If it's not rebutting the total enterprise value,

21  what is it rebutting?

22          MR. BERNICK:  The rebuttal report rebutts the

23  propriety of what Mr. Frezza does and what he does is to take

24  the one estimate and put it in a pro forma balance sheet and

25  all that she says is that he can't do that.

1        Now, there are other things that she says with regard

2   to the Frezza report.  That is her testimony of the stand this

3   morning.  The further subject of her rebuttal has to do -- the

4   further subject of her direct examination this morning has to

5   do with the pre-effective date ability to say anything about

6   solvency.

7        THE COURT:  Yes, if she has provided a report that

8   goes beyond the criticism of the methodology, this is cross

9   examination and it's fair cross.  But, the question -- Mr.

10  Bernick's correct, the form of the question was not proper, so

11  you need to restate the question.

12  BY MR. COBB:

13  Q   Ms. Zilly, is it your opinion in connection with the

14  feasibility opinion you have issued in this case that as of the

15  effective date -- the projected effective date of this plan,

16  Grace will have the ability to pay its debts when they come

17  due?

18       MR. BERNICK:  Object to form.  When you say, as of

19  the effective date, that is after giving effect to the plan or

20  not?

21       MR. COBB:  It is giving full effect to the plan.  It

22  is confirmed and goes effective.

23  A   As part of my feasibility report -- my expert feasibility

24  report, I stated that I believed that the debtor could meet its

25  obligations under the plan on and after the effective date.

1 Q    On and after the effective date, correct?

2 A    Its obligations after the effective date -- meet them

3 after the effective date.

4 Q    All right.  And isn't it true that you testified that if

5 this plan is confirmed and goes effective that there is no

6 difference between a solvency analysis of whether Grace can pay

7 its debts when due as of the effective date and your

8 feasibility analysis of whether Grace can pay its debts when

9 due as of the effective date?

10 A    No, but I believe what I testified to is that if you were

11 to ask me to assume that, that my answer would be the same.

12 Q    Assume that -- assuming -- I'm sorry.

13 A    I did not assume that you asked me to assume that.

14 Q    Okay.  And by the assumption you mean the only assumption

15 we need to make would be that the plan is confirmed and it goes

16 effective?

17        MR. BERNICK:  Well, are we now talking about her

18 testimony, or is there a question that's being posed now?

19        THE COURT:  Yes, I -- that confused me.  I'm sorry.

20 Could you restate that?

21 Q    Ms. Zilly just testified -- Ms. Zilly, you just testified

22 that you were required to make an assumption with regard to

23 whether or not Grace could pay its debts when due as of the

24 effective date -- strike that.  I'm going to restate the line

25 of questioning because I think in context this will be much

1  clearer.  Isn't it true, Ms. Zilly, that you testified that if

2  the plan is confirmed and if it goes effective on the projected

3  effective date, 12/31/09, that there is no difference between a

4  solvency analysis of whether Grace can pay its debts when due

5  as of the effective date and your feasibility analysis of

6  whether Grace can pay its debts when due as of the effective

7  date?

8        MR. BERNICK:  Your Honor, (a) that's not proper use

9  of the deposition, (b) it's complex and we'll end up going back

10 to the same problem which is the issue being asked about her

11 testimony or is she being asked was she --

12       THE COURT:  That's sustained.  You need to ask her a

13 question here, not based on some prior testimony that's not of

14 record.

15       MR. COBB:  Well, Your Honor, I think what Mr.

16 Bernick's referring to is if I show the witness her deposition

17 testimony and if I ask her, was this the question that you were

18 asked and was this the question -- the answer that you

19 provided --

20       THE COURT:  You can only do it for some purpose of

21 impeachment.  She -- you haven't asked her a question yet that

22 she's denied having made the similar statement to.  So, it's

23 not proper yet.

24       MR. COBB:  Right.  And now, I'm going to ask the

25 question, Your Honor.

1 BY MR. COBB:

2 Q    Ms. Zilly, assuming that the plan is confirmed and goes

3 effective, isn't it true that as of the effective date of the

4 plan Grace will have the ability to pay its debts as and when

5 they come due?

6 A    That is my opinion in my feasibility report assuming

7 confirmation of the plan and consummation of the plan.

8 Q    And isn't it true that there's no difference between that

9 conclusion in your feasibility analysis and the conclusion that

10 would be reached if a solvency analysis was performed using the

11 same test, that is, Grace's ability to pay its debts as and

12 when they come due on the effective date?

13        MR. BERNICK:  I'm sorry.  So, object to the form of

14 the question.  If you make the assumption that the test of

15 solvency is identical to the test of feasibility, then the

16 question is -- it states a truism.  So, I don't believe that

17 you're asking for a truism, so I don't understand what the

18 incremental evidence that you're asking for from this witness

19 is.  Object to the form of the question.

20 Q    I'll restate it and try it a different way.  Is there any

21 difference, Ms. Zilly, between the solvency test of a company's

22 ability to pay its debts, when due, and under a feasibility

23 analysis a company's ability to pay its debts when due,

24 speaking generally, not of Grace?

25 A    No.

Zilly - Cross/Cobb                    139

1  Q    Now, in order to perform a balance sheet test for

2  solvency, would you agree with me that an understanding of

3  financial accounting is necessary?

4           MR. BERNICK:  Objection, goes beyond the scope.

5           THE COURT:  For whom?

6           MR. COBB:  She's issued an expert report, Your Honor,

7  saying that Mr. Frezza's balance sheet test for solvency is

8  improper.

9           THE COURT:  Okay.

10          MR. COBB:  And now I'm questioning her on -- I'm

11 walking through her line of questions to determine --

12          THE COURT:  Do you need a background in accounting to

13 read a balance sheet?  I mean, is that the question that was

14 asked?  Does she --

15          MR. COBB:  No, Your Honor.  Do you need a background

16 in accounting in order to perform a balance sheet test for

17 solvency?

18          THE COURT:  Oh, a test for solvency.  Okay.

19 Overruled.

20 A    I think you need familiarity with accounting rules in

21 order to be able to read a balance sheet.

22 Q    And are you familiar with the generally accepted

23 accounting principles, otherwise known as GAAP?

24 A    I am familiar with them.  I am not an accountant.

25 Q    What impact does GAAP have on Mr. Frezza's expert opinion

Zilly - Cross/Cobb                                    140

1 using the balance sheet solvency test?

2 A    I'm afraid I don't understand that question.

3 Q    What impact does GAAP, the application of the generally

4 accepted accounting principles, have to Mr. Frezza's expert

5 opinion on a balance sheet test for solvency?

6         MR. BERNICK:  Objection, lack of foundation, haven't

7 established that she's even analyzed that issue.

8 Q    Have you analyzed Mr. Frezza's expert report?

9 A    Yes.

10 Q    Have you issued an opinion with regard to Mr. Frezza's

11 expert report?

12 A    Yes.

13 Q    Does that opinion address whether Mr. Frezza has correctly

14 conducted the balance sheet test for solvency, in this case?

15 A    Yes.  My opinion stated I didn't think he did a balance

16 sheet test.

17 Q    You don't think that Mr. Frezza correctly valued Grace's

18 assets under that balance sheet test, do you?

19 A    I don't think Mr. Frezza valued -- I don't think Mr.

20 Frezza valued Grace's assets, at all, in his report.

21 Q    So, it's your testimony that you believe that Mr. Frezza

22 never provides an asset value of Grace in order to determine

23 whether or not Grace is solvent?

24         MR. BERNICK:  Objection, at any kind or a correct one

25 or what?  Objection to the form of the question.  Your Honor,

1  this is -- objection to the form of the question.

2          THE COURT:  The form is pretty broad, do you want to

3  restate the question?

4  Q   Ms. Zilly, let me try it this way.  Could you -- isn't it

5  true that you have issued an opinion that Mr. Frezza has

6  incorrectly applied the expert methodology of the balance sheet

7  test for solvency in issuing his opinion regarding Grace's

8  solvency?

9          MR. BERNICK:  Objection, asked and answered three

10 times.

11         THE COURT:  Overruled.

12 A   Yes.  My opinion stated that I thought there were flaws in

13 Mr. Frezza's "balance sheet test", one of which was that I

14 didn't think it was a balance sheet test.

15 Q   Did you -- do you have a belief or an opinion that Mr.

16 Frezza did not correctly calculate the value of Grace's

17 liabilities when he performed that test?

18 A   The reason I'm having trouble with this line of

19 questioning is because my understanding is that Mr. Frezza

20 simply took Grace's balance sheet, assuming the plan had gone

21 effective.  So, to the extent that you say value or not value,

22 he simply adopted Grace's balance sheet on a pro forma basis

23 assuming the plan had gone effective.

24 Q   Okay.  So, he did use Grace's -- well, he used Grace's

25 balance sheet in order to derive certain liability values in

1 order to perform the balance sheet test for solvency, is that

2 true?

3            MR. BERNICK:  Well, no.  I'm sorry.  That is

4 objectionable to form.  Witness says --

5            THE COURT:  It's sustained.  You can restate the

6 question.

7 Q   Mr. Grace relied upon -- excuse me, Mr. Frezza relied upon

8 Grace's reported liabilities on the balance sheet that appears

9 as Exhibit 12 to the plan, correct?

10 A   Mr. Frezza relies on Grace's liabilities as set forth in

11 Exhibit 12.  Exhibit 12 is a pro forma balance sheet, pro forma

12 for the plan of reorganization.  It is not -- it is a pro forma

13 for assuming the plan goes effective, either assuming 12/31/08

14 or 12/31/09.  It makes assumptions that then Mr. Frezza

15 attempts to change in his report, so --

16 Q   And what effect does the application of the generally

17 accepted accounting principles, GAAP, have on the liabilities

18 that Mr. Frezza used in performing the balance sheet test?

19            MR. LOCKWOOD:  Objection, there's no showing at all

20 that GAAP has any relevance, whatsoever, to that issue.

21            MR. COBB:  Fair enough.

22            THE COURT:  Well, that's the question that he's

23 attempting to ask, but she said that she's not an accountant.

24            MR. COBB:  I'll move on.

25            That's all I have for now, Your Honor.  I have a

1 series of questions, Your Honor, that I would like to ask Ms.

2 Zilly regarding exit financing and we've reached an agreement

3 with the debtors, I believe, that I can ask those questions

4 when she is recalled to discuss feasibility.

5          THE COURT:  All right.

6          MR. COBB:  However, I'm not precluded from using her

7 testimony then in response to my questions, or otherwise, in

8 our solvency case in chief.

9          MR. BERNICK:  With respect to exit financing.

10          MR. COBB:  Correct.

11          THE COURT:  Okay.  That's fine.

12          MR. BERNICK:  Thank you.

13          THE COURT:  Mr. Pasquale?

14          MR. PASQUALE:  No questions, Your Honor.  Thank you.

15          THE COURT:  Anyone else have questions for Ms. Zilly?

16 Mr. Bernick?

17          MR. BERNICK:  I have no further questions of Ms.

18 Zilly.

19          THE COURT:  You're excused ma'am.  Thank you.

20          MR. BERNICK:  We have a relatively short witness.  I

21 know -- is Dr. Martin here?  We have a relatively short witness

22 that maybe we can put on and I don't know how extensive your

23 all's cross examination is.  We don't think we'll be on direct

24 for more than about ten minutes max.

25          THE COURT:  All right.

1          MR. BERNICK:  Okay.  We call Dr. --

2          MR. COBB:   I'm sorry.  Can we just have five

3  minutes, please?

4          THE COURT:  Do you -- you want to take lunch?

5          MR. COBB:  I mean, I don't want to preclude Mr.

6  Bernick from doing this now, but I would like to run out for a

7  moment.

8          THE COURT:  All right.  Let's do a ten minute recess

9  and then we'll come back and do at least the direct before

10  lunch.

11          MR. BERNICK:  Okay.

12          THE COURT:  We'll see how it goes.

13          MR. COBB:  Thank you, Your Honor.

14                    (Recess)

15          THE COURT:  Mr. Bernick?

16          MR. BERNICK:  We call Dr. Denise Martin to the stand

17  as our next witness.

18          DR. DENISE MARTIN, WITNESS, SWORN

19                 DIRECT EXAMINATION

20  BY MR. BERNICK:

21  Q    Good morning, Dr. Martin.  Could you tell us a little bit

22  about your educational background?

23  A    Sure.  I got a BA in economics and French from Wellesley

24  College in 1985 and I worked for a year and then I went back to

25  graduate school.  I got a Masters in economics from Harvard

1  University in 1988 and a PhD also from Harvard in 1991.

2  Q    Okay.  After graduating from Harvard in 1991, could you

3  give us a review of your professional experience which I take

4  it has been from beginning to end at NERA Economic Consulting?

5  A    Actually, I worked for a year -- I forgot, as well -- for

6  a year between college and grad school.  I worked at the

7  Federal Reserve Bank and then right after Harvard, I went right

8  to NERA in 1991.  I worked in a number of different practice

9  areas.  NERA is a firm of economic consultants, professionals

10 practicing microeconomics.  And I worked in our labor practice,

11 in our securities and finance practice.  But the practice

12 that's relevant here is our mass torts and product and

13 liability practice.

14 Q    Okay, I'm showing you plan proponents Exhibit 512-3.  Does

15 this review some of your work in connection with asbestos

16 estimation?

17 A    Yes, it does.

18 Q    Okay, just give us an overview of it if you would.

19 A    I've been named an expert in a number of asbestos-related

20 bankruptcies where I've been asked to prepare or critique

21 estimates of asbestos that were prepared.  I've been asked to

22 prepare estimates of asbestos liability for insurance

23 negotiations and also for companies, either preparing their

24 financial reports or deciding whether to acquire a company that

25 has asbestos liabilities.

1        MR. BERNICK:  Your Honor, we would tender Dr. Martin

2  as being an expert in the statistical analysis of asbestos

3  liabilities.

4        MR. PASQUALE:  No objection, Your Honor.

5        THE COURT:  She may express an expert opinion to that

6  of fact.  Mr. Bernick, I don't have the exhibits in the binder

7  for her.

8        MR. BERNICK:  Oh, I'm sorry, they're all sitting here

9  in front of me.

10       THE COURT:  Thank you.

11  Q    Dr. Martin, have you been asked to conduct a certain

12  statistical analysis of certainty and uncertainty relating to

13  the estimation of Grace's personal injury asbestos liabilities

14  not assuming that a plan is approved and going effective, that

15  is, absent that event?  Have you been asked to perform

16  statistical analyses of uncertainty and certainty regarding the

17  estimates?

18  A    I was asked to -- whether you could calculate the

19  uncertainty -- statistical uncertainty surrounding Dr.

20  Florence's estimates.

21  Q    Okay, just as a little bit of a foundation, are you

22  familiar with the fact that Dr. Florence did an asbestos

23  liability estimate in connection with the estimation proceeding

24  in this case?

25  A    Yes.

Martin - Direct/Bernick                    147

1 Q    Okay, are you familiar with the fact that other experts --

2 we had -- like the diadem of estimation experts performed other

3 estimates for purposes of the estimation process?

4 A    Yes.

5 Q    Okay, could you just describe in your own words whether --

6 what the extent of the range or variability was in connection

7 with those different estimates that were done?

8 A    Well, the estimates themselves varied widely as we just

9 saw in the chart that Ms. Zilly put up, you know, from low of

10 200 million up to a high of, I think, it was 6.2 billion.  I

11 was asked to look at just at Dr. Florence's estimates and to

12 calculate the statistical uncertainty around those.

13 Q    Okay, what did you do in order to conduct that analysis

14 directing your attention to 512.5?  In your own words just tell

15 us what it is that you did in connection with your own analysis

16 of Dr. Florence's work.

17 A    Sure.  There are really three steps.  First, we replicated

18 Dr. Florence's work to make sure we understood what it is that

19 he did.  And then second, we identified the sources of

20 uncertainty in his estimates.  And I'll spend a minute saying

21 what I mean by that.  All estimates have inputs or assumptions

22 and Dr. Florence's is no exception and we looked to see how he

23 determined those inputs, how he estimated those and what the

24 historical variability, the observed variability had been in

25 those.

1          Just to take an example, one of his inputs is filing

2    rates, how many claims will arise from the incidents of

3    projected disease.  And for that, he uses an average over a

4    several-year period.  And in some of his work uses a five-year

5    period.  But that average has some uncertainty around it.  The

6    average is made up of individual years, each of which is

7    different.  And so we can use those differences to sort of

8    measure what the uncertainty is in the filing rate assumption.

9    So the second step in our analysis is really to identify each

10   of the big drivers of his forecast so we can measure the

11   statistical uncertainty in them.

12   Q    I've been trying to write while you've been talking a

13   little bit.  We have an estimate by Dr. Florence.  That, in

14   turn, is driven by inputs and the inputs themselves involve

15   data?

16   A    Right.

17   Q    And where is the variability that you are looking to

18   ascertain for purposes of your own analysis?  Where's the

19   variability?

20   A    It's in the underlying data.  Dr. Florence, for example,

21   in the filing -- for the estimated filing rate that he's going

22   to use in his forecast has to get that from somewhere, and he

23   gets it by taking an average of historical filing rates over

24   the period, I think it's 1996 to 2000.  But as I said, that

25   average embodies variability because each of those years is

1 different and so we can look at those differences and

2 understand how the forecast might have been different had he

3 used 1996 alone or 2000 alone or any combination of the

4 different years.

5 Q    Based upon your analysis of the underlying data for these

6 various inputs and looking at how variable the data was, were

7 you able -- where did you go from there?

8 A    Right.

9 Q    In your own words, what would you do with that

10 variability?

11          THE COURT:  Could you check your microphone, Mr.

12 Bernick?

13          MR. BERNICK:  I'm sorry?

14          THE COURT:  Could you check to see -- can you hear in

15 the back because it's a little faint here.  You can?  Okay, I'm

16 sorry for interrupting.  Go ahead.  Would you --

17          MR. BERNICK:  Don't ask them if they're interested.

18 A    So we identified all the sources of uncertainty.  We

19 selected three of them.  We used the filing rate, the exposure

20 qualification rate, what proportion of claims would satisfy --

21 would be able to prove that they had exposure to a Grace

22 asbestos-containing product and then settlement values.  And we

23 basically re-ran Dr. Florence's forecast 100,000 times.  We

24 used a technique called Monte Carlo simulation and we re-ran it

25 letting those three sources of uncertainty vary.  So rather

1 than the input that Dr. Florence had estimated, what if they

2 took on different values based on how they had varied

3 historically.  And so we were able to generate a series of

4 100,000 estimates that would have resulted had those inputs

5 taken on different rates.

6 Q    So you then do a whole bunch of runs looking for what the

7 -- if you change the variables based upon the variability of

8 the data.  I'm assuming you get a whole bunch of final

9 estimates running 100,000 times?

10 A    Exactly right.

11 Q    Now you got 100,000 estimates based upon different uses of

12 -- different assumptions about the variables.  What do you then

13 do with this range of 100,000 potential estimates based upon

14 those variables?

15 A    Our goal was to calculate 95 percent confidence interval

16 around Dr. Florence's estimates.  So what we do is we take

17 those 100,000 simulated estimates and take the middle 95

18 percent and that's our 95 percent confidence interval.

19 Q    The middle 95 percent?

20 A    Right.

21 Q    And so you'd kind of come in at either end and you'd

22 eliminate the far ends, the outliers, far ends of the bell

23 curve --

24 A    That's right.

25 Q    -- to get 95 percent confidence and that would then give

Martin - Direct/Bernick                    151

1  you a confidence interval surrounding the particular estimate

2  that Mr. -- Dr. Florence did?

3  A    That's right.

4  Q    So we kind of go like Florence.  Now, in doing all this

5  work, tell us whether or not the methodologies that you used,

6  tell us to what extent the methodologies that you used

7  comported with established methodologies for statistical

8  analysis.

9  A    Yes, certainly they did.  I mean confidence intervals are

10  a standard statistical technique and the Monte Carlo simulation

11  is used in situations like this when we're working with a

12  model.

13  Q    Is this actually -- I mean ranging from -- it sounds like

14  the McLaughlin group from one to ten -- but ranging from the

15  very routine all the way up to the very esoteric, how routine

16  or esoteric was the calculation that you did?

17  A    Very routine.

18  Q    What did you conclude was the range of the confidence

19  interval around Dr. Florence's estimates?

20  A    It included a range from a lower bound of 4.6 million to

21  an upper bound of 6.3 billion.

22  Q    Is that -- is the conclusion that you reached about the

23  confidence interval reflected in plan proponents 512-6?

24  A    Yes.

25  Q    Based upon this, is there any statistically-significant

Martin - Direct/Bernick                    152

1  difference between Dr. Florence's estimate ,which we see at the

2  low end of the range, and the much higher estimates that would

3  range up to $6.2 billion?

4  A    No.  Given the variability in the underlying inputs, we're

5  unable to reject the hypothesis that those are different.

6  Q    Okay, if we went within this very broad range, based upon

7  the analyses that you have done and applying the test of 95

8  percent confidence -- incidentally, is that a standard test or

9  a non-standard test, 95 percent confidence?

10 A    Ninety-five is generally accepted.

11 Q    Okay, based upon 95 percent confidence, can you state on

12 the basis that any statistically-sound approach that the right

13 answer is in any particular place within this range?

14 A    No, that's what a confidence interval is telling us.  It's

15 telling us that we can't statistically distinguish at the five

16 percent level that those are different from one another.

17 Q    And that's distinguish 4.6 million on the low end from 6.3

18 billion on the high end?

19 A    That's right.

20 Q    Okay, and 95 percent certain that the right answer is

21 somewhere in there --

22 A    Yes.

23 Q    -- but if you adopt the 95 percent standard, is the true

24 estimate within that range certain or uncertain?

25 A    The true estimate is uncertain.

1          MR. BERNICK:  We pass the witness after we offer for

2  demonstrative purposes only Plan Proponents 5-1-2, 1, 2, 3, 5,

3  and 6 for demonstrative purposes.

4          THE COURT:  I think it's 512, isn't it?

5          MR. BERNICK:  I'm sorry, 512 dash 1, 2, 3, 5, and 6.

6          THE COURT:  Any objection for --

7          MR. PASQUALE:  No objection, Your Honor.

8          THE COURT:  All right, they're admitted for

9  demonstrative purposes.

10          MR. BERNICK:  Thank you.

11          THE COURT:  Give me a second, Mr. Pasquale, please.

12          MR. PASQUALE:  Of course.

13          THE COURT:  Okay, thank you.

14          MR. PASQUALE:  Ken Pasquale for the Unsecured

15  Creditors' Committee.

16                      CROSS EXAMINATION

17  BY MR. PASQUALE:

18  Q    Good afternoon, Dr. Martin.

19  A    Good afternoon.

20  Q    You wrote the book on asbestos estimation, didn't you,

21  more particularly, co-authored "Estimating Future Claims,"

22  right?

23  A    Yes, I wrote that book with my colleague, Dr. Dunbar.

24  Q    Okay, and it was published in 1996?

25  A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

Martin - Cross/Pasquale                    154

1  Q    I had the pleasure of again reading your book on vacation.

2         UNIDENTIFIED SPEAKER:  Move to strike.

3                      (Laughter)

4  Q   I didn't see in reading the last two chapters of your book

5  which pertain specifically to estimating asbestos mass tort

6  claims, I didn't see any reference in those chapters to

7  applying confidence intervals.  Did I miss it or did you

8  mention confidence intervals as something that should be done

9  in estimating future asbestos claims?

10  A    No, we didn't mention it and it's not necessarily

11  something that needs to be done in estimating future asbestos

12  claims but there are certain context in which it does need to

13  be done.  When you're testing a hypothesis, you have to know a

14  hypothesis and you want to either accept or reject it, that's

15  when a confidence interval is appropriate.

16  Q    Dr. Florence, the analysis that you reviewed, he didn't

17  apply a confidence interval to assessments, did he?

18  A    No.  Again, he was using -- doing the estimation for a

19  different purpose.

20  Q    Doing estimation for a different purpose than what?

21  A    He was trying to help inform the Court about what Grace's

22  future liabilities might be and --

23  Q    He did the type of -- not following the process you said.

24  But he was estimating future asbestos claims, right?

25  A    Right.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.

2  A    And the Court is then going to take those estimates, his

3  estimates, as well as those -- might have -- didn't in this

4  case -- but might have taken them under advisement.  And

5  knowing the risks and uncertainties that were sort of embodied

6  in those and would reach a determination.  That's a different

7  exercise than sort of setting up a hypothesis that Grace is

8  insolvent and trying to disprove that hypothesis using the

9  Florence estimate.

10 Q    And that's what you were retained by Grace to do, is that

11 right?

12 A    No, I was retained by Grace to just put a confidence

13 interval around Dr. Florence's estimate.

14 Q    You were retained by Grace to put a confidence interval

15 around Grace's own estimation expert, right?

16 A    Or -- yeah -- actually, they hadn't asked me to put a

17 confidence interval so much as to quantify the statistical

18 uncertainty and I chose to do it via a confidence interval.

19          MR. PASQUALE:  Nothing further, Your Honor, thank

20 you.

21          THE COURT:  Anyone else?  Mr. Bernick?

22                   REDIRECT EXAMINATION

23 BY MR. BERNICK:

24 Q    Ms. Zilly testified just before you, Dr. Martin, and in

25 illustrating the range of estimates, talked about Plan

Martin - Redirect/Bernick                    156

1  Proponents Demonstrative 511-6 which reflects her understanding

2  of the broad range of the different estimates that were out

3  there.  My question to you is do you know whether -- do you see

4  whether Dr. Florence or any of the other experts when they

5  presented their estimates chose to ask the question whether

6  their estimates were fundamentally different from one another?

7          MR. PASQUALE:  Objection, Your Honor.  The witness

8  testified that she didn't look at anybody else's estimate, only

9  Dr. Florence.

10         MR. BERNICK:  Well, let's stick with Dr. Florence.

11         THE WITNESS:  I don't think I testified --

12         THE COURT:  Okay, I don't think that's what she

13  testified to though.  I think she said she looked at others.

14  She just wasn't asked to perform any analyses of anybody but

15  Dr. Florence if I understood correctly.

16         MR. PASQUALE:  That's not how I recall it, Your

17  Honor, but --

18         THE COURT:  Well, I'm sorry, maybe we can get the

19  witness to state it then.

20  Q    Did you look at the other estimates?

21  A    Yes, certainly.

22  Q    Now, if your purpose is, as an expert, to present an

23  estimate that you believe to be within the methodology that's

24  been chosen --

25         COURT CLERK:  Sir, (indiscernible).

**J&J COURT TRANSCRIBERS, INC.**

Martin - Redirect/Bernick                    157

1   Q    If your purpose in doing an estimate is to perform an

2   estimate that you would present as being the best estimate, is

3   that same or different from what all these different experts

4   did?

5   A    No, they all use the same general method in that sense.

6   Q    And what, if any, relationship does that have to your

7   testimony just now that they had a certain purpose when they

8   did their estimates?

9   A    It relates in a sense that they were all putting forth

10  their own individual estimates to assist the Court in reaching

11  a determination.

12  Q    Now, Grace has asked a, in connection with this

13  proceeding, a question about how different are these really?  I

14  mean is that essentially what you asked is how certain are we,

15  where the right answer lies?

16  A    Yes, and I did it via Dr. Florence's estimate, you know,

17  could -- are the other -- one question you could ask is are the

18  other estimates within the 95 percent confidence interval of

19  Dr. Florence's estimate and I found that they were.

20  Q    Is that a question that was different from the question

21  that was being addressed by these different experts when they

22  did their own estimates or is it the same question, is the

23  relationship between the three?  I didn't mean for it to be

24  that difficult so I'll be clear.  What you did which is a

25  comparative analysis looking for uncertainty, is that answering

1  a different question from the question that is being addressed

2  by each of the estimates individually?

3  A    Yes, sure.  They're looking at levels, what's -- in their

4  opinion what's the right level.  I'm looking at uncertainty

5  variability around a particular estimate.

6           MR. BERNICK:  Okay, that's all I have, Your Honor.

7           THE COURT:  Mr. Pasquale?

8           MR. PASQUALE:  Nothing further, Your Honor.

9           THE COURT:  You're excused, thank you.

10          THE WITNESS:  Thank you.

11          MR. BERNICK:  At this point, Your Honor, the debtor,

12  at least, has no further witnesses to call with respect to the

13  lender phase, lender stage of the case and I don't believe we

14  have any further documents to offer either.  Mr. Finch has got

15  an additional exhibit.

16          MR. FINCH:  Nathan Finch for the Asbestos Claimants'

17  Committee.  You remember at the close of Dr. Peterson's

18  testimony yesterday we handed up the slides that was over

19  inclusive as to what we actually showed him.  We went back and

20  reviewed the transcript tonight.  What I'd like to do is just

21  put on the record the slides that we showed him and hand up a

22  copy to Your Honor if that would be acceptable --

23          THE COURT:  All right.

24          MR. FINCH:  -- so everybody in the courtroom knows

25  exactly what was shown to him.  This comes out of Plan

**J&J COURT TRANSCRIBERS, INC.**

1 Proponents' Exhibit 178B as in basketball and the slides shown

2 and then used in Dr. Peterson's testimony were slide Number 8,

3 9, 10, 14, 15, 16, 20, 21, 23, 25, 26, 27, 29, 30, 32, 34, 35,

4 36, 38, 39, 41, 43, 44, 45, 46, 47, 49, 51, 52, 53, 54, 56, 57,

5 58, 59, 60, 62, T as in turtle 8, T as in turtle 9, T as in

6 turtle 10.  These are offered and I believe admitted for

7 demonstrative purposes only.  May I approach, Your Honor?

8            THE COURT:  Yes.

9            MR. BERNICK:  We're set now on exhibits in the plan

10 proponents, therefore, rest with respect to this phase, that

11 is, the lender phase of Phase 2.

12            THE COURT:  Okay, you folks have a bit of work to do

13 over the lunch hour.  Do you want an hour, more, less?

14            MR. BERNICK:  Well, I'm now forgetting.  So much time

15 has passed.  What further work do we have to do over the --

16            THE COURT:  You're meeting with many of the other

17 sides --

18            MR. BERNICK:  Oh, I think -- yeah.

19            THE COURT:  -- to go over exhibits and designations.

20            MR. BERNICK:  I don't want to discourage anybody for

21 meeting and conferring more.  I know that we have, with respect

22 -- I think driven by the question of live testimony, I think

23 that the only remaining issue that drives live testimony is

24 Seaton/OneBeacon.  We definitely have to take that up over the

25 lunch hour.  I think that's the one that was remaining that

1 could affect witnesses this afternoon.

