UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Case No.  01-1139 (JKF) |
| | . | |
| W.R. GRACE & CO., | . | |
| et al., | . | USX Tower – 54th Floor |
| | . | 600 Grant Street |
| | . | Pittsburgh, PA 15219 |
| Debtors. | . | |
| | . | September 15, 2009 |
| . . . . . . . . . . . .. | | 9:05 a.m. |

TRANSCRIPT OF PLAN CONFIRMATION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Kirkland & Ellis, LLP<br>By:  DAVID BERNICK, ESQ.<br>     LISA G. ESAYIAN, ESQ.<br>200 East Randolph Drive<br>Chicago, IL  60601 |
| For the Asbestos<br>Creditors Committee: | Caplin & Drysdale, Chartered<br>By:  NATHAN FINCH, ESQ.<br>     PETER V. LOCKWOOD, ESQ.<br>One Thomas Circle, NW<br>Washington, D.C. 20005 |
| For the Future<br>Claimants<br>Representatives: | Orrick, Herrington & Sutcliffe, LLP<br>By:  JONATHAN GUY, ESQ.<br>Washington Harbour<br>3050 K Street, N.W.<br>Washington, D.C.  20007 |
| Audio Operator: | Cathy Younker |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Libby Claimants: Lewis, Slovak & Kovacich, P.C.
                        By:  TOM L. LEWIS, ESQ.
                            MARK KOVACICH, ESQ.
                        725 Third Avenue North
                        Great Falls, MT 59401

For Fireman's Fund       Stevens & Lee
and Allianz Entities:    By:  JOHN D. DEMMY, ESQ.
                        1105 North Market Street
                        Wilmington, DE 19801

For Arrowood:            Wilson, Elser, Moskowitz, Edelman,
                          & Dicker, LLP
                        By:  CARL J. PERNICONE, ESQ.
                        150 East 42nd Street
                        New York, NY 10017

                        O'Melveny & Myers, LLP
                        By:  TANCRED SCHIAVONI, ESQ.
                        Times Square Tower
                        Seven Times Square
                        New York, NY 10036

For BNSF Railway:        Pepper Hamilton, LLP
                        By:  BOB PHILLIPS, ESQ.
                        3000 Two Logan Square
                        Philadelphia, PA  19103

For CNA:                 Goodwin Procter, LLP
                        By:  MICHAEL GIANNOTTO, ESQ.
                        Exchange Place
                        Boston, MA  02109-2881

For Fireman's Fund:      Stevens & Lee
                        By:  MARNIE SIMON, ESQ.
                        600 College Road East, Suite 4400
                        Princeton, NJ 08540

For Maryland Casualty:   Connelly Bove Lodge & Hutz, LLP
                        By:  JEFFREY WISLER, ESQ.
                        The Nemours Building
                        1007 North Orange Street
                        Wilmington, DE  19899

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Ford, Marrin,         Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer           Gleser, LLP
& Gleser, LLP:            By:  ELIZABETH M. DeCRISTOFARO, ESQ.
                          Wall Street Plaza, 23rd Floor
                          New York, NY  10005-1875

For AXA Belgium:          Tucker Arensberg, P.C.
                          By:  MICHAEL A. SHINER, ESQ.
                          1500 One PPG Place
                          Pittsburgh, PA  15222

                          Mendes & Mount
                          By:  EILEEN McCABE, ESQ.
                          750 Seventh Avenue
                          New York, NY  10019

For Kneb Pipe Line        Gilbert & Renton, LLC
Operating Partnership,    By:  ROBERT GILBERT, ESQ.
LP:                       344 North Main Street
                          Andover, MA 01810

For Garlock Sealing       Robinson, Bradshaw & Hinson, P.A.
Technologies:             By:  GARLAND CASSADA, ESQ.
                               RICHARD WORF, ESQ.
                          101 North Tryon Street
                          Suite 1900
                          Charlotte, NC  28246

                          Morris James, LLP
                          By:  BRETT FALLON, ESQ.
                          500 Delaware Avenue, Suite 1500
                          Wilmington, DE 19801

For Federal Insurance     Cozen O'Connor
Company:                  By:  JACOB C. COHN, ESQ.
                          1900 Market Street
                          Philadelphia, PA  19103

For National Union Fire   Zeichner Ellman & Krause, LLP
Insurance Co.:            By:  MICHAEL DAVIS, ESQ.
                          575 Lexington Avenue
                          New York, NY  10022

For the Unsecured         Strook & Strook & Lavan
Creditors' Committee:     By:  KENNETH PASQUALE, ESQ.
                          180 Maiden Lane
                          New York, NY 10038

**J&J COURT TRANSCRIBERS, INC.**

4

APPEARANCES (CONT'D):

For Fireman's Fund        Crowell & Moring LLP
Insurance Co.:            By:  LESLIE A. DAVIS, ESQ.
                               MARK PLEVIN, ESQ.
                          1001 Pennsylvania Avenue, N.W.
                          Washington, DC  20004


For One Beacon            Drinker Biddle & Reath LLP
Ins. Co., Geico,          By:  MICHAEL F. BROWN, ESQ.
Seaton Ins. Co.                JEFFREY M. BOERGER, ESQ.
& Republic Ins. Co:       One Logan Square
                          18th and Cherry Streets
                          Philadelphia, PA  19103

                          Drinker Biddle
                          By:  WARREN PRATT, ESQ.
                          1100 N. Market Street
                          Wilmington, DE 19801-1254

For Longacre Master       Pepper Hamilton
Fund:                     By:  JAMES C. CARIGNAN, ESQ.
                          Hercules Plaza, Suite 5100
                          1313 Market Street
                          Wilmington, DE 19899

TELEPHONIC APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  JANET BAER, ESQ.
                               ELLI LEIBENSTEIN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


For the Debtors:          Kirkland & Ellis, LLP
                          By:  THEODORE FREEDMAN, ESQ.
                               CHRISTOPHER GRECO, ESQ.
                               CLEMENT YEE, ESQ.
                          Citigroup Center, 153 East 53rd St.
                          New York, NY  10022


For the Debtors:          Pachulski, Stang, Ziehl &Jones
                          By:  JAMES O'NEILL, ESQ.
                          919 North Market Street, 17th Floor
                          Wilmington, DE  19899-8705


For Various Claimant      Stutzman, Bromberg, Esserman & Plifka
Firms:                    By:  DAVID J. PARSONS, ESQ.
                          2323 Bryan Street,  Suite 2200
                          Dallas, TX  75201

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

```
For Morgan Stanley         Katten Muchin Roseenman, LLP
Senior Funding, Inc.:      By:  JEFF FRIEDMAN, ESQ.
                                MERRITT PARDINI, ESQ.
                           575 Madison Avenue
                           New York, NY  10022-2585


For Morgan Stanley         Edwards Angell Palmer Dodge, LLP
Senior Funding, Inc.:      By:  ROBERT CRAIG MARTIN, ESQ.
                           919 N Market St.
                           Wilmington, DE 19801-3023


For Serengeti:             Vinson & Elkins, LLP
                           By:  ARI BERMAN, ESQ.
                           Trammell Crow Center
                           2001 Ross Avenue, Suite 3700
                           Dallas, TX  75201


For Scott Company:         Vorys, Sater, Seymour & Pease, LLP
                           By:  TIFFANY COBB, ESQ.
                           52 East Gay Street
                           Columbus, OH  43216


For Official Committee     Dies & Hile, LLP
of Asbestos Property       By:  MARTIN DIES, ESQ.
Damage Claimants:          1601 Rio Grande, Suite 330
                           Austin, TX  78701

                           LECG
                           By:  ELIZABETH DEVINE, ESQ.
                           1725 Eye Street NW, Ste 800
                           Washington, DC,  20006


For the Property           Bilzin Sumberg Baena Price &
Damage Committee:            Axelrod LLP
                           By:  MATTHEW KRAMER, ESQ.
                           200 South Biscayne Boulevard
                           Suite 2500
                           Miami, FL  33131


For the Property           Bilzin Sumberg Baena Price &
Damage Committee:            Axelrod LLP
                           By:  SCOTT BAENA, ESQ.
                                JAY SAKALO, ESQ.
                           200 South Biscayne Boulevard
                           Suite 2500
                           Miami, FL  33131
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For the Bank Lenders:        Paul Weiss Rifkind Wharton &
                                Garrison, LLP
                             By:  MARGARET PHILLIPS, ESQ.
                                  REBECCA ZUBATY, ESQ.
                                  ANDREW N. ROSENBERG, ESQ.
                             1285 Avenue of the Americas
                             New York, NY  10019

For the Bank Lenders:        Crowell & Moring LLP
                             By:  TACIE YOON, ESQ.
                             1001 Pennsylvania Avenue, N.W.
                             Washington, DC  20004

For Asbestos Property        Scott Law Group
Damage Claimants:            By:  DARRELL SCOTT, ESQ.
                             1001 East Main Street, Suite 500
                             Sevierville, TN  37864

For National Union Fire      Zeichner Ellman & Krause, LLP
Insurance Co.:               By:  ROBERT GUTTMANN, ESQ.
                             575 Lexington Avenue
                             New York, NY  10022

For the Future              Orrick, Herrington & Sutcliffe,
Claimants                       LLP
Representatives:             By:  DEBRA FELDER, ESQ.
                                  JOSHUA CUTLER, ESQ.
                             Washington Harbour
                             3050 K Street, N.W.
                             Washington, D.C.  20007

For Federal Insurance        Cozen O'Connor
Company:                     By:  ILAN ROSENBERG, ESQ.
                             1900 Market Street
                             Philadelphia, PA  19103

For Official Committee       Anderson Kill & Olick
of Asbestos Personal         By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:            1251 Avenue of the Americas
                             New York, NY  10020-1186

                             Caplin & Drysdale
                             By:  JAMES P. WEHNER, ESQ.
                             One Thomas Circle, N.W., Suite 1100
                             Washington, District of Columbia 20005

TELEPHONIC APPEARANCES (CONT'D):

For Grace Certain          Montgomery, McCracken, Walker &
Cancer Claimants:             Rhoads, LLP
                           By:  NATALIE D. RAMSEY, ESQ.
                           300 Delaware Avenue, Ste. 750
                           Wilmington, DE  19801

For David T. Austern,      Phillips, Goldman & Spence, P.A.
the Future Claimants'      By:  JOHN C. PHILLIPS, ESQ.
Representative:            1200 North Broom Street
                           Wilmington, DE  19806

For Allstate Insurance:    Cuyler Burk, LLP
                           By:  STEFANO CALOGERO, ESQ.
                                ANDREW K. CRAIG, ESQ.
                           Parsippany Corporate Center
                           Four Century Drive
                           Parsippany, NJ  07054

For the Asbestos           Ferry Joseph & Pearce, P.A.
Creditors Committee:       By:  THEODORE TACCONELLI, ESQ.
                           824 Market Street, Suite 19899
                           Wilmington, DE  19899

For Ford, Marrin,          Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer            Gleser
& Gleser:                  By:  SHAYNE SPENCER, ESQ.
                                ELIZABETH DeCRISTAFANO, ESQ.
                           Wall Street Plaza
                           New York, NY  10005

For Official Committee     Duane Morris, LLP
of Unsecured Creditors:    By:  MICHAEL LASTOWSKI, ESQ.
                           1100 North Market Street, Suite 1200
                           Wilmington, DE  19801-1246

For Official Committee     Brandi Law Firm
of Asbestos Property       By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:               TERENCE D. EDWARDS, ESQ.
                           44 Montgomery St., Suite 1050
                           San Francisco, CA  94104

                           Lieff, Cabraser, Heimann & Bernstein
                           By:  ELIZABETH J. CABRASER, ESQ.
                           Embarcadero Center West
                           275 Battery Street, Suite 3000
                           San Francisco, CA  94111

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Official Committee:   Riker, Danzig, Scherer, Hyland &
of Asbestos Property       Perretti, LLP
Damage Claimants:         By:  TARA MONDELLI, ESQ.
                               CURTIS PLAZA, ESQ.
                          Headquarters Plaza
                          One Speedwell Avenue
                          Morristown, NJ  07962

For the Libby Claimants:  Cohn, Whitesell & Goldberg, LLP
                          By:  CHRISTOPHER M. CANDON, ESQ.
                          101 Arch Street
                          Boston, MA  02110

For the Libby Claimants:  Landis, Rath & Cobb, LLP
                          By:  KERRI K. MUMFORD, ESQ.
                               JAMES S. GREEN, JR., ESQ.
                          919 Market Street, Suite 1800
                          Wilmington, DE  19899

For the Bank Lenders:     Landis, Rath & Cobb, LLP
                          By:  RICHARD COBB, ESQ.
                          919 Market Street, Suite 1800
                          Wilmington, DE  19899

For the PD Committee:     Speights & Runyan
                          By:  DANIEL SPEIGHTS, ESQ.
                               MARION FAIREY, ESQ.
                               ALAN RUNYAN, ESQ.
                          200 Jackson Avenue, East
                          Hampton, SC  29924

For Everest Reinsurance   Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:          By:  BRIAN L. KASPRZAK, ESQ.
                               JOHN D. MATTEY, ESQ.
                          913 North Market Street
                          Suite 800
                          Wilmington, DE  19801

For Murray Capital        Murray Capital Management, Inc.
Management                By:  MARTI MURRAY

For Normandy Hill         Normandy Hill Capital, LLP
Capital, LLP:             By:  MATTHEW CANTOR

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Anderson Memorial          Kozyak, Tropin & Throckmorton, PA
Hospital:                      By:  JOHN W. KOZYAK, ESQ.
                                    DAVID L. ROSENDORF, ESQ.
                               2525 Ponce de Leon, 9th Floor
                               Miami, Florida 33134


For ZAI Claimants              Hogan Firm Attorneys at Law
& various law firms:           By:  DANIEL K. HOGAN, ESQ.
                               1311 Delaware Avenue
                               Wilmington, DE  19801


For the U.S. Trustee:          Office of the U.S. Trustee
                               By:  DAVID KLAUDER, ESQ.
                               844 King Street, Suite 2313
                               Wilmington, DE  19801


For Arrowood                   Bifferato Gentilotti LLC
Indemnity Co.:                 By:  GARVAN McDANIEL, ESQ.
                               800 North King Street
                               Wilmington, DE  19801


For AXA Belgium:               Mendes & Mount
                               By:  ANNA NEWSOM, ESQ.
                               750 Seventh Avenue
                               New York, NY  10019


For Royal Insurance:           Wilson Elser Moskowitz Edelman
                                 & Dicker, LLP
                               By:  CARL PERNICONE, ESQ.
                               150 East 42nd Street
                               New York, NY  10017


For Official Committee         Richardson Patrick Westbrook &
of Asbestos Property             Brickman, P.C.
Claimants:                     By:  EDWARD J. WESTBROOK, ESQ.
                               174 East Bay Street
                               Charleston, SC  29401


For Dow Jones                  Dow Jones News Wires
News Wires:                    By:  PEG BRICKLEY


For the Equity                 Kramer Levin Naftalis & Frankel
Committee:                     By:  DAVID E. BLABEY, JR., ESQ.
                               919 Third Avenue
                               New York, NY  10022


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Hartford Financial      Wilmer Wilmer Cutler Pickering Hale &
Service Group:               Dorr, LLP
                            By:  MELANIE R. DRITZ, ESQ.
                            399 Park Avenue
                            New York, NY  10022

For Travelers Casualty      Morris Nichols Arsht & Tunnell, LLP
Surety Company:             By:  MATTHEW B. HARVEY
                            1201 N. Market Street
                            PO Box 1347
                            Wilmington, DE 19899-1347

For Asbestos Property       Pryor Cashman, LLP
Damage Claimants:           By:  RICHARD LEVY, ESQ.
                            410 Park Avenue
                            New York, NY  10022

For David T. Austern,       Lincoln International, LLC
Future Claimants'           By:  JOSEPH RADECKI
Representative:

- - -

# I N D E X

| | PAGE |
|---|---|

**WITNESSES**

JAY HUGHES

| | |
|---|---|
| Continued Cross Examination by Mr. Plevin | 15 |
| Cross Examination by Ms. McCabe | 23 |
| Cross Examination by Mr. Schiavoni | 31 |
| Cross Examination by Ms. DeCristofaro | 35 |
| Cross Examination by Mr. Davis | 45 |
| Cross Examination by Mr. Demmy | 47 |
| Cross Examination by Mr. Carignan | 51 |
| Redirect Examination by Mr. Bernick | 59 |

MARK SHELNITZ

| | |
|---|---|
| Direct Examination by Mr. Bernick | 76 |
| Cross Examination by Mr. Pratt | 100 |
| Redirect Examination by Mr. Bernick | 125 |

MARK PETERSON

| | |
|---|---|
| Direct Examination by Mr. Finch | 154 |
| Cross Examination by Mr. Bernick | 212 |
| Cross Examination by Mr. Cassada | 230 |
| Cross Examination by Mr. Pasquale | 257 |
| Cross Examination by Mr. Phillips | 270 |
| Redirect Examination by Mr. Finch | 273 |
| Recross Examination by Mr. Bernick | 277 |

| **EXHIBITS** | **ID**. | **EVD**. |
|---|---|---|
| Arrowood-12  Letter | 32 | 34 |
| Long-1  Stipulation of facts | 55 | 56 |
| Long-2  Morgan Stanley Stipulation | 57 | -- |
| Firemen's Fund 2  Supersedeas bond in Aaron Clifton Edwards vs. Pittsburgh Corning & Grace | -- | 67 |
| Firemen's Fund 3  Specialty surety indemnity agreement between Firemen's Fund & Grace | -- | 67 |
| Plan Proponent 243* | -- | 75 |
| OS-46, 50, 51, 15, 28, 40, 41, 44, 14, 16, 17, 18, 48, 49, 19, 20, 27 revised* | -- | 75 |
| GR-14, 15, 16, 17, 18, 19, 20 (all revised)* | -- | 75 |
| 507-1 to 507-9  Organization charts (demonstrative only) | -- | 95 |
| Plan Proponent 121 Lawsuit | -- | 99 |
| Plan Proponent 120 Class action complaint | -- | 99 |
| Plan Proponent 129 Lawsuit | -- | 99 |
| Plan Proponent 143 Addendum to Fresenius proof of claim | -- | 99 |

| **EXHIBITS (Cont'd)** | **ID.** | **EVD.** |
|---|---|---|
| Plan Proponent 178b  Slides | X | X |
| OS-20 Proof of claim of Sealed Air | -- | 99 |
| Libby 271 | 307 | 307 |
| Libby 271A | 307 | 307 |
| Plan Proponents 630  ACC Exhibit A | 311 | 313 |
| LC-281  Libby Exhibit B | 311 | 313 |
| Plan Proponents 631/LC-282  Stipulation | 312 | 313 |
| MCC 1  Settlement Agreement | 334 | 334 |
| MCC 2  Settlement Agreement | 334 | 334 |
| MCC 3  Declaration | 334 | 334 |
| Zurich 17  Settlement Agreement | 334 | 334 |
| Zurich 17  Declaration | 334 | 334 |
| A-34  Declaration | 336 | 336 |
| A-57  Declaration | 336 | 336 |
| FFICSC 1 through 6 | 337 | 338 |
| FFICSC 8 | 337 | 338 |
| FFICSC 9A through 9O | 337 | 338 |
| FFICSC 10 | 337 | 338 |
| FFICSC 14 through 23 | 337 | 338 |
| AXA-1  Declaration | 338 | 339 |
| AXA-2  Declaration | 338 | 339 |
| AXA-3  Declaration | 338 | 339 |
| Garlock 104  Stipulation | 340 | 341 |

*Admitted pursuant to stipulation to be filed

**J&J COURT TRANSCRIBERS, INC.**

1              THE CLERK:  All rise.

2              THE COURT:  Good morning.  Please be seated.  This is

3   the continuation of the Phase II confirmation hearing in W.R.

4   Grace.  The participants by phone today are Scott Baena, Janet

5   Baer, Ari Berman, David Bernick, David Blabey, Thomas Brandi,

6   Peg Brickley, Elizabeth Cabraser, Stefano Calogero, Christopher

7   Candon, Matthew Cantor, Richard Cobb, Tiffany Cobb, Jacob Cohn,

8   Andrew Craig, Joshua Cutler, Leslie Davis, Michael Davis,

9   Elizabeth DeCristofaro, Elizabeth Devine, Martin Dies, Melanie

10  Dritz, Terence Edwards, Patrick Ellard, Marion Fairey, Brett

11  Fallon, Debra Felder, Jordan Fisher, Theodore Freedman, Jeff

12  Friedman, Robert Gilbert, Christopher Greco, James Green, John

13  Greene, Robert Guttmann, Matthew Harvey, Daniel Hogan, Robert

14  Horkovich, Brian Kasprzak, David Klauder, Stuart Kovensky, John

15  Kozyak, Matthew Kramer, Michael Lastowski, Elli Leibenstein,

16  Richard Levy, Robert Craig Martin, John Mattey, Garvan

17  McDaniel, Tara Mondelli, Kerri Mumford, Marti Murray, Anna

18  Newsom, James O'Neill, Merritt Pardini, David Parsons, Carl

19  Pernicone, Margaret Phillips, John Phillips, Curtis Plaza, Mark

20  Plevin, Joseph Radecki, Natalie Ramsey, Andrew Rosenberg, Ilan

21  Rosenberg, David Rodendorf, Alan Runyan, Jay Sakalo, Darrell

22  Scott, Michael Shiner, Marnie Simon, Daniel Speights, Shayne

23  Spencer, Theodore Tacconelli, James Wehner, Edward Westbrook,

24  Clement Yee, Tacie Yoon, and Rebecca Zubaty.

25              And folks who are having discussions, you need to use

1 | the attorney conference rooms, please.  I can hear your
2 | discussions rather than whoever's going to have the microphone.
3 | So, please, that's what the conference rooms are for.  If
4 | you're going to speak, go there to use them.  Good morning.
5 | Are you ready to begin?  All right.

6 |         MR. BERNICK:  Good morning, Your Honor, we have
7 | worked very hard over the evening to try to resolve the
8 | document issues and other issues that were outstanding
9 | yesterday.  I think that Mr. -- obviously, Mr. Hughes is still
10 | on the stand if anybody else has any crosses.  I think some
11 | people indicated that they did.  We can proceed with that, and
12 | then we'll recall Mr. Finke for any further cross with respect
13 | to Mr. Finke.  And, at that point, we will continue on with our
14 | case on the second phase with Mr. Shelnitz and then Dr.
15 | Peterson.  Dr. Peterson is going to be here for all purposes
16 | and needs to get back for family reasons as promptly as
17 | possible.  So we're going to call Mr. -- Dr. Peterson after Mr.
18 | Shelnitz and then I think we'll be at the end of our phase --
19 | Stage II of Phase II case --

20 |         THE COURT:  All right.

21 |         MR. BERNICK:  -- and it'll be up to the carriers.

22 |         THE COURT:  Okay.  Mr. Plevin?  Just to remind you,
23 | Mr. Hughes, you're still under oath.

24 |         MR. HUGHES:  Yes.

25 |         MR. PLEVIN:  Good morning.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. HUGHES:  Good morning.

2          MR. PLEVIN:  Your Honor, before I get started with

3    Mr. Hughes, just to follow up on what Mr. Bernick said.  We

4    reached an agreement with the plan proponents in which I'd

5    mentioned yesterday that we had a witness.  Our witness is now

6    not going to testify and plan proponents have agreed that our

7    Exhibits 10, 15 through 23 are going to come into evidence and

8    we'll be filing a stipulation that reflects that.  And so the

9    witness that we were going to call is not going to be here

10   today.

11              JAY HUGHES, WITNESS, PREVIOUSLY SWORN

12                 CONTINUED CROSS EXAMINATION

13   BY MR. PLEVIN:

14   Q    Good morning, Mr. Hughes.

15   A    Good morning.

16   Q    Do you recall yesterday that Mr. Bernick drew a chart here

17   and asked you some questions about claims brought by, among

18   others, the State of Montana, BNSF, Scotts and Maryland

19   Casualty?

20   A    Yes.

21   Q    And he also talked about a claim brought by Fireman's

22   Fund?

23   A    Yes.

24   Q    And do you recall saying that those claims by those

25   entities I mentioned, Montana, BNSF, Scotts, Maryland Casualty

1  and Fireman's Fund, were all essentially for the same activity

2  for which plaintiffs were alleging Grace is liable?

3  A    Yes.

4  Q    That's not completely true, at least not with respect to

5  the Fireman's Fund claim, isn't that right?

6  A    Well, the tort claims, the claims brought by the other

7  parties are -- they are tort claims being brought against

8  Maryland Casualty, State of Montana and the Scotts arising from

9  exposures to vermiculite.  The Fireman's Fund claim is a

10 judgment, a surety claim on a judgment, but the underlying

11 claim that gave rise to the judgment was the same type of

12 claim, a tort claim, personal injury claim, arising from

13 exposures to Grace products.

14 Q    All right.  Well, let's dig a little deeper on this.  The

15 plaintiff sued BNSF, correct?  Tort plaintiff sued BNSF for

16 bodily injury?

17 A    Yes.

18 Q    And BNSF is alleging that Grace is liable for the bodily

19 injury claims that the plaintiffs are asserting against BNSF,

20 right?

21 A    Yes.

22 Q    And the -- and tort claimants also sued Scotts asserting

23 bodily injury claims against Scotts, correct?

24 A    Yes.

25 Q    And Scotts is then alleging that Grace has some obligation

1 to indemnify Scotts for the liability claims brought by the

2 tort claimants, correct?

3 A     Yes.

4 Q     And tort claimants are also suing the State of Montana

5 directly, correct?

6 A     Yes.

7 Q     And the State of Montana is claiming against Grace saying

8 that Grace is responsible in some way for the claims brought by

9 the tort claimants against the State of Montana, correct?

10 A     Yes.

11 Q     And then with respect to Maryland Casualty, tort claimants

12 are suing Maryland Casualty directly, correct?

13 A     Yes.

14 Q     And Maryland Casualty is then asserting that Grace is

15 liable to Maryland Casualty for the claims brought by the tort

16 claimants, correct?

17 A     Yes.

18 Q     Did any tort claimants sue Fireman's Fund in the Edwards

19 case?

20 A     Not that I'm aware of, but, again, the underlying

21 obligation --

22 Q     That's a yes or no question, Mr. Hughes.  Did any -- to

23 your knowledge, did any of -- did the tort claimants in the

24 Edwards cases sue Fireman's Fund or Grace?

25 A     Grace.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    They asserted bodily injury claims against Grace, correct?

2  A    Yes.

3  Q    They didn't assert any claims against Fireman's Fund,

4  correct?

5  A    No, but under the terms of the surety bond --

6  Q    Fireman's Fund was not a defendant in that lawsuit, was

7  it?

8  A    No, it wasn't.

9  Q    Right.  Now, there was a judgment in that lawsuit against

10 Grace, correct?

11 A    Grace and Pittsburgh Corning.

12 Q    And Grace decided to appeal the judgment?

13 A    Yes.

14 Q    Now, are you aware of the fact that if Grace had simply

15 appealed and had not put up some kind of security, the Edwards

16 claimants at that time could have started to execute their

17 judgment against Grace's assets?

18 A    That's the purpose of an appeal bond is to stop that.

19 Q    Okay.  An appeal bond is one way of, in effect,

20 superceding the judgment, correct?

21 A    Yes.

22          MR. BERNICK:  Objection to the form of the question.

23          THE COURT:  That's sustained.

24          MR. PLEVIN:  Excuse me?

25          THE COURT:  That's sustained.

Hughes - Cross/Plevin                                    19

1  Q    Okay.  The effect of an appeal bond is to preclude the

2  plaintiffs from executing against Grace's assets, correct?

3  A    Yes.

4  Q    An appeal bond is not the only way that Grace could have

5  obtained that relief, correct?

6  A    Correct.

7  Q    Grace could have simply put up enough money, $43 million

8  or whatever, to stop the execution against Grace, correct?

9  A    Yes.

10 Q    And that would have cost Grace $43 million out-of-pocket,

11 right?

12 A    Again, but then they would have -- yes, I guess, yeah.

13 Q    Grace could have taken out a bank loan and used that to

14 put up the $43 million, correct?

15 A    Yes.

16 Q    And if Grace had done that, it would have had to have paid

17 interest to the bank, right?

18 A    Right.

19 Q    What was --

20 A    But the difference is, again, that Grace, as I understand

21 it, we had a current obligation.  In the contract between Grace

22 and Fireman's Fund, Fireman's Fund undertook the, for a

23 premium --

24           MR. PLEVIN:  Your Honor, I move to strike this.

25           THE COURT:  That's sustained.  There's no question.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    If Grace had put up -- if Grace had taken a bank loan to

2  put up $43 million to stop the execution of the judgment

3  against Grace's assets, Grace would have had to have paid money

4  to a bank for interest, correct?

5  A    Yes.

6  Q    At that time, was Grace able to obtain loans at the prime

7  rate?

8  A    I have no idea.

9  Q    Okay.  You don't know whether Grace had to pay more than

10 the prime rate for loans?

11 A    I have no idea.

12        MR. BERNICK:  Objection, this is irrelevant.

13        THE COURT:  He -- well, he's answered he doesn't

14 know, so it doesn't matter.

15 Q    The reason that Grace decided to post an appeal bond

16 rather than put up its own money was that it was a cheaper way

17 from Grace's perspective to stop the Edwards plaintiffs from

18 executing on the bond?

19        MR. BERNICK:  Objection, relevance.

20        THE COURT:  What is the relevance?

21        MR. PLEVIN:  Your Honor, the relevance is that the

22 plan proponents have classified the Fireman's Fund indemnity

23 claim as a Class 6 asbestos claim and I'm trying to show that

24 it's no different than any other kind of credit or financing

25 transaction and that this was just substituted for other ways

1 that Grace could have dealt with that judgment and stopped the

2 execution against Grace's assets.

3         MR. BERNICK:  Yeah, that actually is irrelevant to

4 the classification issue, completely irrelevant.  The fact that

5 the bond is a financial instrument doesn't make it any

6 different from the fact that other people assert different

7 other types of obligations, common law obligations, written

8 indemnity obligations.  It's just the fact that the motive is

9 financing is irrelevant to the question of whether it's an

10 indirect claim.

11         THE COURT:  I'm not certain I understand why the

12 motive makes a difference.  I think there has to be a logical

13 relationship in the classification and if asbestos underlying

14 liability is the logical classification, I'm not sure that

15 there's a problem with it.

16         MR. PLEVIN:  Your Honor, that's Mr. Bernick's

17 argument --

18         THE COURT:  Well, that's the theory.

19         MR. PLEVIN:  -- and I understand that's his argument

20 and his theory.  I have a different theory.  My theory is that

21 if Grace had -- that this is a financing transaction.  This is

22 not a claim over on a bodily injury claim.  It is a financing

23 transaction where Fireman's Fund came in after the fact, was

24 solicited by Grace to put up a supersedeas bond.  Fireman's

25 Fund did so and I have other arguments based on some of the

1 documentary evidence that I've just told the Court we've

2 stipulated to.  I don't need to lay out the whole case right

3 now with Mr. Hughes.  I think this is relevant to my theory

4 that I'd like to pursue.

5          THE COURT:  I think it is relevant to your theory and

6 I'm not sure how the classification issue will work out, so

7 I'll overrule the objection.  You may pursue this line.

8                   (Attorney conversation)

9          UNIDENTIFIED ATTORNEY:  Your Honor, I'm trying to

10 remember what the question was.

11          THE COURT:  The last question that I had was Grace

12 decided to post an appeal bond rather than to put up cash

13 because it was cheaper, right?  Objection to relevance.

14 Q    Okay.  Mr. Hughes, can you answer that question?

15 A    I don't know whether it was cheaper or not.  Again, I

16 would have been involved in the underlying lawsuit which was an

17 asbestos personal injury claim brought against the company.  I

18 wouldn't have been necessarily involved in the decision on what

19 was the cheapest way to, you know, hold off the plaintiff's

20 ability to execute on the judgment while the appeal was

21 pending.

22 Q    Who at Grace had that responsibility?

23 A    The people in the treasury department.

24 Q    And the people in the treasure department included Mr.

25 Tarola?

1  A    Yes.

2  Q    He was the treasurer of Grace?

3  A    He was the CFO.

4  Q    And Mr. Hunter?

5  A    Yes.

6  Q    And what was his job at the time?

7  A    He was involved in the treasury.  I don't know his

8  specific title.

9         MR. PLEVIN:  Thank you, Mr. Hughes.  Your Honor, no

10  more questions.

11         THE COURT:  Ms. McCabe?

12                    CROSS EXAMINATION

13  BY MS. McCABE:

14  Q    Good morning, Mr. Hughes.

15  A    Good morning.

16  Q    My name is Eileen McCabe and we've met and we've known

17  each other, I think, for quite a few years.

18  A    Yes.

19  Q    I'm here today representing Axa Belgium as successor to

20  Royal Belge and I just have hopefully what will be a few

21  questions --

22  A    Sure.

23  Q    -- for you today.  Isn't it correct that Grace had filed

24  declaratory judgment actions against a number of its insurers

25  in the 1980s through the early 1990s?

                    **J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    And those coverage actions were lengthy, they went on for

3  a number of years, correct?

4  A    Yes, they did.

5  Q    They were hotly contested coverage actions?

6  A    They were litigated, yes.

7  Q    They were litigated.  And those actions were pending in a

8  number of jurisdictions, weren't they?

9  A    Yes.

10 Q    Okay.  And eventually Grace entered into settlements with

11 certain of its insurers that it had been involved in coverage

12 actions with, correct?

13 A    Yes.

14 Q    And those settlement agreements that Grace entered into

15 were different types of agreements with different insurers,

16 correct?

17 A    Yes.

18 Q    Okay.  And I believe some of those have been referred to

19 as reimbursement agreements, are you aware of that?

20 A    Yes.

21 Q    And -- okay.  And then other agreements were not

22 reimbursement agreements, correct?

23 A    Yes.

24 Q    All right.  And isn't it also correct that Grace did not

25 enter into settlement agreements with a number of insurers?

Hughes - Cross/McCabe                          25

1   A    There are some unsettled insurer issues.  I understand it,

2   yes.

3   Q    Okay.  For instance, Grace has not entered into any

4   settlement agreements with Royal Belge or Axa Belgium, correct?

5   A    Not that I'm aware of.

6   Q    Okay.  Would it help if I refreshed your recollection in

7   that regard if I showed you some exhibits to the plan?

8   A    Sure.

9   Q    Okay.

10        THE COURT:  Mona, can you call downstairs and see if

11  they can get a couple of extra chairs to put in?  There's

12  always somebody standing back there and if we got some chairs

13  they wouldn't have to.

14        MS. McCABE:  Your Honor, may I approach?

15        THE COURT:  Yes, sir -- ma'am, I'm sorry.

16        MS. McCABE:  That's all right.

17        THE COURT:  I was looking at the back.

18        MR. GUY:  Your Honor, if we could have just a second.

19  I think we could stipulate to this fact.

20        THE COURT:  All right.

21                        (Pause)

22        MR. GUY:  Apparently not, Your Honor.

23        THE COURT:  All right.

24        MS. McCABE:  Okay.  Your Honor, what we've done is

25  I've just excerpted certain portions of documents that have

**J&J COURT TRANSCRIBERS, INC.**

1 been marked exhibits in this case.  I hope that's acceptable,

2 Your Honor.  I gave the hard copies to you, the witness and the

3 opposing counsel because the actual documents are rather

4 lengthy, so I didn't bring the whole thing with me.

5         THE COURT:  That's fine.

6         MS. McCABE:  Okay.

7 Q    If I could refer you, Mr. Hughes, to what's been -- what's

8 under Tab Number 2 in the booklet I just handed you?

9 A    Yes.

10 Q    Okay.  It's a portion of what's been marked Plan

11 Proponents Exhibit 277.06.  It's the Exhibit 6 to exhibit book,

12 asbestos insurance transfer agreement.  Do you see that?

13 A    Yes.

14 Q    Okay.  And if I could refer you, please, to the first

15 exhibit there which is -- I'm sorry, it's not an exhibit, it's

16 a schedule, Schedule 1, primary and excess insurance policies

17 that were or are applicable to asbestos related claims.  It's

18 Page 1 of 20.  Do you see that?

19 A    Yes.

20 Q    Okay.  And then if you thumb through that, it's in

21 alphabetical order.  On Page 16, there's a reference there to

22 Royal Belge midway down.

23 A    Yes.

24 Q    Okay.  And if then I could have you please turn, sir, to

25 what's been -- or what's Schedule 2 here.  It's, yeah, just

1  Schedule 2.

2  A    Yes.

3  Q    Do you see that?  Okay.  There's a listing here of

4  schedule of asbestos insurance settlement agreements.  Do you

5  see that?

6  A    Yes.

7  Q    And there's a number of insurance companies listed there

8  and the date of the agreement is listed to the right.  Am I

9  correct that that's the date of the settlement agreement with

10 that insurance company?

11 A    That's what it appears to be.

12 Q    Okay.  And if you look through there, you do not see a

13 reference, do you, sir, to Royal Belge?

14 A    No, I don't.

15 Q    Okay.  And if you turn to the next schedule which is

16 Schedule 3, the same thing.  It's a -- this is captioned the

17 schedule of asbestos insurance reimbursement agreements, do you

18 see that?

19 A    Yes.

20 Q    And yesterday during your testimony you were discussing

21 your exchanges with the reimbursement insurers, correct?

22 A    Yes.

23 Q    And these were the entities that you were discussing, is

24 that correct?

25 A    Yes.

1 Q    Okay.  And if you look down on this list, there is not a

2 reference, is there, sir, to Royal Belge?

3 A    No, there's not.

4 Q    Does this refresh your recollection, sir, that there is,

5 in fact, no pre-petition settlement agreement with Royal Belge?

6 A    I think the documents speak for themselves.  I -- but I

7 assume they're accurate, yes.

8 Q    Okay.  Thank you.  Mr. Hughes, your involvement with

9 insurers, Grace's insurers, was primarily with regard to

10 obtaining consent from certain insurers who had entered into

11 reimbursement agreements with Grace with regard to -- well, let

12 me strike that.  That was too long.  Your involvement with the

13 insurers was generally with regard to reimbursement insurers

14 and working to document certain requirements under those

15 settlement agreements, isn't that correct?

16 A    Yes.

17 Q    And you were really not involved with insurance carriers

18 otherwise, were you?

19 A    What do you mean by otherwise?

20 Q    Well, your interactions with insurers were primarily with

21 regard to the reimbursement insurers and with regard to

22 obtaining consent as required under certain of those

23 agreements, isn't that correct?

24 A    Yeah, and I was also involved in, to the extent they

25 were -- exercise any audit rights under the agreements, as

1  well.

2  Q    Under those settlement agreements?

3  A    Yes.

4  Q    Okay.  And yesterday counsel went through with you what

5  has been marked Plan Proponents Exhibit 95 and it was a letter

6  written to Mendes & Mount and to me, in fact.  And that letter,

7  sir, that's an example of the type of correspondence that you

8  had with the reimbursement insurers, wasn't that -- isn't that

9  correct?

10  A    It's an example, yes.

11  Q    All right.  But those were the types of letters that you

12  sent to the reimbursement insurers who had agreements which

13  required consent from Grace, isn't that correct?

14  A    Yes.

15  Q    Okay.  You didn't send those letters to Royal Belge, did

16  you, sir?

17  A    No.

18  Q    All right.  You didn't send those letters to high level

19  excess carriers who were unsettled with Grace, did you?

20  A    No.

21  Q    And isn't it correct, sir, that Grace doesn't have any

22  settlement agreements with Royal Belge pursuant to which Royal

23  Belge has given up, waived or ceded any of its rights under its

24  insurance policies?

25  A    Based on what you showed me, there's no agreement except

1 the original insurance policy.

2 Q    Well, let me follow up on that.  The Royal Belge -- to

3 your knowledge, Royal Belge hasn't waived or ceded any of its

4 rights under that insurance policy with Grace, isn't that

5 correct?

6           MR. BERNICK:  Objection, lack of foundation.

7           THE COURT:  You have to lay the foundation.

8           MS. McCABE:  Foundation is the witness said based on

9 what he saw there and so I'm asking his understanding.  Does he

10 understand that Royal Belge has waived any of its rights under

11 the policy.

12          MR. BERNICK:  Yeah --

13          THE COURT:  But you also established that his primary

14 function was to deal with the settlements and apparently there

15 are none.  So you need to lay a foundation as to how he would

16 have this knowledge.

17 Q    Okay.  Do you have any knowledge of any interactions with

18 Royal Belge and W.R. Grace?

19 A    Any?

20 Q    Interactions.

21 A    No, I'm not aware of any.

22          MS. McCABE:  Okay.  Your Honor, I think that's fine.

23 I don't need to follow up on that.  And that's it for me, Mr.

24 Hughes.

25          THE WITNESS:  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

1            MR. BERNICK:  Mr. -- please, please.

2            THE COURT:  Mr. Schiavoni?

3            MR. SCHIAVONI:  Mr. Schiavoni for Arrowood.  Your

4  Honor, we had offered deposition designations in support of the

5  Arrowood settlement.  Those deposition designations at that

6  time were unobjected to.  We then redesignated them for this

7  proceeding and they were unobjected to.  I would just offer

8  those, again, now in lieu of questioning the witness on those

9  and that would be from the June 11, 2009 deposition of Mr.

10 Hughes, Page 361, Line 22.

11           THE COURT:  Wait, I'm sorry, you're going too fast

12 for me.  June 11, 2009, page what?

13           MR. SCHIAVONI:  Page 361, Line 22 --

14           THE COURT:  All right.

15           MR. SCHIAVONI:  -- through Page 378, Line 24.  And,

16 Your Honor, I can hand those up.

17           THE COURT:  All right.

18           MR. SCHIAVONI:  And the only other thing I want to

19 do, Your Honor, is I have four questions just to lay a

20 foundation for a document that was offered, again, in support

21 of the Arrowood settlement so I can enter it into evidence.

22 And if I could approach the witness?

23           THE WITNESS:  Sure.

24                      CROSS EXAMINATION

25 BY MR. SCHIAVONI:


                   **J&J COURT TRANSCRIBERS, INC.**

1  Q    Mr. Hughes, I've handed you a copy of a letter marked
2  Exhibit A-12.  Have you seen a copy of Exhibit A-12 before?
3  A    Yes, I have.
4  Q    And can you tell us generally what Exhibit A-12 is?
5  A    It's a letter from -- actually from Carl Pernicone and I
6  signed it for Grace where we communicate with Jon Moyers, who
7  is, I believe, was counsel for BNSF Railways in Montana
8  concerning the issue of coverages -- coverage -- insurance
9  coverage for BNSF in the asbestos/vermiculite claims against
10 them in Montana.
11 Q    Were you authorized by Grace to cause A-12 to be signed on
12 your behalf for Grace?
13 A    Yes, I was.
14 Q    And did you issue this letter, A-12, in the ordinary
15 course of your duties at Grace?
16 A    Yes, I did.
17 Q    Prior to issuing this May 5 letter that's been marked as
18 A-12, did you review the 1995 Grace/Royal settlement?
19 A    Yes, I did.
20 Q    Okay.  And, Mr. Hughes, did you speak to Mr. Posner and
21 others that were involved in the negotiation of the 1995
22 Grace/Royal settlement before issuing this letter?
23 A    Yes, I did.
24 Q    Were the statements that were made in Exhibit A-12
25 concerning the finality and the scope of the settlement of the

1 Royal coverage true and correct at the time that you made them?

2          MR. PHILLIPS:  Objection, no foundation.

3          THE CLERK:  Your name, sir?

4          MR. PHILLIPS:  Robert Phillips, sorry, for BNSF.

5          MR. SCHIAVONI:  Your Honor, I'm asking the witness

6 whether when he signed the letter, the statements that he made

7 in the letter were true and correct.  The witness signed the

8 letter.  He has the foundation to tell the Court whether he

9 thought the statements that he was making were true and

10 correct.

11          MR. PHILLIPS:  And objection, legal conclusion.

12          THE COURT:  No, I think this is a factual statement

13 asking the witness of his knowledge of the transactions.

14 Overruled.

15 A    At the time, based on my conversations with Mr. Posner and

16 others involved in the agreement, this was my -- this letter

17 reflected what I believe to be the facts concerning the Royal

18 Insurance settlement of -- 1995 settlement agreement, yes.

19          MR. SCHIAVONI:  Okay.  Your Honor, we'd offer Exhibit

20 A-12 into evidence.

21          UNIDENTIFIED ATTORNEY:  No objection.

22          UNIDENTIFIED ATTORNEY:  No objection.  Is that

23 Arrowood-12, Mr. --

24          MR. SCHIAVONI:  Yes.

25          UNIDENTIFIED ATTORNEY:  -- Schiavoni?

1          THE COURT:  It's admitted.

2          MR. SCHIAVONI:  Thank you, Your Honor.  Thank you,

3  Mr. Hughes.

4          THE COURT:  Give me a second, please.

5                    (Pause)

6          THE COURT:  All right.  Ms. DeCristofaro?

7          MS. DeCRISTOFARO:  Good morning.  Elizabeth

8  DeCristofaro for Continental Casualty Company.  Does the

9  witness have available the exhibits marked during his testimony

10 yesterday?

11         THE COURT:  Which ones?

12         MS. DeCRISTOFARO:  Specifically, Plan Proponent

13 Exhibit 1 and Plan Proponent Exhibit 95.

14         THE COURT:  Who marked them?

15         MS. DeCRISTOFARO:  They were marked and offered by

16 Mr. Bernick.

17         MR. BERNICK:  Right.  They were -- they should be --

18 they were, but I don't think that -- remember, we had the issue

19 with the notebook on that one?  Is was the settlement -- is

20 that the settlement agreement?

21         MS. DeCRISTOFARO:  Exhibit 1 is the Baron and Budd

22 settlement agreement and Exhibit 95 is a letter to Eileen

23 McCabe.

24                    (Attorney conversation)

25         THE WITNESS:  I have them here, too.  I'm just trying

**J&J COURT TRANSCRIBERS, INC.**

1  to find them.  They're not organized the way -- oh, I have

2  them.  I have the Baron and Budd settlement, yes.

3         UNIDENTIFIED ATTORNEY:  Do you have extra copies for

4  the judge?

5         MR. DeCRISTOFARO:  Do you have both documents, Mr.

6  Hughes?

7         THE WITNESS:  Yes, I do.

8                         CROSS EXAMINATION

9  BY MS. DeCRISTOFARO:

10 Q    Plan Proponent Exhibit 95 was a letter from you to Eileen

11 McCabe regarding a settlement that Grace was about to make, is

12 that correct?

13 A    Yes, it was.

14 Q    And that letter was written in 1997?

15 A    Yes.

16 Q    And is it fair to say at that time that Grace was very

17 vigorously defending itself?

18 A    Yes.

19 Q    And if you look at the second -- the first two sentences

20 of Plan Proponents Exhibit 95, it refers to a very aggressive

21 strategy by W.R. Grace, doesn't it, in litigating asbestos

22 cases?

23         MR. BERNICK:  Objection, this is completely

24 irrelevant.

25         MS. DeCRISTOFARO:  It is not, Mr. Bernick.

**J&J COURT TRANSCRIBERS, INC.**

Hughes - Cross/DeCristofaro                    36

1          MR. BERNICK:  It is irrelevant, Your Honor.

2          MS. DeCRISTOFARO:  Mr. Bernick opened the door on the

3   course of practices with respect to 1997 and 1998 and offered

4   that as a course of conduct relevant to the treatment of the

5   insurers under the plan and he opened the door.  And he's

6   saying what happened in '97 and '98 is relevant to what should

7   happen now and he opened the door on that.

8          THE COURT:  Well, I don't think that's the theory,

9   but nonetheless, it may be relevant.  So the objection is

10  overruled.

11  Q    And, at that time, Grace was very vigorously defending

12  itself, was it not?

13  A    Yes, it was.

14  Q    And the first two sentences there say that Baron and Budd

15  has recently tried Grace cases to verdict, including the recent

16  $9.3 million verdict in Dallas County, Texas State Court.  The

17  firm has announced publicly that in retaliation for Grace's

18  efforts to conduct discovery on the firm's practices, it

19  intends to try all serious cases against Grace.  So you were

20  vigorously fighting with Baron and Budd at that time, were you

21  not?

22  A    Yes, we were.

23  Q    Okay.  And with respect to Plan Proponent Exhibit 1, which

24  is a settlement agreement that you entered in with Baron and

25  Budd, at the time you entered into that agreement, you were not

1 using Baron and Budd as your advisor, were you?

2 A    No.

3 Q    No.  And, in fact, to the overall point, you were

4 vigorously defending yourself at that time?

5 A    Yes.

6 Q    And to the extent that -- okay.  Now, Mr. Bernick asked

7 you some questions and asked Mr. Posner some questions about

8 insurers who conducted audits or who had the right to consent.

9 And the testimony offered was that none of those insurers

10 offered an objection either by audit or by their right to

11 consent, is that correct?

12        MR. FINCH:  Objection, compound.

13        THE COURT:  It is --

14 Q    Well, let's put it this way.  Are you aware -- is it your

15 testimony that none of the insurers who had to consent did

16 consent?  I mean, did not consent, sorry.

17 A    To the Baron and Budd settlement?

18 Q    I'm just trying to recap the testimony that you gave

19 before.

20 A    To the Baron and Budd settlement or to generally?

21 Q    Generally.

22 A    Well, consent to settlement I view a little bit different

23 than to the audit issue because there were occasionally

24 differences of opinion about not with respect to settlement or

25 participate in the settlement decision, but as far as the

Hughes - Cross/DeCristofaro                    38

1  documentation after the fact and what was appropriate for there

2  when they conducted their audit.

3  Q    Okay.  In your view, should any of the insurers who

4  consented, should they not have consented?

5           MR. BERNICK:  Objection, A, calls for an opinion, B,

6  it exceeds the scope of the examination, C, it's irrelevant.

7           MS. DeCRISTOFARO:  Absolutely not, Your Honor.

8           MR. BERNICK:  Also, lack of foundation, Your Honor.

9  What an insurance company had in its mind is not something that

10 she's established to this witness that he would know.

11          MS. DeCRISTOFARO:  Your Honor, if the question

12 here -- Mr. Bernick stood up and offered testimony that the

13 fact that no insurer objected either by audit or by withholding

14 their consent is relevant to the practices that they're putting

15 forward in this trust plan.  If he put that at issue, the

16 question is should they have not consented.

17          THE COURT:  But you can't ask this witness.

18          MS. DeCRISTOFARO:  If it was reasonable for them to

19 consent, then it --

20          THE COURT:  You can't ask this witness what was

21 reasonable in the mind of another person and you're asking him

22 for an opinion as to their judgment.  He's not a representative

23 of the insurers.

24          MS. DeCRISTOFARO:  No, he's not.  But the point is,

25 unless the plan proponents say that in the exercise of

1 independent proper judgment an insurer should not have

2 consented, then that testimony should be struck and I move to

3 strike it because it's not relevant.

4          MR. BERNICK:  Your Honor, this is -- Ms. DeCristofaro

5 is seeking to use this witness to establish their proposition

6 which goes to the question of whether their rights in some

7 fashion are fundamentally changed by the plan.  The proffer of

8 the witness's testimony has nothing to do with that.  It is

9 simply that the insurers are not being -- that had -- to the

10 extent the insurers had rights pre-petition, they didn't

11 exercise them and there was a course of conduct on the basis of

12 which this plan actually gives them more protection than they

13 would have had.

14          So the witness is only testifying about pre-petition

15 and pre-petition facts, the fact that there was a right and it

16 wasn't exercised, period.  It can't be used on their case to

17 try to make their case by expressing opinions, which is what

18 this asks for, that are in service of their arguments with

19 regard to the plan.

20          THE COURT:  It is asking for an opinion.  He's not

21 been designated as an expert.  The objection is sustained.

22          MS. DeCRISTOFARO:  Your Honor, I think, though, Mr.

23 Bernick just made my point.  He just said that he was -- they

24 were offering the fact that any insurer did not consent or did

25 not object to a settlement by audit as proof of course of

1 conduct as should be appropriate in the plan and our treatment

2 of the plan.  If he offers that, then you're opening up the

3 collateral matter, and this goes to what I was saying.  This is

4 so fundamentally different than the evidence that was offered

5 to you in _Combustion Engineering_.  This is not an objective

6 program or plan.  This is an argument that because someone

7 didn't agree -- didn't object to a settlement, that's

8 indicative of anything other that they exercised their

9 independent judgment that Grace was vigorously defending itself

10 and was reaching reasonable settlements.

11              THE COURT:  Okay.

12              MS. DeCRISTOFARO:  How does that prove a course of

13 conduct?  And if I can't ask him that --

14              THE COURT:  I don't know that it proves the course of

15 conduct.  It's relevant to whether or not there is such a

16 course of conduct, that's the issue.  And you may offer

17 whatever testimony you have to show that it is not reasonable,

18 but you cannot ask a representative of Grace whether the

19 insurer's judgment was reasonable.  He can't testify to that.

20 He doesn't know.

21              MS. DeCRISTOFARO:  But, Your Honor, I'm not asking

22 him whether the insurers -- I think without proof that

23 someone -- that's why the whole line of the proffer made by Mr.

24 Bernick of this witness's testimony was improper because it's

25 not probative of --

1    THE COURT:  It is probative.  It's relevant to the

2  determination.

3    MS. DeCRISTOFARO:  It's not probative if --

4    THE COURT:  Well, I'm sorry.

5    MS. DeCRISTOFARO:  -- you don't get into --

6    THE COURT:  As the finder of fact, I think it is.

7    MS. DeCRISTOFARO:  Your --

8    THE COURT:  So --

9    MS. DeCRISTOFARO:  -- Honor, really, I'm sorry, I

10  just wanted to finish that.

11    MR. BERNICK:  Can we move along?

12    MS. DeCRISTOFARO:  It's not probative because unless

13  you get into whether each settlement was reasonable or not,

14  which we don't want to, it's not probative because if you --

15    THE COURT:  That's not the point, Ms. DeCristofaro.

16  The point that the debtor is trying to establish, whether it

17  turns out to be established, whether it turns out to be

18  relevant, whether it turns out to have anything to do with the

19  plan itself is that there was a pre-petition course of conduct

20  that this plan looks at that pre-petition course of conduct

21  and, essentially, incorporates it with, in the debtor's view,

22  some additional protections.  I'm not sure the insurers will

23  agree with that, but that's the debtor's point of view.

24    It is relevant to substantiate the fact that as to

25  the insurers who had settlement -- who had rights to consent or

1 not consent to settlement pre-petition that they were not

2 exercised.  It is relevant to that point.

3          UNIDENTIFIED ATTORNEY:  Your Honor --

4          THE COURT:  I've ruled.  This is ten minutes after

5 I've ruled --

6          MS. DeCRISTOFARO:  Okay.

7          THE COURT:  -- so let's move on.

8          MR. BROWN:  Your Honor, just one point of

9 clarification.  I don't mean to interrupt, but we're slipping

10 into imprecise language, again.

11          MS. DeCRISTOFARO:  Your --

12          MR. BROWN:  And the testimony that was offered

13 yesterday by Mr. Hughes related to the insurers that had

14 asbestos reinsurance agreements.

15          THE COURT:  Yes, it did.

16          MR. LOCKWOOD:  Reimbursement agreements.

17          MR. BROWN:  I'm sorry, asbestos reimbursement

18 agreements.

19          THE COURT:  Reimbursement agreements, yes.

20          MR. BERNICK:  We would agree with that.  We're not

21 trying to slip into that area.  This is all being prompted

22 really by interrogation from an insurer.

23          THE COURT:  Okay.

24          MR. BERNICK:  We've always recognized that.

25          THE COURT:  I have ruled folks.  Let's move on.

1          MS. DeCRISTOFARO:  Yes, Your Honor, I just only

2    wanted to make my point of what I was offering this from.

3    Q    Just a few more questions going to the weight of the

4    consideration of course of conduct.  This settlement agreement

5    was entered into in 1998, correct?

6    A    Actually, in December of '97 --

7    Q    Sorry, '97, okay.

8    A    -- and the '98.  I think -- I may have misspoke earlier.

9    Q    And you testified that in your position at Grace that

10   you've kept track of what's happening in asbestos litigation,

11   is that correct?

12   A    Yes, I have.

13   Q    And you're aware that there's been significant changes in

14   the field of asbestos litigation since 1997?

15        MR. BERNICK:  Well, could we have more specification

16   as to time period?  And, again, I think this is completely

17   irrelevant, but we can at least get a time frame?  That's ten

18   years ago.

19        MS. DeCRISTOFARO:  That's my point.

20        MR. BERNICK:  Okay.  Well, if that's your point, the

21   question ought to be confined to a particular time period,

22   unless you want to have him express opinions on what's happened

23   since the petition was filed as to which he has not testified.

24        MS. DeCRISTOFARO:  Again, Your Honor, they're

25   offering a course of conduct on direct from 1997.

1        THE COURT:  Yes, this is relevant to the witness's

2   testimony.  He said that he's kept track of litigation.  He can

3   either -- he can qualify his answer if he needs to.  You can

4   answer, Mr. Hughes.

5   Q    All right.  Can you answer that question, Mr. Hughes?

6   A    Could you repeat the question?

7   Q    Yes.  Has there been significant develops in the field

8   of -- development -- legal developments in the field of

9   asbestos litigation since 1997?  Such, for example, is asbestos

10  or tort reform, in the area of tort reform.

11       MR. BERNICK:  That calls for a legal conclusion.

12       THE COURT:  It does.  That's sustained.

13  Q    Are you aware of any changes that would affect whether you

14  would have entered into this settlement agreement since --

15  today, as opposed to 1997?

16                 (Attorney conversation)

17       MR. BERNICK:  Objection, Your Honor.  A, that asks

18  for speculation and, B, it calls for an opinion and, C, it's

19  irrelevant.

20       THE COURT:  Sustained.

21       MS. DeCRISTOFARO:  Your Honor, just quickly, Mr.

22  Bernick, again, is offering these documents dated ten years

23  ago, more than ten years ago, 12 years ago, as evidence of what

24  should occur now.  And I'm only trying to --

25       MR. FINCH:  Objection, Your Honor, this is more in

1 the nature of closing argument.

2         THE COURT:  It is in the nature of closing argument

3 and that isn't the proffer.

4         MS. DeCRISTOFARO:  Okay.  All right.  Your Honor, I

5 have no further questions based on Your Honor's ruling.

6         THE COURT:  Mr. Davis?

7         UNIDENTIFIED ATTORNEY:  Anybody else?  Ah, ha.

8                 (Attorney conversation)

9                 CROSS EXAMINATION

10 BY MR. DAVIS:

11 Q    Good morning, Mr. Hughes.  Michael Davis on behalf of

12 Nation Union Fire Insurance Company --

13 A    Good morning.

14 Q    -- Pittsburgh, PA.  Do you recall that Mr. Plevin asked

15 you a series of questions about the Fireman's Fund bond this

16 morning?

17 A    Yes.

18 Q    And he distinguished it from Scotts and he distinguished

19 it from Maryland and he distinguished it from BNSF on grounds

20 that those defendants were -- had been sued for their own

21 conduct whereas Fireman's Fund had undertaken the issue of bond

22 at the request of Grace, is that correct?

23         MR. BERNICK:  I've got -- sorry, that statement "is

24 that correct" seeks his endorsement of what you take to be Mr.

25 Plevin's arguments.

1          THE COURT:  That's sustained.  Restate the question,

2   please.

3   Q    Did you acknowledge that there was a difference in that

4   BNSF, Scotts and Maryland were sued for their own conduct,

5   whereas Fireman's Fund had been -- Fireman's Fund had issued a

6   bond at the request of Grace?

7          MR. BERNICK:  Objection to the form of the question.

8   Seeks to recharacterize the record.  Record is whatever it is.

9   If we could have a new question, that would be good.

10          THE COURT:  I don't think that was the witness's

11  testimony.  It is -- I think it is assuming a fact not in

12  evidence.  You'll have to restate the question.

13  Q    Well, let me just get to the point.  National Union issued

14  a bond at the request of Grace, correct?

15  A    Yes.

16  Q    National Union did not issue that bond because of its own

17  conduct, did it?

18          MR. BERNICK:  Objection to the form of -- own

19  tortuous underlying conduct.  Objection to the form of the

20  question.

21          THE COURT:  Sustained.

22          MR. DAVIS:  I'll accept the correction.

23  Q    National Union did not issue the bond on account of its

24  own tortuous underlying conduct, did it?

25  A    No, it --

**J&J COURT TRANSCRIBERS, INC.**

Hughes - Cross/Davis/Demmy                    47

1  Q    Thank you.

2  A    -- issued the bond based on a settlement agreement

3  involving asbestos related claims against W.R. Grace.

4  Q    At the request of W.R. Grace, correct?

5  A    Yes.

6          MR. DAVIS:  Thank you.

7  A    Again, the underlying claims or asbestos personal injury

8  claims.

9          THE COURT:  When a witness is talking, it would be

10 nice if you don't walk away.

11         MR. DAVIS:  I'm sorry.

12               (Attorney conversation)

13         THE COURT:  Mr. Demmy, good morning.

14         MR. DEMMY:  Yes, Your Honor.

15                   CROSS EXAMINATION

16 BY MR. DEMMY:

17 Q    Mr. Hughes, good morning.  John Demmy on behalf of

18 Fireman's Fund Insurance Company as to issues apart from the

19 surety bond issues that Mr. Plevin asked you about earlier.  I

20 wanted to make that point clear at the outset.  But also on

21 behalf of Allianz SpA, which was formerly known as Riunione

22 Adriatica Di Sicurta, and also for Allianz SE, formerly known

23 as Allianz Aktiengesellschaft.  And --

24         UNIDENTIFIED ATTORNEY:  Objection.

25 Q    -- I hope I got that right.

                **J&J COURT TRANSCRIBERS, INC.**

1          UNIDENTIFIED ATTORNEY:  Aktiengesellschaft, but

2  that's, you know --

3  Q    I'll accept the correction.

4          THE COURT:  Just so we get the -- a description in

5  writing of how to spell it all.

6          MR. DEMMY:  My questions may be less time than it

7  took me to say the name of the client.

8          UNIDENTIFIED ATTORNEY:  Well, that would be great.

9  Q    Mr. -- AG, thank you.  Mr. Hughes, do you have an

10 understanding at all that Grace contends that Fireman's Fund

11 Insurance Company issued insurance policies to Grace that

12 covered asbestos claims, generally?

13 A    Yes.

14 Q    Same question for both of the Allianz entities.  Do you

15 have an understanding that Grace contends that they both issued

16 insurance policies to Grace?

17 A    Yes.

18 Q    Do you have any understanding with respect to the terms of

19 any of those policies?

20 A    No, not specific terms.  I don't --

21 Q    Do you have any -- do you have a general understanding of

22 the terms of those policies?

23 A    Yes, general understanding.

24 Q    What's your general understanding?

25 A    That they were excess layer over the comprehensive general

1  liability policies for the period of time pre -- I guess, you

2  know, whenever asbestos exclusions were generally included in

3  those kinds of policies.

4  Q    You would agree that they're what would characterize as a

5  high level excess policy, correct?

6  A    I don't know.  I don't know where they fit in

7  specifically, so I wouldn't want to characterize them in that

8  way.

9  Q    But they're excess policies?

10  A    That's my understanding.

11  Q    Did Fireman's Fund Insurance Company ever enter into an

12  agreement with Grace that we've been talking about in

13  connection with your testimony that we've been calling

14  reimbursement agreements?

15  A    I'd have to take a look at the list that was just shown to

16  me by --

17  Q    Would you like to take a look at that list to refresh your

18  recollection?

19        MR. BERNICK:  Well, but, if it's on the list, I mean,

20  if he doesn't -- if he knows, he knows, if he doesn't, he

21  doesn't.  Just reading from documents is not --

22  Q    Do you have --

23        THE COURT:  The question was will it refresh his

24  recollection.  It's proper.  You may refresh his recollection,

25  Mr. Demmy.

1 Q    Do you -- let me try to short circuit this.  Do you have

2 any independent recollection other than what's on the list

3 that's already been discussed previously?

4 A    No, I don't.

5 Q    Okay.  Same question as to the two Allianz entities.  Do

6 you have any recollection, other than what's on that list?

7 A    No, I don't.

8 Q    Okay.  So if they're not on the list, Grace did not have

9 reimbursement agreements with either of those three insurers,

10 correct?

11                  (Attorney conversation)

12 A    Again, based on -- I assume that the lists are accurate.

13 Q    All right.  Do you know whether or not Fireman's Fund

14 Insurance Company ever waived any of its rights under any of

15 the insureds policies that Grace contends at issue to Grace --

16        MR. BERNICK:  Objection, lack of foundation.  Calls

17 for a legal conclusion.

18        THE COURT:  It's a do you know.  Overruled.

19 A    I don't know.

20 Q    Okay.  You don't know one way or the other?

21 A    Right.

22 Q    Were any claims ever tendered by Grace to Fireman's Fund

23 Insurance Company?

24 A    I don't know.

25 Q    Do you know whether either of the Allianz companies waived

1  any of their rights under any of their insurance policies?

2  A    I don't know.

3  Q    Do you know if any claims were ever tendered to either of

4  the Allianz companies?

5  A    I don't know.

6           MR. DEMMY:  That's all the questions I have, Your

7  Honor.

8           THE COURT:  I need a second to get caught up here.

9                        (Pause)

10          UNIDENTIFIED ATTORNEY:  New, anybody else?

11          THE COURT:  Good morning.

12          MR. CARIGNAN:  Good morning.

13                     CROSS EXAMINATION

14  BY MR. CARIGNAN:

15  Q    Good morning, sir, how are you?

16  A    Great.

17  Q    My name is James Carignan.  I represent Longacre Master

18  Fund.  Yesterday, Mr. Bernick asked you some questions about

19  the basis for the claim of Longacre, do you recall that

20  testimony?

21  A    Yes.

22  Q    And would it be a fair characterization to say that -- of

23  your testimony to say that Longacre had purchased a claim

24  formerly owned by National Union?

25  A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    And what was that National Union claim based on?

2        MR. BERNICK:   Your Honor, this is -- we've already

3 had a gentleman from National Union --

4        THE COURT:   This is a different party.  Go ahead, Mr.

5 Carignan.

6 A    It was payments that had been made to the claimants in

7 connection with the National Union surety bond that had been

8 used to -- for payments with respect to the Reaud, Morgan &

9 Quinn settlement agreement.

10 Q    So National Union had posted a surety bond, correct?

11 A    Yes.

12 Q    And that surety bond was intended to secure debtor's

13 obligations under settlement agreements with various asbestos

14 personal injury claimants?

15 A    Yes.

16 Q    And the basis of National Union's claim was for repayments

17 of those amounts that National Union had paid out under those

18 surety bonds?

19 A    Yes.

20 Q    And that was pursuant to a reimbursement agreement issued

21 in connection with those surety bonds?

22 A    It was pursuant to the terms of the surety bond.

23        MR. LOCKWOOD:  Objection to form.  If he's using --

24        THE COURT:  You're microphone's not on, Mr. Lockwood.

25        MR. LOCKWOOD:  Objection to form.  He used the term

**J&J COURT TRANSCRIBERS, INC.**

1  reimbursement agreement.  I don't know whether that's intended

2  to refer to what we've been taking about as insurance

3  reimbursement agreements or whether he's using it in a sort of

4  general sense of describing this particular surety agreement.

5            THE COURT:  I think that's sustained, just because of

6  the use of that particular term in this case.  If you could

7  restate the question so we're all clear, please?

8  Q    Do you know whether the debtors owed National Union any

9  obligation in connection with National Union's payment to

10  settling parties on account of their surety bonds?

11           MR. BERNICK:  Objection to the form.  Is it do you

12  know?

13           THE COURT:  Yes.  Overruled.

14  A    Yes.

15  Q    And what were those obligations?

16  A    I'm not sure specifically, but under the terms of the

17  agreement --

18           MR. BERNICK:  Wait.  I was going to object for lack

19  of foundation, then the witness began to answer.  I'm going to

20  object on grounds of lack of foundation.

21           THE COURT:  No, he said he knew.

22           MR. CARIGNAN:  Judge, I just asked --

23           THE COURT:  It's overruled.

24  A    Could you repeat the question?

25  Q    What were the obligations that debtors owed to National

1 Union on account of National Union's payment to settlement

2 parties under the surety bonds?

3 A    Generally, Grace had an obligation to reimburse National

4 Union for any amounts that it ultimately paid to the claimants

5 for the personal injury claims.

6 Q    But you don't know whether those obligations arose from

7 the surety bonds themselves or from any agreements issued in

8 connection with those surety bonds?

9 A    That's correct.  I don't know the answer to that.

10 Q    Are you aware whether National Union ever issued any

11 insurance policies to the debtors?

12       MR. BERNICK:  You mean liability policies?  Objection

13 to form.

14       THE COURT:  That's sustained.  It's -- obviously,

15 he's testified about a surety bond.  That's not an insurance

16 policy, but I think you need to be a little bit more clear.

17 Q    Are you aware whether National Union ever issued any

18 insurance liability policies to the debtors?

19 A    Not without relying on the schedules that have been

20 produced in this case.

21 Q    But you don't have any memory of anything like that?

22 A    I recall there was an issue with setoff in terms of

23 National Union, but I don't know if it was National Union or

24 another AIG company.

25       MR. CARIGNAN:  Judge, I have no further questions.

1  But, yesterday, after the conclusion of the proceedings, the

2  debtors graciously agreed to my request to be able to admit

3  certain exhibits or at least seek the admission of certain

4  exhibits at the end of my questioning of this witness --

5              THE COURT:  All right.

6              MR. CARIGNAN:  -- if I could.  The first exhibit I

7  handed to your clerk yesterday, but I have another copy here if

8  Your Honor would like to see it.  If I may approach?

9              THE COURT:  Yes.

10                  (Attorney conversation)

11             THE COURT:  Thank you.

12             MR. CARIGNAN:  This is a -- and I've marked it as

13 Long-1.  And this is a stipulation of facts which consents to

14 the admissibility of certain exhibits, most of which are

15 already part of the record, and if I may briefly just run

16 through them.

17             UNIDENTIFIED ATTORNEY:  Wait, how many are there?

18             MR. CARIGNAN:  The order appointing the future

19 asbestos PI claimants representative which is Docket Entry

20 5645, the settlement agreement and order approving that

21 settlement agreement respecting the National Union claim which

22 is adversary Docket Entry 115 in Adversary Proceeding Number

23 02-1657, the notice of transfer of the National Union claim to

24 Longacre which is Docket Entry 17648 and certain exhibits

25 specifically to and for to the plan exhibit book available on

1  the docket at Docket Entry 20874.  The items that are not

2  already part of the record, but which nevertheless the plan

3  proponents have consented to admit are the proof of claim of

4  National Union and the assignment of that claim, the assignment

5  agreement of that claim to Longacre which is appended to the

6  stipulation of facts.  And I would respectfully request that

7  that stipulation be admitted as evidence.

8            THE COURT:  Could you go back to the adversary docket

9  number for the settlement and the order that approved it with

10 National Union?  What was the docket number?

11           MR. CARIGNAN:  Adversary Docket Number 115, according

12 to my notes.

13           THE COURT:  All right.  Thank you.  Any objection?

14           UNIDENTIFIED ATTORNEY:  No.

15           THE COURT:  Okay.  Let me get a note here.

16 Longacre-1, which is the stipulation, is admitted with the

17 attachments that include the proof of claim and notice of

18 transfer and the other documents that have just been

19 articulated on the record which are Docket Numbers 115 and

20 Adversary 02-1657, Docket Number 17648 in the main case, and

21 Docket Number 20874 in the main case.

22           MR. CARIGNAN:  Thank you, Your Honor.

23           THE COURT:  Oh, and Docket Number 5645 in the main

24 case.  All right.

25           MR. CARIGNAN:  Thank you, Judge.  We were not,

1  unfortunately, able to agree as to the admissibility of one

2  exhibit which I would like to have admitted, and that is the

3  stipulation regarding the classification of claims of Morgan

4  Stanley Senior Funding, Inc.  It's available on the docket at

5  DI-21722 and I have a certified copy here, if I may approach?

6              THE COURT:  All right.

7              MR. CARIGNAN:  And, Your Honor, this exhibit I've

8  marked as Long-2.

9              THE COURT:  All right.  And what's the relevance?

10              MR. CARIGNAN:  The relevance, Your Honor, Longacre, a

11  chief component of its confirmation objection is that its claim

12  is improperly classified in Class 6 rather than where we think

13  it should be which is Class 9.  And in support of that

14  argument, we argue that similarly situated or substantially

15  similar claims are classified in Class 9 and the relevance of

16  this exhibit is that this is but one example of those

17  substantially similar claims.

18              MR. BERNICK:  Your Honor, it's not relevant.  It also

19  violates Rule 408.  This was a settlement.  It shouldn't be

20  introduced for the purpose of adjudicating some issue that's in

21  dispute and apart from the fact that we're all waiting here and

22  dealing with this.  It really should be taken up later.  There

23  are significant differences, in fact, between the situation of

24  Morgan Stanley and the situation of the other people as to whom

25  we have not reached agreement because we believe that they're

1  properly part of Class 6.

2          I don't believe that it's appropriate to argue those

3  differences, in fact, while we have a witness on the stand.

4  And I particularly don't think it's appropriate to argue them

5  because it violates Rule 408.  Settlements get reached all

6  kinds of places in this case and we don't have a settlement

7  with Longacre and National Union.  We do with those folks, and

8  that's not a proper subject for inquiry in this court.  And

9  it's certainly not appropriate to take the time of the witness

10 and 50 lawyers sitting here while we deal with it in the course

11 of what's supposed to be a proceeding on live testimony.

12         MR. CARIGNAN:  Well, again, debtor's counsel, you

13 know, they approved my request to seek to admit these exhibits

14 at this time, Your Honor.

15         MR. BERNICK:  We actually approved --

16         MR. CARIGNAN:  It's been publicly filed, it's

17 substantially similar and it should be admitted if it's --

18         THE COURT:  Well, I don't know how it's substantially

19 similar.  I mean, I just don't know.  So you're going to have

20 to produce some evidence that explains to me how it is

21 substantially similar.  So as not to hold this witness up

22 because I understand you're not intending to ask this witness,

23 Mr. Hughes, about Longacre-2, correct?

24         MR. CARIGNAN:  Correct.

25         THE COURT:  All right.  So, with respect to

1  Longacre-2, I'll defer that admission until I -- whoever the

2  proper witness is that you're going to ask about this document

3  can testify.

4        MR. CARIGNAN:  Thank you.

5        MR. BERNICK:  I know that if I stand up, somebody

6  else will stand up to ask questions, so --

7        THE COURT:  Anyone else for Mr. Hughes?  Okay, Mr.

8  Bernick.

9        MR. BERNICK:  Okay.  I just have a couple follow up

10 questions if I could get to the mic.

11                     REDIRECT EXAMINATION

12 BY MR. BERNICK:

13 Q   Mr. Hughes, I want to begin with the questions that Ms.

14 DeCristofaro asked you and in service of trying to expedite

15 this examination in that score, she asked you whether at the

16 time pre-petition that the settlements were entered into with

17 the criteria that you indicated.

18        THE CLERK:  Is your mic on, Mr. Bernick?

19        MR. BERNICK:  Yes, I think -- I need to move it up a

20 little bit closer.  Is that better?  Okay.

21 Q   At the time that we, Grace, entered into the settlement

22 that's documented as Plan Proponents 1 with Baron and Budd,

23 whether Grace was vigorously litigating, do you recall that?

24 A   Yes.

25 Q   She also asked you some questions later on about

                    **J&J COURT TRANSCRIBERS, INC.**

1  litigation developments that have taken place in succeeding

2  years.  Let me just ask you as a general proposition,

3  pre-petition, were there from time to time --

4          MS. DeCRISTOFARO:  Objection, Your Honor.  He was not

5  allowed to answer my question regarding that.

6          MR. BERNICK:  To the contrary, he was.

7          MS. DeCRISTOFARO:  Mr. Bernick objected and said he

8  couldn't answer the question regarding developments.

9          MR. BERNICK:  No, that was overruled.

10          MS. DeCRISTOFARO:  I was not allowed to --

11          THE COURT:  Just a minutes, folks.

12          MS. DeCRISTOFARO:  Sorry.

13          THE COURT:  Actually, I think I overruled the

14  objection, but you didn't pursue the line of questioning.  It's

15  -- I overruled the objection stating that the aggressive

16  litigation strategy issues were relevant to the course of

17  conduct.  You then asked about following up the information

18  and, I'm sorry, my note does not indicate here what I did.

19  Let's see.

20          MS. DeCRISTOFARO:  Your Honor, subsequently, I asked

21  him questions about developments in asbestos litigation.

22          THE COURT:  Yes.

23          MS. DeCRISTOFARO:  Mr. Bernick objected and said that

24  required a legal opinion and you directed him not to answer or

25  you overruled.  You sustained his objection and told me --

Hughes - Redirect/Bernick                    61

1    THE COURT:  I did sustain an objection to one

2 question that I thought called for a legal conclusion, that's

3 true.

4    MR. BERNICK:  You know, the world's not going to

5 change.  I think it's going to be self-evident from what Your

6 Honor already knows.

7    THE COURT:  I don't think your microphone's working,

8 Mr. Bernick.

9    MR. BERNICK:  I'm sorry.  It could be I need a

10 battery.  In more ways than one, but we'll pursue.  I think

11 it's already been evident from other testimony that at all

12 times the litigation environment changes.  Let me get to the

13 comparison that I wanted to draw.  I think you're right.  It

14 does -- it kind of goes in and out.

15    THE COURT:  It's fading in and out.  Is there another

16 one?  There's another one here.  Maybe we can get these

17 batteries changed.

18                    (Pause)

19    MR. BERNICK:  I guess after all this preparation,

20 this better be good, right?

21 Q    Post-petition.  We have a settlement in the plan with TDP

22 criteria.  Are you familiar with the fact that we have a plan

23 that has settlement criteria set forth in the TDP and

24 elsewhere?

25 A    Yes, I am.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Could you tell me about whether there was any litigation

2  which led to and in the context of which that plan was agreed?

3  A    Yes, there was.

4  Q    What was that called?

5  A    The estimation litigation.

6  Q    To your observation, was it every bit as aggressive,

7  intense, hotly contested as the litigation that Grace was

8  pursuing in the context of which it reached settlements

9  pre-petition?

10  A    Yes, it was.

11  Q    I want to talk to you about the comparisons that were made

12  by Fireman's Fund, National Union.  I guess it's Fireman's Fund

13  and National Union.  You have a tort plaintiff who is suing

14  BNSF.  BNSF then has an action that it wants to pursue over

15  against Grace pursuant to a written indemnity, without getting

16  into whether and to what extent that indemnity applies.  Do you

17  recall covering this on your direct examination?

18  A    Yes.

19  Q    Okay.  Now, we have a tort plaintiff, Edwards, sues Grace.

20  We with each other so far?

21  A    Yes, we are.  Yes, I am.

22  Q    Grace wants to take an appeal and it picks up the

23  telephone and rings I guess it's National Union or --

24  A    No.

25  Q    -- it picks up the telephone and rings Fireman's Fund.

Hughes - Redirect/Bernick                                   63

1  A    Yes.

2  Q    So Fireman's Fund now comes into the picture.  Could you

3  tell me with the bond that's entered into what becomes the

4  relationship between Fireman's Fund and Grace?

5           MR. PLEVIN:  Objection, calls for legal conclusion.

6           THE COURT:  Sustained.

7  Q    As a fact, factually, what was the relationship between

8  Fireman's Fund and Grace at that point?

9           MR. PLEVIN:  Objection, form.

10          THE COURT:  Sustained.

11 Q    Factually, what was the deal that was done between

12 Fireman's Fund and Grace?  This was gone over by Mr. Plevin,

13 but go ahead.  Factually, what becomes the deal between

14 Fireman's Fund and Grace?

15 A    Well, it's a -- creates a relationship where Fireman's

16 Fund is a surety, Grace is the principal and Edwards claimants,

17 I guess, are the obligee and Fireman's Fund is -- takes on, in

18 the event that Grace is unable to pay the judgment or any

19 judgment resulting that they would make payments to the

20 claimants in Grace's stead, I guess is a way to put it.

21 Q    So Fireman's Fund, I think one prong that you indicated

22 was a surety?

23 A    Yes.

24 Q    In connection with the surety arrangement, was there also

25 an indemnification that Grace agreed to?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, there was.

2  Q    And that would run from Grace to whom?

3  A    Back to Fireman's Fund.

4  Q    Was that a written indemnity?

5  A    I believe so, yes.

6  Q    So it's between Grace and the Fireman's Fund, the

7  indemnity would be an indemnity that would parallel BNSF versus

8  Grace?

9  A    Yes.

10        MR. PLEVIN:  Objection, calls for legal conclusion.

11        MR. BERNICK:  Well, that was a parallel that was

12  specifically asked by Mr. Plevin and drawn in exactly the same

13  terms.

14        MR. PLEVIN:  I asked individual questions about

15  individual transactions.  I didn't ask him to compare them,

16  Your Honor.

17        THE COURT:  It's sustained.

18  Q    Let's talk about the surety part of the arrangement.  In

19  the event that Grace did not pay the tort claimant, who paid

20  the tort claimant?

21  A    Fireman's Fund.

22  Q    So did I draw that arrow right?

23  A    Yes.

24  Q    Are you familiar with a term stepping into the shoes of

25  another party?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    Tell us whether or not Fireman's Fund by virtue of

3  becoming a surety, in fact, as you understood it, stepped into

4  the shoes of the tortfeasor -- alleged tortfeasor.

5  A    Yes, it did.

6  Q    And to the extent that Fireman's Fund stepped into the

7  shoes of the alleged tortfeasor, tell me whether Fireman's --

8  whether or not Fireman's Fund -- strike that.  Tell me whether

9  or not the tortfeasor could proceed directly against Fireman's

10  Fund in the same fashion that the tortfeasor could proceed

11  directly against BNSF.

12            MR. PLEVIN:  Objection.  Calls for legal conclusion

13  and form.

14  Q    As you understood it --

15  A    I think you mean --

16            MR. PLEVIN:  Objection.

17  A    -- plaintiff.

18  Q    The plaintiff's tortfeasor.

19  A    Yeah -- yes.

20            MR. PLEVIN:  Your Honor, there was no ruling on my

21  objection.

22            THE COURT:  I'm sorry, I can't hear you Mr. Plevin.

23            MR. PLEVIN:  I objected that that was both calling

24  for legal conclusion and objected to the form of the question.

25            THE COURT:  Whether or not the plaintiff could

1 proceed directly against Fireman's Fund?

2          MR. PLEVIN:  And the comparison.  He had both the --

3 he had several things happening in that question.

4          THE COURT:  All right.  Let's break the questions

5 down into pieces, please.

6 Q    Okay.  Could the tort plaintiff under those circumstances

7 by virtue of Fireman's Fund being the surety in Grace not

8 paying, could the tort plaintiff proceed directly against

9 Fireman's Fund based upon its tort entitlement?

10          MR. PLEVIN:  Calls for a legal conclusion, Your

11 Honor.

12 Q    As you understood it?

13          MR. PLEVIN:  Objection, calls for a legal conclusion.

14 He's asking the witness to interpret --

15          THE COURT:  He is.

16          MR. PLEVIN:  -- the rights of the claimants.

17          THE COURT:  He is.  That's a legal conclusion.  It's

18 sustained.  There has to be a document that sets this out.

19          MR. BERNICK:  Yes, there is.

20          THE COURT:  Then the document ought to state whether

21 or not --

22          MR. BERNICK:  Well, let's just do it, go ahead and do

23 that.  I thought it would be easier to do it this way.

24 Q    I want to show you Fireman's Fund Exhibits 2 and 3.  Do we

25 have extra copies?

1           UNIDENTIFIED SPEAKER:  We do.

2           MR. BERNICK: Thank you.

3           UNIDENTIFIED SPEAKER: Thank you.

4  Q     Could you identify for the record, Mr. Hughes, what

5  Fireman's Fund Exhibit 2 is?

6  A     It is the supersedeas bond in the <u>Aaron Clifton Edwards</u>

7  <u>vs. Pittsburgh Corning and Grace</u> case.

8  Q     Could you identify for the record what Fireman's Fund

9  Exhibit 3 is?

10 A     It's the specialty surety indemnity agreement between

11 Fireman's Fund and Grace.

12          MR. BERNICK:  We offer both of the exhibits.

13          MR. PLEVIN:  No objection, Your Honor.  This is part

14 of the stipulation that was filed with the Court at Docket

15 Number 23195.  I was going to move these documents myself at a

16 later time.

17          THE COURT:  All right.  They're admitted.

18          MR. BERNICK:  Okay.

19 Q     Now, this is a bond.  It's signed in favor of the Edwards

20 claimants?

21 A     Yes.

22 Q     Okay.  And if we take a look at the bottom of the first

23 page of Exhibit 2, do we see where the following language

24 appears?  "Now, therefore, we, Grace, as principal, and

25 Fireman's Fund Insurance Company, the surety, acknowledge

1  ourselves bound to pay to the plaintiffs -- the plaintiffs the

2  sum of 43 million," et cetera, "conditioned that the surety on

3  this bond is bound to pay all damages and costs that may be

4  awarded up -- against Grace up to the amount of this bond if,"

5  and then it goes on to list two conditions.

6  A    Yes.

7  Q    Based upon -- does that document -- as you understand that

8  document, does this bear upon your testimony that Fireman's

9  Fund under those circumstances is stepping into the shoes of

10 Grace?

11          MR. PLEVIN:  Your Honor, objection.  Calls for a

12 legal conclusion, and I would also make the objection that Mr.

13 Hughes' understanding what his interpretation of the bond is

14 irrelevant to the obligations of the parties and the rights of

15 other people under the bond.

16          MR. BERNICK:  If Your Honor --

17          MR. PLEVIN:  And I would also add that there's no

18 foundation that he was involved in the negotiation of the bond

19 or that he was part of the group.  He testified, in fact, the

20 Treasury Department handled it.

21          THE COURT:  That's sustained.

22          MR. BERNICK:  Well, Your Honor -- well --

23 Q    Do you recall that Mr. Plevin asked you for your

24 understanding about the -- about the similarities and

25 differences between BNSF and Fireman's Fund?

1  A    Yes.

2  Q    And based solely upon the understanding that you had when

3  you asked -- answered Mr. Plevin's questions, is there a

4  difference in your mind between the fact that BNSF is a direct

5  defendant -- as a -- in a plaintiff's lawsuit involving

6  personal injury does Fireman's Fund -- by virtue of this

7  agreement does Fireman's Fund now occupy the position where it

8  is responsible for the liability that's being asserted in tort?

9           MR. PLEVIN:  Objection.  Relevance.  Calls for a

10 legal conclusion.

11          MR. BERNICK:  Well, they're relevant --

12          MR. PHILLIPS:  Same --

13          MR. BERNICK:  The relevance objection is -- already

14 been undercut by the fact that the only reason I'm pursuing

15 this is it was pursued by Mr. Plevin, so he can't have it both

16 ways.  He can't open the door to precisely this comparison

17 through this witness and then insist that the witness isn't

18 qualified or isn't competent to draw the differences between

19 the same comparison.  That's all that I'm doing, is I'm drawing

20 the differences out through this testimony by the witnesses on

21 a redirect examination, because he opened the door.

22          MR. PHILLIPS:  Same --

23          MR. BERNICK:  He can't have it both ways.

24          MR. PHILLIPS:  Same objection, Your Honor.  It's a

25 legal conclusion, and if we're only asking about his

1 understanding, that's irrelevant.

2          THE COURT:  Okay.  Well, we've been asking this and

3 every other witness about their understanding through the

4 course of the trial.  So I don't know what's changed about the

5 relevance between the other witnesses and this and anything

6 else.  In terms of calling for a legal conclusion, it still is,

7 so the objection is sustained.

8 Q    Let me ask you something else.  Mr. Plevin asked you

9 questions about Grace's -- about whether Grace's conduct in

10 some fashion -- or the Fireman's Fund conduct -- I'm sorry --

11 was at issue in the same way that Grace's conduct was at issue.

12 Remember that?

13 A    Yes.

14 Q    Well, what -- let me ask you about a certain feature of

15 Fireman's Fund's conduct.  At the time that Fireman's Fund

16 entered into this relationship with Grace, at that time was it

17 already known -- did they know that they were stepping into a

18 relationship that involved a tort claim against Grace?

19          MR. PLEVIN:  Objection.  Lack of foundation.  How

20 does he know what Fireman's Fund knew.

21 Q    Well, based upon --

22          THE COURT:  Sustained.

23 Q    Based upon your knowledge of the timing of this

24 relationship, that is the timing of the Fireman's Fund/Grace

25 relationship, was the fact of the Edwards judgment known?

1 A    Yes.

2             MR. PLEVIN:  Objection.  Lack of foundation.

3 Q    Is the fact of the Edwards judgment being known, is that

4 stated --

5             MR. PLEVIN:  Your Honor, I'm --

6             THE COURT:  Wait a second.  Wait.  I'm sorry.  With

7 respect to the lack of foundation, the witness clearly knew

8 about the Edwards judgment.  He's testified about it.  How he

9 knows whether Fireman's Fund knows, I don't have a foundation

10 for --

11            MR. BERNICK:  That's why --

12            THE COURT:  -- so that is sustained.

13            MR. BERNICK:  That's why we're going to go back to

14 this document.

15 Q    If we take a look at the supersedeas bond, is this bond a

16 bond or financial relationship that is general, not specific,

17 to any kind of underlying obligation?

18 A    No, it's specific to Grace's obligation to the tort

19 claimants in -- the Edwards tort claimants and the Edwards

20 judgment claimants.

21 Q    And on the face of this document is this a situation where

22 Fireman's Fund eyes wide open was becoming involved in a tort

23 relationship?

24            MR. PLEVIN:  Objection to the form of the question.

25            THE COURT:  Sustained.

1  Q    Let's talk about National Union.  With National Union,

2  same basic configuration I want to ask you about.  What was the

3  underlying tort claim in National Union?

4  A    The asbestos personal injury claims of the clients of

5  Reaud, Morgan & Quinn and Environmental Litigation Group.

6  Q    So the clients of Reaud, Morgan & Quinn and the

7  Environmental Litigation Group are suing Grace tort claims?

8  A    Yes.

9  Q    And at the time of the entry of Grace into the

10  relationship with National Union, what was the status of those

11  tort claims?

12  A    Could you repeat the question?  I'm sorry.

13  Q    At the time that Grace entered into a relationship with

14  National Union, what was the status of the tort claims?

15  A    The cases had been settled.

16  Q    Factually -- factually what was your understanding of the

17  relationship that National Union entered into -- the agreement

18  that National Union entered into with Grace with respect to the

19  settlement of those tort claims?

20  A    National Union agreed if for any reason that Grace was

21  unable to meet its obligations to the tort claimants, that it

22  would make the payments.

23  Q    That surety relationship again?

24  A    Yes.

25          MR. BERNICK:  No further questions.

1          THE COURT:  Anyone on recross?

2          MR. PLEVIN:  No questions, Your Honor.

3          THE COURT:  All right.  You're excused, Mr. Hughes.

4   Thank you.

5          THE WITNESS:  Thank you.

6          MR. BERNICK:  At this point we would call -- recall

7   Mr. Finke to the stand for any further cross examination.  And

8   I know we worked very hard to resolve a lot of things.  I would

9   suggest though that as we go forward here, based upon what just

10  happened with Longacre, we really believe that it would be an

11  unnecessary consumption of time, particularly in light of --

12  well, an unnecessary consumption of time to have everybody come

13  up with their particular documents and offer them into evidence

14  pursuant to stipulation or argue about the relevance of

15  documents that have not been stipulated to, and I'm concerned

16  about that, because that really was the substance of the

17  discussions that took place last night.

18         THE COURT:  As long as this witness is not the

19  witness through whom some authentication or whatever else

20  that's objected to has to take place, then that issue can be

21  deferred until after Dr. Peterson testifies.

22         MR. BERNICK:  Correct.

23         THE COURT:  But if this witness is necessary for some

24  link in the evidentiary chain, then it'll have to be done

25  through this witness.

1          MR. BERNICK:  I -- thats's fair, and we are prepared

2    later on this afternoon, and I don't even know if folks have to

3    be -- you know, we are prepared later on this afternoon to

4    simply take a few minutes and just put all these documents into

5    evidence without dictating in detail what they are and -- that

6    would be our proposal, Your Honor.

7          THE COURT:  Mr. Brown.  Mr. Finke, you're still under

8    oath, sir.

9          MR. BROWN:  Good morning, Your Honor.  We worked last

10   night and did come up with a stipulation, and the purpose of

11   the stipulation is to dispense with the need to go further with

12   the cross examination or examination of Mr. Finke.  The

13   stipulation sets forth the documents that are to be admitted

14   into evidence as well as the terms pursuant to which they're

15   admitted into evidence, because some of them are not being

16   admitted for the truth of the matter asserted.

17         What might be the easiest way to do this, so that we

18   can release Mr. Finke, is for me simply to go down the list of

19   exhibits that have been stipulated to, the admissibility, and

20   then simply to say that those documents are admitted subject to

21   the terms of the stipulation, which we'll then file with the

22   Court.

23         THE COURT:  All right.

24         MR. BROWN:  Plan Proponents' 243, OS-46, OS-50, OS-

25   51, OS-15, OS-28, OS-40, OS-41, OS-44, OS-14, OS-16, OS-17, OS-

1 || 18, OS-48 --

2 ||           THE COURT:  Wait.  I'm sorry.  OS-48.  Okay.

3 ||           MR. BROWN:  48, OS-49, OS-19, OS-20, OS-27 revised,

4 || GR-14 revised --

5 ||           THE COURT:  Wait.  Pardon me one second.  I'm sorry.

6 || GS what?

7 ||           MR. BROWN:  GR-14 --

8 ||           THE COURT:  GR.

9 ||           MR. BROWN:  -- revised.

10 ||           THE COURT:  All right.

11 ||           MR. BROWN:  GR-15 revised, GR-16 revised, GR-17

12 || revised, GR-18 revised, GR-19 revised, GR-20 revised.  And

13 || that's the complete list, Your Honor.

14 ||           THE COURT:  All right.  Let me just repeat them

15 || quickly.  Plan Proponents' 243, OS-46, 50, 51, 15, 28, 40, 41,

16 || 44, 14, 16, 17, 18, 48, 49, 19, 20, and 27 revised, GR-14

17 || revised, 15 revised, 16 revised, 17 revised, 18 revised, 19

18 || revised, and 20 revised.

19 ||           MR. BROWN:  That's correct.

20 ||           THE COURT:  Okay.  One second.

21 ||                          (Pause)

22 ||           THE COURT:  Okay.  Thank you.  They're all admitted

23 || subject to the terms of the stipulation.

24 ||           MR. BROWN:  Okay.  And, Your Honor, we'll have copies

25 || of this made over the lunch break and provide Your Honor with a

Shelnitz - Direct/Bernick                              76

1  copy and copies for all the other parties.

2          THE COURT:  All right.  Thank you.  Anyone else,

3  questions for Mr. Finke?  Mr. Bernick, do you have questions

4  for Mr. Finke?

5          MR. BERNICK:  No, we don't.

6          THE COURT:  You're excused, Mr. Finke.  Thank you.

7  That was --

8          MR. BERNICK:  Boy, I tell you we're cooking now.  I

9  think our next witness is going to be Dr. Peterson.  Well,

10 actually, no, it's Mr. Shelnitz on the corporate stuff.  So I

11 -- and I think we can probably do this -- it might be actually

12 appropriate to take a short break, but it's up to you, Your

13 Honor.

14         THE COURT:  All right.  We'll take a ten-minute

15 recess.

16                         (Recess)

17         THE COURT:  Please be seated.  Mr. Bernick.

18         MR. BERNICK:  Yes, we call Mark Shelnitz to the

19 stand.

20         THE CLERK:  Raise your right hand, please.

21      MARK SHELNITZ, PLAN PROPONENTS' WITNESS, SWORN

22         THE CLERK:  Please be seated.

23         MR. BERNICK:  Good morning, Mr. Shelnitz.

24                   DIRECT EXAMINATION

25 BY MR. BERNICK:

1  Q    Could you please tell the Court what your position at W.R.

2  Grace is?

3  A    I am Vice President and General Counsel and Secretary.

4  Q    And how long have you held that position?

5  A    I've held the Secretary position since 1999 and the Vice

6  President and General Counsel position since 2005.

7  Q    Okay.  Could you just give the Court a brief overview of

8  your educational background and your career prior to getting

9  the position that you now hold?

10  A    My undergraduate degree was from the Wharton School at the

11  University of Pennsylvania, then I went on to New York

12  University School of Law for my J.D.  After a summer position

13  at a law firm, I joined Grace directly out of law school, have

14  been there almost 26 years.  My positions have evolved from

15  corporate and commercial work to transactional work, joint

16  ventures, acquisitions and divestitures and restructuring, and

17  later in my career I took over roles in management of other

18  lawyers in the department.  In 1998 I became Assistant General

19  Counsel and moved on from there to my current position.

20  Q    In your role as General -- strike that.  In your role at

21  -- in house at W.R. Grace did you have direct involvement in

22  the Sealed Air transaction?

23  A    Yes.

24  Q    During the course of your work on the Sealed Air

25  transaction, tell us whether or not it was part and parcel of

1  your ordinary duties also to become familiar with,

2  knowledgeable about the Fresenius transaction that had taken

3  place earlier.

4  A    Yes.

5  Q    Based upon your experience with those different

6  transactions, have you -- in anticipation of your appearance

7  here today, have you also gone back over to refresh your

8  recollection using the associated documents your recollection

9  of the structures that were used in connection with those

10  transactions?  That is how those transactions were structured.

11  A    Yes.

12  Q    And are you prepared here today to talk about the

13  relationship between the part of Grace that has the underlying

14  asbestos liabilities, on the one hand, and the entities at

15  Grace that subsequently merged with Sealed Air entities and

16  Fresenius entities?

17  A    Yes.

18        MR. PRATT:  Objection, Your Honor.

19  Q    -- and the relationship between the two?

20  A    Yes.

21        MR. PRATT:  Objection, Your Honor.  Could we have a

22  proffer of relevance for the record, please?

23        MR. BERNICK:  Yes, 524(g) provides that there can be

24  a channeling injunction protection with respect to parents of

25  the entity that is the tortfeasor, and we will be establishing

through this testimony that Fresenius and Sealed Air, to the
extent that they're being sued in underlying tort cases, are
being sued by virtue of their former capacity as being parents
of the W.R. Grace company that as a subsidiary was alleged to
be the tortfeasor.  So it relates to 524(g).

        THE COURT:  All right.

Q    There are a series of slides, Mr. Shelnitz, that we
prepared that will help walk the Court through these -- the
various steps of the transactions that were involved in
Fresenius and Sealed Air.  There are a series of slides --

A    Yes.

Q    -- that we have.  We have a slide show this morning.

A    Okay.  Should I be looking in my book here for them?

Q    I hope that they are.  If they're not, we're all in
trouble.

        MR. PLATT:  Your Honor, I have an objection to the
slides just as a foundational matter.

        THE COURT:  All right.

        MR. BERNICK:  Well, what's the objection?

        THE COURT:  He needs to use the microphone.

        MR. PLATT:  Your Honor, I think foundation needs to
be laid for these slides, because -- and this is the premise
for my objection.  The premise is that a lawyer on direct
examination of his own witness cannot ask leading questions
about important matters over objections.  Now, the slides, as

Shelnitz - Direct/Bernick                           80

1  Mr. Bernick just said, are to walk the Court through, and I

2  just want to use my own demonstrative to demonstrate -- to

3  illustrate, really, my objection.

4           THE COURT:  Kathy, can you turn the system on?

5           MR. BERNICK:  Look at that.

6           MR. PRATT:  Now, if that's my demonstrative --

7           THE COURT:  I can't, because the system isn't on yet.

8           MR. BERNICK:  Well, you're really missing something.

9                         (Laughter)

10          MR. BERNICK:  You know, I work so hard --

11          THE COURT:  I think even I could draw that one.

12          MR. PRATT:  Well, you know, I --

13          MR. BERNICK:  My client's paying so much money for me

14 to do this --

15          MR. PRATT:  I dare not --

16          MR. BERNICK:  -- and I -- obviously, I just don't

17 know what's going on.

18          MR. PRATT:  Well, mine aren't as slick as yours, but

19 I dared not try to draw a mountain, Your Honor, so this is what

20 I've got.  Now, if I'm going to use this demonstrative on

21 direct examination of my own witness, what I'm going to try to

22 do is ask a non-leading question on direct, and I think that

23 will illustrate the problem.  Mr. Witness, what color was the

24 traffic light when the accident occurred?  So you see the

25 problem, Your Honor?  There needs to be a foundation as to

1 these demonstratives that the witness either prepared them --

2          MR. BERNICK:  I can't --

3          MR. PRATT:      -- or knows about them before Mr.

4 Bernick uses those demonstratives to lead the witness through

5 his direct examination.

6          THE COURT:  All right.  That's the same objection we

7 had before.  I think Mr. Bernick can lay the foundation before

8 the document is actually displayed.

9          MR. BERNICK:  This is really going to be

10 extraordinary inefficient, but I'll try.

11 BY MR. BERNICK:

12 Q    First of all, let me just ask you, Mr. Shelnitz, these

13 different slides that we have here -- these different slides

14 that we have here, have you ascertained whether or not they

15 are, in fact, a reflection of the underlying corporate

16 documents?

17 A    Yes.

18 Q    Okay, and do they accurately portray the underlying

19 corporate documents?

20 A    I believe so.

21 Q    Now, I didn't realize this morning that Mr. Pratt, I

22 believe it was, was going to zero in on Green.  Would these

23 slides be any different if we did them all in red?

24                    (Laughter)

25 A    I'll take that as a rhetorical question.

1  Q    Okay.  Let's begin before 1988, the world before 1988.

2  What was the main operating entity of W.R. Grace?  What was its

3  name?

4  A    W.R. Grace and Co.

5  Q    Okay, and with respect to W.R. Grace and Co. tell us what,

6  if any, relationship there was between that operating entity

7  and the businesses that gave rise to the claims of asbestos

8  liability.

9  A    That operating entity operated the asset ownership -- most

10 of the businesses of W.R. Grace as a consolidated group.  In

11 particular, it operated the construction products division.

12 The construction products division produced products that gave

13 rise to Grace's asbestos-related liability.

14 Q    Was there an entity named National Medical Care, Inc.

15 before 1988 that had a relationship with W.R. Grace and Co.?

16 A    Yes.

17 Q    And what was the business and what was the nature of the

18 relationship with W.R. Grace and Co.?

19 A    National Medical Care, Inc. was a wholly-owned subsidiary

20 of W.R. Grace and Co.  It was acquired probably around 1984.

21 It was engaged in the medical care service business,

22 principally kidney dialysis.

23 Q    Okay.  Showing you Exhibit -- do you have Exhibit 507-1?

24 I can put it on the screen.  Tell me whether or not this

25 accurately reflects the testimony that you offered regarding

Shelnitz - Direct/Bernick                    83

1  the pre-1988 status of those entities.

2  A    That is an accurate reflection of those two entities.   I

3  will remark that W.R. Grace and Co. also owned several other

4  businesses that are not reflected there, but they're not

5  relevant to subsequent transactions.

6  Q    Did the time come in 1988 when there was a reorganization

7  affecting W.R. Grace?

8  A    Yes.

9         MR. PRATT:  Objection, Your Honor.  The term, as

10 you'll see from these slides -- the term W.R. Grace has a lot

11 of antecedents, and I think it would be helpful if Mr. Bernick

12 and the witness referred to this one by the name W.R. Grace and

13 Co., a Connecticut corporation, if that's correct.

14         MR. BERNICK:  Well, now that I can't show the slide

15 or use the slide until I ask the questions, I'm not sure how

16 it's appropriate that I be given guidance if we're going to use

17 the demonstrative on how to ask the questions.  I'll try to

18 accommodate Mr. Pratt's concern about precision.

19 Q    Was there or was there not a reorganization that took

20 place in 1988?

21 A    Yes.

22 Q    And could you tell the Court what happened in that

23 reorganization?  And please be sure if there is a specific name

24 of a specific company that you recall, to state clearly for Mr.

25 Pratt and the Court's benefit what that name is.

1  A    Through a series of formation and a merger transaction,

2  W.R. Grace and Co., the Connecticut corporation then existing

3  at the time, was converted into a holding company structure

4  whereby after those transactions a new company, formerly known

5  as W.R. Grace and Co.-New York, that subsequently renamed W.R.

6  Grace and Co., stood atop the W.R. Grace and Co. Connecticut

7  corporation.

8  Q    Okay.  Which company, as a result of that reorganization,

9  actually held the underlying construction business and with it

10 the associated liabilities?

11 A    The Connecticut corporation, formerly named W.R. Grace and

12 Co., which was renamed W.R. Grace and Co.-Conn, hence the

13 Connecticut corporation to be distinguished from the new parent

14 company, the New York corporation.

15 Q    You just answered the next question, but following that

16 reorganization, what was the relationship of the new W.R. Grace

17 and Co. to the entity that had the underlying tort liabilities?

18 A    It was the parent corporation.

19 Q    Thank you.  I'm showing you 507-2.  Could you tell us

20 whether or not that accurately reflects the substance of the

21 1988 reorganization?

22 A    It does.

23 Q    Let's now turn to a further change in connection with the

24 Fresenius transaction.  Between the time of the 1988

25 reorganization and the Fresenius transaction, did -- was there

1 a free -- a further organizational change that took place?

2 A    Yes.

3 Q    Could you tell the Court what the further organization

4 change was that took place?

5 A    There were a few different transactions that took place in

6 preparation for the Fresenius transaction, one of which was for

7 the holding company, W.R. Grace and Co., the New York

8 corporation, to form a new subsidiary named Grace Holdings,

9 Inc.  A second step preceding the Fresenius transaction was to

10 move National Medical Care, then a subsidiary directly held by

11 W.R. Grace and Co.-Conn., to move it directly under the holding

12 company W.R. Grace and Co.

13 Q    Showing you demonstrative -- Plaintiff's Demonstrative

14 507-3.  Does that or does it not accurately reflect the changes

15 that you've now just described?

16 A    It does.

17 Q    Let's talk about the Fresenius transaction.  Would it be

18 best to look at the Fresenius transaction in a couple different

19 parts?

20 A    Yes.

21 Q    Now we're going to get very tricky.  This is hard to

22 recall, but could you tell the Court in your own words what the

23 different transactional steps were that were involved in the

24 process of completing the Fresenius transaction?

25 A    Okay.  The Fresenius transaction basically separated

1  Grace's medical care business, National Medical Care, from its

2  chemical and all other businesses held by W.R. Grace and Co.-

3  Conn. and other subsidiaries.  The way the transactions -- the

4  way the companies were separated was that Grace Holdings, Inc.,

5  that newly formed subsidiary, became the parent -- directly

6  held parent company of W.R. Grace and Co.-Conn.  And that was

7  -- that was consummated basically via contribution by W.R.

8  Grace and Co., the New York corporation, of the stock of Grace-

9  Conn. to Grace Holdings.  So now we have a structure where W.R.

10 Grace and Co.-Conn. is directly held by Grace Holdings.

11 Q    Okay.

12 A    The ultimate parent, W.R. Grace and Co., the New York

13 corporation, then spun off to the public shareholders shares of

14 Grace Holdings, Inc.  So the public shareholders at that point

15 in time owned 100 percent of Grace Holdings, Inc., which again

16 held W.R. Grace and Co.-Conn. and the construction-related

17 businesses, and continued to own W.R. Grace and Co., the New

18 York corporation, which now had just the medical care business

19 as a wholly-owned subsidiary.  That's what I would call the

20 first step in the -- in a two-part transaction.

21 Q    And does Exhibit 507-4 as a demonstrative accurately

22 reflect the basic moves that you've now just described?

23 A    Yes, it does.

24 Q    Now, again, before we lose track of Parent 1, is Parent 1

25 the company that used to be the direct parent of W.R. Grace,

1  that is the New York company?

2  A    Correct, the company formed in the 1998 reorganization.

3  Q    Okay, so the relationship of Parent 1 to the company with

4  the liabilities, parent sub?

5  A    Yes.

6  Q    And that parent now is moving up and really becoming

7  separate from the new parent, Parent 2, Grace Holdings?

8  A    That's correct.  Once Grace Holdings was spun off to the

9  public, Parent 1 no longer had an ownership interest, direct or

10  indirect, in W.R. Grace and Co.-Conn.

11  Q    But it was taking --

12         MR. LOCKWOOD:  Wait a minute, Mr. Bernick.  The

13  witness said that he --

14         THE CLERK:  You need to use a mic.

15         MR. LOCKWOOD:  The witness testified that the New

16  York company was formed in the 1998 reorganization.

17         THE WITNESS:  I said '88.

18         THE COURT:  1988.

19         MR. LOCKWOOD:  Thank you.

20         MR. BERNICK:  You've got to keep track here, Pete.

21         MR. LOCKWOOD:  It's on the screen.  I heard it and

22  the Court reporter heard it as 1998.

23         THE COURT:  I heard it as 1988.  What's correct, sir?

24         THE WITNESS:  1988.

25  Q    Once that took place was the parent -- when parent

1 contributed the stock to the new parent, Parent 1, the New York

2 corporation, separate but did it take along with it the NMC

3 subsidiary?

4 A    Yes.

5         THE COURT:  I'm sorry.  I missed the question.  Would

6 you state it again?

7         MR. BERNICK:  Yes, I'll restate it.

8 Q    Once the parent contributed its stock -- Parent 1, New

9 York, contributed its stock in the operating company, Grace-

10 Conn., to what used to be Grace Holdings and now is going to

11 become Parent 2, I think you've told us that Parent 1 is now

12 detached from the Grace organization?

13 A    Correct.

14 Q    But it carries with it the medical products business.

15 A    Correct.

16 Q    Now what role, if any, did that Parent 2, the former

17 direct parent of the operating company -- what role, if any,

18 did Parent 2 go on to play in connection with the Fresenius

19 transaction?

20 A    Well, Parent 2 --

21 Q    I'm sorry.  Parent 1.  What role -- I was pointing at

22 Parent 1 --

23 A    Okay.  Parent 1.

24 Q    -- and I said Parent 2.  What role, if any, did Parent 1

25 go on to play in the Fresenius transaction?

1  A    Well, Parent 1 merged with a subsidiary of Fresenius A.G.

2  Fresenius A.G. was a German holding company publicly traded on

3  the Frankfurt Exchange.  It had a number of different

4  subsidiaries, including U.S. subsidiaries.  It merged with one

5  of the U.S. subsidiaries.  Parent 1, W.R. Grace and Co., the

6  New York corporation, was the surviving corporation in the

7  merger, and following that transaction the combined

8  corporation, Parent 1 and Fresenius' subsidiary, continued to

9  own and operate National Medical Care.

10 Q    I'm showing you 507-5.  Does that accurately reflect the

11 transactions and events that you've just now described?

12 A    In summary fashion, yes.

13 Q    Okay.  Let's talk about the Sealed Air transaction.  Prior

14 to the Sealed Air transaction, we now have, just to review the

15 bidding -- prior to the Sealed Air transaction we have the

16 operating company is still W.R. Grace and Company, a

17 Connecticut corporation, and that still has the asbestos

18 liabilities?

19 A    Yes.

20 Q    And the new parent, Parent 2, is what used to be Grace

21 Holdings but now is called W.R. Grace and Company?

22 A    Correct, it changed its name.

23 Q    Okay.  What further changes, if any, took place before the

24 Sealed Air transaction was executed?

25 A    Again, similar to the Fresenius transaction structure, in

1  order to prepare for the Sealed Air transaction, Parent 2, the

2  new holding company, W.R. Grace and Co., now a Delaware

3  corporation, formed a new co and was named Grace Specialty

4  Chemicals, Inc.  At the same time, in order to do the Sealed

5  Air transaction, Grace needed to separate its packaging

6  business from its chemicals business, and the packaging

7  business was in the U.S. unincorporated.  Its assets were held

8  directly by W.R. Grace and Co.-Conn.  So those packaging assets

9  were pushed down into a subsidiary named Cryovac, Inc., and it

10 became a separate subsidiary initially held directly by W.R.

11 Grace and Co.-Conn.  Similar to the NMC/Fresenius transaction,

12 W.R. Grace and Co.-Conn. then transferred the shares of

13 Cryovac, Inc. to Parent 2, so it was, therefore, held directly

14 by Parent 2, directly by the holding company, W.R. Grace and

15 Co.  So those were the steps -- there were many others, but

16 those were the primary steps that were taken as a prelude to

17 the Sealed Air transaction.

18 Q    I'm showing you Exhibit 507-6.  Does that accurately

19 reflect what you've just described?

20 A    Yes.

21 Q    Now, at this point in time the asbestos liabilities and

22 the former business -- the construction business still held by

23 the operating company, Grace-Conn.?

24 A    Correct.

25 Q    And what was the relationship between the new W.R. Grace,

1  which we've called Parent 2, and the entity that had the

2  asbestos liabilities?

3  A     Parent 2 held the shares of W.R. Grace and Co.-Conn.

4  Q     So parent sub?

5  A     Parent sub.

6  Q     Okay.  Now, tell us what the steps were of the Sealed Air

7  transaction, and again, would it be useful to describe them in

8  two parts?

9  A     Yes.

10  Q     Just take us through the first part.

11  A     The first part had Parent 2 contributing its ownership

12  interest -- the shares of Grace-Conn. to Grace Specialty

13  Chemicals, Inc.  The result of which was that Grace-Conn. now

14  became a directly held subsidiary of Grace Specialty Chemicals,

15  Inc.

16  Q     Is that parallel to pretty much the same as what happened

17  with Grace Holdings in connection with the Fresenius

18  transaction?

19  A     Yes.

20  Q     Okay.

21  A     Grace Specialty Chemicals, Inc. was then spun off to the

22  shareholders -- the public shareholders of Parent 2, what

23  became a standalone publicly held corporation divorced of

24  Parent 2.  That would be the first step of the Sealed Air

25  transaction to separate chemicals and packaging.

1 Q    Does 507-7 now accurately reflect the transaction that

2 you've described?

3 A    Yes.

4 Q    Now, in this transaction Parent 2 is the same parent that

5 in 507-6 was the parent that was the direct parent of the

6 operating company that had the asbestos liabilities?

7 A    Correct.

8 Q    Did Parent 2 in 507-7 go on to participate further in the

9 Sealed Air transaction?

10 A    Yes, it did.

11 Q    And could you describe what happened?

12 A    In that transaction Parent 2, W.R. Grace and Co., the

13 Delaware corporation, merged with Sealed Air Corporation, a

14 publicly traded U.S. corporation that had a protective

15 packaging business.  Parent 2 was the surviving corporation in

16 that transaction, and the merged entity had as a wholly-owned

17 subsidiary the Cryovac, Inc. packaging business.

18 Q    Okay.  Is that now accurately reflected in Exhibit 507-8?

19 A    Yes.

20 Q    What's the current relationship -- what's the current

21 parent subsidiary relationship between W.R. Grace and Co. and

22 the operating business?

23 A    It -- the operating business is a wholly-owned subsidiary

24 of the new W.R. Grace and Co.  That was Grace Specialty

25 Chemicals, Inc., which after the spinoff changed its name to

1  W.R. Grace and Co., and I guess you can call it Parent 3.

2  Q    Okay.  Does Exhibit 507-9 accurately reflect that

3  relationship?

4  A    Yes.

5         MR. BERNICK:  Your Honor, we offer for demonstrative

6  purposes --

7         THE COURT:  Wait.  I'm sorry.  Before you do that, I

8  lost this last transaction.  I don't know which W.R. Grace

9  we're talking about in the 507-9 I think.

10 Q    Yes, 507-9 -- I think if we go back to 507-7 --

11        THE COURT:  All right.

12 Q    -- is an accurate -- in 507-7 Grace Specialty Chemicals

13 becomes the new parent of the operating company, and the old

14 parent, Parent 2, goes off on its way separately to participate

15 in the Fresenius transaction --

16 A    Sealed Air.

17 Q    -- Sealed Air transaction reflected in 507-8.

18 A    That's correct.

19 Q    So if we go back to 507-7, Parent 3 is the new parent that

20 was put in place through a contribution of stock to the

21 operating company prior to the Sealed Air transaction?

22 A    Yes.

23 Q    Is that now still the parent company today as Parent 3 is

24 reflected in 507-9?

25 A    Yes, Grace Specialty Chemicals, Inc. changed its name to

1 W.R. Grace and Co.  At the same time the old W.R. Grace and

2 Co., which we've been calling Parent 2, changed its name to

3 Sealed Air Corporation.

4          MR. BERNICK:  Is that okay, Your Honor?

5          THE COURT:  Yes.

6          MR. BERNICK:  Thank you.  We would offer for

7 demonstrative purposes 507-1 through 507-9.

8          MR. PRATT:  Objection, Your Honor.  Mr. Shelnitz

9 testified that these are accurate.  Actually, I think he will

10 agree with me on cross examination that they're not entirely

11 proper.

12          THE COURT:  I'm having trouble hearing you, Mr.

13 Pratt.  I'm sorry.  I think that microphone's being used for

14 the Lavalier mic, so that one microphone on the end isn't live.

15          MR. PRATT:  Your Honor, I'd prefer if the Court would

16 delay ruling.  The witness testified that these demonstratives

17 are accurate, but they're not quite accurate, and I'm going to

18 bring that out on cross.  So before they're admitted, I'd like

19 to bring that out.  Maybe they can be corrected, but I'd like

20 the Court to defer ruling on whether they're admissible even as

21 demonstratives at this point.

22          MR. BERNICK:  They're not being proffered as a

23 stipulated set of demonstratives.  They're being proffered as

24 demonstratives that would aid the Court in understanding Mr.

25 Shelnitz's testimony, and they should come in for that purpose.

1  It's relatively unusual to have a demonstrative as to which

2  everybody agrees its accuracy, so that goes to the weight.  It

3  doesn't go to admissibility.

4        THE COURT:  I think it does go to the weight, Mr.

5  Pratt, but you can certainly ask questions about them on cross,

6  and then if it turns out that they're inaccurate, then I will

7  take them back out of the record.  But I think as

8  demonstratives for this witness' testimony right now, they're

9  admissible for that limited purpose.  One second, please.

10                           (Pause)

11        THE COURT:  All right, Mr. Bernick.  Thank you.

12  Q    I have some general questions to ask you based upon what

13  you just now testified.  At any point in time did any Grace

14  entity hold the asbestos liabilities other than the operating

15  entity?

16  A    No.

17  Q    At all points in time what was the relationship between

18  that operating entity -- that operating entity that had the

19  liabilities and the entity that went on to participate in the

20  mergers with first Fresenius and then with Sealed Air -- what

21  was the relationship between the operating entity with the

22  liabilities and the entity that respectively went off to do

23  Fresenius and respectively went off to do Sealed Air?

24  A    It was a parent subsidiary structure, directly held

25  subsidiary.

1 Q    Were there -- in connection with these transactions, were

2 there indemnities that were given to first Sealed -- first

3 Fresenius and then Sealed Air?

4 A    Yes, very expensive indemnities.

5 Q    With respect to the Fresenius transaction, did those

6 indemnities cover liabilities -- those liabilities other than

7 those arising from the medical care business?

8 A    That would be correct.

9 Q    And with respect to Sealed Air, did Grace give indemnities

10 to Sealed Air that covered liabilities -- all liabilities other

11 than those arising from the packaging business?

12 A    Yes.

13 Q    Since the transaction was consummated first with Sealed

14 Air and then -- first with Fresenius and then with Sealed Air,

15 have lawsuits, in fact, been filed against Fresenius and Sealed

16 Air arising out of the asbestos business of Grace's operating

17 company?

18 A    Yes.

19 Q    I want to show you Exhibits 121, 120 -- who's OS?  Oh, One

20 Beacon 20, 129 -- Proponents' 129 and Proponents' 143.  They

21 should all be in the book in front of you, and I'm just going

22 to take you through them and then offer them into evidence.

23 A    Okay.

24 Q    In fact, since the -- both shortly before and since the

25 bankruptcy petition have been filed, have lawsuits been brought

1  by tort claimants against both of the entities?

2  A    Yes.

3  Q    And do these documents reflect the existence of these

4  lawsuits?

5  A    Yes.

6  Q    Okay.  Taking you through first 121 -- Plan Proponents'

7  121, is this a copy of a class action complaint that was filed

8  against both Grace and Sealed Air arising out of Grace's

9  asbestos-related activities?

10  A    Yes.

11  Q    Taking you to Plan Proponents' --

12          THE COURT:  I'm sorry.  121.  The question was

13  whether it's against both Sealed Air and --

14          MR. BERNICK:  Grace.

15          THE COURT:  Oh, Grace.

16          MR. BERNICK:  W.R. Grace and Company, a Delaware

17  corporation, and Conn, the operating --

18          THE COURT:  All right.

19          MR. BERNICK:  -- the operating company arising out of

20  Grace's asbestos-related activities.

21          THE COURT:  Okay.  Thank you.

22  Q    And then taking you to Plan Proponents' 120, is this also

23  a lawsuit against both Grace Delaware, Grace Conn, and Sealed

24  Air once again arising out of Grace's activities that related

25  in part to asbestos?

1  A    Yes.

2  Q    OS-20, is this a copy of the proof of claim of the Sealed

3  Air Corporation in this case?

4  A    Yes, it is.

5  Q    Plan Proponents' 129, is this a copy of a different

6  lawsuit that was filed shortly before the Chapter 11 that was

7  brought against Grace, various entities, and then also Sealed

8  Air and Fresenius arising out of Grace's historical asbestos-

9  related activities?

10  A    Yes.

11  Q    And finally, Plan Proponents' 143, is this an addendum to

12  the proof of claim of Fresenius in connection with this case?

13  A    Yes, it is.

14         MR. BERNICK:  Your Honor, we offer all of these

15  exhibits for the fact that the litigation was being pursued

16  prior to the bankruptcy petition by claimants against -- the

17  tort claimants against Sealed Air and Fresenius.  That those --

18  and that those suits continued after the bankruptcy was filed,

19  and the Court will know from the record before the stay was

20  instituted and are the subject of claims that are now being

21  made by Sealed Air and Fresenius in the bankruptcy.  So it's

22  for the fact of the -- that litigation and those claims in the

23  bankruptcy not for the truth of the matters that are asserted.

24         MR. LOCKWOOD:  Mr. Bernick, one question.  Do you

25  include Exhibit 126 when you say all these exhibits, which you

1 did not show to the witness or do you mean to exclude Exhibit

2 126?

3          THE COURT:  Your microphone is not on, Mr. Lockwood.

4          MR. LOCKWOOD:  Exhibit 126.  I'm sorry.  I wasn't

5 talking into it.

6          MR. BERNICK:  I didn't see Exhibit 126.

7          MR. LOCKWOOD:  What?

8          MR. BERNICK:  What are you --

9          MR. LOCKWOOD:  It's Tab 2.

10          MR. BERNICK:  Yes, I didn't -- we don't need Tab 2.

11          THE COURT:  Mr. Pratt.

12          MR. PRATT:  No objection, Your Honor.

13          THE COURT:  All right.  Exhibits, Plan Proponent 121,

14 120, 129, and 143 are admitted, and OS-20 is admitted.  Give me

15 a second, Mr. Bernick.

16                         (Pause)

17          MR. BERNICK:  You may have mentioned this, and I just

18 didn't hear.  There would be a total of five exhibits, 1 --

19          THE COURT:  Yes.

20          MR. BERNICK:  Okay.

21          THE COURT:  120 and 21, 129, 143, and OS-20.

22          MR. BERNICK:  Yes, that's right.  We pass the

23 witness.

24          THE COURT:  Mr. Pratt.

25          MR. PRATT:  Good morning, Mr. Shelnitz.  Warren Pratt

1  representing creditors One Beacon and Seaton.

2          THE WITNESS:  Good morning.

3                    CROSS EXAMINATION

4  BY MR. PRATT:

5  Q    I don't -- I didn't -- it didn't register with me when you

6  said when you first started with Grace companies.

7  A    1983.

8  Q    1983.  And you're currently Vice President and General

9  Counsel and Secretary?

10  A    Correct.

11  Q    Of which entity?

12  A    W.R. Grace and Co., Parent 3, and W.R. Grace and Co.-Conn.

13  Q    And in that capacity you're an officer of those entities?

14  A    That's correct.

15  Q    Now, at some point in the General Counsel's office -- when

16  you first came to the General Counsel's office, to whom did you

17  report?

18  A    In 1983?

19  Q    Yes.

20  A    I don't recall.

21  Q    At some point did you come to report to David Siegel?

22  A    Yes.

23  Q    And that's your predecessor as General Counsel?

24  A    That's correct.

25  Q    And what are you present duties, just in a nutshell?

Shelnitz - Cross/Pratt                              101

1  A    I manage Grace's worldwide legal affairs.  I am a Chief

2  Liaison with the Board.  I function as Grace's Chief

3  Restructuring Officer in the bankruptcy, do most types of

4  things you would expect a General Counsel to do.

5  Q    As General Counsel, do you have occasion to sign

6  declarations that get filed with the court?

7  A    Yes.

8  Q    Now, I'm going to go back through these slides and take

9  another pass, and I'm going to focus specifically on the names

10 of the -- some of the entities and the timing involved.  Now,

11 this entity here, W.R. Grace and Co., that was a Connecticut

12 corporation.  Correct?

13 A    Correct.

14 Q    And that corporation was formed in 1899?

15 A    I believe that's correct.

16        MR. BERNICK:  Your Honor, this -- we're happy to go

17 over and hear corrections, but they should be relevant

18 corrections.  The date on which Grace-Conn. was founded is not

19 of relevance.

20        MR. PRATT:  Well, it's a matter of history, Your

21 Honor.

22        MR. BERNICK:  Well, lots of history.  That's great.

23 But can we keep it to something that -- object on relevance

24 grounds.

25        THE COURT:  Okay.  That's sustained.  Let's move, Mr.

Shelnitz - Cross/Pratt                    102

1  Pratt.

2  Q    Mr. Shelnitz, I'd like to refer to W.R. Grace and Co., the

3  entity -- the Connecticut corporation that's shown on this page

4  as Old Grace.  Have you ever heard that term Old Grace before?

5  A    Yes.

6  Q    Was this company called Old Grace in 1988 at the time of

7  its incorporation -- or excuse me -- at the time of the

8  reorganization?

9  A    I don't recall.

10  Q    Okay.  Well, let's go to Slide 2.

11        MR. BERNICK:  Could we then refer to it as Grace-

12  Conn. if the witness doesn't recall Old Grace?

13  Q    Now, see Number 1 up here at the upper right?

14  A    Yes.

15  Q    This says, "W.R. Grace and Co. reorganized into a holding

16  company, Parent 1."  I don't think that's quite precise, but

17  maybe you can tell me which W.R. Grace and Co. is referred to

18  in that Note 1 there.

19  A    It was meant to depict a general reorganization of the

20  Grace group, a consolidated Grace entity.

21  Q    Okay, so what happened here is that the -- a new company

22  was formed, and that new company is at the very top.  Isn't it?

23  A    Correct.

24  Q    And that's W.R. Grace and Co., a New York corporation.

25  A    Correct.

J&J COURT TRANSCRIBERS, INC.

Shelnitz - Cross/Pratt                                    103

1  Q    And that's sometimes called Grace New York.  Correct?

2  A    Colloquially, yes.

3  Q    And you labeled it here Parent 1 or this slide labels it

4  Parent 1.  And beneath that W.R. Grace and Co.-Conn., Note 2

5  says the operating company was changed to that name in 1988,

6  correct, to add Conn.

7  A    Correct.

8  Q    And that reflects it's a Connecticut corporation.

9  A    Correct.

10 Q    Now, this happened in 1988.  Correct?

11 A    Correct.

12 Q    And this organizational structure continued from 1988 up

13 until the Fresenius transaction closed.  Isn't that right?

14          MR. BERNICK:  Objection.  Your Honor, I -- the cross

15 examination's great, but can we get to some -- I mean this is

16 just going back over exactly the same ground that he gave on

17 direct.  If we can get to something that's different, that

18 might be helpful.

19          MR. PRATT:  I'm taking it fairly quickly, Your Honor.

20 This shouldn't take too long.

21          THE COURT:  All right.  Go ahead.

22          MR. PRATT:  Thank you.

23 Q    Did you remember the question, Mr. Shelnitz?

24          THE COURT:  I don't.

25 A    I don't either.

1  Q    Okay.  This diagram, Slide 2 here that we're looking at,

2  this shows the organization of the company, W.R. Grace and its

3  affiliates from 1988, when this reorganization occurred, up

4  until the closing of the Fresenius transaction.  Is that right?

5  A    Not up until the closing of the Fresenius transaction.

6  That's incorrect.  There were interim steps to prepare for the

7  Fresenius transaction.  And further, to answer your question,

8  this is not what the entire Grace group looks like.  There were

9  other subsidiaries.  There were other businesses.  But for

10 purposes of understanding the Sealed Air/Fresenius

11 transactions, this would be relevant.

12 Q    Okay, and this relevant part didn't change until 1996.

13 Did it?

14 A    I think that's correct.

15 Q    Okay.  Now, Fresenius transaction closed in September of

16 1996.  Is that right?

17 A    Correct.

18           THE COURT:  I'm sorry.  When?  What was the year?

19           MR. PRATT:  September, 1996.

20           THE COURT:  All right.  Thank you.

21 Q    I'm going to skip Number 3, and we'll go to Number 4.

22 Now, this says at the top the Fresenius transaction took place

23 in September, 1996.  Correct?

24 A    Correct.

25 Q    And that was -- the next slide is labeled Fresenius

1  transaction, Part 2.  All of -- Part 1 and Part 2 were

2  essentially simultaneous.  Weren't they?

3  A    I believe that's correct.

4  Q    Now, I just want to clarify --

5           THE COURT:  Mr. Pratt, just a second.  Kathy, did we

6  lose the phone?

7           THE CLERK:  Yes, Judge.

8           THE COURT:  Okay.

9           THE CLERK:  I'll get them back on.

10           THE COURT:  Just a second, Mr. Pratt.  I'm sorry.

11                          (Pause)

12           MR. BERNICK:  Are these local astronomical

13  disturbances, Your Honor?

14           THE COURT:  The President's coming to town today, and

15  one never knows.

16           MR. BERNICK:  That may be plausible.

17                          (Pause)

18           THE CLERK:  Okay, Judge.

19           THE COURT:  Court Call, Operator, are you back live?

20           OPERATOR:  Yes, we are back live.  Thank you so much.

21           THE COURT:  Thank you.  Okay, Mr. Pratt.  Thank you.

22           MR. PRATT:  Thank you, Your Honor.

23  BY MR. PRATT:

24  Q    Mr. Shelnitz, we're looking at Slide 4 here, Exhibit 507-

25  4.  What's labeled at the top Parent 1, that's W.R. Grace and

1  Co., a New York corporation.  Correct?

2  A    Correct.

3  Q    And it shows here off to the right Grace Holdings, Inc.

4  That's a Delaware corporation that was actually created in

5  January, 1996.  Correct?

6  A    Correct.

7  Q    And that was part of the Fresenius transaction when

8  everything was ready to go on that transaction in September.

9        MR. BERNICK:  Objection are we talking specifically

10  about the creation of Holdings?

11        MR. PRATT:  Yes, Grace Holdings was created in

12  January, 1996.

13  A    Correct.

14        MR. BERNICK:  Right, and so you --

15  Q    Do you agree with that?

16        MR. BERNICK:  Then I don't understand the question.

17  If this was created in 1996 and the transaction doesn't take

18  place until September, then I don't understand what your

19  question is.

20        MR. PRATT:  Well, Your Honor, the witness just

21  testified that Grace Holdings was created in January, 1996, and

22  maybe just for clarification --

23  Q    Mr. Shelnitz, was that in preparation for a transaction

24  that would occur later?

25        MR. BERNICK:  Oh, okay, so for a transaction not

1  specifically the Fresenius transaction?

2           MR. PRATT:  A transaction.

3  A    I don't recall.

4  Q    Okay.  Grace Holdings, Inc. is a Delaware corporation?

5  A    Yes.

6  Q    And as part of the Fresenius transaction, that was

7  actually renamed.  Wasn't it?

8  A    Yes.

9  Q    And the renaming of the company was W.R. Grace and Co.

10 A    That's what I said earlier, yes.

11 Q    But it remained a Delaware corporation.

12 A    Yes.

13 Q    So W.R. Grace and Co., a Delaware corporation, is the same

14 company as Grace Holdings, Inc.  It's just been that the name

15 changed.

16 A    Yes.

17 Q    And it says on here Grace Holdings, Inc.  I'm looking at

18 the second block down.  It says Parent 2.  Is that right?

19 A    Yes.

20 Q    So we can call that Parent 2 for purposes of these slides?

21 A    Once the -- yes.  Once the spinoff occurred, it became the

22 ultimate parent and direct parent of Grace-Conn.

23          MR. BERNICK:  Your Honor, again this is all -- I mean

24 this is Note 7.  It's right on the face of the slide.  I -- so

25 far, we're just reiterating.  Is there something that's

Shelnitz - Cross/Pratt                    108

1  different?

2          MR. PRATT:  Your Honor, I'm moving right along here.

3  This isn't going to take long.  This is a very complicated set

4  of slides and, obviously, some very complicated transactions.

5          THE COURT:  Go ahead, Mr. Pratt.

6          MR. PRATT:  Thank you, Judge.

7  Q    Mr. Shelnitz, we're looking at Slide 5, Exhibit 507-5.

8  And here again, Mr. Shelnitz, Parent 1 is W.R. Grace and Co., a

9  New York corporation.  Right?

10 A    Correct.

11 Q    And this illustrates the closing that happened in the

12 Fresenius transaction in September, 1996.  Now, the block on

13 the left here, it says, "Parent 1 merged with a Fresenius

14 Medical Care, A.G. subsidiary and was renamed Fresenius

15 National Medical Care, Inc."  I want to ask you a couple of

16 things about that just as a point of clarification, and I want

17 to contrast that with Slide Number 8.  So let me just put this

18 up for a minute.  Now, here this block says, "Sealed Air

19 Corporation merged into Parent 2," it doesn't say merged with

20 Parent 2.  It says merged into.  And I want to go back to Slide

21 5, Exhibit 507-5 and ask you about this Note 8 at the upper

22 left.  Isn't what actually happened that Fresenius had a

23 subsidiary and, actually, during this transaction the

24 subsidiary merged into Parent 1, Grace New York?

25 A    I think that's correct.

Shelnitz - Cross/Pratt                    109

1  Q    Okay, so that after the merger Parent 1, Grace New York,

2  was the surviving company?

3  A    That's correct.

4  Q    All right.  Now, second of all, in this block up here it

5  says that, "As a part of this transaction, Parent 1, Grace New

6  York, was renamed Fresenius National Medical Care, Inc."

7  Actually, at the time of the transaction wasn't that entity

8  called -- renamed Fresenius National Medical Care Holdings,

9  Inc.?

10 A    It may have been.  That would've been within Fresenius'

11 domain as to what to change the name to.

12 Q    You don't recall one way or the other?

13          MR. BERNICK:  Holdings, Inc.?

14          MR. PRATT:  Yes, Fresenius National Medical Care

15 Holdings, Inc.

16          MR. BERNICK:  Holdings.

17          MR. PRATT:  Your Honor, just to expedite this, I

18 could try to refresh the witness' recollection, but maybe Mr.

19 Bernick will stipulate to it.  If we look at the plan

20 definition -- and I'm looking now in Section 1.1 of the plan,

21 Page 25.  This is 1.1, Subparagraph 115, and it's a defined

22 term, FCMH -- FMCH -- I'm sorry -- and that's says, "Fresenius

23 Medical Care Holdings, Inc., a New York corporation, formerly

24 named W.R. Grace and Co. and Fresenius National Medical Care

25 Holdings, Inc. and its affiliates."

1          MR. BERNICK:  Well, actually, the difference there is

2   the word National, so we're happy to make any and all

3   corrections that are appropriate to make this slide accurate.

4   I'm not prepared to agree to change some language in the plan

5   at this point --

6          MR. PRATT:  No.  No.  No.

7          MR. BERNICK:  -- as it -- so --

8          MR. PRATT:  No, I think, actually, Mr. Bernick, this

9   definition is correct.  The former name at the time of the

10  Fresenius transaction was Fresenius National Medical Care

11  Holdings, Inc.

12         MR. BERNICK:  Okay.  I've got that one down.

13         MR. PRATT:  Okay.

14         MR. BERNICK:  Okay.  Now, do you want me to change 8

15  up at the top to say merged into?

16         MR. PRATT:  No.

17         MR. BERNICK:  Or that actually would be wrong.

18  Right?

19         MR. PRATT:  Not necessary.  Not necessary --

20         MR. BERNICK:  Okay.

21         MR. PRATT:  -- at all.  I think merged with is good

22  enough for now.  The witness explained --

23         MR. BERNICK:  Terrific.

24         MR. PRATT:  -- that actually the Grace entity was the

25  surviving entity.  But I'm focusing now just on the name.  When

Shelnitz - Cross/Pratt                          111

1 that entity was renamed, the new name was not as shown on this

2 slide by one word.  Instead, the new name, in fact, was

3 Fresenius National Medical Care Holdings, Inc., and that's

4 reflected in the plan.

5             MR. BERNICK:  Do I need it?

6             MR. PRATT:  Can we have that stipulation, sir?

7             MR. BERNICK:  What stipulation?  That the chart

8 should say National Medical Care Holdings, Inc.?  I'm prepared

9 to do that.

10            MR. PRATT:  Very good.  I'll move along then.

11 BY MR. PRATT:

12 Q   Now, Mr. Shelnitz, Parent 1 -- what's labeled here Parent

13 1, W.R. Grace, a New York Corporation, the surviving entity of

14 this merger, is renamed Fresenius National Medical Care

15 Holdings, Inc.  It's the same corporation, isn't it, as it

16 always was?

17 A   Yes.

18 Q   It's just got a new name?

19 A   That's correct.

20 Q   Okay.  We're now at Slide 6, Exhibit 507-6.  Now, Mr.

21 Shelnitz, this transaction occurred in March of 1998, did it

22 not?

23 A   Correct.

24 Q   And for purposes of the Fresenius and to seal their

25 issues, essentially nothing changed from the closing of the

1  Fresenius transaction in September 1996 up until the closing of

2  the Sealed Air transaction in March 1998, is that true?

3  A    Other than the transactions depicted in Steps 9 and 11,

4  and then perhaps 10, that would be correct.

5  Q    Okay.  But, at the top of the chart, that would be the

6  same.  And this --

7  A    Same Parent 2, correct.

8  Q    Okay.  So, this Slide 6 says at the top, "Pre-Sealed Air

9  transaction."  We still have at the top, Parent 2.  That's W.R.

10 Grace, a Delaware Corporation, formerly named Grace Holdings,

11 Inc., correct?

12 A    Correct.

13 Q    Okay.  I'm at Slide 7, 507-7.  Now, here we have at the

14 top where it says Parent 2, that same entity, W.R. Grace and

15 Co., a Delaware Corporation, formerly named Grace Holdings,

16 Inc., correct?

17 A    Correct.

18 Q    And a new company was created, Grace Specialty Chemicals,

19 right?

20 A    Yes.

21 Q    And that's a Delaware Corporation?

22 A    Yes.

23 Q    And as it shows here on Note 14 at the side of this slide,

24 that entity was renamed W.R. Grace and Co., correct?

25 A    Following the spinoff, correct.

Shelnitz - Cross/Pratt                        113

1  Q     And again, this was just a name change, but that entity is

2  the same entity as it was before, a Delaware Corporation?

3  A     Correct.

4  Q     But, it's now named W.R. Grace and Co., a Delaware

5  Corporation?

6  A     Correct.

7  Q     Okay.  We're at Slide 8, 507-8.  Now, here, Parent 2 at

8  the top on the left, that's W.R. Grace, a Delaware Corporation,

9  correct?

10  A     Correct.

11  Q     And that gets renamed Sealed Air Corporation?

12  A     Correct.

13  Q     And here the Note 15 says that Sealed Air Corporation

14  merged into Parent 2, W.R. Grace, a Delaware Corporation.  So,

15  that was a surviving entity, right?

16          THE COURT:  Which was?

17  A     Parent 2 was a surviving entity.

18  Q     Parent 2 was a surviving entity.  And Parent 2 was then

19  renamed Sealed Air Corporation?

20  A     Correct.

21  Q     And that's the same company as it always was, it just now

22  has a new name?

23          MR. BERNICK:  Well, if you're talking about the

24  corporate entity as opposed to the business --

25          MR. PRATT:  That's exactly right.

Shelnitz - Cross/Pratt                          114

1  A    It's a corporate entity, correct.

2  Q    It's the same corporate entity.

3  A    It's the same corporate entity.

4  Q    Okay.  So, it started out as Grace Holdings, Inc.  It

5  became W.R. Grace and Co., and now it's named Sealed Air

6  Corporation.

7           MR. BERNICK:  Whoa, whoa, whoa.  It was Grace --

8  let's make sure.  Grace Holdings -- your question was Grace

9  Holdings, Inc., then it became W.R. Grace and Co. --

10           MR. PRATT:  A Delaware Corporation.

11           MR. BERNICK:  -- a Delaware Corporation.  And then

12  you're --

13           MR. PRATT:  And that happened in 1996.

14           MR. BERNICK:  Right.  And now you're saying it

15  becomes Sealed Air as a result of the Sealed Air transaction?

16           MR. PRATT:  Right.

17  BY MR. PRATT:

18  Q    And that's just a name change, not a change in corporate

19  status?

20  A    Correct.

21  Q    Okay.  And that happened in March of 1998?

22  A    Yes.

23  Q    So, today we have at the top, Parent 3.  That's W.R. Grace

24  and Co., a Delaware Corporation, right?

25  A    Right, the second one.  Right.

Shelnitz - Cross/Pratt                    115

1 Q    And that's a different entity from Parent 2 which was W.R.

2 Grace, a Delaware Corporation, now named Sealed Air

3 Corporation?

4 A    Correct.

5 Q    Okay.  But they at one time were each called W.R. Grace

6 and Co., a Delaware Corporation, but -- excuse me -- the

7 existing one was changed to Sealed Air, and this is the new one

8 here?

9 A    Correct.

10        MR. BERNICK:  Well, that's very -- object to the form

11 of question.  That's very ambiguous I think.

12        MR. PRATT:  I'll withdraw that question, Your Honor.

13        MR. BERNICK:  Can I pause here for just a moment, Mr.

14 Pratt?  Of all the things that we've now gone through, the one

15 substantive change that you want to make is on Slide 5 where it

16 says Parent 1 renamed Fresenius National Medical Care, Inc.,

17 you want to insert Holdings after Care, is that right?

18        MR. PRATT:  Yes.  Both places that it appears.  It

19 appears in Note 8 at the top at the upper left, and it appears

20 in the middle block on the right-hand side.

21        MR. BERNICK:  Okay.  So, we -- Your Honor, we will go

22 back and double check the documentation.  And if that change is

23 correct, as I believe it may well be, but I don't know, we will

24 make that change and re-designate 5075 as 5075-A, and also be

25 prepared to tender that as a demonstrative in connection with

1  Mr. Shelnitz's testimony.

2            THE COURT:  That's fine.

3            MR. BERNICK:  We have to double check first because

4  nobody wants to trust their recollection, and particularly mine

5  because it's a recollection of something I've never seen.

6            MR. PRATT:  Your Honor, I'd like to hand the witness

7  Exhibit Plan Proponent 243 which is in evidence by stipulation

8  this morning.

9            THE COURT:  All right.

10 Q    Mr. Shelnitz, have you ever seen this document before do

11 you recall?

12 A    I believe I've seen it.

13 Q    Okay.  I'd like you to go to down at the lower right-hand

14 side there -- what we used to call Bates numbers down there.

15 Do you see that?

16 A    Yes.

17 Q    9916?

18 A    Yes.

19 Q    I'd like you to go over to Page Number 9938, please.

20 A    Okay.

21 Q    And this is the declaration of your former boss, David

22 Siegel, right?

23 A    Yes.

24            MR. PRATT:  I'll just note for the record, Your

25 Honor, that this is -- this declaration on the last page has a

Shelnitz - Cross/Pratt                          117

1  date on it, April 2, 2001.

2  Q    Now, Mr. Shelnitz, at that time Mr. Siegel was senior vice

3  president and general counsel of W.R. Grace and Co., a Delaware

4  Corporation, and Grace Conn., is that correct?

5  A    Yes.

6  Q    And as general counsel, did he sometimes execute

7  declarations the same way you do?

8  A    I believe he did.

9  Q    And that would be in the ordinary course of his duties as

10 an officer of the company, if the occasion arose to require

11 that?

12 A    Yes.

13 Q    Okay.  Now, you'll see the last sentence here on the

14 first -- on this page, 9938, in which Mr. Siegel says under

15 penalty of perjury, "I'm authorized to make this declaration on

16 behalf of Grace, Grace Conn. and the other debtors in these

17 bankruptcy cases."  Do you have any reason to doubt that Mr.

18 Siegel is authorized to sign this on behalf of those companies?

19 A    Without reading through the declaration I couldn't be

20 sure, but he certainly had powers as an officer of the company

21 to execute documents.

22 Q    Okay.

23        MR. PRATT:  Your Honor, I'm going to go through this

24 one very quickly.  The purpose for it is -- and it's already in

25 evidence -- but the purpose for it is, that it puts in succinct

1 narrative form what we just went through with all of those

2 slides.  And I think it'll be helpful to the Court to have that

3 written down as opposed to question and answer because this is

4 very succinct, and I think it's right.  And I just want to

5 confirm with this witness that it is right based on his

6 understanding.

7           THE COURT:  All right.

8           MR. BERNICK:  That should not -- that proffer should

9 not be --

10          THE COURT:  Your microphone.

11          MR. BERNICK:  That proffer should definitely not be

12 accepted.  This document was proffered into evidence yesterday,

13 and it was accepted under extremely limited circumstances

14 because there was a complaint that was coming in through a

15 different witness.  And, Your Honor, I objected --

16          THE COURT:  No, actually, I struck it yesterday, but

17 it was admitted by a stipulation this morning.

18          MR. BERNICK:  Admitted by a stipulation this morning

19 for whatever purpose it was that was being proffered yesterday,

20 I believe, to establish the truth of the matters that are set

21 forth in the document.  It is not -- we did not accept it as a

22 stipulated document for that purpose at all.  It is what it is

23 on the face of it.  It's a verified complaint in the attached

24 declaration.  The declaration does not supplant the testimony,

25 and it's certainly not as complete or detailed a recitation,

Shelnitz - Cross/Pratt                               119

1  and therefore the proffer should be refused.

2            MR. PRATT:  Your Honor --

3            MR. BERNICK:  The purpose of this -- excuse me -- the

4  purpose of this declaration was simply to tell the history

5  leading up to a verified complaint that was filed for the sole

6  purpose of getting a stay for purposes of shutting down related

7  litigation.  And that was its only purpose.  This witness can't

8  verify the accuracy of what Mr. Siegel did at the time.  Let me

9  take that back.  He can verify the accuracy of it.

10           If the question being put to the witness is whether

11 this declaration is accurate, that question can be put.  But,

12 the document can't be tendered as a more succinct recitation of

13 exactly the same facts, a) before there's the verification, and

14 b) before it's established that by being more succinct it's

15 also, you know, better.  It has better quality evidence.  I

16 just don't understand what the purpose of the proffer is other

17 than to suggest that this is the more accurate statement of the

18 entire history which we're certainly not going to accept

19 without a -- you know, suitable testimony from the witness.

20           MR. PRATT:  Could I respond, Your Honor?  First of

21 all, this is already in evidence.  Second of all, the witness

22 said he's seen it before.  Third of all, I'm going to ask him

23 questions to confirm whether certain limited statements in here

24 are correct, and they happen to be more succinct than the

25 narrative testimony.

Shelnitz - Cross/Pratt                    120

1      But, in any event, Your Honor, this is an admission

2  of a party opponent.  We've already established that Mr. Siegel

3  was an officer of Grace at the time he signed it.  He had

4  authority to sign it in the course of his duties, and that

5  makes it an admission of a party opponent under Federal Rule of

6  Evidence 801(b)(2)(a) and (c).  So, I think it's admissible as

7  an admission.  It's not -- certainly not hearsay.

8      Now, Mr. Bernick might prefer that relevant evidence

9  like this not come in, but, Your Honor, let me go back to my

10  stop light analogy.  If a witness testifies that the light was

11  red on Monday, and then on Tuesday -- excuse me -- if the

12  witness admits on Monday that the light was red, and then on

13  Tuesday while he's on the stand he says the light was actually

14  magenta, that doesn't mean that Monday's testimony can't be

15  admitted.  Of course it can.

16      It's relevant because it has some tendency and reason

17  to prove a fact that's of consequence to the determination of

18  the action.  And all I'm doing is going through the same facts

19  that Mr. Bernick has already said of consequence to the

20  determination of this case.  So, it's certainly admissible, and

21  it's not going to take very long, Your Honor.  Three minutes.

22      THE COURT:  What --

23      MR. BERNICK:  Your Honor, I have no problem with the

24  admission of the document.  We've already agreed to it.  It's

25  the purpose of the proffer which is to somehow supplant,

1 because that's what he said, a more accurate and more concise

2 recitation of facts.  That --

3           MR. PRATT:  Not --

4           MR. BERNICK:  -- excuse me.  That proffer is not --

5 we don't believe it's a correct proffer.  And the best way to

6 find out what is different or what he believes is the magenta

7 versus the green light, we don't need a traffic accident

8 analogy to establish that there's something that's wrong

9 pointed out.  It took us a half an hour to get to one change of

10 one statement.  Maybe an important one, but we shouldn't be

11 going through line by line by line if there is an

12 inconsistency.

13           THE COURT:  Mr. Pratt, I don't know whether you're

14 trying to substantiate that there's an inconsistency or a

15 verification.

16           MR. PRATT:  I'm not, Your Honor.  Actually, I have --

17 Mr. Bernick has misstated my position on this.  I'm not

18 intending to show that there's any inconsistency at all with

19 the -- what's already of record, but I think this basically

20 gives it in a slightly different form, and again, I think this

21 is easier to understand --

22           THE COURT:  Okay.  Is --

23           MR. PRATT:  -- because it is so succinct.

24           THE COURT:  Is there a reason why since it's in

25 evidence I simply can't read it and it will be informing as to

1 whatever --

2            MR. PRATT:  Well --

3            THE COURT:  -- extent it is more succinct?

4            MR. PRATT:  Mr. Bernick just said that without a

5 foundation that what I'm trying to establish is in here and

6 it's true and that's all I intend to ask Mr. Shelnitz.

7            THE COURT:  Well, it's a verified complaint by an

8 officer of the company.

9            MR. BERNICK:  Yes.  And we're not --

10            MR. LOCKWOOD:  Your Honor, it's admitted.  It is what

11 it is.

12            THE COURT:  Mr. Pratt, I'll give you a little bit of

13 leeway, but to the extent that it's already in evidence, I will

14 be reading all of the evidence at some point.

15            MR. PRATT:  I hope to save you the trouble, Your

16 Honor.

17            THE COURT:  It won't save me the trouble.  I'll have

18 to read it anyway.  But, go ahead.

19            MR. PRATT:  Thank you, Judge.

20 BY MR. PRATT:

21 Q    Mr. Shelnitz, could you turn to Page 9940 and look at

22 Paragraph 7?  Do you have that there?

23 A    Yes.

24 Q    Okay.  And I'm just going to read the first sentence.  "In

25 1988 Grace reincorporated in New York through the formation of

Shelnitz - Cross/Pratt                    123

1 a new holding company also named W.R. Grace and Co., Grace, New

2 York."  My question for you, sir, is, is that Parent 1 on Slide

3 2?

4 A    Yes.  After the reorganization occurred -- I mean, it

5 would be technically inaccurate to say that the formation of

6 the new holding company was named W.R. Grace and Co.  It wasn't

7 initially named W.R. Grace and Co., but it ultimately became

8 W.R. Grace and Co. and is what we refer to as Parent 1 --

9        MR. BERNICK:  Your Honor, I'm going to really object

10 as being completely cumulative.  If we have to have what is now

11 clearly going to be a recitation of four pages out of the

12 declaration and getting the witness' concurrence as to each one

13 and tying it back to the slide, that is completely wasteful of

14 the Court's time --

15        MR. PRATT:  Your Honor --

16        MR. BERNICK:  -- and it's cumulative.

17        MR. PRATT:  -- talking about a waste of time, we'll

18 be through with this before he's finished with --

19        MR. BERNICK:  Well, that was a promise that was made

20 a long time ago and it's not been discharged.

21        THE COURT:  Mr. Bernick, I think he's right.  We're

22 taking -- we're wasting time.  Mr. Pratt, I'll give you some

23 leeway, but to the extent it's cumulative, the witness has now

24 testified twice about the slides.  He made absolutely no

25 changes except for the name of one of the companies.

Shelnitz - Cross/Pratt                              124

1        MR. PRATT:  I understand, Your Honor.

2        THE COURT:  So, I don't need it a third time.

3   Q    Page 9941, Mr. Shelnitz, Paragraph 10.  Would you look at

4   Paragraph 10, please?

5   A    Okay.  Do you want me to read it?

6   Q    Just to yourself.

7                          (Pause)

8   A    Okay.

9   Q    Is there anything inaccurate about everything except the

10  last sentence?

11  A    I guess I'm now questioning whether the entity was Grace

12  Holdings, Inc. or Grace Holding, Inc.

13  Q    Okay.

14       MR. PRATT:  Your Honor, I'll rest on the exhibit at

15  this point.

16                          (Pause)

17  Q    Mr. Shelnitz, the demonstratives -- Mr. Bernick's

18  demonstratives, Exhibits 507-1 and so on --

19  A    Yes.

20  Q    -- when was the first time you saw those?

21  A    I don't remember if I saw them for the first time

22  yesterday or the day before.

23  Q    Okay.

24  A    Probably yesterday.

25  Q    You did not prepare these?

1          MR. BERNICK:  Oh, I'm sorry.  Objection.  Ambiguous.

2  Q    Did you have any involvement at all in the preparation of

3  these exhibits?

4  A    I don't know what you mean by involvement.

5  Q    Did you supply information that went into the preparation

6  of these exhibits?

7  A    Yes.

8  Q    Okay.  And did you meet with anyone in connection with

9  that process?

10  A    Yes.

11  Q    How long were you in that meeting?

12  A    It was no one meeting that -- I was asked to help Kirkland

13  & Ellis prepare charts depicted in the transaction.  I gave

14  them information.  They prepared charts.  I looked at the

15  charts to see if I thought they were accurate.  That was

16  basically what my involvement was.

17  Q    And that was after reviewing all of the documentation that

18  you said you reviewed?

19  A    What documentation?

20  Q    Well, I think on the foundation for the documents, I had

21  understood that you basically went back and reviewed documents

22  regarding the transaction structure.

23  A    I had briefly reviewed the documents some time ago.

24  Q    Okay.  Now, the purpose of these documents was, as Mr.

25  Bernick described it, to talk about 524(g) protection for

Shelnitz - Cross/Pratt                          126

1  Sealed Air Corporation and Fresenius as former parents of Grace

2  entities.  And in that regard I want to go back to a couple of

3  those slides.  And I'll start with Slide 5 which is Exhibit

4  507-5.  Now, do you see these yellow bubbles here?

5  A    Yes.

6  Q    And it says underneath PLTF.  I guess that's Plaintiff A

7  versus Parent?

8  A    That's what it says, yes.

9  Q    And you find the same thing over on the right, Plaintiff A

10 versus Parent.  Now, does this indicate that if a plaintiff or

11 a claimant has a claim against Parent 1, and that's W.R. Grace

12 and Co., a New York Corporation, that as a result of this

13 transaction where that parent -- actually, the Fresenius

14 subsidiary merged into that parent, then the parent's name was

15 changed to Fresenius National Medical Care Holdings, Inc.  And

16 you see the same yellow bubbles found there, Plaintiff A versus

17 Parent.  That's an indication that if a plaintiff or a claimant

18 has a claim against Parent 1 that that claim after the merger

19 now is properly asserted against the same entity, Parent 1, but

20 now newly named Fresenius, is that correct?

21           MR. BERNICK:  Objection.  Properly.

22           THE COURT:  That's sustained.

23           MR. PRATT:  I didn't understand the objection, Your

24 Honor.

25           MR. BERNICK:  The objection actually calls for a

Shelnitz - Cross/Pratt                    127

1  legal conclusion, and also makes assumptions about whether to

2  prosecute such a claim would be proper.  That is, whether it

3  would have some validity to it or otherwise enjoy some kind of

4  sanction or blessing by somebody under some authority.

5          MR. PRATT:  Well, I'm not asking for sanction.  Maybe

6  the way to get around that is to talk about what the

7  circumstances were at the time of this transaction in September

8  1996.

9  Q    Mr. Shelnitz, is it your understanding that claimants

10 against this entity, Parent 1, W.R. Grace and Co., a New York

11 Corporation, if there are claims asserted against that entity

12 at that time, nothing about this transaction would change the

13 liability or lack thereof when the name was changed to

14 Fresenius?

15         MR. BERNICK:  Objection.  Calls for a legal

16 conclusion.

17         THE COURT:  It does.  The way you're stating the

18 question does call for a legal conclusion.  If you want to get

19 to the facts I think the information could be gotten on record,

20 but not in that fashion.

21         MR. PRATT:  Okay.

22 Q    Did you talk to anyone about the yellow that's on this

23 slide?

24 A    No.

25         MR. BERNICK:  Objection.

1          THE WITNESS:  Sorry.

2          MR. BERNICK:  Go ahead.

3          MR. PRATT:  It was a yes or no question.

4  A    I did not talk to anybody about the yellow portions.  I

5  had not seen that in an earlier draft.

6  Q    Okay.

7          MR. PRATT:  Your Honor, I'm just going to note for

8  the record because this may become very important later that

9  although notwithstanding Mr. Bernick's proffer that the

10 relevance of this witness and these charts is 524(g) protection

11 for the parents, without that legal conclusion, so far on this

12 record there's no showing at all that that injunctive relief or

13 stay is necessary for any purpose.

14         MR. BERNICK:  Your Honor, it --

15         MR. PRATT:  And I'll leave it at that.

16         MR. BERNICK:  Your Honor --

17         MR. PRATT:  And we can argue about it later in our

18 briefs.

19         MR. BERNICK:  Okay.  Your Honor, just --

20         MR. PRATT:  And I pass the witness, Your Honor.

21         MR. BERNICK:  Just for purposes of clarifying the

22 proffer, the witness is not being proffered to testify

23 regarding the necessity for injunctive relief.  That's not the

24 purpose of the witness' testimony.  The purpose of the witness'

25 testimony -- nor is the purpose of the witness' testimony to

1   speak to what may be BeaconOne, Seaton's collateral interest in

2   what certain settlement documents may or may not provide which

3   really is the entire motivation for their cross examination.

4        The purpose of the proffer is to establish that to

5   the extent that 524(g)'s other requirements are met, that

6   Sealed Air and Fresenius would qualify to be covered by 524(g)

7   because they are a former parent.  That is the sole purpose of

8   the proffer.  It is a technical requirement of 524(g) which we

9   wanted to make sure was met.

10       So, the purpose of having Mr. Shelnitz testify has

11   nothing to do with the necessity other than the fact that there

12   was preexisting litigation that was, in fact, stayed.  The

13   purpose of this proffer is to establish compliance with the

14   parental requirement for want of a better word under 524(g).

15       MR. PRATT:  Your Honor, my rejoinder.  Having read

16   the Plan Proponent's pretrial brief, this issue will come back,

17   and I just want everybody to remember that I was shut down by

18   Mr. Bernick in trying to have this witness explain what we just

19   talked about.

20       THE COURT:  No, Mr. Pratt, you're not being shut down

21   by Mr. Bernick.  You're asking questions that lead to legal

22   conclusions, so I've sustained the objections.  You may ask

23   this witness factual predicates that you are trying to get out.

24   It's just that he hasn't been called as an expert witness to

25   provide legal opinions.  And to the extent that they go to the

Shelnitz - Cross/Pratt                        130

1  ultimate -- ultimate findings that the Court has to make,

2  that's the finder of facts province.  But, you're not being

3  closed from asking this witness fact questions.

4           MR. PRATT:  Okay.  I'll try a couple of more things.

5           MR. BERNICK:  Your Honor, while that colloquy took

6  place we did make some progress with respect to holdings.  And

7  it is Holdings, Inc.  So, we will amend the slide.  And the

8  slide that is going to be enhanced through the cross

9  examination of Mr. Pratt is 507-5 which we will re-tender as

10 5075-A with the appropriate correction.

11          THE COURT:  All right.

12          MR. PRATT:  Your Honor, I have two other lines of

13 inquiry.

14 BY MR. PRATT:

15 Q    Mr. Shelnitz, are you aware that my clients, One Beacon

16 and Seaton, have asserted claims against Fresenius and Sealed

17 Air?

18 A    I believe so.

19 Q    How did you become aware of that?

20 A    I was shown letters by Kirkland & Ellis asserting claims

21 against those entities.

22 Q    Do you recall how many letters?

23 A    Two or three.

24 Q    Okay.  I'm going to show you what's been marked for

25 identification as Plan Proponent's Exhibits 238, 239 and 240.

1          (Pause)

2          MR. PRATT:  Your Honor, just for the record, you'll

3  see that Plan Proponent Exhibit 240 is not their standard

4  exhibit sticker, but actually it is their exhibit.  And I just

5  had them I think erroneously marked as confidential, but I

6  don't think it is, and so I'm using it.

7          THE COURT:  All right.

8  Q    Are these the letters, Mr. Shelnitz?

9  A    I believe so.

10 Q    And what was your purpose in reviewing these letters?

11         MR. BERNICK:  Your Honor, at this point I would

12 object on the grounds that it invades the attorney/client

13 privilege.

14         MR. PRATT:  Well, Your Honor, all I asked was for his

15 purpose in reviewing the letters.

16         MR. BERNICK:  Well, that's -- that --

17         MR. PRATT:  I don't see how that's privileged.

18         MR. BERNICK:  The general counsel of a company is --

19 not simply ask for the fact of having done the review, which is

20 revealing, but why he did it?  That is classic privileged

21 information.

22         THE COURT:  Particularly --

23         MR. BERNICK:  And it's with regard to a subject that

24 was not part of my examination at all.

25         MR. PRATT:  Your Honor, I'll withdraw the question.

Shelnitz - Cross/Pratt                    132

1 But, what I'd like to do is to move these in evidence solely

2 for the purpose of showing that these are the letters that Mr.

3 Shelnitz reviewed, and he's already said that.

4        MR. BERNICK:  Well, it doesn't establish that they're

5 relevant to anything.  What's the relevance?

6        MR. PRATT:  I'll get to the relevance.

7        MR. BERNICK:  Well, then, I object on relevance

8 grounds.

9        THE COURT:  Well, establish the relevance and then

10 I'll rule on the admission.

11        MR. PRATT:  Okay.  Your Honor, let me just make a

12 general proffer of relevance.  These letters show, and they're

13 not offered for the truth at all.  What they're offered for is

14 to show that the Seaton and One Beacon are presently asserting

15 claims against Fresenius and Sealed Air, these letters spell

16 out the nature of those claims.  And we're not saying that

17 anybody has to accept those assertions as true or not true.

18 That won't be determined in this court I don't think.  But, the

19 relevance of these is that the plan will enjoin these claims

20 and release these claims.  And we contend that those provisions

21 of the plan are not lawful.  And that's the relevance.

22        THE COURT:  All right.  I'll accept Exhibits 238, 239

23 and 240 for that purpose.

24        MR. BERNICK:  Well, Your Honor, if I can be heard

25 just briefly.

1          THE COURT:  All right.

2          MR. BERNICK:  The proffer is inconsistent with the

3 asserted relevance.  The proffer is not for the truth of the

4 matters asserted but for the fact of their being asserted.  The

5 relevance is -- depends upon the truth of the matter asserted

6 which is that, in fact, they have a claim.

7          MR. PRATT:  Well, it goes further than that, Mr.

8 Bernick --

9          MR. BERNICK:  Excuse me, Mr. Pratt.

10          MR. PRATT:  -- it's that --

11          MR. BERNICK:  Excuse me, Mr. Pratt.

12          THE COURT:  Gentlemen.

13          MR. BERNICK:  The -- when you tender something for

14 the fact of its being said as opposed to the truth of the

15 matter therein, all that it really represents is that a letter

16 was sent on a certain date at a certain time with respect to a

17 certain subject matter.  It has nothing to do with establishing

18 any aspect of that subject matter as being true.  So, if they

19 now say, well, we do have claims and the claims are channeled

20 and released, that presumes the truth of the matter set forth

21 in the letter.

22          MR. PRATT:  Your Honor --

23          MR. BERNICK:  So, the proffer is inconsistent.

24 Moreover, the witness simply said he saw it.  That's all that

25 he has said.  Can't come in through this witness for any

1  purpose.  It's just, he saw it.  And he saw it presumably on or

2  after July 8, 2009.  That is long after this plan was drafted

3  and long after it was put in place.  So, it can't possibly bear

4  upon the good faith or other intendment of the proposing

5  part -- or the proposing parties or the planned proponents or

6  Mr. Shelnitz in particular.

7         And if he wants to get this stuff in for the purpose

8  that he seeks he's got to have a witness.  Maybe he wants to

9  take the stand and Mr. Brown wants to take the stand and get

10 them in, but Mr. Shelnitz is not an appropriate witness to

11 sponsor the tendering of these documents.  And they're all

12 self-serving.

13        MR. PRATT:  May I respond, Your Honor?

14        THE COURT:  Yes.

15        MR. PRATT:  These documents show -- the witness

16 testified that he was aware of claims asserted against

17 Fresenius and Sealed Air by One Beacon and Seaton.  He said

18 that he had received these letters --

19        THE COURT:  No.  He said he had seen these letters.

20        MR. PRATT:  He had seen these letters.  Now, what

21 that establishes is that Grace -- this man's an officer of

22 Grace Co. and Grace Conn., and that establishes that those two

23 debtors have notice of these claims.

24        THE COURT:  Regardless.  If their dated -- and I

25 didn't pick this up because the date wasn't stated -- July 8th,

1  2009, is after this plan was prepared and filed.

2           MR. PRATT:  Your Honor, but --

3           THE COURT:  So, that doesn't substantiate the notice

4  for the purpose that you're offering.

5           MR. PRATT:  Your Honor, Mr. Bernick used the word

6  good faith.  That's not my proffer.  My proffer is that the

7  injunctions and the plan with respect to these claims do not

8  comply with 524(g) and do not --

9           THE COURT:  But, apparently, these claims were

10 submitted to the debtor after the plan was proposed.  So,

11 essentially, One Beacon and Seaton are trying to bootstrap

12 themselves into a finding that the plan is unlawful because of

13 a claim that they submitted after the plan was filed.  You

14 can't do it that way, Mr. Pratt.

15          MR. PRATT:  No, Your Honor, that's not.  If the plan

16 is confirmed the injunctions will go into effect on the

17 effective date.  On the effective date.  That's in the future.

18          THE COURT:  Yes.

19          MR. PRATT:  So, these claims exist as of the date of

20 this letter, actually before if you read the letter.  That's

21 our position.  But, at least as of the date of the letter

22 whether the claims exist or not is not what we're trying to

23 show.  What we're trying to show is that of July 8, 2009, One

24 Beacon and Seaton have asserted these claims, and Grace is on

25 notice of that as of this date.  And if the plan becomes

1 effective it is argument, it will be our argument, it has been

2 our argument in our briefs that there's no compliance with, for

3 example, 105 in the case law under that.

4          THE COURT:  Regardless.  I understand the purpose for

5 which they're being offered.  I agree with Mr. Bernick having

6 seen this.  This witness is not copied on these documents.

7 They are not addressed to him.  And his testimony was that he

8 got them from counsel -- his counsel, Kirkland and -- the

9 company's counsel, Kirkland & Ellis, and in fact, the entities

10 on the ccs are all attorneys from Kirkland & Ellis; Mr.

11 Bernick, Mr. Freedman, Ms. Baer and Ms. Esayian, at least at

12 the time.  I'm not sure when Ms. Baer changed law firms, but

13 she is clearly here representing the debtor in that capacity.

14 So, this witness cannot be the authenticating witness for these

15 documents.

16          MR. PRATT:  Your Honor --

17          THE COURT:  You need a witness, Mr. Pratt.

18          MR. PRATT:  -- I'm not trying to authenticate them.

19 The witness testified that he was aware of claims, and he

20 testified that it had -- he didn't say when, but it had to have

21 been after July 8th.

22          THE COURT:  And his -- it doesn't have to have been

23 after July.  You didn't ask him that question.  He did say that

24 he believes these are the letters that he was shown by his

25 counsel.  To the extent that they are somehow being delivered

1 by counsel, that may invade the attorney/client privilege,

2 although I don't think so far we've necessarily gone that far.

3 But, this witness cannot authenticate these documents.

4        His testimony is that he's aware of claims.  The

5 letters don't add to that testimony.  If anything, it's

6 cumulative.  I don't know what the letters say, so I don't know

7 whether they're prejudicial in the sense that Mr. Bernick seems

8 to be arguing.  I'm not making any assessment of that.  I

9 haven't seen them.  But, this witness is not the proper witness

10 through whom to put in these documents.  So, the objection's

11 sustained.  I'm not accepting the witness' -- the letters,

12 pardon me, even for that limited purpose, but you may certainly

13 put them in through a different witness.

14        MR. PRATT:  Well, let me ask just a couple of more

15 questions about it since the witness did say he saw the

16 letters.

17 BY MR. PRATT:

18 Q    Mr. Shelnitz, when did you see them?

19 A    After July 9th.  I don't recall specifically.

20 Q    Okay.  But, you did say that you were aware that One

21 Beacon and Seaton are presently asserting claims against

22 Fresenius and Sealed Air?

23 A    I do recall -- it wasn't until at least the beginning to

24 middle of August that I saw the letters.  I was focused more on

25 the claim -- the Kaneb claim relating to Fresenius'

1 representation.

2 Q    Okay.  Mr. Shelnitz, you're generally familiar with the

3 Chapter 11 plan that's being proposed?

4 A    Generally.

5 Q    Are you aware that that plan contains a provision for a

6 successor claims injunction?

7 A    Yes.

8 Q    Now, you were proffered as a witness with respect to

9 bankruptcy protection for Sealed Air and Fresenius, so I'm

10 going to ask you, and on the basis that those companies are

11 former parents of Grace entities.  And that means that -- well,

12 let me ask you, do you know what the purpose of the successor

13 claims injunction is?

14 A    I believe so.

15        MR. BERNICK:  Your Honor, this really gets into

16 completely -- a) it's duplicative of ad nauseum efforts to

17 elicit similar testimony yesterday, b) the witness is

18 essentially being asked to comment on a legal document which

19 has legal significance under 524(g), and that really is a

20 matter that calls for a legal conclusion.  So, we would object

21 to the testimony -- object to the questioning on this subject

22 as being cumulative and being an effort to elicit legal

23 testimony from the general counsel of W.R. Grace.

24        MR. PRATT:  Your Honor, just a note of point of

25 order.  My question of the witness was, "Mr. Shelnitz, do you

Shelnitz - Cross/Pratt                                   139

1  know the purpose of the successor claims injunction?"  And his

2  answer was, "I believe so."  And Mr. Bernick then objected and

3  made a long speaking objection, warning the witness off of my

4  questioning on the basis that it was a legal conclusion.

5         MR. BERNICK:  It was a yellow light.

6         MR. PRATT:  I just asked a simple question, does he

7  know the purpose of the successor claims injunction, and the

8  answer was yes.  And if I interpret Mr. Bernick's colloquy

9  there as a motion to strike, I think it should be denied.

10         THE COURT:  No.  The next question I think is, what

11  was the purpose, and that's what Mr. Bernick objected to.

12         MR. PRATT:  Well --

13         THE COURT:  It was calling for a legal conclusion,

14  not the foundation question.

15         MR. PRATT:  And I'll address that, Your Honor.  It's

16  not a legal conclusion at all.  As Your Honor knows, the

17  purpose of various provisions of the plan is brought out in

18  testimony and bankruptcy court all the time in this court and

19  elsewhere.  It's proper questioning, and it's highly relevant.

20  How can the Court understand -- how can the Court approve this

21  injunction without knowing what the purpose --

22         MR. BERNICK:  I'll -- let me ask that question.  And

23  then I want to get up on redirect examination, and we're going

24  to find out why it was so critical to have this provision

25  related to successor liability -- we'll do it.

Shelnitz - Cross/Pratt                    140

1          THE COURT:  That's fine.  Let's -- if we'd stop with

2  the speaking and ask the questions we'd get done a lot further.

3  Fine.  Go ahead, Mr. Pratt.

4          MR. PRATT:  Thank you, Your Honor.

5  BY MR. PRATT:

6  Q    Mr. Shelnitz, what is, to your understanding, the purpose

7  of the successor claims injunction?

8          MR. BERNICK:  Go ahead.

9          THE WITNESS:  Okay.

10 A    It was to protect Fresenius and Sealed Air from

11 liabilities, both asbestos and non-asbestos-related.

12 Q    Asbestos and non-asbestos-related did you say?

13 A    Correct.

14 Q    Okay.  Now, that -- that's in Section 8.5 of the plan.

15 And there was some technical amendments very recently to that

16 section, were there not?

17         MR. BERNICK:  Objection.  Lack of foundation.  It's

18 also a statement by counsel regarding the plan.  Move to strike

19 the statement.

20         MR. PRATT:  Well, let me do it over.  Your Honor,

21 I'll just note for the record that on or about September 4, the

22 Plan Proponents filed a notice of first set of modifications to

23 joint plan of reorganization.  And part of that was a black

24 line revision.  And I'd like to hand that to the Court and to

25 the witness, Section 8.5, the successor claims injunction.  It

Shelnitz - Redirect/Bernick                 141

1  was changed.

2           THE COURT:  All right.  Cathy?

3  Q    Mr. Shelnitz, you're aware that modifications were made to

4  the plan?

5  A    Yes.

6  Q    And you're aware that modifications were made to the

7  successor claims injunction?

8  A    I do not recall that specifically.

9  Q    Do you know -- and that's a yes or no -- do you know what

10  was the purpose of the revisions to Section 8.5 reflected in

11  the modifications?

12  A    No.

13           MR. PRATT:  I pass the witness, Your Honor.

14           THE COURT:  Anyone else?  Mr. Bernick?

15           MR. BERNICK:  I just need a moment to confer with Mr.

16  Freedman on the technical matter.

17                    (Pause)

18                REDIRECT EXAMINATION

19  BY MR. BERNICK:

20  Q    Mr. Shelnitz, in connection with my direct examination I

21  introduced into evidence various documents that you testified

22  reflected the pre and post-petition litigation that was now

23  being mounted against Fresenius and Sealed Air relating to

24  claims -- tort liability of Grace, do you recall that?

25  A    Yes.

Shelnitz - Redirect/Bernick                    142

1  Q    Okay.  And you were then shown also Plan Proponent's

2  Exhibit 243 which was the verified complaint for declaratory

3  and injunction -- injunctive relief by Mr. Pratt.

4  A    Yes.

5  Q    Do you recall what this verified complaint was for?

6  A    Only very generally.

7  Q    Take a look at Page 2, Summary of Action.  It says, "This

8  is an adversary proceeding brought ... for a judgment sub or

9  Romanette (1) enjoining defendants from prosecuting pending

10 asbestos-related actions.  The "asbestos actions" and

11 commencing new actions or proceedings asserting asbestos-

12 related claims to future actions, except pursuant to the terms

13 of any plan or plans of reorganization to be confirmed in these

14 cases against three categories of persons or entities."  And we

15 then see listed Sealed Air and Fresenius.  Do you see that?

16 A    Yes.

17 Q    Does that refresh your recollection about the

18 circumstances leading to the prosecution of this adversary?

19 A    Yes.

20 Q    What happened?

21 A    Well, when Grace filed for Chapter 11 protection we

22 continued to get lawsuits, or I should say Sealed Air and

23 Fresenius continued to get lawsuits --

24      MR. PRATT:  Objection, Your Honor.  That last

25 foundation, how does he know?

1          THE COURT:  Sustained.

2  Q     And did these facts come to your attention in your

3  capacity as being in-house counsel for Grace?

4  A     Yes.

5  Q     Okay.  Go on.

6  A     The -- Grace was very concerned that -- if those lawsuits

7  were permitted to continue that any adverse rulings or any

8  damages resulting from those lawsuits would result in

9  indemnification claims by Fresenius or Sealed Air against the

10 debtors --

11         MR. PRATT:  Your Honor --

12 A     -- thereby negatively impacting the estates in their --

13 its reorganization.

14         MR. PRATT:  Excuse me, Your Honor.  Excuse me.  The

15 witness should be cautioned about waiving the attorney/client

16 privilege.

17         MR. BERNICK:  Yes, we'll avoid that.

18 Q     So, I want to direct your attention to the face of the

19 document that Mr. Pratt brought to your attention.  Take a look

20 at Page 10, Paragraph 31.  It says, "As of the date of this

21 filing, Sealed Air is a named defendant in over 6,000 asbestos

22 actions in which the debtors also have been named as

23 defendants, including eight purported class actions, one of

24 whom -- which has been certified."  Do you recall, Mr.

25 Shelnitz, that in open proceedings before Judge Farnan at the

Shelnitz - Redirect/Bernick                    144

1  very outset of the case that there was very active litigation

2  within the bankruptcy case over stays and injunctions of claims

3  being brought against third parties that related in part to

4  Grace's asbestos liability?

5  A    Yes.

6          MR. PRATT:  Objection, Your Honor.  Compound.  Mr.

7  Bernick just read Paragraph 31.  Now, this document is an

8  admission of Grace.  I can use it.  He cannot.

9          MR. BERNICK:  Okay.  So --

10          MR. PRATT:  It is not established that 31, that the

11  facts in 31 are true.  And then after reading that he asked a

12  different question.

13          THE COURT:  That's sustained.

14          MR. PRATT:  And I move to strike them both.  He

15  should ask one question at a time.

16          THE COURT:  All right.

17          MR. BERNICK:  I'll rephrase the question.  But, I

18  believe at this point as an officer of the Court there is no

19  question that all of this took place.  None of it was appealed.

20  The orders were entered.  Those orders were predicated on an

21  onslaught of litigation against Sealed Air and Fresenius.  And

22  for counsel to somehow suggest that this is actually disputed,

23  I don't believe comports with the obligations of an officer of

24  the Court.

25          MR. PRATT:  Your Honor --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  I will go ahead and ask Mr. Shelnitz

2 the questions independently so that we can just get this out

3 simply.

4 Q    Mr. Shelnitz, shortly after the bankruptcy began, was

5 there or was there not bankruptcy court litigation arising out

6 of the fact that was asserted by Sealed Air and Fresenius that

7 they were now being exposed to the tort system?

8 A    Yes.

9 Q    In the course of that proceeding, were submissions made to

10 the Court by Grace that put before the Court the growing

11 litigation being prosecuted against Sealed Air and Fresenius?

12          MR. PRATT:  Your Honor, my clients were not parties

13 to that litigation.  This line is completely irrelevant.  This

14 is the confirmation hearing.  It's not that lawsuit.

15          MR. BERNICK:  No, to the contrary.  The door's now

16 been open, and it is relevant because it goes to the 524(g)

17 injunction.  It also goes to the successor liability question

18 that Mr. Shelnitz was just asked which is what I want to get

19 to.

20          MR. PRATT:  Your Honor, goose-gander rule.  I was not

21 allowed to ask this witness about things that Mr. Bernick said

22 were legal conclusions about claims.  What Mr. Bernick's now

23 trying to do through this witness is to talk about litigation

24 for which my client was not a party and bootstrap that in as

25 evidence in this confirmation hearing.

Shelnitz - Redirect/Bernick                    146

1          THE COURT:  Well, actually --

2          MR. PRATT:  He needs -- if he wants to show what the

3   nature of the claims were against Fresenius and Sealed Air

4   he'll have to bring somebody in.

5          THE COURT:  I don't think that's the question.  The

6   question was whether submissions were made to the Court by

7   Grace to put the allegations that were in the complaints

8   against -- or the fact that Sealed Air and Fresenius allege

9   that they were being sued before the Court.  That, I think, is

10  a factual contention.  But, I don't have any foundation laid

11  for the fact that this witness has personal knowledge.  He's

12  not the affiant.

13         MR. BERNICK:  No, but that's not -- I think, really

14  the question that I meant to put to Mr. Shelnitz, and I'll

15  rephrase it.

16  BY MR. BERNICK:

17  Q    As a fact of what happened in the bankruptcy court in the

18  open record for all interested parties in the litigation to

19  see, were there submissions made, put in before the open court,

20  the litigation that was being conducted against Fresenius and

21  Sealed Air?

22         MR. PRATT:  Objection, Your Honor.

23         THE COURT:  Overruled.  That's a fact question.

24         MR. PRATT:  May I be heard, Your Honor, on my

25  objection?

1          THE COURT:  Mr. Pratt, I can take judicial notice of

2    the fact that the documents are of record.  I don't even need

3    the witness to say that.  The allegations are clearly of

4    record.  I'm not taking them for the truth or not the truth,

5    but the allegations are of record.  They're in this document.

6    They're part of the record before this Court.

7          MR. PRATT:  Your Honor, let me just -- can I be

8    heard?

9          THE COURT:  If you can get the microphone turned on.

10         MR. PRATT:  Let me come up.  Mr. Bernick very

11   skillfully said that these allegations were made in court.

12   They were made in part -- as part of an adversary proceeding.

13         THE COURT:  No.  Actually, he said that they were

14   made in documents that were filed in the court, I believe.

15         MR. BERNICK:  Actually were made in open court before

16   the adversary was even filed.

17         THE COURT:  Oh.  Well --

18         MR. BERNICK:  The adversary was filed --

19         THE COURT:  -- if that's the case --

20         MR. BERNICK:  -- to cure a technical issue about how

21   to get the injunction.

22         MR. PRATT:  And there's --

23         THE COURT:  Okay.  I'm sorry.  I missed the question.

24         MR. PRATT:  Well, and there's another issue that I

25   just want to bring up, Your Honor, because I think it's

1  pertinent and it's going to come up again.  Mr. Bernick also

2  said that any interested party could see them.  Well, you have

3  to be on notice before you know to look.  And there's no

4  evidence in this record that my clients, One Beacon and Seaton,

5  received notice of this bankruptcy case until years later.

6          THE COURT:  Pardon me.  The fact that W.R. Grace was

7  in bankruptcy wasn't known on an international level?

8          MR. PRATT:  Your Honor, notice was not given.

9  Notices -- there's nothing in the record to establish -- I'll

10 give you an example, Your Honor.  My firm got into this case

11 after the bar date passed, so we had a problem.

12         MR. BERNICK:  What is it -- this is --

13         MR. PRATT:  This is colloquy, Mr. Bernick.

14         MR. BERNICK:  It's not offered for the purposes of

15 notice.

16         THE COURT:  Mr. Bernick, please.  It's Mr. Pratt's

17 turn.

18         MR. PRATT:  Thank you, Judge.  We got into this case

19 after the claims bar date.  So, one of the first emergencies

20 that we had was, what do we do?  We checked.  There was no

21 notice given to Seaton and One Beacon of the claims bar date,

22 and that's reflected in stipulations that had been filed, and

23 the Court's approved them, and that's in the main case, not in

24 an adversary proceeding.

25         THE COURT:  But --

Shelnitz - Redirect/Bernick                    149

1        MR. PRATT:  There's no record that notice was given

2   of this proceeding, the adversary proceeding that's the subject

3   of that document.

4        THE COURT:  Okay.  But, what's the point?  I'm

5   missing what the connection is that you're trying to make.

6        MR. PRATT:  Well, I'm just trying to establish that

7   Mr. Bernick's questions lack foundation.  This document can

8   come in, and I could use it because it's an admission of a

9   party opponent.  Mr. Bernick can't use it because it's not my

10  admission.

11       MR. BERNICK:  I'm not using it anymore.  I didn't

12  even make reference to it.

13       THE COURT:  He isn't making reference to the

14  complaint because of the objection that I sustained that you

15  made earlier.  This question was about whether the witness had

16  some knowledge about allegations that were apparently made in

17  open court.  I missed it.  Rephrase the question, Mr. Bernick,

18  and let's get on with this.

19       MR. BERNICK:  Your Honor, I would love to but for

20  the --

21       THE COURT:  Mr. Bernick, rephrase the question.

22       MR. BERNICK:  Yes.

23  BY MR. BERNICK:

24  Q   Mr. Shelnitz, at the time -- Mr. Shelnitz, in open court

25  in the early stages of the bankruptcy proceeding were pleadings

1  filed and statements made regarding the prosecution of tort

2  litigation relating to Grace now against Fresenius and Sealed

3  Air?

4           MR. PRATT:  Objection, Your Honor.  That question is

5  not relevant, but it also exceeds the scope of --

6           THE CLERK:  I'm not picking you up.

7           MR. PRATT:  -- cross.  This is redirect.

8           THE COURT:  That microphone's not on.

9           THE CLERK:  I'm not picking him up.

10          THE COURT:  Can you press the one in front of Mr.

11 Brown?  I think it's just not turned on.

12          MR. PRATT:  It is on, Your Honor.

13          THE COURT:  The only one that shouldn't be working is

14 the other one.

15          MR. PRATT:  I'll get right close to it.

16          THE COURT:  You don't need to do that once it's on,

17 okay?

18          MR. PRATT:  Okay.  I'll try to calibrate.  Your

19 Honor, this -- Mr. Bernick's most recent question is not

20 relevant at all based on the way he proffered this witness, but

21 also, and just as importantly, it exceeds the scope of my

22 cross.

23          THE COURT:  It does exceed the scope of the cross.

24 The relevance, frankly, I've lost.  I don't have any idea what

25 the relevance is at this point, Mr. Bernick.  But, it does

Shelnitz - Redirect/Bernick                    151

1 exceed the scope of the cross.

2          MR. BERNICK:  I'll go back and we'll tie up first

3 rather than last.

4 BY MR. BERNICK:

5 Q    Do you recall that you were asked on cross examination --

6 I don't know why we're getting feedback -- do you recall that

7 you were asked on cross examination what the purpose of the

8 provision was relating to successor liability?

9 A    Yes.

10 Q    And do you recall that you answered that question by

11 saying the purpose of that provision was to protect Sealed Air

12 and Fresenius?  Do you recall that?

13 A    Correct.  Yes.

14 Q    Now, Fresenius -- Sealed Air and Fresenius, tell the Court

15 whether or not in connection with the plan of reorganization

16 Sealed Air and Fresenius are contributing money to the estate.

17          MR. PRATT:  Objection, Your Honor.  That clearly

18 exceeds scope of cross.

19          MR. BERNICK:  No, it -- it's the whole purpose.  He

20 asked the question what's the purpose of the provision.  The

21 purpose of the provision is totally plain.  They're major

22 contributors to this case.  I want to get that fact out --

23          THE COURT:  The objection is overruled.  You may

24 answer the question.

25 A    Yes, a very substantial portion.

Shelnitz - Redirect/Bernick                    152

1  Q    Okay.  Do you know -- are you familiar with the settlement

2  agreements, and indeed the order that was entered by Judge

3  Woolen approving those settlements?

4          MR. PRATT:  Objection, Your Honor.  We have the same

5  notice problem.  My clients were not on notice of that order

6  and --

7          MR. BERNICK:  It's not offered for notice.

8          MR. PRATT:  Well, you're talking about it and leading

9  the witness toward -- down the road toward it.

10          MR. LOCKWOOD:  Your Honor, Mr. Pratt is testifying

11  that his clients didn't get notice.

12          MR. PRATT:  I'm showing that there's a lack of --

13          MR. LOCKWOOD:  If he wants to put on a witness --

14  excuse me --

15          MR. PRATT:  I'm showing that there's a lack of

16  foundation.

17          THE COURT:  I don't know that there's a lack of --

18          MR. LOCKWOOD:  There's a statement of counsel about

19  facts as not --

20          THE COURT:  Counsel, you know what?  We're going to

21  break for lunch because this has just gotten out of control.

22  We're in recess until one-thirty and we will reconvene.  You

23  folks get control of yourselves while we're gone.

24          UNIDENTIFIED ATTORNEY:  Your Honor, can I just have a

25  housekeeping, Your Honor?

1            THE COURT:  No.  After one-thirty.

2                         (Recess)

3            THE COURT:  Please be seated.  Are you ready to

4  begin, Mr. Bernick?  Yes?

5            MR. BERNICK:  Yes, I'm ready.

6            THE COURT:  Okay.

7            MR. BERNICK:  Well, we're going to try to make it

8  unnecessary.  Over the lunch hour, in order to expedite the

9  proceeding and get Dr. Peterson on who has a very urgent family

10 need to get back this afternoon -- this evening, we're not

11 going to conduct any further cross exam -- redirect examination

12 I should say of Mr. Shelnitz.

13           THE COURT:  All right.

14           MR. PRATT:  No further cross, Your Honor.

15           THE COURT:  You're excused, then, Mr. Shelnitz.

16           THE WITNESS:  Thank you.

17           MR. FINCH:  Your Honor, the Plan Proponents call Dr.

18 Mark Peterson.

19           THE COURT:  Thank you.

20       MARK PETERSON, PLAN PROPONENT'S WITNESS, SWORN

21           MR. FINCH:  Your Honor, we have the same witness

22 notebook for Dr. Peterson as before.  We also have a set of

23 demonstrative exhibits which have been pre-marked as Plan

24 Proponent's Exhibit 178-B.  Does Your Honor have both of those

25 in front of --

1          THE COURT:  I do.  Thank you.

2          MR. FINCH:  -- her?

3                      DIRECT EXAMINATION

4   BY MR. FINCH:

5   Q    Dr. Peterson, do you still have -- do you have those

6   exhibits in front of you?

7   A    Yes, I do.

8   Q    Dr. Peterson, are you the same person who testified

9   extensively last week about your qualifications and expertise

10  in estimating the value of asbestos personal injury claims?

11  A    I believe so, yes.

12                      (Laughter)

13  Q    Have you done anything in the intervening time period to

14  add to your knowledge about asbestos litigation generally or

15  Grace specifically?

16  A    A couple things.

17  Q    Could you describe those briefly, please?

18  A    I read the testimony in this hearing of Mr. Hughes, and I

19  looked at some financial statements for Union Carbide, recent

20  financial statements.

21  Q    In your work in doing estimates for asbestos liabilities,

22  do you from time to time provide estimates of the liabilities

23  of a trust?

24  A    Yes.

25  Q    A 524(g) asbestos settlement trust?

Peterson - Direct/Finch                          155

1  A    Frequently.

2  Q    And does that require you to review the medical and

3  exposure criteria of trust distribution processes used to make

4  those estimates?

5  A    Yes.

6  Q    And do you compare them to companies' claim settlement

7  practices pre-petition to do that?

8  A    Yes, that's one of the steps.

9           MR. FINCH:  Your Honor, last week you recognized Dr.

10  Peterson as an expert in asbestos claims valuation which

11  includes estimating the value of asbestos personal injury

12  claims, the factors that drive those values, the projection of

13  the number and timing of future asbestos personal injury

14  claims, and the cost to resolve pending and future asbestos

15  personal injury claims.  We would add -- we would proffer Dr.

16  Peterson as an expert in all of those subjects here, as well as

17  expertise in projecting the liabilities of an asbestos 524(g)

18  trust.

19           THE COURT:  Any objection?

20                (No audible response)

21           THE COURT:  He may express those opinions as an

22  expert.

23  Q    Dr. Peterson, did you prepare some slides to help

24  illustrate your testimony today?

25  A    Yes, I did.

1  Q    Who determined the content of those slides?

2  A    I did with my associates.

3  Q    Would that be Mr. Relis (phonetic)?

4  A    Yes.

5  Q    Did you oversee the -- did you review every slide?

6  A    Yes.

7  Q    Does every slide accurately convey and summarize your

8  testimony?

9  A    Yes.

10 Q    If I were to ask you one question could you explain your

11 estimation -- opinions here using those slides?  Could you

12 spend an hour using those slides to describe them?

13 A    Yes, certainly.

14        MR. FINCH:  Could we have Slide 8, please?  Jim, at

15 178, Slide 8.

16 Q    While we're waiting for the slide to be on the screen, Dr.

17 Peterson, could you describe briefly the approach and sources

18 of data you used to estimate the liabilities of an asbestos

19 defendant in the tort system?

20 A    Generally I used the same approaches and type of research

21 that I do for both my academic work at Rand and elsewhere and

22 engagements like this.  It's primarily two streams of work.

23 One is quantitative analysis.  I'm very interested in and do a

24 great deal of quantitative analysis in the work I do.  I'm an

25 unusual lawyer in that regard, I guess.

1            And the other track of it, though, is to obtain as

2   much information as I can from documents, from parties that are

3   participating in the litigation, from any source in order to

4   better understand the data.  And data aren't meaningful

5   unless -- and analysis of them aren't meaningful really unless

6   you have some understanding and hypotheses about what the data

7   mean and what relationships are.  So, I try and embed myself on

8   that.

9            In this case it was reading documents from W.R.

10  Grace, reading transcripts of opinions -- transcripts of

11  depositions by primarily people working for and handling the

12  claims for Grace, talking with lawyers.  I didn't have much

13  access to the debtors' personnel who handle asbestos litigation

14  for most of the cases.  It's one of the reasons why the

15  depositions and testimony of Mr. Hughes was important.  Things

16  like that, and in order to understand it not only for this

17  company, but for similar companies.  I -- again, financial

18  statements.  I gather as much information as I can and try and

19  put it altogether and use that to form my quantitative

20  analysis.

21  Q    Do you use epidemiology at all in projecting future

22  asbestos liabilities?

23  A    Yes.  It's central to the forecast in your future claims

24  because the filing of claims as a function of how many people

25  get sick, which is epidemiology, and how many people once

1  they're sick made claims, which is a claiming process and a

2  part of behavior in the litigation system which is kind of the

3  central focus of my research.

4         MR. FINCH:  There's been an exhibit entered into

5  evidence in this case already, Your Honor.  It's Plan

6  Proponent's Exhibit Number 7 which is Grace's historical claims

7  database.

8  Q    Did you use that in your work in estimating Grace's

9  asbestos liabilities, Dr. Peterson?

10  A    Yes.  It was a database provided to us in 2002.  It was

11  the asbestos claim database, CMS database that Grace had.  It's

12  the same database you referred to.

13  Q    Does Slide 8 that's on the screen accurately summarize the

14  sources of data and approach you used to estimate Grace's

15  liability?

16  A    Yes.  I guess the one thing that I'd add is that I -- all

17  of this is, of course, informed by, and in turn contributes to

18  the academic research I do too.  That I and others.

19  Q    Is there an approach to estimating asbestos liabilities

20  that has been used by people in addition to you, a general

21  approach to doing such an estimate in your view?

22  A    Yes.  I describe it as the standard approach.  It was

23  first developed by the dean of Yale Business School in 1981 and

24  '82 in work he was doing for insurance companies.  It's been

25  used since by almost -- most people to do asbestos forecasting,

Peterson - Direct/Finch                    159

1  and I refer to it as the standard method.

2  Q    And what are the components of the standard approach as

3  you do it?

4  A    Well, there are two -- again, two aspects of it.   One is

5  that for purposes of valuing claims, analysts look to the

6  market.   There's really a marketplace of settlements.   Since

7  asbestos litigation began there are millions of settlements

8  that have been achieved across defendants.   For any particular

9  company like W.R. Grace there are hundreds of thousands of

10  settlements over time under varying circumstances

11          But, that magnitude of events, of recurrent common

12  events, presents a lot of information about the marketplace for

13  valuing asbestos claims.   And so, that's how claims are valued.

14  That's the one stream, and basically value claims based upon

15  the marketplace are both what it's been historically and what

16  it is currently.   And second is to -- is the forecast method

17  using epidemiology as I've described earlier, which provides us

18  with information about both past and future incidents of

19  asbestos-related cancers and combine that with data -- from a

20  database like W.R. Grace's which tells us how many people have

21  filed claims and do a quantitative analyses comparing those two

22  sets of information, the incidents data and the past filing

23  data.   And that's really the standard method.

24  Q    Does Slide 9 summarize your view of what the standard

25  approach is for forecasting asbestos personal injury

1  liabilities?

2  A    Yes.

3  Q    Next slide, please, that'll be Slide 10.  Dr. Peterson,

4  has standard -- can we call this the historical base approach

5  to estimating liability?

6  A    Whatever, sure.  I understand it.

7  Q    The standard historical base approach, can you describe to

8  the Court the types of entities that have either used that

9  methodology or described that methodology and relied on it in

10  their work?

11  A    Well, it's been the primary type of analysis done by

12  analysts in cases like this.  Most analysts use it, they may

13  use a variant or additional work, too, but it's really the

14  primary method and as such, it is then used by courts, when

15  courts reach decisions in estimation cases, typically it's

16  based upon the same principles that I just described and we've

17  called the standard historical approach.  So, courts and

18  parties in bankruptcy, is commonly what people use.  It's the

19  only method I've ever used.

20  Q    How about people outside of bankruptcy type litigation,

21  what types of parties have used this historical base approach

22  to estimate asbestos liabilities?

23  A    Well, it's the bases for most financial analyses done by

24  companies and their professionals for their own financial

25  planning, as well as for financial reporting.  It's also the

1 basis for calculation by asbestos trusts, in determining what

2 percentage, what the pari passu percent they can pay to all

3 claimants.

4 Q    As part of your work in this bankruptcy case, did you

5 investigate whether or not the W.R. Grace Company ever used the

6 standard historical base approach to project its asbestos

7 liabilities at any point in time?

8 A    Yes, I investigated that and I saw that, in fact, they

9 did.  They hired outside analysts to do that, who provided that

10 kind of information.

11 Q    Now, at what point in time did they do that?

12 A    Well, they did it up until the preparation for the

13 estimation in this case, but they were using it for the

14 financial reporting, certainly up to the time of the

15 bankruptcy.

16 Q    Are you applying -- when you do an estimate that you

17 present to a court, of a company asbestos liability, are you

18 applying the same methodology that you use in non-litigation

19 contexts, such as providing advice to an ACC or a trust?

20 A    Yes.  Or advice to insurance companies or businesses, yes.

21 Q    What are the major components of an estimate of total

22 liability for an asbestos defendant?

23         THE COURT:  I'm sorry, Mr. Finch, I couldn't hear

24 you.

25 Q    Sure.  If you could describe, Dr. Peterson, what makes up

Peterson - Direct/Finch                              162

1  the total asbestos liability of a defendant?

2  A    Well, it's separate analyses of the total liability for

3  pending claims.  Claims, by pending, I mean pre-petition

4  claims.  They were pending at the time of the bankruptcy and

5  then future claims.  You calculate those separately for reasons

6  that I'll describe in a bit, and add them up and that's the

7  total liability. But it's broken down, and there are separate

8  steps for each of those.

9  Q    Could I have Slide 14.  Are those the steps you just

10  described, Dr. Peterson?

11  A    Yes.

12  Q    Let's turn first to the first box, liability for pending

13  claims.  Can you describe very briefly the steps or the

14  components that you used to value pending claims against an

15  asbestos defendant?

16  A    Yes.  For both pending and future claims, for that matter,

17  the total liability of pending claims is a multiplication of

18  three elements.  It's the number of claims that are pending

19  times the percent of those claims that we estimate will be

20  paid, called percentage paid, and the third element is the

21  average value that will be paid to claims that receive payment.

22        That calculation, those three steps, are done

23  separately for diseases because the values of disease claims

24  vary.  Meso is much more valuable and expensive for a company,

25  than others.  So, you need to do that separately.  And then

**J&J COURT TRANSCRIBERS, INC.**

1  maybe with some time value adjustments in that sum, to produce

2  the total.

3  Q    Is Slide 15 what you just described?

4  A    Yes, it is.  Let me add, though, that colored -- the two

5  boxes on the left are red because together they represent the

6  number of compensable claims.  You take the number of claims

7  and you multiply it by what percent you think are going to be

8  paid.  Sometimes analysts calculate that directly.  I like to

9  calculate each of the two components of that because they're

10 not always -- they're independent, they vary differently with

11 each other and it's useful to be able to identify and discuss

12 and consider each of those separately.

13 Q    Okay.  So, is it correct, then, that if you had, say, a

14 thousand claims in a given disease category and a percent paid

15 of 70 percent, how many compensable claims would that result

16 in?

17 A    Well, 700.  And that's the key number.  I mean, it is

18 simplest, it's just the number of claims that will be paid

19 times the average they get.  Everything is -- all of the

20 analyses is addressed to getting to that point.

21 Q    How did you go about determining the number of claims that

22 were pending against the W.R. Grace Company at the time that it

23 sought Chapter 11 protection?

24 A    We used the count of claims in the database, claims that

25 were identified in W.R. Grace's prepetition database that were

1  identified in that database as having been unsettled at the

2  time of -- and unresolved at the time of the bankruptcy.  And

3  there are two subsets of that.  There are claims that actually

4  were settled, but were -- they were liquidated but unpaid.  And

5  then there are claims that were unliquidated and that was the

6  basis for our calculation of the number pending claims.

7  Q    Does the W.R. Grace database also have data about claims

8  that were resolved historically and been paid, either by

9  judgment or settlement, before Grace sought bankruptcy?

10 A    Yes, and that's the key to calculating the other

11 parameters.

12 Q    Okay.  Could you turn to the next slide, please, Slide 16?

13 A    Yes.  This summarizes our data, W.R. Grace's data.  It

14 shows on the right the total number of resolved claims.  It was

15 193,000 resolved claims.  There were 135,000 pending claims of

16 which 18,500 were claims that were liquidated but had not yet

17 been paid.

18 Q    Does that mean a claim that is settled but not yet --

19 Grace hadn't yet cut the check?

20 A    Yes.

21 Q    Do you follow a process to remove stale or inactive claims

22 from the pending claims analysis, and if so, could you describe

23 it to the Court?

24 A    Yes.  I mean, among the 116,670 claims that were

25 unliquidated and pending, there are claims that we believe will

1 | never be pursued.  They're essentially, they sit on the
2 | database, but they're not significant and they shouldn't and
3 | can't and don't enter into our calculation of liability.  Some
4 | of those are claims that you mentioned are stale, that's a term
5 | that we and other analysts use.  There are claims that have
6 | been filed many years ago, say before 1990, that remain
7 | unresolved.  We assumed that any claim that had been -- we
8 | actually did a lot of analysis looking at this, what's the
9 | likelihood that those claims would settle, because you could
10 | look at patterns.  How, you know, basically what's the rate of
11 | still being resolved even though it's a 20 year old claim, some
12 | do settle, but not many, so effectively what we assumed is that
13 | all claims filed prior to 1999 are stale, they've basically
14 | been abandoned by the law firm and a claimant, they just have
15 | not been removed from the database and we eliminated a little
16 | over 7,000 of those claims, as stale.
17 |         There will be some claims filed later that probably
18 | will become stale but the statistics that we looked at, suggest
19 | that it's a much less frequent issue in more recently filed
20 | claims.  There's something about the 1980s era of claims that
21 | mean they were filed but nothing is ever done with them.
22 | Q    Okay.  Now, I notice a column on the chart up there --
23 | first of all, is that the data that comes right out of Grace's
24 | database after you have analyzed it?
25 | A    Yes.

Peterson - Direct/Finch                                166

1  Q    That's Slide 16.  What is the UNSP?

2  A    It's unspecified.  It's very common in a database of an

3  asbestos defendant to have claims filed and the database

4  doesn't reveal what the disease is for a claim.  Presumably,

5  the plaintiff's lawyer and the claimant know the disease but it

6  either isn't reflected on the complaint because there's often

7  generic terms that are used in the specific disease, doesn't

8  need to be identified in many jurisdictions, or the database

9  didn't get it re-entered.

10 Q    Okay.  Do you have a methodology for dealing with

11 unspecified disease claims in a database, and if so, could you

12 very briefly describe it?

13 A    Yes.  It's one of several general approaches that are

14 used.  What we do is, we look to data from the Manville Trust.

15 The Manville Trust is the largest asbestos trust and it made --

16 for a while was making it's data available to people like me,

17 publicly for a fee, and what we did is, we linked these claims,

18 using social security numbers from the Grace database to the

19 Manville database, and for those that we could, we identified

20 what disease did the Manville Trust say the claim had, and we

21 were able to obtain, I think, 37 or 38,000 identifications of

22 diseases for claimants.  For the remainders that we couldn't

23 identify, we looked at the distributions, basically, what did

24 Manville say, what percentage of claims turned out to be

25 mesothelioma, what percent non-malignant and we just applied

**J&J COURT TRANSCRIBERS, INC.**

1  that percentage across all the remaining claims that we either

2  couldn't match to Manville, or for which Manville also didn't

3  have a disease.  With --

4  Q    But --

5  A    -- with one exception.

6  Q    Excuse me, Doctor, Slide 20 please.

7  A    Yes.

8  Q    Dr. Peterson, does Slide 20 show the distribution of

9  pending Grace claims across diseases, once you go through this

10 process of dealing with stale claims and claims where the

11 disease is not specified in the database?

12 A    Yes. But it retains 6329 unresolved claims as not having

13 asbestos disease and that's because historically W.R. Grace

14 resolved a certain percentage of claims that didn't -- without

15 identifying a disease and basis for no money.  I mean they

16 just, again, it's an indication of a claim that didn't go

17 anywhere.  So, we assume that among the 109,000 pending claims,

18 some fraction of them, or about 6 percent, will be just like

19 these resolved claims, will end up being resolved without

20 payment, without ever finding out what the disease is and

21 basically, who cares.  I mean the forecast just ignores those

22 claims.

23 Q    So, those claims are treated as a zero value in your

24 forecast?

25 A    They're treated at zero value and they're not counted in

**J&J COURT TRANSCRIBERS, INC.**

1  forecasting in future claims.  They have no impact upon the

2  forecast.  We just ignore -- like the stair claims, we ignore

3  them.

4  Q    How many pending mesothelioma claims were there at the

5  time W.R. Grace went into bankruptcy?

6  A    We believe that there were 3,024 of which 2,885 were

7  unliquidated.

8  Q    And how many total claims were pending at the time that

9  Grace went into bankruptcy?

10 A    127,770, of which 109,250 were unliquidated.

11 Q    As part of your estimation work and other for the Grace

12 ACC in this case, did you become generally familiar with the

13 criteria that Grace would apply before offering a settlement to

14 an asbestos personal injury claimant, before Grace went into

15 bankruptcy?

16 A    Yes.  That was part of the process I described earlier,

17 learning about that.

18 Q    And, could you describe just very briefly what Grace's

19 general approach and criteria for resolving asbestos personal

20 injury claims was before it went into this bankruptcy?

21 A    According to documents from W.R. Grace and statements by

22 the people like Mr. Hughes, who handled those claims, they

23 required evidence of exposure to asbestos, of exposure to a

24 Grace asbestos product and of an asbestos -- some, at least

25 minimally credible evidence of an asbestos related disease, all

1 sufficient to withstand summary judgment.  There had to be a

2 meaningful cause of action.

3 Q    Could you turn to Slide 21, please?  Does Slide 21 show

4 some of the documents that you reviewed that set forth Grace's

5 criteria for resolving asbestos personal injury claims?

6 A    Yes, excerpts from a couple.

7 Q    What does Grace's historical data show --

8         THE COURT:  Mr. Finch, you need to stay by a

9 microphone, I'm sorry.

10         MR. FINCH:  I'm sorry, I'm sorry, Your Honor.

11 Q    I'll root myself to the podium here. What does Grace's

12 historical data show about what was going on with respect to

13 the values of its mesothelioma claims in the years prior to its

14 going into bankruptcy?  If you could just describe that just

15 generally very briefly?

16 A    They were increasing, pretty much from across the board,

17 from the early 1990s until the time of their bankruptcy, with

18 that increase accelerating in the couple of years prior to the

19 bankruptcy.

20 Q    Could I have Slide 23, please?  Dr. Peterson, what does

21 Slide 23 show?

22 A    It shows in the red bar, the trends of settlement values

23 for mesothelioma claims by W.R. Grace and compares it to the

24 four other defendants that I discussed in my testimony last

25 week.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    And, why did you pick those four defendants to illustrate

2 on the slide?

3 A    One, I had public data for them; two, and that's

4 important.  Second is that they were all companies that in some

5 measures were similar to W.R. Grace, and, three they -- except

6 for Owens-Corning, it has its own interest for that, the other

7 companies continued resolving claims after W.R. Grace went into

8 bankruptcy.

9 Q    This chart shows mesothelioma values.  Were Grace's

10 historical settlement averages rising for other diseases as

11 well?

12 A    Yes.  Certainly for the cancers.  I think they were

13 relatively -- yes, they were increasing, yes.

14 Q    As much as for mesothelioma?

15 A    I think meso was the sharpest increase and that's typical

16 of defendants.

17 Q    Did you come to an opinion or a conclusion as to what

18 factors were driving the increase in Grace's mesothelioma and

19 other claim values before it went into bankruptcy and did you

20 describe that to the Court last week?

21 A    Prior to bankruptcy, one of the -- in the recent years,

22 one of the important factors was the bankruptcy petitions by

23 other asbestos defendants which began to increase the values it

24 was paying in 2000 and 2001.  There were other elements.  The

25 increasing number of settlements outside of an inventory

Peterson - Direct/Finch                     171

1  process, in more recent years.   When Grace settled claims in

2  bulk, it got a break on the price.   When they settled them more

3  separately, the price went up and there are year-to-year

4  fluctuations.   Grace became a more prominent defendant over

5  time, it was relatively -- I wouldn't say obscure, but kind of

6  borderline of significance in the early and mid-90s and it

7  began to become more important at about the time that the CCR

8  defendants, claims against them were stayed and plaintiffs'

9  lawyers were looking for other additional defendants to

10 supplement the amount of money they lost when the stay was

11 entered in the CCR class action.

12 Q    Did you review Grace's documents to see whether it stated

13 anything about what, if any, factors were acting in the tort

14 system that could have the effect or did have the effect of

15 increasing its cost to resolve asbestos claims?

16 A    Yes.   There's a discussion of a number of factors.   Again,

17 the most important that they identified, according to them, was

18 the bankruptcies -- how many other defendants there are

19 available to help pay the liability and, therefore, the

20 bankruptcies of those defendants tended to drive the values up.

21 There are also factors that suppressed it.   The pendency of the

22 bankruptcy tended to suppress values.

23 Q    Is Slide 26 an accurate depiction of the document -- some

24 of the statements that you've reviewed and commented on in your

25 report about Grace's warnings about the factors that would

**J&J COURT TRANSCRIBERS, INC.**

Peterson - Direct/Finch                                    172

1  increase its asbestos liability?

2  A     Yes.  This is a contemporaneous statement by W.R. Grace in

3  2000 about how it was being impacted and foresaw continuing

4  impacts of the insolvency of other asbestos defendants.  And

5  the effect of it in the last point, it made it a riskier

6  environment with higher values.

7  Q     We are sitting here in 2009 and we, obviously, have some

8  knowledge of what's gone on in the world since 2001 in asbestos

9  litigation.  Did you come to an opinion or conclusion about

10  things that would affect Grace's asbestos liability, based on

11  information that became available since 2001, continuing to the

12  present day?

13  A     Yes.  I mean it's a real luxury for someone doing a

14  forecast to already know what happened for the first eight

15  years they're doing a forecast.  We now, in 2009, have

16  hindsight, we can see what happened and it would be

17  unreasonable not to take that into account in the forecast that

18  we do and that's what I've done here.

19  Q     And, you testified about some of those factors last week.

20  Does Slide 27 accurately set forth the primary factors in your

21  view that would have affected Grace's liability for pending and

22  future asbestos personal injury claims in the tort system?

23  A     These are additional events that happened. I mean,

24  bankruptcies continue to expand to other companies.

25  Non-malignant claims went down because of the legislation in

1  other matters, reducing the number of filings of non-malignant

2  claims, but perversely increasing the value -- particularly

3  mesos, I think I've testified about that last week.  So, you

4  could see these continuing occurrences of events, all of which

5  contributed to the increasing values of claims, although the

6  non-malignant trend, obviously, really cut the number of non-

7  malignant claims.

8         Also, over this eight year period we had an

9  opportunity to test and verify Grace's prediction that it would

10 have -- that values would continue to increase for the reasons

11 they mention and we've been able to see that that's true.

12 Q    How have you been able to do that?

13 A    Well, by looking at the data that I showed you earlier

14 about what happened with U.S. Gypsum and Turner and Newell and

15 Quigley and other companies.

16 Q    You also analyzed the publicly available data of other

17 companies that are still in asbestos tort litigation?

18 A    Yes.

19 Q    What companies?

20 A    That are still in?

21 Q    Still in?

22 A    Publicly available?

23 Q    Yeah, like in financial statements and such.

24 A    Oh, financial statements, GAF, for example, G1 Industries,

25 looked at their statements.  Asarco, looked at their

1 statements.  Their data are not public.

2 Q    You mentioned at the beginning of your -- never mind.

3 Last week we talked some with the Court about how these factors

4 affect the settlement averages, Grace, in your view, would be

5 like to pay going forward.  Do these factors also affect the

6 percent of claims that Grace would likely pay, had it not gone

7 into bankruptcy?

8 A    It's harder to ferret it out, but yes, it certainly

9 suggests there would be fewer meso claims -- I mean, excuse me,

10 fewer non-malignant claims that would be paid for all the

11 reasons, for the tort reform and the increased scrutiny of

12 them, in particular.  And, the experience of some other

13 companies was to be more critical and look more closely and,

14 therefore, pay a smaller percentage of claims.  But I think

15 more than anything, it was kind of Grace's public announcement

16 of what its position was, that it probably would be a bit more

17 aggressive in reviewing claims.  For all those reasons, I think

18 that probably there would have been a reduction in the number

19 of percentage of claims paid by W.R. Grace, after -- if it had

20 continued in litigation after the bankruptcy.

21 Q    Could I have Slide 29 please?  Dr. Peterson, did you

22 analyze Grace's historical database to determine what

23 percentage of mesothelioma claims it would pay money to?

24 A    Yes.  I looked first historically at the bottom, wider box

25 shows what historically Grace's experience was in years 1999

1  through 2001 for each disease.  For mesotheliomas, they paid

2  over 90 percent in each year, and it compares that with Turner

3  and Newell, one of the companies for whom I have publicly

4  accessible data.  We had similar rates of payment of claims for

5  virtually ever disease until 2001 when it sharply reduced -- it

6  rejected many more claims than it had historically.

7  Q    What happened to Turner and Newell in 2001 that made it,

8  in your mind, a good analog for what Grace would likely attempt

9  to do?

10 A    Well, it -- prior to that, it was a member of the Center

11 for Claims Resolution, in --

12 Q    I don't think the Judge has heard what the Center for

13 Claims Resolution is.  Could you just describe briefly what

14 that is?

15         THE COURT:  I think I know, but okay, go ahead.

16         THE WITNESS:  It's a consortium of 20 asbestos

17 defendants that was created to control costs.

18 Q    Okay, now go on.

19 A    That disbanded at the beginning of 2001, so in 2001,

20 Turner Newell was now resolving cases in ordinary litigation,

21 and in a process that was similar to what Grace would be doing

22 on a going forward basis.

23 Q    And so, in the forecast that you did or the estimate that

24 you did of the percentage of pending claims that Grace would

25 pay in the tort system had it not gone into bankruptcy, what

Peterson - Direct/Finch                    176

1 percentages did you use, is it shown on this chart?

2            THE COURT:   I'm sorry, what was the question?

3 Q    Sure.  Dr. Peterson, did you do an estimate of the

4 percentage of pending claims that Grace would pay had it not

5 gone into bankruptcy?

6 A    Yes.

7 Q    And does it appear on this chart?

8 A    Yes.

9 Q    Can you describe where to the Court?

10 A    It's the smaller box in the middle of the page, where it

11 has percent of claims paid forecast, there's two Grace reduced

12 and Grace lowest.  We used really three alternative forecasts

13 in the report of which two, I think, were more credible, both

14 are a reduction.  And the lowest is the rates that are derived

15 from -- slightly different from Turner Newell's, but similar to

16 them and they differ because of -- just differences in the

17 number, the composition of the database.  So, that's meant to

18 replicate pretty much what the experience of Turner Newell and

19 other CCR defendants were in this period of time.

20            The Grace reduced is halfway between the historic

21 rates which are shown at the bottom of the page and the lowest

22 rates, because Turner Newell was a CCR member, I think its

23 having left CCR is a reason why its rates went as low as it

24 did.  And I don't think that all of the same factors apply, so

25 I think the more reasonable rate is to assume basically halfway

**J&J COURT TRANSCRIBERS, INC.**

Peterson - Direct/Finch                    177

1  between what it did historically and what the experience of the

2  CCR members are and that's the reduced rate, which is basically

3  the 78.3 percent of the meso claims that were filed with Grace,

4  we assume would be paid and that, conversely, 21.7 percent

5  would be resolved without payment, which is far higher than the

6  less than 10 percent historically.

7  Q    Did you compare your projection of Grace's likely

8  percentage of claims paid, to what a prominent asbestos

9  defendant was doing in the 1990s?

10 A    Yes.  Owens-Corning was on that earlier slide.

11 Owens-Corning was a major defendant and so we made that

12 comparison.

13 Q    Could you describe very briefly to the Court the various

14 ways in which Owens-Corning attempted to resolve its asbestos

15 liability outside of bankruptcy?

16 A    Well, beginning in the late 1980s and through -- for about

17 ten years, almost, Owens-Corning had a policy of being

18 aggressively litigating claims.  Looking at them closely and

19 litigating them, with the hope that they would drive out claims

20 and discourage filings, and that turned out to be a disastrous

21 policy for them, but it shows what was the rate of being able

22 to reject claims by a company that was quite aggressive with

23 regard to its litigation posture.

24 Q    Do you know whether or not Owens-Corning tried cases to

25 judgment during that period of time?

**J&J COURT TRANSCRIBERS, INC.**

1 A    Oh, it tried over a thousand cases to judgment, and it won

2 about -- a little over half the time, but when it lost, it got

3 nailed badly.

4 Q    And after this strategy by Owens-Corning to try its way

5 out of its asbestos problem, what did it attempt -- what did it

6 do next?

7 A    Then it went into a process, it was quite similar to the

8 process that W.R. Grace did in recent years, of inventory

9 settlements.  Their National Settlement Program, NSP, was where

10 they would basically do inventory settlements or large

11 settlements with law firms.  They went from one extreme to

12 another, with settling almost all claims and trying to

13 negotiate terms for resolving future claims that would make it

14 -- give them some advantage in handling the future claims.  And

15 that became a pretty common tactic that W.R. Grace,

16 Owens-Corning, others used in the late 1990s.

17 Q    How did that work out for Owens-Corning?

18 A    Well, they were going to go into bankruptcy no matter

19 what, but they had spent a lot less money on indemnity, on

20 average, so they spent a lot more money in total because

21 they're resolving so many claims, they spent far less money on

22 defense costs, they were paying enormous burden on defense

23 costs which they basically were able to stop.

24 Q    Slide 30, please.  Dr. Peterson, what does Slide 30

25 depict?

**J&J COURT TRANSCRIBERS, INC.**

1  A    This shows my two forecasts of the Grace paid percentage

2  at the top, with what Owens-Corning achieved.  In the years in

3  red, this was during its period of aggressively reviewing and

4  trying cases.  And my point, really, in preparing this is that

5  even in those years when a significant defendant was being very

6  aggressive with rejecting claims, it achieved rates of

7  rejection that were actually not as low as I'm forecasting

8  Grace would have been able to continue.  By estimating that

9  Grace would be able to get rid of so many claims on being

10 conservative, I'm underestimating the liability.

11 Q    Did you use various different quantitative methods to

12 estimate the value that Grace would pay to successful asbestos

13 personal injury claims as of the time of the bankruptcy?

14 A    Settlement values.

15 Q    Yes.

16 A    Yes.  I've described that in my testimony last week, we

17 used four different -- three different methods with data from

18 four different defendants to estimate, looking at experience of

19 claims, companies that continued to settle claims after Grace

20 went into bankruptcy, in order to come up with five alternative

21 estimates of how much Grace would have paid after bankruptcy,

22 if it had remained in litigation.

23 Q    Okay.  Can I have Slide 32, please?  Does Slide 32 show

24 your estimate of Grace's total liability for pending asbestos

25 personal injury claims as of April 1st, 2001?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    And just -- I want to pick out a few things in the chart.

3  What is the value that you're using for settlement averages for

4  meso claims?  Mesothelioma claims?

5  A    It's $108,918.

6  Q    And, could you just walk the Court, briefly, through how

7  you -- and what's the total indemnity for mesothelioma claims

8  that were pending at the time Grace went into bankruptcy?

9  A    Well, it's the same product of the equation I did before.

10  The number of pending claims, two hundred eighty-eight -- 2885,

11  times the payment rate, 78.3 percent which yields a little over

12  2200 claims that would be paid and they would receive an

13  average of $109,009, which in later years we forecast they'd

14  pay more, in 2001, they paid a bit less, but essentially, we

15  gradually increased the value, we assume these claims would be

16  paid in two thousand -- would have been paid in 2002.

17  Q    Is that with the one year's inflation is about?

18  A    Yes.  Well, the one year step-up, in the one of five

19  years, a step-up in the adjustments we did.  For this

20  particular model.

21  Q    And that results in a total indemnity for mesothelioma

22  claims of what, Dr. Peterson?

23  A    It's $252 million for the unliquidated claims and another

24  $10 million for liquidated claims.

25  Q    And, what is the total liability, for all types of

Peterson - Direct/Finch                      181

1  asbestos claims?

2  A    Again, I believe this is quite a conservative estimate,

3  but it's $576 million.  And this is similar to the values --

4  remember, we have five different bases for valuing claims,

5  they're all about this number.

6  Q    Do you have an opinion as to whether it is likely that the

7  W.R. Grace Company would have been subject to a substantial

8  number of future asbestos personal injury claims?

9  A    Oh, it certainly would have had a large number of future

10 asbestos claims.  You can't know precisely how much they are

11 right now because they're forecasts, but they would have had a

12 large number of future claims filed against them, but the exact

13 number is imprecise.

14 Q    We talked earlier this afternoon about the various

15 components that go into estimating the liability for pending

16 claims. Can you describe to the Court what are the components

17 going into estimating the value of future claims?

18 A    Well, again, there are the average settlement -- I'm

19 working backwards, the average settlement values and the

20 percent of claims that get paid, which are similar to what we

21 used for the pending claims, but here we can't simply count the

22 number of future claims, obviously, they're not there, so we

23 have to forecast the number of future claims.  So, it's the

24 three elements, number of claims, percent get paid, values, but

25 here the number of claims is not a count, it's a forecast.

1  Q    Does Slide 34 show what you've just described?

2  A    Yes.

3  Q    Next slide, Slide 35.

4  A    Basically the same equation.

5  Q    What is Slide 35?

6  A    Well, the forecast claims, one of the two key elements in

7  understanding what was going on was, how claims have been filed

8  in the past.  Well, just know what the trends were in filing,

9  and where the company left off, basically, the level of

10 claimings at the time it went into bankruptcy and these are

11 annual claim filings, by disease, using the -- where we've

12 allocated the unknown disease claims.  And it eliminates the

13 stale claims and the unspecified pending diseases.

14 Q    And, what -- does this show Grace's history of number of

15 claims filed against it, divided by disease each year, between

16 the years shown on the chart?

17 A    Yes, it does.  The last column, the last row in red is an

18 annualized number of the 2001 claims, because they were only in

19 business for, with regard to liability, for a quarter of the

20 year.  We estimated what they would have had for the full year

21 by looking at the claims filings over the previous 27 months.

22 But they received 321,000 claims all together.  Once you

23 eliminate stale and kind of unknown disease claims that won't

24 get paid.

25 Q    Does that -- you said something about 27 months, it that

Peterson - Direct/Finch                          183

1  -- by my math, if you multiply -- first of all, how many

2  mesothelioma claims did Grace receive the first quarter of

3  2001?

4  A    566.

5  Q    And so why isn't the annualized number of mesothelioma

6  claims as estimated by you in 2001, 2400?

7  A    Well, a standard way to do this is just take whatever

8  fraction of the year and gross it up, so here you'd multiply it

9  by four.  When we did that, we thought the numbers were too

10 large, we didn't think that the rest of the year would continue

11 to run at the pace of the first quarter, so rather than

12 creating a number for 2001 that we thought was unrealistically

13 high, we looked at -- we basically grossed it up based upon

14 their experience, over not just the last four months but the

15 last 27 -- about three months, but over the last 27 months to

16 develop what we thought was a more appropriate and reasonable

17 gross up number for the year.

18 Q    Once you have W.R. Grace's claims history, in terms of the

19 number of claims filed against it year-by-year, how do you use

20 that information to project the future number of asbestos

21 personal injury claims?  Could you describe that very briefly

22 to the Court?

23 A    Three steps.  One with just this, it's -- we look at this

24 for trends, if trends are going on, you have to expect that

25 those trends will continue to some degree.  Here there's

**J&J COURT TRANSCRIBERS, INC.**

Peterson - Direct/Finch                                184

1  external reasons for expecting that.

2          Secondly, we look to the epidemiology which gives us

3  a count in each future year as it has for past years of the

4  number of persons who likely will die from asbestos related

5  cancers.  Essentially that's the norm, it's our constant that

6  we can use.  The one thing we know about the future, that we

7  have the most confidence in, and third, is to look at the

8  experience of other companies in the years since this company

9  went into bankruptcy.  Again, we have eight -- well, at the

10 time I wrote this report, we had six years of experience we

11 could look it to see what likely would have happened to Grace.

12 Q    Could I have Slide 36, please?  Dr. Peterson, does Slide

13 36 describe the basic concept behind your methodology for

14 projecting future numbers of asbestos personal injury claims?

15 A    Yes.

16 Q    You've referred several times to epidemiology of asbestos

17 related cancers, what specifically are you referring to?

18 A    Researchers at Mt. Sinai Hospital, which is the center of

19 research on asbestos related disease in this country, Mt.

20 Sinai, New York.  That's where Irving Selikoff was.  Irving

21 Selikoff and his colleagues, primarily Bill Nicholson, did an

22 epidemiological forecast, they looked at all the people who had

23 worked with asbestos in 11 of the major industries where

24 asbestos was used, for the years prior to 1970s, they had

25 counts of people that were exposed to asbestos, they had

1 estimates of how much asbestos they were exposed to, how old

2 these people were, how long they worked and they combined that

3 with medical models of what's the likelihood of getting an

4 asbestos related disease, given those kinds of factors that I

5 just described.  So, based on that, they were able to do

6 separate forecasts for mesothelioma of the number of persons

7 who would die each year from asbestos related mesothelioma, the

8 number of people who die each year from asbestos related lung

9 cancer, the number of people who die each year from asbestos

10 related gastrointestinal cancers.  And they published that

11 report in 1982.

12        It remains the best epidemiological forecast

13 available and not only -- that's understating its value, it's

14 an extraordinary scientific event.  It is a wonderful forecast.

15 Q    Was that published in peer review medical journals?

16 A    Yes.

17 Q    Could I have Slide 38?  What does Slide 38 show, Dr.

18 Peterson?

19 A    Well, these are just graphs of the forecasts of the number

20 of people who have died each year from each of these diseases.

21 They made their forecasts in '82 for the years prior to, about

22 1980 or '81, they actually looked at data that they were able

23 to compile from the federal government.  Beyond that, this is

24 all forecasts.  So, the blue line is lung cancers, red is

25 mesothelioma, the green is other cancers.  And it shows that up

1  until about now, most people who get an asbestos related cancer

2  will get lung cancers, that's changing and now lung cancer and

3  mesothelioma will be about similarly frequent.  And they

4  forecast until 2030, but you can extend -- these lines are

5  still well above zero, so you can extend those lines out and we

6  do to 2040.

7  Q    Approximately how many mesothelioma claims was Dr.

8  Nicholson and the other researchers at Mt. Sinai projecting for

9  the 2005 to 2010 time frame, on an annualized basis?

10 A    It's roughly 3,000 a year in this period.  And that's just

11 about the peak.  It's slightly lower than the peak year. It

12 peaks and tends to go down a little bit, but still around 3,000

13 mesos a year.

14 Q    Have you done anything to test the accuracy of Dr.

15 Nicholson and the other researchers at Mt. Sinai projections of

16 future asbestos related cancer claims?

17 A    Yes.

18 Q    How did you do that, how did you go about doing that?

19 A    The federal government has two different programs for

20 collecting data on the number of people who die from -- who get

21 and die from cancers, various kinds of cancers, from all

22 causes; lung cancer, breast cancer, prostate cancer, and they

23 keep separate records.

24        The first of these, which is a research that's been

25 going on since the 1960s, I guess, 70s, they collect data from

Peterson - Direct/Finch                              187

1   hospices, hospitals, medical facilities to find out how many

2   people died of each of these asbestos related cancers in,

3   originally nine different sites, where the State of Iowa, the

4   whole state's a site, so they go to every one of those

5   facilities and Iowa and collect that data.

6          Long Beach and Los Angeles is a site, so they go to

7   every place there.  And they publish that data, they've

8   expanded that site list twice from 9 to 13 to 17.

9   Q    Do they collect data about mesothelioma?

10  A    Yes.  Mesothelioma is one of the categories, it's

11  separately counted and it's useful to us because it's only --

12  the only known cause of mesothelioma is exposure to asbestos.

13  And so, it's a way we can compare their count of mesothelioma

14  claims -- from the nine sites you can extrapolate to the

15  country as a whole.  It's a sample.  It's not a random sample,

16  but it's a sample.  And you can generalize the whole country

17  based upon their nine sites and you can compare that with

18  Nicholson forecasts in each year.

19  Q    You said claims, did you mean disease incident?

20  A    I'm sorry, incidents.  Actually mesothelioma deaths.

21  Q    What does Slide 39 show?  Next slide, please.

22  A    That makes the comparison.  The green line is actually the

23  result extrapolated to the country as a whole for the nine SEER

24  site study, that the green line. It goes up and down, bumps up

25  and down a lot because it's from a sample, so it's not very

**J&J COURT TRANSCRIBERS, INC.**

Peterson - Direct/Finch                    188

1  orderly.  The blue line is a forecast that KPMG did, attempting

2  to update Manville's -- update Nicholson's study.  They did

3  this in 1982, but the red line is actually Nicholson's

4  forecast.  And you can see that it just -- it falls right in

5  the middle of the green line for virtually the entire period

6  since Nicholson made his study and published it in 1982.

7  Q    Is SEER -- S-E-E-R, the first type of government data you

8  were talking about?

9  A    Yes.

10 Q    And there's something there on U.S.C.S. meso count it's

11 a little black dot.  What's that?

12 A    That's another government program that's more recent.  It

13 began in the year 2000.  Basically, what they've done is,

14 they've taken the SEER method and done it nationally.  Now, in

15 every state, except for Maryland, Maryland is a lagger, they

16 don't have it up yet, but for 49 states they do this in every

17 hospital and every hospice, so now they're collecting national

18 data and you don't have to extrapolate to get a national

19 sample, you can count it and you can see the black dots on this

20 graphic it shows why a census of all data is much better than a

21 sample.  It's orderly, year after year, the blacks lines, and

22 it also is even more remarkably consistent with the Nicholson

23 forecasts than the SEER data were.  This is why I say this is

24 an astounding piece of medical research is because this is a

25 study now that's almost 30 years old.  And over that entire

**J&J COURT TRANSCRIBERS, INC.**

Peterson - Direct/Finch                    189

1  period of time and we can check it, it's been confirmed year

2  after year.  It's a very reliable forecast.  And that's why we

3  use it for forecasting future claims because it gives us a

4  solid basis for starting.

5  Q    Once you have Dr. Nicholson's prediction of mesothelioma

6  deaths in the United States and Grace's claims history, how do

7  you go about using those two pieces of data to project the

8  number of future asbestos personal injury claims?  And can you

9  describe that very briefly to the Court?

10 A    It's simple arithmetic.  You divide the number of

11 mesothelioma claims against Grace in a particular year by the

12 Nicholson forecast of the number of people who died of

13 mesothelioma that year, that fraction is the claiming rate,

14 what percentage of people who could make a claim made a claim.

15 And then in turn, now that you've got -- say that a thousand

16 claims for mesothelioma were filed against Grace in the year,

17 and Nicholson forecasts 3,000 mesothelioma deaths, your

18 claiming rate is a third. So, based on that, you can forecast

19 it in the future, you now know what the Nicholson forecast is,

20 in future years, and you multiply it by a third, in order to

21 estimate the number of claims that Grace would get in a year.

22 That's the simple version of it, it's a bit more complicated

23 than that, but that's the heart of what the method is.

24 Q    Does Slide 41 show what you just described, the number of

25 claims divided by the incidences of propensity to sue?

Peterson - Direct/Finch                    190

1  A     That's the two formulas.  The formula for calculating this

2  claiming rate which is know as the propensity to sue, is in the

3  upper -- step one, step two as you take the propensity to sue,

4  multiply it by the incidence of future years in order to arrive

5  at an estimate of the number of projected future claims.

6  Q     Do you do that --

7  A     And this is -- this is the standard approach that most

8  people do.  They may use Nicholson -- or KPMG, although

9  Nicholson is the better source.

10  Q     You do that separately for each type of cancer?

11  A     Yes.  And for each future year, beginning in 2002.

12  Q     Did you -- what did you do to take into -- what, if

13  anything, did you do to take into account the trends in Grace's

14  claims history and what we know about what's gone on in

15  asbestos litigation and asbestos claiming since 2001, to

16  project the future claims against W.R. Grace?

17         THE COURT:  I'm sorry, I missed something there.  To

18  take into account the trends in the debtors' claims history and

19  what we know about what's gone on with what?

20         MR. FINCH:  What has gone on generally in asbestos

21  litigation since 2001 to -- first let me back up.

22  Q     Did you take into account information, post 2001, about

23  claims filing trends in order to make a forecast of what would

24  have happened to Grace?

25  A     Yes, and would you like me to tell you how we did it?

**J&J COURT TRANSCRIBERS, INC.**

1  Q    I would like for you to tell the Court how you did it.

2  A    We -- as I said, the number of claim filings were trending

3  up, substantially, for Grace.  The experience of other asbestos

4  defendants since Grace went into bankruptcy is a continuation

5  of the upward trend. Grace anticipated that its claims filings

6  would increase for the reasons that we've discussed.  I

7  expected that its claim filings would increase for the reasons

8  that Grace said.  Put those all together and it tells us that

9  the propensity to sue that Grace would have been subject to

10 after its bankruptcy, would be higher than it was faced at the

11 time before.  And all things, including hindsight, point that

12 that would be the case.  The trick is to estimate how much it

13 would increase.  And to estimate it, I looked to Manville data.

14 Q    What does Slide 43 show?

15 A    Slide 43 compares the annual filings against W.R. Grace

16 for mesothelioma from 91 to 2001 and for Manville from '95 to

17 2006.  It shows that the Manville claim filings, if you average

18 it for the period after 2001, it's considerably higher than it

19 was before 2001. And it also shows the increasing trend for

20 Grace prior to its bankruptcy.

21 Q    Why did you look to Manville as a point of comparison?

22 A    Couple reasons.  There are really no other good sources of

23 disease -- of claim filings broken down by the diseases.  There

24 are public financial statements by companies that will tell you

25 the total number of claims they received in a year, but they

1  don't break it out by disease.  We don't have this kind of

2  information for companies that are still in litigation.  But

3  besides that, Manville is generally regarded as, if not the

4  universe of all claims, probably the largest recipient of

5  claims, because Manville was Manville, I mean it dominated the

6  asbestos world.  And so, it gets most claims, it continues to

7  get most, but not all claims.  So, it's a guide of -- the best

8  guide with an overall universe in trends are, and it's publicly

9  available data.

10  Q    Slide 44, please?  What does Slide 44 show?

11  A    This is just a graphic representation of the prior slide,

12  but it extends the Manville claims back and for me what's

13  important about this is that it shows that prior to the

14  bankruptcy, except for the early 1990s, there was a strong

15  parallelism in the trends and claim filings against Manville

16  and against W.R. Grace, so it suggests that the Grace filings

17  tend to shadow Manville and for all of the reasons that I've

18  discussed, it suggests Manville would be a useful source in

19  expectation, not necessarily with the absolute number of claims

20  would be filed in future years against Grace, but what the

21  trends would be.  Just as Manville went up, I expect for this,

22  and all other reasons, that's a way for us to quantify what the

23  rate of increase would have been.

24  Q    I noticed in the post -- what does the line signify on the

25  chart, the vertical line?

**J&J COURT TRANSCRIBERS, INC.**

1  A     That's the bankruptcy date for W.R. Grace.

2  Q     Okay.  I noticed that the red line is flat for Manville

3  going forward, is that what actually happened for mesothelioma

4  filings at Manville?

5  A     Well, it goes up until 2003, then it's flat from 2003 on

6  and what we did is, we averaged the filings in 2003, 4, 5 and 6

7  years for which we had data and we did that because in 2003 the

8  Manville trust adopted a new TDP.  It changed the nature of its

9  TDP, it tightened the requirements for exposure and for medical

10 diseases.  The TDP that basically is in the Grace plan now.

11 Before it was a little easier.  As a result of that, and also

12 the values were changed and the payment percentage went down,

13 all kinds of reasons.  As a result of that, plaintiffs tried to

14 push claim filings earlier.  They did not want to file after

15 the new TDP went into effect, they wanted to beat it.  And so

16 there was a spike in claims in 2002 and 2003 in particular, but

17 what that was, is a process called acceleration, it's a common

18 observed event in litigation like this.  If there's a deadline

19 or some incentive for a law firm to get a claim in earlier,

20 they'll do it, and here the incentive was to get the old TDP.

21 It's like a bar date.  A bar date creates an incentive to get

22 claims in early, to beat the deadline.  So, it also produces an

23 acceleration, any deadline has that affect.

24 Q     Using Manville's data, Grace's claims history and the

25 epidemiology done by the researchers at Mt. Sinai, did you come

Peterson - Direct/Finch                    194

1 up with a year-by-year projection of future mesothelioma claims

2 against Grace?

3 A    Yee, I did.

4 Q    Could I see Slide 45?  Dr. Peterson, is that your -- what

5 is that?

6 A    That's a graphic representation of our year-by-year

7 forecast.  The red line to the left is the historic,

8 prepetition claims, the green line is Nicholson's

9 epidemiological forecast, the blue line is our forecast, which

10 starts lower than the actual level of claims they're receiving

11 in 2000 and 2001 because we calculate -- we started with a

12 historic payment rate, propensity to sue, I'm sorry, propensity

13 to sue for Grace based upon three years, 1999, 2000, 2001, so

14 we start at a lower level because it was trending up, that

15 average over three years was lower than its actual number of

16 claims it received in 2000, 2001 and we expect that the rate of

17 claim filings for meso against Grace would go up modestly,

18 parallel to the increase we observed for Manville, between the

19 year 2001 and 2006, but it would never get greater than the

20 number of mesothelioma claims it received prepetition. So that

21 -- and then, thereafter, the number of mesothelioma claims will

22 be dropping in parallel to the declining number of incidents of

23 disease that Nicholson forecasts.  That's our higher forecast.

24 Q    So -- that is your higher forecast and is it correct that

25 beginning around, maybe, right now or maybe a year or two ago,

Peterson - Direct/Finch                              195

1  you were projecting year-by-year declines in the number of

2  future mesothelioma claims against Grace?  Not the rate, the

3  number.

4  A    The number?  Well, I --

5  Q    Let me back up.  How many mesothelioma --

6  A    -- many years ago I might have, not recently.

7  Q    How many mesothelioma claims do you project against Grace

8  for the year 2005, roughly?

9  A    There's a graphic that shows that.  It's around 1500, I

10 believe.

11 Q    And how about for the year 2010?

12 A    It's less, because the incidence is now going down.

13 Q    And how about for the year 2020, is it less still?

14 A    I have a table, but I -- it'll be even lower, yes, it

15 would be lower, considerably lower by 2020.

16 Q    And does this graphic depicts the future projection of

17 mesothelioma claims?

18 A    Yes.

19 Q    Next slide, please.

20 A    This is the alternative forecast.

21 Q    What is this?

22 A    This is the alternative forecast, where we just take the

23 average propensity to sue in 1999 to 2001 and say that's going

24 to obtain in the future.  It starts lower than Grace was

25 actually experiencing, it never recovers up to its prepetition

**J&J COURT TRANSCRIBERS, INC.**

1 experience and it just goes down year after year.  That's our

2 lower forecast.  I don't believe that's nearly as plausible as

3 the first one I showed you.

4 Q    Did you do forecasts separately for each asbestos related

5 cancer?

6 A    Yes.

7 Q    Does Slide 47 show all the cancer claims put together?

8 A    It does, it shows several things, for all the cancers.

9 Q    Describe for the Court what the several things are.

10 A    The green line to the left is the total -- the height of

11 that line is the total number of all of cancers filed against

12 Grace annually, year-by-year.  The blue line to the right is

13 the total number we're forecasting for the future.  You can see

14 that even -- this, again is my higher model, what I call the

15 best evidence model and even for that model, the future

16 forecasted number of cancers that we have for W.R. Grace is

17 considerably lower than it was prior to its bankruptcy.  We

18 forecast -- again, this is conservative.  We forecast the

19 number of future claims lower than they were getting before the

20 bankruptcy, even though all these events suggested its

21 litigation position was worsening.

22 Q    What does the orange and red show?

23 A    That represents the number of compensable claims.  When

24 you multiply the number of claims by the percent that get paid,

25 it yields the red line.  And here, the red line is the forecast

Peterson - Direct/Finch                    197

1  and that's even further below the orange line because we've

2  made two reductions. We're forecasting fewer future claims than

3  they got in the past and among those claims that get filed in

4  the future, we're forecasting that even fewer of them will get

5  paid than the percent prepetition.  That's two reasons for --

6  two bases for our conservative forecast.

7  Q    Did you do anything to compare the number of non-malignant

8  claims that had been filed historically against Grace with the

9  number of asbestos related cancer claims that had been filed

10 historically against Grace up until the point of the bankruptcy

11 petition?

12 A    Yes.  We calculated this ratio of non-malignant filings to

13 cancer filings year-by-year.  Traditionally, that's a very

14 stable relationship.  As cancers go up, non-malignants go up.

15 They tend to go up and down together.  And that's been up until

16 recent years, that was a very stable relationship and I

17 calculated it in and graphed it.

18 Q    What is Slide 49?

19 A    That's the graph of it. It shows that -- here we put

20 cancers and non-malignants on a different scale so you could

21 make the comparison easily, but the non-malignants are about --

22 the scale is about nine times bigger and you can see they're

23 remarkably consistent year after year until 2000 when

24 non-malignants are pulling ahead.

25 Q    Did you -- in your forecasting work to estimate the number

**J&J COURT TRANSCRIBERS, INC.**

1  of future claims that would be filed against W.R. Grace, did

2  you continue that stable relationship going forward or did you

3  do something different?

4  A    I changed it, because as I showed on an earlier slide,

5  hindsight told us that this pattern changed rather abruptly

6  beginning in around 2002 and we know why it changed, because of

7  tort reform in some states, because defendants, insurance

8  companies, courts were becoming more skeptical of non-malignant

9  and because a lot of law firms got out of the business of

10 processing big numbers of non-malignant claims. They change

11 their business models.  So, we couldn't go back to this past

12 history and say it was going to obtain in the future, because

13 the world had changed while Grace was in bankruptcy.

14 Q    Slide 51, please.  What does Slide 51 show, Dr. Peterson?

15 A    This shows the result of our changed forecast. You can see

16 here now the blue line on the right, the blue bar on the right

17 is much lower than the historic level of claimings.  We assume

18 that the number of claims filed in 2002 against W.R. Grace

19 would be lower than its experience in 2000 and 2001, again,

20 because we're averaging across a longer three year period and

21 the 1999 filings were lower, but then we forecast that every

22 year thereafter, the number of non-malignant claims would go

23 down and, furthermore, we forecast that only a little over 50

24 percent of non-malignant claims would get paid in the future,

25 in contrast to Grace's past experience when 90 percent, over 90

1  percent of non-malignant claims.  So, in effect, it leaves you

2  with a number of compensable, non-malignant claims, at only a

3  little over a quarter of what it was historically.  And I think

4  that's the proper forecast, to reflect today's world.

5  Q    Slide 52.  Dr. Peterson, does Slide 52 summarize your best

6  estimate of the projected number of future claims that Grace

7  would have paid had it stayed in tort litigation?

8  A    Yes, it does. It's the table I made mention of earlier.

9  Q    And how many mesothelioma claims would Grace be expected

10  to pay going forward from 2001 until the present day?

11  A    You can see that on the right side, total is on the bottom

12  row, all the way to the right.  There's 22,917 mesothelioma

13  claims.  These are future, these are the future non-malignant

14  -- future meso claims including the last two-thirds of the year

15  2001.

16  Q    Is that the same number of future mesothelioma claims you

17  were projecting that the Grace asbestos personal injury trust

18  will eventually pay?

19  A    Yes.  Our forecast of liability for the trust assumes that

20  the same number of claims will be filed against the trust.

21  Q    And paid?

22  A    No.

23  Q    Paid is lower for the trust?

24  A    Paid is lower for the trust.  And these are, yes, these

25  are actually -- thank you.  This is compensable claims I

Peterson - Direct/Finch                    200

1  misspoke.  Even in the tort system these are the number of

2  claims multiplied by the payment rates, so it's the product of

3  both of those steps.  I didn't prepare the table you ask.

4  Q    What?

5  A    Never mind.

6  Q    What is Slide 53?  Now that you have the number of

7  projected future claims, what do you do next to come up with a

8  value for Grace's liability?

9  A    We have to calculate how much people would get paid which

10 is the combination of what percent get paid and how much on

11 average they get paid.  The same as it was for pending claims.

12 Q    Does Slide 53 depict those steps?

13 A    Yes.

14 Q    Does Slide 54 show the percent paid that you use in your

15 estimate of future claims?

16 A    Yes.  Again, it reiterates what I showed before, the red

17 bars are the two forecasts that we use.  We also do

18 calculations and provide it in our report for the historic

19 rates, but I do believe that they would have -- we would have

20 disallowed, rejected more claims.

21 Q    And so in your reduced forecast, for example, you're

22 projecting that Grace would pay about 78 percent of the

23 mesothelioma claims?

24 A    78 percent of the mesos and 57.8 percent of the

25 non-malignants.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    You described at some length how you came to an estimate

2  of what values Grace would be paying in the tort system had it

3  not gone into bankruptcy.  Does Slide 56 show the results of

4  that work?

5  A    I believe -- yes, it does.  Well, 56 shows the estimates

6  of how much on average they would have paid for each year from

7  2001 until 2006.  Remember, we're forecasting for the period of

8  what Grace would have paid had it remained in litigation, so we

9  assume on average that for meso, Grace would have paid

10 somewhere between 107 and $111,000 a year for meso.  But that

11 amount would have increased over time, so by 2006 and all

12 subsequent years, Grace would have paid, on average for

13 mesothelioma between 188,000 and 225,000.

14 Q    What assumptions did you use about the timing and the rate

15 to discount claims back to present value, in your forecast for

16 Grace's liability as of the petition date?

17 A    Well, because these liabilities are going to continue to

18 occur and be paid for decades into the future, you have to take

19 into account the present value calculation and inflation. We

20 assume that the values of claims would have increased after

21 2006 when they had reached a fixed amount.  We assume that

22 there will be no change in the real value of claims, they'll

23 always have that same value in the future, but they will be

24 subject to monetary inflation at the rate of 2 1/2 percent a

25 year.  So, that's one.  Then secondly, if you pay a claim in

1 2006 or if you pay it in 2001, when we're present valuing back,

2 you paid $100,000, Grace would have to actually put aside less

3 money to pay a claim a similar amount ten years later, in 2010,

4 because it doesn't need to put $100,00 aside in 2001 to pay the

5 2010 claim.  It can put aside $80,000, something like that,

6 earn interest on that and by 2010 it'll have the $100,000 and

7 that difference between 80, hypothetically and 100 is the net

8 present value of a claim.  You calculate that by a net present

9 value -- by a rate of return, a discount rate.  The discount

10 rate is the assumption of what Grace could have earned on its

11 income, on its assets, had it set money aside.

12 Q    Was the discount rate you used provided to you by a

13 financial expert?

14 A    Yes, it was.

15 Q    Could you turn to Slide 57?

16 A    Yes.

17 Q    Are those the assumptions about timing that you used in

18 estimating Grace's liability as of the petition date?

19 A    Yes.  We assume a 2 1/2 percent CPI of 5.11 percent

20 discount rate and we assumed that claims were to be paid a year

21 after, two years after filing, on average.

22 Q    Next slide, Slide 58.  What does Slide 58 show, Dr.

23 Peterson?

24 A    This puts it all together.  The pending liability forecast

25 -- this is for a particular model, we had two different payment

Peterson - Direct/Finch                    203

1 rate models, the reduced and the lowest, we had five different

2 value models.  We forecast all of them. I think they're all

3 reasonable models, my preferred model is the reduced payment

4 rate.

5 Q    And is that present valued or not?

6 A    This is not a present valued number.

7 Q    Okay.  Could I have Slide 59, please?

8 A    This is present value that shows -- applying the 5.11

9 discount rate.  The total present value of the liability for

10 this particular model is $5.4 billion, broken down by -- most

11 of that is for meso, $3.8 billion.  Of that, $550 million,

12 roughly, is for pending claims.  There's a big liability that's

13 accrued since the bankruptcy, it's $2,253,000,000, and we

14 forecast $2.6 billion for future claims.

15 Q    What did you mean that has accrued since the bankruptcy?

16 A    The bankruptcy period are the claims that we believe would

17 have arisen between April, beginning of April 2001, through the

18 year 2010.  There are claims -- this is period of time that --

19 these are past, or shortly will be past, claims would have been

20 filed during that period of time, they have a value.

21 Q    2009 or 2010?

22 A    2009.  Through 2009, thank you.

23 Q    And, what is the $5.4 billion figure shown there?

24 A    It's the net present value of Grace's liability for

25 asbestos bodily injury claims.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    As of what date?

2  A    As of the date of the bankruptcy petition, April 2001.

3  It's present value back to that date.  If you present valued it

4  back to now, it would be a considerably higher number.

5  Q    Assuming that Grace stayed in the tort system?

6  A    Yes.

7  Q    And what is Slide 60?

8  A    Slide 60 is just a graphic, showing how the liability gets

9  distributed among diseases. Almost -- 70 percent of the

10  liability is attributable to mesothelioma claims.  Like all

11  asbestos defendants, it's the mesothelioma claims that

12  dominate.

13  Q    Dr. Peterson, is it possible to precisely determine the

14  actual amount, number and timing of future asbestos personal

15  injury claims?

16  A    Not precisely, no.

17  Q    Are forecasts like yours subject to some uncertainty?

18  A    Yes.

19  Q    Are there various ways to address this uncertainty?

20  A    Yes.  There's one primary way that most people use.

21  Q    And what is that, how did you do it?

22  A    Sensitivity analysis.  That's what most people use.

23  Sensitivity analysis says, okay, various elements of this

24  forecast are uncertain.  Whether you use the Nicholson or the

25  KPMG epidemiology makes a difference.  How much difference does

1  it make?  You run the forecast, changing only that factor, from

2  Nicholson to KPMG, you compare the results and that tells you

3  how the result is sensitive to variation on that factor.  And

4  so we ran sensitivity analyses varying about a dozen factors,

5  one at a time.

6  Q    Could you see Slide 62?

7  A    Yes.

8  Q    Does Slide 62 list some of the various sensitivities that

9  you analyzed and estimated?

10 A    Yes.  It raises the issue.  For a number of these there

11 are multiple sensitivities, but this is all the list of factors

12 that we vary for the sensitivity analysis.

13 Q    And depending on what analyses, sensitivity analyses, you

14 use what is the range of expected liability for W.R. Grace as

15 of the bankruptcy petition date?

16 A    It's 3.7 to $6.8 billion.  I wouldn't regard each of these

17 alternatives as reasonable.  They're just variations to see

18 what if things changed.

19 Q    Would you regard your best evidence model as reasonable?

20 A    That's a reasonable model.

21 Q    Did you do any estimate of Grace's liability under

22 different scenarios than what its liability would be as of the

23 bankruptcy petition date?

24 A    Yes, two.  Two different variations.

25 Q    What were those two scenarios?

1  A    Well, we first looked at what would be the liability under

2  the TDP.

3  Q    And without describing the second one, what was the second

4  one?

5  A    The second one was what if there were no TDP and no trust

6  and Grace came out of bankruptcy and had to resolve all of

7  these claims now back in the tort litigation system.

8  Q    How did you go about estimating the liability of the Grace

9  524(g) Trust that will be created and use the TDP if this Court

10 confirms this plan of reorganization?

11 A    It's the same basic approach.  It's the number of claims

12 times how many get paid and how they get -- how much on average

13 they get paid, although there is a bit of variation because the

14 TDP is a little more complex.  But, we start with the number of

15 claims which are the same numbers.  It's no different than our

16 tort forecast.  We assume that whatever claims would have been

17 filed against Grace in tort will get filed with the Trust.

18        But, there are eight different Trust distribution

19 categories, as opposed to the four diseases.  There's meso --

20 all mesos -- there's only one meso category of the TDP, but

21 there are two lung cancers, there are four non-malignant

22 categories and so we have nine I guess altogether so --

23 categories altogether.  So, we had to make estimates of how the

24 lung cancer and mesothelioma would distribute among these

25 various categories, as well as there's a ninth category which

1 is a cash discount payment.  It's a $300 basically token

2 payment for someone that can show they have a cause of action,

3 but really can't meet any of the criteria for payment under any

4 of the diseases and moreover they can't -- under IR we don't

5 expect they would be able to qualify even under that.

6 Q    What does Slide T-9, T as in turtle 9, show, Dr. Peterson?

7 A    This summarizes the differences in the forecast for the

8 tort analysis as opposed to the trust.

9 Q    And in doing that analysis did you also provide that

10 estimate of liability to the Grace ACC and the FCR for

11 non-litigation purposes, the liabilities of the trust?

12 A    Yes.  It was used, among other things, in estimating a

13 range of payment -- the payment percentage that the trust would

14 be able to -- probably be able to pay on a pari passu basis.

15 Q    Turn to Slide T-10.  Dr. Peterson, does Slide T-10 show

16 what your estimate is of what the Grace Trust's liability would

17 be if this bankruptcy plan is confirmed and it resolves claims

18 through the TDP?

19 A    Yes.

20 Q    And what is that estimated liability?

21 A    Well, it ranges at a high from $9.3 billion to 6.3, but

22 using the rates of percentage of claims that would be rejected

23 by Grace historically in tort or by the trust, the reduced and

24 the lowest which I think are the two better models, it ranges

25 from $7.4 billion to $6.3 billion.

1  Q    You describe that another scenario you did in addition to

2  the liabilities of the trust, do you recall describing very

3  briefly?

4  A    Yes, I mentioned that.

5  Q    Describe what the estimate of liability is and if it's

6  shown on this page.

7  A    Yes, it is, it's on -- the setting is called tort.  It's

8  at the bottom of the table.  Basically again, we started with

9  the same number of claims and we said what if there were no

10 TDP, there were no trusts -- there may or may not be a trust,

11 but there were no TDP for it to use -- and someone had to deal

12 with these liabilities, but -- so they would presumably go back

13 into the tort litigation system as of 2009 or 2010.  So, all of

14 the claims we forecast that would have accrued through now

15 would be there and available to be -- would have to be

16 liquidated and that's the basis for the forecast at the bottom,

17 again using our three different payment percentage -- our

18 payments rates and our five different estimates of what the

19 current values of claims are.

20 Q    And what is the net present value date, if you will, that

21 that forecast is pegged to?

22 A    Well, now -- this is what someone would do now, like the

23 trust we're net present valuing.  Our trust analysis and this

24 analysis, NPVs to an estimated day for an effective date of the

25 plan I think we have the beginning of 2010 as the estimate.

1  And so these are present valued back to the current date

2  because we're interested in what -- this is really in

3  consideration of the feasability, the capability of resolving

4  claims, (1) under the trust, or (2)without a trust, and so we

5  need to look at what you can do today.

6  Q    And what is the net present value of the liability that

7  whatever entity inherits the Grace liability would face if

8  instead of the TDP in place it was put back in the litigation

9  system?

10 A    Well, again, assuming that the timing of payments would be

11 the same in the trust or by this tort system, which is what I

12 have here, the liability would range anywhere from -- well,

13 here I think if you went back into litigation I don't think the

14 reduced or the lowest payment rates are any longer appropriate.

15 You wouldn't have the trust there to be able to examine claims

16 so you would be -- the trust that the -- whoever has to pay

17 these claims would be basically back in the shoes that Grace

18 was in 2001, but in far worse shape because it now would face

19 over 400,000 claims in the first year or so.  Grace never had

20 to face that and deal with that.  They wouldn't have the time

21 to discriminate a bunch of claims so we used the historic rate

22 of payment and under the historic rate basically it's about $10

23 billion.  It ranges from $9.2 billion to $10.7 billion.

24 Q    Is that billion with a B?

25 A    Billion with a B.

1  Q    Does Slide T, as in turtle, 10 show that?

2  A    It shows that under the historic column to the left.  I

3  think again that's an underestimate because timing will be

4  different.  If this happened, claims would -- I described the

5  acceleration process earlier.  If this happened law firms would

6  clamor to get their claims in because they would be concerned,

7  one, they don't want to be the end of the cue of 400,000 plus

8  claims.  This trust --

9            MR. KOVACICH:  Your Honor, I object.  First of all,

10 the answer goes beyond the question that was asked.

11            DEPUTY CLERK:  Your name, please?

12            MR. KOVACICH:  Mark Kovacich for the Libby Claimants.

13 The witness is now providing testimony about matters that were

14 not disclosed in any of his reports.  These figures appear in

15 his report under a scenario described as Grace dealing with its

16 tort liability in the absence of a trust.  Nothing in his

17 report talks about these matters he's going into now, which

18 include an acceleration of claims and other things that the

19 witness began to discuss about what would happen in the absence

20 of the trust.

21            THE COURT:  All right, it's sustained.

22            MR. FINCH:  Could I have the question back first and

23 we'll do this in pieces?

24                   (Question replayed)

25 Q    Dr. Peterson, what is your estimate of the net present

Peterson - Cross/Kovacich                    211

1 value of the liability or whatever entity inherits the Grace

2 liability would face if this plan were not confirmed?

3        MR. KOVACICH:  I have an objection to that question,

4 as well, with the qualification that the objectionable part of

5 the question is Mr. Finch's language of whatever entity.  This

6 whole discussion in Dr. Peterson's report relates to Grace's

7 liability in the tort system.

8        THE COURT:  That's sustained.

9 Q    What liability would Grace face absent this plan in TDP?

10 A    It would range between $9.2 billion and $10.7 billion.

11 Q    And in your report -- that table is set forth in your

12 March 2009 expert witness report, is that right, Dr. Peterson?

13 A    This table is set forth in my report and the year by year

14 backup analysis was provided to the parties.

15 Q    In your Exhibit Book, Page 201 -- excuse me -- Tab 201,

16 you'll find your March 2009 report.

17 A    I  have that.

18 Q    And does that table appear on Page 17 of your report?

19 A    Yes, the table that's up there is Page 17.

20 Q    Does that include defense costs at all?

21 A    No.

22        MR. FINCH:  Pass the witness, Your Honor.  Actually,

23 Your Honor, before I pass the witness may I offer for

24 demonstrative purposes only the slides from Plan Proponent's

25 Exhibit 178b that Dr. Peterson talked about.  We only discussed

Peterson - Cross/Bernick                    212

1  with him a subset of the slides and what I'd like to do is once

2  we have the transcript is submit to Your Honor the slides that

3  he discussed.  I have a pretty good list right here, but rather

4  than being imprecise about it and taking up the Court's time

5  may I proffer a new Exhibit 178b for demonstrative purposes

6  only that shows just the slides that were shown to Dr. Peterson

7  that he discussed in his direct examination.

8          THE COURT:  All right, they're accepted as

9  demonstratives and yes, you can file a revised Exhibit 178b.

10         MR. FINCH:  Thank you, Your Honor.

11         MR. BERNICK:  Could we just have a couple minutes,

12 Your Honor?

13         THE COURT:  Yes, we'll take a ten minute recess.

14                      (Recess)

15         THE COURT:  Okay, I guess they don't want to come in

16 so are you ready, Dr. Peterson?

17         THE WITNESS:  I am ready.

18         THE COURT:  All right.

19         THE WITNESS:  Thank you.

20                    CROSS EXAMINATION

21 BY MR. BERNICK:

22 Q    Dr. Peterson, I want to pick up where Mr. Finch left off

23 just very briefly and I want to direct your attention to two

24 slides that you've shown and then a couple other documents that

25 relate to the expert work that you've already done and that

1 you've already disclosed to the other side.  And I first want

2 to begin with Slide 59.  And I think we can show it to the

3 Court.  Slide 59 is the present value of pending and future

4 claims against Grace, best evidence model reduced payment

5 rates, did I get that one right?

6 A    Yes.

7 Q    So, does this now take all future -- all present and

8 future and measure the NPV as of '01?

9 A    Yes.

10 Q    And the total number there is what?

11 A    Total is 5.4 billion.

12 Q    Now, if we wanted to do the calculation of all present and

13 future, not back to '01, but back now to where we are to date

14 as if we were sitting here today, and now embark upon the

15 process of paying all these claims wherever they might have

16 arisen, but today they get paid and we did the NPV as of '09,

17 is there another slide that you already have and have already

18 shown to the Court that shows what happens to the NPV?

19 A    Yes.

20 Q    Directing your attention to Slide T-10, does this give us,

21 in the numbers that appear for tort, the range of NPVs that

22 would result?

23 A    Yes.

24 Q    And what accounts for the very significant difference that

25 we see when we talk about all present future between NPV '01

1   and NPV '09?

2   A    There are a couple of differences.  One is the net present

3   value date is a very significant issue.  Net present valuing it

4   back to the current time creates a much higher liability

5   because whoever as payees would have lost the interim eight

6   years of income that they could have earned on their assets.

7   Also, there are slight technical issues with regard to the

8   values of claims.  The pending claims have a greater liability

9   here because they're valued at basically what the 2006 -- the

10  current value, whereas some of the claims were valued by

11  earlier -- remember, there's a step-wise increase -- they were

12  valued lower and that's another difference.  Those are the --

13  and then there's the model you choose.  I mean, I've said that

14  I believe that were the current hypothetical that you asked

15  about the case that you'd have to use the historic payment rate

16  and that creates a higher liability.

17  Q    Okay.  But, if we kind of talked about a real world just

18  very simple deal, we're sitting here in '09, none of the claims

19  that you have forecasted as either being current or future have

20  been paid, at all.

21          MR. KOVACICH:  I object, Your Honor, this is leading.

22          COURT CLERK:  Use the mic, please.

23          MR. BERNICK:  I'm asking him to make an assumption

24  for purposes of a hypothetical.

25          MR. KOVACICH:  Mark Kovacich for the Libby Claimants.

1  This whole examination is leading.

2  Q  I want you to assume a certain hypothetical.

3  A    All right.

4  Q    The hypothetical I want you to assume is that none of the

5  claims have been paid, current or the ones that have accrued

6  all the way through to date, none of them had been paid.

7  A    All right, I understand that.

8  Q    I want you now to assume that they all get paid as they

9  are available to be paid and they're paid current and future

10 tort system values.  I want you to make that assumption.

11 A    Yes.

12 Q    Is that assumption consistent or inconsistent with the

13 scenario that you have here that you've already calculated at

14 nine to ten billion?

15         MR. KOVACICH:  Objection, this is not part of the

16 disclosure.  The nine to ten billion figure comes from Dr.

17 Peterson's analysis of Grace's liability were they back in the

18 tort system.  Mr. Bernick is now asking him to compare it with

19 the 5.4 which was from his estimation report and it's a

20 different numerical analysis.

21         MR. BERNICK:  Judge, this is already in evidence.

22 He's already testified about it and all that he's done.

23         THE COURT:  He has.  This assumption is a proper

24 assumption to explain the values that appear on Exhibit T-10.

25 And I think it's been asked and answered anyway, but okay it's

1 a proper hypothetical.

2 Q    Is my hypothetical the same or different as the number --

3 as what is captured by the number of nine to ten billion that's

4 already appeared at T-10 in your report?

5 A    Your hypothetical -- all the elements of your hypothetical

6 are captured by and consistent with and the same as the

7 analysis on Page T-10 for tort.

8 Q    Now, I want then to capture and go back to 58 for a

9 moment.  And now I want to go within this number.  This number

10 is NPV '01, but it's got a couple components that you've

11 already testified to.  You have pending in bankruptcy period

12 and then you have future, and future refers to 2010 plus.  And

13 we have separate figures for that, right?

14 A    Yes.

15 Q    If we wanted to capture as of '01 the NPV of all claims

16 that would come in all the way through -- up to 2010, that is

17 for the balance of '09, what would be -- according to that

18 table as already set out, what would be the NPV as of '01?

19 A    Well, it would be the sum of the pending liability --

20 liability for pending claims, plus the bankruptcy period.

21 That's actually shown on Page 59.

22 Q    Okay, I'm sorry, did I say 58?  I meant --

23 A    Yes.  It's Page 59.

24 Q    So, what's that number?

25 A    Just a second, I got to do the arithmetic.  It's two

1 billion eight hundred million dollars.

2 Q     Two billion what?

3 A     Eight hundred million.

4           MR. KOVACICH:  I'm sorry, Page 59?

5 A     Yes, if you add -- counsel, if you add the pending in

6 bankruptcy you add 549 for pending and 2253 for the bankruptcy

7 period.

8 Q     Now, if we then wanted to find out the same kind of thing,

9 which is if you now take that number and say okay they were not

10 valued as of '01, but they get valued as of '10 would we see

11 the same relationship, that is 5.4 roughly is doubled, would we

12 see 2.8 roughly double?

13           MR. KOVACICH:  Objection, this is a brand new opinion

14 we've never seen anywhere before.

15           MR. BERNICK:  No, not -- to the contrary.  It's right

16 in his report.  All we're doing is taking exactly the same

17 relationship.  It's just an NPV.

18           MR. KOVACICH:  He didn't do that in his report, Your

19 Honor.

20           MR. BERNICK:  Well, there -- you can -- the reports,

21 Your Honor, he's got thousands of numbers and in his report he

22 specifically -- I'm sorry, I didn't understand that.  He

23 specifically addresses the difference between the pre and post

24 2010 period of time.  It's right flat out in his report.  And

25 he also addresses the effect of the NPV.  It's right flat out

1  in his report.

2            THE COURT:  Can you just point me to where so I can

3  make a ruling on this, Mr. Bernick?

4            MR. BERNICK:  Yes, at Page 59.

5            THE COURT:  Of Exhibit -- I'm sorry, I had it here.

6  Just a second.

7            MR. BERNICK:  Of this exhibit.  And I will further

8  show Your Honor where it comes from materials that were

9  specifically disclosed.

10           THE COURT:  In Exhibit 201?

11           MR. BERNICK:  Yes.

12           THE COURT:  All right.

13           MR. BERNICK:  The difference between pending and

14 bankruptcy pre 2010 and post 2010 is a distinction that is

15 specifically made.  And he then also takes and makes -- on the

16 basis of that distinction he also then when he makes

17 calculations make calculations that are both '01 calculations

18 and '09 calculations and you see that at T-10 he makes the '09

19 calculation that directly corresponds to the 5.4 calculation on

20 59.  So, it's all there.

21           And where does it come from?  It comes from materials

22 that were disclosed.  This is an e-mail.  This is Plan

23 Proponent's Exhibit 234.  Just before Mr. Peterson was deposed

24 in connection with this confirmation hearing an e-mail was sent

25 out to Mr. Cohn and to others -- Mr. Heberling and Mr. Cohn,

1  specifically disclosing the tables that were used to compile

2  all of these values and they break out for every year how much

3  is being spent and into the future, and here we have 2010

4  through the future.  That's the line item.  So, all that he's

5  done is to take these tab runs from materials that were

6  specifically disclosed before his deposition was taken.

7           MR. KOVACICH:  May I respond, Your Honor?  The

8  materials Mr. Bernick is talking about relate to Dr. Peterson's

9  estimation report and the $5.4 billion figure the $2.8 billion

10 figure, I don't have a problem with that.  The nine to ten

11 billion dollar figure that Mr. Bernick has written on his board

12 over there relates to the separate analysis of what Grace's

13 liability would have been back in the tort system and there was

14 nothing in that analysis or the 2009 report which separated out

15 payments by year in order to make a comparison of past and

16 future claims within that number.

17          MR. BERNICK:  That's not true.  These are all the --

18 all these reports that I'm talking about are all of them, tort

19 system values.  There's not a single -- I can ask the witness.

20 Q    Are all these numbers tort system values?

21 A    Yes.

22          MR. KOVACICH:  They're two different sets of numbers,

23 Your Honor.  And we maintain our objection that any attempt by

24 Dr. Peterson to offer an opinion using the nine to ten billion

25 dollar figure relating to the analysis he did of Grace's

1 liability in the tort system for purposes of comparing it to

2 the TDP was never disclosed.

3         MR. BERNICK:  I didn't compare it to the TDP.  This

4 has nothing to do with a comparison to the TDP.

5         MR. KOVACICH:  And I'm --

6         THE COURT:  No.  I think it's a question as to

7 whether or not the same ratio will apply.

8         MR. BERNICK:  Yes.

9         THE COURT:  In the event that you're doing a net

10 present value calculation back to 2001 and then you do it again

11 as of 2010, there is a difference and the witness has explained

12 why largely, but not totally based on the fact that the debtor

13 would have been investing dollars to pay that liability.  Those

14 dollars plus the interest factor would have accumulated and so

15 the NPV currently is higher than the NPV would have been back

16 in 2001.  And he's asking whether the same ratio would apply

17 with respect to whatever -- I've lost the question, I'm sorry

18 -- whatever the $2.8 billion is.  I don't remember the

19 question, Mr. Bernick, I'm sorry.

20         MR. BERNICK:  The 2.8 billion was -- again, going

21 back to Slide 59, the 2.8 billion is the portion of the '01 NPV

22 number that is driven by the pending claims that were both

23 pending at the time of the 11 being filed --

24         THE COURT:  Okay.

25         MR. BERNICK:   -- and have accrued during the

1 bankruptcy.  It excludes future claims.

2          THE COURT:  All right.  So, the only question is

3 whether the same ratio is going to apply.

4          MR. BERNICK:  Yes.

5          MR. KOVACICH:  Your Honor, it's not the only

6 question.  They're mixing two different sets of numbers here.

7          MR. BERNICK:  They're the same sets of numbers, Mark.

8 They're all tort system numbers.

9          THE COURT:  I'm not clear where they're mixing two

10 sets, Mr. Kovacich.

11          MR. KOVACICH:  My understanding of the numbers in the

12 e-mail to Mr. Cohn was, they related to the values in Dr.

13 Peterson's 2007 estimation report.  With the nine to ten

14 billion dollar figure they're talking about his analysis of

15 what would be Grace's liability in the tort system if there

16 were not a trust, and he did not do any separation --

17          MR. BERNICK:  I'll make it easier.  I won't even

18 refer to it.

19 Q    Just based upon the numbers that were put in the tables

20 that were just shown to the witness which make the

21 differentiation between all and current through two thousand --

22 or up through 2010 -- and that's right out of those same pages

23 -- all tort system -- this is not designed to compare with the

24 TDP -- all tort system, we have '01 NPV for all is 5.4 billion,

25 Dr. Peterson?

1  A    Yes.

2  Q    '09 NPV for all is nine to ten billion?

3  A    Yes.

4  Q    If we take the -- based upon Page 59 if we just take the

5  currents through the point of -- throngh today, essentially,

6  the NPV would be tort system 2.8 billion?

7  A    Yes.

8  Q    And what would be the NPV based -- does the NPV now for

9  the pre '10 claims -- does the NPV for that bear roughly the

10 same relationship as the NPV for the --

11        MR. KOVACICH:  I'm going to object, Your Honor.  I

12 won't belabor this.  This is an opinion that was not disclosed.

13 I don't have to continue arguing, but I want my objection noted

14 for the record.

15        THE COURT:  All right, your objection is noted.  It's

16 overruled for the reason that if the same calculations are used

17 and the same number factors are used, the answer to the

18 question has to be self evident.  So, to the extent that it is

19 a mathematical calculation I don't think it takes an expert

20 witness to offer an opinion, but the witness can certainly

21 state as a matter of fact whether a math calculation would lead

22 to that result, and he's clearly competent to do that.  So, the

23 objection is overruled.

24 Q    Sir?

25 A    Yes, you can do that.  Sitting here I've done it.

1  Q    I'm sorry?

2  A    Sitting here -- you can do it and I've done it.

3  Q    Yes.  What's the answer?

4  A    Well, the $10 billion would be about $5 billion $200

5  million, and the nine billion would be about $4.7 billion.

6  Q    Okay.

7  A    I'd put some caveats on it, but we may not want to go

8  there.

9  Q    Well, I'm sure Mr. --

10        MR. KOVACICH:  I'm sorry, counsel, I wouldn't stand

11  up here, but I don't have a microphone.

12        MR. BERNICK:  No, that's all right.  Let me then go

13  on and get the last thing and if he wants to pursue the caveats

14  that's fine.

15  Q    I now want to take a look at this one number here, which

16  is 4.7 to 5.2 billion NPV as of this year for all claims filed

17  prior to the time or accruing up to the time -- not accruing --

18  filed, made, up through the time that we're here now in the

19  confirmation hearing.  I want to ask you whether that number is

20  effective, that is, whether that number reflects the impact of

21  what you've previously testified to and is in your expert

22  report and it is the following -- this is from your expert

23  report, Plan Proponent's 19, is that right?

24        UNIDENTIFIED ATTORNEY:  199.

25  Q    199 -- in your expert report you talk about and you

Peterson - Cross/Bernick                                224

1  actually explain it -- this curve here and you also talked

2  about this, I recall on Mr. Finch's examination of you, do you

3  remember talking about this curve here?

4  A    Which --

5         THE COURT:  We can't see what curve you're pointing

6  at.

7         MR. BERNICK:  Oh, I see.

8  A    I have no idea.

9  Q    Yeah.

10  A    Do you have a page number in the report?

11  Q    Yes, the page is Number 72.

12  A    All right, I have 72.

13  Q    It's not the right one.  Is it in your deal?is I think --

14  I think you testified about 44 -- Page 44 of your presentation.

15  Is that the same thing as what we have in your report as Figure

16  22?

17  A    Well, the number of -- the total number of Grace meso

18  claims --

19         MR. KOVACICH:  I object.  I don't think there's a

20  question pending.

21         MR. BERNICK:  This is really -- just do it.

22  Q    Page 44 of the presentation that you made, do you see that

23  that's mesothelioma propensities to sue increase --

24  A    Oh I'm sorry, I was on the wrong Page 44.  In the

25  demonstratives you're asking about.

1  Q    Yeah.  In the presentation that you made, which is --

2              MR. BERNICK:  -- exhibit what, Nate?

3  A    Yes.

4              MR. FINCH:  Exhibit 198b, as in basketball.

5  Q    198b --

6              THE COURT:  178.

7              MR. FINCH:  178b, as in basketball

8  Q    -- 178b as in basketball?

9  A    Yes, I have that.

10 Q    We're trying the Court's patience here with numbers.  It's

11 178b as is basketball.

12             THE COURT:  No, that's not what tries my patience.  I

13 don't mind numbers.

14             MR. BERNICK:  Oh well.

15 Q    Page 44, the chart there, you talked about the

16 propensities to sue and you have a note Grace filings in 2001

17 are annualized over the 27 month period.  Is that the  same

18 chart that's in your expert report at Page 72?

19 A    Yes.

20 Q    Okay.  And when you displayed this chart here today as

21 Pager 44 I believe you made a statement concerning

22 acceleration.  Do you recall your testimony regarding

23 acceleration?

24 A    Yes, I do.

25 Q    And just so that we can get a point of reference, what did

1  you say about acceleration as concerns this curve?

2  A    On Pages 44 I said that acceleration had occurred in the

3  Manville filings of 2003 to take advantage of the 1995 TDP and

4  so that the actual 2003 filings of meso with Manville Trust

5  were higher that I showed here, but they were lower in

6  subsequent years as a result of the fact that the claims that

7  would have been filed in 2004 and 5 and 6 were accelerated

8  earlier, so that's why we averaged them in order to get a

9  straight line.

10 Q    Dr. Peterson, you said 1995 TDP.  Did you misspeak?  2003

11 TDP?

12 A    No, the asbestos -- Manville claimants wanted to be able

13 to take the 1995 TDP and avoid the 2003 TDP.

14 Q    Okay.  So what you're saying is in fact on this chart,

15 which was Page 44 in your presentation, what actually happened

16 was that there was an acceleration and then it came down?

17 A    Yes, that's what happens with an acceleration, you're

18 borrowing claims from the future in effect.

19 Q    Okay.  And so really what happened was that there was a

20 break point, people knew that a new TDP that was less flexible

21 --

22 A    Less attractive.

23 Q    Less attractive.

24        MR. KOVACICH:  I object to the leading questions.

25        THE COURT:  All right, sustained.

1 Q    The new TDP that you're referring to took effect when?

2 A    2003.  September 2003.

3 Q    And in fact what did you observe in the claims trend of

4 Manville that related to that new TDP?

5 A    Your peak in 2003 is right, but the blue line would drop

6 below the red line.  It goes below the average so --

7 Q    Did I get that right now?

8 A    That's representative.  It's not accurate.

9         MR. BERNICK:  You can see one of my other efforts

10 right behind you that I've heard a lot of feedback on.

11        THE WITNESS:  I've heard some of that, too, yes.

12 Q    So ad then your testimony is that this relates to the

13 concept of acceleration?

14 A    Yes, that's demonstration of acceleration.

15 Q    The pre-announcement of an event --

16        MR. KOVACICH:  Objection, leading.

17        THE COURT:  Sustained.

18        DEPUTY CLERK:  Your microphone is not on.

19        MR. BERNICK:  My microphone is not on?  Okay.

20 Q    In fact, tell us whether or not this concept of

21 acceleration that you've testified to, was that or was that not

22 in your expert report in this case?

23 A    It was.

24 Q    Okay.  Now going back to the number that we've talked

25 about, you showed in your slide about the claims in the tort

1 | system value of claims that would have been filed against Grace

2 | in the tort system up through the date where we are today, this

3 | number here 2.8 billion NPV '01, and then 4.7 to 5.2 billion,

4 | '09 and '10, are these numbers -- are these numbers adjusted in

5 | any way, shape or form to reflect an acceleration if there was

6 | to be an acceleration that would take place in connection with,

7 | let's say in 2009?

8 | A    They have no provision for acceleration and that was one

9 | of the caveats that I would have mentioned.

10 | Q    Okay.  And could you explain that to us?

11 | A    That because if bad things are going to happen if you wait

12 | to file a claim lawyers will file claims earlier.  That was

13 | true with regard to the Manville 2003 TDP.  It would be true

14 | with regard to this large number of claims being put back into

15 | some undefined process for payment.  Lawyers would want to

16 | avoid being at the tail end or being excluded from that

17 | process.  They would be sure to file their claims early to get

18 | them in so that they could take advantage of what money, if

19 | any, might be available to pay claims in this process that

20 | we've been talking about of W.R. Grace being responsible now

21 | for all these claims without the trust.

22 | Q    In your expert report do you make a disclosure of what the

23 | effect of acceleration would be or is when it occurs?  What

24 | does acceleration do?

25 |         MR. KOVACICH:  I object.  The question is not clear

1  that his discussion of claims acceleration related to the

2  Manville experience.

3          MR. BERNICK:  That's what I'm talking about.

4  Q    What did acceleration do in the Manville case?

5  A    Can I answer?

6  Q    Yeah, go ahead.

7  A    Acceleration is a general term that I first applied in the

8  fibreboard trust -- fibreboard litigation in the early

9  nineties.  It's the idea that when there's a deadline that

10 claims -- it borrowed from the future.  Claims that would

11 otherwise have been filed in the future get filed earlier in

12 time and it has two effects; it increases the number of filings

13 preceding the deadline and it depresses the filings after the

14 deadline because those claims have been filed.  This is not a

15 formal deadline, but it is an informal deadline because

16 plaintiffs and plaintiff's lawyers would understand that there

17 are serious consequences of not getting a claim filed right

18 away even if there were no bar date.

19 Q    Is a bar date a formal event that would be associated with

20 acceleration?

21 A    Yes.  And that's why as a forecaster I don't like bar

22 dates.

23         MR. BERNICK:  That's all I have.  I pass the witness,

24 Your Honor.

25         THE COURT:  Good afternoon.

1      MR. CASSADA:  Good afternoon, Your Honor.  Good

2  afternoon, Dr. Peterson.

3      THE WITNESS:  You're the head of a cue here, yes.

4      MR. CASSADA:  I'm Garland Cassada.  I believe we've

5  met before.

6      THE WITNESS:  Yes, we've met many times.  Good to see

7  you again, Mr. Cassada.

8      MR. CASSADA:  Pleasure to see you.

9                      CROSS EXAMINATION

10  BY MR. CASSADA:

11  Q    I'm representing Garlock Sealing Technologies, the

12  codefendant in the tort system.

13  A    Thank you.

14  Q    I have a few questions about your report.  First of all, I

15  gathered from your report that it would be fair to say that

16  Grace as of the date of its bankruptcy case was a highly

17  targeted asbestos defendant, is that correct?

18  A    It had become a targeted defendant.  It would have become

19  a more highly targeted defendant in the future.

20  Q    Can I ask you to look at -- I believe your estimate report

21  is Plan Proponent's Exhibit 199, is that correct?

22  A    Yes, I believe that's correct.

23  Q    I'm going to ask you to look at Table 33, which I believe

24  is a summary of your projected propensities to sue for various

25  asbestos related cancers.

Peterson - Cross/Cassada                    231

1          THE COURT:  Page 87, Table 33?

2          THE WITNESS:  I'm sorry, Table 33, Page 33.

3          THE COURT:  Oh Figure 33.  I'm sorry.

4          MR. CASSADA:  No, it would be -- I think it's called

5   Table 33.

6          THE WITNESS:  Do you have a page number?

7          MR. CASSADA:  Yeah, I believe it's --

8          THE COURT:  Table 33 is on Page 75.

9          THE WITNESS:  Thank you, Your Honor.  I have that.

10          THE COURT:  That's Figure 33, not Table 33.

11          THE WITNESS:  Pager 75.  Counsel, you wanted Table

12   33, which is the table of propensities to sue by year, is that

13   correct?

14          MR. CASSADA:  Yes.

15   Q    I wanted to understand your forecast for the propensities

16   to sue for mesothelioma, lung cancer and other cancers going

17   forward.  Can you see that -- Table 33 I believe is Page 175 of

18   your actual estimate report.

19   A    Page 75.  Yes, I have that.

20   Q    Okay.  And there you have -- that table is divided up into

21   actual and propensities to sue in your forecast, correct?

22   A    Yes.

23   Q    I believe you testified that for your propensities to sue

24   you relied on the Selikoff Nicholson incidents model as opposed

25   to the KPMG?

**J&J COURT TRANSCRIBERS, INC.**

1   A    Yes.

2   Q    Ad you prefer that one because that one is more in line

3   with SEER and the other government report that you've

4   described?

5   A    Yes.  The empirical evidence shows it's a better

6   scientific model.

7   Q    Okay.  Did Selikoff Nicholson purport to forecast the

8   incidents of occupationally caused asbestos related diseases?

9   A    That's exactly what it is, it's occupationally caused.

10  Q    And SEER, does SEER give the actual incidents --

11  A    Yes.

12  Q    -- of occupationally caused diseases or diseases in the

13  population as a whole?

14  A    It's the population as a whole.

15  Q    Okay.  So there may be some within SEER that are -- there

16  may be additional cancers in SEER that wouldn't have been

17  predicted by the Nicholson -- Selikoff Nicholson then?

18  A    To the degree that there are a few non occupationally

19  caused mesotheliomas or lung cancers or so on related to

20  asbestos -- well actually meso, not lung cancer -- they would

21  be over and above what Nicholson forecasts, but they would be

22  counted in SEER, yes.  It's not -- I would not regard that as a

23  significant issue.

24  Q    Okay.  And the other report that a lot of experts rely on

25  is the KPMG report?

1  A    Yes.

2  Q    I believe in fact your Exhibit 199, your report, you have

3  attached to that as Appendix C, you've got both the Selikoff

4  Nicholson incident report going forward as well as the KPMG

5  report?

6  A    Yes.

7  Q    And have you yourself relied on KPMG in the past?

8  A    There was a period of time in the late nineties when we

9  were improperly adjusting SEER date and at the time I thought

10 that the Nicholson forecast was better, but -- I Mean the KPMG

11 forecast was better.  It turns out with the 2000 census data

12 and the correct adjustment that Nicholson was always better.

13 It was my error.

14 Q    Okay.  Moving forward -- and I'm looking at Table 33 at

15 propensities that you forecast going forward from 2002 to 2007,

16 and you have 2007 plus, and I gather that the propensities to

17 sue are constant for 2007 and years after.

18 A    Actually they're constant from 2006 and after.  I just

19 added 2007 to show that.

20 Q    I see.  I see that.  Now, you say that the propensity to

21 sue by persons who suffer from mesothelioma would be 46.1

22 percent?

23 A    In the year 2006 and thereafter, yes.

24 Q    Okay.  Now does that mean that all persons who are

25 diagnosed -- that of all persons who are diagnosed with

1  mesothelioma in a given year that 46 percent of those will sue

2  Grace?

3  A     That's what that means, yes.

4  Q     Okay.  And the same would be true for lung cancer, only 35

5  percent of all persons diagnosed at least with asbestos caused

6  lung cancer would sue Grace?

7  A     Well, it's really a count.  We forecasted the number of

8  lung cancers filed in 2006 and each subsequent year would be

9  equal to 35 percent of Nicholson's forecast of how many of

10 those would be asbestos related.

11 Q     And with respect to other cancer the propensity -- the

12 forecast propensity is 45.6 percent?

13 A     Yes, with the same description that I applied to lung

14 cancer.

15 Q     Okay, thank you.  Let me ask you about the payment rates

16 that you testified about earlier.

17 A     Actually, Mr. Cassada, let me -- I have to clarify my

18 answer for meso if I can.

19 Q     Yes.

20 A     The 46 percent is the same, it's the forecast of the

21 Nicholson -- it's a multiplier times the Nicholson

22 epidemiological forecast of the number of mesos.  As you point

23 out, the number of actual mesos may be slightly more or less,

24 but it's based on Nicholson.

25 Q     I understand.  Okay, thank you for that.  Now focusing on

1 your testimony that related to payment rates.  I believe you

2 testified that prior to Grace's bankruptcy it paid -- it

3 resolved by payment 92.1 percent of all mesothelioma claims?

4 A    Across the period 1999 through 2001 I think that's

5 approximately right, yes.

6 Q    Yes.  And then I mean for lung cancer, other cancer and

7 non malignant claims it resolved by payment over 95 percent of

8 each of those disease categories?

9 A    I don't have the table in front of me.  It's in the

10 report.  But it's in that approximate number, yes.

11 Q    Okay, thank you.  And you have adopted or you have based

12 your liability estimate for the trust liabilities on what you

13 call your reduced payment rate scenario as opposed to your

14 lowest payment rate scenario, is that correct?

15 A    Yes.

16 Q    And I believe you testified that 78.3 percent of

17 mesothelioma claims would be settled by a payment?

18 A    Now you're asking by the trust or in tort?

19 Q    By the trust.

20 A    I think for meso that's correct.

21 Q    Okay.  And that would mean, wouldn't it, that 78.3 percent

22 of plaintiffs who suffer from mesothelioma and sue Grace will

23 meet the credible and meaningful evidence requirement of Grace

24 exposure that's contained within the TDP?

25        MR. GUY:  Objection, Your Honor.  He can't know

1  exactly what the trust will do.

2          THE COURT:  Well okay, that's -- it's correct that

3  you don't know exactly what the trust will do, but I think

4  that's a fair question of this witness based on his report.

5  You may answer, Doctor.

6  A    The forecast is that 78 percent of the claims you have

7  filed would be -- according to -- trust would find them to be

8  claims tat should be paid, yes.

9  Q    And that would necessarily mean, wouldn't it, that the

10  claimants would necessarily have to meet the criteria of the

11  trust, including the meaningful and credible evidence of

12  exposure?

13  A    Yes.

14  Q    Okay.  You testified about the marketplace for settlements

15  that existed within the tort system?

16  A    I recall that.

17  Q    I want to explore that with you a little bit.  You would

18  agree then that a high percentage of cases filed within the

19  tort system have multiple defendants?

20  A    Yes.  Yes, I do.

21  Q    Okay.  And is it quite often true that the multiple

22  defendants are the same targeted defendants?

23  A    Are the what?

24  Q    Are the same targeted group of defendants?

25  A    I don't understand your question.

1  Q    Well in many cases you see the same defendants in case

2  after case, is that correct?

3  A    What's regarded as --

4          MR. LOCKWOOD:  Objection, lack of foundation.

5          THE COURT:  Well, I don't think that the witness

6  doesn't know the tort system cases based on everything he's

7  testified to.  I think there's a foundation.  It's just perhaps

8  that the question is a little confusing.  Could you restate the

9  question.

10 Q    When Grace was sued in the tort system would it often see

11 the same defendants in case after case?

12         THE COURT:  As codefendants?

13         MR. CASSADA:  As codefendants, that's correct.  Thank

14 you, Your Honor.

15 A    Other major codefendants would occur frequently --

16 Q    Okay.

17 A    -- as codefendants where Grace was sued, but none of them

18 would be in every case.  I mean it's a moving mix.

19 Q    Yeah, I understand that.

20 A    Even Manville is only named in about two-thirds of the

21 cases.  So the actual -- they won't be in all of them.  It will

22 be as different mix from case to case, but you tend to --

23 you're more likely to see a major defendant than a less

24 important defendant, of course, that's by definition.

25 Q    I didn't ask you if they were in every case, just -- you

1 would agree they were -- you talked about the impact of the

2 bankruptcy of numerous defendants that either had or would have

3 had on Grace's settlement value, do you recall that?

4 A    Yes.

5 Q    And by the way, do you recall who those defendants were

6 you were referring to?

7 A    Turner Renewal, Owens Corning, Fibreboard, GAF, Armstrong.

8 Q    Babcock & Wilcox?

9 A    Babcock & Wilcox.

10 Q    U.S. Gypsum?

11 A    Yes.  Thank you, you're very helpful.

12 Q    A.P. Green?

13 A    Yeah.  They're not a major one, but they did go into

14 bankruptcy.

15 Q    Combustion Engineering?

16 A    Same as the last question.  They weren't one of the eight

17 major ones I've named in the report.

18 Q    They're named in the report.  Now, these defendants going

19 into bankruptcy, they have the value on settlement value.  I

20 assume that means that these defendants would have either did

21 before the bankruptcy and would have subsequent to the

22 bankruptcy have been in a lot of W.R. Grace cases?

23 A    I would expect that most of them would have been in a

24 substantial number of W.R. Grace cases.

25 Q    So that was a marketplace of settlement and it included a

1  lot of the same repeat market participants, I take it?

2  A    I agree with the phenomena. I'd characterize it a bit

3  differently.  But yes, there -- yes.

4  Q    Did you see a lot of this -- and from jurisdiction to

5  jurisdiction did you have a lot of the same plaintiff's law

6  firms?

7  A    Well the plaintiff's -- I'm sorry, plaintiff's law firms?

8  Q    Yes, sir.

9  A    Yes, there -- yes, there's patterns to that.  Large

10  plaintiff's law firms file lots of claims.

11  Q    And the plaintiff's lawyers were part of your marketplace

12  of settlement as you described?

13  A    I wouldn't characterize it as part of the marketplace so I

14  don't know how to answer that.

15  Q    They were participants in the marketplace?

16  A    Certainly care.

17  Q    Oh yes.  I believe we've heard for two weeks now most

18  cases in the tort system stuff?

19  A    Yes.

20  Q    And in settling a case I believe you said that Grace and

21  indeed any defendant would strive to pay its several share, is

22  that correct?

23  A    At most yes.

24  Q    That's what the goal was was to pay a several share?

25  A    Yes, they wanted to pay a fraction of the overall

1 liability.

2 Q    And it's true, isn't it, that defendants are successful

3 almost all of the time in paying their several share?

4 A    Yes, unless they're a sole defendant or they get a

5 judgment against them and they can't pass off some of that

6 liability.

7 Q    Okay.  And just to be clear about what we're talking about

8 when we're talking about a several share, I believe you said

9 it's a descriptive term and it's several as in joint and

10 several?

11 A    Yes.

12         THE COURT:  I'm sorry, it's several in what?  I

13 couldn't hear you.

14         MR. CASSADA:  As in joint and several.

15 A    Yes.

16 Q    And would you agree that I mean within the marketplace and

17 settlement your definition a several share is a -- it's a

18 partial share of the entire liability that once you've divided

19 that amongst the various responsible defendants would be

20 attached to the particular defendant that you're talking about?

21 A    Yes, although normally it's an informal matter.  It's not

22 formally determined.  But yes, I think that description is

23 accurate.

24 Q    And when the parties are trying to determine a several

25 share they're looking -- they're anticipating what might happen

1  if the case were tried?

2  A    In the long term, but again there's a marketplace for

3  that.

4  Q    Yeah.

5  A    I mean the law -- the defendants tend to know -- well,

6  they tend to know what's expected of them by plaintiff's

7  lawyers.  They may not know what other defendants are paying.

8  They don't get together and talk about that.  But they tend to

9  know -- they come to have a certain share and that share is a

10 partial share and has a number of ways that it gets built that

11 share.

12 Q    But the parties are anticipating what several share may be

13 attached to them if the case were to go to trial?

14 A    They're practices -- practices, norms, just expectations

15 that Grace has as to how much it's going to have to pay for a

16 particular kind of case to a particular lawyer in a particular

17 jurisdiction and the plaintiff's lawyers on the other hand have

18 their own expectations and usually they've done it enough they

19 know what the going rate is.

20 Q    Okay.  Okay.  But you would agree that the parties are

21 anticipating what might happen at trial?

22 A    In theory in some cases the closer you get to trial the

23 more that's true, but the process almost has a life of its own.

24 Q    Now when -- in a case in the tort system when there are

25 multiple responsible defendants the more defendants you have

1  the lower a particular defendant's several share would be in a

2  particular case, is that correct?

3  A     Not necessarily.

4  Q     Not necessarily.

5  A     It depends on who the defendants are, what the

6  jurisdiction is.

7  Q     Well, as a general rule the more defendants there are --

8  the more solvent responsible defendants there are in a case the

9  lower any single defendant would expect to pay to settle the

10 case?

11 A     It depends on who the co-defendants are.  If it's a bunch

12 of A.P. Green's, having five A.P. Greens isn't as significant

13 as having Owens Corning as a co-defendant.  So I mean there

14 isn't -- you can't make simple numerical comparisons.  It

15 depends who they are.  It depends on the jurisdiction.  It

16 depends on the occupation.  There are a lot of factors that go

17 into it.

18 Q     But if it were a bunch of the big companies like the ones

19 you described that went into bankruptcy, the more of them you

20 had before 2001 the lower you would expect your several share

21 to be, correct?

22 A     In general.  But remember, I'm forecasting averages.  I

23 mean I'm not talking about specific cases.

24 Q     Let me ask you about the importance of the extent of

25 exposure to a product to the settlement value of a case.  Is --

Peterson - Cross/Cassada                                243

1  would it be true that the more extensive exposure was to a

2  particular product the more valuable the claim would be against

3  the defendant responsible for that product?

4  A    It isn't a straight line relationship.  A claim with a lot

5  of exposure would have higher value than a claim with

6  questionable exposure.  If you have a lot of exposure your

7  settlement value may not -- I mean it may or may not be

8  affected by some additional exposure to Grace, but there is

9  some relationship.  It's just not a clean one.

10  Q    So then so long as some minimum threshold of exposure

11  exists the extent of the exposure above that may not be

12  important?

13  A    It's important, it's just it isn't as -- you know, it's

14  just -- it's a chunky kind of relationship, I'll leave it at

15  that.

16  Q    You said earlier that the defendants generally knew what

17  each other were paying when they were involved in --

18  A    They tend not to know that.

19  Q    They tend not to know that.

20  A    They have an idea, but they -- one defendant doesn't

21  generally want another defendant to know how much they 're

22  paying.

23  Q    But when the same -- when defendants are in a case they

24  generally know what other defendants are paying to settle a

25  case?

1          MR. FINCH:  Objection, misstates the prior answer.

2          THE COURT:  Yes.  He just said no to that same

3 question.

4          MR. CASSADA:  I asked a different question, I asked

5 generally.

6 A    Again --

7          THE COURT:  Generally in a non asbestos litigation

8 case does the codefendant know what the other codefendants are

9 paying to settle, is -- I just -- I'm not sure I understand the

10 question.  I'm sorry.

11         MR. CASSADA:  I asked him wasn't it true that

12 defendants in asbestos cases had general knowledge, not

13 specific, but knowledge generally about what the share of a

14 particular case other defendants have.

15         THE COURT:  You can answer if you know, Doctor.

16 A    Yes and no.  They would know who the big players are, but

17 again I mean Owens Corning's share for one kind of industrial

18 exposure would be different from another.  So they may know

19 that Owens Corning was a pretty big player and expect they

20 would make a significant contribution, but that will differ

21 from case to case, jurisdiction to jurisdiction, law firm to

22 law firm.  So other -- beyond that kind of very general, as you

23 say, expectation I don't think there's much precision to that

24 knowledge.

25 Q    But I mean there's a meaningful amount of knowledge that

1 each defendant has about what other defendants are paying to

2 make a difference?

3 A    I think I've just described that.

4 Q    All right.  Let me ask you this.  I want to ask you then

5 about an answer you gave during a deposition on November 1,

6 2007.

7           MR. CASSADA:  Your Honor, this deposition was

8 included among confidential materials and came to my possession

9 after I signed a confidentiality agreement.  I don't know if

10 the material --

11          THE COURT:  Could you show counsel and see.

12          MR. FINCH:  Objection, Your Honor.  I don't think

13 this is proper impeachment to --

14          THE COURT:  I don't know what it is yet, Mr. Finch.

15          MR. FINCH:  Objection, Your Honor.  This is still not

16 proper impeachment.  It's consistent with what he just said.

17          MR. CASSADA:  I haven't gotten there yet, Your Honor.

18          THE COURT:  All right, I'll wait until you get there.

19          MR. CASSADA:  Okay.

20 Q    All right.  Dr. Peterson, you recall your deposition on

21 November 1, 2007?

22 A    I recall I was deposed.  I certainly don't recall

23 everything I said.

24 Q    Oh I understand that.  I wouldn't expect you to.  But you

25 recall -- I know you recall that it was Mr. Bernick who was

Peterson - Cross/Cassada                    246

1 asking questions of you.

2 A    I never forget that honor, no.

3 Q    And he put the following question to you and I apologize

4 it's kind of a long question.

5 A    It's Mr. Bernick.

6 Q    Well, in fact, I'll just focus on the last sentence of his

7 question which I think encapsulates his question.

8        "Question:  It is the joint and several liability

9 enabled the individual claimant to obtain settlements that

10 reflected an individual defendant's risk of joint and several

11 liability?"  You see that?

12 A    I have no idea what that means.

13 Q    Well, there was an objection.  And then you said --

14       "Answer:  Well, Grace only pays its several

15 liability.  It's not going to make a payment because Owens

16 Corning is also liable or Turner & Newell is also liable.  They

17 pay for a share.  You referred earlier to a marketplace of

18 settlements and I agree that's what this world is, it's a

19 marketplace.  The marketplace for Grace's claim is to pay for

20 it's share of liability.  Theoretically it may have a joint and

21 several liability in some jurisdictions if you go all the way

22 to trial and that's a consideration that both the lawyer and

23 Grace might take with regard to the decision about whether or

24 not to settle or take a case to trial.  But settlements are

25 invariably or almost invariably determined by this marketplace

1 which is based upon this several -- "

2 A    I'm sorry, could you move the page up so I can see the

3 "but".

4 Q    I'm sorry.  Yes, I sure will.  Thank you for -- "but

5 settlements" -- where did I leave off?

6 A    The but.

7            THE COURT:  Line 14.

8 Q    Okay.  Question, "But settlements are invariably or almost

9 invariably determined by this marketplace which is based upon

10 the several liability of a company, what share of the whole it

11 historically has."  Question, "Well, but no company knows what

12 its several share is in the tort system, correct?"  Answer,

13 "They know they're doing right."  Question, "No, but they don't

14 know what other -- "

15 A    Pull it up, please.

16 Q    " -- no, but they don't know what other people are paying

17 so they don't know what their several -- they don't know their

18 several share, correct?"  Answer, "They know what other people

19 are paying."

20            And then Mr. Bernick asks you to name a single

21 company and you said, "No company -- well a several share is

22 something that gets determined by a jury in any event at the

23 end so you have to anticipate that.  But, in any one case when

24 you're settling it you may not know precisely how much is being

25 paid in that case by the defendants, but there is a knowledge

1  within the industry of the relative amounts of money that

2  people are paying." Did I read that correct?

3  A    You did.

4  Q    Okay.

5         MR. FINCH:  Your Honor, under the rule of

6  completeness, read the next Q and A, please.

7         MR. CASSADA:  Sure.  Can he do that on redirect or do

8  I have to do it?

9         THE COURT:  He can do it on redirect.

10         MR. CASSADA:  Okay.

11         MR. FINCH:  Your Honor, it's also not inconsistent

12  with what Dr. Peterson said in response to his questions.  It's

13  improper impeachment.

14  Q    That is your testimony, is that statement fair and

15  accurate today?  Is that testimony fair and accurate?

16  A    I think the way I characterized in response to your

17  questions is probably a more appropriate description of it.  I

18  wouldn't argue greater than what I said, I think I was just a

19  bit more precise in what I testified to you and I prefer that

20  explanation.  But I'm not going to disavow that testimony.

21  Q    There's nothing you're changing here?

22  A    I think I clarified it.

23  Q    And we talked earlier about your testimony regarding the

24  bankruptcies of the big defendants that affect your analysis of

25  Grace's claim values.  Generally the bankruptcies would tend to

1  push settlement values up, is that correct?

2  A    Bankruptcy of Company A if it's a significant company may

3  affect the values of Company B, yes, increasing them.

4  Q    Yes.  And in fact, did you testify that that's what

5  happened as it related to Grace in 2001 and that's what would

6  have continued to happen through the current date, correct?

7  A    Well, what I testified to is the almost simultaneous

8  bankruptcies of eight other defendants drove it up.  Now, if

9  Grace had just gone into bankruptcy alone would the values paid

10 by Turner & Newell have gone up.  Certainly not as

11 significantly as they did when all the other companies went

12 into bankruptcy.  So there may be some effect on the bankruptcy

13 created by a particular single company, but it's the joint

14 effect of all of these that was the important thing.

15 Q    All right.  So the more companies that file for bankruptcy

16 the more the remaining defendant's settlement values will have

17 upward pressure?

18 A    Not necessarily.

19 Q    Not necessarily.  So the fewer bankruptcies that are filed

20 -- the number of bankruptcies of major targeted defendants that

21 we're talking about?

22 A    That's a different question.

23 Q    Okay.  Well, let's talk about the more of these targeted

24 defendant bankruptcies there were the higher values went up for

25 the remaining defendants?

1 A    Yes, on average, but not necessarily in a particular case

2 or even for a particular other defendant.  But yes, generally

3 that's the effect.

4 Q    And so the idea there is that these bankruptcies affected

5 the several share as determined in the marketplace at

6 settlement?

7 A    It would be reflected in the perturbations in the

8 marketplace.  It would change, perhaps, again depending upon

9 who went into bankruptcy and all the kinds of factors I've been

10 answering for the last half-hour.

11 Q    Okay.  Is it true that many of these defendants who went

12 into bankruptcy have since emerged from bankruptcy with trusts

13 established to process and pay their claim?

14 A    Yes, that's true.

15 Q    And wouldn't the same principles that pushed settlement

16 values up result in at least some downward pressure on

17 settlement values where the defendant's coming -- with these

18 trusts having emerged and begun to pay claims?

19 A    I don't tink so for three reasons.  One is that the once a

20 share of your client's company or any company -- once it goes

21 up it's hard to pull it back down.  Plaintiff's lawyers are

22 reluctant to reduce their demands.  And so it's like paying for

23 gas prices.  I mean they tend to move in one direction and

24 sometimes they'll go back down, but they're sticky.  Secondly,

25 is that the empirical evidence is that it doesn't happen.  When

1  Manville went into bankruptcy in 1982, the obligations and

2  payments by other defendants went up greatly, but when Manville

3  came out of bankruptcy in 1988, even though it was paying a

4  hundred cents on the dollar, the values didn't go up.  Whatever

5  those other companies were paying, they continued to pay.  And

6  so that's an example of the first point I made.

7         The third point I make is that these companies are

8  paying very modest percentages and so, if a company was paying

9  a hundred percent of its then market share when it went into

10 bankruptcy and now it's paying 20 percent, it isn't nearly

11 significant of an event.

12 Q    Let's look at the case of Grace just for a moment.  The

13 scheduled value for a mesothelioma claim for Grace under the

14 Trust distribution procedures is $180,000?

15 A    I think that's right.  Yes.

16 Q    And the average value is $250,000?

17 A    Two hundred and twenty-five,  I believe.

18 Q    Two hundred and twenty-five.  Okay.  And the projection, I

19 believe, is that the Trust is going to pay 25 to 35 percent of

20 that figure?

21 A    I believe so.

22 Q    Okay.  And when Grace went into bankruptcy, it was paying

23 about $90,000 per claim?

24 A    In 1990 -- in 2001, it was paying between 90 and 97,000

25 yes.

1 Q    Okay.  And so, but then it was after that, its liabilities

2 would have increased because it was going to take on all these

3 other shares but, if you compare the -- assume 35 percent of

4 $225,000, I mean, you're talking not a huge drop from the

5 90,000 Grace was paying when it went into bankruptcy, correct?

6 A    It wasn't paying a huge share when it went into bankruptcy

7 by itself.  Today, if it were -- it still wouldn't be paying a

8 huge share and, on the total value, the joint and several

9 value, of mesothelioma claims are considered -- is considerably

10 higher than what it was in 2001.  So, if it's a 30 percent of a

11 $200,000 payment here, that's a $60,000 payment on a claim

12 that's now more valuable in general than a $90,000 payment on a

13 claim at less value.  So, there is a payment but it's certainly

14 a reduced contribution to the overall liability.

15 Q    And within the marketplace of settlements -- that is,

16 within the tort system -- are the Trust claimants, to your

17 knowledge, are they being processed into that marketplace?

18 A    You mean -- I don't understand your question.

19 Q    Well, these trusts are out and they're paying money to

20 claimants.

21 A    Some are.

22 Q    Is that money being processed into the settlement values

23 determined by the tort system which you've described as the

24 marketplace at settlement.

25        THE COURT:  I'm sorry.  Are you asking whether,

1 rather than the TDP values in the Trust setting the values of

2 the claims and the distribution percentage, something is

3 happening in the tort system to drive that?

4          MR. CASSADA:  I'm asking him -- that's what I'm

5 asking him, Your Honor, and when you paraphrase it to me, I can

6 see that it's not a very helpful question so I'll rephrase it.

7 Q    Are the payments that plaintiffs are receiving in trust,

8 do you know whether they're being processed in the settlement

9 values of the non-bankrupt defendants who are resolving claims

10 within the tort system?

11 A    You're term processed isn't very helpful but I don't think

12 that any defendant really is.  The amount they're paying to a

13 claim is going to be much affected by the trust payments by

14 other trusts that are coming on line now.  I don't think so for

15 reasons I've described earlier.

16 Q    So the effect of the bankruptcies on settlement values, it

17 only works one way?

18 A    It --

19 Q    When they go out, settlement values go up, when they come

20 back out of bankruptcy, and they start -- the Trusts start

21 paying claims, the settlement amounts are unchanged?  Is that

22 your testimony?

23 A    That's the historic experience.  Now, whether there's some

24 -- I'm sure in some cases there's some adjustment.  A defendant

25 will argue that, I don't need to pay you as much money now

1  because you're getting paid by the Owens Corning Trust.  And

2  how much bite that will have depends upon the negotiating

3  tactics and the strengths of the plaintiffs and defendants in a

4  particular case.  It's an argument and it may have some bite.

5  Q    Okay.  Do you know whether plaintiffs who received

6  payments for trusts have an incentive to keep those payments

7  confidential from defendants they're suing in the tort system?

8  A    I haven't thought about that.

9  Q    There are confidentiality provisions in trusts, you're

10  aware of that?

11  A    There are confidentiality provisions for most defendants

12  and for trusts, there's concern because the information being

13  submitted is about sensitive personal material, including

14  medical information.  In general, the information of trusts is

15  confidential as it is for any defendant.

16  Q    But in a -- yeah.  In the tort system, all the defendants

17  know who -- what other defendants were sued, right?

18  A    I'm sorry.  Would you ask that question?

19  Q    In the tort system, all defendants, they know who else is

20  in the case, correct?

21  A    Not necessarily.  Sometimes claims are made without being

22  filed in a lawsuit.

23  Q    Well, if a defendant is sued in the tort system, all the

24  other defendants in the suit are aware of that?

25  A    Sometimes claims are made without being a named defendant

1  in a lawsuit.  There are defendants who pay claims without --

2  Q    I asked a different question.

3  A    -- in fact, specifically wanting to avoid being named and

4  those are not known.

5  Q    I ask a different question now and that is that, when a

6  defendant is sued in the tort system, all other defendants know

7  that that defendant has been sued?

8  A    That's -- yes, I would expect so.

9  Q    When a plaintiff files a claim against the Trust, is that

10  knowledge public information?

11  A    I don't believe so.

12  Q    When a plaintiff provides evidence of Grace exposure to

13  the Trust, is that considered sensitive information?

14          MR. BERNICK:  Your Honor, we've been going on for a

15  while and I'm also concerned about Dr. Peterson being able to

16  get out of here.  I object to relevance.  I don't understand

17  the relevance of this whole line of questioning, what's

18  happening in tort system values and all the like.  I don't

19  think it's relevant to any issue in the case.

20          THE COURT:  What's the relevance?

21          MR. CASSADA:  I'm exploring the marketplace of ideas

22  that Dr. Peterson --

23          MR. BERNICK:  That's marketplace claim values.

24          MR. CASSADA:  Marketplace claim values.

25          MR. BERNICK:  This case used to turn on that kind of

 1 thing when it was an estimation case.  It doesn't now.  I don't

 2 know what confirmation issues that bears upon.

 3          THE COURT:  I don't understand what the relevance is

 4 at this point either.  I'll give you some leeway.  This is

 5 cross examination, but I'm not certain I understand the

 6 relevance either.

 7          MR. CASSADA:  Okay.

 8 Q    Dr. Peterson, we talked earlier about the projected

 9 payment by the Trust under the TDP of 25 percent to 35 percent?

10 A    Yes.

11 Q    Did you have a role in determining that range of payments?

12          MR. FINCH:  Object to form.  The plan in TDP says

13 that the payment percentage will be set by the trustees after

14 the Trust is up and running so it hasn't been set one way or

15 the other yet.

16          THE COURT:  All right.  Do you want to rephrase your

17 question?

18          MR. CASSADA:  But the projected -- yeah.

19 Q    The projected payment, right, is 25 to 35 percent, is it

20 not?

21 A    I've heard that number.  I don't know where it appears and

22 it may be just informal discussion and I'm not sure that that

23 captures the range.

24 Q    Did you have any involvement in the calculation of that

25 number?

Peterson - Cross/Cassada                    258

1  A    I don't believe I had any involvement in calculating that

2  number.  I have provided liability forecasts that are an

3  element of that calculation but I don't think we've done it.

4  Q    Do you have knowledge with respect to whether there's a

5  preferred or most likely point within that range of 25 percent

6  to 35 percent?

7  A    No.

8            MR. CASSADA:  Thank you, Your Honor.

9            THE COURT:  All right.

10           MR. CASSADA:  Thank you, Dr. Peterson.

11           THE WITNESS:  Thank you.

12           THE COURT:  Mr. Pasquale?

13           MR. PASQUALE:  Ken Pasquale for the Unsecured

14 Creditors Committee.

15                    CROSS EXAMINATION

16 BY MR. PASQUALE:

17 Q    Good afternoon, Dr. Peterson.

18 A    Good afternoon, Mr. Pasquale.

19 Q    I know you have a plane to catch.  I'm going to be as

20 quick as I can.

21 A    I appreciate your consideration.

22 Q    I want to focus on your original estimation report.  I

23 understand you were advised of the certain typographical errors

24 but that's what I want to talk about for a few minutes.  Your

25 opinion with respect to Grace's liabilities for the estimation

Peterson - Cross/Cassada                    259

1  proceeding, that was not the only opinion that was submitted by

2  the parties, was it?

3  A    There were other experts' generated reports and what was

4  done with them formally in the case, I can't tell you.

5  Q    I'm sorry, sir.  I didn't hear.

6  A    Other reports -- I've seen other reports by other experts.

7  Whether they were submitted in any formal sense, I have no

8  idea.

9  Q    Well, you know that Jennifer Biggs submitted a report for

10 the future claims representative, right?

11 A    I know she wrote a report.  I don't know what was done

12 with it.

13 Q    Do you know what her estimate was as you sit here today?

14 A    I don't recall.

15 Q    Well, how about Dr. Florence for Grace?  You know that he

16 submitted an opinion with respect to the estimation, right?

17 A    I do recall that.  Yes.

18 Q    Okay.  And his -- do you recall that his median estimate

19 of Grace's liabilities was $468 million?

20 A    It was something like that, yes.

21 Q    Something in that range?  That's what you recall?

22 A    It was an implausibly low number.  Yes.

23 Q    Implausibly --

24                        (Laughter)

25 A    Yes.

1 Q    Right.  Because your estimate, your most likely estimate,

2 was over $5 billion, right?

3 A    Well, that wasn't why I was implausible, but my estimate

4 was that, yes.

5 Q    Okay.  Now, you recall that, during this bankruptcy case,

6 there was a personal injury questionnaire process, right?

7 A    There was for some claimants, yes.

8 Q    For many claimants, right?

9 A    For some claimants, yes.

10 Q    And you did not quantitatively use any of the information

11 in any of those questionnaires in any way in rendering your

12 opinion with respect to Grace's liabilities, personal injury

13 asbestos liabilities, right?

14 A    I don't think that's correct.

15 Q    Well, we heard your direct testimony today, sir, and

16 personal injury questionnaires never came up in all of your

17 slides and all of your discussion, isn't that right?

18 A    It didn't enter into the calculations about which I've

19 testified but I generated the rebuttal --

20 Q    But my question, sir -- I'm sorry.

21 A    Would you let me answer?

22 Q    Yes.

23 A    I generated a rebuttal report addressing these issues

24 based in part upon that data.

25 Q    My question was, in rending your opinion, did you use any

1  of the information in the questionnaire quantitatively to reach

2  your conclusion?

3  A    The same answer.  Yes with regard to the rebuttal issues;

4  no with regard to my estimation report.

5  Q    Thank you.  And the same question with respect to the

6  proofs of claim.  You're aware that there was a proof of claim

7  process in this case, right?

8  A    Yes, and I discussed that in my report.

9  Q    Discussed it but did you quantitatively use any of the

10 information in the proofs of claim in rendering your opinion?

11 A    I did some, yes.

12 Q    Quantitatively?

13 A    Yes.

14 Q    It had an impact on your conclusion of in excess of $5

15 billion?

16 A    I had quantitative -- yes.  There are payments -- it's not

17 my final opinion.  I didn't use it for calculating the

18 liability for the reasons that I discussed in part because of

19 the quantitative analyses that are in my report.

20 Q    Okay.  Thank you, sir.  You've answered my question.  Now,

21 it's true, sir, isn't it, that you don't quantify in any of

22 your estimation work in this case how much disease was caused

23 or contributed to by Grace, isn't that right?

24 A    That's an impossible task and I haven't sought to do it.

25 Q    Well, my question is you didn't do it, right?

1  A    I didn't do it because it was an impossible task.

2  Q    Okay.  Now, you talked earlier about propensity to sue but

3  went through that pretty quickly and maybe I missed it, but I

4  didn't hear you mention what period you actually applied to the

5  propensity.  What period did you use?

6  A    1999 to 2001 and I actually did testify to that effect.

7  Q    Okay.  I didn't catch the dates.  Thank you.  And I

8  believe you said, in response to a question from counsel on

9  cross examination that, at least with respect to the cancer

10  claims, you kept that propensity constant from 2006 forward,

11  right?

12  A    At the rate it was in 2006, yes.

13  Q    Does the same apply to non-malignant claims?

14  A    No.  Well, the non-malignant forecast was treated

15  differently in the tort report and the Trust report.

16  Q    Okay.  I'm only focused on the tort report.  I'm not

17  interested in the Trust report.

18  A    In the trust, well, we didn't calculate propensity of suit

19  for non-malignant claims.

20  Q    Okay.  Now, with respect to the cancer claims, and

21  mesothelioma in particular, the period you chose for the

22  propensity to sue represents the highest filing period of

23  claims against Grace in its history prior to the bankruptcy

24  case, isn't that right?

25  A    I don't think that every year in that period were the

1 three highest.

2 Q    That's not what I said.   During that -- that represents --

3 let me repeat it -- represents the highest filing period of

4 claims, in 1999 to April 2001, in Grace's pre-petition history,

5 right?

6 A    Yes, they were because they were the most recent years

7 which are the most relevant for forecasting future liabilities

8 and because the trends, the actual trends, were up.   So, it had

9 to be the highest numbers if it was going to be the most

10 relevant data.

11 Q    Well, those are the years you chose and they happen to be

12 the highest numbers, correct?

13 A    For the reasons that I said, yes.

14 Q    Okay.   Understood.   Now, you would agree with me, Dr.

15 Peterson, that your estimation model attempts to predict

16 behaviors relating to the filing and settlement of claims,

17 right?

18 A    I'm sorry.   Could you repeat that question?

19 Q    Sure.   Does your estimation model attempt to predict

20 behaviors relating to the filing of settlement of claims?

21 A    It attempts to predict the results of the behaviors, not

22 necessarily the behaviors directly.   It predicts numbers of

23 claims which are partly a function of the behavior of lawyers

24 and the law firms and the claimants, victims.

25 Q    And, certainly, your methodology has some limitations,

1  including that you can't speculate about certain future events,

2  right?

3  A     Presumably any expert report can't speculate and so, no, I

4  don't do that.

5  Q     Okay.  And some of the future events that you cannot

6  predict in the future includes legislative changes, right?

7  A     Oh, God, no.  I can't --

8  Q     No, you can't predict?

9  A     I can't predict future legislative changes.  I don't know

10  who can.

11  Q     Right.

12  A     I know who tries but I don't know that anyone can.

13  Q     Now, sir, would you agree with me that the maximum period

14  of time that any -- I believe you called it the standard

15  estimation model earlier in your testimony, right?  Is that --

16  let me withdraw that question.

17  A     That's a term I've used.  Yes.

18  Q     And that term applies to the methodology that you

19  described to us today, right?

20  A     That I and many people use.  Yes.

21  Q     Okay.  Would you agree with me that the maximum period of

22  time that your standard estimation model can reliably predict

23  changes in claiming and claim resolutions is six or seven

24  years?

25  A     I don't have that opinion.

1  Q    You don't have that opinion?

2  A    No.

3  Q    I show you -- the ELMO please -- the bottom of the page.

4  This is from your deposition on November 1st, 2007 and, you

5  know what, I'm going to do this differently.

6            MR. PASQUALE:  If I may, Your Honor.

7                         (Pause)

8            MR. PASQUALE:  Do you mind if I --

9            THE COURT:  Yes.

10           MR FINCH:  Object to form, Your Honor.  It's a

11  different question in the deposition than what he just asked.

12           THE COURT:  Thank you.  He just retracted the

13  question and said he's going to do it differently.

14                         (Pause)

15  Q    Dr. Peterson, would you turn to Page 46, please?

16  A    Yes, I have that.

17  Q    Okay.  You were asked the following question by Mr.

18  Bernick at your deposition, the following questions, and you

19  gave these answers.  Question:  Can you --

20  A    Could you tell me the line you're starting at?

21  Q    Yes.  I'm sorry.  Of course.  It's Line 11 on Page 46.

22  A    Thank you.

23  Q    "Can you identify any scientific model, Dr. Peterson, that

24  has been shown reliably to predict changes in the legal

25  environment?  Answer:  What do you mean by the legal

1  environment?"

2  Q    Question:  "Law suits being filed and litigated, claims

3  being filed and litigated, claims being presented settled.  Do

4  you know of any scientific model that has been demonstrated to

5  reliably predict changes in the legal environment?"  There's an

6  objection.

7          MR. FINCH:  Object to form.  Compound.

8  Q    "Over modest periods of time, there have been models of

9  claiming and claim resolutions that have reliably predicted

10 subsequent changes.  Yes."

11         "Okay.  What's the maximum period of time?  Six years,

12 seven years."

13 Q    Were you asked those questions and did you give those

14 answers under oath, sir?

15         MR. FINCH:  Objection, Your Honor.  It's a different

16 question than what he asked him.

17         THE COURT:  It is.  That's sustained.

18         MR. FINCH:  It's a completely different question.

19         THE COURT:  It is a different question.  You asked

20 him initially about whether the model could reliably predict

21 changes in claims and claims resolutions over six or seven

22 years, not changes in the legal environment.  It is a different

23 question.

24         MR. PASQUALE:  Well, Your Honor, his testimony here

25 under oath was over modest periods of times, there have been

1  models of claiming and claim resolutions.  This is starting on

2  Line 21, Page 46 --

3          MR. FINCH:  Your Honor, the --

4          MR. PASQUALE:  -- that have reliably predicted

5  subsequent changes.

6          MR. FINCH:  Your Honor, the question was changes in

7  the legal environment.

8          THE COURT:  Legal environment.  It's a different

9  question.  The objection is sustained.

10          MR. PASQUALE:  All right.  I'll move on.

11  Q    Dr. Peterson, in your estimation work here with respect to

12  Grace, you predicted increases -- well, strike that.  In the

13  estimation work you originally did with respect to the

14  estimation proceeding, with respect to your prediction of

15  non-malignant claim filings in the future -- sorry.

16  A    I'm sorry.  I don't know --

17  Q    I'll try that one more time.

18  A    I don't understand the reference to --

19  Q    Bad question.  I'm going to try one more time.  You

20  predicted at the time of your estimation report that

21  non-malignant claim filings would be at a particular level,

22  right?

23  A    The 2007 report?

24  Q    Yeah.  Um-huh.

25  A    We based our -- we had a particular forecast for

1 non-malignant claims at that time based upon the information we

2 had at that time.

3 Q    And you predicted, did you not, that non-malignant claims

4 would increase in the future from that point in time, didn't

5 you?

6 A    2007?  I don't believe so.

7 Q    Do you recall -- I think we're going to do it again.

8 Let's look at your deposition, Dr. Peterson.  Let's look at --

9 let's start on Page 70, please, Line 12.  Just to save time,

10 there was a very long question from Mr. Bernick before that but

11 it's really your answer I want you to focus on.  The question

12 in Line 12, starting on Line 12, "What is that scientific

13 methodology?" and that refers to Mr. Bernick's prior question

14 that begins on the bottom of Page 69.  And you give a rather

15 long answer, Dr. Peterson, but I'll read it.

16 A    "Well, the methods that I used, if you have reason,

17 non-speculative reason to anticipate that event is going to

18 occur, and you understand what the effect of that event is, you

19 can predict it.  I'll give you an example.  We know that the

20 asbestos Trust, a lot of asbestos bankruptcy claims, are going

21 to be confirmed and, when they get confirmed, they're going to

22 provide a lot of money for compensation of asbestos victims.  A

23 substantial amount of that money will go to non-malignant

24 claimants.  As a result of that, there will be an increase in

25 the level of non-malignant claim filings in future years from

1  what we see now.  Of course, there's going to be money to

2  compensate victims.  Victims and plaintiffs' lawyers will file

3  claims.  They'll engage in the expense necessary to develop the

4  claims to meet those claims and they'll file.  We can

5  anticipate that.  That's a prediction.  You can come back and

6  ask me that in six years.  I can anticipate that."

7  Q    Were you asked that question and did you give that answer?

8  A    Well, I gave that answer but, again, it isn't what you

9  asked me about before.  This is a hypothetical discussion.  We

10 don't know if that's true yet.  Is that --

11 Q    You made a prediction, didn't you, Dr. Peterson?

12 A    Excuse me.  Would you let me finish my answer?

13        MR. FINCH:  Objection, Your Honor.  Let the witness

14 finish, please.

15        THE COURT:  He's going to finish.  Go ahead, Dr.

16 Peterson.

17 A    This is a -- it's a prediction.  There's still reason to

18 think that may be true.  In fact, I've just gotten e-mails that

19 in the State of Texas, they're now resuming screening so that

20 is a -- there are a couple of rules I have about asbestos

21 litigation.  One of them is that claims follow money.  If

22 there's money there, people will want to make claims.  And

23 here's an instance where there's money being set aside and

24 there's every reason to believe that, at some point in time,

25 plaintiffs' lawyers are going to go after that money.  Now,

1 whether or not that's going to occur, we haven't seen yet but

2 that's -- it was never represented in any forecast that I gave

3 for W.R. Grace.  It was a discussion on -- this is a general

4 scientific discussion.  It's not a particular to W.R. Grace.

5 So in answer to your earlier question --

6 Q    Are you finished with your answer?

7 A    -- did I do a forecast of increasing --

8 Q    That wasn't my question.

9 A    -- of increasing non-malignant claims for Grace, no, I

10 didn't.

11 Q    That wasn't my question, sir, but the record will reflect

12 that.  Isn't it true, sir, that in your most recent report

13 concerning the Trust, you reduced by half the number of

14 malignant claims that you forecast for the future?

15        MR. FINCH:  Object to form.  Non-malignant claims or

16 malignant claims?

17        MR. PASQUALE:  Non-malignant claims.

18 A    Yes, for the reasons we have different -- I engage in

19 empirical research.  If the facts change, the forecasts need to

20 change.  We have different facts available to us now, different

21 information about the world than I had in 2007.  It would be

22 unreasonable not to respond to them so we change the forecasts.

23 I have concerns that the claims, the non-malignant claims, may

24 go back up for the reasons I just described about the screening

25 process plus some of the claims filings I'm seeing with trusts.

1          MR. PASQUALE:  Move to strike everything after yes as

2  non-responsive, Your Honor.  That's all I have.

3          MR. BERNICK:  Is there anyone else?

4          MR. KOVACICH:  Can I have just a moment to confer

5  with counsel, Your Honor?

6                    (Pause)

7          THE COURT:  Do you folks need a recess?

8          MR. KOVACICH:  I don't have any questions for this

9  witness, Your Honor.

10          THE COURT:  Anyone?

11                    (Pause)

12          THE COURT:  Mr. Phillips?

13          MR. PHILLIPS:  Thank you, Your Honor.

14                  CROSS EXAMINATION

15  BY MR. PHILLIPS:

16  Q    Dr. Peterson, good afternoon.  My name is Bob Phillips.

17  It's a pleasure to meet you, sir.  Just a couple of quick

18  questions.  Dr. Peterson, in your analysis of the pre-petition

19  claim costs, I'll call it, did you try to identify any claims

20  costs that we'd call indirect costs?  In other words, payments

21  that the debtor or the asbestos industry would have had to pay

22  for other than direct payments to injured people?

23  A    Are you talking about contribution claims?

24  Q    Or indemnity.  Either one.

25  A    I don't think we made an independent examination of that.

1 No.

2 Q    And that would mean that you didn't do any estimate of

3 what that indirect -- what I'll call an indirect cost might

4 have been pre-petition?

5 A    The only way it might have been -- it was not made as a

6 separate calculation, certainly not.  It may have been

7 incorporated, depending upon how the database treats an

8 indirect claim.  If it comes in under the name of particular

9 defendant, it may be -- excuse me -- particular plaintiff whose

10 costs are being reimbursed, requested, then it would have been

11 included but not separated.

12 Q    And so, then, may we assume, Doctor, that the numbers, the

13 dollar amount of the claims that will be presented to the Trust

14 according to your estimation doesn't include what we would call

15 indirect asbestos personal injury claims?

16 A    Well, the Trust distribution procedures has specific

17 provisions for dealing in indirect claims within the TDP and

18 essentially what it does is it puts the indirect claimant in

19 the footing of the claimant.  If the indemnification or

20 contribution claimant has paid for and gotten a release for the

21 liability of Grace for a particular claimant, then, in effect,

22 that person requesting indemnification contributions has made

23 the claim and that becomes the claimant.  So, it's included in

24 the calculation under the TDP.

25 Q    And if the -- if there is an effect that would allow an

1  indirect personal injury or asbestos personal injury trust

2  claimant to recover more than a direct one, then that wouldn't

3  be included in your estimate, true?

4  A    Well, in principle, they can't recover more because

5  they're standing in the shoes of the plaintiff.

6  Q    Right.  My hypothetical was, if they could recover more

7  than the direct claimant, then your projections don't include

8  those sums, true?

9  A    But you're talking about a different TDP and we didn't

10 make forecasts for a TDP other than the one that's in this

11 plan.

12 Q    I'll just try it once more.  Can you assume for a moment

13 that an indirect asbestos personal injury trust claimant could

14 recover more than a direct one?  Can you assume that fact for

15 just a second?

16 A    I can't and do a forecast involving this TDP.  It's

17 logically impossible to do.  It doesn't happen.

18 Q    And you didn't do that here?

19 A    I didn't do that.

20 Q    Thank you.

21         MR. PHILLIPS:  No further questions.

22         THE COURT:  Anyone else?  Mr. Finch?

23                REDIRECT EXAMINATION

24 BY MR. FINCH:

25 Q    Dr. Peterson, do you have -- you were asked some questions

Peterson - Redirect/Finch                              274

1  about Mr. -- by Mr. Pasquale about your projection of future

2  non-malignant claims that Grace would face if it hadn't gone

3  into bankruptcy.  Do you recall those questions?

4  A    I recall those questions.

5  Q    Do you have your estimation report in front of you?  It's

6  Plan Proponent's Exhibit 199.

7  A    I do.

8  Q    Could you turn in that report --

9         MR. FINCH:  Can I have it on the screen, please?

10  Q    Turn to Page 67.

11  A    I have that.

12  Q    It's the wrong page.  That page right there.  How many

13  claims, non-malignant claims, did Grace receive in the year

14  2000?

15  A    40,079.

16  Q    How many non-malignant claims did Grace receive in the

17  first quarter of 2001?

18  A    30,292.

19  Q    Could you turn to the very last page of that same exhibit,

20  Table C-3?

21  A    Yes, I have that.

22  Q    How many non-malignant claims did your estimate forecast

23  that Grace would -- would be filed against Grace beginning in

24  2002?

25  A    29,419.

1  Q    And of that number, how -- approximately how many did you

2  project would be paid?

3  A    Approximately less than 40 percent.

4  Q    And so is it true that you projected a declining number of

5  non-malignant claims compared to what Grace's actual historical

6  experience had been?

7  A    Yes.  It was a decline.

8         MR. FINCH:  Could I have the ELMO?

9  Q    Does this chart show the relationship between Grace's past

10 non-malignant claims and its future non-malignant claims?

11 A    Yes.

12        THE COURT:  Can you -- what was the exhibit number,

13 please?

14        MR. FINCH:  It's Plan Proponent's Exhibit 178B, Slide

15 51.

16 A    Yes, it shows that.  It shows also the number of

17 compensable claims forecast as compared to the historic

18 compensable claims which is lower in all years since about

19 1994.

20 Q    Do you recall that Mr. Pasquale also asked you a question

21 about -- some questions about Dr. Florence's estimate done for

22 Grace in the estimation case?

23 A    I do.

24 Q    You said that you found that estimate implausible.

25 A    I did.

1 Q    Can you explain why?

2 A    Well, it used a method that was unique to that one work.

3 It was based upon -- the whole estimate liability was based on

4 the values of five mesothelioma claims.  That was the basis for

5 valuing all of the hundreds of thousands of claims that might

6 be filed and it was based on data from the proofs of claim that

7 were recorded by contractors for the debtor which we found to

8 be quite incomplete and inaccurate.  And if you use accurate

9 data, the liability forecast, by including people that should

10 have been counted in this forecast, in calculating value, the

11 liability would have been far higher.  There are lots of

12 reasons.  It's basically unreliable.

13 Q    And did you express those opinions in a rebuttal report at

14 the time?

15 A    I did.

16 Q    Finally, Dr. Peterson, lawyer for Garlock -- and I

17 apologize --

18 A    Mr. Cassada.

19 Q    Excuse me?

20        THE COURT:  Mr. Cassada.

21 Q    Mr. Cassada asked you some questions about co-defendant

22 settlements.  Do you recall those questions?

23 A    Yes.

24 Q    In your direct examination, you testified that you -- for

25 purposes of your work, you couldn't get access to data from

Peterson - Recross/Bernick                    277

1  defendants that are still in the tort system.  Do you recall

2  that testimony?

3  A    Yes.

4  Q    Do you have an understanding whether or not defendants

5  that are still in active tort litigation, asbestos defendants,

6  keep their settlement data confidential?

7  A    Yes, I have an opinion.

8  Q    Not an opinion.  Do you know one way or another?

9            MR. CASSADA:  I object.

10            THE COURT:  You need to use a microphone.  The

11  question is, does he know whether they keep their settlement

12  data confidential; that is, the co-defendants in the tort

13  system.  It's a do you know.  The objection is overruled.

14  A    Yes.

15            MR. CASSADA:  Well, the objection was on the basis of

16  the scope of the cross.  It's outside the cross.

17            THE COURT:  No.  I think this is in the scope.

18  Overruled.

19  Q    Do you know?

20  A    I know and they don't want anyone else to see it.  They

21  protect that very vigorously and aggressively.

22  Q    And --

23            MR. FINCH:  Nothing further, Your Honor.

24            MR. PASQUALE:  No recross, Your Honor.

25            MR. KOVACICH:  That's all I have.

1          THE COURT:  Mr. Bernick?

2                  RECROSS EXAMINATION

3  BY MR. BERNICK:

4  Q    Mr. Pasquale is here.  He asked you some questions on

5  behalf of the Unsecured Creditors.  And so do you remember that

6  he asked you questions about your methodology?

7  A    I do recall that.

8  Q    Okay.  And, in particular, he confronted you with

9  questions that you had been asked in connection with the

10  deposition about the how far out the methodology had been

11  proven, do you remember that?

12  A    I just don't think that was his question.

13  Q    Well, something like that, but it can only -- you've only

14  been able to ascertain the reliability of the methodology by

15  verifying it against empirical facts, at least as concern

16  changes in the legal system, for about seven years?

17  A    I don't even think that was accurate.

18  Q    Okay.  Well, I --

19  A    It asks -- I said that you could only go out for a modest

20  period of time and he asked me to quantify modest but I wasn't

21  stating you could only forecast some things for six or seven

22  years.  It's too specific and actually mis-describes my

23  testimony.

24  Q    Okay.  And I certainly didn't intend to do that.  Do you

25  also recall that he asked you some question regarding basically

1  words to the effect that your methodology doesn't use the --

2  didn't use the PIQ questionnaire data.  Do you remember that?

3  A    Yes.

4  Q    Now, your methodology -- he then asked you about some

5  other people that had submitted expert or estimates, expert

6  estimates, in connection with the estimation process.  Do you

7  remember that?

8  A    Yes.

9  Q    And he asked you in particular about Mr. Florence, right?

10  A    Yes.

11  Q    And Mr. Florence had a different method?  Fair?

12  A    Yes, he certainly did.

13                        (Laughter)

14  Q    Well, I think you're going to want to get me to wind the

15  clock back here, Dr. Peterson.  This afternoon will last a lot

16  longer.

17  A    Whatever you want, counsel.

18  Q    Okay.  So, we had your methodology that you used and then

19  he asked you -- Mr. Pasquale asked you about Ms. Biggs.  Do you

20  remember that?

21  A    I do.

22  Q    And, so, we have Peterson, Biggs.  We have Florence who

23  uses the different method.  But then we have a Chamber in here

24  for the second slot that's not filled.  That Chamber is who?

25  A    Who were experts that didn't submit reports?

1 Q   Oh, no.  It hasn't been mentioned here but has the name

2 Chambers.

3 A    Well, Dr. Chambers.

4 Q    Okay.

5         MR. PASQUALE:  Objection, Your Honor.  Lacks

6 foundation.  Misstates the record.

7 Q    Did Dr. Chambers --

8         THE COURT:  Wait.  I'm sorry.

9         MR. BERNICK:  Strike that.

10         THE COURT:  I think he's being asked whether there

11 was yet another expert.

12         MR. PASQUALE:  And another expert report.

13         THE COURT:  Yes.

14         MR. PASQUALE:  And it lacks foundation.  Mr. Bernick

15 is heading down a path where he's incorrect.

16         THE COURT:  Okay.  There is no other expert report?

17         MR. PASQUALE: Your Honor, I don't want to testify as

18 others have done in this courtroom but Ms. Chambers submitted a

19 rebuttal report, did not give her own opinion.  She simply

20 responded to others.

21         THE COURT:  Okay.

22         MR. BERNICK:  Okay.  Well, I'll accommodate that

23 concern.  I think Mr. Pasquale is perhaps technically accurate.

24                     (Laughter)

25         MR. BERNICK:  I didn't mean that with disrespect.  I

1  think he's being right.

2  Q    So, but Mr. Pasquale representing the unsecured creditors

3  didn't mention the Chambers report?

4            MR. BERNICK:  Is that okay?

5  Q    He didn't mention the Chambers report, right?

6  A    I only recall a Chambers rebuttal report.

7  Q    Right.  But he didn't ask you about the Chambers report

8  just now on cross?

9  A    I don't believe -- I never saw one.

10  Q    Okay.  Did you review any work by Dr. Chambers in this

11  case?

12  A    I reviewed her rebuttal report.  I reviewed her

13  deposition.  I don't recall if I reviewed anything else.

14  Q    Okay.  So, you reviewed Ms. Biggs's work?  You reviewed

15  Dr. Chambers's work and you reviewed Dr. Florence's work,

16  right?

17  A    Yes, some of it.  Yes.

18  Q    Okay.  Now, your own analysis uses a -- adopts an approach

19  which uses historical settlement values and makes projections

20  based upon propensity to sue and historical settlement values?

21  Is that roughly fair?

22  A    Yes.

23  Q    Is there a short way of referring to that methodology?

24  A    It's not really quite past his prologue but it's past and

25  current his prologue.

Peterson - Recross/Bernick                    282

1  Q    Settlement, past settlement, and propensity, and then you

2  project the future based upon the past and part of the backbone

3  for the future is the epidemiological curves, correct?

4  A    Yes, plus looking at a period of time that's the future

5  for purposes of the forecast but we already know what happened.

6  We have perfect vision on that.

7  Q    Now, Ms. Biggs, how did her methodology compare to yours?

8  Was it the same or different?

9  A    She used generally the same method but there are

10  substantial differences and I don't -- I haven't reviewed it

11  recently and don't feel I can testify about it.

12  Q    Okay.  But does she also use past settlement and

13  propensity?

14  A    She does.

15  Q    And does she also use epidemiology to provide the

16  backbone?

17  A    Yes, she does.  They have their own epidemiological

18  forecast that --

19  Q    So, we've now got two folks who basically take the same

20  kind of approach?  Fair?

21  A    Yes.

22  Q    What about Ms. -- Dr. Chambers?  I know that Mr. Pasquale

23  points out correctly that there was no independent estimate

24  that Dr. Chambers did.  But the question to you is, does she

25  take the same or different approach in that she too uses

1  epidemiology?

2  A    Well, she says in her rebuttal report that she agrees with

3  regard to the basic methods that I use.

4  Q    Okay.  Does she also look to past settlement and past

5  propensity?

6  A    Yes.

7  Q    Would it be fair to say that if we went to look at the

8  estimation, three out of the four experts who did work on

9  estimation, including the expert retained by the unsecured

10  creditors themselves, all followed the same basic methodology?

11  A    As I would recall, I would say that all of us used a

12  version of the standard approach.

13  Q    So, to the extent that Mr. Pasquale is suggesting that

14  your methodology is different and subject to question, because

15  the PIQ data wasn't used, could that criticism also be lodged

16  against Ms. Biggs and Dr. Chambers?

17          MR. FINCH:  Objection to form.  Lacks foundation,

18  Your Honor.

19          DEPUTY CLERK:  Use the microphone.

20          MR. FINCH:  I thought I was.

21          THE COURT:  There was an objection to the form and

22  lacks foundation.

23          MR. BERNICK:  Well, okay.

24  Q    The question that was raised or the observation that was

25  made -- let's just make it that way.  The observation that was

1  made that you didn't rely upon the PIQ data, could that same

2  observation be made by two other experts in the case, including

3  the expert retained by the unsecured creditors?

4          MR. FINCH:  Same objection, Your Honor.

5          THE COURT:  I don't know if he knows.

6          MR. BERNICK:  I would ask if he knows.

7  A    I don't think I know about what Dr. Chambers would have

8  done with that because she could have used that somehow in the

9  standard method and I don't recall what Dr. Biggs said.

10 Q    Okay.  Fair enough.  The idea of using -- Mr. Pasquale

11 also asked you about which years you use for your calibration

12 period; that is, 1999 through, I think it was, '01.

13 A    Yes.

14 Q    Okay.  Ms. Biggs, did she have a calibration period?

15 A    Yes, but I don't recall.  Oh, yes.  I think it was the

16 same period.

17 Q    What about Dr. Chambers?  Do you remember if she had a

18 calibration period?

19 A    She, for some purposes, she went back to 1994. I think

20 that might have been for values but not propensity to sue.  I

21 don't recall the propensity to sue.

22 Q    Does the calibration period, if she went back to '94,

23 given the curves that you showed that went up precipitously in

24 the '98 to '01 period of time, if she went back all the way to

25 1994, what effect would that have on the calculation in the

1  case of Grace?

2          MR. PASQUALE:  Objection, Your Honor.  The witness

3  said he didn't recall what Dr. Chambers did.

4          MR. BERNICK:  I just said if she did.

5          THE COURT:  He said that he believes she went back to

6  1994 but with respect to values, not propensity to sue.

7          MR. BERNICK:  Same thing.

8  Q    Would that have an impact on the calculation?

9  A    Well, yes.  It would be -- it's an out-of-date era.

10 Asbestos litigation has changed in many ways and repeatedly.

11 It would be like trying to estimate the amount of teenagers

12 using telephones by looking to an era before there were

13 Iphones in such devices.  It just isn't pertinent.  It's not

14 relevant to the task here which is to forecast the future.

15 Q    Okay.  So, let's in fairness say, okay, let's focus on Dr.

16 Florence.  The real novelty in the estimation trial, was it or

17 was it not the approach that Dr. Florence took?

18 A    It certainly was novel.  I would say it's the real

19 novelty.  It was the outlier.  It was the --

20 Q    It was the outlier.

21 A    It was the unusual.

22 Q    And it was our position, we felt, totally grounded in the

23 law, science in fact, and we said those things and meant those

24 things.  But in the history of estimation --

25 A    Really?

1  Q    Absolutely.  In the history of estimation, has there ever

2  been an asbestos case that adopted the approach that Dr.

3  Florence adopted in connection with his work on the estimation?

4         MR. PASQUALE:  Objection, Your Honor.  Lack of

5  foundation.

6         THE COURT:  Well, if he knows.

7  Q    If you know?

8  A    I know of none.  I know of most estimations, perhaps not

9  every one.  None that I know of have used that method.

10        MR. BERNICK:  Nothing further, Your Honor.

11        THE COURT:  Anyone else?

12        MR. PASQUALE:  No recross from me, Your Honor.

13        THE COURT:  Any recross?

14                   (Pause)

15        THE COURT:  You're excused, Dr. Fleming.  I'm sorry.

16 Dr. Peterson.  I'm sorry.

17        THE WITNESS:  Thank you, Your Honor.

18        THE COURT:  Dr. Peterson.

19        MR. BERNICK:  Farewell.

20        THE COURT:  All right.  Mr. Bernick.

21        MR. BERNICK:  I have a housekeeping matter and then I

22 guess we should probably take up where to go from here.  We do

23 want to tender to the Court an amended demonstrative 507-5

24 relating to Mr. Shelnitz's testimony.  We've now changed the

25 label on slide -- well, it is 507-5 so it now is called -- now

1  is renamed Fresenius National Medical Care Holdings, Inc. and

2  it's 507A and we would offer that into evidence as a

3  demonstrative illustrating the testimony of Mr. Shelnitz.

4          THE COURT:  It's denominated as 507-5A and it is

5  accepted as a demonstrative.

6          MR. PRATT:  No objection, Your Honor.

7          MR. BERNICK:  And with that, I think we're probably

8  -- I know that Mr. Lewis is approaching with his never-ending

9  quest to get some more -- oh, not those.  We're not agreeable

10 to those.  I think probably we could start another witness

11 which would begin really -- I guess the question is, is there

12 any other witness who is going to be called.  We've taken Dr.

13 Peterson as our last witness.

14         MR. LOCKWOOD:  Your Honor, we had requested time to

15 argue the motion in limine on Professor Shine who is going to

16 be flying in tomorrow morning and who --

17         THE COURT:  Yes.  We need to do that.

18         MR. BERNICK:  Yes, and I want to get to that but I

19 want to get -- I'm now kind of reorganizing myself procedurally

20 to where we are in the case, I think with -- Peter, if you

21 could -- I think that with the testimony of Dr. Peterson,

22 subject to some documents that we may want to offer, that the

23 Plan Proponents -- the Plan Proponents are resting this segment

24 of the trial phase?

25         MR. LOCKWOOD:  Yes.

1          MR. GUY:  Yes.

2          MR. RICH:  Yes.

3          MR. BERNICK:  Mr. Rich, that's good enough.  So, I

4  think then the question is whether we start the objector's

5  insurance segment, and I'm not sure what that comprises, or

6  whether we take up some preliminary matters at this point,

7  including a priority matter regarding Mr. Shine.

8          UNIDENTIFIED SPEAKER:  Mr. Giannotto has that.

9          MR. BERNICK:  Oh, okay.

10          THE COURT:  I think we need to do the argument with

11  respect to Professor Shine because, if he is not going to be

12  called, I thought the idea was to save him a trip here if he's

13  not being called and otherwise to make sure that he gets here

14  if he is being called.  Mr. Giannotto?

15          MR. GIANNOTTO:  Yes, Your Honor.  Michael Giannotto

16  for the CNA Companies.  The insurers who retained Dr. Shine and

17  would proffer him have decided to withdraw him as a witness so

18  there's no need for argument on the motion.

19          THE COURT:  Oh.

20          MR. GIANNOTTO:  He will not be testifying.

21          THE COURT:  All right.  Thank you.

22          MR. LEWIS:  Good afternoon, Your Honor.  Tom Lewis

23  for the Libby claimants.

24          THE COURT:  Yes, sir.

25          MR. LEWIS:  We had some matters that were -- I guess

1  the best description, were held in abeyance at the end of our

2  case because we didn't have some things worked out.  One of the

3  matters was we had offered during our case-in-chief, Exhibit

4  LC-27 --

5       MR. BERNICK:  I'm sorry.  Can I just interrupt just

6  one second?

7       MR. LEWIS:  Sure.  Interrupt all you want.

8       MR. BERNICK:  No, no, no.  I know you're here.  I'd

9  like to get clarity if we're going to get into housekeeping

10  stuff, get clarity on the live testimony and, as I understand

11  it, DNSF still wants to consider whether to call somebody live

12  or wants to have that roll over till tomorrow morning, as I

13  understands it, which would be okay with us.  Is there anybody

14  else who intends on the objector's side to call a live witness

15  so that we can at least get that schedule down and then take up

16  the remaining matters?

17       (Pause)

18       MR. PRATT:  Warren Pratt, OneBeacon and Seaton, Your

19  Honor.  We may end up having to call a live witness but I hope

20  we don't.  It relates to these three exhibits, Mr. Brown's

21  letters, and let me just recap that.

22       MR. BERNICK:  Before -- I'm sorry.  This is exhibits

23  and I really would like --

24       MR. PRATT:  Well, I know, but --

25       MR. BERNICK:  I don't want to argue.  Your Honor, I

1  don't want to argue.

2            THE COURT:  Mr. Bernick, he needs to know whether or

3  not he has to call a witness.  That was the point.

4            MR. PRATT:  That's it.

5            THE COURT:  Go ahead, Mr. Pratt.

6            MR. PRATT:  Thank you, Judge.  At the conclusion of

7  Mr. Fink's testimony yesterday -- now, I don't have the fancy

8  on-line stuff but, according to my notes, the Court directed

9  the parties to confer about trial exhibits and the nature of

10 claims asserted against OneBeacon and Seaton.  And we've

11 reached an agreement.  We haven't handed these up yet because

12 they're exhibits, but we've reached agreement as to, I think,

13 just about everything but not as to these three.  We tried to

14 get them in through Mr. Fink.  That objection was sustained. We

15 tried to get them with Mr. Shelnitz.  Your Honor ruled that we

16 couldn't authenticate them through that witness but here's what

17 I want to say about it, Your Honor.

18            I don't believe -- first of all, I don't believe

19 there's any real dispute about authenticity.  We could bring --

20 if we're forced to and we have to bring a witness out here, it

21 would take three minutes to do that but --

22            MR. BERNICK:  There is no issue so that's --

23            MR. PRATT:  No issue as to that.

24            MR. BERNICK:  About authenticity.

25            MR. PRATT:  It's the Plan Proponent's own exhibit

1  that we're using and it's offered for a very limited purpose.

2  Mr. Brown conferred with Mrs. Esayian not that long ago, just a

3  little while ago, and I would hope that we could reach an

4  agreement about that.  But if we can't, and we have to bring a

5  witness out here, then we will.  So, that's something that was

6  on our list but I don't know what we're going to have to do

7  about it.

8           THE COURT:  Okay.  So, the issue is you're going to

9  meet tonight to see if you can get an agreement about it?

10          MR. PRATT:  Well, we've already conferred with

11  debtor's counsel and she, I assume, will pass that along.

12          MR. BERNICK:  Very simple.  Pass it along to me.

13  There's no issue that's going to be resolved by bringing

14  somebody in to authenticate the document.  The document is

15  objectionable for the very reasons that we've indicated.  These

16  are the letters, the self-serving -- not self -- these are the

17  letters that were sent on July 8, 2009 to counsel in order to

18  raise certain matters as to which they might have claims.  And,

19  obviously, that's long after the plan was put in.  I don't want

20  to re-engage in the arguments.  Your Honor already has heard

21  enough of the argument and it's not something that's going to

22  turn upon the testimony of a live witness.  But, if it were,

23  Mr. Brown who signed the letter could simply the stand and

24  supply whatever is necessary.  Mr. Brown is here.  If they want

25  to call Mr. Brown tomorrow morning, that's fine, but it's not

1  going to resolve the objections that we've had nor is it going

2  to elucidate the objections that we had.

3       So, I don't think that there's any fact witness

4  testimony that needs to take place as to which we're going to

5  need to bring somebody in from out-of-town.

6       MR. PRATT:  Your Honor, I'm a little flabbergasted by

7  Mr. Bernick's comment that this couldn't possibly be relevant

8  to anything because it's got his exhibit stickers on it.  But

9  if the idea is --

10       THE COURT:  Lots of things have been marked but not

11  introduced, Mr. Pratt.

12       MR. PRATT:  I understand and we can argue -- we can

13  argue the legal issues.  Is that what it boils down to, Mr.

14  Bernick, in your view?

15       MR. BERNICK:  I think it is a legal issue.  That is

16  correct.  It is a legal issue to the extent if you take this

17  letter at face value -- that is, we assume there is no factual

18  issue but that the letter said what it said -- what its

19  significance is in connection with the confirmation is a

20  relevance issue and I believe that that will turn on the issues

21  that we have in confirmation which is an issue of law.  That's

22  what I think.

23       MR. PRATT:  Well, Your Honor, the argument that we

24  would use this for has already been made in our pretrial brief

25  so I think it's relevant.  You know, maybe the Court doesn't

1  give that weight in the context of this case.  I don't know.

2         THE COURT:  That may be the issue.  If it's relevant

3  to the question of whether or not the plan is illegal because

4  it illegally does something to whatever this claim is -- I

5  haven't read the letters, Mr. Pratt, so I can only speak in

6  pretty broad, general terms since they're not admitted either

7  -- but, so, I don't know what the content in the letter is.

8  But let me assume that the letter says that OneBeacon and

9  Seaton have a certain claim against either Fresenius or Sealed

10 Air and it's raised after the plan has been filed.  The issue I

11 think you're raising is that now, because the debtor's counsel

12 have been made aware of the fact that Fresenius and Sealed Air

13 claim to have -- I'm sorry -- that OneBeacon and Seaton claim

14 to have a claim against Fresenius and Sealed Air, that those

15 claims cannot be properly channeled and/or released and/or

16 whatever the other effect is so that your client can't pursue

17 them against Fresenius and Sealed Air as a result of the plan.

18         MR. PRATT:  Well, close, Your Honor, but not quite.

19         THE COURT:  Okay.

20         MR. PRATT:  The -- and let me just start from the

21 ground up.  OneBeacon and Seaton are creditors and the reason

22 is that they have settlement agreements with the debtor.  The

23 debtor agreed in those settlement agreements to indemnity

24 Seaton and OneBeacon if anybody else claimed coverage under

25 policies that fully resolve as to the debtor.

1          THE COURT:  All right.

2          MR. PRATT:  The exercise today with Mr. Shelnitz will

3 show that the entities that are now called Fresenius and Sealed

4 Air are parties.  They signed the settlement agreement so we've

5 got direct contractual recourse on the indemnity claims against

6 those two entities.

7          In addition, and this gets a little complex but it's

8 explained in the letter, the basis for the claim.  I'm not

9 asking -- not offering that for the truth --

10          THE COURT:  Yes, I understand.

11          MR. PRATT:  -- but just for theory.  As to certain

12 environmental claims asserted by Kaneb -- you've heard of the

13 Kaneb claims -- they sought relief from the stay that was

14 preventing them from asserting those claims and that's

15 implicated as well.  And, you know, those claims came up after

16 the plan was filed so, especially as to Kaneb, I don't think

17 that the timing of when this is being raised makes any

18 difference and that's to start with.   But, second of all --

19          THE COURT:  Well, wait.  I need to interrupt because

20 there were two claims by Kaneb and I know I've ruled that one

21 has been disallowed.  It was disallowed long ago in this case

22 and one wasn't filed, or at least one wasn't filed and maybe

23 that's the reason it was disallowed and I'm not sure about

24 that.

25          MR. BROWN:  Well, Your Honor, may I address that --

1           THE COURT:  Okay.

2           MR. BROWN:  -- because I'm more familiar with that.

3           THE COURT:  All right.

4           MR. BROWN:  Your Honor, I think you're correct as to

5    the claims that Kaneb had directly against the debtors.  There

6    had been a proof of claim filed for one and I think there had

7    been a failure to file a proof of claim for the other.

8           THE COURT:  As to the other.

9           MR. BROWN:  That's not what we're talking about.

10   We're talking about the other relief that Kaneb sought in its

11   lift stay motion.  Kaneb had sought relief from the automatic

12   stay in order to pursue certain Grace insurers for coverage

13   and, included among those insurers were OneBeacon and Seaton.

14   And Your Honor denied the lift stay motion without prejudice.

15   The obvious implication is, at some point, they will have the

16   ability to move forward with those claims after plan

17   confirmation against the insurers; not against Grace but

18   against Grace's insurers.

19          THE COURT:  Well, the implication is that as to the

20   claim that was never filed, I don't know how they're going to

21   against debtor's insurers when they can't go against the

22   debtor.

23          MR. BROWN:  They have two theories, Your Honor.  The

24   first of their theories is that they can go against the debtor

25   as a judgment creditor.  The second of their theories is that

1 they are, in fact, a co-insured under the policies and they

2 would not be precluded from pursuing it or at least that is

3 their position, they would not be precluded from pursuing the

4 settled insurers as purported co-insureds under the policy.

5          THE COURT:  All right.

6          MR. BROWN:  And that gives rise -- and, Your Honor,

7 the argument is that that gives rise, and it's explained in the

8 letters, to a misrepresentation claim in connection with an

9 environmental settlement that took place in March of 1997.  And

10 it's explained in the letter.  It did not arise until Kaneb

11 came in and asserted claims in the bankruptcy case which was

12 long after the plan was confirmed or, excuse me, long after the

13 plan was filed.

14          THE COURT:  Okay.

15          MR. PRATT:  Your Honor, obviously, no one is asking

16 the Court to adjudicate that dispute and we're not offering

17 these letters for the purpose of the truth of anything that's

18 set forth in there.  But the reason that we think they're

19 important is that our argument is, our belief is -- now, you

20 know, again, it turned out to be a legal conclusion today when

21 I was trying to probe Mr. Shelnitz on what does the successor

22 claims injunction cover.  You know, I don't know if that's a

23 matter of law.  I don't know if somebody can talk about its

24 purpose or will during the final 1129 phase of this hearing.

25 But we've already briefed the concept.  Our understanding of

1  the plan is that the injunctions and releases cover these

2  claims against third party non-debtors and our argument that

3  we'd like to make, and Your Honor may or may not accept that

4  argument, but we've got a colorable good faith argument to make

5  that the injunctions and releases are overly broad and not

6  lawful. It doesn't have anything to do with the good faith of

7  the plan.  It's just the scope of the injunctions and releases.

8          THE COURT:  Okay.

9          MR. BERNICK:  But just a short observation.  Now we

10 are deep into the weeds which, I guess, is fine.  Your Honor

11 wants to hear this.

12         THE COURT:  No.  I wanted to know whether we needed a

13 witness.  That's how this started.

14         MR. BERNICK:  Yeah.  I don't -- I think it's quite

15 plain that we don't but, be that as it may, I mean, if they

16 want to make some kind of proffer that they believe they have a

17 claim no the basis of some kind of theory, you know, they can

18 go ahead and do that.  The letter is not the appropriate

19 vehicle for doing this.  It's basically a legal argument and a

20 legal assertion.

21         I think that they probably raised this in their trial

22 brief.  I know that they'll raise it post-confirmation so --

23         MR. BROWN:  Well, the --

24         MR. BERNICK:  Excuse me.  It will be laid out but as

25 to how the plan will deal with this kind of claim, that's not

1  going to be resolved by Mr. Shelnitz.  That's not going to be

2  resolved by any witness that's going to be called.  The person

3  they really should have asked that question about, and a lot of

4  I think what we heard asked of Mr. Fink and Mr. Hughes and Mr.

5  Shelnitz, are a bunch of plan interpretation questions that

6  could have been put to Mr. Inselbuch who did respond to those

7  issues when BNSF raised those issues.  He's the one who knows

8  who is prepared to testify about the plan and they didn't ask

9  him any of those questions.

10      Be that as it may, this is an argument that does not

11  have a witness attached to it.  And what I would propose in

12  order to resolve it is that, if they're interested in getting a

13  fact before the Court, which is the nature of the claim that

14  they're making, I don't have a problem with figuring out some

15  very simple way of doing that and having that be provided to

16  the Court by way of a stipulation; that is, that they believe

17  they have this claim for whatever impact it might have.

18      But to take up all this time going through lawyers'

19  letters and cross examination of witnesses or by putting some

20  other witness on the stand who is going to talk about what that

21  claim is, just strikes me as being very, very unnecessary, Your

22  Honor.

23      MR. PRATT:  Can I respond, Your Honor?  Mr. Bernick

24  just said a stipulation about whether they think they have a

25  claim, how that would be relevant.  We're not --

1           MR. BERNICK:  Well, what the claim is.

2           MR. PRATT:  Excuse me, Mr. Bernick.  The issue isn't

3  whether we think we have a claim.  We do but that's not the

4  issue.  The pertinent fact, and we need to get this established

5  so that we can brief it; if it's not in evidence, then how are

6  we going to brief it?  The pertinent fact is that a claim has

7  been asserted.  A claim has been asserted against the two

8  non-debtor parties and the relevance of that, if we are correct

9  in our interpretation of the successor claims injunction which

10 is not Mr. Inselbuch's issue -- his issue is 524G.  Successor

11 claims injunction is different.  So, with respect to Kaneb, for

12 example, that would be a Class 9 claim, you know, if it's

13 against Grace.

14          THE COURT:  All right.

15          MR. PRATT:  But, you know, we can't really argue that

16 without a basis in the record to argue it and if the easiest

17 way to do this is just admit the letters which are the Plan

18 Proponent's own exhibits.

19          THE COURT:  It seems to me that if you can do a

20 stipulation as to the nature of the claim, frankly, that would

21 make a lot more sense than the letters.  The letters are a

22 position, apparently of your client through its attorney, to

23 another person's attorney.  And does that state a position of a

24 party?  It probably states a position of the party.  But I'm

25 not sure how that is going to carry out the provisions of the

1  relevance.

2           The issue that you need to get to is whether or not

3  the parties agree that a claim has been asserted against

4  Fresenius and Sealed Air and I think I just heard them say that

5  they're willing to figure out a stipulation that will get that

6  information before the record.

7           MR. PRATT:  Well, but, Your Honor, let me just try to

8  address that.  If you say what is the document that shows that

9  a claim has been asserted against a debtor.  That's a proof of

10  claim in a bankruptcy case.  In effect, that's what these

11  letters are.

12           THE COURT:  Oh, absolutely they're not.  It's well

13  past the deadline for proofs of claim.

14           MR. PRATT:  Well, but it's a letter that asserts the

15  claim.  In other words, it's a --

16           THE COURT:  It's a self-serving statement on behalf

17  of your client.

18           MR. PRATT:  No, Your Honor.

19           THE COURT:  You can't use a self-serving statement in

20  your own case.  The debtor could use it in its case if there

21  were some need for that as an admission but you can't do that.

22           MR. PRATT:  Well --

23           THE COURT:  So, to the extent that what you're asking

24  me to do over an objection is to accept that letter as an

25  admission, I can't because you're offering it and not the

1 opposite side.  So, either call a witness -- I'm done with this

2 argument.  We've spent 15 minutes on it.  That's enough.

3 Either call a witness or get a stipulation tonight and then

4 we'll address it tomorrow morning to see whether or not the

5 document itself comes in pursuant to the stipulation or you

6 have a stipulation of fact.  Mr. Brown apparently was the

7 author.  I didn't even notice that, I'm sorry, but he's here.

8 So, calling a witness shouldn't be that hard.  He's here.

9 　　　　　MR. PRATT:  Well, Your Honor, I don't think we'd call

10 Mr. Brown.

11 　　　　　THE COURT:  All right.

12 　　　　　MR. PRATT:  We'd call an officer but let me just -- I

13 don't mean to try the Court's patience, Your Honor, but I just

14 have one more thing to say about it and I'll let it go.  I view

15 these letters essentially as a legal act because whether it's

16 true or not doesn't matter.  It's the fact that the claim was

17 asserted and it's asserted in the very letter that we're

18 talking about.  The stipulation would just be did you assert

19 the claim.  Well, we did in that letter.  And, so, I don't see

20 the reason why to back off the letter but if that's the Court's

21 ruling --

22 　　　　　THE COURT:  I'm not making a ruling of backing off.

23 I think I said go talk to see whether you can get a stipulation

24 done.  As a result of the stipulation, will the letter either

25 come in for this purpose of determining what you've just said

1  -- I'm not going to try to summarize the last 15 minutes -- or

2  will the stipulation stand on its own or do you need a witness.

3  That's what I'm trying to get to.  I don't think you have an

4  answer yet from the Plan Proponents as to whether you need a

5  witness and I've spent 15 minutes trying to figure it out.

6          MR. PRATT:  Well --

7          THE COURT:  I can't do anything.  You need to do it

8  with the debtor.  If you can't get a stipulation, bring a

9  witness.

10         MR. PRATT:  To circle back, Your Honor, we may have

11  one and that's where we started.  We may have a witness.

12         MS. DeCHRISTOFARO:  Your Honor, forgive this, but I

13  just want the record to be clear that the only witness

14  designated regarding the appropriateness of releases on the

15  order of proof submitted to Your Honor was Mr. Shelnitz, not

16  Mr. Inselbuch, just so that there isn't any implications from

17  that and I don't mean to get into -

18         MR. BERNICK:  On the what?  I'm sorry?

19         THE COURT:  I think Mr. Inselbuch testified that he

20  was not getting into the merits of specific sections of the

21  plan in any event so --

22         MS. DeCHRISTOFARO:  Yeah.  I just -- and forgive me

23  but I just felt compelled.

24         MR. BERNICK:  Your Honor, I think actually Mr.

25  Inselbuch did talk about the effect of the injunctions.  I

1  mean, it --

2            THE COURT:  He did as to certain injunctions.

3            MR. BERNICK:  Yeah.  Anybody who wanted to stand up

4  and ask could have asked.

5            THE COURT:  They can do that with any competent

6  witness who's been designated and, if Mr. Shelnitz has been so

7  designated, he's here.  They can ask him but they can't ask

8  legal conclusions.  Mr. Lewis.

9            MR. LEWIS:  Your Honor, I direct your attention to

10  Libby claimant's Exhibit No. 271 which has been enlarged here.

11  We offered this exhibit and the determination was that we would

12  try to work this out.  We haven't.  I don't know that we've

13  worked it out with Mr. Bernick but we have with Mr. Fitch.  Mr.

14  Fitch has no objection to the exhibit.  The exhibit was

15  originally produced in discovery as a Grace document and --

16            THE COURT:  Can you refresh my recollection, please?

17  What is it?  I can't see it on the screen so I just don't know

18  what it is.

19            MR. LEWIS:  I apologize.  It's called Asbestos Bodily

20  Injury Cases With a Judgment Settlement.

21            THE COURT:  All right.

22            MR. LEWIS:  There's been much testimony about this,

23  but there's -- we want to offer it for the purpose of showing

24            THE COURT:  All right.

25            MR. LEWIS:  There's been much testimony about this,

1 but there's -- we want to offer it for the purpose of showing

2 what the verdicts were, whether they were zero, $10 or $10

3 million.  We want to complete the record on this.  I don't know

4 if Mr. Bernick's going to object to this.

5         MR. BERNICK:  I don't have an objection to it.  What

6 I told your partner was that this was -- the reason we objected

7 to it before is, it is not an ordinary course document and

8 that's all that the witness really knew about.  It was attached

9 to a discovery response and what I said to Mark is, if you just

10 show me the discovery response I'm sure we can figure out a way

11 to get the document in.  I just want to make sure that it comes

12 in, in the context of how it was actually created.  No

13 objection the document can come into evidence.  No objection as

14 to relevance or as to the accuracy of the document.

15         MS. DeCRISTOFARO:  Your Honor, could we just have an

16 identification as to what it is?  It doesn't say on it.

17         THE COURT:  It's the --

18         MR. LEWIS:  It does say --

19         THE COURT:  It's the asbestos bodily injury cases

20 that had a judgment or a -- a judgment and a settlement.  It

21 was exhibit, I think he said 271.

22         MS. DeCRISTOFARO:  I'm sorry.  Does this come from

23 Grace's files?  Because that's what I --

24         MR. LEWIS:  Yes.

25         MR. BERNICK:  No, it doesn't come from Grace's -- it

comes, as I indicated, counsel, it was an attachment to a

discovery response.  It's not an ordinary course document.  It

was attached to a discovery response.

        MS. DeCRISTOFARO:  Is it a Grace document?

        MR. BERNICK:  What?

        MS. DeCRISTOFARO:  It's your document though?

        MR. BERNICK:  Yes.  Yes.

        MS. DeCRISTOFARO:  That's all.  That's all I want to

know.

        THE COURT:  All right.  So, it's coming into

evidence, Exhibit 271.

        MR. LEWIS:  Thank you, Your Honor.

        THE COURT:  But, not as an ordinary course document.

Something produced by Grace in discovery from its records?  I'm

not sure what the --

        MR. BERNICK:  No, it's was --

        THE COURT:  -- stipulation is.

        MR. BERNICK:  It was objections and answers -- it

was, I believe, an attachment to either a Grace discovery

response or an ACC discovery response.

        MR. LEWIS:  It was an ACC discovery response.

        MR. BERNICK:  Okay.  So, this is the point is that

it's not a document that was generated in the ordinary course

of -- so, it was an ACC compilation?

        MR. FINCH:  No, no.

1             MR. BERNICK:  Well, then you tell me what --

2             MR. FINCH:  Nathan Finch for the ACC.  Your Honor, in

3   2002 I had the good fortune to be litigating against Mr.

4   Bernick's firm on the fraudulent transfer case involving the

5   (indiscernible) corporation.  The asbestos claimants committee

6   served an interrogatory upon the debtor in that case asking it

7   to list the cases that it went to verdict in -- or judgment.  I

8   can't remember exactly what the interrogatory said, and Grace

9   attached this document which is Libby Claimants' 271.  It's

10  also been marked with a bunch of other exhibit stickers.  The

11  debtor attached that document to the interrogatory answers, so

12  it is attached as a -- the interrogatory answer authenticates

13  the document.  It's a Grace document.  I have no objection to

14  it coming into evidence, but it is not a document created in

15  the ordinary course of business.  It's not a business record,

16  but it's a -- it is what it is.

17            MR. BERNICK:  All I wanted to say, Your Honor, is

18  that we ought to have the interrogatory as to which it was

19  attached so that everybody knows when it was created.  I don't

20  know if there are any limitations or --

21            THE COURT:  That's fair.

22            MR. BERNICK:  -- regarding the accuracy, but it just

23  ought to be would be what it is.

24            THE COURT:  That's -- I think that's fair.

25            MR. LEWIS:  Should I mark that 271A?

1              THE COURT:  Fine.

2              MR. LEWIS:  All right.  It --

3              MR. BERNICK:  Well, we'll mark it 271A when we get

4    the interrogatory to attach to it.

5              UNIDENTIFIED ATTORNEY:  The interrogatory is here.

6              THE COURT:  No, this is 271 is the exhibit, 271A is

7    the interrogatory request.

8              MR. BERNICK:  No, that's not the right interrogatory.

9              THE COURT:  Gentlemen, please.

10             UNIDENTIFIED ATTORNEY:  Your interrogatory is here.

11             MR. BERNICK:  Okay.  Well, why don't you tell him

12   that.

13             MR. LEWIS:  Yes, it's all here.

14             THE COURT:  271A is interrogatory, Mr. Lewis?

15             MR. LEWIS:  It's discovery and discovery response and

16   it includes interrogatories.  It includes requests for

17   production.  The response provides this document as a list of

18   all of the Grace cases that went to verdict and their result,

19   correct?  That's what it is.

20             MR. BERNICK:  This is an incredible waste of time.

21   I've said before just --

22             THE COURT:  Mr. Bernick, I'm tired of your saying

23   that.  You will not say that again in this case.

24             MR. BERNICK:  Well, Your Honor, I'm sorry.  I

25   don't --

1          THE COURT:  Mr. Bernick, you will not say it again in

2    this case.

3          MR. BERNICK:  I will not say it again in the case.

4    Right.

5          THE COURT:  Mr. Lewis?

6          MR. LEWIS:  Your Honor, I hear no objection to it, so

7    I assume it can be admitted.

8          THE COURT:  It -- I will admit it, but I need the

9    interrogatory that I -- that request that asks for it and the

10   response so I know what it is.

11         MR. LEWIS:  All right.  That's a multi-page document.

12         THE COURT:  So, exhibits Libby 271 and 271A are

13   admitted, 271A only to describe what 271 is.

14         MR. BERNICK:  I don't even know what 271 is at this

15   point, Your Honor, because I don't have a copy of it.  I don't

16   know if it's the right interrogatory.  So, I object to it until

17   I see a copy and I've got a copy with the thing attached to it.

18         THE COURT:  That's fine.  Gentlemen, you will once

19   again talk about this tonight and see whether or not this

20   really minor issue can't be resolved.

21         MR. LOCKWOOD:  Your Honor, I would just note for the

22   record that one of the reason they have the interrogatory is

23   the document does not speak for itself.

24         THE COURT:  It doesn't.  I agree.

25         MR. LOCKWOOD:  It says -- it's captioned asbestos

1 bodily injury cases with a judgment settlement.

2           THE COURT:  Yes, sir.

3           MR. LOCKWOOD:  Those two terms are not -- I mean, I

4 don't know what a judgment settlement is.  And then it has --

5 over in the resolutions it has "disposed amount" and I don't

6 know whether that's a settlement, or a judgment or a settlement

7 that occurred after a judgment or a verdict or whatever.  So,

8 hopefully the interrogatory response will clarify --

9           THE COURT:  All right.

10           MR. LOCKWOOD:  -- so, the Court will be able to

11 understand it.

12           THE COURT:  Tomorrow I will address Exhibits 271 and

13 271A.  You are all ordered to confer about it tonight.

14           MR. LEWIS:  Your Honor, I'm getting on a plane early

15 in the morning.  Does that require me to stay?

16           THE COURT:  Not if you can get something -- Mr.

17 Kovacich, will you be here?

18           MR. KOVACICH:  I can handle his as --

19           COURT CLERK:  Use a mic, please.

20           MR. KOVACICH:  I can handle this issue tomorrow.  I

21 believe --

22           THE COURT:  That's not a microphone.

23           MR. KOVACICH:  Your Honor, I will handle this issue

24 tomorrow.  There are some other issues Mr. Lewis would like to

25 take up.

1          THE COURT:  All right.  Let me just make a note that

2  says I've deferred this until tomorrow, please.  I need to

3  change my notes.

4          MR. LEWIS:  Your Honor?

5          THE COURT:  All right.  Yes, sir.

6          MR. LEWIS:  The next issue relates to some affidavits

7  that we were going to put into evidence.  Again that was a

8  matter that was deferred.  We have those affidavits here and

9  there's to be some counter --

10          THE COURT:  Mr. Lewis?

11          MR. LEWIS:  There was supposed to be come counter

12  affidavits or we agreed to some counter affidavits to be filed

13  by the plan proponents.  And so Mr. Finch has prepared those.

14  We're prepared to stipulate those in, and by stipulation

15  already entered, we're offering these.

16          MS. DeCRISTOFARO:  Your Honor, may we see those,

17  please?

18          THE COURT:  Do they have exhibit numbers, Mr. Lewis?

19          MR. LEWIS:  Not yet.

20          MR. GUY:  Your Honor, this document isn't binding on

21  any other party, so the insurers, of course, are welcome to see

22  it, but it specifically says it's not binding on any other

23  party.

24          MR. LEWIS:  There's a stipulation that's been entered

25  into and I believe it's been filed which indicates that it's

1 only binding -- their affidavits are binding on Libby.  Our

2 affidavits are binding on the plan proponents.

3          THE COURT:  All right.

4          MR. FINCH:  That's fine, Your Honor.  We will mark

5 the plan proponents' declarations as Plan Proponents' Exhibit

6 630.  Do you have a document number for yours?  And what I

7 suggest, Your Honor, I've got a copy of the stipulation here

8 which has incomplete versions of the two attachments.  What I

9 suggest that we do is just rip off the back, hand up the

10 stipulation with the two new exhibit numbers and we can hand

11 write the --

12          THE COURT:  That's fine.  That's the plan proponents,

13 correct?  What's Libby?

14          MR. FINCH:  It's also the Libby claimants, too.

15          THE COURT:  It includes everything?

16          MR. FINCH:  It includes everything.

17          MR. LEWIS:  630 will?

18          MR. FINCH:  No, 630 is the plan proponents.  Put an

19 exhibit number on that.

20          MR. LEWIS:  And our exhibit number we be 280 --

21 LC-281, Your Honor.  How's that?

22          MS. DeCRISTOFARO:  Your Honor, there is a

23 stipulation.  I assume it's the same one that we saw before.  I

24 don't have it, but the idea as I understood is, and I'd like it

25 clear on the record, that these are not being submitted as

1 against any insurer and are not used as proof of any insurer of

2 anything.  And I would like if -- certainly if these to be

3 submitted with the stipulation and to be that -- that

4 submission be clear on the record.

5          MR. LEWIS:  The Libby claimants so stipulate, Your

6 Honor.

7          THE COURT:  And, Mr. Guy, I think you already said

8 that on behalf of the plan proponents, but could you confirm

9 it?

10          MR. GUY:  Yes, Your Honor.  It's in the document.

11          THE COURT:  All right.  So, this -- what I am getting

12 as the plan proponents is the declaration and the exhibits and

13 from Libby I'm getting the stipulation and the exhibits?

14          MR. FINCH:  No, Your Honor.  What we're doing is --

15 Nathan Finch for the ACC.  What we're doing is, we have the

16 stipulation which has the six paragraph of agreement and it has

17 -- refers to Libby Exhibit A and ACC Exhibit B.  And what I

18 have done is, right at the bottom, Libby Exhibit A is Libby

19 Claimants' 281.  ACC Exhibit B is Plan Proponents' 630.

20          THE COURT:  All right.

21          MR. FINCH:  I have -- it's got people's John Hancocks

22 on it.  Libby Claimants 281 and Plan Proponents' 630 are all

23 right here and may I hand it up to Your Honor?

24          THE COURT:  Is it with the stipulation?

25          MR. FINCH:  It is with the stipulation.  This is the

1  only copy that exists in the world right now of this.

2           THE COURT:  Okay.  Does the stipulation have an

3  exhibit number because that's what I'm trying to figure out?

4           MR. FINCH:  I didn't -- the stipulation does not have

5  an exhibit number, Your Honor.  If you would like us to put an

6  exhibit number on it we can.  I don't normally --

7           THE COURT:  I think so, because -- I know, but

8  otherwise with exhibits attached to a stipulation they're

9  not -- they're going to get lost if the stipulation itself

10 isn't separately numbered.

11          MR. FINCH:  Okay.  Morgan, what's the next exhibit

12 number?

13          UNIDENTIFIED SPEAKER:  631.

14          MR. FINCH:  Okay.  Let's try this one last time.  The

15 Plan Proponents' Exhibit 631, Your Honor, is the stipulation

16 which is a three-page document which is -- okay, it's a joint

17 exhibit.  It's a Plan Proponents' 631, Libby Claimants' 282.

18          THE COURT:  All right.

19          MR. FINCH:  That's the stipulation.  It's only

20 binding on the plan proponents and the Libby Claimants.

21          THE COURT:  All right.

22          MR. FINCH:  No one else is bound by it.  It attaches

23 as Exhibit A to that stipulation, Libby Claimants' 281 which

24 are their affidavits and Exhibit B to the stipulation is Plan

25 Proponents' 630 which are the plan proponents' declarations

1 from people outside of Libby, and I'm going to, with Your

2 Honor's permission, hand it to Your Honor.

3        THE COURT:  All right.  I will take Exhibit -- wait.

4 Mr. Finch, why don't you give it to my clerk so she can make

5 copies for everybody so that tomorrow morning it won't be the

6 only copy in existence anymore.

7        All right.  So, Plan Proponents' Exhibit 280 -- I'm

8 sorry -- 631 and 630 are admitted.  And Libby Exhibits 281 and

9 282 are admitted and the stipulation is included that indicates

10 that they will not be used against any insurer.  Okay.  Mr.

11 Lewis?

12        MR. LEWIS:  Okay.  The next item is the Libby

13 Claimants have filed notice with the Court that they are --

14 will offer into evidence transcript and deposition excerpt

15 designations.  There have been objections to those transcript

16 and designations filed, but I think more importantly I think

17 they're the subject of a motion in Limine that has not been

18 resolved.  But, we need to offer them into evidence and --

19        UNIDENTIFIED ATTORNEY:  Excuse me, Your Honor.

20        MR. LEWIS:  There is one modification to our proposed

21 excerpts.  We offer the deposition of -- excuse me, Your Honor

22 -- Mr. Hurlbert.

23        THE COURT:  Can you spell that, please?

24        MR. LEWIS:  H-u-r-l-b-e-r-t.

25        THE COURT:  Okay.

1          MR. LEWIS:  That is withdrawn.  All other deposition

2  excerpts and prior trial testimony that's identified -- was

3  identified are being offered at this time.

4          MR. BERNICK:  Your Honor, these are not proper

5  exhibits.  They don't come into evidence that way.  The rules

6  provide for deposition designations to be done in a certain

7  fashion and they can make those designations.  They have made

8  those designations.  We've objected to them and we've moved as

9  to them.  They don't simply come in as a proffer.  That's not

10 how the rules work.

11         So, we've objected on those grounds.  We believe that

12 all of the objections and rulings made in connection with

13 deposition designations were specifically reserved for

14 consideration after this trial.  That's -- those are the rules

15 that we've followed and there's no reason for an exception

16 here, particularly when Your Honor has already issued a bunch

17 of rulings relating to the whole question of individuals.

18         So, this is, again, something where we've staked out

19 the position and we believe it's completely in accordance with

20 the rules that Your Honor has followed.

21         MR. LEWIS:  Your Honor?

22         THE COURT:  I believe I need to hear the motion

23 that's been filed with respect to these, Mr. Lewis, and as a

24 result I think what is proper is to have this case "not closed"

25 until we have argument on these issues and then I can determine

1 whether or not these documents are admissible.  So, I don't

2 think I can admit them today with the objections that are

3 pending.  I have to have the argument on those objections.

4        MR. LEWIS:  But, Your Honor, we want to complete the

5 record that we offered them.  That's the important thing here.

6 I was -- I agree with much of what Mr. Bernick says.  There are

7 objections.  There are motions pending on these, but we need to

8 get these offered while in trial because we don't understand

9 that the designation of transcripts is an offer into evidence

10 unless the Court treats that matter differently.

11        THE COURT:  I'm going to treat it as reserved.  I

12 understand your offer, but I am not admitting them now and I'm

13 not, not admitting them now.  I'm reserving ruling on that

14 issue until I can get through the arguments on those points.

15        So, at an appropriate omnibus hearing date or after,

16 I'll have, I guess Ms. Baer, work out that schedule with my law

17 clerk.  We will --

18        MR. LEWIS:  And then we could offer them then?

19        THE COURT:  You can offer them then and then we'll

20 have the arguments and go forward.  I am not clossing the

21 evidence with respect to those issues because I can't until I

22 can make those rulings.

23        MR. LEWIS:  That's all I was concerned about.

24        THE COURT:  All right.

25        MR. LEWIS:  We have one more issue, Your Honor.

1        THE COURT:  What I'm going to ask, Ms. Baer, is when

2    these documents are put together either in this morass of paper

3    you're going to have to identify for me where all of this is

4    because I know I have this.  I've read -- I actually have read

5    all of these things, but where, I haven't a clue.  Or I'm going

6    to need the docket numbers if they're filed or something that

7    will let me pull them for purposes of that argument, or I need

8    yet again copies stuck into the binders for the argument.  Work

9    something out with Ms. Baker.

10        MR. BERNICK:  We'll be happy to do that.  Oh, I'm

11    sorry.

12        THE COURT:  All right.  Okay.  Mr. Lewis, go ahead.

13        MR. LEWIS:  I apologize for that, Your Honor, but I

14    just wasn't familiar with the procedure of the Court on that

15    issue, so --

16        THE COURT:  There wasn't a procedure, Mr. Lewis.  It

17    wasn't a matter of not being familiar with it.  We need to work

18    something out, except that I said that we would defer it until

19    the end, and we will.

20        MR. LEWIS:  That's perfectly satisfactory with us,

21    Your Honor.  We have no objection to that.

22        The next item is we -- I believe we stipulated now

23    between the conserved parties, at least the insurers and we've

24    talked to Mr. Horkovich about the fact that we want to offer

25    the primary insurance policies of Royal, Maryland Casualty and

1 CNA. I understand, but I don't mean to speak for opposing

2 counsel, I understand that there's not an objection, but there

3 is a problem.

4        Mr. Schiavoni can probably explain it better, but

5 when we talk about the Royal policies they were very old and

6 the coverage period was like 1953 to 1963 and I understand that

7 the policies, in part at least, were lost and there's been a

8 reconstruction and an agreement as to what those policies

9 purport to say. I was not privy to that agreement. I was --

10 didn't -- we didn't negotiate, but perhaps I invite Mr.

11 Schiavoni to explain it better, but we'd like to offer those

12 insurance policies into evidence.

13        THE COURT: So, you're accepting the reconstruction?

14        MR. LEWIS: Yes, Your Honor.

15        THE COURT: All right.

16        MS. DeCRISTOFARO: Your Honor, just -- Mr. Lewis, we

17 haven't heard anything about this yet, so -- on behalf of CNA,

18 so --

19        MR. LEWIS: Oh, I've talked to CNA's counsel.

20        THE COURT: Okay. Mr. Schiavoni?

21        MR. SCHIAVONI: I take what Mr. Lewis' intent is, is

22 that he's offering those policies into evidence on the

23 understanding that they'll only be -- our non-objection to that

24 will be just for this particular proceeding and that the offer

25 is that these are just the most complete pages that the debtor

1 has in its files, and that's the -- and the most complete that

2 other folks have in their files and that they're subject to

3 being supplemented and should disputes arise outside of this

4 case in another case.  Is that acceptable, Mr. Lewis?

5          MR. LEWIS:  Yes, Your Honor.  I've agreed with all of

6 the insurers with an ore on the water on this issue that the --

7 their -- we'll stipulate that they're not to be used for any

8 other case.  They're only to be offered in this case and we

9 will not try to take any advantage of them in any other case

10 that we pay participate in.

11          THE COURT:  Mr. Wisler?

12          MR. WISLER:  Good afternoon, Your Honor.  Jeff Wisler

13 on behalf of Maryland Casualty.  With regard to the Maryland

14 Casualty policies that Mr. Lewis is going to submit, we did

15 agree that we would not object to their admission and, again,

16 as Mr. Lewis stated, that would only be for this confirmation

17 hearing and only for this proceeding.

18          We understand that the Maryland Casualty policies

19 that are being submitted by Mr. Lewis include only those that

20 are on Exhibit 5 to the plan exhibits that have been filed in

21 this case.

22          THE COURT:  Is that correct, Mr. Lewis?

23          MR. LEWIS:  Yes, they're part of Exhibit 5, Your

24 Honor.

25          THE COURT:  All right.

1          MR. LEWIS:  We've got them on disk.  We took it from

2     the data room.  It's our intention because we didn't know about

3     the reconstruction, to tell you the truth, until very recently.

4     It's our intention to put them together in paper form.

5          THE COURT:  I don't need them on paper form.

6          MR. LEWIS:  You don't?  Okay.

7          THE COURT:  No.  What I need in paper form is in your

8     arguments at some point or your proposed findings, when we get

9     there, then you can quote the sections you are referring to.  I

10     don't want thousands of pages of insurance policies that will

11     have no bearing on any issue.

12          MR. LEWIS:  Wonderful, Your Honor.  That saves us

13     some work, too.

14          MR. WISLER:  Your Honor, just to be clear, with --

15     they're not actually -- no policies are attached to Exhibit 5

16     to the plan.

17          THE COURT:  That's the list.

18          MR. WISLER:  The policies are listed.

19          THE COURT:  Yes, sir.  I understand.

20          MR. WISLER:  We're not stipulating to the

21     completeness of whatever Mr. Lewis has, but if he's submitting

22     those policies, we're not objecting.

23          THE COURT:  Okay.  That -- that's fine, but in terms

24     of the submission I'll take them on disk.  But, anyone who

25     wants to make use of them in an argument or examining a

1 witness, show the witness the sections that you need them to

2 refer to or need me to refer to.  Ms. DeCristofaro?

3        MS. DeCRISTOFARO:  Yes, Your Honor.  I just checked

4 with co-counsel.  We haven't had those discussions yet.  The --

5 I would -- in connection with Phase 1, because our policies

6 there are disputes over different endorsements and different

7 versions around, because we're not determining coverage here we

8 stipulated with Mr. Horkovich on behalf of the plan proponents

9 to a curtailed version that we would use for Phase 1.  We were

10 planning to use the same version for Phase 2 as to which we

11 have agreement.  They're not complete.  They're not full, but

12 rather than fight over those kinds of issues we're using that

13 and we probably agree to the same thing.

14        But, the version that just appears on Grace's disk

15 has all kinds of problems on it and we wouldn't agree to that.

16 But, we will follow up on that issue, but I'm certainly not

17 prepared to speak to that at this moment.

18        THE COURT:  Mr. Lewis?  Mr. Lewis, I don't know if

19 you just heard what Ms. DeCristofaro said.  She cannot agree to

20 the use of the version that's on the debtor's disks because of

21 some issues.  So, she has arranged with Mr. Horkovich to have a

22 set -- subset of exhibits of the contents of the exhibits that

23 they do agree to for use in this trial, but not to the full

24 policies because they have disputes as to a variety of issues

25 about those policies.  So, you need to speak with her about the

1  CNA policies --

2              MR. LEWIS:  Okay.

3              THE COURT:  -- and see what you can work out.

4              MR. LEWIS:  I apologize.  I thought Mr. Horkovich had

5  worked that out, but that's my misunderstanding.  I'll

6  certainly speak with her as soon as possible and try to work

7  this out.

8              THE COURT:  All right.

9              MR. LEWIS:  And then I'll have my partner, Mark

10 Kovacich take this up --

11             THE COURT:  -- tomorrow?

12             MR. LEWIS:  -- with the Court in the morning, I

13 guess.

14             THE COURT:  All right.  That's fine.

15             MR. LEWIS:  And that's all I have, Your Honor.

16             THE COURT:  Okay.

17             MR. CARIGNAN:  Your Honor, James Carignan for

18 Longacre.  You may recall this morning I sought to have

19 admitted Exhibit Long 2 which I handed to your clerk dealing

20 with the -- which was the stipulation regarding classification

21 of the Morgan Stanely claims.  We had Mr. Hughes on the stand.

22 He said you might need a -- or you did need a witness to

23 determine the basis of those claims to determine whether that

24 exhibit I wanted admitted was relevant.  What I should have

25 pointed Your Honor's attention to is the first page of the

1  stipulation.  At the time I didn't because like I said we had a

2  witness on the stand which was causing some people some

3  discomfort.

4         But, it's evident from the first page of this

5  stipulation what the basis of these, originally Bank of America

6  then Morgan Stanley claims, is and I think if Your Honor just

7  reads the first four "whereas clauses" of that stipulation

8  you'll be able to make a determination respecting relevancy

9  without a witness testifying as to the nature of those claims.

10         THE COURT:  And what do they say?

11         MR. CARIGNAN:  They say essentially to summarize it

12  that the Morgan Stanley claims are based on the debtor's

13  reimbursement agreements in connection with letters of credit

14  that Bank of America posted, that National Union had drawn on

15  as -- which letters of credit had been posted to secure the

16  reimbursement obligations to National Union which is, of

17  course, the basis of Longacre's claim now.

18         MR. BERNICK:  That -- Your Honor, that proffer --

19         THE COURT:  Yes, Mr. Bernick?

20         MR. BERNICK:  Yes, that proffer does not establish

21  relevance.  The question is, what's the relationship between

22  the situation with Morgan Stanley which was resolved

23  incidentally and the situation as concerns those who -- whose

24  objections have not been resolved and believe that their facts

25  are similar.  In fact, their facts are very, very different.

1          So, the proffer does not establish anything to do

2  with relevance.  It doesn't change any fact, doesn't elucidate

3  any fact concerning the objection that these folks are making.

4  What they're essentially saying is, well, you did it for Morgan

5  Stanley, why don't you do it for us?  That's an established

6  relevance.

7          MR. CARIGNAN:  Mr. Bernick admitted that both claims

8  are based on reimbursement obligations.  They're both based on

9  the same settlements with the same asbestos --

10          MR. BERNICK:  No --

11          MR. CARIGNAN:  -- personal injury claims.

12          MR. BERNICK:  No, they are very different

13  circumstances.  It's not our obligation to establish the

14  relevance of this proffer.  It's theirs.

15          MR. CARIGNAN:  You can tell the relevance from the

16  face of the stipulation, Your Honor.

17          THE COURT:  Well, the face of Longacre 1 or Long 2?

18          MR. CARIGNAN:  Longacre 2, not the certification of

19  counsel, but the stipulation attached as Exhibit 1.

20          THE COURT:  Okay.  Mona, this is Long 1, do you have

21  Long 2?

22          MR. CARIGNAN:  I have another copy, if I can --

23          THE COURT:  All right.  All I have here is Long 1.

24  I'm sorry.

25          MR. BERNICK:  Your Honor, the fact that they're

1  omitting that they need to consider in order to establish

2  whether this is relevant or not, which it's not, is that the

3  circumstances pursuant to which the letter of credit that is

4  the basis for this claim was issued, are entirely different

5  from the circumstances in which the obligation was undertaken

6  by National Union and by Fireman's Fund.

7           MR. CARIGNAN:  And the fact which he's admitting --

8           MR. BERNICK:  Excuse -- excuse me.

9           MR. CARIGNAN:  -- is that indirect asbestos --

10          THE COURT:  Pardon me?  He wasn't finished yet.  Go

11  ahead.

12          MR. BERNICK:  That is the critical fact that is

13  missing.  The facts relating to National Union, as well as

14  Fireman's Fund, indicate that they proceeded to provide -- they

15  agreed to be sureties with respect to a specific claim, a known

16  claim, an asbestos claim and they agreed to stand in the shoes

17  of Grace as the defendant tort-feasor knowing all about those

18  things, and that makes it a very direct Nexus to the underlying

19  claim and makes that situation clearly indirect within the

20  meaning of 524(g).

21          In connection with the letter of credit that

22  underpinned the obligation as to which we resolved with Morgan

23  Stanley that belonged in Class 9 was -- had two parts to it.

24  One, it was clearly preexisting.  It had nothing to -- it was

25  not undertaken.  The letter of credit was not issued in

1  connection with anything to do with asbestos.  It was general

2  and it was simply used by Grace in order to provide the

3  security.  And the second one is at best unclear, but there's

4  no evidence that the letter of credit was issued with any

5  anticipation of its use.

6          So, there you have two obligations that are

7  undertaken that have no direct nexus, indeed no specific nexus

8  at all, to an underlying tort claim and therefore we felt that

9  they probably belonged in Class 9 and we therefore agreed to

10 that treatment.  That's an entirely different set of

11 circumstances and that was what's not considered in the proffer

12 that's made.  I'm sorry.

13         THE COURT:  Frankly, from looking at the four

14 paragraphs, are you talking the stipulation regarding

15 classification of claims, those four paragraphs, the first four

16 "whereas clauses"?

17         MR. CARIGNAN:  Well, yes.  The first five "whereas

18 clauses".

19         THE COURT:  That start --

20         MR. CARIGNAN:  Again the issue is classification,

21 Your Honor.

22         THE COURT:  That is the issue, but because the debtor

23 has agreed to classify a particular claim in that class doesn't

24 make that fact more or less relevant to the classification of

25 any other claim in that class.

But, this one -- there are facts that may come into play that bear on that, but the stipulation itself does not do that. This stipulation only says that Bank of America issued three standby letters of credit that they -- those letters obligated Grace Conn to reimburse the Bank of America and they've stipulated now that this will be an allowed Class 9 claim, in essence.

The fifth paragraph says that pursuant to the terms of the 2005 stipulation the debtors agreed that as a result of the National Union Fire Insurance company, Pittsburgh, PA, having drawn on two of the letters of credit that the Bank of America was entitled to do this Class 9 claim. That does not substantiate that the liability for the letter of credit is an asbestos underlying liability, nor does it substantiate that the National Union claim, whatever it is, belongs in the same class.

It does establish a nexus between the two in that the letter of credit was used to satisfy the National Union claim after National Union drew down on it when debtor -- the debtor didn't pay whatever the obligation was. But, the stipulation itself does not, I think, underlie this specific classification.

Because you need this -- because the argument that you wish to make, I think, is that there is some similarity of claims, I don't think the stipulation substantiates that

1  similarity.  But, I think that the fifth paragraph that shows

2  the relationship between National Union and the Bank of America

3  in that and only in that, the letter was used as a draw down by

4  National Union, that portion may be relevant to what you have

5  to say.  I'm not seeing anything else that really --

6       MR. BERNICK:  We don't have a problem with that --

7       THE COURT:  -- affects the --

8       MR. BERNICK:  We don't have a problem with that, if

9  that's what they want to get in.  It was drawn down for that

10 purpose.  That is not pertinent to the reason why we classified

11 it the way that we did, but we don't have any problem.  It is a

12 stipulated fact.  We don't have any problem with that coming

13 into evidence.

14      THE COURT:  That is, I think, the fact -- a fact at

15 least that you're attempting to rely on, correct?  Because the

16 rest of this document doesn't substantiate anything about

17 National Union's claim.

18      The seventh paragraph goes on to say that if National

19 Union further draws down, then certain consequences will

20 happen, but that really doesn't add anything to what Paragraph

21 5 says for this purpose.

22      MR. CARIGNAN:  Well, that's a portion of what I

23 wanted in, but I also wanted on the record that the Morgan

24 Stanley claims are classified in Class 9.

25      THE COURT:  That's fine.  I don't think there's a

1  dispute about that.

2          MR. BERNICK:  There's no issue about that.

3          THE COURT:  So, yes.  I accept the proposition that

4  right now Morgan Stanley is classified in Class 9 and to the

5  extent that this stipulation, particularly that paragraph has

6  some relevance, I will admit the fact and the stipulation for

7  the Paragraph 5 and if you need it I suppose Paragraph 7 which

8  also refers to National Union although at the time it was a

9  contingent claim.

10          So, all right.  Exhibit Long 2 --

11          MR. BERNICK:  Why doesn't counsel simply mark it up,

12  give it an A number?  We'll look at it and we'll submit it

13  tomorrow morning.

14          THE COURT:  All right.  That's fair.

15          MR. CARIGNAN:  Okay.  Thank you, Your Honor.

16          THE COURT:  All right.  Thank you.

17          MR. BOERGER:  Your Honor, Jeff Boerger for Seaton,

18  OneBeacon, Geico and Republic with a true housekeeping matter.

19  Following up on your instructions yesterday we have a hard copy

20  set of our trial exhibits which I would like to hand up.  Your

21  clerk advised me that you'd like me to do that on the record.

22          THE COURT:  Yes.

23          MR. BOERGER:  And I would like to note for the record

24  that all of these exhibits have been provided to plan

25  proponents.  The binders that I'm about to hand you are

1 substantially similar to what they have, except that we pulled

2 out any exhibits that were not admitted to this point.  So,

3 they only contain exhibits that have been admitted into

4 evidence.

5          THE COURT:  All right.

6          MR. BOERGER:  And in the table of contents we have

7 marked with a checkmark next to the ones that are actually in

8 the binders just for ease of reference.

9          THE COURT:  Okay.  Thank you.

10          MR. BERNICK:  Your Honor, I -- okay.  So, I don't

11 know what the representations, Ms. Baer does.  I just don't

12 have any idea about this, but if we've worked it out, fine.  I

13 don't know what the purpose of the ceremony is now, if we can

14 verify what's going on here we'll probably be able to do it.

15          THE COURT:  The purpose is that I asked that the

16 exhibits be submitted on the record, so I have --

17          MR. BERNICK:  Very well.  That's very well then.

18          THE COURT:  -- a record of the face that the paper

19 exhibits would be here.

20          MR. BERNICK:  I guess we'll take a look at the -- all

21 of these -- these all four?

22          UNIDENTIFIED ATTORNEY:  I didn't hear the

23 representation because three people were talking.

24          THE COURT:  The representation is that the -- you

25 folks would stop talking to each other and pay attention maybe

1  this wouldn't be an issue.  The representation is that this is

2  a paper copy --

3         MR. BERNICK:  I'm trying to find out exactly what the

4  story is, Your Honor, so I can report it accurately to the

5  Court.  I'm sorry.

6         THE COURT:  The representation is that this is a

7  paper copy of the set of trial exhibits that I admitted into

8  evidence, but didn't have a paper copy of for Beacon --

9  OneBeacon and Seaton.  Actually, I don't think it was for Geico

10 and Republic.  I believe it was for Seaton and OneBeacon.

11        MR. BOERGER:  Your Honor, this is pursuant -- there

12 were certain exhibits that were admitted yesterday through

13 testimony --

14        THE COURT:  GR exhibits.

15        MR. BOERGER:  -- and then there were a number of them

16 that Mr. Brown informed you about the stipulation this morning.

17        THE COURT:  Yes.

18        MR. BOERGER:  And he went through the series of

19 exhibits and those did include a handful of Geico and Republic

20 policies --

21        THE COURT:  Okay.  That's fine.

22        MR. BOERGER:  -- that were admitted for limited

23 reasons.

24        THE COURT:  Thank you.  All right.  So, that is the

25 proffer.  These are only a copy of the documents that have

1 already been admitted.  Yes, I will take them.  I don't need to

2 further admit them.  They've already been admitted.  Okay.  Do

3 we -- have we been given a set, Mr. Boerger?

4          MR. BOERGER:  The plan proponents have a set at the

5 moment just to verify that they are --

6          THE COURT:  All right.

7          MR. BERNICK:  Well, if that's what it is, we don't

8 need to verify it.

9          MS. BAER:  Your Honor, that's -- but, I thought it's

10 two things.  He said it's the first seven exhibits you admitted

11 yesterday and then it's the rest of the exhibits that are the

12 exhibits to the stipulation that we agreed to today.

13          MR. BOERGER:  That's correct.

14          MS. BAER:  And if that's what they are, that's fine.

15 I haven't looked at them.  I haven't verified them.

16          THE COURT:  Fine.  Look at them.  I will take them

17 tomorrow.  In the event that there is no issue about them, but

18 let him know tonight, so that he doesn't need to be here

19 tomorrow for this purpose if, in fact, that is -- there is no

20 issue.  All right, Mr. Boerger, I expect I will take them

21 tomorrow as the paper copies.

22          MR. BOERGER:  Thank you, Your Honor.

23          THE COURT:  Good evening.

24          MR. HORKOVICH:  Good evening.  Good evening, Your

25 Honor, Bob Horkovich.  To potentially resolve a dispute

1 tomorrow, something that Mr. Lewis raised.  My understanding is

2 that in Phase 1 CNA offered a certain set of insurance policies

3 to which the plan proponents stipulated.  I understand that

4 same set of exhibits will be offered by CNA tomorrow, a set of

5 CNA insurance policies.  But, CNA will offer a same set -- the

6 same set of exhibits offered in Phase 1 will be offered in

7 Phase 2, and similarly the plan proponents will so stipulate

8 and will not object.  And they're subject to limitations, so

9 it's only to be used for the confirmation in the bankruptcy and

10 so on.  The same set of conditions would apply.

11          MS. DeCRISTOFARO:  We -- Your Honor, we expect that's

12 exactly what will happen.

13          THE COURT:  Okay.  And is this the same set that Mr.

14 Lewis is expecting to use?

15          MR. HORKOVICH:  Yes, that's what Mr. Lewis if

16 referring.  That's -- those are the documents to which Mr.

17 Lewis was referring.

18          THE COURT:  All right.  So, if they're coming in

19 through CNA, then why do I need another set from Libby?

20          MS. DeCRISTOFARO:  Well, Your Honor, what I told Mr.

21 Horkovich is that we were going to go through our exhibits

22 tonight and work it out and see if we can -- the only issue

23 about the proffer by Mr. Lewis was that the version that he had

24 on the disk --

25          THE COURT:  Turn your microphones off, please, folks.

1          MS. DeCRISTOFARO:  That the version he had on the

2  disk wasn't the one that was arrived at, as I explained before,

3  by stipulation and so that we will likely just ask that he rely

4  on that instead of the one that's on the disk that he has.

5          MR. HORKOVICH:  CNA's submission rather than the --

6          COURT CLERK:  Use the microphone.

7          MR. LEWIS:  Your Honor, that's perfectly

8  satisfactory.  That's what I was attempting to accomplish

9  anyway.  We just want to be sure that they're going to be

10  offered and I do't know, based on that, whether they're, in

11  fact, going to be offered in the form they were used in Phase

12  1.  Are they going to be offered, I guess, is the question?

13          MS. DeCRISTOFARO:  Yes, we expect that they will be.

14  I just -- as I told Mr. Horkovich we're going through tonight

15  to make sure that -- which of our exhibits we're offering, and

16  I expect that we will be doing that.

17          MR. LEWIS:  I guess that means we still can't get

18  resolution until tomorrow and --

19          THE COURT:  That's --

20          MR. LEWIS:  -- that's fine, Your Honor.

21          THE COURT:  All right.

22          MR. WISLER:  Your Honor, Jeff Wisler, on behalf of of

23  Maryland Casualty and Zurich.  First on behalf of Maryland

24  Casualty, in lieu of live testimony we have agreed with the

25  plan proponents to submit a declaration as MCC Exhibit 3,

1   Maryland Casualty Exhibit 3, and attached to that declaration

2   are Maryland Casualty Exhibits 1 and 2.  They are the two

3   settlement agreements between W.R. Grace and Maryland Casualty.

4   And I don't believe there are any objections and I would like

5   to hand up a copy to Your Honor and admit Maryland Casualty 1,

6   2 and 3 into evidence.

7             THE COURT:  All right.  Is there any objection?

8             UNIDENTIFIED ATTORNEY:  No, Your Honor.

9             THE COURT:  All right.  They're admitted.  Thank you.

10            MR. WISLER:  As to Zurich, Your Honor, in lieu of

11  testimony we have a declaration from Michael Beresh (phonetic).

12  We've labeled that exhibit, Zurich Exhibit 17A.  Attached to

13  Exhibit 17A is Zurich Exhibit 17 which is an asbestos claim

14  settlement agreement between W.R. Grace and Zurich.  The plan

15  proponents have agreed to allow us to submit this as our

16  evidence so I'd like to admit -- hand to Your Honor and admit

17  into evidence Zurich Exhibits 17 and 17A.

18            THE COURT:  Any objection?

19            UNIDENTIFIED ATTORNEY:  No, Your Honor.

20            THE COURT:  Thank you.  All right, 17 and 17A --

21  Zurich 17 and 17A are admitted.

22            MR. WISLER:  Thank you, Your Honor.  That's all I

23  have.

24            THE COURT:  Okay.  Thank you.  Mr. Schiavoni.

25            MR. SCHIAVONI:  Your Honor, Hank Schiavoni for

1 Arrowwood.  Along the same exact lines I have two declarations.

2 The -- we offered during the hearing on the Arrowwood

3 settlement, we offered testimony from three witnesses.  We made

4 a proffer at that hearing if you recall.  We put in a full

5 declaration from myself.  That's in the record already.  There

6 were no objections then.

7          Subsequently, I'm going to re-offer my own

8 declaration and I'm offering also the declaration of the

9 second witness that we offered at that prior hearing, Carl

10 Pernicone (phonetic), and we've shown this to the plan

11 proponents and to Libby.  I don't believe there's any

12 objection.  I was actually looking forward to testifying, but

13 no takers.  But, I'm prepared to answer questions in the

14 hallway.  We have a third witness --

15          THE COURT:  Take them to the bar, at least, Mr.

16 Schiavoni.

17          MR. SCHIAVONI:  Someone else has to buy drinks if I'm

18 going to let them question me.  I've got a third witness, a Mr.

19 Hooper, that Dan Cohen -- we have a declaration for.  He's

20 raised some questions about that we're going to address -- try

21 to address this evening and he asked to be here when we present

22 that, so we'll wait until tomorrow to do that.

23          THE COURT:  All right.

24          MR. SCHIAVONI:  Otherwise, I'm going to hand these

25 up.  We've marked them as A-34, that's my declaration, and

1 A-57 as Mr. Pernicone's declaration.

2          THE COURT:  A -- I'm sorry, 54?

3          MR. SCHIAVONI:  A-34 is mine --

4          THE COURT:  Oh, 34.

5          MR. SCHIAVONI:  -- and A-57 is Mr. Pernicone's.

6          THE COURT:  Any objection?  All right.  A-34 and A-57

7 are admitted.

8          MR. SCHIAVONI:  Thank you, Your Honor.

9          THE COURT:  Mr. Plevin, just give me a minute.  I've

10 got too many exhibits.  I can't type with all these exhibits

11 here, so I need to move some and I'll be with you in one second

12 please.

13          MR. PLEVIN:  No problem, Your Honor.

14                    (Pause)

15          THE COURT:  Okay, Mr. Plevin.  Thank you.

16          MR. PLEVIN:  Your Honor, you heard earlier today that

17 we had a stipulation on a lot of exhibits.  What I'd like to do

18 is, I've got two notebooks and one loose exhibit and just very

19 briefly tell you what they are.  We have a stipulation that has

20 been filed.  I think I mentioned this morning the docket number

21 is 23-195 and that is a stipulation of facts that not only

22 attaches documents, but also represents the agreement of

23 Fireman's Fund and the plan proponents on certain facts that

24 are not tied to documents.

25          Part of the stipulation attaches documents and those

1 are -- those have exhibit stickers, and so they are -- we've

2 labeled them FFICSC for Fireman's Fund Insurance Company Surety

3 Claim.  And the exhibit numbers attached to the stipulation are

4 1 through 6, 8, and 9A through 9-O.

5                THE COURT:  Wait.  I'm sorry, 1 through 6, 8 and 9 --

6                MR. PLEVIN:  -- A through 9-O.

7                THE COURT:  All right.

8                MR. PLEVIN:  And I would -- I believe 2 and 3 may

9 already have been admitted today.  Those are the bond and the

10 indemnity agreement.

11               THE COURT:  Yes, they were in.

12               MR. PLEVIN:  So, I would offer these exhibits into

13 evidence.  I also have --

14               THE COURT:  Wait.  Is there any objection to

15 Fireman's Fund 1 through 6, 8 and 9A through 9-O?

16               UNIDENTIFIED ATTORNEY:  No, Your Honor.

17               THE COURT:  All right.  They're admitted.

18               MR. PLEVIN:  Your Honor, I also have documents that

19 we agreed would be admitted in lieu of my client's live

20 testimony.  Those are the same prefix, FFICSC-10, 14 through 22

21 and then the loose exhibit is 23.

22               THE COURT:  Can I put it in the binder?

23               MR. PLEVIN:  You can if you have a hole punch.

24               THE COURT:  Okay.  Is there any objection to

25 Fireman's Fund 10, 14 through 23?

1          UNIDENTIFIED ATTORNEY:  No, Your Honor.

2          THE COURT:  Thank you.

3          MR. PLEVIN:  Thank you, Your Honor.

4          THE COURT:  All right.  One second.  Mr. Shiner?

5          MR. SHINER:  Good afternoon, Your Honor, Michael

6   Shiner for AXA Belgium, the successor to Royal Belge.  Back in

7   Phase 1 we had offered three exhibits along with the

8   declaration of Ms. McCabe.  We have the exhibits again.

9   They're the exact same exhibits.  I understand there's no

10  objection to their admission and what we -- would it be easier

11  to simply move in the existing declaration from Phase 1?

12         THE COURT:  If you can give me the exhibit number,

13  maybe.  I'm not sure.  Frankly, I haven't figured out how I'm

14  going to take track of all of this yet, Mr. Shiner.  So, maybe

15  it would be better to get a second copy so I have a binder

16  that's related to Phase 2.

17         MR. SHINER:  I'll bring you a brand new copy with a

18  binder -- in a binder tomorrow --

19         THE COURT:  All right.

20         MR. SHINER:  -- related to Phase 2.

21         THE COURT:  And what are the exhibit numbers?

22         MR. SHINER:  AXA-1, AXA-2 and AXA-3.  And, Your

23  Honor, we had also joined in certain exhibits that were offered

24  by other insurers.  Instead of coming up every time that

25  happens we simply -- to the extent they're moved in, we join in

1  their moving the exhibits.

2      THE COURT:  Well, once evidence is in, unless it's

3  for a limited purpose, it's in for everybody, so you don't need

4  to join in the submission of exhibits and you can use them in

5  the closing argument or the briefs, whatever you need.

6      MR. SHINER:  Thank you, Your Honor.

7      THE COURT:  All right.  Is there any objection to AXA

8  Belgium 1, 2 and 3 being admitted in Phase 2?

9      UNIDENTIFIED ATTORNEY:  No, Your Honor.

10      THE COURT:  All right.  They're admitted and I'll get

11  copies tomorrow.  Good evening.

12      MR. WORF:  Good evening, Your Honor, Richard Worf for

13  Garlock Sealing Technologies.

14      THE COURT:  Yes, sir.

15      MR. WORF:  We have entered into a stipulation in lieu

16  of live testimony with the plan proponents.  It's at Docket

17  Number 23219.  Attached to the stipulation is a list of certain

18  exhibits -- Garlock's exhibit list that Garlock is offering.

19  For the purposes that Garlock is offering them for, I believe

20  the only objections remaining are relevance objections which

21  we're not going to argue at this time I understand.  So, with

22  that I believe we will just move those into evidence subject to

23  the relevance objections that are going to argued at a later

24  time.

25      THE COURT:  All right.  Is that acceptable that I

1  will take them, but subject to a relevance ruling?

2          MR. GUY:  Yes, Your Honor.  It's set forth an

3  exquisite and sometimes excruciating detail in the stipulation.

4  I don't believe these are offered for the use in any live

5  testimony, so they will not be offering copies at this time,

6  but --

7          MR. WORF:  Your Honor, attached to the stipulation

8  there's also a declaration that the proponents have agreed to

9  let Garlock offer in lieu of having a live witness and they've

10  agreed not to object on hearsay grounds and to waive all

11  objections except relevance.  It's also attached to the

12  stipulation and Garlock moves that into evidence, as well.

13          THE COURT:  All right.  Are you giving me a binder

14  with respect to these?

15          MR. WORF:  Yes, I have the stipulation here and I

16  also have --

17          THE COURT:  All right.

18          MR. WORF:  -- a disk with everything that Garlock is

19  going to offer on it.

20          THE COURT:  All right.  And do you have an exhibit

21  number on these?

22          MR. WORF:  The numbers are attached to the

23  stipulation and we can mark the stipulation as Garlock Exhibit

24  104.

25          THE COURT:  All right.

1          MR. WORF:  We're also going to have a limited number

2  of other exhibits that are not coming in through live testimony

3  and that are not referenced in the stipulation.  We're going to

4  attempt to authenticate those by declaration and we're going to

5  discuss that with the plan proponents and offer those at a

6  later time.

7          THE COURT:  Okay.  Garlock Exhibit 104, it is offered

8  and admitted, but subject to a relevance ruling after

9  appropriate argument.

10          MR. WORF:  Thank you, Your Honor.  Mr. Cohn?

11          MR. COHN:  Yes, Jacob Cohn for Federal Insurance

12  Company.  I just wanted to say that in reliance upon the

13  anticipated finalization of the neutrality stipulation, Federal

14  which only has an interest here now as a non-settled high level

15  carrier has avoided litigating anything here and we don't

16  intend to offer any additional exhibits.  Frankly, I think the

17  only issue that's going to be ours is the one that we're denied

18  the neutrality on which is the assignment issue which I don't

19  think is going to require any evidentiary submission.

20          But, we had a few things like our policies and some

21  discovery that was admitted in Phase 1, am I to understand that

22  to the extent it becomes necessary you want extra copies of

23  those in a binder for Phase 2?

24          THE COURT:  Either that or I need a designation

25  somewhere as to where they are in Phase 1.

1          MR. COHN:  That's fair enough.  Thank you, Your
2 Honor.
3          THE COURT:  So, you're going to give me that
4 tomorrow, Mr. Cohn?
5          MR. COHN:  Sure.
6          THE COURT:  All right.  One second.  Mr. Demmy?
7          MR. DEMMY:  Yes, Your Honor, John Demmy for Fireman's
8 Fund and all the FD Allianz insurers.  We had provided exhibits
9 -- the same set of exhibits actually that we provided in Phase
10 1 and largely I think 32 out of the 35 of them drew no
11 objection whatsoever.  I'm bringing out a couple of
12 housekeeping issues and trying to answer a question for Mr.
13 Horkovich.  I just wanted to note that we'll be offering those
14 exhibits tomorrow before this part of the Phase 2 proceeding
15 ends.  I just didn't want to let that go unmentioned, rather,
16 before the phase ended.
17          THE COURT:  Okay.
18          MR. DEMMY:  So, I'll do that tomorrow.
19          THE COURT:  All right.  That's fine and I -- if they
20 were really voluminous, as long as you can tell me where they
21 are in Phase 1 -- this is true for your client, too, Mr. Shiner
22 -- I'm happy to have the exhibits back in Phase 1.  I thought
23 it was just going to be Mr. Shiner's, but if it's all the
24 insurers doing the same thing, I don't need duplicate sets of
25 voluminous records.

1          MR. DEMMY:  That's the question that Mr. Horkovich

2    asked that we're finding out and we'll provide to the Court and

3    to the parties.

4          THE COURT:  All right.

5          MS. BAER:  Your Honor, I hate to walk up here with a

6    large binder, but I'll replace it with something else.  Your

7    Honor, the eagle eyes of Alan Rich last night discovered for us

8    that the Plan documents that were admitted as exhibits and put

9    on your CD were actually the wrong versions.  They were the

10   ones filed on February 27th and as you may recall at the March

11   9th hearing when you approved them there were some minor

12   adjustments made before publication went out.

13         We, Your Honor, last night when we made the discovery

14   took the CD that went out to everybody for publication, printed

15   the plan documents again in hard copy so we know that they're

16   the right versions.  We then put those plan documents on a new

17   CD, Your Honor, so you'd have them on CD as well as hard copy,

18   and we also added on the September 4th, 2009 modifications to

19   the plan that were filed on September 4th, 2009.

20         So, Your Honor, I'd like to give you this binder and

21   the replacement CD.  I have a number of replacement CDs if

22   other parties want them, but we've already put them onto our

23   FTP website and they can get them that way.  And, again, if

24   they want hard copy CDs, we can provide those, too.  And, Your

25   Honor, if you'd like, I can tell you where in your agenda

1  binders are the ones that were given to you that are incorrect

2  and we can grab those.

3          THE COURT:  I think you can just do it.  It will make

4  it easier --

5          MS. BAER:  Well --

6          THE COURT:  -- rather then, yes, straighten them out

7  in the agenda binders yourself, so that I have the correct set.

8  I definitely want the correct set.  I take it nobody has an

9  objection to my having the correct plan.

10          MS. BAER:  And I will hand that to Your Honor.

11          THE COURT:  All right.  All right.  So, Ms. Baer,

12  you'll just have somebody go through.

13          MS. BAER:  Right.

14          THE COURT:  It will be in this front row set.

15          MS. BAER:  Yes.  Well, I'll stand and work with that

16  right away.  And then, Your Honor, one final matter is, we're

17  trying to, you know, limit the number of additional bodies we

18  need to bring in and we had designated a Canadian lawyer to

19  come in to essentially put into the record two vital pieces of

20  information that are confirmation requirements.

21          One is that we have the Canadian ZAI settlement

22  approving Canada.  And you, in fact, have a copy of that order

23  in some other pleading, but we have a certified verified copy

24  from Canada.  And number two that Canadian rep counsel was

25  appointed in Canada to represent all of the Canadian ZAI

1 claimants and to vote the plan.

2         We have an affidavit from him that I will circulate

3 by e-mail tonight.  I have a hard cop here, but it's the copy.

4 I don't have the fancy one certified.  It will be here tomorrow

5 by Federal Express.  The question is whether or not we need to

6 bring him live to put these documents into evidence, or if the

7 parties will accept his affidavit.  Nobody objected with

8 respect to anything Canadian.  There were no objection from any

9 party related to any of the Canadian provisions of the plan and

10 the like.

11         So, Your Honor, again, I'll circulate it hard copy to

12 everybody.  We'd appreciate knowing as soon as possible whether

13 we need to fly somebody in from Toronto to testify.

14         THE COURT:  Is any -- well, they haven't seen the

15 stipulation.  Does anybody see a need at this point for a

16 witness to testify as to those facts?

17                 (No audible response)

18         THE COURT:  I don't think you're going to need a

19 witness for that purpose, but circulate the affidavit tonight

20 and we'll see what the parties say in the morning.

21         MS. BAER:  Thank you, Your Honor.

22         THE COURT:  So, you'll produce those exhibits

23 tomorrow, correct, to the Court?

24         MS. BAER:  Yes, Your Honor.  I have copies now, but

25 I'll bring the original certified copies in.

1              THE COURT:  All right.

2              MR. BERNICK:  Can we inquire as to whether there are

3    any intended live witnesses and I know that, again, BNSF wants

4    the evening to think that over, but is there anybody else that

5    want -- that believes they want to call a live witness, and

6    that's -- the gentleman, Mr. Pratt, anybody else?

7              THE COURT:  I don't think Mr. Pratt wants to.  I

8    think the issue is whether Mr. Pratt has to, but okay.

9                        (Laughter)

10             MR. BERNICK:  Okay.  Well, yes.  So, in that event it

11   sounds like we're probably going to get to the lender's case

12   tomorrow and our expected order of proof would be Mr. Tarola.

13   Mr. Tarola has a very tight schedule tomorrow, so it would

14   actually -- well, I guess we'll go with the proper order and

15   simply take the testimony from BNSF and from whomever, if

16   that's going to be offered.  Then we'll call Mr. Tarola.  Then

17   we'll call Mr. Shelnitz to talk about the lender situation.

18   Then we'll call Ms. Zilly to testify as an expert, and at that

19   point our case with respect to the lenders will close.

20             We then expect that it will -- then there -- I think

21   there some --

22             THE COURT:  Let me remind everyone, tomorrow is the

23   day that this case stops at noon.

24             MR. LOCKWOOD:  I thought that was Thursday.

25             THE COURT:  The 17th, yes.

1          MR. LOCKWOOD:  Tomorrow's the 16th, Your Honor.

2          THE COURT:  Oh, okay.  It's been so much fun, I'm

3   sorry.

4                         (Laughter)

5          THE COURT:  I apologize.  I lost a day.

6          MR. BERNICK:  So, at that point --

7          MR. LOCKWOOD:  I think we've lost two weeks, but

8   that's different.

9          MR. BERNICK:  We may call Denise Martin, as well, as

10  part of our case, but then it will be up to the lenders to call

11  their witnesses and I think that there might be a short

12  rebuttal by Ms. Zilly, depending upon that case.  But, then

13  that is our expected order of witnesses for tomorrow.

14         I don't expect that that's actually going to take all

15  day.  And beyond that I'm not sure to what extent we will--

16  well, we'll then go into the next phase of the case.  I know

17  that we're going to be calling Mr. Ostern and Judge Sanders as

18  part of that case.  I don't -- we may get to them tomorrow.  I

19  just don't know.

20         MR SCHIAVONI:  Your Honor, I came here largely for

21  the BNSF witnesses and I would just ask that tomorrow's the one

22  and only day because of a very unique situation, I can't be

23  here until ten o'clock.  I asked Mr. Bernick as almost a

24  personal favor if BNSF calls a witness if he'd allow them to

25  call it after ten o'clock and he'd have somebody in the slot

1  before them.

2         MR. BERNICK:  That's not -- that's fine.  Mr. Tarola

3  will be grateful for being able to get out all the earlier.

4         THE COURT:  All right.  Is there anyone who has an

5  objection to starting with Mr. Tarola and deferring the rest of

6  the insurer's cases until after Mr. Tarola's testimony?

7         No one's objecting.  We'll start with him tomorrow,

8  so that his schedule can be accommodated and then we'll finish

9  with the insurer/other cases.

10         The lenders, Mr. Pasquale, I don't know whether you

11  know are the lenders going to put on any witnesses?

12         MR. PASQUALE:  Yes, Your Honor.  We will have two

13  witnesses, Mr. Kruger and an expert witness, Mr. Frezza.  And

14  that's for the committee and the lenders.

15         THE COURT:  And how long do you expect they're going

16  to take?  I'm just trying to see whether we're going to get to

17  Mr. Ostern and Mr. Sanders on Friday or whether, in fact, we're

18  going to be taking up Thursday and Friday with the remainder of

19  the debtor's case and the lender's case.

20         MR. PASQUALE:  The Court had Friday, but that's fine.

21  No, Mr. Kruger will be --

22         THE COURT:  Oh, I don't have Friday.  Oh, Thursday.

23  I'm sorry.

24         MR. PASQUALE:  I didn't think so.

25         THE COURT:  I keep thinking today's Wednesday.  I

1 apologize.  I meant Thursday morning.

2        MR. PASQUALE:  I think Mr. Kruger will be very short.

3 Mr. Frezza a little bit longer, maybe an hour and a half all

4 and including cross on --

5        THE COURT:  All right.  So, it's possible Thursday we

6 may actually start another phase of the case.

7        MR. BERNICK:  Yes, I -- I'm not -- that's tomorrow,

8 Wednesday, I think it's possible that we will be starting

9 another phase.  That's to say Mr. Shelnitz on direct

10 examination will be about a half hour.  Mr. Tarola shorter.

11 Ms. Zilly probably 45 minutes, and Ms. Martin probably about a

12 half an hour.

13        THE COURT:  Oh, all right.

14        MR. BERNICK:  So, I think that there's some chance,

15 but we'll definitely start the next phase of the case on

16 Thursday.  I mean, I think we may start it tomorrow and we'll

17 clearly be in it on Thursday.

18        THE COURT:  Okay.  And then when is the next time

19 that this case is reserved for trial?

20        MR. LOCKWOOD:  October 13 and 14, Your Honor.

21        THE COURT:  Okay.  Is it going to finish then?

22        MR. BERNICK:  I think it may finish -- it may finish

23 -- it may finish this week.  I don't know.  It depends on how

24 many witnesses the other folks are going to call, but we don't

25 have that many witnesses for the last phase.  We have Mr.

1 Ostern and Judge Sanders and we have Ms. Zilly to talk about

2 best interests.

3　　　　　THE COURT:  Okay.  My own housekeeping matter then.

4 I know that the -- some of the parties apparently were trying

5 to work out some order that would govern the post-confirmation

6 trial process.  Has that been finalized?

7　　　　　MR. BERNICK:  I think we've submitted that as a

8 proposed order, have we not?  We've submitted it.  It's not

9 agreed to.

10　　　　　THE COURT:  Okay.  Then some time, either Friday if

11 we get to it or if not then in October, I suppose -- I'm sorry.

12　　　　　UNIDENTIFIED ATTORNEY:  Thursday.

13　　　　　THE COURT:  Oh.  I'm sorry.  Thursday we will attempt

14 to address that issue and if we don't get to it then I don't

15 know if it's something that we can put onto the omnibus

16 hearing, so that perhaps we can get that issue looked at before

17 the trial phase is over, if witnesses have to continue in

18 October.

19　　　　　MR. BERNICK:  Well, the -- I'm sorry.  The -- our

20 proposal under the -- on what we've submitted is that we would

21 have the first briefs actually due on the 25th which is before

22 the next omnibus because we would like very much to continue

23 towards the process of getting the plan confirmed.  So, if we

24 can't take it up -- although I don't know why we couldn't be

25 able to take it up at some point before Thursday midday.  I

1 think it's not that difficult to resolve.

2        The real issue is the order of briefing and the

3 timing for briefing.  That may take a little time, but I don't

4 think it's outside the realm of possibility to complete that.

5 That would enable us to at least be working on a schedule to

6 complete the post trial briefing.

7        THE COURT:  Okay.  Well, I suppose it may depend on

8 whether you're finished.  You're talking about submitting the

9 initial briefs a week after the trial starts, essentially?

10        MR. BERNICK:  This -- the original proposal that we

11 made, and it remains our proposal, is that we have a series of

12 briefs that follow the sequencing of the trial.  So, the first

13 brief that would be due on September 25 is obviously not a

14 brief that relates to the matters that we're still litigating.

15 It relates to Libby and the discrimination issue which was the

16 substance of what was presented last week.

17        THE COURT:  Okay.  Am I going to be able to address

18 those issues until we have the arguments on the exhibits that

19 Libby wants to admit that I have to determine relevance and the

20 other things on?

21        MR. BERNICK:  Well, I think that that all deals with

22 the -- our proposal, I think, is going to be that -- the hour

23 is very, very late, Your Honor.  If you want to -- this is a

24 whole new area.  If the proposal that we were going to make is

25 that insofar as Your Honor has reserved on exhibits for

1  relevance and reserved on designations for relevance, there's
2  no way it's going to be humanly possible to actually have
3  arguments, document-by-document, designation-by-designation.
4  We just don't think that's feasible and we don't think it's
5  necessary.

6       So, what our proposal would be is that people submit
7  their post trial briefs and in those post trial briefs make
8  reference to whatever documents they have tendered, but as to
9  which relevance has been reserved.  And the same thing with
10 respect to the designations.  And in the course of the post
11 trial briefs if people want to raise issues regarding the --
12 want to actually address admissibility issues, Your Honor then
13 can see those issues framed in the context of a brief that
14 explains the relevance of the material.  I think it's much,
15 much more efficient than having document-by-document argument
16 where frankly Your Honor is still not going to be completely
17 advanced in terms of knowing what the parties' contentions are
18 regarding relevance.

19      So, if we work the admissibility issues, particularly
20 relevance, into the post trial briefing then at that point when
21 we have argument after the post trial briefs are in and Your
22 Honor wants to entertain argument regarding admissibility, we
23 can do that.  Otherwise, I think we're going to have a very,
24 very long proceeding, which currently is not even scheduled, to
25 deal with deposition designations and with documents.

1            THE COURT:  Okay.

2            MR. BERNICK:  So, our proposal basically works along

3   those lines.

4            THE COURT:  All right.  Well, I don't want to get

5   into this issue tonight because it is pretty late and I've set

6   you about some other tasks that I think you need time to work

7   on tonight.  But, I think that to a certain extent that at

8   least has some facial appeal because to the extent that I can

9   understand your arguments in the context of all of the evidence

10  that you point out to me, that would be helpful.

11           But, I am not going to be accepting briefs and post

12  trial designations that do not refer specifically to the

13  exhibits in the testimony.  I'm not going to do that.  I want

14  the references to the exhibits in the testimony.  If it's been

15  -- if I've reserved, you can tell me that in the post trial

16  submissions and I'll reserve and make a ruling as it's

17  necessary, but this is too much material to try to put together

18  without the references to the specific exhibits.  So, if

19  somebody's going to cite an exhibit, I want it cited.

20           MR. BERNICK:  Well, that was the rule that Your Honor

21  laid out before --

22           THE COURT:  Yes.

23           MR. BERNICK:  -- and I believe that we have

24  incorporated -- or at least I hope we've incorporated it into

25  our proposal.  And we further undertook to the extent possible

1  to provide the linkage so that you can actually click on the

2  images.

3          THE COURT:  Yes, that's great.

4          MR. BERNICK:  Yes, I --

5          THE COURT:  It worked fine even thought it's

6  apparently not the right plan, but it worked fine.

7          MR. BERNICK:  The --

8          MS. DeCRISTOFARO:  Your Honor?

9          MR. BERNICK:  The exhibits -- it would be -- it have

10 to be a matter of record, so the exhibit would have to have

11 been proffered as to the deposition designations because you

12 don't proffer deposition designations, you make the

13 designations, the designation process is the proffer.  The

14 deposition designations would also be fair game in the trial

15 briefs and -- but that is a discrete set of material that I

16 believe already has been furnished to the Court in the fashion

17 that we indicated which is transcripts that have been marked up

18 with the designations and the objections.

19         So, it would be just the record comprised of what's

20 happened here, live and through exhibits and then the

21 designations.

22         THE COURT:  Okay.

23         MS. DeCRISTOFARO:  Your Honor, I was just going to

24 say I'm sure you don't want to hear the merits, but that order

25 was submitted with a statement that every objector has felt

1  that there's inadequate time allowed for the post trial

2  briefing and I just want you to be aware that everyone agreed

3  -- everyone disputed the proposed order, and I just want you to

4  know that.

5          THE COURT:  Okay.  I haven't looked at it.  I know

6  that it's been submitted.  I have not seen it.  I think that in

7  concept the proposal of addressing exhibits and testimony in

8  the context of the briefs makes sense.  The timing, you know,

9  that's a whole different issue.  You're going to get adequate

10 time to do what you need to do, but it's not going to be months

11 and months.

12         You've already submitted pretrial briefs that cover

13 most of what you're going to tell me post trial, so I don't

14 need to have reargued what you've reargued.  What I need is for

15 you to true up the evidence to the contentions that you've

16 made.  That's what I need.

17         MS. DeCRISTOFARO:  Your Honor, September 25th is

18 around the corner to start this.

19         THE COURT:  Well, I understand that.  Okay.  Ms.

20 Kovacich?

21         MR. KOVACICH:  Your Honor, I was going to make a

22 similar point, just that we don't agree with the idea that the

23 briefing for each of the phases which were designated by the

24 plan proponents start at the conclusion of those phases.  For

25 the record, I want that to be clear.  We -- everybody

1 representing Libby in this case has been here throughout the

2 whole trial.  Mr. Lewis is leaving in the morning.  The time

3 for briefing would have started last Friday on their proposal

4 and we obviously haven't been working on that.

5         THE COURT:  That's fine.  This is going to be a

6 monumental task for my staff.  I am losing an experienced clerk

7 and getting an inexperienced clerk.  So, I can tell you that it

8 is going to take awhile to get somebody through all of this

9 evidence and it's not going to be something that's done in a

10 rush.

11         So, I will do my best to get somebody to go through

12 it, but that's what's happening and it's going to be awhile.

13 And it's the nature of the beast as you all know if you've

14 worked with young associates and clerks before.  So, it will

15 take some time to get through this.  I'm not going to, you

16 know, have a rush to judgment over the issues.  I've never had

17 a case at plan confirmation that has so many unresolved issues,

18 so it's going to take me awhile to get through them.

19         Hopefully, while I've ordered you folks to go out and

20 talk, you're also trying to resolve some of these plan issues

21 because as I've heard the evidence coming in, some of these

22 things are not rocket science and they could be resolved

23 without changing the essential provisions of this plan and

24 trust structure.  They could be.  I think you should talk.

25         Anything else before tomorrow morning?  We're

1 adjourned until nine o'clock.

2          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

3                    * * * * *

# **C E R T I F I C A T I O N**

We, KELLI PHILBURN, PAT REPKO, KATHLEEN BETZ, ELAINE HOWELL, LORI AULETTA, CEIL ASHBOCK and AMY L. RENTNER, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our  abilities.

/s/ Kelli Philburn

KELLI PHILBURN


/s/ Pat Repko

PAT REPKO


/s/ Kathleen Betz

KATHLEEN BETZ


/s/ Elaine Howell

ELAINE HOWELL


/s/ Ceil Ashbock

CEIL ASHBOCK


/s/ Amy L. Rentner

AMY L. RENTNER

J&J COURT TRANSCRIBERS, INC.      DATE:  September 23, 2009