# EXHIBIT A

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
--------------------------------------------
CHAPTER 11
IN RE:
W.R. GRACE & CO., ET AL,.

        DEBTORS.

CASE NO. 01-1139 (JFK)
JOINTLY ADMINISTERED
--------------------------------------------

DEPOSITION
Gibson Solomons, Esquire
September 16, 2009
Pittsburgh, Pennsylvania
Lead: Lisa Esayian, Esquire
Firm: Kirkland & Ellis

FINAL COPY
JANE ROSE REPORTING  1-800-825-3341

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - September 16, 2009
Gibson Solomons, Esquire

---

Page 2

DEPOSITION OF GIBSON SOLOMONS, TAKEN AT THE REED
SMITH LAW FIRM, 225 FIFTH AVENUE, SUITE 1200,
PITTSBURGH, PENNSYLVANIA, AT 6:00 P.M.,
WEDNESDAY, SEPTEMBER 16, 2009, BEFORE DANIELLE
OHM

APPEARANCES OF COUNSEL:

FOR THE DEBTORS:
    KIRKLAND & ELLIS, LLP
    BY:  LISA ESAYIAN, ESQUIRE
    300 NORTH LASALLE
    CHICAGO, ILLINOIS  60654
    (312)862-2000

FOR THE DEPONENT:
    SPEIGHTS & RUNYAN
    BY:  ALAN RUNYAN, ESQUIRE
    P.O. BOX 685
    HAMPTON, SOUTH CAROLINA  29924
    1-800-348-3805

---

Page 4

I N D E X

WITNESS     EXAMINATION     PAGE
GIBSON SOLOMONS   BY MS. ESAYIAN     5

E X H I B I T S
NO.        DESCRIPTION        PAGE
EX 1     AFFIDAVIT          9

---

Page 3

APPEARANCES OF COUNSEL (CONTINUED):

FOR THE PROPERTY DAMAGE COMMITTEE:
    BILZIN SUMBERG BAENA PRICE & AXELROD
    LLP
    BY:  MATTHEW KRAMER, ESQUIRE
    200 SOUTH BISCAYNE BOULEVARD
    SUITE 2500
    MIAMI, FLORIDA  33131-5340
    (305)374-7580

ALSO PRESENT:  ALAN RICH

---

Page 5

1                 P R O C E E D I N G S
2     -----------------------------------------------
3     GIBSON SOLOMONS, HAVING FIRST BEEN DULY SWORN,
4     TESTIFIED AS FOLLOWS:
5     -----------------------------------------------
6     EXAMINATION
7     BY ATTORNEY ESAYIAN:
8     Q. Good evening.
9     A. Good evening.
10    Q. Would you state your full name for the
11    record, please?
12    A. Algernon Gibson Solomons, III.
13    Q. Mr. Solomons, by whom are you employed?
14    A. Speights & Runyan law firm.
15    Q. What is your business address?
16    A. 200 Jackson Avenue, Hampton, South Carolina
17    29924.  We also have an office in Buford, but
18    I'm not sure of the street address there.
19    Q. Do you have a particular title with the
20    Speights & Runyan Firm?
21    A. Attorney.
22    Q. I want to thank you for appearing here this
23    evening, particularly on short notice here in
24    Pittsburgh.  I appreciate you taking the time to
25    come over.  As I've indicated, I don't think

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - September 16, 2009
Gibson Solomons, Esquire

Page 6

1    we'll take too long this evening. Are you
2    represented by Counsel here today?
3    A. Mr. Alan Runyan is here with me today.
4    Q. Mr. Solomons, have you ever been deposed
5    before?
6    A. I never have.
7    Q. Have you taken depositions?
8    A. I have taken so many I can't recall the
9    number, but I've never been on this side of it.
10   Q. Well, then I know perfectly well that you
11   know the drill, but I'm just going to run
12   through some background instructions and make
13   sure we're on the same page.
14   As you know I'm going to ask you questions
15   today. You need to give verbal answers so the
16   reporter can take down your answers. If I ask
17   you a question that you don't understand, please
18   let me know and I'll do my best to rephrase. If
19   you answer my question, I'll assume that you
20   heard it and understood it. Is that fair?
21   A. All of those are fair.
22   Q. If you need a break, let us know, although I
23   hope we will be short enough that you don't need
24   a break.
25   A. Okay.

Page 7

1    Q. Do you understand that your testimony is
2    under oath?
3    A. I do.
4    Q. Are you on any medication that might impact
5    your ability to give accurate testimony today?
6    A. I am not.
7    Q. Any other reason you cannot give fair,
8    accurate and truthful testimony today?
9    A. No.
10   Q. Mr. Solomons, can you briefly tell us your
11   education?
12   A. Sure. I went to high school in Hampton
13   County at Patrick Henry Academy. I went to
14   college, obtained a Bachelor's Degree at Clemson
15   University. I obtained a Master's Degree which
16   was jointly issued by Clemson University and the
17   University of South Carolina. That Master's was
18   in public administration. And then I got my JD
19   from the University of South Carolina,
20   graduating there in 2000.
21   Q. What was the subject of your undergraduate
22   degree?
23   A. My major was history.
24   Q. And your Master's in public affairs, any
25   particular concentration?

Page 8

1    A. It was public administration. It primarily
2    --- the program was supposed to prepare you to
3    be a city administrator or something of that
4    type.
5    Q. Since obtaining your JD from the University
6    of South Carolina, have you worked with the
7    Speights & Runyan firm since then?
8    A. No. No. Prior to working for Speights &
9    Runyan, I had a clerkship with a judge, Judge
10   Perry Buckner. He's a trial judge in South
11   Carolina. I then went --- from there I went to
12   work for a firm in Columbia, South Carolina,
13   Richardson & Plowden. And from there I was
14   hired by Speights & Runyan.
15   Q. So when did you start with Speights &
16   Runyan?
17   A. I believe I started with Speights & Runyan
18   in 2005.
19   Q. Do you recall when in 2005?
20   A. Sure, March.
21   Q. So I know that you know this, Mr. Solomons,
22   but what brings us together here today is an
23   affidavit that you provided in the course of the
24   W.R. Grace bankruptcy. And that affidavit we
25   marked as Exhibit --- oh, actually could we

Page 9

1    remark it as just Solomons Exhibit One?
2    (Solomons Exhibit One marked for
3    identification.)
4    BY ATTORNEY ESAYIAN:
5    Q. And it's also marked as Anderson Memorial
6    Hospital Confirmation Hearing Exhibit 39, and if
7    you --- I think you have that affidavit in front
8    of you?
9    A. I have a copy of it, yes.
10   Q. And on the second page it says sworn to me
11   this 20th day of August, 2006; do you see that?
12   A. I do.
13   Q. And is that, in fact, the date on which you
14   signed the affidavit?
15   A. It is.
16   Q. And I take it that you were employed by the
17   Speights & Runyan law firm at that time?
18   A. I was.
19   Q. You had been employed there for about a year
20   and a half at that point?
21   A. That's right. Now, I will tell you this was
22   so long ago that I don't remember specifically
23   signing it on the 20th day of August, 2006,
24   however I'm sure if it says this and it was
25   notarized that's when I signed it.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - September 16, 2009
Gibson Solomons, Esquire

Page 10

1  Q. Okay. You don't have any reason to think
2  that it's dated August 20th, 2006 but that you
3  signed it on some other day?
4  A. No.
5  Q. Okay.
6  A. No.
7  Q. When you joined the Speights & Runyan firm
8  in March 2005, did you begin working on matters
9  related to the W.R. Grace property damage claims
10  right away when you started working there?
11  A. No. The W.R. Grace claims and cases have
12  such a long history that despite me offering, it
13  was decided that you need that history for the
14  context. And so I've actually had very little
15  involvement in that case.
16  Q. Have you had some involvement though?
17  A. I have had some. Sporadic and on discreet
18  issues.
19  Q. All right. Between the time you joined
20  Speights & Runyan in March of 2005, and the time
21  you signed this affidavit in August 2006, do you
22  recall what, if any, issues you worked on with
23  respect to W.R. Grace property damage claims?
24  A. I recall there is one particular issue that
25  I did a lot of work on, but I don't know whether

Page 11

1  it was in the time frame that you're talking
2  about, just because I can't quite put that in my
3  head when it dropped.
4  Q. What issue was that?
5  A. The ratification of any signed document.
6  Q. What do you mean by ratification?
7  A. The process by which authority is ratified.
8  Q. All right. Your affidavit that's been
9  marked as Exhibit One in paragraph
10  four --- your affidavit refers to a particular
11  meeting that was held; is that right?
12  A. That's correct.
13  Q. And paragraph four says one of the items
14  discussed at this meeting was the issue of
15  Speights & Runyan's authority to file certain
16  claims; do you see that?
17  A. I do.
18  Q. And what do you mean by authority? What is
19  the issue with respect to authority to file
20  claims?
21  A. What was being discussed at this meeting as
22  far as the authority to file is Mr. Bernick and
23  Ms. Browdy and potentially others, I'm not sure
24  because I wasn't involved in the pleading
25  preparation or the negotiations back and forth,

Page 12

1  but there was some questions about whether
2  Speights & Runyan had the authority to file all
3  the individual claims that were filed. And the
4  issue that was being discussed was whether a
5  class filing allowed you to file individual
6  claims. There were two types of filings here.
7  There was a class filing as I recall and then
8  there was the filing of individual claims and it
9  seems like both were done and both were being
10  discussed.
11  Q. Okay. So just taking a step back, in
12  general, what do you understand the word
13  authority to mean in this context? When you use
14  in your affidavit and as we're talking about it,
15  what's the authority issue with respect to these
16  claims?
17  A. Whether it was deemed --- this is my
18  interpretation and there was some back and forth
19  discussion about this, but as I understand it,
20  your general question what we were discussing
21  was whether it was proper or whether Speights &
22  Runyan was empowered to file the various claims
23  that they had filed.
24  Q. Okay. So now, going back to the time line
25  here, you're not sure whether you did any work

Page 13

1  on authority issues prior to the August 2006
2  meeting that's discussed in your affidavit?
3  A. I'm not sure whether I did it before or not.
4  I know that it is an issue I'm familiar with
5  because, as you know, it's been appealed and it
6  has raised its head in various forms.
7  Q. Do you have any recollection of whether you
8  did any work to prepare for this August 2006
9  meeting?
10  A. I feel certain that I wouldn't have, and
11  here's why. I wasn't supposed to be at this
12  meeting.
13  Q. Okay.
14  A. Bud Ferry, who at the time was with our firm
15  and has a much longer history in these asbestos
16  cases then I do, was supposed to be the third
17  person in our firm there. And he had knee
18  surgery, and so I was the pinch hitter.
19  Q. All right. So I'd like to ask you some
20  other questions about some events before this
21  August 2006 meeting and then come back to that.
22  Given that you joined the Speights & Runyan
23  firm in March of 2005, would it be fair to say
24  that you were not involved in any discussions in
25  February 2005 between any representative of

Page 14

1  Grace and Speights & Runyan firm about potential
2  resolution of some of the Speights & Runyan
3  firm's claims?
4  A. That would be fair to say.
5  Q. Do you recall being involved in any
6  discussions with Grace around the time you
7  joined in March of 2005 about a stipulation that
8  was under consideration between Grace and
9  Speights & Runyan regarding some of the Speights
10 & Runyan claims?
11 A. I don't recall that, and I'll tell you as we
12 worked through this, again, because it all
13 lacked the historical context it was thought
14 that just resolution required historical
15 context.  And despite overtures to help, I was
16 told that it's best if those who understand the
17 history of this do most of the work.  So even
18 though I wanted to get involved in this, I had
19 very little involvement in this.
20 Q. Okay.  So it's highly unlikely that you were
21 involved in any work on a draft stipulation
22 around the March 2005 time frame, just when you
23 joined the firm?
24 A. It would be highly unlikely, yes.
25 Q. Okay.  Now, going to the affidavit that

Page 15

1  we've marked as Solomons Exhibit One, I believe
2  we confirmed this already but just to be sure,
3  is that your signature on the affidavit?
4  A. Yes.
5  Q. And do you recognize the name of the person
6  who notarized it?
7  A. Yes, I do.
8  Q. Who was that?
9  A. Warren Richards.
10 Q. And who is he?
11 A. Warren at the time this was signed was our
12 office manager.
13 Q. I take it he's a notary or was at that time?
14 A. Well, I didn't check the certificate.
15 Q. As far as you know.
16 A. Yes.
17 Q. The affidavit describes a meeting but does
18 not give the date of the meeting.
19 A. Uh-huh (yes).
20 Q. Do you know the date of the meeting?
21 A. I think it --- I don't know the exact date.
22 It was earlier --- I want to believe it was
23 earlier that summer, but I don't remember the
24 exact meeting.  In fact, I thought about that on
25 the way up here today and I can't recall.

