UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                    .    Case No.  01-1139 (JKF)
                          .
W.R. GRACE & CO.,         .
et al.,                   .    USX Tower - 54th Floor
                          .    600 Grant Street
                          .    Pittsburgh, PA 15219
              Debtors.    .
                          .    September 15, 2009
. . . . . . . . . . . ..       9:05 a.m.
```

TRANSCRIPT OF PLAN CONFIRMATION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               LISA G. ESAYIAN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For the Asbestos          Caplin & Drysdale, Chartered
Creditors Committee:      By:  NATHAN FINCH, ESQ.
                               PETER V. LOCKWOOD, ESQ.
                          One Thomas Circle, NW
                          Washington, D.C. 20005

For the Future            Orrick, Herrington & Sutcliffe, LLP
Claimants                 By:  JONATHAN GUY, ESQ.
Representatives:          Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007

Audio Operator:           Cathy Younker
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Libby Claimants: Lewis, Slovak & Kovacich, P.C.
                         By:  TOM L. LEWIS, ESQ.
                              MARK KOVACICH, ESQ.
                         725 Third Avenue North
                         Great Falls, MT 59401

For Fireman's Fund       Stevens & Lee
and Allianz Entities:    By:  JOHN D. DEMMY, ESQ.
                         1105 North Market Street
                         Wilmington, DE 19801

For Arrowood:            Wilson, Elser, Moskowitz, Edelman,
                           & Dicker, LLP
                         By:  CARL J. PERNICONE, ESQ.
                         150 East 42nd Street
                         New York, NY 10017

                         O'Melveny & Myers, LLP
                         By:  TANCRED SCHIAVONI, ESQ.
                         Times Square Tower
                         Seven Times Square
                         New York, NY 10036

For BNSF Railway:        Pepper Hamilton, LLP
                         By:  BOB PHILLIPS, ESQ.
                         3000 Two Logan Square
                         Philadelphia, PA  19103

For CNA:                 Goodwin Procter, LLP
                         By:  MICHAEL GIANNOTTO, ESQ.
                         Exchange Place
                         Boston, MA  02109-2881

For Fireman's Fund:      Stevens & Lee
                         By:  MARNIE SIMON, ESQ.
                         600 College Road East, Suite 4400
                         Princeton, NJ 08540

For Maryland Casualty:   Connelly Bove Lodge & Hutz, LLP
                         By:  JEFFREY WISLER, ESQ.
                         The Nemours Building
                         1007 North Orange Street
                         Wilmington, DE  19899

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Ford, Marrin,          Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer            Gleser, LLP
& Gleser, LLP:             By:  ELIZABETH M. DeCRISTOFARO, ESQ.
                           Wall Street Plaza, 23rd Floor
                           New York, NY  10005-1875

For AXA Belgium:           Tucker Arensberg, P.C.
                           By:  MICHAEL A. SHINER, ESQ.
                           1500 One PPG Place
                           Pittsburgh, PA  15222

                           Mendes & Mount
                           By:  EILEEN McCABE, ESQ.
                           750 Seventh Avenue
                           New York, NY  10019

For Kaneb Pipe Line        Gilbert & Renton, LLC
Operating Partnership,     By:  ROBERT GILBERT, ESQ.
LP:                        344 North Main Street
                           Andover, MA 01810

For Garlock Sealing        Robinson, Bradshaw & Hinson, P.A.
Technologies:              By:  GARLAND CASSADA, ESQ.
                                RICHARD WORF, ESQ.
                           101 North Tryon Street
                           Suite 1900
                           Charlotte, NC  28246

                           Morris James, LLP
                           By:  BRETT FALLON, ESQ.
                           500 Delaware Avenue, Suite 1500
                           Wilmington, DE 19801

For Federal Insurance      Cozen O'Connor
Company:                   By:  JACOB C. COHN, ESQ.
                           1900 Market Street
                           Philadelphia, PA  19103

For National Union Fire    Zeichner Ellman & Krause, LLP
Insurance Co.:             By:  MICHAEL DAVIS, ESQ.
                           575 Lexington Avenue
                           New York, NY  10022

For the Unsecured          Strook & Strook & Lavan
Creditors' Committee:      By:  KENNETH PASQUALE, ESQ.
                           180 Maiden Lane
                           New York, NY 10038

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Fireman's Fund          Crowell & Moring LLP
Insurance Co.:              By:  LESLIE A. DAVIS, ESQ.
                                 MARK PLEVIN, ESQ.
                           1001 Pennsylvania Avenue, N.W.
                           Washington, DC  20004


For OneBeacon              Drinker Biddle & Reath LLP
Ins. Co., Geico,           By:  MICHAEL F. BROWN, ESQ.
Seaton Ins. Co.                 JEFFREY M. BOERGER, ESQ.
& Republic Ins. Co:        One Logan Square
                           18th and Cherry Streets
                           Philadelphia, PA  19103

                           Drinker Biddle
                           By:  WARREN PRATT, ESQ.
                           1100 N. Market Street
                           Wilmington, DE 19801-1254

For Longacre Master        Pepper Hamilton
Fund:                      By:  JAMES C. CARIGNAN, ESQ.
                           Hercules Plaza, Suite 5100
                           1313 Market Street
                           Wilmington, DE 19899

TELEPHONIC APPEARANCES:

For the Debtors:           Kirkland & Ellis, LLP
                           By:  JANET BAER, ESQ.
                                ELLI LEIBENSTEIN, ESQ.
                           200 East Randolph Drive
                           Chicago, IL  60601


For the Debtors:           Kirkland & Ellis, LLP
                           By:  THEODORE FREEDMAN, ESQ.
                                CHRISTOPHER GRECO, ESQ.
                                CLEMENT YEE, ESQ.
                           Citigroup Center, 153 East 53rd St.
                           New York, NY  10022


For the Debtors:           Pachulski, Stang, Ziehl &Jones
                           By:  JAMES O'NEILL, ESQ.
                           919 North Market Street, 17th Floor
                           Wilmington, DE  19899-8705


For Various Claimant       Stutzman, Bromberg, Esserman & Plifka
Firms:                     By:  DAVID J. PARSONS, ESQ.
                           2323 Bryan Street,  Suite 2200
                           Dallas, TX  75201

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

```
For Morgan Stanley        Katten Muchin Roseenman, LLP
Senior Funding, Inc.:     By:  JEFF FRIEDMAN, ESQ.
                               MERRITT PARDINI, ESQ.
                          575 Madison Avenue
                          New York, NY  10022-2585


For Morgan Stanley        Edwards Angell Palmer Dodge, LLP
Senior Funding, Inc.:     By:  ROBERT CRAIG MARTIN, ESQ.
                          919 N Market St.
                          Wilmington, DE 19801-3023


For Serengeti:            Vinson & Elkins, LLP
                          By:  ARI BERMAN, ESQ.
                          Trammell Crow Center
                          2001 Ross Avenue, Suite 3700
                          Dallas, TX  75201


For Scott Company:        Vorys, Sater, Seymour & Pease, LLP
                          By:  TIFFANY COBB, ESQ.
                          52 East Gay Street
                          Columbus, OH  43216


For Official Committee    Dies & Hile, LLP
of Asbestos Property      By:  MARTIN DIES, ESQ.
Damage Claimants:         1601 Rio Grande, Suite 330
                          Austin, TX  78701

                          LECG
                          By:  ELIZABETH DEVINE, ESQ.
                          1725 Eye Street NW, Ste 800
                          Washington, DC,  20006


For the Property          Bilzin Sumberg Baena Price &
Damage Committee:           Axelrod LLP
                          By:  MATTHEW KRAMER, ESQ.
                          200 South Biscayne Boulevard
                          Suite 2500
                          Miami, FL  33131


For the Property          Bilzin Sumberg Baena Price &
Damage Committee:           Axelrod LLP
                          By:  SCOTT BAENA, ESQ.
                               JAY SAKALO, ESQ.
                          200 South Biscayne Boulevard
                          Suite 2500
                          Miami, FL  33131
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For the Bank Lenders:          Paul Weiss Rifkind Wharton &
                                  Garrison, LLP
                               By:  MARGARET PHILLIPS, ESQ.
                                    REBECCA ZUBATY, ESQ.
                                    ANDREW N. ROSENBERG, ESQ.
                               1285 Avenue of the Americas
                               New York, NY  10019

For the Bank Lenders:          Crowell & Moring LLP
                               By:  TACIE YOON, ESQ.
                               1001 Pennsylvania Avenue, N.W.
                               Washington, DC  20004

For Asbestos Property          Scott Law Group
Damage Claimants:              By:  DARRELL SCOTT, ESQ.
                               1001 East Main Street, Suite 500
                               Sevierville, TN  37864

For National Union Fire        Zeichner Ellman & Krause, LLP
Insurance Co.:                 By:  ROBERT GUTTMANN, ESQ.
                               575 Lexington Avenue
                               New York, NY  10022

For the Future                 Orrick, Herrington & Sutcliffe,
Claimants                        LLP
Representatives:               By:  DEBRA FELDER, ESQ.
                                    JOSHUA CUTLER, ESQ.
                               Washington Harbour
                               3050 K Street, N.W.
                               Washington, D.C.  20007

For Federal Insurance          Cozen O'Connor
Company:                       By:  ILAN ROSENBERG, ESQ.
                               1900 Market Street
                               Philadelphia, PA  19103

For Official Committee         Anderson Kill & Olick
of Asbestos Personal           By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:              1251 Avenue of the Americas
                               New York, NY  10020-1186

                               Caplin & Drysdale
                               By:  JAMES P. WEHNER, ESQ.
                               One Thomas Circle, N.W., Suite 1100
                               Washington, District of Columbia 20005

TELEPHONIC APPEARANCES (CONT'D):

For Grace Certain        Montgomery, McCracken, Walker &
Cancer Claimants:           Rhoads, LLP
                         By:  NATALIE D. RAMSEY, ESQ.
                         300 Delaware Avenue, Ste. 750
                         Wilmington, DE  19801

For David T. Austern,    Phillips, Goldman & Spence, P.A.
the Future Claimants'    By:  JOHN C. PHILLIPS, ESQ.
Representative:          1200 North Broom Street
                         Wilmington, DE  19806

For Allstate Insurance:  Cuyler Burk, LLP
                         By:  STEFANO CALOGERO, ESQ.
                              ANDREW K. CRAIG, ESQ.
                         Parsippany Corporate Center
                         Four Century Drive
                         Parsippany, NJ  07054

For the Asbestos         Ferry Joseph & Pearce, P.A.
Creditors Committee:     By:  THEODORE TACCONELLI, ESQ.
                         824 Market Street, Suite 19899
                         Wilmington, DE  19899

For Ford, Marrin,        Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer          Gleser
& Gleser:                By:  SHAYNE SPENCER, ESQ.
                              ELIZABETH DeCRISTAFARO, ESQ.
                         Wall Street Plaza
                         New York, NY  10005

For Official Committee   Duane Morris, LLP
of Unsecured Creditors:  By:  MICHAEL LASTOWSKI, ESQ.
                         1100 North Market Street, Suite 1200
                         Wilmington, DE  19801-1246

For Official Committee   Brandi Law Firm
of Asbestos Property     By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:             TERENCE D. EDWARDS, ESQ.
                         44 Montgomery St., Suite 1050
                         San Francisco, CA  94104

                         Lieff, Cabraser, Heimann & Bernstein
                         By:  ELIZABETH J. CABRASER, ESQ.
                         Embarcadero Center West
                         275 Battery Street, Suite 3000
                         San Francisco, CA  94111

TELEPHONIC APPEARANCES (CONT'D):

```
For Official Committee:  Riker, Danzig, Scherer, Hyland &
of Asbestos Property      Perretti, LLP
Damage Claimants:        By:  TARA MONDELLI, ESQ.
                              CURTIS PLAZA, ESQ.
                         Headquarters Plaza
                         One Speedwell Avenue
                         Morristown, NJ  07962


For the Libby Claimants: Cohn, Whitesell & Goldberg, LLP
                         By:  CHRISTOPHER M. CANDON, ESQ.
                         101 Arch Street
                         Boston, MA  02110


For the Libby Claimants: Landis, Rath & Cobb, LLP
                         By:  KERRI K. MUMFORD, ESQ.
                              JAMES S. GREEN, JR., ESQ.
                         919 Market Street, Suite 1800
                         Wilmington, DE  19899


For the Bank Lenders:    Landis, Rath & Cobb, LLP
                         By:  RICHARD COBB, ESQ.
                         919 Market Street, Suite 1800
                         Wilmington, DE  19899


For the PD Committee:    Speights & Runyan
                         By:  DANIEL SPEIGHTS, ESQ.
                              MARION FAIREY, ESQ.
                              ALAN RUNYAN, ESQ.
                         200 Jackson Avenue, East
                         Hampton, SC  29924


For Everest Reinsurance  Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:         By:  BRIAN L. KASPRZAK, ESQ.
                              JOHN D. MATTEY, ESQ.
                         913 North Market Street
                         Suite 800
                         Wilmington, DE  19801


For Murray Capital       Murray Capital Management, Inc.
Management               By:  MARTI MURRAY


For Normandy Hill        Normandy Hill Capital, LLP
Capital, LLP:            By:  MATTHEW CANTOR
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

```
For Anderson Memorial      Kozyak, Tropin & Throckmorton, PA
Hospital:                  By:  JOHN W. KOZYAK, ESQ.
                                DAVID L. ROSENDORF, ESQ.
                           2525 Ponce de Leon, 9th Floor
                           Miami, Florida 33134


For ZAI Claimants          Hogan Firm Attorneys at Law
& various law firms:       By:  DANIEL K. HOGAN, ESQ.
                           1311 Delaware Avenue
                           Wilmington, DE  19801


For the U.S. Trustee:      Office of the U.S. Trustee
                           By:  DAVID KLAUDER, ESQ.
                           844 King Street, Suite 2313
                           Wilmington, DE  19801


For Arrowood               Bifferato Gentilotti LLC
Indemnity Co.:             By:  GARVAN McDANIEL, ESQ.
                           800 North King Street
                           Wilmington, DE  19801


For AXA Belgium:           Mendes & Mount
                           By:  ANNA NEWSOM, ESQ.
                           750 Seventh Avenue
                           New York, NY  10019


For Royal Insurance:       Wilson Elser Moskowitz Edelman
                             & Dicker, LLP
                           By:  CARL PERNICONE, ESQ.
                           150 East 42nd Street
                           New York, NY  10017


For Official Committee     Richardson Patrick Westbrook &
of Asbestos Property         Brickman, P.C.
Claimants:                 By:  EDWARD J. WESTBROOK, ESQ.
                           174 East Bay Street
                           Charleston, SC  29401


For Dow Jones              Dow Jones News Wires
News Wires:                By:  PEG BRICKLEY


For the Equity             Kramer Levin Naftalis & Frankel
Committee:                 By:  DAVID E. BLABEY, JR., ESQ.
                           919 Third Avenue
                           New York, NY  10022
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

| | |
|---|---|
| For Hartford Financial Service Group: | Wilmer Wilmer Cutler Pickering Hale & Dorr, LLP<br>By:  MELANIE R. DRITZ, ESQ.<br>399 Park Avenue<br>New York, NY  10022 |
| For Travelers Casualty Surety Company: | Morris Nichols Arsht & Tunnell, LLP<br>By:  MATTHEW B. HARVEY<br>1201 N. Market Street<br>PO Box 1347<br>Wilmington, DE 19899-1347 |
| For Asbestos Property Damage Claimants: | Pryor Cashman, LLP<br>By:  RICHARD LEVY, ESQ.<br>410 Park Avenue<br>New York, NY  10022 |
| For David T. Austern, Future Claimants' Representative: | Lincoln International, LLC<br>By:  JOSEPH RADECKI |

- - -

**I N D E X**

| | PAGE |
|---|---|
| **WITNESSES** | |
| JAY HUGHES | |
| Continued Cross Examination by Mr. Plevin | 15 |
| Cross Examination by Ms. McCabe | 23 |
| Cross Examination by Mr. Schiavoni | 31 |
| Cross Examination by Ms. DeCristofaro | 35 |
| Cross Examination by Mr. Davis | 45 |
| Cross Examination by Mr. Demmy | 47 |
| Cross Examination by Mr. Carignan | 51 |
| Redirect Examination by Mr. Bernick | 59 |
| | |
| MARK SHELNITZ | |
| Direct Examination by Mr. Bernick | 76 |
| Cross Examination by Mr. Pratt | 100 |
| Redirect Examination by Mr. Bernick | 125 |
| | |
| MARK PETERSON | |
| Direct Examination by Mr. Finch | 154 |
| Cross Examination by Mr. Bernick | 212 |
| Cross Examination by Mr. Cassada | 230 |
| Cross Examination by Mr. Pasquale | 257 |
| Cross Examination by Mr. Phillips | 270 |
| Redirect Examination by Mr. Finch | 273 |
| Recross Examination by Mr. Bernick | 277 |

| **EXHIBITS** | **ID**. | **EVD**. |
|---|---|---|
| Arrowood-12  Letter | 32 | 34 |
| Long-1  Stipulation of facts | 55 | 56 |
| Long-2  Morgan Stanley Stipulation | 57 | -- |
| Firemen's Fund 2  Supersedeas bond in Aaron Clifton Edwards vs. Pittsburgh Corning & Grace | -- | 67 |
| Firemen's Fund 3  Specialty surety indemnity agreement between Firemen's Fund & Grace | -- | 67 |
| Plan Proponent 243* | -- | 75 |
| OS-46, 50, 51, 15, 28, 40, 41, 44, 14, 16, 17, 18, 48, 49, 19, 20, 27 revised* | -- | 75 |
| GR-14, 15, 16, 17, 18, 19, 20 (all revised)* | -- | 75 |
| 507-1 to 507-9 Organization charts (demonstrative only) | -- | 95 |
| Plan Proponent 121 Lawsuit | -- | 99 |
| Plan Proponent 120 Class action complaint | -- | 99 |
| Plan Proponent 129 Lawsuit | -- | 99 |
| Plan Proponent 143 Addendum to Fresenius proof of claim | -- | 99 |

| **EXHIBITS (Cont'd)** | **ID.** | **EVD.** |
|---|---|---|
| Plan Proponent 178b  Slides | X | X |
| OS-20 Proof of claim of Sealed Air | -- | 99 |
| Libby 271 | 307 | 307 |
| Libby 271A | 307 | 307 |
| Plan Proponents 630  ACC Exhibit A | 311 | 313 |
| LC-281  Libby Exhibit B | 311 | 313 |
| Plan Proponents 631/LC-282  Stipulation | 312 | 313 |
| MCC 1  Settlement Agreement | 334 | 334 |
| MCC 2  Settlement Agreement | 334 | 334 |
| MCC 3  Declaration | 334 | 334 |
| Zurich 17  Settlement Agreement | 334 | 334 |
| Zurich 17  Declaration | 334 | 334 |
| A-34  Declaration | 336 | 336 |
| A-57  Declaration | 336 | 336 |
| FFICSC 1 through 6 | 337 | 338 |
| FFICSC 8 | 337 | 338 |
| FFICSC 9A through 9O | 337 | 338 |
| FFICSC 10 | 337 | 338 |
| FFICSC 14 through 23 | 337 | 338 |
| AXA-1  Declaration | 338 | 339 |
| AXA-2  Declaration | 338 | 339 |
| AXA-3  Declaration | 338 | 339 |
| Garlock 104  Stipulation | 340 | 341 |

*Admitted pursuant to stipulation to be filed

**J&J COURT TRANSCRIBERS, INC.**

1           THE CLERK:  All rise.

2           THE COURT:  Good morning.  Please be seated.  This is

3 the continuation of the Phase II confirmation hearing in W.R.

4 Grace.  The participants by phone today are Scott Baena, Janet

5 Baer, Ari Berman, David Bernick, David Blabey, Thomas Brandi,

6 Peg Brickley, Elizabeth Cabraser, Stefano Calogero, Christopher

7 Candon, Matthew Cantor, Richard Cobb, Tiffany Cobb, Jacob Cohn,

8 Andrew Craig, Joshua Cutler, Leslie Davis, Michael Davis,

9 Elizabeth DeCristofaro, Elizabeth Devine, Martin Dies, Melanie

10 Dritz, Terence Edwards, Patrick Ellard, Marion Fairey, Brett

11 Fallon, Debra Felder, Jordan Fisher, Theodore Freedman, Jeff

12 Friedman, Robert Gilbert, Christopher Greco, James Green, John

13 Greene, Robert Guttmann, Matthew Harvey, Daniel Hogan, Robert

14 Horkovich, Brian Kasprzak, David Klauder, Stuart Kovensky, John

15 Kozyak, Matthew Kramer, Michael Lastowski, Elli Leibenstein,

16 Richard Levy, Robert Craig Martin, John Mattey, Garvan

17 McDaniel, Tara Mondelli, Kerri Mumford, Marti Murray, Anna

18 Newsom, James O'Neill, Merritt Pardini, David Parsons, Carl

19 Pernicone, Margaret Phillips, John Phillips, Curtis Plaza, Mark

20 Plevin, Joseph Radecki, Natalie Ramsey, Andrew Rosenberg, Ilan

21 Rosenberg, David Rosendorf, Alan Runyan, Jay Sakalo, Darrell

22 Scott, Michael Shiner, Marnie Simon, Daniel Speights, Shayne

23 Spencer, Theodore Tacconelli, James Wehner, Edward Westbrook,

24 Clement Yee, Tacie Yoon, and Rebecca Zubaty.

25           And folks who are having discussions, you need to use

1 the attorney conference rooms, please.  I can hear your

2 discussions rather than whoever's going to have the microphone.

3 So, please, that's what the conference rooms are for.  If

4 you're going to speak, go there to use them.  Good morning.

5 Are you ready to begin?  All right.

6        MR. BERNICK:  Good morning, Your Honor, we have

7 worked very hard over the evening to try to resolve the

8 document issues and other issues that were outstanding

9 yesterday.  I think that Mr. -- obviously, Mr. Hughes is still

10 on the stand if anybody else has any crosses.  I think some

11 people indicated that they did.  We can proceed with that, and

12 then we'll recall Mr. Finke for any further cross with respect

13 to Mr. Finke.  And, at that point, we will continue on with our

14 case on the second phase with Mr. Shelnitz and then Dr.

15 Peterson.  Dr. Peterson is going to be here for all purposes

16 and needs to get back for family reasons as promptly as

17 possible.  So we're going to call Mr. -- Dr. Peterson after Mr.

18 Shelnitz and then I think we'll be at the end of our phase --

19 Stage II of Phase II case --

20        THE COURT:  All right.

21        MR. BERNICK:  -- and it'll be up to the carriers.

22        THE COURT:  Okay.  Mr. Plevin?  Just to remind you,

23 Mr. Hughes, you're still under oath.

24        MR. HUGHES:  Yes.

25        MR. PLEVIN:  Good morning.

1          MR. HUGHES:  Good morning.

2          MR. PLEVIN:  Your Honor, before I get started with

3   Mr. Hughes, just to follow up on what Mr. Bernick said.  We

4   reached an agreement with the plan proponents in which I'd

5   mentioned yesterday that we had a witness.  Our witness is now

6   not going to testify and plan proponents have agreed that our

7   Exhibits 10, 15 through 23 are going to come into evidence and

8   we'll be filing a stipulation that reflects that.  And so the

9   witness that we were going to call is not going to be here

10  today.

11              JAY HUGHES, WITNESS, PREVIOUSLY SWORN

12                CONTINUED CROSS EXAMINATION

13  BY MR. PLEVIN:

14  Q    Good morning, Mr. Hughes.

15  A    Good morning.

16  Q    Do you recall yesterday that Mr. Bernick drew a chart here

17  and asked you some questions about claims brought by, among

18  others, the State of Montana, BNSF, Scotts and Maryland

19  Casualty?

20  A    Yes.

21  Q    And he also talked about a claim brought by Fireman's

22  Fund?

23  A    Yes.

24  Q    And do you recall saying that those claims by those

25  entities I mentioned, Montana, BNSF, Scotts, Maryland Casualty

1  and Fireman's Fund, were all essentially for the same activity

2  for which plaintiffs were alleging Grace is liable?

3  A    Yes.

4  Q    That's not completely true, at least not with respect to

5  the Fireman's Fund claim, isn't that right?

6  A    Well, the tort claims, the claims brought by the other

7  parties are -- they are tort claims being brought against

8  Maryland Casualty, State of Montana and the Scotts arising from

9  exposures to vermiculite.  The Fireman's Fund claim is a

10 judgment, a surety claim on a judgment, but the underlying

11 claim that gave rise to the judgment was the same type of

12 claim, a tort claim, personal injury claim, arising from

13 exposures to Grace products.

14 Q    All right.  Well, let's dig a little deeper on this.  The

15 plaintiff sued BNSF, correct?  Tort plaintiff sued BNSF for

16 bodily injury?

17 A    Yes.

18 Q    And BNSF is alleging that Grace is liable for the bodily

19 injury claims that the plaintiffs are asserting against BNSF,

20 right?

21 A    Yes.

22 Q    And the -- and tort claimants also sued Scotts asserting

23 bodily injury claims against Scotts, correct?

24 A    Yes.

25 Q    And Scotts is then alleging that Grace has some obligation

1  to indemnify Scotts for the liability claims brought by the

2  tort claimants, correct?

3  A    Yes.

4  Q    And tort claimants are also suing the State of Montana

5  directly, correct?

6  A    Yes.

7  Q    And the State of Montana is claiming against Grace saying

8  that Grace is responsible in some way for the claims brought by

9  the tort claimants against the State of Montana, correct?

10 A    Yes.

11 Q    And then with respect to Maryland Casualty, tort claimants

12 are suing Maryland Casualty directly, correct?

13 A    Yes.

14 Q    And Maryland Casualty is then asserting that Grace is

15 liable to Maryland Casualty for the claims brought by the tort

16 claimants, correct?

17 A    Yes.

18 Q    Did any tort claimants sue Fireman's Fund in the <u>Edwards</u>

19 case?

20 A    Not that I'm aware of, but, again, the underlying

21 obligation --

22 Q    That's a yes or no question, Mr. Hughes.  Did any -- to

23 your knowledge, did any of -- did the tort claimants in the

24 <u>Edwards</u> cases sue Fireman's Fund or Grace?

25 A    Grace.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    They asserted bodily injury claims against Grace, correct?

2 A    Yes.

3 Q    They didn't assert any claims against Fireman's Fund,

4 correct?

5 A    No, but under the terms of the surety bond --

6 Q    Fireman's Fund was not a defendant in that lawsuit, was

7 it?

8 A    No, it wasn't.

9 Q    Right.  Now, there was a judgment in that lawsuit against

10 Grace, correct?

11 A    Grace and Pittsburgh Corning.

12 Q    And Grace decided to appeal the judgment?

13 A    Yes.

14 Q    Now, are you aware of the fact that if Grace had simply

15 appealed and had not put up some kind of security, the Edwards

16 claimants at that time could have started to execute their

17 judgment against Grace's assets?

18 A    That's the purpose of an appeal bond is to stop that.

19 Q    Okay.  An appeal bond is one way of, in effect,

20 superceding the judgment, correct?

21 A    Yes.

22         MR. BERNICK:  Objection to the form of the question.

23         THE COURT:  That's sustained.

24         MR. PLEVIN:  Excuse me?

25         THE COURT:  That's sustained.

1  Q    Okay.  The effect of an appeal bond is to preclude the

2  plaintiffs from executing against Grace's assets, correct?

3  A    Yes.

4  Q    An appeal bond is not the only way that Grace could have

5  obtained that relief, correct?

6  A    Correct.

7  Q    Grace could have simply put up enough money, $43 million

8  or whatever, to stop the execution against Grace, correct?

9  A    Yes.

10  Q    And that would have cost Grace $43 million out-of-pocket,

11  right?

12  A    Again, but then they would have -- yes, I guess, yeah.

13  Q    Grace could have taken out a bank loan and used that to

14  put up the $43 million, correct?

15  A    Yes.

16  Q    And if Grace had done that, it would have had to have paid

17  interest to the bank, right?

18  A    Right.

19  Q    What was --

20  A    But the difference is, again, that Grace, as I understand

21  it, we had a current obligation.  In the contract between Grace

22  and Fireman's Fund, Fireman's Fund undertook the, for a

23  premium --

24          MR. PLEVIN:  Your Honor, I move to strike this.

25          THE COURT:  That's sustained.  There's no question.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    If Grace had put up -- if Grace had taken a bank loan to

2  put up $43 million to stop the execution of the judgment

3  against Grace's assets, Grace would have had to have paid money

4  to a bank for interest, correct?

5  A    Yes.

6  Q    At that time, was Grace able to obtain loans at the prime

7  rate?

8  A    I have no idea.

9  Q    Okay.  You don't know whether Grace had to pay more than

10 the prime rate for loans?

11 A    I have no idea.

12        MR. BERNICK:  Objection, this is irrelevant.

13        THE COURT:  He -- well, he's answered he doesn't

14 know, so it doesn't matter.

15 Q    The reason that Grace decided to post an appeal bond

16 rather than put up its own money was that it was a cheaper way

17 from Grace's perspective to stop the Edwards plaintiffs from

18 executing on the bond?

19        MR. BERNICK:  Objection, relevance.

20        THE COURT:  What is the relevance?

21        MR. PLEVIN:  Your Honor, the relevance is that the

22 plan proponents have classified the Fireman's Fund indemnity

23 claim as a Class 6 asbestos claim and I'm trying to show that

24 it's no different than any other kind of credit or financing

25 transaction and that this was just substituted for other ways

1 that Grace could have dealt with that judgment and stopped the

2 execution against Grace's assets.

3        MR. BERNICK:  Yeah, that actually is irrelevant to

4 the classification issue, completely irrelevant.  The fact that

5 the bond is a financial instrument doesn't make it any

6 different from the fact that other people assert different

7 other types of obligations, common law obligations, written

8 indemnity obligations.  It's just the fact that the motive is

9 financing is irrelevant to the question of whether it's an

10 indirect claim.

11        THE COURT:  I'm not certain I understand why the

12 motive makes a difference.  I think there has to be a logical

13 relationship in the classification and if asbestos underlying

14 liability is the logical classification, I'm not sure that

15 there's a problem with it.

16        MR. PLEVIN:  Your Honor, that's Mr. Bernick's

17 argument --

18        THE COURT:  Well, that's the theory.

19        MR. PLEVIN:  -- and I understand that's his argument

20 and his theory.  I have a different theory.  My theory is that

21 if Grace had -- that this is a financing transaction.  This is

22 not a claim over on a bodily injury claim.  It is a financing

23 transaction where Fireman's Fund came in after the fact, was

24 solicited by Grace to put up a supersedeas bond.  Fireman's

25 Fund did so and I have other arguments based on some of the

1  documentary evidence that I've just told the Court we've

2  stipulated to.  I don't need to lay out the whole case right

3  now with Mr. Hughes.  I think this is relevant to my theory

4  that I'd like to pursue.

5          THE COURT:  I think it is relevant to your theory and

6  I'm not sure how the classification issue will work out, so

7  I'll overrule the objection.  You may pursue this line.

8                    (Attorney conversation)

9          UNIDENTIFIED ATTORNEY:  Your Honor, I'm trying to

10  remember what the question was.

11          THE COURT:  The last question that I had was Grace

12  decided to post an appeal bond rather than to put up cash

13  because it was cheaper, right?  Objection to relevance.

14  Q    Okay.  Mr. Hughes, can you answer that question?

15  A    I don't know whether it was cheaper or not.  Again, I

16  would have been involved in the underlying lawsuit which was an

17  asbestos personal injury claim brought against the company.  I

18  wouldn't have been necessarily involved in the decision on what

19  was the cheapest way to, you know, hold off the plaintiff's

20  ability to execute on the judgment while the appeal was

21  pending.

22  Q    Who at Grace had that responsibility?

23  A    The people in the treasury department.

24  Q    And the people in the treasury department included Mr.

25  Tarola?

1  A    Yes.

2  Q    He was the treasurer of Grace?

3  A    He was the CFO.

4  Q    And Mr. Hunter?

5  A    Yes.

6  Q    And what was his job at the time?

7  A    He was involved in the treasury.  I don't know his

8  specific title.

9       MR. PLEVIN:  Thank you, Mr. Hughes.  Your Honor, no

10  more questions.

11       THE COURT:  Ms. McCabe?

12                    CROSS EXAMINATION

13  BY MS. McCABE:

14  Q    Good morning, Mr. Hughes.

15  A    Good morning.

16  Q    My name is Eileen McCabe and we've met and we've known

17  each other, I think, for quite a few years.

18  A    Yes.

19  Q    I'm here today representing Axa Belgium as successor to

20  Royal Belge and I just have hopefully what will be a few

21  questions --

22  A    Sure.

23  Q    -- for you today.  Isn't it correct that Grace had filed

24  declaratory judgment actions against a number of its insurers

25  in the 1980s through the early 1990s?

1  A    Yes.

2  Q    And those coverage actions were lengthy, they went on for

3  a number of years, correct?

4  A    Yes, they did.

5  Q    They were hotly contested coverage actions?

6  A    They were litigated, yes.

7  Q    They were litigated.  And those actions were pending in a

8  number of jurisdictions, weren't they?

9  A    Yes.

10  Q   Okay.  And eventually Grace entered into settlements with

11  certain of its insurers that it had been involved in coverage

12  actions with, correct?

13  A    Yes.

14  Q   And those settlement agreements that Grace entered into

15  were different types of agreements with different insurers,

16  correct?

17  A    Yes.

18  Q   Okay.  And I believe some of those have been referred to

19  as reimbursement agreements, are you aware of that?

20  A    Yes.

21  Q   And -- okay.  And then other agreements were not

22  reimbursement agreements, correct?

23  A    Yes.

24  Q   All right.  And isn't it also correct that Grace did not

25  enter into settlement agreements with a number of insurers?

**J&J COURT TRANSCRIBERS, INC.**

1  A    There are some unsettled insurer issues.  I understand it,
2  yes.
3  Q    Okay.  For instance, Grace has not entered into any
4  settlement agreements with Royal Belge or Axa Belgium, correct?
5  A    Not that I'm aware of.
6  Q    Okay.  Would it help if I refreshed your recollection in
7  that regard if I showed you some exhibits to the plan?
8  A    Sure.
9  Q    Okay.
10         THE COURT:  Mona, can you call downstairs and see if
11  they can get a couple of extra chairs to put in?  There's
12  always somebody standing back there and if we got some chairs
13  they wouldn't have to.
14         MS. McCABE:  Your Honor, may I approach?
15         THE COURT:  Yes, sir -- ma'am, I'm sorry.
16         MS. McCABE:  That's all right.
17         THE COURT:  I was looking at the back.
18         MR. GUY:  Your Honor, if we could have just a second.
19  I think we could stipulate to this fact.
20         THE COURT:  All right.
21                    (Pause)
22         MR. GUY:  Apparently not, Your Honor.
23         THE COURT:  All right.
24         MS. McCABE:  Okay.  Your Honor, what we've done is
25  I've just excerpted certain portions of documents that have

1  been marked exhibits in this case.  I hope that's acceptable,

2  Your Honor.  I gave the hard copies to you, the witness and the

3  opposing counsel because the actual documents are rather

4  lengthy, so I didn't bring the whole thing with me.

5              THE COURT:  That's fine.

6              MS. McCABE:  Okay.

7  Q    If I could refer you, Mr. Hughes, to what's been -- what's

8  under Tab Number 2 in the booklet I just handed you?

9  A    Yes.

10 Q    Okay.  It's a portion of what's been marked Plan

11 Proponents Exhibit 277.06.  It's the Exhibit 6 to exhibit book,

12 asbestos insurance transfer agreement.  Do you see that?

13 A    Yes.

14 Q    Okay.  And if I could refer you, please, to the first

15 exhibit there which is -- I'm sorry, it's not an exhibit, it's

16 a schedule, Schedule 1, primary and excess insurance policies

17 that were or are applicable to asbestos related claims.  It's

18 Page 1 of 20.  Do you see that?

19 A    Yes.

20 Q    Okay.  And then if you thumb through that, it's in

21 alphabetical order.  On Page 16, there's a reference there to

22 Royal Belge midway down.

23 A    Yes.

24 Q    Okay.  And if then I could have you please turn, sir, to

25 what's been -- or what's Schedule 2 here.  It's, yeah, just

Hughes - Cross/McCabe                               27

1 Schedule 2.

2 A    Yes.

3 Q    Do you see that?  Okay.  There's a listing here of

4 schedule of asbestos insurance settlement agreements.  Do you

5 see that?

6 A    Yes.

7 Q    And there's a number of insurance companies listed there

8 and the date of the agreement is listed to the right.  Am I

9 correct that that's the date of the settlement agreement with

10 that insurance company?

11 A    That's what it appears to be.

12 Q    Okay.  And if you look through there, you do not see a

13 reference, do you, sir, to Royal Belge?

14 A    No, I don't.

15 Q    Okay.  And if you turn to the next schedule which is

16 Schedule 3, the same thing.  It's a -- this is captioned the

17 schedule of asbestos insurance reimbursement agreements, do you

18 see that?

19 A    Yes.

20 Q    And yesterday during your testimony you were discussing

21 your exchanges with the reimbursement insurers, correct?

22 A    Yes.

23 Q    And these were the entities that you were discussing, is

24 that correct?

25 A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    Okay.  And if you look down on this list, there is not a

2 reference, is there, sir, to Royal Belge?

3 A    No, there's not.

4 Q    Does this refresh your recollection, sir, that there is,

5 in fact, no pre-petition settlement agreement with Royal Belge?

6 A    I think the documents speak for themselves.  I -- but I

7 assume they're accurate, yes.

8 Q    Okay.  Thank you.  Mr. Hughes, your involvement with

9 insurers, Grace's insurers, was primarily with regard to

10 obtaining consent from certain insurers who had entered into

11 reimbursement agreements with Grace with regard to -- well, let

12 me strike that.  That was too long.  Your involvement with the

13 insurers was generally with regard to reimbursement insurers

14 and working to document certain requirements under those

15 settlement agreements, isn't that correct?

16 A    Yes.

17 Q    And you were really not involved with insurance carriers

18 otherwise, were you?

19 A    What do you mean by otherwise?

20 Q    Well, your interactions with insurers were primarily with

21 regard to the reimbursement insurers and with regard to

22 obtaining consent as required under certain of those

23 agreements, isn't that correct?

24 A    Yeah, and I was also involved in, to the extent they

25 were -- exercise any audit rights under the agreements, as

1  well.

2  Q    Under those settlement agreements?

3  A    Yes.

4  Q    Okay.  And yesterday counsel went through with you what

5  has been marked Plan Proponents Exhibit 95 and it was a letter

6  written to Mendes & Mount and to me, in fact.  And that letter,

7  sir, that's an example of the type of correspondence that you

8  had with the reimbursement insurers, wasn't that -- isn't that

9  correct?

10 A    It's an example, yes.

11 Q    All right.  But those were the types of letters that you

12 sent to the reimbursement insurers who had agreements which

13 required consent from Grace, isn't that correct?

14 A    Yes.

15 Q    Okay.  You didn't send those letters to Royal Belge, did

16 you, sir?

17 A    No.

18 Q    All right.  You didn't send those letters to high level

19 excess carriers who were unsettled with Grace, did you?

20 A    No.

21 Q    And isn't it correct, sir, that Grace doesn't have any

22 settlement agreements with Royal Belge pursuant to which Royal

23 Belge has given up, waived or ceded any of its rights under its

24 insurance policies?

25 A    Based on what you showed me, there's no agreement except

1  the original insurance policy.

2  Q    Well, let me follow up on that.  The Royal Belge -- to

3  your knowledge, Royal Belge hasn't waived or ceded any of its

4  rights under that insurance policy with Grace, isn't that

5  correct?

6           MR. BERNICK:  Objection, lack of foundation.

7           THE COURT:  You have to lay the foundation.

8           MS. McCABE:  Foundation is the witness said based on

9  what he saw there and so I'm asking his understanding.  Does he

10 understand that Royal Belge has waived any of its rights under

11 the policy.

12          MR. BERNICK:  Yeah --

13          THE COURT:  But you also established that his primary

14 function was to deal with the settlements and apparently there

15 are none.  So you need to lay a foundation as to how he would

16 have this knowledge.

17 Q    Okay.  Do you have any knowledge of any interactions with

18 Royal Belge and W.R. Grace?

19 A    Any?

20 Q    Interactions.

21 A    No, I'm not aware of any.

22          MS. McCABE:  Okay.  Your Honor, I think that's fine.

23 I don't need to follow up on that.  And that's it for me, Mr.

24 Hughes.

25          THE WITNESS:  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Mr. -- please, please.

2          THE COURT:  Mr. Schiavoni?

3          MR. SCHIAVONI:  Mr. Schiavoni for Arrowood.  Your

4  Honor, we had offered deposition designations in support of the

5  Arrowood settlement.  Those deposition designations at that

6  time were unobjected to.  We then redesignated them for this

7  proceeding and they were unobjected to.  I would just offer

8  those, again, now in lieu of questioning the witness on those

9  and that would be from the June 11, 2009 deposition of Mr.

10 Hughes, Page 361, Line 22.

11         THE COURT:  Wait, I'm sorry, you're going too fast

12 for me.  June 11, 2009, page what?

13         MR. SCHIAVONI:  Page 361, Line 22 --

14         THE COURT:  All right.

15         MR. SCHIAVONI:  -- through Page 378, Line 24.  And,

16 Your Honor, I can hand those up.

17         THE COURT:  All right.

18         MR. SCHIAVONI:  And the only other thing I want to

19 do, Your Honor, is I have four questions just to lay a

20 foundation for a document that was offered, again, in support

21 of the Arrowood settlement so I can enter it into evidence.

22 And if I could approach the witness?

23         THE WITNESS:  Sure.

24                      CROSS EXAMINATION

25 BY MR. SCHIAVONI:


                 **J&J COURT TRANSCRIBERS, INC.**

1  Q    Mr. Hughes, I've handed you a copy of a letter marked

2  Exhibit A-12.  Have you seen a copy of Exhibit A-12 before?

3  A    Yes, I have.

4  Q    And can you tell us generally what Exhibit A-12 is?

5  A    It's a letter from -- actually from Carl Pernicone and I

6  signed it for Grace where we communicate with Jon Moyers, who

7  is, I believe, was counsel for BNSF Railways in Montana

8  concerning the issue of coverages -- coverage -- insurance

9  coverage for BNSF in the asbestos/vermiculite claims against

10 them in Montana.

11 Q    Were you authorized by Grace to cause A-12 to be signed on

12 your behalf for Grace?

13 A    Yes, I was.

14 Q    And did you issue this letter, A-12, in the ordinary

15 course of your duties at Grace?

16 A    Yes, I did.

17 Q    Prior to issuing this May 5 letter that's been marked as

18 A-12, did you review the 1995 Grace/Royal settlement?

19 A    Yes, I did.

20 Q    Okay.  And, Mr. Hughes, did you speak to Mr. Posner and

21 others that were involved in the negotiation of the 1995

22 Grace/Royal settlement before issuing this letter?

23 A    Yes, I did.

24 Q    Were the statements that were made in Exhibit A-12

25 concerning the finality and the scope of the settlement of the

1  Royal coverage true and correct at the time that you made them?

2         MR. PHILLIPS:  Objection, no foundation.

3         THE CLERK:  Your name, sir?

4         MR. PHILLIPS:  Robert Phillips, sorry, for BNSF.

5         MR. SCHIAVONI:  Your Honor, I'm asking the witness

6  whether when he signed the letter, the statements that he made

7  in the letter were true and correct.  The witness signed the

8  letter.  He has the foundation to tell the Court whether he

9  thought the statements that he was making were true and

10 correct.

11        MR. PHILLIPS:  And objection, legal conclusion.

12        THE COURT:  No, I think this is a factual statement

13 asking the witness of his knowledge of the transactions.

14 Overruled.

15 A    At the time, based on my conversations with Mr. Posner and

16 others involved in the agreement, this was my -- this letter

17 reflected what I believed to be the facts concerning the Royal

18 Insurance settlement of -- 1995 settlement agreement, yes.

19        MR. SCHIAVONI:  Okay.  Your Honor, we'd offer Exhibit

20 A-12 into evidence.

21        MR. BERNICK:  No objection.

22        MR. FINCH:  No objection.  Is that Arrowood-12,

23 Mr. --

24        MR. SCHIAVONI:  Yes.

25        MR. FINCH:  -- Schiavoni?

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  It's admitted.

2          MR. SCHIAVONI:  Thank you, Your Honor.  Thank you,

3  Mr. Hughes.

4          THE COURT:  Give me a second, please.

5                         (Pause)

6          THE COURT:  All right.  Ms. DeCristofaro?

7          MS. DeCRISTOFARO:  Good morning.  Elizabeth

8  DeCristofaro for Continental Casualty Company.  Does the

9  witness have available the exhibits marked during his testimony

10 yesterday?

11         THE COURT:  Which ones?

12         MS. DeCRISTOFARO:  Specifically, Plan Proponent

13 Exhibit 1 and Plan Proponent Exhibit 95.

14         THE COURT:  Who marked them?

15         MS. DeCRISTOFARO:  They were marked and offered by

16 Mr. Bernick.

17         MR. BERNICK:  Right.  They were -- they should be --

18 they were, but I don't think that -- remember, we had the issue

19 with the notebook on that one?  Is was the settlement -- is

20 that the settlement agreement?

21         MS. DeCRISTOFARO:  Exhibit 1 is the Baron and Budd

22 settlement agreement and Exhibit 95 is a letter to Eileen

23 McCabe.

24                  (Attorney conversation)

25         THE WITNESS:  I have them here, too.  I'm just trying

**J&J COURT TRANSCRIBERS, INC.**

1  to find them.  They're not organized the way -- oh, I have

2  them.  I have the Baron and Budd settlement, yes.

3            MR. BERNICK:  Do you have extra copies for the judge?

4            MR. DeCRISTOFARO:  Do you have both documents, Mr.

5  Hughes?

6            THE WITNESS:  Yes, I do.

7                      CROSS EXAMINATION

8  BY MS. DeCRISTOFARO:

9  Q    Plan Proponent Exhibit 95 was a letter from you to Eileen

10 McCabe regarding a settlement that Grace was about to make, is

11 that correct?

12 A    Yes, it was.

13 Q    And that letter was written in 1997?

14 A    Yes.

15 Q    And is it fair to say at that time that Grace was very

16 vigorously defending itself?

17 A    Yes.

18 Q    And if you look at the second -- the first two sentences

19 of Plan Proponents Exhibit 95, it refers to a very aggressive

20 strategy by W.R. Grace, doesn't it, in litigating asbestos

21 cases?

22            MR. BERNICK:  Objection, this is completely

23 irrelevant.

24            MS. DeCRISTOFARO:  It is not, Mr. Bernick.

25            MR. BERNICK:  It is irrelevant, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. DeCRISTOFARO:  Mr. Bernick opened the door on the

2   course of practices with respect to 1997 and 1998 and offered

3   that as a course of conduct relevant to the treatment of the

4   insurers under the plan and he opened the door.  And he's

5   saying what happened in '97 and '98 is relevant to what should

6   happen now and he opened the door on that.

7          THE COURT:  Well, I don't think that's the theory,

8   but nonetheless, it may be relevant.  So the objection is

9   overruled.

10  Q    And, at that time, Grace was very vigorously defending

11  itself, was it not?

12  A    Yes, it was.

13  Q    And the first two sentences there say that Baron and Budd

14  has recently tried Grace cases to verdict, including the recent

15  $9.3 million verdict in Dallas County, Texas State Court.  The

16  firm has announced publicly that in retaliation for Grace's

17  efforts to conduct discovery on the firm's practices, it

18  intends to try all serious cases against Grace.  So you were

19  vigorously fighting with Baron and Budd at that time, were you

20  not?

21  A    Yes, we were.

22  Q    Okay.  And with respect to Plan Proponent Exhibit 1, which

23  is a settlement agreement that you entered in with Baron and

24  Budd, at the time you entered into that agreement, you were not

25  using Baron and Budd as your advisor, were you?

1  A     No.

2  Q     No.  And, in fact, to the overall point, you were

3  vigorously defending yourself at that time?

4  A     Yes.

5  Q     And to the extent that -- okay.  Now, Mr. Bernick asked

6  you some questions and asked Mr. Posner some questions about

7  insurers who conducted audits or who had the right to consent.

8  And the testimony offered was that none of those insurers

9  offered an objection either by audit or by their right to

10 consent, is that correct?

11          MR. FINCH:  Objection, compound.

12          THE COURT:  It is --

13 Q     Well, let's put it this way.  Are you aware -- is it your

14 testimony that none of the insurers who had to consent did

15 consent?  I mean, did not consent, sorry.

16 A     To the Baron and Budd settlement?

17 Q     I'm just trying to recap the testimony that you gave

18 before.

19 A     To the Baron and Budd settlement or to generally?

20 Q     Generally.

21 A     Well, consent to settlement I view a little bit different

22 than to the audit issue because there were occasionally

23 differences of opinion about not with respect to settlement or

24 participate in the settlement decision, but as far as the

25 documentation after the fact and what was appropriate for there

1  when they conducted their audit.

2  Q    Okay.  In your view, should any of the insurers who

3  consented, should they not have consented?

4          MR. BERNICK:  Objection, A, calls for an opinion, B,

5  it exceeds the scope of the examination, C, it's irrelevant.

6          MS. DeCRISTOFARO:  Absolutely not, Your Honor.

7          MR. FINCH:  Also, lack of foundation, Your Honor.

8  What an insurance company had in its mind is not something that

9  she's established to this witness that he would know.

10          MS. DeCRISTOFARO:  Your Honor, if the question

11  here -- Mr. Bernick stood up and offered testimony that the

12  fact that no insurer objected either by audit or by withholding

13  their consent is relevant to the practices that they're putting

14  forward in this trust plan.  If he put that at issue, the

15  question is should they have not consented.

16          THE COURT:  But you can't ask this witness.

17          MS. DeCRISTOFARO:  If it was reasonable for them to

18  consent, then it --

19          THE COURT:  You can't ask this witness what was

20  reasonable in the mind of another person and you're asking him

21  for an opinion as to their judgment.  He's not a representative

22  of the insurers.

23          MS. DeCRISTOFARO:  No, he's not.  But the point is,

24  unless the plan proponents say that in the exercise of

25  independent proper judgment an insurer should not have

1  consented, then that testimony should be struck and I move to

2  strike it because it's not relevant.

3      MR. BERNICK:  Your Honor, this is -- Ms. DeCristofaro

4  is seeking to use this witness to establish their proposition

5  which goes to the question of whether their rights in some

6  fashion are fundamentally changed by the plan.  The proffer of

7  the witness's testimony has nothing to do with that.  It is

8  simply that the insurers are not being -- that had -- to the

9  extent the insurers had rights pre-petition, they didn't

10 exercise them and there was a course of conduct on the basis of

11 which this plan actually gives them more protection than they

12 would have had.

13     So the witness is only testifying about pre-petition

14 and pre-petition facts, the fact that there was a right and it

15 wasn't exercised, period.  It can't be used on their case to

16 try to make their case by expressing opinions, which is what

17 this asks for, that are in service of their arguments with

18 regard to the plan.

19     THE COURT:  It is asking for an opinion.  He's not

20 been designated as an expert.  The objection is sustained.

21     MS. DeCRISTOFARO:  Your Honor, I think, though, Mr.

22 Bernick just made my point.  He just said that he was -- they

23 were offering the fact that any insurer did not consent or did

24 not object to a settlement by audit as proof of course of

25 conduct as should be appropriate in the plan and our treatment

1  of the plan.  If he offers that, then you're opening up the

2  collateral matter, and this goes to what I was saying.  This is

3  so fundamentally different than the evidence that was offered

4  to you in <u>Combustion Engineering</u>.  This is not an objective

5  program or plan.  This is an argument that because someone

6  didn't agree -- didn't object to a settlement, that's

7  indicative of anything other that they exercised their

8  independent judgment that Grace was vigorously defending itself

9  and was reaching reasonable settlements.

10          THE COURT:  Okay.

11          MS. DeCRISTOFARO:  How does that prove a course of

12  conduct?  And if I can't ask him that --

13          THE COURT:  I don't know that it proves the course of

14  conduct.  It's relevant to whether or not there is such a

15  course of conduct, that's the issue.  And you may offer

16  whatever testimony you have to show that it is not reasonable,

17  but you cannot ask a representative of Grace whether the

18  insurer's judgment was reasonable.  He can't testify to that.

19  He doesn't know.

20          MS. DeCRISTOFARO:  But, Your Honor, I'm not asking

21  him whether the insurers -- I think without proof that

22  someone -- that's why the whole line of the proffer made by Mr.

23  Bernick of this witness's testimony was improper because it's

24  not probative of --

25          THE COURT:  It is probative.  It's relevant to the

1 determination.

2          MS. DeCRISTOFARO:  It's not probative if --

3          THE COURT:  Well, I'm sorry.

4          MS. DeCRISTOFARO:  -- you don't get into --

5          THE COURT:  As the finder of fact, I think it is.

6          MS. DeCRISTOFARO:  Your --

7          THE COURT:  So --

8          MS. DeCRISTOFARO:  -- Honor, really, I'm sorry, I

9 just wanted to finish that.

10          MR. BERNICK:  Can we move along?

11          MS. DeCRISTOFARO:  It's not probative because unless

12 you get into whether each settlement was reasonable or not,

13 which we don't want to, it's not probative because if you --

14          THE COURT:  That's not the point, Ms. DeCristofaro.

15 The point that the debtor is trying to establish, whether it

16 turns out to be established, whether it turns out to be

17 relevant, whether it turns out to have anything to do with the

18 plan itself is that there was a pre-petition course of conduct

19 that this plan looks at that pre-petition course of conduct

20 and, essentially, incorporates it with, in the debtor's view,

21 some additional protections.  I'm not sure the insurers will

22 agree with that, but that's the debtor's point of view.

23          It is relevant to substantiate the fact that as to

24 the insurers who had settlement -- who had rights to consent or

25 not consent to settlement pre-petition that they were not

Hughes - Cross/DeCristofaro                           42

1  exercised.  It is relevant to that point.

2            MR. BROWN:  Your Honor --

3            THE COURT:  I've ruled.  This is ten minutes after

4  I've ruled --

5            MS. DeCRISTOFARO:  Okay.

6            THE COURT:  -- so let's move on.

7            MR. BROWN:  Your Honor, just one point of

8  clarification.  I don't mean to interrupt, but we're slipping

9  into imprecise language, again.

10           MS. DeCRISTOFARO:  Your --

11           MR. BROWN:  And the testimony that was offered

12 yesterday by Mr. Hughes related to the insurers that had

13 asbestos reinsurance agreements.

14           THE COURT:  Yes, it did.

15           MR. LOCKWOOD:  Reimbursement agreements.

16           MR. BROWN:  I'm sorry, asbestos reimbursement

17 agreements.

18           THE COURT:  Reimbursement agreements, yes.

19           MR. BERNICK:  We would agree with that.  We're not

20 trying to slip into that area.  This is all being prompted

21 really by interrogation from an insurer.

22           THE COURT:  Okay.

23           MR. BERNICK:  We've always recognized that.

24           THE COURT:  I have ruled folks.  Let's move on.

25           MS. DeCRISTOFARO:  Yes, Your Honor, I just only

1 wanted to make my point of what I was offering this from.

2 Q    Just a few more questions going to the weight of the

3 consideration of course of conduct.  This settlement agreement

4 was entered into in 1998, correct?

5 A    Actually, in December of '97 --

6 Q    Sorry, '97, okay.

7 A    -- and the '98.  I think -- I may have misspoke earlier.

8 Q    And you testified that in your position at Grace that

9 you've kept track of what's happening in asbestos litigation,

10 is that correct?

11 A    Yes, I have.

12 Q    And you're aware that there's been significant changes in

13 the field of asbestos litigation since 1997?

14        MR. BERNICK:  Well, could we have more specification

15 as to time period?  And, again, I think this is completely

16 irrelevant, but we can at least get a time frame?  That's ten

17 years ago.

18        MS. DeCRISTOFARO:  That's my point.

19        MR. BERNICK:  Okay.  Well, if that's your point, the

20 question ought to be confined to a particular time period,

21 unless you want to have him express opinions on what's happened

22 since the petition was filed as to which he has not testified.

23        MS. DeCRISTOFARO:  Again, Your Honor, they're

24 offering a course of conduct on direct from 1997.

25        THE COURT:  Yes, this is relevant to the witness's

1 testimony.  He said that he's kept track of litigation.  He can

2 either -- he can qualify his answer if he needs to.  You can

3 answer, Mr. Hughes.

4 Q    All right.  Can you answer that question, Mr. Hughes?

5 A    Could you repeat the question?

6 Q    Yes.  Has there been significant develops in the field

7 of -- development -- legal developments in the field of

8 asbestos litigation since 1997?  Such, for example, is asbestos

9 or tort reform, in the area of tort reform.

10          MR. BERNICK:  That calls for a legal conclusion.

11          THE COURT:  It does.  That's sustained.

12 Q    Are you aware of any changes that would affect whether you

13 would have entered into this settlement agreement since --

14 today, as opposed to 1997?

15                (Attorney conversation)

16          MR. BERNICK:  Objection, Your Honor.  A, that asks

17 for speculation and, B, it calls for an opinion and, C, it's

18 irrelevant.

19          THE COURT:  Sustained.

20          MS. DeCRISTOFARO:  Your Honor, just quickly, Mr.

21 Bernick, again, is offering these documents dated ten years

22 ago, more than ten years ago, 12 years ago, as evidence of what

23 should occur now.  And I'm only trying to --

24          MR. FINCH:  Objection, Your Honor, this is more in

25 the nature of closing argument.

Hughes - Cross/Davis                                    45

1          THE COURT:  It is in the nature of closing argument

2   and that isn't the proffer.

3          MS. DeCRISTOFARO:  Okay.  All right.  Your Honor, I

4   have no further questions based on Your Honor's ruling.

5          THE COURT:  Mr. Davis?

6          MR. BERNICK:  Anybody else?  Ah, ha.

7                (Attorney conversation)

8                    CROSS EXAMINATION

9   BY MR. DAVIS:

10  Q   Good morning, Mr. Hughes.  Michael Davis on behalf of

11  Nation Union Fire Insurance Company --

12  A   Good morning.

13  Q   -- Pittsburgh, PA.  Do you recall that Mr. Plevin asked

14  you a series of questions about the Fireman's Fund bond this

15  morning?

16  A   Yes.

17  Q   And he distinguished it from Scotts and he distinguished

18  it from Maryland and he distinguished it from BNSF on grounds

19  that those defendants were -- had been sued for their own

20  conduct whereas Fireman's Fund had undertaken the issue of bond

21  at the request of Grace, is that correct?

22          MR. BERNICK:  I've got -- sorry, that statement "is

23  that correct" seeks his endorsement of what you take to be Mr.

24  Plevin's arguments.

25          THE COURT:  That's sustained.  Restate the question,

**J&J COURT TRANSCRIBERS, INC.**

1 please.

2 Q    Did you acknowledge that there was a difference in that

3 BNSF, Scotts and Maryland were sued for their own conduct,

4 whereas Fireman's Fund had been -- Fireman's Fund had issued a

5 bond at the request of Grace?

6        MR. BERNICK:  Objection to the form of the question.

7 Seeks to recharacterize the record.  Record is whatever it is.

8 If we could have a new question, that would be good.

9        THE COURT:  I don't think that was the witness's

10 testimony.  It is -- I think it is assuming a fact not in

11 evidence.  You'll have to restate the question.

12 Q    Well, let me just get to the point.  National Union issued

13 a bond at the request of Grace, correct?

14 A    Yes.

15 Q    National Union did not issue that bond because of its own

16 conduct, did it?

17        MR. BERNICK:  Objection to the form of -- own

18 tortuous underlying conduct.  Objection to the form of the

19 question.

20        THE COURT:  Sustained.

21        MR. DAVIS:  I'll accept the correction.

22 Q    National Union did not issue the bond on account of its

23 own tortuous underlying conduct, did it?

24 A    No, it --

25 Q    Thank you.

1  A    -- issued the bond based on a settlement agreement

2  involving asbestos related claims against W.R. Grace.

3  Q    At the request of W.R. Grace, correct?

4  A    Yes.

5         MR. DAVIS:  Thank you.

6  A    Again, the underlying claims or asbestos personal injury

7  claims.

8         THE COURT:  When a witness is talking, it would be

9  nice if you don't walk away.

10        MR. DAVIS:  I'm sorry.

11             (Attorney conversation)

12        THE COURT:  Mr. Demmy, good morning.

13        MR. DEMMY:  Yes, Your Honor.

14                 CROSS EXAMINATION

15 BY MR. DEMMY:

16 Q    Mr. Hughes, good morning.  John Demmy on behalf of

17 Fireman's Fund Insurance Company as to issues apart from the

18 surety bond issues that Mr. Plevin asked you about earlier.  I

19 wanted to make that point clear at the outset.  But also on

20 behalf of Allianz SpA, which was formerly known as Riunione

21 Adriatica Di Sicurta, and also for Allianz SE, formerly known

22 as Allianz Aktiengesellschaft.  And --

23        UNIDENTIFIED ATTORNEY:  Objection.

24 Q    -- I hope I got that right.

25        MR. BERNICK:  Aktiengesellschaft, but that's, you

1 know --

2 Q    I'll accept the correction.

3        THE COURT:  Just so we get the -- a description in

4 writing of how to spell it all.

5        MR. DEMMY:  My questions may be less time than it

6 took me to say the name of the client.

7        MR. BERNICK:  Well, that would be great.

8 Q    Mr. -- AG, thank you.  Mr. Hughes, do you have an

9 understanding at all that Grace contends that Fireman's Fund

10 Insurance Company issued insurance policies to Grace that

11 covered asbestos claims, generally?

12 A    Yes.

13 Q    Same question for both of the Allianz entities.  Do you

14 have an understanding that Grace contends that they both issued

15 insurance policies to Grace?

16 A    Yes.

17 Q    Do you have any understanding with respect to the terms of

18 any of those policies?

19 A    No, not specific terms.  I don't --

20 Q    Do you have any -- do you have a general understanding of

21 the terms of those policies?

22 A    Yes, general understanding.

23 Q    What's your general understanding?

24 A    That they were excess layer over the comprehensive general

25 liability policies for the period of time pre -- I guess, you

1  know, whenever asbestos exclusions were generally included in

2  those kinds of policies.

3  Q    You would agree that they're what we would characterize as

4  a high level excess policy, correct?

5  A    I don't know.  I don't know where they fit in

6  specifically, so I wouldn't want to characterize them in that

7  way.

8  Q    But they're excess policies?

9  A    That's my understanding.

10  Q    Did Fireman's Fund Insurance Company ever enter into an

11  agreement with Grace that we've been talking about in

12  connection with your testimony that we've been calling

13  reimbursement agreements?

14  A    I'd have to take a look at the list that was just shown to

15  me by --

16  Q    Would you like to take a look at that list to refresh your

17  recollection?

18        MR. BERNICK:  Well, but, if it's on the list, I mean,

19  if he doesn't -- if he knows, he knows, if he doesn't, he

20  doesn't.  Just reading from documents is not --

21  Q    Do you have --

22        THE COURT:  The question was will it refresh his

23  recollection.  It's proper.  You may refresh his recollection,

24  Mr. Demmy.

25  Q    Do you -- let me try to short circuit this.  Do you have

1 any independent recollection other than what's on the list

2 that's already been discussed previously?

3 A    No, I don't.

4 Q    Okay.  Same question as to the two Allianz entities.  Do

5 you have any recollection, other than what's on that list?

6 A    No, I don't.

7 Q    Okay.  So if they're not on the list, Grace did not have

8 reimbursement agreements with either of those three insurers,

9 correct?

10                    (Attorney conversation)

11 A    Again, based on -- I assume that the lists are accurate.

12 Q    All right.  Do you know whether or not Fireman's Fund

13 Insurance Company ever waived any of its rights under any of

14 the insurance policies that Grace contends it issued to Grace

15 --

16           MR. BERNICK:  Objection, lack of foundation.  Calls

17 for a legal conclusion.

18           THE COURT:  It's a do you know.  Overruled.

19 A    I don't know.

20 Q    Okay.  You don't know one way or the other?

21 A    Right.

22 Q    Were any claims ever tendered by Grace to Fireman's Fund

23 Insurance Company?

24 A    I don't know.

25 Q    Do you know whether either of the Allianz companies waived

Hughes - Cross/Demmy/Carignan                    51

1  any of their rights under any of their insurance policies?

2  A    I don't know.

3  Q    Do you know if any claims were ever tendered to either of

4  the Allianz companies?

5  A    I don't know.

6         MR. DEMMY:  That's all the questions I have, Your

7  Honor.

8         THE COURT:  I need a second to get caught up here.

9                    (Pause)

10        MR. BERNICK:  New, anybody else?

11        THE COURT:  Good morning.

12        MR. CARIGNAN:  Good morning.

13                 CROSS EXAMINATION

14  BY MR. CARIGNAN:

15  Q    Good morning, sir, how are you?

16  A    Great.

17  Q    My name is James Carignan.  I represent Longacre Master

18  Fund.  Yesterday, Mr. Bernick asked you some questions about

19  the basis for the claim of Longacre, do you recall that

20  testimony?

21  A    Yes.

22  Q    And would it be a fair characterization to say that -- of

23  your testimony to say that Longacre had purchased a claim

24  formerly owned by National Union?

25  A    Yes.

1  Q    And what was that National Union claim based on?

2            MR. BERNICK:  Your Honor, this is -- we've already

3  had a gentleman from National Union --

4            THE COURT:  This is a different party.  Go ahead, Mr.

5  Carignan.

6  A    It was payments that had been made to the claimants in

7  connection with the National Union surety bond that had been

8  used to -- for payments with respect to the Reaud, Morgan &

9  Quinn settlement agreement.

10 Q    So National Union had posted a surety bond, correct?

11 A    Yes.

12 Q    And that surety bond was intended to secure debtor's

13 obligations under settlement agreements with various asbestos

14 personal injury claimants?

15 A    Yes.

16 Q    And the basis of National Union's claim was for repayments

17 of those amounts that National Union had paid out under those

18 surety bonds?

19 A    Yes.

20 Q    And that was pursuant to a reimbursement agreement issued

21 in connection with those surety bonds?

22 A    It was pursuant to the terms of the surety bond.

23           MR. LOCKWOOD:  Objection to form.  If he's using --

24           THE COURT:  You're microphone's not on, Mr. Lockwood.

25           MR. LOCKWOOD:  Objection to form.  He used the term

1 reimbursement agreement.  I don't know whether that's intended

2 to refer to what we've been taking about as insurance

3 reimbursement agreements or whether he's using it in a sort of

4 general sense of describing this particular surety agreement.

5          THE COURT:  I think that's sustained, just because of

6 the use of that particular term in this case.  If you could

7 restate the question so we're all clear, please?

8 Q    Do you know whether the debtors owed National Union any

9 obligation in connection with National Union's payment to

10 settling parties on account of their surety bonds?

11          MR. BERNICK:  Objection to the form.  Is it do you

12 know?

13          THE COURT:  Yes.  Overruled.

14 A    Yes.

15 Q    And what were those obligations?

16 A    I'm not sure specifically, but under the terms of the

17 agreement --

18          MR. BERNICK:  Wait.  I was going to object for lack

19 of foundation, then the witness began to answer.  I'm going to

20 object on grounds of lack of foundation.

21          THE COURT:  No, he said he knew.

22          MR. CARIGNAN:  Judge, I just asked --

23          THE COURT:  It's overruled.

24 A    Could you repeat the question?

25 Q    What were the obligations that debtors owed to National

1  Union on account of National Union's payment to settlement

2  parties under the surety bonds?

3  A    Generally, Grace had an obligation to reimburse National

4  Union for any amounts that it ultimately paid to the claimants

5  for the personal injury claims.

6  Q    But you don't know whether those obligations arose from

7  the surety bonds themselves or from any agreements issued in

8  connection with those surety bonds?

9  A    That's correct.  I don't know the answer to that.

10  Q    Are you aware whether National Union ever issued any

11  insurance policies to the debtors?

12        MR. BERNICK:  You mean liability policies?  Objection

13  to form.

14        THE COURT:  That's sustained.  It's -- obviously,

15  he's testified about a surety bond.  That's not an insurance

16  policy, but I think you need to be a little bit more clear.

17  Q    Are you aware whether National Union ever issued any

18  insurance liability policies to the debtors?

19  A    Not without relying on the schedules that have been

20  produced in this case.

21  Q    But you don't have any memory of anything like that?

22  A    I recall there was an issue with setoff in terms of

23  National Union, but I don't know if it was National Union or

24  another AIG company.

25        MR. CARIGNAN:  Judge, I have no further questions.

**J&J COURT TRANSCRIBERS, INC.**

1  But, yesterday, after the conclusion of the proceedings, the

2  debtors graciously agreed to my request to be able to admit

3  certain exhibits or at least seek the admission of certain

4  exhibits at the end of my questioning of this witness --

5            THE COURT:  All right.

6            MR. CARIGNAN:  -- if I could.  The first exhibit I

7  handed to your clerk yesterday, but I have another copy here if

8  Your Honor would like to see it.  If I may approach?

9            THE COURT:  Yes.

10                 (Attorney conversation)

11            THE COURT:  Thank you.

12            MR. CARIGNAN:  This is a -- and I've marked it as

13  Long-1.  And this is a stipulation of facts which consents to

14  the admissibility of certain exhibits, most of which are

15  already part of the record, and if I may briefly just run

16  through them.

17            MR. BERNICK:  Wait, how many are there?

18            MR. CARIGNAN:  The order appointing the future

19  asbestos PI claimants representative which is Docket Entry

20  5645, the settlement agreement and order approving that

21  settlement agreement respecting the National Union claim which

22  is adversary Docket Entry 115 in Adversary Proceeding Number

23  02-1657, the notice of transfer of the National Union claim to

24  Longacre which is Docket Entry 17648 and certain exhibits

25  specifically two and four to the plan exhibit book available on

1   the docket at Docket Entry 20874.  The items that are not

2   already part of the record, but which nevertheless the plan

3   proponents have consented to admit are the proof of claim of

4   National Union and the assignment of that claim, the assignment

5   agreement of that claim to Longacre which is appended to the

6   stipulation of facts.  And I would respectfully request that

7   that stipulation be admitted as evidence.

8             THE COURT:  Could you go back to the adversary docket

9   number for the settlement and the order that approved it with

10  National Union?  What was the docket number?

11            MR. CARIGNAN:  Adversary Docket Number 115, according

12  to my notes.

13            THE COURT:  All right.  Thank you.  Any objection?

14            MR. LOCKWOOD:  No.

15            THE COURT:  Okay.  Let me get a note here.

16  Longacre-1, which is the stipulation, is admitted with the

17  attachments that include the proof of claim and notice of

18  transfer and the other documents that have just been

19  articulated on the record which are Docket Numbers 115 in

20  Adversary 02-1657, Docket Number 17648 in the main case, and

21  Docket Number 20874 in the main case.

22            MR. CARIGNAN:  Thank you, Your Honor.

23            THE COURT:  Oh, and Docket Number 5645 in the main

24  case.  All right.

25            MR. CARIGNAN:  Thank you, Judge.  We were not,

1 unfortunately, able to agree as to the admissibility of one

2 exhibit which I would like to have admitted, and that is the

3 stipulation regarding the classification of claims of Morgan

4 Stanley Senior Funding, Inc.  It's available on the docket at

5 DI-21722 and I have a certified copy here, if I may approach?

6          THE COURT:  All right.

7          MR. CARIGNAN:  And, Your Honor, this exhibit I've

8 marked as Long-2.

9          THE COURT:  All right.  And what's the relevance?

10          MR. CARIGNAN:  The relevance, Your Honor, Longacre, a

11 chief component of its confirmation objection is that its claim

12 is improperly classified in Class 6 rather than where we think

13 it should be which is Class 9.  And in support of that

14 argument, we argue that similarly situated or substantially

15 similar claims are classified in Class 9 and the relevance of

16 this exhibit is that this is but one example of those

17 substantially similar claims.

18          MR. BERNICK:  Your Honor, it's not relevant.  It also

19 violates Rule 408.  This was a settlement.  It shouldn't be

20 introduced for the purpose of adjudicating some issue that's in

21 dispute and apart from the fact that we're all waiting here and

22 dealing with this.  It really should be taken up later.  There

23 are significant differences, in fact, between the situation of

24 Morgan Stanley and the situation of the other people as to whom

25 we have not reached agreement because we believe that they're

1  properly part of Class 6.

2              I don't believe that it's appropriate to argue those

3  differences, in fact, while we have a witness on the stand.

4  And I particularly don't think it's appropriate to argue them

5  because it violates Rule 408.  Settlements get reached all

6  kinds of places in this case and we don't have a settlement

7  with Longacre and National Union.  We do with those folks, and

8  that's not a proper subject for inquiry in this court.  And

9  it's certainly not appropriate to take the time of the witness

10 and 50 lawyers sitting here while we deal with it in the course

11 of what's supposed to be a proceeding on live testimony.

12             MR. CARIGNAN:  Well, again, debtor's counsel, you

13 know, they approved my request to seek to admit these exhibits

14 at this time, Your Honor.

15             MR. BERNICK:  We actually approved --

16             MR. CARIGNAN:  It's been publicly filed, it's

17 substantially similar and it should be admitted if it's --

18             THE COURT:  Well, I don't know how it's substantially

19 similar.  I mean, I just don't know.  So you're going to have

20 to produce some evidence that explains to me how it is

21 substantially similar.  So as not to hold this witness up

22 because I understand you're not intending to ask this witness,

23 Mr. Hughes, about Longacre-2, correct?

24             MR. CARIGNAN:  Correct.

25             THE COURT:  All right.  So, with respect to

1  Longacre-2, I'll defer that admission until I -- whoever the

2  proper witness is that you're going to ask about this document

3  can testify.

4          MR. CARIGNAN:  Thank you.

5          MR. BERNICK:  I know that if I stand up, somebody

6  else will stand up to ask questions, so --

7          THE COURT:  Anyone else for Mr. Hughes?  Okay, Mr.

8  Bernick.

9          MR. BERNICK:  Okay.  I just have a couple follow up

10 questions if I could get to the mic.

11                      REDIRECT EXAMINATION

12 BY MR. BERNICK:

13 Q    Mr. Hughes, I want to begin with the questions that Ms.

14 DeCristofaro asked you and in service of trying to expedite

15 this examination in that score, she asked you whether at the

16 time pre-petition that the settlements were entered into with

17 the criteria that you indicated.

18         THE CLERK:  Is your mic on, Mr. Bernick?

19         MR. BERNICK:  Yes, I think -- I need to move it up a

20 little bit closer.  Is that better?  Okay.

21 Q    At the time that we, Grace, entered into the settlement

22 that's documented as Plan Proponents 1 with Baron and Budd,

23 whether Grace was vigorously litigating, do you recall that?

24 A    Yes.

25 Q    She also asked you some questions later on about

1  litigation developments that have taken place in succeeding

2  years.  Let me just ask you as a general proposition,

3  pre-petition, were there from time to time --

4          MS. DeCRISTOFARO:  Objection, Your Honor.  He was not

5  allowed to answer my question regarding that.

6          MR. BERNICK:  To the contrary, he was.

7          MS. DeCRISTOFARO:  Mr. Bernick objected and said he

8  couldn't answer the question regarding developments.

9          MR. BERNICK:  No, that was overruled.

10          MS. DeCRISTOFARO:  I was not allowed to --

11          THE COURT:  Just a minutes, folks.

12          MS. DeCRISTOFARO:  Sorry.

13          THE COURT:  Actually, I think I overruled the

14  objection, but you didn't pursue the line of questioning.  It's

15  -- I overruled the objection stating that the aggressive

16  litigation strategy issues were relevant to the course of

17  conduct.  You then asked about following up the information

18  and, I'm sorry, my note does not indicate here what I did.

19  Let's see.

20          MS. DeCRISTOFARO:  Your Honor, subsequently, I asked

21  him questions about developments in asbestos litigation.

22          THE COURT:  Yes.

23          MS. DeCRISTOFARO:  Mr. Bernick objected and said that

24  required a legal opinion and you directed him not to answer or

25  you overruled.  You sustained his objection and told me --

1    THE COURT:  I did sustain an objection to one

2  question that I thought called for a legal conclusion, that's

3  true.

4    MR. BERNICK:  You know, the world's not going to

5  change.  I think it's going to be self-evident from what Your

6  Honor already knows.

7    THE COURT:  I don't think your microphone's working,

8  Mr. Bernick.

9    MR. BERNICK:  I'm sorry.  It could be I need a

10  battery.  In more ways than one, but we'll pursue.  I think

11  it's already been evident from other testimony that at all

12  times the litigation environment changes.  Let me get to the

13  comparison that I wanted to draw.  I think you're right.  It

14  does -- it kind of goes in and out.

15    THE COURT:  It's fading in and out.  Is there another

16  one?  There's another one here.  Maybe we can get these

17  batteries changed.

18                         (Pause)

19    MR. BERNICK:  I guess after all this preparation,

20  this better be good, right?

21  Q    Post-petition.  We have a settlement in the plan with TDP

22  criteria.  Are you familiar with the fact that we have a plan

23  that has settlement criteria set forth in the TDP and

24  elsewhere?

25  A    Yes, I am.

1  Q    Could you tell me about whether there was any litigation

2  which led to and in the context of which that plan was agreed?

3  A    Yes, there was.

4  Q    What was that called?

5  A    The estimation litigation.

6  Q    To your observation, was it every bit as aggressive,

7  intense, hotly contested as the litigation that Grace was

8  pursuing in the context of which it reached settlements

9  pre-petition?

10  A    Yes, it was.

11  Q    I want to talk to you about the comparisons that were made

12  by Fireman's Fund, National Union.  I guess it's Fireman's Fund

13  and National Union.  You have a tort plaintiff who is suing

14  BNSF.  BNSF then has an action that it wants to pursue over

15  against Grace pursuant to a written indemnity, without getting

16  into whether and to what extent that indemnity applies.  Do you

17  recall covering this on your direct examination?

18  A    Yes.

19  Q    Okay.  Now, we have a tort plaintiff, Edwards, sues Grace.

20  We with each other so far?

21  A    Yes, we are.  Yes, I am.

22  Q    Grace wants to take an appeal and it picks up the

23  telephone and rings I guess it's National Union or --

24  A    No.

25  Q    -- it picks up the telephone and rings Fireman's Fund.

1 A    Yes.

2 Q    So Fireman's Fund now comes into the picture.  Could you

3 tell me with the bond that's entered into what becomes the

4 relationship between Fireman's Fund and Grace?

5            MR. PLEVIN:  Objection, calls for legal conclusion.

6            THE COURT:  Sustained.

7 Q    As a fact, factually, what was the relationship between

8 Fireman's Fund and Grace at that point?

9            MR. PLEVIN:  Objection, form.

10            THE COURT:  Sustained.

11 Q    Factually, what was the deal that was done between

12 Fireman's Fund and Grace?  This was gone over by Mr. Plevin,

13 but go ahead.  Factually, what becomes the deal between

14 Fireman's Fund and Grace?

15 A    Well, it's a -- creates a relationship where Fireman's

16 Fund is a surety, Grace is the principal and Edwards claimants,

17 I guess, are the obligee and Fireman's Fund is -- takes on, in

18 the event that Grace is unable to pay the judgment or any

19 judgment resulting that they would make payments to the

20 claimants in Grace's stead, I guess is a way to put it.

21 Q    So Fireman's Fund, I think one prong that you indicated

22 was a surety?

23 A    Yes.

24 Q    In connection with the surety arrangement, was there also

25 an indemnification that Grace agreed to?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, there was.

2  Q    And that would run from Grace to whom?

3  A    Back to Fireman's Fund.

4  Q    Was that a written indemnity?

5  A    I believe so, yes.

6  Q    So it's between Grace and the Fireman's Fund, the

7  indemnity would be an indemnity that would parallel BNSF versus

8  Grace?

9  A    Yes.

10         MR. PLEVIN:  Objection, calls for legal conclusion.

11         MR. BERNICK:  Well, that was a parallel that was

12  specifically asked by Mr. Plevin and drawn in exactly the same

13  terms.

14         MR. PLEVIN:  I asked individual questions about

15  individual transactions.  I didn't ask him to compare them,

16  Your Honor.

17         THE COURT:  It's sustained.

18  Q    Let's talk about the surety part of the arrangement.  In

19  the event that Grace did not pay the tort claimant, who paid

20  the tort claimant?

21  A    Fireman's Fund.

22  Q    So did I draw that arrow right?

23  A    Yes.

24  Q    Are you familiar with a term stepping into the shoes of

25  another party?

1  A    Yes.

2  Q    Tell us whether or not Fireman's Fund by virtue of

3  becoming a surety, in fact, as you understood it, stepped into

4  the shoes of the tortfeasor -- alleged tortfeasor.

5  A    Yes, it did.

6  Q    And to the extent that Fireman's Fund stepped into the

7  shoes of the alleged tortfeasor, tell me whether Fireman's --

8  whether or not Fireman's Fund -- strike that.  Tell me whether

9  or not the tortfeasor could proceed directly against Fireman's

10  Fund in the same fashion that the tortfeasor could proceed

11  directly against BNSF.

12          MR. PLEVIN:  Objection.  Calls for legal conclusion

13  and form.

14  Q    As you understood it --

15  A    I think you mean --

16          MR. PLEVIN:  Objection.

17  A    -- plaintiff.

18  Q    The plaintiff's tortfeasor.

19  A    Yeah -- yes.

20          MR. PLEVIN:  Your Honor, there was no ruling on my

21  objection.

22          THE COURT:  I'm sorry, I can't hear you Mr. Plevin.

23          MR. PLEVIN:  I objected that that was both calling

24  for legal conclusion and objected to the form of the question.

25          THE COURT:  Whether or not the plaintiff could

**J&J COURT TRANSCRIBERS, INC.**

1 proceed directly against Fireman's Fund?

2          MR. PLEVIN:  And the comparison.  He had both the --

3 he had several things happening in that question.

4          THE COURT:  All right.  Let's break the questions

5 down into pieces, please.

6 Q    Okay.  Could the tort plaintiff under those circumstances

7 by virtue of Fireman's Fund being the surety in Grace not

8 paying, could the tort plaintiff proceed directly against

9 Fireman's Fund based upon its tort entitlement?

10 A    Yes.

11          MR. PLEVIN:  Calls for a legal conclusion, Your

12 Honor.

13 Q    As you understood it?

14          MR. PLEVIN:  Objection, calls for a legal conclusion.

15 He's asking the witness to interpret --

16          THE COURT:  He is.

17          MR. PLEVIN:  -- the rights of the claimants.

18          THE COURT:  He is.  That's a legal conclusion.  It's

19 sustained.  There has to be a document that sets this out.

20          MR. BERNICK:  Yes, there is.

21          THE COURT:  Then the document ought to state whether

22 or not --

23          MR. BERNICK:  Well, let's just do it, go ahead and do

24 that.  I thought it would be easier to do it this way.

25 Q    I want to show you Fireman's Fund Exhibits 2 and 3.  Do we

1 have extra copies?

2          UNIDENTIFIED SPEAKER:  We do.

3          MR. BERNICK: Thank you.

4          UNIDENTIFIED SPEAKER: Thank you.

5 Q    Could you identify for the record, Mr. Hughes, what

6 Fireman's Fund Exhibit 2 is?

7 A    It is the supersedeas bond in the <u>Aaron Clifton Edwards</u>

8 <u>vs. Pittsburgh Corning and Grace</u> case.

9 Q    Could you identify for the record what Fireman's Fund

10 Exhibit 3 is?

11 A    It's the specialty surety indemnity agreement between

12 Fireman's Fund and Grace.

13          MR. BERNICK:  We offer both of the exhibits.

14          MR. PLEVIN:  No objection, Your Honor.  This is part

15 of the stipulation that was filed with the Court at Docket

16 Number 23195.  I was going to move these documents myself at a

17 later time.

18          THE COURT:  All right.  They're admitted.

19          MR. BERNICK:  Okay.

20 Q    Now, this is a bond.  It's signed in favor of the Edwards

21 claimants?

22 A    Yes.

23 Q    Okay.  And if we take a look at the bottom of the first

24 page of Exhibit 2, do we see where the following language

25 appears?  "Now, therefore, we, Grace, as principal, and

**J&J COURT TRANSCRIBERS, INC.**

1 Fireman's Fund Insurance Company, the surety, acknowledge

2 ourselves bound to pay to the plaintiffs -- the plaintiffs the

3 sum of 43 million," et cetera, "conditioned that the surety on

4 this bond is bound to pay all damages and costs that may be

5 awarded up -- against Grace up to the amount of this bond if,"

6 and then it goes on to list two conditions.

7 A    Yes.

8 Q    Based upon -- does that document -- as you understand that

9 document, does this bear upon your testimony that Fireman's

10 Fund under those circumstances is stepping into the shoes of

11 Grace?

12        MR. PLEVIN:  Your Honor, objection.  Calls for a

13 legal conclusion, and I would also make the objection that Mr.

14 Hughes' understanding what his interpretation of the bond is

15 irrelevant to the obligations of the parties and the rights of

16 other people under the bond.

17        MR. BERNICK:  If Your Honor --

18        MR. PLEVIN:  And I would also add that there's no

19 foundation that he was involved in the negotiation of the bond

20 or that he was part of the group.  He testified, in fact, the

21 Treasury Department handled it.

22        THE COURT:  That's sustained.

23        MR. BERNICK:  Well, Your Honor -- well --

24 Q    Do you recall that Mr. Plevin asked you for your

25 understanding about the -- about the similarities and

1 differences between BNSF and Fireman's Fund?

2 A    Yes.

3 Q    And based solely upon the understanding that you had when

4 you asked -- answered Mr. Plevin's questions, is there a

5 difference in your mind between the fact that BNSF is a direct

6 defendant -- as a -- in a plaintiff's lawsuit involving

7 personal injury does Fireman's Fund -- by virtue of this

8 agreement does Fireman's Fund now occupy the position where it

9 is responsible for the liability that's being asserted in tort?

10          MR. PLEVIN:  Objection.  Relevance.  Calls for a

11 legal conclusion.

12          MR. BERNICK:  Well, they're relevant --

13          MR. PHILLIPS:  Same --

14          MR. BERNICK:  The relevance objection is -- already

15 been undercut by the fact that the only reason I'm pursuing

16 this is it was pursued by Mr. Plevin, so he can't have it both

17 ways.  He can't open the door to precisely this comparison

18 through this witness and then insist that the witness isn't

19 qualified or isn't competent to draw the differences between

20 the same comparison.  That's all that I'm doing, is I'm drawing

21 the differences out through this testimony by the witnesses on

22 a redirect examination, because he opened the door.

23          MR. PHILLIPS:  Same --

24          MR. BERNICK:  He can't have it both ways.

25          MR. PHILLIPS:  Same objection, Your Honor.  It's a

1  legal conclusion, and if we're only asking about his

2  understanding, that's irrelevant.

3          THE COURT:  Okay.  Well, we've been asking this and

4  every other witness about their understanding through the

5  course of the trial.  So I don't know what's changed about the

6  relevance between the other witnesses and this and anything

7  else.  In terms of calling for a legal conclusion, it still is,

8  so the objection is sustained.

9  Q    Let me ask you something else.  Mr. Plevin asked you

10  questions about Grace's -- about whether Grace's conduct in

11  some fashion -- or the Fireman's Fund conduct -- I'm sorry --

12  was at issue in the same way that Grace's conduct was at issue.

13  Remember that?

14  A    Yes.

15  Q    Well, what -- let me ask you about a certain feature of

16  Fireman's Fund's conduct.  At the time that Fireman's Fund

17  entered into this relationship with Grace, at that time was it

18  already known -- did they know that they were stepping into a

19  relationship that involved a tort claim against Grace?

20          MR. PLEVIN:  Objection.  Lack of foundation.  How

21  does he know what Fireman's Fund knew.

22  Q    Well, based upon --

23          THE COURT:  Sustained.

24  Q    Based upon your knowledge of the timing of this

25  relationship, that is the timing of the Fireman's Fund/Grace

1 relationship, was the fact of the Edwards judgment known?

2 A    Yes.

3          MR. PLEVIN:  Objection.  Lack of foundation.

4 Q    Is the fact of the Edwards judgment being known, is that

5 stated --

6          MR. PLEVIN:  Your Honor, I'm --

7          THE COURT:  Wait a second.  Wait.  I'm sorry.  With

8 respect to the lack of foundation, the witness clearly knew

9 about the Edwards judgment.  He's testified about it.  How he

10 knows whether Fireman's Fund knows, I don't have a foundation

11 for --

12          MR. BERNICK:  That's why --

13          THE COURT:  -- so that is sustained.

14          MR. BERNICK:  That's why we're going to go back to

15 this document.

16 Q    If we take a look at the supersedeas bond, is this bond a

17 bond or financial relationship that is general, not specific,

18 to any kind of underlying obligation?

19 A    No, it's specific to Grace's obligation to the tort

20 claimants in -- the Edwards tort claimants and the Edwards

21 judgment claimants.

22 Q    And on the face of this document is this a situation where

23 Fireman's Fund eyes wide open was becoming involved in a tort

24 relationship?

25          MR. PLEVIN:  Objection to the form of the question.

1              THE COURT:  Sustained.

2  Q    Let's talk about National Union.  With National Union,

3  same basic configuration I want to ask you about.  What was the

4  underlying tort claim in National Union?

5  A    The asbestos personal injury claims of the clients of

6  Reaud, Morgan & Quinn and Environmental Litigation Group.

7  Q    So the clients of Reaud, Morgan & Quinn and the

8  Environmental Litigation Group are suing Grace tort claims?

9  A    Yes.

10 Q    And at the time of the entry of Grace into the

11 relationship with National Union, what was the status of those

12 tort claims?

13 A    Could you repeat the question?  I'm sorry.

14 Q    At the time that Grace entered into a relationship with

15 National Union, what was the status of the tort claims?

16 A    The cases had been settled.

17 Q    Factually -- factually what was your understanding of the

18 relationship that National Union entered into -- the agreement

19 that National Union entered into with Grace with respect to the

20 settlement of those tort claims?

21 A    National Union agreed if for any reason that Grace was

22 unable to meet its obligations to the tort claimants, that it

23 would make the payments.

24 Q    That surety relationship again?

25 A    Yes.

1          MR. BERNICK:  No further questions.

2          THE COURT:  Anyone on recross?

3          MR. PLEVIN:  No questions, Your Honor.

4          THE COURT:  All right.  You're excused, Mr. Hughes.

5   Thank you.

6          THE WITNESS:  Thank you.

7          MR. BERNICK:  At this point we would call -- recall

8   Mr. Finke to the stand for any further cross examination.  And

9   I know we worked very hard to resolve a lot of things.  I would

10  suggest though that as we go forward here, based upon what just

11  happened with Longacre, we really believe that it would be an

12  unnecessary consumption of time, particularly in light of --

13  well, an unnecessary consumption of time to have everybody come

14  up with their particular documents and offer them into evidence

15  pursuant to stipulation or argue about the relevance of

16  documents that have not been stipulated to, and I'm concerned

17  about that, because that really was the substance of the

18  discussions that took place last night.

19         THE COURT:  As long as this witness is not the

20  witness through whom some authentication or whatever else

21  that's objected to has to take place, then that issue can be

22  deferred until after Dr. Peterson testifies.

23         MR. BERNICK:  Correct.

24         THE COURT:  But if this witness is necessary for some

25  link in the evidentiary chain, then it'll have to be done

1 through this witness.

2       MR. BERNICK:  I -- thats's fair, and we are prepared

3 later on this afternoon, and I don't even know if folks have to

4 be -- you know, we are prepared later on this afternoon to

5 simply take a few minutes and just put all these documents into

6 evidence without dictating in detail what they are and -- that

7 would be our proposal, Your Honor.

8       THE COURT:  Mr. Brown.  Mr. Finke, you're still under

9 oath, sir.

10       MR. BROWN:  Good morning, Your Honor.  We worked last

11 night and did come up with a stipulation, and the purpose of

12 the stipulation is to dispense with the need to go further with

13 the cross examination or examination of Mr. Finke.  The

14 stipulation sets forth the documents that are to be admitted

15 into evidence as well as the terms pursuant to which they're

16 admitted into evidence, because some of them are not being

17 admitted for the truth of the matter asserted.

18       What might be the easiest way to do this, so that we

19 can release Mr. Finke, is for me simply to go down the list of

20 exhibits that have been stipulated to, the admissibility, and

21 then simply to say that those documents are admitted subject to

22 the terms of the stipulation, which we'll then file with the

23 Court.

24       THE COURT:  All right.

25       MR. BROWN:  Plan Proponents' 243, OS-46, OS-50, OS-

1  51, OS-15, OS-28, OS-40, OS-41, OS-44, OS-14, OS-16, OS-17, OS-

2  18, OS-48 --

3          THE COURT:  Wait.  I'm sorry.  OS-48.  Okay.

4          MR. BROWN:  48, OS-49, OS-19, OS-20, OS-27 revised,

5  GR-14 revised --

6          THE COURT:  Wait.  Pardon me one second.  I'm sorry.

7  GS what?

8          MR. BROWN:  GR-14 --

9          THE COURT:  GR.

10          MR. BROWN:  -- revised.

11          THE COURT:  All right.

12          MR. BROWN:  GR-15 revised, GR-16 revised, GR-17

13  revised, GR-18 revised, GR-19 revised, GR-20 revised.  And

14  that's the complete list, Your Honor.

15          THE COURT:  All right.  Let me just repeat them

16  quickly.  Plan Proponents' 243, OS-46, 50, 51, 15, 28, 40, 41,

17  44, 14, 16, 17, 18, 48, 49, 19, 20, and 27 revised, GR-14

18  revised, 15 revised, 16 revised, 17 revised, 18 revised, 19

19  revised, and 20 revised.

20          MR. BROWN:  That's correct.

21          THE COURT:  Okay.  One second.

22                      (Pause)

23          THE COURT:  Okay.  Thank you.  They're all admitted

24  subject to the terms of the stipulation.

25          MR. BROWN:  Okay.  And, Your Honor, we'll have copies

Shelnitz - Direct/Bernick                    76

1  of this made over the lunch break and provide Your Honor with a

2  copy and copies for all the other parties.

3          THE COURT:  All right.  Thank you.  Anyone else,

4  questions for Mr. Finke?  Mr. Bernick, do you have questions

5  for Mr. Finke?

6          MR. BERNICK:  No, we don't.

7          THE COURT:  You're excused, Mr. Finke.  Thank you.

8  That was --

9          MR. BERNICK:  Boy, I tell you we're cooking now.  I

10  think our next witness is going to be Dr. Peterson.  Well,

11  actually, no, it's Mr. Shelnitz on the corporate stuff.  So I

12  -- and I think we can probably do this -- it might be actually

13  appropriate to take a short break, but it's up to you, Your

14  Honor.

15          THE COURT:  All right.  We'll take a ten-minute

16  recess.

17                          (Recess)

18          THE COURT:  Please be seated.  Mr. Bernick.

19          MR. BERNICK:  Yes, we call Mark Shelnitz to the

20  stand.

21          THE CLERK:  Raise your right hand, please.

22        MARK SHELNITZ, PLAN PROPONENTS' WITNESS, SWORN

23          THE CLERK:  Please be seated.

24          MR. BERNICK:  Good morning, Mr. Shelnitz.

25                      DIRECT EXAMINATION

Shelnitz - Direct/Bernick                    77

1 BY MR. BERNICK:

2 Q    Could you please tell the Court what your position at W.R.

3 Grace is?

4 A    I am Vice President and General Counsel and Secretary.

5 Q    And how long have you held that position?

6 A    I've held the Secretary position since 1999 and the Vice

7 President and General Counsel position since 2005.

8 Q    Okay.  Could you just give the Court a brief overview of

9 your educational background and your career prior to getting

10 the position that you now hold?

11 A    My undergraduate degree was from the Wharton School at the

12 University of Pennsylvania, then I went on to New York

13 University School of Law for my J.D.  After a summer position

14 at a law firm, I joined Grace directly out of law school, have

15 been there almost 26 years.  My positions have evolved from

16 corporate and commercial work to transactional work, joint

17 ventures, acquisitions and divestitures and restructuring, and

18 later in my career I took over roles in management of other

19 lawyers in the department.  In 1998 I became Assistant General

20 Counsel and moved on from there to my current position.

21 Q    In your role as General -- strike that.  In your role at

22 -- in house at W.R. Grace did you have direct involvement in

23 the Sealed Air transaction?

24 A    Yes.

25 Q    During the course of your work on the Sealed Air

**J&J COURT TRANSCRIBERS, INC.**

1  transaction, tell us whether or not it was part and parcel of

2  your ordinary duties also to become familiar with,

3  knowledgeable about the Fresenius transaction that had taken

4  place earlier.

5  A    Yes.

6  Q    Based upon your experience with those different

7  transactions, have you -- in anticipation of your appearance

8  here today, have you also gone back over to refresh your

9  recollection using the associated documents your recollection

10 of the structures that were used in connection with those

11 transactions?  That is how those transactions were structured.

12 A    Yes.

13 Q    And are you prepared here today to talk about the

14 relationship between the part of Grace that has the underlying

15 asbestos liabilities, on the one hand, and the entities at

16 Grace that subsequently merged with Sealed Air entities and

17 Fresenius entities?

18 A    Yes.

19        MR. PRATT:  Objection, Your Honor.

20 Q    -- and the relationship between the two?

21 A    Yes.

22        MR. PRATT:  Objection, Your Honor.  Could we have a

23 proffer of relevance for the record, please?

24        MR. BERNICK:  Yes, 524(g) provides that there can be

25 a channeling injunction protection with respect to parents of

1  the entity that is the tortfeasor, and we will be establishing

2  through this testimony that Fresenius and Sealed Air, to the

3  extent that they're being sued in underlying tort cases, are

4  being sued by virtue of their former capacity as being parents

5  of the W.R. Grace company that as a subsidiary was alleged to

6  be the tortfeasor.  So it relates to 524(g).

7            THE COURT:  All right.

8  Q    There are a series of slides, Mr. Shelnitz, that we

9  prepared that will help walk the Court through these -- the

10 various steps of the transactions that were involved in

11 Fresenius and Sealed Air.  There are a series of slides --

12 A    Yes.

13 Q    -- that we have.  We have a slide show this morning.

14 A    Okay.  Should I be looking in my book here for them?

15 Q    I hope that they are.  If they're not, we're all in

16 trouble.

17           MR. PLATT:  Your Honor, I have an objection to the

18 slides just as a foundational matter.

19           THE COURT:  All right.

20           MR. BERNICK:  Well, what's the objection?

21           THE COURT:  He needs to use the microphone.

22           MR. PLATT:  Your Honor, I think foundation needs to

23 be laid for these slides, because -- and this is the premise

24 for my objection.  The premise is that a lawyer on direct

25 examination of his own witness cannot ask leading questions

1  about important matters over objections.  Now, the slides, as

2  Mr. Bernick just said, are to walk the Court through, and I

3  just want to use my own demonstrative to demonstrate -- to

4  illustrate, really, my objection.

5           THE COURT:  Kathy, can you turn the system on?

6           MR. BERNICK:  Look at that.

7           MR. PRATT:  Now, if that's my demonstrative --

8           THE COURT:  I can't, because the system isn't on yet.

9           MR. BERNICK:  Well, you're really missing something.

10                          (Laughter)

11          MR. BERNICK:  You know, I work so hard --

12          THE COURT:  I think even I could draw that one.

13          MR. PRATT:  Well, you know, I --

14          MR. BERNICK:  My client's paying so much money for me

15 to do this --

16          MR. PRATT:  I dare not --

17          MR. BERNICK:  -- and I -- obviously, I just don't

18 know what's going on.

19          MR. PRATT:  Well, mine aren't as slick as yours, but

20 I dared not try to draw a mountain, Your Honor, so this is what

21 I've got.  Now, if I'm going to use this demonstrative on

22 direct examination of my own witness, what I'm going to try to

23 do is ask a non-leading question on direct, and I think that

24 will illustrate the problem.  Mr. Witness, what color was the

25 traffic light when the accident occurred?  So you see the

1 problem, Your Honor?  There needs to be a foundation as to

2 these demonstratives that the witness either prepared them --

3            MR. BERNICK:  I can't --

4            MR. PRATT:      -- or knows about them before Mr.

5 Bernick uses those demonstratives to lead the witness through

6 his direct examination.

7            THE COURT:  All right.  That's the same objection we

8 had before.  I think Mr. Bernick can lay the foundation before

9 the document is actually displayed.

10            MR. BERNICK:  This is really going to be

11 extraordinarily inefficient, but I'll try.

12 BY MR. BERNICK:

13 Q    First of all, let me just ask you, Mr. Shelnitz, these

14 different slides that we have here -- these different slides

15 that we have here, have you ascertained whether or not they

16 are, in fact, a reflection of the underlying corporate

17 documents?

18 A    Yes.

19 Q    Okay, and do they accurately portray the underlying

20 corporate documents?

21 A    I believe so.

22 Q    Now, I didn't realize this morning that Mr. Pratt, I

23 believe it was, was going to zero in on Green.  Would these

24 slides be any different if we did them all in red?

25                      (Laughter)


**J&J COURT TRANSCRIBERS, INC.**

1  A    I'll take that as a rhetorical question.

2  Q    Okay.  Let's begin before 1988, the world before 1988.

3  What was the main operating entity of W.R. Grace?  What was its

4  name?

5  A    W.R. Grace and Co.

6  Q    Okay, and with respect to W.R. Grace and Co. tell us what,

7  if any, relationship there was between that operating entity

8  and the businesses that gave rise to the claims of asbestos

9  liability.

10 A    That operating entity operated the asset ownership -- most

11 of the businesses of W.R. Grace as a consolidated group.  In

12 particular, it operated the construction products division.

13 The construction products division produced products that gave

14 rise to Grace's asbestos-related liability.

15 Q    Was there an entity named National Medical Care, Inc.

16 before 1988 that had a relationship with W.R. Grace and Co.?

17 A    Yes.

18 Q    And what was the business and what was the nature of the

19 relationship with W.R. Grace and Co.?

20 A    National Medical Care, Inc. was a wholly-owned subsidiary

21 of W.R. Grace and Co.  It was acquired probably around 1984.

22 It was engaged in the medical care service business,

23 principally kidney dialysis.

24 Q    Okay.  Showing you Exhibit -- do you have Exhibit 507-1?

25 I can put it on the screen.  Tell me whether or not this

1  accurately reflects the testimony that you offered regarding

2  the pre-1988 status of those two entities.

3  A    That is an accurate reflection of those two entities.  I

4  will remark that W.R. Grace and Co. also owned several other

5  businesses that are not reflected there, but they're not

6  relevant to subsequent transactions.

7  Q    Did the time come in 1988 when there was a reorganization

8  affecting W.R. Grace?

9  A    Yes.

10       MR. PRATT:  Objection, Your Honor.  The term, as

11 you'll see from these slides -- the term W.R. Grace has a lot

12 of antecedents, and I think it would be helpful if Mr. Bernick

13 and the witness referred to this one by the name W.R. Grace and

14 Co., a Connecticut corporation, if that's correct.

15       MR. BERNICK:  Well, now that I can't show the slide

16 or use the slide until I ask the questions, I'm not sure how

17 it's appropriate that I be given guidance if we're going to use

18 the demonstrative on how to ask the questions.  I'll try to

19 accommodate Mr. Pratt's concern about precision.

20 Q    Was there or was there not a reorganization that took

21 place in 1988?

22 A    Yes.

23 Q    And could you tell the Court what happened in that

24 reorganization?  And please be sure if there is a specific name

25 of a specific company that you recall, to state clearly for Mr.

1  Pratt and the Court's benefit what that name is.

2  A    Through a series of formation and a merger transaction,

3  W.R. Grace and Co., a Connecticut corporation then existing at

4  the time, was converted into a holding company structure

5  whereby after those transactions a new company, formerly known

6  as W.R. Grace and Co.-New York, that subsequently renamed W.R.

7  Grace and Co., stood atop the W.R. Grace and Co. Connecticut

8  corporation.

9  Q    Okay.  Which company, as a result of that reorganization,

10 actually held the underlying construction business and with it

11 the associated liabilities?

12 A    The Connecticut corporation, formerly named W.R. Grace and

13 Co., which was renamed W.R. Grace and Co.-Conn, hence the

14 Connecticut corporation to be distinguished from the new parent

15 company, the New York corporation.

16 Q    You just answered the next question, but following that

17 reorganization, what was the relationship of the new W.R. Grace

18 and Co. to the entity that had the underlying tort liabilities?

19 A    It was the parent corporation.

20 Q    Thank you.  I'm showing you 507-2.  Could you tell us

21 whether or not that accurately reflects the substance of the

22 1988 reorganization?

23 A    It does.

24 Q    Let's now turn to a further change in connection with the

25 Fresenius transaction.  Between the time of the 1988

**J&J COURT TRANSCRIBERS, INC.**

1  reorganization and the Fresenius transaction, did -- was there

2  a free -- a further organizational change that took place?

3  A    Yes.

4  Q    Could you tell the Court what the further organizational

5  change was that took place?

6  A    There were a few different transactions that took place in

7  preparation for the Fresenius transaction, one of which was for

8  the holding company, W.R. Grace and Co., the New York

9  corporation, to form a new subsidiary named Grace Holdings,

10 Inc.  A second step preceding the Fresenius transaction was to

11 move National Medical Care, then a subsidiary directly held by

12 W.R. Grace and Co.-Conn., to move it directly under the holding

13 company W.R. Grace and Co.

14 Q    Showing you demonstrative -- Plaintiff's Demonstrative

15 507-3.  Does that or does it not accurately reflect the changes

16 that you've now just described?

17 A    It does.

18 Q    Let's talk about the Fresenius transaction.  Would it be

19 best to look at the Fresenius transaction in a couple different

20 parts?

21 A    Yes.

22 Q    Now we're going to get very tricky.  This is hard to

23 recall, but could you tell the Court in your own words what the

24 different transactional steps were that were involved in the

25 process of completing the Fresenius transaction?

1  A    Okay.  The Fresenius transaction basically separated

2  Grace's medical care business, National Medical Care, from its

3  chemical and all other businesses held by W.R. Grace and Co.-

4  Conn. and other subsidiaries.  The way the transactions -- the

5  way the companies were separated was that Grace Holdings, Inc.,

6  that newly formed subsidiary, became the parent -- directly

7  held parent company of W.R. Grace and Co.-Conn.  And that was

8  -- that was consummated basically via contribution by W.R.

9  Grace and Co., the New York corporation, of the stock of Grace-

10 Conn. to Grace Holdings.  So now we have a structure where W.R.

11 Grace and Co.-Conn. is directly held by Grace Holdings.

12 Q    Okay.

13 A    The ultimate parent, W.R. Grace and Co., the New York

14 corporation, then spun off to the public shareholders shares of

15 Grace Holdings, Inc.  So the public shareholders at that point

16 in time owned 100 percent of Grace Holdings, Inc., which again

17 held W.R. Grace and Co.-Conn. and the construction-related

18 businesses, and continued to own W.R. Grace and Co., the New

19 York corporation, which now had just the medical care business

20 as a wholly-owned subsidiary.  That's what I would call the

21 first step in the -- in a two-part transaction.

22 Q    And does Exhibit 507-4 as a demonstrative accurately

23 reflect the basic moves that you've now just described?

24 A    Yes, it does.

25 Q    Now, again, before we lose track of Parent 1, is Parent 1

1 the company that used to be the direct parent of W.R. Grace,

2 that is the New York company?

3 A    Correct, the company formed in the 1998 reorganization.

4 Q    Okay, so the relationship of Parent 1 to the company with

5 the liabilities, parent sub?

6 A    Yes.

7 Q    And that parent now is moving up and really becoming

8 separate from the new parent, Parent 2, Grace Holdings?

9 A    That's correct.  Once Grace Holdings was spun off to the

10 public, Parent 1 no longer had an ownership interest, direct or

11 indirect, in W.R. Grace and Co.-Conn.

12 Q    But it was taking --

13           MR. LOCKWOOD:  Wait a minute, Mr. Bernick.  The

14 witness said that he --

15           THE CLERK:  You need to use a mic.

16           MR. LOCKWOOD:  The witness testified that the New

17 York company was formed in the 1998 reorganization.

18           THE WITNESS:  I said '88.

19           THE COURT:  1988.

20           MR. LOCKWOOD:  Thank you.

21           MR. BERNICK:  You've got to keep track here, Pete.

22           MR. LOCKWOOD:  It's on the screen.  I heard it and

23 the Court reporter heard it as 1998.

24           THE COURT:  I heard it as 1988.  What's correct, sir?

25           THE WITNESS:  1988.

1  Q    Once that took place was the parent -- when parent

2  contributed the stock to the new parent, Parent 1, the New York

3  corporation, separate but did it take along with it the NMC

4  subsidiary?

5  A    Yes.

6        THE COURT:  I'm sorry.  I missed the question.  Would

7  you state it again?

8        MR. BERNICK:  Yes, I'll restate it.

9  Q    Once the parent contributed its stock -- Parent 1, New

10 York, contributed its stock in the operating company, Grace-

11 Conn., to what used to be Grace Holdings and now is going to

12 become Parent 2, I think you've told us that Parent 1 is now

13 detached from the Grace organization?

14 A    Correct.

15 Q    But it carries with it the medical products business.

16 A    Correct.

17 Q    Now what role, if any, did that Parent 2, the former

18 direct parent of the operating company -- what role, if any,

19 did Parent 2 go on to play in connection with the Fresenius

20 transaction?

21 A    Well, Parent 2 --

22 Q    I'm sorry.  Parent 1.  What role -- I was pointing at

23 Parent 1 --

24 A    Okay.  Parent 1.

25 Q    -- and I said Parent 2.  What role, if any, did Parent 1

1  go on to play in the Fresenius transaction?

2  A    Well, Parent 1 merged with a subsidiary of Fresenius A.G.

3  Fresenius A.G. was a German holding company publicly traded on

4  the Frankfurt Exchange.  It had a number of different

5  subsidiaries, including U.S. subsidiaries.  It merged with one

6  of the U.S. subsidiaries.  Parent 1, W.R. Grace and Co., the

7  New York corporation, was the surviving corporation in the

8  merger, and following that transaction the combined

9  corporation, Parent 1 and Fresenius' subsidiary, continued to

10 own and operate National Medical Care.

11 Q    I'm showing you 507-5.  Does that accurately reflect the

12 transactions and events that you've just now described?

13 A    In summary fashion, yes.

14 Q    Okay.  Let's talk about the Sealed Air transaction.  Prior

15 to the Sealed Air transaction, we now have, just to review the

16 bidding -- prior to the Sealed Air transaction we have the

17 operating company is still W.R. Grace and Company, a

18 Connecticut corporation, and that still has the asbestos

19 liabilities?

20 A    Yes.

21 Q    And the new parent, Parent 2, is what used to be Grace

22 Holdings but now is called W.R. Grace and Company?

23 A    Correct, it changed its name.

24 Q    Okay.  What further changes, if any, took place before the

25 Sealed Air transaction was executed?

1 A    Again, similar to the Fresenius transaction structure, in

2 order to prepare for the Sealed Air transaction, Parent 2, the

3 new holding company, W.R. Grace and Co., now a Delaware

4 corporation, formed a new co and was named Grace Specialty

5 Chemicals, Inc.  At the same time, in order to do the Sealed

6 Air transaction, Grace needed to separate its packaging

7 business from its chemicals business, and the packaging

8 business was in the U.S. unincorporated.  Its assets were held

9 directly by W.R. Grace and Co.-Conn.  So those packaging assets

10 were pushed down into a subsidiary named Cryovac, Inc., and it

11 became a separate subsidiary initially held directly by W.R.

12 Grace and Co.-Conn.  Similar to the NMC/Fresenius transaction,

13 W.R. Grace and Co.-Conn. then transferred the shares of

14 Cryovac, Inc. to Parent 2, so it was, therefore, held directly

15 by Parent 2, directly by the holding company, W.R. Grace and

16 Co.  So those were the steps -- there were many others, but

17 those were the primary steps that were taken as a prelude to

18 the Sealed Air transaction.

19 Q    I'm showing you Exhibit 507-6.  Does that accurately

20 reflect what you've just described?

21 A    Yes.

22 Q    Now, at this point in time the asbestos liabilities and

23 the former business -- the construction business still held by

24 the operating company, Grace-Conn.?

25 A    Correct.

1  Q    And what was the relationship between the new W.R. Grace,

2  which we've called Parent 2, and the entity that had the

3  asbestos liabilities?

4  A    Parent 2 held the shares of W.R. Grace and Co.-Conn.

5  Q    So parent sub?

6  A    Parent sub.

7  Q    Okay.  Now, tell us what the steps were of the Sealed Air

8  transaction, and again, would it be useful to describe them in

9  two parts?

10 A    Yes.

11 Q    Just take us through the first part.

12 A    The first part had Parent 2 contributing its ownership

13 interest -- the shares of Grace-Conn. to Grace Specialty

14 Chemicals, Inc.  The result of which was that Grace-Conn. now

15 became a directly held subsidiary of Grace Specialty Chemicals,

16 Inc.

17 Q    Is that parallel to pretty much the same as what happened

18 with Grace Holdings in connection with the Fresenius

19 transaction?

20 A    Yes.

21 Q    Okay.

22 A    Grace Specialty Chemicals, Inc. was then spun off to the

23 shareholders -- the public shareholders of Parent 2, what

24 became a standalone publicly held corporation divorced of

25 Parent 2.  That would be the first step of the Sealed Air

1  transaction to separate chemicals and packaging.

2  Q    Does 507-7 now accurately reflect the transaction that

3  you've described?

4  A    Yes.

5  Q    Now, in this transaction Parent 2 is the same parent that

6  in 507-6 was the parent that was the direct parent of the

7  operating company that had the asbestos liabilities?

8  A    Correct.

9  Q    Did Parent 2 in 507-7 go on to participate further in the

10  Sealed Air transaction?

11  A    Yes, it did.

12  Q    And could you describe what happened?

13  A    In that transaction Parent 2, W.R. Grace and Co., the

14  Delaware corporation, merged with Sealed Air Corporation, a

15  publicly traded U.S. corporation that had a protective

16  packaging business.  Parent 2 was the surviving corporation in

17  that transaction, and the merged entity had as a wholly-owned

18  subsidiary the Cryovac, Inc. packaging business.

19  Q    Okay.  Is that now accurately reflected in Exhibit 507-8?

20  A    Yes.

21  Q    What's the current relationship -- what's the current

22  parent subsidiary relationship between W.R. Grace and Co. and

23  the operating business?

24  A    It -- the operating business is a wholly-owned subsidiary

25  of the new W.R. Grace and Co.  That was Grace Specialty

1 Chemicals, Inc., which after the spinoff changed its name to

2 W.R. Grace and Co., and I guess you can call it Parent 3.

3 Q    Okay.  Does Exhibit 507-9 accurately reflect that

4 relationship?

5 A    Yes.

6         MR. BERNICK:  Your Honor, we offer for demonstrative

7 purposes --

8         THE COURT:  Wait.  I'm sorry.  Before you do that, I

9 lost this last transaction.  I don't know which W.R. Grace

10 we're talking about in the 507-9 I think.

11 Q    Yes, 507-9 -- I think if we go back to 507-7 --

12        THE COURT:  All right.

13 Q    -- is it accurate that in 507-7 Grace Specialty Chemicals

14 becomes the new parent of the operating company, and the old

15 parent, Parent 2, goes off on its way separately to participate

16 in the Fresenius transaction --

17 A    Sealed Air.

18 Q    -- Sealed Air transaction reflected in 507-8.

19 A    That's correct.

20 Q    So if we go back to 507-7, Parent 3 is the new parent that

21 was put in place through a contribution of stock to the

22 operating company prior to the Sealed Air transaction?

23 A    Yes.

24 Q    Is that now still the parent company today as Parent 3 is

25 reflected in 507-9?

1 A    Yes, Grace Specialty Chemicals, Inc. changed its name to

2 W.R. Grace and Co.  At the same time the old W.R. Grace and

3 Co., which we've been calling Parent 2, changed its name to

4 Sealed Air Corporation.

5          MR. BERNICK:  Is that okay, Your Honor?

6          THE COURT:  Yes.

7          MR. BERNICK:  Thank you.  We would offer for

8 demonstrative purposes 507-1 through 507-9.

9          MR. PRATT:  Objection, Your Honor.  Mr. Shelnitz

10 testified that these are accurate.  Actually, I think he will

11 agree with me on cross examination that they're not entirely

12 proper.

13          THE COURT:  I'm having trouble hearing you, Mr.

14 Pratt.  I'm sorry.  I think that microphone's being used for

15 the Lavalier mic, so that one microphone on the end isn't live.

16          MR. PRATT:  Your Honor, I'd prefer if the Court would

17 delay ruling.  The witness testified that these demonstratives

18 are accurate, but they're not quite accurate, and I'm going to

19 bring that out on cross.  So before they're admitted, I'd like

20 to bring that out.  Maybe they can be corrected, but I'd like

21 the Court to defer ruling on whether they're admissible even as

22 demonstratives at this point.

23          MR. BERNICK:  They're not being proffered as a

24 stipulated set of demonstratives.  They're being proffered as

25 demonstratives that would aid the Court in understanding Mr.

1 Shelnitz's testimony, and they should come in for that purpose.

2 It's relatively unusual to have a demonstrative as to which

3 everybody agrees its accuracy, so that goes to the weight.  It

4 doesn't go to admissibility.

5          THE COURT:  I think it does go to the weight, Mr.

6 Pratt, but you can certainly ask questions about them on cross,

7 and then if it turns out that they're inaccurate, then I will

8 take them back out of the record.  But I think as

9 demonstratives for this witness' testimony right now, they're

10 admissible for that limited purpose.  One second, please.

11                           (Pause)

12          THE COURT:  All right, Mr. Bernick.  Thank you.

13 Q    I have some general questions to ask you based upon what

14 you just now testified.  At any point in time did any Grace

15 entity hold the asbestos liabilities other than the operating

16 entity?

17 A    No.

18 Q    At all points in time what was the relationship between

19 that operating entity -- that operating entity that had the

20 liabilities and the entity that went on to participate in the

21 mergers with first Fresenius and then with Sealed Air -- what

22 was the relationship between the operating entity with the

23 liabilities and the entity that respectively went off to do

24 Fresenius and respectively went off to do Sealed Air?

25 A    It was a parent subsidiary structure, directly held

1  subsidiary.

2  Q     Were there -- in connection with these transactions, were

3  there indemnities that were given to first Sealed -- first

4  Fresenius and then Sealed Air?

5  A     Yes, very expensive indemnities.

6  Q     With respect to the Fresenius transaction, did those

7  indemnities cover liabilities -- those liabilities other than

8  those arising from the medical care business?

9  A     That would be correct.

10 Q     And with respect to Sealed Air, did Grace give indemnities

11 to Sealed Air that covered liabilities -- all liabilities other

12 than those arising from the packaging business?

13 A     Yes.

14 Q     Since the transaction was consummated first with Sealed

15 Air and then -- first with Fresenius and then with Sealed Air,

16 have lawsuits, in fact, been filed against Fresenius and Sealed

17 Air arising out of the asbestos business of Grace's operating

18 company?

19 A     Yes.

20 Q     I want to show you Exhibits 121, 120 -- who's OS?  Oh,

21 OneBeacon 20, 129 -- Proponents' 129 and Proponents' 143.  They

22 should all be in the book in front of you, and I'm just going

23 to take you through them and then offer them into evidence.

24 A     Okay.

25 Q     In fact, since the -- both shortly before and since the

1  bankruptcy petition have been filed, have lawsuits been brought

2  by tort claimants against both of the entities?

3  A    Yes.

4  Q    And do these documents reflect the existence of these

5  lawsuits?

6  A    Yes.

7  Q    Okay.  Taking you through first 121 -- Plan Proponents'

8  121, is this a copy of a class action complaint that was filed

9  against both Grace and Sealed Air arising out of Grace's

10 asbestos-related activities?

11 A    Yes.

12 Q    Taking you to Plan Proponents' --

13         THE COURT:  I'm sorry.  121.  The question was

14 whether it's against both Sealed Air and --

15         MR. BERNICK:  Grace.

16         THE COURT:  Oh, Grace.

17         MR. BERNICK:  W.R. Grace and Company, a Delaware

18 corporation, and Conn, the operating --

19         THE COURT:  All right.

20         MR. BERNICK:  -- the operating company arising out of

21 Grace's asbestos-related activities.

22         THE COURT:  Okay.  Thank you.

23 Q    And then taking you to Plan Proponents' 120, is this also

24 a lawsuit against both Grace Delaware, Grace Conn, and Sealed

25 Air once again arising out of Grace's activities that related

1  in part to asbestos?

2  A    Yes.

3  Q    OS-20, is this a copy of the proof of claim of the Sealed

4  Air Corporation in this case?

5  A    Yes, it is.

6  Q    Plan Proponents' 129, is this a copy of a different

7  lawsuit that was filed shortly before the Chapter 11 that was

8  brought against Grace, various entities, and then also Sealed

9  Air and Fresenius arising out of Grace's historical asbestos-

10 related activities?

11 A    Yes.

12 Q    And finally, Plan Proponents' 143, is this an addendum to

13 the proof of claim of Fresenius in connection with this case?

14 A    Yes, it is.

15         MR. BERNICK:  Your Honor, we offer all of these

16 exhibits for the fact that the litigation was being pursued

17 prior to the bankruptcy petition by claimants against -- the

18 tort claimants against Sealed Air and Fresenius.  That those --

19 and that those suits continued after the bankruptcy was filed,

20 and the Court will know from the record before the stay was

21 instituted and are the subject of claims that are now being

22 made by Sealed Air and Fresenius in the bankruptcy.  So it's

23 for the fact of the -- that litigation and those claims in the

24 bankruptcy not for the truth of the matters that are asserted.

25         MR. LOCKWOOD:  Mr. Bernick, one question.  Do you

1 include Exhibit 126 when you say all these exhibits, which you

2 did not show to the witness or do you mean to exclude Exhibit

3 126?

4             THE COURT:  Your microphone is not on, Mr. Lockwood.

5             MR. LOCKWOOD:  Exhibit 126.  I'm sorry.  I wasn't

6 talking into it.

7             MR. BERNICK:  I didn't see Exhibit 126.

8             MR. LOCKWOOD:  What?

9             MR. BERNICK:  What are you --

10             MR. LOCKWOOD:  It's Tab 2.

11             MR. BERNICK:  Yes, I didn't -- we don't need Tab 2.

12             THE COURT:  Mr. Pratt.

13             MR. PRATT:  No objection, Your Honor.

14             THE COURT:  All right.  Exhibits, Plan Proponent 121,

15 120, 129, and 143 are admitted, and OS-20 is admitted.  Give me

16 a second, Mr. Bernick.

17                         (Pause)

18             MR. BERNICK:  You may have mentioned this, and I just

19 didn't hear.  There would be a total of five exhibits, 1 --

20             THE COURT:  Yes.

21             MR. BERNICK:  Okay.

22             THE COURT:  120 and 21, 129, 143, and OS-20.

23             MR. BERNICK:  Yes, that's right.  We pass the

24 witness.

25             THE COURT:  Mr. Pratt.

**J&J COURT TRANSCRIBERS, INC.**

1      MR. PRATT:  Good morning, Mr. Shelnitz.  Warren Pratt

2 representing creditors OneBeacon and Seaton.

3      THE WITNESS:  Good morning.

4                     CROSS EXAMINATION

5 BY MR. PRATT:

6 Q    I don't -- I didn't -- it didn't register with me when you

7 said when you first started with Grace companies.

8 A    1983.

9 Q    1983.  And you're currently Vice President and General

10 Counsel and Secretary?

11 A    Correct.

12 Q    Of which entity?

13 A    W.R. Grace and Co., Parent 3, and W.R. Grace and Co.-Conn.

14 Q    And in that capacity you're an officer of those entities?

15 A    That's correct.

16 Q    Now, at some point in the General Counsel's office -- when

17 you first came to the General Counsel's office, to whom did you

18 report?

19 A    In 1983?

20 Q    Yes.

21 A    I don't recall.

22 Q    At some point did you come to report to David Siegel?

23 A    Yes.

24 Q    And that's your predecessor as General Counsel?

25 A    That's correct.

Shelnitz - Cross/Pratt                    101

1  Q    And what are your present duties, just in a nutshell?

2  A    I manage Grace's worldwide legal affairs.  I am a Chief

3  Liaison with the Board.  I function as Grace's Chief

4  Restructuring Officer in the bankruptcy, do most types of

5  things you would expect a General Counsel to do.

6  Q    As General Counsel, do you have occasion to sign

7  declarations that get filed with the court?

8  A    Yes.

9  Q    Now, I'm going to go back through these slides and take

10  another pass, and I'm going to focus specifically on the names

11  of the -- some of the entities and the timing involved.  Okay.

12  This is 507-1, Slide 1.  Now, this entity here, W.R. Grace and

13  Co., that was a Connecticut corporation.  Correct?

14  A    Correct.

15  Q    And that corporation was formed in 1899?

16  A    I believe that's correct.

17          MR. BERNICK:  Your Honor, this -- we're happy to go

18  over and hear corrections, but they should be relevant

19  corrections.  The date on which Grace-Conn. was founded is not

20  of relevance.

21          MR. PRATT:  Well, it's a matter of history, Your

22  Honor.

23          MR. BERNICK:  Well, lots of history.  That's great.

24  But can we keep it to something that -- object on relevance

25  grounds.

**J&J COURT TRANSCRIBERS, INC.**

Shelnitz - Cross/Pratt                    102

1          THE COURT:  Okay.  That's sustained.  Let's move, Mr.

2  Pratt.

3  Q    Mr. Shelnitz, I'd like to refer to W.R. Grace and Co., the

4  entity -- the Connecticut corporation that's shown on this page

5  as Old Grace.  Have you ever heard that term Old Grace before?

6  A    Yes.

7  Q    Was this company called Old Grace in 1988 at the time of

8  its incorporation -- or excuse me -- at the time of the

9  reorganization?

10  A    I don't recall.

11  Q    Okay.  Well, let's go to Slide 2.

12          MR. BERNICK:  Could we then refer to it as Grace-

13  Conn. if the witness doesn't recall Old Grace?

14  Q    Now, see Number 1 up here at the upper right?

15  A    Yes.

16  Q    This says, "W.R. Grace and Co. reorganized into a holding

17  company, Parent 1."  I don't think that's quite precise, but

18  maybe you can tell me which W.R. Grace and Co. is referred to

19  in that Note 1 there.

20  A    It was meant to depict a general reorganization of the

21  Grace group, a consolidated Grace entity.

22  Q    Okay, so what happened here is that the -- a new company

23  was formed, and that new company is at the very top.  Isn't it?

24  A    Correct.

25  Q    And that's W.R. Grace and Co., a New York corporation.

**J&J COURT TRANSCRIBERS, INC.**

1  A    Correct.

2  Q    And that's sometimes called Grace New York.  Correct?

3  A    Colloquially, yes.

4  Q    And you labeled it here Parent 1 or this slide labels it

5  Parent 1.  And beneath that W.R. Grace and Co.-Conn., Note 2

6  says the operating company was changed to that name in 1988,

7  correct, to add Conn.

8  A    Correct.

9  Q    And that reflects it's a Connecticut corporation.

10  A    Correct.

11  Q    Now, this happened in 1988.  Correct?

12  A    Correct.

13  Q    And this organizational structure continued from 1988 up

14  until the Fresenius transaction closed.  Isn't that right?

15        MR. BERNICK:  Objection.  Your Honor, I -- the cross

16  examination's great, but can we get to some -- I mean this is

17  just going back over exactly the same ground that he gave on

18  direct.  If we can get to something that's different, that

19  might be helpful.

20        MR. PRATT:  I'm taking it fairly quickly, Your Honor.

21  This shouldn't take too long.

22        THE COURT:  All right.  Go ahead.

23        MR. PRATT:  Thank you.

24  Q    Did you remember the question, Mr. Shelnitz?

25        THE COURT:  I don't.

1  A    I don't either.

2  Q    Okay.  This diagram, Slide 2 here that we're looking at,

3  this shows the organization of the company, W.R. Grace and its

4  affiliates from 1988, when this reorganization occurred, up

5  until the closing of the Fresenius transaction.  Is that right?

6  A    Not up until the closing of the Fresenius transaction.

7  That's incorrect.  There were interim steps to prepare for the

8  Fresenius transaction.  And further, to answer your question,

9  this is not what the entire Grace group looks like.  There were

10  other subsidiaries.  There were other businesses.  But for

11  purposes of understanding the Sealed Air/Fresenius

12  transactions, this would be relevant.

13  Q    Okay, and this relevant part didn't change until 1996.

14  Did it?

15  A    I think that's correct.

16  Q    Okay.  Now, Fresenius transaction closed in September of

17  1996.  Is that right?

18  A    Correct.

19         THE COURT:  I'm sorry.  When?  What was the year?

20         MR. PRATT:  September, 1996.

21         THE COURT:  All right.  Thank you.

22  Q    I'm going to skip Number 3, and we'll go to Number 4.

23  Now, this says at the top Fresenius Transaction Part 1.  The

24  Fresenius took place in September, 1996.  Correct?

25  A    Correct.

1  Q    And that was -- the next slide is labeled Fresenius

2  transaction, Part 2.  All of -- Part 1 and Part 2 were

3  essentially simultaneous.  Weren't they?

4  A    I believe that's correct.

5  Q    Now, I just want to clarify --

6           THE COURT:  Mr. Pratt, just a second.  Kathy, did we

7  lose the phone?

8           THE CLERK:  Yes, Judge.

9           THE COURT:  Okay.

10          THE CLERK:  I'll get them back on.

11          THE COURT:  Just a second, Mr. Pratt.  I'm sorry.

12                         (Pause)

13          MR. BERNICK:  Are these local astronomical

14  disturbances, Your Honor?

15          THE COURT:  The President's coming to town today, and

16  one never knows.

17          MR. BERNICK:  That may be plausible.

18                         (Pause)

19          THE CLERK:  Okay, Judge.

20          THE COURT:  Court Call, Operator, are you back live?

21          OPERATOR:  Yes, we are back live.  Thank you so much.

22          THE COURT:  Thank you.  Okay, Mr. Pratt.  Thank you.

23          MR. PRATT:  Thank you, Your Honor.

24  BY MR. PRATT:

25  Q    Mr. Shelnitz, we're looking at Slide 4 here, Exhibit 507-

**J&J COURT TRANSCRIBERS, INC.**

1  4.  What's labeled at the top Parent 1, that's W.R. Grace and

2  Co., a New York corporation.  Correct?

3  A    Correct.

4  Q    And it shows here off to the right Grace Holdings, Inc.

5  That's a Delaware corporation that was actually created in

6  January, 1996.  Correct?

7  A    Correct.

8  Q    And that was part of the Fresenius transaction when

9  everything was ready to go on that transaction in September.

10         MR. BERNICK:  Objection are we talking specifically

11  about the creation of Holdings?

12         MR. PRATT:  Yes, Grace Holdings was created in

13  January, 1996.

14  A    Correct.

15         MR. BERNICK:  Right, and so you --

16  Q    Do you agree with that?

17         MR. BERNICK:  Then I don't understand the question.

18  If this was created in 1996 and the transaction doesn't take

19  place until September, then I don't understand what your

20  question is.

21         MR. PRATT:  Well, Your Honor, the witness just

22  testified that Grace Holdings was created in January, 1996, and

23  maybe just for clarification --

24  Q    Mr. Shelnitz, was that in preparation for a transaction

25  that would occur later?

1        MR. BERNICK:  Oh, okay, so for a transaction not

2   specifically the Fresenius transaction?

3        MR. PRATT:  A transaction.

4   A    I don't recall.

5   Q    Okay.  Grace Holdings, Inc. is a Delaware corporation?

6   A    Yes.

7   Q    And as part of the Fresenius transaction, that was

8   actually renamed.  Wasn't it?

9   A    Yes.

10  Q    And the renaming of the company was W.R. Grace and Co.

11  A    That's what I said earlier, yes.

12  Q    But it remained a Delaware corporation.

13  A    Yes.

14  Q    So W.R. Grace and Co., a Delaware corporation, is the same

15  company as Grace Holdings, Inc.  It's just been that the name

16  changed.

17  A    Yes.

18  Q    And it says on here Grace Holdings, Inc.  I'm looking at

19  the second block down.  It says Parent 2.  Is that right?

20  A    Yes.

21  Q    So we can call that Parent 2 for purposes of these slides?

22  A    Once the -- yes.  Once the spinoff occurred, it became the

23  ultimate parent and direct parent of Grace-Conn.

24        MR. BERNICK:  Your Honor, again this is all -- I mean

25  this is Note 7.  It's right on the face of the slide.  I -- so

**J&J COURT TRANSCRIBERS, INC.**

Shelnitz - Cross/Pratt                    108

1 far, we're just reiterating.  Is there something that's

2 different?

3          MR. PRATT:  Your Honor, I'm moving right along here.

4 This isn't going to take too long.  This is a very complicated

5 set of slides and, obviously, some very complicated

6 transactions.

7          THE COURT:  Go ahead, Mr. Pratt.

8          MR. PRATT:  Thank you, Judge.

9 Q    Mr. Shelnitz, we're looking at Slide 5, Exhibit 507-5.

10 And here again, Mr. Shelnitz, Parent 1 is W.R. Grace and Co., a

11 New York corporation.  Right?

12 A    Correct.

13 Q    And this illustrates the closing that happened in the

14 Fresenius transaction in September, 1996.  Now, the block on

15 the left here, it says, "Parent 1 merged with a Fresenius

16 Medical Care, A.G. subsidiary and was renamed Fresenius

17 National Medical Care, Inc."  I want to ask you a couple of

18 things about that just as a point of clarification, and I want

19 to contrast that with Slide Number 8.  So let me just put this

20 up for a minute.  Now, here this block says, "Sealed Air

21 Corporation merged into Parent 2," it doesn't say merged with

22 Parent 2.  It says merged into.  And I want to go back to Slide

23 5, Exhibit 507-5 and ask you about this Note 8 at the upper

24 left.  Isn't what actually happened that Fresenius had a

25 subsidiary and, actually, during this transaction the

1 subsidiary merged into Parent 1, Grace New York?

2 A    I think that's correct.

3 Q    Okay, so that after the merger Parent 1, Grace New York,

4 was the surviving company?

5 A    That's correct.

6 Q    All right.  Now, second of all, in this block up here it

7 says that, "As a part of this transaction, Parent 1, Grace New

8 York, was renamed Fresenius National Medical Care, Inc."

9 Actually, at the time of the transaction wasn't that entity

10 called -- renamed Fresenius National Medical Care Holdings,

11 Inc.?

12 A    It may have been.  That would've been within Fresenius'

13 domain as to what to change the name to.

14 Q    You don't recall one way or the other?

15           MR. BERNICK:  Holdings, Inc.?

16           MR. PRATT:  Yes, Fresenius National Medical Care

17 Holdings, Inc.

18           MR. BERNICK:  Holdings.

19           MR. PRATT:  Your Honor, just to expedite this, I

20 could try to refresh the witness' recollection, but maybe Mr.

21 Bernick will stipulate to it.  If we look at the plan

22 definition -- and I'm looking now in Section 1.1 of the plan,

23 Page 25.  This is 1.1, Subparagraph 115, and it's a defined

24 term, FCMH -- FMCH -- I'm sorry -- and that's says, "Fresenius

25 Medical Care Holdings, Inc., a New York corporation, formerly

1  named W.R. Grace and Co. and Fresenius National Medical Care

2  Holdings, Inc. and its affiliates."

3          MR. BERNICK:  Well, actually, the difference there is

4  the word National, so we're happy to make any and all

5  corrections that are appropriate to make this slide accurate.

6  I'm not prepared to agree to change some language in the plan

7  at this point --

8          MR. PRATT:  No.  No.  No.

9          MR. BERNICK:  -- as it -- so --

10         MR. PRATT:  No, I think, actually, Mr. Bernick, this

11 definition is correct.  The former name at the time of the

12 Fresenius transaction was Fresenius National Medical Care

13 Holdings, Inc.

14         MR. BERNICK:  Okay.  I've got that one down.

15         MR. PRATT:  Okay.

16         MR. BERNICK:  Okay.  Now, do you want me to change 8

17 up at the top to say merged into?

18         MR. PRATT:  No.

19         MR. BERNICK:  Or that actually would be wrong.

20 Right?

21         MR. PRATT:  Not necessary.  Not necessary --

22         MR. BERNICK:  Okay.

23         MR. PRATT:  -- at all.  I think merged with is good

24 enough for now.  The witness explained --

25         MR. BERNICK:  Terrific.

**J&J COURT TRANSCRIBERS, INC.**

1       MR. PRATT:  -- that actually the Grace entity was the

2  surviving entity.  But I'm focusing now just on the name.  When

3  that entity was renamed, the new name was not as shown on this

4  slide by one word.  Instead, the new name, in fact, was

5  Fresenius National Medical Care Holdings, Inc., and that's

6  reflected in the plan.

7       MR. BERNICK:  Do I need it?

8       MR. PRATT:  Can we have that stipulation, sir?

9       MR. BERNICK:  What stipulation?  That the chart

10 should say National Medical Care Holdings, Inc.?  I'm prepared

11 to do that.

12      MR. PRATT:  Very good.  I'll move along then.

13 BY MR. PRATT:

14 Q    Now, Mr. Shelnitz, Parent 1 -- what's labeled here Parent

15 1, W.R. Grace, a New York Corporation, the surviving entity of

16 this merger, is renamed Fresenius National Medical Care

17 Holdings, Inc.  It's the same corporation, isn't it, as it

18 always was?

19 A    Yes.

20 Q    It's just got a new name?

21 A    That's correct.

22 Q    Okay.  We're now at Slide 6, Exhibit 507-6.  Now, Mr.

23 Shelnitz, this transaction occurred in March of 1998, did it

24 not?

25 A    Correct.

1  Q    And for purposes of the Fresenius and to seal their

2  issues, essentially nothing changed from the closing of the

3  Fresenius transaction in September 1996 up until the closing of

4  the Sealed Air transaction in March 1998, is that true?

5  A    Other than the transactions depicted in Steps 9 and 11,

6  and then perhaps 10, that would be correct.

7  Q    Okay.  But, at the top of the chart, that would be the

8  same.  And this --

9  A    Same Parent 2, correct.

10 Q    Okay.  So, this Slide 6 says at the top, "Pre-Sealed Air

11 transaction."  We still have at the top, Parent 2.  That's W.R.

12 Grace, a Delaware Corporation, formerly named Grace Holdings,

13 Inc., correct?

14 A    Correct.

15 Q    Okay.  I'm at Slide 7, 507-7.  Now, here we have at the

16 top where it says Parent 2, that same entity, W.R. Grace and

17 Co., a Delaware Corporation, formerly named Grace Holdings,

18 Inc., correct?

19 A    Correct.

20 Q    And a new company was created, Grace Specialty Chemicals,

21 right?

22 A    Yes.

23 Q    And that's a Delaware Corporation?

24 A    Yes.

25 Q    And as it shows here on Note 14 at the side of this slide,

1  that entity was renamed W.R. Grace and Co., correct?

2  A    Following the spinoff, correct.

3  Q    And again, this was just a name change, but that entity is

4  the same entity as it was before, a Delaware Corporation?

5  A    Correct.

6  Q    But, it's now named W.R. Grace and Co., a Delaware

7  Corporation?

8  A    Correct.

9  Q    Okay.  We're at Slide 8, 507-8.  Now, here, Parent 2 at

10 the top on the left, that's W.R. Grace, a Delaware Corporation,

11 correct?

12 A    Correct.

13 Q    And that gets renamed Sealed Air Corporation?

14 A    Correct.

15 Q    And here the Note 15 says that Sealed Air Corporation

16 merged into Parent 2, W.R. Grace, a Delaware Corporation.  So,

17 that was a surviving entity, right?

18           THE COURT:  Which was?

19 A    Parent 2 was a surviving entity.

20 Q    Parent 2 was a surviving entity.  And Parent 2 was then

21 renamed Sealed Air Corporation?

22 A    Correct.

23 Q    And that's the same company as it always was, it just now

24 has a new name?

25           MR. BERNICK:  Well, if you're talking about the

Shelnitz - Cross/Pratt                    114

1  corporate entity as opposed to the business --

2         MR. PRATT:  That's exactly right.

3  A    It's a corporate entity, correct.

4  Q    It's the same corporate entity.

5  A    It's the same corporate entity.

6  Q    Okay.  So, it started out as Grace Holdings, Inc.  It

7  became W.R. Grace and Co., a Delaware Corporation, and now it's

8  named Sealed Air Corporation.

9         MR. BERNICK:  Whoa, whoa, whoa.  It was Grace --

10  let's make sure.  Grace Holdings -- your question was Grace

11  Holdings, Inc., then it became W.R. Grace and Co. --

12         MR. PRATT:  A Delaware Corporation.

13         MR. BERNICK:  -- a Delaware Corporation.  And then

14  you're --

15         MR. PRATT:  And that happened in 1996.

16         MR. BERNICK:  Right.  And now you're saying it

17  becomes Sealed Air as a result of the Sealed Air transaction?

18         MR. PRATT:  Right.

19  BY MR. PRATT:

20  Q    And that's just a name change, not a change in corporate

21  status?

22  A    Correct.

23  Q    Okay.  And that happened in March of 1998?

24  A    Yes.

25  Q    So, today we have at the top, Parent 3.  That's W.R. Grace

**J&J COURT TRANSCRIBERS, INC.**

1  and Co., a Delaware Corporation, right?

2  A    Right, the second one.  Right.

3  Q    And that's a different entity from Parent 2 which was W.R.

4  Grace, a Delaware Corporation, now named Sealed Air

5  Corporation?

6  A    Correct.

7  Q    Okay.  But they at one time were each called W.R. Grace

8  and Co., a Delaware Corporation, but -- excuse me -- the

9  existing one was changed to Sealed Air, and this is the new one

10 here?

11 A    Correct.

12         MR. BERNICK:  Well, that's very -- object to the form

13 of question.  That's very ambiguous I think.

14         MR. PRATT:  I'll withdraw that question, Your Honor.

15         MR. BERNICK:  Can I pause here for just a moment, Mr.

16 Pratt?  Of all the things that we've now gone through, the one

17 substantive change that you want to make is on Slide 5 where it

18 says Parent 1 renamed Fresenius National Medical Care, Inc.,

19 you want to insert Holdings after Care, is that right?

20         MR. PRATT:  Yes.  Both places that it appears.  It

21 appears in Note 8 at the top at the upper left, and it appears

22 in the middle block on the right-hand side.

23         MR. BERNICK:  Okay.  So, we -- Your Honor, we will go

24 back and double check the documentation.  And if that change is

25 correct, as I believe it may well be, but I don't know, we will

Shelnitz - Cross/Pratt                    116

1  make that change and re-designate 5075 as 5075-A, and also be

2  prepared to tender that as a demonstrative in connection with

3  Mr. Shelnitz's testimony.

4            THE COURT:  That's fine.

5            MR. BERNICK:  We have to double check first because

6  nobody wants to trust their recollection, and particularly mine

7  because it's a recollection of something I've never seen.

8            MR. PRATT:  Your Honor, I'd like to hand the witness

9  Exhibit Plan Proponent 243 which is in evidence by stipulation

10 this morning.

11           THE COURT:  All right.

12 Q    Mr. Shelnitz, have you ever seen this document before do

13 you recall?

14 A    I believe I've seen it.

15 Q    Okay.  I'd like you to go to down at the lower right-hand

16 side there -- what we used to call Bates numbers down there.

17 Do you see that?

18 A    Yes.

19 Q    9916?

20 A    Yes.

21 Q    I'd like you to go over to Page Number 9938, please.

22 A    Okay.

23 Q    And this is the declaration of your former boss, David

24 Siegel, right?

25 A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. PRATT:  I'll just note for the record, Your

2     Honor, that this is -- this declaration on the last page has a

3     date on it, April 2, 2001.

4     Q    Now, Mr. Shelnitz, at that time Mr. Siegel was senior vice

5     president and general counsel of W.R. Grace and Co., a Delaware

6     Corporation, and Grace Conn., is that correct?

7     A    Yes.

8     Q    And as general counsel, did he sometimes execute

9     declarations the same way you do?

10    A    I believe he did.

11    Q    And that would be in the ordinary course of his duties as

12    an officer of the company, if the occasion arose to require

13    that?

14    A    Yes.

15    Q    Okay.  Now, you'll see the last sentence here on the

16    first -- on this page, 9938, in which Mr. Siegel says under

17    penalty of perjury, "I'm authorized to make this declaration on

18    behalf of Grace, Grace Conn. and the other debtors in these

19    bankruptcy cases."  Do you have any reason to doubt that Mr.

20    Siegel is authorized to sign this on behalf of those companies?

21    A    Without reading through the declaration I couldn't be

22    sure, but he certainly had powers as an officer of the company

23    to execute documents.

24    Q    Okay.

25          MR. PRATT:  Your Honor, I'm going to go through this

1 one very quickly.  The purpose for it is -- and it's already in

2 evidence -- but the purpose for it is, that it puts in succinct

3 narrative form what we just went through with all of those

4 slides.  And I think it'll be helpful to the Court to have that

5 written down as opposed to question and answer because this is

6 very succinct, and I think it's right.  And I just want to

7 confirm with this witness that it is right based on his

8 understanding.

9            THE COURT:  All right.

10            MR. BERNICK:  That should not -- that proffer should

11 not be --

12            THE COURT:  Your microphone.

13            MR. BERNICK:  That proffer should definitely not be

14 accepted.  This document was proffered into evidence yesterday,

15 and it was accepted under extremely limited circumstances

16 because there was a complaint that was coming in through a

17 different witness.  And, Your Honor, I objected --

18            THE COURT:  No, actually, I struck it yesterday, but

19 it was admitted by a stipulation this morning.

20            MR. BERNICK:  Admitted by a stipulation this morning

21 for whatever purpose it was that was being proffered yesterday,

22 I believe, to establish the truth of the matters that are set

23 forth in the document.  It is not -- we did not accept it as a

24 stipulated document for that purpose at all.  It is what it is

25 on the face of it.  It's a verified complaint in the attached

1 declaration.  The declaration does not supplant the testimony,

2 and it's certainly not as complete or detailed a recitation,

3 and therefore the proffer should be refused.

4          MR. PRATT:  Your Honor --

5          MR. BERNICK:  The purpose of this -- excuse me -- the

6 purpose of this declaration was simply to tell the history

7 leading up to a verified complaint that was filed for the sole

8 purpose of getting a stay for purposes of shutting down related

9 litigation.  And that was its only purpose.  This witness can't

10 verify the accuracy of what Mr. Siegel did at the time.  Let me

11 take that back.  He can verify the accuracy of it.

12          If the question being put to the witness is whether

13 this declaration is accurate, that question can be put.  But,

14 the document can't be tendered as a more succinct recitation of

15 exactly the same facts, a) before there's the verification, and

16 b) before it's established that by being more succinct it's

17 also, you know, better.  It has better quality evidence.  I

18 just don't understand what the purpose of the proffer is other

19 than to suggest that this is the more accurate statement of the

20 entire history which we're certainly not going to accept

21 without a -- you know, suitable testimony from the witness.

22          MR. PRATT:  Could I respond, Your Honor?  First of

23 all, this is already in evidence.  Second of all, the witness

24 said he's seen it before.  Third of all, I'm going to ask him

25 questions to confirm whether certain limited statements in here

1 are correct, and they happen to be more succinct than the

2 narrative testimony.

3         But, in any event, Your Honor, this is an admission

4 of a party opponent.  We've already established that Mr. Siegel

5 was an officer of Grace at the time he signed it.  He had

6 authority to sign it in the course of his duties, and that

7 makes it an admission of a party opponent under Federal Rule of

8 Evidence 801(b)(2)(a) and (c).  So, I think it's admissible as

9 an admission.  It's not -- certainly not hearsay.

10         Now, Mr. Bernick might prefer that relevant evidence

11 like this not come in, but, Your Honor, let me go back to my

12 stop light analogy.  If a witness testifies that the light was

13 red on Monday, and then on Tuesday -- excuse me -- if the

14 witness admits on Monday that the light was red, and then on

15 Tuesday while he's on the stand he says the light was actually

16 magenta, that doesn't mean that Monday's testimony can't be

17 admitted.  Of course it can.

18         It's relevant because it has some tendency and reason

19 to prove a fact that's of consequence to the determination of

20 the action.  And all I'm doing is going through the same facts

21 that Mr. Bernick has already said are of consequence to the

22 determination of this case.  So, it's certainly admissible, and

23 it's not going to take very long, Your Honor.  Three minutes.

24         THE COURT:  What --

25         MR. BERNICK:  Your Honor, I have no problem with the

1  admission of the document.  We've already agreed to it.  It's

2  the purpose of the proffer which is to somehow supplant,

3  because that's what he said, a more accurate and more concise

4  recitation of facts.  That --

5           MR. PRATT:  Not --

6           MR. BERNICK:  -- excuse me.  That proffer is not --

7  we don't believe it's a correct proffer.  And the best way to

8  find out what is different or what he believes is the magenta

9  versus the green light, we don't need a traffic accident

10 analogy to establish that there's something that's wrong

11 pointed out.  It took us a half an hour to get to one change of

12 one statement.  Maybe an important one, but we shouldn't be

13 going through line by line by line if there is an

14 inconsistency.

15          THE COURT:  Mr. Pratt, I don't know whether you're

16 trying to substantiate that there's an inconsistency or a

17 verification.

18          MR. PRATT:  I'm not, Your Honor.  Actually, I have --

19 Mr. Bernick has misstated my position on this.  I'm not

20 intending to show that there's any inconsistency at all with

21 the -- what's already of record, but I think this basically

22 gives it in a slightly different form, and again, I think this

23 is easier to understand --

24          THE COURT:  Okay.  Is --

25          MR. PRATT:  -- because it is so succinct.

**J&J COURT TRANSCRIBERS, INC.**

Shelnitz - Cross/Pratt                              122

1          THE COURT:  Is there a reason why since it's in

2    evidence I simply can't read it and it will be informing as to

3    whatever --

4          MR. PRATT:  Well --

5          THE COURT:  -- extent it is more succinct?

6          MR. PRATT:  Mr. Bernick just said that without a

7    foundation that what I'm trying to establish is in here and

8    it's true and that's all I intend to ask Mr. Shelnitz.

9          THE COURT:  Well, it's a verified complaint by an

10   officer of the company.

11         MR. BERNICK:  Yes.  And we're not --

12         MR. LOCKWOOD:  Your Honor, it's admitted.  It is what

13   it is.

14         THE COURT:  Mr. Pratt, I'll give you a little bit of

15   leeway, but to the extent that it's already in evidence, I will

16   be reading all of the evidence at some point.

17         MR. PRATT:  I hope to save you the trouble, Your

18   Honor.

19         THE COURT:  It won't save me the trouble.  I'll have

20   to read it anyway.  But, go ahead.

21         MR. PRATT:  Thank you, Judge.

22   BY MR. PRATT:

23   Q    Mr. Shelnitz, could you turn to Page 9940 and look at

24   Paragraph 7?  Do you have that there?

25   A    Yes.

1  Q    Okay.  And I'm just going to read the first sentence.  "In

2  1988 Grace reincorporated in New York through the formation of

3  a new holding company also named W.R. Grace and Co., Grace, New

4  York."  My question for you, sir, is, is that Parent 1 on Slide

5  2?

6  A    Yes.  After the reorganization occurred -- I mean, it

7  would be technically inaccurate to say that the formation of

8  the new holding company was named W.R. Grace and Co.  It wasn't

9  initially named W.R. Grace and Co., but it ultimately became

10 W.R. Grace and Co. and is what we refer to as Parent 1 --

11           MR. BERNICK:  Your Honor, I'm going to really object

12 as being completely cumulative.  If we have to have what is now

13 clearly going to be a recitation of four pages out of the

14 declaration and getting the witness' concurrence as to each one

15 and tying it back to the slide, that is completely wasteful of

16 the Court's time --

17           MR. PRATT:  Your Honor --

18           MR. BERNICK:  -- and it's cumulative.

19           MR. PRATT:  -- talking about a waste of time, we'll

20 be through with this before he's finished with --

21           MR. BERNICK:  Well, that was a promise that was made

22 a long time ago and it's not been discharged.

23           THE COURT:  Mr. Bernick, I think he's right.  We're

24 taking -- we're wasting time.  Mr. Pratt, I'll give you some

25 leeway, but to the extent it's cumulative, the witness has now

1 testified twice about the slides.  He made absolutely no

2 changes except for the name of one of the companies.

3                MR. PRATT:  I understand, Your Honor.

4                THE COURT:  So, I don't need it a third time.

5 Q    Page 9941, Mr. Shelnitz, Paragraph 10.  Would you look at

6 Paragraph 10, please?

7 A    Okay.  Do you want me to read it?

8 Q    Just to yourself.

9                          (Pause)

10 A    Okay.

11 Q    Is there anything inaccurate about everything except the

12 last sentence?

13 A    I guess I'm now questioning whether the entity was Grace

14 Holdings, Inc. or Grace Holding, Inc.

15 Q    Okay.

16                MR. PRATT:  Your Honor, I'll rest on the exhibit at

17 this point.

18                          (Pause)

19 Q    Mr. Shelnitz, the demonstratives -- Mr. Bernick's

20 demonstratives, Exhibits 507-1 and so on --

21 A    Yes.

22 Q    -- when was the first time you saw those?

23 A    I don't remember if I saw them for the first time

24 yesterday or the day before.

25 Q    Okay.

1  A    Probably yesterday.

2  Q    You did not prepare these?

3       MR. BERNICK:  Oh, I'm sorry.  Objection.  Ambiguous.

4  Q    Did you have any involvement at all in the preparation of

5  these exhibits?

6  A    I don't know what you mean by involvement.

7  Q    Did you supply information that went into the preparation

8  of these exhibits?

9  A    Yes.

10 Q    Okay.  And did you meet with anyone in connection with

11 that process?

12 A    Yes.

13 Q    How long were you in that meeting?

14 A    It was no one meeting that -- I was asked to help Kirkland

15 & Ellis prepare charts depicted in the transaction.  I gave

16 them information.  They prepared charts.  I looked at the

17 charts to see if I thought they were accurate.  That was

18 basically what my involvement was.

19 Q    And that was after reviewing all of the documentation that

20 you said you reviewed?

21 A    What documentation?

22 Q    Well, I think on the foundation for the documents, I had

23 understood that you basically went back and reviewed documents

24 regarding the transaction structure.

25 A    I had briefly reviewed the documents some time ago.

Shelnitz - Cross/Pratt                    126

1  Q    Okay.  Now, the purpose of these documents was, as Mr.

2  Bernick described it, to talk about 524(g) protection for

3  Sealed Air Corporation and Fresenius as former parents of Grace

4  entities.  And in that regard I want to go back to a couple of

5  those slides.  And I'll start with Slide 5 which is Exhibit

6  507-5.  Now, do you see these yellow bubbles here?

7  A    Yes.

8  Q    And it says underneath PLTF.  I guess that's Plaintiff A

9  versus Parent?

10 A    That's what it says, yes.

11 Q    And you find the same thing over on the right, Plaintiff A

12 versus Parent.  Now, does this indicate that if a plaintiff or

13 a claimant has a claim against Parent 1, and that's W.R. Grace

14 and Co., a New York Corporation, that as a result of this

15 transaction where that parent -- actually, the Fresenius

16 subsidiary merged into that parent, then the parent's name was

17 changed to Fresenius National Medical Care Holdings, Inc.  And

18 you see the same yellow bubbles found there, Plaintiff A versus

19 Parent.  That's an indication that if a plaintiff or a claimant

20 has a claim against Parent 1 that that claim after the merger

21 now is properly asserted against the same entity, Parent 1, but

22 now newly named Fresenius, is that correct?

23          MR. BERNICK:  Objection.  Properly.

24          THE COURT:  That's sustained.

25          MR. PRATT:  I didn't understand the objection, Your

1  Honor.

2        MR. BERNICK:  The objection actually calls for a

3  legal conclusion, and also makes assumptions about whether to

4  prosecute such a claim would be proper.  That is, whether it

5  would have some validity to it or otherwise enjoy some kind of

6  sanction or blessing by somebody under some authority.

7        MR. PRATT:  Well, I'm not asking for sanction.  Maybe

8  the way to get around that is to talk about what the

9  circumstances were at the time of this transaction in September

10 1996.

11 Q   Mr. Shelnitz, is it your understanding that claimants

12 against this entity, Parent 1, W.R. Grace and Co., a New York

13 Corporation, if there are claims asserted against that entity

14 at that time, nothing about this transaction would change the

15 liability or lack thereof when the name was changed to

16 Fresenius?

17        MR. BERNICK:  Objection.  Calls for a legal

18 conclusion.

19        THE COURT:  It does.  The way you're stating the

20 question does call for a legal conclusion.  If you want to get

21 to the facts I think the information could be gotten on record,

22 but not in that fashion.

23        MR. PRATT:  Okay.

24 Q   Did you talk to anyone about the yellow that's on this

25 slide?

**J&J COURT TRANSCRIBERS, INC.**

1 A    No.

2           MR. BERNICK:  Objection.

3           THE WITNESS:  Sorry.

4           MR. BERNICK:  Go ahead.

5           MR. PRATT:  It was a yes or no question.

6 A    I did not talk to anybody about the yellow portions.  I

7 had not seen that in an earlier draft.

8 Q    Okay.

9           MR. PRATT:  Your Honor, I'm just going to note for

10 the record because this may become very important later that

11 although notwithstanding Mr. Bernick's proffer that the

12 relevance of this witness and these charts is 524(g) protection

13 for the parents, without that legal conclusion, so far on this

14 record there's no showing at all that that injunctive relief or

15 stay is necessary for any purpose.

16           MR. BERNICK:  Your Honor, it --

17           MR. PRATT:  And I'll leave it at that.

18           MR. BERNICK:  Your Honor --

19           MR. PRATT:  And we can argue about it later in our

20 briefs.

21           MR. BERNICK:  Okay.  Your Honor, just --

22           MR. PRATT:  And I pass the witness, Your Honor.

23           MR. BERNICK:  Just for purposes of clarifying the

24 proffer, the witness is not being proffered to testify

25 regarding the necessity for injunctive relief.  That's not the

1 purpose of the witness' testimony.  The purpose of the witness'

2 testimony -- nor is the purpose of the witness' testimony to

3 speak to what may be BeaconOne, Seaton's collateral interest in

4 what certain settlement documents may or may not provide which

5 really is the entire motivation for their cross examination.

6      The purpose of the proffer is to establish that to

7 the extent that 524(g)'s other requirements are met, that

8 Sealed Air and Fresenius would qualify to be covered by 524(g)

9 because they are a former parent.  That is the sole purpose of

10 the proffer.  It is a technical requirement of 524(g) which we

11 wanted to make sure was met.

12      So, the purpose of having Mr. Shelnitz testify has

13 nothing to do with the necessity other than to the fact that

14 there was preexisting litigation that was, in fact, stayed.

15 The purpose of this proffer is to establish compliance with the

16 parental requirement for want of a better word under 524(g).

17      MR. PRATT:  Your Honor, my rejoinder.  Having read

18 the Plan Proponent's pretrial brief, this issue will come back,

19 and I just want everybody to remember that I was shut down by

20 Mr. Bernick in trying to have this witness explain what we just

21 talked about.

22      THE COURT:  No, Mr. Pratt, you're not being shut down

23 by Mr. Bernick.  You're asking questions that lead to legal

24 conclusions, so I've sustained the objections.  You may ask

25 this witness factual predicates that you are trying to get out.

1  It's just that he hasn't been called as an expert witness to

2  provide legal opinions.  And to the extent that they go to the

3  ultimate -- ultimate findings that the Court has to make,

4  that's the finder of facts province.  But, you're not being

5  closed from asking this witness fact questions.

6          MR. PRATT:  Okay.  I'll try a couple of more things.

7          MR. BERNICK:  Your Honor, while that colloquy took

8  place we did make some progress with respect to holdings.  And

9  it is Holdings, Inc.  So, we will amend the slide.  And the

10 slide that is going to be enhanced through the cross

11 examination of Mr. Pratt is 507-5 which we will re-tender as

12 5075-A with the appropriate correction.

13         THE COURT:  All right.

14         MR. PRATT:  Your Honor, I have two other lines of

15 inquiry.

16 BY MR. PRATT:

17 Q    Mr. Shelnitz, are you aware that my clients, OneBeacon and

18 Seaton, have asserted claims against Fresenius and Sealed Air?

19 A    I believe so.

20 Q    How did you become aware of that?

21 A    I was shown letters by Kirkland & Ellis asserting claims

22 against those entities.

23 Q    Do you recall how many letters?

24 A    Two or three.

25 Q    Okay.  I'm going to show you what's been marked for

1 identification as Plan Proponent's Exhibits 238, 239 and 240.

2

3                          (Pause)

4            MR. PRATT:  Your Honor, just for the record, you'll

5 see that Plan Proponent Exhibit 240 is not their standard

6 exhibit sticker, but actually it is their exhibit.  And it just

7 had been I think erroneously marked as confidential, but I

8 don't think it is, and so I'm using it.

9            THE COURT:  All right.

10 Q    Are these the letters, Mr. Shelnitz?

11 A    I believe so.

12 Q    And what was your purpose in reviewing these letters?

13            MR. BERNICK:  Your Honor, at this point I would

14 object on the grounds that it invades the attorney/client

15 privilege.

16            MR. PRATT:  Well, Your Honor, all I asked was for his

17 purpose in reviewing the letters.

18            MR. BERNICK:  Well, that's -- that --

19            MR. PRATT:  I don't see how that's privileged.

20            MR. BERNICK:  The general counsel of a company is --

21 not simply ask for the fact of having done the review, which is

22 revealing, but why he did it?  That is classic privileged

23 information.

24            THE COURT:  Particularly --

25            MR. BERNICK:  And it's with regard to a subject that

                    **J&J COURT TRANSCRIBERS, INC.**

1  was not part of my examination at all.

2          MR. PRATT:  Your Honor, I'll withdraw the question.

3  But, what I'd like to do is to move these in evidence solely

4  for the purpose of showing that these are the letters that Mr.

5  Shelnitz reviewed, and he's already said that.

6          MR. BERNICK:  Well, it doesn't establish that they're

7  relevant to anything.  What's the relevance?

8          MR. PRATT:  I'll get to the relevance.

9          MR. BERNICK:  Well, then, I object on relevance

10 grounds.

11         THE COURT:  Well, establish the relevance and then

12 I'll rule on the admission.

13         MR. PRATT:  Okay.  Your Honor, let me just make a

14 general proffer of relevance.  These letters show, and they're

15 not offered for the truth at all.  What they're offered for is

16 to show that Seaton and OneBeacon are presently asserting

17 claims against Fresenius and Sealed Air, these letters spell

18 out the nature of those claims.  And we're not saying that

19 anybody has to accept those assertions as true or not true.

20 That won't be determined in this court I don't think.  But, the

21 relevance of these is that the plan will enjoin these claims

22 and release these claims.  And we contend that those provisions

23 of the plan are not lawful.  And that's the relevance.

24         THE COURT: All right.  I'll accept Exhibits 238, 239

25 and 240 for that purpose.

1          MR. BERNICK:  Well, Your Honor, if I can be heard

2     just briefly.

3          THE COURT:  All right.

4          MR. BERNICK:  The proffer is inconsistent with the

5     asserted relevance.  The proffer is not for the truth of the

6     matters asserted but for the fact of their being asserted.  The

7     relevance is -- depends upon the truth of the matter asserted

8     which is that, in fact, they have a claim.

9          MR. PRATT:  Well, it goes further than that, Mr.

10    Bernick --

11         MR. BERNICK:  Excuse me, Mr. Pratt.

12         MR. PRATT:  -- it's that --

13         MR. BERNICK:  Excuse me, Mr. Pratt.

14         THE COURT:  Gentlemen.

15         MR. BERNICK:  The -- when you tender something for

16    the fact of its being said as opposed to the truth of the

17    matter therein, all that it really represents is that a letter

18    was sent on a certain date at a certain time with respect to a

19    certain subject matter.  It has nothing to do with establishing

20    any aspect of that subject matter as being true.  So, if they

21    now say, well, we do have claims and the claims are channeled

22    and released, that presumes the truth of the matter set forth

23    in the letter.

24         MR. PRATT:  Your Honor --

25         MR. BERNICK:  So, the proffer is inconsistent.

1 Moreover, the witness simply said he saw it.  That's all that

2 he has said.  Can't come in through this witness for any

3 purpose.  It's just, he saw it.  And he saw it presumably on or

4 after July 8, 2009.  That is long after this plan was drafted

5 and long after it was put in place.  So, it can't possibly bear

6 upon the good faith or other intendment of the proposing

7 part -- or the proposing parties or the planned proponents or

8 Mr. Shelnitz in particular.

9         And if he wants to get this stuff in for the purpose

10 that he seeks he's got to have a witness.  Maybe he wants to

11 take the stand and Mr. Brown wants to take the stand and get

12 them in, but Mr. Shelnitz is not an appropriate witness to

13 sponsor the tendering of these documents.  And they're all

14 self-serving.

15         MR. PRATT:  May I respond, Your Honor?

16         THE COURT:  Yes.

17         MR. PRATT:  These documents show -- the witness

18 testified that he was aware of claims asserted against

19 Fresenius and Sealed Air by OneBeacon and Seaton.  He said that

20 he had received these letters --

21         THE COURT:  No.  He said he had seen these letters.

22         MR. PRATT:  He had seen these letters.  Now, what

23 that establishes is that Grace -- this man's an officer of

24 Grace Co. and Grace Conn., and that establishes that those two

25 debtors have notice of these claims.

1        THE COURT:  Regardless.  If they're dated -- and I

2   didn't pick this up because the date wasn't stated -- July 8th,

3   2009, is after this plan was prepared and filed.

4        MR. PRATT:  Your Honor, but --

5        THE COURT:  So, that doesn't substantiate the notice

6   for the purpose that you're offering.

7        MR. PRATT:  Your Honor, Mr. Bernick used the word

8   good faith.  That's not my proffer.  My proffer is that the

9   injunctions and the plan with respect to these claims do not

10  comply with 524(g) and do not --

11       THE COURT:  But, apparently, these claims were

12  submitted to the debtor after the plan was proposed.  So,

13  essentially, OneBeacon and Seaton are trying to bootstrap

14  themselves into a finding that the plan is unlawful because of

15  a claim that they submitted after the plan was filed.  You

16  can't do it that way, Mr. Pratt.

17       MR. PRATT:  No, Your Honor, that's not.  If the plan

18  is confirmed the injunctions will go into effect on the

19  effective date.  On the effective date.  That's in the future.

20       THE COURT:  Yes.

21       MR. PRATT:  So, these claims exist as of the date of

22  this letter, actually before if you read the letter.  That's

23  our position.  But, at least as of the date of the letter

24  whether the claims exist or not is not what we're trying to

25  show.  What we're trying to show is that of July 8, 2009,

1 OneBeacon and Seaton have asserted these claims, and Grace is

2 on notice of that as of this date.  And if the plan becomes

3 effective it is our argument, it will be our argument, it has

4 been our argument in our briefs that there's no compliance

5 with, for example, 105 in the case law under that.

6           THE COURT:  Regardless.  I understand the purpose for

7 which they're being offered.  I agree with Mr. Bernick having

8 seen this.  This witness is not copied on these documents.

9 They are not addressed to him.  And his testimony was that he

10 got them from counsel -- his counsel, Kirkland and -- the

11 company's counsel, Kirkland & Ellis, and in fact, the entities

12 on the ccs are all attorneys from Kirkland & Ellis; Mr.

13 Bernick, Mr. Freedman, Ms. Baer and Ms. Esayian, at least at

14 the time.  I'm not sure when Ms. Baer changed law firms, but

15 she is clearly here representing the debtor in that capacity.

16 So, this witness cannot be the authenticating witness for these

17 documents.

18           MR. PRATT:  Your Honor --

19           THE COURT:  You need a witness, Mr. Pratt.

20           MR. PRATT:  -- I'm not trying to authenticate them.

21 The witness testified that he was aware of claims, and he

22 testified that it had -- he didn't say when, but it had to have

23 been after July 8th.

24           THE COURT:  And his -- it doesn't have to have been

25 after July.  You didn't ask him that question.  He did say that

1 he believes these are the letters that he was shown by his

2 counsel.  To the extent that they are somehow being delivered

3 by counsel, that may invade the attorney/client privilege,

4 although I don't think so far we've necessarily gone that far.

5 But, this witness cannot authenticate these documents.

6        His testimony is that he's aware of claims.  The

7 letters don't add to that testimony.  If anything, it's

8 cumulative.  I don't know what the letters say, so I don't know

9 whether they're prejudicial in the sense that Mr. Bernick seems

10 to be arguing.  I'm not making any assessment of that.  I

11 haven't seen them.  But, this witness is not the proper witness

12 through whom to put in these documents.  So, the objection's

13 sustained.  I'm not accepting the witness' -- the letters,

14 pardon me, even for that limited purpose, but you may certainly

15 put them in through a different witness.

16        MR. PRATT:  Well, let me ask just a couple of more

17 questions about it since the witness did say he saw the

18 letters.

19 BY MR. PRATT:

20 Q    Mr. Shelnitz, when did you see them?

21 A    After July 9th.  I don't recall specifically.

22 Q    Okay.  But, you did say that you were aware that OneBeacon

23 and Seaton are presently asserting claims against Fresenius and

24 Sealed Air?

25 A    I do recall -- it wasn't until at least the beginning to

1  middle of August that I saw the letters.  I was focused more on

2  the claim -- the Kaneb claim relating to Fresenius'

3  representation.

4  Q    Okay.  Mr. Shelnitz, you're generally familiar with the

5  Chapter 11 plan that's being proposed?

6  A    Generally.

7  Q    Are you aware that that plan contains a provision for a

8  successor claims injunction?

9  A    Yes.

10 Q    Now, you were proffered as a witness with respect to

11 bankruptcy protection for Sealed Air and Fresenius, so I'm

12 going to ask you, and on the basis that those companies are

13 former parents of Grace entities.  And that means that -- well,

14 let me ask you, do you know what the purpose of the successor

15 claims injunction is?

16 A    I believe so.

17        MR. BERNICK:  Your Honor, this really gets into

18 completely -- a) it's duplicative of ad nauseum efforts to

19 elicit similar testimony yesterday, b) the witness is

20 essentially being asked to comment on a legal document which

21 has legal significance under 524(g), and that really is a

22 matter that calls for a legal conclusion.  So, we would object

23 to the testimony -- object to the questioning on this subject

24 as being cumulative and being an effort to elicit legal

25 testimony from the general counsel of W.R. Grace.

1          MR. PRATT:  Your Honor, just a note of point of

2    order.  My question of the witness was, "Mr. Shelnitz, do you

3    know the purpose of the successor claims injunction?"  And his

4    answer was, "I believe so."  And Mr. Bernick then objected and

5    made a long speaking objection, warning the witness off of my

6    questioning on the basis that it was a legal conclusion.

7          MR. BERNICK:  It was a yellow light.

8          MR. PRATT:  I just asked a simple question, does he

9    know the purpose of the successor claims injunction, and the

10   answer was yes.  And if I interpret Mr. Bernick's colloquy

11   there as a motion to strike, I think it should be denied.

12         THE COURT:  No.  The next question I think is, what

13   was the purpose, and that's what Mr. Bernick objected to.

14         MR. PRATT:  Well --

15         THE COURT:  It was calling for a legal conclusion,

16   not the foundation question.

17         MR. PRATT:  And I'll address that, Your Honor.  It's

18   not a legal conclusion at all.  As Your Honor knows, the

19   purpose of various provisions of the plan is brought out in

20   testimony in bankruptcy court all the time in this court and

21   elsewhere.  It's proper questioning, and it's highly relevant.

22   How can the Court understand -- how can the Court approve this

23   injunction without knowing what the purpose --

24         MR. BERNICK:  I'll -- let him ask that question.  And

25   then I want to get up on redirect examination, and we're going

1  to find out why it was so critical to have this provision

2  related to successor liability -- we'll do it.

3          THE COURT:  That's fine.  Let's -- if we'd stop with

4  the speaking and ask the questions we'd get done a lot further.

5  Fine.  Go ahead, Mr. Pratt.

6          MR. PRATT:  Thank you, Your Honor.

7  BY MR. PRATT:

8  Q    Mr. Shelnitz, what is, to your understanding, the purpose

9  of the successor claims injunction?

10         MR. BERNICK:  Go ahead.

11         THE WITNESS:  Okay.

12 A    It was to protect Fresenius and Sealed Air from

13 liabilities, both asbestos and non-asbestos-related.

14 Q    Asbestos and non-asbestos-related did you say?

15 A    Correct.

16 Q    Okay.  Now, that -- that's in Section 8.5 of the plan.

17 And there were some technical amendments very recently to that

18 section, were there not?

19         MR. BERNICK:  Objection.  Lack of foundation.  It's

20 also a statement by counsel regarding the plan.  Move to strike

21 the statement.

22         MR. PRATT:  Well, let me do it over.  Your Honor,

23 I'll just note for the record that on or about September 4, the

24 Plan Proponents filed a notice of first set of modifications to

25 joint plan of reorganization.  And part of that was a black

1 line revision.  And I'd like to hand that to the Court and to

2 the witness, Section 8.5, the successor claims injunction.  It

3 was changed.

4        THE COURT:  All right.  Cathy?

5 Q    Mr. Shelnitz, you're aware that modifications were made to

6 the plan?

7 A    Yes.

8 Q    And you're aware that modifications were made to the

9 successor claims injunction?

10 A    I do not recall that specifically.

11 Q    Do you know -- and that's a yes or no -- do you know what

12 was the purpose of the revisions to Section 8.5 reflected in

13 the modifications?

14 A    No.

15        MR. PRATT:  I pass the witness, Your Honor.

16        THE COURT:  Anyone else?  Mr. Bernick?

17        MR. BERNICK:  I just need a moment to confer with Mr.

18 Freedman on the technical matter.

19                    (Pause)

20              REDIRECT EXAMINATION

21 BY MR. BERNICK:

22 Q    Mr. Shelnitz, in connection with my direct examination I

23 introduced into evidence various documents that you testified

24 reflected the pre and post-petition litigation that was now

25 being mounted against Fresenius and Sealed Air relating to

Shelnitz - Redirect/Bernick                 142

1  claims -- tort liability of Grace, do you recall that?

2  A    Yes.

3  Q    Okay.  And you were then shown also Plan Proponent's

4  Exhibit 243 which was the verified complaint for declaratory

5  and injunction -- injunctive relief by Mr. Pratt.

6  A    Yes.

7  Q    Do you recall what this verified complaint was for?

8  A    Only very generally.

9  Q    Take a look at Page 2, Summary of Action.  It says, "This

10 is an adversary proceeding brought ... for a judgment sub or

11 Romanette (1) enjoining defendants from prosecuting pending

12 asbestos-related actions.  The "asbestos actions" and

13 commencing new actions or proceedings asserting asbestos-

14 related claims to future actions, except pursuant to the terms

15 of any plan or plans of reorganization to be confirmed in these

16 cases against three categories of persons or entities."  And we

17 then see listed Sealed Air and Fresenius.  Do you see that?

18 A    Yes.

19 Q    Does that refresh your recollection about the

20 circumstances leading to the prosecution of this adversary?

21 A    Yes.

22 Q    What happened?

23 A    Well, when Grace filed for Chapter 11 protection we

24 continued to get lawsuits, or I should say Sealed Air and

25 Fresenius continued to get lawsuits --

Shelnitz - Redirect/Bernick                    143

1          MR. PRATT:  Objection, Your Honor.  That lacks
2     foundation, how does he know?
3          THE COURT:  Sustained.
4     Q    And did these facts come to your attention in your
5     capacity as being in-house counsel for Grace?
6     A    Yes.
7     Q    Okay.  Go on.
8     A    The -- Grace was very concerned that -- if those lawsuits
9     were permitted to continue that any adverse rulings or any
10    damages resulting from those lawsuits would result in
11    indemnification claims by Fresenius or Sealed Air against the
12    debtors --
13          MR. PRATT:  Your Honor --
14    A    -- thereby negatively impacting the estates in their --
15    its reorganization.
16          MR. PRATT:  Excuse me, Your Honor.  Excuse me.  The
17    witness should be cautioned about waiving the attorney/client
18    privilege.
19          MR. BERNICK:  Yes, we'll avoid that.
20    Q    So, I want to direct your attention to the face of the
21    document that Mr. Pratt brought to your attention.  Take a look
22    at Page 10, Paragraph 31.  It says, "As of the date of this
23    filing, Sealed Air is a named defendant in over 6,000 asbestos
24    actions in which the debtors also have been named as
25    defendants, including eight purported class actions, one of

1 whom -- which has been certified." Do you recall, Mr.

2 Shelnitz, that in open proceedings before Judge Farnan at the

3 very outset of the case that there was very active litigation

4 within the bankruptcy case over stays and injunctions of claims

5 being brought against third parties that related in part to

6 Grace's asbestos liability?

7 A    Yes.

8         MR. PRATT:  Objection, Your Honor.  Compound.  Mr.

9 Bernick just read Paragraph 31.  Now, this document is an

10 admission of Grace.  I can use it.  He cannot.

11        MR. BERNICK:  Okay.  So --

12        MR. PRATT:  It is not established that 31, that the

13 facts in 31 are true.  And then after reading that he asked a

14 different question.

15        THE COURT:  That's sustained.

16        MR. PRATT:  And I move to strike them both.  He

17 should ask one question at a time.

18        THE COURT:  All right.

19        MR. BERNICK:  I'll rephrase the question.  But, I

20 believe at this point as an officer of the Court there is no

21 question but that all of this took place.  None of it was

22 appealed.  The orders were entered.  Those orders were

23 predicated on an onslaught of litigation against Sealed Air and

24 Fresenius.  And for counsel to somehow suggest that this is

25 actually disputed, I don't believe comports with the

Shelnitz - Redirect/Bernick                145

1  obligations of an officer of the Court.

2            MR. PRATT:  Your Honor --

3            MR. BERNICK:  I will go ahead and ask Mr. Shelnitz

4  the questions independently so that we can just get this out

5  simply.

6  Q    Mr. Shelnitz, shortly after the bankruptcy began, was

7  there or was there not bankruptcy court litigation arising out

8  of the fact that was asserted by Sealed Air and Fresenius that

9  they were now being exposed to the tort system?

10 A    Yes.

11 Q    In the course of that proceeding, were submissions made to

12 the Court by Grace that put before the Court the growing

13 litigation being prosecuted against Sealed Air and Fresenius?

14           MR. PRATT:  Your Honor, my clients were not parties

15 to that litigation.  This line is completely irrelevant.  This

16 is the confirmation hearing.  It's not that lawsuit.

17           MR. BERNICK:  No, to the contrary.  The door's now

18 been open, and it is relevant because it goes to the 524(g)

19 injunction.  It also goes to the successor liability question

20 that Mr. Shelnitz was just asked which is what I want to get

21 to.

22           MR. PRATT:  Your Honor, goose-gander rule.  I was not

23 allowed to ask this witness about things that Mr. Bernick said

24 were legal conclusions about claims.  What Mr. Bernick's now

25 trying to do through this witness is to talk about litigation

Shelnitz - Redirect/Bernick                    146

1  for which my client was not a party and bootstrap that in as

2  evidence in this confirmation hearing.

3            THE COURT:  Well, actually --

4            MR. PRATT:  He needs -- if he wants to show what the

5  nature of the claims were against Fresenius and Sealed Air

6  he'll have to bring somebody in.

7            THE COURT:  I don't think that's the question.  The

8  question was whether submissions were made to the Court by

9  Grace to put the allegations that were in the complaints

10 against -- or the fact that Sealed Air and Fresenius allege

11 that they were being sued before the Court.  That, I think, is

12 a factual contention.  But, I don't have any foundation laid

13 for the fact that this witness has personal knowledge.  He's

14 not the affiant.

15            MR. BERNICK:  No, but that's not -- I think, really

16 the question that I meant to put to Mr. Shelnitz, and I'll

17 rephrase it.

18 BY MR. BERNICK:

19 Q    As a fact of what happened in the bankruptcy court in the

20 open record for all interested parties in the litigation to

21 see, were there submissions made, put in before the open court,

22 the litigation that was being conducted against Fresenius and

23 Sealed Air?

24            MR. PRATT:  Objection, Your Honor.

25            THE COURT:  Overruled.  That's a fact question.

Shelnitz - Redirect/Bernick                    147

1          MR. PRATT:  May I be heard, Your Honor, on my

2  objection?

3          THE COURT:  Mr. Pratt, I can take judicial notice of

4  the fact that the documents are of record.  I don't even need

5  the witness to say that.  The allegations are clearly of

6  record.  I'm not taking them for the truth or not the truth,

7  but the allegations are of record.  They're in this document.

8  They're part of the record before this Court.

9          MR. PRATT:  Your Honor, let me just -- can I be

10  heard?

11          THE COURT:  If you can get the microphone turned on.

12          MR. PRATT:  Let me come up.  Mr. Bernick very

13  skillfully said that these allegations were made in court.

14  They were made in part -- as part of an adversary proceeding.

15          THE COURT:  No.  Actually, he said that they were

16  made in documents that were filed in the court, I believe.

17          MR. BERNICK:  Actually were made in open court before

18  the adversary was even filed.

19          THE COURT:  Oh.  Well --

20          MR. BERNICK:  The adversary was filed --

21          THE COURT:  -- if that's the case --

22          MR. BERNICK:  -- to cure a technical issue about how

23  to get the injunction.

24          MR. PRATT:  And there's --

25          THE COURT:  Okay.  I'm sorry.  I missed the question.

1      MR. PRATT:  Well, and there's another issue that I

2  just want to bring up, Your Honor, because I think it's

3  pertinent and it's going to come up again.  Mr. Bernick also

4  said that any interested party could see them.  Well, you have

5  to be on notice before you know to look.  And there's no

6  evidence in this record that my clients, OneBeacon and Seaton,

7  received notice of this bankruptcy case until years later.

8      THE COURT:  Pardon me.  The fact that W.R. Grace was

9  in bankruptcy wasn't known on an international level?

10     MR. PRATT:  Your Honor, notice was not given.

11 Notices -- there's nothing in the record to establish -- I'll

12 give you an example, Your Honor.  My firm got into this case

13 after the bar date passed, so we had a problem.

14     MR. BERNICK:  What is it -- this is --

15     MR. PRATT:  This is colloquy, Mr. Bernick.

16     MR. BERNICK:  It's not offered for the purposes of

17 notice.

18     THE COURT:  Mr. Bernick, please.  It's Mr. Pratt's

19 turn.

20     MR. PRATT:  Thank you, Judge.  We got into this case

21 after the claims bar date.  So, one of the first emergencies

22 that we had was, what do we do?  We checked.  There was no

23 notice given to Seaton and OneBeacon of the claims bar date,

24 and that's reflected in stipulations that had been filed, and

25 the Court's approved them, and that's in the main case, not in

1  an adversary proceeding.

2            THE COURT:  But --

3            MR. PRATT:  There's no record that notice was given

4  of this proceeding, the adversary proceeding that's the subject

5  of that document.

6            THE COURT:  Okay.  But, what's the point?  I'm

7  missing what the connection is that you're trying to make.

8            MR. PRATT:  Well, I'm just trying to establish that

9  Mr. Bernick's questions lack foundation.  This document can

10  come in, and I can use it because it's an admission of a party

11  opponent.  Mr. Bernick can't use it because it's not my

12  admission.

13            MR. BERNICK:  I'm not using it anymore.  I didn't

14  even make reference to it.

15            THE COURT:  He isn't making reference to the

16  complaint because of the objection that I sustained that you

17  made earlier.  This question was about whether the witness had

18  some knowledge about allegations that were apparently made in

19  open court.  I missed it.  Rephrase the question, Mr. Bernick,

20  and let's get on with this.

21            MR. BERNICK:  Your Honor, I would love to but for

22  the --

23            THE COURT:  Mr. Bernick, rephrase the question.

24            MR. BERNICK:  Yes.

25  BY MR. BERNICK:

Shelnitz - Redirect/Bernick                    150

1  Q    Mr. Shelnitz, at the time -- Mr. Shelnitz, in open court

2  in the early stages of the bankruptcy proceeding were pleadings

3  filed and statements made regarding the prosecution of tort

4  litigation relating to Grace now against Fresenius and Sealed

5  Air?

6            MR. PRATT:  Objection, Your Honor.  That question is

7  not relevant, but it also exceeds the scope of --

8            THE CLERK:  I'm not picking you up.

9            MR. PRATT:  -- cross.  This is redirect.

10           THE COURT:  That microphone's not on.

11           THE CLERK:  I'm not picking him up.

12           THE COURT:  Can you press the one in front of Mr.

13 Brown?  I think it's just not turned on.

14           MR. PRATT:  It is on, Your Honor.

15           THE COURT:  The only one that shouldn't be working is

16 the other one.

17           MR. PRATT:  I'll get right close to it.

18           THE COURT:  You don't need to do that once it's on,

19 okay?

20           MR. PRATT:  Okay.  I'll try to calibrate.  Your

21 Honor, this -- Mr. Bernick's most recent question is not

22 relevant at all based on the way he proffered this witness, but

23 also, and just as importantly, it exceeds the scope of my

24 cross.

25           THE COURT:  It does exceed the scope of the cross.

**J&J COURT TRANSCRIBERS, INC.**

1 The relevance, frankly, I've lost.  I don't have any idea what

2 the relevance is at this point, Mr. Bernick.  But, it does

3 exceed the scope of the cross.

4          MR. BERNICK:  I'll go back and we'll tie up first

5 rather than last.

6 BY MR. BERNICK:

7 Q    Do you recall that you were asked on cross examination --

8 I don't know why we're getting feedback -- do you recall that

9 you were asked on cross examination what the purpose of the

10 provision was relating to successor liability?

11 A    Yes.

12 Q    And do you recall that you answered that question by

13 saying the purpose of that provision was to protect Sealed Air

14 and Fresenius?  Do you recall that?

15 A    Correct.  Yes.

16 Q    Now, Fresenius -- Sealed Air and Fresenius, tell the Court

17 whether or not in connection with the plan of reorganization

18 Sealed Air and Fresenius are contributing money to the estate.

19          MR. PRATT:  Objection, Your Honor.  That clearly

20 exceeds scope of cross.

21          MR. BERNICK:  No, it -- it's the whole purpose.  He

22 asked the question what's the purpose of the provision.  The

23 purpose of the provision is totally plain.  They're major

24 contributors to this case.  I want to get that fact out --

25          THE COURT:  The objection is overruled.  You may

Shelnitz - Redirect/Bernick                    152

1  answer the question.

2  A    Yes, a very substantial portion.

3  Q    Okay.  Do you know -- are you familiar with the settlement

4  agreements, and indeed the order that was entered by Judge

5  Wolin approving those settlements?

6            MR. PRATT:  Objection, Your Honor.  We have the same

7  notice problem.  My clients were not on notice of that order

8  and --

9            MR. BERNICK:  It's not offered for notice.

10            MR. PRATT:  Well, you're talking about it and leading

11  the witness toward -- down the road toward it.

12            MR. LOCKWOOD:  Your Honor, Mr. Pratt is testifying

13  that his clients didn't get notice.

14            MR. PRATT:  I'm showing that there's a lack of --

15            MR. LOCKWOOD:  If he wants to put on a witness --

16  excuse me --

17            MR. PRATT:  I'm showing that there's a lack of

18  foundation.

19            THE COURT:  I don't know that there's a lack of --

20            MR. LOCKWOOD:  There's -- a statement of counsel

21  about facts is not --

22            THE COURT:  Counsel, you know what?  We're going to

23  break for lunch because this has just gotten out of control.

24  We're in recess until one-thirty and we will reconvene.  You

25  folks get control of yourselves while we're gone.

1          UNIDENTIFIED ATTORNEY:  Your Honor, can I just have a

2  housekeeping, Your Honor?

3          THE COURT:  No.  After one-thirty.

4                    (Recess)

5          THE COURT:  Please be seated.  Are you ready to

6  begin, Mr. Bernick?  Yes?

7          MR. BERNICK:  Yes, I'm ready.

8          THE COURT:  Okay.

9          MR. BERNICK:  Well, we're going to try to make it

10 unnecessary.  Over the lunch hour, in order to expedite the

11 proceeding and get Dr. Peterson on who has a very urgent family

12 need to get back this afternoon -- this evening, we're not

13 going to conduct any further cross exam -- redirect examination

14 I should say of Mr. Shelnitz.

15         THE COURT:  All right.

16         MR. PRATT:  No further cross, Your Honor.

17         THE COURT:  You're excused, then, Mr. Shelnitz.

18         THE WITNESS:  Thank you.

19         MR. FINCH:  Your Honor, the Plan Proponents call Dr.

20 Mark Peterson.

21         THE COURT:  Thank you.

22      MARK PETERSON, PLAN PROPONENT'S WITNESS, SWORN

23         MR. FINCH:  Your Honor, we have the same witness

24 notebook for Dr. Peterson as before.  We also have a set of

25 demonstrative exhibits which have been pre-marked as Plan

Peterson - Direct/Finch                    154

1 Proponent's Exhibit 178-B.  Does Your Honor have both of those

2 in front of --

3          THE COURT:  I do.  Thank you.

4          MR. FINCH:  -- her?

5                    DIRECT EXAMINATION

6 BY MR. FINCH:

7 Q    Dr. Peterson, do you still have -- do you have those

8 exhibits in front of you?

9 A    Yes, I do.

10 Q    Dr. Peterson, are you the same person who testified

11 extensively last week about your qualifications and expertise

12 in estimating the value of asbestos personal injury claims?

13 A    I believe so, yes.

14                    (Laughter)

15 Q    Have you done anything in the intervening time period to

16 add to your knowledge about asbestos litigation generally or

17 Grace specifically?

18 A    A couple things.

19 Q    Could you describe those briefly, please?

20 A    I read the testimony in this hearing of Mr. Hughes, and I

21 looked at some financial statements for Union Carbide, recent

22 financial statements.

23 Q    In your work in doing estimates for asbestos liabilities,

24 do you from time to time provide estimates of the liabilities

25 of a trust?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    A 524(g) asbestos settlement trust?

3  A    Frequently.

4  Q    And does that require you to review the medical and

5  exposure criteria of trust distribution processes to make those

6  estimates?

7  A    Yes.

8  Q    And do you compare them to companies' claim settlement

9  practices pre-petition to do that?

10 A    Yes, that's one of the steps.

11        MR. FINCH:  Your Honor, last week you recognized Dr.

12 Peterson as an expert in asbestos claims valuation which

13 includes estimating the value of asbestos personal injury

14 claims, the factors that drive those values, the projection of

15 the number and timing of future asbestos personal injury

16 claims, and the cost to resolve pending and future asbestos

17 personal injury claims.  We would add -- we would proffer Dr.

18 Peterson as an expert in all of those subjects here, as well as

19 expertise in projecting the liabilities of an asbestos 524(g)

20 trust.

21        THE COURT:  Any objection?

22            (No audible response)

23        THE COURT:  He may express those opinions as an

24 expert.

25 Q    Dr. Peterson, did you prepare some slides to help

1  illustrate your testimony today?

2  A    Yes, I did.

3  Q    Who determined the content of those slides?

4  A    I did with my associates.

5  Q    Would that be Mr. Relis (phonetic)?

6  A    Yes.

7  Q    Did you oversee the -- did you review every slide?

8  A    Yes.

9  Q    Does every slide accurately convey and summarize your

10 testimony?

11 A    Yes.

12 Q    If I were to ask you one question could you explain your

13 estimation -- opinions here using those slides?  Could you

14 spend an hour using those slides to describe them?

15 A    Yes, certainly.

16          MR. FINCH:  Could we have Slide 8, please?  Exhibit

17 178, Slide 8.

18 Q    While we're waiting for the slide to be on the screen, Dr.

19 Peterson, could you describe briefly the approach and sources

20 of data you used to estimate the liabilities of an asbestos

21 defendant in the tort system?

22 A    Generally I used the same approaches and type of research

23 that I do for both my academic work at Rand and elsewhere and

24 engagements like this.  It's primarily two streams of work.

25 One is quantitative analysis.  I'm very interested in and do a

Peterson - Direct/Finch                          157

1  great deal of quantitative analysis in the work I do.  I'm an

2  unusual lawyer in that regard, I guess.

3          And the other track of it, though, is to obtain as

4  much information as I can from documents, from parties that are

5  participating in the litigation, from any source in order to

6  better understand the data.  And data aren't meaningful

7  unless -- and analysis of them aren't meaningful really unless

8  you have some understanding and hypotheses about what the data

9  mean and what relationships are.  So, I try and embed myself on

10 that.

11         In this case it was reading documents from W.R.

12 Grace, reading transcripts of opinions -- transcripts of

13 depositions by primarily people working for and handling the

14 claims for Grace, talking with lawyers.  I didn't have much

15 access to the debtors' personnel who handle asbestos litigation

16 for most of the cases.  It's one of the reasons why the

17 depositions and testimony of Mr. Hughes was important.  Things

18 like that in order to understand it not only for this company,

19 but for similar companies.  I -- again, financial statements.

20 I gather as much information as I can and try and put it

21 altogether and use that to form my quantitative analysis.

22 Q    Do you use epidemiology at all in projecting future

23 asbestos liabilities?

24 A    Yes.  It's central to the forecast in your future claims

25 because the filing of claims as a function of how many people

1  get sick, which is epidemiology, and how many people once

2  they're sick made claims, which is a claiming process and a

3  part of behavior in the litigation system which is kind of the

4  central focus of my research.

5          MR. FINCH:  There's been an exhibit entered into

6  evidence in this case already, Your Honor.  It's Plan

7  Proponent's Exhibit Number 7 which is Grace's historical claims

8  database.

9  Q    Did you use that in your work in estimating Grace's

10 asbestos liabilities, Dr. Peterson?

11 A    Yes.  It was a database provided to us in 2002.  It was

12 the asbestos claims database, CMS database that Grace had.

13 It's the same database you referred to.

14 Q    Does Slide 8 that's on the screen accurately summarize the

15 sources of data and approach you used to estimate Grace's

16 liability?

17 A    Yes.  I guess the one thing that I'd add is that I -- all

18 of this is, of course, informed by, and in turn contributes to

19 the academic research I do too.  That I and others.

20 Q    Is there an approach to estimating asbestos liabilities

21 that has been used by people in addition to you, a general

22 approach to doing such an estimate in your view?

23 A    Yes.  I describe it as the standard approach.  It was

24 first developed by the dean of Yale Business School in 1981 and

25 '82 in work he was doing for insurance companies.  It's been

1  used since by almost -- most people that do asbestos

2  forecasting, and I refer to it as the standard method.

3  Q    And what are the components of the standard approach as

4  you view it?

5  A    Well, there are two -- again, two aspects of it.  One is

6  that for purposes of valuing claims, analysts look to the

7  market.  There's really a marketplace of settlements.  Since

8  asbestos litigation began there are millions of settlements

9  that have been achieved across defendants.  For any particular

10 company like W.R. Grace there are hundreds of thousands of

11 settlements over time under varying circumstances

12         But, that magnitude of events, of recurrent common

13 events, presents a lot of information about the marketplace for

14 valuing asbestos claims.  And so, that's how claims are valued.

15 That's the one stream, and basically value claims based upon

16 the marketplace are both what it's been historically and what

17 it is currently.  And second is to -- is the forecast method

18 uses epidemiology as I've described earlier, which provides us

19 with information about both past and future incidents of

20 asbestos-related cancers and combine that with data -- from a

21 database like W.R. Grace's which tells us how many people have

22 filed claims and do a quantitative analyses comparing those two

23 sets of information, the incidents data and the past filing

24 data.  And that's really the standard method.

25 Q    Does Slide 9 summarize your view of what the standard

1  approach is for forecasting asbestos personal injury

2  liabilities?

3  A    Yes.

4  Q    Next slide, please, that'll be Slide 10.  Dr. Peterson,

5  has standard -- can we call this the historical base approach

6  to estimating liability?

7  A    Whatever, sure.  I understand it.

8  Q    The standard historical base approach, can you describe to

9  the Court the types of entities that have either used that

10 methodology or described that methodology and relied on it in

11 their work?

12 A    Well, it's been the primary type of analysis done by

13 analysts in cases like this.  Most analysts use it, they may

14 use a variant or additional work, too, but it's really the

15 primary method and as such, it is then used by courts, when

16 courts reach decisions in estimation cases, typically it's

17 based upon the same principles that I just described and we've

18 called the standard historical approach.  So, courts and

19 parties in bankruptcy, is commonly what people use.  It's the

20 only method I've ever used.

21 Q    How about people outside of bankruptcy type litigation,

22 what types of parties have used this historical base approach

23 to estimate asbestos liabilities?

24 A    Well, it's the bases for most financial analyses done by

25 companies and their professionals for their own financial

1 planning, as well as for financial reporting.  It's also the

2 basis for calculation by asbestos trusts, in determining what

3 percentage, what the pari passu percent they can pay to all

4 claimants.

5 Q    As part of your work in this bankruptcy case, did you

6 investigate whether or not the W.R. Grace Company ever used the

7 standard historical base approach to project its asbestos

8 liabilities at any point in time?

9 A    Yes, I investigated that and I saw that, in fact, they

10 did.  They hired outside analysts to do that, who provided that

11 kind of information.

12 Q    Now, at what point in time did they do that?

13 A    Well, they did it up until the preparation for the

14 estimation in this case, but they were using it for the

15 financial reporting, certainly up to the time of the

16 bankruptcy.

17 Q    Are you applying -- when you do an estimate that you

18 present to a court, of a company asbestos liability, are you

19 applying the same methodology that you use in non-litigation

20 contexts, such as providing advice to an ACC or a trust?

21 A    Yes.  Or advice to insurance companies or businesses, yes.

22 Q    What are the major components of an estimate of total

23 liability for an asbestos defendant?

24        THE COURT:  I'm sorry, Mr. Finch, I couldn't hear

25 you.

Peterson - Direct/Finch                    162

1 Q    Sure.  If you could describe, Dr. Peterson, what makes up

2 the total asbestos liability of a defendant?

3 A    Well, it's separate analyses of the total liability for

4 pending claims.  Claims, by pending, I mean pre-petition

5 claims.  They were pending at the time of the bankruptcy and

6 then future claims.  You calculate those separately for reasons

7 that I'll describe in a bit, and add them up and that's the

8 total liability. But it's broken down, and there are separate

9 steps for each of those.

10 Q    Could I have Slide 14.  Are those the steps you just

11 described, Dr. Peterson?

12 A    Yes.

13 Q    Let's turn first to the first box, liability for pending

14 claims.  Can you describe very briefly the steps or the

15 components that you used to value pending claims against an

16 asbestos defendant?

17 A    Yes.  For both pending and future claims, for that matter,

18 the total liability of pending claims is a multiplication of

19 three elements.  It's the number of claims that are pending

20 times the percent of those claims that we estimate will be

21 paid, called percentage paid, and the third element is the

22 average value that will be paid to claims that receive payment.

23       That calculation, those three steps, are done

24 separately for diseases because the values of disease claims

25 vary.  Meso is much more valuable and expensive for a company,

**J&J COURT TRANSCRIBERS, INC.**

1 than others.  So, you need to do that separately.  And then

2 maybe with some time value adjustments in that sum, to produce

3 the total.

4 Q    Is Slide 15 what you just described?

5 A    Yes, it is.  Let me add, though, that colored -- the two

6 boxes on the left are red because together they represent the

7 number of compensable claims.  You take the number of claims

8 and you multiply it by what percent you think are going to be

9 paid.  Sometimes analysts calculate that directly.  I like to

10 calculate each of the two components of that because they're

11 not always -- they're independent, they vary differently with

12 each other and it's useful to be able to identify and discuss

13 and consider each of those separately.

14 Q    Okay.  So, is it correct, then, that if you had, say, a

15 thousand claims in a given disease category and a percent paid

16 of 70 percent, how many compensable claims would that result

17 in?

18 A    Well, 700.  And that's the key number.  I mean, it is

19 simplest, it's just the number of claims that will be paid

20 times the average they get.  Everything is -- all of the

21 analyses is addressed to getting to that point.

22 Q    How did you go about determining the number of claims that

23 were pending against the W.R. Grace Company at the time that it

24 sought Chapter 11 protection?

25 A    We used the count of claims in the database, claims that

1  were identified in W.R. Grace's prepetition database that were

2  identified in that database as having been unsettled at the

3  time of -- and unresolved at the time of the bankruptcy.  And

4  there are two subsets of that.  There are claims that actually

5  were settled, but were -- they were liquidated but unpaid.  And

6  then there are claims that were unliquidated and that was the

7  basis for our calculation of the number of pending claims.

8  Q    Does the W.R. Grace database also have data about claims

9  that were resolved historically and been paid, either by

10 judgment or settlement, before Grace sought bankruptcy?

11 A    Yes, and that's the key to calculating the other

12 parameters.

13 Q    Okay.  Could you turn to the next slide, please, Slide 16?

14 A    Yes.  This summarizes our data, W.R. Grace's data.  It

15 shows on the right the total number of resolved claims.  It was

16 193,000 resolved claims.  There were 135,000 pending claims of

17 which 18,500 were claims that were liquidated but had not yet

18 been paid.

19 Q    Does that mean a claim that is settled but not yet --

20 Grace hadn't yet cut the check?

21 A    Yes.

22 Q    Do you follow a process to remove stale or inactive claims

23 from the pending claims analysis, and if so, could you describe

24 it to the Court?

25 A    Yes.  I mean, among the 116,670 claims that were

1  unliquidated and pending, there are claims that we believe will

2  never be pursued.  They're essentially, they sit on the

3  database, but they're not significant and they shouldn't and

4  can't and don't enter into our calculation of liability.  Some

5  of those are claims that you mentioned are stale, that's a term

6  that we and other analysts use.  There are claims that have

7  been filed many years ago, say before 1990, that remain

8  unresolved.  We assumed that any claim that had been -- we

9  actually did a lot of analysis looking at this, what's the

10 likelihood that those claims would settle, because you could

11 look at patterns.  How, you know, basically what's the rate of

12 still being resolved even though it's a 20 year old claim, some

13 do settle, but not many, so effectively what we assumed is that

14 all claims filed prior to 1990 are stale, they've basically

15 been abandoned by the law firm and a claimant, they just have

16 not been removed from the database and we eliminated a little

17 over 7,000 of those claims, as stale.

18         There will be some claims filed later that probably

19 will become stale but the statistics that we looked at, suggest

20 that it's a much less frequent issue in more recently filed

21 claims.  There's something about the 1980s era of claims that

22 mean they were filed but nothing is ever done with them.

23 Q   Okay.  Now, I notice a column on the chart up there --

24 first of all, is that the data that comes right out of Grace's

25 database after you have analyzed it?

1  A    Yes.

2  Q    That's Slide 16.  What is the UNSP?

3  A    It's unspecified.  It's very common in a database of an

4  asbestos defendant to have claims filed and the database

5  doesn't reveal what the disease is for a claim.  Presumably,

6  the plaintiff's lawyer and the claimant know the disease but it

7  either isn't reflected on the complaint because there's often

8  generic terms that are used in the specific disease, doesn't

9  need to be identified in many jurisdictions, or the database

10 didn't get it entered.

11 Q    Okay.  Do you have a methodology for dealing with

12 unspecified disease claims in a database, and if so, could you

13 very briefly describe it?

14 A    Yes.  It's one of several general approaches that are

15 used.  What we do is, we look to data from the Manville Trust.

16 The Manville Trust is the largest asbestos trust and it made --

17 for a while was making it's data available to people like me,

18 publicly for a fee, and what we did is, we linked these claims,

19 using social security numbers from the Grace database to the

20 Manville database, and for those that we could, we identified

21 what disease did the Manville Trust say the claim had, and we

22 were able to obtain, I think, 37 or 38,000 identifications of

23 diseases for claimants.  For the remainders that we couldn't

24 identify, we looked at the distributions, basically, what did

25 Manville say, what percentage of claims turned out to be

Peterson - Direct/Finch                    167

1  mesothelioma, what percent non-malignant and we just applied

2  that percentage across all the remaining claims that we either

3  couldn't match to Manville, or for which Manville also didn't

4  have a disease.  With --

5  Q     But --

6  A     -- with one exception.

7  Q     Excuse me, Doctor, Slide 20 please.

8  A     Yes.

9  Q     Dr. Peterson, does Slide 20 show the distribution of

10 pending Grace claims across diseases, once you go through this

11 process of dealing with stale claims and claims where the

12 disease is not specified in the database?

13 A     Yes. But it retains 6329 unresolved claims as not having

14 asbestos disease and that's because historically W.R. Grace

15 resolved a certain percentage of claims that didn't -- without

16 identifying a disease and basically for no money.  I mean they

17 just, again, it's an indication of a claim that didn't go

18 anywhere.  So, we assume that among the 109,000 pending claims,

19 some fraction of them, or about 6 percent, will be just like

20 these resolved claims, will end up being resolved without

21 payment, without ever finding out what the disease is and

22 basically, who cares.  I mean the forecast just ignores those

23 claims.

24 Q     So, those claims are treated as a zero value in your

25 forecast?

**J&J COURT TRANSCRIBERS, INC.**

1  A    They're treated at zero value and they're not counted in

2  forecasting in future claims.  They have no impact upon the

3  forecast.  We just ignore -- like the stair claims, we ignore

4  them.

5  Q    How many pending mesothelioma claims were there at the

6  time W.R. Grace went into bankruptcy?

7  A    We believe that there were 3,024 of which 2,885 were

8  unliquidated.

9  Q    And how many total claims were pending at the time that

10 Grace went into bankruptcy?

11 A    127,770, of which 109,250 were unliquidated.

12 Q    As part of your estimation work and other for the Grace

13 ACC in this case, did you become generally familiar with the

14 criteria that Grace would apply before offering a settlement to

15 an asbestos personal injury claimant, before Grace went into

16 bankruptcy?

17 A    Yes.  That was part of the process I described earlier,

18 learning about that.

19 Q    And, could you describe just very briefly what Grace's

20 general approach and criteria for resolving asbestos personal

21 injury claims was before it went into this bankruptcy?

22 A    According to documents from W.R. Grace and statements by

23 the people like Mr. Hughes, who handled those claims, they

24 required evidence of exposure to asbestos, of exposure to a

25 Grace asbestos product and of an asbestos -- some, at least

1 minimally credible evidence of an asbestos related disease, all

2 sufficient to withstand summary judgment.  There had to be a

3 meaningful cause of action.

4 Q    Could you turn to Slide 21, please?  Does Slide 21 show

5 some of the documents that you reviewed that set forth Grace's

6 criteria for resolving asbestos personal injury claims?

7 A    Yes, excerpts from a couple.

8 Q    What does Grace's historical data show --

9         THE COURT:  Mr. Finch, you need to stay by a

10 microphone, I'm sorry.

11         MR. FINCH:  I'm sorry, I'm sorry, Your Honor.

12 Q    I'll root myself to the podium here. What does Grace's

13 historical data show about what was going on with respect to

14 the values of its mesothelioma claims in the years prior to its

15 going into bankruptcy?  If you could just describe that just

16 generally very briefly?

17 A    They were increasing, pretty much from across the board,

18 from the early 1990s until the time of their bankruptcy, with

19 that increase accelerating in the couple of years prior to the

20 bankruptcy.

21 Q    Could I have Slide 23, please?  Dr. Peterson, what does

22 Slide 23 show?

23 A    It shows in the red bar, the trends of settlement values

24 for mesothelioma claims by W.R. Grace and compares it to the

25 four other defendants that I discussed in my testimony last

1 week.

2 Q    And, why did you pick those four defendants to illustrate

3 on the slide?

4 A    One, I had public data for them; two, and that's

5 important.  Second is that they were all companies that in some

6 measures were similar to W.R. Grace, and, three they -- except

7 for Owens-Corning, who has its own interest for that, the other

8 companies continued resolving claims after W.R. Grace went into

9 bankruptcy.

10 Q    This chart shows mesothelioma values.  Were Grace's

11 historical settlement averages rising for other diseases as

12 well?

13 A    Yes.  Certainly for the cancers.  I think they were

14 relatively -- yes, they were increasing, yes.

15 Q    As much as for mesothelioma?

16 A    I think meso was the sharpest increase and that's typical

17 of defendants.

18 Q    Did you come to an opinion or a conclusion as to what

19 factors were driving the increase in Grace's mesothelioma and

20 other claim values before it went into bankruptcy and did you

21 describe that to the Court last week?

22 A    Prior to bankruptcy, one of the -- in the recent years,

23 one of the important factors was the bankruptcy petitions by

24 other asbestos defendants which began to increase the values it

25 was paying in 2000 and 2001.  There were other elements.  The

1  increasing number of settlements outside of an inventory

2  process, in more recent years.   When Grace settled claims in

3  bulk, it got a break on the price.   When they settled them more

4  separately, the price went up and there are year-to-year

5  fluctuations.   Grace became a more prominent defendant over

6  time, it was relatively -- I wouldn't say obscure, but kind of

7  borderline of significance in the early and mid-90s and it

8  began to become more important at about the time that the CCR

9  defendants, claims against them were stayed and plaintiffs'

10 lawyers were looking for other additional defendants to

11 supplement the amount of money they lost when the stay was

12 entered in the CCR class action.

13 Q   Did you review Grace's documents to see whether it stated

14 anything about what, if any, factors were acting in the tort

15 system that could have the effect or did have the effect of

16 increasing its cost to resolve asbestos claims?

17 A    Yes.   There's a discussion of a number of factors.   Again,

18 the most important that they identified, according to them, was

19 the bankruptcies -- how many other defendants there are

20 available to help pay the liability and, therefore, the

21 bankruptcies of those defendants tended to drive the values up.

22 There are also factors that suppressed it.   The pendency of the

23 bankruptcy tended to suppress values.

24 Q    Is Slide 26 an accurate depiction of the document -- some

25 of the statements that you've reviewed and commented on in your

1 report about Grace's warnings about the factors that would

2 increase its asbestos liability?

3 A    Yes.  This is a contemporaneous statement by W.R. Grace in

4 2000 about how it was being impacted and foresaw continuing

5 impacts of the insolvency of other asbestos defendants.  And

6 the effect of it in the last point, it made it a riskier

7 environment with higher values.

8 Q    We are sitting here in 2009 and we, obviously, have some

9 knowledge of what's gone on in the world since 2001 in asbestos

10 litigation.  Did you come to an opinion or conclusion about

11 things that would affect Grace's asbestos liability, based on

12 information that became available since 2001, continuing to the

13 present day?

14 A    Yes.  I mean it's a real luxury for someone doing a

15 forecast to already know what happened for the first eight

16 years they're doing a forecast.  We now, in 2009, have

17 hindsight, we can see what happened and it would be

18 unreasonable not to take that into account in the forecast that

19 we do and that's what I've done here.

20 Q    And, you testified about some of those factors last week.

21 Does Slide 27 accurately set forth the primary factors in your

22 view that would have affected Grace's liability for pending and

23 future asbestos personal injury claims in the tort system?

24 A    These are additional events that happened. I mean,

25 bankruptcies continue to expand to other companies.

Peterson - Direct/Finch                    173

1  Non-malignant claims went down because of the legislation in

2  other matters, reducing the number of filings of non-malignant

3  claims, but perversely increasing the value -- particularly

4  mesos, I think I've testified about that last week.  So, you

5  could see these continuing occurrences of events, all of which

6  contributed to the increasing values of claims, although the

7  non-malignant trend, obviously, really cut the number of non-

8  malignant claims.

9         Also, over this eight year period we had an

10  opportunity to test and verify Grace's prediction that it would

11  have -- that values would continue to increase for the reasons

12  they mention and we've been able to see that that's true.

13  Q    How have you been able to do that?

14  A    Well, by looking at the data that I showed you earlier

15  about what happened with U.S. Gypsum and Turner and Newell and

16  Quigley and other companies.

17  Q    You also analyzed the publicly available data of other

18  companies that are still in asbestos tort litigation?

19  A    Yes.

20  Q    What companies?

21  A    That are still in?

22  Q    Still in?

23  A    Publicly available?

24  Q    Yeah, like in financial statements and such.

25  A    Oh, financial statements, GAF, for example, G1 Industries,

1  looked at their statements.  Asarco, looked at their

2  statements.  Their data are not public.

3  Q    You mentioned at the beginning of your -- never mind.

4  Last week we talked some with the Court about how these factors

5  affect the settlement averages, Grace, in your view, would be

6  likely to pay going forward.  Do these factors also affect the

7  percent of claims that Grace would likely pay, had it not gone

8  into bankruptcy?

9  A    It's harder to ferret it out, but yes, it certainly

10  suggests there would be fewer meso claims -- I mean, excuse me,

11  fewer non-malignant claims that would be paid for all the

12  reasons, for the tort reform and the increased scrutiny of

13  them, in particular.  And, the experience of some other

14  companies was to be more critical and look more closely and,

15  therefore, pay a smaller percentage of claims.  But I think

16  more than anything, it was kind of Grace's public announcement

17  of what its position was, that it probably would be a bit more

18  aggressive in reviewing claims.  For all those reasons, I think

19  that probably there would have been a reduction in the number

20  of percentage of claims paid by W.R. Grace, after -- if it had

21  continued in litigation after the bankruptcy.

22  Q    Could I have Slide 29 please?  Dr. Peterson, did you

23  analyze Grace's historical database to determine what

24  percentage of mesothelioma claims it would pay money to?

25  A    Yes.  I looked first historically at the bottom, wider box

Peterson - Direct/Finch                                    175

1 shows what historically Grace's experience was in years 1999

2 through 2001 for each disease.  For mesotheliomas, they paid

3 over 90 percent in each year, and it compares that with Turner

4 and Newell, one of the companies for whom I have publicly

5 accessible data.  We had similar rates of payment of claims for

6 virtually every disease until 2001 when it sharply reduced --

7 it rejected many more claims than it had historically.

8 Q    What happened to Turner and Newell in 2001 that made it,

9 in your mind, a good analog for what Grace would likely attempt

10 to do?

11 A    Well, it -- prior to that, it was a member of the Center

12 for Claims Resolution, in --

13 Q    I don't think the Judge has heard what the Center for

14 Claims Resolution is.  Could you just describe briefly what

15 that is?

16         THE COURT:  I think I know, but okay, go ahead.

17         THE WITNESS:  It's a consortium of 20 asbestos

18 defendants that was created to control costs.

19 Q    Okay, now go on.

20 A    That disbanded at the beginning of 2001, so in 2001,

21 Turner Newell was now resolving cases in ordinary litigation,

22 and in a process that was similar to what Grace would be doing

23 on a going forward basis.

24 Q    And so, in the forecast that you did or the estimate that

25 you did of the percentage of pending claims that Grace would

Peterson - Direct/Finch                    176

1  pay in the tort system had it not gone into bankruptcy, what

2  percentages did you use, is it shown on this chart?

3          THE COURT:  I'm sorry, what was the question?

4  Q    Sure.  Dr. Peterson, did you do an estimate of the

5  percentage of pending claims that Grace would pay had it not

6  gone into bankruptcy?

7  A    Yes.

8  Q    And does it appear on this chart?

9  A    Yes.

10 Q    Can you describe where to the Court?

11 A    It's the smaller box in the middle of the page, where it

12 has percent of claims paid forecast, there's two Grace reduced

13 and Grace lowest.  We used really three alternative forecasts

14 in the report of which two, I think, were more credible, both

15 are a reduction.  And the lowest is the rates that are derived

16 from -- slightly different from Turner Newell's, but similar to

17 them and they differ because of -- just differences in the

18 number, the composition of the database.  So, that's meant to

19 replicate pretty much what the experience of Turner Newell and

20 other CCR defendants were in this period of time.

21         The Grace reduced is halfway between the historic

22 rates which are shown at the bottom of the page and the lowest

23 rates, because Turner Newell was a CCR member, I think its

24 having left CCR is a reason why its rates went as low as it

25 did.  And I don't think that all of the same factors apply, so

Peterson - Direct/Finch                    177

1  I think the more reasonable rate is to assume basically halfway

2  between what it did historically and what the experience of the

3  CCR members are and that's the reduced rate, which is basically

4  the 78.3 percent of the meso claims that were filed with Grace,

5  we assume would be paid and that, conversely, 21.7 percent

6  would be resolved without payment, which is far higher than the

7  less than 10 percent historically.

8  Q    Did you compare your projection of Grace's likely

9  percentage of claims paid, to what a prominent asbestos

10 defendant was doing in the 1990s?

11 A    Yes.  Owens-Corning was on that earlier slide.

12 Owens-Corning was a major defendant and so we made that

13 comparison.

14 Q    Could you describe very briefly to the Court the various

15 ways in which Owens-Corning attempted to resolve its asbestos

16 liability outside of bankruptcy?

17 A    Well, beginning in the late 1980s and through -- for about

18 ten years, almost, Owens-Corning had a policy of being

19 aggressively litigating claims.  Looking at them closely and

20 litigating them, with the hope that they would drive out claims

21 and discourage filings, and that turned out to be a disastrous

22 policy for them, but it shows what was the rate of being able

23 to reject claims by a company that was quite aggressive with

24 regard to its litigation posture.

25 Q    Do you know whether or not Owens-Corning tried cases to

**J&J COURT TRANSCRIBERS, INC.**

1  judgment during that period of time?

2  A    Oh, it tried over a thousand cases to judgment, and it won

3  about -- a little over half the time, but when it lost, it got

4  nailed badly.

5  Q    And after this strategy by Owens-Corning to try its way

6  out of its asbestos problem, what did it attempt -- what did it

7  do next?

8  A    Then it went into a process, it was quite similar to the

9  process that W.R. Grace did in recent years, of inventory

10  settlements.  Their National Settlement Program, NSP, was where

11  they would basically do inventory settlements or large

12  settlements with law firms.  They went from one extreme to

13  another, with settling almost all claims and trying to

14  negotiate terms for resolving future claims that would make it

15  -- give them some advantage in handling the future claims.  And

16  that became a pretty common tactic that W.R. Grace,

17  Owens-Corning, others used in the late 1990s.

18  Q    How did that work out for Owens-Corning?

19  A    Well, they were going to go into bankruptcy no matter

20  what, but they had to spend a lot less money on indemnity, on

21  average, so they spent a lot more money in total because

22  they're resolving so many claims, they spent far less money on

23  defense costs, they were paying enormous burden on defense

24  costs which they basically were able to stop.

25  Q    Slide 30, please.  Dr. Peterson, what does Slide 30

1  depict?

2  A    This shows my two forecasts of the Grace payment

3  percentage at the top, with what Owens-Corning achieved.    In

4  the years in red, this was during its period of aggressively

5  reviewing and trying cases.   And my point, really, in preparing

6  this is that even in those years when a significant defendant

7  was being very aggressive with rejecting claims, it achieved

8  rates of rejection that were actually not as low as I'm

9  forecasting Grace would have been able to continue.   By

10  estimating that Grace would be able to get rid of so many

11  claims on being conservative, I'm underestimating the

12  liability.

13  Q    Did you use various different quantitative methods to

14  estimate the value that Grace would pay to successful asbestos

15  personal injury claims as of the time of the bankruptcy?

16  A    Settlement values.

17  Q    Yes.

18  A    Yes.   I've described that in my testimony last week, we

19  used four different -- three different methods with data from

20  four different defendants to estimate, looking at experience of

21  claims, companies that continued to settle claims after Grace

22  went into bankruptcy, in order to come up with five alternative

23  estimates of how much Grace would have paid after bankruptcy,

24  if it had remained in litigation.

25  Q    Okay.   Can I have Slide 32, please?   Does Slide 32 show

1  your estimate of Grace's total liability for pending asbestos

2  personal injury claims as of April 1st, 2001?

3  A    Yes.

4  Q    And just -- I want to pick out a few things in the chart.

5  What is the value that you're using for settlement averages for

6  meso claims?  Mesothelioma claims?

7  A    It's $108,918.

8  Q    And, could you just walk the Court, briefly, through how

9  you -- and what's the total indemnity for mesothelioma claims

10 that were pending at the time Grace went into bankruptcy?

11 A    Well, it's the same product of the equation I did before.

12 The number of pending claims, two hundred eighty-eight -- 2885,

13 times the payment rate, 78.3 percent which yields a little over

14 2200 claims that would be paid and they would receive an

15 average of $109,000, which in later years we forecast they'd

16 pay more, in 2001, they paid a bit less, but essentially, we

17 gradually increased the value, we assumed these claims would be

18 paid in two thousand -- would have been paid in 2002.

19 Q    Is that with the one year's inflation is about?

20 A    Yes.  Well, the one year step-up, in the one of five

21 years, a step-up in the adjustments we did.  For this

22 particular model.

23 Q    And that results in a total indemnity for mesothelioma

24 claims of what, Dr. Peterson?

25 A    It's $252 million for the unliquidated claims and another

1  $10 million for liquidated claims.

2  Q    And, what is the total liability, for all types of

3  asbestos claims?

4  A    Again, I believe this is quite a conservative estimate,

5  but it's $576 million.  And this is similar to the values --

6  remember, we have five different bases for valuing claims,

7  they're all about this number.

8  Q    Do you have an opinion as to whether it is likely that the

9  W.R. Grace Company would have been subject to a substantial

10  number of future asbestos personal injury claims?

11  A    Oh, it certainly would have had a large number of future

12  asbestos claims.  You can't know precisely how much they are

13  right now because they're forecasts, but they would have had a

14  large number of future claims filed against them, but the exact

15  number is imprecise.

16  Q    We talked earlier this afternoon about the various

17  components that go into estimating the liability for pending

18  claims. Can you describe to the Court what are the components

19  going into estimating the value of future claims?

20  A    Well, again, there are the average settlement -- I'm

21  working backwards, the average settlement values and the

22  percent of claims that get paid, which are similar to what we

23  used for the pending claims, but here we can't simply count the

24  number of future claims, obviously, they're not there, so we

25  have to forecast the number of future claims.  So, it's the

1 three elements, number of claims, percent get paid, values, but

2 here the number of claims is not a count, it's a forecast.

3 Q    Does Slide 34 show what you've just described?

4 A    Yes.

5 Q    Next slide, Slide 35.

6 A    Basically the same equation.

7 Q    What is Slide 35?

8 A    Well, the forecast claims, one of the two key elements in

9 understanding what was going on was, how claims have been filed

10 in the past.  Well, just know what the trends were in filing,

11 and where the company left off, basically, the level of

12 claimings at the time it went into bankruptcy and these are

13 annual claim filings, by disease, using the -- where we've

14 allocated the unknown disease claims.  And it eliminates the

15 stale claims and the unspecified pending diseases.

16 Q    And, what -- does this show Grace's history of number of

17 claims filed against it, divided by disease each year, between

18 the years shown on the chart?

19 A    Yes, it does.  The last column, the last row in red is an

20 annualized number of the 2001 claims, because they were only in

21 business for, with regard to liability, for a quarter of the

22 year.  We estimated what they would have had for the full year

23 by looking at the claims filings over the previous 27 months.

24 But they received 321,000 claims all together.  Once you

25 eliminate stale and kind of unknown disease claims that won't

1 get paid.

2 Q    Does that -- you said something about 27 months, is that

3 -- by my math, if you multiply -- first of all, how many

4 mesothelioma claims did Grace receive the first quarter of

5 2001?

6 A    566.

7 Q    And so why isn't the annualized number of mesothelioma

8 claims as estimated by you in 2001, 2400?

9 A    Well, a standard way to do this is just take whatever

10 fraction of the year and gross it up, so here you'd multiply it

11 by four.  When we did that, we thought the numbers were too

12 large, we didn't think that the rest of the year would continue

13 to run at the pace of the first quarter, so rather than

14 creating a number for 2001 that we thought was unrealistically

15 high, we looked at -- we basically grossed it up based upon

16 their experience, over not just the last four months but the

17 last 27 -- about three months, but over the last 27 months to

18 develop what we thought was a more appropriate and reasonable

19 gross up number for the year.

20 Q    Once you have W.R. Grace's claims history, in terms of the

21 number of claims filed against it year-by-year, how do you use

22 that information to project the future number of asbestos

23 personal injury claims?  Could you describe that very briefly

24 to the Court?

25 A    Three steps.  One with just this, it's -- we look at this

1 for trends, if trends are going on, you have to expect that

2 those trends will continue to some degree.  Here there's

3 external reasons for expecting that.

4          Secondly, we look to the epidemiology which gives us

5 a count in each future year as it has for past years of the

6 number of persons who likely will die from asbestos related

7 cancers.  Essentially that's the norm, it's our constant that

8 we can use.  The one thing we know about the future, that we

9 have the most confidence in, and third, is to look at the

10 experience of other companies in the years since this company

11 went into bankruptcy.  Again, we have eight -- well, at the

12 time I wrote this report, we had six years of experience we

13 could look at to see what likely would have happened to Grace.

14 Q    Could I have Slide 36, please?  Dr. Peterson, does Slide

15 36 describe the basic concept behind your methodology for

16 projecting future numbers of asbestos personal injury claims?

17 A    Yes.

18 Q    You've referred several times to epidemiology of asbestos

19 related cancers, what specifically are you referring to?

20 A    Researchers at Mt. Sinai Hospital, which is the center of

21 research on asbestos related disease in this country, Mt.

22 Sinai, New York.  That's where Irving Selikoff was.  Irving

23 Selikoff and his colleagues, primarily Bill Nicholson, did an

24 epidemiological forecast, they looked at all the people who had

25 worked with asbestos in 11 of the major industries where

1 asbestos was used, for the years prior to 1970s, they had

2 counts of people that were exposed to asbestos, they had

3 estimates of how much asbestos they were exposed to, how old

4 these people were, how long they worked and they combined that

5 with medical models of what's the likelihood of getting an

6 asbestos related disease, given those kinds of factors that I

7 just described.  So, based on that, they were able to do

8 separate forecasts for mesothelioma of the number of persons

9 who would die each year from asbestos related mesothelioma, the

10 number of people who die each year from asbestos related lung

11 cancer, the number of people who die each year from asbestos

12 related gastrointestinal cancers.  And they published that

13 report in 1982.

14        It remains the best epidemiological forecast

15 available and not only -- that's understating its value, it's

16 an extraordinary scientific event.  It is a wonderful forecast.

17 Q    Was that published in peer review medical journals?

18 A    Yes.

19 Q    Could I have Slide 38?  What does Slide 38 show, Dr.

20 Peterson?

21 A    Well, these are just graphs of the forecasts of the number

22 of people who have died each year from each of these diseases.

23 They made their forecasts in '82 for the years prior to, about

24 1980 or '81, they actually looked at data that they were able

25 to compile from the federal government.  Beyond that, this is

1 all forecasts.  So, the blue line is lung cancers, red is

2 mesothelioma, the green is other cancers.  And it shows that up

3 until about now, most people who get an asbestos related cancer

4 will get lung cancers, that's changing and now lung cancer and

5 mesothelioma will be about similarly frequent.  And they

6 forecast until 2030, but you can extend -- these lines are

7 still well above zero, so you can extend those lines out and we

8 do to 2040.

9 Q    Approximately how many mesothelioma claims was Dr.

10 Nicholson and the other researchers at Mt. Sinai projecting for

11 the 2005 to 2010 time frame, on an annualized basis?

12 A    It's roughly 3,000 a year in this period.  And that's just

13 about the peak.  It's slightly lower than the peak year. It

14 peaks and begins to go down a little bit, but still around

15 3,000 mesos a year.

16 Q    Have you done anything to test the accuracy of Dr.

17 Nicholson and the other researchers at Mt. Sinai projections of

18 future asbestos related cancer claims?

19 A    Yes.

20 Q    How did you do that, how did you go about doing that?

21 A    The federal government has two different programs for

22 collecting data on the number of people who die from -- who get

23 and die from cancers, various kinds of cancers, from all

24 causes; lung cancer, breast cancer, prostate cancer, and they

25 keep separate records.

1        The first of these, which is a research that's been

2   going on since the 1960s, I guess, 70s, they collect data from

3   hospices, hospitals, medical facilities to find out how many

4   people died of each of these asbestos related cancers in,

5   originally nine different sites, where the State of Iowa, the

6   whole state's a site, so they go to every one of those

7   facilities in Iowa and collect that data.

8        Long Beach and Los Angeles is a site, so they go to

9   every place there.  And they publish that data, they've

10  expanded that site list twice from 9 to 13 to 17.

11  Q    Do they collect data about mesothelioma?

12  A    Yes.  Mesothelioma is one of the categories, it's

13  separately counted and it's useful to us because it's only --

14  the only known cause of mesothelioma is exposure to asbestos.

15  And so, it's a way we can compare their count of mesothelioma

16  claims -- from the nine sites you can extrapolate to the

17  country as a whole.  It's a sample.  It's not a random sample,

18  but it's a sample.  And you can generalize the whole country

19  based upon their nine sites and you can compare that with what

20  Nicholson forecasts in each year.

21  Q    You said claims, did you mean disease incident?

22  A    I'm sorry, incidents.  Actually mesothelioma deaths.

23  Q    What does Slide 39 show?  Next slide, please.

24  A    That makes the comparison.  The green line is actually the

25  result extrapolated to the country as a whole for the nine SEER

1  site study, that's the green line.  It goes up and down, bumps

2  up and down a lot because it's from a sample, so it's not very

3  orderly.  The blue line is a forecast that KPMG did, attempting

4  to update Manville's -- update Nicholson's study.  They did

5  this in 1982, but the red line is actually Nicholson's

6  forecast.  And you can see that it just -- it falls right in

7  the middle of the green line for virtually the entire period

8  since Nicholson made his study and published it in 1982.

9  Q    Is SEER -- S-E-E-R, the first type of government data you

10 were talking about?

11 A    Yes.

12 Q    And there's something there on U.S.C.S. meso count it's

13 a little black dot.  What's that?

14 A    That's another government program that's more recent.  It

15 began in the year 2000.  Basically, what they've done is,

16 they've taken the SEER method and done it nationally.  Now, in

17 every state, except for Maryland, Maryland is a lagger, they

18 don't have it up yet, but for 49 states they do this in every

19 hospital and every hospice, so now they're collecting national

20 data and you don't have to extrapolate to get a national

21 sample, you can count it and you can see the black dots on this

22 graphic it shows why a census of all data is much better than a

23 sample.  It's orderly, year after year, the blacks lines, and

24 it also is even more remarkably consistent with the Nicholson

25 forecasts than the SEER data were.  This is why I say this is

1 an astounding piece of medical research is because this is a

2 study now that's almost 30 years old.  And over that entire

3 period of time and we can check it, it's been confirmed year

4 after year.  It's a very reliable forecast.   And that's why we

5 use it for forecasting future claims because it gives us a

6 solid basis for starting.

7 Q    Once you have Dr. Nicholson's prediction of mesothelioma

8 deaths in the United States and Grace's claims history, how do

9 you go about using those two pieces of data to project the

10 number of future asbestos personal injury claims?  And can you

11 describe that very briefly to the Court?

12 A    It's simple arithmetic.  You divide the number of

13 mesothelioma claims against Grace in a particular year by the

14 Nicholson forecast of the number of people who died of

15 mesothelioma that year, that fraction is the claiming rate,

16 what percentage of people who could make a claim made a claim.

17 And then in turn, now that you've got -- say that a thousand

18 claims for mesothelioma were filed against Grace in the year,

19 and Nicholson forecasts 3,000 mesothelioma deaths, your

20 claiming rate is a third. So, based on that, you can forecast

21 it in the future, you now know what the Nicholson forecast is,

22 in future years, and you multiply it by a third, in order to

23 estimate the number of claims that Grace would get in a year.

24 That's the simple version of it, it's a bit more complicated

25 than that, but that's the heart of what the method is.

Peterson - Direct/Finch                    190

1  Q    Does Slide 41 show what you just described, the number of

2  claims divided by the incidences of propensity to sue?

3  A    That's the two formulas.  The formula for calculating this

4  claiming rate which is know as the propensity to sue, is in the

5  upper -- step one, step two as you take the propensity to sue,

6  multiply it by the incidence of future years in order to arrive

7  at an estimate of the number of projected future claims.

8  Q    Do you do that --

9  A    And this is -- this is the standard approach that most

10 people do.  They may use Nicholson -- or KPMG, although

11 Nicholson is the better source.

12 Q    You do that separately for each type of cancer?

13 A    Yes.  And for each future year, beginning in 2002.

14 Q    Did you -- what did you do to take into -- what, if

15 anything, did you do to take into account the trends in Grace's

16 claims history and what we know about what's gone on in

17 asbestos litigation and asbestos claiming since 2001, to

18 project the future number of asbestos claims against W.R.

19 Grace?

20       THE COURT:  I'm sorry, I missed something there.  To

21 take into account the trends in the debtors' claims history and

22 what we know about what's gone on with what?

23       MR. FINCH:  What has gone on generally in asbestos

24 litigation since 2001 to -- first let me back up.

25 Q    Did you take into account information, post 2001, about

1  claims filing trends in order to make a forecast of what would

2  have happened to Grace?

3  A    Yes, and would you like me to tell you how we did it?

4  Q    I would like for you to tell the Court how you did it.

5  A    We -- as I said, the number of claim filings were trending

6  up, substantially, for Grace.  The experience of other asbestos

7  defendants since Grace went into bankruptcy is a continuation

8  of the upward trend. Grace anticipated that its claims filings

9  would increase for the reasons that we've discussed.  I

10 expected that its claim filings would increase for the reasons

11 that Grace said.  Put those all together and it tells us that

12 the propensity to sue that Grace would have been subject to

13 after its bankruptcy, would be higher than it was faced at the

14 time before.  And all things, including hindsight, point that

15 that would be the case.  The trick is to estimate how much it

16 would increase.  And to estimate it, I looked to Manville data.

17 Q    What does Slide 43 show?

18 A    Slide 43 compares the annual filings against W.R. Grace

19 for mesothelioma from 91 to 2001 and for Manville from '95 to

20 2006.  It shows that the Manville claim filings, if you average

21 it for the period after 2001, it's considerably higher than it

22 was before 2001. And it also shows the increasing trend for

23 Grace prior to its bankruptcy.

24 Q    Why did you look to Manville as a point of comparison?

25 A    Couple reasons.  There are really no other good sources of

1  disease -- of claim filings broken down by the diseases.  There

2  are public financial statements by companies that will tell you

3  the total number of claims they received in a year, but they

4  don't break it out by disease.  We don't have this kind of

5  information for companies that are still in litigation.  But

6  besides that, Manville is generally regarded as, if not the

7  universe of all claims, probably the largest recipient of

8  claims, because Manville was Manville, I mean it dominated the

9  asbestos world.  And so, it gets most claims, it continues to

10 get most, but not all claims.  So, it's a guide of -- the best

11 guide with an overall universe in trends are, and it's publicly

12 available data.

13 Q    Slide 44, please?  What does Slide 44 show?

14 A    This is just a graphic representation of the prior slide,

15 but it extends the Manville claims back and for me what's

16 important about this is that it shows that prior to the

17 bankruptcy, except for the early 1990s, there was a strong

18 parallelism in the trends in claim filings against Manville and

19 against W.R. Grace, so it suggests that the Grace filings tend

20 to shadow Manville and for all of the reasons that I've

21 discussed, it suggests Manville would be a useful source in

22 expectation, not necessarily with the absolute number of claims

23 would be filed in future years against Grace, but what the

24 trends would be.  Just as Manville went up, I expect for this,

25 and all other reasons, that's a way for us to quantify what the

Peterson - Direct/Finch                    193

1 rate of increase would have been.

2 Q    I noticed in the post -- what does the line signify on the

3 chart, the vertical line?

4 A    That's the bankruptcy date for W.R. Grace.

5 Q    Okay.  I noticed that the red line is flat for Manville

6 going forward, is that what actually happened for mesothelioma

7 filings at Manville?

8 A    Well, it goes up until 2003, then it's flat from 2003 on

9 and what we did is, we averaged the filings in 2003, 4, 5 and 6

10 years for which we had data and we did that because in 2003 the

11 Manville trust adopted a new TDP.  It changed the nature of its

12 TDP, it tightened the requirements for exposure and for medical

13 diseases.  The TDP that basically is in the Grace plan now.

14 Before it was a little easier.  As a result of that, and also

15 the values were changed and the payment percentage went down,

16 all kinds of reasons.  As a result of that, plaintiffs tried to

17 push claim filings earlier.  They did not want to file after

18 the new TDP went into effect, they wanted to beat it.  And so

19 there was a spike in claims in 2002 and 2003 in particular, but

20 what that was, is a process called acceleration, it's a common

21 observed event in litigation like this.  If there's a deadline

22 or some incentive for a law firm to get a claim in earlier,

23 they'll do it, and here the incentive was to get the old TDP.

24 It's like a bar date.  A bar date creates an incentive to get

25 claims in early, to beat the deadline.  So, it also produces an

Peterson - Direct/Finch                    194

1  acceleration, any deadline has that affect.

2  Q    Using Manville's data, Grace's claims history and the

3  epidemiology done by the researchers at Mt. Sinai, did you come

4  up with a year-by-year projection of future mesothelioma claims

5  against Grace?

6  A    Yee, I did.

7  Q    Could I see Slide 45?  Dr. Peterson, is that your -- what

8  is that?

9  A    That's a graphic representation of our year-by-year

10 forecast.  The red line to the left is the historic,

11 prepetition claims, the green line is Nicholson's

12 epidemiological forecast, the blue line is our forecast, which

13 starts lower than the actual level of claims they're receiving

14 in 2000 and 2001 because we calculate -- we started with a

15 historic payment rate, propensity to sue, I'm sorry, propensity

16 to sue for Grace based upon three years, 1999, 2000, 2001, so

17 we start at a lower level because it was trending up, that

18 average over three years was lower than its actual number of

19 claims it received in 2000, 2001 and we expect that the rate of

20 claim filings for meso against Grace would go up modestly,

21 parallel to the increase we observed for Manville, between the

22 year 2001 and 2006, but it would never get greater than the

23 number of mesothelioma claims it received prepetition. So that

24 -- and then, thereafter, the number of mesothelioma claims will

25 be dropping in parallel to the declining number of incidents of

1  disease that Nicholson forecasts.  That's our higher forecast.

2  Q    So -- that is your higher forecast and is it correct that

3  beginning around, maybe, right now or maybe a year or two ago,

4  you were projecting year-by-year declines in the number of

5  future mesothelioma claims against Grace?  Not the rate, the

6  number.

7  A    The number?  Well, I --

8  Q    Let me back up.  How many mesothelioma --

9  A    -- many years ago I might have, not recently.

10 Q    How many mesothelioma claims do you project against Grace

11 for the year 2005, roughly?

12 A    There's a graphic that shows that.  It's around 1500, I

13 believe.

14 Q    And how about for the year 2010?

15 A    It's less, because the incidence is now going down.

16 Q    And how about for the year 2020, is it less still?

17 A    I have a table, but I -- it'll be even lower, yes, it

18 would be lower, considerably lower by 2020.

19 Q    And does this graphic depicts the future projection of

20 mesothelioma claims?

21 A    Yes.

22 Q    Next slide, please.

23 A    This is the alternative forecast.

24 Q    What is this?

25 A    This is the alternative forecast, where we just take the

1  average propensity to sue in 1999 to 2001 and say that's going

2  to obtain in the future.  It starts lower than Grace was

3  actually experiencing, it never recovers up to its prepetition

4  experience and it just goes down year after year.  That's our

5  lower forecast.  I don't believe that's nearly as plausible as

6  the first one I showed you.

7  Q    Did you do forecasts separately for each asbestos related

8  cancer?

9  A    Yes.

10 Q    Does Slide 47 show all the cancer claims put together?

11 A    It does, it shows several things, for all the cancers.

12 Q    Describe for the Court what the several things are.

13 A    The green line to the left is the total -- the height of

14 that line is the total number of all of cancers filed against

15 Grace annually, year-by-year.  The blue line to the right is

16 the total number we're forecasting for the future.  You can see

17 that even -- this, again is my higher model, what I call the

18 best evidence model and even for that model, the future

19 forecasted number of cancers that we have for W.R. Grace is

20 considerably lower than it was prior to its bankruptcy.  We

21 forecast -- again, this is conservative.  We forecast the

22 number of future claims lower than they were getting before the

23 bankruptcy, even though all these events suggested its

24 litigation position was worsening.

25 Q    What does the orange and red show?

Peterson - Direct/Finch                              197

1 A    That represents the number of compensable claims.  When

2 you multiply the number of claims by the percent that get paid,

3 it yields the red line.  And here, the red line is the forecast

4 and that's even further below the orange line because we've

5 made two reductions. We're forecasting fewer future claims than

6 they got in the past and among those claims that get filed in

7 the future, we're forecasting that even fewer of them will get

8 paid than the percent prepetition.  That's two reasons for --

9 two bases for our conservative forecast.

10 Q    Did you do anything to compare the number of non-malignant

11 claims that had been filed historically against Grace with the

12 number of asbestos related cancer claims that had been filed

13 historically against Grace up until the point of the bankruptcy

14 petition?

15 A    Yes.  We calculated this ratio of non-malignant filings to

16 cancer filings year-by-year.  Traditionally, that's a very

17 stable relationship.  As cancers go up, non-malignants go up.

18 They tend to go up and down together.  And that's been up until

19 recent years, that was a very stable relationship and I

20 calculated it and graphed it.

21 Q    What is Slide 49?

22 A    That's the graph of it. It shows that -- here we put

23 cancers and non-malignants on a different scale so you could

24 make the comparison easily, but the non-malignants are about --

25 the scale is about nine times bigger and you can see they're

1  remarkably consistent year after year until 2000 when

2  non-malignants are pulling ahead.

3  Q    Did you -- in your forecasting work to estimate the number

4  of future claims that would be filed against W.R. Grace, did

5  you continue that stable relationship going forward or did you

6  do something different?

7  A    I changed it, because as I showed on an earlier slide,

8  hindsight told us that this pattern changed rather abruptly

9  beginning in around 2002 and we know why it changed, because of

10 tort reform in some states, because defendants, insurance

11 companies, courts were becoming more skeptical of non-malignant

12 and because a lot of law firms got out of the business of

13 processing big numbers of non-malignant claims. They changed

14 their business models.  So, we couldn't go back to this past

15 history and say it was going to obtain in the future, because

16 the world had changed while Grace was in bankruptcy.

17 Q    Slide 51, please.  What does Slide 51 show, Dr. Peterson?

18 A    This shows the result of our changed forecast. You can see

19 here now the blue line on the right, the blue bar on the right

20 is much lower than the historic level of claimings.  We assume

21 that the number of claims filed in 2002 against W.R. Grace

22 would be lower than its experience in 2000 and 2001, again,

23 because we're averaging across a longer three year period and

24 the 1999 filings were lower, but then we forecast that every

25 year thereafter, the number of non-malignant claims would go

Peterson - Direct/Finch                                    199

1  down and, furthermore, we forecast that only a little over 50

2  percent of non-malignant claims would get paid in the future,

3  in contrast to Grace's past experience when 90 percent, over 90

4  percent of non-malignant claims.  So, in effect, it leaves you

5  with a number of compensable, non-malignant claims, at only a

6  little over a quarter of what it was historically.  And I think

7  that's the proper forecast, to reflect today's world.

8  Q    Slide 52.  Dr. Peterson, does Slide 52 summarize your best

9  estimate of the projected number of future claims that Grace

10 would have paid had it stayed in tort litigation?

11 A    Yes, it does. It's the table I made mention of earlier.

12 Q    And how many mesothelioma claims would Grace be expected

13 to pay going forward from 2001 until the present day?

14 A    You can see that on the right side, total is on the bottom

15 row, all the way to the right.  There's 22,917 mesothelioma

16 claims.  These are future, these are the future non-malignant

17 -- future meso claims including the last two-thirds of the year

18 2001.

19 Q    Is that the same number of future mesothelioma claims you

20 were projecting that the Grace asbestos personal injury trust

21 will eventually pay?

22 A    Yes.  Our forecast of liability for the trust assumes that

23 the same number of claims will be filed against the trust.

24 Q    And paid?

25 A    No.

1  Q    Paid is lower for the trust?

2  A    Paid is lower for the trust.  And these are, yes, these

3  are actually -- thank you.  This is compensable claims I

4  misspoke.  Even in the tort system these are the number of

5  claims multiplied by the payment rates, so it's the product of

6  both of those steps.  I didn't prepare the table you ask.

7  Q    What?

8  A    Never mind.

9  Q    What is Slide 53?  Now that you have the number of

10 projected future claims, what do you do next to come up with a

11 value for Grace's liability?

12 A    We have to calculate how much people would get paid which

13 is the combination of what percent get paid and how much on

14 average they get paid.  The same as it was for pending claims.

15 Q    Does Slide 53 depict those steps?

16 A    Yes.

17 Q    Does Slide 54 show the percent paid that you use in your

18 estimate of future claims?

19 A    Yes.  Again, it reiterates what I showed before, the red

20 bars are the two forecasts that we use.  We also do

21 calculations and provide it in our report for the historic

22 rates, but I do believe that they would have -- we would have

23 disallowed, rejected more claims.

24 Q    And so in your reduced forecast, for example, you're

25 projecting that Grace would pay about 78 percent of the

1  mesothelioma claims?

2  A    78 percent of the mesos and 57.8 percent of the

3  non-malignants.

4  Q    You described at some length how you came to an estimate

5  of what values Grace would be paying in the tort system had it

6  not gone into bankruptcy.  Does Slide 56 show the results of

7  that work?

8  A    I believe -- yes, it does.  Well, 56 shows the estimates

9  of how much on average they would have paid for each year from

10  2001 until 2006.  Remember, we're forecasting for the period of

11  what Grace would have paid had it remained in litigation, so we

12  assume on average that for meso, Grace would have paid

13  somewhere between 107 and $111,000 a year for meso.  But that

14  amount would have increased over time, so by 2006 and all

15  subsequent years, Grace would have paid, on average for

16  mesothelioma between 188,000 and 225,000.

17  Q    What assumptions did you use about the timing and the rate

18  to discount claims back to present value, in your forecast for

19  Grace's liability as of the petition date?

20  A    Well, because these liabilities are going to continue to

21  occur and be paid for decades into the future, you have to take

22  into account the present value calculation and inflation. We

23  assume that the values of claims would have increased after

24  2006 when they had reached a fixed amount.  We assume that

25  there will be no change in the real value of claims, they'll

1  always have that same value in the future, but they will be

2  subject to monetary inflation at the rate of 2 1/2 percent a

3  year.  So, that's one.  Then secondly, if you pay a claim in

4  2006 or if you pay it in 2001, when we're present valuing back,

5  you paid $100,000, Grace would have to actually put aside less

6  money to pay a claim a similar amount ten years later, in 2010,

7  because it doesn't need to put $100,00 aside in 2001 to pay the

8  2010 claim.  It can put aside $80,000, something like that,

9  earn interest on that and by 2010 it'll have the $100,000 and

10 that difference between 80, hypothetically and 100 is the net

11 present value of a claim.  You calculate that by a net present

12 value -- by a rate of return, a discount rate.  The discount

13 rate is the assumption of what Grace could have earned on its

14 income, on its assets, had it set money aside.

15 Q    Was the discount rate you used provided to you by a

16 financial expert?

17 A    Yes, it was.

18 Q    Could you turn to Slide 57?

19 A    Yes.

20 Q    Are those the assumptions about timing that you used in

21 estimating Grace's liability as of the petition date?

22 A    Yes.  We assume a 2 1/2 percent CPI of 5.11 percent

23 discount rate and we assumed that claims were to be paid a year

24 after, two years after filing, on average.

25 Q    Next slide, Slide 58.  What does Slide 58 show, Dr.

1  Peterson?

2  A    This puts it all together.  The pending liability forecast

3  -- this is for a particular model, we had two different payment

4  rate models, the reduced and the lowest, we had five different

5  value models.  We forecast all of them. I think they're all

6  reasonable models, my preferred model is the reduced payment

7  rate.

8  Q    And is that present valued or not?

9  A    This is not a present valued number.

10 Q    Okay.  Could I have Slide 59, please?

11 A    This is present value that shows -- applying the 5.11

12 discount rate.  The total present value of the liability for

13 this particular model is $5.4 billion, broken down by -- most

14 of that is for meso, $3.8 billion.  Of that, $550 million,

15 roughly, is for pending claims.  There's a big liability that's

16 accrued since the bankruptcy, it's $2,253,000,000, and we

17 forecast $2.6 billion for future claims.

18 Q    What did you mean that has accrued since the bankruptcy?

19 A    The bankruptcy period are the claims that we believe would

20 have arisen between April, beginning of April 2001, through the

21 year 2010.  There are claims -- this is period of time that --

22 these are past, or shortly will be past, claims would have been

23 filed during that period of time, they have a value.

24 Q    2009 or 2010?

25 A    2009.  Through 2009, thank you.

1  Q    And, what is the $5.4 billion figure shown there?

2  A    It's the net present value of Grace's liability for

3  asbestos bodily injury claims.

4  Q    As of what date?

5  A    As of the date of the bankruptcy petition, April 2001.

6  It's present value back to that date.  If you present valued it

7  back to now, it would be a considerably higher number.

8  Q    Assuming that Grace stayed in the tort system?

9  A    Yes.

10  Q    And what is Slide 60?

11  A    Slide 60 is just a graphic, showing how the liability gets

12  distributed among diseases. Almost -- 70 percent of the

13  liability is attributable to mesothelioma claims.  Like all

14  asbestos defendants, it's the mesothelioma claims that

15  dominate.

16  Q    Dr. Peterson, is it possible to precisely determine the

17  actual amount, number and timing of future asbestos personal

18  injury claims?

19  A    Not precisely, no.

20  Q    Are forecasts like yours subject to some uncertainty?

21  A    Yes.

22  Q    Are there various ways to address this uncertainty?

23  A    Yes.  There's one primary way that most people use.

24  Q    And what is that, how did you do it?

25  A    Sensitivity analysis.  That's what most people use.

Peterson - Direct/Finch                    205

1 Sensitivity analysis says, okay, various elements of this

2 forecast are uncertain.  Whether you use the Nicholson or the

3 KPMG epidemiology makes a difference.  How much difference does

4 it make?  You run the forecast, changing only that factor, from

5 Nicholson to KPMG, you compare the results and that tells you

6 how the result is sensitive to variation on that factor.  And

7 so we ran sensitivity analyses varying about a dozen factors,

8 one at a time.

9 Q    Could you see Slide 62?

10 A    Yes.

11 Q    Does Slide 62 list some of the various sensitivities that

12 you analyzed and estimated?

13 A    Yes.  It raises the issue.  For a number of these there

14 are multiple sensitivities, but this is all the list of factors

15 that we vary for the sensitivity analysis.

16 Q    And depending on what analyses, sensitivity analyses, you

17 use what is the range of expected liability for W.R. Grace as

18 of the bankruptcy petition date?

19 A    It's 3.7 to $6.8 billion.  I wouldn't regard each of these

20 alternatives as reasonable.  They're just variations to see

21 what if things changed.

22 Q    Would you regard your best evidence model as reasonable?

23 A    That's a reasonable model.

24 Q    Did you do any estimate of Grace's liability under

25 different scenarios than what its liability would be as of the

1  bankruptcy petition date?

2  A    Yes, two.   Two different variations.

3  Q    What were those two scenarios?

4  A    Well, we first looked at what would be the liability under

5  the TDP.

6  Q    And without describing the second one, what was the second

7  one?

8  A    The second one was what if there were no TDP and no trust

9  and Grace came out of bankruptcy and had to resolve all of

10 these claims now back in the tort litigation system.

11 Q    How did you go about estimating the liability of the Grace

12 524(g) Trust that will be created and use the TDP if this Court

13 confirms this plan of reorganization?

14 A    It's the same basic approach.   It's the number of claims

15 times how many get paid and how they get -- how much on average

16 they get paid, although there is a bit of variation because the

17 TDP is a little more complex.   But, we start with the number of

18 claims which are the same numbers.   It's no different than our

19 tort forecast.   We assume that whatever claims would have been

20 filed against Grace in tort will get filed with the Trust.

21        But, there are eight different Trust distribution

22 categories, as opposed to the four diseases.   There's meso --

23 all mesos -- there's only one meso category in the TDP, but

24 there are two lung cancers, there are four non-malignant

25 categories and so we have nine I guess altogether so --

1  categories altogether.  So, we had to make estimates of how the

2  lung cancer and mesothelioma would distribute among these

3  various categories, as well as there's a ninth category which

4  is a cash discount payment.  It's a $300 basically token

5  payment for someone that can show they have a cause of action,

6  but really can't meet any of the criteria for payment under any

7  of the diseases and moreover they can't -- under IR we don't

8  expect they would be able to qualify even under that.

9  Q    What does Slide T-9, T as in turtle 9, show, Dr. Peterson?

10 A    This summarizes the differences in the forecast for the

11 tort analysis as opposed to the trust.

12 Q    And in doing that analysis did you also provide that

13 estimate of liability to the Grace ACC and the FCR for

14 non-litigation purposes, the liabilities of the trust?

15 A    Yes.  It was used, among other things, in estimating a

16 range of payment -- the payment percentage that the trust would

17 be able to -- probably be able to pay on a pari passu basis.

18 Q    Turn to Slide T-10.  Dr. Peterson, does Slide T-10 show

19 what your estimate is of what the Grace Trust's liability would

20 be if this bankruptcy plan is confirmed and it resolves claims

21 through the TDP?

22 A    Yes.

23 Q    And what is that estimated liability?

24 A    Well, it ranges at a high from $9.3 billion to 6.3, but

25 using the rates of percentage of claims that would be rejected

1 by Grace historically in tort or by the trust, the reduced and

2 the lowest which I think are the two better models, it ranges

3 from $7.4 billion to $6.3 billion.

4 Q    You describe that another scenario you did in addition to

5 the liabilities of the trust, do you recall describing very

6 briefly?

7 A    Yes, I mentioned that.

8 Q    Describe what that estimate of liability is and if it's

9 shown on this page.

10 A    Yes, it is, it's on -- the setting is called tort.  It's

11 at the bottom of the table.  Basically again, we started with

12 the same number of claims and we said what if there were no

13 TDP, there were no trusts -- there may or may not be a trust,

14 but there were no TDP for it to use -- and someone had to deal

15 with these liabilities, but -- so they would presumably go back

16 into the tort litigation system as of 2009 or 2010.  So, all of

17 the claims we forecast that would have accrued through now

18 would be there and available to be -- would have to be

19 liquidated and that's the basis for the forecast at the bottom,

20 again using our three different payment percentage -- our

21 payment rates and our five different estimates of what the

22 current values of claims are.

23 Q    And what is the net present value date, if you will, that

24 that forecast is pegged to?

25 A    Well, now -- this is what someone would do now, like the

1  trust we're net present valuing.  Our trust analysis and this

2  analysis, NPVs to an estimated day for an effective date of the

3  plan I think we have the beginning of 2010 as the estimate.

4  And so these are present valued back to the current date

5  because we're interested in what -- this is really in

6  consideration of the feasability, the capability of resolving

7  claims, (1) under the trust, or (2)without a trust, and so we

8  need to look at what you can do today.

9  Q    And what is the net present value of the liability that

10 whatever entity inherits the Grace liability would face if

11 instead of the TDP in place it was put back in the litigation

12 system?

13 A    Well, again, assuming that the timing of payments would be

14 the same in the trust or by this tort system, which is what I

15 have here, the liability would range anywhere from -- well,

16 here I think if you went back into litigation I don't think the

17 reduced or the lowest payment rates are any longer appropriate.

18 You wouldn't have the trust there to be able to examine claims

19 so you would be -- the trust that the -- whoever has to pay

20 these claims would be basically back in the shoes that Grace

21 was in 2001, but in far worse shape because it now would face

22 over 400,000 claims in the first year or so.  Grace never had

23 to face that and deal with that.  They wouldn't have the time

24 to discriminate a bunch of claims so we used the historic rate

25 of payment and under the historic rate basically it's about $10

1  billion.  It ranges from $9.2 billion to $10.7 billion.

2  Q    Is that billion with a B?

3  A    Billion with a B.

4  Q    Does Slide T, as in turtle, 10 show that?

5  A    It shows that under the historic column to the left.  I

6  think again that's an underestimate because timing will be

7  different.  If this happened, claims would -- I described the

8  acceleration process earlier.  If this happened law firms would

9  clamor to get their claims in because they would be concerned,

10 one, they don't want to be the end of the cue of 400,000 plus

11 claims.  This trust --

12         MR. KOVACICH:  Your Honor, I object.  First of all,

13 the answer goes beyond the question that was asked.

14         DEPUTY CLERK:  Your name, please?

15         MR. KOVACICH:  Mark Kovacich for the Libby Claimants.

16 The witness is now providing testimony about matters that were

17 not disclosed in any of his reports.  These figures appear in

18 his report under a scenario described as Grace dealing with its

19 tort liability in the absence of a trust.  Nothing in his

20 report talks about these matters he's going into now, which

21 include an acceleration of claims and other things that the

22 witness began to discuss about what would happen in the absence

23 of the trust.

24         THE COURT:  All right, it's sustained.

25         MR. FINCH:  Could I have the question back first and

1  we'll do this in pieces?

2                    (Question replayed)

3  Q    Dr. Peterson, what is your estimate of the net present

4  value of the liability or whatever entity inherits the Grace

5  liability would face if this plan were not confirmed?

6           MR. KOVACICH:  I have an objection to that question,

7  as well, with the qualification that the objectionable part of

8  the question is Mr. Finch's language of whatever entity.  This

9  whole discussion in Dr. Peterson's report relates to Grace's

10  liability in the tort system.

11           THE COURT:  That's sustained.

12  Q    What liability would Grace face absent this plan in TDP?

13  A    It would range between $9.2 billion and $10.7 billion.

14  Q    And in your report -- that table is set forth in your

15  March 2009 expert witness report, is that right, Dr. Peterson?

16  A    This table is set forth in my report and the year by year

17  backup analysis was provided to the parties.

18  Q    In your Exhibit Book, Page 201 -- excuse me -- Tab 201,

19  you'll find your March 2009 report.

20  A    I  have that.

21  Q    And does that table appear on Page 17 of your report?

22  A    Yes, the table that's up there is Page 17.

23  Q    Does that include defense costs at all?

24  A    No.

25           MR. FINCH:  Pass the witness, Your Honor.  Actually,

1 Your Honor, before I pass the witness may I offer for

2 demonstrative purposes only the slides from Plan Proponent's

3 Exhibit 178b that Dr. Peterson talked about.  We only discussed

4 with him a subset of the slides and what I'd like to do is once

5 we have the transcript is submit to Your Honor the slides that

6 he discussed.  I have a pretty good list right here, but rather

7 than being imprecise about it and taking up the Court's time

8 may I proffer a new Exhibit 178b for demonstrative purposes

9 only that shows just the slides that were shown to Dr. Peterson

10 that he discussed in his direct examination.

11          THE COURT:  All right, they're accepted as

12 demonstratives and yes, you can file a revised Exhibit 178b.

13          MR. FINCH:  Thank you, Your Honor.

14          MR. BERNICK:  Could we just have a couple minutes,

15 Your Honor?

16          THE COURT:  Yes, we'll take a ten minute recess.

17                         (Recess)

18          THE COURT:  Okay, I guess they don't want to come in

19 so are you ready, Dr. Peterson?

20          THE WITNESS:  I am ready.

21          THE COURT:  All right.

22          THE WITNESS:  Thank you.

23                    CROSS EXAMINATION

24 BY MR. BERNICK:

25 Q    Dr. Peterson, I want to pick up where Mr. Finch left off

**J&J COURT TRANSCRIBERS, INC.**

1 just very briefly and I want to direct your attention to two

2 slides that you've shown and then a couple other documents that

3 relate to the expert work that you've already done and that

4 you've already disclosed to the other side.  And I first want

5 to begin with Slide 59.  And I think we can show it to the

6 Court.  Slide 59 is the present value of pending and future

7 claims against Grace, best evidence model reduced payment

8 rates, did I get that one right?

9 A     Yes.

10 Q     So, does this now take all future -- all present and

11 future and measure the NPV as of '01?

12 A     Yes.

13 Q     And the total number there is what?

14 A     Total is 5.4 billion.

15 Q     Now, if we wanted to do the calculation of all present and

16 future, not back to '01, but back now to where we are to date

17 as if we were sitting here today, and now embark upon the

18 process of paying all these claims wherever they might have

19 arisen, but today they get paid and we did the NPV as of '09,

20 is there another slide that you already have and have already

21 shown to the Court that shows what happens to the NPV?

22 A     Yes.

23 Q     Directing your attention to Slide T-10, does this give us,

24 in the numbers that appear for tort, the range of NPVs that

25 would result?

1  A    Yes.

2  Q    And what accounts for the very significant difference that

3  we see when we talk about all present future between NPV '01

4  and NPV '09?

5  A    There are a couple of differences.  One is the net present

6  value date is a very significant issue.  Net present valuing it

7  back to the current time creates a much higher liability

8  because whoever as payees would have lost the interim eight

9  years of income that they could have earned on their assets.

10 Also, there are slight technical issues with regard to the

11 values of claims.  The pending claims have a greater liability

12 here because they're valued at basically what the 2006 -- the

13 current value, whereas some of the claims were valued by

14 earlier -- remember, there's a step-wise increase -- they were

15 valued lower and that's another difference.  Those are the --

16 and then there's the model you choose.  I mean, I've said that

17 I believe that were the current hypothetical that you asked

18 about the case that you'd have to use the historic payment rate

19 and that creates a higher liability.

20 Q    Okay.  But, if we kind of talked about a real world just

21 very simple deal, we're sitting here in '09, none of the claims

22 that you have forecasted as either being current or future have

23 been paid, at all.

24           MR. KOVACICH:  I object, Your Honor, this is leading.

25           COURT CLERK:  Use the mic, please.

1        MR. BERNICK:  I'm asking him to make an assumption

2   for purposes of a hypothetical.

3        MR. KOVACICH:  Mark Kovacich for the Libby Claimants.

4   This whole examination is leading.

5   Q  I want you to assume a certain hypothetical.

6   A    All right.

7   Q    The hypothetical I want you to assume is that none of the

8   claims have been paid, current or the ones that have accrued

9   all the way through to date, none of them had been paid.

10  A    All right, I understand that.

11  Q    I want you now to assume that they all get paid as they

12  are available to be paid and they're paid current and future

13  tort system values.  I want you to make that assumption.

14  A    Yes.

15  Q    Is that assumption consistent or inconsistent with the

16  scenario that you have here that you've already calculated at

17  nine to ten billion?

18       MR. KOVACICH:  Objection, this is not part of the

19  disclosure.  The nine to ten billion figure comes from Dr.

20  Peterson's analysis of Grace's liability were they back in the

21  tort system.  Mr. Bernick is now asking him to compare it with

22  the 5.4 which was from his estimation report and it's a

23  different numerical analysis.

24       MR. BERNICK:  Judge, this is already in evidence.

25  He's already testified about it and all that he's done.

1          THE COURT:  He has.  This assumption is a proper

2    assumption to explain the values that appear on Exhibit T-10.

3    And I think it's been asked and answered anyway, but okay it's

4    a proper hypothetical.

5    Q    Is my hypothetical the same or different as the number --

6    as what is captured by the number of nine to ten billion that's

7    already appeared at T-10 in your report?

8    A    Your hypothetical -- all the elements of your hypothetical

9    are captured by and consistent with and the same as the

10   analysis on Page T-10 for tort.

11   Q    Now, I want then to capture and go back to 58 for a

12   moment.  And now I want to go within this number.  This number

13   is NPV '01, but it's got a couple components that you've

14   already testified to.  You have pending in bankruptcy period

15   and then you have future, and future refers to 2010 plus.  And

16   we have separate figures for that, right?

17   A    Yes.

18   Q    If we wanted to capture as of '01 the NPV of all claims

19   that would come in all the way through -- up to 2010, that is

20   through the balance of '09, what would be -- according to that

21   table as already set out, what would be the NPV as of '01?

22   A    Well, it would be the sum of the pending liability --

23   liability for pending claims, plus the bankruptcy period.

24   That's actually shown on Page 59.

25   Q    Okay, I'm sorry, did I say 58?  I meant --

1  A    Yes.  It's Page 59.

2  Q    So, what's that number?

3  A    Just a second, I got to do the arithmetic.  It's two

4  billion eight hundred million dollars.

5  Q    Two billion what?

6  A    Eight hundred million.

7         MR. KOVACICH:  I'm sorry, Page 59?

8  A    Yes, if you add -- counsel, if you add the pending in

9  bankruptcy you add 549 for pending and 2253 for the bankruptcy

10  period.

11  Q    Now, if we then wanted to find out the same kind of thing,

12  which is if you now take that number and say okay they were not

13  valued as of '01, but they get valued as of '10 would we see

14  the same relationship, that is 5.4 roughly is doubled, would we

15  see 2.8 roughly double?

16         MR. KOVACICH:  Objection, this is a brand new opinion

17  we've never seen anywhere before.

18         MR. BERNICK:  No, not -- to the contrary.  It's right

19  in his report.  All we're doing is taking exactly the same

20  relationship.  It's just an NPV.

21         MR. KOVACICH:  He didn't do that in his report, Your

22  Honor.

23         MR. BERNICK:  Well, there -- you can -- the reports,

24  Your Honor, he's got thousands of numbers and in his report he

25  specifically -- I'm sorry, I didn't understand that.  He

1  specifically addresses the difference between the pre and post

2  2010 period of time.  It's right flat out in his report.  And

3  he also addresses the effect of the NPV.  It's right flat out

4  in his report.

5           THE COURT:  Can you just point me to where so I can

6  make a ruling on this, Mr. Bernick?

7           MR. BERNICK:  Yes, at Page 59.

8           THE COURT:  Of Exhibit -- I'm sorry, I had it here.

9  Just a second.

10          MR. BERNICK:  Of this exhibit.  And I will further

11 show Your Honor where it comes from materials that were

12 specifically disclosed.

13          THE COURT:  In Exhibit 201?

14          MR. BERNICK:  Yes.

15          THE COURT:  All right.

16          MR. BERNICK:  The difference between pending and

17 bankruptcy pre 2010 and post 2010 is a distinction that is

18 specifically made.  And he then also takes and makes -- on the

19 basis of that distinction he also then when he makes

20 calculations make calculations that are both '01 calculations

21 and '09 calculations and you see that at T-10 he makes the '09

22 calculation that directly corresponds to the 5.4 calculation on

23 59.  So, it's all there.

24          And where does it come from?  It comes from materials

25 that were disclosed.  This is an e-mail.  This is Plan

1  Proponent's Exhibit 234.  Just before Mr. Peterson was deposed

2  in connection with this confirmation hearing an e-mail was sent

3  out to Mr. Cohn and to others -- Mr. Heberling and Mr. Cohn,

4  specifically disclosing the tables that were used to compile

5  all of these values and they break out for every year how much

6  is being spent and into the future, and here we have 2010

7  through the future.  That's the line item.  So, all that he's

8  done is to take these tab runs from materials that were

9  specifically disclosed before his deposition was taken.

10         MR. KOVACICH:  May I respond, Your Honor?  The

11  materials Mr. Bernick is talking about relate to Dr. Peterson's

12  estimation report and the $5.4 billion figure the $2.8 billion

13  figure, I don't have a problem with that.  The nine to ten

14  billion dollar figure that Mr. Bernick has written on his board

15  over there relates to the separate analysis of what Grace's

16  liability would have been back in the tort system and there was

17  nothing in that analysis or the 2009 report which separated out

18  payments by year in order to make a comparison of past and

19  future claims within that number.

20         MR. BERNICK:  That's not true.  These are all the --

21  all these reports that I'm talking about are all of them, tort

22  system values.  There's not a single -- I can ask the witness.

23  Q    Are all these numbers tort system values?

24  A    Yes.

25         MR. KOVACICH:  They're two different sets of numbers,

1  Your Honor.  And we maintain our objection that any attempt by

2  Dr. Peterson to offer an opinion using the nine to ten billion

3  dollar figure relating to the analysis he did of Grace's

4  liability in the tort system for purposes of comparing it to

5  the TDP was never disclosed.

6          MR. BERNICK:  I didn't compare it to the TDP.  This

7  has nothing to do with a comparison to the TDP.

8          MR. KOVACICH:  And I'm --

9          THE COURT:  No.  I think it's a question as to

10 whether or not the same ratio will apply.

11         MR. BERNICK:  Yes.

12         THE COURT:  In the event that you're doing a net

13 present value calculation back to 2001 and then you do it again

14 as of 2010, there is a difference and the witness has explained

15 why largely, but not totally based on the fact that the debtor

16 would have been investing dollars to pay that liability.  Those

17 dollars plus the interest factor would have accumulated and so

18 the NPV currently is higher than the NPV would have been back

19 in 2001.  And he's asking whether the same ratio would apply

20 with respect to whatever -- I've lost the question, I'm sorry

21 -- whatever the $2.8 billion is.  I don't remember the

22 question, Mr. Bernick, I'm sorry.

23         MR. BERNICK:  The 2.8 billion was -- again, going

24 back to Slide 59, the 2.8 billion is the portion of the '01 NPV

25 number that is driven by the pending claims that were both

1 pending at the time of the 11 being filed --

2          THE COURT:  Okay.

3          MR. BERNICK:  -- and have accrued during the

4 bankruptcy.  It excludes future claims.

5          THE COURT:  All right.  So, the only question is

6 whether the same ratio is going to apply.

7          MR. BERNICK:  Yes.

8          MR. KOVACICH:  Your Honor, it's not the only

9 question.  They're mixing two different sets of numbers here.

10         MR. BERNICK:  They're the same sets of numbers, Mark.

11 They're all tort system numbers.

12         THE COURT:  I'm not clear where they're mixing two

13 sets, Mr. Kovacich.

14         MR. KOVACICH:  My understanding of the numbers in the

15 e-mail to Mr. Cohn was, they related to the values in Dr.

16 Peterson's 2007 estimation report.  With the nine to ten

17 billion dollar figure they're talking about his analysis of

18 what would be Grace's liability in the tort system if there

19 were not a trust, and he did not do any separation --

20         MR. BERNICK:  I'll make it easier.  I won't even

21 refer to it.

22 Q    Just based upon the numbers that were put in the tables

23 that were just shown to the witness which make the

24 differentiation between all and current through two thousand --

25 or up through 2010 -- and that's right out of those same pages

1  -- all tort system -- this is not designed to compare with the

2  TDP -- all tort system, we have '01 NPV for all is 5.4 billion,

3  Dr. Peterson?

4  A    Yes.

5  Q    '09 NPV for all is nine to ten billion?

6  A    Yes.

7  Q    If we take the -- based upon Page 59 if we just take the

8  currents through the point of -- through today, essentially,

9  the NPV would be tort system 2.8 billion?

10  A    Yes.

11  Q    And what would be the NPV based -- does the NPV now for

12  the pre '10 claims -- does the NPV for that bear roughly the

13  same relationship as the NPV for the all.

14        MR. KOVACICH:  I'm going to object, Your Honor.  I

15  won't belabor this.  This is an opinion that was not disclosed.

16  I don't have to continue arguing, but I want my objection noted

17  for the record.

18        THE COURT:  All right, your objection is noted.  It's

19  overruled for the reason that if the same calculations are used

20  and the same number factors are used, the answer to the

21  question has to be self evident.  So, to the extent that it is

22  a mathematical calculation I don't think it takes an expert

23  witness to offer an opinion, but the witness can certainly

24  state as a matter of fact whether a math calculation would lead

25  to that result, and he's clearly competent to do that.  So, the

1 objection is overruled.

2 Q    Sir?

3 A    Yes, you can do that.  Sitting here I've done it.

4 Q    I'm sorry?

5 A    Sitting here -- you can do it and I've done it.

6 Q    Yes.  What's the answer?

7 A    Well, the $10 billion would be about $5 billion $200

8 million, and the nine billion would be about $4.7 billion.

9 Q    Okay.

10 A    I'd put some caveats on it, but we may not want to go

11 there.

12 Q    Well, I'm sure Mr. --

13         MR. KOVACICH:  I'm sorry, counsel, I wouldn't stand

14 up here, but I don't have a microphone.

15         MR. BERNICK:  No, that's all right.  Let me then go

16 on and get the last thing and if he wants to pursue the caveats

17 that's fine.

18 Q    I now want to take a look at this one number here, which

19 is 4.7 to 5.2 billion NPV as of this year for all claims filed

20 prior to the time or accruing up to the time -- not accruing --

21 filed, made, up through the time that we're here now in the

22 confirmation hearing.  I want to ask you whether that number is

23 effective, that is, whether that number reflects the impact of

24 what you've previously testified to and is in your expert

25 report and it is the following -- this is from your expert

1  report, Plan Proponent's 19, is that right?

2           UNIDENTIFIED ATTORNEY:  199.

3  Q    199 -- in your expert report you talk about and you

4  actually explain it -- this curve here and you also talked

5  about this, I recall on Mr. Finch's examination of you, do you

6  remember talking about this curve here?

7  A    Which --

8           THE COURT:  We can't see what curve you're pointing

9  at.

10          MR. BERNICK:  Oh, I see.

11 A    I have no idea.

12 Q    Yeah.

13 A    Do you have a page number in the report?

14 Q    Yes, the page is Number 72.

15 A    All right, I have 72.

16 Q    It's not the right one.  Is it in your deal?  Is it all in

17 this thing?  I think -- I think you testified about 44 -- Page

18 44 of your presentation.  Is that the same thing as what we

19 have in your report as Figure 22?

20 A    Well, the number of -- the total number of Grace meso

21 claims --

22          MR. KOVACICH:  I object.  I don't think there's a

23 question pending.

24          MR. BERNICK:  This is really -- just do it.

25 Q    Page 44 of the presentation that you made, do you see that

Peterson - Cross/Bernick                          225

1 that's mesothelioma propensities to sue increase --

2 A    Oh I'm sorry, I was on the wrong Page 44.  In the

3 demonstratives you're asking about.

4 Q    Yeah.  In the presentation that you made, which is --

5         MR. BERNICK:  -- exhibit what, Nate?

6 A    Yes.

7         MR. FINCH:  Exhibit 198b, as in basketball.

8 Q    198b --

9         THE COURT:  178.

10         MR. FINCH:  178b, as in basketball

11 Q    -- 178b as in basketball?

12 A    Yes, I have that.

13 Q    We're trying the Court's patience here with numbers.  It's

14 178b as is basketball.

15         THE COURT:  No, that's not what tries my patience.  I

16 don't mind numbers.

17         MR. BERNICK:  Oh well.

18 Q    Page 44, the chart there, you talked about the

19 propensities to sue and you have a note Grace filings in 2001

20 are annualized over the 27 month period.  Is that the  same

21 chart that's in your expert report at Page 72?

22 A    Yes.

23 Q    Okay.  And when you displayed this chart here today as

24 Page 44 I believe you made a statement concerning acceleration.

25 Do you recall your testimony regarding acceleration?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes, I do.

2  Q    And just so that we can get a point of reference, what did

3  you say about acceleration as concerns this curve?

4  A    On Pages 44 I said that acceleration had occurred in the

5  Manville filings of 2003 to take advantage of the 1995 TDP and

6  so than the actual 2003 filings of meso with Manville Trust

7  were higher that I showed here, but they were lower in

8  subsequent years as a result of the fact that the claims that

9  would have been filed in 2004 and 5 and 6 were accelerated

10  earlier, so that's why we averaged them in order to get a

11  straight line.

12          MR. FINCH:  Dr. Peterson, you said 1995 TDP.  Did you

13  misspeak?

14  Q    2003 TDP?  2004?

15  A    No, the asbestos -- Manville claimants wanted to be able

16  to take the 1995 TDP and avoid the 2003 TDP.

17  Q    Okay.  So what you're saying is in fact on this chart,

18  which was Page 44 in your presentation, what actually happened

19  was that there was an acceleration and then it came down?

20  A    Yes, that's what happens with an acceleration, you're

21  borrowing claims from the future in effect.

22  Q    Okay.  And so really what happened was that there was a

23  break point, people knew that a new TDP that was less flexible

24  --

25  A    Less attractive.

1  Q    Less attractive.

2         MR. KOVACICH:  I object to the leading questions.

3         THE COURT:  All right, sustained.

4  Q    The new TDP that you're referring to took effect when?

5  A    2003.  September 2003.

6  Q    And in fact what did you observe in the claims trend of

7  Manville that related to that new TDP?

8  A    Your peak in 2003 is right, but the blue line would drop

9  below the red line.  It goes below the average so --

10  Q    Did I get that right now?

11  A    That's representative.  It's not accurate.

12         MR. BERNICK:  You can see one of my other efforts

13  right behind you that I've heard a lot of feedback on.

14         THE WITNESS:  I've heard some of that, too, yes.

15  Q    So and then your testimony is that this relates to the

16  concept of acceleration?

17  A    Yes, that's demonstration of acceleration.

18  Q    Driven by the fore -- the pre-announcement of an event --

19         MR. KOVACICH:  Objection, leading.

20         THE COURT:  Sustained.

21         DEPUTY CLERK:  Your microphone is not on.

22         MR. BERNICK:  My microphone is not on?  Okay.

23  Q    In fact, tell us whether or not this concept of

24  acceleration that you've testified to, was that or was that not

25  in your expert report in this case?

1  A    It was.

2  Q    Okay.  Now going back to the number that we've talked

3  about, you showed in your slide about the claims in the tort

4  system value of claims that would have been filed against Grace

5  in the tort system up through the date where we are today, this

6  number here 2.8 billion NPV '01, and then 4.7 to 5.2 billion,

7  '09 and '10, are these numbers -- are these numbers adjusted in

8  any way, shape or form to reflect an acceleration if there was

9  to be an acceleration that would take place in connection with,

10  let's say in 2009?

11  A    They have no provision for acceleration and that was one

12  of the caveats that I would have mentioned.

13  Q    Okay.  And could you explain that to us?

14  A    That because if bad things are going to happen if you wait

15  to file a claim lawyers will file claims earlier.  That was

16  true with regard to the Manville 2003 TDP.  It would be true

17  with regard to this large number of claims being put back into

18  some undefined process for payment.  Lawyers would want to

19  avoid being at the tail end or being excluded from that

20  process.  They would be sure to file their claims early to get

21  them in so that they could take advantage of what money, if

22  any, might be available to pay claims in this process that

23  we've been talking about of W.R. Grace being responsible now

24  for all these claims without the trust.

25  Q    In your expert report do you make a disclosure of what the

1  effect of acceleration would be or is when it occurs?  What

2  does acceleration do?

3          MR. KOVACICH:  I object.  The question is not clear

4  there is discussion of claims acceleration related to the

5  Manville experience.

6          MR. BERNICK:  That's what I'm talking about.

7  Q    What did acceleration do in the Manville case?

8  A    Can I answer?

9  Q    Yeah, go ahead.

10 A    Acceleration is a general term that I first applied in the

11 fibreboard trust -- fibreboard litigation in the early

12 nineties.  It's the idea that when there's a deadline that

13 claims -- it borrowed from the future.  Claims that would

14 otherwise have been filed in the future get filed earlier in

15 time and it has two effects; it increases the number of filings

16 preceding the deadline and it depresses the filings after the

17 deadline because those claims have been filed.  This is not a

18 formal deadline, but it is an informal deadline because

19 plaintiffs and plaintiff's lawyers would understand that there

20 are serious consequences of not getting a claim filed right

21 away even if there were no bar date.

22 Q    Is a bar date a formal event that would be associated with

23 acceleration?

24 A    Yes.  And that's why as a forecaster I don't like bar

25 dates.

1          MR. BERNICK:  That's all I have.  I pass the witness,

2    Your Honor.

3          THE COURT:  Good afternoon.

4          MR. CASSADA:  Good afternoon, Your Honor.  Good

5    afternoon, Dr. Peterson.

6          THE WITNESS:  You're the head of a cue here, yes.

7          MR. CASSADA:  I'm Garland Cassada.  I believe we've

8    met before.

9          THE WITNESS:  Yes, we've met many times.  Good to see

10   you again, Mr. Cassada.

11         MR. CASSADA:  Pleasure to see you.

12                    CROSS EXAMINATION

13   BY MR. CASSADA:

14   Q    I'm representing Garlock Sealing Technologies, the

15   codefendant in the tort system.

16   A    Thank you.

17   Q    I have a few questions about your report.  First of all, I

18   gathered from your report that it would be fair to say that

19   Grace as of the date of its bankruptcy case was a highly

20   targeted asbestos defendant, is that correct?

21   A    It had become a targeted defendant.  It would have become

22   a more highly targeted defendant in the future.

23   Q    Can I ask you to look at -- I believe your estimate report

24   is Plan Proponent's Exhibit 199, is that correct?

25   A    Yes, I believe that's correct.

1  Q    I'm going to ask you to look at Table 33, which I believe

2  is a summary of your projected propensities to sue for various

3  asbestos related cancers.

4            THE COURT:  Page 87, Table 33?

5            THE WITNESS:  I'm sorry, Table 33, Page 33.

6            THE COURT:  Oh Figure 33.  I'm sorry.

7            MR. CASSADA:  No, it would be -- I think it's called

8  Table 33.

9            THE WITNESS:  Do you have a page number?

10           MR. CASSADA:  Yeah, I believe it's --

11           THE COURT:  Table 33 is on Page 75.

12           THE WITNESS:  Thank you, Your Honor.  I have that.

13           THE COURT:  That's Figure 33, not Table 33.

14           THE WITNESS:  Page 75.  Counsel, you wanted Table 33,

15  which is the table of propensities to sue by year, is that

16  correct?

17           MR. CASSADA:  Yes.

18  Q    I wanted to understand your forecast for the propensities

19  to sue for mesothelioma, lung cancer and other cancers going

20  forward.  Can you see that -- Table 33 I believe is Page 175 of

21  your actual estimate report.

22  A    Page 75.  Yes, I have that.

23  Q    Okay.  And there you have -- that table is divided up into

24  actual and propensities to sue in your forecast, correct?

25  A    Yes.

1  Q    I believe you testified that for your propensities to sue

2  you relied on the Selikoff Nicholson incidents model as opposed

3  to the KPMG?

4  A    Yes.

5  Q    And you prefer that one because that one is more in line

6  with SEER and the other government report that you've

7  described?

8  A    Yes.  The empirical evidence shows it's a better

9  scientific model.

10  Q    Okay.  Did Selikoff Nicholson purport to forecast the

11  incidents of occupationally caused asbestos related diseases?

12  A    That's exactly what it is, it's occupationally caused.

13  Q    And SEER, does SEER give the actual incidents --

14  A    Yes.

15  Q    -- of occupationally caused diseases or diseases in the

16  population as a whole?

17  A    It's the population as a whole.

18  Q    Okay.  So there may be some within SEER that are -- there

19  may be additional cancers in SEER that wouldn't have been

20  predicted by the Nicholson -- Selikoff Nicholson then?

21  A    To the degree that there are a few non occupationally

22  caused mesotheliomas or lung cancers or so on related to

23  asbestos -- well actually meso, not lung cancer -- they would

24  be over and above what Nicholson forecasts, but they would be

25  counted in SEER, yes.  It's not -- I would not regard that as a

1 significant issue.

2 Q    Okay.  And the other report that a lot of experts rely on

3 is the KPMG report?

4 A    Yes.

5 Q    I believe in fact your Exhibit 199, your report, you have

6 attached to that as Appendix C, you've got both the Selikoff

7 Nicholson incident report going forward as well as the KPMG

8 report?

9 A    Yes.

10 Q    And have you yourself relied on KPMG in the past?

11 A    There was a period of time in the late nineties when we

12 were improperly adjusting SEER data and at the time I thought

13 that the Nicholson forecast was better, but -- I Mean the KPMG

14 forecast was better.  It turns out with the 2000 census data

15 and the correct adjustment that Nicholson was always better.

16 It was my error.

17 Q    Okay.  Moving forward -- and I'm looking at Table 33 at

18 propensities that you forecast going forward from 2002 to 2007,

19 and you have 2007 plus, and I gather that the propensities to

20 sue are constant for 2007 and years after.

21 A    Actually they're constant from 2006 and after.  I just

22 added 2007 to show that.

23 Q    I see.  I see that.  Now, you say that the propensity to

24 sue by persons who suffer from mesothelioma would be 46.1

25 percent?

1  A    In the year 2006 and thereafter, yes.

2  Q    Okay.  Now does that mean that all persons who are

3  diagnosed -- that of all persons who are diagnosed with

4  mesothelioma in a given year that 46 percent of those will sue

5  Grace?

6  A    That's what that means, yes.

7  Q    Okay.  And the same would be true for lung cancer, only 35

8  percent of all persons diagnosed at least with asbestos caused

9  lung cancer would sue Grace?

10  A    Well, it's really a count.  We forecasted the number of

11  lung cancers filed in 2006 and each subsequent year would be

12  equal to 35 percent of Nicholson's forecast of how many of

13  those would be asbestos related.

14  Q    And with respect to other cancer the propensity -- the

15  forecast propensity is 45.6 percent?

16  A    Yes, with the same description that I applied to lung

17  cancer.

18  Q    Okay, thank you.  Let me ask you about the payment rates

19  that you testified about earlier.

20  A    Actually, Mr. Cassada, let me -- I have to clarify my

21  answer for meso if I can.

22  Q    Yes.

23  A    The 46 percent is the same, it's the forecast of the

24  Nicholson -- it's a multiplier times the Nicholson

25  epidemiological forecast of the number of mesos.  As you point

1 out, the number of actual mesos may be slightly more or less,

2 but it's based on Nicholson.

3 Q    I understand.  Okay, thank you for that.  Now focusing on

4 your testimony as it related to payment rates.  I believe you

5 testified that prior to Grace's bankruptcy it paid -- it

6 resolved by payment 92.1 percent of all mesothelioma claims?

7 A    Across the period 1999 through 2001 I think that's

8 approximately right, yes.

9 Q    Yes.  And then I mean for lung cancer, other cancer and

10 non malignant claims it resolved by payment over 95 percent of

11 each of those disease categories?

12 A    I don't have the table in front of me.  It's in the

13 report.  But it's in that approximate number, yes.

14 Q    Okay, thank you.  And you have adopted or you have based

15 your liability estimate for the trust liabilities on what you

16 call your reduced payment rate scenario as opposed to your

17 lowest payment rate scenario, is that correct?

18 A    Yes.

19 Q    And I believe you testified that 78.3 percent of

20 mesothelioma claims would be settled by a payment?

21 A    Now you're asking by the trust or in tort?

22 Q    By the trust.

23 A    I think for meso that's correct.

24 Q    Okay.  And that would mean, wouldn't it, that 78.3 percent

25 of plaintiffs who suffer from mesothelioma and sue Grace will

1  meet the credible and meaningful evidence requirement of Grace

2  exposure that's contained within the TDP?

3          MR. GUY:  Objection, Your Honor.  He can't know

4  exactly what the trust will do.

5          THE COURT:  Well okay, that's -- it's correct that

6  you don't know exactly what the trust will do, but I think

7  that's a fair question of this witness based on his report.

8  You may answer, Doctor.

9  A    The forecast is that 78 percent of the claims you have

10  filed would be -- according to -- trust would find them to be

11  claims that should be paid, yes.

12  Q    And that would necessarily mean, wouldn't it, that the

13  claimants would necessarily have to meet the criteria of the

14  trust, including the meaningful and credible evidence of

15  exposure?

16  A    Yes.

17  Q    Okay.  You testified about the marketplace for settlements

18  that existed within the tort system?

19  A    I recall that.

20  Q    I want to explore that with you a little bit.  You would

21  agree then that a high percentage of cases filed within the

22  tort system have multiple defendants?

23  A    Yes.  Yes, I do.

24  Q    Okay.  And is it quite often true that the multiple

25  defendants are the same targeted defendants?

**J&J COURT TRANSCRIBERS, INC.**

Peterson - Cross/Cassada                    237

1  A    Are the what?

2  Q    Are the same targeted group of defendants?

3  A    I don't understand your question.

4  Q    Well in many cases you see the same defendants in case

5  after case, is that correct?

6  A    What's regarded as --

7              MR. LOCKWOOD:  Objection, lack of foundation.

8              THE COURT:  Well, I don't think that the witness

9  doesn't know the tort system cases based on everything he's

10 testified to.  I think there's a foundation.  It's just perhaps

11 that the question is a little confusing.  Could you restate the

12 question.

13 Q    When Grace was sued in the tort system would it often see

14 the same defendants in case after case?

15             THE COURT:  As codefendants?

16             MR. CASSADA:  As codefendants, that's correct.  Thank

17 you, Your Honor.

18 A    Other major codefendants would occur frequently --

19 Q    Okay.

20 A    -- as codefendants where Grace was sued, but none of them

21 would be in every case.  I mean it's a moving mix.

22 Q    Yeah, I understand that.

23 A    Even Manville is only named in about two-thirds of the

24 cases.  So the actual -- they won't be in all of them.  It will

25 be a different mix from case to case, but you tend to -- you're

1  more likely to see a major defendant than a less important

2  defendant, of course, that's by definition.

3  Q    I didn't ask you if they were in every case, just -- you

4  would agree they were -- you talked about the impact of the

5  bankruptcy of numerous defendants that either had or would have

6  had on Grace's settlement values, do you recall that?

7  A    Yes.

8  Q    And by the way, do you recall who those defendants were

9  you were referring to?

10 A    Turner and Newell, Owens Corning, Fibreboard, GAF,

11 Armstrong.

12 Q    Babcock & Wilcox?

13 A    Babcock & Wilcox.

14 Q    U.S. Gypsum?

15 A    Yes.  Thank you, you're very helpful.

16 Q    A.P. Green?

17 A    Yeah.  They're not a major one, but they did go into

18 bankruptcy.

19 Q    Combustion Engineering?

20 A    Same as the last question.  They weren't one of the eight

21 major ones I've named in the report.

22 Q    They're named in the report.  Now, these defendants going

23 into bankruptcy, they have the value on settlement value.  I

24 assume that means that these defendants would have either did

25 before the bankruptcy and would have subsequent to the

1 bankruptcy have been in a lot of W.R. Grace cases?

2 A    I would expect that most of them would have been in a

3 substantial number of W.R. Grace cases.

4 Q    So that was a marketplace of settlement and it included a

5 lot of the same repeat market participants, I take it?

6 A    I agree with the phenomena. I'd characterize it a bit

7 differently.  But yes, there -- yes.

8 Q    Did you see a lot of this -- and from jurisdiction to

9 jurisdiction did you have a lot of the same plaintiff's law

10 firms?

11 A    Well the plaintiff's -- I'm sorry, plaintiff's law firms?

12 Q    Yes, sir.

13 A    Yes, there -- yes, there's patterns to that.  Large

14 plaintiff's law firms file lots of claims.

15 Q    And the plaintiff's lawyers were part of your marketplace

16 of settlement as you described?

17 A    I wouldn't characterize it as part of the marketplace so I

18 don't know how to answer that.

19 Q    They were participants in the marketplace?

20 A    Certainly are.

21 Q    Oh yes.  I believe we've heard for two weeks now most

22 cases in the tort system stuff?

23 A    Yes.

24 Q    And in settling a case I believe you said that Grace and

25 indeed any defendant would strive to pay its several share, is

1  that correct?

2  A    At most yes.

3  Q    That's what the goal was was to pay a several share?

4  A    Yes, they wanted to pay a fraction of the overall

5  liability.

6  Q    And it's true, isn't it, that defendants are successful

7  almost all of the time in paying their several share?

8  A    Yes, unless they're a sole defendant or they get a

9  judgment against them and they can't pass off some of that

10  liability.

11  Q    Okay.  And just to be clear about what we're talking about

12  when we're talking about a several share, I believe you said

13  it's a descriptive term and it's several as in joint and

14  several?

15  A    Yes.

16        THE COURT:  I'm sorry, it's several in what?  I

17  couldn't hear you.

18        MR. CASSADA:  As in joint and several.

19  A    Yes.

20  Q    And would you agree that I mean within the marketplace and

21  settlement your definition a several share is a -- it's a

22  partial share of the entire liability that once you've divided

23  that amongst the various responsible defendants would be

24  attached to the particular defendant that you're talking about?

25  A    Yes, although normally it's an informal matter.  It's not

1  formally determined.  But yes, I think that description is

2  accurate.

3  Q    And when the parties are trying to determine a several

4  share they're looking -- they're anticipating what might happen

5  if the case were tried?

6  A    In the long term, but again there's a marketplace for

7  that.

8  Q    Yeah.

9  A    I mean the law -- the defendants tend to know -- well,

10 they tend to know what's expected of them by plaintiff's

11 lawyers.  They may not know what other defendants are paying.

12 They don't get together and talk about that.  But they tend to

13 know -- they come to have a certain share and that share is a

14 partial share and has a number of ways that it gets built that

15 share.

16 Q    But the parties are anticipating what several share may be

17 attached to them if the case were to go to trial?

18 A    They're practices -- practices, norms, just expectations

19 that Grace has as to how much it's going to have to pay for a

20 particular kind of case to a particular lawyer in a particular

21 jurisdiction and the plaintiff's lawyers on the other hand have

22 their own expectations and usually they've done it enough they

23 know what the going rate is.

24 Q    Okay.  Okay.  But you would agree that the parties are

25 anticipating what might happen at trial?

**J&J COURT TRANSCRIBERS, INC.**

1  A     In theory in some cases the closer you get to trial the

2  more that's true, but the process almost has a life of its own.

3  Q     Now when -- in a case in the tort system when there are

4  multiple responsible defendants the more defendants you have

5  the lower a particular defendant's several share would be in a

6  particular case, is that correct?

7  A     Not necessarily.

8  Q     Not necessarily.

9  A     It depends on who the defendants are, what the

10  jurisdiction is.

11  Q     Well, as a general rule the more defendants there are --

12  the more solvent responsible defendants there are in a case the

13  lower any single defendant would expect to pay to settle the

14  case?

15  A     It depends on who the co-defendants are.  If it's a bunch

16  of A.P. Green's, having five A.P. Greens isn't as significant

17  as having Owens Corning as a co-defendant.  So I mean there

18  isn't -- you can't make simple numerical comparisons.  It

19  depends who they are.  It depends on the jurisdiction.  It

20  depends on the occupation.  There are a lot of factors that go

21  into it.

22  Q     But if it were a bunch of the big companies like the ones

23  you described that went into bankruptcy, the more of them you

24  had before 2001 the lower you would expect your several share

25  to be, correct?

1 A    In general.  But remember, I'm forecasting averages.  I

2 mean I'm not talking about specific cases.

3 Q    Let me ask you about the importance of the extent of

4 exposure to a product to the settlement value of a case.  Is --

5 would it be true that the more extensive exposure was to a

6 particular product the more valuable the claim would be against

7 the defendant responsible for that product?

8 A    It isn't a straight line relationship.  A claim with a lot

9 of exposure would have higher value than a claim with

10 questionable exposure.  If you have a lot of exposure your

11 settlement value may not -- I mean it may or may not be

12 affected by some additional exposure to Grace, but there is

13 some relationship.  It's just not a clean one.

14 Q    So then so long as some minimum threshold of exposure

15 exists the extent of the exposure above that may not be

16 important?

17 A    It's important, it's just it isn't as -- you know, it's

18 just -- it's a chunky kind of relationship, I'll leave it at

19 that.

20 Q    You said earlier that the defendants generally knew what

21 each other were paying when they were involved in --

22 A    They tend not to know that.

23 Q    They tend not to know that.

24 A    They have an idea, but they -- one defendant doesn't

25 generally want another defendant to know how much they 're

1  paying.

2  Q    But when the same -- when defendants are in a case they

3  generally know what other defendants are paying to settle a

4  case?

5           MR. FINCH:  Objection, misstates the prior answer.

6           THE COURT:  Yes.  He just said no to that same

7  question.

8           MR. CASSADA:  I asked a different question, I asked

9  generally.

10  A    Again --

11           THE COURT:  Generally in a non asbestos litigation

12  case does the codefendant know what the other codefendants are

13  paying to settle, is -- I just -- I'm not sure I understand the

14  question.  I'm sorry.

15           MR. CASSADA:  I asked him wasn't it true that

16  defendants in asbestos cases had general knowledge, not

17  specific, but knowledge generally about what the share of a

18  particular case other defendants have.

19           THE COURT:  You can answer if you know, Doctor.

20  A    Yes and no.  They would know who the big players are, but

21  again I mean Owens Corning's share for one kind of industrial

22  exposure would be different from another.  So they may know

23  that Owens Corning was a pretty big player and expect they

24  would make a significant contribution, but that will differ

25  from case to case, jurisdiction to jurisdiction, law firm to

1 law firm.  So other -- beyond that kind of very general, as you

2 say, expectation I don't think there's much precision to that

3 knowledge.

4 Q    But I mean there's a meaningful amount of knowledge that

5 each defendant has about what other defendants are paying to

6 make a difference?

7 A    I think I've just described that.

8 Q    All right.  Let me ask you this.  I want to ask you then

9 about an answer you gave during a deposition on November 1,

10 2007.

11        MR. CASSADA:  Your Honor, this deposition was

12 included among confidential materials and came to my possession

13 after I signed a confidentiality agreement.  I don't know if

14 the material --

15        THE COURT:  Could you show counsel and see.

16        MR. FINCH:  Objection, Your Honor.  I don't think

17 this is proper impeachment to --

18        THE COURT:  I don't know what it is yet, Mr. Finch.

19        MR. FINCH:  Objection, Your Honor.  This is still not

20 proper impeachment.  It's consistent with what he just said.

21        MR. CASSADA:  I haven't gotten there yet, Your Honor.

22        THE COURT:  All right, I'll wait until you get there.

23        MR. CASSADA:  Okay.

24 Q    All right.  Dr. Peterson, you recall your deposition on

25 November 1, 2007?

1  A    I recall I was deposed.  I certainly don't recall

2  everything I said.

3  Q    Oh I understand that.  I wouldn't expect you to.  But you

4  recall -- I know you recall that it was Mr. Bernick who was

5  asking questions of you.

6  A    I never forget that honor, no.

7  Q    And he put the following question to you and I apologize

8  it's kind of a long question.

9  A    It's Mr. Bernick.

10  Q    Well, in fact, I'll just focus on the last sentence of his

11  question which I think encapsulates his question.

12        "Question:  It is the joint and several liability

13  enabled the individual claimant to obtain settlements that

14  reflected an individual defendant's risk of joint and several

15  liability?"  You see that?

16  A    I have no idea what that means.

17  Q    Well, there was an objection.  And then you said --

18        "Answer:  Well, Grace only pays its several

19  liability.  It's not going to make a payment because Owens

20  Corning is also liable or Turner & Newell is also liable.  They

21  pay for a share.  You referred earlier to a marketplace of

22  settlements and I agree that's what this world is, it's a

23  marketplace.  The marketplace for Grace's claim is to pay for

24  it's share of liability.  Theoretically it may have a joint and

25  several liability in some jurisdictions if you go all the way

1 to trial and that's a consideration that both the lawyer and

2 Grace might take with regard to the decision about whether or

3 not to settle or take a case to trial.  But settlements are

4 invariably or almost invariably determined by this marketplace

5 which is based upon this several -- "

6 A    I'm sorry, could you move the page up so I can see the

7 "but".

8 Q    I'm sorry.  Yes, I sure will.  Thank you for -- "but

9 settlements" -- where did I leave off?

10 A    The but.

11         THE COURT:  Line 14.

12 Q    Okay.  Question, "But settlements are invariably or almost

13 invariably determined by this marketplace which is based upon

14 the several liability of a company, what share of the whole it

15 historically has."  Question, "Well, but no company knows what

16 its several share is in the tort system, correct?"  Answer,

17 "They know they're doing right."  Question, "No, but they don't

18 know what other -- "

19 A    Pull it up, please.

20 Q    " -- no, but they don't know what other people are paying

21 so they don't know what their several -- they don't know their

22 several share, correct?"  Answer, "They know what other people

23 are paying."

24         And then Mr. Bernick asks you to name a single

25 company and you said, "No company -- well a several share is

1  something that gets determined by a jury in any event at the

2  end so you have to anticipate that.  But, in any one case when

3  you're settling it you may not know precisely how much is being

4  paid in that case by the defendants, but there is a knowledge

5  within the industry of the relative amounts of money that

6  people are paying."  Did I read that correct?

7  A    You did.

8  Q    Okay.

9          MR. FINCH:  Your Honor, under the rule of

10  completeness, read the next Q and A, please.

11          MR. CASSADA:  Sure.  Can he do that on redirect or

12  would you like me to do it?

13          THE COURT:  He can do it on redirect.

14          MR. CASSADA:  Okay.

15          MR. FINCH:  Your Honor, it's also not inconsistent

16  with what Dr. Peterson said in response to his questions.  It's

17  improper impeachment.

18  Q    That is your testimony, is that statement fair and

19  accurate today?  Is that testimony fair and accurate?

20  A    I think the way I characterized in response to your

21  questions is probably a more appropriate description of it.  I

22  wouldn't argue greater than what I said, I think I was just a

23  bit more precise in what I testified to you and I prefer that

24  explanation.  But I'm not going to disavow that testimony.

25  Q    You're not disavowing it and there's nothing you're

1 changing here today, I take it?

2 A    I think I clarified it.

3 Q    And we talked earlier about your testimony regarding the

4 bankruptcies of the big defendants that affect your analysis of

5 Grace's claim values.  Generally the bankruptcies would tend to

6 push settlement values up, is that correct?

7 A    Bankruptcy of Company A if it's a sufficiently significant

8 company may affect the values of Company B, yes, increasing

9 them.

10 Q    Yes.  And in fact, you testified that that's what happened

11 as it related to Grace in 2001 and that's what would have

12 continued to happen through the current date, correct?

13 A    Well, what I testified to is the almost simultaneous

14 bankruptcies of eight other defendants drove it up.  Now, if

15 Grace had just gone into bankruptcy alone would the values paid

16 by Turner & Newell have gone up.  Certainly not as

17 significantly as they did when all the other companies went

18 into bankruptcy.  So there may be some effect on the bankruptcy

19 created by a particular single company, but it's the joint

20 effect of all of these that was the important thing.

21 Q    All right.  So the more companies that file for bankruptcy

22 the more the remaining defendant's settlement values will have

23 upward pressure?

24 A    Not necessarily.

25 Q    Not necessarily.  So the fewer bankruptcies that are filed

1 -- the number of bankruptcies of major targeted defendants that

2 we're talking about?

3 A    That's a different question.

4 Q    Okay.  Well, let's talk about the more of these targeted

5 defendant bankruptcies there were the higher values went up for

6 the remaining defendants?

7 A    Yes, on average, but not necessarily in a particular case

8 or even for a particular other defendant.  But yes, generally

9 that's the effect.

10 Q    And so the idea there is that these bankruptcies affected

11 the several share as determined in the marketplace at

12 settlement?

13 A    It would be reflected in the perturbations in the

14 marketplace.  It would change, perhaps, again depending upon

15 who went into bankruptcy and all the kinds of factors I've been

16 answering for the last half-hour.

17 Q    Okay.  Is it true that many of these defendants who went

18 into bankruptcy have since emerged from bankruptcy with trusts

19 established to process and pay their claims?

20 A    Yes, that's true.

21 Q    And wouldn't the same principles that pushed settlement

22 values up result in at least some downward pressure on

23 settlement values where the defendant's coming -- with these

24 trusts having emerged and begun to pay claims?

25 A    I don't think so for three reasons.  One is that the once

1  a share of your client's company or any company -- once it goes

2  up it's hard to pull it back down.  Plaintiff's lawyers are

3  reluctant to reduce their demands.  And so it's like paying for

4  gas prices.  I mean they tend to move in one direction and

5  sometimes they'll go back down, but they're sticky.  Secondly,

6  is that the empirical evidence is that it doesn't happen.  When

7  Manville went into bankruptcy in 1982, the obligations and

8  payments by other defendants went up greatly, but when Manville

9  came out of bankruptcy in 1988, even though it was paying a

10  hundred cents on the dollar, the values didn't go up.  Whatever

11  those other companies were paying, they continued to pay.  And

12  so that's an example of the first point I made.

13          The third point I make is that these companies are

14  paying very modest percentages and so, if a company was paying

15  a hundred percent of its then market share when it went into

16  bankruptcy and now it's paying 20 percent, it isn't nearly

17  significant of an event.

18  Q    Let's look at the case of Grace just for a moment.  The

19  scheduled value for a mesothelioma claim for Grace under the

20  Trust distribution procedures is $180,000?

21  A    I think that's right.  Yes.

22  Q    And the average value is $250,000?

23  A    Two hundred and twenty-five, I believe.

24  Q    Two hundred and twenty-five.  Okay.  And the projection, I

25  believe, is that the Trust is going to pay 25 to 35 percent of

1  that figure?

2  A    I believe so.

3  Q    Okay.  And when Grace went into bankruptcy, it was paying

4  about $90,000 per claim?

5  A    In 1990 -- in 2001, it was paying between 90 and 97,000

6  yes.

7  Q    Okay.  And so, but then it was after that, its liabilities

8  would have increased because it was going to take on all these

9  other shares but, if you compare the -- assume 35 percent of

10 $225,000, I mean, you're talking not a huge drop from the

11 90,000 Grace was paying when it went into bankruptcy, correct?

12 A    It wasn't paying a huge share when it went into bankruptcy

13 by itself.  Today, if it were -- it still wouldn't be paying a

14 huge share and, on the total value, the joint and several

15 value, of mesothelioma claims are considered -- is considerably

16 higher than what it was in 2001.  So, if it's a 30 percent of a

17 $200,000 payment here, that's a $60,000 payment on a claim

18 that's now more valuable in general than a $90,000 payment on a

19 claim at less value.  So, there is a payment but it's certainly

20 a reduced contribution to the overall liability.

21 Q    And within the marketplace of settlements -- that is,

22 within the tort system -- are the Trust claimants, to your

23 knowledge, are they being processed into that marketplace?

24 A    You mean -- I don't understand your question.

25 Q    Well, these trusts are out and they're paying money to

1 claimants.

2 A    Some are.

3 Q    Is that money being processed into the settlement values

4 determined by the tort system which you've described as the

5 marketplace of settlements.

6         THE COURT:  I'm sorry.  Are you asking whether,

7 rather than the TDP values in the Trust setting the values of

8 the claims and the distribution percentage, something is

9 happening in the tort system to drive that?

10         MR. CASSADA:  I'm asking him -- that's what I'm

11 asking him, Your Honor, and when you paraphrase it to me, I can

12 see that it's not a very helpful question so I'll rephrase it.

13 Q    Are the payments that plaintiffs are receiving in trust,

14 do you know whether they're being processed in the settlement

15 values of the non-bankrupt defendants who are resolving claims

16 within the tort system?

17 A    You're term processed isn't very helpful but I don't think

18 that any defendant really is.  The amount they're paying to a

19 claim is going to be much affected by the trust payments by

20 other trusts that are coming on line now.  I don't think so for

21 reasons I've described earlier.

22 Q    So the effect of the bankruptcies on settlement values, it

23 only works one way?

24 A    It --

25 Q    When they go out, settlement values go up, when they come

1  back out of bankruptcy, and they start -- the Trusts start

2  paying claims, the settlement amounts are unchanged?  Is that

3  your testimony?

4  A    That's the historic experience.  Now, whether there's some

5  -- I'm sure in some cases there's some adjustment.  A defendant

6  will argue that, I don't need to pay you as much money now

7  because you're getting paid by the Owens Corning Trust.  And

8  how much bite that will have depends upon the negotiating

9  tactics and the strengths of the plaintiffs and defendants in a

10 particular case.  It's an argument and it may have some bite.

11 Q    Okay.  Do you know whether plaintiffs who received

12 payments for trusts have an incentive to keep those payments

13 confidential from defendants they're suing in the tort system?

14 A    I haven't thought about that.

15 Q    There are confidentiality provisions in trusts, you're

16 aware of that?

17 A    There are confidentiality provisions for most defendants

18 and for trusts, there's concern because the information being

19 submitted is about sensitive personal material, including

20 medical information.  In general, the information of trusts is

21 confidential as it is for any defendant.

22 Q    But in a -- yeah.  In the tort system, all the defendants

23 know who -- what other defendants were sued, right?

24 A    I'm sorry.  Would you ask that question?

25 Q    In the tort system, all defendants, they know who else is

1 in the case, correct?

2 A    Not necessarily.  Sometimes claims are made without being

3 filed in a lawsuit.

4 Q    Well, if a defendant is sued in the tort system, all the

5 other defendants in the suit are aware of that?

6 A    Sometimes claims are made without being a named defendant

7 in a lawsuit.  There are defendants who pay claims without --

8 Q    I asked a different question.

9 A    -- in fact, specifically wanting to avoid being named and

10 those are not known.

11 Q    I ask a different question now and that is that, when a

12 defendant is sued in the tort system, all other defendants know

13 that that defendant has been sued?

14 A    That's -- yes, I would expect so.

15 Q    When a plaintiff files a claim against the Trust, is that

16 knowledge public information?

17 A    I don't believe so.

18 Q    When a plaintiff provides evidence of Grace exposure to

19 the Trust, is that considered sensitive information?

20        MR. BERNICK:  Your Honor, we've been going on for a

21 while and I'm also concerned about Dr. Peterson being able to

22 get out of here.  I object to relevance.  I don't understand

23 the relevance of this whole line of questioning, what's

24 happening in tort system values and all the like.  I don't

25 think it's relevant to any issue in the case.

1          THE COURT:  What's the relevance?

2          MR. CASSADA:  I'm exploring the marketplace of ideas

3  that Dr. Peterson --

4          MR. BERNICK:  That's marketplace claim values.

5          MR. CASSADA:  Marketplace claim values.

6          MR. BERNICK:  This case used to turn on that kind of

7  thing when it was an estimation case.  It doesn't now.  I don't

8  know what confirmation issues that bears upon.

9          THE COURT:  I don't understand what the relevance is

10  at this point either.  I'll give you some leeway.  This is

11  cross examination, but I'm not certain I understand the

12  relevance either.

13          MR. CASSADA:  Okay.

14  Q    Dr. Peterson, we talked earlier about the projected

15  payment by the Trust under the TDP of 25 percent to 35 percent?

16  A    Yes.

17  Q    Did you have a role in determining that range of payments?

18          MR. FINCH:  Object to form.  The plan in TDP says

19  that the payment percentage will be set by the trustees after

20  the Trust is up and running so it hasn't been set one way or

21  the other yet.

22          THE COURT:  All right.  Do you want to rephrase your

23  question?

24          MR. CASSADA:  But the projected -- yeah.

25  Q    The projected payment, right, is 25 to 35 percent, is it

Peterson - Cross/Cassada                    257

1  not?

2  A    I've heard that number.  I don't know where it appears and

3  it may be just informal discussion and I'm not sure that that

4  captures the range.

5  Q    Did you have any involvement in the calculation of that

6  number?

7  A    I don't believe I had any involvement in calculating that

8  number.  I have provided liability forecasts that are an

9  element of that calculation but I don't think we've done it.

10 Q    Do you have knowledge with respect to whether there's a

11 preferred or most likely point within that range of 25 percent

12 to 35 percent?

13 A    No.

14          MR. CASSADA:  Thank you, Your Honor.

15          THE COURT:  All right.

16          MR. CASSADA:  Thank you, Dr. Peterson.

17          THE WITNESS:  Thank you.

18          THE COURT:  Mr. Pasquale?

19          MR. PASQUALE:  Ken Pasquale for the Unsecured

20 Creditors Committee.

21                    CROSS EXAMINATION

22 BY MR. PASQUALE:

23 Q    Good afternoon, Dr. Peterson.

24 A    Good afternoon, Mr. Pasquale.

25 Q    I know you have a plane to catch.  I'm going to be as

1 quick as I can.

2 A     I appreciate your consideration.

3 Q     I want to focus on your original estimation report.  I

4 understand you were advised of the certain typographical errors

5 but that's what I want to talk about for a few minutes.  Your

6 opinion with respect to Grace's liabilities for the estimation

7 proceeding, that was not the only opinion that was submitted by

8 the parties, was it?

9 A     There were other experts' generated reports and what was

10 done with them formally in the case, I can't tell you.

11 Q     I'm sorry, sir.  I didn't hear.

12 A     Other reports -- I've seen other reports by other experts.

13 Whether they were submitted in any formal sense, I have no

14 idea.

15 Q     Well, you know that Jennifer Biggs submitted a report for

16 the future claims representative, right?

17 A     I know she wrote a report.  I don't know what was done

18 with it.

19 Q     Do you know what her estimate was as you sit here today?

20 A     I don't recall.

21 Q     Well, how about Dr. Florence for Grace?  You know that he

22 submitted an opinion with respect to the estimation, right?

23 A     I do recall that.  Yes.

24 Q     Okay.  And his -- do you recall that his median estimate

25 of Grace's liabilities was $468 million?

1  A    It was something like that, yes.

2  Q    Something in that range?  That's what you recall?

3  A    It was an implausibly low number.  Yes.

4  Q    Implausibly --

5                          (Laughter)

6  A    Yes.

7  Q    Right.  Because your estimate, your most likely estimate,

8  was over $5 billion, right?

9  A    Well, that wasn't why it was implausible, but my estimate

10  was that, yes.

11  Q    Okay.  Now, you recall that, during this bankruptcy case,

12  there was a personal injury questionnaire process, right?

13  A    There was for some claimants, yes.

14  Q    For many claimants, right?

15  A    For some claimants, yes.

16  Q    And you did not quantitatively use any of the information

17  in any of those questionnaires in any way in rendering your

18  opinion with respect to Grace's liabilities, personal injury

19  asbestos liabilities, right?

20  A    I don't think that's correct.

21  Q    Well, we heard your direct testimony today, sir, and

22  personal injury questionnaires never came up in all of your

23  slides and all of your discussion, isn't that right?

24  A    It didn't enter into the calculations about which I've

25  testified but I generated the rebuttal --

1  Q    But my question, sir -- I'm sorry.

2  A    Would you let me answer?

3  Q    Yes.

4  A    I generated a rebuttal report addressing these issues

5  based in part upon that data.

6  Q    My question was, in rending your opinion, did you use any

7  of the information in the questionnaire quantitatively to reach

8  your conclusion?

9  A    The same answer.  Yes with regard to the rebuttal issues;

10  no with regard to my estimation report.

11  Q    Thank you.  And the same question with respect to the

12  proofs of claim.  You're aware that there was a proof of claim

13  process in this case, right?

14  A    Yes, and I discussed that in my report.

15  Q    Discussed it but did you quantitatively use any of the

16  information in the proofs of claim in rendering your opinion?

17  A    I did some, yes.

18  Q    Quantitatively?

19  A    Yes.

20  Q    It had an impact on your conclusion of in excess of $5

21  billion?

22  A    I had quantitative -- yes.  There are payments -- it's not

23  my final opinion.  I didn't use it for calculating the

24  liability for the reasons that I discussed in part because of

25  the quantitative analyses that are in my report.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  Thank you, sir.  You've answered my question.  Now,

2  it's true, sir, isn't it, that you don't quantify in any of

3  your estimation work in this case how much disease was caused

4  or contributed to by Grace, isn't that right?

5  A    That's an impossible task and I haven't sought to do it.

6  Q    Well, my question is you didn't do it, right?

7  A    I didn't do it because it was an impossible task.

8  Q    Okay.  Now, you talked earlier about propensity to sue but

9  went through that pretty quickly and maybe I missed it, but I

10 didn't hear you mention what period you actually applied to the

11 propensity.  What period did you use?

12 A    1999 to 2001 and I actually did testify to that effect.

13 Q    Okay.  I didn't catch the dates.  Thank you.  And I

14 believe you said, in response to a question from counsel on

15 cross examination that, at least with respect to the cancer

16 claims, you kept that propensity constant from 2006 forward,

17 right?

18 A    At the rate it was in 2006, yes.

19 Q    Does the same apply to non-malignant claims?

20 A    No.  Well, the non-malignant forecast was treated

21 differently in the tort report and the Trust report.

22 Q    Okay.  I'm only focused on the tort report.  I'm not

23 interested in the Trust report.

24 A    In the trust, well, we didn't calculate propensity of suit

25 for non-malignant claims.

Peterson - Cross/Pasquale                      262

1  Q    Okay.  Now, with respect to the cancer claims, and

2  mesothelioma in particular, the period you chose for the

3  propensity to sue represents the highest filing period of

4  claims against Grace in its history prior to the bankruptcy

5  case, isn't that right?

6  A    I don't think that every year in that period were the

7  three highest.

8  Q    That's not what I said.  During that -- that represents --

9  let me repeat it -- represents the highest filing period of

10 claims, in 1999 to April 2001, in Grace's pre-petition history,

11 right?

12 A    Yes, they were because they were the most recent years

13 which are the most relevant for forecasting future liabilities

14 and because the trends, the actual trends, were up.  So, it had

15 to be the highest numbers if it was going to be the most

16 relevant data.

17 Q    Well, those are the years you chose and they happen to be

18 the highest numbers, correct?

19 A    For the reasons that I said, yes.

20 Q    Okay.  Understood.  Now, you would agree with me, Dr.

21 Peterson, that your estimation model attempts to predict

22 behaviors relating to the filing and settlement of claims,

23 right?

24 A    I'm sorry.  Could you repeat that question?

25 Q    Sure.  Does your estimation model attempt to predict

1 behaviors relating to the filing and settlement of claims?

2 A    It attempts to predict the results of the behaviors, not

3 necessarily the behaviors directly.  It predicts numbers of

4 claims which are partly a function of the behavior of lawyers

5 and the law firms and the claimants, victims.

6 Q    And, certainly, your methodology has some limitations,

7 including that you can't speculate about certain future events,

8 right?

9 A    Presumably any expert report can't speculate and so, no, I

10 don't do that.

11 Q    Okay.  And some of the future events that you cannot

12 predict in the future includes legislative changes, right?

13 A    Oh, God, no.  I can't --

14 Q    No, you can't predict?

15 A    I can't predict future legislative changes.  I don't know

16 who can.

17 Q    Right.

18 A    I know who tries but I don't know that anyone can.

19 Q    Now, sir, would you agree with me that the maximum period

20 of time that any -- I believe you called it the standard

21 estimation model earlier in your testimony, right?  Is that --

22 let me withdraw that question.

23 A    That's a term I've used.  Yes.

24 Q    And that term applies to the methodology that you

25 described to us today, right?

**J&J COURT TRANSCRIBERS, INC.**

1  A    That I and many people use.  Yes.

2  Q    Okay.  Would you agree with me that the maximum period of

3  time that your standard estimation model can reliably predict

4  changes in claiming and claim resolutions is six or seven

5  years?

6  A    I don't have that opinion.

7  Q    You don't have that opinion?

8  A    No.

9  Q    I show you -- the ELMO please -- the bottom of the page.

10  This is from your deposition on November 1st, 2007 and, you

11  know what, I'm going to do this differently.

12           MR. PASQUALE:  If I may, Your Honor.

13                        (Pause)

14           MR. PASQUALE:  Do you mind if I --

15           THE COURT:  Yes.

16           MR FINCH:  Object to form, Your Honor.  It's a

17  different question in the deposition than what he just asked.

18           THE COURT:  Thank you.  He just retracted the

19  question and said he's going to do it differently.

20                        (Pause)

21  Q    Dr. Peterson, would you turn to Page 46, please?

22  A    Yes, I have that.

23  Q    Okay.  You were asked the following question by Mr.

24  Bernick at your deposition, the following questions, and you

25  gave these answers.  Question:  Can you --

1  A    Could you tell me the line you're starting at?

2  Q    Yes.  I'm sorry.  Of course.  It's Line 11 on Page 46.

3  A    Thank you.

4  Q    "Can you identify any scientific model, Dr. Peterson, that

5  has been shown reliably to predict changes in the legal

6  environment?  Answer:  What do you mean by the legal

7  environment?"

8  Q    Question:  "Law suits being filed and litigated, claims

9  being filed and litigated, claims being presented settled.  Do

10 you know of any scientific model that has been demonstrated to

11 reliably predict changes in the legal environment?"  There's an

12 objection.

13       MR. FINCH:  Object to form.  Compound.

14 Q    "Over modest periods of time, there have been models of

15 claiming and claim resolutions that have reliably predicted

16 subsequent changes.  Yes."

17      "Okay.  What's the maximum period of time?  Six years,

18 seven years."

19 Q    Were you asked those questions and did you give those

20 answers under oath, sir?

21       MR. FINCH:  Objection, Your Honor.  It's a different

22 question than what he asked him.

23       THE COURT:  It is.  That's sustained.

24       MR. FINCH:  It's a completely different question.

25       THE COURT:  It is a different question.  You asked

1 him initially about whether the model could reliably predict

2 changes in claims and claims resolutions over six or seven

3 years, not changes in the legal environment.  It is a different

4 question.

5          MR. PASQUALE:  Well, Your Honor, his testimony here

6 under oath was over modest periods of times, there have been

7 models of claiming and claim resolutions.  This is starting on

8 Line 21, Page 46 --

9          MR. FINCH:  Your Honor, the --

10          MR. PASQUALE:  -- that have reliably predicted

11 subsequent changes.

12          MR. FINCH:  Your Honor, the question was changes in

13 the legal environment.

14          THE COURT:  Legal environment.  It's a different

15 question.  The objection is sustained.

16          MR. PASQUALE:  All right.  I'll move on.

17 Q    Dr. Peterson, in your estimation work here with respect to

18 Grace, you predicted increases -- well, strike that.  In the

19 estimation work you originally did with respect to the

20 estimation proceeding, with respect to your prediction of

21 non-malignant claim filings in the future -- sorry.

22 A    I'm sorry.  I don't know --

23 Q    I'll try that one more time.

24 A    I don't understand the reference to --

25 Q    Bad question.  I'm going to try one more time.  You

1 predicted at the time of your estimation report that

2 non-malignant claim filings would be at a particular level,

3 right?

4 A    The 2007 report?

5 Q    Yeah.  Um-huh.

6 A    We based our -- we had a particular forecast for

7 non-malignant claims at that time based upon the information we

8 had at that time.

9 Q    And you predicted, did you not, that non-malignant claims

10 would increase in the future from that point in time, didn't

11 you?

12 A    2007?  I don't believe so.

13 Q    Do you recall -- I think we're going to do it again.

14 Let's look at your deposition, Dr. Peterson.  Let's look at --

15 let's start on Page 70, please, Line 12.  Just to save time,

16 there was a very long question from Mr. Bernick before that but

17 it's really your answer I want you to focus on.  The question

18 in Line 12, starting on Line 12, "What is that scientific

19 methodology?" and that refers to Mr. Bernick's prior question

20 that begins on the bottom of Page 69.  And you give a rather

21 long answer, Dr. Peterson, but I'll read it.

22 A    "Well, the methods that I used, if you have reason,

23 non-speculative reason to anticipate that event is going to

24 occur, and you understand what the effect of that event is, you

25 can predict it.  I'll give you an example.  We know that the

1  asbestos Trust, a lot of asbestos bankruptcy plans, are going

2  to be confirmed and, when they get confirmed, they're going to

3  provide a lot of money for compensation of asbestos victims.  A

4  substantial amount of that money will go to non-malignant

5  claimants.  As a result of that, there will be an increase in

6  the level of non-malignant claim filings in future years from

7  what we see now.  Of course, there's going to be money to

8  compensate victims.  Victims and plaintiffs' lawyers will file

9  claims.  They'll engage in the expense necessary to develop the

10  claims to meet those claims and they'll file.  We can

11  anticipate that.  That's a prediction.  You can come back and

12  ask me that in six years.  I can anticipate that."

13  Q    Were you asked that question and did you give that answer?

14  A    Well, I gave that answer but, again, it isn't what you

15  asked me about before.  This is a hypothetical discussion.  We

16  don't know if that's true yet.  Is that --

17  Q    You made a prediction, didn't you, Dr. Peterson?

18  A    Excuse me.  Would you let me finish my answer?

19       MR. FINCH:  Objection, Your Honor.  Let the witness

20  finish, please.

21       THE COURT:  He's going to finish.  Go ahead, Dr.

22  Peterson.

23  A    This is a -- it's a prediction.  There's still reason to

24  think that may be true.  In fact, I've just gotten e-mails that

25  in the State of Texas, they're now resuming screening so that

**J&J COURT TRANSCRIBERS, INC.**

1  is a -- there are a couple of rules I have about asbestos

2  litigation.  One of them is that claims follow money.  If

3  there's money there, people will want to make claims.  And

4  here's an instance where there's money being set aside and

5  there's every reason to believe that, at some point in time,

6  plaintiffs' lawyers are going to go after that money.  Now,

7  whether or not that's going to occur, we haven't seen yet but

8  that's -- it was never represented in any forecast that I gave

9  for W.R. Grace.  It was a discussion on -- this is a general

10 scientific discussion.  It's not a particular to W.R. Grace.

11 So in answer to your earlier question --

12 Q    Are you finished with your answer?

13 A    -- did I do a forecast of increasing --

14 Q    That wasn't my question.

15 A    -- of increasing non-malignant claims for Grace, no, I

16 didn't.

17 Q    That wasn't my question, sir, but the record will reflect

18 that.  Isn't it true, sir, that in your most recent report

19 concerning the Trust, you reduced by half the number of

20 malignant claims that you forecast for the future?

21       MR. FINCH:  Object to form.  Non-malignant claims or

22 malignant claims?

23       MR. PASQUALE:  Non-malignant claims.

24 A    Yes, for the reasons we have different -- I engage in

25 empirical research.  If the facts change, the forecasts need to

1  change.  We have different facts available to us now, different

2  information about the world than I had in 2007.  It would be

3  unreasonable not to respond to them so we change the forecasts.

4  I have concerns that the claims, the non-malignant claims, may

5  go back up for the reasons I just described about the screening

6  process plus some of the claims filings I'm seeing with trusts.

7              MR. PASQUALE:  Move to strike everything after yes as

8  non-responsive, Your Honor.  That's all I have.

9              MR. FINCH:  Is there anyone else?

10             MR. KOVACICH:  Can I have just a moment to confer

11 with counsel, Your Honor?

12                         (Pause)

13             THE COURT:  Do you folks need a recess?

14             MR. KOVACICH:  I don't have any questions for this

15 witness, Your Honor.

16             THE COURT:  Anyone?

17                         (Pause)

18             THE COURT:  Mr. Phillips?

19             MR. PHILLIPS:  Thank you, Your Honor.

20                    CROSS EXAMINATION

21 BY MR. PHILLIPS:

22 Q    Dr. Peterson, good afternoon.  My name is Bob Phillips.

23 It's a pleasure to meet you, sir.  Just a couple of quick

24 questions.  Dr. Peterson, in your analysis of the pre-petition

25 claim costs, I'll call it, did you try to identify any claims

1  costs that we'd call indirect costs?  In other words, payments

2  that the debtor or the asbestos industry would have had to pay

3  for other than direct payments to injured people?

4  A    Are you talking about contribution claims?

5  Q    Or indemnity.  Either one.

6  A    I don't think we made an independent examination of that.

7  No.

8  Q    And that would mean that you didn't do any estimate of

9  what that indirect -- what I'll call an indirect cost might

10 have been pre-petition?

11 A    The only way it might have been -- it was not made as a

12 separate calculation, certainly not.  It may have been

13 incorporated, depending upon how the database treats an

14 indirect claim.  If it comes in under the name of particular

15 defendant, it may be -- excuse me -- particular plaintiff whose

16 costs are being reimbursed, requested, then it would have been

17 included but not separated.

18 Q    And so, then, may we assume, Doctor, that the numbers, the

19 dollar amount of the claims that will be presented to the Trust

20 according to your estimation doesn't include what we would call

21 indirect asbestos personal injury claims?

22 A    Well, the Trust distribution procedures has specific

23 provisions for dealing in indirect claims within the TDP and

24 essentially what it does is it puts the indirect claimant in

25 the footing of the claimant.  If the indemnification or

Peterson - Cross/Phillips                        272

1  contribution claimant has paid for and gotten a release for the

2  liability of Grace for a particular claimant, then, in effect,

3  that person requesting indemnification contributions has made

4  the claim and that becomes the claimant.  So, it's included in

5  the calculation under the TDP.

6  Q    And if the -- if there is an effect that would allow an

7  indirect personal injury or asbestos personal injury trust

8  claimant to recover more than a direct one, then that wouldn't

9  be included in your estimate, true?

10 A    Well, in principle, they can't recover more because

11 they're standing in the shoes of the plaintiff.

12 Q    Right.  My hypothetical was, if they could recover more

13 than the direct claimant, then your projections don't include

14 those sums, true?

15 A    But you're talking about a different TDP and we didn't

16 make forecasts for a TDP other than the one that's in this

17 plan.

18 Q    I'll just try it once more.  Can you assume for a moment

19 that an indirect asbestos personal injury trust claimant could

20 recover more than a direct one?  Can you assume that fact for

21 just a second?

22 A    I can't and do a forecast involving this TDP.  It's

23 logically impossible to do.  It doesn't happen.

24 Q    And you didn't do that here?

25 A    I didn't do that.

1  Q    Thank you.

2            MR. PHILLIPS:  No further questions.

3            THE COURT:  Anyone else?  Mr. Finch?

4                    REDIRECT EXAMINATION

5  BY MR. FINCH:

6  Q    Dr. Peterson, do you have -- you were asked some questions

7  about Mr. -- by Mr. Pasquale about your projection of future

8  non-malignant claims that Grace would face if it hadn't gone

9  into bankruptcy.  Do you recall those questions?

10 A    I recall those questions.

11 Q    Do you have your estimation report in front of you?  It's

12 Plan Proponent's Exhibit 199.

13 A    I do.

14 Q    Could you turn in that report --

15            MR. FINCH:  Can I have it on the screen, please?

16 Q    Turn to Page 67.

17 A    I have that.

18 Q    It's the wrong page.  That page right there.  How many

19 claims, non-malignant claims, did Grace receive in the year

20 2000?

21 A    40,079.

22 Q    How many non-malignant claims did Grace receive in the

23 first quarter of 2001?

24 A    30,292.

25 Q    Could you turn to the very last page of that same exhibit,

1 Table C-3?

2 A    Yes, I have that.

3 Q    How many non-malignant claims did your estimate forecast

4 that Grace would -- would be filed against Grace beginning in

5 2002?

6 A    29,419.

7 Q    And of that number, how -- approximately how many did you

8 project would be paid?

9 A    Approximately less than 40 percent.

10 Q    And so is it true that you projected a declining number of

11 non-malignant claims compared to what Grace's actual historical

12 experience had been?

13 A    Yes.  It was a decline.

14         MR. FINCH:  Could I have the ELMO?

15 Q    Does this chart show the relationship between Grace's past

16 non-malignant claims and its future non-malignant claims?

17 A    Yes.

18         THE COURT:  Can you -- what was the exhibit number,

19 please?

20         MR. FINCH:  It's Plan Proponent's Exhibit 178B, Slide

21 51.

22 A    Yes, it shows that.  It shows also the number of

23 compensable claims forecast as compared to the historic

24 compensable claims which is lower in all years since about

25 1994.

1  Q    Do you recall that Mr. Pasquale also asked you a question

2  about -- some questions about Dr. Florence's estimate done for

3  Grace in the estimation case?

4  A    I do.

5  Q    You said that you found that estimate implausible.

6  A    I did.

7  Q    Can you explain why?

8  A    Well, it used a method that was unique to that one work.

9  It was based upon -- the whole estimate liability was based on

10 the values of five mesothelioma claims.  That was the basis for

11 valuing all of the hundreds of thousands of claims that might

12 be filed and it was based on data from the proofs of claim that

13 were recorded by contractors for the debtor which we found to

14 be quite incomplete and inaccurate.  And if you use accurate

15 data, the liability forecast, by including people that should

16 have been counted in this forecast, in calculating value, the

17 liability would have been far higher.  There are lots of

18 reasons.  It's basically unreliable.

19 Q    And did you express those opinions in a rebuttal report at

20 the time?

21 A    I did.

22 Q    Finally, Dr. Peterson, lawyer for Garlock -- and I

23 apologize --

24 A    Mr. Cassada.

25 Q    Excuse me?

Peterson - Redirect/Finch                      276

1              THE COURT:  Mr. Cassada.

2  Q    Mr. Cassada asked you some questions about co-defendant

3  settlements.  Do you recall those questions?

4  A    Yes.

5  Q    In your direct examination, you testified that you -- for

6  purposes of your work, you couldn't get access to data from

7  defendants that are still in the tort system.  Do you recall

8  that testimony?

9  A    Yes.

10  Q    Do you have an understanding whether or not defendants

11  that are still in active tort litigation, asbestos defendants,

12  keep their settlement data confidential?

13  A    Yes, I have an opinion.

14  Q    Not an opinion.  Do you know one way or another?

15              MR. CASSADA:  I object.

16              THE COURT:  You need to use a microphone.  The

17  question is, does he know whether they keep their settlement

18  data confidential; that is, the co-defendants in the tort

19  system.  It's a do you know.  The objection is overruled.

20  A    Yes.

21              MR. CASSADA:  Well, the objection was on the basis of

22  the scope of the cross.  It's outside the cross.

23              THE COURT:  No.  I think this is in the scope.

24  Overruled.

25  Q    Do you know?

**J&J COURT TRANSCRIBERS, INC.**

1  A    I know and they don't want anyone else to see it.  They

2  protect that very vigorously and aggressively.

3  Q    And --

4            MR. FINCH:  Nothing further, Your Honor.

5            MR. PASQUALE:  No recross, Your Honor.

6            MR. KOVACICH:  That's all I have.

7            THE COURT:  Mr. Bernick?

8                    RECROSS EXAMINATION

9  BY MR. BERNICK:

10 Q    Mr. Pasquale is here.  He asked you some questions on

11 behalf of the Unsecured Creditors.  And so do you remember that

12 he asked you questions about your methodology?

13 A    I do recall that.

14 Q    Okay.  And, in particular, he confronted you with

15 questions that you had been asked in connection with the

16 deposition about the how far out the methodology had been

17 proven, do you remember that?

18 A    I just don't think that was his question.

19 Q    Well, something like that, but it can only -- you've only

20 been able to ascertain the reliability of the methodology by

21 verifying it against empirical facts, at least as concern

22 changes in the legal system, for about seven years?

23 A    I don't even think that was accurate.

24 Q    Okay.  Well, I --

25 A    It asks -- I said that you could only go out for a modest

1 period of time and he asked me to quantify modest but I wasn't

2 stating you could only forecast some things for six or seven

3 years.  It's too specific and actually mis-describes my

4 testimony.

5 Q    Okay.  And I certainly didn't intend to do that.  Do you

6 also recall that he asked you some question regarding basically

7 words to the effect that your methodology doesn't use the --

8 didn't use the PIQ questionnaire data.  Do you remember that?

9 A    Yes.

10 Q    Now, your methodology -- he then asked you about some

11 other people that had submitted expert or estimates, expert

12 estimates, in connection with the estimation process.  Do you

13 remember that?

14 A    Yes.

15 Q    And he asked you in particular about Mr. Florence, right?

16 A    Yes.

17 Q    And Mr. Florence had a different method?  Fair?

18 A    Yes, he certainly did.

19                      (Laughter)

20 Q    Well, I think you're going to want to get me to wind the

21 clock back here, Dr. Peterson.  This afternoon will last a lot

22 longer.

23 A    Whatever you want, counsel.

24 Q    Okay.  So, we had your methodology that you used and then

25 he asked you -- Mr. Pasquale asked you about Ms. Biggs.  Do you

1 remember that?

2 A    I do.

3 Q    And, so, we have Peterson, Biggs.  We have Florence who

4 uses the different method.  But then we have a Chamber in here

5 for the second slot that's not filled.  That Chamber is who?

6 A    Who were experts that didn't submit reports?

7 Q    Oh, no.  It hasn't been mentioned here but has the name

8 Chambers.

9 A    Well, Dr. Chambers.

10 Q    Okay.

11        MR. PASQUALE:  Objection, Your Honor.  Lacks

12 foundation.  Misstates the record.

13 Q    Did Dr. Chambers --

14        THE COURT:  Wait.  I'm sorry.

15        MR. BERNICK:  Strike that.

16        THE COURT:  I think he's being asked whether there

17 was yet another expert.

18        MR. PASQUALE:  And another expert report.

19        THE COURT:  Yes.

20        MR. PASQUALE:  And it lacks foundation.  Mr. Bernick

21 is heading down a path where he's incorrect.

22        THE COURT:  Okay.  There is no other expert report?

23        MR. PASQUALE: Your Honor, I don't want to testify as

24 others have done in this courtroom but Ms. Chambers submitted a

25 rebuttal report, did not give her own opinion.  She simply

1  responded to others.

2             THE COURT:  Okay.

3             MR. BERNICK:  Okay.  Well, I'll accommodate that

4  concern.  I think Mr. Pasquale is perhaps technically accurate.

5                      (Laughter)

6             MR. BERNICK:  I didn't mean that with disrespect.  I

7  think he's being right.

8  Q    So, but Mr. Pasquale representing the unsecured creditors

9  didn't mention the Chambers report?

10            MR. BERNICK:  Is that okay?

11 Q    He didn't mention the Chambers report, right?

12 A    I only recall a Chambers rebuttal report.

13 Q    Right.  But he didn't ask you about the Chambers report

14 just now on cross?

15 A    I don't believe -- I never saw one.

16 Q    Okay.  Did you review any work by Dr. Chambers in this

17 case?

18 A    I reviewed her rebuttal report.  I reviewed her

19 deposition.  I don't recall if I reviewed anything else.

20 Q    Okay.  So, you reviewed Ms. Biggs's work?  You reviewed

21 Dr. Chambers's work and you reviewed Dr. Florence's work,

22 right?

23 A    Yes, some of it.  Yes.

24 Q    Okay.  Now, your own analysis uses a -- adopts an approach

25 which uses historical settlement values and makes projections

1 based upon propensity to sue and historical settlement values?

2 Is that roughly fair?

3 A    Yes.

4 Q    Is there a short way of referring to that methodology?

5 A    It's not really quite past his prologue but it's past and

6 current his prologue.

7 Q    Settlement, past settlement, and propensity, and then you

8 project the future based upon the past and part of the backbone

9 for the future is the epidemiological curves, correct?

10 A    Yes, plus looking at a period of time that's the future

11 for purposes of the forecast but we already know what happened.

12 We have perfect vision on that.

13 Q    Now, Ms. Biggs, how did her methodology compare to yours?

14 Was it the same or different?

15 A    She used generally the same method but there are

16 substantial differences and I don't -- I haven't reviewed it

17 recently and don't feel I can testify about it.

18 Q    Okay.  But does she also use past settlement and

19 propensity?

20 A    She does.

21 Q    And does she also use epidemiology to provide the

22 backbone?

23 A    Yes, she does.  They have their own epidemiological

24 forecast that --

25 Q    So, we've now got two folks who basically take the same

1 kind of approach?  Fair?

2 A    Yes.

3 Q    What about Ms. -- Dr. Chambers?  I know that Mr. Pasquale

4 points out correctly that there was no independent estimate

5 that Dr. Chambers did.  But the question to you is, does she

6 take the same or different approach in that she too uses

7 epidemiology?

8 A    Well, she says in her rebuttal report that she agrees with

9 regard to the basic methods that I use.

10 Q    Okay.  Does she also look to past settlement and past

11 propensity?

12 A    Yes.

13 Q    Would it be fair to say that if we want to look at the

14 estimation, three out of the four experts who did work on

15 estimation, including the expert retained by the unsecured

16 creditors themselves, all followed the same basic methodology?

17 A    As I would recall, I would say that all of us used a

18 version of the standard approach.

19 Q    So, to the extent that Mr. Pasquale is suggesting that

20 your methodology is different and subject to question, because

21 the PIQ data wasn't used, could that criticism also be lodged

22 against Ms. Biggs and Dr. Chambers?

23          MR. FINCH:  Objection to form.  Lacks foundation,

24 Your Honor.

25          DEPUTY CLERK:  Use the microphone.

1          MR. FINCH:  I thought I was.

2          THE COURT:  There was an objection to the form and

3    lacks foundation.

4          MR. BERNICK:  Well, okay.

5    Q    The question that was raised or the observation that was

6    made -- let's just make it that way.  The observation that was

7    made that you didn't rely upon the PIQ data, could that same

8    observation be made by two other experts in the case, including

9    the expert retained by the unsecured creditors?

10         MR. FINCH:  Same objection, Your Honor.

11         THE COURT:  I don't know if he knows.

12         MR. BERNICK:  I would ask if he knows.

13   A    I don't think I know about what Dr. Chambers would have

14   done with that because she could have used that somehow in the

15   standard method and I don't recall what Dr. Biggs said.

16   Q    Okay.  Fair enough.  The idea of using -- Mr. Pasquale

17   also asked you about which years you use for your calibration

18   period; that is, 1999 through, I think it was, '01.

19   A    Yes.

20   Q    Okay.  Ms. Biggs, did she have a calibration period?

21   A    Yes, but I don't recall.  Oh, yes.  I think it was the

22   same period.

23   Q    What about Dr. Chambers?  Do you remember if she had a

24   calibration period?

25   A    She, for some purposes, she went back to 1994. I think

1  that might have been for values but not propensity to sue.  I

2  don't recall the propensity to sue.

3  Q    Does the calibration period, if she went back to '94,

4  given the curves that you showed that went up precipitously in

5  the '98 to '01 period of time, if she went back all the way to

6  1994, what effect would that have on the calculation in the

7  case of Grace?

8           MR. PASQUALE:  Objection, Your Honor.  The witness

9  said he didn't recall what Dr. Chambers did.

10          MR. BERNICK:  I just said if she did.

11          THE COURT:  He said that he believes she went back to

12  1994 but with respect to values, not propensity to sue.

13          MR. BERNICK:  Same thing.

14  Q    Would that have an impact on the calculation?

15  A    Well, yes.  It would be -- it's an out-of-date era.

16  Asbestos litigation has changed in many ways and repeatedly.

17  It would be like trying to estimate the amount of teenagers

18  using telephones by looking to an era before there were

19  iPhones and such devices.  It just isn't pertinent.  It's not

20  relevant to the task here which is to forecast the future.

21  Q    Okay.  So, let's in fairness say, okay, let's focus on Dr.

22  Florence.  The real novelty in the estimation trial, was it or

23  was it not the approach that Dr. Florence took?

24  A    It certainly was novel.  I would say it's the real

25  novelty.  It was the outlier.  It was the --

1  Q    It was the outlier.

2  A    It was the unusual.

3  Q    And it was our position, we felt, totally grounded in the

4  law, science in fact, and we said those things and meant those

5  things.  But in the history of estimation --

6  A    Really?

7  Q    Absolutely.  In the history of estimation, has there ever

8  been an asbestos case that adopted the approach that Dr.

9  Florence adopted in connection with his work on the estimation?

10         MR. PASQUALE:  Objection, Your Honor.  Lacks

11  foundation.

12         THE COURT:  Well, if he knows.

13  Q    If you know?

14  A    I know of none.  I know of most estimations, perhaps not

15  every one.  None that I know of have used that method.

16         MR. BERNICK:  Nothing further, Your Honor.

17         THE COURT:  Anyone else?

18         MR. PASQUALE:  No recross from me, Your Honor.

19         THE COURT:  Any recross?

20                    (Pause)

21         THE COURT:  You're excused, Dr. Fleming.  I'm sorry.

22  Dr. Peterson.  I'm sorry.

23         THE WITNESS:  Thank you, Your Honor.

24         THE COURT:  Dr. Peterson.

25         MR. BERNICK:  Farewell.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.  Mr. Bernick.

2          MR. BERNICK:  I have a housekeeping matter and then I

3 guess we should probably take up where to go from here.  We do

4 want to tender to the Court an amended demonstrative 507-5

5 relating to Mr. Shelnitz's testimony.  We've now changed the

6 label on slide -- well, it is 507-5 so it now is called -- now

7 is renamed Fresenius National Medical Care Holdings, Inc. and

8 it's 507A and we would offer that into evidence as a

9 demonstrative illustrating the testimony of Mr. Shelnitz.

10          THE COURT:  It's denominated as 507-5A and it is

11 accepted as a demonstrative.

12          MR. PRATT:  No objection, Your Honor.

13          MR. BERNICK:  And with that, I think we're probably

14 -- I know that Mr. Lewis is approaching with his never-ending

15 quest to get some more -- oh, not those.  We're not agreeable

16 to those.  I think probably we could start another witness

17 which would begin really -- I guess the question is, is there

18 any other witness who is going to be called.  We've taken Dr.

19 Peterson as our last witness.

20          MR. LOCKWOOD:  Your Honor, we had requested time to

21 argue the motion in limine on Professor Shein who is going to

22 be flying in tomorrow morning and who --

23          THE COURT:  Yes.  We need to do that.

24          MR. BERNICK:  Yes, and I want to get to that but I

25 want to get -- I'm now kind of reorganizing myself procedurally

1  to where we are in the case, I think with -- Peter, if you

2  could -- I think that with the testimony of Dr. Peterson,

3  subject to some documents that we may want to offer, that the

4  Plan Proponents -- the Plan Proponents are resting this segment

5  of the trial phase?

6          MR. LOCKWOOD:  Yes.

7          MR. GUY:  Yes.

8          MR. RICH:  Yes.

9          MR. BERNICK:  Mr. Rich, that's good enough.  So, I

10 think then the question is whether we start the objector's

11 insurance segment, and I'm not sure what that comprises, or

12 whether we take up some preliminary matters at this point,

13 including a priority matter regarding Mr. Shein.

14         MR. LOCKWOOD:  Mr. Giannotto has that.

15         MR. BERNICK:  Oh, okay.

16         THE COURT:  I think we need to do the argument with

17 respect to Professor Shein because, if he is not going to be

18 called, I thought the idea was to save him a trip here if he's

19 not being called and otherwise to make sure that he gets here

20 if he is being called.  Mr. Giannotto?

21         MR. GIANNOTTO:  Yes, Your Honor.  Michael Giannotto

22 for the CNA Companies.  The insurers who retained Dr. Shein and

23 were proffering him have decided to withdraw him as a witness

24 so there's no need for argument on the motion.

25         THE COURT:  Oh.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. GIANNOTTO:  He will not be testifying.

2          THE COURT:  All right.  Thank you.

3          MR. LEWIS:  Good afternoon, Your Honor.  Tom Lewis

4   for the Libby claimants.

5          THE COURT:  Yes, sir.

6          MR. LEWIS:  We had some matters that were -- I guess

7   the best description, were held in abeyance at the end of our

8   case because we didn't have some things worked out.  One of the

9   matters was we had offered during our case-in-chief, Exhibit

10  LC-27 --

11         MR. BERNICK:  I'm sorry.  Can I just interrupt just

12  one second?

13         MR. LEWIS:  Sure.  Interrupt all you want.

14         MR. BERNICK:  No, no, no.  I know you're here.  I'd

15  like to get clarity if we're going to get into housekeeping

16  stuff, get clarity on the live testimony and, as I understand

17  it, DNSF still wants to consider whether to call somebody live

18  or wants to have that roll over till tomorrow morning, as I

19  understand it, which would be okay with us.  Is there anybody

20  else who intends on the objector's side to call a live witness

21  so that we can at least get that schedule down and then take up

22  the remaining matters?

23                        (Pause)

24         MR. PRATT:  Warren Pratt, OneBeacon and Seaton, Your

25  Honor.  We may end up having to call a live witness but I hope

1  we don't.  It relates to these three exhibits, Mr. Brown's

2  letters, and let me just recap that.

3          MR. BERNICK:  Before -- I'm sorry.  This is exhibits

4  and I really would like --

5          MR. PRATT:  Well, I know, but --

6          MR. BERNICK:  I don't want to argue.  Your Honor, I

7  don't want to argue.

8          THE COURT:  Mr. Bernick, he needs to know whether or

9  not he has to call a witness.  That was the point.

10          MR. PRATT:  That's it.

11          THE COURT:  Go ahead, Mr. Pratt.

12          MR. PRATT:  Thank you, Judge.  At the conclusion of

13  Mr. Fink's testimony yesterday -- now, I don't have the fancy

14  on-line stuff but, according to my notes, the Court directed

15  the parties to confer about trial exhibits and the nature of

16  claims asserted against OneBeacon and Seaton.  And we've

17  reached an agreement.  We haven't handed these up yet because

18  they're exhibits, but we've reached agreement as to, I think,

19  just about everything but not as to these three.  We tried to

20  get them in through Mr. Finke.  That objection was sustained.

21  We tried again with Mr. Shelnitz.  Your Honor ruled that we

22  couldn't authenticate them through that witness but here's what

23  I want to say about it, Your Honor.

24          I don't believe -- first of all, I don't believe

25  there's any real dispute about authenticity.  We could bring --

1 if we're forced to and we have to bring a witness out here, it

2 would take three minutes to do that but --

3          MR. BERNICK:  There is no issue so that's --

4          MR. PRATT:  No issue as to that.

5          MR. BERNICK:  About authenticity.

6          MR. PRATT:  It's the Plan Proponent's own exhibit

7 that we're using and it's offered for a very limited purpose.

8 Mr. Brown conferred with Mrs. Esayian not that long ago, just a

9 little while ago, and I would hope that we could reach an

10 agreement about that.  But if we can't, and we have to bring a

11 witness out here, then we will.  So, that's something that was

12 on our list but I don't know what we're going to have to do

13 about it.

14          THE COURT:  Okay.  So, the issue is you're going to

15 meet tonight to see if you can get an agreement about it?

16          MR. PRATT:  Well, we've already conferred with

17 debtor's counsel and she, I assume, will pass that along.

18          MR. BERNICK:  Very simple.  Pass it along to me.

19 There's no issue that's going to be resolved by bringing

20 somebody in to authenticate the document.  The document is

21 objectionable for the very reasons that we've indicated.  These

22 are the letters, the self-serving -- not self -- these are the

23 letters that were sent on July 8, 2009 to counsel in order to

24 raise certain matters as to which they might have claims.  And,

25 obviously, that's long after the plan was put in.  I don't want

1  to re-engage in the arguments.  Your Honor already has heard

2  enough of the argument and it's not something that's going to

3  turn upon the testimony of a live witness.  But, if it were,

4  Mr. Brown who signed the letter could simply take the stand and

5  supply whatever is necessary.  Mr. Brown is here.  If they want

6  to call Mr. Brown tomorrow morning, that's fine, but it's not

7  going to resolve the objections that we've had nor is it going

8  to elucidate the objections that we had.

9          So, I don't think that there's any fact witness

10 testimony that needs to take place as to which we're going to

11 need to bring somebody in from out-of-town.

12         MR. PRATT:  Your Honor, I'm a little flabbergasted by

13 Mr. Bernick's comment that this couldn't possibly be relevant

14 to anything because it's got his exhibit stickers on it.  But

15 if the idea is --

16         THE COURT:  Lots of things have been marked but not

17 introduced, Mr. Pratt.

18         MR. PRATT:  I understand and we can argue -- we can

19 argue the legal issues.  Is that what it boils down to, Mr.

20 Bernick, in your view?

21         MR. BERNICK:  I think it is a legal issue.  That is

22 correct.  It is a legal issue to the extent if you take this

23 letter at face value -- that is, we assume there is no factual

24 issue but that the letter said what it said -- what its

25 significance is in connection with the confirmation is a

1 relevance issue and I believe that that will turn on the issues

2 that we have in confirmation which is an issue of law.  That's

3 what I think.

4         MR. PRATT:  Well, Your Honor, the argument that we

5 would use this for has already been made in our pretrial brief

6 so I think it's relevant.  You know, maybe the Court doesn't

7 give that weight in the context of this case.  I don't know.

8         THE COURT:  That may be the issue.  If it's relevant

9 to the question of whether or not the plan is illegal because

10 it illegally does something to whatever this claim is -- I

11 haven't read the letters, Mr. Pratt, so I can only speak in

12 pretty broad, general terms since they're not admitted either

13 -- but, so, I don't know what the content in the letter is.

14 But let me assume that the letter says that OneBeacon and

15 Seaton have a certain claim against either Fresenius or Sealed

16 Air and it's raised after the plan has been filed.  The issue I

17 think you're raising is that now, because the debtor's counsel

18 have been made aware of the fact that Fresenius and Sealed Air

19 claim to have -- I'm sorry -- that OneBeacon and Seaton claim

20 to have a claim against Fresenius and Sealed Air, that those

21 claims cannot be properly channeled and/or released and/or

22 whatever the other effect is so that your client can't pursue

23 them against Fresenius and Sealed Air as a result of the plan.

24         MR. PRATT:  Well, close, Your Honor, but not quite.

25         THE COURT:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

1              MR. PRATT:  The -- and let me just start from the

2    ground up.  OneBeacon and Seaton are creditors and the reason

3    is that they have settlement agreements with the debtor.  The

4    debtor agreed in those settlement agreements to indemnify

5    Seaton and OneBeacon if anybody else claimed coverage under

6    policies that fully resolved as to the debtor.

7              THE COURT:  All right.

8              MR. PRATT:  The exercise today with Mr. Shelnitz will

9    show that the entities that are now called Fresenius and Sealed

10   Air are parties.  They signed the settlement agreement so we've

11   got direct contractual recourse on the indemnity claims against

12   those two entities.

13             In addition, and this gets a little complex but it's

14   explained in the letter, the basis for the claim.  I'm not

15   asking -- not offering that for the truth --

16             THE COURT:  Yes, I understand.

17             MR. PRATT:  -- but just for theory.  As to certain

18   environmental claims asserted by Kaneb -- you've heard of the

19   Kaneb claims -- they sought relief from the stay that was

20   preventing them from asserting those claims and that's

21   implicated as well.  And, you know, those claims came up after

22   the plan was filed so, especially as to Kaneb, I don't think

23   that the timing of when this is being raised makes any

24   difference and that's to start with.   But, second of all --

25             THE COURT:  Well, wait.  I need to interrupt because

1 there were two claims by Kaneb and I know I've ruled that one

2 has been disallowed.  It was disallowed long ago in this case

3 and one wasn't filed, or at least one wasn't filed and maybe

4 that's the reason it was disallowed and I'm not sure about

5 that.

6        MR. BROWN:  Well, Your Honor, may I address that --

7        THE COURT:  Okay.

8        MR. BROWN:  -- because I'm more familiar with that.

9        THE COURT:  All right.

10        MR. BROWN:  Your Honor, I think you're correct as to

11 the claims that Kaneb had directly against the debtors.  There

12 had been a proof of claim filed for one and I think there had

13 been a failure to file a proof of claim for the other.

14        THE COURT:  As to the other.

15        MR. BROWN:  That's not what we're talking about.

16 We're talking about the other relief that Kaneb sought in its

17 lift stay motion.  Kaneb had sought relief from the automatic

18 stay in order to pursue certain Grace insurers for coverage

19 and, included among those insurers were OneBeacon and Seaton.

20 And Your Honor denied the lift stay motion without prejudice.

21 The obvious implication is, at some point, they will have the

22 ability to move forward with those claims after plan

23 confirmation against the insurers; not against Grace but

24 against Grace's insurers.

25        THE COURT:  Well, the implication is that as to the

1 claim that was never filed, I don't know how they're going to

2 against debtor's insurers when they can't go against the

3 debtor.

4      MR. BROWN:  They have two theories, Your Honor.  The

5 first of their theories is that they can go against the debtor

6 as a judgment creditor.  The second of their theories is that

7 they are, in fact, a co-insured under the policies and they

8 would not be precluded from pursuing it or at least that is

9 their position, they would not be precluded from pursuing the

10 settled insurers as purported co-insureds under the policy.

11      THE COURT:  All right.

12      MR. BROWN:  And that gives rise -- and, Your Honor,

13 the argument is that that gives rise, and it's explained in the

14 letters, to a misrepresentation claim in connection with an

15 environmental settlement that took place in March of 1997.  And

16 it's explained in the letter.  It did not arise until Kaneb

17 came in and asserted claims in the bankruptcy case which was

18 long after the plan was confirmed or, excuse me, long after the

19 plan was filed.

20      THE COURT:  Okay.

21      MR. PRATT:  Your Honor, obviously, no one is asking

22 the Court to adjudicate that dispute and we're not offering

23 these letters for the purpose of the truth of anything that's

24 set forth in there.  But the reason that we think they're

25 important is that our argument is, our belief is -- now, you

1  know, again, it turned out to be a legal conclusion today when

2  I was trying to probe Mr. Shelnitz on what does the successor

3  claims injunction cover.  You know, I don't know if that's a

4  matter of law.  I don't know if somebody can talk about its

5  purpose or will during the final 1129 phase of this hearing.

6  But we've already briefed the concept.  Our understanding of

7  the plan is that the injunctions and releases cover these

8  claims against third party non-debtors and our argument that

9  we'd like to make, and Your Honor may or may not accept that

10  argument, but we've got a colorable good faith argument to make

11  that the injunctions and releases are overly broad and not

12  lawful. It doesn't have anything to do with the good faith of

13  the plan.  It's just the scope of the injunctions and releases.

14          THE COURT:  Okay.

15          MR. BERNICK:  But just a short observation.  Now we

16  are deep into the weeds which, I guess, is fine.  Your Honor

17  wants to hear this.

18          THE COURT:  No.  I wanted to know whether we needed a

19  witness.  That's how this started.

20          MR. BERNICK:  Yeah.  I don't -- I think it's quite

21  plain that we don't but, be that as it may, I mean, if they

22  want to make some kind of proffer that they believe they have a

23  claim on the basis of some kind of theory, you know, they can

24  go ahead and do that.  The letter is not the appropriate

25  vehicle for doing this.  It's basically a legal argument and a

1 legal assertion.

2          I think that they probably raised this in their trial

3 brief.  I know that they'll raise it post-confirmation so --

4          MR. BROWN:  Well, the --

5          MR. BERNICK:  Excuse me.  It will be laid out but as

6 to how the plan will deal with this kind of claim, that's not

7 going to be resolved by Mr. Shelnitz.  That's not going to be

8 resolved by any witness that's going to be called.  The person

9 they really should have asked that question about, and a lot of

10 I think what we heard asked of Mr. Finke and Mr. Hughes and Mr.

11 Shelnitz, are a bunch of plan interpretation questions that

12 could have been put to Mr. Inselbuch who did respond to those

13 issues when BNSF raised those issues.  He's the one who knows

14 who is prepared to testify about the plan and they didn't ask

15 him any of those questions.

16          Be that as it may, this is an argument that does not

17 have a witness attached to it.  And what I would propose in

18 order to resolve it is that, if they're interested in getting a

19 fact before the Court, which is the nature of the claim that

20 they're making, I don't have a problem with figuring out some

21 very simple way of doing that and having that be provided to

22 the Court by way of a stipulation; that is, that they believe

23 they have this claim for whatever impact it might have.

24          But to take up all this time going through lawyers'

25 letters and cross examination of witnesses or by putting some

1   other witness on the stand who is going to talk about what that

2   claim is, just strikes me as being very, very unnecessary, Your

3   Honor.

4         MR. PRATT:  Can I respond, Your Honor?  Mr. Bernick

5   just said a stipulation about whether they think they have a

6   claim, how that would be relevant.  We're not --

7         MR. BERNICK:  We don't know what the claim is.

8         MR. PRATT:  Excuse me, Mr. Bernick.  The issue isn't

9   whether we think we have a claim.  We do but that's not the

10  issue.  The pertinent fact, and we need to get this established

11  so that we can brief it; if it's not in evidence, then how are

12  we going to brief it?  The pertinent fact is that a claim has

13  been asserted.  A claim has been asserted against the two

14  non-debtor parties and the relevance of that, if we are correct

15  in our interpretation of the successor claims injunction which

16  is not Mr. Inselbuch's issue -- his issue is 524G.  Successor

17  claims injunction is different.  So, with respect to Kaneb, for

18  example, that would be a Class 9 claim, you know, if it's

19  against Grace.

20        THE COURT:  All right.

21        MR. PRATT:  But, you know, we can't really argue that

22  without a basis in the record to argue it and if the easiest

23  way to do this is just admit the letters which are the Plan

24  Proponent's own exhibits.

25        THE COURT:  It seems to me that if you can do a

1 stipulation as to the nature of the claim, frankly, that would

2 make a lot more sense than the letters.  The letters are a

3 position, apparently of your client through its attorney, to

4 another person's attorney.  And does that state a position of a

5 party?  It probably states a position of the party.  But I'm

6 not sure how that is going to carry out the provisions of the

7 relevance.

8         The issue that you need to get to is whether or not

9 the parties agree that a claim has been asserted against

10 Fresenius and Sealed Air and I think I just heard them say that

11 they're willing to figure out a stipulation that will get that

12 information before the record.

13         MR. PRATT:  Well, but, Your Honor, let me just try to

14 address that.  If you say what is the document that shows that

15 a claim has been asserted against a debtor.  That's a proof of

16 claim in a bankruptcy case.  In effect, that's what these

17 letters are.

18         THE COURT:  Oh, absolutely they're not.  It's well

19 past the deadline for proofs of claim.

20         MR. PRATT:  Well, but it's a letter that asserts the

21 claim.  In other words, it's a --

22         THE COURT:  It's a self-serving statement on behalf

23 of your client.

24         MR. PRATT:  No, Your Honor.

25         THE COURT:  You can't use a self-serving statement in

1  your own case.  The debtor could use it in its case if there

2  were some need for that as an admission but you can't do that.

3           MR. PRATT:  Well --

4           THE COURT:  So, to the extent that what you're asking

5  me to do over an objection is to accept that letter as an

6  admission, I can't because you're offering it and not the

7  opposite side.  So, either call a witness -- I'm done with this

8  argument.  We've spent 15 minutes on it.  That's enough.

9  Either call a witness or get a stipulation tonight and then

10 we'll address it tomorrow morning to see whether or not the

11 document itself comes in pursuant to the stipulation or you

12 have a stipulation of fact.  Mr. Brown apparently was the

13 author.  I didn't even notice that, I'm sorry, but he's here.

14 So, calling a witness shouldn't be that hard.  He's here.

15          MR. PRATT:  Well, Your Honor, I don't think we'd call

16 Mr. Brown.

17          THE COURT:  All right.

18          MR. PRATT:  We'd call an officer but let me just -- I

19 don't mean to try the Court's patience, Your Honor, but I just

20 have one more thing to say about it and I'll let it go.  I view

21 these letters essentially as a legal act because whether it's

22 true or not doesn't matter.  It's the fact that the claim was

23 asserted and it's asserted in the very letter that we're

24 talking about.  The stipulation would just be did you assert

25 the claim.  Well, we did in that letter.  And, so, I don't see

1  the reason why to back off the letter but if that's the Court's

2  ruling --

3          THE COURT:  I'm not making a ruling of backing off.

4  I think I said go talk to see whether you can get a stipulation

5  done.  As a result of the stipulation, will the letter either

6  come in for this purpose of determining what you've just said

7  -- I'm not going to try to summarize the last 15 minutes -- or

8  will the stipulation stand on its own or do you need a witness.

9  That's what I'm trying to get to.  I don't think you have an

10 answer yet from the Plan Proponents as to whether you need a

11 witness and I've spent 15 minutes trying to figure it out.

12         MR. PRATT:  Well --

13         THE COURT:  I can't do anything.  You need to do it

14 with the debtor.  If you can't get a stipulation, bring a

15 witness.

16         MR. PRATT:  To circle back, Your Honor, we may have

17 one and that's where we started.  We may have a witness.

18         MS. DeCHRISTOFARO:  Your Honor, forgive this, but I

19 just want the record to be clear that the only witness

20 designated regarding the appropriateness of releases on the

21 order of proof submitted to Your Honor was Mr. Shelnitz, not

22 Mr. Inselbuch, just so that there isn't any implications from

23 that and I don't mean to get into -

24         MR. BERNICK:  On the what?  I'm sorry?

25         THE COURT:  I think Mr. Inselbuch testified that he

1 was not getting into the merits of specific sections of the

2 plan in any event so --

3        MS. DeCHRISTOFARO:  Yeah.  I just -- and forgive me

4 but I just felt compelled.

5        MR. BERNICK:  Your Honor, I think actually Mr.

6 Inselbuch did talk about the effect of the injunctions.  I

7 mean, it --

8        THE COURT:  He did as to certain injunctions.

9        MR. BERNICK:  Yeah.  Anybody who wanted to stand up

10 and ask could have asked.

11        THE COURT:  They can do that with any competent

12 witness who's been designated and, if Mr. Shelnitz has been so

13 designated, he's here.  They can ask him but they can't ask

14 legal conclusions.  Mr. Lewis.

15        MR. LEWIS:  Your Honor, I direct your attention to

16 Libby claimant's Exhibit No. 271 which has been enlarged here.

17 We offered this exhibit and the determination was that we would

18 try to work this out.  We haven't.  I don't know that we've

19 worked it out with Mr. Bernick but we have with Mr. Finch.  Mr.

20 Finch has no objection to the exhibit.  The exhibit was

21 originally produced in discovery as a Grace document and --

22        THE COURT:  Can you refresh my recollection, please?

23 What is it?  I can't see it on the screen so I just don't know

24 what it is.

25        MR. LEWIS:  I apologize.  It's called Asbestos Bodily

1 Injury Cases With a Judgment Settlement.

2          THE COURT:  All right.

3          MR. LEWIS:  There's been much testimony about this,

4 but there's -- we want to offer it for the purpose of showing

5          THE COURT:  All right.

6          MR. LEWIS:  There's been much testimony about this,

7 but there's -- we want to offer it for the purpose of showing

8 what the verdicts were, whether they were zero, $10 or $10

9 million.  We want to complete the record on this.  I don't know

10 if Mr. Bernick's going to object to this.

11          MR. BERNICK:  I don't have an objection to it.  What

12 I told your partner was that this was -- the reason we objected

13 to it before is, it is not an ordinary course document and

14 that's all that the witness really knew about.  It was attached

15 to a discovery response and what I said to Mark is, if you just

16 show me the discovery response I'm sure we can figure out a way

17 to get the document in.  I just want to make sure that it comes

18 in, in the context of how it was actually created.  No

19 objection the document can come into evidence.  No objection as

20 to relevance or as to the accuracy of the document.

21          MS. DeCRISTOFARO:  Your Honor, could we just have an

22 identification as to what it is?  It doesn't say on it.

23          THE COURT:  It's the --

24          MR. LEWIS:  It does say --

25          THE COURT:  It's the asbestos bodily injury cases

1 that had a judgment or a -- a judgment and a settlement.  It

2 was exhibit, I think he said 271.

3         MS. DeCRISTOFARO:  I'm sorry.  Does this come from

4 Grace's files?  Because that's what I --

5         MR. LEWIS:  Yes.

6         MR. BERNICK:  No, it doesn't come from Grace's -- it

7 comes, as I indicated, counsel, it was an attachment to a

8 discovery response.  It's not an ordinary course document.  It

9 was attached to a discovery response.

10         MS. DeCRISTOFARO:  Is it a Grace document?

11         MR. BERNICK:  What?

12         MS. DeCRISTOFARO:  It's your document though?

13         MR. BERNICK:  Yes.  Yes.

14         MS. DeCRISTOFARO:  That's all.  That's all I want to

15 know.

16         THE COURT:  All right.  So, it's coming into

17 evidence, Exhibit 271.

18         MR. LEWIS:  Thank you, Your Honor.

19         THE COURT:  But, not as an ordinary course document.

20 Something produced by Grace in discovery from its records?  I'm

21 not sure what the --

22         MR. BERNICK:  No, it was --

23         THE COURT:  -- stipulation is.

24         MR. BERNICK:  It was objections and answers -- it

25 was, I believe, an attachment to either a Grace discovery

1  response or an ACC discovery response.

2          MR. LEWIS:  It was an ACC discovery response.

3          MR. BERNICK:  Okay.  So, this is the point is that

4  it's not a document that was generated in the ordinary course

5  of -- so, it was an ACC compilation?

6          MR. FINCH:  No, no.

7          MR. BERNICK:  Well, then you tell me what --

8          MR. FINCH:  Nathan Finch for the ACC.  Your Honor, in

9  2002 I had the good fortune to be litigating against Mr.

10 Bernick's firm on the fraudulent transfer case involving the

11 Sealed Air Corporation.  The asbestos claimants committee

12 served an interrogatory upon the debtor in that case asking it

13 to list the cases that it went to verdict in -- or judgment.  I

14 can't remember exactly what the interrogatory said, and Grace

15 attached this document which is Libby Claimants' 271.  It's

16 also been marked with a bunch of other exhibit stickers.  The

17 debtor attached that document to the interrogatory answers, so

18 it is attached as a -- the interrogatory answer authenticates

19 the document.  It's a Grace document.  I have no objection to

20 it coming into evidence, but it is not a document created in

21 the ordinary course of business.  It's not a business record,

22 but it's a -- it is what it is.

23         MR. BERNICK:  All I wanted to say, Your Honor, is

24 that we ought to have the interrogatory as to which it was

25 attached so that everybody knows when it was created.  I don't

1 know if there are any limitations or --

2          THE COURT:  That's fair.

3          MR. BERNICK:  -- regarding the accuracy, but it just

4 ought to be would be what it is.

5          THE COURT:  That's -- I think that's fair.

6          MR. LEWIS:  Should I mark that 271A?

7          THE COURT:  Fine.

8          MR. LEWIS:  All right.  It --

9          MR. BERNICK:  Well, we'll mark it 271A when we get

10 the interrogatory to attach to it.

11          UNIDENTIFIED ATTORNEY:  The interrogatory is here.

12          THE COURT:  No, this is 271 is the exhibit, 271A is

13 the interrogatory request.

14          MR. BERNICK:  No, that's not the right interrogatory.

15          THE COURT:  Gentlemen, please.

16          UNIDENTIFIED ATTORNEY:  Your interrogatory is here.

17          MR. BERNICK:  Okay.  Well, why don't you tell him

18 that.

19          MR. LEWIS:  Yes, it's all here.

20          THE COURT:  271A is interrogatory, Mr. Lewis?

21          MR. LEWIS:  It's discovery and discovery response and

22 it includes interrogatories.  It includes requests for

23 production.  The response provides this document as a list of

24 all of the Grace cases that went to verdict and their result,

25 correct?  That's what it is.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  This is an incredible waste of time.

2   I've said before just --

3          THE COURT:  Mr. Bernick, I'm tired of your saying

4   that.  You will not say that again in this case.

5          MR. BERNICK:  Well, Your Honor, I'm sorry.  I

6   don't --

7          THE COURT:  Mr. Bernick, you will not say it again in

8   this case.

9          MR. BERNICK:  I will not say it again in the case.

10  Right.

11         THE COURT:  Mr. Lewis?

12         MR. LEWIS:  Your Honor, I hear no objection to it, so

13  I assume it can be admitted.

14         THE COURT:  It -- I will admit it, but I need the

15  interrogatory that I -- that request that asks for it and the

16  response so I know what it is.

17         MR. LEWIS:  All right.  That's a multi-page document.

18         THE COURT:  So, exhibits Libby 271 and 271A are

19  admitted, 271A only to describe what 271 is.

20         MR. BERNICK:  I don't even know what 271 is at this

21  point, Your Honor, because I don't have a copy of it.  I don't

22  know if it's the right interrogatory.  So, I object to it until

23  I see a copy and I've got a copy with the thing attached to it.

24         THE COURT:  That's fine.  Gentlemen, you will once

25  again talk about this tonight and see whether or not this

**J&J COURT TRANSCRIBERS, INC.**

1 really minor issue can't be resolved.

2         MR. LOCKWOOD:  Your Honor, I would just note for the

3 record that one of the reasons they have the interrogatory is

4 the document does not speak for itself.

5         THE COURT:  It doesn't.  I agree.

6         MR. LOCKWOOD:  It says -- it's captioned asbestos

7 bodily injury cases with a judgment settlement.

8         THE COURT:  Yes, sir.

9         MR. LOCKWOOD:  Those two terms are not -- I mean, I

10 don't know what a judgment settlement is.  And then it has --

11 over in the resolutions it has "disposed amount" and I don't

12 know whether that's a settlement, or a judgment or a settlement

13 that occurred after a judgment or a verdict or whatever.  So,

14 hopefully the interrogatory response will clarify --

15         THE COURT:  All right.

16         MR. LOCKWOOD:  -- so, the Court will be able to

17 understand it.

18         THE COURT:  Tomorrow I will address Exhibits 271 and

19 271A.  You are all ordered to confer about it tonight.

20         MR. LEWIS:  Your Honor, I'm getting on a plane early

21 in the morning.  Does that require me to stay?

22         THE COURT:  Not if you can get something -- Mr.

23 Kovacich, will you be here?

24         MR. KOVACICH:  I can handle this as --

25         COURT CLERK:  Use a mic, please.

1      MR. KOVACICH:  I can handle this issue tomorrow.  I
2 believe --

3      THE COURT:  That's not a microphone.

4      MR. KOVACICH:  Your Honor, I will handle this issue
5 tomorrow.  There are some other issues Mr. Lewis would like to
6 take up.

7      THE COURT:  All right.  Let me just make a note that
8 says I've deferred this until tomorrow, please.  I need to
9 change my notes.

10      MR. LEWIS:  Your Honor?

11      THE COURT:  All right.  Yes, sir.

12      MR. LEWIS:  The next issue relates to some affidavits
13 that we were going to put into evidence.  Again that was a
14 matter that was deferred.  We have those affidavits here and
15 there's to be some counter --

16      THE COURT:  Mr. Lewis?

17      MR. LEWIS:  There was supposed to be some counter
18 affidavits or we agreed to some counter affidavits to be filed
19 by the plan proponents.  And so Mr. Finch has prepared those.
20 We're prepared to stipulate those in, and by stipulation
21 already entered, we're offering these.

22      MS. DeCRISTOFARO:  Your Honor, may we see those,
23 please?

24      THE COURT:  Do they have exhibit numbers, Mr. Lewis?

25      MR. LEWIS:  Not yet.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. GUY:  Your Honor, this document isn't binding on

2  any other party, so the insurers, of course, are welcome to see

3  it, but it specifically says it's not binding on any other

4  party.

5          MR. LEWIS:  There's a stipulation that's been entered

6  into and I believe it's been filed which indicates that it's

7  only binding -- their affidavits are binding on Libby.  Our

8  affidavits are binding on the plan proponents.

9          THE COURT:  All right.

10          MR. FINCH:  That's fine, Your Honor.  We will mark

11  the plan proponents' declarations as Plan Proponents' Exhibit

12  630.  Do you have a document number for yours?  And what I

13  suggest, Your Honor, I've got a copy of the stipulation here

14  which has incomplete versions of the two attachments.  What I

15  suggest that we do is just rip off the back, hand up the

16  stipulation with the two new exhibit numbers and we can hand

17  write the --

18          THE COURT:  That's fine.  That's the plan proponents,

19  correct?  What's Libby?

20          MR. FINCH:  It's also the Libby claimants, too.

21          THE COURT:  It includes everything?

22          MR. FINCH:  It includes everything.

23          MR. LEWIS:  630 will?

24          MR. FINCH:  No, 630 is the plan proponents.  Put his

25  exhibit number on that.

1        MR. LEWIS:  And our exhibit number will be 280 --

2 LC-281, Your Honor.  How's that?

3        MS. DeCRISTOFARO:  Your Honor, there is a

4 stipulation.  I assume it's the same one that we saw before.  I

5 don't have it, but the idea as I understood is, and I'd like it

6 clear on the record, that these are not being submitted as

7 against any insurer and are not used as proof of any insurer of

8 anything.  And I would like if -- certainly if these to be

9 submitted with the stipulation and to be that -- that

10 submission be clear on the record.

11        MR. LEWIS:  The Libby claimants so stipulate, Your

12 Honor.

13        THE COURT:  And, Mr. Guy, I think you already said

14 that on behalf of the plan proponents, but could you confirm

15 it?

16        MR. GUY:  Yes, Your Honor.  It's in the document.

17        THE COURT:  All right.  So, this -- what I am getting

18 as the plan proponents is the declaration and the exhibits and

19 from Libby I'm getting the stipulation and the exhibits?

20        MR. FINCH:  No, Your Honor.  What we're doing is --

21 Nathan Finch for the ACC.  What we're doing is, we have the

22 stipulation which has the six paragraph of agreement and it has

23 -- refers to Libby Exhibit A and ACC Exhibit B.  And what I

24 have done is, write at the bottom, Libby Exhibit A is Libby

25 Claimants' 281.  ACC Exhibit B is Plan Proponents' 630.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.

2          MR. FINCH:  I have -- it's got people's John Hancocks

3  on it.  Libby Claimants 281 and Plan Proponents' 630 are all

4  right here and may I hand it up to Your Honor?

5          THE COURT:  Is it with the stipulation?

6          MR. FINCH:  It is with the stipulation.  This is the

7  only copy that exists in the world right now of this.

8          THE COURT:  Okay.  Does the stipulation have an

9  exhibit number because that's what I'm trying to figure out?

10         MR. FINCH:  I didn't -- the stipulation does not have

11 an exhibit number, Your Honor.  If you would like us to put an

12 exhibit number on it we can.  I don't normally --

13         THE COURT:  I think so, because -- I know, but

14 otherwise with exhibits attached to a stipulation they're

15 not -- they're going to get lost if the stipulation itself

16 isn't separately numbered.

17         MR. FINCH:  Okay.  Morgan, what's the next exhibit

18 number?

19         UNIDENTIFIED SPEAKER:  631.

20         MR. FINCH:  Okay.  Let's try this one last time.  The

21 Plan Proponents' Exhibit 631, Your Honor, is the stipulation

22 which is a three-page document which is -- okay, it's a joint

23 exhibit.  It's a Plan Proponents' 631, Libby Claimants' 282.

24         THE COURT:  All right.

25         MR. FINCH:  That's the stipulation.  It's only

1  binding on the plan proponents and the Libby Claimants.

2           THE COURT:  All right.

3           MR. FINCH:  No one else is bound by it.  It attaches

4  as Exhibit A to that stipulation, Libby Claimants' 281 which

5  are their affidavits and Exhibit B to the stipulation is Plan

6  Proponents' 630 which are the plan proponents' declarations

7  from people outside of Libby, and I'm going to, with Your

8  Honor's permission, hand it to Your Honor.

9           THE COURT:  All right.  I will take Exhibit -- wait.

10  Mr. Finch, why don't you give it to my clerk so she can make

11  copies for everybody so that tomorrow morning it won't be the

12  only copy in existence anymore.

13          All right.  So, Plan Proponents' Exhibit 280 -- I'm

14  sorry -- 631 and 630 are admitted.  And Libby Exhibits 281 and

15  282 are admitted and the stipulation is included that indicates

16  that they will not be used against any insurer.  Okay.  Mr.

17  Lewis?

18          MR. LEWIS:  Okay.  The next item is the Libby

19  Claimants have filed notice with the Court that they are --

20  will offer into evidence transcript and deposition excerpt

21  designations.  There have been objections to those transcript

22  and designations filed, but I think more importantly I think

23  they're the subject of a motion in Limine that has not been

24  resolved.  But, we need to offer them into evidence and --

25          UNIDENTIFIED ATTORNEY:  Excuse me, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. LEWIS:  There is one modification to our proposed

2   excerpts.  We offer the deposition of -- excuse me, Your Honor

3   -- Mr. Hurlbert.

4          THE COURT:  Can you spell that, please?

5          MR. LEWIS:  H-u-r-l-b-e-r-t.

6          THE COURT:  Okay.

7          MR. LEWIS:  That is withdrawn.  All other deposition

8   excerpts and prior trial testimony that's identified -- was

9   identified are being offered at this time.

10         MR. BERNICK:  Your Honor, these are not proper

11  exhibits.  They don't come into evidence that way.  The rules

12  provide for deposition designations to be done in a certain

13  fashion and they can make those designations.  They have made

14  those designations.  We've objected to them and we've moved as

15  to them.  They don't simply come in as a proffer.  That's not

16  how the rules work.

17         So, we've objected on those grounds.  We believe that

18  all of the objections and rulings made in connection with

19  deposition designations were specifically reserved for

20  consideration after this trial.  That's -- those are the rules

21  that we've followed and there's no reason for an exception

22  here, particularly when Your Honor has already issued a bunch

23  of rulings relating to the whole question of individuals.

24         So, this is, again, something where we've staked out

25  the position and we believe it's completely in accordance with

1  the rules that Your Honor has followed.

2          MR. LEWIS:  Your Honor?

3          THE COURT:  I believe I need to hear the motion

4  that's been filed with respect to these, Mr. Lewis, and as a

5  result I think what is proper is to have this case "not closed"

6  until we have argument on these issues and then I can determine

7  whether or not these documents are admissible.  So, I don't

8  think I can admit them today with the objections that are

9  pending.  I have to have the argument on those objections.

10         MR. LEWIS:  But, Your Honor, we want to complete the

11 record that we offered them.  That's the important thing here.

12 I was -- I agree with much of what Mr. Bernick says.  There are

13 objections.  There are motions pending on these, but we need to

14 get these offered while in trial because we don't understand

15 that the designation of transcripts is an offer into evidence

16 unless the Court treats that matter differently.

17         THE COURT:  I'm going to treat it as reserved.  I

18 understand your offer, but I am not admitting them now and I'm

19 not, not admitting them now.  I'm reserving ruling on that

20 issue until I can get through the arguments on those points.

21         So, at an appropriate omnibus hearing date or after,

22 I'll have, I guess Ms. Baer, work out that schedule with my law

23 clerk.  We will --

24         MR. LEWIS:  And then we could offer them then?

25         THE COURT:  You can offer them then and then we'll

have the arguments and go forward.  I am not closing the

evidence with respect to those issues because I can't until I

can make those rulings.

MR. LEWIS:  That's all I was concerned about.

THE COURT:  All right.

MR. LEWIS:  We have one more issue, Your Honor.

THE COURT:  What I'm going to ask, Ms. Baer, is when

these documents are put together either in this morass of paper

you're going to have to identify for me where all of this is

because I know I have this.  I've read -- I actually have read

all of these things, but where, I haven't a clue.  Or I'm going

to need the docket numbers if they're filed or something that

will let me pull them for purposes of that argument, or I need

yet again copies stuck into the binders for the argument.  Work

something out with Ms. Baker.

MR. BERNICK:  We'll be happy to do that.  Oh, I'm

sorry.

THE COURT:  All right.  Okay.  Mr. Lewis, go ahead.

MR. LEWIS:  I apologize for that, Your Honor, but I

just wasn't familiar with the procedure of the Court on that

issue, so --

THE COURT:  There wasn't a procedure, Mr. Lewis.  It

wasn't a matter of not being familiar with it.  We need to work

something out, except that I said that we would defer it until

the end, and we will.

1          MR. LEWIS:  That's perfectly satisfactory with us,

2    Your Honor.  We have no objection to that.

3          The next item is we -- I believe we stipulated now

4    between the conserved parties, at least the insurers and we've

5    talked to Mr. Horkovich about the fact that we want to offer

6    the primary insurance policies of Royal, Maryland Casualty and

7    CNA.  I understand, but I don't mean to speak for opposing

8    counsel, I understand that there's not an objection, but there

9    is a problem.

10          Mr. Schiavoni can probably explain it better, but

11    when we talk about the Royal policies they were very old and

12    the coverage period was like 1953 to 1963 and I understand that

13    the policies, in part at least, were lost and there's been a

14    reconstruction and an agreement as to what those policies

15    purport to say.  I was not privy to that agreement.  I was --

16    didn't -- we didn't negotiate, but perhaps I invite Mr.

17    Schiavoni to explain it better, but we'd like to offer those

18    insurance policies into evidence.

19          THE COURT:  So, you're accepting the reconstruction?

20          MR. LEWIS:  Yes, Your Honor.

21          THE COURT:  All right.

22          MS. DeCRISTOFARO:  Your Honor, just -- Mr. Lewis, we

23    haven't heard anything about this yet, so -- on behalf of CNA,

24    so --

25          MR. LEWIS:  Oh, I've talked to CNA's counsel.

1            THE COURT:  Okay.  Mr. Schiavoni?

2            MR. SCHIAVONI:  I take what Mr. Lewis' intent is, is

3  that he's offering those policies into evidence on the

4  understanding that they'll only be -- our non-objection to that

5  will be just for this particular proceeding and that the offer

6  is that these are just the most complete pages that the debtor

7  has in its files, and that's the -- and the most complete that

8  other folks have in their files and that they're subject to

9  being supplemented and should disputes arise outside of this

10 case in another case.  Is that acceptable, Mr. Lewis?

11           MR. LEWIS:  Yes, Your Honor.  I've agreed with all of

12 the insurers with an oar in the water on this issue that the --

13 their -- we'll stipulate that they're not to be used for any

14 other case.  They're only to be offered in this case and we

15 will not try to take any advantage of them in any other case

16 that we may participate in.

17           THE COURT:  Mr. Wisler?

18           MR. WISLER:  Good afternoon, Your Honor.  Jeff Wisler

19 on behalf of Maryland Casualty.  With regard to the Maryland

20 Casualty policies that Mr. Lewis is going to submit, we did

21 agree that we would not object to their admission and, again,

22 as Mr. Lewis stated, that would only be for this confirmation

23 hearing and only for this proceeding.

24           We understand that the Maryland Casualty policies

25 that are being submitted by Mr. Lewis include only those that

1  are on Exhibit 5 to the plan exhibits that have been filed in

2  this case.

3          THE COURT:  Is that correct, Mr. Lewis?

4          MR. LEWIS:  Yes, they're part of Exhibit 5, Your

5  Honor.

6          THE COURT:  All right.

7          MR. LEWIS:  We've got them on disk.  We took it from

8  the data room.  It's our intention because we didn't know about

9  the reconstruction, to tell you the truth, until very recently.

10 It's our intention to put them together in paper form.

11         THE COURT:  I don't need them on paper form.

12         MR. LEWIS:  You don't?  Okay.

13         THE COURT:  No.  What I need in paper form is in your

14 arguments at some point or your proposed findings, when we get

15 there, then you can quote the sections you are referring to.  I

16 don't want thousands of pages of insurance policies that will

17 have no bearing on any issue.

18         MR. LEWIS:  Wonderful, Your Honor.  That saves us

19 some work, too.

20         MR. WISLER:  Your Honor, just to be clear, with --

21 they're not actually -- no policies are attached to Exhibit 5

22 to the plan.

23         THE COURT:  That's the list.

24         MR. WISLER:  The policies are listed.

25         THE COURT:  Yes, sir.  I understand.

1          MR. WISLER:  We're not stipulating to the

2     completeness of whatever Mr. Lewis has, but if he's submitting

3     those policies, we're not objecting.

4          THE COURT:  Okay.  That -- that's fine, but in terms

5     of the submission I'll take them on disk.  But, anyone who

6     wants to make use of them in an argument or examining a

7     witness, show the witness the sections that you need them to

8     refer to or need me to refer to.  Ms. DeCristofaro?

9          MS. DeCRISTOFARO:  Yes, Your Honor.  I just checked

10    with co-counsel.  We haven't had those discussions yet.  The --

11    I would -- in connection with Phase 1, because our policies

12    there are disputes over different endorsements and different

13    versions around, because we're not determining coverage here we

14    stipulated with Mr. Horkovich on behalf of the plan proponents

15    to a curtailed version that we would use for Phase 1.  We were

16    planning to use the same version for Phase 2 as to which we

17    have agreement.  They're not complete.  They're not full, but

18    rather than fight over those kinds of issues we're using that

19    and we probably agree to the same thing.

20         But, the version that just appears on Grace's disk

21    has all kinds of problems on it and we wouldn't agree to that.

22    But, we will follow up on that issue, but I'm certainly not

23    prepared to speak to that at this moment.

24         THE COURT:  Mr. Lewis?  Mr. Lewis, I don't know if

25    you just heard what Ms. DeCristofaro said.  She cannot agree to

1  the use of the version that's on the debtor's disks because of

2  some issues.  So, she has arranged with Mr. Horkovich to have a

3  set -- subset of exhibits of the contents of the exhibits that

4  they do agree to for use in this trial, but not to the full

5  policies because they have disputes as to a variety of issues

6  about those policies.  So, you need to speak with her about the

7  CNA policies --

8          MR. LEWIS:  Okay.

9          THE COURT:  -- and see what you can work out.

10          MR. LEWIS:  I apologize.  I thought Mr. Horkovich had

11  worked that out, but that's my misunderstanding.  I'll

12  certainly speak with her as soon as possible and try to work

13  this out.

14          THE COURT:  All right.

15          MR. LEWIS:  And then I'll have my partner, Mark

16  Kovacich take this up --

17          THE COURT:  -- tomorrow?

18          MR. LEWIS:  -- with the Court in the morning, I

19  guess.

20          THE COURT:  All right.  That's fine.

21          MR. LEWIS:  And that's all I have, Your Honor.

22          THE COURT:  Okay.

23          MR. CARIGNAN:  Your Honor, James Carignan for

24  Longacre.  You may recall this morning I sought to have

25  admitted Exhibit Long 2 which I handed to your clerk dealing

**J&J COURT TRANSCRIBERS, INC.**

1  with the -- which was the stipulation regarding classification

2  of the Morgan Stanely claims.  We had Mr. Hughes on the stand.

3  He said you might need a -- or you did need a witness to

4  determine the basis of those claims to determine whether that

5  exhibit I wanted admitted was relevant.  What I should have

6  pointed Your Honor's attention to is the first page of the

7  stipulation.  At the time I didn't because like I said we had a

8  witness on the stand which was causing some people some

9  discomfort.

10          But, it's evident from the first page of this

11  stipulation what the basis of these, originally Bank of America

12  then Morgan Stanley claims, is and I think if Your Honor just

13  reads the first four "whereas clauses" of that stipulation

14  you'll be able to make a determination respecting relevancy

15  without a witness testifying as to the nature of those claims.

16          THE COURT:  And what do they say?

17          MR. CARIGNAN:  They say essentially to summarize it

18  that the Morgan Stanley claims are based on the debtor's

19  reimbursement agreements in connection with letters of credit

20  that Bank of America posted, that National Union had drawn on

21  as -- which letters of credit had been posted to secure the

22  reimbursement obligations to National Union which is, of

23  course, the basis of Longacre's claim now.

24          MR. BERNICK:  That -- Your Honor, that proffer --

25          THE COURT:  Yes, Mr. Bernick?

**J&J COURT TRANSCRIBERS, INC.**

1         MR. BERNICK:  Yes, that proffer does not establish

2    relevance.  The question is, what's the relationship between

3    the situation with Morgan Stanley which was resolved

4    incidentally and the situation as concerns those who -- whose

5    objections have not been resolved and believe that their facts

6    are similar.  In fact, their facts are very, very different.

7         So, the proffer does not establish anything to do

8    with relevance.  It doesn't change any fact, doesn't elucidate

9    any fact concerning the objection that these folks are making.

10   What they're essentially saying is, well, you did it for Morgan

11   Stanley, why don't you do it for us?  That's an established

12   relevance.

13        MR. CARIGNAN:  Mr. Bernick admitted that both claims

14   are based on reimbursement obligations.  They're both based on

15   the same settlements with the same asbestos --

16        MR. BERNICK:  No --

17        MR. CARIGNAN:  -- personal injury claims.

18        MR. BERNICK:  No, they are very different

19   circumstances.  It's not our obligation to establish the

20   relevance of this proffer.  It's theirs.

21        MR. CARIGNAN:  You can tell the relevance from the

22   face of the stipulation, Your Honor.

23        THE COURT:  Well, the face of Longacre 1 or Long 2?

24        MR. CARIGNAN:  Longacre 2, not the certification of

25   counsel, but the stipulation attached as Exhibit 1.

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  Okay.  Mona, this is Long 1, do you have

2 Long 2?

3              MR. CARIGNAN:  I have another copy, if I can --

4              THE COURT:  All right.  All I have here is Long 1.

5 I'm sorry.

6              MR. BERNICK:  Your Honor, the fact that they're

7 omitting that they need to consider in order to establish

8 whether this is relevant or not, which it's not, is that the

9 circumstances pursuant to which the letter of credit that is

10 the basis for this claim was issued, are entirely different

11 from the circumstances in which the obligation was undertaken

12 by National Union and by Fireman's Fund.

13              MR. CARIGNAN:  And the fact which he's admitting --

14              MR. BERNICK:  Excuse -- excuse me.

15              MR. CARIGNAN:  -- is that indirect asbestos --

16              THE COURT:  Pardon me?  He wasn't finished yet.  Go

17 ahead.

18              MR. BERNICK:  That is the critical fact that is

19 missing.  The facts relating to National Union, as well as

20 Fireman's Fund, indicate that they proceeded to provide -- they

21 agreed to be sureties with respect to a specific claim, a known

22 claim, an asbestos claim and they agreed to stand in the shoes

23 of Grace as the defendant tort-feasor knowing all about those

24 things, and that makes it a very direct Nexus to the underlying

25 claim and makes that situation clearly indirect within the

1  meaning of 524(g).

2      In connection with the letter of credit that

3  underpinned the obligation as to which we resolved with Morgan

4  Stanley that belonged in Class 9 was -- had two parts to it.

5  One, it was clearly preexisting.  It had nothing to -- it was

6  not undertaken.  The letter of credit was not issued in

7  connection with anything to do with asbestos.  It was general

8  and it was simply used by Grace in order to provide the

9  security.  And the second one is at best unclear, but there's

10 no evidence that the letter of credit was issued with any

11 anticipation of its use.

12     So, there you have two obligations that are

13 undertaken that have no direct nexus, indeed no specific nexus

14 at all, to an underlying tort claim and therefore we felt that

15 they probably belonged in Class 9 and we therefore agreed to

16 that treatment.  That's an entirely different set of

17 circumstances and that was what's not considered in the proffer

18 that's made.  I'm sorry.

19     THE COURT:  Frankly, from looking at the four

20 paragraphs, are you talking the stipulation regarding

21 classification of claims, those four paragraphs, the first four

22 "whereas clauses"?

23     MR. CARIGNAN:  Well, yes.  The first five "whereas

24 clauses".

25     THE COURT:  That start --

**J&J COURT TRANSCRIBERS, INC.**

1      MR. CARIGNAN:  Again the issue is classification,
2 Your Honor.

3      THE COURT:  That is the issue, but because the debtor
4 has agreed to classify a particular claim in that class doesn't
5 make that fact more or less relevant to the classification of
6 any other claim in that class.

7      But, this one -- there are facts that may come into
8 play that bear on that, but the stipulation itself does not do
9 that.  This stipulation only says that Bank of America issued
10 three standby letters of credit that they -- those letters
11 obligated Grace Conn to reimburse the Bank of America and
12 they've stipulated now that this will be an allowed Class 9
13 claim, in essence.

14      The fifth paragraph says that pursuant to the terms
15 of the 2005 stipulation the debtors agreed that as a result of
16 the National Union Fire Insurance company, Pittsburgh, PA,
17 having drawn on two of the letters of credit that the Bank of
18 America was entitled to this Class 9 claim.  That does not
19 substantiate that the liability for the letter of credit is an
20 asbestos underlying liability, nor does it substantiate that
21 the National Union claim, whatever it is, belongs in the same
22 class.

23      It does establish a nexus between the two in that the
24 letter of credit was used to satisfy the National Union claim
25 after National Union drew down on it when debtor -- the debtor

1  didn't pay whatever the obligation was.  But, the stipulation

2  itself does not, I think, underlie this specific

3  classification.

4          Because you need this -- because the argument that

5  you wish to make, I think, is that there is some similarity of

6  claims, I don't think the stipulation substantiates that

7  similarity.  But, I think that the fifth paragraph that shows

8  the relationship between National Union and the Bank of America

9  in that and only in that, the letter was used as a draw down by

10 National Union, that portion may be relevant to what you have

11 to say.  I'm not seeing anything else that really --

12          MR. BERNICK:  We don't have a problem with that --

13          THE COURT:  -- affects the --

14          MR. BERNICK:  We don't have a problem with that, if

15 that's what they want to get in.  It was drawn down for that

16 purpose.  That is not pertinent to the reason why we classified

17 it the way that we did, but we don't have any problem.  It is a

18 stipulated fact.  We don't have any problem with that coming

19 into evidence.

20          THE COURT:  That is, I think, the fact -- a fact at

21 least that you're attempting to rely on, correct?  Because the

22 rest of this document doesn't substantiate anything about

23 National Union's claim.

24          The seventh paragraph goes on to say that if National

25 Union further draws down, then certain consequences will

1 happen, but that really doesn't add anything to what Paragraph

2 5 says for this purpose.

3         MR. CARIGNAN:  Well, that's a portion of what I

4 wanted in, but I also wanted on the record that the Morgan

5 Stanley claims are classified in Class 9.

6         THE COURT:  That's fine.  I don't think there's a

7 dispute about that.

8         MR. BERNICK:  There's no issue about that.

9         THE COURT:  So, yes.  I accept the proposition that

10 right now Morgan Stanley is classified in Class 9 and to the

11 extent that this stipulation, particularly that paragraph has

12 some relevance, I will admit the fact and the stipulation for

13 the Paragraph 5 and if you need it I suppose Paragraph 7 which

14 also refers to National Union although at the time it was a

15 contingent claim.

16         So, all right.  Exhibit Long 2 --

17         MR. BERNICK:  Why doesn't counsel simply mark it up,

18 give it an A number?  We'll look at it and we'll submit it

19 tomorrow morning.

20         THE COURT:  All right.  That's fair.

21         MR. CARIGNAN:  Okay.  Thank you, Your Honor.

22         THE COURT:  All right.  Thank you.

23         MR. BOERGER:  Your Honor, Jeff Boerger for Seaton,

24 OneBeacon, Geico and Republic with a true housekeeping matter.

25 Following up on your instructions yesterday we have a hard copy

1  set of our trial exhibits which I would like to hand up.  Your

2  clerk advised me that you'd like me to do that on the record.

3          THE COURT:  Yes.

4          MR. BOERGER:  And I would like to note for the record

5  that all of these exhibits have been provided to plan

6  proponents.  The binders that I'm about to hand you are

7  substantially similar to what they have, except that we pulled

8  out any exhibits that were not admitted to this point.  So,

9  they only contain exhibits that have been admitted into

10 evidence.

11         THE COURT:  All right.

12         MR. BOERGER:  And in the table of contents we have

13 marked with a checkmark next to the ones that are actually in

14 the binders just for ease of reference.

15         THE COURT:  Okay.  Thank you.

16         MR. BERNICK:  Your Honor, I -- okay.  So, I don't

17 know what the representations, Ms. Baer does.  I just don't

18 have any idea about this, but if we've worked it out, fine.  I

19 don't know what the purpose of the ceremony is now, if we can

20 verify what's going on here we'll probably be able to do it.

21         THE COURT:  The purpose is that I asked that the

22 exhibits be submitted on the record, so I have --

23         MR. BERNICK:  Very well.  That's very well then.

24         THE COURT:  -- a record of the fact that the paper

25 exhibits would be here.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. BERNICK:  I guess we'll take a look at the -- all

2  of these -- these all four?

3        MR. BAER:  I didn't hear the representation because

4  three people were talking.

5        THE COURT:  The representation is that the -- you

6  folks would stop talking to each other and pay attention maybe

7  this wouldn't be an issue.  The representation is that this is

8  a paper copy --

9        MR. BERNICK:  I'm trying to find out exactly what the

10  story is, Your Honor, so I can report it accurately to the

11  Court.  I'm sorry.

12        THE COURT:  The representation is that this is a

13  paper copy of the set of trial exhibits that I admitted into

14  evidence, but didn't have a paper copy of for Beacon --

15  OneBeacon and Seaton.  Actually, I don't think it was for Geico

16  and Republic.  I believe it was for Seaton and OneBeacon.

17        MR. BOERGER:  Your Honor, this is pursuant -- there

18  were certain exhibits that were admitted yesterday through

19  testimony --

20        THE COURT:  GR exhibits.

21        MR. BOERGER:  -- and then there were a number of them

22  that Mr. Brown informed you about the stipulation this morning.

23        THE COURT:  Yes.

24        MR. BOERGER:  And he went through the series of

25  exhibits and those did include a handful of Geico and Republic

1  policies --

2          THE COURT:  Okay.  That's fine.

3          MR. BOERGER:  -- that were admitted for limited

4  reasons.

5          THE COURT:  Thank you.  All right.  So, that is the

6  proffer.  These are only a copy of the documents that have

7  already been admitted.  Yes, I will take them.  I don't need to

8  further admit them.  They've already been admitted.  Okay.  Do

9  we -- have we been given a set, Mr. Boerger?

10          MR. BOERGER:  The plan proponents have a set at the

11  moment just to verify that they are --

12          THE COURT:  All right.

13          MR. BERNICK:  Well, if that's what it is, we don't

14  need to verify it.

15          MS. BAER:  Your Honor, that's -- but, I thought it's

16  two things.  He said it's the first seven exhibits you admitted

17  yesterday and then it's the rest of the exhibits that are the

18  exhibits to the stipulation that we agreed to today.

19          MR. BOERGER:  That's correct.

20          MS. BAER:  And if that's what they are, that's fine.

21  I haven't looked at them.  I haven't verified them.

22          THE COURT:  Fine.  Look at them.  I will take them

23  tomorrow.  In the event that there is no issue about them, but

24  let him know tonight, so that he doesn't need to be here

25  tomorrow for this purpose if, in fact, that is -- there is no

1 issue.  All right, Mr. Boerger, I expect I will take them

2 tomorrow as the paper copies.

3          MR. BOERGER:  Thank you, Your Honor.

4          THE COURT:  Good evening.

5          MR. HORKOVICH:  Good evening.  Good evening, Your

6 Honor, Bob Horkovich.  To potentially resolve a dispute

7 tomorrow, something that Mr. Lewis raised.  My understanding is

8 that in Phase 1 CNA offered a certain set of insurance policies

9 to which the plan proponents stipulated.  I understand that

10 same set of exhibits will be offered by CNA tomorrow, a set of

11 CNA insurance policies.  But, CNA will offer a same set -- the

12 same set of exhibits offered in Phase 1 will be offered in

13 Phase 2, and similarly the plan proponents will so stipulate

14 and will not object.  And they're subject to limitations, so

15 it's only to be used for the confirmation in the bankruptcy and

16 so on.  The same set of conditions would apply.

17          MS. DeCRISTOFARO:  We -- Your Honor, we expect that's

18 exactly what will happen.

19          THE COURT:  Okay.  And is this the same set that Mr.

20 Lewis is expecting to use?

21          MR. HORKOVICH:  Yes, that's what Mr. Lewis is

22 referring.  That's -- those are the documents to which Mr.

23 Lewis was referring.

24          THE COURT:  All right.  So, if they're coming in

25 through CNA, then why do I need another set from Libby?

1           MS. DeCRISTOFARO:  Well, Your Honor, what I told Mr.

2    Horkovich is that we were going to go through our exhibits

3    tonight and work it out and see if we can -- the only issue

4    about the proffer by Mr. Lewis was that the version that he had

5    on the disk --

6           THE COURT:  Turn your microphones off, please, folks.

7           MS. DeCRISTOFARO:  That the version he had on the

8    disk wasn't the one that was arrived at, as I explained before,

9    by stipulation and so that we will likely just ask that he rely

10   on that instead of the one that's on the disk that he has.

11          MR. HORKOVICH:  CNA's submission rather than the --

12          COURT CLERK:  Use the microphone.

13          MR. LEWIS:  Your Honor, that's perfectly

14   satisfactory.  That's what I was attempting to accomplish

15   anyway.  We just want to be sure that they're going to be

16   offered and I do't know, based on that, whether they're, in

17   fact, going to be offered in the form they were used in Phase

18   1.  Are they going to be offered, I guess, is the question?

19          MS. DeCRISTOFARO:  Yes, we expect that they will be.

20   I just -- as I told Mr. Horkovich we're going through tonight

21   to make sure that -- which of our exhibits we're offering, and

22   I expect that we will be doing that.

23          MR. LEWIS:  I guess that means we still can't get

24   resolution until tomorrow and --

25          THE COURT:  That's --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. LEWIS:  -- that's fine, Your Honor.

2          THE COURT:  All right.

3          MR. WISLER:  Your Honor, Jeff Wisler, on behalf of of

4  Maryland Casualty and Zurich.  First on behalf of Maryland

5  Casualty, in lieu of live testimony we have agreed with the

6  plan proponents to submit a declaration as MCC Exhibit 3,

7  Maryland Casualty Exhibit 3, and attached to that declaration

8  are Maryland Casualty Exhibits 1 and 2.  They are the two

9  settlement agreements between W.R. Grace and Maryland Casualty.

10 And I don't believe there are any objections and I would like

11 to hand up a copy to Your Honor and admit Maryland Casualty 1,

12 2 and 3 into evidence.

13         THE COURT:  All right.  Is there any objection?

14         UNIDENTIFIED ATTORNEY:  No, Your Honor.

15         THE COURT:  All right.  They're admitted.  Thank you.

16         MR. WISLER:  As to Zurich, Your Honor, in lieu of

17 testimony we have a declaration from Michael Beresh (phonetic).

18 We've labeled that exhibit, Zurich Exhibit 17A.  Attached to

19 Exhibit 17A is Zurich Exhibit 17 which is an asbestos claim

20 settlement agreement between W.R. Grace and Zurich.  The plan

21 proponents have agreed to allow us to submit this as our

22 evidence so I'd like to admit -- hand to Your Honor and admit

23 into evidence Zurich Exhibits 17 and 17A.

24         THE COURT:  Any objection?

25         UNIDENTIFIED ATTORNEY:  No, Your Honor.

1          THE COURT:  Thank you.  All right, 17 and 17A --
2 Zurich 17 and 17A are admitted.

3          MR. WISLER:  Thank you, Your Honor.  That's all I
4 have.

5          THE COURT:  Okay.  Thank you.  Mr. Schiavoni.

6          MR. SCHIAVONI:  Your Honor, Tanc Schiavoni for
7 Arrowwood.  Along the same exact lines I have two declarations.
8 The -- we offered during the hearing on the Arrowwood
9 settlement, we offered testimony from three witnesses.  We made
10 a proffer at that hearing if you recall.  We put in a full
11 declaration from myself.  That's in the record already.  There
12 were no objections then.

13          Subsequently, I'm going to re-offer my own
14 declaration and I'm offering also the declaration of the
15 second witness that we offered at that prior hearing, Carl
16 Pernicone (phonetic), and we've shown this to the plan
17 proponents and to Libby.  I don't believe there's any
18 objection.  I was actually looking forward to testifying, but
19 no takers.  But, I'm prepared to answer questions in the
20 hallway.  We have a third witness --

21          THE COURT:  Take them to the bar, at least, Mr.
22 Schiavoni.

23          MR. SCHIAVONI:  Someone else has to buy drinks if I'm
24 going to let them question me.  I've got a third witness, a Mr.
25 Hooper, that Dan Cohen -- we have a declaration for.  He's

1 raised some questions about that we're going to address -- try

2 to address this evening and he asked to be here when we present

3 that, so we'll wait until tomorrow to do that.

4          THE COURT:  All right.

5          MR. SCHIAVONI:  Otherwise, I'm going to hand these

6 up.  We've marked them as A-34, that's my declaration, and

7 A-57 as Mr. Pernicone's declaration.

8          THE COURT:  A -- I'm sorry, 54?

9          MR. SCHIAVONI:  A-34 is mine --

10          THE COURT:  Oh, 34.

11          MR. SCHIAVONI:  -- and A-57 is Mr. Pernicone's.

12          THE COURT:  Any objection?  All right.  A-34 and A-57

13 are admitted.

14          MR. SCHIAVONI:  Thank you, Your Honor.

15          THE COURT:  Mr. Plevin, just give me a minute.  I've

16 got too many exhibits.  I can't type with all these exhibits

17 here, so I need to move some and I'll be with you in one second

18 please.

19          MR. PLEVIN:  No problem, Your Honor.

20                    (Pause)

21          THE COURT:  Okay, Mr. Plevin.  Thank you.

22          MR. PLEVIN:  Your Honor, you heard earlier today that

23 we had a stipulation on a lot of exhibits.  What I'd like to do

24 is, I've got two notebooks and one loose exhibit and just very

25 briefly tell you what they are.  We have a stipulation that has

1   been filed.   I think I mentioned this morning the docket number

2   is 23-195 and that is a stipulation of facts that not only

3   attaches documents, but also represents the agreement of

4   Fireman's Fund and the plan proponents on certain facts that

5   are not tied to documents.

6           Part of the stipulation attaches documents and those

7   are -- those have exhibit stickers, and so they are -- we've

8   labeled them FFICSC for Fireman's Fund Insurance Company Surety

9   Claim.   And the exhibit numbers attached to the stipulation are

10  1 through 6, 8, and 9A through 9-O.

11          THE COURT:  Wait.  I'm sorry, 1 through 6, 8 and 9 --

12          MR. PLEVIN:  -- A through 9-O.

13          THE COURT:  All right.

14          MR. PLEVIN:  And I would -- I believe 2 and 3 may

15  already have been admitted today.   Those are the bond and the

16  indemnity agreement.

17          THE COURT:  Yes, they were in.

18          MR. PLEVIN:  So, I would offer these exhibits into

19  evidence.  I also have --

20          THE COURT:  Wait.  Is there any objection to

21  Fireman's Fund 1 through 6, 8 and 9A through 9-O?

22          UNIDENTIFIED ATTORNEY:  No, Your Honor.

23          THE COURT:  All right.  They're admitted.

24          MR. PLEVIN:  Your Honor, I also have documents that

25  we agreed would be admitted in lieu of my client's live

1  testimony.  Those are the same prefix, FFICSC-10, 14 through 22

2  and then the loose exhibit is 23.

3          THE COURT:  Can I put it in the binder?

4          MR. PLEVIN:  You can if you have a hole punch.

5          THE COURT:  Okay.  Is there any objection to

6  Fireman's Fund 10, 14 through 23?

7          UNIDENTIFIED ATTORNEY:  No, Your Honor.

8          THE COURT:  Thank you.

9          MR. PLEVIN:  Thank you, Your Honor.

10          THE COURT:  All right.  One second.  Mr. Shiner?

11          MR. SHINER:  Good afternoon, Your Honor, Michael

12  Shiner for AXA Belgium, the successor to Royal Belge.  Back in

13  Phase 1 we had offered three exhibits along with the

14  declaration of Ms. McCabe.  We have the exhibits again.

15  They're the exact same exhibits.  I understand there's no

16  objection to their admission and what we -- would it be easier

17  to simply move in the existing declaration from Phase 1?

18          THE COURT:  If you can give me the exhibit number,

19  maybe.  I'm not sure.  Frankly, I haven't figured out how I'm

20  going to take track of all of this yet, Mr. Shiner.  So, maybe

21  it would be better to get a second copy so I have a binder

22  that's related to Phase 2.

23          MR. SHINER:  I'll bring you a brand new copy with a

24  binder -- in a binder tomorrow --

25          THE COURT:  All right.

1          MR. SHINER:  -- related to Phase 2.

2          THE COURT:  And what are the exhibit numbers?

3          MR. SHINER:  AXA-1, AXA-2 and AXA-3.  And, Your

4  Honor, we had also joined in certain exhibits that were offered

5  by other insurers.  Instead of coming up every time that

6  happens we simply -- to the extent they're moved in, we join in

7  their moving the exhibits.

8          THE COURT:  Well, once evidence is in, unless it's

9  for a limited purpose, it's in for everybody, so you don't need

10  to join in the submission of exhibits and you can use them in

11  the closing argument or the briefs, whatever you need.

12          MR. SHINER:  Thank you, Your Honor.

13          THE COURT:  All right.  Is there any objection to AXA

14  Belgium 1, 2 and 3 being admitted in Phase 2?

15          UNIDENTIFIED ATTORNEY:  No, Your Honor.

16          THE COURT:  All right.  They're admitted and I'll get

17  copies tomorrow.  Good evening.

18          MR. WORF:  Good evening, Your Honor, Richard Worf for

19  Garlock Sealing Technologies.

20          THE COURT:  Yes, sir.

21          MR. WORF:  We have entered into a stipulation in lieu

22  of live testimony with the plan proponents.  It's at Docket

23  Number 23219.  Attached to the stipulation is a list of certain

24  exhibits -- Garlock's exhibit list that Garlock is offering.

25  For the purposes that Garlock is offering them for, I believe

1 the only objections remaining are relevance objections which

2 we're not going to argue at this time I understand.  So, with

3 that I believe we will just move those into evidence subject to

4 the relevance objections that are going to be argued at a later

5 time.

6         THE COURT:  All right.  Is that acceptable that I

7 will take them, but subject to a relevance ruling?

8         MR. GUY:  Yes, Your Honor.  It's set forth an

9 exquisite and sometimes excruciating detail in the stipulation.

10 I don't believe these are offered for the use in any live

11 testimony, so they will not be offering copies at this time,

12 but --

13         MR. WORF:  Your Honor, attached to the stipulation

14 there's also a declaration that the proponents have agreed to

15 let Garlock offer in lieu of having a live witness and they've

16 agreed not to object on hearsay grounds and to waive all

17 objections except relevance.  It's also attached to the

18 stipulation and Garlock moves that into evidence, as well.

19         THE COURT:  All right.  Are you giving me a binder

20 with respect to these?

21         MR. WORF:  Yes, I have the stipulation here and I

22 also have --

23         THE COURT:  All right.

24         MR. WORF:  -- a disk with everything that Garlock is

25 going to offer on it.

1          THE COURT:  All right.  And do you have an exhibit

2     number on these?

3          MR. WORF:  The numbers are attached to the

4     stipulation and we can mark the stipulation as Garlock Exhibit

5     104.

6          THE COURT:  All right.

7          MR. WORF:  We're also going to have a limited number

8     of other exhibits that are not coming in through live testimony

9     and that are not referenced in the stipulation.  We're going to

10     attempt to authenticate those by declaration and we're going to

11     discuss that with the plan proponents and offer those at a

12     later time.

13          THE COURT:  Okay.  Garlock Exhibit 104, it is offered

14     and admitted, but subject to a relevance ruling after

15     appropriate argument.

16          MR. WORF:  Thank you, Your Honor.  Mr. Cohn?

17          MR. COHN:  Yes, Jacob Cohn for Federal Insurance

18     Company.  I just wanted to say that in reliance upon the

19     anticipated finalization of the neutrality stipulation, Federal

20     which only has an interest here now as a non-settled high level

21     carrier has avoided litigating anything here and we don't

22     intend to offer any additional exhibits.  Frankly, I think the

23     only issue that's going to be ours is the one that we're denied

24     the neutrality on which is the assignment issue which I don't

25     think is going to require any evidentiary submission.

**J&J COURT TRANSCRIBERS, INC.**

1          But, we had a few things like our policies and some

2    discovery that was admitted in Phase 1, am I to understand that

3    to the extent it becomes necessary you want extra copies of

4    those in a binder for Phase 2?

5          THE COURT:  Either that or I need a designation

6    somewhere as to where they are in Phase 1.

7          MR. COHN:  That's fair enough.  Thank you, Your

8    Honor.

9          THE COURT:  So, you're going to give me that

10   tomorrow, Mr. Cohn?

11         MR. COHN:  Sure.

12         THE COURT:  All right.  One second.  Mr. Demmy?

13         MR. DEMMY:  Yes, Your Honor, John Demmy for Fireman's

14   Fund and all the FD Allianz insurers.  We had provided exhibits

15   -- the same set of exhibits actually that we provided in Phase

16   1 and largely I think 32 out of the 35 of them drew no

17   objection whatsoever.  I'm bringing out a couple of

18   housekeeping issues and trying to answer a question for Mr.

19   Horkovich.  I just wanted to note that we'll be offering those

20   exhibits tomorrow before this part of the Phase 2 proceeding

21   ends.  I just didn't want to let that go unmentioned, rather,

22   before the phase ended.

23         THE COURT:  Okay.

24         MR. DEMMY:  So, I'll do that tomorrow.

25         THE COURT:  All right.  That's fine and I -- if they

1 were really voluminous, as long as you can tell me where they

2 are in Phase 1 -- this is true for your client, too, Mr. Shiner

3 -- I'm happy to have the exhibits back in Phase 1.  I thought

4 it was just going to be Mr. Shiner's, but if it's all the

5 insurers doing the same thing, I don't need duplicate sets of

6 voluminous records.

7        MR. DEMMY:  That's the question that Mr. Horkovich

8 asked that we're finding out and we'll provide to the Court and

9 to the parties.

10        THE COURT:  All right.

11        MS. BAER:  Your Honor, I hate to walk up here with a

12 large binder, but I'll replace it with something else.  Your

13 Honor, the eagle eyes of Alan Rich last night discovered for us

14 that the Plan documents that were admitted as exhibits and put

15 on your CD were actually the wrong versions.  They were the

16 ones filed on February 27th and as you may recall at the March

17 9th hearing when you approved them there were some minor

18 adjustments made before publication went out.

19        We, Your Honor, last night when we made the discovery

20 took the CD that went out to everybody for publication, printed

21 the plan documents again in hard copy so we know that they're

22 the right versions.  We then put those plan documents on a new

23 CD, Your Honor, so you'd have them on CD as well as hard copy,

24 and we also added on the September 4th, 2009 modifications to

25 the plan that were filed on September 4th, 2009.

1          So, Your Honor, I'd like to give you this binder and

2     the replacement CD.  I have a number of replacement CDs if

3     other parties want them, but we've already put them onto our

4     FTP website and they can get them that way.  And, again, if

5     they want hard copy CDs, we can provide those, too.  And, Your

6     Honor, if you'd like, I can tell you where in your agenda

7     binders are the ones that were given to you that are incorrect

8     and we can grab those.

9          THE COURT:  I think you can just do it.  It will make

10    it easier --

11         MS. BAER:  Well --

12         THE COURT:  -- rather then, yes, straighten them out

13    in the agenda binders yourself, so that I have the correct set.

14    I definitely want the correct set.  I take it nobody has an

15    objection to my having the correct plan.

16         MS. BAER:  And I will hand that to Your Honor.

17         THE COURT:  All right.  All right.  So, Ms. Baer,

18    you'll just have somebody go through.

19         MS. BAER:  Right.

20         THE COURT:  It will be in this front row set.

21         MS. BAER:  Yes.  Well, I'll stand and work with that

22    right away.  And then, Your Honor, one final matter is, we're

23    trying to, you know, limit the number of additional bodies we

24    need to bring in and we had designated a Canadian lawyer to

25    come in to essentially put into the record two vital pieces of

1 information that are confirmation requirements.

2         One is that we have the Canadian ZAI settlement

3 approving Canada.  And you, in fact, have a copy of that order

4 in some other pleading, but we have a certified verified copy

5 from Canada.  And number two that Canadian rep counsel was

6 appointed in Canada to represent all of the Canadian ZAI

7 claimants and to vote the plan.

8         We have an affidavit from him that I will circulate

9 by e-mail tonight.  I have a hard copy here, but it's the copy.

10 I don't have the fancy one certified.  It will be here tomorrow

11 by Federal Express.  The question is whether or not we need to

12 bring him live to put these documents into evidence, or if the

13 parties will accept his affidavit.  Nobody objected with

14 respect to anything Canadian.  There were no objection from any

15 party related to any of the Canadian provisions of the plan and

16 the like.

17         So, Your Honor, again, I'll circulate a hard copy to

18 everybody.  We'd appreciate knowing as soon as possible whether

19 we need to fly somebody in from Toronto to testify.

20         THE COURT:  Is any -- well, they haven't seen the

21 stipulation.  Does anybody see a need at this point for a

22 witness to testify as to those facts?

23                 (No audible response)

24         THE COURT:  I don't think you're going to need a

25 witness for that purpose, but circulate the affidavit tonight

**J&J COURT TRANSCRIBERS, INC.**

1 and we'll see what the parties say in the morning.

2          MS. BAER:  Thank you, Your Honor.

3          THE COURT:  So, you'll produce those exhibits

4 tomorrow, correct, to the Court?

5          MS. BAER:  Yes, Your Honor.  I have copies now, but

6 I'll bring the original certified copies in.

7          THE COURT:  All right.

8          MR. BERNICK:  Can we inquire as to whether there are

9 any intended live witnesses and I know that, again, BNSF wants

10 the evening to think that over, but is there anybody else that

11 want -- that believes they want to call a live witness, and

12 that's -- the gentleman, Mr. Pratt, anybody else?

13          THE COURT:  I don't think Mr. Pratt wants to.  I

14 think the issue is whether Mr. Pratt has to, but okay.

15                         (Laughter)

16          MR. BERNICK:  Okay.  Well, yes.  So, in that event it

17 sounds like we're probably going to get to the lender's case

18 tomorrow and our expected order of proof would be Mr. Tarola.

19 Mr. Tarola has a very tight schedule tomorrow, so it would

20 actually -- well, I guess we'll go with the proper order and

21 simply take the testimony from BNSF and from whomever, if

22 that's going to be offered.  Then we'll call Mr. Tarola.  Then

23 we'll call Mr. Shelnitz to talk about the lender situation.

24 Then we'll call Ms. Zilly to testify as an expert, and at that

25 point our case with respect to the lenders will close.

1       We then expect that it will -- then there -- I think
2  there will be some --
3       THE COURT:  Let me remind everyone, tomorrow is the
4  day that this case stops at noon.
5       MR. LOCKWOOD:  I thought that was Thursday.
6       THE COURT:  The 17th, yes.
7       MR. LOCKWOOD:  Tomorrow's the 16th, Your Honor.
8       THE COURT:  Oh, okay.  It's been so much fun, I'm
9  sorry.
10                      (Laughter)
11      THE COURT:  I apologize.  I lost a day.
12      MR. BERNICK:  So, at that point --
13      MR. LOCKWOOD:  I think we've lost two weeks, but
14  that's different.
15      MR. BERNICK:  We may call Denise Martin, as well, as
16  part of our case, but then it will be up to the lenders to call
17  their witnesses and I think that there might be a short
18  rebuttal by Ms. Zilly, depending upon that case.  But, then
19  that is our expected order of witnesses for tomorrow.
20      I don't expect that that's actually going to take all
21  day.  And beyond that I'm not sure to what extent we will--
22  well, we'll then go into the next phase of the case.  I know
23  that we're going to be calling Mr. Ostern and Judge Sanders as
24  part of that case.  I don't -- we may get to them tomorrow.  I
25  just don't know.

1           MR SCHIAVONI:  Your Honor, I came here largely for

2    the BNSF witnesses and I would just ask that tomorrow's the one

3    and only day because of a very unique situation, I can't be

4    here until ten o'clock.  I asked Mr. Bernick as almost a

5    personal favor if BNSF calls a witness if he'd allow them to

6    call it after ten o'clock and he'd have somebody in the slot

7    before them.

8           MR. BERNICK:  That's not -- that's fine.  Mr. Tarola

9    will be grateful for being able to get out all the earlier.

10          THE COURT:  All right.  Is there anyone who has an

11   objection to starting with Mr. Tarola and deferring the rest of

12   the insurer's cases until after Mr. Tarola's testimony?

13          No one's objecting.  We'll start with him tomorrow,

14   so that his schedule can be accommodated and then we'll finish

15   with the insurer/other cases.

16          The lenders, Mr. Pasquale, I don't know whether you

17   know are the lenders going to put on any witnesses?

18          MR. PASQUALE:  Yes, Your Honor.  We will have two

19   witnesses, Mr. Kruger and an expert witness, Mr. Frezza.  And

20   that's for the committee and the lenders.

21          THE COURT:  And how long do you expect they're going

22   to take?  I'm just trying to see whether we're going to get to

23   Mr. Austern and Mr. Sanders on Friday or whether, in fact,

24   we're going to be taking up Thursday and Friday with the

25   remainder of the debtor's case and the lender's case.

1          MR. PASQUALE:  The Court had Friday, but that's fine.

2  No, Mr. Kruger will be --

3          THE COURT:  Oh, I don't have Friday.  Oh, Thursday.

4  I'm sorry.

5          MR. PASQUALE:  I didn't think so.

6          THE COURT:  I keep thinking today's Wednesday.  I

7  apologize.  I meant Thursday morning.

8          MR. PASQUALE:  I think Mr. Kruger will be very short.

9  Mr. Frezza a little bit longer, maybe an hour and a half all in

10 including cross on --

11         THE COURT:  All right.  So, it's possible Thursday we

12 may actually start another phase of the case.

13         MR. BERNICK:  Yes, I -- I'm not -- that's tomorrow,

14 Wednesday, I think it's possible that we will be starting

15 another phase.  That's to say Mr. Shelnitz on direct

16 examination will be about a half hour.  Mr. Tarola shorter.

17 Ms. Zilly probably 45 minutes, and Ms. Martin probably about a

18 half an hour.

19         THE COURT:  Oh, all right.

20         MR. BERNICK:  So, I think that there's some chance,

21 but we'll definitely start the next phase of the case on

22 Thursday.  I mean, I think we may start it tomorrow and we'll

23 clearly be in it on Thursday.

24         THE COURT:  Okay.  And then when is the next time

25 that this case is reserved for trial?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. LOCKWOOD:  October 13 and 14, Your Honor.

2          THE COURT:  Okay.  Is it going to finish then?

3          MR. BERNICK:  I think it may finish -- it may finish

4    -- it may finish this week.  I don't know.  It depends on how

5    many witnesses the other folks are going to call, but we don't

6    have that many witnesses for the last phase.  We have Mr.

7    Austern and Judge Sanders and we have Ms. Zilly to talk about

8    best interests.

9          THE COURT:  Okay.  My own housekeeping matter then.

10   I know that the -- some of the parties apparently were trying

11   to work out some order that would govern the post-confirmation

12   trial process.  Has that been finalized?

13         MR. BERNICK:  I think we've submitted that as a

14   proposed order, have we not?  We've submitted it.  It's not

15   agreed to.

16         THE COURT:  Okay.  Then some time, either Friday if

17   we get to it or if not then in October, I suppose -- I'm sorry.

18         UNIDENTIFIED ATTORNEY:  Thursday.

19         THE COURT:  Oh.  I'm sorry.  Thursday we will attempt

20   to address that issue and if we don't get to it then I don't

21   know if it's something that we can put onto the omnibus

22   hearing, so that perhaps we can get that issue looked at before

23   the trial phase is over, if witnesses have to continue in

24   October.

25         MR. BERNICK:  Well, the -- I'm sorry.  The -- our

1  proposal under the -- on what we've submitted is that we would

2  have the first briefs actually due on the 25th which is before

3  the next omnibus because we would like very much to continue

4  towards the process of getting the plan confirmed.  So, if we

5  can't take it up -- although I don't know why we couldn't be

6  able to take it up at some point before Thursday midday.  I

7  think it's not that difficult to resolve.

8          The real issue is the order of briefing and the

9  timing for briefing.  That may take a little time, but I don't

10 think it's outside the realm of possibility to complete that.

11 That would enable us to at least be working on a schedule to

12 complete the post trial briefing.

13         THE COURT:  Okay.  Well, I suppose it may depend on

14 whether you're finished.  You're talking about submitting the

15 initial briefs a week after the trial starts, essentially?

16         MR. BERNICK:  This -- the original proposal that we

17 made, and it remains our proposal, is that we have a series of

18 briefs that follow the sequencing of the trial.  So, the first

19 brief that would be due on September 25 is obviously not a

20 brief that relates to the matters that we're still litigating.

21 It relates to Libby and the discrimination issue which was the

22 substance of what was presented last week.

23         THE COURT:  Okay.  Am I going to be able to address

24 those issues until we have the arguments on the exhibits that

25 Libby wants to admit that I have to determine relevance and the

1  other things on?

2        MR. BERNICK:  Well, I think that that all deals with

3  the -- our proposal, I think, is going to be that -- the hour

4  is very, very late, Your Honor.  If you want to -- this is a

5  whole new area.  If the proposal that we were going to make is

6  that insofar as Your Honor has reserved on exhibits for

7  relevance and reserved on designations for relevance, there's

8  no way it's going to be humanly possible to actually have

9  arguments, document-by-document, designation-by-designation.

10 We just don't think that's feasible and we don't think it's

11 necessary.

12       So, what our proposal would be is that people submit

13 their post trial briefs and in those post trial briefs make

14 reference to whatever documents they have tendered, but as to

15 which relevance has been reserved.  And the same thing with

16 respect to the designations.  And in the course of the post

17 trial briefs if people want to raise issues regarding the --

18 want to actually address admissibility issues, Your Honor then

19 can see those issues framed in the context of a brief that

20 explains the relevance of the material.  I think it's much,

21 much more efficient than having document-by-document argument

22 where frankly Your Honor is still not going to be completely

23 advanced in terms of knowing what the parties' contentions are

24 regarding relevance.

25       So, if we work the admissibility issues, particularly

1  relevance, into the post trial briefing then at that point when

2  we have argument after the post trial briefs are in and Your

3  Honor wants to entertain argument regarding admissibility, we

4  can do that.  Otherwise, I think we're going to have a very,

5  very long proceeding, which currently is not even scheduled, to

6  deal with deposition designations and with documents.

7          THE COURT:  Okay.

8          MR. BERNICK:  So, our proposal basically works along

9  those lines.

10          THE COURT:  All right.  Well, I don't want to get

11  into this issue tonight because it is pretty late and I've set

12  you about some other tasks that I think you need time to work

13  on tonight.  But, I think that to a certain extent that at

14  least has some facial appeal because to the extent that I can

15  understand your arguments in the context of all of the evidence

16  that you point out to me, that would be helpful.

17          But, I am not going to be accepting briefs and post

18  trial designations that do not refer specifically to the

19  exhibits in the testimony.  I'm not going to do that.  I want

20  the references to the exhibits in the testimony.  If it's been

21  -- if I've reserved, you can tell me that in the post trial

22  submissions and I'll reserve and make a ruling as it's

23  necessary, but this is too much material to try to put together

24  without the references to the specific exhibits.  So, if

25  somebody's going to cite an exhibit, I want it cited.

1          MR. BERNICK:  Well, that was the rule that Your Honor
2  laid out before --

3          THE COURT:  Yes.

4          MR. BERNICK:  -- and I believe that we have
5  incorporated -- or at least I hope we've incorporated it into
6  our proposal.  And we further undertook to the extent possible
7  to provide the linkage so that you can actually click on the
8  images.

9          THE COURT:  Yes, that's great.

10         MR. BERNICK:  Yes, I --

11         THE COURT:  It worked fine even though it's
12  apparently not the right plan, but it worked fine.

13         MR. BERNICK:  The --

14         MS. DeCRISTOFARO:  Your Honor?

15         MR. BERNICK:  The exhibits -- it would be -- it would
16  have to be a matter of record, so the exhibit would have to
17  have been proffered as to the deposition designations because
18  you don't proffer deposition designations, you make the
19  designations, the designation process is the proffer.  The
20  deposition designations would also be fair game in the trial
21  briefs and -- but that is a discrete set of material that I
22  believe already has been furnished to the Court in the fashion
23  that we indicated which is transcripts that have been marked up
24  with the designations and the objections.

25         So, it would be just the record comprised of what's

1  happened here, live and through exhibits and then the

2  designations.

3            THE COURT:  Okay.

4            MS. DeCRISTOFARO:  Your Honor, I was just going to

5  say I'm sure you don't want to hear the merits, but that order

6  was submitted with a statement that every objector has felt

7  that there's inadequate time allowed for the post trial

8  briefing and I just want you to be aware that everyone agreed

9  -- everyone disputed the proposed order, and I just want you to

10 know that.

11           THE COURT:  Okay.  I haven't looked at it.  I know

12 that it's been submitted.  I have not seen it.  I think that in

13 concept the proposal of addressing exhibits and testimony in

14 the context of the briefs makes sense.  The timing, you know,

15 that's a whole different issue.  You're going to get adequate

16 time to do what you need to do, but it's not going to be months

17 and months.

18           You've already submitted pretrial briefs that cover

19 most of what you're going to tell me post trial, so I don't

20 need to have reargued what you've reargued.  What I need is for

21 you to true up the evidence to the contentions that you've

22 made.  That's what I need.

23           MS. DeCRISTOFARO:  Your Honor, September 25th is

24 around the corner to start this.

25           THE COURT:  Well, I understand that.  Okay.  Mr.

1 Kovacich?

2        MR. KOVACICH:  Your Honor, I was going to make a

3 similar point, just that we don't agree with the idea that the

4 briefing for each of the phases which were designated by the

5 plan proponents start at the conclusion of those phases.  For

6 the record, I want that to be clear.  We -- everybody

7 representing Libby in this case has been here throughout the

8 whole trial.  Mr. Lewis is leaving in the morning.  The time

9 for briefing would have started last Friday on their proposal

10 and we obviously haven't been working on that.

11        THE COURT:  That's fine.  This is going to be a

12 monumental task for my staff.  I am losing an experienced clerk

13 and getting an inexperienced clerk.  So, I can tell you that it

14 is going to take awhile to get somebody through all of this

15 evidence and it's not going to be something that's done in a

16 rush.

17        So, I will do my best to get somebody to go through

18 it, but that's what's happening and it's going to be awhile.

19 And it's the nature of the beast as you all know if you've

20 worked with young associates and clerks before.  So, it will

21 take some time to get through this.  I'm not going to, you

22 know, have a rush to judgment over the issues.  I've never had

23 a case at plan confirmation that has so many unresolved issues,

24 so it's going to take me awhile to get through them.

25        Hopefully, while I've ordered you folks to go out and

1 talk, you're also trying to resolve some of these plan issues

2 because as I've heard the evidence coming in, some of these

3 things are not rocket science and they could be resolved

4 without changing the essential provisions of this plan and

5 trust structure.  They could be.  I think you should talk.

6        Anything else before tomorrow morning?  We're

7 adjourned until nine o'clock.

8        UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

9                    * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T I O N

We, KELLI PHILBURN, PAT REPKO, KATHLEEN BETZ, ELAINE HOWELL, LORI AULETTA, CEIL ASHBOCK and AMY L. RENTNER, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our abilities.

/s/ Kelli Philburn

KELLI PHILBURN


/s/ Pat Repko

PAT REPKO


/s/ Kathleen Betz

KATHLEEN BETZ


/s/ Elaine Howell

ELAINE HOWELL


/s/ Ceil Ashbock

CEIL ASHBOCK


/s/ Amy L. Rentner

AMY L. RENTNER

J&J COURT TRANSCRIBERS, INC.      DATE:  September 23, 2009


**J&J COURT TRANSCRIBERS, INC.**