IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
In Re:                       )
                             )
W.R. Grace & Co.,            )
et al.                       )Bankruptcy No. 01-01139
         Debtor              )  Docket No. 23028
                             )  Jointly Administered
                             )  Chapter 11
```

## ORDER REGARDING ANDERSON MEMORIAL HOSPITAL'S MOTION TO COMPEL DEBTORS TO PROVIDE FULL AND COMPLETE DEPOSITION ANSWERS

AND NOW this 8th Day of October, 2009, after consideration of the pleadings, the argument of counsel at the hearing held on October 7, 2009, the depositions of the witnesses identified below, and the briefs, the Court has determined that some questions to be propounded to certain witnesses must be answered by Debtors and others need not. The Court will address the issues on a witness by witness basis, in accord with the Motion to Compel's format. *See* Anderson Memorial Hospital's Motion to Compel Debtors to Provide Full and Complete Deposition Answers, Docket Number 23028 (hereafter, "Motion").

Now Therefore it is ORDERED:

1 - Regarding the deposition of Hudson LaForce (the CFO of Grace) and the issue of what the $37.3 Million represents, Mr. LaForce testified that the figure did not represent a payment for ZAI claims and that he did not recall the other types of claims sufficiently to testify as to what it did represent. He identified Mr. Shelnitz as the person who should be asked the question of "what the $37.3 Million was for." *Deposition of Hudson LaForce, August 6, 2009 at 84-85* (hereafter, "LaForce Deposition").

However, Mr. LaForce also testified at 85-89 of the LaForce Deposition that the $37.3 Million together with the $30 Million representing the ZAI payment indicates that Grace "is projecting 67.3 million dollars in future payments on property damage, yes, asbestos property damage." *Id.* at 85-86. In response to questions concerning Grace's ability to make a $67.3 Million future payment that he had absolutely no question in his mind that Grace could make that payment, that he agreed with the projections of Pamela Zilly (Grace's feasibility expert) that Grace would have approximately $143 Million in cash on emergence (the date of emergence was not specified in the question asked of the witness), that Grace requires a minimum csh balance to operate of an estimated $100 Million, that the $100 Million did not need to be adjusted for inflation and was a reasonable long-term estimate. *Id.* at 86-89. He later testified that even if Grace had to pay as much as $342 Million over a 250year time period for property damage liability, Grace could do so. Id. at 94-95. Additional testimony was offered including the witness's understanding of certain assumptions that were or were not made to arrive at Grace's liability for the non-ZAI future property damage claims, Mr. LaForce's knowledge or lack thereof concerning payments made by Grace and additional questions concerning Grace's ability to make payments based on varying assumptions.

Based on the testimony Mr. LaForce provided and his testimony that he lacks sufficient information to answer questions concerning "what the $37.3 Million was for" other than through information communicated to him by attorneys for W.R. Grace, the questions identified on page 3 of the Motion cannot be answered by this witness.

Therefore, the Motion is **DENIED** as to Hudson LaForce.

2 - Regarding the Deposition of Pamela Zilly dated August 19, 2009 (hereafter "Zilly Deposition"), Ms. Zilly testified that she relied on the company for its estimate of unresolved asbestos-related litigation and claims and its estimate of the payment of property damage claims in the future and identified that number as the $37.3 Million reflected on page 8 of the balance sheet. *Zilly Deposition* at 26-28. When asked of her knowledge of the estimate, Ms Zilly testified that she knew

"generally" *Id.* at 29, how it was calculated and that the source of her information was "Internal counsel at W.R. Grace" *Id.* at 30, and later identified that counsel as "Mark Shelnitz." *Id.* at 30. Ms Zilly stated that she knew nothing regarding how Grace came up with that number other than how it was estimated the discussion of that number, *Id.* at 30, but her knowledge came from a discussion that involved "overall items, legacy items on the balance sheet" and that she had included the $37.3 Million number in her report under "Total legacy payments" as a payment Grace would make in 2011. *Id.* at 31-33. She testified at length about plan feasibility including that "the feasibility test is based on whether or not the debtor can meet its obligations under the plan. The plan resolves those liabilities [i.e.,existing and future asbestos personal injury and property damage liabilities]. *Id.* at 35-37. Her opinion relied on the estimate of the payment of any property damage claims in the future. *Id.* at 38, 42.

