UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .    Case No.  01-1139 (JKF)
                                .
W.R. GRACE & CO.,               .
et al.,                         .    USX Tower - 54th Floor
                                .    600 Grant Street
                                .    Pittsburgh, PA 15219
                    Debtors.    .
                                .    September 16, 2009
. . . . . . . . . . . . . ..         9:09 a.m.


TRANSCRIPT OF PLAN CONFIRMATION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                            By:  DAVID BERNICK, ESQ.
                            200 East Randolph Drive
                            Chicago, IL  60601

For the Asbestos            Caplin & Drysdale, Chartered
Creditors Committee:        By:  NATHAN FINCH, ESQ.
                                 JAMES WEHNER, ESQ.
                            One Thomas Circle, NW
                            Washington, D.C. 20005

For the Future             Orrick, Herrington & Sutcliffe, LLP
Claimants                  By:  ROGER FRANKEL, ESQ.
Representatives:                JONATHAN GUY, ESQ.
                           Washington Harbour
                           3050 K Street, N.W.
                           Washington, D.C.  20007


Audio Operator:            Janet Heller

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For the Libby Claimants:   Lewis, Slovak & Kovacich, P.C.
                           By:  TOM L. LEWIS, ESQ.
                           725 Third Avenue North
                           Great Falls, MT 59401

                           McGarvey, Heberling, Sullivan and
                            McGarvey, P.C.
                           By:  JON HEBERLING, ESQ.
                                JOHN LACEY, ESQ.
                           725 Third Avenue North
                           Great Falls, MT  59401

                           Cohn Whitesell & Goldberg, LLP
                           By:  DANIEL C. COHN, ESQ.
                           101 Arch Street
                           Boston, MA  02110

For Arrowood:              Wilson, Elser, Moskowitz, Edelman,
                            & Dicker, LLP
                           By:  CARL J. PERNICONE, ESQ.
                           150 East 42nd Street
                           New York, NY 10017

                           O'Melveny & Myers, LLP
                           By:  TANCRED SCHIAVONI, ESQ.
                           Times Square Tower
                           Seven Times Square
                           New York, NY 10036

For BNSF Railway:          Pepper Hamilton, LLP
                           By:  LINDA CASEY, ESQ.
                                BOB PHILLIPS, ESQ.
                           3000 Two Logan Square
                           Philadelphia, PA  19103

For CNA:                   Goodwin Procter, LLP
                           By:  MICHAEL GIANNOTTO, ESQ.
                           Exchange Place
                           Boston, MA  02109-2881

For Fireman's Fund:        Stevens & Lee
                           By:  MARNIE SIMON, ESQ.
                           600 College Road East, Suite 4400
                           Princeton, NJ 08540

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Maryland Casualty:      Connelly Bove Lodge & Hutz, LLP
                            By:  JEFFREY WISLER, ESQ.
                            The Nemours Building
                            1007 North Orange Street
                            Wilmington, DE  19899

For MCC & Zurich:           Eckert Seamans
                            By:  EDWARD D. LONGOSZ, ESQ.
                            1747 Pennsylvania Avenue, NW
                            Suite 1200
                            Washington, DC 20006

                            Wiley Rein, LLP
                            By:  RICHARD A. IFFT, ESQ.
                            1776 K Street NW
                            Washington, DC 20006

For Ford, Marrin,          Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer            Gleser, LLP
& Gleser, LLP:              By:  ELIZABETH M. DeCRISTOFARO, ESQ.
                            Wall Street Plaza, 23rd Floor
                            New York, NY  10005-1875

For Kaneb Pipe Line        Fulbright & Jaworski
Operating Partnership,      By:  STEVE PEIRCE, ESQ.
LP:                         300 Convent Street, Suite 2200
                            San Antonio, TX 78205-3792

For Travelers:             Simpson Thacher
                            By:  ELISA ALCABES, ESQ.
                            425 Lexington Avenue
                            New York, NY  10017

For State of Montana       Womble Carlyle Sandridge & Rice
Dept. of Environmental     By:  FRANCIS MONACO, ESQ.
Quality:                    222 Delaware Avenue, Suite 1501
                            Wilmington, DE 19801

For AXA Belgium:           Tucker Arensberg, P.C.
                            By:  MICHAEL A. SHINER, ESQ.
                            1500 One PPG Place
                            Pittsburgh, PA  15222

                            Mendes & Mount
                            By:  EILEEN McCABE, ESQ.
                            750 Seventh Avenue
                            New York, NY  10019

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

| | |
|---|---|
| For Committee of<br>Asbestos Personal<br>Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701 |
| For Kaneb Pipe Line<br>Operating Partnership,<br>LP: | Gilbert & Renton, LLC<br>By:  ROBERT GILBERT, ESQ.<br>344 North Main Street<br>Andover, MA 01810 |
| For Garlock Sealing<br>Technologies: | Robinson, Bradshaw & Hinson, P.A.<br>By:  GARLAND CASSADA, ESQ.<br>     RICHARD WORF, ESQ.<br>101 North Tryon Street<br>Suite 1900<br>Charlotte, NC  28246 |
| For Federal Insurance<br>Company: | Cozen O'Connor<br>By:  JACOB C. COHN, ESQ.<br>1900 Market Street<br>Philadelphia, PA  19103 |
| For Sealed Air: | Skadden, Arps, Slate, Meagher & Flom,<br> LLP<br>By:  DAVID TURETSKY, ESQ.<br>     J. GREGORY ST. CLAIR, ESQ.<br>One Rodney Square<br>Wilmington, DE  19801 |
| For National Union Fire<br>Insurance Co.: | Zeichner Ellman & Krause, LLP<br>By:  MICHAEL DAVIS, ESQ.<br>575 Lexington Avenue<br>New York, NY  10022 |
| For the Unsecured<br>Creditors' Committee: | Strook & Strook & Lavan<br>By:  ARLENE KRIEGER, ESQ.<br>     KENNETH PASQUALE, ESQ.<br>180 Maiden Lane<br>New York, NY 10038 |
| For Continental<br>Casualty Co.: | Goodwin Procter, LLP<br>By:  DANIEL GLOSBAND, ESQ.<br>Exchange Place<br>Boston, MA  02109-2881 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (CONT'D):

For Fireman's Fund        Crowell & Moring LLP
Insurance Co.:            By:  LESLIE A. DAVIS, ESQ.
                              MARK PLEVIN, ESQ.
                         1001 Pennsylvania Avenue, N.W.
                         Washington, DC  20004


For OneBeacon             Drinker Biddle & Reath LLP
Ins. Co., Geico,          By:  MICHAEL F. BROWN, ESQ.
Ins. Co.                      JEFFREY M. BOERGER, ESQ.
& Republic Ins. Co:       One Logan Square
                         18th and Cherry Streets
                         Philadelphia, PA  19103


                         Drinker Biddle
                         By:  WARREN PRATT, ESQ.
                         1100 N. Market Street
                         Wilmington, DE 19801-1254

TELEPHONIC APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                         By:  JANET BAER, ESQ.
                              ELLI LEIBENSTEIN, ESQ.
                              RAFAEL VALDES, ESQ.
                         200 East Randolph Drive
                         Chicago, IL  60601


For the Debtors:          Kirkland & Ellis, LLP
                         By:  THEODORE FREEDMAN, ESQ.
                              CHRISTOPHER GRECO, ESQ.
                              CLEMENT YEE, ESQ.
                         Citigroup Center, 153 East 53rd St.
                         New York, NY  10022


For the Debtors:          Pachulski, Stang, Ziehl &Jones
                         By:  JAMES O'NEILL, ESQ.
                         919 North Market Street, 17th Floor
                         Wilmington, DE  19899-8705


For Various Claimant      Stutzman, Bromberg, Esserman & Plifka
Firms:                   By:  DAVID J. PARSONS, ESQ.
                         2323 Bryan Street,  Suite 2200
                         Dallas, TX  75201


**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Morgan Stanley          Katten Muchin Rosenman, LLP
Senior Funding, Inc.:       By:  JEFF FRIEDMAN, ESQ.
                                 MERRITT PARDINI, ESQ.
                            575 Madison Avenue
                            New York, NY  10022-2585

For Morgan Stanley          Edwards Angell Palmer Dodge, LLP
Senior Funding, Inc.:       By:  ROBERT CRAIG MARTIN, ESQ.
                            919 N Market St.
                            Wilmington, DE 19801-3023

For Serengeti:              Vinson & Elkins, LLP
                            By:  ARI BERMAN, ESQ.
                            Trammell Crow Center
                            2001 Ross Avenue, Suite 3700
                            Dallas, TX  75201

For Scott Company:          Vorys, Sater, Seymour & Pease, LLP
                            By:  TIFFANY COBB, ESQ.
                            52 East Gay Street
                            Columbus, OH  43216

For Official Committee      Dies & Hile, LLP
of Asbestos Property        By:  MARTIN DIES, ESQ.
Damage Claimants:           1601 Rio Grande, Suite 330
                            Austin, TX  78701

                            LECG
                            By:  ELIZABETH DEVINE, ESQ.
                            1725 Eye Street NW, Ste 800
                            Washington, DC,  20006

For the Property            Bilzin Sumberg Baena Price &
Damage Committee:             Axelrod LLP
                            By:  MATTHEW KRAMER, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

For the Property            Bilzin Sumberg Baena Price &
Damage Committee:             Axelrod LLP
                            By:  SCOTT BAENA, ESQ.
                                 JAY SAKALO, ESQ.
                            200 South Biscayne Boulevard
                            Suite 2500
                            Miami, FL  33131

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For the Bank Lenders:        Paul Weiss Rifkind Wharton &
                               Garrison, LLP
                             By:  MARGARET PHILLIPS, ESQ.
                                  REBECCA ZUBATY, ESQ.
                             1285 Avenue of the Americas
                             New York, NY  10019

For the Bank Lenders:        Crowell & Moring LLP
                             By:  TACIE YOON, ESQ.
                             1001 Pennsylvania Avenue, N.W.
                             Washington, DC  20004

For Asbestos Property        Scott Law Group
Damage Claimants:            By:  DARRELL SCOTT, ESQ.
                             1001 East Main Street, Suite 500
                             Sevierville, TN  37864

For National Union Fire      Zeichner Ellman & Krause, LLP
Insurance Co.:               By:  ROBERT GUTTMANN, ESQ.
                             575 Lexington Avenue
                             New York, NY  10022

For the Future              Orrick, Herrington & Sutcliffe,
Claimants                      LLP
Representatives:             By:  DEBRA FELDER, ESQ.
                                  JOSHUA CUTLER, ESQ.
                             Washington Harbour
                             3050 K Street, N.W.
                             Washington, D.C.  20007

For Federal Insurance        Cozen O'Connor
Company:                     By:  ILAN ROSENBERG, ESQ.
                             1900 Market Street
                             Philadelphia, PA  19103

For Official Committee       Anderson Kill & Olick
of Asbestos Personal         By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:            1251 Avenue of the Americas
                             New York, NY  10020-1186

For Grace Certain            Montgomery, McCracken, Walker &
Cancer Claimants:              Rhoads, LLP
                             By:  NATALIE D. RAMSEY, ESQ.
                             300 Delaware Avenue, Ste. 750
                             Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For David T. Austern,      Phillips, Goldman & Spence, P.A.
the Future Claimants'      By:  JOHN C. PHILLIPS, ESQ.
Representative:            1200 North Broom Street
                           Wilmington, DE  19806


                           By:  DAVID T. AUSTERN

For Allstate Insurance:    Cuyler Burk, LLP
                           By:  STEFANO CALOGERO, ESQ.
                                ANDREW K. CRAIG, ESQ.
                           Parsippany Corporate Center
                           Four Century Drive
                           Parsippany, NJ  07054

For the Asbestos           Ferry Joseph & Pearce, P.A.
Creditors Committee:       By:  THEODORE TACCONELLI, ESQ.
                           824 Market Street, Suite 19899
                           Wilmington, DE  19899

For Ford, Marrin,          Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer           Gleser
& Gleser:                  By:  SHAYNE SPENCER, ESQ.
                                ELIZABETH DeCRISTAFARO, ESQ.
                           Wall Street Plaza
                           New York, NY  10005

For Official Committee     Duane Morris, LLP
of Unsecured Creditors:    By:  MICHAEL LASTOWSKI, ESQ.
                           1100 North Market Street, Suite 1200
                           Wilmington, DE  19801-1246

For Official Committee     Brandi Law Firm
of Asbestos Property       By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:               TERENCE D. EDWARDS, ESQ.
                           44 Montgomery St., Suite 1050
                           San Francisco, CA  94104


                           Lieff, Cabraser, Heimann & Bernstein
                           By:  ELIZABETH J. CABRASER, ESQ.
                           Embarcadero Center West
                           275 Battery Street, Suite 3000
                           San Francisco, CA  94111

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Official Committee:   Riker, Danzig, Scherer, Hyland &
of Asbestos Property       Perretti, LLP
Damage Claimants:         By:  TARA MONDELLI, ESQ.
                               CURTIS PLAZA, ESQ.
                          Headquarters Plaza
                          One Speedwell Avenue
                          Morristown, NJ  07962

For the Libby Claimants:  Cohn, Whitesell & Goldberg, LLP
                          By:  CHRISTOPHER M. CANDON, ESQ.
                          101 Arch Street
                          Boston, MA  02110

For the Libby Claimants:  Landis, Rath & Cobb, LLP
                          By:  KERRI K. MUMFORD, ESQ.
                               JAMES S. GREEN, JR., ESQ.
                          919 Market Street, Suite 1800
                          Wilmington, DE  19899

For the Bank Lenders:     Landis, Rath & Cobb, LLP
                          By:  RICHARD COBB, ESQ.
                          919 Market Street, Suite 1800
                          Wilmington, DE  19899

For the PD Committee:     Speights & Runyan
                          By:  DANIEL SPEIGHTS, ESQ.
                               MARION FAIREY, ESQ.
                               ALAN RUNYAN, ESQ.
                          200 Jackson Avenue, East
                          Hampton, SC  29924

For Everest Reinsurance   Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:          By:  BRIAN L. KASPRZAK, ESQ.
                               JOHN D. MATTEY, ESQ.
                          913 North Market Street
                          Suite 800
                          Wilmington, DE  19801

For Murray Capital        Murray Capital Management, Inc.
Management                By:  MARTI MURRAY

For Normandy Hill         Normandy Hill Capital, LLP
Capital, LLP:             By:  MATTHEW CANTOR

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Anderson Memorial          Kozyak, Tropin & Throckmorton, PA
Hospital:                      By:  JOHN W. KOZYAK, ESQ.
                               2525 Ponce de Leon, 9th Floor
                               Miami, Florida 33134

For ZAI Claimants              Hogan Firm Attorneys at Law
& various law firms:           By:  DANIEL K. HOGAN, ESQ.
                               1311 Delaware Avenue
                               Wilmington, DE  19801

For the U.S. Trustee:          Office of the U.S. Trustee
                               By:  DAVID KLAUDER, ESQ.
                               844 King Street, Suite 2313
                               Wilmington, DE  19801

For Arrowood                   Bifferato Gentilotti LLC
Indemnity Co.:                 By:  GARVAN McDANIEL, ESQ.
                               800 North King Street
                               Wilmington, DE  19801

For AXA Belgium:               Mendes & Mount
                               By:  ANNA NEWSOM, ESQ.
                               750 Seventh Avenue
                               New York, NY  10019

For Royal Insurance:           Wilson Elser Moskowitz Edelman
                                 & Dicker, LLP
                               By:  CARL PERNICONE, ESQ.
                               150 East 42nd Street
                               New York, NY  10017

For Official Committee         Richardson Patrick Westbrook &
of Asbestos Property             Brickman, P.C.
Claimants:                     By:  EDWARD J. WESTBROOK, ESQ.
                               174 East Bay Street
                               Charleston, SC  29401

For Dow Jones                  Dow Jones News Wires
News Wires:                    By:  PEG BRICKLEY

For the Equity                 Kramer Levin Naftalis & Frankel
Committee:                     By:  DAVID E. BLABEY, JR., ESQ.
                               919 Third Avenue
                               New York, NY  10022

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (CONT'D):

For Hartford Financial       Wilmer Wilmer Cutler Pickering Hale &
Service Group:                Dorr, LLP
                             By:  MELANIE R. DRITZ, ESQ.
                                  NANCY MANZER, ESQ.
                             399 Park Avenue
                             New York, NY  10022

For Travelers Casualty       Morris Nichols Arsht & Tunnell, LLP
Surety Company:              By:  MATTHEW B. HARVEY
                             1201 N. Market Street
                             PO Box 1347
                             Wilmington, DE 19899-1347

For Asbestos Property        Pryor Cashman, LLP
Damage Claimants:            By:  RICHARD LEVY, ESQ.
                             410 Park Avenue
                             New York, NY  10022

For David T. Austern,        Lincoln International, LLC
Future Claimants'            By:  JOSEPH RADECKI
Representative:

For Onex Credit              Onex Credit Partners
Partners:                    By:  STUART KOVENSKY

# I N D E X

| **WITNESSES** | **PAGE** |
|---|---|

**ROBERT TAROLA**
Direct Examination by Mr. Bernick — 19
Cross Examination by Mr. Pasquale — 36
Redirect Examination by Mr. Bernick — 47
Recross Examination by Mr. Pasquale — 51

**MARK SHELNITZ**
Direct Examination by Mr. Bernick — 53
Cross Examination by Mr. Pasquale — 73
Redirect Examination by Mr. Bernick — 79
Recross Examination by Mr. Pasquale — 80

**PAM ZILLY**
Direct Examination by Mr. Bernick — 102
Cross Examination by Mr. Cobb — 110

**DENISE MARTIN**
Direct Examination by Mr. Bernick — 145
Cross Examination by Mr. Pasquale — 153
Redirect Examination by Bernick — 155

**MICHAEL BROWN**
Direct Examination Mr. Pratt — 167
Cross Examination by Mr. Bernick — 175
Redirect Examination by Mr. Pratt — 177

**LEWIS KRUGER**
Direct Examination by Mr. Pasquale — 195
Cross Examination by Mr. Bernick — 205
Redirect Examination by Mr. Pasquale — 249
Recross Examination by Mr. Bernick — 250

**ROBERT FREZZA**
Direct Examination by Mr. Pasquale — 255
Voir Dire Examination by Mr. Bernick — 262
Continued Direct Examination by Mr. Pasquale — 267
Cross Examination by Mr. Cobb — 294
Cross Examination by Mr. Bernick — 296
Redirect Examination by Mr. Pasquale — 321
Recross Examination by Mr. Bernick — 324
Further Redirect By Mr. Pasquale — 328
Recross Examination by Mr. Cobb — 329

**J&J COURT TRANSCRIBERS, INC.**

## I N D E X(CONT'D)

**EXHIBITS**

|  |  | I.D. | EVD. |
|---|---|---|---|
| PP-632 | Affidavit | 15 | 15 |
| PP-285 | Letter Agreement | 26 | 26 |
| PP-286 | Second Letter Agreement | 33 | 33 |
| BNSF-85 - 279 | Complaints | | 85 |
| 507-10 | Graphic | | 54 |
| PP-160 | Term Sheet | | 65 |
| PP-344 | E-mail from Mr. Shelnitz | | 67 |
| PP-284 | E-mail from Ms. Krieger | | 70 |
| FF/Allianz 1 - 33 | Documents | | 96 |
| FF/Allianz 34 - 36 | Documents | | 96 |
| OS-1 | Documents (Revised through OS-7) | | 97 |
| OS-14 - OS-20 | Documents | | 97 |
| OS-27 | Document | | 97 |
| OS-28 | Document | | 97 |
| OS-40 | Document | | 97 |
| OS-41 | Document | | 97 |
| OS-44 | Document | | 97 |
| OS-46 | Document | | 97 |
| OS-48 - OS-51 | Documents | | 97 |
| GR-14 - GR-20 | Revised Documents | | 97 |
| PP-1 | Demonstrative | | 110 |
| PP-2 & 3 | Demonstratives | 103 | 110 |
| PP-4 | Demonstrative | | 110 |
| PP-5 | Demonstrative | 105 | 110 |
| PP-6 | Document | | 110 |
| PP-7 | Demonstrative | 107 | |
| S12-1,2,3,5,6 | Documents | | 153 |
| Montana-1-148 | Documents | | 163 |
| Garlock-3-10 | Documents | | 165 |
| Garlock-13 | Document | | 165 |
| Garlock-105 | Document | | 165 |
| Garlock-106 | Document | | 165 |
| Garlock-107 | Document | | 165 |
| PP-239 - 240 | Documents | | 178 |
| PP-271 & 271B | Documents | | 181 |
| Libby-283 | Document | | 184 |
| CCNLG 1 - 5 | Documents | | 194 |
| CCBLG 41 | Chart | 283 | |
| Arrowood A-58 | Declaration by Mr. Kemp Hooper | | 338 |

1         THE COURT:  This is the continuation of the Phase II

2  confirmation hearing in the matter of W.R. Grace, 01-1139.  The

3  list of telephonic of participants today is Scott Baena, Janet

4  Baer, Ari Berman, David Bernick, David Blabey, Thomas Brandi,

5  Peg Brickley, Elizabeth Cabraser, Stefano Calogero, Christopher

6  Candon, Matthew Cantor, Richard Cobb, Tiffany Cobb, Jacob Cohn,

7  Ann Cordo, Andrew Craig, Joshua Cutler, Leslie Davis, Michael

8  Davis, Elizabeth DeCristofaro, Elizabeth Devine, Martin Dies,

9  Melanie Dritz, Terence Edwards, Marion Fairey, Brett Fallon,

10  Debra Felder, Jordan Fisher, Theodore Freedman, Jeff Friedman,

11  Christopher Greco, James Green, John Green, Robert Guttmann,

12  Daniel Hogan, Robert Horkovich, Brian Kasprzak, David Klauder,

13  Stuart Kovensky, John Kozyak, Matthew Kramer, Michael

14  Lastowski, Elli Leibenstein, Richard Levy, Nancy Manzer, Robert

15  Craig Martin, John Mattey, Garvan McDaniel, Tara Mondelli,

16  Kerri Mumford, Marti Murray, Anna Newsom, James O'Neill,

17  Merritt Pardini, David Parsons, Carl Pernicone, Margaret

18  Phillips, John Phillips, Curtis Plaza, Mark Plevin, Joseph

19  Radecki, Natalie Ramsey, Andrew Rosenberg, Ilan Rosenberg,

20  David Rosendorf, Alan Runyan, Jay Sakalo, Darrell Scott,

21  Michael Shiner, Marnie Simon, Daniel Speights, Shayne Spencer,

22  Theodore Tacconelli, Rafael Valdes, James Wehner,  Edward

23  Westbrook, Clement Yee, Tacie Yoon and Rebecca Zubaty.  Are

24  there any changes of appearances in Court?  All right, Ms.

25  Baer?

1          MS. BAER:  Good morning, Your Honor.  Janet Baer on

2   behalf of W.R. Grace.  Your Honor, last night I mentioned that

3   we had an affidavit from Canadian counsel that we were

4   circulating to everybody in the hopes that we could shorten

5   this up and not have to bring him down to testify with respect

6   to the ZAI settlement in Canada as well as the appointment of a

7   Canadian representative for ZAI claimants.  I did circulate

8   that document, Your Honor.  I asked if anybody had an objection

9   they would let me know.  I have not heard anything from anybody

10  about objections.  And, Your Honor, if there are no objections,

11  I would like to submit into evidence and ask to be admitted,

12  the affidavit from Canadian counsel with the Canadian orders

13  that was referenced.

14          THE COURT:  Does anyone have an objection to the

15  admission of the affidavit rather than having counsel appear

16  live as a witness?  There's no objection.  Is it marked as an

17  exhibit?

18          MS. BAER:  It is, Your Honor.  It's Plan Proponents'

19  Exhibit 632.  And if I may I'll approach.

20          THE COURT:  All right.  Okay, this is the affidavit

21  of Orestes Pasparakis dated September 15, 2009 with associated

22  documents and it is admitted.  Okay.

23          MS. BAER:  Thank you, Your Honor.

24          THE COURT:  Mr. Bernick.

25          MR. BERNICK:  Your Honor, we would propose this

1  morning that the following two witnesses have to testify

2  regarding the lender issues.  Mr. Tarola and Mr. Shelnitz.  And

3  then if there is anybody on the other side of the courtroom who

4  wishes to call a witness in connection with, a live witness in

5  connection with Phase II, we can go ahead and do that.  Mr.

6  Tarola has got a commitment and needs to get out of town as

7  soon as possible, and Mr. Shelnitz's, testimony, as you will

8  see, simply picks up on the same chronological sequence so we

9  think it makes sense to have both those witnesses heard first

10 thing.  Neither one of them should be long witnesses.  And then

11 maybe we can pick up with any remaining issues concerning the

12 insurers.

13      THE COURT:  I don't think your microphone's working,

14 Mr. Bernick, I'm sorry.  But I can hear you, but I'm not sure

15 that they can in the back.  They're saying no, they can't.  The

16 proposal is to begin, as we said yesterday, with Mr. Tarola,

17 then Mr. Shelnitz then back up to what we left off with

18 yesterday.

19      MR. BERNICK:  That's correct.  And then we should be

20 able to finish off, I think, Phase II, and then continue on to

21 Phase II -- Stage II, and then continue on with the examination

22 of witnesses relating to the insurers -- I'm sorry, the lender

23 issues, and we'll have Ms. Zilly, Dr. Martin and then -- those

24 are our live witnesses, and then I know that the -- good

25 morning -- I know that the unsecured creditors will then have a

1  couple of live witnesses.  We may have a very short rebuttal,

2  but we then expect that we'll be done with the lender's issue

3  probably sometime, I hope early this afternoon at the latest.

4  And then at that point we can go on with the rest of the case.

5  I don't know if Mr. Pasquale or Mr. Cobb have any different

6  views or Mr. Kruger have any different views.

7         MR. PASQUALE:  Your Honor, no, that sounds fine with

8  us.  I think Mr. Bernick may be optimistic on timing, but we'll

9  see.  But the process is fine.

10         THE COURT:  It's Mr. Pasquale.  All right, that's

11 fine.

12         MR. BERNICK:  Okay.

13         THE COURT:  With respect to the issues that we left

14 reserved yesterday then, is everyone fine with starting with

15 Mr. Tarola and then backing up to those issues as we had talked

16 about yesterday?  Mr. Pratt?

17         MR. PRATT:  Good morning, Your Honor.  Warren Pratt

18 for creditor Seaton and One Group and that's fine with us.

19         THE COURT:  All right.

20         MR. PERNICONE:  Good morning, Your Honor.  Carl

21 Pernicone, cocounsel for Arrowood.  Just to remind you that Mr.

22 Schiavoni had mentioned at the end of yesterday's proceeding

23 that he has an urgent matter, he's attending to it this

24 morning.

25         THE COURT:  Yes.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. PERNICONE:  He hopes to be here like around ten

2   o'clock, but certainly no later than midday, then we'll be able

3   to finish off whatever remains with respect to the Burlington

4   issues.

5          THE COURT:  All right.

6          MR. PERNICONE:  Thank you, Your Honor.

7          THE COURT:  Okay, Mr. Bernick, I think we can begin

8   with Mr. Tarola then.

9          MR. BERNICK:  I just need to know, does he need to be

10  here for the --

11         UNIDENTIFIED SPEAKER:  Lender?

12         MR. BERNICK:  -- yes, that is to say, I think we're

13  going to be done before midday with the first two witnesses.

14  And then we are going to get back to the second stage.  So it's

15  going to be, you know, let's say ten thirty or something like

16  that.  Would you prefer to simply have the whole thing --

17         MR. PERNICONE:  Mr. Schiavoni was here principally to

18  deal with the Burlington issues, as he mentioned yesterday,

19  Your Honor, so he does need to be here for that.

20         THE COURT:  Okay, why don't we just start --

21         MR. BERNICK:  Yes, okay, that's fine.

22         THE COURT:  -- and we'll see when he comes.

23         MR. PERNICONE:  Great.  Thank you, Your Honor.

24         MR. BERNICK:  Okay.  We call Robert Tarola as the

25  next witness in connection with the, now the third stage on

1 Phase II.  Mr. Tarola can take the stand.

2             THE COURT:  Good morning.

3             ROBERT TAROLA, DEBTOR'S WITNESS, SWORN

4             MR. BERNICK:  This covers both Mr. Tarola and Mr.

5 Shelnitz.

6             THE COURT:  all right, thank you.

7                      DIRECT EXAMINATION

8 BY MR. BERNICK:

9 Q    Good morning, Mr. Tarola.

10 A    Good morning.

11 Q    Good to see you again.  Could you tell the Court whether

12 you have in the last little while departed from Grace?  I know

13 you sometimes came to the hearings.  Have you now left Grace?

14 A    Yes.  I left Grace on October 31, 2008.

15 Q    Okay.  And what was your position at the time that you

16 left?

17 A    At the time I left I was senior vice president in charge

18 of corporate strategy.

19 Q    Okay.  And what relationship, if any, did that have to the

20 financial function of the company?

21 A    At that point in time, I was not involved directly with

22 overseeing or operating the financial function.

23 Q    Okay.  What have you done since you left Grace in 2008?

24 A    I set up a private consulting firm in Washington, D.C.,

25 called Right Advisory, LLC.

1  Q    Okay.  And just tell us briefly what it is that you're now

2  doing as part of that enterprise.

3  A    I'm doing three main things.  I'm working as a director of

4  one public company based in Denver called Tele Tech Holdings,

5  Inc.  I'm also working as a director of about 15 mutual funds

6  sponsored by Legg Mason Inc.  I serve as a financial expert to

7  the audit committees of each of those entities.  I'm also

8  engaged in consulting projects with generally large entities,

9  primarily consulting at the governance level in risk management

10 area and in corporate finance in the business improvement area.

11 Q    Okay.

12 A    I'm also teaching.

13 Q    Okay.  Where are you teaching at?

14 A    At corporate finance groups.  Most recently Marriott and

15 Northrop Grumman.  And I'm also pursuing teaching at MBA

16 programs.

17 Q    Terrific.  Okay, could you just tell us, give us a brief

18 overview of your educational background and then career path up

19 to Grace and then through Grace to kind of give the Court an

20 overview of your educational and professional background?

21 A    I graduated from Temple University with a bachelors of

22 business administration, concentrations in accounting and

23 marketing in 1973.  I spent the first two years after college

24 as a financial analyst with Chrysler Motors.  I was then hired

25 by Price Waterhouse, an international accounting and consulting

1 firm, roughly in the 1974 time frame in the Philadelphia office

2 of Price Waterhouse.  After roughly ten years, I was admitted

3 into the partnership of Price Waterhouse in 1984.  My first

4 assignment as a partner with Price Waterhouse was in their SEC,

5 Securities and Exchange Commission advisory group based in

6 Manhattan, New York City, where I consulted on capital markets

7 matters and financial reporting matters on behalf of clients of

8 that firm.

9       I then transferred to the Baltimore office of Price

10 Waterhouse where I took over as lead auditing partner for some

11 major clients of that office including T. Rowe Price mutual

12 fund and Legg Mason mutual funds.  And in 1991 roughly I was

13 promoted to a regional managing partner handling an industry

14 segment specializing in telecommunications media and

15 entertainment businesses based out of Washington, D.C. where I

16 became lead audit partner on MCI Communications and ran a

17 business base of about 500 people.

18       In 1996 -- let me back up.  At the same time I was a

19 partner with Price Waterhouse, I was serving on the board of

20 directors of a number of health and welfare organizations, one

21 of which was a hospital system that was based in Baltimore.  In

22 1996 I resigned from Price Waterhouse to become the CFO of that

23 hospital system.  It was eventually named Medstar Health, which

24 is a regional health system, hospitals, ambulatory care,

25 physician groups.

1          I was CFO for that health system from 1996 to 1999,

2 at which point I joined W.R. Grace as a senior vice president

3 and chief financial officer when Grace decided to move

4 headquarters from Florida to Maryland.

5 Q    Okay.  Are you appearing here at our request, at the

6 request of the debtors W.R. Grace?

7 A    Yes, sir.

8 Q    And are you receiving any kind of compensation at all in

9 connection with your appearance?

10 A    Only -- my expectation is that my out of pocket costs will

11 be covered and some of my prep time, because I had to forego

12 some of my consulting assignments to be here.

13 Q    Okay.  Were you involved, while you were at W.R. Grace, in

14 the relationship of Grace in this case with the Unsecured

15 Creditors' Committee?

16 A    Yes, sir.

17 Q    Could you just describe -- well, let me just ask -- in

18 connection with that relationship, were you the lead person at

19 Grace who, on an ongoing basis, dealt with the members of the

20 Unsecured Creditors' Committee with regard to financial

21 matters?

22 A    I was the lead person dealing with financial matters

23 within Grace and I would deal with members of the Committee,

24 with members of the financial support group that they had

25 engaged, and from time to time with the law firm they had

1  engaged.

2  Q    Okay.  I'm going to focus my examination of you this

3  morning on the period of time up through February 19 -- excuse

4  me -- February 2006 and then Mr. Shelnitz is going to pick up

5  thereafter.  But during that period of time, that is up through

6  February of 2006, was there -- could you just describe for us

7  the nature of the relationship between W.R. Grace and the

8  Unsecured Creditors' Committee as concerns reporting of

9  information to the Unsecured Creditors' Committee?

10 A    Within a few months after filing for Chapter 11 protection

11 in April of 2001, we began reporting regularly to all of the

12 official committees in this bankruptcy case including the

13 Official Committee of General Unsecured Creditors.  The

14 reporting included regular public reporting as Grace continued

15 to be a public reporting entity as well as special reporting

16 which was designed under confidentiality arrangements with the

17 committees to give the committees and their financial advisors

18 a little more in depth information about how the company was

19 performing.  Those reports were quarterly.  The special

20 reporting was generally done by conference call with financial

21 advisors.  And then annually certain members of the management

22 team at W.R. Grace met in person with members of the Official

23 Committee of Unsecured Creditors together with their counsel

24 and financial advisors.

25 Q    Just describe in your own words the level of specificity

1  and detail that was provided to the Unsecured Creditors'

2  Committee during this period of time as part of the procedures

3  that you've just described.

4  Q    Well, we would share with them a normal report that we

5  would prepare for our board of directors.  A little more

6  condensed and focused than what is included in public reporting

7  to shareholders covering the same general information, but

8  basically would cover business performance, would cover

9  initiatives that we had ongoing, how we were doing toward

10 those, would cover peer comparisons, would cover market,

11 capital matters.  Would cover areas of productivity and asset

12 management, and a basic summary financial briefing for our

13 board, which was then shared with official committees.

14 Q    Did a time come in late 2004 when Grace submitted the

15 proposed plan of reorganization?

16 A    Yes, sir.

17 Q    What was the basic approach, just in very general terms,

18 as you recall it.  What was the basic approach that was taken

19 in that plan with respect to the treatment of personal injury

20 liabilities?

21 A    The basic approach was to enter into a process of

22 estimation to determine the amount that that liability might

23 require in the way of funding in order to satisfy that creditor

24 group.

25 Q    Was it a consensual plan as it was proposed?

1  A    No, sir, not to my knowledge.

2  Q    Okay.  Did that plan -- tell us in your own words your

3  understanding as to whether that original plan made provision

4  for value to go to old equity.

5  A    My understanding was that based on Grace's estimate of the

6  amount of value that would be eligible for settling claims that

7  were then uncertain, that there would be value leftover for old

8  equity.

9  Q    Did a time come in early 2005 when an amended plan was

10  proposed and filed by W.R. Grace?

11  A    Yes, sir.

12  Q    Let me just ask you, same basic approach as the first

13  plan?

14  A    Same basic approach, yes.

15  Q    Okay.  In connection with the amended plan, tell us

16  whether there was some discussion with the unsecured creditors

17  about post-petition interest.

18  Q    Well, after the original plan was filed, we began speaking

19  with both the chair of the Unsecured Creditors' Committee as

20  well as the chair of the Equity Committee about seeking their

21  support for our plan of reorganization.

22  Q    Ultimately did those discussions result in some agreement?

23  A    Yes, sir.

24  Q    I want to show you what we've marked as Plan Proponents

25  Exhibit 285.  It's in your notebook, which I'll give you.  I

1 knew there was a purpose for that last notebook.   Do you see

2 it there?  It's Plan Proponents' 285.

3 A    Yes, sir.

4 Q    Is that a copy, is Exhibit 285 a copy of the letter

5 agreement that reflects the agreement that was reached between

6 Grace and the Official Committee of Unsecured Creditors?

7 A    This is the letter that confirms the agreement of the

8 Official Committee of Unsecured Creditors to be a plan

9 proponent with respect to that January '06 amended plan.

10          MR. BERNICK:  Okay.  We offer Exhibit 285.

11          THE WITNESS:  Sorry, I meant January '05.

12          MR. BERNICK:  We offer Exhibit 285.

13          MR. PASQUALE:  No objection, Your Honor.

14          THE COURT:  It's admitted.

15 Q    Now, was this agreement, did this agreement, is this an

16 agreement to support the plan?

17          MR. BERNICK:  If we could just put it on ELMO please

18 for just a moment.  No, now you turned it off.  I appreciate

19 that.  You just turned it off again.  There, we've got it.

20 Q    While we're doing that, did this agreement relate, did

21 this agreement call for or reflect that there be support of the

22 plan?

23 A    Yes, sir.  By the Official Committee of Unsecured

24 Creditors.

25 Q    Right.  And this plan then is the amended plan, did the

1  amended plan that was filed in early '05 now specify a

2  particular rate of post-petition interest?

3  A    It did, and so did the original plan.  By virtue of this

4  agreement, that rate of interest changed.

5  Q    Yes.  It became more favorable?

6  A    It was higher than in the original plan, yes.

7  Q    Okay.  Now, I note that this letter is signed by the

8  esteemed head counsel for the Unsecured Creditors' Committee,

9  Mr. Kruger, and it says that this is in confirmation of an

10 agreement with the Official Committee of Unsecured Creditors.

11 Let me pursue that a little bit.  Prior to the time that this

12 letter was executed, could you describe how the negotiations

13 regarding the new rate of post-petition interest, how those

14 negotiations proceeded?  First of all, were you involved in

15 those negotiations?

16 A    Yes, sir.

17 Q    Okay.  And so just tell us in your own words how the

18 negotiations regarding the post-petition rate of interest

19 unfolded?

20 A    There were two other folks that participated in those

21 negotiations from W.R. Grace with me.  The CEO at the time, Mr.

22 Paul Norris, and the chief counsel at the time, Mr. David

23 Siegel.  We were speaking with Mr. Thomas Maher, who at that

24 time chaired the Official Committee of General Unsecured

25 Creditors, and with Mr. Ted Weschler who at the time chaired

1 the Equity Committee.

2 Q    Before you go on, Tom Maher, for whom did he work?

3 A    J.P. Morgan Chase.

4 Q    Had J.P. Morgan Chase played any role prepetition in

5 connection with the financing of W.R. Grace?

6 A    J.P. Morgan Chase through Chase Bank participated as lead

7 agent in the prepetition lending facility and had a

8 participation in that facility.

9 Q    Okay.  So now -- I've interrupted you.  Continue on.  How

10 did things unfold in the discussions with Mr. Maher?

11 A    Well, in trying to get the support of both the General

12 Unsecured Creditors' Committee as well as the Equity Committee,

13 we spoke with the chair people of both of those committees

14 looking for ways to achieve their dual support.  And with

15 respect to the General Unsecured Creditors' Committee, those

16 discussions were really centered around the amount of interest

17 Grace would pay on top of full value of prepetition claims for

18 anyone holding bank debt at the time as well as anyone holding

19 general unsecured creditor claims that were not of a lending

20 nature.

21 Q    And what was the outcome of those discussions?  First of

22 all, at any point during those discussions did Mr. Maher

23 indicate that he spoke only for the Committee, that the

24 Committee was separate from the lenders and he only spoke for

25 the Committee?

1  A    He never said anything to that effect.

2  Q    What ultimately was the outcome of the discussions with

3  Mr. Maher concerning the post-petition interest rate that would

4  be agreed?

5  A    Mr. Maher, the ultimate outcome was an agreement on the

6  part of W.R. Grace and the chair of the Equity Committee to

7  accept a rate of interest on bank debt equal to 6.09 percent

8  compounded quarterly from the beginning of the bankruptcy up

9  until a date forward.  An agreement to pay what was the federal

10  judgment rate going into bankruptcy on general unsecured claims

11  that did not have a contractual interest rate associated with

12  it, and to honor the general contractual rate of unsecured

13  claims that had a stated rate.

14  Q    The rate of 6.09 percent applied to lenders -- or I should

15  say the debt holders?

16  A    It applied to our bank debt and therefore anyone holding

17  it would have received that amount under that proposal.

18  Q    Was that amount, 6.09, greater than, less than or equal to

19  the federal judgment rate?

20  A    It was greater than the federal judgment rate.

21  Q    Was the 6.09 percent greater than, less than or equal to

22  the non-default contract rate set out in the debt?

23  A    At that point in time when we reached that agreement, it

24  was in excess of the non-default contract rate as measured from

25  the beginning of the bankruptcy to that point in time.

1  Q    Was it as much as the default rate under the contracts?

2  A    It all depends where the prime rate was at any point in

3  time.  It could have been in excess of the default rate

4  depending on where the prime rate was.

5  Q    At that point in time was it as much as the contract --

6  A    It was close.

7  Q    Close.  Okay.  So the letter agreement is then entered

8  into and with respect to -- well, let me ask you a question.

9  Who came up with 6.09?  Whose proposal was that?

10 A    Mr. Maher proposed that rate to W.R. Grace as a rate he

11 needed to get the support of his committee as a co-proponent of

12 our plan.

13 Q    Okay.  Now I noticed again that the official committee is

14 what's listed as being the counter party to this agreement.

15 Did you draw any distinction, did you read that when you saw

16 that in the letter as being any kind of indication somehow the

17 lenders were not in support of this agreement?

18        MR. PASQUALE:  Objection to form, leading, Your

19 Honor.

20 Q    What, if any, relationship did you draw between the fact

21 it was purported to this was a commitment by the official

22 committee and whether or not it was also a commitment for the

23 lenders?

24 A    Well, two things.  My understanding of Mr. Maher's role

25 was that he was representing all of the unsecured creditors in

**J&J COURT TRANSCRIBERS, INC.**

Tarola - Direct/Bernick                              31

1  his position as chairman of the official committee.  Secondly,

2  in the discussions around what interest rate would be

3  acceptable, he clearly indicated to us that he was in

4  consultation with certain lenders about what would be

5  acceptable.  And the 6.09 percent frankly was ascribed as an

6  amount that would provide an internal rate of return to the

7  lenders that would be acceptable.

8  Q    Okay.

9  A    I would say the holders of bank debt at the time, because

10  they may not have been the original lenders.

11  Q    Would there have been any point, as you understood at the

12  time, would there have been any point whatsoever in engaging in

13  this negotiation and entering into this agreement if it didn't

14  represent a commitment on behalf of the people who were

15  lenders?

16             MR. PASQUALE:  Objection, leading.

17             THE COURT:  Sustained.

18  Q    Well, did you think that you were engaged in an enterprise

19  that the lenders could simply walk away from?

20  A    I didn't even think about that.  I thought I was engaged

21  in an enterprise that we would honor and that would be honored

22  by the committee representing unsecured creditors.

23  Q    Was there anything that happened in connection with those

24  negotiations, either the discussions with Mr. Maher or the

25  discussions that involved counsel, was there anything that

1 happened in connection with those negotiations that was

2 inconsistent with the expectation that you've just now

3 described?

4          MR. PASQUALE:  Objection, Your Honor.  Lacks

5 foundation with respect to any discussions with counsel.

6          MR. BERNICK:  Any discussions that Mr. -- any

7 discussions that Mr. Tarola had with anybody who represented

8 the unsecured creditors.

9 Q    Was there anything about that happened in any of those

10 discussions that was in any way inconsistent with the

11 expectation that you have just described regarding the lenders?

12          MR. PASQUALE:  I'm sorry, Your Honor, I'm not trying

13 to impede.  I just -- I have no foundation that Mr. Tarola had

14 any discussions on this topic with counsel.

15          MR. BERNICK:  I didn't say, I said any

16 representative.

17          THE COURT:  He's not asking for counsel, he said any

18 representative, not limited to counsel.

19 A    I'm sorry.  Could you clarify that?

20 Q    Was there anything that you heard, learned of, experienced

21 in connection with the negotiations leading up to this letter,

22 anything that you heard, learned or experienced from any

23 representative of the unsecured creditors that was inconsistent

24 with your expectations regarding lender support?

25 A    My expectations through discussions was that the Creditors

1  Committee was representing all general unsecured creditors. It

2  was the arrangement we reached was embodied in the amended plan

3  of reorganization.  We adjusted our books and records for that

4  arrangement and we continued to do accounting on the basis of

5  that arrangement.  So I presumed the arrangement would be

6  honored and was of sufficient validity to be relied upon.

7  Q    Thank you.  A year later, was there a second letter

8  agreement that was entered into?

9  A    In early 2006, yes.

10  Q    Yes.  Showing you Plan Proponents' Exhibit 286, is that a

11  copy of that letter?

12  A    Yes, sir.

13          MR. BERNICK:  We offer it.

14          MR. PASQUALE:  No objection.

15          THE COURT:  It's admitted.

16  Q    This letter, does this now reflect, Mr. Tarola, a further

17  agreement between the Official Committee of Unsecured Creditors

18  and the debtor?

19  A    Yes, sir.

20  Q    What's the difference between this agreement and the

21  agreement the year before, if any?

22  A    The only change reflected in this agreement from the

23  original agreement is the arrangement or agreement to replace

24  the 6.09 percent fixed rate of interest on our prepetition bank

25  debt, that is on W.R. Grace's prepetition bank debt with a

1 floating rate of interest that was tied to the prime rate

2 represented by major banks.

3 Q    Okay.  Were you involved in negotiations concerning this

4 change?

5 A    Yes, sir.

6 Q    And with whom did you engage in those negotiations?

7 A    Again, with Mr. Thomas Maher.

8 Q    Okay.  The particular approach that was then taken and

9 reflected in this letter regarding post-petition interest, who

10 came up with that idea?

11 A    Well, I can't recall exactly whether it was he or I.  But

12 at the time, the short term interest rates were trending upward

13 from where they had been a year earlier, and Mr. Maher wanted

14 to capture that upward trend for the holders of our prepetition

15 bank debt in an amended agreement.

16 Q    Okay.  When this agreement was amended as reflected in

17 Plan Proponents' 286, tell us whether your expectations

18 concerning lender support for this agreement were any different

19 from the expectations that you've already describe in

20 connection with the agreement of January 2005.  Any difference?

21 A    No, sir.  Again, these discussions occurred over several

22 weeks, perhaps more than a month I'm sure.  And it was my

23 understanding that Mr. Maher was in consultation with committee

24 members as well as anyone else he had to speak with in order to

25 sign this agreement.

1  Q    In the same fashion after the January 2005 letter, you've

2  described how the company relied upon the interest rate in

3  terms of its books and records and the statements that it made

4  to the public marketplace.  Tell us, how if at all, Grace

5  relied upon the amended agreement or the new agreement in

6  February 2006.

7  A    Well, again, we relied upon it in the same way.  The issue

8  we were trying to address at the time was that the committee by

9  virtue of the original agreement, in theory anyway, had the

10  ability to change its support for our plan as of the end of

11  November.  The ultimate arrangement was that the committee

12  would accept the 6.09 percent through the end of December 2005

13  with an adjustment to a floating prime rate from January 1 of

14  2006 forward.  So we were dealing with a potential issue in

15  continued support.

16  Q    Okay.  There's a potential issue in continued support

17  leading up to the February '06 agreement?

18  A    Yes, sir.

19  Q    Was there any issue that you had about continuing support

20  after the new agreement was entered into?

21  A    No, sir.

22          MR. BERNICK:  Your Honor, we pass the witness.

23          THE COURT:  Mr. Pasquale.

24          MR. PASQUALE:  Your Honor, I know you don't have

25  enough paper, may I approach?

Tarola - Cross/Pasquale                          36

1          THE COURT:  Sure.  Thank you.

2                    CROSS EXAMINATION

3  BY MR. PASQUALE:

4  Q    Good morning, Mr. Tarola, how are you?

5  A    Good morning.

6  Q    Mr. Tarola, in answering Mr. Bernick's questions you said

7  more than once that Mr. Maher was negotiating with you on

8  behalf of not simply the bank debt holders, but all unsecured

9  creditors, is that right?

10 A    Yes, sir.

11 Q    And in fact leading up to the January 12th, '05 agreement,

12 you mentioned Mr. Maher specifically requested, and ultimately

13 it was agreed to, a specific rate for non-bank lender

14 creditors, right?

15 A    Yes, sir.

16 Q    And that wasn't surprising to you because you understood,

17 did you not, that Mr. Maher was negotiating as chair of the

18 Creditors' Committee.

19 A    That's correct.  Yes, sir.

20 Q    Now, the January 12th, '05 agreement -- I'm sorry, I lost

21 my reference -- Plan Proponents' Exhibit 285.

22 A    Yes, sir.

23 Q    That agreement is not signed by anyone but counsel for the

24 Creditors' Committee and counsel for W.R. Grace, correct?

25 A    That's correct.

**J&J COURT TRANSCRIBERS, INC.**

Tarola - Cross/Pasquale                    37

1          THE COURT:  I'm sorry, was that by counsel for the
2    Committee or by Mr. Maher?
3          MR. PASQUALE:  Counsel for the Committee and counsel
4    for Grace, Your Honor.
5          THE COURT:  Okay, thank you.
6    Q     And that agreement, Mr. Tarola, pertains to the specific
7    joint plan before the Court in January of '05, isn't that
8    right?
9    A     The amended plan before the Court filed more or less
10   coincident with this agreement.
11   Q     And it's referred to in the agreement not as the amended
12   plan, but as the joint plan, correct?
13   A     Oh, yes, you're correct.  Yes, it's a joint plan.
14   Q     Now, the letter agreement provides for certain termination
15   events, doesn't it?
16   A     Well, it provides for the right to withdraw.
17   Q     Correct.
18   A     Yes, sir.
19   Q     That's right.
20   A     And you mentioned in fact towards the expiration period of
21   one of these dates, it became an issue as to whether or not the
22   Committee would renew the agreement, right?  Did you say that
23   in response to Mr. Bernick's question?
24   A     Well, specifically, the event, number one, was the failure
25   --

1          MR. BERNICK:  Judge, I'm sorry.  I'm sorry.  I object

2     to the form of the question, renew.

3          MR. PASQUALE:  Okay, I'll rephrase, Your Honor.

4          THE COURT:  I'm sorry.  Okay.

5          MS. PASQUALE:  Not a problem, I'll rephrase, Your

6     Honor.

7     Q    Isn't it true, Mr. Tarola, that the disclosure statement

8     for the joint plan was not approved by the Court by November

9     30th, 2005?

10    A    That's correct.

11    Q    And the joint plan did not become effective by January

12    1st, 2007?

13    A    That's my understanding.

14    Q    In fact, the joint plan never became effective, because it

15    was never pursued by Grace subsequent to April 2008, right?

16    A    I don't know how to answer that.

17         MR. PASQUALE:  I'll withdraw, Your Honor.  Let me ask

18    a different question.

19    Q    Are you aware that the debtor's exclusive period under the

20    bankruptcy laws terminated in July of 2007?

21         MR. BERNICK:  Objection, it's beyond scope.

22         THE COURT:  It's a foundation question, it's a yes or

23    no.  You can answer, sir.

24    A    I don't recall being aware of that specifically.

25    Q    Now, at or about the time of this letter in January of

1  2005, did Grace obtain the signature of any bank debt holder on

2  any document obligating that holder to support the joint plan?

3  A    Not to my knowledge.

4  Q    Did W.R. Grace obtain the signature of J.P. Morgan on any

5  document obligating J.P. Morgan to support the joint plan?

6  A    Not to my knowledge.

7  Q    Did Grace obtain the signature of any bank debt holder on

8  any document obligating that holder to support the interest

9  rate that was negotiated by Mr. Maher for the Creditors'

10  Committee?

11          MR. BERNICK:  Objection, that calls for a legal

12  conclusion.

13          THE COURT:  No, the question -- all right, rephrase

14  the question.

15          MR. PASQUALE:  I will, Your Honor.

16  Q    Did Grace obtain the signature of any bank debt holder on

17  any document by which that bank debt holder agreed to the

18  post-petition interest rate negotiated between you and Mr.

19  Maher on behalf of the Committee?

20  A    Again, not to my knowledge.

21  Q    And did Grace get J.P. Morgan's signature on any document

22  by which J.P. Morgan agreed to the interest rate that you

23  negotiated with Mr. Maher on behalf of the Committee?

24  A    Not to my knowledge.

25  Q    Before I lose it, Mr. Tarola, you mentioned the joint

Tarola - Cross/Pasquale                          40

1  plan.  This letter itself doesn't set forth the interest rate

2  agreement that you reached with the Committee, right?

3  A    That's correct.  It refers to the details of the joint

4  plan.

5  Q    And the interest rates that you recited in response to Mr.

6  Bernick's questions, those interest rates are provided in the

7  joint plan, right?

8  A    That's correct.

9  Q    Do you recall the form of the consideration that the joint

10 plan provided for treatment of unsecured claims?

11 A    I don't recall off the top of my head.

12 Q    Do you recall if it was all cash?

13 A    Now that you mention, I think it was part cash, part

14 equity value.

15 Q    Do you recall how much of cash and how much of stock?

16 A    My recollection is 85 percent cash, 15 percent other

17 consideration.

18 Q    Now turning to the February 27, 2006 letter, that's Plan

19 Proponents' Exhibit 286.

20 A    Yes, sir.

21 Q    That letter also refers specifically to the joint plan

22 that we've been discussing, doesn't it?

23 A    Yes, sir.

24 Q    And that letter agreement also provides for certain events

25 upon which the Committee could choose to terminate the

**J&J COURT TRANSCRIBERS, INC.**

1 agreement, right?

2 A    Specifically it says the Committee has the right to

3 withdraw as a plan proponent if certain events occur.

4 Q    Thank you.  And I can take you down the same questions,

5 Mr. Tarola, but with respect to the disclosure statement

6 approval and confirmation of that plan, those events never

7 happened, right?

8 A    My understanding, that's correct.

9 Q    Now at or about the time of this letter, and in fact any

10 time thereafter during your tenure at Grace, did Grace ever

11 obtain the signature of any holder of bank debt providing for

12 that bank debt holder to support the joint claim.

13          MR. BERNICK:  Object to the question, the form of the

14 question in its scope.  The witness testified on direct only as

15 to matters that led up to and included the time of these two

16 letters.  We were the only ones who designated Mr. Tarola to

17 testify in this phase.  They're now attempting to use Mr.

18 Tarola as their own witness, and that is not permissible either

19 under the rules of examination or under the orders of this

20 Court, which required that they identify him and they also

21 identify the matters as to which he would testify on their

22 behalf, and they failed to do so.

23          MR. PASQUALE:  Your Honor, this was the CFO of W.R.

24 Grace until -- sorry -- I think it was October 2008.  It's

25 directly relevant to the scope of the direct.

1          THE COURT:  It's clearly relevant, and to the extent

2    that he knows, he may answer this question.

3          THE WITNESS:  I'm sorry, could you repeat the

4    question?

5    Q    Sure.  At any time from this point, February of 2006 to

6    the time you left W.R. Grace, did W.R. Grace ever obtain the

7    signature on any document from any bank debt holder by which

8    that bank debt holder agreed to the terms of the joint plan?

9    A    Again, not to my knowledge, but I would like to say my

10   understanding of the bankruptcy process was that if individual

11   creditors objected to a proposed plan, that would come out at

12   the time the plan was voted upon, not in some interim period.

13         MR. PASQUALE:  Move to strike after his answer, Your

14   Honor, as nonresponsive.

15         THE COURT:  No, I think it is responsive.  He is the

16   CFO and to the extent that the debt company isn't asking for

17   that rate because of his understanding, that's relevant to your

18   question.

19         MR. PASQUALE:  That's fine, Your Honor.

20   Q    And as to J.P. Morgan, did Grace ever, during your tenure

21   at the company, obtain J.P. Morgan's signature on any piece of

22   paper by which J.P. Morgan agreed to be bound by the Creditors'

23   Committee's agreement set forth in Plan Proponent 286?

24   A    Again, not to my understanding.

25   Q    Now, during your negotiations with Mr. Maher in late 2005,

Tarola - Cross/Pasquale                                    43

1  did Mr. Maher advise you that at least certain holders of the

2  bank debt were seeking default interest on their claim?

3  A    Not to my recollection.

4  Q    That wasn't a demand that Mr. Maher initially made in

5  negotiating with you?

6  A    No, sir.

7  Q    Now, between the time of -- strike that.  Between February

8  2006 and April 2008, isn't it true that you would periodically

9  check to determine at what prices the bank debt was trading?

10         MR. BERNICK:  Objection.  This is completely beyond

11  scope.

12         THE COURT:  It is beyond the scope.  His testimony

13  was limited by Mr. Bernick's statement at the outset to the

14  period up to February of 2006.  And I did permit the question

15  with respect to the signatures, I think that's relevant.  But

16  this, you've got to substantiate what the purpose is.

17         MR. PASQUALE:  Very clear, Your Honor.  I mean, the

18  purpose is the plan proponents have made allegations with

19  respect to the Committee and bank lenders objection and with

20  respect to the Creditors' Committee's actions, knowledge of the

21  bank holders and whether in essence it is equitable for the

22  bank debt holders and the Committee to be taking the positions

23  we're now taking in opposition to the plan.  The questions I'm

24  trying to elicit go to the fact, and I have other questions for

25  Mr. Shelnitz as to Grace's knowledge at the time they

1  negotiated the plan term sheet leading to the plan before the

2  Court, which we believe we can prove through this evidence show

3  that Grace knew or should have known of the bank lenders'

4  demands and taken that into account.

5           THE COURT:  All right, well --

6           MR. PASQUALE:  It goes to the equities, Your Honor.

7           MR. BERNICK:  I'm sorry, Your Honor.

8           THE COURT:  What the bank interest rates -- I

9  apologize -- I'm not sure if you were asking about what the

10 bank debt was trading at or the interest rates on the debt.

11          MR. PASQUALE:  I'm asking about the bank debt, in all

12 of these questions I'm about to ask go to the CFO, Mr. Tarola's

13 knowledge at the time and what he told others at Grace --

14          THE COURT:  But I missed the question.

15          MR. PASQUALE:  I'm sorry, Your Honor.

16          THE COURT:  Did you ask him about was he periodically

17 checking what the bank debt traded at?

18          MR. PASQUALE:  That's right.

19          THE COURT:  Is that the question?  Okay, I don't see

20 what relevance that has to Grace's knowledge of a demand by the

21 banks.

22          MR. PASQUALE:  It goes to Grace's knowledge -- and I

23 didn't get the answer yet, Your Honor -- but I will, as an

24 offer of proof, because we did depose Mr. Tarola, that Mr.

25 Tarola knew for a period of time that the price of the debt was

Tarola - Cross/Pasquale                          45

1  trading above the rate agreed to in the February 2006

2  agreement.

3         THE COURT:  But even if that's the case, that doesn't

4  substantiate that he has knowledge of a demand by the bank

5  lenders that's different from the letter.

6         MR. PASQUALE:  Your Honor, I think it does and that's

7  my offer of proof.  I think it's evidence that is relevant to

8  the responses to our objections.

9         THE COURT:  Okay.  I don't see how.  If there's a

10 demand that's been made, then you can clearly pursue a demand,

11 but knowing what the bank debt's trading at when the letter

12 says that it's attached to the prime doesn't seem to me to be

13 significant.  I'm losing the relevance.  I don't see the

14 relevance.

15        MR. PASQUALE:  Well, the letter, Your Honor, as Mr.

16 Tarola has testified, is simply between the Creditors'

17 Committee and Grace.  We're talking now about the bank debt and

18 its trading itself, and again, W.R. Grace's knowledge of that.

19        MR. COBB:  Your Honor, may I be heard on this?

20        THE COURT:  Okay.

21        MR. COBB:  Your Honor, Richard Cobb on behalf of the

22 bank lenders.  Your Honor this goes to Grace's state of mind.

23 Mr. Bernick spent a great deal of time developing what he

24 believes is evidence that supports that Grace had a belief, had

25 an understanding, that certain representations were made by Mr.

**J&J COURT TRANSCRIBERS, INC.**

1 Maher on behalf of certain bank lenders.  That there were

2 certain commitments that were made perhaps.  It goes to what

3 Grace's perception was, Grace's understanding was of where the

4 bank lenders were with regard to excepting or rejecting this

5 interest rate.  What Mr. Pasquale is attempting to

6 demonstrate, Your Honor, is simply that there was information

7 available to Grace that would have told Grace that there were

8 some bank holders, at least, that did not have, that did not

9 have a perception or an agreement that this was the interest

10 rate that they would accept or that would apply.  It's directly

11 relevant to what Grace knew or should have known.

12         THE COURT:  What the bank debt is trading at has

13 nothing to do with whether or not a lender has or has not made

14 a commitment to Grace.  If you're going to substantiate that

15 there was some demand made of Grace, you can pursue that.  But

16 the bank debt trade and this witness's knowledge of the bank

17 debt trade has nothing to do with whether or not a lender made

18 a demand -- or a bank debt holder made a demand.

19         MR. COBB:  I agree with, Your Honor, they're

20 different issues.

21         THE COURT:  Yes.

22         MR. COBB:  One is whether a demand was made, the

23 other is, what was Grace's state of mind, what was Grace's

24 understanding, what was Grace's knowledge with regard to what

25 the bank debt holders had agreed to accept.  And if the market

1  trading price is reflecting trading ranges above what the

2  purported agreed rate was, that's inconsistent with under a

3  different topic area, whether there was a demand made and

4  whether there was an acceptance, whether there was a counter to

5  that demand.

6          THE COURT:  Okay, this question was asked between

7  February 2006 and April 2008, the agreement was reached in, I

8  believe, January 2006.  Grace's understanding of what happened

9  after the agreement is reached clearly cannot be relevant to

10 Grace's intent to enter into an agreement that predated that

11 period.  The objection is sustained.

12         MR. PASQUALE:  With that, Your Honor, I have nothing

13 further for the witness.  Thank you.

14         THE COURT:  Mr. Cobb, do you have anything of this

15 witness?

16         MR. COBB:  I do not, Your Honor.  Thank you.

17         MR. BERNICK:  Mr. Plevin?

18         THE COURT:  Anyone?  All right, Mr. Bernick?

19                    REDIRECT EXAMINATION

20 BY MR. BERNICK:

21 Q    You're not a bankruptcy lawyer, are you, Mr. Tarola?

22 A    No, sir.

23 Q    When you negotiated this deal, did you negotiate, that is

24 the '05 and '06 letters, did you negotiate with a bankruptcy

25 lawyer?

1  A    No, sir.

2  Q    When you talked with Mr. Maher, did Mr. Maher make

3  distinctions about, I'm just the Committee and the lenders may

4  or may not sign on.  Did he ever make that distinction to you?

5  A    It never came up.

6  Q    Mr. Maher as a business man dealing with you as a business

7  man, when the letter came through, did you say, hey, you know,

8  you guys should note that Mr. Kruger, the lawyer signed it, not

9  a business person.  Did he ever point that out to you?

10  A    No, sir.

11  Q    At any point in time did the business people that you were

12  counting on in your negotiations ever give the slightest

13  indication that the kinds of questions that Mr. Pasquale is now

14  asking were questions that were in any way, shape or form

15  material to your deal with the Committee?

16  A    No, sir.  I thought we had a business arrangement.  We

17  intended to honor it.  I thought it would be honored by the

18  Committee.

19  Q    Now, it was pointed out that under the terms of the '05

20  letter, that the Creditors' Committee could, had the right to

21  withdraw if a bunch of different things didn't happen, and the

22  same right to withdraw under those same circumstances or

23  parallel circumstances was also in the '06 letter.  Do you

24  recall his questions along those lines?

25  A    Yes, sir.

1  Q    Did they ever withdraw?

2  A    Not to my knowledge.

3  Q    You were also asked whether, you know, representations

4  were made et cetera, et cetera about support and the like

5  throughout the entire period of time between the execution of

6  this letter in February 2006 and the time that the term sheet

7  -- were you still at the company the time that the term sheet

8  for the plan was executed?

9  A    Do you mean the term sheet with the personal injury

10 creditors' group?

11 Q    Yes.

12 A    Yes, sir.

13 Q    At any point in time, pursuant to Mr. Pasquale's

14 questions, at any point in time between February of '06 and the

15 time of that term sheet did you ever hear any kind of

16 representation that the lenders would not vote in favor of a

17 plan that contained the interest rate that's set forth in the

18 plan that's referred to in the '06 letter.

19         MR. PASQUALE:  They're all leading questions, Your

20 Honor, I object.

21         THE COURT:  They are.  And I just sustained the

22 objections to questions beyond February 2006 because that was

23 your proffer.  If you're going beyond them, it's opening the

24 door.

25         MR. BERNICK:  In fact, with due respect to the Court,

1 I specifically objected to those questions.  And you permitted,

2 I believe the Court permitted the witness to answer regarding

3 the termination of the letter and whether in fact the, whether

4 anybody ever signed --

5          THE COURT:  Signed it, correct.

6          MR. BERNICK:  -- the documents.  And that obviously

7 raises the question of whether somebody is saying that the

8 letter is no longer any good as so far as the lenders are

9 concerned.

10          THE COURT:  All right.  Then the objection of the

11 leading nature of the question's sustained.  You can rephrase.

12 Q    What statements, if any, did you ever hear from Mr. Maher

13 or any other member of the Unsecured Creditors' Committee in

14 all these different meetings, what statements if any did you

15 hear?  That the lenders would not in fact support this plan?

16 A    I never heard any statements to that effect.

17 Q    Was there ever a demand?  Tell us whether or not there was

18 ever a demand made by the Unsecured Creditors in your dealings

19 with them at all theses different meetings if they ever made a

20 demand prior to the term sheet coming out for a rate of

21 pendency interest that was different from the plan that's

22 referred to in the 2006 letter.  Was such a demand made?

23          MR. PASQUALE:  Objection to form, Your Honor.  I'm

24 not clear from counsel's questions whether he's just referring

25 to this witness or Grace as an entity.

1          MR. BERNICK:  Well, I'm talking about, is, they asked

2  the questions of this witness and asked, I think the question

3  was, did he ever hear in any of these meetings such a demand?

4  Is that -- okay.

5  Q    Did you ever hear in any of these meetings a demand by the

6  business people, the people that you were counting on, did you

7  ever hear a demand for a rate of interest that was different

8  from what was set forth in the plan that's referenced in the

9  February '06 letter?

10  A    Prior to what point in time?

11  Q    Prior to the term sheet coming out.

12  A    My recollection is that term sheet came out in early April

13  of 2008 and I never heard any demand for default interest until

14  after that date.

15  Q    Thank you.  Nothing further.

16          MR. PASQUALE:  Couple questions, Your Honor.

17          THE COURT:  Yes, sir.

18          MR. PASQUALE:  Thank you.

19                    RECROSS EXAMINATION

20  BY MR. PASQUALE:

21  Q    Mr. Tarola, with respect to the two letter agreements, and

22  please just answer this yes or no, did it ever -- did you ever

23  consider consulting with Grace's counsel as to whether or not

24  those agreement would be binding on bank debt holders directly.

25          MR. BERNICK:  Objection to the -- actually two

**J&J COURT TRANSCRIBERS, INC.**

1 objections.  One is it goes beyond scope, and two is that

2 inevitably if he says yes then the fact that he says yes

3 invades the privilege.

4          MR. PASQUALE:  It has to be considered, Your Honor.

5 I mean, Mr. Bernick just asked him questions on redirect about

6 his expectations.

7          THE COURT:  All right.  So the question is, did he

8 consider consulting, not did he consult.

9          MR. BERNICK:  I'm sorry, Your Honor.  I asked no

10 questions about his expectations.  I asked questions about

11 whether representations were made, I asked questions about

12 whether demands were made.  I pursued nothing relating to his

13 state of mind.

14          THE COURT:  I think he was asked factual testimony.

15          MR. PASQUALE:  About his understanding of the meaning

16 of those letters, specifically to the point of what it meant to

17 him, to Mr. Tarola, that the Creditors' Committee was the party

18 to the agreement.

19          MR. BERNICK:  I didn't ask --

20          THE COURT:  Well, he asked, those questions were

21 asked on his original direct, not on redirect.  On redirect he

22 was asked, in essence, this is a quick summary, whether Mr.

23 Maher made a distinction between representing the Committee and

24 the lenders, it never came up.  He said the fact that Mr.

25 Kruger signed this letter, not the business people, did Mr.

1 Kruger ever mention that it wasn't a business person.  Did the

2 two letters contain essentially similar rights to withdraw if

3 certain events occurred.  As far as he knew, the Committee

4 never did withdraw.  Then there were factual questions about

5 whether he ever heard that lenders would not vote on the plan,

6 in essence, that form of question, objection was sustained, but

7 that was in essence the question.  And was there a demand by

8 the Unsecured Creditors' Committee for a default rate prior to

9 that agreement?  They're all factual questions, so the

10 objection is sustained in that form.

11 Q    Mr. Tarola, did you -- are you aware that the committee,

12 and Grace, and its legal counsel, would have regularly

13 scheduled calls to discuss the status of the case?

14 A    Yes, I am.

15 Q    Did you ever participate in any of those calls?

16 A    It's my recollection maybe -- maybe a few times, but not

17 on a regular basis.

18         MR. PASQUALE:  No other questions, Your Honor.

19         THE COURT:  Mr. Bernick?  You're excused, Mr. Tarola.

20 Thank you.

21         THE WITNESS:  Thank you.

22         MR. BERNICK:  Thank you, Mr. Tarola.  Our next

23 witness is Mark Shelnitz.

24         MARK SHELNITZ, PLAN PROPONENTS' WITNESS, SWORN

25                     DIRECT EXAMINATION

Shelnitz - Direct/Bernick                        54

1  BY MR. BERNICK:

2  Q    Good morning, Mr. Shelnitz.

3  A    Good morning, Dave.

4  Q    Do you have the same notebook in front of you that Mr.

5  Tarola had?

6  A    I believe so.

7  Q    Okay.  If you could turn to Proponents' Exhibit 507-10,

8  which also is in the Court's notebook?

9  A    Okay.

10 Q    Do you see that that's a graphic?

11 A    Yes.

12 Q    Did you review that graphic in order to determine whether

13 it was accurate to the best of your knowledge?

14 A    I took a quick look, yes.

15 Q    Okay.  Would this graphic be helpful in going through the

16 sequence of events relating to the interest rate discussions

17 with the unsecured creditors?

18 A    Yes.

19         MR. BERNICK:  We offer 507-10 for demonstrative

20 purposes, Your Honor.

21         THE COURT:  It's admitted.

22 Q    I want to --

23         THE COURT:  I should explain.  For demonstrative

24 purposes only.

25         UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    You were present just now during the examination of Mr.

2  Tarola, were you not, sitting back in the back of the

3  courtroom?

4  A    Yes.

5  Q    And you heard him describe the first two letters, or the

6  two letters, the January '05 letter and the February '06

7  letter, which are Exhibits 285 -- Plan Proponents' Exhibits 285

8  and 286?  Did you hear that testimony?

9  A    Yes, I did.

10  Q    When did you first become involved in anything relating to

11  the on-going relationship between the Unsecured Creditors'

12  Committee and W.R. Grace?

13  A    I was involved from the beginning of the bankruptcy.  I

14  served under David Siegel, so I wasn't on the front line of the

15  negotiations for the 2005 letter agreement, but after Mr.

16  Siegel left I assisted Mr. Tarola in discussions with Mr. Maher

17  on the 2006 letter agreement.

18  Q    Okay.  I want to take us now beyond the two letter

19  agreements and talk about the period of time between the letter

20  agreement in February 2006 and entry into -- or, the submission

21  of the term sheet that had been agreed with the personal injury

22  representatives in April of 2008.  That's the period of time

23  that I want to cover first in my examination of you.  Did a

24  time come during this period of time when you had a telephone

25  conversation with Mr. Kruger regarding post-petition interest

1 rates that would be paid on the unsecured debt?

2 A    Generally, yes.

3 Q    Okay.  And roughly when in time did those -- did that

4 discussion with Mr. Kruger regarding the post-petition interest

5 rates, when did it occur?

6         MR. PASQUALE:  Objection to form, lacks foundation.

7 Your Honor, he said telephone conversation, singular.

8         THE COURT:  Oh.  All right.  It was a telephone

9 conversation, singular, and now it's discussions, plural, so

10 the foundation is that there's only been established one phone

11 call.

12        MR. BERNICK:  Oh.

13        THE COURT:  Restate the question.

14        MR. BERNICK:  Okay.  Just so we're on the same wave

15 length --

16 BY MR. BERNICK:

17 Q    Roughly when did the telephone conversation, first such

18 telephone conversation occur?

19 A    I believe it was in the spring of 2007.

20 Q    Okay.  What do you recall concerning your telephone

21 conversation with Mr. Kruger during that period of time, in the

22 spring of 2007?

23 A    I recall that the telephone conversation wasn't specific

24 to bank debt interest rates.  We had had -- I had been having

25 regular communications with committee counsel and Mr. Kruger,

**J&J COURT TRANSCRIBERS, INC.**

1 periodic discussions on various issues relating to the

2 bankruptcy, and in one of those discussions, somewhere in the

3 spring of 2007 time frame, Mr. Kruger happened to mention to me

4 that he saw that the bank debt, or he had been advised that the

5 bank debt was trading at a level that indicated some

6 expectation of interest above the accrual rate in the 2006

7 letter agreement.

8 Q    Okay.  And was there anything else that you recall Mr.

9 Kruger saying during that conversation?

10 A    Well, we talked about that, and we talked about how thinly

11 traded the debt was, how it may not be indicative of anyone's

12 expectations, and that we really didn't know what to make of

13 it.

14 Q    Okay.  Did he tell you anything about whether there was a

15 majority -- whether the majority of lenders -- I'm just going

16 to ask you flat out -- did Mr. Kruger, during that call, make a

17 demand of any kind that -- on behalf of the committee or any of

18 the bank lenders, that Grace pay an interest rate different

19 from the interest rate in the plan that's referenced in the

20 February 2006 letter?

21 A    No.

22 Q    Did Mr. Kruger, during the course of that telephone call,

23 ever tell you that Stroock was going to advise, or had advised

24 the Unsecured Creditors' Committee to seek full default

25 interest?

**J&J COURT TRANSCRIBERS, INC.**

1 A    No.

2 Q    Did he ever tell you during that call that J.P. Morgan had

3 already expressed -- had expressed with you that a demand for

4 default interest should be made?

5 A    No.

6 Q    Did Mr. Kruger, during the course of that call, state in

7 words or in substance that the Unsecured Creditors' Committee

8 was withdrawing from the February '06 letter agreement?

9        MR. PASQUALE:  Your Honor, objection.  Mr. Bernick is

10 again just leading the witness.

11       THE COURT:  He is.  Sustained.

12       MR. BERNICK:  Okay.

13 Q    So, tell me whether there was any demand -- whether or not

14 any demand to withdraw -- strike that.  Could you tell me

15 whether or not any statement was made by Mr. Kruger regarding

16 withdrawal?

17 A    No.

18 Q    At any point in time -- let's -- instead of doing that

19 let's get a little bit closer to the actual term sheet.  Did a

20 time come when negotiations with the representatives in this

21 case of the personal injury claimants and personal injury

22 interest, did a time come when those negotiations toward an

23 agreement intensified?

24 A    Yes.

25 Q    Roughly when was that?

1  A    Late fall of 2007, into the first quarter of 2008.

2  Q    Okay.  Was that during the same period of time, going back

3  to our chart here, that the estimation proceedings were

4  intensifying as well, and we were facing a trial?

5  A    Very much so.

6  Q    Okay.  During that period of time was Grace negotiating --

7  during the period of time that Grace was negotiating with

8  representatives of the personal injury constituency, do you

9  know whether or not the Unsecured Creditors' Committee, through

10  their counsel, was made aware of the fact that Grace was

11  negotiating?

12  A    Yes.  I was the one that kept Mr. Kruger informed of the

13  status and nature of negotiations.

14  Q    During any of the discussions that you had with Mr. Kruger

15  prior to the time that the term sheet was entered into did Mr.

16  Kruger give any kind of warning to Grace that the unsecured

17  creditors would not vote in favor of a plan that contained the

18  same rate of interest in the plan that was referenced in the

19  February '06 letter?

20  A    No.

21  Q    At any point in time did Mr. Kruger make any statement

22  regarding withdrawal from the letter?

23  A    No.

24  Q    At any point in time did Mr. Kruger make a demand on

25  behalf of -- any kind of demand on behalf of the unsecured

1 creditors, or the Unsecured Creditors' Committee, regarding

2 default interest?

3 A    No.

4 Q    Now, are you aware of whether the Unsecured Creditors'

5 Committee, through any representative, actually participated

6 directly in negotiations with representatives of the personal

7 injury claimants in the negotiations leading up to the term

8 sheet?

9        MR. FRIEDMAN:  Your Honor, Jeff Friedman from Morgan

10 Stanley.  I object to the relevancy of this line of

11 questioning.  I've sat through Mr. Tarola's testimony, and I'm

12 now sitting through Mr. Shelnitz's testimony.  The plan

13 provides Class 9, and that's what this is all about, for the

14 unimpairment of each of the sub classes or each of the

15 treatments in Class 9.  That is a matter of law, and I don't

16 understand the relevancy of testimony as to what was agreed to

17 and what was not when it's ultimately up to this Court to

18 decide whether the interest rates provided are warranted,

19 should be higher, should be lower, and what's necessary to have

20 this plan confirmed based on the theory that Class 9 is

21 completely unimpaired.  I just don't understand the relevancy

22 of this.

23        MR. BERNICK:  Yes.  I think that's pretty simple.

24 The position that's been taken, at least by certain members of

25 -- certain creditors within Class 9, is that they are impaired.

1  Your Honor has yet to decide the issue of whether there's

2  impairment or not.  If Your Honor were to decide that there is

3  impairment, this is a dissenting class.  We would be required

4  to demonstrate fairness and equity, and as a consequence we

5  would be required to demonstrate that the interest rate that is

6  provided in the plan is fair and equitable, that it's an

7  equitable determination, and equitable determinations are fact

8  specific, made in context, and this is of vital relevance to

9  the issue of whether the interest rate in the plan is, in fact,

10  fair and equitable.

11          MR. FRIEDMAN:  Your Honor, fair and equitable is also

12  a legal determination.  The committee's agreement certainly

13  couldn't have bound all of the creditors in the universe that

14  are creditors in this plan.  At best it might have bound the

15  committee.  But I just, again, don't see the relevance of that

16  because Your Honor has to determine whether a particular

17  interest rate under the cram down standards of 1129(b) is fair

18  and equitable.

19          THE COURT:  I do have to determine that, but Mr.

20  Bernick is also correct, I need facts on which to base that

21  determination, so it is relevant toward that end if I determine

22  that there is an impairment.  I don't know at this point

23  whether I'm at that level, but we've got the witnesses here.

24  If I determine there's no impairment, then this is all

25  irrelevant.  If I determine there is an impairment, it is

1  relevant.  So, I need to hear it now because I'm not to the

2  point where I know the answer to the first legal question.

3          MR. FRIEDMAN:  Your Honor, I'm not -- for the record,

4  I'm just not sure why a particular entity's agreement or

5  disagreement as to a particular interest rate makes it fair and

6  equitable as to all of the creditors that are in Class 9.

7          THE COURT:  I don't think it's an issue as to all of

8  the creditors in Class 9 at this stage, but we'll see.  I mean,

9  I haven't heard that all of the creditors in Class 9 have voted

10 against the plan, but that's --

11          MR. BERNICK:  This --

12          THE COURT:  -- not the issue.

13          MR. BERNICK:  I'm sorry.

14          THE COURT:  Go ahead.

15          MR. BERNICK:  This particular creditor actually has

16 opted in favor of a completely different procedure, as the

17 Court is familiar, but that is, again, a subject for another

18 day.  It doesn't really bear upon, I think, Mr. Shelnitz's

19 examination.

20          MR. FRIEDMAN:  Just for the record, Morgan Stanley

21 voted against the plan.

22 BY MR. BERNICK:

23 Q    I think we left off, and I'll pose the question to you

24 again, in connection with the negotiations leading up to the

25 term sheet agreement with the personal injury constituency, are

1  you aware of whether any representative of the Unsecured

2  Creditors' Committee, or any representative of any lender

3  participated directly in those negotiations?

4  A    They did not.

5  Q    Okay.  At some point prior to these negotiations had there

6  been a period during which there were direct negotiations

7  between members -- representatives of the unsecured creditors

8  on the one hand and personal injury representatives on the

9  other?

10        THE COURT:  Mr. Bernick, I've lost the time frame.

11  I'm sorry.

12        MR. BERNICK:  I'll be clear and go back.

13  Q    Going back now, historically -- historically, was there a

14  point in time during which there were direct negotiations

15  between the unsecured creditor representatives and

16  representatives of the personal injury constituency?

17  A    Yes.

18  Q    And was Grace involved in those direct negotiations?

19  A    There were on and off negotiations throughout the course

20  of the bankruptcy, some of which Grace was -- were with

21  representatives of the unsecured creditors, and there were also

22  separate conversations between representatives of the unsecured

23  creditors and the representatives of the personal injury

24  claimants.

25  Q    In any of the discussions, now moving forward to the

1  negotiations that took place in '08, leading up to the term

2  sheet, would you say you participated in, correct?

3  A    Yes.

4  Q    In any of those discussions and your communications -- I

5  should say in any of your communications with Mr. Kruger during

6  that particular period of time where Grace is talking directly

7  with the personal injury constituency and the unsecured

8  creditors are not, in any of your discussions with Mr. Kruger

9  did he say, demand that he wanted to participate directly in

10 the negotiations with the personal injury constituency?

11 A    No.  We had an understanding that -- in the negotiations,

12 any negotiations with the personal injury committee we were

13 going to fight for, negotiate for the rate agreed upon in the

14 2006 letter agreement, and the committee and committee counsel

15 were quite content to let the debtors negotiate on their

16 behalf.

17 Q    Did Mr. Kruger, at any point in time, during this period

18 leading up to the term sheet, say we are not going to sign onto

19 a plan unless it includes full default interest?

20 A    No.

21       MR. PASQUALE:  Your Honor, again, Mr. Bernick is

22 doing nothing but leading with all these questions.

23       THE COURT:  That's sustained.

24 Q    Well, tell me whether any such demand -- tell me whether

25 there was any conversation where any such demand was discussed?

1  A     There was no such conversation.  There was an

2  understanding between Mr. Kruger and I, the traditional

3  position of the Asbestos Creditors' Committee was that

4  everybody should take a haircut as part of a consensual plan.

5  And that would include the general unsecured class taking a

6  haircut not only as to interest, but as to principal.  And I

7  think that led to the alliance of the debtors with the general

8  unsecured class leading to the co-proponency in 2005 and 2006.

9  So, this is something that the committee was very well aware

10 of, the asbestos creditors' committee's position, and therefore

11 I think was part of their strategy in allying themselves with

12 the debtors to try to get them the rate negotiated for in 2006.

13 Q     Well, I want to be sure that that's not simply your

14 speculation.  Was that something -- was that or was that not

15 something that was discussed with Mr. Kruger?

16 A     It was.

17 Q     Showing you Plan Proponents' Exhibit 160, is this a copy

18 of the term sheet that was ultimately reached with the personal

19 injury constituency?

20 A     This copy isn't signed by the debtors, but it looks to be

21 the final term sheet, yes.

22        MR. BERNICK:  Okay.  We offer it.

23        MR. PASQUALE:  I'm not sure of the relevance, Your

24 Honor, but we don't have an objection.

25        THE COURT:  All right.  It's admitted.

1  BY MR. BERNICK:

2  Q    I see, if we go to Page 3, there is a reference under B7

3  to the allowed general unsecured claims.  Do you see that?

4  A    Yes.

5  Q    It actually spells out a rate of post-petition interest?

6  A    Yes.

7  Q    Is that rate the same or different from the rate of post-

8  petition interest that was set out in the plan, referenced in

9  the February '06 letter?

10 A    Yes.

11 Q    Is it the same or different?

12 A    It's the same.

13 Q    Okay.  Now, why was this included, if this is a deal with

14 the personal injury constituency, why was it important, if it

15 was important, to recite the rate of interest, post-petition

16 interest, for the general unsecured claims?

17 A    This is the arrangement I had with the committee that any

18 consensual plan with the PI committee, the Asbestos Claimants'

19 Committee, would include interest at the negotiated rate, and

20 we would not negotiate for any other deal, so this basically

21 was included to confirm to the general unsecured committee and

22 class that we had delivered what we had bargained -- what they

23 had bargained for.

24 Q    Okay.  I want to show you exhibit -- Plan Proponents'

25 Exhibit 344.  Do you see that?

1  A    Yes.

2  Q    Could you identify that document for the record?

3  A    That is an e-mail that I sent to committee counsel, Arlene

4  Krieger, Lewis Kruger, and Ken Pasquale, attaching a draft of

5  the term sheet with the Personal Injury Committee.  Consistent

6  with what I said earlier, we were keeping the committee

7  apprized of the negotiations.  This term sheet was fairly

8  advanced, although not final, and I sent it to them for their

9  information as to where we were in negotiations.

10 Q    Okay.

11          MR. BERNICK:  We offer it, Your Honor.

12          MR. PASQUALE:  No objection, Your Honor.

13          THE COURT:  Exhibit 334 is admitted.

14 BY MR. BERNICK:

15 Q    This is dated April --

16          MR. LOCKWOOD:  334 or 344, Your Honor.

17          MR. BERNICK:  It's 344, Your Honor.

18          THE COURT:  Oh.  I'm sorry.  One second, please.

19 Okay.  344.

20 BY MR. BERNICK:

21 Q    Looking at Exhibit 344, is it dated April the 3rd?

22 A    Yes.

23 Q    And it goes from you to Ms. Krieger, who is counsel -- one

24 of the counsel for the Unsecured Creditors' Committee?

25 A    Correct.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    And it attaches the term sheet as it then was?

2  A    Yes.

3  Q    Now, this makes a reference to a clause.  It says, "As

4  discussed with Lewis, we are very close.  Please call me before

5  10:15 tomorrow if you need to discuss."  Did you have a

6  discussion with Mr. Kruger in about this period of time, that

7  is after the term sheet was advanced to the point that it was

8  close to being agreed?

9  A    I believe so, but I don't know exactly when.

10  Q    Okay.  Did you have a conversation regarding the term

11  sheet?

12  A    Yes.

13  Q    Okay.  Could you tell us how that conversation came about,

14  and what the substance of the conversation was?

15  A    The -- counsel for the committee had, I guess, a comment

16  on the term sheet, and they knew from my conversation with Mr.

17  Kruger, I guess, they knew that there were at least some

18  members of the class that might want to object to the interest

19  provided for in that Section B7 that you had pointed out to the

20  Court just earlier.  And they had suggested language to

21  effectively give any objectors to the interest rate the right

22  to advocate for a different rate.  So, they wanted to make sure

23  that objectors had any rights that they may have, or parties

24  that may have objections have those rights preserved to object.

25  Q    Did Mr. Kruger, during the course of the call, did he

1 discuss with you termination of the February '06 letter, or

2 withdrawal from it?

3 A    No.

4 Q    Did he discuss with you making a demand on behalf of the

5 Unsecured Creditors' Committee or the lenders a demand for full

6 default interest?

7         MR. PASQUALE:  Your Honor, again, I've been not

8 standing up every often, these are all leading questions.  Mr.

9 Bernick can just ask the witness what was discussed?

10        MR. BERNICK:  To the contrary.  I asked him what was

11 -- A, they're not leading; B, I asked him what was discussed

12 and he gave me an answer, and now I am eliciting whether

13 further items were discussed in the call.  And I've put

14 neutrally whether there was discussion.  Was there discussion

15 is about as non-leading as you can get.  Was there discussion

16 regarding termination?  Was there discussion regarding a

17 demand?

18        THE COURT:  You can answer, Mr. Shelnitz.

19 A    No, there were no -- no discussion regarding termination

20 or demand for default interest.

21 Q    Now, did you ultimately receive a response from Ms.

22 Krieger to Exhibit 344, that is the April 3 e-mail?

23 A    Yes.

24 Q    I want to show you Plan Proponents' Exhibit 284.  Is that

25 the e-mail response from Ms. Krieger?

1  A    Yes.

2              MR. BERNICK:  We offer it.

3              THE COURT:  I'm sorry.  What's the exhibit number?

4              MR. BERNICK:  284.

5              MR. PASQUALE:  No objection, Your Honor.

6              THE COURT:  All right.  It's admitted.

7  BY MR. BERNICK:

8  Q    Now, this document is the next date, right?

9  A    Yes.

10 Q    From Ms. Krieger to you, with a copy to Mr. Kruger.  The

11 Re: is W.R. Grace term sheet.  It says, "Mark, set forth below

12 are our initial thoughts on changes to the allowed general

13 unsecured claims treatment description in the term sheet."  It

14 says, "Allowed general unsecured claims:  100 percent of

15 allowed amount plus post-petition interest as follows."  I'm

16 not sure why -- I must have bopped something here.  I'm getting

17 it displayed sideways even though I'm showing it -- well, I

18 guess maybe we can fool it.  There we go.  I'm now showing --

19 I'll read it on the screen.  "100 percent of allowed amount

20 plus post-petition interest as follows.  (i) for holders of

21 pre-petition bank credit facilities post-petition interest --"

22 I have to, again, make sure that I -- "interest at the rate of

23 6.09 percent from the filing date through December 31, 2005,

24 and thereafter at the floating rate, in each case compounded

25 quarterly in the matter provided for under such bank credit

1  facilities; and (ii) for all other unsecured claims, interest

2  at 4.9 percent compounded annually, or if pursuant to an

3  existing contract, interest at the non-default contract rate."

4      So far, tell us whether or not the language that Ms.

5  Krieger is suggesting is any different from what was set forth

6  in the February -- the plan referenced in the February '06

7  letter or what was set forth in the term sheet?  Any

8  difference?

9  A    No difference.

10 Q    It goes on to say, "Provided, however, any such holder may

11 seek to obtain a higher interest rate and shall be entitled to

12 such higher interest rate if the Court determines that such

13 interest is appropriate."  That was a proviso that was added by

14 Ms. Krieger?

15 A    Yes.

16 Q    How did you understand this e-mail?

17 A    I understood it as the committee and committee counsel

18 continued to be supportive of the letter agreement, but they

19 knew there were certain members of their class that might want

20 -- might object, and they sought to preserve their rights to

21 object, a right that, I guess, we believed that they had all

22 along anyway, but she sought to give express comfort to a

23 holder who may want to seek a higher rate, that they could do

24 so.

25 Q    Was there any communication -- tell us whether or not

**J&J COURT TRANSCRIBERS, INC.**

1  there was any further communication with representatives of the

2  unsecured creditors regarding the issue of the post-petition

3  interest prior to the time that the term sheet was finalized

4  and filed?

5  A    I believe there was, to advise them that we didn't feel

6  that language was necessary.

7  Q    Any other communication?

8  A    Not that I recall.

9  Q    Any demand -- any discussion at any point prior to going

10 back to our graphic here, which probably also needs to be re-

11 oriented.  We'll figure this out, I think, on a break.  During

12 this period of time that the graphic shows, between April 3

13 when the term sheet is circulated and April 6th when it's

14 filed, any discussion of a demand for a default interest,

15 demand made by the creditors through their counsel?

16 A    No.

17          MR. BERNICK:  Pass the witness, Your Honor.

18          THE COURT:  Why don't we take a few minute recess,

19 and then we'll do cross examination?

20          MR. PASQUALE:  Thank you, Your Honor.  I appreciate

21 it.

22          THE COURT:  All right.  Ten minutes, please.  You're

23 excused, sir.  Go ahead.  I just want to finish a note.  Thank

24 you.

25                    (Recess)


                **J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  Please be seated.  Mr. Shelnitz, are you

2  ready?

3            THE WITNESS:  Yes.

4            THE COURT:  Mr. Pasquale?

5            MR. PASQUALE:  Thank you, Your Honor.

6                        CROSS EXAMINATION

7  BY MR. PASQUALE:

8  Q    Good morning, Mr. Shelnitz.

9  A    Good morning, Ken.

10 Q    Mr. Shelnitz, let me start pretty much where Mr. Bernick

11 left off, and that's with Exhibit 284.  Mr. Bernick asked you

12 some questions in particular about the last clause in Ms.

13 Krieger's e-mail; do you remember that?

14 A    Yes.

15 Q    You understood that that clause applied not only to the

16 claims of the bank debt holders, but also all other unsecured

17 claims, didn't you?

18 A    I don't recall, but I do recall in discussion with Stroock

19 that you had specifically raised the issue with me having it

20 applied to the others as well, yes.

21 Q    So, just so we're clear for the record, the issue being

22 that all unsecured creditors, bank debt holders and non-bank

23 debt holders, have the right to petition the Court for the rate

24 of interest they believe appropriate, correct?

25 A    Yes, I think that's right.

1 Q    Thank you.  Now, Mr. Shelnitz, were you in the courtroom

2 during the examination of Mr. Tarola?

3 A    Yes.

4 Q    And I asked Mr. Tarola a number of questions about whether

5 Grace had ever entered into agreements with bank debt holders,

6 so I'd now like to ask you, are you aware of whether Grace ever

7 requested a plan support or other agreement with any bank debt

8 holder with respect to any plan in these cases?

9 A    No, other than -- no.  Other than J.P. Morgan Chase was a

10 debt holder, and they -- they supported -- they chaired the

11 committee, so from that perspective we believe J.P. Morgan

12 Chase was certainly committed.

13 Q    Did J.P. Morgan Chase ever sign -- let me withdraw and try

14 again.  Did J.P. -- did you ever request -- I'll try one more

15 time.  Withdrawn.  Did Grace ever request from J.P. Morgan a

16 plan support or other agreement with respect to any plan in

17 these bankruptcy cases?

18 A    Well, J.P. Morgan negotiated the agreement with the 2005,

19 2006 letters agreement.  The fact that Mr. Kruger signed was

20 typical for the bankruptcy where counsel often signed

21 agreements on behalf of their clients, so -- whether Mr. Kruger

22 signed or J.P. Morgan signed it didn't really make a difference

23 from a documentation or memorialization standpoint.

24 Q    And Mr. Kruger's client is the Unsecured Creditors'

25 Committee, correct?

1  A    Correct.  Chaired by J.P. Morgan Chase.

2  Q    All right.  But I want to go back again, Mr. Shelnitz,

3  because I'm not sure you've answered my question.

4  A    Okay.

5  Q    Did Grace ever request a separate agreement with J.P.

6  Morgan Chase to support any plan of reorganization in these

7  cases?

8  A    No.

9  Q    Now, Mr. Bernick asked you a number of questions about

10  things that Mr. Kruger did not tell you.  Did Mr. Kruger, or

11  anyone at Stroock ever tell you that the committee would

12  support the term sheet or the plan currently before this Court?

13  A    No, but the question was never asked.

14  Q    Never asked by you in any of the discussions with Mr.

15  Kruger?

16  A    Well, we had discussions, and when he indicated to me that

17  the trading price of the debt indicated there may be some bank

18  debt holders that had an expectation of a higher rate of

19  interest, I recognized that that could be an issue, but that

20  the committee support would be very powerful in getting the

21  plan confirmed.

22  Q    That was your expectation as to the effect of the

23  committee's support, correct?

24  A    Mr. Kruger never took issue with the statement.  Correct.

25  Q    Now, let's stay in the range of April 2008, you know, the

1  time of Exhibit 284, and -- which is April 4, 2008, and then

2  your e-mail was the day before that.  That's also in Evidence.

3  A    Right.

4  Q    You were told during the discussions with Stroock, during

5  that period of time, that certain bank debt holders were not

6  agreeable to the rate provided in the term sheet, weren't you?

7  A    I believe so.

8  Q    So, you knew that before the term sheet was signed?

9  A    Yes.

10 Q    Now, with respect to the negotiations that led to the term

11 sheet, Mr. Bernick asked you some questions about the

12 creditors' committee -- that the creditors' committee did not

13 participate in those negotiations.  Do you recall the

14 questions?

15 A    Correct.

16 Q    That was actually your decision, wasn't it?

17 A    Well, it was my position and suggestion to Mr. Kruger that

18 that would be the best way to get a deal done that -- a more

19 intimate discussion without the General Unsecured Committee

20 being there would be more productive and it would enable the

21 committee to avoid having to address the Asbestos Claimants'

22 Committee directly with an expectation that the ACC would be

23 requesting them to take a cut in their -- in recovery of the

24 amount of their principal.

25 Q    So, it was your strategic decision to which we agreed;

1 isn't that right?

2 A    Correct.

3 Q    Now, you mentioned also that you believed that there were,

4 at some point in time, direct negotiations between the

5 committee and the asbestos claimants.  What's the basis for

6 your -- for that statement?

7 A    Again, it's been a long case, but I was certainly aware of

8 communications between the committee or its counsel and members

9 of the ACC or their counsel on what the ACC might expect the

10 General Unsecured Committee to agree to.  Whether that took

11 place in connection with the Judge Pointer mediation, earlier

12 negotiations that preceded my being general counsel, I don't

13 recall specifically.

14 Q    So, you don't know when these negotiations that you

15 testified to would have taken place?

16 A    I think they took place on one or more occasions

17 throughout the course of the bankruptcy.

18 Q    And how did you --

19 A    They were communications --

20 Q    I'm sorry.

21 A    -- more than negotiations.

22 Q    Thank you.  You mentioned in response to Mr. Bernick's

23 questions at least a conversation with Mr. Kruger with respect

24 to the trading price of the debt.  In fact, there was more than

25 one conversation, wasn't there?

1  A    He did mention it in more than one conversation, yes.

2  Q    And it was at least five conversations that you can

3  recall?

4  A    That would be a ballpark.

5  Q    Now, you mentioned also that you discussed that the debt

6  was thinly traded.  That was something you said to Mr. Kruger;

7  isn't that right?

8  A    Yes.  I mean, this was bank debt.  This wasn't publicly-

9  traded debt.  Mr. Tarola would receive notice any time that

10 bank debt traded hands.  He did not know what price it traded

11 hands at, but he was able to keep current with who the current

12 debt holders were and he would advise, since we consulted very

13 regularly, our offices were right down the hall, that the debt

14 was very thinly traded.

15 Q    Okay.  So, your comment to Mr. Kruger that the debt was

16 thinly traded, it is based on Mr. Tarola's checking the trading

17 of the bank debt?  Is that right?

18 A    I believe Blackstone may have also checked it, as well.

19 Q    And how often was that done?

20 A    Once a quarter.  It's just a -- I don't know specifically.

21 Q    And how did Mr. Tarola communicate the information that he

22 learned to Grace?

23 A    He, or someone in his treasury department, would keep a

24 list of the current bank debt holders based on the information

25 provided in the notices that were required to be given to the

Shelnitz - Redirect/Bernick                              79

1  company.

2  Q     That was information that he shared with you?

3  A     Yes.

4  Q     And was it information that he shared with others at Grace

5  management?

6  A     Yes.

7  Q     Did he share that information with any members of the

8  board of directors, to your knowledge?

9  A     I don't recall.

10  Q     Did he share it with Mr. Festa?

11             THE COURT:  With whom?

12             MR. PASQUALE:  Mr. Festa, the CEO.

13  A     I believe so.

14             MR. PASQUALE:  Your Honor, may I just have one

15  minute, please?

16                     (Pause)

17             MR. PASQUALE:  That's all I have, Your Honor.  Thank

18  you.

19             THE COURT:  Anyone else?  Mr. Bernick?

20             MR. BERNICK:  Would it be all right if I just asked

21  the question from here, Your Honor?

22                  REDIRECT EXAMINATION

23  BY MR. BERNICK:

24  Q     Mr. Pasquale asked you whether you had ever requested an

25  agreement directly with the bank lenders themselves as opposed

                    **J&J COURT TRANSCRIBERS, INC.**

1  to the committee.   Remember those questions?

2  A    Yes.

3  Q    And you said no, you did not.   Why not?

4  A    It really wasn't top of mind.   The issue was trying to get

5  the committee to support the joint plan, and we believed that

6  the committee, in its fiduciary capacity on behalf of all

7  members of the class, were negotiating on behalf of the bank

8  debt holders.   As a matter of fact, the 2006 letter agreement

9  says it's on behalf of the bank debt holders, so we didn't

10  believe it was necessary to try to go track down individual

11  bank debt holders and sign them up to an agreement.   It really

12  just wasn't part of our thought process.

13            MR. BERNICK:   That's all I have.

14            MR. PASQUALE:   One question, Your Honor.

15                      RECROSS EXAMINATION

16  BY MR. PASQUALE:

17  Q    What belief did you have, Mr. Shelnitz, that Mr. Maher's

18  negotiating would be binding upon individual bank debt holders?

19            MR. BERNICK:   He just answered that.

20            THE COURT:   He can answer.

21  A    As I said, I didn't -- I wasn't really focusing on the

22  extent to which individual bank debt holders may or may not

23  have been bound.   Not being a bankruptcy law expert I really

24  wasn't quite sure to what extent they would or would not be

25  bound.

1          MR. PASQUALE:  Nothing further, Your Honor.  Thank

2   you.

3          THE COURT:  Anyone else?  Mr. Bernick, anything

4   further?

5          MR. BERNICK:  No.

6          THE COURT:  You're excused, Mr. Shelnitz.

7          THE WITNESS:  Thank you.

8          THE COURT:  Thank you.

9          THE WITNESS:  This binder still up there?

10          THE COURT:  Yes.  They can stay.  I'm not sure if

11   anybody else is going to use them yet.

12          MR. BERNICK:  The plan proponents' next witness is

13   Pam Zilly.  Oh, I'm sorry --

14          MR. PASQUALE:  I thought we were switching --

15          MR. BERNICK:  Yes.  We -- now that Mr. Schiavoni is

16   here -- I'm sorry.  I guess -- you know, you just --

17          THE COURT:  What's the order -- I'm sorry.  I'm

18   confused.  Are we going back to yesterday, or finishing the --

19          MR. BERNICK:  I was going to call Ms. Zilly, but I

20   recalled that we undertook to take up to -- take up the

21   remaining matters from yesterday before Ms. Zilly is called,

22   so, my apologies to Ms. Zilly and the Court.  I think that

23   that's what our commitment was, so we may as well do that now.

24          THE COURT:  All right.  So, who is on first, then,

25   and what are we returning to?

1            MR. PASQUALE:  She switched, to get out of the way,

2   Your Honor.

3            MR. LOCKWOOD:  Your Honor, as I recall we had two

4   matters left over, one involving BNSF and one involving

5   OneBeacon.  So, those are the folks we need to hear from, I

6   guess.

7                          (Pause)

8            THE COURT:  Well, if that's the case, I'm not sure if

9   you do want these binders left up here if you're going to be

10  using other exhibits.  I was thinking that they would be used

11  with the subsequent witnesses for the -- on the lender issues.

12           MR. BERNICK:  Is there going to be a witness for

13  BNSF?

14           UNIDENTIFIED ATTORNEY:  I don't think so.

15           MR. BERNICK:  Is there going to be a witness for

16  Seaton/OneBeacon?  I don't see them here.

17           MR. LOCKWOOD:  I think I saw Mr. Brown and Mr. Platt

18  in the conference room down the hallway.  Or maybe --

19           THE COURT:  And Mr. Phillips just left, so --

20           UNIDENTIFIED ATTORNEY:  I'll see if I can find them,

21  Your Honor.

22           THE COURT:  All right.  There's Mr. Phillips.  Is

23  BNSF going to be calling a witness?

24           MR. PHILLIPS:  No, Your Honor, unless the Court wants

25  to hear -- we're going to be making an offer of proof of the

1  certified copies of the complaints, our Exhibits 85 through

2  279.  They're electronic in the exhibit room.  I've got a box

3  full of documents that are certified that I could -- that I'd

4  be happy to leave here in case we need them for authentication.

5  But I'd also be willing to take them back to -- not Montana,

6  but the offices of Pepper and shred them if we don't need that

7  much more paper.  So, we move the admission of Exhibits 85

8  through 279.

9          THE COURT:  And are they marked as BNSF exhibits?

10          MR. PHILLIPS:  Yes, ma'am.  They are offered -- they

11  are BNSF-85 through BNSF-279.  And again, I have certified

12  copies if --

13          THE COURT:  And what are they?

14          MR. PHILLIPS:  They are complaints that are now

15  pending in Montana State Courts, four different counties,

16  Lincoln County, Flathead County, Lewis and Clark County, and --

17  one more.  I don't remember.  Anyway -- and these are the

18  complaints that are currently pending involving BNSF and

19  others, representing roughly 500 claimants in that 195

20  lawsuits.

21          THE COURT:  All right.  And they're offered for the

22  purpose of establishing that BNSF has, in fact, been sued?

23          MR. PHILLIPS:  Yes, Your Honor.  And not for the

24  purpose of the contents, so they are not being offered to prove

25  the -- they aren't being offered to prove the truth of the

1 allegations, obviously, which we hotly contest.  They're really

2 to give Your Honor an idea of the nature of the claims that are

3 being made against BNSF, because you may be comparing that to

4 the indemnity agreements that we have already placed in the

5 record.  So, I so move.

6           THE COURT:  Okay.  Any objection?

7           MS. ESAYIAN:  Your Honor, Lisa Esayian for the

8 debtors.  The debtors do not object to the complaints with the

9 caveats as stated by Mr. Phillips that they're coming in just

10 for that limited purpose.

11           THE COURT:  I'll --

12           MR. SCHIAVONI:  No objection, Your Honor.

13           THE COURT:  I'm sorry?

14           MR. SCHIAVONI:  No objection.

15           THE COURT:  Okay.  I will take the -- since you've

16 got the certified copies I'll take them.  I don't know whether

17 we'll use them, but if we don't need them --

18           MR. PHILLIPS:  I'm sorry, Your Honor.

19           THE COURT:  I'll take the certified copies since

20 they're here.

21           MR. PHILLIPS:  Very good.

22           THE COURT:  And we'll just keep them.  If I don't

23 need them, for whatever reason, we'll make sure they're

24 shredded at the end --

25           MR. PHILLIPS:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  -- because the disks will also contain

2     them.  But, all right, let me make a note here.  BNSF Exhibits

3     85 through 279 are admitted for the purpose just stated.

4          MR. PHILLIPS:  Thank you, Your Honor.

5          MR. BERNICK:  Have you found Seaton/OneBeacon yet?

6          UNIDENTIFIED ATTORNEY:  Oh, there you --

7          MR. BERNICK:  You're up.

8          MS. ESAYIAN:  Your Honor, before Seaton/OneBeacon

9     speaks, may I get up and state something for the record related

10    to BNSF?

11         THE COURT:  Yes.

12         MS. ESAYIAN:  We have -- the plan proponents, Royal,

13    CNA and Maryland Casualty and BNSF have worked out some plan

14    modifications.  Your Honor might recall that I handed out some

15    proposed plan modifications.  I think it was yesterday or the

16    day before.  We've done some further tweaks on them.  We've

17    worked it out, and we will be filing those in due course.

18         MS. CASEY:  Your Honor, just for the record, part of

19    the --

20         THE CLERK:  Please state your name for the record.

21         MS. CASEY:  Oh.  Linda Casey for BNSF.  Part of the

22    understanding is that any settlement agreement that is going to

23    be deemed an insurance settlement agreement under the plan, the

24    debtors will be seeking a 9019 motion on that, and that's part

25    of the reliance that we have.

1          THE COURT:  All right.  Let me make a note, please.

2          MR. SCHIAVONI:  I --

3          THE COURT:  Wait until I make a note, please.

4                    (Pause)

5          THE COURT:  Yes, sir, Mr. Schiavoni?

6          MR. LOCKWOOD:  Excuse me.  Before Mr. Schiavoni, I

7   might offer one other comment about the plan modification Ms.

8   Casey just described.  That will also cure, in our view, an

9   objection to the plan modifications made by the Libby claimants

10  within the last relatively near term because they had objected

11  that the plan, as previously drafted, allowed us to make

12  settlements during the course of the bankruptcy without seeking

13  the Court's approval.  I'm not asking the Libby claimant's

14  counsel to agree to that.  I'm just noting it for the record.

15         MR. SCHIAVONI:  Tanc Schiavoni for Arrowood.  Thank

16  you, Your Honor and Mr. Bernick, for indulging me this morning.

17  I think there's something happy that comes from that short

18  delay, that it's also -- it's -- and I'll let BNSF confirm

19  this, but our overall understanding is that to the extent these

20  plan modifications are accepted by the Court, and the parties

21  have consented to it, that BNSF intends to withdraw the notice

22  of appeal that it's filed with respect to the Arrowood

23  settlement, so that would be a net positive.

24         It's also my understanding that BNSF intends to

25  withdraw certain of the objections it's asserted to the plan.

1  It's going to retain certain objections concerning -- and I'll

2  let them explain -- the contractual indemnity, and how they're

3  treated with respect to that, but objections with respect to

4  the injunction and how it deals with insurers they're going to

5  withdraw.  So, it narrows the objections, and that's a net

6  positive all the way around.

7         MS. CASEY:  Yes, Your Honor.  As -- with the proposed

8  revisions the settlement agreement will result in BNSF's

9  objections relating to the scope of the 524(g) injunction and

10 the permissibility of the Section 105(a) injunction, it would

11 resolve all of those objections.  BNSF has filed additional

12 objections relating to the plan's discrimination of its claims

13 for indemnity and contribution, and those claims that are based

14 on the discrimination both in how they are classified with the

15 direct claimants and the discriminatory treatment under the TDP

16 are not resolved and we will be continuing to press them.

17        THE COURT:  All right.

18        MR. SCHIAVONI:  Your Honor, the last thing deals

19 with just the completion of Arrowood's proof, and that is

20 yesterday we put into Evidence two declarations of witnesses

21 that were proffered in connection with our settlement.  There's

22 a third that was proffered during the settlement hearing by the

23 plan proponents.  It's a declaration of Richard Finke in

24 support of the Arrowood settlement.  It went in unobjected to

25 in connection with the -- those proceedings, and we just would

1  re-tender it as part of these proceedings.  It's marked as

2  Arrowood Exhibit 35, and if there's no objections we would ask

3  that that be admitted.

4        MS. ESAYIAN:  There's no objection from the debtors,

5  Your Honor.  It's our declaration.

6        MR. SCHIAVONI:  And then, otherwise, Your Honor,

7  Arrowood had circulated its --

8        THE COURT:  Do I have that exhibit?

9        MR. SCHIAVONI:  No -- yeah.  It's in the record,

10  actually.

11        THE COURT:  No.

12        MR. SCHIAVONI:  But I --

13        THE COURT:  I need it here.  I'm not going to search

14  through 25,000 docket entries to find an exhibit.

15        MR. SCHIAVONI:  Understood.

16        THE COURT:  Okay.

17        MR. SCHIAVONI:  Your Honor, instead of -- what I'd

18  propose to do for Arrowood is give you a whole binder with all

19  of our exhibits in it --

20        THE COURT:  Yes.

21        MR. SCHIAVONI:  -- instead of piecemeal.  In fact,

22  I've sort of given you some things piecemeal already.  I'd like

23  to give you just one.

24        THE COURT:  That would be helpful.

25        MR. SCHIAVONI:  I don't have it physically right with

**J&J COURT TRANSCRIBERS, INC.**

1 me, but I will pass it up as soon as we can.

2          THE COURT:  All right.

3          MR. SCHIAVONI:  The other -- we also had -- Arrowood

4 had, in accordance with the CMO, circulated our exhibit list

5 beforehand in accordance with the time deadlines, and in

6 accordance with those time lines we got --

7          THE COURT:  Wait.  Mr. Brown, could you turn your

8 microphone off?  Could you turn the microphone off?  For some

9 reason it's now working.

10                    (Laughter)

11          THE COURT:  I'm sorry, Mr. Schiavoni.  I didn't want

12 to listen in on their conversation.  Your --

13          MR. SCHIAVONI:  So, I'm going to proffer some

14 exhibits that -- we filed our exhibit list.  We did not get

15 objections to a number of our exhibits, and I think we can

16 proffer those without any objection.  They're out of -- and the

17 exhibits numbers for those are Arrowood Exhibit 1 through 6,

18 Arrowood Exhibit 8 --

19          THE COURT:  Wait.  I'm sorry.  1 through 6, 8?

20          MR. SCHIAVONI:  Eight.  Arrowood Exhibit 11 and 12,

21 Arrowood Exhibit 21, Arrowood Exhibit 35, 36, 37, Arrowood

22 Exhibit 43 and 44, Arrowood Exhibit 48, Arrowood Exhibit 76,

23 and then Arrowood Exhibit 77 through 79.  If there's no

24 objection, and I don't believe there are any, I'd ask that

25 those be admitted now.

1          THE COURT:  And what are they?

2          MR. SCHIAVONI:  I can read each one of them.

3          THE COURT:  Just in general terms.

4          MR. SCHIAVONI:  These are -- the first two are copies

5   of our excess policies that were settled.  But what these are,

6   as a general matter is the affidavits that went into Evidence.

7   The witnesses in those affidavits referred to policies,

8   letters, other documents all in support of our settlement in

9   their declarations themselves and they explained those exhibits

10  by and large in their declarations.  So, as a general matter

11  that's the type of --

12         THE COURT:  They're the affidavits, or they're the

13  documents referred to?

14         MR. SCHIAVONI:  They're the documents referred to by

15  the declarants in their declarations.

16         THE COURT:  All right.  Is there any objection to any

17  of the listed exhibits, Arrowood 1 to 6, 8, 11, 12, 21, 35, 36,

18  37, 43, 44, 48, 76 through 79?

19         MR. KOVACICH:  Your Honor, Mark Kovacich on behalf of

20  the Libby claimants.  I just don't know what these documents

21  are.  My recollection of the exhibit exchange with Arrowood was

22  that they filed some sort of document indicating they had a

23  settlement, and incorporating a prior exhibit list, and for the

24  record I guess I would just ask that we have the opportunity to

25  look at what is being offered here and make an objection if we

1  have one.

2          MR. SCHIAVONI:  Your Honor, I just -- I --

3          THE COURT:  Weren't these part of the documents that

4  were filed already, that were listed already?

5          MR. SCHIAVONI:  Yes, they were, and the list -- I've

6  circulated the list several times.  I understand -- I just

7  don't want you to think I didn't follow the rules and that I

8  haven't made an effort to meet and confer, but I'm also willing

9  to just go and meet, and we can come back after lunch and do

10 this again.  I know the Libby folks have been busy with a lot

11 of things, and I don't hold any fault that they haven't gotten

12 back to me.

13         THE COURT:  All right.  I'll accept the proffer,

14 then, after lunch.

15         MR. SCHIAVONI:  Okay.  Thank you, Your Honor.

16         THE COURT:  Anyone else have an objection to any of

17 these exhibits and need to meet with Mr. Schiavoni?

18         MR. SCHIAVONI:  Your Honor, we also have, on the same

19 list -- there are some exhibits that are in the nature of

20 pleadings, and SEC filings, that we would offer for a limited

21 purpose.  And Mr. Bernick kept sort of alluding that there

22 might be almost like an exhibit objection day, and I thought

23 that's when we'd deal with those.  I don't want to take up his

24 time here.  If we could agree with him over lunch I'd try to do

25 that, but we've -- or however he wants to do it.

1          MR. BERNICK:  You shouldn't hesitate.  There's a long

2  history of our time being taken up, and for good purpose.

3                         (Laughter)

4          MS. ESAYIAN:  Your Honor --

5          MR. SCHIAVONI:  We'll come back after lunch, then,

6  and I'll read those into the record --

7          MS. ESAYIAN:  Your Honor --

8          THE COURT:  That is much a more uplifting way to

9  complain about trial delay, Mr. Bernick.  Thank you.

10                        (Laughter)

11         MS. ESAYIAN:  Your Honor, I'm not sure, I would like

12 to think we could solve this over lunch, but I'm not sure that

13 we can because as to those exhibits we don't object to the

14 limited purpose for which counsel would want them, but the

15 exhibits themselves are voluminous and have a lot of hearsay,

16 and we haven't figured out how to deal with that.

17         MR. SCHIAVONI:  Well, I could just specifically

18 identify my proffer the specific clauses we want.  I was --

19 we've come up with different ways to suggest that we could --

20 we'd sign a little stipulation specifically identifying those,

21 or I can just read them.  It would take 20 minutes or so to do

22 it and we can do it that way after lunch.

23         THE COURT:  Talk about it at lunch.  Whichever way

24 you want to do it is fine.  If I need to make rulings, at some

25 point I have to make the rulings, and I'm going to need to

1 actually see the exhibits.  So, it would be helpful to have the

2 exhibits that you're proffering in some fashion.  I don't know

3 if we actually need a day just to deal with exhibits, in

4 general.  There are some things we are going to have to deal

5 with, for example the motions in limine, I will want some

6 argument on some of those, but they generally deal with

7 witnesses' testimony as opposed to exhibits.  At least that's

8 what I recall now.  So, if you need some specific day, okay,

9 but it will be a very painful day, I know, because you're going

10 to have to put it all back in context, and that will probably

11 be tough.  I would think that if you can agree that the

12 exhibits can come in, and then argue them, as Mr. Bernick was

13 proposing yesterday in the briefs, and also explain that the

14 Court hasn't yet made a ruling, but here's what the proffer is

15 for, I think that might make the most sense.  But it's your

16 trial and I'll do it whatever way you folks want.

17         MR. SCHIAVONI:  We'll come back after lunch, Your

18 Honor.  Thank you.

19         THE COURT:  All right.

20         MS. DeCRISTOFARO:  Your Honor, just to finish up on

21 the BNSF issue, obviously the plan modifications will speak for

22 themselves, and no one here is trying to characterize them.

23 But just to be clear that the modifications or the agreement

24 doesn't obviate any claim by BNSF for indemnification under --

25 for the complaints that they had tendered, or any claim by

1 Continental Casualty arising out of what we have to pay BNSF

2 against the debtors, which I understand --

3          THE COURT:  Wait.  I'm sorry.  I apologize.  I don't

4 think my head was following what you were saying.

5          MS. DeCRISTOFARO:  I'm sorry.

6          THE COURT:  Is this a -- is it a question or is it a

7 statement?

8          MS. DeCRISTOFARO:  Just further to everybody else's

9 statements about the BNSF --

10          THE COURT:  Okay.

11          MS. DeCRISTOFARO:  -- situation.

12          THE COURT:  All right.  And they don't what?

13          MS. DeCRISTOFARO:  They don't cover -- they don't

14 eliminate BNSF's claim for indemnification, and they don't

15 eliminate any claim that my client, Continental Casualty, might

16 have for what it may have to pay BNSF.

17          THE COURT:  All right.

18          MS. DeCRISTOFARO:  Thank you.

19          THE COURT:  Anything else on BNSF?

20          UNIDENTIFIED ATTORNEY:  No.

21          THE COURT:  All right.  Mr. Demmy?

22          MR. DEMMY:  Your Honor, John Demmy for Fireman's Fund

23 Insurance Company, Allianz S.p.A., formerly known as Allianz

24 Riunione di Sicurta, and Allianz SE, formerly known as Allianz

25 AG.  I have our exhibits, the Phase II exhibits that I'd like

1  to hand up to the Court, and I would just note in that regard

2  that there are 36 exhibits, 1 through 33 of which there's no

3  objection to them.  The exhibits, 34 through 36, consist of

4  discovery responses by the plan proponents.  There is a

5  relevance objection to those exhibits.  It's the same objection

6  that was lodged in connection with Phase I.  These are the

7  exact same exhibits that were submitted for Phase I, and I

8  would note that the debtors have -- or the plan proponents,

9  pursuant to the procedure that was put in place by the Court in

10 connection with Phase I, they've already filed a motion to

11 exclude those exhibits.  That motion appears at Docket Number

12 22331.  We've filed an objection to that motion.

13          THE COURT:  Wait.  I'm sorry.  Docket Number what?

14          MR. DEMMY:  The motion is at Docket 22331, and the

15 objection that we filed in response is at Docket 22409.  The

16 point of that is, Your Honor, we're not looking to do anything

17 more than what's already been done.  We're submitting the same

18 exhibits.  We understand the same relevance objection was made

19 to Exhibits 34 through 36.  It's already been briefed.  If

20 there's a further procedure about dealing with exhibits to

21 which there's objections in connection with post-trial

22 briefing, we'll follow that, as well.  But I'd like to hand up

23 the binder which contains our exhibits 1 through 33, to which

24 there's no objection, 34 through 36, to which there's

25 objection, but there's already been proceedings on them, and

1  perhaps will be further proceedings with regard to those.

2          And I would also note, Your Honor, that I've given a

3  complete set of this binder to Mr. Horkovich, counsel for the

4  ACC.

5          THE COURT:  All right.  And these are marked as FF,

6  or as something else?

7          MR. DEMMY:  They are marked as FFIC/Allianz Phase II

8  Trial Exhibits.

9          THE COURT:  Mr. Horkovich?

10          MR. HORKOVICH:  Your Honor, no objection to

11  FFIC/Allianz Exhibits 1 through 33.  As Mr. Demmy said, we do

12  have an objection to 34 through 36, which has been briefed.

13          THE COURT:  All right.  One second.  Fireman's

14  Fund/Allianz Exhibits 1 through 33 are admitted, and Fireman's

15  Exhibits 34 through 36, the only objection is relevance?

16          MR. HORKOVICH:  It's a relevance objection, Your

17  Honor.  And as I've said, we've already briefed the issue.

18          THE COURT:  Admitted subject to a ruling on

19  relevance.

20          MR. HORKOVICH:  Thank you, Your Honor.

21          MR. BOERGER:  Your Honor --

22          THE COURT:  Good morning.

23          MR. BOERGER:  -- Jeff Boerger for OneBeacon/Seaton,

24  Geico and Republic, to complete our tender of our trial

25  exhibits.  Ms. Baer had an opportunity to look at these

1 yesterday evening, and as I understand it there are no

2 objections.

3          THE COURT:  All right.  I'll take them.  And can you

4 just restate for me the exhibit numbers, please?

5          MR. BOERGER:  Just a moment.

6                         (Pause)

7          MR. BOERGER:  The exhibit numbers are OS-1 Revised

8 through OS-7 Revised, OS-14, OS-15 -- I'm sorry, OS-14 through

9 OS-20, OS-27 and OS-28, OS-40 and 41, OS-44, OS-46, OS-48

10 through OS-51, and then, I believe, GR-14 through GR-20

11 Revised.

12          THE COURT:  All right.  All of those documents are

13 admitted.  You can give them to my clerk there.  I actually

14 have no more room.

15          MS. BAER:  Your Honor, it's just -- it's the

16 understanding that these are being admitted pursuant to the

17 terms of the stipulation that we've agreed to with

18 OneBeacon/Seaton.

19          THE COURT:  Yes.  I think that was stated on the

20 record yesterday, but let me make a note about that fact, too.

21                         (Pause)

22          THE COURT:  Yes, sir?

23          MR. WORF:  Good morning, Your Honor.  Richard Worf

24 for Garlock Sealing Technologies.  We have a few exhibits that

25 are not addressed in the stipulation that we had entered into

1  Evidence yesterday, and they are Garlock Exhibits 3, 4, 5, 6,

2  7, 8, 9, 10 and 13.  We move to have those admitted, and we are

3  going to support the authenticity of those through declarations

4  that we circulated to the plan proponents last night.  We

5  haven't heard any objection from them as to authenticity.  We

6  imagine they may have some relevance objections.  These are

7  complaints that were filed against Garlock during the

8  bankruptcy in which the plaintiff identified Grace as somebody

9  they would have sued if Grace was not in bankruptcy.

10        We also have a Rule 1006 summary of 14,000 complaints

11  from Texas that were filed against both Grace and Garlock

12  before the petition date.  We also have one other exhibit that

13  is some discovery materials that were filed during the

14  bankruptcy in which the plaintiff identified Grace products and

15  exposure to Grace products in cases where they had sued

16  Garlock.  So, we would move to have those admitted.

17        MR. GUY:  Your Honor --

18        THE COURT:  Wait.  I'm not clear.  The exhibits --

19  I'm not clear what the exhibits are from that description.

20  Three through ten and 13 are just the complaints, but then you

21  have a separate 1006 summary that has to be identified and

22  another exhibit?

23        MR. WORF:  Thirteen is the 1006 summary.  Three

24  through nine are the complaints, and Number 10 is the discovery

25  materials.  They're from Louisiana.

1        THE COURT:  Yes, Mr. Guy?

2        MR. GUY:  Your Honor, if it's anybody's fault, it's

3 probably my fault.  I haven't had an opportunity to review

4 those individual documents and it's not Mr. Worf's fault.  I

5 would just like a chance to look at them over lunch.  I don't

6 think we'll have an issue with the complaints because they're

7 not being offered for the truth of the matter asserted.  I'm

8 sure the debtors would like to have a quick review of the

9 summary.  It's 14,000 complaints listed there.

10        In principle, we don't have an issue.  We just would

11 like an opportunity to look through the documents.

12        THE COURT:  All right.  I'll address these additional

13 documents after lunch.

14        MR. WORF:  Thank you.

15        THE COURT:  Okay.  Ms. DeCristofaro?

16        MS. DeCRISTOFARO:  Your Honor, just to quickly say

17 that we are working with the debtor to proffer exhibits as

18 expeditiously and to take as little time as possible and we

19 expect to do that.

20        MS. BAER:  Your Honor, I spoke with a couple of the

21 insurers in the hallway during the proceedings and a number of

22 them have a lot of exhibits we don't have an objection to, or

23 our objection is relevance which is preserved and it will be

24 argued in the briefs.  So the real question is sort of

25 procedurally, how does everybody get all this stuff in?  We --

J&J COURT TRANSCRIBERS, INC.

1  from the plan proponents' perspective are going through our

2  list of exhibits now with the thought that there will be other

3  exhibits that are not objected to, we would move for the

4  admission of.  I would suggest we try to work through this and

5  come up with a procedure and tell you tomorrow morning what

6  that is.

7          THE COURT:  Well, yes, at some point it would be nice

8  to know.  So, okay.  That's fine.

9          What I do need from someone at some point, maybe

10 Friday is -- or Thursday -- I'll get the days straight some

11 time -- maybe Thursday morning is a good time to do it, is a --

12 an indication of when the parties who owe me exhibits are going

13 to produce them in binders so that I know that, in fact,

14 they're coming in because I still don't have from everyone all

15 of the exhibits that have been introduced and I need to make

16 sure that I do have them so that if we need them during the

17 course of this analysis that they're available.  So, while

18 you're talking about how you're going to do it, maybe you can

19 also discuss when you're going to do it.

20         And you're not going to be using, Mr. Pratt, any of

21 these binders that I have stacked in front of me that have just

22 been offered, are you?

23         MR. PRATT:  Not going to use them?

24         THE COURT:  Yes, right now.

25         MR. PRATT:  Well, Your Honor, all of those have been

1  used I believe, or they're coming in by agreement, but I'm not

2  going to use them right now.

3          THE COURT:  Then just give me a second to move them

4  out of my way.

5          MR. PRATT:  Sure thing.

6                      (Pause)

7          THE COURT:  Okay, sir.  Thank you.

8          MR. PRATT:  Warren Pratt, Your Honor, for creditors

9  Seaton and OneBeacon.  At Mr. Bernick's suggestion last night

10 we put together a proposed stipulation and worked on it quite

11 a while.  We didn't get it over to Mr. Freedman until about

12 8:30 this morning.  He just requested, a few minutes ago, that

13 he have an opportunity to consult with Mr. Bernick about that

14 over lunch, so Mr. Bernick's going to have a busy lunch.  But,

15 if the Court would indulge us on that we might preempt the need

16 for testimony here.

17         THE COURT:  All right.

18         MR. PRATT:  Thank you, Your Honor.

19         THE COURT:  Before you re-begin the cases, if you've

20 got this much you want to work out, do you want an early lunch

21 recess or do you want to start with another witness and then

22 recess at a normal time?

23         MR. BERNICK:  It's up to the Court.  We would prefer

24 to get on with the testimony, but we don't really care.

25 Whatever is most convenient for the Court.

1           THE COURT:  That's fine.  I think I'd rather keep

2  going for a little while, too, just so everyone is still going

3  to be here.  Is there anybody who was planning to leave?

4

5                    (No audible response)

6           THE COURT:  Okay.  Then why don't we start with

7  another witness and --

8           MR. BERNICK:  Can we --

9           THE COURT:  -- then we'll take a lunch recess.

10          MR. BERNICK:  Can we at least ask whether there's

11 anybody else who may call a live witness other than Seaton and

12 OneBeacon?

13          THE COURT:  Anyone?

14          MR. SCHIAVONI:  Judge, we had this one -- we had a

15 witness -- that we couldn't --

16          THE CLERK:  You have to use a microphone.

17          MR. SCHIAVONI:  We had a witness that Dan Cohn asked

18 to confer with us on and we're going to do that at lunch and

19 hopefully we'll resolve that.

20          THE COURT:  All right.  Possibly Arrowood.

21          MR. BERNICK:  We call Pam Zilly.

22                    PAM ZILLY, WITNESS, SWORN

23          MR. BERNICK:  Do we have notebooks?

24          THE COURT:  All right.  Someone is going to have to

25 take all of these notebooks away, so the witness has some room

**J&J COURT TRANSCRIBERS, INC.**

1  to deal with whatever you're going to give her.  Thank you.

2                      (Pause)

3            MR. BERNICK:  Has the witness been sworn?

4            THE COURT:  Yes, she has.

5            MR. BERNICK:  Thank you.

6                   DIRECT EXAMINATION

7  BY MR. BERNICK:

8  Q    Good morning, Ms. Zilly.  I want to take you through your

9  -- you've previously been qualified as an expert to testify

10  before this Court, is that right?

11  A    That's correct.

12  Q    Okay.  So, we'll go through this relatively quickly.

13  Could you please just describe your educational background

14  leading up to your first job?

15  A    I received a Bachelor of Arts in Economics and American

16  History from Connecticut College in 1975 and a Masters of

17  Science in Industrial Administration from Carnegie Mellon

18  University in 1977.

19  Q    Okay.  Does Exhibit 511-2, a demonstrative, reflect your

20  work experience up to the present time, does the different -- I

21  shouldn't say that -- does it reflect the different positions

22  that you've held at different companies up to the present time?

23  A    Yes, it does.

24  Q    Okay.  Have you had a variety of restructuring assignments

25  in connection with your professional career?

1 A    Yes, I have.

2 Q    Are some of the restructuring assignments reflected on

3 Demonstrative Exhibit 511-3?

4 A    Yes, they are.

5 Q    What about involvement in mass tort bankruptcies, what

6 mass tort bankruptcies, if any, have you been involved with?

7 A    It started with Dow Corning around 1996, Combustion

8 Engineering, ABB Lummus, The Babcock and Wilcox Company and

9 obviously W.R. Grace.

10          MR. BERNICK:  Okay.  Have -- we tender Ms. Zilly as

11 an expert in the field of being a financial advisor in

12 connection with restructuring matters.

13          MR. COBB:  I have no objection, Your Honor, for that

14 purpose.

15          THE COURT:  She is so qualified.

16 Q    Have we asked you, Ms. Zilly, to address certain tasks and

17 issues regarding solvency in connection with this case?

18 A    Yes, you have.

19 Q    Okay.  But, as you understand it, what basically are some

20 of the tasks that you've been asked to perform?

21 A    With respect to specifically to solvency, I was asked to

22 review a report prepared by Mr. Robert Frezza on behalf of the

23 unsecured creditors committee and to write a rebuttal, prepare

24 a rebuttal report to his report.

25 Q    Have you been asked, specifically in connection with your

1  work, to focus on solvency of W.R. Grace as of the time the --

2  just before the term sheet was signed up?

3  A    No, I was not.

4  Q    Okay.  If we wanted to capture what the state of play is

5  concerning solvency pre-plan, what definition can we work with

6  of solvency for purposes of understanding your work?

7  A    I think if you're asking me precisely in terms of a

8  definition or a test, various tests of solvency, there are

9  typically three tests that are put forth; a balance sheet test,

10 an adequate capital test and whether or not the debtor has the

11 ability to pay its debts as they come due.

12 Q    Okay.  If we wanted to take a look at what do all the --

13 do all of the different kinds of approaches that you've talked

14 about, do all of them require some examination of assets?

15 A    Yes.

16 Q    What about liabilities?

17 A    Yes.

18 Q    Okay.  As of the time that the -- as of the time that the

19 terms sheet was negotiated and, indeed, up through the present

20 time, have you looked at the question of whether it's possible

21 to quantify, with any degree of precision, the extent of the

22 personal injury asbestos liability of the company?

23 A    Yes, I have looked into that.

24 Q    And what have you done in order to look at that?

25 A    I have evaluated the various estimates put forth during

1  the estimation hearing, as well as rebuttal reports to those

2  estimates.  I have looked at the plan document, the amended

3  plan document, with respect to the assets that are going into

4  the PI trust, asbestos PI trust.  And, obviously, in connection

5  with looking at the estimation reports, also obviously read

6  those estimation -- the actual reports.

7  Q    I'm showing you the Plan Proponents' Demonstrative 511-6,

8  could you tell us what is reflected in that document?

9  A    This page shows the ranges, or certain of the ranges that

10 were set forth, I believe, in connection with the estimation

11 hearing either expert reports or rebuttal reports as to the

12 estimates of asbestos personal injury liabilities ranging from

13 a -- for purposes of this chart a low of $200 million to a high

14 of $6.2 billion.

15 Q    Okay.  At any point in time has the extent of Grace's

16 personal injury liabilities, absent a plan that is confirmed,

17 has the -- as an estimate -- strike that.  Has an estimate of

18 Grace's personal liability injuries actually been fixed?

19 A    No, it has not.

20 Q    As of this point in time, absent a plan of reorganization

21 that is confirmed, as a financial advisor and an expert in

22 restructuring, is there any methodology that you're aware of

23 that can be used to establish exactly or even approximately

24 what that personal injury ultimate -- liability ultimately

25 would be determined to be?

1  A    No, there is not.

2  Q    Based upon the current state of affairs with these

3  different estimates that are out there, is it possible to

4  render an opinion, a formal opinion, regarding Grace's

5  solvency?

6  A    No, I don't believe it is.

7  Q    Now, are you familiar with the fact that the plan of

8  reorganization that's been proposed in this case spells out a

9  rate of interest for -- post-petition interest to be paid to

10 the general unsecured creditors?

11 A    Yes, I'm aware of that.

12 Q    And within that, are you aware of the rate that is

13 specified for the debt holders, in particular?

14 A    Yes, I'm aware of that.

15 Q    Okay.  And what is that rate?

16 A    The plan provides for a rate that beginning as of the

17 petition date was 6.09 percent, compounded annually, and then

18 beginning, I believe, January 1st, 2006, that rate now floats

19 with prime, also compounded annually.

20 Q    Okay.

21 A    Quarterly -- compounded quarterly, I'm sorry.

22 Q    Turning to Plan Proponents' Exhibit 511-7 for

23 demonstrative purposes.  And I'd say, Your Honor, this is a

24 chart that we've created for demonstrative purposes, not

25 representing that it was prepared by Ms. Zilly.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  It's not on yet.

2  Q    Now, let me ask you some questions, I've put on the

3  lefthand margin a range of 488 -- $468 million to $6.2 billion,

4  and in so doing I've used -- I've taken the median estimate

5  from Dr. Florence of 468 to the high estimate of Dr. Peterson

6  at 6.2, so it's pretty much the full range.  And I want to ask

7  you based upon your assessments of the assets and liabilities

8  of Grace, at $468 million, if the estimate were to turn out --

9  the binding estimate were to turn out to be $468 million, would

10 Grace be solvent or insolvent?

11 A    I'm assuming it was a binding termination.  At that level

12 of liability, I believe that Grace would be found solvent.

13 Q    By contrast, if we go to the high end at 6.2 billion,

14 could you tell us whether or not Grace would be solvent or

15 insolvent?

16 A    Grace would be insolvent at that level.

17 Q    Are you able to tell us where within that range of

18 potential outcomes the crossover point is; that is, where would

19 Grace be on the edge of insolvency or conversely on the edge of

20 solvency?

21 A    I haven't done a precise analysis, but it would in my --

22 based on my knowledge to date, it would fall closer to the $468

23 million number than the billion six for purposes of solvency.

24 Q    Okay.

25 A    Or six billion two for purposes of solvency.

1  Q    Now, you've told us that you recited the fact that the

2  amount of the estimated personal injury liability is disputed

3  at this time and you can't fix it, have you looked to see what,

4  if any, relationship there is between the rate that was put in

5  the plan of reorganization on the one hand and full default

6  interest versus zero post-petition interest on the other; that

7  is, if you determine where within that range the rate that's in

8  the plan falls?

9  A    Well, obviously, with insolvency there would be zero

10 post-petition interest and the compromised rate, in my view

11 falls somewhere in the middle between having zero interest and,

12 frankly, probably closer to the default interest line.

13 Q    Okay.  I want to ask you, in response to -- you said that

14 you took a look in connection with your work, at the work that

15 Mr. Frezza has done?

16 A    Yes.

17 Q    Okay.  Could you just describe, generally, what approach

18 Mr. Frezza has taken, and he's going to testify here in a bit,

19 but we thought that we would, consistent with the practice that

20 we've followed elsewhere, ask Ms. Zilly to take the stand once

21 in connection with this issue, could you tell us whether or not

22 -- what kind of approach Mr. Frezza has taken in terms of

23 whether he -- well, I'll just ask you flat out, what kind of

24 approaches has he taken?

25 A    Mr. Frezza's analysis primarily relies on a balance sheet

1 test where he inserts the number of 468 million for the

2 asbestos PI claims and assumes that given that number the

3 debtor has no liability whatsoever for asbestos PI claims

4 because the entire 468 million would be paid for out of the

5 Sealed Air and Fresenius settlements that are part of the plan

6 before this Court.

7 Q    Are you familiar with any convention or methodology within

8 your field -- established convention or methodology within your

9 field that would call for that kind of a support, that kind of

10 analysis?

11 A    No.  In my opinion it's simply picking one number without

12 giving any regard to what the effect on all other numbers would

13 have, nor does it give any effect to the fact that there is a

14 very wide range of numbers around "the asbestos PI number that

15 he uses".

16          MR. BERNICK:  Your Honor, we would offer for

17 demonstrative purposes Plan Proponents' Demonstratives 511-1,

18 511-2, 3, 4, 6 -- and 6 (sic).

19          THE COURT:  Any objection as to demonstratives?

20          MR. COBB:  No objection, Your Honor.

21          THE COURT:  All right.  One second please, 511-1, 2,

22 3, 4 ,5 and 6 are admitted as demonstratives.

23          MR. BERNICK:  Pass the witness, Your Honor.

24                    CROSS EXAMINATION

25 BY MR. COBB:

1  Q    Good morning, Ms. Zilly.

2  A    Good morning.

3  Q    My name is Richard Cobb and I represent the Bank Lender

4  Group in this bankruptcy along with the firm of Paul Weiss.

5  Now, let me start with some background and I apologize if some

6  of this is repetitive, but I think it's important for us to

7  appreciate your depth of knowledge about Grace in connection

8  with the opinions, observations and comments you've made today

9  and in your deposition.  Blackstone was retained by Grace in

10 2001, correct?

11 A    That's correct.

12 Q    And that, of course, is at or about the time when the

13 debtors filed for bankruptcy?

14 A    We were retained slightly before.

15 Q    And you are the principal person at Blackstone responsible

16 for this engagement?

17 A    That is correct.

18 Q    And as principal in charge of this engagement at

19 Blackstone your activities have included reviewing the

20 company's projections, correct?

21 A    Yes.

22 Q    Preparing valuation analyses?

23 A    Yes.

24 Q    Advising the company with respect to acquisitions and

25 divestitures?

1  A    I believe what I testified to was advising them with

2  respect to acquisitions and divestitures in connection with

3  receiving bankruptcy court approval and the approval of various

4  committees in the case.

5  Q    And you've also provided advice to Grace with respect to

6  the settlement, some of the settlements that have been achieved

7  in this case, correct?

8  A    That's correct.

9  Q    And you are also working with the company to secure exit

10 financing for Grace, correct?

11 A    That's correct.

12 Q    And Blackstone's engagement here requires you to serve as

13 an expert testimony, as Grace may request, and is appropriate

14 in these cases, correct?

15 A    Yes, that is part of our engagement.

16 Q    And you have submitted various expert reports in this

17 bankruptcy.  I'll refer first to your expert report in rebuttal

18 to a Sean Mathis expert report?

19 A    That's correct.

20 Q    And describe for me, if you will, what that report

21 consists of, generally?

22 A    Mr. Mathis prepared an expert report which purported to

23 determine the value of the warrant that is being issued by

24 Grace to the asbestos PI trust as part of this plan.  My report

25 rebutted his purported value in his report.

1  Q    You also produced a feasibility report in connection with

2  this confirmation process, correct?

3  A    That's correct.

4  Q    And can you generally describe what that report consists

5  of?

6          MR. BERNICK:  She's going to be brought back to

7  testify about feasibility --

8          MR. COBB:  That's fine.

9          MR. BERNICK:  -- tomorrow.

10 Q    I'll move to the next question.  You also recently

11 submitted an expert report regarding best interests, that is,

12 the best interest test under the bankruptcy code, is that

13 correct?

14 A    That's correct.

15 Q    And can you describe generally what that report relates

16 to?

17 A    It was an expert report setting forth the analysis and the

18 reasons why we, myself and the debtor, believes that the plan

19 meets the best interest test.

20          MR. KOVACICH:  I object to the --

21          THE COURT:  I don't think your microphone's on.

22          COURT CLERK:  That one doesn't work.

23          MR. BERNICK:  She's not going to offer any opinion

24 now.

25          MR. KOVACICH:  Well, that --

1          THE COURT:  You need to use the microphone.  I'm

2     sorry.  And please let him finish.

3          MR. KOVACICH:  I object to the --

4          THE COURT:  It's still not in, Mr. -- on Mr.

5     Kovacich.

6          MR. KOVACICH:  Okay.  Is that better?

7          THE COURT:  Yes.  Thank you.

8          MR. KOVACICH:  I object to the opinion -- she did

9     just offer an opinion in response to the question which is what

10    she did on the best interest analysis.  She started to explain

11    how she and the debtor felt that the best interest test was

12    met.  I object to that.  There's no foundation for it, and it's

13    also speculative.

14          MR. COBB:  Well, I guess I need to defend this one,

15    Judge, now that I'm on cross.  Your Honor, I am only

16    establishing background in the work that Ms. Zilly has

17    performed on behalf of Grace.  That's all.  I'm not attempting

18    to admit this report into evidence.  That is the report that

19    we're referring to on best interest.  I'm only trying to inform

20    the Court with regard to her depth of knowledge of Grace's

21    financial condition.  That's it.

22          THE COURT:  All right.  Well, I think the answer

23    fairly meets the question.  It was tell us what it was about

24    and she said what it was about.  That's what it was about, so I

25    don't see that there's an objection.  I don't believe at this

1  point she's expressing an opinion.  She's talking about what

2  the report did, so the objection's overruled.  I'm not

3  accepting it as an opinion.  I'm just accepting it as what she

4  was doing in analyzing the best interest test in her report.

5  Okay.

6  Q    In addition, Ms. Zilly, you are the debtor's sole expert

7  witness with regard to solvency, that's correct?

8  A    That's correct.

9  Q    And you've submitted in that context your expert rebuttal

10 report to Mr. Frezza, the committee's expert and the lender's

11 expert, and you've also submitted an affidavit in connection

12 with the debtor's objection to the bank lender's proofs of

13 claim, correct?

14 A    That's correct.

15 Q    Now, in performing all of the analysis and preparing and

16 reviewing the financial reports, spread sheets, cash flows, all

17 of the items that we just discussed and referenced, you will

18 agree that you have never performed a solvency analysis of

19 Grace?

20 A    I have not performed a complete solvency analysis of

21 Grace, that's correct.

22 Q    I'm sorry, did you say a complete solvency analysis of

23 Grace or you --

24 A    Yes, in my view there are several tests for solvency.

25 Q    So, in your view there are simple tests for solvency?

1   A    Several.

2   Q    Several, okay.  Thank you.  And you would agree that

3   you're offering no opinion in this confirmation process with

4   regard to whether Grace is solvent?

5   A    That is correct.

6   Q    And you also are offering no opinion as to whether Grace

7   is insolvent?

8   A    That is correct.

9   Q    As of any date with respect to both of those questions?

10  A    I'm offering a rebuttal to Mr. Frezza's report.

11  Q    And you will agree with me that for purposes of the plan

12  that is before the Court -- I think it's been referred to as

13  the joint plan, I'll call it the plan for purposes of our

14  discussion -- that for purposes of the plan, the Court must

15  determine whether Grace will be solvent as of the effective

16  date of the plan, correct?

17          MR. BERNICK:  Objection, calls for the witness to

18  discuss procedures that the Court may or may not follow.

19  That's not an appropriate question for an expert in this case.

20          MR. COBB:  Your Honor, she's a -- she's been offered

21  as a financial restructuring expert.

22          THE COURT:  Yes, but --

23          MR. COBB:  She has extensive expertise apparently in

24  -- not only in testifying in bankruptcy processes, but also in

25  providing advice --

1          THE COURT:  Yes.

2          MR. COBB:  -- in connection with the bankruptcy.

3          THE COURT:  But, the issue is whether or not as a

4 legal matter I have to determine solvency as of the effective

5 date.  The objection's sustained.

6 Q    You would agree that one of the principal reasons, if not

7 the sole purpose for the debtors filing for Chapter 11, was

8 because of present and potential asbestos personal injury

9 claims and law suits against the company?

10          MR. BERNICK:  Your Honor, I object to this as being

11 irrelevant and beyond the scope.  Most of the questions so far

12 have been.

13          MR. COBB:  Your Honor, it's not beyond the scope.

14 Ms. Zilly has testified that in connection with her opinion she

15 believes that -- I mean, in the general context, Your Honor,

16 Ms. Zilly has actually said that she believes that Grace's

17 asbestos personal injury liabilities have not been resolved.

18          THE COURT:  Yes.

19          MR. COBB:  She just said that.  I am beginning the

20 process of getting to a -- several questions that she has -- I

21 mean, I want to hear from her whether she believes they have

22 been resolved and whether or not this plan resolves those

23 liabilities.

24          THE COURT:  Okay.  I'm not -- I'll give you a little

25 bit of leeway.  Overruled.  Do you want to restate the

1  question, Mr. Cobb?

2          MR. COBB:  You know what, I'm going to skip to the --

3  what I would consider to be the better stuff.

4          THE COURT:  All right.

5  BY MR. COBB:

6  Q    And you would also agree, Ms. Zilly -- would you agree,

7  Ms. Zilly, that under the plan through this bankruptcy process

8  that Grace's asbestos personal injury claims and lawsuits

9  against the company are resolved?

10          MR. BERNICK:  Objection, to form.  Are we assuming

11  that the plan has now gone effective?

12          MR. COBB:  We are assuming that the plan, for

13  purposes of this question, is confirmed by the Court.

14          MR. BERNICK:  Well, then under -- strike that.

15  That's fine.  Is confirmed by the Court and goes effective?

16          MR. COBB:  And goes effective.

17  A    If the amended plan is confirmed by the Court and goes

18  effective, then I believe that pursuant to the settlement set

19  forth in the plan that relates to the amount of assets that

20  Grace and others will contribute to the PI trust, then the

21  asbestos claims will be resolved.

22  Q    And let's talk for a moment about the solvency test that I

23  think you had spoken briefly with, with Mr. Bernick.  You had

24  identified the ability to pay debts as when they -- as they

25  come due test, correct, that is one of the accepted methods --

1  expert methodologies for determining solvency of a company?

2  A    That is a test to determine solvency, correct.

3  Q    And one of the tests?

4  A    And one of the tests.

5  Q    And it's also referred to as the cash flow test, is that

6  fair?

7  A    I don't, but perhaps others do.

8  Q    I'll stick with your definition then.  There's a second

9  test described as the adequate capital test, correct?

10  A    That's correct.

11  Q    And then the balance sheet test, correct?

12  A    Excuse me.  That's correct.

13  Q    And under the balance sheet test there are three generally

14  accepted methodologies for arriving at the value of a company's

15  assets, correct?

16  A    (No audible response).

17  Q    Well, let me walk you through them.  One of those

18  methodologies is determining the asset value by determining the

19  fair market value of the assets, correct?

20  A    That's correct.

21  Q    Second method would be determining the enterprise value of

22  the debtor?

23  A    That's another method.

24  Q    And then determining the debtor -- the value of the

25  debtor's assets by using the discounted cash flow method,

1  correct?

2  A    I would put three with two because I believe that the

3  discounted cash flow method is a way -- one way of determining

4  the debtor's enterprise value.

5  Q    Okay.  Well, let's talk about total enterprise value then.

6  How would an expert, in a solvency context, calculate an

7  entity's total enterprise value?

8        MR. BERNICK:  Your Honor, this goes beyond the scope

9  of my examination.  They've got their own expert who's going to

10 go back and review all of this stuff, and she's not expressed

11 -- Ms. Zilly has not expressed as an expert an opinion

12 regarding how those would work.

13       MR. COBB:  Your Honor, I'm entitled to inquire of the

14 debtor's expert whether she has any issue, or any problems or

15 concerns or criticisms of Mr. Frezza's methodologies that he

16 employs in his report.

17       THE COURT:  Overruled.

18 Q    So, the question, I'll restate it.

19       MR. BERNICK:  I -- I'm sorry.  If that's the question

20 then I want you to ask that question.

21       MR. COBB:  I'm just trying to facilitate the witness

22 by simply restating the question, but you can read it back to

23 her if she'd like to hear it.

24       THE COURT:  No, I think that wasn't the objection.

25 He wanted to eliminate the preliminaries and get to the end

1  question was the point.  You may restate this question which

2  was how would an expert calculate an entity's enterprise value?

3  Q    That is the question, Ms. Zilly, that's pending.

4  A    Well, I'm a little bit confused because I don't think Mr.

5  Frezza did anything in that -- his report along those lines.

6  So, are you asking generally?

7  Q    I'm asking generally what would an expert do in order to

8  determine the total enterprise value of an entity's assets?

9  A    There are several tests of several ways, several analyses

10 that can be performed to determine a company's enterprise

11 value.  Number one is a discounted cash flow analysis, assuming

12 that you have projections for a sufficient period of time in

13 order to make that meaningful.  The second way is to do a

14 comparable company analysis which typically uses current

15 financial informations, as well as current financial

16 information and market information from companies that are

17 comparable to the company that you are evaluating.  And the

18 third way is to look at what is called comparable transactions

19 which attempts to look at transactions that would apply a

20 multiple that could be used to evaluate the fair market value

21 of the company that you're determining the enterprise value of.

22 Q    And let me ask you that same question with regard to

23 discounted cash flow, how would an expert employ that

24 methodology to determine the asset value of a company?

25 A    Well, I think as I testified several minutes ago, the

1  discounted cash flow analysis is one of the ways to determine

2  the enterprise value.  And typically if you're asking

3  specifically, discounted cash flow analysis is done by taking

4  the company's projections over a five or so longer period of

5  time, if they're available, and discounting those projections

6  back at an appropriate discount rate, as well as analyzing what

7  the terminal value is which is done by taking the company's

8  EBITDA and multiplying it times a multiple and discounting that

9  back at the same discount rate and arriving at a value of the

10 company.

11 Q    Now, you as Grace's solvency expert -- and actually in any

12 capacity, have you ever performed a discounted cash flow to

13 determine the value of Grace's assets?

14 A    No, I have not.

15 Q    And I think there's a third test under asset valuation and

16 that's fair market value, can you briefly explain what that

17 test involves?

18 A    Well, I'm -- in my view the fair -- in the solvency

19 analysis you're trying to determine what the value of the

20 assets is.  It is typically assumed that you're trying to

21 determine the fair market value, and the way I would have

22 phrased it was that all of the things we just discussed,

23 enterprise value is one way to determine the fair market value

24 of the assets.  I'm not --

25 Q    I'm sorry?

**J&J COURT TRANSCRIBERS, INC.**

1 A    So, I'm -- I've lost the thread of your questions.

2 Q    Okay.  I had -- I think we had discussed earlier that -- I

3 had asked you whether there are three accepted methodologies

4 that an expert would employ to determine the asset value of a

5 company under a solvency test --

6 A    Right.

7         MR. BERNICK:  I'm sorry.  Actually what you asked

8 was, tests, at least that's what she testified to is tests.

9         MR. COBB:  Thank you, Mr. Bernick.

10 Q   And I'm not sure I understand your response with regard to

11 the fair market value test.  So, let me ask this.  Is the fair

12 market value test a distinct methodology for determining the

13 value of the debtor's assets under a solvency examination?

14 A   Solvency analysis requires you to value the assets and all

15 I'm saying is that the value of the assets is -- one of the

16 ways is the "fair market value" of those assets.

17 Q   Fair enough.  Are you -- and fair market value of assets,

18 does that require that there be appraisals of the company's

19 assets in order to complete that examination?

20 A   Not necessarily.

21 Q   Would it be helpful to an expert to have appraisals of a

22 company's assets in order to conduct that examination?

23 A   It would depend on how you plan to evaluate or determine

24 the fair market value.  If you wanted to do it via appraisals,

25 it would be helpful to have appraisals.  If you were doing it

Zilly - Cross/Cobb                                    124

1 another way, appraisals would not be as helpful.

2 Q    And how else could you determine a fair market value of a

3 debtor's assets other than through market appraisals?

4 A    I think as I testified to doing an enterprise valuation.

5 Q    Okay.  I'll let this go.  I think you and I may be talking

6 past each other.  Now, let's talk for a moment about your

7 rebuttal expert report in connection with the expert report

8 issued by Sean Mathis, you do recall that you issued that

9 report, correct?

10 A    Yes.

11 Q    And you recall that you calculated Grace's total

12 enterprise value in connection with that report?

13 A    No, I don't believe I did do that.  I believe what I did

14 in my rebuttal report was to evaluate the way Mr. Mathis did it

15 and then I took the valuation I had prepared for the debtor's

16 disclosure statement and compared it to Mr. Mathis' way in my

17 report.

18 Q    Okay.  Now, what I'm going to do is I'm going to show you

19 a copy of that report.

20        MR. COBB:  For Mr. Bernick's purposes and for the

21 Court's purposes, I am not going to move this report or attempt

22 to move this report into evidence.  This is only to facilitate

23 our discussion about the work she performed in this context.

24        THE COURT:  All right.

25        MR. COBB:  May I approach the witness?

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes.  Is this Mr. Mathis' or hers?

2          MR. COBB:  This is her expert report in rebuttal of

3   Mr. Mathis' report --

4          THE COURT:  All right.

5          MR. COBB:  -- I -- just to be clear.

6                    (Pause)

7          MR. COBB:  Your Honor, what I have shown the witness,

8   and for Ms. Zilly's benefit as well, this only includes the

9   supporting charts to your rebuttal report.

10         MR. BERNICK:  Yes --

11         MR. COBB:  For purposes of our discussion I'm only

12  going to be focusing on the charts.

13         MR. BERNICK:  Your Honor, I -- I'm not sure which --

14  is this the rebuttal report for Mathis or the rebuttal report

15  for Frezza?

16         MR. COBB:  This is the rebuttal report for Mr.

17  Mathis.

18         MR. BERNICK:  Well, I -- we shouldn't testify about

19  this at all.

20         MR. COBB:  I'm sorry, what's the objection, Your

21  Honor?

22         THE COURT:  That it's outside the scope --

23         MR. BERNICK:  The objection is that it goes beyond

24  the scope of her direct examination.  She testified about her

25  rebuttal to Frezza.  Mathis isn't going to testify and she's

1  not testifying about her rebuttal.

2         MR. COBB:  You're going to hear, Your Honor, in --

3  probably in two or three hours from Mr. Frezza that Mr. Frezza

4  did rely on some of Ms. Zilly's calculations performed in the

5  context of this bankruptcy case.

6         MR. BERNICK:  Well, that's terrific.

7         MR. COBB:  May I?

8         MR. BERNICK:  But, -- I'm sorry.  Go ahead.

9         THE COURT:  Finish.

10        MR. COBB:  Thank you, Your Honor.  And, Your Honor,

11 part of that discussion is going to make a direct reference to

12 this total enterprise value that Ms. Zilly, as I questioned her

13 in her deposition, this total enterprise value calculation that

14 she performed.  Mr. Frezza will testify as he testifies.  And

15 what I am trying to provide the Court with is a foundational

16 basis as to where this number came from, that is, the total

17 enterprise value number, how Ms. Zilly calculated it and how --

18 and otherwise question her about this chart.  And I can explain

19 to you what Mr. Frezza's going to say, if you would prefer, but

20 I don't want to step out of line here.

21        THE COURT:  Mr. Bernick?

22        MR. BERNICK:  These are the documents that I believe

23 are relied upon by Mr. Frezza and there is no reference to

24 anything to do with her report regarding Mathis.

25        MR. COBB:  Let me clarify, Your Honor.  This same

1  analysis is employed in the debtor's disclosure statement.

2          THE COURT:  All right.

3          MR. COBB:  And I can refer to this chart which I

4  think Ms. Zilly is going to say she didn't perform a separate

5  calculation.  I can ask her this question -- separate

6  calculation of the debtor's total enterprise value that then

7  was used in the disclosure statement, or I can question her

8  from the disclosure statement.

9          MR. BERNICK:  I think there's a fundamental

10 misapprehension -- fundamental misapprehension about our

11 proffer of Ms. Zilly and what she's done.  She was proffered

12 this morning to testify about two things.  One is whether an

13 opinion regarding solvency can be expressed, given the broad

14 range of potential liabilities for the asbestos personal injury

15 claims, and the second was in rebuttal to the Frezza report.

16 We did not tender her to talk about enterprise value, to talk

17 about her response to Mr. Mathis' report, you know, or what

18 else Mr. Frezza might now want to do.

19          And, so it is improper examination.  It's not

20 impeachment.  It goes beyond the scope of direct examination.

21 Under the rules of evidence, Your Honor, I believe that he is

22 not entitled to turn our expert into his expert with respect to

23 matters not covered on direct examination, so I object to this

24 line of questioning.

25          MR. COBB:  Let me respond fully, Your Honor.  Your

1  Honor, Mr. Frezza has opined in his report that using Ms.

2  Zilly's calculations, including total enterprise value, that he

3  believes that Grace is solvent employing accepted expert

4  methodologies including the balance sheet test, including --

5           MR. BERNICK:  That's not what he says.  That's just

6  not -- that's not in there.  I mean, there's no state --

7           MR. COBB:  I'm sorry.  What's not in there?

8           MR. BERNICK:  Their reliance materials don't include

9  that.

10           MR. COBB:  Your Honor, this is not about reliance.

11  This is about Ms. Zilly's criticisms of his --

12           THE COURT:  No.  I think -- let me understand the

13  issue.  I think what the objection is, is that your expert has

14  not stated that he relied on Ms. Zilly's work in rebutting the

15  Mathis report as any part of his work product, and as a result

16  there's no disclosure of the fact that this witness may be

17  called for that purpose and she hasn't been proffered for that

18  purpose.

19           And in looking at what Mr. Bernick has put up, which

20  is just called Exhibit 2, documents relied on as part of Mr.

21  Frezza's report, I don't see the rebuttal report that this

22  witness prepared concerning Mr. Mathis listed.  So, unless

23  there's something else, I think it goes outside the scope of

24  the direct and it's not fair cross because it's not a subject

25  matter on which this witness could be prepared because it's not

1  identified in Mr. Frezza's report.

2          MR. COBB:  All right.  And, Your Honor, let me

3  address it this way.  This total enterprise value, meaning the

4  total enterprise value that appears in her rebuttal -- Ms.

5  Zilly's rebuttal report to Mr. Mathis, that enterprise value

6  appears in the disclosure statement.  I can continue my

7  questioning asking Ms. Zilly about the total enterprise value

8  calculations that appear in the disclosure statement.

9          THE COURT:  I guess you'll have to.

10         MR. COBB:  That's fine.

11         MR. BERNICK:  Your Honor, she wasn't tendered --

12         THE COURT:  I understand, but I'm sustaining the

13  objection --

14         MR. BERNICK:  Okay.

15         THE COURT:  -- to the use of this witness and that

16  document, her report.  That's all I have right now.

17         MR. BERNICK:  Thank you.

18  BY MR. COBB:

19  Q    Now, Ms. Zilly, in connection with the debtor's disclosure

20  statement, did you provide any information to the debtors

21  concerning total enterprise value?

22  A    For purposes of the debtor's disclosure statement,

23  Blackstone prepared a valuation analysis of the debtor assuming

24  that the plan was implemented and confirmed and went effective.

25  And if I may add it was based on the debtor's projections which

1  assumed the same.

2  Q    And that appears in the disclosure statement at Pages 47

3  through 50, I believe?

4  A    I wouldn't know.  I don't have the disclosure statement in

5  front of me.

6          MR. BERNICK:  Your Honor, object on two grounds.

7  One, is that he's now making Ms. Zilly into his expert with

8  regard to enterprise value.  That is not the subject of her

9  rebuttal report.  That's not the subject of Mr. Frezza's

10 rebuttal report that he ever relied upon that in connection

11 with his work.  Secondly -- and, so this continues to be

12 completely outside the scope of direct examination.

13         Secondly, what Ms. Zilly just said in response to the

14 question was that the enterprise value that was assessed in

15 connection with the disclosure statement made the assumption

16 that the plan went effective.  Ms. Zilly hasn't offered any

17 opinion with respect to what happens when the plan goes

18 effective.  What her opinions relate to in this regard is the

19 status before the plan goes effective.  So, for that reason, as

20 well, it is beyond the scope of my direct examination and

21 beyond the scope of what she did in her report.

22         MR. FINCH:  I also add, it's beyond -- there's been

23 no disclosure of this expert opinion in a report.

24         THE COURT:  I'm sorry.  There's been no disclosure --

25         MR. FINCH:  There's been no -- under the rule --

1  under the federal rules of evidence and the federal rules of

2  civil procedure if an expert witness is going to testify to an

3  opinion about a matter they're required to produce not only

4  what the opinion is, but also the backup information and data

5  on that matter.  Counsel for the bank debt group has

6  elicited -- or starting to elicit an expert opinion from the

7  witness that she has not provided an expert witness report for.

8  She has not provided the backup data for.  I don't have the

9  ability to cross examine or redirect that because it's never

10 been disclosed pursuant to either the federal rules of civil

11 procedure or federal rules of evidence.

12         MR. COBB:  Where shall I start, Your Honor?

13         THE COURT:  Responding.

14         MR. COBB:  Let me start with the fact that Mr. Frezza

15 clearly relied on the disclosure statement in forming his

16 opinion.

17         THE COURT:  But, reliance on the disclosure statement

18 in not necessarily the same thing as having this witness

19 testify to an opinion that she hasn't issued in an expert

20 report.  You cannot make her your expert.  She's the expert for

21 the debtor.  She hasn't been proffered for this purpose, so it

22 goes well beyond the scope of the direct.

23         MR. COBB:  Your Honor, all I was asking her -- we'll

24 jump to the end then.  All I was asking her was, what is the

25 accepted -- describe for the Court, essentially how you

1  calculate total enterprise value.  And then I was going to ask

2  her directly, is there any difference between the manner and

3  method that you employed in determining total enterprise value

4  and the manner and method in which an expert would employ in

5  determining total enterprise value in the context of a solvency

6  test?  That's it.  I'm not asking her opinion as to whether

7  they're solvent or not.  I'm just asking her is there any

8  difference in that methodology because Mr. Frezza's going to

9  testify -- because now they're begging this discussion, he's

10  going to testify that Ms. Zilly's done this work.  He's

11  examined the work that she's done.  He's relied on the figures

12  and the projections in the disclosure statement that she's

13  done.  He's relied on the conclusions that she's reached and he

14  is going to say there would be no different work done, at all,

15  if another expert was to issue an opinion with regard to

16  solvency of Grace as of the effective date, assuming the plan

17  does go effective.  It's before the Court.

18            THE COURT:  Okay.  You were going so fast I can't

19  even follow your words.

20            MR. COBB:  I'm fighting two people, Judge.  I feel

21  like I've got to --

22            THE COURT:  Well, you'll have help.

23            MR. COBB:  I'll slow down.

24            THE COURT:  There's help coming from the other side.

25            The objection is sustained.  If you want to get this

1 witness to describe, in her capacity, what the various

2 methodologies are, she is clearly an expert, she may do that.

3 So, let's start with that.

4          MR. COBB:  Your Honor, and, in fact, in fairness to

5 Grace and to Ms. Zilly she has already walked us through that

6 by providing a description of how she would calculate total

7 enterprise value.

8          MR. BERNICK:  Thank you.

9          MR. COBB:  You're welcome.

10 BY MR. COBB:

11 Q    Now, Ms. Zilly, you have no opinion as to what is the best

12 methodology in performing a solvency analysis to use in this

13 case to value Grace's assets, do you?

14 A    I'm sorry.  Could you repeat the question?

15 Q    You have no opinion, isn't it true, as to what is the best

16 expert methodology to employ in performing a solvency analysis

17 of Grace --

18          MR. BERNICK:  -- pre-effective date?

19 Q    -- pre-effective date?

20 A    I have not done a solvency analysis, so as of this date I

21 have no opinion as to what the best methodology is.

22 Q    Now, under this plan, assuming it is confirmed and goes

23 effective, it is your opinion that Grace will have the ability

24 to pay its debts, when due, as of the effective date, correct?

25          MR. BERNICK:  I'm sorry.  Those are -- the question

1 is defective as a matter of form.  Say assuming the plan goes

2 effective and then it's now the effective date, I don't know if

3 there's a distinction.  I would think there's one, but beyond

4 the objection to form, the witness has testified repeatedly

5 that she has not performed the post-effective date analysis of

6 solvency.  And on my examination which is -- ought to define

7 the proper scope of cross, she was asked solely about the state

8 of affairs before the effective date.  So, this again goes

9 beyond the scope of my examination.

10        MR. COBB:  Your Honor, Ms. Zilly has provided a

11 report in rebuttal of Mr. Frezza's report and Mr. Frezza's

12 report issues an opinion with regard to Grace's solvency as of

13 12/31/09.  So, I think this is clearly within the ambit of what

14 I should be permitted to examine Ms. Zilly on.

15        MR. BERNICK:  I'm sorry, Your Honor.  She testified

16 again as to pre-effective date and the only comment that she

17 made regarding the post effective date period of time is that

18 there's no methodology that would simply permit the

19 substitution of one estimate in the pro forma plan or the pro

20 forma balance sheet.

21        THE COURT:  I don't know what the rebuttal report

22 rebuts.  If it's not rebutting the total enterprise value,

23 what is it rebutting?

24        MR. BERNICK:  The rebuttal report rebuts the

25 propriety of what Mr. Frezza does and what he does is to take

1  the one estimate and put it in a pro forma balance sheet and

2  all that she says is that he can't do that.

3         Now, there are other things that she says with regard

4  to the Frezza report.  That is her testimony on the stand this

5  morning.  The further subject of her rebuttal has to do -- the

6  further subject of her direct examination this morning has to

7  do with the pre-effective date ability to say anything about

8  solvency.

9         THE COURT:  Yes, if she has provided a report that

10 goes beyond the criticism of the methodology, this is cross

11 examination and it's fair cross.  But, the question -- Mr.

12 Bernick's correct, the form of the question was not proper, so

13 you need to restate the question.

14 BY MR. COBB:

15 Q   Ms. Zilly, is it your opinion in connection with the

16 feasibility opinion you have issued in this case that as of the

17 effective date -- the projected effective date of this plan,

18 Grace will have the ability to pay its debts when they come

19 due?

20        MR. BERNICK:  Object to form.  When you say, as of

21 the effective date, that is after giving effect to the plan or

22 not?

23        MR. COBB:  It is giving full effect to the plan.  It

24 is confirmed and goes effective.

25 A   As part of my feasibility report -- my expert feasibility

Zilly - Cross/Cobb                    136

1  report, I stated that I believed that the debtor could meet its

2  obligations under the plan on and after the effective date.

3  Q    On and after the effective date, correct?

4  A    Its obligations after the effective date -- meet them

5  after the effective date.

6  Q    All right.  And isn't it true that you testified that if

7  this plan is confirmed and goes effective that there is no

8  difference between a solvency analysis of whether Grace can pay

9  its debts when due as of the effective date and your

10 feasibility analysis of whether Grace can pay its debts when

11 due as of the effective date?

12 A    No, but I believe what I testified to is that if you were

13 to ask me to assume that, that my answer would be the same.

14 Q    Assume that -- assuming -- I'm sorry.

15 A    I did not assume that you asked me to assume that.

16 Q    Okay.  And by the assumption you mean the only assumption

17 we need to make would be that the plan is confirmed and it goes

18 effective?

19        MR. BERNICK:  Well, are we now talking about her

20 testimony, or is there a question that's being posed now?

21        THE COURT:  Yes, I -- that confused me.  I'm sorry.

22 Could you restate that?

23 Q    Ms. Zilly just testified -- Ms. Zilly, you just testified

24 that you were required to make an assumption with regard to

25 whether or not Grace could pay its debts when due as of the

1  effective date -- strike that.  I'm going to restate the line

2  of questioning because I think in context this will be much

3  clearer.  Isn't it true, Ms. Zilly, that you testified that if

4  the plan is confirmed and if it goes effective on the projected

5  effective date, 12/31/09, that there is no difference between a

6  solvency analysis of whether Grace can pay its debts when due

7  as of the effective date and your feasibility analysis of

8  whether Grace can pay its debts when due as of the effective

9  date?

10        MR. BERNICK:  Your Honor, (a) that's not proper use

11  of the deposition, (b) it's complex and we'll end up going back

12  to the same problem which is that, is she being asked about her

13  testimony or is she being asked what she believes?

14        THE COURT:  That's sustained.  You need to ask her a

15  question here, not based on some prior testimony that's not of

16  record.

17        MR. COBB:  Well, Your Honor, I think what Mr.

18  Bernick's referring to is if I show the witness her deposition

19  testimony and if I ask her, was this the question that you were

20  asked and was this the question -- the answer that you

21  provided --

22        THE COURT:  You can only do it for some purpose of

23  impeachment.  She -- you haven't asked her a question yet that

24  she's denied having made the similar statement to.  So, it's

25  not proper yet.

1          MR. COBB:  Right.  And now, I'm going to ask the

2    question, Your Honor.

3    BY MR. COBB:

4    Q    Ms. Zilly, assuming that the plan is confirmed and goes

5    effective, isn't it true that as of the effective date of the

6    plan Grace will have the ability to pay its debts as and when

7    they come due?

8    A    That is my opinion in my feasibility report assuming

9    confirmation of the plan and consummation of the plan.

10   Q    And isn't it true that there's no difference between that

11   conclusion in your feasibility analysis and the conclusion that

12   would be reached if a solvency analysis was performed using the

13   same test, that is, Grace's ability to pay its debts as and

14   when they come due on the effective date?

15         MR. BERNICK:  I'm sorry.  So, object to the form of

16   the question.  If you make the assumption that the test of

17   solvency is identical to the test of feasibility, then the

18   question is -- it states a truism.  So, I don't believe that

19   you're asking for a truism, so I don't understand what the

20   incremental evidence that you're asking for from this witness

21   is.  Object to the form of the question.

22   Q    I'll restate it and try it a different way.  Is there any

23   difference, Ms. Zilly, between the solvency test of a company's

24   ability to pay its debts, when due, and under a feasibility

25   analysis a company's ability to pay its debts when due,

Zilly - Cross/Cobb                                      139

1  speaking generally, not of Grace?

2  A     No.

3  Q     Now, in order to perform a balance sheet test for

4  solvency, would you agree with me that an understanding of

5  financial accounting is necessary?

6           MR. BERNICK:  Objection, goes beyond the scope.

7           THE COURT:  For whom?

8           MR. COBB:  She's issued an expert report, Your Honor,

9  saying that Mr. Frezza's balance sheet test for solvency is

10  improper.

11          THE COURT:  Okay.

12          MR. COBB:  And now I'm questioning her on -- I'm

13  walking through her line of questions to determine --

14          THE COURT:  Do you need a background in accounting to

15  read a balance sheet?  I mean, is that the question that was

16  asked?  Does she --

17          MR. COBB:  No, Your Honor.  Do you need a background

18  in accounting in order to perform a balance sheet test for

19  solvency?

20          THE COURT:  Oh, a test for solvency.  Okay.

21  Overruled.

22  A     I think you need familiarity with accounting rules in

23  order to be able to read a balance sheet.

24  Q     And are you familiar with the generally accepted

25  accounting principles, otherwise known as GAAP?

1  A    I am familiar with them.  I am not an accountant.

2  Q    What impact does GAAP have on Mr. Frezza's expert opinion

3  using the balance sheet solvency test?

4  A    I'm afraid I don't understand that question.

5  Q    What impact does GAAP, the application of the generally

6  accepted accounting principles, have to Mr. Frezza's expert

7  opinion on a balance sheet test for solvency?

8        MR. BERNICK:  Objection, lack of foundation, haven't

9  established that she's even analyzed that issue.

10 Q    Have you analyzed Mr. Frezza's expert report?

11 A    Yes.

12 Q    Have you issued an opinion with regard to Mr. Frezza's

13 expert report?

14 A    Yes.

15 Q    Does that opinion address whether Mr. Frezza has correctly

16 conducted the balance sheet test for solvency, in this case?

17 A    Yes.  My opinion stated I didn't think he did a balance

18 sheet test.

19 Q    You don't think that Mr. Frezza correctly valued Grace's

20 assets under that balance sheet test, do you?

21 A    I don't think Mr. Frezza valued -- I don't think Mr.

22 Frezza valued Grace's assets, at all, in his report.

23 Q    So, it's your testimony that you believe that Mr. Frezza

24 never provides an asset value of Grace in order to determine

25 whether or not Grace is solvent?

1        MR. BERNICK:  Objection, at any kind or a correct one

2  or what?  Objection to the form of the question.  Your Honor,

3  this is -- objection to the form of the question.

4        THE COURT:  The form is pretty broad, do you want to

5  restate the question?

6  Q    Ms. Zilly, let me try it this way.  Could you -- isn't it

7  true that you have issued an opinion that Mr. Frezza has

8  incorrectly applied the expert methodology of the balance sheet

9  test for solvency in issuing his opinion regarding Grace's

10 solvency?

11       MR. BERNICK:  Objection, asked and answered three

12 times.

13       THE COURT:  Overruled.

14 A    Yes.  My opinion stated that I thought there were flaws in

15 Mr. Frezza's "balance sheet test", one of which was that I

16 didn't think it was a balance sheet test.

17 Q    Did you -- do you have a belief or an opinion that Mr.

18 Frezza did not correctly calculate the value of Grace's

19 liabilities when he performed that test?

20 A    The reason I'm having trouble with this line of

21 questioning is because my understanding is that Mr. Frezza

22 simply took Grace's balance sheet, assuming the plan had gone

23 effective.  So, to the extent that you say value or not value,

24 he simply adopted Grace's balance sheet on a pro forma basis

25 assuming the plan had gone effective.

1 Q    Okay.  So, he did use Grace's -- well, he used Grace's

2 balance sheet in order to derive certain liability values in

3 order to perform the balance sheet test for solvency, is that

4 true?

5        MR. BERNICK:  Well, no.  I'm sorry.  That is

6 objectionable to form.  Witness says --

7        THE COURT:  It's sustained.  You can restate the

8 question.

9 Q    Mr. Grace relied upon -- excuse me, Mr. Frezza relied upon

10 Grace's reported liabilities on the balance sheet that appears

11 as Exhibit 12 to the plan, correct?

12 A    Mr. Frezza relies on Grace's liabilities as set forth in

13 Exhibit 12.  Exhibit 12 is a pro forma balance sheet, pro forma

14 for the plan of reorganization.  It is not -- it is a pro forma

15 for assuming the plan goes effective, either assuming 12/31/08

16 or 12/31/09.  It makes assumptions that then Mr. Frezza

17 attempts to change in his report, so --

18 Q    And what effect does the application of the generally

19 accepted accounting principles, GAAP, have on the liabilities

20 that Mr. Frezza used in performing the balance sheet test?

21        MR. LOCKWOOD:  Objection, there's no showing at all

22 that GAAP has any relevance, whatsoever, to that issue.

23        MR. COBB:  Fair enough.

24        THE COURT:  Well, that's the question that he's

25 attempting to ask, but she said that she's not an accountant.

1          MR. COBB:  I'll move on.

2          That's all I have for now, Your Honor.  I have a

3  series of questions, Your Honor, that I would like to ask Ms.

4  Zilly regarding exit financing and we've reached an agreement

5  with the debtors, I believe, that I can ask those questions

6  when she is recalled to discuss feasibility.

7          THE COURT:  All right.

8          MR. COBB:  However, I'm not precluded from using her

9  testimony then in response to my questions, or otherwise, in

10 our solvency case in chief.

11         MR. BERNICK:  With respect to exit financing.

12         MR. COBB:  Correct.

13         THE COURT:  Okay.  That's fine.

14         MR. BERNICK:  Thank you.

15         THE COURT:  Mr. Pasquale?

16         MR. PASQUALE:  No questions, Your Honor.  Thank you.

17         THE COURT:  Anyone else have questions for Ms. Zilly?

18 Mr. Bernick?

19         MR. BERNICK:  I have no further questions of Ms.

20 Zilly.

21         THE COURT:  You're excused ma'am.  Thank you.

22         MR. BERNICK:  We have a relatively short witness.  I

23 don't know -- is Dr. Martin here?  We have a relatively short

24 witness that maybe we can put on and I don't know how extensive

25 your all's cross examination is.  We don't think we'll be on

1  direct for more than about ten minutes max.

2          THE COURT:  All right.

3          MR. BERNICK:  Okay.  We call Dr. --

4          MR. PASQUALE:  I'm sorry.  Can we just have five

5  minutes, please?

6          THE COURT:  Do you -- you want to take lunch?

7          MR. PASQUALE:  I mean, I don't want to preclude Mr.

8  Bernick from doing this now, but I would like to run out for a

9  moment.

10         THE COURT:  All right.  Let's do a ten minute recess

11 and then we'll come back and do at least the direct before

12 lunch.

13         MR. BERNICK:  Okay.

14         THE COURT:  We'll see how it goes.

15         MR. COBB:  Thank you, Your Honor.

16                        (Recess)

17         THE COURT:  Mr. Bernick?

18         MR. BERNICK:  We call Dr. Denise Martin to the stand

19 as our next witness.

20              DR. DENISE MARTIN, WITNESS, SWORN

21                    DIRECT EXAMINATION

22 BY MR. BERNICK:

23 Q    Good morning, Dr. Martin.  Could you tell us a little bit

24 about your educational background?

25 A    Sure.  I got a BA in economics and French from Wellesley

1  College in 1985 and I worked for a year and then I went back to

2  graduate school.  I got a Masters in economics from Harvard

3  University in 1988 and a PhD also from Harvard in 1991.

4  Q    Okay.  After graduating from Harvard in 1991, could you

5  give us a review of your professional experience which I take

6  it has been from beginning to end at NERA Economic Consulting?

7  A    Actually, I worked for a year -- I forgot, as well -- for

8  a year between college and grad school.  I worked at the

9  Federal Reserve Bank and then right after Harvard, I went right

10 to NERA in 1991.  I worked in a number of different practice

11 areas.  NERA is a firm of economic consultants, professionals

12 practicing microeconomics.  And I worked in our labor practice,

13 in our securities and finance practice.  But the practice

14 that's relevant here is our mass torts and product and

15 liability practice.

16 Q    Okay, I'm showing you plan proponents Exhibit 512-3.  Does

17 this review some of your work in connection with asbestos

18 estimation?

19 A    Yes, it does.

20 Q    Okay, just give us an overview of it if you would.

21 A    I've been named an expert in a number of asbestos-related

22 bankruptcies where I've been asked to prepare or critique

23 estimates of asbestos that were prepared.  I've been asked to

24 prepare estimates of asbestos liability for insurance

25 negotiations and also for companies, either preparing their

1  financial reports or deciding whether to acquire a company that

2  has asbestos liabilities.

3         MR. BERNICK:  Your Honor, we would tender Dr. Martin

4  as being an expert in the statistical analysis of asbestos

5  liabilities.

6         MR. PASQUALE:  No objection, Your Honor.

7         THE COURT:  She may express an expert opinion to that

8  effect.  Mr. Bernick, I don't have the exhibits in the binder

9  for her.

10         MR. BERNICK:  Oh, I'm sorry, they're all sitting here

11  in front of me.

12         THE COURT:  Thank you.

13  Q    Dr. Martin, have you been asked to conduct a certain

14  statistical analysis of certainty and uncertainty relating to

15  the estimation of Grace's personal injury asbestos liabilities

16  not assuming that a plan is approved and going effective, that

17  is, absent that event?  Have you been asked to perform

18  statistical analyses of uncertainty and certainty regarding the

19  estimates?

20  A    I was asked to -- whether you could calculate the

21  uncertainty -- statistical uncertainty surrounding Dr.

22  Florence's estimates.

23  Q    Okay, just as a little bit of a foundation, are you

24  familiar with the fact that Dr. Florence did an asbestos

25  liability estimate in connection with the estimation proceeding

Martin - Direct/Bernick                         147

1  in this case?

2  A    Yes.

3  Q    Okay, are you familiar with the fact that other experts --

4  we had -- like the diadem of estimation experts performed other

5  estimates for purposes of the estimation process?

6  A    Yes.

7  Q    Okay, could you just describe in your own words whether --

8  what the extent of the range or variability was in connection

9  with those different estimates that were done?

10 A    Well, the estimates themselves varied widely as we just

11 saw in the chart that Ms. Zilly put up, you know, from low of

12 200 million up to a high of, I think, it was 6.2 billion.  I

13 was asked to look at just at Dr. Florence's estimates and to

14 calculate the statistical uncertainty around those.

15 Q    Okay, what did you do in order to conduct that analysis

16 directing your attention to 512.5?  In your own words just tell

17 us what it is that you did in connection with your own analysis

18 of Dr. Florence's work.

19 A    Sure.  There are really three steps.  First, we replicated

20 Dr. Florence's work to make sure we understood what it is that

21 he did.  And then second, we identified the sources of

22 uncertainty in his estimates.  And I'll spend a minute saying

23 what I mean by that.  All estimates have inputs or assumptions

24 and Dr. Florence's is no exception and we looked to see how he

25 determined those inputs, how he estimated those and what the

1  historical variability, the observed variability had been in

2  those.

3           Just to take an example, one of his inputs is filing

4  rates, how many claims will arise from the incidents of

5  projected disease.  And for that, he uses an average over a

6  several-year period.  And some of his forecast uses a five-year

7  period.  But that average has some uncertainty around it.  The

8  average is made up of individual years, each of which is

9  different.  And so we can use those differences to sort of

10 measure what the uncertainty is in the filing rate assumption.

11 So the second step in our analysis is really to identify each

12 of the big drivers of his forecast so we can measure the

13 statistical uncertainty in them.

14 Q    I've been trying to write while you've been talking a

15 little bit.  We have an estimate by Dr. Florence.  That, in

16 turn, is driven by inputs and the inputs themselves involve

17 data?

18 A    Right.

19 Q    And where is the variability that you are looking to

20 ascertain for purposes of your own analysis?  Where's the

21 variability?

22 A    It's in the underlying data.  Dr. Florence, for example,

23 in the filing -- for the estimated filing rate that he's going

24 to use in his forecast he has to get that from somewhere, and

25 he gets it by taking an average of historical filing rates over

Martin - Direct/Bernick                     149

1  the period, I think it's 1996 to 2000.  But as I said, that

2  average embodies variability because each of those years is

3  different and so we can look at those differences and

4  understand how the forecast might have been different had he

5  used 1996 alone or 2000 alone or any combination of the

6  different years.

7  Q    Based upon your analysis of the underlying data for these

8  various inputs and looking at how variable the data was, were

9  you able -- where did you go from there?

10  A    Right.

11  Q    In your own words, what would you do with that

12  variability?

13          THE COURT:  Could you check your microphone, Mr.

14  Bernick?

15          MR. BERNICK:  I'm sorry?

16          THE COURT:  Could you check to see -- can you hear in

17  the back because it's a little faint here.  You can?  Okay, I'm

18  sorry for interrupting.  Go ahead.  Would you --

19          MR. BERNICK:  Don't ask them if they're interested.

20  A    So we identified all the sources of uncertainty.  We

21  selected three of them.  We used the filing rate, the exposure

22  qualification rate, what proportion of claims would satisfy --

23  would be able to prove that they had exposure to a Grace

24  asbestos-containing product and then settlement values.  And we

25  basically re-ran Dr. Florence's forecast 100,000 times.  We

**J&J COURT TRANSCRIBERS, INC.**

1  used a technique called Monte Carlo simulation and we re-ran it

2  letting those three sources of uncertainty vary.  So rather

3  than the input that Dr. Florence had estimated, what if they

4  took on different values based on how they had varied

5  historically.  And so we were able to generate a series of

6  100,000 estimates that would have resulted had those inputs

7  taken on different rates.

8  Q    So you then do a whole bunch of runs looking for what the

9  -- if you change the variables based upon the variability of

10  the data.  I'm assuming you get a whole bunch of final

11  estimates running 100,000 times?

12  A    Exactly right.

13  Q    Now you got 100,000 estimates based upon different uses of

14  -- different assumptions about the variables.  What do you then

15  do with this range of 100,000 potential estimates based upon

16  those variables?

17  A    Our goal was to calculate 95 percent confidence interval

18  around Dr. Florence's estimates.  So what we do is we take

19  those 100,000 simulated estimates and take the middle 95

20  percent and that's our 95 percent confidence interval.

21  Q    The middle 95 percent?

22  A    Right.

23  Q    And so you'd kind of come in at either end and you'd

24  eliminate the far ends, the outliers, far ends of the bell

25  curve --

Martin - Direct/Bernick                    151

1 A    That's right.

2 Q    -- to get 95 percent confidence and that would then give

3 you a confidence interval surrounding the particular estimate

4 that Mr. -- Dr. Florence did?

5 A    That's right.

6 Q    So we kind of go like Florence.  Now, in doing all this

7 work, tell us whether or not the methodologies that you used,

8 tell us to what extent the methodologies that you used

9 comported with established methodologies for statistical

10 analysis.

11 A    Yes, certainly they did.  I mean confidence intervals are

12 a standard statistical technique and the Monte Carlo simulation

13 is used in situations like this when we're working with a

14 model.

15 Q    Is this actually -- I mean ranging from -- it sounds like

16 the McLaughlin group from one to ten -- but ranging from the

17 very routine all the way up to the very esoteric, how routine

18 or esoteric was the calculation that you did?

19 A    Very routine.

20 Q    What did you conclude was the range of the confidence

21 interval around Dr. Florence's estimates?

22 A    It included a range from a lower bound of 4.6 million to

23 an upper bound of 6.3 billion.

24 Q    Is that -- is the conclusion that you reached about the

25 confidence interval reflected in plan proponents 512-6?

1 A    Yes.

2 Q    Based upon this, is there any statistically-significant

3 difference between Dr. Florence's estimate ,which we see at the

4 low end of the range, and the much higher estimates that would

5 range up to $6.2 billion?

6 A    No.  Given the variability in the underlying inputs, we're

7 unable to reject the hypothesis that those are different.

8 Q    Okay, if we went within this very broad range, based upon

9 the analyses that you have done and applying the test of 95

10 percent confidence -- incidentally, is that a standard test or

11 a non-standard test, 95 percent confidence?

12 A    Ninety-five is generally accepted.

13 Q    Okay, based upon 95 percent confidence, can you state on

14 the basis that any statistically-sound approach that the right

15 answer is in any particular place within this range?

16 A    No, that's what a confidence interval is telling us.  It's

17 telling us that we can't statistically distinguish at the five

18 percent level that those are different from one another.

19 Q    And that's distinguish 4.6 million on the low end from 6.3

20 billion on the high end?

21 A    That's right.

22 Q    Okay, and 95 percent certain that the right answer is

23 somewhere in there --

24 A    Yes.

25 Q    -- but if you adopt the 95 percent standard, is the true

1 estimate within that range certain or uncertain?

2 A    The true estimate is uncertain.

3         MR. BERNICK:  We pass the witness after we offer for

4 demonstrative purposes only Plan Proponents 5-1-2, 1, 2, 3, 5,

5 and 6 for demonstrative purposes.

6         THE COURT:  I think it's 512, isn't it?

7         MR. BERNICK:  I'm sorry, 512 dash 1, 2, 3, 5, and 6.

8         THE COURT:  Any objection for --

9         MR. PASQUALE:  No objection, Your Honor.

10         THE COURT:  All right, they're admitted for

11 demonstrative purposes.

12         MR. BERNICK:  Thank you.

13         THE COURT:  Give me a second, Mr. Pasquale, please.

14         MR. PASQUALE:  Of course.

15         THE COURT:  Okay, thank you.

16         MR. PASQUALE:  Ken Pasquale for the Unsecured

17 Creditors' Committee.

18                     CROSS EXAMINATION

19 BY MR. PASQUALE:

20 Q    Good afternoon, Dr. Martin.

21 A    Good afternoon.

22 Q    You wrote the book on asbestos estimation, didn't you,

23 more particularly, co-authored "Estimating Future Claims,"

24 right?

25 A    Yes, I wrote that book with my colleague, Dr. Dunbar.

1 Q    Okay, and it was published in 1996?

2 A    Yes.

3 Q    I had the pleasure of again reading your book on vacation.

4        MR. LOCKWOOD:  Move to strike.

5                    (Laughter)

6 Q    I didn't see in reading the last two chapters of your book

7 which pertain specifically to estimating asbestos mass tort

8 claims, I didn't see any reference in those chapters to

9 applying confidence intervals.  Did I miss it or did you

10 mention confidence intervals as something that should be done

11 in estimating future asbestos claims?

12 A    No, we didn't mention it and it's not necessarily

13 something that needs to be done in estimating future asbestos

14 claims but there are certain contexts in which it does need to

15 be done.  When you're testing a hypothesis, you have a known

16 hypothesis and you want to either accept or reject it, that's

17 when a confidence interval is appropriate.

18 Q    Dr. Florence, the analysis that you reviewed, he didn't

19 apply a confidence interval to his assessments, did he?

20 A    No.  Again, he was using -- doing the estimation for a

21 different purpose.

22 Q    Doing estimation for a different purpose than what?

23 A    He was trying to help inform the Court about what Grace's

24 future liabilities might be and --

25 Q    He did the type of -- not following the process you said.

1  But he was estimating future asbestos claims, right?

2  A    Right.

3  Q    Okay.

4  A    And the Court is then going to take those estimates, his

5  estimates, as well as those -- might have -- didn't in this

6  case -- but might have taken them under advisement.  And

7  knowing the risks and uncertainties that were sort of embodied

8  in those and would reach a determination.  That's a different

9  exercise than sort of setting up a hypothesis that Grace is

10 insolvent and trying to disprove that hypothesis using the

11 Florence estimate.

12 Q    And that's what you were retained by Grace to do, is that

13 right?

14 A    No, I was retained by Grace to just put a confidence

15 interval around Dr. Florence's estimate.

16 Q    You were retained by Grace to put a confidence interval

17 around Grace's own estimation expert, right?

18 A    Or -- yeah -- actually, they hadn't asked me to put a

19 confidence interval so much as to quantify the statistical

20 uncertainty and I chose to do it via a confidence interval.

21           MR. PASQUALE:  Nothing further, Your Honor, thank

22 you.

23           THE COURT:  Anyone else?  Mr. Bernick?

24                     REDIRECT EXAMINATION

25 BY MR. BERNICK:


                    **J&J COURT TRANSCRIBERS, INC.**

1 Q    Ms. Zilly testified just before you, Dr. Martin, and in

2 illustrating the range of estimates, talked about Plan

3 Proponents Demonstrative 511-6 which reflects her understanding

4 of the broad range of the different estimates that were out

5 there.  My question to you is do you know whether -- did you

6 see whether Dr. Florence or any of the other experts when they

7 presented their estimates chose to ask the question whether

8 their estimates were fundamentally different from one another?

9         MR. PASQUALE:  Objection, Your Honor.  The witness

10 testified that she didn't look at anybody else's estimate, only

11 Dr. Florence.

12        MR. BERNICK:  Well, let's stick with Dr. Florence.

13        THE WITNESS:  I don't think I testified --

14        THE COURT:  Okay, I don't think that's what she

15 testified to though.  I think she said she looked at others.

16 She just wasn't asked to perform any analyses of anybody but

17 Dr. Florence if I understood correctly.

18        MR. PASQUALE:  That's not how I recall it, Your

19 Honor, but --

20        THE COURT:  Well, I'm sorry, maybe we can get the

21 witness to state it then.

22 Q    Did you look at the other estimates?

23 A    Yes, certainly.

24 Q    Now, if your purpose is, as an expert, to present an

25 estimate that you believe to be within the methodology that's

1 been chosen --

2          COURT CLERK:  Sir, (indiscernible).

3 Q    If your purpose in doing an estimate is to perform an

4 estimate that you would present as being the best estimate, is

5 that same or different from what all these different experts

6 did?

7 A    No, they all used the same general method in that sense.

8 Q    And what, if any, relationship does that have to your

9 testimony just now that they had a certain purpose when they

10 did their estimates?

11 A    It relates in a sense that they were all putting forth

12 their own individual estimates to assist the Court in reaching

13 a determination.

14 Q    Now, Grace has asked a, in connection with this

15 proceeding, a question about how different are these really?  I

16 mean is that essentially what you asked is how certain are we,

17 where the right answer lies?

18 A    Yes, and I did it via Dr. Florence's estimate, you know,

19 could -- are the other -- one question you could ask is are the

20 other estimates within the 95 percent confidence interval of

21 Dr. Florence's estimate and I found that they were.

22 Q    Is that a question that was different from the question

23 that was being addressed by these different experts when they

24 did their own estimates or is it the same question, is the

25 relationship between the three?  I didn't mean for it to be

1  that difficult so I'll be clear.  What you did which is a

2  comparative analysis looking for uncertainty, is that answering

3  a different question from the question that is being addressed

4  by each of the estimates individually?

5  A    Yes, sure.  They're looking at levels, what's -- in their

6  opinion what's the right level.  I'm looking at uncertainty

7  variability around a particular estimate.

8           MR. BERNICK:  Okay, that's all I have, Your Honor.

9           THE COURT:  Mr. Pasquale?

10          MR. PASQUALE:  Nothing further, Your Honor.

11          THE COURT:  You're excused, thank you.

12          THE WITNESS:  Thank you.

13          MR. BERNICK:  At this point, Your Honor, the debtor,

14 at least, has no further witnesses to call with respect to the

15 lender phase, lender stage of the case and I don't believe we

16 have any further documents to offer either.  Mr. Finch has got

17 an additional exhibit.

18          MR. FINCH:  Nathan Finch for the Asbestos Claimants'

19 Committee.  You remember at the close of Dr. Peterson's

20 testimony yesterday we handed up the slides that was over

21 inclusive as to what we actually showed him.  We went back and

22 reviewed the transcript tonight.  What I'd like to do is just

23 put on the record the slides that we showed him and hand up a

24 copy to Your Honor if that would be acceptable --

25          THE COURT:  All right.

1          MR. FINCH:  -- so everybody in the courtroom knows

2     exactly what was shown to him.  This comes out of Plan

3     Proponents' Exhibit 178B as in basketball and the slides shown

4     and then used in Dr. Peterson's testimony were slide Number 8,

5     9, 10, 14, 15, 16, 20, 21, 23, 25, 26, 27, 29, 30, 32, 34, 35,

6     36, 38, 39, 41, 43, 44, 45, 46, 47, 49, 51, 52, 53, 54, 56, 57,

7     58, 59, 60, 62, T as in turtle 8, T as in turtle 9, T as in

8     turtle 10.  These are offered and I believe admitted for

9     demonstrative purposes only.  May I approach, Your Honor?

10          THE COURT:  Yes.

11          MR. BERNICK:  We're set now on exhibits in the plan

12     proponents, therefore, rest with respect to this phase, that

13     is, the lender phase of Phase 2.

14          THE COURT:  Okay, you folks have a bit of work to do

15     over the lunch hour.  Do you want an hour, more, less?

16          MR. BERNICK:  Well, I'm now forgetting.  So much time

17     has passed.  What further work do we have to do over the --

18          THE COURT:  You're meeting with many of the other

19     sides --

20          MR. BERNICK:  Oh, I think -- yeah.

21          THE COURT:  -- to go over exhibits and designations.

22          MR. BERNICK:  I don't want to discourage anybody from

23     meeting and conferring more.  I know that we have, with respect

24     -- I think driven by the question of live testimony, I think

25     that the only remaining issue that drives live testimony is

1  Seaton/OneBeacon.  We definitely have to take that up over the

2  lunch hour.  I think that's the one that was remaining that

3  could affect witnesses this afternoon.

4         THE COURT:  Probably will affect witnesses.  I think,

5  though, that there's a whole host of exhibits that have been

6  proffered that somebody on your side wanted to look at and I

7  said I'd take that up this afternoon.

8         MR. BERNICK:  Right, but I'm saying that there are a

9  variety of other exhibit issues that are out there that people

10 have identified but I don't think any of them actually drive

11 the live testimony.  So we'll certainly get that done.  But

12 then we would like to come back and either put that -- that

13 witness has to be called, that's fine.  But then either after

14 that or absent that, we can start with the lenders.  I think

15 the lenders have two witnesses.

16        THE COURT:  And who will you be calling?

17        MR. PASQUALE:  I always have trouble knowing if it's

18 on, Your Honor.

19        THE COURT:  It's not.

20        MR. PASQUALE:  It's not?  I think it was.

21        THE COURT:  Oh, sorry.

22        MR. PASQUALE:  It's okay, Your Honor.

23        THE COURT:  Now I can hear you.  It must be in that

24 conference mic that you get out of the zone.

25        MR. PASQUALE:  We have two witnesses.  We have Mr.

**J&J COURT TRANSCRIBERS, INC.**

1  Kruger and Mr. Frezza and then we have a declaration to submit

2  that's already been agreed to.  We'll take 30 seconds.

3          THE COURT:  All right.

4          MR. BERNICK:  And then we don't expect to be calling

5  any rebuttal witnesses so that will be done.

6          THE COURT:  Okay, we'll take a recess until -- oh,

7  Mr. Monaco?

8          MR. MONACO:  Your Honor, for the record, Frank Monaco

9  for the State of Montana.  Before we take a break, I just

10 wanted to pick up on something we had discussed at the end of

11 Monday's hearing about the 148 complaints that were filed

12 against the State of Montana in the state court there.

13         Your Honor, on further reflection, I know that the

14 plan proponents had agreed to stipulate to the fact there were

15 these 148 complaints but I think I would feel more comfortable

16 if they were actually admitted as exhibits.  Not only the

17 nature of the underlying claims but also the timing of the

18 complaints may be relevant to some of the arguments I'll have

19 to make in these post trial briefs.

20         I've discussed it with the plan proponents.  They

21 have no problem with it.  They obviously originally stipulated

22 to that.  There were some objections that were filed.  We

23 resolved those.  The resolution is they're not being admitted

24 for the truth of the matter asserted but I still would feel

25 more comfortable with having -- I know it's a lot of paper.  I

1  hate to burden the Court with more paper.  I don't have hard

2  copies with me but I could have them delivered to chambers.

3  They are on the disk that was submitted to the Court, whatever

4  Your Honor prefers.

5          THE COURT: The only thing I would like I think with

6  respect to this is the same perhaps as what I said yesterday

7  about insurance policies.  If you give them to me on a disk,

8  that's sufficient.

9          MR. MONACO:  Okay.

10          THE COURT:  But then if you cite a particular portion

11  or complaint or whatever in your papers, then attach that to

12  whatever you cite --

13          MR. MONACO:  I will do so.

14          THE COURT:  -- so that I have the hard copy there and

15  can see it there.

16          MR. MONACO:  Okay, thank you, Your Honor.

17          THE COURT:  All right, has that disk been submitted?

18          MR. MONACO:  I believe so, Your Honor.  I was told

19  that it was.  It was given to the plan proponents.

20          MR. GUY:  I'm sure it's somewhere where we can find

21  it, Your Honor.  The only thing I would add to that is that,

22  not being offered for the truth of the matter asserted as Mr.

23  Monaco said --

24          THE COURT:  Oh, yes, I'm sure the State doesn't want

25  them admitted --

1          MR. GUY:  Of course not.

2          THE COURT:  -- for the truth of the matters.

3          MR. GUY:  And the plan proponents are reserving

4  relevancy objections but we have no objection to them being

5  accepted into evidence.

6          THE COURT:  All right, what are they marked as

7  please?

8          MR. MONACO:  Well, Your Honor, if you recall, they

9  were marked as Montana 1 through 148 and then our proof of

10  claim was 149 and we can stick with that numbering system.

11          THE COURT:  All right, so Montana Exhibits 1 through

12  148 are admitted for limited purposes that you've just

13  described.

14          MR. MONACO:  Correct.

15          THE COURT:  Okay.

16          MR. MONACO:  Proof of claim will be 149.  I could --

17          THE COURT:  I thought I admitted 149 already, did I

18  not?

19          MR. MONACO:  Right, you did, Your Honor.

20          THE COURT:  Okay.

21          MR. MONACO:  I think we did use that number.  Your

22  Honor, at the break I can check.  I believe a disk was

23  submitted to chambers.

24          THE COURT:  Okay.

25          MR. MONACO:  Okay, all right.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  It's on the -- okay, that's fine.

2          MR. MONACO:  Good.  Thank you, Your Honor.

3          THE COURT:  All right, anything else before recess?

4    Okay, I didn't get an answer as to how much time you want.

5          MR. BERNICK:  We only need 45 minutes for speaking

6    for the plan proponents.

7          THE COURT:  Is that enough?  Okay, we'll be in recess

8    until 2 p.m.

9                    (Recess)

10         THE COURT:  Please be seated, I'm sorry.  Good

11   afternoon.

12         MR. WORF:  Your Honor, Richard Worf for Garlock

13   Sealing Technologies.

14         THE COURT:  Yes, sir.

15         MR. WORF:  Over lunch we wrapped up our matter with

16   the plan proponents.  They agreed to let us admit those

17   exhibits subject to relevance objections and to establish

18   authenticity with these three declarations that we're going to

19   submit to the Court.

20         THE COURT:  All right.

21         MR. BERNICK:  I hate to interrupt here.  Are you

22   prepared to handle this, Jonathan?

23         MR. GUY:  Yes.

24         MR. GUY:  Your Honor, the Garlock Exhibits 3 through

25   10 were the complaints and we have no issue with those being

accepted.  There was a declaration that has been offered by

Garlock concerning the 1006 summary.  We have no issue with

that either.

MR. WORF:  That's number 13 and our declarations are

Garlock 105, Garlock 106 and Garlock 107, so we offer those

exhibits.

THE COURT:  Okay, one second.  Okay, Garlock Exhibits

3 through 10, 13, 105, 106 and 107 are admitted subject to the

relevancy objections.

MR. WORF:  Thank you, Your Honor.

THE COURT:  And, I'm sorry, I lost track.  Have those

been handed up?

MR. WORF:  May I approach and hand them up right now?

THE COURT:  Okay.

MR. WORF:  The exhibits that are referenced are on

the disk that we gave the Court yesterday.

THE COURT:  Okay, that's fine.  That's right, I do

have the disk.  I apologize.  I forgot.  Thank you.  Mr. Pratt?

MR. PRATT:  Good afternoon, Your Honor.  Warren Pratt

for Creditors Seaton and OneBeacon.  Your Honor, we were unable

to reach agreement with the plan proponents so we will have a

witness to present.  I'll just make a relevance proffer.  I

think once the witness is sworn, the direct examination should

take probably less than 15 minutes unless there's a lot of

colloquy.

1          Your Honor, Michael Brown will testify concerning

2   certain claims asserted against Seaton Insurance Company by

3   Kaneb Pipeline Operating Partnership which is now known as

4   NuStar and its affiliate Support Terminal Services.  And also

5   he will testify about the resulting claims asserted by Seaton

6   against Fresenius and Sealed Air Corporation based on a 1997

7   settlement agreement between Seaton, the debtors, Fresenius and

8   Sealed Air Corporation.

9          Your Honor, these claims are not asbestos-related

10  claims.  They ultimately derive from environmental issues at an

11  abandoned pipeline at the Otis Air Force Base in Massachusetts

12  and they are potentially significant claims.  The relevance of

13  this testimony is that Seaton's claims against non debtors

14  Fresenius and Sealed Air are enjoined under the plan and

15  they're not asbestos-related claims so they're not enjoined by

16  the 524-G injunction channeling order but instead by a Section

17  105 injunction.

18          Seaton contends in this case among other things that

19  its non-asbestos-related claims against non debtors Fresenius

20  and Sealed Air Corporation cannot properly be enjoined under

21  Section 105 as provided in the plan.  And Mr. Brown's testimony

22  will provide a foundation for that argument.  His testimony is

23  relevant and admissible and we think it will be helpful to the

24  Court in understanding the nature of the claims involved.

25          Your Honor, I just want to note for the record that

1  the fourth amended case management order at Paragraph 10

2  provides that no attorney shall be precluded from testifying at

3  the confirmation hearing by reason of representing claimants or

4  an official committee.  And, of course, Mr. Inselbuch testified

5  here.  He represents the ACC.  But Paragraph 10 of the CMO also

6  specifically refers to claimants and that would include Seaton

7  as a creditor.

8           I also would just note for the record that there's no

9  intention here to waive Seaton's attorney/client privilege.

10 Mr. Brown's testimony will be largely about what actions he

11 took and that's not a waiver any more than Mr. Bernick's

12 actions or Mr. Lockwood's fee applications, for example, would

13 be deemed to be a waiver of the privilege.

14           I call Michael Brown.

15           THE COURT:  Mr. Brown?

16                     MICHAEL BROWN , SWORN

17                     DIRECT EXAMINATION

18 BY MR. PRATT:

19 Q    Mr. Brown, are you an attorney?

20 A    Yes, I am.

21 Q    Who do you represent in this segment of Phase 2?

22 A    OneBeacon America Insurance Company and Seaton Insurance

23 Company.

24 Q    Have you ever heard of Kaneb Pipeline Operating

25 Partnership now known as NuStar?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Yes.

2  Q    When did you first learn of that entity?

3  A    In December of 2008.

4  Q    What were the circumstances?

5  A    I received a copy of a letter that had been sent to my

6  clients OneBeacon and Seaton from Kaneb's counsel.

7  Q    What action did you take when you received that letter?

8  A    Well, it was a letter that was accompanied by a number of

9  different materials so I, in conjunction with my colleague Mr.

10 Boerger, undertook a factual analysis of what was in the letter

11 and what the letter was all about.  This was something new we'd

12 never heard of before.

13 Q    And why did you undertake the investigation?

14 A    Well, in the letter Kaneb was asking OneBeacon and Seaton

15 to participate in the defense of a claim brought by the

16 Department of Justice in connection with an environmental site

17 in Massachusetts involving the Otis Pipeline.

18 Q    And what was the focus of your factual investigation?

19 A    We wanted to find out the nature of the claim.  We wanted

20 to find out why this particular entity was making the claim.

21 And we wanted to find out whether any of the pre-petition

22 settlements that OneBeacon and Seaton had with Grace dealt with

23 the sort of claim that was being asserted by Kaneb.

24 Q    Did you review any other documents in connection with this

25 initial investigation?

1  A    Yes.

2  Q    What did you look at?

3  A    I looked at the settlement agreements in particular.  And

4  the one I focused on the most was a March 1997 settlement

5  agreement between Unigard which is Seaton's predecessor and

6  Grace which is the defined term in the settlement agreement.

7          MR. PRATT:  Your Honor, I'll just note for the record

8  that that March 1997 settlement agreement is in evidence.  It's

9  marked as Exhibit OS-7.

10 Q    Mr. Brown, when did you review that settlement agreement?

11 A    I don't know the precise time frame.  I got the letter

12 that had been sent to my client some time in mid December.  It

13 was either late December or early January.

14 Q    And what happened next?

15 A    Well, while we were in the midst of looking into the

16 details of this particular matter, Kaneb had filed a motion in

17 the bankruptcy court to lift the automatic stay and they were

18 seeking relief from the bankruptcy court to do a few different

19 things.  One was to pursue Grace as a potential judgment

20 creditor and the other was to have the Court lift the automatic

21 stay so they could pursue some of Grace's insurers as alleged

22 co-insureds under various policies.

23         MR. PRATT:  Your Honor, again, I'd note for the

24 record that Kaneb's motion for relief from the stay and the

25 supplemental memorandum that accompanied that motion are in

1  evidence as part of the confirmation proceedings here.  That

2  was filed on January 16th, 2009.  They're in evidence here as

3  Exhibits OS-40, that's the motion, and Exhibit OS-44 which is

4  Kaneb's memorandum.

5  Q    Mr. Brown, do you have a general understanding of the

6  asserted basis for the relief that Kaneb was seeking?

7  A    In terms of why they wanted to pursue the insurers that

8  were listed in the motion, their claim was that they were a

9  co-insured under the policy or policies and that to the extent

10  that the policies were settled pursuant to a settlement

11  agreement, the settlement post dated the time when they ceased

12  being a subsidiary of Grace.

13  Q    Did the motion -- did Kaneb's motion reference policies?

14  A    Yes.

15  Q    Did you focus on any particular policies?

16  A    Yeah, I wanted to see whether Seaton's policies were

17  listed or Commercial Union -- Seaton -- well, Commercial Union

18  being OneBeacon, and I found that the two policies that had

19  been referred to in the letter that I had received earlier were

20  also listed as targeted policies by Kaneb in its motion.

21  Q    Now, after that motion was filed in mid January of this

22  year what action did you take?

23  A    Continued to investigate the nature of the claims.  The

24  motion was a very thick motion.  It was accompanied by a number

25  of different exhibits and we focused attention on the exhibits

1  and what we could learn from the exhibits, again, in trying to

2  determine the nature of the claim and why we were being

3  targeted.

4  Q    Did you focus on any particular part of those exhibits?

5  A    Yes.  There was a complaint that was one of the exhibits

6  and it was a complaint that was filed by Grace Energy

7  Corporation, a subsidiary of Grace and one of the debtors, in

8  Texas state court.

9  Q    And do you recall that that complaint was part of the

10  materials?

11  A    Correct.

12  Q    And do you recall when the Grace Energy complaint was

13  filed in Texas?

14  A    I believe it was filed in June of 1997.

15        MR. PRATT:  Your Honor, again, I just note for the

16  record that that GEC complaint is attached to Exhibit OS-40

17  which is the Kaneb motion for relief from the stay.

18  Q    Mr. Brown, what did you do next?

19  A    Well, because we were concerned about the claim and the

20  allegations that were being made, we continued with the factual

21  analysis of looking at the materials that we had received with

22  the complaint or the lift stay motion and we -- I eventually

23  made a comparison between the settlement agreements and the

24  materials that accompanied the lift stay motion.

25  Q    In making that comparison did you focus on any particular

1  aspect of the settlement agreement?

2  A    Yes.

3  Q    What did you look at?

4  A    The settlement agreement had a sort of an oddly-worded

5  representation in it and it was something to the effect of that

6  Grace which was a defined term in the settlement agreement

7  represented that it was unaware of any environmental claims

8  contemplated being made by former subsidiaries.

9  Q    Did you look at any other part of that March 1997

10 settlement agreement?

11 A    I looked at who signed it.

12 Q    And what is your recollection about who signed it?

13 A    It was signed by three Grace entities.  One was W.R. Grace

14 and Co., a Delaware corporation.  The other was W.R. Grace and

15 Co. Conn., and the third was described as W.R. Grace and Co.

16 followed by a parenthetical that said a New York corporation

17 formerly known as Fresenius National Medical Care Holdings,

18 Inc.

19 Q    Formerly known?

20 A    I'm sorry, current -- now known as Fresenius National

21 Medical Care Holdings, Inc.

22 Q    What action did you take upon focusing on those parties?

23 A    The terms were familiar to me from having looked at the

24 plan that there had already been a plan filed.  I hadn't really

25 focused on the provision dealing with Fresenius before.  But I

1  now took some interest in them and in particular, I looked at

2  the definitions in the plan of various terms.

3  Q    What definitions did you look at?

4  A    I don't remember the precise ones.  There were a number of

5  different terms like Grace, New York and Old Grace and so

6  forth.  I don't remember which ones they were but what I

7  discovered in the process of going through the definitions was

8  that the entity that had signed the document that was W.R.

9  Grace and Co., a Delaware corporation, at least according to

10  the definitions in the plan, now appeared to be Sealed Air

11  Corporation.  I did that by comparing tax ID numbers that were

12  actually in the definitions.

13  Q    Now, did you look again at any other documents?

14  A    I looked back at the complaint and what I had noticed in

15  the complaint -- this is the complaint that had been filed by

16  GEC -- was that there was something of a time line that was set

17  forth in the complaint where GEC had indicated that it was --

18  it had received a letter from a company called Samson

19  Hydrocarbons and I don't know the precise relationship between

20  the two but it had been tendered to Grace and Grace was looking

21  into -- when I say Grace, I mean Grace Energy Corp. -- was

22  looking into the ownership of the pipeline.

23        And there was another paragraph in the complaint that

24  indicated that Grace Energy Corporation had a discussion with

25  the defendants in that case which included Kaneb and STS

1  concerning the issue of the ownership of the pipeline and

2  responsibility for the environmental liabilities associated

3  with it.

4  Q    Did you make any comparison with the environmental rep in

5  the settlement agreement?

6  A    Yeah --

7         THE COURT:  I'm sorry, I couldn't hear you, Mr.

8  Pratt, I'm sorry.

9         MR. PRATT:  Excuse me, Your Honor.

10  Q    Did you make a comparison of the averments

11  in the complaint with the representations in the March 1997

12  settlement agreement?

13  A    Yes, I did and I found them to be inconsistent.

14  Q    Now, as counsel for Seaton, did you take any action as a

15  result of that inconsistency?

16  A    Yes.

17  Q    What did you do?

18  A    I sent a letter to counsel for Sealed Air Corporation and

19  I sent another letter to counsel for Fresenius National Medical

20  Care Holdings, Inc.

21  Q    And what was the point of sending those letters?

22  A    Well, I pointed out what we had discovered in our factual

23  analysis and demanded that Fresenius and Sealed Air defend and

24  indemnify Seaton in order to put it into the position it would

25  have been in had the representation been true.

Brown - Cross/Bernick                    175

1  Q    Do you recall the date on those letters?

2  A    July 8th, 2009.

3  Q    And when were the letters sent?

4  A    They were sent that day by email and also by regular mail.

5  Q    To whom were they sent?

6  A    One was to Mr. Rosenbloom at McDermott, Will and Emery,

7  it's Fresenius's counsel, and the other was to a Mr. St. Clair

8  and a Mr. Turetsky at Skadden, Arps, Sealed Air's counsel.

9  Q    Sealed Air's counsel?

10  A    Yes.

11  Q    And were there any cc copies that you sent?

12  A    Yes, I copied Mr. Bernick, I copied Mr. Freedman, I copied

13  Ms. Esayian and Ms. Baer.

14        MR. PRATT:  Your Honor, the Court saw those letters

15  dated July 8, 2009 yesterday marked for identification as plan

16  proponents 239 and 240.

17  Q    Mr. Brown, are those the letters that you sent?

18  A    Yes, they are.

19  Q    Have you ever received any response to those letters to

20  date?

21  A    Not yet but I'm still anxious to.

22        MR. PRATT:  I pass the witness, Your Honor.

23                    CROSS EXAMINATION

24  BY MR. BERNICK:

25  Q    As I understand it, Mr. Brown, just seeing you on the

**J&J COURT TRANSCRIBERS, INC.**

Brown - Cross/Bernick                    176

1  stand reminds me of my first bankruptcy hearing in the Dow

2  Corning case where I wasn't a bankruptcy lawyer and I was

3  called adversely as part of the bankruptcy proceeding by a

4  bunch of Texas lawyers and some of whom probably these guys

5  represent.  But I actually found the experience gracing, so I

6  hope you do too.

7         In any event, as I understand your answers to Mr.

8  Pratt's questions, you first became involved in looking at the

9  potential for this claim at some point in late 2008?

10  A    Yes.

11  Q    Okay, and is it true that the first time that you actually

12  provided any kind of notice of this claim to the debtors was in

13  July of 2009?

14  A    I believe that's correct.

15  Q    When were you first on notice of the fact that there might

16  be a claim?

17         MR. PRATT:  Objection, Your Honor, which claim?

18  Q    The claim that ultimately you wrote about in July 2008 --

19  9, excuse me.

20  A    I don't know the precise date.  I can tell you that we

21  went through a process of analyzing the plan, analyzing the

22  settlement agreement, analyzing the materials in the lift stay

23  motion and concluded -- it was certainly before July 8th.  It

24  may have been as much as a month or two, possibly more before

25  that.

1 Q    But you wouldn't have done the investigation that you did

2 in late 2008 unless you were on notice of the fact that there

3 might be a claim, correct?

4 A    That is correct although there could be a claim against

5 the debtors as well.

6         MR. BERNICK:  All right, that's all I have, Your

7 Honor.

8         MR. PRATT:  Nothing further, Your Honor.

9         THE COURT:  Wait, Mr. Brown, I think -- just a

10 second.

11        MR. PRATT:  I do have just one follow up question.

12 My colleague, Mr. Boerger, reminded me.

13                    REDIRECT EXAMINATION

14 BY MR. PRATT:

15 Q    Mr. Brown, are you familiar with the final plan objections

16 submitted on behalf of Seaton and OneBeacon filed on May 20th

17 of this year?

18 A    Yes.  Generally.  I haven't looked at them in a while.

19 Q    Did that document reference these claims against Fresenius

20 and Sealed Air?

21 A    I believe it did but I'm not sure of the degree of

22 specificity.

23        MR. PRATT:  Okay, nothing further, Your Honor.

24        THE COURT:  Mr. Bernick, anything else?

25        MR. BERNICK:  No.

1          THE COURT:  You're excused, Mr. Brown, thank you.

2          MR. PRATT:  Your Honor, at this point in time I would

3  move the admission of plan proponent exhibits 239 and 240 for a

4  limited purpose, not for the truth of the matters asserted but

5  for the purpose of demonstrating that Seaton has asserted

6  claims against non debtors Fresenius and Sealed Air, also for

7  the purpose of demonstrating the general nature of those

8  claims.

9          MR. BERNICK:  Your Honor, that's the whole purpose of

10 taking the time and trouble to have the witness testify.  I

11 believe those matters have now been made a matter of record and

12 the objections that we have to the underlying letters remain as

13 they were before.

14         THE COURT:  Okay well, at this point I think the

15 letters have been clearly authenticated.  They are relevant to

16 the issue that has been articulated.  And although they are

17 somewhat cumulative, I think they're admissible so I will admit

18 Exhibits PP-239 and 240 for the limited purposes of

19 establishing that claims exist and really that's pretty much it

20 because I think Mr. Brown has articulated the nature of the

21 claim.

22         MR. PRATT:  Your Honor, you have copies from

23 yesterday but I have more copies here if you'd like them.

24         THE COURT:  I have a copy of 239 but I couldn't find

25 one of 240 so I'll take both of them if you have them.

1           MR. PRATT:  Yes, Your Honor.

2           THE COURT:  That way, I'll just make sure I have them

3  together.

4           MR. PRATT:  I did note yesterday on the record that

5  these are marked as plan proponent exhibits.

6           THE COURT:  Yes.

7           MR. PRATT:  PP-240 has our own exhibit sticker on it.

8  That had been erroneously designated at first by the proponents

9  as confidential but it's not and I'm handing Mr. Boerger -- Mr.

10  Bernick a copy of these.

11           THE COURT:  All right.  Thank you.

12                         (Pause)

13           THE COURT:  Ms. Casey?

14           MS. CASEY:  Yes, hi, Your Honor.  Linda Casey for

15  BNSF.  One more quick follow up from before lunch.  You had

16  requested that we hand up the hard copies of the certified

17  copies of the complaints and amended complaints.  I wanted to

18  point out to Your Honor that we have brought a box to the

19  courtroom.  It's over on the bench that has the BNSF-85 to

20  BNSF-279 that are the actual certified copies.

21           THE COURT:  All right, thank you.

22           MS. CASEY:  Thank you.

23           THE COURT:  Okay, are there any other exhibit issues

24  to deal with -- Mr. -- from left over from this morning?

25           MR. PERNICONE:  Right.  Mr. Schiavoni and I were

1  working on exhibit issues at lunch time.  We're wrapping that

2  up and hopefully he'll be up in a few minutes and we can deal

3  with that, okay?

4         THE COURT:  Okay.  All right.  I'm sorry, Mr. --

5         MR. KOVACICH:  Your Honor, we have some exhibit

6  issues as well.

7         THE COURT:  Mr. Kovacich, I'm sorry, I can't hear

8  you.

9         MR. KOVACICH:  Mark Kovacich on behalf of the Libby

10  claimants.  Just to answer the Court's question, we do have a

11  couple of exhibit issues left over from yesterday.  If the

12  Court would like to address those now, we can do that.

13         THE COURT:  Have you worked out agreements?

14         MR. KOVACICH:  I believe so.  We have the infamous

15  list of verdicts finally attached to a set of discovery that

16  Mr. Bernick is comfortable with.

17         THE COURT:  All right.

18         MR. KOVACICH:  We can mark that as Libby claimants

19  271B and offer it in evidence.

20         THE COURT:  All right.

21         MR. KOVACICH:  And to be clear, the interrogatory

22  answers that are attached are offered only for the purpose of

23  showing the context in which the attached list of verdicts was

24  produced.

25         THE COURT:  Okay.  I don't think that exhibit was

1 ever admitted itself, Mr. Kovacich, because I believe I waited

2 to see what you folks would work out.  So I don't think the

3 exhibit itself is in evidence yet.

4         MR. KOVACICH:  Your Honor, I believe that's correct.

5 I'm not used to microphones in Montana.  We don't use them.  I

6 believe you're correct, Your Honor, and we would offer Exhibit

7 271 again.  It's simply a copy of the verdict list attached to

8 271B.

9         MR. FINCH:  And the interrogatory answer that

10 describes what it is, correct, Mr. Kovacich?

11         MR. KOVACICH:  Yes, that's agreeable.

12         THE COURT:  All right, 271 and 271B are admitted but

13 I need a copy I think.

14                       (Pause)

15         MR. KOVACICH:  Your Honor, I also believe there's

16 still an issue with the insurance policies that were discussed

17 yesterday.  My co-counsel, John Lacey, was planning on

18 addressing that.  I'm not certain of the status myself.  If the

19 Court would like Mr. Lacey to address that now or --

20         THE COURT:  That's fine.  I was trying to get the

21 exhibit issues tied up so that I actually have some semblance

22 of order in these notes.  Mr. Lacey?

23         MR. LACEY:  I understand, and I think -- I apologize

24 that we're doing this piece meal in this way but yes, in follow

25 up to your comment this morning about a number of exhibits that

1  had been introduced but not handed up, in addition to the

2  insurance policies which I think we might -- during a break

3  here I discussed with Mr. Horkovich that there were three

4  different sets of insured's policies that Libby claimants are

5  interested in having introduced as exhibits and it was

6  represented yesterday that both CNA and Royal were going to be

7  doing that independently.

8        We were not confident necessarily at the time about

9  whether that was going to happen with Maryland Casualty

10  policies and so we were prepared to submit those but I think we

11  may have -- they may have been introduced by Maryland Casualty

12  -- no.  Then we are prepared through Libby claimants exhibit

13  what will be 283 to submit those primary policies on disk and I

14  have copies for everyone here.

15        THE COURT:  All three sets, the CNA, the Royal and

16  the Maryland Casualty?

17        MR. LACEY:  No.  For the record we'd like to reserve

18  the opportunity if Royal and if CNA do not submit them as

19  represented yesterday that Libby claimants would come forward

20  with that but we're presuming right now that one, because the

21  Royal policies are essentially recreations given their age,

22  we're depending upon those being available through Royal and a

23  copy that the Court can actually read.  And then the ones with

24  CNA, as I understood from CNA counsel, there was some issue

25  about which one was going to be the correct one and we wanted

1  to defer to their representation about which policy should be

2  relied upon.

3          So as long as all three, CNA, Maryland Casualty and

4  Royal, come in, Libby claimants are satisfied to let them come

5  in through the insurers except if Maryland Casualty is not

6  necessarily going to be submitting them right now, we can.  It

7  doesn't really matter I suppose.

8          THE COURT:  All right, and what was your exhibit

9  number?

10          MR. LACEY:  That one we have marked as 283 and it's

11  just a disk.

12          THE COURT:  Okay, Mr. Wisler?

13          MR. WISLER: Good afternoon, Your Honor.  Jeffrey

14  Wisler on behalf of Maryland Casualty.  I thought Mr. Lewis --

15  I guess Mr. Lewis did not hand these up yesterday.  We're not

16  objecting to the admission of the Maryland Casualty policies

17  with the same understanding and reservations as I put on the

18  record yesterday.

19          MR. LACEY:  And so that the record is clear, we

20  understand that that same reservation exists for all the

21  insurers that want them in evidence but we're not necessarily,

22  you know, trying to hold us up against the insurers for them.

23          THE COURT:  They're to be used only in connection

24  with the confirmation process?

25          MR. LACEY:  Correct.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right, you can pass the disk up.

2          MR. LACEY:  I have a binder here that represents a

3 few other exhibits as well.

4          THE COURT:  All right, Exhibit 283 -- excuse me,

5 Libby Exhibit 283 is admitted for the limited purposes

6 articulated yesterday.

7          MR. LACEY:  The other issues that I think will

8 hopefully resolve the Libby claimants exhibits -- I know Mr.

9 Kovacich addressed, 271 and 271A as marked in the Court's book,

10 we may have had a little confusion about whether it's 271A or

11 271B but it's the exact same.

12          UNIDENTIFIED ATTORNEY: (indiscernible)

13          MR. LACEY:  Okay.

14          COURT CLERK:  If he wants it on the record, he has to

15 talk into the microphone.

16          THE COURT:  What he said is that it's a different

17 exhibit.  271A and 271B are not the same exhibit.

18          MR. LACEY:  So --

19          THE COURT:  And 271B with 271 attached has been

20 admitted.

21          MR. LACEY:  So as I understand our position, we will

22 be withdrawing the 271A.

23          THE COURT:  All right, so Exhibit 271A is withdrawn

24 and not offered.  All right.

25          MR. LACEY:  Also referred to in the Court's book as

1  6312 that was relied upon during Mr. Hughes' testimony and

2  during the course of that testimony, if you recall, it was a

3  very large, blurry exhibit and this just pulls out that we

4  needed a few days to --

5            THE COURT:  I'm sorry, what's the number?

6            MR. LACEY:  6312.  It's the first tab in the Court's

7  binder that I just handed up.

8            THE COURT:  Okay.  That was admitted?

9            MR. LACEY:  I believe it was, yes.

10           THE COURT:  All right, this is a much better copy,

11 thank you.

12           MR. LACEY:  That was the intent, I think.

13           MR. BERNICK:  If that's the bottom of the

14 contributing factor analysis or is that the bottom of that

15 Grace litigation report?

16           MR. LACEY:  I believe it's the bottom of the Grace

17 report.

18           THE COURT:  It starts off with "average

19 settlement/judgment cost for claim in thousands" if that helps.

20           MR. LACEY:  I think the document came in as 63, Page

21 1 to 26.  And this is just the bottom portion of Page 12 on

22 that, 63-0 to 26 are already in evidence.

23           THE COURT:  Okay, so this is just part of that

24 series?

25           MR. LACEY:  Yes.

1          MR. BERNICK:  Previously supplied a blowup of that to

2   Your Honor as you may recall.  You probably have it back there

3   someplace.

4          THE COURT:  Okay.

5          MR. LACEY:  Then Exhibits 272 through 279 are

6   overheads that were used with Libby claimants' experts and

7   those overheads were admitted, as I recall, for demonstrative

8   purposes only and just through an oversight they were

9   introduced but never handed up and as you referred to this

10  morning, we just wanted to get them in.

11         THE COURT:  All right.

12         MR. BERNICK:  Counsel is representing that the Court

13  actually previously received a proffer and accepted that

14  proffer, admitted them.

15         MR. LACEY:  That was my understanding.  Again, I know

16  that --

17         MR. BERNICK:  I mean we're happy with the Court

18  having copies of something that actually has been admitted but

19  it doesn't sound to me like that's crystal clear.  Do we know?

20         THE COURT:  272 through 279 were actually marked but

21  never offered.  That's what my notes say.

22         MR. LACEY:  Okay, well, for purposes here, and again,

23  I guess I'm glad that we're doing this now, we would move that

24  they be admitted for demonstrative purposes as I think that was

25  clear through the course of the testimony.

1          MR. BERNICK:  I would need to go back over the record

2  and ascertain that.  I don't have those documents here and our

3  people are gone dealing with other issues so I'm a little bit

4  at a disadvantage, Your Honor.

5          THE COURT:  All right, you can --

6          MR. BERNICK:  If you want to just give them to me, I

7  can take a look.

8          THE COURT:  These were definitely exhibits that were

9  used by Dr. Whitehouse.  I recognize them.  But my notes

10  indicate that they were marked but not offered.

11          MR. BERNICK:  Which ones are they now?

12          THE COURT:  272 through 279.

13          MR. LACEY:  And what we've done here in the book is

14  we've noted which witness they were used with.  Some of them

15  were Dr. Molgaard, some of them were Dr. Frank.  I'm not sure

16  how many, if any, were Dr. Whitehouse.

17          THE COURT:  Okay, I know -- oh, I see.  I apologize.

18  I picked up the name at the bottom rather than the witness.  In

19  any event, they definitely were used.  I recognize that all of

20  them were put up on the board at some point by some witness but

21  I'm not going to say which witness.

22          MR. LACEY:  And if it's something that we need to

23  follow up with later, I don't want to put anybody at a

24  disadvantage here.

25          MR. BERNICK:  276, it was, in fact, displayed at one

1  point but there was an objection that was made and I believe

2  sustained that the rates of mortality were not germane and

3  further, the comparison between the CARD mortality study and

4  this one I think also was not established.  That's my very

5  vague recollection.  That's LC-276 so though it may have been

6  displayed, I don't think it was -- I know it wasn't proffered

7  and I don't think it properly was admitted.

8          And 279, the comparison, I remember there was a

9  colloquy about whether this comparison was germane.  I remember

10 that there was a colloquy.  It turned out that Dr. Weill, with

11 respect to whom this became germane, Dr. Weill never used, did

12 a B-read or had a B-read done that he used in connection with

13 his progression analysis.  He relied upon the medical records.

14 So the ascertainment about who reads best which is the essence

15 of LC-279 doesn't go to any issue that's before the Court.

16 Again, this is purely from memory and a lot of stuff has

17 happened but I think that we need to go back and track this

18 down.

19         MR. LACEY:  The one thing I would offer to the Court

20 is that I understand that in the context of parties' post trial

21 briefing obviously there have been a great many relevance and

22 to use Mr. Bernick's term, germane-type arguments made.  For

23 them to come in now, I wouldn't be surprised at all if there

24 are, in fact, objections stated during the course of the

25 transcript that we find related to these exhibits.

1          But for purposes now of having them available for the

2  parties to brief and knowing that there may be overreaching

3  objections, I would again just move that they (indiscernible).

4          THE COURT:  I wish you'd do this when the witness is

5  on the stand and I can rule on the objections in that context.

6  I mean it's going to be hard enough to try to figure it out

7  with exhibits that are not something that were used with the

8  witness but they were not offered at the time that the witness

9  was here so I can't deal with objections when the witness isn't

10 here when you might be able to cure the objection.  I don't

11 know.

12          In any event, I think you folks may be able to work

13 this out.  Why don't you take a look at them tonight, Mr.

14 Bernick, and let me know what your view is tomorrow and I'll

15 hold off on 272 through 279 until tomorrow morning.

16          MR. LACEY:  The last section that I would bring to

17 the Court's attention is as we discussed I think very, very

18 early on Libby claimants' testimony there's a great deal of

19 patient information that for purposes of convenience through

20 the witnesses' testimony and the parties here was used in

21 unredacted form with the understanding that the redacted

22 versions would be substituted.

23          And so what is at the back of the book as noted here

24 in your binder, LC-13, LC-15A, LC-15 and LC-16A, those were

25 exhibits that were used and entered and I believe those were

1 admitted over -- or I don't even know if they necessarily were

2 objected to -- I know 16A was revised because there were three

3 columns that needed to be removed.  But regardless of whatever

4 the status of those particular objections, the documents that

5 you have here now are the redacted ones.

6          THE COURT:  I only ever had the redacted versions.

7          MR. LACEY:  Then it sounds like we may not even

8 necessarily have -- as long as the official court copy then,

9 whatever ends up with the clerk had that, then that's fine too.

10          THE COURT:  Right, as far as I know, the unredacted

11 versions were put on the screen so the witness would see them

12 but I had to ask always what line they were referring to

13 because I had redacted versions.  So it's fine.  Whatever the

14 rulings were with respect to those exhibits remain the same but

15 I do note that these copies have been redacted.  I believe they

16 just duplicate what I've already got but at least they're here

17 in redacted form.

18          Speaking of which, someone is going to have go

19 through the transcripts to make sure, on behalf of your own

20 witnesses that you appropriately redact the names or whatever

21 the other identifying information is because my staff will not

22 be able to do that.  You folks have that obligation under the

23 rules so you'll have to take care of doing that.

24          MR. LACEY:  So it's our understanding that to the

25 extent we've modified the procedure a little bit here on that

1  first day of trial that the protective order about May 26th

2  still otherwise -- should that be our working guide?

3          THE COURT:  I don't know what that order is.

4          MR. LACEY:  Okay.  No, that's fine.  We'll work it

5  out with counsel.

6          MR. BERNICK:  There was extensive colloquy.  There

7  was a specific agreement that was reached the first day of

8  trial about what would govern in this proceeding.  And from the

9  debtors' point of view that is what still controls in the

10 proceeding.  I don't know where Mr. Lacey is.  There's a lot of

11 stuff in that book.  Ms. Baer has just come back in because

12 she's trying to do a lot of different things.  We had thought

13 that we were going to proceed with the testimony of the

14 witnesses so we have not had the opportunity to look through

15 that notebook, and therefore we're now in the same position

16 that we were yesterday.  So I'd be happy to --

17         THE COURT:  I think I just said to do it tonight so

18 that we can get on with this, and I'll address this tomorrow.

19         MR. BERNICK:  Well, that's what I would like to be

20 able to do, because I don't know what's going on with those

21 medical records and what their status in the transcript is and

22 so rather than trying to do anything about it now I think that

23 we need to get back to the --

24         MS. BAER:  Your Honor, I don't understand what's

25 going on here.  Mr. Lacey saw me earlier today and said he was

1 going to send me all these things by email and we'd work it

2 out.  Nobody's given me a single piece of paper on Libby.  In

3 fact, we're missing exhibits from them they won't give us.

4        THE COURT:  Well, I think what this is supposed to be

5 is all of the exhibits that were used with the witnesses in

6 this binder is what I asked for and that's what I thought this

7 is.  What you're missing, I don't know.  If it hasn't been used

8 with the witness I can't speak to that.  But this binder should

9 now have every exhibit that was marked and used by Libby in

10 connection with their witnesses and they're marked as to the

11 same exhibit number that was used during the course of the

12 trial.  The problem is that some of them are not in evidence.

13 But, for example, those at the back of the book that have been

14 simply redacted to take out the confidential information that's

15 what that -- that's what this book does.  It takes out the

16 confidential information.  It doesn't change the rulings with

17 respect to whether the document is or isn't admitted.

18        MS. BAER:  Your Honor, I'm happy to look at this.

19 It's the first time I've ever seen it.

20        THE COURT:  Tonight.  I'll deal with it tomorrow.

21        MR. LACEY:  And just to clarify, Your Honor, the book

22 is not intended to represent as, I think you just stated now,

23 every exhibit that was used with the --

24        THE COURT:  Only the ones that were not handed up.

25        MR. LACEY:  Exactly.  And it's in large part to

1  respond to the plan proponents' request for exhibits that may

2  have been dropped through or not handed up.  So in response to

3  Ms. Baer's comment, we hope now to have everything cured and

4  have everything in everybody's hands.

5          THE COURT:  Okay.  I apologize.  I did misstate that,

6  and I didn't mean to, but I did misstate it.  So I understand

7  that this is a compilation of the documents that were not

8  handed up during the witnesses -- when they were being

9  examined.

10          MR. LACEY:  Thank you.

11          THE COURT:  Thank you.  All right, are we ready for

12  trial.  Mr. Pasquale.

13          MR. PASQUALE:  I'm going to try to get up again, Your

14  Honor.  Your Honor, Ken Pasquale for the Unsecured Creditors

15  Committee.  We now move to the affirmative case on the

16  objections raised by the Unsecured Creditors Committee and the

17  Bank Lender Group.  As I advised the Court earlier we have two

18  live witnesses.  We also have testimony from one witness that

19  we have an agreement with the plan proponents can be submitted

20  by affidavit.  And in fact this is old news.  This is the

21  affidavit of Charles Freedgood was already submitted with

22  respect to Phase I of these proceedings.  Your Honor, the

23  smallest of the three binders I gave you has Exhibits 1 through

24  5.  Exhibit 1 being Mr. Freedgood's affidavit, and Exhibits 2

25  through 5 being the exhibits to that affidavit.  Exhibit 2 the

Kruger - Direct/Pasquale                    194

1  credit agreement dated May 14th, 1998, Exhibit 3 the credit

2  agreement dated May 5th, 1999, and Exhibits 4 and 5 the two JP

3  Morgan as agent for the lenders the proofs of claims filed with

4  the Court.

5           Just for the record, Your Honor, the Freedgood

6  affidavit, the Exhibit 1, was filed with the Court under Docket

7  Number 22279 and the exhibits were filed under Docket Number

8  22306.  So at this time, just so we're clear for the record, we

9  would move into evidence CCBLG Exhibits 1 through 5.

10          MR. BERNICK:  Mr. Pasquale, I don't have the docket

11 entry.  And I know that the affidavits underwent a revision

12 process.  Is this --

13          MR. PASQUALE:  They're the most recent.

14          MR. BERNICK:  Okay.

15          MR. PASQUALE:  Right after Phase I.

16          MR. BERNICK:  If that's what it is then I don't have

17 an objection to it.

18          MR. PASQUALE:  Thank you.  Thank you, Your Honor.

19          THE COURT:  All right, Exhibit CCBLG Exhibits 1 to 5

20 are admitted.

21          MR. PASQUALE:  Thank you, Your Honor.  At this time

22 we call Lewis Kruger to the stand on behalf of the Creditors

23 Committee and the Bank Lender Group.

24                LEWIS   KRUGER, SWORN

25          THE COURT:  Mr. Pasquale, I need to switch exhibits.

1 Okay.  Thank you.

2          MR. PASQUALE:  Good afternoon, Mr. Kruger.

3          THE WITNESS:  Good afternoon, Mr. Pasquale.

4                    DIRECT EXAMINATION

5 BY MR. PASQUALE:

6 Q    Can you please describe for the Court your education,

7 please?

8 A    Surely.  I graduated from Harvard College with a BA with

9 honors in economics in 1956 and then from Columbia Law School

10 in 1959.

11 Q    Can you briefly describe your legal experience for the

12 Court?

13 A    I've acted, obviously, as a bankruptcy lawyer since 1962

14 when I merged my -- well, I should give you a little bit of

15 history.  I originally started out as intellectual property

16 lawyer with the U.S. Office of an English law firm called Marks

17 & Clark.  I then joined a bankruptcy boutique called Krause,

18 Hersh & Gross in February of 1962, merged that firm into

19 Stroock in January of 1980.  So I've been practicing in the

20 bankruptcy field for 47 years or so.  I have also taught over

21 the years, 17 years, at Columbia Law School.  Most recently

22 I've been an adjunct professor of law at NYU Law School and

23 over the years I've also taught at Harvard, Queens College and

24 Oxford in England among other places.

25 Q    Can you describe, please the types of clients you have

1  represented with respect to bankruptcy and reorganization

2  matters?

3  A    I represented both debtors and creditors.  Debtors of all

4  varieties over the course of the years.  Creditors committees,

5  official creditors committees, ad hoc creditors committees and

6  the like.  I've also represented many of the major financial

7  institutions in the United States as agents for bank lender

8  groups or individually as members of bank lender groups.

9  Q    Can you please describe your and Stroock's involvement in

10  the W.R. Grace bankruptcy cases.

11  A    Stroock was retained as counsel for the unsecured

12  creditor's committee in the early part of April, 2001 shortly

13  after the filing of the petition by W.R. Grace and we've acted

14  since that time on behalf of the general unsecured creditors

15  committee.

16  Q    Have you been the lead attorney at Stroock with respect to

17  that representation since that time?

18  A    Yes, I have been.

19  Q    Now, Mr. Kruger, were you in court this morning for the

20  testimony of Mr. Tarola and Mr. Shelnitz?

21  A    Yes, I was.

22  Q    And you heard their testimony with respect to two letter

23  agreements that were entered into between the creditors

24  committee and W.R. Grace.

25  A    Yes, I did.

Kruger - Direct/Pasquale                    197

1  Q    Okay.  I'm just trying to save some time here so instead

2  of going over that same ground again, let me ask you, with

3  respect to those agreements, the January 2005 and February 2006

4  agreements that are in evidence as Plan Proponents' 285 and

5  286, do you know whether any individual creditor ever expressly

6  agreed in writing with Grace to support the terms of the joint

7  plan?

8  A    Not to my knowledge.

9         MR. BERNICK:  Objection.  I'm sorry.  Are we

10 excluding communications that Mr. Kruger had with his clients

11 or their constituency on the committee?

12        MR. PASQUALE:  That's not necessary to my question.

13 I asked if he -- sorry.

14        THE COURT:  Ask the question again.

15        MR. PASQUALE:  I will.

16 Q    Do you know whether any individual creditor entered into

17 -- sorry, one more time.  Do you know whether any individual

18 creditor ever expressly agreed in writing with Grace to support

19 the joint plan?

20 A    Not to my knowledge.

21 Q    Now, Mr. Kruger, over the tenure representing the

22 creditors committee in these cases, how would you characterize

23 the working relationship between the committee and the debtors?

24 A    I think it's both been very, very cordial and very, very

25 close, and we work together very carefully.

**J&J COURT TRANSCRIBERS, INC.**

Kruger - Direct/Pasquale                    198

1  Q    Did there come a time where Stroock, on behalf of the

2  committee, began to have regularly scheduled calls with the

3  debtor?

4  A    Yes.  Starting, I think with Mr. Shelnitz's arrival as

5  general counsel.  We started to have essentially every other

6  week meetings on the phone with officers of the debtor, with

7  the debtor's professionals and ourselves.

8  Q    And what generally was discussed during those regularly

9  scheduled conference calls?

10  A    We discussed usually the agenda for the upcoming court

11  hearings, the status of acquisitions and other things that were

12  on Grace's agenda, and our joint strategy for dealing with the

13  issues that confronted us in the Chapter 11 proceeding.

14  Q    Did there come a time subsequent to February 2006 when you

15  and others at Stroock began to discuss with Grace the issue of

16  interest to be paid on Grace's bank debt?

17  A    What period of time are you referring to?

18  Q    After the February 2006 agreement.

19  A    Yes.  Certainly by the latter part of 2006 in my

20  recollection and certainly by the spring of 2007.  That became

21  a regular subject of discussions both with Grace in those bi-

22  weekly phone calls with Grace offices and the like as well as

23  individual phone calls between myself and Mr. Shelnitz.

24  Q    What generally was discussed with respect to the bank

25  debt?

*J&J COURT TRANSCRIBERS, INC.*

1  A    What I --

2          MR. BERNICK:  I'm sorry.  I object to the form of the

3  question.  If we can't get concrete about a particular

4  conversation.  General recollection, I think, at this point,

5  Your Honor, is not really germane.  It really is very specific

6  --

7          THE COURT:  That's sustained.

8  Q    Mr. Kruger, do you remember any specific conversations?

9  A    Yes, I certainly do.  I don't know that I can give you the

10 dates of them, but I certainly do recall having conversations

11 with Mr. Shelnitz individually, one-on-one, in which I informed

12 him that as a result of phone calls that I was receiving from

13 holders of the bank debt that they were anticipating receiving

14 default interest and that they also informed me that the bank

15 debt was trading in the marketplace at a price which reflected

16 the understanding and expectation of the persons holding that

17 debt that they would receive default interest in these

18 proceedings.

19 Q    Just so we try to be a little more precise on the record,

20 do you recall when you first said that to Mr. Shelnitz?

21 A    Certainly by the spring of 2007 and I believe perhaps a

22 little earlier.

23 Q    Is there any particular reason you think it's that date?

24 A    I think that the calls that we started to receive at the

25 office from holders of the bank debt informing us as I just

1    said that they're anticipating receiving default interest in

2    these proceedings and that the debt was trading at a price that

3    indicated that the marketplace expected them to be receiving

4    default interest, I believe that those calls began sometime

5    after the decision by the Circuit Court in the <u>Dow Corning's</u>

6    proceeding which gave rise to a belief on the part of the

7    holders of the bank that their entitlement now was to default

8    interest.

9    Q    Now, Mr. Kruger, did there come a time when Mr. Shelnitz

10   advised you that the debtors were engaging in settlement

11   discussion with other constituencies in these cases to resolve

12   the personal injury asbestos liability?

13   A    Yes, he did so advise me.

14   Q    Do you recall -- I'm sorry.

15   A    He did so advise me.

16   Q    Do you recall generally when that occurred?

17   A    Probably the early part of 2008.

18   Q    Did the creditors committee participate in those

19   negotiations?

20   A    No, we did not.

21   Q    Why not?

22   A    We suggested -- I suggested to Mr. Shelnitz that we should

23   participate in those negotiations and I wanted to be present

24   for them to set forth the claims of the holders of the bank

25   debt as well as the other claimants in the unsecured creditor

1  community.  Mr. Shelnitz thought that he would be able to carry

2  our water, so-to-speak, in that he was going to negotiate a

3  plan with the PI committee.  So we were not invited.

4  Q    During that period of time, what, if anything, did you

5  tell Mr. Shelnitz about what you believed to be the

6  expectations of holders of bank debt to receive default

7  interest?

8  A    I told Mr. --

9         MR. BERNICK:  Again, if we can have a specific

10 conversation.

11 Q    Can you recall a specific conversation?

12 A    Without date, yes, I can certainly recall a specific

13 conversation in which I informed Mr. Shelnitz that if Grace

14 expected to have the bank debt holders vote in favor of any

15 reorganization plan that they might offer that that plan would

16 need to provide for default interest for the bank debt holders,

17 and that in addition to that, that regardless of the view that

18 the committee might hold, the committee doesn't vote, it would

19 be the bank debt holders that ultimately voted on the plan.

20 Q    Did you ever tell Mr. Shelnitz that the committee would

21 support the plan that was documented in the April 2008 term

22 sheet?

23 A    No, I did not.

24        MR. PASQUALE:  Your Honor, may I approach the

25 witness?  Just for the record, I've just given the witness the

1  binder used by Mr. Bernick with Mr. Tarola and Mr. Shelnitz

2  this morning.

3           THE COURT:  Excuse me one minute.

4           MR. PASQUALE:  I'm sorry, Your Honor.

5           THE COURT:  Okay, I have it.  Thank you.

6           MR. PASQUALE:  Okay.

7  Q    Mr. Kruger, can you turn to what is in evidence as Plan

8  Proponents' Exhibit 344.

9  A    Yes, I have that.

10 Q    And that should be an email from Mr. Shelnitz dated April

11 3rd, 2008?

12 A    Correct.

13 Q    Do you recall receiving that email?

14 A    Yes, I do.

15 Q    Do you recall having a discussion with Mr. Shelnitz on the

16 date of that email?

17 A    I believe we did speak on that day.

18 Q    Do you recall -- what, if anything, do you recall about

19 that conversation?

20 A    I told him that I hoped that the negotiation that he was

21 having were going to result in both the resolution of the PI

22 claims, but also that they would provide for default interest

23 if they anticipated receiving the votes of the bank debt

24 holders.  Otherwise they would not receive those votes.

25 Q    Email also says that Mr. Shelnitz will be available the

1  following day.  Do you recall a subsequent discussion with Mr.

2  Shelnitz with respect to the term sheet?

3  A    I believe we had two conversations.  One on that day and

4  one the following day in which I said essentially the same

5  things to Mr. Shelnitz.

6  Q    Let me ask you to turn to what's in evidence as Plan

7  Proponents' Exhibit 284.

8  A    Yes.

9  Q    And that should be our colleague Ms. Krieger's email to

10 Mr. Shelnitz and I believe you're copied on it.

11 A    Yes.

12 Q    Okay.  What was the purpose -- well, withdrawn.  Do you

13 recall discussing with Mr. Shelnitz -- did you discuss with Mr.

14 Shelnitz that the provision in the term sheet for treatment of

15 general unsecured claims would need to be amended if he

16 expected to have the support of the bank debt holders?

17 A    Yes.

18        MR. BERNICK:  Objection.  Leading.

19        MR. PASQUALE:  Did he, Your Honor.

20        THE COURT:  It is a did he, but it does assume.

21        MR. PASQUALE:  Fine.

22 Q    What do you recall -- you have the email in front of you.

23 A    Yes.

24 Q    What do you recall discussing with Mr. Shelnitz --

25 A    We had discussed --

1  Q    -- with respect to the subject of the email?

2  A    We had discussed with Mr. Shelnitz both prior to this

3  email and right at the time of this email that we thought that

4  it was appropriate that if there was going to be a prospect of

5  having the unsecured creditors committee support this plan that

6  there needed to be a provision in the plan that allowed

7  individual creditors to seek redress from the Court with

8  respect to what they believe was appropriate interest rates for

9  them to receive.  We had suggested that there were similar

10  provisions in the USG plan and that this was a model that ought

11  to be followed in the Grace plan.

12  Q    And in fact was that language added to the term sheet?

13  A    No, it was not.

14         MR. PASQUALE:  May I just have a moment, Your Honor?

15  I have nothing further.  I pass the witness.

16         THE COURT:  Mr. Bernick.

17         MR. BERNICK:  Good afternoon, Mr. Kruger, how are

18  you?

19         THE WITNESS:  Good.  Thank you, Mr. Bernick.

20                      CROSS EXAMINATION

21  BY MR. BERNICK:

22  Q    I believe you just testified that essentially in the

23  course of the negotiations that Grace was undertaking that

24  resulted in the term sheet, I think your words were that you

25  were expecting -- you volunteered to participate, Mr. Shelnitz

1  said, no, better that you not.  And then you went on to say, I

2  think your words were that you were expecting that Grace would,

3  "Carry our water."  Do you recall that testimony just a moment

4  ago?

5  A    Yes, I do.

6  Q    Isn't it a fact that Mr. Shelnitz, in negotiating, did not

7  have your authority to negotiate on behalf of the bank lenders

8  or any of the other folks represented by your committee?

9  A    He certainly was not authorized to negotiate on behalf of

10 the committee, but on the other hand, he was certainly advised

11 that if he wanted to get the bank debt holders to vote in favor

12 of the plan he would have to have default interest as part of

13 the arrangements.

14 Q    I really just asked you the first part of that question.

15 Isn't it a fact that Mr. Shelnitz had no authority to negotiate

16 on behalf of bank lenders or any of the other folks represented

17 by your committee?

18 A    That's correct.

19 Q    And therefore when it came to the actual negotiation

20 process, Mr. Shelnitz and Grace were not in fact carrying the

21 water of your constituency, correct?

22 A    That's correct.

23 Q    And isn't it also true that not only is that the case, but

24 there is nothing -- if you wanted to make sure that your view

25 was being represented, that is the view of your constituency

Kruger - Cross/Bernick                                  206

1  was being represented there was nothing that stopped you from

2  picking up the telephone and telling others besides Mr.

3  Shelnitz that the bank lenders were going to insist on default

4  interest, isn't that correct?

5  A    That's correct.

6  Q    You never did that, did you?

7  A    No.

8  Q    Now, you also testified just a moment ago that there are

9  actually two conversations that you had with Mr. Shelnitz

10 during the period of time that surrounded your receipt of that

11 term sheet, do you recall that?

12 A    Yes, I do.

13 Q    And in fact, pursuant to questions by Mr. Pasquale you

14 testified specifically about a conversation that took place

15 just when the term sheet was received, and a further

16 conversation that took place after that was received, correct?

17 A    Yes.  Both after they were received.

18 Q    Both after they were received, but you have a distinct

19 recollections of both discussions, correct?

20 A    Yes.

21 Q    Isn't it true that on September 2, 2009, which was just a

22 few weeks ago, he testified as follows about that very same

23 period of time.  I asked you about going back to Page 67 --

24          UNIDENTIFIED ATTORNEY:  Excuse me.  Mr. Bernick, what

25 page?

1            MR. BERNICK:  Page 67.

2            UNIDENTIFIED ATTORNEY:  Thank you.

3  Q    I said, "Let me go back to the conversation that you said

4  you've had or conversation or conversations you had with Mr.

5  Shelnitz in the period immediately after getting the term sheet

6  for the deal that is now reflected in the plan.  And we

7  pinpointed that as roughly April 3 and April 4.  Does that

8  square with your recollection"?  "Yes."

9  "Q    How many conversations did you have with Mr. Shelnitz?

10 "A    I don't recall.  One or two, maybe.  We are talking about

11 the days immediately after the term sheet?

12 "Q    Yes."

13            You said, "I would guess one or two."  And I then

14 said -- I don't reiterate the question.

15 "Q    In the period of time before there was a signed executed

16 term sheet how many conversations, if any, do you actually

17 recall having with Mr. Shelnitz?"

18            And your answer at that time was, "I don't recall.

19 My guess is one or two."  Was that your testimony?

20 A    Yes, it was.

21 Q    Is it also true that you don't really recall precisely

22 what you said to him, but you then went on to say, "I'm sure

23 that I said to him that the bank debt holders were looking for

24 default interest and a term sheet that didn't provide would be

25 opposed by them."  You don't recall precisely what was

1 discussed, correct?

2 A    Yes.  If your question was what actually --

3 Q    I'm sorry, Mr. Kruger.  Please.

4 A    I'm answering the question.

5 Q    It's a very specific question.  Isn't it true that you

6 don't recall precisely what was discussed with Mr. Shelnitz in

7 those one or two conversations?

8 A    No, that's not true.

9 Q    I want to go back perhaps in a little bit more orderly

10 fashion, and I'll try to get through this as quickly as I can,

11 to the basic sequence that we have here to see what it is that

12 you and Mr. Shelnitz actually disagree about at the end of the

13 day.  So the amended plan that first contained a provision

14 regarding post-petition interest that had been negotiated by

15 you very ably leading your committee.

16         MR. BERNICK:  And let me stress to the Court and Mr.

17 Kruger, our position is not about Mr. Kruger's integrity or the

18 skill with which he performs his job, we totally endorse the

19 idea that we've always had a good relationship with his

20 committee and with Mr. Kruger in particular.  That is not the

21 subject of our position.

22 Q    But that the plan that first provided for a rate of post-

23 petition interest that had been negotiated, was a plan that was

24 filed in early 2005.  Do you recall that?

25 A    Yes, I do.

1  Q    Okay.  And then so we go '05, '06, '07, '08.  And that

2  plan was a plan, can we agree, which contemplated that equity

3  would get value.  Is that correct?

4  A    I think that's right.

5  Q    Okay.  And is it true that at all times since 2005 the

6  plans that Grace and that your committee were prepared to

7  support were always going to be -- were in fact plans that

8  would provide value to equity?

9  A    Correct.

10  Q    Is it also true that this letter then got put together,

11  and in connection with drafting the plan that was going to

12  provide value to equity, that it was very important for Grace

13  to get the support, in your view, it was very important for

14  Grace to get the support of the unsecured creditors.

15  A    Grace thought so, obviously.

16  Q    That's right.  And you on behalf of your committee

17  recognized that Grace really wanted your support, correct?

18  A    Surely.

19  Q    So when I say you, in the sense of you and your committee.

20  A    Yes.

21  Q    And in fact not just the committee, it was very important

22  for Grace, and you received repeated discussions and inquiries

23  from Mr. Shelnitz asking whether you, as counsel, Stroock as

24  counsel to the committee, would support one position or

25  another, correct?

1  A    I think we're talking about 2005.  I'm not sure Mr.

2  Shelnitz was involved in those conversations.

3  Q    Okay.  Well, that's true, but both before and since Mr.

4  Shelnitz came on board, your views were views that as expressed

5  to you by representatives of Grace, were important views from

6  their point of view in making sure that they got the support of

7  the committee.

8  A    Yes.

9  Q    All right.  Now, Grace sought the support from the

10 committee to -- in connection with the -- what was to be the

11 amended plan of '05, and Grace was successful in obtaining an

12 agreement for that support, correct?

13 A    Correct.

14 Q    Okay.  Now, that agreement, that letter agreement

15 therefore, no question about it, that letter -- we'll call it

16 the '05 letter, no question but that that letter in your view

17 bound the debtor W.R. Grace, correct?

18 A    Sure.  I think it bound them to file the plan that it

19 filed with that interest rate in it.

20 Q    I'm sorry?

21 A    It bound Grace which filed the amended plan with the

22 interest rate that had been negotiated in it.

23 Q    So no question about it binding agreement with respect to

24 Grace, fair?

25 A    For the moment.  Yes.

1  Q    Well, for as long as the agreement lasted.

2  A    Yes.

3  Q    Okay.  Is it also true, and let me get this straight a

4  little bit, is it also true that under the particular agreement

5  that was reached at this time, the agreement was not the same

6  for all parts of your constituency.  That is, the position that

7  was being articulated by the committee in this letter was not a

8  position that was uniform with respect to all of the different

9  creditors who were part of the unsecured creditors

10 constituency, correct?

11 A    That's correct.

12 Q    So there are some matters, for example, creditors

13 committee says exclusivity should be terminated.  That's a

14 matter of general interest or general importance to the

15 creditors as a whole when that position is taken, right?

16 A    Yes.

17 Q    And yet, there are other matters that are not of so much

18 of general interest to the committee as they are of more

19 specific interest to different creditors within the

20 constituency, right?

21 A    Yes.

22 Q    In fact, we've seen in this case how particularly Mr.

23 Speights and others have taken the view that when it comes to

24 claims -- matters that pertain to their clients specifically,

25 that they, not the committee, represents their clients in

1  connection with those claims.  You've seen that position taken

2  in this case.

3  A    Yes.

4  Q    And that's also been done in connection with the personal

5  injury constituency when it came to matters that were specific

6  to their claims.  We have seen, for example, the Libby

7  claimants have their own counsel, right?

8  A    Yes.

9  Q    Okay.  But when it came to the question of the particular

10 rate of default -- the particular rate of post-petition

11 interest that members of your constituency were insistent upon

12 getting as a condition for supporting the plan, that issue, the

13 pendency interest issue was an issue that was specific to

14 different lenders within the group, fair?

15             MR. PASQUALE:  Objection to the form, Your Honor.

16 A    I'm not sure I understand the --

17             THE COURT:  Wait.  I'm sorry, I have an objection.

18 That's sustained.

19             MR. PASQUALE:  Different lenders, I think, Mr.

20 Bernick means different creditors.

21             MR. BERNICK:  Different creditors.  Yes.

22 Q    But when it came to post-petition interest, that was an

23 issue where the positions being taken by the creditors within

24 the group, differed depending upon their particular claims,

25 correct?

1  A    Correct.

2  Q    And so really when the committee was negotiating on behalf

3  of the creditors with regard to post-petition interest, they

4  were negotiating with respect to an issue that was creditor

5  specific, correct?

6  A    Both as to the bank debt holders as well as to the other

7  general unsecured creditors.  Yes.

8  Q    Yes.  So we end up, in fact, with a situation where the

9  committee is effectively negotiating something that affects

10 different creditors within the class differently.  Is that a

11 fair statement?

12 A    Yes.

13 Q    Okay.  So, for example, the debt holders they ended up

14 with the highest rate of interest, correct?

15 A    Correct.

16 Q    The people who were not debt holders, but were unsecured

17 creditors who had contracts, they ended up with the contract

18 rate.

19 A    Correct.

20 Q    And then everybody else who wasn't one of the heavies, I

21 mean, after all it's the debt holders, they're the heaviest

22 constituency within the group, correct?

23       MR. PASQUALE:  Objection, Your Honor.

24 A    But that's not the issue.  The issue is that they had

25 contracts which gave them certain rights they believed and we

**J&J COURT TRANSCRIBERS, INC.**

Kruger - Cross/Bernick                              214

1  believed those rights existed as well.

2  Q    All the more.  So that effectively this is an issue where

3  different people with different contracts were taking different

4  positions and effectively your committee was really acting as a

5  broker with respect to what they wanted as precondition for

6  agreeing that the committee would support the plan, correct?

7            MR. PASQUALE:  Objection to form, Your Honor.

8  A    I'm not sure I understand the question --

9            THE COURT:  Wait.  I'm sorry --

10 A    -- acting as a broker?  I'm sorry.

11           COURT CLERK:  Mr. Pasquale, I can't hear you.

12           THE COURT:  He's already stated that he needs the

13 question rephrased.

14 Q    This is not a matter of general interest to the unsecured

15 creditors.  This is a matter of interest that is the issue

16 relates to their specific claims and their entitlement to

17 receive money as part of their claims in their view pursuant to

18 their contracts, correct?

19 A    That's true as to the bank debt holders and to others who

20 had claims arising as a result of contracts.

21 Q    Right.  Well, but if they didn't have a contract then

22 their claim is a weaker claim.

23           MR. PASQUALE:  Objection to form, Your Honor.

24           MR. BERNICK:  I'm really getting at a --

25           MR. PASQUALE:  What is a weaker claim?

**J&J COURT TRANSCRIBERS, INC.**

Kruger - Cross/Bernick                    215

1          COURT CLERK:  Mr. Pasquale, you're not recording.

2          MR. PASQUALE:  I'm sorry.

3          MR. BERNICK:  If you -- want me give you a mic, is

4  that easier?

5          THE COURT:  No, the microphone just wasn't on.  Do

6  you want to restate your objection?

7          MR. PASQUALE:  Objection to form.  What is a weaker

8  claim?

9          MR. BERNICK:  Okay.  I'll withdraw it.  I want to get

10  into a somewhat different point.  I think maybe we've already

11  gone over this and I've beaten it too much already.  But this

12  is a situation where in contrast to something like exclusivity.

13  Exclusivity is of general interest in the sense that the issue

14  of exclusivity doesn't attach to the specifics of a claim,

15  correct?

16  A    Yes.

17  Q    Whereas there are other matters that pertain to the

18  specifics of a claim including like the merit of a claim,

19  right?

20  A    Right.

21  Q    And when it comes to post-petition interest in the view of

22  your constituency, post-petition interest was part of the

23  merits of the claim, right?  They said that as a matter of

24  contract they were entitled to it.

25  A    Yes.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    So really in asserting that this constituency, that is the

2  bank lenders, insisted upon a certain rate of interest and you

3  negotiated it effectively as a negotiation pertains to their

4  entitlements based upon the merits of their claim, right?

5  A    Correct.

6  Q    Okay.

7         THE COURT:  Just a second, Mr. Bernick.  Excuse me.

8  I need a very quick recess.  We'll take a five minute recess.

9                        (Recess)

10        THE COURT:  Mr. Kruger, I'm sorry.  Are you ready?

11        THE WITNESS:  Oh, not at all.  Yes, I am.

12        THE COURT:  Mr. Bernick.

13  Q    I think where we left off, Mr. Kruger, was that we had

14  gone over the fact that when the letter agreement was entered

15  into in January of 2005 that was a letter agreement that

16  certainly was binding upon Grace in connection with its

17  existing plan to provide a certain rate of post-petition

18  interest, correct?

19  A    Correct.

20  Q    And I was then turning to well, what about the other side

21  of the equation, what did this mean for the lenders?  And I

22  think where we were was that in contrast to a general issue

23  like termination of exclusivity, the agreement that came out of

24  the negotiations in January of 2005, was an agreement that

25  related to one aspect of the merits of the underlying claims by

1  the creditors within your group, correct?

2          MR. PASQUALE:  Your Honor, at this point I'd like to

3  raise an objection.  I haven't before, but this is way outside

4  of the scope of my direct which really was limited to just Mr.

5  Kruger's conversations with Mr. Shelnitz.  It had nothing to do

6  with anything that Mr. Bernick's been asking him about.  I

7  wasn't going to object, but this has been going on for quite

8  some time now.

9          MR. BERNICK:  Well, the subject matter of these

10 letters most certainly was within the direct scope of the

11 direct examination, and a lot of questions, as a matter of

12 fact, the very specific question that this pertains to is

13 whether Mr. Kruger ever became aware of a direct agreement

14 between Grace on the one hand and the lenders on the other.

15 And what I'm exploring is how did the lenders fit into the

16 agreement that was reached?

17          THE COURT:  All right.  That's fair for now.

18 Overruled.

19          MR. BERNICK:  And I'm going to tie it up pretty

20 quickly.

21 Q    My point is that I think the question to you, Mr. Kruger,

22 is whether the negotiation in connection with the letters

23 related to one aspect of the merits of the underlying claims.

24 That is pendency interest was to the mind of at least certain

25 of the lenders something that was a function of their contract,

Kruger - Cross/Bernick                                    218

1  correct?

2  A    Correct.

3  Q    Okay.  And so I take it that when it came to the

4  obligation that was being assumed in these letters with regard

5  to post-petition interest, that those discussions were

6  discussions where if you're going to be dealing with something

7  that affects the merit of an underlying claim by your lenders,

8  you wanted and other people on the committee wanted to make

9  sure that they knew that the lenders were in fact going to be

10 able to support the plan that was under discussion, correct?

11         MR. PASQUALE:  Objection, Your Honor.  I'm not clear

12 if Mr. Bernick's question is limited to the lenders.  Of course

13 the agreement was no so limited.

14         MR. BERNICK:  We're going to get to the others in a

15 minute.  For the moment it's the lenders.

16         THE COURT:  All right.  Go ahead, Mr. Kruger, you can

17 answer.

18 Q    If you're going to have discussions that pertain to the

19 merits of the underlying claims by the lenders you certainly

20 want to make sure that before the committee made a commitment

21 with regard to that subject matter that it knew that the

22 lenders were in fact going to be able to support the plan,

23 correct?

24 A    Correct.

25 Q    Okay.  And in fact there would have been no point in

1  executing the letters, the February 2005 letter if the

2  expectation was that the lenders were going to turn around and

3  not support the plan.  That would have been pointless, right?

4  A    That's true.  But you need to remember that the lenders

5  who we were aware of may not have been all the lenders who

6  supportive of the arrangements at that time, you know, were not

7  bound by anything.  They could trade their debt, they could do

8  whatever.  They were not subject to plan support agreements.

9  The passage of time changed the constituency.  So it's hard to

10 know whether or not, you know, that anybody was really bound,

11 if you will, aside from the unsecured creditors committee which

12 was still supportive of the joint plan.

13 Q    I didn't ask you whether the underlying lenders were

14 contractually bound.  That's not my question.  My question is

15 before the committee undertook to enter into an agreement

16 affecting the merits of the underlying claims, whether it was

17 important that the committee in so doing make sure that the

18 expectation was that those lenders were in fact going to

19 support the plan.

20 A    We believe that was true.

21 Q    We believe that was true.  And in fact there wouldn't have

22 been any point in the lenders signing the agreement -- strike

23 that -- in the committee signing the agreement if the

24 expectation was that the lenders were not going to support the

25 plan.  It would have been pointless, correct?

1  A    That's correct.

2  Q    Okay.  In fact, it would have been misleading to Grace if

3  the letter agreement were entered into without the expectation

4  that the lenders were going to support the plan, correct?

5           MR. PASQUALE:  Objection.  Calls for legal

6  conclusion.

7           THE COURT:  Sustained.  Well, it's speculative.  I

8  don't know how could he know what's misleading to Grace?

9  Q    Well, you certainly would have -- I don't think it's

10 difficult.  Mr. Kruger, you certainly didn't want the letter to

11 mislead Grace about the expectations of lender support, did

12 you?

13 A    Certainly not.

14 Q    Okay.  In that same vein if you didn't expect lender

15 support based upon all the contacts that had taken place with

16 the lenders, if you didn't support it the letter would be

17 misleading to Grace, correct?

18           MR. PASQUALE:  Objection, Your Honor.  Same

19 objection.

20 Q    As you understood it.

21           MR. PASQUALE:  We also don't have any time frame on

22 these questions.

23           MR. BERNICK:  This is all 2005 in connection with the

24 2005 letter.  That's what it's all been about.

25           MR. PASQUALE:  Thank you.

1          THE COURT:  All right, you may answer.

2  Q    Can you answer the question, Mr. Kruger?

3  A    I'm sorry.  You want to try it again?

4  Q    The question is whether to execute this letter with Grace

5  in 2005 where there wasn't an expectation of lender support

6  would have been misleading, correct?

7          MR. PASQUALE:  That's the same objection, Your Honor.

8          THE COURT:  It's asking for a legal conclusion.

9          MR. BERNICK:  Your Honor, I'm not asking for a legal

10  conclusion at all.  I'm asking for a very commonsense word,

11  misleading.  Factually misleading.  Element of a burden --

12  element of proof.  Misleading.

13          MR. PASQUALE:  And as the Court correctly noted it's

14  speculative.

15          MR. BERNICK:  Well, no, I'm asking about the

16  substance of the letter.

17  Q    Isn't it a fact that this letter effectively represented

18  to Grace that the lenders in fact would support the plan that

19  was then being filed?

20  A    Yes.  With the caveat, as I understand it, that it's a

21  temporal event.  It may apply to some lenders.  Maybe not all

22  are supportive.  And that if Grace wanted the support of the

23  lenders it should seek plan support agreements.

24  Q    I didn't ask for your counsel with respect to what Grace

25  should do.  I'm asking whether the letter -- all about Grace in

1 a minute.  What the letter did was to represent that -- to

2 Grace that the expectation was in fact for lender support,

3 correct?

4 A    I don't think the letter actually ever says that.  But I

5 think that Grace was entitled to think that the committee was

6 supportive of the 6.09 percent interest as an appropriate

7 recovery for interest for the creditors.

8 Q    Again, it wouldn't make any sense for the -- to have Grace

9 have the impression that the committee was supportive if the

10 lenders were not, would it?

11          MR. PASQUALE:  Objection, Your Honor, asked and

12 answered many times.

13          THE COURT:  He had --

14          MR. BERNICK:  No, I don't think I've got an answer.

15 Q    I think this is very, very simple.  They've introduced the

16 idea that somehow the lenders are out there and it's kind of

17 oh, well, we'll see what happens.  And the very distinct

18 representation that is made in this document is in fact that

19 because the commitment is being made Grace is being told, yes,

20 we expect the support is going to be there.  True or not, Mr.

21 Kruger?

22 A    The letter itself does not say that, and the letter only

23 says that the committee will support a plan that provides that

24 level of interest.

25 Q    Okay.  So you think that -- you expected that when this

Kruger - Cross/Bernick                                    223

1 letter was sent to Grace it carried with it no expectation

2 whatsoever --

3 A    I didn't say that.

4 Q    Okay.  Well, then that's my point.  You expected at the

5 time because you made the inquiries, the committee expected at

6 the time that the lenders would be supportive of the plan.

7 True or not?

8 A    That's true.

9 Q    And certainly you wanted through this letter and the

10 committee wanted to tell Grace the same thing as your

11 expectation.  True or not?

12 A    That's correct.  With all of the conditions that were in

13 the letter we expected that the lenders would support them.

14 Q    Okay.  And the conditions in the letter included the

15 question of how long it was going to last, right?

16 A    Correct.

17 Q    And this was a letter that although you could withdraw,

18 did not have some discreet point in time that actually ended

19 the letter, did it?

20 A    That's correct.

21 Q    So for so long as that letter was out there, the '05

22 letter was out there, again, the expectation was, that was

23 being conveyed was that there would be lender support.  True or

24 not?

25 A    True.

1  Q    Okay.  Now, when we get to 2006 we have a new letter, do

2  we not?

3  A    Yes, we do.

4  Q    And a letter basically comes out in '06 and that also was

5  a binding agreement, was it not?

6  A    Well, I'd like to think so, although I notice that the

7  exhibit itself is not signed by Jan Baer on behalf of Kirkland

8  & Ellis, but I presumed it was binding on Grace.

9  Q    I think everybody probably regarded it that way right?

10 You certainly heard that both Mr. Shelnitz and Mr. Tarola

11 regarded it as binding, correct?

12 A    Yes, they did.

13 Q    And they acted and they relied upon it, right?

14 A    Yes.

15 Q    Yes.  So the '06 letter comes out, and isn't it true that

16 the '06 letter actually reflects an enhancement that the result

17 of the letter is an enhancement to the rate of interest that's

18 going to be paid for post-petition interest, correct?

19 A    At that time.  That was correct.

20 Q    At that time.  And isn't it also true that this letter,

21 too, by virtue of being sent to Grace, represented the

22 committee's expectation as conveyed to Grace that in fact the

23 lender support would be there for the plan, correct?

24 A    Correct under the circumstances of the letter and

25 recognizing that times change.

Kruger - Cross/Bernick                    225

1  Q     Times can change.  But in fact that letter just like the

2  '05 letter would have that element of representation to it

3  until it was withdrawn, correct?

4  A     That's true.  But at the same time it's also important for

5  the --

6  Q     Could you just --

7  A     Sure.  Yes.

8  Q     The answer is yes.  And that letter actually remained out

9  there with that implicit representation all the way through at

10 some point in 2008, correct?

11 A     That's not correct.

12 Q     Okay.  Well, did you ever withdraw.  At any time did the

13 committee state it was exercising its rights under the '06

14 letter and withdrawing from that letter all the way up to the

15 time that the term sheet was distributed?

16 A     No.

17 Q     Okay.  Now, I want to then ask you some further questions

18 about what actually took place during -- I want to go from '06

19 to '07.  So we're now a year after.  In '07 there was no effort

20 to change the terms of the letter, correct?

21 A     Correct.

22 Q     There was no termination of the letter, right?

23 A     Right.

24 Q     There was no enhancement.  It was status quo, right?

25 A     With respect to the letter itself --

1  Q    With respect to the letter itself.

2  A    Yes.

3  Q    Now, when it came to the -- what was going on during this

4  period of time beginning in '07 it started to become a pretty

5  intense period in terms of the estimation process, correct?

6  A    Correct.

7  Q    And the estimation process was one in which the plan

8  proponents were going arm and arm to do battle with our able

9  adversaries, correct?

10 A    That's right.

11 Q    Okay.  In '07 you said you had this conversation with Mr.

12 Shelnitz.  Do you recall that?

13 A    Yes.

14 Q    Now, I listened very carefully to the content of those

15 discussions that you had with Mr. Shelnitz, and I heard a word

16 that was an important word because it was a word that you've

17 used frequently before in talking about these discussions.

18 These discussions took place in the spring of '07.

19 A    They started then or maybe earlier.

20 Q    Maybe earlier, but I think in your deposition you said,

21 look, it may have been earlier, but I'm pretty sure it was

22 certainly by the spring of '07, right?

23 A    Correct.  Yes.

24 Q    And in those discussions you represented to Mr. Shelnitz

25 that holders, holders of bank debt were expecting default

1 interest if they were to support an ultimate plan.  That's the

2 word that you used, right?

3 A    Yes.

4 Q    In fact, in your declaration that you provided to the

5 Court in connection with this matter that's exactly the same

6 word.  Holders of the bank debt, right?

7 A    Correct.

8 Q    Okay.  And so we're very, very clear that that is the

9 essence of what you told Mr. Shelnitz in terms of the actual

10 information that you had received from lenders was that holders

11 of bank debt wanted default interest, right?

12 A    Is there a distinction in your mind between lenders and

13 holders?

14 Q    No.  But there's a distinction in my mind --

15 A    I'm not understanding the question.

16 Q    -- between saying holders and saying a majority of

17 holders.

18 A    I'm happy to comment on that if you'd like.

19 Q    No.  I'm going to give you a question.  Okay?

20 A    Ask away.

21 Q    Isn't it a fact that you didn't know that there were a

22 majority of holders who would insist upon default interest,

23 correct?

24 A    In that same sentence --

25 Q    No, I'm sorry.

Kruger - Cross/Bernick                              228

1  A     -- that you just quoted to me --

2  Q     Excuse me.   The next question that I'm asking you --

3           MR. PASQUALE:   Mr. Bernick's interrupting the

4  witness, Your Honor.

5           THE COURT:   No.   He hasn't answered yes or no.

6  Answer yes or no, Mr. Kruger.   You can explain your answer.

7  Q     Isn't it a fact that you did not in fact know that there

8  was a majority of holders who would oppose, who would insist

9  upon the default rate, isn't that true?

10  A     No.

11  Q     That's not true?

12  A     When I use the word --

13  Q     I'm just saying.   Did you or did you not know that there

14  was a majority of holders who would oppose the plan if there

15  weren't default interest?

16  A     No, in the sense that I polled them all, no, in the sense

17  that I surmise it to be true.   I'm not sure how to answer that

18  question.

19  Q     You answered it at the deposition, didn't you?   Page 29.

20  "Q     Well, that began a different proposition.   You didn't know

21  that there was a majority out there to oppose the plan,

22  correct?   And your answer was, "A   I surmise that there was."

23  A     Yes.

24  Q     And I said let's be specific.

25           MR. PASQUALE:    -- improper use of the deposition,

**J&J COURT TRANSCRIBERS, INC.**

1 Your Honor.  He's being inconsistent here.

2         MR. BERNICK:  I'm sorry.

3 Q    And then you went on to say, "Let's be specific."  You

4 didn't know that there was a majority.  You said I didn't know,

5 correct?

6 A    Correct.

7 Q    And therefore you did not state to Mr. Shelnitz that in

8 fact you knew that there was a majority of holders that would

9 oppose the plan.  You never said that specifically to Mr.

10 Shelnitz.

11 A    No, what I said instead was that holders --

12 Q    No, I didn't ask you what you said instead.  I said you

13 never said that to Mr. Shelnitz, correct?

14 A    Correct.  I did not use the word majority.

15 Q    And in fact you never said that the committee would oppose

16 a plan that contained default -- didn't contain default

17 interest, correct?

18 A    That's correct.

19 Q    In fact, you never said that Stroock would advise the

20 committee to oppose a plan that didn't provide for default

21 interest, correct?

22 A    I don't think I can answer that question because that's

23 privileged.

24 Q    Well, you had no problem answering it in the deposition.

25 A    I'll answer it again if that's if I did there.

1  Q    Right.  And the fact is you never told Mr. Shelnitz that

2  the committee would oppose it, correct?

3  A    Correct.

4  Q    You never told Mr. Shelnitz that even JP Morgan the chair

5  of the committee would oppose it, correct?

6  A    I don't know how to answer that since I don't speak on

7  their behalf.

8  Q    I'm just asking what it is that you told -- what it is --

9  an aspect of what your conversation with Mr. Shelnitz.  You

10  never told Mr. Shelnitz that JP Morgan would oppose a plan as

11  chair of the committee.  Would oppose a plan that didn't

12  provide for default interest, did you?

13        MR. PASQUALE:  Objection to form.  Lacks foundation.

14  I don't know how JP Morgan opposes as chair of the committee.

15        MR. BERNICK:  I just asked whether -- a very factual

16  question.  That the position was --

17        MR. PASQUALE:  In its capacity as chair of the

18  committee?

19        THE COURT:  The form of the question is incorrect.

20  You need to restate the question.

21  Q    JP Morgan was chair of the committee, true or not?

22  A    True.

23  Q    You never told Mr. Shelnitz that JP Morgan as chair of the

24  committee would oppose a plan that didn't provide for default

25  interest, did you?

1  A    I did not.  But I did tell Mr. Shelnitz --

2  Q    We know what you told Mr. Shelnitz because you testified

3  to it on direct examination, Mr. Kruger.  You don't have to

4  testify about it again.  I'm asking you different questions

5  about things you didn't tell Mr. Shelnitz.

6  A    Oh, but you're asking questions and not giving me an

7  opportunity to explain what the word holders means.  If you

8  want to use the word you need to know what it means.

9  Q    Well, I think we're already defining what it doesn't mean.

10  So that's my point to you, Mr. Kruger, and let me go on --

11  A    No, I don't think that's correct.  I think that your

12  definition --

13          THE COURT:  Gentlemen, we're not going to argue.

14  There's no question.  Your counsel may take care of this, Mr.

15  Kruger.  Mr. Bernick, ask your questions.

16          MR. KRUGER:  Okay.

17  Q    Now, isn't it true that during this period of time you

18  never -- the committee through you, never made a demand on

19  Grace to provide for full default interest otherwise support

20  would be withdrawn, correct?

21  A    Correct.

22  Q    And let's also talk about -- I appreciate that.  I also

23  want to talk about then what was going on as a result of the

24  estimation.  Isn't it true that at the time that the estimation

25  was underway the position that was being taken by the asbestos

1  claimants committee was that Grace was hopelessly insolvent?

2  A    I don't recall.

3  Q    You don't recall we spent two years litigating the scope

4  of the asbestos liabilities?

5  A    They had a view of the asbestos liabilities.  I'm not sure

6  that that led to Grace's insolvency.

7  Q    $6.2 billion wouldn't lead to Grace's insolvency?

8  A    I never heard a valuation of Grace actually.  But let's

9  assume that's correct.

10  Q    I think it would be a safe assumption.  Would you

11  recognize, Mr. Kruger, that at this time when the estimation

12  was taking place, you and other constituencies of Grace, had a

13  common interest.  And the common interest was to have the

14  asbestos liabilities quantified at a level that would not

15  impair full payment of your claims?

16  A    Yes.

17  Q    And is it also true that if in fact the estimation came in

18  high enough that would threaten full payment of your client's

19  claims?

20  A    Yes.

21  Q    Okay.  And therefore, isn't it true that it was of

22  critical importance to the unsecured creditors committee that

23  there be a united front between Grace and the unsecured

24  creditors in engaging with the other constituencies about the

25  value of the personal injury claims?

Kruger - Cross/Bernick                          233

1 A    Yes.

2 Q    And the fact was that to break that alliance, to break

3 that alliance, was a situation where the unsecured creditors

4 had too much to lose, correct?

5 A    No.

6 Q    Oh.  So if you -- it was not part of your strategy to

7 maintain the united front because your clients were at risk if

8 the alliance broke down?

9         MR. PASQUALE:  Objection, Your Honor, that calls for

10 attorney/client privilege.  He's asking for strategy of Mr.

11 Kruger.

12 Q    Well, actually you told us what the strategy was, right?

13 A    We said we were --

14         MR. PASQUALE:  Well then, let's limit it to that.

15 Q    Isn't it true that you actually had a strategy that drove

16 your decision not to make a demand, not to seek enhancement,

17 and not to terminate the letter?  You had a strategy.

18 A    Correct.

19 Q    And the strategy was to make sure that the front that was

20 maintained, the alliance was maintained between the debtor and

21 your committee because the other constituencies had much to

22 lose if the asbestos claimants were successful in the

23 estimation, true?

24 A    That's true, but the too much to lose was the problem with

25 the question.

Kruger - Cross/Bernick                    234

1  Q    Okay.   I'll say --

2  A    Because I think you would have continued on with the

3  estimation process and probably been successful with it.

4  Q    Well, I appreciate that vote of confidence.   But in point

5  of fact your own strategy was not to take the risk, not to take

6  the risk that a debate about rate of interest would break up an

7  alliance that was important to your constituency because they

8  were at risk if the estimation were lost, true?

9  A    Correct.

10  Q    Now, as we go forward into '08, at that point the

11  negotiations began in earnest in early '08, correct?

12  A    Not that I was aware of.

13  Q    Well, there are actual reports in open court in connection

14  with the estimation process that there were negotiations that

15  were commencing both at the start of trial and that were going

16  to continue during the recess, don't you recall that?

17  A    Oh, I'm sorry.   I take that back.   Yes.   That's correct.

18  Q    So we're sitting here and we're now going to the point of

19  trial and the negotiations intensify, right?

20  A    Early '08?

21  Q    Early '08.

22  A    I believe so.

23  Q    Well, you testified to it on direct examination, don't you

24  recall, that you had discussions with Mr. Shelnitz about

25  whether you all should directly participate in the

1  negotiations, right?

2  A    Yes.

3  Q    And those negotiations were the negotiations that were

4  taking place in the face of a trial, correct?

5  A    Correct.

6  Q    Okay.  Now, as those negotiations were taking place, I

7  think we've already established that you, at some point in the

8  past, had actually done direct negotiations with

9  representatives of the asbestos claimants over the recovery for

10 your clients.  There had been historically direct negotiations,

11 correct?

12        MR. PASQUALE:  Objection, Your Honor.  That misstates

13 the testimony from this morning.

14        MR. BERNICK:  Okay.  Well, then I'll just ask him

15 flat out.

16        MR. PASQUALE:  There's no such evidence.

17 Q    Isn't it a fact that prior to '08 at some point in the

18 last prior two years, there had been a process where you

19 actually sat down with Mr. Inselbuch to talk about what it is

20 that your clients could recover on a consensual basis with

21 them, correct?

22 A    I don't recall that.

23 Q    You don't recall?

24 A    I know we had a mediation, but I don't recall direct

25 negotiations between ourselves -- myself and Mr. Inselbuch.

**J&J COURT TRANSCRIBERS, INC.**

1 Q    You don't recall actually standing before -- hearing Mr.

2 Inselbuch talk about the negotiations with you that had not

3 come to fruition?

4 A    I don't recall that.  Sorry.

5 Q    Okay.  In any event there's nothing that stopped you from

6 participating directly in the negotiations again, fair?

7 A    Fair.

8 Q    Okay.  As the discussions proceeded though isn't it true

9 that once again during this period of time all the way up to

10 the point where the term sheet came out there was no

11 termination of the letter, the February '06 letter, correct?

12 A    Correct.

13 Q    There was no effort to get enhancement, correct?

14 A    Not correct.

15 Q    Oh, I'm sorry.  There was no renegotiation of the terms of

16 the letter, correct?

17 A    That's correct.

18 Q    And there was no demand that was made, correct?

19 A    Correct.

20 Q    Again, isn't it true that all the way through the process,

21 particularly because the issue is now on trial, the strategy as

22 you've discussed it, the strategy that the committee had was to

23 maintain a consolidated, unified front because if the

24 estimation were lost there was much to lose for your

25 constituency, correct?

1 A    Correct.

2 Q    Now, isn't it at this point in time that -- I want to ask

3 you whether you agree with some things.  Have you read the

4 deposition of Mr. Frezza who's your expert on this?

5 A    No.

6 Q    Well, I'll read you a couple things and just ask you

7 whether you agree with his assessment of what was happening at

8 this point in time.

9      MR. PASQUALE:  Your Honor, this is way beyond the

10 scope of direct.

11      MR. BERNICK:  It isn't.  It bears directly on exactly

12 what it is that the committee was doing during this period of

13 time and exactly why they took the position that they did.

14      MR. PASQUALE:  This is reading Mr. Frezza's

15 deposition?

16      THE COURT:  I'm a little --

17      MR. PASQUALE:  I didn't ask Mr. Kruger anything about

18 Mr. Frezza.

19      THE COURT:  No, you didn't.  I think you can ask a

20 direct question.  But he hasn't read the deposition so I don't

21 think that's appropriate at this point.

22 Q    Well, let me just ask you.  Depending upon how that trial

23 worked out isn't it true that the result that Grace might not

24 be found, but the result could mean that Grace was solvent or

25 Grace was insolvent, true?

1  A    That's true.

2  Q    And therefore during this period of time where you

3  decided, your committee decided not to terminate the letter,

4  not to demand an enhancement was a period during which because

5  of the pending liability issue, Grace was in a zone of

6  insolvency.

7           MR. PASQUALE:  Your Honor, that calls for a legal

8  conclusion.

9           MR. BERNICK:  No.

10          MR. PASQUALE:  I object.

11          MR. BERNICK:  I'm not asking for a legal conclusion.

12          MR. PASQUALE:  That's a term of art as we all know in

13 bankruptcy.

14          MR. BERNICK:  I can't figure out a better way to do

15 it.

16 Q    Where Grace's insolvency was in doubt, correct?

17 A    I think Grace didn't think so, but I think maybe it was.

18 Q    Well, your own assessment was that due to the uncertainty

19 of how the estimates were coming out there was great

20 uncertainty about whether in fact Grace was solvent, true?

21 A    For the world, I always believed Grace was solvent.

22 Q    I understand your belief.  I'm asking you about certainty

23 and uncertainty.  There was a great deal of uncertainty about

24 whether Grace would ultimately be solvent, fair?

25 A    Fair.

1 Q    Okay.  Now the term sheet comes out and you have a call,

2 actually you say two calls with Mr. Shelnitz when the term

3 sheet comes out.  Is it true that during those two calls

4 associated with the term sheet that you did not say that there

5 was a majority of lenders who in fact would vote against the

6 plan?  You never said that to Mr. Shelnitz, correct?

7 A    I believe I've said that by saying that the holders would

8 not vote for the plan.

9 Q    Actually what you said was holders, not the entire group

10 of the holders.  You said, again, there were holders who would

11 vote against the plan, correct?

12 A    I said --

13 Q    That's your word.

14 A    No.  I said holders would vote against the plan.

15 Q    Right.  And therefore you never told Mr. Shelnitz that in

16 fact not just that there were holders who would vote against

17 the plan, but that they would be able to block the plan because

18 they were a majority.  You never said that to Mr. Shelnitz, did

19 you?

20 A    In my mind when I said holders that was a pluralized

21 statement.  Holders in the plural and therefore I meant that

22 holders in the plural, in a plurality of holders would vote

23 against it.

24 Q    You know what, Mr. Kruger, I'll accept that.  I'll accept

25 that.  Is it a fact though what you told Mr. Shelnitz --

1  you didn't tell Mr. Shelnitz that in fact the holders of the

2  debt were going to vote the proposed plan down, did you?

3  A    No.  What I told him was that the holders anticipated

4  receiving default interest and if there was any hope of getting

5  them to vote for the plan they would have to receive default

6  interest since default interest was not forthcoming --

7  Q    You said that before.

8  A    -- the corollary was they would vote against the plan.

9  Q    Oh, the corollary.  But you didn't tell Mr. Shelnitz the

10 corollary, right?  You didn't tell Mr. Shelnitz --

11 A    I did not.

12 Q    -- that in fact there were the votes there to vote down

13 the plan.

14 A    I did not tell him that.

15 Q    I'm sorry?

16 A    I did not tell him that.

17 Q    You didn't tell him that the committee would oppose the

18 plan, did you?

19 A    No, I did not.

20 Q    You didn't tell him that JP Morgan as chair of the

21 committee would oppose the plan, did you?

22 A    I did not tell him that.

23 Q    And you didn't tell him that your own advice to the

24 committee was that the committee should oppose the plan, did

25 you?

**J&J COURT TRANSCRIBERS, INC.**

1   MR. PASQUALE:  Objection, Your Honor.

2   THE COURT:  That's sustained.

3  Q    Isn't it true that even after this term sheet came out

4  there was again, no termination of the February '06 letter?

5  A    That's correct.

6  Q    Isn't it true that even when the term sheet came out there

7  was no demand by the committee for a full default interest,

8  correct?

9  A    Correct.

10 Q    In fact, isn't it true that it wasn't until a hearing

11 months after or weeks -- weeks after the term sheet was

12 actually filed?  It wasn't until a hearing weeks after the term

13 sheet was filed that you finally made the public announcement

14 that the February '06 letter was terminated, correct?

15 A    That's correct, because I thought that it was

16 supererogatory to do that because the plan that was being now

17 followed by the debtor, the plan that we now have in front of

18 us for this hearing, is one that was very different from the

19 plan that originally we had entered into.  The plan that we

20 were co-proponents of was not that plan and therefore it seemed

21 silly to have to say, oh, yes, by the way, we did notice that

22 you filed the plan that was not the plan that we were

23 supporters of.

24 Q    Oh, I see.  Well, okay.  The fact of the matter is,

25 though, that that letter remained in place until it was

1  terminated, right, by its own terms?

2  A    Correct.

3  Q    And, therefore --

4  A    With respect to that plan.

5  Q    With respect -- no, with respect to the -- with respect to

6  that plan, correct?

7  A    With respect to that plan and no other.

8  Q    That plan and no other.  But, if, in fact, the debtor were

9  unsuccessful, the plan -- the debtor and the asbestos claimants

10 were unsuccessful in pursuing the new proposed plan, if you

11 didn't terminate the letter you could still say that the letter

12 was still in place, right?

13 A    I don't think so.  As I understand it and using your

14 analogy before of the executory contract, either it's all or

15 it's nothing.  Either you're the co-proponent of a specific

16 plan.  When that plan does not see the light of day and another

17 plan is present, it's hard to think that that arrangement still

18 attains in any plan forever.

19 Q    Fair enough.  Isn't it true that we repeatedly said in

20 court that you still hadn't terminated the letter --

21 A    And that's what prompted me to actually say the letter is

22 terminated really to make you happy.

23                        (Laughter)

24 Q    If I had known that would've been better.  Okay.  Not an

25 awful lot is going to probably turn at the end of the day when

1 you made the particular announcement, but we're clear that the

2 moment before the term sheet came out these letters -- this

3 letter was still in place, correct?

4 A    Correct.

5 Q    Okay.

6 A    Modified, of course, by all the comments I've made about

7 the interest rate issue.

8 Q    Fair enough.  Isn't it true that there was specific

9 correspondence, as you're aware, regarding the term sheet?

10 There was an email from Mr. Shelnitz, and there was a

11 responsive e-mail from Ms. Krieger, correct?

12 A    Yes.

13 Q    And the responsive letter from Ms. Krieger actually made a

14 proposal for certain language to be included in the term sheet?

15 A    Correct.

16 Q    And it was just adding a proviso, right?

17 A    Yes.

18 Q    That proviso assumed that the term sheet would remain as

19 it was, correct?

20 A    Not necessarily.

21 Q    Well, at least insofar as the interest rate is concerned.

22 A    Well, I think she said these are her initial thoughts and

23 we had discussed this issue prior to Ms. Krieger's e-mail

24 because we had suggested that Grace should look at the USG plan

25 for a provision that enabled individual creditors to seek

Kruger - Cross/Bernick                          244

1  redress for their individual claims.

2  Q    Ms. Krieger didn't say in her e-mail as Mr. Kruger

3  reported, we reject the proposed term sheet insofar as the

4  unsecured creditors are concerned, did she?

5  A    She did not because the unsecured creditors committee had

6  not yet considered the term sheet.

7  Q    I see.  Well, when did the unsecured creditors committee

8  first consider the term sheet?

9  A    I assume at some point during the -- our receipt of it,

10 and probably after they'd been filed with the court.

11 Q    Okay.  That's a piece of information that I wasn't aware

12 of.  At some point, it's about April the 6th, the term sheet

13 gets filed with the report --

14 A    Court.

15 Q    With the court, correct?  Right?

16 A    Yes.

17 Q    Okay.  And isn't it true that all the way up until that

18 point in time you actually then were careful not to get ahead

19 of your committee, and you didn't take a formal position about

20 what the committee would say about the term sheet, fair?

21 A    Correct.

22 Q    I want to kind of go back over this for just a moment, Mr.

23 Kruger.  Isn't it true that before the term sheet between the

24 debtor and the asbestos claimants interests came to be, that

25 your constituency recognized that it was at risk, even with

Kruger - Cross/Bernick                    245

1  respect to principal, that it was at risk to the personal

2  injury constituency regarding the value of their claims, true?

3           MR. PASQUALE:  Objection, Your Honor.  I don't know

4  how the witness can testify to what the entire constituency was

5  thinking.

6           MR. BERNICK:  No, I don't think I asked it.  If I did

7  I didn't mean to and I'll rephrase it.

8  Q    Isn't it true that throughout the period of time all the

9  way up until the term sheet, your committee recognized that its

10 constituency, the unsecured creditors, were at risk to a

11 determination of the asbestos claimants' liability being so

12 high that they'd have to take a haircut on their principal,

13 correct?

14          MR. PASQUALE:  I just want to -- I believe the

15 witness can answer the question.  I just want to be careful to

16 protect the attorney/client privilege here, so just a yes or

17 no.

18 A    Yes.

19 Q    Isn't it true that your committee always wanted to have

20 Grace go forward and, for want of a better term, do battle with

21 the personal injury claimants to get the liability down to the

22 level to reduce the risk to the committee's constituency?  That

23 was an objective, correct?

24          MR. PASQUALE:  I object.  Asked and answered.  We've

25 been through this.

1          THE COURT:  I think we have covered this, Mr.

2    Bernick.

3          MR. BERNICK:  Yes, well, I'm going to get to one

4    point that I want to cover.  I'm sorry if it's taking too long,

5    Your Honor.

6    A    Yes.

7    Q    Okay.  And that that remained all the -- that remained

8    true all the way up until the time that the term sheet was

9    executed, correct?

10   A    Correct.

11   Q    Now, once the term sheet was executed, once the term sheet

12   was executed, isn't it true that the term sheet, if it became a

13   plan, if it became a plan and the plan was confirmed, would not

14   only preserve equity value, but would provide protection

15   against the risk that your committee had been concerned with

16   previously?

17   A    I'm not sure I'm following the question.

18   Q    Yes, once the term sheet was executed --

19   A    Yes.

20   Q    -- if that term sheet became a plan, if the plan was

21   adopted and approved and executed along the lines of the term

22   sheet, that plan would solve the risk issue that your committee

23   had been concerned with, correct?

24   A    That's correct, but recognize that originally that even in

25   the 2005 plan, since there was a recovery by equity, we always

1 believed that Grace was indeed solvent through this process.

2          MR. BERNICK:  Again, I move to strike as not being

3 responsive.

4          THE COURT:  I think it explains his answer.  It's

5 fine.

6          MR. BERNICK:  I'm getting to a point of timing, Your

7 Honor, once again, so I'll try to put it a little bit

8 differently.

9 Q    Before the term sheet came out you've recognized that --

10 your committee recognized that there was a problem with risk,

11 true?

12 A    True.

13 Q    The term sheet, if it was implemented, solved that problem

14 with risk, true or not?

15 A    If the plan that is supported became effective, yes.

16 Q    And isn't it true that the approach that your committee

17 took to dealing with Grace on the interest issue became far

18 more aggressive after the term sheet came out then it had ever

19 been previously?

20          MR. PASQUALE:  Objection to form, Your Honor.

21 A    No.

22          THE COURT:  There was an objection to form, but Mr.

23 Kruger answered, so it doesn't matter at this point.

24 Q    After that term sheet, the lenders were taken care of,

25 they get their principle, they get interest, they get

**J&J COURT TRANSCRIBERS, INC.**

1  post-petition interest, right?

2  A    Taken care of?  I'm not sure what that means.  They didn't

3  think so, obviously.

4  Q    They get their principal -- they get their principal, they

5  get post-petition interest, and they get post-petition interest

6  at a level in excess of the federal judgment rate and the base

7  contract rate, correct?

8  A    But, not at the rate they anticipated receiving.

9  Q    Not at the rate they anticipated, but certainly they would

10 get all those different things, correct?

11 A    They got some of those.  Yes, they got some things.

12 Q    And isn't it true that even when the negotiations broke

13 down before the plan was actually filed, the negotiations broke

14 down between Grace and the unsecured creditors over the

15 interest rate that Grace still put in the plan?  It didn't take

16 the position that all post-petition interest was off the table.

17 It stood by the position that it had taken for years about what

18 the appropriate rate of interest --

19 A    Even though it realizes that was not --

20         MR. PASQUALE:  Your Honor --

21 A    -- going to be satisfactory to the unsecured creditors.

22 Yes, that's true.

23 Q    Thank you.

24         MR. PASQUALE:  Brief redirect, Your Honor.

25         MR. BERNICK:  Yes, I'm done.

1      MR. PASQUALE:  I'm sorry.  I thought you said were,

2  too.

3                  REDIRECT EXAMINATION

4  BY MR. PASQUALE:

5  Q    Mr. Kruger, you started to explain something before Mr.

6  Bernick cut you off.  What did you mean when you used the term

7  "holders"?

8  A    Well, when I use the word I assume that there were

9  numerous holders of the bank debt.  We had heard from and I had

10 heard from several holders of the bank debt telling me that the

11 holders were expecting to get default interest that the debt

12 was trading in the marketplace with default interest.  Now,

13 when I communicated the word holders to Mr. Shelnitz, I use

14 that in the plural.  In my mind that indicated that a majority

15 at the very least of the holders would be opposed to a plan

16 that did not provide them with default interest.  I did not use

17 the word -- I used the affirmative, I guess, which said that if

18 there was any hope to get a plan approved by the bank debt

19 holders it would have to contain default interest.

20 Q    Now, there came a -- did there come a time when a majority

21 of the lenders actually did demand default interest from Grace?

22 A    Yes.  I believe there's a letter of April 20 or 21st.  Got

23 a call from Paul Weiss to the --

24 Q    What year, sir?

25 A    From -- I'm sorry?

**J&J COURT TRANSCRIBERS, INC.**

1  Q    What year?

2  A    Of 2000 -- I guess 2009.  Pardon me.  I take that back.

3  2008.  Within, I guess, three weeks of the -- or two weeks of

4  the unveiling of the term sheet saying that 85 percent of the

5  holders, I think it was roughly that amount, opposed the plan

6  and expected to receive default interest.

7            MR. PASQUALE:  Nothing else, Your Honor.

8            MR. BERNICK:  Just a couple of questions from my desk

9  if I can, Your Honor.

10                    RECROSS EXAMINATION

11 BY MR. BERNICK:

12 Q    You say you assume.  When you described what holders

13 meant, you say you assume.  That was your word just now,

14 correct?

15 A    Yes.  I take my words carefully, and when I say holders I

16 mean the plural holders.  I don't mean some holders.  I mean

17 holders.

18 Q    You mean holders?

19 A    Is that the universe of all holders?  I didn't say all

20 holders.  I said holders.  And in my mind the plural meant the

21 significant amount of holders likely more than a majority.

22 Q    You said -- that's why I kept this note -- these words.

23 You said holders.  Then you said in response to Mr. Pasquale's

24 questions, you assume several.  Those were you words, correct?

25 A    No, I didn't say --

                    **J&J COURT TRANSCRIBERS, INC.**

1  Q    Just now you said you assume.

2  A    I assume that a significant majority would oppose the

3  debtor's plan.

4  Q    You said you assumed several.  Then you said just now

5  significant and then majority.  When you said holders --

6  A    Mr. --

7  Q    -- I just want to know what you knew.

8  A    I'll tell you.

9  Q    Now, I just want to -- I take it when you said assume you

10 never actually went out when you were talking -- before you

11 talked and when you talked with Mr. Shelnitz, notwithstanding

12 all these conversations, you never actually went out to find

13 how many holders had the position that you were expressing to

14 Mr. Shelnitz, correct?

15 A    That's correct.

16 Q    And, therefore,  you didn't know, you didn't know, apart

17 from your surmise or your assumption, you didn't know whether

18 they were a significant, and you didn't know whether they were

19 majority, true?

20 A    No.  When I heard from several holders --

21 Q    Several.

22 A    Right.  That the holders as a group -- and that's what I

23 said in my declaration in case -- you only showed the first

24 word of what was part of the sentence -- I said the creditors'

25 committee professionals are being told by holders of the bank

1 that the holder expected to receive post-petition interest at

2 the default rate, not just the holders that call, but all

3 holders, and it was indicative that the debt was trading in the

4 marketplace at a price indicative of the fact that the trading

5 community and the holders expected to receive default interest.

6 Q    Okay.  You now say you assumed several, and that the

7 several told you that the holders --

8 A    Right.

9 Q    Did we get that right now?

10 A    Mm-mm.

11 Q    So, a) you didn't know how many there were, right?

12 A    Correct.

13 Q    b) when the information came to you that the holders were

14 expecting default interest, even that information from the

15 lenders that you spoke with didn't tell you how many, correct?

16 A    That's correct, but --

17 Q    And that -- I'm sorry -- and that because you didn't know

18 how many, in fact, there were, you never told Mr. Shelnitz

19 either that the number was significant or that it was a

20 majority, true or not?  You never told him that.

21 A    That's not true.  I told them that the holders expected to

22 receive default interest.

23 Q    One last question.  The market information was important

24 to you, right?

25 A    It was what I was being told, yes.

1  Q    Okay.  And that market information was of what vintage

2  when you looked at it?

3  A    I never looked at it, but I was being told by the holders

4  that the market price was such that --

5  Q    Oh, okay.  So, you never actually went out to find out how

6  many holders actually had the position that was being told you,

7  right?

8  A    I would not be able to do that, no.

9  Q    Okay.  You never did it, right?

10  A    Correct.

11  Q    And you never actually -- you certainly had a financial

12  advisor.  You could go take a look at the market information

13  yourself, correct?

14  A    Correct.

15  Q    You never did that either, did you?

16  A    At some point later on, yes.

17  Q    At some point.  At what point?

18  A    I mean, the latter part of 2007, early 2008.

19  Q    Okay.  During the period of time leading up to when you

20  learned that the negotiations were in process, when you learned

21  that those negotiations were in process I take it you never

22  went back out to find out or even ask how many holders actually

23  will insist on default interest, did you?  You never did that,

24  did you, Mr. Kruger?

25  A    I did not do that.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Thank you.  And you never actually went back to find out

2  at what level the debt was trading during that period of time,

3  correct?

4  A    Personally, no, but I was told by the holders who called

5  me who are financial institutions of repute that they were

6  reporting to me that which they believed and knew to be true.

7  And I've been at this a very, very long time.  When I have

8  enough phone calls from enough holders telling me that

9  something is so and that the market price reflects it, I

10  usually tend to believe that it may be true.

11  Q    Nothing had prevented you from calling up your own

12  financial advisor and finding out what the ticker was?

13  A    That's true.

14  Q    Okay.  In fact, isn't it true that during the period of

15  time of the estimation when these negotiations were going on,

16  the actual trades of this debt reflected an expectation of

17  interest that was less than the full default interest, correct?

18         MR. PASQUALE:  Your Honor, now we're going way beyond

19  my redirect.

20         MR. BERNICK:  I'm just asking whether he knows that.

21         MR. PASQUALE:  Don't.

22         THE COURT:  It is beyond the redirect.

23         MR. BERNICK:  I have nothing further.

24         MR. PASQUALE:  Nothing else, Your Honor.

25         THE COURT:  You're excused, Mr. Kruger.  Thank you.

1          MR. PASQUALE:  Your Honor, we have one more witness.

2    I don't know if you want a break or we should just start.

3          THE COURT:  Why don't we take a five-minute recess

4    just to let everybody stretch and then we'll start again.

5                         (Recess)

6          THE COURT:  Mr. Pasquale.

7          MR. PASQUALE:  Thank you, Your Honor.  The creditor's

8    committee and the bank lender group call Robert Frezza.

9                ROBERT FREZZA, WITNESS, SWORN

10                    DIRECT EXAMINATION

11   BY MR. PASQUALE:

12   Q    Good afternoon, Mr. Frezza.

13   A    Hello, Mr. Pasquale.

14   Q    Can you please describe for the Court your education?

15   A    Certainly.  I graduated from Pace University in New York

16   in 1990 -- 1983, excuse me -- with a bachelor of business

17   administration degree.

18   Q    Did you have a concentration while at Pace?

19   A    Yes.  It was a concentration in accounting and finance,

20   and that program was an intensive accounting and finance

21   program designed to prepare students for the CPA exam.

22   Q    And did you take the CPA exam?

23   A    I did.

24   Q    And are you a CPA?

25   A    I am a CPA.

1 Q    Are you a member of any professional organizations?

2 A    I'm a member of the American Institute of Certified Public

3 Accountants, as well as the American Institute of Restructuring

4 Advisors.

5 Q    Can you please describe your professional experience

6 starting with your graduation from the Pace University

7 accounting program?

8 A    Certainly.  I spent my first 15 years out of school as an

9 audit professional in firms including Arthur Young, Massar

10 International which is actually a Paris-based CPA firm.  I

11 spent eight years with Massar and was a partner there for many

12 years.  Subsequent to that I joined Ernst & Young's Transaction

13 Services Group as a mergers and acquisitions professional.

14 Thereafter I had joined a firm that performed roll-ups of

15 businesses, smaller businesses in the pursuit of creating a

16 larger business to sell to a strategic or run.

17 Q    What was the name of that firm?

18 A    The name of that firm was Wellesley.  Thereafter I worked

19 as an interim executive, interim chief financial officer and

20 chief operating officer for a couple of companies which were my

21 own clients.  This brings us to 2000.  And thereafter joined

22 Capstone Advisory Group which I am a partner at currently.

23 Q    When specifically did you join Capstone?

24 A    I've been with Capstone Advisory Group since January 2001.

25 Q    And what is the business of Capstone Advisory Group?

1 A    Capstone Advisory Group is a nationwide restructuring

2 firm.  Primarily restructuring, but we also have the evaluation

3 practice as well as a forensic investigation and litigation

4 support group.  I primarily spend my time in the restructuring

5 side, and that is the largest part of the business.

6 Q    Do you consider yourself to be a financial advisor?

7 A    I do.

8 Q    And what is a financial advisor?

9 A    As a financial restructuring advisor at Capstone we

10 perform, depending on whether it's a debtor or a creditor

11 assignment, a situation analyses, determine the situation in a

12 particular -- in particular situations as we're engaged,

13 perform business plan reviews, analyze the near-term cash flow

14 need to the company, determine whether they're able to meet

15 their debts as they come due based on their cash flow forecast,

16 perform detailed financial modeling -- complex financial

17 modeling projects, and a whole host of other types of financial

18 analyses in an effort to help the client move through a

19 potential restructuring both in and out of court.

20 Q    Now, you said we do these things.  Do you personally do

21 the things you just described?

22 A    I personally do these things, and it is what Capstone does

23 as well, in general.

24 Q    Can you describe for the Court some representative matters

25 on which you have been involved in your period -- excuse me --

1  in your tenure at Capstone?

2  A    Certainly.  I've been involved with the restructuring of

3  Polaroid Corporation, Sunbeam products, American Commercial

4  Lines which is the largest inland barge company in the United

5  States, U.S. Shipping, Gainey Trucking, Great Wide Logistics,

6  to name a few.

7  Q    And whom -- keeping in mind the capital structure is what

8  I'm thinking about -- what types of parties did Capstone advise

9  in those matters?

10  A    Most of those matters involved Capstone's advising the --

11  either the senior lenders -- the senior lenders in each case,

12  actually.

13  Q    Now, does Capstone serve in any role with respect to the

14  W.R. Grace bankruptcy case?

15  A    It does.  Capstone represents the official committee of

16  unsecured creditors.

17  Q    So, Capstone is our financial advisor, is that right?

18  A    Capstone is your financial advisor, yes.

19  Q    Okay.  Describe your personal role with respect to

20  Capstone's services for the creditor's committee.

21  A    Sure.  My personal role has been since some time in 2005

22  working with the unsecured creditor's committee primarily

23  reviewing the annual business plan of W.R. Grace, analyzing the

24  quarterly actual performance to that business plan in each

25  case, analyzing business acquisitions or asset divestitures as

1  well as other issues that arose during the settlement.  And we

2  would analyze the situation, interface with management and its

3  advisors of Grace and then report back to the creditor's

4  committee.

5  Q    Mr. Frezza, have you ever been qualified as an expert by

6  any federal court?

7  A    I have.

8  Q    When was that?

9  A    That was in October 2008.

10 Q    And in which matter?  Can you please describe for the

11 Court?

12 A    In the matter of Gainey Trucking.  Sorry.  In the matter

13 of Gainey Trucking in the U.S. Bankruptcy Court of the Western

14 District of Michigan.  I was engaged by the pre-petition

15 lenders to analyze the company's cash flow forecasts that were

16 put forth in connection with that company's Chapter 11 filing.

17 I was asked to opine on whether the company's -- the company

18 was cash flow solvent in that case based on those financial

19 forecasts.

20        MR. PASQUALE:  Your Honor, at this time we would move

21 that Mr. Frezza be qualified as an expert in the fields of

22 accounting and as a financial advisor in restructuring matters.

23        MR. BERNICK:  Your Honor, I don't have any objection

24 to those qualifications, but I don't believe that that proffer

25 will support the opinions that are going to be offered.  And

1  so, I don't have an objection at this time, but I -- we're

2  going to very, very shortly run into the issue of whether he's

3  got an expert -- he has sufficient expertise with regard to the

4  solvency analyses that he did.  So, that's where we are now

5  from our point of view.

6          THE COURT:  All right.  There's no objection.  The

7  witness is permitted to express an expert opinion in the fields

8  of accounting and financial forecasting.

9          MR. PASQUALE:  Thank you.

10 BY MR. PASQUALE:

11 Q    Mr. Frezza, as part of your work for the Grace unsecured

12 creditor's committee, were you asked to render an opinion

13 concerning whether Grace is solvent?

14 A    I was.

15 Q    In rendering that opinion, did you consider solvency of

16 the plan now before the Court on any specific date?

17 A    I did.

18         MR. BERNICK:  Your Honor, I think that we're now

19 getting into the area of his opinions, and we have some very

20 brief voir dire with respect to his expertise and ability to

21 render an opinion on solvency.

22         MR. PASQUALE:  Your Honor, the time for that was when

23 I qualified him.

24         MR. BERNICK:  Okay.  I don't think that I -- I lodged

25 my timely objection at that time.

1          THE COURT:  I think the -- maybe I misunderstood the

2     objection.  I did not -- I thought you said that you were not

3     objecting to the witness' ability to express an opinion.  It's

4     just that you were objecting to the opinion that was being

5     expressed for reasons you were going to get into.  Maybe I

6     misunderstood.

7          MR. BERNICK:  What I tried to say, and I probably was

8     not clear, is that we don't believe that this witness has

9     sufficient expertise to offer an opinion regarding solvency.  I

10    think that's what --

11         THE COURT:  You did say that with respect to

12    solvency, yes.

13         MR. BERNICK:  And so, to the extent that the

14    proffer -- I didn't hear that the proffer was a proffer about

15    him as an expert in making solvency determinations.

16         THE COURT:  It was not.  It was about accounting and

17    advising and financial forecasts.

18         MR. BERNICK:  Right.  He is now going to be -- he is

19    now being asked to get into his analysis and opinions regarding

20    solvency because he's already talking about the date on which

21    he chose to measure solvency.

22         MR. PASQUALE:  Let me -- may I ask a foundation

23    question --

24         THE COURT:  Yes.

25         MR. PASQUALE:   -- and try to address this?

1 BY MR. PASQUALE:

2 Q    Mr. Frezza, in your experience, do professionals in the

3 areas of your expertise of accounting and financial advisors,

4 do they render solvency opinions?

5 A    They do.

6 Q    Okay.  And have you been involved in cases where you've

7 seen that?

8 A    I have.

9        MR. PASQUALE:  Your Honor, I don't know what else I

10 need to say in that --

11        MR. BERNICK:  Now I have some voir dire because it

12 relates to that foundation.

13        THE COURT:  All right.  You may voir dire.

14        MR. BERNICK:  Well, if Your Honor would prefer that I

15 not do it I can defer --

16        THE COURT:  I don't have a preference.

17                VOIR DIRE EXAMINATION

18 BY MR. BERNICK:

19 Q    Isn't it true -- good afternoon, Mr. Frezza.

20 A    Hi, Mr. Bernick.  How are you?

21 Q    Isn't it true that you've never personally issued an

22 expert report on solvency?

23 A    That's true.

24 Q    So, this would be your first time?

25 A    This will be my first report issued on solvency.

1  Q    Expert report on solvency.

2  A    Expert report, excuse me.

3  Q    Isn't it true that you've never issued a valuation

4  opinion?

5  A    I've never issued an expert report on valuation, that's

6  true.  However, I've done much work in the field of valuation.

7  Q    Have you ever -- and I asked this question of you in your

8  deposition -- "Have you ever issued an opinion -- a valuation

9  opinion", Answer, "I've never issued a valuation opinion, no."

10  Is that your answer?

11  A    That's correct.  That's correct.

12  Q    Is it also true that you don't hold yourself out in the

13  marketplace -- non-litigation marketplace, you don't hold

14  yourself out in the non-litigation marketplace as an expert in

15  valuation?

16  A    That's correct because in doing so it would presuppose

17  that you are someone certified by the American Society of

18  Appraisers, for instance, just to be clear.

19  Q    Would it also be clear that you would not hold yourself

20  out in the marketplace as being an expert in valuation or

21  quantification of liabilities?  Isn't that true that you would

22  not so hold yourself out?

23  A    That's correct.

24        MR. BERNICK:  I don't believe that there should be

25  different standards in court from in the marketplace.  I think

1  the witness has been candid.  That he would not be able to

2  issue these opinions in the marketplace and wouldn't hold

3  himself out as being expert in doing it.  I don't think I've

4  seen a set of questions and answers that are quite so on point

5  and clear usually people waffle on.  This witness didn't.  He

6  was candid.  But, he does not have the expertise.  And this is

7  not the -- this is not a place where he should be permitted to

8  do what he can't do outside of the courtroom.

9          MR. PASQUALE:  Your Honor, I have two very easy

10 responses.  First, as Mr. Frezza's already testified, he wasn't

11 asked to perform a valuation of the company.  He was asked to

12 do a solvency opinion.  It's not the same as a valuation.

13 Secondly, this witness has, in fact in my opinion, greater

14 qualifications -- he's also an accountant -- than Ms. Zilly

15 who's already testified to her opinions on solvency.  I don't

16 see that there should be any different standard for Mr. Frezza

17 than there was for Ms. Zilly.

18          THE COURT:  Well --

19          MR. BERNICK:  Ms. Zilly didn't render a solvency

20 opinion.  This witness does.  We can't --

21          MR. PASQUALE:  She was never -- sorry, Dave.

22          MR. BERNICK:  -- excuse me -- and he can't do it

23 without rendering an opinion on valuation and rendering an

24 opinion on both quantification of liabilities.  And he doesn't

25 have the expertise to do either one.  A plus B equals C.

1          THE COURT:  I don't see how the witness is going to

2    testify about solvency which necessarily involves

3    quantification of liabilities and valuation if he says that he

4    doesn't hold himself out as an expert in those areas.

5          MR. PASQUALE:  In the areas of valuation, Your Honor,

6    that's right.

7          THE COURT:  And quantification.

8          MR. PASQUALE:  And Mr. Frezza said that's because

9    he's not certified by the organization.

10         MR. BERNICK:  Well --

11         MR. PASQUALE:  He has done, and I'm happy to ask him,

12   he has done valuation work in his experience.  Just hasn't

13   rendered an expert valuation report, and Mr. Frezza started to

14   say that on the stand, and he certainly said that at his

15   deposition.

16         MR. BERNICK:  I understand the witness' testimony,

17   but the fact of the matter is, that in his field that

18   certification's required.

19         MR. PASQUALE:  The other thing I'd just raise, Your

20   Honor, on a procedural level is, there's been no _Daubert_ or

21   motion in limine filed about Mr. Frezza.  This is the first

22   we're hearing about a problem with his qualifications.  That

23   deadline has long since passed.

24         MR. BERNICK:  Well, in point of fact, this is

25   something that developed very, very late in the process because

1 the testimony was taken very late in the process.  And I think

2 that the <u>Daubert</u> problems go not only -- this is a <u>Daubert</u>

3 problem, they go way beyond it, and we're going to see that if

4 he were to testify.  I know that Your Honor is generally very

5 reluctant to preclude testimony.  You want to hear it.  But, we

6 do have an objection based upon his expertise.  And I'm

7 prepared in service of getting the witness done and getting

8 this part of the trial done to suggest, perhaps, that the Court

9 reserve on this and to be flexible about it.  But, I -- you

10 know, I don't think we're going to get there over this issue.

11          THE COURT:  I'm concerned about the witness'

12 qualification when he says he does not hold himself out as

13 someone who quantifies liabilities because you certainly can't

14 do this type of a solvency analysis without quantifying to some

15 extent the liabilities that have to be paid.

16          MR. PASQUALE:  I'd ask for just the opportunity to

17 ask the witness a few questions in that regard --

18          THE COURT:  All right.

19          MR. PASQUALE:  -- so the Court can hear it from the

20 witness.

21          THE COURT:  Okay.

22                    CONTINUED DIRECT EXAMINATION

23 BY MR. PASQUALE:

24 Q    Mr. Frezza, please explain for the Court your experience

25 with respect to valuations.

**J&J COURT TRANSCRIBERS, INC.**

1  A    Okay.  Prior to joining Capstone, as I mentioned, I was

2  with a firm that rolled up entities.  That entailed -- and I

3  was also the director of due diligence for that entity.  And

4  what that entailed was finding small middle market companies,

5  working through their financial statements and their

6  operations, and then actually putting a value on them to create

7  a tranche of value in order to sell to a strategic buyer.  That

8  entailed a substantial amount of financial due diligence

9  valuing assets not from the perspective of a court expert, but

10 from the perspective of doing the analyses of a valuation

11 person or a -- let's say a financial expert in valuing these

12 companies.

13       Since joining Capstone I've been involved with

14 various cases where valuation work was required, but not an

15 expert opinion.  In terms of valuing liabilities, a liability

16 from an accounting standpoint is that which is owed, and when

17 we say an expert in valuing liability, it's sort of irrelevant

18 from the perspective of a solvency opinion because it's based

19 on stated liabilities.  Those stated liabilities are the stated

20 liabilities of the company.  So, I honestly don't know what Mr.

21 Bernick meant by an expert in valuing liabilities because --

22       THE COURT:  I'm sorry.  Just so the witness is clear,

23 it was not about valuing liabilities, it was about quantifying

24 liabilities.

25 A    Well, if that's the case, quantifying liabilities is a

**J&J COURT TRANSCRIBERS, INC.**

1  very basic part of financial accounting, quite frankly.

2          MR. BERNICK:  That's the problem.  I mean, these were

3  not my -- these were not -- there wasn't a lot of back and

4  forth here.  It was pretty clean.  And, Your Honor, the

5  testimony is going to be, as we're going to see here shortly,

6  he didn't quantify him here.  I mean, he just took somebody

7  else's number because the lawyers told him to.

8          MR. PASQUALE:  Well, that's only one aspect of the

9  work that Mr. Frezza --

10         MR. BERNICK:  If we can have -- I'm sorry.  If we can

11 have an agreement that he won't testify about that, that at

12 least will be progress.

13         THE COURT:  Won't testify about --

14         MR. PASQUALE:  Well, let's be clear.  You have

15 testified -- I'm not sure I follow --

16         MR. BERNICK:  You know, we've made our objection,

17 Your Honor.

18         THE COURT:  All right.  At this point I will accept

19 it because we have the witness here.  So, you're right, Mr.

20 Bernick.  I'll hear it.  But, Mr. Pasquale, I am really

21 concerned.  I am not at all sure that the witness has stated

22 the qualifications necessary to render this opinion.  So, I'm

23 going to hear it, but I may strike it.

24         MR. PASQUALE:  I appreciate that Your Honor, and let

25 me just say one more comment before we get back into the

1  testimony, and that is, an expert witness need not be a

2  professional expert.

3          THE COURT:  No, obviously not.

4          MR. PASQUALE:  The fact that it's Mr. Frezza's first

5  time --

6          THE COURT:  That has --

7          MR. PASQUALE:  -- has explained -- I'm sorry, Your

8  Honor.

9          THE COURT:  That has no bearing on this

10  determination.  The problem is that he said in his deposition

11  that he is not an expert.  He does not hold himself out to be

12  an expert in quantifying liabilities.  I don't know how you do

13  a solvency analysis without quantifying liabilities.  So, okay,

14  go ahead.

15  BY MR. PASQUALE:

16  Q    I think the question I left you with, Mr. Frezza, is, in

17  considering solvency of the plan before the Court, on what date

18  did you test solvency?

19  A    Upon the effective date of the proposed plan.

20  Q    And what date is that?

21  A    12/31/2009.

22          MR. BERNICK:  The effective date -- can we be clear

23  that that is -- assumes that the plan has gone into effect?

24          THE WITNESS:  That's correct.

25          MR. BERNICK:  Thank you.

**J&J COURT TRANSCRIBERS, INC.**

Frezza - Continued Direct/Pasquale                    270

1          THE COURT:  And what date, Mr. Frezza?

2          THE WITNESS:  December 31st, 2009.

3   Q    Did you form an opinion as to whether Grace will be

4   solvent on the effective date of the plan now being considered

5   by the Court?

6   A    I did.

7   Q    What is your opinion?

8   A    That Grace --

9          MR. BERNICK:  Can we just -- sorry.  It would solve

10  the objection problem if he could just say assuming the plan

11  was effective because --

12         MR. PASQUALE:  All of my questions for Mr. Frezza

13  will assume that the plan is confirmed and becomes effective.

14         MR. BERNICK:  Thank you very much.

15  A    Could you repeat your question, Mr. Pasquale?

16  Q    I asked you, I believe, what is your opinion?

17  A    In my opinion, upon the effective date Grace will be

18  solvent.

19  Q    What did you do to form that opinion?

20  A    I did a number of things.  I performed a number of tests

21  that are commonly done in forming an opinion on solvency.

22  Q    Please describe those tests.

23  A    Let me describe the tests.  The three most common tests

24  are the cash flow test -- what is commonly known as the cash

25  flow test or the ability to pay debts as they come due.  The

Frezza - Continued Direct/Pasquale                    271

1  adequate capital test which is more of a qualitative test of

2  considerations -- various considerations that a professional

3  would take into consideration in forming an opinion.  And

4  finally, a balance sheet test.

5  Q    Let me ask you about each of those, one by one.  Please

6  describe for the Court what is entailed with a cash flow test

7  of solvency.

8  A    A cash flow test is designed -- the professional would

9  approach it by reviewing a cash flow forecast prepared by the

10 company, evaluating whether the forecast makes sense,

11 critically challenging the underlying assumptions, considering

12 sensitivities to that forecast in view of the company's

13 historical performance.  And once you've considered those

14 factors and form an opinion as to whether the company is able

15 to at a particular test date as well as in the future able to

16 meet its obligations as they come due.

17 Q    Is there anything else involved in the cash flow test?

18 A    And that's principally the cash flow test.

19 Q    Please describe for the Court the components, or what you

20 do in performing an adequate capital test of solvency.

21 A    The adequate capital test is more of a qualitative test

22 whereby the professional would consider, for instance, the

23 results of the cash flow test which is more quantitative.  In

24 addition, you would look to see what indicators would allow one

25 to determine whether a company is solvent or insolvent such as,

**J&J COURT TRANSCRIBERS, INC.**

1 does the company have cash on its balance sheet.  Does the

2 company have access to a revolver in order to fund debts as

3 they come due in excess of cash for instance.  Does the company

4 have credit terms from its vendors.  Does the company have an

5 equity cushion that would be determined based on the balance

6 sheet test which we'll discuss in a moment, and various other

7 factors.

8         One might look at various ratios, as well, whether

9 the company's current assets exceed its current liabilities and

10 so forth.  So, that -- and once you take those data points into

11 consideration, it would allow the professional to form an

12 opinion on whether the company passes the capital test.

13 Q    Thank you.  And you mentioned in passing the third of the

14 test, the balance sheet test, please describe that test for the

15 Court.

16 A    In general, the balance sheet test is a test to determine

17 whether the company -- the company's assets exceed its

18 liabilities at a test date.  And taking that one step further,

19 the balance sheet test can be administered in up to three

20 different ways in its most common form.  Those three methods

21 that could be performed under the balance sheet test include

22 the market approach, the income approach, and the cost

23 approach.

24 Q    I'll stop you there.  Let's break that down.  Please

25 describe for the Court the market approach to the balance sheet

1 test.

2 A    Certainly.  In the market approach the professional would

3 analyze peer group companies or guideline companies that are

4 comparable to the company being tested and review, for

5 instance, their enterprise value and compare that to the

6 company's EBITDA, earnings before interest, taxes,

7 depreciation, and amortization.

8        And after reviewing those companies, determine sort

9 of a mean and median multiple of EBITDA to enterprise value of

10 those entities.  In addition, the professional would look to

11 precedent transactions or MNA transactions in the market that

12 would be indicative of a value for the target company or the

13 company being discussed for solvency.

14        And one would take the combination of the results of

15 those two analyses and determine a range of multiples to apply

16 to, for instance, Grace's EBITDA, for let's say all of 2009.

17 And then that would result in what would be called enterprise

18 value.  In the market approach to the balance sheet test,

19 enterprise value is a proxy for the fair value of the assets.

20 when you're performing the balance sheet test in each case, one

21 must look to the fair value of the assets.  Not the book value,

22 but the fair value of those assets in determining whether the

23 company has -- is solvent in terms of assets exceeding

24 liabilities, and by how much those assets exceed liabilities,

25 which is also referred to as an equity cushion.

1  Q    Now, you mentioned also the income approach.  Can you

2  please describe the income approach?

3  A    Sure.  The income approach is an approach whereby you

4  would take the company's detailed financial projections over

5  whatever period is involved -- or available.  Excuse me -- and

6  also taking a terminal value year which is to -- the terminal

7  value year is generally thought to be the normalized income

8  statement performance of a company ad infinitum.

9          And then a professional would perform a discounted

10 cash flow analysis on those projections, including the terminal

11 year, and come up with and apply an appropriate discount

12 factor.  And then determine a -- again, an enterprise value

13 which again would be the proxy for asset value -- fair value of

14 assets.  And then --

15 Q    And finally -- I'm sorry.  Were you finished?

16 A    And then, again, there would be an examination of

17 liabilities against those assets to determine what the equity

18 cushion is on the income approach.

19 Q    Thank you.  And finally is the cost approach.  Can you

20 please describe the cost approach?

21 A    Sure.  Under the cost approach one would take the

22 traditional stated balance sheet as of the test date, in this

23 case 12/31/2009 projected pro forma balance sheet, and one

24 would need to seek to find the fair value of those assets,

25 compare them to the stated liabilities as reported, and

Frezza - Continued Direct/Pasquale                    275

1  determine what the equity cushion is.

2          And the thought under the cost approach is, what

3  would it cost the willing buyer to replace these assets because

4  the book value of a company's assets, depending on the asset

5  class, typically are lower than fair value.  So, one would need

6  appraisals or a business valuation of the assets to determine

7  what the fair value of those assets would be under the cost

8  approach and then compare the stated liabilities on the balance

9  sheet to determine the equity cushion.

10 Q    Let me ask you, Mr. Frezza -- well, a foundational

11 question first.  What is GAAP?

12 A    GAAP stands for generally accepted accounting principles,

13 and it is the codification of accounting principles by which

14 all United States reporting companies, and even companies that

15 don't report, use to record transactions and report their

16 financial statements.

17 Q    And are you familiar with the GAAP principles?

18 A    Yes, I am.

19 Q    How do GAAP principles, if at all, impact a balance sheet

20 test?

21 A    Under GAAP, typically -- well, again, there are 161

22 statements of financial accounting standards that have to be

23 applied.  Many of them are for specific purposes or specific

24 accounting issues, but the entire codification of GAAP requires

25 assets to be recorded on the books at the most conservative

1 value, for instance, the lowest value possible.

2        And just to provide an example, for instance,

3 inventory -- let's say a company has inventory that is a highly

4 traded commodity.  GAAP requires that inventory to be recorded

5 at the lower of cost or market.  So, if the market value of

6 that inventory is actually higher than book value, the book

7 value is used.  If the market value of that inventory is below

8 its cost of the company, then you use the market value only to

9 the extent it does not exceed cost.

10        With respect to property and equipment, a good

11 example is the purchase of real estate for a facility prior to

12 1980 let's say.  And the company functioning now has this real

13 estate, and assuming there aren't environmental issues, if it

14 were to sell it the land value would likely exceed what the

15 company purchased the land and building for because keep in

16 mind when you purchase land and building you're actually

17 depreciating the building and any improvements over a long

18 period of time, so the book value actually declines over a long

19 period of time such that if you were to sell that facility it

20 would likely be -- again, if it was not soiled by environmental

21 issues -- likely be valued higher than its book value.

22        On the liability side, GAAP, again being -- taking

23 the most conservative approach to recording transactions,

24 liabilities have to be at their highest level possible.  Any

25 liability that is likely to be paid and is estimable must be

Frezza - Continued Direct/Pasquale                277

1 recorded on the balance sheet.  So, a balance sheet reflects

2 all the liabilities that the company could possibly be aware

3 of, and as long as they're estimable -- reasonably estimable --

4 they are on the balance sheet.  So --

5 Q    And -- I'm sorry.

6 A    I'm sorry.  So, just to wrap up, GAAP really is the most

7 conservative approach to recording transactions on financial

8 statements.

9 Q    Now, doing a balance sheet analysis of solvency, you

10 mentioned on the asset side fair value of assets is a standard,

11 with respect to liabilities, is that at book value or fair

12 value or something else?

13 A    The typical language is stated value which would be

14 normally book value.

15 Q    Now, do each of the three tests that you've described, a

16 cash flow test, adequate capital test, balance sheet test, do

17 each of those tests have to be satisfied in order for -- in

18 order to determine that a company is solvent or insolvent as of

19 a specific date?

20 A    No, there's no requirement to perform all three tests.

21 And it also depends on the situation to the extent solvency is

22 very clear versus murky.  A professional who is approaching a

23 solvency analysis would not need to do all three tests and just

24 take into consideration whatever factors are demonstrative of

25 solvency or insolvency.

**J&J COURT TRANSCRIBERS, INC.**

Frezza - Continued Direct/Pasquale                    278

Q    Now, let's turn to Grace specifically.  Did you consider whether Grace is solvent under the cash flow test?

A    I did.

Q    What did you do?

A    I started off with Ms. Zilly's feasability study -- feasibility report, and that was the only source of financial projections that I had available to me.  In that report she provides a summary of the company's financial projections. What I did is, in reviewing those projections I analyzed the revenue trend being assumed, the core EBITDA trend being assumed.  I considered the underlying assumptions by deriving them from my analysis in that report.

     As well as in reading her report, it's very clear that -- very clear -- a number of things are very clear by reading her report.  In looking at the trends being assumed, it was clear to me that the assumptions being used in that forecast are very conservative considering my knowledge of Grace's performance in the past, as well as what she stated in her report, just for some data points, sales have doubled since the company filed, or I should say from the year 2000 to 2008. Core EBITDA has increased by 64 percent from the year 2003 to 2008.

     The company has generated operating-free cash flow of over $1.6 billion in that period, and the company is currently sitting on $622 million, or I should say at the end of June,

**J&J COURT TRANSCRIBERS, INC.**

Frezza - Continued Direct/Pasquale                    279

1  $622 million of cash.  Very strong performance, and in my

2  analyses of the company's performance over the years, has

3  continuously exceeded -- with the exception of 2008 has

4  continually exceeded its performance -- its budget, excuse me.

5        So, based on my knowledge of the company and my

6  involvement with the company, based on my analysis of the

7  summarized cash flow forecast in her report, and also taking

8  into consideration all the facts and data that she laid out, I

9  completely concurred with her view that the projections are

10 reasonable and easily met.  And quite frankly, I would go as

11 far to say that, you know, that the work that she had done to

12 come up with that view is the same work that I did, or was able

13 to do, to come up with my solvency opinion.

14 Q    Well, let's be clear.  The work that you reviewed of Ms.

15 Zilly was not a solvency report, was it?

16 A    That's correct.  But, it could've been.

17 Q    Please elaborate on that.  What do you mean by it

18 could've?

19 A    Just simply, as I said already, that the analyses and the

20 work performed by me and by Ms. Zilly is the identical work

21 that would be performed if she were to render a solvency

22 opinion.  It's the same thing.

23 Q    And just so we're clear, this is with respect to the cash

24 flow test?

25 A    With respect to the cash flow test, correct.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    What conclusion, if any, did you draw from the cash flow

2  analysis that you did?

3  A    That Grace will be solvent on the effective date and

4  thereafter based on those financial projections under the cash

5  flow test.  It passes the cash flow test.

6  Q    Did you consider whether Grace is solvent as of the

7  effective date under the adequate capital test?

8  A    I did.

9  Q    And what did you do?

10  A    As mentioned earlier, I looked at all the factors that I

11  listed, including the fact that leading up to the proposed

12  effective date, Grace has, with one exception, has really never

13  used its debtor in possession borrowing facility with the

14  exception of the payment to the EPA, I believe, where they had

15  drawn it down, but paid it back very quickly.

16          Other than that, to my knowledge, the company's

17  really never used its DIP facility for any substantial reason

18  other than to provide liquidity for letters of credit

19  requirements.  The company has maintained a very significant

20  cash balance, and while it -- these are periods in time leading

21  up to, they're all indicative of the fact that the company was

22  very strong -- had a very strong financial performance in its

23  ability to generate cash and have capital available to --

24  weather bumps in the road -- financial bumps in the road.

25          In addition, we understand that the company's very

Frezza - Continued Direct/Pasquale                281

1  far along in negotiating with exit lenders.  Generally, lenders

2  aren't going to spend the amount of time that we understand is

3  being spent here if they felt that the company was insolvent.

4  Based on -- to the best of our knowledge, and when I say our

5  knowledge, in the work that I've done over the quarters and

6  over the years, that Grace's vendor community holds it in high

7  regard.  The company continues to get full vendor terms.  So,

8  that providing of credit is an indication that the company is

9  solvent, and the fact that the company has a substantial equity

10 cushion under the balance sheet test.

11 Q    We'll talk about that in a second.  Mr. Frezza, did you

12 draw a conclusion as to whether Grace is solvent under the

13 adequate capital test?

14 A    In my report I concluded that it passed the adequate

15 capital test, yes.

16 Q    Now, did you consider whether Grace is solvent as of the

17 effective date under the balance sheet test?

18 A    I did.

19 Q    Okay.  And how did you perform a balance sheet test as of

20 the effective date?

21 A    As of the effective date.  I started with the company's

22 disclosure statement.  So, first let me say, the approach I

23 took was the market approach.  And I first went to the

24 company's disclosure statement because there were substantial

25 disclosures about how the company arrived at its enterprise

Frezza - Continued Direct/Pasquale                282

1  value for instance.  And as I mentioned, what a professional

2  would do would seek to find guideline companies, analyze the

3  statistics related to those companies, key statistic being its

4  EBITDA multiple or its enterprise values to EBITDA, as well as

5  precedent transactions.

6          It was very clear from the disclosure statement that

7  a substantial amount of work had been done by the company and

8  its advisors to determine guideline companies and precedent

9  transactions.  And one point that I noted in the disclosure

10 statement was the fact that -- it was a very good point -- that

11 the company indicates the key -- a key to the success of this

12 test is the appropriate selection of the guideline companies

13 such that we're certain that those guidelines -- those

14 guideline companies are appropriate in comparing them to the

15 various businesses within Grace, and in my opinion, who better

16 to make that decision but the company.

17         And it's completely appropriate for a professional to

18 rely on other professional's analyses to determine, for

19 instance, what enterprise value is.  So, I used the disclosure

20 statements enterprise value to determine what the proxy for

21 fair value of the assets were under the market approach of the

22 balance sheet test.

23 Q    Did the disclosure statement provide amounts, figures,

24 that you could use in determining -- in applying a balance

25 sheet test under the market approach?

**J&J COURT TRANSCRIBERS, INC.**

1  A    It did.  It did.  Yes.

2  Q    Please explain what you did.

3  A    Okay.  So, once I felt comfortable with the fact that I

4  had the appropriate proxy for fair value of assets under the

5  market approach of the balance sheet test, I reviewed the

6  company's balance sheet -- pro forma balance sheet at 2009 and

7  looked through the liability section to determine which

8  liabilities should be deducted from enterprise value.  And in

9  doing so, the liabilities that I would deduct from enterprise

10 value were the same that were included in the disclosure

11 statement.  And I created an analysis to that effect and --

12 Q    You created a chart --

13 A    I created a chart that was --

14 Q    -- and that was included in your expert report?

15 A    It was included in my expert report, yes.

16            MR. PASQUALE:  Your Honor, may I approach the

17 witness?

18            THE COURT:  Yes.

19 Q    Mr. Frezza, I've just shown you what we've marked for

20 identification purposes as CCBLG Exhibit 41.  Is this the chart

21 that you've prepared?

22 A    It is.

23 Q    Okay.  Can you tell us what this chart demonstrates?

24 A    Sure.  As I mentioned, it's typical to do a range of

25 values because it's not -- these types of analyses are not that

Frezza - Continued Direct/Pasquale                284

1  precise such that it's one number.  So, the --

2           MR. BERNICK:  I'm sorry.  Just so I don't have a

3  waiver issue.  We object to all testimony regarding his

4  ultimate opinions insofar as numbers are concerned, as

5  irrelevant as well because he's measuring the wrong thing.

6  He's measuring the assumed effect of an assumed to be modified

7  plan, and that has no relevance to any issue before the Court.

8  And I just wanted to make sure that I've got that objection,

9  and can I have a continuing objection on those grounds so I

10 don't have to --

11          THE COURT:  That it's --

12          MR. BERNICK:  Thank you.

13          THE COURT:  -- a soon to be modified plan?  I'm

14 sorry.

15          MR. BERNICK:  Assumed to be --

16          THE COURT:  Oh, assumed.

17          MR. BERNICK:  -- modified and effective plan.  He

18 assumes that a plan becomes effective, and it's not the one

19 that's before the Court.  So --

20          MR. PASQUALE:  Well, I -- I'm sorry.

21          MR. BERNICK:  I'm sorry.  So, we object on relevance

22 grounds and we'd like to have a continuing objection.

23          THE COURT:  You have that continuing objection.

24          MR. BERNICK:  Thank you.

25          MR. PASQUALE:  I think -- just for the record, Your

1  Honor, I think Mr. Bernick's mistaken, and as the witness will

2  explain.  And in any event, I think that's a subject he can

3  cross examine the witness on.

4  BY MR. PASQUALE:

5  Q    So, Mr. Frezza, please explain what your chart

6  demonstrates.

7  A    Sure.  So, as we discussed, the disclosure statement was

8  very clear on its approach which it would be considered the

9  market approach to determining enterprise value which would be

10 the proxy for the fair value of assets under that balance sheet

11 test.  And the disclosure statement indicated that a range of

12 2.1 billion to 2.5 billion represents the enterprise value of

13 Grace, which again is the fair value of those assets.

14           The next step in looking at the balance sheet, only

15 selected liabilities are deducted from enterprise value to

16 determine an equity cushion under this approach which -- so

17 the --

18 Q    Let me stop you, Mr. Frezza.

19 A    Yes, sure.

20 Q    I'm sorry.  When you say looking at the balance sheet,

21 what did you look at?

22 A    Just using the company's second corrected Exhibit 12 to

23 the POR.  On the last page there are historical and projected

24 balance sheets, and I used the projected 2009 balance sheet.

25           MR. PASQUALE:  Your Honor, what I put on the ELMO,

Frezza - Continued Direct/Pasquale                286

1  and I had -- I do have copies, is Exhibit -- Plan Proponents

2  Exhibit 277.12.  If Your Honor would like a copy I'll

3  certainly --

4           THE COURT:  Please.  Thank you.

5  Q    And specifically, it is the very last page of that

6  exhibit?

7  A    That's correct.

8  Q    Mr. Frezza, is this what you were just referring to in

9  your testimony?

10  A    It was.

11  Q    Okay.  So, I interrupted you.  You were starting to

12  explain the liability section of the chart there.

13  A    Correct.  So, because you're starting out with enterprise

14  value, you don't take a GAAP balance sheet approach to

15  deducting liabilities, and I'll explain what I mean by that.

16  For instance, certain liabilities such as current liabilities,

17  accounts payable, accrued expenses and anything considered

18  current liabilities are already considered within the

19  enterprise value because there's a notion that the enterprise

20  value takes into consideration what the networking capital of

21  the company.  And when I say networking capital, that typically

22  means current assets minus current liabilities.  So --

23  Q    Well, then, let's -- I'm sorry, Mr. Frezza.  Let's go down

24  the balance --

25  A    Sure.

1  Q    -- sheet then, which is the 277.12, and first, just so

2  we're clear, which of the balance sheets set forth here, which

3  did you rely upon for purposes of the market approach to the

4  balance sheet?

5  A    It's projected December 31st, 2009 balance sheet.

6  Q    I'm sorry.  December 31st, 2009?

7  A    Yes.

8  Q    Okay.  And that's the second to last column on the exhibit

9  on the balance sheet?

10 A    Second from the right on the last page of the exhibit,

11 yes.

12 Q    Thank you.  Okay.  So, let's look at the liabilities --

13 liability section of that balance sheet.  And let's first focus

14 on the top section, current liabilities.  Are the current

15 liabilities included in the liabilities that you considered

16 with respect to the market approach to the balance sheet test?

17 A    Those liabilities are not listed below enterprise value

18 because they're already considered in the enterprise value,

19 again, because there's a notion that it includes the networking

20 capital of the company and its valuing of the assets.

21 Q    Okay.

22 A    So, those are not deducted under this approach.

23 Q    So, we don't find them on your chart?

24 A    So, they're not on my chart.

25 Q    Okay.  Let's look at the next section, and let's take

1 these one at a time.  Debts payable after one year.  Is that  a

2 deduction that you included in your market approach?

3 A    That's correct.  That's a billion dollars of funded debt

4 that would have to be deducted from enterprise value to

5 determine equity cushion.

6 Q    So, on the chart it's called funded debt upon emergents,

7 is that right?

8 A    Correct.

9 Q    Okay.  Why use a different terminology there?

10 A    Just to be consistent with the disclosure statement.  You

11 know, just --

12 Q    That was the terminology used in --

13 A    Yes.  These are the terms used in the disclosure

14 statement, so it was just to be consistent.

15 Q    Okay.  The next item is a deferred payments, 395 million.

16 And is that --

17 A    That is also listed as a deduction, and it's referred to

18 as deferred payment agreements.

19 Q    Okay.  The next item is deferred income taxes, is that

20 included?  Let me be clear.  Let me withdraw that question.

21 Deferred income tax, is that an item that you deducted from

22 reorganize enterprise value?

23 A    It's not because, again, there are substantial deferred

24 income tax assets, and as a result of having a proxy for those

25 deferred value of those assets under enterprise value, it's

1  considered -- it's already considered, so you wouldn't deduct

2  it.  It would be a theoretical double count if you did.

3  Q    The next item is minority interest.  Is that a deduction?

4  A    That is a deduction and it is listed on the chart.

5  Q    And let's take the next two together.  They both pertain

6  to define benefit pension plans.  Are those amounts deductions

7  from reorganize enterprise value on your chart?

8  A    That -- those two together are not for a couple of reasons

9  because, again, pension liabilities are based on actuarial

10 calculations of plan value because there are plan assets that

11 offset plan liabilities.  These represent an underfunding of

12 the plan due to low asset value that is reconsidered every

13 year.

14        And in addition, the related pension expense that is

15 a component or directly related to these liabilities is already

16 considered in EBITDA.  And as we mentioned, the way we come up

17 with enterprise value is a multiple applied to EBITDA.  So,

18 again, it's theoretically taken into consideration in the

19 enterprise value, so it wouldn't be deducted.

20 Q    The last item in that section is other liabilities.  Is

21 that a deduction that you made from reorganize enterprise

22 value?

23 A    That is not, and again, the thought is that the related

24 expense is already considered in enterprise value.

25 Q    Now, I think we can take the entire next section in one

1  lump sum.  Liabilities subject to compromise, is that a

2  deduction?

3  A    I took the entire amount because those are debts that have

4  to be paid over time.

5  Q    Okay.  So, they are a deduction from reorganize

6  enterprise --

7  A    They are a deduction because they're not considered

8  anywhere else.

9  Q    Mr. Frezza, the bottom line, total liabilities figure for

10 the 2000 -- excuse me -- projected December 31st, 2009 balance

11 sheet is a $2.9 billion number, do you see that?

12 A    I do.

13 Q    And the total reductions on your chart using the market

14 approach is low, mid and high, but they're just under 1.7

15 billion?

16 A    That's correct.

17 Q    Okay.  And how do you explain that difference just in sum?

18 A    Again, because the calculated enterprise value, which is a

19 proxy for the fair value of those assets, already considers

20 certain of these liabilities, so you wouldn't deduct them

21 again, so we don't want to have a double count here.  So, you

22 wouldn't have a 2.9 billion of liabilities deducted from the

23 enterprise value because it's just not intuitive.  It's not how

24 the calculation and the analysis is done.  So --

25 Q    So, let's go back to your chart then.  We've now discussed

**J&J COURT TRANSCRIBERS, INC.**

1  the proxy -- excuse me -- the liability section, the deductions

2  from reorganized enterprise value.  Please explain the bottom

3  line, the reorganized equity value and what that represents?

4  A    As I mentioned earlier, this test is designed to determine

5  whether the fair value of assets exceeds stated liabilities,

6  and the equity cushion, therefore, represents that asset value,

7  fair value of assets, in excess of stated liabilities which

8  indicates that there's a substantial equity cushion at the

9  effective date.

10 Q    When you say there's an equity cushion as of the effective

11 date, did that inform a conclusion that you formed with respect

12 to whether Grace would be solvent under the market approach as

13 of the effective date?

14 A    It does.  Under the market approach of the balance sheet

15 test, that indicates that the company is solvent.

16 Q    Now, did you perform a balance sheet test applying the

17 income approach as of the effective date, December 31st, 2009?

18 A    Sorry?  Restate the question?

19 Q    Let me try that again.  Did you perform a balance sheet

20 test applying the income approach as of the effective date?

21 A    I did not.

22 Q    And why not?

23 A    Because, again, having the -- one would need detailed

24 financial projections over a period of time to determine that

25 and I didn't have -- while there was a summary, set of summary

1 projections, in Ms. Zilly's report, I did not have access to or

2 I did not have available to me those -- any projections that

3 would have allowed me to do a discounted cash flow approach.

4         MR. BERNICK:  I object to that, Your Honor.  This now

5 gets into a whole history of the information room that was made

6 available and I don't really think it's an appropriate thing

7 for an expert to testify to.  He can't testify to facts he

8 doesn't know about.  He can say that he didn't have it, but to

9 say that it wasn't available goes beyond his factual knowledge.

10         THE COURT:  Okay.  That's sustained unless you can

11 substantiate that he had knowledge on his own.

12         MR. PASQUALE:  Your Honor, I'm actually --

13 Q    You didn't do that test, did you?

14 A    I didn't do that test.

15 Q    Okay.  Did you perform a balance sheet test applying a

16 cost approach with respect to this plan as of the effective

17 date?

18 A    With respect to this plan, I did not.  Again --

19 Q    And why not?

20 A    Because you would need -- as I mentioned earlier, under

21 the cost approach, you would look at -- you would take a more

22 traditional balance sheet, but -- like this GAAP balance sheet,

23 but you would need -- one would need to determine the fair

24 value of those assets as stated on the GAAP balance sheet and

25 that would require either having had an independent third party

1  business valuation or set of appraisals on individual assets.

2  Again, for instance, if there were appraisals available on

3  facilities, the myriad of facilities that Grace owns, whether

4  there would also be, to the extent available, when one would

5  require appraisals of intellectual property and other

6  intangible property, and that I did not have.

7  Q    Now, in addition to the tests that you've already

8  described, were you also asked by counsel to consider Grace's

9  solvency under any specific assumptions?

10 A    Yes.  I was asked by counsel to substitute the --

11 substitute Grace's experts' median asbestos PI claim liability

12 estimate of -- I want to say -- I forget -- four sixty eight to

13 substitute that amount for the amount in the currently proposed

14 plan.

15 Q    What, if anything, did you conclude from that analysis?

16 A    Well, based on the work that I had done, had that level of

17 liabilities been at issue, and assuming other components of the

18 current plan, such as the Fresenius and Sealed Air settlement

19 amounts been available, as well as with insurance, that Grace

20 would be solvent in that case, as well.

21 Q    Now, with the various methods that you used in determining

22 whether Grace is solvent under a plan before the Court as of

23 the December 31st, 2009 effective date, is any one method

24 preferable to the other?

25 A    No.  All of these methods are probative.  You know, the

1  desire is to have as many tests performed as possible and have

2  as much data available to the professional to do it, but there

3  is no one best way to do it and there's no stipulation that all

4  three have to be done.  So, there's no best, one best, plan --

5  I'm sorry -- approach.

6           MR. PASQUALE:  Nothing more at this time, Your Honor.

7  We pass the witness.

8           THE COURT:  Mr. Cobb?

9                    CROSS EXAMINATION

10 BY MR. COBB:

11 Q    Mr. Frezza, in producing your opinion with regard to

12 Grace's solvency as of 12/31/09, under the balance sheet test

13 using the market approach, what was the range of values that

14 you discovered that Grace's assets will exceed its liabilities?

15 A    The resultant numbers were 430 million to 821 million.

16 Q    Now, in performing any of the tests -- and let me step

17 back and be more specific.  In performing the cash flow test to

18 determine Grace's solvency as of 12/31/09 under this plan,

19 assuming it's effective, did you need to quantify any

20 liabilities?

21 A    No.  You just needed to take the stated liabilities from

22 the company's balance sheet.

23 Q    And that's an accepted expert methodology --

24 A    Yes.

25 Q    -- of determining solvency?

                    **J&J COURT TRANSCRIBERS, INC.**

1             MR. BERNICK:  Objection.

2   A    Yes.

3             MR. BERNICK:  Objection.  Leading.

4             THE COURT:  It's leading.  Sustained.

5             MR. COBB:  I'm sorry, Your Honor.

6             MR. BERNICK:  He already answered it.  Go ahead.

7   It's not worth it.

8             THE COURT:  Well, if he did, I didn't hear it so --

9             MR. FREZZA:  It's just simply --

10            MR. COBB:  Your Honor, I'm going to try this again

11  with the second test --

12            THE COURT:  All right.

13            MR. COBB:  -- we'll get the timing right.  We're all

14  ready now.  Okay?

15  Q    With the second test you performed, Mr. Frezza, to

16  determine Grace's solvency as of 12/31/09 under the plan before

17  the Court, assuming it's confirmed and it goes effective, that

18  is the adequate capital test, did you need to quantify any

19  liabilities in issuing your opinion?

20  A    No.

21  Q    And why is that?

22  A    Because it's not the accepted method under the -- there's

23  nothing under the adequate capital test that requires anyone to

24  value liabilities.

25  Q    Okay.  And then lastly, under the balance sheet test where

Frezza - Cross/Bernick                    296

1  you used the market approach to value assets, and you issueD an

2  opinion that as of 12/31/09, under this plan, assuming it's

3  confirmed and goes effective, did you need to quantify any

4  liabilities in order to reach your -- in order to issue your

5  opinion?

6  A    No.  The rule is using stated liabilities at the test

7  date.

8           MR. COBB:  Thank you.

9           MR. BERNICK:  Okay?

10          MR. COBB:  All yours.

11          MR. BERNICK:  Well, hardly.

12                    CROSS EXAMINATION

13  BY MR. BERNICK:

14  Q    Different board.  Mr. Frezza, all of your work -- can you

15  hear this?  I'm sorry.  Can you hear it?  All of your work

16  assumes that a plan has gone effective and that plan is the

17  agreed plan that is now before the Court, but with a change,

18  right?

19  A    Not exactly correct, because my conclusion clearly states

20  also --

21  Q    Okay.  Well, if that's not true --

22  A    I'm sorry.

23  Q    -- then I'll withdraw the question.

24  A    Okay.

25  Q    I'll get to it a different way.  Grace has done analyses

Frezza - Cross/Bernick                          297

1 which assume that the plan that actually is before the Court,

2 the agreed plan, has gone effective, correct?

3 A    Correct.

4 Q    You gave us three different methodologies for conducting

5 your solvency analysis.  One, as I understand it, is the

6 balance sheet, the other, as I understand it is the --

7 A    Cash flow test?

8 Q    Yeah, kind of pay debt side.  You have sufficient money to

9 pay debts?

10 A    Correct.

11 Q    So, I've got that down here as "pay debts".  And the third

12 one that you talked about was the reorganized equity value.

13 A    Adequate capital test.

14 Q    Okay.  But, in fact, you end up determining what the

15 equity value is, correct, and reorganized --

16 A    Can I just correct you?  If the equity value, the equity

17 cushion, is determined under the balance sheet test, it would

18 be a data point under the adequate capital test.  That's all.

19 Q    Okay.  So, adequate capital.  That's fine.

20 A    Now, in fact, it's true, is it not, that Grace has gone

21 ahead and determined what the balance sheet pro forma looks

22 like if this plan goes effective as it's currently stated,

23 right?

24 A    On a GAAP basis, yes.

25 Q    Okay.  On a GAAP basis, they've gone ahead and actually

**J&J COURT TRANSCRIBERS, INC.**

1  conducted and done the balance sheet on a pro forma basis,

2  right?

3  A    Correct.

4  Q    Okay.  Grace has gone ahead and done, and it's disclosed,

5  the capitalization of a reorganized Grace, right?  You -- it's

6  right in the disclosure statement, you took it?

7  A    Correct.

8  Q    And Grace has gone ahead and done a feasibility analysis

9  -- actually, Ms. Zilly has done a feasibility analysis, right?

10  A    Correct.

11  Q    So, when it comes to all three different approaches that

12  you have focused on, Grace has addressed in the expert work

13  that Ms. Zilly has done and in the exhibits to the plan, the

14  very same things that you're talking about with respect to the

15  plan that's actually before the Court, correct?

16  A    Not completely.  If I may?

17  Q    Sure.

18  A    With respect to the adequate capital test, that wasn't

19  laid out anywhere, the credit terms with vendors and, you know,

20  there are data points that have to be accumulated, cash

21  balance, availability of debt capital.  So, I just wanted to be

22  precise, so I don't think Grace did an adequate capital test

23  that's disclosed anywhere.

24  Q    Well, but you don't know.  All you know is that the

25  results -- they have done work and they have displayed the

1  result showing the capitalization of Grace post-effective date,

2  correct?

3  A    Yes.  They have made sufficient data available.

4  Q    Right.  And you used that, right?

5  A    Sure.

6  Q    Okay.  And you used the balance sheet, right?  The pro

7  forma balance sheet, you used in your work?

8  A    Sure, as a basis for --

9  Q    Right.

10  A    -- one of the tests, correct.

11  Q    Okay.  And you used Ms. Zilly's feasibility analysis,

12  true?

13  A    I used it to have data available to do my own analysis.

14  Q    I'm not criticizing you.  I just want to get the facts.

15  A    Oh, okay.  I just want to be precise.

16  Q    I just -- I want to be very precise.

17  A    Okay.

18  Q    As a matter of fact, you borrowed -- for whatever reason,

19  you borrowed Grace's pro forma balance sheet and assuming that

20  the plan goes effective, it's capitalization presentation

21  assuming that the plan goes effective, and Ms. Zilly's

22  feasibility analysis assuming that the plan goes effective.

23  Right?

24  A    Correct.

25  Q    Okay.  So, let's now talk about what you did.  Okay?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Okay.

2  Q    What you did.

3  A    Okay.

4  Q    You have come in and you have said, I want to assume that

5  the agreed plan has, as the asbestos liability, the Florence

6  estimate, correct?

7  A    Correct.  This is one aspect of what I did.  Yeah.

8  Q    Well, I understand that.  But, actually, that is the huge

9  driver of your analysis of the balance sheet and

10 capitalization, correct?

11 A    Incorrect.

12         MR. PASQUALE:  Objection, Your Honor.

13 Q    Well, let me get it this way.  You did assume that we now

14 have an agreed plan that has -- that replaces the asbestos

15 liability with the Florence estimate, correct?

16 A    I had my --

17         MR. PASQUALE:  Objection, Your Honor, that misstates

18 the testimony.

19         THE COURT:  All right.  Can the witness explain?

20         MR. BERNICK:  Sure.

21 A    One of the aspects of my report was to do an analysis,

22 hypothetical analysis, if a plan that had a lower liability

23 than the plan before us, under the balance sheet test.  So, in

24 my report, a lot of the work that I had done was focused on

25 your description with the Florence estimate.  But, I only did

Frezza - Cross/Bernick                                301

1  that on the balance sheet basis.  The other tests --

2  Q    I'm going to get to them.

3  A    Okay.  I thought you were --

4  Q    I'm just talking about the balance sheet.

5  A    I'm sorry.  I thought you --

6  Q    Oh, okay.  No, I'm sorry.

7  A    -- were pointing to the adequate --

8  Q    With respect to the balance sheet, is it fair to say, as

9  you've testified --

10 A    Absolutely.

11 Q    Okay.  Right.

12 A    That's correct.

13 Q    So, when it comes to what you did regarding the balance

14 sheet, you took the Grace balance sheet, you didn't do your own

15 balance sheet, correct?

16 A    Correct.  But we --

17 Q    Just one at a time.

18 A    Correct.

19 Q    And you assumed that the agreed plan, the plan would go

20 effective, except that the Florence estimate for liability

21 would be substituted for what the plan spelled out as being the

22 payments made to the personal injury claimants, correct?

23 A    Correct.

24 Q    Okay.  So, that was the principle -- and then you made

25 some adjustments to the rest of the balance sheet in

1 consideration of that change?

2 A    Correct.

3 Q    Okay.  So that to state it completely, that you assume in

4 the balance sheet that the plan of reorganization remains

5 intact.  It's consensual.  PI signs on -- that's the personal

6 injury people sign on -- except that there's a modification,

7 and the modification is that you substitute for the personal

8 injury liability that would otherwise have to be funded or the

9 payment that would otherwise have to be made for the benefit of

10 personal injury claimants, you substitute for that amount of

11 the median estimate of asbestos liability that was developed by

12 Mr. Florence.  Did we get all that right?

13 A    Correct.

14 Q    Okay.  So, the guy on the street, and I think I went on to

15 ask you, the world that you're thinking about happening is that

16 that plan goes effective, but when it goes effective, everybody

17 is consensual.  You know, Fresenius is there.  Sealed Air is

18 there.  Everything is hunky dory and they've all agreed that

19 the amount that's going to be paid to the asbestos personal

20 injury claimants instead of being what's in the plan that we

21 have, is the Florence estimate.  Did I get that right?

22 A    Yes.

23 Q    Okay.  And then you -- based on that assumption, you've

24 now effectively assumed that there was a modified agreed plan,

25 right?

1  A    Yes.

2  Q    And you now say, okay, what does the balance sheet look

3  like, right?

4  A    Correct.

5  Q    Have I captured now the essence of what you did?

6  A    Perfectly.

7  Q    Okay.  Now, you've assumed also, when it comes to the

8  adequate capitalization analysis, what you did that was

9  different is that, once again, you assume the same thing; that

10  is, that the agreed plan is now a different agreed plan, it

11  includes the Florence estimate, correct?

12  A    That's incorrect.  No.

13  Q    That's incorrect, you didn't do that?

14  A    No.

15  Q    Okay.  Tell me how what you did with regard to the

16  liability that you're assuming -- the plan, when it goes

17  effective and the capitalization analysis that's associated

18  with that provides -- Grace's GAAP provides that the

19  restructured reorganized debtor is affected by an obligation

20  that's set forth in the plan, correct?  Do I have it right so

21  far?

22  A    Could you restate that?

23  Q    Yes.

24  A    I'm not sure I got it all.

25  Q    The capitalization presentation that's in the disclosure

1 statement, that presentation that's actually there assumes the

2 plan that's actually before the Court, correct?

3 A    Correct.

4 Q    And you now, in connection with your own capitalization

5 analysis work assumed, once again, that Grace does not have to

6 pay that liability.  It only has to pay the liability as Dr.

7 Florence has estimated, correct?

8 A    I did that test under both the Florence estimate plan, as

9 well as the plan before the Court, and they're both on the same

10 page and this is what it is.

11 Q    Okay.  That's fine.

12 A    Okay.

13 Q    Okay.  But, the difference between the way that you get to

14 your solvency analysis or the adequate capitalization that's

15 different from what Grace has done is that one of your analyses

16 uses -- you're pursing your lips like you're going to disagree

17 but let me get the question out first -- one of your analyses

18 assumes that the Florence estimate is the agreed liability,

19 correct?

20        MR. PASQUALE:  Your Honor, I object.  It's not at all

21 what he testified to on direct.

22        THE COURT:  Well, I think he just said that he did it

23 two ways, one making that assumption and one not.

24        MR. PASQUALE:  Right.

25 Q    Is that right?

Frezza - Cross/Bernick                                305

1  A     But, you keep referring to the adequate capital test.  If

2  I could just be precise?  This --

3          THE WITNESS:  -- and I'm showing Mr. Bernick the

4  chart that was provided to me.

5  Q     41.

6  A     Just to be precise --

7  Q     Yes.

8  A     -- that is the market approach to the balance sheet test.

9  So, let's leave off -- you keep pointing to adequate capital

10  and that's what's giving me pause.

11  Q     Okay.

12  A     That's all.  That's all.

13  Q     I see.  But when it comes to adequate capital, you did

14  make the assumption in one of your analyses to show solvency

15  that the Florence estimate was agreed in the plan, fair?

16  A     Not for the adequate capital test.  If you look at my

17  report, the adequate capital test, I made observations about

18  how much access to capital Grace has, in general.

19  Q     Oh, okay.

20  A     That's all.

21  Q     So, maybe I got it wrong.

22  A     That's all.

23  Q     Did you assume that this plan simply goes effective as it

24  was?

25  A     For the adequate capital test?

1  Q    Yes.

2  A    Yes.

3  Q    Okay.  Okay.  So, now, the plan goes effective according

4  to its terms and, lo and behold, there's adequate capital, is

5  that your opinion?

6  A    Yes.

7  Q    Okay.  That's terrific and that's something that Grace

8  agrees about, too, right?

9  A    Yes.

10 Q    Okay.  And the plan goes effective and Ms. Zilly's

11 analysis of feasibility is done and you agree with that, too?

12 A    Yes.

13 Q    And I don't see that you actually did any work to do

14 anything other than say, you concur with Ms. Zilly, right?

15 A    Well, as I just testified.

16 Q    Right.

17 A    I just testified that I took those projections that were

18 included --

19 Q    Right.

20 A    -- in her report and came to my own conclusions about the

21 reasonableness of the assumptions.  Again, based on my history

22 with the company over the last four years, the fact that -- can

23 I just give you an example of how I would have disagreed?

24 Q    Well, actually, what I'm really kind of getting to --

25 A    Okay.  I'm sorry.

1  Q    I appreciate --

2  A    It's just simply -- I actually did work.

3  Q    Okay.  I'm not --

4  A    That's all I'm saying.

5  Q    I used the wrong word.

6  A    Right.

7  Q    I know you did work.  I know that from your deposition.

8  You're clear in your testimony and I think you testified

9  truthfully, and that's not the issue whether you're testifying

10  truthfully in the case.  You did a lot of work maybe, but at

11  the end of the day, you did not do your own feasibility or pay

12  debts analysis.  You took the work that Ms. Zilly had done,

13  kicked the tires hard, and basically you concurred with her.

14  Fair?

15  A    I concurred with her, but I disagree that I didn't do my

16  own work is all.

17  Q    You didn't do your own feasibility --

18  A    I was --

19  Q    I don't see any different feasibility numbers from hers.

20  A    Right.  You mean solvency?  I didn't do a feasibility

21  test.

22  Q    Well, I mean, Ms. Zilly did a feasibility test.  You then

23  took her work and said, does it answer the question of the

24  ability to pay debts and you concluded that it did?

25  A    Absolutely.

1  Q    And in doing so, you didn't set out a different analysis

2  about why it was that the company would be able to pay debts,

3  correct?

4  A    Correct, but that would be inconsistent with the cash flow

5  test.  Why would I do a different test?

6  Q    I didn't ask you whether it would.  The point is that you

7  didn't do -- you have no separate analysis that I see in the

8  report, right?

9  A    That's correct.

10 Q    Okay.  Likewise on adequate capitalization.  I don't see

11 -- I see no separate analysis in the report, correct?

12 A    Well, with adequate capital, again, as I mentioned a

13 little while ago, that the adequate capital test is more a

14 qualitative -- a qualitative analysis, if you will, considering

15 factors, and I do list those factors.

16 Q    I'm sorry?

17 A    I do list those factors in my report.

18 Q    Yeah, but I don't see -- I don't see that --

19 A    In my report.

20 Q    I'm sorry.  But, I don't see -- oh, so, you say it's

21 qualitative.  The factors are there, so you analyzed the

22 factors?

23 Q    That's -- so, this is not quantitative then, adequate

24 capital?

25 A    It's not, no.

1  Q    Okay.

2  A    Adequate capital is not a quantitative test.

3  Q    Okay.  Okay.  It's not quantitative.  Well, I want to come

4  back to this balance sheet because most of the work that's in

5  your report focuses on the balance sheet.  Fair?

6  A    Fair.

7  Q    Okay.  And we now know what your contribution was which is

8  this assumption, and we can see, in fact, in the tables that

9  you presented you're very careful, and at Page 9 of your report

10 -- I'm zooming and it's not zooming, I guess, because I'm

11 pressing the wrong side.  Okay.  So, in Page 9 of your report,

12 you take the Grace pro forma, right?

13 A    Correct.

14 Q    And then you make certain adjustments and then you have

15 the Capstone pro forma, right?

16 A    Correct.

17 Q    And if we look to what's different, we can see in the

18 second column that there are two big differences, right?

19 A    Correct.

20 Q    You assume that there's more cash in investments

21 available, 391 million versus 118, and we assume that the debt

22 that's payable down the road is much smaller than what's

23 actually in the pro forma, right?

24 A    Correct.

25 Q    And those two adjustments, those are the biggies, right?

1  A    Those are the only two.

2  Q    Right.  Those two adjustments are simply the mechanical --

3  not the mechanical; I won't say that.  They are the carefully

4  considered implementation of a simple substitution which is the

5  Florence estimate for the agreed liability in the plan,

6  correct?

7  A    Correct.

8  Q    Okay.  And that's the heart of the thing, isn't it?  We

9  can see that, on the balance sheet -- excuse me -- on the

10  market -- the other one that you did, CC41, it's the same basic

11  deal.  You take what Grace's presentation is, which assumes

12  cash on emergence of 144 million, and you show that cash upon

13  emergence is actually much greater, 561 million.  Likewise,

14  deferred payments are 395 under the Grace analysis -- or the

15  Grace analysis, whereas with respect to your assumption, the

16  deferred payments are only 23 million, right?

17  A    Correct.

18  Q    And that again is the simple -- is the careful

19  implementation pursuant to GAAP of the simple assumption that

20  the agreement as to the Florence estimate as opposed to the

21  estimate that -- the liability that's agreed in the plan.

22  True?

23  A    Well, not pursuant to GAAP, but true if you remove that.

24  Okay.

25  Q    I'll accept that correction.  Again, very careful.  Forget

1  about GAAP.  This, again, is essentially the same kind of

2  careful implementation of this one simple assumption.  Fair?

3  A    Fair.

4  Q    Okay.  Now, let's be clear about that one simple clear

5  assumption.  That was an assumption as to which?

6  A    Which test?

7  Q    No.

8  A    Oh, I'm sorry.

9  Q    The idea, the assumption that was made in both cases where

10 you assume that the Florence estimate was the agreed number

11 instead of what's actually in the plan, isn't it true that the

12 decision to put into a consensual plan balance sheet a disputed

13 number, that decision is one as to which there is no

14 established convention or methodology within your expertise

15 that says that it's right?  Well, let's be clear.

16 A    Could you restate it again?

17 Q    The Florence estimate was intensely disputed, was it not?

18 A    That I don't know.

19 Q    You don't know that the Florence estimate --

20 A    I'm sure it was.  Again, I did not follow closely the

21 various disputes among the experts.

22 Q    I want you to assume it was disputed --

23 A    That's fine.

24 Q    -- and I think we'll go back to your deposition and find

25 it.

1  A    Okay.  That's fine.

2  Q    At least at that time you thought it was.

3  A    Yeah.

4  Q    But, assuming that it was disputed, you're not aware of

5  any convention or methodology in your area of expertise that

6  says that it's right to substitute into a pro forma agreed

7  plan, a disputed estimate, correct?

8  A    Correct.  But, I mean, you don't need an expertise to do

9  that or not do that.

10  Q    Right.  You don't need an expertise to make this

11  assumption or substitution that you made, right?  They're not

12  going to help you so --

13  A    No.  Just -- yeah.  To make that a substitution, no, you

14  don't need an expertise to make that substitution.

15  Q    Right.

16  A    But, the analysis, you do.

17  Q    No, no.  I'm just talking about the assumption.

18  A    Okay.  Yeah.  The assumption doesn't require --

19  Q    You're not saying here as an expert that that assumption

20  constitutes the exercise of any of your expertise, right?

21  A    Correct.

22  Q    You're not even expressing an opinion as to whether that

23  assumption is proper or not, right?

24  A    Right.

25  Q    In fact, the assumption was simply given to you by

1  counsel, right?

2  A    Counsel asked me to prepare an analysis based on that

3  assumption.

4  Q    Based upon that assumption.  Okay.  I'd like to test that

5  assumption a little bit.  That's something that you, within

6  your field, do from time to time, right, is to test assumptions

7  and put things to facts and --

8  A    Critically challenge.

9  Q    -- you do verifications.  I'm sorry?

10  A    Critically challenge.

11  Q    Critically challenge.  Let's critically challenge this for

12  just a moment by focusing on the historical facts as you

13  understood them, the actual historical facts.  You're assuming

14  that everybody would agree to a plan with a different number.

15  That's your assumption, right?

16  A    That's correct.

17  Q    So, this is still agreed and the Sealed Air money is still

18  there and the Fresenius money is still there, everybody agrees

19  and they're just agreeing to a number, right?

20  A    Right.  That's the assumption.

21  Q    Okay.  So, if you critically analyze that and take a look

22  at the events, there are facts that are available to you, are

23  there not, within the historical events leading up to this

24  plan?  You can use the historical events leading up to the plan

25  to test and critically challenge your assumption, correct?

Frezza - Cross/Bernick                          314

1  A    Correct.

2  Q    Okay.  Now, did the lawyers ask you to do that?

3  A    To critically challenge the assumption they asked me to

4  use?

5  Q    Yes.

6  A    No.

7  Q    Well, you know about the market facts that are relevant,

8  do you not?  Let me just give them to you.  You know that in

9  April of 2008, which is when the plan deal was done, you know

10 then that the issue of estimated liability was hotly contested,

11 correct?

12 A    Correct.

13 Q    You knew at the time that there was a wide range of

14 estimated liability, right?

15 A    Correct.

16 Q    You knew at the time that, depending upon which estimate

17 was accepted, the company would be solvent or insolvent,

18 correct?

19 A    I'm sorry?  Say that one more time?

20 Q    You knew that, depending upon which estimate was accepted

21 while the deal was being negotiated, you got a big contest

22 about what the number is, and depending upon who wins that

23 contest, which number is accepted, the company would be solvent

24 or insolvent.  You knew that, correct?

25 A    Correct.

1  Q    You agree that nobody, on the basis of any established

2  accounting methodology or valuation methodology could have

3  predicted at that time, before the plan was actually put

4  together, could have predicted what the final estimated number

5  would be?

6  A    Probably not.  No.

7  Q    Well, in fact, you said at your deposition, I agree that

8  somebody could not predict that, right?

9  A    Yes.

10  Q    And if somebody had asked you back in the day leading up

11  to the plan that you're assuming would have been agreed in a

12  certain way, if you had been asked, well, is Grace solvent or

13  insolvent, you would have had to say, I don't know, solvent

14  versus insolvent, right?

15  A    Because of not knowing what the liability was.

16  Q    Right.  That's what you would have said, you don't know,

17  right?

18  A    Correct.

19  Q    Just like Ms. Zilly said this morning, right?

20  A    Correct.

21  Q    You agreed with what she said this morning that, given the

22  facts as they were then known, solvency or insolvency was

23  uncertain during the period of time that the term sheet was

24  being negotiated, correct?

25  A    In April for instance.  Yes.

1  Q    Yeah, in April.

2  A    Yeah.

3  Q    Okay.  Indeed, nobody at that point could have told, on

4  the basis of any expertise, whether Grace would turn out to be

5  solvent or insolvent, correct?

6  A    Correct.

7  Q    So, you have two hugely committed, hugely resourced

8  adversaries battling it out and then sitting down at a table

9  through their representatives and negotiating at arm's length.

10 That's the historical fact of what occurred, right?

11 A    Right.

12 Q    Okay.  And those are very important facts.  They're market

13 facts, actual market facts, about how this deal was done, two

14 very, very committed, enormously skilled and dedicated -- I'm

15 being facetious -- I won't -- two very committed adversaries

16 litigating a very important issue.  Fair?

17 A    Fair.

18 Q    And they sit down and they do a deal, right?

19 A    I believe so.

20 Q    And that deal calls for a number, a liability to be paid,

21 that is much, much, much greater.  After they sit down and they

22 negotiate at arm's length, the market comes out with a

23 liability number which is much greater than the number that

24 you've assumed for purposes of your analysis, correct?

25 A    Correct, but for one arm of the analysis.  That's all.

1  Q    Well, the balance sheet arm of the analysis, right?

2  A    For that purpose.

3  Q    Yes.

4  A    But --

5  Q    Your balance sheet analysis assumes -- we've already been

6  through this -- a disputed estimate which is much, much less

7  than what the marketplace has set is the actual agreed

8  liability for asbestos, right?

9  A    Correct.

10 Q    And yet you're assuming, for purposes of your analysis,

11 that an agreement was reached that's completely different from

12 what the marketplace says the agreement is, right?

13 A    For that particular test, yes.

14 Q    For that particular test.  In fact, isn't it true that the

15 personal injury claimants would never have agreed, never have

16 agreed, in an agreed plan to the Florence estimate?

17 A    I can't answer that.

18           MR. PASQUALE:  Objection, Your Honor.  How can the

19 witness know that?

20           THE COURT:  He just said he can't know but, yes,

21 that's sustained.

22           THE WITNESS:  I can't answer that.

23 Q    Based upon what it is that is testing the assumption,

24 you've assumed that they would, right?

25 A    In that analysis, I did.  Yes.

1  Q    Okay.  And then, based upon the historical facts that are

2  real, as opposed to the assumption that was given to you by

3  counsel, those historical facts tell you that, in fact, they

4  never would have agreed to that lower number, correct?

5           MR. PASQUALE:  Objection, Your Honor, it's the same

6  question.

7           MR. BERNICK:  Well, it's inherent in this process.

8  He's making a prediction.

9           THE COURT:  I think that's a different issue.  This

10 is not what's in the mind of the committee.  This is what he

11 can subsume from the historical facts.  So, the objection is

12 overruled.

13 Q    Isn't that correct that the marketplace agreement is

14 completely different than the agreement that you've assumed for

15 purposes of your balance sheet analysis, correct?

16 A    Correct, but that wouldn't preclude a sensitivity, in

17 other words, an analysis that would sensitize that.

18 Q    Sensitize that.

19 A    All I'm saying is it's not incorrect to do that.  It's

20 just --

21 Q    Not incorrect?  It's completely contrary to the historical

22 facts, right?

23 A    Right.  And all I'm trying to say is that, that shouldn't

24 preclude someone performing an analysis of this.

25 Q    I'm not saying you should be precluded.

Frezza - Cross/Bernick                    319

1  A    Right.

2  Q    I'm just saying -- I'm suggesting to you that the analysis

3  that you've done is contrary to historical fact.  Can we agree

4  on that?

5  A    I guess we could agree on that.  Yes.

6  Q    Okay.  And in point of fact, it's so bad that you've

7  recognized that if the plan proponent, if the PI claimants'

8  representatives would have been presented with the idea of

9  agreeing to the Florence estimate, they would have said, when

10 hell freezes over, right?

11          MR. PASQUALE:  Objection, Your Honor.

12          THE COURT:  Sustained, to the first couple words, "it

13 was so bad".

14          MR. BERNICK:  Oh.

15 Q    They probably would have said, when hell freezes over,

16 right?

17 A    I can't answer that.

18 Q    Well, you did at your deposition.

19 A    I know.

20                    (Laughter)

21 Q    That is what you said.  They probably would have, right?

22 A    I did say that in my deposition.

23 Q    Okay.  And what about force?  You have no ability, no

24 reason, no basis to say that they could have been forced to

25 agree, do you?

1  A    No.

2  Q    Okay.  And, in point of fact, have you been told that

3  throughout the entire estimation process, it was the position

4  both of the asbestos claimants and the futures representatives,

5  that even if the estimate turned out to be lower, that it

6  couldn't be used legally to bind individual claimants?  Were

7  you ever told that?

8  A    I don't know that.  If I knew it in my deposition, then I

9  must have, but I don't recall that.

10 Q    And to be clear, you do not have -- I'll adopt some of the

11 questions that Mr. Cobb posed.  You do not express an expert

12 opinion that the assumption that you were given by counsel is a

13 proper or correct assumption?  You do not have an expert on

14 that, correct?

15 A    Could you just restate that?

16 Q    Yes.

17 A    I just want to make sure I'm --

18 Q    To substitute for the plan asbestos claimant payments, the

19 Florence asbestos claimants, you are not offering any expert

20 opinion that that substitution is appropriate, are you?

21 A    No, I'm not.  I'm not opining on the appropriateness of

22 the substitution.

23 Q    You don't have the expertise to do that, correct?

24 A    Right.  I'm not an asbestos estimator.

25 Q    I don't know if you've got -- the answer to that is no,

Frezza - Redirect/Pasquale                    321

1  you don't have the expertise, right?

2  A    No, I don't.

3        MR. BERNICK:  Pass the witness.  And I renew the

4  motion to find that this testimony and these opinions are

5  inadmissible because they don't satisfy the requirements of the

6  Federal Rules 702 and 703 by the witness' own testimony.

7        MR. PASQUALE:  And we obviously disagree with that,

8  and I think Mr. Cobb's questions made that quite clear, as well

9  as the witness' testimony, but let me do my redirect.

10        THE COURT:  All right.

11                    REDIRECT EXAMINATION

12  BY MR. PASQUALE:

13  Q    Mr. Bernick spent an awful lot of time talking about the

14  one simple clear assumption.  Was that the only analysis you

15  did?

16  A    No.  As I testified, I performed all three tests on the

17  plan that is before the Court, the market approach or the

18  balance sheet test, the adequate capital test and the cash flow

19  test.

20  Q    Okay.  Let me ask you, did your cash flow test assume the

21  Florence amount for personal injury claims?

22  A    It did not.

23        MR BERNICK:  I've already -- there's no issue about

24  that.

25        MR. PASQUALE:  Well, I'm asking questions on

Frezza - Redirect/Pasquale                                322

1 redirect.

2             MR. BERNICK:  Okay.

3 Q    Did your adequate capital test assume the Florence number

4 for personal injury claims?

5 A    No, it did not.

6 Q    Did your balance sheet test, using the market approach,

7 assume the Florence personal injury estimate?

8 A    One version did, but I did one for the plan before the

9 Court so I did it -- I did the market approach for both.

10 Q   And Mr. Bernick asked you about a cash flow test.  Why

11 didn't you do your own cash flow test?

12 A   Well, we keep saying I didn't do my own, but I used the

13 information in the Zilly report to do my own analyses.  To just

14 simply restate the projections included in her report would

15 have just been redundant, but I did analyze those projections.

16 I did consider those projections in the context of Grace's past

17 performance that I'm well-aware of due to my participation in

18 the case.  So, I did do my own analysis.  It's just -- I just

19 refer to the Zilly report as relying on that in terms of laying

20 out the information in the report.

21 Q   And as an accountant and a financial advisor, did you

22 believe it was reasonable to rely upon the information provided

23 by Grace in the documents?

24            MR. BERNICK:  Again, there's no --

25 A   I do and --

**J&J COURT TRANSCRIBERS, INC.**

1        MR. BERNICK:  (A) it's leading, (B) it's not in

2   dispute.

3        THE COURT:  Well, it's leading.

4   A    Okay.  It's perfectly appropriate for experts --

5   Q    No.  I need to ask you a question.

6   A    Okay.

7   Q    Did you believe it was reasonable to rely on the

8   information provided by Grace in the documents you looked at?

9   A    I believe it's perfectly reasonable to rely on the

10  information in the document, because I would have done nothing

11  different.

12  Q    Why?  Why was it reasonable?

13  A    Because it's the exact set of procedures that one would do

14  in the -- under the cash flow test to arrive at a decision or

15  an opinion, excuse me, of solvency under that test.

16  Q    Did you have any reason to doubt the information that you,

17  in fact all of us, have been provided in Grace's disclosure

18  statement?

19  A    No, not at all.

20  Q    Did Grace, in any of the documents you've relied upon in

21  rendering your opinions, do a balance sheet solvency test under

22  the market approach?

23  A    Not to my knowledge, no.

24       MR. PASQUALE:  Nothing further, Your Honor.

25       MR. BERNICK:  I just have a couple of quick

1 questions.

2                    RECROSS EXAMINATION

3 BY MR. BERNICK:

4 Q    First, let's be clear.  I don't want to -- first, with

5 respect to Ms. Zilly.  She has a whole -- she has a series of

6 tables and actual quantitative analysis demonstrating

7 feasibility, correct?

8 A    Correct.

9 Q    I've not seen any such presentation in your report, is

10 that correct?

11 A    That's correct.

12 Q    Yeah.  In fact, all I see in your report is maybe a couple

13 of paragraphs that are there?

14 A    Correct, but I didn't need to in order to arrive at an

15 opinion of solvency under the cash flow test.

16 Q    Again, Ms. Zilly shows her work, has the tables, you take

17 the tables.  You do work, but I don't see the presentation of

18 any different numbers or any different analysis from Ms.

19 Zilly's, correct?

20 A    Correct.

21           MR. PASQUALE:  Asked and answered.

22 Q    I'm sorry?

23 A    You don't see any --

24           MR. PASQUALE:  Objection.  Asked and answered.

25           THE COURT:  Not exactly this question.  He was asked

1  a similar but not identical question.  You may answer.

2  Q    I just want to be very clear about it.

3  A    I'm sorry.  Could you restate that?  I'm sorry.

4  Q    Yes.  Ms. Zilly has a series -- a table and a series of

5  numerical analyses on the basis of which she concludes that

6  this plan, if it's put into effect, is feasible.  In your

7  report, I see three paragraphs.  I don't see any such

8  quantitative analysis.  I see your concurrence with what Ms.

9  Zilly has shown.  Fair?

10 A    Fair but, again, I would just be restating those facts

11 because they're facts about the company.

12 Q    As set forth in Ms. Zilly's work?

13 A    Correct.

14 Q    Okay.  The adequate capital analysis, the adequate capital

15 test, you did not perform a complete adequate capital test,

16 right?

17 A    A complete adequate capital test?  I'm sorry.

18 Q    Did not perform a complete adequate capital test.  True?

19 A    True.

20 Q    Okay.

21 A    However -- however, an adequate capital test, again, is a

22 collection of data points, some of which flow from the cash

23 flow test, some of which flow from balance sheet tests.

24 Q    All I'm asking you -- I understand that.

25 A    Okay.

1  Q    All I'm asking is, bottom line, there are standards and

2  methods for how to conduct an adequate capital test, correct?

3  A    Actually, no.  It's more to the -- it's more to the

4  judgment of the professional performing the test.

5  Q    Well, in your judgment, the analysis that you did was not

6  complete.  True or not?

7  A    It was less complete had I spent more time focusing on the

8  adequate capital test.

9  Q    Right.  Now, under the balance sheet, the only way that

10 you can conclude that -- strike that.  If the plan goes

11 effective, you believe that Grace will be solvent under that

12 plan, correct?

13 A    Correct.

14 Q    As it's currently constituted; that is, with no changes?

15 A    Correct.

16 Q    We all hope and pray and expect that the plan, as styled,

17 will go effective, and if it does go effective, the good news

18 is that Grace won't be insolvent, right?

19 A    Correct.

20 Q    Okay.  What you -- and we already knew that before you

21 came into the case, right?

22 A    Right.

23 Q    It wouldn't have made an awful lot of sense to come up

24 with a plan of reorganization and these guys would never have

25 agreed to it if it turns out that once Grace came out of

1 bankruptcy it was insolvent, right?

2 A    I would hope that's the case.  Right.

3 Q    So, in fact, your whole analysis is designed to show that

4 Grace will be solvent after this plan is approved, you're kind

5 of telling the Court something that it already knows, right?

6          MR. PASQUALE:  Objection.

7 A    I can't answer for the Court.

8          THE COURT:  That's sustained.

9 Q    No one -- you're not telling anybody else in court.  The

10 Court hasn't heard it formally, but that's like no surprise,

11 right?

12          MR. PASQUALE:  Same objection, Your Honor.  Same

13 question, just different words.

14          MR. BERNICK:  No.

15 Q    It's no surprise?

16          MR. PASQUALE:  Your Honor.

17          THE COURT:  To whom?

18 Q    To anybody involved in the case, Mr. Frezza, right?

19 A    I can't speak for other people.

20 Q    It wasn't any shocker to you, was it?

21 A    It wasn't a shocker to me.

22 Q    Okay.  And so your analysis then says, let's -- I want to

23 say -- guild the lily, just a little bit.  Let's make a change

24 in assumption to show that there's huge solvency, if we change

25 a key part of the plan, right?

1  A    That's the effect of that, yes.

2  Q    Okay.  And that's the part of your analysis that's all

3  driven by this assumption that's not based in historical fact,

4  correct?  Did I get that right?

5  A    That's correct.

6  Q    Thank you.

7            MR. PASQUALE:  One question, Your Honor?

8            THE COURT:  Yes.

9                  FURTHER REDIRECT EXAMINATION

10  BY MR. PASQUALE:

11  Q    Adequate capital test.  What else would you have had to

12  have done to do a complete adequate capital test?

13  A    When we say complete adequate capital test, I mean, as I

14  testified a couple of times in this sitting, the adequate

15  capital test is really a judgment test of qualitative factors.

16  So, for instance, if it was a close call, if a professional

17  would have performed a balance sheet test and a cash flow test,

18  and it was not clear whether the company was completely

19  solvent, then there would be a number, maybe additional

20  factors, under the adequate capital test to determine whether

21  the company was solvent under that test.  However, when the

22  tests show that there is a significant equity cushion as

23  displayed by the balance sheet test, the market approach of the

24  balance sheet test on the plan before the Court and the fact

25  that the financial projections, while reasonable, show a

1  substantial ability to generate cash going forward on a

2  conservative basis, there is really no need to go beyond

3  determining is an equity cushion of 430 to $820 million enough

4  of an equity cushion for a company to weather financial bumps

5  in the road.

6          When you see that the company has excellent terms

7  with its vendors, has had and continues to have access to debt

8  capital in order to draw down in the event of an emergency,

9  does the company have the ability to go out to the equity

10 markets to raise equity capital, you don't need more than that

11 in a situation like this to come to a conclusion under the

12 adequate capital test because it is very much a judgmental

13 test, qualitative judgmental test.

14         MR. COBB:  One question, Your Honor.

15                    REDIRECT EXAMINATION

16 BY MR. COBB:

17 Q    Mr. Frezza, Mr. Bernick asked you -- well, actually, I

18 think elicited through your testimony that said that you simply

19 relied upon Ms. Zilly's numbers, calculations, in connection

20 with producing your opinion as to whether Grace can pay its

21 debts, when due, as of the effective date.  Do you recall that

22 testimony?

23 A    I do.

24 Q    How in the world, as an expert, could you just rely on her

25 numbers to produce your expert opinion?

1  A     Well, first of all --

2          MR. BERNICK:  Okay.  I'll accept that.  I think that

3  this is just a reiteration of where we've already been, Your

4  Honor.

5          THE COURT:  I think so, too, but I'll let him answer.

6  Go ahead, sir.

7  A     First of all, it's perfectly appropriate for a

8  professional to rely on another professional's work.  Secondly,

9  it wouldn't be appropriate for me to create my own version of

10 Grace's projections without, for instance, access to management

11 or time with the company.  So, it's perfectly appropriate to do

12 that in arriving at an opinion if, in my opinion, that

13 professional did all the appropriate work that they needed to

14 do to come to a view of reasonableness in those cash flow

15 projections and whether those cash flow projections indicate

16 the company could pay its debts as they come due.

17 Q     And did you make that conclusion with regard to Ms.

18 Zilly's work in this case on feasibility?

19 A     I did.  I did.

20         MR. COBB:  Your Honor, I have nothing more of this

21 witness.  I would like to speak very briefly to Mr. Bernick's

22 efforts to try to eliminate this witness' opinions from the

23 evidentiary record.

24         THE COURT:  All right.

25         MR. COBB:  Your Honor, I think --

1           MR. BERNICK:  Your Honor, if I --

2           MR. COBB:  First, Mr. Bernick has presented the Court

3 --

4           THE COURT:  Wait, just a second.  I'm not sure if the

5 testimony is done.

6           MR. COBB:  I'm sorry.  Go ahead.

7           MR. BERNICK:  I just -- if Mr. Cobb wants to make a

8 statement, I know the Court will hear it.  It seems to me that

9 we're going to have time to argue motions, I think, on the 13th

10 or 14th is what your Honor wants.

11           THE COURT:  We are going to be arguing motions then.

12           MR. BERNICK:  So, why don't we just save it until

13 then?  We're all going to have an argument.  If you want to

14 make a statement, I guess that's fine, but --

15           MR. COBB:  Your Honor, he had an opportunity to file

16 a Daubert motion and he didn't, and now he wants to fix this --

17 he wants to deal with this in this manner.  He's the first one

18 to raise the CMO and wave it in everyone's faces.  It's just

19 improper.  Second, Your Honor, he's presented no evidence that

20 this phrase, is it qualify or -- I don't know, whatever phrase

21 he used, that that somehow is relevant to producing a solvency

22 opinion.

23           I asked this expert whether it is relevant and he

24 said -- and he provided an answer the Court can easily review

25 in the record.  He's simply saying things, Your Honor, in an

1 effort to discredit this witness.  He's presented no evidence

2 that this witness' testimony should not be considered by the

3 Court.

4          Your Honor, frankly, if Your Honor would like to give

5 less weight to some of his opinions and -- however Your Honor

6 judges this witness' testimony and the evidence that he's

7 provided this Court, that's up to Your Honor.  But,

8 discrediting this witness from any of his testimony coming in,

9 is simply inappropriate and improper in this case.  Thank you.

10          THE COURT:  Does anyone have any questions for the

11 witness who is still sitting here?

12                         (Laughter)

13          THE COURT:  You're excused, sir.  Thank you.

14          THE WITNESS:  Thank you, Your Honor.

15          MR. BERNICK:  Do you have any more witnesses?

16          MR. PASQUALE:  Your Honor, we have no other witnesses

17 to call in our affirmative case.  Thank you.

18          THE COURT:  Mr. Cobb?

19          MR. COBB:  We have no witnesses, Your Honor.  We've

20 relied on the evidence that's been supported in -- are we

21 calling this Phase 2?  I think that's been clear from all the

22 filings that we've made before the Court.  The bank lender

23 group rests, as well.

24          THE COURT:  All right.

25          MR. PASQUALE:  Well, I should say, Your Honor --

1          MR. COBB:  Well, in fairness --

2          THE COURT:  Well, I'm not having people --

3          MR. COBB:  You have our one clean up issue tomorrow

4     with regard to exit financing.

5          THE COURT:  Yes.  I'm not having anybody rest because

6     this case is coming in, in pieces.  I just want to finish the

7     testimony with respect to the areas of the case that we're in.

8          MR. PASQUALE:  The evidence that has been submitted,

9     we have submitted jointly and we have nothing else.  Thank you.

10         MR. BERNICK:  We don't have any rebuttal live

11    testimony, and so I think we're subject to the caveat Mr. Cobb

12    indicated which is that he wants to talk about exit financing

13    with Ms. Zilly tomorrow.  Ms. Zilly is going to be testifying

14    about feasibility.  In that regard, she's going to be talking

15    about exit financing and I think he's reserving his right -- I

16    know he's reserving his right -- to examine on that, but we're

17    not doing it now.

18         So, I think we're done with that caveat with the live

19    testimony concerning the lenders' phase of Phase 2.  The hour

20    is late and I know that people probably have some things that

21    they want to take up from --

22         THE COURT:  Well, they're going to have about ten

23    minutes to do it so let's start with that, then.  Mr. Finch?

24         MR. COBB:  Your Honor, the parties have all --

25         THE COURT:  Mr. Cobb?

1        MR. COBB:  Thank you, Your Honor.  The parties have

2  all kind of dealt with their exhibits as their case has closed,

3  so-to-speak.  We're not using that terminology.  Your Honor,

4  we've reached an agreement with the debtors that we will meet

5  and confer with regard to their objections to our exhibits over

6  the next few days and we will be submitting to the Court what

7  we believe will be a fully agreed exhibit list for the

8  committee and for the bank lender group, just so the Court

9  knows where those exhibits stand.  Thank you.

10        MR. FINCH:  Nathan Finch for the Asbestos Claimants

11  Committee.  Your Honor, a couple of housekeeping matters.

12  Working backwards, I guess.  With respect to some evidence that

13  was admitted, I guess it was Monday, it was two 1006 summaries

14  during testimony of Mr. Hughes.  They were marked Plan

15  Proponents' Exhibit 506-2 and 506-3.  There was a column that

16  was stricken --

17        THE COURT:  Yes.

18        MR. FINCH:  -- as a result of the Court's evidentiary

19  ruling and the title of the slide has no probative value.  Mr.

20  Hughes' testimony is what it is about the basis of this.  We

21  have deleted or blacked out the column.  I'd like to hand those

22  up to Your Honor.

23        THE COURT:  All right.  Are these remarked as 506-2a

24  and 506-3a?

25        MR. FINCH:  No, they're not, Your Honor.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  I think that's what you said you were

2  going to do.  Maybe it would be helpful to do that.

3          MR. FINCH:  Okay.  I'll put a sticker on it.

4          MR. BERNICK:  Can I get -- I'll now get in line.

5          MR. FINCH:  The second issue related to the admission

6  of solely as against the Libby claimants, the Plan Proponents'

7  Exhibit 199, which is Dr. Peterson's estimation report, and it

8  was offered and admitted only for the purposes of showing that

9  it was -- the Libby claimants had notice of it and it was given

10  -- produced in the case.  It was subject to proving up or

11  having Libby claimants stipulate that they, in fact, got that

12  report.

13          It's my understanding counsel for Libby claimants has

14  agreed that they did get that report and therefore there is no

15  issue as to whether it was, in fact, served in the case on

16  them.

17          THE COURT:  Mr. Kovacich?  First of all, let me just

18  mark for the record -- note for the record, that Exhibits

19  506-2a and 506-3a will be admitted as the substitute exhibits

20  for demonstrative purposes.  Yes, Mr. Kovacich?

21          MR. KOVACICH:  I believe what Mr. Finch said is

22  right, but I apologize, I couldn't quite hear back there in the

23  bleachers so --

24          MR. FINCH:  What I -- with respect to Dr. Peterson's

25  report, it's only being offered not for its truth.  It's only

1 being offered for the purposes of proving that he created such

2 a report in the estimation case and that it was served on the

3 Libby claimants' counsel through the normal bankruptcy process

4 and that is Plan Proponents' Exhibit 199.

5          MR. KOVACICH:  Yes, Your Honor.  That exhibit, as I

6 recall, was admitted over objection for that purpose.  The

7 Libby claimants don't dispute that it was served, as Mr. Finch

8 represents, but we maintain the objection that it should not

9 have been admitted in the first place.

10          MR. FINCH:  And in the -- the final housekeeping

11 matter that I have, Your Honor, is that the Libby claimants

12 have given us their demonstrative exhibits and we are looking

13 at them tonight and will have any comments back to them.  The

14 objections and rulings are what they are from the transcript

15 and we're just looking over them.

16          MR. PERNICONE:  Your Honor, hello.  Carl Pernicone

17 for Arrowood Indemnity.

18          THE COURT:  Just a minute, Mr. Pernicone.

19          MR. PERNICONE:  Sure.

20          THE COURT:  I'm sorry, Mr. Finch.  It's been a long

21 day but -- Mr. Finch?  Hello.  I'm sorry.  It's been a long

22 day, but I think that some of those exhibits may not have been

23 offered, but I may be confusing that with a different witness,

24 I'm not sure.  So, I'm not -- I thought I said that I would

25 reserve ruling on the exhibits that hadn't been offered until

1  tomorrow when the debtors had an opportunity -- the plan

2  proponents had an opportunity to look at the exhibits.

3          MR. FINCH:  Yes.  What's what we're going to do

4  tonight.

5          THE COURT:  Oh, all right.

6          MR. FINCH:  I just wanted to inform Your Honor that

7  that's what we, in fact, are doing.

8          THE COURT:  Okay.  I thought you meant that whatever

9  rulings had already been made were of record and I didn't think

10  I --

11          MR. FINCH:  No, no, no.  They -- I don't know if they

12  neglected to offer them or what, but we're looking at them

13  tonight.

14          THE COURT:  All right.  Okay.

15          MR. PASQUALE:  Yeah.  As I understand it, it's the

16  272 to 279 overheads that we're addressing, correct?

17          MR. FINCH:  That's correct.

18          MR. PASQUALE:  Okay.  Thank you.

19          THE COURT:  Mr. Pernicone?

20          MR. PERNICONE:  Your Honor, you'll recall yesterday,

21  Mr. Schiavoni, my co-counsel, proffered the declaration of Mr.

22  Kemp Hooper from Arrowood in lieu of live testimony.  The Libby

23  claimants had some objections to his content.  He and I have

24  been negotiating today with Mr. Cohn and we resolved those

25  differences, and I now have for offering into evidence the

1 declaration of Camphooper.  That's Arrowood Exhibit A-58.  May

2 I approach, Your Honor?

3          THE COURT:  Yes, please.  All right.  Arrowood

4 Exhibit A-58 is admitted.  Thank you.

5          MR. PERNICONE:  Your Honor, one more housekeeping

6 point.  Mr. Schiavoni and I have also reviewed with Mr. Cohn,

7 Libby claimants' counsel, their objections to the remainder of

8 Arrowood's exhibits.  We've resolved those, we think.  We're

9 going to be circulating this evening to everybody a list of our

10 exhibits addressing the resolution of their objections and

11 we're prepared to move for the admission of those exhibits

12 tomorrow.

13          THE COURT:  All right.

14          MR. PERNICONE:  Thank you, Your Honor.

15          THE COURT:  Mr. Bernick?

16          MR. BERNICK:  Yes.  Two matters I think of general

17 interest.  One, we've had discussions before the Court about

18 the schedule for post-trial briefing.  We previously had

19 circulated, as was indicated to the Court, a proposed schedule

20 in some related matters.  We've taken a hand at trying to

21 revise it in order to provide greater space in the schedule to

22 still keep us on some track that has some degree of

23 promptitude.

24          We've circulated the draft and we're now, in light of

25 some other developments that have just taken place, including

1  the in limine hearing, we're going to circulate a new draft

2  shortly and what we would propose is that tomorrow, some time

3  before we break at 12:45, we reserve at least a little bit of

4  time to take up the question of the future schedule to see if

5  we can't reach some kind of resolution about that.

6        THE COURT:  That's fine.  I think we'll do it first

7  thing in the morning because that -- everyone will want to get

8  out and therefore there will be less time spent on this issue.

9  So, everybody come prepared.  We're going to go through it and

10  I'm -- if we don't get it done in 30 minutes, then I'm going to

11  do it myself without anybody else's agreement.

12        MR. BERNICK:  Terrific.

13        THE COURT:  Do you want to start at 8:30 --

14        MR. BERNICK:  That would be fine.

15        THE COURT:  -- for that purpose?

16        MR. BERNICK:  That would be terrific.  So, we'll get

17  this on the -- we'll circulate this, including to the Court,

18  for discussion.  In terms of the order of witnesses, tomorrow I

19  do know we have at least three live witnesses who are going to

20  be prepared to go; Mr. Austern, Judge Sanders and then Ms.

21  Zilly with respect to feasibility and best interest.  I don't

22  know if there are going to be other live witnesses.  I know

23  that Mr. Speights is now here.  I know that he has a couple of

24  witnesses.  One of them presents a fairly important issue that

25  I need to raise at the outset which is that one of the

1  witnesses is a Dr. Ewing.  Dr. Ewing is an expert.  We don't

2  have an expert report for Dr. Ewing so there's a threshold

3  matter about why it is that Dr. Ewing is going to be coming

4  here and testifying.  I know that Mr. Speights will be prepared

5  to address that, but that also is available for tomorrow

6  morning.

7          In terms of what actual order we'll pursue, we

8  haven't had the opportunity to discuss that with Mr. Speights,

9  and we'll endeavor to do that, as well as with the FCR for both

10 PD and PI and see if we can reach some agreement.  But, we

11 certainly have ample live testimony to take place tomorrow.  We

12 are nearing the end of the case, so while I don't think we're

13 going to finish tomorrow, it's going to be pretty close which I

14 think is, thanks to the Court's patience and willingness to

15 make time available for us --

16          THE COURT:  You're too funny.

17                    (Laughter)

18          MR. BERNICK:  -- we're almost there.

19          THE COURT:  Okay.

20          MR. BERNICK:  I'm going to go have a drink here.

21          THE COURT:  Mr. Worf?

22          MR. WORF:  Just a quick point of clarification that's

23 probably self-explanatory, but we're making.  The complaints

24 that Garlock introduced into evidence earlier today, as well as

25 the other discovery materials and the summary complaints, is

1  not for the truth, but only for the fact that allegations were

2  made.

3           THE COURT:  Oh, yes.  I understand that.

4           MR. WORF:  Yes.  I just wanted to make that clear.

5           UNIDENTIFIED ATTORNEY:  You mean Garlock doesn't want

6  to admit liability on all those complaints?

7           MR. WORF:  For the record, yes.  That's right.

8           THE COURT:  Mr. Speights?

9           MR. SPEIGHTS:  Just a housekeeping matter.  I came

10 over today, Your Honor, to figure out how many boxes I need to

11 bring over tomorrow and I understand the live witnesses are

12 Austern, Sanders, and Zilly, that means --

13          THE COURT:  Lots of boxes.

14          MR. SPEIGHTS:  Well, no.  It means -- I'm happy.  I

15 mean, I only have to bring those.  I understand you want to

16 start at 8:30.  I have been --

17          THE COURT:  Well, let me see.  I was going to ask my

18 recorder, Jan, can we get somebody in that early now or is it

19 too late?

20          COURT RECORDER:  I can.

21          THE COURT:  You can?  All right.  Yes.  We can -- is

22 that all right, to start at 8:30?  We'll start with the case

23 management order post-trial?  Okay.  Yes, Mr. Speights?

24          MR. SPEIGHTS:  And for those of us who have to catch

25 a couple of planes home, I had heard that you were stopping at

1 12, and then I heard a minute ago it was 12:45.

2          THE COURT:  I thought it was 12, myself.

3          MR. SPEIGHTS:  That's what I had heard you say before

4 and I just -- I just wanted to know whether I need to change my

5 flight, Your Honor.

6          THE COURT:  Let me look and see what's --

7          MR. BERNICK:  Well, we'll stop whenever it is that

8 Your Honor wants to stop.  I think that the order actually said

9 12:45, but certainly --

10          THE COURT:  Okay.  My next hearing -- I think the one

11 issue that I -- okay.  My twelve o'clock case cancelled, so the

12 next case that I'm taking testimony in starts at one.  So, I

13 will need to give my staff a little bit of a break.  Can we

14 compromise at 12:30?

15          MR. BERNICK:  Whatever it is, we're not -- I don't

16 think we're going to finish tomorrow.  I know we're not going

17 to finish tomorrow, so there's no point in --

18          THE COURT:  All right.  No later than 12:30.

19          MR. BERNICK:  Yeah.

20          MR. SPEIGHTS:  Thank you, Your Honor.

21          THE COURT:  Anyone else?  You're not lined up to put

22 housekeeping matters on?

23                    (Laughter)

24          THE COURT:  Okay.  We'll be adjourned until 8:30

25 tomorrow.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. PASQUALE:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3                    * * * * *

4              **C E R T I F I C A T I O N**

5          We, RITA BERGEN, TAMMY DeRISI, AMY RENTNER, MARY

6  POLITO, KIMBERLY UPSHUR, KATHLEEN BETZ, and CECILIA ASHBOCK,

7  court approved transcribers, certify that the foregoing is a

8  correct transcript from the official electronic sound recording

9  of the proceedings in the above-entitled matter, and to the

10 best of our ability.

11 /s/ Rita Bergen

12 RITA BERGEN

13 /s/ Tammy DeRisi

14 TAMMY DeRISI

15 /s/ Amy Rentner

16 AMY RENTNER

17 /s/ Mary Polito

18 MARY POLITO

19 /s/ Kimberly Upshur

20 KIMBERLY UPSHUR

21 /s/ Kathleen Betz

22 KATHLEEN BETZ

23 /s/ Cecilia Ashbock        DATE:  September 18, 2009

24 CECILIA ASHBOCK

25 J&J COURT TRANSCRIBERS, INC.