UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                   .    Case No.  01-1139 (JKF)
                         .
W.R. GRACE & CO.,        .
et al.,                  .    USX Tower - 54th Floor
                         .    600 Grant Street
                         .    Pittsburgh, PA 15219
             Debtors.    .
                         .    September 17, 2009
. . . . . . . . . . . ..      8:36 a.m.
```

TRANSCRIPT OF PLAN CONFIRMATION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               LISA G. ESAYIAN, ESQ.
                               JANET BAER, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601


For the Asbestos          Caplin & Drysdale, Chartered
Creditors Committee:      By:  PETER LOCKWOOD, ESQ.
                          One Thomas Circle, NW
                          Washington, D.C. 20005


For the Future            Orrick, Herrington & Sutcliffe, LLP
Claimants                 By:  ROGER FRANKEL, ESQ.
Representatives:               JONATHAN GUY, ESQ.
                          Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007


Audio Operator:           Cathy Younker

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For W.R. Grace:            W.R. Grace & Co.
                           By:  RICHARD C. FINKE, ESQ.
                           5400 Broken Sound Boulevard NW
                           Boca Raton, FL  33487

For W.R. Grace:            W.R. Grace & Co.
                           By:  MARK SHELNITZ, ESQ.
                           7500 Grace Drive
                           Columbia,  MD 21044

For the Libby Claimants:   Lewis, Slovak & Kovacich, P.C.
                           By:  MARK KOVACICH, ESQ.
                           725 Third Avenue North
                           Great Falls, MT 59401

For Fireman's Fund/        Stevens & Lee
Allianz:                   By:  JOHN D. DEMMY, ESQ.
                           1105 North Market Street, 7th Floor
                           Wilmington, DE  19801

For CNA:                   Goodwin Procter, LLP
                           By:  MICHAEL GIANNOTTO, ESQ.
                           Exchange Place
                           Boston, MA  02109-2881

                           Cohn Whitesell & Goldberg, LLP
                           By:  DANIEL C. COHN, ESQ.
                           101 Arch Street
                           Boston, MA  02110

For Arrowwood:             Wilson, Elser, Moskowitz, Edelman,
                             & Dicker, LLP
                           By:  CARL J. PERNICONE, ESQ.
                           150 East 42nd Street
                           New York, NY 10017

For BNSF Railway:          Pepper Hamilton, LLP
                           By:  LINDA CASEY, ESQ.
                           3000 Two Logan Square
                           Philadelphia, PA  19103

For Maryland Casualty:     Connelly Bove Lodge & Hutz, LLP
                           By:  JEFFREY WISLER, ESQ.
                           The Nemours Building
                           1007 North Orange Street
                           Wilmington, DE  19899

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd):

For Anderson Memorial        Kozyak, Tropin & Throckmorton, PA
Hospital:                    By:  JOHN W. KOZYAK, ESQ.
                             2525 Ponce de Leon, 9th Floor
                             Miami, Florida 33134

For MCC & Zurich:            Eckert Seamans
                             By:  EDWARD D. LONGOSZ, ESQ.
                             1747 Pennsylvania Avenue, NW
                             Suite 1200
                             Washington, DC 20006

                             Wiley Rein, LLP
                             By:  RICHARD A. IFFT, ESQ.
                             1776 K Street NW
                             Washington, DC 20006

For Ford, Marrin,            Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer             Gleser, LLP
& Gleser, LLP:               By:  ELIZABETH M. DeCRISTOFARO, ESQ.
                             Wall Street Plaza, 23rd Floor
                             New York, NY  10005-1875

For Kaneb Pipe Line          Fulbright & Jaworski
Operating Partnership,        By:  STEVE PEIRCE, ESQ.
LP:                          300 Convent Street, Suite 2200
                             San Antonio, TX 78205-3792

For Travelers:               Simpson Thacher & Bartlett LLP
                             By: MINDY LOK, ESQ.
                             425 Lexington Avenue
                             New York, NY  10017

For State of Montana         Womble Carlyle Sandridge & Rice
Dept. of Environmental       By:  FRANCIS MONACO, ESQ.
Quality:                     222 Delaware Avenue, Suite 1501
                             Wilmington, DE 19801

For AXA Belgium:             Tucker Arensberg, P.C.
                             By:  MICHAEL A. SHINER, ESQ.
                             1500 One PPG Place
                             Pittsburgh, PA  15222

For Kaneb Pipe Line          Gilbert & Renton, LLC
Operating Partnership,       By:  ROBERT GILBERT, ESQ.
LP:                          344 North Main Street
                             Andover, MA 01810

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd):

| | |
|---|---|
| For Garlock Sealing Technologies: | Robinson, Bradshaw & Hinson, P.A.<br>By:  GARLAND CASSADA, ESQ.<br>      RICHARD WORF, ESQ.<br>101 North Tryon Street<br>Suite 1900<br>Charlotte, NC  28246 |
| For Sealed Air: | Skadden, Arps, Slate, Meagher & Flom, LLP<br>By:  DAVID TURETSKY, ESQ.<br>      J. GREGORY ST. CLAIR, ESQ.<br>One Rodney Square<br>Wilmington, DE  19801 |
| For the Unsecured Creditors' Committee: | Strook & Strook & Lavan<br>By:  ARLENE KRIEGER, ESQ.<br>      KENNETH PASQUALE, ESQ.<br>180 Maiden Lane<br>New York, NY 10038 |
| For Continental Casualty Co.: | Goodwin Procter, LLP<br>By:  DANIEL GLOSBAND, ESQ.<br>Exchange Place<br>Boston, MA  02109-2881 |
| For Arrowwood: | Wilson Elser Moskowitz Edelman & Dicker, LLP<br>By:  CARL PERNICONE, ESQ.<br>150 East 42nd Street<br>New York, NY  10017 |
| For One Beacon Ins. Co., Geico, Seaton Ins. Co. & Republic Ins. Co: | Drinker Biddle & Reath LLP<br>By:  MICHAEL F. BROWN, ESQ.<br>One Logan Square<br>18th and Cherry Streets<br>Philadelphia, PA  19103 |
| For the PD Committee: | Speights & Runyan<br>By:  DANIEL SPEIGHTS, ESQ.<br>      ALAN RUNYAN, ESQ.<br>      DAVID ROSENDORF, ESQ.<br>200 Jackson Avenue, East<br>Hampton, SC  29924 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd):

For the Debtors:              Kirkland & Ellis, LLP
                             By:  THEODORE FREEDMAN, ESQ.
                                  DEANNA D. BOLL, ESQ.
                             Citigroup Center, 153 East 53rd St.
                             New York, NY  10022


For Fresenius:               McDermott, Will & Emery
                             By:  NATHAN F. COCO, ESQ.
                             227 West Monroe Street
                             Chicago, IL  60606


For the Future              Orrick, Herrington & Sutcliffe,
Claimants                      LLP
Representatives:             By:  PERI N. MAHALEY, ESQ.
                                  RICHARD WYRON, ESQ.
                             Washington Harbour
                             3050 K Street, N.W.
                             Washington, D.C.  20007


For Asbestos Property       Scott Law Group
Damage Claimants:           By:  DARRELL SCOTT, ESQ.
                             1001 East Main Street, Suite 500
                             Sevierville, TN  37864


For Allstate Insurance:     Cuyler Burk, LLP
                             By:  ANDREW K. CRAIG, ESQ.
                             Parsippany Corporate Center
                             Four Century Drive
                             Parsippany, NJ  07054


For the Libby Claimants:    Landis, Rath & Cobb, LLP
                             By:  JAMES S. GREEN, JR., ESQ.
                             919 Market Street, Suite 1800
                             Wilmington, DE  19899


For the Equity              Kramer Levin Naftalis & Frankel
Committee:                  By:  DAVID E. BLABEY, JR., ESQ.
                             919 Third Avenue
                             New York, NY  10022


For the Bank Lenders:       Landis, Rath & Cobb, LLP
                             By:  RICHARD COBB, ESQ.
                             919 Market Street, Suite 1800
                             Wilmington, DE  19899


**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd):

For Official Committee Richardson Patrick Westbrook &
of Asbestos Property  Brickman, P.C.
Claimants:     By:  EDWARD J. WESTBROOK, ESQ.
         KATIE McELVEEN, ESQ.
       174 East Bay Street
       Charleston, SC  29401

For the Debtors:   Kirkland & Ellis, LLP
       By:  ELLI LEIBENSTEIN, ESQ.
       200 East Randolph Drive
       Chicago, IL  60601

For the Debtors:   Kirkland & Ellis, LLP
       By:  CHRISTOPHER GRECO, ESQ.
        CLEMENT YEE, ESQ.
       Citigroup Center, 153 East 53rd St.
       New York, NY  10022

TELEPHONIC APPEARANCES:

For Committee of   Campbell & Levine
Asbestos Personal  By:  MARK T. HURFORD, ESQ.
Injury Claimants:  800 North King Street
       Suite 300
       Wilmington, DE  19701

For the Debtors:   Pachulski, Stang, Ziehl &Jones
       By:  JAMES O'NEILL, ESQ.
       919 North Market Street, 17th Floor
       Wilmington, DE  19899-8705

For Fireman's Fund  Crowell & Moring LLP
Insurance Co.:   By:  LESLIE A. DAVIS, ESQ.
        MARK PLEVIN, ESQ.
       1001 Pennsylvania Avenue, N.W.
       Washington, DC  20004

For Federal Insurance Cozen O'Connor
Company:      By:  JACOB C. COHN, ESQ.
       1900 Market Street
       Philadelphia, PA  19103

For National Union Fire Zeichner Ellman & Krause, LLP
Insurance Co.:   By:  MICHAEL DAVIS, ESQ.
       575 Lexington Avenue
       New York, NY  10022

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd):

For Fireman's Fund:          Stevens & Lee
                             By:  MARNIE SIMON, ESQ.
                             600 College Road East, Suite 4400
                             Princeton, NJ 08540

For Various Claimant         Stutzman, Bromberg, Esserman & Plifka
Firms:                       By:  DAVID J. PARSONS, ESQ.
                             2323 Bryan Street,  Suite 2200
                             Dallas, TX  75201

For Morgan Stanley           Katten Muchin Roseenman, LLP
Senior Funding, Inc.:        By:  JEFF FRIEDMAN, ESQ.
                                  MERRITT PARDINI, ESQ.
                             575 Madison Avenue
                             New York, NY  10022-2585

For Morgan Stanley           Edwards Angell Palmer Dodge, LLP
Senior Funding, Inc.:        By:  ROBERT CRAIG MARTIN, ESQ.
                             919 N Market St.
                             Wilmington, DE 19801-3023

For Serengeti:               Vinson & Elkins, LLP
                             By:  ARI BERMAN, ESQ.
                             Trammell Crow Center
                             2001 Ross Avenue, Suite 3700
                             Dallas, TX  75201

For Scott Company:           Vorys, Sater, Seymour & Pease, LLP
                             By:  TIFFANY COBB, ESQ.
                             52 East Gay Street
                             Columbus, OH  43216

For Official Committee       Dies & Hile, LLP
of Asbestos Property         By:  MARTIN DIES, ESQ.
Damage Claimants:            1601 Rio Grande, Suite 330
                             Austin, TX  78701

                             LECG
                             By:  ELIZABETH DEVINE, ESQ.
                             1725 Eye Street NW, Ste 800
                             Washington, DC,  20006

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd):

```
For the Property          Bilzin Sumberg Baena Price &
Damage Committee:            Axelrod LLP
                          By:  MATTHEW KRAMER, ESQ.
                          200 South Biscayne Boulevard
                          Suite 2500
                          Miami, FL  33131


For the Property          Bilzin Sumberg Baena Price &
Damage Committee:            Axelrod LLP
                          By:  SCOTT BAENA, ESQ.
                               JAY SAKALO, ESQ.
                          200 South Biscayne Boulevard
                          Suite 2500
                          Miami, FL  33131


For the Bank Lenders:     Paul Weiss Rifkind Wharton &
                             Garrison, LLP
                          By:  MARGARET PHILLIPS, ESQ.
                               REBECCA ZUBATY, ESQ.
                               ANDREW N. ROSENBERG, ESQ.
                          1285 Avenue of the Americas
                          New York, NY  10019


For the Bank Lenders:     Crowell & Moring LLP
                          By:  TACIE YOON, ESQ.
                          1001 Pennsylvania Avenue, N.W.
                          Washington, DC  20004


For National Union Fire   Zeichner Ellman & Krause, LLP
Insurance Co.:            By:  ROBERT GUTTMANN, ESQ.
                          575 Lexington Avenue
                          New York, NY  10022


For the Future            Orrick, Herrington & Sutcliffe,
Claimants                    LLP
Representatives:          By:  DEBRA FELDER, ESQ.
                               JOSHUA CUTLER, ESQ.
                          Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007


For Federal Insurance     Cozen O'Connor
Company:                  By:  ILAN ROSENBERG, ESQ.
                          1900 Market Street
                          Philadelphia, PA  19103
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd):

For Official Committee          Anderson Kill & Olick
of Asbestos Personal            By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:               1251 Avenue of the Americas
                                New York, NY  10020-1186

For Grace Certain               Montgomery, McCracken, Walker &
Cancer Claimants:                 Rhoads, LLP
                                By:  NATALIE D. RAMSEY, ESQ.
                                300 Delaware Avenue, Ste. 750
                                Wilmington, DE  19801

For David T. Austern,           Phillips, Goldman & Spence, P.A.
the Future Claimants'           By:  JOHN C. PHILLIPS, ESQ.
Representative:                 1200 North Broom Street
                                Wilmington, DE  19806


                                By:  DAVID T. AUSTERN

For Allstate Insurance:         Cuyler Burk, LLP
                                By:  STEFANO CALOGERO, ESQ.
                                Parsippany Corporate Center
                                Four Century Drive
                                Parsippany, NJ  07054

For the Asbestos                Ferry Joseph & Pearce, P.A.
Creditors Committee:            By:  THEODORE TACCONELLI, ESQ.
                                824 Market Street, Suite 19899
                                Wilmington, DE  19899

For Ford, Marrin,               Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer                Gleser
& Gleser:                       By:  SHAYNE SPENCER, ESQ.
                                Wall Street Plaza
                                New York, NY  10005

For Official Committee          Duane Morris, LLP
of Unsecured Creditors:         By:  MICHAEL LASTOWSKI, ESQ.
                                1100 North Market Street, Suite 1200
                                Wilmington, DE  19801-1246

TELEPHONIC APPEARANCES (Cont'd):

For Official Committee      Brandi Law Firm
of Asbestos Property        By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:                TERENCE D. EDWARDS, ESQ.
                            44 Montgomery St., Suite 1050
                            San Francisco, CA  94104


                            Lieff, Cabraser, Heimann & Bernstein
                            By:  ELIZABETH J. CABRASER, ESQ.
                            Embarcadero Center West
                            275 Battery Street, Suite 3000
                            San Francisco, CA  94111

For Official Committee:     Riker, Danzig, Scherer, Hyland &
of Asbestos Property         Perretti, LLP
Damage Claimants:           By:  TARA MONDELLI, ESQ.
                                 CURTIS PLAZA, ESQ.
                            Headquarters Plaza
                            One Speedwell Avenue
                            Morristown, NJ  07962

For the Libby Claimants:    Cohn, Whitesell & Goldberg, LLP
                            By:  CHRISTOPHER M. CANDON, ESQ.
                            101 Arch Street
                            Boston, MA  02110

For the Libby Claimants:    Landis, Rath & Cobb, LLP
                            By:  KERRI K. MUMFORD, ESQ.
                            919 Market Street, Suite 1800
                            Wilmington, DE  19899

For Everest Reinsurance     Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:            By:  BRIAN L. KASPRZAK, ESQ.
                                 JOHN D. MATTEY, ESQ.
                            913 North Market Street
                            Suite 800
                            Wilmington, DE  19801

For Murray Capital          Murray Capital Management, Inc.
Management                  By:  MARTI MURRAY

For Normandy Hill           Normandy Hill Capital, LLP
Capital, LLP:               By:  MATTHEW CANTOR

For ZAI Claimants           Hogan Firm Attorneys at Law
& various law firms:        By:  DANIEL K. HOGAN, ESQ.
                            1311 Delaware Avenue
                            Wilmington, DE  19801


**J&J COURT TRANSCRIBERS, INC.**

11

TELEPHONIC APPEARANCES (Cont'd):

For the U.S. Trustee:     Office of the U.S. Trustee
                          By:  DAVID KLAUDER, ESQ.
                          844 King Street, Suite 2313
                          Wilmington, DE  19801

For Arrowwood             Bifferato Gentilotti LLC
Indemnity Co.:            By:  GARVAN McDANIEL, ESQ.
                          800 North King Street
                          Wilmington, DE  19801

For AXA Belgium:          Mendes & Mount
                          By:  ANNA NEWSOM, ESQ.
                          750 Seventh Avenue
                          New York, NY  10019

For Dow Jones             Dow Jones News Wires
News Wires:               By:  PEG BRICKLEY

For Hartford Financial    Wilmer Wilmer Cutler Pickering Hale &
Service Group:             Dorr, LLP
                          By:  MELANIE R. DRITZ, ESQ.
                          399 Park Avenue
                          New York, NY  10022

For Travelers Casualty    Morris Nichols Arsht & Tunnell, LLP
Surety Company:           By:  MATTHEW B. HARVEY
                          1201 N. Market Street
                          PO Box 1347
                          Wilmington, DE 19899-1347

For Asbestos Property     Pryor Cashman, LLP
Damage Claimants:         By:  RICHARD LEVY, ESQ.
                          410 Park Avenue
                          New York, NY  10022

For David T. Austern,     Lincoln International, LLC
Future Claimants'         By:  JOSEPH RADECKI
Representative:

For Travelers Casualty:   Morris Nichols Arsht & Tunnell, LLP
                          By:  ANN C. CORDO, ESQ.
                          1201 North Market Street, 18th Floor
                          Wilmington, DE  19899

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd):

For the PD Committee:        Speights & Runyan
                             By:  MARION FAIREY, ESQ.
                             200 Jackson Avenue, East
                             Hampton, SC  29924

For Garlock Sealing          Morris James LLP
Technologies:                By:  BRETT FALLON, ESQ.
                             500 Delaware Avenue, Suite 1500
                             Wilmington, DE  19801


For Halcyon Asset            Halcyon Asset Management
Management:                  By:  JOHN GREENE


For W.R. Grace:              Onex Credit Partners
                             By:  STUART KOVENSKY


For The Hartford:            Wilmer Cutler Pickering Hale & Dorr
                               LLP
                             By:  NANCY MANZER, ESQ.
                             1875 Pennsylvania Avenue NW
                             Washington, DC  20006

For the Debtors:             Kirkland & Ellis, LLP
                             By:  RAFAEL VALDES, ESQ.
                             200 East Randolph Drive
                             Chicago, IL  60601

For the Asbestos             Caplin & Drysdale, Chartered
Creditors Committee:         By:  JAMES WEHNER, ESQ.
                             One Thomas Circle, NW
                             Washington, D.C. 20005

# I N D E X

                                                         **PAGE**

**WITNESS FOR THE PLAN PROPONENTS**
DAVID AUSTERN
        Direct Examination by Mr. Guy                      46
        Cross Examination by Mr. Monaco                    69
        Cross Examination by Mr. Kovacich                  71
        Cross Examination by Mr. Brown                     76
        Cross Examination by Mr. Speights                  77
        Further Cross Examination by Mr. Monaco            82
        Redirect Examination by Mr. Guy                    83
        Recross Examination by Mr. Bernick                 84


JUDGE ALEXANDER SANDERS
        Direct Examination by Mr. Rich                     97
        Cross Examination by Mr. Speights                 100
        Cross Examination by Mr. Brown                    119
        Cross Examination by Mr. Bernick                  121
        Redirect Examination by Mr. Rich                  121

PAMELA ZILLY
        Direct Examination by Mr. Bernick                 122




**EXHIBITS**                                   **ID.**      **EVD.**
PP-633   Document (also denominated as
          PDFCR-1)                               91           97

**J&J COURT TRANSCRIBERS, INC.**

1           THE CLERK:  All rise.

2                       (Pause)

3           THE COURT:  Good morning.  Please be seated.  This is

4   the continuation of the Phase 2 hearing, confirmation hearing

5   in W.R. Grace.  The participants listed by phone are:  Michael

6   Shiner, Scott Baena, Janet Baer, Ari Berman, David Bernick,

7   David Blabey, Thomas Brandi, Peg Brickley, Elizabeth Cabraser,

8   Stefano Calogero, Christopher Candon, Matthew Cantor, Richard

9   Cobb, Tiffany Cobb, Jacob Cohn, Ann Cordo, Andrew Craig, Joshua

10  Cutler, Leslie Davis, Michael Davis, Elizabeth DeCristofaro,

11  Elizabeth Devine, Martin Dies, Melanie Dritz, Terence Edwards,

12  Marion Fairey, Brett Fallon, Debra Felder, Theodore Freedman,

13  Jeff Friedman, Christopher Greco, James Green, John Greene,

14  Robert Guttmann, Daniel Hogan, Robert Horkovich, Mark Hurford,

15  Brian Kasprzak, David Klauder, Stuart Kovensky, John Kozyak,

16  Matthew Kramer, Michael Lastowski, Elli Leibenstein, Richard

17  Levy, Nancy Manzer, Robert Craig Martin, John Mattey, Garvan

18  McDaniel, Tara Mondelli, Kerri Mumford, Marti Murray, Anna

19  Newsom, James O'Neill, Merritt Pardini, David Parsons, Carl

20  Pernicone, Margaret Phillips, John Phillips, Curtis Plaza, Mark

21  Plevin, Joseph Radecki, Natalie Ramsey, Andrew Rosenberg, Ilan

22  Rosenberg, David Rosendorf, Allan Runyan, Jay Sakalo, Darrell

23  Scott, Marnie Simon, Daniel Speights, Shayne Spencer, Theodore

24  Tacconelli, Rafael Valdes, James Wehner, Edward Westbrook,

25  Clement Yee, Taci Yoon, Rebecca Zubaty, and Oliver Butt.

1              I see the same people, essentially -- there are a few

2    changes, so maybe I need to get new entries for people who have

3    not entered appearances yet.  Good morning.

4              MR. SPEIGHTS:  Good morning, Your Honor.  Dan

5    Speights, Alan Runyan, John Kozyak and David Rosendorf for

6    Anderson Memorial Hospital.

7              THE COURT:  Anyone else need to enter an appearance

8    this morning?  Okay.  Before -- I know we're starting with the

9    case management issues, but I have a housekeeping matter to

10   address, too, and that is where are you folks going to put all

11   of the things that you intend to keep here or need to move out

12   so that I can do my other evidentiary hearing this afternoon?

13   So, that's the question.  Can you stack things in the attorney

14   conference room and we'll lock it?

15             MR. BERNICK:  Well, we're happy to -- yeah.  We've

16   got certainly all of the things that the plan proponents, all

17   of the boards and all the rest of that, those will be gone.

18   With respect to the exhibits -- you mean that kind of stuff?

19             THE COURT:  Yes.

20             MR. BERNICK:  We'll just -- it will be out of here.

21             THE COURT:  Oh, you're taking them -- is anybody --

22             MR. BERNICK:  It's not a problem as long as we still

23   have the use of that room next door here, the one right here.

24             THE COURT:  The attorney conference room.

25             MR. BERNICK:  Is that -- yes.

1          THE COURT:  Yes.

2          MR. BERNICK:  We'll just use that for whatever we

3 have.  It will be a cozy, but we'll do it.

