UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Case No.  01-1139 (JKF) |
| | . | |
| W.R. GRACE & CO., | . | |
| et al., | . | USX Tower - 54th Floor |
| | . | 600 Grant Street |
| | . | Pittsburgh, PA 15219 |
| Debtors. | . | |
| | . | October 14, 2009 |
| . . . . . . . . . . . . . | . | 9:08 a.m. |

TRANSCRIPT OF PLAN CONFIRMATION HEARING
BEFORE HONORABLE JUDITH K. FITZGERALD
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          Kirkland & Ellis, LLP
                          By:  DAVID BERNICK, ESQ.
                               JANET BAER, ESQ.
                               LISA G. ESAYIAN, ESQ.
                               ELLI LEIBENSTEIN, ESQ.
                          200 East Randolph Drive
                          Chicago, IL  60601

For the Asbestos          Caplin & Drysdale, Chartered
Creditors Committee:      By:  NATHAN FINCH, ESQ.
                               PETER LOCKWOOD, ESQ.
                          One Thomas Circle, NW
                          Washington, D.C. 20005

For the Future           Orrick, Herrington & Sutcliffe, LLP
Claimants                By:  JONATHAN GUY, ESQ.
Representatives:         Washington Harbour
                          3050 K Street, N.W.
                          Washington, D.C.  20007

Audio Operator:           Cathy Younker

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For W.R. Grace: | W.R. Grace<br>By:  MARK SHELNITZ, ESQ.<br>7500 Grace Drive<br>Columbia, MD  21044 |
| For Allstate Insurance: | Cuyler Burk, LLP<br>By:  ANDREW K. CRAIG, ESQ.<br>Parsippany Corporate Center<br>Four Century Drive<br>Parsippany, NJ  07054 |
| For the Property<br>Damage Committee: | Bilzin Sumberg Baena Price &<br> Axelrod LLP<br>By:  MATTHEW KRAMER, ESQ.<br>200 South Biscayne Boulevard<br>Suite 2500<br>Miami, FL  33131 |
| For OneBeacon Ins. Co.,<br>Geico, Seaton Ins. Co.,<br>& Republic Ins. Co.: | Drinker Biddle & Reath LLP<br>By:  MICHAEL F. BROWN, ESQ.<br>One Logan Square<br>18th and Cherry Streets<br>Philadelphia, PA  19103 |
| For State of Montana<br>Dept. of Environmental<br>Quality: | Womble Carlyle Sandridge & Rice<br>By:  KEVIN MANGAN, ESQ.<br>222 Delaware Avenue, Suite 1501<br>Wilmington, DE 19801 |
| For the Libby Claimants: | Lewis, Slovak & Kovacich, P.C.<br>By:  MARK KOVACICH, ESQ.<br>725 Third Avenue North<br>Great Falls, MT 59401 |
| | McGarvey, Heberling, Sullivan and<br> McGarvey, P.C.<br>By:  JON HEBERLING, ESQ.<br>725 Third Avenue North<br>Great Falls, MT  59401 |
| | Cohn Whitesell & Goldberg, LLP<br>By:  DANIEL C. COHN, ESQ.<br>101 Arch Street<br>Boston, MA  02110 |

**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

For Arrowood:                Wilson, Elser, Moskowitz, Edelman,
                               & Dicker, LLP
                             By:  CARL J. PERNICONE, ESQ.
                             150 East 42nd Street
                             New York, NY 10017


For BNSF Railway:            Pepper Hamilton, LLP
                             By:  LINDA CASEY, ESQ.
                             3000 Two Logan Square
                             Philadelphia, PA  19103


For CNA:                     Goodwin Procter, LLP
                             By:  MICHAEL GIANNOTTO, ESQ.
                             Exchange Place
                             Boston, MA  02109-2881


For Maryland Casualty:       Connelly Bove Lodge & Hutz, LLP
                             By:  JEFFREY WISLER, ESQ.
                             The Nemours Building
                             1007 North Orange Street
                             Wilmington, DE  19899


For MCC & Zurich:            Eckert Seamans
                             By:  EDWARD D. LONGOSZ, ESQ.
                             1747 Pennsylvania Avenue, NW
                             Suite 1200
                             Washington, DC 20006

                             Wiley Rein, LLP
                             By:  RICHARD A. IFFT, ESQ.
                             1776 K Street NW
                             Washington, DC 20006

For Ford, Marrin,            Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer             Gleser
& Gleser:                    By:  ELIZABETH DeCRISTOFARO, ESQ.
                             Wall Street Plaza
                             New York, NY  10005

For Kaneb Pipe Line          Fulbright & Jaworski
Operating Partnership,       By:  STEVE PEIRCE, ESQ.
LP:                          300 Convent Street, Suite 2200
                             San Antonio, TX 78205-3792


**J&J COURT TRANSCRIBERS, INC.**

APPEARANCES (Cont'd.):

| | |
|---|---|
| For Kaneb Pipe Line<br>Operating Partnership,<br>LP: | Gilbert & Renton, LLC<br>By:  ROBERT GILBERT, ESQ.<br>344 North Main Street<br>Andover, MA 01810 |
| For AXA Belgium: | Tucker Arensberg, P.C.<br>By:  MICHAEL A. SHINER, ESQ.<br>1500 One PPG Place<br>Pittsburgh, PA  15222 |
| For Committee of<br>Asbestos Personal<br>Injury Claimants: | Campbell & Levine<br>By:  MARK T. HURFORD, ESQ.<br>800 North King Street<br>Suite 300<br>Wilmington, DE  19701 |
| For Garlock Sealing<br>Technologies: | Robinson, Bradshaw & Hinson, P.A.<br>By:  RICHARD WORF, ESQ.<br>101 North Tryon Street<br>Suite 1900<br>Charlotte, NC  28246 |
| For Sealed Air: | Skadden, Arps, Slate, Meagher & Flom,<br>  LLP<br>By:  DAVID TURETSKY, ESQ.<br>One Rodney Square<br>Wilmington, DE  19801 |
| | Skadden, Arps, Slate, Meagher & Flom,<br>  LLP<br>By:  J. GREGORY St. CLAIR, ESQ.<br>Four Times Square<br>New York, NY 10036 |
| For the Unsecured<br>Creditors' Committee: | Strook & Strook & Lavan<br>By:  ARLENE KRIEGER, ESQ.<br>       KENNETH PASQUALE, ESQ.<br>180 Maiden Lane<br>New York, NY 10038 |
| For Continental<br>Casualty Co.: | Goodwin Procter, LLP<br>By:  DANIEL GLOSBAND, ESQ.<br>Exchange Place<br>Boston, MA  02109-2881 |

```
APPEARANCES (Cont'd.):

For the Debtors:            Kirkland & Ellis, LLP
                            By:  THEODORE FREEDMAN, ESQ.
                            Citigroup Center, 153 East 53rd St.
                            New York, NY  10022

For the PD Committee:       Speights & Runyan
                            By:  DANIEL SPEIGHTS, ESQ.
                                 ALAN RUNYAN, ESQ.
                            200 Jackson Avenue, East
                            Hampton, SC  29924

For Anderson Memorial       Kozyak, Tropin & Throckmorton, PA
Hospital:                   By:  JOHN W. KOZYAK, ESQ.
                                 DAVID ROSENDORF, ESQ.
                            2525 Ponce de Leon, 9th Floor
                            Miami, Florida 33134

For the Equity              Kramer Levin Naftalis & Frankel
Committee:                  By:  DAVID E. BLABEY, JR., ESQ.
                            919 Third Avenue
                            New York, NY  10022

For the Bank Lenders:       Landis, Rath & Cobb, LLP
                            By:  RICHARD COBB, ESQ.
                            919 Market Street, Suite 1800
                            Wilmington, DE  19899

For PD/FCR:                 Law Office of Alan B. Rich
                            By: ALAN B. RICH, ESQ.
                            1201 Main Street
                            Suite 1910, LB 201
                            Dallas, TX

                            ALEX SANDERS, ESQ.

TELEPHONIC APPEARANCES:

For the Debtors:            Kirkland & Ellis, LLP
                            By:  SAM BLATNICK, ESQ.
                                 BARBARA HARDING, ESQ.
                            200 East Randolph Drive
                            Chicago, IL  60601
```

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd.):

| | |
|---|---|
| For the Debtors: | Kirkland & Ellis, LLP<br>By:  KRISTINA ALEXANDER, ESQ.<br>       DEANNA BOLL, ESQ.<br>       CHRISTOPHER GRECO, ESQ.<br>       CLEMENT YEE, ESQ.<br>Citigroup Center, 153 East 53rd St.<br>New York, NY  10022 |
| For the Debtors: | Pachulski, Stang, Ziehl &Jones<br>By:  KATHLEEN P. MAKOWSKI, ESQ.<br>919 North Market Street, 17th Floor<br>Wilmington, DE  19899-8705 |
| For the Debtors: | Onex Credit Partners<br>By:  LEWIS KRUGER, ESQ. |
| For the Equity<br>Committee: | Kramer Levin Naftalis & Frankel<br>By:  PHILIP BENTLEY, ESQ.<br>919 Third Avenue<br>New York, NY  10022 |
| For National Casualty<br>Co.: | Dorsey & Whitney, LLP<br>By:  JOSE L. HERNANDEZ, ESQ.<br>250 Park Avenue<br>New York, NY  10177-1500 |
| For Various Claimant<br>Firms: | Stutzman, Bromberg, Esserman & Plifka<br>By:  DAVID J. PARSONS, ESQ.<br>2323 Bryan Street,  Suite 2200<br>Dallas, TX  75201 |
| For Morgan Stanley<br>Senior Funding, Inc.: | Katten Muchin Roseenman, LLP<br>By:  JEFF FRIEDMAN, ESQ.<br>       MERRITT PARDINI, ESQ.<br>575 Madison Avenue<br>New York, NY  10022-2585 |
| For Fireman's Fund<br>Insurance Co.: | Crowell & Moring LLP<br>By:  LESLIE A. DAVIS, ESQ.<br>       MARK PLEVIN, ESQ.<br>1001 Pennsylvania Avenue, N.W.<br>Washington, DC  20004 |
| | Stevens & Lee<br>By:  JOHN D. DEMMY, ESQ.<br>1105 North Market Street, 7th Floor<br>Wilmington, DE 19801 |

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd.):

For Serengeti:               Vinson & Elkins, LLP
                             By:  ARI BERMAN, ESQ.
                             Trammell Crow Center
                             2001 Ross Avenue, Suite 3700
                             Dallas, TX  75201

For Scott Company:           Vorys, Sater, Seymour & Pease, LLP
                             By:  TIFFANY COBB, ESQ.
                             52 East Gay Street
                             Columbus, OH  43216

For Official Committee       Dies & Hile, LLP
of Asbestos Property         By:  MARTIN DIES, ESQ.
Damage Claimants:            1601 Rio Grande, Suite 330
                             Austin, TX  78701

                             LECG
                             By:  ELIZABETH DEVINE, ESQ.
                             1725 Eye Street NW, Ste 800
                             Washington, DC,  20006

                             Riker Danzig Scherer Hyland & Perretti
                             By:  CURTIS PLAZA, ESQ.
                             Headquarters Plaza
                             One Speedwell Avenue
                             Morristown, NJ 07962-1981

For the Property             Bilzin Sumberg Baena Price &
Damage Committee:              Axelrod LLP
                             By:  SCOTT BAENA, ESQ.
                                  JAY SAKALO, ESQ.
                             200 South Biscayne Boulevard
                             Suite 2500
                             Miami, FL  33131

For the Bank Lenders:        Paul Weiss Rifkind Wharton &
                               Garrison, LLP
                             By:  MARGARET PHILLIPS, ESQ.
                                  REBECCA ZUBATY, ESQ.
                                  ANDREW N. ROSENBERG, ESQ.
                             1285 Avenue of the Americas
                             New York, NY  10019

For Asbestos Property        Scott Law Group
Damage Claimants:            By:  DARRELL SCOTT, ESQ.
                             1001 East Main Street, Suite 500
                             Sevierville, TN  37864


                   **J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd.):

For National Union Fire       Zeichner Ellman & Krause, LLP
Insurance Co.:                By:  ROBERT GUTTMANN, ESQ.
                             575 Lexington Avenue
                             New York, NY  10022

For the Future               Orrick, Herrington & Sutcliffe,
Claimants                      LLP
Representatives:             By:  DEBRA FELDER, ESQ.
                                  KATE ORR, ESQ.
                             Washington Harbour
                             3050 K Street, N.W.
                             Washington, D.C.  20007

For Federal Insurance        Cozen O'Connor
Company:                     By:  ILAN ROSENBERG, ESQ.
                             1900 Market Street
                             Philadelphia, PA  19103

For Official Committee       Anderson Kill & Olick
of Asbestos Personal         By:  ROBERT M. HORKOVICH, ESQ.
Injury Claimants:            1251 Avenue of the Americas
                             New York, NY  10020-1186

For David T. Austern,        Phillips, Goldman & Spence, P.A.
the Future Claimants'        By:  JOHN C. PHILLIPS, ESQ.
Representative:              1200 North Broom Street
                             Wilmington, DE  19806

For the Asbestos             Ferry Joseph & Pearce, P.A.
Creditors Committee:         By:  THEODORE TACCONELLI, ESQ.
                             824 Market Street, Suite 19899
                             Wilmington, DE  19899

For Ford, Marrin,            Ford, Marrin, Esposito, Witmeyer &
Esposito, Witmeyer             Gleser
& Gleser:                    By:  SHAYNE SPENCER, ESQ.
                             Wall Street Plaza
                             New York, NY  10005

For Official Committee       Duane Morris, LLP
of Unsecured Creditors:      By:  MICHAEL LASTOWSKI, ESQ.
                             1100 North Market Street, Suite 1200
                             Wilmington, DE  19801-1246

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd.):

For Official Committee          Brandi Law Firm
of Asbestos Property            By:  THOMAS J. BRANDI, ESQ.
Damage Claimants:                    TERENCE D. EDWARDS, ESQ.
                                44 Montgomery St., Suite 1050
                                San Francisco, CA  94104

                                Lieff, Cabraser, Heimann & Bernstein
                                By:  ELIZABETH J. CABRASER, ESQ.
                                Embarcadero Center West
                                275 Battery Street, Suite 3000
                                San Francisco, CA  94111

For the Libby Claimants:        Cohn, Whitesell & Goldberg, LLP
                                By:  CHRISTOPHER M. CANDON, ESQ.
                                101 Arch Street
                                Boston, MA  02110

For the Libby Claimants:        Landis, Rath & Cobb, LLP
                                By:  KERRI K. MUMFORD, ESQ.
                                     JAMES S. GREEN, JR., ESQ.
                                919 Market Street, Suite 1800
                                Wilmington, DE  19899

For the PD Committee:           Speights & Runyan
                                By:  MARION FAIREY, ESQ.
                                200 Jackson Avenue, East
                                Hampton, SC  29924

For Everest Reinsurance         Marks, O'Neill, O'Brien & Courtney LLP
Company, et al.:                By:  BRIAN L. KASPRZAK, ESQ.
                                     JOHN D. MATTEY, ESQ.
                                913 North Market Street
                                Suite 800
                                Wilmington, DE  19801

For Arrowwood                   Bifferato Gentilotti LLC
Indemnity Co.:                  By:  GARVAN McDANIEL, ESQ.
                                800 North King Street
                                Wilmington, DE  19801

For Official Committee          Richardson Patrick Westbrook &
of Asbestos Property              Brickman, P.C.
Claimants:                      By:  EDWARD J. WESTBROOK, ESQ.
                                174 East Bay Street
                                Charleston, SC  29401


                    **J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd.):

For Hartford Financial        Wilmer Wilmer Cutler Pickering Hale &
Service Group:                 Dorr, LLP
                              By:  MELANIE R. DRITZ, ESQ.
                              399 Park Avenue
                              New York, NY  10022

For Asbestos Property         Pryor Cashman, LLP
Damage Claimants:             By:  RICHARD LEVY, ESQ.
                              410 Park Avenue
                              New York, NY  10022

For David T. Austern,         Lincoln International, LLC
Future Claimants'             By:  JOSEPH RADECKI
Representative:

For Travelers:                Simpson Thacher
                              By:  ELISA ALCABES, ESQ.
                                   MARY BETH FORSHAW, ESQ.
                              425 Lexington Avenue
                              New York, NY  10017

                              Morris Nichols Arsht & Tunnell, LLP
                              By:  ANN C. CORDO, ESQ.
                                   ERIN FAY, ESQ.
                              1201 N. Market Street
                              PO Box 1347
                              Wilmington, DE 19899-1347

For State of Montana          Womble Carlyle Sandridge & Rice
Dept. of Environmental        By:  FRANCIS MONACO, ESQ.
Quality:                      222 Delaware Avenue, Suite 1501
                              Wilmington, DE 19801

For Garlock Sealing           Robinson, Bradshaw & Hinson, P.A.
Technologies:                 By:  GARLAND CASSADA, ESQ.
                              101 North Tryon Street
                              Suite 1900
                              Charlotte, NC  28246

                              Morris, James, Hitchens & Williams,LLP
                              By:  BRETT D. FALLON, ESQ.
                              PNC Bank Center
                              222 Delaware Avenue
                              10th Floor
                              P.O. Box 2306
                              Wilmington, DE  19899

**J&J COURT TRANSCRIBERS, INC.**

TELEPHONIC APPEARANCES (Cont'd.):

```
For Federal Insurance      Cozen O'Connor
Company:                   By:  JACOB C. COHN, ESQ.
                           1900 Market Street
                           Philadelphia, PA  19103

For National Union Fire    Zeichner Ellman & Krause, LLP
Insurance Co.:             By:  MICHAEL DAVIS, ESQ.
                           575 Lexington Avenue
                           New York, NY  10022

For Deborah Pace:          DebtWire
                           By:  DEBORAH PACE

For the State of           Hahn & Hessen
California:                By:  ALISON SCHRAG, ESQ.
                           488 Madison Avenue
                           New York, NY  10022

For Party Siegel:          Traub, Lieberman, Straus & Shrewsberry
                           By:  ROBERT SIEGEL, ESQ.
                           Seven Skyline Drive
                           Hawthorne, NY 10532
```

**I N D E X**

| **EXHIBITS** | | **I.D.** | **EVD.** |
|---|---|---|---|
| AMH-63 | Letter from Dr. Rourke | 239 | -- |
| PP-361 | Marked copy of LC-10 | -- | 188 |
| Prouty Deposition | Designation 118 | -- | 188 |
| Prouty 1006 | Summary slide | -- | 188 |

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.  Good morning, everyone.  Please be

2    seated.  This is a continuation of the plan confirmation

3    hearing in the matter of W.R. Grace, 01-1139.  Present by phone

4    today:  Elisa Alcabes, Kristina Alexander, Scott Baena, Janet

5    Baer, Philip Bentley, Ari Berman, David Bernick, David Blabey,

6    Sam Blatnick, Deanna Boll, Thomas Brandi, Elizabeth Cabraser,

7    Christopher Candon, Garland Cassada, Richard Cobb, Tiffany

8    Cobb, Jacob Cohn, Ann Cordo, Andrew Craig, Leslie Davis,

9    Michael Davis, Elizabeth DeCristofaro, John Demmy, Elizabeth

10   Devine, Martin Dies, Melanie Dritz, Terence Edwards, Lisa

11   Esayian, Marion Fairey, Brett Fallon, Erin Fay, Debra Felder,

12   Mary Beth Forshaw, Theordore Freedman, Robert Frezza, Jeff

13   Friedman, Robert Gilbert, Christopher Greco, James Green,

14   Robert Guttmann, Barbara Harding, Jose Hernandez, Robert

15   Horkovich, Brian Kasprzak, Stuart Kovensky, Matthew Kramer,

16   Lewis Kruger, Michael Lastowski, Elli Leibenstein, Richard

17   Levy, Kathleen Makowski, John Mattey, Garvan McDaniel, Francis

18   Monaco, Kerri Mumford, Kate Orr, Deborah Pace, Merritt Pardini,

19   David Parsons, Margaret Phillips, John Phillips, Curtis Plaza,

20   Mark Plevin, Joseph Radecki, Andrew Rosenberg, Ilan Rosenberg,

21   Alan Runyan, Jay Sakalo, Alison Schrag, Darrell Scott, Robert

22   Siegel, Marnie Simon, Daniel Speights, Shayne Spencer, Theodore

23   Tacconelli, Edward Westbrook, Clement Yee and Rebecca Zubaty.

24   Are there any changes of appearance in court today?  Okay.

25   Then I think we can proceed.  Mr. Bernick?

1          MR. BERNICK:  Excuse me, Your Honor, I just -- I'm

2    trying to get a little something together here.

3                    (Attorney conversation)

4          MR. BERNICK:  It'll just be a second, Your Honor.  I

5    apologize.

6                         (Pause)

7          THE COURT:  Cathy, I had Claire give you the orders.

8    Did you get --

9          THE CLERK:  Yes.

10         THE COURT:  Okay.

11                   (Attorney conversation)

12         THE COURT:  Do you folks need a few minutes because

13   if you do, I'll just go do some work?

14                   (Attorney conversation)

15         MR. BERNICK:  Your Honor, what we would propose to do

16   today is what we indicated yesterday which is to go through the

17   remaining items on the agenda and they're mostly related to

18   Libby at this point.  And then take up any and all remaining

19   issues relating to exhibits and any other housekeeping matters

20   that we have left to do.  And I guess we could talk about, to

21   the extent that it's appropriate, talk about where to go from

22   here.  So that's the basic and I know Mr. Speights is anxious

23   to offer exhibits with respect to Anderson Memorial, as are

24   other people, so it would take that all up at the same time.

25         I want to go through what we've done in connection

1 with the Item 4 which is the <u>Daubert</u> motions and the <u>Daubert</u>

2 motions relate overwhelmingly.  Indeed all that we're going to

3 talk about here today are the <u>Daubert</u> motions relating to the

4 Libby witnesses.  As you know, Your Honor, and will recall, the

5 <u>Daubert</u> motions were all made before trial.  They were made on

6 the basis of a schedule that contemplated the briefing on

7 <u>Daubert</u> would be completed before the evidence started.  It

8 was.  And because as is Your Honor's practice, has been both in

9 this case and other cases, not to rule on those objections

10 prior to the commencement of the evidence, all the objections

11 that were made by way of <u>Daubert</u> motions were preserved during

12 the course of trial.  And what that now means is that the -- we

13 have a trial record where all the <u>Daubert</u> objections are now

14 focused on particular pieces of evidence and there's some real

15 advantage to that.

16         So what we've done here today, and Your Honor has a

17 copy of this in your notebook.  Does she have her notebook yet?

18 Just hand it up to the Court.  What we've done is to go through

19 and try to create a road map and then supply the relevant parts

20 of the record in the rest of the notebook.  And I have a copy

21 of the road map graphics.  The road map graphics have been

22 distributed to counsel.  But I have a copy here that I'll just

23 go through so that Your Honor doesn't have to flip through the

24 many tabs that are in the notebook as we're sitting here and

25 talking about it.

1          The road map is, basically, designed to pinpoint

2  those particular opinions and matters that are the focus now of

3  the <u>Daubert</u> challenge because the record or as the trial

4  proceeded Your Honor had the opportunity to rule on many other

5  matters that have affected the scope of the evidence.  And, as

6  a consequence, there are many matters that are no longer really

7  before the Court.  They're now moot.  They've already been

8  decided.

9          The way that it's organized is first of all to

10 differentiate the issue that's before the Court which is unfair

11 treatment or unequal treatment or discrimination, that issue

12 from the different categories of evidence that actually had

13 been presented in the associated opinions.  So, for example, we

14 start with discrimination as the issue.  Does the plan

15 unfair -- treat differently the Libby claimants, have a

16 different treatment for Libby claimants than for non-Libby

17 claimants?  That's the central discrimination issue.  And I

18 know that Mr. Heberling or others may disagree with that

19 characterization, but that is what we believe to be the

20 appropriate issue under the law.

21          And then one step removed from that, is there

22 evidence relating to individual review as opposed to expedited

23 review at Libby?  The answer on discrimination is, and we'll

24 get back to this a little bit later on, is that there's no

25 evidence that's been provided by the Libby claimants that there

1  is dissimilar or not -- dissimilar treatment of the Libby

2  claims in connection with the trust distribution procedures

3  from non-Libby claims.  Everybody's treated according to the

4  same process.

5       And this is focused, incidently, on the evidence

6  relating to the medical criteria because that is the subject

7  matter of the testimony of the witnesses to be focused on.  So

8  there's no opinion that's actually been offered that there is

9  different treatment under the medical criteria of the TDP,

10  Libby versus non-Libby.  The category then one step removed is,

11  well, what about individual review specifically.  And that

12  really has not been the subject of any testimony by any expert

13  as to which there's certainly not been studied, there's been no

14  analysis, but there may have been some references to it.

15       What about the effect of the TDP expedited review

16  process on Libby that is now going from individual review to

17  expedited review?  Are there opinions that deal with the effect

18  on the expedited review of Libby claimants?  And this is really

19  focused on the opinions that have been offered regarding

20  Category 4B, severe pleural disease; that is, are those

21  criteria, those medical criteria, do they have an unequal

22  effect on people at Libby?

23       Your Honor has ruled out -- and this is where we get

24  into the whole question of how many people pass, how many

25  people would qualify for benefits under the expedited review

portion of the TDP?  Your Honor ruled out testimony regarding
the 950 claimants, so that's not any longer before the Court
today.  The Court also ruled out the 1,800 because the
underlying reliance information had not been provided.  So the
only areas, the only analyses that or I should say the only
evidence that was provided to the Court regarding the impact of
the medical criteria under Section 4B was evidence and opinions
relating to the 76 people who came out of the CARD mortality
study.  Those were the 70 people where the testimony from the
Libby claimants' experts was that they had died from asbestos
related disease and that that disease was non-malignant.  Those
were the 76 people that did come into evidence.

        And then there was also testimony about how many
people out of Exhibit 16A, which were 37 people, the 37 people
being people who either -- there are two categories.  Some were
people who had died, actually part of the CARD mortality study,
and some of the people were people who were still living who
were claimants.  And there were a total, I think, of 37.  And
there was commentary about how many of those cases would have
qualified under Section 4B.  Could you remind me to get another
-- I just thought of an excerpt I want to do on that.

        I've highlighted those in yellow because that is
testimony that did come in and that is subject to our Daubert
challenge.  So there is evidence that has been presented and
opinion that has been presented on the effect of the 4B medical

1 criteria on expedited review for Libby claimants that we seek

2 to exclude under _Daubert_.  The next category is, well, how

3 evidence relating to the selection of the TDP medical criteria,

4 the 4B medical criteria.  There are many criticisms that were

5 offered of those criteria.  That is an area of evidence that's

6 in the record.  It's yellow highlighted.  That means that it's

7 subject to a _Daubert_ challenge.

8        And, finally, we have furthest to the right the

9 general question of is there something different about disease

10 at Libby.  And Your Honor has ruled out different areas of

11 evidence already in that regard.  Those areas are listed here.

12 But there has been testimony offered by the experts for Libby

13 in this area.  Indeed, the bulk of the testimony really

14 addressed the question is there something different about

15 Libby.  So it's Libby is different is one type of opinion.

16        Another type of opinion is disease rates at Libby.

17 In other words, that there are isolated cases of severe loss of

18 diffusion capacity.  That is the only finding of respiratory

19 impairment that's isolated in the sense that the impairment's

20 not reflected in FVC or in TLC, total lung capacities, only in

21 the DLCO.  And, of course, DLCO is not one of the medical

22 criteria.  There's that testimony.  There's testimony that at

23 Libby there's impairment without blunting.  There was testimony

24 where Dr. Molgaard had commentary on the accuracy and propriety

25 of Dr. Moolgavkar's statement about the state of the evidence

1  at Libby.

2          Then there were then -- there was a lot of testimony

3  -- this all came from Dr. Molgaard -- that the CARD mortality

4  study was sound epidemiology and the progression study was

5  sound epidemiology.  All of those areas are subject to <u>Daubert</u>

6  challenge.  That part of the table, the bottom part of the

7  table, then deals with the studies or publications that were

8  used and, finally, the data that was relied upon.

9          And we are seeking to exclude data, the CARD 76

10  people that were the basis for the commentary about the effect

11  of the TDP medical criteria, the people who were the subject of

12  Exhibit 16A, the 37 people.  Those we would want to exclude and

13  are seeking to exclude.  And Table LC-8 from the CARD study

14  regarding the proportionate mortality, that was the subject of

15  testimony, as well, and we would seek to exclude those.  So

16  these are all of the areas.

17          What we've then done in the succeeding slides is that

18  the first slide has got all footnotes indicating where the

19  citations are, the footnotes that will pick up the citations

20  actually to the record that's implicated, and those citations

21  are then on the succeeding three pages; that is, 516-2, 516-3,

22  516-4, all succeeding 516-1.  And the format that we've used is

23  very simple.  We have the footnotes and then the actual cites

24  to the trial record and then whether they're challenged or not.

25  Some of the cites are to rulings that the Court made.  Some of

1  the cites are to articles that are not being challenged.

2  They're not highlighted in yellow on the first page.  And the

3  citations are not highlighted in yellow on the succeeding

4  pages.  So we've wanted to be clear on what parts of the

5  transcript were in the evidence we're challenging.  We've

6  highlighted that in yellow and we flagged it with a red

7  citation.  In all the succeeding pages, three -- two -- three

8  pages are the same thing.

9      Which then brings us to the opinions themselves and

10  the relevant admissions that have been made and the relevant

11  Daubert issues.  And all that we've done is very simple.  Going

12  back to the first table, for each of the different categories,

13  we have taken each category, each column and then created a

14  slide for each column that has in more detail the opinions, the

15  citations to important admissions that were made and then the

16  Daubert issues that are involved.

17      So, for example, if we take opinions regarding the

18  effect of Category 4B, the medical criteria, on the expedited

19  review of the Libby claimants and, in particular, talk about

20  the pass rates, testimony that, gee, given the medical criteria

21  under 4B, the -- even the people who died of non-malignant

22  disease, according to the 76 people, even those people wouldn't

23  have passed or very few of them would have passed thereby being

24  critical of the criteria under 4B.  And the pass rates,

25  likewise, for the 37, that's not a subject of this slide.  And

1  I'm not going to go through in detail exactly what the

2  testimony has been, but we have the key admissions over here,

3  both the general ones that pertain to what's being -- what was

4  acknowledged about the TDP and then specific admissions

5  regarding the 76 and the 37.

6         And the essence of what we're saying is simple and

7  it's set forth on the other side which is that you have a

8  problem with fit, there's no fit.  The 76 people are not

9  current claimants, they're people who all have passed away and

10 they're not current claimants.  The analysis of the pass rates

11 under the -- for the 76 does not consider individual review.

12 The testimony was simply confined to the expedited review.  And

13 as Your Honor repeatedly indicated, that doesn't mean that the

14 people aren't going to get compensation and, most pointedly,

15 that the whole question of the pass rates for Libby people is

16 not relevant to discrimination.

17        Discrimination is the unequal treatment of Libby

18 versus non-Libby.  And the analysis of the 76 wasn't replicated

19 for the analysis of any compared or group outside of Libby.  So

20 this whole exercise on the impact of Libby simply goes to the

21 proposition that, yes, not all people at Libby will pass.  But

22 that's not a confirmation standard.  There has to be a

23 demonstration that the Libby people are being treated unequally

24 that way.  And so the real question is, is there something

25 about the criteria that unequally says that Libby people won't

**J&J COURT TRANSCRIBERS, INC.**

1  pass, whereas similarly situated or comparable people outside

2  of Libby would.  And there's been no evidence of that and

3  there's certainly no evidence out of the analysis of the 76

4  that says that is so.  And I'm going to take a little time on

5  these because this is really the heart of the matter and the

6  problem that the Libby claimants have in prosecuting their

7  discrimination claim.

8        The second problem is that the 76 are anecdotal.  The

9  CARD mortality study, the 1,800 did not come in.  There's no

10  scientific methodologies that was presented to the Court that

11  the 76 are a group that was constituted through any methodology

12  that is scientific.  They're not representative.  There was

13  lots of effort to get in testimony that they were

14  representative.  All of that testimony failed.  Therefore, the

15  only thing that came in by way of opinion testimony was the 76.

16        So we have 76 people that were studied by Dr.

17  Whitehouse as to whom patient data was gathered.  It was

18  reviewed by Dr. Frank.  It's still 76 people.  And the 76

19  people -- if it's 76 people, it's just a case series, it is not

20  a representative group.  It's not a group that can be used to

21  study or characterize anything.  It can't even be used to

22  characterize anything at Libby and that effort was made to say,

23  oh, well, it's representative of people who have been diagnosed

24  as being sick at Libby.  That testimony failed to come in

25  because there was no indication of what supported that

1 statement that they were representative.  So that didn't come

2 in.  All that came in is the 76.  So the group is 76 Libby

3 people with no evidence in the record to link them up to other

4 Libby people or to link them up to people outside of Libby for

5 comparison purposes.  They simply stand alone as the 76.

6 　　　　　If we could get -- well, I guess I got Page 106 here

7 someplace else.  If we go to the same testimony regarding the

8 people on 16A, which was, again, the two-pager columns that

9 were people who had passed away, first page.  The second page

10 is people who are still claimants.  All of the same problems.

11 Half of them are not current claims.  They've already passed

12 away, again, does not consider individual review and, again, is

13 not relevant to discrimination.  It's not representative of any

14 group at Libby.  It's not representative of any group at Libby

15 for comparison purposes outside of Libby.  And the anecdotal

16 problem is even more severe because Dr. Whitehouse admitted --

17 this actually is at Whitehouse-106 and 107.  Do you have that

18 transcript, Nate, right there, 106 and 107?

19 　　　　　UNIDENTIFIED ATTORNEY:  Yeah.

20 　　　　　MR. BERNICK:  Instead of paging through my own

21 materials here.  Do you have 106 and 107?

22 　　　　　UNIDENTIFIED ATTORNEY:  From the September 11th

23 transcript, Mr. Bernick?

24 　　　　　MR. BERNICK:  Yeah, 106 and 107.  Okay.  That's --

25 no.  This is Whitehouse-106 and 107.  I asked Mr. Whitehouse at

**J&J COURT TRANSCRIBERS, INC.**

1  106 regarding --

2        THE COURT:  What transcript is this?

3        MR. BERNICK:  This is at page -- the citation is on

4  the chart here, so it'll be here for Your Honor.  And it's

5  Whitehouse 9/11/09, 106 and 107.

6        THE COURT:  Okay.

7        MR. BERNICK:  So that's the whole idea is that we're

8  trying to make it a little bit easier for Your Honor to get to.

9  So at 106, again, dealing with 16A --

10        MR. FINCH:  Your Honor, 16A is found at -- behind Tab

11  5 in your notebook.

12        THE COURT:  Okay.  Thank you.

13        MR. BERNICK:  So there's testimony about 16A.  I ask

14  him, I said, "I'm asking you whether it's true, is it not, that

15  there's no scientific method, no scientific research method or

16  analysis that was used that was used to select the particular

17  claimants who are in 16A."  There's an objection.  "Dr.

18  Whitehouse, this isn't the study, is it?  No."  Answer, "okay".

19  Or question, "okay".  "It's just a chart."  Question, "It's

20  just a chart."  And that's all that it is.  It's not a

21  scientific study.

22        At 107, we know that the attorneys had a hand.  Who

23  was -- at Question 20, Line 20 on 107 -- "Who was it that

24  determined that these particular dates and reads would be

25  included in the chart?  The attorneys did."  So, again, this is

1 not scientific, it's an illustrative example that was chosen.

2 So we have something that's not a study, it's just a chart.

3 The attorneys had an input to what information would be put in

4 there.  It's not part of anything.  No one's saying it's being

5 published.  There was some talk that maybe the CARD study would

6 be published as a whole.  There's no such testimony in

7 connection with 16A.

8          So we have, again, totally anecdotal information that

9 says, oh, well, this particular group of people, some of them

10 will pass, some of them won't pass.  That doesn't cut <u>Daubert</u>,

11 both under reliability, the reliability prong.  It doesn't cut

12 <u>Daubert</u> under fit because it doesn't tend to establish

13 discrimination in a care where there are no comparatives.

14          The next chart, 516-6, again, works off the first

15 board, first chart, selection of TDP criteria.  There are

16 criticisms that have been offered of the TDP criteria.  The

17 admissions, first of all, the criticisms apply both inside and

18 outside of Libby.  That's all acknowledged.  And, again, if the

19 criticisms apply both inside and outside of --

20          THE COURT:  Wait, Mr. Bernick.  I -- this chart only

21 has up to -- I'm sorry, this binder only has up to Exhibit

22 516-4.  I don't have --

23          MR. BERNICK:  Yes.  No, that's because the binder --

24 we'll help you page through it.  The binder is organized

25 sequentially so you get the backup for each one.  So you have

1  to get back to tabs --

2              UNIDENTIFIED ATTORNEY:  B, C.

3              MR. BERNICK:  -- I think B, C, D and behind each tab

4  are additional slides and backup.

5              THE COURT:  Ah, okay.  I see.  So could you start

6  over, again, with 516-6 then?

7              MR. BERNICK:  Yeah, 516-6 --

8              UNIDENTIFIED ATTORNEY:  C.

9              THE COURT:  This is behind Tab C.  I'm with you now.

10             MR. BERNICK:  Okay.  So you can see under the slide

11 any criticisms apply both inside and outside of Libby.  That's

12 an admission by Dr. Frank.  We have a citation.  And the key

13 thing here is that the issue of whether -- essentially what

14 happened here, opinions regarding the selection of the TDP

15 criteria, there were criticisms that were made.  It should have

16 included -- there was testimony from Dr. Frank that the

17 criteria should have included loss of diffusion capacity, DLCO.

18             There are criticisms that there was blunting required

19 and blunting should not be required.  There was criticism that

20 the thickness requirement was unnecessary.  And these all went

21 to the proposition that Dr. Frank and Dr. Whitehouse advance is

22 the criteria that were selected, the medical or diagnostic

23 criteria that were selected under 4B, were unduly restrictive

24 because there might be people who were impaired and they still

25 wouldn't be picked up.