2          THE COURT:  Probably will affect witnesses.  I think,

3 though, that there's a whole host of exhibits that have been

4 proffered that somebody on your side wanted to look at and I

5 said I'd take that up this afternoon.

6          MR. BERNICK:  Right, but I'm saying that there are a

7 variety of other exhibit issues that are out there that people

8 have identified but I don't think any of them actually drive

9 the live testimony.  So we'll certainly get that done.  But

10 then we would like to come back and either put that -- that

11 witness has to be called, that's fine.  But then either after

12 that or absent that, we can start with the lenders.  I think

13 the lenders have two witnesses.

14          THE COURT:  And who will you be calling?

15          MR. PASQUALE:  I always have trouble knowing if it's

16 on, Your Honor.

17          THE COURT:  It's not.

18          MR. PASQUALE:  It's not?  I think it was.

19          THE COURT:  Oh, sorry.

20          MR. PASQUALE:  It's okay, Your Honor.

21          THE COURT:  Now I can hear you.  It must be in that

22 conference mic that you get out of the zone.

23          MR. PASQUALE:  We have two witnesses.  We have Mr.

24 Kruger and Mr. Frezza and then we have a declaration to submit

25 that's already been agreed to.  We'll take 30 seconds.

1          THE COURT:  All right.

2          MR. BERNICK:  And then we don't expect to be calling

3  any rebuttal witnesses so that will be done.

4          THE COURT:  Okay, we'll take a recess until -- oh,

5  Mr. Monaco?

6          MR. MONACO:  Your Honor, for the record, Frank Monaco

7  for the State of Montana.  Before we take a break, I just

8  wanted to pick up on something we had discussed at the end of

9  Monday's hearing about the 148 complaints that were filed

10  against the State of Montana in the state court there.

11          Your Honor, on further reflection, I know that the

12  plan proponents had agreed to stipulate to the fact of these

13  148 complaints but I think I would feel more comfortable if

14  they were actually admitted as exhibits.  Not only the nature

15  of the underlying claims but also the timing of the complaints

16  may be relevant to some of the arguments I'll have to make in

17  these post trial briefs.

18          I've discussed it with the plan proponents.  They

19  have no problem with it.  They obviously originally stipulated

20  to that.  There were some objections that were filed.  We

21  resolved those.  The resolution is they're not being admitted

22  for the truth of the matter asserted but I still would feel

23  more comfortable with having -- I know it's a lot of paper.  I

24  hate to burden the Court with more paper.  I don't have hard

25  copies with me but I could have them delivered to chambers.

1  They are on the disk that was submitted to the Court, whatever

2  Your Honor prefers.

3          THE COURT: The only thing I would like I think with

4  respect to this is the same perhaps as what I said yesterday

5  about insurance policies.  If you give them to me on a disk,

6  that's sufficient.

7          MR. MONACO:  Okay.

8          THE COURT:  But then if you cite a particular portion

9  or complaint or whatever in your papers, then attach that to

10  whatever you cite --

11          MR. MONACO:  I will do so.

12          THE COURT:  -- so that I have the hard copy there and

13  can see it there.

14          MR. MONACO:  Okay, thank you, Your Honor.

15          THE COURT:  All right, has that disk been submitted?

16          MR. MONACO:  I believe so, Your Honor.  I was told

17  that it was.  It was given to the plan proponents.

18          MR. GUY:  I'm sure it's somewhere where we can find

19  it, Your Honor.  The only thing I would add to that is that,

20  not being offered for the truth of the matter asserted as Mr.

21  Monaco said --

22          THE COURT:  Oh, yes, I'm sure the State doesn't want

23  them admitted --

24          MR. GUY:  Of course not.

25          THE COURT:  -- for the truth of the matters.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. GUY:  And the plan proponents are reserving

2   relevancy objections but we have no objection to them being

3   accepted into evidence.

4          THE COURT:  All right, what are they marked as

5   please?

6          MR. MONACO:  Well, Your Honor, if you recall, they

7   were marked as Montana 1 through 148 and then our proof of

8   claim was 149 and we can stick with that numbering system.

9          THE COURT:  All right, so Montana Exhibits 1 through

10  148 are admitted for limited purposes that you've just

11  described.

12         MR. MONACO:  Correct.

13         THE COURT:  Okay.

14         MR. MONACO:  Proof of claim will be 149.  I could --

15         THE COURT:  I thought I admitted 149 already, did I

16  not?

17         MR. MONACO:  Right, you did, Your Honor.

18         THE COURT:  Okay.

19         MR. MONACO:  I think we did use that number.  You

20  know, at the break I can check.  I believe a disk was submitted

21  to chambers.

22         THE COURT:  Okay.

23         MR. MONACO:  Okay, all right.

24         THE COURT:  It's on the -- okay, that's fine.

25         MR. MONACO:  Good.  Thank you, Your Honor.

1          THE COURT:  All right, anything else before recess?

2  Okay, I didn't get an answer as to how much time you want.

3          MR. BERNICK:  We only need 45 minutes for speaking

4  for the plan proponents.

5          THE COURT:  Is that enough?  Okay, we'll be in recess

6  until 2 p.m.

7                    (Recess)

8          THE COURT:  Please be seated, I'm sorry.  Good

9  afternoon.

10          MR. WORF:  Your Honor, Richard Worf for Garlock

11  Sealing Technologies.

12          THE COURT:  Yes, sir.

13          MR. WORF:  Over lunch we wrapped up our matter with

14  the plan proponents.  They agreed to let us admit those

15  exhibits subject to relevance objections and to establish

16  authenticity with these three declarations that we're going to

17  submit to the Court.

18          THE COURT:  All right.

19          MR. BERNICK:  I hate to interrupt here.  Are you

20  prepared to handle this, Jonathan?

21          MR. GUY:  Yes.

22          MR. GUY:  Your Honor, the Garlock Exhibits 3 through

23  10 were the complaints and we have no issue with those being

24  accepted.  There was a declaration that has been offered by

25  Garlock concerning the 1006 summary.  We have no issue with

1  that either.

2         MR. WORF:  That's number 13 and our declarations are

3  Garlock 105, Garlock 106 and Garlock 107, so we offer those

4  exhibits.

5         THE COURT:  Okay, one second.  Okay, Garlock Exhibits

6  3 through 10, 13, 105, 106 and 107 are admitted subject to the

7  relevancy objections.

8         MR. WORF:  Thank you, Your Honor.

9         THE COURT:  And, I'm sorry, I lost track.  Have those

10 been handed up?

11        MR. WORF:  May I approach and hand them up right now?

12        THE COURT:  Okay.

13        MR. WORF:  The exhibits that are referenced are on

14 the disk that we gave the Court yesterday.

15        THE COURT:  Okay, that's fine.  That's right, I do

16 have the disk.  I apologize.  I forgot.  Thank you.  Mr. Pratt?

17        MR. PRATT:  Good afternoon, Your Honor.  Warren Pratt

18 for Creditors Seaton and OneBeacon.  Your Honor, we were unable

19 to reach agreement with the plan proponents so we will have a

20 witness to present.  I'll just make a relevance proffer.  I

21 think once the witness is sworn, the direct examination should

22 take probably less than 15 minutes unless there's a lot of

23 colloquy.

24        Your Honor, Michael Brown will testify concerning

25 certain claims asserted against Seaton Insurance Company by

**J&J COURT TRANSCRIBERS, INC.**

1  Kaneb Pipeline Operating Partnership which is now known as New

2  Star and its affiliate Support Terminal Services.  And also he

3  will testify about the resulting claims asserted by Seaton

4  against Fresenius and Sealed Air Corporation based on a 1997

5  settlement agreement between Seaton, the debtors, Fresenius and

6  Sealed Air Corporation.

7         Your Honor, these claims are not asbestos-related

8  claims.  They ultimately derive from environmental issues at an

9  abandoned pipeline at the Otis Air Force Base in Massachusetts

10 and they are potentially significant claims.  The relevance of

11 this testimony is that Seaton's claims against not debtors

12 Fresenius and Sealed Air are enjoined under the plan and

13 they're not asbestos-related claims so they're not enjoined by

14 the 524-G injunction channeling order but instead by a Section

15 105 injunction.

16        Seaton contends in this case among other things that

17 its non-asbestos-related claims against non debtors Fresenius

18 and Sealed Air Corporation cannot properly be enjoined under

19 Section 105 as provided in the plan.  And Mr. Brown's testimony

20 will provide a foundation for that argument.  His testimony is

21 relevant and admissible and we think it will be helpful to the

22 Court in understanding the nature of the claims involved.

23        Your Honor, I just want to note for the record that

24 the fourth amended case management order at Paragraph 10

25 provides that no attorney shall be precluded from testifying at

**J&J COURT TRANSCRIBERS, INC.**

1  the confirmation hearing by reason of representing claimants or

2  an official committee.  And, of course, Mr. Inselbuch testified

3  here.  He represents the ACC.  But Paragraph 10 of the CMO also

4  specifically refers to claimants and that would include Seaton

5  as a creditor.

6          I also would just note for the record that there's no

7  intention here to waive Seaton's attorney/client privilege.

8  Mr. Brown's testimony will be largely about what actions he

9  took and that's not a waiver any more than Mr. Bernick's

10 actions or Mr. Lockwood's fee applications, for example, would

11 be deemed to be a waiver of the privilege.

12          I call Michael Brown.

13          THE COURT:  Mr. Brown?

14                  MICHAEL BROWN , SWORN

15                  DIRECT EXAMINATION

16 BY MR. PRATT:

17 Q    Mr. Brown, are you an attorney?

18 A    Yes, I am.

19 Q    Who do you represent in this segment of Phase 2?

20 A    OneBeacon America Insurance Company and Seaton Insurance

21 Company.

22 Q    Have you ever heard of Kaneb Pipeline Operating

23 Partnership now known as New Star?

24 A    Yes.

25 Q    When did you first learn of that entity?

1  A    In December of 2008.

2  Q    What were the circumstances?

3  A    I received a copy of a letter that had been sent to my

4  clients OneBeacon and Seaton from Kaneb's counsel.

5  Q    What action did you take when you received that letter?

6  A    Well, it was a letter that was accompanied by a number of

7  different materials so I, in conjunction with my colleague Mr.

8  Boerger, undertook a factual analysis of what was in the letter

9  and what the letter was all about.  This was something new we'd

10  never heard of before.

11  Q    And why did you undertake the investigation?

12  A    Well, in the letter Kaneb was asking OneBeacon and Seaton

13  to participate in the defense of a claim brought by the

14  Department of Justice in connection with an environmental site

15  in Massachusetts involving the Otis Pipeline.

16  Q    And what was the focus of your factual investigation?

17  A    We wanted to find out the nature of the claim.  We wanted

18  to find out why this particular entity was making the claim.

19  And we wanted to find out whether any of the pre-petition

20  settlements that OneBeacon and Seaton had with Grace dealt with

21  the sort of claim that was being asserted by Kaneb.

22  Q    Did you review any other documents in connection with this

23  initial investigation?

24  A    Yes.

25  Q    What did you look at?

1  A    I looked at the settlement agreements in particular.  And

2  the one I focused on the most was a March 1997 settlement

3  agreement between Uniguard which is Seaton's predecessor and

4  Grace which is the defined term in the settlement agreement.

5          MR. PRATT:  Your Honor, I'll just note for the record

6  that that March 1997 settlement agreement is in evidence.  It's

7  marked as Exhibit OS-7.

8  Q    Mr. Brown, when did you review that settlement agreement?

9  A    I don't know the precise time frame.  I got the letter

10  that had been sent to my client some time in mid December.  It

11  was either late December or early January.

12  Q    And what happened next?

13  A    Well, while we were in the midst of looking into the

14  details of this particular matter, Kaneb had filed a motion in

15  the bankruptcy court to lift the automatic stay and they were

16  seeking relief from the bankruptcy court to do a few different

17  things.  One was to pursue Grace as a potential judgment

18  creditor and the other was to have the Court lift the automatic

19  stay so they could pursue some of Grace's insurers as alleged

20  co-insureds under various policies.

21          MR. PRATT:  Your Honor, again, I'd note for the

22  record that Kaneb's motion for relief from the stay and the

23  supplemental memorandum that accompanied that motion are in

24  evidence as part of the confirmation proceedings here.  That

25  was filed on January 16th, 2009.  They're in evidence here as

1 Exhibits OS-40, that's the motion, and Exhibit OS-44 which is

2 Kaneb's memorandum.

3 Q    Mr. Brown, do you have a general understanding of the

4 asserted basis for the relief that Kaneb was seeking?

5 A    In terms of why they wanted to pursue the insurers that

6 were listed in the motion, their claim was that they were a

7 co-insured under the policy or policies and that to the extent

8 that the policies were settled pursuant to a settlement

9 agreement, the settlement post dated the time when they ceased

10 being a subsidiary of Grace.

11 Q    Did the motion -- did Kaneb's motion reference policies?

12 A    Yes.

13 Q    Did you focus on any particular policies?

14 A    Yeah, I wanted to see whether Seaton's policies were

15 listed or Commercial Union -- Seaton -- well, Commercial Union

16 being OneBeacon, and I found that the two policies that had

17 been referred to in the letter that I had received earlier were

18 also listed as targeted policies by Kaneb in its motion.

19 Q    Now, after that motion was filed in mid January of this

20 year what action did you take?

21 A    Continued to investigate the nature of the claims.  The

22 motion was a very thick motion.  It was accompanied by a number

23 of different exhibits and we focused attention on the exhibits

24 and what we could learn from the exhibits, again, in trying to

25 determine the nature of the claim and why we were being

1 targeted.

2 Q    Did you focus on any particular part of those exhibits?

3 A    Yes.  There was a complaint that was one of the exhibits

4 and it was a complaint that was filed by Grace Energy

5 Corporation, a subsidiary of Grace and one of the debtors, in

6 Texas state court.

7 Q    And do you recall that that complaint was part of the

8 materials?

9 A    Correct.

10 Q    And do you recall when the Grace Energy complaint was

11 filed in Texas?

12 A    I believe it was filed in June of 1997.

13          MR. PRATT:  Your Honor, again, I just note for the

14 record that that GEC complaint is attached to Exhibit OS-40

15 which is the Kaneb motion for relief from the stay.

16 Q    Mr. Brown, what did you do next?

17 A    Well, because we were concerned about the claim and the

18 allegations that were being made, we continued with the factual

19 analysis of looking at the materials that we had received with

20 the complaint or the lift stay motion and we -- I eventually

21 made a comparison between the settlement agreements and the

22 materials that accompanied the lift stay motion.

23 Q    In making that comparison did you focus on any particular

24 aspect of the settlement agreement?

25 A    Yes.

1  Q    What did you look at?

2  A    The settlement agreement had a sort of an oddly-worded

3  representation in it and it was something to the effect of that

4  Grace which was a defined term in the settlement agreement

5  represented that it was unaware of any environmental claims

6  contemplated being made by former subsidiaries.

7  Q    Did you look at any other part of that March 1997

8  settlement agreement?

9  A    I looked at who signed it.

10  Q    And what is your recollection about who signed it?

11  A    It was signed by three Grace entities.  One was W.R. Grace

12  and Co., a Delaware corporation.  The other was W.R. Grace and

13  Co. Conn., and the third was described as W.R. Grace and Co.

14  followed by a parenthetical that said a New York corporation

15  formerly known as Fresenius National Medical Care Holdings,

16  Inc.

17  Q    Formerly known?

18  A    I'm sorry, current -- now known as Fresenius National

19  Medical Care Holdings, Inc.

20  Q    What action did you take upon focusing on those parties?

21  A    The terms were familiar to me from having looked at the

22  plan that there had already been a plan filed.  I hadn't really

23  focused on the provision dealing with Fresenius before.  But I

24  now took some interest in them and in particular, I looked at

25  the definitions in the plan of various terms.

1  Q     What definitions did you look at?

2  A     I don't remember the precise ones.  There were a number of

3  different terms like Grace, New York and Old Grace and so

4  forth.  I don't remember which ones they were but what I

5  discovered in the process of going through the definitions was

6  that the entity that had signed the document that was W.R.

7  Grace and Co., a Delaware corporation, at least according to

8  the definitions in the plan, now appeared to be Sealed Air

9  Corporation.  I did that by comparing tax ID numbers that were

10 actually in the definitions.

11 Q     Now, did you look again at any other documents?

12 A     I looked back at the complaint and what I had noticed in

13 the complaint -- this is the complaint that had been filed by

14 GEC -- was that there was something of a time line that was set

15 forth in the complaint where GEC had indicated that it was --

16 it had received a letter from a company called Sampson

17 Hydrocarbons and I don't know the precise relationship between

18 the two but it had been tendered to Grace and Grace was looking

19 into -- when I say Grace, I mean Grace Energy Corp. -- was

20 looking into the ownership of the pipeline.

21        And there was another paragraph in the complaint that

22 indicated that Grace Energy Corporation had a discussion with

23 the defendants in that case which included Kaneb and STS

24 concerning the issue of the ownership of the pipeline and

25 responsibility for the environmental liabilities associated

Brown - Direct/Pratt                    174

1  with it.

2  Q    Did you make any comparison with the environmental rep in

3  the settlement agreement?

4  A    Yeah --

5              THE COURT:  I'm sorry, I couldn't hear you, Mr.

6  Pratt, I'm sorry.

7              MR. PRATT:  Excuse me, Your Honor.

8  Q    Did you make a comparison of the averments

9  in the complaint with the representations in the March 1997

10 settlement agreement?

11 A    Yes, I did and I found them to be inconsistent.

12 Q    Now, as counsel for Seaton, did you take any action as a

13 result of that inconsistency?

14 A    Yes.

15 Q    What did you do?

16 A    I sent a letter to counsel for Sealed Air Corporation and

17 I sent another letter to counsel for Fresenius National Medical

18 Care Holdings, Inc.

19 Q    And what was the point of sending those letters?

20 A    Well, I pointed out what we had discovered in our factual

21 analysis and demanded that Fresenius and Sealed Air defend and

22 indemnify Seaton in order to put it into the position it would

23 have been in had the representation been true.

24 Q    Do you recall the date on those letters?

25 A    July 8th, 2009.

1  Q    And when were the letter sent?

2  A    They were sent that day by email and also by regular mail.

3  Q    To whom were they sent?

4  A    One was to Mr. Rosenbloom and McDermott, Will and Emery,

5  it's Fresenius's counsel, and the other was to a Mr. Saint

6  Clair and a Mr. Turetsky at Skadden, Arps, Sealed Air's

7  counsel.

8  Q    Sealed Air's counsel?

9  A    Yes.

10 Q    And were there any cc copies that you sent?

11 A    Yes, I copied Mr. Bernick, I copies Mr. Freedman, I copied

12 Mrs. Sayen and Ms. Baer.

13          MR. PRATT:  Your Honor, the Court saw those letters

14 dated July 8, 2009 yesterday marked for identification as plan

15 proponents 239 and 240.

16 Q    Mr. Brown, are those the letters that you sent?

17 A    Yes, they are.

18 Q    Have you ever received any response to those letters to

19 date?

20 A    Not yet but I'm still anxious to.

21          MR. PRATT:  I pass the witness, Your Honor.

22                         CROSS EXAMINATION

23 BY MR. BERNICK:

24 Q    As I understand it, Mr. Brown, just seeing you on the

25 stand reminds me of my first bankruptcy hearing in the Dow

Brown - Cross/Bernick                    176

1  Corning case where I wasn't a bankruptcy lawyer and I was

2  called adversely as part of the bankruptcy proceeding by a

3  bunch of Texas lawyers and some of whom probably these guys

4  represent.  But I actually found the experience gracing, so I

5  hope you do too.

6          In any event, as I understand your answers to Mr.

7  Pratt's questions, you first became involved in looking at the

8  potential for this claim at some point in late 2008?

9  A    Yes.

10 Q    Okay, and is it true that the first time that you actually

11 provided any kind of notice of this claim to the debtors was in

12 July of 2009?

13 A    I believe that's correct.

14 Q    When were you first on notice of the fact that there might

15 be a claim?

16          MR. PRATT:  Objection, Your Honor, which claim?

17 Q    The claim that ultimately you wrote about in July 2008 --

18 9, excuse me.

19 A    I don't know the precise date.  I can tell you that we

20 went through a process of analyzing the plan, analyzing the

21 settlement agreement, analyzing the materials in the lift stay

22 motion and concluded -- it was certainly before July 8th.  It

23 may have been as much as a month or two, possibly more before

24 that.

25 Q    But you wouldn't have done the investigation that you did

**J&J COURT TRANSCRIBERS, INC.**

Brown - Redirect/Pratt                    177

1  in late 2008 unless you were on notice of the fact that there

2  might be a claim, correct?

3  A    That is correct although there could be a claim against

4  the debtors as well.

5           MR. BERNICK:  All right, that's all I have, Your

6  Honor.

7           MR. PRATT:  Nothing further, Your Honor.

8           THE COURT:  Wait, Mr. Brown, I think -- just a

9  second.

10          MR. PRATT:  I do have just one follow up question.

11 My colleague, Mr. Boerger, reminded me.

12                    REDIRECT EXAMINATION

13 BY MR. PRATT:

14 Q    Mr. Brown, are you familiar with the final plan objections

15 submitted on behalf of Seaton and OneBeacon filed on May 20th

16 of this year?

17 A    Yes.  Generally.  I haven't looked at them in a while.

18 Q    Did that document reference these claims against Fresenius

19 and Sealed Air?

20 A    I believe it did but I'm not sure of the degree of

21 specificity.

22          MR. PRATT:  Okay, nothing further, Your Honor.

23          THE COURT:  Mr. Bernick, anything else?

24          MR. BERNICK:  No.

25          THE COURT:  You're excused, Mr. Brown, thank you.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. PRATT:  Your Honor, at this point in time I would

2   move the admission of plan proponent exhibits 239 and 240 for a

3   limited purpose, not for the truth of the matter just asserted

4   but for the purpose of demonstrating that Seaton has asserted

5   claims against non debtors Fresenius and Sealed Air, also for

6   the purpose of demonstrating the general nature of those

7   claims.

8          MR. BERNICK:  Your Honor, that's the whole purpose of

9   taking the time and trouble to have the witness testify.  I

10  believe those matters have now been made a matter of record and

11  the objections that we have to the underlying letters remain as

12  they were before.

13         THE COURT:  Okay well, at this point I think the

14  letters have been clearly authenticated.  They are relevant to

15  the issue that has been articulated.  And although they are

16  somewhat cumulative, I think they're admissible so I will admit

17  Exhibits PP-239 and 240 for the limited purposes of

18  establishing that claims exist and really that's pretty much it

19  because I think Mr. Brown has articulated the nature of the

20  claim.

21         MR. PRATT:  Your Honor, you have copies from

22  yesterday but I have four copies here if you'd like them.

23         THE COURT:  I have a copy of 239 but I couldn't find

24  one of 240 so I'll take both of them if you have them.

25         MR. PRATT:  Yes, Your Honor.

1       THE COURT:  That way, I'll just make sure I have them

2  together.

3       MR. PRATT:  I did note yesterday on the record that

4  these are marked as plan proponent exhibits.

5       THE COURT:  Yes.

6       MR. PRATT:  PP-240 has our own exhibit sticker on it.

7  That had been erroneously designated at first by the proponents

8  as confidential but it's not and I'm handing Mr. Boerger -- Mr.

9  Bernick a copy of these.

10       THE COURT:  All right.  Thank you.

11                     (Pause)

12       THE COURT:  Ms. Casey?

13       MS. CASEY:  Yes, hi, Your Honor.  Linda Casey for

14  BNSF.  One more quick follow up from before lunch.  You had

15  requested that we hand up the hard copies of the certified

16  copies of the complaints and amended complaints.  I wanted to

17  point out to Your Honor that we have brought a box to the

18  courtroom.  It's over on the bench that has the BNSF-85 to

19  BNSF-279 that are the actual certified copies.

20       THE COURT:  All right, thank you.

21       MS. CASEY:  Thank you.

22       THE COURT:  Okay, are there any other exhibit issues

23  to deal with -- Mr. -- from left over from this morning?

24       MR. PERNICONE:  Right.  Mr. Schiavoni and I were

25  working on exhibit issues at lunch time.  We're wrapping that

1 up and hopefully he'll be up in a few minutes and we can deal

2 with that, okay?

3          THE COURT:  Okay.  All right.  I'm sorry, Mr. --

4          MR. KOVACICH:  Your Honor, we have some exhibit

5 issues as well.

6          THE COURT:  Mr. Kovacich, I'm sorry, I can't hear

7 you.

8          MR. KOVACICH:  Mark Kovacich on behalf of the Libby

9 claimants.  Just to answer the Court's question, we do have a

10 couple of exhibit issues left over from yesterday.  If the

11 Court would like to address those now, we can do that.

12          THE COURT:  Have you worked out agreements?

13          MR. KOVACICH:  I believe so.  We have the infamous

14 list of verdicts finally attached to a set of discovery that

15 Mr. Bernick is comfortable with.

16          THE COURT:  All right.

17          MR. KOVACICH:  We can mark that as Libby claimants

18 271B and offered in evidence.

19          THE COURT:  All right.

20          MR. KOVACICH:  And to be clear, the interrogatory

21 answers that are attached are offered only for the purpose of

22 showing the context in which the attached list of verdicts was

23 produced.

24          THE COURT:  Okay.  I don't think that exhibit was

25 ever admitted itself, Mr. Kovacich, because I believe I waited

1  to see what you folks would work out.  So I don't think the

2  exhibit itself is in evidence yet.

3         MR. KOVACICH:  Your Honor, I believe that's correct.

4  I'm not used to microphones in Montana.  We don't use them.  I

5  believe you're correct, Your Honor, and we would offer Exhibit

6  271 again.  It's simply a copy of the verdict list attached to

7  271B.

8         MR. BERNICK:  And the interrogatory answer that

9  describes what it is, correct, Mr. Kovacich?

10        MR. KOVACICH:  Yes, that's agreeable.

11        THE COURT:  All right, 271 and 271B are admitted but

12  I need a copy I think.

13                     (Pause)

14        MR. KOVACICH:  Your Honor, I also believe there's

15  still an issue with the insurance policies that were discussed

16  yesterday.  My co-counsel, John Lacy, was planning on

17  addressing that.  I'm not certain of the status myself.  If the

18  Court would like Mr. Lacy to address that now or --

19        THE COURT:  That's fine.  I was trying to get the

20  exhibit issues tied up so that I actually have some semblance

21  of order in these notes.  Mr. Lacy?

22        MR. LACY:  I understand, and I think -- I apologize

23  that we're doing this piece meal in this way but yes, in follow

24  up to your comment this morning about a number of exhibits that

25  had been introduced but not handed up, in addition to the

1  insurance policies which I think we might -- during a break

2  here I discussed with Mr. Horkovich that there were three

3  different sets of insured's policies that Libby claimants are

4  interested in having introduced as exhibits and it was

5  represented yesterday that both CNA and Royal were going to be

6  doing that independently.

7          We were not confident necessarily at the time about

8  whether that was going to happen with Maryland Casualty

9  policies and so we were prepared to submit those but I think we

10 may have -- they may have been introduced by Maryland Casualty.

11 We are prepared through Libby claimants exhibit what will be

12 283 to submit those primary policies on disk and I have copies

13 for everyone here.

14         THE COURT:  All three sets, the CNA, the Royal and

15 the Maryland Casualty?

16         MR. LACY:  No.  For the record we'd like to reserve

17 the opportunity if Royal and if CNA do not submit them as

18 represented yesterday that Libby claimants would come forward

19 with that but we're presuming right now that one, because the

20 Royal policies are essentially recreations given their age,

21 we're depending upon those being available through Royal and a

22 copy that the Court can actually read.  And then the ones with

23 CNA, as I understood from CNA counsel, there was some issue

24 about which one was going to be the correct one and we wanted

25 to defer to their representation about which policy should be

1  relied upon.

2         So as long as all three, CNA, Maryland Casualty and

3  Royal, come in, Libby claimants are satisfied to let them come

4  in through the insurers except if Maryland Casualty is not

5  necessarily going to be submitting them right now, we can.  It

6  doesn't really matter I suppose.

7         THE COURT:  All right, and what was your exhibit

8  number?

9         MR. LACY:  That one we have marked as 283 and it's

10 just a disk.

11        THE COURT:  Okay, Mr. Wisler?

12        MR. WISLER: Good afternoon, Your Honor.  Jeffrey

13 Wisler on behalf of Maryland Casualty.  I thought Mr. Lewis --

14 I guess Mr. Lewis did not hand these up yesterday.  We're not

15 objecting to the admission of the Maryland Casualty policies

16 with the same understanding and reservations as I put on the

17 record yesterday.

18        MR. LACY:  And so that the record is clear, we

19 understand that that same reservation exists for all the

20 insurers that want them in evidence but we're not necessarily,

21 you know, trying to hold us up against the insurers for them.

22        THE COURT:  They're to be used only in connection

23 with the confirmation process?

24        MR. LACY:  Correct.

25        THE COURT:  All right, you can pass the disk up.


                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. LACY:  I have a binder here that represents a few

2     other exhibits as well.

3          THE COURT:  All right, Exhibit 283 -- excuse me,

4     Libby Exhibit 283 is admitted for the limited purposes

5     articulated yesterday.

6          MR. LACY:  The other issues that I think will

7     hopefully resolve the Libby claimants exhibits -- I know Mr.

8     Kovacich addressed, 271 and 271A as marked in the Court's book,

9     we may have had a little confusion about whether it's 271A or

10    271B but it's the exact same.

11         UNIDENTIFIED ATTORNEY: (indiscernible)

12         MR. LACY:  Okay.

13         COURT CLERK:  If he wants it on the record, he has to

14    talk into the microphone.

15         THE COURT:  What he said is that it's a different

16    exhibit.  271A and 271B are not the same exhibit.

17         MR. LACY:  So --

18         THE COURT:  And 271B with 271 attached has been

19    admitted.

20         MR. LACY:  So as I understand our position, we will

21    be withdrawing the 271A.

22         THE COURT:  All right, so Exhibit 271A is withdrawn

23    and not offered.  All right.

24         MR. LACY:  Also referred to in the Court's book as

25    6312 that was relied upon during Mr. Hughes' testimony and

1 during the course of that testimony, if you recall, it was a

2 very large, blurry exhibit and this just pulls out that we

3 needed a few days to --

4          THE COURT:  I'm sorry, what's the number?

5          MR. LACY:  6312.  It's the first tab in the Court's

6 binder that I just handed up.