Page 16

1  Q. I will tell you that it's been stated in
2  various briefs filed by your firm and at
3  depositions that Mr. Speights has taken that the
4  meeting was in July of 2005.
5  A. Yeah.
6  Q. Which would actually be a whole year, more
7  than a year before your affidavit?
8  A. That's probably right.
9  Q. I don't mean to suggest that it's right or
10 wrong but do you --- does that trigger a
11 recollection at all as to when the meeting was
12 in your mind?
13 A. I think that that's accurate, yes, I do
14 believe that.
15 Q. Sitting here today as you think about it,
16 does it make sense that the meeting could have
17 been just a few months after you had joined
18 Speights & Runyan?
19 A. It does, given the nature of the role I was
20 playing.  That does make sense.
21 Q. And why does it make sense given that you
22 didn't have a lot of involvement at that point?
23 A. Well, like I said, at the time this was
24 something that --- a duty that was assigned to
25 me sort of the last minute, because of Bud's

Page 17

1  involvement.  It would make sense that I would
2  have had free time --- or not free time, but I
3  wouldn't have been so engrossed in my own cases
4  that I could have dropped whatever I was doing
5  and gone there.
6  Q. Okay.  Do you recall if Mr. Ferry had his
7  knee surgery around July of 2005?
8  A. I'm guessing.  I mean, I recall that very
9  specifically that Bud had an issue with his knee
10 and that's why I was there.  Because I remember
11 him being on crutches.  I remember telling him
12 thanks a lot, you know, for this.
13 Q. Okay.  If you remember at any point during
14 the deposition, if something occurs to you that
15 makes you think it was not in July of 2005, let
16 us know.
17 A. Okay.
18 Q. Now, then there's no date for the meeting
19 stated in the affidavit.  Do you know why that
20 is, why the affidavit doesn't state a date for
21 the meeting?
22 A. I don't and --- I don't other than it could
23 be that when ---.  I don't know.  Anything would
24 be a guess.
25 Q. Do you recall why you provided this

Page 18

1    affidavit in August of 2006, which was more than
2    a year after the meeting?
3    A. Sure. I do. I was asked to --- if I
4    recalled the meeting. And I said I sure do.
5    And I was asked what do you recall and I
6    discussed it with Mr. Speights. And he said
7    well, the part --- the paragraph six, he said,
8    would you be willing to write an affidavit that
9    included the statement contained in paragraph
10   six? And I said, sure. So I --- that was why I
11   prepared the affidavit.
12   Q. So Mr. Speights specifically focused in on
13   the statement that's in paragraph six and
14   specifically wanted you to provide an affidavit
15   that gave that statement?
16   A. Well, I think what he wanted me to do is he
17   asked what I recalled about the meeting. And I
18   told him. And then that --- the fact that I
19   recalled that, he asked, would you sign
20   something saying that you recall it? And I
21   said, sure, I will.
22   Q. Do you recall how long the meeting took?
23   A. It was long. I remember it took some time.
24   We got there. I believe we ate while we were
25   there. We had a break-out session where we were

Page 19

1    divided. Came back together.
2    Q. I'm sorry, go ahead.
3    A. No. That's it. It was not a short meeting.
4    Q. So it sounds like it was well more than an
5    hour long, several hours?
6    A. Oh, yeah. Yeah, several hours.
7    Q. It was held at the Washington office of my
8    law firm, Kirkland & Ellis?
9    A. It was, yeah.
10   Q. And we provided you with lunch or did you
11   bring your own?
12   A. I assume you provided.
13   Q. Okay. Do you recall whether it was in the
14   morning or the afternoon, or both?
15   A. I believe it started in the morning and
16   ended in the afternoon.
17   Q. All right. So it was at least a couple of
18   hours long. The affidavit is very short. It's
19   one page, six paragraphs, and the first two of
20   those are your name and the fact that you work
21   for Speights & Runyan; right?
22   A. Right.
23   Q. Would it be fair to say that the affidavit
24   does not capture everything that went on at the
25   meeting?

Page 20

1    A. Obviously not.
2    Q. All right. Do you recall anything that went
3    on in the meeting that's not captured in the
4    affidavit?
5    A. Well, yeah, I just told you there was a
6    break-out session. This is very --- there are
7    parts of this that are very distinct in my mind
8    because your conference room is an impressive
9    location, so I remember being there. I remember
10   seeing the White House.
11   Q. It's on the 12th floor facing the White
12   House.
13   A. Yes.
14   Q. Yes.
15   A. And that was impressive to me. And so I
16   remember those things very vividly. I remember
17   meeting Mr. Bernick for the first time. He had
18   a cast on. You know, there were parts of that
19   meeting that I'm sure aren't in here.
20   Q. Okay. But there's also substantive parts of
21   the meeting in terms of matters discussed that
22   plainly are not in this affidavit?
23   A. Absolutely.
24   Q. What was the purpose of the meeting?
25   A. As I recall this --- there were many matters

Page 21

1    were sort of coming to a head, but I believe
2    that the ultimate goal because Mr. Beber and Mr.
3    Fink were there also, was to try and resolve
4    this.
5    Q. Mr. Beber was a lawyer for W.R. Grace?
6    A. I believe he is. Now, keep in mind, other
7    than this meeting and a brief conversation I had
8    with him at this meeting, I've never had a
9    discussion with Mr. Beber, so I don't know his
10   role.
11   Q. Your understanding at the time of this
12   meeting was that he was a lawyer for W.R. Grace?
13   A. I actually think that he wasn't actively
14   litigating this. That he had some role and he
15   had a history of maybe being someone who could
16   --- what's the word I'm looking for. He was
17   good at working out a deal, compromise, and so
18   that was why I thought he was there.
19   Q. Okay. But did you understand that he was
20   there in representative of W.R. Grace or more
21   as a neutral party?
22   A. He wouldn't have been there in his own
23   capacity, so I feel like he was there as a
24   representative of W.R. Grace.
25   Q. Did you understand that Mr. Fink was a

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - September 16, 2009
Gibson Solomons, Esquire

Page 22

1    **lawyer for W.R. Grace?**
2    A. I did.  That's how he was introduced.
3    **Q. And Mr. Bernick was an outside lawyer for**
4    **W.R. Grace?**
5    A. He was.  As I understood Mr. Bernick's
6    role was that he was the bankruptcy attorney
7    for W.R. Grace.
8    **Q. And Ms. Browdy was also an outside lawyer**
9    **for W.R. Grace?**
10   A. She is working, as I understood it, as
11   number two under Mr. Bernick.
12   **Q. And Mr. Speights and Mr. Runyan were also**
13   **at this meeting?**
14   A. They were.
15   **Q. Anyone else at this meeting who we haven't**
16   **just discussed and not named in your affidavit?**
17   A. I don't recall there being anyone else in
18   the meeting.
19   **Q. I believe you said the purpose of the**
20   **meeting was to try to work out a resolution of**
21   **the Speights & Runyan claims?**
22   A. I think that was at least one of the
23   purposes.
24   **Q. Do you recall any other purposes?**
25   A. I don't recall and I will tell you that at

Page 23

1    the time, the exchanges between your firm and
2    my firm were quite vitriolic.  They were ---
3    and they seemed to be building towards a
4    crescendo.  And having no involvement in this,
5    I just thought that maybe this was a clear-the-
6    air type meeting, maybe we resolved it but at
7    the very least we're working towards taking
8    some of that out.  Or maybe that's wishful
9    thinking, but that's what I thought it was.
10   **Q. To the best as you can recall today, did**
11   **the meeting start out at a vitriolic level or**
12   **did it start out at a calmer and then ---?**
13   A. You know, Mr. Bernick, the entire time we
14   were there, he was not --- even when he made
15   the statement that we're here about today, he
16   said it matter of factly.  He wasn't --- the
17   entire time, he was civil and I don't remember
18   him being anything but nice.  Ms. Browdy, she
19   was a little more aggressive.
20   **Q. Okay.  How about Mr. Beber, was he ---?**
21   A. A super nice.  A super nice man.
22   **Q. All right.  How about Mr. Fink?  How did**
23   **he comport himself?**
24   A. I don't remember him talking much.  He
25   talked almost the same amount I did, and I said

Page 24

1    very little.
2    **Q. Did you take any notes ---.**
3    BRIEF INTERRUPTION
4    BY ATTORNEY ESAYIAN:
5    **Q. Did you take any notes at this meeting?**
6    A. I did.
7    **Q. You did?**
8    A. I did and I looked for those notes when
9    this came up and I can't find them.  I wish I
10   could.  But the act of taking the notes, the
11   notetaking has that twofold effect.  You have
12   your notes but you also --- that you're taking
13   it, impresses what you write down in your mind.
14   **Q. These were handwritten notes?**
15   A. Sure, they were.
16   **Q. Did you have anybody type them up when you**
17   **got back to the office?**
18   A. That wouldn't have been my practice at the
19   time.
20   **Q. Would it have been your practice to type**
21   **up the key points about the meeting in an e-**
22   **mail and send them to Mr. Speights or Mr.**
23   **Runyan or anyone else?**
24   A. No, although it's been recommended to me
25   to do those types of things.  I'm bad about

Page 25

1    that and I know I didn't.
2    **Q. Some people recommend against doing that**
3    **type of thing.  Do you believe that you do have**
4    **your notes somewhere and you just couldn't lay**
5    **your hands on it for today?**
6    A. I looked hard for those notes and I had a
7    secretary looking, too, and I can't find them.
8    **Q. Do you have a file related to W.R. Grace**
9    **matters in general?**
10   A. No, I didn't and that was the --- that is
11   one of the problems.  Because I have done so
12   little on this, this wouldn't be a file that
13   was in my office.  This would have been a file
14   that someone else had control of.  So if it was
15   saved, it would have been saved in a
16   miscellaneous.  And I looked through that and
17   couldn't find it.  So I may have never ripped
18   it out of the notebook.  I just don't know.
19   **Q. Do you know if anyone else --- do you know**
20   **if Mr. Speights took any notes at this meeting?**
21   A. I can't recall whether he did or not.  I
22   can't.
23   **Q. Do you know if Mr. Runyan took any notes**
24   **at this meeting?**
25   A. Mr. Runyan usually takes notes, but I

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - September 16, 2009
Gibson Solomons, Esquire