Based on the testimony Ms Zilly provided and her testimony that she lacks sufficient information to answer questions concerning "how Grace's future property damage projection was calculated or estimated" other than through information communicated to her by Mark Shelnitz, General Counsel for W.R. Grace, the questions identified on page 4 of the Motion cannot be answered by this witness.

Therefore, the Motion is **DENIED** as to Pamela Zilly.

3 - Regarding the Deposition of Mark Shelnitz dated August 19, 2009[1] (hereafter "Shelnitz Deposition"), the Motion lists 3 areas of inquiry for additional responses (the $37.3 Million as a projection of future asbestos property damage claims at 4-5 of the Motion, feasibility at 5 - 6 of the motion and good faith at 6 - 8 of the Motion). Many of the questions involve matters as to which Mr. Shelnitz is likely not to be the sole percipient witness. Questions of Mr. Shelnitz risk invasion of the attorney client privilege and that risk outweighs the need for information from Mr. Shelnitz when another witness is available.

---

[1] At page 4, the Motion incorrectly identifies the date of the Shelnitz Deposition as August 20, 2009. The transcript provided by the Movant in its Reply is dated August 19, 2009.

Insufficient cause has been shown to require Grace's General Counsel to testify in lieu of another competent witness. The questions as to which this Court will deny the Motion, in the Court's view, either would invade the attorney client privilege, would not be calculated to lead to admissible evidence, or are obtainable from another source. Others of the questions seek to learn Grace's settlement or litigation position regarding Anderson, a matter clearly outside the scope of the plan confirmation hearing.

For these reasons, the Motion is **DENIED** for all questions listed in the Motion under the heading of "Mark Shelnitz" **OTHER THAN** the questions listed herein, as to which the Motion is **GRANTED.**

As a point of clarification, most of the questions listed under the heading of "Mark Shelnitz" were not asked by counsel to Anderson Memorial Hospital. Anderson's counsel passed the witness on page 145 of the Shelnitz Deposition. The parties who asked the questions have not sought to compel responses. Thus, it is unclear how Anderson Memorial Hospital has grounds on which to seek this motion as to those questions. Nonetheless, that issue was not addressed by the parties and so the court will review all of the questions in the Motion.

Where additional clarification is needed as to a specific question, that information can be found in note 2, *infra*.[2]

---

[2] 1 - At page 4 of the Motion, the question is stated to be "Whether the projections are in the report [Exhibit 8] with a reference to the Shelnitz Deposition at 129. In fact, the question asked was "Is that information in a report?" *See Shelnitz Deposition* at 129, line 14. There was no reference in the question to a specific report. As posed, the question called for privileged information. The Court notes that in the Shelnitz Deposition at 140-141, a document was marked as Exhibit 8. The Exhibits to the Shelnitz Deposition were not provided and the Court does not know what Exhibit 8 is. It appears, from the Deposition at 140-141 to be a copy of a financial model dated June 1, 2009. Later in the Deposition, Mr. Shelnitz testified that Exhibit 8 was prepared for exit financing purposes. *Id.* at 157 lines 23-25.
   2 - Mr. Shelnitz did, in fact, answer the questions at page 4 of the motion, "Whether he knows what it [the $37.3 Million figure] is for" and "What the $37.3 million figure is for" at page 141, line 19 of the Shelnitz Deposition, where he
(continued...)

Therefore, cognizant that this is a discovery deposition and reserving all rulings as to the admissibility of any evidence obtained hereby, it is ORDERED that the Motion to Compel is GRANTED as to the following questions and Debtor shall provide answers to them either in the form of a renewed deposition of Mark Shelnitz or by way of a written answer from Mark Shelnitz or when the question is not directed specifically to Mr. Shelnitz's participation), by another witness who is competent to make the written response and available to testify at trial. In the event that the witness who responds is someone other than Mr. Shelnitz, the court reserves ruling on whether additional discovery will be warranted from that witness. If no witness with knowledge of the subject matter knows the answer to a particular question, that information shall be stated in the answer and the question shall be answered by Mr. Shelnitz as the person to whom it was directed.