4          THE COURT:  All right.  Is that acceptable to

5 everyone, just stacking things in there, and then we'll keep

6 that door locked.  If you need access you can notify my staff

7 and they'll unlock the door for you any time between now and

8 when the trial resumes.

9          MR. BERNICK:  I think that -- on the other side I

10 don't see an awful lot of material.  It looks like most of it

11 is portable, so I think we're probably just dealing -- I'm

12 assuming we're just dealing with what's over here, and there is

13 enough room there for that, and that's not a problem.

14          THE COURT:  All right.  Well, if it turns out to be a

15 problem let me know, because we have other storage space, but I

16 wanted to put it somewhere where it could be locked and not

17 accessible, so --

18          MR. BERNICK:  Okay.  Thank you.

19          THE COURT:  Okay.  Mr. Speights?

20          MR. SPEIGHTS:  Your Honor, very briefly, Late

21 yesterday when I made my cameo appearance we talked about the

22 time we would end today, and I just want to let you know I'm

23 fine with the 12:30 time, but I got a lot of abuse afterward by

24 some other people here, not my team, who have flights at -- I

25 think the big southern players at 1:40, and some other concerns

1  raised by others.  It's not my issue, but since I'm the one

2  that spoke on it yesterday I just wanted to inform the Court

3  perhaps you just want to see how the day goes.

4        THE COURT:  I will -- to the extent that there is

5  anything that I have to do about the length of direct and cross

6  examinations and the length of objections that are made, Mr.

7  Speights, I will do my best to keep things moving, but I am

8  going to let people talk, so it's up to you folks to control

9  your own verbosity.

10        MR. SPEIGHTS:  I understand that.  Apparently some

11 people were relying on a 12 noon time.  I'm fine.  This is not

12 my issue.

13        THE COURT:  Okay.

14        MR. SPEIGHTS:  I don't want to use up any of any of

15 my credits on this issue.

16        THE COURT:  It's not a matter of credits.  I

17 appreciate the need to get out of town.  Okay.  Let's start

18 with the case management issue.

19                    (Pause)

20        THE COURT:  Thank you.

21        MR. BERNICK:  Your Honor, we have circulated the

22 order that I have tendered up to the Court, and just to kind of

23 go through it pretty briefly, we had extended out -- we

24 originally had a tighter schedule for briefing.  We've extended

25 that out so that simultaneous briefs would be submitted by all

1  parties on the second of November, reply briefs again

2  simultaneously on the 20th, which will be a more generous

3  schedule.  We've spent, then, on Item 2, a lot of time trying

4  to figure out the most efficient way in which to close out the

5  record on the messiest part of the evidentiary submissions,

6  which are the exhibits and the deposition designations.  And

7  basically the process for accomplishing that is set forth in

8  Item 2.  Essentially, everybody is supposed to get together,

9  try to figure out what can be done by stipulation with regard

10 to exhibits by the 30th of September, and then the -- during

11 that same period of time there's supposed to be a lot of

12 discussion about, in the same vein, about the deposition

13 designations and other prior testimony designations.  And then,

14 we're supposed to have binders emanating from that process come

15 to the Court by the 7th of October.  So, essentially we're

16 creating further space between now and the time that we're

17 supposed to be back before the Court in mid-October to try to

18 get our act together and see how much we can agree with respect

19 to the deposition designations and the exhibits, and they'll

20 come to the Court by the 7th of October.

21        Sub (c) of 2 then basically is designed to flag for

22 the Court what that -- what the record is based upon all of

23 that, as well as on the proceedings so far, so that essentially

24 you would get a chart -- you would get charts that would record

25 all of the exhibits that have been tendered and admitted, as

1  well as the ones that have not been admitted, and the same

2  thing with respect to the deposition designations.  And then

3  there's the further indication of providing a brief summary, so

4  that essentially by the 7th of October, and I'm going to look

5  over to Ms. Baer, who is the architect of all this, the whole

6  idea is that by the 7th of October, which is a little bit in

7  advance of the hearing in October, or the continued trial, I

8  should say, we should have all of this pretty much packaged.

9       We're also completely open to the idea, and I know

10 that Your Honor has suggested that this be accomplished in the

11 context of the actual trial briefs -- Your Honor, what I'm

12 referring to is that you've suggested that when it comes to the

13 trial briefs if we have citations to exhibits that there be

14 some submission to the Court in connection with the trial

15 briefs that isolates from a lot of these bulky exhibits the

16 ones that -- the pages, or whatever the count.  Now, obviously

17 the essence of that is that you'll have the brief, which

18 presumably will focus on the evidence that really does count as

19 opposed to perhaps a lot of the evidence that has been

20 submitted and admitted, and that you'll be able, then, to zero

21 in more particularly on the part of the evidence that counts.

22      We're also open to the idea of trying to accomplish

23 that in some other fashion, the goal being perhaps to reduce by

24 an order of magnitude the amount of paper that's in all of your

25 binders and the like.  So, if Your Honor, either now or at some

1  point between now and then, has an idea of ideally what would

2  you like to have on your --

3          THE COURT:  A consensual plan.

4                    (Laughter)

5          MR. BERNICK:  I was going to touch on that.  I was

6  going to touch on that.  The plan is hugely consensual.

7  Completely consensual, I don't know if we're going to get

8  there, but I'll come back to that in a minute.  But in terms of

9  the materials that are available for the Court, if you have

10  kind of an ideal picture of what you'd like to have when you go

11  to work on this thing, you know, we've got the resources to do

12  it, God knows, so we can certainly accomplish that.  This is

13  designed to --

14          THE COURT:  Well, I think the chart idea actually

15  works because then people could incorporate from the chart into

16  the briefs, too, to the extent that that information is there,

17  and it may be a good check for everyone.

18          MR. BERNICK:  Right.  But what I'm actually thinking

19  is even -- we clearly need that, but one step further is the

20  question of how you get both in the -- obviously in the

21  descriptions of the briefs, but how you get the package of

22  actual material --

23          THE COURT:  Oh.

24          MR. BERNICK:  -- that's -- that really counts, that

25  you're going to want to put your eyes on in connection with

1 doing the work to get this thing done, and there's no reason

2 why --

3          THE COURT:  I need a separate convention center for

4 that, Mr. Bernick.

5          MR. BERNICK:  Yes.

6          THE COURT:  I've run out of room for this.

7          MR. BERNICK:  Yes.  Well, but it's not -- it's

8 essentially all the lawyers in the case who actually put on the

9 evidence here.  You know, we all show things, that's show and

10 tell, and what's difficult is that the show and tell really is

11 what counts, but when it get put into Evidence it becomes part

12 of this enormous, you know, package.  And so, it really is a

13 question of figuring out how to re-isolate that thin extract,

14 or a stream of information, so that it's at your fingertips.

15 And so, beyond what's here we're prepared to do anything that

16 Your Honor thinks would be helpful just to avoid this huge

17 resorting through all of the evidence to figure out what it is

18 that you need to look at.  That's really kind of what I'm

19 thinking about.

20          THE COURT:  Let me discuss that with my clerk, but I

21 think perhaps getting the briefs with the attachments

22 submitted, provided that to the extent that they're searchable

23 in PDF searchable format on disk would make the most sense

24 because it's very easy to manipulate them when they're on disk

25 and everything could come in attached to the brief itself, but

1  only the relevant portions that I need to look at as opposed to

2  the entire exhibit.

3          MR. BERNICK:  Right.  And -- right.  And the

4  hyperlinks was our way of --

5          THE COURT:  Yes.

6          MR. BERNICK:  -- thinking about that, but I don't

7  know if that works for the Court, and I don't know --

8          THE COURT:  Oh.  The hyperlinks are great.

9          MR. BERNICK:  Yes.  And I also don't know whether all

10 the other -- I know that we'll be prepared to do that.  I don't

11 know whether -- I don't want to suggest that that burden be --

12         THE COURT:  Yes.

13         MR. BERNICK:  -- imposed on everybody, although Your

14 Honor may decide, yeah, let's go impose that on everybody, and

15 we would be happy also to provide, you know, some level of

16 support to other parties that aren't -- you know, haven't done

17 that before, or whatever, so that everybody can do it.  That, I

18 think, is ideal, that you double click on the citation and,

19 boom, there you are.

20         THE COURT:  Going -- manipulating the evidence that

21 I've looked at so far on the computer, the hyperlinks are

22 really -- they're just -- they're fabulous.

23         MR. BERNICK:  Yes.

24         THE COURT:  They're easier to look at than the

25 printed --

**J&J COURT TRANSCRIBERS, INC.**

1                MR. BERNICK:  The binder.

2                THE COURT:  -- documents.  Yes.

3                MR. BERNICK:  So, we'll certainly think about -- if

4    you like, we can start to look into that now, in --

5                THE COURT:  I think that might be helpful.

6                MR. BERNICK:  Okay.  And that will be -- the sooner

7    the better because then people can start to think about their

8    briefs in that context.

9                Closing arguments, we have left a blank for when the

10   closing arguments are because we don't know the Court's

11   schedule.  The pending motions in limine will be heard on the

12   13th and 14th as -- and the Daubert motions, as Your Honor has

13   suggested.

14               THE COURT:  Can you go back to the closing arguments,

15   though?  Where it says, for example, Part 1, Libby, does the

16   three hours total include the plan proponents and Libby?  Or is

17   that just for --

18               MR. BERNICK:  Yes, that --

19               THE COURT:  -- Libby?

20               MR. BERNICK:  No -- I think it's all parties.  That's

21   --

22               THE COURT:  All parties?

23               MR. BERNICK:  Yes.  That's the idea here.  God knows,

24   you know, in an ordinary trial a lot of Judges would say you've

25   got, you know, 45 minutes a side, even a long trial --

1            THE COURT:  Yes.  I had a 13-week trial and had --

2            MR. BERNICK:  -- these would be very generous.

3            THE COURT:  -- 45 minutes for closing.

4            MR. BERNICK:  What?

5            THE COURT:  I had a 13-week trial with 45 minutes to

6   close one time.

7            MR. BERNICK:  Yes.

8            THE COURT:  It was a lot of fun.

9            MR. BERNICK:  Right.

10           THE COURT:  But, actually, it makes you think about

11  your evidence.

12           MR. BERNICK:  What you're going to do.  Yes.  So, I

13  think that these actually are quite generous.  The one that's

14  tighter -- I mean, the lenders -- we've been over this a

15  gagillion (sic) times, so I think that that's probably more

16  than we need, but we wanted to put it down to make sure that

17  nobody would feel constrained.  This guy --

18           THE COURT:  Well, what's missing from this -- the

19  evidence isn't closed, and so I can't make findings of fact,

20  but I have heard a substantial portion of the evidence, and as

21  to a couple of issues I have some instincts and views that are

22  observations, not findings, because the evidence isn't closed.

23  And I think you need a time in here perhaps where you can

24  continue to negotiate some modifications to the plan.  And

25  perhaps at some point, if we can take a few minutes to discuss

1 what I think may be helpful without undoing the basic structure

2 of the plan, perhaps that would focus some of the issues.

3         MR. BERNICK:  Yes.  What I would think is that -- and

4 let me just kind of get to the settlement part of the equation,

5 as well, I think we'll have time for that on the 13th and 14th.

6         THE COURT:  Okay.

7         MR. BERNICK:  And I know that we're not going to

8 finish today, and there are -- there is evidence that remains

9 to be presented --

10         THE COURT:  Oh, yes.

11         MR. BERNICK:  -- so I think some of the time on the

12 13th is going to have to be devoted to that.  But I would think

13 that that would be helpful to take up on the 13th or 14th.  I

14 mean, we've got -- we certainly have the time to argue the

15 motions in limine and _Daubert_ motions.  It is, again, we can

16 spend a lot of time if we want, but I don't think we really

17 have to because I think Your Honor is already familiar with a

18 lot of that, but it would be an opportunity for Your Honor to

19 kind of hear everything and sort through in your mind, as you

20 always do, where it is that, you know, the issues really lie.

21 So, that would really make a lot of sense.  I don't think it's

22 going to take a lot of time.  The bottom line is I think we'll

23 have time on the 13th and 14th to focus on that.

24         I do think it would be appropriate to wait until

25 then.  It's kind of tempting to say, well, why don't you tell

1  us right now?  But the difficulty is that there are -- Your

2  Honor has asked, and suggested also, you know, why don't you

3  guys talk?  There are lots of discussions that are going on.

4  As in all other aspects of this case, the settlement track has

5  been a parallel track, and Your Honor is starting to see now

6  that there are settlements with many of the carriers.  I

7  believe that's going to continue.  There are settlement

8  discussions in other aspects of the case, as well, which may

9  have the effect of taking large numbers of issues off the

10 table.  The problem is as soon as we start talking about Your

11 Honor's reactions to the evidence in certain ways with respect

12 to plan modifications or whatever, they -- that immediately

13 starts to be a vector that may effect some of the on-going

14 discussions.

15         THE COURT:  That would be the intent.

16         MR. BERNICK:  Well, I understand --

17               (Laughter)

18         MR. BERNICK:  I understand that, but it's -- the

19 issue there is, I know Your Honor knows that I'm drifting

20 towards, is apart from the intended consequence, it's the

21 unintended consequence.

22         THE COURT:  Yes.  I understand.

23         MR. BERNICK:  And so I would suggest that perhaps we

24 continue on with the discussions that we have on-going, and

25 then that -- this will give us a couple more weeks to see what

1  we can resolve, and then I think it would be very worthwhile to

2  hear from Your Honor with respect to the other ideas that you

3  have.

4        THE COURT:  Even then -- I want to make it clear, I

5  am not prepared to be making findings.  What I am talking about

6  at the moment are observations and nothing more.  And whether I

7  will make findings consistent with what I now have observed I

8  don't know, the evidence isn't done and I certainly have not

9  assimilated this entire courtroom full of information which has

10 been submitted.

11       MR. BERNICK:  That's certainly -- that's certainly

12 very understandable.  So, that's pretty much where we are.  I

13 know that the -- we've had a little bit of feedback from the

14 Libby claimants.  I think that they're in agreement, but I

15 don't know, and I don't want to represent that.  Maybe that

16 will jinx it.  We really haven't heard back from anybody else,

17 and so, that's pretty much where we are.  This would put us on

18 track, though, to keep -- the whole idea is to keep this

19 process rolling forward so that at least we get done.  And I

20 know that Your Honor then will have a very significant task on

21 her hands depending upon what we resolve and what remains to be

22 decided.  But we want to really get this thing submitted to the

23 Court.

24       THE COURT:  Well, I think that the overall schedule,

25 before I hear from the other parties let me state this, I think

1  is a pretty good one.   In terms of the specific dates, you

2  know, if there's some objection to the specific dates I'll

3  certainly hear that.   But I want you to be advised.   I'm

4  starting the Pittsburgh Corning confirmation hearing in

5  January.   I think you want to have everything submitted to me

6  before that trial starts, because once that trial starts I am

7  once again going to have a room that probably won't look quite

8  like this, but may.   There are some significant issues that are

9  being litigated in that case, too.   So, my suggestion is that

10 you may want to have everything submitted in this case before

11 that trial starts.

12         MR. BERNICK:   Well, I -- this would certainly -- I

13 mean -- we think this is really pretty generous, and let me

14 just raise -- I guess this does trigger another thought.   It is

15 always a difficult and often fruitless exercise in this case to

16 suggest that the submissions be limited in terms of page

17 numbers and the like, but I have heard Your Honor observe, if

18 not direct, that you don't want to have simply a rehash of

19 everything that's happened.

20         THE COURT:   I absolutely do not want a rehash of the

21 pretrial briefs.   I do not need to read the same information

22 again.   If you need me to read it again, just say, Judge, read

23 it again.   I probably will be reading it again anyway.   What I

24 need is a connection between the evidence in the case and the

25 elements of proof and/or the defense to the elements of proof.

1  That's what I want.  I want to know where in the record you --

2  whoever the party is -- I don't mean you, Mr. Bernick, but

3  whoever the party is who is submitting the information, ties in

4  the facts to the legal conclusions that you want me to draw,

5  and then I want a separate statement of what those legal

6  conclusions are in your view, and where they are supported with

7  a couple of citations, if possible.

8            MR. BERNICK:  Yes.

9            THE COURT:  Legal citations.

10           MR. BERNICK:  Yes.  I'm just trying to think.

11 There's really no one -- people do things in different ways.  I

12 -- it may also be easier from that point of view if people

13 submit relatively short briefs where they kind of -- if they

14 want to tell their story and they want to sound their themes,

15 that's done.  But you're really more or less talking about

16 what's essentially a --

17           THE COURT:  Findings of fact.

18           MR. BERNICK:  Yes.

19           THE COURT:  Yes.

20           MR. BERNICK:  A compendium that goes through the

21 evidence that counts and then --

22           THE COURT:  Yes.

23           MR. BERNICK:  -- so that you can just go through it

24 without an awful lot of the argument that's -- here's where it

25 is, here are the basic propositions, and here's where it is.

1          THE COURT:  Well, I don't -- I don't mind the

2    argument because it -- I'm going to have closing arguments --

3          MR. BERNICK:  Right.

4          THE COURT:  -- so, you know, if somebody wants to

5    essentially summarize the argument in the brief, that's fine.

6    But what I want in the briefing is to show me where the

7    findings are going to be that you want me to make so that I can

8    see how the logic follows and can actually make those findings.

9    That's what I'm really looking for.

10          MR. BERNICK:  Okay.  Well, that's pretty much where

11    we are.  I don't know who else wants to speak.

12          THE COURT:  Mr. Cohn?

13          MR. COHN:  Your Honor, the Libby claimants are in

14    agreement with the proposed form of order.  We think it ought

15    to work.

16          THE COURT:  Well, there's a great start.  Now maybe I

17    can send you folks out right now, while you're in settlement

18    mode, and you can start talking.

19                    (Laughter)

20          MR. COHN:  We are.  We are assuming -- and by the

21    way, that is something that is, I think, deeply interesting to

22    both sides.  But back to post-trial procedure.  The assumption

23    we are making is that when three hours are allotted to Libby,

24    that that means, in effect, 90 minutes per side, so that --

25    because obviously there are a lot of people who have been

1  ganging up on us in the trial and we don't want to just

2  allocate it to all those parties because we'll then end up with

3  ten or 12 minutes for ourselves.

4          THE COURT:  That's fair.

5          MR. COHN:  Thank you.

6          THE COURT:  Okay.  Mr. Cobb?

7          MR. COBB:  Good morning, Your Honor.  Your Honor,

8  just to clarify, does the Court expect that there would be

9  findings of fact, conclusions of law with regard to Phase 1, as

10 well, correct?

11         THE COURT:  Oh, absolutely.

12         MR. COBB:  For the entire confirmation process?

13         THE COURT:  Yes, sir.

14         MR. COBB:  Thank you.

15         THE COURT:  Mr. Monaco?

16         MR. MONACO:  Good morning, Your Honor.  For the

17 record, Frank Monaco for the State of Montana.  Your Honor, the

18 proposed order is certainly a big improvement from what was

19 circulated earlier to the plan objectors.  One question I have,

20 and it's also a comment, is exactly where the State of Montana

21 and other indirect asbestos claimants fit in.  I wasn't on the

22 call that they had to discuss the proposed order.  But I

23 understand it, we could theoretically be part two, or part

24 four, which is general and third parties.  I would like to have

25 some certainty on that.  And my other observation is, to the

1  extent that we're considered a third party, and there's others,

2  like Garlock and BNSF, and I really haven't had an opportunity

3  to speak with them, but we may want to be separated from the

4  insurers.  It seems to me the insurers' issues are fairly

5  uniform, and rather than have to have six, or seven, or eight

6  parties negotiate with 12 insurance companies as to how much

7  time we should have, maybe we should just be separated, have

8  our own block of time.

9           THE COURT:  All right.  How much time do you want?

10          MR. MONACO:  Well, Your Honor, I don't think it's

11 going to take that long, and I can't speak for the others, but

12 maybe an hour-and-a-half to two for the seven or eight parties

13 that may fall within that category.  I'll let others speak to

14 that.  I --

15          THE COURT:  So, you're saying two hours total for

16 both sides to argue?  Or two hours for your side?

17          MR. MONACO:  Your Honor, myself, I don't see more

18 than 15 minutes, but -- and I can't speak for the others.  It

19 would probably be two hours total.

20          THE COURT:  Okay.  It's fine if we add another two

21 hours in.  I'm going to have to look for days to do this

22 anyway, so --

23          MR. BERNICK:  Well, but we -- I mean, this -- there's

24 five hours total, so there's already time in there.  It really

25 comes down to the question of whether -- how many insurers want

1  to speak and how long they're going to speak, as well.

2          THE COURT:  I don't think the insurer issues are

3  going to take a total of five hours.  I mean, if we broke it

4  down to three for insurers and two for the third parties --

5          MR. BERNICK:  That's what I would think, and if

6  people -- if people have a major problem with it, I think that

7  Mr. Monaco's concern is a good one, and I think the idea of

8  making that distinction is a good one.

9          THE COURT:  All right.

10         MR. BERNICK:  I think it will make the process easier

11 to follow.  If people have a real issue with it at the end of

12 the day we can always tinker with this.

13         THE COURT:  Why don't we simply increase that by one

14 hour and make it a total of six hours and divide it two hours

15 for the third parties and four for the insurers?  That should

16 surely be sufficient time.  I just -- I mean, the issues are

17 significant, but especially for the insurer issues, most, not

18 all of them, have been argued before, so I think you can

19 probably cite to the record in other cases and say I make that

20 argument again, and I'll probably know what you mean.

21         MR. MONACO:  That's fine, Your Honor.

22         THE COURT:  All right.  Anyone else?

23         MS. DeCRISTOFARO:  Good morning, Your Honor.

24 Elizabeth DeCristofaro.  This is simply a question of how Your

25 Honor wants to handle it.  Certain of the issues that were

1  briefed in the beginning were pure legal issues --

2           THE COURT:  Yes.

3           MS. DeCRISTOFARO:  -- that we didn't put on.  How do

4  you want to handle the integration of post-trial findings of

5  fact?  Do you want us to identify which issues are still -- do

6  you want us to --

7           THE COURT:  I think it would be helpful, yes, to

8  identify which issues you believe can be addressed only as

9  matters of law that required no evidence and as to which no

10 evidence was submitted, because some of them are mixed issues

11 --

12          MS. DeCRISTOFARO:  Right.

13          THE COURT:  -- and there was evidence submitted, so

14 it might be easier if you simply break out the pure issues of

15 law with no findings.  And if you want to cite back to the

16 earlier brief and say it was briefed at this docket number and

17 you incorporate that without anything additional, that's fine.

18 Or, you know, based on what's transpired you have these couple

19 of extra cases, you can cite something more but refer back.  I

20 really don't need you to redo what you've already done.

21          MS. DeCRISTOFARO:  But we will encompass those

22 arguments in this final --

23          THE COURT:  Yes, please.

24          MS. DeCRISTOFARO:  Yes.

25          THE COURT:  Because otherwise I'm not going to have a

1   complete set, and I'll lose track of it.  There's just been too

2   many -- too much stuff that's gone on in this trial.  I know

3   I'll lose track of it.

4           MS. DeCRISTOFARO:  Thank you, Your Honor.

5           THE COURT:  Good morning.

6           MR. CASSADA:  Good morning, Your Honor.  Garland

7   Cassada for Garlock Sealing Technologies.  It would be helpful

8   if I understood a little bit more about the order that -- the

9   two hours that was given to certain of the third parties, am I

10  to understand that that two hours is split evenly between the

11  plan proponents and the third parties?

12          THE COURT:  That would be the gist, yes.

13          MR. CASSADA:  And how many third parties are within

14  the group?