1          Of course, Dr. Welch explained the basis for all

2    those criteria and how they were selected.  So the real

3    question is, well, what's the issue.  Is the issue whether a

4    clinician or a doctor would still find an individual to be

5    impaired in the course of clinical or medical practice?  That's

6    the issue that Dr. Frank addressed.  That's the issue that Dr.

7    Whitehouse addressed.  It's not the issue in the case.

8          The issue in the case is whether those criteria, not

9    whether they exclude people or include people, it's whether

10    they do so differently Libby versus not Libby.  And you heard

11    testimony from -- both from Dr. Welch, as well as from Mr.

12    Inselbuch, the whole purpose of the TDP criteria for expedited

13    review is to go to the sweet spot to pick out the clear cases

14    where there aren't a lot of confusing -- there's not -- there

15    aren't ambiguous or equivocal tests that can be met by people

16    who aren't impaired as a result of asbestos exposure or not

17    sufficiently impaired.  The idea is to get to the sweet spot,

18    not to pick up absolutely everybody.

19          So the question is does it capture the clear cases

20    because that's the purpose.  It's not a diagnostic guide for

21    doctors in their practices, it's a compensation scheme.  Well,

22    there was testimony that any criticism supplied both inside and

23    outside of Libby, that was Mr. -- Dr. Frank will talk about

24    that a minute.  The TDP captures clear cases inside and outside

25    and then even acknowledgment that there are authorities that

1  do, in fact, use the same criteria.  Indeed, the mainstream

2  scientific view includes the criteria that are in the TDP.

3        These are key admissions, one of the <u>Daubert</u>

4  problems: (a) there's no fit because, again, doesn't address

5  discrimination; and (b) none of these people are expert in

6  compensation schemes.  They all -- no one got up here and said,

7  gee, thickness has no relevance or, gee, extent of -- the

8  extent of the thickening has no relevance clinically, or that

9  the ratio, the lung capacity ratios have no relevance.  That

10  wasn't the testimony of anybody.

11        What they all said was that there are people at Libby

12  who are impaired who don't meet those criteria.  So there's no

13  issue, but those are criteria.  The criteria of the TDP are

14  found in the literature, are felt to be important in the

15  literature, not dispositive, but important, and that that is

16  exactly what Dr. Welch looked to in developing the criteria for

17  expedited review.  There's no question.  There's a complete

18  disconnect.

19        Dr. Frank and Dr. Whitehouse say, oh, well, but they

20  shouldn't be the only criteria or they're too restrictive.

21  That testimony, while it may be true medically, is being

22  applied -- I'm not saying necessarily it is -- is being applied

23  to what is essentially a compensation scheme that says we're

24  not going to compensate everybody on an expedited basis who

25  might ultimately be entitled to compensation.  We're only going

1  to compensate certain people.  And that question is, basically,

2  a compensation question is does it capture the clear cases.

3  It's not something these people opined on.  We brought it out

4  on cross, but it's not something they opined to.  That is the

5  issue.

6           And so these are -- this is a problem of no fit and

7  it's also a problem that these people aren't expert in

8  compensation schemes.  They have no expertise in determining

9  whether, in fact, these criteria -- whether the sweet spot is

10 the right sweet spot or the wrong sweet spot.  None of them

11 even addressed that.  They addressed a completely different

12 question.

13          And then, finally, we have slides 516-7, 516-8.  And

14 these got to the last category which really is in the sense the

15 most fundamental disconnect that we have with respect to the

16 Libby evidence.  The Libby people have come in and through

17 their experts have been at pains to say Libby's different,

18 Libby's different, Libby's different.  That may be something

19 that's important to Libby claimants and may be something that's

20 important to their counsel.  Maybe it's something that's

21 important to the people of Libby and, indeed, to the government

22 that says we're going to have more funds to go study Libby.

23 But it's not the issue in the case.  And they came in with all

24 kinds of stuff that says, oh, different, different, different,

25 different, different.  It's not a question of whether there is

1  a different disease at Libby.  It is a question of whether --

2  whatever the facts on the ground are at Libby, whether these

3  criteria unequally treat the people of Libby versus people not

4  at Libby.

5          So this was the big disconnect and there's a lot of

6  very, very irrelevant evidence and that's captured on these two

7  slides.  First, there's the testimony that says, well, Libby is

8  different in disease rates, mortality, in a sense the clinical

9  severity and presentation, isolated DLCO, impairment without

10  blunting.  There are admissions there, but the key thing is, is

11  there's just no fit.  This doesn't show discrimination.  It

12  doesn't even go to the issue of discrimination and it's all

13  anecdotal.

14          Remember, the CARD mortality study is not in

15  evidence.  It's not even published.  It has not come into

16  evidence.  And, as a result, we're just sitting here with a lot

17  of anecdotal testimony that says the people in Libby are

18  different, mostly focused on the 76 people who are anecdotal

19  and the 37 people who are anecdotal.

20          We then get onto those studies themselves.  And this

21  is the last slide, and this is the one that really implicates

22  most centrally the testimony of Dr. Molgaard because Dr.

23  Molgaard was brought in to address what really is the ultimate

24  Daubert issue which is whether any of this meets standards for

25  epidemiological analysis.  And we know that because we're

1   talking about -- if we're talking about the right issue which

2   is Libby and non-Libby, that's a question of comparing two

3   groups, Group 1 and Group 2.  And when it comes to comparing

4   groups to determine to what extent they reflect the same, you

5   know, process, whatever it is disease-wise, that's an issue for

6   epidemiology.  Epidemiology is the science of groups, medical

7   science of groups.

8           So an epidemiologist is key.  They recognize that

9   given Your Honor's determinations before trial -- not

10  determinations, but comments before trial regarding Dr.

11  Whitehouse that they had a big problem because Dr. Whitehouse

12  is not an epidemiologist.  So they bring in Dr. Frank who goes

13  back over the data, but Dr. Frank is also not an

14  epidemiologist.  So they brought in an epidemiologist.  And

15  that epidemiologist was Dr. Molgaard.

16          And so the issue on the table with Dr. Molgaard is

17  the central issue of reliability; that is, is anything that

18  Libby's got -- that the Libby claimants have to say either

19  about their group, Group 1, or about non-Libby or about that

20  those are all, all of them, epidemiological issues, are any of

21  them properly founded in the principles of epidemiology.  And

22  the answer to that question was no.

23          We had extensive cross examination of Dr. Molgaard

24  and Dr. Molgaard, basically, and this is really what I wanted

25  to kind of in the sense wind up with is the sandwich here.  The

1  sandwich is that at one extreme, that is, when you go all the

2  way down the road, way away from discrimination to this

3  fundamental question of -- that the Libby people have

4  addressed, but we don't think is germane, is Libby different.

5  The enormously -- the overwhelming problem is not only the

6  relevance or fit problem, this gets to the question of is there

7  reliable data.  Is there really anything that satisfies the

8  reliability prong?

9          And from that point of view, the testimony from Dr.

10  Molgaard was very important because Dr. Molgaard acknowledged

11  that his basic approach -- this is LC-273 -- and his basic

12  approach was as set forth here.  This is where he talked about

13  the difference between analytic and descriptive epidemiology

14  studies and also a lot of their similarities.  He recognized

15  that the Whitehouse studies that we're talking about here, both

16  the progression study and the mortality study, were

17  descriptive, that they could not establish a hypothesis.  They

18  may not test a hypothesis.  He acknowledged that.

19          He also said they can't test dose response.  They

20  can -- he says they can establish an association, but they only

21  may have a comparison group.  He says it's evidence for

22  causation, but ultimately at the end of the day, as you know

23  from the definitions, they can't establish causation.  So what

24  he did in order to make up for the fact that everything coming

25  out of Libby was descriptive rather than analytic and he

1  acknowledges this right down here on this chart.  All these

2  studies, Whitehouse, they're all descriptive.  They're not

3  analytic.

4        It was a very clever, imaginative move, but he

5  basically said, oh, well, they're just two different kinds.

6  It's not like the analytic is the prior one and the dominant

7  one.  The descriptive serves to create hypotheses that are then

8  tested in analytic.  He made them all kind of equal standing in

9  service, therefore, of making a base or providing a basis for

10  public health decisions.  His schema, his approach, his

11  methodology, if you want to call it that, basically said

12  everything serves to make judgments that at the end of the day

13  are not dictated by analytic epidemiology, they're dictated by

14  public health.

15        And the problem with that, of course, is that at that

16  point epidemiology per Dr. Molgaard and on the basis of which

17  then he said that these studies were good epidemiology and,

18  therefore, on the basis of which the Libby people would have to

19  say that when they talk about groups and when they say anything

20  about Libby, different disease, whatever, that it is based upon

21  reliable methodology and does pass Daubert.  All of that

22  depends then on whether Dr. Molgaard's approach is, in fact, a

23  reliable methodology for Daubert purposes.

24        So the central question that carries through and

25  effects all of the evidence that has been mustered regarding

1 different disease present in Libby, all of that evidence has to
2 be tested under the reliability prong.  Molgaard was the guy
3 who was brought in to try to satisfy the test and what did he
4 do?  He told us what the scheme was.  It was a scheme that says
5 analytic, descriptive, that's fine.  We only have descriptive
6 here and descriptive is enough because this is all based upon
7 public health decisions.

8          And Your Honor was justifiably taken aback by this.
9 And you made a comment after this line of cross examination.
10 This is at Page 106 of the cross examination of Molgaard.
11 Again, it's a citation in the package that you have.  And I
12 asked him about the second report that he did.  And I said, "In
13 fact, your chart that you have submitted to this Court and
14 shown is all about how science serves public policy decisions,
15 right?"  Answer, "yes."  "And those are judgements, are they
16 not?  They are."  Again, we're now on the third rail of
17 Daubert.  Daubert is not about judgment.  It's not about ipse
18 dixit.  It's about reliable methodology.

19          I said, "They're not scientific statements, correct?"
20 Answer, "They're often based upon scientific statements."  So
21 we now get the effort to be a little bit evasive.  "Did
22 somebody tell you but they are -- did somebody tell you that in
23 this case somehow we're going to determine the appropriate
24 public policy is with respect to the Libby -- to the claimants
25 of Libby?"  And the answer to that was no.  Did I ever get Page

1 107?

2                              (Pause)

3           MR. BERNICK:  We have a colloquy that then continues
4 on 107.  We finally come to closure in 108.  "I didn't ask you
5 about your first deposition."  This is 108, Lines 7 through 17.
6 "You actually say in your final report that the etiological
7 impact of asbestos exposure in Lincoln County is without
8 epidemiological doubt.  Now, etiological impact, that's
9 causation, right?"  "I'm sorry, yes," he answers.  Question,
10 "So the bottom line of your final report is that causation is
11 without doubt?"  And the answer is, "Right."

12           "And the only way you can't get to that statement,
13 you can't get there on the basis of established science,
14 correct?"  Answer, "Yes, you can because it's done all of the
15 time in public health and epidemiology."  This is all about the
16 whole problem of public health.  This is what his chart says,
17 he is dealing with public health in this arena, public health
18 decisions.  He's not dealing with the descriptions, the
19 descriptive epidemiology and the analytic epidemiology that, in
20 fact, are the prong -- are the established methodologies for
21 determining the behavior of groups.  And I apologize.  There's
22 one more quote that I wanted to do, but I don't have it right
23 here.

24           So we have on this side of the table a lot of
25 scientific statements that are not backed up by epidemiological

**J&J COURT TRANSCRIBERS, INC.**

1  principles.  That was the cross examination of Dr. Molgaard and

2  it's all out in Your Honor's book.  We have data that is

3  anecdotal data from the CARD 76 and from LC-16A.  We don't

4  really have, therefore, even when it comes to what is happening

5  within Libby, we don't have established science, we don't have

6  the principles of epidemiology being applied as they are in

7  mainstream science.  They're being applied with an individual

8  who believes that they all stand, basically, to support a

9  public health judgment and he acknowledges that the only

10  studies are descriptive and, therefore, they cannot establish

11  any hypothesis.  They are simply for purposes of generating

12  hypotheses, not testing them.  We have a fundamental deficit of

13  any reliable data whatsoever, either in the progression study

14  or in the 76 people from CARD to support the opinions of these

15  experts and they should be stricken.

16          At the other extreme, when we come back to the real

17  question which is the issue in the case, not whether Libby

18  disease is different, but is there discrimination, there's no

19  question but that the testimony has shown -- yeah, here's the

20  last quote from Dr. Molgaard.  This is at 111.  "And,

21  therefore, the only way you feel you can get to a statement

22  like without a doubt causation has been shown, in this case,

23  the only way you can get there is based upon public health

24  policy, correct?"  And that's at Page 111, Line 16 through 21.

25  And it bears out the chart that he has shown is that ultimately

1  because all he's got are descriptive studies, the only way that

2  he can get to the idea of causation without doubt is by taking

3  it through a test that is not a scientific test, it's a public

4  health test.  And that's why Your Honor then observed, gee, did

5  anybody tell you I'm not here to decide public policy.  I'm

6  here to decide a case based upon the evidence.

7       So Dr. Molgaard's efforts to take all of this

8  evidence and put it on a footing that would satisfy the

9  reliability prong, all of those efforts were exposed, is being

10 based upon a unique approach that he uses that involves public

11 health judgment and that's the only way that he can get to the

12 conclusions expressed in his report.  Again, at the other

13 extreme, there's the discrimination issue.  And on the

14 discrimination issue we had the testimony from Dr. Whitehouse.

15      The testimony from Dr. Whitehouse was equally

16 revealing as to the real issue which is not the difference in

17 the disease, but discrimination.  And this is at Page 129 of

18 Dr. Whitehouse's testimony.  And, again, all these cites should

19 be in Your Honor's book.  At 129, we get to the ultimate

20 question -- page -- Line 20 -- Page 129, Line 22.  "Where the

21 TDP is applied to people in Libby and they actually satisfied

22 the medical criteria of the TDP, science says that those are

23 people who are pretty clear cases of diffuse pleural thickening

24 and severe disabling disease, correct?"  Answer, "Probably so,

25 but it doesn't include into that.  I'm not sure how exactly to

1  answer the question.  I assume that it's probably the case."

2           We then confront him with the deposition and in the

3  deposition he says, "As the tests are imposed by the TDP for

4  severe disabling pleural disease for the diagnosis of it, those

5  are the tests that science says if they're satisfied the

6  claimant will be a pretty clear case of having severe disabling

7  pleural disease, correct?"  And then I said, "And your answer

8  was a simple yes, isn't that what you said?"  And Your Honor

9  then said the objection is overruled.  The answer was qualified

10 here and not qualified there.  That is impeachment.  You may

11 answer the question.  And then he says, "Oh, yes, that is what

12 I did say in the question."  But he then tells me I had a

13 convoluted question, so he wasn't sure what the heck I was

14 asking.

15          So apparently it was pretty clear in the deposition.

16 Again, basic point is it captures the clear cases at Libby.

17 And I then go on to then say, well, what about the people Libby

18 versus non-Libby?  And this is at Line 18.  "Now, it's true, is

19 it not, that by virtue of the TDP, some people will be included

20 in the expedited review based upon the medical criteria and

21 some people will be excluded, correct?  True.  And that's true

22 both at Libby and it's true outside of Libby, correct?"

23 Answer, "I assume so.  Outside of Libby it's the same rules,

24 yes."

25          Continuing onto Page 30 -- 132, "Outside of Libby

1   it's the same rules, yes.  True."  "And that's true both at

2   Libby and it's true outside of Libby?"  "Answer:  I assume so.

3   Outside of Libby it's the same rules, yes."

4          We then had a very interesting exchange.  We got the

5   same rules.  They're excluding people in Libby.  They're

6   excluding people outside of Libby.  So, I asked the question.

7   I said, "Isn't it true that you've not done any scientific

8   analysis, any scientific analysis of diffuse pleural thickening

9   on any patient population outside of Libby?"  So, he

10  acknowledges that the rules are the same.  They exclude people

11  at Libby, but they get the clear cases at Libby.  They also

12  apply outside of Libby, and they apply outside of Libby in the

13  same way.  It's the same rules.  So then, my question is,

14  "Well, have you studied people outside of Libby so that you can

15  say it's different for them?"  And so, that's why I asked the

16  question.  There's then a colloquy where Mr. Heberling made a

17  very important statement.  Mr. Heberling objects, and he makes

18  the following statement.  "Our contention is that people in

19  Libby have severe pleural disease and they're discriminated

20  against by the TDP medical criteria.  That is a discrimination.

21  It is -- our case is not that they're being discriminated,

22  again, relative to other people outside of Libby."  And then

23  goes on to say, "We don't represent people who are outside of

24  Libby."

25         So, the reason that there's no evidence that says

1  that these criteria have an unequal effect, that they

2  discriminate against people in Libby versus outside of Libby,

3  is that that's not really even the contention that's being made

4  by Mr. Heberling in the case.

5          Now, we tried to get a stipulation to that effect,

6  and Your Honor will recall, we took a pause in the examination

7  to see if we could get an agreement.  And we didn't get the

8  agreement, and therefore Your Honor said -- Your Honor -- or,

9  Mr. Heberling said, "No, I think we could get into

10  complexities.  I'd like to have the record stand as it is."

11  And that's in response to -- I say, "My request is that there

12  simply be a stipulation that you don't have the contention that

13  people in Libby are treated differently than people outside of

14  Libby.  We're not dealing with that contention in this case.

15  If that's true and you say so, then I'll stop acting Dr.

16  Whitehouse questions."  And Mr. Heberling refused the

17  invitation and says, "We'll just let the record stand as it

18  is."  And Your Honor then says, "Okay.  I guess you should

19  continue."  And I then ask the same question.  "Is it accurate

20  that you have not done any scientific analysis of diffuse

21  pleural thickening in any patient population outside of Libby?"

22  And the answer is, Page 134, Line 19:  "That's true."

23          So, we go back to our big board, our big chart here.

24  The whole issue in this case, is there unequal treatment, not

25  only in connection with the expedited review, but individual

1 review, there's no -- there's not even a contention, there

2 certainly is no expert evidence that has been provided by Dr.

3 Whitehouse, Dr. Frank, Dr. Molgaard, doctor anybody else, that

4 says to a reliable methodology people in Libby as a group are

5 being treated differently from people outside of Libby as a

6 group.  There's no reliable methodology.  Indeed, there's no

7 data.  There's no nothing.  All they talk about is what's

8 happening at Libby.  They distort the epidemiology to be able

9 to say anything about what's happening in Libby at all, just as

10 a group.  And they've got nothing, they've got zero, they've

11 got zip when it comes to people outside of Libby.

12        So, they're not at square one, and because they're

13 not at square one over here, all of what then follows in the

14 way of opinions they have to offer just don't meet the fit

15 criteria.  They're just irrelevant.  It doesn't go to an issue

16 in the case.  And even  when you look at it, it doesn't fit the

17 reliability criteria because you don't have an epidemiologist

18 who follows the rules of epidemiology.

19        So, while it's taken -- and my argument this morning

20 unfortunately has taken more time than I had hoped that it

21 would -- it took a lot of time to go through all the evidence.

22 At the end of the day there's no there there, there's no here

23 there.  There's nothing -- there's no where's the beef?  And

24 whatever it is.  We spent a lot of time and a lot of effort in

25 discovery and on cross examination to expose the fact that

1  they're making the wrong contention based upon the wrong data

2  for purposes of confirmation.  It may be important again in

3  some other context, but it doesn't cut it here in this

4  confirmation trial under the rules.

5       We would ask that Your Honor therefore, with the

6  benefit of that notebook which goes through the trial evidence,

7  strike specifically the yellow highlighted portions of the

8  record and -- under _Daubert_, because it doesn't meet the rules

9  that are set forth by Rule 702 -- tests that are set forth by

10  Rule seven oh -- 702, 703, and the decisions by the Supreme

11  Court in _Daubert_.

12       MR. FINCH:  Nathan Finch for the asbestos claimants'

13  committee.  Is the mike picking me up?

14       THE COURT:  Yes.

15       MR. FINCH:  As Your Honor well knows and will recall,

16  Mr. Bernick and I don't always see eye to eye on _Daubert_

17  arguments.  However, in this instance the ACC agrees with and

18  supports everything that Mr. Bernick put on this chart and all

19  of his arguments about why the Libby claimants' evidence and

20  testimony doesn't meet either the fit prong or the reliability

21  prong of _Daubert_.

22       However, on the theory that the Libby claimants may

23  disagree with certain aspects of this chart, I have attempted

24  to anticipate the arguments that they will make and also to

25  address the arguments that they make in their papers.

1           One of the things they assert in their papers, and I

2    suspect you'll hear it here, is that causation under the law

3    doesn't require an epidemiological study, and they cite a case

4    called Rider v. Sandoz.  Whatever the merits of that may be, if

5    you had an individual mesothelioma case and you're trying to

6    say was a painter's mesothelioma caused by this asbestos

7    exposure, or in a pharmaceutical case did this person's --

8    using a differential diagnosis approach did some kind of

9    adverse event result from taking some drug?  The fact here is

10   that their opinions ultimately are grounded on Dr. Whitehouse's

11   work, and he is attempting to do epidemiology.

12          In his testimony at trial, I asked Mr. Molgaard, and

13   he agreed, that if someone is attempting to make predictions

14   about the future course of disease in a group of people,

15   they're attempting to do epidemiology, and if they are doing

16   that they should be held to epidemiological standards.

17          And there are three epidemiological standards that

18   Dr. Molgaard testified about.  One, you have to precisely

19   define your hypothesis.  Two, you don't mix diseases, which

20   means if you're going to say something about a particular type

21   of disease you don't look at people who have a different

22   disease and mix them all in and try to analyze the impact of

23   the disease you're interested in on a group of people.  And,

24   three, in order to make any kind of -- prove a causal

25   hypothesis you need to do it through controlled analytic

1 studies.

2          Your Honor will recall, I showed all the Libby

3 claimants' experts this chart, which is Plan Proponents'

4 Exhibit 600, and they all agreed that what we're talking about

5 here is pleural disease, so the hypothesis that they're trying

6 to prove is that pleural disease is different in Libby, and

7 that because of that all these supposed add ons to the TDP are

8 unfair and discriminate against Libby, and that therefore the

9 TDP doesn't satisfy 1123(a)(4).

10          In addition to all the problems that Mr. Bernick

11 identified with their analysis and their arguments, if the

12 hypothesis is about pleural disease, as Dr. Molgaard testified,

13 if you're going to talk about the risk of death from a disease,

14 it's important to distinguish between different types of

15 diseases.  And so, we -- I took him through a hypothetical

16 about smoking diseases, i.e., lung cancer versus emphysema, and

17 if your hypothesis is that bronchitis caused by smoking is more

18 likely to kill you than bronchitis caused by something else,

19 you've got to look at people with bronchitis and not mix them

20 in with people who have lung cancer.

21          Well, in all of the work that Dr. Whitehouse did, he

22 does the same thing.  He mixes into his population, whether

23 it's the 76 people in the CARD mortality study, or the 123

24 patients in the progression study, he mixes in people who have

25 asbestosis, which is a very different disease than pleural

1  disease.

2      Now, you may hear the Libby claimants argue that,

3  well, asbestos is the same disease as pleural disease, they're

4  not different diseases.  I suggest to you, Your Honor, you can

5  quickly dispose of that argument just by looking at Plan

6  Proponents' Exhibit 147, which is in Evidence.  If you recall,

7  that's the American Thoracic Society document which the experts

8  all agreed is important and authoritative for purposes of

9  making a diagnosis of a non-malignant disease.

10     The title of the document says non-malignant

11  diseases, plural, related to asbestos, and it very clearly

12  breaks out asbestosis and non-malignant pleural abnormalities.

13  And later in the document it has a whole long discussion of

14  asbestosis.  That's at Page 697 of that exhibit.  It then has a

15  long discussion of non-malignant pleural abnormalities

16  associated with asbestos.  That's at Page 702.  And it divides

17  them between pleural plaques, which is circumcised pleural

18  thickening, and then gets -- eventually gets to diffuse pleural

19  thickening, which is the disease that TDP Category 4B is trying

20  to capture.

21     So, it's pretty clear we're talking about different

22  and distinct diseases, yet what does Dr. Whitehouse and the

23  people that rely on him do?  What he -- in his mortality study

24  and in his progression study he mixes in the people with

25  asbestosis with people who have pleural disease.  And perhaps

1  the best example of this is -- this was marked as Libby

2  Claimants' Exhibit 10.  It never came into evidence of that.

3  It will be offered for demonstrative purposes as Plan

4  Proponents' 361.  I'm not -- we're not going to offer it for

5  substantive purposes, but this is a <u>Daubert</u> argument, and the

6  point I'm using to make with this is if you look -- if you

7  recall I asked Dr. Whitehouse what does the IF category mean?

8  He said that means interstitial fibrosis, which is people with

9  asbestosis.  And if you just look at this chart, over half of

10  these people have interstitial fibrosis, and the majority of

11  the people who have asbestosis, we're not talking 1/0.  There

12  are people on this chart who have 2/2's, 3/3's, 2/2's, 1/1's.

13  These are people with very severe, at least radiologically,

14  asbestosis.  So, basically what he's done, it's as if he mixed

15  a bunch of people who had lung cancer with a bunch of people

16  who had bronchitis, tried to see what happened to that group of

17  people, and then said, okay, the people with bronchitis are a

18  lot sicker because half of them died.  Well, a lot of them had

19  asbestosis.

20          Finally, the -- Mr. Bernick is absolutely right.  In

21  order to prove causal hypotheses, which is that there's

22  something different about pleural disease emanating from Libby

23  that would support their arguments about the problems with the

24  TDP, the add ons to the TDP, to make those kind of assertions

25  you've got to have controlled analytic epidemiological studies,

1  not descriptive studies.  And Dr. Molgaard was very clear when

2  we took his deposition back in June.  Mr. Bernick's partner

3  took him through all of Whitehouse's work.  I took him through

4  a series of questions, and it wasn't just one or two questions.

5  Mr. Bernick asked at trial what I call the most important

6  questions, which is that -- and this is on the September 10th

7  transcript, Page 98, "You acknowledge that you cannot offer an

8  opinion to a reasonable degree of certainty as an

9  epidemiologist that the pleural disease caused by exposure to

10 Libby asbestos is more severe in terms of loss of lung function

11 than pleural disease caused by other forms of asbestos outside

12 of Libby?  You acknowledge that, correct?"  "Answer:  Yes."

13 And he also admitted that pleural disease that he could not say

14 as a matter of epidemiological science that someone who has

15 pleural disease caused by exposure to Libby asbestos is more

16 likely to die than someone who has pleural disease caused by

17 some other asbestos.  He said that.

18           THE COURT:  I'm sorry.  Could you put that back up a

19 second, please?

20           MR. FINCH:  Sure.  It's Page 99 of the September 10th

21 transcript, and I believe that's in Your Honor's book, as well.

22 If not I can just hand it up.

23           THE COURT:  Can you show me the top part?

24           MR. FINCH:  Sure.

25           THE COURT:  I think I need the page before it.

1          MR. FINCH:  Okay.  It's Page 98 and 99.  Would you

2   like me to read it more slowly into the --

3          THE COURT:  I just wasn't sure what the first

4   question was.

5          MR. FINCH:  The first question was he admitted that

6   he could not offer an opinion to a reasonable degree of

7   certainty as an epidemiologist that the pleural disease caused

8   by exposure to Libby asbestos is more severe in terms of loss

9   of lung function than pleural disease caused by other forms of

10  asbestos outside of Libby.

11         THE COURT:  All right.  Thank you.

12         MR. FINCH:  I'm not sure if that's in your book.  May

13  I just hand this copy up to Your Honor?

14         THE COURT:  Yes.  That's fine.  Thank you.

15                        (Pause)

16         MR. FINCH:  Those were the two most important

17  questions, but it wasn't like those were just gotcha questions

18  in a deposition.  And I asked him, for about an hour, a whole

19  series of questions along those lines.  Isn't it true that you

20  couldn't prove as an epidemiologist, or you couldn't say as a

21  matter of -- to a reasonable degree of certainty as an

22  epidemiologist, that something about Libby "X."  And so, I

23  would just respectfully ask the Court to read Dr. Molgaard's

24  deposition testimony along these lines.  It's attached as an

25  exhibit to our Daubert papers, and begins at Page 157 of his

1  June 25th deposition, and carries over -- it goes on for about

2  30 or 40 pages, which is a fair amount of time.

3       Now, at trial, and before trial, Dr. Molgaard talked

4  about this EPA order as somehow creating eco-epidemiology that

5  he put in this middle category.  If you recall in his chart he

6  had this middle category.  The problem with that, Your Honor,

7  is as Your Honor quickly noted by looking at the document, the

8  EPA order, and all this material it cites, and Dr. Molgaard

9  admitted this, is that you -- "You would agree with me that the

10  EPA order that you talked about on direct, it's Libby

11  Claimants' 48, 49 and 50, there's nothing in this document that

12  says if you have pleural disease caused by exposure to asbestos

13  in and around Lincoln County, Montana, that you have a

14  probability of dying from the pleural disease, correct?"

15  "Answer:  Correct."  "There's nothing in the EPA order or any

16  of the literature it cites that says if you have pleural

17  disease caused by exposure to asbestos in or around Lincoln

18  County, Montana, you have a probability of dying?"  "I believe

19  that's true."  Finally, "And the only thing the EPA cites to in

20  all the references attached that has any information at all

21  about lung function test scores is Dr. Whitehouse's 123 patient

22  progression study, correct?"  "Answer:  Yes."  And as we know,

23  the 123 patient progression study is a descriptive study; you

24  can't use it to make projections about the future course of

25  disease in other people.

**J&J COURT TRANSCRIBERS, INC.**

1          I think that the timing of what's going on here is

2   kind of interesting.  In May, Dr. Molgaard serves up his first

3   report.  June 17th, the EPA order comes out.  At his deposition

4   on the 25th, Mr. Heberling gives Ms. Harding and myself notice

5   that -- "We're giving you notice of that."  That's -- he's

6   talking about some NIOSH documents he handed out.  "And also

7   notice that he," he referring to Dr. Molgaard, "may discuss the

8   public health emergency declared for Libby which again happened

9   since the date of his report."  So, all those admissions in the

10  deposition about how you can't use descriptive epidemiology to

11  prove the causal hypotheses that the Libby claimants' lawyers

12  at least are trying to put them through, and their doctors, all

13  those were in the face of Dr. Molgaard's -- presumably because

14  he was going to talk about it, or was prepared to talk about

15  it, he read the EPA order before he took his deposition.

16         So, the order comes out on June 17th.  He gets

17  deposed on June 25th.  And the deposition transcript becomes

18  available to people on June 30.  And lo and behold we get a

19  supplemental report where he tries to sort of walk away from

20  some of the admissions he made in his deposition.

21         I suggest to you the supplemental report had more to

22  do with the timing of when the deposition transcript became

23  available to Dr. Molgaard and his counsel than to anything in

24  the EPA order, and at bottom the EPA order cannot be used to

25  prove the assertions that Dr. Whitehouse and the other Libby

1 claimants' experts put them to it.

2          So, with all of that, Your Honor, there is absolutely

3 no reliable evidence that can support the Libby claimants'

4 contentions that there is something about Libby pleural disease

5 which makes the TDP add ons -- all of this hinges on these two

6 things.  There's nothing in the record, there's nothing that's

7 admissible, or should be admissible, that allows them to make

8 these assertions, and therefore you have to strike all this

9 testimony, as well.  Thank you, Your Honor

10          MR. PERNICONE:  Good morning, Your Honor.  Carl

11 Pernicone for Arrowwood Indemnity.  Arrowwood joined in the

12 plan proponents' motions to exclude the -- the <u>Daubert</u> motions

13 to exclude the Libby claimants' expert testimony, and we

14 restate and renew our support this morning for those motions

15 and ask that they be granted.

16          Your Honor may recall that Arrowwood filed a separate

17 in limine motion to exclude the Whitehouse testimony for

18 failure to comply with disclosure requirements, both the

19 mandatory requirements under the Federal Rules, and then Your

20 Honor's own CMO deadlines that were set forward in the CMO.

21 The record indicated that those violations were severe and that

22 they were pervasive in nature.

23          In its briefing Arrowwood cited extensive case

24 authority for the proposition that those types of violations

25 standing alone would support the exclusion of expert testimony.

1  In Arrowwood's view this violation provides a separate,

2  alternative independent basis for excluding the Whitehouse

3  testimony that's the subject of the plan proponents'

4  <u>Daubert</u> challenge.

5         So, to the extent that Your Honor grants the plan

6  proponents' <u>Daubert</u> motion with respect to the Whitehouse

7  testimony, we'd ask that you also include in your finding a

8  separate statement that the testimony would have excluded in

9  any event for failure to comply with the disclosure

10  requirements.  Thank you, Your Honor.

11         THE COURT:  All right.  Anyone else in support of the

12  <u>Daubert</u> motions first?  Mr. Guy?

13         MR. GUY:  Your Honor, for the FCR I'd like to

14  reserve.  I may not have any comments depending on what the

15  Libby claimants say, but I'd like to reserve.

16         THE COURT:  All right.

17         MR. GUY:  Thank you.

18         THE COURT:  Anyone else?  Why don't we take a ten-

19  minute recess and then we'll start with the responses?  Thank

20  you.

21                        (Recess)

22         THE CLERK:  All rise.

23         THE COURT:  Please be seated.  Mr. Heberling?

24         MR. HEBERLING:  Good morning, Your Honor.

25         THE COURT:  Good morning.

1          MR. HEBERLING:  I will begin by following up on some

2 comments of Mr. Lockwood yesterday.  Yes, there have been

3 settlement negotiations between the CC and Libby, and we

4 believe we're close to a settlement agreement.  We're working

5 on term sheet details, and I'll add that this has not been --

6 the term sheet has not been sent over to W.R. Grace at this

7 point.

8          THE COURT:  Is this as to all issues or some issues?

9          MR. HEBERLING:  All issues.

10          THE COURT:  Okay.

11          MR. HEBERLING:  The Daubert motion, and the motion in

12 limine generally relates, I think, to relevance.  The CARD

13 mortality study is in Evidence, the objections there are more

14 to relevance than to procedural matters.

15          As the Court will recall, as to the 59 percent

16 probability of death percentage generated by the CARD mortality

17 study, the Court decided that that was not relevant either to

18 the issue of discrimination, or to the issue of not

19 substantially similar under Combustion Engineering.

20          I'll further note that these are procedural -- the

21 Daubert motions are procedural attacks upon the CARD mortality

22 study and other opinions.  Grace, with all its resources in

23 this case, did no study to show that these people are dying of

24 something else, that pleural disease is not severe, that

25 there's not a probability of death.  In fact, Grace did not

1  perform a single physical examination upon a Libby claimant.

2  Instead, they're nibbling around the edges with procedural

3  motions.  And Mr. Bernick, at the outset, stated that he would

4  be focusing on pieces of evidence from the trial record, which

5  I think is the appropriate approach.

6         Our problem is that, of course, these pieces of the

7  trial record which he's citing are not in any of the briefing

8  pre-trial, and to some extent here we're arguing -- we will be

9  arguing over what is in the trial record.  And so, we would

10 like to have the opportunity to respond to some of the

11 transcript cites in the post-trial briefing.

12        I think the best thing for me to do is to simply go

13 through Mr. Bernick's demonstratives and point out some errors

14 in the argument.

15        First of all, we're looking at the initial framework

16 outline, and we have the issue of discrimination.  And under it

17 it says it's not studied.  Our view of the discrimination issue

18 is that what we needed to do was to show that people who have

19 severe disease in Libby are discriminated against, and that

20 they're excluded from the expedited review under Level 4B, and

21 to some extent under Level 3, as well.

22        We have shown that 86 percent of people who have died

23 of asbestos-related disease, non-malignant, are excluded.  We

24 believe that makes out a discrimination.

25        The other argument is that Libby is not substantially

J&J COURT TRANSCRIBERS, INC.

1   similar under <u>Combustion Engineering</u>.  And that is the area

2   where we go into the Libby is different arguments, which I'll

3   discuss in greater detail.

4         The second column says individual review, Libby not

5   studied.  We do not consider that we had to do a nationwide

6   study on pleural disease or asbestos disease, nor did we have

7   to do a nationwide study on how other people are treated under

8   individual review.  Our position on individual review follows

9   the <u>G-I Holdings</u> case, which held that the medical criteria are

10   a judicial function and they cannot be simply transferred,

11   packaged up and transferred to a private entity.  So, we do not

12   believe that individual review is an answer to the

13   discriminations for that reason.

14         Then, in fact, on expedited review Mr. Bernick noted

15   that the 76 are in Evidence and will be a subject of debate.

16         The TDP criteria, that's the third area that we go

17   into.  We have opinions on why the TDP criteria are

18   inappropriate in terms of normal diagnostic procedures and

19   medically not reasonable.  And that, of course, would apply to

20   any severe pleural anywhere.  That, again, is not a question of

21   Libby -- of us having to prove that Libby is different from

22   others in that way.  The discriminations in those regards are

23   against all severe pleurals.

24         Then the Libby is different arguments, that, as I've

25   mentioned, go to the not substantially similar argument.  The

1  major one is the probability of death, which we recognize that

2  the Court has refused evidence on.  That -- the probability of

3  death is what gives a probability of future medical expenses,

4  and therefore you get into a life care plan for each person who

5  appears asking for damages, and you get a whole different level

6  of damages than in a case where there is no probability of

7  death, where there is some symptomatic problem, some suffering,

8  some medical expenses, but no probability of death.

9       The probability of death, we believe, justifies Libby

10  being treated as a separate class because the levels of damages

11  are so much different.

12       THE COURT:  But why would the level of damage for

13  somebody who has that level of disease in Libby be any

14  different from the level of damage from somebody who has the

15  same disease not in Libby?

16       MR. HEBERLING:  Again, it applies to people with

17  probability of death inside and outside of Libby.

18       THE COURT:  Then why would Libby be in a separate

19  class?