7          THE COURT:  Okay.  That was admitted?

8          MR. LACY:  I believe it was, yes.

9          THE COURT:  All right, this is a much better copy,

10 thank you.

11          MR. LACY:  That was the intent, I think.

12          MR. BERNICK:  Is that's the bottom of the

13 contributing factor analysis or is that the bottom of that

14 Grace litigation report?

15          MR. LACY:  I believe it's the bottom of the Grace

16 report.

17          THE COURT:  It starts off with "average

18 settlement/judgment cost for claim in thousands" if that helps.

19          MR. LACY:  I think the document came in as 63, Page 1

20 to 26.  And this is just the bottom portion of Page 12 on that,

21 63-0 to 26 are already in evidence.

22          THE COURT:  Okay, so this is just part of that

23 series?

24          MR. LACY:  Yes.

25          MR. BERNICK:  Previously supplied a blowup of that to

1  Your Honor as you may recall.  You probably have it back there

2  someplace.

3            THE COURT:  Okay.

4            MR. LACY:  Then Exhibits 272 through 279 are

5  overheads that were used with Libby claimants' experts and

6  those overheads were admitted, as I recall, for demonstrative

7  purposes only and just through an oversight they were

8  introduced but never handed up and as you referred to this

9  morning, we just wanted to get them in.

10           THE COURT:  All right.

11           MR. BERNICK:  Counsel is representing that the Court

12 actually previously received a proffer and accepted that

13 proffer, admitted them.

14           MR. LACY:  That was my understanding.  Again, I know

15 that --

16           MR. BERNICK:  I mean we're happy with the Court

17 having copies of something that actually has been admitted but

18 it doesn't sound to me like that's crystal clear.  Do we know?

19           THE COURT:  272 through 279 were actually marked but

20 never offered.  That's what my notes say.

21           MR. LACY:  Okay, well, for purposes here, and again,

22 I guess I'm glad that we're doing this now, we would move that

23 they be admitted for demonstrative purposes as I think that was

24 clear through the course of the testimony.

25           MR. BERNICK:  I would need to go back over the record

1 and ascertain that.  I don't have those documents here and our

2 people are gone dealing with other issues so I'm a little bit

3 at a disadvantage, Your Honor.

4           THE COURT:  All right, you can --

5           MR. BERNICK:  If you want to just give them to me, I

6 can take a look.

7           THE COURT:  These were definitely exhibits that were

8 used by Dr. Whitehouse.  I recognize them.  But my notes

9 indicate that they were marked but not offered.

10           MR. BERNICK:  Which ones are they now?

11           THE COURT:  272 through 279.

12           MR. LACY:  And what we've done here in the book is

13 we've noted which witness they were used with.  Some of them

14 were Dr. Molgaard, some of them were Dr. Frank.  I'm not sure

15 how many, if any, were Dr. Whitehouse.

16           THE COURT:  Okay, I know -- oh, I see.  I apologize.

17 I picked up the name at the bottom rather than the witness.  In

18 any event, they definitely were used.  I recognize that all of

19 them were put up on the board at some point by some witness but

20 I'm not going to say which witness.

21           MR. LACY:  And if it's something that we need to

22 follow up with later, I don't want to put anybody at a

23 disadvantage here.

24           MR. BERNICK:  276, it was, in fact, displayed at one

25 point but there was an objection that was made and I believe

1 sustained that the rates of mortality were not germane and

2 further, the comparison between the CARD mortality study and

3 this one I think also was not established.  That's my very

4 vague recollection.  That's LC-276 so though it may have been

5 displayed, I don't think it was -- I know it wasn't proffered

6 and I don't think it properly was admitted.

7 And 279, the comparison, I remember there was a

8 colloquy about whether this comparison was germane.  I remember

9 that there was a colloquy.  It turned out that Dr. Weill, with

10 respect to whom this became germane, Dr. Weill never used, did

11 a B-read or had a B-read done that he used in connection with

12 his progression analysis.  He relied upon the medical records.

13 So the ascertainment about who reads best which is the essence

14 of LC-279 doesn't go to any issue that's before the Court.

15 Again, this is purely from memory and a lot of stuff has

16 happened but I think that we need to go back and track this

17 down.

18 MR. LACY:  The one thing I would offer to the Court

19 is that I understand that in the context of parties' post trial

20 briefing obviously there have been a great many relevance and

21 to use Mr. Bernick's term, germane-type arguments made.  For

22 them to come in now, I wouldn't be surprised at all if there

23 are, in fact, objections stated during the course of the

24 transcript that we find related to these exhibits.

25 But for purposes now of having them available for the

1 parties to brief and knowing that there may be overreaching

2 objections, I would again just move that they (indiscernible).

3       THE COURT:  I wish you'd do this when the witness is

4 on the stand and I can rule on the objections in that context.

5 I mean it's going to be hard enough to try to figure it out

6 with exhibits that are not something that were used with the

7 witness but they were not offered at the time that the witness

8 was here so I can't deal with objections when the witness isn't

9 here when you might be able to cure the objection.  I don't

10 know.

11       In any event, I think you folks may be able to work

12 this out.  Why don't you take a look at them tonight, Mr.

13 Bernick, and let me know what your view is tomorrow and I'll

14 hold off on 272 through 279 until tomorrow morning.

15       MR. LACY:  The last section that I would bring to the

16 Court's attention is as we discussed I think very, very early

17 on Libby claimants' testimony there's a great deal of patient

18 information that for purposes of convenience through the

19 witnesses' testimony and the parties here was used in

20 unredacted form with the understanding that the redacted

21 versions would be substituted.

22       And so what is at the back of the book as noted here

23 in your binder, LC-13, LC-15A, LC-15 and LC-16A, those were

24 exhibits that were used and entered and I believe those were

25 admitted over -- or I don't even know if they necessarily were

1  objected to -- I know 16A was revised because there were three

2  columns that needed to be removed.  But regardless of whatever

3  the status of those particular objections, the documents that

4  you have here now are the redacted ones.

5          THE COURT:  I only ever had the redacted versions.

6          MR. LACY:  Then it sounds like we may not even

7  necessarily have -- as long as the official court copy then,

8  whatever ends up with the clerk had that, then that's fine too.

9          THE COURT:  Right, as far as I know, the unredacted

10  versions were put on the screen so the witness would see them

11  but I had to ask always what line they were referring to

12  because I had redacted versions.  So it's fine.  Whatever the

13  rulings were with respect to those exhibits remain the same but

14  I do note that these copies have been redacted.  I believe they

15  just duplicate what I've already got but at least they're here

16  in redacted form.

17          Speaking of which, someone is going to have go

18  through the transcripts to make sure, on behalf of your own

19  witnesses that you appropriately redact the names or whatever

20  the other identifying information is because my staff will not

21  be able to do that.  You folks have that obligation under the

22  rules so you'll have to take care of doing that.

23          MR. LACEY:  So it's our understanding that to the

24  extent we've modified the procedure a little bit here on that

25  first day of trial that the protective order about May 26th

1  still otherwise -- should that be our working guide?

2           THE COURT:  I don't know what that order is.

3           MR. LACEY:  Okay.  No, that's fine.  We'll work it

4  out with counsel.

5           MR. BERNICK:  There was extensive colloquy.  There

6  was a specific agreement that was reached the first day of

7  trial about what would govern in this proceeding.  And from the

8  debtors' point of view that is what still controls in the

9  proceeding.  I don't know where Mr. Lacey is.  There's a lot of

10 stuff in that book.  Ms. Baer has just come back in because

11 she's trying to do a lot of different things.  We had thought

12 that we were going to proceed with the testimony of the

13 witnesses so we have not had the opportunity to look through

14 that notebook, and therefore we're now in the same position

15 that we were yesterday.  So I'd be happy to --

16          THE COURT:  I think I just said to do it tonight so

17 that we can get on with this, and I'll address this tomorrow.

18          MR. BERNICK:  Well, that's what I would like to be

19 able to do, because I don't know what's going on with those

20 medical records and what their status in the transcript is and

21 so rather than trying to do anything about it now I think that

22 we need to get back to the --

23          MS. BAER:  Your Honor, I don't understand what's

24 going on here.  Mr. Lacey saw me earlier today and said he was

25 going to send me all these things by email and we'd work it

                    **J&J COURT TRANSCRIBERS, INC.**

1 out.  Nobody's given me a single piece of paper on Libby.  In

2 fact, we're missing exhibits from them they won't give us.

3       THE COURT:  Well, I think what this is supposed to be

4 is all of the exhibits that were used with the witnesses in

5 this binder is what I asked for and that's what I thought this

6 is.  What you're missing, I don't know.  If it hasn't been used

7 with the witness I can't speak to that.  But this binder should

8 now have every exhibit that was marked and used by Libby in

9 connection with their witnesses and they're marked as to the

10 same exhibit number that was used during the course of the

11 trial.  The problem is that some of them are not in evidence.

12 But, for example, those at the back of the book that have been

13 simply redacted to take out the confidential information that's

14 what that -- that's what this book does.  It takes out the

15 confidential information.  It doesn't change the rulings with

16 respect to whether the document is or isn't admitted.

17       MS. BAER:  Your Honor, I'm happy to look at this.

18 It's the first time I've ever seen it.

19       THE COURT:  Tonight.  I'll deal with it tomorrow.

20       MR. LACEY:  And just to clarify, Your Honor, the book

21 is not intended to represent as, I think you just stated now,

22 every exhibit that was used with the --

23       THE COURT:  Only the ones that were not handed up.

24       MR. LACEY:  Exactly.  And it's in large part to

25 respond to the plan proponents' request for exhibits that may

1 have been dropped through or not handed up.  So in response to

2 Ms. Baer's comment, we hope now to have everything cured and

3 have everything in everybody's hands.

4          THE COURT:  Okay.  I apologize.  I did misstate that,

5 and I didn't mean to, but I did misstate it.  So I understand

6 that this is a compilation of the documents that were not

7 handed up during the witnesses -- when they were being

8 examined.

9          MR. LACEY:  Thank you.

10          THE COURT:  Thank you.  All right, are we ready for

11 trial.  Mr. Pasquale.

12          MR. PASQUALE:  I'm going to try to get up again, Your

13 Honor.  Your Honor, Ken Pasquale for the Unsecured Creditors

14 Committee.  We now move to the affirmative case on the

15 objections raised by the Unsecured Creditors Committee and the

16 Bank Lender Group.  As I advised the Court earlier we have two

17 live witnesses.  We also have testimony from one witness that

18 we have an agreement with the plan proponents can be submitted

19 by affidavit.  And in fact this is old news.  This is the

20 affidavit of Charles Freedgood was already submitted with

21 respect to Phase I of these proceedings.  Your Honor, the

22 smallest of the three binders I gave you has Exhibits 1 through

23 5.  Exhibit 1 being Mr. Freedgood's affidavit, and Exhibits 2

24 through 5 being the exhibits to that affidavit.  Exhibit 2 the

25 credit agreement dated May 14th, 1998, Exhibit 3 the credit

Kruger - Direct/Pasquale                    194

1  agreement dated May 5th, 1999, and Exhibits 4 and 5 the two JP

2  Morgan as agent for the lenders the proofs of claims filed with

3  the Court.

4          Just for the record, Your Honor, the Freedgood

5  affidavit, the Exhibit 1, was filed with the Court under Docket

6  Number 22279 and the exhibits were filed under Docket Number

7  22306.  So at this time, just so we're clear for the record, we

8  would move into evidence CCBLG Exhibits 1 through 5.

9          MR. BERNICK:  Mr. Pasquale, I don't have the docket

10 entry.  And I know that the affidavits underwent a revision

11 process.  Is this --

12         MR. PASQUALE:  They're the most recent.

13         MR. BERNICK:  Okay.

14         MR. PASQUALE:  Right after Phase I.

15         MR. BERNICK:  If that's what it is then I don't have

16 an objection to it.

17         MR. PASQUALE:  Thank you.  Thank you, Your Honor.

18         THE COURT:  All right, Exhibit CCBLG Exhibits 1 to 5

19 are admitted.

20         MR. PASQUALE:  Thank you, Your Honor.  At this time

21 we call Lewis Kruger to the stand on behalf of the Creditors

22 Committee and the Bank Lender Group.

23                 LEWIS  KRUGER, SWORN

24         THE COURT:  Mr. Pasquale, I need to switch exhibits.

25 Okay.  Thank you.

1          MR. PASQUALE:  Good afternoon, Mr. Kruger.

2          THE WITNESS:  Good afternoon, Mr. Pasquale.

3                    DIRECT EXAMINATION

4    BY MR. PASQUALE:

5    Q    Can you please describe for the Court your education,

6    please?

7    A    Surely.  I graduated from Harvard College with a BA with

8    honors in economics in 1956 and then from Columbia Law School

9    in 1959.

10   Q    Can you briefly describe your legal experience for the

11   Court?

12   A    I've acted, obviously, as a bankruptcy lawyer since 1962

13   when I merged my -- well, I should give you a little bit of

14   history.  I originally started out as intellectual property

15   lawyer with the U.S. Office of an English law firm called Marks

16   & Clark.  I think joined a bankruptcy boutique called Krause,

17   Hersh & Gross in February of 1962, merged that firm into

18   Stroock in January of 1980.  So I've been practicing in the

19   bankruptcy field for 47 years or so.  I have also taught over

20   the years, 17 years, at Columbia Law School.  Most recently

21   I've been an adjunct professor of law at NYU Law School and

22   over the years I've also taught at Harvard, Queens College and

23   Oxford in England among other places.

24   Q    Can you describe, please the types of clients you have

25   represented with respect to bankruptcy and reorganization

Kruger - Direct/Pasquale                    196

1 matters?

2 A    I represented both debtors and creditors.  Debtors of all

3 varieties over the course of the years.  Creditors committees,

4 official creditors committees, ad hoc creditors committees and

5 the like.  I've also represented many of the major financial

6 institutions in the United States as agents for bank lender

7 groups or individually as members of bank lender groups.

8 Q    Can you please describe your and Stroock's involvement in

9 the W.R. Grace bankruptcy cases.

10 A    Stroock was retained as counsel for the unsecured

11 creditor's committee in the early part of April, 2001 shortly

12 after the filing of the petition by W.R. Grace and we've acted

13 since that time on behalf of the general unsecured creditors

14 committee.

15 Q    Have you been the lead attorney at Stroock with respect to

16 that representation since that time?

17 A    Yes, I have been.

18 Q    Now, Mr. Kruger, were you in court this morning for the

19 testimony of Mr. Tarola and Mr. Shelnitz?

20 A    Yes, I was.

21 Q    And you heard their testimony with respect to two letter

22 agreements that were entered into between the creditors

23 committee and W.R. Grace.

24 A    Yes, I did.

25 Q    Okay.  I'm just trying to save some time here so instead

1 of going over that same ground again, let me ask you, with

2 respect to those agreements, the January 2005 and February 2006

3 agreements that are in evidence as Plan Proponents' 285 and

4 286, do you know whether any individual creditor ever expressly

5 agreed in writing with Grace to support the terms of the joint

6 plan?

7 A    Not to my knowledge.

8         MR. BERNICK:  Objection.  I'm sorry.  Are we

9 excluding communications that Mr. Kruger had with his clients

10 or their constituency on the committee?

11        MR. PASQUALE:  That's not necessary to my question.

12 If asked if he -- sorry.

13        THE COURT:  Ask the question again.

14        MR. PASQUALE:  I will.

15 Q    Do you know whether any individual creditor entered into

16 -- sorry, one more time.  Do you know whether any individual

17 creditor ever expressly agreed in writing with Grace to support

18 the joint plan?

19 A    Not to my knowledge.

20 Q    Now, Mr. Kruger, over the tenure representing the

21 creditors committee in these cases, how would you characterize

22 the working relationship between the committee and the debtors?

23 A    I think it's both been very, very cordial and very, very

24 close, and we work together very carefully.

25 Q    Did there come a time where Stroock, on behalf of the

1 committee, began to have regularly scheduled calls with the

2 debtor?

3 A    Yes.  Starting, I think with Mr. Shelnitz's arrival as

4 general counsel.  We started to have essentially every other

5 week meetings on the phone with officers of the debtor, with

6 the debtor's professionals and ourselves.

7 Q    And what generally was discussed during those regularly

8 scheduled conference calls?

9 A    We discussed usually the agenda for the upcoming court

10 hearings, the status of acquisitions and other things that were

11 on Grace's agenda, and our joint strategy for dealing with the

12 issues that confronted us in the Chapter 11 proceeding.

13 Q    Did there come a time subsequent to February 2006 when you

14 and others at Stroock began to discuss with Grace the issue of

15 interest to be paid on Grace's bank debt?

16 A    What period of time are you referring to?

17 Q    After the February 2006 agreement.

18 A    Yes.  Certainly by the latter part of 2006 in my

19 recollection and certainly by the spring of 2007.  That became

20 a regular subject of discussions both with Grace in those bi-

21 weekly phone calls with Grace offices and the like as well as

22 individual phone calls between myself and Mr. Shelnitz.

23 Q    What generally was discussed with respect to the bank

24 debt?

25 A    What I --

Kruger - Direct/Pasquale                    199

1          MR. BERNICK:  I'm sorry.  I object to the form of the

2   question.  If we can't get concrete about a particular

3   conversation.  General recollection, I think, at this point,

4   Your Honor, is not really germane.  It really is very specific

5   --

6          THE COURT:  That's sustained.

7   Q    Mr. Kruger, do you remember any specific conversations?

8   A    Yes, I certainly do.  I don't know that I can give you the

9   dates of them, but I certainly do recall having conversations

10  with Mr. Shelnitz individually, one-on-one, in which I informed

11  him that as a result of phone calls that I was receiving from

12  holders of the bank debt that they were anticipating receiving

13  default interest and that they also informed me that the bank

14  debt was trading in the marketplace at a price which reflected

15  the understanding and expectation of the persons holding that

16  debt that they would receive default interest in these

17  proceedings.

18  Q    Just so we try to be a little more precise on the record,

19  do you recall when you first said that to Mr. Shelnitz?

20  A    Certainly by the spring of 2007 and I believe perhaps a

21  little earlier.

22  Q    Is there any particular reason you think it's that date?

23  A    I think that the calls that we started to receive at the

24  office from holders of the bank debt informing us as I just

25  said that they're anticipating receiving default interest in

1  these proceedings and that the debt was trading at a price that

2  indicated that the marketplace expected them to be receiving

3  default interest, I believe that those calls began sometime

4  after the decision by the Circuit Court in the Dow Corning's

5  proceeding which gave rise to a belief on the part of the

6  holders of the bank that their entitlement now was to default

7  interest.

8  Q    Now, Mr. Kruger, did there come a time when Mr. Shelnitz

9  advised you that the debtors were engaging in settlement

10 discussion with other constituencies in these cases to resolve

11 the personal injury asbestos liability?

12 A    Yes, he did so advise me.

13 Q    Do you recall -- I'm sorry.

14 A    He did so advise me.

15 Q    Do you recall generally when that occurred?

16 A    Probably the early part of 2008.

17 Q    Did the creditors committee participate in those

18 negotiations?

19 A    No, we did not.

20 Q    Why not?

21 A    We suggested -- I suggested to Mr. Shelnitz that we should

22 participate in those negotiations and I wanted to be present

23 for them to set forth the claims of the holders of the bank

24 debt as well as the other claimants in the unsecured creditor

25 community.  Mr. Shelnitz thought that he would be able to carry

1  our water, so-to-speak, in that he was going to negotiate a

2  plan with the PI committee.  So we were not invited.

3  Q    During that period of time, what, if anything, did you

4  tell Mr. Shelnitz about what you believed to be the

5  expectations of holders of bank debt to receive default

6  interest?

7  A    I told Mr. --

8         MR. BERNICK:  Again, if we can have a specific

9  conversation.

10 Q    Can you recall a specific conversation?

11 A    Without date, yes, I can certainly recall a specific

12 conversation in which I informed Mr. Shelnitz that if Grace

13 expected to have the bank debt holders vote in favor of any

14 reorganization plan that they might offer that that plan would

15 need to provide for default interest for the bank debt holders,

16 and that in addition to that, that regardless of the view that

17 the committee might hold, the committee doesn't vote, it would

18 be the bank debt holders that ultimately voted on the plan.

19 Q    Did you ever tell Mr. Shelnitz that the committee would

20 support the plan that was documented in the April 2008 term

21 sheet?

22 A    No, I did not.

23        MR. PASQUALE:  Your Honor, may I approach the

24 witness?  Just for the record, I've just given the witness the

25 binder used by Mr. Bernick with Mr. Tarola and Mr. Shelnitz

1 this morning.

2          THE COURT:  Excuse me one minute.

3          MR. PASQUALE:  I'm sorry, Your Honor.

4          THE COURT:  Okay, I have it.  Thank you.

5          MR. PASQUALE:  Okay.

6 Q    Mr. Kruger, can you turn to what is in evidence as Plan

7 Proponents' Exhibit 344.

8 A    Yes, I have that.

9 Q    And that should be an email from Mr. Shelnitz dated April

10 3rd, 2008?

11 A    Correct.

12 Q    Do you recall receiving that email?

13 A    Yes, I do.

14 Q    Do you recall having a discussion with Mr. Shelnitz on the

15 date of that email?

16 A    I believe we did speak on that day.

17 Q    Do you recall -- what, if anything, do you recall about

18 that conversation?

19 A    I told him that I hoped that the negotiation that he was

20 having were going to result in both the resolution of the PI

21 claims, but also that they would provide for default interest

22 if they anticipated receiving the votes of the bank debt

23 holders.  Otherwise they would not receive those votes.

24 Q    Email also says that Mr. Shelnitz will be available the

25 following day.  Do you recall a subsequent discussion with Mr.

J&J COURT TRANSCRIBERS, INC.

Kruger - Direct/Pasquale                          203

1  Shelnitz with respect to the term sheet?

2  A    I believe we had two conversations.  One on that day and

3  one the following day in which I said essentially the same

4  things to Mr. Shelnitz.

5  Q    Let me ask you to turn to what's in evidence as Plan

6  Proponents' Exhibit 284.

7  A    Yes.

8  Q    And that should be our colleague Ms. Krieger's email to

9  Mr. Shelnitz and I believe you're copied on it.

10  A    Yes.

11  Q    Okay.  What was the purpose -- well, withdrawn.  Do you

12  recall discussing with Mr. Shelnitz -- did you discuss with Mr.

13  Shelnitz that the provision in the term sheet for treatment of

14  general unsecured claims would need to be amended if he

15  expected to have the support of the bank debt holders?

16  A    Yes.

17             MR. BERNICK:  Objection.  Leading.

18             MR. PASQUALE:  Did he, Your Honor.

19             THE COURT:  It is a did he, but it does assume.

20             MR. PASQUALE:  Fine.

21  Q    What do you recall -- you have the email in front of you.

22  A    Yes.

23  Q    What do you recall discussing with Mr. Shelnitz --

24  A    We had discussed --

25  Q    -- with respect to the subject of the email?

**J&J COURT TRANSCRIBERS, INC.**

1  A    We had discussed with Mr. Shelnitz both prior to this

2  email and right at the time of this email that we thought that

3  it was appropriate that if there was going to be a prospect of

4  having the unsecured creditors committee support this plan that

5  there needed to be a provision in the plan that allowed

6  individual creditors to seek redress from the Court with

7  respect to what they believe was appropriate interest rates for

8  them to receive.  We had suggested that there were similar

9  provisions in the U.S. Sheet plan and that this was a model

10 that ought to be followed in the Grace plan.

11 Q    And in fact was that language added to the term sheet?

12 A    No, it was not.

13          MR. PASQUALE:  May I just have a moment, Your Honor?

14 I have nothing further.  I pass the witness.

15          THE COURT:  Mr. Bernick.

16          MR. BERNICK:  Good afternoon, Mr. Kruger, how are

17 you?

18          THE WITNESS:  Good.  Thank you, Mr. Bernick.

19                         CROSS EXAMINATION

20 BY MR. BERNICK:

21 Q    I believe you just testified that essentially in the

22 course of the negotiations that Grace was undertaking that

23 resulted in the term sheet, I think your words were that you

24 were expecting -- you volunteered to participate, Mr. Shelnitz

25 said, no, better that you not.  And then you went on to say, I

1 think your words were that you were expecting that Grace would,

2 "Carry our water."  Do you recall that testimony just a moment

3 ago?

4 A    Yes, I do.

5 Q    Isn't it a fact that Mr. Shelnitz, in negotiating, did not

6 have your authority to negotiate on behalf of the bank lenders

7 or any of the other folks represented by your committee?

8 A    He certainly was not authorized to negotiate on behalf of

9 the committee, but on the other hand, he was certainly advised

10 that if he wanted to get the bank debt holders to vote in favor

11 of the plan he would have to have default interest as part of

12 the arrangements.

13 Q    I really just asked you the first part of that question.

14 Isn't it a fact that Mr. Shelnitz had no authority to negotiate

15 on behalf of bank lenders or any of the other folks represented

16 by your committee?

17 A    That's correct.

18 Q    And therefore when it came to the actual negotiation

19 process, Mr. Shelnitz and Grace were not in fact carrying the

20 water of your constituency, correct?

21 A    That's correct.

22 Q    And isn't it also true that not only is that the case, but

23 there is nothing -- if you wanted to make sure that your view

24 was being represented, that is the view of your constituency

25 was being represented there was nothing that stopped you from

1 picking up the telephone and telling others besides Mr.

2 Shelnitz that the bank lenders were going to insist on default

3 interest, isn't that correct?

4 A    That's correct.

5 Q    You never did that, did you?

6 A    No.

7 Q    Now, you also testified just a moment ago that there are

8 actually two conversations that you had with Mr. Shelnitz

9 during the period of time that surrounded your receipt of that

10 term sheet, do you recall that?

11 A    Yes, I do.

12 Q    And in fact, pursuant to questions by Mr. Pasquale you

13 testified specifically about a conversation that took place

14 just when the term sheet was received, and a further

15 conversation that took place after that was received, correct?

16 A    Yes.  Both after they were received.

17 Q    Both after they were received, but you have a distinct

18 recollections of both discussions, correct?

19 A    Yes.

20 Q    Isn't it true that on September 2, 2009, which was just a

21 few weeks ago, he testified as follows about that very same

22 period of time.  I asked you about going back to Page 67 --

23            UNIDENTIFIED ATTORNEY:  Excuse me.  Mr. Bernick, what

24 page?

25            MR. BERNICK:  Page 67.

1              UNIDENTIFIED ATTORNEY:  Thank you.

2  Q    I said, "Let me go back to the conversation that you said

3  you've had or conversation or conversations you had with Mr.

4  Shelnitz in the period immediately after getting the term sheet

5  for the deal that is now reflected in the plan.  And we

6  pinpointed that as roughly April 3 and April 4.  Does that

7  square with your recollection"?  "Yes."

8  "Q    How many conversations did you have with Mr. Shelnitz?

9  "A    I don't recall.  One or two, maybe.  We are talking about

10  the days immediately after the term sheet?

11  "Q    Yes."

12          You said, "I would guess one or two."  And I then

13  said -- I don't reiterate the question.

14  "Q    In the period of time before there was a signed executed

15  term sheet how many conversations, if any, do you actually

16  recall having with Mr. Shelnitz?"

17          And your answer at that time was, "I don't recall.

18  My guess is one or two."  Was that your testimony?

19  A    Yes, it was.

20  Q    Is it also true that you don't really recall precisely

21  what you said to him, but you then went on to say, "I'm sure

22  that I said to him that the bank debt holders were looking for

23  default interest and a term sheet that didn't provide would be

24  opposed by them."  You don't recall precisely what was

25  discussed, correct?

1  A    Yes.  If your question was what actually --

2  Q    I'm sorry, Mr. Kruger.  Please.

3  A    I'm answering the question.

4  Q    It's a very specific question.  Isn't it true that you

5  don't recall precisely what was discussed with Mr. Shelnitz in

6  those one or two conversations?

7  A    No, that's not true.

8  Q    I want to go back perhaps in a little bit more orderly

9  fashion, and I'll try to get through this as quickly as I can,

10  to the basic sequence that we have here to see what it is that

11  you and Mr. Shelnitz actually disagree about at the end of the

12  day.  So the amended plan that first contained a provision

13  regarding post-petition interest that had been negotiated by

14  you very ably leading your committee.

15        MR. BERNICK:  And let me stress to the Court and Mr.

16  Kruger, our position is not about Mr. Kruger's integrity or the

17  skill with which he performs his job, we totally endorse the

18  idea that we've always had a good relationship with his

19  committee and with Mr. Kruger in particular.  That is not the

20  subject of our position.

21  Q    But that the plan that first provided for a rate of post-

22  petition interest that had been negotiated, was a plan that was

23  filed in early 2005.  Do you recall that?

24  A    Yes, I do.

25  Q    Okay.  And then so we go '05, '06, '07, '08.  And that

Kruger - Cross/Bernick                                  209

1  plan was a plan, can we agree, which contemplated that equity

2  would get value.  Is that correct?

3  A    I think that's right.

4  Q    Okay.  And is it true that at all times since 2005 the

5  plans that Grace and that your committee were prepared to

6  support were always going to be -- were in fact plans that

7  would provide value to equity?

8  A    Correct.

9  Q    Is it also true that this letter then gets put together,

10 and in connection with drafting the plan that was going to

11 provide value to equity, that it was very important for Grace

12 to get the support, in your view, it was very important for

13 Grace to get the support of the unsecured creditors.

14 A    Grace thought so, obviously.

15 Q    That's right.  And you on behalf of your committee

16 recognized that Grace really wanted your support, correct?

17 A    Surely.

18 Q    So when I say you, in the sense of you and your committee.

19 A    Yes.

20 Q    And in fact not just the committee, it was very important

21 for Grace, and you received repeated discussions and inquiries

22 from Mr. Shelnitz asking whether you, as counsel, Stroock as

23 counsel to the committee, would support one position or

24 another, correct?

25 A    I think we're talking about 2005.  I'm not sure Mr.

1  Shelnitz was involved in those conversations.

2  Q    Okay.  Well, that's true, but both before and since Mr.

3  Shelnitz came on board, your views were views that as expressed

4  to you by representatives of Grace, were important views from

5  their point of view in making sure that they got the support of

6  the committee.

7  A    Yes.

8  Q    All right.  Now, Grace sought the support from the

9  committee to -- in connection with the -- what was to be the

10  amended plan of '05, and Grace was successful in obtaining an

11  agreement for that support, correct?