Page 26

1   don't recall specifically whether he did at
2   that meeting.
3   **Q. You don't recall seeing any notes from**
4   **either Mr. Speights or Mr. Runyan about this**
5   **meeting?**
6   A. I don't. And I know that there was no
7   time after this where let's compare notes
8   because I remember leaving --- I left by
9   myself, so it wasn't like we flew home and we
10   compared notes about what was said. So I don't
11   know whether they took notes or not.
12   **Q. Paragraph four of your affidavit says one**
13   **of the items discussed was the issue of**
14   **Speights & Runyan's authority to file certain**
15   **claims. We touched on this already but do you**
16   **recall any other specific issues that were**
17   **discussed?**
18   A. I'm trying to think about that. I don't
19   know whether it's just because the passage of
20   time, but that seems to be the issue that
21   sticks out in my mind the most. But at the
22   same time, I know there were these other issues
23   discussed because of the length of the meeting.
24   But I recall certain things being said about
25   the authority and what was going back and forth

Page 27

1   there.
2   **Q. So you do know that other matters were**
3   **discussed, but sitting here today, you can't**
4   **remember what they were?**
5   A. I wish I could to tell you, but I can't
6   recall what they were.
7   **Q. Okay. Did someone, presumably either Mr.**
8   **Speights or Mr. Runyan, presumably not you, but**
9   **did someone on behalf of the Speights & Runyan**
10   **firm state at this meeting a position regarding**
11   **why Speights & Runyan had authority to file**
12   **certain claims?**
13   A. Yes, they did. When the meeting began, I
14   believe it was Mr. Speights. He had sort of an
15   opening salvo, and he encompassed in that
16   opening salvo was a discussion about authority
17   and why we believe that we have authority to
18   prosecute those claims.
19   **Q. What else was in the opening salvo?**
20   A. There were discussions about the tenor of
21   the pleadings and ---.
22   **Q. Meaning the tenor of pleadings filed**
23   **against the Speights & Runyan firm by counsel**
24   **for W.R. Grace?**
25   A. I think that's accurate. You know, there

Page 28

1   were discussions about some --- what Mr.
2   Speights believed were mischaracterizations of
3   fact, mischaracterizations of the record. And
4   then you know, following Mr. Speights, Mr. ---
5   I can't remember whether Mr. Bernick or Ms.
6   Browdy spoke up next. Early on in that
7   meeting, Ms. Browdy spoke a lot and then there
8   came a point when it was time to do business
9   when Ms. Browdy quit talking, at Mr. Bernick's
10   direction, I believe.
11   **Q. After Mr. Speights' opening statement, do**
12   **you recall --- if it was Ms. Browdy who**
13   **responded for Grace, do you recall what she**
14   **said?**
15   A. I don't recall what she said. I recall
16   how Mr. Bernick characterized it, and he said
17   you come in here and bang the drum. I remember
18   him saying that. But no, I don't remember what
19   she said in response. It would be typical back
20   and forth. If you and I were taking a legal
21   position, I would tell you why I'm right a
22   million times and you'd tell me why I'm wrong
23   and you're right a million times. That's why
24   that type of stuff doesn't stick out in my
25   head, but an off-the-cuff comment would be more

Page 29

1   memorable.
2   **Q. About what was Mr. Bernick saying that**
3   **someone had come in banging a drum? About the**
4   **authority issue?**
5   A. Yeah. I think he --- you know, he just
6   said, we're here to work with you and the
7   opening salvo felt like Mr. Speights was
8   banging on a drum.
9   **Q. Do you recall what happened after that,**
10   **after the opening exchange of positions?**
11   A. I recall certain points in the day. I
12   don't recall --- I think what you're trying to
13   ask me to do, and I want to do it for you if I
14   can, is break the day down in a neat timeline.
15   But I can't do that. I just can't recall it
16   that way.
17   **Q. Okay. No, I'm actually just trying to**
18   **figure out the best way to probe your**
19   **recollection about the meeting.**
20   A. Right.
21   **Q. If the neat timeline doesn't work, that's**
22   **fine. Let me ask you this. The banging the**
23   **drum statement stood out in your mind and the**
24   **statement that we'll discuss that's in**
25   **paragraph six in your affidavit stood out in**

Page 30

1  your mind.  Any other statements made by any
2  Grace representatives at the meeting that stand
3  out in your mind, sitting here today?
4  A. Well, we were talking about money.  We
5  were discussing --- that was the whole purpose
6  of being there.
7  Q. Stands out in people's minds?
8  A. Right.  And I do --- you know, I recall a
9  couple of the statements about money just
10  because --- substantial sums of money.
11  Q. Before I ask you about any specific dollar
12  amounts, when you say you were talking about
13  money, what do you mean by that?
14  A. Well, there was some discussion both with
15  Mr. Bernick and I believe Mr. Beber, but I ---
16  I know that at some point in time, Mr. Speights
17  and Mr. Beber went off by themselves.  And the
18  purpose of them having a discussion was to see
19  if --- let's cut through all this other stuff;
20  could we agree on money and maybe get to the
21  bottom of this?  And I remember that happening.
22  Q. Do you recall whether that was before or
23  after Mr. Bernick made the statement that you
24  say that he made in paragraph six of your
25  affidavit?

Page 31

1  A. I think that was after.  I think that was
2  after.  Mr. Bernick's statement wasn't at the
3  very beginning of the meeting, but it was in
4  the first half of the meeting.  And that's why
5  I say it seems --- on paper, it reads as if
6  that would have been something that would have
7  been something screamed or shouted.  It was
8  stated as matter of factly as you can possibly
9  state it.
10  Q. And so your recollection is that sometime
11  after Mr. Bernick made that statement, Mr.
12  Beber and Mr. Speights went off on their own
13  and had some private discussion?
14  A. They went out into the hallway, as I
15  recall, while we were in the conference room.
16  Q. Do you recall for roughly how long they
17  were out in the hallway?
18  A. I don't.  I don't.  And I don't even
19  recall --- for instance, because it was your
20  firm's office, Mr. Bernick would leave and I'm
21  sure he could conduct other business there and
22  Ms. Browdy would do the same thing.
23  Q. I'm sure they did.
24  A. Yeah.  And so I was in there, waiting for
25  a while.

Page 32

1  I don't remember the amount of time.
2  Q. Now, in paragraph five of your affidavit,
3  you say as a result of this discussion, Mr.
4  Speights offered to provide opposing counsel a
5  stipulation citing the basis for authority on
6  each claim.
7  A. Yes.
8  Q. What do you recall about --- do you recall
9  what that stipulation generally would have
10  said?
11  A. Yeah.  I think that what was proposed,
12  there was a body of claims that the debtor had
13  --- or counsel for the debtor had decided or
14  marked these as questionable authority claims.
15  And it seems like that body of claims, in this
16  meeting, there was a proposal that we will
17  divide those into two groups and that there is
18  a group out there that we will dismiss a number
19  of the claims.  And then there is a group,
20  another group of claims that we will provide
21  you writing which supports --- or a stipulation
22  that shows the authority to file the claim.
23  Q. For that second group of claims, was the
24  authority that the Speights & Runyan firm would
25  have described in the stipulation based on the

Page 33

1  firm's role as class counsel for the Anderson
2  Memorial class?
3  A. I think you are now getting into things
4  that I probably had light involvement in.  I
5  would assume that would be one of them.  I
6  think that there was --- as I recall, there was
7  sort of a three-fold, three part authority
8  issue.  You had this overlapping class
9  authority discussion which there was a
10  disagreement about, and then you had the ---
11  whether that then triggered a duty to then file
12  those individual claims because of the class
13  claims, which I think there was a disagreement
14  about.  And then you had the individual
15  claimants who are in the same group that we've
16  been talking about all along, but filing as
17  individual claims not necessarily as members of
18  the class which then there was discussion about
19  whether you had actual authority to file those
20  claims.
21  Q. So do you remember whether the stipulation
22  that Mr. Speights offered to provide would have
23  covered all of that or some of that, or one
24  particular issue within that or ---?
25  A. That I don't know.

Page 34

1  Q. So you just don't recall?
2  A. I don't recall that. I know that was all
3  being discussed and I do recall Mr. Speights
4  felt very strongly that we had authority on the
5  group that we offered the stipulation on.
6  Q. Later on after you provided this affidavit
7  in August of 2006 and these W.R. Grace
8  bankruptcy proceedings went on, were you
9  involved at all in the briefing on the Anderson
10 Memorial class certification issues?
11 A. There's a chance that I would have been
12 --- had some involvement. I would have been
13 asked --- if I had involvement, I would have
14 been asked to look at discrete legal issues,
15 something that didn't take an awful lot of fact
16 but just taking a look at the law in a
17 particular state or the law in a particular
18 federal circuit on this discrete legal issue
19 than to what it is.
20 Q. So you're certainly aware that Anderson
21 Memorial sought certification of class and
22 property damage claims in the course a Grace
23 bankruptcy proceeding?
24 A. Yeah. I mean, I'm aware that there was a
25 certified class in South Carolina, and I'm

Page 35

1  aware that there was a --- it proceeded as a
2  class or it was perceived as a class. And then
3  I'm aware that class certification became an
4  issue, yes. And there was an appeal. I don't
5  know the status of the appeal.
6  Q. So you're aware that it was pursued in the
7  bankruptcy and then you're aware that the
8  bankruptcy judge denied class certification for
9  Anderson Memorial?
10 A. I am.
11 Q. And you're aware that it went off on
12 appeal?
13 A. I am.
14 Q. Okay. Were you in this meeting in July of
15 2005 for the entire meeting, excepting that Mr.
16 Beber and Mr. Speights outside for part of the
17 time and maybe the meeting lulled at that
18 point, but were you in the meeting the whole
19 time?
20 A. I was there the whole time.
21 Q. Do you keep time sheets in the course of
22 your work at Speights & Runyan?
23 A. That's another thing. You're hitting on
24 all my sore topics. I'm supposed to keep ---
25 Q. Time sheets are always a sore topic.

Page 36

1  A. --- very regular time recollection and I
2  do dictate some of that, but I don't do it
3  regularly. And so I'd like to tell you there's
4  a time sheet out there that would show that I
5  was here for this, but I can't guarantee that.
6  Q. In the course of preparing your affidavit
7  back in August of 2006, did you go back and
8  look for time sheets from that meeting?
9  A. No, because I didn't need to at the time
10 to recall this. Sometimes if you're trying to
11 recall how much time you spent on something or
12 where you let a day go that you didn't take
13 your notes, you go back and look at your e-
14 mails or that kind of thing, I didn't need to
15 do that for this because like I said, this was
16 a meeting that had an impression on my mind.
17 Q. Does the Speights & Runyan firm keep time
18 entries for its attorneys in some kind of
19 electronic system?
20 A. We have a system and we --- Dan and Alan
21 are much better at that than me.
22 Q. I'm sorry?
23 A. Dan and Alan are much better at sticking
24 to that system than me. This is ---.
25 Q. Right. But I'm not asking if you stick to

Page 37

1  the system. I'm just asking if the firm keeps
2  the time --- maintains the time entries in some
3  kind of a ---?
4  A. Yes. We have a timekeeping system. Now,
5  it's not like --- when I was working on the
6  defense firm, it's not like it's on your
7  computer screen and you crack it like a taxi
8  cab and then when you're done, you call and you
9  do that. That isn't the way we have ever kept
10 it. At the end of the day, you dictate or you
11 make a note to your file and then your
12 secretary then puts it inside the time system
13 that this is the time.
14 Q. Other than this meeting in August of 2006
15 as described in your affidavit, have you
16 attended any other meetings with Grace
17 representatives about Speights & Runyan
18 property damage claims?
19 A. I feel certain that I haven't. You said
20 with Grace representatives?
21 Q. Yes.
22 A. Yeah, I haven't.
23 Q. I take it that you've been involved in
24 other meetings related to Speights & Runyan's
25 property damage claims against Grace, they just

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - September 16, 2009
Gibson Solomons, Esquire

Page 38

1    weren't meetings with Grace representatives?
2    A. I've had meetings with Mr. Speights and
3    Mr. Runyan and Mr. Ferry who was formerly with
4    our firm about either legal analysis in this
5    matter or --- actually, I don't even know if I
6    was in any strategy meetings. So it would have
7    been legal analysis.
8    Q. Now, in paragraph six of the affidavit ---
9    well, paragraph five as we discussed says that
10   Mr. Speights offered to provide opposing
11   counsel with stipulation citing the basis for
12   authority on each claim.
13   Then in paragraph six you say in response
14   to this offer, Mr. Bernick stated that keeping
15   the authority issue alive provided a method to
16   smear Mr. Speights and in turn all property
17   damage claimants because, in his opinion, it
18   was in Grace's best interest to do that. I
19   take it at the time you wrote this affidavit in
20   August of 2006, you did recall that Mr. Bernick
21   made those statements?
22   A. Yeah, I did.
23   Q. Okay. But you also recall, as you said
24   earlier, that he said it in a calm tone of
25   voice, he wasn't yelling?