**Responses to the following questions shall be provided by the Debtor not later than midnight (Eastern time) on October 11, 2009:**

1 - What the $37.3 Million figure is (in generic terms);
2 - Whether the figure came from inside of Grace (yes or no);
3 - Whether the figure came from outside of Grace (yes or no);

---

[2](...continued)
responded "Yes" to the statement of Grace's counsel that he could answer the question of whether he's aware of what that line item represents, yes or no. Similarly, he answered that he believes he knows what the number was composed of, what went into the number. *Id* at 154. Without attempting an exhaustive list, there are other examples of questions that Mr. Shelnitz answered although the Motion suggests otherwise. *See, e.g., Id.* at 95 lines 12 where Mr. Shelnitz testified in response to a question whether he had any involvement, including any discussions, or management, of any other people in connection with objections to Speights and Runyan claims in 2005, "Yes;" and in response to when was the last time he talked to Mr. Rich, "This morning." *Id.* at 104.

3 - Mr. Shelnitz, according to Grace's counsel, is not being called regarding plan feasibility, Therefore, some questions of fact that are within his knowledge and that can be stated without violating the attorney client privilege may be addressed by this witness. However, "Whether the plan is feasible" as stated on page 5 of the Motion is not a fact question but calls for a legal conclusion.

4 - Whether Grace has attempted to project future traditional property damage claims (yes or no);

5 - If the answer to question 4 is "no," then Why Grace has not attempted to quantify future property damage claims IF THIS ANSWER CAN BE PROVIDED WITHOUT VIOLATING THE ATTORNEY CLIENT PRIVILEGE;

6 - What is Grace's position on the total value of the personal injury claims;

7 - Whether Mr. Shelnitz attended a meeting in June of 2009 with lenders where feasibility of the plan was discussed (yes or no);

8 - Whether Mr. Shelnitz has ever discussed traditional property damage claims with the lender group IF THE WITNESS HAS AN UNDERSTANDING OF WHO " THE LENDER GROUP" IS - OTHERWISE, THE OBJECTION TO THE USE OF THE TERM "LENDER GROUP" AS VAGUE WILL BE SUSTAINED (yes or no BUT INCLUDING A DESCRIPTION OF "THE LENDER GROUP");

9 - The names of the people who were involved in the process of reviewing property damage claims filed in response to the bar date;

10- Which members of the Personal injury committee were involved in settlement discussions;

11 - Whether Mr. Sheltniz met with anybody other than Kirland and Ellis at a deposition preparation meeting IF THIS ANSWER CAN BE PROVIDED WITHOUT VIOLATING THE ATTORNEY CLIENT PRIVILEGE (yes or no and who);

12 - Whether Mr. Shelnitz examined any documents during his deposition prep other than those discussed with Mr. Pasquale ( yes or no);

13 - Whether Mr. Shelnitz was involved in the process of developing procedures for treating present traditional property damage claims and future property damage claims (yes or no);

14 - Whether Mr. Shelnitz had any discussions with Judge Sanders or Alan Rich regarding the treatment of future traditional property damage claims (yes or no);

15 - IF THIS ANSWER CAN BE PROVIDED WITHOUT VIOLATING THE ATTORNEY CLIENT PRIVILEGE, when was the last time he talked to Judge Sanders;

16 - Who Mr. Shelnitz negotiated with regarding the ZAI negotiations;

17 - Whether Mr. Shelnitz negotiated with the Asbestos Property Damage Committee (yes or no); and

18 - Whether the personal injury committee encouraged Grace to make objections to Speights and Runyan claims (yes or no, and if yes, who and when).

Dated: 10/8/2009
16:59:56

*Judith K. Fitzgerald*
Judith K. Fitzgerald
United States Bankruptcy Judge

cjs