15          THE COURT:  Well --

16          MR. BERNICK:  It's -- the -- I think you can just go

17  through and look around the courtroom.  We have Garlock.  We

18  have BNSF.  We have the State of Montana.  There -- I'm not

19  sure who -- Maryland Casualty -- well, to the extent that the

20  -- we have carriers that are --

21          THE COURT:  Involved in the third party issues.

22          MR. BERNICK:  Yes.  We have --

23          THE COURT:  Indirect issues.

24          MR. BERNICK:  If you go back -- go up and down the

25  mountain.

1               (Laughter)

2               MR. BERNICK:  So, we've got Maryland Casualty, that's

3    right, is a significant one.  Then we had -- I don't know where

4    Fireman's Fund -- yes, Fireman's Fund and National Union --

5               THE COURT:  National Union.

6               MR. BERNICK:  -- because they're sureties, so that's

7    the full list, I think.

8               THE COURT:  So then, maybe it needs to be -- actually

9    those are probably the more significant issues than the direct

10   insurer issues.  Maybe it needs to be broken down as three

11   hours and three hours.

12              MR. BERNICK:  Yes, although I really -- well, I'm not

13   going to comment.  Whatever it is that makes sense to the

14   Court.

15              MR. CASSADA:  Yes.  I think given that there are so

16   many parties, that one hour split among those parties is --

17              THE COURT:  It's probably not enough.  And this is --

18   what I'm trying to do is get a general framework.  I think it

19   would -- it might be advisable if you talk to the debtors, it's

20   possible that the plan proponents will not need, for example,

21   an hour-and-a-half to respond to all of those issues.  So, it's

22   possible that maybe they need an hour and it can be two hours

23   in that circumstance.  I just need a general framework to know

24   how many days I need to reserve for argument and when it's

25   going to be, and so, I think -- I do want time limits because

1  I'm not going to allow anybody just to prattle on.  The time to

2  do that has come, and between today and the rest of the

3  evidentiary day we'll be done.  For the arguments I expect a

4  focused analysis.

5         MR. CASSADA:  Yes.  And I think time limits are

6  reasonable, and I'm sure they'd be serious, and that's why I

7  want to make sure that they're realistic and adequate.

8         THE COURT:  Why don't I suggest -- that this

9  framework is fine, but perhaps what -- a little tweaking before

10  an actual order is submitted, at least as to the indirect

11  plaintiffs, since their issues are not uniform.  Perhaps that

12  could be a division that's actually stated in the order.  You

13  know, I'm just making up numbers.  Garlock has 20 minutes, and

14  BNSF has 40 minutes, or however it's going to be, so that you

15  will know in advance how much time is allocated.

16         MR. BERNICK:  Maybe it will be sensible -- I think

17  what Your Honor indicated yesterday was that you wanted to hear

18  this and then basically you were going to do an order.  Maybe

19  if the order reads out generally now, and then at some point

20  before we're back on the 13th and 14th of October you all

21  really need to get together, the third parties need to get

22  together and figure out what you think you need, and let us

23  know, and then we can have a discussion, then maybe the order

24  can be --

25         THE COURT:  Tweaked.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  -- refined --

2          THE COURT:  Yes.

3          MR. BERNICK:  -- on that time.

4          THE COURT:  That's fine.

5          MR. CASSADA:  That makes a lot of sense.

6          THE COURT:  Okay.  So, I have heard no objections by

7   anyone to simultaneous submission of briefs on November 2nd and

8   reply briefs by the 20th of November, or at any of the other

9   provisions here.  Mr. Speights?

10          MR. SPEIGHTS:  Your Honor, I was trying to get up

11  when you started talking.  I apologize for not being quicker.

12  Our concern is that the case is not over as to Anderson

13  Memorial.

14          THE COURT:  Well, it will be by the 13th of October.

15          MR. SPEIGHTS:  Well, we just want as much time as

16  everybody else to do the briefing, and frankly this came in and

17  I haven't studied it in any detail, so as long as we have as

18  much time as everybody else, but we really can't -- you know,

19  until the case is over we are a little bit handicapped.

20          THE COURT:  Well, let me see when I can do an

21  argument, because that may effect a little bit of these dates

22  and it may give everybody a little more time, so let me see.

23          MR. SPEIGHTS:  And I have no problem addressing that

24  at the end of the day when we see where we are on Anderson.  I

25  just -- I can't sign off on it until we see that.

1        MR. BERNICK:  If Mr. Speights believes that the

2   Anderson Memorial issues are sufficiently complicated that he

3   needs more time, as to those specific matters that lag -- on

4   the presentation of evidence, that is, there are all kinds of

5   issues -- I don't know what Anderson Memorial is going to want

6   to cover, but with respect to all of the evidence and issues

7   that have been addressed so far, they should be on the same

8   track as everybody else.

9        If they want to have a separate date I'm happy to

10  talk about that with Mr. Speights, but I think that we should

11  not have that effect the overall schedule in terms of briefing

12  and all the other matters that are set forth here.

13       THE COURT:  My month of December I have not a single

14  day with any time in it.  I think I am going to have to

15  schedule these arguments -- let me see what -- oh, that's -- is

16  anybody here for Travelers in Owens Corning to know whether

17  that trial in January is actually going forward?  Mr. Demmy?

18       MR. DEMMY:  Your Honor, we are working towards

19  getting it resolved.  I can't tell you it is resolved, but

20  we've been trying to do that.  I think it is -- I hate to put

21  an estimate on it, but I think it's probably a 50/50

22  proposition at this point in time, so I don't think you can

23  take those days off the calendar.  But I may know, actually

24  within a matter of days, whether that will come off the

25  calendar or not.

1              THE COURT:  Okay.

2              MR. DEMMY:  But that's the best I can do, standing

3    here right now.

4              THE COURT:  All right.  I appreciate it.  Thank you.

5    The days that that trial is set to take place are January 6 and

6    7.  I can probably adjust my schedule to do this argument on

7    the 4th and 5th.  I will have to move some things around, but I

8    think I could do that.  So, if -- I know that's right after the

9    new year.  I hate to schedule things the first day back after

10   the new year because people have problems, but I think that's

11   what I'm going to have to do, unless this Travelers issue

12   settles and I can use the 6th and 7th.

13             MR. DEMMY:  Your Honor, John Demmy for Fireman's Fund

14   Insurance Company.  I was going to rise with respect to the

15   schedule just to state that I generally agree that the insurer

16   issues probably need less as opposed to more time vis-a-vis the

17   third party claims issues.  I'm not sure that the three hours

18   total -- as Mr. Plevin's surrogate on the FFIC surety issues,

19   I'm not sure three hours total is appropriate for the third

20   party portion, but what I think I heard was that we're going to

21   have some meet and confers, perhaps first among the third party

22   claimants --

23             THE COURT:  Yes.

24             MR. DEMMY:  -- and then also with the plan

25   proponents.  And it may be that by the time we've done that

1  we'll know about the Travelers/Owens Corning trial, so that --

2  those issues could be taken care of in the next couple of

3  weeks, hopefully, and then this order could be implemented.

4          THE COURT:  All right.  Mr. Shiner?

5          MR. SHINER:  Your Honor, as I think you're aware, the

6  Pittsburgh Corning trial is the next week.

7          THE COURT:  I know.

8          MR. SHINER:  Those dates present at least some

9  difficulty for some of us.

10          THE COURT:  For me, too, because I have another major

11  trial going on the two days after it if it doesn't settle, Mr.

12  Shiner, so I'm in the same position as the rest of you, but

13  it's life in the big city.

14          Okay.  I will attempt to move things around from the

15  4th and 5th if Mr. Demmy and the Owens Corning counsel can't

16  advise me that the 6th and 7th are available, so reserve the

17  4th, 5th, 6th and 7th until further notice when I can specify

18  which dates the argument will actually be.  Now, having said

19  that --

20          MR. BERNICK:  Having said that --

21          THE COURT:  -- I think that may give you a little

22  more time to submit the briefs because, you know, an extra week

23  in that fashion isn't really going to make much difference.

24          MR. BERNICK:  That's fair, Your Honor.  But I -- if

25  people were prepared, as I think that they were, to meet this

1 schedule, I strongly believe that we should stick with it.  And

2 part of the reason for sticking with it is, again, to maintain

3 the momentum here so that we keep pressure also on the

4 settlement process.

5           THE COURT:  Oh, I have no problems with that.  I was

6 trying to address Mr. Speights's concern.

7           MR. BERNICK:  I understand Mr. Speights's concern,

8 and without commenting further on it, it seems to me that can

9 be accommodated with something with respect to whatever matters

10 get taken up in the continuation of the trial on the 13th of

11 October with respect to Mr. Speights.  I don't think we should

12 have that drive the whole schedule.  There's just no reason for

13 it.

14           THE COURT:  Well, I'm happy with the schedule.  It

15 gives me a little more time to get prepared for the arguments,

16 too, so I'm fine with it.  Why don't we keep this schedule, but

17 Mr. Speights, after the trial concludes on the 13th I'll hear

18 whether you, on behalf of your client, need some additional

19 time, and why, because I think there would be room in this

20 schedule to give you, for example, another week to get

21 everything finished and to push the reply brief with respect to

22 Anderson Memorial back a week, or -- I'm hypothesizing at the

23 moment, but something reasonable within that time.  So, I'll

24 keep this schedule fixed, but it's with the caveat that on

25 October 13th I will address the Anderson Memorial issues

J&J COURT TRANSCRIBERS, INC.

1 specifically, and try to that day come up with, or have you

2 folks submit an order that will allocate the time as you have

3 then agreed.

4          MR. BERNICK:  That's fine, Your Honor.

5          THE COURT:  Mr. Cassada?

6          MR. CASSADA:  Sorry to interrupt, Your Honor, but

7 just one question.  Do we know when the official transcript

8 will be ready?

9          THE COURT:  I have no idea.

10          MR. CASSADA:  Because I think particularly if we're

11 going to hyperlink Grace, and we're going to be referring to

12 evidence in the transcript -- I don't have a problem with the

13 November 2nd time, but I'm assuming that we'll have some

14 reasonable --

15          MR. BERNICK:  Yes.  I believe that the transcript

16 will be some time next week.

17          THE COURT:  Well, the transcripts for each day come

18 out at a different time, so I think the -- we have the

19 unofficial transcript from, I think, Friday and --

20          UNIDENTIFIED SPEAKER:  If I'm correct the 8th is on

21 the docket, the 9th and 10th are going on the docket today,

22 this morning, and the 11th --

23          THE COURT:  Yes.  The 11th, the transcript on the

24 11th, I'm going to ask my clerk to work with Ms. Baer to submit

25 that to the parties who need to see it for purposes of

**J&J COURT TRANSCRIBERS, INC.**

1  redaction, because that transcript is the one that has the

2  privacy concern, and before I put even the unofficial

3  transcript on the docket, I thought perhaps we might be able to

4  e-mail it to the parties who need to see it for redaction

5  purposes so that you can then e-mail us back the line and

6  information that needs to be redacted so that we can then have

7  the transcriber give us a different version --

8           MR. BERNICK:  That's fine.

9           THE COURT:  -- to post.

10          MR. BERNICK:  That will mostly, I think, relate to

11 the Libby folks.

12          THE COURT:  Libby.  Yes.

13          UNIDENTIFIED ATTORNEY:  That would be excellent, Your

14 Honor.  We appreciate that.

15          MR. BERNICK:  But it's supposed to be out there -- I

16 think that the official transcript, with that caveat, is

17 generally three days --

18          THE COURT:  After.

19          MR. BERNICK:  A three-day lag, so you'll have --

20          MR. CASSADA:  That's fine.  That's -- November 2nd --

21 I mean, the schedule is fine.

22          THE COURT:  Okay.  Yes.  The September transcripts

23 will be done, I'm sure, well in advance of October 13.  The

24 only issue really would be whatever is left over from the 13th,

25 and that should be done in sufficient time to afford a briefing

1  schedule by the 2nd of November.  All right.  So, do you need

2  an order today?

3          I think that -- what I will do is simply say my oral

4  order is that this outline and the dates that are contained in

5  it are fine, and the Court order, with the caveat concerning

6  Anderson Memorial and the caveat concerning the time

7  allocations that the parties are to work out and hand me an

8  order on October 13, and then I will enter the order on October

9  13th.

10          MR. BERNICK:  That's fine.

11          THE COURT:  Okay.  Anything else on the schedule?

12          UNIDENTIFIED ATTORNEY:  Not on the schedule.  No.

13          THE COURT:  Anybody on the schedule?

14          UNIDENTIFIED ATTORNEY:  No.

15          THE COURT:  Okay.  Mr. Giannotto?

16          MR. GIANNOTTO:  I was going to ask that certain

17  documents be --

18          THE CLERK:  State your name, please?

19          MR. GIANNOTTO:  Michael Giannotto for Continental

20  Casualty and the CNA Companies.  I was going to -- I had

21  conferred with Ms. Baer and thought that she was in agreement

22  that I should move for admission of these exhibits now, but if

23  witnesses are waiting I can do it at the end of the proceeding

24  today.

25          THE COURT:  All right.  Thank you.

1          MR. GIANNOTTO:  Thank you.

2          MR. BERNICK:  I think that the plan proponents will

3 call as our next witness David Austern, the Future Claimants'

4 Representative.

5          THE CLERK:  Sir, would you raise your right hand,

6 please?

7          DAVID AUSTERN, PLAN PROPONENTS' WITNESS, SWORN

8          THE CLERK:  Please be seated.

9          THE COURT:  Good morning, Mr. Guy.

10          MR. GUY:  Good morning, Your Honor.  It's good to be

11 out from behind the screen over there.  If I may, approach,

12 Your Honor?

13          THE COURT:  Yes.

14          MR. GUY:  It's Jonathan Guy for the Asbestos PI/FCR.

15 A couple of binders.

16          THE COURT:  Yes, sir.

17                    DIRECT EXAMINATION

18 BY MR. GUY:

19 Q    Sir, could you state your name for the record?

20 A    David Austern.

21 Q    Mr. Austern, I would first like to move quickly through

22 your educational background.  Can you tell the Court about your

23 educational background?

24 A    I went to the University of Pennsylvania and graduated

25 from there in 1961, and then I received a law degree from the

**J&J COURT TRANSCRIBERS, INC.**

1 Yale Law School in 1964.

2 Q    Are you currently admitted to the Bar, sir?

3 A    Yes.  I'm admitted to practice in Washington, D.C., New

4 York, and Indiana.

5 Q    Could you describe your professional --

6 A    I'm also admitted before some Federal Courts.  Sorry.

7 Q    Could you describe your professional background to the

8 Court, excluding your current position?

9 A    I am the general counsel of the Manville Personal Injury

10 Settlement Trust.  Prior to that I was in the private practice

11 of law in Washington, D.C. in the law firm of Goldfarb, Singer

12 and Austern.  I was an Assistant United States Attorney in

13 Washington, D.C., an Assistant District Attorney in New York,

14 and I have been an adjunct law professor at Georgetown

15 University Law School and the American University Law School

16 for about 30 years.

17 Q    And what topics did you teach as a law professor?

18 A    I taught civil procedure, criminal procedure, and legal

19 ethics.

20 Q    Mr. Austern, you talked about the Manville Trust.  What

21 was your role in connection with that trust?

22 A    The trust hired staff in 1987, including me as general

23 counsel, and I was part of the team that took the trust

24 distribution process, as it was called in that plan

25 confirmation, and turned it into a claims processing facility

1  and entity.  And then, in 1992 or so, when it became apparent

2  that that trust distribution process was running into some cash

3  constraints, I was part of a team of people that re-did that

4  trust distribution process so that it would work, and that is

5  close to 90 percent -- the trust distribution process is part

6  of the Grace plan.

7  Q    Do you review claims made against the trust?

8  A    Yes.  I also, both in my prior employment and as general

9  counsel of the trust, attend to look at -- not all claims, but

10 the very few claims that are so-called high end claims in terms

11 of value, as well as claims that have unique exposure or

12 medical problems associated with them.

13 Q    Can you explain to the Court if you served as a future

14 claimants' representative in any other asbestos bankruptcy

15 cases?

16 A    I was the future claims representative in the Combustion

17 Engineering bankruptcy.

18 Q    And are you currently the --

19         THE CLERK:  Could you keep your voice up?

20         MR. GUY:  Yes.  I'm sorry.

21 Q    Are you currently the FCR in the Combustion

22 Engineering trust, 524(g) trust?

23 A    Yes.

24 Q    In addition to your roles with claims resolution and as

25 the FCR for Combustion Engineering, have you been involved in

Austern - Direct/Guy                              49

1 any other asbestos-related bankruptcy matters?

2 A    Yes.  I am a consultant to the trustees of the NARCO

3 asbestos trust.  That is a trust that is in formation.  It is

4 not yet consummated.  And over the years I have provided in

5 non-public settings some consulting services to entities that

6 were looking at asbestos liabilities, and in some cases

7 contemplating bankruptcy.

8 Q    Mr. Austern, have you ever represented any individual

9 asbestos plaintiff in any capacity?

10 A    No.

11 Q    So, what is your current occupation?

12 A    Well, in addition to being general counsel of the Manville

13 Personal Injury Settlement Trust, I am a trustee and the claims

14 administrator of the Dow Corning trust, which is a bankruptcy

15 trust, not an asbestos trust, which is set up to handle claims

16 for implants against Dow Corning.  And I also, independent of

17 all of that, provide some consulting services for other

18 entities.

19 Q    Mr. Austern, I'd like now to turn to your role in this

20 case.  Can you explain to the Court what your role in this case

21 is and how you see your duties to your clients?

22 A    I am the representative of future claimants that will have

23 demands and file claims with the asbestos personal injury

24 settlement trust.  I'm a fiduciary for those purposes and I

25 represent their interests.

1  Q    Do you act, then, as -- something similar to a guardian ad

2  litem for the futures?

3  A    Yes.

4  Q    And when were you appointed in this case?

5  A    In April of 2004.

6  Q    And you have counsel and advice in this proceeding, sir?

7  A    I do.

8  Q    Who are your counsel?

9  A    My counsel are Orrick, Herrington & Sutcliffe.  I also

10 have some other advisors.  Jennifer Biggs has provided services

11 for the purposes of looking at future liabilities that will

12 come to the trust, and Joseph Radecki has provided financial

13 advice.

14 Q    So, when you were appointed in the bankruptcy what was the

15 status of the bankruptcy at that time?

16 A    Well, it had been underway for, I think, approximately

17 three years, so I talked to a number of people who were

18 currently involved in the bankruptcy to try and establish what

19 the status of the case was.

20 Q    Did you analyze Grace's asbestos history to determine

21 current and future claims?

22 A    Yes.  I looked at Grace's history.  I asked Mr. Radecki to

23 look at Grace's then extant financial situation.  A bit later

24 on Ms. Biggs looked at Grace's past asbestos history in a more

25 scientific manner and attempted to look at that for the

1  purposes of future liabilities.  Also, I asked Orrick,

2  Herrington & Sutcliffe to look at this entire case from a

3  524(g) point of view to establish what would be needed to

4  satisfy 524(g).

5          THE COURT:  Mr. Austern, could you push the

6  microphone down just a bit?  Thank you.

7  Q    Was it apparent to you, sir, when you were appointed in

8  the case, that there would be an estimation proceeding?

9  A    Yes.  Well, when I was appointed there was --

10         THE COURT:  I'm sorry.  That took you out of it.  We

11 were getting some feedback and I was trying to stop the

12 feedback, but that didn't work.

13         THE WITNESS:  I'm sorry.  What is the question?

14 Q    The pending question was, was it apparent to you when you

15 were appointed in the case that there would be an estimation

16 proceeding?

17 A    Yes.  There was a debtor's plan that had been proposed,

18 and it became apparent that because of the methodologies

19 suggested in that plan for determining asbestos liabilities

20 that there was going to be an estimation hearing.

21 Q    Was there ultimately a settlement concerning the

22 estimation litigation?

23 A    Yes.  After that litigation began and while it was on-

24 going there were numerous, in fact, more than numerous meetings

25 and negotiations concerning a settlement, and ultimately there

1  was a settlement.

2  Q    And who was involved in the settlement negotiations?

3  A    Well, there was me and my advisors, the debtors and their

4  legal advisors, representatives of the equity committee, and

5  the asbestos claimants' committee.

6  Q    And what was the extent of your personal involvement?

7  A    In addition to virtually daily communications from my

8  lawyers concerning on-going negotiations, I participated in

9  many, many meetings myself, not just with the whole group, but

10 with various constituents.  I also was involved in a -- what

11 was ultimately a failed mediation as part of this process, and

12 finally was involved in the series of last meetings that led to

13 a settlement.

14 Q    To your knowledge, sir, was the settlement negotiated at

15 arm's length?

16 A    It was certainly negotiated at arm's length.

17 Q    Can you explain further to the Court?

18 A    Well, it was -- in addition to how long it took, I think

19 it would be fair to say that the discussions that led to the

20 settlement were intense and lively.

21 Q    Is there a document, sir, that reflects the amount at

22 which the parties resolved the estimation litigation and

23 settled the case?

24 A    Yes, there was a term sheet, and that was reduced by the

25 debtor to an 8-K filing.

1          MR. GUY:  If you could pull up PP-160?

2          THE COURT:  I'm sorry.  I couldn't hear you.

3          MR. GUY:  Your Honor, PP-160 is the term sheet.  It's

4  already been admitted into Evidence.

5                         (Pause)

6  Q    Mr. Austern, could you explain to the Court the basic

7  elements of the consideration provided in the term sheet?

8  A    It consists of $250 million in cash with interest running

9  from January 1st, 2009 until whenever we have consummation, the

10 right to the proceeds of W.R. Grace insurance policies, ten

11 million warrants exercisable for a year following plan

12 confirmation at $17, payments by the debtor of $110 million a

13 year for five years commencing in 2019, and then in 2024

14 payments of $100 million a year for five years, plus the

15 proceeds of the Fresenius and Sealed Air settlements.

16 Q    Mr. Austern, I'd like to turn briefly to the plan that

17 followed from that settlement.  Are you familiar with the plan

18 and the trust distribution procedures, the TDP?

19 A    Yes.

20 Q    Generally how does the plan deal with Grace's asbestos

21 personal injury liability?

22 A    All of Grace's asbestos personal injury liabilities are

23 channeled to the trust and there are injunctions that protect

24 those who might otherwise be subject to litigation based on

25 those personal injury liabilities.  They are also, of course,

1  paid by the trust after a process that is described in the

2  trust distribution process.

3  Q    And how similar is that trust distribution process to the

4  Manville trust distribution process?

5  A    I would say it's over 90 percent similar.

6           MR. COHN:  Your Honor, if I might ask for a

7  clarification of that last one -- which Manville trust?

8           THE WITNESS:  I'm sorry.  The 1995 Manville trust,

9  trust distribution process.

10 Q    Mr. Austern, how is unsettled insurance treated under the

11 plan?

12 A    Well, depending on what I would call which bucket the

13 unsettled insurance goes to, unsettled insurance -- unsettled

14 insurers can determine what they are going to do under the

15 trust distribution process, and I dare say that that cannot be

16 settled post confirmation, or pre-confirmation there will be

17 coverage litigation.

18 Q    So, are claims against unsettled insurers enjoined under

19 the plan?

20 A    Yes.  They're enjoined subject to certain injunctions, and

21 there are also injunctions as against settled insurers.

22 Q    And what is the rationale for enjoining claims against

23 unsettled insurers?

24 A    Well, the insurance proceeds are a large part and a

25 significant part of the assets of the -- what will be the Grace

1 trust, and if you permit people to -- this is not a term of

2 art, but if you permit people to end run the rights of the

3 trust to the proceeds of that insurance, you in fact deplete

4 the assets of the trust.