20       MR. HEBERLING:  Well, I should say Libby and people

21  with a probability of death from asbestos-related pleural

22  disease.  So, yes.  It should be somewhat broader than just

23  Libby, as with all the other suggested arguments we make.

24       Okay.  Then, under the Libby is different argument we

25  have testimony from Dr. Frank that the differences are based

1    upon severity of pleural disease, the prognosis for pleural

2    disease, Libby being the number one county in the nation for

3    asbestosis, and asbestosis on death certificates includes both

4    pleural disease and interstitial disease, that Libby is the

5    number three mesothelioma rate in the United States, it's the

6    only area where the Public Health Emergency declared the 20

7    pure pleural deaths.  Dr. Frank talked about that has not been

8    -- that's unknown elsewhere.  He testified that there are only

9    four or five others reported in the literature for all the rest

10   of the United States.  And then, of course, Libby is also

11   different based upon a different kind of asbestos.  It's

12   winchite asbestos, not chrysotile or other amphiboles.

13          After the first page there are three pages of

14   citations to the record, and I mentioned that we would like to

15   respond to some of those, at least, through briefing.  And then

16   the second page that received attention was the expedited

17   review page, and it says the TDP captures clear cases of

18   disease.  The TDP does not so state.  It does not state a

19   specific purpose of that nature.  And we believe that the TDP

20   cannot simply capture a certain number of clear cases and then

21   transfer all the others to individual review.  In Libby's case

22   we have shown through the example of the CARD mortality study

23   that 86 percent of the people are simply transferred to

24   individual review for determination as to what category they

25   may be -- may be qualified for.

1          Dr. Frank testified that there is understanding that

2    there's no physician, no guidelines, there are no medical

3    criteria specific to individual review, no guidelines for the

4    trust to follow.  It's simply a discretionary decision, and we

5    do not think that's proper under the G-I Holdings case.

6          Then -- okay.  Then over under the Daubert issues

7    it's contended that there's no fit because these are not

8    current claims.  As was pointed out in argument at trial in

9    response to the Court's question, these people in the CARD

10   mortality study, the 76, will have wrongful death claims, and

11   -- actually, since many died after the date of bankruptcy they

12   would have survival claims, as well, so they are kind of

13   current claims.  I've discussed individual review and

14   discrimination.

15         So, then there was discussion of the 37 which were on

16   a chart Dr. Whitehouse testified to.  That chart was called

17   settled and non-settled cases.  There was a listing of settled

18   cases where we had Dr. Whitehouse simply mechanically go back

19   through the records, and based upon the lung function tests and

20   a few that are now dead who are measured in the CARD mortality

21   study, certain information in terms of lung function test

22   results and chest x-ray measurements were presented on this

23   sheet.  And then we did that also for, I think, 22 people who

24   are still alive.  This was not a study that's -- as they

25   pointed out, this is not an epidemiological study.  It's a

1  chart.   And Dr. Whitehouse testified as to -- as treating

2  physician for these people to what their lung function test

3  scores showed.   There's nothing more than that.   The chart will

4  be used, then, to compare settlement values in those who have

5  settled, what they got, and most of them were excluded from --

6  or, yes, will be excluded from Level 4B expedited review.

7        And then, as to the -- they can be compared to the

8  living individuals, the 22 on the list, as to their lung

9  functions, their chest x-ray measurements were available, and

10 not only as to their fate under the expedited review, but also

11 their settlement values.   So, that's going to be a matter for

12 briefing later.

13       There was mention that there's not current

14 information on these 37 people.   I'm not sure what that could

15 relate to as to the settled individuals.   It was proper to

16 include the information just before settlement, so that's what

17 Grace was looking at when it settled these cases.   And as to

18 the others the information is current.   So, the 37 people is

19 not really a Daubert issue.

20       The next sheet is opinions re: selection of TDP

21 criteria.   And again, we have the question of the criticisms

22 from Dr. Frank as to the medical criteria.   Whether they apply

23 inside and outside Libby, they certainly apply to all people

24 who are severe pleurals who face this gauntlet of requirements.

25 So, yes, Dr. Frank testified that the medical criteria are

1  unduly restrictive and are arbitrary in many ways.

2          As to the three millimeter minimum thickness

3  requirement, that's not a part of diagnostic requirements for

4  asbestos-related disease.  That's undisputed.  Dr. Welch agreed

5  with that as to the requirement that there be an extent of

6  pleural thickening greater than 25 percent.  Again, that's not

7  part of the diagnostic requirements.  That's undisputed.

8          Dr. Welch also agreed that the three millimeter and

9  25 percent extent requirements are not measures of severity of

10 asbestos disease, and so, as both Mr. Finch and Mr. Bernick

11 referred to them, yes, they're add ons.  They're add ons to the

12 basic medical criteria for diagnosis and evaluation of severity

13 of asbestos disease.  We think these add ons are improper and

14 the result is that each one in succession discriminates against

15 more and more people.

16         As to the blunting requirement, that is not a

17 requirement for a diagnosis of asbestos-related disease, and

18 Dr. Frank pointed out that as to blunting the ATS 2004 article

19 which Mr. Finch showed briefly does recognize the three forms

20 of blunting.  And I realize we're getting a little technical

21 here, but there were three forms, and -- excuse me -- the three

22 forms of diffuse pleural thickening, and the TDP only

23 recognized the kind with blunting.  And under the CARD

24 mortality study 43 percent of the people did not have blunting.

25 And so, just for that reason they would be excluded from 4B

62

1  expedited review.

2          And as to CT scans, that's another one of our

3  observations, Dr. Frank testified that it was not medically

4  reasonable to exclude the use of CT scans.  And we note that

5  for all the other levels, 2, 3 and 5, and 6, 7, 8, CT scans are

6  used, but not for Level 4.  So, that's a discrimination,

7  especially against pleural disease where it was undisputed

8  among the experts that chest x-rays miss 20 to 50 percent of

9  pleural disease.

10         And it's also undisputed that the measurements

11 necessary for the TDP can be made using CT scans.  You can

12 measure the thickness of the pleural thickening, you can

13 measure the extent of it, and you can determine whether or not

14 blunting is present.  So, CT scans can be used for all the same

15 purposes that the chest x-ray is, but they're excluded under

16 4B, which has the effect of excluding people, unreasonably,

17 from the level 4B on expedited review.

18         Then, over on the right hand side of the page there's

19 the argument that there's no fit, it does not address

20 discrimination.  This is a relevance argument.  This goes

21 directly to discrimination because this is how the

22 discrimination is done.  The medical criteria generate the

23 discrimination.  And then there's the objection that these are

24 not experts in compensation schemes.  Well, the issue here, and

25 the issue Dr. Welch testified to was that in her view the

1  medical criteria were medically reasonable.  And Dr. Frank has

2  testified that in his view the medical criteria are not

3  reasonable.  That is the issue.  It's not -- you don't have to

4  be an expert in compensation schemes.  In fact, I'm not sure

5  that that would be useful.  The real issue is whether the

6  medical criteria work, whether they're consistent with the

7  literature and clinical practice, and whether they're

8  reasonable.

9          So then, the next section was disease at Libby, and I

10  think we've covered most of that.  That fits into the not

11  substantially similar argument, and I've discussed the ways in

12  which Libby is different, and how that -- how those ways in

13  which Libby is different would generate higher level verdicts,

14  along with anybody else with a probability of death.

15          Then, finally, the last section is on epidemiology.

16  And Mr. Bernick began with again insisting that we had to do a

17  nationwide study to compare Libby to everybody else, a proper

18  epidemiological study nationwide which would cost in the

19  millions.  Our response is that, of course, we don't have to

20  show -- we don't have to do a nationwide study on pleural

21  disease to show discrimination or that Libby is not

22  substantially similar.

23          Dr. Frank testified that -- actually, on the

24  probability of death there was an offer of proof.  Dr. Frank

25  would have testified, and I placed it in the record, that there

1  is no cohort in the United States which shows a probability of

2  death other than Libby.  So, Libby is different from elsewhere

3  in that regard.

4       Getting to the epidemiology, there was a lot of talk

5  about causation, and basically the argument goes that the

6  studies on Libby are descriptive studies.  They generate

7  hypotheses.  They generate associations.  But a descriptive

8  study cannot test a hypothesis.  A descriptive study cannot be

9  used to prove causation, therefore they can't be used in Court.

10 And there's a trap here.  In the criminal case in Montana Mr.

11 Bernick made the same argument.  The District Court bought it

12 and got reversed by the Ninth Circuit.  So, I think it requires

13 some special consideration.

14       Okay.  Briefly, going back through the -- LC-273, the

15 overhead we used with Dr. Molgaard, first -- and we'll focus on

16 the descriptive side because the Libby studies, as listed at

17 the bottom, are descriptive.  They can establish an

18 association.  And an association was defined as a statistical

19 relationship between two events, like death by asbestos-related

20 disease, and presence or absence of blunting.  The 43 percent

21 who did not have blunting, that's an association between the

22 phenomena of blunting and the phenomena of dying by asbestos

23 disease.  So, these percentages that were developed in the CARD

24 mortality study are associations, and they may have a

25 comparison group.  They form evidence for causation, but they

1  do not prove causation.  In epidemiology to prove causation you

2  not only have to test it once, the CARD mortality is a single

3  test.  They've run a certain group who have died through

4  measurements and valuation, and they came up with 43 percent.

5  They can do the same study in ten years with more people and

6  see how that comes out.  That would be a second test.  That

7  would be a second association, if it's established.

8          In epidemiology, in order for proof there has to be

9  replication.  It has to be done at least twice, and preferably

10  more than that.  So, a descriptive study can create a

11  statistical inference which can be a generalization.

12          And we also heard from the other side -- we heard the

13  terms hypothesis and causation, and what Mr. Bernick is

14  suggesting is that we take the definitions of hypothesis and

15  causation and use them -- use the epidemiology definitions to

16  supplant the legal definitions, and then exclude our evidence

17  as not having met this higher bar.  So, under the law mere

18  hypothesis is something that is unsupported, speculation,

19  unsupported by data, and we've cited in our brief cases that so

20  indicate.

21          In epidemiology a hypothesis may include an

22  association not yet proven by replication.  Something that's

23  only been tested once remains -- it's an association, but it

24  remains a hypothesis until proven.  And, of course, you have

25  this much higher level of proof before something is proven in

1  epidemiology.  So, even though a hypothesis has been validated

2  by data, it remains a hypothesis in epidemiology.  And that use

3  of the term hypothesis should not be -- should not appear in a

4  legal conclusion because in the law a hypothesis tends to be

5  one that's unsupported by data and would be unacceptable under

6  <u>Daubert</u>.

7          Okay.  Then, on the causation side I've talked about

8  --

9          THE COURT:  Wait.  I'm confused by that argument, and

10 so I just want to make sure I understand.  The issue with

11 respect to the expert witnesses, none of whom for purposes of

12 these <u>Daubert</u> motions are lawyers, isn't that we're looking at

13 a legal hypothesis, we're looking at the hypothesis that the

14 science that they are expert in would either generate or prove,

15 so I should be looking at the epidemiological hypothesis, not

16 the legal one, because they're not -- we're not -- the issue

17 isn't whether or not they've proven a legal hypothesis, the

18 issue is whether or not the studies have either generated

19 and/or proven the medical, in the case, for example, of Dr.

20 Whitehouse, Dr. Frank, the medical criteria on which -- or the

21 medical hypothesis on which the data and the study have been

22 put together to base it.  So, I'm -- I don't understand what

23 you're arguing.

24         MR. HEBERLING:  I'll continue and try to explain.

25         THE COURT:  Okay.

1          MR. HEBERLING:  For the Court to find causation, one

2    factor you must -- an event or -- or agent must be a

3    substantial factor in causing something else.  That's the legal

4    standard.  And that's the standard the Court must finally use.

5    Experts only inform the Court as to what goes on in their

6    fields --

7          THE COURT:  Yes.

8          MR. HEBERLING:  -- and they apply their standards.

9    But --

10          THE COURT:  But that's because as a -- in looking at

11   the ultimate issue, which is whether or not the plan is

12   confirmable, the hypothesis is whether or not the elements of

13   the plan have been established, and if they are, then the legal

14   criteria support that.  But one method of determining whether

15   or not you get to that level is by looking at the expert

16   testimony.  When I'm evaluating the expert testimony or the

17   expert's qualifications under _Daubert_, I don't use the legal

18   standard, I use the standard of their science.  Don't I?

19          MR. HEBERLING:  In the evaluating what the experts

20   say, I would agree you look at what they do in their field.

21   But that doesn't direct the legal conclusion.  And this is

22   where Mr. Bernick's argument ran into trouble with the Ninth

23   Circuit.  The Ninth Circuit was looking at the Peipins study,

24   which was a study on Libby.  It was referred to a few times in

25   the trial.  It was a study based upon the screenings done by

1  the ATSDR in 2000 and 2001.  6,668 people were given chest x-

2  rays.  It was something like 61 percent of the population of

3  the Libby area.  And 18 percent came out with pleural

4  abnormalities.  That was not such a factor in this case.  It

5  was much more important for the criminal case, and Judge

6  Molloy, in Missoula in the criminal case, ruled that the study

7  could not go into Evidence and no opinion from an expert based

8  upon that study, or showing the meaning of it, could go into

9  Evidence either, and he was reversed on that.

10          The Ninth Circuit said that the fact that a study is

11  associational -- now, the Peipins study was not an analytic

12  study, it was a descriptive study, it was associational, rather

13  than an epidemiologic study intended to show causation, does

14  not bar it from being used to inform an expert's opinion about

15  the dangers of asbestos releases.

16          So, even though the Peipins study did not prove

17  causation, even though the Peipins study was not analytic, even

18  though it was only evidence of causation, even though it only

19  created an association, and of course hadn't been replicated,

20  it was nevertheless a proper subject for expert opinion on what

21  it meant.  So, that's --

22          THE COURT:  Well, okay, going on with this quote it

23  says it was published in a peer reviewed journal and relevant

24  to associations under Rule 702, and should be accorded weight.

25  But the issue here is apparently it was published in a peer

1 reviewed journal.  Where was Dr. Whitehouse's study published

2 or subject to any peer review?

3         MR. HEBERLING:  In the <u>American Journal of Industrial</u>

4 --

5         THE COURT:  The CARD mortality.

6         MR. HEBERLING:  That's the Whitehouse progression

7 study.  The CARD --

8         THE COURT:  No, I'm talking about the mortality.

9         MR. HEBERLING:  The CARD mortality study has not been

10 published as yet, so the question is whether it meets --

11 whether the methods used meet the standards required for

12 publication.  And Dr. --

13         THE COURT:  Well, no whether they're -- not required

14 for publication.

15         MR. HEBERLING:  Well, yeah.  Yeah, it doesn't have to

16 be published to be usable in court, obviously.

17         THE COURT:  That's right.

18         MR. HEBERLING:  Dr. Frank testified that the

19 procedures used were done with all the same rigor as used for

20 publication and, in fact, he testified that they do intend to

21 move toward publication.  So --

22         THE COURT:  When was the study done, I'm sorry?

23         MR. HEBERLING:  When.

24         THE COURT:  When.  I just don't remember.  I know

25 it's in evidence.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. HEBERLING:  In the fall of 2008 and the cut off

2    data, date for data was July of 2008 as to -- that was the

3    cutoff date for people who --

4           THE COURT:  For the CARD mortality study?

5           MR. HEBERLING:  Yes.

6           THE COURT:  Okay.  For people who --

7           MR. HEBERLING:  Who had been CARD patients and who

8    died.  So it only included people who died up to July 9th, I

9    think, 2008.  And Dr. Frank testified at great length about how

10   the subjects were selected and the procedures used and we went

11   through all of that.  And then there were three exhibits that

12   were admitted into evidence.  There was a summary of the

13   subjects, which is LC-8, which I think was referred to in the

14   earlier argument.  There was a big spreadsheet with all the

15   data.  And under Daubert it does say -- the cases say that the

16   expert's opinion should be evaluated based upon all the facts

17   in the record.  And I argued that out of an abundance of

18   caution I'd like to put all these facts in and the Court

19   allowed it in relative to the percentages developed ultimately.

20   And then there was a third exhibit which was a summary of the

21   death certificates which feed into the spreadsheet.  So that

22   was the CARD mortality study.

23          And getting back to the causation issue, again, the

24   CARD mortality study is associational and it's a descriptive

25   study as was the Peipins study.  And even though it can't be

1 used to show causation in an epidemiologic way through the

2 expert opinions the percentages developed are admissible as

3 expert opinion can inform the Court and the Court can make

4 determinations on substantial factor causation. So that's how

5 we get there and that's the trap. That's the flaw in what the

6 other side is urging in urging that epidemiologic standards be

7 used to control the legal result that the Ninth Circuit

8 determined was error.

9      Then I think there was -- it was somewhat unclear

10 what was being said about Dr. Molgaard's opinion. He said

11 without epidemiological doubt asbestos is causing disease in

12 Libby. That's well accepted. It's even been admitted in

13 briefing and in various documents by Grace here, so that was

14 what he was talking about. Without a doubt there is asbestos

15 causing disease in Libby.

16      And Mr. Finch's presentation went again to this

17 causation issue. He used the word predictions and a prediction

18 in epidemiology is again a different kind of thing that

19 requires an analytic study, as he pointed out. And a

20 prediction in epidemiology can't be -- the higher bar for that

21 can't be used to control the legal result as they're

22 suggesting. Mr. Finch said that we can't mix disease. Well,

23 we can't separate out the people by -- you know, they can't

24 take the part of the individual that has asbestosis

25 interstitial disease and the part that has pleural disease.

1  All the CARD mortality study 76 had pleural disease to one

2  degree or another.  Most of them also had some small amount of

3  interstitial disease.  So they had both and that's not a

4  problem.  The statistics and the percentages developed relate

5  to people who have pleural disease and whether or not they have

6  some degree of asbestosis, as well, does not disqualify them

7  from Level 4B.  They can have both and be in Level 4B.

8         And the American Thoracic Society 2004 diagnostic

9  criteria, which everybody relies upon, speaks of asbestos

10 related disease, ARD, and that's the designation used in the

11 patient files at the Libby Clinic -- or at the CARD Clinic and

12 Libby and at the -- on the first page of ATS 2004 it defines

13 asbestos disease as including asbestosis, pleural disease,

14 pleural thickening and several other entities.

15        So Mr. Finch pointed out with Exhibit 10, I think,

16 two examples of people with 2/2, which is severe asbestosis.

17 Of course, there are people with severe asbestosis in the

18 group, but they all have pleural disease.  And just because a

19 person has severe asbestosis doesn't mean that he can't be

20 analyzed under Category 4B.  So the mixing of disease issue is

21 a false issue.

22        And Mr. Finch also suggested that before there could

23 be a decision on causation or a prediction there must be a

24 controlled study.  And of course, controls are what are in the

25 analytic side of studies.  And we have shows and the Ninth

1  Circuit has agreed that associational studies may be used to

2  inform a court on a determination of legal causation.  And I

3  think that covers the ground.

4         THE COURT:  Well, okay, that's not what this quote

5  says though.  What it says is the fact that a study was

6  associational and didn't prove causation is something that an

7  expert can use in forming in this case an opinion about the

8  dangers of asbestos releases.  That's what it says.  It doesn't

9  say that it changes the standard or applies a legal standard

10 versus a medical standard.  It's simply saying that a study,

11 especially one that's been peer reviewed, even though it's

12 associational is something that an expert in the field could

13 use to inform his opinion.  So it doesn't -- at least this part

14 doesn't say that the study itself establishes causation.  It

15 says that an expert can consider that study in forming an

16 opinion and then the expert's opinion is what the Court should

17 determine the weight of, I think.  I haven't read the case, but

18 that's --

19        MR. HEBERLING:  Yes, that's exactly it.  The Court --

20 well, the study informs the expert and the expert informs the

21 court, the court decides whether something has been caused or

22 has -- is sufficiently connected to be included in a legal

23 conclusion, but --

24        THE COURT:  Okay.

25        MR. HEBERLING:   -- yes, I don't think we're in

**J&J COURT TRANSCRIBERS, INC.**

1  disagreement on that.

2           THE COURT:  All right.

3           MR. HEBERLING:  So with that I think I've covered the

4  ground.  Thank you.

5           THE COURT:  Anyone else in opposition to the pending

6  motions?  All right, Mr. Bernick.

7                     (Pause)

8           MR. BERNICK:  We tested out the propositions that

9  without the demonstratives, Dr. Martin wouldn't be able to talk

10 either, as you can't respond, so I could probably do with all

11 of those.  (Indiscernible) the court reporter --

12          THE COURT:  I don't think it's the microphone, Mr.

13 Bernick, I think it's the charts.

14          MR. BERNICK:  Yes, that's -- yeah, it's the charts.

15 Well, we'll test out that -- I've had judges that sometimes say

16 that you can't do that kind of thing, so -- infrequently, but

17 it hasn't been outcome determinative.

18          I want to begin with a couple basic propositions that

19 seem to me to be essentially issues of law and they're not even

20 really issues of law.  The law is very clear on these things.

21 And I just wanted to kind of get them a little bit out of the

22 way and -- I mean beginning with Daubert and then I want to

23 talk about the Bankruptcy Law.

24          Under Daubert, Mr. Heberling indicates that Daubert

25 really is a procedural matter, that we're fighting this battle

1  over procedure.  There's a (indiscernible) set of the Federal

2  Rules called the Rules of Civil Procedure.  <u>Daubert</u> comes out

3  of not the procedural rules, but the evidentiary rules.  This

4  is a rule of evidence, it's not a rule of procedure and it's a

5  consequence in the substantive, it's not a simply a question of

6  process.

7           Number two, he says that these matters really go to

8  relevance, that most of the arguments go to relevance.  Well,

9  it's true that the most critical argument does go to relevance

10 because if it doesn't bear on discrimination it doesn't --

11 there's no need to have it at all.  We don't have to get into

12 some of the intricacies of the science.

13          But, in fact, the FIT prong of <u>Daubert</u> is a relevance

14 test.  And the reason that's important is that together with

15 assessing how reliable the information is -- let me take a step

16 back.  Expert testimony has impact.  It's special.  You don't

17 have to have any personal knowledge.  You're being held out to

18 -- for your opinions as being authoritative.  And as a

19 consequence because it's so powerful you have to be particular

20 careful that, (a)it is what it purports to be, that is it's

21 reliable; and (b)it really is relevant, that is it speaks

22 precisely to an issue in the case.

23          So while relevance is a general requirement under the

24 Rules of Evidence it is important specifically with respect to

25 scientific or technical testimony or opinion testimony by

1  experts because there the dangers of having not completely

2  relevant information are so pronounced.  And that's why it

3  doesn't say relevance, which is kind of a broader standard in a

4  way, it's FIT.  There really has to be kind of a lock and key

5  connexity between the opinions that are being offered and the

6  issue in the case.  So relevance is extremely important.

7  Indeed, FIT really incorporates a particular brand of relevance

8  that is central to _Daubert_ and central to the threshold

9  question of whether expert opinions should come in.

10         The third misconception about _Daubert_ is that somehow

11  it's our burden to conduct studies to prove the negative.  We

12  have no burden to conduct studies to prove the negative.  It is

13  they who have the burden of proof.  They're making an objection

14  based upon discrimination, but now apparently also

15  classification, although I want to address that separately.  In

16  support of that objection they are seeking to admit evidence.

17  To satisfy _Daubert_ the burden of proof is theirs.  They have

18  the burden of proof under the law regarding admissibility;  and

19  therefore, whatever it is that we do or don't do insofar as our

20  own studies are concerned, does nothing to establish that

21  they've discharged their own burden of satisfying the

22  requirements under _Daubert_.  So number one, it's not

23  procedural, it's substantive;  two, FIT is of critical --

24  relevance is of critical importance under the FIT requirement;

25  and three, it is their burden to establish it.


**J&J COURT TRANSCRIBERS, INC.**

1            The second aspect when it comes just to threshold
2    legal matters that I want to highlight because it's a recurring
3    problem -- and then I'll get into some of the specifics and try
4    to move through them pretty quickly -- is the Bankruptcy Law.
5    We have a claim of discrimination and we have a claim of
6    improper classification.  Now, as I heard Mr. Heberling speak
7    he says our view of discrimination is that all people with
8    severe pleural disease are the subject of the discrimination.
9    Well, there is no such issue under the law.  The issue under
10   the law -- these are all people who if they are similarly
11   situated in that they've got severe pleural disease there can't
12   be discrimination with respect to them.  If he wants to have
13   them separated out both for classification purposes and he also
14   wants to say that they are the ones who are discriminated
15   against they can't be discriminated against.  They're all
16   similar, that's why he wants to classify them the same way, and
17   they're all treated the same way.

18           So as a matter of law he's got discrimination wrong.
19   Discrimination doesn't require identical treatment.  It
20   requires the same treatment of people who are similarly
21   situated.  If the people who are similarly situated are people
22   with severe pleural disease, there can't be discrimination as
23   between them.  If he then wants to say severe pleural disease
24   people are situated with other people with asbestos related
25   disease he still hasn't established that there is

1  discrimination because all people are treated the same way in

2  that they all go through a TDP, et cetera.  He hasn't shown

3  that the people who go through the severe pleural disease

4  filter that we have failed to segregate out clear cases in the

5  same fashion that we segregate out clear cases of mesothelioma.

6        But even if he wants to assert that it's not what his

7  experts say.  His experts didn't provide testimony that says

8  that somehow there is some standard for clear cases that's

9  known to the scientific literature and has not been -- has been

10  followed with respect to other diseases, but not with respect

11  to severe pleural disease.  They may say that the other

12  criteria were better, but there's no scientific methodology or

13  scientific standard of when somebody presents a clear case for

14  compensation purposes.  That's not the subject of their

15  testimony.

16        So we started out that the people of Libby were

17  different, that they were being singled out, that they were

18  being discriminated against.  We now have a new theory of

19  discrimination that says that discrimination is with respect to

20  people with severe pleural disease.  That is insufficient as a

21  matter of law, but we now know that the concession that as a

22  matter of fact they have not shown discrimination of Libby

23  versus non Libby.

24        So the state of the record today is that they

25  recognize that they haven't borne their burden of proof

factually to show discrimination of Libby versus non Libby.
They're now coming up with a new legal theory that, (a) we
think is deficient; and (b) they haven't proven up through
expert testimony that there's some scientific differentiation
between the treatment of clear cases for severe pleural
diseases between -- as opposed to severe cases of severe
asbestosis or --- which I guess would be probably the closest
-- but there's no such testimony.

        The second problem is classification.  What the
classification theory now is again, it's not that the Libby
people should be treated differently, which is the whole reason
they said we want our own vote so that we can vote this plan
down.  So now apparently he's saying we should have a vote for
everybody with severe pleural disease.  And so presumably we
should have a vote for everybody with mesothelioma and have a
vote for everybody with asbestosis and a vote for everybody
with non malignant other and then -- we have nine votes
depending upon what your disease is.  That again is a very new
theory in this case.  It's also a theory that enjoys no support
under the Bankruptcy Law.

        Classification for voting purposes required that we
tease out stripes and varieties of different kinds of disease,
(a) we'd never be able to figure out ow to do the
classification; (b) we'd never figure out how to apply the
classification for voting purposes.  The classification

1 requirement is a much more flexible requirement. This case is

2 no different from other cases that have been -- that have

3 pursued the classification scheme that we have here today. And

4 it's particularly well suited because you're talking about a

5 trust, a trust that's going to serve the purpose of providing

6 for processing and compensation of the entire class of people

7 who are personal injury claimants. So, 524(g) also underscores

8 the necessity of the classification scheme that we've

9 introduced with respect to people who are personal injury

10 claimants. So beyond the issues of what is in the record there

11 are fundamental misapprehensions of the law of discrimination

12 and the law of classification to go along with the fundamental

13 misapprehensions of the law of <u>Daubert</u> and the Rules of

14 Evidence.

15         Let me go through just the charts very quickly and I

16 want to spend a little bit of time on the last one because I

17 think that probably got the most discussion and it also drew

18 some questions from the Court. But I appreciate that Mr.

19 Heberling went through the charts because at least we can have

20 a common basis for keeping track of what's been said. First on

21 discrimination -- this is 516-1 -- first column, we said not

22 studied. He said, well, but we have a different theory of

23 discrimination. Maybe their theory is right or wrong under the

24 law, we think it's wrong. But there's no dispute on the facts

25 that they have no evidence that's purported to compare the

1  treatment of severe pleural disease in Libby versus outside of

2  Libby.  There's no issue of fact.  And because there's no issue

3  of fact with regard to that we know that really in a sense

4  everything else on the chart probably doesn't make a difference

5  because it doesn't serve to establish the fact that -- actually

6  a factual dispute about the matter actually at issue, which is

7  discrimination.

8          There's no dispute that they did not study individual

9  review.  They didn't feel apparently that it was their burden.

10 We don't necessarily agree with that, but there's no dispute

11 that it wasn't studied.  Going to the column on 516-1 called

12 the effect on expedited review, that is the effect of category

13 4B on expedited review, Mr. Heberling briefly adverted to the

14 fact that yes, it's true there was evidence about the past

15 rates or how the criteria would apply to the 76 and how they'd

16 apply to the 37.  He said they're in evidence and he says, well

17 there is a debate and that was his only answer to the question

18 of whether it passed the Daubert standard.

19         I'm sorry, the fact that there is a debate doesn't

20 mean that you -- it's not suitable for determination under

21 Daubert.  If there is a debate on admissible evidence that's a

22 matter then that's decided by the Court based upon the weight

23 of the evidence in connection with Your Honor's fact-finding

24 responsibilities.  The whole issue here is admissibility.  So

25 the fact that there is a debate doesn't really bear upon

1  admissibility.  Admissibility is a threshold issue that's

2  resolved before you get to the question of whether there is a

3  debate, so then again, just a misapprehension of the law.

4          With respect to the selection of the TDP criteria he

5  again said -- the only thing he really said here was -- this is

6  on the first chart -- discrimination is against all severe

7  pleurals, they're banned as to all severe pleurals, and again

8  that clarified that we're not talking about Libby versus the

9  world any more.  And then finally when it got to the last

10  column it became clear that the theory that we're talking

11  about, discrimination against pleurals, both as their theory of

12  discrimination and their theory of classification

13  -- misclassification, and I've already commented on both the

14  novelty and impropriety of both of those contentions.

15          Turning to 516-5, which is the chart dealing with the

16  impact of Category 4B on expedited review, it became another

17  clarification was made that Mr. Heberling said in respect of

18  the admission, Dr. Whitehouse that's not simply our contention,

19  Dr. Whitehouse admitted that the TDP captures clear cases of

20  disease inside and outside of Libby.  That was his admission.

21  And, in fact, it's really an endorsement of the idea that the

22  TDP is nondiscriminatory.  And the only response that Mr.

23  Heberling made was, oh, that's not the problem.  The problem is

24  that too many people are excluded, perhaps outside of Libby as

25  well as inside of Libby, that is, they shouldn't have to go to

1  individual review.  Number one -- well I've already dealt with

2  the question about whether that is discrimination.  But as a

3  factual matter what standard establishes that too many people

4  have to go to individual review.  That's not a scientific

5  standard.  That's not a defense of <u>Daubert</u> that challenges with

6  respect to scientific testimony.  So I think that that is

7  really totally apart from the point here where we're dealing

8  with scientific issues and reliability issues.

9       There was some commentary on the 76.  Again, the 76

10  are not the function of any scientific methodology.  Again, the

11  effort to show that they were, that they were represented

12  failed.  And when it comes to the 37 he says -- Mr. Heberling

13  says, this is not a <u>Daubert</u> issue.  This is (LC-16A).  It's not

14  a <u>Daubert</u> issue.  It's a chart.  It's just chart.  We're going

15  to use this to support our contentions regarding settlement.

16  Well, just a chart used to support our contentions regarding

17  settlement does nothing to say that that chart should come in

18  through an expert and should be endorsed by the expert much

19  less used as to establish a foundation for expert opinions

20  regarding the past rate.

21       If Mr. Heberling wanted to use the chart and do up

22  his own little calculations and say this shows that out of

23  these 37 people not enough people are going to get expedited --

24  going to get benefits on expedited review he can make that as a

25  argument if there were a factual foundation to get the chart

1   in.  I don't think there was, but that's not what we're talking

2   about here anyway.  We're talking about the opinions that were

3   rendered using that chart.  That's the problem, it's the expert

4   opinions that need to come out.  That is most definitely a

5   Daubert issue and we now know that on this score too there is

6   not, in fact, an issue about whether it's a scientific chart or

7   study.  It's not.  That's now been conceded by Mr. Heberling.

8        On 516-6 when it came to criticisms of the TDP

9   criteria again it became clear that he's talking about

10  criticisms that apply both in and out of Libby.  He then said

11  well, gee, the evidence from Dr. Welch is that three

12  millimeters and 25 percent of the chest wall requirements are

13  not diagnostic requirement.  Again, that is not the issue, not

14  the issue.  The issue is whether based upon the scientific

15  literature that these criteria will seek out people who are

16  clear cases of (a)sever pleural disease, but (b)caused by

17  exposure to asbestos.  There are other causes of severe pleural

18  disease.  And it has to be severe to the point that it is

19  clear, not just that it can be argued, but that it's clear.

20       So what is it that Dr. Welch did -- and this is

21  apropos of Mr. Heberling's comments regarding Dr. Welch's

22  testimony that she wasn't an expert in compensation and that

23  she, herself, had expressed an issue about the reasonableness

24  and the criteria.  Mr. Heberling has missed the point and it

25  was explicit in Dr. Welch's testimony.  Dr. Welch didn't say I

1  am going to list or I have put in or we have put in Category

2  4B, the accepted diagnostic criteria for clinical severe

3  pleural disease.  That was not her testimony.  She's not there

4  to say, oh, this is how everybody should in fact do the

5  diagnosis.  Her testimony was that in developing criteria for

6  expedited review and benefits that the goal was to pick out

7  people who were clear cases.

8        She then went to the scientific literature to say

9  what tests are available in the scientific literature that tell

10  us that this is how we can pick out people who in fact satisfy

11  that basic goal, which are, compensation goal, that is clear

12  severe cases due to asbestos.  And she went to a variety of

13  places and they're all well -- they're all authoritative

14  places.  The ILO has the three millimeters requirement.  The

15  ILO also has the 25 percent chest wall.  It is a requirement --

16  not a requirements, but it is an indication that if you are

17  talking about people with a severe condition that is an

18  indication of a severe condition.

19        So they're not diagnostic requirements, never

20  purported to be diagnostic requirements, were never held up by

21  Dr. Welch to be diagnostic requirements.  And to the extent

22  that all of his experts used the same language and addressed

23  the same issues that Mr. Heberling has addressed they all miss

24  the mark.  These are criticisms that are not germane when

25  you're talking about a TPD.

1          I want to go them to the end and talk about

2    epidemiology because again epidemiology really is the heart

3    blood of whatever it is that they're going to be able to say

4    about anything concerning Libby.  Libby is a group issue.

5    Severe pleural disease is a group issue.  Even if they wanted

6    to recharacterize their world and say forget about Libby versus

7    non-Libby, let's just talk about folks with severe pleural

8    disease everywhere, that's still a matter of epidemiology.  So

9    they either have the epidemiology that they're using to support

10   to give their opinions or they do not.  And if they do not

11   given the discipline -- put it this way, the discipline -- this

12   case has an issue.  The issue is inherently a group issue.

13   Whether it's discrimination or classification it's group,

14   group, group and it all deals with disease.  That means that of

15   necessity if you're looking to science epidemiology is front

16   and center.  It's the only way in this context that you can get

17   there.

18          So Dr. Molgaard is not simply an option.  Dr.

19   Molgaard's testimony was a sine qua non of being able to

20   express any kind of view with respect to the issues that they

21   want to address.  All group issues as a matter of law,  they

22   want to address them scientifically, they got to have

23   epidemiology, absolute bedrock principle.  So Molgaard, they

24   rise or fall with respect to all of this information that

25   they're talking about in all these theories.

1          So we get to this last point about what it is that

2   Dr. Molgaard did and what it is that he did not do and then

3   they interface with rules about <u>Daubert</u>, which again I think

4   are misapprehended by Mr. Heberling.  First of all, let's deal

5   with the issue.  We know that the issue is groups, disease and

6   groups.  We have in connection with that issue -- I have my

7   little cheat sheet here -- we have -- we know that because of

8   that the relevant science is EPI.  So we have Dr. Molgaard, and

9   Dr. Molgaard is going to express an opinion and in doing so

10  he's going to use a method.  The method we know he's going to

11  invoke is epidemiology.  That's not disputed.

12          What's the opinions he has to offer?  Well, the

13  opinion that he has to offer had three different things that

14  are -- basically the best way to capture it -- (1)is he

15  expressed the opinion where he recognized that Whitehouse in

16  the CARD study was expressing causal opinions.  That was a

17  clear admission that we obtained in the course of cross

18  examination of Dr. Molgaard.  This is at Page 94, this is all

19  in your book, Line 15.

20  "Q   And, in fact, Dr. Whitehouse when he's offered opinions in

21  his report doesn't stay away from causal relationships, he

22  addresses causal relationship, right?

23  "A   Yes.

24  "Q   Even though all the studies are descriptive, right?

25  "A   Yes.

**J&J COURT TRANSCRIBERS, INC.**

1  "Q   So we know from Dr. Molgaard that Dr. Whitehouse, in fact,

2  believes that" -- Dr. Whitehouse is expressing causal -- here's

3  another one --"Dr. Whitehouse's own reports, Page 96" -- "Dr.

4  Whitehouse's own opinions which he reviewed in the context of

5  his reports, those opinions get into causation.  It says

6  pleural disease from exposure to Libby asbestos, is that a

7  causal statement in Dr. Whitehouse's report?"  And he says, "It

8  would seem to be."  And I say, "It's not only would it seem to

9  be, it is, is it not?"  And he says, "I guess."

10        So it's quite clear that Dr. Molgaard is recognizing

11 that Whitehouse, in doing this CARD study and expressing views,

12 is expressing views regarding causation.  There's no question

13 that Dr. Molgaard also is saying that the CARD mortality study

14 is sound EPI, that is that he's now applying his method to say

15 CARD is sound epidemiology.  And then it is also clear from Dr.

16 Molgaard's own report -- remember I asked him, this is how we

17 got into the whole discussion about causation.  I said, "Isn't

18 it true that you've expressed the opinion that the etiological

19 impact of asbestos exposure in Lincoln County, Montana is

20 without epidemiological doubt?"  And etiological means causal

21 and epidemiological doubt is epidemiological doubt.

22        What is it that he's referring to.  He's referring

23 not simply to the narrow issue of whether asbestos caused

24 disease in Libby, it is all of the different features of how

25 that disease was caused that people have studied, including Dr.