12  A    Correct.

13  Q    Okay.  Now, that agreement, that letter agreement

14  therefore, no question about it, that letter -- we'll call it

15  the '05 letter, no question but that your letter in your view

16  bound the debtor W.R. Grace, correct?

17  A    Sure.  I think it bound them to file the plan it had filed

18  with that interest rate in it.

19  Q    I'm sorry?

20  A    It bound Grace which filed the amended plan with the

21  interest rate that had been negotiated in it.

22  Q    So no question about it binding agreement with respect to

23  Grace, fair?

24  A    For the moment.  Yes.

25  Q    Well, for as long as the agreement lasted.

1  A    Yes.

2  Q    Okay.  Is it also true, and let me get this straight a

3  little bit, is it also true that under the particular agreement

4  that was reached at this time, the agreement was not the same

5  for all parts of your constituency.  That is, the position that

6  was being articulated by the committee in this letter was not a

7  position that was uniform with respect to all of the different

8  creditors who were part of the unsecured creditors

9  constituency, correct?

10  A    That's correct.

11  Q    So there are some matters, for example, creditors

12  committee says exclusivity should be terminated.  That's a

13  matter of general interest or general importance to the

14  creditors as a whole when that position is taken, right?

15  A    Yes.

16  Q    And yet, there are other matters that are not of so much

17  of general interest to the committee as they are of more

18  specific interest to different creditors within the

19  constituency, right?

20  A    Yes.

21  Q    In fact, we've seen in this case how particularly Mr.

22  Speights and others have taken the view that when it comes to

23  claims -- matters that pertain to their clients specifically,

24  that they, not the committee, represents their clients in

25  connection with those claims.  You've seen that position taken

1 in this case.

2 A    Yes.

3 Q    And that's also been done in connection with the personal

4 injury constituency when it came to matters that were specific

5 to their claims.  We have seen, for example, the Libby

6 claimants have their own counsel, right?

7 A    Yes.

8 Q    Okay.  But when it came to the question of the particular

9 rate of default -- the particular rate of post-petition

10 interest that members of your constituency were insistent upon

11 getting as a condition for supporting the plan, that issue, the

12 pendency interest issue was an issue that was specific to

13 different lenders within the group, fair?

14          MR. PASQUALE:  Objection to the form, Your Honor.

15 A    I'm not sure I understand the --

16          THE COURT:  Wait.  I'm sorry, I have an objection.

17 That's sustained.

18          MR. PASQUALE:  Different lenders, I think, Mr.

19 Bernick means different creditors.

20          MR. BERNICK:  Different creditors.  Yes.

21 Q    But when it came to post-petition interest, that was an

22 issue where the positions being taken by the creditors within

23 the group, differed depending upon their particular claims,

24 correct?

25 A    Correct.

1  Q    And so really when the committee was negotiating on behalf

2  of the creditors with regard to post-petition interest, they

3  were negotiating with respect to an issue that was creditor

4  specific, correct?

5  A    Both as to the bank debt holders as well as to the other

6  general unsecured creditors.  Yes.

7  Q    Yes.  So we end up, in fact, with a situation where the

8  committee is effectively negotiating something that affects

9  different creditors within the class differently.  Is that a

10  fair statement?

11  A    Yes.

12  Q    Okay.  So, for example, the debt holders they ended up

13  with the highest rate of interest, correct?

14  A    Correct.

15  Q    The people who were not debt holders, but were unsecured

16  creditors who had contracts, they ended up with the contract

17  rate.

18  A    Correct.

19  Q    And that everybody else who wasn't one of the heavies, I

20  mean, after all it's the debt holders, they're the heaviest

21  constituency within the group, correct?

22         MR. PASQUALE:  Objection, Your Honor.

23  A    But that's not the issue.  The issue is that they had

24  contracts which gave them certain rights they believed and we

25  believed those rights just as well.

**J&J COURT TRANSCRIBERS, INC.**

Kruger - Cross/Bernick                    214

1 Q    All the more.  So that effectively this is an issue where

2 different people with different contracts were taking different

3 positions and effectively your committee was really acting as a

4 broker with respect to what they wanted as precondition for

5 agreeing that the committee would support the plan, correct?

6       MR. PASQUALE:  Objection to form, Your Honor.

7 A    I'm not sure I understand the question --

8       THE COURT:  Wait.  I'm sorry --

9 A    -- acting as a broker?  I'm sorry.

10       COURT CLERK:  Mr. Pasquale, I can't hear you.

11       THE COURT:  He's already stated that he needs the

12 question rephrased.

13 Q    This is not a matter of general interest to the unsecured

14 creditors.  This is a matter of interest that is the issue

15 relates to their specific claims and their entitlement to

16 receive money as part of their claims in their view pursuant to

17 their contracts, correct?

18 A    That's true as to the bank debt holders and to others who

19 had claims arising as a result of contracts.

20 Q    Right.  Well, but if they didn't have a contract then

21 their claim is a weaker claim.

22       MR. PASQUALE:  Objection to form, Your Honor.

23       MR. BERNICK:  I'm really getting at a --

24       MR. PASQUALE:  What is a weaker claim?

25       COURT CLERK:  Mr. Pasquale, you're not recording.

1          MR. PASQUALE:  I'm sorry.

2          MR. BERNICK:  If you -- want me give you a mic, is

3  that easier?

4          THE COURT:  No, the microphone just wasn't on.  Want

5  to restate your objection?

6          MR. PASQUALE:  Objection to form.  What is a weaker

7  claim?

8          MR. BERNICK:  Okay.  I'll withdraw it.  I want to get

9  into a somewhat different point.  I think maybe we've already

10  gone over this and I've beaten it too much already.  But this

11  is a situation we're in contract to something like exclusivity.

12  Exclusivity is of general interest in the sense that the issue

13  of exclusivity doesn't attach to the specifics of a claim,

14  correct?

15  A     Yes.

16  Q     Whereas there are other matters that pertain to the

17  specifics of a claim including like the merit of a claim,

18  right?

19  A     Right.

20  Q     And when it comes to post-petition interest and the view

21  of your constituency, post-petition interest was part of the

22  merits of the claim, right?  They said as a matter of contract

23  they were entitled to it.

24  A     Yes.

25  Q     So really in asserting that this constituency, that is the

Kruger - Cross/Bernick                    216

1  bank lenders, insisted upon a certain rate of interest and you

2  negotiated it effectively as a negotiation pertains to their

3  entitlements based upon the merits of their claim, right?

4  A    Correct.

5  Q    Okay.

6            THE COURT:  Just a second, Mr. Bernick.  Excuse me.

7  I need a very quick recess.  We'll take a five minute recess.

8                          (Recess)

9            THE COURT:  Mr. Kruger, I'm sorry.  Are you ready?

10           THE WITNESS:  Oh, not at all.  Yes, I am.

11           THE COURT:  Mr. Bernick.

12 Q    I think where we left off, Mr. Kruger, was that we had

13 gone over the fact that when the letter agreement was entered

14 into in January of 2005 that was a letter agreement that

15 certainly was binding upon Grace in connection with its

16 existing plan to provide a certain rate of post-petition

17 interest, correct?

18 A    Correct.

19 Q    And I was then turning to well, what about the other side

20 of the equation, what did this mean for the lenders?  And I

21 think where we were was that in contrast to a general issue

22 like termination of exclusivity, the agreement that came out of

23 the negotiations in January of 2005, was an agreement that

24 related to one aspect of the merits of the underlying claims by

25 the creditors within your group, correct?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. PASQUALE:  Your Honor, at this point I'd like to

2   raise an objection.  I haven't before, but this is way outside

3   of the scope of my direct which really was limited to just Mr.

4   Kruger's conversations with Mr. Shelnitz.  It had nothing to do

5   with anything that Mr. Bernick's been asking him about.  I

6   wasn't going to object, but this has been going on for quite

7   some time now.

8          MR. BERNICK:  Well, the subject matter of these

9   letters most certainly was within the direct scope of the

10  direct examination, and a lot of questions, as a matter of

11  fact, the very specific question that this pertains to is

12  whether Mr. Kruger ever became aware of a direct agreement

13  between Grace on the one hand and the lenders on the other.

14  And what I'm exploring is how did the lenders fit into the

15  agreement that was reached?

16         THE COURT:  All right.  That's fair for now.

17  Overruled.

18         MR. BERNICK:  And I'm going to tie it up pretty

19  quickly.

20  Q    My point is that I think the question to you, Mr. Kruger,

21  is whether the negotiation in connection with the letters

22  related to one aspect of the merits of the underlying claims.

23  That is pendency interest was to the mind of at least certain

24  of the lenders something that was a function of their contract,

25  correct?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Correct.

2  Q    Okay.  And so I take it that when it came to the

3  obligation that was being assumed in these letters with regard

4  to post-petition interest, that those discussions were

5  discussions where if you're going to be dealing with something

6  that affects the merit of an underlying claim by your lender,

7  you wanted and other people on the committee wanted to make

8  sure that they knew that the lenders were in fact going to be

9  able to support the plan that was under discussion, correct?

10        MR. PASQUALE:  Objection, Your Honor.  I'm not clear

11  if Mr. Bernick's question is limited to the lenders.  Of course

12  the agreement was no so limited.

13        MR. BERNICK:  We're going to get to the others in a

14  minute.  For the moment it's the lenders.

15        THE COURT:  All right.  Go ahead, Mr. Kruger, you can

16  answer.

17  Q    But if you're going to have discussions that pertain to

18  the merits of the underlying claims by the lenders you

19  certainly want to make sure that before the committee made a

20  commitment with regard to that subject matter that it knew that

21  the lenders were in fact going to be able to support the plan,

22  correct?

23  A    Correct.

24  Q    Okay.  And in fact there would have been no point in

25  executing the letters, the February 2005 letter if the

1  expectation was that the lenders were going to turn around and

2  not support the plan.  That would have been pointless, right?

3  A    That's true.  But you need to remember that the lenders

4  who we were aware of may not have been all the lenders who were

5  supportive of the arrangements at that time, you know, were not

6  bound by anything.  They could trade their debt, they could do

7  whatever.  They were not subject to plan support agreements.

8  The passage of time changed the constituency.  So it's hard to

9  know whether or not, you know, that anybody was really bound,

10 if you will, aside from the unsecured creditors committee which

11 was still supportive of the joint plan.

12 Q    I didn't ask you whether the underlying lenders were

13 contractually bound.  That's not my question.  My question is

14 before the committee undertook to enter into an agreement

15 affecting the merits of the underlying claims, whether it was

16 important that the committee in so doing make sure that the

17 expectation was that those lenders were in fact going to

18 support the plan.

19 A    We believe that was true.

20 Q    We believe that was true.  And in fact there wouldn't have

21 been any point in the lenders signing the agreement -- strike

22 that -- in the committee signing the agreement if the

23 expectation was that the lenders were not going to support the

24 plan.  It would have been pointless, correct?

25 A    That's correct.

Kruger - Cross/Bernick                         220

1 Q    Okay.  In fact, it would have been misleading to Grace if

2 the letter agreement were entered into without the expectation

3 that the lenders were going to support the plan, correct?

4          MR. PASQUALE:  Objection.  Calls for legal

5 conclusion.

6          THE COURT:  Sustained.  Well, it's speculative.  I

7 don't know how could he know what's misleading to Grace?

8 Q    Well, you certainly would have -- I don't think it's

9 difficult.  Mr. Kruger, you certainly didn't want the letter to

10 mislead Grace about the expectations of lender support, did

11 you?

12 A    Certainly not.

13 Q    Okay.  In that same vein if you didn't expect lender

14 support based upon all the contacts that had taken place with

15 the lenders, if you didn't support it the letter would be

16 misleading to Grace, correct?

17          MR. PASQUALE:  Objection, Your Honor.  Same

18 objection.

19 Q    As you understood it.

20          MR. PASQUALE:  We also don't have any time frame on

21 these questions.

22          MR. BERNICK:  This is all 2005 in connection with the

23 2005 letter.  That's what it's all been about.

24          MR. PASQUALE:  Thank you.

25          THE COURT:  All right, you may answer.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Can you answer the question, Mr. Kruger?

2  A    I'm sorry.  You want to try it again?

3  Q    The question is whether to execute this letter with Grace

4  in 2005 where there wasn't an expectation of lender support

5  would have been misleading, correct?

6             MR. PASQUALE:  That's the same objection, Your Honor.

7             THE COURT:  It's asking for a legal conclusion.

8             MR. BERNICK:  Your Honor, I'm not asking for a legal

9  conclusion at all.  I'm asking for a very commonsense word,

10 misleading.  Factually misleading.  Element of a burden --

11 element of proof.  Misleading.

12            MR. PASQUALE:  And as the Court correctly noted it's

13 speculative.

14            MR. BERNICK:  Well, no, I'm asking about the

15 substance of the letter.

16 Q    Isn't it a fact that this letter effectively represented

17 to Grace that the lenders in fact would support the plan that

18 was then being filed?

19 A    Yes.  With the caveat, as I understand it, that it's a

20 temporal event.  It may apply to some lenders.  Maybe not all

21 are supportive.  And that if Grace wanted the support of the

22 lenders it should seek plan support agreements.

23 Q    I didn't ask for your counsel with respect to what Grace

24 should do.  I'm asking whether the letter -- all about Grace in

25 a minute.  What the letter did was to represent that -- to

1  Grace that the expectation was in fact for lender support,

2  correct?

3  A    I don't think the letter actually ever says that.  But I

4  think that Grace was entitled to think that the committee was

5  supportive of the 6.09 percent interest as an appropriate

6  recovery for interest for the creditors.

7  Q    Again, it wouldn't make any sense for the -- to have Grace

8  have the impression that the committee was supportive if the

9  lenders were not, would it?

10           MR. PASQUALE:  Objection, Your Honor, asked and

11  answered many times.

12           THE COURT:  He had --

13           MR. BERNICK:  No, I don't think I've got an answer.

14  Q    I think this is very, very simple.  They've introduced the

15  idea that somehow the lenders are out there and it's kind of

16  oh, well, we'll see what happens.  And the very distinct

17  representation that is made in this document is in fact that

18  because the commitment is being made Grace is being told, yes,

19  we expect the support is going to be there.  True or not, Mr.

20  Kruger?

21  A    The letter itself does not say that, and the letter only

22  says that the committee will support a plan that provides that

23  level of interest.

24  Q    Okay.  So you think that -- you expected that when this

25  letter was sent to Grace it carried with it no expectation

Kruger - Cross/Bernick                              223

1  whatsoever --

2  A     I didn't say that.

3  Q     Okay.  Well, then that's my point.  You expected at the

4  time because you made the inquiries, the committee expected at

5  the time that the lenders would be supportive of the plan.

6  True or not?

7  A     That's true.

8  Q     And certainly you wanted through this letter and the

9  committee wanted to tell Grace the same thing as your

10  expectation.  True or not?

11  A     That's correct.  With all of the conditions that were in

12  the letter we expected that the lenders would support them.

13  Q     Okay.  And the conditions in the letter included the

14  question of how long it was going to last, right?

15  A     Correct.

16  Q     And this was a letter that although you could withdraw,

17  did not have some discreet point in time that actually ended

18  the letter, did it?

19  A     That's correct.

20  Q     So for so long as that letter was out there, the '05

21  letter was out there, again, the expectation was, that was

22  being conveyed was that there would be lender support.  True or

23  not?

24  A     True.

25  Q     Okay.  Now, when we get to 2006 we have a new letter, do

1  we not?

2  A    Yes, we do.

3  Q    And a letter basically comes out in '06 and that also was

4  a binding agreement, was it not?

5  A    Well, I like to think so, although I notice that the

6  exhibit itself is not signed by Jan Baer on behalf of Kirkland

7  & Ellis, but I presumed it was binding on Grace.

8  Q    I think everybody probably regarded it that way right?

9  You certainly heard that both Mr. Shelnitz and Mr. Tarola

10 regarded it as binding, correct?

11 A    Yes, they did.

12 Q    And they acted and they relied upon it, right?

13 A    Yes.

14 Q    Yes.  So the '06 letter comes out, and isn't it true that

15 the '06 letter actually reflects an enhancement that the result

16 of the letter is an enhancement to the rate of interest that's

17 going to be paid for post-petition interest, correct?

18 A    At that time.  That's correct.

19 Q    At that time.  And isn't it also true that this letter,

20 too, by virtue of being sent to Grace, represented the

21 committee's expectation as conveyed to Grace that in fact the

22 lender support would be there for the plant, correct?

23 A    Correct under the circumstances of the letter and

24 recognizing that times change.

25 Q    Times can change.  But in fact that letter just like the

1 '05 letter would have that element of representation to it

2 until it was withdrawn, correct?

3 A    That's true.  But at the same time it's also important for

4 the --

5 Q    Could you just --

6 A    Sure.  Yes.

7 Q    The answer is yes.  And that letter actually remained out

8 there with that implicit representation all the way through at

9 some point in 2008, correct?

10 A    That's not correct.

11 Q    Okay.  Well, did you ever withdraw at any time that the

12 committee state it was exercising its rights under the '06

13 letter and withdrawing from that letter all the way up to the

14 time that the term sheet was distributed?

15 A    No.

16 Q    Okay.  Now, I want to then ask you some further questions

17 about what actually took place during -- I want to go from '06

18 to '07.  So we're now a year after.  In '07 there was no effort

19 to change the terms of the letter, correct?

20 A    Correct.

21 Q    There was no termination of the letter, right?

22 A    Right.

23 Q    There was no enhancement.  It was status quo, right?

24 A    With respect to the letter itself --

25 Q    With respect to the letter itself.

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    Now, when it came to the -- what was going on during this

3  period of time beginning in '07 it started to become a pretty

4  intense period in terms of the estimation process, correct?

5  A    Correct.

6  Q    And the estimation process was one in which the plan

7  proponents were going arm and arm to do battle with our able

8  adversaries, correct?

9  A    That's right.

10 Q    Okay.  In '07 you said you had this conversation with Mr.

11 Shelnitz.  Do you recall that?

12 A    Yes.

13 Q    Now, I listened very carefully to the content of those

14 discussions that you had with Mr. Shelnitz, and I heard a word

15 that was an important word because it was a word that you've

16 used frequently before in talking about these discussions.

17 These discussions took place in the spring of '07.

18 A    They started then or maybe earlier.

19 Q    Maybe earlier, but I think in your deposition you said,

20 look, in may have been earlier, but I'm pretty sure it was

21 certainly by the spring of '07, right?

22 A    Correct.  Yes.

23 Q    And in those discussions you represented to Mr. Shelnitz

24 that holders, holders of bank debt were expecting default

25 interest if they were to support an ultimate plan.  That's the

1 word that you used, right?

2 A    Yes.

3 Q    In fact, in your declaration that you provided to the

4 Court in connection with this matter that's exactly the same

5 word.  Holders of the bank debt, right?

6 A    Correct.

7 Q    Okay.  And so we're very, very clear that that is the

8 essence of what you told Mr. Shelnitz in terms of the actual

9 information that you had received from lenders was that holders

10 of bank debt wanted default interest, right?

11 A    Is there a distinction in your mind between lenders and

12 holders?

13 Q    No.  But there's a distinction in my mind --

14 A    I'm not understanding the question.

15 Q    -- between saying holders and saying a majority of

16 holders.

17 A    I'm happy to comment on that if you'd like.

18 Q    No.  I'm going to give you a question.  Okay?

19 A    Ask away.

20 Q    Isn't it a fact that you didn't know that there were a

21 majority of holders who would insist upon default interest,

22 correct?

23 A    In that same sentence --

24 Q    No, I'm sorry.

25 A    -- that you just quoted to me --

1  Q    Excuse me.  The next question that I'm asking you --

2         MR. PASQUALE:  Mr. Bernick's interrupting the

3  witness, Your Honor.

4         THE COURT:  No.  He hasn't answered yes or no.

5  Answer yes or no, Mr. Kruger.  You can explain your answer.

6  Q    Isn't it a fact that you did not in fact know that there

7  was a majority of holders who would oppose, who would insist

8  upon the default rate, isn't that true?

9  A    No.

10 Q    That's not true?

11 A    When I use the word --

12 Q    I'm just saying.  Did you or did you not know that there

13 was a majority of holders who would oppose the plan if there

14 weren't default interest?

15 A    No, in the sense that I hold them all, no, in the sense

16 that I surmise it to be true.  I'm not sure how to answer that

17 question.

18 Q    You answered it at the deposition, didn't you?  Page 29.

19 "Q   Well, that began a different proposition.  You didn't know

20 that there was a majority out there to oppose the plan,

21 correct?  And your answer was, "A  I surmise that there was."

22 A    Yes.

23 Q    And I said let's be specific.

24        MR. PASQUALE:  -- improper use of the deposition,

25 Your Honor.  He's being inconsistent here.

1          MR. BERNICK:  I'm sorry.

2   Q    And then you went on to say, "Let's be specific."  You

3   didn't know that there was a majority.  You said I didn't know,

4   correct?

5   A    Correct.

6   Q    And therefore you did not state to Mr. Shelnitz that in

7   fact you knew that there was a majority of holders that would

8   oppose the plan.  You never said that specifically to Mr.

9   Shelnitz.

10  A    No, what I said instead was that holders --

11  Q    No, I didn't ask you what you said instead.  I said you

12  never said that to Mr. Shelnitz, correct?

13  A    Correct.  I did not use the word majority.

14  Q    And in fact you never said that the committee would oppose

15  a plan that contained default -- didn't contain default

16  interest, correct?

17  A    That's correct.

18  Q    In fact, you never said that Stroock would advise the

19  committee to oppose a plan it didn't provide for default

20  interest, correct?

21  A    I don't think I can answer that question because that's

22  privileged.

23  Q    Well, you had no problem answering it in the deposition.

24  A    I'll answer it again if that's if I did there.

25  Q    Right.  And the fact is you never told Mr. Shelnitz that

1 the committee would oppose it, correct?

2 A    Correct.

3 Q    You never told Mr. Shelnitz that even JP Morgan the chair

4 of the committee would oppose it, correct?

5 A    I don't know how to answer that since I don't speak on

6 their behalf.

7 Q    I'm just asking what it is that you told -- what it is --

8 an aspect of what your conversation with Mr. Shelnitz.  You

9 never told Mr. Shelnitz that JP Morgan would oppose a plan as

10 chair of the committee.  Would oppose a plan that didn't

11 provide for default interest, did you?

12          MR. PASQUALE:  Objection to form.  Lacks foundation.

13 I don't know how JP Morgan opposes as chair of the committee.

14          MR. BERNICK:  I just asked whether -- a very factual

15 question.  That the position was --

16          MR. PASQUALE:  In its capacity as chair of the

17 committee?

18          THE COURT:  The form of the question is incorrect.

19 You need to restate the question.

20 Q    JP Morgan was chair of the committee, true or not?

21 A    True.

22 Q    You never told Mr. Shelnitz that JP Morgan as chair of the

23 committee would oppose a plan that didn't provide for default

24 interest, did you?

25 A    I did not.  But I did tell Mr. Shelnitz --

1  Q    We know what you told Mr. Shelnitz because you testified

2  to it on direct examination, Mr. Kruger.  You don't have to

3  testify about it again.  I'm asking you different questions

4  about things you didn't tell Mr. Shelnitz.

5  A    Oh, but you're asking questions and not giving me an

6  opportunity to explain what the word holders means.  If you

7  want to use the word you need to know what it means.

8  Q    Well, I think we're already defining what it doesn't mean.

9  So that's my point to you, Mr. Kruger, and let me go on --

10  A    No, I don't think that's correct.  I think that your

11  definition --

12           THE COURT:  Gentlemen, we're not going to argue.

13  There's no question.  Your counsel may take care of this, Mr.

14  Kruger.  Mr. Bernick, ask your questions.

15           MR. BERNICK:  Okay.

16  Q    Now, isn't it true that during this period of time you

17  never -- the committee through you, never made a demand on

18  Grace to provide for full default interest otherwise support

19  would be withdrawn, correct?

20  A    Correct.

21  Q    And let's also talk about -- I appreciate that.  I also

22  want to talk about then what was going on as a result of the

23  estimation.  Isn't it true that at the time that the estimation

24  was underway the position that was being taken by the asbestos

25  claimants committee was that Grace was hopelessly insolvent?

1  A    I don't recall.

2  Q    You don't recall we spent two years litigating the scope

3  of the asbestos liabilities?

4  A    They had a view of the asbestos liabilities.  I'm not sure

5  that that led to Grace's insolvency.

6  Q    $6.2 billion wouldn't lead to Grace's insolvency?

7  A    I never heard a valuation of Grace actually.  But let's

8  assume that's correct.

9  Q    I think it would be a safe assumption.  Would you

10 recognize, Mr. Kruger, that at this time when the estimation

11 was taking place, you and other constituencies of Grace, had a

12 common interest.  And the common interest was to have the

13 asbestos liabilities quantified at a level that would not

14 impair full payment of your claims?

15 A    Yes.

16 Q    And is it also true that if in fact the estimation came in

17 high enough that would threaten full payment of your client's

18 claims?

19 A    Yes.

20 Q    Okay.  And therefore, isn't it true that it was of

21 critical importance to the unsecured creditors committee that

22 there be a united front between Grace and the unsecured

23 creditors in engaging with the other constituencies about the

24 value of the personal injury claim?

25 A    Yes.

Kruger - Cross/Bernick                            233

1  Q    And the fact was that to break that alliance, to break

2  that alliance, was a situation where the unsecured creditors

3  had too much to lose, correct?

4  A    No.

5  Q    Oh.  So if you -- it was not part of your strategy to

6  maintain the united front because your clients were at risk if

7  the alliance broke down?

8        MR. PASQUALE:  Objection, Your Honor, that calls for

9  attorney/client privilege.  He's asking for strategy of Mr.

10 Kruger.

11 Q    Well, actually you told us what the strategy was, right?

12 A    We said we were --

13       MR. PASQUALE:  Well then, let's limit it to that.

14 Q    Isn't it true that you actually had a strategy that drove

15 your decision not to make a demand, not to seek enhancement,

16 and not to terminate the letter?  You had a strategy.

17 A    Correct.

18 Q    And the strategy was to make sure that the front that was

19 maintained, the alliance was maintained between the debtor and

20 your committee because the other constituencies had much to

21 lose if the asbestos claimants were successful in the

22 estimation, true?

23 A    That's true, but the too much to lose was the problem with

24 the question.

25 Q    Okay.  I'll say --

                    **J&J COURT TRANSCRIBERS, INC.**

1 A    Because I think you would have continued on with the

2 estimation process and probably been successful with it.

3 Q    Well, I appreciate that vote of confidence.  But in point

4 of fact your own strategy was not to take the risk, not to take

5 the risk that a debate about rate of interest would break up an

6 alliance that was important to your constituency because they

7 were at risk if the estimation were lost, true?

8 A    Correct.

9 Q    Now, as we go forward into '08, at that point the

10 negotiations began in earnest in early '08, correct?

11 A    Not that I was aware of.

12 Q    Well, there are actual reports in open court in connection

13 with the estimation process that there were negotiations that

14 were commencing both at the start of trial and that were going

15 to continue during the recess, don't you recall that?

16 A    Oh, I'm sorry.  I take that back.  Yes.  That's correct.

17 Q    So we're sitting here and we're now going to the point of

18 trial and the negotiations intensify, right?

19 A    Early '08?

20 Q    Early '08.

21 A    I believe so.

22 Q    Well, you testified to it on direct examination, don't you

23 recall, that you had discussions with Mr. Shelnitz about

24 whether you all should directly participate in the

25 negotiations, right?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    And those negotiations were the negotiations that were

3  taking place in the face of a trial, correct?

4  A    Correct.

5  Q    Okay.  Now, as those negotiations were taking place, I

6  think we've already established that you, at some point in the

7  past, had actually done direct negotiations with

8  representatives of the asbestos claimants over the recovery

9  through your clients.  There had been historically direct

10  negotiations, correct?

11         MR. PASQUALE:  Objection, Your Honor.  That misstates

12  the testimony from this morning.

13         MR. BERNICK:  Okay.  Well, then I'll just ask him

14  flat out.

15         MR. PASQUALE:  There's no such evidence.

16  Q    Isn't it a fact that prior to '08 at some point in the

17  last prior two years, there had been a process where you

18  actually sat down with Mr. Inselbuch to talk about what it is

19  that your clients could recover on a consensual basis with

20  them, correct?

21  A    I don't recall that.

22  Q    You don't recall?

23  A    I know we had a mediation, but I don't recall direct

24  negotiations between ourselves -- myself and Mr. Inselbuch.

25  Q    You don't recall actually standing before -- hearing Mr.

1  Inselbuch talk about the negotiations with you that had not

2  come to fruition?

3  A    I don't recall that.  Sorry.

4  Q    Okay.  In any event there's nothing that stopped you from

5  participating directly in the negotiations again, fair?

6  A    Fair.

7  Q    Okay.  As the discussions proceeded though isn't it true

8  that once again during this period of time all the way up to

9  the point where the term sheet came out there was no

10  termination of the letter, the February '06 letter, correct?

11  A    Correct.

12  Q    There was no effort to get enhancement, correct?

13  A    Not correct.

14  Q    Oh, I'm sorry.  There was no renegotiation of the terms of

15  the letter, correct?

16  A    That's correct.

17  Q    And there was no demand that was made, correct?

18  A    Correct.

19  Q    Again, isn't it true that all the way through the process,

20  particularly because the issue is now on trial, the strategy as

21  you've discussed it, the strategy that the committee had was to

22  maintain a consolidated, unified front because if the

23  estimation were lost there was much to lose for your

24  constituency, correct?

25  A    Correct.

Kruger - Cross/Bernick                    237

1  Q    Now, isn't it at this point in time that -- I want to ask

2  you whether you agree with some things.  Have you read the

3  deposition of Mr. Frezza who's your expert on this?

4  A    No.

5  Q    Well, I'll read you a couple things and just ask you

6  whether you agree with his assessment of what was happening at

7  this point in time.

8        MR. PASQUALE:  Your Honor, this is way beyond the

9  scope of direct.

10        MR. BERNICK:  It bears directly on exactly what it is

11  that the committee was doing during this period of time and

12  exactly why they took the position that they did.

13        MR. PASQUALE:  This is reading Mr. Frezza's

14  deposition?

15        THE COURT:  I'm a little --

16        MR. PASQUALE:  I didn't ask Mr. Kruger anything about

17  Mr. Frezza.

18        THE COURT:  No, you didn't.  I think you can ask a

19  direct question.  But he hasn't read the deposition so I don't

20  think that's appropriate at this point.