Page 39

1    A. He wasn't reaching out pounding the table,
2    he said it very matter-of-fact ---. He was
3    sitting --- as I recall, he was sitting about
4    in relation to me where you are sitting to me,
5    except in Washington and not in Pittsburgh. So
6    I could hear him, he was talking across the
7    table with Mr. Speights and it was just a very
8    matter-of-fact statement.
9    Q. What was Mr. Speights' response?
10   A. He said, well --- I'm trying to think of
11   the exact words, but Mr. Speights obviously
12   wasn't taken by the statement. He said that
13   --- I can't remember the exact words. I can't.
14   I wish I could. The gist of what he said was I
15   don't think that that's the right course for
16   you. I don't think it's right and I don't
17   think it will be successful.
18   Q. And then the, as you testified earlier,
19   the meeting continued on from there. The
20   meeting didn't end right there?
21   A. Oh, yeah. That wasn't a deal-breaker
22   statement. It was just a statement and we
23   moved on as if that was a fact and we were
24   going to deal with that fact, but there were
25   other reasons to be there.

Page 40

1    Q. In paragraph six, you say provide a method
2    to smear Mr. Speights and in turn all property
3    damage claimants. I understand that you're
4    reporting Mr. Bernick's words, but do you
5    understand --- do you have any understanding of
6    what the connection was between taking some
7    action with respect to Mr. Speights and that
8    action in turn having some affect on all
9    property damage claimants?
10   A. Well, we talked at that meeting, we talked
11   a little bit about the personal injury side of
12   things and we talked a little bit about the
13   property damage side as compared to the
14   personal injury side and there was --- there
15   seemed to be some tension in the treatment of
16   one as compared to the other. And so what I
17   assumed Mr. Bernick to be saying when he said
18   that was that if I can cast a pall --- that
19   might even be too strong. If I can do this and
20   smear, then I think it would benefit Grace
21   because maybe it will translate into the
22   property damage side of it being smeared. I'm
23   assuming what Mr. Bernick meant. I don't know
24   what he meant, but that's what he said.
25   Q. Do you have any personal knowledge of the

Page 41

1    asbestos personal injury side of the Grace
2    bankruptcy case in terms of how those claims
3    were litigated, what those claims were about,
4    what Grace's litigation strategy was, what
5    actually happened to those claims?
6    A. No, I don't have any ---. Do I have any
7    personal knowledge of the litigation between
8    Grace and the PI ---?
9    Q. PI claimants, right.
10   A. I don't have any personal knowledge of the
11   litigation between Grace and the PI claimants.
12   Q. Do you know if Grace pursued authority
13   issues with respect to any property damage
14   claimants other than claimants on whose behalf
15   Speights & Runyan had filed claims?
16   A. I don't know that. Maybe someone may have
17   commented to me about that, but I don't know as
18   we sit here today whether they did that with
19   everybody or they just did that with us.
20   Q. Now, you are aware that eventually ---
21   well, let me ask you, are you aware that
22   Speights & Runyan firm did withdraw some
23   property damage claims because of authority
24   issues?
25   ATTORNEY RUNYAN:

Page 42

1  Object to the form of the
2  question.
3  A. I think that was one of the things that
4  was negotiated in this meeting. That was part
5  of what we were talking about when we said ---
6  not we. When Mr. Speights said I will withdraw
7  this group and I will provide this stipulation
8  and what he was trying to do is put authority
9  to bed. And that's when Mr. Bernick said what
10  he said about authority, it's good to keep it
11  ginned up.
12  BY ATTORNEY ESAYIAN:
13  Q. So Mr. Speights went ahead and did
14  withdraw some claims after this meeting?
15  A. I think he did. Now, keep in mind, after
16  my pinch hitting roles, I went back to doing
17  what it is I was doing. And Mr. Ferry, he
18  reassumed the role, so I didn't play any active
19  role in withdrawing any claims, but I'm
20  assuming that that happened.
21  Q. Right. Are you also aware that for some
22  claims field by the Speights & Runyan firm,
23  there was a whole sequence of briefing related
24  to the authority issue and eventually a
25  Bankruptcy Court decision?

Page 43

1  A. Like I said, I know that I did some work
2  on ratification.
3  Q. Okay. Are you aware that the Bankruptcy
4  Court eventually decided that issue against the
5  Speights & Runyan firm?
6  A. I am.
7  Q. Okay. Not that we're suggesting any
8  problems with your legal research, that's not
9  the implication, but are you also aware that
10  the District Court affirmed the Bankruptcy
11  Court on that?
12  A. I am.
13  Q. And are you aware that the Third Circuit
14  also affirmed on that?
15  A. I wasn't actually aware of that.
16  Q. Other than working on that ratification
17  issue at some point, after we've had this
18  discussion so far today, do you recall working
19  on any other issues related to Grace property
20  damage claims during your work at the Speights
21  & Runyan firm?
22  A. Nothing that was discussed in this
23  meeting.
24  Q. Do you have any understanding as to
25  whether under the bankruptcy code an attorney

Page 44

1  who files a Proof of Claim does need to have
2  authority from the claimant to file that claim?
3  A. I think that's --- I don't have any
4  knowledge about what ---. I've looked at the
5  ratification issue, and I know that sounds like
6  where you're headed and so I don't want to tell
7  you I don't know anything about the particular
8  issue. I don't recall what the bankruptcy code
9  said.
10  Q. Now, Mr. Solomons, are you aware that in
11  roughly the past year or so Grace and the
12  Speights & Runyan firm have reached settlement
13  agreements on some property damage claims?
14  A. I don't know any of the material details
15  about any of those settlements.
16  Q. But are you aware that settlements have
17  been reached on some claims or is that just not
18  something you're aware of at all?
19  A. Yes, I am aware of that but it is as
20  surface level as your statement is. It's just
21  that simple.
22  Q. You were not involved in those settlement
23  agreements for that settlement process?
24  A. No, it would have been a comment from Mr.
25  Runyan or Mr. Speights that we resolved some of

Page 45

1  the claims. I mean, really that simple.
2  Q. Are you aware, again if you don't know
3  that's fine, but do you know how many claims
4  Grace and the Speights & Runyan firm have
5  resolved?
6  A. I don't.
7  Q. Did you do anything to prepare for today's
8  deposition?
9  A. I looked for those notes and couldn't find
10  them, and I had a brief discussion with Mr.
11  Runyan today about the deposition.
12  Q. Roughly for how long?
13  A. Thirty (30) minutes, and that's generous.
14  Q. Did you review any documents in
15  preparation for this deposition?
16  A. My affidavit and then I took a look at
17  your Notice of Deposition just, truthfully, to
18  make sure you weren't asking me for those notes
19  because I couldn't find them. That's why I was
20  looking at the Notice.
21  Q. Given that three attorneys from your firm
22  attended this meeting in July of 2005,
23  yourself, Mr. Speights and Mr. Runyan, do you
24  know why you were asked to provide an affidavit
25  describing the meeting?

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - September 16, 2009
Gibson Solomons, Esquire

Page 46

1   A. I don't know for sure, but I have a pretty
2   good idea why.
3   **Q. Why is that?**
4   A. I think it's a combination of two things.
5   One, it makes sense for me to do it. If I have
6   to be a fact witness on this very tiny discreet
7   fact, it doesn't blur the line between lawyer
8   and fact witness because I'm not a lawyer in
9   this case. Whereas Mr. Speights has spent the
10  last 10 or 12 years inside of this W.R. Grace
11  matter and Mr. Runyan has spent a substantial
12  amount of time and has a large role. It
13  wouldn't be an impediment for me to be a
14  witness. And the other is just the basic fact
15  that I'm the low guy on the totem pole so I do
16  what I'm told.
17  **Q. In the present day, and I don't mean**
18  **today, but do you consider yourself to be**
19  **presently doing any work on any matters related**
20  **to W.R. Grace's bankruptcy?**
21  A. No. You know, I don't know if you would
22  call this working on W.R. Grace bankruptcy or
23  not. I think I'm just being a witness, so no,
24  I don't think I'm doing any work on W.R. Grace
25  bankruptcy.

Page 47

1   **Q. And that's a good clarification. Leaving**
2   **aside your preparing for this deposition and**
3   **appearing here today for the deposition, are**
4   **you currently doing any other work on the W.R.**
5   **Grace bankruptcy?**
6   A. No, I'm not actively involved. And like I
7   said, it's not because I haven't offered, it's
8   just because I don't have the historical
9   context.
10  **Q. Do you recall when you last did any legal**
11  **work related to this Grace bankruptcy**
12  **proceedings?**
13  A. Well, that's such a broad term to say
14  legal work. There are lots of kinds of legal
15  work. I sometimes will proofread, but all I'm
16  doing is proofreading. And I'll make a
17  comment, oh, that reads well or that doesn't
18  read well. But I'm not the one thinking that
19  up, I'm just looking at it.
20  **Q. But you will on occasion do some**
21  **proofreading of materials that the Speights &**
22  **Runyan firm has prepared for the W.R. Grace**
23  **bankruptcy case?**
24  A. Right. And this is a large case. This is
25  a substantial case to our firm, and so when a

Page 48

1   pleading is in our mailroom, not because I'm
2   asked or I'm doing any role, but sure I'll take
3   a look at some of your writing or some of Mr.
4   Bernick's writing.
5   **Q. His and mine are both pretty good, but I**
6   **don't know about anybody else's.**
7   A. Right.
8   **Q. Anything else that you do on a --- that**
9   **you have done on --- strike that.**
10  **Is there anything else that you ---?**
11  A. Did I serve in any role?
12  **Q. Did you serve in any other role other than**
13  **reading pleadings and making some comments?**
14  A. Not on any kind of routine basis, no.
15  **Q. Okay. What about on a non-routine basis?**
16  A. Well, we're a very small firm and so we
17  discuss things with each other and although
18  they have the absolute right to ignore anything
19  I say, we will discuss lots of things. What do
20  you think if we did this or what do you think
21  if we did that? Now, keep in mind, the reason
22  they're doing that is they want --- the only
23  reason they would bounce something in this case
24  off of me is because I'm absolutely uninformed.
25  So it would be what's someone who is cold to

Page 49

1   the facts gut is on this. So I've served in
2   that role, but I don't ultimately make any
3   decisions in this case.
4   **Q. Do you recall, and if not that's fine, but**
5   **do you recall the last time you had some sort**
6   **of meeting or discussion where you served in**
7   **the type of role that you just described?**
8   A. I don't recall any particular day, no.
9   **Q. Do you recall whether you had any of those**
10  **meetings or discussions in let's say the last**
11  **six months?**
12  A. Yes, sure.
13  **Q. As we've had this question and answer**
14  **today, have you recalled anything else about**
15  **the July 2005 meeting that we haven't already**
16  **discussed?**
17  A. Not that's relevant to what we're
18  discussing.
19  **Q. And do you recall anything else at all,**
20  **even if it's not relevant to what we are**
21  **discussing?**
22  A. No, I just --- you know, like I said there
23  are things about that day that I remember and I
24  remember being in that meeting, but it's not
25  really pertinent to our discussion.