5 Q    As the FCR, Mr. Austern, what do you see as the risks

6 associated with a plan of reorganization that did not have a

7 524(g) injunction?

8 A    Well, in addition to the one I just mentioned in which the

9 rights to insurance proceeds would be depleted, Grace would be

10 back into the tort system, I suppose there could be a Chapter

11 7, but I'll come to that in a minute, and in the tort system I

12 believe that after a discrete period of time there would be

13 virtually no assets left for my clients, the future claimants,

14 and that would also be true, perhaps not completely true, but

15 largely true in a Class 7 setting where there would be a

16 liquidation and practically nothing left.

17          MR. KOVACICH:  I object to this, Your Honor.  It's

18 not responsive to the question and it's also an expert opinion

19 that was not disclosed in this case.

20          THE COURT:  Mr. Guy?

21          MR. GUY:  Your Honor, the witness isn't offering an

22 expert opinion.  Certainly he could offer a lay opinion on

23 these issues, and it's relevant to the question as to how the

24 futures would be treated in the event that a 524(g) injunction

25 isn't created, which is one of the fundamental things that the

1  FCR must look at in determining whether this plan is

2  appropriate.

3          THE COURT:  Yes.  I think this is -- his assessment

4  is, I believe, a relevant consideration.  As the future claims

5  representative that is his fiduciary duty, and assessing those

6  risks is part of his factual undertaking.  I don't think it's

7  offering an expert opinion.  It's explaining his view of the

8  analysis of the plan.  So, the objection is overruled.

9  BY MR. GUY:

10  Q    Mr. Austern, you said you reviewed the TDP in this case,

11  correct?

12  A    Yes.

13  Q    Does the TDP value similar present and future claims in

14  substantially the same manner?

15  A    Yes.  And it does so in two ways, at least two ways.

16  There is an expedited review process with scheduled values and

17  very particular and specific criteria for both exposure and for

18  medical proof that will be applied to both present claimants

19  and future claimants.  In terms of individual review it

20  presents guidelines for what individual reviewers should look

21  at in the terms of assessing both present and future claims.

22  Q    Mr. Austern, from your work in this case do you believe

23  that the trust will be in a position to pay similar present and

24  future demands, future claims in substantially the same manner?

25  A    I do.

Austern - Direct/Guy                                      57

1  Q    What is the basis for that, sir?

2  A    There is a continual stream of income and assets available

3  to the trust, and there are mechanisms in place whereby the

4  scheduled values and the payment percentages can be adjusted if

5  unforeseen circumstances arise.

6  Q    Mr. Austern, I now want to turn to the contributions that

7  are to be made by various parties under the plan, but first I

8  want to ask you, are you familiar with 524(g) of the Bankruptcy

9  Code?

10 A    I believe I am.

11 Q    Are you familiar with the section that addresses whether

12 it's fair and equitable to provide a 524(g) injunction to third

13 parties in light of the benefits they provide under the plan?

14 A    It is specifically mentioned.

15         MR. GUY:  Vince, if you could pull up the code

16 section?

17                        (Pause)

18         MR. GUY:  If you could highlight (b)(2), please?

19 Q    Is this the section?

20 A    That's the section I was referring to, yes.

21 Q    Thank you.  Are you aware, Mr. Austern, whether certain

22 parties are treated as asbestos protected parties under the

23 plan?

24 A    Yes.

25 Q    Does that list of parties include companies that have been

J&J COURT TRANSCRIBERS, INC.

1 referred to here as Sealed Air and Fresenius?

2 A    Yes.

3 Q    Are you aware, sir, that Sealed Air and Fresenius entered

4 into settlements with the debtors?

5 A    Yes.

6 Q    Those settlements predated your appointment, correct?

7 A    Yes.

8 Q    Have you reviewed the settlements?

9 A    I have.

10 Q    Have you reviewed the orders approving the settlements?

11 A    Yes.

12 Q    Do you have a general understanding of those settlements

13 and orders?

14 A    I believe I do.

15           MR. GUY:  Your Honor, and these documents are in the

16 binder, but the Plan Proponent Exhibit Numbers are 277.22 and

17 277.13.

18           THE COURT:  That's the settlement and the order?

19           MR. GUY:  I believe so, Your Honor, but I'll probably

20 stand corrected by Ms. Baer.

21           THE COURT:  Well, now, the Fresenius settlement is

22 277.13, and the Sealed Air settlement is 277.22.

23           MR. GUY:  Thank you, Your Honor.

24 Q    Mr. Austern, do you have a general understanding of the

25 settlements with Sealed Air and Fresenius and the orders

1  approving those settlements?

2  A    A general understanding, yes.

3  Q    What is the total consideration being provided under those

4  settlements?

5  A    Combined, approximately 1.1 billion.

6  Q    Are those settlement proceeds being contributed to the

7  trust that is created by this plan?

8  A    Yes.

9  Q    Does that contribution provide a benefit to the trust?

10  A    It provides enormous benefit to the trust.  $1.1 billion

11  is a very significant portion of what will be the trust assets.

12  Q    If that contribution were not available, how would that

13  impact future claimants?

14  A    It would seriously jeopardize my view that the -- that

15  future claimants would receive the same or similar treatment as

16  present claimants, and very candidly, I don't think that

17  without that we would have had an understanding with the

18  debtors to settle this matter.

19  Q    Is the contribution by Sealed Air -- of the Sealed Air and

20  Fresenius settlement monies, is that a condition of this plan?

21  A    It is a condition of this plan.

22  Q    Are you aware of any condition precedents in the

23  settlement agreements with Sealed Air and Fresenius regarding

24  that contribution?

25  A    Yes.

Austern - Direct/Guy                               60

1  Q    What are those, sir?

2  A    Well, among other things they have to receive 524(g)

3  protection.  There are certain releases that are in effect, and

4  there are further injunctions that are available.

5  Q    Is one of those injunctions a successor claims injunction?

6  A    Yes.

7  Q    I think you've answered this already, sir, but did you

8  agree to provide 524(g) injunction protection to Sealed Air and

9  Fresenius?

10  A    Yes.

11          MR. BROWN:  Objection, Your Honor.  Foundation.

12          THE COURT:  Mr. Brown, your objection is foundation?

13          MR. BROWN:  The witness was not even involved in the

14  case when the settlements were negotiated.

15          THE CLERK:  You need to use a mike, sir.

16          THE COURT:  If you're going to speak you have to use

17  a mike.  I was willing to repeat foundation, but --

18          MR. GUY:  I'll restate the question, Your Honor.

19          THE COURT:  Okay.

20  BY MR. GUY:

21  Q    Is it a condition of the settlement agreements with Sealed

22  Air and Fresenius, as far as you know, that they receive 524(g)

23  protection?

24  A    Yes.

25  Q    You became involved in the case after those settlements

**J&J COURT TRANSCRIBERS, INC.**

Austern - Direct/Guy                                    61

1  were entered into, as Mr. Brown just advised us?

2  A    Correct.

3  Q    Have you agreed to accept that condition?

4  A    Yes.

5  Q    Why?

6  A    Well, I think it is self evident that no one is going to

7  pay $1.1 billion.

8           MR. BROWN:  Objection, Your Honor.

9           MR. KOVACICH:  Objection.  This is speculation.

10          THE COURT:  That's sustained.

11          MR. GUY:  Let me try again.

12 BY MR. GUY:

13 Q    You, as the FCR, why did you accept the extension of

14 524(g) protection to Sealed Air and Fresenius?

15 A    As I understood it, it was a condition for Sealed Air --

16          MR. BROWN:  Objection, Your Honor.

17          MR. KOVACICH:  Objection.

18          MR. BROWN:  There's no foundation that he has any

19 knowledge of the subject --

20          MR. KOVACICH:  And he's a --

21          MR. BROWN:  -- other than what's in the settlement

22 agreement itself.

23          MR. GUY:  Your Honor --

24          MR. KOVACICH:  He's also attempting to speculate as

25 to the motivations of other parties in their decision to settle

**J&J COURT TRANSCRIBERS, INC.**

1  -- enter into that settlement agreement.

2         THE COURT:  Well, he did earlier, but I sustained the

3  objection.  This one, however, is his understanding.  He is

4  testifying to his understanding, and that is not a motive for

5  someone else.  It's his own.

6         MR. BROWN:  Your Honor, he can only have an

7  understanding through discussions with the other side,

8  otherwise he's simply speculating.

9         MR. GUY:  Your Honor --

10         MR. KOVACICH:  And even to the extent of discussions

11  with the other side, if that were the foundation for his

12  testimony it would be hearsay, and those people should be

13  called in here to testify about their own motivations.

14         THE COURT:  Okay.

15         MR. KOVACICH:  But they were not listed as witnesses.

16         THE COURT:  He can state his own reasons, please, Mr.

17  Guy.

18         MR. GUY:  That was my question, Your Honor, but let

19  me try again.

20  BY MR. GUY:

21  Q    What are your reasons, sir, for accepting the extension of

22  the 524(g) injunction to Sealed Air and Fresenius as the FCR,

23  fiduciary in this case?

24  A    It is my understanding that it is a condition precedent to

25  receiving the $1.1 billion.

1  Q    And as you stated, that is a material benefit to the

2  futures?

3  A    It's an enormous material benefit.

4  Q    I want to move now to pre-petition insurance settlements.

5  Are you familiar with insurance settlements that the debtor

6  entered into pre-petition?

7  A    Yes.

8  Q    Do you know whether those settlement agreements provided

9  for proceeds to be paid to Grace pre-petition?

10  A    Yes.

11  Q    Do you know whether those settlement agreements provided

12  for indemnities?

13  A    In some cases.

14  Q    And in some cases they didn't?

15  A    Right.

16  Q    Is the debtor contributing --

17        THE COURT:  Mr. Guy, I need to get the record clear.

18  You're asking him if he knows, and he's saying yes, but then

19  you don't ask him what he knows, so I need to make sure that --

20  because you're then inferring that his answer is yes to a

21  substantive question.  Could you back up, please?

22        MR. GUY:  Yes, I'll back up, Your Honor.

23  Q    Do the settlement agreements, pre-petition settlement

24  agreements, provide for indemnities to Grace?

25  A    Yes.

1  Q    Do some of the settlement agreements not provide for

2  indemnities?

3  A    That's correct.

4  Q    Do the settlement agreements provide for monies to be paid

5  to Grace?

6  A    Yes.

7  Q    Is the debtor contributing monies to the trust on behalf

8  of settled insurers?

9  A    Yes.

10 Q    Did you agree, as the FCR, to extend 524(g) protection

11 under the plan to settled insurers with indemnities?

12 A    Yes.

13 Q    Could you explain to the Court why?

14 A    Well, they fall into a couple of different categories.

15 There are settled insurers who have essentially paid all of the

16 insurance that they would be required to pay pursuant to the

17 policies who have indemnity agreements.  There are insurance

18 companies that do not fall into that category but have

19 insurance in place agreements with W.R. Grace, and those

20 proceeds will go to the trust pursuant to those agreements and

21 524(g) protection has been extended to them.  There are, of

22 course, unsettled insurance companies.

23 Q    Have the plan proponents reached settlements with insurers

24 post-petition?

25 A    Yes.

1  Q    And certain of those settlements are with previously fully

2  unsettled insurers, correct?

3  A    That's correct.

4  Q    Are certain of those settlements with insurers that had

5  previously entered into what has been referred to as

6  reimbursement agreements in this case?

7  A    Yes.  Those are my way of saying agreements in place.

8  Q    Do those post-petition settlements, in general, as far as

9  you're concerned as the FCR, provide benefits to the trust?

10 A    Yes, the same benefits I've mentioned.  Those proceeds are

11 going to the trust and are extremely valuable to the trust.

12 Q    And in those post-petition settlements that have been

13 entered into, have you agreed that 524(g) protection should be

14 extended to those settled insurers, acting as the FCR with your

15 fiduciary obligations to futures?

16 A    Yes.

17 Q    Why?

18 A    Because 524(g) specifically articulates the fact that such

19 protection can be granted, and in words of one syllable, it is

20 an inducement for such settlements, and I believe it, again,

21 will provide enormous benefit to the future beneficiaries.

22 Q    Mr. Austern, is the plan before the Court fair and

23 equitable to asbestos P.I. future claimants?

24 A    I believe it is.

25 Q    Why?

1  A    A number of reasons.  They will be treated in the same and

2  similar manner as present claimants.  There are sufficient

3  funds that are available to ensure that they will be paid in

4  the same and similar manner -- excuse me -- as present

5  claimants.    And there are mechanisms in place within the trust

6  distribution process to ensure that as well.

7  Q    Mr. Austern, as the FCR, is the channeling injunction, the

8  524 channeling injunction, fair and equitable to futures in

9  light of the contributions and benefits being provided to the

10  trust by, on and behalf of asbestos protected parties?

11  A    I believe it is.

12            MR. CASSADA:  Your Honor, objection.

13            THE COURT:  Mr. Cassada.

14            MR. CASSADA:  He's asking a --

15            THE COURT:  You need to use a microphone.

16            MR. CASSADA:  Mr. Guy is asking the legal

17  representative to make a -- to state a conclusion of law which

18  is a determination that the Court has to make.

19            THE COURT:  I think he was asked as the future

20  representative whether in his view this treated the entities

21  for which he has a fiduciary duty fairly.  I think that is a

22  standard that the future claims representative has to assure

23  himself of in order to agree to participate in a 524(g) plan.

24  There is no future demand holder here to raise that type of

25  issue or objection other than the future claims representative.

1 So I think he was being asked as a matter of fact, not a

2 conclusion of law.  But can you restate the question and make

3 that clear please, Mr. Guy?

4           MR. CASSADA:  Your Honor, just to be clear on the

5 record, there is -- there are future demand holders here who

6 have objected and appear (indiscernible).

7           THE COURT:  There can't be.  We don't know who they

8 are.

9           MR. CASSADA:  Garlock would be a future demand

10 holder.

11          THE COURT:  No, you may be an indirect claimant, but

12 you're not a future asbestos personal injury demand holder.

13 Your client is not.

14          MR. CASSADA:  Well, when you say a future asbestos

15 personal injury, are you referring just to bodily injury claim?

16          THE COURT:  Yes.  That's who he represents.

17          MR. CASSADA:  Okay, thanks.

18          THE COURT:  Okay.  Mr. Guy, can you restate the

19 question please?

20          MR. GUY:  Yes.  Let me first do a foundational

21 question.

22 BY MR. GUY:

23 Q    Do you represent future asbestos claimants?

24 A    Yes.

25 Q    Does that constituency include tort claimants?

1  A    Yes.

2  Q    Does that constituency include indirect asbestos

3  claimants?

4  A    Yes.

5  Q    Mr. Austern, as the FCR, is the channeling injunction fair

6  and equitable to future claimants in light of the contributions

7  benefits being provided to the trust by or on behalf of

8  asbestos protected products?

9          THE COURT:  That's the same question, Mr. Guy.  You

10 didn't restate it.  I'm sorry.  It's still asking for a legal

11 conclusion.

12         MR. GUY:  Your Honor, we're asking just for his

13 factual analysis.

14         THE COURT:  That question doesn't ask for a factual

15 analysis.  You need to restate the question.

16 Q    Mr. Austern, as the FCR, is the plan and trust fair to

17 futures in light of the contributions you made by and behalf of

18 asbestos protected parties?

19 A    I believe it is.

20         MR. CASSADA:  Same objection, Your Honor.

21         THE COURT:  Well, that's a different standard from

22 fair and equitable.  The legal conclusion is fair and

23 equitable.  Whether his clients are being treated fairly under

24 this trust, I think, is a matter of his factual determination.

25 The objection is overruled.

1          MR. GUY:  Thank you, Your Honor.  Nothing further,

2    Your Honor.

3          THE COURT:  Anyone else on the Plan Proponents' side?

4    Mr. Monaco?

5                      CROSS EXAMINATION

6    BY MR. MONACO:

7    Q    Good morning, Mr. Austern.

8    A    Good morning.

9    Q    My name is Frank Monaco, I represent the State of Montana.

10   I have a couple questions for you.  You stated in your

11   testimony that you're familiar with the TDP and that it's in

12   the position to pay all present and future asbestos claimants,

13   correct?

14   A    Yes.

15   Q    Now, the TDP operates on a first in, first out basis,

16   correct?

17   A    It does.

18   Q    And payments are made in that manner as well, correct?

19   A    There are some exceptions to that, but generally, yes.

20   Q    Now, you're aware that there are a number of indirect

21   asbestos claimants -- let me rephrase that.  There are a number

22   of claimants who have been put in the subclass of indirect

23   asbestos personal injury claimants, correct?

24   A    Yes.

25   Q    Okay, and that would include my client?

1  A    Yes.

2  Q    And as you're aware, my client has claims for contribution

3  indemnification.

4  A    Okay.

5  Q    Now, the TDP acknowledges, I think, and I'll just to speed

6  things along, under Sections 4.1 and 4.3 of the TDP that there

7  is uncertainty in connection with the value of the assets, the

8  amount of liabilities?

9  A    Yes.

10  Q    Now, in light of all this, first in, first out and

11  uncertainty, is it possible that the trust could run out of

12  funds before it is positioned to pay contribution

13  indemnification claims?

14  A    I don't believe that's likely.

15  Q    Why is that, sir?

16  A    Because from the very first, the trustees, and I daresay

17  the trustees' constituents, are going to look very closely at

18  the rate at which claims are filed, the valuation of the claims

19  that are being paid, and I might say the future queue of those

20  claims, which is to say there's always a backlog and that

21  backlog are filed claims, and there are methods to very quickly

22  evaluate what those claims are even though they are not in FIFO

23  queue for payment.

24  Q    Okay.  But aren't you really talking about direct asbestos

25  personal injury claims?

Austern - Cross/Kovacich                    71

1  A    Well, I'm talking about all claims.

2  Q    But the way the trust is set up, isn't it more likely that

3  direct asbestos claimants are going to get paid first just

4  given the nature of their claims?

5  A    I don't know that to be true.  I think prepetition claims

6  will get paid first, but I don't believe that subsequent

7  personal injury claims will be.

8  Q    Okay.  So the fact that prepetition direct asbestos claims

9  more likely would get paid first and given the uncertainty, is

10 it possible, sir, that the Trust may not have sufficient funds

11 to pay contribution indemnifications claims which are

12 established later?

13 A    At the risk of future liability to me, I'm not doing my

14 job if that happens.

15 Q    So your testimony is there is no possibility of that

16 happening?

17 A    Well, of course there is a possibility, but I don't

18 believe it is likely to happen.

19 Q    Okay.  Thank you, sir.

20                     CROSS EXAMINATION

21 BY MR. KOVACICH:

22 Q    Good morning, Mr. Austern.  Mark Kovacich on behalf of

23 Libby Claimants.  I have just a couple of quick questions for

24 you.  You testified that Grace is contributing funds to the

25 plan on behalf of prepetition settled insurers, right?

1  A    Yes.

2  Q    There's nothing in the plan that says that, is there?

3            MR. LOCKWOOD:  Objection.

4            THE COURT:  Your microphone's not on, Mr. Lockwood.

5  On what basis?

6            MR. LOCKWOOD:  Objection, Your Honor.  He's asking

7  the witness in effect to tell him every particular provision in

8  the plan.  I don't know that he's established a foundation that

9  the witness has that much detailed knowledge of the plan.

10           THE COURT:  Well, the witness can answer if he knows.

11 If he doesn't, he knows to say he doesn't know, I'm sure.  You

12 may answer, Mr. Austern.

13 A    I don't know where in the plan that would be contained.

14 Q    You're not aware of any language in the plan that says

15 Grace's contribution is on behalf of the prepetition settled

16 insurers, are you, sir?

17 A    Not in that exact language, no.

18 Q    Under the terms of the settlement that was reached, if the

19 plan were modified to remove 524(g) protection for the

20 prepetition settled insurers, would Grace be entitled to pay

21 less money into the plan?

22           MR. GUY:  Objection, Your Honor.  Calls for

23 speculation.

24           MR. LOCKWOOD:  I join the objection.

25           MR. KOVACICH:  I can try to ask a better question.

Austern - Cross/Kovacich                    73

1  That was a horrible question.

2          MR. GUY:  It wasn't that horrible, Your Honor.

3                      (Laughter)

4  Q    Mr. Austern, under the terms of the settlement that was

5  reached, was securing 524(g) protection on behalf of the

6  prepetition settled insurers a condition of the settlement?

7          MR. LOCKWOOD:  Objection to form.  What settlement

8  that was reached is being referred to, Your Honor?

9  Q    The settlement with the asbestos PI constituency that Mr.

10 Austern testified about this morning.

11 A    That term sheet, and I believe the 8K filing is silent on

12 that subject.

13 Q    Because the term sheet is silent, if the plan were

14 modified to remove the 524(g) protection for those parties,

15 would it be your position that Grace would be able to reduce

16 the amount of money that it is required to pay into the trust?

17         MR. LOCKWOOD:  Objection.  Calls for speculation, and

18 also assumes that somehow or another, the term sheet supersedes

19 the plan.

20         THE COURT:  I'm sorry, I thought the question was if

21 the plan, was it the term sheet and I just misheard it?  I

22 apologize.

23         MR. KOVACICH:  I don't understand the objection, but

24 I can try to ask the question again.

25         THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Because the term sheet was silent on the issue of 524(g)

2  protection for the prepetition settled insurers, that was your

3  testimony, correct, sir?

4  A    Yes.

5  Q    Based on that as the representative of the FCR, would it

6  be your position that if the plan were modified to remove that

7  524(g) protection for the prepetition settled insurers, would

8  it be your position that Grace could reduce the amount of money

9  that it would be required to pay into the trust?

10        MR. LOCKWOOD:  Objection.  Lack of foundation that

11  he's ever considered the matter, and also calls for

12  speculation.

13        THE COURT:  I think it's asking for a legal position.

14  That's what I think you've asked for.  And I'm not certain what

15  relevance that has.

16  Q    Mr. Austern, as the future claimants' representative, when

17  you were involved in negotiations for the settlement with --

18  the personal injury settlement that we were talking about, did

19  you agree during those negotiations that 524(g) protection

20  would be provided to the prepetition settled insurers?

21        MR. GUY:  Objection, Your Honor, to the extent it

22  invades the settlement communications.  I'm happy for the

23  witness to answer what he did, but not how he got there with

24  regard to the other parties.

25        THE COURT:  Well, this is a did he agree, so I think

1  that's permissible.  You may answer.

2  A    Well, at some point I agreed, but I can't tell you when.

3  Q    One last question, Mr. Austern.  Under the term sheet that

4  memorializes the settlement that was reached, was Grace's

5  contribution to the trust tied in any way to the 524(g)

6  protection that the plan now provides to prepetition settled

7  insurers?

8  A    I would have to look at the term  --

9            MR. BERNICK:  I'm sorry.  This is a question that

10  focuses on Grace as somehow being -- is the question focused on

11  Grace or the estate?

12            THE COURT:  It said Grace's contribution.

13            MR. BERNICK:  So, I think the -- well, I think that

14  that still is not clear that is whether Grace is somehow

15  negotiating as the reorganized Grace as opposed to the Grace

16  which is the estate.

17            THE COURT:  The question was, under the term sheet,

18  was the debtor's contribution tied to the 524(g) protection for

19  the prepetition settled insurers.  I think that's an analysis

20  of the document.  That objection is overruled.  The document

21  will speak for itself, but the witness can answer his question.

22            MR. LOCKWOOD:  That was going to be my objection,

23  Your Honor.  The document speaks for itself.

24            THE COURT:  It does, but I'll let the witness answer

25  anyway.