1  Whitehouse.  Indeed, he supports -- he recites -- he makes this

2  statement in support of the idea, the testimony, that the CARD

3  study was sound epidemiology.  So we have Dr. Molgaard

4  expressing views about causality, not causality in the narrow

5  sense that Mr. Heberling indicated, but broadly, causality at

6  Libby.  So the opinions are opinions dealing with epidemiology

7  and they are causal opinions.  So we have the opinion and the

8  method.  The opinions are causal and epidemiology is the method

9  of choice.

10         So now what is this that the record reveals actually

11  occurred.  What the record reveals actually occurred is that we

12  had Dr. Molgaard.  In order to support these -- in order to

13  make these opinions, he basically used a methodology that was

14  predicated upon public health.  He recognized that the

15  descriptive studies could not test a hypothesis, could not

16  produce, could not establish causation, that the only way that

17  he could get there to causation without doubt was, as I recited

18  in -- and I pointed out in initial remarks -- was through

19  public health.  So he had a public health approach that enabled

20  him to be able to say all that he did about epidemiology all of

21  what he did about epidemiology, even though the epidemiology

22  was all descriptive.  And because it was all descriptive it

23  could not be anything other than hypothesis generated.

24         And why do we know that.  Well, Mr. Heberling's own

25  chart indicates what Last's textbook on epidemiology says,

1 which is that descriptive epidemiology can only give you a

2 hypothesis, only give you a hypothesis.  So Dr. Molgaard took a

3 public health approach in order to assert, basically say that

4 while all the epidemiology under epidemiological standards was

5 only a hypothesis, he was able to assert without doubt, it had

6 already been established.  But he says absolutely and

7 completely in conflict.  Same discipline is supposed to be

8 used, but while the epidemiology that he's attempting to

9 support is causal, and while he recognizes that that is so

10 through Dr. Whitehouse and through Mr. -- the CARD mortality

11 study, and while all of those studies clearly are descriptive,

12 he is able to say something far greater, something far more

13 potent, and why, because he is applying a different test that

14 is his own test.

15        Now, that all is absolutely clear on the record.  How

16 then does the law interface with this.  And the answer is, the

17 law is quite clear.  Your Honor has indicated it quite clearly,

18 as well.  The opinion and the method are set out here.

19 Opinions and methods are the subject of Rule 702.  Rule 702

20 deals with the conditions under which somebody can do, but Dr.

21 Molgaard did, is to offer an opinion and use the methodology.

22        702 is a requirement for admission, and 702 adopts

23 under _Daubert_ scientific practice.  That's what it does.  It

24 doesn't say, oh, we're now going to tell doctors and scientists

25 to apply legal standards for causation.  Says, no, no, no.  If

you want to get the evidence in to speak to an issue of legal

causation, if you want to get the evidence in, you have to

follow the science.  So if you want to make -- if you want to

express a conclusion about cause that will then be tested under

a substantive legal standard you must follow the science.

        That's the whole idea is that <u>Daubert</u> deals with a

threshold for admission based upon science.  It is only when it

becomes admissible that you then consider the legal standard.

So when Mr. Heberling says oh well, gee, the law is different

somehow from the science because the law says substantial

factor for causation, but epidemiology requires more, he's got

it completely and utterly backwards.  You can't get the

testimony in to speak to substantial factor unless that

testimony passes scientific muster.  And if the nature of the

testimony is causal, whatever the legal standard might be for

cause, if the testimony is causal it has to meet scientific

standards for causation.  Then it comes in and can be

considered in terms of whether it meets whatever substantive

factor -- whatever state or federal law factor or test would

govern the weighing of that evidence.

        Now, 702 is different from 703.  703 talks about the

basis -- not the basis, but what can be relied upon.  And this

again is a fundamental confusion I think that we have here and

that hasn't been properly put before the Court in the Grace

case.  As Your Honor well appreciated, there are two different

1  issues, there are two different rules.  702 deals with the

2  requirements for offering the opinion.  It's got to be based

3  upon a reliable method, et cetera, et cetera, et cetera.  We've

4  talked all about that.  This takes you into the world of

5  epidemiology in its pure form, unadulterated requirements for

6  epidemiology.  No legal gloss, no nothing.  It is straight

7  science.  However, in offering that opinion under 702 based

8  upon a method under 702 the expert can also rely upon and refer

9  to other material -- that's 703 -- other material which does

10 not itself come into evidence, except within the specific

11 conditions that are outlined in Rule 703.  There's an

12 optionality for it to come into evidence if its admission is --

13 (a) if it's admissible independently, that is it comes in under

14 some other rule -- if it's not admissible independently it can

15 still come in under 703, but you have to then consider the

16 prejudice that would be associated with that, that is it's

17 unduly prejudicial under the Rules of Evidence.

18      So 703 gives us the opportunity to do what we've done

19 repeatedly in court, which is have a witness testify, offer

20 scientific opinions based upon scientific methodology and make

21 reference to a lot of materials that don't actually come into

22 evidence.  And the test for being able to do that is not a test

23 for admissibility, it's a test of whether the information or

24 material is of the kind that is considered to be sufficiently

25 reliable by people in the discipline as to -- or from which the

1  expert comes.

2          So 703 is material that can be considered.  It has a

3  looser test in a sense that it doesn't have to be independently

4  admissible.  It still has a scientific test in that it has to

5  be the kind of information that people from the field of

6  expertise often find to be reliable.  These are two very, very

7  different things.

8          Now again, we don't get to 703 in this case because

9  they can't meet 702.  The only way they can meet 702 is by

10  performing public health epidemiology, which is not the

11  standard of science that applies to epidemiology.  It is

12  completely contrary to Last, it's completely contrary to what

13  the witness recognized would be applicable here.  But when you

14  get to 703 you're still not talking about the admission of the

15  information.  So when you would get back to what now has come

16  in to support what the expert is using here we get back to the

17  CARD study and the progression study and Dr. Moolgavkar's

18  statement, and I'll separate that out.

19          Dr. Molgaard relied upon the CARD study and he relied

20  upon the progression study.  The CARD study is not in evidence.

21  It did not come into evidence.  There was discussion of parts

22  of it, but it didn't come into evidence.  In fact the study was

23  barred because it was based upon information that was not

24  available to all parties.  So the CARD study need not come into

25  evidence to -- even to support Dr. Molgaard's view, shouldn't

1  come into evidence because it has its own problems itself, it's

2  based on information that's not available and also because Dr.

3  Molgaard's testimony is not admissible under the threshold

4  question of 702, so we never even reach the 703 issue.  Same

5  thing is true of the progression study.  The progression study

6  to support the opinion that it's sound epidemiology need not

7  come in for that purpose and should not come in for that

8  purpose.  Again, this is just basic Rule 702, 703.

9          In the Grace case -- the Ninth Circuit's opinion

10  before trial in the Grace case occasioned very extensive

11  briefing and discussion by Judge Malloy on remand.  It is a

12  very, very difficult opinion to understand because it deals

13  with this interaction between 702 and 703 in a very complex

14  context, but it does not have anything to do with what we have

15  in this particular case.  In this particular case we have Dr.

16  Moolgavkar -- Dr. Molgaard and Dr. Molgaard didn't even appear

17  in the Montana case.  There was no testimony in the Montana

18  case by Dr. Molgaard or anybody else that purported to

19  establish causation by virtue of pure public health policy.

20  That was not at issue at all in connection with the Ninth

21  Circuit's opinion.

22          So the Ninth Circuit's opinion doesn't have anything

23  to do with Dr, Molgaard, it doesn't have anything to do with

24  Dr. Molgaard's use of public health policy to trump

25  epidemiology.  It had to do with the very specific question of

1  whether the Peipins Study could provide a 703 basis for a 702

2  opinion.  And it basically said, even though it's not coming in

3  itself and -- I'm hesitant to speak about the Ninth Circuit's

4  opinion because you got to be really, really careful -- but

5  from memory here today it says, the case is remanded.  It was

6  remanded back to Judge Malloy to redo his analysis and figure

7  out what, in fact, could be used as a 703 basis for the

8  opinions that were being offered and then determine whether

9  those opinions pass <u>Daubert</u>.  That's what happened in the Grace

10  case.  And with that I will sit down.

11       MR. FINCH:  Nathan Finch for the Asbestos Claimants

12  Committee.  Your Honor, I'm going to address three things and I

13  think I can do it in less than ten minutes.  Picking up where

14  Mr. Bernick left off on the Grace -- the three things are the

15  G1 Holdings case that Mr. Heberling referred to, the comment

16  about the future medical expenses being somewhat different for

17  Libby and then finally, his response to my comments about you

18  have to separate out what disease you're talking about if

19  you're going to use any of this work to make statements about

20  whether the TDP criteria are somehow discriminatory or unfair.

21       Mr. Lockwood and I were sitting over there trying --

22  racking our brains about when exactly Mr. Heberling was talking

23  about G1 Holdings because both of us were involved in the G1

24  Holdings case, which is an asbestos bankruptcy in the District

25  of New Jersey.  And there is nothing that happened in that case

1  that is remotely like what's going on here.  I think what he's

2  talking about and I guess we'll see when we get their

3  post-trial briefing when they cite to the case because you

4  couldn't find it in their pre-trial brief -- I think what he's

5  talking about is an attempt by the debtor over the objections

6  of the asbestos creditors' constituency to create a 706 panel

7  that would disallow claims based on certain medical criteria

8  that the debtor would provide.

9       That's a far cry from in the context of a plan where

10  a properly constituted class has voted in favor of the plan by

11  the 75 percent requirements to meet the 524(g) where you would

12  have a channeling of the claims to a trust, the trust has a

13  series of ways to -- for claimants to be compensated, either by

14  settlement or if they ultimately disagree with the trust, by

15  getting to a jury in the State of Montana.  It's just

16  completely inapplicable, not relevant here.  I guess we will

17  deal with it in our post-trial briefing if they cite it, but

18  you should not be misguided by his citation to that case.

19       The second thing that Mr. Heberling talked about that

20  I want to address -- and Mr. Bernick addressed it in large part

21  -- but he made a comment something to the effect that Libby

22  claimants are different because they have the right to get

23  future medical expenses because of this probability of death.

24  I haven't done a 50 state survey, but I've got news for Mr.

25  Heberling.  You don't need a probability of death to get future

1 medical expenses almost anywhere that I've ever done -- tried a

2 tort case.  I did a lot of tort cases in Virginia and West

3 Virginia and the District of Columbia and Maryland when I was a

4 younger lawyer and you don't have to prove a probability of

5 death to get future medical expenses.  You have to prove a

6 probability of having -- that you will incur the future medical

7 expenses.

8         So if you, for example, break your foot and if the

9 doctor testifies it's going to cost X, Y, Z to fix it in the

10 future you get the expenses.  Similarly in an asbestosis case

11 even though you may not have a probability of dying if a doctor

12 comes in and testifies in an asbestosis case it would be my

13 recommendation that every two years you get screened and you

14 have to take certain drugs to make sure you don't get -- you

15 know, if you get a respiratory infection you have to treat it

16 more quickly and that's going to cost a thousand dollars a year

17 the rest of your life you get those expenses, and there's

18 nothing to do with the probability of death.

19         On the broader point about classification, as we have

20 belabored many times until I'm sick of it and maybe Your Honor

21 is too -- but the point is distinctions between and among the

22 strength of cases against a debtor are no basis -- are not a

23 proper basis for separate classification.  Once you start going

24 down that path there's no end to it.  The question is, what is

25 a legal relationship, what's the rights against the debtor.  If

1  it relates to asbestos it's properly classified.  You can't

2  draw distinctions between -- you don't have to draw

3  distinctions for classification purposes between settled

4  asbestos claimants on the one hand where there's no dispute as

5  to liability and no dispute as to value, and unsettled asbestos

6  cases.  That issue has been litigated in various courts, maybe

7  even in front of this Court, and it's very clear that there's

8  no basis for separate classification because Libby disease is

9  somehow arguably different.

10          Finally, Mr. Heberling made a lot of comments about

11  well, they couldn't separate out the people who had asbestosis

12  from pleural disease in their CARD mortality study because the

13  people have both diseases.  But remember -- and again, what

14  we're talking about is pleural disease.  All the doctors for

15  the Libby claimants said there's nothing different about

16  asbestosis.  There's no proof.  It's just -- I think Dr. Frank

17  maybe changed the word nothing to no basis.  He had no basis to

18  say there's anything different about asbestosis.

19          So then they go to the CARD mortality study, 76

20  deaths non-malignant AR disease.  Well, what disease are they

21  talking about.  Mr. Heberling said I showed two cases of people

22  in the mortality study, the 76 people, that had asbestosis.  In

23  fact, Your Honor -- and I'd like to hand this up if I may.

24  This is -- it started out as Libby Claimants' 10.  I used it

25  with Dr. Whitehouse when I was cross examining him, and that's

1  the -- the little red stars are the two cases that I showed him

2  because they were in the chart of the settled people and one of

3  those people had 2/2 -- two of those people had 2/2 asbestosis

4  and a third one died of mesothelioma -- to show that chart is

5  completely irrelevant to what they were trying to use it to

6  prove.   But if you look at the interstitial fibrosis category

7  -- and these are chest x-ray readings done by Dr. Whitehouse --

8  over half of the people -- over half of the 76 people are 1/1

9  or higher, 14 are 2/1 or higher, which means Dr. -- in Dr.

10  Whitehouse's view there's no dispute that over half of these

11  people have asbestosis.

12        And so if you're trying to get to a -- to make a

13  statement about the severe disabling pleural disease, Category

14  4B, you got to look at the people that have pleural disease,

15  not the people who have pleural disease and something else.

16  Just as I mentioned an hour-and-a-half ago, that would be like

17  saying we're focusing on bronchitis from smoking, but we're

18  going to look at the people who died of lung cancer, too, and

19  analyze that.   You can't do that.   You got to separate out the

20  disease.

21        As to Mr. Heberling's argument that the 2004 ATS

22  statement treats all the non-malignant diseases as one disease,

23  I guess I'm reminded of the old line, who are you going to

24  believe, me or your lying eyes.   I mean, I would just urge the

25  Court to look at the document.   And I don't think you can get

**J&J COURT TRANSCRIBERS, INC.**

1  any clearer than the statement on Page 697 where the authors of

2  the American Thoracic Society statement says that asbestosis

3  specifically refers to interstitial fibrosis caused by the

4  deposition of asbestos fibers in the lung.  It does not refer

5  to visceral pleural fibrosis, the sub-pleural extensions of

6  fibrosis into the interlobular septae or lesions of the

7  membranes' bronchials.  I don't know how you can draw a clearer

8  distinction between different diseases than those two

9  sentences.  And the whole document as a whole is clear that

10 they were talking about different diseases.

11          Finally, when Dr. Frank was actually confronted by

12 Mr. Bernick about the people who have the clear cases of

13 pleural disease, what if any discrimination does the Category

14 4B show for them.  I'll read this testimony because I think it

15 just -- it destroys their entire argument and shows why what

16 they're doing just completely fails to meet the evidentiary

17 standards of <u>Daubert</u>.

18 "Q   So these people, you start with the 37, that's the 37 out

19 of the 76 who have some evidence of pleural disease.  That's

20 moderate or extensive pleural disease.  You want to get to the

21 pure pleural disease, right?

22 "A   Right.

23          "Dr. Frank.

24 "Q   So you eliminate the people who have evidence of an ILO of

25 1/0 or greater, correct?

1  "A    Yes."

2  And then the next page, this is Page 265 from the September

3  10th, 2009 transcript.

4  "Q    And you end up for the pure pleurals of approximately 20

5  people, correct?

6  "A    Yes."

7  Then -- and this is key --

8  "Q    How many people within the 20 people who had pure pleural

9  disease of moderate or extensive nature failed, would have

10 failed to pass -- in your view would have failed to pass the

11 medical criteria for Section 4B of the TDP?  How many would

12 have failed to pass?

13             "Eighty-six percent of the group.

14             "And no, I'm not talking about the 20 -- I'm talking

15 about the 20 I'm not talking about the entire group.

16             "I don't know."

17             So we don't have any evidence at all of how many of

18 the people with the pure pleural disease, which is what this

19 whole fight they're raising is about, would fail to meet the

20 TDP 4B criteria.  So with all of that, Your Honor, I think

21 there's just no competent evidence to support their contentions

22 here and I would respectfully ask you to disregard and strike

23 all this testimony.  May I hand up the Plan Proponents' 361

24 which we will offer as a demonstrative when we get around to

25 offering exhibits, but this is the one where I did the math on

1   it and also the pieces of the testimony I just read to Your

2   Honor, may I hand those up, please?

3           THE COURT:  Yes.

4           MR. BERNICK:  I think those are -- the pieces of

5   testimony are already in her book.

6           MR. FINCH:  Oh, they are.

7           MR. BERNICK:  Yeah.

8           MR. FINCH:  Where in her book?  Well, I'll hand them

9   up and she --

10          THE COURT:  That's fine.  Thank you.  Give me one

11   second, Mr. Guy.  I want to mark who I am getting these

12   documents from.

13          MR. FINCH:  And that concludes my argument, Your

14   Honor.

15          THE COURT:  All right.  Okay, Mr. Guy, thank you.

16          MR. GUY:  Jonathan Guy for the Asbestos PI FCI.  I'm

17   going to try to beat Mr. Brown's record, but I probably won't

18   manage it.

19          Your Honor, you heard a lot of testimony, a lot of

20   argument, you've had a lot of papers, but the issue is whether

21   the expert testimony being proffered by the Libby claimants is

22   relevant and reliable.  That's what you have to determine here.

23   The issue as to whether it's relevant is clear from the --

24   counsel for the future representatives -- future claimants.

25   Would a similarly situated claimant be treated differently

1 under the TDP if it was a non-Libby claimant as opposed to a

2 Libby claimant.  And I think from Mr. Finch's argument it's

3 clear that we're really focused on the pleural disease, but it

4 doesn't matter for our immediate purposes.  Would they be

5 treated differently under the TDP.  There is no expert

6 testimony whatsoever on that issue.  None.  So for the legal

7 issue that the Court has to decide there's no expert testimony

8 so I don't think we even need to get to reliability.

9        On the different class issue I don't want to belabor

10 that.  I think it's clear, we can't have multiple classes for

11 different disease categories.  On reliability, which we don't

12 really need to address, what we would need to have for you to

13 consider would be a proper epidemiological study looking at a

14 whole group of non-Libby claimants and comparing them to a

15 group of Libby claimants.  We don't have that study at all.

16 The decision was made by the Libby claimants to rely upon Dr.

17 Whitehouse.  He's a clinician.  He's always been a clinician.

18 He admits he isn't an epidemiologist.  And all the other

19 experts just marched off the back of his self selected patient

20 analysis.

21        So there's no proper study.  there wasn't --

22 obviously there's no study of the non-Libby claimants at all

23 and there's no comparison between the two.  And then there's

24 none of the next step, which is to say well this how they're

25 discriminated against.  So we would ask that the motions be

1  granted.  Thank you.

2                              (Pause)

3          THE COURT:  Mr. Heberling, closing comments. I'll

4  give you a chance since there are so many people opposed to

5  you, if you have anything to say and I'll also give them a

6  very, very brief rebuttal if they've got anything in response

7  to your comments.

8          MR. HEBERLING:  No, I don't believe we need to do

9  that.  I believe we covered all the issues in the earlier

10 presentation and I don't need to reiterate it.  Thank you.

11         THE COURT:  All right.  You had mentioned that you

12 wanted an opportunity, perhaps, to take a look at the evidence

13 and the evidentiary submissions.  Do you still need that?

14         MR. HEBERLING:  Yes, we would like that.

15         THE COURT:  How much time do you want?

16         MR. HEBERLING:  Can we include a section in our

17 post-trial brief on epidemiology issues and the -- the

18 testimony cites?  We're going to be supplying testimony cites

19 for our arguments anyway so I think we would best just add a

20 section on epidemiology to the post-trial brief.  I do also

21 have a question about the post-trial briefing.  As I understand

22 it you want the arguments not extensive legal authority, brief

23 legal authority plus the factual arguments with transcript

24 cites, am I correct on that?

25         THE COURT:  As to the briefing, yes.  What I want is

1  if there is some issue that developed during the course of the

2  trial that hasn't been briefed -- and, frankly, at this point

3  I'm not sure what that could be -- but if it's out there then I

4  don't mind a brief on those narrow issues.  But what I don't

5  want is a repetition of the briefs that have already been

6  filed. I don't need to kill this many more trees to have

7  something that I already have available and can read.  So to

8  the extent that the issue has already been briefed I simply

9  don't want it briefed again.  If there is something in the way

10 the evidence came in that either changes your view or gives you

11 another case, you know, if you want to point me to a case cite

12 fine, I'll be happy to look at that, but I don't want another

13 hundred pages worth of briefs on issues that are already

14 briefed.

15          In terms of the recitation to the record, yes, if

16 you're going to make a factual contention that says that your

17 objection is supported by X I want to know where X is in the

18 record.  So I want the trial transcript or the deposition,

19 whatever the evidence is, because it hasn't even all been

20 proffered yet so I don't have a -- necessarily have a

21 description.  But, you know, if it's an insurance policy, for

22 example, then I want the reference to the insurance policy and

23 the particular section, only the particular section, that

24 supports what it is that the fact that you want me to find is

25 based on.

1          MR. HEBERLING:  I'm a little confused.  The Court is

2     not asking for findings of fact and conclusions of law from the

3     parties as proposed, correct?

4          THE COURT:  Well, I am, yes.

5          MR. BERNICK:  We went through, I think, all of this I

6     think twice and I think what the Court -- at least what we're

7     working on is something that doesn't have a lot of legal

8     argument at all because it's already been done.  We can just

9     refer back to it.  But we would have a recitation of what the

10    record shows on the key issues, not background stuff, but

11    things that are really in dispute or not in dispute that are

12    important elements under the law so that the Court doesn't have

13    to -- I mean it essentially has in that the ability to make --

14    to cull it out and make a finding of fact with regard to the

15    that.

16         THE COURT:  Right.  That's --

17         MR. BERNICK:  In fact, we're hyperlinking the cites

18    to images that will be taken from the transcript.

19         THE COURT:  Yes.  And actually the hyperlinks work

20    really well.  And the debtor had offered to assist parties --

21         MR. BERNICK:  Yes.

22         THE COURT:  -- who can't do it in getting that done

23    and if that's possible that is the best way to go about

24    preparing these.  So yes, I do want proposed findings of fact

25    and conclusions of law.  I normally ask for them in separately,

1 you know, numbered paragraphs, but I'm not sure in this case

2 that makes total sense because there are discreet issues that

3 apply to particular creditors or insurers and so I'm not sure

4 I'm married to that format.  But I don't want an assertion of

5 fact that doesn't have a record to support.

6 　　　　　MR. HEBERLING:  Okay, so we submit findings and

7 conclusions and then post-trial brief on any additional issues

8 we need to discuss.

9 　　　　　THE COURT:  No, on any additional issues that haven't

10 already been briefed --

11 　　　　　MR. HEBERLING:  Okay.

12 　　　　　THE COURT:  -- that are new issues.

13 　　　　　MR. HEBERLING:  Okay.  Thank you, Your Honor.

14 　　　　　THE COURT:  All right.  Mr. Bernick, is there -- what

15 about the concept of having a section in the post-trial briefs

16 for this?

17 　　　　　MR. BERNICK:  I don't really -- that doesn't --

18 that's fine.

19 　　　　　THE COURT:  Anyone have an objection?  Okay.  That's

20 fine, Mr. Heberling.  And I'm not sure that there's anything in

21 addition to what you've argued today from the objector's side

22 that has to be flushed out any further than this binder and Mr.

23 Finch's handouts.

24 　　　　　MR. BERNICK:  Yes.  With respect to -- well, on Item

25 4, which are the Daubert motions, I think that that -- we

**J&J COURT TRANSCRIBERS, INC.**

1  really -- the _Daubert_ motions that we filed directed at the

2  testimony of Libby experts that -- we're done with that.  5,

3  again, was moot.  6 through 8 I think is the only other

4  substantive matter that we had to talk about before we deal

5  with exhibits.  9, again, was the Frezza material, and we

6  provided a slide and then the backup for Frezza.  You don't

7  have the backup for it?  Well, you'll get it right now.  So --

8  it's pretty slim.

9          So, we've now discharged our responsibility to

10  provide the citations to counsel, and I suppose that probably

11  the sensible thing to do in order to -- they'll file a brief.

12  We will, in connection with the agenda for the omnibus, provide

13  the same materials to the Court, albeit, we -- I think we

14  probably have a set right now if the Court wants to take it

15  now.  It's really up to you, Your Honor.

16          THE COURT:  On what?

17          MR. BERNICK:  This is the Frezza/_Daubert_ issue.

18          THE COURT:  Oh, it doesn't -- yes, I can take them

19  now if you want because that argument -- is that argument going

20  to be today or --

21          MR. BERNICK:  No.  Again, the agreement that we

22  reached yesterday was that we would not argue it today because

23  they wanted to submit a brief.  This was Item 9.

24          THE COURT:  Oh, okay.  So, that's going to be on

25  November.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Yes.  As I said, we'll give him the
2    package.  We'll give him the package.  We can give it -- that
3    to Your Honor now?

4          THE COURT:  Yes, that's fine.

5          MR. BERNICK:  Okay.  Well, then -- do we have an
6    extra copy for the Court?  Okay.  So, that's in the same
7    binder, Your Honor, as the other <u>Daubert</u> material.

8          THE COURT:  Oh, yes, it is.  I see it at the end.

9          MR. BERNICK:  Okay.  So, that relates -- that binder
10   then relates to 4 and 9.

11         THE COURT:  All right.

12         MR. BERNICK:  So, it includes Frezza.

13         THE COURT:  Okay.

14         MR. BERNICK:  10 was dropped in connection with the
15   designations relating to Anderson Memorial.  And that then
16   leaves 6 through 8.  I don't know what Your Honor's pleasure
17   is.  I think my argument on 6 through 8 would take -- and you
18   can hold me to this one -- ten minutes.  And I don't know how
19   long Mr. Kozavich or -- Kovacich or Mr. Heberling would take,
20   but I think we could probably do that before lunch and that way
21   everybody can go unless they have a matter to take up relating
22   to exhibits.  And maybe we can do that now as well or whatever
23   Your Honor's pleasure is.

24         THE COURT:  Well, I am not -- there are an awful lot
25   of parties with exhibits.  I think we'll take a lunch recess

**J&J COURT TRANSCRIBERS, INC.**

1 before we do those.

2         MR. BERNICK:  Okay.

3         THE COURT:  With respect to the argument on Item 6 to

4 8, Mr. Kovacich --

5         MR. KOVACICH:  If Mr. Bernick is going to limit his

6 argument to ten minutes I would not expect to be any longer

7 than that.

8         THE COURT:  All right.  Mr. Wisler?

9         MR. WISLER:  Good afternoon, Your Honor.  Jeffrey

10 Wisler on behalf of Maryland Casualty.  Your Honor, we filed an

11 objection to certain Libby designations that overlaps with the

12 objection that was put on the calendar by plan proponents, so

13 what I have to say will be somewhat different than what Mr.

14 Bernick has to say, but we'll supplement it also, and I don't

15 expect that I would take more than five minutes.

16         THE COURT:  Okay.  Well, I -- perhaps we should just

17 get through the argument, and then to the extent that there is

18 anything that can be done on the exhibits -- did you folks have

19 a chance to meet to discuss exhibits last night?  Are you in

20 accord with what's going to happen with the evidentiary

21 submissions?

22         MR. BERNICK:  I think the short answer, and then I

23 think maybe it would be appropriate for Ms. Baer to address

24 that after lunch, there's been enormous meet and confer with

25 respect to exhibits, or I should say in almost all cases.

1  There may be a couple of cases where the meet and confer

2  effort, we didn't get the exhibits and it hasn't been

3  completed.  But, by and large, this is not a situation where

4  there's been a lack of meet and confer.  If anybody wants to

5  meet and confer with us over lunch I suppose they're available

6  for that as well if that was the kind of suggestion that Your

7  Honor was getting to.  But, there has been a very significant

8  process on an ongoing basis and Ms. Baer is most familiar with

9  that and where we stand on that.  So --

10        THE COURT:  All right.  Well, let's do the arguments

11  on Items 6 to 8.  We'll stop around one o'clock if it's not

12  finished.  But, if each of you stick to your proposed time

13  limits we should be done by then.  We'll take a short recess

14  for lunch and then we'll start the evidentiary submissions.

15        MR. BERNICK:  Okay.  Your Honor, the 6 through 8, as

16  I indicated yesterday, the items on the agenda, 6 through 8,

17  started out as motions that were filed before the evidence

18  commenced, and as a consequence, just like the Daubert motions,

19  time has passed them by a little bit.  Some parts of them have

20  been mooted, others have not.  And I think the best way to look

21  at them as a consequence is that while they're all on the

22  agenda and they're all in a sense up for decision, insofar, at

23  least as the debtor is concerned, Item -- Agenda Item 7

24  captures --

25        THE COURT:  Excuse me.  Is there a chart?  You're

1  looking at something.  Is --

2          MR. BERNICK:  Yes.  It's going to be --

3          THE COURT:  Is there a binder?

4          MR. BERNICK:  Do you have a -- is there a separate

5  folder for the Court?  This is 515-1, and we'll be providing a

6  copy to the Court.  We've already furnished a copy to the folks

7  from Libby.

8          THE COURT:  All right.

9          MR. BERNICK:  Agenda Item 6 and 8, as I said,

10 overlap.  Agenda Item 7 really sets out the items of evidence

11 that are still at issue in connection with these motions, and

12 they are listed here on 515-1.  They are testimony by

13 individuals in the form of deposition designations.  There are

14 approximately 21 witnesses whose testimony has been designated.

15         There are the openings -- portions of the openings --

16 opening of Grace in the criminal trial in Montana.  Portions of

17 the openings in the estimation trial before this Court, and

18 then testimony that was offered in connection with the

19 estimation of trial by two witnesses.  They are Lees and

20 Anderson.  And Your Honor will see 6, 7, 8 for your records

21 as -- that's what it relates to.

22         THE COURT:  Okay.  Thank you.

23         MR. BERNICK:  The grounds for exclusion are listed on

24 the right-hand side and they're fairly straightforward and

25 that's why my remarks are to be fairly simple, starting from

the bottom going up.  Lees' and Anderson's testimony -- Lees
was the industrial hygienic.  Anderson was the toxicologist.
Lees testified to exposures that would be expected from -- in
occupational settings and broken up by a couple of the
categories that were used in connection with the proof of claim
process, that is for the PIQ process.

         Your Honor will recall in those distant days a
personal injury questionnaire was sent out to all people who
had currently pending claims who -- and who responded by the
bar date.  They were filled out, and certain of the questions
related to the occupational exposure history and those
exposures were defined by categories.  So, based upon the
answers to categories, Dr. Lees provided estimates about
potential exposures and the dose, and then Dr. Anderson
translated those doses into risks and the like.

         So, this was all essentially risk assessment
testimony with respect to people exposed to -- occupationally
to Grace asbestos in the form of Monokote.  That testimony is
completely irrelevant to any issue here, and the more -- and
the procedural problem is that effectively, Libby is seeking to
inject here the testimony of experts that they did not list as
their experts in connection with this phase of the trial.  So,
we have undisclosed expert testimony and it's irrelevant.

         With respect to the openings and the estimation,
those are irrelevant to the issues that are now before the

1  Court and they are hearsay.  They're simply the statements of

2  counsel.  They were not authorized as statements for use on

3  this proceeding.  And they're certainly not evidence on their

4  own.

5       Openings in the criminal trial are also hearsay, and

6  those openings contain a lot of information that goes to the

7  issue of culpability, that is whether Grace's conduct in Libby,

8  Montana was right -- was wrongful conduct that was a criminal

9  case.  There's a lot of testimony that came in on that case

10  about the conduct of the mine historically and the conduct of

11  Libby historically.  We anticipated that that evidence would

12  come in in our opening statements and we commented on it.  The

13  Court already has ruled that culpability is out.  It's not an

14  issue that's relevant in this proceeding.

15       So -- and then we come to the individual -- testimony

16  of individuals that have taken place through -- or they're

17  being proffered through deposition.  And there are several

18  dimensions of this that are grounds for the exclusion of this

19  evidence.  First of all, there was an order entered by the

20  Court.  It's at Docket 22822.  And it set a limit on the number

21  of individual witnesses who could testify.  And that was about

22  five or six that emanated from -- that order was agreed, but

23  followed a hearing in which the issue of testimony by

24  individuals was discussed extensively because there was

25  originally a proposal they have all kinds of witnesses testify.

1          At that hearing it was Your Honor's observation that

2 that testimony really was not relevant in this proceeding, and

3 prompted by that discussion we had negotiations over an order.

4 The order was entered.  That is the Docket 22822.  And that

5 specifies that there may be five or six witnesses and they're

6 all identified.

7          THE COURT:  Well, I thought what I said -- I haven't

8 looked at the order, but I thought what I said was that I would

9 reserve whether or not the testimony was relevant to any issue,

10 but that more than five or six were certainly going to be

11 cumulative.  So, pick five or six and tell me that.

12          MR. BERNICK:  That is -- I think you were a little

13 stronger on the relevance side.  Not going to be personal

14 injury trials and the like, but yes, your guidance at that time

15 was that you were reserving on relevance and that we only

16 needed five or six.  That's correct.

17          The five or six live witnesses were not called, but

18 instead we now have 23 witnesses who are appearing by

19 deposition.  And they present, in terms of the evidence, an

20 identical problem, which is that it's a) cumulative, b) it goes

21 to medical -- their medical condition, which really has no

22 relevance.  It's not coming in through any expert, and c) is,

23 it goes to culpability.  And culpability, again, is out of the

24 case.

25          So, the number exceeds what Your Honor suggested as

**J&J COURT TRANSCRIBERS, INC.**

1 an upper limit of how much really would be, under any

2 circumstances, appropriate.  But, on the number of witnesses I

3 would further observe that the Court already has heard

4 extensively from Dr. Whitehead -- Whitehouse -- his testimony

5 about a whole series of individuals.  Individuals who are

6 listed as part of the mortality study LC-10, individuals who

7 are listed in the so-called chart that are relevant to

8 settlements.  That's Chart LC-16-A.

9        And so, there's already been extensive testimony

10 about the medical condition of individuals, which was the first

11 purpose of the proffer, and then there is -- it's not

12 appropriate to have any testimony about culpability.  So,

13 insofar as the deposition testimony relates to medical

14 condition, it's totally cumulative, indeed.  We already have

15 cumulative evidence on that.  Insofar as it relates to

16 culpability, the Court's already ruled that out.

17        The last point with respect to the individual

18 designations is that as Mr. Heberling indicated this morning,

19 they intend to use the information from LC-16-A with regard to

20 settlement amounts, and in order to make arguments about why

21 the cases -- what kinds of cases have what kinds of values in

22 settlement.

23        In point of fact in LC-16-A, if memory serves, the

24 settlement column of that document was stricken.  That is to

25 say, the settlements did not come in through testimony of Dr.

1 Whitehouse.  There were other sources of settlement

2 information, but it wasn't here.  And one of the reasons that

3 that was a problem, and it still is a problem today, is to the

4 extent that these individuals whose depositions are being

5 designated are the same individuals where we now have

6 settlement data, and they are, as these were the litigating

7 cases, but then settled.

8        So, we know what's going to happen.  We're going to

9 have the evidence of what their condition was and who they are

10 through the depositions come in, and then we're going to have

11 evidence of the settlements which comes from another source.

12 And we're going to hear and see in the papers arguments by Mr.

13 Heberling and his able colleagues to the effect that these are

14 the kinds of cases that got settled and this is why settlements

15 were different.

16        That is improper.  It's improper because no expert

17 has drawn that linkage.  They declined to call any such expert.

18 And is most pointedly improper because we never got what we

19 were supposed to get which was the settlement files for these

20 people.  The settlement files were supposed to have been

21 provided under court order.  Your Honor said if there's going

22 to be testimony about any individual settlement we need to have

23 all the settlement records.

24        We never got those settlement records with respect to

25 the people who are the deposition deponents.  And as a

1 consequence it is improper to use them in order to illustrate

2 how the settlement process worked or did not because we were

3 foreclosed from getting the discovery that Your Honor said we

4 would be afforded.  So, for all those reasons we seek to

5 exclude the deposition designations of these individuals and

6 the other items that are in Agenda Item Number 7.

7            THE COURT:  And is this what you're limiting what

8 used to be 6, 7 and 8 --

9            MR. BERNICK:  Yes.

10            THE COURT:  -- is now limited to this?

11            MR. BERNICK:  Yes.  What we are moving for under 6, 7

12 and 8, the debtors are, is now limited to the items that are

13 set forth in 515-1.

14            MR. FINCH:  And, Your Honor, just so it's clear, the

15 asbestos claimants committee joins in those motions.

16            THE COURT:  And do you have anything else to add, Mr.

17 Finch, or are you --

18            MR. FINCH:  I have nothing else to add.  Whether I

19 stand up in response to Mr. Kovacich, it kind of depends on

20 what he says.

21            THE COURT:  Mr. Wisler?

22            MR. WISLER:  Your Honor, Jeff Wisler on behalf of

23 Maryland Casualty.  Your Honor, Maryland Casualty objected to

24 all of the Libby designated testimony.  It came from

25 proceedings outside of this bankruptcy case.  For the record,

1   Your Honor, if this is not on the agenda, our objection is at

2   Docket Number 22896.  And both our objection and the objection

3   that Mr. Bernick just presented are to Libby's designation at

4   Docket Entry 22814.

5            Your Honor, the specific testimony that we're

6   objecting to is the admission of testimony of a gentleman named

7   Earl Lovick.  Mr. Lovick, as I understand it, was a Grace

8   employee.  He was not a claimant.  His testimony were from

9   proceedings --

10            THE COURT:  Mr. Wisler --

11            MR. WISLER:  Yes.

12            THE COURT:  -- excuse me one second.

13                        (Pause)

14            THE COURT:  Okay.  I'm sorry.  Mr. Lovick?

15            MR. WISLER:  Yes.

16            THE COURT:  Okay.  Thank you.

17            MR. WISLER:  As I understand it he was a Grace

18   employee, but he was not a claimant.  The proceedings from

19   which the transcripts come are personal injury cases that were

20   in Montana in the '90s.  One is a deposition transcript and one

21   is a trial transcript.