21  Q    Well, let me just ask you.  Depending upon how that trial

22  worked out isn't it true that the result that Grace might not

23  be found, but the result could mean that Grace was solvent or

24  Grace was insolvent, true?

25  A    That's true.

Kruger - Cross/Bernick                           238

1  Q    And therefore during this period of time where you

2  decided, your committee decided not to terminate the letter,

3  not to demand an enhancement was a period during which because

4  of the pending liability issue, Grace was in a zone of

5  insolvency.

6           MR. PASQUALE:  Your Honor, that calls for a legal

7  conclusion.

8           MR. BERNICK:  No.

9           MR. PASQUALE:  I object.

10           MR. BERNICK:  I'm not asking for a legal conclusion.

11           MR. PASQUALE:  That's a term of art as we all know in

12  bankruptcy.

13           MR. BERNICK:  I can't figure out a better way to do

14  it.

15  Q    Where Grace's insolvency was in doubt, correct?

16  A    I think Grace didn't think so, but I think maybe it was.

17  Q    Well, your own assessment was that due to the uncertainty

18  of how the estimates were coming out there was great

19  uncertainty about whether in fact Grace was solvent, true?

20  A    For the world, I always believed Grace was solvent.

21  Q    I understand your belief.  I'm asking you about certainty

22  and uncertainty.  There was a great deal of uncertainty about

23  whether Grace would ultimately be solvent, fair?

24  A    Fair.

25  Q    Okay.  Now the term sheet comes out and you have a call,

**J&J COURT TRANSCRIBERS, INC.**

1 actually you say two calls with Mr. Shelnitz when the term

2 sheet comes out.  Is it true that during those two calls

3 associated with the term sheet that you did not say that there

4 was a majority of lenders who in fact would vote against the

5 plan?  You never said that to Mr. Shelnitz, correct?

6 A    I believe I've said that by saying that the holders would

7 not vote for the plan.

8 Q    Actually what you said was holders, not the entire group

9 of the holders.  You said, again, there were holders who would

10 vote against the plan, correct?

11 A    I said --

12 Q    That's your word.

13 A    No.  I said holders would vote against the plan.

14 Q    Right.  And therefore you never told Mr. Shelnitz that in

15 fact not just that there were holders who would vote against

16 the plan, but that they would be able to block the plan because

17 they were a majority.  You never said that to Mr. Shelnitz, did

18 you?

19 A    In my mind when I said holders that was a pluralize

20 statement.  Holders in the pleural and therefore I meant that

21 holders in the plural, in a plurality of holders would vote

22 against it.

23 Q    You know what, Mr. Kruger, I'll accept that.  I'll accept

24 that.  Is it a fact though that what you told Mr. Shelnitz --

25 you didn't tell Mr. Shelnitz that in fact the holders of the

1  debt were going to vote the proposed plan down, did you?

2  A    No.  What I told him was that the holders anticipated

3  receiving default interest and if there was any hope of getting

4  them to vote for the plan they would have to receive default

5  interest since default interest was not forthcoming --

6  Q    You said that before.

7  A    -- the corollary was they would vote against the plan.

8  Q    Oh, the corollary.  But you didn't tell Mr. Shelnitz the

9  corollary, right?  You didn't tell Mr. Shelnitz --

10  A    I did not.

11  Q    -- that in fact there were the votes there to vote down

12  the plan.

13  A    I did not tell him that.

14  Q    I'm sorry?

15  A    I did not tell him that.

16  Q    You didn't tell him that the committee would oppose the

17  plan, did you?

18  A    No, I did not.

19  Q    You didn't tell him that JP Morgan as chair of the

20  committee would oppose the plan, did you?

21  A    I did not tell him that.

22  Q    And you didn't tell him that your own advice to the

23  committee was that the committee should oppose the plan, did

24  you?

25        MR. PASQUALE:  Objection, Your Honor.

1          THE COURT:  That's sustained.

2  Q    Isn't it true that even after this term sheet came out

3  there was again, no termination of the February '06 letter?

4  A    That's correct.

5  Q    Isn't it true that even when the term sheet came out there

6  was no demand by the committee for a full default interest,

7  correct?

8  A    Correct.

9  Q    In fact, isn't it true that it wasn't until a hearing

10 months after or weeks -- weeks after the term sheet was

11 actually filed?  It wasn't until a hearing weeks after the term

12 sheet was filed that you finally made the public announcement

13 that the February '06 letter was terminated, correct?

14 A    That's correct, because I thought that it was

15 supererogatory to do that because the plan that was being now

16 followed by the debtor, the plan that we now have in front of

17 us for this hearing, is one that was very different from the

18 plan that originally we had entered into.  The plan that we

19 were proponents of was not that plan and therefore it would

20 seem silly to have to say, oh, yes, by the way, we did notice

21 that you filed the plan that was not the plan that we were

22 supporters of.

23 Q    Oh, I see.  Well, okay.  The fact of the matter is,

24 though, that that letter remained in place until it was

25 terminated, right, by its own terms?

1  A    Correct.

2  Q    And, therefore --

3  A    With respect to that plan.

4  Q    With respect -- no, with respect to the -- with respect to

5  that plan, correct?

6  A    With respect to that plan and no other.  But, if, in fact,

7  the debtor were unsuccessful, the plan -- the debtor and the

8  asbestos claimants were unsuccessful in pursuing the new

9  proposed plan, if you didn't terminate the letter you could

10 still say that the letter was still in place, right?

11 A    I don't think so.  As I understand it and using your

12 analogy before the executory contract, either it's all or it's

13 nothing.  Either you're with a co-proponent of a specific plan.

14 When that plan does not see the light of day and another plan

15 is present, it's hard to think that that arrangement still

16 obtains in any plan forever.

17 Q    Isn't it true that we repeatedly said in court that you

18 still hadn't terminated the letter --

19 A    And that's what prompted me to actually say the letter is

20 terminated really to make you happy.

21                    (Laughter)

22 Q    If I had known that would've been better.  Okay.  Not an

23 awful lot is going to probably turn at the end of the day when

24 you made the particular announcement, but we're clear that the

25 moment before the term sheet came out these letters -- this

1 letter was still in place, correct?

2 A    Correct.

3 Q    Okay.

4 A    Modified, of course, by all the comments I've made about

5 the interest rate issue.

6 Q    Fair enough.  Isn't it true that there was specific

7 correspondence, as you're aware, regarding the term sheet?

8 There is an email from Mr. Shelnitz, and there was a responsive

9 e-mail from Ms. Krieger, correct?

10 A    Yes.

11 Q    And the responsive letter from Ms. Krieger actually made a

12 proposal for certain language to be included in the term sheet?

13 A    Correct.

14 Q    And it was just adding a proviso, right?

15 A    Yes.

16 Q    That proviso assumed that the term sheet would remain as

17 it was, correct?

18 A    Not necessarily.

19 Q    Well, at least insofar as the interest rate is concerned.

20 A    Well, I think she said these are her initial thoughts and

21 we had discussed this issue prior to Ms. Krieger's e-mail

22 because we had suggested that Grace should look at the USG plan

23 for a provision that enabled individual creditors to seek

24 redress for their individual claims.

25 Q    Ms. Krieger didn't say in her e-mail as Mr. Kruger

1 reported, we reject the proposed term sheet insofar as the

2 unsecured creditors are concerned, did she?

3 A    She did not because the unsecured creditors committee had

4 not yet considered the term sheet.

5 Q    I see.  Well, when did the unsecured creditors committee

6 first consider the term sheet?

7 A    I assume at some point during the -- our receipt of it,

8 and probably after they'd been filed with the court.

9 Q    Okay.  That's a piece of information that I wasn't aware

10 of.  At some point, it's about April the 6th, the term sheet

11 gets filed with the report --

12 A    Court.

13 Q    With the court, correct?  Right?

14 A    Yes.

15 Q    Okay.  And isn't it true that all the way up until that

16 point in time you actually then were careful not to get ahead

17 of your committee, and you didn't take a formal position about

18 what the committee would say about the term sheet, fair?

19 A    Correct.

20 Q    I want to kind of go back over this for just a moment, Mr.

21 Kruger.  Isn't it true that before the term sheet between the

22 debtor and the asbestos claimants interests came to be, that

23 your constituency recognized that it was at risk to the

24 personal injury constituency regarding the value of their

25 claims, true?

1        MR. PASQUALE:  Objection, Your Honor.  I don't know

2   how the witness can testify to what the entire constituency was

3   thinking.

4        MR. BERNICK:  Well, I don't think I asked it.  If I

5   did I didn't mean to and I'll rephrase it.

6   Q    Isn't it true that throughout the period of time all the

7   way up until the term sheet, your committee recognized that its

8   constituency, the unsecured creditors, were at risk to a

9   determination of the asbestos claimants' liability being so

10  high that they'd have to take a haircut on their principle,

11  correct?

12       MR. PASQUALE:  I just want to -- I believe the

13  witness can answer the question.  I just want to be careful to

14  protect the attorney/client privilege here, so just a yes or

15  no.

16  A    Yes.

17  Q    Isn't it true that your committee always wanted to have

18  Grace go forward and, for want of a better term, do battle with

19  the personal injury claimants to get the liability down to the

20  level to reduce the risk to the committee's constituency?  That

21  was an objective, correct?

22       MR. PASQUALE:  I object.  Asked and answered.  We've

23  been through this.

24       THE COURT:  I think we have covered this, Mr.

25  Bernick.

1      MR. BERNICK:  Yes, well, I'm going to get to one

2 point that I want to cover.  I'm sorry if it's taking too long,

3 Your Honor.

4 A    Yes.

5 Q    Okay.  And that that remained all the -- that remained

6 true all the way up until the time that the term sheet was

7 executed, correct?

8 A    Correct.

9 Q    But, once the term sheet was executed, once the term sheet

10 was executed, isn't it true that the term sheet, if it became a

11 plan, if it became a plan and the plan was confirmed, would not

12 only preserve equity value, but would provide protection

13 against the risk that your committee had been concerned with

14 previously?

15 A    I'm not sure I'm following the question.

16 Q    Yet, once the term sheet was executed --

17 A    Yes.

18 Q    -- if that term sheet became a plan, if the plan was

19 adopted and approved and executed along the lines of the term

20 sheet, that plan would solve the risk issue that your committee

21 had been concerned with, correct?

22 A    That's correct, but recognize that originally that even in

23 the 2005 plan, since there was a recovery by equity, we always

24 believed that Grace was indeed solvent through this process.

25      MR. BERNICK:  Again, I move to strike as not being

1  responsive.

2          THE COURT:  I think it explains his answer.  It's

3  fine.

4          MR. BERNICK:  I'm getting to a point of timing, Your

5  Honor, once again, so I'll try to put it a little bit

6  differently.

7  Q    Before the term sheet came out you've recognized that --

8  your committee recognized that there was a problem with risk,

9  true?

10 A    True.

11 Q    The term sheet, if it was implemented, solved that problem

12 with risk, true or not?

13 A    If the plan that is supported became effective, yes.

14 Q    And isn't it true that the approach that your committee

15 took to dealing with Grace on the interest issue became far

16 more aggressive after the term sheet came out then it had ever

17 been previously?

18          MR. PASQUALE:  Objection to form, Your Honor.

19 A    No.

20          THE COURT:  There was an objection to form, but Mr.

21 Kruger answered, so it doesn't matter at this point.

22 Q    After that term sheet, the lenders were taken care of,

23 they get their principle, they get interest, they get

24 post-petition interest, right?

25 A    Taken care of?  I'm not sure what that means.  They didn't

1 think so, obviously.

2 Q    They get their principle -- they get their principle, they

3 get post-petition interest, and they get post-petition interest

4 at a level in excess of the federal judgment rate and the base

5 contract rate, correct?

6 A    But, not at the rate they anticipated receiving.

7 Q    Not at the rate they anticipated, but certainly they would

8 get all those different things, correct?

9 A    They got some of those.  Yes, they got some things.

10 Q    And isn't it true that even when the negotiations broke

11 down before the plan was actually filed, the negotiations broke

12 down between Grace and the unsecured creditors over the

13 interest rate that Grace still put in the plan?  It didn't take

14 the position that all post-petition interest was off the table.

15 It stood by the position that it had taken for years about what

16 the appropriate rate of interest --

17 A    Even though it realizes that was not --

18         MR. PASQUALE:  Your Honor --

19 A    -- going to be satisfactory to the unsecured creditors.

20 Yes, that's true.

21 Q    Thank you.

22         MR. PASQUALE:  Brief redirect, Your Honor.

23         MR. BERNICK:  Yes, I'm done.

24         MR. PASQUALE:  I'm sorry.  I thought you said were,

25 too.

1  REDIRECT EXAMINATION

2  BY MR. PASQUALE:

3  Q    Mr. Kruger, you started to explain something before Mr.

4  Bernick cut you off.  What did you mean when you used the term

5  "holders"?

6  A    Well, when I use the word I assume that there were

7  numerous holders of the bank debt.  We had heard from and I had

8  heard from several holders of the bank debt telling me that the

9  holders were expecting to get default interest that the debt

10  was trading in the marketplace with default interest.  Now,

11  when I communicated the word holders to Mr. Shelnitz, I use

12  that in the plural.  In my mind that indicated that a majority

13  at the very least of the holders would be opposed to a plan

14  that did not provide them with default interest.  I did not use

15  the word -- I used the affirmative, I guess, which said that if

16  there was any hope to get a plan approved by the bank debt

17  holders it would have to contain default interest.

18  Q    Now, there came a -- did there come a time when a majority

19  of the lenders actually did demand default interest from Grace?

20  A    Yes.  I believe there's a letter of April 20 or 21st.  Got

21  a call from Paul Weiss to the --

22  Q    What year, sir?

23  A    From -- I'm sorry?

24  Q    What year?

25  A    Of 2000 -- I guess 2009.  Pardon me.  I take that back.

Kruger - Recross/Bernick                     250

1  2008.  Within, I guess, three weeks of the -- or two weeks of

2  the unveiling of the term sheet saying that 85 percent of the

3  holders, I think it was roughly that amount, opposed the plan

4  and expected to receive default interest.

5              MR. PASQUALE:  Nothing else, Your Honor.

6              MR. BERNICK:  Just a couple of questions from my desk

7  if I can, Your Honor.

8                         RECROSS EXAMINATION

9  BY MR. BERNICK:

10 Q    You say you assume.  When you described what holders

11 meant, you say you assume.  That was your word just now,

12 correct?

13 A    Yes.  I take my words carefully, and when I say holders I

14 mean the plural holders.  I don't mean some holders.  I mean

15 holders.

16 Q    You mean --

17 A    Is that the universe of all holders?  I didn't say all

18 holders.  I said holders.  And in my mind the plural meant the

19 significant amount of holders likely more than a majority.

20 Q    You said -- that's why I kept this note -- these words.

21 You said holders.  Then you said in response to Mr. Pasquale's

22 questions, you assume several.  Those were you words, correct?

23 A    No, I didn't say --

24 Q    Just now you said you assume.

25 A    I assume that a significant majority would oppose the

                **J&J COURT TRANSCRIBERS, INC.**

1 debtor's plan.

2 Q    You said you assumed several.  Then you said just now

3 significant and then majority.  When you said holders --

4 A    Mr. --

5 Q    -- I just want to know what you knew.

6 A    I'll tell you.

7 Q    Now, I just want to -- I take it when you said assume you

8 never actually went out when you were talking -- before you

9 talked and when you talked with Mr. Shelnitz, notwithstanding

10 all these conversations, you never actually went out to find

11 how many holders had the position that you were expressing to

12 Mr. Shelnitz, correct?

13 A    That's correct.

14 Q    And, therefore,  you didn't know, you didn't know, apart

15 from your surmise or your assumption, you didn't know whether

16 they were significant, and you didn't know whether they were

17 majority, true?

18 A    No.  When I heard from several holders --

19 Q    Several.

20 A    Right.  That the holders as a group -- and that's what I

21 said in my declaration in case -- you only showed the first

22 word of what was part of the sentence -- I said if committee

23 professionals are being told by holders of the bank that the

24 holder is expected to receive post-petition interest at the

25 default rate, not just the holders that call, but all holders,

Kruger - Recross/Bernick                    252

1  and it was indicative that the debt was trading in the

2  marketplace at a price indicative of the fact that the trading

3  community and the holders expected to receive default interest.

4  Q    Okay.  You now say you assume several, and that the

5  several told you that the holders --

6  A    Right.

7  Q    Did we get that right now?

8  A    Mm-mm.

9  Q    So, a) you didn't know how many there were, right?

10 A    Correct.

11 Q    b) when the information came to you that the holders were

12 expecting default interest, even that information from the

13 lenders that you spoke with didn't tell you how many, correct?

14 A    That's correct, but --

15 Q    And that -- I'm sorry -- and that because you didn't know

16 how many, in fact, there were, you never told Mr. Shelnitz

17 either that the number was significant or that it was a

18 majority, true or not?  You never told him that.

19 A    That's not true.  I told them that the holders expected to

20 receive default interest.

21 Q    One last question.  The market information was important

22 to you, right?

23 A    It was what I was being told, yes.

24 Q    Okay.  And that market information was of what vintage

25 when you looked at it?

1  A    I never looked at it, but I was being told by the holders

2  that the market price was such that --

3  Q    Oh, okay.  So, you never actually went out to find out how

4  many holders actually had the position was being told you,

5  right?

6  A    I would not be able to do that, no.

7  Q    Okay.  You never did it, right?

8  A    Correct.

9  Q    And you never actually -- you certainly had a financial

10  advisor.  You could go take a look at the market information

11  yourself, correct?

12  A    Correct.

13  Q    You never did that either, did you?

14  A    At some point later on, yes.

15  Q    At some point.  At what point?

16  A    I mean, the latter part of 2007, early 2008.

17  Q    Okay.  During the period of time leading up to when you

18  learned that the negotiations were in process, when you learned

19  that those negotiations were in process I take it you never

20  went back out to find out or even ask how many holders actually

21  will insist on default interest, did you?  You never did that,

22  did you, Mr. Kruger?

23  A    I did not do that.

24  Q    Thank you.  And you never actually went back to find out

25  at what level the debt was trading during that period of time,

1  correct?

2  A    Personally, no, but I was told by the holders who called

3  me who are financial institutions of repute that they were

4  reporting to me that which they believed and knew to be true.

5  And I've been at this a very, very long time.  When I have

6  enough phone calls from enough holders telling me that

7  something is so and that the market price reflects it, I

8  usually tend to believe that it may be true.

9  Q    Nothing had prevented you from calling up your own

10 financial advisor and finding out what the ticker was?

11 A    That's true.

12 Q    Okay.  In effect, isn't it true that during the period of

13 time of the estimation when these negotiations were going on,

14 the actual trades of this debt reflected an expectation of

15 interest that was less than the full default interest, correct?

16      MR. PASQUALE:  Your Honor, now we're going way beyond

17 my redirect.

18      MR. BERNICK:  I'm just asking whether he knows that.

19      MR. PASQUALE:  Don't.

20      THE COURT:  It is beyond the redirect.

21      MR. BERNICK:  I have nothing further.

22      MR. PASQUALE:  Nothing else, Your Honor.

23      THE COURT:  You're excused, Mr. Kruger.  Thank you.

24      MR. PASQUALE:  Your Honor, we have one more witness.

25 I don't know if you want a break or we should just start.

1      THE COURT:  Why don't we take a five-minute recess

2 just to let everybody stretch and then we'll start again.

3                      (Recess)

4      THE COURT:  Mr. Pasquale.

5      MR. PASQUALE:  Thank you, Your Honor.  The creditor's

6 committee and the bank lender group call Robert Frezza.

7              ROBERT FREZZA, WITNESS, SWORN

8                  DIRECT EXAMINATION

9 BY MR. PASQUALE:

10 Q    Good afternoon, Mr. Frezza.

11 A    Hello, Mr. Pasquale.

12 Q    Can you please describe for the Court your education?

13 A    Certainly.  I graduated from Pace University in New York

14 in 1990 -- 1983, excuse me -- with a bachelor of business

15 administration degree.

16 Q    Did you have a concentration while at Pace?

17 A    Yes.  It was a concentration in accounting and finance,

18 and that program was an intensive accounting and finance

19 program designed to prepare students for the CPA exam.

20 Q    And did you take the CPA exam?

21 A    I did.

22 Q    And are you a CPA?

23 A    I am a CPA.

24 Q    Are you a member of any professional organizations?

25 A    I'm a member of the American Institute of Certified Public

1  Accountants, as well as the American Institute of Restructuring

2  Advisors.

3  Q    Can you please describe your professional experience

4  starting with your graduation from the Pace University

5  accounting program?

6  A    Certainly.  I spent my first 15 years out of school as an

7  audit professional in firms including Arthur Young, Massar

8  International which is actually a Paris-based CPA firm.  I

9  spent eight years with Massar and was a partner there for many

10  years.  Subsequent to that I joined Ernst & Young's Transaction

11  Services Group as a mergers and acquisitions professional.

12  Thereafter I had joined a firm that performed roll-ups of

13  businesses, smaller businesses in the pursuit of creating a

14  larger business to sell to a strategic or run.

15  Q    What was the name of that firm?

16  A    The name of that firm was Wellesley.  Thereafter I worked

17  as an interim executive, chief financial officer and chief

18  operating officer for a couple of companies which were my own

19  clients.  This brings us to 2000.  And thereafter joined

20  Capstone Advisory Group which I am a partner at currently.

21  Q    When specifically did you join Capstone?

22  A    I've been with Capstone Advisory Group since January 2001.

23  Q    And what is the business of Capstone Advisory Group?

24  A    Capstone Advisory Group is a nationwide restructuring

25  firm.  Primarily restructuring, but we also have the evaluation

1 practice as well as a forensic investigation and litigation

2 support group.  I primarily spend my time in the restructuring

3 side, and that is the largest part of the business.

4 Q    Do you consider yourself to be a financial advisor?

5 A    I do.

6 Q    And what is a financial advisor?

7 A    As a financial restructuring advisor at Capstone we

8 perform, depending on whether it's a debtor or a creditor

9 assignment, a situation analyses, determine the situation in a

10 particular -- in particular situations as we're engaged,

11 perform business plan reviews, analyze the near-term cash flow

12 need to the company, determine whether they're able to meet

13 their debts as they come due based on their cash flow forecast,

14 perform detail financial modeling -- complex financial modeling

15 projects, and a whole host of other types of financial analyses

16 in an effort to help the client move through a potential

17 restructuring both in and out of court.

18 Q    Now, you said we do these things.  Do you personally do

19 the things you just described?

20 A    I personally do these things, and it is what Capstone does

21 as well, in general.

22 Q    Can you describe for the Court some representative matters

23 on which you have been involved in your period -- excuse me --

24 in your tenure at Capstone?

25 A    Certainly.  I've been involved with the restructuring of

1  Polaroid Corporation, Sunbeam products, American Commercial

2  Lines which is the largest inland barge company in the United

3  States, U.S. Shipping, Gainey Trucking, Great Wide Logistics,

4  to name a few.

5  Q    And whom -- keeping in mind the capital structure is what

6  I'm thinking about -- what types of parties did Capstone advise

7  in those matters?

8  A    Most of those matters involved Capstone's advising the --

9  either the senior lenders -- the senior lenders in each case,

10  actually.

11  Q    Now, does Capstone serve in any role with respect to the

12  W.R. Grace bankruptcy case?

13  A    It does.  Capstone represents the official committee of

14  unsecured creditors.

15  Q    So, Capstone is our financial advisor, is that right?

16  A    Capstone is your financial advisor, yes.

17  Q    Okay.  Describe your personal role with respect to

18  Capstone's services for the creditor's committee.

19  A    Sure.  My personal role has been since some time in 2005

20  working with the unsecured creditor's committee primarily

21  reviewing the annual business plan of W.R. Grace, analyzing the

22  quarterly actual performance to that business plan in each

23  case, analyzing business acquisitions or asset divestitures as

24  well as other issues that arose during the settlement.  And we

25  would analyze the situation, interface with management and its

1 advisors of Grace and then report back to the creditor's

2 committee.

3 Q    Mr. Frezza, have you ever been qualified as an expert by

4 any federal court?

5 A    I have.

6 Q    When was that?

7 A    That was in October 2008.

8 Q    And in which matter?  Can you please describe for the

9 Court?

10 A    In the matter of Gainey Trucking.  Sorry.  In the matter

11 of Gainey Trucking in the U.S. Bankruptcy Court of the Western

12 District of Michigan.  I was engaged by the pre-petition

13 lenders to analyze the company's cash flow forecasts that were

14 put forth in connection with that company's Chapter 11 filing.

15 I was asked to opine on whether the company's -- the company

16 was cash flow solvent in that case based on those financial

17 forecasts.

18          MR. PASQUALE:  Your Honor, at this time we would move

19 that Mr. Frezza be qualified as an expert in the fields of

20 accounting and as a financial advisor in restructuring matters.

21          MR. BERNICK:  Your Honor, I don't have any objection

22 to those qualifications, but I don't believe that that proffer

23 will support the opinions that are going to be offered.  And

24 so, I don't have an objection at this time, but I -- we're

25 going to very, very shortly run into the issue of whether he's

1 got an expert -- he has sufficient expertise with regard to the

2 solvency analyses that he did.  So, that's where we are now

3 from our point of view.

4           THE COURT:  All right.  There's no objection.  The

5 witness is permitted to express an expert opinion in the fields

6 of accounting and financial forecasting.

7           MR. PASQUALE:  Thank you.

8 BY MR. PASQUALE:

9 Q    Mr. Frezza, as part of your work for the Grace unsecured

10 creditor's committee, were you asked to render an opinion

11 concerning whether Grace is solvent?

12 A    I was.

13 Q    In rendering that opinion, did you consider solvency of

14 the plan now before the Court on any specific date?

15 A    I did.

16           MR. BERNICK:  Your Honor, I think that we're now

17 getting into the area of his opinions, and we have some very

18 brief voir dire with respect to his expertise and ability to

19 render an opinion on solvency.

20           MR. PASQUALE:  Your Honor, the time for that was when

21 I qualified him.

22           MR. BERNICK:  Okay.  I don't think that I -- I lodged

23 my timely objection at that time.

24           THE COURT:  I think the -- maybe I misunderstood the

25 objection.  I did not -- I thought you said that you were not

1 objecting to the witness' ability to express an opinion.  It's

2 just that you were objecting to the opinion that was being

3 expressed for reasons you were going to get into.  Maybe I

4 misunderstood.

5          MR. BERNICK:  What I tried to say, and I probably was

6 not clear, is that we don't believe that this witness has

7 sufficient expertise to offer an opinion regarding solvency.  I

8 think that's what --

9          THE COURT:  You did say that with respect to

10 solvency, yes.

11          MR. BERNICK:  And so, to the extent that the

12 proffer -- I didn't hear that the proffer was a proffer about

13 him as an expert in making solvency determinations.

14          THE COURT:  It was not.  It was about accounting and

15 advising and financial forecasts.

16          MR. BERNICK:  Right.  He is now going to be -- he is

17 now being asked to get into his analysis and opinions regarding

18 solvency because he's already talking about the date on which

19 he chose to measure solvency.

20          MR. PASQUALE:  Let me -- may I ask a foundation

21 question --

22          THE COURT:  Yes.

23          MR. PASQUALE:  -- and try to address this?

24 BY MR. PASQUALE:

25 Q    Mr. Frezza, in your experience, do professionals in the

1  areas of your expertise of accounting and financial advisors,

2  do they render solvency opinions?

3  A    They do.

4  Q    Okay.  And have you been involved in cases where you've

5  seen that?

6  A    I have.

7            MR. PASQUALE:  Your Honor, I don't know what else I

8  need to say in that --

9            MR. BERNICK:  Now I have some voir dire because it

10  relates to that foundation.

11            THE COURT:  All right.  You may voir dire.

12            MR. BERNICK:  Well, if Your Honor would prefer that I

13  not do it I can --

14            THE COURT:  I don't have a preference.

15                    VOIR DIRE EXAMINATION

16  BY MR. BERNICK:

17  Q    Isn't it true -- good afternoon, Mr. Frezza.

18  A    Hi, Mr. Bernick.  How are you?

19  Q    Isn't it true that you've never personally issued an

20  expert report on solvency?

21  A    That's true.

22  Q    So, this would be your first time?

23  A    This will be my first report issued on solvency.

24  Q    Expert report on solvency.

25  A    Expert report, excuse me.

1  Q    Isn't it true that you've never issued a valuation

2  opinion?

3  A    I've never issued an expert report on valuation, that's

4  true.  However, I've done much work in the field of valuation.

5  Q    Had you ever -- and I asked this question of you in your

6  deposition -- "Have you ever issued an opinion -- a valuation

7  opinion", Answer, "I've never issued a valuation opinion, no."

8  Is that your answer?

9  A    That's correct.  That's correct.

10  Q    Is it also true that you don't hold yourself out in the

11  marketplace -- non-litigation marketplace, you don't hold

12  yourself out in the non-litigation marketplace as an expert in

13  valuation?

14  A    That's correct because in doing so it would presuppose

15  that you are someone certified by the American Society of

16  Appraisers, for instance, just to be clear.

17  Q    Would it also be clear that you would not hold yourself

18  out in the marketplace as being an expert in valuation or

19  quantification of liabilities?  Isn't that true that you would

20  not so hold yourself out?

21  A    That's correct.

22        MR. BERNICK:  I don't believe that there should be

23  different standards in court from in the marketplace.  I think

24  the witness has been candid.  That he would not be able to

25  issue these opinions in the marketplace and wouldn't hold

1 himself out as being expert in doing it.  I don't think I've

2 seen a set of questions and answers that are quite so on point

3 and clear usually people waffle on.  This witness didn't.  He

4 was candid.  But, he does not get the expertise.  And this is

5 not the -- this is not a place where he should be permitted to

6 do what he can't do outside of the courtroom.

7          MR. PASQUALE:  Your Honor, I have two very easy

8 responses.  First, as Mr. Frezza's already testified, he wasn't

9 asked to perform a valuation of the company.  He was asked to

10 do a solvency opinion.  It's not the same as a valuation.

11 Secondly, this witness has, in fact in my opinion, greater

12 qualifications -- he's also an accountant -- than Ms. Zilly

13 who's already testified to her opinions on solvency.  I don't

14 see that there should be any different standard for Mr. Frezza

15 than there was for Ms. Zilly.

16          THE COURT:  Well --

17          MR. BERNICK:  Ms. Zilly didn't render a solvency

18 opinion.  This witness does.  We can't --

19          MR. PASQUALE:  She was never -- sorry, Dave.

20          MR. BERNICK:  -- excuse me -- and he can't do it

21 without rendering an opinion on valuation and rendering an

22 opinion on both quantification of liabilities.  And he doesn't

23 have the expertise to do either one.  A plus B equals C.