Page 50

1  Q. Do you recall any other statements that
2  Mr. Bernick made during the meeting other than
3  the two you've described today, the one that's
4  in your affidavit and there was a statement
5  about banging a drum?
6  A. Uh-huh (yes).
7  Q. Do you recall any others?
8  A. I remember meeting him and shaking his
9  hand.
10  Q. Do you recall any other particular
11  statements that he made?
12  A. He talked a lot that day, but I don't
13  recall any particular statements, no. He and I
14  had some casual conversation, not work related.
15  I remember that.
16  Q. All right. So you don't recall anything
17  else specifically that he said ---
18  A. About this?
19  Q. --- about the meeting ---? Not just about
20  the authority issues, but about the property
21  damage claims generally, about the substance of
22  the meeting as opposed to him greeting you and
23  exchanging pleasantries?
24  A. I don't recall the ---. There were
25  discussions. We discussed the PI claims. We

Page 51

1  discussed the posture of the case, but I don't
2  recall the particulars of that discussion. I
3  do recall him talking about them.
4  Q. Again, other than anything we've already
5  discussed today, do you recall any specific
6  statements that Mr. Speights made?
7  A. In the meeting?
8  Q. Yes.
9  A. Nothing other than what we've already
10  discussed.
11  Q. And again, other than what we've already
12  discussed, do you recall any specific
13  statements that Mr. Runyan made during this
14  meeting?
15  A. Mr. Runyan, no, I don't recall any
16  specific statements Mr. Runyan made in the
17  bigger boardroom meeting.
18  Q. Does that mean that during some breakout
19  sessions, you recall some specific statements
20  that were made?
21  A. I just remember Mr. Runyan giving his
22  assessment about a few things that we were
23  discussing in the breakout, but ---.
24  Q. Would the breakout have been a discussion
25  just among you and Mr. Runyan and Mr. Speights?

Page 52

1  A. Yes.
2  ATTORNEY ESAYIAN:
3  Mr. Solomon, that is all that I
4  have. I'd like to thank you for your time.
5
6  * * * * * * * *
7  DEPOSITION CONCLUDED AT 7:00 P.M.
8  * * * * * * * *

Page 53

1  COMMONWEALTH OF PENNSYLVANIA )
2  COUNTY OF ALLEGHENY          )
3
4  CERTIFICATE
5  I, Danielle Ohm, a Notary Public in
6  and for the Commonwealth of Pennsylvania, do
7  hereby certify:
8  That the witness whose testimony
9  appears in the foregoing deposition, was duly
10  sworn by me on said date and that the
11  transcribed deposition of said witness is a
12  true record of the testimony given by said
13  witness;
14  That the proceeding is herein recorded
15  fully and accurately;
16  That I am neither attorney nor counsel
17  for, nor related to any of the parties to the
18  action in which these depositions were taken,
19  and further that I am not a relative of any
20  attorney or counsel employed by the parties
21  hereto, or financially interested in this
22  action.

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - September 16, 2009
Gibson Solomons, Esquire

Page 54

1      ACKNOWLEDGMENT OF DEPONENT
2
3          I, Gibson Solomons,
4      do hereby certify that I have read the
5      foregoing pages and that the same is a
6      correct transcription of the answers given
7      by me to the questions therein propounded,
8      except for the corrections or changes in form
9      or substance, if any, noted in the attached
10     Errata Sheet.
11
12
13     _____
14          Gibson Solomons
15     Signed this ____ day of _____,2009.
16
17              ---
18          E R R A T A
19              ---
20     PAGE  LINE  CHANGE    REASON THEREFOR
21     _____
22     _____
23     _____
24     _____
25     _____

Page 55

1              ---
2          E R R A T A
3              ---
4      PAGE  LINE  CHANGE    REASON THEREFOR
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     _____
23     _____
24     _____
25     _____

Page 56

1      NOTICE TO READ AND SIGN
2
3       A copy of this deposition transcript
4      is being provided to counsel for the witness
5      by JANE ROSE REPORTING for signature.
6
7
8
9
10     _____
11          JANE ROSE REPORTING
            74 Fifth Avenue
12        New York, New York 10011
            1-800-825-3341
13
14
15
16
17
18
19
20
21
22
23
24
25

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - September 16, 2009
Gibson Solomons, Esquire
Page 57

**A**

ability 7:5
absolute 48:18
absolutely 20:23
48:24
Academy 7:13
accurate 7:5,8 16:13
27:25
accurately 53:15
ACKNOWLEDGMENT
54:1
act 24:10
action 40:7,8 53:18,22
active 42:18
actively 21:13 47:6
actual 33:19
address 5:15,18
ADMINISTERED 1:11
administration 7:18
8:1
administrator 8:3
affairs 7:24
affect 40:8
affidavit 4:9 8:23,24
9:7,14 10:21 11:8,10
12:14 13:2 14:25
15:3,17 16:7 17:19
17:20 18:1,8,11,14
19:18,23 20:4,22
22:16 26:12 29:25
30:25 32:2 34:6 36:6
37:15 38:8,19 45:16
45:24 50:4
affirmed 43:10,14
afternoon 19:14,16
aggressive 23:19
ago 9:22
agree 30:20
agreements 44:13,23
ahead 19:2 42:13
air 23:6
AL 1:6
Alan 2:18 3:12 6:3
36:20,23
Algernon 5:12
alive 38:15
ALLEGHENY 53:2
allowed 12:5
amount 23:25 32:1
46:12
amounts 30:12
analysis 38:4,7
Anderson 9:5 33:1
34:9,20 35:9
answer 6:19 49:13
answers 6:15,16 54:6
anybody 24:16 48:6
appeal 35:4,5,12
appealed 13:5

**APPEARANCES** 2:7
3:1
appearing 5:22 47:3
appears 53:9
appreciate 5:24
aren't 20:19
asbestos 13:15 41:1
aside 47:2
asked 18:3,5,17,19
34:13,14 45:24 48:2
asking 36:25 37:1
45:18
assessment 51:22
assigned 16:24
assume 6:19 19:12
33:5
assumed 40:17
assuming 40:23 42:20
ate 18:24
attached 28:2
attended 37:16 45:22
attorney 5:7,21 9:4
22:6 24:4 41:25
42:12 43:25 52:2
53:16,20
attorneys 36:18 45:21
August 9:11,23 10:2
10:21 13:1,8,21 18:1
34:7 36:7 37:14
38:20
authority 11:7,15,18
11:19,22 12:2,13,15
13:1 26:14,25 27:11
27:16,17 29:4 32:5
32:14,22,24 33:7,9
33:19 34:4 38:12,15
41:12,23 42:8,10,24
44:2 50:20
Avenue 2:2 5:16 56:11
aware 34:20,24 35:1,3
35:6,7,11 41:20,21
42:21 43:3,9,13,15
44:10,16,18,19 45:2
awful 34:15
AXELROD 3:4

**B**

B 4:7
Bachelor's 7:14
back 11:25 12:11,18
12:24 13:21 19:1
24:17 26:25 28:19
36:7,7,13 42:16
background 6:12
bad 24:25
BAENA 3:4
bang 28:17
banging 29:3,8,22
50:5

bankruptcy 1:1 8:24
22:6 34:8,23 35:7,8
41:2 42:25 43:3,10
43:25 44:8 46:20,22
46:25 47:5,11,23
based 32:25
basic 46:14
basis 32:5 38:11 48:14
48:15
Beber 21:2,5,9 23:20
30:15,17 31:12
35:16
bed 42:9
began 27:13
beginning 31:3
behalf 27:9 41:14
believe 8:17 15:1,22
16:14 18:24 19:15
21:1,6 22:19 25:3
27:14,17 28:10
30:15
believed 28:2
benefit 40:20
Bernick 11:22 20:17
22:3,11 23:13 28:5
28:16 29:2 30:15,23
31:11,20 38:14,20
40:17,23 42:9 50:2
Bernick's 22:5 28:9
31:2 40:4 48:4
best 6:18 14:16 23:10
29:18 38:18
better 36:21,23
bigger 51:17
BILZIN 3:4
BISCAYNE 3:7
bit 40:11,12
blur 46:7
boardroom 51:17
body 32:12,15
bottom 30:21
BOULEVARD 3:7
bounce 48:23
BOX 2:19
break 6:22,24 29:14
breakout 51:18,23,24
break-out 18:25 20:6
brief 21:7 24:3 45:10
briefing 34:9 42:23
briefly 7:10
briefs 16:2
bring 19:11
brings 8:22
broad 47:13
Browdy 11:23 22:8
23:18 28:6,7,9,12
31:22
Buckner 8:10
Bud 13:14 17:9

Bud's 16:25
Buford 5:17
building 23:3
business 5:15 28:8
31:21

**C**

C 5:1
cab 37:8
call 37:8 46:22
calm 38:24
calmer 23:12
can't 6:8 11:2 15:25
24:9 25:7,21,22 27:3
27:5 28:5 29:15,15
36:5 39:13,13
capacity 21:23
capture 19:24
captured 20:3
Carolina 2:20 5:16
7:17,19 8:6,11,12
34:25
case 1:10 10:15 41:2
46:9 47:23,24,25
48:23 49:3 51:1
cases 10:11 13:16
17:3
cast 20:18 40:18
casual 50:14
certain 11:15 13:10
26:14,24 27:12
29:11 37:19
certainly 34:20
certificate 15:14 53:4
certification 34:10,21
35:3,8
certified 34:25
certify 53:7 54:4
chance 34:11
CHANGE 54:20 55:4
changes 54:8
CHAPTER 1:4
characterized 28:16
check 15:14
CHICAGO 2:13
circuit 34:18 43:13
citing 32:5 38:11
city 8:3
civil 23:17
claim 32:6,22 38:12
44:1,2
claimant 44:2
claimants 33:15 38:17
40:3,9 41:9,11,14,14
claims 10:9,11,23
11:16,20 12:3,6,8,16
12:22 14:3,10 22:21
26:15 27:12,18
32:12,14,15,19,20