**J&J COURT TRANSCRIBERS, INC.**

1        THE WITNESS:  Well, I don't know, if you could get me

2   the document I could answer the question.

3        THE COURT:  Do you want him to look at it?  He has

4   it.

5   Q    That's fine, sir.  We'll go ahead and read it.

6        MR. BROWN:  Michael Brown for OneBeacon and Seaton.

7                     CROSS EXAMINATION

8   BY MR. BROWN:

9   Q    Good morning, Mr. Austern.

10  A    Good morning, Mr. Brown.

11  Q    Just a couple of questions for you.  You were appointed

12  the FCR in this case after the Fresenius and Sealed Air

13  settlement agreements were reached, correct?

14  A    Yes.

15  Q    And you had no role at all in the negotiation of those

16  agreements, did you?

17  A    That's correct.

18       THE COURT:  Mr. Speights.

19                     CROSS EXAMINATION

20  BY MR. SPEIGHTS:

21  A    Good morning, Mr. Austern.

22  Q    Good morning, Mr. Speights.

23  A    I want to go back to the beginning of your testimony when

24  you talked about the negotiation process.  And I believe you

25  said it was an arm's length negotiation, is that correct?

1  A    Yes.

2  Q    And during that process when you negotiated the deal, the

3  Asbestos Personal Injury Committee was involved, correct?

4  A    Yes.

5  Q    And members of the Asbestos Personal Injury Committee,

6  such as Mr. Rice and others were involved in that process?

7  A    Yes.

8  Q    The debtors were involved in that process?

9  A    Yes.

10  Q    An equity was involved in that process?

11  A    Yes.

12  Q    Was a PD Committee involved in that process?

13  A    There were meetings with the PD Committee and Mr.

14  Westbrook and others.

15  Q    Well, let's back up a minute.  Are you telling me the

16  Official Property Damage Committee, through its counsel or

17  through its members, Mr. Baena and his group were involved in

18  the 2008 settlement negotiations?

19        MR. BERNICK:  When you talk about settlement

20  negotiations, is that face to face meetings, telephone calls

21  between -- I think there's a lack of foundation as well as

22  ambiguity.  The ambiguity is what particular context is he

23  talking about and the lack of foundation is the extent to which

24  Mr. Austern was aware of all aspects of the negotiation.

25        THE COURT:  Okay.  Well, with respect to all aspects,

1  Mr. Austern's testified that he had nearly daily conversations

2  with his counsel and participated in numerous meetings.  I

3  think the foundation has been laid.  To the extent that the

4  issue concerns some ambiguity in the time frame, that's

5  sustained.  Can you restate the question?

6  Q    During the 2008 settlement negotiations that you discussed

7  earlier which led to the deal, was a PD Committee's counsel,

8  let's start with the PD's Committee's counsel, Mr. Baena or

9  members of his firm, the Bilzin firm, involved in those

10 negotiations?

11 A    Mr. Speights, I can't tell you by date, by year even,

12 whether Mr. Baena or Mr. Westbrook or you or others were at

13 particular meetings.  I can tell you that at perhaps the last

14 five or six meetings, which by the way were very close upon

15 each other, I do not believe that any representative of the

16 property damage committees were present.  But they were

17 certainly present in what were seemingly endless numbers of

18 meetings that took place before the last four or five meetings

19 that led to the settlement.

20 Q    Well, let's go back then.  Because I think the record

21 needs to be clear on this, Mr. Austern.  In 2004, you put

22 together a group to try to negotiate a consensual plan and a

23 meeting of principals only, is that correct?

24 A    I think the group was put together by many others, but

25 yes.

1  Q    You participated in that?

2  A    Yes.

3  Q    And it was a session of principals only?

4  A    I think that's right, yes.

5  Q    And not only you participated, but the debtors

6  participated, the principals, correct?

7  A    Yes.

8  Q    The PI Committee's principals, Mr. Rice and others

9  participated?

10 A    Yes.

11 Q    And members of the PD Committee, Mr. Westbrook, Mr.

12 Speights, Mr. Dies, et cetera, also participated?

13 A    Yes.

14       MR. GUY:  Your Honor, I object to this -- sorry -- I

15 object to this line of -- I object to this line of questioning,

16 because it goes to settlement negotiations that took place in

17 2004 that are irrelevant to the plan that's before the Court.

18       THE COURT:  I don't know whether they're irrelevant.

19 Eventually we got to a settlement, and I'm not sure that any of

20 the negotiations that led to a settlement are irrelevant.  It

21 may not have led at that time to a settlement, but it got to

22 one.  So the objection's overruled.

23 Q    For whatever reason there was no settlement back in 2004,

24 correct?

25 A    Correct.

Q     And then later on, I believe 2006, there was a, there were

a series of meetings before Judge Horner I think, is that

correct?

A     Correct.

Q     And the PI Committee was involved in that, correct?

A     Yes.

Q     The PI principals were involved in that, correct?

A     Some of them.

Q     You were involved in that?

A     Yes.

Q     Your counsel was involved in that.

A     Yes.

Q     The PD Committee was involved in that.

A     Yes.

Q     Individual PD representatives, such as Mr. Westbrook and

Mr. Speights were involved in that.

A     Correct.

Q     And as a result of that, and I'm not trying to

characterize it at this point, there was a 85/15 document

produced.  We call it an agreement.  You're not ready to call

it an agreement, but whatever it was that's what produced the

85/15 split.

A     There were certainly discussions about that.  I don't

recall a document.

Q     Okay.  In any event, back in 2006, those discussions did

1  not lead to a settlement.

2  A    Correct.

3  Q    Now, you talked about 2008.  Can you point me to any

4  settlement meeting that involved the PD Committee, Mr. Baena or

5  lawyers in his firm, between the split discussions, the

6  mediation discussions, and 2008, Mr. Austern?

7  A    I'm sorry, did you say any meeting or any document?

8  Q    Any discussions, settlement discussions that involved the

9  PD Committee after we put aside the 2004 and after we've put

10 aside the split discussions, neither of which led to an

11 agreement, can you point to any session in which the PD

12 Committee participated, any settlement negotiations in which

13 they participated and you were there?

14 A    There was -- I do not recall any meeting that I attended

15 in which that happened.

16 Q    Thank you, sir.  Now, you clearly said that in 2008 the

17 last five or six sessions, which led to the deal, no PD

18 representatives were there, is that correct?

19 A    I believe that's correct, yes.

20 Q    And that's -- by PD representatives, I mean the PD

21 Committee or any PD lawyers, Mr. Westbrook or Mr. Speights or

22 Mr. Dies, none of those were present.

23 A    I do not believe any of them were present.

24 Q    And of course there was no PD Future Claimants

25 representative at that time?

1  A    I don't remember when Judge Sanders was appointed, but I

2  don't believe there was.

3  Q    And certainly Judge Sanders did not attend those meetings

4  or his counsel, correct?

5  A    He did not.

6  Q    So during those 2008 negotiation sessions, was PD

7  discussed?

8  A    I don't remember.

9          MR. SPEIGHTS:  Thank you, Mr. Austern.

10         THE COURT:  Anyone else?

11         MR. MONACO:  Can I ask two more questions?

12         THE COURT:  Mr. Monaco?  I'm sorry, I couldn't hear

13  you, sir.

14         MR. LOCKWOOD:  Your Honor, Mr. Monaco already asked

15  --

16         THE COURT:  I couldn't hear him.

17         MR. LOCKWOOD:  Mr. Monaco already questioned the

18  witness.

19         THE COURT:  I couldn't hear Mr. Monaco.  I'm sorry,

20  what did you say?

21         MR. MONACO:  Your Honor, I said I would like just to

22  ask one or two more questions  --

23         MR. GUY:  I have no objection.

24         MR. MONACO:  -- to follow up with Mr. Speights' --

25         THE COURT:  All right, that's fine.  Go ahead.

1    MR. MONACO:  I think it's relatively

2  non-controversial.

3                  FURTHER CROSS EXAMINATION

4  BY MR. MONACO:

5  Q    I apologize for acting like Columbo, Mr. Austern.  You've

6  been involved with the negotiations both with the original plan

7  and the current plan that's on the table throughout this case?

8  A    Well, since 2004, not throughout the case.

9  Q    Okay, fine.  And I think this is relatively

10 uncontroversial, but I want to make sure this is clear for the

11 record.  Has the State of Montana ever been a participant to

12 any of these settlement discussions that led up to the plan to

13 your knowledge?

14 A    I didn't see you or any other representative of the State

15 there.

16         MR. MONACO:  Thank you.  No further questions, Your

17 Honor.

18         THE COURT:  Any other cross examination?  Redirect?

19         MR. GUY:  Short redirect, Your Honor, honoring the

20 12:30 rule.

21                  REDIRECT EXAMINATION

22 BY MR. GUY:

23 A    Mr. Austern, if you could turn to the first document in

24 your binder, which is the term sheet that you refer to.

25         THE COURT:  Is this Exhibit PP-160?

**J&J COURT TRANSCRIBERS, INC.**

 1            MR. GUY:  Yes, Your Honor.  If Chris could pull it up

 2  on the screen?

 3  Q    Mr. Austern, if you could look at the very opening

 4  paragraph.  See the language there that says the co-proponents

 5  providing for a resolution of all asbestos personal injury

 6  claims and liabilities?

 7  A    Yes.

 8  Q    Does that refresh your recollection as to whether the

 9  parties to this term sheet agreed for the resolution of all

10  asbestos personal injury claims and liabilities?

11  A    Yes.

12  Q    Do the indemnities provided under the prepetition

13  settlement agreements with insurers give rise to liabilities?

14  A    Yes.

15  Q    So to satisfy this condition, those indemnities would have

16  to be addressed and claims would have to be enjoined under the

17  plan?

18            MR. KOVACICH:  Objection, leading.

19            THE COURT:  Sustained.

20            MR. GUY:  I'll withdraw it, Your Honor.  I think it's

21  a given.

22  Q    If you could turn to Page 4, Mr. Austern.  Paragraph 2

23  there, sir.

24  A    Yes.

25  Q    If you could highlight for the Court and the courtroom,

                    **J&J COURT TRANSCRIBERS, INC.**

1 the first paragraph of Paragraph 2 on Page 4.  The first

2 sentence in the first paragraph.

3        MR. GUY:  Just the first sentence, Chris.

4 Q    Mr. Austern, could you take a moment to read that?.

5 A    Yes, I've read it.

6 Q    Do you see the language there that says the plan shall

7 contain injunctions under 524(g) for various parties including

8 insurers?

9 A    Yes.

10 Q    Does that refresh your recollection, sir, as to whether

11 the term sheet addressed the provision of 524(g) protection for

12 insurers?

13 A    It does and it did.

14        MR. GUY:  No further questions, Your Honor.

15                    RECROSS EXAMINATION

16 BY MR. BERNICK:

17 Q    Good morning, Mr. Austern.

18 A    Good morning, Mr. Bernick.

19 Q    I want to revisit, just very briefly, the history that Mr.

20 Speights covered with you briefly on his cross examination.  Do

21 you recall -- I'm assuming that you got regular updates on what

22 was happening of consequence in the case?

23 A    Yes.

24 Q    Do you recall that in connection with the mediation

25 process, as Mr. Speights indicated, was that mediation process

1  focused on doing a settlement piece by piece through the case

2  or was it focused on a global or overall deal?

3  A    It was a global or overall deal.

4  Q    Was that mediation process successful?

5  A    It was not.

6  Q    After the mediation process was done, could you tell us

7  whether or not there were any further efforts to essentially

8  put together a global deal that its efforts involving PD, PI --

9  PD and PI together?

10 A    Specific timing is difficult for me, but I certainly did

11 have discussions and I know my counsel did with Mr. Westbrook,

12 perhaps Mr. Speights, I don't remember, but these tended to be

13 piecemeal meetings and I do not recall a global meeting that

14 took place.

15 Q    Well, let me be more specific.  Did a time come, I think

16 Mr. Speights referred to an 85/15 split, remember that?

17 A    Yes.

18 Q    And that was an effort that was undertaken, as I recall at

19 least as it was reported to the Court and to us, that was

20 undertaken by the PD and PI people working as a group.

21 A    Yes, that's correct.

22 Q    Remember that they then reached out to try to also include

23 the unsecured creditors at one point?

24 A    I do.

25 Q    And the only folks that were left out of that dialogue

1 were the debtor and equity.

2 A    That's correct.

3 Q    Did those efforts come to fruition, that is, did they

4 produce an overall deal?

5 A    They did not.

6 Q    Could you tell us whether or not after that time, the

7 focal point of the negotiation and settlement process turned

8 from overall packages to kind of a piece by piece approach.

9         MR. SPEIGHTS:  Objection, as leading, Your Honor.

10 He's a plan proponent, that's one of their witnesses.

11        THE COURT:  He said whether or not, it's not leading.

12 Overruled.

13 A    It was piecemeal, including visits to various constituents

14 by me and counsel.

15 Q    Okay.  Now, when you sat down in the discussions and the

16 ACC was present as well, in discussions with the debtor and

17 equity, tell us what the subject matter focus, what was the

18 principal focus of those negotiations in terms of reaching a

19 deal?

20 A    How much money the trust was going to get.

21 Q    But in terms of which constituency you all were

22 negotiating for resolution, which constituency was it?

23 A    It was just equity and the debtor.

24 Q    Do you recall whether during the same period of time, do

25 you remember that during the course of the case, much was made

1 by Mr. Speights, in particular, pointing out that on certain

2 matters, the PD Committee could speak for PD Claimants, and on

3 other matters, PD Claimants were the only ones through their

4 counsel who could speak to those issues.  Do you recall that

5 distinction being made?

6 A    Yes, and it was reinforced to me by counsel on several

7 occasions.

8 Q    Right.  Now when it came to the settlement of PD Claims,

9 can you tell the Court whether or not, while the debtor and

10 equity on the one hand and the PI constituency on the other

11 were trying to resolve their issues, could you tell us whether

12 you had any awareness, whether it was ever reported to you that

13 settlement discussions were taking place between the debtor on

14 the one hand and representatives of individual PD claimants on

15 the other?

16          MR. SPEIGHTS:  I object, Your Honor.  That's patently

17 hearsay.

18          THE COURT:  Sustained.

19          MR. BERNICK:  Well, no.  I'll rephrase the question.

20 Q    Mr. Speights asked you without regard to your personal

21 knowledge, he asked you, were you aware.  So I'm not asking for

22 the truth of the matter, I'm asking in terms of your awareness,

23 was it reported to you that there were discussions that were

24 unfolding between the debtor and representatives of individual

25 PD claimants?

1          MR. SPEIGHTS:  Same objection, Your Honor.

2          THE COURT: It's a yes or no answer, Mr. Austern, you

3   may answer yes or no.

4   A    Yes.

5   Q    During the course of this case as the process again

6   continued to unfold between the PI folks and the debtor and

7   equity over their issues, could you tell -- were you made aware

8   of reports that Mr. Restivo made on a regular basis to the

9   Court with his little chart about PD settlements that were

10  being reached?

11  A    Yes.

12  Q    Okay.  Are you aware of any effort by the PD Committee as

13  a committee to participate in the discussions that you've

14  discussed between the debtor and the bodily injury constituency

15  about settling bodily injury?

16  A    Not to me.

17  Q    At the end of the day, with the exception of Anderson

18  Memorial, and I believe the State of California, which has

19  pursued an appeal, are there any outstanding, unsettled,

20  current PD claims?

21  A    Not that I know of.

22  Q    After the term sheet was done and there was the light

23  shown, there was happiness in the courtroom.  I remember the

24  Court expressing a certain degree of satisfaction with the

25  process, did the discussions then turn to the next pieces,

1 which were ZAI and PD futures?

2 A    Yes.

3 Q    And again, just as all of the other elements of the plan

4 that's now before the table, were those handled on a piecemeal

5 basis?

6 A    As far as I know they were.

7         MR. BERNICK:  I have nothing further, Your Honor.

8         THE COURT:  Any recross?

9         MR. SPEIGHTS:  None from Anderson, Your Honor.

10        THE COURT:  All right, you're excused, Mr. Austern,

11 thank you.  Why don't we take a five-minute recess since we've

12 been going since 8:30, and then we'll reconvene with the next

13 witness.

14                  (Recess)

15        THE COURT:  All right, whose next?

16        MR. SPEIGHTS:  Your Honor, excuse me, are we supposed

17 to have the monitors working?

18        THE COURT:  She's turning it on.  They're turned on,

19 but there's no presentation at the moment.

20        MR. SPEIGHTS:  The people on the telephone have been

21 disconnected.

22        MR. BERNICK:  We call Judge Sanders, the Future

23 Claimants representative for PD.

24     JUDGE ALEXANDER SANDERS, DEBTOR'S WITNESS, SWORN

25        MR. RICH:  May it please the Court, Alan Rich for the

1  PD FCR, Your Honor.  What we have is a proffer of Judge

2  Sanders' direct testimony.  It was filed with the Court the day

3  before yesterday and we've marked it here as PD FCR's Exhibit 1

4  and Plan Proponents' Exhibit 633.  And I'd like to hand it up

5  to the Court at this time.

6           THE COURT:  All right.

7           MR. SPEIGHTS:  Your Honor, before he does that, I do

8  have an objection.

9           THE COURT:  I'll hear the objection Mr. -- I'm sorry

10 -- Mr. Speights.

11          MR. SPEIGHTS:  May it please the Court.  Number one,

12 we do not object to Judge Sanders' direct testimony coming in

13 by way of declaration as opposed to Q&A.  But we -- and we

14 don't have an objection to much of the proposed or proffered

15 testimony.  However, there are parts of this proffered

16 testimony that in our view contain expert opinion.  Judge

17 Sanders provides expert opinions, in our view, in fact, the

18 document says in my opinion on both the issues of equality of

19 treatment and on feasibility.

20          And that being the case, Judge Sanders has not

21 provided, or his counsel has not provided an expert report.

22 And as Mr. Bernick so eloquently stated yesterday with respect

23 to Mr. Ewing, without an expert report in advance, we would be

24 at a disadvantage to question him, and in fact, had he provided

25 an expert report, we could have then taken his deposition on

                    J&J COURT TRANSCRIBERS, INC.

1  his expert opinions.  I don't need Judge Sanders' deposition

2  concerning his factual, the factual aspect of his testimony as

3  PD FCR.  But we do object to that without an expert report and

4  the opportunity to examine it.  Now, we can decide what to do

5  about that, if Your Honor agrees with me, if they want to

6  pursue getting in the expert opinions.  But I think it was

7  incumbent upon him when he walked off into the land of expert

8  to provide an expert report.

9          THE COURT:  Okay, I haven't seen the document.  Do

10 you have an objection to my looking at it --

11         MR. SPEIGHTS:  No, Your Honor.

12         THE COURT:  -- so you can tell me specifically what

13 parts you're addressing?

14         MR. SPEIGHTS:  No, Your Honor.  I just wanted to get

15 my objection on the record first.

16         THE COURT:  What parts, Mr. Speights, are you

17 addressing?

18         MR. SPEIGHTS:  I'm sorry, Your Honor, did you ask me

19 a question?

20         THE COURT:  Yes, sir.

21         MR. SPEIGHTS:  I'm sorry.

22         THE COURT:  I'm trying to find out specifically in

23 the declaration what parts you are objecting to.

24         MR. SPEIGHTS:  I think if we work backwards, Your

25 Honor, in particular it would be Paragraph 26, which is the

1  last numbered paragraph of the document, and it would be the

2  last sentences of Paragraphs 18 and 19.

3          MR. RICH:  Your Honor, if I may address Mr. Speights'

4  objection.

5          THE COURT:  Yes, sir.

6          MR. RICH:  The Futures' representative is required to

7  have these opinions and give them to the Court.  It's not an

8  expert opinion, it's his opinion in the capacity of the PD FCR

9  and really in the nature of the factual opinions that he

10 satisfied himself that the requirements of his fiduciary duties

11 have been met by the existing plan and the plan documents.  So

12 this is not like a traditional hired expert opinion, this is

13 simply Judge Sanders expressing an opinion which he's required

14 to express under the statute.

15         THE COURT:  All right.  Well, let me look at

16 Paragraph 26 first.  Okay, I think the same problem here is

17 what I just addressed with Mr. Austern in Paragraph 26.

18         MR. RICH:  We're happy to strike the word equitable

19 if that's too much of a legal conclusion.  But I think

20 equitable here is used definitely in the lowercase sense

21 meaning simply a synonym to fair.  So I don't mind if equitable

22 is not in there.

23         THE COURT:  Mr. Speights?

24         MR. SPEIGHTS:  I think Mr. Rich and I are passing in

25 the night a little bit.  I understand the FCR's role in the

1  case.  And it may be that -- certainly Judge Sanders is as

2  eminent a witness as will ever appear in this courtroom, and it

3  may be he can express opinions about many things.  The issue

4  is, they did not file an expert report.  I get this the day

5  before yesterday and it contains expert opinions.  If he files

6  an expert report, I take his deposition, they come here and do

7  the same thing and I'm prepared.  But without an expert report,

8  I'm left in the wilderness until two days before and I don't

9  know the basis, frankly, of especially the feasibility opinions

10 of Judge Sanders.

11        THE COURT:  Okay, well, I'm looking at Paragraph 26,

12 and I believe that with the term fairly and equitably, because

13 that is a term of art under Section 524(g), that that expresses

14 a legal opinion and I don't challenge Judge Sanders' ability to

15 make legal judgments.  But I think as a witness in this case,

16 that is not the function of the witness.  Fair treatment is a

17 question of fact in his eye, based on what he has articulated

18 later that based on his due diligence and so forth that the

19 demand holders are reasonably assured of payment.  But the

20 words and equitably constitute a legal conclusion and must be

21 stricken.

22        MR. RICH:  Yes, Your Honor.

23        THE COURT:  So you'll have to run this by Judge

24 Sanders to see whether or not this will change his view.  But

25 that is my ruling with respect to Paragraph 26.  With respect

1  to Paragraph 18, I need to read it, excuse me.

2          MR. BERNICK:  I think Mr. Speights indicates the last

3  sentence of 18.

4                          (Pause)

5          THE COURT:  The way this is stated does constitute an

6  opinion.  I'm sure the question can be put to this witness in a

7  fashion that will elicit a fact as opposed to an opinion.  But

8  nonetheless, the last sentence in Paragraph 18 constitutes an

9  opinion, whether it constitutes an expert opinion, frankly, I'm

10 not so sure.  It seems to me that it's an opinion based on the

11 observation of the witness of the facts in the plan that he

12 discusses in Paragraph 18.  Nonetheless, Mr. Rich, I'm going to

13 ask that you put the question to the witness in a fashion that

14 will not in any way come to a possible legal opinion, but will

15 be based on the facts as he has ascertained them under the

16 plan, and I think that will take care of that objection.

17         And the last paragraph of 19, I do not see that this

18 is a statement of expert opinion as much as it is a conclusion

19 that is drawn from the procedures that the trust distribution

20 process is required to follow.  It is simply, I believe, this

21 witness' opinion in the capacity that he holds as a fiduciary

22 to that class.  But again, Mr. Rich, if you would please just

23 restate the question so we have the fact on record as opposed

24 to the possibility of an opinion.

25         MR. SPEIGHTS:  And, Your Honor, going back to 26 a

1  minute.  At the very end of the paragraph that holders of

2  future PD claims...

3          THE COURT:  Oh, I see, there's another opinion

4  expressed.  Let's see, based on his due diligence -- well, that

5  one, I believe, Mr. Speights, is a statement of his

6  responsibility under this plan to assure that the class that he

7  represents is treated the way the law requires them to be

8  treated. I don't think it's an expert opinion as much as it is

9  a lay opinion based on his observation of the facts.