22            Importantly, Your Honor, Maryland Casualty was not a

23   party to either of those cases.  So, under Third Circuit

24   precedent, this is inadmissible hearsay.  Because Maryland

25   Casualty was not at the deposition and was not at the trial and

1  was not a defendant or party in that case, Maryland Casualty

2  was not there to cross examine or challenge any of Mr. Lovick's

3  testimony.

4       And because Grace's motivation in that case was to

5  defend its own liability, their presence does not eliminate the

6  hearsay problem because Maryland Casualty's motive in this case

7  is to preserve what this Court already found, and that is that

8  Libby's claims against Maryland Casualty arise from the

9  products and conduct of Grace, and that's not what Libby wants

10  this Court to find.

11       So, for this reason alone, both of these transcripts

12  should be excluded in their entirety.  But, in addition, Your

13  Honor, this testimony lacks any foundation.  It is irrelevant,

14  number one, because Mr. Lovick's not a claimant and he has

15  nothing to say about any of the claims.  Number two, because

16  Mr. Lovick's testimony is about the conditions and events in

17  Libby, Montana prior to the 1990s.  And Your -- as I recall,

18  Your Honor's already ruled that conditions in Libby are not

19  relevant to this case.

20       Those transcripts and the testimony in those

21  transcripts have nothing to do with, and no relevance to, the

22  plan, this plan, or the plan's treatment of the Libby claimants

23  or any other issues raised in this case.  So, for those

24  reasons, Your Honor, we ask that Your Honor not admit those

25  designations into evidence.

**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  All right.

2            MR. BERNICK:  Just so the record is clear, I omitted

3    to mention Mr. Lovick specifically, but he is included in our

4    motion Grace is moving with respect to Mr. Lovick, as well.

5    And on the same grounds, which is it's beyond the number and it

6    is really all -- he was the plant manager, mine manager, so it

7    all goes to the conditions of the plant.

8            MS. DeCRISTOFARO:  Good afternoon, Your Honor.

9    Elizabeth DeCristofaro for Continental Casualty Company.  Not

10   to prolong this, but we also have written objections on file to

11   the Libby claimants' deposition designation, both the 21

12   individual claimants and the deposition of Earl Lovick.  We

13   also join in the objections that they're not relevant and not

14   admissible as to Continental Casualty.  We were not a

15   participant to any of these proceedings.  Had no opportunity to

16   participate.  And for that reason we also ask that they be

17   excluded.

18           THE COURT:  Mr. Heberling?  I'm sorry.  I'm all

19   right.  I apologize.

20           MR. KOVACICH:  Mark Kovacich for the Libby claimants,

21   Your Honor.  Thank you.  I'll try to stick with my

22   representation about keeping this to ten minutes, but it might

23   be a little bit more difficult now that I'm getting ganged up

24   on.

25           I'll start by addressing Maryland Casualty's comments

122

1  regarding Mr. Lovick just briefly.  Mr. Lovick's testimony in

2  cases where those transcripts are being offered is not hearsay.

3  It's an admission of a party to this proceeding which is W.R.

4  Grace.  Mr. Lovick was a management level employee of Grace who

5  worked at the Libby mining mill, and I don't think there's any

6  serious question but that his testimony is an admission, and

7  therefore is excluded from hearsay.

8          THE COURT:  Well -- but his testimony appears to

9  define certain relationships and the conditions of the mine and

10 the conditions under which the people worked in the mine.  And

11 I'm still not sure what that has to do with the plan

12 confirmation.

13         MR. KOVACICH:  And, Your Honor, I hope we can

14 expedite this argument somewhat.  I think really the real issue

15 -- gut issue here that needs to be addressed with respect to

16 all of this testimony is the purpose for which it's offered and

17 that gets to the relevance arguments that have been made.  And

18 the reason, really, all of this -- all of these designations

19 have been made is to demonstrate from our point of view one of

20 the reasons for the large disparity in settlement values

21 between cases resolved in Libby versus cases resolved in other

22 parts of the country.

23         The medical evidence that we've heard so much about

24 here this morning is a part of that, but it's not the only

25 part.  The strength of the exposure evidence, the lack of any

1  causation defense, and the aggravated liability in Libby were

2  all factors that drove the value of these settlements up to the

3  level that they were.  And all of these designations really do

4  go to that issue.

5       I recall extensive discussions with the Court in

6  Delaware concerning this.  We are offering this evidence for

7  the same reasons we offered the testimony of Dr. Terry Spear to

8  demonstrate that these other factors played a huge part in the

9  values that were -- that Grace itself attributed to the claims

10 in Libby versus the values attributed to claims elsewhere.

11      The claims of the Libby claimants in this bankruptcy

12 are of the same nature as those claims that were settled

13 pre-bankruptcy for an average of -- I think it was nearly

14 $300,000 as opposed to a nationwide average of $2500.  The

15 opening statements in the criminal --

16      THE COURT:  I'm sorry.  I just need you to back up

17 for a second.  The 300,000 as opposed to nationwide for $2500

18 in the same category of claims?  You know, these are

19 mesothelioma settlements.  They're asbestos settlements.

20 They're -- what are they?

21      MR. KOVACICH:  Those averages are for all claims,

22 Your Honor.  And we do now have evidence in the record that

23 will demonstrate what the averages were if you break it down by

24 disease category.  There is evidence of what the Libby

25 settlements were and there's also evidence of what the type of

J&J COURT TRANSCRIBERS, INC.

1  disease that those settlements were based on.  Most of them

2  were non-malignant disease cases.  Many were pleural disease

3  cases, and many had components of both pleural disease and

4  asbestosis.

5          I don't -- I can't recite what the number is off the

6  top of my head excluding the meso settlements and the lung

7  cancer settlements, but it would not be significantly different

8  than the -- I think it was $268,000 average.  That -- so really

9  the largest disparity in settlement value is with respect to

10 the non-malignant claims.  In Libby they were well in excess of

11 $200,000, and nationwide non-malignant settlements averaged I

12 think on the order of $2500.

13         The purpose for which the opening statements is being

14 offered I think really demonstrates one of the critical factors

15 here.  In his opening statement in the estimation hearing Mr.

16 Bernick advised the Court that over 95 percent of the claimants

17 in this bankruptcy would have cumulative exposures of less than

18 one fiber year.  And he went on to advise the Court that it was

19 Grace's position that those levels of exposure were not

20 sufficient to cause any type of asbestos-related disease.

21         In the Grace criminal trial in Missoula on the other

22 hand, Mr. Bernick admitted that the conditions at the Libby

23 mine and mill did cause disease.  And he also admitted that the

24 workers who took asbestos home from the mine and mill caused

25 disease in their family members.  There are more than 300 Libby

1  claimants in this bankruptcy who either worked at the Libby

2  mine and mill or were a family member of a mine and mill

3  worker.

4          Those claimants, if they had been permitted to

5  prosecute their claims in the tort system, would not have been

6  up against the type of defenses that other claimants nationwide

7  would face.  The exposure defenses that are illustrated very

8  effectively by the testimony of Dr. Peter Lees and Dr.

9  Elizabeth Anderson in the estimation case, Grace would not have

10 been able to defend those employee cases by suggesting that

11 there were cumulative exposures of less than one fiber year.

12 The cumulative exposures in those cases would've been many

13 times that.

14          Additionally, Grace would not have been defending

15 those cases by pointing out that the claimants had higher

16 levels of exposure to all kinds of other asbestos products.

17 Those are significant reasons why Grace paid so much more in

18 Libby than they paid on average elsewhere.

19          There are many examples that could be used to

20 illustrate this, two that I'd like to talk about just briefly,

21 and the amounts of their settlements are in the record.  One is

22 Claimant Number 13.  His case was settled for $1.1 million.  He

23 is one of the claimants on the chart that Mr. Bernick

24 referenced.  His disease was characterized on the chart in Dr.

25 Whitehouse's testimony as being moderate pleural disease.

1          Claimant Number 13 is not a claimant who could go

2    to -- a claimant with the same condition as Claimant Number 13

3    would not be the type of claimant who could go to individual

4    review and be characterized as a Category 4B claimant.  His

5    treating physician would take the position that his impairment

6    was moderate.  He is not a -- was not a severe pleural case.

7          Under the TDP, even if he received the full

8    extraordinary claims treatment, the value of his claim would be

9    capped at $60,000.  The value of his claim in the tort system

10   was $1.1 million.  That is not simply because of the nature of

11   his disease.  It is because of the nature of his exposure, the

12   fact that Grace had no exposure defense, no causation defense,

13   and the aggravated nature of the liability which is

14   demonstrated most effectively by Earl Lovick's testimony where

15   he said among other things that the Grace management in Libby

16   knew that they were diseasing and -- causing disease in the

17   employees working in those facilities.  With respect to the

18   hearsay issues --

19          THE COURT:  So, all of this is to go to the

20   proposition that Grace settled claims in Libby for more money

21   for a period of time than it settled claims elsewhere?

22          MR. KOVACICH:  And to demonstrate that the existing

23   Libby claims would have values in the tort system far in excess

24   of the values that could ever be assigned to them in this

25   bankruptcy regardless of whether they pursue individual or

1   expedited review.

2        THE COURT:  Well, depending on the nature of the

3   disease, that's true of everyone who contracts the type of

4   disease that's going to be dealt with in this TDP.  Every

5   mesothelioma victim, for example, is -- if they went through a

6   jury trial or outside the case may be able to settle for more

7   than the tort values that are going to be paid through this

8   plan.  There's no -- I don't think there's any doubt about

9   that.

10        MR. KOVACICH:  Well, I think that the mesothelioma

11  cases that would be settled for values in excess of the -- what

12  they could receive under the plan are those cases like the

13  example the plan proponents have been using in this trial, Mr.

14  Dayton Prouty, the cases where the exposure evidence is very

15  strong and undisputed just like it is in Libby.  Those cases

16  are being watered down so that we can pay on equal terms all of

17  the other cases, most of which would've been lost had they been

18  tried to a verdict in the tort system because they did not have

19  sufficient evidence of exposure.

20        THE COURT:  Well -- but how can you prove that?

21  That's simply something that you can't prove.  All of the

22  testimony I have in this trial is that it's an unknown what a

23  jury or even a non-jury will do at trial in a case.  That's why

24  people settle because the risk of the outcome of litigation can

25  be dastardly for either side, so people get together and

1 settle.  There's no way to know that any particular jury would

2 award, to pick a number, 1.1 million as opposed to 1.0 million

3 as opposed to $60,000.  There's just no way to know that.

4        MR. KOVACICH:  I agree there's no way to know what a

5 jury would award, but there are many factors that parties on

6 both sides of the settlement take into account --

7        THE COURT:  Sure.

8        MR. KOVACICH:  -- in deciding how to value the

9 claims, and those factors go far beyond what is the disease

10 that the claimant has.  I think Mr. Finch circulated a 1006

11 summary for Mr. Prouty.  I'll be corrected if I'm wrong, but I

12 believe it indicated he settled for something like $3.7

13 million.

14        THE COURT:  Sure.  I mean, there can be -- I agree.

15 There can be all kinds of factors that can be your age, your

16 other medical condition, how many children you have, how long

17 an employee you've been, whether you've had other exposure.

18 The list goes on and on.

19        MR. KOVACICH:  And the TDP does not adequately

20 account for those factors, and it does not account for those

21 factors with respect to the situation in Libby because the

22 strength of the exposure evidence, the lack of a causation

23 defense, and the aggravated liability do not allow these

24 claimants to get anywhere near the values that similar claims

25 were getting prior to the bankruptcy.

1            THE COURT:   If the debtor tried to classify Libby

2    claimants in a different class simply to pay them more through

3    this plan than they paid other claimants with the same disease

4    the plan would not be confirmable.   The debtor could not do

5    that.   It would be gerrymandering.   That plan simply wouldn't

6    work.

7            MR. KOVACICH:   Well, Your Honor, I respectfully

8    disagree that the only factor that should be used to classify

9    and determine the value that these claims receive under the

10   bankruptcy is the medical condition.   I think that --

11           THE COURT:   I don't think that's what's --

12           MR. KOVACICH:   -- other factors do need to be taken

13   into account.

14           THE COURT:   Yes.

15           MR. KOVACICH:   And the plan does not adequately

16   account for those factors in order to pay these claims

17   according to the value that they --

18           THE COURT:   I think that's --

19           MR. KOVACICH:   -- that similar claims received prior

20   to the bankruptcy.

21           THE COURT:   I think that's a misapprehension of the

22   plan.   The plan has based what it can pay through the TDP on

23   preexisting settlement criteria -- settlement numbers and

24   criteria which took into account all of those factors.   If the

25   TDP attempted to do it again it would be duplicating the

1  settlement factors that were already considered before the TDP

2  was written.  That's the purpose --

3          MR. KOVACICH:  But, the --

4          THE COURT:  -- for which you categorize particular

5  claims at payment levels in the TDP because all of those

6  factors have been considered, and this is what the debtor and

7  the parties who negotiate feel they can pay to particular

8  claimants with particular diseases in those categories.  Those

9  factors had to have been considered beforehand because they

10  were considered in the settlements, and that's the basis for

11  the TDP values.

12          MR. KOVACICH:  There is some discretion in the

13  individual review process --

14          THE COURT:  Sure.

15          MR. KOVACICH:  -- for other factors to be taken into

16  account, but there is a cap for every disease level --

17          THE COURT:  Absolutely.

18          MR. KOVACICH:  -- that prevents a claimant with a

19  certain disease level from having a claim valued in excess of

20  that cap.  And the problem with respect to --

21          THE COURT:  Absolutely, because if there were no cap

22  we'd back in the non-bankruptcy world where the debtor could

23  never propose a feasible plan.  There has to be a cap.

24  Otherwise, the debtor may as well go litigate and the first

25  people who get their verdicts will bankrupt the company and

1  it'll be in a liquidation and no one will get paid.  That's the

2  whole purpose for having a trust that looks at these issues and

3  figures out how to pay within those classifications.

4          I can't see how that's discriminatory.  The fact that

5  more people in Libby may end up in the individual review than

6  elsewhere is actually to Libby's benefit, not to its detriment.

7  So, if there's a discrimination it's a positive one in that

8  sense, in the terms of the numerical sense.  I'm not making any

9  assertion with respect to anything other than the numerics at

10 the moment.

11         MR. KOVACICH:  Regardless of the individual review

12 they'll be capped based only on their medical condition.  And

13 the cap will put the values of those claims at a small fraction

14 of what those values would've been in the tort system.

15         THE COURT:  I don't think that's the case in the

16 individual review.  You can point that out to me in the briefs

17 if you will, please -- the post-trial briefs.  I don't -- I

18 didn't understand the testimony to say that the individual

19 review is going to be based only on the medical condition.  In

20 fact, I understood the testimony to say exactly the opposite.

21 That the purpose for the individual review was because the

22 expedited criteria are more restrictive than the Libby

23 claimants would like.

24         And so, in getting into the -- outside the expedited

25 review and into the individual review category, the trustees

1  are able to consider factors other than the medical criteria

2  that would have impact the amount that a Libby claimant could

3  get.  And yes, there is a cap.  I understand the issue that you

4  think the cap isn't big enough, but --

5          MR. KOVACICH:  And the cap is tied to medical

6  condition.  It's not based on any of the other factors that

7  would cause the value of a claim to exceed, for example, in Mr.

8  Schwennis' (phonetic) case, $20,000 is what the cap would be

9  for his level of disease.

10         THE COURT:  Well, okay.  I disagree about the plan

11 structure, but -- okay.

12         MR. BERNICK:  Your Honor, if I could -- I'm sorry.

13         MR. KOVACICH:  Just briefly, some of the other issues

14 raised here.  The statements by counsel and these other cases

15 are not hearsay.  Mr. Bernick was authorized by Grace to make

16 the statements that he did in those cases.  It's well-accepted

17 that statements of counsel are binding on the client that they

18 were made on behalf of --

19         THE COURT:  As an opening statement in a trial?  I

20 don't think so.  I think the evidence in the trial is what's

21 relevant, not counsel's assertion of what he's going to prove

22 but, in fact, what he actually does prove.

23         MR. KOVACICH:  There is substantial authority that

24 statements made by counsel on behalf of his or her clients are

25 binding on --

1                    THE COURT:  Yes.

2                    MR. KOVACICH:  -- the client.

3                    THE COURT:  You could stand here and tell me that you

4    have authority from your client to represent A, and as a result

5    the Court can enter an order that -- that does B.  I agree.

6    There can be circumstances.  But, in a trial, the judge in

7    almost every jury trial I ever conducted, the first thing they

8    told the jury was, don't forget, the statements of counsel are

9    not evidence.  You need to base your verdict on your judgment

10   on the evidence in the case, not on statements of counsel.

11   That is pure argument.  And I don't understand it to be

12   anything else.  If you can give me a case that says that

13   opening statements are, in fact, of evidentiary value as

14   opposed to pure argument I will be happy to read it.

15                   MR. KOVACICH:  The statements Mr. Bernick made in the

16   estimation case and the criminal case were not evidence in

17   those cases.  Nonetheless, "Statements made by an attorney

18   concerning a matter within his employment may be admissible

19   against the party retaining the attorney."  That's United

20   States v. Margiotta 662 F.2d --

21                   THE COURT:  This is talking about statement --

22   opening statements?  I'm sorry --

23                   MR. KOVACICH:  You know, I couldn't tell you whether

24   or not the context of this decision was an opening statement.

25   I believe the authority stands for the proposition that when an

1 attorney stands up and makes statements on behalf of his or her

2 client those statements are binding on the client.  Mr. Bernick

3 has effectively used that himself here today, referring in his

4 argument to statements made by Mr. Heberling.  That's exactly

5 what we intend to do with these statements and support the

6 arguments that we're going to make in our post-trial

7 briefing --

8             THE COURT:  I need a --

9             MR. KOVACICH:  -- with statements that Mr. Bernick

10 made on behalf of W.R. Grace and those other cases.

11             THE COURT:  I have no dispute with the proposition

12 that a lawyer can bind a client when the lawyer has the

13 authority of the client to make a representation and that's

14 what it is.  My concern is how an opening statement that has no

15 evidentiary value or significance whatsoever and is only an

16 effort of the lawyer to explain to the fact finder what he

17 intends to prove how that in any way binds the client.  If you

18 can give me a case I'll be happy to read it.

19             MR. KOVACICH:  We will cite authority for that --

20             THE COURT:  Okay.

21             MR. KOVACICH:  -- Your Honor, in our post-trial

22 briefing.

23             THE COURT:  All right.

24             MR. KOVACICH:  Unless the Court has other questions

25 on these issues I think I can finish with that.  Perhaps one

**J&J COURT TRANSCRIBERS, INC.**

1   other thing I should address.  The argument by Mr. Bernick

2   about files not being provided for the individual claimants

3   whose depositions have been designated --

4            MR. BERNICK:  Settlement files.

5            MR. KOVACICH:  We did provide for a week leading up

6   to that hearing in Delaware, I think Mr. Lewis discussed --

7   addressed the Court about this very issue.  We went through and

8   provided every document we had for those clients with the

9   exception of privilege material, privilege communications

10  between their -- them and their attorneys.  We provided

11  substantial material for all of these claimants and believe we

12  did so in compliance with the Court's order requiring that

13  information be provided.

14           THE COURT:  All right.

15           MR. KOVACICH:  Thank you.

16           MR. BERNICK:  That exception, the caveat, swallows

17  everything up.  The whole idea was that if they were going to

18  put the settlements at issue then privilege wouldn't apply.

19  They were going to talk about the motivations and the like for

20  someone just like Grace did when that was put at issue in

21  connection with the estimation process.  It was open kimono

22  time.  And, yes, they did offer, I think, to produce certain

23  materials, but the exception was that privilege materials, and

24  that was exactly the problem, be that as it may.

25           I think that there are a couple -- and there are

three things very quickly.  Number one, with regard to my

statements and the statements of other counsel in connection

with the criminal case, yes, if you -- technically under the

rules, a) would have to be a statement that was an admission,

and therefore -- because I am a third party.  I am not an

employee of Grace.  But, it has to be an admission.

To be an admission it'd have to be authorized, and it

would have to be authorized for the purpose for which it's now

being offered.  And I don't think there's any evidence that I

was authorized to make those statements as commitments to this

Court or even in connection with the issues that are presented

here as authorized to make those statements as counsel for

Grace in connection with that proceeding.

Number two, if it were authorized so that it then

becomes a statement of Grace it still has to be a statement

that under the circumstances is an admission, and an argument

as Your Honor well has indicated is not an admission.  Very

different from Mr. Heberling.  Mr. Heberling was -- his

statement was cited to the Court as a recitation of the

position of the Libby claimants in this case.

He is most certainly authorized to make those

statements.  The Court is certainly entitled to rely upon them

as is everybody else in the court because this is the case, and

he is acting in his counsel -- position as counsel representing

what it is he's here to do which is the position of his client.

1  So, a completely kind of circumstance.

2          And then the purpose of that proffer is to establish

3  in the view of Grace, yes, there was harm that was caused to

4  individuals at Libby.  Well, that's certainly not disputed.  It

5  never has been disputed.  That doesn't go to any proposition

6  here.  Grace has agreed and it's agreed for many years that

7  there are, in fact, people who have been harmed by its products

8  in its conduct both at Libby and outside of Libby.  That's not

9  at issue.  The issue is whether there's some disparate

10 treatment.  And nothing that Mr. Kovacich has said goes to the

11 question that really is at issue which is the discrimination

12 point.

13         But, there I want to talk a little bit about what's

14 at issue here today versus some merits.  And I know Your Honor

15 is very focused on the merits, as well.  But, the issue here

16 today is whether this material, this incremental information

17 evidence should come in.  And I don't think anything has really

18 been said that demonstrates there's a need for this evidence to

19 come in.

20         With respect to the evidence that goes to culpability

21 such as the Lovick deposition and such as the testimony of the

22 individuals in their depositions regarding what happened to

23 them, that is the culpability issue.  Your Honor already has

24 ruled in connection with Dr. Spears' testimony.  It is not

25 coming in for the very reasons that Your Honor indicated.  No

1  effort has been made to differentiate this culpability

2  information from the culpability information that Dr. Spears

3  was going to testify to because he was going to talk about the

4  same thing which is conditions at Libby.

5       It's then -- the second purpose for the proffer was

6  to demonstrate that the cases had high values because of

7  severity and because of sole exposure and high exposure.  Basic

8  idea being, and I think counsel was very candid and very

9  succinct in saying as I'll try to be in responding, that what

10 they wanted to show is the reasons -- the unique reasons why

11 the settlement values were higher.

12      All of that was gone over.  It was gone over in terms

13 of severity of illness, in terms of the kinds of exposures.

14 That was gone over, severity of illness, by many of their

15 experts, and the significance of their exposure to Grace

16 asbestos alone.  Sole exposure was gone over by many of their

17 experts.  And the impact that that then had on settlement,

18 according to their view, was actively contested in the course

19 of this case, including through testimony about individuals by

20 a whole series of people.

21      There was cross examination of Mr. Hughes and direct

22 examination of Mr. Hughes on the settlement process at Libby

23 versus outside of Libby.  There was testimony by Dr. Peterson,

24 and there was also testimony by Mr. Inselbuch regarding the

25 TDPs in all those different respects.

1              So, there's no incremental evidence of value that is

2    set -- is contained or comprised by these individual

3    depositions.  All they are is individuals about whom people

4    already have testified, both individually and as groups.

5    Individually with respect to settlements, as groups with

6    respect to settlements.  Individually with regard to their

7    medical conditions, as groups with regard to their medical

8    conditions, including Mr. Schwennis, I think was the specific

9    subject of some examination.

10             So, is there a need for any of this material or is it

11   cumulative?  Your Honor's concern was cumulative.  This is

12   clearly cumulative, and I think that counsel has been candid in

13   saying this goes to the same proposition that we've been

14   arguing all along.  Well, that's been the subject of a lot of

15   testimony all along.

16             I'm not going to get into the merits.  Your Honor was

17   very focused on some of these numbers.  And the favorite number

18   of 2500 outside of Libby -- let me -- sorry -- 2500 outside of

19   Libby, you know, millions inside of Libby.  That's the same

20   apples and oranges comparison that's been out there forever.

21   You had to compare like to like.

22             And Your Honor already has heard extensive evidence

23   through Dr. Peterson and in cross examination of Dr. Peterson

24   and cross examination of Mr. Hughes extensive evidence about

25   not only the valuable cases in Libby, but the valuable cases

1 outside of Libby where the same kinds of claims of severity,

2 high exposures, culpability -- they're all being made in a lot

3 of different places in the country.

4      Is Libby a high verdict jurisdiction?  I don't know.

5 Maybe it is a high verdict jurisdiction.  The issue, though, is

6 not whether there's a high verdict jurisdiction.  The issue is

7 why and whether it's different in kind from all kinds of other

8 people out there who have got claims of various serious

9 disease, serious culpability, and very, very sympathetic cases,

10 including people who say -- who had sole exposure.  Sole

11 exposure is not a new issue.

12      And so, all this is just the same -- it's the same

13 tape that's going through the machine that plays out one

14 statistic and avoids the issue which is Libby versus non-Libby

15 like to like.  And none of this proffer -- none of this proffer

16 goes to that issue.  All it is is more Libby stuff.  So, for

17 all those reasons, Your Honor, we think this evidence should be

18 excluded.

19      THE COURT:  Mr. Lockwood?

20      MR. LOCKWOOD:  Your Honor, I just want to address one

21 point that I didn't think we were going to have to make here.

22 But, this -- the Libby claimants' argument about Mr. Bernick's

23 statements at the estimation proceeding being admissible in

24 this case as admissions, I would just like to say that the ACC

25 and the FCR are co-plan proponents here.  I think it's a matter

1  of record that we did not subscribe for Mr. Bernick's things.

2          I think it's a matter of record that we -- that this

3  entire plan represents a settlement of a dispute among parties,

4  and that the Libby claimants are among the constituents of the

5  ACC.  And for them to come in here and attempt to use against

6  the entire asbestos constituency and argument made by their

7  adversary in an estimation proceeding I think is, a) just

8  utterly unfounded, and b) wholly inappropriate.

9          THE COURT:  Mr. Wisler?

10          MR. WISLER:  Two quick things, Your Honor.  Because

11  really -- Mr. Kovacich really only had two comments or

12  responses to our objection.  Number one, unless Libby is now

13  standing down from all of their efforts to pursue Maryland

14  Casualty directly -- Maryland Casualty's a party opponent in

15  this case, and the Lovick testimony is not an admission of my

16  client.  So, it's inadmissible.

17          Number two, what I understood the response to be is,

18  well, Mr. Lovick's testimony is important because we're trying

19  to talk about value of the claims.  His testimony has nothing

20  to do with the value of claims.  Perhaps the results of those

21  two proceedings from which the testimony came is relevant.

22  That's not an issue right now, but the testimony itself is not.

23          Your Honor, the precedent is very clear on this.

24  This is inadmissible hearsay.  And while I know you invited

25  counsel to submit a case on another issue, I think -- Your

1 Honor, unless you had any other questions, I think you have

2 enough now to exclude the Lovick testimony without the need for

3 having to address that further in briefs.

4        THE COURT:  Well, evidence may be admissible against

5 one party and not against another, too.  So, it may or may not

6 be admissible against Maryland and Continental and all the

7 other parties.  It may be -- I don't think that the estimation

8 arguments would be admissible against the other plan proponents

9 because the whole reason we were going into that estimation

10 hearing was because the plan proponents who are now plan

11 proponents couldn't agree on what the estimated value of the

12 claims was, so they were adversaries.

13        So, whether it can come in against the debtor as

14 opposed to anybody else, I don't know.  But, I do not

15 understand how an argument of counsel can be admissible

16 evidence in a case when it is an opening statement in which the

17 purpose is to set out what you're going -- what you intend to

18 prove at trial.  But, if they can give me a case I'll change my

19 view if there's some authority out there.

20        MR. WISLER:  Right.  But, that doesn't affect the

21 admissibility of the Lovick testimony, and I don't think it's

22 really possible in this case given the dynamics, to draw a line

23 between what's admissible against one party and what's

24 admissible against another party.

25        THE COURT:  It's going to be very hard.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. WISLER:  I understand.  But, in any event,

2    there's other reasons to exclude that testimony, including its

3    irrelevance, which I think Your Honor's already ruled on in

4    terms of conditions at Libby at those times.

5           THE COURT:  All right.

6           MS. DeCRISTOFARO:  Your Honor, and also it -- making

7    the same point, it would not be admissible as to Continental

8    Casualty, either on the grounds of hearsay or because we were

9    not a party and because it's not an admission against us.  And

10   I think getting back to the overall big picture, I think Mr.

11   Finch said it very succinctly before.  This goes to such

12   collateral matters as to the merits of all the cases that are

13   being resolved in this plan and comparison about them that it

14   has to be irrelevant.  It's just too far afield from what the

15   plan has to resolve and what's at issue here.  So, we object it

16   on the grounds of relevance too, Your Honor.

17          THE COURT:  All right.  Anyone else?  Mr. Kovacich,

18   any closing comments?

19          MR. KOVACICH:  No, Your Honor.  I think we've covered

20   this adequately.

21          THE COURT:  Okay.  Why don't we be in recess until

22   two and then we'll start with the evidentiary submissions.

23          MR. FINCH:  Thank you, Your Honor.  Your Honor, may I

24   be excused?  Mr. Lockwood will cover the rest of the hearing.

25          THE COURT:  Okay.  That's fine.  Thank you.


                    **J&J COURT TRANSCRIBERS, INC.**

1                     (Recess)

2           COURT CLERK:  All rise.

3           THE COURT:  Good afternoon.  Please be seated.  Mr.

4  Freedman?

5           MR. FREEDMAN:  Your Honor, as they say, every dog has

6  his day, and I have the opportunity to brief the Court very

7  briefly on plan modifications before we go to the other

8  business of the afternoon.

9           The debtors -- the plan proponents have filed two

10  sets of modifications; one on September 4th and the other on

11  October 12th.  It's the view of the plan proponents, and I am

12  here to give a report, not to argue about anything, and really

13  just a quick overview.  But, it's a view of the plan proponents

14  that all of these are amendments which are either technical

15  amendments or do not require any -- or do not raise issues

16  under Sections 1127 -- excuse me, 1122 or 1123 that would

17  require some Court authorization on these amendments.  They all

18  comply with 1127-A.

19           In any event, if I could just briefly walk the Court

20  through the key points that are raised in these amendments, and

21  again, just for purposes of informing the Court what we've

22  done.  In effect, what this represents is a -- for the status

23  report on settlement because virtually all of these amendments

24  in one way or another are designed to address objections that

25  various parties have raised to the plan and to resolve those

**J&J COURT TRANSCRIBERS, INC.**

1 objections in a way that only further the plan with respect to

2 the issues raised by a particular party was implicated, but

3 without impairing anybody else's interests.

4           So, to start with, we're talking about modifications

5 to the joint plan itself.  There are several amendments to --

6 that involve the insurance settlements, insurance settlement

7 agreements, and issues related to insurance settlements as a

8 concept.  The most significant ones are that the plan

9 proponents have provided more time for 524(g) settlements as

10 was -- the plan originally provided that 524(g) settlements had

11 to be entered into as of the confirmation date.  Now it's 11

12 days from the entry of the confirmation order.

13           The -- in addition to that all post-petition 524(g)

14 settlements have to be approved by the Court in order to assure

15 that the requisite standards of 524(g) are met with respect to

16 those post-petition settlements.

17           THE COURT:  Okay.  I have an issue only because of

18 what happened yesterday in Armstrong, and that is, I know the

19 plan in Armstrong was confirmed by the district court, but of

20 course if you're adding somebody to a 524(g) injunction, I

21 don't care whether the hearing goes before the bankruptcy

22 court, but at some point I think there has to be a mechanism to

23 get the issue before the district court since the district

24 courts approve of 524(g) injunctions.

25           So, you may just want to take care of that as a

1  technical issue so that -- because in Armstrong it's not clear

2  where it's supposed to go and it may be better just to clarify

3  that the hearing's going to be by the bankruptcy court with

4  recommendations to the district court the way the confirmation

5  hearing's going if that's what you want.

6          I can't, of course, assure that the district court

7  would be willing to hear it.  You know, sometimes they tell the

8  bankruptcy court to hear it even if you want to go there.  So,

9  I don't really have a way around it, but I do think that if you

10 put it in the order or in the process, if it's not already in

11 there that would be helpful.

12         MR. FREEDMAN:  We appreciate that advice and we will

13 take it to heart in terms of looking at how the plan currently

14 works to make sure that that issue will not be an issue for our

15 plan.

16         THE COURT:  Okay.  And what exhibit number are you

17 looking at?

18         MR. FREEDMAN:  I'm sorry?

19         THE COURT:  There's an exhibit number.

20         MR. FREEDMAN:  Excuse me, Your Honor.  Let me -- it

21 is labeled as an exhibit.  It has not been moved in.  It's a

22 report that -- appeared it was handed out as a demonstrative.

23         THE COURT:  Okay.  Thank you.

24         MR. FREEDMAN:  Moving on, Your Honor.  Then we also

25 have made amendments to the insurance entity injunction and to

1 some of the other provisions that relate generally to

2 injunctions in order to clarify certain things that were not

3 intended to be covered by those injunctions.  Most notably,

4 BNSF has raised some issues with respect to policies that were

5 issued only to BNSF, although they were paid for by the

6 debtors, to make sure that those policies are not covered by

7 either the insurance entity injunction or the other injunctions

8 under the plan, and the plan's been amended to clarify that.

9          And we've also amended the insurance entity

10 injunction to make clear that in the situation that many

11 insurers raised where one insurer might have a contribution

12 claim against another insurer, that the insurance entity

13 injunction, the injunction that's entered to protect the

14 insurance asset, does not keep an insurer from asserting those

15 contribution claims.

16          There are a number of clarifications that we've made

17 to the plan.  We have clarified at the urging of the general

18 unsecured creditors committee to make sure that it's very clear

19 that Class 9 is not impaired.  And what that means, the

20 successor claims injunction needed to be clarified in order to

21 cure some ambiguities that Fresenius was concerned might lead

22 to a conclusion that the injunction as worded did not fully

23 meet the terms of the Fresenius settlement agreement, so some

24 changes were made to that injunction in order to effect that

25 clarification.  And throughout there are numerous minor

1 clarifications.

2          I would add, Your Honor, that in the two pleadings
3 filed by the plan proponents that actually set forth these
4 amendments there is a detailed list within the cover pleading
5 that actually identifies each of the specific changes and then
6 attached to that are blackline pages that show the changes to
7 the plan.  And in the modification that was filed on October
8 12th, we also included that blackline version of the entire
9 plan and all of the changed documents that contains all of the
10 changes, all of the modifications made to date.  But, rather
11 than just having single blackline pages, the entire plan now is
12 available in a blackline form.

13          THE COURT:  Okay.  What are the docket entry numbers?
14 I saw the modifications filed in September, but I don't
15 remember the docket number entry and I haven't seen the ones
16 filed on the 12th.

17          MR. FREEDMAN:  These are Docket Numbers 23177 and
18 23474.

19          THE COURT:  Okay.  Thank you.

20          MR. FREEDMAN:  And they also do have -- at least the
21 one that was filed in September has an exhibit number that's
22 Plan Proponents 352, for the Court's convenience.

23          The releases and exculpation provisions in the plan
24 were modified.  Most notably, all objections of the United
25 States Trustee have been resolved by modifications to the plan

1  that address those objections and certain objections and

2  concerns raised by the Department of Justice with respect to

3  its regulatory powers, making sure that the exculpation did not

4  affect those regulatory powers, changes to the plan were made

5  to that.  And then there are numerous typos that were picked up

6  by various parties which have now been fixed.

7          In the plan documents the PITDP was amended to

8  accommodate certain objections of the Libby claimants.  Other

9  claimants, a group known as the Edwards claimants, and the

10  various clarification amendments to that document, technical

11  and clarifying modifications, very technical frankly,

12  modifications to the insurance transfer agreement that's

13  schedules have been made.  The PD trust agreement was modified

14  at the behest of the PDFCR to address a concern about what

15  would happen in the very unlikely event that the debtors were

16  to default in their obligations to the PD trust, and so we made

17  amendments to clarify that.

18          And then the PDCMO has been amended in a few ways,

19  most notably with respect to some objections raised by the

20  State of California, that the PDCMO did not adequately cover

21  what will happen.  At the time we made the amendment it was a

22  hypothetical if the PD -- if the State of California claims

23  needed to be further addressed before the Court.

24          THE COURT:  What is the resolution in the event the

25  debtor defaults under the property damage trust?

1        MR. FREEDMAN:  Well, the resolution with respect to

2   the PD trust agreement was to make sure that in that event that

3   the PD trust would then be operating as a limited fund.  And to

4   clarify that the PD trust could operate as a limited fund and

5   make payments as a limited fund rather than having to pay 100

6   cent dollars if that was a necessary circumstance.

7        THE COURT:  But, this is only as to futures?

8        MR. FREEDMAN:  This is as to futures.  Exactly.

9        THE COURT:  All right.

10        MR. FREEDMAN:  All current PD claims will be paid --

11  the ones that have already been settled are going to be paid

12  100 cent dollars.  The ones that will be settled will be paid

13  100 cent dollars when they're resolved.  I supposed I changed

14  my answer.  I mean, theoretically if there were a default

15  before any existing PD claims that have not yet been resolved

16  were to be resolved, then that would require the same changes

17  to kick in.  But, that's really a feasibility issue, that is,

18  it goes to whether or not the terms of the plan that the

19  debtors intend to pay all these claims 100 cents will be

20  complied with.

21        THE COURT:  It may also be a voting issue.  That's

22  changing -- that is diminishing the treatment, potential

23  treatment of the current claimants, as well as the future.

24  But, if the future rep is willing to go along with that, that

25  takes care of that issue.  There are no futures who can vote.