24          THE COURT:  I don't see how the witness is going to

25 testify about solvency which necessarily involves

1 quantification of liabilities and valuation if he says that he

2 doesn't hold himself out as an expert in those areas.

3          MR. PASQUALE:  In the areas of valuation, Your Honor,

4 that's right.

5          THE COURT:  And quantification.

6          MR. PASQUALE:  And Mr. Frezza said that's because

7 he's not certified by the organization.

8          MR. BERNICK:  Well --

9          MR. PASQUALE:  He has done, and I'm happy to ask him,

10 he has done valuation work in his experience.  Just hasn't

11 rendered an expert valuation report, and Mr. Frezza started to

12 say that on the stand, and he certainly said that at his

13 deposition.

14          MR. BERNICK:  I understand the witness' testimony,

15 but the fact of the matter is, that in his field that

16 certification's required.

17          MR. PASQUALE:  The other thing I'd just raise, Your

18 Honor, on a procedural level is, there's been no _Daubert_ or

19 motion in limine filed about Mr. Frezza.  This is the first

20 we're hearing about a problem with his qualifications.  That

21 deadline has long since passed.

22          MR. BERNICK:  Well, in point of fact, this is

23 something that developed very, very late in the process because

24 the testimony was taken very late in the process.  And I think

25 that the _Daubert_ problems go not only -- this is a _Daubert_

1 problem, they go way beyond it, and we're going to see that if

2 he were to testify.  I know that Your Honor is generally very

3 reluctant to preclude testimony.  You want to hear it.  But, we

4 do have an objection based upon his expertise.  And I'm

5 prepared in service of getting the witness done and getting

6 this part of the trial done to suggest, perhaps, that the Court

7 reserve on this and to be flexible about it.  But, I -- you

8 know, I don't think we're going to get there over this issue.

9        THE COURT:  I'm concerned about the witness'

10 qualification when he says he does not hold himself out as

11 someone who quantifies liabilities because you certainly can't

12 do this type of a solvency analysis without quantifying to some

13 extent the liabilities that have to be paid.

14        MR. PASQUALE:  I'd ask for just the opportunity to

15 ask the witness a few questions in that regard --

16        THE COURT:  All right.

17        MR. PASQUALE:  -- so the Court can hear it from the

18 witness.

19        THE COURT:  Okay.

20             CONTINUED DIRECT EXAMINATION

21 BY MR. PASQUALE:

22 Q    Mr. Frezza, please explain for the Court your experience

23 with respect to valuations.

24 A    Okay.  Prior to joining Capstone, as I mentioned, I was

25 with a firm that rolled up entities.  That entailed -- and I

1 was also the director of due diligence for that entity.  And

2 what that entailed was finding small middle market companies,

3 working through their financial statements and their

4 operations, and then actually putting a value on them to create

5 a tranche of value in order to sell to a strategic buyer.  That

6 entailed a substantial amount of financial due diligence

7 valuing assets not from the perspective of a court expert, but

8 from the perspective of doing the analyses of a valuation

9 person or a -- let's say a financial expert in valuing these

10 companies.

11        Since turning Capstone I've been involved with

12 various cases where valuation work was required, but not an

13 expert opinion.  In terms of valuing liabilities, a liability

14 from an accounting standpoint is that which is owed, and when

15 we say an expert in valuing liability, it's sort of irrelevant

16 from the perspective of a solvency opinion because it's based

17 on stated liabilities.  Those stated liabilities are the stated

18 liabilities of the company.  So, I honestly don't know what Mr.

19 Bernick meant by an expert in valuing liabilities because --

20        THE COURT:  I'm sorry.  Just so the witness is clear,

21 it was not about valuing liabilities, it was about quantifying

22 liabilities.

23 A    Well, if that's the case, quantifying liabilities is a

24 very basic part of financial accounting, quite frankly.

25        MR. BERNICK:  That's the problem.  I mean, these were

**J&J COURT TRANSCRIBERS, INC.**

Frezza - Continued Direct/Pasquale                    268

1  not my -- these were not -- there wasn't a lot of back and

2  forth here.  It was pretty clean.  And, Your Honor, the

3  testimony is going to be, as we're going to see here shortly,

4  he didn't quantify him here.  I mean, he just took somebody

5  else's number because the lawyers told him to.

6          MR. PASQUALE:  Well, that's only one aspect of the

7  work that Mr. Frezza --

8          MR. BERNICK:  If we can have -- I'm sorry.  If we can

9  have an agreement that he won't testify about that, that at

10  least will be progress.

11          THE COURT:  Won't testify about --

12          MR. PASQUALE:  Well, let's be clear.  You have

13  testified -- I'm not sure I follow --

14          MR. BERNICK:  You know, we've made our objection,

15  Your Honor.

16          THE COURT:  All right.  At this point I will accept

17  it because we have the witness here.  So, you're right, Mr.

18  Bernick.  I'll hear it.  But, Mr. Pasquale, I am really

19  concerned.  I am not at all sure that the witness has stated

20  the qualifications necessary to render this opinion.  So, I'm

21  going to hear it, but I may strike it.

22          MR. PASQUALE:  I appreciate that Your Honor, and let

23  me just say one more comment before we get back into the

24  testimony, and that is, an expert witness need not be a

25  professional expert.

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  No, obviously not.

2           MR. PASQUALE:  The fact that it's Mr. Frezza's first

3  time --

4           THE COURT:  That has --

5           MR. PASQUALE:  -- has explained -- I'm sorry, Your

6  Honor.

7           THE COURT:  That has no bearing on this

8  determination.  The problem is that he said in his deposition

9  that he is not an expert.  He does not hold himself out to be

10 an expert in quantifying liabilities.  I don't know how you do

11 a solvency analysis without quantifying liabilities.  So, okay,

12 go ahead.

13 BY MR. PASQUALE:

14 Q    I think the question I left you with, Mr. Frezza, is, in

15 considering solvency of the plan before the Court, on what date

16 did you test solvency?

17 A    Upon the effective date of the proposed plan.

18 Q    And what date is that?

19 A    12/31/2009.

20          MR. BERNICK:  The effective date -- can we be clear

21 that that is -- assumes that the plan has gone into effect?

22          THE WITNESS:  That's correct.

23          MR. BERNICK:  Thank you.

24          THE COURT:  And what date, Mr. Frezza?

25          THE WITNESS:  December 31st, 2009.

Frezza - Continued Direct/Pasquale                    270

1  Q    Did you form an opinion as to whether Grace will be

2  solvent on the effective date of the plan now being considered

3  by the Court?

4  A    I did.

5  Q    What is your opinion?

6  A    That Grace --

7           MR. BERNICK:  Can we just -- sorry.  It would solve

8  the objection problem if he could just say assuming the plan

9  was effective because --

10          MR. PASQUALE:  All of my questions for Mr. Frezza

11 will assume that the plan is confirmed and becomes effective.

12          MR. BERNICK:  Thank you very much.

13 A    Could you repeat your question, Mr. Pasquale?

14 Q    I asked you, I believe, what is your opinion?

15 A    In my opinion, upon the effective date Grace will be

16 solvent.

17 Q    What did you do to form that opinion?

18 A    I did a number of things.  I performed a number of tests

19 that are commonly done in forming an opinion on solvency.

20 Q    Please describe those tests.

21 A    Let me describe the tests.  The three most common tests

22 are the cash flow test -- what is commonly known as the cash

23 flow test or the ability to pay debts as they come due.  The

24 adequate capital test which is more of a qualitative test of

25 considerations -- various considerations that are professional

**J&J COURT TRANSCRIBERS, INC.**

Frezza - Continued Direct/Pasquale                    271

1  we'll take into consideration in forming an opinion.  And

2  finally, a balance sheet test.

3  Q    Let me ask you about each of those, one by one.  Please

4  describe for the Court what is entailed with a cash flow test

5  of solvency.

6  A    A cash flow test is designed -- the professional would

7  approach it by reviewing a cash flow forecast prepared by the

8  company, evaluating whether the forecast makes sense,

9  critically challenging the underlying assumptions, considering

10 sensitivities to that forecast in view of the company's

11 historical performance.  And once you've considered those

12 factors and form an opinion as to whether the company is able

13 to at a particular test date as well as in the future able to

14 meet its obligations as they come due.

15 Q    Is there anything else involved in the cash flow test?

16 A    And that's principally the cash flow test.

17 Q    Please describe for the Court the components, or what you

18 do in performing an adequate capital test of solvency.

19 A    The adequate capital test is more of a qualitative test

20 whereby the professional would consider, for instance, the

21 results of the cash flow test which is more quantitative.  In

22 addition, you would look to see what indicators would allow one

23 to determine whether a company is solvent or insolvent such as,

24 does the company have cash on its balance sheet.  Does the

25 company have access to a revolver in order to fund debts as

1   they come due in excess of cash for instance.  Does the company

2   have credit terms from its vendors.  Does the company have an

3   equity cushion that would be determined based on the balance

4   sheet test which we'll discuss in a moment, and various other

5   factors.

6         One might look at various ratios, as well, whether

7   the company's current assets exceed its current liabilities and

8   so forth.  So, that -- and once you take those data points into

9   consideration, it would allow the professional to form an

10  opinion on whether the company passes the capital test.

11  Q    Thank you.  And you mentioned in passing the third of the

12  test, the balance sheet test, please describe that test for the

13  Court.

14  A    In general, the balance sheet test is a test to determine

15  whether the company -- the company's assets exceed its

16  liabilities at a test date.  And taking that one step further,

17  the balance sheet test can be administered in up to three

18  different ways in its most common form.  Those three methods

19  that could be performed under the balance sheet test include

20  the market approach, the income approach, and the cost

21  approach.

22  Q    I'll stop you there.  Let's break that down.  Please

23  describe for the Court the market approach to the balance sheet

24  test.

25  A    Certainly.  In the market approach the professional would

Frezza - Continued Direct/Pasquale                273

1  analyze peer group companies or guideline companies that are

2  comparable to the company being tested and review, for

3  instance, their enterprise value and compare that to the

4  company's EBITDA, earnings before interest, taxes,

5  depreciation, and amortization.

6         And after reviewing those companies, determine sort

7  of a mean and median multiple of EBITDA to enterprise value of

8  those entities.  In addition, the professional would look to

9  precedent transactions or MNA transactions in the market that

10 would be indicative of a value for the target company or the

11 company being discussed for solvency.

12        And one would take the combination of the results of

13 those two analyses and determine a range of multiples to apply

14 to, for instance, Grace's EBITDA, for let's say all of 2009.

15 And then that would result in what would be called enterprise

16 value.  In the market approach to the balance sheet test,

17 enterprise value is a proxy for the fair value of the assets.

18 when you're performing the balance sheet test in each case, one

19 must look to the fair value of the assets.  Not the book value,

20 but the fair value of those assets in determining whether the

21 company has -- is solvent in terms of assets exceeding

22 liabilities, and by how much those assets exceed liabilities,

23 which is also referred to as an equity cushion.

24 Q    Now, you mentioned also the income approach.  Can you

25 please describe the income approach?

Frezza - Continued Direct/Pasquale                    274

1  A    Sure.  The income approach is an approach whereby you

2  would take the company's detailed financial projections over

3  whatever period is involved -- or available.  Excuse me -- and

4  also taking a terminal value year which is to -- the terminal

5  value year is generally thought to be the normalized income

6  statement performance of a company ad infinitum.

7          And then a professional would perform a discounted

8  cash flow analysis on those projections, including the terminal

9  year, and come up with and apply an appropriate discount

10 factor.  And then determine a -- again, an enterprise value

11 which again would be the proxy for asset value -- fair value of

12 assets.  And then --

13 Q    And finally -- I'm sorry.  Were you finished?

14 A    And then, again, there would be an examination of

15 liabilities against those assets to determine what the equity

16 cushion is on the income approach.

17 Q    Thank you.  And finally is the cost approach.  Can you

18 please describe the cost approach?

19 A    Sure.  Under the cost approach one would take the

20 traditional stated balance sheet as of the test date, in this

21 case 12/31/2009 projected pro forma balance sheet, and one

22 would need to seek to find the fair value of those assets,

23 compare them to the stated liabilities as reported, and

24 determine what the equity cushion is.

25          And the thought under the cost approach is, what

1  would it cost the willing buyer to replace these assets because

2  the book value of a company's assets, depending on the asset

3  class, typically are lower than fair value.  So, one would need

4  appraisals or a business valuation of the assets to determine

5  what the fair value of those assets would be under the cost

6  approach and then compare the stated liabilities on the balance

7  sheet to determine the equity cushion.

8  Q    Let me ask you, Mr. Frezza -- well, a foundational

9  question first.  What is GAAP?

10 A    GAAP stands for generally accepted accounting principles,

11 and it is the codification of accounting principles by which

12 all United States reporting companies, and even companies that

13 don't report, use to record transactions and report their

14 financial statements.

15 Q    And are you familiar with the GAAP principles?

16 A    Yes, I am.

17 Q    How do GAAP principles, if at all, impact a balance sheet

18 test?

19 A    Under GAAP, typically -- well, again, there are 161

20 statements of financial accounting standards that have to be

21 applied.  Many of them are for specific purposes or specific

22 accounting issues, but the entire codification of GAAP requires

23 assets to be recorded on the books at the most conservative

24 value, for instance, the lowest value possible.

25         And just to provide an example, for instance,

1  inventory -- let's say a company has inventory that is a highly

2  traded commodity.  GAAP requires that inventory to be recorded

3  at the lower of cost or market.  So, if the market value of

4  that inventory is actually higher than book value, the book

5  value is used.  If the market value of that inventory is below

6  its cost of the company, then you use the market value only to

7  the extent it does not exceed cost.

8        With respect to property and equipment, a good

9  example is the purchase of real estate for a facility prior to

10 1980 let's say.  And the company functioning now has this real

11 estate, and assuming it's their own environmental issues, if it

12 were to sell it the land value would likely exceed what the

13 company purchased the land and building for because keep in

14 mind when you purchase land and building you're actually

15 depreciating the building and any improvements over a long

16 period of time, so the book value actually declines over a long

17 period of time such that if you were to sell that facility it

18 would likely be -- again, if it was not soiled by environmental

19 issues -- likely be valued higher than its book value.

20       On the liability side, GAAP, again being -- taking

21 the most conservative approach to recording transactions,

22 liabilities have to be at their highest level possible.  Any

23 liability that is likely to be paid and is estimable must be

24 recorded on the balance sheet.  So, a balance sheet reflects

25 all the liabilities that the company could possibly be aware

Frezza - Continued Direct/Pasquale                277

1  of, and as long as they're estimable -- reasonably estimable --

2  they are on the balance sheet.  So --

3  Q    And -- I'm sorry.

4  A    I'm sorry.  So, just to wrap up, GAAP really is the most

5  conservative approach to recording transactions on financial

6  statements.

7  Q    Now, doing a balance sheet analysis of solvency, you

8  mentioned on the asset side fair value of assets is a standard,

9  with respect to liabilities, is that a book value or a fair

10  value or something else?

11  A    The typical language is stated value which would be

12  normally book value.

13  Q    Now, do each of the three tests that you've described, a

14  cash flow test, adequate capital test, balance sheet test, do

15  each of those tests have to be satisfied in order for -- in

16  order to determine that a company is solvent or insolvent as of

17  a specific date?

18  A    No, there's no requirement to perform all three tests.

19  And it also depends on the situation to the extent solvency is

20  very clear versus murky.  A professional who is approaching a

21  solvency analysis would not need to do all three tests and just

22  take into consideration whatever factors are demonstrative of

23  solvency or insolvency.

24  Q    Now, let's turn to Grace specifically.  Did you consider

25  whether Grace is solvent under the cash flow test?

1  A     I did.

2  Q     What did you do?

3  A     I started off with Ms. Zilly's feasability study --

4  feasibility report, and that was the only source of financial

5  projections that I had available to me.  In that report she

6  provides a summary of the company's financial projections.

7  What I did is, in reviewing those projections I analyzed the

8  revenue trend being assumed, the core EBITDA trend being

9  assumed.  I considered the underlying assumptions by deriving

10 them from my analysis in that report.

11        As well as in reading her report, it's very clear

12 that -- very clear -- a number of things are very clear by

13 reading her report.  In looking at the trends being assumed, it

14 was clear to me that the assumptions being used in that

15 forecast are very conservative considering my knowledge of

16 Grace's performance in the past, as well as what she stated in

17 her report, just for some data points, sales have doubled since

18 the company filed, or I should say from the year 2000 to 2008.

19 Core EBITDA has increased by 64 percent from the year 2003 to

20 2008.

21        The company has generated operating-free cash flow of

22 over $1.6 billion in that period, and the company is currently

23 sitting on $622 million, or I should say at the end of June,

24 $622 million of cash.  Very strong performance, and in my

25 analyses of the company's performance over the years, has

Frezza - Continued Direct/Pasquale                 279

1  continuously exceeded -- with the exception of 2008 has

2  continually exceeded its performance -- its budget, excuse me.

3        So, based on my knowledge of the company and my

4  involvement with the company, based on my analysis of the

5  summarized cash flow forecast in her report, and also taking

6  into consideration all the facts and data that she laid out, I

7  completely concurred with her view that the projections are

8  reasonable and easily met.  And quite frankly, I would go as

9  far to say that, you know, that the work that she had done to

10 come up with that view is the same work that I did, or was able

11 to do, to come up with my solvency opinion.

12 Q    Well, let's be clear.  The work that you reviewed of Ms.

13 Zilly was not a solvency report, was it?

14 A    That's correct.  But, it could've been.

15 Q    Please elaborate on that.  What do you mean by you

16 could've?

17 A    Just simply, as I said already, that the analyses and the

18 work performed by me and by Ms. Zilly is the identical work

19 that would be performed if she were to render a solvency

20 opinion.  It's the same thing.

21 Q    And just so we're clear, this is with respect to the cash

22 flow test?

23 A    With respect to the cash flow test, correct.

24 Q    What conclusion, if any, did you draw from the cash flow

25 analysis that you did?

**J&J COURT TRANSCRIBERS, INC.**

1  A    That Grace will be solvent on the effective date and

2  thereafter based on those financial projections under the cash

3  flow test.  It passes the cash flow test.

4  Q    Did you consider whether Grace is solvent as of the

5  effective date under the adequate capital test?

6  A    I did.

7  Q    And what did you do?

8  A    As mentioned earlier, I looked at all the factors that I

9  listed, including the fact that leading up to the proposed

10  effective date, Grace has, with one exception, has really never

11  used its debtor in possession borrowing facility with the

12  exception of the payment to the EPA, I believe, where they had

13  drawn it down, but paid it back very quickly.

14         Other than that, to my knowledge, the company's

15  really never used its DIP facility for any substantial reason

16  other than to provide liquidity for letters of credit

17  requirements.  The company has maintained a very significant

18  cash balance, and while it -- these are periods in time leading

19  up to, they're all indicative of the fact that the company was

20  very strong -- had a very strong financial performance in its

21  ability to generate cash and have capital available to -- where

22  there are bumps in the road -- financial bumps in the road.

23         In addition, we understand that the company's very

24  far along in negotiating with exit lenders.  Generally, lenders

25  aren't going to spend the amount of time that we understand is

Frezza - Continued Direct/Pasquale                    281

1  being spent here if they felt that the company was insolvent.

2  Based on -- to the best of our knowledge, and when I say our

3  knowledge, in the work that I've done over the quarters and

4  over the years, that Grace's vendor community holds it in high

5  regard.  The company continues to get full vendor terms.  So,

6  that providing of credit is an indication that the company is

7  solvent, and the fact that the company has a substantial equity

8  cushion under the balance sheet test.

9  Q    We'll talk about that in a second.  Mr. Frezza, did you

10 draw a conclusion as to whether Grace is solvent under the

11 adequate capital test?

12 A    In my report I concluded that it passed the adequate

13 capital test, yes.

14 Q    Now, did you consider whether Grace is solvent as of the

15 effective date under the balance sheet test?

16 A    I did.

17 Q    Okay.  And how did you perform a balance sheet test as of

18 the effective date?

19 A    As of the effective date.  I started with the company's

20 disclosure statement.  So, first let me say, the approach I

21 took was the market approach.  And I first went to the

22 company's disclosure statement because there were substantial

23 disclosures about how the company arrived at its enterprise

24 value for instance.  And as I mentioned, what a professional

25 would do will seek to find guideline companies, analyze the

Frezza - Continued Direct/Pasquale                282

1 statistics related to those companies, key statistic being its

2 EBITDA multiple or its enterprise values to EBITDA, as well as

3 precedent transactions.

4        It was very clear from the disclosure statement that

5 a substantial amount of work had been done by the company and

6 its advisors to determine guideline companies and precedent

7 transactions.  And one point that I noted in the disclosure

8 statement was the fact that -- it was a very good point -- that

9 the company indicates the key -- a key to the success of this

10 test is the appropriate selection of the guideline companies

11 such that we're certain that those guidelines -- those

12 guideline companies are appropriate in comparing them to the

13 various businesses within Grace, and in my opinion, who better

14 to make that decision but the company.

15       And it's completely appropriate for a professional to

16 rely on other professional's analyses to determine, for

17 instance, what enterprise value is.  So, I used the disclosure

18 statements enterprise value to determine what the proxy for

19 fair value of the assets were under the market approach of the

20 balance sheet test.

21 Q    Did the disclosure statement provide amounts, figures,

22 that you could use in determining -- in applying a balance

23 sheet test under the market approach?

24 A    It did.  It did.  Yes.

25 Q    Please explain what you did.

Frezza - Continued Direct/Pasquale                    283

1   A    Okay.  So, once I felt comfortable with the fact that I

2   had the appropriate proxy for fair value of assets under the

3   market approach of the balance sheet test, I reviewed the

4   company's balance sheet -- pro forma balance sheet at 2009 and

5   looked through the liability section to determine which

6   liabilities should be deducted from enterprise value.  And in

7   doing so, the liabilities that I would deduct from enterprise

8   value were the same that were included in the disclosure

9   statement.  And I created an analysis to that effect and --

10  Q    You created a chart --

11  A    I created a chart that was --

12  Q    -- and that was included in your expert report?

13  A    It was included in my expert report, yes.

14        MR. PASQUALE:  Your Honor, may I approach the

15  witness?

16        THE COURT:  Yes.

17  Q    Mr. Frezza, I've just shown you what we've marked for

18  identification purposes as CCBLG Exhibit 41.  Is this the chart

19  that you've prepared?

20  A    It is.

21  Q    Okay.  Can you tell us what this chart demonstrates?

22  A    Sure.  As I mentioned, it's typical to do a range of

23  values because it's not -- these types of analyses are not that

24  precise such that it's one number.  So, the --

25        MR. BERNICK:  I'm sorry.  Just so I don't have a

1 waiver issue.  We object to all testimony regarding his

2 ultimate opinions insofar as numbers are concerned, as

3 irrelevant as well because he's measuring the wrong thing.

4 He's measuring the assumed effect of an assumed to be modified

5 plan, and that has no relevance to any issue before the Court.

6 And I just wanted to make sure that I've got that objection,

7 and can I have a continuing objection on those grounds so I

8 don't have to --

9             THE COURT:  That it's --

10            MR. BERNICK:  Thank you.

11            THE COURT:  -- a soon to be modified plan?  I'm

12 sorry.

13            MR. BERNICK:  Assumed to be --

14            THE COURT:  Oh, assumed.

15            MR. BERNICK:  -- modified and effective plan.  He

16 assumes that a plan becomes effective, and it's not the one

17 that's before the Court.  So --

18            MR. PASQUALE:  Well, I -- I'm sorry.

19            MR. BERNICK:  I'm sorry.  So, we object on relevance

20 grounds and we'd like to have a continuing objection.

21            THE COURT:  You have that continuing objection.

22            MR. BERNICK:  Thank you.

23            MR. PASQUALE:  I think -- just for the record, Your

24 Honor, I think Mr. Bernick's mistaken, and as the witness will

25 explain.  And in any event, I think that's a subject he can

1  cross examine the witness on.

2  BY MR. PASQUALE:

3  Q    So, Mr. Frezza, please explain what your chart

4  demonstrates.

5  A    Sure.  So, as we discussed, the disclosure statement was

6  very clear on its approach which it would be considered the

7  market approach to determining enterprise value which would be

8  the proxy for the fair value of assets under that balance sheet

9  test.  And the disclosure statement indicated that a range of

10  2.1 billion to 2.5 billion represents the enterprise value of

11  Grace, which again is the fair value of those assets.

12         The next step in looking at the balance sheet, only

13  selected liabilities are deducted from enterprise value to

14  determine an equity cushion under this approach which -- so

15  the --

16  Q    Let me stop you, Mr. Frezza.

17  A    Yes, sure.

18  Q    I'm sorry.  When you say looking at the balance sheet,

19  what did you look at?

20  A    Just using the company's second corrected Exhibit 12 to

21  the POR.  On the last page there are historical and projected

22  balance sheets, and I used the projected 2009 balance sheet.

23         MR. PASQUALE:  Your Honor, what I put on the ELMO,

24  and I had -- you have copies, is Exhibit -- Plan Proponents

25  Exhibit 277.12.  If Your Honor would like a copy I'll

Frezza - Continued Direct/Pasquale                     286

1  certainly --

2           THE COURT:  Please.  Thank you.

3  Q    And specifically, it is the very last page of that

4  exhibit?

5  A    That's correct.

6  Q    Mr. Frezza, is this what you were just referring to in

7  your testimony?

8  A    It was.

9  Q    Okay.  So, I interrupted you.  You were starting to

10 explain the liability section of the chart there.

11 A    Correct.  So, because you're starting out with enterprise

12 value, you don't take a GAAP balance sheet approach to

13 deducting liabilities, and I'll explain what I mean by that.

14 For instance, certain liabilities such as current liabilities,

15 accounts payable, accrued expenses and anything considered

16 current liabilities are already considered within the

17 enterprise value because there's a notion that the enterprise

18 value takes into consideration with the networking capital of

19 the company.  And when I say networking capital, that typically

20 means current assets minus current liabilities.  So --

21 Q    Well, then, let's -- I'm sorry, Mr. Frezza.  Let's go down

22 the balance --

23 A    Sure.

24 Q    -- sheet then, which is the 277.12, and first, just so

25 we're clear, which of the balance sheets set forth here, which

1  did you rely upon for purposes of the market approach to the

2  balance sheet?

3  A    It's projected December 31st, 2009 balance sheet.

4  Q    I'm sorry.  December 31st, 2009?

5  A    Yes.

6  Q    Okay.  And that's the second to last column on the exhibit

7  on the balance sheet?

8  A    Second from the right on the last page of the exhibit,

9  yes.

10  Q    Thank you.  Okay.  So, let's look at the liabilities --

11  liability section of that balance sheet.  And let's first focus

12  on the top section, current liabilities.  Are the current

13  liabilities included in the liabilities that you considered

14  with respect to the market approach to the balance sheet test?

15  A    Those liabilities are not listed below enterprise value

16  because they're already considered in the enterprise value,

17  again, because there's a notion that it includes the networking

18  capital of the company and its valuing of the assets.

19  Q    Okay.

20  A    So, those are not deducted under this approach.

21  Q    So, we don't find them on your chart?

22  A    So, they're not on my chart.

23  Q    Okay.  Let's look at the next section, and let's take

24  these one at a time.  Debts payable after one year.  Is that  a

25  deduction that you included in your market approach?

Frezza - Continued Direct/Pasquale                    288

1  A    That's correct.   That's a billion dollars of funded debt

2  that would have to be deducted from enterprise value to

3  determine equity cushion.

4  Q    So, on the chart it's called funded debt upon emergents,

5  is that right?

6  A    Correct.

7  Q    Okay.  Why use a different terminology there?

8  A    Just to be consistent with the disclosure statement.  You

9  know, just --

10 Q    That was the terminology used in --

11 A    Yes.  These are the terms used in the disclosure

12 statement, so it was just to be consistent.

13 Q    Okay.  The next item is a deferred payments, 395 million.

14 And is that --

15 A    That is also listed as a deduction, and it's referred to

16 as deferred payment agreements.

17 Q    Okay.  The next item is deferred income taxes, is that

18 included?  Let me be clear.  Let me withdraw that question.

19 Deferred income tax, is that an item that you deducted from

20 reorganize enterprise value?

21 A    It's not because, again, there are substantial deferred

22 income tax assets, and as a result of having a proxy for those

23 deferred value of those assets under enterprise value, it's

24 considered -- it's already considered, so you wouldn't deduct

25 it.   It would be a theoretical double count if you did.

1  Q    The next item is minority interest.  Is that a deduction?

2  A    That is a deduction and it is listed on the chart.

3  Q    And let's take the next two together.  They both pertain

4  to define benefit pension plans.  Are those amounts deductions

5  from reorganize enterprise value on your chart?

6  A    That -- those two together are not for a couple of reasons

7  because, again, pension liabilities are based on actuarial

8  calculations of plan value because there are plan assets that

9  offset plan liabilities.  These represent an underfunding of

10 the plan due to low asset value that is reconsidered every

11 year.

12        And in addition, the related pension expense that is

13 a component or directly related to these liabilities is already

14 considered an EBITDA.  And as we mentioned, the way we come up

15 with enterprise value is a multiple applied to EBITDA.  So,

16 again, it's theoretically taken into consideration in the

17 enterprise value, so it wouldn't be deducted.

18 Q    The last item in that section is other liabilities.  Is

19 that a deduction that you made from reorganize enterprise

20 value?

21 A    That is not, and again, the thought is that the related

22 expense is already considered in enterprise value.

23 Q    Now, I think we can take the entire next section in one

24 lump sum.  Liabilities subject to compromise, is that a

25 deduction?

1  A    I took the entire amount because those are debts that have

2  to be paid over time.

3  Q    Okay.  So, they are a deduction from reorganize

4  enterprise --

5  A    They are a deduction because they're not considered

6  anywhere else.

7  Q    Mr. Frezza, the bottom line, total liabilities figure for

8  the 2000 -- excuse me -- projected December 31st, 2009 balance

9  sheet is a $2.9 billion number, do you see that?

10  A    I do.

11  Q    And the total reductions on your chart using the market

12  approach is low, mid and high, but they're just under 1.7

13  billion?