32:23 33:12,13,17
33:20 34:22 37:18
37:25 41:2,3,5,15,23
42:14,19,22 43:20
44:13,17 45:1,3
50:21,25
clarification 47:1
class 12:5,7 33:1,2,8
33:12,18 34:10,21
34:25 35:2,2,3,8
clear-the 23:5
Clemson 7:14,16
clerkship 8:9
code 43:25 44:8
cold 48:25
college 7:14
Columbia 8:12
combination 46:4
come 5:25 13:21 28:17
29:3
coming 21:1
comment 28:25 44:24
47:17
commented 41:17
comments 48:13
COMMITTEE 3:3
Commonwealth 53:1
53:6
compare 26:7
compared 26:10 40:13
40:16
comport 23:23
compromise 21:17
computer 37:7
concentration 7:25
CONCLUDED 52:7
conduct 31:21
conference 20:8 31:15
Confirmation 9:6
confirmed 15:2
connection 40:6
consider 46:18
consideration 14:8
contained 18:9
context 10:14 12:13
14:13,15 47:9
continued 3:1 39:19
control 25:14
conversation 21:7
50:14
copy 1:24 9:9 56:3
correct 11:12 54:6
corrections 54:8
couldn't 25:4,17 45:9
45:19
counsel 2:7 3:1 6:2
27:23 32:4,13 33:1
38:11 53:16,20 56:4
County 7:13 53:2

JANE ROSE REPORTING
1-800-825-3341  janerosereporting.com

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - September 16, 2009
Gibson Solomons, Esquire
Page 58

couple 19:17 30:9
course 8:23 34:22
  35:21 36:6 39:15
Court 1:1 42:25 43:4
  43:10,11
covered 33:23
crack 37:7
crescendo 23:4
crutches 17:11
currently 47:4
cut 30:19

**D**

D 4:1 5:1
damage 3:3 10:9,23
  34:22 37:18,25
  38:17 40:3,9,13,22
  41:13,23 43:20
  44:13 50:21
Dan 36:20,23
Danielle 2:4 53:5
date 9:13 15:18,20,21
  17:18,20 53:10
dated 10:2
day 9:11,23 10:3 29:11
  29:14 36:12 37:10
  46:17 49:8,23 50:12
  54:15
deal 21:17 39:24
deal-breaker 39:21
debtor 32:12,13
DEBTORS 1:8 2:9
decided 10:13 32:13
  43:4
decision 42:25
decisions 49:3
deemed 12:17
defense 37:6
degree 7:14,15,22
DELAWARE 1:2
denied 35:8
DEPONENT 2:16 54:1
deposed 6:4
deposition 1:14 2:1
  17:14 45:8,11,15,17
  47:2,3 52:7 53:9,11
  56:3
depositions 6:7 16:3
  53:18
described 32:25 37:15
  49:7 50:3
describes 15:17
describing 45:25
DESCRIPTION 4:8
despite 10:12 14:15
details 44:14
dictate 36:2 37:10
didn't 15:14 16:22
  25:1,10 34:15 36:9

36:12,14 39:20
  42:18
direction 28:10
disagreement 33:10
  33:13
discreet 10:17 46:6
discrete 34:16,18
discuss 29:24 48:17
  48:19
discussed 11:14,21
  12:4,10 13:2 18:6
  20:21 22:16 26:13
  26:17,23 27:3 34:3
  38:9 43:22 49:16
  50:25 51:1,5,10,12
discussing 12:20 30:5
  49:18,21 51:23
discussion 12:19 21:9
  27:16 30:14,18
  31:13 32:3 33:9,18
  43:18 45:10 49:6,25
  51:2,24
discussions 13:24
  14:6 27:20 28:1
  49:10 50:25
dismiss 32:18
distinct 20:7
District 1:2 43:10
divide 32:17
divided 19:1
document 11:5
documents 45:14
doesn't 17:20 28:24
  29:21 46:7 47:17
doing 17:4 25:2 42:16
  42:17 46:19,24 47:4
  47:16 48:2,22
dollar 30:11
don't 5:25 6:17,23
  9:22 10:1,25 14:11
  15:21,23 16:9 17:22
  17:22,23 21:9 22:17
  22:25 23:17,24
  25:18 26:1,3,6,10,18
  28:15,18 29:12
  31:18,18,18 32:1
  33:25 34:1,2 35:4
  36:2 38:5 39:15,16
  39:16 40:23 41:6,10
  41:16,17 44:3,6,7,8
  44:14 45:2,6 46:1,17
  46:21,24 47:8 48:6
  49:2,8 50:12,16,24
  51:1,15
draft 14:21
drill 6:11
dropped 11:3 17:4
drum 28:17 29:3,8,23
  50:5

duly 5:3 53:9
duty 16:24 33:11

**E**

e 4:1,7 5:1,1 24:21
  36:13 54:18 55:2
earlier 15:22,23 38:24
  39:18
Early 28:6
education 7:11
effect 24:11
either 26:4 27:7 38:4
electronic 36:19
Ellis 1:19 2:10 19:8
else's 48:6
employed 5:13 9:16
  9:19 53:20
empowered 12:22
encompassed 27:15
ended 19:16
engrossed 17:3
entire 23:13,17 35:15
entries 36:18 37:2
Errata 54:10
Esayian 1:18 2:11 4:4
  5:7 9:4 24:4 42:12
  52:2
Esquire 1:15,18 2:11
  2:18 3:6
ET 1:6
evening 5:8,9,23 6:1
events 13:20
eventually 41:20
  42:24 43:4
everybody 41:19
EX 4:9
exact 15:21,24 39:11
  39:13
EXAMINATION 4:3 5:6
excepting 35:15
exchange 29:10
exchanges 23:1
exchanging 50:23
Exhibit 8:25 9:1,2,6
  11:9 15:1

**F**

facing 20:11
fact 9:13 15:24 18:18
  19:20 28:3 34:15
  39:23,24 46:6,7,8,14
factly 23:16 31:8
facts 49:1
fair 6:20,21 7:7 13:23
  14:4 19:23
familiar 13:4
far 11:22 15:15 43:18
February 13:25
federal 34:18

feel 13:10 21:23 37:19
felt 29:7 34:4
Ferry 13:14 17:6 38:3
  42:17
field 42:22
Fifth 2:2 56:11
figure 29:18
file 11:15,19,22 12:2,5
  12:22 25:8,12,13
  26:14 27:11 32:22
  33:11,19 37:11 44:2
filed 12:3,23 16:2
  27:22 41:15
files 44:1
filing 12:5,7,8 33:16
filings 12:6
FINAL 1:24
financially 53:21
find 24:9 25:7,17 45:9
  45:19
fine 29:22 45:3 49:4
Fink 21:3,25 23:22
firm 1:19 2:2 5:14,20
  8:7,12 9:17 10:7
  13:14,17,23 14:1,23
  16:2 19:8 23:1,2
  27:10,23 32:24
  36:17 37:1,6 38:4
  41:22 42:22 43:5,21
  44:12 45:4,21 47:22
  47:25 48:16
firm's 14:3 31:20 33:1
first 5:3 19:19 20:17
  31:4
five 32:2 38:9
flew 26:9
floor 20:11
FLORIDA 3:9
focused 18:12
following 28:4
FOLLOWS 5:4
foregoing 53:9 54:5
form 42:1 54:8
formerly 38:3
forms 13:6
forth 11:25 12:18
  26:25 28:20
four 11:10,13 26:12
frame 11:1 14:22
free 17:2,2
front 9:7
full 5:10
fully 53:15
further 53:19

**G**

G 5:1
general 12:12,20 25:9
generally 32:9 50:21

generous 45:13
getting 33:3
Gibson 1:15 2:1 4:4
  5:3,12 54:3,14
ginned 31:2
gist 39:14
give 6:15 7:5,7 15:18
given 13:22 16:19,21
  45:21 53:12 54:6
giving 51:21
go 19:2 36:7,12,13
goal 21:2
going 6:11,14 12:24
  14:25 26:25 39:24
good 5:8,9 21:17
  42:10 46:2 47:1 48:5
Grace 1:6 8:24 10:9,11
  10:23 14:1,6,8 21:5
  21:12,20,24 22:1,4,7
  22:9 25:8 27:24
  28:13 30:2 34:7,22
  37:16,20,25 38:1
  40:20 41:1,8,11,12
  43:19 44:11 45:4
  46:10,22,24 47:5,11
  47:22
Grace's 38:18 41:4
  46:20
graduating 7:20
greeting 50:22
group 32:18,19,20,23
  33:15 34:5 42:7
groups 32:17
guarantee 36:5
guess 17:24
guessing 17:8
gut 49:1
guy 46:15

**H**

H 4:7
half 9:20 31:4
hallway 31:14,17
Hampton 2:20 5:16
  7:12
hand 50:9
hands 25:5
handwritten 24:14
happened 29:9 41:5
  42:20
happening 30:21
hard 25:6
haven't 22:15 37:19
  37:22 47:7 49:15
head 11:3 13:6 21:1
  28:25
headed 44:6
hear 39:6
heard 6:20

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - September 16, 2009
Gibson Solomons, Esquire
Page 59

**Hearing** 9:6
**held** 11:11 19:7
**help** 14:15
**Henry** 7:13
**hereto** 53:21
**here's** 13:11
**he's** 8:10 15:13
**high** 7:12
**highly** 14:20,24
**hired** 8:14
**historical** 14:13,14
   47:8
**history** 7:23 10:12,13
   13:15 14:17 21:15
**hitter** 13:18
**hitting** 35:23 42:16
**home** 26:9
**hope** 6:23
**Hospital** 9:6
**hour** 19:5
**hours** 19:5,6,18
**House** 20:10,12

**I**

**idea** 46:2
**identification** 9:3
**ignore** 48:18
**III** 5:12
**ILLINOIS** 2:13
**impact** 7:4
**impediment** 46:13
**implication** 43:9
**impresses** 24:13
**impression** 36:16
**impressive** 20:8,15
**included** 18:9
**indicated** 5:25
**individual** 12:3,5,8
   33:12,14,17
**injury** 40:11,14 41:1
**inside** 37:12 46:10
**instance** 31:19
**instructions** 6:12
**interest** 38:18
**interested** 53:21
**interpretation** 12:18
**INTERRUPTION** 24:3
**introduced** 22:2
**involved** 11:24 13:24
   14:5,18,21 34:9
   37:23 44:22 47:6
**involvement** 10:15,16
   14:19 16:22 17:1
   23:4 33:4 34:12,13
**isn't** 37:9
**issue** 10:24 11:4,14,19
   12:4,15 13:4 17:9
   26:13,20 29:4 33:8
   33:24 34:18 35:4

38:15 42:24 43:4,17
   44:5,8
**issued** 7:16
**issues** 10:18,22 13:1
   26:16,22 34:10,14
   41:13,24 43:19
   50:20
**items** 11:13 26:13
**it's** 9:5 10:2 13:5 14:16
   14:20 16:1,9 19:18
   20:11 24:24 26:19
   37:5,6,6 39:16 42:10
   44:20 46:4 47:7,7
   49:20,24
**I'd** 13:19 36:3 52:4
**I'll** 6:18,19 14:11 47:16
   48:2
**I'm** 5:18 6:11,14 9:24
   11:23 13:3,4 17:8
   19:2 20:19 21:16
   24:25 26:18 28:21
   28:22 29:17 31:20
   31:23 34:24,25 35:3
   35:24 36:22,25 37:1
   39:10 40:22 42:19
   46:8,15,16,23,24
   47:6,15,18,19 48:1,2
   48:24
**I've** 5:25 6:9 10:14
   21:8 38:2 44:4 49:1

**J**

**Jackson** 5:16
**JANE** 1:25 56:5,11
**JD** 7:18 8:5
**JFK** 1:10
**joined** 10:7,19 13:22
   14:7,23 16:17
**jointly** 1:11 7:16
**judge** 8:9,9,10 35:8
**July** 16:4 17:7,15
   35:14 45:22 49:15