10         MR. SPEIGHTS:  I understand the ruling on that, Your

11 Honor.  But in addition to that, the statement, the very end,

12 that holders of future PD claims or demands are reasonably

13 assured of receiving the payments contemplated by the joint

14 plan.  We think, Number one, that's an expert opinion, and

15 Number two, if you allow it in, we still don't think there's

16 foundation for it.

17         THE COURT:  All right.  Well, the foundation issue

18 you may raise as an objection and either we'll do it on direct

19 or you may explore it on cross, however you choose to do it.

20 With respect to the opinion, I think I've stated I believe that

21 is a lay opinion based on what precedes it based on the

22 observations of how the plan and the trust distribution

23 procedures will work.  So do you want a minute to discuss with

24 Judge Sanders whether the striking from this affidavit of the

25 words and equitably in Paragraph 26 will make a material

1   modification so that he wishes to withdraw this declaration?  I

2   will just simply leave for a second.

3           MR. RICH:  I don't think we need to consult on that

4   minor point, Your Honor.  I think I'm ready to ask him the

5   questions that you want modified from the proffer.  Subject to

6   all the modifications that Your Honor mentioned, is the exhibit

7   admitted?

8           THE COURT:  Subject to those rulings, yes.  Exhibit

9   PP-633, also denominated as PDFCR-1 is admitted.

10          MR. RICH:  Thank you, Your Honor.  And I will just

11  ask Judge Sanders some questions that clear up some of the

12  issues in the proffer, and then I will tender him for cross

13  examination, Your Honor.

14          THE COURT:  All right.

15          JUDGE SANDERS:  Counsel, one matter occurs to me as I

16  observe this.  I was a Judge once years ago, far away.  You can

17  call me Judge, but I'm not a Judge anymore.  As I look around

18  this courtroom for the last two weeks, I don't believe we have

19  room for more than one Judge.

20                    (Laughter)

21          JUDGE SANDERS:  I would propose that you just call me

22  something else.

23          MR. RICH:  Mr. Sanders doesn't sound right to me, but

24  I will yield to your views.

25          THE COURT:  I think it's appropriate to refer to this

erererersnavnavinavignavigatCase 01-01139-AMC    Doc 23532    Filed 10/20/09    Page 98 of 154

gentleman as Judge Sanders.

        MR. RICH:  Thank you, Your Honor.  Your Honors or

something like that.  Okay.

DIRECT EXAMINATION BY MR. RICH:

Q    Judge Sanders, I want to clear up some of the matters that

we've just been discussing on the record concerning your

proffer.  You're familiar with the Class 7A CMO, correct?

A    Yes.

Q    And you know pursuant to that CMO what the procedures in

that document are for traditional PD claimants?

A    Yes.

Q    And that document concerns all PD claimants, both current

and future, who have traditional claims, is that right?

A    In addition to ZAI claims.

Q    ZAI is treated in a different document?

A    Yes.

Q    Based on your review of those documents and your

familiarity with the procedures in that document, do you

perceive any differences in the way futures and current

claimants are to receive payment from the PD Trust?

A    No substantial differences.  I address that to the way

they receive payments, which is what I understand 524(g)

requires.  There are different procedures, it seems to me those

are outside the requirements of 524(g).

Q    Of course, the documents speak for themselves, but there

**J&J COURT TRANSCRIBERS, INC.**

1  are different procedures that are applicable to current

2  claimants versus future claimants, correct?

3  A    Correct.

4  Q    But they're both getting what percentage of their claims?

5  A    Hundred percent.

6  Q    In that way, in the fact that they're receiving 100

7  percent of the allotted amount of their claims, is that what

8  you mean by being treated in substantially the same manner?

9  A    Yes.

10 Q    Now, even though we've touched on this in your proffer,

11 you do state that the plan would treat future PD traditional

12 claimants and future holders of ZAI claimants fairly and

13 equitably et cetera.  With the removal of that word equitably,

14 that doesn't -- does that change your views in any way?

15 A    It does not.

16 Q    Were those two words, in your mind, synonymous?

17 A    They are used here synonymously.  One's a Saxon word,

18 one's a Norman word, that's common in the law.  We pair those

19 words up.  We'll devise and bequeath --

20                        (Laughter)

21 Q    Now, also there was an issue regarding an opinion you set

22 forth in Paragraph 26 of your proffer where you say that future

23 PD claims are reasonably assured of receiving their payments.

24 That was your opinion.  And your proffer also saying that your

25 opinion was based on your due diligence in Paragraph 14.  Do

1  you remember that part of your proffer?

2  A    Yes.

3  Q    Okay.  In Paragraph 14 of your proffer, you set out the

4  various forms of what we're calling due diligence that you

5  undertook, is that correct?

6  A    Yes.

7  Q    And your opinion in your proffer that the future PD claims

8  are reasonably assured of being paid are based on that due

9  diligence you did in Paragraph 14, is that right?

10 A    That's correct.

11         MR. RICH:  Pass the witness, Your Honor.

12         THE COURT:  Mr. Speights.

13                     CROSS EXAMINATION

14 BY MR. SPEIGHTS:

15 Q    Good morning again, Judge Sanders.  Judge Sanders, you

16 referred to the current PD CMO and the treatment that PD

17 claimants -- let me stop right here -- is it agreeable with you

18 when I use the term PD claimants that I'm just referring to

19 traditional PD claimants?

20 A    Right.  I understand that.

21 Q    I don't expect to ask you a question about ZAI today.

22 A    Okay.

23 Q    And you referred to the current treatment of PD claimants

24 under the CMO and stated that you are familiar with it.  Would

25 it be also fair to say that you were familiar with a previous

1  version of the PD CMO?

2  A    I'm not sure I recall that previous version.

3  Q    Is it fair to say that you had your counsel negotiate with

4  the debtors to change some of the terms of the proposal that

5  was originally made for the treatment of PD?

6  A    That's correct.  But of course, it's been through so many

7  iterations that I can't recall in detail all the previous

8  propositions.  I know what it says now, and that's the plan I'm

9  supporting.

10 Q    I understand that.  And I want to go back to --

11 A    If you remind me of a previous one, I'll be glad to

12 respond to it.

13 Q    I'm about to.  I believe there are only two on file.  The

14 current one and the previous one dated December 19, 2008,

15 Document 20304, that's just for the record.  Under the previous

16 iteration, I believe that future PD claims, after going through

17 some bankruptcy procedures, ultimately, if they got to go to

18 trial, would go to trial in the District Court of the District

19 of Delaware, is that your recollection?

20 A    Yes, that's not contrary to my recollection.  The way it

21 works now is they go to trial in any district court, federal

22 court that has jurisdiction.

23 Q    But isn't it correct that through the good services of Mr.

24 Rich, you thought that it would be better than -- rather than

25 going to trial -- I'm talking about the future PD claimants --

1  rather than going to trial or restricted in going to trial in

2  the District Court of Delaware, you negotiated a provision

3  which allowed future PD claimants trials if they are conducted

4  to be conducted in any district court that had jurisdiction.

5  A    That's right.  I thought that was a better deal and more

6  fair for the future PD claimants.

7  Q    Now, are you aware that under the original PD CMO, present

8  PD claimants also would have been tried in the district court

9  for the District of Delaware?

10 A    I'm aware of that and that's the case now.  But you see, I

11 didn't negotiate on behalf of existing claims.  My title is

12 future claims' representative.

13 Q    Well, I'm concerned a little bit, and I hope you are right

14 and I'm wrong, okay, but my understanding is under the present

15 PD CMO, present PD claims are actually tried in the Bankruptcy

16 Court, is that different from your understanding?

17 A    Well, that's different from my understanding, but let me

18 say my understanding is subject to being wrong.  Because I

19 really haven't addressed in any depth, I haven't even thought

20 very hard about existing PD claims like that of Anderson

21 Memorial Hospital.  How you would treat it, I must say, it was

22 my impression that you can try your case in the District Court

23 of Delaware assuming you satisfied all the requirements for

24 bankruptcy court preliminary there too.  But maybe not.

25 Q    Well, do you have a copy of the current PD CMO in front

Sanders - Cross/Speights                         103

1  of --

2  A     No, not with me.  You show me one.

3  Q     Well, let me put it on the screen so we all can see it.

4  This is February 28, 2009, the PD CMO.  Does that appear to be,

5  just what you can see, the present --

6           THE COURT:  It's not on yet, Mr. Speights, just a

7  second, please.

8                         (Pause)

9           JUDGE SANDERS:  Mr. Speights --

10          THE COURT:  Just a minute, Judge Sanders.  She can't

11  record your answers because of the problem with the system.

12          JUDGE SANDERS:  Okay.

13                        (Pause)

14          MR. BERNICK:  What's the problem?  Is it just the

15  screen?  Your Honor, it would be great to have the screen, but

16  I don't think the future is going to rest or fall on whether we

17  see these things up there.  I think we ought to -- at least

18  we're prepared to proceed.

19          THE COURT:  I agree.  Mr. Speights, would you like us

20  to make some copies so that you can show the witness?

21  Apparently whatever happened with my system has affected more

22  things than just the audio.

23          THE WITNESS:  Your honor, maybe I can help.  If

24  you're going to ask me what the existing CMO or a previous

25  proposed CMO provides as to existing claims, I'm not going to

**J&J COURT TRANSCRIBERS, INC.**

Sanders - Cross/Speights                    104

1  be able to give you an answer to that any better than your own

2  answer.  It provides whatever it provides.  It speaks for

3  itself.  I didn't negotiate it and I didn't spend any time

4  thinking about it.  I was under the impression that you had

5  told me that Anderson Memorial Hospital was going to have to be

6  tried in the District Court of Delaware as opposed --

7          THE COURT:  Gentlemen.

8          THE WITNESS:  -- to a District Court in South

9  Carolina or wherever else you might find jurisdiction.  Is that

10 wrong?

11                    (Laughter)

12         MR. SPEIGHTS:  Well, if you were on the bench, I

13 think you would instruct the witness that you can't ask me a

14 question.

15                    (Laughter)

16         MR. SPEIGHTS:  But I'm glad to have this

17 conversation.

18         THE WITNESS:  Well, I wouldn't have done that if the

19 screen had been working.

20         THE COURT:  You can proceed, Mr. Speights.

21 Q    For the benefit of everybody, Judge Sanders, I think you

22 and I have known each other since the very early '70s, haven't

23 we?

24 A    We have known each other since childhood.  His childhood,

25 not my childhood.

**J&J COURT TRANSCRIBERS, INC.**

1          (Laughter)

2              THE COURT:  You're not winning here, Mr. Speights.

3  Q    Let's approach it this way.  Clearly, I could have told

4  you I don't remember that the original CMO in this case said

5  that both your clients and my clients would be tried in the

6  District Court of Delaware.  And you've agreed already today --

7  A    I have agreed that it said that as to my clients and it

8  probably said that said that as to your clients too.  I can't

9  think of any reason why it wouldn't have.

10 Q    And as a result of your negotiations, which you've

11 described, your clients can, if they go through all the hoops,

12 go back to a state such as South Carolina and proceed in the

13 District Court in South Carolina if there's jurisdiction.

14 A    That is correct.

15 Q    And I'm asking you to assume that my clients cannot do

16 that, that they must now be tried in the Bankruptcy Court.

17 A    I agree with that.

18 Q    So if that's the case, after your negotiations with

19 somebody, presumably the plan proponents, you got to head south

20 and I got to head west.  Not because you did it, but that's the

21 bottom line of what happened after your negotiations.

22 A    My clients got a better deal than yours.

23 Q    Thank you.  Now --

24 A    Now, let me say about what a better deal amounts to.

25 524(g), as I read it, says that two categories of claimants

1  have to be paid in the same or similar way.  I'm not sure it

2  says they have to be treated in every respect in the same or

3  similar way, but whatever it says it says and I'm not here as

4  an expert on the law.

5  Q    Well, let's assume that one of your clients who can go

6  through the hoops is a future claimant.

7  A    Right.

8  Q    And has a building down in Honea Path, South Carolina.

9  You know where Honea Path is, don't you?

10  A    I know you know, nobody else knows.

11  Q    Well, Honea Path is in Anderson County, isn't it?

12  A    It is.

13  Q    Now suppose a building owner down there with Grace

14  product, let's assume it's a homeowner with Grace product on

15  its ceiling, has a claim against Grace for $40,000.  It's a

16  future claim.  Is it your understanding of this plan that that

17  homeowner, if it goes through all the hoops, can sue in the

18  United States District Court for South Carolina with a $40,000

19  claim?

20  A    That's my understanding.

21  Q    So that if that case goes before the Honorable Henry

22  Herlong, you know Judge Herlong, don't you?

23  A    I do.

24  Q    That he will, by virtue of this plan, entertain that case

25  even though there's not the requisite jurisdictional amount?

1          MR. RICH:  Objection, Your Honor.  It calls for a

2    legal conclusion.

3          THE COURT:  Well, it calls for some speculation as to

4    what the Judge would do too.  So the objection is sustained.

5    Q    Have you, in your due diligence, and I'm not being

6    critical, Judge, at all, have you working with the debtors and

7    the future claimants' personal injury representative and PI

8    Committee, et cetera, addressed that issue of what if the claim

9    itself does not have the minimum jurisdictional amount for

10   diversity jurisdiction.

11         MR. RICH:  Your Honor, I just want to clarify that

12   does not include discussions he might have had with his

13   counsel, is that right?

14         MR. SPEIGHTS:  It does not.

15   A    I've addressed that scenario in my own mind, but not in

16   any depth.  And the conclusion I reached is of my own.

17   Q    Well, leaving aside the conclusion you reached, as a

18   former Chief Judge of the South Carolina Court of Appeals,

19   would it be fair to say that you have a great deal of

20   respect for State Court tribunals as well as Federal Court

21   tribunals?

22   A    I do.  So why didn't I negotiate a deal for the future

23   claimants to have their cases resolved in State Court?

24   Q    Well, I didn't ask you that question.

25   A    Well, I won't answer it then.


                    **J&J COURT TRANSCRIBERS, INC.**

1                     (Laughter)

2              THE COURT:  You won one.

3  Q    But I will say that if they offered future claimants, if

4  they were agreeable for future claimants to try their case in

5  State or Federal Court, you would not have objected to that,

6  would you?

7  A    No, I would not have objected to that.  But unlikely.

8              MR. BERNICK:  Now that the question hasn't been

9  answered so that we don't have to worry about it, it's also not

10 an issue that's been raised in any objection that Anderson

11 Memorial has filed in the case.

12 Q    Now, I want to go to the end of your declaration

13 concerning what you and I might refer to as the money issues

14 and the bankruptcy lawyers might call the feasibility issues,

15 Judge Sanders.

16 A    Yes, right.

17 Q    In regard to your opinions in Paragraph 26, I want you to

18 identify what people provided you information, if any, other

19 than your counsel, Mr. Rich, upon which that opinion is based.

20 Either oral or in writing.

21 A    Mr. La Force.  You know who he is, don't you?

22 Q    And, is that in addition to Mr. LaForce's deposition or

23 are you relying on his deposition?

24 A    Well, I'm relying on his deposition and probably also what

25 he told me, frankly.

1  Q    All right.

2  A    I met with the officers of Grace at their headquarters in

3  Columbia, Maryland.  His five-year projection, which leads to

4  the conclusion of feasibility, hasn't really been disputed in

5  this proceeding, that I know of.  I relied also on the

6  affirmation of that by the witness, Ms. Zilly, and then the

7  expert hired by the PD Committee, your committee, the committee

8  you serve on as co-chairman, was a man named Jim Haas, I

9  believe.  He first had a different sort of a projection, in

10 terms of the likely number of claims, but then he revised that

11 and he used some different methodology that had a strange name

12 with which I'm not familiar, but he came to the conclusion of

13 about the same thing, $1.6 billion.  That's where my

14 information came from, in addition to the general conversations

15 I had with the debtor at the headquarters when I met with them

16 there and the advice I received from my counsel and the various

17 documents that I reviewed.

18 Q    Now, when you went to Columbia, Maryland and met with the

19 officers of Grace, in addition to Mr. LaForce, who did you meet

20 with?

21 A    Well, I'm not sure I can name them.  Mr. Shelnitz, of

22 course, was there, his lawyer.  And someone would have to

23 remind me of the names.

24 Q    Now, did you also --

25 A    They provided me with extensive documentation, let me say.

Sanders - Cross/Speights                110

1   They inundated me with documentation, both there and after I

2   got back to South Carolina.

3   Q    Did you also look at a projection of PD liability that was

4   done in the 1990s on behalf of the debtors by a group headed by

5   Tom Florence and Mr. Rourke?

6   A    Well, I've heard those projections referred to, but I'm

7   not familiar with those because I had subsequent information.

8        MR. SPEIGHTS:  Now, if I could -- may I just approach

9   the witness?

10       THE COURT:  Yes, sir.

11  Q    I want to show you what is an exhibit, it's entitled A

12  Five-Year Financial Model, it was LaForce 3 and Zilly 3 and

13  it's listed by us and it's probably listed by others.  I want

14  to make sure that by having a discussion of it, I don't

15  trespass on the highly confidential line that has been at some

16  point proposed here on this document, but I want to ask you

17  about one line of this document.  Do I need a mobile mic to do

18  that?

19       MR. KOVACICH:  Excuse me, Your Honor, can I see what

20  he's showing the witness?

21       THE COURT:  Mr. Speights, does this have an exhibit

22  label?

23       MR. SPEIGHTS:  Yes, but let me ask Mr. Rosendorf.

24  What's our exhibit number of it?

25                    (Off the record conversation)

                J&J COURT TRANSCRIBERS, INC.

1          MR. BERNICK:  In the interest of time, why don't we

2    just mark it with the next number so we can go forward?

3          MR. SPEIGHTS:  I found my list, so it's just a matter

4    of a couple of seconds now.  It's AMH-55, Your Honor.

5          THE COURT:  All right, thank you.

6          MR. SPEIGHTS:  However, we didn't actually submit it,

7    we said not being submitted because the debtors had said it was

8    highly confidential.

9          THE COURT:  All right.

10   Q    Now, Judge Sanders, I believe this is the document you

11   referred to in your direct as having reviewed, is that correct?

12   A    Well, without being able to -- taking the time to read the

13   whole thing again, I think so.

14   Q    Okay.  I just want to ask you about one number on it.

15   A    Okay.

16         MR. BERNICK:  Yes, well if you could just specify the

17   number, Mr. Speights, without revealing it on the record, just

18   indicate its position on the page.  I don't know what number it

19   is, but if it is highly confidential, which I believe that it

20   is, we're going to have to clear the court and we're going to

21   have to take all kinds of steps to protect it.

22   Q    Well, let me ask you this way and let's see if we -- we

23   might know -- you might know where I'm going.  You probably do.

24        A    Could I suggest this?  If you are attempting to

25   demonstrate by asking me questions, that there's a different

1    conclusion that can be drawn as to the amount of the future

2    claims, greatly in excess, perhaps, of $1.6 billion, then I

3    believe I can resolve your concerns in that regard, without

4    knowing what that number is.

5                        (Laughter)

6    Q    Well, that actually wasn't where I'm going, but I'm going

7    to do what no trial lawyer should do and step in that, and let

8    you do it.

9                        (Laughter)

10         UNIDENTIFIED ATTORNEY:  I object to the extent the

11   witness is offering an expert opinion on the amount of property

12   damage.  It was not disclosed, and at this point there's --

13         THE WITNESS:  I'm not purporting to do that.  I've

14   simply testified that I relied upon the people that I mentioned

15   and their reports and their testimony to reach the conclusion

16   that the plan is feasible.  That is to say, that there will be

17   compensation available to the future claimants.

18         But, you know what, consider this.  Suppose we never

19   had a bankruptcy and we never had a plan, and we never had a

20   524(g) trust, these future claimants would be in almost exactly

21   the same position they are in now, that is they can sue in

22   court and get a judgment if their claim is valid and that Grace

23   will have to pay into the trust 100 percent of that amount and

24   that's secured, something these claimants never had before we

25   had a bankruptcy, by over half of the Grace stock.  So, this

1  plan will be feasible and it will not run out of money unless

2  Grace runs out of money.  And if Grace runs out of money, then

3  all the future claimants will be in the same position they

4  would have been without a bankruptcy.

5  Q    However, Judge Sanders, you understand, of course, that

6  one of your obligations is to try to make sure a claimant in

7  Honea Path, 20 years from now, is treated equally with a

8  claimant one year from now in Belton.

9  A    Is paid equally.

10  Q    Paid equally.  And if all the --

11      MR. BERNICK:  I object to the -- object to the form

12  of the question.  That states Mr. Speights' interpretation of

13  the statute as opposed to the language of the statute.

14      THE COURT:   The witness clarified his own view, I

15  think that's what the point was.  Go ahead, Mr. Speights.

16  Q    And you would agree with me that you have an obligation,

17  as does Mr. Austern, to try to make sure that future claimants,

18  tomorrow and 20 years from now are treated substantially the

19  same.

20  A    Paid substantially the same.

21  Q    Right.  Now, I want to go back to my question.  There's a

22  number in this document, 37.3, are you familiar with that

23  number, you know what I'm talking about?

24  A    No, I don't.

25  Q    All right, sir.  Then I need to show you the line.  This

1  is a document produced or discussed at both Ms. Zilly and Mr.

2  LaForce's deposition and on Page 6 of 14, under "Liabilities

3  and Shareholders' Equity", I won't --

4          MR. BERNICK:  Excuse me, Mr. Speights, what I

5  suggested, and I don't know if that's going to be the 37 point,

6  whatever number that you've now stated on the record, before we

7  have numbers stated on the record, if we can get an indication

8  of the part of the document and the entry under a column or a

9  line, we can determine whether there's an issue here.

10          THE COURT:  All right.  Mr. Speights, if you'd show

11  it to Mr. Bernick first.

12          MR. SPEIGHTS:  I'd be happy to.

13          THE COURT:  Thank you.

14              (Off the record conversation)

15          MR. BERNICK:  The number is okay.

16          THE COURT:  All right.

17          MR. BERNICK:  And I don't know what else Judge

18  Sanders knows about it, but the number itself is okay.

19          THE COURT:  All right.

20          MR. SPEIGHTS:  Well, he's just said I'm innocent thus

21  far.  What I want to do is read the line with the number and

22  ask him about the number.  I want to have the description and

23  the number and discuss it with Judge Sanders, both on that page

24  and Page 8 of 14.  So --

25          MR. BERNICK:  Same number?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. SPEIGHTS:  It's the same number, it's a different

2  line.

3          MR. BERNICK:  Okay.  Can I just inquire of Judge

4  Sanders very briefly, Your Honor, maybe this will obviate

5  everything.

6          THE COURT:  Yes.

7          MR. BERNICK:  Judge Sanders, have you discussed with

8  the people at Grace the underpinning for that particular

9  number, or do you not even have it in front of you so you don't

10  know what it is?

11          THE WITNESS:  No.

12          MR. BERNICK:  Okay.

13          THE COURT:  No, you don't know what it is, Judge, or

14  --

15          THE WITNESS:  No, I haven't discussed it.

16          THE COURT:  Okay

17          THE WITNESS:  Is that a reserve number?

18          MR. BERNICK:  It's a reserve number.

19          THE WITNESS:  I don't know how that number was

20  reached or what it's for.  All I know is that Grace is

21  obligated to pay 100 percent of the claims.

22          MR. BERNICK:  Okay, that's fine.

23          THE WITNESS:  How Grace handles that internally is

24  not known to me and was not of any particular interest to me.

25          MR. SPEIGHTS:  Counsel has requested to see the

**J&J COURT TRANSCRIBERS, INC.**

Sanders - Cross/Speights                    116

1  document and I have no objection.  He's advised me he signed a

2  confidentiality agreement.