1 But, as to the presence, that changes the plan treatment.

2          MR. FREEDMAN:  But, Your Honor, the obligation is an

3 obligation of the debtors --

4          THE COURT:  Yes.

5          MR. FREEDMAN:  -- to pay 100 cent dollars.  And as

6 with every obligation of the debtors, the question would be

7 whether or not it's feasible that the debtors will be able to

8 meet that obligation.  The debtors can meet that obligation

9 because the Court finds that the plan will work, then the fact

10 that there is a provision that will address a circumstance

11 which is already built into the plan; that is, the circumstance

12 of the plan that the PD trust might be a limited fund is a

13 circumstances which is already built into the plan required by

14 524(g).

15          THE COURT:  Wait.  I think I'm confused.  Does the PD

16 trust cover the current property damage claims or only the

17 futures?

18          MR. FREEDMAN:  It covers all property damage

19 claims -- all current and future --

20          THE COURT:  And future.

21          MR. FREEDMAN:  -- property damage claims are

22 channeled to the trust.  But, the issue --

23          THE COURT:  It's a voting issue.

24          MR. BERNICK:  Your Honor, does -- I -- Your Honor,

25 just -- this is supposed to be a status report, but I mean, the

1  status --

2         THE COURT:  But, you're telling me there's no notice

3  required, and if it's a voting issue there is notice required.

4         MR. BERNICK:  I understand that, but this is -- this

5  puts the -- there's no change in the footing of the current

6  claimants in the sense that today all the current claimants

7  whose claims have been settled get paid in full upon

8  emergence.

9         THE COURT:  Yes.

10        MR. BERNICK:  With respect to the current claims that

11 are still in the litigation.  Before this amendment took place

12 they would have been paid by the reorganized debtor.  After the

13 amendment takes place they would have been paid -- they are

14 paid by the reorganized debtor.  Before the amendment took

15 place if there had been a default; that is, if the debtor were

16 not able to pay, which is something that is partly a

17 feasibility issue --

18        THE COURT:  Yes.

19        MR. BERNICK:  -- because if the debtor were not able

20 to pay there would be a limitation on the ability to pay those

21 claims anyhow.  All current -- all future -- current and future

22 claims, without exception, have an inherent limitation to the

23 extent that the post-confirmation debtor has the inherent

24 limitation about how well it does in its business and whether

25 it can pay all the claims.

1          THE COURT:  No, that's a --

2          Mr. BERNICK:  All that this does -- all that this

3  does I think, Your Honor, is to say that at such time as it's

4  no longer possible to pay the PD claims -- future PD claims --

5  current PD claims or future PD claims, in full, it spells out

6  the mechanism pursuant to which the issue will then become

7  resolved.  If we had left it just the way that it is, they come

8  out against the reorganized debtor, if the reorganized debtor

9  is not able to pay, you can't squeeze blood from a turnip.

10 There would have to be an adjustment under that sort of

11 circumstances.  It is inherent in the future course of the

12 debtors' operations that that is so.

13         All that this does is to say that in the event that

14 it's no longer feasible to pay 100 cent dollars, the mechanism

15 for resolving how the payment takes place going forward is

16 spelled out in advance and will be done pursuant to a trust.

17         THE COURT:  Yes.  And unless these claimants have

18 already voted, it's an impairment issue because when you allege

19 that you will pay 100 percent on the claims whenever they're

20 resolved without any caveat to it, then there's a contractual

21 obligation of the debtors to pay 100 percent.  When you now

22 change it to say I can't pay 100 percent, therefore I'm going

23 to prorate whatever is available, that's an impairment issue.

24         MR. LOCKWOOD:  Your Honor, they're not saying they're

25 not going to pay --

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  Can you turn the microphone on?

2           MR. LOCKWOOD:  Sorry.  Your Honor, they're not saying

3  that they're not going to pay 100 percent.  As Mr. Bernick

4  said, the plan says Grace is paying 100 percent.  This is sort

5  of like Manville.  Manville said they were going to pay 100

6  percent.  That was the plan.  That was the requirement.  The

7  trust ran out of money.  What did it do?  They had to go in and

8  reorganize.

9           What's being done here is, they've put in a provision

10  that says, hypothetically, if somehow or another the debtor

11  breaches the obligation contained in the plan, by the plan's

12  terms and contained in the plan document by the document's

13  terms, and if that breach is not remediable, in other words

14  it's not a refusal by Grace to pay the money, it's an inability

15  by Grace to pay the money which would presumably result in

16  Grace winding up back in Chapter 11 again if they can't pay

17  their debts as they come due.  It's a simple -- it's a

18  provision that says, during such period of time as Grace is

19  unable to pay the money, we will anticipate the need for making

20  sure that what would otherwise be a first come, first serve run

21  on the trust will be -- it's like the amendment procures to the

22  PITDP, the PI trust that allow a change in the payment

23  percentage.

24           Here what this does in is it allows prospectively for

25  the possibility of a change from 100 cent dollars to less than

1  100 cent dollars by the trust if the trust doesn't have the

2  money.

3          THE COURT:  I understand what it's doing.

4          MR. LOCKWOOD:  That's not impairment --

5          THE COURT:  Well --

6          MR. LOCKWOOD:  -- because the plan leaves their

7  rights unimpaired.  Every claimant has the right to 100 percent

8  payment, it's just that there's not enough money to do it.

9          THE COURT:  Well --

10          MR. BERNICK:  Put simply, Your Honor --

11          THE COURT:  -- I'll have to take a look at this

12  because it seems to me if this were built in as a mechanism at

13  the outset where everybody knew that this was how it would be

14  treated upon voting, I wouldn't have this issue.  I'm not

15  suggesting that it shouldn't be in the trust.  It probably

16  should.  The mechanism to resolve that issue should have been

17  stated probably at the outset, but putting it in now changes

18  the respective rights of the parties to the trust.  It simply

19  changes them.

20          MR. FREEDMAN:  Your Honor --

21          THE COURT:  They're now saying it's going to be a pro

22  rata allocation and it wouldn't have been before.

23          MR. BERNICK:  No, but --

24          MR. FREEDMAN:  Your Honor, I'd like to speak to that

25  because it was, in fact, built into the mechanism.

**J&J COURT TRANSCRIBERS, INC.**

1         THE COURT:  Okay.

2         MR. FREEDMAN:  The trust itself was a heavily

3    negotiated document with PDCFCR and frankly the committee was

4    well-aware -- the PD committee was well-aware of the terms of

5    the trust negotiations.

6         Those negotiations extensively focused on the

7    obligations of Section 524(g) that related to providing

8    collateral, the possibility of a 51 percent ownership of the

9    shares of the debtor, those kinds of issue.  Those are

10   requirements of Section 524(g) and those issues go to what

11   would happen if there is a default.

12        So, the plan itself has numerous documents in it that

13   are designed to address what happens when the debtor defaults

14   on the obligations to the various trusts.  That eventuality was

15   well discussed fully before everybody at the time of the voting

16   on this plan at the time that people had an opportunity to file

17   objections.  All this change does is to clarify that the

18   trustees have the power and the flexibility to address that

19   eventuality without any ambiguity.

20        In fact, the trust agreement already says that the

21   trustees have all the powers and obligations that they're

22   required to exercise under Delaware law and frankly we believe

23   that for that reason this is a purely technical and clarifying

24   amendment to make sure that nobody can raise the problem that

25   when -- if the trust became a limited fund they could treat it

1  as a limited fund in order to make the payments.  But, the

2  eventuality of a limited fund, the circumstances on default

3  were all completely before all parties at the time that they

4  voted on the plan.

5          THE COURT:  All right.  I'll take a look at it.  I'm

6  not convinced that this one doesn't need notice.  So far I

7  don't see anything else that's anything other than a technical

8  amendment, but I'm a little concerned about this one.

9          MR. FREEDMAN:  Thank you, Your Honor.

10          MR. PASQUALE:  Good afternoon, Your Honor.  Ken

11  Pasquale for the creditors' committee.  Just a quick comment.

12  Mr. Freedman seemed to say that some of these changes were

13  resolving objections.  With respect to the change to Class 9,

14  and I believe this was in the notice or certification to

15  counsel that the debtors filed, we do not agree with the

16  language.  It does not resolve any of the issues that we

17  raised.  We'll address them in the post-hearing brief, but I

18  just wanted the record to be clear that at least with respect

19  to our objections, it did not address the objection.

20          THE COURT:  Well, the objection is that --

21          MR. PASQUALE:  Well, let me just --

22          THE COURT:  -- is it with respect to the interest

23  rates?  I mean --

24          MR. PASQUALE:  No, well -- no, this really had to do

25  with the non-lender --

1         THE COURT:  Yes, oh, okay.

2         MR. PASQUALE:  -- on secured claims, and we had

3 talked back, I guess, at disclosure statement time and then

4 again in Phase I about some language that could address our

5 objection.  We still have a disagreement as to the language.  I

6 don't think we need to take up the time.  I'll address it, but

7 I just wanted the record to be clear that that's still

8 outstanding.

9         THE COURT:  All right.

10        MR. PASQUALE:  Thank you.

11        MR. BERNICK:  Should we just go ahead?  I know that

12 Mr. Speights wanted to have his exhibits heard early in the

13 process and I think that if there's -- do you want to make --

14        MS. BAER:  Yes.

15        MR. BERNICK:  -- some things out first and then maybe

16 we can --

17        MS. BAER:  Maybe, Your Honor, if I can explain the

18 process and then we can figure out what to do.  And, Your

19 Honor, before I do that in Mr. Bernick's discussion earlier he

20 had handed up a few additional pages that were made as exhibits

21 that were not in your binder and we'd like to hand those up to

22 you.  They're Pages 107, 108 and 111 of the Molgaard testimony.

23        MR. BERNICK:  And they go beyond the -- behind the

24 Molgaard tab.

25        THE COURT:  Oh, yes.  Thank you.  I have a matter to

1  raise, too.  There was the name, and I don't want to repeat it

2  because it will just cause another problem if I do, an

3  individual claimant's name was put on the record along with a

4  description of that claimant's disease I think in Mr.

5  Kovacich's or Mr. Heberling's argument this morning.  If it's

6  possible, I would like the staff to be able to go through this

7  transcript and simply delete that name.  Perhaps we can refer

8  to that person as either "S" or if there was a designation for

9  that witness that was given in the changes that were submitted

10 to the Court before, perhaps we can use that.  Otherwise, I'm

11 going to have to go through this correction of the transcript

12 process again before I can put this record -- the transcript on

13 the public record.

14         MR. KOVACICH:  Your Honor, I believe I know who

15 you're referring to and that person is a settled claimant, not

16 an existing claimant, and I thought we had resolved that, that

17 we weren't going to have a problem with the names of the

18 settled --

19         THE COURT:  Oh.

20         MR. KOVACICH:  -- claimants --

21         THE COURT:  With the disease description.

22         MR. KOVACICH:  -- being in the record.

23         THE COURT:  Because there was a description of the

24 disease, too.

25         MR. LOCKWOOD:  I believe Mr. Kovacich is correct.

1          COURT CLERK:  Please use the mic.

2          MR. LOCKWOOD:  I believe Mr. Kovacich is correct

3  about that, Your Honor.  The concern were living claimants that

4  still had pending claims that were addressed with the

5  confidentiality restrictions.

6          THE COURT:  Okay.  Well, if you're not -- if there's

7  no a confidentiality issue, then I won't worry about it, but I

8  wanted to raise it before I put this on the public record and

9  then find out that there is an issue.

10          MR. KOVACICH:  The same individual with the same

11  characterization of his disease appears on Exhibit LC-16a.

12          THE COURT:  Yes, but I thought those exhibits had

13  been -- or were going to modified to delete the names because

14  the exhibits that have been handed up to me didn't have the

15  names.  They only had some other -- like a number that was

16  associated.

17          MR. KOVACICH:  Well, I hope I'm not misunderstanding

18  what the agreement was, but I didn't think we had a problem

19  with the settled claimants and if it helps with the issue

20  today, I'm not concerned about the individual whose name I

21  referenced in my description of his disease being in this

22  record.  I'm confident that's not going to be a problem.

23          THE COURT:  All right.  That's fine.  I won't worry

24  about it then.  Thank you.  One second, Ms. Baer, until I put

25  these exhibits in.

1                              (Pause)

2              THE COURT:  Okay.  Thank you.  Wait.

3              COURT CLERK:  That name was what was redacted

4    according to the e-mail we got.  That has -- had to be redacted

5    in the September 11th transcript.  That name was the same one.

6              THE COURT:  My clerk is saying that the name was one

7    that was redacted on the September 11th transcript.

8              MR. KOVACICH:  Are we talking about Claimant Number

9    13?

10             MR. BERNICK:  No, that's not --

11             THE COURT:  Yes.

12             MR. BERNICK:  -- I don't think that's who it was.

13             THE COURT:  Yes, that's who it was.  Can you print

14   it?

15             COURT CLERK:  Sure.

16             THE COURT:  Mona, is there a description that's

17   substituted for him?

18             COURT CLERK:  Claimant Number 14.

19             THE COURT:  Okay.  Where his name just appeared now,

20   if no one objects, I'm going to have this designation changed

21   to say Claimant Number 14.

22             COURT CLERK:  There's another one.  There's the same

23   last name, different first name.  That's Claimant Number 13.

24             THE COURT:  There were apparently two, 13 and 14.

25             MR. KOVACICH:  Yes, I think there are two Claimant

                        **J&J COURT TRANSCRIBERS, INC.**

1  Number 13s.  The one that I referred to is Claimant Number 13.

2  Claimant Number 13 is $1.1 million settlement.

3          COURT CLERK:  That's Number 13.

4          THE COURT:  What -- Number 13, okay then --

5          MR. BERNICK:  Number 13.

6          THE COURT:  -- every place Claimant Number 13's name

7  appears in this transcript I am going to -- if no one objects,

8  have it substituted to say Claim Number 13.  Is that all right?

9          I don't think you need it printed.  No one's

10 objecting.  Everyone will know who it is.  Cathy, can you just

11 make that substitution in the record before you send it our

12 everywhere it appears?  Okay.

13         I -- there may have been another claimant name, too,

14 but I don't recall.  I know -- I remember that one for sure.

15 Okay.  Thank you.  Ms. Baer, go ahead.

16         MS. BAER:  Good afternoon, Your Honor.  Janet Baer on

17 behalf of W.R. Grace.  Your Honor, I'm going to hand you a

18 binder just for convenience.  It's documents that are in the

19 agenda all in one spot so you don't have to pull binders to try

20 to find them.

21         THE COURT:  All right.  Thank you.

22         MS. BAER:  Your Honor, I just wanted to go through a

23 little bit of what the objection process or the exhibit process

24 has been and a little bit on the deposition designations.  I

25 think this will be very quick.  I don't think we have a lot of

1  controversies.  Just to sort of review where we were, after the

2  last hearing we put in a process that was approved by Your

3  Honor at the last hearing on how to deal with exhibits to see

4  if we can get agreements on everything that can be admitted and

5  know what we're going to continue to object on.

6         Your Honor, the first thing we did is we assembled a

7  list of all the admitted exhibits.  We went through the

8  transcripts, assembled this, shared it with all the parties.

9  Many of the parties came back to us where we had little

10 disputes about maybe the manner in which something had been

11 admitted and ultimately got to the point where we had an

12 agreement that the list was correct.  That agreement and that

13 list was filed on October 10th -- I'm sorry, on October 7th,

14 2009 at Docket Number 23441.

15        Subsequent to that we found a couple more errors.  We

16 corrected those errors on October 12th at Docket Number 23476.

17 And in your binder, Your Honor, the chart we filed on the 8th

18 is the first tab and the couple corrections we made are on the

19 second tab.  There were very few corrections.  There was a

20 correction where we removed Document Number LC-280.  It had

21 erroneously been listed as admitted.  It was not admitted.

22 There was an objection by Maryland Casualty and I understand

23 that actually that objection has now been resolved and we'll

24 take that out momentarily.

25        We also added in as an admitted Exhibit LC-284.  They

1  were the Royal policies.  There's a whole CD of policies.

2  Nobody objected to their admission, and that is now listed as

3  an admitted exhibit.  The third thing we did, Your Honor, is we

4  revised the highly confidential designation on PP-239 and 240,

5  so the revised pages we filed on October 12th show now that

6  that designation is removed.

7        Your Honor, if you look at the very first tab in your

8  binder it is the list of all admitted exhibits and the very

9  last column of that part we have listed yes when the exhibit

10 was admitted by Your Honor and the date from the trial

11 transcript and when it's been admitted.  Where, Your Honor,

12 it's been stipulated to, but you have actually not on the

13 record said, yes, this is admitted, we've only indicated on

14 there that it's been stipulated to and we indicate the date on

15 which the stipulation was agreed to.

16       In some instances it was agreed to by a writing that

17 was submitted to the Court.  In some instances, in the case of

18 Libby, for example, it was agreed to among the parties.  We're

19 all in agreement.  In fact, the binder was submitted to you of

20 the documents, but Your Honor did not actually rule that those

21 exhibits were admitted into evidence.

22       So, what we'd like to do, Your Honor, first of all is

23 have Your Honor rule that all of the exhibits that have been

24 agreed to pursuant to stipulation and the terms and conditions

25 of those stipulations, as outlined on here, all of those

1    exhibits are, in fact, admitted into evidence as outlined in

2    the chart.

3           THE COURT:  All right.  Some of these admit the

4    documents for limited purposes.  So if I agree that they're all

5    admitted for these purposes then I have to take cognizance of

6    the fact that they're not admitted for all purposes if there is

7    some caveat under the column admitted in these charts, is that

8    correct?

9           MS. BAER:  Yes.  Yes, Your Honor, and that's what we

10   are asking you to do.

11          THE COURT:  All right.  Does anybody have an

12   objection to that process; that is, that I will admit all of

13   the documents that have been identified pursuant to either

14   certifications of counsel, certifications of no objection or

15   stipulations for the purposes which are listed in these either

16   CNOCOCs or stipulations as applicable and if there is no caveat

17   with no limitation with respect to the admission then it will

18   be admitted for all purposes?

19          All right.  There's no objection.  These documents

20   and exhibits are so admitted, as I've just recited.

21          MS. BAER:  Thank you, Your Honor.  Your Honor, in

22   addition what we did is we also invited all of the parties if

23   they wanted to see if we could agree to the stipulation of

24   additional exhibits to be admitted into evidence to share

25   stipulations and share the documents.  That process was done,

1  and to the best of my knowledge everybody complied but Anderson

2  Memorial.  We never heard from Anderson Memorial.  We heard

3  from all of the insurers.  We heard separately from a few of

4  the other parties and the result of that process, Your Honor,

5  was two more stipulations were agreed to.  They were

6  stipulations by CNA and by the additional insurers.  They were

7  filed both on October 9th at Docket Number 23454 and 23464.

8             THE COURT:  I'm sorry, 23454 and what?

9             MS. BAER:  23464.

10            THE COURT:  All right.

11            MS. BAER:  They are, Your Honor, the third and fourth

12 tabs in your binder.  And pursuant to those stipulations I can

13 either go through the documents that are listed here or if Your

14 Honor would simply admit the documents listed on these two

15 stipulations into evidence we will, at the end of this process,

16 give you a full chart of all exhibits that reflects all of the

17 stipulations, including these two new stipulations.

18            THE COURT:  I didn't understand that in admitting all

19 the exhibits before I was excluding any exhibits that on the

20 stipulations.  I thought everything in this binder that has

21 been admitted -- agreed upon by the parties is admissible is

22 admitted.

23            MS. BAER:  That's correct.  These are additional

24 documents that are not on this list because they were agreed to

25 after the list was put together.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Oh, I see.  Well, okay.  I'll admit them.

2    I don't know what they are, but that's fine.

3          MS. BAER:  Your --

4          THE COURT:  You'll revised these submissions.

5          MS. BAER:  We're going to revise the chart to include

6    these exhibits and the stipulations outline which exhibits they

7    are.  And since, in the case of CNA they're very voluminous,

8    they probably don't want to take the time of listing them all.

9    So, again, Your Honor, we would ask that the exhibits listed on

10   the CNA stipulation and on the insurer's stipulation also be

11   admitted into evidence.

12         THE COURT:  They are admitted under the same terms

13   and conditions that I articulated previously.

14         MS. BAER:  Your Honor, then the debtors -- I should

15   really say the plan proponents also circulated the list of

16   additional exhibits they sought to seek in -- to get admitted

17   into evidence.  The Libby folks and some others needed to get

18   back to us on the few of those and did not get back in time for

19   us to submit -- or to get a stipulation signed up.

20         What we did do, Your Honor, is on October 7th at

21   Docket Number 23442 we filed a certification of counsel and

22   attached to the certification of counsel is a chart of the

23   additional exhibits that the debtors have sought to move into

24   evidence.  Your Honor, ultimately Libby and the other parties

25   got back to us and agreed that these exhibits could be

1  admitted, some without limitation and some for limited

2  purposes.  And, Your Honor, at Docket Number 23442, which is

3  also in your binder, we have a last column that shows comments

4  where it indicates the circumstances under which the documents

5  are to be admitted.  And, again, sometimes it says some --

6  nothing.  Sometimes it says things like not to show the truth,

7  but for the existence that the request exists.

8        And, Your Honor, on that there's just one issue and

9  that is, there are some documents that we have sought to be

10 admitted that are actually filed pleadings on the docket of

11 this case.  And the question was, under what circumstances are

12 these documents being admitted?  They, for example, include the

13 motion to approve the seal of their settlement agreement, the

14 motion.  And it's not appropriate to say, Your Honor, in

15 certain circumstances it's not for the truth.  There are

16 certain things in there that could necessarily be for the

17 truth.

18       What, Your Honor, we have indicated and what we

19 understand is that these documents really did not have to be

20 marked as exhibits.  We did it for the convenience of the Court

21 and for the parties.  Rather than getting mixed up with what it

22 is, we put an exhibit sticker on it and we admitted it and we

23 put it that way and we'd like it admitted into evidence.  All

24 we're asking, Your Honor, is that they be admitted pursuant to

25 the federal rules of evidence.  To the extent you can cite a

1 pleading for whatever you can cite a pleading for under the

2 federal rules of evidence, that's all we're asking.  That's

3 what we believe is appropriate.  We frankly, again, don't

4 believe there's really any need to have them admitted as

5 exhibits, except that it's a convenient way to do so and a

6 convenient way to then refer to documents in the future.  It's

7 happened throughout this entire trial where pleadings have, in

8 fact, been marked as exhibits and admitted into evidence.

9        So, Your Honor, we're asking that all of the exhibits

10 on this list be admitted into evidence for the purposes

11 outlined here.  And with respect to the pleadings we've

12 indicated on the chart they be admitted and accepted as

13 documents on the case docket, and what we mean by that is

14 they're admitted under the federal rules of evidence to be used

15 as pleadings and cited as pleadings to the extent that you're

16 always able to cite other pleadings on the docket of the case.

17        And, Your Honor, I believe the only party who had an

18 issue with that was the OneBeacon Seaton parties who were a

19 little confused about what that meant.  I think I've clarified

20 it, but certainly Mr. Brown can speak to it if he has an issue

21 with it.

22        THE COURT:  Mr. Brown?

23        MR. BROWN:  Your Honor, I think Ms. Baer got that

24 accurate.  We tried at a meet and confer to sort of reach a

25 landing on this and one of the things the plan proponents have

1  pointed out is that the parties have been less than consistent

2  in the manner in which they cite to pleadings in the main

3  bankruptcy case and in the adversary proceeding.  I know in the

4  case of some of the documents we had they were admitted

5  pursuant to stipulations with limitations.

6        The certification that Ms. Baer circulated has a --

7  maybe I can put it under here and Your Honor will be able to

8  read it.  It has a statement on there in terms of using

9  pleadings and I conferred with Ms. Baer before this afternoon's

10  session and she indicated that this is not necessarily limited

11  to the documents that are on the actual certification.  In

12  other words, if a party wants to cite to a document that's part

13  of the record in this case as part of the post-trial briefing,

14  they're free to do so, same thing with adversary proceedings.

15  And we don't have any objection to that.  I think that's

16  perfectly fine.

17        I guess the question we have and the concern we have

18  is that there's all sorts of things that get filed by parties

19  with which other parties disagree.  They get resolved in all

20  sorts of different ways.  Sometimes they don't get resolved.

21  Sometimes they get mooted.  And the question really is, to the

22  extent that someone wants to cite such a document, are we going

23  to be in a position where they're being admitted for the truth

24  of the matter asserted?  And I think there's -- every party in

25  this room would probably have concerns with a particular

1  document given the document if that were the case.

2          And I guess so long as the arguments are preserved to

3  argue that such and such is hearsay in this context, then I

4  guess I don't have a problem with it.  But, my concern was with

5  the language that was used in this certification and -- bring

6  it up here.

7          THE COURT:  So, your concern is that they can be used

8  for any proper purpose, but any objection is preserved.

9          MR. BROWN:  Yes, and I think that that probably would

10 solve the problem, Your Honor, because I, you know, there --

11 people are going to be citing the things under these

12 circumstances that may not even be exhibits now in the record.

13 Some may be, some may not be, but just because of the

14 inconsistency, and I just, you know, don't want to find myself

15 in a position down the road where all of a sudden we're being

16 told that that document was admitted and it's been admitted for

17 the truth of the matter asserted if, in fact, there's a hearsay

18 objection to it.

19         THE COURT:  Okay.  It -- well, it seems to me with

20 respect to the pleadings in the case that they don't need to be

21 admitted as substantive evidence.

22         MR. BROWN:  Sure.

23         THE COURT:  The Court can always take judicial notice

24 of them, but that's not going to get you a ruling with respect

25 to the truth of any matter asserted.  It's simply going to be a

1  recognition that there is a pleading and that it says X, but

2  not that that X is true or not true --

3          MR. BROWN:  Right.

4          THE COURT:  -- as the case may be.  So, if this

5  admission is for that same purpose, I don't have any problem

6  with it.  I think Ms. Baer is correct, the parties can always

7  refer to pleadings, but whether or not the reference is

8  relevant or admissible in a particular case has to do with all

9  sorts of things, not just the fact that a pleading was filed.

10          MR. BROWN:  Right.  And, Your Honor, in fairness in

11  our meet and confer we identify the problem, but neither one of

12  us could really come up with a solution as to how to word that

13  comment section and that's why, you know, Ms. Baer took a crack

14  at it.  I think it's as good as anything I could come up with,

15  but I'm not sure it's descriptive enough to capture the

16  problem.

17          MR. BERNICK:  That --

18          THE COURT:  All right.  Well, it seems to me that if

19  we simply say that they're being marked for purposes of

20  convenience, they can be used for purposes authorized by the

21  rules of evidence and that any objection to the admissibility

22  of their use as evidence in the case is preserved, that ought

23  to do it.

24          MR. BROWN:  That's fine.

25          MR. BERNICK:  Yes, I think that's right.  I think

1  that we're calling them exhibits, so that we have a

2  nomenclature on the basis of which to retrieve them.  We're all

3  agreeing that they are usable as pleadings in the case, and

4  beyond that they may have further use depending upon whether

5  they're noticed judicially, or otherwise admissible.

6          So, I think it's less that in the sense they're

7  admitted into evidence they've become part of the record as

8  exhibits for those purposes.

9          THE COURT:  That's fine.

10         MR. BERNICK:  Does that sound right, Mike?

11         THE COURT:  That's fine, too.  The difficulty I have

12 with not admitting them as evidence if they're marked as

13 exhibits is, I don't know what you do with them later.  I mean,

14 they're already on the docket as pleadings, so --

15         MR. BERNICK:  Well, this is a contested proceeding

16 confirmation, so we have a record that's an evidentiary record

17 that goes to issues in the case and from that point of view for

18 something to be actually admitted into evidence means that as

19 part of an evidentiary record as to which any determination

20 made by the Court is reviewable.

21         THE COURT:  Right.

22         MR. BERNICK:  So, I think at this point, because I

23 tend to agree with what Mr. Brown is saying, you really can't

24 say that they're all admitted into evidence, that we don't have

25 proffers of all of the underlying materials, and I think he's

1 correct that some of these documents are voluminous and contain

2 a lot of stuff.

3      So, I think that probably the best idea is to say

4 that they are exhibits as part of the record in this case and

5 we have an agreement that they may be used for purposes of this

6 proceeding to the extent that they are otherwise admissible or

7 useable under the federal rules of evidence.

8      THE COURT:  That's fine.

9      MR. BERNICK:  And then people can -- if they want to

10 use them for that purpose, I think they probably have to

11 specify how that's being used.  What?

12           (Attorney conversation)

13      THE COURT:  I think that's fine and because I'm going

14 to have to know why the parties would want to use them anyway

15 because typically the pleadings themselves would not be

16 evidence in the case from an -- from a trial standpoint.  So, I

17 think I would have to know why somebody is citing to a pleading

18 anyway.

19      MR. BROWN:  Right.  And then some of these, Your

20 Honor, have already been dealt with by way of stipulation.  I'm

21 not proposing that we change any of that.

22      THE COURT:  Yes.

23      MR. BROWN:  I'm just talking with respect to the

24 particular document that Ms. Baer handed to Your Honor; the

25 certification.

1           THE COURT:  I don't have anything handed up.

2           MR. BROWN:  I handed mine to Mr. Bernick.  I don't

3    have --

4           MR. BERNICK:  What I would propose actually is that

5    we do it this way for now and it is a finite population of

6    documents and it may be that for those parties who really want

7    to be able to say a given pleading is now in evidence or it's

8    been judicially noticed that we have -- we still have a little

9    bit of time and we can come back in and provide in some

10   fashion -- presumably it doesn't require that we all be here --

11   a specification of the rule under which it -- or the purpose

12   for which it's being offered, because I do believe that that

13   really has to be done in order for the record to be -- the

14   evidentiary record to be clear.  That's kind of a bright line

15   demarcation.

16          THE COURT:  Well, I can obviously take judicial

17   notice of any of the pleadings that are of record in this case

18   and the adversaries that are in this case.  I have no problem

19   doing that.  They're part of this Court's file.

20          MR. BERNICK:  Yes.

21          THE COURT:  So, for judicial notice purposes, that's

22   not an issue.  But, the evidentiary use, I agree.  You've got

23   to give me some foundation for why the evidence is admissible

24   in connection with what you're trying to use it for.

25          MR. BERNICK:  Right.

1          THE COURT:  And so if you want to do a supplement, I
2  don't know, in conjunction with the briefing schedule or
3  something that lays that out.
4          MR. BERNICK:  Or maybe even if we can reach agreement
5  in advance.  But, yes, I think we ought to have a -- I think
6  that really we probably ought to have a supplement that is due
7  when?  The omnibus?
8          Well, let us propose this.  Let's just handle it the
9  way that Your Honor's indicated that it's judicially noticed
10  and that the -- then that's it, and then we'll --
11          THE COURT:  Yes, they can be used as evidence if the
12  parties either agree or give me some basis --
13          MR. BERNICK:  Right.
14          THE COURT:  -- subject to anybody else's objections.
15          MR> BERNICK:  And then we'll try to work out a
16  schedule --
17          THE COURT:  Okay.
18          MR. BERNICK:  -- for the next step that's consistent
19  with the briefing schedule.
20          THE COURT:  All right.
21          MR. BROWN:  Your Honor, I think I follow that.  I
22  just have on question.  The -- what are we doing with the
23  certification of documents that the plan proponents wanted
24  admitted which I had a copy of here a moment ago?
25          MR. BERNICK:  Yes.

**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  I don't even know what that is.

2            MR. BROWN:  Okay.  It's -- you have it?

3            MS. BAER:  Your Honor, with respect to the plan

4   proponents' certification, that is Document 23444, that is in

5   your binder.  And, again, it was -- we were asking they be

6   admitted into evidence for these limited purposes, that you

7   essentially take judicial notice they're pleadings in the

8   docket.  They can be referred to pursuant to the federal rules

9   of civil procedure.

10           THE COURT:  Okay.  Well, I don't have any problem

11  taking judicial notice of all of the pleadings in the case and

12  the adversaries in the case, if that's helpful, but that

13  doesn't put them into evidence.  So, I think perhaps what I

14  should do is deny the certification as it's requested.  Let you

15  folks work out what you actually want to try to admit from

16  those pleadings and you can use the fact that I have taken

17  judicial notice of all of the pleadings in the case and all of

18  the adversary dockets and pleadings in the case, but only for

19  the purpose of getting you past whether or not they are a

20  pleading in the case, not for any other purpose.

21           MS. BAER:  Your Honor, that will work.  That's only

22  as to some of them.  Now, some of these documents we have

23  agreement that they should be admitted into evidence, and so

24  what I would suggest, Your Honor, is that we will submit

25  something to you that's revised that only talks about the

1   non-pleadings that the parties have agreed can, in fact, be

2   admitted into evidence for the purposes listed on this chart.

3           THE COURT:  Okay.  I think it would be better to give

4   me a certification as to the ones that have been admitted

5   rather than having me sign off on a certification that doesn't

6   -- that is then going to look like I've approved everything

7   when I haven't.

8           MR. BERNICK:  I think that --

9           MS. BAER:  Yes.

10          MR. BERNICK:  -- that's what our idea is, is to do a

11  new one.

12          THE COURT:  I think that --

13          MS. BAER:  Yes, Your Honor.

14          THE COURT:  Oh, yes, a new one.  Okay.

15          MS. BAER:  Yes, I will do a new one with the

16  documents that are being admitted into evidence --

17          THE COURT:  All right.

18          MS. BAER:  -- which are the non-pleadings that the

19  parties have agreed may be admitted.

20          THE COURT:  That's fine.  Can you link it to this

21  23444 number when you file it as a revised?  So that I think

22  that would make it --

23          MS. BAER:  Yes.

24          THE COURT:  -- easier for everyone to know where to

25  look at it -- so to find it, that is, so --

1           MS. BAER:  Yes, Your Honor.

2           THE COURT:  All right.

3           MS. BAER:  And then, Your Honor, with respect to the

4 stipulation of the insurers which was the 23464, Mr. Brown

5 actually has binders of the documents that are the agreed to

6 exhibits.

7           THE COURT:  All right.  One second because you're

8 going -- you're getting ahead of me.

9           MS. BAER:  Sorry.

10           THE COURT:  Okay.  There -- I think I'm wholly

11 confused.  I thought that all this stuff with which I am now

12 surrounded were the documents that the parties were admitting

13 into evidence.  So, why am I getting supplemental binders of

14 what the parties are now admitting into evidence and what do I

15 do with all this stuff?

16           MS. BAER:  Your Honor, what I would propose to do,

17 and hopefully you can get rid of most of this stuff then, is we

18 are now hopefully today going to conclude this trial.  The

19 debtors will provide to you a list of all of the exhibits which

20 will designate which ones are admitted into evidence pursuant

21 to the rulings from the Court, stipulations of the parties and

22 all the rest that have not been admitted into evidence where we

23 list what the objections are to those documents and we will

24 give you a CD that has all of the exhibits.

25           You have a CD now of all of the exhibits, but it

1 doesn't include all of the new stuff that's come in in the last

2 -- well, actually since we gave you the CD prior to the

3 commencement of the September trial.  So, we'll give it to you

4 all again on a CD and frankly you won't need those binders.

5          THE COURT:  But, a lot of these documents in the

6 binders to the -- at least as far as I know, haven't even been

7 used.  I mean, they're not -- as far as I know they're not part

8 of the proffer.  They're not part of anything.  They were just

9 included I guess in -- as an in case which is what I asked not

10 to have done.  That's why I wanted the CDs.

11          MS. BAER:  Yes, Your Honor, a great -- the great

12 majority of the documents that were designated as exhibits

13 have, in fact, been used and admitted as exhibits and that will

14 be very clear when you look at the chart.  It's fairly long.

15          There are a whole bulk of exhibits that parties have

16 never mentioned.  I know from the plan proponents' perspective,

17 we're not going to use them.  We can certainly on the sort of

18 the chart of the remaining documents strike them all out.

19 We're not going to use them.  We don't have to ever give them

20 to you again.

21          With respect to those parties though that still have

22 exhibits that have not been agreed to and have not been

23 admitted into evidence, there are pending objections.  I had

24 hoped through the stipulation process we would narrow those

25 down.  I think we're at the point where, but for Anderson

1 Memorial, pretty much everybody who has wanted to get an

2 exhibit into evidence has gotten it in.  We've agreed to by

3 stipulation or Your Honor has ruled.

4        The only party that I have not heard from is Anderson

5 Memorial.  So, to the best of my knowledge all of the exhibits

6 on their exhibit list, they still seek to get admitted into

7 evidence and we still object to.  And the reason that's the

8 case is because we never heard from them.  We never had any

9 discussions, and so there wasn't an opportunity to see if we

10 could stipulate and I would --

11        MR. BERNICK:  If I could make a suggestion.  I think

12 what Ms. Baer has described is a long process that's now put us

13 in a position where there is agreement to the extent that

14 agreement can be reached on a whole range of documents.  And,

15 so Your Honor will, (a) have those, (b) have a list of them and

16 know their status.

17        With respect to the documents that have been --

18 they've all been objected to if they -- if there hasn't been

19 agreement they're still objected to.  With respect to those

20 documents I think it really might be important.  We're

21 certainly prepared to embark upon a process here to make it

22 happen to have people pull the documents that they no longer

23 want Your Honor to rule upon because I think that's the only

24 way I think Ms. Baer is saying that the rest of the list is

25 going to come to rest is if people pull documents and say that

1  they're no longer proffering them.

2          THE COURT:  I'm going to order people to pull

3  documents they're not proffering.

4          MR. BERNICK:  Yes.

5          THE COURT:  I don't need all of this, and I don't

6  want them on the CD.

7          MR. BERNICK:  Right.

8          THE COURT:  I simple don't want them.

9          MR. BERNICK:  So, what we can do again, and I think

10 rather than try to hash it out here, we can set up a call.

11 We'll circulate a proposed schedule that contemplates people

12 letting us know if they want something still on the list.  So,

13 the default will be it goes off the list.  If people want

14 something to still be on the list, they got to let us know by X

15 date and then we will complete the list that is all -- will

16 then be all of the active exhibits, either agreed or the ones

17 where there's still an objection.  And that, I think, would be

18 a good version of the list and then we can give you the CD

19 that's associated with that.

20          I think we should -- we understand the issue.  We've

21 got some loose ends here that are -- have been identified and I

22 think the best way to do this is what we've done throughout the

23 last few weeks, which is the debtor plan proponents circulate a

24 proposed process with dates, then have a call and see if people

25 will sign on and just get it done.  If we have a problem, we'll

1  let Your Honor know.