14  A    That's correct.

15  Q    Okay.  And how do you explain that difference just in sum?

16  A    Again, because the calculated enterprise value, which is a

17  proxy for the fair value of those assets, already considers

18  certain of these liabilities, so you wouldn't deduct them

19  again, so we don't want to have a double count here.  So, you

20  wouldn't have a 2.9 billion of liabilities deducted from the

21  enterprise value because it's just not intuitive.  It's not how

22  the calculation and the analysis is done.  So --

23  Q    So, let's go back to your chart then.  We've now discussed

24  the proxy -- excuse me -- the liability section, the deductions

25  from reorganized enterprise value.  Please explain the bottom

Frezza - Continued Direct/Pasquale                    291

1  line, the reorganized equity value and what that represents?

2  A    As I mentioned earlier, this test is designed to determine

3  whether the fair value of assets exceeds stated liabilities,

4  and the equity cushion, therefore, represents that asset value,

5  fair value of assets, in excess of stated liabilities which

6  indicates that there's a substantial equity cushion at the

7  effective date.

8  Q    When you say there's an equity cushion as of the effective

9  date, did that inform a conclusion that you formed with respect

10 to whether Grace would be solvent under the market approach as

11 of the effective date?

12 A    It does.  Under the market approach of the balance sheet

13 test, that indicates that the company is solvent.

14 Q    Now, did you perform a balance sheet test applying the

15 income approach as of the effective date, December 31st, 2009?

16 A    Sorry?  Restate the question?

17 Q    Let me try that again.  Did you perform a balance sheet

18 test applying the income approach as of the effective date?

19 A    I did not.

20 Q    And why not?

21 A    Because, again, having the -- one would need detailed

22 financial projections over a period of time to determine that

23 and I didn't have -- while there was a summary, set of summary

24 projections, in Ms. Zilly's report, I did not have access to or

25 I did not have available to me those -- any projections that

1  would have allowed me to do a discounted cash flow approach.

2          MR. BERNICK:  I object to that, Your Honor.  This now

3  gets into a whole history of the information room that was made

4  available and I don't really think it's an appropriate thing

5  for an expert to testify to.  He can't testify to facts he

6  doesn't know about.  He can say that he didn't have it, but to

7  say that it wasn't available goes beyond his factual knowledge.

8          THE COURT:  Okay.  That's sustained unless you can

9  substantiate that he had knowledge on his own.

10          MR. PASQUALE:  Your Honor, I'm actually --

11  Q    You didn't do that test, did you?

12  A    I didn't do that test.

13  Q    Okay.  Did you perform a balance sheet test applying a

14  cost approach with respect to this plan as of the effective

15  date?

16  A    With respect to this plan, I did not.  Again --

17  Q    And why not?

18  A    Because you would need -- as I mentioned earlier, under

19  the cost approach, you would look at -- you would take a more

20  traditional balance sheet, but -- like this GAAP balance sheet,

21  but you would need -- one would need to determine the fair

22  value of those assets as stated on the GAAP balance sheet and

23  that would require either having had an independent third party

24  business valuation or set of appraisals on individual assets.

25  Again, for instance, if there were appraisals available on

1  facilities, the myriad of facilities that Grace owns, whether

2  there would also be, to the extent available, when one would

3  require appraisals of intellectual property and other

4  intangible property, and that I did not have.

5  Q    Now, in addition to the tests that you've already

6  described, were you also asked by counsel to consider Grace's

7  solvency under any specific assumptions?

8  A    Yes.  I was asked by counsel to substitute the --

9  substitute Grace's experts' median asbestos PI claim liability

10 estimate of -- I want to say -- I forget -- four sixty eight to

11 substitute that amount for the amount in the currently proposed

12 plan.

13 Q    What, if anything, did you conclude from that analysis?

14 A    Well, based on the work that I had done, had that level of

15 liabilities been at issue, and assuming other components of the

16 current plan, such as the Fresenius and Sealed Air settlement

17 amounts been available, as well as with insurance, that Grace

18 would be solvent in that case, as well.

19 Q    Now, with the various methods that you used in determining

20 whether Grace is solvent under a plan before the Court as of

21 the December 31st, 2009 effective date, is any one method

22 preferable to the other?

23 A    No.  All of these methods are probative.  You know, the

24 desire is to have as many tests performed as possible and have

25 as much data available to the professional to do it, but there

Frezza - Cross/Cobb                              294

1 is no one best way to do it and there's no stipulation that all

2 three have to be done.  So, there's no best, one best, plan --

3 I'm sorry -- approach.

4          MR. PASQUALE:  Nothing more at this time, Your Honor.

5 We pass the witness.

6          THE COURT:  Mr. Cobb?

7                    CROSS EXAMINATION

8 BY MR. COBB:

9 Q    Mr. Frezza, in producing your opinion with regard to

10 Grace's solvency as of 12/31/09, under the balance sheet test

11 using the market approach, what was the range of values that

12 you discovered that Grave's assets will exceed its liabilities?

13 A    The resultant numbers were 430 million to 821 million.

14 Q    Now, in performing any of the tests -- and let me step

15 back and be more specific.  In forming the cash flow test to

16 determine Grace's solvency as of 12/31/09 under this plan,

17 assuming it's effective, did you need to quantify any

18 liabilities?

19 A    No.  You just needed to take the stated liabilities from

20 the company's balance sheet.

21 Q    And that's an accepted expert methodology --

22 A    Yes.

23 Q    -- of determining solvency?

24          MR. BERNICK:  Objection.

25 A    Yes.

1           MR. BERNICK:  Objection.  Leading.

2           THE COURT:  It's leading.  Sustained.

3           MR. COBB:  I'm sorry, Your Honor.

4           MR. BERNICK:  He already answered it.  Go ahead.

5  It's not worth it.

6           THE COURT:  Well, if he did, I didn't hear it so --

7           MR. BERNICK:  It's just simply --

8           MR. COBB:  Your Honor, I'm going to try this again

9  with the second test --

10           THE COURT:  All right.

11           MR. COBB:  -- we'll get the timing right.  We're all

12  ready now.  Okay?

13  Q    With the second test you performed, Mr. Frezza, to

14  determine Grace's solvency as of 12/31/09 under the plan before

15  the Court, assuming it's confirmed and it goes effective, that

16  is the adequate capital test, did you need to quantify any

17  liabilities in issuing your opinion?

18  A    No.

19  Q    And why is that?

20  A    Because it's not the accepted method under the -- there's

21  nothing under the adequate capital test that requires anyone to

22  value liabilities.

23  Q    Okay.  And then lastly, under the balance sheet test where

24  you used the market approach to value assets, and you issue an

25  opinion that as of 12/31/09, under this plan, assuming it's

1  confirmed and goes effective, did you need to quantify any

2  liabilities in order to reach your -- in order to issue your

3  opinion?

4  A    No.  The rule is using stated liabilities at the test

5  date.

6           MR. COBB:  Thank you.

7           MR. BERNICK:  Okay?

8           MR. COBB:  All yours.

9           MR. BERNICK:  Well, hardly.

10                    CROSS EXAMINATION

11  BY MR. BERNICK:

12  Q    Different board.  Mr. Frezza, all of your work -- can you

13  hear this?  I'm sorry.  Can you hear it?  All of your work

14  assumes that a plan has gone effective and that plan is the

15  agreed plan that is now before the Court, but with a change,

16  right?

17  A    Not exactly correct, because my conclusion clearly states

18  also --

19  Q    Okay.  Well, if that's not true --

20  A    I'm sorry.

21  Q    -- then I'll withdraw the question.

22  A    Okay.

23  Q    I'll get to it a different way.  Grace has done analyses

24  which assume that the plan that actually is before the Court,

25  the agreed plan, has gone effective, correct?

1  A    Correct.

2  Q    You gave us three different methodologies for conducting

3  your solvency analysis.  One, as I understand it, is the

4  balance sheet, the other, as I understand it is the --

5  A    Cash flow test?

6  Q    Yeah, kind of pay debt side.  You have sufficient money to

7  pay debts?

8  A    Correct.

9  Q    So, I've got that down here as "pay debts".  And the third

10 one that you talked about was the reorganized equity value.

11 A    Adequate capital test.

12 Q    Okay.  But, in fact, you end up determining what the

13 equity value is, correct, and reorganized --

14 A    Can I just correct you?  If the equity value, the equity

15 cushion, is determined under the balance sheet test, it would

16 be a data point under the adequate capital test.  That's all.

17 Q    Okay.  So, adequate capital.  That's fine.

18 A    Now, in fact, it's true, is it not, that Grace has gone

19 ahead and determined what the balance sheet pro forma looks

20 like if this plan goes effective as it's currently stated,

21 right?

22 A    On a GAAP basis, yes.

23 Q    Okay.  On a GAAP basis, they've gone ahead and actually

24 conducted and done the balance sheet on a pro forma basis,

25 right?

1  A    Correct.

2  Q    Okay.  Grace has gone ahead and done, and it's disclosed,

3  the capitalization of a reorganized Grace, right?  You -- it's

4  right in the disclosure statement, you took it?

5  A    Correct.

6  Q    And Grace has gone ahead and done a feasibility analysis

7  -- actually, Ms. Zilly has done a feasibility analysis, right?

8  A    Correct.

9  Q    So, when it comes to all three different approaches that

10 you have focused on, Grace has addressed in the expert work

11 that Ms. Zilly has done and in the exhibits to the plan, the

12 very same things that you're talking about with respect to the

13 plan that's actually before the Court, correct?

14 A    Not completely.  If I may?

15 Q    Sure.

16 A    With respect to the adequate capital test, that wasn't

17 laid out anywhere, the credit terms with vendors and, you know,

18 there are data points that have to be accumulated, cash

19 balance, availability of debt capital.  So, I just wanted to be

20 precise, so I don't think Grace did an adequate capital test

21 that's disclosed anywhere.

22 Q    Well, but you don't know.  All you know is that the

23 results -- they have done work and they have displayed the

24 result showing the capitalization of Grace post-effective date,

25 correct?

Frezza - Cross/Bernick                              299

1  A    Yes.  They have made sufficient data available.

2  Q    Right.  And you used that, right?

3  A    Sure.

4  Q    Okay.  And you used the balance sheet, right?  The pro

5  forma balance sheet, you used in your work?

6  A    Sure, as a basis for --

7  Q    Right.

8  A    -- one of the tests, correct.

9  Q    Okay.  And you used Ms. Zilly's feasibility analysis,

10 true?

11 A    I used it to have data available to do my own analysis.

12 Q    I'm not criticizing you.  I just want to get the facts.

13 A    Oh, okay.  I just want to be precise.

14 Q    I just -- I want to be very precise.

15 A    Okay.

16 Q    As a matter of fact, you borrowed -- for whatever reason,

17 you borrowed Grace's pro forma balance sheet and assuming that

18 the plan goes effective, it's capitalization presentation

19 assuming that the plan goes effective, and Ms. Zilly's

20 feasibility analysis assuming that the plan goes effective.

21 Right?

22 A    Correct.

23 Q    Okay.  So, let's now talk about what you did.  Okay?

24 A    Okay.

25 Q    What you did.

1  A    Okay.

2  Q    You have come in and you have said, I want to assume that

3  the agreed plan has, as the asbestos liability, the Florence

4  estimate, correct?

5  A    Correct.  This is one aspect of what I did.  Yeah.

6  Q    Well, I understand that.  But, actually, that is the huge

7  driver of your analysis of the balance sheet and

8  capitalization, correct?

9  A    Incorrect.

10        MR. PASQUALE:  Objection, Your Honor.

11 Q    Well, let me get it this way.  You did assume that we now

12 have an agreed plan that has -- that replaces the asbestos

13 liability with the Florence estimate, correct?

14 A    I had my --

15        MR. PASQUALE:  Objection, Your Honor, that misstates

16 the testimony.

17        THE COURT:  All right.  Can the witness explain?

18        MR. BERNICK:  Sure.

19 A    One of the aspects of my report was to do an analysis,

20 hypothetical analysis, if a plan that had a lower liability

21 than the plan before us, under the balance sheet test.  So, in

22 my report, a lot of the work that I had done was focused on

23 your description with the Florence estimate.  But, I only did

24 that on the balance sheet basis.  The other tests --

25 Q    I'm going to get to them.

Frezza - Cross/Bernick                    301

1  A    Okay.  I thought you were --

2  Q    I'm just talking about the balance sheet.

3  A    I'm sorry.  I thought you --

4  Q    Oh, okay.  No, I'm sorry.

5  A    -- were pointing to the adequate --

6  Q    With respect to the balance sheet, is it fair to say, as

7  you've testified --

8  A    Absolutely.

9  Q    Okay.  Right.

10  A    That's correct.

11  Q    So, when it comes to what you did regarding the balance

12  sheet, you took the Grace balance sheet, you didn't do your own

13  balance sheet, correct?

14  A    Correct.  But we --

15  Q    Just one at a time.

16  A    Correct.

17  Q    And you assumed that the agreed plan, the plan would go

18  effective, except that the Florence estimate for liability

19  would be substituted for what the plan spelled out as being the

20  payments made to the personal injury claimants, correct?

21  A    Correct.

22  Q    Okay.  So, that was the principle -- and then you made

23  some adjustments to the rest of the balance sheet in

24  consideration of that change?

25  A    Correct.

1  Q    Okay.  So that to state it completely, that you assume in

2  the balance sheet that the plan of reorganization remains

3  intact.  It's consensual.  PI signs on -- that's the personal

4  injury people sign on -- except that there's a modification,

5  and the modification is that you substitute for the personal

6  injury liability that would otherwise have to be funded or the

7  payment that would otherwise have to be made for the benefit of

8  personal injury claimants, you substitute for that amount of

9  the median estimate of asbestos liability that was developed by

10  Mr. Florence.  Did we get all that right?

11  A    Correct.

12  Q    Okay.  So, the guy on the street, and I think I went on to

13  ask you, the world that you're thinking about happening is that

14  that plan goes effective, but when it goes effective, everybody

15  is consensual.  You know, Fresenius is there.  Sealed Air is

16  there.  Everything is hunky dory and they've all agreed that

17  the amount that's going to be paid to the asbestos personal

18  injury claimants instead of being what's in the plan that we

19  have, is the Florence estimate.  Did I get that right?

20  A    Yes.

21  Q    Okay.  And then you -- based on that assumption, you've

22  now effectively assumed that there was a modified agreed plan,

23  right?

24  A    Yes.

25  Q    And you now say, okay, what does the balance sheet look

1  like, right?

2  A     Correct.

3  Q     Have I captured now the essence of what you did?

4  A     Perfectly.

5  Q     Okay.  Now, you've assumed also, when it comes to the

6  adequate capitalization analysis, what you did that was

7  different is that, once again, you assume the same thing; that

8  is, that the agreed plan is now a different agreed plan, it

9  includes the Florence estimate, correct?

10 A     That's incorrect.  No.

11 Q     That's incorrect, you didn't do that?

12 A     No.

13 Q     Okay.  Tell me how what you did with regard to the

14 liability that you're assuming -- the plan, when it goes

15 effective and the capitalization analysis that's associated

16 with that provides -- Grace's GAAP provides that the

17 restructured reorganized debtor is affected by an obligation

18 that's set forth in the plan, correct?  Do I have it right so

19 far?

20 A     Could you restate that?

21 Q     Yes.

22 A     I'm not sure I got it all.

23 Q     The capitalization presentation that's in the disclosure

24 statement, that presentation that's actually there assumes the

25 plan that's actually before the Court, correct?

1  A    Correct.

2  Q    And you now, in connection with your own capitalization

3  analysis work assumed, once again, that Grace does not have to

4  pay that liability.  It only has to pay the liability as Dr.

5  Florence has estimated, correct?

6  A    I did that test under both the Florence estimate plan, as

7  well as the plan before the Court, and they're both on the same

8  page and this is what it is.

9  Q    Okay.  That's fine.

10 A    Okay.

11 Q    Okay.  But, the difference between the way that you get to

12 your solvency analysis or the adequate capitalization that's

13 different from what Grace has done is that one of your analyses

14 uses -- you're pursing your lips like you're going to disagree

15 but let me get the question out first -- one of your analyses

16 assumes that the Florence estimate is the agreed liability,

17 correct?

18        MR. PASQUALE:  Your Honor, I object.  It's not at all

19 what he testified to on direct.

20        THE COURT:  Well, I think he just said that he did it

21 two ways, one making that assumption and one not.

22        MR. PASQUALE:  Right.

23 Q    Is that right?

24 A    But, you keep referring to the adequate capital test.  If

25 I could just be precise?  This --

1        THE WITNESS:  -- and I'm showing Mr. Bernick the

2   chart that was provided to me.

3   Q    41.

4   A    Just to be precise --

5   Q    Yes.

6   A    -- that is the market approach to the balance sheet test.

7   So, let's leave off -- you keep pointing to adequate capital

8   and that's what's giving me pause.

9   Q    Okay.

10  A    That's all.  That's all.

11  Q    I see.  But when it comes to adequate capital, you did

12  make the assumption in one of your analyses to show solvency

13  that the Florence estimate was agreed in the plan, fair?

14  A    Not for the adequate capital test.  If you look at my

15  report, the adequate capital test, I made observations about

16  how much access to capital Grace has, in general.

17  Q    Oh, okay.

18  A    That's all.

19  Q    So, maybe I got it wrong.

20  A    That's all.

21  Q    Did you assume that this plan simply goes effective as it

22  was?

23  A    For the adequate capital test?

24  Q    Yes.

25  A    Yes.

1  Q    Okay.  Okay.  So, now, the plan goes effective according

2  to its terms and, lo and behold, there's adequate capital, is

3  that your opinion?

4  A    Yes.

5  Q    Okay.  That's terrific and that's something that Grace

6  agrees about, too, right?

7  A    Yes.

8  Q    Okay.  And the plan goes effective and Ms. Zilly's

9  analysis of feasibility is done and you agree with that, too?

10 A    Yes.

11 Q    And I don't see that you actually did any work to do

12 anything other than say, you concur with Ms. Zilly, right?

13 A    Well, as I just testified.

14 Q    Right.

15 A    I just testified that I took those projections that were

16 included --

17 Q    Right.

18 A    -- in her report and came to my own conclusions about the

19 reasonableness of the assumptions.  Again, based on my history

20 with the company over the last four years, the fact that -- can

21 I just give you an example of how I would have disagreed?

22 Q    Well, actually, what I'm really kind of getting to --

23 A    Okay.  I'm sorry.

24 Q    I appreciate --

25 A    It's just simply -- I actually did work.

1  Q    Okay.  I'm not --

2  A    That's all I'm saying.

3  Q    I used the wrong word.

4  A    Right.

5  Q    I know you did work.  I know that from your deposition.

6  You're clear in your testimony and I think you testified

7  truthfully, and that's not the issue whether you're testifying

8  truthfully in the case.  You did a lot of work maybe, but at

9  the end of the day, you did not do your own feasibility or pay

10 debts analysis.  You took the work that Ms. Zilly had done,

11 kicked the tires hard, and basically you concurred with her.

12 Fair?

13 A    I concurred with her, but I disagree that I didn't do my

14 own work is all.

15 Q    You didn't do your own feasibility --

16 A    I was --

17 Q    I don't see any different feasibility numbers from hers.

18 A    Right.  You mean solvency?  I didn't do a feasibility

19 test.

20 Q    Well, I mean, Ms. Zilly did a feasibility test.  You then

21 took her work and said, does it answer the question of the

22 ability to pay debts and you concluded that it did?

23 A    Absolutely.

24 Q    And in doing so, you didn't set out a different analysis

25 about why it was that the company would be able to pay debts,

1  correct?

2  A    Correct, but that would be inconsistent with the cash flow

3  test.  Why would I do a different test?

4  Q    I didn't ask you whether it would.  The point is that you

5  didn't do -- you have no separate analysis that I see in the

6  report, right?

7  A    That's correct.

8  Q    Okay.  Likewise on adequate capitalization.  I don't see

9  -- I see no separate analysis in the report, correct?

10  A    Well, with adequate capital, again, as I mentioned a

11  little while ago, that the adequate capital test is more a

12  qualitative -- a qualitative analysis, if you will, considering

13  factors, and I do list those factors.

14  Q    I'm sorry?

15  A    I do list those factors in my report.

16  Q    Yeah, but I don't see -- I don't see that --

17  A    In my report.

18  Q    I'm sorry.  But, I don't see -- oh, so, you say it's

19  qualitative.  The factors are there, so you analyzed the

20  factors?

21  Q    That's -- so, this is not quantitative then, adequate

22  capital?

23  A    It's not, no.

24  Q    Okay.

25  A    Adequate capital is not a quantitative test.

1  Q    Okay.  Okay.  It's not quantitative.  Well, I want to come

2  back to this balance sheet because most of the work that's in

3  your report focuses on the balance sheet.  Fair?

4  A    Fair.

5  Q    Okay.  And we now know what your contribution was which is

6  this assumption, and we can see, in fact, in the tables that

7  you presented you're very careful, and at Page 9 of your report

8  -- I'm zooming and it's not zooming, I guess, because I'm

9  pressing the wrong side.  Okay.  So, in Page 9 of your report,

10 you take the Grace pro forma, right?

11 A    Correct.

12 Q    And then you make certain adjustments and then you have

13 the Capstone pro forma, right?

14 A    Correct.

15 Q    And if we look to what's different, we can see in the

16 second column that there are two big differences, right?

17 A    Correct.

18 Q    You assume that there's more cash in investments

19 available, 391 million versus 118, and we assume that the debt

20 that's payable down the road is much smaller than what's

21 actually in the pro forma, right?

22 A    Correct.

23 Q    And those two adjustments, those are the biggies, right?

24 A    Those are the only two.

25 Q    Right.  Those two adjustments are simply the mechanical --

1  not the mechanical; I won't say that.  They are the carefully

2  considered implementation of a simple substitution which is the

3  Florence estimate for the agreed liability in the plan,

4  correct?

5  A    Correct.

6  Q    Okay.  And that's the heart of the thing, isn't it?  We

7  can see that, on the balance sheet -- excuse me -- on the

8  market -- the other one that you did, CC41, it's the same basic

9  deal.  You take what Grace's presentation is, which assumes

10 cash on emergence of 144 million, and you show that cash upon

11 emergence is actually much greater, 561 million.  Likewise,

12 deferred payments are 395 under the Grace analysis -- or the

13 Grace analysis, whereas with respect to your assumption, the

14 deferred payments are only 23 million, right?

15 A    Correct.

16 Q    And that again is the simple -- is the careful

17 implementation pursuant to GAAP of the simple assumption that

18 the agreement as to the Florence estimate as opposed to the

19 estimate that -- the liability that's agreed in the plan.

20 True?

21 A    Well, not pursuant to GAAP, but true if you remove that.

22 Okay.

23 Q    I'll accept that correction.  Again, very careful.  Forget

24 about GAAP.  This, again, is essentially the same kind of

25 careful implementation of this one simple assumption.  Fair?

1  A    Fair.

2  Q    Okay.  Now, let's be clear about that one simple clear

3  assumption.  That was an assumption as to which?

4  A    Which test?

5  Q    No.

6  A    Oh, I'm sorry.

7  Q    The idea, the assumption that was made in both cases where

8  you assume that the Florence estimate was the agreed number

9  instead of what's actually in the plan, isn't it true that the

10 decision to put into a consensual plan balance sheet a disputed

11 number, that decision is one as to which there is no

12 established convention or methodology within your expertise

13 that says that it's right?  Well, let's be clear.

14 A    Could you restate it again?

15 Q    The Florence estimate was intensely disputed, was it not?

16 A    That I don't know.

17 Q    You don't know that the Florence estimate --

18 A    I'm sure it was.  Again, I did not follow closely the

19 various disputes among the experts.

20 Q    I want you to assume it was disputed --

21 A    That's fine.

22 Q    -- and I think we'll go back to your deposition and find

23 it.

24 A    Okay.  That's fine.

25 Q    At least at that time you thought it was.

Frezza - Cross/Bernick                    312

1  A    Yeah.

2  Q    But, assuming that it was disputed, you're not aware of

3  any convention or methodology in your area of expertise that

4  says that it's right to substitute into a pro forma agreed

5  plan, a disputed estimate, correct?

6  A    Correct.  But, I mean, you don't need an expertise to do

7  that or not do that.

8  Q    Right.  You don't need an expertise to make this

9  assumption or substitution that you made, right?  They're not

10 going to help you so --

11 A    No.  Just -- yeah.  To make that a substitution, no, you

12 don't need an expertise to make that substitution.

13 Q    Right.

14 A    But, the analysis, you do.

15 Q    No, no.  I'm just talking about the assumption.

16 A    Okay.  Yeah.  The assumption doesn't require --

17 Q    You're not saying here as an expert that that assumption

18 constitutes the exercise of any of your expertise, right?

19 A    Correct.

20 Q    You're not even expressing an opinion as to whether that

21 assumption is proper or not, right?

22 A    Right.

23 Q    In fact, the assumption was simply given to you by

24 counsel, right?

25 A    Counsel asked me to prepare an analysis based on that

1  assumption.

2  Q    Based upon that assumption.  Okay.  I'd like to test that

3  assumption a little bit.  That's something that you, within

4  your field, do from time to time, right, is to test assumptions

5  and put things to facts and --

6  A    Critically challenge.

7  Q    -- you do verifications.  I'm sorry?

8  A    Critically challenge.

9  Q    Critically challenge.  Let's critically challenge this for

10  just a moment by focusing on the historical facts as you

11  understood them, the actual historical facts.  You're assuming

12  that everybody would agree to a plan with a different number.

13  That's your assumption, right?

14  A    That's correct.

15  Q    So, this is still agreed and the Sealed Air money is still

16  there and the Fresenius money is still there, everybody agrees

17  and they're just agreeing to a number, right?

18  A    Right.  That's the assumption.

19  Q    Okay.  So, if you critically analyze that and take a look

20  at the events, there are facts that are available to you, are

21  there not, within the historical events leading up to this

22  plan?  You can use the historical events leading up to the plan

23  to test and critically challenge your assumption, correct?

24  A    Correct.

25  Q    Okay.  Now, did the lawyers ask you to do that?

**J&J COURT TRANSCRIBERS, INC.**

1  A    To critically challenge the assumption they asked me to

2  use?

3  Q    Yes.

4  A    No.  Well, you know about the market facts that are

5  relevant, do you not?  Let me just give them to you.  You know

6  that in April of 2008, which is when the plan deal was done,

7  you know then that the issue of estimated liability was hotly

8  contested, correct?

9  A    Correct.

10 Q    You knew at the time that there was a wide range of

11 estimated liability, right?

12 A    Correct.

13 Q    You knew at the time that, depending upon which estimate

14 was accepted, the company would be solvent or insolvent,

15 correct?

16 A    I'm sorry?  Say that one more time?

17 Q    You knew that, depending upon which estimate was accepted

18 while the deal was being negotiated, you got a big contest

19 about what the number is, and depending upon who wins that

20 contest, which number is accepted, the company would be solvent

21 or insolvent.  You knew that, correct?

22 A    Correct.

23 Q    You agree that nobody, on the basis of any established

24 accounting methodology or valuation methodology could have

25 predicted at that time, before the plan was actually put

1 together, could have predicted what the final estimated number

2 would be?

3 A    Probably not.  No.

4 Q    Well, in fact, you said at your deposition, I agree that

5 somebody could not predict that, right?

6 A    Yes.

7 Q    And if somebody had asked you back in the day leading up

8 to the plan that you're assuming would have been agreed in a

9 certain way, if you had been asked, well, is Grace solvent or

10 insolvent, you would have had to say, I don't know, solvent

11 versus insolvent, right?

12 A    Because of not knowing what the liability was.

13 Q    Right.  That's what you would have said, you don't know,

14 right?

15 A    Correct.

16 Q    Just like Ms. Zilly said this morning, right?

17 A    Correct.

18 Q    You agreed with what she said this morning that, given the

19 facts as they were then known, solvency or insolvency was

20 uncertain during the period of time that the term sheet was

21 being negotiated, correct?

22 A    In April for instance.  Yes.

23 Q    Yeah, in April.

24 A    Yeah.

25 Q    Okay.  Indeed, nobody at that point could have told, on

1  the basis of any expertise, whether Grace would turn out to be

2  solvent or insolvent, correct?

3  A     Correct.

4  Q     So, you have two hugely committed, hugely resourced

5  adversaries battling it out and then sitting down at a table

6  through their representatives and negotiating at arm's length.

7  That's the historical fact of what occurred, right?

8  A     Right.

9  Q     Okay.  And those are very important facts.  They're market

10 facts, actual market facts, about how this deal was done, two

11 very, very committed, enormously skilled and dedicated -- I'm

12 being facetious -- I won't -- two very committed adversaries

13 litigating a very important issue.  Fair?

14 A     Fair.

15 Q     And they sit down and they do a deal, right?

16 A     I believe so.

17 Q     And that deal calls for a number, a liability to be paid,

18 that is much, much, much greater.  After they sit down and they

19 negotiate at arm's length, the market comes out with a

20 liability number which is much greater than the number that

21 you've assumed for purposes of your analysis, correct?

22 A     Correct, but for one arm of the analysis.  That's all.

23 Q     Well, the balance sheet arm of the analysis, right?

24 A     For that purpose.

25 Q     Yes.

1  A    But --

2  Q    Your balance sheet analysis assumes -- we've already been

3  through this -- a disputed estimate which is much, much less

4  than what the marketplace has set is the actual agreed

5  liability for asbestos, right?

6  A    Correct.

7  Q    And yet you're assuming, for purposes of your analysis,

8  that an agreement was reached that's completely different from

9  what the marketplace says the agreement is, right?

10  A    For that particular test, yes.

11  Q    For that particular test.  In fact, isn't it true that the

12  personal injury claimants would never have agreed, never have

13  agreed, in an agreed plan to the Florence estimate?

14  A    I can't answer that.

15          MR. PASQUALE:  Objection, Your Honor.  How can the

16  witness know that?

17          THE COURT:  He just said he can't know but, yes,

18  that's sustained.

19          THE WITNESS:  I can't answer that.

20  Q    Based upon what it is that is testing the assumption,

21  you've assumed that they would, right?

22  A    In that analysis, I did.  Yes.

23  Q    Okay.  And then, based upon the historical facts that are

24  real, as opposed to the assumption that was given to you by

25  counsel, those historical facts tell you that, in fact, they

Frezza - Cross/Bernick                              318

1  never would have agreed to that lower number, correct?

2          MR. PASQUALE:  Objection, Your Honor, it's the same

3  question.

4          MR. BERNICK:  Well, it's inherent in this process.

5  He's making a prediction.

6          THE COURT:  I think that's a different issue.  This

7  is not what's in the mind of the committee.  This is what he

8  can subsume from the historical facts.  So, the objection is

9  overruled.