**K**

**keep** 21:6 35:21,24
   36:17 42:10,15
   48:21
**keeping** 38:14
**keeps** 37:1
**kept** 37:9
**key** 24:21
**kind** 36:14,18 37:3
   48:14
**kinds** 47:14
**Kirkland** 1:19 2:10
   19:8
**knee** 13:17 17:7,9
**know** 6:10,11,14,18,22
   8:21,21 10:25 13:4,5

15:15,20,21 17:12
   17:16,19,23 20:18
   21:9 23:13 25:1,18
   25:19,19,23 26:6,11
   26:19,22 27:2,25
   28:4 29:5 30:8,16
   33:25 34:2 35:5 38:5
   40:23 41:12,16,17
   43:1 44:5,7,14 45:2
   45:3,24 46:1,21,21
   48:6 49:22
**knowledge** 40:25 41:7
   41:10 44:4
**KRAMER** 3:6

**L**

**lacked** 14:13
**large** 46:12 47:24
**LASALLE** 2:12
**law** 2:2 5:14 9:17 19:8
   34:16,17
**lawyer** 21:5,12 22:1,3
   22:8 46:7,8
**lay** 25:4
**Lead** 1:18
**leave** 31:20
**leaving** 26:8 47:1
**left** 26:8
**legal** 28:20 34:14,18
   38:4,7 43:8 47:10,14
   47:14
**length** 26:23
**let's** 26:7 30:19 49:10
**level** 23:11 44:20
**light** 33:4
**line** 12:24 46:7 54:20
   55:4
**Lisa** 1:18 2:11
**litigated** 41:3
**litigating** 21:14
**litigation** 41:4,7,11
**little** 10:14 14:19 23:19
   24:1 25:12 40:11,12
**LLP** 2:10 3:5
**location** 20:9
**long** 6:1 9:22 10:12
   18:22,23 19:5,18
   31:16 45:12
**longer** 13:15
**look** 34:14,16 36:8,13
   45:16 48:3
**looked** 24:8 25:6,16
   44:4 45:9
**looking** 21:16 25:7
   45:20 47:19
**lot** 10:25 16:22 17:12
   28:7 34:15 50:12
**lots** 47:14 48:19
**low** 46:15

**lulled** 35:17
**lunch** 19:10

**M**

**mail** 24:22
**mailroom** 48:1
**mails** 36:14
**maintains** 37:2
**major** 7:23
**making** 48:13
**man** 23:21
**manager** 15:12
**March** 8:20 10:8,20
   13:23 14:7,22
**marked** 8:25 9:2,5
   11:9 15:1 32:14
**Master's** 7:15,17,24
**material** 44:14
**materials** 47:21
**matter** 23:16 31:8 38:5
   46:11
**matters** 10:8 20:21,25
   25:9 27:2 46:19
**matter-of-fact** 39:2,8
**MATTHEW** 3:6
**mean** 11:6,18 12:13
   16:9 17:8 30:13
   34:24 45:1 46:17
   51:18
**Meaning** 27:22
**meant** 40:23,24
**medication** 7:4
**meeting** 11:11,14,21
   13:2,9,12,21 15:17
   15:18,20,24 16:4,11
   16:16 17:18,21 18:2
   18:4,17,22 19:3,25
   20:3,17,19,21,24
   21:7,8,12 22:13,15
   22:18,20 23:6,11
   24:5,21 25:20,24
   26:2,5,23 27:10,13
   28:7 29:19 30:2 31:3
   31:4 32:16 35:14,15
   35:17,18 36:8,16
   37:14 39:19,20
   40:10 42:4,14 43:23
   45:22,25 49:6,15,24
   50:2,8,19,22 51:7,14
   51:17
**meetings** 37:16,24
   38:1,2,6 49:10
**members** 43:7
**memorable** 29:1
**Memorial** 9:5 33:2
   34:10,21 35:9
**method** 38:15 40:1
**MIAMI** 3:9
**million** 28:22,23

**mind** 16:12 20:7 21:6
   24:13 26:21 29:23
   30:1,3 36:16 42:15
   48:21
**minds** 30:7
**mine** 48:5
**minute** 16:25
**minutes** 45:13
**miscellaneous** 25:16
**mischaracterizations**
   28:2,3
**money** 30:4,9,10,18
   30:20
**months** 16:17 49:11
**morning** 19:14,15
**moved** 39:23

**N**

**N** 4:1 5:1
**name** 15:10 15:5 19:20
**named** 22:16
**nature** 16:19
**neat** 29:14,21
**necessarily** 33:17
**need** 6:15,22,23 10:13
   36:9,14 44:1
**negotiated** 42:4
**negotiations** 11:25
**neither** 53:16
**neutral** 21:21
**never** 6:6,9 21:8 25:17
**New** 56:12,12
**nice** 23:18,21,21
**non-routine** 48:15
**NORTH** 2:12
**notarized** 9:25 15:6
**notary** 15:13 53:5
**note** 37:11
**notebook** 25:18
**noted** 54:9
**notes** 24:2,5,8,10,12
   24:14 25:4,6,20,23
   25:25 26:3,7,10,11
   36:13 45:9,18
**notetaking** 24:11
**notice** 5:23 45:17,20
   56:1
**number** 6:9 22:11
   32:18

**O**

**O** 5:1
**oath** 7:2
**Object** 42:1
**obtained** 7:14,15
**obtaining** 8:5
**obviously** 20:1 39:11
**occasion** 47:20
**occurs** 17:14

US District Court - Delaware
Chapter 11 - W.R. Grace

FINAL - September 16, 2009
Gibson Solomons, Esquire
Page 60

offer 38:14
offered 32:4 33:22
  34:5 38:10 47:7
offering 10:12
office 5:17 15:12 19:7
  24:17 25:13 31:20
off-the-cuff 28:25
oh 8:25 19:6 39:21
  47:17
Ohm 2:5 53:5
Okay 6:25 10:1,5
  12:11,24 13:13
  14:20,25 17:6,13,17
  19:13 20:20 21:19
  23:20 27:7 29:17
  35:14 38:23 43:3,7
  48:15
opening 27:15,16,19
  28:11 29:7,10
opinion 38:17
opposed 50:22
opposing 32:4 38:10
outside 22:3,8 35:16
overlapping 33:8
overtures 14:15

——————————
        P
——————————
P 5:1
page 4:3,8 6:13 9:10
  19:19 54:20 55:4
pages 54:5
pall 40:18
paper 31:5
paragraph 11:9,13
  18:7,9,13 26:12
  29:25 30:24 32:2
  38:8,9,13 40:1
paragraphs 19:19
part 18:7 33:7 35:16
  42:4
particular 5:19 7:25
  10:24 11:10 33:24
  34:17,17 44:7 49:8
  50:10,13
particularly 5:23
particulars 51:2
parties 53:17,20
parts 20:7,18,20
party 21:21
passage 26:19
Patrick 7:13
Pennsylvania 1:17 2:3
  53:1,6
people 25:2
people's 30:7
perceived 35:2
perfectly 6:10
Perry 8:10
person 13:17 15:5

personal 40:11,14,25
  41:1,7,10
pertinent 49:25
PI 41:8,9,11 50:25
pinch 13:18 42:16
Pittsburgh 1:17 2:3
  5:24 39:5
plainly 20:22
play 42:18
playing 16:20
pleading 11:24 48:1
pleadings 27:21,22
  48:13
pleasantries 50:23
please 5:11 6:17
Plowden 8:13
point 9:20 16:22 17:13
  28:8 30:16 35:18
  43:17
points 24:21 29:11
pole 46:15
position 27:10 28:21
positions 29:10
possibly 31:8
posture 51:1
potential 14:1
potentially 11:23
pounding 39:1
practice 24:18,20
preparation 11:25
  45:15
prepare 8:2 13:8 45:7
prepared 18:11 47:22
preparing 36:6 47:2
present 3:12 46:17
presently 46:19
presumably 27:7,8
pretty 46:1 48:5
PRICE 3:4
primarily 8:1
prior 8:8 13:1
private 31:13
probably 16:8 33:4
probe 29:18
problems 25:11 43:8
proceeded 35:1
proceeding 34:23
  53:14
proceedings 34:8
  47:12
process 11:7 44:23
program 8:2
Proof 44:1
proofread 47:15
proofreading 47:16,21
proper 12:21
property 3:3 10:9,23
  34:22 37:18,25
  38:16 40:2,9,13,22

41:13,23 43:19
  44:13 50:20
proposal 32:16
proposed 32:11
propounded 54:7
prosecute 27:18
provide 18:14 32:4,20
  33:22 38:10 40:1
  42:7 45:24
provided 8:23 17:25
  19:10,12 34:6 38:15
  56:4
public 7:18,24 8:1
  53:5
purpose 20:24 22:19
  30:5,18
purposes 22:23,24
pursued 35:6 41:12
put 11:2 42:8
puts 37:12
P.M 2:3 52:7
P.O 2:19

——————————
        Q
——————————
question 6:17,19
  12:20 42:2 49:13
questionable 32:14
questions 6:14 12:1
  13:20 54:7
quit 28:9
quite 11:2 23:2

——————————
        R
——————————
R 5:1 54:18,18 55:2,2
raised 13:6
ratification 11:5,6 43:2
  43:16 44:5
ratified 11:7
reached 44:12,17
reaching 39:1
read 47:18 54:4 56:1
reading 48:13
reads 31:5 47:17
really 45:1 49:25
reason 7:7 10:1 48:21
  48:23 54:20 55:4
reasons 39:25
reassumed 42:18
recall 6:8 8:19 10:22
  10:24 12:7 14:5,11
  15:25 17:6,8,25 18:5
  18:20,22 19:13 20:2
  20:25 22:17,24,25
  23:10 25:21 26:1,3
  26:16,24 27:6 28:12
  28:13,15,15 29:9,11
  29:12,15 30:8,22
  31:15,16,19 32:8,8
  33:6 34:1,2,3 36:10

36:11 38:20,23 39:3
  43:18 44:8 47:10
  49:4,5,8,9,19 50:1,7
  50:10,13,16,24 51:2
  51:3,5,12,15,19
recalled 18:4,17,19
  49:14
recognize 15:5
recollection 13:7
  16:11 29:19 31:10
  36:1
recommend 25:2
recommended 24:24
record 5:11 28:3 53:12
recorded 53:14
REED 2:1
refers 11:9,10
regarding 14:9 27:10
regular 36:1
regularly 36:3
related 10:9 25:8
  37:24 42:23 43:19
  46:19 47:11 50:14
  53:17
relation 39:4
relative 53:19
relevant 49:17,20
remark 9:1
remember 9:22 15:23
  17:10,11,13 18:23
  20:9,9,16,16 23:17
  23:24 26:8 27:4 28:5
  28:17,18 30:21 32:1
  33:21 39:13 49:23
  49:24 50:8,15 51:21
rephrase 6:18
reporter 6:16
reporting 1:25 40:4
  56:5,11
representative 13:25
  21:20,24
representatives 30:2
  37:17,20 38:1
represented 6:2
required 14:14
research 43:8
resolution 14:2,14
  22:20
resolve 21:3
resolved 23:6 44:25
  45:5
respect 10:23 11:19
  12:15 40:7 41:13
responded 28:13
response 28:19 38:13
  39:9
result 32:3
review 45:14
RICH 3:12