3          MR. KOVACICH:  Which line are we talking about?

4          MR. BERNICK:  It's the reserve number for asbestos

5  liabilities.

6          MR. RICH:  Your Honor, I think that Mr. Bernick's

7  voir dire just showed that the judge has no basis to answer any

8  questions at all about that number, so I don't know why we just

9  can't move on.

10          THE COURT:  Mr. Kovacich wants to see the document,

11  he has the right to see the document, and then we'll move on.

12          MR. BERNICK:  Here, Mark -- Mark, right here.

13              (Off the record conversation)

14          THE COURT:  Okay, Mr. Speights, back to you.

15  Q    Let's first go to Page 6-14, Judge Sanders, and you see

16  the number 37.3 to the right?

17  A    Yes, I see that.  It's 37.3 million, right?

18  Q    I believe so.  And would you tell us what the description

19  is on the far left side for that item?

20  A    Asbestos related litigation and claims.

21  Q    All right, sir.  And then it appears again on Page 8-14,

22  do you see it there?

23  A    Yes, I do.

24  Q    And what is that description on that page?

25  A    Unresolved asbestos related litigation and claims.

Sanders - Cross/Speights                    117

1  Q    And does that show that that would be paid -- same page

2  -- that it no longer appears after 2010?

3  A    Yes.  This expresses someone's opinion that after 2010

4  that amount of money is going to be enough money to pay

5  asbestos related litigation and claims.  But you see, how Grace

6  handles this internally and what their predictions are as to

7  how much money future claims is going to cost them, is not

8  binding on future claimants because they are required to pay

9  future claimants 100 percent of their claims.  And if that

10 turns out to be more than $37.3 million, stated as a reserve

11 item in the balance statement, is something they'll have to

12 take up with their bankers, I guess.

13 Q    I want to go back to the basics, though, here, Judge

14 Sanders.  My question is simply whether now, having reviewed

15 this document, whether you know the basis of that 37.3 number?

16 A    I do not know.  I don't even know what it's for.

17 Q    Do you -- that was my next questions.

18 A    It could be for Anderson Memorial Hospital.

19                    (Laughter)

20        MR. SPEIGHTS:  Your Honor, I need two minutes, Judge

21 Sanders has completely thrown me off my outline and I want to

22 check with my partner to see what I've missed.

23        THE COURT:  All right.

24                (Off the record conversation)

25        THE COURT:  Apparently this is a major system

**J&J COURT TRANSCRIBERS, INC.**

1  failure.  That is the computer system that we're dealing with,

2  so for my next trial at one o'clock we have to find another

3  courtroom.  I'm sorry for the delay, but this apparently is

4  something major.

5                          (Pause)

6          THE COURT:  Folks, any more questions?

7  Q    Judge Sanders, you were here, I think you've been here the

8  entire week, haven't you?

9  A    Physically.

10                         (Laughter)

11 Q    I'm honored to be your straight man.  Were you here when

12 Dr. Peterson testified?

13 A    Yes.

14 Q    And you observed Dr. Peterson give estimations on future

15 PI liabilities, correct?

16 A    Yes.

17 Q    Now, is it fair to say that you did not retain an expert

18 to estimate the future PD claims; that is, the number of future

19 PD claims?

20 A    I didn't.  Of course, you did.  His name was Haas.

21 Q    Well, actually, I'll strike that as a not responsive, I

22 did not.

23          THE COURT:  That's -- sustained.

24 A    Your committee.

25 Q    I wish I controlled that committee, Judge Sanders, but I

1  don't.  In any event, you knew that, of course, you could have

2  retained an expert.

3  A    I could have, yes, I could have.

4  Q    All right.  And is it fair to say that, as you've already

5  testified, that the PD claims could be far in excess of what

6  Mr. Haas said, or could be less than Mr. Haas says.

7  A    That's --

8         MR. BERNICK:  Objection.  Objection.  Calls for

9  speculation, lack of foundation.

10        THE COURT:  I'm sorry, Mr. Speights, I apologize for

11 this, but I lost the question, would you repeat it for my

12 benefit?

13        MR. SPEIGHTS:  I asked the question, and actually he

14 answered it.  I understand you can strike it, but that the PD

15 claims could be far in excess of Mr. Haas' projections or less

16 that Mr. Haas' projections.

17        THE COURT:  Oh, he's clearly entitled to answer that,

18 in his capacity.  What was the answer?

19        MR. SPEIGHTS:  His answer was, yes.

20        THE WITNESS:  Yes.

21        THE COURT:  All right.

22        MR. SPEIGHTS:  Thank you, Your Honor.  Thank you,

23 God.

24        THE COURT:  Mr. Brown?

25                      CROSS EXAMINATION

                 **J&J COURT TRANSCRIBERS, INC.**

1 BY MR. BROWN:

2 Q    Good morning, Judge Sanders, Michael Brown.  I represent

3 One Beacon and Seaton.

4 A    Good morning.

5 Q    I just have a couple of questions for you.  You were

6 appointed the PD FCR long after the Fresenius and Sealed Air

7 settlement agreements were reached, correct?

8 A    I was, but I've reviewed those settlements.

9 Q    Okay.  But, you didn't play any role at all in the

10 negotiation of those settlements?

11 A    I did not.  I was appointed in September of 2008, as I

12 recall.

13 Q    And the settlements took place back in 2003, correct?

14 A    Correct.

15          MR. BROWN:  Thank you.

16          THE COURT:  Anyone else on cross?  Mr. Bernick?

17                    CROSS EXAMINATION

18 BY MR. BERNICK:

19 Q    I was going to ask this question from my desk there, Judge

20 Sanders, but I rise out of respect and also to --

21 A    Oh, my goodness.  That's too much.

22 Q    -- and also, maybe I can be -- maybe I can experience the

23 same privilege of being your straight man, but that's not

24 necessary to what I want to ask you.  So, you were asked some

25 questions about the treatment of the Anderson Memorial case in

**J&J COURT TRANSCRIBERS, INC.**

1  future claims that might be brought and Mr. Speights asked you

2  a question, at a certain point, you said did they get the same

3  kind of deal, maybe they didn't get as good a deal.  What

4  524(g) says is that the trust will operate, et cetera,

5  et cetera, to provide reasonable assurance that the trust will

6  value and be in a financial position to pay present claims and

7  future demands that involve similar claims, in substantially

8  the same manner.  Now, without getting into whether 524(g) is

9  simply talking about payment or more than payment, did you

10  become familiar, at least in a general sense, with the Anderson

11  Memorial case?

12  A    In a general sense.

13  Q    Okay.  And when we think about whether Anderson Memorial

14  is similar to other claims that would be brought in the future,

15  did you become familiar with the fact that Anderson Memorial

16  has been the subject of litigation already in this court, did

17  you come to have that understanding?

18  A    I understand that.  It was also litigated in the state

19  court of South Carolina.

20  Q    So, is there any difference in the litigation process when

21  you talk about similarity?  Even forget about the word

22  "similarity", is there a difference between Anderson Memorial,

23  a case that has had extensive litigation already in this court,

24  and the expected litigation of cases that haven't even been

25  filed, is that difference something that makes a difference to

Sanders - Redirect/Rich                      122

1  a judge?

2  A    That's a distinction.  Whether it makes a difference or

3  not remains to be seen.

4        MR. BERNICK:  Thank you.  I have nothing further,

5  Your Honor.

6        THE COURT:  Anything further?  Mr. Rich?

7        MR. RICH:  Yes.

8        UNIDENTIFIED ATTORNEY:  Excuse me, Mr. Rich.

9        MR. RICH:  You want something?

10       UNIDENTIFIED ATTORNEY:  No.

11       MR. RICH:  Okay.

12                    REDIRECT EXAMINATION

13 BY MR. RICH:

14 Q    Judge Sanders, in reaching your conclusions about your

15 views of this plan, did you ever consider what would happen if

16 there were no plan and no 524(g) trust for traditional and ZAI?

17       MR. KOVACICH:  I object.  He's asking the witness for

18 another expert opinion that has not been disclosed in this

19 case.

20       THE COURT:  Well, I don't think it's an expert

21 opinion, but he's already stated his view.

22       MR. RICH:  Okay.  I'll withdraw the question, Your

23 Honor.  That's all I have.

24       THE COURT:  You're excused, Judge Sanders, thank you.

25       THE WITNESS:  Thank you, Judge.

**J&J COURT TRANSCRIBERS, INC.**

Zilly - Direct/Bernick                    123

1      MR. BERNICK:  The plan proponents call Pam Zilly back

2 to the stand to testify as an expert regarding best interest

3 and feasibility.

4      THE COURT:  Feasibility and something else, Mr.

5 Bernick, I'm sorry?

6      MR. BERNICK:  Best interest.

7      THE COURT:  Oh, best interest, thank you.  She has to

8 be re-sworn, I excused her before, Cathy.

9      MS. YOUNKER:  Would you raise your right hand,

10 please?

11          PAMELA ZILLY, PLAN PROPONENTS' WITNESS, SWORN

12      MS. YOUNKER:  Please be seated.

13              (Off the record conversation)

14      THE COURT:  Mona, can you send a note down to IT that

15 we need new Lavalier mics.  These two are not working, and it's

16 not a battery issue.

17                  DIRECT EXAMINATION

18 BY MR. BERNICK:

19 Q    Good morning, Ms. Zilly.  Have you conducted a best

20 interest test analysis in connection with this plan?

21 A    Yes, I have.

22 Q    For purposes of that analysis, is this the definition, or

23 is this the language that you have --

24      THE COURT:  Mr. Bernick, the system isn't working.

25 We have no overhead capability.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Oh, okay.  I thought it --

2          THE COURT:  It was, but it blew up, too.

3          MR. BERNICK:  Okay.  So, does this also --

4          THE COURT:  No, that works.

5          MR. BERNICK:  Then I'll just stay over here.

6    Q    Is this the definition of best interest that you used for

7    purposes of your analysis, showing you Plan Proponents' 511-9?

8          THE COURT:  Mr. Bernick, the system isn't working.

9          MR. BERNICK:  Oh, that's not working either?

10         THE COURT:  No.

11         MR. BERNICK:  Oh.

12   Q    Do you have a notebook in front of you?

13   A    Yes, I do.

14   Q    Could you turn to PP-511-9?

15         MR. BERNICK:  And I think Your Honor has that same --

16         THE COURT:  I do, it's behind the second tab.

17   Q    You don't have it?

18   A    Just one moment, please.

19         UNIDENTIFIED FEMALE SPEAKER:  What number is it?

20         MR. BERNICK:  It's 511-9.

21         THE COURT:  It's the first one behind the second tab.

22         THE WITNESS:  Right.  It's just --

23         UNIDENTIFIED FEMALE SPEAKER:  And best interest

24   slides.

25                        (Pause)


                    **J&J COURT TRANSCRIBERS, INC.**

1                THE COURT:  Mr. Bernick, you want to use this one?

2                MR. BERNICK:  No, that's okay.  It's partly --

3                THE WITNESS:  Everything but.  Thank you.

4    Q    Is that the definition of best interest that you used for

5    purposes of your analysis?

6    A    Yes, it is.

7    Q    Pursuant to that definition, did you undertake to make a

8    comparison between the plan that's before the Court on the one

9    hand and the potential outcome of a Chapter 7 liquidation on

10   the other?

11   A    Yes, I did.

12   Q    Did that analysis include both assets and liabilities?

13   A    Yes.

14   Q    Okay.  Let's focus on the asset side of the equation.

15   Turning to Exhibit 511-10, could you tell us about how it is

16   that you assessed the value of Grace as an enterprise, both in

17   the plan and the Chapter 7 liquidation?

18               MR. KOVACICH:  Your Honor, I object.  Once again,

19   counsel is leading the witness with demonstrative exhibits.  I

20   also object to 511-10 because it includes information that was

21   not part of Ms. Zilly's expert disclosure in this case.

22               MR. BERNICK:  With regard to the first, I'll proceed

23   however it is that Your Honor wants, but I don't believe when

24   it comes to numbers analysis, that it's appropriate to have a

25   witness recite from memory a bunch of numbers.  And I don't

1  think that that is an -- and I will add that virtually all

2  witnesses who have testified to technical matters have used

3  demonstratives in this fashion.  And I just don't think there's

4  an efficient way in which to proceed otherwise.

5         THE COURT:  Mr. Bernick, why don't you substantiate

6  first whether she has an independent recollection and can do it

7  without the exhibits or not.  If she doesn't -- if it's going

8  to help her then, frankly, I don't see what the problem is.  If

9  there's a problem with the specific exhibit, she'll note it or

10 I'll hear it on cross.

11 Q    Ms. Zilly, you can't look at the demonstrative over here.

12 Okay?  Could you tell us how it is that you compared the value,

13 the enterprise value, of Grace in an 11 and the 7?

14 A    With respect to the value of Grace, for purposes of the

15 disclosure statement, Blackstone and the debtor had done an

16 analysis of the enterprise value of Grace using traditional

17 valuation methodologies.  With respect to the plan, that value,

18 I believe, ranged from 2.1 billion to 2.5 billion, that is the

19 enterprise value of Grace, raised from 2.1 billion to 2.5

20 billion.  And, again, it was done on traditional valuation

21 methodologies, primarily using a comparable company methodology

22 and the current EBITDA of the company.

23        For purposes of the Chapter 7 analysis, what we did

24 or what I did, was to assume a 50 percent discount to that

25 value of 2.1 to 2.5 billion.  The 50 percent discount is meant

1  to represent the discount off the value of Grace due to several

2  factors that would be in a Chapter 7 that are not in a Chapter

3  11, those factors being the time pressure of a trustee to sell

4  this business as expeditiously as possible, and it also

5  reflects the discount based on a probability that those assets

6  could not be sold at fair market value, if at all, based on the

7  fact that there is no 524(g) protection in a Chapter 7 and,

8  therefore, the buyer has no protection with respect to

9  successor liability issues.

10 Q    Thank you.  Did you assess the difference between setting

11 aside or going beyond -- in addition to the enterprise

12 valuation, did you consider the value of additional assets that

13 are available or would be available as between a plan and

14 Chapter 7, was there an additional asset analysis that you did?

15 A    With respect to the Chapter 7 analysis, we assumed, excuse

16 me -- in both cases, we assumed that there would be -- cash

17 would be available of approximately $787 million, I believe,

18 and we also assumed that there would be insurance asset

19 available in the amount of approximately $500 million.  And in

20 addition, we analyzed the Fresenius and Sealed Air settlements.

21 With respect to the Chapter 11 --

22        MR. KOVACICH:  Your Honor, I object to the opinion

23 that's about to be offered here, and Ms. Zilly is going to

24 offer an opinion about the likelihood of what Fresenius and

25 Sealed Air would have paid under either Chapter 7 or Chapter

1  11.  There's no foundation for that and it's speculative.

2          MR. BERNICK:  Your Honor, the Chapter 7 analysis and

3  the best interest test inevitably asks for a future oriented

4  statement to the extent that you don't have already liquidated

5  liability.  So, there's no way to answer the question of what

6  kinds of assets would accrue to that claim in a Chapter 7,

7  without offering a view with regard to what the recoveries

8  would have been.

9          THE COURT:  That's sustained.

10          MR. BERNICK:  I'm sorry?

11          THE COURT:  That is -- I'm sorry.  The objection is

12  overruled.  I agree with your opinion.

13          MR. BERNICK:  Thank you.

14          MR. KOVACICH:  Your Honor, may I respond?

15          THE COURT:  Mr. Kovacich, no.  Let's just move on.

16  It's -- I disagree with the objection.

17  Q    In the Chapter 11 plan, in fact, we already have the

18  benefit of the Sealed Air settlement, right?

19  A    Correct.

20  Q    Tell us whether or not the Sealed Air settlement took

21  place in the context of a 524(g) plan, or I'll put the question

22  more precisely.  In connection with the Sealed Air settlement,

23  do you know whether part of that settlement is, that it's

24  subject to the ultimate approval of a 524(g) plan, including a

25  524(g) channeling injunction with respect to Sealed Air and

1  Fresenius?

2            MR. KOVACICH:  Objection, it's leading and there's

3  not been a foundation laid for this witness to provide that

4  kind of detail about the Fresenius and Sealed Air settlements.

5            THE COURT:  It was --

6            MR. BERNICK:  Just trying to expedite matters.  I'll

7  do it the painful way.

8            THE COURT:  All right.

9  Q    Ms. Zilly, with respect to the Fresenius and Sealed Air

10 settlements, do you know whether they have conditions to them?

11 A    Yes, they have conditions.

12 Q    Do any of those conditions -- tell us whether or not any

13 of those conditions have any relationship or not to 524(g)?

14 A    Both of the agreements, the Fresenius and the Sealed Air

15 agreements, have a condition that a 524(g) trust be established

16 as part of a plan and that is a condition to both of the

17 agreements.

18 Q    If we were to take ourselves into a Chapter 7 liquidation

19 context and to assume that Sealed Air and Fresenius were in

20 exactly the same circumstances that they were at the beginning

21 of the Grace Chapter 11, which is that they were -- as the

22 Court already has heard, that they were being sued, in Sealed

23 Air's case, hundreds and thousands of times after the Chapter

24 11 was commenced, and we were further to assume that there was

25 a fraudulent conveyance claim that was brought by the estate,

1 or on behalf of the estate, against Sealed Air and Fresenius,

2 in other words, we were to make the assumption Sealed Air,

3 Fresenius similarly situated, identically situated, at the

4 beginning of a Chapter 7 as they were at the beginning of this

5 Chapter 11, have you considered whether the circumstances that

6 were material to the settlement of those claims in 11, would be

7 present in the context of a Chapter 7?

8 A    Yes, I have considered that.

9 Q    And what consideration -- what conclusion did you reach

10 with regard to that?

11         MR. KOVACICH:  Your Honor, could I have a continuing

12 objection?  The basis of the objection is this witness couldn't

13 possibly know what Fresenius and Sealed Air would have paid

14 under a Chapter 7 scenario if they were sued by a Chapter 7

15 trustee on a fraudulent conveyance action.

16         MR. BERNICK:  I didn't even ask that question.

17         MR. BROWN:  Your Honor, I join in those objections.

18         MR. BERNICK:  I didn't even ask the question.  That's

19 not the question.

20         THE COURT:  I don't think that question was asked.  I

21 think she was asked what conclusion she has drawn.

22         MR. BERNICK:  Correct.

23         THE COURT:  I don't know what that conclusion is.

24         MR. BERNICK:  Again, we'll do it the painful way,

25 again.

Zilly - Direct/Bernick                    131

1  Q    So, my original question was, did you give consideration

2  to whether the circumstances surrounding the settlement in 11

3  were present, would have been present in connection with a

4  Chapter 7?  I believe the witness' assessment -- statement was

5  yes, I gave consideration to that.  So, now the question is,

6  did you reach any conclusion as to whether the circumstances

7  surrounding the settlement in 11 would have been present in a

8  7?

9  A    One of the major differences in the circumstance that

10  would have been in a Chapter 11 but not in a Chapter 7, is in a

11  Chapter 7 there is no possibility of those parties receiving

12  protection, via a 524(g) injunction.

13  Q    Okay.  And why is that important?

14  A    Because it is my understanding that based on the asbestos

15  litigation and potential liabilities that both Sealed Air and

16  Fresenius were facing, under the fraudulent conveyance,

17  successor liability lawsuits, that it was important for them to

18  get the protection of not having to face any of those lawsuits

19  and the overhang from those lawsuits from a financial

20  standpoint going forward.  The only way they would have been

21  able to do that would be to have in any settlement agreement or

22  any agreement, the fact that there would be 524(g) protection

23  for those parties going forward and in my view, and I believe

24  it's a reasonable view, that drove the settlement discussions

25  and the dollars that Sealed Air and Fresenius ultimately

1  settled for.

2          MR. KOVACICH:  Just so the record is clear, Your

3  Honor, the witness has now offered the opinion that was

4  objected to.  I object that it lacks foundation and is

5  speculative.

6          MR. BROWN:  Your Honor, I join in those objections.

7          THE COURT:  All right.  The portion of the testimony

8  that indicates that in her opinion that drove the settlement

9  value, that they ultimately settled for is an opinion.  Is it

10 part of her report?

11         MR. BERNICK:  Yes.

12         THE COURT:  Okay.

13         MR. BERNICK:  It's not only part of her report.

14 She's given a report and she's given two depositions, including

15 a deposition that took place earlier this week where all of

16 these things were said.

17         THE COURT:  Okay.  Her conclusions, based on her

18 investigation, is part of her expert opinion.  Whether it's a

19 fact or not, I think is not material, the issue is what factors

20 she considered in arriving at her opinion and that was one.

21 And that is what I will accept the testimony for, not as a

22 statement of fact as to what the parties did on their own

23 behalf.  She clearly could not know what actually drove the

24 settlement, but she can determine in her view, in doing her

25 best interest analysis, what in her opinion is important and

1 her analysis of the facts.  So, I will accept it in that

2 respect.

3           MR. BERNICK:  Then I'm a little bit --

4           MR. KOVACICH:  Your Honor, just --

5           MR. BERNICK:  Excuse me.  I'm a little bit unclear --

6           THE COURT:  I'm not accepting the proposition as a

7 fact that Fresenius and Sealed Air actually -- that the

8 settlements were actually driven, in fact, by the proposition

9 of the 524(g) trust from this witness who was not party to

10 them.  But, I will accept the fact that she has analyzed the

11 circumstances, and as an expert, she is clearly entitled to

12 look at those documents and to use those documents in assessing

13 her opinion and that it is her opinion that that is what may

14 have driven the circumstances.

15           MR. BERNICK:  That's fine, Your Honor.

16           MR. KOVACICH:  And, Your Honor, I just want one thing

17 to be clear on the record here.  The witness did not prepare a

18 report addressing that issue.  She prepared a report which

19 incorporated the plan proponents' trial brief, including the

20 portion where they made that argument.

21           MR. BERNICK:  Your Honor has already ruled with

22 respect to all of that.  There was already a hearing, a motion

23 that was rejected, a deposition was offered up pursuant to our

24 undertaking and the Court's suggestion, that deposition has

25 been taken.  So, I don't know that this is a -- the matter has

Zilly - Direct/Bernick                    134

1   already been resolved.

2           THE COURT:  I did issue a ruling on that issue.  To

3   the extent that the witness was provided for the deposition, I

4   ruled that that would cure any prejudicial consequence, so

5   we're here.

6           MR. KOVACICH:  And, I'm sorry, it wasn't my intent to

7   reargue that, I just didn't -- the record prior to my statement

8   suggested that this witness prepared a report addressing that

9   issue and that's not accurate.

10          THE COURT:  Okay.

11          MR. BERNICK:  That's -- actually what I said

12  specifically was, she had a report and she had two depositions.

13          THE COURT:  All right.

14          MR. BERNICK:  The --

15          THE COURT:  Mr. Brown, did you have something else?

16          MR. BERNICK:  I'm sorry.

17          MR. BROWN:  No.  I think that's it, Your Honor.

18          THE COURT:  Okay.

19  BY MR. BERNICK:

20  Q    As a result of that opinion, what weight did you give to

21  the value of the claims that would be made -- strike that.

22  What value did you give in the context of a Chapter 7

23  liquidation analysis to contributions that might have come from

24  Sealed Air and Fresenius?

25  A    In the Chapter 7 analysis, I took the dollars amount --

1 dollar amount that both Fresenius and Sealed Air were providing

2 under their settlements in the Chapter 11 and set them forth in

3 two different ways.  Number one, in each case I took the actual

4 dollars of the settlement under the Chapter 11 and discounted

5 them over a period of several years to take into account the

6 fact that those settlements might, in fact, be achievable in a

7 Chapter 7, but in the future and not at the present time.

8         And in the second case, I assumed zero for the

9 settlements from Sealed Air and Fresenius.  In other words,

10 that in the Chapter 7, there would not be any dollars

11 contributed by Sealed Air or Fresenius in the Chapter 7

12 liquidation.