2         THE COURT:  Okay.  In connection with that, I want to

3  make it very clear, if somebody doesn't get a document to the

4  debtor that says leave it on the list and it comes off, I'm not

5  later going to hear an, oops, we goofed, or oops we were too

6  late.  If you don't meet the deadline, it's not going into

7  evidence, period, end of story, no further objections, no

8  delays, no extensions.  So, make a reasonable process.  I'm not

9  going to go through this again.

10         As I understand it, anything that has been ruled into

11  evidence, anything that's on these stipulations, whether

12  admitted or contested, will be on that list for now.  What

13  we're talking about is documents that nobody has mentioned and

14  don't intend to proffer in any respect.  That's what I expect

15  the list of -- to go to the debtor that says leave it on, and

16  then I want an explanation of why because if you haven't

17  referred to it, you're not going to use it in an argument

18  somewhere and it's not in evidence, I don't know why I have it.

19  So, you need to tell me why I have it if it's not proffered and

20  it's not in evidence.

21         MR. BERNICK:  Well, it -- but, let me make a little

22  of the exception.  We've already got that with respect to --

23  Jan, right -- the slug of documents that we had.  We've already

24  got a lot of them agreed and I think the rest of them are

25  pleadings.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. BAER:  We do.  We do, Your Honor.

2          MR. BERNICK:  So, I have not --

3          THE COURT:  Okay.

4          MR. BERNICK:  I mean, if -- that's what I would

5 suggest, that we complete that process because it's already

6 underway and then with respect to other documents -- we'll get

7 this done, we'll set up a --

8          THE COURT:  All right.

9          MR. BERNICK:  -- we'll set up a letter and we'll get

10 it done.

11          THE COURT:  Okay.

12          MS. BAER:  Your Honor, there are three other exhibits

13 that Mr. Finch wanted to make sure that I --

14          THE COURT:  Wait, I'm not done.  I haven't even

15 looked at Mr. Brown yet.  I'm sorry.

16          MS. BAER:  Sorry.

17          THE COURT:  You're -- I'm getting way -- it's getting

18 too confusing.  The binder that I have from the debtor that you

19 gave me, Ms. Baer, that has the certifications and the

20 stipulations, these are all things that were filed of record

21 somewhere in the court docket?

22          MS. BAER:  Yes, Your Honor.  They're all filed on the

23 docket.  I just gave it to you so you'd have it in one spot --

24          THE COURT:  Okay.

25          MS. BAER:  -- if you needed to look at it.

1          THE COURT:  All right.  Now, Mr. Brown, what do I

2     have from OneBeacon and Seaton?

3          MR. BROWN:  Your Honor, I believe in the book

4     although I don't know where it is, you have a stipulation that

5     was entered into between my clients and the plan proponents.

6          THE COURT:  That's the one dated October 9?

7          MS. BAER:  Yes, Your Honor, 234 --

8          COURT CLERK:  Use the mic.

9          MS. BAER:  Yes, Your Honor, October 9th, Docket

10    Number 23464.

11         THE COURT:  All right.

12         MR. BROWN:  Okay.  And, Your Honor, what I handed you

13    in the binder is a copy of that stipulation with all of the

14    exhibits, so that you would have them --

15         THE COURT:  Okay.

16         MR. BROWN:  -- have copies of them.

17         THE COURT:  With the stip -- those that are addressed

18    by the stipulation.

19         MR. BROWN:  By the stipulation and they -- we thought

20    about having you supplementing the files you already had.  We

21    thought it would be easier to give you another binder.  We

22    don't have any documents, I don't think, in our binders now

23    that have not been admitted into evidence.

24         THE COURT:  These are only the supplemental materials

25    though.

**J&J COURT TRANSCRIBERS, INC.**

1           MR. BROWN:  These are only the supplemental

2    materials, correct.

3           THE COURT:  Okay.  All right.

4           MR. BROWN:  Shall I go through the formal process of

5    moving for their admission, or are they --

6           THE COURT:  No, I --

7           MR. BROWN:  -- admitted at this point?

8           THE COURT:  They're admitted.

9           MR. BROWN:  Okay.  Thank you, Your Honor.

10           THE COURT:  With the caveats, if there are any, that

11   may be addressed in this specific binder itself.  I don't know

12   what the stipulations say, Mr. Brown.

13           MR. BROWN:  Yes, and subject to the terms of the

14   stipulation.

15           THE COURT:  Exactly.

16           MR. BROWN:  Yes.

17           THE COURT:  Okay.  Ms. Baer?

18           MS. BAER:  Your Honor, still on exhibits from the

19   debtors -- from the plan proponents there are three exhibits

20   that have been discussed that we sought to also move into

21   evidence.  They are documents with respect to the Libby folks

22   and they did not have any disagreement on their admission into

23   evidence.  It's Prouty Deposition Designations 118, Prouty the

24   1006 summary slide -- as a summary slide under 106 -- 1006, and

25   the marked up copy of LC-10 which was marked as Plan Proponent

1  361.  This was the Libby claimants' slide that Mr. Finch marked

2  up.  We seek to have that admitted into evidence also for

3  demonstrative purposes, the same way the other one was

4  admitted.

5          THE COURT:  And there's no objection?

6          MR. KOVACICH:  No, I assume the Prouty deposition

7  designations include the designations that we made, as well as

8  those that were made by the plan proponents.

9          MS. BAER:  Well, you -- do you have it?

10         MR. LOCKWOOD:  Yes.

11         MS. BAER:  All right.  I will let Mr. Lockwood

12 address it since he knows them better than I do.

13         THE COURT:  Don't I already have these in the

14 depositions designation binders?

15         MS. BAER:  I think you do, and I was going to get to

16 the depositions in a moment.

17         MR. LOCKWOOD:  I have -- are those in the binder?

18         MS. BAER:  Yes, I can show you.

19         MR. LOCKWOOD:  I've shown them to Mr. Kovacich and

20 the deposition designations do include the Libby designations

21 in red, as well as the plan proponents in blue, Your Honor.

22         THE COURT:  All right.

23         MR. KOVACICH:  I thought we were in black, but --

24         MR. LOCKWOOD:  Excuse me.  Mr. Finch misled me, Your

25 Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Okay.

2          MR. LOCKWOOD:  Yes, Libby claimants are in black.

3          THE COURT:  All right.  But, they're already in the

4   deposition binder that I have.

5          MS. BAER:  Yes, Your Honor.  They are.

6          THE COURT:  Okay.  That's fine.  They're admitted.

7          MS. DeCRISTOFARO:  Your Honor, just one thing on the

8   Prouty deposition designations.  I think there are other Prouty

9   materials that were previously submitted and they were admitted

10  subject to the limitation that they weren't to be used against

11  the insurers.  And I understood that there were going to be

12  offered -- proffered with the same limitation here.  I think

13  that's clear.

14         MS. BAER:  That's correct.

15         MR. BERNICK:  What are they doing?

16         THE COURT:  All right.  So, then they're offered and

17  they're admitted, but not to be used against the insurers.

18  Okay.

19         MR. WISLER:  Your Honor, Jeff Wisler on behalf of

20  Maryland Casualty.  Consistent with what you said a few minutes

21  ago we don't -- we didn't deem it necessary to take pleadings

22  we were going to use from this case and admit them as evidence.

23         THE COURT:  No.

24         MR. WISLER:  So, we were just going to ask Your Honor

25  to take judicial notice, but consistent with everyone's

1  concerns and as Mr. Bernick suggested about getting the record

2  clean, we'll work with debtor's counsel and make sure that

3  whatever process is used for marking pleadings as exhibits

4  subject to whatever limitations they have, we'll cooperate

5  with.

6          THE COURT:  Okay.  All -- I think since I'm taking

7  judicial notice of the entire file in this case and all the

8  adversaries, that the only thing I need marked are the pieces

9  of the pleadings that the people want to introduce into

10  evidence with an explanation as to why.

11          MR. WISLER:  And we'll provide that to debtor's

12  counsel and --

13          THE COURT:  Okay.

14          MR. WISLER:  -- they'll probably provide you with a

15  chart.

16          THE COURT:  All right.

17          MR. PERNICONE:  Good afternoon, Your Honor.  Carl

18  Pernicone for Arrowood.  Just to clarify while we're still on

19  the subject of supplemental -- or stipulated exhibits, Ms. Baer

20  was absolutely correct when she reported earlier that Arrowood

21  and Libby had reached a stipulation concerning the

22  admissibility of certain of the Arrowood policies.  That was

23  actually put on the record by Mr. Schiavoni and Mr. Lewis.

24          After we -- after the first -- the September session

25  we took another look at it and said, you know, let's reduce it

J&J COURT TRANSCRIBERS, INC.

1 to writing, so we actually did that.  We now have a written

2 stipulation, which I have here, which I signed for Arrowood

3 which Mr. Kovacich has signed for the Libby claimants.  So, I

4 wanted just to hand that up to Your Honor if I could.

5              THE COURT:  File it.

6              MR. PERICONE:  Fine.

7              THE COURT:  Because then it will be -- there will be

8 a docket number and it will be filed electronically.  I will

9 take a copy, but I can't promise that a stipulation's not going

10 to get lost somewhere.  So, I'll take a copy, if you've got it,

11 but file it --

12              MR. PERICONE:  We'll do, Your Honor.  Thank you.

13              THE COURT:  -- and then tell the debtor what the

14 docket number is so that Ms. Baer can include it in the chart

15 that she's giving me.

16              MR. PERICONE:  That's fine.  I'll hand you the copy

17 and then we'll file it.

18              THE COURT:  All right.  Thank you.

19              MR. PERICONE:  And may I approach?

20              THE COURT:  Yes.

21              MR. PERICONE:  Thank you.  Thank you, Your Honor.

22              THE COURT:  Thank you.  Good afternoon, Mr.

23 Giannotto.

24              MR. GIANNOTTO:  Your Honor, Michael Giannotto for the

25 CNA companies.  This is just out of an abundance of caution.

1  Ms. Baer described for you and gave you the stipulation that we

2  entered into with the plan proponents.  Mr. Brown had handed up

3  the documents that were subject to that.  I can hand them up if

4  you would like.  We've already given them to you when we

5  originally gave you our documents and Ms. Baer is going to put

6  them on a CD, so I don't want to burden you with extra stuff,

7  unless you want it.

8          THE COURT:  No, I think what I'm going to do at the

9  end of this trial is have probably somebody from the debtor,

10  since I got the filings largely from the debtor, go through

11  this record with somebody on my staff and figure out where the

12  exhibits are that are going to be used, unless Ms. Baer's

13  chart's going to tell me that.  Because otherwise between the

14  Phase I and Phase II and duplications I'm afraid that

15  something's going to be lost and I want to make sure that we

16  have it.  But, if it's on the CD with links, that's really what

17  I need.  I'm going to be looking at that much more so than the

18  paper anyway.

19          MR. GIANNOTTO:  That's fine, Your Honor.  We won't

20  burden you with this then.

21          THE COURT:  Okay.

22          MR. GIANNOTTO:  Thank you.

23          MR. WORF:  Good afternoon, Your Honor.

24          THE COURT:  Good afternoon.

25          MR. WORF:  Richard Worf for Garlock Sealing

1 Technologies.  We circulated two additional exhibits pursuant

2 to the procedure that Ms. Baer outlined and we heard back from

3 the futures' rep.  We didn't hear back from the other plan

4 proponents, so we figured we would just address it here and

5 seek to have them admitted.  May I approach?

6           THE COURT:  All right.

7           MR. BERNICK:  Do you know what this is?

8           THE COURT:  These are marked as Garlock 108 and

9 Garlock 109.

10          MR. BERNICK:  Thank you.

11          MR. WORF:  These are charts of publically available

12 information about the various bankruptcy trusts asbestos trusts

13 that had emerged from the 2000 to 2002 wave.  Garlock 108 is a

14 summary of the dates of the petitions and the companies that

15 filed and where they filed.  The -- Garlock 109 is a summary of

16 payments that these trusts made in 2008.  All this information

17 is from documents that are publically filed in the courts that

18 supervise these bankruptcies.

19          THE COURT:  And what's the relevance?

20          MR. WORF:  Well, we're happy to discuss it now.  I --

21 we figured that that would be deferred until the post-trial

22 briefing the way everything else has been, but I'm happy to

23 address it if the Court would like me to.

24          THE COURT:  If you can give me the down and dirty

25 five minute version, yes.

1          MR. WORF:  I'll give you the two minute version.  The

2    two minute version is that the Court heard abundant testimony

3    from the plan proponents that one of the chief actors that went

4    into increased settlement values for Grace and other defendants

5    in the tort system in the early part of this decade and raging

6    all the way until 2006 and perhaps afterwards, but that's where

7    Dr. Peterson's report cut off.  One of the most important

8    factors was the exit of the major defendants from the tort

9    system.

10         The Court also heard testimony that the -- when these

11   defendants reentered the system in the form of bankruptcy

12   trusts, 524(g) trusts, there was no effect on co-defendant

13   settlement values, the ones that are still in the tort system,

14   from the reentry of those trust payments into the system.

15         Garlock's argument is that the reason for that is

16   simple, it's that the plaintiffs bar which drafted the TDP of

17   the trusts that emerged was successful in drafting TDP with

18   various provisions that facilitate the obscuring and

19   concealment of these trust payments from other defendants in

20   the tort system and preventing those from being taken into

21   account in the marketplace of settlement that Dr. Peterson

22   testified to.  That's the argument.

23         This shows the substantial payments that these trusts

24   are making, the trusts that emerged, and shows the substantial

25   payments they made in 2008 and provides context to that

1  argument to show that there are billions of dollars that

2  reentered the tort system, and according to the plan

3  proponents' own testimony had no effect on settlement values,

4  and that's why it's relevant to Garlock's argument.

5       MR. BERNICK:  If that's the proffer, at least the

6  debtor would object to the admission of this exhibit.  There's

7  no foundation for it.  It's a bunch of hearsay.  It's a

8  compilation.  It's a summary of something or another that's not

9  admissible under the rules relating to summaries.  It sounds

10  like an expert type of assembly of information that's been put

11  together by counsel and they now want to have it received into

12  evidence, and they can't do that.  There's no witness on the

13  stand who will provide the documents that are the basis for the

14  summary.  There's no witness on the stand who will say that

15  it's accurate, that it speaks to the issues that -- there's

16  just -- if they want to attach it to their brief and talk about

17  it they can always do it, but it's not evidence.

18       MR. WORF:  Your Honor, we would seek to have the

19  Court take judicial notice of the facts contained herein.

20  They're not open to reasonable dispute.  Every single one of

21  these numbers is in the annual report of each of these trusts,

22  many of which are supervised by this very Court.

23       THE COURT:  Well, I've certainly taken a look at

24  quite a number of the annual reports in some of these cases,

25  but in terms of how that's relevant to whether or not there are

1 available funds when the trust distribution procedures are

2 still operating pursuant to, in most instances, the caps that

3 are traditional in the TDP context and how that relates to

4 settlement values for entities still in the tort system I don't

5 get.  That's like a leap of faith I think.

6     MR. LOCKWOOD:  Well, Your Honor, the ACC objects also

7 because what Mr. Worf described the purpose for this, we don't

8 dispute that they could cite from publically available sources

9 that the various numbers here, assuming that those numbers are

10 accurate.  And we don't dispute that they can try to make

11 arguments from them.

12     The proffer I just heard, however, seemed to contain

13 a bunch of additional assertions about what this shows and

14 means, which are unrelated to anything on the face of the

15 document.  And so if the notion is somehow or another by

16 admitting this into evidence we are conceding that there is

17 some sort of basis for the additional statements which sounded

18 to me like statements of fact which aren't contained in the

19 document then, again, I would -- I see no reason why this

20 should be admitted as evidence.

21     It's simply, as Mr. Bernick pointed out, a

22 compilation of information taken by lawyers for Garlock from

23 sources that they, (a) deem authoritative and, (b) are

24 publically available and they can attach it to their brief and

25 make whatever argument they want to out of it.  And we can

1 argue that it's either inaccurate or more likely that it

2 doesn't prove the point.

3          THE COURT:  Yes.  I think to the extent that the

4 information is accurate, and I'm not challenging that it is, I

5 mean, there may be a typo, I don't know, but if there is I'm

6 sure that's not an indication of overall inaccuracy.  I think

7 you can make your arguments, but I don't see how this is

8 evidence that's relevant to any point that came up before me in

9 this case.  The leap between the fact that in 2008 a particular

10 trust distributed so much money back to the claimants against

11 it, is somehow indicative that in 2002 there were or were not

12 additional settlement funds, I'm not getting.

13          MR. WORF:  Well, let me be clear and more precise,

14 which I don't think I was.  Dr. Peterson, when my colleague was

15 cross examining him, testified that according to him there were

16 three reasons why the trust payments that come back into the

17 system the -- as this chart shows billions of dollars of trust

18 payments --

19          THE COURT:  I think his --

20          MR. WORF:  He gave three reasons why --

21          THE COURT:  Why the debtor was settling.

22          MR. WORF:  -- they didn't have an effect --

23          THE COURT:  Right.

24          MR. WORF:  -- on the co-defendant's settlement

25 values.  One of the those was --

1                THE COURT:  Why they did have an effect.

2                MR. WORF:  That they're sticky, the settlement values

3    are sticky, and they don't like to go down.  The second was,

4    well, we just don't see it happen, an admission that it doesn't

5    happen.  And the third one was, well, these payments are just

6    small and insignificant, and I think this goes to that third

7    point.  Now --

8                MR. LOCKWOOD:  Your Honor, it would only go to the

9    third point if you could show what the payments would have been

10   if those defendants had remained in the tort system and had the

11   ability to make the payments.  He's trying to suggest that you

12   can compare -- mind you, this could have been shown to Dr.

13   Peterson on cross examination if it existed at the time.  What

14   they're now trying to do is impeach Dr. Peterson, after the

15   fact, with information that could have been used at the time

16   and making assertions that as Mr. Worf just put it, the total

17   payments made on claims by these entities in the year 2008 are

18   slightly under two and a half billion dollars by the trusts

19   were somehow or another either large or small in comparison to

20   something.

21               Well, what's the something that it's being compared

22   to?  There's no evidence that anybody has put on in this case

23   as to what the defendants, who are represented by the trust set

24   forth here, either we're paying in tort claims in the year

25   2002,  would be paying tort claims in the year 2008, or

1  anything else. So, we're --

2          MR. WORF:  Your Honor, this is not an argument about

3  relevance, this is their brief argument right here and they're

4  perfectly free to raise it.

5          MR. LOCKWOOD:  It's an argument about the relevance

6  of -- what you --

7          THE COURT:  I don't see the relevance of these

8  documents as an evidentiary matter.  It seems to me that if

9  this information is something that you need to argue to support

10 the position that your client is taking in the trial, you may

11 do that and to the extent that when the parties have a chance

12 to look at this, if they haven't already, they can agree that

13 the numbers are from publicly available sources, I'm willing to

14 take judicial notice of that fact if there is an agreement that

15 I may do so.  I mean this one, because it's a compilation, it's

16 not a specific document itself.  That's an unusual way to take

17 judicial notice.

18         Nonetheless, to the extent that you want to attach it

19 to your brief, and make some argument, I don't see a problem

20 with that, but I don't see how this is substantive evidence in

21 the case.

22         MR. WORF:  Okay, Your Honor, we will do that and I

23 think that's fine.  We just wanted to make sure we would be

24 able to cite these in our brief and we do think they're

25 relevant.  I mean, just to answer Mr. Lockwood's point, it's

1 certainly probative that trusts are making positive payments to

2 claimants in the tort system, regardless of how much they were

3 paying before.  It's probative.

4        THE COURT:  It's only probative -- well, I --

5        MR. WORF:  The fact that 2.5 billion comes back into

6 the tort system, it has no effect, according to Dr. Peterson,

7 who stood up here on the stand and said that, it's probative

8        THE COURT:  It's not back in the tort system.  It's

9 specifically out of the tort system, that's why it's gone into

10 a bankruptcy trust.

11        MR. WORF:  Well, Your Honor, that's precisely the

12 problem that Garlock sees with the entire trust system.  That

13 the plaintiffs have succeeded in isolating it from the tort

14 system that why it's unfair and inequitable and we look forward

15 to making that argument to you.

16        THE COURT:  Well -- all right, you may make that

17 argument but you'd also better take a look at a number of

18 orders that have been entered not just by this court, but by

19 others that have made information available upon request to

20 various courts and parties in cases which otherwise may have

21 been kept private or confidential because those orders exist.

22 So, I'm not exactly sure what the issue is, but just do some

23 research before you make that argument.

24        MR. WORF:  Wait, I'm sorry, Your Honor, I'm not sure

25 I understood that.  What are those orders?

1          THE COURT:  I don't see quite how this information is

2     being kept out of the tort system when you've got it contained

3     in the documents.  Let me just me just leave it at that.  So,

4     you can explain it to me in your brief.

5          MR. WORF:  We look forward to.

6          THE COURT:  All right.

7          MR. WORF:  Thank you very much.

8          THE COURT:  Exhibits 108 and 109 are not admitted but

9     may be used for argument.  Garlock Exhibits 108 and 109.  Okay.

10         MS. BAER:  Your Honor, that pretty much takes care of

11    the documentary exhibits and we will, as indicated, communicate

12    with everybody about a procedure for dealing with the documents

13    that have not been admitted into evidence as to which people

14    still would like to seek doing so.

15         THE COURT:  All right.

16         MS. BAER:  That moves us onto deposition

17    designations.  And, again, just to explain what happened, Your

18    Honor, pursuant to your case management order, we did all

19    submit deposition designations, counter designations and

20    objections.  Three binders were submitted to the Court and

21    recently, through a process that we put together after the last

22    hearing, charts were submitted that summarized what the

23    deposition designations are that people still want to get into

24    evidence, and objections that are still pending to those.

25         We're going to need to come to Your Honor as part of

1  this whole process and pull out what people are no longer

2  seeking to get into evidence because, in fact, I note from the

3  Plan Proponents perspective, for example, we dropped a great

4  number of the deposition designations and I see that others

5  have, too.  And we will do that.

6          We have a process now with respect to Anderson

7  Memorial and those deposition designations and objections will

8  be included in the binders.  So, I think we're all set with

9  respect to dep designations and we will, again, revise all of

10 that.  There was one revision that was made this week.

11 Arrowood had some designations that had been admitted the last

12 time we were in trial.  We filed a certification of counsel

13 this week that included those and we've inserted them into your

14 binders.

15         Montana has indicated they're withdrawing their

16 deposition designations, so there's no issue with the Montana

17 designations because there was a dispute over them being late

18 or not late, they were timely, but they weren't correct and

19 then they were corrected.  And I think that pretty much takes

20 care of it on deposition designations.

21         Obviously, you have three binders, two of the binders

22 are Libby related and they relate to the arguments that were

23 made today that Your Honor is considering.  The third binder is

24 all the rest and on all the rest the debtors or the plan

25 proponents are withdrawing a number of the designations.  The

1  Ordway designations have been agreed to pursuant to a separate

2  stipulation that you signed.  The Prouty ones we've discussed

3  and they're agreed to and so, we will just get your binders up

4  to date with where everything stands, including Anderson.

5          THE COURT:  Okay. I think what I'm going to need from

6  you, Ms. Baer is some information, somewhere, that says get rid

7  of exhibits or binder numbers that were filed on or given to

8  you on such and such a date, because otherwise, that's going to

9  cause a problem, too, if I have multiple sets of the same

10 thing, which appear to be the same thing, but they're not.

11         MR. BERNICK:  Well, it seems to me, Your Honor, that

12 if we have this process whereby the debtor is going to be

13 circulating a list of the exhibits that are still active,

14 pursuant to the process that we are going to embark upon here,

15 and that insofar as exhibits are concerned, you will have on CD

16 in that chart everything and it just seems to me that at that

17 point the fact of their being paper copies of additional

18 documents here in court if somebody wants to do something with

19 them, they can let us know or let the Court know but it seems

20 to me that they're basically -- they're just papers that were

21 brought to your courtroom at some point in time.  To look back

22 over all of those files in kind of --

23         THE COURT:  I'm talking about the deposition binders.

24         MR. BERNICK:  Oh, just the deposition binders.

25         THE COURT:  Yes,

1          MR. BERNICK:  So, what you want is a -- what will

2     become a conformed binder of the depositions that have been

3     designated.

4          THE COURT:  Yes, because if you're withdrawing some,

5     I think it would --

6          MR. BERNICK:  Yes, we'll be happy to do that and

7     we'll wrap that into the same process.  So, we'll take out

8     stuff that we don't need, we'll give other people notice that

9     they need to do the same thing, to let us know what can be

10    taken out and then we'll give you a conformed set of the

11    deposition designations.

12         THE COURT:  To the extent that what's happening is

13    that things are being taken out of the deposition binders, we

14    can handle them thee same way we do the omnibus.  If you simply

15    give me -- send me a letter that says, you know, throw away

16    deposition -- I'm going to make somebody up, you know, of Ms.

17    Baer, then I'll take them out of the binder and throw them

18    away.

19         MR. BERNICK:  I think it's probably easier that if

20    people do that through this same process that we're talking

21    about for the exhibits --

22         THE COURT:  Yes.

23         MR. BERNICK:  -- then we can be the focal point for

24    that, get the requests and then give it to Your Honor so you

25    don't have to worry about getting communications from a whole

1  bunch of people.

2          THE COURT:  Okay.  Well let --

3          MR. BERNICK:  But you can do whatever you want.

4          THE COURT:  -- I only want one final set of binders.

5          MR. BERNICK:  That's right.

6          MS. BAER:  Right.

7          THE COURT:  Is it easier if I simply throw away what

8  I have and you give me a new set, or is it easier to cut and --

9          MR. BERNICK:  Yes.

10          THE COURT:  -- yes, your staff is telling me yes.

11          MS. BAER:  Yes.

12          THE COURT:  Fine, that's fine.  I will not consider

13  any of these binders except for ruling on objections right now.

14  I'll get a final set from you and I will discard what is the

15  current set.

16          MS. BAER:  That makes a lot of sense, Your Honor.

17  It's unfortunate that we kill a few trees, but I think time

18  wise it saves a lot of time.

19          THE COURT:  Okay.  Well, as to the depositions, I

20  would like those designations in paper copy.  They're much

21  easier to read.  I'm happy to get them on the disk with the

22  links, too, but they are really much easier to read in paper

23  copy.

24          MS. BAER:  Your Honor, we'll do exactly what we did

25  before, we will give you those color coded binders that show

1 you what's been designated and where there's an objection, the

2 chart will be on top of it, that you can use as an index, and

3 we'll pull everything you don't need to look at.

4          THE COURT:  All right.  Fair enough.

5          MS. BAER:  And we'll communicate withe everybody

6 before we do any of that.

7          THE COURT:  Okay.  So, give me a relative time frame

8 for when all this is going to happen with the court filings.

9          MR. BERNICK:  I think that we can accomplish all of

10 this before the briefs are due on November 2.

11          MS. BAER:  I think, Your Honor, our goal would be the

12 October 27th date that you had given with respect to submitting

13 the Speights binder, it would make sense to submit everything,

14 and I think that's very doable.

15          THE COURT:  Okay.  So, none of the issues are going

16 to come up at the omnibus then.  I will have no issues in any

17 of these newly submitted binders or CDs that will be on that

18 omnibus hearing.

19          MR. BERNICK:  I think the only thing on the omnibus

20 right now is the Frezza argument and there's one other think

21 you said, I think it was -- it's collateral to the confirmation

22 process.

23          MS. BAER:  Yeah.

24          THE COURT:  Okay.  All right.

25          MR. BROWN:  Your Honor, I just wanted to bring -- I

1  guess, bring up an administrative matter.  When we originally

2  filed the deposition designations we included with those the

3  exhibits that were being discussed in that testimony.  If it

4  was a plan exhibit, rather than burdening the Court with more

5  paper, what we did was, we put the cover page on it so that

6  you'd know what the exhibit number was so that if Exhibit 5 to

7  the exhibit book was, in fact, Think 10, you would know what

8  was being discussed in the testimony.

9        I think when the -- at some point when the counter

10 designations were submitted, they were submitted without the

11 actual exhibits, and I actually had binders prepared to give

12 you the exhibits, but in light of the discussion we just had,

13 I'll refrain from doing that, but it does raise the issue of

14 how we're going to deal with exhibits to deposition

15 designations and I've gone through at least the ones that we

16 have.

17       A lot of the deposition exhibits are, in fact, plan

18 documents, so they've already been admitted into evidence.

19 Several others have been admitted.  There's a few that have not

20 and what I thought we might do, in conjunction with this

21 process that's just been outlined, is to work with the plan

22 proponents in terms of putting together with the binders that

23 go to the Court the actual exhibits that are being discussed in

24 that testimony because absent having those exhibits or at least

25 have a cover page for plan documents, you won't know what's

1  being discussed, it'll be very difficult to follow --

2          THE COURT:  Actually, that's a good point because in

3  one of the deposition transcripts I was reading, there was a

4  reference all the time to Exhibit 8 and I had no idea what

5  Exhibit 8 was because it wasn't there and there were several

6  Exhibit 8s.  So, it took me a long time to figure out what

7  Exhibit 8 was.  So, that would be helpful.

8          MR. BROWN:  That's our concern and hopefully we've

9  already pulled some designations out, hopefully, we'll work out

10  with Mr. Lockwood and the FCR's counsel, the neutrality and a

11  lot of the designations were dealing with the neutrality issue,

12  we may be able to get rid of a lot of it.  Thank you.

13          THE COURT:  Okay.  To the extent that the deposition

14  designations are also put onto a CD, I think the link -- there

15  can be a link to those documents right on the CD, which would

16  make that easy.

17          MR. BERNICK:  But the -- I thought Your Honor just

18  observed, and it was not surprising to me, it actually is

19  easier to have the designations in hard copy form.

20          THE COURT:  It is because of the color coding --

21          MR. BERNICK:  Yes, yes.

22          THE COURT:  But to the extent that I can -- well I

23  guess if you're not putting them on a CD okay, if you're going

24  to put them on a CD anyway, linking to the document the

25  exhibits is much easier that way.

1          MR. BROWN: I think the problem, Mr. Bernick --

2          COURT CLERK:  I can't pick you up Mr. --

3          MR. BROWN:  -- Your Honor, I think the problem that

4    Mr. Bernick is eluding to is the fact that -- just to use an

5    example, if a witness was being questioned about Exhibit 2 to

6    the plan book, that might not be referred to as Exhibit 2 in

7    the testimony, it might be Exhibit 8, so if you had a link it

8    would make it very confusing. So, your suggesting hard copies

9    of the actual exhibits --

10          THE COURT:  Oh, okay, that's fine.

11          MR. BERNICK:  No, no I wasn't suggesting that.  I

12    mean, I would have thought that people who wanted actually to

13    have the Court have the exhibits for the depositions be part of

14    the evidentiary record, that they also would have listed those

15    documents as exhibits on the exhibit list and, therefore, we

16    wouldn't have this problem.

17          But be that as it may, if we now end up going back

18    and providing a hard copy set of the exhibits to go along with

19    all the depositions, then we're back into the world of -- in

20    what way are thy part of the record?  Ate they evidence in the

21    record, or are they not?  I don't think they are, all that's

22    evidence in the record is the testimony to the extent that it

23    comes in, in the deposition.  The document is not independently

24    offered.

25          So, to the extent that Mr. Brown wants to give the

1 Court more hard copy of all the exhibits that were part of the

2 depositions, I don't have an objection to that, but then the

3 same thing is going to apply to all of the other deposition

4 designations.  So, that we may as well then have one set of the

5 depositions designations and then in that same notebook, all of

6 the hard copy to the extent that the hard copy is not otherwise

7 available to the Court, and to do it all at once.

8           THE COURT:  Okay.  Wait, but to the extent -- let's

9 assume that there were, you know, 15 deposition exhibits, but

10 only one is referred to in the designated portion of the

11 testimony --

12           MR. BERNICK:  Yes. It's just the one.

13           THE COURT:  -- I'd only expect the one.

14           MR. BERNICK:  Right.  But I just don't know what the

15 scope of this is.  I just want consistency so we don't have a

16 notebook for Mr. Brown's clients and something --

17           THE COURT:  Right.

18           MR. BERNICK:  So, I think what probably makes sense

19 is that now to wrap this, again to the process, (a) we're going

20 to need to know the designations that are no longer being used;

21 (b) if people want to have a deposition exhibit included in the

22 set of designation, we need it, I think it's probably going to

23 be best if it's just the cover page and the page that was used

24 so it doesn't take up a lot of space.

25           THE COURT:  I agree with that.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  Yes.  And that we can work that way,

2    but I want it to be clear that unless a document is actually

3    listed as an exhibit in the case, and offered as an exhibit in

4    the case and accepted as an exhibit in the case, just because

5    it is referred to and, indeed, attached to the transcript,

6    doesn't mean that it's in evidence.

7          THE COURT:  That's right.  I think the point is to

8    make sure that I understand in the deposition designation --

9          MR. BERNICK:  I understand.

10         THE COURT:  -- what's going on because it was -- it

11   is sometimes very difficult.

12         MR. BERNICK:  So, I'm very sympathetic.

13         MR. LOCKWOOD:  The other thing that may need to be

14   done, I agree with Mr. Bernick it should be the cover page of

15   the document and only those portions of the actual document

16   that are being testified about because otherwise --

17         THE COURT:  I agree with that.  That's all I want.

18         MR. LOCKWOOD:  -- you're going to kill a lot of

19   trees, but apart from that, I haven't gone back and reviewed

20   the deposition designations, but there was originally

21   deposition testimony designated about plan documents that were

22   subsequently amended and Mr. Bernick's concern about accurate

23   identification of what was admitted and what is an admitted

24   exhibit and what isn't, is particularly cute if those

25   deposition designations continue to be proffered and accompany

J&J COURT TRANSCRIBERS, INC.

1 a version, let's say, of Section 7.15 of the plan, which has

2 subsequently been changed, therefore, the testimony that was

3 given was with respect to a document which may or may not

4 render -- because of the change, the testimony irrelevant or

5 erroneous and the only way you can do that is to make --

6      THE COURT:  Well, hopefully somebody is going to

7 point that out to me.

8      MR. LOCKWOOD:  -- well, you're going to have to be --

9 if they identify the plan, they're going to have to identify

10 which version of the plan they're talking about.

11      MR. BERNICK:  No, that's -- wait, wait, wait, wait.

12 I thought we were okay, which is that it's just the document

13 that is part of the designation, and it's just the cover page

14 and the piece that is used.  If, if, if the document is in

15 evidence as an exhibit, that should probably be marked on the

16 document -- if it's not admitted into evidence, then we can

17 say, not admitted into evidence, but what ought to -- what is

18 the determinant of whether the document itself is in evidence,

19 is whether it's been tendered as an exhibit and it's agreed,

20 and it's on the exhibit list.  It's not, I don't want to go

21 through the process of worrying about whether just because

22 something is in the deposition, it has evidentiary status.  So,

23 I think rather than doing this generally, we're probably

24 spending, you know, enormous amounts of -- we just need to work

25 this through.  I think Mr. Brown has a very good point and I

1  think that we should just work it into the process so that we

2  end up, again, with one set of materials so Your Honor has the

3  context, knows whether the document is in evidence, and that's

4  about -- I think that's about it.  To get into explanations of

5  -- it's not in evidence, and the change between the time it was

6  -- people can argue about that in the briefs.

7           THE COURT:  That's what I meant, but I hope that if

8  the discussion is about some document that's not before me,

9  some plan that's not before me, that somebody is going to point

10 that out.

11          MR. BERNICK:  Yes.

12          THE COURT:  Okay.

13          MR. BROWN: Your Honor, just to -- I'm in agreement

14 with what Mr. Bernick suggested.  Can I show you something as

15 an example of how we might skin this cat?

16          THE COURT:  Yes.  As long as I can give it back.

17          MR. BROWN:  Your Honor, if you look at the first tab,

18 it's for Mr. Austern.

19          THE COURT:  Yes.

20          MR. BROWN:  What we had included here was only the

21 exhibits that were discussed in the designated testimony and in

22 this particular case, all of those were plan documents,

23 although Mr. Lockwood raises a good point, in the sense that

24 the plan has, in fact, to some extent, has been modified and,

25 therefore, what the individual was testifying to at the time

1  may now be different.  I'm not quite sure how to skin that cat,

2  but I would suggest that the way we might do it is to -- is the

3  way we've done it here, and if you look at the second page,

4  you'll see it's the cover page for the deposition designation

5  and then Exhibit 2, all we've done is include the first page,

6  so that you know what the exhibit number is, in the actual

7  testimony.  And then there's a reference there to the document

8  that's being referred to with the document index number.

9          THE COURT:  Yes.

10         MR. BROWN:  So, if there is, in fact, a difference

11  between that version of the plan and what were currently

12  dealing with, obviously the testimony is probably not going to

13  have any relevance and as Your Honor pointed out, someone will

14  probably bring that up, whether it's --

15         MR. BERNICK:  I am very leery, I'm very leery --

16         COURT CLERK:  Use the mic.

17         MR. BERNICK:  Yes.  I'm sorry.  I'm very leery --

18  this is exactly the kind of thing that's going to create lots

19  and lots of problems because they've done it in a way that

20  works, or maybe it's a good idea, but this is just what they're

21  proposing and it's a lot of paperwork and a lot of description.

22  I think this has got to be worked out consistently for

23  everybody.

24         THE COURT:  I think so, too.

25         MR. BERNICK:  And, if there's an easier or a faster

1 way to do it and we don't have spreadsheets, I mean, the whole

2 beauty of the deposition designations is that literally it

3 appears on the page, you can do it right there.  So, if you

4 have a document that is attached and it says, here's cover

5 sheet, it is exhibit such and such in evidence, fine, if it's

6 not in evidence, it's fine.  But that's all that the paperwork

7 associated with the deposition should be.  Explanations of how

8 Mr. Lockwood's significant admission in his deposition has now

9 been cured by a subsequent amendment to the plan, is something

10 that the -- I know that the ACC can cover in its brief, rather

11 than trying to get it done, you know, in the paperwork.

12        THE COURT:  I don't think anybody is disagreeing with

13 that.