10 Q   Isn't that correct that the marketplace agreement is

11 completely different than the agreement that you've assumed for

12 purposes of your balance sheet analysis, correct?

13 A   Correct, but that wouldn't preclude a sensitivity, in

14 other words, an analysis that would sensitize that.

15 Q   Sensitize that.

16 A   All I'm saying is it's not incorrect to do that.  It's

17 just --

18 Q   Not incorrect?  It's completely contrary to the historical

19 facts, right?

20 A   Right.  And all I'm trying to say is that, that shouldn't

21 preclude someone performing an analysis of this.

22 Q   I'm not saying you should be precluded.

23 A   Right.

24 Q   I'm just saying -- I'm suggesting to you that the analysis

25 that you've done is contrary to historical fact.  Can we agree

Frezza - Cross/Bernick                    319

1  on that?

2  A    I guess we could agree on that.  Yes.

3  Q    Okay.  And in point of fact, it's so bad that you've

4  recognized that if the plan proponent, if the PI claimants'

5  representatives would have been presented with the idea of

6  agreeing to the Florence estimate, they would have said, when

7  hell freezes over, right?

8              MR. PASQUALE:  Objection, Your Honor.

9              THE COURT:  Sustained, to the first couple words, "it

10  was so bad".

11             MR. BERNICK:  Oh.

12  Q    They probably would have said, when hell freezes over,

13  right?

14  A    I can't answer that.

15  Q    Well, you did at your deposition.

16  A    I know.

17                        (Laughter)

18  Q    That is what you said.  They probably would have, right?

19  A    I did say that in my deposition.

20  Q    Okay.  And what about force?  You have no ability, no

21  reason, no basis to say that they could have been forced to

22  agree, do you?

23  A    No.

24  Q    Okay.  And, in point of fact, have you been told that

25  throughout the entire estimation process, it was the position

1 both of the asbestos claimants and the futures representatives,

2 that even if the estimate turned out to be lower, that it

3 couldn't be used legally to bind individual claimants?  Were

4 you ever told that?

5 A    I don't know that.  If I knew it in my deposition, then I

6 must have, but I don't recall that.

7 Q    And to be clear, you do not have -- I'll adopt some of the

8 questions that Mr. Cobb posed.  You do not express an expert

9 opinion that the assumption that you were given by counsel is a

10 proper or correct assumption?  You do not have an expert on

11 that, correct?

12 A    Could you just restate that?

13 Q    Yes.

14 A    I just want to make sure I'm --

15 Q    To substitute for the plan asbestos claimant payments, the

16 Florence asbestos claimants, you are not offering any expert

17 opinion that that substitution is appropriate, are you?

18 A    No, I'm not.  I'm not opining on the appropriateness of

19 the substitution.

20 Q    You don't have the expertise to do that, correct?

21 A    Right.  I'm not an asbestos estimator.

22 Q    I don't know if you've got -- the answer to that is no,

23 you don't have the expertise, right?

24 A    No, I don't.

25         MR. BERNICK:  Pass the witness.  And I renew the

1 motion to find that this testimony and these opinions are

2 inadmissible because they don't satisfy the requirements of the

3 Federal Rules 702 and 703 by the witness' own testimony.

4           MR. PASQUALE:  And we obviously disagree with that,

5 and I think Mr. Cobb's questions made that quite clear, as well

6 as the witness' testimony, but let me do my redirect.

7           THE COURT:  All right.

8                    REDIRECT EXAMINATION

9 BY MR. PASQUALE:

10 Q    Mr. Bernick spent an awful lot of time talking about the

11 one simple clear assumption.  Was that the only analysis you

12 did?

13 A    No.  As I testified, I performed all three tests on the

14 plan that is before the Court, the market approach or the

15 balance sheet test, the adequate capital test and the cash flow

16 test.

17 Q    Okay.  Let me ask you, did your cash flow test assume the

18 Florence amount for personal injury claims?

19 A    It did not.

20           MR BERNICK:  I've already -- there's no issue about

21 that.

22           MR. PASQUALE:  Well, I'm asking questions on

23 redirect.

24           MR. BERNICK:  Okay.

25 Q    Did your adequate capital test assume the Florence number

1 for personal injury claims?

2 A    No, it did not.

3 Q    Did your balance sheet test, using the market approach,

4 assume the Florence personal injury estimate?

5 A    One version did, but I did one for the plan before the

6 Court so I did it -- I did the market approach for both.

7 Q    And Mr. Bernick asked you about a cash flow test.  Why

8 didn't you do your own cash flow test?

9 A    Well, we keep saying I didn't do my own, but I used the

10 information in the Zilly report to do my own analyses.  To just

11 simply restate the projections included in her report would

12 have just been redundant, but I did analyze those projections.

13 I did consider those projections in the context of Grace's past

14 performance that I'm well-aware of due to my participation in

15 the case.  So, I did do my own analysis.  It's just -- I just

16 refer to the Zilly report as relying on that in terms of laying

17 out the information in the report.

18 Q    And as an accountant and a financial advisor, did you

19 believe it was reasonable to rely upon the information provided

20 by Grace in the documents?

21        MR. BERNICK:  Again, there's no --

22 A    I do and --

23        MR. BERNICK:  (A) it's leading, (B) it's not in

24 dispute.

25        THE COURT:  Well, it's leading.

Frezza - Redirect/Pasquale                    323

1  A    Okay.  It's perfectly appropriate for experts --

2  Q    No.  I need to ask you a question.

3  A    Okay.

4  Q    Did you believe it was reasonable to rely on the

5  information provided by Grace in the documents you looked at?

6  A    I believe it's perfectly reasonable to rely on the

7  information in the document, because I would have done nothing

8  different.

9  Q    Why?  Why was it reasonable?

10  A    Because it's the exact set of procedures that one would do

11  in the -- under the cash flow test to arrive at a decision or

12  an opinion, excuse me, of solvency under that test.

13  Q    Did you have any reason to doubt the information that you,

14  in fact all of us, have been provided in Grace's disclosure

15  statement?

16  A    No, not at all.

17  Q    Did Grace, in any of the documents you've relied upon in

18  rendering your opinions, do a balance sheet solvency test under

19  the market approach?

20  A    Not to my knowledge, no.

21            MR. PASQUALE:  Nothing further, Your Honor.

22            MR. BERNICK:  I just have a couple of quick

23  questions.

24                    RECROSS EXAMINATION

25  BY MR. BERNICK:

1  Q    First, let's be clear.  I don't want to -- first, with

2  respect to Ms. Zilly.  She has a whole -- she has a series of

3  tables and actual quantitative analysis demonstrating

4  feasibility, correct?

5  A    Correct.

6  Q    I've not seen any such presentation in your report, is

7  that correct?

8  A    That's correct.

9  Q    Yeah.  In fact, all I see in your report is maybe a couple

10 of paragraphs that are there?

11 A    Correct, but I didn't need to in order to arrive at an

12 opinion of solvency under the cash flow test.

13 Q    Again, Ms. Zilly shows her work, has the tables, you take

14 the tables.  You do work, but I don't see the presentation of

15 any different numbers or any different analysis from Ms.

16 Zilly's, correct?

17 A    Correct.

18        MR. PASQUALE:  Asked and answered.

19 Q    I'm sorry?

20 A    You don't see any --

21        MR. PASQUALE:  Objection.  Asked and answered.

22        THE COURT:  Not exactly this question.  He was asked

23 a similar but not identical question.  You may answer.

24 Q    I just want to be very clear about it.

25 A    I'm sorry.  Could you restate that?  I'm sorry.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Yes.  Ms. Zilly has a series -- a table and a series of

2 numerical analyses on the basis of which she concludes that

3 this plan, if it's put into effect, is feasible.  In your

4 report, I see three paragraphs.  I don't see any such

5 quantitative analysis.  I see your concurrence with what Ms.

6 Zilly has shown.  Fair?

7 A    Fair but, again, I would just be restating those facts

8 because they're facts about the company.

9 Q    As set forth Ms. Zilly's work?

10 A    Correct.

11 Q    Okay.  The adequate capital analysis, the adequate capital

12 test, you did not perform a complete adequate capital test,

13 right?

14 A    A complete adequate capital test?  I'm sorry.

15 Q    Did not perform a complete adequate capital test.  True?

16 A    True.

17 Q    Okay.

18 A    However -- however, an adequate capital test, again, is a

19 collection of data points, some of which flow from the cash

20 flow test, some of which flow from balance sheet tests.

21 Q    All I'm asking you -- I understand that.

22 A    Okay.

23 Q    All I'm asking is, bottom line, there are standards and

24 methods for how to conduct an adequate capital test, correct?

25 A    Actually, no.  It's more to the -- it's more to the

1  judgment of the professional performing the test.

2  Q    Well, in your judgment, the analysis that you did was not

3  complete.   True or not?

4  A    It was less complete had I spent more time focusing on the

5  adequate capital test.

6  Q    Right.   Now, under the balance sheet, the only way that

7  you can conclude that -- strike that.   If the plan goes

8  effective, you believe that Grace will be solvent under that

9  plan, correct?

10  A    Correct.

11  Q    As it's currently constituted; that is, with no changes?

12  A    Correct.

13  Q    We all hope and pray and expect that the plan, as styled,

14  will go effective, and if it does go effective, the good news

15  is that Grace won't be insolvent, right?

16  A    Correct.

17  Q    Okay.   What you -- and we already knew that before you

18  came into the case, right?

19  A    Right.

20  Q    It wouldn't have made an awful lot of sense to come up

21  with a plan of reorganization and these guys would never have

22  agreed to it if it turns out that once Grace came out of

23  bankruptcy it was insolvent, right?

24  A    I would hope that's the case.   Right.

25  Q    So, in fact, your whole analysis is designed to show that

1 Grace will be solvent after this plan is approved, you're kind

2 of telling the Court something that it already knows, right?

3          MR. PASQUALE:  Objection.

4 A    I can't answer for the Court.

5          THE COURT:  That's sustained.

6 Q    No one -- you're not telling anybody else in court.  The

7 Court hasn't heard it formally, but that's like no surprise,

8 right?

9          MR. PASQUALE:  Same objection, Your Honor.  Same

10 question, just different words.

11          MR. BERNICK:  No.

12 Q    It's no surprise?

13          MR. PASQUALE:  Your Honor.

14          THE COURT:  To whom?

15 Q    To anybody involved in the case, Mr. Frezza, right?

16 A    I can't speak for other people.

17 Q    It wasn't any shocker to you, was it?

18 A    It wasn't a shocker to me.

19 Q    Okay.  And so your analysis then says, let's -- I want to

20 say -- guild the lily, just a little bit.  Let's make a change

21 in assumption to show that there's huge solvency, if we change

22 a key part of the plan, right?

23 A    That's the effect of that, yes.

24 Q    Okay.  And that's the part of your analysis that's all

25 driven by this assumption that's not based in historical fact,

1 correct?  Did I get that right?

2 A    That's correct.

3 Q    Thank you.

4         MR. PASQUALE:  One question, Your Honor?

5         THE COURT:  Yes.

6              FURTHER REDIRECT EXAMINATION

7 BY MR. PASQUALE:

8 Q    Adequate capital test.  What else would you have had to

9 have done to do a complete adequate capital test?

10 A    When we say complete adequate capital test, I mean, as I

11 testified a couple of times in this sitting, the adequate

12 capital test is really a judgment test of qualitative factors.

13 So, for instance, if it was a close call, if a professional

14 would have performed a balance sheet test and a cash flow test,

15 and it was not clear whether the company was completely

16 solvent, then there would be a number, maybe additional

17 factors, under the adequate capital test to determine whether

18 the company was solvent under that test.  However, when the

19 tests show that there is a significant equity cushion as

20 displayed by the balance sheet test, the market approach of the

21 balance sheet test on the plan before the Court and the fact

22 that the financial projections, while reasonable, show a

23 substantial ability to generate cash going forward on a

24 conservative basis, there is really no need to go beyond

25 determining is an equity cushion of 430 to $820 million enough

1 of an equity cushion for a company to weather financial bumps

2 in the road.

3       When you see that the company has excellent terms

4 with its vendors, has had and continues to have access to debt

5 capital in order to drawn down in the event of an emergency,

6 does the company have the ability to go out to the equity

7 markets to raise equity capital, you don't need more than that

8 in a situation like this to come to a conclusion under the

9 adequate capital test because it is very much a judgmental

10 test, qualitative judgmental test.

11       MR. COBB:  One question, Your Honor.

12              REDIRECT EXAMINATION

13 BY MR. COBB:

14 Q    Mr. Frezza, Mr. Bernick asked you -- well, actually, I

15 think elicited through your testimony that said that you simply

16 relied upon Ms. Zilly's numbers, calculations, in connection

17 with producing your opinion as to whether Grace can pay its

18 debts, when due, as of the effective date.  Do you recall that

19 testimony?

20 A    I do.

21 Q    How in the world, as an expert, could you just rely on her

22 numbers to produce your expert opinion?

23 A    Well, first of all --

24       MR. BERNICK:  Okay.  I'll accept that.  I think that

25 this is just a reiteration of where we've already been, Your

1 Honor.

2            THE COURT:  I think so, too, but I'll let him answer.

3 Go ahead, sir.

4 A    First of all, it's perfectly appropriate for a

5 professional to rely on another professional's work.  Secondly,

6 it wouldn't be appropriate for me to create my own version of

7 Grace's projections without, for instance, access to management

8 or time with the company.  So, it's perfectly appropriate to do

9 that in arriving at an opinion if, in my opinion, that

10 professional did all the appropriate work that they needed to

11 do to come to a view of reasonableness in those cash flow

12 projections and whether those cash flow projections indicate

13 the company could pay its debts as they come due.

14 Q    And did you make that conclusion with regard to Ms.

15 Zilly's work in this case on feasibility?

16 A    I did.  I did.

17            MR. COBB:  Your Honor, I have nothing more of this

18 witness.  I would like to speak very briefly to Mr. Bernick's

19 efforts to try to eliminate this witness' opinions from the

20 evidentiary record.

21            THE COURT:  All right.

22            MR. COBB:  Your Honor, I think --

23            MR. BERNICK:  Your Honor, if I --

24            MR. COBB:  First, Mr. Bernick has presented the Court

25 --

1          THE COURT:  Wait, just a second.  I'm not sure if the

2   testimony is done.

3          MR. COBB:  I'm sorry.  Go ahead.

4          MR. BERNICK:  I just -- if Mr. Cobb wants to make a

5   statement, I know the Court will hear it.  It seems to me that

6   we're going to have time to argue motions, I think, on the 13th

7   or 14th is what your Honor wants.

8          THE COURT:  We are going to be arguing motions then.

9          MR. BERNICK:  So, why don't we just save it until

10  then?  We're all going to have an argument.  If you want to

11  make a statement, I guess that's fine, but --

12         MR. COBB:  Your Honor, he had an opportunity to file

13  a Daubert motion and he didn't, and now he wants to fix this --

14  he wants to deal with this in this manner.  He's the first one

15  to raise the CMO and wave it in everyone's faces.  It's just

16  improper.  Second, Your Honor, he's presented no evidence that

17  this phrase, is it qualify or -- I don't know, whatever phrase

18  he used, that that somehow is relevant to producing a solvency

19  opinion.

20         I asked this expert whether it is relevant and he

21  said -- and he provided an answer the Court can easily review

22  in the record.  He's simply saying things, Your Honor, in an

23  effort to discredit this witness.  He's presented no evidence

24  that this witness' testimony should not be considered by the

25  Court.

1          Your Honor, frankly, if Your Honor would like to give

2   less weight to some of his opinions and -- however Your Honor

3   judges this witness' testimony and the evidence that he's

4   provided this Court, that's up to Your Honor.  But,

5   discrediting this witness from any of his testimony coming in,

6   is simply inappropriate and improper in this case.  Thank you.

7          THE COURT:  Does anyone have any questions for the

8   witness who is still sitting here?

9                    (Laughter)

10          THE COURT:  You're excused, sir.  Thank you.

11          THE WITNESS:  Thank you, Your Honor.

12          MR. BERNICK:  Do you have any more witnesses?

13          MR. PASQUALE:  Your Honor, we have no other witnesses

14   to call in our affirmative case.  Thank you.

15          THE COURT:  Mr. Cobb?

16          MR. COBB:  We have no witnesses, Your Honor.  We've

17   relied on the evidence that's been supported in -- are we

18   calling this Phase 2?  I think that's been clear from all the

19   filings that we've made before the Court.  The bank lender

20   group rests, as well.

21          THE COURT:  All right.

22          MR. PASQUALE:  Well, I should say, Your Honor --

23          MR. COBB:  Well, in fairness --

24          THE COURT:  Well, I'm not having people --

25          MR. COBB:  You have our one clean up issue tomorrow

1 with regard to exit financing.

2        THE COURT:  Yes.  I'm not having anybody rest because

3 this case is coming in, in pieces.  I just want to finish the

4 testimony with respect to the areas of the case that we're in.

5        MR. PASQUALE:  The evidence that has been submitted,

6 we have submitted jointly and we have nothing else.  Thank you.

7        MR. BERNICK:  We don't have any rebuttal live

8 testimony, and so I think we're subject to the caveat Mr. Cobb

9 indicated which is that he wants to talk about exit financing

10 with Ms. Zilly tomorrow.  Ms. Zilly is going to be testifying

11 about feasibility.  In that regard, she's going to be talking

12 about exit financing and I think he's reserving his right -- I

13 know he's reserving his right -- to examine on that, but we're

14 not doing it now.

15        So, I think we're done with that caveat with the live

16 testimony concerning the lenders' phase of Phase 2.  The hour

17 is late and I know that people probably have some things that

18 they want to take up from --

19        THE COURT:  Well, they're going to have about ten

20 minutes to do it so let's start with that, then.  Mr. Finch?

21        MR. COBB:  Your Honor, the parties have all --

22        THE COURT:  Mr. Cobb?

23        MR. COBB:  Thank you, Your Honor.  The parties have

24 all kind of dealt with their exhibits as their case has closed,

25 so-to-speak.  We're not using that terminology.  Your Honor,

**J&J COURT TRANSCRIBERS, INC.**

1  we've reached an agreement with the debtors that we will meet

2  and confer with regard to their objections to our exhibits over

3  the next few days and we will be submitting to the Court what

4  we believe will be a fully agreed exhibit list for the

5  committee and for the bank lender group, just so the Court

6  knows where those exhibits stand.  Thank you.

7          MR. FINCH:  Nathan Finch for the Asbestos Claimants

8  Committee.  Your Honor, a couple of housekeeping matters.

9  Working backwards, I guess.  With respect to some evidence that

10  was admitted, I guess it was Monday, it was two 1006 summaries

11  during testimony of Mr. Hughes.  They were marked Plan

12  Proponents' Exhibit 506-2 and 506-3.  There was a column that

13  was stricken --

14          THE COURT:  Yes.

15          MR. FINCH:  -- as a result of the Court's evidentiary

16  ruling and the title of the slide has no probative value.  Mr.

17  Hughes' testimony is what it is about the basis of this.  We

18  have deleted or blacked out the column.  I'd like to hand those

19  up to Your Honor.

20          THE COURT:  All right.  Are these remarked as 506-2a

21  and 506-3a?

22          MR. FINCH:  No, they're not, Your Honor.

23          THE COURT:  I think that's what you said you were

24  going to do.  Maybe it would be helpful to do that.

25          MR. FINCH:  Okay.  I'll put a sticker on it.

1          MR. BERNICK:  Can I get -- I'll now get in line.

2          MR. FINCH:  The second issue related to the admission

3    of solely as against the Libby claimants, the Plan Proponents'

4    Exhibit 199, which is Dr. Peterson's estimation report, and it

5    was offered and admitted only for the purposes of showing that

6    it was -- the Libby claimants had notice of it and it was given

7    -- produced in the case.  It was subject to proving up or

8    having Libby claimants stipulate that they, in fact, got that

9    report.

10         It's my understanding counsel for Libby claimants has

11   agreed that they did get that report and therefore there is no

12   issue as to whether it was, in fact, served in the case on

13   them.

14         THE COURT:  Mr. Kovacich?  First of all, let me just

15   mark for the record -- note for the record, that Exhibits

16   506-2a and 506-3a will be admitted as the substitute exhibits

17   for demonstrative purposes.  Yes, Mr. Kovacich?

18         MR. KOVACICH:  I believe what Mr. Finch said is

19   right, but I apologize, I couldn't quite hear back there in the

20   bleachers so --

21         MR. FINCH:  What I -- with respect to Dr. Peterson's

22   report, it's only being offered not for its truth.  It's only

23   being offered for the purposes of proving that he created such

24   a report in the estimation case and that it was served on the

25   Libby claimants' counsel through the normal bankruptcy process

**J&J COURT TRANSCRIBERS, INC.**

1  and that is Plan Proponents' Exhibit 199.

2          MR. KOVACICH:  Yes, Your Honor.  That exhibit, as I

3  recall, was admitted over objection for that purpose.  The

4  Libby claimants don't dispute that it was served, as Mr. Finch

5  represents, but we maintain the objection that it should not

6  have been admitted in the first place.

7          MR. FINCH:  And in the -- the final housekeeping

8  matter that I have, Your Honor, is that the Libby claimants

9  have given us their demonstrative exhibits and we are looking

10 at them tonight and will have any comments back to them.  The

11 objections and rulings are what they are from the transcript

12 and we're just looking over them.

13         MR. PERNICONE:  Your Honor, hello.  Carl Pernicone

14 for Arrowood Indemnity.

15         THE COURT:  Just a minute, Mr. Pernicone.

16         MR. PERNICONE:  Sure.

17         THE COURT:  I'm sorry, Mr. Finch.  It's been a long

18 day but -- Mr. Finch?  Hello.  I'm sorry.  It's been a long

19 day, but I think that some of those exhibits may not have been

20 offered, but I may be confusing that with a different witness,

21 I'm not sure.  So, I'm not -- I thought I said that I would

22 reserve ruling on the exhibits that hadn't been offered until

23 tomorrow when the debtors had an opportunity -- the plan

24 proponents had an opportunity to look at the exhibits.

25         MR. FINCH:  Yes.  What's what we're going to do

1  tonight.

2          THE COURT:  Oh, all right.

3          MR. FINCH:  I just wanted to inform Your Honor that

4  that's what we, in fact, are doing.

5          THE COURT:  Okay.  I thought you meant that whatever

6  rulings had already been made were of record and I didn't think

7  I --

8          MR. FINCH:  No, no, no.  They -- I don't know if they

9  neglected to offer them or what, but we're looking at them

10  tonight.

11          THE COURT:  All right.  Okay.

12          MR. PASQUALE:  Yeah.  As I understand it, it's the

13  272 to 279 overheads that we're addressing, correct?

14          MR. FINCH:  That's correct.

15          MR. PASQUALE:  Okay.  Thank you.

16          THE COURT:  Mr. Pernicone?

17          MR. PERNICONE:  Your Honor, you'll recall yesterday,

18  Mr. Schiavone, my co-counsel, proffered the declaration of Mr.

19  Camphooper (phonetic) from Arrowood in lieu of live testimony.

20  The Libby claimants had some objections to his content.  He and

21  I have been negotiating today with Mr. Cohn and we resolved

22  those differences, and I now have for offering into evidence

23  the declaration of Camphooper.  That's Arrowood Exhibit A-58.

24  May I approach, Your Honor?

25          THE COURT:  Yes, please.  All right.  Arrowood

1  Exhibit A-58 is admitted.  Thank you.

2          MR. PERNICONE:  Your Honor, one more housekeeping

3  point.  Mr. Schiavone and I have also reviewed with Mr. Cohn,

4  Libby claimants' counsel, their objections to the remainder of

5  Arrowood's exhibits.  We've resolved those, we think.  We're

6  going to be circulating this evening to everybody a list of our

7  exhibits addressing the resolution of their objections and

8  we're prepared to move for the admission of those exhibits

9  tomorrow.

10          THE COURT:  All right.

11          MR. PERNICONE:  Thank you, Your Honor.

12          THE COURT:  Mr. Bernick?

13          MR. BERNICK:  Yes.  Two matters I think of general

14  interest.  One, we've had discussions before the Court about

15  the schedule for post-trial briefing.  We previously had

16  circulated, as was indicated to the Court, a proposed schedule

17  in some related matters.  We've taken a hand at trying to

18  revise it in order to provide greater space in the schedule to

19  still keep us on some track that has some degree of

20  promptitude.

21          We've circulated the draft and we're now, in light of

22  some other developments that have just taken place, including

23  the in limine hearing, we're going to circulate a new draft

24  shortly and what we would propose is that tomorrow, some time

25  before we break at 12:45, we reserve at least a little bit of

1  time to take up the question of the future schedule to see if

2  we can't reach some kind of resolution about that.

3           THE COURT:  That's fine.  I think we'll do it first

4  thing in the morning because that -- everyone will want to get

5  out and therefore there will be less time spent on this issue.

6  So, everybody come prepared.  We're going to go through it and

7  I'm -- if we don't get it done in 30 minutes, then I'm going to

8  do it myself without anybody else's agreement.

9           MR. BERNICK:  Terrific.

10          THE COURT:  Do you want to start at 8:30 --

11          MR. BERNICK:  That would be fine.

12          THE COURT:  -- for that purpose?

13          MR. BERNICK:  That would be terrific.  So, we'll get

14  this on the -- we'll circulate this, including to the Court,

15  for discussion.  In terms of the order of witnesses, tomorrow I

16  do know we have at least three live witnesses who are going to

17  be prepared to go; Mr. Austern, Judge Sanders and then Ms.

18  Zilly with respect to feasibility and best interest.  I don't

19  know if there are going to be other live witnesses.  I know

20  that Mr. Speights is now here.  I know that he has a couple of

21  witnesses.  One of them presents a fairly important issue that

22  I need to raise at the outset which is that one of the

23  witnesses is a Dr. Ewing.  Dr. Ewing is an expert.  We don't

24  have an expert report for Dr. Ewing so there's a threshold

25  matter about why it is that Dr. Ewing is going to be coming

1  here and testifying.  I know that Mr. Speights will be prepared

2  to address that, but that also is available for tomorrow

3  morning.

4          In terms of what actual order we'll pursue, we

5  haven't had the opportunity to discuss that with Mr. Speights,

6  and we'll endeavor to do that, as well as with the FCR for both

7  PD and PI and see if we can reach some agreement.  But, we

8  certainly have ample live testimony to take place tomorrow.  We

9  are nearing the end of the case, so while I don't think we're

10 going to finish tomorrow, it's going to be pretty close which I

11 think is, thanks to the Court's patience and willingness to

12 make time available for us --

13         THE COURT:  You're too funny.

14                    (Laughter)

15         MR. BERNICK:  -- we're almost there.

16         THE COURT:  Okay.

17         MR. BERNICK:  I'm going to go have a drink here.

18         THE COURT:  Mr. Worf?

19         MR. WORF:  Just a quick point of clarification that's

20 probably self-explanatory, but we're making.  The complaints in

21 Garlock introduced into evidence earlier today, as well as the

22 other discovery materials and the summary complaints, it's not

23 been to the truth, but only for the fact that allegations were

24 made.

25         THE COURT:  Oh, yes.  I understand that.

**J&J COURT TRANSCRIBERS, INC.**

1              MR. WORF:  Yes.  I just wanted to make that clear.

2              MR. BERNICK:  You mean Garlock doesn't want to admit

3      liability on all those complaints?

4              MR. WORF:  For the record, yes.  That's right.

5              THE COURT:  Mr. Speights?

6              MR. SPEIGHTS:  Just a housekeeping matter.  I came

7      over today, Your Honor, to figure out how many boxes I need to

8      bring over tomorrow and I understand the live witnesses are

9      Austern, Sanders, and Zilly, that means --

10             THE COURT:  Lots of boxes.

11             MR. SPEIGHTS:  Well, no.  It means -- I'm happy.  I

12     mean, I only have to bring those.  I understand you want to

13     start at 8:30.  I have been --

14             THE COURT:  Well, let me see.  I was going to ask my

15     recorder, Jan, can we get somebody in that early now or is it

16     too late?

17             COURT RECORDER:  I can.

18             THE COURT:  You can?  All right.  Yes.  We can -- is

19     that all right, to start at 8:30?  We'll start with the case

20     management order post-trial?  Okay.  Yes, Mr. Speights?

21             MR. SPEIGHTS:  And for those of us who have to catch

22     a couple of planes home, I had heard that you were stopping at

23     12, and then I heard a minute ago it was 12:45.

24             THE COURT:  I thought it was 12, myself.

25             MR. SPEIGHTS:  That's what I had heard you say before

1  and I just -- I just wanted to know whether I need to change my

2  flight, Your Honor.

3         THE COURT:  Let me look and see what's --

4         MR. BERNICK:  Well, we'll stop whenever it is that

5  Your Honor wants to stop.  I think that the order actually said

6  12:45, but certainly --

7         THE COURT:  Okay.  My next hearing -- I think the one

8  issue that I -- okay.  My twelve o'clock case cancelled, so the

9  next case that I'm taking testimony in starts at one.  So, I

10 will need to give my staff a little bit of a break.  Can we

11 compromise at 12:30?

12        MR. BERNICK:  Whatever it is, we're not -- I don't

13 think we're going to finish tomorrow.  I know we're not going

14 to finish tomorrow, so there's no point in --

15        THE COURT:  All right.  No later than 12:30.

16        MR. BERNICK:  Yeah.

17        MR. SPEIGHTS:  Thank you, Your Honor.

18        THE COURT:  Anyone else?  You're not lined up to put

19 housekeeping matters on?

20                    (Laughter)

21        THE COURT:  Okay.  We'll be adjourned until 8:30

22 tomorrow.

23        MR. PASQUALE:  Thank you, Your Honor.

24        THE COURT:  Thank you.

25                    * * * * *


**J&J COURT TRANSCRIBERS, INC.**

# C E R T I F I C A T I O N

We, RITA BERGEN, TAMMY DeRISI, AMY RENTNER, MARY POLITO, KIMBERLY UPSHUR, KATHLEEN BETZ, and CECILIA ASHBOCK, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

/s/ Rita Bergen

RITA BERGEN

/s/ Tammy Bergen

TAMMY DeRISI

/s/ Amy Rentner

AMY RENTNER

/s/ Mary Polito

MARY POLITO

/s/ Kimberly Upshur

KIMBERLY UPSHUR

/s/ Kathleen Betz

KATHLEEN BETZ

/s/ Cecilia Ashbock        DATE:   September 18, 2009

CECILIA ASHBOCK

J&J COURT TRANSCRIBERS, INC.