Richards 15:9
Richardson 8:13
right 9:21 10:10,19
  11:8,11 13:19 16:8,9
  19:17,21,22 20:2
  23:22 28:21,23
  29:20 30:8 36:25
  39:15,16,20 41:9
  42:21 47:24 48:7,18
  50:16
ripped 25:17
role 16:19 21:10,14
  22:6 33:1 42:18,19
  46:12 48:2,11,12
  49:2,7
roles 42:16
room 20:8 31:15
ROSE 1:25 56:5,11
roughly 31:16 44:11
  45:12
routine 48:14
run 6:11
Runyan 2:17,18 5:14
  5:20 6:3 8:7,9,14,16
  8:17 9:17 10:7,20
  12:2,22 13:22 14:1,2
  14:9,10 16:18 19:21
  22:12,21 24:23
  25:23,25 26:4 27:8,9
  27:11,23 32:24
  35:22 36:17 37:17
  38:3 41:15,22,25
  42:22 43:5,21 44:12
  44:25 45:4,11,23
  46:11 47:22 51:13
  51:15,16,21,25
Runyan's 11:15 26:14
  37:24

——————————
        S
——————————
S 4:7 5:1
salvo 27:15,16,19 29:7
saved 25:15,15
saying 18:20 28:18
  29:2 40:17
says 9:10,24 11:13
  26:12 38:9
school 7:12
screamed 31:7
screen 37:7
second 9:10 32:23
secretary 25:7 37:12
see 9:11 11:16 30:18
seeing 20:10 26:3
send 24:22
sense 16:16,20,21
  17:1 46:5
September 1:16 2:4
sequence 42:23

US District Court - Delaware
Chapter 11 - W.R. Grace

serve 48:11,12
served 49:1,6
session 18:25 20:6
sessions 51:19
settlement 44:12,22 44:23
settlements 44:15,16
shaking 50:8
sheet 36:4 54:10
sheets 35:21,25 36:8
short 5:23 6:23 19:3 19:18
shouted 31:7
show 36:4
shows 32:22
side 6:9 40:11,13,14 40:22 41:1
sign 18:19 56:1
signature 15:3 56:5
signed 9:14,25 10:3 10:21 11:5 15:11 54:15
signing 9:23
simple 44:21 45:1
sit 41:18
sitting 16:15 27:3 30:3 39:3,3,4
six 18:7,10,13 19:19 29:25 30:24 38:8,13 40:1 49:11
small 48:16
smear 38:16 40:2,20
smeared 40:22
SMITH 2:2
Solomon 52:3
Solomons 1:15 2:1 4:4 5:3,12,13 6:4 7:10 8:21 9:1,2 15:1 44:10 54:3,14
sore 35:24,25
sorry 19:2 36:22
sort 16:25 21:1 27:14 33:7 49:5
sought 34:21
sounds 19:4 44:5
South 2:20 3:7 5:16 7:17,19 8:6,10,12 34:25
specific 26:16 30:11 51:5,12,16,19
specifically 9:22 17:9 18:12,14 26:1 50:17
Speights 2:17 5:14,20 8:7,8,14,15,17 9:17 10:7,20 11:15 12:2 12:21 13:22 14:1,2,9 14:9 16:3,18 18:6,12 19:21 22:12,21 24:22 25:20 26:4,14

27:8,9,11,14,23 28:2 28:4,11 29:7 30:16 31:12 32:4,24 33:22 34:3 35:16,22 36:17 37:17,24 38:2,10,16 39:7,9,11 40:2,7 41:15,22 42:6,13,22 43:5,20 44:12,25 45:4,23 46:9 47:21 51:6,25
spent 36:11 46:9,11
spoke 28:6,7
Sporadic 10:17
stand 30:2
Stands 30:7
start 8:15 23:11,12
started 8:17 10:10 19:15
state 5:10 17:20 27:10 31:9 34:17
stated 16:1 17:19 31:8 38:14
statement 18:9,13,15 23:15 28:11 29:23 29:24 30:23 31:2,11 39:8,12,22,22 44:20 50:4
statements 30:1,9 38:21 50:1,11,13 51:6,13,16,19
STATES 1:1
status 35:5
stayed 31:15
step 12:11
stick 28:24 36:25
sticking 36:23
sticks 26:21
stipulation 14:7,21 32:5,9,21,25 33:21 34:5 38:11 42:7
stood 29:23,25
strategy 38:6 41:4
street 5:18
strike 48:9
strong 40:19
strongly 34:4
stuff 28:24 30:19
subject 7:21
substance 50:21 54:9
substantial 30:10 46:11 47:25
substantive 20:20
successful 39:17
suggest 16:9
suggesting 43:7
SUITE 2:2 3:8
SUMBERG 3:4
summer 15:23
sums 30:10

super 23:21,21
supports 32:21
supposed 8:2 13:11 13:16 35:24
sure 5:18 6:13 7:12 8:20 9:24 11:23 12:25 13:3 15:2 18:3 18:4,10,21 20:19 24:15 31:21,23 45:18 46:1 48:2 49:12
surface 44:20
surgery 13:18 17:7
sworn 5:3 9:10 53:10
system 36:19,20,24 37:1,4,12

**T**

T 4:7 54:18 55:2
table 39:1,7
take 6:1,16 9:16 15:13 24:2,5 34:15 36:12 37:23 38:19 48:2
taken 2:1 6:7,8 16:3 39:12 53:18
takes 25:25
talked 23:25 40:10,10 40:12 50:12
talking 11:1 12:14 23:24 28:9 30:4,12 33:16 39:6 42:5 51:3
taxi 37:7
tell 7:10 9:21 14:11 16:1 22:25 27:5 28:21,22 36:3 44:6
telling 17:11
tenor 27:20,22
tension 40:15
term 47:13
terms 20:21 41:2
testified 5:4 39:18
testimony 7:1,5,8 53:8 53:12
thank 5:22 52:4
thanks 17:12
that's 9:21,25 11:8,12 13:2 16:8,13 17:10 18:13 19:3 20:3 22:2 23:8,9 27:25 28:23 29:21,24 31:4 35:23 39:15 40:24 42:9 43:8 44:3 45:3,13,19 47:1,13 49:4,17 50:3
THEREFOR 54:20 55:4
there's 17:18 20:20 34:11 36:3
they're 48:22
thing 25:3 31:22 35:23

36:14
things 20:16 24:25 26:24 33:3 40:12 42:3 46:4 48:17,19 49:23 51:22
think 5:25 9:7 10:1 15:21 16:13,15 17:15 18:16 21:13 22:22 26:18 27:25 29:5,12 31:1,1 32:11 33:3,6,13 39:10,15 39:16,17 40:20 42:3 42:15 44:3 46:4,23 46:24 48:20,20
thinking 23:9 47:18
third 13:16 43:13
Thirty 45:13
thought 14:13 15:24 21:18 23:5,9
three 33:7 45:21
three-fold 33:7
time 5:24 9:17 10:19 10:20 11:1 12:24 13:14 14:6,22 15:11 15:13 16:23 17:2,2 18:23 20:17 21:11 23:1,13,17 24:19 26:7,20,22 28:8 30:16 32:1 35:17,19 35:20,21,25 36:1,4,8 36:9,11,17 37:2,2,12 37:13 38:19 46:12 49:5 52:4
timekeeping 37:4
timeline 29:14,21
times 28:22,23
tiny 46:6
title 5:19
today 6:2,3,15 7:5,8 8:22 15:25 16:15 23:10,15 25:5 27:3 30:3 41:18 43:18 45:11 46:18 47:3 49:14 50:3 51:5
today's 45:7
told 14:16 18:18 20:5 46:16
tone 38:24
topic 35:25
topics 35:24
totem 46:15
touched 26:15
transcribed 53:11
transcript 56:3
transcription 54:6
translate 40:21
treatment 40:15
trial 8:10
trigger 16:10

triggered 33:11
true 53:12
truthful 7:8
truthfully 45:17
try 21:3 22:20
trying 26:18 29:12,17 36:10 39:10 42:8
turn 38:16 40:2,8
two 12:6 19:19 22:11 32:17 46:4 50:3
twofold 24:11
type 8:4 23:6 24:16,20 25:3 28:24 49:7
types 12:6 24:25
typical 28:19

**U**

Uh-huh 15:19 50:6
ultimate 21:2
ultimately 49:2
undergraduate 7:21
understand 6:17 7:1 12:12,19 14:16 21:19,25 40:3,5
understanding 21:11 40:5 43:24
understood 6:20 22:5 22:10
uninformed 48:24
UNITED 1:1
University 7:15,16,17 7:19 8:5
use 12:13
usually 25:25

**V**

various 12:22 13:6 16:2
verbal 6:15
vitriolic 23:2,11
vividly 20:16
voice 38:25

**W**

waiting 31:24
want 5:22 15:22 29:13 44:6 48:22
wanted 14:18 18:14 18:16
Warren 15:9,11
Washington 19:7 39:5
wasn't 11:24 13:11 21:13 23:16 26:9 31:2 38:25 39:1,12 39:21 43:15
way 15:25 29:16,18 37:9
WEDNESDAY 2:4

US District Court - Delaware
Chapter 11 - W.R. Grace

went 7:12,13 8:11,11
  19:24 20:2 30:17
  31:12,14 34:8 35:11
  42:13,16
weren't 38:1 45:18
we'll 6:1 29:24
we're 6:13 12:14 23:7
  23:15 29:6 43:7
  48:16 49:17
we've 15:1 33:15
  43:17 49:13 51:4,9
  51:11
what's 12:15 21:16
  48:25
White 20:10,11
willing 18:8
wish 24:9 27:5 39:14
wishful 23:8
withdraw 41:22 42:6
  42:14
withdrawing 42:19
witness 4:3 46:6,8,14
  46:23 53:8,11,13
  56:4
word 12:12 21:16
words 39:11,13 40:4
work 8:12 10:25 12:25
  13:8 14:17,21 19:20
  22:20 29:6,21 35:22
  43:1,20 46:19,24
  47:4,11,14,15 50:14
worked 8:6 10:22
  14:12
working 8:8 10:8,10
  21:17 22:10 23:7
  37:5 43:16,18 46:22
wouldn't 13:10 17:3
  21:22 24:18 25:12
  46:13
write 18:8 24:13
writing 32:21 48:3,4
wrong 16:10 28:22
wrote 38:19
W.R 1:6 8:24 10:9,11
  10:23 21:5,12,20,24
  22:1,4,7,9 25:8
  27:24 34:7 46:10,20
  46:22,24 47:4,22

**X**

X 4:1,7

**Y**

yeah 16:5 19:6,6,9
  20:5 29:5 31:24
  32:11 34:24 37:22
  38:22 39:21
year 9:19 16:6,7 18:2
  44:11

years 46:10
yelling 38:25
York 56:12,12
you'd 28:22
you're 11:1 12:25
  24:12 28:23 29:12
  34:20 35:6,7,11,23
  36:10 37:8 40:3 44:6
  44:18
you've 37:23 50:3

**0**

01-1139 1:10

**1**

1 4:9
1-800-348-3805 2:21
1-800-825-3341 1:25
  56:12
10 46:10
10011 56:12
11 1:4
12 46:10
12th 20:11
1200 2:2
16 1:16 2:4

**2**

20th 9:11,23 10:2
200 3:7 5:16
2000 7:20
2005 8:18,19 10:8,20
  13:23,25 14:7,22
  16:4 17:7,15 35:15
  45:22 49:15
2006 9:11,23 10:2,21
  13:1,8,21 18:1 34:7
  36:7 37:14 38:20
2009 1:16 2:4 54:15
225 2:2
2500 3:8
29924 2:20 5:17

**3**

30 45:13
300 2:12
305)374-7580 3:10
312)862-2000 2:14
33131-5340 3:9
39 9:6

**5**

5 4:4

**6**

6:00 2:3
60654 2:13
685 2:19

**7**

7:00 52:7
74 56:11

**9**

9 4:9