13 Q   Based upon the analysis that you've now given us, with

14 respect to the enterprise value of Grace, the other assets

15 available from Grace to the estate and the Sealed Air and

16 Fresenius settlements, as well as considering costs,

17 administrative expenses and priority security claims, did you

18 reach an assessment as to a range of value that would attach to

19 the assets of the estate in the context of a Chapter 7

20 liquidation?

21 A   Yes, I did.

22 Q   And what was it?

23 A   The range of values was from 2.2 billion to 2.4 billion.

24 Q   Okay.  Was that your conclusion with respect to the most

25 likely case, or did you have other conclusions with respect to

1 other cases?

2 A    That's my conclusion with respect to the most likely case.

3 Q    Okay.  Compared to the 2.4 billion, what is -- what did

4 you determine was the value of the assets available to the

5 creditors in the context of this plan?

6 A    From memory, I believe it's approximately double that,

7 something closer to 4.6 billion.

8 Q    Let's turn to the liability side.  Did you give similar

9 consideration -- strike that.  Did you make a similar

10 comparison regarding the liabilities that would be asserted and

11 paid out in the context of a plan versus a Chapter 7 --this

12 plan, versus the Chapter 7 liquidation?

13 A    Yes, I did.

14 Q    Okay.  And how did you go about determining the

15 liabilities that were being -- that are being handled or being

16 resolved in this plan?  What did you do with regard to the

17 liabilities on the Chapter 11 side?

18 A    Since the number I previously gave took into account, as

19 you mentioned, administrative expenses, and other

20 administrative claims and priority claims and tax claims coming

21 down to a liability number with respect to the remaining

22 claims, meant looking at, primarily, general unsecured claims,

23 asbestos PI and asbestos PD claims.

24        With respect to the general unsecured claims, based

25 on detailed analysis that I have done with respect to claim

1  filings, as well as the company's books and records, the

2  general unsecured claim number in the Chapter 11 plan would be

3  approximately 1 billion 397 million.  That assumes an effective

4  date of 12/31/09; the amount of general unsecured claims plus

5  any post-petition interest pursuant to the plan provisions that

6  would be payable to general unsecured claims in the Chapter 11.

7        With respect to general unsecured claims in the

8  Chapter 7, I took the same base amount of claims, which is

9  approximately a billion dollars, and assumed no post-petition

10  interest would be payable on those general unsecured claims.

11  Q    Let's go now to the -- beyond the general unsecured

12  claims, the asbestos personal injury liabilities.  How did you

13  deal with those in 11 and in 7?

14  A    In the Chapter 11, we assumed for the asbestos personal

15  injury claims the amount of the assets, the dollar amount of

16  the assets that are being contributed pursuant to the plan, to

17  the asbestos PI trust, and with respect to property damage

18  claims, including ZAI claims, we took the amount of settlements

19  that have been achieved under the Chapter 11.

20  Q    Okay.

21        MR. ROSENDORF:  Your Honor, I'm going to object and

22  move to strike to this witness testifying as to the valuation

23  or estimation of property damage claims, in this context, or

24  otherwise.  She has never before been proffered for that

25  purpose, it's not included within the best interest analysis

1  that she provided.

2          MR. BERNICK:  I don't understand what the -- is the

3  objection to her qualifications, or is the objection to prior

4  disclosure?

5          MR. ROSENDORF:  It is both.

6          MR. BERNICK:  Okay.  With respect to her

7  qualifications, I think that all the questions so far have

8  proceeded under the basis that she is qualified and there was

9  no issue taken with her qualifications at the outset of this

10 examination, but has proceeded on the basis that as an expert

11 in financial aspects of restructuring, she has to consider

12 information from a wide variety of sources in which she is not,

13 herself, an expert.  That's inherent in the process of dealing

14 with liabilities and assets.

15         THE COURT:  If you could just have the witness

16 substantiate what experts in her field would consider, please?

17         MR. BERNICK:  Sure.

18 Q   Ms. Zilly, experts in your field -- first of all, doing

19 best interest analysis, is that something that you've done

20 before?

21 A   Yes.

22 Q   And have you been qualified and accepted as an expert by

23 this Court in prior cases, in doing a best interest analysis?

24 A   Yes, I have.

25 Q   And those best interest analyses, have they included,

1  specifically, in prior cases where you've offered testimony

2  before this Court as an expert, have they included the

3  assessment of liabilities, tort liabilities, such as personal

4  injury?

5  A    Yes, they have.

6  Q    Is there anything different, fundamentally, about the

7  process that you follow, in the sense of, what are the sources

8  of information that you consider when it comes to determining

9  potential personal injury liabilities, what are your sources of

10  information?

11  A    The sources of information, perhaps I can make this

12  easier.  The sources of information in the Chapter 11 analysis

13  that I've just stated, was a summation of assets, dollar

14  amounts of assets that were set forth in the plan of

15  reorganization as to what was comprising the Asbestos PI Trust.

16  There was no independent analysis, per se, of what those

17  dollars were.  And with respect to the property damage claims,

18  again, there is an amount set forth in the plan of

19  reorganization and assumed by the debtor in its financial

20  statements as to what the dollar amounts of those settlements

21  have, that have already been approved by this Court and the

22  same with the ZAI settlements.

23  Q    Well, I understand that, but I think that you're

24  absolutely correct.  The question that's been raised, though, I

25  think, anticipates that you're going to offer testimony

1 regarding liabilities.  What is your source of information,

2 what has been your source of information, both here and in

3 prior cases, where your testimony has been accepted as an

4 expert, what has been your source of information regarding the

5 scope of personal injury -- personal injury liabilities?

6 A    The scope of my analysis ranges from looking at numerous

7 expert reports that have been filed both in this case and in

8 other cases with respect to the possible range of personal

9 injury liabilities, as well as just a general knowledge of --

10 and a general knowledge of how those methodologies work and

11 what the results indicate.

12 Q    Okay.  Is that a process that is generally accepted as the

13 appropriate procedure by people who are expert within your

14 field of performing restructuring analyses regarding best

15 interests?

16 A    Yes, it is.

17 Q    So, with the benefit of that now, I want to go back to the

18 liability side of the equation.  When it comes to the asbestos

19 personal injury liability side of the equation, what was your

20 source of information about what the personal injury

21 liabilities are in the context of this Chapter 11?  What

22 numbers did you go to, where did you go to get your numbers for

23 personal injury liability, Chapter 11 here?

24 A    There have been numerous estimates, several estimates,

25 numerous estimates made in this case with respect to Chapter 11

1  personal injury liabilities.

2  Q    Okay.  In picking out, in the context of your chapter --

3  of your best interest analysis of a plan, did you have a source

4  of information on the liability that is projected to be paid by

5  the trust; that is, the scheduled values and the liabilities to

6  be paid by the trust?

7  A    Yes, I did.

8  Q    Okay.  And what was that source?

9  A    That source was a report prepared by Dr. Peterson that

10 specifically set forth his views as to the amount of

11 liabilities that would be paid by the Asbestos Personal Injury

12 Trust.

13 Q    Okay.  Now, let's talk about asbestos liabilities that

14 were assumed in your analysis, to be paid not by the plan, but

15 in the context of litigation in a Chapter 7.  Did you have a

16 source of an estimated personal injury liability that would be

17 asserted by people in the Chapter 11 who had filed or would

18 file claims as part of the liquidation process?

19 A    Yes.

20 Q    What was that source of information?

21 A    My source for that range of numbers was Dr. Peterson's

22 report with respect to an estimation -- with respect to the

23 estimation of personal injury claims.  The difference would be

24 that that report was a present value number, that was present

25 valued and I think his best, as he called it, his best evidence

1  number was a $5.4 billion number.  And in addition to that

2  number and in conjunction with that number, he also set forth a

3  dollar amount of claims that were pending and/or otherwise

4  accrued through the current date of today.  The total of those

5  two numbers was $2.8 billion.

6  Q    For purposes of your analysis, did you also use a number

7  that expressed those numbers as NPV, as of today?

8        MR. KOVACICH:  I object, Your Honor.  This opinion

9  was not part of Ms. Zilly's disclosure.  She did reference Dr.

10 Peterson's 2007 report and the numbers she just testified to,

11 she did not reference his later report which was the subject of

12 discussion in this court the last time Dr. Peterson testified,

13 which according to his testimony included the net present value

14 calculation up through 2009.

15        MR. BERNICK:  Okay.  The report that was formally --

16 this, again, partly -- or just a re-argument -- the report that

17 was filed, attached to the trial brief.  The trial brief

18 specifically set out the 2.8 number on an '01 NPV basis for

19 claims that would have been asserted up through the present

20 time.  The only thing that is new -- and that wasn't actually

21 in the report, and she was deposed on it.

22        The only thing that is new is that Dr. Peterson

23 testified before this Court as to what the '09 NPV would be for

24 that number.  You remember the ratio of 2.82 and we filled in

25 the blank and the Court will recall that that was 4.7 to 5.2.

1  So, the only thing that is new is taking 2.8 to 4.7 to 5.2, so

2  it's apples and apples comparable with the Chapter 11.  That

3  came out in testimony that just occurred.  Therefore, it is

4  new, it is new solely to the extent that it is a calculation

5  that she has now taken because it's more current information.

6        THE COURT:  Her testimony was that she had just taken

7  this calculation through today and I don't think those numbers

8  were presented before the plan confirmation hearing, as I

9  recall, but Mr. Kovacich, I haven't been through all the expert

10 reports yet.  I'm going to accept the testimony, but subject to

11 a motion to strike if it turns out that there is not

12 documentation somewhere, but that would include Dr. Peterson's

13 oral testimony, if we substantiate that that's what she's

14 talking about here, that would establish that this is not part

15 of a report that I permitted her to make and I'm using those

16 words because of the deposition issues that I authorized after

17 the last omnibus hearing.

18       MR. BERNICK:  But, to be clear.  The 2. -- the

19 difference -- the 2.8 is attached to the report.

20       THE COURT:  Yes.

21       MR. BERNICK:  Okay.  So, the only thing that's not

22 there is to put it on an NPV as of today basis, just like the

23 Chapter 11.

24       THE COURT:  Yes.

25       MR. BERNICK:  That came from Dr. Peterson's testimony

1  where he performed that arithmetic exercise.  That is not in

2  the report, he just did it now.  The basis for it --

3          THE COURT:  The problem is, you haven't substantiated

4  that that's what she's using.

5          MR. BERNICK:  I will, I will.

6  Q    Well, what were you -- what have you used now as the

7  liability number for Asbestos PI in Chapter 7?

8          MR. KOVACICH:  Subject to the objection?

9          THE COURT:  Yes, sir.

10          THE WITNESS:  In a Chapter 7, I have used a liability

11  that represents a current -- an estimate of current claimants,

12  ranging from 4.5 to 5.7, which was based on, assuming the same

13  ratio of currents to total, as Dr. Peterson assumed in his

14  reports as well as testimony with respect to his $2.8 billion

15  which was the currents NPV to 2001, over his total NPV number

16  to 2001 of 5.4 billion.

17  Q    Thank you.  Now, the Court will recall -- I'll just ask

18  you.  In the context of the deposition that you gave the other

19  day, were you asked questions regarding reliance upon Dr.

20  Peterson's March '09 report?

21  A    Yes.

22  Q    Okay.  And in the March '09 report, was there a table that

23  broke out the NPV as of '01?  Was there a table that broke out

24  the NPV as of '01 of claims that would have been processed as

25  of today?

1  A    Yes, I believe so.

2  Q    And is that the 2.8 number?

3  A    Yes.

4  Q    Now, is there a further table in Dr. Peterson's '09 report

5  that enabled you to determine the ratio between an NPV '01

6  versus an NPV '09?

7  A    Yes.

8  Q    Is that the basis for -- strike that.  In order to come up

9  with the 4. -- what you said is 4.5 to 5.6, what is the

10 relationship that you looked to in Dr. Peterson's own report?

11 I know he later testified to it, but is there a relationship

12 that you can determine from Dr. Peterson's own report that

13 enables you to take the 2.8 to roughly $5.5 billion?

14 A    Yes, it's very simple.  His report lays out current

15 claimants, he may do it in two different fashions, he may do it

16 through simply pending plus what has occurred during the

17 bankruptcy period.  That number is the $2.8 billion number

18 which is -- it's not laid out as 2.8 billion, but you can sum

19 two numbers to get to the 2.8, to get to the number on an '01

20 present value basis of what are current claimants.  He has a

21 total number of $5.4 billion done on the same basis, you can

22 simply take 2.8 or the ratio of 2.8 to 5.4 and determine what

23 the percentage is of the currents versus the total.  You have

24 the total number in the 2009 report done on a 2009 basis and

25 you simply apply that percentage to the total number to get

Zilly - Direct/Bernick                    146

1 that range.

2 Q    Thank you.  And, again, was the March 2009 report

3 something that was available to opposing counsel and actually

4 used during the deposition that you gave the other day?

5         MR. KOVACICH:  Objection, that's leading first of all

6 and -- well, objection, it's leading.

7         THE COURT:  It's leading.

8 Q    Could you tell us whether -- which of the reports you were

9 asked about at the deposition, which of the Peterson expert

10 reports you were asked about?

11 A    I was asked questions with respect to numbers that were in

12 the 2009 report.

13 Q    Thank you.  Now, did you also give consideration to the

14 potential scope of non-ZAI PD liabilities in the context of a

15 Chapter 7 liquidation?  Non-ZAI PD liabilities.  Did you give

16 consideration to what the scope of those asserted liabilities

17 might be in the Chapter 7?

18 A    Yes, I did.

19 Q    What did you do there?

20         MR. ROSENDORF:  Your Honor, I'm going to --

21         MR. KOVACICH:  I object.  This -- there's nothing

22 about this in any of the reports, including the brief, aside

23 from a discussion of the settlement reached under Chapter 11.

24         MR. BERNICK:  No, it's inaccurate.  The subject was

25 specifically discussed at Ms. Zilly's deposition the other

**J&J COURT TRANSCRIBERS, INC.**

1  night.

2           MR. KOVACICH:  I agree, Your Honor, it was discussed

3  at her deposition.  The problem is, it's not in her report, we

4  don't have any reliance materials that she used to arrive at

5  that figure.

6           MR. BERNICK:  I'll establish the reliance.

7           MR. ROSENDORF:  Your Honor, I concur in that

8  objection.  Even if it was discussed at a deposition, there is

9  nothing in any report to indicate that this would be the

10  subject matter of her testimony.  We had no reason to go to

11  that deposition.

12           MR. BERNICK:  Well, but everybody had notice of the

13  deposition.

14           THE COURT:  The best interest analysis isn't stated

15  as what the focus of the deposition is?

16           MR. BERNICK:  It was.  There's extensive examination

17  --

18           MR. KOVACICH:  Well, we filed a deposition notice,

19  the notice wouldn't have said best interest analysis, but I

20  certainly agree that was the intent of the deposition.

21           THE COURT:  All right.  I can't address the notice

22  issue except to say that it was addressed in an omnibus

23  hearing, I made rulings and I ordered the parties to get

24  together to set up a deposition where -- her deposition date by

25  which her deposition could be taken.  So, I don't know why

1 there wouldn't be notice, based on the circumstances within

2 which it came up, although I haven't seen the deposition

3 notice.  I don't know what it specifies.

4           With respect to this not being in a report, that was

5 the purpose for authorizing the deposition so that there would

6 not be prejudice to any party.  My view was, I wasn't even sure

7 that I needed an expert opinion about the best interests

8 analysis, I think most of it is legal conclusion that has to be

9 drawn in any event.  But, to the extent that parties want to

10 substantiate the underlying nature of the facts that lead to

11 that conclusion by the Court, that this witness appeared to be

12 an appropriate witness to do it.

13          So, I guess I'm overruling the objection, but I'm

14 going to have to consider this in the context of all of the

15 evidence when it comes in.  I don't have the reports or the

16 depositions here to know what the full scope is.

17          So, I'm accepting it, but subject to hearing your

18 argument in your pleadings, your post trial briefings as to why

19 I should not consider it.

20 Q   Ms. Zilly, there was present -- were you present this

21 morning when Mr. Austern testified?

22 A   I was not in the courtroom, I heard some of the testimony.

23 Q   Okay, that's right.  Well, I will tell you, Ms. Zilly,

24 that Mr. Austern was specifically asked about, by Mr. Speights,

25 was asked about settlement discussions that took place and an

1  arrangement that was reached between the PI constituency and

2  the PD constituency, whereby they would split a fund 85/15,

3  that was the representation that was made.  In your deposition

4  the other night did you, in fact, specifically talk about the

5  same thing?

6  A    Yes, I did.

7  Q    And what use, if any, did you make of the 85/15 split in

8  determining the potential scope of asserted tort liability by

9  traditional PD claimants in a Chapter 7?

10 A    In a Chapter 7, the amount of traditional PD claims is,

11 obviously, uncertain.  The one reference point is the 85/15

12 percent split, which was an agreement that I was aware of, that

13 came about based on earlier negotiations with respect to any

14 settlements in this case and my understanding was, it was based

15 on a roughly $6 billion PI number and that to the extent that

16 that number was, in fact, recovered from the estate, that the

17 proceeds of that and any recovery on that number would be split

18 85 percent to the PI claimants and 15 percent to the PD

19 claimants.  And, again, doing the math, that would approximate

20 about a billion dollars.

21 Q    Why was it germane to your analysis of what would have

22 happened, or what would have happened in the Chapter 7

23 liquidation, why was it germane how PI and PD were prepared to

24 split up their respective shares?

25 A    Because in a Chapter 7 liquidation, there would be -- none

1  of the settlements, or you could not assume that any of the

2  settlements that had been achieved in the Chapter 11, would

3  hold up or be achievable in the Chapter 7, and, therefore, to

4  the extent that there was any discussion with respect to an

5  overall plan as to how to split proceeds that could be

6  achieved, that would be relevant to my analysis to the same

7  type of arrangement in a Chapter 7.

8         MR. KOVACICH:  Move to strike that testimony, it's

9  speculative and there's not an adequate foundation for the

10 witness to provide that opinion.

11        MR. BERNICK:  It's totally relevant.  Chapter 7

12 liquidation, you know, I'll bring --

13 Q   In a Chapter 7 liquidation, is there going to be the same

14 kind -- would you just tell us whether you would expect, based

15 upon your experience and also based upon the expert reports

16 that have been submitted, about whether there would be, due to

17 the nature of a liquidation, the same kind of opportunity for

18 detailed litigation that we've had in the Chapter 11?

19        MR. KOVACICH:  That question is okay.

20 Q   Could you tell us?

21 A   I think it's -- Chapter 7 liquidation is going to be very

22 different from a Chapter 11 case.  A Chapter 11 case is done,

23 assuming that you have an ongoing debtor, who has the ability

24 to make ongoing payments and it is a situation where claimants

25 can come together in a fashion and reach a settlement such that

1 the company can come out as a reorganized debtor through a

2 confirmed plan.

3        In a Chapter 7 situation, you've got the overhang of

4 fewer assets, depreciating assets, and you have the possibility

5 that this is the one and only time that any claimant can come

6 into court and be able to file a claim, in which case there is

7 going to be more claims, fewer assets, more people fighting

8 over those assets and I believe not -- the money that's been

9 available in this Chapter 11 case, for a trustee to be able to

10 litigate those claims in a fashion such that it arrives at a

11 mutual settlement.

12 Q    Okay.  And how does that -- how, if at all, does that then

13 bear on the relevance of the 85/15 split?

14        MR. KOVACICH:  Same objection, Your Honor.  I don't

15 think that is a sufficient foundation for this witness to

16 speculate about how the liabilities would be divided in a

17 Chapter 7 liquidation.

18        THE COURT:  I don't either.  That's sustained.  Mr.

19 Bernick, it's almost 12:30 and we're wrapping up at 12:30.  Do

20 you have any concluding questions, or are you going to be going

21 on for awhile?  Because otherwise, we might as well stop at

22 this point.

23        MR. BERNICK:  Well, because I really -- Ms. Zilly has

24 been here for four days and --

25        THE COURT:  Mr. Bernick, I'm sorry, there's nothing I

J&J COURT TRANSCRIBERS, INC.

1  can do about it.  She's going to have to come back.

2          MR. BERNICK:  Well, I at least wanted to finish up

3  the best interest --

4          THE COURT:  You've got two minutes.  If you can do it

5  in two minutes, fine.

6          MR. BERNICK:  Your Honor, then I will simply suspend

7  -- no, there's nothing further.  Then I will simply suspend the

8  examination and we'll return.

9          THE COURT:  Yes, I'm sorry, you know.  I'm very sorry

10 that the equipment failures were here, but there's nothing I

11 can do about it and I promised folks we would adjourn at 12:30.

12 We will reconvene this trial on October 13th, at 9 a.m., here

13 in Pittsburgh.

14         MR. KOVACICH:  Your Honor, could I state something

15 for the record?

16         THE COURT:  Mr. Kovacich.

17         MR. KOVACICH:  With Ms. Zilly being on the stand and

18 her testimony being continued, it should be clear to the plan

19 proponents and Ms. Zilly, that she should not be conferring

20 about her testimony between now and the resumption of the

21 trial.

22         MR. BERNICK:  That is --

23         THE COURT:  Ms. Zilly, you will still be --

24         MR. BERNICK:  -- completely -- I --

25         THE COURT:  -- Ms. Zilly, you will still be under

1 oath when you resume.  Please do not discuss your testimony

2 with anyone in the interim.

3          MR. BERNICK:  Your Honor, if I -- can I be heard on

4 this?

5          THE COURT:  Mr. Bernick, she's in the middle of

6 direct.

7          MR. BERNICK:  I understand that.  She's in the middle

8 -- she's in the middle of direct with respect to a specific

9 subject matter.

10          THE COURT:  This testimony is what I'm saying.

11          MR. BERNICK:  That's what I wanted to be heard on.

12 That is, she was going to address feasibility --

13          THE COURT:  Yes.

14          MR. BERNICK:  -- and, I am assuming there's no

15 obstacle to our conferring with her regarding feasibility.

16          THE COURT:  No, it's going to be a month from now

17 until she resumes.  I'm certain that she will have an

18 opportunity to look over her trial transcript if that's

19 necessary.  If anybody has an objection to that, let me know

20 because it's a month from  now until this witness is back on

21 the stand.

22          All right.  There's no objection, she may refresh

23 whatever recollection she needs in that fashion, but this

24 portion of her testimony she may not discuss with anyone

25 between now and October 13th.

154

1          MR. BERNICK:  There's no issue with that.

2          THE COURT:  All right, we're in recess.  I'm sorry,

3 Ms. Zilly.

4                          * * * * *

5                  **C E R T I F I C A T I O N**

6          We, TAMMY DeRISI, RITA BERGEN and ELAINE HOWELL,

7 court approved transcribers, certify that the foregoing is a

8 correct transcript from the official electronic sound recording

9 of the proceedings in the above-entitled matter, and to the

10 best of our ability.

11

12 /s/ Tammy DeRisi

13 TAMMY DeRISI

14

15 /s/ Rita Bergen

16 RITA BERGEN

17

18 /s/ Elaine Howell

19 ELAINE HOWELL

20 J&J COURT TRANSCRIBERS, INC.    DATE:  September 21, 2009

21

22

23

24

25

                    **J&J COURT TRANSCRIBERS, INC.**