14        MR. BROWN:  I think that's what -- and, Your Honor --

15        COURT CLERK:  Use the mic please.

16        MR. BROWN:  Your Honor, if you look at -- just behind

17 the first tab for Austern, one of the things we could do, I

18 think to solve Mr. Bernick's concern, is to simply have a con

19 -- some of these things were background, frankly, I don't care

20 whether they're in or out, so I mean, if they're not exhibits,

21 I'm happy to take them out.  We could have a cross-reference to

22 what the actual trial exhibit number is which would then, I

23 think, solve that problem.

24        THE COURT:  Yeah, I think you folks just need to talk

25 and I agree that that would be a way that this can be done, but

1  I think it's probably not going to be anything you can resolve

2  sitting here in court.

3          MR. BROWN:  Right.

4          THE COURT:  Because there are a lot of you who have

5  to feed into this process, but I do want just one process

6          MR. BERNICK:  Right.  Thank you.  I know that Mr.

7  Speights wants to proffer his exhibits and I think we should

8  probably get to that, but I think the context in which that

9  should probably be taken up, unless there's any other business,

10  is that we're now at the point where, I think it's appropriate

11  to have the parties rest this trial.  And, what I would suggest

12  is that we rest, the plan proponents, at least I'll speak for

13  Grace, Grace rests its case and by rest, I think what we mean

14  is that there are no more submissions that are going to be made

15  before the Court through any kind of testimony or through

16  exhibits, either through testimony or exhibits, and all

17  proposed exhibits and proposed trial testimony, or through

18  deposition has, in fact, been submitted to the Court.

19          So, we know that people are going to fine tune the

20  status of those submission, whether the exhibits are accepted

21  by the Court, whether they're agreed, the deposition testimony

22  the Court has yet to rule on whether it's coming in, but that

23  all evidence in connection with this confirmation trial, all

24  evidence has now been proffered to the Court.  I think that's

25  the simplest way to put it.  We rest in the sense that all

1  evidence relating to the trial has now been proffered to the

2  Court.

3       We would suggest that the Court obtain statements

4  from the rest of the parties to the case as to whether they

5  rest on that basis.  So, from the debtors' point of view we

6  rest on that basis and we would propose that the Court find out

7  if there's anybody else who does not rest.

8       THE COURT:  Other than Mr. Speights, is there anyone

9  else who does not rest their case?  Let me put it

10 affirmatively, has every party rested its case?  There will be

11 no additional evidentiary submissions of any type submitted to

12 the Court that have not already been identified on the record

13 at some point through the trial or today.

14      MR. LOCKWOOD:  The ACC has rested its case.

15      THE COURT:  All right.  I'm not hearing a response.

16 I'm taking that to mean everyone has rested, except Mr.

17 Speights, who I will deal with separately.  So, except for Mr.

18 Speights, if you have not rested your case, speak now or

19 forever hold your peace.

20      MR. KOVACICH:  Your Honor, Mark Kovacich on behalf of

21 the Libby claimants.  I'm comfortable with Mr. Bernick's

22 description of how we're resting here.  Of course, taking into

23 account the other things discussed previously about designating

24 pleadings and some exhibits that have yet to be cleaned up as

25 Ms. Baer discussed earlier.

1          THE COURT:  Yes.  I understand I'm going to be

2     getting a complete set of exhibits and deposition designations,

3     but what has been described today is the sum and substance of

4     the evidence.  There isn't going to be some surprise that

5     someone will come in, say, next week and say, oh, I forgot X.

6          MR. BERNICK:  Everybody has made their evidentiary

7     submissions.  No further evidence will be proffered and in that

8     respect the case is closed.  I think that's really what we're

9     talking about.

10          THE COURT:  That's what I'm talking about.  So, does

11     anybody have anything additional to add, if so, this is the

12     time to tell me, otherwise, I'm not accepting anything

13     additional.

14                    (No audible response)

15          THE COURT:  All right.  Everyone's case has been

16     rested other than Anderson Memorial.   So, Mr. Speights.

17          MR. PASQUALE:  Your Honor, if I may just one quick

18     housekeeping and then I would ask if the Court would excuse me

19     and probably others who don't have issues with Mr. Speights.

20          Just a housekeeping matter with respect to the brief

21     you directed we file next week on the Frezza issue.  We'll of

22     course, file that on Thursday. Because the hearing is Monday,

23     would the Court like that in any other format, delivered as

24     well?

25          THE COURT:  As long as you notify my office that it's

1  been filed and the docket number, we'll pull it off.  And I'm

2  only asking that as a courtesy.  I should be getting it

3  electronically anyway, but just in case, that would be helpful.

4          MR. PASQUALE:  Okay.

5          THE COURT:  If you just call Pittsburgh and let me

6  know.

7          MR. PASQUALE:  We'll do that, Your Honor.

8          THE COURT:  All right, thank you.

9          MR. PASQUALE:  May I be excused?

10          THE COURT:  Yes.

11          MR. PASQUALE:  Thank you.

12          THE COURT:  Anybody who is --

13          MR. BERNICK:  Before Mr. Pasquale and others leave, I

14  think that with respect to the briefing schedule, we had talked

15  about a briefing schedule for November 2, and then the

16  subsequent brief -- we actually made the proposal, was it

17  November 2 and then --

18          UNIDENTIFIED FEMALE SPEAKER:  November 2 and then the

19  reply is November 20.

20          MR. BERNICK:  Reply November 20.  So it will be

21  simultaneous on November 2, reply November 20.  I know that

22  Your Honor, I think we've all been working with that, but I

23  don't know that Your Honor actually has ordered it.

24          THE COURT:  I don't think I have because actually, I

25  thought I got a draft order that the parties were going to

1 discuss but I, frankly, forgot that it hadn't been discussed,

2 so Ms. Baer?

3      MS. BAER: Your Honor, just for the record, we

4 circulated a revised draft order last week because a lot of

5 actually the old order was moot because it dealt with exhibits

6 and that sort of thing. This morning, I circulated a slightly

7 more revised order because I was still working with this whole

8 process of exhibits and dep designations. I did circulate it

9 to everybody, I have copies in court, and I also, this order

10 makes adjustments to the closing schedule pursuant to what you

11 had discussed and ordered in court last time we were there in

12 September. So, that's this order.

13      THE COURT: Thank you. All right. This order

14 proposes simultaneous post trial briefs by November 2, reply

15 briefs simultaneously by November 20. They're to be prepared

16 electronically with hyperlinks that says to the extent

17 possible, is the debtor still offering to assist any party with

18 this?

19      MR. BERNICK: If people give us timely submissions

20 and we're prepared to help folks arrange through a common

21 vendor, I think that's probably the way that it would work to

22 get that done, but whatever -- if people need help in doing

23 that, as the order would contemplate, we're prepared to assist

24 in that process.

25      THE COURT: Okay. I'm taking out the words to the

1  extent possible.  I'm ordering that the post trial briefs are

2  to be submitted, electronically, with hyperlinks.  Okay.  Then

3  by October 27th, the debtor is to provide the chart of

4  exhibits, and the CD of exhibits.

5         This order indicates that there are going to be no

6  arguments with respect to the admission of exhibits or

7  depositions, and that's fine, except if I determine that I need

8  some argument, I reserve the right to ask for it.

9         MR. BERNICK:  Right.

10        THE COURT:  So, I'm going to say, unless otherwise

11  ordered by the Court.

12        This date on January 6 and 7, I'm sorry, are those

13  the dates that I said that you definitely could have or they

14  were the proposed prospective dates?

15        MS. BAER:  Yes.  Those are the definite dates.

16        THE COURT:  Definite dates, okay.

17        MR. BERNICK:  We had a colloquy about peoples

18  availability, to make sure that that was all right and then

19  those are the ones you chose.

20        THE COURT:  Okay.  Okay, yes.

21        MS. CASEY:  Good afternoon, Your Honor, Linda Casey

22  on behalf of BNSF.  The indirects' PI claimants have been

23  allocated three hours for oral argument on that day.  There are

24  seven different indirect PI claimants, I have spoken with most

25  of them, I know Kevin Mangan who represents the State of

1  Montana, left the courtroom right before we started discussing

2  this and he had also conferred with me on this point.  We don't

3  believe that three hour is sufficient when you have seven

4  claimants who have discrete issues, each arguing different

5  matters.  We have discussed that and we just do not believe

6  that three hours will be sufficient.  I believe there are other

7  indirect claimants standing behind me on that point as well.

8        THE COURT:  With respect to the indirect claimants,

9  at this point, why don't I simply say that you are to go last

10  and then if we need additional time, we'll figure it out that

11  day, rather than my trying to tell you right now because I

12  still haven't heard from the Owens-Corning folks as to whether

13  or not that settlement of the trial has or hasn't gone through.

14  They're trying very hard.  I think they're to the point maybe,

15  where they're papering some issues, but I still don't know. And

16  it's possible that by then, in fact, maybe by the omnibus, I

17  may have the next day available, too.  So, simply for now

18  reserve the next day, I'll confirm it when I can.  If it can't

19  be the next day and you need additional time with seven

20  entities, I'm willing to consider additional time, but it may

21  turn out that you really don't need it.  So, how about if we

22  simply defer as to those seven people whether three hours is

23  going to be sufficient until we get there.

24        MS. CASEY:  Thank you, Your Honor.

25        MR. BERNICK:  We don't have any quarrel with that,

1 Your Honor.  We're kind of wondering how even with seven, if

2 they're not duplicative, it's going to take more than three

3 hours, but we'll figure that out later.

4         THE COURT:  All right, one second, please.  So the --

5 I guess the issue is whether on January 6 the contemplation is

6 that you'd start with Libby, then to go the insurers and then

7 move into non-insurer issues. I think it may make more sense to

8 say, Libby, traditional insurers and the lenders, on January 6.

9         MR. BERNICK:  I actually think, Your Honor, it

10 probably makes sense, the reason -- what drove this to begin

11 with is that there are a lot of common -- there's a lot of

12 commonality between the positions taken by the traditional

13 insurers and then non-insurer issues.  I think there's going to

14 be a lot of overlap and it seems to me that before we then get

15 into lenders and the general -- the whole idea of general is

16 just like the trial, that we pick up the miscellaneous stuff at

17 the end.  I think that if we change the order, we might find

18 the general ends up taking up other issues.  So, it may be

19 better if we're going to defer something, we defer -- for

20 example, the lenders, if Mr. Pasquale is okay with that.

21 That's very discrete in many ways.  Well, lenders are always

22 discrete.

23         THE COURT:  All right.  So put the lenders at the end

24 and start with non-insurer issues on the 6th.

25         MR. BERNICK:  Right.

1          THE COURT:  To the extent that they need to carry

2  over into the 7th they will.  Is that what you're suggesting?

3          MR. BERNICK:  Right, that's right.

4          THE COURT:  Ms. Casey, is that all right with you?

5  We'll start them on the 6th as the third issue on the 6th and

6  carry into the 7th.  And the lenders we'll do on the 7th, if

7  possible, but defer that if needed.

8          MR. GILBERT:  Your Honor, Robert Gilbert for Kaneb.

9  I believe that we fall within the general category, so we're

10  being lumped in.  That's fine with us, we don't particularly

11  care where we go, but we will need between 30 and 45 minutes,

12  including rebuttal time.  I just want to ensure that we're on

13  record that we're going to need that amount of time as we try

14  to get everything swept in.  And handling in the manner that

15  you suggested for the non-insurer issues is satisfactory with

16  us.

17          THE COURT:  Well, okay.  That's fine.  There has be

18  to a little bit of flexibility with respect to where there are

19  more than one client, but Mr. Bernick was very good about

20  getting people to state how much time they needed and adding it

21  all up and putting into this order.  So, I don't expect much

22  carryover from the last hearing but, nonetheless, you know, if

23  it needs a little --

24          MR. BERNICK:  Forty-five minutes for a closing

25  argument after all this briefing for Kaneb alone?  That's just

**J&J COURT TRANSCRIBERS, INC.**

1  a lot of time.

2       THE COURT:  If -- at this point, Mr. Bernick, because

3  I may be asking questions at various states because, hopefully,

4  I will have had a chance to get through at least some, if not

5  all of the evidence by then, I'm not certain that these exact

6  numbers of ours are going to work anyway, because I will feel

7  compelled if I ask too many questions, to let people actually

8  make an argument.  And I understand appellate courts don't do

9  it that way, but I'm not an appellate court, I'm just trying to

10 understand the evidence and I want to make sure I have it

11 clear.  So, I intend to stick to these time limits, but to the

12 extent there has to be a little flexibility, there may be.

13      MR. GILBERT:  Thank you, Your Honor.

14      THE COURT:  But I think 30 to 45 minutes on the

15 discrete Garlock issue is a lot.

16      MR. BERNICK:  Kaneb.

17      THE COURT:  I'm sorry, on the -- I meant Kaneb, I

18 said Garlock, I'm sorry, on the Kaneb issue is a lot.

19      MR. GILBERT:  We'll be as brief as we can but we do

20 need to make our points.

21      THE COURT:  Yes, you do.  I think I'm ready for you,

22 Mr. Speights.

23      MR. SPEIGHTS:  Well, actually I wanted to comment on

24 the order.

25      THE COURT:  Oh, okay.


**J&J COURT TRANSCRIBERS, INC.**

1              MR. BERNICK:  Your Honor --

2              MR. SPEIGHTS:  I want to comment on the briefing

3    order.  I'll move to the other, I will, but --

4              THE COURT:  All right.

5              MR. SPEIGHTS:  Your Honor, at the hearing on

6    September 17, when the briefing order came up, I expressed

7    several concerns because of Anderson's position being last in

8    line, etcetera, etcetera, and we had the following exchange at

9    the -- I expressed those concerns.  Mr. Bernick:  "I

10   understand, Mr Speights concern and without commenting further

11   on it, it seems to me that can be accommodated with something

12   with respect to whatever matters get taken up in the

13   continuation of the trial on the 13th of October with respect

14   to Mr. Speights. I don't think we should have that drive the

15   whole schedule.  There's just no reasons for it."

16             Your Honor then said, well, I'm happy with the

17   schedule --

18             THE COURT:  Yes, I recognize that Anderson may need

19   some additional time.

20             MR. SPEIGHTS:  Right. And I was going to read that

21   you agreed, at the end of the day on the 13th, which is today,

22   and I'm prepared to address that, but I'd rather finish my

23   evidence first and we can address Anderson on the briefing

24   schedule if that's --

25             MR. BERNICK:  Well --

226

1            THE COURT:  All right.  With regard to --

2            MR. SPEIGHTS:  -- or I'll do it now.  I'll do it

3   either way.

4            MR. BERNICK:  Your Honor, to be clear, yes, I said

5   those things, yes, in the context of Mr. Speights doing what --

6   I won't go further down that road, yes, I said those things,

7   yes, in light of the concerns that Mr. Speights raised, but a

8   lot of the concerns that Mr. Speights raised, turned out to be

9   concerns that he never implemented to the extent he never ended

10  up calling any live witnesses and at this point, I don't think

11  that there is anything about the record in this case, or the

12  procedures that have been adopted with respect to Mr. Speights,

13  that says that somehow there should be an exception to the

14  overall schedule for Anderson Memorial.  There's just no reason

15  for it.

16           So, I think we ought to address that now, so that we

17  can at least get the schedule settled and people who don't want

18  to stay here for the other things, can leave.

19           THE COURT:  All right.

20           MR. SPEIGHTS:  I'm happy to do that, Your Honor.  And

21  I must say that I think it was the late George Gobel who said

22  it, I feel like a pair of brown shoes with a black tuxedo

23  sometime in this proceeding.

24           As Your Honor knows, at the debtors request, you

25  bifurcated this proceeding, Anderson did not begin its case

                    **J&J COURT TRANSCRIBERS, INC.**

1  until yesterday afternoon at four o'clock.  We thought this

2  morning, and I'm not being critical, when I came here, we would

3  offer our exhibits and get through our case pretty quickly and

4  Mr. Bernick preferred, and I'm not being critical, to go ahead

5  with his Libby motions.  We were engaged in discovery that

6  continued over the last week.  We had motions, the Ewing

7  motions, the Solomons motion, the Shelnitz motions, we had

8  hearings on it, we had trial preparation, all going up until

9  Sunday, I think I got the Shelnitz new discovery.  We've been

10  in trial mode, full blast.

11         It is true that as things happened yesterday and I

12  believe the Court is happier than anybody, that as a result of

13  the Court's encouragement, we probably saved many hours of

14  trial time and probably many other issues surfacing and many

15  other documents and I think both Mr. Bernick and I deserve some

16  credit for that.

17         But without that testimony of Mr. Finke and without

18  the testimony of Mr. Solomons it's true that we took -- we

19  abbreviated what we were going to do by a great deal.

20         Having said that, Your Honor, the fact remains, as I

21  said to Your Honor on September 17 when I raised the concern,

22  all we wanted was the same amount of time that everybody else

23  had to file their post confirmation briefs.  Everybody else's

24  case was over on September 17 and from September 17 until

25  November it's 46 days.

1           THE COURT:  Is that right?  I thought there was -- I

2  thought there were proceedings after that.  Time must fly when

3  you're having fun if that's the case.

4           MR. SPEIGHTS:  My calculation is September 17, but

5  whatever it is, it is, and that's -- it's been a while.

6           MR. BERNICK:  Well, there was live testimony this

7  week.  People have been tendering documents into evidence this

8  week  Stipulations regarding evidence have been reached this

9  week, today.

10           MR. SPEIGHTS:  Your Honor, we were in day seven and

11  day eight, we dealt with feasibility on an issue, I don't

12  recall whether -- I certainly recall Libby cross examining on

13  feasibility, and I recall our doing so and then Mr. Bernick

14  went forward in his case on Anderson, but some parties finished

15  their evidence on September 17th and went to work.  They have

16  had --

17           MR. BERNICK:  I'm sorry, Your Honor.  There was no

18  case on Anderson.  What was the case on Anderson?

19           THE COURT:  Okay.  Finish, Mr. Speights.

20           MR. SPEIGHTS:  Thank you, Your Honor.  I sort of

21  wondered what I was doing here this week, maybe there was

22  nothing going on respecting Anderson.  I thought I came with

23  all my boxes and all my materials to go forward and cross

24  examine their witnesses, some of which they chose not to call,

25  on feasibility which we actively participated in, through Mr.

1 Rosendorf, and all, taking all of those depositions, many of

2 which we will publish, in fact.

3        So, we're going to have a pretty substantial record

4 with our depositions and exhibits, not to mention what we could

5 have put forward.  Your Honor made some rulings which

6 restricted our evidence and we're not arguing that again today,

7 but we were here for trial.  We haven't put a pen to paper

8 since September 17th.  And we couldn't put a pen to paper, we

9 couldn't put a pen to paper until after the rulings yesterday

10 and after the decisions were made. In fact, it wasn't until

11 this morning at 5 a.m. that I could go through the exhibits and

12 determine which ones do we now really need to put in this

13 record in light of what happened yesterday at the trial with

14 respect to the witnesses and Mr. Bernick.  He says, what did he

15 do?  He finished.  That's what he did, so we knew what the

16 evidence was on good faith and we knew what the evidence was on

17 Anderson.  So --

18        THE COURT:  Well, just tell me how much time you

19 need, Mr. Speights, because I said that I would consider this,

20 I want to keep the argument dates January 6 and 7.

21        MR. SPEIGHTS:  Well, the short answer is, Your Honor,

22 there are two short answers.  Number one is, I';d like all the

23 time that we can have, okay?  Number two is, I would do

24 anything in the world to accommodate Your Honor.  If it's Your

25 Honor that's going to have -- you know when we started this

1  process out and saying November 2, everybody thought the

2  hearing would be much earlier.  Now, if we carry the process

3  through, as I counted the days to equal to everybody reply

4  briefs would be due December 14th.  If we did that, you would

5  have more than three weeks with the material.  If that's an

6  incumbrance upon the Court, I'm more than happy to back off

7  from there.  I was going to suggest with the same times,

8  November 28 and December 14, but if that's inconvenient to the

9  Court, I'll back off.

10       You know last week I did a brief in 24 hours.  It

11 wasn't a very good one, I'll admit, on Mr. Solomons, but it's

12 what I had.

13       But it's not, you know, Mr. Bernick and, again, not

14 casting aspersions, he's got all his lawyers prepared to do all

15 his briefs and get them in.  If Your Honor needs them in by

16 November 2, Anderson's and an additional -- somebody else, I

17 can understand that, but I don't think Your Honor has to have

18 all the briefs by November 2 and Anderson's brief, and I would

19 urge you to give me as much time as possible because I've got

20 to go to Miami and meet with Mr. Kozyak and Mr. Rosendorf and

21 work on all these materials, and we have not started.

22       THE COURT:  All right.  Well, I would actually like

23 to get Anderson's brief, if at all possible, rather than after

24 Thanksgiving, before Thanksgiving.  That would be a much

25 better time frame if that's possible, because then I can get

1  the debtors response, only as to Anderson's -- or the debtor, I

2  guess, is going to file its brief as to Anderson anyway, with

3  the rest of the briefs, correct?

4       MR. BERNICK:  Well, the problem is this, Your Honor.

5  When you talk about Anderson, Anderson has got a good faith

6  argument for whatever it's worth.  If we want to create a

7  separate track for that, if Your Honor wants to accommodate

8  Anderson Memorial, that's fine.  The problem here is not the

9  Anderson bad faith claim or the Anderson classification issue,

10 those are specific to Anderson.  The problem is, is that

11 Anderson has cross examined and has taken positions with

12 respect to issues that are not specific to Anderson.

13 Feasibility is one of them.  Best interest is another.  And to

14 bifurcate, have a separate track, and they have the same time

15 as everybody else on those particular issues, everybody --

16 those issues were put at the end of the schedule for everybody.

17 There's no difference.  So, I think if we create a special

18 track for Anderson, we are totally flexible insofar as that

19 separate track encompasses matters that are specific to

20 Anderson.  Whatever the dates are that Your Honor wants to do

21 is absolutely fine.  We're very much against the idea that we

22 go through briefing on feasibility and best interests for

23 everybody, and then there's now a new feasibility and best

24 interest brief from Anderson that we still have to reply to.

25 That's not fair, it gives them an advantage of essentially

1 having a third brief to deal, and a fourth brief, to deal with

2 the same issue that we're going to have to respond to on the

3 first two.  And they are not being treated differently that

4 way.  Everybody agreed that feasibility and best interests

5 would be at the end.

6           So, we would propose that they adhere to the same

7 schedule as everybody else on feasibility and best interests

8 and if Your Honor wants to crate a separate schedule for

9 matters that are specific to Anderson, like good faith and

10 classification, or multiple trusts or whatever it is, that's

11 fine.

12           MR. SPEIGHTS:  Well, since Mr. Rosendorf is my

13 feasibility person, may I consult with Mr. Kozyak?

14           THE COURT:  Yes.

15                     (Pause)

16           THE COURT:  Mr. Speights.

17           MR. SPEIGHTS:  At 4:05 p.m., on the last day of the

18 confirmation hearing, Your Honor, we'll accept that as being

19 reasonable.

20           MR. BERNICK:  Thank you.

21           THE COURT:  All right.  So, let's deal with the

22 separate issues, then.  Can you file whatever brief you intend

23 to file by, let's say November 23rd, which is a week earlier

24 than you -- it's the beginning of the week rather than the end

25 of the week that you proposed.

1          MR. SPEIGHTS:  Yes, Your Honor.

2          THE COURT:  And how much time, then, does the -- the

3    debtor will need a chance to respond because these are --

4          MR. SPEIGHTS:  Well, they'll be filing their brief at

5    the same time.

6          THE COURT:  Oh, the same day.

7          MR. BERNICK:  It's simultaneous.  So, then they'll be

8    a simultaneous reply.  Of course, I don't even know how we file

9    a brief, I think that maybe in this instance -- I don't know.

10         THE COURT:  It may be --

11         MR. BERNICK:  I don't know how we file a brief on

12   their good faith argument --

13         THE COURT:  When you don't have it.

14         MR. BERNICK:  -- when you don't even have his.  We

15   know -- I think we know what it's going to say but it's kind of

16   pointless.

17         THE COURT:  Well, what about this?  What about the

18   debtor in its brief that it's going to file November 2,

19   addressing whatever issues concerning Anderson you would have

20   addressed in your normal brief?  Then I'll have a response from

21   Mr. Speights on the only -- the issues that are peculiar to

22   Anderson later than the other briefs are due and I'll give the

23   debtor a chance to respond to that, a reply to that response.

24         MR. BERNICK:  That's right.  So that Mr. Speights,

25   then, will have -- I should say, Mr. Speights, on behalf of

**J&J COURT TRANSCRIBERS, INC.**

1 Anderson Memorial, will file the first brief on November

2 whatever it is, that is Anderson Memorial specific and we will

3 not file at that time, but we will file a response

4 subsequently.

5           THE COURT:  The debtors' post trial brief, that would

6 include any issues that you want to raise with respect to the

7 general issues that would encompass Anderson will be due

8 November 2nd.  Anderson's brief, on those general issues, will

9 be due, just -- oh.

10           MR. BERNICK:  No.

11           THE COURT:  That's not giving you much additional

12 time.

13           MR. BERNICK:  No, no, the --

14           THE COURT:  The brief is due November 20.

15           MR. BERNICK:  -- the whole point was that on matters

16 like feasibility and best interests, they're on the same

17 schedule as everybody else.

18           THE COURT:  Oh, that's right.  They'd be filing

19 November 2.  I apologize.  I got myself mixed up.

20           MR. BERNICK:  Yes. So, that what I would then

21 propose, Mr. Speights wants -- whatever the date is in November

22 fine for his brief on Anderson Memorial specific issues, and

23 then just give us some time to respond. I don't see that

24 there's much point in our filing a simultaneous brief with

25 theirs.  It's just kind of --

1           THE COURT:  No, I don't either, on that issue.  So,

2  is -- well, I had asked for November 23rd, but I didn't realize

3  that the other briefs are due November 20. I'm not sure that

4  does much good.

5           MR. SPEIGHTS:  Right.

6           THE COURT:  The initial post trial briefs are, under

7  this schedule, simultaneously due November 2 and the response

8  briefs are due November 20.  So, if I can give you till the

9  23rd, that's just giving you the weekend on Anderson specific

10 issues.  Does that work?

11          MR. SPEIGHTS:  Well, frankly, I'd prefer more now

12 that he's not having to file his then and then it's just a

13 reply to that, it just depends on when you want the reply on

14 Anderson specific and work back from that.

15          THE COURT:  All right.  Well, I would like to have

16 the last brief, in hand, not later than December 30, because

17 the argument is going to be the following week.

18          MR. SPEIGHTS:  Well, the normal reply has been 18

19 days, I think.  November 2 to the 20th, puts you back out 18

20 days from that, and wherever it falls --

21          MR. BERNICK:  We're talking about our brief in

22 response?

23          MR. SPEIGHTS:  Right.

24          MR. BERNICK:  I don't -- we don't need 18 days to

25 respond, Your Honor.  So --

**J&J COURT TRANSCRIBERS, INC.**

1          MR. SPEIGHTS:  So then, again, some time in December.

2    I originally suggested December 14, that gives them two weeks.

3          THE COURT:  All right.

4          MR. BERNICK:  I don't -- yeah, we're done writing

5    over the holidays.

6          THE COURT:  All right.  How about December the 8th

7    for Anderson's, which is a Tuesday.

8          MR. SPEIGHTS:  That's fine, Your Honor.

9          THE COURT:  And, the reply by the plan proponents the

10   23rd, which is before the holiday.

11         MR. BERNICK:  That's fine, that's fine.

12         THE COURT:  All right.  Does that schedule cause

13   anybody any heart palpitations?

14                    (No audible response)

15         THE COURT:  Okay.  Then that's the schedule I would

16   like from you, Ms. Baer, if you will put it in an order, that's

17   the order I'm going to sign.  I'm not going to grant any

18   continuances.  So, let me make that very clear.  No

19   continuances.  Ms. Baer put it in bold, in capital letters, in

20   the order, please.  There will be no continuances of this

21   schedule.  Anybody who is not interested in listening to the

22   evidentiary submission is free to leave.

23         UNIDENTIFIED MALE SPEAKER:  Thank you, Your Honor.

24         MR. BROWN:  Your Honor, could I just make on quick

25   inquiry?

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes, sir.

2          MR. BROWN:  On the hyperlink issue.  I know I've been

3  circulating in my firm, trying to find out who has information

4  about that, but I understand the debtor is going to assist us

5  with that?  Is there --

6          MR. BERNICK:  I'm sorry, I didn't hear, in the --

7          MR. BROWN: The hyperlink, the assistance with the

8  hyperlink?

9          MR. BERNICK:  Yes, just give us a call, we'll work it

10  out.

11          MR. BROWN:  Okay.  All right.  And I also promised to

12  take back my binder.

13          THE COURT:  Can I interest you in any others?   Okay,

14  Mr. Speights.

15          MR. SPEIGHTS:  How many exhibits are there, Dan?

16  Dan, how many exhibits are we talking about.

17          MR. ROURKE:  I'm just calling out the numbers, is all

18  I'm doing.

19          UNIDENTIFIED MALE SPEAKER:  There's 62 total.  I

20  don't --

21                    (Counsel whispering)

22          MR. SPEIGHTS:  Your Honor, first of all, now that we

23  have returned to Anderson's case, yesterday, as Ms. Baer again

24  acknowledged, today we worked out an arrangement on deposition

25  designations and I'm serving those on Friday evening, and that

1  -- in the form of the chart that Your Honor has requested and

2  that chart will have the depositions.  We are actually

3  tendering, in other words, it will omit some deposition

4  designations that are probably somewhere in those notebooks.

5          THE COURT:  All right.

6          MR. SPEIGHTS:  And the other information.  One of the

7  objections raised to one deposition, Dr. Rourke, was that we

8  had to show he was unavailable and I've provided this to the

9  debtors the first thing this morning.  I have a letter from

10 Daniel Rourke dated October 7, 2009 concerning in

11 unavailability and I would like to mark it for identification

12 purposes only, so that will take care of that issue, I believe.

13         THE COURT:  All right.

14         MR. BERNICK:  Your Honor, if I can make a proposal.

15 I don't know what Mr. Speights has in mind today, but we have a

16 list of 60 odd exhibits, and everybody else in the case has

17 simply submitted their exhibits with a description of what the

18 proffer is and then we object and then the matter is not argued

19 and there's then the ability to deal with this in the context

20 of the briefing schedule.  I think it's an unfair advantage and

21 we're certainly not prepared here, today, to go through each

22 and every one of these documents and hear an oral proffer from

23 Mr. Speights and have documents shuttled back and forth.

24 That's not how this case has proceeded.

25         MR. SPEIGHTS:  That was not my intent, Your Honor,

1  nor was it my understanding, based on yesterday, I sent my

2  boxes back to South Carolina.  I just want to read the numbers

3  of the exhibits, to eliminate many exhibits and you'll have

4  them and we'll argue them in our briefs.

5           MR. BERNICK:  Fine.  Great.

6           THE COURT:  Okay.  You had something you were

7  marking.  What is this exhibit that you're marking now with

8  respect to Dr. Rourke?

9           MR. SPEIGHTS:  It's a letter from Dr. Rourke that I

10  wanted marked for identification.

11           THE COURT:  Yes, can you mark it?  I don't know your

12  exhibit numbers.  Can you just put on it whatever your next

13  exhibit number is?

14           MR. SPEIGHTS:  Yes, Your Honor.  By my count, it's

15  AMH-63.

16           THE COURT:  All right, okay.

17           MR. SPEIGHTS:  Should I --

18           THE COURT:  All right, yes, give it to my clerk.

19  Thank you.  Thank you.

20           MR. SPEIGHTS:  And then, Your Honor, Anderson would

21  proffer the following exhibits.  All of Anderson's exhibits

22  begin with the letters AMH, and I'll just read out the numbers.

23  4, 5, 6, 11, 12, 13, 15, 19, 20, 27, 28, 29, 30, 31, 32, 33,

24  34, 36, 37.

25           Your Honor, we would tender 40, however, you've

**J&J COURT TRANSCRIBERS, INC.**

1   already ruled that inadmissible during my cross examination of

2   Mr. Inselbuch.  So, I'm not, again, proffering it, but it's for

3   the record.  We did proffer it during that examination.

4           THE COURT:  All right.

5           MR. SPEIGHTS:  41, 42.  If I could pause for 42 for

6   one minute, al though it's listed as AMH-42, just so somebody

7   reading this record now or a year from now will not be

8   confused, in addition to it being 42, it was LaForce Exhibit 5

9   and it was Florence Exhibit 2, and it was Rourke Exhibit 3, but

10  we've included it here as AMH-42.

11          THE COURT:  All right.

12          MR. SPEIGHTS:  Continuing, 44, 45, 46, 47, 48, 49,

13  50, 51, 52, 53, 54, 56H, as in hotel, 58, 59, 60, 61 and 62.

14          THE COURT:  All right.  Can I just double check to be

15  sure I have them?

16          MR. SPEIGHTS:  Yes, Your Honor, one moment, let me go

17  back to the first of the page.

18          THE COURT:  4, 5, 6, 11, 12, 13, 15, 19, 20, 27

19  through 30, I'm sorry, through 34.  27, 8, 9, 30, 1, 2, 3, 4.

20          MR. BERNICK:  Can we pause on that?  My list here has

21  A, B, C's and the like for 29, 30, 32, 32 and 34.  So, which

22  ones of those documents?

23          MR. SPEIGHTS:  May I look over them?

24          THE COURT:  Yes.

25          MR. BERNICK:  Yeah.

J&J COURT TRANSCRIBERS, INC.

1                    (Discussing exhibits)

2              MR. SPEIGHTS:  All of them.

3              MR. BERNICK:  All of them?

4              MR. SPEIGHTS:  All.

5              MR. BERNICK:  So, just so the record is clear, if I

6    can recite then, 29A, B, C, D; 30A, B, C, D; 31, 32A, B, C, D.

7              THE COURT:  Wait, I'm sorry.  31 is just 31, then 32?

8              MR. BERNICK:  That's correct.  32 is A through F.

9              THE COURT:  Okay.

10             MR. BERNICK:  33, just plain vanilla 33.  34A and B.

11   Did I get that right?

12             MR. SPEIGHTS:  Yes.

13             THE COURT:  Okay.  29A through D; 30A through D; 31.

14   32A through F, 33, 34A and B; 36, 37, 40, but it was already

15   ruled inadmissible; 41, 42 which is also marked as LaForce 5,

16   Florence 2 and Rourke 3; continuing  now 44, 45, 46, 47, 48,

17   49, 50, 51, 52, 53, 54, 56H, as in hotel, 58, 59, 60, 61 and 62

18   and then 63 which is the recently marked letter from Dr.

19   Rourke.

20             MR. SPEIGHTS:  Yes, Your Honor.

21             THE COURT:  Okay.

22             MR. SPEIGHTS:  May I check one other thing?

23             THE COURT:  Yes.

24                         (Pause)

25             THE COURT:  Now, are these agreed upon exhibits?

                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. BERNICK:  No.

2          THE COURT:  They're not.

3          MR. BERNICK:  We just got -- we've gotten this now

4  and we'll now see what agreements we can reach, if any, with

5  respect to these documents and they'll be included in the same

6  schedule.

7          THE COURT:  All right.  Is that all of them, Mr.

8  Speights?

9          MR. SPEIGHTS:  That's all of them, Your Honor, you

10  read them back correctly.

11          THE COURT:  Okay.

12          MR. SPEIGHTS:  And, that's all that Anderson has in

13  terms of exhibits and the depositions will be sent out on the

14  chart on Friday evening.

15          THE COURT:  All right.  And with respect to

16  Anderson's case, then, but for the deposition designations,

17  which you will be sending out and the exhibits, which I need to

18  rule on when you folks see if you can come to a stipulation

19  with respect to these, is there any other evidence that

20  Anderson is submitting?

21          MR. SPEIGHTS:  No, Your Honor.

22          THE COURT:  So, Anderson's case is rested with that

23  caveat?

24          MR. SPEIGHTS:  With that caveat and as described by

25  Mr. Bernick when he rested with respect to everybody else.

1          THE COURT:  Okay.  Is there anything else in terms of

2    the way of evidentiary submission?

3          MR. BERNICK:  We have some champagne out in the hall.

4          THE COURT:  Just some?

5          MS. BAER:  Your Honor, do you want a completely new

6    post trial briefing order that includes the Anderson Memorial

7    schedule or are you signing the one we gave you and then that

8    will be a separate little order?

9          THE COURT:  Well, if I -- I think I wrote on this --

10   the problem is, Ms. Baer, I wrote on this one the dates that

11   the parties may be expected to start their case.  Why don't I

12   just give you this, maybe you can make those modifications and

13   include Anderson in it.

14         MR. BERNICK:  Yes.

15         MS. BAER:  Okay.

16         THE COURT:  Okay  Because I made a couple of other

17   handwritten changes that I'd like in the order anyway.  All

18   right?

19         MS. BAER:  Yes.

20         THE COURT:  Are we finished?

21         MR. BERNICK:  I think we're finished.

22         THE COURT:  Okay, thank you all, folks, see you in

23   Delaware.

24         MR. BERNICK:  Thank you very much, Your Honor.

25         THE COURT:  Oh, Mr. Speights, I'm sorry, I should

**J&J COURT TRANSCRIBERS, INC.**

244

1  ask.  The exhibits themselves are going to Ms. Baer and going

2  to be included in the binders with the rest of -- is that the

3  agreement.

4           MS. BAER:  I think so.

5           THE COURT:  Okay, yes, all right, thank you.  I'm

6  sorry.  All right, we're adjourned.

7

8                        * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**

# C E R T I F I C A T I O N

We, KELLI PHILBURN, TAMMY DeRISI, LORI AULETTA, KATHLEEN BETZ, AMY RENTNER & ELAINE HOWELL, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of our ability.


/s/ Kelli Philburn

KELLI PHILBURN


/s/ Tammy DeRisi

TAMMY DeRISI


/s/ Lori Auletta

LORI AULETTA


/s/ Kathleen Betz

KATHLEEN BETZ


/s/ Amy Rentner

AMY RENTNER


/s/ Elaine Howell                    Date: October 18, 2009

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.


**J&J COURT TRANSCRIBERS, INC.**